ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-0139 (___) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## MOTION OF THE DEBTORS TO APPROVE
## LITIGATION CREDITOR NOTICE PROCEDURES

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move the Court (the "Motion") for entry of an order, under section 105(a) of title 11 of the

United States Code (as amended, the "Bankruptcy Code") and Fed. R. Bankr. P. 2002(g), approving

the Debtors' proposed notice procedures for certain litigation creditors (the "Litigation Creditor

Notice Procedures"). In support of this Motion, the Debtors respectfully represent as follows:[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] The facts and circumstances supporting this Motion are set forth in the Affidavit of David B. Siegel, Senior Vice President

(continued...)

## Jurisdiction

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory basis for the relief requested herein is section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2002(g) and (m).

## Background

3.    On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). Contemporaneously herewith, the Debtors filed a motion to consolidate, for administrative purposes only, the Chapter 11 Cases. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

## Summary of Operations

4.    The Debtors engage in specialty chemicals and materials businesses, operating on a worldwide basis, with their corporate headquarters located in Columbia, Maryland. The Debtors predominately operate through two business units - Davison Chemicals and Performance

---

[2] (...continued)
and General Counsel of W.R. Grace & Co., in Support of First Day Motions, filed contemporaneously herewith.

Chemicals. The Debtors' parent company, W. R. Grace & Co. ("Grace"), is a global holding company that conducts substantially all of its business through a direct, wholly owned subsidiary W. R. Grace & Co. - Conn. ("Grace-Conn"). Grace-Conn owns substantially all of the assets, properties and rights of Grace in the United States and has 76 domestic subsidiaries and affiliates, 60 of which are debtors and debtors in possession in the Chapter 11 Cases. Grace's businesses are managed globally from a strategic operating standpoint. Its foreign operations, however, are conducted through 71 foreign non-debtor subsidiaries and affiliates that are legally independent from Grace with separate management. The Debtors operate their businesses and support their domestic operations through the use of a centralized cash management system. The Debtors' non-debtor foreign subsidiaries and affiliates also receive credit support and loans for their operations from their respective domestic parent companies.

5.      The Debtors and their non-debtor subsidiaries and affiliates employ approximately 6,550 full and part time employees of which approximately 3,750 are employed by the Debtors. The Debtors and their non-debtor subsidiaries and affiliates operate and report on a consolidated basis. For the fiscal year 2000, on a consolidated basis, Grace reported a net loss of $89.7 million (resulting from a $294 million asbestos-related charge to earnings recorded in the fourth quarter of 2000) from $1.59 billion in net revenues. For the fiscal year 1999, on a consolidated basis, Grace reported net income of $135.9 million from $1.55 billion in revenues.

Approximately 50% of Grace's consolidated sales are made by the Debtors. The remaining 50% of Grace's consolidated sales are made by the Debtors' non-debtor subsidiaries and affiliates, substantially all of which are foreign entities.

### The Debtors' History

6.    In 1854, William Russell Grace founded W. R. Grace & Co. in Peru. In 1865, Grace relocated its headquarters to New York City, operating as a trading and shipping company with South America and Europe. Grace incorporated in 1899 in Connecticut. Through the first half of the 20th century, Grace expanded its South American businesses into manufacturing and established U.S. operations ranging from agricultural fertilizers to banking. In 1954, Grace acquired Davison Chemical Company and Dewey and Almy Chemical Company, establishing the foundation for the Debtors' catalysts, silicas, packaging, construction and container product lines. Over the following decades, Grace expanded these businesses into more than 50 countries. Over this time, Grace and certain of the Debtors also acquired, divested and ceased operating a myriad of different companies and product lines, including, but not limited to, retail stores, restaurants, oil and gas exploration, coal interests, industrial chocolate, book distribution, water treatment chemicals, kidney dialysis clinics and consumer goods.

7.    Further, many of the Debtors in the Chapter 11 Cases came into being solely in association with the Debtors' acquisition, divestment or, in some cases, cessation of these

4

businesses and as a result, are no longer operating. In connection with the Debtors' divestment or

cessation of these businesses, the Debtors retained certain liabilities which relate to, and are typical

of, asset or stock purchase and sale agreements. Such liabilities include, but are not limited to, real

estate lease obligations (as tenant, assignor or guarantor), environmental, tax and employee-related

liabilities and indemnity provisions for purchasers of the Debtors' former businesses related to

events occurring prior to the closing of any individual divestment transaction. Many of these

liabilities and obligations are ongoing and indefinite in duration. Accordingly, these Debtors have

filed petitions for relief under the Bankruptcy Code because they no longer have any assets or

revenue streams and are not capable of funding their own liabilities, if any.

8.      In 1988, Grace reincorporated in New York through the formation of a new

holding company, also named W. R. Grace & Co. ("Grace-New York"). The "old" Grace was

renamed W. R. Grace & Co.-Conn. and continued to exist as a subsidiary of Grace-New York.

Grace-Conn is the same Connecticut corporation that is the principal operating subsidiary of Grace

today.

9.      In 1996, Grace-New York combined its health care business with a subsidiary

of Fresenius Medical Care AG, a German company, in a "Morris Trust" tax-free transaction pursuant

to section 355 of the Internal Revenue Code. In connection with this transaction, Grace's chemicals

and packaging businesses were transferred to Grace's shareholders through a newly formed

5

subsidiary of Grace-New York, Grace Holding, Inc., a Delaware corporation. ("Grace-Delaware I").

In addition, a cash distribution of approximately $2.3 billion was made to Grace-Conn by the merged

health care company. Following the transaction, Grace-Delaware I was renamed W. R. Grace & Co.,

with Grace-Conn and the other Debtors continuing to exist as its subsidiaries. Grace-New York was

renamed Fresenius Medical Care Holding, Inc.

   10. In 1998, Grace-Delaware I combined its flexible packaging business with

Sealed Air Corporation, a Delaware corporation, also in a "Morris Trust" tax-free transaction

pursuant to section 355 of the Internal Revenue Code. In connection with this transaction, Grace's

chemicals businesses were transferred to Grace's shareholders through a new Grace subsidiary

named Grace Specialty Chemicals, Inc., a Delaware corporation ("Grace-Delaware II"). In addition,

a cash distribution of approximately $1.2 billion was made to Grace-Conn by the merged packaging

company. Following this transaction, Grace-Delaware II was renamed W. R. Grace & Co., with

Grace-Conn and the other Debtors continuing to exist as its subsidiaries. Grace-Delaware I was then

renamed Sealed Air Corporation. Grace emerged from this transaction substantially in the form seen

today - a global specialty chemicals and materials company focusing on catalysts and silica products,

specialty construction chemicals, building materials and container protection products.

## Davison Chemicals

11.    Davison Chemicals is a leading global supplier of refining and chemical catalysts and silica-based products. Refining catalysts include: (i) fluid cracking catalysts used by petroleum refiners to convert crude oil into transportation fuels and other petroleum-based products; (ii) hydroprocessing catalysts that upgrade heavy oils and remove impurities; and (iii) chemical additives for treatment of feedstock impurities. Davison Chemicals' refining catalysts are used by every major oil company in the world and are critical in transforming hydrocarbons into finished goods such as gasoline, jet fuel and diesel fuel. Nearly one-half of the gasoline produced in the United States is produced with Davison Chemicals' fluid cracking catalysts and additives. Davison Chemicals is a recognized leader in new catalyst technologies that reduce sulfur in gasoline and assist petroleum refiners in meeting more stringent clean air regulations. Davison Chemicals' chemical catalysts are essential components in the manufacture of polyethylene resins used to produce such products as plastic film, high performance pipe and household containers. Davison Chemicals is also the only source of supply for certain unique chemical catalysts. Davison Chemicals' silica-based products are used in a wide variety of industrial and consumer applications such as coatings, food processing, plastics, adsorbents and personal care products.

12.    Davison Chemicals' sales represented approximately 49% of Grace's total consolidated 2000 sales. In 2000, Davison Chemicals had $131.6 million of pre-tax operating

7

income from $783.9 million of net sales. Approximately 47% of Davison Chemicals' 2000 sales were in the United States. Davison Chemicals employs approximately 3,000 employees worldwide, approximately 1,750 of whom are employed by the Debtors.

## Performance Chemicals

13.    Grace formed Performance Chemicals in 1999 through the combination of its previously separate business segments of Grace Construction Products and Darex Container Products. These businesses were consolidated under one management team to capitalize on infrastructure synergies and Grace's worldwide production facilities. Performance Chemicals' major product groups include: (i) specialty construction chemicals and building materials used primarily by the commercial construction industry; and (ii) container sealants and coatings for food, beverage and other packaging. Performance Chemicals' construction chemicals are used to add strength, control corrosion and enhance the handling and application of concrete. Performance Chemicals' building materials are used worldwide for waterproofing and to provide fireproofing protection to structural steel.

14.    Performance Chemicals' container products are used to seal beverage and food containers, to protect metal packaging from corrosion and to protect the contents of such packages from the effects of metal. Performance Chemicals is a leader in container products technology and its rigid package sealing is used to protect safety and freshness in billions of cans annually.

15.    Performance Chemicals' sales represented approximately 51% of Grace's total consolidated 2000 sales.  In 2000, Performance Chemicals had $95.5 million of pre-tax operating income from $809.9 million of net sales.  Approximately 57% of Performance Chemicals' 2000 sales were in the United States.  Performance Chemicals employs approximately 3,300 of Grace's 6,550 employees, approximately 1,750 of whom are employed by Grace-Conn.

### Prepetition Financing

16.    As of the Petition Date, Grace and Grace-Conn maintained two $250 million unsecured revolving credit facilities, both of which contain covenants typical of credit facilities of this size and type.  The first credit facility is titled the 364-Day Credit Agreement by and among Grace-Conn, Bank of America National Trust and Saving Association, as documentation agent, Chase Manhattan Bank as administrative agent for the banks therein and Chase Securities, Inc., as book manager (the "364-Day Facility").  The 364-Day Facility expires in May, 2001 and is currently fully drawn.

17.    The second facility is titled Credit Agreement, by and among Grace, Grace-Conn, Chase Manhattan Bank as administrative agent and Chase Securities, Inc. as arranger (the "5-Year Facility", and together with the 364-Day Facility, the "Prepetition Facilities").  The 5-Year Facility expires in May, 2003 and is also fully drawn.

18.    Grace-Conn entered into a transaction pursuant to which it sold certain of its trade accounts receivable then existing and thereafter generated and to be generated by the Davison Chemicals and Performance Chemicals business units to Grace Receivables Purchasing, Inc., a special purpose subsidiary of Grace-Conn ("Grace Receivables").  Grace Receivables is not one of the above captioned debtors and debtors in possession.  Grace Receivables, pursuant to an $80 million facility, then sells an undivided interest in the receivables it purchased from Grace-Conn to Blue Ridge Asset Funding Corporation, an affiliate of Wachovia Bank ("Blue Ridge").  Collections of the receivables made on behalf of and allocable to the interest of Blue Ridge are then either reinvested by Grace Receivables in additional receivables of Grace-Conn or paid out to Blue Ridge. Grace Receivables retains the remainder interest in those receivables not sold to Blue Ridge.  Grace-Conn services the receivables for a monthly servicing fee of $50,000 and Grace guarantees the servicing obligations of Grace-Conn.  The proceeds from the sales of receivables by Grace-Conn to Grace Receivables are used to support the Debtors' operations.

### Postpetition Financing

19.    The Debtors entered into extensive negotiations with various lending institutions and third parties in an effort to arrange an out-of-court restructuring of the Prepetition Facilities as an alternative to filing for bankruptcy protection.  The Debtors also discussed the possibility of conversion of the Prepetition Facilities into a DIP facility.

10

20.    After reviewing all of their strategic alternatives and liquidity needs, the Debtors determined that the best alternative for all parties-in-interest was to file the Chapter 11 Cases and enter into the Post-Petition Credit Agreement with Bank of America, N.A. as agent (the "DIP Agreement"), to obtain postpetition financing up to the principal amount of $250,000,000 and contemporaneously herewith filed with this Court the Emergency Motion For Interim and Final Orders, Under 11 U.S.C. §§ 105, 362, 363 And 364, Approving Postpetition Financing and Related Relief And Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c) requesting the approval of the DIP Agreement.

### Fraudulent Conveyance

21.    In September, 2000, a lawsuit was filed in the California Superior Court, San Francisco County, alleging that arm's-length transactions between Grace and Fresenius Medical Care A.G. in 1996, and between Grace and Sealed Air Corporation in 1998, were fraudulent transfers designed to frustrate litigants with alleged asbestos-related claims (the "Fraudulent Transfer Lawsuit"). The Fraudulent Transfer Lawsuit purports to be a nationwide class action brought on behalf of all persons with lawsuits currently on file in the United States for alleged asbestos related claims against the Debtors, Fresenius Medical Care A.G. and Sealed Air Corporation and certain of their affiliates.

11

22.    Simultaneously with the filing of the Chapter 11 Cases, the Debtors that are also defendants in the Fraudulent Transfer Lawsuit are filing a motion to remove the Fraudulent Transfer Lawsuit from the Superior Court of the State of California to the Northern District of California. Those Debtors also intend to file a Motion for Transfer of Venue of the Fraudulent Transfer Lawsuit from the Northern District of California to the District of Delaware.

23.    Simultaneously with the filing of the Chapter 11 Cases, the Debtors are also filing a Verified Complaint for Declaratory and Injunctive Relief and Emergency Motion for a Temporary Restraining Order Staying All Asbestos-Related and Fraudulent Transfers Claims Against Affiliated Entities.

### Need for Relief Under Chapter 11

24.    Until 1973, the Debtors manufactured certain products with commercially added asbestos. Until 1990, the Debtors manufactured certain products from vermiculite from Grace's Libby, Montana mine, a mineral containing naturally occurring asbestos impurities. These impurities were largely removed during the processing of the vermiculite. Nonetheless, as a result of prior business operations, the Debtors have for years confronted a substantial volume of claims alleging asbestos related injuries.

25.    These claims can be divided into four general categories: claims for bodily injury from asbestos exposure, property damage claims, attic insulation claims and claims arising

out of vermiculite mining and processing operations. Bodily injury claims allege health effects from

exposure to the Debtors' asbestos containing products, such as fireproofing materials. Property

damage claims generally seek payment for the cost of removing or containing asbestos in buildings.

Attic fill insulation claims have been brought as class actions, purportedly on behalf of homeowners

who used the Debtors' attic insulation products and are now seeking damages and other relief,

including removal of the attic insulation allegedly containing asbestos. The claims arising from the

Debtors' vermiculite operations allege personal injury and property damage from exposure to

naturally occurring asbestos in connection with the mining and processing of vermiculite at the

Debtors' mine in Libby, Montana. In total, the Debtors have been served with 324,000 asbestos

related claims through February, 2001, of which approximately 127,000 remain outstanding.

26.     While, for years, the Debtors have faced a substantial volume of asbestos

claims, they were able to resolve such claims primarily through negotiated settlements. Despite the

high percentage of claims the Debtors believed to be without merit, the Debtors agreed to settle most

claims rather than incur the significant costs and practical difficulties associated with litigating

thousands of independent claims at one time in multiple jurisdictions nationwide. While the Debtors

also believe that the volume of claims filed against them historically, and the amounts paid in

settlement thereof, is not indicative of the Debtors' true liability - the asbestos claims resolution

process has not reflected actual legal liability for years - in very recent months, the number of claims

13

has risen dramatically without any basis in science, medicine or law.  The recent dramatic influx of

new claims now threatens the Debtors' core business operations and an effective defense of such

dispersed and voluminous litigation is simply not feasible.  The dramatic increase in asbestos claims

and the increasing threat of adversarial litigation have impaired the Debtors' ability to obtain

financing, consumed management's time and attention, and threatened the health of the Debtors'

core business operations.

27.    Under these circumstances, the Debtors have concluded that there is no other

way to define and resolve their asbestos liability, while preserving the value and viability of their

core business operations, other than through a reorganization under chapter 11 of the Bankruptcy

Code.

**Relief Requested**

28.    As set forth above, the Debtors are engaged in substantial litigation.  However,

the Debtors do not have personal information concerning each and every alleged litigation claimant

(the "Alleged Litigation Creditors") that has asserted a claim or filed a suit against the Debtors.  In

particular, due to the manner in which such alleged claims are handled by plaintiffs' counsel, the

Debtors do not have, and cannot reasonably obtain, the names and addresses of each individual

Alleged Litigation Creditor.  Indeed, the Debtors' records mainly reflect only the counsel of record

for each of the Alleged Litigation Creditors, and all communication regarding the Alleged Litigation

14

Creditors and their various pending lawsuits has been through and with such counsel of record. Accordingly, the Debtors, by this Motion, seek this Court's approval to send all notices, mailings and other communications related to the Chapter 11 Cases to the counsel of record for the Alleged Litigation Creditors, rather than notifying each individual claimant personally (the "Litigation Creditor Notice Procedures").

29.    The Debtors believe that the Litigation Creditor Notice Procedures represent a fair and appropriate process to provide each of the Alleged Litigation Creditors with all necessary notices and other communications in the Chapter 11 Cases. Moreover, the Litigation Creditor Notice Procedures will ease the Debtors' administrative burden of sending notices to several tens of thousands of individuals, thus resulting in a more cost-efficient notice procedure and thereby benefitting the Debtors' estates. Indeed, since the Debtors have little or no personal information concerning the individual Alleged Litigation Creditors, direct notice to such individuals is a practical impossibility. Finally, the Debtors posit that any risk of prejudice to the Alleged Litigation Creditors resulting from the Litigation Creditor Notice Procedures will be eliminated by the Debtors' intention to publish, when appropriate, relevant notices concerning the Chapter 11 Cases in nationally-circulated publications.

## Basis for Relief Requested

30.    Two legal grounds support the relief requested in this Motion. Although there is case law to the contrary, case law suggests that when a debtor in a chapter 11 reorganization proceeding is aware of counsel of record for tort claimants, Fed. R. Bankr. P. 2002(g)[3] requires that notices be sent to such counsel of record rather than to the individual claimants. See In re The Grand Union Company, 204 B.R. 864 (Bankr. D. Del. 1997).   Second, Annotated Model Rules of Professional Conduct Rule 4.2 (1992) ("Rule 4.2") contemplates that sending notices in this type of proceeding to individual creditors, when information concerning their counsel of record is available and known to the debtors, is improper.  The Debtors, however, (i) acknowledge that there is case law to the contrary that requires notice to be sent to an individual claimant rather than, or in addition to, such claimant's counsel of record and (ii) reserve the right to readdress such notice issues during the course of these Chapter 11 Cases, including, without limitation, in connection with providing notice of the bar date as established in these Chapter 11 Cases.

31.    In In re The Grand Union Company, Chief Bankruptcy Judge Walsh interpreted Fed. R. Bankr. P. 2002(g) as it relates to notice requirements for tort claimants where a

---

[3]  Fed. R. Bankr. P. 2002(g) provides:

> All notices required to be mailed under this rule to a creditor, equity security holder, or indenture trustee shall be addressed as such entity or an authorized agent may direct in a filed request; otherwise, to the address shown in the list of creditors or the schedule whichever is filed later.  If a different address is stated in a proof of claim duly filed, that address shall be used unless a notice of no dividend has been given.

chapter 11 debtor (a) is aware of the existence of counsel of record for tort claimants, (b) has the contact information for such counsel of record and (c) has communicated with such counsel prior to the petition date. Id. at 872. In that case, three individual tort claimants filed late-filed claims against the debtor's estate after they received notice of the claims bar date. These creditors were represented by counsel prior to the petition date. The debtor was aware of such representation, knew the names and addresses of the attorneys of record for these creditors, and had communicated with such counsel prior to the petition date. The debtor, however, sent notice of the claims bar date directly to the individual claimants and not to their counsel of record. The bankruptcy court faced the issue of whether:

> . . . a chapter 11 reorganizing debtor has a duty to furnish the claimants' attorneys with the bar date notice where [the debtor], prior to its commencement of the case, had specific knowledge of the claimants' representation in pursuing their personal injury claims against it and there had been a series of pre-petition communications between [debtor's] agent and the claimants' attorneys exploring possible resolutions of the claims.

Id. at 870-71. The court in Grand Union held that failure to notify the claimants' attorneys of the bar-date notice violated the due-process requirement of adequate notice, and that, "under the facts here, mailing of the bar date notice to a personal injury claimant whose exclusive representation by counsel is specifically known by the debtor is . . . inadequate." Id. at 872.[4]

---

[4] The Court explained its rationale as follows:

(continued...)

32.    As in <u>Grand Union</u>, the Debtors here know the names and addresses of

counsel of record for the Alleged Litigation Creditors and, in many instances, have communicated

with such counsel regarding the Alleged Litigation Creditors' pending lawsuits.  Thus, the Debtors

believe that the Litigation Creditor Notice Procedures are consistent with relevant case law as well

as due-process requirements for adequate notice.

33.    In addition, Rule 4.2 also supports the Debtors' request for approval of the

Litigation Creditor Notice Procedures.  Rule 4.2 provides:

> In representing a client, a lawyer shall not communicate about the
> subject of the representation with a person the lawyer knows to be
> represented by another lawyer in the matter, unless the lawyer has the
> consent of the other lawyer or is authorized by law to do so.

<u>Id.</u>  While the Comments to Rule 4.2 state that Rule 4.2 may not prohibit communication with a

represented person concerning matters outside the scope of representation, the Comments are clear

that communications involving matters within the scope of representation are not permitted.  In these

cases, the Alleged Litigation Creditors are represented by counsel of record for purposes of

protecting their rights against the Debtors resulting from alleged tortious conduct.  Any notices or

---

[4]  (...continued)

> The movants are lay-persons, and unlike commercial creditors, presumably had never
> been involved in a commercial bankruptcy proceeding.  It is unreasonable to suggest that
> these movants, who presumably had never seen a bar date notice before, would fully
> appreciate the meaning and legal significance of the notice and react accordingly.  It is
> equally unreasonable to expect that they would travel to the offices of [debtor's] counsel,
> check the schedules, see whether their claims are correctly listed, and determine what
> action, if any, needs to be followed.

<u>Id.</u> at 873.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (___) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## ORDER APPROVING LITIGATION CREDITOR NOTICE PROCEDURES

Upon the motion (the "Motion") of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") seeking entry of an order approving the Litigation Creditor

Notice Procedures[2]; and it appearing that the relief requested in the Motion is in the best interests

of the Debtors' estates, their creditors and other parties in interest; and it appearing that this Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not defined herein shall have the same meaning as in the Motion.

proceeding is a core proceeding pursuant to 28 U.S.C. § 157; and after due deliberation and cause appearing therefor; it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized to send all notices, mailings and other communications relating to the Chapter 11 Cases to counsel of record for the Alleged Litigation Creditors and the Debtors hereby are not required to send such notices, mailings or other communications directly to the individual Alleged Litigation Creditors; and it is further

ORDERED that the Litigation Creditor Notice Procedures constitute sufficient notice to these parties of all matters relating to the Chapter 11 Cases and are hereby approved; and it is further

ORDERED that the Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.

Dated: _April 2_, 2001.

_Randall Newsom_
JUDGE

2