# EXHIBIT A

Declaration of Matthew Parrott

# BUILDING FACILITY AGREEMENT

in the amount of

## $162,112,896.16

MADE BY AND AMONG

**MALAYAN BANKING BERHAD, NEW YORK BRANCH,**
as administrative agent,

**MALAYAN BANKING BERHAD, NEW YORK BRANCH,**
and
**WARBA BANK K.S.C.P.,**
as co-lead arrangers and joint bookrunners,

**INTESA SANPAOLO S.P.A., NEW YORK BRANCH,**
as documentation agent,

**MALAYAN BANKING BERHAD, LONDON BRANCH,**
**INTESA SANPAOLO S.P.A., NEW YORK BRANCH,**
**WARBA BANK K.S.C.P.,**
**45 PARK PLACE INVESTMENTS, LLC**
and other financiers that are from time to time signatories hereto,
as financiers,

and

**PARK PLACE DEVELOPMENT PRIMARY LLC,**
as obligor,

Project:      Block: 126, Lot: 8

Dated:      as of April 26, 2016

43 PARK PLACE
NY, NY  10007

US_ACTIVE-7971497

# TABLE OF CONTENTS

**Page**

ARTICLE 1 INCORPORATION OF RECITALS AND EXHIBITS .......................................... 2
    1.1   Incorporation of Recitals............................................................ 2
    1.2   Incorporation of Exhibits and Schedules ...................................... 2

ARTICLE 2 DEFINITIONS....................................................................................... 2
    2.1   Defined Terms ...................................................................... 2
    2.2   Other Definitional Provisions .................................................. 23

ARTICLE 3 OBLIGOR'S REPRESENTATIONS AND WARRANTIES .............................. 24
    3.1   Representations and Warranties................................................. 24
    3.2   Single Purpose Representations and Warranties............................. 31
    3.3   Condominium Regime Covenants and Warranties........................... 34
    3.4   Survival of Representations and Warranties.................................. 36
    3.5   Remaking of Representations .................................................... 36
    3.6   Facility to Value Covenant ...................................................... 37
    3.7   Obligor's Agreements With Respect to Sale of Units ...................... 37

ARTICLE 4 REVOLVING PURCHASE FACILITY ...................................................... 38
    4.1   Revolving Purchasing Facility and Appointment of Agents ............... 38
    4.2   Purchase Requests................................................................. 39
    4.3   Purchase Confirmations .......................................................... 40
    4.4   Purchase of Metals................................................................ 40
    4.5   Offer to Purchase Metals ........................................................ 40
    4.6   On-sale of Metals.................................................................. 40
    4.7   Assignment of Warranties........................................................ 41
    4.8   Conditions Precedent ............................................................. 41

ARTICLE 5 TERMS OF FACILITY AND DOCUMENTS ............................................... 42
    5.1   Agreement to Enter into Transactions ........................................ 42
    5.2   Facility Documents ............................................................... 42
    5.3   Term of the Facility .............................................................. 44
    5.4   Due on Sale ........................................................................ 45
    5.5   Partial Releases ................................................................... 46
    5.6   Application of Prepayments Pursuant to this Article 5...................... 47
    5.7   Assignment of Mortgage to Contract Vendees............................... 47

ARTICLE 6 PURCHASE PRICE AND PROFIT ........................................................... 47
    6.1   Profit Payments.................................................................... 47
    6.2   Computation of Profit ............................................................ 47
    6.3   Determination of Profit Rate.................................................... 48
    6.4   Optional Method for Payment of Profit ...................................... 49
    6.5   Profit Rate Protection Agreement ............................................. 49
    6.6   Late Charges and Default Profit Rate ......................................... 50

i

6.7     Prepayments and Termination of Commitment to Finance .......................................... 50
6.8     Additional Costs............................................................................................................. 50
6.9     Change in Governing Law. ............................................................................................ 52

ARTICLE 7 FACILITY AND ADMINISTRATION EXPENSES AND ADVANCES AND
          SECURITY FOR SAME ...................................................................................... 55
7.1     Facility and Administration Expenses ........................................................................ 55
7.2     Administrative Fee......................................................................................................... 55
7.3     Time of Payment of Fees .............................................................................................. 56
7.4     Expenses and Increase Transactions Secured by Facility Documents........................ 56
7.5     Transactions in Excess of Amount of Note ................................................................ 56
7.6     Right to Execute Transactions or Make Disbursements to Cure Obligor's
          Defaults............................................................................................................................ 56

ARTICLE 8 BUDGET AND CONTINGENCY LINE ITEMS.................................................... 57
8.1     Budget.............................................................................................................................. 57
8.2     Budget Line Items........................................................................................................... 57
8.3     Contingency Line Item .................................................................................................. 57

ARTICLE 9 SUFFICIENCY OF FACILITY .............................................................................. 58
9.1     Balancing ........................................................................................................................ 58
9.2     Reallocation of Budget Line Items ............................................................................. 59
9.3     Finance Reserve Account .............................................................................................. 59

ARTICLE 10 REQUIREMENTS PRECEDENT TO THE FIRST ADVANCE FOR
           CONSTRUCTION.................................................................................................. 59
10.1    Required Construction Documents................................................................................ 59

ARTICLE 11 CONSTRUCTION PAYOUT REQUIREMENTS WITH RESPECT TO ALL
           ADVANCES............................................................................................................ 63
11.1    Applicability of Sections............................................................................................... 63
11.2    Monthly Payouts ............................................................................................................ 63
11.3    Approval By Financiers' Construction Consultant...................................................... 63
11.4    Documents to be Furnished for Each Transaction....................................................... 63
11.5    Retainages....................................................................................................................... 64
11.6    Administrative Agent's Right to Employ Financiers' Consultant............................... 65
11.7    Transactions for Stored Materials................................................................................. 65
11.8    Draws After Completion Date ...................................................................................... 66
11.9    Funding of Imprest Account ......................................................................................... 66

ARTICLE 12 OBLIGOR'S OBLIGATIONS FOR THE FINAL TRANSACTION FOR
           CONSTRUCTION PAYMENTS........................................................................... 66
12.1    Obligations Prior to the Final Increase Transaction ................................................... 66

ARTICLE 13 OBLIGOR'S AGREEMENTS .............................................................................. 68
13.1    Obligor's Agreements.................................................................................................... 68
13.2    Obligor's Agreements With Respect to Sales of Units................................................ 81

13.3    Leases.................................................................................................. 82

ARTICLE 14 CASUALTY AND CONDEMNATION ............................................. 82
14.1    Administrative Agent's Election to Apply Takaful/Insurance or
        Condemnation Proceeds................................................................... 82
14.2    Obligor's Obligation to Rebuild or Restore; Use of Takaful/Insurance and
        Condemnation Proceeds................................................................... 83
14.3    Condominium Declaration................................................................ 84
14.4    Prepayments Pursuant to this Article 14 ......................................... 84

ARTICLE 15 ASSIGNMENTS; FINANCIER'S RIGHT TO ASSIGN ...................... 84
15.1    Assignments.................................................................................... 84
15.2    Prohibition of Assignments by Obligor ........................................... 86
15.3    Successors and Assigns.................................................................... 86

ARTICLE 16 EVENTS OF DEFAULT.................................................................. 86
16.1    Events of Default ............................................................................ 86
16.2    Obligation to Fund Suspended......................................................... 90

ARTICLE 17 FINANCIER'S REMEDIES IN EVENT OF DEFAULT ...................... 90
17.1    Remedies Conferred Upon Financier............................................... 90
17.2    Non-Waiver of Remedies................................................................. 91
17.3    Acceptance of Cure After an Event of Default ................................ 91

ARTICLE 18 CONDOMINIUM PROVISIONS ...................................................... 92
18.1    Condominium Provisions................................................................. 92
18.2    Obligor shall: .................................................................................. 92
18.3    Joinder and Consent to Declaration of Condominium...................... 93

ARTICLE 19 CASH ACCOUNTS PLEDGE, ASSIGNMENT AND SECURITY
        AGREEMENT.................................................................................... 95
19.1    Pledge, Assignment and Security Agreement................................... 95
19.2    Security for Obligor's Obligations................................................... 96
19.3    Delivery of Collateral ..................................................................... 96
19.4    Continuing Security Interest ........................................................... 96
19.5    Security Interest Absolute............................................................... 96
19.6    Representations and Warranties as to Pledged Collateral................. 97
19.7    Covenants with Respect to Pledged Collateral ................................ 97
19.8    Waiver by Obligor .......................................................................... 98
19.9    Reserve Funds Generally. ............................................................... 98

ARTICLE 20 ADMINISTRATIVE AGENT........................................................... 98
20.1    Appointment ................................................................................... 98
20.2    Reliance on Administrative Agent.................................................... 99
20.3    Obligor's Rights .............................................................................. 99
20.4    General Immunity ........................................................................... 99
20.5    Successor Administrative Agent....................................................... 99

Page

ARTICLE 21 GENERAL PROVISIONS ............................................................. 100
21.1    Captions ......................................................................................... 100
21.2    Modification; Waiver....................................................................... 100
21.3    Reimbursement for Facility Expenses ............................................. 100
21.4    Merger ........................................................................................... 100
21.5    Acquiescence Not to Constitute Waiver of Administrative Agent's
        Requirements ................................................................................. 100
21.6    Disclaimer by Administrative Agent and Financiers........................ 100
21.7    Partial Invalidity; Severability ....................................................... 102
21.8    Definitions Include Amendments .................................................... 102
21.9    Execution in Counterparts............................................................... 102
21.10   ERISA............................................................................................ 103
21.11   Customer Identification – USA Patriot Act Notice; OFAC............. 103
21.12   Agreement Supplements other Facility Documents; Conflict .......... 104
21.13   Waiver of Non-Compulsory Counterclaims .................................... 104
21.14   Waiver of Consequential and Punitive Damages............................. 104
21.15   Claims Against Administrative Agent or Financier.......................... 104
21.16   Governing Law ............................................................................... 105
21.17   Venue and Jurisdiction.................................................................... 105
21.18   Waiver of Jury Trial ....................................................................... 106
21.19   Set-Offs ......................................................................................... 106
21.20   Assignment of Mortgage................................................................. 107
21.21   Exculpation .................................................................................... 107
21.22   Substitution of Contractor Controlled Insurance Program for Bond ........ 107
21.23   Sales and Marketing Office Lease ................................................... 107
21.24   Notices ........................................................................................... 107
21.25   Time is of the Essence .................................................................... 109
21.26   Tax Consequences .......................................................................... 110

## EXHIBITS

EXHIBIT A          Legal Description – Perimeter
EXHIBIT B          Form of Pending Disbursements Clause
EXHIBIT C          Commitment Amounts of Financiers
EXHIBIT D          Permitted Exceptions
EXHIBIT E          List of Design Professionals
EXHIBIT F          Takaful/Insurance Requirements
EXHIBIT G          Section 22 Lien Law Affidavit
EXHIBIT H          Letter of Agency
EXHIBIT I          Purchase Request
EXHIBIT J          Purchase Confirmation
EXHIBIT K          Purchase Order
EXHIBIT L          Purchase Acceptance

## SCHEDULES

SCHEDULE 1          Form of Lien Waiver
SCHEDULE 2          Form of Obligor's Payment Application

## BUILDING FACILITY AGREEMENT

**THIS BUILDING FACILITY AGREEMENT** (as may be modified, amended, restated or supplemented from time to time, this "**Agreement**") is made as of April 26, 2016 (the "**Closing Date**"), by and among **MALAYAN BANKING BERHAD, NEW YORK BRANCH,** a corporation organized under the laws of Malaysia, having an address at 400 Park Avenue, New York, New York 10022, as administrative agent (together with any successors appointed pursuant to this Agreement, "**Administrative Agent**") **PARK PLACE DEVELOPMENT PRIMARY LLC,** a Delaware limited liability company, having a principal place of business at c/o Soho Properties, 31 West 27th Street, 9th Floor, New York, NY 10001 ("**Obligor**"), **MALAYAN BANKING BERHAD, LONDON BRANCH** and the financiers that are, from time to time, party hereto, together with their successors and permitted assigns, collectively, "**Building Facility Financiers**", and each a "**Building Facility Financier**").

## W I T N E S S E T H:

**WHEREAS,** Obligor is the owner and holder of a fee interest in certain real property and development rights more particularly described on <u>Exhibit A</u>, which exhibit is attached hereto and made a part hereof, commonly known as 43 Park Place, City of New York, County of New York, State of New York, (the "**Real Property**");

**WHEREAS,** Obligor proposes to construct on the Real Property a building, comprised of approximately **111,933** saleable square feet of residential space containing fifty (50) residential condominium units (collectively, the "**Residential Units**" and each, a "**Residential Unit**"), approximately 1,129 square feet containing retail condominium units (collectively, the "**Retail Units**" and each, a "**Retail Unit**"), and 413 square feet of storage space containing approximately 19 storage units (collectively, the "**Storage Units**" and each, a "**Storage Unit**");

**WHEREAS,** Obligor has requested that Financiers provide a building facility in the maximum amount of **ONE HUNDRED SIXTY-TWO MILLION ONE HUNDRED TWELVE THOUSAND EIGHT HUNDRED NINETY-SIX DOLLARS AND 16/100 ($162,112,896.16)** (the "**Building Facility**") to finance the Costs of Improvements (as such term is hereinafter defined) associated with the "**Project**" (as such term is hereinafter defined), which Building Facility is to be made and disbursed pursuant to this Agreement;

**WHEREAS,** Obligor has requested that Financiers provide a project facility in the maximum amount of **ELEVEN MILLION EIGHT HUNDRED EIGHTY-SEVEN THOUSAND ONE HUNDRED THREE DOLLARS 84/100 ($11,887,103.84)** (the "**Project Facility**") to finance costs associated with the Project other than Costs of Improvements, which Project Facility is to be made pursuant to that certain Project Facility Agreement, dated as of the Closing Date, by and among Administrative Agent, Obligor and Project Facility Financiers (as such term is hereinafter defined) which, from time to time, are parties thereto (as the same may be modified, amended or supplemented from time to time, the "**Project Facility Agreement**"); and

1

**WHEREAS,** Building Facility Financiers are willing to make the Building Facility on the terms and conditions set forth in this Agreement, the proceeds of which will be disbursed as more specifically set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE 1
## INCORPORATION OF RECITALS AND EXHIBITS

1.1     Incorporation of Recitals. The foregoing Preamble and Recitals and all other preambles and recitals set forth herein are made a part of this Agreement.

1.2     Incorporation of Exhibits and Schedules. The Exhibits and Schedules attached hereto are incorporated herein and expressly made a part hereof by this reference.

## ARTICLE 2
## DEFINITIONS

2.1     Defined Terms. The following terms as used herein shall have the following meanings:

"**Accounting Firm**" shall mean Marcum LLP, a "big four" accounting firm or another firm reasonably agreed to by Administrative Agent.

"**Accounting Method**" shall mean (1) generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied, and (2) with respect to individual persons, sound accounting principles, consistently applied.

"**Additional Security**" shall have the meaning given such term in Section 3.6(a).

"**Additional Security Account**" shall mean an account under the sole dominion and control of Administrative Agent, for the purposes set forth in Section 3.6(a).

"**Adjusted Disruption Rate**" shall mean the Disruption Rate plus the Spread.

"**Administrative Agent**" shall mean Malayan Banking Berhad, New York Branch and any successor Administrative Agent appointed pursuant to this Agreement.

"**Administrative Fee**" shall have the meaning given such term in Section 7.2.

"**Affiliate**" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common Control with such specified Person..

2

"**Aggregate Deferred Sale Price**" means at any time the aggregate of the unpaid Deferred Sale Price amounts at such time which shall include the aggregate purchase price and murabahah profit.

"**Aggregate Purchase Price**" means at any time the aggregate of the unpaid Purchase Price amounts included in the Aggregate Deferred Sale Price at such time which amount shall not exceed the amount of the Building Facility.

"**Agreed Profit**" shall mean for any Transaction, the Applicable Profit Rate multiplied by the Purchase Price of the Metals covered by such Transaction multiplied by the actual number of days from the Value Date for such Transaction to the Profit Payment Date for such Transaction and dividing such product by 360.

"**Agreement**" shall mean have the meaning given such term in the Preamble hereof.

"**Annual Appraisal**" shall have the meaning given such term in Section 13.1(ff).

"**Applicable Law**" shall mean the collective reference to all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

"**Applicable Profit Rate**" shall mean (x) the Profit Rate for a LIBOR Facility, (y) if the provisions of Section 6.3(c) or Section 6.3(d) apply, the Adjusted Disruption Rate, or (z) the Default Profit Rate if the provisions of Section 6.6 apply.

"**Appraisal**" shall mean an appraisal of the Project performed by the Appraiser, in form and substance reasonably satisfactory to Administrative Agent and prepared using a methodology reasonably satisfactory to Administrative Agent and in conformity with USPAP guidelines and FIRREA regulations, as any of the same may be updated by recertification from time to time by the Appraiser performing such Appraisal.

"**Appraiser**" shall mean CBRE, Inc. or such other senior commercial appraiser of the American Appraisal Institute, as shall be acceptable to Administrative Agent in its sole discretion.

"**Approved Sale Contract**" shall mean a Sale Contract or Option Agreement pursuant to which (i) a non-refundable (except for Obligor default thereunder) Contract Deposit or Option Payment, as applicable, of no less than fifteen percent (15%) of the aggregate purchase price has been made, or a non-refundable (except for Obligor default thereunder) Contract Deposit or Option Payment, as applicable, of no less than five percent (5%) of the aggregate purchase price has been made and such Sale Contract or Option Agreement is with a Contract Vendee identified on Exhibit A to the Omnibus Forms Agreement, and (ii) no Contract Vendee or any Affiliate thereof is acquiring more than seven (7) Residential Units, or as otherwise approved by Administrative Agent in its sole and absolute discretion.

"**Architect**" shall mean Ismael Leyva Architects P.C.

3

"**Architect's Certificate**" shall have the meaning given such term in Section 10.1(k).

"**Asbestos**" shall mean the asbestiform varieties of chrysolite, crocidolite, amosite, anthophylite, tremolite, and actinolite.

"**Assignment and Assumption**" shall have the meaning given such term in Section 15.1.

"**Assignment and Assumption Agreement**" shall mean that form of Assignment and Assumption Agreement attached as Exhibit B to the Co-Financier Agreement.

"**Bankruptcy Code**" shall have the meaning given such term in Section 16.1(j).

"**Board**" shall mean the board of directors of the condominium association established under any Condominium Documents.

"**Bond**" shall mean a Performance Bond or Payment Bond in the form approved by the American Institute of Architects and identified as Form AIA No. A-312-2010 with the contractor or subcontractor (as the case may be) as principal, with a surety company acceptable to Administrative Agent in its reasonable discretion and licensed to do business in the State of New York as a surety, naming Obligor and Administrative Agent, for the benefit of Financiers as dual obligees and providing first dollar coverage to Administrative Agent for the benefit of Financier.

"**Breakage Costs**" shall mean any actual third-party loss or expense which Administrative Agent or any Financier actually sustains or incurs as a consequence of (i) any default by Obligor in making when due a payment with respect to a LIBOR Facility, including, without limitation, any such actual third-party loss or expense arising from costs or fees payable by any Financier on funds obtained by it in order to maintain a LIBOR Facility hereunder, (ii) any prepayment (whether voluntary or mandatory) of the LIBOR Facility on a day that is not a Profit Payment Date, including, without limitation, such loss or expense arising from costs or fees payable by any Financier on of funds obtained by it in order to maintain the LIBOR Facility hereunder and (iii) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Profit Rate from Profit Rate to the Adjusted Disruption Rate with respect to any portion of the outstanding Purchase Price which shall at no time exceed the Aggregate Deferred Sale Price.

"**Budget**" shall mean the Building Facility Budget and the Project Facility Budget, collectively.

"**Budget Line Item**" or "**Budget Line Items**" shall mean the line items in the Building Facility Budget or the Project Facility Budget, as applicable.

"**Building Facility**" shall have the meaning given such term in the Recitals hereof.

4

"**Building Facility Budget**" shall mean a budget for the construction of Improvements at the Project constituting the Costs of Improvements, as such budget may be amended, modified or supplemented and as approved by Administrative Agent from time to time if required pursuant to the terms hereof and otherwise in accordance with the Facility Documents.

"**Building Facility Contingency Line Item**" shall mean the Budget Line Item designated as such in the Building Facility Budget.

"**Building Facility Deficiency Account**" shall mean the account established and maintained by Administrative Agent, which account shall be entitled as Administrative Agent may require and into which all Building Facility Deficiency Deposits shall be made.

"**Building Facility Deficiency Deposit**" shall have the meaning given such term in Section 9.1(b).

"**Building Facility Documents**" shall mean the collective reference to this Agreement, the documents described in Section 5.2, and all other documents, instruments, or agreements evidencing, securing or otherwise pertaining to the Building Facility, as the same may be amended, modified or supplemented from time to time.

"**Building Facility Mortgage**" shall mean that certain Consolidated, Amended and Restated Building Facility Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of the Closing Date, made by Obligor, as mortgagor, in favor of Administrative Agent, as mortgagee, for the benefit of Financiers encumbering Obligor's interest in the Project and securing, among other things, the Building Facility Note, as the same may be severed, amended, modified, restated, consolidated or supplemented from time to time.

"**Building Facility Note**" shall mean that certain Consolidated, Amended and Restated Building Facility Note, dated as of the Closing Date, made by Obligor and payable to the order of Building Facility Financiers in the amount of the Building Facility, as may be severed, amended, modified, restated, consolidated or supplemented from time to time.

"**Building Facility Title Policy**" shall mean the policy of title takaful/insurance issued in connection with the Building Facility together with the pending disbursements clause in the form attached hereto as Exhibit B, issued by the Title Takaful/Insurance Company to Administrative Agent, each insuring a Building Facility Mortgage as a valid and subsisting lien on the Project, subject only to the Permitted Exceptions, prior recorded Building Facility Mortgages and prior recorded Project Facility Mortgages.

"**Business Day**" shall mean any day (other than a Saturday or Sunday) on which commercial banks are generally open for the conduct of business in New York City, New York, London, England, and Kuala Lumpur, Malaysia.

"**Close**" along with "**Closed**" and "**Closing**" shall mean title to a Unit which is the subject matter of a Sale Contract or Option Agreement will, has or is passing to the applicable Contract Vendee.

5

"**Closing Date**" shall have the meaning given such term in the Preamble hereof.

"**Code**" means the Internal Revenue Code of 1986.

"**Commitment**" shall mean the maximum amount committed by each Financier as part of the Facility, as set forth on Exhibit C hereto, as the same may be amended, modified or supplemented from time to time, and as the same is subject to further modification by each Assignment and Assumption.

"**Completion Guarantors**" shall mean SoHo, Soho Properties General Partner, LLC, Sharif El-Gamal and Gilbane Building Company.

"**Condominium**" shall mean the condominium to be created pursuant to the Condominium Declaration which, unless otherwise consented to by Administrative Agent, upon creation, will be composed of Units as set forth in the Recitals hereof and various common elements.

"**Condominium Act**" shall mean Article 9-B of the Real Property Law of the State of New York, and all amendments and replacements thereof.

"**Condominium Declaration**" shall mean the instrument, in the form included in the Condominium Offering Plan or otherwise reasonably satisfactory to Administrative Agent, subjecting the Project to a condominium form of ownership, all in conformance with the Condominium Act.

"**Condominium Documents**" shall mean, collectively, all documents, as required by the Condominium Act and otherwise relating to the submission of the Project to the provisions of the Condominium Act or to the regulation, operation, administration or sale thereof after such submission, including, without limitation, the Condominium Offering Plan, the Condominium Declaration, by-laws of the Condominium, rules and regulations of the Condominium, management agreement, escrow agreements, plats and the form of contract of sale and deed forms to be used in connection with the sale of Units.

"**Condominium Escrow Agent**" shall mean Holland & Knight LLP, or another escrow agent reasonably acceptable to Administrative Agent, which is qualified under Applicable Law to hold the contract deposits or payments made pursuant to sales contracts or option agreements, as applicable, in accordance with an escrow agreement and with a depositary reasonably acceptable to Administrative Agent.

"**Condominium Offering Plan**" shall mean the condominium offering plan for the Condominium, as reasonably approved by Administrative Agent and amended with the reasonable consent of Administrative Agent from time to time.

"**Condominium Sales Report**" shall mean a report in writing specifying the number and type of Units sold, Unit designation, purchase price for each Unit, name and address of the Contact Vendees, number of Units closed during the preceding reporting period, together with a photocopy of any newly-executed Sale Contracts or Option Agreements, arising subsequent to the last Condominium Sales Report submitted to Administrative Agent, notice of

6

any revisions to the relevant marketing plan and any other information relevant to the sales program reasonably requested by Financiers and/or Administrative Agent from time to time.

"**Consent and Agreement**" shall mean that certain form of Consent and Agreement attached to the Omnibus Forms Agreement.

"**Construction**" shall mean, with respect to the Project, any and all demolition, construction, improvement or renovation work to be performed and completed by Obligor in accordance with the Plans and Specifications.

"**Construction Commencement Date**" shall mean forty-five (45) days after the First Transaction Date.

"**Construction Completion**" shall mean completion of all of the Construction including punch list items.

"**Construction Completion Date**" shall mean the six (6) months following the Original Termination Date, subject to Unavoidable Delays..

"**Construction Schedule**" shall have the meaning given such term in Section 10.1(h).

"**Contingency Line Item**" shall mean the Building Facility Contingency Line Item and the Project Facility Contingency Line Item.

"**Contract Deposits**" shall mean a deposit received from Contract Vendees.

"**Contract Vendee**" shall mean a purchaser pursuant to a Sale Contract or a holder of an option pursuant to an Option Agreement.

"**Control**" shall mean as such term is used with respect to any Person, including the correlative meanings of the terms "**controlled by**" and "**under common control with**", shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Costs of Improvements**" shall mean "Costs of Improvements" as such term is defined in Paragraph 5 of Section 2 of Article 1 of the Lien Law.

"**Date Down Endorsement**" shall mean any date down endorsement(s) to a Title Policy covering an Increase Transaction made or to be made subsequent to the date of the applicable Title Policy.

"**Default or default**" shall mean any event which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default hereunder.

"**Default Profit Rate**" shall mean the Applicable Profit Rate plus one percent (1%).

7

"**Deferred Sale Price**" shall mean, with respect to the Metals specified in a Purchase Acceptance, (i) the Purchase Price of such Metals, plus (ii) the Agreed Profit for such Transaction, plus (iii) if applicable, the Supplemental Profit, as computed by Administrative Agent in accordance with this Agreement.

"**Deficiency Accounts**" shall mean the Building Facility Deficiency Account and the Project Facility Deficiency Account.

"**Deficiency Deposit**" shall mean the Building Facility Deficiency Deposits and the Project Facility Deficiency Deposit.

"**Design Professionals**" shall mean the collective reference to the Architect and any structural engineers and other infrastructure design professionals engaged by Obligor to provide services relating to the Construction or the Project, each as reasonably approved by Administrative Agent.

"**Determination Date**" shall mean, with respect to any Profit Period, the date that is two (2) London Business Days prior to the commencement of the applicable Profit Period.

"**Disruption Rate**" shall have the meaning given to such term in <u>Section 6.3(c)</u> hereof.

"**Disruption Rate Facility**" shall mean a Facility having a rate of profit per annum equal to the Disruption Rate.

"**Environmental Indemnity Agreement**" shall mean that certain Environmental and Hazardous Substances Indemnification Agreement, of even date herewith, made jointly and severally by Obligor and Guarantors in favor of Administrative Agent, as the same may be modified, amended, restated, reaffirmed or supplemented from time to time.

"**Environmental Proceedings**" shall have the meaning given such term in <u>Section 3.1(p)</u>.

"**Environmental Report**" shall have the meaning given such term in <u>Section 10.1(i)</u>.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

"**ERISA Affiliate**" shall mean any Person that is under common control with Obligor or any of its Affiliates within the meaning of Section 414 of the Code or Section 4001(B) of ERISA.

"**Event of Default**" shall have the meaning given such term in <u>Section 16.1</u>.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch

8

profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Financier, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Financier, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Financier with respect to an applicable interest in a Facility or Commitment pursuant to a law in effect on the date on which (i) such Financier acquires such interest in the Facility or Commitment or (ii) such Financier changes its lending office, except in each case to the extent that, pursuant to Section 6.9, amounts with respect to such Taxes were payable either to such Financier's assignor immediately before such Financier became a party hereto or to such Financier immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 6.9(a)(v), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Exculpated Parties**" shall have the meaning given such term in Section 21.21.

"**Extension**" shall have the meaning given such term in Section 5.3(b).

"**Extension Determination Date**" shall have the meaning given such term in Section 5.3(b)(ii).

"**Extension Effective Date**" shall have the meaning given such term in Section 5.3(b)(iii).

"**Extension Notice**" shall have the meaning given such term in Section 5.3(b)(ii).

"**Facility**" shall mean the collective reference to the Building Facility and the Project Facility.

"**Facility Documents**" shall mean the collective reference to the Building Facility Documents and the Project Facility Documents.

"**Facility to Value Ratio**" shall mean the percentage derived by dividing (x) the Facility amounts funded up to the date of calculation plus any unfunded and committed Facility amounts less the value of the Additional Security to the extent that such Additional Security is cash or cash equivalents by (y) the appraised value of the as completed Project as set forth in the most recent Annual Appraisal.

"**Facility Opening Date**" shall mean the date of the first Increase Transaction pursuant to a Transaction Request.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Financial Covenants Certification**" shall mean a certification from Guarantors as to whether Guarantors, jointly, are in compliance with the Financial Covenants as of the

9

annual calculation thereof in accordance with Section 13.1(q)(ii). and fairly presenting in accurate detail the information set forth therein and not omitting any material facts. Administrative Agent shall have the right to require Guarantors (a) to make any reasonable adjustments to the calculation of compliance with the Financial Covenants as contained in the Financial Covenants Certification as is necessary to correct any errors in such calculations, and (b) to make any reasonable adjustments necessary to cause the Financial Covenants Certification to fairly present whether or not the Financial Covenants were then complied with.

"**Financial Covenants**" shall mean Guarantors have (i) a Net Worth of not less than $50,000,000, and (ii) Liquidity of not less than $10,000,000.

"**Financiers**" shall mean, collectively, Building Facility Financiers and Project Facility Financiers.

"**Financiers' Consultant**" shall mean, collectively, consultants retained by Administrative Agent from time to time which may include consulting architect, engineer and/or other professional, to review, analyze and make recommendations to Administrative Agent with respect to, among other things, environmental matters, any Plans and Specifications, the Budget, the Construction Schedule, Transaction Requests, the General Contract, Major Subcontracts and all subcontracts.

"**FIRREA**" shall mean the Financial Institutions, Reform, Recovery and Enforcement Act of 1989, as amended from time to time, and the regulations promulgated thereunder from time to time.

"**First Extension Option**" shall mean the meaning given such term in Section 5.3(b).

"**First Transaction Date**" shall mean May 17, 2016.

"**Foreign Financier**" means (a) if Obligor is a U.S. Person, a Financier that is not a U.S. Person, and (b) if Obligor is not a U.S. Person, a Financier that is resident or organized under the laws of a jurisdiction other than that in which Obligor is resident for tax purposes.

"**FTV Payment**" shall have the meaning given such term in Section 3.6(a).

"**FTV Threshold**" shall mean a Facility to Value Ratio of sixty percent (60%).

"**General Contract**" shall mean that certain Construction Management Agreement (which shall be a guaranteed maximum price contract, inclusive of all fees), between Obligor and General Contractor, dated on or prior to the First Transaction Date.

"**General Contractor**" shall mean Gilbane Residential Construction LLC or a replacement approved by Administrative Agent in its sole and absolute discretion.

"**Governmental Approvals**" shall have the meaning given such term in Section 3.1(k).

10

"**Governmental Authority**" shall mean any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court, administrative tribunal, or public utility.

"**Gross Sale Proceeds**" shall mean any and all consideration received by Obligor with respect to the sale or transfer of a Unit.

"**Guaranties**" shall mean, collectively, the Performance and Completion Guaranty, Non-Recourse Carveout Guaranty and the Environmental Indemnity Agreement.

"**Guarantors**" shall mean Soho, Soho Properties General Partner LLC and Sharif El-Gamal, jointly and severally.

"**Hazardous Materials**" shall mean gasoline, petroleum, Asbestos, explosives, radioactive materials or any hazardous or toxic material, substance or waste which is defined by those or similar terms or is regulated as such under any Law of any Governmental Authority having jurisdiction over the Project or any portion thereof or its use, including: (i) any "hazardous substance" defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. § 9601(14) as may be amended from time to time, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (ii) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (iii) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (iv) any petroleum, including crude oil or any fraction thereof; (v) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (vi) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; and (vii) any other substance, regardless of physical form, that is subject to any other Law or other past or present requirement of any Governmental Authority, including any applicable environmental laws of the State of New York as amended from time to time, regulating, relating to, or imposing obligations, liability, or standards of conduct concerning the protection of human health, plant life, animal life, natural resources, property, or the reasonable enjoyment of life or property from the presence in the environment of any solid, liquid, gas, odor, microbial matter, any form of energy, any form of contaminant, or from any other source.

"**Imprest Account**" shall have the meaning given such term in <u>Section 11.9</u>.

"**Improvements**" shall mean the collective reference to all buildings, structures and other improvements located on or for the benefit of the Real Property.

"**In Balance**" shall have the meaning given such term in <u>Section 9.1(a)</u>.

"**Increase Transaction**" means each Transaction that, immediately after giving effect to such Transaction, causes the Aggregate Purchase Price to be greater than the Aggregate Purchase Price on the date immediately prior to the Value Date for such Transaction.

"**Indemnified Persons**" shall mean Administrative Agent and Financiers, and their respective direct or indirect officers, directors, shareholders, employees, agents, attorneys, accountants, partners and principals, any assignee or successor to any interest of Administrative

Agent or any Financier in or to the Property and such assignee's or successor's direct or indirect officers, directors, shareholders, employees, agents, attorneys, accountants, partners and principals.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Obligor under any Facility Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Independent Manager**" shall mean a Person who is not at any time while serving as a director, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Manager), officer, employee, partner, member, attorney or counsel of the principal, Obligor or any Affiliate of either of them; (b) a customer, supplier or other person who derives any of its purchases or revenues from its activities with the principal, Obligor or any Affiliate of either of them; (c) a Person Controlling or under common Control with any such stockholder, director, officer, partner, member, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, customer, supplier or other person. Notwithstanding the foregoing, the Independent Manager for Obligor may be CT Corporation System, Independent Member Services LLC or an employee of either such company.

"**Initial Appraisal**" shall mean that certain Appraisal prepared by Appraiser and dated as of August 7, 2015.

"**IRS**" means the United States Internal Revenue Service.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, from time to time.

"**Late Charge**" shall have the meaning given such term in <u>Section 6.6</u>.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable, clean sight draft letter of credit, as the same may be replaced, split, substituted, modified, amended, supplemented, assigned or otherwise restated from time to time, (either an evergreen letter of credit or a letter of credit which does not expire until at least ten (10) Business Days after the Termination Date or such earlier date as such Letter of Credit is no longer required pursuant to the terms of this Agreement) in favor of Administrative Agent and entitling Administrative Agent to draw thereon based solely on a statement executed by an officer of Administrative Agent stating that it has the right to draw thereon, and issued by a domestic approved bank or the U.S. agency or branch of a foreign approved bank.

"**LIBOR**" shall mean, with respect to each Profit Period, the greater of (i) the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest one thousandth of one percent (.001%)) for deposits in U.S. dollars, for the applicable Profit Period, that appears on the display designated as "ICE ONE MONTH LIBOR USD" (or comparable designation concerning the London Interbank Offered Rate set by the Ice Benchmark Administration for US Dollars) on the Bloomberg System (or any comparable successor thereto)

as of 11:00 a.m., London time, on the related Determination Date, and (ii) one-quarter of one percent (0.25%).

"**LIBOR Facility**" shall mean a Facility having a rate of Profit per annum equal to the Profit Rate.

"**Lien**" shall have the meaning given such term in Section 13.1(e).

"**Lien Law**" shall mean the Lien Law of the State of New York, as amended from time to time.

"**Liquidity**" shall mean the following assets free of all security interests, liens, pledges, charges or any other encumbrance: (i) cash and cash equivalents, (ii) certificates of deposit (with a maturity of 90 days or less) issued by, or savings or money market accounts with, any bank or other financial institution reasonably acceptable to Financiers, (iii) U.S. treasury securities marked to market, and (iv) securities traded on a national or international exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations that can be readily marked to market and liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market and (v) money market funds.

"**Major Subcontract**" shall mean any subcontracts between General Contractor and any Major Subcontractor.

"**Major Subcontractor**" shall mean each subcontractor or material supplier performing work or supplying materials, equipment or furnishings costing five million dollars ($5,000,000.00) or more and all Design Professionals.

"**Management Agreement**" shall mean the property management agreement to be executed by the applicable condominium association and Property Manager after the recordation of the Condominium Documents, in accordance with the Condominium Offering Plan and otherwise in form and substance reasonably satisfactory to Administrative Agent, as the same may be modified, amended, restated, reaffirmed or supplemented from time to time, in accordance with the provisions of Section 13.1(aa).

"**Material Adverse Change**" shall mean a material adverse change in the (i) business, condition (financial or otherwise), results of operations or performance of the Project, Obligor or Sole Member, (ii) the ability of Obligor, Sole Member or Guarantors to perform any of its obligations under the Facility Documents to which it is a party, including Obligor's ability to perform its obligations under the General Contract or any material obligations under any other material agreements affecting the Project, or (iii) the validity or enforceability of any of the Facility Documents or any material right or remedy of Administrative Agent thereunder, or the validity or priority of the lien of the Mortgage.

"**Maximum Facility Amount**" shall mean $174,000,000.00.

"**Members**" shall mean the collective reference to the Sole Member, any permitted replacement managing member and each other member of Obligor.

13

"**Mezzanine Facility Note**" shall mean that certain note, dated as of even date herewith, by Mezzanine Borrower, in favor of Mezzanine Financier.

"**Mezzanine Facility Termination Date**" shall mean the termination date pursuant to the Murabaha Facility Agreement.

"**Mezzanine Financier**" shall mean BERNI, aa Exempt Corporation organized under the laws of the Cayman Islands.

"**Mezzanine Obligor**" shall mean Park Place Secondary, LLC, a Delaware limited liability company.

"**Mezzanine Termination Event**" shall mean the failure of (x) the Mezzanine Facility to be extended pursuant to the Mezzanine Facility Note or (y) the Mezzanine Facility to be satisfied or replaced with a mezzanine facility subject to a termination date that is no sooner than the third anniversary of the First Transaction Date.

"**Metals**" shall mean such metals as may be purchased by Administrative Agent for sale to, and acceptance by, Obligor from time to time in accordance with this Agreement.

"**Mezzanine Facility**" shall mean that certain mezzanine finance facility by and between Mezzanine Financier and Sole Member, in the amount of $62,250,000.00, including Murabaha Profit.

"**Mortgages**" shall mean the Building Facility Mortgage and the Project Facility Mortgage.

"**Minimum Sale Price**" shall mean the Unit prices set forth on Exhibit D of the Omnibus Forms Agreement.

"**Net Sales Proceeds**" shall mean Gross Sale Proceeds received from the sale of any portion of the Project less the costs of sale, including legal fees and expenses, commissions and closing costs; *provided, however*, that the costs of sale shall not exceed 7% of Gross Sale Proceeds plus transfer taxes and condominium reserves payable by Obligor.

"**Net Worth**" shall mean, as of any date, (1) the aggregate amount of all assets owned by a Person individually, which would be reflected on a balance sheet or personal financial statement prepared pursuant to the applicable Accounting Method other than (i) capitalized interest, debt discount and expense, goodwill, patents, trademarks, service marks, trade names, copyrights, franchises, licenses, amount due from Affiliates and any other items which would be treated as intangibles, (ii) any amount, however designated on the balance sheet, representing the excess of the purchase price paid for assets of stocks acquired over the value assigned thereto, (iii) assets owned jointly with another Person, (iv) assets owned by a trust with respect to which such Person is not the sole beneficiary thereof, and the sole controlling party thereof, and (v) the fair market value of its interest in the Project except to the extent it exceeds the amount of Obligor's Equity Contribution, minus (2) the aggregate amount of all liabilities of such Person, other than contingent liabilities of such Person.

14

"**Non-Consolidation Opinion**" shall mean that certain substantive non-consolidation opinion relating to the Facility and delivered to Administrative Agent on the First Transaction Date..

"**Non-Recourse Carveout Guaranty**" shall mean that certain Non-Recourse Carveout Guaranty, of even date herewith, made by Guarantors in favor of Administrative Agent for the benefit of Financiers, as the same may be modified, amended, restated, reaffirmed or supplemented from time to time.

"**Note**" shall mean the collective reference to the Building Facility Note and the Project Facility Note.

"**Obligations**" shall mean all obligations and liabilities of every nature of Obligor and Guarantors from time to time owed to Administrative Agent and/or Financiers under the Facility Documents, including the Deferred Sale Price and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and/or from time to time hereafter owing, due or payable whether before or after the filing of a proceeding under the Bankruptcy Code by or against any Obligor.

"**Obligor**" shall have the meaning given such term in the Preamble of this Agreement.

"**Obligor's Certificate**" shall mean that certain certificate of Obligor, dated on the Closing Date, certifying to the truth and accuracy of the matters therein contained.

"**Obligor's Equity Contribution**" shall mean $56,500,000.00.

"**Omnibus Forms Agreement**" shall mean that certain Omnibus Forms Agreement dated as of the Closing Date, by and among Administrative Agent, Financiers and Obligors, setting forth the forms of documents which, due to the stage of the Project, could not be delivered on the Closing Date.

"**Option Agreement**" shall mean an option agreement between Obligor and a third party option holder whereby such option holder and Affiliates thereof (including those under separate option agreements and Sale Contracts) has the option of acquiring, no more than seven (7) Residential Units in the aggregate at a price for each Unit of no less than the Minimum Sale Price and provides for a non-refundable (except for a Obligor default thereunder) option payment of no less than ten percent (10%).

"**Option Payment**" shall mean an option payment made and delivered to Condominium Escrow Agent pursuant to an Option Agreement.

"**Original Termination Date**" shall mean the third anniversary of the First Transaction Date.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed,

delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Facility Document, or sold or assigned an interest in any Facility or Facility Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Facility Document.

"**Percentage Interest**" shall mean, as to any Financier, the ratio, expressed as a percentage, of (i) a Financier's portion in dollars of the Facility (both funded and unfunded) as reflected on Exhibit C hereto and in each Assignment and Assumption in which such Financier is the Permitted Assignee (but as reduced as to portions subsequently assigned by it to another Permitted Assignee) to (ii) the Facility (both funded and unfunded).

"**Performance and Completion Guaranty**" shall mean that certain Performance and Completion Guaranty, of even date herewith, made by Completion Guarantors in favor of Administrative Agent, as the same may be modified, amended, restated, reaffirmed or supplemented from time to time.

"**Permitted Assignee**" shall mean a proposed assignee of all or a portion of Financier's, or any Financier comprising Financier, right, title, interest and obligations of the Facility, who is subject to the reasonable approval of Administrative Agent and, so long as no Event of Default exists, Obligor, or is either (a) an Affiliate of any Financier, (b) an EB5 Regional Center lender, or (c) any entity, having total assets of two billion dollars ($2,000,000,000) and either net worth or combined capital and surplus of six hundred million dollars ($600,000,000) as confirmed, in each case, by such potential assignee in writing, and which exists under the laws of the United States, any state thereof, the District of Columbia or any foreign jurisdiction as: (i) a bank, savings institution, trust company or national banking association, acting for its own account, (ii) a finance company principally engaged in the origination of commercial mortgage loans, (iii) a takaful/insurance company, acting for its own account, (iv) a public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds, (v) a pension, retirement, or profit-sharing, or commingled trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent or (vi) a real estate investment trust which invests in real estate mortgages.

"**Permitted Exceptions**" shall mean those matters listed on Exhibit D hereto to which title to the Project may be subject on the Closing Date, the liens in favor of Administrative Agent and/or Financiers created by the Facility Documents, liens of property taxes not yet due and payable, mechanic's and similar liens which are being dealt with in accordance with the Facility Documents and for which affirmative takaful/title insurance has been obtained, and thereafter such other title exceptions or objections, if any, as Administrative Agent may approve in writing.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or

municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Plans and Specifications**" shall mean any plans and specifications prepared in connection with the Project, including any working or shop drawings made in furtherance of such plans and specifications, and change orders, as modified from time to time in accordance with the terms hereof.

"**Pledged Collateral**" shall have the meaning given such term in Section 19.1.

"**Proceeds**" shall have the meaning given such term in Section 14.1(a).

"**Profit Allocation**" shall have the meaning given such term in Section 6.4.

"**Profit Payment Date**" shall mean the 17th day of each month or if such day is not a Business Day, the next succeeding Business Day.

"**Profit Period**" shall mean the period of time during which periodic payments of Agreed Profit, having accrued hereunder, shall be due and payable on the immediately following Profit Payment Date.

"**Profit Rate**" shall mean the LIBOR plus the Spread.

"**Profit Rate Protection Agreement**" shall have the meaning given such term in Section 6.5 hereof.

"**Profit Rate Protection Provider**" shall have the meaning given such term in Section 6.5(b)(iv) hereof.

"**Project**" shall mean, collectively, the Real Property, together with (i) all buildings, structures and Improvements located or to be located thereon, (ii) all offsite improvements, (iii) all development rights and other rights, privileges, easements, hereditaments and appurtenances relating or appertaining thereto, and (iv) all fixtures, equipment and items of personal property now or hereafter located therein or thereon owned by Obligor and required or beneficial for the operation thereof) but shall not include (a) Units which have been released from the lien of the Facility Documents in accordance herewith.

"**Project Facility Agreement**" shall have the meaning given such term in the Recitals hereof.

"**Project Facility Amount**" shall mean Eleven Million Eight Hundred Eighty-Seven Thousand One Hundred Three Dollars 84/100 ($11,887,103.84).

"**Project Facility Budget**" shall mean a budget for the portion of the costs relating to the Project which are not or may not constitute Costs of Improvements of the Project, as of the Closing Date, a copy of which is attached to the Project Facility Agreement as the same may be amended, modified or supplemented in accordance with the terms of the Facility Documents.

17

"**Project Facility Contingency Line Item**" shall mean the Budget Line Item designated as such in the Project Facility Budget.

"**Project Facility Deficiency Account**" shall mean the account established and maintained by Administrative Agent at a financial institution, which account shall be entitled as Administrative Agent may require and into which all Project Facility Deficiency Deposits (as defined in the Project Facility Agreement) shall be made.

"**Project Facility Deficiency Deposit**" shall have the meaning given such term in the Project Facility Agreement.

"**Project Facility Documents**" shall mean the collective reference to the Project Facility Agreement, the documents listed in Section 5.2 of the Project Facility Agreement, and all other documents, instruments and agreements evidencing, securing or otherwise pertaining to the Project Facility, as the same may be amended, modified or supplemented from time to time.

"**Project Facility Financiers**" shall mean each party having an interest in Project Facility as evidenced by one or more notes made by Obligor in favor of such party and their respective successors and Permitted Assignees.

"**Project Facility Mortgage**" shall mean the Project Facility Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of the Closing Date, made by Obligor, as mortgagor, in favor of Administrative Agent, as mortgagee, for the benefit of Financiers encumbering Obligor's interest in the Project and securing, among other things, the Project Facility Note, as the same may be severed, amended, modified, restated, consolidated or supplemented from time to time.

"**Project Facility Note**" shall mean that certain Project Facility Note, dated as of the Closing Date, made by Obligor payable to the order of Project Facility Financiers, in the amount of the Project Facility, as the same may be severed, amended, modified, restated, consolidated or supplemented from time to time.

"**Project Facility Title Policy**" shall mean each of the Facility policies of title takaful/insurance issued in connection with the Project Facility together with a pending disbursements clause in the pro forma attached hereto on Exhibit B, issued by the Title Takaful/Insurance Company to Administrative Agent, insuring the Building Facility Mortgage as a valid and subsisting lien on the Project, subject only to the Permitted Exceptions.

"**Property Manager**" shall mean a professional managing agent reasonably acceptable to Financier, subject to and in accordance with the requirements of Section 13.1(aa).

"**Purchase Price**" shall mean, with respect to the Metals covered by a Transaction, the total amount paid by Administrative Agent to Supplier for such Metals, which total amount (i) shall equal 100% of the spot market price for such Metals prevailing on the Transaction Date, as reported to Administrative Agent by Supplier, (ii) an transaction fee to be agreed to between Administrative Agent and Supplier, and (iii) shall include any value added tax, sales tax, registration or transfer tax or other similar taxes or duties (where applicable) payable by Administrative Agent or Financiers on or in relation to such Transaction.

"**Purchase Request**" shall have the meaning given such term in <u>Section 4.2</u>.

"**Purchase Confirmation**" shall have the meaning given such term in <u>Section 4.3</u>.

"**Recipient**" means (a) the Administrative Agent and (b) any Financier, as applicable.

"**Related Party**" shall mean any Person which owns a direct or indirect interest in Obligor or which is owned or controlled by or under common ownership or control with Obligor.

"**Release**" shall have the meaning given such term in <u>Section 5.5</u>.

"**Release Payment**" shall mean, with respect to any Unit, the amount of Net Sales Proceeds.

"**Required Financiers**" shall mean Financiers holding Percentage Interests in the Facility which aggregate at least 74% of the amount of Facility, excluding Defaulting Financiers and interests held thereby.

"**Reserve Accounts**" shall mean, collectively, the Strike Price Reserve Account, the Additional Security Account, the Deficiency Account and any other reserves provided for hereunder.

"**Retainage**" shall have the meaning given such term in <u>Section 11.5</u>.

"**Sale Contract**" shall mean a purchase and sale agreement between Obligor and a third party contract vendee whereby such contract vendee and Affiliates thereof (including those under separate Option Agreements and purchase and sale agreements), has agreed to purchase, no more than seven (7) Units in the aggregate at a price for each Unit of no less than the Minimum Sale Price and provides for a non-refundable (except for an Obligor default thereunder) Contract Deposit of no less than ten percent (10%).

"**Sales Agency Agreement**" shall mean that certain sales agreement, in form and substance reasonably satisfactory to Administrative Agent, executed by Obligor and Selling Agent on May 23, 2013, as the same may be modified, amended, restated, reaffirmed or supplemented from time to time, in accordance with the provisions of this Agreement.

"**Sales Milestone**" shall mean, collectively or individually, as the context may require, Sales Milestone One, Sales Milestone Two, and Sales Milestone Three.

"**Sales Milestone Letter of Credit**" shall mean, collectively or individually, as the context may require, Sales Milestone One Letter of Credit, Sales Milestone Two Letter of Credit, and Sales Milestone Three Letter of Credit.

"**Sales Milestone One**" shall mean three (3) fully executed Approved Sale Agreements.

19

"**Sales Milestone One Testing Date**" shall mean the date that is seven (7) months after the First Transaction Date.

"**Sales Milestone One Letter of Credit**" shall mean a Letter of Credit in an amount equal to (i) $15,000,000.00, less (ii) the aggregate sale price under Approved Sale Agreements.

"**Sales Milestone Testing Date**" shall mean, collectively or individually, as the context may require, Sales Milestone Testing Date One, Sales Milestone Testing Date Two, and Sales Milestone Testing Date Three.

"**Sales Milestone Three**" shall mean fully executed Approved Sale Agreements, pursuant to which a Closing has not yet occurred, representing an aggregate sale price of no less than one hundred twenty percent 120% of the outstanding amount of the Facility.

"**Sales Milestone Three Testing Date**" shall mean the date that is the one year anniversary of the First Transaction Date, and each successive date that is six months thereafter in each case.

"**Sales Milestone Three Letter of Credit**" shall mean a Letter of Credit in an amount equal to (i) the outstanding amount of the Facility multiplied by 1.20, less (ii) the aggregate sale price under Approved Sale Agreements.

"**Sales Milestone Two**" shall mean fully executed Approved Sale Agreements, pursuant to which a Closing has not yet occurred, representing an aggregate sale price of no less than $50,000,000.00.

"**Sales Milestone Two Testing Date**" shall mean the date that is nine (9) months after the First Transaction Date.

"**Sales Milestone Two Letter of Credit**" shall mean a Letter of Credit in an amount equal to (i) $50,000,000.00, less (ii) the aggregate sale price under Approved Sale Agreements

"**Sales Office**" shall have the meaning given such term in Section 21.23.

"**Second Extension Period**" shall have the meaning given such term in Section 5.3(b).

"**Section 22 Lien Law Affidavit**" shall have the meaning given such term in Section 13.1(ee).

"**Selling Agent**" shall mean Stribling Marketing Associates, LLC or another licensed real estate broker, subject to and in accordance with the requirements of Section 13.1(aa)(ii)

20

"**Single Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the Closing Date fulfills the requirements of Section 3.2 hereof.

"**SoHo**" shall mean 45 Park Place Partners LLC, a New York limited liability company.

"**Sole Member**" shall mean Park Place Development Secondary LLC, a Delaware limited liability company.

"**Spread**" shall mean (i) four hundred (400) basis points so long as no Event of Default exists and, (ii) five hundred (500) basis points at any time an Event of Default exists.

"**Strike Price Reserve Account**" shall mean an account under the sole dominion and control of Administrative Agent, for the purposes set forth in Section 6.5.

"**Subcontract**" shall mean any subcontract which is not a Major Subcontract.

"**Substantial Completion**" or "**Substantially Complete**" shall mean that all Construction, except minor punch list items, has been completed as determined by Administrative Agent, in consultation with Financiers' Consultant, in its reasonable discretion and temporary certificates of occupancy have been issued for all Residential and Storage Units.

"**Substantial Completion Date**" shall mean the Original Termination Date, subject to Unavoidable Delays.

"**Supplemental Profit**" shall mean the sums due to Financiers pursuant to Section 6.9 or as set forth in Article 7.

"**Supplier**" means Amro, Traderight or such other metals supplier as may be agreed upon by Obligor and Administrative Agent.

"**Survey**" shall mean (i) an ALTA plat of survey of the Project prepared and certified by a surveyor licensed in the State of New York and otherwise reasonably satisfactory to Administrative Agent (the "Survey"), in triplicate, showing, through the use of course bearings and distances, (A) all foundations of the Improvements, if any, in place; (B) the dimensions and locations of all easements and roads or rights of way and setback lines, if any, affecting the Project and that the same are unobstructed; (C) the dimensions, boundaries and square footage of the Improvements, if any; (D) that all foundations and other structures are within the lot lines and in compliance with any restrictions of record or ordinances relating to the location thereof; (E) the dimensions of all buildings and improvements, if any, and distance of such buildings and improvements from the lot lines; (F) no encroachments by any improvements located on adjoining property; (G) the location of adjoining streets and utilities and the distance and name of the nearest intersecting streets; and (H) such additional information which may be reasonably required by Administrative Agent and (ii) said survey shall be (A) dated no earlier than thirty (30) days prior to the Closing Date, (B) made (and certified to have been made) in compliance with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by the American Land Title Association and the

"**Single Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the Closing Date fulfills the requirements of Section 3.2 hereof.

"**SoHo**" shall mean 45 Park Place Partners LLC, a New York limited liability company.

"**Sole Member**" shall mean Park Place Development Secondary LLC, a Delaware limited liability company.

"**Spread**" shall mean (i) four hundred (400) basis points so long as no Event of Default exists and, (ii) five hundred (500) basis points at any time an Event of Default exists.

"**Strike Price Reserve Account**" shall mean an account under the sole dominion and control of Administrative Agent, for the purposes set forth in Section 6.5.

"**Subcontract**" shall mean any subcontract which is not a Major Subcontract.

"**Substantial Completion**" or "**Substantially Complete**" shall mean that all Construction, except minor punch list items, has been completed as determined by Administrative Agent, in consultation with Financiers' Consultant, in its reasonable discretion and temporary certificates of occupancy have been issued for all Residential and Storage Units.

"**Substantial Completion Date**" shall mean the Original Termination Date, subject to Unavoidable Delays.

"**Supplemental Profit**" shall mean the sums due to Financiers pursuant to Section 6.9 or as set forth in Article 7.

"**Supplier**" means Amro, Traderight or such other metals supplier as may be agreed upon by Obligor and Administrative Agent.

"**Survey**" shall mean (i) an ALTA plat of survey of the Project prepared and certified by a surveyor licensed in the State of New York and otherwise reasonably satisfactory to Administrative Agent (the "Survey"), in triplicate, showing, through the use of course bearings and distances, (A) all foundations of the Improvements, if any, in place; (B) the dimensions and locations of all easements and roads or rights of way and setback lines, if any, affecting the Project and that the same are unobstructed; (C) the dimensions, boundaries and square footage of the Improvements, if any; (D) that all foundations and other structures are within the lot lines and in compliance with any restrictions of record or ordinances relating to the location thereof; (E) the dimensions of all buildings and improvements, if any, and distance of such buildings and improvements from the lot lines; (F) no encroachments by any improvements located on adjoining property; (G) the location of adjoining streets and utilities and the distance and name of the nearest intersecting streets; and (H) such additional information which may be reasonably required by Administrative Agent and (ii) said survey shall be (A) dated no earlier than thirty (30) days prior to the Closing Date, (B) made (and certified to have been made) in compliance with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by the American Land Title Association and the

American Congress on Surveying and Mapping in 2011, and includes the items set forth in Table A thereof, except as otherwise approved by Administrative Agent, (C) bear a proper certificate by the surveyor in favor of Administrative Agent and Title Company, (D) include a metes and bounds legal description, (E) include a statement indicating whether or not the Project is located within a flood plain or flood hazard area, and (F) shall otherwise be acceptable to Administrative Agent in its reasonable discretion; or a survey in the form delivered to Administrative Agent at the time of Closing.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" shall mean the sooner of the third anniversary of the Closing Date or the termination date pursuant to the Mezzanine Facility if a Mezzanine Termination Event occurs, unless extended pursuant to the terms hereof, on which date all sums due and payable under the Notes and other Facility Documents, if not sooner paid pursuant to the terms hereof, shall be due and payable in full.

"**Transaction**" shall mean each purchase of Metals by Administrative Agent at the request of Obligor and the subsequent sale of said Metals by Administrative Agent to Obligor.

"**Transaction Confirmation**" shall have the meaning specified in Section 4.3.

"**Transaction Date**" shall mean, in relation to any Transaction, the date on which Obligor and Administrative Agent exchange a Purchase Offer and Purchase Acceptance in accordance with Sections 4.5 and 4.6.

"**Transaction Request**" shall mean each of the packages submitted to Administrative Agent by Obligor, containing all of the documents required by this Agreement, requesting an Increase Transaction under the Building Facility and/or the Project Facility.

"**Title Company**" shall mean First Nationwide Title Insurance and Kensington Vanguard National Land Services each as agent for Stewart Title Guaranty Company.

"**Title Policies**" shall mean the collective reference to the Building Facility Title Policy and the Project Facility Title Policy.

"**Trading 1**" shall mean AMBRO Limited.

"**Trading 2**" shall mean Traderight (Bermuda) Limited.

"**Transfer**" shall have the meaning given such term in Section 15.2.

"**U.S. Obligor**" means any Obligor that is a U.S. Person.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 6.9(a)(v)(B)(ll)(3).

"**Unavoidable Delays**" shall mean any delay or delays in the Construction, not to exceed one hundred eighty days (180) in the aggregate (unless otherwise specifically provided for herein), if and so long as such delays are caused by (directly or indirectly) natural disaster, fire, earthquake, floods, explosion, actions of the elements, declared or undeclared war, riots, terrorist acts, mob violence, inability to procure or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes, lockouts not instituted by Obligor, actions of labor unions, condemnation, court orders, laws, rules, regulations or orders of governmental or military authorities or any other similar causes outside of Obligor's reasonable control, so long as (a) such cause is not within the reasonable control of Obligor, (b) Obligor gives notice of such delay to Administrative Agent or Financier's Consultant as is reasonable, (c) after giving effect to the consequences of such delay, the Facility shall remain In Balance, and the Budget Line Item for interest in the Budget shall remain sufficient at all times despite such delay, and (d) such excuses for delay shall not be based upon lack of or inability to procure monies necessary to fulfill Obligor's commitments and obligations under the Facility Documents.

"**Units**" shall mean, collectively, the Residential Units, the Retail Units, the Storage Units, together with any appurtenant, undivided interest in the common elements, including any rights of ownership or possession in or to any of the Units, to be created by the submission thereof to the applicable provisions of the Condominium Act in accordance with the Condominium Documents; and each of the foregoing Units, individually, a "**Unit**".

"**USPAP**" shall mean Uniform Standards of Professional Appraisal Practice.

"**Value Date**" shall mean the current months Profit Payment Date.

"**Withholding Agent**" means Obligor and the Administrative Agent.

"**ZLDA**" shall mean that certain Zoning Lot Development Agreement contemplated to be entered into by the Obligor.

"**Zoning Agreements**" shall mean the ZLDA.

2.2   Other Definitional Provisions.   All of the Exhibits attached to this Agreement are incorporated in and made a part of this Agreement, but in the event of any conflict or inconsistency between the provisions of this Agreement and the Exhibits, the provisions of this Agreement shall control. As used in this Agreement: (a) the word "including" is not limiting, (b) references to a law include any rule or regulation issued under the law and any amendment to the law, rule or regulation, (c) whenever the words "include", "includes", or "including" appear, they shall be deemed to be followed by the words "without limitation", (d) personal pronouns shall be deemed to include the other genders and the singular to include the plural, and (e) all Article and Section references shall, unless otherwise expressly stated, be deemed references to the Articles and Sections of this Agreement. Wherever a period of time is stated in this Agreement as commencing or ending on specified dates, unless otherwise specified, such period of time shall be deemed (i) inclusive of such stated commencement and ending

23

dates, and (ii) to commence at 12:00 A.M. Eastern Time on such stated commencement date and to end at 11:59 P.M. Eastern Time on such stated ending date. The captions used in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement nor the intent of any provision hereof.

## ARTICLE 3
## OBLIGOR'S REPRESENTATIONS AND WARRANTIES

3.1    Representations and Warranties.  To induce each of Administrative Agent and Financiers to execute this Agreement and perform its obligations hereunder, Obligor hereby represents and warrants as of the First Transaction Date:

(a)    Obligor has good and marketable fee simple title to the Project, subject only to the Permitted Exceptions.

(b)    No litigation or proceedings are pending, or to the best of Obligor's knowledge threatened, against Obligor, Sole Member or Guarantors which could reasonably be expected to cause a Material Adverse Change nor are there pending or, to the best of Obligor's knowledge threatened proceedings or actions to revoke, attack, or challenge the validity of, rescind, or modify the zoning of the Project or any part thereof, or any certificate of occupancy or building or other permits heretofore issued with respect thereto asserting that such zoning or permits do not permit the Construction or the Improvements.

(c)    This Agreement and all of the other Facility Documents (to the extent such Facility Documents are executed and delivered by the parties thereto as of the Closing Date) each have been duly authorized, executed and delivered and constitute the legal, valid and binding obligations of Obligor and Guarantors, as the case may be, and are enforceable in accordance with their respective terms subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity and Applicable Law.

(d)    Obligor is a duly organized and validly existing limited liability company and is authorized to transact business in the State of New York and has full power and authority to execute and deliver all Facility Documents to which Obligor is a party, perform all obligations thereunder and such execution, delivery and performance have been duly authorized by all requisite action on the part of Obligor.

(e)    Sole Member is a duly organized and validly existing limited liability company and has full power and authority to execute and deliver all Facility Documents to which Sole Member is a party, perform all obligations thereunder and such execution, delivery and performance have been duly authorized by all requisite corporate action on the part of Sole Member.

(f)    No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental Person, including any creditor, partner, member or Affiliate of Obligor, is required in connection with the execution, delivery and performance of this Agreement or any of the Building Facility Documents, other than the recordation of this Agreement, the Facility Mortgage, the Section 22

24

Lien Law Affidavit, any assignments of leases and rents, any notice of lending and UCC-1 financing statements.

      (g)    No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental Person, including any creditor, partner, member or Affiliate of Guarantors, is required in connection with the execution, delivery or performance of any of the Facility Documents to which it is party other than those which have been obtained prior to the Closing Date.

      (h)    The execution, delivery and performance of this Agreement, the execution and payment of the Building Facility Note and the granting of the Building Facility Mortgage and other security interests under the other Facility Documents have not constituted and will not constitute, upon the giving of notice or lapse of time or both, (i) a breach or default under any other agreement to which Obligor or any Guarantor is a party, is bound to or affected by, or (ii) a violation of any law or court order which affects the Project, any part thereof, any interest therein, or the use thereof or.

      (i)    No condemnation of any portion of the Project by, relocation of any roadways abutting the Project, nor proceeding to deny access to the Project from any point or planned point of access to the Project, has commenced or, to the best of Obligor's knowledge, is contemplated by any Governmental Authority or any other Person.

      (j)    The amounts set forth in the Budget present a full and complete itemization by category of all costs, expenses and fees which Obligor expects to pay or incur or anticipates becoming obligated to pay or incur to achieve Construction Completion. Obligor is unaware of any other costs, expenses or fees which are not covered by the Budget. Each Budget Line Item included in the Building Facility Budget is included within the definition of Costs of Improvements and the Section 22 Lien Law Affidavit is in full compliance with the Lien Law.

      (k)    To the best of Obligor's knowledge neither the Construction nor the use of the Project will violate (i) any Applicable Laws (including the subdivision, zoning, building, environmental protection and the Americans With Disabilities Act), or (ii) any building permits, restrictions of record, or agreements affecting the Project or any part thereof.

      (l)    All consents, licenses and permits and all other authorizations or approvals (collectively, **"Governmental Approvals"**) required to complete the Project in substantial accordance with the Plans and Specifications have been obtained and paid for or will be obtained and paid for during the course of Construction of the Project.

      (m)    Upon Substantial Completion the Project will have adequate water, gas and electrical supply, storm and sanitary sewerage facilities necessary to service the Improvements as well as other required public utilities, fire and police protection, and means of access between the Project and public streets or highways; none of the foregoing will be foreseeably delayed or impeded by virtue of any requirements under any Applicable Law; and upon completion of the Improvements, to the best of Obligor's knowledge, all of the foregoing will comply with all Applicable Law, including applicable environmental protection and control Laws.

25

(n)    No brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Facility to be disbursed hereunder. Obligor represents that it has not retained any broker, finder or similar entity in connection with this transaction and shall indemnify and hold Financiers and Administrative Agent harmless against all claims, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) arising in relation to any such claim by a broker, finder or similar person that has dealt with Obligor with respect to the Facility.

(o)    All financial statements and other information previously furnished by Obligor, or its Affiliates to Administrative Agent or Financiers in connection with the Facility are true, complete and correct in all material respects and fairly present the financial conditions of the subjects thereof as of the respective dates. No Material Adverse Change has occurred since the furnishing of such statements and information or since the Closing Date or the date of the last Increase Transaction. Neither Obligor, Sole Member nor Guarantors has any liability, contingent or otherwise, not disclosed in such financial statements. Guarantors are in compliance with the Financial Covenants.

(p)    Except as disclosed in the Environmental Report and to the best of Obligor's knowledge, (i) the Project is free of all Hazardous Materials; (ii) neither Obligor nor any other Person, has ever caused or permitted any Hazardous Materials to be placed, held, located or disposed of on, under, at or in a manner to affect the Project, or any part thereof, and the Project has never been used (whether by Obligor or by any other person or entity) for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Materials, in any case, in violation of any Applicable Law; (iii) neither the Project nor Obligor is subject to any existing, pending, or threatened investigation or inquiry by any Governmental Authority relating to Hazardous Materials located on or about the Project, and the Project is not subject to any remedial obligations under any Applicable Law pertaining to health or the environment; (iv) there are not now, nor have there ever been, any underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Materials of any sort on or affecting the Project; (v) there are no pending environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Project (collectively, "**Environmental Proceedings**"); and (vi) there are no threatened Environmental Proceedings or any facts or circumstances which are reasonably likely to give rise to any future Environmental Proceedings.

(q)    There is no Asbestos within the Project.

(r)    For all purposes contemplated by the Facility Documents and the Condominium Documents, the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel or parcels, without regard to any other property.

(s)    Obligor and its agents have not entered into any leases or other arrangements for occupancy of space within the Project.

(t)    To the best of Obligor's knowledge, when the Improvements are completed in accordance with the Plans and Specifications, no building or other improvement will encroach upon any building line, setback line, side yard line or any recorded or visible

easement (or other easement of which Obligor is aware or has reason to believe may exist) with respect to the Project in violation of any applicable agreements, including but not limited to the Zoning Agreements.

(u)     The Facility is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U or a "margin security" with the meaning of Regulation T issued by the Board of Governors of the Federal Reserve System, and Obligor agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(v)     Neither Obligor nor any ERISA Affiliate of Obligor sponsors, is obligated to contribute to, or is itself an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Obligor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101 as modified by Section 3(42) of ERISA. In addition, (a) Obligor is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and (b) transactions by or with Obligor are not subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement including, but not limited to, the exercise by Administrative Agent on behalf of Financiers of any of its rights under the Facility Documents.

(w)     To the best of Obligor's knowledge, there exists no condition which, given notice or the passage of time or both, would constitute an Event of Default.

(x)     Obligor will use the Facility proceeds in accordance with the Budget to, among other things, construct and complete the Project.

(y)     Except for the Facility Documents, Obligor has not made any contract or arrangement of any kind, the performance of which by the other party thereto would give rise to a lien on the Project or any portion thereof, except for its agreements with any General Contractor, Design Professionals, engineer and other contractors and their agreements with various contractors, subcontractors and material suppliers, all of which have been disclosed in writing to Administrative Agent or are set forth in the Budget. There are no service contracts relating to the Project or the operation thereof between Obligor and third parties other than as disclosed to Administrative Agent. No Design Professionals have been engaged by Obligor to provide material services relating to the Improvements, except for the Design Professionals listed on Exhibit E attached hereto.

(z)     Obligor is not a "foreign person" within the meaning of Section 1445 or 7701 of the Internal Revenue Code.

(aa)    Obligor uses no trade name other than its actual name set forth herein. The principal place of business of Obligor is as stated in the Preamble hereof.

(bb)    All statements set forth in the Recitals are true and correct in all material respects.

27

(cc)   To the best of Obligor's knowledge, the information provided by Obligor to Administrative Agent concerning the Project, Obligor, Sole Member, Sales Agency Agreement and the Condominium Documents do not include an untrue statement of a material fact or omit to state any material fact which is necessary to make the statements contained therein (in the light of the circumstances under which they were made) not misleading in a material respect.

(dd)   To the extent delivered to Administrative Agent, the Condominium Documents provided to Administrative Agent are true and complete copies thereof.

(ee)   All of the Facility Documents executed by or on behalf of Obligor, Sole Member and Guarantors, as the case may be, have been duly authorized, executed and delivered.

(ff)   To the best of Obligor's knowledge when duly recorded or filed in the appropriate public records, the Building Facility Mortgages and the Uniform Commercial Code financing statements shall each create in favor of Administrative Agent, for the benefit of Financiers, a valid and perfected lien upon and security interest in the property enumerated therein, for the benefit of Financiers, and no further action will be required to perfect any such lien or security interest.

(gg)   Each of Obligor and Sole Member is, and at all times during the term of the Facility shall remain, a Single Purpose Entity.

(hh)   No Affiliate of Obligor is a "Public Utility Holding Company" as defined in The Public Utility Holding Company Act of 1935, as amended.

(ii)   Obligor is the owner of all personal property, machinery and equipment located at the Project, free and clear of all chattel mortgages, conditional vendor's liens and other liens, encumbrances and security interests other than as may be permitted under the Facility Documents.

(jj)   Neither Obligor, nor any of its officers, directors, shareholders, partners, members or Affiliates, and no other direct or indirect holder of any equity interest in Obligor is or will be an entity or person: (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("**EO13224**"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("**OFAC**") most current list of "Specially Designated Nationals and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/t11sdn.pdf); (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224; or (iv) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) through (iv) above are herein referred to as a **"Prohibited Person"**). Obligor covenants and agrees that Obligor will not: (x) conduct any business, or engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (y) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of

28

evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224. On request by Administrative Agent from time to time, Obligor further covenants and agrees to promptly deliver to Administrative Agent any such certification or other evidence as may be requested by Administrative Agent in its sole and absolute discretion, confirming that no violation of this Section shall have occurred. To Obligor's knowledge, no tenant at the Project currently is identified on the OFAC list referred to above or otherwise qualifies as a Prohibited Person, and no tenant at the Project is owned or Controlled by a Prohibited Person. Obligor shall cause any Project Manager to implement commercially reasonable procedures to protect against any Prohibited Person's being or controlling any tenant at the Project.

(kk)    To the best of Obligor's knowledge, neither Obligor, nor any of its officers or directors, and no other direct or indirect holder of any equity interest in Obligor is under investigation by any Governmental Authority.

(ll)    Obligor shall not exercise any right to terminate any Sale Contract without the prior written consent of Administrative Agent unless Contract Vendee is in default thereunder.

(mm)    Obligor is not subject to and shall not make any filing to register the Condominium Documents and the sales of the Units under the Interstate Land Sales Act.

(nn)    Obligor has reviewed and is familiar with all opinions of legal counsel to be delivered in connection with the Facility. None of the assumptions set forth in such opinions is incorrect in any material respect, provided that this representation does not pertain to any assumption regarding Administrative Agent or any Financier.

(oo)    Obligor shall not cause or suffer any of the assumptions set forth in any opinions of their legal counsel delivered in connection with the Facility to be incorrect in any material respect, except that this covenant shall not (i) require future solvency or future adequacy of capital as to any party, (ii) apply to any assumption regarding Administrative Agent or Financiers, or (iii) prohibit any transfer of any interest in any Obligor if the same otherwise is permitted hereunder, and if the same would not render the Non-Consolidation Opinion inaccurate or inapplicable.

(pp)    Guarantors are in compliance with the Financial Covenants.

(qq)    Obligor, at the time of the execution of each of the Zoning Agreements, was duly organized, validly existing, authorized to transact business in the State of New York, had full power and authority to execute and deliver the Zoning Agreements, and has performed all obligations thereunder and such execution, delivery and performance have been duly authorized by all requisite action on the part of each party thereto.

(rr)    Obligor is and will remain in compliance with all terms, covenants and conditions of the Zoning Agreements.

(ss)    Pursuant applicable zoning regulations and the Zoning Agreements, Obligor shall be entitled to construct no less than 106,200 square feet of saleable floor area.

29

(tt)    Without, in each case, the prior written consent of Administrative Agent, in its sole and absolute discretion, (i) Obligor shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Real Property or the Improvements; or (ii) if, under applicable zoning provisions, the use of all or any part of the Real Property or the Improvements is or becomes a nonconforming use Obligor shall not cause or permit such use to be discontinued or abandoned.

(uu)    Obligor shall not enter into any contract for the sale of any Units that don't conform to the requirements of a Sale Contract.

(vv)    The Facility provided shall be utilized for a purpose which is not in contravention of Shariah principles.

(ww)    Obligor shall not make or permit changes to that certain lease dated July 19, 1972, between Consolidated Edison Company of New York, Inc., as landlord, and 49 Park Associates, Inc., as tenant (as same may have been amended, modified or assigned).

(xx)    The beneficial interest holders (and their respective interests) in each of Park Place Partners Development LLC and Obligor are substantially the same in each case.

(yy)    Obligor shall diligently proceed with (or, following release of the Tax Lot 9 and conveyance thereof to Park 51 Inc., cause the Museum Owner (as defined in the Zoning Agreement) to proceed with) construction of the Plaza. In all events, the Plaza shall be substantially completed, and a determination of substantial completion obtained from the Department of City Planning, by September 29, 2018, provided, however that if the Mezzanine Facility Termination Date is extended, such substantial completion date of the Plaza shall be December 31, 2018 (the "**Plaza Outside Date**"). In the event Obligor or Museum Owner fails to diligently pursue the substantial completion of the Plaza, and the Museum Owner fails to diligently pursue construction of the Museum Building (as defined in the Zoning Agreement) in each case so as to substantially complete the Plaza and obtain a determination of substantial completion from the Department of City Planning by Plaza Outside Date, Residential Mortgagee (as defined in the Zoning Agreement) shall have the right, upon not less than fifteen (15) days prior written notice to Obligor and Museum Owner, (i) to make application to the City Planning Commission and the Department of Buildings for such modifications to the plans required to complete construction of the Plaza, e.g., by reflecting the construction of a decorative fence in accordance with Zoning Resolution Section 37-712 in lieu of the Museum Building and such other changes as may be required by such agencies in connection with completion of the Plaza by Residential Owner (as defined in the Zoning Agreement) and/or Residential Mortgagee, and (ii) to complete the construction of the Plaza pursuant to and in accordance with the approved plans (as so modified) in order to receive the temporary certificate of occupancy for the entire Residential Building (as defined in the Zoning Agreement), including the units utilizing the floor area generated from the provision of such Plaza. In furtherance of the foregoing, Obligor hereby grants to Residential Mortgagee a power of attorney to make such applications in its own name and the right and authority to enter onto the Project (and the right and authority to enter onto the Tax Lot 9 as and to the extent Obligor is permitted to do so under the Zoning Agreement) to

complete the construction of the Plaza. Obligor shall reimburse to Residential Mortgagee all costs incurred by Residential Mortgagee in connection with the foregoing.

3.2    Single Purpose Representations and Warranties. Obligor hereby represents, warrants and covenants as of the Closing Date, and also until such time as all Obligations are paid in full, that absent express advance written waiver from Administrative Agent, which may be withheld in Administrative Agent's sole discretion, such Obligor;

(a)    was organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Project, entering into this Agreement with Administrative Agent, refinancing the Project in connection with a permitted repayment of the Facility, and transacting all lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(b)    has not owned, does not own and will not own any assets other than those related to the Project;

(c)    has not engaged, is not engaged and will not engage in any business, directly or indirectly, other than as set forth in Section 3.2(a) disposition and operation of the Project;

(d)    if such entity is a limited liability company with only one member, is a limited liability company organized in the State of Delaware that has (i) at least one Independent Manager and (ii) at least one springing member that will become the non-managing member of such entity upon the dissolution of the existing non-managing member;

(e)    has not entered into, and will not enter into any contract or agreement with any partner, member, shareholder, trustee, beneficiary, principal or Affiliate of Obligor except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than such Affiliate;

(f)    except as may be permitted under the Facility Documents, has not voluntarily incurred and will not voluntarily incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the Obligations, and (ii) trade payables or accrued expenses incurred in the ordinary course of the Construction or operation of the Project;

(g)    except as may be permitted under the Facility Documents, has not made and will not make any loan or distribution of assets to any of its Affiliates;

(h)    at all times has been solvent and has paid its own liabilities and obligations of any kind from its own separate assets, and is and reasonably expects to remain solvent and pay its own liabilities and obligations of any kind from its own separate assets as the same shall become due, provided, however, under no circumstances shall this provision be deemed to require Sole Member or any direct or indirect holder of the interests in Sole Member to contribute capital;

31

(i)     has done or caused to be done and will do all things necessary to preserve its existence;

(j)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(k)     has not pledged and will not pledge its assets for the benefit of any other Person other than in connection with the Facility;

(l)     will at all times have provisions in its organizational documents imposing on it substantially the same requirements as are specified in this Section 3.2, and will not, nor will any partner, member, shareholder, trustee, beneficiary, or principal amend, modify or otherwise change any provision of such party's organizational documents which pertains to the subject matter of this definition;

(m)     has maintained its existence and has been qualified to do business in all states necessary to carry on its business, and shall continuously maintain its existence and be qualified to do business in all states necessary to carry on its business, specifically including in the case of Obligor, the state where the Project is located;

(n)     has conducted and operated, and will conduct and operate its business as presently conducted and operated, subject to the terms of the Facility Documents and adequacy of cash flow;

(o)     has maintained and will maintain books and records and bank accounts separate from those of its partners, members, shareholders, trustees, beneficiaries, principals, Affiliates, and any other Person provided that Obligor may use consolidated financial statements to the extent (1) part of a consolidated group filing a consolidated return or returns or (2) treated as a disregarded entity for tax purposes; provided, that if Obligor's financial statements are consolidated with another entity in accordance with law, such financial statements shall contain appropriate footnotes that distinguish the assets and liabilities of each entity and provide that the assets for one entity shall not be used to satisfy the liabilities of another entity;

(p)     has been and will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any of its partners, members, shareholders, trustees, beneficiaries, principals and Affiliates, and any Affiliates of any of the same), and not as a department or division of any Person;

(q)     has not failed and will not fail to correct any known misunderstanding regarding its separate identity;

(r)     has conducted and will conduct its business in its own name;

(s)     has allocated and will allocate fairly and reasonably any overhead for any shared office space;

(t)     has used and will at all times use separate stationery, invoices, and checks;

32

(u)    has filed and will file its own tax returns to the extent required by law to do so provided, that if such tax returns are consolidated with another entity in accordance with law, such tax return shall contain appropriate footnotes that distinguish the assets and liabilities of each entity and provide that the assets for one entity shall not be used to satisfy the liabilities of another entity;

(v)    has and reasonably expects to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations, provided, however, under no circumstances shall this provision be deemed to require Sole Member or any direct or indirect holder of the interests in Sole Member to contribute capital;

(w)    has not sought, acquiesced in, or suffered or permitted, and, to the fullest extent permitted by Applicable Law, will not seek, acquiesce in, or suffer or permit its liquidation, dissolution or winding up, in whole or in part;

(x)    has not entered into and will not enter into any transaction of merger or consolidation, and has not acquired and will not acquire by purchase or otherwise all or substantially all of the business or assets of, or any stock or beneficial ownership of, any Person;

(y)    the articles of organization, a certificate of formation and/or an operating agreement, as applicable, provide that such entity will not: dissolve, merge, liquidate, consolidate; sell all or substantially all of its assets or the assets of Obligor (as applicable); engage in any other business activity, or amend its organizational documents with respect to the matters set forth in this definition without the consent of Administrative Agent;

(z)    has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(aa)    has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations and has paid and shall pay the salaries of its employees (if any) solely from its own funds, provided, however, under no circumstances shall this provision be deemed to require Sole Member or any direct or indirect holder of the interests in Sole Member to contribute capital;

(bb)    has not commingled or permitted to be commingled, and will not commingle or permit to be commingled its funds or other assets with those of any other Person;

(cc)    has not maintained and will not maintain its assets in such a manner that would be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(dd)    except as expressly provided for in the Facility Documents, has not guaranteed or otherwise become liable on or in connection with any obligation of any other Person, and does not and will not hold itself out to be responsible for the debts or obligations of any other Person;

33

(ee)    does not and will not have any of its obligations guaranteed by any Affiliate except in connection with the Facility;

(ff)    has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Facility and will not constitute a claim against it in the event that cash flow is insufficient to pay the Obligation;

(gg)    has not possessed or assigned and will not possess or assign the Real Property for other than a Obligor's business purpose;

(hh)    has complied and will comply with all of the terms and provisions contained in its organizational documents and the statement of facts contained in its organizational documents are true and correct and will remain true and correct;

(ii)    has not held and shall not hold title to its assets other than in its name;

(jj)    shall comply with all of the factual assumptions and certifications, regarding or made by it contained in or appended to the Non-Consolidation Opinion;

(kk)    shall not, without the affirmative vote of its Independent Manager, institute proceedings to be adjudicated bankrupt or insolvent; consent to the institution of a bankruptcy or insolvency proceedings against it, file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy, consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) for itself or a substantial part of its property or with respect to any other entity in which it has a direct or indirect legal or beneficial ownership interest; make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due;

(ll)    shall not, without the affirmative vote of its Independent Manager: (i) liquidate or dissolve, in whole or in part; or (ii) consolidate, merge or enter into any form of consolidation with or into any other Person, nor convey, transfer or lease its assets substantially as an entirety to any Person nor permit any Person to consolidate, merge or enter into any form of consolidation with or into itself, nor convey, transfer or lease its assets substantially as an entirety to any Person; and

(mm)   shall at all times maintain at least one Independent Manager.

### 3.3    Condominium Regime Covenants and Warranties.

(a)    None of Obligor or its designees on the board of directors of the condominium association (the **"Board"**) established or to be established under any Condominium Documents shall consent to any material amendment, modification or supplement to or termination of any Condominium Documents without the prior written reasonable consent of Administrative Agent.

34

(b)     Obligor will comply in all material respects with all of the terms, covenants and conditions on Obligor's part to be complied with pursuant to any Condominium Documents and any rules and regulations that may be adopted pursuant thereto, as the same shall be in force and effect from time to time. Without limiting the foregoing, Obligor shall promptly pay all operating expenses (including common charges) when the same become due and payable with respect to the Units for which title is held by Obligor. Obligor shall promptly notify Administrative Agent of the imposition of any special assessments levied or assessed under the Condominium Documents. Obligor shall furnish to Administrative Agent such information and such other evidence as Administrative Agent may reasonably request from time to time concerning Obligor's due observance, performance and compliance with the terms, covenants and provisions of the Condominium Documents, including, without limitation, evidence that such common charges and special assessments have been so paid or are not then delinquent with respect to the Units for which title is held by Obligor.

(c)     From and after the time that the Project is subject to the Condominium Act, Obligor shall take all actions as may be necessary from time to time to preserve and maintain the Project in accordance with the securities and condominium laws of the State of New York and the rules and regulations pertaining thereto.

(d)     Obligor shall, following submission of the Project to the Condominium Act, notify the Board of the Condominium that Administrative Agent is a "permitted mortgagee" under the Condominium Documents.

(e)     Obligor shall promptly pay as and when due, all amounts payable by Obligor pursuant to the Condominium Documents including all condominium charges thereunder.

(f)     From and after the time that the Project is subject to the Condominium Act, Obligor shall not, without the prior written consent of Administrative Agent, not to be unreasonably withheld, take (and hereby assigns to Administrative Agent any right it may have to take) any action to terminate any condominium property regime of all or any portion of the Project, withdraw all or any portion of the Project from the condominium laws of the State of New York and the rules and regulations pertaining thereto, or cause a partition of any portion of the Project.

(g)     Subject to the threshold amounts set forth in Article 14 hereof, Obligor shall not, without the prior written consent of Administrative Agent, not to be unreasonably withheld, exercise any right it may have to vote for (i) the expenditure of Proceeds for the restoration of all or any portion of the Project, (ii) any additions or improvements to the common elements of the Condominium, except to the extent such additions or improvements are required by law or are contemplated under the Facility Documents, in which case, Obligor agrees that if reasonably required by Administrative Agent, Obligor shall establish a reserve with Administrative Agent for the costs and expenses associated with completing such additions and improvements in amounts reasonably determined by Administrative Agent, or (iii) any borrowing on behalf of any master association, if any, or any condominium association established under any Condominium Documents.

35

(h)     To the extent in Obligor's control pursuant to the Condominium Documents, Obligor shall seek Administrative Agent's review and obtain Administrative Agent's prior written approval, such approval not to be unreasonably withheld, of Obligor's agreement (as evidenced by the actions of Obligor's designees on any Board or by any vote of Obligor in its capacity as the developer of the Project or as a Unit owner) to any engagement of or change of managing agent and any material amendment to the Management Agreement for the operation of the Project or any part thereof, as well as the original and any revision of any operating and/or capital budgets. Administrative Agent shall have the right to receive notice of and attend all meetings of any Board.

(i)     Other than a superintendent's Unit, as provided for in the Condominium Documents, Obligor shall not, without the prior written consent of Administrative Agent, not to be unreasonably withheld, convey any portion of the Project to any owners association or any condominium association.

(j)     Obligor hereby covenants and agrees to comply in all material respects with the Condominium Act. In addition, Obligor hereby assigns to Administrative Agent all of Obligor's right, title and interest in and to all reserves created and established pursuant to the Condominium Act and the Condominium Documents to the extent permitted by Applicable Law.

(k)     Obligor shall take (and cause to be taken) all such actions and shall do (and cause to be done) all such things as are necessary under the Condominium Documents from time to time to cause Administrative Agent to have all rights afforded to Obligor under the Condominium Documents.

3.4     Survival of Representations and Warranties. Obligor agrees that all of the representations and warranties set forth in Section 3.1 and elsewhere in this Agreement will be true and correct in all material respects on the First Transaction Date and, except as set forth in Section 3.5 and for matters which have been disclosed in writing and approved by Administrative Agent in its reasonable discretion, shall be true and correct in all material respects, at all times thereafter. It shall be a condition precedent to the Facility Opening Date and each subsequent Increase Transaction that each of said representations and warranties is true and correct in all material respects as of the date of such requested Increase Transaction, except as set forth in Section 3.5 and for matters which have been disclosed in writing and approved by Administrative Agent in its discretion. Each Transaction Request shall constitute a reaffirmation of such representations and warranties, as deemed modified in accordance with the disclosures made and approved as aforesaid, as of the date of such request. Obligor shall promptly notify Administrative Agent if any representation or warranty set forth in Section 3.1 or elsewhere in this Agreement becomes untrue in any material respect for any reason.

3.5     Remaking of Representations. Notwithstanding the foregoing, to the extent any representation made by Obligor in this Agreement are remade at the time of a Transaction Request, if at the time of such remaking the representation is no longer true by virtue of an act or omission of Obligor which act or omission is otherwise permitted by the terms of this Agreement, then a change of fact due to such act or omission shall not be deemed to be a misrepresentation or breach of warranty hereunder.

36

3.6    Facility to Value Covenant.

(a)    Notwithstanding anything in this Agreement or the Facility Documents to the contrary, Obligor covenants that it shall at all times maintain a Facility to Value Ratio equal to or below the FTV Threshold, *provided, however,* if the Facility to Value Ratio shall fail at any time to be equal to or below the FTV Threshold, Obligor shall, within twenty (20) Business Days' notice from Administrative Agent, provide (i) additional collateral and/or support for the Facility in the form of cash or cash equivalents as otherwise is reasonably agreed to by Required Financiers ("**Additional Security**"), or (ii) prepay, without any fee other than LIBOR Breakage, if any, a portion of the outstanding principal balance of the Facility in an amount that would reduce the Facility To Value Ratio to a level equal to or below the FTV Threshold (an "**FTV Payment**"). Additional Security, to the extent same is cash or cash equivalents shall be deposited into the Additional Security Account and such account shall be a Reserve Account hereunder for the purposes of further securing the debt.

(b)    No sooner than six (6) months after the date upon which Obligor posted Additional Security, Obligor shall have the right to have Administrative Agent obtain a new Appraisal at Obligor's expense. If the Facility to Value Ratio is equal to or below the FTV Threshold, as reasonably determined by Administrative Agent based upon said Appraisal, so long as no Event of Default has occurred and is continuing, Administrative Agent shall return so much of the Additional Security to Obligor as soon as is reasonably practical, so as to increase the Facility to Value Ratio to the FTV Threshold; *provided, however,* return of the Additional Security to Obligor shall not serve as a waiver of the covenant set forth in Section 3.6(a) above with respect to any future dates.

3.7    Obligor's Agreements With Respect to Sale of Units.

(a)    On each Sales Milestones Testing Date, Administrative Agent shall determine whether Obligor has satisfied the applicable Sales Milestone. In the event that Obligor fails to achieve the applicable Sales Milestone, Obligor shall, within ninety (90) days of the notice of such failure from Administrative Agent, provide to Administrative Agent the applicable Sales Milestone Letter of Credit.

(b)    All Units shall be Closed in accordance with a Sale Contract or an Option Agreement and all deposits made by Contract Vendees shall be deposited into an escrow account with Condominium Escrow Agent.

(c)    Other than customary negotiated changes which are not in contravention of the terms of this Agreement, Obligor shall not make any material changes in or material amendments to any approved form of Sale Contract or Option Agreement in a manner that would cause it to no longer meet the definition of Sale Contract or Option Agreement, as applicable, or terminate any Sale Contract or Option Agreement, without Administrative Agent's approval.

(d)    Obligor shall promptly notify Administrative Agent of all matters of which Obligor has received notice that a material default by Obligor under or noncompliance with any Sale Contract, Option Agreement or Condominium Document exists and Obligor shall

37

do all such acts and undertake all such steps and institute all such proceedings as shall be reasonably necessary to cure or avert such default or noncompliance if Obligor so elects in its reasonable business judgment and will promptly forward to Administrative Agent any notices Obligor receives in regard to any of the foregoing matters.

(e)    Any sale of a Unit shall (i) be in full compliance with all applicable Legal Requirements, including, without limitation, the Magnuson-Moss Warranty Act, the Federal Reserve Board Regulations "B" (Equal Credit Opportunity Act) and "Z" (Truth-in-Lending), and the Department of Housing and Urban Development Regulation "X" (RESPA), and any requirement for such Unit to have a permanent or temporary certificate of occupancy, (ii) not be considered the sale of a security under the Securities Act of 1933, and (iii) be in compliance with the applicable Condominium Documents.

(f)    Within five (5) days after each closing of the conveyance of a residential Unit, to the extent not already delivered to Administrative Agent, Obligor shall deliver to Administrative Agent a true and complete copy of the executed closing statement (certified to be true, correct and complete by Obligor) signed by Obligor and the purchaser in respect to such residential Unit sale.

(g)    Obligor shall not enter into any contract for the sale of any Units that do not conform to the requirements of a Sale Contract or Option Agreement.

(h)    Notwithstanding anything contained in this Section 3.7 relating to Sales Milestones, if, on the first anniversary of the First Transaction Date, there are fewer than five (5) Approved Sale Agreements pursuant to which a Closing has not occurred with respect to full-floor Units, Obligor shall convert any remaining unsold full-floor Units located on floors 24 through 28 into two (2) two-bedroom Units.

## ARTICLE 4
## REVOLVING PURCHASE FACILITY

4.1    Revolving Purchasing Facility and Appointment of Agents.

(a)    Subject to the terms and conditions hereof, and in reliance upon the representations and warranties set forth herein, Administrative Agent and Financiers agree to make available to Obligor the Facility which is a deferred payment revolving purchasing facility, from the First Transaction Date to the Termination Date, in an aggregate amount, calculated as the Aggregate Purchase Price at any one time outstanding, not to exceed the Maximum Facility Amount. At the request of Obligor, Administrative Agent shall purchase the Metals from supplier and shall on-sale of such Metals by Administrative Agent to Obligor, in each case subject to the terms and conditions hereof.

(b)    Administrative Agent has heretofore appointed Trading 1 and Malayan Banking Berhad, London Branch, as its agents to deal in its name, place and stead, for the limited purpose of performing such acts as may be reasonably required in order to enter into Transactions approved by and at the risk of Administrative Agent (including without limitation any transfer of funds from any accounts needed to implement any such Transaction), in each case

subject to such instructions and limitations relating thereto as Administrative Agent may provide from time to time. Subject to the limitations herein, (i) Administrative Agent authorized Trading 1 to enter into Transactions covered by this Agreement, including without limitation the purchase of Metals by Administrative Agent from Supplier and the sale of Metals by Administrative Agent to Obligor, in each case in Trading 1's own name as the agent and for the benefit of Administrative Agent, as the case may be, but for the account and at the sole risk of Administrative Agent, and (ii) Administrative Agent authorized Trading 1 (and without limiting Trading 1's obligations hereunder) to enter into Transactions covered by this Agreement through any agent, sub-agent, sub-contractor or representative (each, a "**Sub-Agent**") which may carry out all or part of the services to be provided by Trading 1 under this Agreement on such terms as it thinks fit, provided always that any such Sub-Agent shall be a subsidiary, associate or affiliate of Trading 1, provided, further that the appointment of any Sub-Agent shall not relieve Trading 1 of its obligation under this Agreement; provided, further, that the appointment of and performance by any such Sub-Agent shall be at the sole cost and expense of Trading 1 or such Sub-Agent.

　　　　4.2　　Purchase Requests.

　　　　　　　(a)　　Obligor may from time to time request that Administrative Agent undertake a Transaction by presenting to Administrative Agent prior to 11:00 A.M. (New York time) at least ten (10) Business Days prior to the proposed Value Date of the requested Transaction a written request for Administrative Agent's purchase of Metals (each a "**Purchase Request**") substantially in the form of Exhibit I. By copying Trading 2 on a Purchase Request, Obligor authorizes Trading 2 to execute the Purchase Offer (as defined below) related thereto, as agent of Obligor. Each Purchase Request shall include (i) an undertaking from the Obligor to purchase the Metals, (ii) a general description of the Metals to be purchased, (iii) the total price of the Metals to be paid by Administrative Agent to Supplier, (iv) the Value Date, which shall be at least ten (10) Business Days after the date of the Purchase Request, and (v) the Payment Date on which the Deferred Sale Price is to be paid by Obligor for each Transaction, which Payment Date (as such term is defined in the Purchase Request) shall be one month from the Value Date. Administrative Agent and Obligor agree that the Payment Date shall be a date occurring one month after the Value Date, as selected and specified by Obligor in each Purchase Request, and shall not occur after the Termination Date; _provided_, _however_, (A) if any Payment Date would occur on a day that is not a Business Day, such Payment Date shall be extended to the next succeeding Business Day.

　　　　　　　(b)　　Obligor hereby appoints Trading 2 as its agent to deal in its name, place and stead, for the limited purpose of performing such acts as may be reasonably required in order to enter into Transactions approved by and at the risk of Obligor (including without limitation any transfer of funds from any accounts needed to implement any such Transaction), in each case subject to such instructions and limitations relating thereto as Obligor may provide from time to time, which appointment shall be memorialized in a Letter of Agency, substantially in the form of Exhibit H hereto. For the purpose of the authority of Trading 2 to act as the agent of Obligor, a Transaction shall be approved by Obligor upon the issuance of the Purchase Request by Obligor with respect to such Transaction, a copy of which will be provided to Trading 2 in accordance with Section 4.2. Subject to the limitations herein, (i) Obligor authorizes Trading 2 to enter into Transactions covered by this Agreement, including without limitation the

sale of Metals by Administrative Agent to Obligor and the on-sale of Metals by Obligor to third parties, in each case in Trading 2's own name as the agent and for the benefit of Obligor, but for the account and at the sole risk of Obligor, and (ii) Obligor authorizes Trading 2 (and without limiting Trading 2's obligations hereunder) to enter into Transactions covered by this Agreement through any Sub-Agent, which may carry out all or part of the services to be provided by Trading 2 under this Agreement on such terms as it thinks fit, provided always that any such Sub-Agent shall be a subsidiary, associate or affiliate of Trading 2, provided, further, that the appointment of any such Sub-Agent shall not relieve Trading 2 of its obligation under this Agreement; provided, further, that the appointment of and performance by any Sub-Agent shall be at the sole cost and expense of Trading 2 or such Sub-Agent.

4.3    Purchase Confirmations. On the Value Date for a proposed Transaction, and subject to the satisfaction of the conditions specified in Section 4.2, Administrative Agent (or Trading 1 as agent of Administrative Agent), shall confirm Obligor's Purchase Request by executing and delivering to Obligor, a Purchase Confirmation in substantially the form of Exhibit J (the "**Purchase Confirmation**"; a signed Purchase Request and a signed Purchase Confirmation being referred to collectively as a "**Transaction Confirmation**"). In each Purchase Confirmation, Administrative Agent (or Trading 1 as agent of Administrative Agent) shall (i) confirm (A) the terms on which the Metals specified in the related Purchase Request have been purchased and (B) the on-sale of such Metals to Obligor, (ii) quote the unit price of the Metals paid by Administrative Agent, the quantity of such Metals and the total Purchase Price for the same, and (iii) state the Deferred Sale Price as computed by Administrative Agent to be paid by Obligor on the Payment Date. Administrative Agent shall not be obligated to issue a Purchase Confirmation for any proposed Transaction if, upon completion of such proposed Transaction, the Aggregate Purchase Price would exceed the Maximum Facility Amount.

4.4    Purchase of Metals. Before a Transaction Confirmation has been entered into by Obligor and Administrative Agent, Administrative Agent (or Trading 1 as agent of Administrative Agent) shall arrange for the purchase of Metals from Supplier on the Value Date and otherwise in accordance with the terms of such Transaction Confirmation and this Agreement. On the Value Date, Administrative Agent shall fund the entire Purchase Price of the Metals. Obligor acknowledges and agrees that the obligation of Administrative Agent to arrange for the purchase, and to purchase Metals in accordance with a Transaction Confirmation is subject to the satisfaction of all conditions precedent set forth herein for Administrative Agent's obligations to provide accommodations under this Facility.

4.5    Offer to Purchase Metals. On the same Business Day upon which it receives a Purchase Confirmation in accordance with Section 4.3, Obligor (or Trading 2 as agent of Obligor) covenants and agrees that it shall submit to Administrative Agent (or Trading 1 as agent of Administrative Agent) a notice, substantially in the form of Exhibit K (a "**Purchase Offer**") in which Obligor offers to purchase Metals from Administrative Agent on the terms specified in the Transaction Confirmation of which such Purchase Confirmation forms a part.

4.6    On-sale of Metals. On the Business Day on which Administrative Agent completes its purchase of Metals from Supplier, and after the completion of such purchase in accordance with Section 4.4, Administrative Agent covenants and agrees that it (or Trading 1 as agent of Administrative Agent) shall issue to Obligor a notice, substantially in the form of

40

Exhibit L (a "**Purchase Acceptance**") in which Administrative Agent accepts Obligor's offer to purchase the Metals as set forth in Obligor's Purchase Offer, subject to the satisfaction of all conditions precedent set forth herein for Administrative Agent's obligations to provide accommodations under this Facility. The Deferred Sale Price to be paid by Obligor for such Metals, and the Value Date and Payment Date specified in the Transaction Confirmation and Purchase Offer relating to the Purchase Acceptance, shall be confirmed by Administrative Agent(or by Trading 1 as agent of Administrative Agent) in such Purchase Acceptance, and Obligor hereby agrees to pay such Deferred Sale Price to Administrative Agent on such Payment Date.

       4.7     <u>Assignment of Warranties</u>. Administrative Agent hereby assigns to Obligor (to the extent permitted by applicable law) any and all warranties and indemnities of, and claims against, (i) Supplier that Administrative Agent may have in relation to any Metals purchased by Administrative Agent from Supplier and resold to Obligor hereunder, and (ii) any dealers, manufacturers, vendors, contractors or subcontractors in relation to such Metals, and Obligor hereby acknowledges and agrees to resolve all such claims related to any such warranties directly with such Supplier or applicable party. If Administrative Agent is legally or contractually prohibited from assigning any such warranty, indemnity or claim, Administrative Agent hereby grants to Obligor, to the extent permitted by applicable law, its entire beneficial interest in such warranty, indemnity or claim. In consideration of the foregoing assignment of warranties, indemnities and claims, Obligor hereby waives any claims it may have against Administrative Agent in relation to the quality or other condition of any Metals, and acknowledges and agrees that Administrative Agent shall not be deemed to have made any representation or warranty relating to the Metals, whether arising by implication, by common law or statute or otherwise.

       4.8     <u>Conditions Precedent</u>. Administrative Agent shall have no obligation to enter into or consummate any Transaction hereunder unless and until the following conditions precedent shall have been satisfied:

       (a)     Receipt of a Purchase Request complying with the requirements of Section 4.2.

       (b)     The representations and warranties of Obligor set forth herein (or incorporated herein by reference) shall be true and correct in all material respects on and as of each of the date of the relevant Purchase Request, the Transaction Date and the Value Date as though made on and as of such date (in each case except for those representations and warranties which expressly relate to an earlier date);

       (c)     No Default or Event of Default shall have occurred and be continuing on and as of each of the date of the relevant Purchase Request, the Transaction Date and the Value Date, nor shall either result from the Transaction entered into on such dates; and

       (d)     All conditions set forth in this Agreement with respect to such Transaction or other extension of credit shall have been satisfied.

## ARTICLE 5
## TERMS OF FACILITY AND DOCUMENTS

5.1     Agreement to Enter into Transactions.

(a)     Subject to the terms, provisions and conditions of this Agreement and the other Building Facility Documents, Obligor and Administrative Agent, on behalf of Financiers, agree to enter into Transactions for the purposes and subject to all of the terms, provisions and conditions contained in this Agreement. Each Financier severally (and not jointly and severally) agrees to fund its Percentage Interest of each Transaction under the Building Facility up to the amount of its Commitment. No Financier shall be obligated to fund any part of a Transaction which another Financier fails to fund.

(b)     Financiers agree, upon Obligor's compliance with and satisfaction of all conditions precedent to the opening of the Building Facility and provided (i) the Facility is In Balance, and (ii) no Event of Default has occurred and is continuing hereunder, to open the Building Facility in order to reimburse Obligor for a portion of the costs incurred by Obligor in connection with the development of the Project and the Construction, to the extent provided for in the Building Facility Budget.

(c)     Subsequent to the Closing Date, Obligor shall be entitled to enter into successive Transactions in accordance with Article 10, Article 11 and Article 12 within fifteen (15) Business Days after compliance with all conditions precedent thereto, provided that (i) the Facility remains In Balance; (ii) Obligor has complied with all conditions precedent to Transaction from time to time including the requirements of Article 10, Article 11 and Article 12; and (iii) no Event of Default has occurred and is continuing hereunder or under any other Facility Document. If at any time the Facility is not In Balance, Administrative Agent and Financiers shall not be required to make any disbursements from any Reserve Accounts or enter into any Increase Transaction under the Facility.

(d)     To the extent that Financiers or Administrative Agent may have acquiesced in Obligor's noncompliance with any requirements (construction or nonconstruction) precedent to any Increase Transaction such acquiescence shall not constitute a waiver by Financiers or Administrative Agent unless otherwise provided in writing by Administrative Agent, and Financiers or Administrative Agent may at any time after such acquiescence require Obligor to comply with all such requirements with respect to future Transaction Requests.

5.2     Facility Documents. Obligor agrees that it will, on or before the Closing Date, unless provided otherwise for, execute and deliver or cause to be executed and delivered to Administrative Agent for the benefit of Financiers the following Facility Documents in form, substance and execution acceptable to Administrative Agent:

(a)     Building Facility Note;

(b)     Building Facility Mortgage;

(c)     Performance and Completion Guaranty;

42

(d)   Environmental Indemnity Agreement;

(e)   Non-Recourse Carveout Guaranty;

(f)   Omnibus Forms Agreement;

(g)   An assignment of Obligor's right, title and interest in any cash collateral accounts as may be required by Administrative Agent under this Agreement or any other Building Facility Document, as may be amended, supplemented, restated or otherwise modified from time to time, together with consents to such assignment required by Administrative Agent;

(h)   An assignment of Obligor's right, title and interest in all construction documents, including the General Contract, and all assignable permits, licenses, approvals and development rights, architectural and engineering documents, including all contracts with Design Professionals (including, without limitation, all architectural and engineering contracts), all Plans and Specifications and any studies, tests or design materials relating to the Project, performance bonds and letters of credit in favor of governmental entities with jurisdiction over the Project, all as the same as may be amended, supplemented, restated or otherwise modified from time to time, and in any miscellaneous contracts, including development, maintenance, development and/or construction management, leasing and service contracts, together with all consents of General Contractor, Design Professionals (including, without limitation, architects and engineers), leasing and service agents and any other persons required by Administrative Agent, and continuation agreements of all management and leasing agents required by Administrative Agent;

(i)   Obligor shall have duly executed and delivered, or caused to be duly executed and delivered, to Administrative Agent (A) conditional assignments of Obligor's or the declarant's (if the declarant under the applicable Condominium Documents is other than Obligor) rights under the Condominium Documents, (B) to the extent not expressly prohibited by any Legal Requirements, conditional resignations of the officers and members of the board of directors of the applicable condominium association to the extent who have been appointed or elected by Obligor or any Affiliate of Obligor, and (C) to the fullest extent permitted by Applicable Law, irrevocable proxies in form and substance acceptable to Administrative Agent, executed in blank, enabling Administrative Agent in its reasonable discretion after the occurrence and during the continuance of an Event of Default to exercise the votes held by Obligor in any condominium association relating to the Project;

(j)   Such UCC financing statements as Administrative Agent's (or Financier's) counsel determines are advisable or necessary to perfect or notify third parties of the security interests intended to be created by the Building Facility Documents;

(k)   A Consent and Agreement of Escrow Agent, executed by Condominium Escrow Agent in favor of Administrative Agent, pursuant to which Condominium Escrow Agent agrees to act in accordance with Administrative Agent's instructions with respect to disbursement of any funds being held by Condominium Escrow Agent under the Sale Contracts;

43

(l)     Such other papers, instructions, documents, instruments or certificates as Title Company may reasonably require for the issuance of the Title Policies and for construction payouts as provided herein;

(m)     Section 22 Lien Law Affidavit;

(n)     Notice of Lending pursuant to Section 73 of the Lien Law;

(o)     At such time as Obligor enters into an agreement with a Property Manager, a Consent and Agreement of Property Manager, executed by the Property Manager in favor of Administrative Agent;

(p)     All Facility Documents required to be delivered on the Closing Date in connection with the Project Facility;

(q)     Estoppel certificates with respect to the Zoning Agreements; and

(r)     Such other papers, instructions, documents, opinion, instruments or certificates as Administrative Agent (or Financiers) and its counsel may require, including such documents as Administrative Agent in its reasonable discretion deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the Facility Documents, and to comply with the laws of the State of New York.

5.3     Term of the Facility.

(a)     Subject to the provisions of Section 5.3(b) below, the term of the Facility shall expire on the Termination Date, at which time the unpaid Deferred Sale Price and all other sums due and payable under the Notes and the other Facility Documents, shall be paid in full.

(b)     At Obligor's option (the "**Extension Option**"), the Facility term may be extended (the "**Extension**") for two additional 6-month periods (each an "**Extension Period**"), provided that with respect to the first such Extension Period (the "**First Extension Period**"):

(i)     No Event of Default shall have occurred and be continuing as of the Original Termination Date;

(ii)     Administrative Agent shall have received from Obligor written Notice stating that Obligor thereby exercises its option to extend the Termination Date (the "**Extension Notice**") and the Extension Notice shall have been received by Administrative Agent at least thirty (30) days but no more than ninety (90) days prior to the Original Termination Date (such date of receipt the "**Extension Determination Date**");

(iii)     Prior to the effectiveness of the exercise of the Extension Option, and in any event, prior to the Original Termination Date, Obligor shall have provided a Profit Rate Protection Agreement covering the First Extension Period, in a notional amount equal to the sum of (a) the outstanding amount of the Facility as of the effective date of the extension

44

(the "**Extension Effective Date**") plus (b) the unfunded amounts of the Facility, and otherwise conforming to the requirements set forth in Section 6.5 hereof;

(iv)     The applicable Sales Milestone has been met or the applicable Sales Milestone Letter of Credit has been delivered to Administrative Agent;

(v)     Substantial Completion of the Project shall have been achieved; and

(vi)     The Mezzanine Facility Termination Date shall be no sooner than the Termination Date hereunder, as extended.

(c)     At Obligor's option, the Facility term may be extended for a second Extension Period (the "**Second Extension Period**"), upon satisfaction of the following:

(i)     No Event of Default shall have occurred and be continuing on the then applicable Termination Date;

(ii)     Administrative Agent shall have received from Obligor written Notice stating that Obligor thereby exercises its option to extend the Termination Date (the "**Extension Notice**") and the Extension Notice shall have been received by Administrative Agent at least thirty (30) days but no more than ninety (90) days prior to the then applicable Termination Date (such date of receipt the "**Extension Determination Date**");

(iii)     Prior to the effectiveness of the exercise of the Extension Option, and in any event, prior to the then applicable Termination Date, Obligor shall have provided a Profit Rate Protection Agreement covering the Extension Period, in a notional amount equal to the sum of (a) the amount of the Facility as of the effective date of the extension (the "**Extension Effective Date**") plus (b) the unfunded amounts of the Facility, and otherwise conforming to the requirements set forth in Section 6.5 hereof;

(iv)     The applicable Sales Milestone has been met or the applicable Sales Milestone Letter of Credit has been delivered to Administrative Agent; and

(v)     Construction Completion shall have been achieved; and

(vi)     The Mezzanine Facility Termination Date shall be no sooner than the Termination Date hereunder, as extended.

5.4     Due on Sale.   (a)   Subject to Section 5.5 and Section 15.2 hereof, the unpaid balance of the Deferred Sale Price and all other sums due and payable under the Notes and the other Facility Documents, if not sooner paid, shall be paid in full, upon a Transfer by Obligor or any Related Party of (a) all or any portion of the Project or any interest therein, other than the sale of Units, pursuant to Sale Contracts and Option Agreements, for which the requisite Release Payments have been delivered to Administrative Agent, (b) all or any portion of Obligor's right, title and interest, whether direct or indirect, in and to the Project or any other property serving as collateral for the Facility, or (c) all or any portion of any ownership interest (direct or indirect) in Obligor or any Related Party.

45

(b)     Notwithstanding anything to the contrary contained in the Facility Documents, the following transfers of indirect interests in Obligor, shall be permitted with notice to Administrative Agent and provided there shall be (x) no change in Control of Obligor, and (y) satisfactory completion prior to such transfer by Financiers of its customary know-your-customer background checks with respect to any transferee that, as of the date of this agreement owns less than twenty percent (20%) of the equity interests in Obligor and subsequent to such proposed transfer will own twenty percent (20%) or more of the equity interests in Obligor: (i) transfers among existing equity holders; (ii) transfers by existing equity holders to family members; (iii) transfers by existing equity holders to an entity or entities owned by his/her family members, (iv) transfers by existing equity holders to trusts the beneficiaries of which are the existing equity holder and or his/her family members, and (v) transfers by devise, descent or operation of law; (vi) transfers of limited partnership interests in SoHo Properties Developer LLC, Park Place Members SP LLC and Park Place Members SP II LLC; and (vii) transfers to third parties, provided all such transfers pursuant to clauses (i) through (vii) above, in the aggregate, do not exceed (A) forty-nine percent (49%) of the equity in Obligor or (B) cause the direct or indirect equity interest of Sharif El-Gamal in Obligor to be less than fifteen percent (15%).

5.5     Partial Releases.  (a) Administrative Agent shall, from time to time, release Units from the lien of the Mortgages (a "**Release**") upon satisfaction of the following conditions precedent:

(i)     Obligor shall have fully complied with the provisions of Section 18.2(a) and Section 18.2(b);

(ii)     Administrative Agent shall have received not less than five (5) days' prior written notice of the proposed Release;

(iii)     contemporaneously with such Release, there shall be a sale of a Unit pursuant to a Sale Contract or Option Agreement;

(iv)     Administrative Agent, or its designee as set forth herein, shall have received all of the following with respect to each Unit which is the subject of a Release:

(A)     the Sale Contract or Option Agreement for such Unit, certified by Obligor to be a true and complete statement of the terms of sale with respect thereto;

(B)     subject to Section 5.5(a)(iv)(F) below, the Release Payment for such Unit shall be paid by bank or certified check or wire transfer at the Closing for application as set forth in Section 5.6;

(C)     subject to Section 5.5(a)(iv)(F) below, payment of all actual out-of-pocket costs and expenses, including reasonable attorney's fees, incurred by Administrative Agent in connection with such Release;

(D)     a copy of the temporary or permanent certificate of occupancy for the applicable Unit;

46

(E)      such other documents, certificates, or assurances as Administrative Agent may reasonably request, including, without limitation, affirmative takaful/insurance endorsement to the Title Policy and a copy of the closing statement with respect to the Unit which is the subject of the Release; and

(F)      with respect to the items in Section 5.5(B) and Section 5.5(C) above, such items shall be delivered to Title Company at the time of the relevant Closing and shall be a condition to Title Company delivering the applicable release of lien for the subject Unit.

(b)      Intentionally Deleted.

5.6      Application of Prepayments Pursuant to this Article 5.  On the first Profit Payment Date occurring subsequent to a Closing, Administrative Agent may apply any prepayments made to either the Building Facility or the Project Facility as it deems appropriate.

5.7      Assignment of Mortgage to Contract Vendees.  At Obligor's request, Administrative Agent shall sever a Mortgage and provide an assignment of mortgage to a Contract Vendee at the time of the Closing of a Unit pursuant to Section 5.5 above.

## ARTICLE 6
## PURCHASE PRICE AND PROFIT

6.1      Profit Payments.

(a)      Subject to Section 6.4 hereof, on each Profit Payment Date, Obligor shall pay to Administrative Agent for the benefit of Financiers Agreed Profit applicable to the immediately preceding Profit Period; *provided*, *however*, Obligor may credit, as appropriate, the applicable amounts for such Agreed Profit payments that any Profit Rate Protection has paid to Administrative Agent for the benefit of Financiers for such Profit Period.

(b)      Obligor shall receive credit for payments on the Building Facility which are transferred to the account of Administrative Agent, as provided below, (i) on the day that such funds are received by Administrative Agent if such receipt occurs by 1:00 p.m. (New York time) on such day, or (ii) on the next succeeding Business Day after such funds are received by Administrative Agent if such receipt occurs after 1:00 p.m. (New York time). Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment may be made on the immediately preceding Business Day.

(c)      Obligor promises to pay all of the Obligations relating to the Facility as such amounts become due or are declared due pursuant to the terms of this Agreement. All payments by Obligor on the Facility shall be made without deduction, defense, set off or counterclaim and in immediately available funds in lawful money of the United States of America, delivered to Administrative Agent by wire transfer to such accounts at such banks as Administrative Agent may from time to time designate.

6.2      Computation of Profit.  Profit on the Facility shall be calculated on the basis of a 360-day year for the actual number of days elapsed for such period. If the Purchase

47

Price of a Transaction is repaid on the same day on which it is made, one (1) day's Agreed Profit shall be paid on such Transaction. Each determination of the Applicable Profit Rate by Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on Obligor in the absence of manifest error.

6.3    Determination of Profit Rate.

(a)    The Applicable Profit Rate with respect to the Facility shall be (x) Profit Rate for a LIBOR Facility or (y) if the provisions of Section 6.3(c) or Section 6.3(d) apply, the Adjusted Disruption Rate for a Disruption Rate Facility.

(b)    Subject to the terms and conditions set forth in this Section 6.3, the Facility shall be a LIBOR Facility and Obligor shall pay Agreed Profit on the unrepaid Purchase Price at the Profit Rate for the applicable Profit Period.

(c)    In the event, and on each occasion, that on a Determination Date, Administrative Agent shall have determined in good faith (which determination shall be conclusive and binding upon Obligor absent manifest error) that U.S. dollar deposits, in an amount approximately equal to the unpaid Deferred Sale Price (i) are not generally available at such time in the London Interbank Market, (ii) reasonable means do not exist for ascertaining a LIBOR for such particular Profit period, or (iii) the LIBOR for the requested Profit Period does not cover the cost of funds to Financiers for such Profit period, Administrative Agent will (x) request at least two major banks, as determined by Administrative Agent to provide the LIBOR that is quoted to prime banks at approximately 11:00 AM, London time, on such Determination Date in an amount that is representative for a single transaction in that market at that time, and the arithmetic mean of such quotations shall be the LIBOR. If there are fewer than two such quotations provided as requested, Administrative Agent will determine, in its reasonable discretion, the rate based upon Financiers' then cost of funds (the "**Disruption Rate**") as of such Determination Date and the Facility shall bear profit at the Adjusted Disruption Rate as shall be determined conclusively by Administrative Agent, absent manifest error.

(d)    Change in Governing Law. In the event that any change in Applicable Law or in the interpretation thereof by any governmental or other regulatory authority charged with the administration thereof occurring after the Closing Date, makes it unlawful for any Financier to make or maintain LIBOR Facilities, the obligation of such Financier to maintain LIBOR Facilities hereunder shall, upon the happening of such event, immediately terminate. Administrative Agent shall provide prompt notice of such change to Obligor and all LIBOR Facilities convert to Disruption Rate Facilities as of the earlier of (i) the last day of the then current LIBOR period with respect thereto, and (ii) the date on which it becomes unlawful for such Financier to maintain LIBOR Facilities. Obligor agrees to pay to Administrative Agent for the benefit of Financiers, upon demand by Administrative Agent, all third-party costs or expenses, if any, incurred by Financiers as a result of such change. A certificate furnished by Administrative Agent as to the amount of Administrative Agent's good faith determination of any such costs or expenses furnished to Obligor by Administrative Agent shall be conclusive and binding upon Obligor and Financiers as to the substance therein in the absence of a demonstrable error. Each Financier hereby represents that, as of the Closing Date,

such Financier is currently able to enter into LIBOR contracts for the terms specified herein without the imposition of any such costs.

6.4    Optional Method for Payment of Profit. For Obligor's benefit, the Building Facility Budget includes a Budget Line Item for Agreed Profit (the "**Profit Allocation**"). Obligor hereby authorizes Administrative Agent on each Profit Payment Date, for the mutual convenience of Financiers and Obligor, to disburse Building Facility proceeds to pay all the then accrued and unpaid Agreed Profit on the Building Facility Notes which is due and payable, regardless of whether Obligor shall have specifically requested a Transaction in connection with such amount. The Purchase Price for any such Transaction, if made, shall be added to the unpaid Purchase Price. The authorization hereby granted shall obligate Financiers, so long as no Event of Default has occurred and is continuing, to enter into Transactions for the payment of Agreed Profit but shall not preclude Obligor from paying Agreed Profit from its own funds. The Purchase Price for any such Transaction shall be paid along with Agreed Profit thereon. Upon the occurrence of an Event of Default, Obligor shall pay to Administrative Agent all Agreed Profit having accrued during the immediately preceding Profit Period at the Applicable Profit Rate or the Default Profit Rate, as the case may be. Any failure of Administrative Agent to timely release profit when obligated to do so by this Section 6.4 shall not, in and of itself, give rise to an Event of Default on the part of Obligor under this the Facility Documents.

6.5    Profit Rate Protection Agreement.

(a)    Obligor shall deliver to Administrative Agent on or prior to the First Transaction Date, as a condition precedent thereto, Profit Rate Protection Agreement satisfying the criteria set forth herein (a "**Rate Cap**"), and otherwise reasonably acceptable to Administrative Agent in all respects, and Obligor shall maintain such Profit Rate Protection Agreement in the possession of Administrative Agent, in full force and effect, until all Obligations are fully and finally repaid.

(b)    The Profit Rate Protection Agreements shall:

(i)    At all times have an aggregate notional amount equal to the amount of the Facility then outstanding;

(ii)    Provide that, to the extent that LIBOR exceeds three percent (3%) per annum (the "**Strike Price**"), the Profit Rate Protection Provider shall pay to Administrative Agent not less than the amount of profit that would apply to the notional amount at a profit rate equal to the difference between the LIBOR and the Strike Price;

(iii)    Be in form and substance reasonably satisfactory to Administrative Agent with opinions of counsel to the Profit Rate Protection Provider as are reasonably acceptable to Administrative Agent; and

(iv)    Be issued by a financial institution, which institution shall have a financial rating issued by S&P of not less than "BBB-", or the equivalent rating from another Rating Agency if the Profit Rate Protection Provider is not then rated by S&P; *provided*, *however*, if thereafter the financial rating of the Profit Rate Protection Provider falls below the rating criteria specified above, then within ten (10) Business Days following written request from

49

Administrative Agent, Obligor shall deliver to Administrative Agent a replacement Profit Rate Protection Agreement.

(c)     Five (5) Business Days prior to the expiration of any Rate Cap, Obligor shall deliver to Administrative Agent a replacement Profit Rate Protection Agreement satisfying the criteria of Section 6.5(b) hereof.

(d)     Strike Price Reserve. If at the time that Obligor is required to provide a Profit Rate Protection Agreement hereunder, rate cap agreements having the required Strike Price are not available at commercially reasonable pricing, then at or prior to the time when such Profit Rate Protection Agreement is due hereunder, Obligor shall (i) deliver to Administrative Agent a Profit Rate Protection Agreement having any strike price that Obligor determines is reasonable but in no event greater than five percent (5)%, and (b) make a deposit into the Strike Price Reserve Account in the sum of the amount of Agreed Profit that would be due over the balance of the term at a rate per annum equal to the difference between the Strike Price and the strike price of the Profit Rate Protection Agreement actually provided by Obligor.

6.6     Late Charges and Default Profit Rate. Notwithstanding the foregoing, after the occurrence of an Event of Default and for so long as such Event of Default continues and in any event from and after the Termination Date, Obligor shall be required to pay to Financiers Agreed Profit at the Default Profit Rate for so long as the Obligations shall be outstanding. If any payment due under any of the Facility Documents is not paid as and when due, Obligor shall pay to Administrative Agent, in addition to all sums otherwise due and payable, a late fee in an amount equal to one percent (1%) (the **"Late Charge"**) of such sums due; provided, however, such Late Charge shall not be applicable to the payment due on the Termination Date. Such Late Charge shall not be compounded.

6.7     Prepayments and Termination of Commitment to Finance. Obligor may, upon two (2) days' notice to Administrative Agent prepay the Facility in whole or in part so long as such prepayment is accompanied by any actual Breakage Costs. The Maximum Facility Amount will be reduced by the amount of Purchase Price paid in connection with any such prepayment. No monies prepaid for any reason may be re-advanced.

6.8     Additional Costs.

(a)     With respect to any LIBOR Facilities, Obligor agrees to pay to Administrative Agent for the benefit of each affected Financier, within ten (10) days following written demand by Administrative Agent, such amounts as will compensate any affected Financier for any increase in cost to such Financier, from time to time, resulting from any increase in any reserve and/or special deposit requirement against assets held by, or deposits in or for the amount of any facility by, such affected Financier which are hereafter imposed on, or are applicable to, such Financier from time to time, which increased costs are imposed as a result of the Facility evidenced hereby, under or pursuant to (i) any change in any law, treaty or regulation now in effect or hereafter enacted (including Regulation D of the Board of Governors of the Federal Reserve System), (ii) any change in interpretation thereof by any governmental authority charged with the administration thereof or by any central bank or other fiscal, monetary or other authority having jurisdiction over LIBOR Facilities or the lending institution where the

50

applicable portion of the Facility is lodged, or (iii) any change in any requirement imposed by any central bank or such other authority, whether or not having the force of law. A certificate as to the amount of Administrative Agent's reasonable good faith determination of any such cost or any change therein furnished by Administrative Agent to Obligor shall be conclusive and binding upon Obligor and Financiers in the absence of demonstrable error. The payment of such amount shall not exceed the Aggregate Deferred Sale Price.

(b)    In the event that by reason of the adoption of any new law or regulation, or by reason of any change in any existing law or regulation or any guideline or directive (whether or not having the force of law) or any change in the interpretation thereof by any governmental authority, central bank or comparable agency charged with the administration thereof, (i) any Financier should be subjected to any Taxes (other than Indemnified Taxes and Excluded Taxes) on its facilities or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, (ii) such Financier shall have reasonably determined that compliance by such Financier with any such law or regulation, request or directive regarding capital adequacy (whether or not having the force of law) or with any such authority, central bank or comparable agency, has or would have the effect of reducing the profit on such Financier's capital as a consequence of their obligations hereunder to a level below that which such Financier could have achieved but for such adoption, change or compliance (taking into consideration such Financier's policies with respect to capital adequacy), or (iii) any other event should occur which would impose any additional condition on any Financier with respect to such amounts, and if any of the above-mentioned measures, or any other similar measure, should result, in such Financier's reasonable opinion, in an increase in the cost to such Financier or Financiers of making or maintaining LIBOR Facilities hereunder or a reduction in the amount of profit receivable by such Financier in respect thereof, then Obligor shall pay to Administrative Agent for the benefit of the applicable Financier or Financiers, within ten (10) days following written demand by Administrative Agent, such additional amounts as will fully compensate the applicable Financier or Financiers for such increased cost or reduction. A certificate as to Administrative Agent's reasonable, good faith determination of any such increased cost or reduction furnished by Administrative Agent to Obligor shall be conclusive and binding upon Obligor and Financiers in the absence of demonstrable error. In determining such increased cost or reduction, the affected Financier or Financiers may use any reasonable averaging and attribution methods.

(c)    In the event that Financiers' commitment of funds under the Notes or the other Facility Documents increases the amount of capital required or to be required in order for a Financier to be in compliance with any Law, regulation, capital requirements of general applicability adopted after the Closing Date, guideline or directive (whether or not having the force of law) hereafter enacted or any change in the interpretation thereof by any governmental authority, central bank or comparable agency charged with the administration thereof governing such Financier or any Affiliate of such Financier and such Financier determines that the amount of capital so required or to be required has been increased by or based upon such commitment of funds or rate election, as the case may be, then Obligor shall be liable to each such Financier and shall pay to each such Financier, upon demand by Administrative Agent, Obligor's pro rata share of any increased expense to the applicable Financier which such Financier attributes to such commitment of funds. A certificate as to Administrative Agent's good faith determination of any such increased expense furnished by

51

Administrative Agent to Obligor shall be binding and conclusive in the absence of demonstrable error.

### 6.9    Change in Governing Law.

#### (a)    Taxes.

(i)    <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of Obligor under any Facility Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Obligor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 6.9</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(ii)    <u>Payment of Other Taxes by Obligor</u>. Obligor shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(iii)    <u>Indemnification by Obligor</u>. Obligor shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 6.9</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Obligor by a Financier (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Financier, shall be conclusive absent manifest error.

(iv)    <u>Evidence of Payments</u>. As soon as practicable after any payment of Taxes by Obligor to a Governmental Authority pursuant to this <u>Section 6.9(a)</u>, Obligor shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)    <u>Status of Financiers</u>.

(A)    Any Financier that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Facility Document shall deliver to Obligor and the Administrative Agent, at the time or times reasonably requested

52

by Obligor or the Administrative Agent, such properly completed and executed documentation reasonably requested by Obligor or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Financier, if reasonably requested by Obligor or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Obligor or the Administrative Agent as will enable Obligor or the Administrative Agent to determine whether or not such Financier is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 6.9(a)(v)(B)(I), (II) and (IV) shall not be required if in Financier's reasonable judgment such completion, execution or submission would subject such Financier to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Financier.

(B)    Without limiting the generality of the foregoing, in the event that Obligor is a U.S. Obligor,

(I)    any Financier that is a U.S. Person shall deliver to Obligor and the Administrative Agent on or prior to the date on which such Financier becomes a Financier under this Agreement (and from time to time thereafter upon the reasonable request of Obligor or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Financier is exempt from U.S. federal backup withholding tax;

(II)    any Foreign Financier shall, to the extent it is legally entitled to do so, deliver to Obligor and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Financier becomes a Financier under this Agreement (and from time to time thereafter upon the reasonable request of Obligor or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Financier claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of profit under any Facility Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Facility Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Financier claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Financier is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Obligor within the meaning of

Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN; or

(4) to the extent a Foreign Financier is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Financier is a partnership and one or more direct or indirect partners of such Foreign Financier are claiming the portfolio interest exemption, such Foreign Financier may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner;

(III) any Foreign Financier shall, to the extent it is legally entitled to do so, deliver to Obligor and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Financier becomes a Financier under this Agreement (and from time to time thereafter upon the reasonable request of Obligor or the Administrative Agent), executed originals of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Obligor or the Administrative Agent to determine the withholding or deduction required to be made; and

(IV) if a payment made to a Financier under any Facility Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Financier were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Financier shall deliver to Obligor and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Obligor or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Obligor or the Administrative Agent as may be necessary for Obligor and the Administrative Agent to comply with their obligations under FATCA and to determine that such Financier has complied with such Financier's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (IV), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(vi) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 6.9(a) (including by the payment of additional amounts pursuant to this Section 6.9(a)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 6.9 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the

54

Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN; or

(4)     to the extent a Foreign Financier is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Financier is a partnership and one or more direct or indirect partners of such Foreign Financier are claiming the portfolio interest exemption, such Foreign Financier may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner;

(III)     any Foreign Financier shall, to the extent it is legally entitled to do so, deliver to Obligor and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Financier becomes a Financier under this Agreement (and from time to time thereafter upon the reasonable request of Obligor or the Administrative Agent), executed originals of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Obligor or the Administrative Agent to determine the withholding or deduction required to be made; and

(IV)     if a payment made to a Financier under any Facility Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Financier were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Financier shall deliver to Obligor and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Obligor or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Obligor or the Administrative Agent as may be necessary for Obligor and the Administrative Agent to comply with their obligations under FATCA and to determine that such Financier has complied with such Financier's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (IV), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(vi)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 6.9(a) (including by the payment of additional amounts pursuant to this Section 6.9(a)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 6.9 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the

relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

<div align="center">

ARTICLE 7
FACILITY AND ADMINISTRATION EXPENSES AND
ADVANCES AND SECURITY FOR SAME

</div>

7.1    Facility and Administration Expenses.    Obligor irrevocably and unconditionally agrees to pay all reasonable third-party expenses of Financiers and Administrative Agent in connection with (i) the preparation, negotiation and attendance upon the execution of this Agreement and of the other Facility Documents, the review of any underlying title documents, Leases, estoppel certificates, subordination, non-disturbance and attornment agreements, Assignment and Assumptions, and the preparation of the closing binders, (ii) the administration of the Facility, (iii) consultation regarding, review of and the enforcement of the terms of this Agreement and the other Facility Documents, and (iv) the enforcement of the terms of this Agreement and the other Facility Documents; (v) all third-party expenses of Administrative Agent in connection with Transaction Requests and the administration of the Facility, together with all amounts payable pursuant to Sections 7.2, 7.3 and 13.1(n) and any and all other fees owing to Administrative Agent or to Financiers pursuant to the Building Facility Documents, and also including, without limiting the generality of the foregoing, all recording, filing and registration fees and charges, mortgage recording taxes, all takaful contributions/insurance premiums, title takaful contributions/insurance premiums for the Title Policies and other reasonable charges of Title Company (including, without limitation, all charges, if any, incurred in connection with Date Down Endorsements), photocopying expenses, survey fees and charges for surveys obtained by Obligor, cost of certified copies of instruments, cost of contributions/premiums on all required surety company bonds, reasonable charges of Title Company or other escrowee for administering Transactions, all reasonable fees and disbursements of Financiers' Consultant, the Environmental Report, reasonable fees of outside appraisers for the Appraisals, and reasonable takaful/insurance consultant's fees. Without limiting the foregoing, Obligor shall reimburse Administrative Agent and Financiers upon request for reasonable third-party costs associated with providing and administering the Facility, including all costs of: (i) monitoring construction, (ii) engineering services, (iii) real estate tax services, and (iv) appraisal fees for any Appraisals obtained in accordance with the provisions of this Agreement. All of the foregoing expenses, charges, costs and fees shall be Obligor's obligation regardless of whether the Facility is disbursed in whole or in part including as set forth in Section 13.1(tt).

7.2    Administrative Fee.    Obligor agrees to pay Administrative Agent, for its own account, an administrative fee (the "**Administrative Fee**") of $8,333.33 per month, payable

<div align="center">55</div>



on the First Transaction Date and on each Profit Payment Date thereafter until satisfaction of all Obligations. The Administrative Fee shall be earned when due and shall be non-refundable once paid.

7.3    Time of Payment of Fees.  Obligor shall pay all expenses and fees on the First Transaction Date and at such time or times thereafter as Administrative Agent may require or as provided for in this Agreement or the other Facility Documents. On the First Transaction Date, Administrative Agent may pay from the proceeds of the Facility all reasonable Facility expenses including Administrative Agent's and Financiers' attorneys' and Financiers' Consultant's fees and disbursements. Administrative Agent may require the payment of outstanding fees and expenses as a condition to any Increase Transaction. Financiers are hereby authorized, without any specific request or direction by Obligor, to execute Increase Transactions from time to time in payment of or to reimburse Financiers and Administrative Agent for all Facility expenses and fees (whether or not at such time there may be any undisbursed amounts of the Facility allocated in the Budget to the items set forth in this Article 7), provided such Increase Transaction does not cause the amount of the Facility allocated to the Costs of Improvements set forth in the Section 22 Lien Law Affidavit to be reduced.

7.4    Expenses and Increase Transactions Secured by Facility Documents.  Any and all Increase Transactions executed or payments made by Administrative Agent or Financiers hereunder, from time to time, together with Financiers' Consultant's fees and all other Facility expenses shall, as and when executed, advanced or incurred, constitute Obligations evidenced by the Notes and secured by the Building Facility Mortgages and the other Building Facility Documents, whether or not the totality of the Deferred Sale Price shall thereafter exceed the aggregate face amount of the Notes.

7.5    Transactions in Excess of Amount of Note.  In the event that the Purchase Price of any Increase Transactions together with any other disbursements of the proceeds of the Facility made in accordance with this Agreement exceed the aggregate face amount of the Notes, such excess shall constitute Supplemental Profit evidenced by the Notes and secured by the Building Facility Mortgages and the other Facility Documents. Obligor shall pay, on demand by Administrative Agent, the amount by which the Deferred Sale Price secured by the Building Facility Mortgages, at any time, exceeds the aggregate face amount of the Note.

7.6    Right to Execute Transactions or Make Disbursements to Cure Obligor's Defaults.  In the event that Obligor fails to perform any of Obligor's covenants or agreements herein contained (after the expiration of applicable notice and grace periods, except in the event of an emergency or other exigent circumstances), Administrative Agent or any Financier may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Administrative Agent or any Financier in so doing and any amounts expended by Administrative Agent or any Financier shall constitute Supplemental Profit evidenced by the Notes and secured by the Building Facility Mortgages and the other Facility Documents.

## ARTICLE 8
## BUDGET AND CONTINGENCY LINE ITEMS

8.1    Budget.  Obligor shall provide to Administrative Agent (a) the Building Facility Budget and (b) the Project Facility Budget. Each of the Building Facility Budget and the Project Facility Budget, taken together, shall specify the amount of cash equity invested in the Project, which, in the aggregate, shall be not less than Obligor's Equity Contribution. The Building Facility Budget shall include, in addition to the Budget Line Items described in Section 8.2 below, the Building Facility Contingency Line Item described in Section 8.3 below. The initial Building Facility Budget as of the Closing Date is attached to Obligor's Certificate. Subject to the terms of Section 8.3, Section 9.2 and Section 13.1(c) hereof, all changes to the Building Facility Budget shall in all respects be subject to the prior reasonable written approval of Administrative Agent and any changes to the Building Facility Budget shall also be accompanied by an amended Section 22 Lien Law Affidavit to the extent required by Title Company or Applicable Law.

8.2    Budget Line Items.  Obligor agrees that the proceeds of all Transactions entered into by Financiers shall be used only for the Budget Line Items for which such Facility proceeds were advanced. Obligor agrees that Financiers may, following the occurrence and during the continuance of an Event of Default, without prior written notice to Obligor, advance the Budget Line Items for the purposes for which they have been set aside, or for any other purposes as Administrative Agent may reasonably determine, either by payment of such items or by reimbursement to Obligor for payments actually made by Obligor for such items. Subject to the terms of Section 8.3, Section 9.2 and Section 13.1(c) hereof, Financiers shall not be obligated to make any Increase Transaction for any category of costs set forth as a Budget Line Item which is greater than the amount set forth for such category in the applicable Budget Line Item.

8.3    Contingency Line Item.  The Building Facility Budget shall contain a Line Item for the Building Facility Contingency Line Item and the Project Facility Budget shall contain a Budget Line Item for the Project Facility Contingency Line Item, both of which represent amounts necessary to provide reasonable assurances to Administrative Agent that additional funds are available to be used as provided herein and in the Project Facility Agreement in the event additional costs, expenses and/or delays are incurred or additional costs accrue on the Facility, or unanticipated events or problems occur. No profit shall accrue upon the Building Facility Contingency Line Item until advance thereof, whereupon such Transaction shall be deemed to be an advance of the proceeds of the Facility. Subject to Obligor's rights to reallocate the Building Facility Contingency Line Item pursuant to Article 9 hereof, Obligor agrees that it may be required to make a Building Facility Deficiency Deposit even if funds remain in the Building Facility Contingency Line Item. Under no circumstances shall any portion of any Building Facility Contingency Line Item be reallocated to the Project Facility or used for an item which does not constitute a Cost of Improvements. Obligor may reallocate excess amounts from the Project Facility Contingency Line Item (or any other Project Facility Budget Line Items) to the Building Facility so long as same is accompanied by any and all necessary affidavits, amendments and takaful/title insurance as reasonably required and approved by Administrative Agent, Title Company or Applicable Law. Notwithstanding anything to the contrary set forth in the Facility Documents, so long as no Event of Default exists, Obligor,  without consent of Administrative Agent, shall be permitted to reallocate (i) the Building Facility Contingency Line

57

Item to other Building Facility Budget Line Items in an aggregate amount equal to the percentage of the completion of the items set forth in the Building Facility Budget to date times the original amount provided for in the Building Facility Budget Contingency Line Item and (ii) the Project Facility Contingency Line Item to other Project Facility Budget Line Items or other Building Facility Budget Line Items in an aggregate amount equal to the percentage of the completion, as determined by Administrative Agent in its reasonable discretion, of the items set forth in the Project Facility Budget to date times the original amount provided for in the Project Facility Budget Contingency Line Item.

## ARTICLE 9
## SUFFICIENCY OF FACILITY

### 9.1    Balancing.

(a)    Anything in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that as determined by Administrative Agent in its reasonable discretion, the Building Facility shall at all times be In Balance, on both a line-by-line and an aggregate basis. The Building Facility shall be deemed to be **"In Balance"** in the aggregate only when the total of the undisbursed portion of the Building Facility plus any amounts in the Strike Price Reserve Account relating to the Building Facility and the Building Facility Deficiency Account and that portion of the Building Facility Contingency Line Item with respect to Costs of Improvements which does not exceed the then percentage of the Construction completed, as determined by Administrative Agent in its reasonable discretion, equals or exceeds the aggregate of (without duplication) (i) the costs required to complete the Construction substantially in accordance with all Plans and Specifications and the Building Facility Budget, (ii) the amounts to be paid as Retainages to persons who have supplied labor or materials to the Project; and (iii) all other Costs set forth in the Building Facility Budget in all instances, related to the Improvements, not yet paid for in connection with the Project, including, without limitation taxes, profit and insurance, as such costs and amounts described in the immediately preceding clauses (i) through (iii) may reasonably be estimated and/or approved in writing by Administrative Agent from time to time. The Building Facility shall be deemed to be In Balance on a line-by-line basis only when the undisbursed amount in each Building Facility Budget Line Item equals or exceeds the costs expected to be funded from such Building Facility Budget Line Item until the Termination Date taking into account amounts in the Deficiency Account and the Strike Price Reserve Account and that portion of the Building Facility Contingency Line Item with respect to Costs of Improvements which does not exceed the then percentage of the Construction completed as determined by Administrative Agent in its reasonable discretion.

(b)    Subject to Section 9.2 below, Obligor agrees that if for any reason, Administrative Agent determines in its reasonable judgment that the Building Facility or any Building Facility Budget Line Item is not In Balance, Obligor shall, within five (5) Business Days after written request by Administrative Agent, deposit the amount of any deficiency or a Letter of Credit in such amount with Administrative Agent (**"Building Facility Deficiency Deposit"**). So long as no Event of Default exists and is continuing, any Building Facility Deficiency Deposit shall be held by Administrative Agent in the Building Facility Deficiency Account. The amounts on deposit in the Building Facility Deficiency Account shall first be exhausted before any further disbursement of Building Facility Increase Transaction shall be

58

made and Financiers shall not be obligated to enter into any Increase Transactions if and for as long as the Building Facility is not In Balance. Financiers will have no obligation to enter into any Increase Transaction so long as the Facility is not In Balance on both a line-by-line and an aggregate basis. The Letter of Credit provided pursuant to this <u>Section 9.1</u> may be drawn upon by Administrative Agent as needed to fund the Building Facility Deficiency Deposit.

9.2     <u>Reallocation of Budget Line Items</u>. Upon Administrative Agent's reasonable approval and in consultation with Financiers' Consultant that (a) all work relating to a particular Budget Line Item in the Building Facility Budget has been completed and fully paid for (or in the event all such work has not been completed and fully paid for, Administrative Agent has reviewed and approved any relevant documentation with respect to such Budget Line Item, including change orders with respect to such work), (b) with respect to any such work which has been completed, all lien releases applicable thereto have been received, and (c) the total cost of such work (or work to be completed as set forth in (a) above) was (or is reasonably expected to be) less than the amount allocated for the work in such Budget Line Item, Administrative Agent shall permit Obligor to shift the savings achieved by Obligor in such Budget Line Item other than profit to the Building Facility Contingency Line Item. Administrative Agent shall, in its reasonable discretion, at the request of Obligor, permit Obligor to allocate a portion of the Building Facility Contingency Line Item to another Building Facility Budget Line Item; <u>provided</u>, <u>however</u>, that in no event shall a reduction be made in the Budget Line Item in the Building Facility Budget for Agreed Profit (other than as a result of the application of amounts in the Strike Price Reserve Account to Agreed Profit pursuant to the Building Facility), <u>further provided</u>, any such changes to the Building Facility Budget shall also be accompanied by, to the extent required by Title Company or Applicable Law, an amended Section 22 Lien Law Affidavit executed by Obligor. Obligor shall pay as they become due all amounts set forth in the Building Facility Budget with respect to costs to be paid for by Obligor.

9.3     <u>Finance Reserve Account</u>. Obligor shall deposit with Administrative Agent on the First Transaction Date the sum of $25,580,524.20 (the "**Finance Reserve**"). Any Draw Request pursuant to the Facility Documents to which Obligor shall be entitled shall be disbursed first from the Finance Reserve until the Finance Reserve is depleted.

## ARTICLE 10
### REQUIREMENTS PRECEDENT
### TO THE FIRST ADVANCE FOR CONSTRUCTION

10.1     <u>Required Construction Documents</u>. Obligor agrees to perform and satisfy all of the following conditions precedent on or before the Facility Opening Date, and Obligor agrees that Financiers' obligation to make the first Transaction is conditioned upon Obligor's performance and satisfaction of all such conditions precedent in form and substance reasonably satisfactory to Administrative Agent:

(a)     Obligor shall have fully funded Obligor's Equity Contribution and all Mezzanine Facility Funds shall have been advanced and utilized as set forth in the Budget.

(b)     A fully-executed copy of the General Contract and all Subcontracts then in effect or subject to a purchase order shall be delivered to Financiers' Consultant prior to

the Facility Opening Date. Such Subcontracts then in effect or subject to a purchase order will comprise no less than eighty percent (80%) of the value of the General Contract including all Major Subcontracts. If in the judgment of Administrative Agent and Financiers' Consultant, the General Contract does not cover all of the work necessary for completion of Construction, Obligor shall cause to be furnished firm bids from responsible parties, or estimates and other information reasonably satisfactory to Administrative Agent, for the work not so covered, to enable Administrative Agent to ascertain the total estimated cost of all work done and to be done. If the value of such work is in excess of one million dollars ($1,000,000) Administrative Agent shall have the right to reasonably approve the applicable proposed contract.

(c)     A schedule of values from General Contractor, setting forth, at a level of detail appropriate for the type of construction and the value of the General Contract, as reasonably acceptable to Administrative Agent, a description of all the work to be let, or that has been let under an executed subcontract or to be self-performed work by General Contractor for the design, engineering, construction and equipping of the Improvements as required by the General Contract. Such schedule of values shall include the following:

(A)     A schedule of Line Items;

(B)     The initial value attributed to each Line Item in the determination of the total value of the General Contract;

(C)     If under executed subcontract or to be self-performed work by General Contractor, then listing:

(1)     the name of the subcontractor(s) (or designated as self-performed work);

(2)     date of the subcontract;

(3)     the original value of the subcontract (or the initial fixed value of the self-performed work);

(4)     the current value of the subcontract (or the current value of the self-performed work);

The level of detail provided shall be sufficient for Administrative Agent and Financiers' Consultant to utilize the schedule of values for purposes of monitoring the progress of Construction and for approval of Transaction Requests. General Contractor shall certify to Administrative Agent that the schedule of values represents all of General Contractor's obligations under the General Contract and that the subcontracts entered into by General Contractor, and delivered to Administrative Agent, contain all detail necessary for completion of such Construction as required under the General Contract.

(d)     Subject to Section 21.22 hereof, a Bond for the General Contract and each of the Major Subcontractors, together with an assignment thereof for the benefit of Administrative Agent, such Bonds to be in the full amount of the General Contract or Major Subcontract, as applicable.

60

(e)    Two photocopies of each of the building permits, environmental permits, utility permits, land use permits and any other permits, approvals or licenses issued by any Governmental Authority which are required in connection with the Construction, or the completion, use, marketing, and operation of the Project, including zoning, subdivision, environmental, utility, land use and wetland permits, complete in all respects, and which shall authorize such Construction substantially in accordance with the Plans and Specifications for the Improvements, and evidence reasonably satisfactory to Administrative Agent that same are in full force and effect.

(f)    Fully coordinated Plans and Specifications.

(g)    Plans and Specifications for all of the Improvements, in duplicate or electronic form, prepared by an architect approved by Administrative Agent in writing, consistent with preliminary plans, if any, reasonably satisfactory to Administrative Agent and Financiers' Consultant in all respects, including all changes to the date of submission thereof and as to which, to the extent required, Obligor shall have obtained the approval of any third party, and which Plans and Specifications must be approved in writing by Administrative Agent.

(h)    A schedule (the "**Construction Schedule**") prepared by General Contractor reasonably satisfactory to Administrative Agent and Financiers' Consultant, presenting, at a level of detail appropriate for the type of construction and the value of the General Contract, a timetable for completion of the Improvements, the anticipated progress of the Improvements and also showing that the Construction can be completed on or before the Construction Completion Date. The Construction Schedule shall also contain a construction draw schedule which correlates in all material respects to General Contractor's schedule of values and must include a statement to Administrative Agent from General Contractor stating that the schedule with respect to General Contractor's work is realistic in all material respects and can be adhered to in all material respects in completing the Construction in accordance with all Plans and Specifications within the guaranteed maximum price, inclusive of all fees, as set forth in the General Contract.

(i)    A Phase I environmental survey (and if suggested in such Phase I, a Phase II environmental survey) satisfactory to Administrative Agent and Financiers' Consultant (the "**Environmental Report**") which shall, at a minimum, (i) disclose any existing or potential Hazardous Materials contamination, and physical conditions that may result in such contamination, at the Project, (ii) include the results of all sampling or monitoring, if any is required, to confirm the extent of existing or potential Hazardous Materials contamination at the Project, including the results of leak detection tests for each underground storage tank located at the Project, if any, (iii) describe response actions appropriate to remedy any existing or potential Hazardous Materials contamination, and report the estimated cost of any such appropriate response, or (iv) indicate whether any prior removal of Hazardous Materials from the Project was completed in accordance with Applicable Law. Upon Administrative Agent's request and after an occurrence of an Event of Default related to an environmental issue, Obligor shall pay for additional or supplemental environmental surveys to be performed by Financiers' Consultant.

(j)    An engineering report demonstrating the feasibility of the Project and a current report from Financiers' Consultant which contains an analysis of the Plans and

Specifications, the Budget, the Construction Schedule, the General Contract, all subcontracts then existing, and the Environmental Report. In addition, such report shall contain (A) an analysis satisfactory to Administrative Agent demonstrating the adequacy of the Budget to complete the Construction in accordance with the Construction Schedule, (B) a confirmation that the Construction Schedule is realistic, and (C) a confirmation of the information contained in the initial Architect's Certificate. Administrative Agent shall also have received such other reports and certification concerning the Construction as Financiers' Consultant may require. Financiers' Consultant shall monitor Construction and shall visit the Project at least twice each month.

(k)     A copy of the contract with each Design Professional for the design of the Project and a certificate executed by the Architect in favor of Administrative Agent (an "**Architect's Certificate**") in form and substance reasonably acceptable to Administrative Agent, advising Administrative Agent that:

(i)     the Plans and Specifications are full and complete and conform in all material respects to all presently applicable zoning;

(ii)     the Subcontracts delivered to Administrative Agent contain all detail necessary to provide for that portion of the Construction covered by such Subcontracts in accordance with the Plans and Specifications relating thereto with respect to the Improvements;

(iii)     if constructed in accordance with the Plans and Specifications, the Construction of the Improvements will comply with all presently applicable zoning, building, subdivision, environmental, land use laws, statutes, codes and regulations including requirements of the Americans with Disabilities Act and any environmental protection and similar agencies having jurisdiction over the Project;

(iv)     all permits necessary to commence and complete the Construction have been paid for and issued, or will be paid for and issued;

(v)     the calculation of the gross square footage and the net saleable square footage for each Unit in the Project; and

(vi)     adequate ingress and egress to the Project is available over adjacent streets, rights of way and/or easements.

(l)     Such other papers, materials and documents as Administrative Agent may reasonably require with respect to the Construction and Improvements.

ARTICLE 11
CONSTRUCTION PAYOUT REQUIREMENTS WITH RESPECT TO
ALL ADVANCES

11.1    Applicability of Sections.  The provisions contained in this Article 11 (and where the context so requires, the provisions contained in Article 10) shall apply on the Facility Opening Date and to all Increase Transactions during Construction.

11.2    Monthly Payouts.  After the Facility Opening Date, Increase Transactions shall be made during Construction from time to time as Construction progresses, but no more frequently than once in each calendar month (except for Agreed Profit and Supplemental Profit, fees, and Financier's third party expenses all of which may be advanced more than once per calendar month, and takaful contributions/insurance premiums and real estate taxes, both of which may be advanced when due and, at Financier's option, without requisition), upon compliance by Obligor with the conditions precedent to such Increase Transaction set forth in this Agreement.

11.3    Approval By Financiers' Construction Consultant.  All Transaction Requests will be subject to review and approval by Administrative Agent in consultation with Financiers' Consultant. Financiers' Consultant shall be permitted, upon request, to attend Obligor's draw meetings, and shall be provided with reasonable notice of the scheduling of all such meetings.

11.4    Documents to be Furnished for Each Transaction.  As a condition precedent to each Transaction, Obligor shall furnish or cause to be furnished to Administrative Agent and Financiers' Consultant as designated by Administrative Agent the following documents covering each Transaction, in form and substance reasonably satisfactory to Administrative Agent and Financiers' Consultant:

(a)    The following duly executed: (i) Obligor's Purchase Request in substantially the form attached hereto as Exhibit I and (ii) Conditional Waiver of Lien or Final Waiver of Lien, as applicable, in substantially the same form attached hereto as Schedule 1;

(b)    A completed Application and Certificate for Payment, AIA Document G702/703, or its equivalent, together with such invoices, contracts or other supporting data as Administrative Agent may reasonably require to evidence that all Costs for which such Increase Transaction is sought have been incurred;

(c)    A duly executed Application for Payment in substantially the form attached hereto as Schedule 2;

(d)    Paid invoices or other evidence reasonably satisfactory to Administrative Agent that any fixtures and equipment to be purchased with the proceeds of such Transaction are, or upon payment will be, free of any purchase money security interest therein and evidence reasonably satisfactory to Administrative Agent that all fixtures and equipment are and, upon payment will be, and remain free of security interests of all kinds (other than in favor of Administrative Agent);

63

(e)     A continuation to the Title Policies, redating the Title Policies as needed to cover the amount of the Facility proceeds then disbursed in connection with the Transaction and to insure against mechanics' liens to the date covered by such continuation. The cost of all such endorsements and continuations, including, without limitation, the cost of each Date Down Endorsement, shall be paid by Obligor. If any intervening mechanics' liens are filed against the Project, Obligor shall, subject to the provisions of Section 13.1(e), cause Title Company to provide affirmative coverage over such liens, or Obligor shall discharge such liens (which may be accomplished by posting a bond in accordance with Lien Law Section 19(4), as amended, and in compliance with all other Laws). Such endorsement shall also reflect that the Condominium Documents, if then recorded, have not been changed, modified or amended, unless such change, modification or amendment has been previously approved in writing by Administrative Agent or such change is not subject to Administrative Agent's consent;

(f)     Copies of all construction contracts (including Subcontracts) applicable to the Construction, together with any Bonds, which have been executed since the last Increase Transaction;

(g)     If any material dispute arises between or among Obligor and General Contractor or any Major Subcontractor, a written summary by Obligor in form reasonably acceptable to Administrative Agent setting forth the nature of such dispute;

(h)     Such other instruments, documents and information which may be reasonably required by Title Company if it is administering the disbursements for which the subject Increase Transaction has been made;

(i)     All requirements of Article 9 and Article 10 shall have been satisfied or expressly waived by Administrative Agent; and

(j)     Such other instruments, documents and information pertaining to the Increase Transaction that Administrative Agent may reasonably request.

11.5    Retainages.   At the time of each Increase Transaction, (i) prior to the Construction being fifty (50%) percent completed, ten percent (10%) (or such greater percentage as may be provided as a retainage or withholding in the relevant contract, Obligor hereby agreeing to advise Administrative Agent in writing of any such greater retainage or withholding concurrently with or prior to the request by Obligor for an Increase Transaction to pay amounts due under such contract) of the total amount (other than general conditions) then due General Contractor and the various trade contractors, Subcontractors and material suppliers for costs of Construction shall be withheld from the amount disbursed, and (ii) after the Construction is fifty (50%) percent completed, five (5%) then due General Contractor and the various trade contractors, Subcontractors for costs of Construction shall be withheld from the amount disbursed (such amount, the "**Retainage**"); *provided, however,* that upon the satisfactory completion of one hundred percent (100%) of the work with respect to any trade or the delivery of all materials pursuant to a purchase order substantially in accordance with the Plans and Specifications relating to such Construction as certified by the appropriate Design Professionals and Financiers' Consultants, all Retainages with respect to such work, trade or order, as the case may be, will be disbursed to Obligor upon Administrative Agent's receipt of (a) a final waiver of

lien with respect to such completed work or delivered materials from the contractor or subcontractor performing or providing such work, trade or order (or the expiration of the time period within which the such contractors or subcontractor is permitted to file a mechanic's lien has lapsed), and (b) evidence reasonably satisfactory to Administrative Agent that (i) the Budget is In Balance, and (ii) there is no Event of Default under this Agreement or any of the other Facility Documents; and (iii) the work to be performed under such Subcontract or purchase order has been completed substantially in accordance with the Plans and Specifications relating to such Construction as certified by the appropriate Design Professionals and Financiers' Consultants.

        11.6    <u>Administrative Agent's Right to Employ Financiers' Consultant</u>. Administrative Agent shall employ Financiers' Consultant to review any Plans and Specifications and all other matters related to the Construction, and to inspect and monitor all Construction on a monthly basis and the periodic progress of the same. The costs and charges for Financiers' Consultant shall be borne by Obligor as a Building Facility expense to the extent the same constitutes a Costs of Improvements, and a Project Facility expense to the extent the same does not constitute a Costs of Improvements.

        11.7    <u>Transactions for Stored Materials</u>.

        (a)    <u>Increase Transactions for Materials Stored On-Site</u>. Any requests for Increase Transactions which, in whole or in part, relate to materials, equipment or furnishings which Obligor owns and which are not incorporated into the Improvements as of the date of the request for Transaction, but are to be temporarily stored at the Project, shall be made to the extent the request relates to such stored materials so long as (i) to the extent Administrative Agent so elects, Administrative Agent and/or Financiers' Consultant shall have inspected the materials, equipment or furnishings and approved the quality and quantity thereof; and (ii) the request is accompanied by (A) proof that such stored materials are included within the coverages of takaful plans/insurance policies carried by Obligor or proof of other takaful/insurance which has been approved by Administrative Agent in its reasonable discretion, (B) evidence reasonably satisfactory to Administrative Agent that the ownership of such materials is, or upon payment will be, vested in Obligor free of any liens and claims of third parties other than Administrative Agent; and, (C) evidence reasonably satisfactory to Administrative Agent that such materials are protected against theft or damage. Administrative Agent may require a separate security agreement and Uniform Commercial Code financing statements to cover any such materials, equipment or furnishings so stored at the Project in addition to other information and assurances in regard thereto. In no event shall Financiers be obligated to enter into a Transaction for on-site stored materials where more than $5,000,000 is outstanding with respect to such materials at any given time.

        (b)    <u>Increase Transactions for Materials Stored Off-Site</u> Any requests for Increase Transactions which, in whole or in part, relate to materials, equipment or furnishings which Obligor owns and which are not incorporated into the Improvements as of the date of the request for Transaction and are not to be temporarily stored at the Project, shall be made to the extent the request relates to such stored materials so long as (i) to the extent Administrative Agent so elects, Administrative Agent and/or Financiers' Consultant shall have inspected the materials, equipment or furnishings and approved the quality and quantity thereof; and (ii) the request is accompanied by (A) proof that such stored materials are included within the coverages

of takaful plans/insurance policies carried by Obligor or proof of other takaful/insurance which has been approved by Administrative Agent in its reasonable discretion, (B) evidence reasonably satisfactory to Administrative Agent that the ownership of such materials is, or upon payment will be, vested in Obligor free of any liens and claims of third parties other than Administrative Agent; and, (C) evidence reasonably satisfactory to Administrative Agent that such materials are protected against theft or damage. Administrative Agent may require a separate security agreement and Uniform Commercial Code financing statements to cover any such materials, equipment or furnishings not stored at the Project in addition to other information and assurances in regard thereto. In no event shall Financiers be obligated to enter into a Transaction for off-site stored materials where more than $13,000,000 is outstanding with respect to such materials at any given time.

    11.8    Draws After Completion Date. Administrative Agent shall permit Increase Transactions subsequent to the Substantial Completion Date, but prior to the Construction Completion Date, and otherwise pursuant to this Agreement so long as, in Administrative Agent's reasonable judgment, the Construction will be Completed prior to the Construction Completion Date.

    11.9    Funding of Imprest Account. Obligor shall be permitted to include in its first Transaction Request the sum of $1,000,000.00 to be held in an imprest account (the "**Imprest Account**"), which account shall be under the control of Obligor, for the purpose of making disbursements related to the Costs of Improvements. Administrative Agent and Financiers agree that upon the making by Obligor of subsequent Transaction Requests, Obligor shall be entitled to replenish the Imprest Account upon the presentation of the documents required for a Transaction Request pursuant to Section 11.4 hereof, and to extent, that sums on deposit in the Imprest Account were utilized by Obligor to pay for Costs of Improvements. In no event shall Financiers be required to fund the Imprest Account in an amount that will increase the balance therein beyond $1,000,000.00.

## ARTICLE 12
## OBLIGOR'S OBLIGATIONS FOR THE
## FINAL TRANSACTION FOR CONSTRUCTION PAYMENTS

    12.1    Obligations Prior to the Final Increase Transaction. As a condition to the final Increase Transaction:

        (a)    Obligor shall have furnished to Administrative Agent reasonably satisfactory evidence that the Construction has been completed substantially in accordance with the Plans and Specifications free and clear of mechanics' liens and security interests;

        (b)    Obligor shall have furnished to Administrative Agent evidence that takaful/insurance meeting the requirements set forth on Exhibit F are in full force and effect;

        (c)    Obligor shall have furnished to Administrative Agent, at or about the time of Completion of Construction, copies of all licenses and permits required by any Governmental Authority having jurisdiction for the occupancy of the Improvements and the operation thereof, including a temporary certificate of occupancy from the municipality in which



the Project is located accompanied by certificates from Obligor and General Contractor, each dated at or about the date of Completion of Construction, certifying that (i) no notices of any claimed violations of Laws arising from the Construction or operation of the Project were served on the party making such certification which have not been cured or, to the best of such party's knowledge, General Contractor or any Subcontractor or their respective agents or representatives, and (ii) the party making such certification is not aware of any circumstances which could give rise to the issuance of any such notice of claimed violation;

(d) All fixtures, furnishings, furniture, equipment and other property contemplated under any Plans and Specifications relating thereto to be incorporated into or installed in the Improvements by Obligor shall have been installed or incorporated free and clear of all liens and security interests except those in favor of Administrative Agent;

(e) Obligor shall have furnished to Administrative Agent a full and complete certified set of "as built" Plans and Specifications for the Improvements;

(f) Obligor shall have furnished to Administrative Agent a full and complete "as built" survey for the Project showing all Improvements and certified as Administrative Agent may then reasonably require;

(g) Obligor shall have furnished to Administrative Agent copies of all final waivers of lien and sworn statements from contractors, subcontractors and material suppliers and an affidavit from General Contractor and the Major Subcontractors in accordance with the Lien Law;

(h) Obligor shall have furnished to Administrative Agent a certificate from the Architect or other evidence reasonably satisfactory to Administrative Agent stating that the Improvements (x) have been completed substantially in accordance with the Plans and Specifications relating thereto, and (y) the Improvements as so completed, comply with all Applicable Law;

(i) Administrative Agent shall have determined in consultation with Financiers' Consultant that the Improvements have been completed substantially in accordance with the Plans and Specifications relating thereto;

(j) Obligor shall have furnished Administrative Agent with a certificate from each surety providing a Bond, consenting to the final Increase Transaction under the Facility;

(k) Obligor shall provide evidence reasonably satisfactory to Administrative Agent that the transactions contemplated by and the obligations pursuant to the Zoning Agreements have been finalized and fulfilled.

## ARTICLE 13
## OBLIGOR'S AGREEMENTS

13.1    Obligor's Agreements. Obligor further covenants and agrees as follows:

(a)    Satisfaction of Facility Opening Date Conditions on or Prior to the Facility Opening Date. All work completed on or prior to the Facility Opening Date has been performed substantially in accordance with the Plans and Specifications relating to such work.

(b)    Construction of Improvements.    The Improvements will be constructed and fully equipped in a good and workmanlike manner with materials of reasonably high quality, substantially in accordance with the Plans and Specifications relating thereto (or in accordance with any changes therein permitted by Administrative Agent pursuant to Section 13.1(c) or as otherwise permitted by the Facility Documents). The Construction shall be prosecuted with due diligence and continuity in accordance with the Construction Schedule subject to Unavoidable Delay, and shall be Substantially Completed not later than the Substantial Completion Date.

(c)    Changes in Plans and Specifications and Subcontracts.

(i)    Except as set forth in clause (ii) below, no changes will be made in any Plans and Specifications without the prior written approval of Administrative Agent in its reasonable discretion.

(ii)    Subject, in all instances, to the provisions of Article 9 hereof, the General Contract may not be materially modified amended, terminated or canceled in any respect without, in each case, the prior written reasonable approval of Administrative Agent: *provided*, *however*, Obligor may enter into a change order without Administrative Agent's consent so long as (i) the aggregate change orders with respect to any single Line Item does not change the relevant Line Item by the lesser of (x) ten percent (10%), and (y) $3,000,000, and (ii) the aggregate of the change orders entered into, including the proposed change order, does not change the Budget, in the aggregate, more than five million dollars ($5,000,000); Any change order that fails to meet the foregoing criteria shall be subject to approval by Administrative Agent, which approval shall not be unreasonably withheld, conditioned or delayed.

(iii)    Financiers shall not be required to make any Transactions for change orders or Subcontracts which are not fully executed, delivered and approved by Required Financiers, to the extent that such approval is required by this Agreement.

(d)    Inspection by Administrative Agent. Obligor will reasonably cooperate with Administrative Agent in arranging for inspections by representatives of Administrative Agent and Financier's Consultants of the Project from time to time including an examination of (i) the Construction, (ii) all materials to be used in Construction, (iii) all plans and shop drawings which are or may be kept at the construction site, (iv) any contracts, bills of sale, statements, receipts or vouchers in connection with the Improvements, (v) all work done, labor performed, materials furnished in and about the Improvements, (vi) all books, contracts and records with respect to the Improvements, and (vii) any other documents relating to the Improvements or the construction thereof, and Obligor will reasonably cooperate and instruct

68

General Contractor and Major Subcontractors and the other subcontractors to reasonably cooperate with Financiers' Consultant to enable him to perform his functions hereunder.

(e)     Mechanics' Liens and Contest Thereof.  Obligor will, if any mechanic's lien claim is filed or otherwise asserted against the Project or any funds due General Contractor or Major Subcontractors (each a "**Lien**" and collectively "**Liens**"), discharge same, by either payment or the posting of a bond in accordance with Lien Law Section 19(4), (as amended and in compliance with all other laws), or cause Title Company to provide affirmative takaful/insurance against within ten (10) days after receipt of notice of the filing of any claims for lien and, in any event, prior to proceedings for the enforcement thereof; *provided, however*, that Obligor and General Contractor shall have the right to contest in good faith and with diligence the validity of any such lien or claim upon discharging same of record by posting a bond as set forth above and furnishing to Title Company and Administrative Agent evidence of same and such other security, indemnities, documentation and/or agreements as Title Company may require to induce Title Company to issue an endorsement to the Title Policies or affirmative coverage insuring against all such claims or liens (including inchoate liens); and *provided, further*, that (i) Financiers will not be required to make any Increase Transactions until any mechanic's lien filed against the Project or any part thereof have been insured against by Title Company and are being diligently contested by Obligor, or (ii) Administrative Agent shall have received evidence reasonably satisfactory to it that such mechanic's lien shall have been discharged of record.

(f)     Settlement of Mechanics' Lien Claims.  If Obligor shall fail, within thirty (30) days after becoming aware of any mechanic's lien to either (i) discharge same of record, or (ii) contest claims asserted and give security or indemnity in the manner provided in Section 13.1(e) above, or having commenced to contest the same, and having given such security or indemnity, shall fail to prosecute such contest with diligence, or to maintain such indemnity or security so required by Title Company for its full amount, or upon adverse conclusion of any such contest, to cause any judgment or decree to be satisfied and lien to be released, then and in any such event Administrative Agent upon prior notice of not less than 10 days to Obligor may, at its election (but shall not be required to), procure the release and discharge of any such claim and any judgment or decree thereon and, further, may in its reasonable discretion effect any settlement or compromise of the same, or may furnish such security or indemnity to Title Company, and any amounts so expended by Administrative Agent or Financiers, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute the Purchase Price of a Transaction under the Facility. In settling, compromising or discharging any claims for lien, neither Administrative Agent nor any Financier shall be required to inquire into the validity or amount of any such claim. Notwithstanding the foregoing, Financiers shall have no obligation to make Increase Transactions prior to Obligor having obtained affirmative insurance against such lien issued by the Title Company, bonded or otherwise discharged any claims in accordance with Section 13.1(e) above.

(g)     Renewal of Takaful/Insurance.  Subject to Financiers' obligation set forth in Section 13.1(m) below, Obligor covenants to maintain, at all times, casualty, liability and other plans/policies of takaful/insurance relating to the Project as more particularly set forth in Exhibit F hereto. Obligor shall timely pay all contributions/premiums on all takaful plans/

insurance policies required hereunder, and as and when additional takaful insurance is required, from time to time, during the term of the Facility, and at least fifteen (15) days prior to the date on which any plans/policies of takaful/insurance shall expire, furnish to Administrative Agent, proof that the takaful plans/insurance policies with companies, coverage and in amounts reasonably satisfactory to Administrative Agent in accordance with <u>Exhibit F</u> will be in full force and affect. Nothing in this subsection shall affect the right of Administrative Agent hereunder, from and after the occurrence of an Event of Default, to place takaful/insurance as set forth in <u>Exhibit F</u> and treat the amounts expended therefor as the Purchase Price of a Transaction (even if the total amount of the Aggregate Purchase Price would thereafter exceed the aggregate face amounts of the Notes).

(h)     <u>Payment of Taxes</u>.  Subject to Financiers' obligation set forth in <u>Section 13.1(m)</u> below, Obligor shall pay special assessments which have been placed in collection and all real estate taxes and assessments and charges of every kind upon the Project before the same become delinquent; <u>*provided*</u>, <u>*however*</u>, that Obligor shall have the right to pay such tax or assessment under protest or to withhold payment therefor and otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such tax or assessment so contested and also of preventing the imposition of any penalty and the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Obligor has notified Administrative Agent, in writing, of its intent to contest such tax or assessment, and (iii) if the tax or assessment has not been paid Obligor has deposited security in form and amount reasonably satisfactory to Administrative Agent and has increased the amount of such security so deposited promptly after Administrative Agent's request therefor. If Obligor fails to commence such contest or, having commenced such to contest, and having deposited such security required by Administrative Agent for its full amount, shall thereafter fail to prosecute such contest in good faith and with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Administrative Agent upon prior notice to Obligor may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any profit or penalty thereon, and any amounts so expended by Administrative Agent shall be deemed to constitute the Purchase Price of a Transaction hereunder (even if the total amount of Aggregate Purchase Price would exceed the aggregate face amounts of the Notes).

(i)     <u>Personal Property</u>.  Except for materials stored off-site, all of Obligor's personal property, fixtures, attachments and equipment delivered upon, attached to or used in connection with the Construction or the operation of the Project shall always be located at the Project and shall be kept free and clear of all chattel mortgages, conditional vendor's liens and all liens, encumbrances and security interests whatsoever (except for such liens, encumbrances and security interests granted to Administrative Agent for the benefit of Financiers pursuant to the Facility Documents), and Obligor will be the absolute owner of said personal property, fixtures, attachments and equipment, and will, from time to time, upon reasonable request of Administrative Agent furnish Administrative Agent with reasonably satisfactory evidence of such ownership, including searches of applicable public records.

(j)     <u>Chattel Mortgage Security Agreement</u>.  Upon Administrative Agent's reasonable request, Obligor will execute and deliver, or cause to be executed and delivered, a chattel mortgage-security agreement upon Obligor's furniture, furnishings, fixtures and equipment to the extent so required and other supporting documents which Administrative

Agent may reasonably require in connection therewith, including financing statements and searches of records under the Uniform Commercial Code.

(k)    Proceedings to Enjoin or Prevent Construction. If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the Construction, occupancy, maintenance or operation of the Improvements or any portion thereof, Obligor will cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom, and will, without limiting the generality of the foregoing, resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such proceedings and of any other proceedings of the nature referred to in Section 3.1(b).

(l)    Cash Management. Obligor shall not release or use any Contract Deposit, Option Payment or any portion of either for costs incurred in connection with the Construction or for any other purposes, it being the intent that the full amount of each Contract Deposit and Option Payment shall be held in escrow until such time as (i) the Unit with respect to which the same has been deposited has been conveyed to a Contract Vendee in accordance with the Facility Documents, or (ii) a Contract Vendee properly cancels its Sale Contract or Option Agreement, as applicable, in which case such Contract Deposit or Option Payment shall be refunded to Contract Vendee, or (iii) Contract Vendee has defaulted and Obligor is entitled to the Contract Deposit or Option Payment in which case such sum, to the extent of Obligor's rights in the same, shall promptly be paid to Administrative Agent and applied to the Deferred Sale Price.

(m)    Payment of Taxes and Takaful Contributions/Insurance Premiums. So long as no Event of Default has occurred and is continuing Financiers shall enter into Increase Transactions to the extent necessary to pay real estate taxes (including special assessments) and all takaful contributions/insurance premiums on all policies required to be maintained by Obligor under the Facility Documents so long as such policies are maintained for the Project alone and not for the general or other business operations of Obligor, Sole Member, Guarntors or any of their Affiliates; *provided, however,* Financiers shall not be required to make any disbursements to the extent same is not provided for in the Budget.

(n)    Financier's and Administrative Agent's Attorneys' Fees for Enforcement of Agreement. In case of any Default or Event of Default hereunder, Obligor will pay the reasonable, attorneys' fees (including any attorneys' fees and costs incurred in connection with any litigation, bankruptcy or administrative hearing and any appeals therefrom) of Administrative Agent and Financiers in connection with the enforcement of this Agreement. Without limiting the generality of the foregoing, if at any time or times hereafter Administrative Agent or Financiers employ counsel (whether or not any suit has been or shall be filed and whether or not other legal proceedings have been or shall be instituted) for advice or other representation with respect to the Project, this Agreement, or any of the other Facility Documents, or to protect, collect, lease, sell, take possession of, or liquidate any of the Project, or to attempt to enforce any security interest or lien in any portion of the Project, or to enforce any rights of Administrative Agent or Financiers, or Obligor's Obligations hereunder or any other Person under this Agreement or any other agreement, instrument or document, heretofore

71

or hereafter delivered to Administrative Agent or Financiers by or on behalf of Obligor, then in any of such events all of the reasonable, fees arising from such services, and any costs and charges relating thereto, shall constitute an additional liability owing by Obligor to Administrative Agent for the benefit of Financiers, payable within five (5) Business Days of demand therefore and secured by the Building Facility Mortgages and the other Facility Documents.

(o)     Administrative Agent's Action for its Own Protection Only.  The authority herein conferred upon Administrative Agent and Financiers and any action taken by Administrative Agent or Financiers in making inspections of the Project, procuring sworn statements and waivers of lien, approving Major Subcontracts and approving Plans and Specifications, will be taken by Administrative Agent or Financiers and by Financiers' Consultant for their own protection only, and none of Administrative Agent, Financiers or Financiers' Consultant shall be deemed to have assumed any responsibility to Obligor with respect to any such action herein authorized or taken by Administrative Agent, Financiers or Financiers' Consultant or with respect to the proper construction of Improvements, performance of Subcontracts by any Subcontractors, or prevention of claims for mechanics' liens. Any review, investigation or inspection conducted by Administrative Agent, Financiers, Financiers' Consultant or any agent or representative of Administrative Agent or Financiers in order to verify independently Obligor's satisfaction of any conditions precedent to Transactions under this Agreement, Obligor's performance of any of its covenants, agreements and Obligations, or the validity of any representations and warranties made by Obligor hereunder (regardless of whether or not the party conducting such review, investigation or inspection should have discovered that any of such conditions precedent were not satisfied or that any such covenants, agreements or Obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by Administrative Agent or Financiers of) (i) any of Obligor's representations and warranties under the Facility Documents or Administrative Agent's reliance thereon or (ii) Administrative Agent's or Financiers' reliance upon any certifications of Obligor, General Contractor or the Architect required under this Agreement or any other facts, information or reports furnished Administrative Agent or Financiers by Obligor hereunder.

(p)     Authority to Furnish Copies.  Administrative Agent may exhibit or furnish copies of this Agreement or copies hereof to General Contractor, Subcontractors and materialmen employed in the Construction.

(q)     Furnishing Information.

(i)     Obligor shall deliver to Administrative Agent an annual financial statement, audited by Accounting Firm, not more than one hundred twenty (120) days after the end of each calendar year, commencing with calendar year 2016, and prepared in accordance with Accounting Method and certified as true, complete and correct, in all material respects, by the principal financial or accounting officer of Obligor.

(ii)     Obligor shall cause Guarantors to deliver to Administrative Agent annual financial statements certified by Accounting Firm (including a detailed balance sheet, income statement, cash flow statement and contingent liability schedule in substantially

the same form as accepted by Administrative Agent prior to the Closing Date) of such Guarantor prepared in accordance with Accounting Method by Accounting Firm within one hundred twenty (120) days of the end of each calendar year and certified as true, complete and correct, in all material respects, by the principal financial or accounting officer of such Guasrntor, along with a Financial Covenants Certification.

      (iii)  With respect to the Project, Obligor shall deliver to Administrative Agent:

      (1)  Within fifteen (15) days following the end of each calendar month, commencing with the first month in which public sales efforts are initiated, and a Condominium Sales Report (including copies of all Sale Contracts executed during such calendar month);

      (2)  Within fifteen (15) days after the end of each calendar quarter, a certificate of the principal financial or accounting officer of Obligor or Guarantors, as the case may be, stating that such officer knows of no Default or Event of Default which has occurred and is continuing, or, if any such Default or Event of Default has occurred and is continuing, specifying the nature and period of existence thereof and what action Obligor has taken or proposes to take with respect thereto.

      (iv)  Obligor, Sole Member and Guarntors shall provide such additional financial information Administrative Agent reasonably requires.

      (v)  Additionally, Obligor shall and shall cause Sole Member and Guarntors to:

      (1)  Within ten (10) Business Days of request therefore, supply Administrative Agent with such information concerning their respective affairs and property as Administrative Agent may reasonably request from time to time hereafter;

      (2)  within ten (10) Business Days after becoming aware of the same, notify Administrative Agent of any condition or event which constitutes (or which upon the giving of notice or lapse of time or both would constitute) an Event of Default of any term, condition, warranty, representation or provision of this Agreement or of any of the other Facility Documents;

      (3)  within ten (10) Business Days after becoming aware of the same, notify Administrative Agent of the existence of any Material Adverse Change in Obligor's, Sole Member's or Guarntors' financial condition or in connection with the operation of the Project;

      (4)  within ten (10) Business Days after becoming aware of the same, notify Administrative Agent in each instance of any litigation reasonably likely to result in a judgment in the amount of $250,000 or more against Obligor, the Sole Member, or Guarantors, the cause and expense of which are not covered by the applicable takaful plans/insurance policies;

(5)     upon reasonable prior notice and during regular business hours permit Administrative Agent or any of its agents or representatives to have access to and examine all of its books and records regarding the development and operation of the Project; and

(6)     permit Administrative Agent to copy and make abstracts from any and all of said books and records.

(r)     Documents of Further Assurance.  Obligor will, on written request of Administrative Agent, from time to time, execute, deliver and furnish documents as may be necessary to perfect and maintain perfected as valid liens upon the Project the liens granted by Obligor to Administrative Agent pursuant to this Agreement and the other Facility Documents, and to fully consummate the transactions contemplated under this Agreement.

(s)     Lost Note.  Upon Administrative Agent's furnishing to Obligor an affidavit to such effect together with an indemnity from Administrative Agent (or Financiers) reasonably satisfactory to Obligor, Obligor shall, if any Note is mutilated, destroyed, lost or stolen, deliver to Administrative Agent, in substitution therefor, a new promissory note or notes containing the same terms and conditions as the Note it is replacing with a notation thereon (i) of the unpaid Deferred Sale Price, and (ii) stating that such promissory note is a duplicate original of such Note, intended to replace such Note.

(t)     Indemnification.  Obligor shall indemnify Indemnified Person and defend and hold same harmless from and against all claims, injury, damage, loss and liability, actual cost and actual expense (including reasonable attorneys' fees, costs and expenses) of any and every kind to any persons or property by reason of (i) the Construction or other work contemplated herein; (ii) the operation or maintenance of the Project by Obligor (iii) any breach of any representation or warranty, default or Event of Default hereunder or under any of the other Facility Documents by Obligor; (iv) any other similar matter arising in connection with the Facility, Obligor or the Project, (v) any other action or inaction by, or matter which is the responsibility of, Obligor; or (vi) any construction of the parties or their relationship (as partners, joint venturers, or otherwise) excluding, however, in each case, any liability resulting from the gross negligence or willful misconduct of any such Indemnified Person or arising out of any event or condition which arises following the date such Indemnified Person (or any nominee or Affiliate thereof) takes title to the Project.

(u)     No Additional Obligations.  Obligor and Sole Member shall not, without the prior written consent of Administrative Agent, which consent may be withheld in Administrative Agent's sole discretion, create, incur, assume or suffer to exist any obligations of either Obligor or Sole Member (whether personal or nonrecourse, secured or unsecured, subordinate or otherwise), except for (i) the Facility, (ii) any trade credit incurred in the ordinary course of Obligor's business, and (iii) the Mezzanine Facility.

(v)     Compliance With Laws.  Obligor shall comply in all material respects with all applicable requirements (including compliance with all Applicable Law) of any Governmental Authority having jurisdiction over Obligor or the Project including all requirements and conditions set forth in all permits, licenses and other approvals which have

been obtained or are required to be obtained from Governmental Authorities for the construction, operation, use or occupancy of the Project. Throughout the term of the Facility, Obligor shall (i) obtain, or cause to be obtained, all approvals or consents required in connection with the performance or consummation by Obligor of any of its Obligations, and (ii) perform any and all work, repairs or improvements to the Project required from time to time by Applicable Laws. Obligor shall have the right to contest by appropriate legal proceedings the validity or application of any Applicable Law and to suspend compliance therewith during the period of such contest, *provided*, (A) such contest is conducted in good faith and with due diligence, (B) failure to comply with such Applicable Law shall not subject Administrative Agent or any Financier to any civil or criminal liability, (C) such contest shall not otherwise affect the priority or validity of the lien of the Building Facility Mortgages or other Facility Documents, (D) the Project or any part thereof or any interest therein shall not be in any imminent danger of being sold, forfeited or lost by reason of such contest by Obligor, (E) such contest shall not cause nor reasonably be expected to cause a Material Adverse Change in the value of the Project, and (F) upon a final determination of such proceeding, Obligor shall take all steps necessary to comply with such Law if that is the determination in such proceedings.

(w)    Charter Documents.  Except as set forth in Section 15.2 hereof, neither Obligor nor Sole Member shall, without the prior written consent of Administrative Agent, permit or suffer (i) any material amendment or modification of its operating agreement or certificate of formation, partnership agreement or certificate of partnership, or articles of incorporation or by-laws, as applicable, (ii) the admission of any new member, partner or shareholder, as applicable, or (iii) any dissolution or termination of its existence.

(x)    Hazardous Materials.

(i)    Obligor covenants that Obligor will not cause or permit the Project to contain Hazardous Materials in violation of Applicable Law, nor install, store, use, treat, transport or dispose of (or knowingly permit or acquiesce in the installation, storage, use, treatment, transportation or disposal by Obligor, its agents, employees, independent contractors or tenants of) any Hazardous Materials on the Project in violation of Applicable Law. In the event of any such prohibited installation, storage, use, treatment, presence, transportation or disposal, whether previously existing or hereafter occurring, and whether by Obligor, or any predecessor in title, or any employees, agents, contractors or third parties, Obligor shall remove or remediate any such Hazardous Materials in accordance with Applicable Law, and otherwise comply with all Applicable Law, all at the expense of Obligor. If Obligor shall fail to proceed with such removal or remediation or otherwise fail to comply with Applicable Law as soon as reasonably possible, and in any case within any cure period permitted under Applicable Law, this Agreement or the Environmental Indemnity, Administrative Agent may declare an Event of Default. In the event the presence of any Hazardous Materials requiring removal or remediation as set forth in this Section 13.1(x) is caused by the act or failure to act of any party other than Obligor, Obligor may commence appropriate proceedings to cause such other party to cause such removal or remediation, *provided*, *however*, the commencement of any such proceeding shall not relieve Obligor of its obligations to remove or remediate the presence of such Hazardous Materials as set forth herein. Notwithstanding anything contained herein or in any other Facility Document to the contrary, Administrative Agent acknowledges that Obligor may be maintaining, at the Project, small quantities of certain solvents, cleaning fluids, petroleum products, and other

items which may contain Hazardous Materials to be held in the normal course of trade to be used, treated, stored and disposed of in full compliance with applicable regulations for small-quantity generators, if any; provided: (i) the presence of such Hazardous Materials, in such concentrations, is not prohibited under Applicable Law, (ii) such Hazardous Materials, in such concentrations, is contained and stored in accordance with Applicable Law, and (iii) the acknowledgment by Administrative Agent as to the presence of such Hazardous Materials shall not diminish Obligor's obligation to indemnify Administrative Agent and Financiers against any loss or damage occasioned by the presence thereof.

(ii)     Obligor shall notify Administrative Agent in writing within ten (10) days of Obligor's becoming aware of any order or pending or threatened action by any Governmental Authority having jurisdiction over the Project, or any claims made by any third party, relating to Hazardous Materials on, or emanations from, the Project, and shall promptly furnish Administrative Agent with copies of any correspondence or legal pleadings in connection therewith.

(iii)     To the extent required by Applicable Law, Administrative Agent, after consulting with Obligor, shall have the right, but shall not be obligated, to notify any Governmental Authority having jurisdiction over the Project of information which Administrative Agent, in good faith, believes to be reliable, which may come to its attention with respect to Hazardous Materials on or emanating from the Project in violation of Applicable Law, and Obligor irrevocably releases Administrative Agent and Financiers from any claims of loss, damage, liability, expense or injury relating to or arising from, directly or indirectly, any such disclosure. In the event Administrative Agent provides such notice to any Governmental Authority, Administrative Agent shall promptly thereafter provide the same information to Obligor.

(iv)     Obligor agrees to defend, indemnify and hold harmless Indemnified Persons from and against all loss, costs, damage and expense (including attorneys' fees) Indemnified Persons (or an Affiliate thereof) (i) sustains by reason of an assertion by any party of any claim in connection with Hazardous Materials or (ii) incurs as a result of or in connection with the presence or removal of any Hazardous Materials on or from the Project, or (iii) resulting from activity on or off the Project, previously existing or hereafter occurring, and whether such activity was carried on by Obligor or any predecessor in title or any employees, agents, contractors or third parties, if such activity involved Hazardous Materials, in whole or in part, directly or indirectly, or non-compliance with any Applicable Laws relating thereto. If Indemnified Persons (or any nominee or Affiliate) takes title to the Project, the foregoing indemnification shall not apply to any loss, cost, damage or expense thereafter incurred to the extent the same arises out of any release, use, discharge, deposit, transportation, storage, processing or treatment of Hazardous Materials at or from the Project first occurring after (i) the date such Indemnified Persons (or any nominee or Affiliate) takes title to the Project or a receiver is appointed for the Property or (ii) Mezzanine Financier is in control of the membership interest in Obligor, whether through a UCC foreclosure or an assignment in lieu of foreclosure, provided that such claim, presence or removal of any Hazardous Materials or activity on or off the Project was not caused by Obligor (the "**Transfer Date**"); _provided_, _however_, that the foregoing indemnification shall otherwise remain in full force and effect, including with respect

to any loss, cost, damage or expense arising out of any Hazardous Materials existing at or about the Project on the Transfer Date.

(y)  Asbestos.  Obligor shall neither install nor knowingly permit to be installed in the Project friable Asbestos or any substance or material containing more than 1% Asbestos, and with respect to any Asbestos currently present within the Project shall promptly either (i) remove any material which Applicable Law deem hazardous and require to be removed or (ii) otherwise comply with such Applicable Laws at Obligor's expense. If Obligor shall fail to comply with any Applicable Law pertaining to Asbestos located at the Project, Administrative Agent may declare an Event of Default.

(z)  Furnishing Reports.  Upon Administrative Agent's request, Obligor shall provide Administrative Agent with copies of all inspections, reports, test results and other information received by Obligor from its employees, agents, representatives, architects, engineers, contractors and any other parties involved in the design, development or operation of the Project or which in any way relate to the Project or any part thereof.

(aa)  Management Agreement and Sales Agency Agreement.

(i)  Obligor shall not enter into, modify, amend, terminate or the Management Agreement, so long as such action or inaction, as the case may be, is within Obligor's authority pursuant to the Condominium Documents, without the reasonable prior written approval of Administrative Agent. The Project shall at all times after being subject to a Condominium Declaration be managed on behalf of Obligor by a Property Manager in a competent and professional manner appropriate for mixed use condominiums similar to the Project. Prior to engaging any Property Manager or executing any Management Agreement, each such Property Manager and Management Agreement shall be subject to approval by Administrative Agent in its reasonable discretion. Upon the recordation of the Condominium Declaration, Obligor shall deliver to Administrative Agent (i) a true, correct and complete copy of the fully-executed Management Agreement, approved by Administrative Agent and otherwise in compliance with the provisions of the Condominium Offering Plan, and (ii) a Consent and Agreement of Property Manager, executed by the Property Manager in favor of Administrative Agent, in the form attached to the Omnibus Forms Agreement. In the event that there shall have occurred and be continuing an Event of Default, then, upon Administrative Agent's request, Obligor shall replace any present Property Manager with a managing agent approved by Administrative Agent in its reasonable discretion in accordance with the Consent and Agreement of Property Manager, so long as such change is not prohibited by the Condominium Documents.

(ii)  Obligor shall not enter into, modify, amend, terminate or cancel the Sales Agency Agreement or any other agreements with agents or brokers, without the prior written reasonable approval of Administrative Agent. Units in the Project shall at all times be offered for sale by Selling Agent in a competent and professional manner appropriate for residential condominiums similar to the Project. Prior to engaging Selling Agent or executing any Sales Agency Agreement, each such Selling Agent and Sales Agency Agreement shall be subject to approval by Administrative Agent in its reasonable discretion and Selling Agent and Obligor represents it will deliver to Administrative Agent a Consent and Agreement of Selling Agent, in the form attached to the Omnibus Forms Agreement, executed by Selling Agent. In the



event that there shall have occurred and be continuing an Event of Default, then, upon Administrative Agent's request, Obligor shall replace any present Selling Agent with a selling agent approved by Administrative Agent in its reasonable discretion.

(bb)    Takaful/Insurance Reporting Requirements.    Obligor shall promptly notify the takaful/insurance carrier or agent therefor (with a copy of such notification being provided to Administrative Agent) if there is any increase in hazard relating to the Project, suspension of construction, or Transfer of ownership.

(cc)    Project Contracts.    Obligor will furnish Administrative Agent promptly, after execution thereof, executed copies of all contracts between Obligor, architects, engineers and contractors and all subcontracts between any General Contractor and all of their subcontractors and suppliers, which contracts and subcontracts may not have been furnished pursuant to Section 10.1(a) on the Facility Opening Date.

(dd)    Correction of Defects.    Within ten (10) days after Obligor acquires knowledge of or receives notice of a defect in the Project or any material departure from any Plans and Specifications, other than pursuant to a change order approved by Administrative Agent pursuant to the terms of this Agreement (or pursuant to a change order which Administrative Agent is not required to approve pursuant to the terms of this Agreement), Obligor will proceed with diligence to correct or otherwise remedy all such defects and departures. Obligor shall complete such correction or remedy within thirty (30) days after Obligor acquires such knowledge or is given such notice, or, if such correction or remedy cannot be completed within thirty (30) days, such additional period of time as it shall take with diligence to complete such corrections or remedies. Upon Obligor acquiring knowledge of such defect or material departure from such Plans and Specifications, Obligor shall promptly advise Administrative Agent in writing of such matter and the measures being taken to make such corrections or remedy such defect or material departure along with an estimate of the time of completion. Prior to, and as a condition of, a subsequent Increase Transaction, Obligor shall advise Administrative Agent of the status of all defects and any corrections which have not been completed. No Transaction shall constitute a waiver of Administrative Agent's right to require compliance with this covenant with respect to any such defect or departure from such Plans and Specifications or any other requirements of this Agreement, nor shall anything in this subsection affect Obligor's obligation to achieve Substantial Completion by the Substantial Completion Date or complete the Construction on or before the Construction Completion Date.

(ee)    Hold Transaction Proceeds in Trust.    Obligor shall receive all Transaction proceeds, as a trust fund in accordance with the provisions of the Lien Law to be applied first for the purpose of paying the Costs of Improvements, and will apply all such Transaction proceeds first to the payment of the Costs of Improvements before using any part of such Transaction proceeds for any other purpose. A true statement under oath by Obligor, as required pursuant Section 22 of the Lien Law, is attached hereto as Exhibit G (as such statement may hereafter be modified, amended or changed in accordance with the terms of this Agreement, the "**Section 22 Lien Law Affidavit**"). Obligor shall indemnify Administrative Agent and Financiers and hold Administrative Agent and Financiers harmless from and against any and all claims, damages, judgments, liabilities, costs and expenses of every kind (including, without

limitation, reasonable attorneys' fees and expenses) by reason of the Section 22 Lien Law Affidavit being untrue, violated or deficient in any respect.

(ff) <u>Appraisals</u>. Administrative Agent shall have the right to obtain an Appraisal annually, at Obligor's Expense. Subsequent to the Facility Opening Date, Administrative Agent will obtain an Appraisal in eleven (11) to thirteen (13) month intervals (each, an "**Annual Appraisal**").

(gg) <u>Alterations</u>. Without the prior written reasonable consent of Administrative Agent, Obligor shall not make any material alterations to the Project or the Plans and Specifications except as amended by change orders approved by Administrative Agent or for which Administrative Agent's approval is not required pursuant to the terms of this Agreement.

(hh) <u>Prohibition Against Cash Distributions</u>. The proceeds shall be used for Shariah compliant purposes. Until such time as the all sums due and payable under the Facility shall have been repaid in full, Obligor shall not have the right to make, and shall not make, any distributions or payments to or for the benefit of any of its Members or their Affiliates or to any direct or indirect equity holder in Obligor; *provided, however*, notwithstanding the foregoing, so long as no Event of Default shall have occurred and is continuing, Obligor shall have the right to make distributions of monies to Sole Member, solely to the extent, as a result of Administrative Member's consent, such monies are (x) not required to be paid to Administrative Agent or to the obligations or (y) otherwise required to be applied to the Project pursuant to this Agreement, and in each case, solely for the purpose of distribution to the financier under the Mezzanine Facility for application against the obligations under such Mezzanine Facility.

(ii) <u>Use of Facility Proceeds</u>. Obligor shall not use or permit any Facility proceeds to be used for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System) or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(jj) <u>Single Purpose Entity</u>. Obligor and Sole Member organizational documents shall at all times conform to the requirements of <u>Section 3.2</u> hereof, provided that Obligor's sole purpose shall be to own, develop, manage, operate, maintain, sell and lease the Project, as applicable, and Obligor shall not engage in activities for any other purpose.

(kk) <u>Control.</u> Obligor is, and shall at all times during the term of the Facility be, under the Control of Sharif El-Gamal.

(ll) <u>Commencement of Construction</u>. Obligor will commence Construction not later than the Construction Commencement Date.

(mm) <u>No Waivers</u>. Obligor shall not waive, or consent to the waiver of, performance by, or any other obligation of, any other party thereto of its material obligations under the General Contract, without in each such instance the prior written approval thereto of Administrative Agent.

(nn) <u>Mortgage and Recording Taxes</u>. Obligor shall pay all mortgage, mortgage recording, stamp, intangible or similar taxes in respect of the issuance of the Notes or



the recording of the Mortgages or the execution and delivery of any other documents in connection with the Facility. Obligor further covenants and agrees to defend, at Obligor's sole cost and expense, any claim that may be made against Administrative Agent and/or Financiers for the payment of any such mortgage, mortgage recording, stamp, intangible or similar taxes.

(oo)   Compliance with Management Agreement.   Obligor will timely comply with all of the material terms and conditions on its part to be performed under the Management Agreement. Obligor shall promptly provide Administrative Agent with copies of all material notices, sent by Obligor to the Property Manager or received by Obligor from the Property Manager pursuant to the provisions of the Management Agreement.

(pp)   Compliance with Sales Agency Agreement.   Obligor will timely comply with all of the material terms and conditions on its part to be performed under the Sales Agency Agreement. Obligor shall promptly provide Administrative Agent with copies of all material notices, sent by Obligor to the Selling Agent or received by Obligor from the Selling Agent pursuant to the provisions of the Sales Agency Agreement.

(qq)   Filing of Condominium Documents.   Obligor has obtained approval and acceptance from the Attorney General of New York State with respect to the Condominium Offering Plan.

(rr)   Condominium Documents.   Obligor shall not be in default under and will timely comply with all of the terms and conditions on its part to be performed under the Condominium Documents. Obligor shall not modify, amend, or otherwise alter in any manner the Condominium Documents, except as permitted by the terms of this Agreement, to increase the sale prices of Units set forth therein, without the prior written consent of Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed. Additionally, Obligor shall provide copies of all correspondence to or from the Office of the New York State Attorney General within three (3) Business Days from the date thereof with respect to the Condominium Documents.

(ss)   Unit Sale Contract Deposits.   Obligor shall not at any time hereafter exercise any right Obligor may have under Applicable Law to use any Contract Deposits under any Sale Contract or to post a bond or other security with a Governmental Authority to receive payment of such Contract Deposits, without Administrative Agent's prior written consent, which consent may be withheld in Administrative Agent's sole and absolute discretion.

(tt)   Financiers' Consultant.   Administrative Agent shall have the right to retain, at Obligor's expense, Financiers' Consultant to review, analyze and make recommendations to Administrative Agent with respect to, among other things, environmental matters, any Plans and Specifications, the Budget, the Construction Schedule, Transaction Requests, the General Contract, Major Subcontracts and all subcontracts. Financiers' Consultant shall have the right to inspect the Project at any time upon reasonable notice.

(uu)   Construction Contracts.   All Contracts and Subcontracts shall provide for a minimum Retainage as set forth in Section 11.5.

(vv)    Developer's Fees and Obligor's Overhead.    Obligor shall be permitted to pay its overhead and a development fee to Soho Properties Development LLC as set forth in the Budget; *provided*, *however*, such fee shall not be payable during the continuance of an Event of Default.

(ww)    Zoning Agreements.    Obligor shall perform all of its duties and obligations under the Zoning Agreements and shall keep all Zoning Agreements in full force and effect. If at any time a default arises under any of the Zoning Agreements, due to the action or inaction of Obligor, Obligor shall promptly notify Administrative Agent of same and shall promptly begin to render any performance necessary to eliminate such default. If at any time a default arises under any of the Zoning Agreements due to the action or inaction of a counterparty to any of the agreements, Obligor shall promptly exercise all of its rights and remedies under such agreement. Obligor shall not amend or modify any of the Zoning Agreements without Administrative Agent's written consent, which consent shall not be unreasonably withheld.

(xx)    Obligor shall promptly deliver to Administrative Agent copies of all correspondence it receives with respect to any of the Zoning Agreements.

13.2    Obligor's Agreements With Respect to Sales of Units.

(a)    All Units shall be Closed in accordance with a Sale Contract or an Option Agreement and all deposits made by Contract Vendees shall be deposited into an escrow account with Condominium Escrow Agent;

(b)    Obligor shall not, without the prior written consent of Administrative Agent in each instance, materially modify, amend, supplement or terminate (except in the case of an uncured default by Contract Vendee thereunder) any Sale Contract or Option Agreement.

(c)    Obligor shall promptly notify Administrative Agent of all matters of which Obligor has received notice that a material default by Obligor under or noncompliance with any Sale Contract, Option Agreement or Condominium Document exists or is about to occur, and Obligor shall do all such acts and undertake all such steps and institute all such proceedings as shall be reasonably necessary to cure or avert such default or noncompliance and will promptly forward to Administrative Agent any notices Obligor receives in regard to any of the foregoing matters.

(d)    Any sale of a Unit shall (i) be in full compliance with all applicable Legal Requirements, including, without limitation, the Magnuson-Moss Warranty Act, the Federal Reserve Board Regulations "B" (Equal Credit Opportunity Act) and "Z" (Truth-in-Lending), and the Department of Housing and Urban Development Regulation "X" (RESPA), and any requirement for such Unit to have a permanent or temporary certificate of occupancy, (ii) not be considered the sale of a security under the Securities Act of 1933, and (iii) be in compliance with the applicable Condominium Documents.

(e)    Obligor shall not release or use any Contract Deposits or any portion thereof for costs incurred in connection with the construction of any Improvements or for any other purposes, it being the intent that the full amount of each Contract Deposit shall be held

by Escrow Agent until such time as (i) the Unit with respect to which the same has been deposited has been conveyed to a Contract Vendee in accordance with the Facility Documents, or (ii) Contract Vendee thereunder properly cancels its Approved Sale Contract (in which case such deposit shall be refunded to Contract Vendee, if Contract Vendee is entitled to same), or (iii) Contract Vendee has defaulted and Obligor retains the same (in which case such sum, to the extent of Obligor's rights in the same, shall promptly be paid to Administrative Agent and, provided that no Event of Default has Occurred, shall be treated as a payment applicable to the Deferred Sale Price).

(f)     Within five (5) days after each closing of the conveyance of a residential Unit, to the extent not already delivered to Financier, Obligor shall deliver to Administrative Agent a true and complete copy of the executed closing statement (certified to be true, correct and complete by Obligor) signed by Obligor and the purchaser in respect to such residential Unit sale.

13.3    Leases. Obligor will not enter into any lease for any portion of the Project without the prior reasonable written consent of Administrative Agent and the execution of an assignment of leases and rents, a cash management agreement, a subordination, non-disturbance and attornment agreement and other documents reasonably requested by Administrative Agent.

## ARTICLE 14
## CASUALTY AND CONDEMNATION

14.1    Administrative Agent's Election to Apply Takaful/Insurance or Condemnation Proceeds.

(a)     Subject to the provisions of Section 14.1(b) below, Administrative Agent (for the benefit of Financiers) may elect to collect, retain and apply to the Obligations all proceeds of takaful/insurance or condemnation (individually and collectively referred to as "**Proceeds**") after deduction of all reasonable expenses of collection and settlement, including reasonable attorneys' and adjusters' fees and charges, to the extent they may suffice to pay the Obligations, and if the same are insufficient to pay such amount in full, to declare the balance remaining unpaid on the Notes and Building Facility Mortgages to be immediately due and payable and avail itself of any of the remedies afforded thereby as in the case of an Event of Default. Any proceeds remaining after application to the Obligations, as aforesaid, shall be paid to Obligor.

(b)     In the event of any casualty affecting the Project, or any condemnation of all or any part of the Project, Obligor shall have the option of applying the Proceeds to restoration thereof only if:

(i)     no Event of Default exists and in Administrative Agent's judgment the cost to restore the Improvements is not greater than **$40,000,000**; or

(ii)    (A) no Event of Default exists and in Administrative Agent's judgment the cost to restore the Improvements is greater than **$40,000,000**, (B) all Proceeds are deposited with Administrative Agent so that Administrative Agent may disburse such proceeds to repair or restore the Improvements in accordance with this Article 14, (C) in

Administrative Agent's judgment, the amount of Proceeds available for restoration of the Improvements (together with undisbursed proceeds of the Facility, if any, allocated for the cost of the Construction and any sums or other security reasonably acceptable to Administrative Agent deposited with Administrative Agent by Obligor for such purpose) is sufficient to pay the full and complete costs of such restoration, (D) in Administrative Agent's determination, upon completion of such restoration the ratio of the Facility to the value of the total projected sales value of the Project will not exceed the ratio of the Facility to the value of the total projected sales value of the Project immediately prior to such casualty, but in no event greater than seventy percent (70%), (E) all applicable Guaranties are reaffirmed with respect to such casualty and reinstated so that it is in full force and effect and covers such restoration, (F) in Administrative Agent's determination, the Project can be restored to an architecturally and economically viable project in compliance with Applicable Law, including zoning laws and ordinances, and (G) in Administrative Agent's reasonable determination, such restoration is likely to be completed not later than three (3) months prior to the Termination Date.

14.2    Obligor's Obligation to Rebuild or Restore; Use of Takaful/Insurance and Condemnation Proceeds. In case Administrative Agent does not elect to apply or does not have the right to apply the Proceeds toward the payment, as provided in Section 14.1 above, Obligor shall:

(a)    Proceed with diligence to make settlement with insurers or the appropriate Governmental Authorities and cause the Proceeds to be deposited with Administrative Agent; *provided, however*, that Obligor shall not approve or accept any settlement without the prior written approval of Administrative Agent (not to be unreasonably withheld) if Proceeds exceed $40,000,000.00;

(b)    In the event the Proceeds, the available proceeds of the Facility and the monies on deposit in the Deficiency Accounts are insufficient to assure Administrative Agent that the Facility will be In Balance, deposit with Administrative Agent within ten (10) days after Administrative Agent's request therefor (but in any event prior to any Increase Transaction) any amount necessary to place the Facility In Balance; and

(c)    Promptly proceed with the Construction, including the repair of all damage resulting from such fire, condemnation or other cause and restoration to its former condition.

All Proceeds and funds deposited by Obligor with Administrative Agent hereunder shall first be fully disbursed before any Increase Transaction is made. In the event of deposit by Obligor of the full amount required to complete construction, as aforesaid, and the subsequent receipt of Proceeds, such Proceeds, as and when received, may be collected and retained by Obligor. Any request by Obligor for an Increase Transaction by Administrative Agent of Proceeds and funds deposited by Obligor shall be treated by Administrative Agent as if such request were for an Increase Transaction, and the disbursement thereof shall be conditioned upon Obligor's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an Increase Transaction.

14.3    Condominium Declaration.    Notwithstanding anything to the contrary contained herein upon recording of the Condominium Declaration in accordance with this Agreement, this Article 14 shall be subject thereto.

14.4    Prepayments Pursuant to this Article 14.    So long as Obligor is acting in accordance with this Article 14, Obligor shall have the right to pay the Obligations in whole within one hundred twenty (120) days of notice to Obligor of Administrative Agent's decision to apply any casualty or condemnation proceeds to payment of the Obligations.

## ARTICLE 15
## ASSIGNMENTS; FINANCIER'S RIGHT TO ASSIGN

15.1    Assignments.

(a)    Any Financier shall have the right, at its sole cost and expense, to assign or transfer (such Financier an "Assigning Financier") this Agreement and any of its rights and security hereunder and under the other Facility Documents to any Permitted Assignee; provided that (i) the parties to each such assignment shall execute and exchange an assignment and assumption agreement ("Assignment and Assumption") in substantially the form attached to the Omnibus Forms Agreement, and (ii) each such assignment shall be of all of the assignor's rights and obligations under this Agreement to the extent of the interest so assigned. Upon such execution and exchange and upon the effective date specified in the applicable Assignment and Assumption, (A) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it and assumed by it pursuant to such Assignment and Assumption, shall have the rights and obligations of a Financier hereunder and under the other Facility Documents, and Obligor hereby agrees that all of the rights and remedies of Assigning Financier in connection with the interest so assigned shall be enforceable against Obligor by a Permitted Assignee with the same force and effect and to the same extent as the same would have been enforceable by Assigning Financier, and (B) the Assigning Financier, to the extent that rights and obligations hereunder and under the other Facility Documents have been assigned by it pursuant to such Assignment and Assumption, shall relinquish its rights and shall be released from all of its obligations hereunder and thereunder. All the rights and remedies of Obligor in connection with the interest so assigned shall be enforceable against the Permitted Assignee.

(b)    (i)    Upon receipt of a fully executed and completed Assignment and Assumption, Administrative Agent shall accept such Assignment and Assumption, and record the information contained therein in its records, and Administrative Agent shall promptly deliver a copy thereof to Obligor. Such assignment shall not affect or modify, in any way, the obligations of Obligor under the Facility Documents, including obligations with respect to payments of principal and profit under the Facility.

(ii)    Administrative Agent shall maintain a copy of each Assignment and Assumption delivered to and accepted by it and shall record in its records the names and address of such Permitted Assignee as a Financier hereunder and the Commitment of, and Percentage Interest of the Facility owing to, such Permitted Assignee as a Financier (the "Register"). The entries in the Register shall be conclusive absent manifest error, and Obligor,

84

Administrative Agent and Financiers may treat each Permitted Assignee whose name is so recorded as a Financier hereunder for all purposes of this Agreement.

(c)    Each Financier shall have the right, at its sole cost and expense and without the consent of Obligor, to sell participations to one or more other financiers (a "**Participant**") in or to all or a portion of its rights and obligations under the Facility and the Facility Documents; *provided*, *however*, that (i) such Financier's obligations under this Agreement (including without limitation its Commitment to Obligor hereunder) shall remain unchanged, (ii) such Financier shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) Obligor, Administrative Agent and other Financiers shall continue to deal solely and directly with such Financier in connection with such Financier's rights and obligations under this Agreement and with regard to any and all payments to be made under this Agreement, and (iv) the holder of any such participation shall not be entitled to voting rights under this Agreement or the other Facility Documents.

(d)    No Participant in any rights and obligations under this Agreement shall be permitted to sell subparticipations of such rights and obligations.

(e)    Within ten (10) Business Days after delivery to Obligor by Administrative Agent of a true and complete copy of such Assignment and Assumption, Obligor shall, if requested by Administrative Agent, execute and deliver to Administrative Agent for the benefit of Financier the following replacement Notes: (i) a replacement Note in the same form as the original Note in favor of the Assignee, to the extent of the Deferred Sale Price and future funding obligations are being assigned to such Assignee, and all other sums and charges due under the Facility Documents, and (ii) a replacement Note in the same form as the original Note in favor of the assigning Financier, to the extent of the Deferred Sale Price and future funding obligations are retained by the assigning Financier, and all other sums and charges due under the Facility Documents. Neither such assignment nor such delivery of replacement Notes shall affect or modify the obligations of Obligor under the Facility Documents, including obligations with respect to payments of the Deferred Sale Price under the Facility. Concurrently with the execution and delivery of the fully executed replacement Notes, the original Note (and any previously executed replacement Notes) evidencing all or any portion of the Facility being assigned shall be marked "Cancelled" and returned to Obligor.

(f)    Each Financier hereby severally represents and warrants that as of the Closing Date it is able to enter into LIBOR contracts for the terms specified in this Agreement.

(g)    Obligor acknowledges and agrees that a Financier may provide to any prospective Permitted Assignee or prospective Participant originals or copies of this Agreement, any other Facility Document and any other documents, instruments, certificates, opinions, takaful plans/insurance policies, letters of credit, reports, requisitions and other materials and information of every nature or description, and may communicate all oral information, at any time submitted by or on behalf of Obligor or Guarantors or received by any Financier in connection with the Facility or with respect to Obligor or Guarantors. In order to facilitate assignments to Permitted Assignees, Obligor shall execute such further documents, instruments or agreements as Administrative Agent may reasonably require; *provided*, *however*,

85

that Obligor shall not be required to execute any document or agreement which would decrease its rights, or increase its obligations, relative to those set forth in this Agreement or any of the other Facility Documents (including financial obligations, personal recourse, representations and warranties and reporting requirements). In addition, Obligor agrees to cooperate with Financiers and Administrative Agent in the exercise of any Financiers' rights pursuant to this Section 15.1, including providing such information and documentation regarding Obligor as any Financier or any potential Permitted Assignee may reasonably request and to meet with potential Permitted Assignees. A Financier's delivery of any financial statements, and any other material data of a confidential nature which has been identified as such to Financiers in writing at the time of Obligor's delivery thereof, to any such Permitted Assignee or prospective Permitted Assignee shall be done on a confidential basis and on condition that such material be used for no purpose other than in connection with the Facility.

15.2    Prohibition of Assignments by Obligor.  Obligor shall not assign or attempt to assign its rights under this Agreement or under any other Facility Document and any purported assignment shall be void. Subject to Section 5.5 hereof, until the provisions of this Agreement have been fully complied with and the Facility and all other sums evidenced by the Notes and/or secured by the Building Facility Mortgages and other Facility Documents have been repaid in full, without the prior written consent of Administrative Agent, in Administrative Agent's sole discretion, neither Obligor nor Sole Member will suffer or permit (i) any change in the Control of Obligor (whether direct or indirect) or of the Project, or (ii) subject to Section 5.4(b) hereof, the sale, transfer, lease, conveyance, alienation, pledge, assignment, encumbrance, hypothecation or other disposition (a "**Transfer**") by Obligor or any Related Party of all or any portion, directly or indirectly, of the Project, or title and interest in and to the Project, or any interest in Obligor or any interest in any entity which holds an interest in, or directly or indirectly controls Obligor.

15.3    Successors and Assigns.  Subject to the foregoing restrictions on transfer and assignment contained in this Article 15, this Agreement shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and permitted assigns.

## ARTICLE 16
## EVENTS OF DEFAULT

16.1    Events of Default.  The occurrence of any one or more of the following shall constitute an "**Event of Default**" under this Agreement:

(a)    Failure of Obligor to pay any part of the Deferred Sale Price, when due, any Release Payment, whether on the scheduled Profit Payment Date, the accelerated Profit Payment Date otherwise; *provided*, *however*, it shall not be an Event of Default if Obligor is entitled to an Increase Transaction for payment of Agreed Profit and a Financier defaults in its obligation to make an Increase Transaction therefore;

(b)    Failure of Obligor to satisfy the requirements of Section 3.6.

(c)     Failure of Obligor to pay any amounts from time to time owing under this Facility Agreement, the Notes, or any other Facility Documents (other than amounts subject to the preceding paragraphs) within 10 days following written demand;

(d)     Failure of Obligor to start Construction by the Construction Commencement Date, to achieve Substantial Completion by the Substantial Completion Date or to complete Construction by the Construction Completion Date;

(e)     The disapproval by Administrative Agent at any time of any construction work not in conformity with the Plans and Specifications and failure to cause the same to be corrected or otherwise remedied to the satisfaction of Administrative Agent in accordance with Section 13.1(dd);

(f)     Subject to Unavoidable Delays, a discontinuance of the Construction for a period of sixty (60) consecutive days;

(g)     The bankruptcy or insolvency of General Contractor and the failure of Obligor to procure a contract with a new contractor reasonably satisfactory to Administrative Agent within sixty (60) days from the date Obligor becomes aware of such bankruptcy or insolvency; *provided, however,* if despite such bankruptcy or insolvency, the affected contractor continues to perform under its contract in all material respects, and thereafter discharges all of its obligations thereunder, such bankruptcy or insolvency shall not be deemed to be an Event of Default hereunder;

(h)     Any Transfer or other disposition in violation of this Agreement.

(i)     If at any time or times any written warranty, representation, statement, report or certificate executed and delivered in connection with the Facility Documents and prepared now or hereafter by Obligor, Sole Member or Guarantors prove to have been untrue, incorrect or misleading in any material respect when made or delivered;

(j)     (i) Obligor, Sole Member, or Guarantors shall commence a voluntary case concerning Obligor, Sole Member or Guarantors or under Title 11 of the United States Code as now or hereafter in effect, or any successor thereto or any other present or future bankruptcy or insolvency statute (the "**Bankruptcy Code**"); (ii) an involuntary proceeding is commenced against Obligor, Sole Member or Guarantors or under the Bankruptcy Code and the petition is not dismissed within sixty (60) days after the commencement of the case; (iii) a trustee (as defined in the Bankruptcy Code) is appointed for or takes charge of all or substantially all of the property of Obligor, Sole Member or Guarantors; (iv) Obligor, Sole Member or Guarantors commence any other proceedings under any reorganization, arrangement, readjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar Law of any jurisdiction whether now or hereafter in effect relating to Obligor, Sole Member or Guarantors; (v) Obligor, Sole Member or Guarantors fail to controvert in a timely manner any such case under the Bankruptcy Code or any such proceeding, or any order of relief or other order approving any such case or proceeding is entered; or (vi) Obligor, Sole Member or Guarantors by any act or failure to act indicates its consent to, approval of, or acquiescence in any such case or proceeding or the appointment of any custodian or the like of or for it for any substantial part of its property or

87

suffers any such appointment to continue undischarged or unstayed for a period of ninety (90) days; (vii) Obligor, Sole Member or Guarantors shall make an assignment for the benefit of creditors, or shall admit in writing in any legal proceeding its inability to pay its debts generally as they become due; or (viii) any actions are taken by Obligor, Sole Member or Guarantors for the purpose of effecting any of the foregoing; provided, however, in the case of any of the above in connection with Guarantors, same shall not be an Event of Default if a replacement guarantor, reasonably acceptable to Administrative Agent, is presented within sixty (60) days of said occurrence;

(k)    (i) If Obligor, Sole Member or any Guarntor is enjoined, restrained or in any way prevented by any court order from performing the Construction or otherwise operating the Project; (ii) if a notice of lien, levy or assessment is filed of record with respect to all or any part of the Project, all or any part of the property of Obligor, Sole Member or Guarantors; or (iii) if any proceeding is filed or commenced seeking to enjoin, restrain or in any way prevent Obligor, Sole Member or Guarantors from conducting all or a substantial part of its business affairs; and any of the matters described in the immediately preceding subclauses (i), (ii) or (iii) is not vacated, stayed, dismissed, set aside or remedied within ninety (90) days after the occurrence thereof;

(l)    Failure by Obligor to make any Deficiency Deposit with Administrative Agent within the time and in the manner required pursuant to the Facility Documents;

(m)    Failure by Obligor or Guarantors to pay to Administrative Agent within ten (10) days after Financier's written request the amount by which the Obligations hereunder may, at any time, exceed the aggregate face amount of the Note(s);

(n)    Failure, at any time, for the recorded Building Facility Mortgages to, in the aggregate, equal or exceed the unpaid Deferred Sale Price;

(o)    One or more final, unappealable uninsured judgments are entered (i) against Obligor in amounts aggregating in excess of $1,000,000 or (ii) Guarantors in amounts aggregating in excess of $10,000,000 and said judgments are not discharged in full, stayed or bonded over within thirty (30) days after service upon either Obligor or Guarantors, as the case may be, of entry of such judgment;

(p)    Failure of Guarantors to comply with the Financial Covenants which is not cured within fourteen (14) Business Days following written notice provided, however, that such failure may be cured by written notice to Administrative Agent within such fourteen (14) Business Days of Obligor's intent to appoint (followed by the actual the appointment by Obligor within thirty (30) days of the written notice of default) a Person, acceptable to Administrative Agent in its reasonable discretion, who, together with Guarantors, shall be co-liable for Guarantor's obligations under the Facility Documents but only to the extent that his or its additional Net Worth or Liquidity is required for Guarantors to be able to comply with the Financial Covenants;

(q)     Failure of Completion Guarantors to comply with the Financial Covenants set forth in the Performance and Completion Guaranty which is not cured within seven (7) Business Days following written notice;

(r)     Any material default under the Management Agreement by Obligor which lasts 30 days beyond any applicable notice and cure period;

(s)     The bankruptcy or insolvency of Property Manager and/or Selling Agent and the failure of Obligor to procure a replacement reasonably satisfactory to Administrative Agent within sixty (60) days after the occurrence of such bankruptcy or insolvency;

(t)     Any mortgage, mortgage recording, stamp, intangible or similar taxes are due in respect of the issuance of the Notes or the recording of the Mortgages or the execution and delivery of any other documents in connection with the Facility, and said taxes, together with all costs, penalties and profit relating thereto, are not paid in full by Obligor within ten (10) Business Days' notice from Administrative Agent;

(u)     The occurrence of any default by Obligor or the sponsors under the Condominium Documents or any notice from the Office of the Attorney General of the State of New York to halt the sales or marketing of Units and failure of Obligor to cure same within any applicable notice and cure period;

(v)     Obligor fails to have Condominium Escrow Agent deliver any forfeited Contract Deposit or Option Payment to Administrative Agent within five (5) Business Days after the date that Obligor becomes entitled to same;

(w)     The occurrence of any other event or circumstance denominated as an Event of Default herein or under any other Facility Document and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default, provided, however, if no such grace or cure period is specified, then the notice and grace periods set forth in (bb) below shall apply;

(x)     Obligor shall have amended or modified the Condominium Documents without the prior written consent of Administrative Agent to the extent consent is required;

(y)     Existence of a default, beyond applicable notice and cure periods, by Obligor under any Zoning Agreement;

(z)     Failure of Obligor to provide any Rate Cap as required pursuant to Section 6.5 hereof.

(aa)    Dissolution of Obligor or Sole Member;

(bb)    The failure of Obligor to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Facility Document for a period of thirty (30) days; *provided*, *however*, if any such failure concerning a non-monetary covenant

89

or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Obligor shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as (i) Obligor commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such additional sixty (60) day period; *provided, however,* if a different notice or grace period is specified with respect to a particular breach under any other subsection of this Section 16.1, the specific provision shall control;

(cc)    Failure to meet any applicable Sales Milestone and deliver to Administrative Agent the applicable Sales Milestone Letter of Credit in lieu thereof as set forth in Section 3.7(a);

(dd)    Breach of the provisions of Section 13.1(hh);

(ee)    Breach of the provisions of Section 21.11; and

(ff)    Any Event of Default under the Project Facility Agreement shall be deemed to be an Event of Default hereunder.

16.2    Obligation to Fund Suspended.    Administrative Agent shall have no obligation to disburse Facility proceeds if (a) there exists any written threat of termination of any of the Zoning Agreements by any party beyond any applicable notice and cure periods; or (b) during any period in which a Zoning Agreement has been terminated due to a default by any party other than Obligor and such Zoning Agreement is not replaced by Obligor with a comparable agreement. Without limiting any event which shall constitute an Event of Default under Section 16.1, the occurrence of an event under this Section 16.2 which results in Administrative Agent not being obligated to disburse Facility proceeds shall not result in an Event of Default.

## ARTICLE 17
## FINANCIER'S REMEDIES IN EVENT OF DEFAULT

17.1    Remedies Conferred Upon Financier.    Upon the occurrence of any Event of Default, Administrative Agent for the benefit Financiers, in addition to all remedies conferred upon Financiers by law and by the terms of the Building Facility Notes, the Building Facility Mortgages and other Facility Documents, may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a)    Take possession of the Project and complete the Construction thereof and do anything in its sole judgment to fulfill the obligations of Obligor hereunder, including either the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others and to employ watchmen to protect the Project from injury. Without restricting the generality of the foregoing and for the purposes aforesaid, Obligor hereby appoints and constitutes Administrative Agent its lawful attorney-in-fact, such appointment coupled with an interest, with full power of substitution in the Project to complete the Construction in the name of Obligor; to use unadvanced funds remaining under the Facility or which may be reserved or escrowed or set aside for any purposes hereunder at any time, or to

advance funds in excess of the aggregate face amount of the Notes, to make changes in the Plans and Specifications which shall be necessary or desirable to complete the Construction in substantially the manner contemplated by the Plans and Specifications; to retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims which may be liens or security interests, or to avoid such bills and claims becoming liens against the Project, or as may be necessary or desirable for the completion of the Construction or for the clearance of title; to execute all applications and certificates in the name of Obligor which may be required by any of the contract documents; and to do any and every act which Obligor might do in its own behalf; to prosecute and defend all actions or proceedings in connection with the Construction; to take action and require such performance as it deems necessary under any of the Bonds to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction and to do every act which Obligor may do on its own behalf; it being understood and agreed that this power of attorney shall be coupled with an interest and cannot be revoked;

(b)     Withhold further Increase Transactions and/or any sums in the Deficiency Account;

(c)     To accelerate the Termination Date and declare the Obligations to be immediately due and payable;

(d)     Apply any cash or cash equivalent collateral then held as security for the Facility, including sums and collateral held in Reserve Accounts, in payment of any of the Obligations due and owing under the Notes, this Agreement or any of the other Facility Documents;

(e)     Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Facility Documents, or conferred upon Administrative Agent (for the benefit of Financier) by operation of Laws; and .

(f)     Upon the occurrence of an Event of Default set forth in Section 16.1(j) above, the Termination Date shall be automatically accelerated and all Obligations shall be immediately due and payable.

17.2    Non-Waiver of Remedies.  No waiver of any breach or default hereunder shall constitute or be construed as a waiver by Administrative Agent or Financiers of any subsequent breach or default or of any breach or default of any other provision of this Agreement.

17.3    Acceptance of Cure After an Event of Default.  Neither Administrative Agent nor Financiers shall be under any obligation to accept any proffered cure from Obligor subsequent to the occurrence of an Event of Default nor shall Administrative Agent or Financiers be obligated in any way to discontinue any exercise of remedies which Financiers may have initiated subsequent to the occurrence of an Event of Default upon any such proffer by Obligor.

## ARTICLE 18
## CONDOMINIUM PROVISIONS

18.1    Condominium Provisions.    Obligor has received approval of the Condominium Offering from Administrative Agent.

18.2    Obligor shall:

(a)    in compliance with the provisions of Section 18.2 hereof and, unless otherwise required by Administrative Agent, submit the Project to the provisions of the Condominium Act and satisfy all of the requirements thereof and any other Applicable Law, regulation, restriction, rule or ordinance necessary to create a valid condominium regime (which shall include residential and commercial Units) in respect of the Project;

(b)    execute and deliver to Administrative Agent, promptly upon the execution thereof, a complete set of the Condominium Documents, in form and content set forth in the Condominium Offering Plan or otherwise reasonably satisfactory to Administrative Agent, which Condominium Documents shall have been approved and, to the extent applicable, recorded and/or filed (except for the Condominium Declaration) in accordance with all Applicable Law necessary to create a valid residential condominium regime which includes residential and commercial Units, in respect of the Project;

(c)    duly perform or cause to be duly performed all obligations of developers or sponsors under the Condominium Documents, and do or cause to be done all things necessary to operate and maintain the Project as a mixed use Condominium with ancillary storage space; provided, however, that Obligor will not record or file the Condominium Declaration with the appropriate land records except as and when set forth in this Agreement and Obligor shall comply with all laws and regulations of any Governmental Authorities, including securities laws and regulations, which may apply to the sale of Units and furnish such evidence of compliance therewith as Administrative Agent may reasonably request;

(d)    deliver to Administrative Agent, prior to the creation of the Condominium and the recordation of the Condominium Declaration, confirmation from Title Company that Title Company has affirmatively committed to issue a Condominium Endorsement to the Title Policies;

(e)    comply with all Applicable Law in connection with the offering and sale of Units;

(f)    not Transfer the Project or any part thereof other than in connection with the sale of Units pursuant to Sale Contracts or Option Agreements;

(g)    not enter into any contract of sale or option agreement with respect to any Unit in contravention of this Agreement, nor shall Obligor make any changes in or amendments to any approved form of sale contract in contravention of this Agreement;

(h)     not enter into any contract of sale of any Unit with Obligor or any Affiliate of Obligor, without Administrative Agent's prior written approval unless such contract is consistent with the definition of Approved Sale Contract;

(i)     promptly upon its receipt, deliver into escrow with the Condominium Escrow Agent all deposits received in respect of Sale Contracts, to be held in accordance with the terms and provisions of the Condominium Offering Plan and Applicable Law and the Sale Contracts;

(j)     Obligor agrees that certain discrepancies were found to exist in the Condominium Offering Plan which require clarification by Obligor. Obligor shall amend the Condominium Offering Plan in order make such clarification by presenting to Administrative Agent, within thirty (30) days from the date hereof, for the reasonable review and approval of the Administrative Agent, a draft of the proposed amendment to the Condominium Offering Plan (the "**Required Amendment**") addressing such clarifications. Within five (5) days of Administrative Agent approving such Required Amendment, Obligor shall cause the same to be submitted to the New York State Department of Law ("**DOL**") for filing, and shall diligently pursue such filing with DOL in order to procure acceptance for filing of the Required Amendment from DOL within sixty (60) days from the date of such initial submission of the Required Amendment. From and after such time as the Required Amendment has been accepted for filing by DOL, Borrower shall cause the Required Amendment to be served on all purchasers and prospective purchasers in accordance with DOL's regulations governing the same. Until such time as the Required Amendment has been accepted for filing by DOL, Borrower shall cause a draft thereof (or, if not possible because the Required Amendment has not yet been drafted, the substantive contents of the draft thereof) to be included in a rider to any Sale Contract or Option Agreement entered into with any Contract Vendee under the Condominium Offering Plan so as to notify such Contract Vendee of the intended changes to the Condominium Offering Plan, which rider shall be subject to the reasonable review and approval of Administrative Agent; and

(k)     promptly upon its receipt, deliver to Administrative Agent a copy of the recorded Condominium Declaration certified by Obligor to be true, accurate and complete.

18.3    Joinder and Consent to Declaration of Condominium. Provided there exists no Event of Default, Administrative Agent shall, on Obligor's written request, promptly join in and consent to the Condominium Declaration and shall execute the appropriate instruments (reasonably satisfactory in all respects to Administrative Agent) in recordable form to effectuate the subordination of Mortgage to the Condominium Declaration, upon the satisfaction of the following conditions:

(a)     any required approval by the Board of Fire Underwriters or its equivalent having jurisdiction over the Project and any other approval required by any Governmental Authorities, to the extent that any such approval is a condition to the lawful use and occupancy of the Improvements and the opening of same to the public and can be obtained;

(b)     Administrative Agent shall have received and approved in all respects (which approval shall not be unreasonably withheld, conditioned or delayed) the

Condominium Documents, all of which shall be in proper form for recording or filing, as necessary, in the appropriate offices;

(c)    the Title Policy shall have been endorsed to provide affirmative takaful/insurance to the effect that the Project constitutes a condominium validly created under the Condominium Act, the lien of the Mortgages will not be impaired by any of the Condominium Documents and that the release of any Unit will not affect the lien of the Mortgages except as to the Unit so released and further insuring against any loss or damage by reason of the failure of any of the Units to be included in the condominium created pursuant to the Condominium Act;

(d)    Obligor shall have duly executed and delivered, or caused to be duly executed and delivered, to Administrative Agent (i) a collateral assignment of Obligor's or the declarant's (if the declarant under the applicable Condominium Documents is other than Obligor) rights under the Condominium Documents, together with an irrevocable proxy to vote the interests of Obligor as owner of the Units during the continuation of an Event of Default, and (ii) conditional resignations of the officers and members of the Board of Directors of the applicable condominium association, (iii) an assignment and subordination of the Management Agreement, if not previously delivered, in compliance with the requirements of Section 13.1(aa) hereof;

(e)    Administrative Agent's counsel shall have received an opinion from counsel for Obligor (upon which Administrative Agent and its successors and assigns may rely and subject only to customary assumptions and qualifications required by counsel rendering the opinion) which counsel is reasonably satisfactory to Administrative Agent to the effect that upon filing of the Condominium Declaration (A) all requirements of any applicable statute, rule or ordinance relating to the formation of the Condominium will have been duly satisfied and, assuming the recording of the Condominium Declaration for the Condominium and the subordination of the Mortgages to the Condominium Declaration, the Condominiums have been duly and validly created and are existing in full force and effect and no filing, registration or other compliance with any federal or state securities law or other Legal Requirement will be required in connection with the sale of Units within the Condominiums in the State of New York, or if such filing is necessary, that the applicable Legal Requirement governing the same has been fully complied with, and (B) the assignment, resignations and agreements referred to in Section 5.2(i) and Section 18.3(d) have each been duly authorized, executed and delivered by the respective parties thereto and are enforceable against said parties in accordance with their respective terms; and

(f)    Obligor shall have paid all out-of-pocket costs and expenses of Administrative Agent including, without limitation, reasonable attorneys' fees and expenses incurred by Administrative Agent in connection with reviewing the Condominium Documents and the joinder and subordination to the Condominium Declaration; and

(g)    Obligor or the condominium associations which shall be created by the Condominium Documents shall have furnished to Administrative Agent, at no cost or expense to Administrative Agent or Financiers, the takaful/insurance coverage required as set forth on Exhibit F.

94

ARTICLE 19
CASH ACCOUNTS PLEDGE,
ASSIGNMENT AND SECURITY AGREEMENT

19.1    Pledge, Assignment and Security Agreement. (a) As additional security for the Obligations, Obligor hereby pledges and assigns to Administrative Agent for the benefit of Financiers, and grants to Administrative Agent for the benefit of Financiers, a continuing lien on and security interest in, and rights of set-off against the following collateral (the "**Pledged Collateral**"):

(i)    the Deficiency Account and all certificates and instruments, if any, from time to time representing or evidencing the Deficiency Account;

(ii)    the Additional Security Account and all certificates and instruments, if any, from time to time representing or evidencing the Additional Security Account;

(iii)    the Strike Price Reserve Account all certificates and instruments, if any, from time to time representing or evidencing the Strike Price Reserve Account;

(iv)    all notes, certificates of deposit, checks and other instruments from time to time hereafter delivered to or otherwise possessed by Administrative Agent for or on behalf of Obligor in substitution for or in addition to any or all of the then existing Pledged Collateral;

(v)    all profit, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Pledged Collateral; and

(vi)    to the extent not covered by clauses (i) through (v), above, all proceeds, products and accessions of and to any or all of the foregoing Pledged Collateral.

(b)    This Agreement shall constitute a security agreement as such term is used in the Uniform Commercial Code of the State of New York, and information concerning the security interest created hereby may be obtained by application to Administrative Agent for the benefit of Financier, as secured party, at the address specified in the introduction hereto. The mailing address of Obligor is also set forth in the introduction hereto. Obligor irrevocably authorizes Administrative Agent for the benefit of Financiers, to execute and file any financing or continuation statement which Administrative Agent reasonably deems necessary or advisable to perfect or continue the perfection of the security interest granted hereby, or to preserve and maintain the priority of the lien hereof, and Obligor, upon demand, shall pay, or shall reimburse Administrative Agent for paying, any and all reasonable costs and expenses from time to time incurred in connection with the preparation, execution and filing of any such statements, and all payments made by Administrative Agent shall be a lien on the Pledged Collateral and shall be deemed secured by this Agreement.

95

(c)     Prior to or concurrently with the execution and delivery of this Agreement, Obligor shall file such financing statements and other documents in such offices as Administrative Agent may request to perfect the security interests granted by this Agreement.

19.2     Security for Obligor's Obligations.  This Agreement, including the Reserve Accounts, secures the payment and performance of the Facility and the Obligations of Obligor evidenced by the Facility Documents.

19.3     Delivery of Collateral.  All certificates or instruments, if any, representing or evidencing the Pledged Collateral shall be delivered to and held by or on behalf of Administrative Agent pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignments in blank, all in form and substance satisfactory to Administrative Agent. The security interest of Administrative Agent in all Pledged Collateral will be reflected on all books and records necessary to perfect such interest, and Administrative Agent shall have the right to transfer to or to register in the name of Administrative Agent for the benefit of Financiers or any of its nominees any or all of the Pledged Collateral. In addition, Administrative Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations.

19.4     Continuing Security Interest.  This Agreement shall create a continuing security interest in the Pledged Collateral and shall remain in full force and effect until payment in full of the Facility.

19.5     Security Interest Absolute.  All rights of Administrative Agent and all Obligations of Obligor hereunder shall be absolute and unconditional irrespective of, and shall not in any manner be affected or impaired by:

(a)     any lack of validity or enforceability of the Notes, the Mortgages or any other Facility Document; or

(b)     any failure to perfect or continue perfection or lack of priority of Administrative Agent's security interest in any of the Pledged Collateral or any other collateral constituting security for Obligor's Obligations; or

(c)     the acceptance by Administrative Agent or any other holder of any of Obligor's Obligations of any other security for or guaranty of Obligor's Obligations; or

(d)     any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any of Obligor's Obligations, or of any collateral security therefor, or of any guaranty thereof, or of the Notes or any of the other Facility Documents executed in connection therewith; or

(e)     any change in the time, manner or place of payment of, or any other term of, all or any portion of the Facility and the obligation evidenced or secured by the Facility Documents; or

96

(f)     any act or omission of Administrative Agent or any other holder of all or any portion of the Facility and the Obligations as evidenced or secured by the Facility Documents; or

(g)     any failure, neglect or omission on the part of Administrative Agent, or any other holder of all or any portion of the Facility and the Obligations evidenced or secured by the Facility Documents, to realize upon or protect any of the collateral security secured by the Facility Documents; or

(h)     any failure of Administrative Agent to give notice of sale or other disposition of the Pledged Collateral to any person or entity (except Obligor) or any defect in any notice that may be given to any person or entity (except Obligor) in connection with any sale or disposition of Pledged Collateral; or

(i)     any other amendment, modification, extension or waiver of, or consent to any departure from, the Notes, this Agreement or any other security for the Obligations evidenced or secured by the Facility Documents.

19.6     Representations and Warranties as to Pledged Collateral.  With respect to the Collateral:

(a)     Obligor is the legal and beneficial owner of the Pledged Collateral free and clear of any lien, security interest, attachment, garnishment or other charge or encumbrance of any kind, except for the security interest created by this Agreement and the Permitted Exceptions.

(b)     Obligor's office and principal place of business is located at the address set forth in the Preamble hereto, and Obligor has no other offices or places of business. If Obligor shall change or add to the locations of its office or principal place of business, Obligor shall provide prompt written notice to Financier, specifying the new location thereof.

(c)     Upon deposit into any Reserve Account, or delivery to Administrative Agent, as the case may be, and the filing of the necessary financing statements, the pledge and assignment of the Pledged Collateral pursuant to this Agreement will create a valid and perfected first priority security interest in the Pledged Collateral in favor of Administrative Agent for the benefit of Financier, securing the payment of Obligor's Obligations evidenced by the Facility Documents.

19.7     Covenants with Respect to Pledged Collateral.  With respect to the Pledged Collateral:

(a)     Obligor shall defend the Pledged Collateral against the claims of any and all persons which may be adverse to that of Administrative Agent for the benefit of Financiers.

(b)     Except as expressly set forth in this Agreement Obligor shall not sell, assign, pledge, grant a security interest in, Transfer, mortgage or otherwise hypothecate any of the Pledged Collateral, or any interest therein, or attempt to contract to do so, nor permit or

97

suffer to exist any levy, judicial seizure, attachment, garnishment or security interest thereof or thereon.

(c) Obligor shall pay punctually and discharge when due all taxes, assessments and other governmental charges or levies imposed on Obligor or upon the Pledged Collateral and shall not permit or suffer to exist thereon any lien for taxes or assessments, and shall provide Administrative Agent with evidence reasonably satisfactory that such charges and levies have been paid or discharged.

(d) Obligor shall give Administrative Agent prompt written notice of the occurrence of any default or event which with notice or the passage of time, or both, would constitute an Event of Default under the terms of this Agreement.

19.8    Waiver by Obligor.  Obligor agrees that the provisions of this Article 19 are solely for the benefit of Administrative Agent and Financiers and that Obligor shall have no claim, and does hereby expressly waive any claim or right Obligor might have under the Facility Documents, at law or in equity, for any liability, damages, costs and expenses Obligor may have against Administrative Agent and/or any Financier.

19.9    Reserve Funds Generally.Obligor hereby grants to Administrative Agent a first-priority perfected security interest in the Reserve Funds and in any and all monies now or hereafter deposited in each Reserve Fund as additional security for payment of the Deferred Purchase Price.  Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Deferred Purchase Price.

(b) Notwithstanding anything to the contrary contained herein or in any other Facility Documents, upon the occurrence and during the continuance of an Event of Default, Administrative Agent may, in addition to any and all other rights and remedies available to Administrative Agent, apply any sums then present in any or all of the Reserve Funds to the payment of the Deferred Purchase Price in any order in its sole discretion.

(c) The Reserve may not be commingled with other monies held by Administrative Agent.  Each of the Reserve Funds shall be held in a separate account in the name of Obligor but under the exclusive control of Administrative Agent.

(d) Obligor shall not, without obtaining the prior written consent of Administrative Agent, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-I Financing Statements, except those naming Administrative Agent as the secured party, to be filed with respect thereto.

## ARTICLE 20
## ADMINISTRATIVE AGENT

20.1    Appointment. Malayan Banking Berhad, New York Branch, has been appointed by each Financier as the administrative agent hereunder and under each other Facility Agreement, and subject to the rights of the Financiers under the Co-Financier Agreement, Malayan Banking Berhad, New York Branch, shall perform the duties of Administrative Agent

for as long as the Facility remains outstanding.. Administrative Agent has the power to issue, and has been authorized by Financiers to issue, all of Financiers' consents and approvals and waivers hereunder. In performing its functions and duties under the Facility Documents, Administrative Agent shall act solely as agent of Financiers and does not assume, and shall not be deemed to have assumed, any obligations toward or relationship of agency or trust with or for Obligor.

20.2    Reliance on Administrative Agent. All acts of and communications by Administrative Agent, as agent for Financiers, shall be deemed conclusively authorized and binding on Financiers. Obligor and any third party (including any court) shall be entitled to rely on any and all communications or acts of Administrative Agent with respect to the exercise of any rights or the granting of any consent, waiver or approval on behalf of Financiers in all circumstances where an action by Financiers is required or permitted pursuant to this Agreement or any other Financing Document or by Applicable Law without the necessity of making any inquiry of any individual Financier as to the authority of Administrative Agent with respect to such matter. Each Financier acknowledges and agrees for the benefit of Administrative Agent and Obligor that Administrative Agent shall be, and Obligor shall be entitled to deal with Administrative Agent as, the exclusive representative of Financiers on all matters relating to the Loan, this Agreement and each of the other Financing Documents.

20.3    Obligor's Rights. If any (but less than all) of the Financiers default (each, a **"Defaulting Financier"**) in funding its Percentage Interest on or before the time required herein and such Financier remains a Defaulting Financier for twenty (20) days, and no other Financier or Financiers have funded all amounts not theretofore funded by the Defaulting Financier, then Obligor shall have the right to designate a Permitted Assignee reasonably satisfactory to Administrative Agent, which agrees to fund all amounts not theretofore funded by the Defaulting Financier and agrees to assume all obligations thereafter to be performed by the Defaulting Financier. Additionally, Obligor shall have the right to fund the amounts which the Defaulting Financiers failed to fund and the other Financiers shall fund notwithstanding that there exists a Defaulting Financier.

20.4    General Immunity. Neither Administrative Agent nor any of its directors, officers, agents or employees shall be liable to Obligor or any Financier for any action taken or omitted to be taken by it or them hereunder or under any other Financing Document or in connection herewith or therewith, except for its or their own gross negligence or willful misconduct. In no event shall Administrative Agent have any obligation or liability in connection with the funding of, or any Financier's failure to fund, all of any portion of the Facility.

20.5    Successor Administrative Agent. Upon the acceptance of any appointment as an administrative agent hereunder by a successor Administrative Agent the new Administrative Agent shall promptly deliver to Obligor a copy of the designation and acceptance. The Financiers shall notify Obligor of the replacement of Administrative Agent as soon as reasonably practicable; provided that such replacement of Administrative Agent shall not be effective against Obligor until Obligor receives such notice of removal. Any successor Administrative Agent shall be regularly engaged in the administration of construction financing similar to the Facility. Notwithstanding the foregoing, so long as no Event of Default then exists, Obligor shall have the right to consent to a proposed replacement administrative agent if the proposed replacement is not a Financier hereunder.

## ARTICLE 21
## GENERAL PROVISIONS

21.1    Captions. The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

21.2    Modification; Waiver. No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

21.3    Reimbursement for Facility Expenses. Financiers are hereby authorized, without any specific request or direction by Obligor, to enter into Transactions from time to time, upon reasonable prior written notice to Obligor, in payment of or to reimburse Financiers (or Administrative Agent, as the case may be) for all Facility expenses and fees (whether or not, at such time, there may be any unused amounts of the Facility allocated in the Budget for the same).

21.4    Merger. This Agreement and the Facility Documents and instruments delivered in connection herewith constitute the entire agreement of the parties with respect to the Project and the Facility, and all prior discussions, negotiations and document drafts are merged herein and therein. Neither Financiers nor any employee of any Financiers has made or is authorized to make any representation or agreement upon which Obligor may rely unless such matter is in writing signed by an authorized officer of Financiers. Obligor agrees that it has not and will not rely on any custom or practice of any Financier, or on any course of dealing with any Financier, in connection with the Facility unless such matters are set forth in this Agreement or the Facility Documents or in an instrument made for the benefit of Obligor and in a writing signed by an authorized officer of such Financier.

21.5    Acquiescence Not to Constitute Waiver of Administrative Agent's Requirements. Each and every covenant and condition for the benefit of Financiers contained in the Facility Documents may be waived by Administrative Agent; provided, however, that to the extent that Administrative Agent and/or Financiers may have acquiesced in any noncompliance with any construction or nonconstruction conditions precedent to the Facility Opening Date or to any subsequent Increase Transactions, such acquiescence shall not be deemed to constitute a waiver by Administrative Agent or Financiers of such requirements with respect to any future Transactions.

21.6    Disclaimer by Administrative Agent and Financiers. This Agreement is made for the sole benefit of Obligor, Administrative Agent and Financiers (and Financiers' successors and Permitted Assignees and any successor Administrative Agent), and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Administrative Agent or Financiers pursuant to this Agreement. Neither Administrative Agent nor Financiers shall be liable to any contractors, subcontractors, supplier, laborer, architect, engineer, tenant or other party for labor or services

performed or materials supplied in connection with the Construction. Neither Administrative Agent nor Financiers shall be liable for any debts or claims accruing in favor of any such parties against Obligor or others or against the Project. Obligor is not and shall not be an agent of Financiers or Administrative Agent for any purposes. Except as expressly set forth in the Facility Documents, Administrative Agent and Financiers are not and shall not be an agent of Obligor for any purposes. Neither Administrative Agent nor Financiers, by making the Facility or taking any action pursuant to any of the Facility Documents, shall be deemed a partner or a joint venturer with Obligor or fiduciary of Obligor. Except in connection with Administrative Agent's or Financiers' gross negligence or willful misconduct, Obligor shall indemnify and hold Administrative Agent and Financiers harmless from and against any and all expenses of defending or settling any such claims or demands and all fees and disbursements of legal counsel engaged or employed by Administrative Agent or any Financier in defending and settling such claims or demands resulting from such a construction of the parties and their relationship. Neither Administrative Agent nor Financiers shall be deemed to be in privity of contract with any contractor or provider of services to the Project, nor shall any payment of funds directly to a contractor or subcontractor or provider of services be deemed to create any third-party beneficiary status or recognition of same by Administrative Agent or Financiers. Without limiting the generality of the foregoing:

(a)    Neither Administrative Agent nor any Financier shall have any liability, obligation or responsibility whatsoever with respect to the Construction. Any inspections of the Improvements made by or through Administrative Agent or any Financier are for purposes of administration of the Facility only and Obligor is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to all Plans and Specifications, state of completion or otherwise. Obligor shall make its own inspections of such Construction to determine that the quality of the Improvements and all other requirements of such Construction are being performed in a manner satisfactory to Obligor and in conformity with the Plans and Specifications and all other requirements and Obligor shall immediately notify Administrative Agent, in writing, upon becoming aware that the same are not in substantial conformity with the Plans and Specifications and all other requirements;

(b)    By accepting or approving anything required to be observed, performed, fulfilled or given to Administrative Agent pursuant to the Facility Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or takaful plan/insurance policy, Administrative Agent shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by either Administrative Agent or any Financier;

(c)    Neither Administrative Agent nor any Financier undertakes or assumes any responsibility or duty to Obligor or any other Affiliate of Obligor to select, review, inspect, supervise, pass judgment upon or inform Obligor or any other Affiliate of Obligor of any matter in connection with the Project, including matters relating to the quality, adequacy or suitability of: (i) all Plans and Specifications, (ii) architects, contractors, subcontractors and material suppliers employed or utilized in connection with Construction, or the workmanship of

101

or the materials used by any of them, or (iii) the progress or course of Construction and its conformity or nonconformity with the Plans and Specifications; and Obligor and any other Affiliate of Obligor shall rely entirely upon its or his own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Obligor or any other Affiliate of Obligor by Administrative Agent or any Financier in connection with such matters is for the protection of Financiers only, and neither Obligor nor any other Affiliate of Obligor is entitled to rely thereon; and

(d)    Neither Administrative Agent nor any Financier owes any duty of care to protect Obligor, Guarantors, any Affiliate of either Obligor, Guarantors or any other party against negligent, faulty, inadequate or defective building or construction. Neither Administrative Agent nor any Financier shall be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any activity on, or occupancy or use of, all or any portion of the Project, including any loss, claim, cause of action, liability, indebtedness, damage or injury caused by, or arising from: (i) any defect in any building, structure, grading, fill, landscaping or other Improvements or other facility therein, thereon or relating thereto, irrespective of whether or not such defect was disclosed in any of the reports or other documents described in Section 13.1(c) or otherwise delivered to Administrative Agent; (ii) any act or omission of any Affiliate of Obligor, or any of their agents, employees, independent contractors, licensees or invites; (iii) any accident at the Project or any fire, flood or other casualty or hazard thereon; (iv) the failure of Obligor, any of Obligor's licensees, employees, invites, agents, independent contractors or other representatives to maintain all or any portion of the Project in a safe condition; or (v) any nuisance made or suffered on any part of the Project; *provided*, *however*, to the extent that any of the circumstances described in clauses (i), (iii) or (v) above are caused by the gross negligence or willful misconduct of Administrative Agent or any Financier after Administrative Agent or such Financier has entered onto or has possession of the Project pursuant to the terms hereof.

21.7    Partial Invalidity; Severability.    Wherever possible, each provision of the Facility Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of the Facility Documents shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

21.8    Definitions Include Amendments.    Definitions contained in this Agreement which identify documents, including the Facility Documents, shall be deemed to include all amendments and supplements to such documents entered into from time to time to satisfy the requirements of the Facility Documents or otherwise with the consent of Administrative Agent. Reference to this Agreement contained in any of the Facility Documents shall be deemed to include all amendments and supplements to this Agreement.

21.9    Execution in Counterparts.    This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

102

21.10  ERISA.

(a)  Notwithstanding anything herein to the contrary, Obligor shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by any Financier of any of its rights under the Notes, this Agreement or the other Facility Documents) to be a nonexempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)  Obligor further covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Facility, as requested by Administrative Agent or any Financier in its sole discretion, that (i) Obligor is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Obligor is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one or more of the following circumstances is true:

(i)  Equity interests in Obligor are publicly offered securities, within the meaning of 29 C.F.R. §2510.3 101(b)(2);

(ii)  Less than twenty-five percent (25%) of each outstanding class of equity interests in Obligor is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3 101(f)(2); or

(iii)  Obligor qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3 101(c) or (e).

21.11  Customer Identification – USA Patriot Act Notice; OFAC. Administrative Agent hereby notifies Obligor that pursuant to the requirements of the Patriot Act and Administrative Agent's and the Financiers' policies and practices, Administrative Agent and the Financiers are required to obtain, verify and record certain information and documentation that identifies Obligor, which information includes the name and address of Obligor and such other information that will allow Administrative Agent and the Financiers to identify Obligor in accordance with the Patriot Act. Obligor represents and covenants that it is not and will not become a Prohibited Person listed on the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC or otherwise subject to any other prohibitions or restriction imposed by any Laws administered by OFAC (collectively the "OFAC Rules"). Obligor represents and covenants that it also (a) is not and will not become owned or controlled by a Prohibited Person, (b) is not acting and will not act for or on behalf of a Prohibited Person, (c) is not otherwise associated with and will not become associated with a Prohibited Person, (d) is not providing and will not provide any material, financial or technological support for or financial or other service to or in support of acts of terrorism or a Prohibited Person. Obligor shall immediately notify Administrative Agent if Obligor has knowledge that any Guarantor or any member or beneficial owner of Obligor or any Guarantor is or becomes a Prohibited Person or (i) is indicted on or (ii) arraigned and held over on charges involving money laundering or predicate crimes to money laundering. Obligor will not enter into any Lease or any other transaction or undertake any activities related to the Loan in violation of anti-money laundering Laws. Obligor shall (A) not use or permit the use of any proceeds of the Loan in any way that will violate either the OFAC



Rules or any anti-money laundering Laws or anti-terrorism Laws, (B) comply and cause all of its subsidiaries to comply with applicable OFAC Rules, anti-terrorism Laws and anti-money laundering Laws, (C) provide information as Administrative Agent and/or the Financiers may require from time to time to permit Administrative Agent and the Financiers to satisfy their obligations under the OFAC Rules, anti-terrorism Laws and/or the anti-money laundering Laws and (D) not engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the foregoing. Obligor shall immediately notify Administrative Agent if any tenant becomes a Prohibited Person or (1) is convicted of, (2) pleads nolo contendere to, (3) is indicted on, or (4) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

21.12 _Agreement Supplements other Facility Documents; Conflict_. This Agreement and the rights, remedies, benefits, representations, warranties, covenants, promises, obligations and liabilities provided for in this Agreement are intended to be in addition and supplemental to all of the rights, remedies, benefits, representations, warranties, covenants, promises, obligations and liabilities contained in the Building Facility Mortgages and the other Facility Documents and are not intended to be in lieu thereof or in substitution therefor, unless expressly so stated in this Agreement. In the event of a conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of the Building Facility Mortgages or any other Facility Document, the terms of this Agreement shall control. The fact that this Agreement contains terms and provisions which are not contained or provided for in the Building Facility Mortgages or any other Facility Document and the fact that the Building Facility Mortgages or any other Facility Document contains terms and provisions which are not contained or provided for in this Agreement shall not constitute a conflict or inconsistency.

21.13 _Waiver of Non-Compulsory Counterclaims_. Obligors hereby waive the right to assert a counterclaim in any action or proceeding brought against it by Administrative Agent or Financiers, other than a claim related to and arising out of the Facility and the subject matter of the Facility Documents.

21.14 _Waiver of Consequential and Punitive Damages_. In no event shall Administrative Agent or any Financier be liable to Obligor or any other party for consequential or punitive damages, whatever the nature of a breach by Administrative Agent or such Financier of its obligations under this Agreement or any of the Facility Documents, and Obligor for itself and its Affiliates hereby waives all claims for consequential damages.

21.15 _Claims Against Administrative Agent or Financier_. Neither Administrative Agent nor any Financier shall be in default under this Agreement, or under any other Facility Documents, unless a written notice specifically setting forth the claim of Obligor shall have been given to Administrative Agent within ninety (90) days after Obligor first had knowledge of the occurrence of the event which Obligor alleges gave rise to such claim and Administrative Agent or such Financier does not remedy or cure the default, if any there be, promptly thereafter. Obligor waives any claim, set-off or defense against Administrative Agent and/or Financiers arising by reason of any such alleged default as to which Obligor does not give such notice timely as aforesaid. Obligor acknowledges that such waiver is or may be essential to Administrative Agent's and/or Financiers' ability to enforce its remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Administrative Agent

and Financiers, on the one hand, and Obligor, on the other, with regard to the Facility. If it is determined in any proceedings that Administrative Agent or any Financier has improperly failed to grant its consent or approval, where such consent or approval is required by this Agreement or any other Facility Documents, Obligor's sole remedies shall be an action for specific performance or injunctive relief, or to obtain declaratory relief determining such withholding to have been improper, and Obligor hereby waives all other claims for damages and all claims for set-off against Administrative Agent and/or Financiers resulting from any such withholding of consent or approval.

21.16 Governing Law. THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE FACILITY WAS MADE BY ADMINISTRATIVE AGENT AND FINANCIERS AND ACCEPTED BY OBLIGOR IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE FACILITY DELIVERED PURSUANT HERETO ARE TO BE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTES AND THE OTHER FACILITY DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF FINANCIERS AND OBLIGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTES AND THE OTHER FACILITY DOCUMENTS. THIS AGREEMENT, THE NOTES AND THE OTHER FACILITY DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

21.17 Venue and Jurisdiction. ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY FINANCIER OR OBLIGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER FACILITY DOCUMENTS SHALL BE INSTITUTED ONLY IN A FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND EACH OF ADMINISTRATIVE AGENT, OBLIGOR AND FINANCIERS WAIVE ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND ADMINISTRATIVE AGENT, OBLIGOR AND FINANCIERS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. OBLIGOR DOES HEREBY DESIGNATE AND APPOINT:

UNITED CORPORATE SERVICES, INC..

874 WALKER ROAD, SUITE C
DOVER, DELAWARE 19904

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF
SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT,
ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW
YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID
ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO OBLIGOR IN
THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT
EFFECTIVE SERVICE OF PROCESS UPON OBLIGOR IN ANY SUCH SUIT, ACTION OR
PROCEEDING IN THE STATE OF NEW YORK. OBLIGOR (I) SHALL GIVE PROMPT
NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS
AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO
TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW
YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE
DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND
(III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED
AGENT CEASES TO HAVE AN OFFICE IN DELAWARE OR NEW YORK, NEW YORK
OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

21.18  Waiver of Jury Trial. ADMINISTRATIVE AGENT, FINANCIERS AND
OBLIGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE
TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY
TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH
REGARD TO THE FACILITY DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR
OTHER ACTION ARISING IN CONNECTION THEREWITH THIS WAIVER OF RIGHT TO
TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY OBLIGOR, AND IS
INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS
TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH
OF  ADMINISTRATIVE  AGENT,  FINANCIERS  AND  OBLIGOR  IS  HEREBY
AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS
CONCLUSIVE EVIDENCE OF THIS WAIVER BY OBLIGOR.

21.19  Set-Offs.  In addition to any other rights and remedies of Administrative
Agent on behalf of Financiers provided by the Facility Documents and by law, during the
existence of an Event of Default, Financiers shall have the right, without prior notice to Obligor,
any such notice being expressly waived by Obligor to the extent permitted by Applicable Law,
upon any amount becoming due and payable by Obligor hereunder or under the other Facility
Documents (whether at the stated maturity, by acceleration or otherwise) to set-off and
appropriate and apply against such amount any and all deposits (general or special, time or
demand, provisional or final), in any currency, and any other credits, or claims, in any currency,
in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time
held or owing by a Financier to or for the credit or the account of Obligor. Each Financier agrees
to promptly notify Obligor after any such set-off and application made by Financier; provided
that the failure to give such notice shall not affect the validity of such set-off and application.

106

21.20  Assignment of Mortgage.  At Obligor's option, upon satisfaction of all Obligations and delivery of customary documentation as shall be determined by Administrative Agent in its reasonable discretion, Administrative Agent will either provide a satisfaction of mortgage or an assignment of mortgage at no cost to Obligor other than the Administrative Agent's reasonable outside legal fees for preparation and delivery of said release or assignment of mortgage.

21.21  Exculpation.  Notwithstanding anything to the contrary contained in this Agreement or any other Facility Document, it is expressly understood and agreed that, except for the liability of (i) Obligor pursuant to the Facility Documents, and (ii) Guarantors pursuant to the terms of the Guaranties, nothing contained herein or under any of the other Facility Documents shall be construed as creating any personal liability on any of the following parties (the "**Exculpated Parties**"): (a) any officer, director, shareholder, partner or member of Obligor; (b) any officer, director, shareholder or member of Sole Member of Obligor; or (c) any direct or indirect owner of Obligor. Nothing contained herein, except as set forth in this Section 21.21 above, shall be construed to prevent Administrative Agent from exercising any other rights or remedies available to Administrative Agent, either at law or in equity, which do not result in such an obligation by the Exculpated Parties to pay money or incur personal liability.

21.22  Substitution of Contractor Controlled Insurance Program for Bonds. Notwithstanding anything to the contrary herein contained, Obligor, in lieu of providing the Bonds required hereunder, including the Bonds for the General Contractor, Major Contractors and Subcontractors, may have General Contractor provide a Contractor Controlled Insurance Program.

21.23  Sales and Marketing Office Lease.  Notwithstanding anything to the contrary herein contained, Obligor has entered into a space lease for the purpose of utilizing such space to conduct sales of Units and activities ancillary thereto (the "**Sales Office**").

21.24  Notices.  Any notice, report, demand or other instrument authorized or required to be given or furnished hereunder shall be in writing and shall be given as follows: (a) by hand delivery; (b) by overnight nationwide commercial courier service; or (c) by telecopy transmission (other than for notices of default) with a confirmation copy to be delivered by duplicate notice in accordance with any of clause (a) or (b) above, in each case, to the party intended to receive the same at the following address(es):

If to Obligor:

> Park Place Development Primary LLC
> c/o Soho Properties
> 31 West 27th Street, 9th Floor
> New York, NY 10001
> Attention: Sharif El-Gamal
> Telephone: (212) 966-9600
> Facsimile: (212) 966-2200

with copies to:

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Attention: Andrew Metcalf, Esq.
Telephone: (212) 556-2111
Telecopier: (212) 556-2222

and:

Goldberg Weprin Finkel Goldstein LLP
1501 Broadway
New York, NY 10036
Attention: Elizabeth Smith, Esq.
Telephone: (212) 301-6917
Telecopier: (212) 730-4518

If to Administrative Agent or Financiers:

Malayan Banking Berhad, New York Branch
400 Park Avenue
New York, New York 10022
Attention: Jacqueline Keller, Esq.
Telephone: (212) 303-1363
Telecopier: (212) 308-0109

with a copy to:

Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Attention: Joseph A. Sarcinella, Esq.
Telephone: (212) 549-0428
Telecopier: (214) 521-5450

If to Trading 1:

Ambro Limited
3000 Hillswood Drive
Chertsey, Surrey,KT160RS
United Kingdom
Attention: Simone Morgan & Marianne Clogher
Telephone: +44 (0) 1932 796677
Fax: +44 (0) 1932 796677
Email: admin@ambrometal.co.uk



with a copy to:

> Malayan Banking Berhad, London Branch
> 77 Queen Victoria Street, London EC4V 4AY
> United Kingdom
> Attention: Afinaz Aidil Kasim
> Telephone: +44 20 7628 4808
> Fax: +44 20 7638 9329
> Email: afinazaidil@maybank.uk.com

If to Trading 2:

> Traderight (Bermuda) Limited
> The Continental Building,
> 25 Church Street
> Hamilton, HM 12
> Bermuda
> Attention: Steven Spencer
> Telephone: +44 (0) 1932 796757 / 001 441 295 1078
> Fax: +44 (0) 1932 796677/ 001 441 292 3623
> Email: administrator@traderight-bermuda.com

with a copy to:

> Malayan Banking Berhad, London Branch
> 77 Queen Victoria Street, London EC4V 4AY
> United Kingdom
> Attention: Afinaz Aidil Kasim
> Telephone: +44 20 7628 4808
> Fax: +44 20 7638 9329
> Email: afinazaidil@maybank.uk.com

Any party may change the address to which any such notice is to be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Section 21.24. Notices shall be deemed to have been given upon delivery or refusal thereof, *provided, however*, that the inability to deliver notices because of a changed address of which no notice was given, or rejection or refusal to accept any notice offered for delivery shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for any party may be given by its respective counsel.

21.25  Time is of the Essence.  OBLIGOR AGREES THAT TIME IS OF THE ESSENCE AS TO ITS PERFORMANCE OF EACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND ALL OTHER FACILITY DOCUMENTS.

21.26 <u>Tax Consequences</u>.    Obligor, Administrative Agent and Financiers expressly agree that, for all income tax purposes: (a) the transactions contemplated by the Facility Documents are intended to accomplish a single transaction that is characterized as a mere financing by Financiers to Obligor; (b) the Purchase Price constitutes the principal amount of such financing; and (c) the amounts described in the definition of "Agreed Profit" constitute profit accrued on such financing. Obligor, Administrative Agent, Financiers, any assignee of Financier's rights and obligations under the Facility Documents Agreement and any Person to whom a participation is granted shall report the tax consequences of the transactions described in clause (a) of this <u>Section 21.26</u> on their respective tax returns (to the extent same are required to be filed) consistently and in accordance with the intended tax treatment described in this <u>Section 21.26</u>.

**[No Further Text on this Page; Signature Pages Follows]**



**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**<u>OBLIGOR:</u>**

**PARK PLACE DEVELOPMENT PRIMARY LLC**, a Delaware limited liability company

By: _____
    Name: Sharif El-Gamal
    Title: President

[Signatures continue on following page]

**ADMINISTRATIVE AGENT:**

**MALAYAN BANKING BERHAD, NEW YORK BRANCH,** a corporation organized under the laws of Malaysia

By: _____  26 APRIL 2006
    Name: Shahida Mohd Jaffar Sadiq Maricar
    Title: General Manager

[Signatures continue on following page]



**FINANCIERS:**

**MALAYAN BANKING BERHAD, LONDON BRANCH**, a corporation organized under the laws of Malaysia

By: _____  April 26 2016
   Name: Kevin Koh
   Title: Regional Director


[Signatures continue on following page]

**INTESA SANPAOLO S.P.A., NEW YORK
BRANCH**, a banking institution incorporated and
existing under the laws of the Republic of Italy

By:_____

    Name: Alessandro Vitale
    Title: First Vice President

By:_____

    Name: Riccardo Amoni
    Title: Vice President

[Signatures continue on the following page]

**WARBA BANK K.S.C.P.**, a company organized
under the laws of the State of Kuwait

By: _____
Name: Thuwaini AlThuwaini
Title: Executive manager


By: _____
Name: Hakam Mahmoud
Title: senior manager

US_ACTIVE-7971497

**45 PARK PLACE INVESTMENTS, LLC,** a
Delaware limited liability company

By: _____
    Name: Marcello Liguori
    Title: Vice President

## ACKNOWLEDGMENTS

STATE OF __New York__    }
                          } ss
COUNTY OF __New York__   }


    On __April__ __26,__ 2016, before me, __Choo San Phon__, personally appeared __Shant El- Gawhdl__, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

    Witness my hand and official seal.                    [SEAL]

PHON CHOOI SAN
Notary Public, State of New York
No. 01PH6117535
Qualified in New York County
Commission Expires October 25, 20 16

**ACKNOWLEDGMENTS**

STATE OF New York }
COUNTY OF New York } ss

On April 26 , 2016, before me, Joyce Yee , personally appeared Shath DA Moho Jaffer Saoiq Manager, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.                [SEAL]

**JOYCE YEE**
Notary Public, State of New York
No. 31-4942014
Qualified in New York County
Commission Expires 09/12/2018

## ACKNOWLEDGMENTS

STATE OF New York }
} ss
COUNTY OF New York }

On April 26, 2016, before me, JOYCE YEE , personally
appeared Kevin Koth , personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.                              [SEAL]

**JOYCE YEE**
Notary Public, State of New York
No. 31-4942014
Qualified in New York County
Commission Expires 09/12/2018

## ACKNOWLEDGMENTS

STATE OF _New York_ }

COUNTY OF _New York_ } ss

On _May 10_ , 2016, before me, _Serena Palumbo_ , personally appeared _Riccardo Amoni, Alessandro_ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.                                    [SEAL]

SERENA PALUMBO
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY LIC. #02PA6300998
COMM. EXP.

## ACKNOWLEDGMENT

STATE OF _NEW YORK_  )
                     } ss
COUNTY OF _NEW YORK_ )

   On _MAY 10_ , 2016, before me, _SERENA PALUMBO_ , personally
appeared _RICCARDO ANTONI; ALESSANDRO_, personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

   Witness my hand and official seal.                    [SEAL]

SERENA PALUMBO
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY LIC. #02PA6200996
COMM. EXP. _02-7-19_

## ACKNOWLEDGMENTS

STATE OF _Illinois_ }

COUNTY OF _Cook_ } ss

On _May_ _13_, 2016, before me, _Thuwaini AlThuwaini_, personally appeared _Thuwaini AlThuwaini_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_Norma I. Huntley_

[SEAL]
**"OFFICIAL SEAL"**
NORMA I HUNTLEY
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/18/2019

## ACKNOWLEDGMENTS

STATE OF _Illinois_ }
} ss
COUNTY OF _Cook_ }

On _May_ _13_, 2016, before me, _Hakam Mahmoud_, personally
appeared _Hakam Mahmoud_, personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_Norma J. Huntley_

[SEAL]
"OFFICIAL SEAL"
NORMA I HUNTLEY
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/18/2019

## ACKNOWLEDGMENTS

STATE OF _New York_ }

COUNTY OF _New York_ } ss

On _April 26_, 2016, before me, _Christopher Lunde_, personally appeared _Marcello Liguori_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

[SEAL]
CHRISTOPHER LUNDE
Notary Public, State of New York
No. 02LU6311613
Qualified in Westchester County
Commission Expires September 15, 20_18_

## EXHIBIT A

### Legal Description

LOT 8

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of Park Place distant 114 feet 4 inches easterly from the corner formed by the intersection of the said northerly side of Park Place with the easterly side of West Broadway;

RUNNING THENCE northerly at right angles with the northerly side of Park Place 59 feet 11 and 3/8 inches to a point;

THENCE easterly at right angles with the last described course 31 feet 6 inches to a point;

THENCE northerly at right angles with the last described course 30 feet 2 and 5/8 inches to a point;

THENCE easterly at right angles with the last described course 63 feet 0 and 3/8 inches to a point;

THENCE southerly along a line forming an angle on its westerly side with the last described course of 89 degrees 46 minutes 17 seconds, 90 feet 2 inches to the northerly side of Park Place;

THENCE westerly along the northerly side of Park Place, 94 feet 2 inches to the point or place of BEGINNING.

TOGETHER with rights, benefits and easements contained in the Zoning Lot Development and Easement Agreement to be recorded.

**EXHIBIT B**

**Form of Pending Disbursements Clause**

This policy insures only to the extent of the amount actually disbursed plus sums accrued thereon, but increases up to the face amount of the policy as disbursements are made without knowledge of the Insured of any defects in, or encumbrances prior to, the insured mortgage other than exceptions on Schedule B of this policy not insured against hereunder.

Title shall be continued down to the date of each disbursement and the company shall furnish to the Insured a continuation report which shall note the new effective date and amount of the policy, any and all matters affecting title which have been filed of record or discovered by the Company since the original date of the policy regardless of whether they affect the priority of the Insured's lien and, without limiting the generality of the foregoing, shall state whether, since the date hereof or since the date of the last preceding continuation report, any liens or encumbrances have been recorded, whether any taxes, assessments or other municipal charges of any nature as shown by the records of the appropriate governmental authority which have become due and payable have been paid, whether there are survey variations, encroachments or violations of setback, and whether there are any title exceptions or objections of record not specified herein which are not insured against hereunder. Each report of continuation requested in connection with insurance of future advances will include a statement showing survey variations or encroachments, if any, since the date of the preceding report and information regarding any liens which have been discharged by bonding, court deposit or any other means other than full payment.

In the event that the lien of the insured mortgage described herein is insured by more than one insurer, this Company agrees that it shall be bound by the continuation reports of a single company specified as "lead" insurer herein.

Exhibit B-1

## EXHIBIT C

### Commitment Amounts of Financiers

| Financier | Commitment |
|---|---|
| Malayan Banking Behard, London Branch | $77,329,714.83 |
| 45 Park Place Investments, LLC | $19,565,349.54 |
| Warba Bank K.S.C.P. | $41,925,749.01 |
| Intesa Sanpaolo, S.p.A. | $23,292,082.78 |

Exhibit C-1

## EXHIBIT D

### Permitted Exceptions

1. Rights of tenants or persons in possession, as tenants only, with no options to purchase or rights of first refusal.

2. Covenants, Restrictions Easements and Agreements of record:

a) Covenants Restrictions and Agreements as contained in Liber 669 Cp. 103. Policy affirmatively insures that any violation will not result in a forfeiture or reversion of title.

b) Covenants Restrictions and Agreements as contained in Liber 729 Cp. 464. Policy affirmatively insures that any violation will not result in a forfeiture or reversion of title.

c) Declaration of Zoning Lot Restrictions made by and between Park Place Partners Development, LLC and 51 Park Place LH, LLC, dated as of 7/30/2014 and recorded 10/7/2014 as CRFN 2014000333137. Policy affirmatively insures that any violation will not result in a forfeiture or reversion of title.

d) Restrictions contained in deed recorded 2/23/1923 in Liber 3289 Cp. 471. Policy affirmatively insures that any violation will not result in a forfeiture or reversion of title.

3. Survey made by Fehringer Surveying, P.C. dated 9/9/2014 and last revised 1/14/2016 shows premises described in Schedule A herein and another parcel to be designated block 126 Tentative Lot 9. As to premises described in Schedule A herein survey sows vacant land and the following:

A. Vaults extend under Park place up to 16 feet 9 inches
B. Cellar entrance and oil fill up to 5 feet 6 inches on Park Place
C. MTA Easement over the southwesterly portion of premises
D. 1 story building on premises adjoining on the northeast encroaches 0 feet 0-5/8 inches west on to subject premises
E. 6 story building on premises adjoining on the southeast encroaches 0 feet 2-1/4 inches west on to subject premises

Policy affirmatively insures that there will be no loss or diminution in the value of the mortgaged premises as a result of said encroachments and/or projections set forth above.

4. This policy insures only to the extent of the amount actually disbursed plus sums accrued thereon, but increases up to the face amount of the policy as disbursements are made without knowledge of the Insured of any defects in, or encumbrances prior to, the insured mortgage other than exceptions on Schedule B of this policy not insured against hereunder.

Title shall be continued down to the date of each disbursement and the company shall furnish to the Insured a continuation report which shall note the new effective date and amount of the policy, any and all matters affecting title which have been filed of record or discovered by the Company since the original date of the policy regardless of whether they affect the priority of the Insured's lien and, without limiting the generality of the foregoing, shall state whether, since the

Exhibit D-1

date hereof or since the date of the last preceding continuation report, any liens or encumbrances have been recorded, whether any taxes, assessments or other municipal charges of any nature as shown by the records of the appropriate governmental authority which have become due and payable have been paid, whether there are survey variations, encroachments or violations of setback, and whether there are any title exceptions or objections of record not specified herein which are not insured against hereunder. Each report of continuation requested in connection with insurance of future advances will include a statement showing survey variations or encroachments, if any, since the date of the preceding report and information regarding any liens which have been discharged by bonding, court deposit or any other means other than full payment.

In the event that the lien of the insured mortgage described herein is insured by more than one insurer, this Company agrees that it shall be bound by the continuation reports of a single company specified as "lead" insurer herein.

Policy affirmatively insures that any endorsement or building contin letter in connection with a subsequent draw after the date hereof will not include any further exception related to the re-borrowing under the Note structure related to Sharia Law except for any items of Public Record or any changes in Laws.

5. Policy affirmatively insures against any loss or damage due to any gaps or gores in the insured description.

6. Policy insures the owner of the indebtedness secured by the insured mortgage(s) against loss or damage which may be sustained by reason that all mortgage recording taxes required to be paid on the insured mortgage(s) have not been paid by reason of the Sharia funding mechanism.

## EXHIBIT E

### List of Design Professionals

| Design Architect | Soma Architects |
|---|---|
| Architect of Record | Ismael Leyva Architects |
| Landscape Architect | Thomas Balsley Associates |
| Structural Engineer | WSP Cantor Seinuk |
| Mechanical Engineer | Edwards and Zuck |
| Surveyor | Fehringer Surveying |
| Expeditor | William Vitacco Associates |
| Zoning Attorney (Plaza) | Fox Rothschild |
| Elevator Consultant | Jenkins and Huntington, Inc. |
| Geotechnical Engineer | Pillori Associates |
| Zoning Consultant | Development Consulting Services |
| Wind Tunnel Consultant | Rowan Davies Williams & Irwin Inc |
| Acoustic Consultant | Shen Milsom & Wilke |
| Window Cleaning & Façade Maintenance | Lerch Bates |
| Environmental Engineer 1 | Langan |
| Environmental Engineer 2 | EWMI |
| BPP Engineer | Michael Wein |
| Façade Consultant | Gilsanz Murray Steficek |
| Document Production | A. Esteban & Company, Inc. |
| SOE Engineer / MTA Consultant | FNA Associates, Inc |
| Fire Department Consultant | Total Quality Fire & Security, Inc. |
| Lighting Consultant | Reveal Design Group |

Exhibit E-1

| Interior Designer | NMM By Lissoni |
|---|---|
| Security Consultant | Statewide Security Integration |
| ADA Consultant | The Access Partnership |
| General Contractor | Gilbane Building Company |

## EXHIBIT F

### Takaful/Insurance Requirements

a.  Builder's Risk; Casualty; Business Interruption.

      i.  During the construction (and during any other period of repair or restoration of the Project), builder's risk "all-risk" insurance written on a completed value form (100% non-reporting or its equivalent) insuring against loss customarily included thereunder including, without limitation, loss to materials in storage and in transit, loss or damage by fire or other casualty, with extended coverage for such other hazards (including, without limitation, collapse, debris removal, explosion, underground hazards, flood, earthquake, acts of terrorism, off premises power, demolition, increased cost of construction, including, without limitation, increased costs arising out of changes in applicable Laws and codes and all other coverage in so called "all-risk" or "Special Perils" form) with no exclusions for terrorist actions (except as expressly permitted in subparagraph A(a)(vii) below) or mold and also as Administrative Agent may require. Such insurance shall contain (w) a replacement cost endorsement equal to not less than one hundred percent (100%) of the replacement cost value of the completed Improvements and one hundred percent (100%) of the replacement cost of all tenant improvements and an agreed amount endorsement, (x) an endorsement covering so called "soft costs" and "extra expenses" including, but not limited to, loss suffered with respect to materials, equipment, machinery and supplies, whether on-site, in transit, or stored off-site, and with respect to temporary structures, hoists, sidewalks, retaining walls, and underground property, plans, specifications, blueprints and models in connection with any restoration following a casualty, soft costs and business income/loss of rents and extra expense including, but not limited to, plans, specifications, financial costs, blueprints and models in connection with any restoration following a casualty (soft costs and business income/loss of rents and extra expense shall be written on an actual loss sustained basis with a period of indemnity for such length of time as would be required with the exercise of due diligence and dispatch to restore Obligor's business to the condition that would have existed had no loss occurred or as otherwise required by Administrative Agent); (y) an endorsement permitting occupancy of the Project; and (z) all insurance required to be carried by Obligor under the provisions of all the Plans and Specifications.    Flood, earthquake, demolition and increased cost of construction, debris removal and off premises power failure coverages above may have sublimits and/or minimum limits as deemed acceptable to Administrative Agent.    Such insurance will have deductibles as deemed acceptable to Administrative Agent.  Such insurance policy shall name Obligor as the Insured. Such policy shall also name Administrative Agent under a non-contributing New York standard mortgagee clause or an equivalent endorsement satisfactory to Administrative Agent for real property and as "Loss Payee" as respects total soft costs and business income/loss of rents.  If the insurance required under this paragraph is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide full building replacement cost to the Project and tenant improvements in an amount to be subject to the consent of Administrative Agent, which consent shall not be unreasonably withheld.

Exhibit F-1

ii.  From and after the completion of construction, property insurance against loss customarily included under so called "all-risk" policies including, without limitation, flood, collapse, theft and earthquake, acts of terrorism, debris removal, off-premises power, comprehensive boiler and machinery, mold and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height and type of construction. Such insurance policy shall also insure the additional expense of demolition and increased cost of construction due to the enforcement of applicable Laws regulating reconstruction at the time of rebuilding following a loss, which insurance for demolition and increased cost of construction may contain a sublimit of 25% of the insurable value. The amount of such "all-risk" insurance shall be not less than one hundred percent (100%) of the replacement cost value of the Improvements, without deduction for physical depreciation. Each such insurance policy shall contain an agreed amount (coinsurance waiver) and replacement cost value endorsement and shall cover, without limitation, all tenant improvements and betterments, which Obligor is required to insure in accordance with any Lease. Flood, earthquake, demolition and increased cost of Construction, debris removal and off premises power failure coverages in this paragraph (ii) may contain a sublimit acceptable to Administrative Agent. Such insurance will have deductibles deemed acceptable by Administrative Agent. If the insurance required under this paragraph (ii) is not obtained by blanket insurance policies, the insurance policy shall be endorsed to provide also full building replacement cost to the Project and such tenant improvements in an amount to be subject to the consent of Administrative Agent, which consent shall not be unreasonably withheld. Obligor shall be named as the insured. Administrative Agent on behalf of Financiers shall be named as mortgagee/loss payee as respects real property and business income/loss of rents under a New York standard Mortgagee Endorsement or its equivalent.

iii.  At all times, if any portion of the Improvements is located within an area designated as "flood prone" or a "special flood hazard area" (as defined under the regulations adopted under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973), flood insurance shall be provided, in an amount not less than the maximum limit of coverage available under the federal flood insurance plan with respect to the Project. Administrative Agent reserves the right to require flood insurance in excess of that available under the federal flood insurance plan. Should the available aggregate limits of flood insurance be eroded by losses so that the remaining limits available to pay losses are less than 40% of the required limits, Obligor shall promptly purchase additional coverage to restore the available limit and aggregate limit to not less than 80% of the required amount of flood insurance. Amounts of flood insurance required by this subparagraph (iii) shall be solely for the protection of the Improvements. If the amounts of flood insurance required by any ground lease, condominium declaration, reciprocal easement agreement, covenants, conditions and restrictions, or the like are greater than the amounts required herein, then Obligor

shall maintain such higher amounts of flood insurance. If the flood insurance and associated aggregate limits are shared among other locations, then the risks associated with other locations also insured in the same policy shall be taken into consideration in determining the amount of flood insurance to be provided herein. Such insurance shall have deductibles as deemed acceptable by Administrative Agent.

iv. Prior to energization and at all times thereafter, comprehensive boiler and machinery coverage, with a $100,000,000 minimum limit for all mechanical and electrical equipment with exclusions for testing removed. Such coverage shall include, without limitation, all tenant improvements and betterments which Obligor is required to insure and include, without limitation, coverage for soft costs, extra expense and rental interruption, as applicable, with at least a 365-day extended period of indemnity.

v. At all times Administrative Agent reserves the right to require rent loss and/or business interruption insurance on an actual loss sustained basis as an extension to coverage required by (ii) and (iii) above, in an amount not less than the amount of rent receivable or business income earned in an 18-month period and additionally providing a 365-day extended period of indemnity or as otherwise acceptable to Administrative Agent. Administrative Agent on behalf of Financiers shall be named as loss payee as respects this coverage using a New York Standard Mortgagee Endorsement or its equivalent.

vi. The policies of insurance set forth in the foregoing clauses (i), (ii), (iv), (v) and (vi), shall not exclude from coverage acts of terrorism and such policies, therefore, shall include one hundred percent (100%) replacement cost insurance without co-insurance for damage to, or loss of rents from, the Project caused by terrorist activities (herein referred to as "Terrorism Coverage"). All policies of insurance set forth in this Exhibit F shall have deductibles of not more than five percent (5%) of the insurable value of the Project. Should the available aggregate limits of terrorism coverage be eroded by losses so that the remaining limits available to pay losses are less than 40% of the required limits, Obligor shall purchase additional coverage to restore the available limit and aggregate limit to not less than 80% of the required amount of terrorism coverage. Amounts of terrorism coverage required by this subparagraph (vi) shall be solely for the protection of the Improvements. If the amounts of terrorism coverage required by any ground lease, condominium declaration, reciprocal easement agreement, covenants, conditions and restrictions, or the like are greater than the amounts required herein, then Obligor shall maintain such higher amounts of terrorism coverage. If terrorism coverage and associated aggregate limits are shared among other locations, then the risks associated with other locations also insured in the same policy shall be taken into consideration in determining the amount of terrorism coverage to be provided herein.

b. Liability.

F-3

i.  Commercial general liability insurance covering personal and advertising injury, bodily injury, death, accident, property damage and "xcu" hazards with a minimum limit of $1,000,000 per occurrence and $2,000,000 in the annual aggregate per location including products and completed operations liability coverage with at least $2,000,000 in aggregate limits for a period of at least five (5) years after completion of the Project; umbrella/excess liability insurance in excess of primary liability limits cited in (i), (ii) and (iii) below in combination no less than $100,000,000 per occurrence and in the annual aggregate on per location basis. The policies described in this paragraph (i) shall cover, without limitation: elevators, escalators, independent contractors, contractual liability covering, to the maximum extent permitted by Laws, Obligor's obligation to indemnify Financiers as required under this Agreement. The policies described in this paragraph (i) and paragraph (ii) below shall name Administrative Agent on behalf of Financiers as an additional insured on an endorsement acceptable to Administrative Agent. These policies shall contain cross-liability and severability of interest clauses, all reasonably satisfactory to Administrative Agent. Any deductibles or self-insured retentions are to be deemed acceptable to Administrative Agent. It is understood and agreed that from the time of closing until the commencement of construction, or two weeks post-closing, whichever is sooner, that $5,000,000 per occurrence and in the annual aggregate on a per location basis will be accepted. At all other times, the requirement will remain $100,000,000 on a per occurrence and in the annual aggregate on a per location basis.

ii.  Automobile liability covering Owned, Hired and Non-Owned Vehicle Liability shall be on an occurrence basis with a combined single limit of $1,000,000 per accident.

iii.  Worker's compensation insurance including employer's liability insurance for all employees of Obligor, if any, engaged on or with respect to the Project in such amount as is reasonably satisfactory to Administrative Agent, or, if such limits are established by Laws, in such amounts.

iv.  Obligor shall ensure that the General Contractor maintains similar liability coverage as is required from Obligor during Construction providing commercial general liability coverage, including, without limitation, products and completed operations with no less than $100,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability coverages or as otherwise acceptable to Administrative Agent. Such insurance shall name Obligor and Financiers as additional insureds. In the event that the General Contractor and Obligor share coverages under the same policies, then no less than $100,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability coverages or as otherwise acceptable to Administrative Agent shall be required. Such coverage must include Extended Products and Completed Operations coverage for a minimum period of 6 years. Obligor shall also ensure that all Subcontractors maintain similar coverage with

## EXHIBIT H

### Letter of Agency

[To be adopted on the letterhead of the Customer]

Date    :

To      : Trading 2

Attention:  [*]

Dear Sirs

**PARK PLACE DEVELOPMENT PRIMARY LLC ("Customer")**
**[Revolving Purchase Facility of up to USD165 Million] ("Facility")**
**[Building Facility Agreement dated [●] ("Facility Agreement")]**
**- Letter of Agency**

---

Unless otherwise defined herein, terms defined in the Facility Agreement shall have the same meanings herein.

We hereby irrevocably and unconditionally appoint Trading 2 to be our agent to sell the Metals to any third party purchaser as the Agent may deem fit at the sale price of [*] after the conclusion of the Purchase Acceptance.

We shall be bound by any contract or agreement the Agent enters into with the said third party purchaser for the purpose of the sale of the Metals on our behalf.

Kindly deposit the proceeds from such sale into our account with [*] designated for the purpose of the Facility.

We hereby undertake to indemnify the Agent from any losses, costs, expenses or damages that the Agent may suffer or incur as a result of fulfilling the function of the Agent as set out above.


Yours faithfully
for and on behalf of
**PARK PLACE DEVELOPMENT PRIMARY LLC**



..................................    .....................................
*Authorised signatory*                *Authorised signatory*
Name:                                 Name:
Designation:                          Designation:


Exhibit H-1

limits of no less than $5,000,000 per occurrence and in the annual aggregate per project or as otherwise as reasonably acceptable to Administrative Agent. All parties engaged in work on the Improvements shall maintain statutory workers' compensation and disability insurance in force for all workers on the job.

v. General Contractor to provide and maintain Subguard/Subcontractor Default Insurance in the minimum amount of $50,000,000 Each Loss and $100,000,000 Aggregate with Deductibles, Self-Insured Retentions and Co-Insurance deemed acceptable to Administrative Agent. Coverage must include a Project Addition Endorsement (or similar) and a Financial Interest Endorsement/Secondary Interest Endorsement (or similar) in favor of Administrative Agent. Bonds may be required for subcontractors not enrolled in the coverage.

vi. Notwithstanding the foregoing, Obligor may provide the commercial general and umbrella liability and workers compensation required in paragraphs (i) and (iii) above through the purchase of a wrap-up or owner controlled insurance program. This program shall have a limit of no less than $100,000,000 per occurrence and in the annual aggregate dedicated to the Project only and shall also provide coverage for all parties engaged in construction operations at the Project site. Any deductibles are to be deemed acceptable to Administrative Agent.

vii. Such other types, forms and amounts of insurance with respect to the Project and the operation thereof which are commonly maintained in the case of other property and buildings similar to the Project in nature, use, location, height and type of construction, as may from time to time be reasonably required by Administrative Agent.

viii. Obligor shall cause each Design Professional to obtain and maintain the applicable design professional's professional liability insurance during the period commencing on the date of each respective Design Professional's agreement and expiring no earlier than five (5) years after occupancy of the Project. Such insurance shall be in an amount equal to at least $1,000,000 per claim or such other limit as shall be approved by Administrative Agent.

ix. During the time of demolition (if any) of any Improvements, the General Contractor (if any) and the demolition contractor shall separately maintain with respect to such demolition (A) commercial general liability coverage with limits of $1,000,000 per occurrence and $2,000,000 in the annual aggregate per location/project or as otherwise acceptable to Administrative Agent, (B) automobile liability insurance covering owned, hired and non-owned vehicles with a combined single limit of $1,000,000 per accident, (C) workers' compensation/employers' liability and disability insurance as required by Law, and (D) umbrella/excess liability coverages over the coverage required by clauses (A) and (D) above with limits of no less than $10,000,000 per occurrence and in the annual aggregate per location/project or as otherwise acceptable to Administrative Agent for the demolition contractor and no less than $100,000,000

per occurrence and in the annual aggregate for the General Contractor (if any). Obligor must maintain a minimum of $1,000,000 per occurrence and $2,000,000 in the annual aggregate per location/project for general liability and umbrella/excess liability in the amount of $10,000,000 per occurrence/annual aggregate during any period of Demolition. The policies provided by such parties pursuant to this paragraph (viii) shall name Obligor and Administrative Agent on behalf of Financiers as an additional insured on all policies except workers' compensation/employers' liability and disability insurance on an endorsement acceptable to Administrative Agent on behalf of Financiers. Obligor shall maintain similar coverages as stated within this paragraph (viii) in clauses (A), (C) and (D), if applicable, and (E) with limits of no less than $10,000,000 per occurrence and in the annual aggregate per location/project or as otherwise acceptable to Administrative Agent on behalf of Financiers. The insurance required to be maintained pursuant to this paragraph (viii) shall provide not less than thirty (30) days advance notice of change in coverage, cancellation or non-renewal or as otherwise acceptable to Administrative Agent on behalf of Financiers. Obligor shall also ensure that all Trade Contractors maintain similar coverage with limits of no less than $5,000,000 per occurrence with respect to the coverage required by clause (E) above. The Trade Contractor coverages required by clauses (A), (C), (D) and (E) above shall also include the Construction Manager as an additional insured. Insurance required to be maintained above shall provide not less than thirty (30) days advance notice of change in coverage, cancellation or non-renewal or as otherwise acceptable to Administrative Agent on behalf of Financiers.

c. Form and Quality.

   i. All insurance policies shall be endorsed in form and substance acceptable to Administrative Agent to name Administrative Agent on behalf of Financiers as an additional insured, loss payee or mortgagee thereunder, as its interest may appear, with loss payable to Administrative Agent on behalf of Financiers, without contribution, under a standard New York mortgagee clause. With respect to all insurance under Section (a) of this Exhibit F, no Person other than Administrative Agent on behalf of Financiers shall be named as loss payee. All premiums for such insurance policies and endorsements shall be paid for when the same are due and payable and all such policies and endorsements shall contain such provisions and expiration dates and be in such form and issued by such insurance companies licensed or authorized to do business in the State of New York, with a rating of "A:X" or better as established by Best's Rating Guide (or an equivalent rating approved by Administrative Agent). If any insurance company issuing such insurance shall no longer have such required rating, Obligor shall, within ten (10) Business Days after notice from Administrative Agent, cause a replacement insurance policy(ies) to be issued by an insurance company licensed to do business in the State of New York which has such required rating (upon issuance of such replacement insurance policy(ies), Administrative Agent will simultaneously release the insurance policy(ies) being replaced). If any insurance

F-6

company issuing such insurance shall enter into any form of regulatory or governmental receivership or other similar regulatory or governmental proceeding, or is otherwise declared insolvent or required to run off its insurance coverages, Obligor shall, within five (5) Business Days, deliver to Administrative Agent a replacement insurance policy(ies) to be issued by an insurance company licensed to do business in the State which has such required rating. Each policy shall provide that such policy may not be cancelled or materially changed except upon thirty (30) days' prior notice of intention of non-renewal, cancellation or material change to Administrative Agent and that no act or thing done by Obligor shall invalidate any policy as against Administrative Agent and Financiers. Obligor shall deliver copies of all original policies certified to Administrative Agent by the insurance company or its authorized agent as being true copies, together with the endorsements required hereunder; provided, however, neither Administrative Agent nor any Financier shall be deemed by reason of the custody of such insurance policies to have knowledge of the contents thereof. The proceeds of insurance policies coming into the possession of Administrative Agent shall not be deemed trust funds, and Administrative Agent shall be entitled to apply such proceeds as herein provided. Obligor may effect such coverage under its blanket insurance policies, provided that (i) any such policy of blanket insurance either shall specify therein, or Obligor shall furnish Administrative Agent with a written statement from the insurer under such policy so specifying, (A) the maximum amount of the total insurance afforded by the blanket policy allocated to the Project and (B) any sublimits in such blanket policy applicable to the Project, which amounts shall not be less than the amount required pursuant to this Exhibit F; (ii) any policy of blanket insurance hereunder shall comply in all respects with the other provisions of this subparagraph (c); and (iii) the protection afforded Obligor under any policy of blanket insurance hereunder shall be no less than that which would have been afforded under a separate policy or policies relating only to the Project. Obligor shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Exhibit F unless Administrative Agent is included thereon as a named insured with loss payable to Administrative Agent under a standard mortgage endorsement of the character and to the extent above described. Obligor shall promptly notify Administrative Agent whenever any such separate insurance is taken out and shall promptly deliver to Administrative Agent the policy or policies of such insurance. Each insurance policy shall contain a provision whereby the insurer: (1) waives any right to claim any premiums and commissions against Administrative Agent, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (2) provides that Administrative Agent is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums. In the event any insurance policy (except for general public and other liability and Workers Compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Administrative Agent, such insurance policy shall not be invalidated by and shall insure Administrative Agent regardless of (X) any act,

failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (Y) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (Z) any foreclosure or other action or proceeding taken by Administrative Agent pursuant to any provision of this Agreement or any of the other Facility Documents.

d. **Financier's Right to Procure Insurance.** Notwithstanding anything to the contrary contained herein, if at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is maintained in full force and effect, Administrative Agent shall have the right (but not the obligation), upon notice to Obligor, to take such action as Administrative Agent deems necessary to protect its interests in the Project, including, without limitation, the obtaining of such insurance coverage as Administrative Agent deems appropriate, and all premiums paid and expenses incurred by Administrative Agent in connection with such action shall be paid by Obligor and shall be secured by the Project Facility Mortgage.

e. **Delivery of Policies.** Obligor shall deliver to Administrative Agent certified copies (or other evidence as deemed acceptable by Administrative Agent) of the insurance policies required to be maintained pursuant to <u>Section 13.1</u> of the Building Facility Agreement, provided, however, neither Administrative Agent nor any Financier shall be deemed by reason of the custody of such insurance policies to have knowledge of the contents thereof. Obligor also shall deliver to Administrative Agent, within ten (10) days of Administrative Agent's request, a certificate of each insurance carrier, in form and substance satisfactory to Administrative Agent, evidencing the coverages set forth herein together with evidence that all insurance premiums due thereon have been paid and that such coverages are in full force and effect. Not later than thirty (30) days prior to the expiration date of each of the insurance policies, Obligor shall deliver to Administrative Agent full and complete binders of all such renewal insurance policies. Such proof of renewal insurance shall include evidence satisfactory to Administrative Agent that all insurance premiums therefor have been paid and that the insurance coverages are in full force and effect. Any certificate of insurance delivered to Administrative Agent in compliance with the requirements of this Agreement shall include a letter from the respective insurance company confirming that the entity issuing such certificate of insurance is authorized to do so, and in delivering such certificate such Person is acting as an agent of the insurance company providing the coverage. If such letter is not provided, then Administrative Agent will only accept insurance company issued binders confirming that the required insurance is in full force and effect.

F-8

EXHIBIT G

### Section 22 Lien Law Affidavit

## [SUBJECT TO REVIEW BY TITLE COMPANY]

## AFFIDAVIT PURSUANT TO SECTION 22 OF
## THE LIEN LAW OF THE STATE OF NEW YORK

STATE OF NEW YORK      )
                       :  ss.:
COUNTY OF NEW YORK  )

The undersigned, being duly sworn, deposes and says that:

(1)      Each has an address at the respective addresses shown at the foot hereof under his/her signature.

(2)      Each is an Authorized Signatory of Park Place Development Primary LLC ("Obligor") under that certain Building Facility Agreement, dated as of the date hereof, between Malayan Banking Berhad, New York Branch, as administrative agent ("Administrative Agent") and certain financiers thereto ("Financiers") (as the same may be amended, modified and in effect from time to time, the "Facility Agreement").

(3)      The amount of the Building Facility (as defined in the Facility Agreement) is: $[_____].

(4)      The consideration for the Building Facility to be paid and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Building Facility are (or are estimated to be) as follows:

| Profit: | $[            ] | |
|---------|----------------|--|
| TOTAL: | $[            ] | |

(5)      The amount, if any, to be advanced from the Building Facility to reimburse the Obligor for costs of the Improvements (as defined in the Facility Agreement) expended by the Obligor prior to the date hereof is $0.00.

(6)      The estimated amount to be advanced from the Building Facility for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the Improvements (such as fees of architects, engineers, taxes, insurance, permits and fees and leasing commissions) is: $[_____].

(7)      The net sum available to the Obligor from the Building Facility to pay contractors, subcontractors, laborers and materialmen for the Improvements is: $[_____].

Exhibit G-1

(8)     This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York.

(9)     This statement is verified by deponents and not by the Obligor because the Obligor is a limited liability company and each deponent is an Authorized Signatory of the Obligor.

(10)    The facts stated above and any costs itemized on this statement are true, to the knowledge of the undersigned.

[Signatures follow immediately]

Exhibit G-2

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the date first written above.

Sworn and subscribed to before me
this _____ day of _____, 2016.

_____
Notary Public

Name: _____
Title: Authorized Signatory of Obligor

Address:
[_____]
[_____]
[_____]

Sworn and subscribed to before me
this _____ day of _____, 2016

_____
Notary Public

Name: _____
Title: Authorized Signatory of Obligor

Address:
[_____]
[_____]
[_____]

Exhibit G-3

## EXHIBIT I

### Purchase Request

Date: _____

To:    [Funding]
      Telefax:
      Telex:

From:  [Opco]
      Telefax:
      Telex:

Copy:  Trading 1
      Telefax:
      Telex:

Re:    Building Facility Agreement
      dated as of [_____]

We refer to the above-referenced agreement (the capitalized terms used in this notification having the meanings specified in such agreement) and hereby request that you purchase, for on-sale to us, the Metals specified below in accordance with the terms set forth below:

Purchase Terms

Our Reference:
Supplier:              [_____]
Metals:
Purchase Price for Funding:
Deferred Sale Price to Obligor:      [Purchase Price plus Agreed Profit plus Supplemental Profit]

Transaction Date:
Value Date:
Payment Date:

We hereby irrevocably and unconditionally undertake and commit to purchase the Metal described above in accordance with the terms described above should you arrange the purchase of such Metal in accordance with such terms. The Transaction described above shall be subject to the terms of above-referenced agreement.

[Obligor]

By_____
    Name:
    Title:

Exhibit I-1

**EXHIBIT J**

**Purchase Confirmation**


Date: _____

To:    [Obligor]
       Telefax:
       Telex:

From:  [Funding]
       Telefax:
       Telex:

Re:    Building Facility Agreement
       dated as of [_____]

We refer to the above-referenced agreement (the capitalized terms used in this acceptance having the meanings specified in such agreement) and the Purchase Request, dated _____, ____, from you to us ("***Purchase Request***"), and hereby confirm that we have purchased for on-sale to you the Metals described in the Purchase Request on the terms specified therein, which terms are set forth below:

Purchase Terms

Our Reference:
Your Reference:
Supplier:                         [_____]
Metal:
Quantity:
Location:
Delivery:
Purchase Price for Funding:
Deferred Sale Price to Obligor:
Transaction Date:
Value Date:
Payment Date:

The Transaction described above shall be subject to the terms of above-referenced agreement.

[Funding]

By_____
   Name:
   Title:

Exhibit J-1

## SCHEDULE 1

### FORM OF LIEN WAIVER

9.   Delivery of an executed signature page hereof by facsimile, portable document format or other electronic form shall be deemed delivery of an original.

Duly sworn upon oath, executed and delivered by Contractor this _____ day of _____, 20___.

**WITNESS**:                          **BY**:

_____        _____
Name:                            Name:
Title:                           Title:

Sworn to and subscribed before me this ____ day of _____, 20____.

_____
Notary Public

My commission expires:

_____
(SEAL)

## EXHIBIT K

### Purchase Offer

Date: _____

To:    [Funding]
      Telefax:
      Telex:

From:  [Obligor]
      Telefax:
      Telex:

Re:    Building Facility Agreement
      dated as of [_____]

        We refer to the above-referenced agreement (the capitalized terms used in this offer having the meanings specified in such agreement), the Purchase Request, dated _____, ____, and the Purchase Confirmation, dated _____, ____, from you to us, and hereby offer to purchase from you the Metals described in the Purchase Confirmation on the terms specified therein, which terms are set forth below:

<u>Purchase Terms</u>

Our Reference:
Your Reference:
Supplier:                 [_____]
Metal:
Quantity:
Location:
Delivery:
Purchase Price for Funding:
Deferred Sale Price to Obligor:
Transaction Date:
Value Date:
Payment Date:

        The Transaction described above shall be subject to the terms of above-referenced agreement.

[Obligor]

By_____
  Name:
  Title:

Exhibit K-1

## EXHIBIT L

### Purchase Acceptance

Date: _____

To:    [Obligor]
       Telefax:
       Telex:

From: [Funding]
       Telefax:
       Telex:

Re:    Building Facility Agreement
       dated as of [_____]

We refer to the above-referenced agreement (the capitalized terms used in this acceptance having the meanings specified in such agreement), the Purchase Request, dated _____, ____, the Purchase Confirmation, dated _____, ____, and the Purchase Offer, dated _____, ____, from you to us. We hereby confirm that we have purchased the Metals described in the Purchase Offer, and hereby accept your offer to purchase from us such Metals on the terms specified in such Purchase Offer, which terms are set forth below:

#### Purchase Terms

Our Reference:
Your Reference:
Supplier:                [_____]
Metal:
Quantity:
Location:
Delivery:
Purchase Price for Funding:
Deferred Sale Price to Obligor:
Transaction Date:
Value Date:
Payment Date:

The Transaction described above shall be subject to the terms of above-referenced agreement.

[Funding]

By_____
   Name:
   Title:

Exhibit L-1

<u>SCHEDULE 1</u>

<u>FORM OF LIEN WAIVER</u>

**CONTRACTOR'S PARTIAL WAIVER AND RELEASE OF LIEN**
(To accompany each application for progress payment)

(address)

**To:**        [_____] ("**Owner**")
              Malayan Banking Berhad, New York Branch ("**Financier**")

**From:**     [_____] ("**Contractor**")

**Re:**        45 Park Place (the "**Project**")

              Contract Name: _____ (the "**Contract**")

              Contract Date: _____

              Application for Payment # _____

              Period: _____ to _____ (the "**Period Ending Date**")

              Original GMP Amount:                    $_____

              Plus (Less) Approved Change Orders:      $_____

              Adjusted GMP Amount:                     $_____

              _____

              Cost of the Work to Date:                $_____

              Less: Retainage:                         $_____

              Less: Total Payments Received to Date:    $_____

              Net Amount Due:                          $_____

        For and in consideration of payments made to it by Owner, Contractor hereby certifies as follows:

        1.      Contractor hereby acknowledges receipt of the Total Payments Received to Date as payment in full, excluding the Retainage, for all labor employed and all materials furnished or stored in connection with the construction of the Project through the last day of the previous

Schedule 1 - 1

## SCHEDULE 1

### FORM OF LIEN WAIVER

payment period for which payment has been made, and hereby now and forever waives, releases and quitclaims all claims and rights to claim against Financier, Owner and/or its sureties or the land upon which the Project is situated with respect to the Project. Contractor hereby affirms that except for notice of claim(s) submitted in writing to Owner and Financier, including amounts, if any, withheld by Owner from the amount requested by Contractor, there are no known outstanding claims against Owner and/or its sureties in connection with the Project through said date.

2.    Upon receipt of the sum of the Net Amount Due, as set forth herein, Contractor acknowledges and agrees that except for notice of claim(s) submitted in writing to Owner and Financier, including amounts, if any, withheld by Owner from the amount requested by Contractor, it will have received payment in full, excluding the Retainage, for all labor employed and all materials furnished or stored in connection with the construction of the Project through the Period Ending Date, and hereby now and forever waives, releases and quitclaims all claims and rights to claims against Owner and/or its sureties, Financier or the land upon which the Project is situated with respect to the Project, except for the Retainage and except for claims which are presently unknown to Contractor or to its subcontractors but which would be timely under the Contract if subsequently asserted.

3.    Contingent upon the receipt of the sum of the Net Amount Due, and except for any unpaid Retainage, Contractor does hereby as of the date hereof, forever waive, release and quitclaim in favor of Owner and/or its sureties, Financier, each and every party acquiring title to and/or providing financing for the Project, and the title company or companies examining and/or insuring title to the Project and any and all of their successors and assignees, all rights that presently exist to any and all types and forms of contractor's, mechanics' and/or materialmen's lien and other liens (including without limitation, any liens or preliminary notice of lien which might otherwise have been filed pursuant to this state's mechanic's lien law) for which payment has been made. Contractor further warrants that all applicable taxes, fees and benefits relating directly or indirectly to Contractor's work have been paid in full.

4.    Contractor further states on oath that, except for money withheld by Contractor arising from good faith disputes with subcontractor(s) and disclosed to Owner in writing, all laborers and subcontractors employed by it, and all suppliers or materialmen from which it has acquired materials incorporated into the Project and any lien or bond claimant relating to Contractor's work has been paid their respective portion of prior payments for all work, labor, materials, machinery, equipment and supplies provided, or to be provided, in connection with the Project, other than Retainage, and that no laborers or materialmen have any claim or lien, either actual or inchoate, against the Work, the Project, Owner and/or its sureties or Financier by virtue of their having furnished labor or material going into or towards the Work.

5.    No security interest has been given or executed by Contractor for or in connection with any materials, appliances, machinery, fixtures or furnishings placed upon or installed in the Project.

Schedule 1 - 2

## SCHEDULE 1

## FORM OF LIEN WAIVER

6.      Contractor hereby certifies that the amounts set forth above are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and/or material on the Project other than as set forth above.

7.      Contractor has not assigned any lien or right to perfect a lien against the Project, and Contractor has the right, power and authority to execute this document.

8.      Delivery of an executed signature page hereof by facsimile, portable document format or other electronic form shall be deemed delivery of an original.

Duly sworn upon oath, executed and delivered by Contractor this _____ day of _____, 20__.

**WITNESS:**                                    **BY:**

_____          _____
Name:                                         Name:
Title:                                        Title:

Sworn to and subscribed before me this _____ day of _____, 20____.


_____
Notary Public

My commission expires:


_____

            (SEAL)

Schedule 1 - 3

<u>SCHEDULE 1</u>

<u>FORM OF LIEN WAIVER</u>

**CONTRACTOR'S FINAL AFFIDAVIT AND RELEASE OF CLAIMS**
(To Accompany Application For Final Payment)

(address)

**To:**    [_____] ("**Owner**")
Malayan Banking Berhad, New York Branch ("**Financier**")

**From:**    Lend Lease Corporation ("**Contractor**")

**Re:**    45 Park Place (the "**Project**")

Contract Name: _____ (the "**Contract**")

Contract Date: _____

| | |
|---|---|
| Original GMP Amount: | $_____ |
| Plus (Less) Approved Change Orders: | $_____ |
| Adjusted GMP Amount: | $_____ |
| Less: Final Cost of the Work: | $_____ |
| Less: Total Payments Received to Date: | $_____ |
| Balance Due for Work: | $_____ |
| Plus Contractor's Share of Savings (GMP less Cost of the Work x _____%) | $_____ |
| Final Payment: | $_____ |

     For and in consideration of payments made to it by Owner, Contractor hereby certifies as follows:

     1.    Contractor hereby acknowledges receipt of the Total Payments Received to Date as payment in full, including the Retainage, for all labor employed and all materials furnished or stored in connection with the construction of the Project through the last day of the previous payment period, and hereby now and forever waives, releases and quitclaims all claims and rights to claim against Owner and/or its sureties, Financier or the land upon which the Project is situated with respect to the Project. Contractor hereby affirms that there are no outstanding claims against Contractor and/or its sureties in connection with the Project through said date.

## SCHEDULE 1

## FORM OF LIEN WAIVER

2.      Upon receipt of the Final Payment, as set forth herein, Contractor acknowledges and agrees that it will have received payment in full for all labor employed and all materials furnished in connection with the construction of the Project, and hereby now and forever waives, releases and quitclaims all claims and rights to claim against Owner and/or its sureties, Financier or the land upon which the Project is situated with respect to the Project, and as an inducement to Financier to make the same, Contractor hereby affirms that there are no outstanding claims against Contractor and/or its sureties in connection with the Project.

3.      Contingent upon the receipt of the Final Payment, Contractor does hereby forever waive, release and quitclaim in favor of Owner and/or its sureties, Financier, each and every party acquiring title to and/or providing financing for on the Project, and the title company or companies examining and/or insuring title to the Project and any and all of their successors and assignees, all rights that presently exist to any and all types and forms of contractor's, mechanics' and materialmen's lien and other liens (including without limitation, any liens or preliminary notice of lien which might otherwise have been filed pursuant to this state's mechanic's lien law). Contractor further warrants that all applicable taxes, fees and benefits relating directly or indirectly to Contractor's work have been paid in full.

4.      Contractor further states on oath that all laborers and subcontractors employed by it, and all suppliers or materialmen from which it has acquired materials incorporated into the Project and any lien or bond claimant relating to Contractor's work has been paid their respective portion of prior payments for all work, labor, materials, machinery, equipment and supplies provided, or to be provided, in connection with the Project, and that no laborers or materialmen have any claim or lien, either actual or inchoate, against the Work, the Project, Owner and/or its sureties or Financier by virtue of their having furnished labor or material going into or towards the Work.

5.      No security interest has been given or executed by Contractor for or in connection with any materials, appliances, machinery, fixtures or furnishings placed upon or installed in the Project.

6.      Contractor hereby certifies that the amounts set forth above are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and/or material on the Project.

7.      Contractor has not assigned any lien or right to perfect a lien against the Project, and Contractor has the right, power and authority to execute this document.

8.      Contractor does hereby forever release, waive and discharge the Project Owner and Financier from (and quitclaim to them) any and all claims on, against, related to, arising out of, connected with, and/or on account of the above-described Contract or the Project, whether known or unknown, and whether presently ascertainable or not, which Contractor or its successors and/or assignees ever had, now have, or ever will have against Owner and/or its sureties, Financier or the Project.

<u>SCHEDULE 1</u>

<u>FORM OF LIEN WAIVER</u>

**SUBCONTRACTOR'S PARTIAL WAIVER AND RELEASE OF LIEN**
(To accompany each application for progress payment)

**To:**       [_____] ("**Owner**")
         Malayan Banking Berhad, New York Branch ("**Financier**")

**From:**     _____ ("**Subcontractor**")

**Re:**       45 Park Place (the "**Project**")

          Contract Name: _____ (the "**Subcontract**")

          Contract Date:     _____

          Application for Payment No.: _____

          Period : _____ to _____    ("**Period Ending Date**")

          Original Subcontract Amount          $ _____

          Plus (Less) Approved Change Orders:   $ _____

          Adjusted Subcontract Amount:         $ _____

          _____

          Cost of Work to Date:                $ _____

          Less Retainage:                      $ _____

          Less Total Payments Received to Date: $ _____

          Net Amount Due:                      $ _____

     For and in consideration of the payments made to it by Contractor, Subcontractor hereby certifies as follows:

     1.     Subcontractor hereby acknowledges receipt of the Total Payments Received to Date stated above as payment in full, excluding the Retainage stated above, for all labor, services and materials furnished or stored and reimbursed, in connection with the construction of the Project through the last day of the previous payment period, and hereby waives, releases and quitclaims all claims and rights (including but not limited to lien rights) to claim against Contractor, Owner and/or its sureties, Financiers or the land upon which the Project is situated with respect to the Project.

Schedule 1 - 7

## SCHEDULE 1

### FORM OF LIEN WAIVER

2.      Subcontractor, for and in consideration of the receipt of the current payments made to it by Contractor, hereby waives, releases and quitclaims all claims and rights (including but not limited to lien rights) against Contractor, Owner and/or its sureties, Financiers or the land upon which the Project is situated, for labor, services or materials furnished through the Period Ending Date to Subcontractor on the Project. This waiver and release does not cover any retention or labor, services or materials furnished after the Period Ending Date specified.

3.      Subcontractor hereby affirms that there are no outstanding claims against either Owner, Owner's agents or Contractor and/or its sureties in connection with the Project through said Period Ending Date for which Subcontractor has not already been provided with definitive, formal written notice.

4.      Subcontractor further states on oath that all laborers and subcontractors employed by it, and all suppliers or materialmen from which it has acquired materials incorporated into the Project and any lien or bond claimant relating to Subcontractor's work has been paid their respective portion of prior payment received for all work, labor, materials, machinery, equipment and supplies provided in connection with the Project, other than Retainage, and that no laborers or materialmen have any claim, either actual or inchoate, against the Work, the Project, Owner and/or its sureties or Financiers by virtue of their having furnished labor or material going into or towards the Work.

5.      No security interest has been given or executed by Subcontractor for or in connection with any materials, appliances, machinery, fixtures, or furnishings placed upon or installed in the Project prior to the Period Ending Date.

6.      Subcontractor hereby certifies that the amounts set forth above are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and/or material on the Project other than as set forth above.

7.      Subcontractor has not assigned any lien or right to perfect a lien against the Project and Subcontractor has the right, power and authority to execute this document.

8.      Delivery of an executed signature page hereof by facsimile, portable document format or other electronic form shall be deemed delivery of an original.

[Signatures on following page]

## SCHEDULE 1

### FORM OF LIEN WAIVER

Duly sworn upon oath, executed and delivered by Subcontractor this _____ day of
_____, 20__.

**WITNESS:**                    **BY:**


_____      _____
Name:                                Name:
Title:                               Title:


Sworn to and subscribed before me this ____ day of _____, 20____.


_____
Notary Public

My commission expires:


_____
(SEAL)

Schedule 1 - 9

SCHEDULE 1

FORM OF LIEN WAIVER

**SUBCONTRACTOR'S FINAL AFFIDAVIT AND RELEASE OF CLAIMS**
(to accompany application for final payment)

**To:**     [_____] ("Owner")
Malayan Banking Berhad, New York Branch ("**Financier**")

**From:**     _____ ("**Subcontractor**")

**Re:**     45 Park Place (the "**Project**")

Contract Name: _____ (the "**Subcontract**")

Contract Date: _____

Application for Payment No.: _____

Period : _____ to _____     (the "**Period Ending Date**")

| | |
|---|---|
| Original Subcontract Amount | $ _____ |
| Plus (Less) Approved Change Orders: | $ _____ |
| Adjusted Subcontract Amount: | $ _____ |
| Cost of Work to Date: | $ _____ |
| Less Retainage: | $ _____ |
| Less Total Payments Received to Date: | $ _____ |
| Final Payment: | $ _____ |

For and in consideration of the payments made to it by Contractor, Subcontractor hereby certifies as follows:

1.     Subcontractor hereby acknowledges receipt of the Total Payments Received to Date stated above as payment in full, excluding the Retainage stated above, for all labor, services and materials furnished or stored and reimbursed, in connection with the construction of the Project through the last day of the previous payment period, and hereby waives and releases its lien and right to claim a lien against Owner and/or its sureties, Financiers or the land upon which the Project is situated with respect to the Project.

2.     Subcontractor, for and in consideration of the receipt of the Final Payment, as set forth herein, including the Retainage stated above, made to it by Contractor, hereby acknowledges and agrees that it will have received final payment in full for all labor employed

Schedule 1 - 10

SCHEDULE 1

## FORM OF LIEN WAIVER

and all materials furnished in connection with the construction of the Project, and hereby now and forever waives and releases its lien and right to claim a lien against Owner and/or its sureties, Contractor, Financiers or the land upon which the Project is situated, for labor, services or materials furnished at any time on the Project.

3.      Subcontractor hereby affirms that there are no outstanding claims against Owner, Contractor, Financiers, or their respective sureties or agents in connection with the Project. Subcontractor hereby certifies that the amounts set forth above are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and/or material on the Project other than as set forth above.

4.      Subcontractor further states on oath that all laborers and subcontractors employed by it, and all suppliers or materialmen from which it has acquired materials incorporated into the Project and any lien or bond claimant relating to Subcontractor's work has been paid their respective portion of all payment received including the Final Payment, for all work, labor, materials, machinery, equipment and supplies provided in connection with the Project, and that no laborers or materialmen have any claim, either actual or inchoate, against the Work, the Project, Owner and/or its sureties or Financiers by virtue of their having furnished labor or material going into or towards the Work.

5.      No security interest has been given or executed by Subcontractor for or in connection with any materials, appliances, machinery, fixtures, or furnishings placed upon or installed in the Project prior to the Period Ending Date.

6.      Subcontractor has not assigned any lien or right to perfect a lien against the Project and Subcontractor has the right, power and authority to execute this document.

7.      Subcontractor does hereby forever release, waive and discharge Owner, Contractor and Financiers from any and all claims on, against, related to, arising out of, connected with, and/or on account of the above described Contract or the Project, whether known or unknown, and whether presently ascertainable or not, which Subcontractor or its successors and/or assignees ever had, now have, or ever will have against Owner and/or its sureties, Contractor, Financiers or the Project.

8.      Delivery of an executed signature page hereof by facsimile, portable document format or other electronic form shall be deemed delivery of an original.

[Signatures on following page]

Schedule 1 - 11

## SCHEDULE 1

## FORM OF LIEN WAIVER

Duly sworn upon oath, executed and delivered by Subcontractor this _____ day of
_____, 20__.

**WITNESS**:                                    **BY**:


_____            _____
Name:                                      Name:
Title:                                     Title:

Sworn to and subscribed before me this ____ day of _____, 20____.


_____
Notary Public

My commission expires:


_____

    (SEAL)

Schedule 1 - 12

## SCHEDULE 2

## FORM OF OBLIGOR'S PAYMENT APPLICATION

**[Obligor's Letterhead]**

[_____]. 201_

Malayan Banking Berhad, New York Branch
400 Park Avenue
New York, New York 10022
Attention: Peter Sonza

Re:    $[165,000,000.00] Facility available pursuant to that certain Building Facility Agreement dated __, 2016, (the **"Facility Agreement"**) by and between Malayan Banking Berhad, New York Branch, as administrative agent (**"Administrative Agent"**), to Park Place Development Primary LLC, as obligo (**"Obligor"**) Payment Application #: [____]

Dear Mr. Sonza::

Obligor issues this Payment Application hereby requesting payment of a portion of the proceeds of the Facility pursuant to the terms of the Facility Agreement (capitalized terms utilized and not defined herein shall have the meaning given such terms in the Facility Agreement) under and hereby confirms, represents and warrants, as a condition to such disbursement the following:

THAT all amounts shown on all previous Payment Applications have been paid in full and all amounts requested herein have been paid or will be paid in full from the proceeds of the payment applied for hereby.

THAT all work performed through the date of this Payment Application has been performed substantially in accordance with the Plans and Specifications and there have been no changes in the Plans and Specifications except as accepted by the Administrative Agent or as permitted pursuant to the Facility Agreement.

THAT all labor, materials, and/or services shown on this Payment Application, for which funds have been or are requested, are incorporated into the Property, as defined in the Facility Agreement except otherwise set forth.

THAT none of the amounts for which payment is applied have been included in any prior Payment Application.

<u>SCHEDULE 2</u>

<u>FORM OF OBLIGOR'S PAYMENT APPLICATION</u>

THAT there have been obtained all required authorizations, approvals, permits, licenses, and other actions by governmental agency or authority required to complete the Pre-Development Work described in the Plans and Specifications which work is now in progress or was previously completed.

THAT all work on the Property, which has been completed or which is in process as of this date and which is described on the Plans and Specifications, does not violate any applicable law, ordinance, rule, or regulation.

THAT no Event of Default exists or this Payment Application is made by a Guarantor and no Event of Default exists that is susceptible of cure by Guarantor.

THAT the representations and warranties set forth in the Facility Agreement are hereby reaffirmed by this application for payment of facility proceeds pursuant to the Facility Agreement and are true and correct in all respects on and as of the date of this Owner's Certification and will be true and correct in all respects on and as of the date of such disbursement except to the extent any such representation or warranty is no longer true and correct due to a change in facts or circumstances which does not otherwise constitute an Event of Default.

THAT the attached Application and Certificate for Payment is complete and accurate in all material respects.

Accordingly, Obligor requests disbursement of Facility proceeds in the amount of $_____ to be wire transferred to the following account:

> Name of Bank:
> Address:
> ABA#:
> Account #:
> Account Name:

**PARK PLACE DEVELOPMENT PRIMARY LLC**, a Delaware limited liability company

By:_____
    Name: Sharif El-Gamal
    Title: President:

Schedule 2 - 2

## AFFIDAVIT PURSUANT TO SECTION 22 OF
## THE LIEN LAW OF THE STATE OF NEW YORK

STATE OF NEW YORK     )
                       :  ss.:
COUNTY OF NEW YORK  )

The undersigned, being duly sworn, deposes and says that:

(1) He has an address at the address shown at the foot hereof under his signature.

(2) He is an Authorized Signatory of Park Place Development Primary LLC ("Obligor") under that certain Building Facility Agreement, dated as of the date hereof, between Malayan Banking Berhad, New York Branch, as administrative agent ("Administrative Agent") and certain financiers thereto ("Financiers") (as the same may be amended, modified and in effect from time to time, the "Facility Agreement").

(3) The amount of the Building Facility (as defined in the Facility Agreement) is: $162,112,896.16.

(4) The portion of the Building Facility to be used to repay existing financing on the property is $33,000,000.00.

(5) The portion of the Buidling Facility to be used to pay consideration for the Building Facility and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Building Facility are (or are estimated to be) as follows: $3,040,548.13.

(6) The amount, if any, to be advanced from the Building Facility to reimburse the Obligor for costs of the Improvements (as defined in the Facility Agreement) expended by the Obligor prior to the date hereof is $141,218.52.

(7) The estimated amount to be advanced from the Building Facility for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the Improvements (such as fees of architects, engineers, taxes, insurance, permits and fees and leasing commissions) is: $17,326,070.48.

(8) The net sum available to the Obligor from the Building Facility to pay contractors, subcontractors, laborers and materialmen for the Improvements is: $108,605,059.03.

(9) This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York.

(10)     This statement is verified by deponent and not by the Obligor because the Obligor is a limited liability company and each deponent is an Authorized Signatory of the Obligor.

(11)     The facts stated above and any costs itemized on this statement are true, to the knowledge of the undersigned.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the date first written above.

Name: Shahd El-Gamal
Title: Authorized Signatory of Obligor

Sworn and subscribed to before me
this 26 day of April , 2016.

Notary Public

Address:
31 West 27th Street, 9th Floor
New York, New York

**PHON CHOOI SAN**
**Notary Public, State of New York**
No. 01PH6117535
Qualified in New York County
Commission Expires October 25, 20 16

| NYC DEPARTMENT OF FINANCE<br>OFFICE OF THE CITY REGISTER<br><br>This page is part of the instrument. The City<br>Register will rely on the information provided<br>by you on this page for purposes of indexing<br>this instrument.The information on this page<br>will control for indexing purposes in the event<br>of any conflict with the rest of the document. | <br><br>2019052000235001002EB972 |
|---|---|

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 41 |
|---|---|---|
| **Document ID: 2019052000235001**<br>Document Type: SUNDRY AGREEMENT<br>Document Page Count: 40 | Document Date: 05-01-2019 | Preparation Date: 05-30-2019 |

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| FIRST AMERICAN TITLE<br>666 THIRD AVENUE<br>960202 ACCOM<br>NEW YORK, NY 10017<br>212-551-9421<br>MLETTIERI@FIRSTAM.COM | FOX ROTHSCHILD LLP<br>101 PARK AVENUE SUITE 1700<br>ATTN: GLENNA GRINNELL<br>NEW YORK, NY 10178 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 126 | 8 | Entire Lot | 43 PARK PLACE |

Property Type: APARTMENT BUILDING

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 126 | 9 | Entire Lot | 45 PARK PLACE |

Property Type: APARTMENT BUILDING

### CROSS REFERENCE DATA

**CRFN:** 2015000076854

### PARTIES

**PARTY 1:**
PARK PLACE PARTNERS DEVELOPMENT, LLC
31 WEST 27TH STREET
NEW YORK, NY 10001

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | S | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | S | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | S | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | S | 0.00 | | $ | 0.00 |
| Spec (Additional): | S | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | S | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | S | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | S | 0.00 | Recorded/Filed          06-03-2019 16:56 | | |
| Additional MRT: | S | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | S | 0.00 | **2019000172428** | | |
| Recording Fee: | S | 240.00 | | | |
| Affidavit Fee: | S | 0.00 | *Annette M Hill* | | |
| | | | ***City Register Official Signature*** | | |

## FIRST AMENDED AND RESTATED

## NOTICE OF CERTIFICATION

### (Plaza)

This Notice, made as of the ___ day of _____ , 2019, by Park Place Partners Development, LLC, a limited liability company having an address at c/o Soho Properties 31 West 27th Street, New York, NY 10001 (the "Owner").

**WHEREAS,** the Owner is the fee owner of certain real property located in the Borough of Manhattan, County of New York, City and State of New York, which property is designated as Tax Block 126, Lot(s) 8 and 9 and commonly known by the street address of 43-51 Park Place, New York, NY and which is more particularly described in Exhibit A attached hereto (the "Property"); and

**WHEREAS,** publicly accessible open space is proposed for the Property for which valuable benefits will be received in the form of additional floor area (the "Plaza"); and

**WHEREAS,** Owner submitted an application designated number N150216ZCM dated January 8, 2015 to the Chairperson of the City Planning Commission (the "Chairperson") requesting certification pursuant to Section 37-78 of Article III, Chapter 7 of the Zoning Resolution of the City of New York ("ZR") that a site plan for a public plaza that complies with ZR Section 37-70 was submitted to the Chairperson and recorded with the City Register on March 6, 2015 under CRFN 2015000076854 and certified to the Department of Buildings on April 6, 2015; and

Active\81609329.v1-3/19/19

**WHEREAS**, Owner desires to amend the Plaza under N150216ZCM and submitted an application designated number N190034ZCM dated August 8, 2018 (the "Application") to the Chairperson of the City Planning Commission (the "Chairperson") requesting certification pursuant to Section 37-78 of Article III, Chapter 7 of the Zoning Resolution of the City of New York ("ZR") that a site plan for a public plaza that complies with ZR Section 37-70 has been submitted to the Chairperson; and

**WHEREAS**, in connection with and as a requirement of certification, Owner is required to file a Notice of Certification with the New York City Register; and

**WHEREAS**, Owner desires to restrict the manner in which the Property may be developed, redeveloped, maintained and operated in the future and intends these restrictions to benefit all the land, including land owned by the City of New York, lying within one-half mile of the Property;

**THEREFORE**, the Owner gives this Notice of Certification to the City of New York (the "City") and future owners and to every party having any right, title or interest in the Property and their respective heirs, successors, or assigns:

1.     The Plaza shall be developed and maintained substantially in accordance with the following drawings, prepared by Stephen Thomson of SOMA and updated by Ismael Leyva of Ismael Leyva Architects and Thomas Balsley of Thomas Balsley Associates and attached hereto as Exhibit B (the "Drawings"):

-2-

| Drawing No./Title | Architect | Date | Last Revised Dated |
|---|---|---|---|
| ZL-03A/Zoning Compliance Z.R. 37-70 | Thomas Balsley | July 17, 2014 | January 20, 2015 |
| ZL-03B/ Zoning Compliance Z.R. 37-70 | Thomas Balsley | July 17, 2014 | January 06, 2015 |
| ZL-100.00/Site Plan | Stephen Thomson/Ismael Leyva | January 20, 2015 | June 20, 2018 |
| ZL-101/Plaza Plan | Thomas Balsley | July 17, 2014 | October 9, 2018 |
| ZL-101A/Sidewalk Frontage, Circulation Diagram & Permitted Obstruction | Thomas Balsley | July 17, 2014 | October 9, 2018 |
| ZL-101B/Seating & Planting | Thomas Balsley | July 17, 2014 | October 9, 2018 |
| ZL-102/ Planting Plan, Schedule, and Details | Thomas Balsley | July 17, 2014 | October 9, 2018 |
| ZL-103/Plaza Photometric Analysis | Stephen Thomson/Ismael Leyva | January 20, 2015 | January 20, 2015 |
| ZL-200/Site Details | Thomas Balsley | July 17, 2014 | June 20, 2018 |
| ZL-201/Site Details | Thomas Balsley | July 17, 2014 | June 20, 2018 |
| ZL-202.00/Elevation Details & Frontage Calculations | Stephen Thomson/Ismael Leyva | January 06, 2015 | June 20, 2018 |
| ZL-400/Site Details | Thomas Balsley | July 17, 2014 | June 20, 2018 |
| ZL-401/Site Details | Thomas Balsley | July 17, 2014 | June 20, 2018 |
| ZL-402/Site Details | Thomas Balsley | July 17, 2014 | June 20, 2018 |
| ZL-403/Site Details | Thomas Balsley | July 17, 2014 | June 20, 2018 |
| ZL-404/Glazing Details Paver Details | Stephen Thomson/Ismael Leyva | January 06, 2015 | June 20, 2018 |

2.      The Plaza shall be accessible to the public at all times, in accordance with ZR

Section 37-727, and shall be maintained in accordance with ZR Section 37-77.

-3-

3.     Prior to certification of the Application by the Chairperson, Owner shall file and duly record this Notice of Certification in the Borough Office of the City Register of the City of New York, indexing it against the Property. Owner shall, promptly following recordation, deliver to the Chairperson a true copy of this Notice of Certification as recorded and certified by the City Register. Such recording is a precondition of the filing for or the issuance of any building permit for any development or enlargement on the zoning lot or any construction/site preparation/filing with the New York City Department of Buildings in connection with such development or enlargement on the Property.

4.     A duly recorded copy of this Notice of Certification shall be attached to and submitted with any application relating to the Property filed with the New York City Department of Buildings or Department of Transportation. These agencies and any other agency of the City of New York may enforce the restrictions contained herein by any method authorized by law or in equity.

5.     No temporary or final certificate of occupancy shall be issued for any additional floor area generated by the Plaza unless and until the Plaza has been substantially completed in accordance with the Drawings.

6.     The recording information that appears on this Notice of Certification shall be included on any Certificate of Occupancy issued in connection with the Property after such recording date.

7.     A plaza compliance report shall be provided to the Department of City Planning and the affected Community Board, pursuant to ZR Section 37-78(b).

-4-

signature page to follow

**IN WITNESS WHEREOF**, the Owner has executed this Notice of Certification

on the date written above.

By: _____

Name: Stuart El tamal

Title: Managing member

State of New York

County of New York

On the 1st day of May, 2019, before me, the undersigned, a notary public in and for said state, personally appeared Stuart El-Carmel, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

PHON CHOOI SAN
Notary Public, State of New York
No. 01CH6117335
Qualified in New York County
Commission Expires October 26, 2020

-6-

# PARK51 GALLERY

## 51 PARK PLACE, NEW YORK, NY, 10007

### CLIENT



31 West 27th Street
Floor 09
New York, NY 10001
Phone: 212-966-0834
Fax:   212-966-2200

### ARCHITECT OF RECORD
### RESIDENTIAL BUILDING



48 West 37th St. New York, NY 10018
TEL.(212)290-1444
FAX.(212)290-1425

### DESIGN CONSULTANT



31 West 27th Street
New York, NY 10001
Phone: 212-966-1200

### LANDSCAPE ARCHITECT

thomasbalsleyassociates

31 West 27th Street
New York, NY 10001
Phone:  212-684-9230

### CONSULTANTS

**REVEAL DESIGN GROUP**
LIGHTING DESIGNER
150 W 28TH ST, 401
NEW YORK, NY 10001

VALCON CONSTRUCTION ADVISORS
OWNER'S REPRESENTATIVE
181 WESTCHESTER AVE
SUITE 403 B
PORT CHESTER, NY 105736

## JANUARY 06, 2015
## DEPT OF CITY PLANNING ISSUE

EXHIBIT B, ZL-001.00, 1 OF 2



MATCH LINE 2 OF 2



46 West 37th St. New York, NY 10018
TEL.(212)392-4444
FAX.(212)342-7803

## soma

**Name**
PARK STREET
10 PARK STREET
NEW YORK, NY 10017

**Owner**
SOHO PROPERTIES
31 W 27TH STREET
FLOOR 10
NEW YORK, NY 10001

**Design Consultant**
soma
SOMA
45 W 27TH STREET, FL 9
NEW YORK, NY 10001
T (212)696-9400

**Structural Engineer**

**Lighting Designer**

| PARK ST PUBLIC PLAZA DRAWING LIST | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SHEET | SHEET NAME | SCALE | DCP FILING 01/17/2014 | DCP FILING 10/10/2014 | DCP FILING 10/10/2014 | DCP FILING 11/11/2014 | DCP FILING 06/06/2015 | DCP FILING 7/22/2015 | DCP FILING 06/20/2016 | |
| ZL-001 | COVER SHEET & DRAWING LIST | N/A | • | • | • | • | • | • | • | |
| ZL-002 | AREA MAP | AS NOTED | | • | • | • | • | • | • | |
| ZL-003A | ZONING COMPLIANCE ZR. 37-70 | AS NOTED | | • | • | • | • | • | • | |
| ZL-003B | ZONING COMPLIANCE ZR. 37-70 | AS NOTED | | • | • | • | • | • | • | |
| ZL-100 | SITE PLAN | 3/32"=1' | | • | • | • | • | • | • | |
| ZL-101 | PLAZA PLAN | AS NOTED | | • | • | • | • | • | • | |
| ZL-101A | PERMITTED OBSTRUCTION, SIDEWALK FRONTAGE & CIRCULATION DIAGRAM | AS NOTED | | | | | • | • | • | |
| ZL-102 | SEATING & PLANTING | AS NOTED | | • | • | • | • | • | • | |
| ZL-102 | PLANTING PLAN, SCHEDULE, AND DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-103 | PLAZA PHOTOMETRIC ANALYSIS | AS NOTED | | • | • | • | • | • | • | |
| ZL-200 | SITE DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-201 | SITE DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-202 | ELEVATION DETAILS & FRONTAGE CALCULATIONS | 3/4"=1' | | • | • | • | • | • | • | |
| ZL-400 | SITE DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-400 | SITE DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-402 | SITE DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-403 | SITE DETAILS | AS NOTED | | • | • | • | • | • | • | |
| ZL-406 | GLAZING & PAVER DETAILS | AS NOTED | | • | • | • | • | • | • | |
| Z-101 | AREA PLAN & ZONING CALCULATIONS | AS NOTED | • | • | | | | | | |
| Z-102 | ZONING MAP | AS NOTED | • | • | | | | | | |
| Z-103 | TAX MAP | AS NOTED | • | • | | | | | | |
| Z-105 | ARCHITECTURAL SURVEY | AS NOTED | • | • | | | | | | |
| Z-106 | ZONING LOT PLAN | 1/16"=1' | • | • | | | | | | |
| Z-104 | ROOF PLAN | 3/16"=1' | • | • | | | | | | |
| Z-109 | FIRST FLOOR PLAN | 3/16"=1' | • | • | | | | | | |
| Z-110 | PARK PLACE STREET ELEVATION | 3/16"=1' | • | • | | | | | | |
| Z-112 | SECTION B | 3/16"=1' | • | • | | | | | | |
| A-111 | SECTION C | 3/16"=1' | • | • | | | | | | |
| Z-107 | FRONTAGE CALCULATIONS | AS NOTED | • | • | | | | | | |

| | | |
|---|---|---|
| 1. | 07/08/2016 | DCP PLAZA FILING |
| 2. | 07/24/2014 | REVISED PER DCP COMMENTS |
| 3. | 10/09/2014 | REVISED PRE LCP COMMENTS |
| 4. | 01/06/2016 | ISSUED WITH REVISION AS PER DCP COMMENTS |
| 5. | 01/30/2015 | ISSUED WEB REVISED AS PER DCP COMMENTS |
| 6. | 07/22/2015 | PLAZA REVISION |
| 7. | 06/07/2016 | REVISED PER DCP COMMENTS |

| | |
|---|---|
| **Scale** | **Date** |
| R.T.S. | JANUARY 20, 2015 |
| **Job No.** | **Phase** |
| 15 | PERMIT FILING |
| **Proj.** | **Issue For** |
| 15A | DCP PLAZA FILING |

**Drawing**
COVER
DRAWING LIST

**Sheet**

## ZL-001.00

EXHIBIT B, ZL-001.00, 2 OF 2

## Public Plaza - New Requirement for Public Plaza - Section 37-70

Public Plaza Total Area   2,868.27 sf (Plaza Major Portion: 2,552.77 sf, PLAZA MINOR PORTION: 315.50 sf)

| Public Plaza Standards | Permitted/Required | Proposed |
|---|---|---|
| **37-70 PUBLIC PLAZAS** Public plazas are open areas on a zoning lot intended for public use and enjoyment (a) to serve a variety of users of the public plaza area; (b) to provide spaces for sitting, users who sit do so here and provide opportunities for social interaction for small groups; (c) to provide safe spaces, with maximum visibility from the street and adjacent buildings and with multiple avenues for ingress and egress. | Public plazas are open areas on a zoning lot intended for public use and enjoyment. (a) to serve a variety of users of the public plaza area; (b) to provide spaces for sitting users while at the same time pedestrian free and open spaces for social interaction for small groups; (c) to provide safe spaces, with maximum visibility from the street and adjacent buildings and with multiple avenues for ingress and egress. | Complies |
| **37-71 BASIC DESIGN CRITERIA** | | |
| **37-711 AREA DIMENSIONS** - A Public Plaza shall contain an area no less than 2,000 sf. Any sloped-raised open area located adjacent to a public plaza, other than an open area bounding a street may used for pedestrian access, must not | Area > 2,000 sf Any non-bounded open area located adjacent to a public plaza, other than an open area bounding a street be used for pedestrian access, must either: | 2,868.27 sf provided: Complies |
| (a) be separated from the public plaza by a buffer, such as a wall, decorative fence, or opaque plantings at least six feet in height; or (b) meet all requirements for minor portions of public plazas related to size, configuration, orientation, as specified in Section 37-716. | (a) be separated from the public plaza by a buffer, such as a wall, decorative fence, or opaque plantings at least six feet in height; or (b) meet all requirements for minor portions of public plazas related to size, configuration, orientation, as specified in Section 37-716. | (a) 6 ht? buffer: Complies (b) Complies (see Section 37-716) |
| **37-712 LOCATIONAL RESTRICTIONS** No Public Plaza shall be located within 175' of an existing publicly accessible open area or public park. Unless the Chair finds that the location would create a pedestrian circulation network. | No public plaza within 175' of an existing public plaza or park | Complies (see dwg. ZL-100) |
| **37-714 RESTRICTIONS ON ORIENTATION** (a) Where the major portion of a public plaza fronts on only one street line, such major portion is not permitted to front on a north-facing street line of a zoning lot. (b) No major portion of a public plaza shall only front on a west-facing street line or an east-facing street line. (c) A corner public plaza must have its major portion. | (a) Where the major portion of a public plaza fronts on only one street line, such major portion is not permitted to front on a north-facing street line of a zoning lot. (b) No major portion of a public plaza shall only front on a west-facing street line or an east-facing street line. (c) A corner public plaza must have its major portion. | Complies |
| **37-715 REQUIREMENTS FOR MAJOR PORTIONS OF PUBLIC PLAZAS VISIBILITY** The major portion of a public plaza shall be generally regular in shape, easily and directly accessible from adjoining buildings and public spaces, and continuously visible from within all portions of the public plaza and from adjoining public spaces. | The major portion of a public plaza shall be generally regular in shape, easily and directly accessible from adjoining buildings and public spaces, and continuously visible from within all portions of the public plaza and from adjoining public spaces. | The major portion is continuously visible: Complies |
| (a) All contiguous public plaza areas on a zoning lot shall be considered as one public plaza. | (a) All contiguous public plaza areas on a zoning lot shall be considered as one public plaza. | Complies |
| (b) Major portion of a public plaza shall be at least 75% of total area. | 2,868.27 sf x 75% = 2,151.20 sf minimum. | Major portion 2,868.27 sf: Complies |
| (c) The major portion of a public plaza shall have a minimum average width and depth of 40'. No more than 20% of the public plaza area may have a width of less than 40'. | The major portion of a public plaza shall have a minimum average width and depth of 40'. No more than 20% of the public plaza area may have a width of less than 40'. | 42'-7" width & 69'-11" depth: Complies |
| (d) No Major Portions of Public Plazas, the maximum width measured parallel to any one street shall not be greater than three times the average depth of the Public Plaza measured perpendicular to three lines that are measured parallel to any one street shall not be greater than three times the maximum depth of the Public Plaza measured perpendicular to the street line. | 69' average depth) x 3 = 180' (max width permitted) | 42'-7" (max proposed width) < 180': Complies |
| **37-716 REQUIREMENTS FOR MINOR PORTIONS OF PUBLIC PLAZAS** The Minor portion shall not occupy more than 25% of the total area of the Public Plaza. | 2,868.27 sf x 25% = 717.07 sf maximum. | Minor portion: 315.50 sf: Complies |
| (a) The Minor Portion shall have a minimum average width and depth of 15'. | The Minor Portion shall have a minimum average width and depth of 15' | Minimum width 15'-3", minimum depth 19' 51: Complies |
| (b) The Minor Portion must be directly adjacent to the major portion. | The Minor Portion must be directly adjacent to the major portion. | Complies |
| (c) The Minor Portion must be visible from within the major portion when viewed perpendicular to the line separating the major and minor portions. | The Minor Portion must be visible from within the major portion when viewed perpendicular to the line separating the major and minor portions. | Complies |
| (d) The Minor Portion must tend directly on the same street as the major portion unless the minor portion has a width (depth 2:1, 2) longest dimension contiguous with major portion. | The Minor Portion must front directly on the same street as the major portion unless the minor portion has a width (depth 2:1, 2) longest dimension contiguous with major portion. | Complies |
| **37-717 REGULATIONS FOR THROUGH BLOCK PLAZA** | N/A | N/A |
| **37-718 PAVING** The paving of the public plaza shall be of non-skid durable materials that are decorative and compatible in color and pattern with other design features. | The paving of the public plaza shall be of non-skid durable materials that are decorative and compatible in color and pattern with other design features. | Complies |
| **37-72 ACCESS AND CIRCULATION** | | |
| **37-721 SIDEWALK FRONTAGE** (a) At least 50% of Public Plaza street frontage within 15' of a street line shall be free of obstructions. (1) At least 50% of the public plaza frontage along each street line or sidewalk widening line shall be free of obstructions; and (2) such obstructions across shall extend to a depth of 15' measured perpendicular to the street line. | (a) 63'-7"(63.583') x 15 = 953.76 sf, 953.75 x 50% = 476.88 sf maximum obstructed area (1) 63'-7"(63.583') (clear frontage) x 50% = 31.79' minimum. | 953.76 sf = 476.88 sf: Complies 32'-57" (free of obstruction): Complies (see dwg. ZL-101A) |
| (b) For the remaining 50% of the frontage on within 15' of the street line, no walls or other obstructions except for permitted obstructions and fixed and movable seating and tables, shall be higher than 2' above the curb level of the street line. | (2) Unobstructed access extend to depth 15. (b) No obstructions higher than 2' above the sidewalk. | Complies Complies |
| **37-722 LEVEL OF PLAZA** The level of a public plaza shall not be less than the average elevation of curb level of the nearest adjoining street nor more than 3' above the average elevation of curb level of the nearest adjoining street. | Average curb elevation (10.64 = 21.82') 22 - 21.76 Maximum permitted plaza level 20.76' + 3 = 22.76 | Plaza level (high point): 22.75 < 22.76: Complies |
| **37-723 CIRCULATION PATHS** 4 min. 6' clear wide path second to at least 50% at the depth of the major portion of the public plaza. | Min. 6' clear wide path extend to at least 50% of the depth of the major portion of the public plaza. | Complies (see dwg. ZL-101A) |
| **37-724 SUBWAY ENTRANCES** Public plaza shall be at the same elevation as the adjacent sidewalk for a distance of at least 15 feet in all directions from the entry superstructure. | Public plaza shall be at the same elevation as the adjacent sidewalk for a distance of at least 15 feet in all directions from the entry superstructure. | N/A |
| **37-725 STEPS** Any steps provided within the public plaza must have a minimum 4" to grade and maximum 6" height and minimum 11" tread. | Minimum 4" height, maximum 6"; minimum tread of 11" | Complies (see dwg 4, dwg ZL-101) |
| **37-726 PERMITTED OBSTRUCTIONS** (a) Items counted as permitted obstruction no walls, canopy, planters, benches, drinking fountains, lighting, litter receptacles, waterfalls, sculptures and other works of art etc | Seating, planters, bleachers, drinking fountains and lighting, litter receptacles, waterfalls, sculptures and other works of art etc. | Complies |
| (b) For public plaza area less than 10,000 sf permitted obstruction's may not occupy more than 40% of the total plaza area | 7,868.27 sf x 40% = 3,147.31 sf | 1,098.73 sf; 1,142.31 s_f: Complies (see dwg. ZL-101A) |
| **37-727 PERMITTED OBSTRUCTIONS - CANOPIES, AWNINGS, AND MARQUEES** (1) Entrances to buildings located within a public plaza may have a maximum of one canopy, awning or marquee provided that it has a maximum area of 250 sf does not project into the public plaza more than 15' when measured perpendicular to the building facade, is located a minimum of 15' feet above the level of the public plaza and does not contain vertical supports. (2) Sun control devices shall be located above the level of the first story ceiling, shall be limited to a maximum projection of 2'-6', shall be limited to a maximum projection of 2'-6', that have solid surface that cover no more than 20% of the area of the building wall, may rise above the permitted building height. | (1) a maximum of one canopy, awning or marquee provided that it has a maximum area of 250 sf, does not project into the public plaza more than 15' when measured perpendicular to the building facade, is located a minimum of 15' feet above the level of the public plaza and does not contain vertical supports. (2) Sun control devices shall be located above the level of the first story ceiling, shall be limited to a maximum projection of 2'-6', that have a solid surface that cover no more than 20% of the area of the building wall, may rise above the permitted building height. | N/A |

| Public Plaza Standards | Permitted/Required | Proposed |
|---|---|---|
| **PERMITTED OBSTRUCTIONS - PROHIBITION OF GARAGE ENTRANCES, DRIVEWAYS, PARKING FACILITIES, LOADING BERTHS, EXHAUST VENTS, MECHANICAL EQUIPMENT, AND BUILDING TRASH STORAGE FACILITIES.** | | |
| garage entrances, driveways, parking spaces, passenger drop-offs or loading berths shall be permitted within a Public Plaza. If the above listed on building trash storage facilities are located near a public plaza, they shall be separated from it by a barrier sufficient to substantially conceal... | No garage entrances, driveways, parking spaces, passenger drop-offs or loading berths. No exhaust vents or mechanical equipment are permitted on any public plaza or on any building wall fronting upon public plaza | Complies |
| exhaust vents or mechanical equipment are permitted on any public plaza or on any building wall fronting upon public plaza. All exhaust vents are mechanical equipment located adjacent to a public plaza shall be separated from it by a barrier sufficient to substantially, visually and audibly conceal presence and operation. An inlake vents or shafts shall be concealed by planting or other design area | No exhaust vents or mechanical equipment are permitted on any public plaza or on any building wall fronting upon public plaza. All exhaust vents and mechanical equipment located adjacent to a public plaza shall be separated from it by a barrier sufficient to substantially, visually and audibly conceal their presence and operation. An intake vents or shafts shall be concealed by planting or other design features. | Complies |
| **37-728 HOURS OF ACCESS** | | |
| public plaza shall be accessible to the public at all times | All public plaza shall be accessible to the public at all times | Complies |
| **37-728 STANDARDS OF ACCESSIBILITY FOR PERSONS WITH THE DISABILITIES** | | |
| public plazas shall conform with applicable laws pertaining to access for persons with disabilities | All public plazas shall conform with applicable laws. | Complies |
| **37-73 KIOSK AND OPEN AIR CAFE** | | |
| A new open air cafe may be placed within a publicly accessible open area upon certification... | CPC certification | N/A |
| **37-74 AMENITIES** | | |
| public plazas shall provide amenities, as listed in Sections 37-741 through 37-748, inclusive. All fixed amenities shall be considered permitted obstructions within the public plaza. | All public plazas shall provide amenities, as listed in Sections 37-741 through 37-748, inclusive. All required amenities shall be considered permitted obstructions within the public plaza. | Complies |
| **37-741 SEATING** | | |
| sf seating per 30 sf of plaza area | 2,866.37 sf/30 = 95.6 min. of seating | -130'-10" ** - Complies (see dwg. ZL-101B) |
| more than 50% may be moveable | -95.6 X 50% = -47.8 max. of moveable seating | -2'-0" *** - Complies (see dwg ZL-101B) |
| least 2 types of seating | -At least 2 types of seating | -Complies (See dwg. ZL-101B) |
| FIXED INDIVIDUAL SEAT OR STREET FURNITURE | | |
| of seating per 2' within 15' of street line | 62.7'/(30.58ft) / 2=-31.8 | -35'-0" **** - Complies (see dwg. ZL-101B) |
| least 50% of the required seating shall have backs | -31.8' X 50% = -15.9' min with backs | -35'-5" **** - Complies (see dwg ZL-101B) |
| least 50% of seats across street face street | -15.9' X 50% = -8.0' min. with backs face street | -70'-7" **** - Complies (see dwg ZL-101B) |
| Seating depth: 18" min. | -18" min. depth | Complies (see dwg #6 & 7, dwg. ZL-400, dwg #1 & 2, dwg. ZL-401) |
| ing depth more than 35" may be counted as 2 seats | | N/A |
| ing length depth 32" min. | -22" min. depth for seating wall | N/A |
| Seating height: 18" min-22" max. | -18" min. - 20" max. ht | Complies (see dwg #6 & 7, dwg. ZL-400, dwg #1 & 2, dwg ZL-401) |
| Seating with backs: | | |
| % of fixed seating shall have backs | -59 1/2" of fixed seating, 99 1/2" X 50% = 49-1/2 min. with backs | -62'-4" with backs - Complies (see dwg ZL-101B) |
| min. back ht | -14" min. back ht | Complies (see dwg #7, dwg ZL-400, dwg #2, dwg ZL-401) |
| max. depth | -20" max. depth | Complies (see dwg #7, dwg ZL-400, dwg #2, dwg ZL-401) |
| al be reclined from vertical between 15 to 35 degrees | -Shall be reclined from vertical between 10 to 35 degrees | Complies (see dwg #7, dwg ZL-400, dwg #2, dwg ZL-401) |
| Moveable seating. will be counted 2 ft per chair, 1 chair per 200 sf of plaza area, provide 1 table if chairs. Max. seat depth: 90". Moveable chairs shall not be chained, fixed, or otherwise secured to the public plaza in open or public... | 2 / 1 chair, max. 90" seat depth | Complies |
| Seating steps and folding walls. Permitted max. 15% of the required seating. Seating steps ht 15"-30". Seat wall height: less than 18". | 95.6 (required seating) x 15% = 14.34 maximum | N/A |
| Seating in open air cafe shall not be counted toward the required seating | Seating in open air cafe shall not be counted toward the required seating | N/A |
| Seats that face walls must be a minimum of 6' from such wall | 6' min. from walls | N/A |
| **37-742 PLANTINGS AND TREES** | | |
| public plazas shall provide min 4 trees | -min 4 trees | -5 Trees - Complies |
| t 50% of the area of a public plaza shall be comprised of planting beds with min sf transition of 2. use on of only bounding walls. | -2,866.37 sf / 20% = -573.2 sf | -Planting beds: 573.3 sf ***** - Complies (see dwg ZL-101B) |
| least 50% of required trees shall be planted flush-to-grade. 50% required trees planted in to-grade shall be surrounded by a porous surface or planted at grade within planting beds with least caliber of planting. | -4 trees X 50% = 2 trees | -5 Trees - Complies -4 1/2" caliber - Complies |
| caliper min. | -4" caliper min. | -Complies |
| l soil depth min.: 200 cf soil per tree | -3'-0" soil depth min., 200 cf soil per tree | -Complies |
| shrubs: 3'-0' soil depth min. | -For shrubs: 3'-0" soil depth min. | -Complies |
| groundcover and grass: 1'-6" soil depth min. | -For groundcover and grass: 1'-6" soil depth min. | (see dwg ZL-102) |
| vide automatic irrigation system or specify hardy plants. | Provide automatic irrigation system or specify hardy plants | -Complies |
| ast trees are required to be planted in the public sidewalk area adjacent to a zoning lot in ordance with Section 26-41 (Street Tree Planting) | -see Section 26-41 | -Complies (see Section 26-41) |
| **37-743 STREET TREE PLANTING** | | |
| 1 street tree shall be provided for every 25 sf of street frontage of the plaza | -136 1/7/25= 5.44 (5 Trees) | 5 Trees : Complies (see dwg ZL-102) |
| **37-744 LIGHTING AND ELECTRICAL POWER** | | |
| n 2 foot candles for all usable areas (walking/seating), including sidewalks directly adjacent to public plaza | -Min 2 foot candles for all usable areas (walking/seating), including sidewalks directly adjacent | Complies (see dwg. ZL-106) |
| n 0.5 foot candles for all other areas | -Min. 0.5 foot candles for all other areas | Complies |
| vide electrical outlets furnishing electrical power 1200 watt/4000 sf | -Provide electrical power 1200 watt/4000 sf | Complies |
| **37-744 LITTER RECEPTACLES** | | |
| vide min 25 gallons capacity litter receptacle per 1,500 sf | -Provide 1 litter receptacle per 1,500 sf -2,862.57 sf / 1,500= 1.91 cf) | -two 30 gallons Receptacles - Complies (see dwg. ZL-431) |
| 12" sidewalk opening | -Min. 12" sidewalk opening | -Complies |
| ate within 50' of required seating area within the public plaza | -Locate within 50' of required seating area | -Complies |
| **37-745 BICYCLE PARKING** | | |
| vide parking for min. 2 bikes on the adjacent sidewalk per 00" standard | -min. 2 bike parkings | Complies (see dwg. ZL-101) |
| **37-746 DRINKING FOUNTAIN** | | |
| min 1 per a public plaza | -min. 1 per a public plaza | Complies (see dwg. ZL-101) |

See dwg. ZL-101A for calculation
See dwg. ZL-101A for calculation
See dwg. ZL-101A for calculation
See dwg. ZL-101B for calculation
See dwg. ZL-101B for calculation
See dwg. ZL-101B for calculation



ZONING COMPLIANCE
2.R. 37-70

ZL-003A

MATCH LINE 1 OF 2

EXHIBIT B, ZL-003A, 2 OF 2

## Public Plaza - New Requirement for Public Plaza - Section 37-70

Public Plaza Total Area    2,868.27 sf (Plaza Major Portion: 2,552.77 sf, PLAZA MINOR PORTION: 315.50 sf)

| Public Plaza Standards | Permitted/Required | Proposed |
|---|---|---|
| **37-747 PUBLIC SPACE SIGNAGE** | | |
| Entry and information plaques shall be provided, as described in Section 37-751 | -see Section 37-751 | Complies (see Section 37-751) |
| **37-748 ADDITIONAL AMENITIES** | N/A | N/A |
| **37-75 SIGNS** | | |
| **37-751 PUBLIC SPACE SIGNAGE SYSTEMS** | | |
| (a) ENTRY PLAQUES | | |
| Locate the entry plaque at each street frontage or point of pedestrian entry to the plaza. One (1) entry plaque per 40 of street frontage. | One entry plaque per 40 of street frontage.<br>(1) Provide min. 12" sq. a public space symbol. That symbol shall match exactly the symbol provided in the Required Signage Symbol.<br>(2) State "OPEN TO PUBLIC" with 2" min. ht. within 6" of the public space symbol<br>(3) Provide lettering min. 1" ht. stating "Open 24 hours"<br>(4) Provide min. 3" sq. an international symbol of access for persons with disabilities | Complies (see sheet 1 & 2, dwg. ZL-403) |
| (b) INFORMATION PLAQUE | | |
| Locate the information plaque within 6" of a sidewalk and 3" above the level of the public plaza. The maximum height of such free-standing sign shall be 6', with a maximum width and depth of 16".<br>(1) A min. 6" sq. public space symbol, if provided on a separate plaque from a required entry plaque<br>(2) In lettering min. 1/2" ht. state "Open 24 hours", if provided on a separate plaque from a required entry plaque<br>(3) In lettering min 3/4" ht. indicate the type and quantity of trees, the total linear feet of seating, the number of bike racks, the number of drinking fountains, and additional amenities such as movable seating, after stating "This public plaza contains"<br>(4) In lettering min. 3/4" ht. indicate the name of the owner and the name, address, phone number, and email address of the person designated to maintain the public plaza<br>(5) State "Compliance or Questions: Call 311 and the reference the public plaza at 45 Park Place and<br>(6) State "This public plaza is accessible to persons with disabilities" | Within 6" of the sidewalk and min. 3 above the elevation of the nearest walkable pavement<br>(1) A min. 6" sq. public space symbol, if provided on a separate plaque from a required entry plaque<br>(2) In lettering min. 1/2" ht. state "Open 24 hours", if provided on a separate plaque from a required entry plaque<br>(3) In lettering min 3/4" ht. indicate the type and quantity of trees, the total linear feet of seating, the number of bike racks, the number of drinking fountains, and additional amenities such as movable seating, after stating "This public plaza contains"<br>(4) In lettering min. 3/4" ht. indicate the name of the owner and the name, address, phone number, and email address of the person designated to maintain the public plaza<br>(5) State "Compliance or Questions: Call 311 and the reference the public plaza at 45 Park Place and<br>(6) State "This public plaza is accessible to persons with disabilities" | Complies (see sheet 1, dwg. ZL-403) |
| (c) HOURS OF ACCESS PLAQUE | N/A | N/A |
| **37-752 PROHIBITION SIGNS** | | |
| -Maximum of one prohibition or "Rule of Conduct" sign, less than 1 foot square in dimension, may not be free standing, no lettering greater than 3/4" in height | Maximum of one prohibition or "Rule of conduct sign" | N/A |
| **37-753 ACCESSORY SIGNS** | | |
| (a) No more than one sign affixed to the building wall fronting on the public plaza<br>(b) All signs shall be non-illuminated<br>(c) All signs shall contain only the building or establishment name and address<br>(d) All signs accessory to retail uses affixed to building wall may not exceed 4 SF in size<br>(e) Not more than three accessory signs, no higher than 3'. Sign shall not exceed 2 SF, no portion of sign shall exceed 10' facing street and 24' not facing street<br>(f) All signs located on permitted canopies or awnings within the public plaza shall contain only the building or establishment name and shall not exceed 1" | (a) No more than one sign affixed to the building wall fronting on the public plaza<br>(b) All signs shall be non-illuminated<br>(c) All signs shall contain only the building or establishment name and address<br>(d) All signs accessory to retail uses affixed to building wall may not exceed 4 SF in size<br>(e) Not more than three accessory signs, no higher than 3'. Sign shall not exceed 2 SF, no portion of sign shall exceed 10' facing street and 24' not facing street<br>(f) All signs located on permitted canopies or awnings within the public plaza shall contain only the building or establishment name and shall not exceed 1" | One 4 sf retail sign. Complies (sht. of 4, dwg ZL-252)<br>One 11.5 sf sign. Complies with section 33-642 for maximum allowable surface area of 500 sf (see sheet 1, dwg ZL-701) |
| **37-76 MANDATORY ALLOCATION OF FRONTAGES FOR PERMITTED USES - ENTRANCES AND LOBBIES** | | |
| -Principal entrances to buildings associated with the public plaza shall be located within 10-0" of the major portion. Entrances or Lobbies shall not occupy less than 20 feet of plaza frontage, nor shall exceed 40% of the total aggregate frontage. | Aggregate Building Frontage<br>34'-7" + 30'-6" + 11'-6" = 65'-7"<br>Minimum Entrance Lobby = 20'-0"<br>Maximum Entrance/Lobby (40% frontage) = ~34'-2" | Entrance/Lobby<br>20'-3"<br>Complies (see dwg. ZL-202) |
| **37-76 MANDATORY ALLOCATION OF FRONTAGES FOR PERMITTED USES - RETAIL ESTABLISHMENTS** | | |
| -At least 50% of the total frontage of building walls of the development fronting on a public plaza, exclusive of such frontage occupied by building lobbies shall be allocated for occupancy by retail, community facilities, museum and art galleries for a service establishment is permitted by the applicable district regulations. Such retail spaces shall have a minimum depth of 15' | Aggregate Retail Frontage (65'-7" x 2) 3' = 65'-4"<br>Minimum Retail Frontage (50%) = 32'-8"<br>Minimum depth = 15'-0" | Retail Frontage 16'-9" + 11'-6" + 34'-7" = 69'-4"<br>Retail Depth = 15'-0" & 18'-4"<br>Complies (see dwg. ZL-202) |
| **37-76 MANDATORY ALLOCATION OF FRONTAGES FOR PERMITTED USES - TRANSPARENT MATERIAL** | | |
| The building frontage on the major and minor portions of the public plaza shall be treated with clear, untinted transparent materials for 50% of its surface area below 14' or the ceiling level at the ground floor of the building, whichever is lower. Any non-transparent area fronting on the major or minor portion at a public plaza shall be treated with decorative element or materials or shall be planted to a minimum height of "15 above the public plaza | Ground Floor Ceiling Height<br>20'-0" (Residential) > 14'-0"<br>22'-0" (Museum) > 14'-0"<br><br>Glazing Major Portion (Res.) = 39'-6" x 14'-0" = 553 sf<br>Glazing Minor Portion (Res.) = 34'-7" x 14'-0" = 484 17 sf<br>Glazing Major Portion (Mus.) = 1091.17 sf<br>Glazing Minor Portion (Res.) = 11'-6" x 14'-0" = 161.00 sf<br><br>Glazing Major Portion Total 50% x 1091.17 sf = 519.59 sf<br>Glazing Minor Portion Total 50% x 161.0 sf = 80.5 sf | Major Portion<br>TYPE A (0% TRANSPARENT), 65-83 sf<br>TYPE B (100% TRANSPARENT)<br>487.17 sf (Res.) + 484.17 sf (Mus.) = 971.34 sf<br>TOTAL TRANSPARENT (Res. + Mus.) 971.34 sf<br><br>Minor Portion<br>TYPE A (0% TRANSPARENT), 22.04 sf<br>TYPE B (100% TRANSPARENT) 138.96 sf<br>TOTAL TRANSPARENT 138.96 sf<br>Complies (see dwg. ZL-202) |
| **37-77 MAINTENANCE** | | |
| a) The building owner shall be responsible for the maintenance of the public plaza including the care and replacement of vegetation within the zoning lot and in the street sidewalk area adjacent to the zoning lot | The building owner is responsible for maintenance | Complies |

EXHIBIT B, ZL-003B, 1 OF 2

MATCH LINE 1 OF 2

EXHIBIT B, ZL-003B, 2 OF 2

ZONING COMPLIANCE
Z.R. 37-70

ZL-003B



EXHIBIT B, ZL-100.00, 1 OF 2

# AREA SCHEDULE

| BLOCK: | 126 |
|---|---|
| LOT: | 8 & 9 |
| ZONING LOT AREA | 12,247 |
| ZONING DISTRICT: | C6-4/LM |
| ZONING MAP: | 12B |
| BOROUGH: | MANHATTAN |
| COMMUNITY BOARD | 1 |

| ZR SECTION | PERMITTED | PROPOSED |
|---|---|---|
| FAR<br>91-22 | BASIC FAR = 10.00<br>MAX PLAZA BONUS = 2.00<br>TOTAL FAR MAX PERMITTED = 12.00 | BASIC FAR = 10.00<br>PLAZA BONUS PROVIDED = 1.41<br>TOTAL FAR = 11.41 |
| FLOOR AREA<br>91-22 | BASIC = 12,247 x 10 = 122,470 SF<br>MAX PLAZA BONUS = 12,247 x 2 = 24,494 SF<br>TOTAL MAX PERMITTED = 12,247 x 12 = 146,964 SF | BASIC = 122,470 SF<br>PLAZA BONUS PROVIDED = 17,209.62 SF<br>TOTAL = 139,679.62 SF |
| PLAZA<br>91-24 | MAX PLAZA BONUS FLOOR AREA = 24,494 SF<br>THEREFORE MAX PLAZA AREA PERMITTED FOR<br>PROPOSED BONUS = 24,494 / 6 = 4,082.33 SF | MAJOR PORTION PROVIDED = 2,552.77 SF<br>MINOR PORTION PROVIDED = 315.50 SF<br>TOTAL PLAZA AREA PROVIDED = 2,868.27 SF |

ZONING LOT LINE

110 CHURCH ST
20 STORY BLDG

## LEGEND

PLAZA: MAJOR PORTION

PLAZA: MINOR PORTION

NEW DEVELOPMENT

SURROUNDING BUILDINGS

ZONING LOT LINE

## 1. SITE PLAN
SCALE: 3/32" 1'

EXHIBIT B, ZL-100.00, 2 OF 2

MATCH LINE 1 OF 2

48 West 37th St. New York, NY 10018
TEL.(212)382-1444
FAX(212)342-7803

soma

Scale
3/32" 1'

Date
JANUARY 28, 2015

Phase
PERMIT FILING

Issue No.
DCP PLAZA FILING

Drawing
SITE PLAN

## ZL-100.00



EXHIBIT B, ZL-101, 1 OF 2



LEGEND

NEW TREE

BACKED CAST STONE BENCH

BACKLESS CAST STONE BENCH

MOVABLE TABLE & CHAIRS

TRASH RECEPTACLE

DRINKING FOUNTAIN

BIKE RACK

+0.00    SPOT GRADE

TW    TOP OF WALL

TC    TOP OF CURB

ZONING LOT LINE

MAJOR/MINOR PORTIONS OF PLAZA

BUILDING OVERHANG

GLASS PAVER

PLANTING

PLANTING (6 HT. HEDGE)

GREEN WALL

GRANITE BENCH WITH BACKS

EXHIBIT B, ZL-101, 2 OF 2

ZL-101



EXHIBIT B, ZL-101A, 1 OF 2

## Public Plaza - New Requirement for Public Plaza - Section 37-70

Public Plaza Total Area 2,868.27sf (Plaza Major Portion: 2,552.77sf, PLAZA MINOR PORTION 315.50 sf)

| Public Plaza Standards | Permitted/Required | Proposed |
|---|---|---|
| **37-721 SIDEWALK FRONTAGE**<br>(a) At least 50% of Public Plaza street frontage within 15' of a street line shall be free of obstructions.<br>(1) At least 50% of the public plaza frontage along each street line or sidewalk widening line shall be free of obstructions, and<br>(2) such obstructed access area shall extend to a depth of 15' measured perpendicular to the street line<br>(b) For the remaining 50% of the frontage and within 15' of the street line, no walls or other obstructions, except for permitted obstructions and fixed and movable seating and tables, shall be higher than 2' above the curb level of the street line | (a) 63'-7"(63.583') x 15' = 953.75 sf, 953.75 x 50% = 476.88 sf maximum obstructed area.<br>(1) 63'-7"(63.583')(street frontage) x 50% = 31.79' minimum.<br>(2) Unobstructed access extend to depth 15'.<br>(b) No obstructions higher than 2' above the sidewalk. | 265.05 sf** < 476.88 sf. Complies<br>32'-5"* (free of obstruction): Complies (see dwg. ZL-101A)<br>Complies<br>Complies |
| **37-723 CIRCULATION PATHS**<br>-A min. 8' clear wide path extend to at least 80 % of the depth of the major portion of the public plaza | Min. 8' clear wide path extend to at least 80 % of the depth of the major portion of the public plaza | Complies (see dwg. ZL-101A) |
| **37-726 PERMITTED OBSTRUCTIONS**<br>(a) Items counted as permitted obstructions include seating, planters, benches, drinking fountains, lighting, litter receptacles, waterfalls, sculptures and other works of art etc | Seating, planters, benches, drinking fountains, lighting, litter receptacles, waterfalls, sculptures and other works of art etc. | Complies |
| (b) For public plaza area less than 10,000 sf, permitted obstructions may not occupy more than 40% of the total plaza area | 2,868.27 sf X 40% = 1,147.31 sf | 1,090.2 sf < 1,147.31 sf *:<br>Complies (see dwg. ZL-101B) |
| (c) PERMITTED OBSTRUCTIONS - CANOPIES, AWNINGS, AND MARQUEES<br>(1) Entrances to buildings located within a public plaza may have a maximum of one canopy, awning or marquee provided that it has a maximum area of 250 sf, does not project into the public plaza more than 15' when measured perpendicular to the building facade, is located a minimum of 15 feet above the level of the public plaza and does not contain vertical supports.<br>(2) Sun control devices shall be located above the level of the first story ceiling, shall be limited to a maximum projection of 2'-6"; shall be limited to a maximum projection of 2'-6"; shall have solid surface that cover no more than 20% of the area of the building wall; may rise above the permitted building height. | a maximum of one canopy, awning or marquee provided that it has a maximum area of 250 sf, does not project into the public plaza more than 15 feet when measured perpendicular to the building facade, is located a minimum of 15 feet above the level of the public plaza and does not contain vertical supports.<br>(2) Sun control devices shall be located above the level of the first story ceiling, shall be limited to a maximum projection of 2'-6", shall be limited to a maximum projection of 2'-6"; shall have solid surface that cover no more than 20% of the area of the building wall; may rise above the permitted building height | Complies<br>Complies |
| (d) PERMITTED OBSTRUCTIONS - PROHIBITION OF GARAGE ENTRANCES, DRIVEWAYS, PARKING SPACES, LOADING BERTHS, EXHAUST VENTS, MECHANICAL EQUIPMENT, AND BUILDING TRASH STORAGE FACILITIES.<br>-No garage entrances, driveways, parking spaces, passenger drop-offs or loading berths shall be permitted within a Public Plaza. If the above listed or building trash storage facilities are located near or adjoin a Public Plaza, they shall be separated from it by a barrier sufficient to substantially conceal these facilities and any vehicles therein when viewed from any point in the Public Plaza.<br>-No exhaust vents or mechanical equipment are permitted on any public plaza or on any building wall fronting upon public plaza. All exhaust vents and mechanical equipment located adjacent to a public plaza shall be separated from it by a barrier sufficient to substantially, visually and audibly, conceal their presence and operation. Air intake vents or shafts shall be concealed by planting or other design features. | No garage entrances, driveways, parking spaces, passenger drop-offs or loading berths shall be permitted within a Public Plaza. If the above listed or building trash storage facilities are located near or adjoin a Public Plaza, they shall be separated from it by a barrier sufficient to substantially conceal these facilities and any vehicles therein when viewed from any point in the Public Plaza.<br>No exhaust vents or mechanical equipment are permitted on any public plaza or on any building wall fronting upon public plaza. All exhaust vents and mechanical equipment located adjacent to a public plaza shall be separated from it by a barrier sufficient to substantially, visually and audibly, conceal their presence and operation. Air intake vents or shafts shall be concealed by planting or other design features. | Complies<br>Complies |

* PERMITTED OBSTRUCTION

| | | |
|---|---|---|
| 1. | 3.00 | SF |
| 2. | 4.50 | SF |
| 3. | 33.00 | SF |
| 4. | 29.00 | SF |
| 5 | 113.20 | SF |
| 6. | 125.60 | SF |
| 7. | 37.50 | SF |
| 8. | 37.50 | SF |
| 9. | 37.50 | SF |
| 10. | 10.00 | SF |
| 11. | 46.00 | SF |
| 12 | 37.50 | SF |
| 13. | 430.00 | SF |
| 14. | 74.10 | SF |
| 14B. | 71.20 | SF |
| TOTAL: | 1,090.20 | SF |

** SIDEWALK FRONTAGE PERMITTED OBSTRUCTION AREA

| | | |
|---|---|---|
| 2A: | 2.25 | SF |
| 3: | 33.00 | SF |
| 4 | 29.00 | SF |
| 10. | 10.00 | SF |
| 11. | 46.00 | SF |
| 13A: | 74.00 | SF |
| 14A: | 29.50 | SF |
| 14B. | 71.20 | SF |
| TOTAL | 265.05 | SF |

* SIDEWALK FRONTAGE FREE OF OBSTRUCTIONS

| | |
|---|---|
| A: | 12'-8" |
| B: | 14'-9" |
| C: | 5'-0" |
| TOTAL: | 32'-5" |

LEGEND

- NEW TREE
- BACKED CAST STONE BENCH
- BACKLESS CAST STONE BENCH
- MOVABLE TABLE & CHAIRS
- TRASH RECEPTACLE
- DRINKING FOUNTAIN
- BIKE RACK
- +0.00 SPOT GRADE
- TW TOP OF WALL
- TC TOP OF CURB
- ZONING LOT LINE
- MAJOR/MINOR PORTIONS OF PLAZA
- BUILDING OVERHANG
- GLASS PAVER
- PLANTING
- PLANTING (6' HT. HEDGE)
- GREEN WALL
- 6' WIDE PATH
- GRANITE BENCH WITH BACKS

SCALE 1/4" = 1'-0"

| | |
|---|---|
| Scale AS NOTED | Date JULY 17, 2014 |
| | Phase PERMIT FILING |
| Proj # 151 | Issue for DCP PLAZA FILING |

Drawing: SIDEWALK FRONTAGE, CIRCULATION DIAGRAM & PERMITTED OBSTRUCTION

Sheet: ZL-101A

EXHIBIT B, ZL-101A, 2 OF 2



EXHIBIT B, ZL-101B, 1 OF 2

## Public Plaza - New Requirement for Public Plaza 37-70

Public Plaza Total Area    2,868.27 sf (Plaza Major Portion: 2,552.77 sf, PLAZA MINOR PORTION: 315.50 sf)

| Public Plaza Standards | Permitted/Required | Proposed |
|---|---|---|
| **37-741 SEATING** | | |
| 17-741 seating min. 31 sf of plaza area | 2,868.27 sf/30 = 95.6 min. of seating | -113 - 1sf ****: Complies (see dwg. ZL-101B) |
| - Not more than 50% may be movable | -95.6 X 50% = 47.8 max. of moveable seating | -14'-0" ***: Complies (see dwg. ZL-101B) |
| - At least two types of seating | - At least two types of seating | - Complies (see dwg. ZL-101B) |
| *SEATING WITHIN 15' OF STREET LINE* | | |
| - 1 lf of seating per 2 lf within 15' of street line | -63 - 7 (63.585) / 2 = 31.8' | -39-5" ****: Complies (see dwg. ZL-101B) |
| - At least 50% of the required seating must have backs | -31.8' X 50% = 15.9 min with backs | -39-5" ****: Complies (see dwg. ZL-101B) |
| - At least 50% of seat with backs must face street | -15.9 X 50% = 8.0' min. with backs face street | -20-7" ****: Complies (see dwg. ZL-101B) |
| **(1) Seating depth: 18' min.** | 18' min. depth | Complies (see dwg. 6, 7, dwg. ZL-400, dwg. 1 & 2, dwg. ZL-401) |
| - Seating depth more than 30" may be counted as 2 seats | | |
| - Seating wall depth: 22" min. | -22" min. depth for seating wall | N/A |
| **(2) Seating height: 16" min. -20" max.** | 16" min. - 20" max. ht | Complies (see dwg 6, 7, dwg. ZL-400, dwg 1 & 2, dwg. ZL-401) |
| **(3) Seating with backs** | | |
| - 50% of seat seating shall have backs | -99-1/2" of fixed seating, 39'-10" X 50% = 49'-11" min. with backs | -62-4" with backs ***: Complies (see dwg. ZL-101B) |
| - 14" min. back ht | -14" min. back ht | -Complies (see dwg 6, dwg. ZL-400, dwg 2, dwg. ZL-401) |
| - 30" max. depth | -30" max. depth | -Complies (see dwg 6, dwg. ZL-400, dwg 2, dwg. ZL-401) |
| - Shall be reclined from vertical between 10 to 15 degrees | -Shall be reclined from vertical between 10 to 15 degrees | -Complies (see dwg 6, dwg. ZL-400, dwg 2, dwg. ZL-401) |
| **(4)** Movable seating: will be counted 2 lf per chair, 1 chair per 200 sf of plaza area, provide 1 table per 4 chairs. Max. seat depth: 30" Moveable chairs shall not be chained, fixed, or otherwise secured while the public plaza is open to public. | 2/1 chair, max. 20" seat depth | Complies |
| **(5)** Seating steps and seating walls. Permitted max. 15% of the required seating. Seating steps height: 16'-30'. Seat wall height: less than 18' | 95.6 (required seating) x 15% = 14.34' maximum | N/A |
| **(6)** Seating in open air café shall not be counted toward the required seating | Seating in open air cafe shall not be counted toward the required seating | N/A |
| **(7)** Seats that face walls must be a minimum of 6' from such wall | 6' min. from walls | N/A |
| **37-742 PLANTING AND TREES** | | |
| - All public plaza shall provide min. 4 trees | - min. 4 trees | -5 Trees - Complies |
| - Min. 20% of the area of a public plaza, shall be comprised of planting beds with min dimension of 2', exclusive of any bounding walls. | - 2,868.27 sf X 20% = 573.7 sf | -Planting beds: 575.3 sf ****: Complies (see dwg. ZL-101B) |
| - 50% required trees planted flush-to-grade or planted at grade within planting beds with no raised curbs or railings. | -4 max X 50% = 2 trees | -5 Trees : Complies |
| - 4" caliper min. | 4" caliper min. | -4 1/2" caliper - Complies |
| - 3'-0" soil depth min., 200 cf soil per tree. | -3'-0" soil depth min., 200 cf soil per tree | -Complies |
| - For shrubs: 3'-0" soil depth min. | -For shrubs: 3'-0" soil depth min. | -Complies |
| - For groundcover and grass: 1'-6" soil depth min. | -For groundcover and grass: 1'-6" soil depth min. | -Complies (see dwg. ZL-102) |
| - Provide automatic irrigation system or specify hardy plants. | -Provide automatic irrigation system or specify hardy plants | -Complies |
| - Street trees are required to be planted in the public sidewalk area adjacent to a zoning lot in accordance with Section 26-41 (Street Tree Planting) | -See Section 26-41 | -Complies (See Section 26-41) |
| **26-41 STREET TREE PLANTING** | | |
| - One street tree shall be provided for every 25' of street frontage of the zoning lot. | 136.17/25 = 5.46 (5 Trees) | -5 Trees : Complies (see dwg. ZL-102) |

### LEGEND



NEW TREE
BACKED CAST STONE BENCH
BACKLESS CAST STONE BENCH
MOVABLE TABLE & CHAIRS
TRASH RECEPTACLE
DRINKING FOUNTAIN
BIKE RACK
SPOT GRADE
TOP OF WALL
TOP OF CURB
ZONING LOT LINE
MAJOR/MINOR PORTIONS OF PLAZA
BUILDING OVERHANG
GLASS PAVER
PLANTING
PLANTING (6' HT. HEDGE)
GREEN WALL
GRANITE BENCH WITH BACKS

** SEATING
A. 39'-11"
B. 12'-6"
C. 10'-6"
D. 12'-9"
E. 8'-9"
F. 7'-10"
G. 7'-10"
H. 14'-0" (MOVABLE)
TOTAL: 113'-10" (99'-10" FIXED, 14'-0" MOVABLE)

*** SEATING WITH BACK (FIXED)
D. 39'-11"
E. 8'-9"
F. 7'-10"
G. 7'-10"
TOTAL: 62'-4"

**** SEATING WITHIN 15' OF STREET LINE
ALL
E. 8'-9"
F. 7'-10"
G. 7'-10"
H. 14'-0" (MOVABLE)
TOTAL: 38'-5"

WITH BACKS
E. 8'-9"
F. 7'-10"
G. 7'-10"
TOTAL: 38'-5"

WITH BACKS FACING STREET
E. 8'-9"
F. 7'-10"
H. 6'-0" (MOVABLE)
TOTAL: 20'-7"

***** PLANTING
A. 430 SF
B. 74.1 SF
C. 71.2 SF
TOTAL: 575.3 SF

STREET LINE

MATCH LINE 1 OF 2

EXHIBIT B, ZL-101B, 2 OF 2

ZL-101B

SEATING & PLANTING



TOPSOIL MIX - FILL ALL
VOIDS AND AIR POCKETS

PLANT AT ORIGINAL DEPTH
TRIANGULATE SPACING

3" MULCH

TAMP SOIL BEFORE PLANTING

**6  GROUND COVER PLANTING**
SCALE N.T.S.

SHRUB SHALL BEAR SAME
RELATION TO FINISHED GRADE
AS IT DID IN NURSERY

2" MULCH (DO NOT PUT MULCH
AGAINST THE BASE OF THE PLANT)

BALLED & BURLAPPED -
LOOSEN BURLAP & REMOVE TOP 1/3

FINISHED GRADE

CONTAINER - GROWN PLANT
WITH ROOTS PULLED OUT OF BALL

PREPARED SOIL FOR SHRUBS

**5  SHRUB PLANTING**
SCALE N.T.S.

TREE SHALL BEAR SAME RELATION TO
FINISH GRADE AS IT DID IN NURSERY

3" MULCH

DEAD MAN 4 PER TREE

TOPSOIL MIX

ROOTBALL

LOOSEN BURLAP & REMOVE TOP 1/3

DRAINAGE MAT (ENKA PERMIUM)
RIGID INSULATION (SEE ARCHITECTURAL DOCS.)
WATERPROOFING & PROTECTION BOARD
(SEE ARCHITECTURAL DOCS.)
CONCRETE FILL PITCH TO DRAIN
(SEE ARCHITECTURAL DOCS.)
TOP OF STRUCTURAL SLAB
(SEE STRUCTURAL DOCS.)

**4  TREE PLANTING ON STRUCTURE**
SCALE N.T.S.

EXHIBIT B, ZL-102, 1 OF 2



#1 EUROPEAN HORNBEAM   #2 Taxe B. 'Stevens' Hotz   #3 ??

**3  PLANTING IMAGES**
SCALE N.T.S.

| KEY | QTY. PLAZA | QTY. STREET | P.A.A. | N.B.A.* | BOTANICAL NAME | COM... |
|-----|-----|-----|-----|-----|-----|-----|
| **TREES** | | | | | | |
| 1 | 5 | | 4 | - | Carpinus betulus 'Fastigiata' | Fastigia... |
| 2 | 1 | | 7 | 12 | Taxa x Nellie R. Stevens | 'Nellie R. |
| 3 | | 5 | - | - | Quercus palustris | Pin Oak |
| **SHRUBS/PERENNIALS** | | | | | | |
| 11 | 61 | | 28 | - | Taxus baccata 'repandens' | Spread... |
| 12 | 58. | | 35 | - | Rhododendron 'Nova Zembla' | Nova Ze... |
| **GROUNDCOVER** | | | | | | |
| 21 | 347 | - | - | 538 | Pachysandra terminalis | Japane... |
| **GREEN WALL** | | | | | | |
| 31 | 1120 S.F. | - | - | - | Pachysandra terminalis | Japane... |

* N.B.A. - NON-BONUSED AREA

**2  PLANTING SCHEDULE**
SCALE:



(3) #2
(1) #2

(5) #1

(1120 S.F.) #31

(52) #12

(52) #11

(5) #3



**1  PLANTING PLAN**
SCALE 1/8" = 1'-0"

MATCHLINE 2 OF 2



#11 SPREADING ENGLISH YEW      #12 NOVA ZEMBLA RHODODENDRON      #21/31 JAPANESE SPURGE

| COMMON NAME | SIZE/CALIPER/HT. | ROOT | SPACING | REMARKS |
|---|---|---|---|---|
| Fastigiata European Hornbeam | 4 1/2' CAL. | B & B | AS SHOWN | FULL CROWN, MATCHING SPECIMENS, 7'-0' LOWEST BRANCHING HT. |
| Nelle R. Stevens Holly | 6' HT. | B & B | 30' O.C. | FULL TO GROUND, SYMMETRICAL, MAINTAIN AS HEDGE |
| Pin Oak | 3 1/2' CAL. | B & B | AS SHOWN | FULL CROWN, MATCHING SPECIMENS, 7' LOWEST BRANCHING HT. |
| Spreading English Yew | 24' HT., 24' SP. | B & B | 24' O.C. | FULL TO GROUND |
| Nova Zembla Rhododendron | 36' HT. | B & B | 24' O.C. | FULL TO GROUND, SYMMETRICAL |
| Japanese Spurge | 2 1/2' POT | CONT. | 6' O.C. | FULL |
| Japanese Spurge |  |  |  | MODULAR GREEN WALL SYSTEM |



RESIDENTIAL
ACCESSORY

NOTE: PROVIDE AUTOMATIC IRRIGATION SYSTEM PER IRRIGATION
PERFORMANCE SPECIFICATION IN THE CONSTRUCTION DOCUMENTS.

MATCH LINE 1 OF 2

EXHIBIT B, ZL-102, 2 OF 2

PERMIT FILING

PLANTING PLAN, SCHEDULE
AND DETAILS

ZL-102



PLAZA PHOTOMETRIC ANALYSIS PLAN

EXHIBIT B, ZL-103.00, 1 OF 2





**FEATURES AND BENEFITS**

Physical :

[illegible]

Performance :

[illegible]

Electrical :

[illegible]

lumenpulse

Sustainable architectural LED lighting systems

1 MOON LIGHT FIXTURE - LUMAPULSE XLARGE
SCALE: NTS

## SPECIFICATION SHEET

lumenbeam™ XLARGE

WHITE & STATIC COLORS

**MOUNTING OPTION**

**OPTICAL OPTIONS**
***Factory installed**

2/10

lumenpulse

Sustainable architectural LED lighting systems

2 MOON LIGHT FIXTURE - LUMAPULSE XLARGE
SCALE: NTS

EXHIBIT B, ZL-103.00, 2 OF 2

EDWARD FRYMA ARCHITECTS
48 West 37th St. New York, NY 10018
TEL.(212)283-1444
FAX.(212)342-7603

soma

Project
PARK51 GALLERY
51 PARK PLACE
NEW YORK, NY 10007

Client
SOHO PROPERTIES
31 W 27TH STREET
FLOOR 9
NEW YORK, NY 10001

Design Consultant
SOMA
31 W 27TH STREET, 9th FL
NEW YORK, NY 10001

Landscape Architect
thomasbalsleyassociates
31 W 27TH STREET, 9th FL
NEW YORK, NY 10001

Lighting Designer
RENTAL DESIGN GROUP
NEW YORK, NY 10001

Owner Representative
VALIDUS CONSTRUCTION ADVISORS
165 WESTCHESTER AVE
SUITE 403 B
PORT CHESTER, NY 10573

| Number | Date | Description |
|---|---|---|
| 1 | [illegible] | DCP PLAZA FILING |
| 2 | [illegible] | REVISED PER DCP COMMENTS |
| 3 | [illegible] | REVISED PER DCP COMMENTS |
| 4 | [illegible]/2015 | ISSUED WITH REVISIONS AS PER DCP COMMENTS |
| 5 | [illegible]/2015 | ISSUED WITH REVISIONS AS PER DCP COMMENTS |
| 6 | [illegible] | PLAZA REVISIONS |
| 7 | [illegible] | REVISED PER DCP COMMENTS |

| Scale | Date |
|---|---|
| AS NOTED | JANUARY 20, 2015 |
| Unit: in | Phase: PERMIT FILING |
| Project #: 151 | Issued for: DCP PLAZA FILING |

Drawing
PLAZA PHOTOMETRIC ANALYSIS

Sheet
ZL-103.00



EXHIBIT B, ZL-200, 1 OF 2

EXHIBIT B, ZL-200, 2 OF 2

MATCH LINE 1 OF 2



KEY PLAN
N.T.S.



NORTH FACE OF PROPOSED MUSEUM

6' HI EVERGREEN HEDGE

**EAST ELEVATION**
② SCALE: 1/4" = 1'-0"

PROPERTY LINE

BRUSHED ST. STL. CUTOUT LETTER
BRUSHED ST. STL. GREEN WALL FR
MODULAR GREEN WALL SYSTEM

PUBLIC PLAZA SIGN B

STONE BENCH

FINISH GRADE

**WEST ELEVATION**
① SCALE: 1/4" = 1'-0"

MATCH LINE 2 OF 2

EXHIBIT B, ZL-201, 1 OF 2



NORTH FACE OF BUILDING

FACE OF BUILDING BEHIND

FASTIGIATE TREE, TYP.

PROPERTY LINE

SEE DETAIL #4, DWG ZL-2PG

6 HI. EVERGREEN HEDGE

CAST STONE BENCH WITH BACKS

PUBLIC PLAZA SIGN, TYP.

FINISH GRADE PLAZA

STONE BENCH
CURB

FINISH GRADE

P. OR MUSEUM PORTION
PLAZA

NORTH FACE OF PROPOSED MUSEUM

58'-1½"

UTICUT LETTER SIGN
RESIN WALL FRAME
WALL SYSTEM

BRUSHED STL. STL. GREEN WALL FRAME

6 HI. EVERGREEN HEDGE
CAST STONE BENCH, TYP.
TRASH RECEPTACLE TYP.

FINISH GRADE

MATCH LINE 1 OF 2

EXHIBIT B, ZL-201, 2 OF 2

ZL-201

SITE DETAILS

AS NOTED    JULY 17, 2014

PERMIT FILING

DDP PLAZA FILING



## 6. WEST ELEVATION: MAJOR PORTION

## 5. SOUTH ELEV

## 3. SOUTH ELEVATION: MAJOR PORTION

EXHIBIT B, ZL-202.00, 1 OF 2

MATCH LINE 2 OF 2

LINE OF PUBLIC PLAZA
BOUNDARY

FLOOR 02
ELEV +51'-4"

"4" FROM T.O. PLAZA
ELEV +38'-4"

FLOOR 01
ELEV +23'-4"

T.O. PLAZA
ELEV +22'-9"

9'-6"

## VATION: MINOR PORTION

4'-0"

SIGNAGE

PROVISION FOR RETAIL SIGNAGE:
COMPLIES WITH ZR 37-753
AREA = 4 SQ FT
SEE ZONING CALCULATIONS ZL-003

## 4. RETAIL SIGNAGE
SCALE 1/2"=1'

TYPE A
SPANDREL GLAZING
0% TRANSPARENT

TYPE B
CLEAR VISION GLASS
100% TRANSPARENT

GALLERY &
ENTRANCE
AGGREGATE FRONTAGE
IN RED
34'-7" PLAZA FRONTAGE

RESIDENTIAL
ENTRANCE
& LOBBY

MAJOR PORTION
7952.37 SQ FT

RETAIL #1

P.A.B.
11'-5" PLAZA
FRONTAGE

MINOR PORTION
315.58 SQ FT

## 1. KEY
SCALE NTS

## 2. PLAZA FRONTAGE
SCALE 1/16"=1'

EXHIBIT B, ZL-202.00, 2 OF 2

MATCH LINE 1 OF 2

soma

Project
ELEVATION DETAILS &
FRONTAGE CALCULATIONS

Scale AS NOTED    Date JANUARY 20, 2005
Drawn a    Phase PERMIT FILING
Proj No    Issue For DKP PLAZA FILING

Sheet
ZL-202.00



7 GRANITE BENCH WITH BACK - TYPE B

SCALE: 1 1/2" = 1'-0"

5 ST. STL. STAIR RAILING

SCALE: 3/4" = 1'-0"

6 GRANITE BENCH WITH BACK - TYPE A

SCALE: 1 1/2" = 1'-0"

4 GRANITE STAIR

SCALE: 3/4" = 1'-0"

NOTE: "

MATCH LINE 2 OF 2

EXHIBIT B, ZL-400, 1 OF 2



STATE OF NEW YORK
BRUCE W. BALLER
LANDSCAPE ARCHITECT

ST. STL. CURB
SCALE: 3" = 1'-0"

GRANITE CURB
SCALE: 1 1/2" = 1'-0"

GRANITE PAVERS
SCALE: 1 1/2" = 1'-0"

ZL-400

SITE DETAILS

EXHIBIT B, ZL-400, 2 OF 2



SKATE DETERRENT NOTCH

FACE OF BENCH SEAT NOSE

A. PLAN

B. SECTI OI

3  SKATE DETERRENT
SCALE 6" = 1'-0"

7  TRASH RECEPTACLE
SCALE N.T.S

NOTE
1. COLOR: SILVER
2. FINISH: POWDER COATED STEEL

FINISH: GALVANIZED STEEL

A. ELEVATION
1 1/2" = 1'-0"

6  BIKE RACK
SCALE N.T.S

2  CAST STONE BENCH WITH BACK
SCALE AS SHOWN

ADA ACCESSIBLE FOUNTAIN

5  DRINKING FOUNTAIN
SCALE N.T.S.

NOTE
1. COLOR: SILVER
2. FINISH: POWDER COATED STEEL

A. ELEVATION
1 1/2" = 1'-0"

TABLE

CHAIR

NOTE
1. COLOR: SILVER
2. FINISH: POWDER COATED STEEL

4  MOVABLE TABLE AND CHAIR
SCALE N.T.S.

1  CAST STONE BENCH
SCALE AS SHOWN

EXHIBIT B, ZL-401, 1 OF 2

MATCH LINE 2 OF 2



C. AXONOMETRIC

CAST STONE BENCH

1/2" R

B. SECTION
1 1/2" = 1'-0"

C. AXONOMETRIC

CAST STONE BENCH

FINISH GRADE

1/2" R, TYP

B. SECTION
1 1/2" = 1'-0"

MATCH LINE 1 OF 2

EXHIBIT B, ZL-401, 2 OF 2

SITE DETAILS

ZL-401



D. IMAGE

C. ELEVATION
1/4" = 1'-0"

GREEN WALL
SCALE AS SHOWN

1

EXHIBIT B, ZL-402, 1 OF 2

MATCH LINE 2 OF 2



EXISTING BUILDING

SEAMLESS CORNER, TYP.

STAINLESS STEEL SUPPORT FRAME

**B. GREEN WALL HEADER**
1 1/2" = 1'-0"



PLAZA LEVEL DP PORTION
NON-BONDED AREA



EXISTING BUILDING

MODULAR GREENWALL SYSTEM WITH INTEGRATED IRRIGATION, HUNG PER MANUFACTURER'S RECOMMENDATION AND APPROVAL

STEEL SHEET METAL MECHANICALLY FASTENED TO STEEL SUPPORT FRAME, AIR TIGHT, UNIFORM COVERAGE WITH EPOXY SEALED SEAMS AND CONNECTIONS.

STAINLESS STEEL SUPPORT FRAME

1" Ø WASHED RIVER STONE

6" x 5" x 3/8" CONTINUOUS ST. ST. U-CHANNEL SHALL LEVEL

WEEP HOLES AS REQUIRED

C.I.P. CONCRETE

**A. GREEN WALL BASE**
1 1/2" = 1'-0"

MATCH LINE 1 OF 2

EXHIBIT B, ZL-402, 2 OF 2



STATE OF NEW YORK

LANDSCAPE ARCHITECT

SCALE: AS NOTED
DATE: JULY 19, 2014
PERMIT FILING
DEP PLAZA FILING

SITE DETAILS

ZL-402



PRECEDENTS

GLASS PAVERS    (WATER OVER GLASS PAVERS [SCEIM FOUNTAIN])

PERIMETER SLOT DRAIN
A THIN LAYER OF WATER
GLASS PAVER, TYP.

WATER RETURN TROUGH

WATER SUPPLY TROUGH

TO DRAIN/PUMP

WATER SUPPLY

NOTE: SEE ARCHITECTURAL DOCS. FOR GLASS

**4** FOUNTAIN DIAGRAM
SCALE: N.T.S.

RESIN PANEL
CONTINUOUS RUBBER GASKET, TYP.
BUTT JT, TYP.
FINISH GRADE PAVEMENT

3/8" THK. X 16" WST. STL. ANGLE SUPPORT, TYP.
ST. STL. BOLT CONNECTION, TYP.
(SEE STRUCTURAL DOCS. FOR SIZE)

CONCRETE FOOTING & ANCHOR BOLTS
(SEE STRUCTURAL DOCS.)

SECTION

**3** PUBLIC PLAZA SIGN BASE
SCALE: 3/4" = 1'-0"

# OPEN TO PUBLIC

OPEN 24 HOURS

**2** PUBLIC PLAZA SIGN B
SCALE: 3 = 1'-0"

NOTE:
1. FONTS S
2. GRAPHIC

MATCH LINE 2 OF 2

EXHIBIT B, ZL-403, 1 OF 2



NOTE:
1. FONTS SHALL BE CENTURY GOTHIC
2. GRAPHIC COLOR SHALL BE BLACK

1 PUBLIC PLAZA SIGN A
SCALE: 3" = 1'-0"

NOTE:
1. FONTS SHALL BE CENTURY GOTHIC
2. GRAPHIC COLOR SHALL BE BLACK

MATCH LINE TO ZL

Scale: AS NOTED | Date: JULY 17, 2014
Phase: PERMIT FILING
Project: 151 | Issue for: DCP PLAZA FILING
Drawing: SITE DETAILS
Sheet: ZL-403

EXHIBIT B, ZL-403, 2 OF 2

EXHIBIT B, ZL-404.00, 1 OF 2



2. DIAGRAM: PAVER
SCALE: NTS

MATCH LINE 2 OF 2





## 3. PAVER IMAGES
SCALE: NTS

| MATERIAL SLIP RATING | | 9IR 8"x8" GLASS PAVER | GRANITE PAVER |
| --- | --- | --- | --- |
| | | CIRCLE REDMONT | COLD SPRING GRANITE |
| COEFFICIENT | DRY | 0.78 | 0.91 |
| OF FRICTION | WET | 0.50 | 0.78 |

## PAVER SLIP RATING

VER



## 1. DETAIL: PAVER
SCALE: 5"=1'



MATCH LINE 1 OF 2

EXHIBIT B, ZL-404.00, 2 OF 2




soma

ZL-404.00

EXHIBIT 62

```
USER:  NEWYORK  COUNTY CLERKS OFFICE  NEW YORK        DATE:  03/02/2020
TERM:  S122      BUILDING LOANS BOOK INQUIRY          TIME:  13:49:32
              CONTROL NUMBER : 003480491 - 01

       *** DOCKETING DATA ***        *** SOURCE DOCUMENT ***
DOCKETING DATE: 05/25/2016               TYPE: BL   BUILDING LOAN
        TIME:  10:21:00               COUNTY: 31   NEW YORK
EFFECTIVE DATE: 05/25/2016             COURT: S    SUPREME COURT
        TIME:  10:21:00   TOTAL BLOCKS & LOTS: 01      UPDATED: N
CLERK/SEQ #  :  TORRES   004          LOAN #: 530
                    *** PREMISES ***
            BLOCK # : 00126    LOT #: 00008
   ADDRESS   NUMBER: 43     STREET: PARK PLACE
            CITY : NY NY               ZIP CODE:  10007
              *** BORROWER/CORPORATION ***
   NAME    FORMAT C  : PARK PLACE DEVEOPMENT PRIMARY LLC
                  *** LENDER ***
   NAME    FORMAT C  : MALAYAN BANKING BERHAD
   ADDRESS   NUMBER:        STREET:
            CITY :                    ZIP CODE:  00000


       AMOUNT: $99999999.99
ENTER CONTROL NUMBER FOR NEXT INQUIRY
PRESS: PF1- HELP, PF2- CANCEL INQUIRY PF8- 2ND PAGE DATA, ENTER- INQUIRE RECORD
```

BUILDING LOANS INQUIRY CONTINUED
CONTROL NUMBER : 003480491 - 01

*** LENDER ATTORNEY ***

```
NAME    FORMAT    :
  ADDRESS   NUMBER:          STREET:
            CITY  :                   ZIP CODE:  00000
```

*** AGAINST WHOM CLAIMED ***

```
NAME    FORMAT    :
  ADDRESS   NUMBER:          STREET:
            CITY  :                   ZIP CODE:  00000
```

*** DISPOSITION DATA ***

```
          DISPOSITION:
          DATE:    /     /        OPERATOR ID:
```

REMARKS: Y   (Y OR N)

ENTER CONTROL NUMBER FOR NEXT INQUIRY
PRESS: PF2- CANCEL INQUIRE PF7- RETURN TO THE FIRST PAGE, ENTER- INQUIRE RECORD

USER:   NEWYORK  COUNTY CLERKS OFFICE -  NEW YORK        DATE:   03/02/2020
TERM:   S122      JUDGMENT DOCKET AND LIEN BOOK SYSTEM      TIME:   13:49:34
                        REMARKS INQUIRY                   LAST PAGE: 0001
BOOK TYPE: 04                              CONTROL NUMBER: 003480491 - 01


DATE                              REMARKS
05252016 THIS IS A BUILDING FACILITY AGREEMENT
05252016 AMOUNT $162,112,896.16


PRESS:PF1- HELP, PF2- RETURN, PF7- SCR UP, PF8- SCR DOWN, CLEAR- RESHOW

# EXHIBIT 60

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER |  |
|---|---|
| This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | |

**2016060700046012002EEF6E**

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 11 |
|---|---|---|

**Document ID: 2016060700646012**    Document Date: 05-17-2016    Preparation Date: 06-08-2016
Document Type: ASSIGNMENT OF LEASES AND RENTS
Document Page Count: 10

| PRESENTER: | RETURN TO: |
|---|---|
| KENSINGTON VANGUARD<br>39 WEST 37TH ST TITLE NO. 822371(S-NY-CR-KV)A<br>HOLD/ PICKUP SEARCH NY<br>NEW YORK, NY 10018<br>212-532-8686<br>chrisc@KVNATIONAL.COM | REED SMITH LLP<br>599 LEXINGTON AVENUE<br>ATTENTION: JOSEPH A. SARCINELLA, ESQ.<br>NEW YORK, NY 10022 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 126 | 8 | Entire Lot | 43 PARK PLACE |

**Property Type:** NON-RESIDENTIAL VACANT LAND

**CROSS REFERENCE DATA**

**Document ID:**    2016060700646011

**PARTIES**

| ASSIGNOR: | ASSIGNEE: |
|---|---|
| PARK PLACE DEVELOPMENT PRIMARY LLC<br>C/O SOHO PROPERTIES, 31 WEST 27TH STREET, 9TH<br>FLOOR<br>NEW YORK, NY 10001 | MALAYAN BANKING BERHAD, NEW YORK BRANCH<br>400 PARK AVENUE<br>NEW YORK, NY 10022 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 162,112,896.16 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 87.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed        06-23-2016 12:36
City Register File No.(CRFN):
**2016000211379**

*Annette M Hill*

**City Register Official Signature**

8 22 37 |

EXECUTION VERSION   ) )


**PARK PLACE DEVELOPMENT PRIMARY LLC**
(Assignor)

to

**MALAYAN BANKING BERHAD, NEW YORK BRANCH**
(Assignee)


**BUILDING FACILITY**
**ASSIGNMENT OF LEASES AND RENTS**

May 17
Dated: ~~April 26~~, 2016

Property Location:     Block 126, Tax Lot 8


DOCUMENT PREPARED BY AND
WHEN RECORDED RETURN TO:

REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Attention:  Joseph A. Sarcinella, Esq.
Reference: 382348.20002

EXECUTION VERSION

# BUILDING FACILITY
## ASSIGNMENT OF LEASES AND RENTS

THIS BUILDING FACILITY ASSIGNMENT OF LEASES AND RENTS (this "**Assignment**") made as of April 25, 2016, by PARK PLACE DEVELOPMENT PRIMARY LLC, a Delaware limited liability company ("**Assignor**"), having an address at c/o Soho Properties, 31 West 27th Street, 9th Floor, New York, NY 10001 to **MALAYAN BANKING BERHAD, NEW YORK BRANCH,** a corporation organized under the laws of Malaysia ("**Assignee**"), its successors and permitted assigns, as administrative agent for the Building Facility Financiers (as such term is defined in the Building Facility Agreement), having an address at 400 Park Avenue, New York, New York 10022. Unless otherwise indicated, all capitalized terms used herein shall have the meanings indicated in that certain Building Facility Agreement of even date herewith, among Assignor, as obligor, the Building Facility Financiers party thereto from time to time and Assignee, as administrative agent (as the same may be amended, modified and in effect from time to time, the "**Building Facility Agreement**"). If any term, condition or provision of the Building Facility Agreement shall be inconsistent with any term condition or provision of this Assignment, then the Building Facility Agreement shall control.

## W I T N E S S E T H :

THAT Assignor for good and valuable consideration, receipt whereof is hereby acknowledged, hereby grants, transfers and absolutely and unconditionally assigns to Assignee the Assignor's entire lessor's interest in and to all current and future leases and other agreements affecting the use, enjoyment, or occupancy of all or any part of the parcel of land, more particularly described in Exhibit A annexed hereto and made a part hereof, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (hereinafter collectively referred to as the "**Property**").

TOGETHER WITH any extensions or renewals of the same, this Assignment of other present and future leases and present and future agreements being effective without further or supplemental assignment;

The leases and other agreements described above are hereinafter collectively referred to as the "**Leases**";

TOGETHER WITH all accounts, deposits, rents, income, issues, revenues, receipts, takaful/insurance proceeds and profits arising from the Leases and renewals thereof and together with all rents, income, issues and profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses) from the use, enjoyment and occupancy of the Property, or the lease, sublease, license, concession or other grant of right to use or occupy any portion thereof and vending machine proceeds (hereinafter collectively referred to as the "**Rents**").

THIS ASSIGNMENT is made in consideration of the Building Facility made by Assignee to Assignor pursuant to the Building Facility Agreement, and secures the obligations of Assignor under the Building Facility Documents, which include, but are not limited to, the

Building Facility Agreement, the Consolidated, Amended and Restated Building Facility Note the Consolidated, Amended and Restated Building Facility Mortgage.

ASSIGNOR WARRANTS that (A) none of the Rents have been assigned or otherwise pledged or hypothecated, except pursuant to security interests that have been entirely released or pursuant to the Building Facility Documents and (B) Assignor has full power and authority to execute and deliver this Assignment and the execution and delivery of this Assignment has been duly authorized and to Assignor's knowledge, does not conflict with or constitute a violation of any law, judicial order or other agreement affecting Assignor or the Property.

ASSIGNOR COVENANTS with Assignee that Assignor shall observe and perform all material obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to materially impair the value of the Leases as security for the Obligations and shall otherwise act in accordance with Section 13.3 of the Building Facility Agreement.

THIS ASSIGNMENT is made on the following terms, covenants and conditions:

**Present Assignment**. To the fullest extent permitted by applicable law, Assignor does hereby absolutely and unconditionally assign to Assignee Assignor's right, title and interest in all current and future Leases and Rents, it being intended by Assignor that this assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only. Such assignment to Assignee shall not be construed to bind Assignee to the performance of any of the covenants, conditions, or provisions contained in any such Lease or otherwise to impose any obligation upon Assignee. Assignor agrees to execute and deliver to Assignee such additional instruments, in form and substance reasonably satisfactory to Assignee, as may hereinafter be reasonably requested by Assignee to further evidence and confirm said assignment. Nevertheless, subject to the terms of this paragraph, and notwithstanding anything the contrary contained herein, Assignee hereby grants to Assignor a revocable license to operate and manage the Property and to collect the Rents, which license shall not be revoked prior to the occurrence of an Event of Default. Assignor shall hold the Rents, or a portion thereof, sufficient discharge all sums then currently due and payable on the Obligations for use in the payment of such sums. Upon the occurrence and during the continuance of an Event of Default, the license granted to Assignor herein shall automatically be revoked by Assignee and Assignee shall immediately be entitled to receive and apply all Rents, whether or not Assignee enters upon and takes control of the Property. Assignee is hereby granted and assigned by Assignor the right, at option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected during any period which the license herein granted has been revoked may be applied toward payment of the Obligations in such priority and proportion as Assignee, in its discretion, shall deem proper. Anything to the contrary set forth herein or elsewhere notwithstanding, (i) the provisions of the Building Facility Agreement shall control over any conflicting provisions of this Section, (ii) the provisions of the Building Facility Agreement which require that Rents shall be delivered or paid directly to a lockbox or similar cash control mechanism shall take priority over any conflicting provisions herein or elsewhere in the Building Facility Documents, and (iii) the provisions of the Building Facility Agreement which specify the order of application of Rents, if any, shall take

priority over any conflicting provisions in this Section or elsewhere in the Building Facility; provided, however, that such provisions regarding application of Rents shall not be deemed to conflict with any other provisions hereof granting to Assignee any further rights following an Event of Default.

**Remedies of Assignee.** Upon the occurrence of and during the continuance of an Event of Default, Assignee may, at its option, without waiving such Event of Default, without notice and without regard to the adequacy of the security for the Obligations, either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the Property and have, hold, manage, lease and operate the Property on such terms and for such period of time as Assignee may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents, including those past due and unpaid, with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may seem reasonably necessary to Assignee and may apply the Rents to the payment of the following in such order and proportion as Assignee in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all reasonable, third-party expenses of managing and securing the Property, including, without being limited thereto, the reasonable salaries, fees and wages of a managing agent and such other employees or agents as Assignee may deem reasonably necessary and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all takaful/insurance which Assignee may deem reasonably necessary, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property; and (b) the Obligations, together with all costs and reasonable attorneys' fees. In addition to the rights which Assignee may have herein, upon the occurrence and during the continuance of an Event of Default, Assignee may require Assignor to vacate and surrender possession of the Property to Assignee or to such receiver and, in default thereof, Assignor may be evicted by summary proceedings or otherwise. Additionally, Assignee shall have the right to establish a lock box for the deposit of all Rents and other receivables of Assignor relating to the Property. For purposes of Sections 1 and 2 hereof, Assignor grants to Assignee its irrevocable power of attorney, coupled with an interest, to take any and all of the aforementioned actions and any or all other actions designated by Assignee for the proper management and preservation of the Property. The exercise by Assignee of the option granted it in this paragraph and the collection of the Rents and the application thereof as herein provided shall not be considered a waiver of any default by Assignor under the Building Facility Agreement, the Consolidated, Amended and Restated Building Facility Note, the Consolidated, Amended and Restated Building Facility Mortgage, the Leases, this Assignment or the other Building Facility Documents.

**No Liability of Assignee.** Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Property after an Event of Default or from other act or omission of Assignee in managing the Property after an Event of Default except to extent of Assignee's gross negligence or willful misconduct. Assignee shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or under or by reason of Assignment and Assignor shall, and hereby agrees, to indemnify Assignee for, and to hold Assignee harmless from, any and all liability, loss or damage which Assignee incurs under the

Leases or under or by reason of this Assignment and from any and all claims and demands whatsoever, including the defense of any such claims or demands which are asserted against Assignee by reason of any alleged obligations and undertakings on its part to perform or any of the terms, covenants or agreements contained in the Leases (excluding liability, loss, damage or expense (i) due to Assignee's gross negligence or willful misconduct, or (ii) arising after transfer of the Property to Assignee or any third party pursuant to a foreclosure or deed in of foreclosure, which liability loss, damage or expense is not attributable to any condition or existing or occurring prior to such transfer). Should Assignee incur any such liability, the thereof, including reasonable third-party costs, expenses and reasonable attorneys' fees, shall be secured hereby and by the Consolidated, Amended and Restated Building Facility Mortgage and the other Building Facility Documents and Assignor shall reimburse Assignee therefor within ten (10) days of demand and upon the failure of Assignor so to do Assignee may, at its option, all sums secured hereby, the Building Facility Agreement, the Consolidated, Amended and Restated Building Facility Note, the Consolidated, Amended and Restated Building Facility Mortgage and the other Building Facility Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, or repair of the Property upon Assignee, nor for the carrying out of any of the terms and of the Leases; nor shall it operate to make Assignee responsible or liable for any waste on the Property by the lessees or any other parties, or for any dangerous or defective condition of the Property, including, without limitation, the presence of any Hazardous Materials, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or or death to any lessee, licensee, employee or stranger, in all cases except to the extent of Assignee's gross negligence or willful misconduct.

**Notice to Lessees.** Assignor hereby authorizes and directs the lessees named in the Leases or any other or future lessees or occupants of the Property, upon receipt from Assignee of written notice to the effect that the Assignee is then the holder of the Consolidated, Amended and Restated Building Facility Note and that an Event of Default exists, to pay over to Assignee all Rents and to continue so to do until otherwise notified by Assignee.

**Other Security.** Assignee may take or release other security for the payment of the Obligations, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Obligations without prejudice to any of its rights under this Assignment.

**Other Remedies.** Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the power and rights granted to Assignee hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Building Facility Agreement, the Consolidated, Amended and Restated Building Facility Note, the Consolidated, Amended and Restated Building Facility Mortgage or the other Building Facility Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms thereof. The right of Assignee to collect the Obligations and to enforce any other security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

**No Building Facility Mortgagee in Possession.** Nothing herein contained shall be construed as constituting Assignee a "mortgagee in possession" in the absence of the taking of

US_ACTIVE-7971503.6-382348-
20002

4

actual possession of the Property by Assignee or any designee or agent of Assignee. In the exercise of the powers herein granted Assignee, no liability shall be asserted or enforced against Assignee, all such liability being expressly waived and released by Assignor, except to the extent of Assignee's gross negligence or willful misconduct.

**Conflict of Terms.** In case of any conflict between the terms of this Assignment and the terms of the Building Facility Agreement, the terms of the Building Facility Agreement shall prevail.

**No Oral Change.** This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Assignor or Assignee, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Certain Definitions.** Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Assignor" shall mean Assignor and any subsequent owner or owners of the Property or any part thereof or any interest therein; the word "Assignee" shall mean Assignee and any subsequent holder of the Building Facility Note; and the word "Property" shall include the Property and any portion of the Property and any interest therein. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms; and the singular form of nouns and pronouns shall include the plural and vice versa.

**Non-Waiver.** The failure of Assignee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Assignor shall not be relieved of Assignor's obligations hereunder by reason of (i) failure of Assignee to comply with any request of Assignor or any other party to take any action to enforce any of the provisions hereof or of the Consolidated, Amended and Restated Building Facility Mortgage, the Consolidated, Amended and Restated Building Facility Note or the other Building Facility Documents, (ii) the release regardless of consideration, of any part of the Property less than the whole, or (iii) any agreement or stipulation by Assignee extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Building Facility Agreement, the Consolidated, Amended and Restated Building Facility Note, the Building Facility or the other Building Facility Documents. Assignee may resort for the payment of the Obligations to any other security held by Assignee in such order and manner as Assignee, in its discretion, may elect. Assignee may take any action to recover the Obligations, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Assignee thereafter to enforce its rights under this Assignment. The rights of Assignee under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Assignee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

**Inapplicable Provisions.** If any term, covenant or condition of this Assignment held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

EXECUTION VERSION

**Duplicate Originals.**  This Assignment may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

**Governing Law.**  This Assignment, and the security interests created hereunder, shall be governed by the laws of the state in which the Property is located.  In the event that any provision of this Assignment conflicts with applicable law, such conflict shall not affect other provisions of this Assignment which can be given effect without the conflicting provisions, and to this end the provisions of this Assignment are declared to be severable.

**Termination of Assignment.**  Upon payment in full of the Obligations this Assignment shall become and be void and of no effect.

**WAIVER OF JURY TRIAL.**  **ASSIGNOR AND ASSIGNEE EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ASSIGNMENT, THE CONSOLIDATED, AMENDED AND RESTATED BUILDING FACILITY MORTGAGE OR THE OTHER BUILDING FACILITY DOCUMENTS OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY ASSIGNOR AND ASSIGNEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.**

**Personal Liability**.  Notwithstanding anything to the contrary contained in this Assignment, the liability of Assignor for the Obligations and for performance of the other agreements, covenants and obligations contained herein and in the Building Facility Documents shall be limited as set forth in Section 21.21 of the Building Facility Agreement; provided, however that nothing shall herein be deemed a waiver of any right which Assignee may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Obligations or to require that all collateral shall continue to secure all indebtedness owing to Assignee in accordance with the Consolidated, Amended and Restated Building Facility Note, this Assignment and the other Building Facility Documents.

THIS ASSIGNMENT shall inure to the benefit of Assignee and any subsequent holder of the Consolidated, Amended and Restated Building Facility Note and shall be binding upon Assignor, and each and every Assignor's heirs, executors, administrators, successors and assigns and any subsequent owner of the Property.

[SIGNATURES FOLLOW ON NEXT PAGE]

US_ACTIVE-7971503.6-382348-
20002

**IN WITNESS WHEREOF**, Assignor, intending to be legally bound hereby, has duly executed this Assignment as of the day and year first above written.

**ASSIGNOR**:

**PARK PLACE DEVELOPMENT PRIMARY
LLC**, a Delaware limited liability company

By:_____
    Name: Sharif El-Gamal
    Title: President

# ACKNOWLEDGMENT

STATE OF ___New York___ }
                               } ss
COUNTY OF ___New York___ }

On ___April___ 26, 2016, before me, ___Choon San Phon___, personally appeared ___Shant El-Carmal___, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.                                    [SEAL]

PHON CHOOI SAN
Notary Public, State of New York
No. 01PH6117535
Qualified in New York County
Commission Expires October 25, 2016

**EXHIBIT A**

**Legal Description**

LOT 8

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of Park Place distant 114 feet 4 inches easterly from the corner formed by the intersection of the said northerly side of Park Place with the easterly side of West Broadway;

RUNNING THENCE northerly at right angles with the northerly side of Park Place 59 feet 11 and 3/8 inches to a point;

THENCE easterly at right angles with the last described course 31 feet 6 inches to a point;

THENCE northerly at right angles with the last described course 30 feet 2 and 5/8 inches to a point;

THENCE easterly at right angles with the last described course 63 feet 0 and 3/8 inches to a point;

THENCE southerly along a line forming an angle on its westerly side with the last described course of 89 degrees 46 minutes 17 seconds, 90 feet 2 inches to the northerly side of Park Place;

THENCE westerly along the northerly side of Park Place, 94 feet 2 inches to the point or place of BEGINNING.

TOGETHER with rights, benefits and easements contained in the Zoning Lot Development and Easement Agreement to be recorded.

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2016060700646012002S21EF

| SUPPORTING DOCUMENT COVER PAGE | PAGE 1 OF 1 |
|---|---|

**Document ID:** 2016060700646012    Document Date: 05-17-2016    Preparation Date: 06-08-2016
Document Type: ASSIGNMENT OF LEASES AND RENTS

---

**SUPPORTING DOCUMENTS SUBMITTED:**

| | Page Count |
|---|---|
| 255 MORTGAGE TAX EXEMPT AFFIDAVIT | 5 |

822371

**AFFIDAVIT UNDER SECTION 255 TAX LAW**
**ASSIGNMENT OF LEASES AND RENTS**
(Building Facility)

STATE OF NEW YORK       :
                        : ss.:
COUNTY OF  NEW YORK  :


        Sharif El-Gamal being duly sworn, deposes and says:

1. That he is the President of Park Place Development Primary LLC, a Delaware limited liability ("**Assignor**"), which is the owner of certain premises encumbered by the mortgage (the "**Mortgage**") described in EXHIBIT A attached hereto and made a part hereof, and is familiar with the facts set forth herein.

2. That Assignor executed and delivered a certain mortgage to Malayan Banking Berhad, New York Branch, a corporation organized under the laws of Malaysia ("**Assignee**"), which Mortgage was dated April 26, 2016, in the principal sum of $162,112,896.16 encumbering the Premises. Said mortgage is simultaneously offered herewith for recording in the Office of the City Register of the County of New York, and that the proper mortgage tax in the amount of $3,615,161.21 is being paid thereon.

3. That as additional collateral security for the payment of the indebtedness secured by the above mentioned Mortgage, Assignor executed and delivered to Assignee an Assignment of Leases and Rents dated April 26, 2016, which said Assignment of Leases and Rents is herewith offered for recording in the Office of the City Register of the County of New York.

4. That the Assignment of Leases and Rents submitted herewith for recording does not create or secure any new or further indebtedness or obligation other than the principal indebtedness or obligation secured by or which under any contingency may be secured by the said primary mortgage mentioned above.

WHEREFORE, deponent respectfully requests that such Assignment of Leases and Rents may be declared exempt from taxation pursuant to Section 255 of Article XI of the Tax Law of the State of New York.

Dated this 26th day of April , 2016

**PARK PLACE DEVELOPMENT PRIMARY**
**LLC, a Delaware limited liability company**

By:_____
    Name: Sharif El-Gamal
    Title: President

# ACKNOWLEDGMENT

STATE OF _New York_          }
                            } ss
COUNTY OF ___New York___     }


On _April_  _26_, 2016, before me, ___Chooi San Phon___, personally
appeared ___Shanf El- Gamal___, personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity(ies) upon behalf of which the person(s) acted, executed the instrument.


Witness my hand and official seal.                    [SEAL]


PHON CHOOI SAN
Notary Public, State of New York
No. 01PN6117525
Qualified in New York County
Commission Expires October 25, 20 16

**EXHIBIT A**

**Legal Description**

LOT 8

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of Park Place distant 114 feet 4 inches easterly from the corner formed by the intersection of the said northerly side of Park Place with the easterly side of West Broadway;

RUNNING THENCE northerly at right angles with the northerly side of Park Place 59 feet 11 and 3/8 inches to a point;

THENCE easterly at right angles with the last described course 31 feet 6 inches to a point;

THENCE northerly at right angles with the last described course 30 feet 2 and 5/8 inches to a point;

THENCE easterly at right angles with the last described course 63 feet 0 and 3/8 inches to a point;

THENCE southerly along a line forming an angle on its westerly side with the last described course of 89 degrees 46 minutes 17 seconds, 90 feet 2 inches to the northerly side of Park Place;

THENCE westerly along the northerly side of Park Place, 94 feet 2 inches to the point or place of BEGINNING.

TOGETHER with rights, benefits and easements contained in the Zoning Lot Development and Easement Agreement to be recorded.

## ORIGINAL MORTGAGE

MORTGAGE made by PARK PLACE PARTNERS DEVELOPMENT LLC to 45-51 PARK PLACE LLC in the amount of $33,000,000 dated July 30, 2014, recorded September 25, 2014 at CRFN 2014000318521. (Mortgage Tax Paid: $924,000.00).

which above mortgage has been assigned by Assignment of mortgage to Malayan Banking Berhad, New York Branch dated 4/28/16 to be recorded simultaneously herewith

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100348049101 191218 | BL | 530 | 05/25/16 | | 126 | 8 | $99,999,999.99 |

**Debtor**   PARK PLACE DEVEOPMENT PRIMARY LLC 43 PARK PLACE NY NY 10007

**Creditor**   MALAYAN BANKING BERHAD 00000

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100348049701 190315 | NL | 210 | 05/25/16 | | 126 | 8 | $99,999,999.99 |

**Debtor**   PARK PLACE DEVELOPMENT PRIMARY LLC 43 PARK PLACE NY NY 00000

**Creditor**   MAYLAYAN BANKING BERHAD 400 PARK AVE NY NY 10022

**Third Party**   PARK PLACE DEVELOPMENT PRIMARY LLC 00000

9

## NOTICE OF FINANCING
(Pursuant to Section 73 of the Lien Law)

1. Name and Address of person or financier making advances:

   **MAYLAYAN BANKING BERHAD,**
   **NEW YORK BRANCH**
   400 Park Avenue
   New York, New York 10022

2. Specify person to whom or on whose behalf advances are made and whether such person is owner, contractor or subcontractor:

   **PARK PLACE DEVELOPMENT PRIMARY LLC**
   c/o Soho Properties
   31 West 27th Street, 9th Floor
   New York, New York 10001

   ___X___ Owner _____Contractor _____Subcontractor

3. Description sufficient for identification of the improvement and of the real property involved or public improvement for which advances are made (if advances relate to one specific project or one specific public improvement):

   **CONSTRUCTION OF MIXED USE BUILDING**

4. If the Notice of Financing relates to several or undetermined projects or for public improvements, include a statement of each county wherein the real property is or may be situated:

   **N/A**

5. Address of property affected:

   **43 PARK PLACE, COUNTY OF NEW YORK, STATE OF NEW YORK,**
   **BLOCK: 126**
   **LOT: 8**

6. Date of any advance made on or before the date of filing for which this Notice of Financing is intended to be effective: May 17, 2016

7. Maximum balance of advances outstanding to be permitted by the Lender pursuant to this Notice of Financing: $174,000,000

Filed by:

Dated: May 17, 2016

**MALAYAN BANKING BERHAD, NEW YORK BRANCH**, a corporation organized under the laws of Malaysia

By: _____  26 APRIL 2016

    Name: Shahida Mohd Jaffar Sadiq Maricar
    Title: General Manager

# ACKNOWLEDGMENT

STATE OF _New York_ }
} ss
COUNTY OF _New York_ }

On _April 26_, 2016, before me, _Joyce Yee_, personally appeared _Shathba Mohd Jaffar Sadiq Mirza_ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.                    [SEAL]

_____
JOYCE YEE
Notary Public, State of New York
No. 31-4942014
Qualified in New York County
Commission Expires _09/12/2018_

003864

FILED
COUNTY CLERK
N.Y. COUNTY

2016 MAY 25  AM 10: 21

New York County Clerk's Office
Paym 271023 05/25/2016 10:25a
Cashier MMGONZAL Register # 4

Tr.360474                    $30.00

Notice of Lending  --------------
--------311134
RM 109B NOTICE OF LENDING #3864

Total:                       $30.00

Check                        $30.00

DOCKETED BY