# EXHIBIT H

Declaration of Matthew Parrott

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MALAYAN BANKING BERHAD, NEW YORK
BRANCH, as Administrative Agent for MALAYAN
BANKING BERHAD, LONDON BRANCH, INTESA
SANPAOLO S.P.A., NEW YORK BRANCH, WARBA
BANK K.S.C.P., and 45 PARK PLACE INVESTMENTS,
LLC,

                         Plaintiff,

              - against -

PARK PLACE DEVELOPMENT PRIMARY LLC, PARK
PLACE PARTNERS DEVELOPMENT LLC, 45 PARK
PLACE PARTNERS, LLC, SOHO PROPERTIES
GENERAL PARTNER, LLC, SHARIF EL-GAMAL,
STATE OF NEW YORK CIVIL RECOVERIES
BUREAU, GILBANE RESIDENTIAL CONSTRUCTION
LLC, US CRANE & RIGGING LLC, CONSTRUCTION
REALTY SAFETY GROUP INC., TRADE OFF PLUS,
LLC, ALL-CITY METAL INC., PERMASTEELISA
NORTH AMERICA CORP., TRANSCONTINENTAL
STEEL CORP., ISMAEL LEYVA ARCHITECT, P.C.,
PERI FORMWORK SYSTEMS, INC., ULE GROUP
CORP. D/B/A UNITED LIGHTING ELECTRICAL
CORP., S&E BRIDGE & SCAFFOLD LLC, NEW YORK
CITY ENVIRONMENTAL CONTROL BOARD, NEW
YORK STATE DEPARTMENT OF TAXATION AND
FINANCE, and JOHN DOES 1-100, the last one hundred
names being fictitious and unknown to plaintiff, the
persons or parties intended being the tenants, occupants,
persons or corporations, if any, having or claiming an
interest in or lien upon the premises described in the
complaint,

                       Defendants.

---

Index No. 850083/2020

**FIRST AMENDED VERIFIED
COMPLAINT**

# TABLE OF CONTENTS

INDEX TO EXHIBITS ............................................................................................. i

PRELIMINARY STATEMENT ............................................................................ 1

PARTIES AND RELEVANT NON-PARTIES ..................................................... 4
    Plaintiff and the Administrative Agent ............................................................... 4
    The Financiers ..................................................................................................... 4
    The Borrower ....................................................................................................... 4
    The Guarantor Defendants ................................................................................... 5
    The New York State Defendant ........................................................................... 6
    The Lienholder Defendants ................................................................................. 7
    The NYC and NYS Tax Defendants .................................................................. 10
    John Doe Defendants ......................................................................................... 11

JURISDICTION AND VENUE ............................................................................. 11

FACTUAL BACKGROUND ................................................................................. 11
    The Facility Documents ..................................................................................... 11
    The Building Facility ......................................................................................... 12
    The Project Facility ........................................................................................... 14
    The Guaranties .................................................................................................. 17
    The ZLDA ......................................................................................................... 17
    Operative Provisions of the Facility Documents .............................................. 19
    The Borrower's Defaults under the Facility Documents ................................... 24

AS AND FOR A FIRST CAUSE OF ACTION (*Foreclosure of the Mortgages*) ...................... 42

AS AND FOR A SECOND CAUSE OF ACTION (*Foreclosure on Security Agreements*) ........ 45

AS AND FOR A THIRD CAUSE OF ACTION  (*Enforcement, or Alternatively, Foreclosure of Assignment of Rents and Leases*) ......................................................... 46

AS AND FOR A FOURTH CAUSE OF ACTION (*Deficiency Judgment*) ................................ 47

PRAYER FOR RELIEF ......................................................................................... 50

**INDEX TO EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1. | Deed dated as of May 17, 2016, and recorded June 23, 2016 as CRFN 2016000211377 in the Office of the New York City Register, State of New York (the "Deed of Assignment") |
| 2. | Judgment entered on May 14, 2019 in the New York Supreme Court, Albany County, in the matter of *State of New York v. Park Place Development Primary, LLC,* (Index No. L-01002-18) |
| 3. | Building Facility Agreement, dated as of April 26, 2016, by and among Malayan Banking Berhad, New York Branch (the "Administrative Agent"), as administrative agent for Malayan Banking Berhad, London Branch, Intesa Sanpaolo S.P.A., New York Branch, Warba Bank K.S.C.P., and 45 Park Place Investments, LLC (collectively, the "Financiers"), the Financiers, and Park Place Development Primary LLC (the "Borrower") |
| 4. | Consolidated, Amended and Restated Building Facility Note dated as of April 26, 2016, between Borrower (as Obligor) and Administrative Agent (as Obligee) |
| 5. | Building Facility Note Splitter and Modification Agreement dated as of April 26, 2016, by and between Borrower and Administrative Agent |
| 6. | Consolidated, Amended, and Restated Building Facility Note 1, dated as of April 26, 2016, between Borrower and Administrative Agent |
| 7. | Consolidated, Amended, and Restated Building Facility Note 2, dated as of April 26, 2016, between Borrower and Administrative Agent |
| 8. | Consolidated, Amended, and Restated Building Facility Note 3, dated as of April 26, 2016, between Borrower and Administrative Agent |
| 9. | Consolidated, Amended, and Restated Building Facility Note 4, dated as of April 26, 2016, between Borrower and Administrative Agent |
| 10. | Consolidated, Amended, and Restated Building Facility Note 5, dated as of April 26, 2016, between Borrower and Administrative Agent |
| 11. | Consolidated, Amended and Restated Building Facility Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of May 17, 2016, by |

i

|  | Borrower (as Mortgagor) to and for the benefit of Administrative Agent (as Mortgagee) |
|---|---|
| 12. | Building Facility Assignment of Leases and Rents dated as of April 26, 2016, by Borrower (as Assignor) to Administrative Agent (as Assignee) |
| 13. | Project Facility Agreement, dated as of April 26, 2016, by and among Administrative Agent, the Financiers, and Borrower |
| 14. | Project Facility Note, dated as of April 26, 2016, between Borrower (as Obligor) and Administrative Agent (as Obligee) |
| 15. | Project Facility Note Splitter and Modification Agreement, dated as of April 26, 2016, by and between Borrower and Administrative Agent |
| 16. | Project Facility Note 1, dated as of April 26, 2016, between Obligor and Administrative Agent |
| 17. | Project Facility Note 2, dated as of April 26, 2016, between Obligor and Administrative Agent |
| 18. | Project Facility Note 3, dated as of April 26, 2016, between Obligor and Administrative Agent |
| 19. | Project Facility Note 4, dated as of April 26, 2016, between Obligor and Administrative Agent |
| 20. | Project Facility Note 5, dated as of April 26, 2016, between Obligor and Administrative Agent |
| 21. | Project Facility Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of May 17, 2016, by Borrower (as Mortgagor), to and for the benefit of Administrative Agent (as Mortgagee) |
| 22. | Project Facility Assignment of Leases and Rents, dated as of May 17, 2016, by Borrower (as Assignor) to Administrative Agent (as Assignee) |
| 23. | Performance and Completion Guaranty, dated as of April 26, 2016, by 45 Park Place Partners LLC, Soho Properties General Partner, LLC, and Sharif El-Gamal (collectively, the "Guarantors"), in favor of Administrative Agent for the benefit of the Financiers |

ii

| 24. | Non-Recourse Carveout Guaranty, dated as of April 26, 2016, by the Guarantors (as Indemnitor) in favor of the Administrative Agent for the benefit of the Financiers |
|---|---|
| 25. | Zoning Lot Development and Easement Agreement dated as of May 17, 2016 by and between Park Place Partners Development LLC (as "Museum Owner") and Park Place Partners Development LLC (as "Residential Owner") |
| 26. | Letter dated April 29, 2019 regarding (i) Notice of Event of Default for Obligor's Failure to Pay Upon Termination Date, (ii) Notice of Event of Default for Obligor's Failure to Deliver Sales Milestone Three Letter of Credit, (iii) Notice of Event of Default Regarding Execution of Amendments of Mezzanine Facility Documents and (iv) Reservation of Rights, sent from Administrative Agent to Borrower and Guarantors |
| 27. | Letter dated December 21, 2018 regarding Notice of Failure to Achieve Sales Milestone Three and Agreement Regarding Funding, sent by Administrative Agent to Borrower |
| 28. | *Murabaha* Facility Agreement, dated as of May 17, 2016, by and between Berni (as Seller/*Al-Murtahin*) and Park Place Development Secondary LLC (as Buyer/*Arrahin*) |
| 29. | Second Amendment of *Murabaha* Facility Agreement, dated July 2018, by and between Park Place Development Secondary and Berni |
| 30. | Letter dated August 16, 2018 regarding the Facility between Administrative Agent, the Financiers, and Borrower, sent from Administrative Agent to Borrower |
| 31. | Letter dated June 13, 2018 regarding 43 Park Place – Notice of (i) Failure of Guarantors to Satisfy Financial Covenants, (ii) Request for Deficiency Deposit, (iii) Request for Updated Construction Schedule and (iv) Effect on Transactions, sent from Administrative Agent to Borrower and Guarantors |
| 32. | Letter dated March 3, 2020 regarding 45 Park Place, New York, New York, sent from Matthew Hearle to Administrative agent, Malayan Banking Berhad, London Branch, and Andrew L. Jagoda, Esq., attaching the Letter dated February 28, 2020 regarding Notice and Demand of Removal, sent from Joseph E. Czerniawski to Borrower |

iii

Plaintiff Malayan Banking Berhad, New York Branch (the "Administrative Agent" or "Plaintiff"), as administrative agent for Malayan Banking Berhad, London Branch, Intesa Sanpaolo S.P.A., New York Branch, Warba Bank K.S.C.P., and 45 Park Place Investments, LLC (collectively, the "Financiers," collectively with the Administrative Agent ("Lender") pursuant to the Building Facility Agreement, dated as of April 26, 2016 (the "Building Facility Agreement"), and the Project Facility Agreement, dated as of April 26, 2016 (the "Project Facility Agreement," and collectively with the Building Facility Agreement, the "Facility Agreements") by its attorneys Fried, Frank, Harris, Shriver & Jacobson LLP, for its first amended verified complaint, alleges upon knowledge as to themselves and their own acts and upon information and belief as to all other matters as follows:[1]

## PRELIMINARY STATEMENT

1.      This is an action by the Plaintiff to foreclose certain mortgages on certain real property located in New York County, commonly known as 43 Park Place, located at 43 Park Place, New York, New York 10007 (Block 126, Lot 8) (the "Mortgaged Property"), and for related relief.  In addition to being secured by the Mortgaged Property, the mortgages also include as part of the Lender's collateral all "rights, benefits and easements contained in the Zoning Lot Development and Easement Agreement."

2.      Defendant Park Place Development Primary LLC (the "Borrower"), the fee owner of the Mortgaged Property, obtained financing from the Lender in order to complete a development

---

[1]      Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Facility Agreements.

1

at the property consisting of approximately 111,933 saleable square feet of residential space containing fifty (50) residential condominium units, approximately 1,129 square feet containing retail condominium units, and 413 square feet of storage space containing approximately 19 storage units (the "Project"). To finance the Project, the Borrower entered into the Building Facility Agreement to borrow a loan in the maximum principal amount of $162,112,896.16 (the "Building Facility"). The Borrower also entered into the Project Facility Agreement to borrow a loan in the maximum principal amount of $11,887,103.84 (the "Project Facility," and together with the Building Facility, the "Facility"). Building the contemplated Project required a Zoning Lot Development and Easement Agreement (the "ZLDA") with the neighboring property owner, who was owned or controlled by Borrower's principal, to ensure there was sufficient floor area.

3.    As set forth in detail in this First Amended Verified Complaint, the Borrower has committed multiple defaults under the Facility Agreements and related Mortgages (as defined hereinafter), including but not limited to (i) failing to repay the amounts owed at maturity under the Facility, (ii) failing to achieve unit sale milestones mandated under the Facility Agreements, (iii) failing to obtain prior written consent from the Administrative Agent with respect to material amendments to the mezzanine loan facility for the Project, including upsizing the amount of the mezzanine loan facility, (iv) failing to cure certain guarantor liquidity covenants, (v) failing to arrange for the completion of construction in accordance with agreed deadlines, (vi) permitting construction work to be stopped for more than sixty days, (vii) failing to take steps to remove certain mechanics' liens which have been filed against the Mortgaged Property, and (viii) breaching several covenants in the Facility Agreements relating to the ZLDA. As a result of the Borrower's foregoing defaults, there is now due and owing to Lender more than $120 million as of June 30, 2020, including outstanding principal, Agreed Profit (*i.e.*, the equivalent of interest

2

under the Facility), late charges, and fees, in addition to, among other things, the costs and expenses of bringing this action, including attorneys' fees.

4.      By this foreclosure action, the Lender seeks to enforce the terms of the Facility Agreements and foreclose upon the Mortgages executed in connection therewith following the Borrower's numerous defaults under the Facility Agreements.  The Lender seeks, among other things, (a) foreclosure of the Mortgages, (b) foreclosures of the Mortgages insofar as they also constitute security agreements granting Lenders a security interest in the Borrower's personal property, and (c) a deficiency judgment and related relief against the Borrower and Defendants 45 Park Place Partners, LLC, Soho Properties General Partner, LLC, and Sharif El-Gamal, who guaranteed repayment of certain amounts owed to Lender.  Lender has already made an application to the Court seeking the appointment of a temporary receiver to protect the Mortgaged Property and collateral at issue during the pendency of this action, including, among others, the rights and interests under the ZLDA which is expressly included as part of collateral for the Facility.  On or about March 12, 2020, the Court granted Lender's application, finding there was sufficient evidence "to justify the appointment of a Temporary Receiver and that the appointment of a Temporary Receiver is necessary to ensure the mortgaged property and collateral is not lost or materially injured....," and appointing Scott E. Mollen, Esq. as Temporary Receiver.

5.      The Plaintiff, as administrative agent, is the lawful owner and holder of the respective Mortgages sought to be foreclosed and of the notes secured thereby.

6.      No other action or proceeding has been had at law or otherwise for the recovery of the indebtedness secured by the Mortgaged Property herein sought to be foreclosed, or any part thereof, within the prohibition of RPAPL 1301.

3

## PARTIES AND RELEVANT NON-PARTIES

### Plaintiff and the Administrative Agent

7.    Malayan Banking Berhad is a corporation organized under the laws of Malaysia, and Plaintiff Malayan Banking Berhad, New York Branch is authorized to do business in the State of New York and is also registered with and supervised by the New York State Department of Financial Services.  As described below, Plaintiff is the lawful holder of the Mortgages to be foreclosed herein, and is the administrative agent for the Financiers under the Facility Agreements.

### The Financiers

8.    Malayan Banking Berhad, London Branch, is a corporation organized under the laws of Malaysia, and is one of the financier parties under the Facility Agreements.

9.    Intesa Sanpaolo S.P.A., New York Branch, is a banking institution incorporated and existing under the laws of the Republic of Italy, and is the documentation agent under the Facility Agreements, as well as one of the financier parties under those Facility Agreements.

10.    Warba Bank K.S.C.P., is a corporation organized under the laws of the State of Kuwait, and together with Plaintiff was the co-lead arranger and joint bookrunner under the Facility Agreements, as well as one of the financier parties under the Facility Agreements.

11.    45 Park Place Investments, LLC is a limited liability company organized under the laws of Delaware, and is one of the financier parties under the Facility Agreements.

### The Borrower

12.    Defendant Park Place Partners Development LLC is a Delaware limited liability company which is registered with the New York Department of State in New York County, and maintains its principal office in New York County, New York.

4

13.     Defendant Park Place Partners Development LLC was the owner of the fee interest in the Mortgaged Property until it assigned its interest to Defendant Park Place Development Primary LLC by a deed dated as of May 17, 2016, and recorded June 23, 2016 as CRFN 2016000211377 in the Office of the New York City Register, State of New York (the "Deed of Assignment"). A true and correct copy of the Deed of Assignment is attached hereto as **Exhibit 1**.

14.     Defendant Park Place Development Primary LLC is a Delaware limited liability company which is registered with the New York Department of State in New York County, and maintains its principal office in New York County, New York. Defendant Park Place Development Primary LLC is the Borrower under the Facility Agreements.

15.     Upon information and belief, the Defendant Park Place Development Primary LLC is, and at all relevant times hereinafter mentioned was, the owner of the fee interest in the Mortgaged Property. The title to the fee interest in the Mortgaged Property was acquired by Defendant Park Place Development Primary LLC from Defendant Park Place Partners Development LLC by the Deed of Assignment.

16.     Borrower and Park Place Partners Development LLC are affiliated entities that are owned and operated by the same beneficial interest holders, including Sharif El-Gamal, the lead developer and guarantor of the Project.

**The Guarantor Defendants**

17.     Defendant 45 Park Place Partners, LLC ("45 Park Place") is a New York limited liability company with its office in New York County, State of New York. Along with Defendants Soho and El-Gamal (as defined hereinafter), 45 Park Place is one of the guarantors under the Non-Recourse Carveout Guaranty and Performance and Completion Guaranty (as defined hereinafter).

5

18.     Defendant Soho Properties General Partner, LLC ("Soho") is a Delaware limited liability company which is registered with the New York Department of State in New York County, and maintains its principal office in New York County, State of New York.  Along with Defendants 45 Park Place and El-Gamal (as defined hereinafter), Soho is one of the guarantors under the Non-Recourse Carveout Guaranty and Performance and Completion Guaranty (as defined hereinafter).

19.     Defendant Sharif El-Gamal ("El-Gamal") is an individual having an address c/o 45 Park Place Partners, LLC, 31 West 27th Street, 9th Floor, New York, New York 10001.  As part of the representations made and warranties contained in the Facility Agreements, Borrower represented that "beneficial interest holders (and their respective interests) in each of Park Place Partners Development LLC and [Borrower] are substantially the same in each case." *See* Ex. 3, §3.1(xx); Ex. 13, Art. 3.

20.     El-Gamal is the principal and controller of Borrower and Park Place Partners Development LLC.  Along with Defendants 45 Park Place and Soho, El-Gamal is one of the guarantors under the Non-Recourse Carveout Guaranty and Performance and Completion Guaranty (as defined hereinafter).

**The New York State Defendant**

21.     Defendant State of New York Civil Recoveries Bureau is a division of the State Counsel of the New York Attorney General (the "NYS Defendant"), having an address at The Capitol, Albany, NY 12224.

22.     The NYS Defendant is a judgment creditor against Defendant Park Place Development Primary LLC, pursuant to that certain money judgment for a total of $21,761.20 entered on May 14, 2019 in the New York Supreme Court, Albany County, in the matter of *State*

6

*of New York v. Park Place Development Primary, LLC,* (Index No. L-01002-18). That judgment was entered in the Albany County Clerk's Office on May 14, 2019. A true and correct copy of that judgment is attached hereto as **Exhibit 2**.

23.     The basis of the NYS Defendant's claim in the abovementioned proceedings was a claim for fees due under New York Environmental Conservation Law Article 72 (Hazardous Waste), to the Department of Environmental Conservation. *See* Ex. 2.

**The Lienholder Defendants**

24.     Defendant Gilbane Residential Construction LLC ("Gilbane") is a Delaware limited liability company which is registered with the New York Department of State in New York County and maintains its principal office at 88 Pine Street, 27th Floor, New York, New York 10005. Gilbane is a mechanic's lien creditor with respect to the Mortgaged Property pursuant to multiple mechanic's liens, including the following: that certain mechanic's lien filed 12/5/2019 having Index No. 60 for $2,872,740.15; that certain mechanic's lien filed 9/25/2019 having Index No. 285 for $2,626,351.68; that certain mechanic's lien filed 12/18/2019 having Index No. 186 for $2,589,769.08; that certain mechanic's lien filed 1/21/2020 having Index No. 175 for $5,352,509.96; that certain mechanic's lien filed 2/5/2020 having Index No. 29 for $2,496,300.04; and that certain mechanic's lien filed 4/28/2020 having Index No. 305 for $501,085.01 (collectively, the "Gilbane Mechanics' Liens"). Gilbane is named as a defendant by virtue of the above liens and others it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

25.     Defendant US Crane & Rigging LLC ("US Crane & Rigging") is a New York limited liability company with its principal office in the State of New York. US Crane & Rigging

7

is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 11/22/2019 having Index No. 227 for $1,092,879.09 and that certain mechanic's lien filed 6/23/2020 having Index No. 396, for $1,473,750.00.  US Crane & Rigging is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

26.     Defendant Construction Realty Safety Group Inc. ("Construction Realty Safety") is a New York corporation with its principal office in the State of New York.  Construction Realty Safety is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 12/20/2019 having Index No. 228 for $34,937.50.  Construction Realty Safety is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

27.     Defendant Trade Off Plus, LLC ("Trade Off Plus") is a New York limited liability company with its principal place of business in the State of New York.  Trade Off Plus is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 12/20/2019 having Index No. 229 for $240,146.25.  Trade Off Plus is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

28.     Defendant All-City Metal Inc. ("All-City Metal") is a New York corporation with its principal office in the State of New York.  All-City Metal is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 12/23/2019 having Index No. 243 for $19,655.20. All-City Metal is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

8

29.    Defendant Permasteelisa North America Corp. ("Permasteelisa") is a Delaware corporation which is registered with the New York Department of State and whose Registered Agent for Service of Process is Corporation Service Company, 80 State Street, Albany, New York 12207-2543. Permasteelisa is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 12/27/2019 having Index No. 282 for $4,641,222.35, and that certain mechanic's lien filed 2/19/2020 having Index No. 163 for $8,875,284.80 (marked as corrected Notice of Mechanic's Lien with no reference to which Mechanic's Lien corrects). Permasteelisa is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

30.    Defendant Transcontinental Steel Corp. ("Transcontinental") is a New Jersey corporation. Transcontinental is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 3/4/2020 having Index No. 48 for $354,177.00. Transcontinental is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

31.    Defendant Ismael Leyva Architect, P.C. ("Ismael") is a New York corporation with its principal office in the State of New York. Ismael is the architect for the Project. Ismael is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 5/22/2020 having Index No. 236 for $93,571.40. Ismael is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

32.    Defendant PERI Formwork Systems, Inc. ("Peri") is a Maryland corporation which is registered with the New York Department of State and whose Registered Agent for Service of

9

Process is Corporation Service Company, 80 State Street, Albany, New York 12207-2543. Peri is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 5/27/2020 having Index No. 383 for $294,736.31. Peri is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

33.     Defendant ULE Group Corp. d/b/a United Lighting Electrical Corp. ("United Lighting") is a New York corporation with its principal office in the State of New York. United Lighting is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 6/18/2020 having Index No. 364 for $756,426.57. United Lighting is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

34.     Defendant S&E Bridge & Scaffold LLC ("S&E") is a New York limited liability company with its principal place of business in the State of New York. S&E is a mechanic's lien creditor pursuant to that certain mechanic's lien filed 6/30/2020 having Index No. 502 for $409,118.41, and that certain mechanic's lien filed 6/30/2020 having Index No. 503 for $90,090.00. S&E is named as a defendant by virtue of the above and other liens it may have filed against the Mortgaged Property, which liens accrued subsequent to and are subordinate to the liens of the Mortgages being foreclosed herein.

### The NYC and NYS Tax Defendants

35.     The New York City Environmental Control Board ("NYC ECB") and the New York State Department of Taxation and Finance ("NYS Tax") are made defendants herein with

respect to any right, title, or interest that each may have in the Mortgage Property arising from any failure of Borrower to pay taxes or charges with regard thereto or otherwise.

**John Doe Defendants**

36.     Defendants John Does 1-100 are the fictitious names of persons whose true names presently are unknown to the Lender, being individuals, corporations or other legal entities, that are tenants, occupants or other persons, if any, having or claiming an interest in or lien upon the Mortgaged Property.

## JURISDICTION AND VENUE

37.     The Court has jurisdiction over Defendants pursuant to CPLR 301 because they are citizens of or otherwise subject to the jurisdiction of the State of New York, and this action concerns the Mortgaged Property which is located in Manhattan that the Defendants have sought to develop.  Moreover, the agreements at issue in this case were negotiated in New York.  The Borrower and the Guarantors have consented to this Court's jurisdiction.

38.     Venue in this county is proper pursuant to CPLR 507 because the real property which is the subject of this action is situated in this county.  In addition, the Borrower and the Guarantors have contractually consented to venue in this Court.

## FACTUAL BACKGROUND

**The Facility Documents**

39.     On or about April 26, 2016, the Lender advanced loans to the Borrower in the maximum aggregate principal amount of up to $174,000,000.00, consisting of: (i) a loan in the aggregate principal amount of up to $162,112,896.16, the proceeds of which were to be used to finance the costs of improvements (as such term is defined in the Lien Law) associated with the

11

Project; (ii) a loan in the aggregate principal amount of up to $11,887,103.84, the proceeds of which were to be used to pay soft costs associated with the Project other than the costs of improvements.

### The Building Facility

40.    The Building Facility was made pursuant to that certain Building Facility Agreement, dated as of April 26, 2016, by and among the Administrative Agent for the financiers party thereto, the Financiers, and the Borrower.    Briefly summarized, the Building Facility Agreement was structured to be compliant with Sharia Law as a deferred payment revolving purchasing facility whereby the Administrative Agent, on behalf of the Financiers, provided funding to the Borrower upon receipt of funding requests for the purchase of "Metals" (referred to as "Purchase Requests" under the Facility Agreements), which funding was to be used to fund the construction of the Project.    The Borrower is thereafter required to repay the funds to the Lender in the form of a Deferred Sale Price, which includes the Purchase Price of the Metals previously advanced by the Lender pursuant to the terms of the Facility, plus an Agreed Profit on the sales, the latter of which is the functional equivalent of interest under the Facility, and if applicable, a Supplemental Profit.    A true and correct copy of the Building Facility Agreement is attached hereto as **Exhibit 3**.

41.    To evidence their indebtedness to the Lender under the Building Facility Agreement, the Borrower duly executed and delivered to the Lender that certain Consolidated, Amended and Restated Building Facility Note dated as of April 26, 2016, in the principal amount of $162,112,896.16 (the "Building Facility Note").    A true and correct copy of the Building Facility Note is attached hereto as **Exhibit 4**.

12

42.     On or about April 26, 2016, the Borrower entered into a Building Facility Note Splitter and Modification Agreement pursuant to which the Building Facility Note was severed and modified into five separate notes.  A true and correct copy of the Building Facility Note Splitter and Modification Agreement is attached as **Exhibit 5** (the "Building Note Splitter Agreement").

43.     A true and correct copy of Consolidated, Amended, and Restated Building Facility Note 1, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $54,037,632.05, is attached as **Exhibit 6.**

44.     A true and correct copy of Consolidated, Amended, and Restated Building Facility Note 2, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $23,292,082.78, is attached as **Exhibit 7**.

45.     A true and correct copy of Consolidated, Amended, and Restated Building Facility Note 3, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $41,925,749.01, is attached as **Exhibit 8**.

46.     A true and correct copy of Consolidated, Amended, and Restated Building Facility Note 4, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $23,292,082.78, is attached as **Exhibit 9**.

47.     A true and correct copy of Consolidated, Amended, and Restated Building Facility Note 5, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $19,565,349.54, is attached as **Exhibit 10**.

48.     The Administrative Agent is the lawful owner and holder of the five Consolidated, Amended, and Restated Building Facility Notes identified herein.

49.     As security for the payment of the Building Facility Note, the Borrower executed and delivered to the Lender that certain Consolidated, Amended and Restated Building Facility

13

Mortgage, Security Agreement and Assignment of Leases and Rents, by and between the Borrower

(as Mortgagor) and the Lender (as Mortgagee) (the "Building Mortgage"). A true and correct copy

of the Building Mortgage is attached hereto as **Exhibit 11.**

50.     The Building Mortgage was duly recorded in the Office of the City Register of the

City of New York ("City Register") on or about June 23, 2016, under City Register File Number

("CRFN") 2016000211378.

51.     On or about April 26, 2016, the Borrower, as assignor, entered into that certain

Building Facility Assignment of Leases and Rents with the Administrative Agent, as assignee. A

true and correct copy of the Building Facility Assignment of Leases and Rents is attached hereto

as **Exhibit 12**.

52.     The Building Facility Agreement was filed on or about May 25, 2016.

**The Project Facility**

53.     The Project Facility was made pursuant to that certain Project Facility Agreement,

dated as of April 26, 2016, by and among the Administrative Agent for the financiers party thereto,

the Financiers, and the Borrower. Like the Building Facility Agreement, the Project Facility

Agreement was structured to be compliant with Sharia Law as a deferred payment revolving

purchasing facility whereby the Administrative Agent, on behalf of the Financiers, provided

funding to the Borrower upon receipt of funding requests for the purchase of "Metals" (referred to

as "Purchase Requests" under the Facility Agreements), which funding was to be used to fund the

construction of the Project. The Borrower is thereafter required to repay the funds to the Lender

in the form of a Deferred Sale Price, which includes the Purchase Price of the Metals previously

advanced by the Lender pursuant to the terms of the Facility, plus an Agreed Profit on the sales,

14

the latter of which is the functional equivalent of interest under the Facility, and if applicable, a Supplemental Profit.   A true and correct copy of the Project Facility Agreement is attached hereto as **Exhibit 13.**

54.    To evidence their indebtedness to the Lender under the Project Facility Agreement, the Borrower duly executed and delivered to the Lender that certain Project Facility Note, dated as of April 26, 2016, in the principal amount of $11,887,103.84 (the "Project Facility Note", and together with the Building Facility Note, the "Notes").  A true and correct copy of the Project Facility Note is attached hereto as **Exhibit 14.**

55.    On or about April 26, 2016, the Borrower entered into a Project Facility Note Splitter and Modification Agreement pursuant to which the Project Facility Note was severed and modified into five separate notes.   A true and correct copy of the Project Facility Note Splitter and Modification Agreement is attached as **Exhibit 15** (the "Facility Note Splitter Agreement").

56.    A true and correct copy of Project Facility Note 1 under the Facility Note Splitter Agreement, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $3,962,367.95, is attached as **Exhibit 16**.

57.    A true and correct copy of Project Facility Note 2 under the Facility Note Splitter Agreement, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $1,707,917.22, is attached as **Exhibit 17**.

58.    A true and correct copy of Project Facility Note 3 under the Facility Note Splitter Agreement, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $3,074,250.99 is attached as **Exhibit 18**.

15

59. A true and correct copy of Project Facility Note 4 under the Facility Note Splitter Agreement, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $1,707,917.22, is attached as **Exhibit 19**.

60. A true and correct copy of Project Facility Note 5 under the Facility Note Splitter Agreement, evidencing the Borrower's obligation to pay the Administrative Agent the principal amount of $1,434,650.46, is attached as **Exhibit 20**.

61. The Administrative Agent is the lawful owner and holder of the five Project Facility Notes under the Facility Note Splitter Agreement identified herein.

62. As security for the payment of the Project Facility Note, the Borrower executed and delivered to the Lender that certain Project Facility Mortgage, Security Agreement and Assignments of Leases and Rents, by and between the Borrower (as Mortgagor) and the Lender (as Mortgagee) (the "Project Mortgage", and together with the Building Mortgage, the "Mortgages").   A true and correct copy of the Project Mortgage is attached hereto as **Exhibit 21.**

63. The Project Mortgage was duly recorded in the City Register on or about June 23, 2016, under CRFN 2016000211380.

64. A notice of lending was filed on or about May 25, 2016 for $174,000,000.

65. On or about April 26, 2016, the Borrower, as assignor, entered into that certain Project Facility Assignment of Leases and Rents with Administrative Agent, as assignee.  A true and correct copy of the Project Facility Assignment of Leases and Rents is attached hereto as **Exhibit 22.**

66. Under the Mortgages, the Borrower granted to the Lender a first and prior security interest in and to the Mortgaged Property, together with its rights, interests, and estates then owned

16

or thereafter acquired by the Borrower.  The Mortgages encumber the real property, and all improvements thereon and appurtenances thereto, described in each of those documents.

### The Guaranties

67.    As an inducement to the Lender entering into the Facility Agreements, the Lender also required that the Borrower arrange for certain guaranties of the Borrower's obligations for the benefit of the Financiers.

68.    In particular, 45 Park Place, Soho, and El-Gamal (collectively, the "Guarantors"), entered into that certain Performance and Completion Guaranty, dated as of April 26, 2016, made by and for the benefit of the Borrower for the benefit of Agent and the Financiers (the "Performance and Completion Guaranty").  A true and correct copy of the Performance and Completion Guaranty is attached hereto as **Exhibit 23**.

69.    Additionally, the Guarantors entered into that certain Non-Recourse Carveout Guaranty, dated as of April 26, 2016, by the Guarantors in favor of the Borrower for the benefit of the Financiers (the "Non-Recourse Carveout Guaranty," and together with the Performance and Completion Guaranty, the "Guaranties").  A true and correct copy of the Non-Recourse Carveout Guaranty is attached hereto as **Exhibit 24**.

70.    The Facility Agreements, Notes, Mortgages, and Guaranties, as well as the other affiliated documents that were executed in order to give effect to the transactions between the Lender and the Borrower, are referred to herein as the "Facility Documents."

### The ZLDA

71.    On or about May 17, 2016, Defendant Park Place Partners Development LLC (as "Museum Owner") and Defendant Park Place Partners Development LLC (as "Residential

17

Owner") entered into that certain Zoning Lot Development and Easement Agreement (the "ZLDA"), concerning the premises located at 43-51 Park Place, New York, New York (Block 126, Lots 8 and 9) (the "ZLDA Property"), which property encompassed within it the Mortgaged Property. A true and correct copy of the ZLDA is attached as **Exhibit 25**.

72.     At the time the ZLDA was entered into, it was anticipated that the ZLDA Property would be developed in two parts, with each part to be situated on its own tax lot. In the first part, one portion of the ZLDA Property on proposed Lot 9 was to be developed as a religious facility, art museum, and public open area intended for public use and enjoyment (the "Museum Building"). In the second part, the other portion of the ZLDA Property on proposed Lot 8 was to be developed as a residential building (the "Residential Building"). As described *supra,* Park Place Partners Development LLC by the Deed of Assignment assigned the Mortgaged Property (which comprised the second portion of the ZLDA Property located on Lot 8) to the Borrower.

73.     Borrower and Park Place Partners Development LLC are affiliated entities that are owned and operated by the same beneficial interest holders, including Sharif El-Gamal, the lead developer and guarantor of the Project.

74.     This affiliation and common control is expressly confirmed in section 3.1(xx) of the Facility Agreements, which explicitly provides that the "beneficial interest holders (and their respective interests) in each of Park Place Partners Development LLC and [Park Place Development Primary LLC] are substantially the same in each case."

75.     The ZLDA was necessary to ensure that the Project had sufficient floor area to construct the Project.

76.     The rights, benefits and easements under the ZLDA form part of the collateral that secures the Facility. Indeed, both the Building Mortgage and the Project Mortgage specifically

18

Case 01-01139-AMC    Doc -8    Filed 07/08/21    Page 25 of 61

include as part of the legal description of the property mortgaged by each of those instruments all of the "rights, benefits and easements contained in the Zoning Lot Development and Easement Agreement to be recorded." *See* Ex. 11, Exhibit A; Ex. 21, Exhibit A.

### **Operative Provisions of the Facility Documents**

77.     The Facility Documents provide that the Borrower will repay to Financiers the principal amount extended under the Facility as evidenced by the Notes plus the Agreed Profit (*i.e.*, the Deferred Sale Price), and all other sums that become due and owing pursuant to the Facility Documents, at the time and place and in the manner specified in the Facility Documents.

78.     The "Agreed Profit" is defined in the Facility Agreements to "mean for any Transaction, the Applicable Profit Rate multiplied by the Purchase Price of the Metals covered by such Transaction multiplied by the actual number of days from the Value Date for such Transaction to the Profit Payment Date for such Transaction and dividing such product by 360." Ex. 3, § 2.1; Ex. 13, § 2.1.

79.     On the Profit Payment Date (i.e., the 17th of each month or the next succeeding business day), the Borrower "shall pay to Administrative Agent for the benefit of Financiers Agreed Profit applicable to the immediately preceding Profit Period...." Ex. 3, § 6.1(a); Ex. 13, Art. 6.

80.     Furthermore, the Facility Agreements provide that upon the occurrence of an Event of Default, the Financiers are entitled to payment of the "Agreed Profit" at the "Default Profit Rate" for so long as the obligations of the Obligor and Guarantors remain outstanding. Ex. 3, § 6.6; Ex. 13, Article 6.

81.     The Default Profit Rate is the "Applicable Profit Rate plus one percent."  Ex. 3, §

2.1; Ex. 13, § 2.1.

82.     The Applicable Profit Rate is defined to "mean the Profit Rate for LIBOR Facility,

(y) if the provisions of Section 6.3(c) or Section 6.3(d) apply, the Adjusted Disruption Rate, or (z)

the Default Profit Rate if the provisions of Section 6.6 apply.  Ex. 3, § 2.1; Ex. 13, § 2.1.

83.     The Facility Documents further provide that the whole of the secured principal

amount, plus Agreed Profit and all other sums provided for in the Facility Documents shall become

due and payable at the option of the Lender after any defined Event of Default by the Borrower.

84.     Further, Section 5.3(a) of the Building Facility Agreement states that "the term of

the Facility shall expire on the Termination Date, at which time the unpaid Deferred Sales Price

and all other sums due and payable under the Notes and the other Facility Documents, shall be

paid in full." Ex. 3, § 5.3(a).

85.     The Building Facility Agreement also identifies certain Events of Default in Article

16 that entitle the Lender to take enforcement action as set out in the Facility Documents.

86.     Specifically, Section 16.1 of the Building Facility Agreement provides, in pertinent

part, as follows:

> "The occurrence of any one or more of the following shall constitute
> an "**Event of Default**" under this Agreement:
>
> (a) Failure of Obligor to pay any part of the Deferred Sale Price,
> when due, any Release Payment, whether on the scheduled Profit
> Payment Date, the accelerated Profit Payment Date otherwise;
> provided, however, it shall not be an Event of Default if Obligor is
> entitled to an Increase Transaction for payment of Agreed Profit and
> a Financier defaults in its obligation to make an Increase Transaction
> therefore; …
>
> (c) Failure of Obligor to pay any amounts from time to time owing
> under this Facility Agreement, the Notes, or any other Facility

20

Documents (other than amounts subject to the preceding paragraphs) within 10 days following written demand; [hereafter referred to in this First Amended Verified Complaint as the "Ancillary Payment Event of Default"]…

(d) Failure of Obligor to start Construction by the Construction Commencement Date, to achieve Substantial Completion by the Substantial Completion Date or to complete Construction by the Construction Completion Date; [hereafter referred to in this First Amended Verified Complaint as the "Construction Event of Default"]…

(p) Failure of Guarantors to comply with the Financial Covenants which is not cured within fourteen (14) Business Days following written notice provided, however, that such failure may be cured by written notice to Administrative Agent within such fourteen (14) Business Days of Obligor's intent to appoint (followed by the actual the appointment by Obligor within thirty (30) days of the written notice of default) a Person, acceptable to Administrative Agent in its reasonable discretion, who, together with Guarantors, shall be co-liable for Guarantor's obligations under the Facility Documents but only to the extent that his or its additional Net Worth or Liquidity is required for Guarantors to be able to comply with the Financial Covenants; [hereafter referred to in this First Amended Verified Complaint as the "Liquidity Event of Default"] …

(y) Existence of a default, beyond applicable notice and cure periods, by Obligor under [the ZLDA]; …

(bb) The failure of Obligor to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Facility Document for a period of thirty (30) days…;

(cc) Failure to meet any applicable Sales Milestone and deliver to Administrative Agent the applicable Sales Milestone Letter of Credit in lieu thereof as set forth in Section 3.7(a); [hereafter referred to in this First Amended Verified Complaint as the "Sales Milestone Event of Default"]…"

Ex. 3, Art. 16.

21

87.    The Events of Default specified in Article 16 of the Building Facility Agreement constitute the same Events of Default under the Project Facility Agreement.  Article 16 of the Project Facility Agreement provides as follows:

> "<u>Article 16</u> of the Building Facility Agreement and the terms and conditions thereof are hereby incorporated into this Agreement by reference, *mutatis mutandis*, with the same force and effect as if fully set forth herein"

Ex. 13, Art. 16.

88.    The Building Facility Agreement provides in pertinent part that upon the occurrence of an Event of Default, the Lender can "[e]xercise or pursue any [] remedy or cause of action permitted under this Agreement or any other Facility Documents, or conferred upon Administrative Agent (for the benefit of Financier) by operation of Laws." Ex. 3, § 17.1(e).

89.    Likewise, the Project Facility Agreement gives the Lender the same rights upon the occurrence of an Event of Default as specified in Article 17 of the Building Facility Agreement, as the Project Facility Agreement incorporates the terms of Article 17 of the Building Facility Agreement *mutatis mutandis.*  Ex. 13, Article 17.

90.    Further, the Notes provide in pertinent part:

> "Upon the occurrence and during the continuance of an Event of Default, then subject to and in accordance with the [] Facility Agreement[s], all obligations outstanding hereunder and under the [] Facility Agreement[s] and other [] Facility Documents shall become immediately due and payable, and Administrative Agent and/or [] Facility Financier shall have all rights and remedies provided for or available under the [] Facility Documents or applicable law."

Ex. 4, 1; Ex. 6, 2; Ex. 7, 2; Ex. 8, 2; Ex. 9, 2; Ex. 10, 2; Ex. 14, 1; Ex. 16, 2; Ex. 17, 2; Ex. 18, 2; Ex. 19, 2; Ex. 20, 2.

22

91.     Finally, the Mortgages provide the Mortgagees with certain rights and remedies upon the occurrence of an Event of Default.  Both the Building Mortgage and the Project Mortgage provide that an Event of Default "as defined in the Building Facility Agreement shall be an Event of Default hereunder." Ex. 11, § 3.13; Ex. 21, § 3.13.

92.     The Mortgages provide in pertinent part that if an Event of Default shall occur and be continuing, then:

> "Mortgagee shall have all rights and remedies available under law, at equity, and pursuant to the [Mortgage and Project] Facility Documents.  Without limitation, this Mortgage shall be subject to foreclosure as provided by law, and Mortgagee may, at its option and by or through a trustee, nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights and remedies, either successively or concurrently, after the occurrence and during the continuance of an Event of Default: …
>
> (e) <u>Foreclosure</u>. Mortgagee immediately shall have the right to foreclose this Mortgage or to specifically enforce its provisions or any of the Secured Obligations pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Mortgage…"
>
> Ex. 11, § 2.1(e); Ex. 21, § 2.1(e).

93.     The Facility Agreements and the Mortgages further provide that the Borrower shall pay the Lender any costs and expenses arising from any action taken by the Lender in connection with the enforcement of the Facility Agreements or the Mortgages, including, but not limited to, attorneys' fees. *See* Ex. 3, § 13.1(n); Ex. 13, Article 13l; Ex. 11, § 2.6; Ex. 21, § 2.6.

94.     Pursuant to Section 21.13 of the Building Facility Agreement, the Borrower and Guarantors waived their respective rights to assert a counterclaim, other than a mandatory or

23

compulsory counterclaim, in any action or proceeding brought against it by the Lender arising out of or in any way connected to the Facility Documents. *See* Ex. 3, § 21.13.

95.    Section 2.1(d) of the Mortgages specifically provides that "Mortgagee shall have the right to make application, ex-parte to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Mortgagor..." In addition, the Mortgages further provide that "Mortgagor does hereby irrevocably consent to such appointment, waives any and all notices of and defenses to such appointment, and agrees not to oppose any application therefor by Mortgagee." Ex. 11, § 2.1(d); Ex. 21, § 2.1(d).

**The Borrower's Defaults under the Facility Documents**

*The Maturity Default*

96.    Section 5.3(a) of the Building Facility Agreement states that "the term of the Facility shall expire on the Termination Date, at which time the unpaid Deferred Sales Price and all other sums due and payable under the Notes and the other Facility Documents, shall be paid in full." Ex. 3, § 5.3(a).

97.    The "Termination Date" is defined in Article 2.1 of the Building Facility Agreement to be the third anniversary of the Closing Date, which was April 26, 2019. Ex. 3, § 2.1.

98.    The Deferred Sales Price is defined in Article 2.1 of the Building Facility Agreement to be the Purchase Price of the Metals previously advanced by the Lender to the Borrower pursuant to the terms of the Facility, plus an Agreed Profit on the sale, the latter of which again is the functional equivalent of interest under the Facility. Ex. 3, § 2.1.

99.    The definitions contained in Article 2.1 of the Building Facility Agreement are incorporated by reference into the Project Facility Agreement. Ex. 13, § 2.1.

24

100.    The Termination Date of the Facility was April 26, 2019.

101.    On April 26, 2019, the Borrower was obligated to pay in full to the Lender the unpaid Deferred Sales Price and all other sums due and payable under the Notes and the other Facility Documents (the "Outstanding Amount").   The Outstanding Amount under the Facility as of the Termination Date was $108,391,832.03.

102.    The Borrower failed to pay the Outstanding Amount to the Lender on the Termination Date (the "Maturity Default").

103.    The Maturity Default was an Event of Default under both Section 16.1(a) of the Building Facility Agreement.

104.    Section 16.1(a) of the Building Facility Agreement was incorporated by reference into the Project Facility Agreement and thus the Maturity Default constituted an Event of Default under the Project Facility Agreement as well.

105.    On April 29, 2019, the Lender sent to the Borrower a notice stating, *inter alia,* that the Borrower's default in its obligation to the pay the Outstanding Amount on or before the Termination Date was an Event of Default under the Facility Agreements, and demanding payment of the then Outstanding Amount of $108,391,832.03 (the "April 2019 Notice of Default").  A true and correct copy of the April 2019 Notice of Default is attached hereto as **Exhibit 26.**

106.    The Borrower did not pay the Outstanding Amount within 10 days of receipt of the April 2019 Notice of Default.  This failure to pay within 10 days constituted a separate Event of Default under Section 16.1(c) of the Building Facility Agreement.  Section 16.1(c) of the Building Facility Agreement was likewise incorporated by reference into the Project Facility Agreement and thus this default constituted an Event of Default under the Project Facility Agreement as well.

25

107.    As of the date hereof, the Maturity Default has not been cured and the Outstanding

Amount remains unpaid by the Borrower.  The Outstanding Amount as of June 30, 2020 is

$120,031,427.18 for the both the Building Facility and Project Facility, which does not include the

cost of collection, including, but not limited to the costs and expenses of bringing this action,

including reasonable attorneys' fees.

*The Sales Milestones Three Letter of Credit Default*

108.    The Facility Agreements sets out various "Sales Milestones," that imposed an

obligation upon the Borrower to provide the Lender with executed sales contracts for the sale of

specified numbers of condominium units at the Mortgaged Property—subject to certain conditions,

and in each case as set out more fully in the Building Facility Agreement.  Each of the Sales

Milestones required the Borrower to provide evidence to the Lender either that a certain number

of approved sale agreements, sales agreements for a total amount above a monetary threshold, or

sales agreements for a total monetary amount above a certain percentage of the outstanding amount

of the facility, had been satisfied.

109.    As is relevant here, the Borrower was obligated to achieve "Sales Milestone Three,"

being the execution of Approved Sale Agreements (as that term is defined in the Building Facility

Agreement) representing an aggregate sale price of no less than one hundred twenty percent

(120%) of the outstanding amount of the Facility.

110.    The Sales Milestone Three Testing Date was November 19, 2018, which was the

one year anniversary of the "First Transaction Date."

111.    Pursuant to Section 3.7(a) of the Building Facility Agreement, which is

incorporated by reference into the Project Facility Agreement, Lender was to determine whether

26

the Borrower had satisfied Sales Milestone Three on Sales Milestone Three Testing Date.  Ex. 3, § 3.7(a); Ex. 13, Art. 3.

112.    If the Borrower failed to satisfy Sales Milestone Three, the Borrower was obligated to provide to the Lender a letter of credit in an amount equal to the outstanding amount of the facility multiplied by 1.20, less the aggregate sales price under certain Approved Sale Agreements, within ninety (90) days of notice from the Lender of such failure (the "Sales Milestone Three Letter of Credit").  Ex. 3, § 2.1, 3.7(a); Ex. 13, Art. 3.

113.    In  a letter dated December 21, 2018, the Lender notified the Borrower of its determination that the Borrower had failed to achieve Sales Milestone Three as required by Section 3.7(a) of the Facility Agreements (the "December 2018 Notice").  A true and correct copy of the December 2018 Notice is attached hereto as **Exhibit 27**.

114.    The December 2018 Notice informed Borrower that "Sales Milestone Three was not satisfied because Obligor did not deliver fully executed Approved Sale Agreements representing an aggregate sale price of no less than one hundred twenty percent of the outstanding amount of the Facility on or before November 19, 2018."  Ex. 27, 2.

115.    The December 2018 Notice requested that the Borrower furnish the Sales Milestone Three Letter of Credit on or before March 21, 2019, as provided for in Section 3.7(a) of the Facility Agreements. Ex. 27, 2.

116.    The Borrower failed to provide the Lender with the required Sales Milestone Three Letter of Credit on or before March 21, 2019 (the "Sales Milestone Three Letter of Credit Default").

117.    The Sales Milestone Three Letter of Credit Default constituted a Sales Milestone Event of Default pursuant to Section 16.1(cc) of the Building Facility Agreement.

27

118.    Sections 3.7 and 16.1(cc) of the Building Facility Agreement are incorporated by reference in the Project Facility Agreement. Thus, the Sales Milestone Three Letter of Credit Default constituted a Sales Milestone Event of Default under the Project Facility Agreement as well.

119.    In its April 2019 Notice of Default, the Lender reiterated the Sales Milestone Three Letter of Credit Default, and that this default constituted an Event of Default under Section 16.1(cc) of the Facility Agreements.  *See* Ex. 26, 3.

120.    As of the date hereof, the Borrower has still not provided the Lender with a satisfactory Sales Milestone Three Letter of Credit.  Thus, the Sales Milestone Three Letter of Credit Default remains outstanding.

### *The Unauthorized Mezzanine Facility Increase Defaults*

121.    In addition to the Facility that is the subject of these foreclosure proceedings, the sole member of the Borrower, Park Place Development Secondary LLC (the "Sole Member" or "Mezzanine Borrower"), borrowed $62,250,000.00 in mezzanine financing from BERNI, an Exempt Corporation organized under the laws of the Cayman Islands (the "Mezzanine Lender"), pursuant to that certain *Murabaha* Facility Agreement dated as of May 17, 2016, as amended by that certain First Amendment to the *Murabaha* Facility Agreement, dated as of October 31, 2017, that certain Second Amendment to the *Murabaha* Facility Agreement, dated as of July 25, 2018 (the "Second Mezzanine Facility Amendment"), and that certain Third Amendment to the *Murabaha* Facility Agreement, dated as of November 15, 2018 (the "Third Mezzanine Facility Amendment," collectively the "Mezzanine Facility").  A true and correct copy *Murabaha* Facility Agreement is attached hereto as **Exhibit 28**.

28

122.    On or about July 25, 2018, the Mezzanine Borrower and the Mezzanine Lender agreed to increase the amount of the Mezzanine Facility to $76,462,329.00, representing an increase of $11,212,329.00 to the Mezzanine Facility (the "2018 Unauthorized Mezzanine Facility Increase").

123.    The 2018 Unauthorized Mezzanine Facility Increase was done without the Lender's prior written consent, and the Lender was not aware of the Unauthorized Mezzanine Facility Increase until after it was effected.

124.    The 2018 Unauthorized Mezzanine Facility Increase is evidenced by the Second Mezzanine Facility Amendment, and that certain Amended and Restated Promissory Note, dated July 25, 2018, by the Mezzanine Borrower as maker, payable to the order of the Mezzanine Lender. A true and correct copy of the Second Mezzanine Facility Amendment is attached hereto as **Exhibit 29.**

125.    On or about July 27, 2018, the amount of the 2018 Unauthorized Mezzanine Facility Increase was disbursed from the Mezzanine Lender to the Mezzanine Borrower.

126.    On or about January 12, 2019, the Borrower provided the Lender copies of the Third Mezzanine Facility Amendment.  The Third Mezzanine Facility Amendment was entered into without Borrower or Mezzanine Borrower obtaining Lender's prior written consent.

127.    The Third Mezzanine Facility Amendment reflected the Unauthorized Mezzanine Facility Increase, as well as the payment of a $150,000 extension fee (the "2019 Unauthorized Mezzanine Facility Increase").

128.    The 2018 Unauthorized Mezzanine Facility Increase and the 2019 Unauthorized Mezzanine Facility Increase constituted a breach of the Building Facility Agreement because neither the Borrower nor the Mezzanine Borrower obtained the Lender's prior written consent

29

before obtaining the increase.  Specifically, Section 13.1(u) of the Building Facility Agreement prohibits the Borrower, *without the prior written consent of the Lender,* from creating, incurring, assuming or suffering any obligations of either the Borrower or the Mezzanine Borrower, except for, *inter alia,* the Mezzanine Loan.  Thus, pursuant to this section, neither the Borrower nor the Mezzanine Borrower were authorized to amend the obligations of the Mezzanine Borrower under the Mezzanine Facility without the Lender's prior written consent.  *See* Ex. 3, § 13.1(u).

129.     Section 13.1(u) of the Building Facility Agreement is incorporated by reference into the Project Facility Agreement.  Accordingly, the 2018 Unauthorized Mezzanine Facility Increase and the 2019 Unauthorized Mezzanine Facility Increase constituted a breach of the Project Facility Agreement as well.  *See* Ex. 13, Art. 13.

130.     Since Section 13.1(u) of Facility Agreements constituted a non-monetary default of the Facility Agreements, the passage of a cure period without cure was required for the Borrower's default to constitute an Event of Default pursuant to Section 16.1(bb) of the Building Facility Agreement, which is incorporated by reference into the Project Facility Agreement.

131.     By notice to the Borrower dated August 16, 2018, the Lender expressly reference the 2018 Unauthorized Mezzanine Facility Increase, and stated that the unauthorized increase was a breach of Section 13.1(u) of the Facility Agreements (the "August 2018 Notice"). A true and correct copy of the August 2018 Notice is attached hereto as **Exhibit 30**.

132.     The 2018 Unauthorized Mezzanine Facility Increase was not cured within the time frame provided in Section 16.1(bb) of the Facility Agreements.  Moreover, no steps were taken to cure the 2018 Unauthorized Mezzanine Facility Increase during the time period provided in Section 16.1(bb).

30

133.    In its April 2019 Notice of Default, the Lender notified Borrower that the 2018 Unauthorized Mezzanine Facility Increase had still not been cured, and declared that the increase was an Event of Default under the Facility Agreements (the "2018 Unauthorized Mezzanine Facility Increase Default"). *See* Ex. 26, 3-4.

134.    Moreover, the April 2019 Notice of Default expressly stated that the 2019 Unauthorized Mezzanine Increase as a violation of Section 13.1(u) of the Facility Agreements. The 2019 Unauthorized Mezzanine Facility Increase Default was not cured within 30 days as provided by Section 16.1(bb) of the Facility Agreements.  Moreover, no steps were taken to cure the 2019 Unauthorized Mezzanine Facility Increase during the time period provided in Section 16.1(bb).  The 2019 Unauthorized Mezzanine Increase has become another Event of Default (the "2019 Unauthorized Mezzanine Facility Increase Default").

135.    As of the date hereof, the Borrower has still not cured either the 2018 Unauthorized Mezzanine Facility Increase Default or the 2019 Unauthorized Mezzanine Facility Increase Default.  Thus, these defaults are continuing to this day.

### *The Liquidity Covenant Event of Default*

136.    Pursuant to Section 6.1 of the Performance and Completion Guaranty, and Section 7.1 of the Non-Recourse Carveout Guaranty, the Guarantors are required to satisfy the "Financial Covenants" on an ongoing basis until the Borrower's obligations under the Facility Agreements are fully satisfied and the Guarantors' obligations are fully satisfied.  *See* Ex. 23, § 6.1; Ex. 24, § 7.1.

137.    The Financial Covenants require the Guarantors to maintain, *inter alia*, liquidity of not less than $10,000,000.00 (the "Liquidity Covenant").

31

138.    As noticed by the Lender in its June 13, 2018 letter to the Borrower (the "June 2018 Notice"), those Guarantors failed to satisfy the Liquidity Covenant as of June 2018.  A true and correct copy of the June 2018 Notice is attached as **Exhibit 31**.

139.    The Liquidity Covenant had not been satisfied by June 2018 because (i) the relevant May 30, 2018 Financial Covenants Certification stated that the total Liquidity of the relevant guarantors was $10,669,688, of which $10,000,004 was attributable to 45 Park Place; (ii) note 3 in the 2017 45 Park Place financial statement provided that 45 Park Place entered an agreement on November 15, 2015 with an investor to contribute $10 million in exchange for a 17.65% equity interest in 45 Park Place; (iii) as of December 31, 2017, such funding had not been called by 45 Park Place; and (iv) the definition of "Liquidity" in the Facility Agreements does not include unfunded capital calls.  *See* Ex. 31, 2, 3.

140.    Moreover, the Liquidity Covenant needed to be satisfied by the relevant *guarantors,* and not by affiliated third parties.  Therefore, 45 Park Place's financing arrangement did not satisfy the Liquidity Covenant.

141.    The failure of the Guarantors to comply with the Liquidity Covenant becomes a Liquidity Event of Default under the Section 16.1(p) of the Building Facility Agreement after a failure to cure after fourteen (14) business days' notice.

142.    Section 16.1(p) of the Building Facility Agreement is incorporated by reference into Project Facility Agreement.  Ex. 13, Art. 16.  Accordingly, the failure of the Guarantors to comply with Liquidity Covenant will constitute a Liquidity Event of Default under the Project Facility Agreement as well after a failure to cure after fourteen (14) business days' notice.

143.    The June 2018 Notice constituted notice that the Guarantors were not in compliance with the Liquidity Covenant.

32

Case 01-01139-AMC    Doc -8    Filed 07/08/21    Page 39 of 61

144.    The Guarantors did not cure the breach of the Liquidity Covenant within the time specified in the June 2018 Notice.  Thus, the Borrower committed yet another Event of Default under the Facility Agreements under Article 16 of the Facility Agreements (the "Liquidity Covenant Event of Default").

145.    In its April 2019 Notice of Default, the Lender reiterated that there had been a Liquidity Covenant Event of Default and that event of default had still not been cured. *See* Ex. 26, 4-5.

146.    As of the date hereof, the Liquidity Covenant Event of Default has still not been cured.  Thus, this default is subsisting as of the date hereof.

### *The Construction Events of Default*

147.    Section 16.1(f) of the Building Facility Agreement provides that it is an Event of Default if:  "[s]ubject to Unavoidable Delays, a discontinuance of the Construction [exists] for a period of sixty consecutive days." Ex. 3, § 16.1(f).

148.    Section 16.1(f) of the Building Facility Agreement is incorporated reference into the Project Facility Agreement.  Ex. 13, Art. 16.

149.    Construction Work at the Project has been suspended for more than 60 days (the "Unauthorized Work Stoppage Default").

150.    Unavoidable Delays are defined in the Building Facility Agreement as:

> "any delay or delays in the Construction, not to exceed one hundred eighty days (180) in the aggregate (unless otherwise specifically provided for herein), if and so long as such delays are caused by (directly or indirectly) natural disaster, fire, earthquake, floods, explosions, actions of the elements, declared or undeclared war, riots, terrorist acts, mob violence, inability to procure or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes, lockouts not

33

instituted by Obligor, actions of labor unions, condemnation, court orders, laws, rules, regulations or orders of governmental or military authorities or any other similar causes outside of Obligor's reasonable control, so long as (a) such cause is not within the reasonable control of Obligor, (b) Obligor gives notice of such delay to Administrative Agent or Financier's Consultant as is reasonable, (c) after giving effect to the consequence of such delay, the Facility shall remain in Balance, and the Budget Line Item for interest in the Budget shall remain sufficient at all times despite such delay, and (d) such excuses for delay shall not be based upon lack of or inability to procure monies necessary to fulfill Obligor's commitments and obligations under the Facility Documents."

Ex. 3, § 2.1.

151.    The Unauthorized Work Stoppage Default was not the result of an Unavoidable Delay.

152.    The Unauthorized Work Stoppage Default was the result of factors within the control of the Borrower.

153.    The Borrower did not give any notice to Lender claiming that the Unauthorized Work Stoppage Default was an Unavoidable Delay.

154.    The Unauthorized Work Stoppage Default has not been cured and remains an outstanding event of default permitting Lender to exercise its rights and remedies under the Facility Agreements.

155.    Section 16.1(d) provides of the Building Facility Agreement provides that it is an Event of Default if the Borrower fails "to start Construction by the Construction Commencement Date, to achieve Substantial Completion by the Substantial Completion Date or to complete Construction by the Construction Completion Date." Ex. 3, § 16.1(d).

156.    Section 16.1(d) of the Building Facility Agreement is incorporated reference into the Project Facility Agreement.  Ex. 13, Art. 16.

34

157.    The Borrower has failed to "achieve Substantial Completion by the Substantial Completion Date or to complete Construction by the Construction Completion Date" (the "Failure to Progress Construction Default").

158.    First, the Borrower failed to achieve Substantial Completion in the timeframe required.  Substantial Completion is defined to mean "that all Construction, except minor punch list items, has been completed as determined by Administrative Agent, in consultation with Financiers' Consultant, in its reasonable discretion and temporary certificates of occupancy have been issued for all Residential and Storage Units."  Further, the "Substantial Completion Date" means the "Original Terminate Date, subject to Unavoidable Delays." Ex. 3, § 2.1; Ex. 13, § 2.1.

159.    Temporary certificates of occupancy had not been issued for all Residential and Storage Units by May 17, 2019 (the third anniversary of the First Transaction Date).  Significant work remains to be done for temporary certificates of occupancy to be obtained.

160.    There were no Unavoidable Delays at the Project that would have extended the deadline for Substantial Completion.  The Borrower has never claimed an Unavoidable Delay excused its compliance with the Substantial Completion Date.

161.    Second, the Borrower has filed to achieve Construction Completion by the Construction Completion Date.

162.    "Construction Completion" is defined to "mean the six (6) months following the Original Termination Date, subject to Unavoidable Delays."  Ex. 3, § 2.1; Ex. 13, § 2.1.

163.    Completion of all construction had not been completed in the six months following May 17, 2019.  Significant work remains to be done for construction to be completed.

35

164.     There were no Unavoidable Delays at the Project that would have extended the deadline for Construction Completion.  The Borrower has never claimed an Unavoidable Delay excused its compliance with the deadline for Construction Completion.

165.     The Failure to Progress Construction Default has not been cured and remains an outstanding Event of Default permitting Lender to exercise its rights and remedies under the Facility Agreements.

### *Mechanics' Liens Default*

166.     Section 13.1(e) of the Building Facility Agreement, which is incorporated by reference into the Project Facility Agreement, provides that any mechanics' liens filed by the General Contractor or Major Subcontractor shall be discharged by the Borrower "by either payment or the posting of a bond in accordance with Lien Law Section 19(4)...", or that the Borrower shall otherwise "cause Title Company to provide affirmative takaful/insurance against within ten (10) days after receipt of notice of the filing of any claims for lien and, in any event, prior to proceedings for the enforcement thereof...." Ex. 3, § 13.1(e); Ex. 13, Art. 13.

167.     Gilbane served as the general contractor for the Project.

168.     Gilbane filed the Gilbane Mechanics' Liens.

169.     The Gilbane Mechanics' Liens have not been bonded or released.

170.     Permasteelisa is a Major Subcontractor because its subcontract for the erection of the curtainwall is in excess of $5 million.  Permasteelisa filed a mechanic's lien in excess of $8 million.  That mechanic's lien has not been bonded or released.

36

171.    U.S. Crane & Rigging is Major Subcontractor because its subcontract is in excess of $5 million.  U.S. Crane & Rigging has filed two mechanic's liens and neither of those liens have been bonded or released.

172.    Ismael is a Major Subcontractor because it is the architect for the Project.  Ismael has filed a mechanic's lien  for $93,571.40 and that lien has not been bonded or released.

173.    Despite being aware and having of either actual and/or constructive knowledge of the Gilbane Mechanics' Liens, the Permasteelisa mechanic's lien, and the U.S. Crane & Rigging liens, Borrower has not taken any steps to satisfy its obligation under Section 13.1(e) of the Facility Documents (the "Mechanics' Lien Default").

174.    The obligations set forth in Section 13.1(e) could be performed within the 30-day period contained in Section 16.1(bb) of the Building Facility Agreement, and Borrower has failed to perform its obligations under Section 13.1(e).

### *The ZLDA Defaults*

175.    On March 3, 2020, the Administrative Agent received a letter of even date, from counsel for the Borrower with respect to the premises located at 45 Park Place, New York, New York, which enclosed a February 28, 2020 letter (the "February 28 Letter") which was purportedly sent from Park Place Partners Development LLC to the Borrower.  A true and correct copy of the February 28 Letter is attached as **Exhibit 32**.

176.    Borrower and Park Place Partners Development LLC are affiliated entities that are owned and operated by the same beneficial interest holders, including El-Gamal, the lead developer and guarantor of the Project.

37

177.    This affiliation and common control is expressly confirmed in section 3.1(xx) of the Facility Agreements, which provides that the "beneficial interest holders (and their respective interests) in each of Park Place Partners Development LLC and [Park Place Development Primary LLC] are substantially the same in each case."  Ex. 3, § 3.1(xx); Ex. 13, § Art. 3.

178.    Recognizing the critical importance of the ZLDA to the collateral package, Borrower explicitly represented and warranted in Section 3.1(rr) of the Facility Agreements that "Obligor was and will remain in compliance with all terms, covenants and conditions of the Zoning Agreements."  Ex. 3, § 3.1(rr); Ex. 13, § Art. 3.

179.    Notwithstanding such representation and warranty, however, the February 28 Letter alleges that the Park Place Partners Development LLC will "issu[e] a Formal Notice to the DOB that the ZLDA agreement is ineffective and void" and that Obligor "is precluded from using any development rights in the zoning parcel that belongs to the Company" because "the developer has ceased construction and no formal allocation agreement has been entered into" with respect to the Property.  Ex. 32, 3 - 4.

180.    The February 28 Letter asserted that there was an agreement to pay Park Place Partners Development LLC "in exchange for the ability to utilize 40,000 square feet of development rights … the sum of $40 million."  Ex. 32, 3.

181.    This purported agreement was never disclosed by Borrower to the Lenders. Borrower never sought Lender's consent to enter into any such modification of the ZLDA.

182.    The ZLDA was necessary to ensure that the Project had sufficient floor area to be constructed.

183.    In addition, the February 28 Letter claimed that El-Gamal would cause the Park Place Partners Development LLC to seek to remove the cranes and hoists being used for the

38

construction of the Project based on Borrower's purported failure to comply with its obligations under a previously undisclosed agreement with its affiliated entity Park Place Partners Development LLC whereby Borrower purportedly agreed to pay to the Park Place Partners Development LLC $100,000 per month (to be paid upon completion of the residential development project) in exchange for access to the Property for construction equipment and activities. The February 28 Letter demanded that Park Place Partners Development LLC be paid a sum of $4.5 million. Ex. 32, 3 - 4.

184.    This purported agreement was never disclosed by Borrower to the Lenders. Borrower never sought Lender's consent to enter into any such modification of the ZLDA or enter into any such access agreement with its affiliate. The construction of the Project is dependent on having continued access to Lot 9 as Lot 9 has been used for construction related activity, including staging, and the placement of certain cranes and hoists.

185.    The February 28 Letter and threats contained therein were sent at the instruction of El-Gamal as part of a bad faith scheme to threaten the viability of the Mortgaged Property in an effort to gain leverage regarding the exercise of remedies under the Facility Agreements.

186.    The allegations set forth in the February 28 Letter show that the Borrower is in breach of several representations and warranties made under Section 3.1 of the Facility Agreements, including, but not limited to:

> "(j) The amounts set forth in the Budget present a full and complete itemization by category of all costs, expenses and fees which Obligor expects to pay or incur or anticipates becoming obligated to pay or incur to achieve Construction Completion. Obligor is unaware of any other costs, expenses or fees which are not covered by the Budget. …
>
> (o) All financial statements and other information previously furnished by Obligor, or its Affiliates to Administrative Agent or

39

Financiers in connection with the Facility are true, complete and correct in all material respects and fairly present the financial conditions of the subjects thereof as of the respective dates. … Neither Obligor, Sole Member nor Guarantors has any liability, contingent or otherwise, not disclosed in such financial statements. …

(qq) Obligor, at the time of the execution of each of the Zoning Agreements, was duly organized, validly existing, authorized to transact business in the State of New York, had full power and authority to execute and deliver the Zoning Agreements, and has performed all obligations thereunder and such execution, delivery and performance have been duly authorized by all requisite action on the part of each party thereto.

(rr) Obligor is and will remain in compliance with all terms, covenants and conditions of the Zoning Agreements. …

(tt) Without, in each case, the prior written consent of Administrative Agent, … (i) Obligor shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Real Property or the Improvements…"

Ex. 3, § 3.1; Ex. 13, Art. 3.

187.  Furthermore, the Borrower is prohibited from amending or modifying in any way the terms of the ZLDA without the Administrative Agent's written consent, which consent shall not be unreasonably withheld.  The Facilities Agreements require Borrower to "perform all of its duties and obligations under the Zoning Agreements [including the ZLDA] and shall keep all Zoning Agreements [including the ZLDA] in full force and effect."  Ex. 3, § 13.1(ww); Ex. 13, Article 13.

188.  The covenants in Section 13.1(ww) of the Facility Agreements were further supported by Borrower's ongoing representation that "Obligor is will and remain in compliance with all terms, covenants and conditions of the Zoning Agreements," and that Borrower "has performed all obligations thereunder..."  *See* Ex. 3, § 3.4; Ex. 13, Art. 3.

40

189.    The allegations of the February 28 Letter constitute an Event of Default pursuant to Section 16.1(y) of the Facility Agreements, which provides that it is an Event of Default if there is the "[e]xistence of a default, beyond applicable notice and cure periods, by Obligor under [the ZLDA]." Ex. 3, § 16.1; Ex. 13, Art. 16.

190.    The assertions and representations contained in the February 28 Letter also constitute an Event of Default pursuant to Section 16.1(b)(b) of the Facility Agreements.

191.    These defaults related to the ZLDA have not been cured and remain outstanding permitting Lender to exercise its rights and remedies under the Facility Agreements.

### *Failure to Pay Expenses*

192.    Borrower has also failed to pay many of the critical operating expenses for the Mortgaged Property.

193.    On July 1, 2020, a tax bill of $1,984,586.98 was due for the Mortgaged Property. $1,241,859.38 of that tax bill was for outstanding charges.

194.    Pursuant to Section 13.1(h) of the Facility Agreements, it is Borrower's obligation to pay the tax bills in connection with the Mortgaged Property before they become delinquent.

195.    On July 2, 2020, counsel for Lender requested that Borrower's counsel provide proof of payment for the July 1, 2020 tax bill within ten days.

196.    Borrower has not provided proof of payment of the July 1, 2020 tax bill.

197.    Section 7.6 of the Facility Agreements provides that protective advances, like a payment of the July 1, 2020 tax bill by Lender, "shall constitute Supplemental Profit evidenced by the Notes and secured by the Mortgages and other Facility Documents." Ex. 3, § 7.6; Ex. 13, § 7.6.

41

198.     The Mortgages securing the Facility provide that any advances made by Lender upon the occurrence of an Event of Default and the continuance of an Event of Default "to protect or preserve the Property, or the lien or security interest created hereby on the Property, or for taxes, assessments, or takaful contributions/insurance premiums..." are secured by the Mortgages. Ex. 11, 5; Ex. 21, 4.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Foreclosure of the Mortgages)

199.     Lender repeats and realleges each and every allegation set forth in paragraphs 1 through 198 hereof as if fully set forth herein.

200.     The Borrower has committed multiple Events of Default under the Facility Agreements, the Notes, and the Mortgages, and accordingly the Lender is entitled to foreclose the Mortgages due to the Maturity Default, the Sales Milestone Letter of Credit Default, the Liquidity Covenant Event of Default, the 2018 Unauthorized Mezzanine Facility Increase Default, the 2019 Unauthorized Mezzanine Facility Increase Default, the Unauthorized Work Stoppage Default, the Failure to Progress Construction Default, the Mechanics' Lien Default, and the additional Events of Default set forth above.

201.     The Administrative Agent is the lawful owner and holder of the operative notes under the Building Note Splitter Agreement and the Facility Note Splitter Agreement as well as the Mortgages.

202.     As of June 30, 2020, there remains due and owing to the Lender from the Borrower under the Notes and the Mortgages: $120,031,427.18, which includes the Agreed Profit due and the applicable late charges.  In addition to the $120,031,427.18 that was outstanding as of June 30, 2020, the Borrower also owes all other sums due and owning under the Facility Documents, plus

42

the costs of collection, including, without limitation, reasonable attorneys' fees and expenses and other sums, all as more fully provided for in the Facility Documents which sums are due and owing in addition to any usual costs and allowances which the Lender may be entitled to and may be awarded under any law or statute applicable to this action.

203.    All Defendants have, may have or claim to have some interest or lien upon the Mortgaged Property, which interest or lien, if any, is subsequent and/or subordinate to the Lender's lien.

204.    No persons (including the Borrower and all other named defendants herein) have, may have, or claim to have any interest or lien upon the Mortgaged Property that is superior to the Lender's interest in or lien upon the Mortgaged Property.

205.    Notwithstanding any other allegation in this complaint to the contrary, the NYS Defendant, Gilbane, US Crane & Rigging, Construction Realty Safety, Trade Off Plus, All-City Metal, Permasteelisa, Transcontinental, Ismael, Peri, United Lighting, S&E, NYC ECB, and NYS Tax are made parties defendant herein solely for the purpose of foreclosing those liens, if any, against the Mortgaged Property that accrued or may accrue subsequent to the lien of the Mortgages.

206.    To protect its security during the pendency of this action, the Lender may be compelled to pay taxes, assessments, water rates, and/or insurance premiums or other charges or expenses related to the Mortgaged Property and has incurred, and will in future incur, expenses of litigation (including attorneys' fees) in connection with the within action to foreclose and to collect the indebtedness secured by the Mortgages.  The Lender requests that any sums thus paid by it for said purposes (together with interest and loan fees thereon) be added to the indebtedness otherwise then due, be secured by the Mortgages, earn default interest thereafter and be adjudged a valid lien on the Mortgaged Property as provided in the Mortgages.

43

207.    The Lender shall not be deemed to have waived, altered, released or changed any election hereinbefore made, by reason of the payment after the date of the commencement of this action, of any or all of the defaults mentioned herein, and such election shall continue and remain effective.

208.    Upon the issuance of the requested judgment of foreclosure and the occurrence of the sale requested herein, the Mortgaged Property should be sold subject to (a) any covenants, restrictions, easements and public utility agreements of record; (b) any state of facts that an accurate survey and physical inspection would show; (c) any restrictions, regulations and building and zoning ordinances of any municipal authority having jurisdiction thereof; (d) any municipal, departmental and other governmental violations; (e) any lien or liens of unpaid taxes, assessments, sewer rents and water rates or charges for maintenance of street vaults, if any; (f) any equity of redemption of the United States of America to redeem the Mortgaged Property within 120 days from the date of sale; and (g) any prior liens of record.

209.    In the event that the Lender possesses any other liens against the Mortgaged Property, the Lender asks that such liens not be merged in the causes of action alleged herein, but that the Lender be permitted to enforce them and/or seek determination of their priority in any other actions or proceedings, including, without limitation, surplus money proceedings.

210.    All required mortgage tax associated with the Mortgages has been paid.

211.    The Lender has no adequate remedy at law.

212.    None of the defendants are infants, absentees or incompetents, nor have they been proceeded against as such.

213.    No other action or proceeding has been brought to recover the sums secured by the Mortgages or any part thereof.

44

214.    By virtue of the foregoing, the Lender is entitled to a judgment of foreclosure under the Mortgages.

215.    Lender is entitled to the appointment of a temporary receiver to protect the Mortgaged Property and collateral, including, but not limited to, the ZLDA, during the pendency of this action.

## AS AND FOR A SECOND CAUSE OF ACTION
### (*Foreclosure on Security Agreements*)

216.    The Lender repeats and realleges each and every allegation set forth in paragraphs 1 through 215 hereof as if fully set forth herein.

217.    This cause of action is to foreclose the Mortgages insofar as they constitute security agreements under the Uniform Commercial Code of the State of New York ("UCC").

218.    Each of the Mortgages also constitutes a "security agreement" within the meaning of, and creates a security interest under, the UCC, with respect to all accounts, fixtures and personalty, general intangibles, inventory, and other collateral constituting a part of the Mortgaged Property (the "Personal Property").  In each of the Mortgages, the Borrower granted to the Lender a security interest and lien in all rights, titles, and interests then owned or thereafter acquired by the Borrower in the Personal Property.

219.    UCC-1 financing statements covering the Personal Property were duly filed with the New York Department of State.

220.    As set forth above, Borrower has committed numerous breaches of its obligations under the Mortgages and other Facility Documents, which breaches amount to Events of Default under the Mortgages and other Facility Documents.  The Lender therefore is now entitled to take possession of the Personal Property and to receive the proceeds from the sale thereof toward

45

satisfaction of the Borrower's indebtedness, or to have the Personal Property deemed part of the

Mortgaged Property upon foreclosure and sale thereof, without waiver of any of the Lender's other

rights and remedies.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (*Enforcement, or Alternatively, Foreclosure of Assignment of Rents and Leases*)

221.     The Lender repeats and realleges each and every allegation set forth in paragraphs

1 through 220 hereof as if set fully forth herein.

222.     Under the Building Facility Assignment of Leases and Rents and the Project

Facility Assignment of Leases and Rents, the Borrower "absolutely and unconditionally assign[ed]

to Assignee's Assignor's, right, title and interest in all current and future Leases and Rents, it being

intended by Assignor that this assignment consists a present, absolute and unconditional

assignment and not an assignment for additional security only."

223.     In the Building Facility Assignment of Leases and Rents and the Project Facility

Assignment of Leases and Rents, the Lender granted the Borrower a revocable license to operate

and manage the Mortgaged Property and to collect the Rents.  Pursuant to the Revocable License,

the Borrower "shall hold the Rents, or a portion thereof, sufficient discharge all sums then currently

due and payable on the Obligations for use in the payment of such sums [*sic*]."

224.     The Events of Default under the Facility Agreements give rise to Events of Default

under the Building Facility Assignment of Leases and Rents and the Project Facility Assignment

of Leases and Rents.

225.     As a result of such Events of Default, the Lender is entitled to exercise remedies

under the Building Facility Assignment of Leases and Rents and the Project Facility Assignment

of Leases and Rents and all other collateral assigned therein.  Upon the occurrence of an Event of

46

Default, the revocable license granted to the Borrower is automatically revoked and the Lender shall immediately be entitled to receive and apply all rents.

226.    No other action or proceeding has been had at law or otherwise for recovery under the Building Facility Assignment of Leases and Rents and the Project Facility Assignment of Leases and Rents.

227.    The Lender has no adequate remedy at law.

228.    By virtue of the foregoing, the Lender is entitled to and should be granted, a judgment of specific performance of the Borrower's duties under the Building Facility Assignment of Leases and Rents and the Project Facility Assignment of Leases and Rents, mandating that the Borrower shall deliver to the Lender all Rents and Leases, if any, collected or held by the Borrower from and after the occurrence of the Events of Default, or hereafter collected or held by the Borrower, and requiring the Borrower to account therefore, and directing the Borrower to pay the Lender expenses, including its reasonable attorneys' fees and expenses.

229.    By virtue of the foregoing, the Lender is entitled to and should be granted a judgment of foreclosure under the Building Facility Assignment of Leases and Rents and the Project Facility Assignment of Leases and Rents.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### *(Deficiency Judgment)*

230.    The Lender repeats and realleges each and every allegation set forth in paragraphs 1 through 229 hereof as if set fully forth herein.

231.    This cause of action is to obtain a deficiency judgment against the Borrower, and the Guarantors, respectively, in the event that the proceeds of the sale of the Mortgaged Property

47

are insufficient to satisfy all amounts owed under the Notes, the Mortgages, the Facility Agreements and other Facility Documents.

232.    Pursuant to Section 21.21 of the Facility Agreements, the Borrower is personally liable pursuant to the terms of the Facility Agreements.  Ex. 3, § 21.21; Ex. 13, Art. 21.

233.    The Non-Recourse Carveout Guaranty is an unconditional guaranty of payment and performance and not of collection.  Ex. 24, § 2.3.

234.    Pursuant to the Non-Recourse Carveout Guaranty, the Guarantors indemnified the Lenders from all "Costs" imposed upon the Lender as a result of, *inter alia,* the Borrower obtaining financing without the consent of the Administrative Agent which is secured by an interest in the Mortgaged Property or the Collateral, whether senior, *pari passu* or subordinate to the Facility, other than the *Murabaha* Facility. Ex. 24, § 2.1(xi).  This section of the Non-Recourse Carveout Guaranty provision was violated by the 2018 Unauthorized Mezzanine Facility Increase Default and 2019 Unauthorized Mezzanine Facility Increase Default.

235.    Pursuant to Section 2.1(viii) of the Non-Recourse Carveout Guaranty, the Guarantors indemnified the Lenders from all "Costs" imposed upon the Lender as a result of, inter alia, the following acts:

> "fraud, willful misconduct…, any material misrepresentation, or intentional breach of a warranty by any Facility Party with respect to any representation, warranty or certification contained in any Building Facility Documents or in any document, certificate or report provided under, pursuant to or in connection therewith, whether or not the same constitutes fraud."

> Ex. 24, § 2.1(viii).

236.    The assertions and representations contained in the February 28 Letter constitute fraud, willful misconduct, material misrepresentations, and intentional breaches of representations and warranties made by the Borrower under the Facility Agreements.

48

237.    The assertions and representations contained in the February 28 Letter constitute multiple additional breaches by Borrower of the Facility Agreements, including but not limited to violations of Sections 3.1(j), 3.1(o), 3.1(qq), 3.1(rr), 3.1(tt) and Section 13.1(ww) thereof.

238.    Each of these breaches were willful and intentional, and knowingly made without the consent or knowledge of the Administrative Agent.

239.    "Costs" are defined in the Non-Recourse Carveout Guaranty to include:

> "any and all losses, damages, actual costs, fees, actual expenses, claims, suits, judgments, awards, liens, liabilities (excluding special or punitive damages, except to the extent owed by Administrative Agent or any Financier to a third party), obligations, debts, fines, penalties, charges, amounts paid in settlement, litigation costs, reasonable attorneys' fees, and assessments, whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards."

> Ex. 24, § 1.1.

240.    Accordingly, the "Costs" incurred by the Lender in connection with the enforcement of the Facility Documents (including the costs of this action, including but not limited to reasonable attorneys' fees) are costs that the guarantors under the Non-Recourse Carveout Guaranty are liable to indemnify the Lender for under the Non-Recourse Carveout Guaranty.

241.    The Performance and Completion Guaranty is an "absolute[], unconditional[] and irrevocabl[e]" guaranty of the Guaranteed Obligations, being (a) the "full and complete observance, performance and satisfaction of all of the material obligations, duties, covenants and agreements of Obligor under the Facility Agreements and the other Facility Documents that pertain specifically to the completion of the Construction;" and (b) the full and prompt payment of any Enforcement Costs in connection with that guaranty. Ex. 23, § 1.1(a)-(b).

49

242.    Enforcement Costs under the Performance and Completion Guaranty include, among other things, all reasonable, third-party attorneys' fees, costs and expenses when an attorney is retained to represent Administrative Agent or the Financiers in any proceedings whatsoever in connection with the Performance and Completion Guaranty in addition to all other amounts due.

243.    By reason of the foregoing, the Borrower and Guarantors, respectively, are liable to the Lender for any deficiency in their respective obligations under the Facility Agreements, the Non-Recourse Carveout Guaranty, and the Performance and Completion Guaranty, respectively, remaining unsatisfied after the foreclosure sale.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully demands entry of judgment on its four causes of action, as against Defendants, as follows:

a)    Declaring that Defendants and all persons claiming by, through, or under them and every person or entity whose right, title, interest, conveyance, or encumbrance is recorded subsequent to the filing of the Notice of Pendency of this action in the Office of the Clerk of New York County be barred and foreclosed of all right, title, interest, claim, lien, and equity of redemption in and to the Mortgaged Property and each and every part thereof including, but not limited to, any fixtures and articles of personalty upon which the Mortgages are liens attached to or used in connection with said premises;

b)    Directing that said Mortgaged Property be sold according to law and that the moneys arising from such sale be brought into Court; and that all of the

50

Mortgaged Property shall first be offered as one parcel, and then the real

property described in the First Cause of Action shall be offered as one

separate parcel, and the items of property covered by the Second Cause of

Action shall each be offered as a separate parcel, and that the sale shall be

consummated for whatever amount or amounts shall result in the highest

aggregate purchase price; and that Defendants shall surrender possession to

the purchaser or purchasers, of all items of property sold at the foreclosure

sale;

c)    Appointing a temporary receiver to protect the Mortgaged Property and

collateral under the Facilities, including, but not limited to, the ZLDA, and

collect the rents, issues, benefits, and profits of the Mortgaged Property

during the pendency of this action or to perform such other acts as the Court

orders and deems appropriate;

d)    Awarding to the Lender from such moneys arising from the foreclosure sale,

the amounts due on the Notes, Mortgages, and Facility Documents as set

forth above, plus the expenses of such sale, together with Agreed Profit at

the Default Profit Rate to the time of such payment, exit fees, make-whole

fees, late fees, the costs and disbursements of this action, including, without

limitation, the Lender's reasonable attorneys' fees and expenses, plus all

sums incurred by the Lender pursuant to any provision of the Facility

Documents, including without limitation, the Notes and Mortgages, or to

protect the liens of the Mortgages and all other charges and liens on the

Mortgaged Property that are now payable or that shall arise or become

51

payable after commencement of this action, together with Agreed Profit at the Default Profit Rate upon such sums until the respective dates of their payments, together with interest thereon allowable under law;

e)    Directing that the Lender may specifically enforce each and every contract, right, and agreement assigned to it by the Defendants, as the Lender may choose in its own discretion;

f)    That the referee or other officer making such sale be directed to pay from the proceeds thereof all taxes, assessments, water and sewer charges, and other charges that are liens on the property sold;

g)    That the Lender be awarded a deficiency judgment against the Borrower, and the Guarantors, respectively, pursuant to the Mortgages and the abovementioned guaranties, for an amount equal to any deficiency in the payment of their respective obligations to the Lender that may remain, to the extent that the Borrower, and the Guarantors, respectively, are liable therefor pursuant to the Facility Agreements and the respective guaranties, or so much thereof as the Court may determine to be just and equitable, after a sale of the Mortgaged Property and the application of the proceeds pursuant to the directions contained in such judgment, the amount thereof to be determined by the Court as provided in § 1371 of the Real Property Actions and Proceedings Law, together with accrued and unpaid Agreed Profit, including Agreed Profit at the Default Profit Rate and late charges on such amount, together with interest thereon allowable under law, plus

52

INDEX NO. 850083/2020

Case 01-01139-AMC    Doc -8    Filed 07/08/21    Page 59 of 61

RECEIVED NYSCEF: 07/14/2020

the reasonable costs and expenses incurred by the Lender in collecting such amounts (including, without limitation, attorneys' fees and costs);

h)      Awarding the Lender its costs and disbursements in bringing this action and enforcing its rights under the Facility Documents, including, without being limited to, its reasonable attorneys' fees; and

i)      Awarding the Lender such other and further relief as may be just and proper.

53

INDEX NO. 850083/2020

RECEIVED NYSCEF: 07/14/2020

Case 01-01139-AMC    Doc -8    Filed 07/08/21    Page 60 of 61

Dated:      New York, New York
            July 14, 2020

                              FRIED, FRANK, HARRIS, SHRIVER
                                 & JACOBSON LLP

                              By: _____/s/Matthew D. Parrott_____
                                        Matthew D. Parrott

                              One New York Plaza
                              New York, New York 10004-1980
                              (212) 859-8000

                              m.parrott@friedfrank.com

                              *Attorneys for Plaintiff Malayan Banking Berhad,
                              New York Branch, as Administrative Agent for
                              Malayan Banking Berhad, London Branch, Intesa
                              Sanpaolo S.P.A., New York Branch, Warba Bank
                              K.S.C.P., and 45 Park Place Investments, LLC*

54

## VERIFICATION

STATE OF NEW YORK          )

                          ss.:

COUNTY OF NEW YORK         )

Ahmad Hamdi Bin Abdullah, being duly sworn, deposes and says:

I am the General Manager of Malayan Banking Berhad, New York Branch, Plaintiff in this action, and I have read and know the contents of the foregoing first amended verified complaint. The same is true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

_____
Ahmad Hamdi Bin Abdullah

Sworn to before me this
14th th day of July 2020

_____
Notary Public    *located in Nassau County

EDWARD STRECKER
Notary Public, State of New York
No. 01ST6219591
Qualified in Nassau County
Certificate on file in New York County
Commission Expires March 29, 2022

Notarization made pursuant
to Executive Order 202-7

55

22111335