**ORIGINAL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

FILED
2001 APR 25 PM 3:53
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al | ) | Case No. 01-01139(JFF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Hearing Date: May 3, 2001** |
| | ) | **at 8:00 a.m.** |
| | ) | **Objection Deadline: April 25, 2001** |
| | ) | **at 4:00 p.m.** |

**OBJECTION OF CREDIT LYONNAIS, NEW YORK BRANCH TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS, UNDER 11 U.S.C. §§ 105, 362, AND 364, APPROVING POSTPETITION FINANCING AND RELATED RELIEF AND SETTING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c) [DOCKET NO. 25]**

Credit Lyonnais, New York Branch ("Credit Lyonnais"), through its undersigned counsel, Anderson Kill & Olick, P.C. and Walsh, Monzack and Monaco, P.A., as and for its Objection ("Objection") to Debtors' Emergency Motion ("Motion") for Interim and Final Orders Under 11 U.S.C. §§105, 362 and 364, Approving Postpetition Financing And Related Relief and Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c), respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Motion should be denied because the Debtors have not demonstrated that they lack adequate cash for their operations. Unquestionably, they are accumulating significant cash as a consequence of the statutory prohibition against payment of post-petition interest on unsecured obligations and the application of the automatic stay to asbestos litigation. Further, at this stage of these cases the Debtors should not pre-finance merger and acquisition activity.

2. Secured financing authorized pursuant to 11 U.S.C. §364, to have priority over all administrative expenses allowable pursuant to 11 U.S.C. §503(b)(1), presumably must itself be for

a purpose itself cognizable under that latter statute. That is, for "the actual, necessary costs and expenses of preserving the estate . . .". Id. Credit Lyonnais believes that the Debtors cannot make an adequate showing that the proposed financing is "necessary" for the Debtors to operate profitably and thereby "preserve" the estate. Furthermore, at this time the funds at issue should not be made available for acquisitions.

3.  Buried in the financing agreement - and mentioned nowhere in the Motion - is a provision allowing for the utilization of borrowed funds for "Permitted Acquisitions." This term is defined, essentially, as any corporate acquisition that does not otherwise adversely affect traditional financial covenants and following which transaction the Debtors will still have at least $75 million in borrowing availability under the loan agreement.

4.  Put bluntly, the Debtors appear to have no present need for additional cash, or cash in the magnitude of the DIP, and it is improvident for them to obtain it at this juncture on a super-priority and secured basis under a credit facility in the amount of $250 million - - for which they will pay substantial fees -- in order to fund acquisitions. The Motion should be denied.

### FACTUAL BACKGROUND

5.  The Court and the parties are respectfully referred to the discussion of the factual background of the case and the proposed financing arrangements contained in the Motion at pages 3 through 21 thereof.

6.  The existing prepetition unsecured facilities consist of a $250 million five-year revolving credit in which Credit Lyonnais is a lender in the principal amount of $10.6 million, and a $250 million 364 day revolving credit facility in which Credit Lyonnais does not participate. As of the petition date, both facilities were, and remain, fully drawn.

## "MERGERS, CONSOLIDATIONS OR SALES"

7.  At page 46 of the proposed Post-Petition Loan and Security Agreement (the "DIP Agreement"), which page is annexed hereto as Exhibit A, is Section 7.9 thereof, encaptioned "Mergers Consolidations or Sales". This provision states that "[e]xcept for Permitted Acquisitions, no Borrower shall enter into any transaction of merger, reorganization or consolidation, or transfer, sell, assign, lease or otherwise dispose of all or any part of it property, or wind up, liquidate or dissolve, or agree to do any of the foregoing . . ."

8.  The introductory exception, i.e., "Permitted Acquisitions" requires reference to Annex A to the DIP Agreement. There, at pages A-19 and A-20, annexed hereto as Exhibit B, it is provided that as long as the Debtors are not in default, remain in compliance with certain covenants contained in the DIP Agreement and, "after giving effect to any such acquisition or purchases" Debtors still have "Availability of at least $75 million," the acquisitions will qualify as "Permitted Acquisitions." The Debtors must, of course, obtain Bankruptcy Court approval for such transactions, and the DIP Agreement so provides, but presumably any objection to the use of DIP priority financing for these clearly anticipated transactions must be made now.

9.  Upon information and belief, at the time the cases were commenced the Debtors had sufficient cash for working capital and operations, notwithstanding their boilerplate assertions to the contrary contained at pages 12-14 of the Motion. Indeed, it appears that there was little prepetition debt other than the $500 million owing to pre-petition lenders and exposure to asbestos claimants.

10. Under these circumstances, the need for approval for the DIP Agreement has not adequately been shown.

## ARGUMENT

### THE PROPOSED FACILITY IS NOT "NECESSARY" AS REQUIRED BY STATUTE

11.	Motions for the approval of post-petition secured financing are routine, and objections to the form of proposed financing regularly express dissatisfaction with the extent of such loans, cross-collateralization, improper liens on avoidance actions, inadequate carve-outs for case professionals, and inadequate time to object to validation of liens and releases of the lenders. This Objection addresses none of those issues. Rather, it is the contention of Credit Lyonnais that no DIP loans (or perhaps, at most, greatly reduced DIP loans) should be made to these Debtors, whether secured or unsecured, absent a demonstration of actual financial need. Credit Lyonnais respectfully submits that no such showing has been made.

12.	The principal authority on bankruptcy matters has noted that the reference contained in Bankruptcy Code Section 364(a) to the "allowability" requirement under Bankruptcy Code Section 503(b)(1) "suggests that the transaction must meet the requirement of section 503(b)(1)(a) that the expenses for which priority is sought be 'actual, necessary costs and expenses of preserving the estate.'" Collier on Bankruptcy, 15th ed., ¶[364.02[3], p. 364-6. Specifically, "extensions of credit for which priority is sought must be actual and necessary." Id. Here, the Debtors have not made that showing. Rather, as a consequence of the Debtors' present ability to accumulate cash, it is clear that the financing proposed is designed not to meet the Debtors' current needs but, rather, is in anticipation of a program of "Permitted Acquisitions." This, Credit Lyonnais respectfully suggests, is premature at best.

13.	The Debtors have sought approval of a method of financing for acquisitions which the DIP Agreement contemplates will require Bankruptcy Court approval. It is not appropriate for

the prepetition creditor body to be forced to anticipate what the Debtors' next moves will be and formulate objections to transactional and financing proposals on a speculative basis. The Debtors must demonstrate - as they have not-any urgent need for approval of the DIP Agreement. Further, they must disclose - as they have not - what their acquisition program is, how it will be accomplished, and why the estates at this juncture should bear the expense associated with the DIP Agreement. The fees include 3/8% per annum times the unused amount of the $250 million facility.

14. Expenses allowable under Bankruptcy Code Section 503(b)(1)(a) must be for the "actual, necessary costs and expenses of preserving the estate." Id. In re Burlington Motor Holdings, Inc., 235 B.R. 741, 746 (Bankr. D.Del. 1999)(payment of interstate trucking license fees "was a necessary cost" of doing business).

15. In order to satisfy the requirement of this statute the "actual, necessary" standard must be met. This standard is substantial, insofar as "[a]llowances for administrative expenses are narrowly construed for proper protection of other creditors." In re Molnar Brothers, 200 B.R. 555, 558 (Bankr. D.N.J. 1996). "The priority embraces only those claims for costs that were actually and necessarily incurred in preserving the estate for the benefit of its creditors." Id.

16. Here, the apparent purpose of the DIP Agreement is not to allow the Debtors to continue in business. Rather, it is clear, a purpose of the DIP facility is to pre-ordain the financial terms for acquisitions as yet undisclosed. It is premature and misleading for the Debtors to proffer this DIP Agreement at this time in this form without so much as a single reference to its proposed acquisition schedule.

17. Under these circumstances, Credit Lyonnais respectfully suggests that the Motion is premature, incomplete, and improper. As such, it should be denied.

## CONCLUSION

WHEREFORE, Credit Lyonnais, New York Branch, respectfully requests that this Court (a) deny the pending Motion, and (b) grant to Credit Lyonnais such further relief as is just and proper.

Respectfully submitted,

ANDERSON KILL & OLICK, P.C.
Attorneys for Credit Lyonnais, New York Branch
Jeffrey L. Glatzer, Esq.
Mark D. Silverschotz, Esq.
1251 Avenue of the Americas
New York, New York 10020
(212) 278-1000
(212) 278-1733 (Fax)

- and -

WALSH, MONZACK AND MONACO, P.A.
Attorneys for Credit Lyonnais, New York Branch

_____
Francis A. Monaco, Jr. (#2078)
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, Delaware 19899-2789
(302) 656-8162
(302) 656-2769 (fax)

EXHIBIT A

prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) or violation of the fiduciary responsibility rules with respect to any Plan; and (e) not engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

    7.9    Mergers, Consolidations or Sales. Except for Permitted Acquisitions, no Borrower shall enter into any transaction of merger, reorganization, or consolidation, or transfer, sell, assign, lease, or otherwise dispose of all or any part of its property, or wind up, liquidate or dissolve, or agree to do any of the foregoing (or apply to the Bankruptcy Court for authority to do so), except (i) for sales of Inventory in the ordinary course of its business; (ii) for sales or other dispositions of property in the ordinary course of business that is surplus, worn out, obsolete or no longer useable by any Borrower; (iii) for any merger or consolidation of any Borrower with any other Borrower; (iv) for any transfer, sale, assignment, lease or other disposition of all or any part of its assets (upon voluntary liquidation or otherwise) by any Borrower to any other Borrower; (v) the sale or compromise of past due accounts receivable in connection with the collection thereof in the ordinary course of business; (vi) leases or subleases (or assignments of leases or subleases) of fixed assets which are not included or intended to be included in the Borrowing Base or licenses or sublicenses (or assignments of licenses or sublicenses) of intangibles, in either case in the ordinary course of business; (vii) dispositions of Cash Equivalents; (viii) as long as no Default or Event of Default has occurred and is continuing, asset dispositions which are not Material Asset Dispositions, (ix) as long as no Default or Event of Default has occurred and is continuing, a Material Asset Disposition as long as, after giving effect to such Material Asset Disposition, the aggregate Net Proceeds from all Material Asset Dispositions (plus the aggregate amount of insurance and condemnation proceeds relating to Collateral consisting of Fixed Assets) received by the Borrowers after the date hereof is less than $20,000,000, (x) as long as no Default or Event of Default has occurred and is continuing, a Material Asset Disposition if, after giving effect to such Material Asset Disposition, (a) the aggregate Net Proceeds from all Material Asset Dispositions (plus the aggregate amount of insurance and condemnation proceeds relating to Collateral consisting of Fixed Assets) received by the Borrowers after the date hereof is greater than $20,000,000 but less than $50,000,000, (b) the aggregate outstanding Obligations at the time of the consummation of the relevant Material Asset Disposition are less than $150,000,000 and (c) none of the assets which are the subject of such Material Asset Disposition is or was an Eligible Fixed Asset or an asset located at or on any Real Estate included within the definition of Land and Buildings.

    7.10    Distributions; Capital Change; Restricted Investments. No Borrower shall (or apply to the Bankruptcy Court for authority to) (i) directly or indirectly declare or make, or incur any liability to make, any Distribution, except (A) Distributions to any other Borrower and (B) the acquisitions of shares of the Company's stock pursuant to any compensation or benefit plan approved by the Majority Lenders (in their sole discretion) and the Bankruptcy Court, (ii) make any change in its capital structure which would be reasonably expected to have a Material Adverse Effect or (iii) make any Restricted Investment, except Permitted Acquisitions.

    7.11    Transactions Affecting Collateral or Obligations. No Borrower nor any of its Subsidiaries shall enter into any transaction which would be reasonably expected to have a Material Adverse Effect.

46

Case 01-01139-AMC    Doc 148    Filed 04/25/01    Page 9 of 13

"Notice of Borrowing" has the meaning specified in Section 1.2(b).

"Notice of Continuation/Conversion" has the meaning specified in Section 2.2(b).

"Obligations" means all present and future loans, advances, liabilities, obligations, covenants, duties, and debts owing by any Borrower to the Agent and/or any Lender, arising under or pursuant to this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to any Borrower hereunder or under any of the other Loan Documents. "Obligations" includes, without limitation, (a) all debts, liabilities, and obligations now or hereafter arising from or in connection with the Letters of Credit and (b) all debts, liabilities and obligations now or hereafter arising from or in connection with Bank Products.

"Other Subsidiary" means any Subsidiary of the Company other than those Subsidiaries which are Borrowers.

"Other Subsidiary-Domestic" means each Other Subsidiary which is organized under the laws of the United States of America or a political subdivision thereof.

"Other Taxes" means any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Documents.

"Participant" means any Person who shall have been granted the right by any Lender to participate in the financing provided by such Lender under this Agreement, and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"PBGC" means the Pension Benefit Guaranty Corporation or any Governmental Authority succeeding to the functions thereof.

"Pending Revolving Loans" means, at any time, the aggregate principal amount of all Revolving Loans requested in any Notice of Borrowing received by the Agent which have not yet been advanced.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA and Code Section 412 which any Borrower or ERISA Affiliate of any Borrower sponsors or maintains.

"Permitted Acquisitions" means the acquisition by a Borrower of all or substantially all of the assets of any Person or an operating business division of any Person, the acquisition by a Borrower by merger of any Person, or the purchase by a Borrower of a majority of the issued and outstanding voting stock of any Person; provided that (i) no Event of Default

A-19

shall have occurred and be continuing at the time of such acquisition or purchase or would result after giving effect thereto; (ii) Borrowers shall be in compliance with the covenant contained in Section 7.22 as of the last day of the fiscal quarter of the Borrowers immediately preceding the date such acquisition or purchase is consummated after giving pro forma effect thereto; (iii) Borrowers shall have obtained Bankruptcy Court approval therefor; and (iv) after giving effect to any such acquisition or purchases, Borrowers shall have Availability of at least $75 million.

"Permitted Intercompany Debt" means (a) unsecured Debt of any Borrower to any other Borrower and (b) unsecured Debt of any Borrower to any Other Subsidiary that is subordinated to the Obligations hereunder.

"Permitted Liens" means, as to any Borrower:

(a) Liens for taxes, assessments and other governmental charges not delinquent or statutory Liens for taxes in an amount (not to exceed $1,000,000 in the aggregate for the Borrowers) provided that the payment of such taxes which are due and payable is being contested in good faith and by appropriate proceedings diligently pursued and as to which adequate financial reserves, to the extent required by GAAP, have been established on the applicable Borrower's books and records and a stay of enforcement of any such Lien is in effect;

(b) the Agent's Liens;

(c) Liens consisting of deposits made in the ordinary course of business in connection with, or to secure payment of, obligations under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of Debt) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of Debt) or to secure statutory obligations (other than liens arising under ERISA or Environmental Liens) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds;

(d) Liens securing the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other like Persons, provided that if any such Lien arises from the nonpayment of such claims or demand when due, such claims or demands shall not exceed $1,000,000 in the aggregate;

(e) Liens constituting encumbrances in the nature of reservations, exceptions, encroachments, easements, rights of way, covenants running with the land, and other similar title exceptions or encumbrances affecting any Real Estate; provided that they do not in the aggregate materially detract from the value of the Real Estate or materially interfere with its use in the ordinary conduct of such Borrower's business;

(f) Liens arising from judgments and attachments in connection with court proceedings provided that the attachment or enforcement of such Liens would not result in an Event of Default hereunder and such Liens are being contested in good faith by appropriate proceedings, adequate reserves have been set aside and no material Property is subject to a material risk of loss or forfeiture and the claims in respect of such Liens are fully covered by

A-20

## CERTIFICATE OF SERVICE

I, Kristie L. Dalton, certify that I am not less than 18 years of age, and that service of the foregoing document was made on April 25, 2001 upon:

## SEE ATTACHED SERVICE LIST

Under penalty of perjury, I declare that the foregoing is true and correct.

04/25/01
Date

Kristie L. Dalton

## SERVICE LIST

Laura Davis Jones, Esq.
David Carickoff, Esq.
Pachulski Stang Ziehl Young
& Jones
919 North Market Street, 16th Floor
Wilmington, DE 19899-8750

Hamid R. Raftjoo, Esq.
Pachulski Stang Ziehl Young
& Jones
10100 Santa Monica Boulevard
Los Angelas, CA 90067-4100

Steven M. Yoder, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Matthew G. Zaleski, III, Esq.
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

James H.M. Sprayregen, Esq.
James Kapp, III, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Mark Kenney, Esq.
Office of the United States Trustee
601 Walnut Street, Curtis Center
Suite 950 West
Philadelphia,, PA 19106

J. Douglas Bacon, Esq.
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

Nance Woth Davis, Esq.
Ness Motley Loadhold Richardson
& Poole
P.O. Box 1792
Mount Pleasant, SC 29465

Jonathan P. Carter, Esq.
118 S. 5th Street
Boise, ID 83702

Lewis Krueger, Esq.
Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038

Michael Lastowski, Esq.
Duane Morris & Heckscher, LLP
1100 North Market Street, Suite 1200
P.O. Box 195
Wilmington, DE 19801