1        Class certification under Fed. R. Civ. P. 23(b)(2) is the best and most practicable

2    means of fairly adjudicating the central issue pervading this case — whether or not Zonolite Attic

3    Insulation poses hazards which merit equitable relief of asbestos notification, education and

4    remediation. The Honorable Kathleen O'Connor's recent decision certifying a state-wide class of

5    Washington residents pursuing identical relief shows the suitability of class treatment in this action.

6    *Barbanti v. W.R. Grace & Co.*, No. 00-2-01756-6 (Spokane Co. Sup. Ct. Nov. 28, 2000). Here, the

7    *Price* plaintiffs meet the same requirements for a mandatory, non-opt out injunctive relief class.

8        Class certification of claims for equitable relief -- relief in the form of asbestos

9    notification, education and remediation -- seeks to create a procedural mediation by which to

10   preserve class members' health and to prevent serious avoidable injuries and death caused by

11   asbestos exposure.  Whether the requested relief is necessary, and what precise form the health and

12   safety warnings and remediation programs should take, also present common issues of fact spanning

13   the proposed class.  The class-wide determination of these issues on the merits at trial will fairly and

14   efficiently dispose of the equitable claims of thousands of people living in homes with asbestos

15   contaminated Zonolite Attic Insulation.

16       The highest and best use of judicial resources in this case is the class-wide exercise of

17   equitable power to prevent human suffering and avoidable property contamination, rather than

18   after-the-fact money judgments which seek to compensate for avoidably injured or lost family

19   members.  Further, a major benefit of the class action device available in this case is its provision of

20   procedures to ensure vindication of "the rights of groups of people who individually would be

21   without effective strength to bring their opponents into court at all." *Amchem Prods. v. Windsor*,

22   521 U.S. 591, 617, 117 S. Ct. 2231, 2246, 138 L. Ed. 2d 689 (1997) (quoting *Mace v. Van Ru Credit*

23   *Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).  That benefit applies here.[1]

24

25

26       [1]Only an equitable remedy will ensure that available remediation funds are reserved for actual asbestos remediation-related purposes. Although this Court could alternatively certify an opt-out class seeking monetary damages under Rule 23(b)(3) alongside the Rule 23(b)(2) class, the

27   incidental damages at issue here are properly included in the proposed Rule 23(b)(2) class. Absent class certification, class members will be stripped of any practicable means of seeking

28   recourse from Grace's extraordinary wrongdoing and will remain vulnerable to dangerous (and otherwise avoidable) future asbestos exposures.

1     Class certification of all claims for punitive damages serves similarly sensible

2   procedural and jurisprudential goals.  A common issue for all proposed class members is whether

3   Grace's conduct with respect Zonolite Attic Insulation warrants punitive damages.  Resolution of

4   punitive damages liability and exposure on a mandatory class-wide basis also achieves finality for

5   defendants and potential distributive justice for plaintiffs, goals that cannot likely be accomplished

6   by seriatum litigation.

7     Zonolite Attic Insolation presents a serious threat to the health of all persons who own

8   or occupy property that contain this asbestos product.  Class certification is the appropriate

9   procedural mechanism by which to  adjudicate all claims for injunctive and other equitable relief,

10  and for punitive damages.

11  **II.    PROCEDURAL HISTORY**

12     This litigation consists of four constituent nationwide class actions and several

13  additional potential tag-along actions centralized in this Court by order of the United States Judicial

14  Panel on Multidistrict Litigation.  The Judicial Panel found that the Zonolite actions involve

15  common questions of fact because each involves allegations of property damage caused by the

16  presence of tremolite asbestos in Zonolite Attic Insulation marketed by Grace.  Two similar state-

17  wide class actions are also pending in Washington and Minnesota.  Counsel in all cases before this

18  Court join in the *Price* plaintiffs' pending motion for class certification.

19     Motions for nationwide class certification and class notice have been filed and briefed

20  by all of the parties in *Price v. W. R. Grace & Co.*, No. CV 0071-M-DWM, the constituent action

21  transferred from the District of Montana.  The *Price* Plaintiffs' class action complaint was filed in

22  the District of Montana on April 14, 2000 on behalf of a proposed nationwide class of all owners or

23  occupiers of real property with Zonolite Attic Insulation.  All defendants subsequently appeared.

24  Motions for class certification and class notice/preliminary injunction were filed by the *Price*

25  Plaintiffs on or about July 25, 2000.  Defendants opposed the motions on October 23, 2000 and the

26  *Price* plaintiffs' reply papers were filed on or about November 3, 2000.  Over two dozen depositions,

27  of the parties and their experts, have already taken place in *Price* and/or in *Barbanti*, the Washington

28  state court action which shares discovery with *Price*, and the parties' experts have performed testing

1  of the *Price* and *Barbanti* Plaintiffs' homes. The *Price* court did not conduct oral argument and did

2  not issue a ruling on the plaintiffs' class certification motions prior to MDL transfer.

3        In the companion case pending in Washington state court, *Barbanti v. W.R. Grace &*

4  *Co.*, Case No. 00 2 01756-6 (Spokane Co.), the Honorable Kathleen O'Connor has certified a

5  state-wide class, under Washington's equivalent to Fed. R. Civ. P. 23(b)(2),[2] by memorandum

6  decision dated November 28, 2000, which was entered by Order of December 19, 2000. *See*

7  *Barbanti* Order Granting Plaintiff's Motion for Class Certification Pursuant to CR23(b)(2),

8  (December 19, 2000). *See* Lewis Declaration Exhibit (hereinafter "Exhibit") 1. In pertinent part,

9  Judge O'Connor found that "Plaintiffs focus on a common course of conduct by the Defendants

10  towards all potential class members; i.e., a pattern of alleged misrepresentation in advertising, failure

11  to warn, etc. . . .") Memorandum Decision [Class] Motion #1 (November 28, 2000) at p. 3

12  (Exhibit 2). In addition, the Washington Court found the *Barbanti* litigation to serve the salutory

13  purposes of class action litigation in achieving judicial economy and finality for the parties. *Id.* at

14  pp. 5-6. ("The purpose of class action litigation is to allow individuals, who have common causes of

15  action, to pool their resources and pursue legal relief which would otherwise be unavailable due to

16  the cost of litigation and the individual amount of damages involved. It is also a benefit to both

17  Plaintiffs and Defendants that putative class members litigate the class issues in one proceeding to

18  avoid inconsistent adjudication.")[3]

19        Judge O'Connor then addressed notice. After a multi-day evidentiary hearing Judge

20  O'Connor ordered that a "neutral" class notice, including information from governmental public

21  health agencies, should issue pursuant to Washington Civil Rule 23(d)(2), which is analogous to the

22  federal rule, and denied plaintiffs' request for "emergency" notice relief under Rule 65(a), finding

23  that there were factual issues in dispute. Memorandum Opinion [Notice] Motion No. 2 at pp. 2-4

24  (December 19, 2000) (Exhibit 3); Order Denying Plaintiffs' Motion for Preliminary Injunction and

25

26  

27  [2]Washington State's CR 23(b)(2) is identical to Fed. R. Civ. P. 23(b)(2) and Washington courts are guided by federal authority in applying Rule 23. *Dore v. Kinnear*, 79 Wash.2d 755, 787, 489 P.2d 898, 916 (1971).

28

[3]Defendants filed a Notice for Discretionary Review on January 17, 2001.

1  Emergency Notice to Class Members (Exhibit 4) (to be supplied when available).  In support of this

2  ruling, the *Barbanti* court found that "notice to potential class members of the existence of this

3  litigation is appropriate even though not required when a class is certified under Civil Rule

4  CR23(b)(2)."  Memorandum Opinion [Notice] Motion No. 2 at p. 2 (Exhibit 3).  The *Barbanti* court

5  has requested proposed Rule 23(d)(2) forms of notice from the parties.  The Plaintiffs' proposed

6  forms of notice is attached as Exhibit 5; the Defendants' proposed notice will be supplied when

7  available.  The *Barbanti* court will review each form of notice, and approve a notice.

8          In addition to finding that a Rule 23(d)(2) notice should issue in *Barbanti*, Judge

9  O'Connor also rejected defendants' argument based on the doctrine of primary jurisdiction.  In her

10  class certification opinion, the Court noted the following:

11          Finally, defendants rightly point out that asbestos is heavily regulated
            by federal agencies and Zonolite is under review by the EPA.
12          Arguably, the resources of a federal regulatory agency are greater than
            a state superior court and this court has considered that fact.  However,
13          federal regulation does not preclude class litigation or preempt the
            court's ability to take jurisdiction.
14
    Memorandum Decision (Motion #1) at p. 6 (attached as Exhibit 2).
15
            In support of plaintiffs' request to this MDL Court for nationwide notice (excluding
16
    the State of Washington and any other statewide certified class), plaintiffs now rely exclusively on
17
    the authority of Fed. R. Civ. P. 23, and Rule 23(d)(2) in particular; and hereby withdraw the *Price*
18
    argument for the "emergency" notice under Rule 65(a).  This approach is consistent with the class
19
    certification and order authorizing a neutral notice in *Barbanti*, as well as this Court's schedule for
20
    prompt consideration of class certification, including the notice issue.
21
    **III.   STATEMENT OF FACTS**
22
            This motion is brought by the *Price* plaintiffs on behalf of a class comprised of all
23
    owners or occupiers of real property located throughout the United States in which Zonolite Attic
24
    Insulation has been installed, excluding residents of the State of Washington where a state-wide class
25
    seeking identical relief has been certified.  Defendants are the manufacturers of Zonolite attic
26
    insulation or their alter egos or agents.  The claims asserted in this action against Grace include
27
    negligence, deceit, fraudulent concealment, fraud and strict liability.  Plaintiffs seek equitable relief
28
    in the form of a defendant-funded asbestos notification, education and remediation program.

1

**A.      Grace's Manufacturing and Marketing of Zonolite Attic Insulation Occurred with its Full Knowledge That it Contained Asbestos and Was Hazardous.**

2

3          For many decades, W.R. Grace & Company ("Grace") and its predecessor, Zonolite

4   Company, mined, milled and processed vermiculite in Libby, Montana. Vermiculite, a form of mica,

    makes a satisfactory insulating material when exfoliated (heated and expanded) in a furnace. Prior to

5   the mid-1980s, Grace was the leading producer of vermiculite-based insulation products in the

6   United States. Grace manufactured and sold over three thousand tons of vermiculite each year

7   including sales of over eighty-eight thousand bags of Zonolite attic insulation each month. *See* 1978

8   Performance Report of W.R. Grace's U.S. Zonolite operations (April 3, 1975) [sic] (Exhibit 6)  and

9   R.J. Bettacchi Monthly Report Memo (October 7, 1983)  (Exhibit 7).

10         Zonolite Attic Insulation was one of Grace's vermiculite-based products sold

11  nationwide. The vermiculite used in Grace's products, including Zonolite Attic Insulation, contained

12  asbestos. The raw vermiculite used in Grace's product contained up to 21% asbestos. Letter from

13  Wake to Byers (September 12, 1956) (Exhibit 8). Despite its recognition of the hazards of asbestos,

14  Grace never completely removed the asbestos from its finished vermiculite-based products,

15  including Zonolite Attic Insulation. Grace's testing showed that its finished vermiculite products

16  contained asbestos in amounts up to and exceeding 5% by weight. Memo from Yang to Wood

17  (April 19, 1977) (Exhibit 9).

18         Moreover, weight is not a precise measure of  risk presented by residential exposure

19  to asbestos. The asbestos fibers in tremolite are so small that millions of them are present in a tiny

20  portion of an asbestos product, yet they are barely detectable by weight. In *Harashe v. Flintkote Co.*,

21  848 S.W.2d 506 (Mo. Ct. App. 1993), expert testimony established that 600 billion tremolite fibers

22  would constitute approximately the volume of the cap of a fountain pen. *Harashe*, 848 S.W.2d at

23  508. In *Harashe*, the jury found that plaintiff's fatal mesothelioma disease was caused by Zonolite

24  Attic Insulation. The appellate court upheld that verdict. Though potentially lethal to the lungs,

25  asbestos fibers are invisible to the naked eye and can only be identified through the use of

26  microscopic equipment used by highly trained professionals. Memo from Wood on Tremolite in

27  Vermiculite at 9 (May 24, 1977) (hereinafter "Wood Memo") (Exhibit 10).

28

1    Grace's Zonolite Attic Insulation was marketed and used as a "do-it-yourself" product

2  to be installed by homeowners immediately following construction or during remodeling.  Most of

3  this material was installed in homes before 1985.  It is common for older homes to be in need of

4  maintenance, repair and remodeling involving rewiring, installation and replacement of fixtures and

5  utilities in ceilings, attics, and walls, and similar dust-creating and dust-disturbing activities.  *See*

6  U.S. Census Bureau data compilations (Exhibits 11, 12 and 13).  The Zonolite Attic Insulation

7  product itself is a granular substance that was poured out of large bags into spaces between the roof

8  and the ceiling.  The granules are small, about the size of a pencil eraser.  After years in the attic, the

9  product may darken and lose some structure and become more dust-like or sand-like.

10    The facts described herein show that homeowners, members of the class, are

11  generally unaware of asbestos in Grace's Zonolite Attic Insulation and the dangers posed when this

12  product is disturbed.  As a result, homeowners nationwide are unwittingly disturbing Grace's

13  Zonolite Attic Insulation during maintenance, repair, and remodeling and are at risk of causing

14  dangerous asbestos exposures and contamination without any knowledge of the hazard and the need

15  for precautions in order to minimize exposure and contamination.

16    As contrasted with class members' lack of knowledge of the Zonolite Attic Insulation

17  hazards, Grace and Grace's predecessor, the Zonolite Company, have been aware of the serious

18  health hazards associated with asbestos in their vermiculite since the 1950s.  Montana State Board of

19  Health Report on Industrial Hygiene Study of the Zonolite Company (August 8-9, 1956) (Exhibit

20  14) and Dr. Cairns letter to Bleich (July 20, 1959) (Exhibit 15).

21    In the 1960s, recognition of the asbestos hazard in Libby vermiculite was confirmed

22  repeatedly, as demonstrated in documents from Grace's predecessor the Zonolite Company, the

23  Montana State Board of Health, and Grace itself.  *See* Grace letter from Lovick (June 14, 1961)

24  (Exhibit 16); Chicago Daily News Article (October 6, 1964) (Exhibit 17); Montana Board of Health

25  letter to Bleich (May 11, 1964) (Exhibit 18) and Lovick Memo (December 23, 1969) with Study and

26  Graph (Exhibit 19) (showing 90% of Zonolite/Libby employees suffered lung disease).  Grace's

27  safety manager knew in the late 1960s that Grace's vermiculite-based products were contaminated

28  with asbestos which occurred in the vermiculite ore.  Accordingly, he advised:

> I think it well at this time, with the advice of counsel, to consider
> applying a warning or precautionary label or statement on all
> containers of products containing vermiculite. This may aid our
> defense in cases of product liability claims.

Memo to Kostic from Dugan (March 31, 1969) (Exhibit 20). This was not done.

In 1977, in an exhaustive report done by Grace with the benefit of extensive product testing and consultation with its own legal counsel, including the corporate legal division, Grace found that former Libby employees were suffering a "risk of lung cancer . . . five times the national average." The report went on to state in a section entitled "Harm to Customers," that "[t]he highest level of exposure is for Attic Insulation and Masonry Insulation. The high concentrations of upwards of 15 fibers per milliliter ["f/ml"] (15 minute maximum) for attic insulation . . . were observed . . . ." In a telling conclusion to its exhaustive report, Grace stated that "a decision to label our consumer products would eliminate the risk of future liability, while exacerbating the risk of claims . . . from past use of the product." "Wood Memo" at 1909, 1919 and 1924 (Exhibit 10).

In the 1970s, Grace documented the dangerous level of airborne asbestos that resulted from pouring attic insulation and seriously considered discontinuing the production and sale of vermiculite products due to these hazards. "Wood Memo" at 1917 (Exhibit 10), Memo from Brown to Locke (March 11, 1976) (Exhibit 21). Nevertheless, Grace continued to sell Zonolite Attic Insulation until 1984, without warning consumers about the asbestos and the cancer hazard associated with this product. As clearly noted in its exhaustive 1977 analysis, Grace's decision not to provide such an asbestos warning was motivated by its concern that warnings would increase the risk of claims, and thus reduce the profitability of Zonolite Attic Insulation. "Wood Memo" at 1921 (Exhibit 10) and Junker Deposition at 84 (October 23, 1991) (Exhibit 22).

In 1985, one year after Grace discontinued the production and sale of Zonolite Attic Insulation, Grace performed a risk assessment of workers exposed to asbestos from vermiculite products nationwide and estimated that 30,000 lung cancers would result from such exposures. Walsh Memo (November 1, 1985) (Exhibit 23). The lethal effect of exposure to this asbestos compound was unequivocally known to Grace as a result of its own health data on its workers and its own product testing data. Although armed with sufficient knowledge of the asbestos hazard from Zonolite Attic Insulation as early as the 1960s, Grace did not issue an asbestos warning to consumers

1   then, or at any subsequent point from 1960 until today, as it acquired more and more compelling

2   information identifying this hazard.  Instead, the company decided to forego asbestos warnings and

3   take their chances in defending themselves against lawsuits brought by persons injured by this

4   product.

5         **B.**      **The Asbestos in Grace's Zonolite Attic Insulation Is An Ongoing Serious Health Hazard to Homeowners Who Conduct Routine Household Maintenance in Their Attics.**

6

7         The disturbance of readily airborne asbestos as a result of home maintenance, repair,

8   and remodeling is a severe health hazard to persons conducting maintenance and to members of the

9   household where such work is done.  This hazard is amplified as a public health threat given the

10  widespread use of Zonolite Asbestos Insulation and because routine homeowner renovation is so

11  prevalent.  Nationwide thousands of homes with  Zonolite Attic Insulation undergo renovation each

12  year.

13        These facts recently compelled the U.S. Environmental Protection Agency ("EPA"),

14  to issue an advisory describing the vermiculite attic insulation problem and the precautionary steps

15  for a homeowner to take. The advisory first describes the problem as follows:

16        If disturbed, asbestos fibers in vermiculite insulation may get into the air.  These fibers can be inhaled and become trapped in the lungs

17        where they may cause diseases such as asbestosis, lung cancer, and mesothelioma.  These diseases can develop many years after exposure

18        to asbestos.

19  *Asbestos in Vermiculite Insulation*, U.S. EPA Office of Pollution Prevention and Toxics at 1

20  (December 29, 2000) (Exhibit 24).[4]

21        The EPA advisory details the considerable precautionary procedures to be instituted if

22  disturbance of the insulation does occur, including the use of accredited asbestos removal

23  professionals to perform product identification, risk assessment, product removal and contamination

24  "clearance" testing – skills and tasks well beyond the know-how of a layperson class member.  For

25  example, the advisory recommends:

26

27  _____

28      [4]This description of the health risk is confirmed by the expert opinion of Dr. Henry A. Anderson, a medical doctor/epidemiologist with two decades of experience with asbestos research. *See* Affidavit of Henry A. Anderson, M.D. (July 20, 2000), ¶ 7 (Exhibit 25).

1             If you are planning to remodel or replace vermiculite insulation, have
              it tested first.

2

       •     EPA recommends using a trained and accredited professional to
3              conduct the tests. If you decide to remove the vermiculite home
             insulation, use accredited, licensed asbestos removal professionals.
4              Use of a "negative pressure enclosure" technique will prevent fibers
             and dust from escaping from the attic into the rest of the home. **Do**
5              **not attempt to do this yourself.** You could spread asbestos fibers
             throughout your home, putting you and your family at risk of inhaling
6              asbestos fibers.

7        •     After the vermiculite insulation is removed, you may want to consider having
             air monitoring tests done in your attic and throughout the living areas of your
8              home. This is to ensure that the concentration of asbestos fibers in the home
             is low or not present.

9
*Id.* at 2-3 (emphasis in original).[5]

10
      The public health threat is manifest. Even though Grace marketed Zonolite Attic
11
Insulation as a "do-it-yourself" home improvement product without warnings, **the assessment,**
12
**remediation and control of the hazard is absolutely not a "do-it-yourself" endeavor,** and can
13
only be safely and effectively accomplished by adequately informed professional asbestos abatement
14
personnel.[6]
15
      Three central liability issues -- the risks of Zonolite Attic Insulation, the necessity to
16
avoid disturbance, and the need for professional assistance to address the problem -- are confirmed
17

18
     [5]These procedures are consistent with recognized practices to prevent hazardous exposures to
19 asbestos in schools and other buildings. *See* "Guidance for Controlling Asbestos-Containing
Materials in Buildings," U.S. EPA (1985) (known as the "Purple Book") ("However, when ACM
20 [asbestos-containing material] is damaged or disturbed – for example, by maintenance or repairs
conducted without proper controls – asbestos fibers are released. These fibers can create a potential
21 hazard for building occupants.") (Exhibit 26); "Managing Asbestos in Place," U.S. EPA (1990)
(known as the "Green Book") (["A]sbestos materials can become hazardous when, due to damage,
22 disturbance, or deterioration over time, they release fibers into building air. Under these conditions,
when ACM is damaged or disturbed – for example, by maintenance repairs conducted without
23 proper controls – elevated airborne asbestos concentrations can create a potential hazard for workers
and other building occupants. As this guide will explain in some detail, in-place management does
24 not mean "do nothing." It means having a program to ensure that the day-to-day management of the
building is carried out in a manner that minimizes release of asbestos fibers into the air. . . .")
25 (Exhibit 27) Affidavit of Donald J. Hurst (May 25, 2000), President of Fulcrum Environmental
Consulting at ¶ 21-24 (identifying the need for safety precautions to minimize exposure and stressing
26 need for use of specifically trained professionals) (Exhibit 28).

27      [6]*Asbestos in Vermiculite Insulation*, US EPA Office of Pollution Prevention and Toxics at 3
(December 29, 2000) (Exhibit 24 at 3). Other similar public health advisories were issued by EPA
28 Region I, Region X, and the Centers for Disease Control ("CDC"), Agency for Toxic Substances
Disease Registry (ASTDR"). *See also* Exhibits 29, 30, and 31.

MEMORANDUM OF POINTS AND AUTHORITIES ISO CLASS CERTIFICATION AND NOTICE
MDL NO. 1376                                                1312.zon
                                                        −10−

1   by a review of Grace's own documents, the asbestos abatement literature and specific field testing

2   performed by professional environmental consultants in this litigation.

3            Scientific testing simulating home maintenance, repair and remodeling recently

4   performed by both Materials Analytical Services and Fulcrum Environmental Consulting,

5   environmental consultants in this litigation,[2] demonstrate dangerous levels of airborne asbestos

6   during routine household remodeling. Testing in the Spokane, Washington home of Susan and Rand

7   Hatch demonstrated that the demolition of walls, drilling of holes in a ceiling, shoveling and

8   vacuuming of attic insulation, emptying the vacuumed material into bags, and the sweeping of the

9   dust resulted in airborne asbestos levels ranging from .31 to 5.6 fibers per cubic centimeter ("f/cc")

10   when analyzed by phase contrast microscopy. (Exhibit 28 at Exhibit B). In addition, dust found on

11   horizontal surfaces in the vicinity of the renovation was found to contain actinolite-tremolite

12   asbestos. *Id.*

13            Similarly, in the Spokane, Washington home owned by Marco Barbanti, it was

14   determined that simply scooping the vermiculite using a tin dust pan and pouring it into a bag

15   resulted in airborne asbestos concentrations ranging from 6.96 to 12.48 structures per cubic

16   centimeter ("str/cc"). *See* Affidavit of Richard Hatfield (July 18, 2000) at ¶ 16 (Exhibit 32). The

17   dust below the vermiculite contained approximately 47 million structures per square foot of asbestos.

18   *Id.*

19            These measurements exceed current Occupational Safety and Health Administration

20   ("OSHA") and Environmental Protection Agency ("EPA") standards and are clearly unsafe for

21   homeowners and their families. *See* Affs. of Anderson at ¶ 7 (Exhibit 25), Hatfield at ¶ 19-21

22   (Exhibit 32), and Hurst at ¶ 14 (Exhibit 28). *See* also EPA Report to Congress of

23   Asbestos-Containing Materials in Public Buildings (February 1988) at p. 5. (Exhibit 33) and OSHA

24   Fed. Reg., Vol. 59, No. 153 (August 10 1994) at p. 40978 (Exhibit 34). The OSHA permissible

25   exposure limit has continued to be reduced over the years, and is currently 0.1 fibers per cubic

26   centimeter ("f/cc"). OSHA has stated that it expects worker exposure at this level will result in

27

28        [2]Mr. Hurst is a certified environmental consultant and the President of Fulcrum Environmental Consulting, Inc.; Mr. Hatfield is a certified environmental consultant and the Senior Asbestos Consultant at Materials Analytical Services.

1  significant risk (1994 OSHA Reg. 59 CFR at 40967).  Further, the OSHA regulation prohibits

2  workers from being exposed to airborne asbestos concentrations exceeding 1.0 f/cc for a period

3  exceeding 30 minutes.  (Exhibit 34)  The EPA clearance level of 0.01 f/cc represents the airborne

4  asbestos concentration below which a public building can be reoccupied following removal of

5  asbestos.  This standard involves aggressive testing in which dust on all surfaces is made airborne

6  using a leaf blower.  EPA Final Rule and Notice on Asbestos-Containing Materials in Schools, 52

7  Fed. Reg. 41856 (Oct.30,1987) (Exhibit 34.1).  The design of EPA clearance testing recognizes

8  settled dust can be resuspended  and cause an exposure hazard and recognizes the hazards  associated

9  with asbestos dust on surfaces.

10      In addition, Grace's own historical testing also has shown that use or disturbance of

11  its finished vermiculite-based products results in dangerously high airborne concentrations of

12  asbestos.  In 1976, Grace conducted testing of its vermiculite attic fill insulation and determined that

13  "attic fill tested in excess of the 5 fibre level generally and in excess of the 10 fibre ceiling in some

14  instances."  Grace concluded that "this necessitates a binder development program or other

15  remedy."[9]  Also in 1976, Grace conducted simulated testing involving the pouring of Zonolite Attic

16  Insulation and analyzed the air samples by a transmission electron microscope.  All ten samples

17  analyzed exceeded 4.5 f/cc.  Memo to  Hamilton (July 11, 1977) (Exhibit 35).  In March 1980, Grace

18  conducted additional testing of its Zonolite Attic Insulation and found that use of this product

19  resulted in fiber levels of 0.971-2.597 f/cc, Letter from Wood to Ray (April 1, 1980) (Exhibit 36).

20  Grace's Construction Products Division concluded internally that these results were of concern.

21  Memo to McCord from Eaton (March 25, 1980) (Exhibit 37).

22      All of the measurements of asbestos released from Zonolite Attic Insulation described

23  above, both contemporary and historical, field testing and laboratory testing, show that disturbance

24  of Zonolite Attic Insulation presents a significant risk of health and property damage.

25      As explained by Dr. Henry A. Anderson, M.D., a medical doctor and public health

26  official with extensive clinical and research experience with asbestos disease, exposure to asbestos

27  _____

28      [9]A "binder" program refers to the asbestos dust control concept of binding the asbestos fibers
   together to the product so the fibers cannot so easily be separated from the product and cause
   exposures.

1  can and does cause cancer and other lung disease. *See* Anderson Aff.,¶ 4-7 (Exhibit 25).

2  Furthermore, medical research has established that asbestos is highly carcinogenic and there is no

3  known safe level of exposure to asbestos. *Id.* NIOSH Pamphlet (April 1980) at p. 3 (Exhibit 38),

4  EPA Study (February 1988) at p. 5 (Exhibit 33) and EPA Guidance Document ((March 1979) at

5  Part I, p. 1 (Exhibit 39). The release of asbestos particles in confined spaces such as attics where

6  persons lack proper protective equipment, such as air supplied respirators, will result in peak

7  episodic exposures to asbestos.[2] *See* Affs. of Anderson at ¶ 7 (Exhibit 25), Hatfield at ¶ 23

8  (Exhibit 28), ¶21-24. As explained by Dr. Anderson, based on the epidemiology and toxicology of

9  asbestos, even non-occupational low-level exposures to asbestos can cause mesothelioma and other

10  asbestos-associated diseases. *See* Anderson Aff., at ¶¶ 4, 7 (Exhibit 25).

11          Documented dangers are posed by residential exposure to Zonolite Attic Insulation.

12  In *Harashe*, 848 S.W.2d at 507-508, a case where the plaintiff sued successfully for

13  asbestos-induced cancer, the plaintiff sustained a limited number of exposures to dust from the

14  Zonolite Attic Insulation – during installation, and during subsequent inspections of vents in the

15  attic. In affirming the plaintiff's verdict against Grace, the court described plaintiff's exposures as

16  follows:

17          Plaintiff used the insulation to insulate his attic by pouring the product between the
        joists of his ceiling. Because of the layout and confined space of the attic, he was
18          required to place his face quite close to the insulation as it was being poured into the
        spaces between the joists. He testified that the insulation created heavy amounts of
19          dust. Insulating the attic took approximately one day. Thereafter the plaintiff would
        go to the attic twice a year to check on a vent located there. On those occasions the
20          attic was quite dusty. Several years after the attic work plaintiff bought additional
        Zonolite to insulate between walls. Again in installing this insulation plaintiff came
21          into contact with heavy clouds of dust. In 1975 plaintiff utilized Zonolite to do
        additional insulating in the roof of a new addition and again functioned in quite dusty
22          conditions in close proximity to the insulating product. The 1975 exposure would be
        on the very edge of the latency period of the plaintiff's expert and outside the latency
23          period of the defendant's expert. From the testimony of the plaintiff we believe that a
        jury could find that the plaintiff sustained at least two heavy exposures to dust from
24          the Zonolite.

25          _____

26          [2]EPA Proposed Identification and Notification (September 17, 1980) (Exhibit 40) and EPA
        Guidance document (March 1983) at 1-1 (Exhibit 41). Notably, EPA has declared that "since peak
        exposures to asbestos in schools entail risks of serious injuries . . . EPA finds that these exposures
27          present an unreasonable risk and should be reduced accordingly." *Id.* at 61972-73. EPA has noted
        that while peak concentrations may be high for brief periods, time-waited averages calculated for an
28          eight-hour period, are often deceptively low. EPA Airborne Asbestos Assessment Updated (June
        1986) at 72 (Exhibit 42).

1   *Id.*

2         Historical testing done by Grace and recent testing done in homes with Zonolite Attic

3   Insulation by certified environmental consultants demonstrate that disturbances of Zonolite Attic

4   Insulation are causing and will continue to cause hazardous exposures.  These dangerous exposures

5   will go on unless homeowners are properly notified.

6         **C.**    **Without Effective Notice, Homeowners Are Ignorant of the Extreme Hazard**
7             **from Disturbing the Zonolite Attic Insulation Product and Remain at**
          **Preventable Risk.**

8         Grace's Zonolite Attic Insulation was sold to homeowners as a "do-it-yourself"

9   product.  Remarkably, in product literature and on its Zonolite bags, Grace affirmatively represented

10  to homeowners that Zonolite Attic Insulation "pours easily and cleanly," does not require "mask

11  gloves or special equipment," and "[c]ontains no harmful chemicals."  Zonolite brochure and bag

12  (Exhibit 43).  Further, Grace depicted in its literature and on its bags a person pouring the material

13  without any safety precautions whatsoever, including no mention of respiratory protection, noting the

14  material was "non-irritating to the lungs," and an appropriate activity for "family fun."  Exhibit 44.[10]

15  *See also*, Zonolite advertisement (November 1960) and brochure (1950) and other undated

16  advertisements (Exhibit 44).  Grace has never corrected this dangerously misleading information,[11]

17

---

18      [10]With Grace's Zonolite Attic Insulation, an examination of construction records, such as
Grace's product literature, would not disclose the presence of asbestos, Further, a visual inspection of
19  the insulation (without specific knowledge of the physical characteristics of Zonolite Attic
Insulation) would not disclose the presence of asbestos since asbestos fibers are invisible to the
20  naked eye.

21      [11]This misinformation and deceit continues and is compounded by Grace's ongoing public
statements. For example, Grace's website encourages homeowners to feel safe when working with
22  and around Zonolite attic insulation:

23  Grace took steps to remove fibrous tremolite from the vermiculite used in Zonolite® Attic
Insulation . . .

24
•     Asbestos fibers in the attic space during installation were at a level well below what was then
25       considered a permissible lifetime occupation exposure.

26  •     Air sampling indicated no asbestos fibers were detected in the attic within six hours after
     installation.

27
Based on these results, Grace concluded that no unreasonable risk of injury was posed to a
28  homeowner installer.

                    (continued...)

1   nor has Grace warned homeowners that Zonolite Attic Insulation contains toxic levels of asbestos.

2   As a result of Grace's failure to warn and affirmative misstatements of fact, many thousands of

3   homeowners remain ignorant of the dangers to which they and their families may be exposed.

4            Class member John Holbrook's experience illustrates this point.  John Holbrook and

5   his family have over the years engaged in typical homeowner renovation activities, and use their attic

6   area for storage.  Because the Holbrooks were not advised or warned that Zonolite Attic Insulation

7   contained asbestos, they conducted their work and accessed their attic storage area without taking

8   important safety precautions.  Aff. of John Holbrook (July 21, 2000) (Exhibit 45).  Now the

9   Holbrooks face an uncertain future risk to their health, are uncertain what home repairs they can or

10   cannot make, and are concerned that living spaces in the home are contaminated.  The circumstances

11   of the Holbrook family illustrates that routine homeowner renovation activities taking place in

12   homes threaten public health and safety and present dangers that could be mitigated through an

13   appropriate nationwide notification program to homeowners,[12] who are at risk due to no fault of their

14   own.

15            In addition to the demonstration of anecdotal information documenting lack of

16   homeowner knowledge as to the Zonolite Attic Insulation problem and how to deal with it,

17   plaintiffs' counsel commissioned a statistical marketing research survey in the State of Washington

18   to assess the level of homeowner awareness or lack thereof of the problem.  The survey, which was

19   admitted into evidence in the *Barbanti* hearing, was conducted by a professional marketing

20   consultant and determined that approximately 90 % of homeowners surveyed were not aware of the

21   problem or how to deal with it.[13]  Needless to say, one cannot take appropriate safety precautions or

22

23        [11]/(...continued)
http://www.grace.com/html/libby/libby.html.

24

25        [12]/For similar illustrations, *see* Affs. of Rand Hatch (July 20, 2000) (Exhibit 46), Ralph Busch (July 20, 2000) (Exhibit 47) and Brendan King (July 19, 2000) (Exhibit 48) (homeowners who were unwittingly exposed to airborne asbestos while engaged in typical home renovation activities).

26

27        [13]/Washington State Survey Summary Report (October 2000) at 6 (Exhibit 49).  It should be noted that Washington homeowners have been exposed to more media coverage of the problem than other markets due to the presence of Grace vermiculite expanding plants in the state and the

28   occurrence of an extensive series of articles in the *Seattle Post Intelligencer*.  The *Intelligencer* has

(continued...)

1 hire properly trained safety personnel (as the EPA recommends) if one is unaware of the presence of

2 Zonolite Attic Insulation in the home or its risks.

3          In sum, the members of the class face a common risk in the form of asbestos

4 exposures and property contamination resulting from uncontrolled disturbance of Zonolite Attic

5 Insulation, and are in need of a common solution – accurate hazard information on risk assessment

6 and hazard abatement.

7 **IV.    ARGUMENT**

8          In considering whether to certify this case as a class action, the Court must first

9 determine that the numerosity, commonality, typicality and adequacy prerequisites of Rule 23(a) are

10 satisfied. Fed. R. Civ. P. 23(a)(1)-(4). *See Amchem*, 521 U.S. at 613. If the requirements of Rule

11 23(a) are met, the Court must then decide whether one or more of the three criteria set forth in Rule

12 23(b) are satisfied. *Amchem*, 521 U.S. at 614.

13          This case is ideally suited for class treatment. If plaintiffs prevail on liability, the

14 entire class will benefit from a uniform asbestos notification, education and remediation program.

15 Class treatment of such claims is routine. *See, e.g.*, *In re School Asbestos*, 789 F.2d 996, 1008-11

16 (3d. Cir. 1986) (defective asbestos-containing building products); *In re "Agent Orange" Prods.*

17 *Liab. Litig.*, 100 F.R.D. 718, 724 (E.D.N.Y. 1983). Where a defendant has caused injury through its

18 manufacture, distribution, and fraudulent marketing of a dangerous product, a class action enables

19 common proof of the dangerous nature of the product and of the defendant's wrongful conduct.

20     **A.    Applying A Washington Class Action Rule That Parallels F.R.C.P. 23, The**
       **Washington State Court Properly Certified A Statewide Class Seeking Identical**

21        **Relief In The Companion Case, *Barbanti v. W.R. Grace.***

22          This Court will, of course, make its own independent analysis of the class

23 certification issues. However, a review of the *Barbanti* court's reasoning is instructive. *Barbanti v.*

24 *W.R. Grace & Co.* No. 00-2-01756-6 (Sup. Ct. Nov. 28, 2000).

25

26 _____

27          [13]/(...continued)
played a lead role nationally in coverage of the Grace vermiculite issue. Thus, there is every reason

28 to expect that homeowner awareness of the problem will be greater in Washington State than around
the country.

1    The *Barbanti* court, applying state rules that track Fed.R.Civ.P.23, first found that
2    plaintiffs met the four requirements of Rule 23(a): (1) numerosity; (2) commonality of questions of
3    law or fact; (3) typicality of the claims of class representatives; and (4) adequacy of representation of
4    the class's interests. The *Barbanti* court held that defendants had not challenged plaintiffs' estimate
5    that Zonolite Attic Insulation was installed in 900,000 homes nationwide, which establishes
6    numerosity.  The court further found that the commonality requirement was met by "[p]laintiffs'
7    focus on a common course of conduct by the defendants towards all potential class members," and
8    by the fact that "plaintiffs seek equitable relief for the class as a whole in the areas of warnings,
9    education, and remediation, not individual relief." *Id.* at 3.  As to typicality, the court held that
10   where "'the same unlawful conduct . . . affects both the named plaintiff and the rest of the putative
11   class,'" the typicality requirement is usually satisfied, "'despite disparities in individual factual
12   scenarios.'" *Id.* at 4 (*quoting Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 230 (E.D. Pa. 1999)).

13   The *Barbanti* court also rejected Grace's arguments, that the class representative was
14   inadequate because of "claim splitting."  The *Barbanti* court correctly held: "In a class action, the
15   concept of 'claim splitting' is less of a concern than it would be in an individual action.  It can be
16   more efficient to manage some issues in a class action setting, i.e. liability issues, and this will not
17   preclude individual litigation of other claims, i.e. personal injury claims." *Id.*  The *Barbanti* court
18   also rejected Grace's other boilerplate arguments regarding the adequacy of the class representative.
19   *Id.*

20   Turning to the question of whether the relief sought was properly characterized as
21   injunctive as opposed to monetary, the *Barbanti* court held that the notification program, the
22   development of safety procedures and remediation techniques, and prospective remediation were
23   primarily injunctive in character.

24   Given the lengthy proceedings and evidentiary record that led to a detailed analysis of
25   identical issues in *Barbanti*, plaintiffs submit that the *Barbanti* decision is highly instructive to the
26   analysis of issues before this Court.

27
28

**B.    The Class Satisfies All of the Prerequisites of Rule 23(a).**

      **1.    Joinder Is Impracticable and Common Questions of Law and Fact Are Shared Among the Class.**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is difficult or impracticable. Here, defendants do not dispute that the proposed class comprises thousands of people, and is sufficiently numerous to make joinder impracticable.

Rule 23(a)(2) requires that there be "questions of law or fact common to the members of the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is to be construed liberally: "'[T]hose courts that have focused on Rule 23(a)(2) have given it a permissive application so that common questions have been found to exist in a wide range of contexts.' The Rule does not require all questions of law and fact to be common." *Rodriguez v. Carlson*, 166 F.R.D. 465, 472 (E.D. Wash. 1996) (citations omitted). The commonality requirement is satisfied if the named plaintiffs share even one question of fact or law with the grievances of the prospective class. *See e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-1020 (9th Cir. 1998); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972); Herbert B. Newberg and Albert Conte, *Newberg on Class Actions* § 3.10 at 3-50 (3d ed. 1992); *In re "Agent Orange Prods. Liab. Litig.,"* 818 F.2d 145, 167 (2d Cir. 1987).

Courts analyzing class certification of product liability claims routinely find the commonality requirement satisfied because those cases tend to the focus on the product and the defendant's conduct in designing, manufacturing or distributing that product. *See, e.g.*, *Hanlon*, 150 F.3d at 1020-21 (noting that the product defect class before it presented none of the individualized issues attendant to personal injury cases); *In re School Asbestos*, 789 F.2d at 1009 (finding common factual issues under claims for negligence and strict liability in asbestos product liability action); *In re Copley Pharmaceutical, Inc., "Albuterol" Prod. Liability Litig.*, MDL 1013, 158 F.R.D. 485, 489 (D. Wyo. 1994) (common questions regarding liability existed in contaminated drug case).

Here, the commonality requirement is more than satisfied. The common questions of fact and law include:

      (a)    Whether Zonolite Attic Insulation mined, manufactured and sold by Grace is dangerous due to dangerous levels of readily airborne asbestos;

      (b)    Whether Grace failed to provide adequate warnings in connection with Zonolite Attic Insulation;

1            (c)      Whether Zonolite Attic Insulation constitutes a present threat to health and safety;

2

3            (d)      Whether Grace intentionally concealed asbestos health hazards from consumers and government agencies responsible for public health;

4            (e)      Whether Grace's public announcements, statements, or representation concerning Zonolite Attic Insulation were untrue, deceptive, or misleading; and

5

6            (f)      Whether Grace's conduct with respect to Zonolite Attic Insulation warrants classwide equitable relief and punitive damages.

7            See Complaint, ¶ 58.

8            At bottom, this case involves a single mass-produced, standardized product and a

9    single course of conduct over many years, i.e., that Grace engaged in a common fraudulent scheme

10    by manufacturing, warranting, advertising, and selling asbestos-contaminated attic insulation that it

11    knew to be hazardous to thousands, while intentionally concealing the asbestos contamination.

12    Complaint, ¶ 1. All persons in the class face similar health risks, and all deserve to be warned and to

13    have the benefit of a remediation program. Commonality exists.

14            **2.    The Claims of the Representative Plaintiffs Are Typical of the Other Class Member Claims.**

15

16            Rule 23(a)(3) requires that the claims or defenses of the representative parties be

17    "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A plaintiff's claims will be

18    deemed typical if "they are reasonably co-extensive with those of absent class members." *Hanlon*,

19    150 F.3d at 1020. "Factual differences will not render a claim atypical if the claim arises from the

20    same event or practice or course of conduct that gives rise to the claims of the class members, and if

21    it is based on the same legal theory." *Hoxworth v. Blinder Robinson and Co.*, 980 F.2d 912, 923 (3d

22    Cir. 1992) (internal quotations, citations omitted); *Rodriguez*, 166 F.R.D. at 472 (same). "When it is

23    alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the

24    class sought to be represented, the typicality requirement is usually satisfied, irrespective of varying

25    fact patterns which underlie individual claims. Typicality turns on the defendant's actions toward

26    the plaintiff class, not particularized defenses against individual class members." *Smith v. Univ. of

27    Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998) (internal quotations, citations

28    omitted); *Cullen*, 188 F.R.D. at 230 (citing *Baby Neal v. Casey*, 43 F.3d 48, 58 (3rd Cir. 1994))

(same); *German v. Federal Home Loan Mort. Corp.*, 885 F. Supp. 537, 554 (S.D.N.Y. 1995)

1  (typicality test does not involve an examination of the specific facts from which the named plaintiffs'

2  claim arose, but rather an examination of the nature of his claim).

3          This is all the more true where, as here, an action seeks injunctive relief under

4  Rule 23(b)(2).  Then, there is no requirement "'that the district court look into the particular

5  circumstances of each member of the class.' . . . Actions under Rule 23(b)(2) may be more

6  rough-hewn than those in which the court is asked to award damages." *Griffin v. Burns*, 570 F.2d

7  1065, 1074 (1st Cir. 1978) (citing 3B *Moore's Federal Practice* ¶ 23.40 (1977)).

8          Plaintiffs' claim arises out of the present health threat created by a decades-long,

9  company-wide practice of marketing a dangerously contaminated product, knowing that it contained

10  dangerous levels of asbestos while concealing product hazards from consumers and public health

11  officials.  As in *Prudential*,

12              [T]he named plaintiffs here have not relied on allegations that they
               were singled out and defrauded by [defendant].  They have instead
13              alleged that they suffered harm as a result of the same company-wide
               conduct that injured the absentee class members.  The various forms
14              which their injuries may take do not negate a finding of typicality,
               provided the cause of those injuries is some common wrong.  In this
15              instance, the alleged common scheme provides an appropriate basis for
               a finding of typicality.  Since all members of the class would need to
16              demonstrate the existence of this scheme, their interests are
               sufficiently aligned that the class representatives can be expected to
17              adequately pursue the interests of the absentee class members.

18  *In re Prudential Ins. Co. America Sales Litig.*, 148 F.3d 283, 312 (3d Cir. 1998) (internal quotations

19  and citations omitted).

20          The claims of the representative plaintiffs in this action are typical of the class as a

21  whole.  They all own and/or reside in homes or other structures with Zonolite Attic Insulation.  No

22  class representative has interests adverse to those of the class as a whole.  Representative and class

23  members alike have been injured as a result of the installation of Zonolite Attic Insulation.  The

24  representative plaintiffs' and class members' claims arise from the same events and course of

25  conduct, and are based on the same legal theories.  Plaintiffs, like other class members, are burdened

26  with substantial future operation, maintenance, and abatement needs due to the presence of this

27  asbestos-contaminated product in their homes.

28

Thus, plaintiffs' claim "arises from the same event or practice or course of conduct that gives rise to the claims of the class members and . . . is based on the same legal." *Hoxworth v. Blinder*, 980 F.2d at 923. The typicality requirement is satisfied.

### 3. The Representative Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

Rule 23(a)(4) states that the representative plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This criterion ensures that the class representative and class counsel will be diligent and capable in protecting the interest of class members. *General Tel. Co. v. Falcon*, 457 U.S. 147, 157, 102 S. Ct. 2364, 2370-71, 72 L.Ed.2d 740 (1982), *aff'd*, 815 F.2d 317 (5th Cir. 1987); *see also Hill v. Western Electric Co., Inc.*, 672 F.2d 381, 389, n.3 (4th Cir. 1982). To determine whether the criterion is met, courts look at two factors: (1) whether the named plaintiffs' counsel is competent to represent the class; and (2) whether there exists any conflict of interest between the named plaintiffs and the rest of the class. *Hanlon*, 150 F.3d at 1020; *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). When there is no evidence of any conflict between the class representatives and the class, this Court may presume that there is no such conflict. *Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24 (N.D. Cal. 1977).

Class representatives Price, Prebil and Prebil, have demonstrated their willingness and diligence in representing the class by bringing the present action, promptly seeking preliminary injunctive relief that runs to the benefit of class members, subjecting themselves to lengthy depositions, answering numerous interrogatories and requests for production, and subjecting their homes to days of testing by teams of defendants' experts. Each of the proposed representative plaintiffs has articulated their commitment to obtaining classwide relief:

> I basically have three objectives; three goals. One, to make sure there's notification to all homeowners of the dangers of Zonolite, to set up a fund to defray the problems with Zonolite and to cure them. Number two, establish protocol for the safety of those who will work with Zonolite in the future. Three, to establish a fund to cover the expenses involved with anyone working around Zonolite in the future.

John Prebil Depo., 31:22-32:04 (Deposition excerpts attached to the Vincent Decl.).

> [I]t's my understanding, to represent ourselves in a class as well as we can, to make sure that homeowners are notified, if they have Zonolite

1    in their homes, of the dangers of Zonolite, to set up a safety protocol
      for anyone entering a Zonolite area, and to set up a fund to cover all
2    expenses for anyone having to work in a Zonolite area.

3  Margery Prebil Depo., 16:9-16.

4    [P]ossibly we could get a fund or something set up here so when
      people have a problem with their Zonolite situation, whether it be
5    advertising or maybe a loss of property value or going in for
      remodeling, that they could draw from it.

6  Paul Price Depo., 32:7-12.

7        There are no legitimate objections to the level of plaintiffs' concern for the class.

8  Further, the proper emphasis in this prong of the inquiry is on the integrity and effectiveness of class

9  counsel. *Adair v. Sorenson*, 134 F.R.D. 13, 18 (D. Mass. 1991) (guideline for adequacy of

10  representation is "that counsel chosen by the representative parties is qualified, experienced and able

11  to vigorously conduct the proposed litigation") (*quoting Andrews v. Bechtel Power Corp.*, 780 F.2d

12  124, 130 (1st Cir. 1985)); *Chevalier v. Baird Sav. Assoc.*, 72 F.R.D. 140, 146 (E.D. Pa. 1976)

13  (certifying a class even though the named plaintiffs had "a very sketchy view" of the litigation and

14  class counsel proceeded in the case "without significant restraints from the named plaintiffs"); *In re

15  Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1037 (N.D. Miss. 1993) (noting that requiring leadership

16  by class representatives rather than class counsel in sophisticated litigation would reduce the class

17  action device to "an impotent tool").

18        Plaintiffs' proposed class counsel consist of the MDL 1376 Plaintiffs' Executive

19  Committee members and *Price* counsel, a group with extensive experience litigating complex

20  actions, including class actions, asbestos claims and consumer cases. Counsel possess the resources

21  and the will to actively and vigorously prosecute this case.

22        Rule 23(a)(4) adequacy is also demonstrated by the remedy sought here. Class-wide

23  equitable relief to forestall future injury differs radically from an individual personal injury claim for

24  compensatory damages for physical injury caused by exposure. In requesting equitable relief for the

25  class to avert future physical injury, while at the same time preserving class members' rights to

26  pursue personal injury claims in the future should they have the misfortune of contracting a disease,

27  plaintiffs serve the class members' interests.

28        The Rule 23(a)(4) adequacy requirement is satisfied.

C.     **Certification Of A Mandatory Class Is Appropriate Under Rule 23(b)(2).**

Having satisfied the threshold requirements of Rule 23(a), class certification is first sought as to all claims for injunctive and other equitable relief, as well as for punitive damage relief, pursuant to Rule 23(b)(2). A class action may be maintained if:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed. R. Civ. P. 23(b)(2).

In considering whether to certify an injunctive class under Rule 23(b)(2), "'the conduct complained of is the benchmark.'" *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 326 (D. Mass. 1997) (quoting *Yaffe*, 454 F.2d at 1366. "As the First Circuit has explained, if injunctive or declaratory relief is appropriate with respect to the whole class, certification is proper." *Boulet v. Cellucci*, 107 F. Supp. 2d 61 (D. Mass. 2000) (*citing Dionne v. Bouley*, 757 F.2d 1344, 1356 (1st Cir. 1985); *Fraser v. Major League Soccer, L.L.C.*, 180 F.R.D. 178, 181 (D. Mass. 1998) (liability issues and remedy sought by plaintiffs were common to all plaintiffs, justifying certification of a class under Rule 23(b)(2)). Here, as in *Fraser*, both the conduct complained of the and relief sought are common to all plaintiffs.

1.     **Rule 23(b)(2) Certification of Equitable Claims Is Necessary to Protect Against a Substantial Threat to Public Health.**

Among the high callings of a court is the exercise of equitable power to preserve public health and safety. Judicial experience with asbestos litigation teaches that avoidance of human exposure to asbestos, coupled with prompt remediation of property contamination, are far more affective remedies than after-the-fact compensatory schemes. The concerns driving a court's consideration of equitable remedies to prevent fatal illnesses and contamination are quite distinct from the private pecuniary interests typically at issue in damages-only actions. As recognized by the California Supreme Court in its leading medical monitoring decision, *Potter v. Firestone*, 6 Cal. 4th 965, 863 P.2d 795, 825 (Cal. 1993):

> Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism

1      that encourages regular medical monitoring for victims of toxic
       exposure.

2

3    Quoting *Ayers v. Jackson Tp.*, 106 N.J. 557, 525 A. 2d 287, 314 (N.J. 1987). The Supreme Courts of

4    California and New Jersey found that those public interests warrant such equitable remedies as funds

5    to pay for diagnostic tests that encourage plaintiffs to safeguard their health, and that do not allow

6    them the option of spending a money judgment for purposes that do not serve public health aims. *Id.*

7        Both the equities and the law strongly favor imposition upon Grace for the costs of a

8    court-supervised equitable asbestos notification, education and remediation programs. As Chief

9    Judge Emeritus Louis C. Bechtle observed in his decision approving the nationwide diet drug class

10   action settlement, which included a Rule 23(b)(2) medical monitoring program analogous to the

11   notification, education, and remediation program sought here:

12            [T]he tort system often fails to accurately identify injured individuals.
              The economics of tort litigation means that intervention can only occur
              after a litigant has already sustained an injury. There are no incentives
13            for the tort system to screen asymptomatic individuals, since such
              persons generally have limited compensation rights. Medical
14            monitoring, on the other hand, suits public health goals of prevention
              and early treatment, because it seeks to preserve health and prevent
15            injury rather than maximize damages, thereby ameliorating the harsh
              dynamics of an injury-compensation based tort system.

16
   *In re Diet Drugs*, MDL 1203, 2000 WL 1222042 at * 41, 2000 U.S. Dist. LEXIS 12275 at *167-168.
17
   *See also Vadino v. American Home Products Corp.*, No. MID-L-425-98, at 5 (N.J. Superior Court
18
   1999).
19
        Establishment, under Fed. R. Civ. P. 23(b)(2), of a Court-supervised asbestos
20
   notification, education and remediation regimen will not only ensure that the proceeds of any
21
   monitoring trust fund be used to abate the public health hazard created by Grace, but will also
22
   substantially reduce the costs of asbestos notification, education and remediation efforts. The fact
23
   that courts today routinely administer complex forms of equitable and injunctive relief with the help
24
   of court-appointed outside experts belies any assertion that the equitable relief would be difficult to
25
   manage effectively.
26
            **2.     Rule 23(b)(2) Certification of Equitable Claims Is Common Under No**
27                   **More Compelling Circumstances.**

28

1    Injunctions compelling defendants to provide class members with health and safety

2 protections are appropriate uses of a court's equitable powers under Fed. R. Civ. P. 23(b)(2).[14/] *See* ,

3 *e.g.*, *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 828-31 (D.C. Cir.

4 1984) (upholding district court's mandatory preliminary injunction compelling defendants to create a

5 medical monitoring fund for children at risk of neurological damage sustained during an airplane

6 accident); *Day v. NLO*, 851 F. Supp. 869, 886 (S.D. Ohio 1994) (endorsing and applying courts'

7 injunctive powers under 23(b)(2) to "oversee and direct medical surveillance" for radiation victims);

8 *Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193, 203-205 (N.D. Cal. 1987) (affirming

9 plaintiffs' right to seek a medical monitoring injunction because the exposure creating the need for

10 surveillance was "the very essence of irreparable harm"); *Hansen v. Mountain Fuel Supply Co.*,

11 858 P.2d 970, 982 (Utah 1993) (use of a court-supervised fund to administer medical-monitoring "is

12 an appropriate use of the Court's equitable powers").

13    Courts reject the argument that equitable health and safety claims are actually claims

14 for money damages, rather than injunctive relief, and thus outside the authority of Fed. R. Civ.

15 P. 23(b)(2). In *Redland Soccer Club v. Department of the Army*, 548 Pa. 178, 696 A.2d 137, 142-43,

16 n.6 (1997), the Pennsylvania Supreme Court recognized, for example, that the right to medical

17 monitoring is an equitable cause of action to obtain the necessary monitoring services through a

18 court-supervised trust fund for all affected persons, rather than a legal claim for compensatory

19 damages. Similarly, in *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993), for

20 example, the court found the groundwater contamination monitoring claim suitable for Fed. R. Civ.

21 P. 23(b)(2) certification, explaining: "[H]ere, plaintiffs do not merely seek money from [defendant].

22 Plaintiffs seek to implement a court-supervised program requiring ongoing, elaborate medical

23 monitoring. Accordingly, plaintiffs' relief qualifies as injunctive relief and the Court may properly

24

---

25    [14/]Similarly, under Fed. R. Civ. P. 23(b)(1)(A), a class action may be maintained when the "prosecution of separate actions by or against individual members of the class would create a risk of

26 . . .inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct . . . " Claims for injunctive relief are often

27 certified under Fed. R. Civ. P. 23(b)(1)(A); *see McDonnell Douglas Corp. v. U.S. District Court*, 523 F.2d 1083, 1086 (9th Cir. 1975); *Fraser v. Major League Soccer*, 180 F.R.D. 178 (D. Mass.

28 1998); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1772 (2d ed. 1986). Accordingly, this Court may also rest certification on the alternative basis of Rule 23(b)(1)(A).

1  certify the class under 23(b)(2)." In *German*, 885 F. Supp. at 558-60, the court, in certifying a Fed.

2  R. Civ. P. 23(b)(2) medical monitoring class consisting of apartment tenants exposed to lead paint,

3  properly rejected defendants' argument that the request for medical diagnostic testing is simply a

4  legal damages request trying to disguise itself as injunctive relief.

5  In the federal diet drug litigation, too, the MDL Transferee Court certified 23(b)(2)

6  injunctive claims on behalf of medical monitoring classes, first for litigation purposes, and later for

7  settlement purposes. *In re Diet Drugs Prod. Liab. Litig.; Jeffers,* MDL 1203, 1999 U.S. Dist. LEXIS

8  13228 (E.D. Pa. 1999) (23(b)(2) litigation class certified); *In re Diet Drugs Prod. Liab. Litig.;*

9  *Brown*, MDL 1203, No. 99-20593, 2000 U.S. Dist. LEXIS 12275, 2000 WL 1222042 (E.D. Pa.

10  2000) (settlement class certified under 23(b)(2) and (b)(3)). Chief Judge Emeritus Louis C.

11  Bechtle's recent decision certifying this nationwide medical monitoring litigation class, under the

12  laws of all states, of dexfenfluramine- and fenfluramine-exposed persons, well-illustrates the

13  appropriateness of nationwide class certification of claims for equitable relief. *In re Diet Drugs*

14  *(Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*; *Jeffers v. American Home*

15  *Products*, MDL 1203, 1999 U.S. Dist. LEXIS 13228 at *37-46 (E.D. Pa. 1999).[15/]

16

17  ### 3. Rule 23(b)(2) Certification of Equitable Claims Is Warranted in this Case.

18  Plaintiffs seek three forms of equitable relief: asbestos notification, education, and

19  remediation. The notification component serves to effectively advise class members of dangers

20

21  [15/]  While funds to ensure medical diagnostic testing provide one important illustration of
the use of equitable funds, equitable relief is not, of course, limited to medical monitoring. For
22  example, in *In re GMC Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir.
1995), the court rejected a proposed class action settlement of claims stemming from a dangerous
23  design that placed gas tanks outside the frames of certain GM trucks, because the settlement only
provided coupons worth $1,000 toward the purchase of a new GM truck, and failed to provide
24  equitable relief in the form of remediation of the defect. Leaving open the question of whether the
court could order a recall of GM trucks by injunction, and whether a retrofit process was in fact
25  preferable, the Third Circuit stated: "At all events, the district court could clearly have awarded
relief that would require GM to set up a fund to finance retrofits initiated by owners individually."
26  *Id.* at 811. Similarly, in *Garza v. Sporting Goods Properties, Inc.*, No. SA-93-CA-1082, 1996 U.S.
Dist. LEXIS 2009 (W.D. Tex. 1996), the court approved a class settlement including equitable relief
27  in the form of warnings and facilitation of replacement of defective rifle barrels. Warnings were also
a component of the injunctive relief approved in the diet drugs class action multi-district litigation.
28  *In re Diet Drugs*; *Jeffers* 1999 U.S. Dist. LEXIS 13228; *In re Diet Drugs*; *Brown* 2000 U.S. Dist.
LEXIS 12275, 2000 WL 1222042.

1    associated with Zonolite Attic Insulation, thus averting future injury.  The education component

2    serves to educate consumers as to actions they must take as homeowners to avoid asbestos exposure

3    and contamination of property.  The remediation component seeks to ensure that appropriate

4    operation, maintenance, and abatement activities actually occur through creation of an equitable fund

5    that facilitates and funds such activities exclusively.

6            If a claim is appropriately certified under Rule 23(b)(2), the predominance and

7    superiority requirements of Rule 23(b)(3) need not be considered.  Plaintiffs meet the requirements

8    for class certification under Rule 23(b)(2) with respect to their claims for injunctive and equitable

9    relief.  The facts of this case cry for immediate equitable relief, as opposed to after-the-fact efforts to

10   obtain a money judgment to compensate for the loss of a loved one or the considerable financial

11   damages that typically follow in the wake of unknowing contamination of property with asbestos.

12

13           Plaintiffs' claims are typical of the claims of the class they seek to represent and they

14   have demonstrated the adequacy of their representation. The relief they seek is equitable in character.

15   Plaintiffs, therefore, have fully satisfied each of the elements of Fed. R. Civ. Proc. 23(a) and one of

16   the elements of Fed. R. Civ. Proc. 23(b), making class certification appropriate.

17

18           **4.   Rule 23(b)(2) Certification Is Not Defeated Where Claims for Damages
             Are Incidental to Claims for Equitable Relief.**

19

20           Courts adjudicating cases which involve predominantly equitable relief, but which

21   also include incidental claims for damages, regularly certify both the injunctive claims for relief and

22   the monetary damages claims under 23(b)(2).  Classes certified under Rule 23(b)(2) may include

23   individual monetary damage claims if the resolution of those claims does not destroy the cohesive

24   nature of the class. *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 250-251 (3d Cir. 1975).

25           For example, in *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir.

26   1998), the Ninth Circuit upheld the district court's 23(b)(2) certification of a class settlement which

27   provided cellular telephone minority interest holders with equitable relief including

28   management-related changes, along with $10 million in damages.  The court held that "'class actions

     certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory

1  relief, but may include cases that also seek monetary damages.'" *Id.* at 1240 n.3 (*quoting Probe v.*

2  *State Teacher's Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (upholding class certification of

3  Title VII claims and enjoining use of sex-segregated actuarial tables in action also seeking money

4  damages)).

5       "The hallmark of a 23(b)(2) class action is homogeneity." *Von Colln v. County of*

6  *Ventura*, 189 F.R.D. 583, 592-593 (C.D. Cal. 1999). The analysis of class certification under

7  23(b)(2) turns not on the predominance of the injunctive relief relative to the monetary relief

8  requested, but on "identifying the cohesiveness of the class and the homogeneity of the members'

9  interest as the salient factors on which the availability of the (b)(2) class action form hinges . . . ."

10 *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 451-52 (N.D. Cal. 1994); *see also*

11 *Barefield v. Chevron*, 1998 WL 188433, at *3-*4, 12 Fed. R. Serv. 3d (Callaghan) 1232; 48 Fair

12 Empl. Prac. Case (BNA) 907 (N.D. Cal. 1988).

13      Pursuant to this authority, this Court may include within the certified class costs

14 incurred by class members who have already removed their asbestos-contaminated Zonolite Attic

15 Insulation and thereby incurred monetary damages.

16

17       **5.   Punitive Damages Claims May Properly be Certified on a Mandatory
             Basis Under 23(b)(2) and/or 23(b)(1)(B).**

18

19       Plaintiffs' punitive damages claims may be properly certified on a mandatory basis

20 under 23(b)(2), and/or 23(b)(1)(B), since only a mandatory class can possibly ensure an equitable

21 distribution of any punitive damage award among the affected community. In *Barefield v. Chevron*,

22 1998 U.S. Dist. LEXIS 15816 *11, 12 Fed. R. Serv. 3d (Callaghan) 1232 (N.D. Cal. 1988), for

23 example, the district court held that punitive damages awards are appropriately certified under Rule

24 23(b)(2):

25           A class claim for punitive damages does not detract from the
             homogeneity or cohesiveness of the class. Rather it is consistent with
             the notion that the focus of a (b)(2) action is the defendant's conduct

26           toward persons sharing a common characteristic. Because the purpose
             of punitive damages is not to compensate the victim, but to punish and

27           deter the defendant, any claim for such damages hinges, not on facts
             unique to each class member, but on the defendant's conduct toward

28           the class as a whole. The cohesive core of the (b)(2) action is thus
             maintained.

1  (Citations omitted.)

2          In *Barefield,* plaintiffs pursuing injunctive relief under Title VII and other race
3  discrimination laws against Chevron also pursued punitive damages claims.  The punitive damages
4  claims were determined to be appropriately certified under Rule 23(b)(2) because "such relief may
5  be treated as ancillary to the claims for injunctive and declaratory relief which remain at the heart of
6  this action." *Id.* This is also true here.  The same misconduct driving plaintiffs' principal claims for
7  equitable relief against Grace also justify their ancillary claims for punitive damages.  "[W]here the
8  plaintiffs allege that the defendant acted in a manner applicable to the class as a whole, the issue
9  whether that conduct is sufficiently culpable to support punitive damages is identical for each class
10  member," *Id* at *15.

11          Similarly, many courts have found the issue of punitive damages to be susceptible to
12  classwide treatment, even in cases in which the determinations of classwide entitlement to punitive
13  damages precede determinations of classwide or individual compensatory damages. *See, e.g.*, *In re*
14  *Estate of Ferdinand E. Marcos Human Rights Litigation*, 910 F. Supp. 1460, 1464 (D. Haw. 1995);
15  *Jenkins v. Raymark Industries, Inc.*, 109 F.R.D. 269 (E.D. Tex. 1985), *aff'd*, 782 F.2d 468, *reh'g*
16  *denied*, 785 F.2d 1034 (5th Cir. 1986).  In both of these decisions, the respective courts of appeal
17  affirmed class trial structures which provided for the entitlement and quantification of punitive
18  damages (by either a fixed aggregate sum, as in the $1.2 billion affirmed in *Marcos*, or determination
19  of a punitive-to-compensatory damages ratio, as in *Jenkins*).

20          In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991), the Supreme Court held
21  that due process imposes both procedural and substantive limits on punitive damages (punitive
22  damages should not be "greater than reasonably necessary to punish and deter").  In *TXO Prod.*
23  *Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), the Court expressly reaffirmed that
24  principle, stating that "Due Process . . . imposes substantive limits beyond which penalties may not
25  go." 509 U.S. at 57.  *BMW of No. Am. v. Gore*, 517 U.S. 559, 581 (1996) held that due process and
26  the avoidance of unreasonable or excessive punitive damages requires that punitive damages bear a
27  "reasonable relationship" or ratio to compensatory damages.

28

1    Rule 23(b)(1)(B) certification is ideally suited to punitive damages claims for both

2  practical reasons, and under principles of equity.  In many cases (including this one) a defendant may

3  face financial ruin from multiple or disproportionate punitive damages awards.  In other cases, even

4  a financially robust defendant may be entitled to the constitutional protection of punitive damages

5  limits.  In all cases, the interests of plaintiffs and society may be ill-served without the application of

6  a class mechanism that protects them against under-deterrence from insufficient punitive damages

7  awards, while in turn protecting defendants from punitive damages overkill.  Judge Weinstein

8  applied these principles, which have come to be known as the limited punishment theory, in *In re*

9  *"Agent Orange" Prods. Liab. Litig.*, 100 F.R.D. 718 (E.D.N.Y. 1983), *aff'd*, 818 F.2d 145 (2d Cir.

10  1987), certifying a mandatory nationwide class of Vietnam war veterans seeking punitive damages

11  for injuries from exposure to the Agent Orange defoliant.  The court determined that the chemical

12  manufacturer defendants had sufficient assets to respond to any probable judgments, such that the

13  traditional "limited fund" theory for Rule 23(b)(1)(B) certification would not apply.  Nevertheless,

14  the court concluded that a mandatory punitive damages class under Rule 23(b)(1)(B) was most

15  appropriate, because the pool of potential punitive damages dollars was inherently limited as a

16  matter of law:

17    When a plaintiff recovers punitive damages against defendant, that
    represents a finding by the jury that the defendant was sufficiently
18    punished for the wrongful conduct.  There must . . . be some limit,
    either as a matter of policy or as a matter of due process, to the amount
19    of times defendants may be punished for a single transaction.  At the
    very least, a trial court in passing on future claims may admit evidence
20    as to the payment of prior awards which may be used by a jury to
    reduce an award to a party seeking additional punishment for the same
21    misconduct.  There is, therefore, a substantial probability that
    "adjudication with respect to individual members of the class . . .
22    would as a practical matter be dispositive of the interests of the other
    members not parties to the adjudication."  Accordingly, a class of all
23    [claimants] is certified under (b)(1)(B) . . . for the award of punitive
    damages.

24
*Id.* at 728.

25
    In 1994 it was the defendant, Exxon Corporation, that successfully invoked the
26
  "limited punishment" theory to obtain Rule 23(b)(1)(B) certification for trial purposes in *In re The*
27
  *Exxon Valdez*, No. A89-0095-CV (HRH) (D. Alaska).  Exxon desired to face a single classwide trial
28
  and punitive damages award, and hence persuaded the trial court that mandatory class certification,

1  including the stay of any other proceedings by class members, was appropriate.  In Fall 1994, the

2  jury returned a classwide punitive damages verdict of $5 billion against Exxon, which remains on

3  appeal to the Ninth Circuit.  In approving mandatory classwide treatment of the punitive damages

4  claim (over the objection of some plaintiffs), the *Exxon Valdez* court noted that federal punitive

5  damages jurisprudence had, "in substance, created a limited fund for punitive damages in

6  multi-claim cases," and that these were "substantive limits," "beyond which penalties may not go"

7  without violating due process.  *Exxon Valdez*, Order No. 180 Supplement at 8, citing, *TXO*, 509 U.S.

8  at 454 and *Haslip*, 499 U.S. at 22.

9        The circuit courts have also acknowledged these principles.  In *Morgan v. Woessner*,

10  997 F.2d 1244, 1258 (9th Cir. 1993), the Ninth Circuit held punitive damages should not "exceed[]

11  the amount necessary to accomplish the goals of punishment and deterrence . . . ."  And while courts

12  have thus far declined to construe the Due Process Clause as a per se prohibition against multiple

13  punitive awards for the same conduct, (*see Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir. 1993)), they have

14  uniformly acknowledged that earlier punitive awards must be considered in mitigation of later

15  ones.[16]  This is best achieved by comparing aggregate compensatory damages to aggregate punitive

16  damages.  Class certification of compensatory damages and punitive damages makes it possible to

17  achieve the fairest and most equitable assessment of these damages in a single proceeding.

18        Thus the courts accord judicial sympathy even to well-funded defendants who

19  nonetheless wish to avoid seriatim and potentially limitless exposure to punitive damages.  But what

20  of defendants who do not affirmatively seek such relief, preferring, like the Grace defendants, to

21  deploy a tactic of delay and attrition?  In such an instance, the courts have determined that

22  defendants may not elect to spend themselves into insolvency, gambling that the claimants' assets

23  and energies will first be exhausted.  As one federal court has put it, certifying punitive damages for

24  classwide treatment is called for to prevent "an unseemly race to the courtroom door with monetary

25

26

27        [16]One court has alternatively referred to this theory as the "limited generosity" theory-
   apparently in reference to the fact that the law limits a jury's "generosity" to plaintiffs in awarding
28  punitive damages.  *In re School Asbestos*, 789 F.2d at 1005-06.  Others have referred to it as the
   "punitive damages overkill" theory.  *Id.*; *see also Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d
   832, 839-41 (2d Cir. 1967).

prizes for a few winners and worthless judgments for the rest." *Coburn v. 4-R Corporation*,

77 F.R.D. 43, 45 (E.D. Ky. 1977).

### D.    Certification Is Also Appropriate Under Rule 23(b)(3).

Alternatively, this Court may certify all plaintiffs' claims for relief pursuant to Fed. R.

Civ. P. 23(b)(3).[17/] To certify a class under Rule 23(b)(3), this Court must find that:

> the questions of law or fact common to the members of the class
> predominate over any questions affecting only individual members,
> and that a class action is superior to other available methods for the
> fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). Both criteria are met in this case: common issues predominate, and a class

action is the superior method to adjudicate the claims of the class.

### 1.    Common Questions Predominate.

Predominance of common issues ensures only that common proof at trial will not be

overwhelmed with individual issues. *Hanlon*, 150 F.3d at 1022. The predominance inquiry tests

"whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

*Amchem*, 521 U.S. at 623. The existence of individual issues such as statute of limitations does not

compel a finding that individual issues predominate "[a]s long as a sufficient constellation of

common issues binds class members together." *Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d

288, 296 (1st Cir. 2000). "When common issues present a significant aspect of the case and they can

be resolved for all members of the class in a single adjudication, there is clear justification for

handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at

1022 (citations and quotations omitted); *see also In re Prudential Ins. Co.*, 148 F.3d at 314-15

---

[17/]Where a choice exists between certification under Rule 23(b)(3) and either Rule 23(b)(1) or (b)(2), courts generally prefer to certify the class action pursuant to (b)(1) or (b)(2). A mandatory class action is seen as preferable because there is no risk that individual members will opt out of the class and pursue separate litigation that might prejudice other class members or the defendant. *See In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989), *cert. denied sub nom, Anderson v. Aetna Casualty & Sur. Co.*, 493 U.S. 959 (1989) (certification should be made under Rule 23(b)(1) if action may also qualify under (b)(3)); *see also In re Real Estate Title and Settlement Servs. Antitrust Litig.*, 1986 U.S. Dist. LEXIS 24435 at *34 (E.D. Pa. 1986); *Newberg on Class Actions*, § 4.20 at 4-71 through 4-75. Additionally, certification under Rule 23(b)(1) or (b)(2) avoids the greater burdens on the parties and the court in meeting heightened notice and other requirements that may be applied to Rule 23(b)(3) class actions. *Eubanks*, 110 F.3d at 92 (certification under Rule (b)(1) or (b)(2) avoids "the often burdensome and costly notice requirements applicable to a [Rule23] (b)(3) class").

1  (certifying nationwide consumer fraud class); *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540,

2  545 (D.N.J. 1999) (individual issues do not defeat a finding of predominance of common issues );

3  *Rodriguez*, 166 F.R.D. at 479 ("any individual issues regarding damages were overshadowed by the

4  "predominant common questions of liability.").

5         In previous asbestos remediation cases brought on behalf of schools, courts certified

6  Rule 23(b)(3) classes for asbestos property damage claims of school districts nationwide, *In re*

7  *Asbestos School Litigation*, 104 F.R.D. 422, 431-434, (E.D. Pa. 1984) *aff'd in relevant part*, *In re*

8  *School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986), and of colleges and universities nationwide,

9  *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 643 (D.S.C. 1992), *aff'd*, 6 F.3d

10  177 (4th Cir. 1993).  In concluding that the class should be certified, the district court in *Asbestos*

11  *School* held:

12         These claims, as noted, arise out of the same common nucleus of
         operative facts relating to defendants' conduct and the nature of
13         asbestos products.  Common questions relating to the hazards of
         asbestos, the knowledge of the defendants of the hazards, industry
14         policies and practices and defendants' failure to warn and to test are at
         the core of all the damage claims for relief, and will dominate other
15         issues at trial, regardless of how defendants' conduct is characterized
         in terms of a specific tort.

16  *Id.*, 104 F.R.D. at 432; accord *In re School Asbestos*, 789 F.2d at 1008 ("Experience shows that in

17  the asbestos litigation arena redundant evidence is the rule rather than the exception.");[18] *see also*

18  *Jenkins*, 782 F.2d 468 (upholding Rule 23(b)(3) class certification of asbestos personal injury claims

19  of almost one thousand individuals).

20

21

22

23  [18]     In *In re School Asbestos*, the Third Circuit affirmed 23(b)(3) certification but reversed
the district court's certification of a mandatory 23(b)(1)(B) punitive damage class on the grounds
that the class was underinclusive and that there had been no financial showing of any limitation in
24  the availability of punitive damages.  *In re School Asbestos*, 789 F.2d 996, 1004-1008 (3rd Cir.
1986).  Here, however, the class in fully inclusive since it includes all persons nationwide with
25  Zonolite Attic insulation, except Washington residents for whom a class has already been certified
and with respect to whom this court may readily coordinate claims.  Similarly, the recent Third
26  Circuit decision in *In re Mary Collins*, 2000 U.S. App. LEXIS 30176 (3d Cir. 2000), denying a
petition for mandamus seeking the remand of punitive damage claims from MDL 875, held that it is
27  appropriate to postpone adjudication of asbestos punitive damages claims in asbestos actions
because of the existence of asbestos defendants' limited assets.  This decision foreshadows the
28  classwide determination of such claims.

1    In the *School Asbestos* cases, unlike in this action, every school had already been

2  notified and ordered by Congress to remediate their asbestos contamination. *School Asbestos*, 789

3  F.2d at 1008. Therefore, damages rather than injunctive relief were the appropriate remedy and, for

4  that reason, the district court declined certification under 23(b)(2) and certified the class under

5  23(b)(3). Here, on the other hand, class members are homeowners and tenants who remain ignorant

6  of the contamination, and are not under any mandate to remediate. For these reasons, injunctive

7  relief under Rule 23(b)(2) is required to ensure notification and education, and to further ensure that

8  the funds provided are expended to remediate the hazard. Should the principle character of the

9  action change as a result of any necessary shift in emphasis from equitable/injunctive relief to the

10  adjudication of claims for money damages, then this Court would be free to modify its order and

11  certify the entire case under Fed. R. Civ. P. 23(b)(3), a change which would only require

12  consideration of an additional notice to inform class members of their right to opt out of any Fed. R.

13  Civ. P. 23(b)(3) class.

14    The fact that claims against Grace include allegations of widespread consumer fraud

15  bolsters, rather than undermines, the grounds for class certification. As the United States Supreme

16  Court recently affirmed, "[p]redominance is a test readily met in . . . cases alleging consumer or

17  securities fraud." *Amchem*, 521 U.S. at 625. For example, in *Duhaime v. John Hancock*, 177 F.R.D.

18  54, 64 (D. Mass. 1997) (*citing Amchem*), where plaintiffs alleged fraud in the sales of life insurance,

19  the court held that because the fraud was allegedly committed through a common scheme or

20  deception, common factual issues predominated, and a damages class would be certified. Similarly,

21  in *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 471 (D. Mass. 1984),

22  the court certified a class notwithstanding issues of reliance and execution of releases by some class

23  members. *See also Waste Mgt.*, 208 F.3d 288 (rejecting defendants' contention that issues of

24  reliance precluded class certification); *Hurley v. Federal Deposit Ins. Corp.*, 719 F. Supp. 27, 34 (D.

25  Mass. 1989) (same); *In re Badger Mtn. Irrigation Dist. Secs. Litig.*, 143 F.R.D. 693, 697 (W.D.

26  Wash. 1992) ("Where plaintiffs allege a common course of wrongdoing based on the same

27  misrepresentations, individual issues of reliance do not preclude certification of the class."); *Cope v.

28  Metropolitan Life Ins.*, 82 Ohio St. 3d. 426, 696 N.E.2d 1001 (Ohio 1998) (reversing trial court's

1  refusal to certify a nationwide class of life insurance policy owners who were allegedly defrauded

2  into paying excessive premiums and renewal fees, stated: "If a fraud was accomplished on a common

3  basis, there is no valid reason why those affected should be foreclosed from proving it on that

4  basis.").

5  These arguments are all the more applicable here because plaintiffs allege consumer

6  fraud by concealment or omission. In such cases, the notion of subjective reliance has been

7  recognized as illogical, or at least speculative. One cannot "rely" on that which is undisclosed,

8  concealed, or omitted. That a person has taken action in ignorance of a material fact is a more

9  objective and direct proof that defendants' fraud caused that person's damages than his speculative

10 testimony, after the fact, could ever be. Failure to disclose a material fact creates a presumption of

11 relevance that, as a well-established precept of common law proof, suffices in such cases to establish

12 causation; this substantive rule applies both to individual actions or class actions. *See, e.g.*,

13 *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) (class action); *Cope*, 696

14 N.E.2d 1001 (class action); *Hunter v. McKenzie*, 197 Cal. 176, 239 P. 1090 (Cal. 1925) (individual

15 action); *Amato v. General Motors Corp.*, 463 N.E.2d 625 (Ohio Ct. App. 1982) (class action). *In re*

16 *Prudential Ins.*, 148 F.3d at 314("'because plaintiffs' fraud-based claims stem largely from

17 misleading omissions,' reliance can be presumed"); *Zacharjasz v. Lomas and Nettleton Co.*, 1988

18 U.S. Dist. LEXIS 4957 (E.D. Pa. 1988) (certifying class arising from mortgages that were sold via a

19 "standardized pattern of oral [misre]presentations."); *State, ex rel, Guste v. General Motors Corp.*,

20 370 So.2d 477 (La. 1978) (certifying class under Louisiana UTPCPL arising from nondisclosures

21 regarding source of automobile engines); *Heastie v. Community Bank*, 125 F.R.D. 669 (N.D. Ill.

22 1989) (class of satellite dish purchasers under Illinois Consumer Protection Law injured by "bait and

23 switch" scheme). *See also FTC v. Intl'l Diamond Corp.*, 1983-2 Trade Cas. (CCH) ¶ 65,725, 1983

24 U.S. Dist. LEXIS 11862 (N.D. Cal. 1983), *(citing Affiliated Ute*, 406 U.S. 128). *See generally* Fed.

25 R. Civ. P. 23, 1966 Advisory Committee Notes ("a fraud perpetrated on numerous persons by the use

26 of similar misrepresentations may be an appealing situation for a class action").

27 This case involves a single group of defendants and a request for a unitary

28 determination of defendants' liability to fund an equitable a remedy to be uniformly offered to all

1  class members.  Central to the claim of every class member is common proof that a single product,

2  Zonolite Attic Insulation, contains asbestos which poses great danger when disturbed by activities

3  such as remodeling or children playing in the attic.  The case-in-chief for the plaintiff class presents

4  proof common to all class members, will not vary from plaintiff to plaintiff, and does not depend on

5  the knowledge or conduct of any plaintiff.  Similarly, Grace's affirmative defenses or denials -- that

6  the product is not defective and presents no danger -- present issues common to all class members.

7     The Rule 23(b)(3) predominance requirement is satisfied.

8     **2.    A Class Action is the Superior Method for the Fair and Efficient Adjudication of this Controversy.**

10     This case also meets the second requirement of Rule 23(b)(3):  that the class action be

11  "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed.

12  R. Civ. P. 23(b)(3).

13     Superiority is demonstrated where "classwide litigation of common issues will reduce

14  litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,

15  1234 (9th Cir. 1996).  To determine whether the class action mechanism is superior, courts should

16  consider the following factors:  (1) the interest of members of the class in individually controlling the

17  prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the

18  controversy already commenced by or against members of the class; (3) the desirability of

19  concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be

20  encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

21     Here, equitable asbestos notification, education and remediation relief can only be

22  obtained on a class basis.  Moreover, the only theoretical alternative, piecemeal individual litigation,

23  is not economically viable due to the relatively small value of injunctive relief in any particular

24  building when compared to the litigation costs necessary to pursue any separate claim.  *See e.g.*,

25  *Hanlon*, 150 F.3d 1011; *M. Berenson Co.*, 100 F.R.D. at 471.  Even if feasible, individual

26  adjudication would unnecessarily burden the courts and would eliminate the possibility of class-wide

27  equitable relief.  *Hanlon*, 150 F.3d 1011.  It would also impose a substantial risk of inconsistent or

28  contradictory adjudications of the claims.

3.    **The Case Is Manageable Under Montana or Massachusetts Law Or Under The Laws Of All Jurisdictions.**

There is no evidence before this Court that a class action will prove unmanageable because of the need to apply different laws to different class members. This case is manageable whether the law of a single state (*e.g.,* Montana or Massachusetts) applies, or whether the laws of the 50 states and the District of Columbia are applied.

a.    **The Law of Montana Applies Because There is No Conflict.**

This Court may properly apply either the law of Montana or the law of Massachusetts to the tort claims of all class members because the relevant laws of Montana, Massachusetts and other interested states do not materially or directly conflict with respect to plaintiffs' claims for negligence, fraud and failure to warn. *Phillips Petroleum v. Shutts*, 472 U.S. 797, 817-822 (1985); *see also Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992) ("Before entangling itself in messy conflict of laws analysis a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states."); *In re Complaint of Bankers Trust Co.*, 752 F.2d 874 (3d Cir. 1984) (unless a material conflict exists creating a significant possible effect on the outcome of the trial, choice of law rules are inapplicable.). With respect to plaintiffs' punitive damages claims, 46 jurisdictions recognize the claim and, as a result, a choice of law analysis is appropriate. A choice of law analysis indicates that the law of Montana or Massachusetts would apply because those states have the most significant relationships with the parties, the states involved and the interstate system as a whole.

Montana and Massachusetts law provide for a cause of action against a manufacturer whose product causes harm either as a result of defective design or manufacture or as a result of inadequate warnings or instructions. *See* Montana Code Annotated ("MCA") T.27, Ch.1, Pt.7 (1999); *Vassallo v. Baxter HealthCare Corp.*, 696 N.E.2d 909, 923 (Mass. 1998). Montana and Massachusetts also provide for claims against a manufacturer who fraudulently deceives the public, conceals information, or fails to disclose information. *See* MCA T.30, Ch.14, Pt.1 (1999); *Vassallo*, 696 N.E.2d 909.

1                 **b.**     **There Are Few Material Significant Differences Among The Laws Of All States Which The Court Could Also Apply To The Controversy.**

2

3         Plaintiffs' class claims can be tried under the laws of all jurisdictions since all states

4 recognize analogous claims. Any asserted differences in the laws of all states with respect to these

5 claims may readily be managed with jury instructions and special verdict forms. Furthermore,

6 should the need arise, subclasses can be created to account for variances pursuant to Rule 23(c)(4).

7 See, e.g., *In re Asbestos School Litigation*, 104 F.R.D. at 434; *In re Diet Drugs*, *Jeffers*, 1999 U.S.

8 Dist. LEXIS 13228, at *37-46.

9                     **(1)**     **Negligence.**

10         In every American jurisdiction, the legal standards with respect to negligence are

11 essentially the same. *See* Appendix A1-2. As MDL Transferee Judge Spiegel concluded in

12 *Telectronics*: "[A]ll states use the same elements to define a cause of action in negligence." *In re*

13 *Telectronics Pacing Systems Inc.*, MDL 1057, 172 F.R.D. 271, 291 (S.D. Ohio 1997). After

14 considering the same question in *Copley*, MDL Transferee Judge Brimmer concluded: "the standard

15 for ordinary negligence does not significantly differ throughout the country, and the differences that

16 do exist can be remedied through careful instructions to the jury." *In Re Copley Pharm., Inc.*,

17 MDL 1013, 158 F.R.D. 485, 491 (D. Wyo. 1994) ("*Copley I*"). All American jurisdictions require a

18 plaintiff to demonstrate the same four elements to establish a cause of action for negligence: duty,

19 breach, causation and damages. *See* Appendices A-1 and A-2. Plaintiffs will establish Grace's

20 negligence in the sale and marketing of its asbestos contaminated insulation and its ongoing efforts

21 to conceal asbestos hazards from the class. Given the similarities in the law of negligence among the

22 fifty-one jurisdictions, all jurisdictions can be squarely placed within the parameters of a single

23 negligence subclass.

24                     **(2)**     **Strict Liability for Failure to Warn.**

25         Plaintiffs' strict liability claims arise from Grace's knowing failure to warn of dangers

26 of asbestos contamination of its Zonolite product, claims which are treated uniformly across the

27 nation. *See* Appendix B. While Massachusetts does not recognize strict liability, it recognizes

28

1  analogous failure to warn claims brought in negligence.  *Id.*  The law in the area of "failure to warn"

2  is essentially the same in all American jurisdictions:

3           Warning claims . . . tend to be treated the same way by the courts,
         regardless of the underlying cause of action.  Thus with regard to
4         different theories of recovery, and particularly strict liability and
         negligence, judges have opined that there is 'no practical difference,'
5         no doctrinal distinction;' no 'rigid distinctions,' a 'strong resemblance'
         between the different  products liability theories, or that any distinction
6         is 'illusory.'  Other courts have held that regardless of the underlying
         theory, warning claims are 'equivalent' 'indistinguishable,' virtually
7         inextricable,' 'identical,' 'essentially the same,' and are generally
         measured by the same standards.'

8
   2 Frumer & Friedman, *Products Liability* § 2.02[1], pp. 12-22 - 12-24 (1998) (citations omitted).

9
           Plaintiffs' failure to warn claims are readily addressed on a classwide basis since all
10
   strict liability jurisdictions effectively apply the same knowledge test, also applicable in negligence,
11
   to measure whether a manufacturer or supplier may be found strictly liable for failing to warn of
12
   product risks:
13
           [T]he courts for the most part, in jurisdictions generally espousing the
14         doctrine of strict products liability (when a negligence theory is
         applied, there is no question that actual or constructive knowledge is
15         an essential element), hold that liability based upon a failure to warn
         users of a product's inherently dangerous quality or characteristic may
16         be imposed only where the manufacturer, distributor, or seller as the
         case may be, had actual or constructive knowledge of the dangerous
17         quality or characteristic.

18  Charles C. Marvel, *Strict Products Liability: Liability for Failure to Warn as Dependent on*

19  *Defendant's Knowledge of Danger*, § 2, 33 A.L.R.4th 368 (1981-1988); Appendix B.

20                         **(3)    Fraud.**

21           All 51 jurisdictions recognize the tort of nondisclosure and/or fraudulent

22  concealment.  *See* Appendices C 1-4 (surveying all jurisdictions, which recognize *Restatement*

23  *(Second) of Torts*, §§ 551 and 550 (1977) (Fraud by Nondisclosure and Fraudulent Concealment,

24  respectively, or standards similar thereto).  The attached charts visually demonstrate the substantial

25  similarity and essential uniformity of the laws of the 51 jurisdictions on the fraud claims.  Indeed, the

26  only noteworthy nuances among these laws are the three alternative predicates creating a duty to

27  disclose:  superior knowledge, partial disclosure, and/or fraudulent concealment.  All jurisdictions

28

1  recognize at least one of these predicates.  Most jurisdictions recognize two or all of these as

2  alternative bases for establishing duty.  *See id.*

3          This nuance is immaterial as a matter of fact here, because all three duty predicates

4  are alleged by the plaintiffs in this action.  Here, plaintiffs allege that the Grace defendants knew, but

5  concealed from the public, that asbestos contamination of Zonolite Attic Insulation posed significant

6  hazards to class members.  Plaintiffs allege further that Grace knowingly concealed the presence of

7  asbestos from all class members by affirmatively concealing and suppressing the fact of

8  contamination, allegations which suffice to create a duty to disclose under the laws of all

9  jurisdictions, regardless of which predicate triggers the duty to disclose.  *See* Appendices C 1-4.

10                              **(4)    Punitive Damages.**

11          The laws of forty-six jurisdictions recognize the availability of punitive damages, and

12  those laws demonstrate a high degree of uniformity with respect to the description of the conduct

13  that triggers punitive damages, the factors to be considered by the jury in deciding entitlement to

14  punitive damages, and, if so, the quantum of the award that may be made.  *See* Appendix D.

15          The United States Supreme Court has established common factors that must be

16  considered by a fact finder in determining punitive damages.  *Pacific Mutual Life Ins.*, 499 U.S. 1;

17  *TXO Prod.*, 509 U.S. 443; *BMW of No. Am.*, 517 U.S. 559.  These factors are:

18          a.      that the purpose of punitive damages is to punish or deter the defendant or

19  others in its position;[19/]

20          b.      that punitive damages cannot be awarded unless compensatory damages are

21  awarded;

22          c.      that punitive damages must bear some reasonable relation to the compensatory

23  damages; and

24          d.      that the jury must consider the reprehensibility of the defendant's conduct.

25

26          [19/]There is one exception, Michigan, which has held that "exemplary damages are recoverable
    as compensation to the plaintiff and not as punishment of the defendant."  *Green v. Evans*, 156 Mich.
    App. 145, 401 N.W. 2d 250 (Mich. App. 1985).  A few other states disallow any punitive or

27  exemplary damages in this case.  To simplify the proceedings in the event the Court elects to proceed
    under an "all states" regime rather than selecting a single state's law, Plaintiffs would not seek

28  exemplary damages for residents in these states (New Hampshire, Massachusetts, Louisiana,
    Nebraska and Washington).

1  Appendix D1.

2       For choice of law considerations addressed further below, it is noteworthy that

3  Montana's well-crafted punitive damage statute expressly addresses the Due Process concerns

4  described in these Supreme Court cases.  MCA section 27-1-221 MCA provides: 1) an objective

5  standard of liability; 2) a "clear and convincing evidence" standard of proof; 3) trial judge review of

6  jury award; 4) enumerated factors for consideration, including previous punitive assessments for the

7  same wrongful act, and proportionality to actual damages.  For this reason, the Montana punitive

8  statute well represents the federal constitutional law and is a procedural and substantive "common

9  denominator" of the punitive damage laws of nearly all of the states.

10              **c.      Assuming There is a Conflict, This Court Should Apply the
                          Choice of Law Rules of Montana.**

11

12       As shown, with the exception of punitive damages, the relevant laws of all interested

13  states do not materially conflict. This Court must apply the choice of law rules of Montana to resolve

14  any conflict.  Generally, a federal court with diversity jurisdiction must apply the choice of law

15  principles of the forum state in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487,

16  496, 61 S. Ct. 1020, 1021 (1941).  However, a federal court hearing diversity cases transferred to it

17  by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 is bound to apply the

18  choice of law rules of the relevant transferor court.  *In re Sunrise Sec. Litig.*, 698 F. Supp. 1256,

19  1261 (E.D. Pa. 1988) (*citing In re "Agent Orange" Prod. Liab. Litig.*, 580 F. Supp. 690, 695

20  (E.D.N.Y. 1984)).  Because *Price* was transferred from the District of Montana, this Court should

21  apply the choice of law rules of Montana.[20]

22       Montana choice of law rules determine that Montana or Massachusetts has the most

23  significant interest in the dispute and therefore Montana or Massachusetts law should apply.

24       [20]This Court need not apply the choice of law rules of the forum of each of the consolidated
        cases because only the *Price* plaintiffs move for class certification.  However, because the choice of
25      law rules of the other two states — Massachusetts (Lindholm and Goldstein), and Illinois
        (Hunter) — apply compatible choice of law criteria, the analysis and conclusion are equally
26      applicable and there is no potential conflict regarding the conflict analysis itself.  *See, e.g., Bushkin
        Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985) (Massachusetts
27      Supreme Judicial Court adopting a fluid "functional choice-of-law approach that responds to the
        interests of the parties, the States involved, and the interstate system as a whole."); *Ingersoll v. Klein*,
28      46 Ill. 2d 42, 262 N.E.2d 593 (1970) (Illinois Supreme Court uses "most significant relationship" test
        in tort cases.).

1    Montana follows the *Restatement (Second) of Conflict of Laws*, which holds that the law of the place

2    of injury presumptively applies unless, with respect to the particular legal issue, a different state has

3    a more significant relationship. *Phillips v. GMC*, 298 Mont. 438, 995 P.2d 1002 (Sup. Ct. Mont.

4    2000). The *Restatement's* "significant relationship" test, § 6, provides that:

5        (1)    A court, subject to constitutional restrictions, will follow a statutory directive
           of its own state on choice of law.

6        (2)    When there is no such directive, the factors relevant to the choice of the
           applicable rule of law include:

7        (a)    the needs of the interstate and international systems,
    (b)    the relevant policies of the forum,

8        (c)    the relevant policies of other interested states and the relative interests of those
           states in the determination of the particular issue,

9        (d)    the protection of justified expectations,
    (e)    the basic policies underlying the particular field of law,

10       (f)    certainty, predictability and uniformity of result, and
    (g)    ease in the determination and application of the law to be applied.

11

12       Judge Weinstein's recent decision in a nationwide tobacco class action proceeding,

13   *Simon v Philip Morris Inc.*, No. 99 CV 1988, 2000 U.S. Dist. LEXIS 16713 (D.N.Y. Nov. 17, 2000)

14   exhaustively analyzes the judicial history and applicable public policy concerns relating to

15   application of choice of law rules in the mass tort context, analyzing principles recognized under the

16   *Restatement (Second) of Conflicts* as well as other choice of law standards and decisions. Judge

17   Weinstein's decision observes and approves a historical move away from a focus upon the location

18   of injury in the diffuse mass tort context, to determine applicable law by focusing upon the location

19   of the defendants' fraudulent conduct. *Id.* Following this analysis, Judge Weinstein elected to apply

20   New York law to the majority of the claims of the proposed nationwide class, due to New York's

21   interest in ensuring that it is "not a base or a haven for law breakers to wreak injury nationwide" and

22   based upon allegations that a substantial portion of the alleged conspiracy was orchestrated in New

23   York. *Id.* at *82. Notably, the court simultaneously recognized and adopted the rule of depecage, a

24   rule previously applied by MDL transferee courts, that permits different laws to apply to different

25   claims, depending upon the different degrees of state interest with respect to the operative facts. *Id.*

26   at *85. In applying depecage to the tobacco class action proceeding, the court determined that

27   "while New York has a paramount interest in punishing and deterring misconduct, other states have

28   a concurrent interest in ensuring that their own citizens receive individual relief in line with their

own compensatory scheme." *Id.* at 91.

1    Since the *Price* plaintiffs seek a uniform, equitable nationwide asbestos notification,
2  education and remediation program, they urge application of the law of Montana or, in the
3  alternative, Massachusetts to the tort claims of all class members and the adoption of the depecage
4  principle to permit application of the punitive damage laws of all jurisdictions, in appropriate
5  recognition of the differing state interests on punitive damages.

6                           **(1)    Montana Has The Most Significant Relationship.**

7    In this case, the actionable activity was the fraudulent conduct in Libby, Montana
8  involving the asbestos-contaminated vermiculite mined in Libby and distributed nationwide.  All of
9  the insulation materials were mined in Libby, Montana and the defendants' fraud was centered there.
10  For years, Grace has deliberately made false claims in Montana to health officials denying any
11  connection between the ore that it mined and processed and dangerous health conditions affecting
12  Libby Workers, including high incidences of disease.  Montana's relationship to the dispute is
13  probably more significant than that of any other state.  A state's interest in ensuring that its resident
14  manufacturers and distributors made products safe for public consumption is "not only a cognizable
15  interest but also the paramount interest in its law being enforced." *Butkera v. Hudson River Sloop*
16  *"Clearwater,"* 300 N.J. Super. 550, 554, 693 A.2d 520 (N.J. Super. Ct. App. 1997); *Gantes v.*
17  *Kason Corp.*, 145 N.J. 478, 679 A.2d 106 (N.J. Sup. Ct., 1996) (applying New Jersey law where
18  malfunctioning machine made in New Jersey killed a Georgia resident in Georgia).  Although each
19  state has an interest in compensating its citizens and preventing unlawful business conduct within its
20  jurisdiction, none has a significantly greater interest than Montana.  Because Montana's interest
21  exceeds that of all other interested states, Montana law should apply to all class members' claims.

22    This Court need not resolve with finality which law applies.  For current class
23  certification purposes, it is sufficient to conclude that each rational choice of law ruling will not
24  create difficulties in manageability such that the class vehicle becomes undesirable. As addressed in
25  greater detail, below, class members residing in states which do not recognize punitive damages,
26  New Hampshire, Massachusetts, Louisiana, Nebraska and Washington: may potentially recover
27  punitive damages should the Court apply Montana law; may simply be excepted from any potential
28  punitive damage recovery, should the Court apply the laws of each state for the resident of that state;

1  or may be denied damages, along with class members in all states, should the Court apply

2  Massachusetts law.

3                          **(2)**       **Massachusetts Also Has A Significant Relationship.**

4        A second rational result is that, Massachusetts law applies to the claims of all class

5  members since a great part of the fraud also occurred in Massachusetts. *See Grace v. Perception*

6  *Technology Corp.*, 128 F.R.D. 165, 171-72 (D. Mass. 1989) (applying Massachusetts law to

7  nationwide claims). Specifically, the following conduct is believed to have occurred in

8  Massachusetts.

9            Grace's Construction Products Division ("CPD") had overall
          responsibility for the manufacture and marketing of Zonolite and was
10            headquartered in Cambridge, Massachusetts.

11            Although Grace had expanding plants and other facilities in various
          states, the manufacturing activity was coordinated and supervised
12            through the Cambridge headquarters.

13            The managers at the various plants reported to personnel in the
          Cambridge headquarters.
14

          The marketing, advertising and promotional materials for Zonolite
15            were developed and prepared at the Cambridge headquarters.

16            The marketing, advertising and promotional materials for Zonolite
          were distributed to dealers (and other members of the distribution
17            network) from the Cambridge headquarters.

18            CPD personnel in Cambridge were partially, if not wholly, responsible
          for decisions with respect to the labeling of Zonolite.
19

          CPD personnel in Cambridge were partially, if not wholly, responsible
20            for decisions with respect to whether or not to warn Zonolite
          purchasers or members of the public about the asbestos content of
21            Zonolite and the hazards posed thereby.

22        Defendants may argue that *all* states have a significant interest because the

23  Defendants' conduct resulted in the distribution and installation of their product nationwide, thereby

24  creating a conflict of laws' thicket that prevents the fair and efficient adjudication of the claims

25  arising from this conduct by a single court under a single state's law. Yet this is the precise reason

26  that courts and commentators have recognized the special need for the application of choice of law

27  principles to select one law to adjudicate all claims. There will always be one state with the *most*

28  significant interest in the conduct giving rise to the controversy. *Simon, supra.* The federal courts

1   have long recognized that other states do indeed have an interest:  the interest in seeing the claims

2   adjudicated, rather than having their own laws applied.  Thus, it has been frequently determined that

3   these states would prefer to see the claims proceed on a class basis rather than to see them go

4   unprosecuted.  This is particularly true where, as here, the claims are not susceptible to economically

5   feasible individualized litigation.  *In re Pizza Time Theatre Securities Litigation*, 112 F.R.D. 15

6   (N.D. Cal. 1986).  In *Pizza Time*, defendants had contended that class treatment of dependent tort

7   claims "would be unmanageable because the court would have to apply dozens of separate legal

8   standards."  *Id.* at 17.  The *Pizza Time* court rejected this contention under the controlling *Shutts*

9   analysis, concluding that, whether or not a particular state's law would ultimately be determined to

10  apply, no state had articulated an interest in protecting defendants from liability for wrongdoing, or

11  would insist on having its own law apply at the expense of utilizing the class action mechanism,

12  since no state had a legitimate interest in barring plaintiffs from court:

13       The Court first notes that each of the interested jurisdictions shares the goals of
         deterring fraudulent conduct, protecting those wronged when accused of fraud, and
14       providing a remedy for its residents who have been defrauded . . . .  Each jurisdiction
         has laws prohibiting fraud that accommodate these sometimes competing concerns.  It
15       is evident that the similarities in these laws vastly outweigh any differences.  It is also
         apparent that each jurisdiction would rather have the injuries of its citizens litigated
16       and compensated under another state's law than not litigated or compensated at all.

17  112 F.R.D. at 20.

18       **E.      Notice To the Class  Will Protect Their Procedural Rights and Interests and
                  Assure the Fair Conduct of the Action.**
19
                In addition to seeking certification of all equitable and punitive damages claims,
20
    plaintiffs have also moved this Court to order that notice to be sent to the class.  If this matter is
21
    certified pursuant to Rule 23(b)(2), the provision of notice is within the broad discretion of the
22
    Court; if the matter is certified pursuant to Rule 23(b)(3), notice is required pursuant to Rule
23
    23(c)(2).  *See 2 Newberg on Class Actions* §§ 8-15, at 8-48 through 8-55.  Rule 23(d)(2) gives the
24
    Court discretion to require that notice be given:
25
                *[F]or the protection of the members of the class* . . . of any step in the
26              action, or of the proposed extent of the judgment, or of the opportunity
                of members to signify whether they consider the representation fair
27              and adequate, to intervene and present claims or defenses, or otherwise
                to come into the action.
28
    Rule 23(d)(2) (emphasis added).

1            Rule 23 notice and particularly Rule 23(d)(2) notice enables this Court to exercise its

2 "broad and flexible powers under Fed.R.Civ.P. 23" in order to protect the due process rights of the

3 class by fulfilling its unique fiduciary role in controlling the fair conduct of the action. *Avery v.*

4 *HHS*, 762 F.2d 158, 164-165 (1st Cir. 1985); *see also Manual for Complex Litigation* § 30.213 (3rd

5 ed. 2000), *Quern v. Jordan*, 440 U.S. 332, 335 n.3 (1979); *Fraser*, 180 F.R.D. at 182. Moreover,

6 because class members will, in most instances, not have actual knowledge of changes in the status of

7 their rights as the litigation develops, courts may need to advise class members of their need to

8 protect their rights, by enabling them to make meaningful and informed choices in relation to

9 on-going proceedings. *See id.* (court exercises discretion to order class notice informing members of

10 binding effect of litigation); *see also Barkman v. Wabash, Inc.*, No. 85 C 611, 1988 WL 5039, at

11 *2-3 (N.D. Ill. Jan. 20, 1988*) (notice provides class members with sufficient information to permit

12 intelligent decisions and clearly disclaims any opinion by the court on the merits of the action.);

13 *Manual for Complex Litigation* § 30.211 (3rd ed. 2000) ("In addition, sufficient information about

14 the case should be provided to enable class members to make an informed decision about their

15 participation. Thus, the notice should: . . . explain any special risks of class members, such as being

16 bound by the judgment, while emphasizing that the court has not ruled on the merits of any claims or

17 defenses . . . ."); *Harriss*, 74 F.R.D. 24 (issuing 23(d)(2) notice to promote "the fair conduct of the

18 action" by providing information to, and obtaining information from, the class to guide the court and

19 the parties in making future procedural and case management decisions.).[21/]

20            Thus, Rule 23(d)(2) protects the interest of the class by ensuring that their legal rights

21 are not prejudiced by the litigation itself or some conduct that occurs within the litigation. For

22 example, in *In re Alert Income Partners Sec. Litig.*, MDL 915, No. 92-2-9150 (D. Colo. 1992), Rule

23 23(d)(2) informational notice was employed by the court in order to protect a class of investors by

24 supplying factual information to prevent further losses of money and impairment of rights as a result

25 of defendants' misconduct. In *Barbanti*, the Court found a "neutral" informational notice to be

26

27 [21/]*See also*, Marjorie A. Silver, *Giving Notice: An Argument For Notification Of Putative Plaintiffs In Complex Litigation*, 66 Wash. L. Rev. 775, 789 (1991) ("the purpose of such notice is principally to protect the due process interests of class members"); Debra J. Gross, *Mandatory*

28 *Notice and Defendant Class Actions: Resolving the Paradox of Identity Between Plaintiffs and Defendants*, 40 Emory L.J. 611, n. 167 (1991) (same).

1    appropriate for the class certified under C.R. 23(b)(2) and required that governmental public health

2    agency information on the vermiculite attic insulation hazard be made available to the class.[22]

3    　　　Like the class members in the cases described above (including *Barbanti*), class

4    members here face a potential prejudice for which informational notice is appropriate, both to protect

5    legal rights and to provide important information. Here, the plaintiffs can be prejudiced by an

6    affirmative defense alleged by defendants, namely, failure to mitigate damages. Defendants may

7    argue that if class members in fact disturb the Zonolite Attic Insulation in their homes or fail to hire a

8    professional certified asbestos abatement contractor **after** the date that such precautionary

9    recommendations were provided by the EPA (i.e., September 2000), then class members would have

10    failed to mitigate. (See Grace Answer, Affirmative Defenses 13, 18 and 19.) Although plaintiffs

11    contest this defense, even the possibility of assertion of such affirmative defenses warrants that

12    notice of rights issue. Without such notice the class action could become a "trap" in which rights are

13    waived without knowledge or consent. Of course, such notice in this case would also provide

14    important public health information to the class.

15    　　　The Court's inherent authority under Rule 23, and the Rule 23(d)(2) notice provision,

16    enable the Court to preserve order and integrity in the proceedings by providing material information

17    to class members. Rule 23(d)(2) notice should issue.

18    **F.    Certification of the Class and Issuance of Injunctive Relief Does Not Give Rise to
　　　Any Conflict with a Regulatory Action.**

19

20    　　　Grace can be expected to argue that the doctrine of primary jurisdiction bars this

21    Court from hearing the case. In *Barbanti*, Judge O'Connor considered this defense argument and

22    ─────────────

23    　　[22]The Court specified that the contents of the neutral notice are as follows:

24    　　• Identify the subject-matter of the litigation
　　• Identify the court, participants in the litigation and lead counsel
　　• Identify the criteria for members of the class

25    　　• Identify the implications to the class of certification under CR23(b)(2)
　　• Identify how potential class members should contact plaintiffs' counsel

26    　　• Identify how potential class members can find out information about the litigation, i.e.,
　　　website, newsletter, correspondence etc.

27    　　• Identify how potential class members can access other information about the issues in this
　　　case, i.e. EPA website, State of Washington Department of Health websites, etc.

28

　　(Exhibit 3.)

1    held that, even if Zonolite Attic Insulation is under some consideration by a federal agency such as

2    the EPA, this class litigation should go forward without delay.  Exhibit 1 at 6; Exhibit 2 at 4.

3        **1.    The Doctrine of Primary Jurisdiction Is Inapplicable To Plaintiffs'
               Request For Class Certification and Notice.**

4

5        Class certification and notice are necessary to protect the legal rights of the potential

6    class members.  The doctrine of primary jurisdiction only comes into play where **both a court and**

7    **an agency** have jurisdiction over the issue presented, and in that case the doctrine guides the court in

8    determining whether and when it should refrain from proceeding with the matter and allow the

9    agency to resolve the issue.  *See PHC, Inc. v. Pioneer Healthcare Inc.*, 75 F.3d 75, 80 (1st Cir.

10   1996); *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir. 2000).  Under Rule

11   23, the class certification and notice issue presented here is a matter of legal rights and fair

12   procedure, and this subject matter is vested exclusively in the Court.  Therefore, the doctrine of

13   primary jurisdiction has no applicability to the class certification and notice issue before the Court.

14       **2.    The Doctrine of Primary Jurisdiction Should Not Be Invoked Because
               The Relief Requested Does Not Conflict With Any Government
               Regulation.**

15

16       Defendants' primary jurisdiction argument ignores the existence of countless federal

17   and state cases involving highly regulated products and activities in which courts exercised their

18   authority to determine common law and statutory rights.  Examples span a wide range of litigation,

19   from the nationwide litigation of asbestos in schools, where the EPA regulated abatement activity; to

20   the recent example of a court-ordered recall of faulty TFI ignition switches in Ford automobiles,

21   even though the U.S. Department of Transportation regulates cars and orders recalls.  *See In re*

22   *Asbestos School Products Liability Litigation*, 606 F. Supp. 713 (J.P.M.L., Apr. 10, 1985) (No. 624);

23   *Howard v. Ford Motor Co.*, No. 763785-2, at 21 (Ca. Super. Ct. Alameda County).[23/]

24       Here, like *Asbestos School Products*, *Howard*, *Diet Drugs* and *Naef*, this Court is

25   fully authorized to order a common law remedy if it finds sufficient merit in the evidence supporting

26   the request.  *See also In re General Motors Corp.*, 55 F.3d at 811.

27       [23/]*See also In re Diet Drugs; Brown*, 2000 U.S. Dist. LEXIS 12275 (certification and notice
     to class of users of prescription diet pills regulated by FDA); *Naef v. Masonite Corp.*, No.
28   CV-94-4033 (Ala. Cir. Ct. Mobile County March 7, 1996) (class certification and notice to
     homeowners regarding faulty Masonite hardboard siding).

1       Certification of a homeowner class and provision of the injunctive relief requested

2 here would not conflict with nor in any way interfere with an ongoing agency action or any existing

3 statutory or regulatory scheme. *See Avery v. HHS*, 762 F.2d at 164-165 ("[A]bsent a clear statement

4 to the contrary, legislation should not ordinarily be interpreted to oust a federal court's equitable

5 power, or its jurisdiction over a pending case."); *In re General Motors*, 55 F.3d at 811 (Court

6 expressed view that the court could order remediation in an auto defect case, even though NHTSA

7 had considered the defect and already ordered a limited remedy.).

8       The doctrine of primary jurisdiction guides courts in deciding when to await agency

9 determinations in the context of ongoing litigation. *PHC Inc.*, 75 F.3d at 80.  Factors to consider in

10 determining the application of the doctrine include "expertise of the agency, avoidance of conflicts,

11 indications of legislative intent . . . ." *Id.*; *see also Pejepscot Indus. Park Inc. v. Maine Central R.R.

12 Co.*, 215 F.3d 195, 205 (1st Cir. 2000); *Cal-Almond Inc. v. Dept. of Agriculture*, 67 F.3d 874, 882

13 (9th Cir. 1995) *vacated on other grounds*, 521 U.S. 1113 (1997); *Wilson v. Amoco Corp.*, 989

14 F.Supp. 1159, 1169 (D. Wyo. 1998).

15       Government regulation does not cover **residential** uses of asbestos-containing

16 materials and few consumer products that contain asbestos are regulated. Vermiculite attic

17 insulation, which Grace withdrew from the market in 1984, has never been regulated.[24]  No

18 rulemakings that might impact this action are open,  thus there is no regulatory action to wait for or

19 to protect from alleged interference.  All that has happened is that CPSC and EPA have made limited

20

---

21     [24]The EPA and CPSC have regulated asbestos in some consumer products.  Their actions in this capacity have been limited to the following:

22     •    In 1977 the CPSC banned two products containing asbestos, consumer patching

23 compounds and artificial emberizing materials (ash and embers). 16 C.F.R. §§1304, 1305.

24     •    In 1986 the CPSC announced a policy to pursue enforcement against asbestos-containing consumer products not bearing labels warning of the hazards

25 associated with asbestos.  Notice of Enforcement Policy, 51 Fed. Reg. 33910 (Sept. 24, 1986).  (According to Grace, even if Zonolite had been on the market in 1986, it

26 would not have been covered by this policy.  (Affidavit of Bertram Price at 15, Exhibit 1 to Defendants' Opposition to Notice in *Price*.)

27

28     •    In 1989 EPA issued a ban on the manufacture, import and distribution of flooring felt, commercial paper, corrugated paper, rollboard and specialty paper containing asbestos. 40 C.F.R. §763, Subpart I.

1   consumer information on asbestos products and asbestos in the home publicly available. Together
2   the agencies produced a booklet, Asbestos in Your Home. Other publications include Asbestos in
3   Attic Insulation (Exhibit 30), and Q&A Regarding Vermiculite Insulation (Exhibit 29). These
4   agency publications, while serving an information function, hardly constitute a comprehensive
5   statutory or regulatory scheme governing vermiculite attic insulation.

6          None of the various regulatory programs that pertain to asbestos, nor the "Superfund"
7   action in Libby, Montana, where the Grace mine and plant are located, amount to a comprehensive
8   regulatory scheme addressing vermiculite attic insulation. The Superfund statute (CERCLA) does
9   not provide for remedial actions in residential buildings. See Unilateral Administrative Order for
10  Removal Response Activities, Libby Asbestos Site, Attachment 1 at 2-6; 42 U.S.C. § 9604(a)(3); see
11  also First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 868 (4th Cir.
12  1989) (holding that CERCLA does not encompass asbestos-removal actions); Prudential Ins. Co. of
13  America v. U.S. Gypsum Co., 711 F. Supp. 1244, 1254-55 (D.N.J. 1989) (finding that the sale of
14  asbestos products does not constitute disposal, and therefore is not covered by CERCLA). Thus,
15  vermiculite attic insulation is not encompassed by a comprehensive statutory or regulatory scheme.

16         Federal courts have found that where court action is consistent with on-going
17  regulatory efforts, and will actually advance those efforts, abstention is not necessary under the
18  doctrine of primary jurisdiction. L.E.A.D. v. Exide Corp., 199 WL 124473*22 (E.D. Pa. 1999); see
19  also PHC, 75 F.3d at 80; Wilson, 989 F. Supp. at 1169. Here, such is the case.

20         In sum, the vermiculite attic insulation at issue is not governed by a comprehensive
21  regulatory scheme and the injunctive relief requested here would not conflict with any agency matter.
22  Therefore the doctrine of primary jurisdiction does not apply.

23  **V.    CONCLUSION**

24         This is an appropriate case for class treatment. The proposed class is large, the class
25  representatives and counsel are adequate and their claims are typical, common legal and factual
26  issues predominate, and injunctive relief and punitive damages applicable to the whole class is
27  sought. This motion presents the Court with a unique opportunity to certify class claims to promote
28  the prevention of injuries and harm before they occur, a prospect which is far better than simply

1    adjudicating injury claims which could have been prevented in the first instance.  Accordingly, the

2    Court should certify the class of all owners and occupiers of real property located in United States in

3    which Zonolite attic insulation has been installed; designate plaintiffs as class representatives; and

4    appoint the *Price* counsel and Plaintiffs' Executive Committee as class counsel.

5    DATED:   January 23, 2001                      Respectfully submitted,

6
                                                 By: _____
7                                                        Elizabeth J. Cabraser,
                                                         Plaintiffs' Executive Committee and as
8                                                        Proposed Class Counsel

9                                                Elizabeth J. Cabraser
                                                 Fabrice N. Vincent
10                                               John Low-Beer
                                                 LIEFF, CABRASER, HEIMANN
11                                                  & BERNSTEIN, LLP
                                                 Embarcadero Center West, 30th Floor
12                                               275 Battery Street
                                                 San Francisco, CA  94111
13                                               Telephone:  (415) 956-1000
                                                 Facsimile:  (415) 956-1008

14
                                                 and
15
                                                 By: _____
16                                                       Thomas M. Sobol (BBO No. 471770)
                                                         Proposed Class Counsel
17
                                                 Thomas M. Sobol (BBO No. 471770)
18                                               Jan R. Schlichtmann
                                                 LIEFF, CABRASER, HEIMANN
19                                                  & BERNSTEIN, LLP
                                                 214 Union Wharf
20                                               Boston, MA  02109-1216
                                                 Telephone:  (617) 720-5000
21                                               Facsimile:  (617) 720-5015

22

23

24

25

26

27

28