//29/01



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:                                          )
                                                )   MDL Docket No. 1376
ZONOLITE ATTIC INSULATION                       )
PRODUCTS LIABILITY LITIGATION                   )   The Honorable Patti B. Saris, Presiding
                                                )
————————————————————————  )
THIS DOCUMENT RELATES TO:                        )
ALL ACTIONS                                      )
————————————————————————  )

## GRACE'S MEMORANDUM CONCERNING THE MERITS

W.R. Grace & Company and W.R. Grace & Company (Conn.) (collectively referred to for the purposes of this document as "Grace"), pursuant to this Court's suggestion at the January 4, 2001 case scheduling conference, submits the following statement on the merits of these cases.[1]

### INTRODUCTION: ZONOLITE ATTIC
### INSULATION IS NOT HAZARDOUS

Zonolite Attic Insulation ("ZAI") is safe. The presence and sporadic disturbance of ZAI in homes is not hazardous to human health. This was true from the time ZAI began being sold to insulate unfinished attics through today, more than sixteen years after Grace stopped selling the product. ZAI has effectively insulated houses across America for several decades without harming the people living in those homes. These lawsuits are not driven by real homeowners with real problems, but by lawyers seeking to capitalize on the public's fear

---

[1]     Grace offers this memorandum as a discussion of the factual merits of the case, not as a brief of the numerous legal issues and defenses that will be advanced in these proceedings such as statute of limitations and statutes of repose.

of anything relating to asbestos and the illusion that what has been a completely innocuous product for many many years is now a serious threat.

Scientific testing and medical analysis has shown that ZAI does not present a hazard to human health. In this memorandum, Grace will show the following:

- When viewed from a scientific perspective, ZAI is safe. Scientific analysis of ZAI has shown that the product contains at most miniscule amounts of asbestos. The asbestos content by weight of ZAI has been measured at between **1/100th and 1/1000th of one percent**. Scientific testing of the air in homes with ZAI has found almost non-detectable or zero asbestos levels. In tests by the Environmental Protection Agency ("EPA"), the highest asbestos air concentration was 0.0003 fibers per cubic centimeter. This is hundreds of times lower than the permissible occupational exposure level of 0.1 fibers per cc for eight hours set by the Occupational Safety and Health Administration ("OSHA").

- When viewed from a medical health perspective, ZAI is safe. Medical and epidemiological data demonstrates that there is no health hazard from sporadic potential exposure to the trace amounts of asbestos that may be present in ZAI. Asbestos is ubiquitous. All adults living in urban areas are exposed to low levels of asbestos in the ambient air and have millions of asbestos fibers in their lungs without any adverse effect on human health. Even if the exposure levels from attics of homes with ZAI was at 0.1 fibers per cc, which they are not, a homeowner would have to be exposed at that level for a minimum of eight hours a day for fifty years to even be at a risk of an asbestos-related disease.

- When viewed from an industrial hygiene perspective, ZAI is safe. Due to the manner in which ZAI is utilized, ZAI in homes does not result in exposure to significant asbestos fibers. The location of the insulation in unfinished attics or sealed behind boards eliminates any possibility of disturbance sufficient enough and long enough to release a potentially hazardous amount of asbestos.

- Federal regulatory agencies have known about the presence of minute trace amounts of naturally-occurring asbestos in ZAI for decades and decided not to regulate

it.  These agencies have recognized that the potential for on-going exposure to asbestos from ZAI is "remote".

Each of these perspectives were recently examined in a three-day preliminary injunction hearing before Judge Kathleen O'Conner in Spokane, Washington in a ZAI state court class action brought by some of the same plaintiffs' lawyers involved in these actions.[2] After the three-day hearing, Judge O'Connor denied Plaintiffs' motion for a preliminary injunction, rejecting the Plaintiffs' assertions that an emergency health hazard exists.[3]

## HISTORY OF ZAI

ZAI was made of an expanded mineral known as vermiculite.  Grace never added asbestos to ZAI and vermiculite itself is not asbestos.  However, vermiculite ore extracted from Grace's Libby, Montana vermiculite mine contained small amounts of a naturally-occurring mineral called tremolite asbestos.[4] Almost all of the asbestos in the ore was eliminated as the vermiculite was milled at the mine.

After the milling process, the material was shipped from the mine to expanding plants across the country.  At these expanding plants, the vermiculite was processed through high temperature furnaces where the heat caused the vermicullte to expand into a puffy product with excellent insulating qualities.  During expansion, nearly all of the remaining tremolite asbestos was eliminated.  Scientific experts for Grace and for the Plaintiffs in Barbanti found that the asbestos content by weight of ZAI is between 1/100th and 1/1000th of one percent.

---

2    Barbanti v. W.R. Grace & Co., et al., in the Superior Court of the State of Washington, For Spokane County at No. 00201756-6,  is referred to herein as the "Barbanti" case.

3    Testimony proffered in the Barbanti case is referenced throughout this Memorandum and portions of the hearing transcripts are submitted with this Memorandum in a separate Appendix.

4    Asbestos is a general term that describes a family of related mineral fibers. Amphibole refers to a type of asbestos fibers that share similar mineral structures. Amphiboles include tremolite, amosite, crocidolite, and actinolite.

ZAI was used for decades as an easy-to-apply, loose fill insulation product that could significantly increase the insulation value in a home. ZAI was primarily used in unfinished and uninhabited attics. It was normally poured into the spaces between the joists of the attic floor, or poured on top of existing fiberglass or mineral wool insulation to provide an additional insulation layer. The insulated attic space either was unfinished and not used by the homeowner, or to the extent a homeowner wanted to use the unfinished space, ZAI would be covered with plywood or lumber. As a result, there is minimal contact with ZAI by a homeowner.

After years of steadily declining sales due to increasing popularity of competing products such as fiberglass, Grace ceased selling ZAI in 1984.

## SCIENTIFIC ANALYSIS DEMONSTRATES THAT
## THE AMOUNT OF ASBESTOS IN ZAI IS MINUTE

Bulk sample analysis is the process of determining the amount of asbestos in a solid piece of material. (Affidavit and Testimony of Dr. Richard J. Lee, Appendix at Tabs A and B, respectively, p. 51:19-25.)[5] In the Barbanti case, bulk sample analysis from the plaintiffs' homes resulted in a finding of asbestos fibers by weight of $1/100^{th}$ of one percent to $1/1000^{th}$ of one percent in the attic insulation material. (Lee Testimony, pp. 52:23-53:22.)

Grace's findings were consistent with the findings of Plaintiffs' attorneys own expert. Ernest R. Crutcher conceded that the percent of asbestos by weight of bulk samples from the Plaintiffs' residences could be in the range of 1/100th to 1/1000th of one percent. (Deposition of Ernest R. Crutcher, Appendix at Tab C, p. 146:23-25; Lee Testimony, Tab B, p.54:1-14.)

---

[5]   **Dr. Lee** holds a Ph.D. in Theoretical Solid State Physics. Dr. Lee has worked with the EPA in the development of methodologies to identify and quantify the amount of asbestos in air and bulk materials, including performing the laboratory analysis of the EPA's major study on airborne levels of asbestos in public buildings. Dr. Lee has consulted with over 500 government, corporate, educational and scientific organizations, including NASA, the Army, Navy, FBI and the General Services Administration.

In addition to bulk sampling, air sampling data was also collected from the Barbanti Plaintiffs' homes. The results of that analysis found either non-detectable or only background levels of asbestos.

> Q.     Dr. Lee, what did you find in terms of the presence of asbestos fibers in these homes in [the Washington State litigation]?
>
> A.     We basically found no -- almost no asbestos. We found one fiber indoors and one fiber outdoors, in whatever number of homes we analyzed.
>
> Q.     Was the air quality within the OSHA permissible exposure limits?
>
> A.     Far below it.
>
> Q.     Was it within the EPA's clean air criteria after an abatement.
>
> A.     Far below it.

(Lee Testimony, p. 62:5-20.)

In addition to the Barbanti Plaintiffs' homes, homes containing vermiculite insulation in Libby, Montana, where vermiculite was mined and processed for a number of years, were tested by the EPA. The EPA's air sampling of the Libby homes found that the highest indoor air concentration was 0.0003 fibers per cubic centimeter, hundreds of times lower than the maximum exposure level allowed by the EPA for re-occupancy after an abatement. In fact, most of the EPA's air samples from the Libby homes did not find any asbestos fibers at all. (Lee Testimony, pp. 62:21-63:12.)

In Barbanti, Plaintiffs attempted to artificially skew the circumstances under which testing is done in the hope of raising the air concentration levels to show a potential hazard from renovations or disturbance of the vermiculite insulation.

Plaintiffs' self-created hazard is flawed in two ways. First, the Plaintiffs artificially created an environment that was unrealistic based upon the practical application of ZAI. Second, the testing protocol and counting methods utilized by the Plaintiffs were scientifically flawed.

The Barbanti Plaintiffs themselves testified about how infrequently ZAI was even remotely disturbed in their own homes. Under normal living conditions, homeowners rarely, if ever, come into contact with or disturb ZAI in their unfinished attics. More significantly, the disturbance activities that Plaintiffs' experts tried to simulate did not and would not elevate the air concentrations to a sufficient level for a prolonged period of time to create a risk. Based upon the level and duration of exposure that is required to cause an increased health risk, and the miniscule amount of asbestos in ZAI, it would be rare for a homeowner to disturb the insulation enough to create a hazardous exposure level, much less sustain that level for the minimum duration necessary to create a risk. (Declaration and Testimony of Dr. Morton Corn at Appendix Tab D and Tab E, respectively.)

The second flaw in Plaintiffs' simulated testing is that the air sampling data is unreliable due to the questionable methods of its preparation. The renovation or disturbance "hazard" is a result of Plaintiffs' attorneys relying on "junk science". Plaintiffs' methods of analysis did not comply with the standards required under OSHA or the National Institute of Occupational Safety and Health ("NIOSH"), which are the generally accepted analysis and fiber counting protocols. The faulty techniques used by the Plaintiffs caused an artificially increased asbestos count.

The testing protocol used by Plaintiffs is known as "indirect sample preparation." Indirect sample preparation breaks up asbestos fibers into smaller thinner particles and thereby increases the number of particles that are counted in the sample. This artificially increases fiber counts from a factor of two to a factor of one thousand. (Lee Testimony, p. 64:12-24, pp. 67:2-68:22.) As a result, Plaintiffs obtained inflated results.

Further, Plaintiffs' collection of air samples did not comply with approved regulatory methods. Plaintiffs did not collect the requisite amount of air required for a valid testing volume. (Lee Testimony, p. 69:4-22.) Plaintiffs also failed to count correctly the fibers they found according to the recognized standards. As a result, the Plaintiffs' air sampling data overestimates the number of asbestos fibers in the air samples.

The results that the Barbanti Plaintiffs obtained from their faulty air sampling also were not adjusted for time-weighted averages. The time-weighted average is the average

concentration of exposure per an eight-hour day. (Lee Testimony, pp. 71:17-72:3.) It is not only scientifically necessary, but common sense to adjust for the actual exposure level and duration.

Even if the Plaintiffs' data were scientifically valid despite the unrealistic testing environment and the numerous computation errors, the time-weighted average exposure in an attic would be 0.1 to .05 fibers per cc. (Lee Testimony, p. 76:24-10.) At these levels, a homeowner would have to be exposed at least **eight hours a day for 12,000 days in order to be at a risk of an asbestos related disease**. Simply stated, the minute amount of asbestos in ZAI, even if disturbed, cannot create any legitimate health risk to homeowners.

### FROM AN INDUSTRIAL HYGIENE STANDPOINT, THERE IS NO HEIGHTENED RISK THAT ANY RESIDENT IN A BUILDING CONTAINING ZAI WILL SUFFER FROM AN ASBESTOS-RELATED DISEASE

Decades of air monitoring in buildings that contain materials with asbestos levels far greater than found in ZAI have shown that there are no more asbestos fibers in the air inside buildings than in the outside air. (Declaration of Dr. Morton Corn, Tab D, ¶ 18.)[6]  No meaningful data suggests that the situation is at all different for ZAI. Dr. Morton Corn, the former head of the Occupational Safety and Health Administration ("OSHA"), inspected the houses of putative class members in the <u>Barbanti</u> litigation for potential exposure to dust from ZAI. (Corn Testimony, Tab E, p. 112:3-5.) He found that "the vermiculite attic insulation present in the homes does not pose an increased or significant risk to the health of the occupants[.]" (Declaration of Dr. Corn, ¶ 22.)

---

[6]   **Dr. Corn** holds advanced degrees in industrial hygiene and sanitary engineering from Harvard University. Dr. Corn is the former head of the Occupational Safety and Health Administration ("OSHA"). He has provided consultation to the World Health Organization, the Surgeon General of the United States, the Air Force, the Atomic Energy Commission, the Department of State and the Department of Energy. In 1996 Dr. Corn was named one of the ten most influential industrial hygenists in the United States.

Since ZAI is located in unfinished attics, and there is minimal opportunity for prolonged disturbance of the material, Dr. Corn opined that there is an insignificant probability that exposure to airborne fibers would occur. (Id. ¶ 23.) OSHA regulations that require control measures when working with asbestos materials are triggered, if at all, by air concentration levels. The method of controls under OSHA are graduated in conjunction with airborne asbestos levels. The initial level that triggers control methods is a time-weighted average of 0.1 fibers per cc.

The occasional disturbance of ZAI by homeowners through renovations or other activities also would not pose any significant health risk even if the activity were undertaken without protection because the cumulative exposure would be minimal. The OSHA permissible exposure level is 0.1 fibers per cc, 8 hours a day, 50 weeks per year for 45 years. Given the low or undetectable, asbestos levels in homes with ZAI, even if it is disturbed, homeowners would never approach the OSHA threshold level. (Corn Testimony, pp. 116:19-117:20.) Thus, "intermediate exposure during the attic remodeling or renovations would not have any health significance." (Declaration of Dr. Corn, ¶ 23.)

### THERE IS NO MEDICAL RISK FROM EXPOSURE TO TRACE AMOUNTS OF ASBESTOS CONTAINED IN ZAI

Medical science teaches that exposure to low levels of asbestos is not harmful to human health and does not create a risk of disease. (November 29-30, 2000 testimony of William E. Hughson, M.D., Appendix at Tab F.)[7] Whether a person is at an increased health risk from exposure to asbestos depends on the level of exposure (the dose), and the duration of the exposure (time). The type of asbestos fibers, and the size of the fibers are also factors that determine whether an asbestos health risk exists.

_____

7       **Dr. Hughson** is board-certified in internal medicine and pulmonary diseases in occupational medicine. Dr. Hughson has a private practice and is a clinical professor of medicine at the University of California at San Diego. He also holds a Ph.D. in epidemiology and has researched extensively in the area of occupational injuries and disease resulting from asbestos exposure. (Hughson Testimony, pp. 171:21-174:13.)

In order to be at risk of an asbestos-related disease, an individual must have a significant cumulative lifetime exposure to asbestos that as a practical matter is not possible from ZAI, given the extremely low or non-existent levels of asbestos in the respirable air of homes insulated with it.

The claim that every exposure to asbestos can cause harm to human health is not supported by medical evidence or common sense. Asbestos is a naturally-occurring mineral present in every urban environment. All people in urban environments have many asbestos fibers in their lungs. It has been estimated that the average person in the United States breathes approximately 2,000 asbestos fibers per day. (Hughson Testimony, p. 184:7-18.) Most adults have about ten million asbestos fibers in their lungs simply from breathing ambient air. (Hughson Testimony, pp. 184:19-185:13.) The presence of this level of asbestos fibers has no pathological or toxic effect on the human body:

> Q.    So that person with ten million fibers in the general population doesn't have an asbestos disease.
>
> A.    No. X-ray would be normal. Pathology would be normal. Pulmonary function would be normal.    Everything would be normal.

(Hughson Testimony, p. 185:14-18.)

Plaintiffs' claims of a health risk from alleged exposure to trace amounts of asbestos are invalid. There is no evidence that exposure to the levels of asbestos in the ambient air over an entire lifetime causes any increased incidence of asbestos-related disease.    The asbestos levels of homes with ZAI are no higher than the ambient air levels everyone breathes.

Low levels of asbestos exposure do not cause disease because the human body's built-in defense mechanisms guard against the hundreds of thousands of foreign particles and bacteria everyone breathes every day. (Hughson Testimony, pp. 179:17-181:19.) Mucous membranes that line the nose, throat and lungs as well as silia catch and filter airborne particles in the air people breath. Other cells and channels called lymphatics vacuum and clean-up those particles that may get past these initial defense mechanisms.

The body's defense mechanisms can also ingest and destroy asbestos fibers up to a certain size. Thus, in the context of medical hazard for the purpose of evaluating potential risk from asbestos exposure, only those fibers that are greater than five microns in length are believed to have any toxic effect or to cause disease. (Hughson Testimony, pp. 182:8-183:16.) This is because the smaller fibers are eliminated by the body's defense mechanisms.

The basic pathology of asbestos-related diseases explains why there is no health risk posed by the low asbestos levels in ZAI. Prolonged exposure to high levels of airborne asbestos fibers is associated with certain non-malignant (noncancers) and malignant (cancers) diseases. Non-malignant diseases include asbestosis (a scarring of the lungs) and pleural plaques (thickening of lung tissue or the lining of the chest cavity). Malignancies associated with asbestos include lung cancer of the type caused by smoking and mesothelioma (a tumor in the lining of the chest or abdomen). (Hughson Testimony, pp. 177:18-178:20.) Asbestosis and lung cancer require a high exposure to asbestos to initiate the disease process. Mesothelioma and pleural plaques also require a high level of exposure, but comparatively less. (Hughson Testimony, pp. 178:21-179:16.)

The levels of potential exposure to respirable asbestos fibers from ZAI is simply too low cause these diseases. As previously noted, adults in the general population of the United States have millions of asbestos fibers in their lungs from breathing background ambient air, without any adverse effect. (Hughson Testimony, pp. 192:10-193:25.)

There are a number of seemingly benign substances such as water and sunlight which can be toxic at certain levels. Too much water can delete electrolytes causing seizures and death. Too much sun can cause sunburn and prolonged exposure can cause cancer. These are examples of substances which, under normal circumstances, are not harmful but in high doses can be toxic. (Hughson Testimony, p. 2:7-19.) A common phrase used in medicine is that: "the poison is in the dose." If something is potentially harmful, as the amount of exposure increases, the risk of getting the disease increases. (Hughson Testimony, p. 186:1-4.) This concept is known as the "dose-response relationship".

Dose-response refers to the level of exposure by quantity and duration. The exposure requires adjustment to what is known as time-weighted average. That is, because the levels of asbestos fibers one may be exposed to during a day fluctuates depending upon a number of variables, the asbestos level is adjusted or averaged out to more accurately quantify the actual level of exposure. (Hughson Testimony, p. 188:5-23.) This takes into account that individuals are not consistently exposed at the same level. Once time-weighted average exposure is determined, it is multiplied by the number of years of exposure at that level to determine the cumulative life-time exposure level. This cumulative dose, usually expressed in terms of "fiber per ml year" or "fiber per cc year," dictates the potential risk of developing an asbestos disease. (Hughson Testimony, pp. 188:5-190:10.)

In Barbanti, Dr. Hughson testified that the level of asbestos exposure necessary to create a risk of asbestosis or lung cancer is at least 25 fibers per cc years. The exposure threshold is lowered for mesothelioma, but it is still at about 5 fibers per ml years. (Hughson Testimony, p. 195:13-19.)

These cumulative dose levels are significant. The current OSHA permissible exposure limit for asbestos is 0.1 fibers as a time-weighted average, far in excess of the level found in homes with ZAI. A worker working at that time-weighted average exposure would have to work at that level for 250 years before there would be a risk of asbestosis or lung cancer and 50 years for a risk of mesothelioma. (Hughson Testimony, pp. 195:3-196:19.)

With respect to exposure from ZAI, under normal living conditions there is essentially no exposure. (Hughson Testimony, November 30, 2000, pp. 6:1-7:6.) Dr. Hughson stated as follows:

> [The plaintiffs] would never be at risk of an asbestos-related disease because there's essentially no exposure, particularly since there is no tremolite detected and since TEM transmission electronic microscopy was used, which is the most sensitive method of detection. There is no exposure, therefore there cannot be any risk.

(Hughson Testimony, p. 7:1-6.)

Even if a home owner would disturb attic insulation for a full eight-hour time period and cause an exposure at the level of 0.1 fibers per cc as a time-weighted average, a resident

would have to be in that attic and exposed at that level for **fifty years or twelve thousand days** in order to reach the 5 fiber years per cc threshold level for a mesothelioma risk. (Hughson Testimony, pp. 7:15-8:22.)    Such a continuous and prolonged exposure is unrealistic.

## FEDERAL REGULATORY AGENCIES
## HAVE STUDIED VERMICULITE FOR DECADES

For more than thirty years, federal government agencies have been closely involved in studying and regulating potential hazards posed by asbestos-containing products. This area is covered by a host of regulatory schemes, addressing areas ranging from workplace safety to environmental protection to consumer protection. Conversely, despite historical and recent activities of these agencies with respect to vermiculite products in particular, there has been no regulation or ban of vermiculite products, as no health risk has been found. This is in large part due to the miniscule trace amounts of asbestos in ZAI.

If a product contains less than one percent by weight of asbestos, the EPA does not classify the product as "asbestos-containing" subject to regulation. The asbestos content of ZAI is at or below 1/100th of one percent. The EPA has noted, "at very low exposure levels [to asbestos], the risk may be negligible or zero". (Affidavit of Dr. Bertram Price, Appendix at Tab G, p. 13.)

The Plaintiffs will no doubt attempt to piece together documents or, more likely, parts of documents taken out of context in order to concoct some theory that Grace believed ZAI was harmful and mislead regulators. A fair reading of documents, in their entirety and in context, shows that Grace always believed ZAI to be safe, and regulatory agencies were fully aware of contamination of vermiculite with trace amounts of asbestos. In truth, the efforts of regulatory agencies with respect to the study of vermiculite were anything but uninformed and include the following:

- Since 1977, the Consumer Product Safety Commission ("CPSC") has investigated the safety of asbestos-containing products and has the authority to ban any that it deems unsafe. CPSC began investigating vermiculite insulation with trace amounts of asbestos in the early 1980s. Grace provided CPSC with

- 12 -

its results of air testing upon installation of ZAI and pointed out that while detectable fibers were generated, the product would be used only two or three times in a person's lifetime.  The CPSC elected not to ban or regulate such products. (Price Affidavit, pp. 2-3.)

- The Environmental Protection Agency ("EPA") has studied potential vermiculite exposure since the early 1980s.  It has made a comprehensive effort to obtain data, including contracting with several private scientific consultants. The EPA has been actively involved in exposure and risk assessment studies.  It has specifically evaluated the potential health hazard from ZAI.  In an exposure assessment published by the EPA in 1985, the EPA concluded that "[O]nce in place, vermiculite attic insulation would probably not lead to subsequent consumer exposure.  The type of attic in which vermiculite is used is ordinarily isolated from the rest of the home and is not regularly entered."   (Price Affidavit, p. 9.)

- The EPA's current web page concludes:  "[D]ue to the physical characteristics of vermiculite, there is a low potential the material is getting into the air.  If the insulation is not exposed to the home environment -- for example, it's sealed behind wallboards and floorboards or is isolated in the attic which is vented outside -- the best advice would be to leave it alone."  (EPA Region I Web Site: "Q&A Regarding Vermiculite Attic Insulation", emphasis added.)

- In the EPA's guidance document on asbestos-in-buildings, with respect to products containing more than ten times as much asbestos as ZAI, the EPA has stated: "[T]he average airborne asbestos levels in buildings seems to be very low . . . the health risks to most occupants appears to be very low." (Price Affidavit, p. 13 quoting Managing Asbestos in Place:  A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials, EPA 20T-2003, July 1990.)

The presence of trace amounts of asbestos in ZAI has been known to regulators for over twenty years.  The EPA has studied and regulated asbestos products due to health

concerns. However, because the amount of asbestos that may be present in ZAI is so miniscule, ZAI is not classified as "asbestos-containing" by the EPA and is not subject to regulations. The EPA has not and does not regulate vermiculite products.

## CONCLUSION

ZAI is safe. This unqualified truth is supported by scientific analysis of the product, the practical applications of the product when viewed from an industrial hygiene perspective, and medical/epidemiological data.

- ZAI contains less than one one-hundredth of one percent by weight of asbestos. The asbestos levels in the air of homes with ZAI are either non-detectable or the same as the background ambient air we all breathe every day.

- ZAI is primarily used in vented attics sealed off from the living spaces of homes. The level of asbestos in homes with ZAI, even if disturbed, is far below permissible exposure levels. A homeowner simply would not be exposed to ZAI at significant levels for a prolonged period of time to be at any health risk.

- Everyone is exposed to background levels of asbestos in the ambient air breathed every day without any adverse health effects. Medical studies show that exposure to low levels of asbestos is not harmful to human health.

- Regulatory agencies with the resources of the federal government have known about the potential contamination of raw vermiculite with trace amounts of asbestos for decades.

Because ZAI is safe and does not pose any health risk to owners, it is not defective. There is no new crisis here that creates a legitimate risk to homeowners. Rather, Plaintiffs' attorneys have only attempted to create a "vermiculite litigation industry" out of a product that has been used successfully and without hazard for over fifty years. The Plaintiffs cannot succeed on their concocted strict liability, negligence, fraud claims or any other legal theory asserted in the various ZAI cases nationwide.

**Counsel for Grace Defendants:**

Robert A. Murphy
Casner & Edwards
One federal Street
Boston, MA 02110
Telephone: 617-426-5900
Facsimile: 617-426-8810

James J. Restivo
Lawrence E. Flatley
Douglas E. Cameron
James W. Bentz
Stephen J. Del Sole
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219
Telephone: 412-288-3131
Facsimile: 412-288-3063

Arlene Fickler
Hoyle, Morris & Kerr LLP
One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA 19103
Telephone: 215-981-5850
Facsimile: 215-981-5959

By: _____

## CERTIFICATE OF SERVICE

I, Robert A. Murphy, hereby certify that on January 29, 2001, I caused to be served copies of the following documents:

1.    Grace's Memorandum Concerning the Merits;

2.    Appendix of References to Grace's Memorandum Concerning the Merits; and

3.    Certificate of Service.

upon the following counsel by hand delivery:

> Elizabeth J. Cabraser, Esq.
> c/o Thomas M. Sobol, Esq.
> Leiff, Cabraser, Heimann & Bernstein, LLP
> 214 Union Wharf
> Boston, MA  02109-1216

> James R. Carroll, Esq.
> Skadden, Arps, Slate, Meagher & Flom, LLP
> One Beacon Street
> Boston, MA  02108

and upon the following counsel by Federal Express overnight delivery:

> David Pastor, Esq.
> Gilman and Pastor, LLP
> 999 Broadway
> Saugus, MA  01906

> Edward J. Westbrook, Esq.
> Robert M. Turkewitz
> Ness Motley Loadholt Richardson & Poole
> 28 Bridgeside Blvd.
> P.O. Box 1792
> Mt. Pleasant, SC  29465

> John J. Stoia, Jr., Esq.
> Milberg Weiss Bershad Hynes & Lerach, LLP
> 600 West Broadway
> 1800 One America Plaza
> San Diego, CA  92101-5050

John A. Cochrane, Esq.
Cochrane & Bresnahan, P.A.
24 East Fourth Street
St. Paul, MN 55101

Frederick P. Furth, Esq.
The Furth Firm
201 Sansome Street, Suite 1000
San Francisco, CA 94104

Stephen M. Tillery, Esq.
Carr, Korein, Tillery, Kunin, Montroy, Cates,
    Katz & Glass, LLC
10 Executive Woods Court
Swansea, IL 62226

Harvey N. Jones, Esq.
Sieben, Polk LaVerdiere, Jones & Hawn, P.C.
999 Westview Drive
Hastings, MN 55033

Sheila Birnbaum, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036

Robert A. Murphy

52000.43/176111

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**FILE COPY**

In re: )
)
) MDL Docket No. 1376
ZONOLITE ATTIC INSULATION )
PRODUCTS LIABILITY LITIGATION ) The Honorable Patti B. Saris, Presiding
)
_____ )
THIS DOCUMENT RELATES TO: )
ALL ACTIONS )
_____ )

## APPENDIX OF REFERENCES TO
## GRACE'S MEMORANDUM CONCERNING THE MERITS

### Counsel for Grace Defendants:

Robert A. Murphy
Casner & Edwards
One Federal Street
Boston, MA  02110
Telephone:  617-426-5900
Facsimile:  617-426-8810

James J. Restivo
Lawrence E. Flatley
Douglas E. Cameron
James W. Bentz
Stephen J. Del Sole
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA  15219
Telephone:  412-288-3131
Facsimile:  412-288-3063

Arlene Fickler
Hoyle, Morris & Kerr LLP
One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA  19103
Telephone:  215-981-5850
Facsimile:  215-981-5959

## **APPENDIX**

Tab A          Affidavit of Richard J. Lee, Ph.D.

Tab B          Testimony of Richard J. Lee, Ph.D.

Tab C          Deposition of Ernest R. Crutcher

Tab D          Declaration of Dr. Morton Corn

Tab E          Testimony of Dr. Morton Corn

Tab F          Testimony of William E. Hughson M.D.

Tab G          Affidavit of Dr. Bertram Price

COPY

FILE COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | MDL Docket No. 1376 |
| | ) | |
| ZONOLITE ATTIC INSULATION | ) | The Honorable Patti B. Saris, Presiding |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| PAUL PRICE, JOHN PREBIL and | ) | Civil Action No. CV 0071-M-DWM |
| MARGERY PREBIL, on behalf of | ) | |
| themselves and all others similarly situated, | ) | (Transferred from the District of Montana, |
| | ) | Missoula Division) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| W.R. GRACE & COMPANY (a Delaware | ) | |
| corporation); W.R. GRACE & COMPANY- | ) | |
| CONN. (a Connecticut Corporation); W.R. | ) | |
| GRACE & CO., a/k/a GRACE, an association | ) | |
| of business entities; SEALED AIR | ) | |
| CORPORATION (a Delaware corporation), | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFFS' POSITION STATEMENT**

120SF.ZON

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................ 1

II.  PLAINTIFFS' CONTENTIONS ............................................. 2

      A.   HISTORY OF LIBBY, MONTANA MINING ACTIVITIES AND
          COMPANY KNOWLEDGE  OF ASBESTOS HAZARDS . . . . . . . . . . . 3

      B.   HOMEOWNERS ARE IGNORANT OF THE EXTREME
          HAZARDS CAUSED BY DISTURBING ZONOLITE. . . . . . . . . . . . . . 4

      C.   THE ASBESTOS IN GRACE'S ZONOLITE ATTIC INSULATION
          IS AN ONGOING SERIOUS HEALTH HAZARD TO
          HOMEOWNERS WHO CONDUCT ROUTINE HOUSEHOLD
          MAINTENANCE IN THEIR ATTICS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.   EXPOSURES CAN BE MINIMIZED AND AVOIDED WITH
          NOTICE AND SAFETY PRECAUTIONS.  . . . . . . . . . . . . . . . . . . . . . . . 6

III. PLAINTIFFS' RESPONSE TO GRACE'S DEFENSES  . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  SETTLEMENT DISCUSSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

–i–

120SF.ZON

1    This "Position Statement" of Plaintiffs' is submitted in accordance with the request

2  of this Court during the January 4, 2001 status conference.

3  **I.    INTRODUCTION**

4    Defendants W. R. Grace & Company and its related and spin-off entities

5  (collectively, "Grace") are responsible for mining hazardous asbestos-contaminated vermiculite in

6  Montana, selling it nationwide as Zonolite Attic Insulation and failing to warn of associated health

7  and safety hazards. Despite Grace's long-standing knowledge that Zonolite Insulation was

8  contaminated with readily loftable asbestos capable of producing dangerously high exposures and

9  contamination, Grace rejected its own managers' recommendations that it warn of the hazards and,

10  instead, consciously elected to conceal the hazards from its workers, consumers and public

11  officials. Many thousands of persons living in homes with asbestos-contaminated Zonolite Attic

12  Insulation remain ignorant of the health and safety hazards and the steps necessary to minimize or

13  prevent exposure.

14    Plaintiffs in all MDL 1376 actions seek to implement an equitable classwide

15  asbestos notification, education and remediation program in order, to preserve human health and

16  avoid injuries and death caused by asbestos exposure. Once warned, class members can protect

17  themselves by, for example, keeping themselves and their children out of asbestos contaminated

18  attics and by taking appropriate precautions during remodeling or other disturbance-related

19  activities. Plaintiffs' claims are well-suited for litigation and/or settlement purposes on a classwide

20  basis because they raise predominantly common questions of law and fact.

21    Mindful of the costs, risks and delays of protracted litigation, plaintiffs are

22  amenable to pursuing creative ways to resolve their claims through comprehensive settlement.

23  Paramount among plaintiffs' objectives is the dissemination of health and safety warnings to

24  ensure that class members are apprised of asbestos hazards and the means to avoid and/or

25  minimize exposure and contamination. Plaintiffs also seek establishment of a claims-based,

26  remediation trust and program available to class members to conduct asbestos testing and asbestos

27  containment and/or remediation.

28

1    Plaintiffs propose the following mediators:  Eric Green, of Resolutions, LLP,

2   Boston, Massachusetts; The Hon. Ellen James (Ret.) of J.A.M.S., San Francisco, CA; Professor

3   John Coffee, Columbia University, New York, NY; and Anthony C. Piazza of Gregorio, Haldeman

4   & Piazza, San Francisco, CA.

5

6   **II.    PLAINTIFFS' CONTENTIONS**

7    Plaintiffs have brought this action on behalf of a class of owners or occupiers of real

8   property located throughout the United States in which Zonolite Attic Insulation has been installed.

9   The class excludes residents of Washington, in which a state-wide asbestos-contaminated Zonolite

10   Attic Insulation classhase been certified.  Defendants are the manufacturers of Zonolite Attic

11   Insulation.  Plaintiffs believe that they will prevail upon their claims, which include claims for

12   negligence, deceit, fraudulent concealment, fraud, strict liability failure to warn and RICO

13   violations.

14    Zonolite Attic Insulation is made of vermiculite contaminated with readily airborne

15   asbestos.  This asbestos constitutes an immediate, present and ongoing threat to health and safety

16   because disturbance of the material during routine household maintenance, repair, and remodeling

17   results in dangerous airborne concentrations of asbestos and can cause long-term contamination of

18   the home.  Medical science indicates that exposure to asbestos causes severe lung disease including

19   a unique form of cancer of the lining of the lung called mesothelioma, lung cancer, and a restrictive

20   lung disease called asbestosis.  Notably, asbestosis is a powerful carcinogen.  It is commonly

21   accepted by most governmental agencies and private physicians and scientists that there is no

22   known safe level of exposure to asbestos.  When these diseases are eventually discovered and

23   diagnosed in persons exposed to asbestos, there is no cure, only limited forms of medical treatment

24   exist.  These diseases are "latent," meaning it may take years or decades after exposure before the

25   disease manifests and is diagnosed.

26    **A.    HISTORY OF LIBBY, MONTANA MINING ACTIVITIES AND COMPANY
         KNOWLEDGE  OF ASBESTOS HAZARDS**.

27
    For many decades, W.R. Grace & Company ("Grace") and its predecessor, Zonolite
28
    Company, mined, milled and processed vermiculite in Libby, Montana. Vermiculite, a form of

–2–

1   mica, makes a satisfactory insulating material when exfoliated (heated and expanded) in a furnace.

2   Prior to the mid-1980s, Grace was the leading producer of vermiculite-based insulation products in

3   the United States.  Grace manufactured and sold over three thousand tons of vermiculite each year

4   including sales of over eighty-eight thousand bags of Zonolite attic insulation each month.

5           Zonolite Attic Insulation was one of Grace's vermiculite-based products sold

6   nationwide.  The vermiculite used in Grace's products, including Zonolite Attic Insulation,

7   contained asbestos.  The raw vermiculite used in Grace's product contained up to 21% asbestos.

8   Though potentially lethal to the lungs, asbestos fibers are invisible to the naked eye and only can

9   be identified through the use of microscopic equipment used by highly trained professionals.

10  Memo from Wood on Tremolite in Vermiculite at 9 (May 24, 1977) (hereinafter "Wood Memo")

11  (Exhibit 4).[1]

12          Grace has been aware of the serious health hazards associated with asbestos in

13  Zonolite Attic Insulation since the 1950's.  In the 1960's, Grace's recognition of the asbestos

14  hazards in Libby vermiculite was confirmed by evidence of a high incidence of disease among

15  Libby Zonolite workers.  *See e.g.*, Lovick Memo (December 23, 1969) with Study and Graph

16  (Exhibit 3) (showing 92% of Zonolite/Libby employees suffered lung disease, as of 1969, for

17  workers with 21-25 years exposure).  Indeed, Grace's safety manager knew in the late 1960's that

18  Grace's vermiculite-based products were contaminated with asbestos which occurred in the

19  vermiculite ore.  Accordingly, he advised:

20          I think it well at this time, with the advice of counsel, to consider
            applying a warning or precautionary label or statement on all
21          containers of products containing vermiculite.  This may aid our
            defense in cases of product liability claims.
22
    Memo to Kostic from Dugan (March 31, 1969) (Exhibit 5).  This was not done.
23
            In 1977, in an exhaustive report done by Grace with the benefit of extensive product
24
    testing and consultation with its own legal counsel, including the corporate legal division, Grace
25
    found that former Libby employees were suffering a "risk of lung cancer . . . five times the national
26

27          [1]The asbestos fibers in tremolite are so small that millions of them are present in a tiny
    portion of an asbestos product, yet they are barely detectable by weight.  *Harashe v. Flintkote Co.*,
28  848 S.W.2d 506, 508 (Mo. Ct. App. 1993) (expert testimony established that 600 billion tremolite
    fibers would constitute approximately the volume of the cap of a fountain pen).

120SF.ZON  PLAINTIFFS' POSITION STATEMENT - SETTLEMENT PURPOSES-PRIVILEGED [DRAFT]

average."  The report went on to state in a section entitled "Harm to Customers," that "[t]he highest level of exposure is for Attic Insulation and Masonry Insulation. . . ."  In a telling conclusion to its exhaustive report, Grace stated that "a decision to label our consumer products would eliminate the risk of future liability, while exacerbating the risk of claims . . . from past use of the product."  "Wood Memo" at 1909, 1919 and 1924 (Exhibit 4).  Grace's decision not to provide such an asbestos warning was motivated by its concern that warnings would increase the risk of claims, and thus reduce the profitability of Zonolite Attic Insulation.  *Id.* at 1921.

In 1985, one year after Grace discontinued the production and sale of Zonolite Attic Insulation, Grace performed a risk assessment of workers exposed to asbestos from vermiculite products nationwide and estimated that 30,000 lung cancers would result from such exposures. Walsh Memo (November 1, 1985) (Exhibit 6).

**B.**    **HOMEOWNERS ARE IGNORANT OF THE EXTREME HAZARDS CAUSED BY DISTURBING ZONOLITE ATTIC INSULATION**.

Grace's Zonolite Attic Insulation was primarily installed directly by homeowners as a "do-it-yourself" product.  Homeowners typically installed Zonolite Attic Insulation when remodeling their homes, seeking to add insulation to newly constructed homes and/or working to increase the insulation factor in homes with some existing insulation.  The Zonolite Attic Insulation product itself is a small granular substance – about the size of an eraser – that was poured out of large bags into spaces between the roof and the ceiling.  Remarkably, in product literature and on its Zonolite bags, Grace affirmatively represented to homeowners that Zonolite Attic Insulation "pours easily and cleanly," does not require "mask gloves or special equipment," and "[c]ontains no harmful chemicals."  (Exhibit 1).  Further, Grace depicted in its literature and on its bags a person pouring the material without any safety precautions whatsoever, noting the material was "non-irritating to the lungs," and an appropriate activity for "family fun."  (Exhibit 2).

Grace  has never corrected its dangerously misleading information, and has never warned homeowners that Zonolite Attic Insulation contains toxic levels of asbestos.  Most Zonolite Attic Insulation material was installed in homes built before 1985.  It is common for these older homes to now be in need of maintenance, repair and remodeling involving rewiring, installation and replacement of fixtures and utilities in ceilings, attics, and walls, and similar dust-creating

–4–

1  disturbance activities.  As a result of Grace's failure to warn and affirmative misstatements of fact,

2  thousands of homeowners remain ignorant of the dangers to which they and their families are

3  exposed.

4  **C.    THE ASBESTOS IN GRACE'S ZONOLITE ATTIC INSULATION IS AN ONGOING SERIOUS HEALTH HAZARD TO HOMEOWNERS WHO**

5  **CONDUCT ROUTINE HOUSEHOLD MAINTENANCE IN THEIR ATTICS**.

6              The disturbance of readily airborne asbestos as a result of home maintenance,

7  repair, and remodeling is a severe health hazard to persons conducting maintenance and to

8  members of the household where such work is done because disturbance of the material results in

9  high airborne concentrations of asbestos.  This hazard is amplified as a public health threat given

10  the widespread use of Zonolite Attic Insulation and because routine homeowner renovation is so

11  prevalent.  Nationwide, thousands of homes with Zonolite Attic Insulation undergo renovation

12  each year.

13              The EPA has recently issued an advisory describing the vermiculite attic insulation

14  problem and the precautionary steps for a homeowner to take.  According to the EPA:

15              If disturbed, asbestos fibers in vermiculite insulation may get into the
              air.  These fibers can be inhaled and become trapped in the lungs
16              where they may cause diseases such as asbestosis, lung cancer, and
              mesothelioma.  These diseases can develop many years after
17              exposure to asbestos.

18  "Asbestos in Vermiculite Insulation," US EPA Office of Pollution Prevention and Toxics ("EPA

19  Advisory"), at 1 (December 29, 2000) (Exhibit 7).

20              Scientific testing simulating home maintenance, repair and remodeling recently

21  performed by environmental consultants in this litigation demonstrate dangerous levels of airborne

22  asbestos during routine household remodeling.  Testing in the Spokane, Washington home of

23  Susan and Rand Hatch demonstrated that the demolition of walls, drilling of holes in a ceiling,

24  shoveling and vacuuming of attic insulation, emptying the vacuumed material into bags, and the

25  sweeping of the dust, resulted in airborne asbestos levels that exceed current Occupational Safety

26  and Health Administration ("OSHA") and Environmental Protection Agency ("EPA") standards,

27  and are clearly unsafe for homeowners and their families.  *See* Affs. of Anderson at (Exhibit 8),

28  Hatfield at (Exhibit 9), and Hurst (Exhibit 10, and at Exhibit B).  Similarly, in the Spokane,

–5–

1   Washington home owned by Marco Barbanti, a named plaintiff and court approved class

2   representative in the Washington state court action,  it was determined that simply scooping the

3   vermiculite using a tin dust pan and pouring it into a bag resulted in equally dangerous airborne

4   asbestos concentrations.  *See* Affidavit of Richard Hatfield (July 18, 2000) (Exhibit 9).

5           Historical testing done by Grace and very recent testing done in homes with

6   Zonolite Attic Insulation by certified environmental consultants demonstrate that disturbances of

7   Zonolite Attic Insulation are causing and will continue to cause dangerous exposures.  These

8   dangerous exposures will continue unless homeowners are properly warned.

9           **D.      EXPOSURES CAN BE MINIMIZED AND AVOIDED WITH NOTICE AND
        SAFETY PRECAUTIONS.**

10

11          Ongoing asbestos exposure to homeowners and other individuals conducting home

    maintenance, repair, and remodeling in the vicinity of Grace's Zonolite Attic Insulation can be

12
    minimized by the use of certain safety precautions.  In his Affidavit, Donald J. Hurst, President of
13
    Fulcrum Environmental Consulting, identifies safety precautions that should be taken to minimize
14
    exposure, including the use of respirators, setting up of containment and negative air, wetting down
15
    of the material and surfaces in the vicinity of the material, use of HEPA vacuum cleaners, and
16
    decontamination of personnel and materials exposed during work areas.  Hurst Aff. (Exhibit 10).
17
    These activities should be conducted by specially trained professionals and should not be
18
    undertaken by homeowners without proper asbestos training.  *Id.*
19
            In its recent advisory, the EPA confirms that precautionary recommendations to
20
    homeowners include avoiding disturbing the material and consulting with a professional asbestos
21
    abatement contractor to assess the problem.  *See* "EPA Advisory," at 1 (Exhibit 7).
22
    **III.    PLAINTIFFS' RESPONSE TO GRACE'S DEFENSES**
23
            Plaintiffs acknowledge the existence of various defenses asserted by Grace,
24
    including its claim that the asbestos exposure levels associated with Zonolite are not hazardous.
25
    Plaintiffs are confident, however, that the Court will agree that the class needs and deserves to be
26
    warned of asbestos contamination in Zonolite Attic Insulation and that the Grace defendants will
27
    be held responsible for covering the costs of warnings and for contributing to the costs of
28
    containment and/or remediation.

                                        –6–

1    **IV.    SETTLEMENT DISCUSSIONS**

2            Mindful of the risks, costs and delays of litigation and of the potential that Grace

3    may seek bankruptcy protection, as have the majority of asbestos manufacturers, plaintiffs are

4    committed to pursuing meaningful settlement discussions with the Grace defendants.

5            Paramount among plaintiffs' concerns is the nationwide dissemination of warnings

6    to class members concerning asbestos in Zonolite Attic Insulation and steps available to minimize

7    and avoid exposure.  Additionally, plaintiffs seek the establishment of a defendant-funded, claims

8    based remediation trust and program which will be available to provide class members with

9    asbestos testing, containment and/or remediation.

10           Plaintiffs welcome the participation of any suitable, experienced mediator willing to

11    help the parties craft a creative resolution to the dispute.  Plaintiffs propose the following

12    mediators: Eric Green, of Resolutions LLP, Boston, Massachusetts; The Hon. Ellen James (Ret.)

13    of J.A.M.S., San Francisco, CA; Professor John Coffee, Columbia University,  New York, NY;

14    and Anthony C. Piazza of Gregorio, Haldeman & Piazza, San Francisco, CA.

15

16    DATED:  January 29, 2001                    Respectfully submitted,

17
                                                 By:
18                                                   Elizabeth J. Cabraser,
                                                     Plaintiffs' Executive Committee and as
19                                                   Proposed Class Counsel

20                                               Elizabeth J. Cabraser
                                                 Fabrice N. Vincent
21                                               John Low-Beer
                                                 LIEFF, CABRASER, HEIMANN
22                                                 & BERNSTEIN, LLP
                                                 Embarcadero Center West, 30th Floor
23                                               275 Battery Street
                                                 San Francisco, CA  94111
24                                               Telephone:  (415) 956-1000
                                                 Facsimile:  (415) 956-1008
25
                                                 and
26

27

28

120SF.ZON  PLAINTIFFS' POSITION STATEMENT - SETTLEMENT PURPOSES-PRIVILEGED [DRAFT]

By: _____
      Thomas M. Sobol
      Proposed Class Counsel

Thomas M. Sobol (BBO No. 471770)
Jan R. Schlichtmann
Hector D. Geribon
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
214 Union Wharf
Boston, MA  02109-1216
Telephone:  (617) 720-5000
Facsimile:  (617) 720-5015

By: _____
      John G. Stoia, Jr.,
      Plaintiffs' Executive Committee and as
      Proposed Class Counsel

John J. Stoia, Jr.
Timothy G. Blood
Jobeth Halper
MILBERG WEISS BERSHAD HYNES & LERACH
LLP
600 West Broadway
1800 One America Plaza
San Diego, CA  92101-5050
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423

By: _____
      David Pastor,
      Plaintiffs' Executive Committee and as
      Proposed Class Counsel

David Pastor
Edward L. Manchur
John C. Martland
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:  (781) 231-7850
Facsimile:  (781) 231-7840

1

By: _____
      Edward J. Westbrook,
      Plaintiffs' Executive Committee and as
      Proposed Class Counsel

2

3

4       Edward J. Westbrook
        Robert M. Turkewitz
        NESS MOTLEY LOADHOLT
5         RICHARDSON & POOLE
        28 Bridgeside Blvd.
6       P.O. Box 1792
        Mt. Pleasant, SC 29465
7       Telephone: (843) 216-9000
        Facsimile: (843) 216-9440

8

9

By: _____
      Darrell Scott,  As Proposed Class Counsel

10

11      Darrell Scott
        Michael Black
        LUKINS & ANNIS, P.S.
12      1600 Washington Trust Financial Cntr
        717 W Sprague Ave.
13      Spokane, WA 99201-0466
        Telephone: (509) 455-9555
14      Facsimile: (509) 747-2323

15      Attorneys for Plaintiffs Paul Price, John Prebil, and
        Margery Prebil

16

17

18

19

20

21

22

23

24

25

26

27

28

–9–

By: _____
    Richard Lewis, As Proposed Class Counsel

Richard Lewis
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

and

Steve Toll
Tamara Driscoll
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
999 Third Avenue, Suite 3600
Seattle, WA  98104
Telephone:  (206) 521-0080
Facsimile:  (206) 521-0166

Attorneys for Plaintiffs Paul Price, John Prebil, and
Margery Prebil

By: _____
    Allan McGarvey, As Proposed Class Counsel

Allan McGarvey
McGARVEY, HEBERLING, SULLIVAN
  & McGARVEY, P.C.
745 South Main
Kalispell, MT  59901
Telephone:  (406) 752-5566
Facsimile:  (406) 752-7124

Attorneys for Plaintiffs Paul Price, John Prebil, and
Margery Prebil

On the Brief:

Christopher A. Seeger
SEEGER WEISS LLP
One William Street
New York, NY  10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

Attorneys for Jan Hunter

–10–

1

2

Mark S. Williams
BORRELLI, HUTTON & WILLIAM, P.A.
376 Trapelo Road
Belmont, MA  02478

Attorneys for Edward Lindholm and John J.
Szufnarowski

3

4

5

6

7

8

9

William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107-3389
Telephone:  (215) 238-1700
Facsimile:  (215) 238-1968

Attorneys for Edward Lindholm and John J.
Szufnarowski

10

11

12

13

14

Mark C. Goldenberg
HOPKINS & GOLDENBERG, P.C.
2132 Pontoon Road
Granite City, IL  62040
Telephone:  (618) 877-0088
Facsimile:  (618) 877-6230

Attorneys for Jan Hunter

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: ) | MDL Docket No. 1376 |
| ) | |
| ZONOLITE ATTIC INSULATION ) | The Honorable Patti B. Saris, |
| ) | Presiding |
| PRODUCTS LIABILITY LITIGATION ) | |
| ) | |
| ————————————————————— ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| PAUL PRICE, JOHN PREBIL and ) | Case No. 1:00cv12510-PBS |
| MARGERY PREBIL, on behalf of themselves ) | |
| and all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| W.R. GRACE & COMPANY (a Delaware ) | |
| Corporation); W.R. GRACE & COMPANY ) | |
| CONN (a Connecticut corporation); W.R. GRACE ) | |
| & CO., a/k/a GRACE, an association ) | |
| of business entities; SEALED AIR ) | |
| CORPORATION (a Delaware corporation), ) | |
| ) | |
| Defendants. ) | |
| ————————————————————— ) | |

**GRACE DEFENDANTS' BRIEF IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
AND NOTICE**

## TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ................................................................................................ 3

I.  The Product At Issue. ......................................................................................... 3

   A.  ZAI Is Safe From A Scientific Perspective ............................................. 4

   B.  ZAI Is Safe From A Medical Perspective. ............................................... 6

   C.  ZAI Is Safe From An Industrial Hygiene Perspective............................. 8

   D.  ZAI Is Safe From A Regulatory Perspective .......................................... 9

II.  This Lawsuit. ..................................................................................................... 10

ARGUMENT..................................................................................................................... 11

I.  CLASS CERTIFICATION IS INAPPROPRIATE UNDER RULE 23(b)(2)
   BECAUSE THIS ACTION, WHICH PRIMARILY SEEKS MONEY
   DAMAGES, IS NOT COHESIVE AND MANDATORY CERTIFICATION
   WOULD BE UNCONSTITUTIONAL. ............................................................. 13

   A.  The Allegedly "Equitable" Relief Sought By Plaintiffs Does Not Make
       Rule 23(b)(2) Certification Available. .................................................... 14

       1.  The Predominant Relief Sought by Plaintiffs – Whether
           Directly in the Form of Compensatory Damages or in The
           Guise of A Claims-Based Remediation Trust – Is Money
           Damages And Not The Injunctive Relief Which Justifies Rule
           23(b)(2) Certification. ............................................................... 15

       2.  The Requested "Equitable" Relief In The Form Of An
           Education Trust And A Notification Program Are Within The
           Purview And Ambit Of Regulatory Agencies .......................... 20

   B.  A Mandatory Nationwide Class Action Which Seeks Money Damages
       Would Violate Due Process. .................................................................. 22

   C.  A Bifurcated Trial of Plaintiffs' Equitable and Damages Claims
       Would Implicate the Parties' Seventh Amendment Right to a Jury
       Trial......................................................................................................... 24

   D.  The Overwhelming Individual Issues of Fact And Law Destroy Class
       Cohesiveness. ......................................................................................... 25

       1.  The Class Lacks Cohesiveness Because Of Overwhelming
           Individual Issues of Fact............................................................ 25

       2.  The Class Lacks Cohesiveness Because The Differences In The
           Applicable Laws Create Overwhelming Individual Issues of
           Law. ........................................................................................... 27

II.    CLASS CERTIFICATION IS INAPPROPRIATE UNDER 23(b)(3)
       BECAUSE INDIVIDUAL RATHER THAN COMMON ISSUES OF FACT
       AND LAW PREDOMINATE AND BECAUSE CLASS CERTIFICATION
       IS NOT THE SUPERIOR METHOD OF ADJUDICATING PLAINTIFFS'
       CLAIMS.......................................................................................................... 33

       A.    Common Factual And Legal Issues Do Not Predominate.................... 34

       B.    A Class Action Is Not The Superior Method For the Fair and Efficient
             Adjudication of The Claims Of The Putative Class.............................. 35

III.   CLASS CERTIFICATION OF PLAINTIFFS' PUNITIVE DAMAGES
       CLAIM VIOLATES DUE PROCESS AND IS UNSUPPORTED BY RULE
       23(b)(1)(B)'S LIMITED FUND THEORY. ...................................................... 40

IV.    PLAINTIFFS FAIL TO SATISFY THE ADEQUACY REQUIREMENT OF
       RULE 23(a)...................................................................................................... 41

       A.    Plaintiff Price Is An Inadequate Class Representative Because His
             Claims Are Barred By The Statutes Of Limitations............................. 42

       B.    The Prebils' Lack of Familiarity With the Claims Asserted in This
             Litigation Make Them Inadequate Class Representatives. ................ 42

       C.    Because Plaintiffs Have Strategically Limited The Relief Sought, They
             Are Not Adequate Class Representatives. ........................................... 44

V.     PLAINTIFFS' CLASS DEFINITION IS OVERBROAD AND THE
       PROPOSED CLASS IS INCAPABLE OF ASCERTAINMENT. ................. 45

VI.    PLAINTIFFS' REQUESTED NOTICE IS NOT AUTHORIZED BY RULE
       23(d)(2). .......................................................................................................... 47

CONCLUSION ............................................................................................................... 50

## TABLE OF AUTHORITIES

### CASES

*In re Alert Income Partners Security Litig., MDL 915*, No. 92-Z-9150
(D. Colo. Sept. 3, 1992) .............................................................................49

*In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718 (E.D.N.Y. 1983),
*aff'd*, 818 F.2d 145 (2d Cir. 1987) ..............................................................41

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987),
*cert. denied*, 484 U.S. 1004 (1988) .............................................................13

*Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168 (5th Cir. 1996)................................31

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402
(5th Cir. 1998) .........................................................11, 12, 13, 16, 19, 25, 40

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591
(1997). ........................................................ 11, 12, 13, 28, 33, 34, 35, 37-38

*In re American Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) ..............................13, 22, 36

*Anderson v. Lyng*, 652 F. Supp. 1237 (M.D. Ala. 1987) ....................................................49

*Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D. Pa. 1997) .................15, 17, 38, 39

*In re Asbestos Sch. Litig.*, 104 F.R.D. 422 (E.D. Pa. 1984), *modified sub nom.*,
*In re School Asbestos Litig.*, 789 F.2d 996, 1108 (3d Cir.), *cert. denied*,
479 U.S. 852 (1986) ................................................................................17, 18

*Avery v. Secretary of Health & Human Servs.*, 762 F.2d 158 (1st Cir. 1985) ..................48

*Ayers v. Township of Jackson*, 525 A.2d 287 (N.J. 1987)....................................................18

*Balyeat Law, P.C. v. Hatch*, 942 P.2d 716 (Mont. 1997)....................................................44

*Barefield v. Chevron, U.S.A.*, 12 F.R.D. 1232 (N.D.Cal. 1988) .........................................40

*Barkman v. Wabash, Inc.*, No. 85 C 611, 1998 WL 5039
(N.D. Ill. Jan. 20, 1998) ..............................................................................50

*Barnes v. American Tobacco Co.*, 176 F.R.D. 479 (E.D. Pa. 1997),
*aff'd*, 161 F.3d 127 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999) ..................26

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998),
*cert. denied*, 526 U.S. 1114 (1999) .................................................18, 26, 27

*Bartlett v. Allstate*, 929 P.2d 227 (Mont. 1996) ................................................................27

*Barth v. Firestone Tire & Rubber*, 661 F. Supp. 193 (N.D. Cal. 1987). ...........................18

*Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977) ...............................................48

*BMW v. Gore*, 517 U.S. 559 (1996) ...............................................................................40

*Broughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir. 1995) ..................................................18

*Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992); ...........................................23

*Burroughs v. Jackson Nat'l Life Ins. Co.,*, 618 So. 2d 1329 (Ala. 1993) ..........................31

*Butler v. Colwell*, 967 P.2d 779 (Mont. 1998) ...................................................................44

*Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319 (M.D. Fla. 1997) ...........................43

*Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421 (E.D. La. 1997) ......................43

*Castano v. American Tobacco Co.*, 160 F.R.D. 544 (E.D. La. 1995),
    *modified on other grounds*, 84 F.3d 734 (5th Cir. 1996) ..........................15, 17, 19, 25

*Castano v. American Tobacco Co.*, 84 F.3d 734
    (5th Cir. 1996) ......................................................................3, 13, 27, 31, 35, 36, 38, 39

*Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628
    (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993).............................................................35

*Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993) ...................37

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) ........................................20, 29, 36

*Cline v. Prowler Indus.*, 418 A.2d 968 (Del. 1980) .............................................................30

*Davenport v. Gerber Prods. Co.*, 125 F.R.D. 116 (E.D. Pa. 1989) .............................18, 26

*Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980), *reh'g denied*,
    446 U.S. 947 (1980) ......................................................................................................48

*Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D. Ill. 1998) ...........................18

*In re Diet Drugs*, No. 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)................26

*Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So. 2d 1288 (Ala. 1993) ........................31

*Doe v. General Hosp. of D.C.*, 434 F.2d 427 (D.C. Cir. 1970) .........................................49

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .......................................................3, 38

*Emigrant Savings Bank v. Chicago*, No. 72 C 1644, 1987 U.S. Dist.
LEXIS 16749 (N.D. Ill. Feb. 2, 1987) ............................................................48

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) .........44, 45

*Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365 (N.D. Ill. 1998) ..............................30

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360
(E.D. La. 1997) ........................................................................................28, 37, 44, 45

*In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214 (E.D. La. 1998) ............31, 32

*Forman v. Data Transfer*, 164 F.R.D. 400 (E.D. Pa. 1995) ..............................................46

*Friends For All Children Inc. v. Lockheed Aircraft Corp.*,
746 F.2d 816 (D.C. Cir. 1984) ........................................................................................18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*,
120 S. Ct. 693 (2000) ......................................................................................................42

*Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) ..............................39

*General Telegraph Co. v. Falcon*, 457 U.S. 147 (1982) ..............................................13, 41

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1995),
*aff'd sub nom.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .....1, 13, 36, 38

*German v. Federal Home Loan Mortgage Corp.*, 168 F.R.D. 145
(S.D.N.Y. 1996) ..............................................................................................................49

*Grace v. Detroit*, 145 F.R.D. 413 (E.D. Mich. 1992) ........................................................48

*Great Rivers Co-op. v. Farmland Indus., Inc.*, 120 F.3d 893 (8th Cir. 1997) ..................42

*Green v. Mansour*, 474 U.S. 64 (1986), *reh'g denied*, 474 U.S. 1111 (1986)..................49

*In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977) ..........................................48

*Haley v. Medtronic, Inc.*, 169 F.R.D. 643 (C.D. Cal. 1996)..................................18, 32, 33

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)............................................42

*Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993) ....................................18

*Harashe v. Flintkote Co.*, 848 S.W.2d 506 (Mo. Ct. App. 1993)......................................38

*Harding v. Tambrands, Inc.*, 165 F.R.D. 623 (D. Kan. 1996)......................................18, 33

*Jaffee v. United States*, 592 F.2d 712 (3d Cir. 1979), *cert. denied*,
44̇1 U.S. 961 (1979)......................................................................................18

*Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999) ..........................................23

*Kent v. Sunamerica Life Ins. Co.*, 190 F.R.D. 271 (D. Mass. 2000) ..................................45

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987),
*cert. denied*, 485 U.S. 959 (1988) .........................................................................43, 44

*Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985) ............................................49

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir. 1981) ........................................48, 49

*Leist v. Tamco Enterprises*, No. 80 Civ. 4439, 1984 WL 2425
(S.D.N.Y. Apr. 3, 1984)................................................................................................48

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*,
216 F.3d 577 (7th Cir. 2000) ..................................................................................14, 40

*Lewis v. Casey*, 518 U.S. 343 (1996) ................................................................................42

*Marcera v. Chinlund*, 595 F.2d 1231 (2d Cir. 1979), *vacated on other
grounds sub nom., Lombard v. Marcera*, 442 U.S. 915 (1979) ....................................50

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D.
417 (E.D. La. 1997) ..............................................................................................31, 32

*Mattingly v. First Bank*, 947 P.2d 66 (Mont. 1997) ..........................................................27

*Messier v. Southbury Training Sch.*, 183 F.R.D. 350 (D. Conn. 1998) .............................49

*Miller v. Central Chincilla Group*, 66 F.R.D. 411 (S.D. Iowa 1975) ...............................48

*Miller v. Hygrade Food Prods. Corp.*, No. 99-1087, 2001 U.S. Dist.
LEXIS 733 (E.D. Pa. Jan. 29, 2001) ............................................................................25

*Millett v. Atlantic Richfield Co.,* No. Civ. A. CV-98-555,
2000 WL 359979 (Me. Super. Ct. March 2, 2000),
*appeal dismissed*, 760 A.2d 250 (2000) .....................................................16, 17, 38, 39

*Nagy v. Jostens, Inc.*, 91 F.R.D. 431 (D. Minn. 1981) ......................................................49

*Nelsen v. King County*, 895 F.2d 1248 (9th Cir. 1990) .....................................................15

*Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625 (S.D. Ga. 1995),
*aff'd*, 95 F.3d 59 (11th Cir. 1996) ...............................................................................46

*In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983).........................13, 27

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ...................................................23

*O. S. Stapley Co. v. Miller*, 447 P.2d 248 (Ariz. 1968) ......................................30

*Pagan v. Dubois*, 884 F. Supp. 25 (D. Mass. 1995) ............................................45

*Parks v. Morris Homes Corp.,* 141 S.E. 2d 129 (S.C. 1965)................................31

*Penson v. Terminal Trans. Co.*, 634 F.2d 989 (5th Cir. 1981) ..........................48

*Phillips v. General Motors Corp.*, 995 P.2d 1002 (Mont. 2000) .................28, 29

*Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985).................................23, 28, 40

*Poe v. Sears Roebuck & Co.*, No. 1:96-CV-358, 1998 WL 113561 (N.D. Ga.
    Feb. 13, 1998).....................................................................................31, 33

*Punnett v. United States*, 602 F. Supp. 530 (E.D. Pa. 1984) ..............................21

*Quern v. Jordan*, 440 U.S. 332 (1979) ...............................................................49

*In re Real Estate Title and Settlement Servs. Antitrust Litig.*, 869 F.2d 760
    (3d Cir.), *cert. denied*, 493 U.S. 821 (1989) ..................................................23

*In re Rhône-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir.), *cert. denied*,
    516 U.S. 867 (1995)...........................................................13, 32, 37, 38, 39, 40

*In re School Asbestos Litig.*, 789 F.2d 996, 1108 (3d Cir. 1986), *cert. denied*,
    *Celotex Corp. v. Sch. Dist. of Lancaster*, 479 U.S. 852 (1986)..............35, 37, 40, 41

*Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976)..........................42

*Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795 (Cal. 1993) ....................................18

*Redland Soccer Club v. Department of the Army*, 696 A.2d 137 (Pa. 1997) ....................18

*Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593 (N.Y. App. Div.
    1998), *aff'd*, 720 N.E.2d 892 (N.Y. 1999) .....................................................45

*Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D. Mo. 1997)..............18

*Smith v. Nat'l Steel & Shipbuilding Co.*, 125 F.3d 751 (9th Cir. 1997),
    *cert. denied*, 523 U.S. 1094 (1998)..................................................................21

*Spence v. Glock*, 227 F.3d 308 (5th Cir. 2000) ....................................................29

*Strout v. Paisley*, No. CIV 00-107-B, 2000 WL 1900313
(D. Me. Dec. 4, 2000) ................................................................50

*Sugarhouse Finance Co. v. Anderson*, 610 P.2d 1369 (Utah 1980) ..................................31

*In re Sunrise Sec. Litig.*, 698 F. Supp. 1256 (E.D. Pa. 1988) ...........................................28

*In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997) .....................32, 33

*Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400 (W.D. Mo. 1994) ...........................18

*Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999) ...........................26

*Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493 (N.D. Ill. 1998) ...........................................36

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) .......................................21

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ...............................35, 36

*Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), *appeal dismissed*,
945 F.2d 1188 (D.C. Cir. 1991) ................................................................13, 15, 20, 21

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986), *cert. denied*,
482 U.S. 915 (1987) ................................................................................................30, 36

*Werlein v. United States*, 746 F. Supp. 887 (D. Minn. 1990), *vacated in
part on other grounds*, 793 F. Supp. 898 (D. Minn. 1992) .........................................18

*Young v. Ray Brandt Dodge*, 176 F.R.D. 230 (E.D. La. 1997) .........................................38

*Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) ...................................19

## CONSTITUTIONAL PROVISIONS

U. S. Const. Amend. VII ...........................................................................2, 14, 25, 26, 40

## FEDERAL STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 2054 (b)(1) (West 2000) ................................................................................21

15 U.S.C. § 2064(c)(1) (West 2000) ................................................................................21

18 U.S.C. § 1962 (West 2000)..........................................................................................30

42 U.S.C. § 4321 (West 2000) ..........................................................................................21

40 C.F.R. § 61.141 ..............................................................................................................3

40 C.F.R. § 763.83 ..............................................................................................................3

Fed. R. Civ. P. 23 ......................................................................................................... *passim*

## STATE STATUTES

MCA 27-2-203 ................................................................................................................42

MCA 27-2-204 ................................................................................................................42

## MISCELLANEOUS

Charles Allen Wright, Arthur R. Miller, *et al.,*
   *Federal Prac. and Proc. Civ. 2d* (2000 Supp.).......................................................20, 49

Francis E. McGovern, *Resolving Mature Mass Tort Litig.,*
   69 B.U. L. Rev. 659, 659 (1989) ...................................................................................38

*Manual For Complex Litig.* (3d ed. 1995) ....................................................................38, 45

Restatement (Second) of Torts § 402A .............................................................................30

Asbestos litigation has been described as "'a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s.'" *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618-19 (3d Cir. 1995) (quoting Report of The Judicial Conference Ad Hoc Committee on Asbestos, 1-3 (1991)), *aff'd sub nom.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). While the Zonolite Attic Insulation cases may be the latest chapter in that tale, they tell a very different story: not a story of building owners with real problems caused by a truly hazardous product, but rather a story of lawyers using class actions to create and capitalize on the illusion that what has been a completely innocuous product for years is now a serious threat.

This action complains about the alleged hazards of Zonolite Attic Insulation ("ZAI"), a vermiculite product that *may* contain a trace amount – well below 1% – of asbestos. Contrary to the alarmist allegations contained both in plaintiffs' complaint and their memorandum in support of class certification, ZAI is safe. The presence and sporadic disturbance of ZAI in homes is not hazardous to human health. ZAI has effectively insulated houses across America for decades without harming the people living in those homes.

Nonetheless, in the last year, ten lawsuits – all but one of them putative class actions – have been filed in state and federal courts complaining about the alleged risks to homeowners and building occupants from the presence of ZAI in attics. The lawyer-driven nature of this litigation is illustrated by the proposed class representatives: Paul Price, who has known about the presence of asbestos in ZAI for at least ten years, and John and Margery Prebil, who maintain that they did not know about asbestos in the product even after the complaint was filed.

The nature of the relief sought is also lawyer-driven. Instead of simply seeking compensatory damages for remediating plaintiffs' homes of ZAI and for any diminution in the homes' value, which is the relief the named plaintiffs truly desire, the complaint is artfully crafted as one for "equitable relief" seeking the establishment of several defendant-financed funds for testing, notification, research and remediation (plus compensatory and punitive damages). Through this sleight of hand, plaintiffs attempt to obtain class certification under the

facially less stringent Fed. R. Civ. P. 23(b)(2), while relying on Rule 23(b)(3), which contains more prerequisites to certification, as the less desirable alternative.

Defendants W.R. Grace & Company-Conn. ("Grace") and its parent W.R. Grace & Company, a Delaware corporation, (collectively the "Grace defendants") oppose class certification and will show that certification of the nationwide class that plaintiffs purport to represent is inappropriate under any provision of Rule 23:

- Certification under Rule 23(b)(2) is inappropriate because (i) notwithstanding plaintiffs' characterization of their requested relief as equitable, property owners with ZAI primarily seek monetary compensation for identifying, managing, and removing the product and (ii) any program for notification and education of homeowners is appropriately within the jurisdiction of administrative agencies charged with the obligation to advise citizens about hazardous substances.

- Certification is inappropriate under Rule 23(b)(2) because the putative class lacks cohesiveness and under Rule 23 (b)(3) because individual questions of fact and law predominate: (i) a trial of individual issues related to each property owner would be required before liability could be found, including whether a hazard relating to ZAI exists in a class member's building(s) and whether the insulation is, indeed, tremolite-containing ZAI; and (ii) 50 jurisdictions' different laws would govern the resolution of the class members' claims, making class-wide adjudication unmanageable.

- Certification of a mandatory class action under Rules 23(b)(2) or (b)(1)(B) violates class members' due process rights because it would bind them to a monetary judgment entered in a state with which they have no contacts.

- Certification of a class action that would rely upon bifurcated trials of either plaintiffs' equitable and legal claims or "common" and "individual" issues implicates the parties' Seventh Amendment right to a jury trial.

- Certification of a Rule 23(b)(1)(B) punitive damages class under a limited fund theory is inappropriate because a class seeking to punish Grace for its conduct with respect to asbestos hazards but limited to owners and occupants of buildings with ZAI would be under-inclusive.

- Certification of the proposed class is inappropriate in that the class as defined is both overbroad and incapable of ascertainment because, *inter alia*, the class includes owners of buildings with ZAI that is not comprised of Libby vermiculite.

- Certification of any class is inappropriate because the absent class members' interests will not be adequately represented by the named plaintiffs.

For all these reasons, class certification should be denied. And in the absence of a ruling on class certification, it is premature to determine whether a notice to owners and occupants of buildings containing ZAI is necessary or appropriate.

## FACTUAL BACKGROUND

I.    **The Product At Issue.**

ZAI is a vermiculite product used primarily in homes for insulation. Vermiculite is *not* a form of asbestos. It is a mica-like mineral that has been used for more than 75 years in many products. Vermiculite, when milled and thermally expanded, serves as an effective insulation.

From 1963 until 1984, Grace mined vermiculite in Libby, Montana; milled the raw ore to remove unwanted materials; heated the resulting concentrate to expand the vermiculite into very light "kernels" which could be poured into attics or walls for insulation; and packaged vermiculite of the appropriate size for sale to lumber yards and other retailers as ZAI. When Libby vermiculite of the appropriate size was not available, Grace may have used vermiculite from other mines to manufacture ZAI. Property owners purchased ZAI primarily for do-it-yourself installation in existing properties. They would pour the product between the joists of the attic and level it. Given the nature of the product (including that an attic containing ZAI cannot be used for storage or other purposes unless some flooring is installed over it), ZAI is rarely disturbed by the typical property owner.

When vermiculite was mined in Libby, contaminants, including tremolite asbestos, were excavated with the ore. Asbestos was never an ingredient affirmatively added to ZAI. Grace acted to remove all the contaminants during milling and expansion of the vermiculite. Grace's efforts were so successful that ZAI does not meet the definition of an asbestos-containing product in various government regulations. *See, e.g.*, 40 C.F.R. §§ 61.141 and 763.83.[1]

The presence and occasional disturbance of ZAI in homes is not hazardous to human health. This was true from the time ZAI began being sold to insulate unfinished attics through today, more than sixteen years after Grace stopped selling the product. While now is not the time to decide the merits, it is proper for this Court to consider what the parties intend to prove and how such issues make class certification improper.[2] While Grace disputes that ZAI is

---

[1] "Materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials." Plaintiffs' own expert, Donald Hurst, acknowledged that the vermiculite attic insulation which he tested contained less than 1/10 of 1% by weight of asbestos. (Affidavit of Donald Hurst ¶ 10)

[2] As the Fifth Circuit explained in *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996), notwithstanding the Supreme Court's instruction in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156

hazardous in general, Grace is entitled to show that in no event is ZAI harmful under the site-specific conditions as it is installed and used in each plaintiff's particular building – an individualized showing that destroys cohesiveness and predominates over any alleged common issue. Accordingly, both to explain the individualized evidence that makes class certification inappropriate in this case and to respond to plaintiffs' one-sided characterization of the facts to be considered in resolving plaintiffs' motion, the Grace defendants briefly summarize the scientific, medical, industrial hygiene and regulatory evidence that they would present at any trial.

## A.    ZAI Is Safe From A Scientific Perspective.

When viewed from a scientific perspective, ZAI is safe. Scientific analysis has shown that ZAI contains at most miniscule amounts of asbestos. In *Barbanti v. W.R. Grace & Co.*, No. 00201756-6 (Wash. Super. Ct. Spokane County),[3] analysis of samples taken in homes in Washington, by both plaintiff's and defendants' experts, revealed that the asbestos content by weight of ZAI has been measured at between one one-hundredth (1/100th) and one one-thousandth (1/1000th) of one percent. (Deposition of plaintiffs' expert Ernest R. Crutcher, Ex. 1, p. 146:23-25; Testimony of Richard J. Lee ("Lee Test."), Nov. 30, 2000, Ex. 2, p. 54:1-14)[4]

Moreover, the mere presence of asbestos in a building product does not create a hazard. To assess any health risk, one must assess the theoretical possibility of inhalation of asbestos fibers in large quantities over lengthy periods of time. (Declaration of Dr. Morton Corn ("Corn Decl."), Ex. 3, ¶ 14) To measure *actual* exposure to asbestos in any individual home, it is necessary to measure levels of respirable fibers in the air in that home. (*Id.* ¶ 15)

Scientific testing of the air in homes with ZAI has found almost non-detectable or zero

---

(1974), that a court should not make a preliminary determination of the merits of plaintiffs' claims in the context of a Rule 23 determination, a "district court certainly may look past the pleadings to determine whether the requirements of Rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."

    [3] *Barbanti* is a statewide class action brought by some of the same plaintiffs' lawyers involved in these actions on behalf of owners of buildings containing ZAI in the state of Washington. For the reasons set forth in footnote 21 *infra*, the Grace defendants believe that the class certification order in *Barbanti* was made in error and are seeking appellate review. In *Barbanti*, plaintiff also sought a preliminary injunction requiring Grace to issue an emergency warning notifying class members of the alleged hazards of Zonolite. Following a three-day hearing, Judge Kathleen O'Connor denied plaintiff's motion for a preliminary injunction, rejecting plaintiff's assertions that an emergency exists.

    [4] All referenced exhibits are attached to the Declaration of Robert Murphy and will be cited as "Ex." followed by the exhibit number.

4

asbestos levels. The Grace defendants' analysis of air samples taken in the homes of certain of the named plaintiffs in these coordinated cases – specifically, in the Price, Prebil, Lindholm and Szufnarowski homes – found either non-detectable or only extraordinarily minute levels of asbestos. (Declaration of Richard J. Lee ("Lee Decl."), Ex. 4, ¶¶ 19, 21) In *Barbanti*, the results of defendants' analysis of air samples taken in homes in Washington were similar. (Lee Test., Ex. 2, p. 62:5-20)   In tests by the Environmental Protection Agency ("EPA") at homes containing vermiculite insulation in Libby, the highest asbestos air concentration was 0.0003 fibers per cubic centimeter ("cc"). (*Id.* pp. 62:21-63:12)   This is 300 times lower than the permissible occupational exposure level of 0.1 fibers per cc set by the Occupational Safety and Health Administration ("OSHA").   In fact, most of the EPA's air samples from the Libby homes did not find any asbestos fibers at all.

Plaintiffs have attempted artificially to skew the circumstances under which testing is done in the hope of raising the asbestos air concentration levels to show a hazard.   Plaintiffs suggest that their methods are necessary to demonstrate a potential hazard from renovations or disturbance of the vermiculite insulation.   Plaintiffs' self-created hazard is flawed in two ways. First, the plaintiffs artificially created an environment that was unrealistic based upon the practical utilization of ZAI.   Under normal living conditions, homeowners rarely, if ever, come into contact with or disturb ZAI in their unfinished attics.[5]   More significantly, based upon the level and duration of exposure that is required to cause an increased health risk, and the miniscule amount of asbestos in ZAI, it would be rare for a homeowner to disturb the insulation

___

[5] This is demonstrated by plaintiffs' testimony.   Two of the three sections of the Prebils' attic are inaccessible.   The third section is entered "seldom" by Mr. Prebil and never by Mrs. Prebil. (J. Prebil Dep., Ex. 5, pp. 75:19-76:10; 79:3-13; M. Prebil Dep., Ex. 6, p. 27:9-11)   The Price attic has never been used and is entered solely for purposes of inspection.   Mr. Price identified a single disturbance of the vermiculite during a six-hour attic repair project in the 22 years he has owned the home. (Price Dep., Ex. 7, pp. 66:12-24; 11:2-3)   In the home owned by Edward Lindholm, plaintiff in *Lindholm v. W.R. Grace & Co.*, No. 00-CV-10323 (D. Mass.), the spaces where there is vermiculite are not accessed.   He identified a single renovation – the installation of a bathroom exhaust fan – in approximately 40 years since installation of the ZAI that impacted or disturbed the ZAI in any way. (Lindholm Dep., Ex. 8, pp. 82:1-83:22; 6:14-17)   The other *Lindholm* plaintiff, John Szufnarowski, testified that he has entered the ZAI-insulated attic in the original portion of his home approximately three times since he bought the home in 1965.   He and his wife would enter a portion of the addition's attic approximately five times a year to remove and replace items stored there.   Mr. Szufnarowski identified a single renovation in over 25 years since the ZAI was installed that may have disturbed the ZAI – the repair of a ceiling crack performed by contractors outside of his presence. (Szufnarowski Dep., Ex. 9, pp. 52:10-16; 56:15-58:17; 62:10-66:1; 20:10-14)

5

enough even to create a hazardous exposure level, much less sustain that level for the minimum duration necessary to create a hazard. (*See* Corn Decl., Ex. 3, ¶ 26; Testimony of Dr. Morton Corn ("Corn Test."), Nov. 30, 2000, Ex. 10, pp. 115:6-117:20)

Second, the testing protocol and counting methods utilized by the plaintiffs were scientifically flawed for at least the following reasons: (i) they did not collect the requisite amount of air for a valid testing volume; (ii) they used an inappropriate sample preparation procedure; (iii) they used the wrong analysis method and fiber counting protocol; (iv) they failed to adjust for time-weighted averages, and (v) they incorrectly applied regulations to reported concentrations. (Lee Test., Ex. 2, pp. 64:12-24; 67:2-68:22; p. 69:4-22; pp. 71:17-72:3; Lee Decl., Ex. 4, ¶¶ 29-31) As a result, the plaintiffs' air sampling data greatly overestimate an individual's exposure to asbestos fibers. *Id.*

Even if the plaintiffs' data were scientifically valid despite the unrealistic testing environment and the numerous errors in its computation, the time-weighted average exposure in an attic would be .05 to 0.1 fibers per cc. (*Id.* p. 76:24-77:10) At these levels, a homeowner would have to be exposed at least eight hours a day for 12,000 days in order to be at a risk of an asbestos related disease. (Testimony of Dr. William Hughson ("Hughson Test."), Ex. 11, pp. 7:15-8:22)[6] Simply stated, the minute amount of asbestos in ZAI, even if disturbed, cannot create any legitimate health risk to homeowners.

As part of the plaintiffs' case at trial, each homeowner would have to show both the amount of tremolite asbestos in the ZAI in that home[7] and, more importantly, the actual exposures to airborne asbestos fibers to the occupants of that home.

### B.   ZAI Is Safe From A Medical Perspective.

When viewed from a medical perspective, ZAI is safe. Medical and epidemiological data demonstrate that there is no health hazard from sporadic exposure to the trace amounts of asbestos that may be present in ZAI. Whether a person is at an increased health risk from

---

[6] Dr. Hughson's testimony for both days – November 29 and 30, 2000 – is collectively appended as Ex. 11. The first day is pages 171-196; and the second day, 1-45.
[7] As discussed more fully in Section V *infra*, the ZAI in plaintiff Lindholm's home is not comprised of Libby vermiculite and does not contain any tremolite asbestos. (*See* Lee Decl., Ex. 4, ¶¶ 21, 25)

exposure to asbestos depends on the level of exposure (dose), and the duration of the exposure (time). (Hughson Test., Ex. 11, pp. 185:19-190:10) To be at risk of an asbestos disease, an individual must have a significant cumulative lifetime asbestos exposure that as a practical matter is not possible from ZAI, given the extremely low and often non-existent levels of asbestos in the breathable air of homes insulated with it. (Corn Test., Ex. 10, pp. 115:6-117:20)

The claim that every exposure to asbestos can cause harm to human health is not supported by medical evidence or common sense. Asbestos is ubiquitous. It is a naturally occurring mineral present in every urban environment. All adults living in urban areas are exposed to low levels of asbestos in the ambient air and have millions of asbestos fibers in their lungs without any adverse effect on their health. There is no evidence that exposure to the levels of asbestos in the ambient air over a lifetime causes any increased incidence of asbestos-related disease. (Hughson Test., Ex. 11, pp. 183:17-185:18) The asbestos levels of homes with ZAI are no higher than the ambient air levels everyone breathes. (Corn Decl., Ex. 3, ¶ 19)

The levels of potential exposure to respirable asbestos fibers from ZAI are simply too low to harm human health. In *Barbanti*, Dr. William Hughson, a board certified physician in pulmonary diseases and occupational medicine and a clinical professor at the University of California at San Diego, testified that the level of asbestos exposure necessary to create a risk of asbestosis or lung cancer is at least 25 fibers per cc years.[8] The exposure threshold is lower for mesothelioma, but it is still about 5 fibers per cc years. (Hughson Test., Ex. 11, pp. 194:1-196:19) With respect to exposure from ZAI, under normal living conditions there is essentially no exposure. (*Id.* pp. 6:1-7:6) Even if the homeowners disturbed the attic insulation for a full eight-hour time period and caused an exposure at the level of 0.1 fibers per cc as a time-weighted average, a resident would have to be in his or her attic and exposed at that level for fifty years or twelve thousand days in order to reach the 5 fibers per cc year threshold level for mesothelioma risk. (*Id.* pp. 7:15-8:22) Such a continuous and prolonged exposure is apocryphal. (Corn Test.,

---

[8] A fiber per cc year is the number of asbestos fibers to which a person is exposed during a working year (240 days). For example, a person exposed to 1 fiber per cc for eight hours a day for a working year has accumulated a 1 fiber per cc year exposure; a person working for forty years would have to have an average exposure of .625 fibers per cc to accumulate a 25 fibers per cc year exposure. (*See* Hughson Test., Ex. 11, p. 187:2-22)

Ex. 10, p. 117:2-19)

In any trial of a building owner's claims, the Grace defendants must have the ability to demonstrate that the particular homeowner does not use his or her attic in a way that creates a hazardous exposure to the individuals in that building.

C.    **ZAI Is Safe From An Industrial Hygiene Perspective.**

When viewed from an industrial hygiene perspective, ZAI is safe. Decades of air monitoring in buildings that contain materials with asbestos content far greater than found in ZAI have shown that there are no more asbestos fibers in the air inside buildings than outside. (Corn Decl, Ex. 3, ¶ 19) No meaningful data suggest that the situation is at all different for ZAI.

The occasional disturbance of ZAI by homeowners through renovations or other activities also would not pose any significant health risk even if the activity were undertaken without protection because the cumulative exposure would be minimal. The OSHA permissible exposure level is 0.1 fibers per cc, 8 hours a day, 50 weeks per year for 45 years. Given the low, and in some instances undetectable, asbestos levels in homes with ZAI, even after it is disturbed, homeowners would never approach the OSHA threshold level. (Corn Test., Ex. 10, pp. 116:19-117:20) Thus, even "intermittent exposure during the attic remodeling or renovations would not have any health significance." (Corn Decl., Ex. 3, ¶ 26)

Each attic, of course, is different. To assess the *potential* for exposure in any individual home, the following factors must be considered, together with the results of air testing: (1) the quantity of asbestos-containing materials present; (2) their type and composition; (3) their condition; (4) their location; and (5) the potential for fiber release. (*Id.* ¶ 14)

Dr. Morton Corn, the former head of OSHA, inspected the Price, Prebil, and Holbrook homes, as well as the homes of the plaintiff and affiants in *Barbanti*. (*Id.* ¶ 22; Corn Test., Ex. 10, p. 112:3-5) He observed many variations in attic conditions that would affect any ability of asbestos fibers to enter the ambient air: attics with highly limited access; completely unused attics; attics used only for storage; attics with floorboards covering the vermiculite and attics without floor boards; attics with ventilation providing an opportunity for recirculation of air; the presence of a variety of insulation types and varying amounts of vermiculite; evidence of

8