2/21/01

2. ν\

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re ZONOLITE ATTIC INSULATION PRODUCTS LIABILITY LITIGATION ) ) | MDL Docket No. 1376 |
| ) | The Honorable Patti B. Saris, Presiding |
| This Document Relates To: ) ) | |
| ALL ACTIONS. ) ) | |
| BARBANTI, ) ) | Superior Court, State of Washington County of Spokane |
| Plaintiff, ) | No. 00-2-01756-6 |
| v. ) ) | NOTICE OF DEPOSITION OF DEFENDANT SEALED AIR |
| W.R. GRACE & COMPANY-CONN, et al. ) ) | CORPORATION PURSUANT TO FEDERAL RULE OF CIVIL |
| Defendants. ) | PROCEDURE 30(b)(6) |

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, that plaintiffs, by their attorneys, will take the deposition of Sealed Air Corporation on March 14, 2001 at 9:00 a.m. the offices of Lieff, Cabraser, Heimann & Bernstein, LLP, 214 Union Wharf, Boston, MA 02109, or at another location mutually agreed upon by the parties.  The deposition will be before a person authorized by law to administer oaths, pursuant to  Fed. R. Civ. P. 28 and will continue from day to day, excluding Sundays and holidays, until the examination is completed.

## I.    DEFINITIONS

The following definitions shall apply to each of the document requests and are deemed to be incorporated in each of the requests:

1.    "Grace Defendants" means W.R. Grace & Company (a Delaware corporation) and W.R. Grace & Company-Conn. (a Connecticut company) (defined below).

2.    "Grace Companies" means the "Grace Defendants," their predecessors, subsidiaries and affiliates, including, but not limited to, Grace Speciality Chemical, Inc., W.R. Grace & Company (a New York corporation), Grace Holdings, Inc., the Zonolite Company, and "Cryovac," (defined below) and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

3.    "Sealed Air" means defendant Sealed Air Corporation, its subsidiaries and affiliated entities and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

4.    "Grace-Conn." means W.R. Grace & Company - Conn. (a Connecticut company) and shall include the Grace Companies' specialty chemical business as it existed after the "reorganization", and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

- 1 -

5.     "Cryovac" means the Grace Companies' packaging business as it existed before the "merger" (defined below), both when operated as a division of W.R. Grace & Company (a New York corporation) and subsequently as a subsidiary of W.R. Grace & Company (a Delaware corporation), and its subsidiaries, affiliates, predecessors and successors and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

6.     "Sealed Air's 1998 10-K" means Sealed Air's Form 10-K filed with the United States Securities & Exchange Commission for the fiscal year ending December 31, 1998.  (Relevant portions of which are attached as Exhibit A.)

7.     "Sealed Air's Proxy Statement" means Sealed Air's Joint Proxy Statement/Prospectus, dated February 1998. (Relevant portions of which are attached as Exhibit B.)

8.     "Reorganization" means the transaction in which the Grace Companies' specialty chemical business was "separated from its packaging business, the packaging business was contributed to one group of wholly owned subsidiaries ("Cryovac") and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("Grace-Conn.")," as defined on page 1 of Sealed Air's 1998 10-K.  (Ex. A.)

9.     "Recapitalization" refers to the "recapitalization" as defined on page 1 of Sealed Air's 1998 10-K.  (Ex. A.)

10.    "Merger" refers to the merger between the Grace Companies' packaging business and Sealed Air as defined on page 1 of Sealed Air's 1998 10-K.  (Ex. A.)

11.    "Excess insurance" refers to coverage beyond the primary amount of insurance which becomes effective when the primary insurance is exhausted.

12.    "Primary" insurance means that insurance that is not conditioned on any other insurance coverage.

13.    "Reinsurance" means insurance brought by an insurance company for its own protection whereby an insurer reduces its possible maximum loss on a risk by giving a portion of its liability to another insurer, *i.e.*, the reinsurer.

- 2 -

## II.    DEPOSITION TOPICS

Pursuant to Rule 30(b)(6), Sealed Air shall designate and produce for deposition one or more of its officers, directors, employees, or other persons who consent to testify on behalf of the Grace Companies regarding the following, and who are able to testify to all subject matter to the extent information is known or is reasonably available to the corporation:

1.    The search conducted by Sealed Air for documents responsive to Plaintiffs' First Request for Production of Documents to Defendant Sealed Air ("Plaintiffs' Requests to Sealed Air"), including the identity of all persons whose individual files were searched.

2.    The location of all documents responsive to Plaintiffs' Requests to Sealed Air.

3.    The methods, including any electronic means, of storage, archiving, retaining, searching and locating all documents responsive to Plaintiffs' Requests to Sealed Air.

4.    The destruction of any documents responsive to Plaintiffs' Requests to Sealed Air.

5.    The existence of any computerized databases concerning documents response to Plaintiffs' Requests to Sealed Air or otherwise relating to plaintiffs' claims.

6.    The reorganization.

7.    The recapitalization.

8.    The merger.

9.    The indemnification and liability of Sealed Air for any liabilities of the Grace Companies, including the preparation of all indemnity agreements.

10.    Sealed Air's knowledge at the time of the merger of the Grace Defendants' sufficiency of assets to satisfy liabilities and continue to conduct business after the reorganization, recapitalization and merger.

11.    The reason for the reorganization, recapitalization and merger.

12.    Sealed Air's risk management policies for the period of 1997 to the present, including:

(a)    all insurance companies and policies providing liability protection to Sealed Air, including all layers of primary, excess and reinsurance coverage; and

(b)    all risks retained, self-insured or co-insured.

- 3 -

13.     How Sealed Air intends to fund the defense and indemnification of all liability claims currently pending or anticipated against it, including what insurance or other sources of funds are, may be or may become available.

14.     Any contracts, settlements, releases, commutations or other agreements with Sealed Air's primary or excess insurers or reinsurers which released any such insurer, in whole or in part, from its obligation or potential obligation to provide a defense or indemnification under Sealed Air's liability insurance policies.

15.     Any indemnity agreements, agreements to assume liability, agreements to assume the defense or joint defense agreements made by or entered into by Sealed Air or by another entity on its behalf relating to the reorganization, recapitalization and merger or to the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing of Zonolite or asbestos-containing products or materials.

16.     Any indemnity agreements, agreements to assume liability, agreements to assume the defense or joint defense agreements made with or entered into between Sealed Air and the Grace Companies or by another entity on the Grace Companies' behalf.

17.     The rationale for, and determination of the amount of, the $1.3 billion cash payment to Grace-Conn. and/or related entities in connection with the reorganization, recapitalization or merger.

18.     Any information related to Sealed Air's knowledge of the Grace Companies' potential liability arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, and installing of asbestos-containing products or materials and any attempt to quantify

- 4 -

such potential liability, including whether such potential liability is reflected in Sealed Air's or the

Grace Companies' current estimates related to asbestos liability.

DATED: February 21, 2001

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
JOBETH HALPER
THOMAS R. MERRICK
JENNIFER TEMPLETON SCHIRMER

_____
TIMOTHY G. BLOOD

600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
EDWARD J. WESTBROOK
ROBERT M. TURKEWITZ
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
ELIZABETH J. CABRASER
FABRICE N. VINCENT
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: 415/956-1000
415/956-1008 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
THOMAS SOBOL
JAN R. SCHLICHTMANN
214 Union Wharf
Boston, MA 02109
Telephone: 617/720-5000
617/720-5015 (fax)

GILMAN AND PASTOR, LLP
DAVID PASTOR
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:  781/231-7850
781/231-7840 (fax)

Plaintiffs' Executive Committee Members

EXHIBIT  A

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Wcz3CDN9y6G4MOFMjNF2CQ+Nb4fe+FGzfMFaN7L1Y0uJ2V4VmVQsmtbBugvVTgrl
 u4QoedF1Mj3SX6EK/97n3A==

<SEC-DOCUMENT>0000930413-99-000449.txt : 19990331
<SEC-HEADER>0000930413-99-000449.hdr.sgml : 19990331
ACCESSION NUMBER:               0000930413-99-000449
CONFORMED SUBMISSION TYPE:      10-K
PUBLIC DOCUMENT COUNT:          7
CONFORMED PERIOD OF REPORT:     19981231
FILED AS OF DATE:               19990330

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:              SEALED AIR CORP/DE
                CENTRAL INDEX KEY:                   0001012100
                STANDARD INDUSTRIAL CLASSIFICATION:  UNSUPPORTED PLASTICS FILM &
                IRS NUMBER:                          650654331
                STATE OF INCORPORATION:              DE
                FISCAL YEAR END:                     1231

        FILING VALUES:
                FORM TYPE:          10-K
                SEC ACT:
                SEC FILE NUMBER:    001-12139
                FILM NUMBER:        99577149

        BUSINESS ADDRESS:
                STREET 1:          PARK 80 EAST
                CITY:              SADDLE BROOK
                STATE:             NJ
                ZIP:               07663
                BUSINESS PHONE:    2017917600

        MAIL ADDRESS:
                STREET 1:          PARK 80 EAST
                CITY:              SADDLE BROOK
                STATE:             NJ
                ZIP:               07663

        FORMER COMPANY:
                FORMER CONFORMED NAME:  WR GRACE & CO/DE
                DATE OF NAME CHANGE:    19961015

        FORMER COMPANY:
                FORMER CONFORMED NAME:  GRACE HOLDING INC
                DATE OF NAME CHANGE:    19960805
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>10-K
<TEXT>
```

# EXHIBIT A

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
----------------------
FORM 10-K

(Mark one)

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 1998

OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934 For the transition period from _____ to _____

Commission File Number 1-12139

SEALED AIR CORPORATION
(Exact name of registrant as specified in its charter)

State or other jurisdiction of incorporation or organization: Delaware
Address of principal executive offices: Park 80 East, Saddle Brook,
 New Jersey 07663-5291
I.R.S. Employer Identification Number: 65-0654331
Registrant's telephone number, including area code: (201) 791-7600
Securities registered pursuant to Section 12(b) of the Act:

|                                         | NAME OF EACH EXCHANGE          |
| TITLE OF EACH CLASS                     | ON WHICH REGISTERED            |
| Common Stock, par value $0.10 per share | New York Stock Exchange, Inc.  |
| Series A Convertible Preferred Stock,   | New York Stock Exchange, Inc.  |
| par value $0.10 per share               |                                |

Securities registered pursuant to Section 12(g) of the Act:  None

     Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes X No ___

     Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

     The aggregate market value of the registrant's Common Stock held by
non-affiliates of the registrant on March 24, 1999 was approximately
$3,921,000,000.

     The number of outstanding shares of the registrant's Common Stock as of
March 24, 1999 was 83,486,552.

     DOCUMENTS INCORPORATED BY REFERENCE: Portions of the registrant's 1998
Annual Report to Stockholders are incorporated by reference into Parts I and II
of this Form 10-K. Portions of the registrant's definitive proxy statement for
its 1999 Annual Meeting of Stockholders are incorporated by reference into Part
III of this Form 10-K.

<PAGE>

PART I

ITEM 1.  BUSINESS

   Sealed Air Corporation (together with its subsidiaries, the "Company") is engaged in the manufacture and sale of a wide range of protective, food and specialty packaging materials and systems throughout the world.

   On March 31, 1998, the Company (formerly known as W. R. Grace & Co.) and Sealed Air Corporation (US), a Delaware corporation formerly known as Sealed Air Corporation ("old Sealed Air"), completed a series of transactions as a result of which:

    (a) The specialty chemicals business of the Company was separated from its packaging business, the packaging business ("Cryovac") was contributed to one group of wholly owned subsidiaries, and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("New Grace"); the Company and Cryovac borrowed approximately $1.26 billion under two new revolving credit agreements and transferred substantially all of those funds to New Grace; and the Company distributed all of the outstanding shares of common stock of New Grace to its stockholders. As a result, New Grace became a separate publicly owned company that is unrelated to the Company. These transactions are referred to below as the "Reorganization."

    (b) The Company recapitalized its outstanding shares of common stock, par value $0.01 per share, into a new common stock and Series A convertible preferred stock, each with a par value of $0.10 per share (the "Recapitalization").

    (c) A subsidiary of the Company merged into old Sealed Air (the "Merger"), with old Sealed Air being the surviving corporation. As a result of the Merger, old Sealed Air became a subsidiary of the Company, and the Company was renamed Sealed Air Corporation.

References to "Grace" in this Annual Report on Form 10-K refer to the Company before the Reorganization, the Recapitalization and the Merger.

SEGMENTS

   The Company operates in two reportable business segments: (i) food and specialty packaging products and (ii) protective packaging products, described more fully below. Information concerning the Company's reportable segments appears in Note 3 of the Notes to Consolidated Financial Statements in Item 8 of this Annual Report on Form 10-K, which Note is incorporated herein by reference.

2

<PAGE>

FOOD AND SPECIALTY PACKAGING PRODUCTS

   The Company's principal food and specialty packaging products

are its flexible materials and related products, comprising principally shrink bag and film products, non-shrink laminates and specialty packaging systems marketed primarily under the Cryovac (R) trademark for a broad range of perishable food applications. This segment also includes the Company's rigid packaging and absorbent pads, principally absorbent pads used for the retail packaging of meat, fish and poultry, foam trays used by supermarkets and food processors, and rigid plastic containers for dairy and other food products.

FLEXIBLE MATERIALS AND RELATED SYSTEMS

                    The Company produces a variety of high-performance proprietary flexible films, bags and associated packaging equipment marketed and sold primarily under the Cryovac (R) trademark in North America, Europe, Latin America, South Africa and the Asia Pacific region that are used to package a broad range of perishable foods such as fresh, smoked and processed meat products, cheese, poultry, prepared foods (including soups and sauces for restaurants and institutions) and produce. The Company also offers sterilized medical bags and films for use with medical products and produce bags with dispensing systems used by customers in supermarket produce departments.

                    Cryovac (R) food packaging products include shrink bags, shrink films sold for food packaging applications and laminated films. Shrink bags and films are multi-layered shrinkable plastic bags and films that mold themselves to the shape of the product. Laminates are multi-layered, non-shrinkable plastic materials used to package perishable foods and shelf-stable products such as syrups and toppings. Films and bags are sold in barrier and permeable forms, depending on whether oxygen or other gases can pass through the material. Offerings include modified atmosphere packaging (MAP) that is designed to provide a controlled gas environment within a package to extend shelf life.

                    The Company's food packaging films and bags incorporate the Company's core technologies, including proprietary film processing technology, resin technology, and packaging and food science expertise. The Company seeks to maintain technological leadership through a continuous program of research and development in its core technologies.

                    For processed meats and poultry, Cryovac (R) cook-in bags and laminates withstand high cooking temperatures while retaining product shape, clarity and weight. For fresh-cut produce, the Company produces films that permit oxygen to pass through at various rates, thereby matching the varying respiration rates of different vegetables and permitting longer shelf life. During 1998, the Company introduced a new low-oxygen packaging film for use with MAP packaging. The Company's Cryovac (R) films offer a wide variety of other characteristics, such as anti-fog, clarity, gloss, oxygen barrier or strength, that meet customer demands in specific food packaging applications.

                                        3

<PAGE>

                    The Company's food packaging equipment offerings include: dispensing and loading units to package foods in shrink, vacuum or vacuum skin packages using the Company's films and bags; form, fill and seal units to package foods in pouches made using the Company's films; and bagging systems. Systems are marketed to the food processing industry under the Cryovac (R) trademark and other trademarks.

RIGID PACKAGING AND ABSORBENT PADS

The Company manufactures and sells Cryovac (R) polystyrene foam trays that are used by supermarkets and by food processors to protect and display fresh meat, poultry and produce. The Company also manufactures and sells absorbent pads used for food packaging, including its Dri-Loc (R) absorbent pads. The Company's foam trays and absorbent pads are often used together. The Company's case-ready packaging customers, principally meat and poultry processors, purchase trays, pads and specially-designed films and packaging equipment to package centrally meat and poultry products prior to shipment to the supermarket. The Company also manufactures rigid plastic containers, primarily plastic tubs for dairy products such as margarine and yogurt, in Australia that are marketed under the Omicron (TM) trademark.

PROTECTIVE PACKAGING PRODUCTS

The Company's protective packaging products include its cushioning and surface protection products and certain other products. The Company's principal cushioning and surface protection products are air cellular cushioning materials, Cryovac (R) films for non-food applications, Instapak (R) polyurethane foam packaging systems, polyethylene foam sheets and planks, protective and durable mailers and bags, paper-based packaging products, suspension and retention packaging and packaging systems.

CUSHIONING AND SURFACE PROTECTION PRODUCTS

AIR CELLULAR CUSHIONING MATERIALS: The Company manufactures and markets Bubble Wrap (R) air cellular cushioning materials, which are also marketed under various other trademarks, including AirCap (R) and PolyCap (R). These materials consist of air bubbles encapsulated between two layers of plastic film, each containing a barrier layer to retard air loss, that form a pneumatic cushion to protect products from damage through shock or vibration during shipment. The Company's air cellular cushioning materials are used by a wide variety of end users, including both manufacturers and retailers.

CRYOVAC (R) FILMS FOR NON-FOOD APPLICATIONS: The Company manufactures and sells Cryovac (R) films used to shrink-wrap a wide assortment of industrial and consumer products. The Company's proprietary multi-layer films provide features such as strength and clarity. In certain regions the Company also offers shrink-wrap equipment for use with the Company's shrink films.

4

<PAGE>

INSTAPAK (R) SYSTEMS: Instapak (R) polyurethane foam packaging systems consist of proprietary blends of polyurethane chemicals and specially designed dispensing equipment. The Company also manufactures high-performance polyolefin films designed for use with Instapak (R) packaging systems.

Instapak (R) chemicals, films and equipment are marketed as integrated packaging systems to provide protective packaging for a wide variety of products, including computer, electronic, office, medical and communications equipment, compressors and motors, furniture and spare parts, and void-fill packaging of office supplies, books, cosmetics and other small products for distribution. Instapak (R) systems are also used to produce polyurethane foams used in certain non-packaging applications, including Instapak (R) Floral, a foam used as a design base for artificial flower arrangements.

POLYETHYLENE FOAMS: The Company manufactures thin polyethylene

products are sold or used, laws and regulations have been adopted or proposed that seek to regulate, among other things, recycled or reprocessed content, sale and disposal of packaging materials. In addition, customer demand for packaging materials that are viewed as being "environmentally responsible" and that minimize the generation of solid waste continues to evolve. While these issues can be a competitive factor in the marketplace for packaging materials, the Company maintains active programs designed to comply with these laws and regulations, to monitor their evolution, and to meet such customer demand.

        The Company believes that its packaging materials offer superior packaging protection, enabling customers to achieve lower package cube and weight using the Company's packaging materials than with many alternative packaging methods, thereby reducing the disposal of damaged products as well as the generation of packaging waste. Because the Company offers both plastic-based and paper-based protective packaging materials, customers can select the protective packaging materials that they consider to best meet their performance and cost needs and

                                9

<PAGE>

environmental preferences. A number of the Company's protective packaging product lines incorporate recycled or reprocessed content, and the Company maintains ongoing efforts to add or increase recycled or reprocessed content in many of its protective packaging product lines.

        The Company also supports its customers' interests in eliminating waste by offering or participating in collection programs for certain of the Company's products or product packaging and for materials used in certain of the Company's products, and, when possible, materials collected through these collection programs are reprocessed and either reused in the Company's protective packaging operations or offered to other manufacturers for use in other products.

EMPLOYEES

        At December 31, 1998, the Company had approximately 14,700 employees worldwide.

ITEM 2.  PROPERTIES

        The Company's food and specialty packaging products are produced in 40 manufacturing facilities (15 in North America, 10 in Europe, 5 in Latin America, 9 in the Asia Pacific region, and 1 in South Africa). Protective packaging products are produced in 62 manufacturing facilities (29 in North America, 18 in Europe, 4 in Latin America, and 11 in the Asia Pacific region, including certain small converting facilities). Several of the Company's manufacturing facilities serve both segments. The Company occupies other facilities containing fabricating or converting operations or sales, distribution, technical, warehouse or administrative offices at a number of locations in the United States and in various foreign countries.

        In the United States, the Company's food and specialty products are manufactured at facilities in California, Indiana, Iowa, Mississippi, Missouri, New York, North Carolina, Pennsylvania, South Carolina, and Texas. Its protective packaging products are manufactured at facilities in California, Connecticut, Georgia, Illinois, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas and

Washington. Because of the light but voluminous nature of the Company's air
cellular, polyethylene foam and protective mailer products, significant freight
savings may be realized by locating manufacturing facilities for these products
near markets. To realize the benefit of such savings, the Company has facilities
for manufacturing these products in various locations in proximity to major
markets.

        The Company owns the large majority of its manufacturing
facilities, certain of which are owned subject to mortgages or similar financing
arrangements. The balance of the Company's manufacturing facilities are located
in leased premises. The Company's manufacturing facilities are usually located
in general purpose buildings in which the Company's specialized machinery for
the manufacture of one or more products is contained. The Company believes that
its manufacturing facilities are well maintained, suitable for their purposes,
and adequate for the Company's needs.

10

<PAGE>

ITEM 3. LEGAL PROCEEDINGS

        The Company is a party to various lawsuits and administrative
and other proceedings incidental to its business, including certain federal or
state governmental environmental proceedings or private environmental claims
relating to the cleanup of Superfund sites or other sites. While it is often
difficult to estimate potential environmental liabilities and the future impact
of environmental matters, based upon the information currently available to the
Company and its experience in dealing with such matters, the Company believes
that its potential liability with respect to such sites is not material. The
Company believes, after consulting with counsel, that the disposition of its
lawsuits and other legal proceedings, including environmental matters, will not
have a material effect on the Company's consolidated financial position.

        In connection with the Reorganization, the Recapitalization
and the Merger, New Grace agreed to indemnify the Company against all
liabilities of Grace, whether accruing or occurring before or after the merger,
other than liabilities arising from or relating to Cryovac's operations. New
Grace also agreed to retain certain liabilities of Cryovac and to indemnify the
Company against such liabilities. The Company may remain liable with respect to
certain of such liabilities if New Grace fails to fulfill its indemnity
obligations to the Company. Based upon currently available information, the
Company believes that future costs related to such indemnified liabilities will
not have a material adverse effect on the Company's consolidated financial
position.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

        No matters were submitted to a vote of the Company's stockholders
during the fourth quarter of 1998.

11

<PAGE>

EXECUTIVE OFFICERS OF THE REGISTRANT

        The information appearing in the table below sets forth the

current position or positions held by each executive officer of the Company, his or her age as of March 15, 1999, the year in which he or she first was elected to the position currently held with the Company or with old Sealed Air (as indicated in the footnote to the table), and the year in which he or she first was elected an officer of the Company or of old Sealed Air (as indicated in the footnote to the table).

     All of the Company's officers serve at the pleasure of the Board of Directors. All officers have been employed by the Company or its subsidiaries for more than five years except for Mr. Van Riper, who was elected Senior Vice President and Chief Financial Officer of the Company effective July 1, 1998. Previously Mr. Van Riper was a partner in the accounting firm of KPMG LLP, which were the independent accountants for old Sealed Air for many years prior to the Merger and have acted as the independent accountants for the Company since the Merger. There are no family relationships among any of the Company's officers or directors.

| NAME AND CURRENT POSITION | AGE AS OF MARCH 15, 1999 | FIRST ELECTED TO CURRENT POSITION | FIRST ELECTED AN OFFICER |
| --- | --- | --- | --- |
| T. J. Dermot Dunphy Chairman of the Board, Chief Executive Officer and Director | 66 | 1971 | 1971 |
| William V. Hickey President and Chief Operating Officer | 54 | 1996 | 1980 |
| J. Gary Kaenzig, Jr.* Executive Vice President | 53 | 1998 | 1995 |
| Bruce A. Cruikshank Senior Vice President | 55 | 1996 | 1990 |
| Robert A. Pesci Senior Vice President | 53 | 1997 | 1990 |
| Daniel S. Van Riper Senior Vice President and Chief Financial Officer | 58 | 1998 | 1998 |
| Jonathan B. Baker Vice President | 46 | 1994 | 1994 |
| James A. Bixby Vice President | 55 | 1990 | 1990 |
| Leonard R. Byrne* Vice President | 57 | 1998 | 1998 |

12

<PAGE>

| Mary A. Coventry Vice President | 45 | 1994 | 1994 |
| --- | --- | --- | --- |

```
<S>                                                 <C>            <C>
Interest payments, net of amounts capitalized       $    47,997   $
Income tax payments                                      80,069            74,
</TABLE>
```

                                    38

<PAGE>

The consolidated statement of cash flows for the year ended December 31, 1998
excludes the following non-cash transactions that were accounted for as changes
in additional paid-in capital:

```
<TABLE>
<CAPTION>

<S>
    Issuance of 36,021,851 shares of Series A convertible preferred stock and 40,64
      shares of common stock in connection with the Reorganization and Recapitaliza
    Net assets acquired in the Merger in exchange for 42,624,246 shares of common s
    Liabilities assumed by the Company, net
    Liabilities retained by New Grace
</TABLE>
```

NOTE 16 EARNINGS PER COMMON SHARE

In calculating basic and diluted earnings per common share for 1998, 1997 and
1996, retroactive recognition has been given to the Recapitalization as if it
had occurred on January 1, 1996 in accordance with SAB No. 98. Accordingly, net
earnings have been reduced for preferred stock dividends (as if such shares had
been outstanding during each period) to arrive at earnings ascribed to common
shareholders. The weighted average number of outstanding common shares used to
calculate basic earnings per common share has been calculated on an equivalent
share basis using the weighted average number of shares of common stock
outstanding for the first quarter of 1998 and for the 1997 and 1996 periods,
adjusted to reflect the terms of the Recapitalization. The weighted average
number of common shares used to calculate diluted earnings per common share also
considers the exercise of dilutive stock options in each year and repurchased
preferred stock in 1998. Except as noted in the table below, the outstanding
preferred stock is not assumed to be converted in the calculation of diluted
earnings per common share for 1998 or 1996 because the treatment of the
preferred stock as the common stock into which it is convertible would be
anti-dilutive (i.e., would increase earnings per common share) in those years.

The following table sets forth the reconciliation of the basic and diluted
earnings per common share computations for years ended December 31, 1998, 1997
and 1996 (shares in thousands).

```
<TABLE>
<CAPTION>

                                                    1998 (a)   1997 (a
- -----------------------------------------------------------------------------
<S>                                                 <C>        <C>
Basic EPS:
NUMERATOR
Net earnings                                        $ 73,007   $173,732
Add: Excess of book value over repurchase price of preferred
          Stock                                        1,798        --
Less: Preferred stock dividends                       53,921        --
Less: Retroactive recognition of preferred stock dividends  18,011   72,044
- -----------------------------------------------------------------------------
```

| | | |
|---|---:|---:|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |

DENOMINATOR

| | | |
|---|---:|---:|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Basic earnings per common share | $ 0.04 | $ 2.54 |

39

<PAGE>

Diluted EPS:
NUMERATOR

| | | |
|---|---:|---:|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |
| Add:  Dividends associated with outstanding preferred stock | -- | 72,044 |
| Add:  Dividends associated with preferred stock repurchased | 316 | -- |
| Less: Excess of book value over repurchase of preferred stock | 1,798 | -- |
| Earnings ascribed to common shareholders-diluted | 1,391 | 173,732 |

DENOMINATOR

| | | |
|---|---:|---:|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Effect of assumed exercise of options | 118 | 917 |
| Effect of assumed conversion of preferred stock | -- | 31,864 |
| Weighted average of preferred stock purchased | 158 | -- |
| Weighted average common shares outstanding - diluted | 73,273 | 72,833 |
| Diluted earnings per common share | $ 0.02 | $ 2.39 |

</TABLE>

(a)  Such  earnings per common share amounts are not  necessarily  indicative of
     the results that would have occurred had Cryovac been a stand-alone company
     prior to the Reorganization, Recapitalization and the Merger.

NOTE 17 CERTAIN TRANSACTIONS WITH GRACE

CASH

Prior to the Merger,  Cryovac used Grace's centralized cash management services.
Under  such  service  arrangements,  excess  domestic  cash  was  invested,  and
disbursements were funded, centrally by Grace on behalf of Cryovac.

SHARED SERVICES AND FACILITIES

Prior to the Merger,  Grace  allocated a portion of its  domestic  and  overseas
regional  corporate  expenses to Cryovac.  These  expenses  reflected  corporate

overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; general legal services, including intellectual property; and other support and executive functions. Allocations and charges were based on either a direct cost pass-through or a percentage allocation for services provided, based on factors such as net sales, management effort or headcount.

Domestic corporate expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $18,044, $28,213 and $15,175 for 1998, 1997 and 1996, respectively, and were included in marketing, administrative and development expenses.

Domestic research and development expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $5,074 for 1996 and are included in marketing, administrative and development expenses. No amounts were allocated for 1998 or 1997.

Grace management believed that the basis used for allocating corporate services was reasonable and that the terms of these transactions would not materially differ from those among unrelated parties.

The statements of earnings for periods prior to the Merger also included allocations of costs for general and administrative services and maintenance services for facilities that Cryovac shared with other Grace businesses as well as data processing services provided by Grace's European central data processing facility. The allocated costs and expenses related to general and administrative functions, maintenance, data processing and other facility support functions were estimated to be approximately $14,000 for the 1998 period and $55,802 and $84,005 for 1997 and 1996, respectively. Of these amounts, $6,181 was included in cost of sales and $49,621 was included in marketing, administrative and development expenses in 1997 ($15,226 and $68,779 in 1996). The cost allocations for these services were determined based on methods that Grace management considered to be reasonable.

Prior to the Merger, Grace also charged Cryovac for its share of domestic workers' compensation, automobile and other general business liability insurance premiums and claims, which were all handled by Grace on a corporate basis. These charges were based on Cryovac's actual and expected future experience, including annual payroll expense, and were not significant to Cryovac results of operations.

40

<PAGE>

ALLOCATION OF LONG-TERM INCENTIVE PROGRAM EXPENSE

In accordance with SAB No. 55, the financial statements for 1997 and 1996 reflect an allocation of LTIP expense related to Grace corporate employees that performed services on behalf of Cryovac. The provision included in the financial statements for allocated LTIP expenses was $23,710 and $9,293 for 1997 and 1996, respectively.

NOTE 18 COMMITMENTS AND CONTINGENCIES

The Company is obligated under the terms of various leases covering many of the facilities that it occupies. The Company accounts for substantially all of its leases as operating leases. Net rental expense was $20,873, $9,588, and $12,036 for 1998, 1997 and 1996, respectively. Estimated future minimum annual rental commitments under non-cancelable real property leases expiring through 2023 are

as follows:  1999 - $19,686; 2000 - $16,767; 2001 - $12,481; 2002 - $8,369; 2003 - - $6,574; and subsequent years - $15,557.

The Company's worldwide operations are subject to environmental laws and regulations which, among other things, impose limitations on the discharge of pollutants into the air and water and establish standards for the treatment, storage and disposal of solid and hazardous wastes. The Company reviews the effects of environmental laws and regulations on its operations and believes that it is in substantial compliance with all material applicable environmental laws and regulations.

At December 31, 1998, the Company was a party to, or otherwise involved in, several federal and state government environmental proceedings and private environmental claims for the cleanup of Superfund or other sites. The Company may have potential liability for investigation and clean up of certain of such sites. At most of such sites, numerous companies, including either the Company or one of its predecessor companies, have been identified as potentially responsible parties ("PRPs") under Superfund or related laws. It is the Company's policy to provide for environmental cleanup costs if it is probable that a liability has been incurred and if an amount which is within the estimated range of the costs associated with various alternative remediation strategies is reasonably estimable, without giving effect to any possible future insurance proceeds. As assessments and cleanups proceed, these liabilities are reviewed periodically and adjusted as additional information becomes available. At December 31, 1998 and 1997, such environmental related provisions were not material. While it is often difficult to estimate potential liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material to the Company's consolidated financial position. Environmental liabilities may be paid over an extended period, and the timing of such payments cannot be predicted with certainty.

The Company is also involved in various legal actions incidental to its business. Company management believes, after consulting with counsel, that the disposition of its litigation and other legal proceedings and matters, including environmental matters, will not have a material effect on the Company's consolidated financial position.

In connection with the Reorganization, certain environmental liabilities of Cryovac were retained by or assumed by New Grace. As of March 31, 1998, the Company's liability with respect to such environmental obligations retained by New Grace, including related deferred income taxes, was reversed and accounted for as an equity contribution to the Company from Grace.

CONTINGENT LIABILITIES INDEMNIFIED BY NEW GRACE

Pursuant to the Transaction Agreements, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the Merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain contingently liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's results of operations or consolidated financial position.

41

<PAGE>

GUARANTEE OF NEW GRACE OUTSTANDING PUBLIC DEBT

The Company is the guarantor of certain outstanding public debt that was assumed by New Grace pursuant to the Transaction Agreements. At December 31, 1998, approximately $32,000 of such debt was outstanding. New Grace has indemnified the Company against any liability arising under such guarantee pursuant to the Transaction Agreements.

TRANSACTION AGREEMENTS

Pursuant to the Transaction Agreements final determinations and accountings are necessary with respect to matters pertaining to the Reorganization and the Merger. The Company believes that the final outcome of such matters will not have a material effect on its consolidated financial position.

NOTE 19 SELECTED PRO FORMA STATEMENT OF EARNINGS INFORMATION (UNAUDITED)

The following table presents selected unaudited pro forma statement of earnings information for the years ended December 31, 1998 and 1997 that has been prepared as if the Reorganization, the Recapitalization and the Merger had occurred on January 1, 1997. Such information reflects pro forma adjustments made in combining the historical results of old Sealed Air and Cryovac as a result of such transactions for the years presented. Such amounts include, among other things, incremental goodwill amortization of approximately $10,300 and $41,200 and incremental interest expense of approximately $20,400 and $81,600 in the first quarter of 1998 and full year 1997, respectively. Such amounts exclude a non-cash inventory charge of approximately $8 million recorded in the second quarter of 1998 resulting from the turnover of certain of the Company's inventories previously stepped-up to fair value in connection with the Merger. This pro forma information is not intended to represent what the Company's actual results of operations would have been for such years, if such transactions had occurred on January 1, 1997.

<TABLE>
<CAPTION>

| (Amounts in thousands, except for per share data) | Year Ended 1998 Pro Forma |
|---|---|
| <S> | <C> |
| Net sales by segment: | |
|    Food and Specialty Packaging | $ 1,709,428 |
|    Protective Packaging | 1,010,080 |
| Net sales | 2,719,508 |
| Cost of sales | 1,762,957 |
| Gross profit | 956,551 |
| Marketing, administrative and development expenses | 516,269 |
| Goodwill amortization | 47,893 |
| Restructuring and other charges, net | 87,182 |
| Operating profit | 305,207 |

| | | |
|---|---|---|
| Other expense, net | | (82,141) |
| Earnings before income taxes | | 223,066 |
| Income taxes | | 141,574 |
| Net earnings | $ | 81,492 |
| Less:  Preferred stock dividends | | 71,932 |
| Add:  Excess of book value over repurchase price of preferred stock | | 1,798 |
| Net earnings ascribed to common shareholders | $ | 11,358 |
| Earnings per common share (1) | | |
| Basic | $ | 0.14 |
| Diluted | $ | 0.12 |
| Weighted average number of common shares outstanding: | | |
| Basic | | 83,478 |
| Diluted | | 83,754 |

</TABLE>

(1)  For purposes of  calculating  basic and diluted  earnings per common share,
     net earnings for 1998 and 1997 have been reduced by the dividends  ($18,011
     in 1998 for the first  quarter  and $72,044  in 1997) that would have been
     payable on the  preferred  stock (as if such  shares  had been  outstanding

                                        42

<PAGE>

     during such periods) to arrive at earnings ascribed to common shareholders.
     The weighted average number of outstanding  common shares used to calculate
     basic earnings per common share is calculated on an equivalent  share basis
     using the shares of common stock  outstanding  for the first quarter of 1998
     and for 1997,  adjusted to reflect the terms of the  Recapitalizaiton.  The
     assumed  conversion  of  the  preferred  stock  is  not  considered  in the
     calculation of diluted  earnings per common share in either 1998 or 1997 as
     the effect would be anti-dilutive (i.e., would increase earnings per share)
     in each year.

NOTE 20 INTERIM FINANCIAL INFORMATION (UNAUDITED)
<TABLE>
<CAPTION>

| | First | Second | Third |
|---|---|---|---|
| (Amounts in thousands, except  for per share data) | Quarter | Quarter | Quarter |
| **1998** | | | |
| <S> | <C> | <C> | <C> |
| Net sales | $ 431,035 | $ 670,005 | $ 684,3 |
| Cost of sales | 290,913 | 442,945 | 443,2 |
| Net earnings(loss) | 27,052 | 35,565 | (54,1 |
| Preferred stock dividends | -- | 18,011 | 17,9 |
| Earnings(loss) per common share – basic (2) | 0.22(3) | 0.21 | (0. |

EXHIBIT B

Filed by the Registrant |X|
Filed by a Party other than the Registrant |_|

Check the appropriate box:
|_| Preliminary Proxy Statement                    |_|Confidential.  For Use of the
                                                       Commission Only (as per-
                                                       mitted by Rule 14a-6(e)(2))

|X| Definitive Proxy Statement
|_| Definitive Additional Materials
|_| Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

                            Sealed Air Corporation
- --------------------------------------------------------------------------
                (Name of Registrant as Specified in Its Charter)

- --------------------------------------------------------------------------
    (Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)
Payment of Filing Fee (Check the appropriate box):

        |X|    No fee required.

        |_|    Fee computed on table below per Exchange Act Rules 14a-6(i)(1)
               and 0-11.
        (1) Title of each class of securities to which transaction applies:

- --------------------------------------------------------------------------
        (2) Aggregate number of securities to which transaction applies:

- --------------------------------------------------------------------------

        (3) Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee
is calculated and state how it was determined):

- --------------------------------------------------------------------------

        (4) Proposed maximum aggregate value of transaction:

- --------------------------------------------------------------------------

        (5) Total fee paid:

- --------------------------------------------------------------------------

        |_| Fee paid previously with preliminary materials:

- --------------------------------------------------------------------------

        |_| Check box if any part of the fee is offset as provided by Exchange
Act Rule 0- 11(a)(2) and identify the filing for which the offsetting fee was
paid previously. Identify the previous filing by registration statement number,
or the form or schedule and the date of its filing.

        (1) Amount previously paid:
- --------------------------------------------------------------------------

        (2) Form, Schedule or Registration Statement no.:
- --------------------------------------------------------------------------


                                EXHIBIT B

global marketing network.

Here are a few points that highlight how New Sealed Air would have looked in 1996:

- o New Sealed Air would have had annual net sales of more than $2.5 billion.

- o Approximately 60% of New Sealed Air's net sales would have come from specialty (primarily food) packaging products and 40% from protective packaging and other products.

- o New Sealed Air would have had operations in 46 countries, with 51% of its revenues generated in the U.S. and 49% outside the U.S.

Following these transactions, New Sealed Air will:

- o be an independent company, initially owned 37% by the existing Sealed Air stockholders and 63% by the existing Grace stockholders;

- o own and operate the businesses of Sealed Air and Grace Packaging; and

- o be obligated to repay the approximately $1.2 billion that will be borrowed and transferred to Grace's specialty chemicals businesses.


New Grace After the Merger

After the spin-off, New Grace will be a highly focused specialty chemicals company. Grace stockholders should review the New Grace Information Statement.

New Grace will:

- o initially be owned 100% by the existing Grace stockholders;

- o own and operate Grace's specialty chemicals businesses; and

- o be essentially debt-free following the approximately $1.2 billion cash transfer from Grace, which will be used to repay borrowings.

-------------------------------

Considerations for Sealed Air Stockholders

The Sealed Air stockholders will be asked to approve the merger agreement. The favorable vote of a majority of the outstanding shares of Sealed Air common stock is required to approve the merger.

Recommendation to Sealed Air Stockholders

The Board of Directors of Sealed Air believes the merger is fair to you and in your best interests and recommends that you vote "FOR" the merger proposal.

In reaching its recommendation in favor of the merger, the Sealed Air Board considered the challenges and risks associated with combining the companies and achieving the benefits anticipated from the merger, as discussed in "Certain Risk Factors" beginning on page 22.

What Sealed Air Stockholders Will Receive

If these transactions are completed, Sealed Air stockholders will receive one share of New Sealed Air common stock for each share of Sealed Air common stock that they own.

Sealed Air's Reasons for the Proposed Merger (See page 29 and 31)

Sealed Air believes the merger will:

o   offer a strategic business opportunity to bring together two leading packaging companies with Sealed Air's entrepreneurial management team;

o   combine complementary product lines to create marketing opportunities;

o   bring together innovative technologies and worldwide marketing networks and distribution channels; and

o   create opportunities for efficiencies through the integration of the two companies' operations.

Opinion of Financial Advisor (See page 39)

In deciding to approve the merger, the Sealed Air Board received and considered the opinion of Donaldson, Lufkin & Jenrette Securities Corporation, its financial advisor, as to the fairness of the consideration to be received by its stockholders from a financial point of view. The opinion is attached as Annex C to this Joint Proxy Statement/Prospectus. We encourage you to read the opinion.

-------------------------------

Considerations for Grace Stockholders

The Grace stockholders will be asked:

o   to approve the merger agreement (which will constitute approval of the spin-off, certain charter amendments, the recapitalization of the Grace common stock and the issuance of shares in the merger); and

o   to approve a charter amendment to repeal certain provisions requiring supermajority stockholder approval (see below).

The favorable vote of a majority of the outstanding shares of Grace common stock is required to approve the reorganization and merger. The favorable vote of 80% of the outstanding shares of Grace common stock is required to approve the repeal of the charter provisions requiring supermajority approval.

Recommendation to Grace Stockholders

The Board of Directors of Grace believes the reorganization and merger are fair to you and in your best interests and recommends that you vote "FOR" the proposal to approve the reorganization and merger. As agreed with Sealed Air, the Board recommends that you vote "FOR" the proposal to repeal the charter provisions requiring supermajority approval.

In reaching its recommendation in favor of the proposed transactions, the Grace Board considered the challenges and risks associated with combining the companies and achieving the benefits anticipated from the reorganization and

To protect the tax-free treatment of the reorganization and merger under U.S. federal income tax laws, Sealed Air and Grace have agreed to certain restrictions on New Sealed Air. For two years after the merger:

o    New Sealed Air and its affiliates may not repurchase 20% or more of New Sealed Air's equity securities (subject to certain additional limitations).

o    New Sealed Air and its affiliates may not issue or sell equity securities of New Sealed Air or Grace Packaging, and they may not solicit, support or participate in any tender offer for New Sealed Air equity securities, or approve or permit any business combination or other transaction that (alone or together with the merger) will result in one or more persons obtaining a 50% or greater interest in New Sealed Air.

o    New Sealed Air must continue to operate Grace Packaging's business and may not sell or otherwise dispose of more than 60% of Grace Packaging's assets except in the ordinary course of business.

o    The subsidiaries engaged in Grace Packaging's business may not voluntarily dissolve, liquidate, merge, consolidate or reorganize, subject to certain exceptions.

New Grace will be subject to similar restrictions.

These restrictions may limit the ability of New Sealed Air and New Grace to engage in certain business transactions that otherwise might be advantageous for the companies and their stockholders, and could deter potential acquisitions of control of New Grace or New Sealed Air. The restrictions are designed to protect the tax-free treatment of the reorganization for U.S. federal income tax purposes. Accordingly, New Sealed Air or New Grace may engage in a restricted transaction so long as it (i) obtains a ruling from the Internal Revenue Service ("IRS") or an opinion of tax counsel that the transaction will not adversely affect the tax-free treatment of the reorganization and (ii) indemnifies the other party against adverse tax consequences arising from the transaction. See "Certain United States Federal Income Tax Consequences" beginning on page 34 and "Relationship Between New Sealed Air and New Grace After the Reorganization and Merger--Tax Sharing Agreement" beginning on page 78, 78.

Liabilities of New Grace, Fraudulent Transfer and Related Considerations

Grace's primary U.S. operating subsidiary has significant liabilities relating to previously sold asbestos-containing products. As a result, Grace and the subsidiary are currently defendants in numerous asbestos-related lawsuits and are likely to be named as defendants in additional lawsuits in the future. At September 30, 1997, the liability recorded on Grace's books with respect to the defense and disposition of asbestos-related lawsuits and claims was $910.5 million, including a current liability of $135.0 million. In addition, at September 30, 1997, Grace had recorded a receivable of $295.4 million, reflecting amounts that Grace believes will ultimately be recovered from insurance carriers with respect to its asbestos-related lawsuits and claims. Grace and its subsidiaries also have substantial environmental and other liabilities.

After the merger and related transactions, New Grace will be responsible for all of the asbestos-related liabilities, substantially all of the environmental liabilities (other than certain liabilities relating to Grace Packaging) and other liabilities of Grace and its subsidiaries that are

unrelated to Grace Packaging. Based on currently available information and
advice provided by their respective financial, legal and other advisors, Sealed
Air and Grace believe that New Grace will be able to satisfy its liabilities as
they become due. Nevertheless, claimants might seek to hold New Sealed Air
liable for obligations of New Grace. New Grace has agreed to indemnify New
Sealed Air for liabilities and costs that New Sealed Air may incur relating to
New Grace's liabilities; however, New Grace may not be able to fulfill its
indemnity obligations to New Sealed Air.

Claimants may also bring suit seeking recovery from New Sealed
Air or its subsidiaries by claiming that the transfers of assets and liabilities
in connection with the reorganization of Grace, including the separation of
Grace's packaging and specialty chemicals businesses and the cash transfer to
and spin-off of New Grace, were "fraudulent transfers". A transfer would be a
fraudulent transfer if the transferor received less than reasonably equivalent
value and the transferor was insolvent at the time of the transfer, was rendered
insolvent by the transfer or was left with unreasonably small capital to engage
in its business. A transfer may also be a fraudulent transfer if it was made to
hinder, delay or defraud creditors. If any transfers in connection with the
reorganization of Grace are found to be fraudulent transfers, the recipient
(including New Sealed Air and its subsidiaries) might be required to return the
property to the transferor. Similar consequences would result if a court were to
find that any transfers were made in violation of laws restricting dividends.

Sealed Air and Grace believe that Grace, New Grace and their
subsidiaries are adequately capitalized and will be adequately capitalized after
the reorganization, and that none of the transfers contemplated to occur in the
reorganization is a fraudulent transfer. Sealed Air and Grace also believe that
the reorganization of Grace and the spin-off of New Grace will comply with
applicable dividend laws. However, a court applying the relevant legal standards
may not reach the same conclusions.

More information regarding Grace's asbestos and other liabilities
is included in Grace's filings with the Securities and Exchange Commission
("SEC"). See "Where You Can Find More Information" on page 100 and the New Grace
Information Statement.

No Prior Market for New Sealed Air Stock

There is no current public trading market for New Sealed Air
common and convertible preferred stock. New Sealed Air will apply to list its
common and convertible preferred stock on the New York Stock Exchange, and we
expect "when-issued" trading in New Sealed Air common and convertible preferred
stock to develop before the merger is consummated. This means that shares can be
traded before the share certificates are issued, and before the actual numbers
of shares to be issued in the reorganization and merger are determined.

We cannot predict the prices at which New Sealed Air common and
convertible preferred stock may trade, either before the merger on a
"when-issued" basis or after the merger. Such trading prices will be determined
by the marketplace and may be influenced by many factors, including the depth
and liquidity of the market for such shares, investor perceptions of New Sealed
Air and the industries in which it participates, New Sealed Air's dividend
policy and general economic and market conditions. Until an orderly market
develops, the trading prices for these shares may fluctuate significantly.

The New Sealed Air common and convertible preferred stock will be
freely transferable, except for shares received by Sealed Air or Grace
"affiliates", as that term is defined under the Securities Act of 1933, as
amended (the "Securities Act"). See "The Reorganization and Merger--Federal

relevant management and board of directors regarding the structure and terms of the Reorganization and Merger and the negotiation of the Transaction Agreements.

In deciding to approve the Reorganization and Merger, the Sealed Air and Grace Boards considered opinions from their respective financial advisors as to the fairness of the Reorganization and Merger to their respective stockholders from a financial point of view.

Opinion of Sealed Air Financial Advisor

Sealed Air asked DLJ, in its role as financial advisor to Sealed Air, to render an opinion to the Sealed Air Board as to the fairness to Sealed Air stockholders, from a financial point of view, of the Exchange Ratio, pursuant to which Sealed Air stockholders would receive one share of New Sealed Air common stock for each share of Sealed Air common stock.

On August 14, 1997, DLJ rendered its written opinion to the effect that, as of such date, based upon and subject to the assumptions, limitations and qualifications set forth in the DLJ Opinion, the Exchange Ratio was fair to Sealed Air stockholders from a financial point of view.

The full text of the DLJ Opinion is attached hereto as Annex C. The summary of the DLJ Opinion set forth in this Joint Proxy Statement/Prospectus is qualified in its entirety by reference to the full text of the opinion of DLJ. Sealed Air stockholders are urged to read the DLJ Opinion carefully and in its entirety for the procedures followed, assumptions made, other matters considered and limits of the review by DLJ in connection with such opinion.

The DLJ Opinion was prepared for the Sealed Air Board and was directed only to the fairness from a financial point of view, as of the date thereof, of the Exchange Ratio to Sealed Air stockholders. DLJ expressed no opinion in the DLJ Opinion as to the prices at which New Sealed Air's securities would actually trade at any time. The DLJ Opinion does not constitute a recommendation to any stockholder of Sealed Air as to how such holder should vote on the Merger at the Sealed Air Special Meeting.

Sealed Air selected DLJ to act as its financial advisor because of DLJ's familiarity with Sealed Air and its qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as its reputation as a nationally recognized investment banking firm engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, leveraged buy-outs and valuations for corporate and other purposes. Sealed Air did not impose any restrictions or limitations upon DLJ with respect to the investigations made or the procedures followed by DLJ in rendering the DLJ Opinion.

In arriving at the DLJ Opinion, DLJ reviewed the Merger Agreement and the Distribution Agreement. DLJ also reviewed financial and other information that was publicly available or furnished to DLJ by Sealed Air and Grace, including information provided during discussions with their respective managements. Included in the information provided during such discussions were certain financial analyses and projections of Grace Packaging and New Grace prepared by the management of Grace and certain financial analyses and projections of Sealed Air and New Sealed Air prepared by the management of Sealed Air. These projections were substantially similar to then publicly available estimates of research analysts with respect to the future financial performance of each company. In addition, DLJ compared certain financial data of Sealed Air and Grace Packaging, under certain assumptions, with publicly

available information concerning various other companies whose securities are traded in public markets, reviewed the historical stock prices and trading volumes of Grace common stock and Sealed Air common stock, reviewed prices and premiums paid in certain other business combinations and conducted such other financial studies, analyses and investigations as DLJ deemed appropriate for purposes of rendering the DLJ Opinion.

In rendering the DLJ Opinion, DLJ relied upon and assumed the accuracy and completeness of all of the financial and other information that was available to it from public sources, that was provided to it by Sealed Air, Grace, their respective managements or other representatives, or that was otherwise reviewed by DLJ. In particular, DLJ relied upon the estimates of management of Sealed Air of the operating efficiencies (the "Synergies") that might be achievable as a result of the Merger (annual increases in EBITDA ranging from approximately $20 million to $100 million in later years) and upon DLJ's discussions of such Synergies with the management of Grace. In supplying information regarding possible operating efficiencies to DLJ, the managements of Sealed Air and Grace advised DLJ that estimates regarding operating efficiencies were necessarily based on incomplete information and subject to significant risks and uncertainties. Accordingly, DLJ performed certain analyses assuming that Synergies would be realized, and certain other analyses assuming that Synergies would not be realized. With respect to the financial analyses and projections supplied to DLJ, DLJ assumed that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the managements of Sealed Air and Grace as to the future operating and financial performance of Sealed Air, Grace Packaging and New Sealed Air. DLJ did not assume responsibility for making any independent evaluation of the assets, liabilities or contingent liabilities of Sealed Air, New Sealed Air, Grace or New Grace, or for making any independent verification of the information reviewed by DLJ. DLJ relied as to certain legal matters on advice of Grace's special counsel and Sealed Air's special counsel, including that the transactions contemplated under the Distribution Agreement would qualify as tax-free transactions under the Code and that the Merger will be tax-free under the Code to Grace, Sealed Air and their respective stockholders.

The DLJ Opinion was necessarily based on economic, market, financial and other conditions as they existed on, and on the information made available to it as of, the date of the DLJ Opinion. The DLJ Opinion states that, although subsequent developments may affect the DLJ Opinion, DLJ does not have any obligation to update, revise or reaffirm its opinion. DLJ did not express any opinion regarding the financial impact of Grace's contingent liabilities on New Grace or New Sealed Air, and was not requested to and did not express any opinion in the DLJ Opinion regarding the financial impact of Grace's contingent liabilities on New Grace and New Sealed Air.

The following is a summary of the presentation made by DLJ to the Sealed Air Board at its August 14, 1997 meeting in connection with the DLJ Opinion. For purposes of the presentation and opinion, DLJ analyzed Grace Packaging as if the Spin-off and Cash Transfer, but not the Merger, had occurred.

Comparable Company Analyses.  DLJ compared selected historical and projected operating information and financial ratios for Grace Packaging to selected historical and projected operating information, stock market data and financial ratios for certain publicly traded specialty packaging and specialty chemicals companies, the two market segments with which Sealed Air is usually compared by the investment community.  The specialty packaging companies were Sealed Air, Bemis Company, Inc., Sealright Co., Inc. and Sonoco Products Company (collectively, the "Specialty Packaging Comparable Companies").  The specialty chemicals companies were Avery Dennison

provide a different perspective on the transaction and to add to the total mix of information available. DLJ did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion as to fairness from a financial point of view. Rather, in reaching its conclusion, DLJ considered the results of the analyses in light of each other and ultimately reached its opinion based on the results of all analyses taken as a whole. Accordingly, notwithstanding the separate factors summarized above, DLJ has indicated to Sealed Air that it believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by it, without considering all analyses and factors, could create an incomplete view of the evaluation process underlying its opinion. In performing its analysis, DLJ made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by DLJ are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

   Pursuant to the terms of an engagement agreement dated August 14, 1997, Sealed Air (i) has paid DLJ a fee of $3,750,000 ($2,000,000 of which was payable on account of past financial advisory services unrelated to the Reorganization and Merger rendered by DLJ to Sealed Air) and (ii) will pay an additional $11,250,000, payable upon consummation of the Merger. Sealed Air has also agreed that if the Merger or similar transaction is not consummated and Sealed Air receives a $150 million termination fee, Sealed Air will pay DLJ $7,500,000 (in addition to the $3,750,000 fee already paid) in cash upon Sealed Air's receipt of the termination fee, provided that, if the termination fee is less than $150 million, DLJ's compensation shall be proportionately reduced. In addition, Sealed Air agreed to reimburse DLJ, upon request by DLJ from time to time, for all out-of-pocket expenses (including the reasonable fees and expenses of counsel) incurred by DLJ in connection with its engagement thereunder and to indemnify DLJ and certain related persons against certain liabilities in connection with its engagement, including liabilities under U.S. federal securities laws. DLJ and Sealed Air negotiated the terms of the fee arrangement, and the Sealed Air Board was aware of such arrangement, including the fact that a significant portion of the aggregate fee payable to DLJ is contingent upon consummation of the Merger. DLJ believes that the terms of this fee arrangement are customary in transactions of this nature.

   In the ordinary course of business, DLJ and its affiliates may own or actively trade the securities of Sealed Air and Grace for their own accounts and for the accounts of their customers and, accordingly, may at any time hold a long or short position in Sealed Air or Grace securities. See "Security Ownership of Certain Beneficial Owners" on page 87 for a description of the security ownership of The Equitable Companies, an affiliate of DLJ. DLJ, as part of its investment banking services, is regularly engaged in the valuation of businesses and securities in connection with mergers, acquisitions, underwritings, sales and distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. DLJ has performed investment banking and other services in the past for Sealed Air (including delivery of a fairness opinion for Sealed Air in connection with the $57 million acquisition of Trigon Industries in 1995) and for Grace (including acting as advisor to Grace in the sale of its remaining interest in The Restaurant Enterprises Group, Inc. in 1994). In addition, in 1996 DLJ was lead manager in a $360 million high-yield offering for Fresenius Medical Care AG. (Fresenius Medical Care AG is the parent company of a predecessor of Grace, but has always been unrelated to Grace.) DLJ has received usual and customary compensation for its past services for Sealed Air, Grace, and Fresenius Medical Care AG.

Opinions of Grace Financial Advisors

Credit Suisse First Boston and Merrill Lynch were retained to act as the Grace Financial Advisors in connection with the Reorganization and Merger. The Grace Financial Advisors were selected by Grace because of their familiarity with Grace and Sealed Air and their respective businesses and their qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as their reputations as internationally recognized investment banking firms. Each of the Grace Financial Advisors has consented to the reprinting of its fairness opinion and the summary of such firm's activities included herein.

At the request of the Grace Board, each of the Grace Financial Advisors delivered a written opinion to the Grace Board on August 14, 1997 to the effect that, as of such date, and based upon the assumptions made, general procedures followed, factors considered and limitations on the review undertaken as set forth in such opinions, the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, were fair, from a financial point of view, to the holders of Grace common stock. In preparing these opinions, these firms performed a variety of financial and comparative analyses and made a detailed presentation to the Grace Board with respect to the Reorganization and Merger. The Grace Board, in accepting the opinions of the Grace Financial Advisors, was aware that the Grace Financial Advisors relied upon certain financial information, projections and other information provided by Grace's management and that the opinions of such firms relied, in part, on certain assumptions and were subject to certain limitations. While the Grace Board did not perform an independent review of the financial information, projections and other information provided to the Grace Financial Advisors, the Grace Financial Advisors and management did review certain financial information and projections with the Grace Board. The Grace Board relied on the Grace Financial Advisors, whom it considered to be experts in such matters, to select appropriate methodologies to determine fairness. No updates of such opinions have been requested because such opinions were provided solely in connection with the decisions of the Grace Board taken on August 14, 1997.

The full texts of the written opinions of Credit Suisse First Boston and Merrill Lynch, which set forth the assumptions made, general procedures followed, factors considered and limitations on the review undertaken by Credit Suisse First Boston and Merrill Lynch in rendering their opinions, are set forth in Annex D to this Joint Proxy Statement/Prospectus and are incorporated herein by reference. The opinions of Credit Suisse First Boston and Merrill Lynch are directed only to the fairness from a financial point of view, as of the date thereof, of the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, to the holders of Grace's existing common stock and do not address the merits of the underlying decision by Grace to engage in the Reorganization and Merger and do not constitute a recommendation to any stockholder of Grace as to how such stockholder should vote on any proposal related to the Reorganization and Merger. The summary of the opinions of Credit Suisse First Boston and Merrill Lynch set forth in this Joint Proxy Statement/Prospectus are qualified in their entirety by reference to the full text of the opinions of Credit Suisse First Boston and Merrill Lynch. Holders of shares of Grace common stock are urged to, and should, read the opinions of Credit Suisse First Boston and Merrill Lynch in their entirety.

Opinion of Credit Suisse First Boston. In arriving at its opinion, Credit Suisse First Boston reviewed certain publicly available business and financial information relating to Grace and Sealed Air, as well as the Merger Agreement, the Distribution Agreement and the forms of related agreements attached as exhibits thereto. Credit Suisse First Boston also reviewed certain other information, including financial forecasts and certain information with respect to potential operating efficiencies which may result from the Merger,

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.     That on February 21, 2001, declarant served the NOTICE OF DEPOSITION OF DEFENDANT SEALED AIR CORPORATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6) by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of February, 2001, at San Diego, California.

June P. Ito

ZONOLITE
Service List - 02/16/01
Page 1

## COUNSEL FOR PLAINTIFF(S)

Mark C. Goldenberg
Elizabeth V. Heller
HOPKINS GOLDENBERG, P.C.
2227 South State Route 157
Edwardsville, IL 62025
   618/656-5150
   618/656-6230 (fax)

John J. Stoia, Jr.
Timothy G. Blood
JoBeth Halper
MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
   619/231-1058
   619/231-7423 (fax)

Christopher A. Seeger
David R. Buchanan
Amy P. Albert
SEEGER WEISS LLP
One William Street
New York, NY 10004-2502
   212/584-0700
   212/584-0799 (fax)

## COUNSEL FOR DEFENDANTS

* Deborah G. Solmor
  SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
  333 West Wacker Drive, Suite 2100
  Chicago, IL 60606-1285
   312/407-0700
   312/407-0411 (fax)

* Douglas King
  James H. Ferrick, III
  BRYAN CAVE LLP
  211 North Broadway, Suite 3600
  St. Louis, MO 63102-2750
   314/259-2000
   314/259-2020 (fax)

* Sheila L. Birnbaum
  Bert L. Wolff
  Arthur H. Aizley
  SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
  4 Times Square
  New York, NY 10036
   212/735-3000
   212/735-2000 (fax)

** V.L. Woolston, Jr.
  Thomas L. Boeder
  PERKINS COIE LLP
  1201 Third Avenue, Suite 4800
  Seattle, WA 98101-3099
   206/583-8888
   206/583-8500 (fax)

* Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

ZONOLITE
Service List - 02/16/01
Page 2

COUNSEL FOR DEFENDANTS (cont'd)

\*\* Rocco Treppiedi
 PERKINS COIE LLP
 221 N. Wall Street, Suite 600
 Spokane, WA  99201
  509/624-2212
  509/458-3399 (fax)

\*\* Donald G. Stone
 David L. Broom
 Curtis L. Shoemaker
 PAINE, HAMBLEN, COFFIN, BROOKE
  & MILLER LLP
 717 West Sprague Avenue, Suite 1200
 Spokane, WA  99201-3505
  509/455-6000
  509/838-0007 (fax)

\* Denotes service via Federal Express Next Day Delivery
\*\* Denotes service via Facsimile and Federal Express Next Day Delivery

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re ZONOLITE ATTIC INSULATION PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL Docket No. 1376 |
| | ) | The Honorable Patti B. Saris, Presiding |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) | |
| BARBANTI, | ) ) ) | Superior Court, State of Washington County of Spokane |
| Plaintiff, | ) ) | No. 00-2-01756-6 |
| v. | ) ) | PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO |
| W.R. GRACE & COMPANY-CONN, et al. | ) ) | DEFENDANT SEALED AIR CORPORATION |
| Defendants. | ) ) | |

TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs request that defendant, Sealed Air Corporation produce for inspection and copying the documents listed below. These documents are to be produced within 30 days from the date of service of this request at the offices of Lieff, Cabraser, Heimann & Bernstein, LLP, 214 Union Wharf, Boston, MA 02109, or at a mutually convenient time, date and location agreed to by the parties.

## I.    DEFINITIONS

The following definitions shall apply to each of the document requests and are deemed to be incorporated in each of the requests:

1.    "Grace Defendants" means W.R. Grace & Company (a Delaware corporation) and W.R. Grace & Company-Conn. (a Connecticut company) (defined below).

2.    "Grace Companies" means the "Grace Defendants," their predecessors, subsidiaries and affiliates, including, but not limited to, Grace Speciality Chemical, Inc., W.R. Grace & Company (a New York corporation), Grace Holdings, Inc., the Zonolite Company, and "Cryovac," (defined below) and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

3.    "Sealed Air" means defendant Sealed Air Corporation, its subsidiaries and affiliated entities and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

4.    "Grace-Conn." means W.R. Grace & Company - Conn. (a Connecticut company) and shall include the Grace Companies' specialty chemical business as it existed after the "reorganization", and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

- 1 -

5.      "Cryovac" means the Grace Companies's packaging business as it existed before the "merger" (defined below), both when operated as a division of W.R. Grace & Co., a New York corporation, and subsequently as a subsidiary of W.R. Grace (a Delaware corporation), and its subsidiaries, affiliates, predecessors and successors and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

6.      "Sealed Air's 1998 10-K" means Sealed Air's Form 10-K filed with the United States Securities & Exchange Commission for the fiscal year ending December 31, 1998.  (Relevant portions of which are attached as Exhibit A.)

7.      "Sealed Air's Proxy Statement" means Sealed Air's Joint Proxy Statement/Prospectus, dated February 1998.  (Relevant portions of which are attached as Exhibit B.)

8.      "Sealed Air's Position Statement" means the Statement of Sealed Air Corporation pursuant to the Court's Request, dated January 29, 2001.

9.      "Reorganization" means the transaction in which the Grace Companies's specialty chemical business was "separated from its packaging business, the packaging business was contributed to one group of wholly owned subsidiaries ("Cryovac") and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("Grace-Conn.")," as defined on page 1 of Sealed Air's 1998 10-K.  (Ex. A.)

10.      "Recapitalization" refers to the "recapitalization" as defined on page 1 of Sealed Air's 1998 10-K.  (Ex. A.)

11.      "Merger" refers to the merger between the Grace Companies's packaging business and Sealed Air as defined on page 1 of Sealed Air's 1998 10-K.  (Ex. A.)

12.      "Document" or "Documents" shall be interpreted in the broadest possible sense and includes, without limitation, all written, recorded, printed, typed, transcribed, filmed, digitized, or graphic matter and all other tangible things and media upon which any handwriting, typing, printing, drawing, representation, electrostatic or other copy, sound or video recording, magnetic or electrical impulse, visual reproduction or communication is recorded, reproduced or represented, including each and any book, record, correspondence, report, memoranda, electronic mail ("e-mail"), voice

mail, contract, table, tabulation, graph, chart, diagram, plan, schedule, appointment book, calendar, diary, time sheet, report, study, analysis, draft, telegram, teletype or telecopy message, file, telephone log, telephone message, check, microfilm, microfiche, picture, photograph, printout, electronic data compilation, tape, diskette, drive, removable media, note, minutes or transcript of proceedings, including, but not limited to, minutes of meetings, or other communications of any type, including inter-office communications, questionnaires, surveys, charges, newspapers, booklets, circulars, work papers, bulletins, notices, instructions, resolutions, reports, records, papers, bills or invoices, books of account, financial statements, working papers, deeds, loan agreements, notes, ledgers, security agreements, financing statements, tax returns, checks, receipts, journals and data of every description and shall include each and any original produced or reproduced by any method, all non-identical copies (whether different from the original because of notes made in or attached to such copy, or otherwise), all other data compilations from which information can be obtained (translated, if necessary, into usable form), and any preliminary versions, drafts or revisions of any of the foregoing.

13.    "All Documents" means every document within the custody, possession or control of you, your national, regional and local offices, and any of your attorneys, representatives, and employees, whether an original or copy (as defined above), known to you, and every such document or writing which you can locate or discover through reasonably diligent efforts.

14.    "Including" means "including, but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction, not to limit the request, definition or instruction.

15.    "And" means and/or.

16.    "Or" means and/or.

17.    "Refer," "referring," "discuss," "discussing," "concern," and "concerning" all mean documents which explicitly or implicitly, in whole or in part, compare, were received in conjunction with, or were generated as a result of the subject matter of the request, including all documents which reflect, record, specify, memorialize, relate, describe, consider, concern, constitute, embody,

evaluate, analyze, review, report on, comment on, impinge upon or impact the subject matter of the request.

## II.    INSTRUCTIONS

1.    Each document requested shall be produced in its entirety and without deletion or excisions, regardless of whether you consider the entire document to be relevant or responsive to this request. If you have redacted any portion of a document based upon attorney-client or work privilege grounds, stamp the word "REDACTED" on each page of the document which you have redacted.

2.    If any document responsive to these requests is not produced in full or is redacted on the grounds that it is privileged or otherwise claimed to be protected against production, you are requested to provide the following information with respect to each such document or redaction:

(a)    The date such document or redaction was prepared;

(b)    The document's author, signatory and every other person who prepared or participated in its preparation, and their affiliation (*e.g.,* in-house attorney, executive, outside party) and title at that time;

(c)    The type of document (*e.g.,* letter, chart, memorandum, etc.) and its page length;

(d)    The title of the document;

(e)    A description of the document's subject matter and purpose;

(f)    A list of those persons and entities to whom the document was disseminated, together with their affiliation (*e.g.,* in-house attorney, executive, outside party) and title at that time;

(g)    Each and every person having possession, custody or control of the document and all copies thereof; and

(h)    The nature of the privilege or other rule of law relied upon and any facts supporting your position in withholding production of each document.

3.    If an otherwise responsive document was, but is no longer in existence or in your possession, custody or control, identify its current or last known custodian and describe in full the circumstances surrounding its disposition from your possession or control. All documents shall be

- 4 -

deemed to be in your control if you have the right to secure the document or copy thereof from another person or private entity having possession or custody thereof.

    4.      If any documents requested herein have been altered, lost, discarded or destroyed, they shall be identified as completely as possible and shall include the following information:

        (a)      the date of alteration or disposal;

        (b)      the manner of alteration or disposal;

        (c)      the reason for alteration or disposal;

        (d)      the person authorizing alteration or disposal; and

        (e)      the person altering or disposing of the document or documents in question.

## III.    DOCUMENT REQUESTS

REQUEST NO. 1:

    All documents concerning due diligence performed with respect to the reorganization, recapitalization and merger.

REQUEST NO. 2:

    All documents relating to the engagement, disengagement, dismissal or change of independent auditors retained by Sealed Air in connection with the reorganization, recapitalization and merger, including documents concerning the purpose or reason for any changes in the firms auditing the reorganization, recapitalization and merger.

REQUEST NO. 3:

    All documentation provided to or received from Sealed Air's independent auditors concerning the reorganization, recapitalization and merger.

REQUEST NO. 4:

    All reports, letters or forms relating to any audit, consulting or tax engagement with Sealed Air's independent auditors concerning the reorganization, recapitalization and merger.

REQUEST NO. 5:

    All documents reflecting meetings of Sealed Air's audit committee or discussions with members of Sealed Air's audit committee concerning the reorganization, recapitalization and merger.

REQUEST NO. 6:

All documents relating to presentations and reports given to Sealed Air's Board of Directors concerning the reorganization, recapitalization and merger.

REQUEST NO. 7:

All documents sent to or received from consultants concerning the reorganization, recapitalization and merger.

REQUEST NO. 8:

All documents discussing or concerning the reorganization, recapitalization and merger, including documents discussing the reasons or purpose of the reorganization, recapitalization and merger.

REQUEST NO. 9:

All documents concerning set monetary limits on transactions that could occur without board approval of Sealed Air's Board of Directors.

REQUEST NO. 10:

All documents discussing, analyzing or constituting the indemnification or liability of Sealed Air for any liabilities of the Grace Companies, including all indemnity agreements.

REQUEST NO. 11:

All documents discussing, supporting or contradicting the following statement on page 10 of Sealed Air's 1998 10-K: "The Company may remain liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligation to the company." (Ex. A.)

REQUEST NO. 12:

All documents discussing or analyzing the sufficiency of Grace-Conn.'s assets to satisfy liability and/or continue to conduct business after the reorganization, recapitalization and merger.

REQUEST NO. 13:

All documents (whether created before, after or during the reorganization, recapitalization and merger) discussing or analyzing the sufficiency of Grace-Conn.'s assets to satisfy liabilities arising from the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing of asbestos products.

REQUEST NO. 14:

All documents comparing the value of assets transferred to Sealed Air from the Grace Companies as a result of the reorganization, recapitalization and merger with the market value of those assets.

REQUEST NO. 15:

All documents comparing the value of assets transferred to Sealed Air from the Grace Companies with the value of assets transferred to the Grace Companies from Sealed Air.

REQUEST NO. 16:

All documents concerning, analyzing or discussing the market value of Cryovac at the time of the reorganization.

REQUEST NO. 17:

All documents constituting, discussing or relating to reports or analyses of the value of Cryovac's "goodwill."

REQUEST NO. 18:

All documents pertaining to the 1998 loan of $1.2 billion taken out by Sealed Air and transferred to Grace-Conn., including the documents concerning the reason or purpose for the loan and transfer.

REQUEST NO. 19:

All documents discussing, relating to or analyzing the "fairness of the consideration" of the reorganization, recapitalization and merger as analyzed by Donaldson, Lufkin & Jenrette Securities Corporation and discussed at page 39 of Sealed Air's Proxy Statement. (Ex. B.)

REQUEST NO. 20:

All documents concerning, discussing and used in preparation of Sealed Air's Proxy Statement, including documents used in preparation of the section titled "Liabilities of New Grace, Fraudulent Transfer and Related Considerations." (Ex. B.)

REQUEST NO. 21:

All documents referenced in §C of Sealed Air Corporation's Initial Disclosure, dated November 13, 2000, served in *Hunter v. W.R. Grace & Company*, No. 00-569-GPM (S.D. Ill.).

- 7 -

REQUEST NO. 22:

All documents discussing or relating to the Grace Companies's liabilities as described on page 40, n.18 of Sealed Air's 1998 10-K. (Ex. A.)

REQUEST NO. 23:

All documents supporting or negating Sealed Air's statement on page 2 of Sealed Air's Position Statement that, "[t]he 1998 corporate transaction was an arm's length business transaction."

REQUEST NO. 24:

All documents supporting or negating Sealed Air's statement on page 2 of Sealed Air's Position Statement that the transaction "was supported by more than adequate consideration."

REQUEST NO. 25:

All documents supporting or negating Sealed Air's statement on page 2 of Sealed Air's Position Statement that the transaction "was engaged in for valid business reasons."

REQUEST NO. 26:

All documents supporting or negating Sealed Air's statement on page 2 of Sealed Air's Position Statement that "successor liability does not attach" to the transaction.

REQUEST NO. 27:

All documents used or relied upon in preparing Sealed Air's Position Statement.

REQUEST NO. 28:

Each insurance policy which, for any time during the period 1998 through 2001, provided Sealed Air with insurance coverage, whether primary, excess or reinsurance, for liability arising out of the reorganization, recapitalization and merger or arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing of Zonolite and other asbestos products.

REQUEST NO. 29:

All documents which refer to or evidence Sealed Air's risk retention, self-insurance or co-insurance at any time during the period of 1998 through 2001 for liability arising out of the reorganization, recapitalization and merger or arising out of the mining, manufacturing, fabricating,

advertising, marketing, selling, distributing, transporting or installing of Zonolite and other asbestos products.

REQUEST NO. 30:

All documents related to any and all transactions that resulted in termination of coverage for liability arising out of the reorganization, recapitalization and merger or arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing of Zonolite and other asbestos products.

REQUEST NO. 31:

All documents constituting or concerning any indemnity agreements, agreements to assume liability, agreements to assume the defense or joint defense agreements made by Sealed Air, its insurers or any other entities relating to the reorganization, recapitalization and merger or arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing of Zonolite and other asbestos products.

REQUEST NO. 32:

All documents which refer, relate to or constitute contracts, settlements, releases, commutations or other agreements with Sealed Air's primary or excess insurers which released any such insurer, in whole or in part, from its obligation or potential obligation to provide liability insurance coverage to the Grace Companies as identified in Request No. 28 above.

REQUEST NO. 33:

All documents which refer or relate to or constitute mitigation insurance or liability-sharing arrangements, including options to purchase such insurance or enter into such sharing arrangements, which may provide coverage, in whole or in part, for Sealed Air's liability arising out of the reorganization, recapitalization or merger or arising out of the mining, manufacturing, fabricating,

- 9 -

advertising, marketing, selling distributing, transporting or installing Zonolite and other asbestos products.

DATED: February 21, 2001

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
JOBETH HALPER
THOMAS R. MERRICK
JENNIFER TEMPLETON SCHIRMER

_____
TIMOTHY G. BLOOD

600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
EDWARD J. WESTBROOK
ROBERT M. TURKEWITZ
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
ELIZABETH J. CABRASER
FABRICE N. VINCENT
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: 415/956-1000
415/956-1008 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
THOMAS SOBOL
JAN R. SCHLICHTMANN
214 Union Wharf
Boston, MA 02109
Telephone: 617/720-5000
617/720-5015 (fax)

- 10 -

GILMAN AND PASTOR, LLP
DAVID PASTOR
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:  781/231-7850
781/231-7840 (fax)

Plaintiffs' Executive Committee Members

EXHIBIT A

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINer.
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Wcz3CDN9y6G4MOFMjNF2CQ+Nb4fe+FGzfMFaN7L1Y0uJ2V4VmVQsmtbBugvVTgrl
 u4QoedFlMj3SX6EK/97n3A==

<SEC-DOCUMENT>0000930413-99-000449.txt : 19990331
<SEC-HEADER>0000930413-99-000449.hdr.sgml : 19990331
ACCESSION NUMBER:		0000930413-99-000449
CONFORMED SUBMISSION TYPE:	10-K
PUBLIC DOCUMENT COUNT:		7
CONFORMED PERIOD OF REPORT:	19981231
FILED AS OF DATE:		19990330

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			SEALED AIR CORP/DE
		CENTRAL INDEX KEY:			0001012100
		STANDARD INDUSTRIAL CLASSIFICATION:	UNSUPPORTED PLASTICS FILM &
		IRS NUMBER:				650654331
		STATE OF INCORPORATION:			DE
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		10-K
		SEC ACT:
		SEC FILE NUMBER:	001-12139
		FILM NUMBER:		99577149

	BUSINESS ADDRESS:
		STREET 1:		PARK 80 EAST
		CITY:			SADDLE BROOK
		STATE:			NJ
		ZIP:			07663
		BUSINESS PHONE:		2017917600

	MAIL ADDRESS:
		STREET 1:		PARK 80 EAST
		CITY:			SADDLE BROOK
		STATE:			NJ
		ZIP:			07663

	FORMER COMPANY:
		FORMER CONFORMED NAME:	WR GRACE & CO/DE
		DATE OF NAME CHANGE:	19961015

	FORMER COMPANY:
		FORMER CONFORMED NAME:	GRACE HOLDING INC
		DATE OF NAME CHANGE:	19960805
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>10-K
<TEXT>

# EXHIBIT A

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
----------------------
FORM 10-K

(Mark one)

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 1998

                              OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934 For the transition period from _____ to _____

                  Commission File Number 1-12139

                       SEALED AIR CORPORATION
            (Exact name of registrant as specified in its charter)

     State or other jurisdiction of incorporation or organization: Delaware
     Address of principal executive offices: Park 80 East, Saddle Brook,
      New Jersey 07663-5291
     I.R.S. Employer Identification Number: 65-0654331
     Registrant's telephone number, including area code: (201) 791-7600
     Securities registered pursuant to Section 12(b) of the Act:

                                            NAME OF EACH EXCHANGE
          TITLE OF EACH CLASS                ON WHICH REGISTERED
Common Stock, par value $0.10 per share     New York Stock Exchange, Inc.
Series A Convertible Preferred Stock,       New York Stock Exchange, Inc.
par value $0.10 per share

        Securities registered pursuant to Section 12(g) of the Act:  None

        Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes X No ___

        Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

        The aggregate market value of the registrant's Common Stock held by
non-affiliates of the registrant on March 24, 1999 was approximately
$3,921,000,000.

        The number of outstanding shares of the registrant's Common Stock as of
March 24, 1999 was 83,486,552.

        DOCUMENTS INCORPORATED BY REFERENCE: Portions of the registrant's 1998
Annual Report to Stockholders are incorporated by reference into Parts I and II
of this Form 10-K. Portions of the registrant's definitive proxy statement for
its 1999 Annual Meeting of Stockholders are incorporated by reference into Part
III of this Form 10-K.

<PAGE>

PART I

ITEM 1.  BUSINESS

Sealed Air Corporation (together with its subsidiaries, the "Company") is engaged in the manufacture and sale of a wide range of protective, food and specialty packaging materials and systems throughout the world.

On March 31, 1998, the Company (formerly known as W. R. Grace & Co.) and Sealed Air Corporation (US), a Delaware corporation formerly known as Sealed Air Corporation ("old Sealed Air"), completed a series of transactions as a result of which:

(a) The specialty chemicals business of the Company was separated from its packaging business, the packaging business ("Cryovac") was contributed to one group of wholly owned subsidiaries, and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("New Grace"); the Company and Cryovac borrowed approximately $1.26 billion under two new revolving credit agreements and transferred substantially all of those funds to New Grace; and the Company distributed all of the outstanding shares of common stock of New Grace to its stockholders. As a result, New Grace became a separate publicly owned company that is unrelated to the Company. These transactions are referred to below as the "Reorganization."

(b) The Company recapitalized its outstanding shares of common stock, par value $0.01 per share, into a new common stock and Series A convertible preferred stock, each with a par value of $0.10 per share (the "Recapitalization").

(c) A subsidiary of the Company merged into old Sealed Air (the "Merger"), with old Sealed Air being the surviving corporation. As a result of the Merger, old Sealed Air became a subsidiary of the Company, and the Company was renamed Sealed Air Corporation.

References to "Grace" in this Annual Report on Form 10-K refer to the Company before the Reorganization, the Recapitalization and the Merger.

SEGMENTS

The Company operates in two reportable business segments: (i) food and specialty packaging products and (ii) protective packaging products, described more fully below. Information concerning the Company's reportable segments appears in Note 3 of the Notes to Consolidated Financial Statements in Item 8 of this Annual Report on Form 10-K, which Note is incorporated herein by reference.

2

<PAGE>

FOOD AND SPECIALTY PACKAGING PRODUCTS

The Company's principal food and specialty packaging products

are its flexible materials and related products, comprising principally shrink
bag and film products, non-shrink laminates and specialty packaging systems
marketed primarily under the Cryovac (R) trademark for a broad range of
perishable food applications. This segment also includes the Company's rigid
packaging and absorbent pads, principally absorbent pads used for the retail
packaging of meat, fish and poultry, foam trays used by supermarkets and food
processors, and rigid plastic containers for dairy and other food products.

FLEXIBLE MATERIALS AND RELATED SYSTEMS

        The Company produces a variety of high-performance proprietary
flexible films, bags and associated packaging equipment marketed and sold
primarily under the Cryovac (R) trademark in North America, Europe, Latin
America, South Africa and the Asia Pacific region that are used to package a
broad range of perishable foods such as fresh, smoked and processed meat
products, cheese, poultry, prepared foods (including soups and sauces for
restaurants and institutions) and produce. The Company also offers sterilized
medical bags and films for use with medical products and produce bags with
dispensing systems used by customers in supermarket produce departments.

        Cryovac (R) food packaging products include shrink bags,
shrink films sold for food packaging applications and laminated films. Shrink
bags and films are multi-layered shrinkable plastic bags and films that mold
themselves to the shape of the product. Laminates are multi-layered,
non-shrinkable plastic materials used to package perishable foods and
shelf-stable products such as syrups and toppings. Films and bags are sold in
barrier and permeable forms, depending on whether oxygen or other gases can pass
through the material. Offerings include modified atmosphere packaging (MAP) that
is designed to provide a controlled gas environment within a package to extend
shelf life.

        The Company's food packaging films and bags incorporate the
Company's core technologies, including proprietary film processing technology,
resin technology, and packaging and food science expertise. The Company seeks to
maintain technological leadership through a continuous program of research and
development in its core technologies.

        For processed meats and poultry, Cryovac (R) cook-in bags and
laminates withstand high cooking temperatures while retaining product shape,
clarity and weight. For fresh-cut produce, the Company produces films that
permit oxygen to pass through at various rates, thereby matching the varying
respiration rates of different vegetables and permitting longer shelf life.
During 1998, the Company introduced a new low-oxygen packaging film for use with
MAP packaging. The Company's Cryovac (R) films offer a wide variety of other
characteristics, such as anti-fog, clarity, gloss, oxygen barrier or strength,
that meet customer demands in specific food packaging applications.

                                3

<PAGE>

        The Company's food packaging equipment offerings include:
dispensing and loading units to package foods in shrink, vacuum or vacuum skin
packages using the Company's films and bags; form, fill and seal units to
package foods in pouches made using the Company's films; and bagging systems.
Systems are marketed to the food processing industry under the Cryovac (R)
trademark and other trademarks.

RIGID PACKAGING AND ABSORBENT PADS

The Company manufactures and sells Cryovac (R) polystyrene foam trays that are used by supermarkets and by food processors to protect and display fresh meat, poultry and produce. The Company also manufactures and sells absorbent pads used for food packaging, including its Dri-Loc (R) absorbent pads. The Company's foam trays and absorbent pads are often used together. The Company's case-ready packaging customers, principally meat and poultry processors, purchase trays, pads and specially-designed films and packaging equipment to package centrally meat and poultry products prior to shipment to the supermarket. The Company also manufactures rigid plastic containers, primarily plastic tubs for dairy products such as margarine and yogurt, in Australia that are marketed under the Omicron (TM) trademark.

PROTECTIVE PACKAGING PRODUCTS

The Company's protective packaging products include its cushioning and surface protection products and certain other products. The Company's principal cushioning and surface protection products are air cellular cushioning materials, Cryovac (R) films for non-food applications, Instapak (R) polyurethane foam packaging systems, polyethylene foam sheets and planks, protective and durable mailers and bags, paper-based packaging products, suspension and retention packaging and packaging systems.

CUSHIONING AND SURFACE PROTECTION PRODUCTS

AIR CELLULAR CUSHIONING MATERIALS: The Company manufactures and markets Bubble Wrap (R) air cellular cushioning materials, which are also marketed under various other trademarks, including AirCap (R) and PolyCap (R). These materials consist of air bubbles encapsulated between two layers of plastic film, each containing a barrier layer to retard air loss, that form a pneumatic cushion to protect products from damage through shock or vibration during shipment. The Company's air cellular cushioning materials are used by a wide variety of end users, including both manufacturers and retailers.

CRYOVAC (R) FILMS FOR NON-FOOD APPLICATIONS: The Company manufactures and sells Cryovac (R) films used to shrink-wrap a wide assortment of industrial and consumer products. The Company's proprietary multi-layer films provide features such as strength and clarity. In certain regions the Company also offers shrink-wrap equipment for use with the Company's shrink films.

4

<PAGE>

INSTAPAK (R) SYSTEMS: Instapak (R) polyurethane foam packaging systems consist of proprietary blends of polyurethane chemicals and specially designed dispensing equipment. The Company also manufactures high-performance polyolefin films designed for use with Instapak (R) packaging systems.

Instapak (R) chemicals, films and equipment are marketed as integrated packaging systems to provide protective packaging for a wide variety of products, including computer, electronic, office, medical and communications equipment, compressors and motors, furniture and spare parts, and void-fill packaging of office supplies, books, cosmetics and other small products for distribution. Instapak (R) systems are also used to produce polyurethane foams used in certain non-packaging applications, including Instapak (R) Floral, a foam used as a design base for artificial flower arrangements.

POLYETHYLENE FOAMS: The Company manufactures thin polyethylene

products are sold or used, laws and regulations have been adopted or proposed that seek to regulate, among other things, recycled or reprocessed content, sale and disposal of packaging materials. In addition, customer demand for packaging materials that are viewed as being "environmentally responsible" and that minimize the generation of solid waste continues to evolve. While these issues can be a competitive factor in the marketplace for packaging materials, the Company maintains active programs designed to comply with these laws and regulations, to monitor their evolution, and to meet such customer demand.

The Company believes that its packaging materials offer superior packaging protection, enabling customers to achieve lower package cube and weight using the Company's packaging materials than with many alternative packaging methods, thereby reducing the disposal of damaged products as well as the generation of packaging waste. Because the Company offers both plastic-based and paper-based protective packaging materials, customers can select the protective packaging materials that they consider to best meet their performance and cost needs and

9

<PAGE>

environmental preferences. A number of the Company's protective packaging product lines incorporate recycled or reprocessed content, and the Company maintains ongoing efforts to add or increase recycled or reprocessed content in many of its protective packaging product lines.

The Company also supports its customers' interests in eliminating waste by offering or participating in collection programs for certain of the Company's products or product packaging and for materials used in certain of the Company's products, and, when possible, materials collected through these collection programs are reprocessed and either reused in the Company's protective packaging operations or offered to other manufacturers for use in other products.

EMPLOYEES

At December 31, 1998, the Company had approximately 14,700 employees worldwide.

ITEM 2.  PROPERTIES

The Company's food and specialty packaging products are produced in 40 manufacturing facilities (15 in North America, 10 in Europe, 5 in Latin America, 9 in the Asia Pacific region, and 1 in South Africa). Protective packaging products are produced in 62 manufacturing facilities (29 in North America, 18 in Europe, 4 in Latin America, and 11 in the Asia Pacific region, including certain small converting facilities). Several of the Company's manufacturing facilities serve both segments. The Company occupies other facilities containing fabricating or converting operations or sales, distribution, technical, warehouse or administrative offices at a number of locations in the United States and in various foreign countries.

In the United States, the Company's food and specialty products are manufactured at facilities in California, Indiana, Iowa, Mississippi, Missouri, New York, North Carolina, Pennsylvania, South Carolina, and Texas. Its protective packaging products are manufactured at facilities in California, Connecticut, Georgia, Illinois, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas and

Washington. Because of the light but voluminous nature of the Company's air cellular, polyethylene foam and protective mailer products, significant freight savings may be realized by locating manufacturing facilities for these products near markets. To realize the benefit of such savings, the Company has facilities for manufacturing these products in various locations in proximity to major markets.

The Company owns the large majority of its manufacturing facilities, certain of which are owned subject to mortgages or similar financing arrangements. The balance of the Company's manufacturing facilities are located in leased premises. The Company's manufacturing facilities are usually located in general purpose buildings in which the Company's specialized machinery for the manufacture of one or more products is contained. The Company believes that its manufacturing facilities are well maintained, suitable for their purposes, and adequate for the Company's needs.

10

<PAGE>

ITEM 3. LEGAL PROCEEDINGS

The Company is a party to various lawsuits and administrative and other proceedings incidental to its business, including certain federal or state governmental environmental proceedings or private environmental claims relating to the cleanup of Superfund sites or other sites. While it is often difficult to estimate potential environmental liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material. The Company believes, after consulting with counsel, that the disposition of its lawsuits and other legal proceedings, including environmental matters, will not have a material effect on the Company's consolidated financial position.

In connection with the Reorganization, the Recapitalization and the Merger, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's consolidated financial position.

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of the Company's stockholders during the fourth quarter of 1998.

11

<PAGE>

EXECUTIVE OFFICERS OF THE REGISTRANT

The information appearing in the table below sets forth the

current position or positions held by each executive officer of the Company, his or her age as of March 15, 1999, the year in which he or she first was elected to the position currently held with the Company or with old Sealed Air (as indicated in the footnote to the table), and the year in which he or she first was elected an officer of the Company or of old Sealed Air (as indicated in the footnote to the table).

        All of the Company's officers serve at the pleasure of the Board of Directors. All officers have been employed by the Company or its subsidiaries for more than five years except for Mr. Van Riper, who was elected Senior Vice President and Chief Financial Officer of the Company effective July 1, 1998. Previously Mr. Van Riper was a partner in the accounting firm of KPMG LLP, which were the independent accountants for old Sealed Air for many years prior to the Merger and have acted as the independent accountants for the Company since the Merger. There are no family relationships among any of the Company's officers or directors.

| NAME AND CURRENT POSITION | AGE AS OF MARCH 15, 1999 | FIRST ELECTED TO CURRENT POSITION | FIRST ELECTED AN OFFICER |
| --- | --- | --- | --- |
| T. J. Dermot Dunphy Chairman of the Board, Chief Executive Officer and Director | 66 | 1971 | 1971 |
| William V. Hickey President and Chief Operating Officer | 54 | 1996 | 1980 |
| J. Gary Kaenzig, Jr.* Executive Vice President | 53 | 1998 | 1995 |
| Bruce A. Cruikshank Senior Vice President | 55 | 1996 | 1990 |
| Robert A. Pesci Senior Vice President | 53 | 1997 | 1990 |
| Daniel S. Van Riper Senior Vice President and Chief Financial Officer | 58 | 1998 | 1998 |
| Jonathan B. Baker Vice President | 46 | 1994 | 1994 |
| James A. Bixby Vice President | 55 | 1990 | 1990 |
| Leonard R. Byrne* Vice President | 57 | 1998 | 1998 |

12

<PAGE>

| Mary A. Coventry Vice President | 45 | 1994 | 1994 |

```
- -------------------------------            ---------------------------------
<S>                                          <C>                <C>
Interest payments, net of amounts capitalized  $     47,997     $
Income tax payments                                  80,069              74,
</TABLE>
```

                                    38

<PAGE>

The  consolidated  statements  of cash flows for the year ended  December 31, 1998
excludes the following non-cash  transactions that were accounted for as changes
in additional paid-in capital:
<TABLE>
<CAPTION>

<S>
    Issuance of 36,021,851 shares of Series A convertible preferred stock and 40,64
      shares of common stock in connection with the Reorganization and Recapitaliza
    Net assets acquired in the Merger in exchange for 42,624,246 shares of common s
    Liabilities assumed by the Company, net
    Liabilities retained by New Grace
</TABLE>

NOTE 16 EARNINGS PER COMMON SHARE

In calculating  basic and diluted  earnings per common share for 1998,  1997 and
1996,  retroactive  recognition has been given to the  Recapitalization as if it
had occurred on January 1, 1996 in accordance with SAB No. 98. Accordingly,  net
earnings have been reduced for preferred  stock dividends (as if such shares had
been  outstanding  during each period) to arrive at earnings  ascribed to common
shareholders.  The weighted average number of outstanding  common shares used to
calculate  basic earnings per common share has been  calculated on an equivalent
share  basis  using the  weighted  average  number  of  shares  of common  stock
outstanding  for the first  quarter  of 1998 and for the 1997 and 1996  periods,
adjusted  to reflect the terms of the Recapitalization.  The  weighted  average
number of common shares used to calculate diluted earnings per common share also
considers the exercise of dilutive  stock  options in each year and  repurchased
preferred  stock in 1998.  Except as noted in the table below,  the  outstanding
preferred  stock is not assumed to be  converted in the  calculation  of diluted
earnings  per  common  share  for  1998 or 1996  because  the  treatment  of the
preferred  stock as the  common  stock  into  which it is  convertible  would be
anti-dilutive (i.e., would increase earnings per common share) in those years.

The  following  table sets  forth the  reconciliation  of the basic and  diluted
earnings per common share  computations  for years ended December 31, 1998, 1997
and 1996 (shares in thousands).
<TABLE>
<CAPTION>

|                                                              | 1998 (a)  | 1997 (a |
| ------------------------------------------------------------ | --------- | ------- |
| <S>                                                          | <C>       | <C>     |
| Basic EPS:                                                   |           |         |
| NUMERATOR                                                    |           |         |
| Net earnings                                                 | $ 73,007  | $173,732 |
| Add: Excess of book value over repurchase price of preferred |           |         |
|      Stock                                                    | 1,798     | --      |
| Less: Preferred stock dividends                              | 53,921    | --      |
| Less: Retroactive recognition of preferred stock dividends   | 18,011    | 72,044  |

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Basic earnings per common share | $ 0.04 | $ 2.54 |

                                       39
<PAGE>

Diluted EPS:
NUMERATOR

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |
| Add:  Dividends associated with outstanding preferred stock | -- | 72,044 |
| Add:  Dividends associated with preferred stock repurchased | 316 | -- |
| Less: Excess of book value over repurchase of preferred stock | 1,798 | -- |
| Earnings ascribed to common shareholders-diluted | 1,391 | 173,732 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Effect of assumed exercise of options | 118 | 917 |
| Effect of assumed conversion of preferred stock | -- | 31,864 |
| Weighted average of preferred stock purchased | 158 | -- |
| Weighted average common shares outstanding - diluted | 73,273 | 72,833 |
| Diluted earnings per common share | $ 0.02 | $ 2.39 |

</TABLE>

(a)  Such  earnings per common share amounts are not  necessarily  indicative of
     the results that would have occurred had Cryovac been a stand-alone company
     prior to the Reorganization, Recapitalization and the Merger.

NOTE 17 CERTAIN TRANSACTIONS WITH GRACE

CASH

Prior to the Merger,  Cryovac used Grace's centralized cash management services.
Under  such  service  arrangements,  excess  domestic  cash  was  invested,  and
disbursements were funded, centrally by Grace on behalf of Cryovac.

SHARED SERVICES AND FACILITIES

Prior to the Merger,  Grace  allocated a portion of its  domestic  and  overseas
regional  corporate  expenses to Cryovac.  These  expenses  reflected  corporate

overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; general legal services, including intellectual property; and other support and executive functions. Allocations and charges were based on either a direct cost pass-through or a percentage allocation for services provided, based on factors such as net sales, management effort or headcount.

Domestic corporate expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $18,044, $28,213 and $15,175 for 1998, 1997 and 1996, respectively, and were included in marketing, administrative and development expenses.

Domestic research and development expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $5,074 for 1996 and are included in marketing, administrative and development expenses. No amounts were allocated for 1998 or 1997.

Grace management believed that the basis used for allocating corporate services was reasonable and that the terms of these transactions would not materially differ from those among unrelated parties.

The statements of earnings for periods prior to the Merger also included allocations of costs for general and administrative services and maintenance services for facilities that Cryovac shared with other Grace businesses as well as data processing services provided by Grace's European central data processing facility. The allocated costs and expenses related to general and administrative functions, maintenance, data processing and other facility support functions were estimated to be approximately $14,000 for the 1998 period and $55,802 and $84,005 for 1997 and 1996, respectively. Of these amounts, $6,181 was included in cost of sales and $49,621 was included in marketing, administrative and development expenses in 1997 ($15,226 and $68,779 in 1996). The cost allocations for these services were determined based on methods that Grace management considered to be reasonable.

Prior to the Merger, Grace also charged Cryovac for its share of domestic workers' compensation, automobile and other general business liability insurance premiums and claims, which were all handled by Grace on a corporate basis. These charges were based on Cryovac's actual and expected future experience, including annual payroll expense, and were not significant to Cryovac results of operations.

40

<PAGE>

ALLOCATION OF LONG-TERM INCENTIVE PROGRAM EXPENSE

In accordance with SAB No. 55, the financial statements for 1997 and 1996 reflect an allocation of LTIP expense related to Grace corporate employees that performed services on behalf of Cryovac. The provision included in the financial statements for allocated LTIP expenses was $23,710 and $9,293 for 1997 and 1996, respectively.

NOTE 18 COMMITMENTS AND CONTINGENCIES

The Company is obligated under the terms of various leases covering many of the facilities that it occupies. The Company accounts for substantially all of its leases as operating leases. Net rental expense was $20,873, $9,588, and $12,036 for 1998, 1997 and 1996, respectively. Estimated future minimum annual rental commitments under non-cancellable real property leases expiring through 2023 are