GILMAN AND PASTOR, LLP
DAVID PASTOR
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:  781/231-7850
781/231-7840 (fax)

Plaintiffs' Executive Committee Members

N:\CASES\Zonolite\JPI80574.req

EXHIBIT A

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 H6GPkpTKnepeIJsUT4R2GIHBGNKXZGgeISv2Zqf/a/UUxxA+KvKXyY3h1wUmoic4
 bRrk5i8ytvwj/NMm20KFSg==

<SEC-DOCUMENT>0000950144-98-003611.txt : 19980331
<SEC-HEADER>0000950144-98-003611.hdr.sgml : 19980331
ACCESSION NUMBER:               0000950144-98-003611
CONFORMED SUBMISSION TYPE:      10-K405
PUBLIC DOCUMENT COUNT:          5
CONFORMED PERIOD OF REPORT:     19971231
FILED AS OF DATE:               19980330
SROS:            NONE

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:               GRACE SPECIALTY CHEMICALS IN
                CENTRAL INDEX KEY:                    0001045309
                STANDARD INDUSTRIAL CLASSIFICATION:   CHEMICALS & ALLIED PRODUCTS
                IRS NUMBER:                           650773649
                STATE OF INCORPORATION:               DE
                FISCAL YEAR END:                      1231

        FILING VALUES:
                FORM TYPE:             10-K405
                SEC ACT:
                SEC FILE NUMBER:       001-13953
                FILM NUMBER:           98578470

        BUSINESS ADDRESS:
                STREET 1:              ONE TOWN CENTER ROAD
                CITY:                  BOCA RATON
                STATE:                 FL
                ZIP:                   33486-1010
                BUSINESS PHONE:        5613622000

        MAIL ADDRESS:
                STREET 1:              ONE TOWN CENTER ROAD
                CITY:                  BOCA RATON
                STATE:                 FL
                ZIP:                   33486-1010
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>GRACE SPECIALTY CHEMICALS, INC. 10-K405 12/31/97
<TEXT>

<PAGE>  1
================================================================================
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# EXHIBIT A

------------------

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1997      Commission file number 1-13953

GRACE SPECIALTY CHEMICALS, INC.
(TO BE RENAMED W. R. GRACE & CO.)

Incorporated under the Laws of the          I.R.S. Employer Identification No.
         State of Delaware                            65-0773649

ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
561/362-2000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|                              | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS          | WHICH REGISTERED |
| ---------------------------- | ---------------- |
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Share Purchase Rights | |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

        Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months and (2) has been subject to such filing
requirements for the past 90 days. Yes [ ] No [X]

        Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in the Proxy Statement incorporated by
reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

        The aggregate market value of Grace Specialty Chemicals, Inc. voting
stock held by nonaffiliates was $0 at March 23, 1998.

        At March 23, 1998, 1,000 shares of Grace Specialty Chemicals, Inc.
Common Stock were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

<TABLE>
<CAPTION>

| DOCUMENT | WHERE INCORPORATE |
| -------- | ----------------- |
| <S> | <C> |
| Annual Report on Form 10-K of W. R. Grace & Co. for the year ended December 31, 1997 (specified portions) | Parts I, II, III an |
| Information Statement of Grace Speciality Chemicals, Inc. dated February 13, 1998 (specified portions) | Part III |

```
  </TABLE>

==============================================================================

  <PAGE>    2
```

                         TABLE OF CONTENTS

  <TABLE>
  <CAPTION>


                                    PART I

  <S>
  Item 1.   Business.....................................................................
  Item 2.   Properties...................................................................
  Item 3.   Legal Proceedings............................................................
  Item 4.   Submission of Matters to a Vote of Security Holders.......................

                                   PART II

  Item 5.   Market for the Registrant's Common Equity and Related Stockholder Matters.
  Item 6.   Selected Financial Data.....................................................
  Item 7.   Management's Discussion and Analysis of Financial
            Condition and Results of Operations.........................................
  Item 7A.  Quantitative and Qualitative Disclosures About Market Risk................
  Item 8.   Financial Statements and Supplementary Data...............................
  Item 9.   Changes in and Disagreements with Accountants on
            Accounting and Financial Disclosure.........................................

                                  PART III

  Item 10.  Directors and Executive Officers of the Registrant........................
  Item 11.  Executive Compensation......................................................
  Item 12.  Security Ownership of Certain Beneficial Owners and Management............
  Item 13.  Certain Relationships and Related Transactions............................

                                   PART IV

  Item 14.  Exhibits, Financial Statement Schedules, and Reports on Form 8-K..........

  Signatures..............................................................................
  </TABLE>


```
  <PAGE>    3
```


                                    PART I

  ITEM 1.   BUSINESS

EXHIBIT B

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7zlT+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Nr2RS1BZnTKtzvdKQSRiYY8+P6KirIhpc7RDQup6IB1xUUwmUjJFaBl5uEECGPfe
 3IF+W7OSGoM4n2UbA1wHWA==

<SEC-DOCUMENT>0000950136-00-000425.txt : 20000329
<SEC-HEADER>0000950136-00-000425.hdr.sgml : 20000329
ACCESSION NUMBER:                    0000950136-00-000425
CONFORMED SUBMISSION TYPE:           10-K
PUBLIC DOCUMENT COUNT:               6
CONFORMED PERIOD OF REPORT:          19991231
FILED AS OF DATE:                    20000328

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:              W R GRACE & CO
                CENTRAL INDEX KEY:                   0001045309
                STANDARD INDUSTRIAL CLASSIFICATION:  CHEMICALS & ALLIED PRODUCTS
                IRS NUMBER:                          650773649
                STATE OF INCORPORATION:              DE
                FISCAL YEAR END:                     1231

        FILING VALUES:
                FORM TYPE:            10-K
                SEC ACT:
                SEC FILE NUMBER:      001-13953
                FILM NUMBER:          581600

        BUSINESS ADDRESS:
                STREET 1:             1750 CLINT MOORE ROAD
                CITY:                 BOCA RATON
                STATE:                FL
                ZIP:                  33487-2707
                BUSINESS PHONE:       5613622000

        MAIL ADDRESS:
                STREET 1:             1750 CLINT MOORE ROAD
                CITY:                 BOCA RATON
                STATE:                FL
                ZIP:                  33487-2707

        FORMER COMPANY:
                FORMER CONFORMED NAME: GRACE SPECIALTY CHEMICALS INC
                DATE OF NAME CHANGE:   19970902
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K
<TEXT>

<PAGE>

                UNITED STATES SECURITIES AND EXCHANGE COMMISSION

# EXHIBIT B

WASHINGTON, D.C. 20549

------------------------

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1999        Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                    65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION
12(B) OF THE ACT:

|  | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS | WHICH REGISTERED |
| ------------------- | ---------------- |
| Common Stock, $.01 par value<br>Preferred Stock Purchase Rights | New York Stock Exchange, Inc. |
| 7-3/4% Notes Due 2002<br>(issued by W. R. Grace & Co.-Conn.,<br>a wholly owned subsidiary) and<br>related Guarantees | New York Stock Exchange, Inc. |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X]  No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in the Proxy Statement incorporated by reference
in Part III of this Form 10-K or any amendment to this Form 10-K.  [X]

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates was approximately $668,308,406 at March 13, 2000.

At March 13, 2000, 67,186,224 shares of W. R. Grace & Co. Common Stock, $.01 par
value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

W. R. Grace & Co. is incorporating by reference into Part III of this Annual
Report on Form 10-K specified portions of its Proxy Statement for its Annual
Meeting of Stockholders to be held May 10, 2000.

<PAGE>

TABLE OF CONTENTS

```
<TABLE>
<CAPTION>

<S>
PART I...............................................................................
          Item 1.       Business......................................................
                        Introduction and Overview.............................
                        Products and Markets..................................
                        Discontinued Operations...............................
                        Research Activities...................................
                        Patents and Other Intellectual Property Matters..........
                        Environmental, Health and Safety Matters.................
          Item 2.       Properties....................................................
          Item 3.       Legal Proceedings.............................................
          Item 4.       Submission of Matters to a Vote of Security Holders..........

                        Executive Officers............................................


PART II..............................................................................
          Item 5.       Market for Registrant's Common Equity and Related Shareholder
          Item 6.       Selected Financial Data.......................................
          Item 7.       Management's Discussion and Analysis of Results of Operations
          Item 7A.      Quantitative and Qualitative Disclosures About Market Risk...
          Item 8.       Financial Statements and Supplementary Data..................
          Item 9.       Changes in and Disagreements with Accountants on
                        Accounting and Financial Disclosure.....................


PART III.............................................................................
          Item 10.      Directors and Executive Officers of the Registrant...........
          Item 11.      Executive Compensation........................................
          Item 12.      Security Ownership of Certain Beneficial Owners and Managemen
          Item 13.      Certain Relationships and Related Transactions...............


PART IV..............................................................................
          Item 14.      Exhibits, Financial Statement Schedules, and Reports on Form

SIGNATURES...........................................................................

FINANCIAL SUPPLEMENT.................................................................
</TABLE>
```

<PAGE>

PART I

ITEM 1. BUSINESS

INTRODUCTION AND OVERVIEW

W. R. Grace & Co., through its subsidiaries, is one of the world's leading specialty chemicals companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace primarily operates through the following two business segments:

o          Davison Chemicals manufactures catalysts, including (1) fluid cracking

| | ---------------- | ------------<br>(in millions) | ----------- |
|---|---|---|---|
| 1997 | $36 | $7 | $37 |
| 1998 | 38 | 6 | 37 |
| 1999 | 31 | 6 | 25 |
| 2000 (est.) | 33 | 7 | 43 |
| 2001 (est.) | 38 | 7 | 38 |

Additional material environmental costs may arise as a result of future legislation or other developments. Grace's earnings, competitive position and other capital expenditures have not been, and are not expected to be, materially adversely affected by compliance with environmental requirements. See Note 13 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

With the goal of continuously improving Grace's environmental, health and safety ("EHS") performance, Grace established its Commitment to Care(R) initiative (based on the Responsible Care(R) program of the Chemical Manufacturers Association) in 1994 as the program under which all Grace EHS activities are to be implemented. To the extent applicable, Commitment to Care extends the basic elements of Responsible Care to all Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention.

See Item 3 below for information concerning environmental proceedings to which Grace is a party.

9

<PAGE>

ITEM 2. PROPERTIES

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit, and since the disposition of the Packaging Business, some plants and facilities are shared with Sealed Air Corporation. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Additional information regarding Grace's properties is set forth in Item 1 above and in Notes 1, 8 and 13 to the Consolidated Financial Statements.

ITEM 3. LEGAL PROCEEDINGS

Asbestos Litigation. Grace is a defendant in property damage and bodily

current position or positions held by each executive officer of the Company, his
or her age as of March 15, 1999, the year in which he or she first was elected
to the position currently held with the Company or with old Sealed Air (as
indicated in the footnote to the table), and the year in which he or she first
was elected an officer of the Company or of old Sealed Air (as indicated in the
footnote to the table).

         All of the Company's officers serve at the pleasure of the
Board of Directors. All officers have been employed by the Company or its
subsidiaries for more than five years except for Mr. Van Riper, who was elected
Senior Vice President and Chief Financial Officer of the Company effective July
1, 1998. Previously Mr. Van Riper was a partner in the accounting firm of KPMG
LLP, which were the independent accountants for old Sealed Air for many years
prior to the Merger and have acted as the independent accountants for the
Company since the Merger. There are no family relationships among any of the
Company's officers or directors.

| NAME AND CURRENT POSITION | AGE AS OF MARCH 15, 1999 | FIRST ELECTED TO CURRENT POSITION | FIRST ELECTED AN OFFICER |
| --- | --- | --- | --- |
| T. J. Dermot Dunphy Chairman of the Board, Chief Executive Officer and Director | 66 | 1971 | 1971 |
| William V. Hickey President and Chief Operating Officer | 54 | 1996 | 1980 |
| J. Gary Kaenzig, Jr.* Executive Vice President | 53 | 1998 | 1995 |
| Bruce A. Cruikshank Senior Vice President | 55 | 1996 | 1990 |
| Robert A. Pesci Senior Vice President | 53 | 1997 | 1990 |
| Daniel S. Van Riper Senior Vice President and Chief Financial Officer | 58 | 1998 | 1998 |
| Jonathan B. Baker Vice President | 46 | 1994 | 1994 |
| James A. Bixby Vice President | 55 | 1990 | 1990 |
| Leonard R. Byrne* Vice President | 57 | 1998 | 1998 |

                                12

<PAGE>

| Mary A. Coventry Vice President | 45 | 1994 | 1994 |

```
- ------------------------------------------------------------------------
<S>                                                      <C>            <C>
Interest payments, net of amounts capitalized       $    47,997      $
Income tax payments                                      80,069             74,
</TABLE>
```

38

<PAGE>

The consolidated statement of cash flows for the year ended  December 31, 1998
excludes the following non-cash  transactions that were accounted for as changes
in additional paid-in capital:
<TABLE>
<CAPTION>

<S>
    Issuance of 36,021,851 shares of Series A convertible preferred stock and 40,64
        shares of common stock in connection with the Reorganization and Recapitaliza
    Net assets acquired in the Merger in exchange for 42,624,246 shares of common s
    Liabilities assumed by the Company, net
    Liabilities retained by New Grace
</TABLE>

NOTE 16 EARNINGS PER COMMON SHARE

In calculating  basic and diluted  earnings per common share for 1998,  1997 and
1996,  retroactive  recognition  has been given to the  Recapitalization as if it
had occurred on January 1, 1996 in accordance with SAB No. 98. Accordingly,  net
earnings have been reduced for preferred  stock dividends (as if such shares had
been  outstanding  during each period) to arrive at earnings  ascribed to common
shareholders.  The weighted average number of outstanding  common shares used to
calculate  basic earnings per common share has been  calculated on an equivalent
share  basis  using the  weighted average  number  of  shares of common  stock
outstanding  for the first  quarter  of 1998 and for the 1997 and 1996  periods,
adjusted  to reflect the terms of the  Recapitalization.  The  weighted  average
number of common shares used to calculate diluted earnings per common share also
considers the exercise of dilutive  stock  options in each year and  repurchased
preferred  stock in 1998.  Except as noted in the table below,  the  outstanding
preferred  stock is not assumed to be  converted in the  calculation  of diluted
earnings  per common  share  for  1998 or 1996  because  the  treatment  of the
preferred  stock as the  common  stock  into  which it is  convertible  would be
anti-dilutive (i.e., would increase earnings per common share) in those years.

The  following  table sets  forth the  reconciliation  of the basic and  diluted
earnings per common share  computations  for years ended December 31, 1998, 1997
and 1996 (shares in thousands).
<TABLE>
<CAPTION>
```

|                                                              | 1998 (a) | 1997 (a |
| --- | --- | --- |
| <S>                                                          | <C>      | <C>     |
| Basic EPS: |  |  |
| NUMERATOR |  |  |
| Net earnings                                                 | $ 73,007 | $173,732 |
| Add: Excess of book value over repurchase price of preferred |  |  |
| Stock                                                        | 1,798    | -- |
| Less: Preferred stock dividends                              | 53,921   | -- |
| Less: Retroactive recognition of preferred stock dividends   | 18,011   | 72,044 |

```
- ------------------------------------------------------------------------
```

injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in 50,342 asbestos-related lawsuits at December 31, 1999 (11 involving claims for property damage and the remainder involving 105,670 claims for bodily injury), as compared to 45,086 lawsuits at year-end 1998 (14 involving claims for property damage and the remainder involving 97,017 claims for bodily injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through December 31, 1999, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 203 property damage cases were settled for a total of $603.8 million.

Included in the asbestos property damage cases pending against Grace and others at December 31, 1999 were the following class actions: (i) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials, which Grace has moved to decertify (Central Wesleyan College, et al. v. W. R. Grace, et al.). During the fourth quarter of 1999, the parties agreed to a preliminary settlement of this action pending final approval by the court; and (ii) a purported class action (Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al.), filed in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all

10

<PAGE>

entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

In February 2000 an action filed as a class action lawsuit was filed in U.S. District Court in Boston, Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing Zonolite(R) attic fill insulation, a product previously sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. While Grace has not completed its investigation of the claims described in this lawsuit, Grace believes that this product is safe for its intended purpose and poses little or no threat to human health. At this time Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through December 31, 1999, approximately 14,700 bodily injury lawsuits involving 32,800 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 48,200 such suits involving approximately 124,900 claims were disposed of for a total of $410.3 million.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace also has settled with its excess insurance carriers that wrote policies available for both property damage and bodily injury cases and claims with the exception of two carriers that wrote policies Grace believes are available for bodily injury claims. Grace is currently in litigation with these two excess insurance carriers, whose policies represent layers of coverage Grace has not yet reached, in the action Maryland Casualty Co. v. W. R. Grace & Co. (filed April 13, 1988), pending in the U.S. District Court for the Southern District of New York. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $752.7 million prior to 1997, as well as payments totaling $68.7 million in 1997, $74.0 million in 1998 and $73.1 million in 1999. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded receivables to reflect the expected amounts to be recovered as asbestos-related claims are paid.

In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-related bodily injury claims. Since 1996, Grace had been accruing for all current asbestos-related bodily injury claims and those expected to be asserted over the ensuing five-year period. Based on Grace's experience and recent trends in asbestos bodily injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, and now has accrued for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1999 was $1,084.0 million; this amount reflects all asbestos-related property damage and bodily injury

11

<PAGE>

cases and claims then pending (except for the Lindholm case referenced above with respect to Grace's attic fill insulation, which was not filed until February 2000 and for which insufficient information exists to estimate any potential liability), as well as all bodily injury claims expected to be filed in the future.

Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the actual number and nature of claims filed and the extent to which insurance will cover damages for which it may be liable, amounts paid in settlement and litigation costs. At December 31, 1999, Grace had recorded a receivable of $366.1 million, as well as notes receivable of $5.3 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims, including all projected bodily injury cases as described above. In Grace's opinion (which is not based on a formal opinion of counsel), it is probable that recoveries from its insurance carriers, along with other sources of funds, will be available to satisfy the property damage and bodily injury cases and claims pending at December 31, 1999, as well as bodily injury claims expected to be filed in the future.

See Note 2 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 1999, proceedings were pending with respect to approximately 33 sites as to which Grace has been designated a PRP. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities.

The EPA is currently conducting an investigation of the air, water and soil quality in and around Libby, Montana. This investigation was triggered by newspaper reports of excessive levels of asbestos-related disease related to Grace's former vermiculite mining activities in the area. This investigation, which will also include a comprehensive health-screening program, is scheduled to be completed in the third quarter of 2000. EPA is also reviewing Grace's present and former vermiculite processing plant operations in other locations. This investigation is not expected to result in significant sanctions or material liability to Grace. In addition, on February 22, 2000, a class action lawsuit was filed in U.S. District Court in Missoula, Montana (Tennison, et al. v. W.R. Grace & Co., et al) against Grace on behalf of all owners of real property situated within 12 miles from Libby, Montana that are improved private properties. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. While Grace has not completed its investigation of the claims, it has no reason to believe that its former activities caused damage to the environment or property. At this time, the Company is not able to assess the extent of any possible liability related to this lawsuit.

12

<PAGE>

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge or disposition of hazardous wastes and other materials.

Grace has been involved in litigation with its insurance carriers, seeking reimbursement from them for certain amounts for which Grace may be held liable with respect to such costs. In 1998, Grace entered into a settlement agreement with one of its carriers and received payment of $57 million. Grace is a party to two environmental insurance coverage actions pending in the U.S. District Court for the Southern District of New York. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed June 21, 1988). Litigation continues in this case as to a certain primary-level carrier that has not settled with respect to claims for environmental property damage. The second case, entitled Uniguard v. W. R. Grace, was filed on December 17, 1997. This

declaratory judgment action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

Grace believes that the liabilities for environmental remediation costs, including costs relating to environmental proceedings, that have been recorded in Grace's historical financial statements are adequate and, irrespective of outcome of the insurance litigations referred to above, Grace believes that the resolution of pending environmental proceedings will not have a material adverse effect on the consolidated financial position or liquidity of Grace. For further information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

U.S. Justice Department Lawsuit. The United States and the State of California, acting through the U.S. Justice Department and the Attorney General for California, have intervened in a qui tam lawsuit, originally filed in June 1995, pending in the U.S. District Court for the Northern District of California (United States ex rel. Robert Costa and Ronald Thornburg, et al. v. Baker & Taylor, Inc., et al.). The amended complaint in this lawsuit alleges that Baker & Taylor Books, a book wholesaler sold by Grace in 1992, overcharged public schools, libraries and federal agencies for book sales since at least 1980, including the period during which Baker & Taylor Books was owned by Grace. Grace and Baker & Taylor, Inc. (the entity that currently operates Baker & Taylor Books) have been named as defendants. The lawsuit seeks unspecified actual damages plus trebled damages under the Federal and California False Claims Acts, other civil penalties, attorneys' fees and expenses and such other relief as the Court may deem proper. In June 1999, Baker & Taylor, Inc. settled the claims of the United States for $3 million. In August 1999, the Court permitted 17 additional states to intervene in this case. The case continues with claims by the U.S. against Grace and by the states against Grace and Baker & Taylor, Inc.

13

<PAGE>

Liabilities Relating to National Medical Care. In connection with the reorganization of a predecessor of the Company ("Grace New York") on September 27, 1996, Grace's former National Medical Care ("NMC") health care businesses were separated from Grace's other businesses and merged with a subsidiary of Fresenius A.G., a German corporation. The agreement governing such transactions provides generally for certain cross-indemnities designed to place with Grace New York (now a subsidiary of Fresenius A.G.) financial responsibility for the liabilities of such health care businesses and to place with Grace financial responsibility for the other liabilities of Grace New York and its other subsidiaries.

Under the terms of the transactions, NMC remains responsible for all liabilities resulting from the investigation by the Office of the Inspector General ("OIG") of the U.S. Department of Health and Human Services and certain related matters. In July 1996, an agreement was entered into with the U.S. government under which, among other things, Grace guaranteed under certain circumstances the payment obligations of NMC and its affiliates to the U.S. government arising out of the OIG investigation with respect to acts and transactions taking place prior to September 27, 1996. In the fourth quarter of 1999, Fresenius Medical Care A.G. ("Fresenius") entered into a preliminary agreement with the U.S. government settling the OIG and related claims. In January, 2000 Fresenius announced that it had finalized this settlement agreement and agreed to pay the U.S. government $486 million in full settlement

of these claims. Grace does not expect that there will be any impact on its financial condition or results of operations as a result of this settlement.

See Note 13 to the Consolidated Financial Statements for additional information concerning certain litigation and proceedings involving NMC.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 1999.

EXECUTIVE OFFICERS

The Company's current executive officers are listed below. Executive officers are elected to serve until the following annual meeting of the Company's Board of Directors. The next annual meeting of the Company's Board of Directors is scheduled to be held on May 10, 2000.

| Name and Age | Office | First Elected |
| ------------ | ------ | ------------- |
| Robert J. Bettacchi (57) | Senior Vice President | 04/01/97 |
| William M. Corcoran (50) | Vice President | 05/11/99 |
| W. Brian McGowan (50) | Senior Vice President | 12/06/90* |
| William L. Monroe (58) | Vice President | 05/11/87* |

14

<PAGE>

| Name and Age | Office | First Elected |
| ------------ | ------ | ------------- |
| Paul J. Norris (52) | Chairman, President and Chief Executive Officer | 01/01/99 11/01/98 |
| David B. Siegel (51) | Senior Vice President and General Counsel | 09/01/98* |
| Robert M. Tarola (49) | Senior Vice President and Chief Financial Officer | 05/11/99 |

* Designated an Executive Officer on July 9, 1998

Messrs. Bettacchi, McGowan, Monroe and Siegel have been actively engaged in Grace's business for the past five years. Prior to joining Grace, Mr. Corcoran had served as Vice President of Business and Regulatory Affairs for AlliedSignal Incorporated's specialty chemicals business since 1997. For nine years prior to that, he served as Vice President of Public Affairs in AlliedSignal's engineered materials sector. Mr. Norris was a Senior Vice President of AlliedSignal and President of its specialty chemicals business from January 1997 until joining Grace. Mr. Norris joined AlliedSignal in 1989 as President of its fluorine products/chemicals and catalysts businesses. Mr. Tarola joined Grace from MedStar Health, Inc., where he had served as Senior Vice President and Chief Financial Officer since July 1998. He previously served in a similar capacity with Helix Health, Inc. for two years. From 1974 through 1996, Mr. Tarola was an employee of and partner in Price Waterhouse LLP.

PART II

any proceeds from disposal, is charged or credited to income. Grace reviews
long-lived assets for impairment whenever events or changes in circumstances
indicate that the carrying amount of an asset may not be fully recoverable.

GOODWILL: Goodwill arises from certain purchase business combinations and is
amortized using the straight-line method over appropriate periods not exceeding
40 years. Grace reviews its goodwill for impairment whenever events or changes
in circumstances indicate that the carrying amount may not be fully recoverable.

REVENUE RECOGNITION: Grace generally recognizes revenue upon shipment of goods
to customers or upon performance of services.

RESEARCH AND DEVELOPMENT COSTS: Research and development costs are charged to
expense as incurred.

CONSOLIDATED STATEMENT OF CASH FLOWS: Balance sheet information relating to a
discontinued business is not restated for periods prior to the date of
classification of a business as a discontinued operation. Accordingly, "Net
pre-tax cash used for operating activities of discontinued operations" excludes
the effects of changes in working capital of discontinued operations prior to
their classification as such. The net investing and financing activities of
discontinued operations represent cash flows of discontinued operations
subsequent to the respective dates of such classifications.

INCOME TAXES: Grace recognizes deferred tax assets and liabilities with respect
to the expected future tax consequences of events that have been recorded in the
Consolidated Financial Statements and tax returns. If it is more likely than not
that all or a portion of deferred tax assets will not be realized, a valuation
allowance is provided against such deferred tax assets.

FOREIGN CURRENCY TRANSLATION: Assets and liabilities of foreign subsidiaries
(other than those located in countries with highly inflationary economies) are
translated into U.S. dollars at current exchange rates, while their revenues,
costs and expenses are translated at average exchange rates during each
reporting period; resulting translation adjustments are included in the
accumulated other comprehensive income (loss) section of the Consolidated
Balance Sheet. The financial statements of subsidiaries located in countries
with highly inflationary economies are remeasured as if the functional currency
were the U.S. dollar; the remeasurement creates translation adjustments that are
reflected in net income.

FINANCIAL INSTRUMENTS: Grace periodically enters into interest rate swap
agreements and foreign exchange forward and option contracts to manage exposure
to fluctuations in interest and foreign currency exchange rates. Grace does not
hold or issue derivative financial instruments for trading purposes.

- ------------------------------------------------------------------------------
2.   ASBESTOS-RELATED LITIGATION
================================================================================

Grace is a defendant in property damage and bodily injury lawsuits relating to
previously sold asbestos-containing products and expects that it will be named
as a defendant in additional asbestos-related lawsuits in the future. Grace was
a defendant in 50,342 asbestos-related lawsuits at December 31, 1999 (11
involving claims for property damage and the remainder involving 105,670 claims
for bodily injury), as compared to 45,086 lawsuits at December 31, 1998 (14
involving claims for property damage and the remainder involving 97,017 claims
for bodily injury).

PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants
absorb the cost of removing, containing or repairing the asbestos-containing
materials in the affected buildings. Each property damage case is unique in that
the age, type, size and use of the building, and the difficulty of asbestos
abatement, if necessary, vary from structure to structure. Thus, the amounts
involved in prior dispositions of property damage cases are not necessarily
indicative of the amounts that may be required to dispose of cases in the
future. Information regarding product identification, the amount of product in
the building, the age, type,

F-9

<PAGE>

size and use of the building, the jurisdictional history of prior cases and the
court in which the case is pending provide meaningful guidance as to the range
of potential costs. Grace has recorded an accrual for all existing property
damage cases for which sufficient information is available to form a reasonable
estimate of such exposure.

Through December 31, 1999, 140 asbestos property damage cases were dismissed
without payment of any damages or settlement amounts; judgments were entered in
favor of Grace in nine cases (excluding cases settled following appeals of
judgments in favor of Grace); judgments were entered in favor of the plaintiffs
in seven cases for a total of $60.3 million; and 203 property damage cases were
settled for a total of $603.8 million.

| PROPERTY DAMAGE CASE ACTIVITY | 1999 | 1998 |
|---|---|---|
| Cases outstanding, beginning of year | 14 | 18 |
| New cases filed | -- | 2 |
| Settlements | (3) | (5) |
| Dismissals | -- | (1) |
| Judgments | -- | -- |
| Cases outstanding, end of year | 11 | 14 |

BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in
the type of asbestos-related illness allegedly suffered by the plaintiff).
However, Grace's estimated liability for such claims is influenced by numerous
variables, including the solvency of other former asbestos producers,
cross-claims by co-defendants, the rate at which new claims are filed, the
jurisdiction in which the filings are made, and the defense and disposition
costs associated with these claims. Grace's bodily injury liability reflects
management's estimate of the number and ultimate cost of present and future
bodily injury claims expected to be asserted against Grace given demographic
assumptions of possible exposure to asbestos products manufactured by Grace.

Through December 31, 1999, approximately 14,700 asbestos bodily injury lawsuits

involving approximately 32,800 claims were dismissed without payment of any
damages or settlement amounts (primarily on the basis that Grace products were
not involved), and approximately 48,200 lawsuits involving approximately 124,900
claims were disposed of (through settlement and judgments) for a total of $410.3
million. Bodily injury claim activity for 1999 and 1998 was as follows:

| BODILY INJURY CLAIM ACTIVITY | 1999 | 1998 |
|---|---|---|
| Claims outstanding, beginning of year | 97,017 | 96,933 |
| New claims | 26,941 | 20,993 |
| Settlements | (16,174) | (19,503) |
| Dismissals | (2,109) | (1,399) |
| Judgments | (5) | (7) |
| Claims outstanding, end of year | 105,670 | 97,017 |

ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its
experience with, and recent trends in, asbestos litigation. These estimates
include property damage and bodily injury indemnity as well as defense costs.
Grace regularly evaluates its financial exposure to asbestos-related lawsuits
and the adequacy of related recorded liabilities. The amounts recorded at each
balance sheet date reflect Grace's best estimate of probable and estimable
liabilities in all material respects. However, changes to estimates of probable
liabilities may occur as actual experience is gained over time. In the fourth
quarter of 1998, a change in the accrual period for asbestos-related bodily
injury litigation resulted in a noncash net pre-tax charge of $376.1 million
($244.4 million after-tax). The provision consisted of an addition of $576.9
million to the asbestos liability primarily for bodily injury indemnity and
defense costs, partially offset by expected recoveries from insurance carriers
of $200.8 million ($130.5 million after-tax).

| ESTIMATED LIABILITY FOR ASBESTOS-RELATED LITIGATION (Dollars in millions) | 1999 | 1998 |
|---|---|---|
| Asbestos-related liability expected to be satisfied within one year | $ 199.3 | $ 95.5 |
| Asbestos-related liability expected to be satisfied after one year | 884.7 | 1,104.4 |
| Total asbestos-related liability | $1,084.0 | $1,199.9 |

The current portion of Grace's asbestos-related liability is based on
management's estimate of indemnity payments and defense costs expected to be
paid within one year.

ASBESTOS-RELATED INSURANCE

Grace previously purchased insurance policies with respect to its
asbestos-related lawsuits and claims. Activity in Grace's notes receivable from
insurance carriers and asbestos-related insurance receivable during 1999 and

1998 was as follows:

<PAGE>

| ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES (Dollars in millions) | 1999 | 1998 |
|---|---|---|
| **NOTES RECEIVABLE** | | |
| Notes receivable from insurance carriers, beginning of year, net of discount of $2.3 (1998 - $4.8) .. | $ 18.0 | $ 31.3 |
| Proceeds received under asbestos-related insurance settlements ..................... | (14.2) | (15.8) |
| Current year amortization of discount | 1.5 | 2.5 |
| Notes receivable from insurance carriers, end of year, net of discount of $0.8 (1998 - $2.3) .................. | 5.3 | 18.0 |
| **INSURANCE RECEIVABLE** | | |
| Asbestos-related insurance receivable, beginning of year .............. | 425.0 | 282.4 |
| Proceeds received under asbestos-related insurance settlements ..................... | (58.9) | (58.2) |
| Increase in asbestos-related insurance receivable ...................... | -- | 200.8 |
| Asbestos-related insurance receivable, end of year ......... | 366.1 | 425.0 |
| Total amounts due from insurance carriers ........................ | 371.4 | 443.0 |
| Expected to be realized within one year ............................ | (75.2) | (66.7) |
| Expected to be realized after one year ............................ | $ 296.2 | $ 376.3 |

Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for bodily injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related bodily injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to

be paid by Grace. Estimated insurance reimbursements relate to property damage and bodily injury cases and claims pending at year-end 1999 and bodily injury claims expected to be filed in the future.

Notes receivable from insurance carriers do not bear stated interest rates and, therefore, have been discounted using a weighted average interest rate of 6.7%. Installments due in 2000 are classified as "current" in the Consolidated Balance Sheet. Payments under these notes will be received through 2001.

Grace's ultimate exposure with respect to its asbestos-related cases and claims partly depends on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, it is probable that recoveries from its insurance carriers (including amounts reflected as an asset discussed above), along with other funds, will be available to satisfy the property damage and bodily injury cases and claims pending at December 31, 1999, as well as bodily injury claims expected to be filed in the future.

3.   DISCONTINUED OPERATIONS

PACKAGING BUSINESS TRANSACTION

As discussed in Note 1, the Spin-off and the Merger were completed on March 31, 1998. Prior to the Spin-off and the Merger, Old Grace and a Packaging Business subsidiary borrowed $1,258.8 million (inclusive of $2.2 million of bank fees) and made a cash transfer of $1,256.6 million to Grace, which used the transferred funds to repay substantially all of Grace's debt (see Note 10). The borrowed funds are shown as a net financing activity of discontinued operations in the Consolidated Statement of Cash Flows for 1998. In the Merger and a related recapitalization, for each Old Grace common share outstanding at the close of trading on March 31, 1998, each shareholder received .536 shares of New Sealed Air common stock and .475 shares of New Sealed Air convertible preferred stock. Upon the completion of the Spin-off and the Merger, the shareholders of Old Grace owned (a) 100% of the specialty chemicals businesses (through their ownership of 100% of the Company's outstanding shares) and (b) approximately 63% of New Sealed Air, on a fully diluted basis.

The Packaging Business transaction resulted in an adjustment to shareholders' equity of $196.4 million, representing Grace's net investment in the Packaging Business.

During 1998, Grace made certain amendments to one of its domestic pension plans which included offering a lump sum settlement option to former Grace employees not currently receiving benefits. During 1999, a significant number of the lump sum offers were settled and in accordance with Statement of Financial Accounting Standards (SFAS) No. 88, "Employers' Accounting for Settlements and Curtailments of Defined Benefit Plans and for Termination Benefits," the Company recognized a pre-tax loss of $11.0 million in connection with these settlements. A pre-tax noncash charge of $9.1 million ($5.7 million after-tax) is included in "Income from

F-11

<PAGE>

discontinued operations, net of tax" in the Consolidated Statement of Operations as it relates to settlements with former Packaging Business employees. A pre-tax

noncash charge of $1.9 million is included in selling, general and
administrative expenses in the Consolidated Statement of Operations for
settlements relating to former Grace employees not associated with the former
Packaging Business.

The Packaging Business transaction also required the Company to split certain
pension plans and recognize a net curtailment loss for other plans. In
accordance with SFAS No. 88, the Company recognized a net pre-tax loss of $8.4
million ($5.5 million after-tax) in 1998, in connection with these plans. This
net pre-tax loss is included in "Income from discontinued operations, net of
tax" in the Consolidated Statement of Operations.

CROSS COUNTRY STAFFING

In July 1999, the Company completed the sale of substantially all of its
interest in Cross Country Staffing (CCS), a provider of temporary nursing and
other healthcare services for total cash proceeds of $184.6 million. The
Company's investment in CCS had been accounted for under the equity method. The
sale resulted in a net pre-tax gain of $76.3 million ($32.1 million after-tax)
including the cost of the Company's purchase of the interests held by third
parties in CCS and the amount payable under CCS's phantom equity plan prior to
closing under the sale transaction. The gain and the operations of CCS prior to
the sale are included in "Income from discontinued operations, net of tax" in
the Consolidated Statement of Operations. Certain contingent liabilities,
primarily related to tax matters of CCS, are being retained by the Company and
are included in other current liabilities in the Consolidated Balance Sheet.

COCOA

In February 1997, Grace sold its cocoa business to Archer-Daniels-Midland
Company (ADM) for total proceeds of $477.6 million (including debt assumed by
the buyer), subject to adjustment. The pre-tax and after-tax effects of the
divestment were consistent with prior estimates and were charged against
previously established reserves. In October 1997, ADM paid Grace an additional
$7.9 million (including $0.4 million of interest income) in settlement of the
purchase price adjustment. In anticipation of this settlement, in the third
quarter of 1997 Grace reversed previously recorded provisions of $19.0 million
($12.4 million after-tax) in discontinued operations.

OTHER

In August 1997, Grace sold TEC Systems to Sequa Corporation for total proceeds
of $16.1 million. The loss on this sale was consistent with prior estimates and
was charged against previously established reserves.

RETAINED OBLIGATIONS

Under certain divestiture agreements, the Company has retained contingent
obligations that could develop into situations where accruals for estimated
costs of defense or loss would be recorded in a period subsequent to divestiture
under generally accepted accounting principles. The Company assesses its
retained risks quarterly and accrues amounts estimated to be payable related to
these obligations when probable and estimable.

During the third quarter of 1999, the Company revised its estimate of the
outcome of certain of these retained contingent obligations based on current
circumstances and, as a result, recorded an additional charge of $25.7 million
($16.7 million after-tax). This charge is included in "Income from discontinued
operations, net of tax" in the Consolidated Statement of Operations.

F-12

<PAGE>

```
========================================================================
RESULTS OF DISCONTINUED
OPERATIONS (Dollars in millions)  1999      1998       1997
========================================================================
Net sales ...............      $   --    $431.2   $1,833.1
                               ------------------------------

(Loss) income from
  operations before taxes.       (17.7)     14.7      264.6
Income tax provision .....         8.0     (13.8)    (101.9)
                               ------------------------------

(Loss) income from
  discontinued operations         (9.7)      0.9      162.7
Net gains on dispositions of
  businesses .............        76.3        --       19.0
Provision for income taxes
  on dispositions of
   businesses ............       (44.2)       --       (6.6)
Other charges, net of tax.       (16.7)       --         --
                               ------------------------------

TOTAL INCOME FROM
  DISCONTINUED OPERATIONS.    $    5.7   $    0.9  $  175.1
                               ==============================

BASIC EARNINGS PER SHARE
  FROM DISCONTINUED
   OPERATIONS..............    $   0.08   $   0.01  $   2.37
DILUTED EARNINGS PER SHARE
  FROM DISCONTINUED
   OPERATIONS..............    $   0.08   $   0.01  $   2.32
========================================================================
```

-----------------------------------------------------------------------------

4.   INCOME TAXES
========================================================================

The components of income (loss) from continuing operations before income taxes
and the related (provision for) benefit from income taxes are as follows:

```
=============================  ==========  =========  ==========
INCOME TAXES - CONTINUING
  OPERATIONS
  (Dollars in millions)           1999       1998       1997
=============================  ==========  =========  ==========
Income (loss) from
  continuing operations
  before income taxes:
  Domestic.................    $ 135.9    $(275.8)  $   58.9
  Foreign.................        67.5       52.6       78.5
                               ----------  ---------  ----------
                               $ 203.4    $(223.2)  $  137.4
                               ==========  =========  ==========
(Provision for) benefit
  from income taxes:
  Federal - current........    $ (21.2)   $  79.2   $   12.3
```

EXHIBIT C

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Wcz3CDN9y6G4MOFMjNF2CQ+Nb4fe+FGzfMFaN7LlY0uJ2V4VmVQsmtbBugvVTgrl
 u4QoedFlMj3SX6EK/97n3A==

<SEC-DOCUMENT>0000930413-99-000449.txt : 19990331
<SEC-HEADER>0000930413-99-000449.hdr.sgml : 19990331
ACCESSION NUMBER:            0000930413-99-000449
CONFORMED SUBMISSION TYPE:   10-K
PUBLIC DOCUMENT COUNT:       7
CONFORMED PERIOD OF REPORT:  19981231
FILED AS OF DATE:            19990330

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:             SEALED AIR CORP/DE
                CENTRAL INDEX KEY:                  0001012100
                STANDARD INDUSTRIAL CLASSIFICATION: UNSUPPORTED PLASTICS FILM &
                IRS NUMBER:                         650654331
                STATE OF INCORPORATION:             DE
                FISCAL YEAR END:                    1231

        FILING VALUES:
                FORM TYPE:          10-K
                SEC ACT:
                SEC FILE NUMBER:    001-12139
                FILM NUMBER:        99577149

        BUSINESS ADDRESS:
                STREET 1:           PARK 80 EAST
                CITY:               SADDLE BROOK
                STATE:              NJ
                ZIP:                07663
                BUSINESS PHONE:     2017917600

        MAIL ADDRESS:
                STREET 1:           PARK 80 EAST
                CITY:               SADDLE BROOK
                STATE:              NJ
                ZIP:                07663

        FORMER COMPANY:
                FORMER CONFORMED NAME:  WR GRACE & CO/DE
                DATE OF NAME CHANGE:    19961015

        FORMER COMPANY:
                FORMER CONFORMED NAME:  GRACE HOLDING INC
                DATE OF NAME CHANGE:    19960805
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>10-K
<TEXT>
```

# EXHIBIT C

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
----------------------
FORM 10-K

(Mark one)

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 1998

OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934 For the transition period from _____ to _____

Commission File Number 1-12139

SEALED AIR CORPORATION
(Exact name of registrant as specified in its charter)

State or other jurisdiction of incorporation or organization: Delaware
Address of principal executive offices: Park 80 East, Saddle Brook,
New Jersey 07663-5291
I.R.S. Employer Identification Number: 65-0654331
Registrant's telephone number, including area code: (201) 791-7600
Securities registered pursuant to Section 12(b) of the Act:

|                                          | NAME OF EACH EXCHANGE          |
| TITLE OF EACH CLASS                      | ON WHICH REGISTERED            |
| Common Stock, par value $0.10 per share  | New York Stock Exchange, Inc.  |
| Series A Convertible Preferred Stock,    | New York Stock Exchange, Inc.  |
| par value $0.10 per share                |                                |

Securities registered pursuant to Section 12(g) of the Act:  None

        Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes X No ___

        Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

        The aggregate market value of the registrant's Common Stock held by
non-affiliates of the registrant on March 24, 1999 was approximately
$3,921,000,000.

        The number of outstanding shares of the registrant's Common Stock as of
March 24, 1999 was 83,486,552.

        DOCUMENTS INCORPORATED BY REFERENCE: Portions of the registrant's 1998
Annual Report to Stockholders are incorporated by reference into Parts I and II
of this Form 10-K. Portions of the registrant's definitive proxy statement for
its 1999 Annual Meeting of Stockholders are incorporated by reference into Part
III of this Form 10-K.

<PAGE>

PART I

ITEM 1.   BUSINESS

Sealed Air Corporation (together with its subsidiaries, the "Company") is engaged in the manufacture and sale of a wide range of protective, food and specialty packaging materials and systems throughout the world.

On March 31, 1998, the Company (formerly known as W. R. Grace & Co.) and Sealed Air Corporation (US), a Delaware corporation formerly known as Sealed Air Corporation ("old Sealed Air"), completed a series of transactions as a result of which:

(a) The specialty chemicals business of the Company was separated from its packaging business, the packaging business ("Cryovac") was contributed to one group of wholly owned subsidiaries, and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("New Grace"); the Company and Cryovac borrowed approximately $1.26 billion under two new revolving credit agreements and transferred substantially all of those funds to New Grace; and the Company distributed all of the outstanding shares of common stock of New Grace to its stockholders. As a result, New Grace became a separate publicly owned company that is unrelated to the Company. These transactions are referred to below as the "Reorganization."

(b) The Company recapitalized its outstanding shares of common stock, par value $0.01 per share, into a new common stock and Series A convertible preferred stock, each with a par value of $0.10 per share (the "Recapitalization").

(c) A subsidiary of the Company merged into old Sealed Air (the "Merger"), with old Sealed Air being the surviving corporation. As a result of the Merger, old Sealed Air became a subsidiary of the Company, and the Company was renamed Sealed Air Corporation.

References to "Grace" in this Annual Report on Form 10-K refer to the Company before the Reorganization, the Recapitalization and the Merger.

SEGMENTS

The Company operates in two reportable business segments: (i) food and specialty packaging products and (ii) protective packaging products, described more fully below. Information concerning the Company's reportable segments appears in Note 3 of the Notes to Consolidated Financial Statements in Item 8 of this Annual Report on Form 10-K, which Note is incorporated herein by reference.

2

<PAGE>

FOOD AND SPECIALTY PACKAGING PRODUCTS

The Company's principal food and specialty packaging products

are its flexible materials and related products, comprising principally shrink
bag and film products, non-shrink laminates and specialty packaging systems
marketed primarily under the Cryovac (R) trademark for a broad range of
perishable food applications. This segment also includes the Company's rigid
packaging and absorbent pads, principally absorbent pads used for the retail
packaging of meat, fish and poultry, foam trays used by supermarkets and food
processors, and rigid plastic containers for dairy and other food products.

FLEXIBLE MATERIALS AND RELATED SYSTEMS

          The Company produces a variety of high-performance proprietary
flexible films, bags and associated packaging equipment marketed and sold
primarily under the Cryovac (R) trademark in North America, Europe, Latin
America, South Africa and the Asia Pacific region that are used to package a
broad range of perishable foods such as fresh, smoked and processed meat
products, cheese, poultry, prepared foods (including soups and sauces for
restaurants and institutions) and produce. The Company also offers sterilized
medical bags and films for use with medical products and produce bags with
dispensing systems used by customers in supermarket produce departments.

          Cryovac (R) food packaging products include shrink bags,
shrink films sold for food packaging applications and laminated films. Shrink
bags and films are multi-layered shrinkable plastic bags and films that mold
themselves to the shape of the product. Laminates are multi-layered,
non-shrinkable plastic materials used to package perishable foods and
shelf-stable products such as syrups and toppings. Films and bags are sold in
barrier and permeable forms, depending on whether oxygen or other gases can pass
through the material. Offerings include modified atmosphere packaging (MAP) that
is designed to provide a controlled gas environment within a package to extend
shelf life.

          The Company's food packaging films and bags incorporate the
Company's core technologies, including proprietary film processing technology,
resin technology, and packaging and food science expertise. The Company seeks to
maintain technological leadership through a continuous program of research and
development in its core technologies.

          For processed meats and poultry, Cryovac (R) cook-in bags and
laminates withstand high cooking temperatures while retaining product shape,
clarity and weight. For fresh-cut produce, the Company produces films that
permit oxygen to pass through at various rates, thereby matching the varying
respiration rates of different vegetables and permitting longer shelf life.
During 1998, the Company introduced a new low-oxygen packaging film for use with
MAP packaging. The Company's Cryovac (R) films offer a wide variety of other
characteristics, such as anti-fog, clarity, gloss, oxygen barrier or strength,
that meet customer demands in specific food packaging applications.

                                   3

<PAGE>


          The Company's food packaging equipment offerings include:
dispensing and loading units to package foods in shrink, vacuum or vacuum skin
packages using the Company's films and bags; form, fill and seal units to
package foods in pouches made using the Company's films; and bagging systems.
Systems are marketed to the food processing industry under the Cryovac (R)
trademark and other trademarks.

RIGID PACKAGING AND ABSORBENT PADS

The Company manufactures and sells Cryovac (R) polystyrene foam trays that are used by supermarkets and by food processors to protect and display fresh meat, poultry and produce. The Company also manufactures and sells absorbent pads used for food packaging, including its Dri-Loc (R) absorbent pads. The Company's foam trays and absorbent pads are often used together. The Company's case-ready packaging customers, principally meat and poultry processors, purchase trays, pads and specially-designed films and packaging equipment to package centrally meat and poultry products prior to shipment to the supermarket. The Company also manufactures rigid plastic containers, primarily plastic tubs for dairy products such as margarine and yogurt, in Australia that are marketed under the Omicron (TM) trademark.

PROTECTIVE PACKAGING PRODUCTS

The Company's protective packaging products include its cushioning and surface protection products and certain other products. The Company's principal cushioning and surface protection products are air cellular cushioning materials, Cryovac (R) films for non-food applications, Instapak (R) polyurethane foam packaging systems, polyethylene foam sheets and planks, protective and durable mailers and bags, paper-based packaging products, suspension and retention packaging and packaging systems.

CUSHIONING AND SURFACE PROTECTION PRODUCTS

AIR CELLULAR CUSHIONING MATERIALS: The Company manufactures and markets Bubble Wrap (R) air cellular cushioning materials, which are also marketed under various other trademarks, including AirCap (R) and PolyCap (R). These materials consist of air bubbles encapsulated between two layers of plastic film, each containing a barrier layer to retard air loss, that form a pneumatic cushion to protect products from damage through shock or vibration during shipment. The Company's air cellular cushioning materials are used by a wide variety of end users, including both manufacturers and retailers.

CRYOVAC (R) FILMS FOR NON-FOOD APPLICATIONS: The Company manufactures and sells Cryovac (R) films used to shrink-wrap a wide assortment of industrial and consumer products. The Company's proprietary multi-layer films provide features such as strength and clarity. In certain regions the Company also offers shrink-wrap equipment for use with the Company's shrink films.

4

<PAGE>

INSTAPAK (R) SYSTEMS: Instapak (R) polyurethane foam packaging systems consist of proprietary blends of polyurethane chemicals and specially designed dispensing equipment. The Company also manufactures high-performance polyolefin films designed for use with Instapak (R) packaging systems.

Instapak (R) chemicals, films and equipment are marketed as integrated packaging systems to provide protective packaging for a wide variety of products, including computer, electronic, office, medical and communications equipment, compressors and motors, furniture and spare parts, and void-fill packaging of office supplies, books, cosmetics and other small products for distribution. Instapak (R) systems are also used to produce polyurethane foams used in certain non-packaging applications, including Instapak (R) Floral, a foam used as a design base for artificial flower arrangements.

POLYETHYLENE FOAMS: The Company manufactures thin polyethylene

products are sold or used, laws and regulations have been adopted or proposed that seek to regulate, among other things, recycled or reprocessed content, sale and disposal of packaging materials. In addition, customer demand for packaging materials that are viewed as being "environmentally responsible" and that minimize the generation of solid waste continues to evolve. While these issues can be a competitive factor in the marketplace for packaging materials, the Company maintains active programs designed to comply with these laws and regulations, to monitor their evolution, and to meet such customer demand.

        The Company believes that its packaging materials offer superior packaging protection, enabling customers to achieve lower package cube and weight using the Company's packaging materials than with many alternative packaging methods, thereby reducing the disposal of damaged products as well as the generation of packaging waste. Because the Company offers both plastic-based and paper-based protective packaging materials, customers can select the protective packaging materials that they consider to best meet their performance and cost needs and

                                9

<PAGE>

environmental preferences. A number of the Company's protective packaging product lines incorporate recycled or reprocessed content, and the Company maintains ongoing efforts to add or increase recycled or reprocessed content in many of its protective packaging product lines.

        The Company also supports its customers' interests in eliminating waste by offering or participating in collection programs for certain of the Company's products or product packaging and for materials used in certain of the Company's products, and, when possible, materials collected through these collection programs are reprocessed and either reused in the Company's protective packaging operations or offered to other manufacturers for use in other products.

EMPLOYEES

        At December 31, 1998, the Company had approximately 14,700 employees worldwide.

ITEM 2.  PROPERTIES

        The Company's food and specialty packaging products are produced in 40 manufacturing facilities (15 in North America, 10 in Europe, 5 in Latin America, 9 in the Asia Pacific region, and 1 in South Africa). Protective packaging products are produced in 62 manufacturing facilities (29 in North America, 18 in Europe, 4 in Latin America, and 11 in the Asia Pacific region, including certain small converting facilities). Several of the Company's manufacturing facilities serve both segments. The Company occupies other facilities containing fabricating or converting operations or sales, distribution, technical, warehouse or administrative offices at a number of locations in the United States and in various foreign countries.

        In the United States, the Company's food and specialty products are manufactured at facilities in California, Indiana, Iowa, Mississippi, Missouri, New York, North Carolina, Pennsylvania, South Carolina, and Texas. Its protective packaging products are manufactured at facilities in California, Connecticut, Georgia, Illinois, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas and

Washington. Because of the light but voluminous nature of the Company's air cellular, polyethylene foam and protective mailer products, significant freight savings may be realized by locating manufacturing facilities for these products near markets. To realize the benefit of such savings, the Company has facilities for manufacturing these products in various locations in proximity to major markets.

The Company owns the large majority of its manufacturing facilities, certain of which are owned subject to mortgages or similar financing arrangements. The balance of the Company's manufacturing facilities are located in leased premises. The Company's manufacturing facilities are usually located in general purpose buildings in which the Company's specialized machinery for the manufacture of one or more products is contained. The Company believes that its manufacturing facilities are well maintained, suitable for their purposes, and adequate for the Company's needs.

10

<PAGE>

ITEM 3. LEGAL PROCEEDINGS

The Company is a party to various lawsuits and administrative and other proceedings incidental to its business, including certain federal or state governmental environmental proceedings or private environmental claims relating to the cleanup of Superfund sites or other sites. While it is often difficult to estimate potential environmental liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material. The Company believes, after consulting with counsel, that the disposition of its lawsuits and other legal proceedings, including environmental matters, will not have a material effect on the Company's consolidated financial position.

In connection with the Reorganization, the Recapitalization and the Merger, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's consolidated financial position.

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of the Company's stockholders during the fourth quarter of 1998.

11

<PAGE>

EXECUTIVE OFFICERS OF THE REGISTRANT

The information appearing in the table below sets forth the

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Basic earnings per common share | $ 0.04 | $ 2.54 |

<center>39</center>

<PAGE>

Diluted EPS:
NUMERATOR

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |
| Add: Dividends associated with outstanding preferred stock | -- | 72,044 |
| Add: Dividends associated with preferred stock repurchased | 316 | -- |
| Less: Excess of book value over repurchase of preferred stock | 1,798 | -- |
| Earnings ascribed to common shareholders-diluted | 1,391 | 173,732 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Effect of assumed exercise of options | 118 | 917 |
| Effect of assumed conversion of preferred stock | -- | 31,864 |
| Weighted average of preferred stock purchased | 158 | -- |
| Weighted average common shares outstanding - diluted | 73,273 | 72,833 |
| Diluted earnings per common share | $ 0.02 | $ 2.39 |

</TABLE>

(a)  Such  earnings per common share amounts are not  necessarily  indicative of
     the results that would have occurred had Cryovac been a stand-alone company
     prior to the Reorganization, Recapitalization and the Merger.

NOTE 17 CERTAIN TRANSACTIONS WITH GRACE

CASH

Prior to the Merger,  Cryovac used Grace's centralized cash management services.
Under  such  service  arrangements,  excess  domestic  cash  was  invested,  and
disbursements were funded, centrally by Grace on behalf of Cryovac.

SHARED SERVICES AND FACILITIES

Prior to the Merger,  Grace  allocated a portion of its  domestic  and  overseas
regional  corporate  expenses to Cryovac.  These  expenses  reflected  corporate

overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; general legal services, including intellectual property; and other support and executive functions. Allocations and charges were based on either a direct cost pass-through or a percentage allocation for services provided, based on factors such as net sales, management effort or headcount.

Domestic corporate expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $18,044, $28,213 and $15,175 for 1998, 1997 and 1996, respectively, and were included in marketing, administrative and development expenses.

Domestic research and development expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $5,074 for 1996 and are included in marketing, administrative and development expenses. No amounts were allocated for 1998 or 1997.

Grace management believed that the basis used for allocating corporate services was reasonable and that the terms of these transactions would not materially differ from those among unrelated parties.

The statements of earnings for periods prior to the Merger also included allocations of costs for general and administrative services and maintenance services for facilities that Cryovac shared with other Grace businesses as well as data processing services provided by Grace's European central data processing facility. The allocated costs and expenses related to general and administrative functions, maintenance, data processing and other facility support functions were estimated to be approximately $14,000 for the 1998 period and $55,802 and $84,005 for 1997 and 1996, respectively. Of these amounts, $6,181 was included in cost of sales and $49,621 was included in marketing, administrative and development expenses in 1997 ($15,226 and $68,779 in 1996). The cost allocations for these services were determined based on methods that Grace management considered to be reasonable.

Prior to the Merger, Grace also charged Cryovac for its share of domestic workers' compensation, automobile and other general business liability insurance premiums and claims, which were all handled by Grace on a corporate basis. These charges were based on Cryovac's actual and expected future experience, including annual payroll expense, and were not significant to Cryovac results of operations.

40

<PAGE>

ALLOCATION OF LONG-TERM INCENTIVE PROGRAM EXPENSE

In accordance with SAB No. 55, the financial statements for 1997 and 1996 reflect an allocation of LTIP expense related to Grace corporate employees that performed services on behalf of Cryovac. The provision included in the financial statements for allocated LTIP expenses was $23,710 and $9,293 for 1997 and 1996, respectively.

NOTE 18 COMMITMENTS AND CONTINGENCIES

The Company is obligated under the terms of various leases covering many of the facilities that it occupies. The Company accounts for substantially all of its leases as operating leases. Net rental expense was $20,873, $9,588, and $12,036 for 1998, 1997 and 1996, respectively. Estimated future minimum annual rental commitments under non-cancelable real property leases expiring through 2023 are

as follows:  1999 - $19,686; 2000 - $16,767; 2001 - $12,481; 2002 - $8,369; 2003 - - $6,574; and subsequent years - $15,557.

The Company's worldwide operations are subject to environmental laws and regulations which, among other things, impose limitations on the discharge of pollutants into the air and water and establish standards for the treatment, storage and disposal of solid and hazardous wastes. The Company reviews the effects of environmental laws and regulations on its operations and believes that it is in substantial compliance with all material applicable environmental laws and regulations.

At December 31, 1998, the Company was a party to, or otherwise involved in, several federal and state government environmental proceedings and private environmental claims for the cleanup of Superfund or other sites. The Company may have potential liability for investigation and clean up of certain of such sites. At most of such sites, numerous companies, including either the Company or one of its predecessor companies, have been identified as potentially responsible parties ("PRPs") under Superfund or related laws. It is the Company's policy to provide for environmental cleanup costs if it is probable that a liability has been incurred and if an amount which is within the estimated range of the costs associated with various alternative remediation strategies is reasonably estimable, without giving effect to any possible future insurance proceeds. As assessments and cleanups proceed, these liabilities are reviewed periodically and adjusted as additional information becomes available. At December 31, 1998 and 1997, such environmental related provisions were not material. While it is often difficult to estimate potential liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material to the Company's consolidated financial position. Environmental liabilities may be paid over an extended period, and the timing of such payments cannot be predicted with certainty.

The Company is also involved in various legal actions incidental to its business. Company management believes, after consulting with counsel, that the disposition of its litigation and other legal proceedings and matters, including environmental matters, will not have a material effect on the Company's consolidated financial position.

In connection with the Reorganization, certain environmental liabilities of Cryovac were retained by or assumed by New Grace. As of March 31, 1998, the Company's liability with respect to such environmental obligations retained by New Grace, including related deferred income taxes, was reversed and accounted for as an equity contribution to the Company from Grace.

CONTINGENT LIABILITIES INDEMNIFIED BY NEW GRACE

Pursuant to the Transaction Agreements, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the Merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain contingently liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's results of operations or consolidated financial position.

41

<PAGE>

GUARANTEE OF NEW GRACE OUTSTANDING PUBLIC DEBT

The Company is the guarantor of certain outstanding public debt that was assumed by New Grace pursuant to the Transaction Agreements. At December 31, 1998, approximately $32,000 of such debt was outstanding. New Grace has indemnified the Company against any liability arising under such guarantee pursuant to the Transaction Agreements.

TRANSACTION AGREEMENTS

Pursuant to the Transaction Agreements final determinations and accountings are necessary with respect to matters pertaining to the Reorganization and the Merger. The Company believes that the final outcome of such matters will not have a material effect on its consolidated financial position.

NOTE 19 SELECTED PRO FORMA STATEMENT OF EARNINGS INFORMATION (UNAUDITED)

The following table presents selected unaudited pro forma statement of earnings information for the years ended December 31, 1998 and 1997 that has been prepared as if the Reorganization, the Recapitalization and the Merger had occurred on January 1, 1997. Such information reflects pro forma adjustments made in combining the historical results of old Sealed Air and Cryovac as a result of such transactions for the years presented. Such amounts include, among other things, incremental goodwill amortization of approximately $10,300 and $41,200 and incremental interest expense of approximately $20,400 and $81,600 in the first quarter of 1998 and full year 1997, respectively. Such amounts exclude a non-cash inventory charge of approximately $8 million recorded in the second quarter of 1998 resulting from the turnover of certain of the Company's inventories previously stepped-up to fair value in connection with the Merger. This pro forma information is not intended to represent what the Company's actual results of operations would have been for such years, if such transactions had occurred on January 1, 1997.

<TABLE>
<CAPTION>

|                                                      | Year Ended<br>------------<br>1998<br>Pro Forma |
| (Amounts in thousands, except for per share data)    |  |
| --- | --- |
| <S>                                                  | <C> |
| Net sales by segment:                                |  |
|     Food and Specialty Packaging | $ 1,709,428 |
|     Protective Packaging         | 1,010,080 |
| Net sales                                            | 2,719,508 |
| Cost of sales                                        | 1,762,957 |
| Gross profit                                         | 956,551 |
| Marketing, administrative and development expenses   | 516,269 |
| Goodwill amortization                                | 47,893 |
| Restructuring and other charges, net                 | 87,182 |
| Operating profit                                     | 305,207 |

```
Other expense, net                                                    (82,141)
- --------------------------------------------------------------------------
Earnings before income taxes                                          223,066

Income taxes                                                          141,574
- --------------------------------------------------------------------------
Net earnings                                                    $      81,492
- --------------------------------------------------------------------------

Less:  Preferred stock dividends                                       71,932

Add:  Excess of book value over repurchase price of preferred stock    1,798
- --------------------------------------------------------------------------

Net earnings ascribed to common shareholders                    $      11,358
- --------------------------------------------------------------------------

Earnings per common share (1)
       Basic                                                    $       0.14
       Diluted                                                  $       0.12
- --------------------------------------------------------------------------

Weighted average number of common shares outstanding:
       Basic                                                           83,478
       Diluted                                                         83,754
- --------------------------------------------------------------------------
</TABLE>
```

(1)   For purposes of  calculating  basic and diluted  earnings per common share,
      net earnings for 1998 and 1997 have been reduced by the dividends  ($18,011
      in 1998 for the first  quarter  and  $72,044  in 1997) that would have been
      payable on the  preferred  stock (as if such  shares  had been  outstanding

                                       42

<PAGE>

      during such periods) to arrive at earnings ascribed to common shareholders.
      The weighted average number of outstanding  common shares used to calculate
      basic earnings per common share is calculated on an equivalent  share basis
      using the shares of common stock  outstanding for the first quarter of 1998
      and for 1997,  adjusted to reflect the terms of the  Recapitalizaiton.  The
      assumed  conversion of  the preferred  stock  is  not  considered  in  the
      calculation of diluted  earnings per common share in either 1998 or 1997 as
      the effect would be anti-dilutive (i.e., would increase earnings per share)
      in each year.

NOTE 20 INTERIM FINANCIAL INFORMATION (UNAUDITED)
<TABLE>
<CAPTION>

| (Amounts in thousands, except for per share data) | First Quarter | Second Quarter | Third Quarter |
|---|---|---|---|
| 1998 | | | |
| <S> | <C> | <C> | <C> |
| Net sales | $ 431,035 | $ 670,005 | $ 684,3 |
| Cost of sales | 290,913 | 442,945 | 443,2 |
| Net earnings(loss) | 27,052 | 35,565 | (54,1 |
| Preferred stock dividends | -- | 18,011 | 17,9 |
| Earnings(loss) per common share - basic (2) | 0.22(3) | 0.21 | (0. |

EXHIBIT  D

Filed by the Registrant |X|
Filed by a Party other than the Registrant |_|

Check the appropriate box:
|_| Preliminary Proxy Statement                    |_|Confidential.  For Use of the
                                                       Commission Only (as per-
                                                       mitted by Rule 14a-6(e)(2))

|X| Definitive Proxy Statement
|_| Definitive Additional Materials
|_| Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

                          Sealed Air Corporation
- ----------------------------------------------------------------------------
                (Name of Registrant as Specified in Its Charter)

- ----------------------------------------------------------------------------
    (Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)
Payment of Filing Fee (Check the appropriate box):

        |X|     No fee required.

        |_|     Fee computed on table below per Exchange Act Rules 14a-6(i)(1)
                and 0-11.
        (1) Title of each class of securities to which transaction applies:

- ----------------------------------------------------------------------------
        (2) Aggregate number of securities to which transaction applies:

- ----------------------------------------------------------------------------

        (3) Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee
is calculated and state how it was determined):

- ----------------------------------------------------------------------------

        (4) Proposed maximum aggregate value of transaction:

- ----------------------------------------------------------------------------

        (5) Total fee paid:

- ----------------------------------------------------------------------------

        |_| Fee paid previously with preliminary materials:

- ----------------------------------------------------------------------------
        |_| Check box if any part of the fee is offset as provided by Exchange
Act Rule 0- 11(a)(2) and identify the filing for which the offsetting fee was
paid previously. Identify the previous filing by registration statement number,
or the form or schedule and the date of its filing.

        (1) Amount previously paid:
- ----------------------------------------------------------------------------

        (2) Form, Schedule or Registration Statement no.:
- ----------------------------------------------------------------------------

**EXHIBIT D**

global marketing network.

Here are a few points that highlight how New Sealed Air would have looked in 1996:

o    New Sealed Air would have had annual net sales of more than $2.5 billion.

o    Approximately 60% of New Sealed Air's net sales would have come from specialty (primarily food) packaging products and 40% from protective packaging and other products.

o    New Sealed Air would have had operations in 46 countries, with 51% of its revenues generated in the U.S. and 49% outside the U.S.

Following these transactions, New Sealed Air will:

o    be an independent company, initially owned 37% by the existing Sealed Air stockholders and 63% by the existing Grace stockholders;

o    own and operate the businesses of Sealed Air and Grace Packaging; and

o    be obligated to repay the approximately $1.2 billion that will be borrowed and transferred to Grace's specialty chemicals businesses.

New Grace After the Merger

After the spin-off, New Grace will be a highly focused specialty chemicals company. Grace stockholders should review the New Grace Information Statement.

New Grace will:

o    initially be owned 100% by the existing Grace stockholders;

o    own and operate Grace's specialty chemicals businesses; and

o    be essentially debt-free following the approximately $1.2 billion cash transfer from Grace, which will be used to repay borrowings.

-----------------------------

Considerations for Sealed Air Stockholders

The Sealed Air stockholders will be asked to approve the merger agreement. The favorable vote of a majority of the outstanding shares of Sealed Air common stock is required to approve the merger.

Recommendation to Sealed Air Stockholders

The Board of Directors of Sealed Air believes the merger is fair to you and in your best interests and recommends that you vote "FOR" the merger proposal.

In reaching its recommendation in favor of the merger, the Sealed Air Board considered the challenges and risks associated with combining the companies and achieving the benefits anticipated from the merger, as discussed in "Certain Risk Factors" beginning on page 22.

What Sealed Air Stockholders Will Receive

If these transactions are completed, Sealed Air stockholders will receive one share of New Sealed Air common stock for each share of Sealed Air common stock that they own.

Sealed Air's Reasons for the Proposed Merger (See page 29 and 31)

Sealed Air believes the merger will:

o    offer a strategic business opportunity to bring together two leading packaging companies with Sealed Air's entrepreneurial management team;

o    combine complementary product lines to create marketing opportunities;

o    bring together innovative technologies and worldwide marketing networks and distribution channels; and

o    create opportunities for efficiencies through the integration of the two companies' operations.

Opinion of Financial Advisor (See page 39)

In deciding to approve the merger, the Sealed Air Board received and considered the opinion of Donaldson, Lufkin & Jenrette Securities Corporation, its financial advisor, as to the fairness of the consideration to be received by its stockholders from a financial point of view. The opinion is attached as Annex C to this Joint Proxy Statement/Prospectus. We encourage you to read the opinion.

-------------------------------

Considerations for Grace Stockholders

The Grace stockholders will be asked:

o    to approve the merger agreement (which will constitute approval of the spin-off, certain charter amendments, the recapitalization of the Grace common stock and the issuance of shares in the merger); and

o    to approve a charter amendment to repeal certain provisions requiring supermajority stockholder approval (see below).

The favorable vote of a majority of the outstanding shares of Grace common stock is required to approve the reorganization and merger. The favorable vote of 80% of the outstanding shares of Grace common stock is required to approve the repeal of the charter provisions requiring supermajority approval.

Recommendation to Grace Stockholders

The Board of Directors of Grace believes the reorganization and merger are fair to you and in your best interests and recommends that you vote "FOR" the proposal to approve the reorganization and merger. As agreed with Sealed Air, the Board recommends that you vote "FOR" the proposal to repeal the charter provisions requiring supermajority approval.

In reaching its recommendation in favor of the proposed transactions, the Grace Board considered the challenges and risks associated with combining the companies and achieving the benefits anticipated from the reorganization and

To protect the tax-free treatment of the reorganization and merger under U.S. federal income tax laws, Sealed Air and Grace have agreed to certain restrictions on New Sealed Air. For two years after the merger:

o    New Sealed Air and its affiliates may not repurchase 20% or more of New Sealed Air's equity securities (subject to certain additional limitations).

o    New Sealed Air and its affiliates may not issue or sell equity securities of New Sealed Air or Grace Packaging, and they may not solicit, support or participate in any tender offer for New Sealed Air equity securities, or approve or permit any business combination or other transaction that (alone or together with the merger) will result in one or more persons obtaining a 50% or greater interest in New Sealed Air.

o    New Sealed Air must continue to operate Grace Packaging's business and may not sell or otherwise dispose of more than 60% of Grace Packaging's assets except in the ordinary course of business.

o    The subsidiaries engaged in Grace Packaging's business may not voluntarily dissolve, liquidate, merge, consolidate or reorganize, subject to certain exceptions.

New Grace will be subject to similar restrictions.

These restrictions may limit the ability of New Sealed Air and New Grace to engage in certain business transactions that otherwise might be advantageous for the companies and their stockholders, and could deter potential acquisitions of control of New Grace or New Sealed Air. The restrictions are designed to protect the tax-free treatment of the reorganization for U.S. federal income tax purposes. Accordingly, New Sealed Air or New Grace may engage in a restricted transaction so long as it (i) obtains a ruling from the Internal Revenue Service ("IRS") or an opinion of tax counsel that the transaction will not adversely affect the tax-free treatment of the reorganization and (ii) indemnifies the other party against adverse tax consequences arising from the transaction. See "Certain United States Federal Income Tax Consequences" beginning on page 34 and "Relationship Between New Sealed Air and New Grace After the Reorganization and Merger--Tax Sharing Agreement" beginning on page 78, 78.

Liabilities of New Grace, Fraudulent Transfer and Related Considerations

Grace's primary U.S. operating subsidiary has significant liabilities relating to previously sold asbestos-containing products. As a result, Grace and the subsidiary are currently defendants in numerous asbestos-related lawsuits and are likely to be named as defendants in additional lawsuits in the future. At September 30, 1997, the liability recorded on Grace's books with respect to the defense and disposition of asbestos-related lawsuits and claims was $910.5 million, including a current liability of $135.0 million. In addition, at September 30, 1997, Grace had recorded a receivable of $295.4 million, reflecting amounts that Grace believes will ultimately be recovered from insurance carriers with respect to its asbestos-related lawsuits and claims. Grace and its subsidiaries also have substantial environmental and other liabilities.

After the merger and related transactions, New Grace will be responsible for all of the asbestos-related liabilities, substantially all of the environmental liabilities (other than certain liabilities relating to Grace Packaging) and other liabilities of Grace and its subsidiaries that are

unrelated to Grace Packaging. Based on currently available information and advice provided by their respective financial, legal and other advisors, Sealed Air and Grace believe that New Grace will be able to satisfy its liabilities as they become due. Nevertheless, claimants might seek to hold New Sealed Air liable for obligations of New Grace. New Grace has agreed to indemnify New Sealed Air for liabilities and costs that New Sealed Air may incur relating to New Grace's liabilities; however, New Grace may not be able to fulfill its indemnity obligations to New Sealed Air.

Claimants may also bring suit seeking recovery from New Sealed Air or its subsidiaries by claiming that the transfers of assets and liabilities in connection with the reorganization of Grace, including the separation of Grace's packaging and specialty chemicals businesses and the cash transfer to and spin-off of New Grace, were "fraudulent transfers". A transfer would be a fraudulent transfer if the transferor received less than reasonably equivalent value and the transferor was insolvent at the time of the transfer, was rendered insolvent by the transfer or was left with unreasonably small capital to engage in its business. A transfer may also be a fraudulent transfer if it was made to hinder, delay or defraud creditors. If any transfers in connection with the reorganization of Grace are found to be fraudulent transfers, the recipient (including New Sealed Air and its subsidiaries) might be required to return the property to the transferor. Similar consequences would result if a court were to find that any transfers were made in violation of laws restricting dividends.

Sealed Air and Grace believe that Grace, New Grace and their subsidiaries are adequately capitalized and will be adequately capitalized after the reorganization, and that none of the transfers contemplated to occur in the reorganization is a fraudulent transfer. Sealed Air and Grace also believe that the reorganization of Grace and the spin-off of New Grace will comply with applicable dividend laws. However, a court applying the relevant legal standards may not reach the same conclusions.

More information regarding Grace's asbestos and other liabilities is included in Grace's filings with the Securities and Exchange Commission ("SEC"). See "Where You Can Find More Information" on page 100 and the New Grace Information Statement.

No Prior Market for New Sealed Air Stock

There is no current public trading market for New Sealed Air common and convertible preferred stock. New Sealed Air will apply to list its common and convertible preferred stock on the New York Stock Exchange, and we expect "when-issued" trading in New Sealed Air common and convertible preferred stock to develop before the merger is consummated. This means that shares can be traded before the share certificates are issued, and before the actual numbers of shares to be issued in the reorganization and merger are determined.

We cannot predict the prices at which New Sealed Air common and convertible preferred stock may trade, either before the merger on a "when-issued" basis or after the merger. Such trading prices will be determined by the marketplace and may be influenced by many factors, including the depth and liquidity of the market for such shares, investor perceptions of New Sealed Air and the industries in which it participates, New Sealed Air's dividend policy and general economic and market conditions. Until an orderly market develops, the trading prices for these shares may fluctuate significantly.

The New Sealed Air common and convertible preferred stock will be freely transferable, except for shares received by Sealed Air or Grace "affiliates", as that term is defined under the Securities Act of 1933, as amended (the "Securities Act"). See "The Reorganization and Merger--Federal

relevant management and board of directors regarding the structure and terms of the Reorganization and Merger and the negotiation of the Transaction Agreements.

In deciding to approve the Reorganization and Merger, the Sealed Air and Grace Boards considered opinions from their respective financial advisors as to the fairness of the Reorganization and Merger to their respective stockholders from a financial point of view.

Opinion of Sealed Air Financial Advisor

Sealed Air asked DLJ, in its role as financial advisor to Sealed Air, to render an opinion to the Sealed Air Board as to the fairness to Sealed Air stockholders, from a financial point of view, of the Exchange Ratio, pursuant to which Sealed Air stockholders would receive one share of New Sealed Air common stock for each share of Sealed Air common stock.

On August 14, 1997, DLJ rendered its written opinion to the effect that, as of such date, based upon and subject to the assumptions, limitations and qualifications set forth in the DLJ Opinion, the Exchange Ratio was fair to Sealed Air stockholders from a financial point of view.

The full text of the DLJ Opinion is attached hereto as Annex C. The summary of the DLJ Opinion set forth in this Joint Proxy Statement/Prospectus is qualified in its entirety by reference to the full text of the opinion of DLJ. Sealed Air stockholders are urged to read the DLJ Opinion carefully and in its entirety for the procedures followed, assumptions made, other matters considered and limits of the review by DLJ in connection with such opinion.

The DLJ Opinion was prepared for the Sealed Air Board and was directed only to the fairness from a financial point of view, as of the date thereof, of the Exchange Ratio to Sealed Air stockholders. DLJ expressed no opinion in the DLJ Opinion as to the prices at which New Sealed Air's securities would actually trade at any time. The DLJ Opinion does not constitute a recommendation to any stockholder of Sealed Air as to how such holder should vote on the Merger at the Sealed Air Special Meeting.

Sealed Air selected DLJ to act as its financial advisor because of DLJ's familiarity with Sealed Air and its qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as its reputation as a nationally recognized investment banking firm engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, leveraged buy-outs and valuations for corporate and other purposes. Sealed Air did not impose any restrictions or limitations upon DLJ with respect to the investigations made or the procedures followed by DLJ in rendering the DLJ Opinion.

In arriving at the DLJ Opinion, DLJ reviewed the Merger Agreement and the Distribution Agreement. DLJ also reviewed financial and other information that was publicly available or furnished to DLJ by Sealed Air and Grace, including information provided during discussions with their respective managements. Included in the information provided during such discussions were certain financial analyses and projections of Grace Packaging and New Grace prepared by the management of Grace and certain financial analyses and projections of Sealed Air and New Sealed Air prepared by the management of Sealed Air. These projections were substantially similar to those publicly available estimates of research analysts with respect to the future financial performance of each company. In addition, DLJ compared certain financial data of Sealed Air and Grace Packaging, under certain assumptions, with publicly

available information concerning various other companies whose securities are traded in public markets, reviewed the historical stock prices and trading volumes of Grace common stock and Sealed Air common stock, reviewed prices and premiums paid in certain other business combinations and conducted such other financial studies, analyses and investigations as DLJ deemed appropriate for purposes of rendering the DLJ Opinion.

In rendering the DLJ Opinion, DLJ relied upon and assumed the accuracy and completeness of all of the financial and other information that was available to it from public sources, that was provided to it by Sealed Air, Grace, their respective managements or other representatives, or that was otherwise reviewed by DLJ. In particular, DLJ relied upon the estimates of management of Sealed Air of the operating efficiencies (the "Synergies") that might be achievable as a result of the Merger (annual increases in EBITDA ranging from approximately $20 million to $100 million in later years) and upon DLJ's discussions of such Synergies with the management of Grace. In supplying information regarding possible operating efficiencies to DLJ, the managements of Sealed Air and Grace advised DLJ that estimates regarding operating efficiencies were necessarily based on incomplete information and subject to significant risks and uncertainties. Accordingly, DLJ performed certain analyses assuming that Synergies would be realized, and certain other analyses assuming that Synergies would not be realized. With respect to the financial analyses and projections supplied to DLJ, DLJ assumed that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the managements of Sealed Air and Grace as to the future operating and financial performance of Sealed Air, Grace Packaging and New Sealed Air. DLJ did not assume responsibility for making any independent evaluation of the assets, liabilities or contingent liabilities of Sealed Air, New Sealed Air, Grace or New Grace, or for making any independent verification of the information reviewed by DLJ. DLJ relied as to certain legal matters on advice of Grace's special counsel and Sealed Air's special counsel, including that the transactions contemplated under the Distribution Agreement would qualify as tax-free transactions under the Code and that the Merger will be tax-free under the Code to Grace, Sealed Air and their respective stockholders.

The DLJ Opinion was necessarily based on economic, market, financial and other conditions as they existed on, and on the information made available to it as of, the date of the DLJ Opinion. The DLJ Opinion states that, although subsequent developments may affect the DLJ Opinion, DLJ does not have any obligation to update, revise or reaffirm its opinion. DLJ did not express any opinion regarding the financial impact of Grace's contingent liabilities on New Grace or New Sealed Air, and was not requested to and did not express any opinion in the DLJ Opinion regarding the financial impact of Grace's contingent liabilities on New Grace and New Sealed Air.

The following is a summary of the presentation made by DLJ to the Sealed Air Board at its August 14, 1997 meeting in connection with the DLJ Opinion. For purposes of the presentation and opinion, DLJ analyzed Grace Packaging as if the Spin-off and Cash Transfer, but not the Merger, had occurred.

Comparable Company Analyses.  DLJ compared selected historical and projected operating information and financial ratios for Grace Packaging to selected historical and projected operating information, stock market data and financial ratios for certain publicly traded specialty packaging and specialty chemicals companies, the two market segments with which Sealed Air is usually compared by the investment community. The specialty packaging companies were Sealed Air, Bemis Company, Inc., Sealright Co., Inc. and Sonoco Products Company (collectively, the "Specialty Packaging Comparable Companies").  The specialty chemicals companies were Avery Dennison

provide a different perspective on the transaction and to add to the total mix of information available. DLJ did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion as to fairness from a financial point of view. Rather, in reaching its conclusion, DLJ considered the results of the analyses in light of each other and ultimately reached its opinion based on the results of all analyses taken as a whole. Accordingly, notwithstanding the separate factors summarized above, DLJ has indicated to Sealed Air that it believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by it, without considering all analyses and factors, could create an incomplete view of the evaluation process underlying its opinion. In performing its analysis, DLJ made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by DLJ are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

Pursuant to the terms of an engagement agreement dated August 14, 1997, Sealed Air (i) has paid DLJ a fee of $3,750,000 ($2,000,000 of which was payable on account of past financial advisory services unrelated to the Reorganization and Merger rendered by DLJ to Sealed Air) and (ii) will pay an additional $11,250,000, payable upon consummation of the Merger. Sealed Air has also agreed that if the Merger or similar transaction is not consummated and Sealed Air receives a $150 million termination fee, Sealed Air will pay DLJ $7,500,000 (in addition to the $3,750,000 fee already paid) in cash upon Sealed Air's receipt of the termination fee, provided that, if the termination fee is less than $150 million, DLJ's compensation shall be proportionately reduced. In addition, Sealed Air agreed to reimburse DLJ, upon request by DLJ from time to time, for all out-of-pocket expenses (including the reasonable fees and expenses of counsel) incurred by DLJ in connection with its engagement thereunder and to indemnify DLJ and certain related persons against certain liabilities in connection with its engagement, including liabilities under U.S. federal securities laws. DLJ and Sealed Air negotiated the terms of the fee arrangement, and the Sealed Air Board was aware of such arrangement, including the fact that a significant portion of the aggregate fee payable to DLJ is contingent upon consummation of the Merger. DLJ believes that the terms of this fee arrangement are customary in transactions of this nature.

In the ordinary course of business, DLJ and its affiliates may own or actively trade the securities of Sealed Air and Grace for their own accounts and for the accounts of their customers and, accordingly, may at any time hold a long or short position in Sealed Air or Grace securities. See "Security Ownership of Certain Beneficial Owners" on page 87 for a description of the security ownership of The Equitable Companies, an affiliate of DLJ. DLJ, as part of its investment banking services, is regularly engaged in the valuation of businesses and securities in connection with mergers, acquisitions, underwritings, sales and distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. DLJ has performed investment banking and other services in the past for Sealed Air (including delivery of a fairness opinion for Sealed Air in connection with the $57 million acquisition of Trigon Industries in 1995) and for Grace (including acting as advisor to Grace in the sale of its remaining interest in The Restaurant Enterprises Group, Inc. in 1994). In addition, in 1996 DLJ was lead manager in a $360 million high-yield offering for Fresenius Medical Care AG. (Fresenius Medical Care AG is the parent company of a predecessor of Grace, but has always been unrelated to Grace.) DLJ has received usual and customary compensation for its past services for Sealed Air, Grace, and Fresenius Medical Care AG.

Opinions of Grace Financial Advisors

Credit Suisse First Boston and Merrill Lynch were retained to act as the Grace Financial Advisors in connection with the Reorganization and Merger. The Grace Financial Advisors were selected by Grace because of their familiarity with Grace and Sealed Air and their respective businesses and their qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as their reputations as internationally recognized investment banking firms. Each of the Grace Financial Advisors has consented to the reprinting of its fairness opinion and the summary of such firm's activities included herein.

At the request of the Grace Board, each of the Grace Financial Advisors delivered a written opinion to the Grace Board on August 14, 1997 to the effect that, as of such date, and based upon the assumptions made, general procedures followed, factors considered and limitations on the review undertaken as set forth in such opinions, the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, were fair, from a financial point of view, to the holders of Grace common stock. In preparing these opinions, these firms performed a variety of financial and comparative analyses and made a detailed presentation to the Grace Board with respect to the Reorganization and Merger. The Grace Board, in accepting the opinions of the Grace Financial Advisors, was aware that the Grace Financial Advisors relied upon certain financial information, projections and other information provided by Grace's management and that the opinions of such firms relied, in part, on certain assumptions and were subject to certain limitations. While the Grace Board did not perform an independent review of the financial information, projections and other information provided to the Grace Financial Advisors, the Grace Financial Advisors and management did review certain financial information and projections with the Grace Board. The Grace Board relied on the Grace Financial Advisors, whom it considered to be experts in such matters, to select appropriate methodologies to determine fairness. No updates of such opinions have been requested because such opinions were provided solely in connection with the decisions of the Grace Board taken on August 14, 1997.

The full texts of the written opinions of Credit Suisse First Boston and Merrill Lynch, which set forth the assumptions made, general procedures followed, factors considered and limitations on the review undertaken by Credit Suisse First Boston and Merrill Lynch in rendering their opinions, are set forth in Annex D to this Joint Proxy Statement/Prospectus and are incorporated herein by reference. The opinions of Credit Suisse First Boston and Merrill Lynch are directed only to the fairness from a financial point of view, as of the date thereof, of the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, to the holders of Grace's existing common stock and do not address the merits of the underlying decision by Grace to engage in the Reorganization and Merger and do not constitute a recommendation to any stockholder of Grace as to how such stockholder should vote on any proposal related to the Reorganization and Merger. The summary of the opinions of Credit Suisse First Boston and Merrill Lynch set forth in this Joint Proxy Statement/Prospectus are qualified in their entirety by reference to the full text of the opinions of Credit Suisse First Boston and Merrill Lynch. Holders of shares of Grace common stock are urged to, and should, read the opinions of Credit Suisse First Boston and Merrill Lynch in their entirety.

Opinion of Credit Suisse First Boston. In arriving at its opinion, Credit Suisse First Boston reviewed certain publicly available business and financial information relating to Grace and Sealed Air, as well as the Merger Agreement, the Distribution Agreement and the forms of related agreements attached as exhibits thereto. Credit Suisse First Boston also reviewed certain other information, including financial forecasts and certain information with respect to potential operating efficiencies which may result from the Merger,

DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.     That on February 21, 2001, declarant served the PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS W.R. GRACE & COMPANY – CONN. (A CONNECTICUT CORPORATION) AND W.R. GRACE & COMPANY (A DELAWARE CORPORATION) by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of February, 2001, at San Diego, California.

June P. Ito

ZONOLITE
Service List - 02/16/01
Page 1

COUNSEL FOR PLAINTIFF(S)

Mark C. Goldenberg
Elizabeth V. Heller
HOPKINS GOLDENBERG, P.C.
2227 South State Route 157
Edwardsville, IL 62025
   618/656-5150
   618/656-6230 (fax)

John J. Stoia, Jr.
Timothy G. Blood
JoBeth Halper
MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
   619/231-1058
   619/231-7423 (fax)

Christopher A. Seeger
David R. Buchanan
Amy P. Albert
SEEGER WEISS LLP
One William Street
New York, NY 10004-2502
   212/584-0700
   212/584-0799 (fax)

COUNSEL FOR DEFENDANTS

* Deborah G. Solmor
  SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
  333 West Wacker Drive, Suite 2100
  Chicago, IL 60606-1285
    312/407-0700
    312/407-0411 (fax)

* Douglas King
  James H. Ferrick, III
  BRYAN CAVE LLP
  211 North Broadway, Suite 3600
  St. Louis, MO 63102-2750
    314/259-2000
    314/259-2020 (fax)

* Sheila L. Birnbaum
  Bert L. Wolff
  Arthur H. Aizley
  SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
  4 Times Square
  New York, NY 10036
    212/735-3000
    212/735-2000 (fax)

** V.L. Woolston, Jr.
  Thomas L. Boeder
  PERKINS COIE LLP
  1201 Third Avenue, Suite 4800
  Seattle, WA 98101-3099
    206/583-8888
    206/583-8500 (fax)

 * Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

ZONOLITE
Service List - 02/16/01
Page 2


COUNSEL FOR DEFENDANTS (cont'd)

** Rocco Treppiedi
   PERKINS COIE LLP
   221 N. Wall Street, Suite 600
   Spokane, WA  99201
      509/624-2212
      509/458-3399 (fax)

** Donald G. Stone
   David L. Broom
   Curtis L. Shoemaker
   PAINE, HAMBLEN, COFFIN, BROOKE
    & MILLER LLP
   717 West Sprague Avenue, Suite 1200
   Spokane, WA  99201-3505
      509/455-6000
      509/838-0007 (fax)


 * Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

2/21/01

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re ZONOLITE ATTIC INSULATION<br>PRODUCTS LIABILITY LITIGATION | ) MDL Docket No. 1376<br>)<br>) The Honorable Patti B. Saris, Presiding |
| This Document Relates To: | )<br>) |
| ALL ACTIONS. | )<br>) |
| | ) Superior Court, State of Washington<br>) County of Spokane |
| BARBANTI, | )<br>) No. 00-2-01756-6 |
| Plaintiff, | )<br>) |
| v. | ) NOTICE OF DEPOSITION OF<br>) DEFENDANTS W.R. GRACE &<br>) COMPANY – CONN. (A CONNECTICUT |
| W.R. GRACE & COMPANY-CONN, et al. | ) CORPORATION) AND W.R. GRACE &<br>) COMPANY (A DELAWARE |
| Defendants. | ) CORPORATION) PURSUANT TO<br>) FEDERAL RULE OF CIVIL<br>) PROCEDURE 30(b)(6) |

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, that plaintiffs, by their attorneys, will take the deposition of W.R. Grace & Company - Conn. (a Connecticut corporation) and W.R. Grace & Company (a Delaware corporation) on March 13, 2001 at 9:00 a.m. at the offices of Lieff, Cabraser, Heimann & Bernstein, LLP, 214 Union Wharf, Boston, MA 02109, or at another location mutually agreed upon by the parties.  The deposition will be before a person authorized by law to administer oaths, pursuant to Fed. R. Civ. P. 28 and will continue from day to day, excluding Sundays and holidays, until the examination is completed.

## I.    DEFINITIONS

The following definitions shall apply to each of the document requests and are deemed to be incorporated in each of the requests:

1.     "Grace Defendants" means W.R. Grace & Company (a Delaware corporation) and W.R. Grace & Company-Conn. (a Connecticut company) (defined below).

2.     "Grace Companies" means the "Grace Defendants," their predecessors, subsidiaries and affiliates, including, but not limited to, Grace Speciality Chemical, Inc., W.R. Grace & Company (a New York corporation), Grace Holdings, Inc., the Zonolite Company, and "Cryovac," (defined below) and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

3.     "Sealed Air" means defendant Sealed Air Corporation, its subsidiaries and affiliated entities and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

4.     "Grace-Conn." means W.R. Grace & Company - Conn. (a Connecticut company) and shall include the Grace Companies' specialty chemical business as it existed after the "reorganization", and any of their directors, officers, agents (including attorneys, accountants,

- 1 -

consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

5.      "Cryovac" means the Grace Companies' packaging business as it existed before the "merger" (defined below), both when operated as a division of W.R. Grace & Co., a New York corporation, and subsequently as a subsidiary of W.R. Grace (a Delaware corporation), and its subsidiaries, affiliates, predecessors and successors and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

6.      "Sealed Air's 1998 10-K" means Sealed Air's Form 10-K filed with the United States Securities & Exchange Commission for the fiscal year ending December 31, 1998. (Relevant portions of which are attached as Exhibit A.)

7.      "Sealed Air's Proxy Statement" means Sealed Air's Joint Proxy Statement/Prospectus, dated February 1998. (Relevant portions of which are attached as Exhibit B.)

8.      "Reorganization" means the transaction in which the Grace Companies' specialty chemical business was "separated from its packaging business, the packaging business was contributed to one group of wholly owned subsidiaries ("Cryovac") and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("Grace-Conn.")," as defined on page 1 of Sealed Air's 1998 10-K. (Ex. A.)

9.      "Recapitalization" refers to the "recapitalization" as defined on page 1 of Sealed Air's 1998 10-K. (Ex. A.)

10.     "Merger" refers to the merger between the Grace Companies' packaging business and Sealed Air as defined on page 1 of Sealed Air's 1998 10-K. (Ex. A.)

11.     "Excess insurance" refers to coverage beyond the primary amount of insurance which becomes effective when the primary insurance is exhausted.

12.     "Primary" insurance means that insurance that is not conditioned on any other insurance coverage.

- 2 -

13.    "Reinsurance" means insurance brought by an insurance company for its own protection whereby an insurer reduces its possible maximum loss on a risk by giving a portion of its liability to another insurer, *i.e.*, the reinsurer.

## II.    DEPOSITION TOPICS

Pursuant to Rule 30(b)(6), the Grace Companies shall designate and produce for deposition one or more of its officers, directors, employees, or other persons who consent to testify on behalf of the Grace Companies regarding the following, and who are able to testify to all subject matter to the extent information is known or is reasonably available to the corporation:

1.    The search conducted by the Grace Companies for documents responsive to Plaintiffs' First Request for Production of Documents to Defendant W.R. Grace & Co. - Conn. and W.R. Grace & Co. (a Delaware corporation) ("Plaintiffs' Requests to the Grace Defendants"), including the identity of all persons whose individual files were searched.

2.    The location of all documents responsive to Plaintiffs' Requests to the Grace Defendants.

3.    The methods, including any electronic means, of storage, archiving, retaining, searching and locating all documents responsive to Plaintiffs' Requests to the Grace Companies.

4.    The destruction of any documents responsive to Plaintiffs' Requests to the Grace Companies.

5.    The existence of any computerized databases concerning documents response to Plaintiffs' Requests to the Grace Companies or otherwise relating to plaintiffs' claims.

6.    The reorganization.

7.    The recapitalization.

8.    The merger.

9.    The indemnification and liability of Sealed Air for any liabilities of the Grace Companies, including the preparation of all indemnity agreements.

10.    The Grace Defendants' sufficiency of assets to satisfy liabilities and continue to conduct business before and after the reorganization.

11.     The Grace Defendants' sufficiency of assets to satisfy liabilities and continue to conduct business before and after the recapitalization and merger.

12.     The value of the Grace Companies' assets transferred to the Grace Companies' packaging business compared to the value of assets transferred to the Grace Companies' specialty chemical business during the reorganization, recapitalization and merger.

13.     The reason for the reorganization, recapitalization and merger.

14.     The Grace Companies' risk management policies for the period of 1963 to the present, including:

       (a)     all insurance companies and policies providing liability protection to the Grace Companies, including all layers of primary, excess and reinsurance coverage; and

       (b)     all risks retained, self-insured or co-insured.

15.     How the Grace Companies intends to fund the defense and indemnification of all liability claims currently pending or anticipated against the Grace Companies, including what insurance or other sources of funds are, may be or may become available.

16.     Any contracts, settlements, releases, commutations or other agreements with the Grace Companies' primary or excess insurers or reinsurers which released any such insurer, in whole or in part, from its obligation or potential obligation to provide a defense or indemnification under the Grace Companies' liability insurance policies.

17.     Any indemnity agreements, agreements to assume liability, agreements to assume the defense or joint defense agreements made by or entered into by the Grace Companies or by another entity on the Grace Companies' behalf relating to the reorganization, recapitalization and merger and to the Grace Companies' mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing asbestos containing products or materials.

18.     The rationale for, and determination of the amount of, the $1.3 billion cash payment to Grace-Conn. and/or related entities in connection with the reorganization, recapitalization and merger.

19.     Any information related to the Grace Companies' knowledge of the potential for liability arising out of the manufacture, distribution, sale and installation of asbestos containing attic

- 4 -

insulation products by the Grace Companies and any attempt to quantify such potential liability, including whether such potential liability is reflected in the Grace Companies' current estimates related to asbestos liability.

DATED: February 21, 2001

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
JOBETH HALPER
THOMAS R. MERRICK
JENNIFER TEMPLETON SCHIRMER

_____

TIMOTHY G. BLOOD

600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
EDWARD J. WESTBROOK
ROBERT M. TURKEWITZ
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
ELIZABETH J. CABRASER
FABRICE N. VINCENT
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: 415/956-1000
415/956-1008 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
THOMAS SOBOL
JAN R. SCHLICHTMANN
214 Union Wharf
Boston, MA 02109
Telephone: 617/720-5000
617/720-5015 (fax)

GILMAN AND PASTOR, LLP
DAVID PASTOR
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:  781/231-7850
781/231-7840 (fax)

Plaintiffs' Executive Committee Members

EXHIBIT A

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Wcz3CDN9y6G4MOFMjNF2CQ+Nb4fe+FGzfMFaN7LlY0uJ2V4VmVQsmtbBugvVTgrl
 u4QoedFlMj3SX6EK/97n3A==

<SEC-DOCUMENT>0000930413-99-000449.txt : 19990331
<SEC-HEADER>0000930413-99-000449.hdr.sgml : 19990331
ACCESSION NUMBER:		0000930413-99-000449
CONFORMED SUBMISSION TYPE:	10-K
PUBLIC DOCUMENT COUNT:		7
CONFORMED PERIOD OF REPORT:	19981231
FILED AS OF DATE:		19990330

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:		SEALED AIR CORP/DE
		CENTRAL INDEX KEY:		0001012100
		STANDARD INDUSTRIAL CLASSIFICATION:	UNSUPPORTED PLASTICS FILM &
		IRS NUMBER:			650654331
		STATE OF INCORPORATION:		DE
		FISCAL YEAR END:		1231

	FILING VALUES:
		FORM TYPE:		10-K
		SEC ACT:
		SEC FILE NUMBER:	001-12139
		FILM NUMBER:		99577149

	BUSINESS ADDRESS:
		STREET 1:		PARK 80 EAST
		CITY:			SADDLE BROOK
		STATE:			NJ
		ZIP:			07663
		BUSINESS PHONE:		2017917600

	MAIL ADDRESS:
		STREET 1:		PARK 80 EAST
		CITY:			SADDLE BROOK
		STATE:			NJ
		ZIP:			07663

	FORMER COMPANY:
		FORMER CONFORMED NAME:	WR GRACE & CO/DE
		DATE OF NAME CHANGE:	19961015

	FORMER COMPANY:
		FORMER CONFORMED NAME:	GRACE HOLDING INC
		DATE OF NAME CHANGE:	19960805
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>10-K
<TEXT>

# EXHIBIT A

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
----------------------
FORM 10-K

(Mark one)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 1998

OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934 For the transition period from _____ to _____

Commission File Number 1-12139

SEALED AIR CORPORATION
(Exact name of registrant as specified in its charter)

State or other jurisdiction of incorporation or organization: Delaware
Address of principal executive offices: Park 80 East, Saddle Brook,
New Jersey 07663-5291
I.R.S. Employer Identification Number: 65-0654331
Registrant's telephone number, including area code: (201) 791-7600
Securities registered pursuant to Section 12(b) of the Act:

|                                        | NAME OF EACH EXCHANGE       |
| TITLE OF EACH CLASS                    | ON WHICH REGISTERED         |
| Common Stock, par value $0.10 per share | New York Stock Exchange, Inc. |
| Series A Convertible Preferred Stock,  | New York Stock Exchange, Inc. |
| par value $0.10 per share              |                             |

Securities registered pursuant to Section 12(g) of the Act:   None

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

The aggregate market value of the registrant's Common Stock held by
non-affiliates of the registrant on March 24, 1999 was approximately
$3,921,000,000.

The number of outstanding shares of the registrant's Common Stock as of
March 24, 1999 was 83,486,552.

DOCUMENTS INCORPORATED BY REFERENCE: Portions of the registrant's 1998
Annual Report to Stockholders are incorporated by reference into Parts I and II
of this Form 10-K. Portions of the registrant's definitive proxy statement for
its 1999 Annual Meeting of Stockholders are incorporated by reference into Part
III of this Form 10-K.

<PAGE>

PART I

ITEM 1.  BUSINESS

Sealed Air Corporation (together with its subsidiaries, the "Company") is engaged in the manufacture and sale of a wide range of protective, food and specialty packaging materials and systems throughout the world.

On March 31, 1998, the Company (formerly known as W. R. Grace & Co.) and Sealed Air Corporation (US), a Delaware corporation formerly known as Sealed Air Corporation ("old Sealed Air"), completed a series of transactions as a result of which:

(a) The specialty chemicals business of the Company was separated from its packaging business, the packaging business ("Cryovac") was contributed to one group of wholly owned subsidiaries, and the specialty chemicals business was contributed to another group of wholly owned subsidiaries ("New Grace"); the Company and Cryovac borrowed approximately $1.26 billion under two new revolving credit agreements and transferred substantially all of those funds to New Grace; and the Company distributed all of the outstanding shares of common stock of New Grace to its stockholders. As a result, New Grace became a separate publicly owned company that is unrelated to the Company. These transactions are referred to below as the "Reorganization."

(b) The Company recapitalized its outstanding shares of common stock, par value $0.01 per share, into a new common stock and Series A convertible preferred stock, each with a par value of $0.10 per share (the "Recapitalization").

(c) A subsidiary of the Company merged into old Sealed Air (the "Merger"), with old Sealed Air being the surviving corporation. As a result of the Merger, old Sealed Air became a subsidiary of the Company, and the Company was renamed Sealed Air Corporation.

References to "Grace" in this Annual Report on Form 10-K refer to the Company before the Reorganization, the Recapitalization and the Merger.

SEGMENTS

The Company operates in two reportable business segments: (i) food and specialty packaging products and (ii) protective packaging products, described more fully below. Information concerning the Company's reportable segments appears in Note 3 of the Notes to Consolidated Financial Statements in Item 8 of this Annual Report on Form 10-K, which Note is incorporated herein by reference.

2

<PAGE>

FOOD AND SPECIALTY PACKAGING PRODUCTS

The Company's principal food and specialty packaging products

are its flexible materials and related products, comprising principally shrink
bag and film products, non-shrink laminates and specialty packaging systems
marketed primarily under the Cryovac (R) trademark for a broad range of
perishable food applications. This segment also includes the Company's rigid
packaging and absorbent pads, principally absorbent pads used for the retail
packaging of meat, fish and poultry, foam trays used by supermarkets and food
processors, and rigid plastic containers for dairy and other food products.

FLEXIBLE MATERIALS AND RELATED SYSTEMS

        The Company produces a variety of high-performance proprietary
flexible films, bags and associated packaging equipment marketed and sold
primarily under the Cryovac (R) trademark in North America, Europe, Latin
America, South Africa and the Asia Pacific region that are used to package a
broad range of perishable foods such as fresh, smoked and processed meat
products, cheese, poultry, prepared foods (including soups and sauces for
restaurants and institutions) and produce. The Company also offers sterilized
medical bags and films for use with medical products and produce bags with
dispensing systems used by customers in supermarket produce departments.

        Cryovac (R) food packaging products include shrink bags,
shrink films sold for food packaging applications and laminated films. Shrink
bags and films are multi-layered shrinkable plastic bags and films that mold
themselves to the shape of the product. Laminates are multi-layered,
non-shrinkable plastic materials used to package perishable foods and
shelf-stable products such as syrups and toppings. Films and bags are sold in
barrier and permeable forms, depending on whether oxygen or other gases can pass
through the material. Offerings include modified atmosphere packaging (MAP) that
is designed to provide a controlled gas environment within a package to extend
shelf life.

        The Company's food packaging films and bags incorporate the
Company's core technologies, including proprietary film processing technology,
resin technology, and packaging and food science expertise. The Company seeks to
maintain technological leadership through a continuous program of research and
development in its core technologies.

        For processed meats and poultry, Cryovac (R) cook-in bags and
laminates withstand high cooking temperatures while retaining product shape,
clarity and weight. For fresh-cut produce, the Company produces films that
permit oxygen to pass through at various rates, thereby matching the varying
respiration rates of different vegetables and permitting longer shelf life.
During 1998, the Company introduced a new low-oxygen packaging film for use with
MAP packaging. The Company's Cryovac (R) films offer a wide variety of other
characteristics, such as anti-fog, clarity, gloss, oxygen barrier or strength,
that meet customer demands in specific food packaging applications.

                                    3


<PAGE>


        The Company's food packaging equipment offerings include:
dispensing and loading units to package foods in shrink, vacuum or vacuum skin
packages using the Company's films and bags; form, fill and seal units to
package foods in pouches made using the Company's films; and bagging systems.
Systems are marketed to the food processing industry under the Cryovac (R)
trademark and other trademarks.

RIGID PACKAGING AND ABSORBENT PADS

The Company manufactures and sells Cryovac (R) polystyrene foam trays that are used by supermarkets and by food processors to protect and display fresh meat, poultry and produce. The Company also manufactures and sells absorbent pads used for food packaging, including its Dri-Loc (R) absorbent pads. The Company's foam trays and absorbent pads are often used together. The Company's case-ready packaging customers, principally meat and poultry processors, purchase trays, pads and specially-designed films and packaging equipment to package centrally meat and poultry products prior to shipment to the supermarket. The Company also manufactures rigid plastic containers, primarily plastic tubs for dairy products such as margarine and yogurt, in Australia that are marketed under the Omicron (TM) trademark.

PROTECTIVE PACKAGING PRODUCTS

The Company's protective packaging products include its cushioning and surface protection products and certain other products. The Company's principal cushioning and surface protection products are air cellular cushioning materials, Cryovac (R) films for non-food applications, Instapak (R) polyurethane foam packaging systems, polyethylene foam sheets and planks, protective and durable mailers and bags, paper-based packaging products, suspension and retention packaging and packaging systems.

CUSHIONING AND SURFACE PROTECTION PRODUCTS

AIR CELLULAR CUSHIONING MATERIALS: The Company manufactures and markets Bubble Wrap (R) air cellular cushioning materials, which are also marketed under various other trademarks, including AirCap (R) and PolyCap (R). These materials consist of air bubbles encapsulated between two layers of plastic film, each containing a barrier layer to retard air loss, that form a pneumatic cushion to protect products from damage through shock or vibration during shipment. The Company's air cellular cushioning materials are used by a wide variety of end users, including both manufacturers and retailers.

CRYOVAC (R) FILMS FOR NON-FOOD APPLICATIONS: The Company manufactures and sells Cryovac (R) films used to shrink-wrap a wide assortment of industrial and consumer products. The Company's proprietary multi-layer films provide features such as strength and clarity. In certain regions the Company also offers shrink-wrap equipment for use with the Company's shrink films.

4

<PAGE>

INSTAPAK (R) SYSTEMS: Instapak (R) polyurethane foam packaging systems consist of proprietary blends of polyurethane chemicals and specially designed dispensing equipment. The Company also manufactures high-performance polyolefin films designed for use with Instapak (R) packaging systems.

Instapak (R) chemicals, films and equipment are marketed as integrated packaging systems to provide protective packaging for a wide variety of products, including computer, electronic, office, medical and communications equipment, compressors and motors, furniture and spare parts, and void-fill packaging of office supplies, books, cosmetics and other small products for distribution. Instapak (R) systems are also used to produce polyurethane foams used in certain non-packaging applications, including Instapak (R) Floral, a foam used as a design base for artificial flower arrangements.

POLYETHYLENE FOAMS: The Company manufactures thin polyethylene

products are sold or used, laws and regulations have been adopted or proposed that seek to regulate, among other things, recycled or reprocessed content, sale and disposal of packaging materials. In addition, customer demand for packaging materials that are viewed as being "environmentally responsible" and that minimize the generation of solid waste continues to evolve. While these issues can be a competitive factor in the marketplace for packaging materials, the Company maintains active programs designed to comply with these laws and regulations, to monitor their evolution, and to meet such customer demand.

The Company believes that its packaging materials offer superior packaging protection, enabling customers to achieve lower package cube and weight using the Company's packaging materials than with many alternative packaging methods, thereby reducing the disposal of damaged products as well as the generation of packaging waste. Because the Company offers both plastic-based and paper-based protective packaging materials, customers can select the protective packaging materials that they consider to best meet their performance and cost needs and

9

<PAGE>

environmental preferences. A number of the Company's protective packaging product lines incorporate recycled or reprocessed content, and the Company maintains ongoing efforts to add or increase recycled or reprocessed content in many of its protective packaging product lines.

The Company also supports its customers' interests in eliminating waste by offering or participating in collection programs for certain of the Company's products or product packaging and for materials used in certain of the Company's products, and, when possible, materials collected through these collection programs are reprocessed and either reused in the Company's protective packaging operations or offered to other manufacturers for use in other products.

EMPLOYEES

At December 31, 1998, the Company had approximately 14,700 employees worldwide.

ITEM 2. PROPERTIES

The Company's food and specialty packaging products are produced in 40 manufacturing facilities (15 in North America, 10 in Europe, 5 in Latin America, 9 in the Asia Pacific region, and 1 in South Africa). Protective packaging products are produced in 62 manufacturing facilities (29 in North America, 18 in Europe, 4 in Latin America, and 11 in the Asia Pacific region, including certain small converting facilities). Several of the Company's manufacturing facilities serve both segments. The Company occupies other facilities containing fabricating or converting operations or sales, distribution, technical, warehouse or administrative offices at a number of locations in the United States and in various foreign countries.

In the United States, the Company's food and specialty products are manufactured at facilities in California, Indiana, Iowa, Mississippi, Missouri, New York, North Carolina, Pennsylvania, South Carolina, and Texas. Its protective packaging products are manufactured at facilities in California, Connecticut, Georgia, Illinois, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas and

Washington. Because of the light but voluminous nature of the Company's air cellular, polyethylene foam and protective mailer products, significant freight savings may be realized by locating manufacturing facilities for these products near markets. To realize the benefit of such savings, the Company has facilities for manufacturing these products in various locations in proximity to major markets.

        The Company owns the large majority of its manufacturing facilities, certain of which are owned subject to mortgages or similar financing arrangements. The balance of the Company's manufacturing facilities are located in leased premises. The Company's manufacturing facilities are usually located in general purpose buildings in which the Company's specialized machinery for the manufacture of one or more products is contained. The Company believes that its manufacturing facilities are well maintained, suitable for their purposes, and adequate for the Company's needs.

10

<PAGE>

ITEM 3. LEGAL PROCEEDINGS

        The Company is a party to various lawsuits and administrative and other proceedings incidental to its business, including certain federal or state governmental environmental proceedings or private environmental claims relating to the cleanup of Superfund sites or other sites. While it is often difficult to estimate potential environmental liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material. The Company believes, after consulting with counsel, that the disposition of its lawsuits and other legal proceedings, including environmental matters, will not have a material effect on the Company's consolidated financial position.

        In connection with the Reorganization, the Recapitalization and the Merger, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's consolidated financial position.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

        No matters were submitted to a vote of the Company's stockholders during the fourth quarter of 1998.

11

<PAGE>

EXECUTIVE OFFICERS OF THE REGISTRANT

        The information appearing in the table below sets forth the

current position or positions held by each executive officer of the Company, his or her age as of March 15, 1999, the year in which he or she first was elected to the position currently held with the Company or with old Sealed Air (as indicated in the footnote to the table), and the year in which he or she first was elected an officer of the Company or of old Sealed Air (as indicated in the footnote to the table).

        All of the Company's officers serve at the pleasure of the Board of Directors. All officers have been employed by the Company or its subsidiaries for more than five years except for Mr. Van Riper, who was elected Senior Vice President and Chief Financial Officer of the Company effective July 1, 1998. Previously Mr. Van Riper was a partner in the accounting firm of KPMG LLP, which were the independent accountants for old Sealed Air for many years prior to the Merger and have acted as the independent accountants for the Company since the Merger. There are no family relationships among any of the Company's officers or directors.

| NAME AND<br>CURRENT POSITION | AGE AS OF<br>MARCH 15, 1999 | FIRST ELECTED TO<br>CURRENT POSITION | FIRST ELECTED<br>AN OFFICER |
| --- | --- | --- | --- |
| T. J. Dermot Dunphy<br>Chairman of the Board,<br>Chief Executive Officer<br>and Director | 66 | 1971 | 1971 |
| William V. Hickey<br>President and Chief<br>Operating Officer | 54 | 1996 | 1980 |
| J. Gary Kaenzig, Jr.*<br>Executive Vice President | 53 | 1998 | 1995 |
| Bruce A. Cruikshank<br>Senior Vice President | 55 | 1996 | 1990 |
| Robert A. Pesci<br>Senior Vice President | 53 | 1997 | 1990 |
| Daniel S. Van Riper<br>Senior Vice President<br>and Chief Financial Officer | 58 | 1998 | 1998 |
| Jonathan B. Baker<br>Vice President | 46 | 1994 | 1994 |
| James A. Bixby<br>Vice President | 55 | 1990 | 1990 |
| Leonard R. Byrne*<br>Vice President | 57 | 1998 | 1998 |

                                12

<PAGE>

| Mary A. Coventry<br>Vice President | 45 | 1994 | 1994 |

```
- -------------------------------------------------------------------------------
<S>                                                <C>              <C>
Interest payments, net of amounts capitalized     $    47,997      $
Income tax payments                                    80,069              74,
</TABLE>
```

                                    38

<PAGE>

The consolidated statement of cash flows for the year ended December 31, 1998
excludes the following non-cash transactions that were accounted for as changes
in additional paid-in capital:

```
<TABLE>
<CAPTION>

<S>
    Issuance of 36,021,851 shares of Series A convertible preferred stock and 40,64
       shares of common stock in connection with the Reorganization and Recapitaliza
    Net assets acquired in the Merger in exchange for 42,624,246 shares of common s
    Liabilities assumed by the Company, net
    Liabilities retained by New Grace
</TABLE>
```

NOTE 16 EARNINGS PER COMMON SHARE

In calculating basic and diluted earnings per common share for 1998, 1997 and
1996, retroactive recognition has been given to the Recapitalization as if it
had occurred on January 1, 1996 in accordance with SAB No. 98. Accordingly, net
earnings have been reduced for preferred stock dividends (as if such shares had
been outstanding during each period) to arrive at earnings ascribed to common
shareholders. The weighted average number of outstanding common shares used to
calculate basic earnings per common share has been calculated on an equivalent
share basis using the weighted average number of shares of common stock
outstanding for the first quarter of 1998 and for the 1997 and 1996 periods,
adjusted to reflect the terms of the Recapitalization. The weighted average
number of common shares used to calculate diluted earnings per common share also
considers the exercise of dilutive stock options in each year and repurchased
preferred stock in 1998. Except as noted in the table below, the outstanding
preferred stock is not assumed to be converted in the calculation of diluted
earnings per common share for 1998 or 1996 because the treatment of the
preferred stock as the common stock into which it is convertible would be
anti-dilutive (i.e., would increase earnings per common share) in those years.

The following table sets forth the reconciliation of the basic and diluted
earnings per common share computations for years ended December 31, 1998, 1997
and 1996 (shares in thousands).

```
<TABLE>
<CAPTION>
```

|                                                             | 1998 (a) | 1997 (a |
| ----------------------------------------------------------- | -------- | ------- |
| <S>                                                         | <C>      | <C>     |
| Basic EPS:                                                  |          |         |
| NUMERATOR                                                   |          |         |
| Net earnings                                                | $ 73,007 | $173,732 |
| Add: Excess of book value over repurchase price of preferred |          |         |
|          Stock                                              | 1,798    | --      |
| Less: Preferred stock dividends                             | 53,921   | --      |
| Less: Retroactive recognition of preferred stock dividends  | 18,011   | 72,044  |

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $  2,873 | $101,688 |

DENOMINATOR
| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |

| | | |
|---|---|---|
| Basic earnings per common share | $   0.04 | $   2.54 |

39

<PAGE>

Diluted EPS:
NUMERATOR

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $  2,873 | $101,688 |
| Add:  Dividends associated with outstanding preferred stock | -- | 72,044 |
| Add:  Dividends associated with preferred stock repurchased | 316 | -- |
| Less: Excess of book value over repurchase of preferred stock | 1,798 | -- |
| Earnings ascribed to common shareholders-diluted | 1,391 | 173,732 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Effect of assumed exercise of options | 118 | 917 |
| Effect of assumed conversion of preferred stock | -- | 31,864 |
| Weighted average of preferred stock purchased | 158 | -- |
| Weighted average common shares outstanding - diluted | 73,273 | 72,833 |

| | | |
|---|---|---|
| Diluted earnings per common share | $   0.02 | $   2.39 |

</TABLE>

(a)  Such  earnings per common share amounts are not  necessarily  indicative of
     the results that would  have occurred had Cryovac been a stand-alone company
     prior to the Reorganization, Recapitalization and the Merger.

NOTE 17 CERTAIN TRANSACTIONS WITH GRACE

CASH

Prior to the Merger,  Cryovac used Grace's centralized cash management services.
Under such service  arrangements, excess domestic cash was invested,  and
disbursements were funded,  centrally by Grace on behalf of Cryovac.

SHARED SERVICES AND FACILITIES

Prior to the Merger,  Grace  allocated a portion of its  domestic  and  overseas
regional  corporate  expenses to Cryovac. These  expenses  reflected  corporate

overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; general legal services, including intellectual property; and other support and executive functions. Allocations and charges were based on either a direct cost pass-through or a percentage allocation for services provided, based on factors such as net sales, management effort or headcount.

Domestic corporate expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $18,044, $28,213 and $15,175 for 1998, 1997 and 1996, respectively, and were included in marketing, administrative and development expenses.

Domestic research and development expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $5,074 for 1996 and are included in marketing, administrative and development expenses. No amounts were allocated for 1998 or 1997.

Grace management believed that the basis used for allocating corporate services was reasonable and that the terms of these transactions would not materially differ from those among unrelated parties.

The statements of earnings for periods prior to the Merger also included allocations of costs for general and administrative services and maintenance services for facilities that Cryovac shared with other Grace businesses as well as data processing services provided by Grace's European central data processing facility. The allocated costs and expenses related to general and administrative functions, maintenance, data processing and other facility support functions were estimated to be approximately $14,000 for the 1998 period and $55,802 and $84,005 for 1997 and 1996, respectively. Of these amounts, $6,181 was included in cost of sales and $49,621 was included in marketing, administrative and development expenses in 1997 ($15,226 and $68,779 in 1996). The cost allocations for these services were determined based on methods that Grace management considered to be reasonable.

Prior to the Merger, Grace also charged Cryovac for its share of domestic workers' compensation, automobile and other general business liability insurance premiums and claims, which were all handled by Grace on a corporate basis. These charges were based on Cryovac's actual and expected future experience, including annual payroll expense, and were not significant to Cryovac results of operations.

40

<PAGE>

ALLOCATION OF LONG-TERM INCENTIVE PROGRAM EXPENSE

In accordance with SAB No. 55, the financial statements for 1997 and 1996 reflect an allocation of LTIP expense related to Grace corporate employees that performed services on behalf of Cryovac. The provision included in the financial statements for allocated LTIP expenses was $23,710 and $9,293 for 1997 and 1996, respectively.

NOTE 18 COMMITMENTS AND CONTINGENCIES

The Company is obligated under the terms of various leases covering many of the facilities that it occupies. The Company accounts for substantially all of its leases as operating leases. Net rental expense was $20,873, $9,588, and $12,036 for 1998, 1997 and 1996, respectively. Estimated future minimum annual rental commitments under non-cancelable real property leases expiring through 2023 are

as follows: 1999 - $19,686; 2000 - $16,767; 2001 - $12,481; 2002 - $8,369; 2003 - - $6,574; and subsequent years - $15,557.

The Company's worldwide operations are subject to environmental laws and regulations which, among other things, impose limitations on the discharge of pollutants into the air and water and establish standards for the treatment, storage and disposal of solid and hazardous wastes. The Company reviews the effects of environmental laws and regulations on its operations and believes that it is in substantial compliance with all material applicable environmental laws and regulations.

At December 31, 1998, the Company was a party to, or otherwise involved in, several federal and state government environmental proceedings and private environmental claims for the cleanup of Superfund or other sites. The Company may have potential liability for investigation and clean up of certain of such sites. At most of such sites, numerous companies, including either the Company or one of its predecessor companies, have been identified as potentially responsible parties ("PRPs") under Superfund or related laws. It is the Company's policy to provide for environmental cleanup costs if it is probable that a liability has been incurred and if an amount which is within the estimated range of the costs associated with various alternative remediation strategies is reasonably estimable, without giving effect to any possible future insurance proceeds. As assessments and cleanups proceed, these liabilities are reviewed periodically and adjusted as additional information becomes available. At December 31, 1998 and 1997, such environmental related provisions were not material. While it is often difficult to estimate potential liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material to the Company's consolidated financial position. Environmental liabilities may be paid over an extended period, and the timing of such payments cannot be predicted with certainty.

The Company is also involved in various legal actions incidental to its business. Company management believes, after consulting with counsel, that the disposition of its litigation and other legal proceedings and matters, including environmental matters, will not have a material effect on the Company's consolidated financial position.

In connection with the Reorganization, certain environmental liabilities of Cryovac were retained by or assumed by New Grace. As of March 31, 1998, the Company's liability with respect to such environmental obligations retained by New Grace, including related deferred income taxes, was reversed and accounted for as an equity contribution to the Company from Grace.

CONTINGENT LIABILITIES INDEMNIFIED BY NEW GRACE

Pursuant to the Transaction Agreements, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the Merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain contingently liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's results of operations or consolidated financial position.

41

<PAGE>

GUARANTEE OF NEW GRACE OUTSTANDING PUBLIC DEBT

The Company is the guarantor of certain outstanding public debt that was assumed by New Grace pursuant to the Transaction Agreements. At December 31, 1998, approximately $32,000 of such debt was outstanding. New Grace has indemnified the Company against any liability arising under such guarantee pursuant to the Transaction Agreements.

TRANSACTION AGREEMENTS

Pursuant to the Transaction Agreements final determinations and accountings are necessary with respect to matters pertaining to the Reorganization and the Merger. The Company believes that the final outcome of such matters will not have a material effect on its consolidated financial position.

NOTE 19 SELECTED PRO FORMA STATEMENT OF EARNINGS INFORMATION (UNAUDITED)

The following table presents selected unaudited pro forma statement of earnings information for the years ended December 31, 1998 and 1997 that has been prepared as if the Reorganization, the Recapitalization and the Merger had occurred on January 1, 1997. Such information reflects pro forma adjustments made in combining the historical results of old Sealed Air and Cryovac as a result of such transactions for the years presented. Such amounts include, among other things, incremental goodwill amortization of approximately $10,300 and $41,200 and incremental interest expense of approximately $20,400 and $81,600 in the first quarter of 1998 and full year 1997, respectively. Such amounts exclude a non-cash inventory charge of approximately $8 million recorded in the second quarter of 1998 resulting from the turnover of certain of the Company's inventories previously stepped-up to fair value in connection with the Merger. This pro forma information is not intended to represent what the Company's actual results of operations would have been for such years, if such transactions had occurred on January 1, 1997.
<TABLE>
<CAPTION>

| (Amounts in thousands, except for per share data) | Year Ended |
| --- | --- |
| | 1998 Pro Forma |
| <S> | <C> |
| Net sales by segment: | |
|     Food and Specialty Packaging | $ 1,709,428 |
|     Protective Packaging | 1,010,080 |
| Net sales | 2,719,508 |
| Cost of sales | 1,762,957 |
| Gross profit | 956,551 |
| Marketing, administrative and development expenses | 516,269 |
| Goodwill amortization | 47,893 |
| Restructuring and other charges, net | 87,182 |
| Operating profit | 305,207 |

| | |
|---|---:|
| Other expense, net | (82,141) |
| Earnings before income taxes | 223,066 |
| Income taxes | 141,574 |
| Net earnings | $   81,492 |
| Less:  Preferred stock dividends | 71,932 |
| Add:  Excess of book value over repurchase price of preferred stock | 1,798 |
| Net earnings ascribed to common shareholders | $   11,358 |
| Earnings per common share (1) | |
| Basic | $    0.14 |
| Diluted | $    0.12 |
| Weighted average number of common shares outstanding: | |
| Basic | 83,478 |
| Diluted | 83,754 |

</TABLE>

(1)  For purposes of  calculating  basic and diluted  earnings per common share,
     net earnings for 1998 and 1997 have been reduced by the dividends  ($18,011
     in 1998 for the first  quarter  and $72,044  in 1997) that would have been
     payable on the preferred  stock (as if such  shares  had been  outstanding

42

<PAGE>

     during such periods) to arrive at earnings ascribed to common shareholders.
     The weighted average number of outstanding  common shares used to calculate
     basic earnings per common share is calculated on an equivalent  share basis
     using the shares of common stock  outstanding for the first quarter of 1998
     and for 1997,  adjusted to reflect the terms of the  Recapitalizaiton.  The
     assumed conversion of  the preferred  stock  is not  considered  in the
     calculation of diluted  earnings per common share in either 1998 or 1997 as
     the effect would be anti-dilutive (i.e., would increase earnings per share)
     in each year.

NOTE 20 INTERIM FINANCIAL INFORMATION (UNAUDITED)
<TABLE>
<CAPTION>

| (Amounts in thousands, except for per share data) | First Quarter | Second Quarter | Third Quarter |
|---|---|---|---|
| 1998 | | | |
| <S> | <C> | <C> | <C> |
| Net sales | $ 431,035 | $ 670,005 | $ 684,3 |
| Cost of sales | 290,913 | 442,945 | 443,2 |
| Net earnings(loss) | 27,052 | 35,565 | (54,1 |
| Preferred stock dividends | -- | 18,011 | 17,9 |
| Earnings(loss) per common share - basic (2) | 0.22(3) | 0.21 | (0. |

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.      That on February 21, 2001, declarant served the PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS W.R. GRACE & COMPANY - CONN. (A CONNECTICUT CORPORATION) AND W.R. GRACE & COMPANY (A DELAWARE CORPORATION) by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of February, 2001, at San Diego, California.

June P. Ito

ZONOLITE
Service List - 02/16/01
Page 1

COUNSEL FOR PLAINTIFF(S)

Mark C. Goldenberg
Elizabeth V. Heller
HOPKINS GOLDENBERG, P.C.
2227 South State Route 157
Edwardsville, IL  62025
    618/656-5150
    618/656-6230 (fax)

John J. Stoia, Jr.
Timothy G. Blood
JoBeth Halper
MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
    619/231-1058
    619/231-7423 (fax)

Christopher A. Seeger
David R. Buchanan
Amy P. Albert
SEEGER WEISS LLP
One William Street
New York, NY  10004-2502
    212/584-0700
    212/584-0799 (fax)

COUNSEL FOR DEFENDANTS

* Deborah G. Solmor
  SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
  333 West Wacker Drive, Suite 2100
  Chicago, IL  60606-1285
    312/407-0700
    312/407-0411 (fax)

* Douglas King
  James H. Ferrick, III
  BRYAN CAVE LLP
  211 North Broadway, Suite 3600
  St. Louis, MO  63102-2750
    314/259-2000
    314/259-2020 (fax)

* Sheila L. Birnbaum
  Bert L. Wolff
  Arthur H. Aizley
  SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
  4 Times Square
  New York, NY  10036
    212/735-3000
    212/735-2000 (fax)

** V.L. Woolston, Jr.
  Thomas L. Boeder
  PERKINS COIE LLP
  1201 Third Avenue, Suite 4800
  Seattle, WA  98101-3099
    206/583-8888
    206/583-8500 (fax)

 * Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; general legal services, including intellectual property; and other support and executive functions. Allocations and charges were based on either a direct cost pass-through or a percentage allocation for services provided, based on factors such as net sales, management effort or headcount.

Domestic corporate expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $18,044, $28,213 and $15,175 for 1998, 1997 and 1996, respectively, and were included in marketing, administrative and development expenses.

Domestic research and development expenses of Grace allocated to Cryovac in accordance with SAB No. 55 totaled $5,074 for 1996 and are included in marketing, administrative and development expenses. No amounts were allocated for 1998 or 1997.

Grace management believed that the basis used for allocating corporate services was reasonable and that the terms of these transactions would not materially differ from those among unrelated parties.

The statements of earnings for periods prior to the Merger also included allocations of costs for general and administrative services and maintenance services for facilities that Cryovac shared with other Grace businesses as well as data processing services provided by Grace's European central data processing facility. The allocated costs and expenses related to general and administrative functions, maintenance, data processing and other facility support functions were estimated to be approximately $14,000 for the 1998 period and $55,802 and $84,005 for 1997 and 1996, respectively. Of these amounts, $6,181 was included in cost of sales and $49,621 was included in marketing, administrative and development expenses in 1997 ($15,226 and $68,779 in 1996). The cost allocations for these services were determined based on methods that Grace management considered to be reasonable.

Prior to the Merger, Grace also charged Cryovac for its share of domestic workers' compensation, automobile and other general business liability insurance premiums and claims, which were all handled by Grace on a corporate basis. These charges were based on Cryovac's actual and expected future experience, including annual payroll expense, and were not significant to Cryovac results of operations.

40

<PAGE>

ALLOCATION OF LONG-TERM INCENTIVE PROGRAM EXPENSE

In accordance with SAB No. 55, the financial statements for 1997 and 1996 reflect an allocation of LTIP expense related to Grace corporate employees that performed services on behalf of Cryovac. The provision included in the financial statements for allocated LTIP expenses was $23,710 and $9,293 for 1997 and 1996, respectively.

NOTE 18 COMMITMENTS AND CONTINGENCIES

The Company is obligated under the terms of various leases covering many of the facilities that it occupies. The Company accounts for substantially all of its leases as operating leases. Net rental expense was $20,873, $9,588, and $12,036 for 1998, 1997 and 1996, respectively. Estimated future minimum annual rental commitments under non-cancelable real property leases expiring through 2023 are

as follows:  1999 - $19,686; 2000 - $16,767; 2001 - $12,481; 2002 - $8,369; 2003
- - $6,574; and subsequent years - $15,557.

The Company's worldwide operations are subject to environmental laws and
regulations which, among other things, impose limitations on the discharge of
pollutants into the air and water and establish standards for the treatment,
storage and disposal of solid and hazardous wastes. The Company reviews the
effects of environmental laws and regulations on its operations and believes
that it is in substantial compliance with all material applicable environmental
laws and regulations.

At December 31, 1998, the Company was a party to, or otherwise involved in,
several federal and state government environmental proceedings and private
environmental claims for the cleanup of Superfund or other sites. The Company
may have potential liability for investigation and clean up of certain of such
sites. At most of such sites, numerous companies, including either the Company
or one of its predecessor companies, have been identified as potentially
responsible parties ("PRPs") under Superfund or related laws. It is the
Company's policy to provide for environmental cleanup costs if it is probable
that a liability has been incurred and if an amount which is within the
estimated range of the costs associated with various alternative remediation
strategies is reasonably estimable, without giving effect to any possible future
insurance proceeds. As assessments and cleanups proceed, these liabilities are
reviewed periodically and adjusted as additional information becomes available.
At December 31, 1998 and 1997, such environmental related provisions were not
material. While it is often difficult to estimate potential liabilities and the
future impact of environmental matters, based upon the information currently
available to the Company and its experience in dealing with such matters, the
Company believes that its potential liability with respect to such sites is not
material to the Company's consolidated financial position. Environmental
liabilities may be paid over an extended period, and the timing of such payments
cannot be predicted with certainty.

The Company is also involved in various legal actions incidental to its
business. Company management believes, after consulting with counsel, that the
disposition of its litigation and other legal proceedings and matters, including
environmental matters, will not have a material effect on the Company's
consolidated financial position.

In connection with the Reorganization, certain environmental liabilities of
Cryovac were retained by or assumed by New Grace. As of March 31, 1998, the
Company's liability with respect to such environmental obligations retained by
New Grace, including related deferred income taxes, was reversed and accounted
for as an equity contribution to the Company from Grace.

CONTINGENT LIABILITIES INDEMNIFIED BY NEW GRACE

Pursuant to the Transaction Agreements, New Grace agreed to indemnify the
Company against all liabilities of Grace, whether accruing or occurring before
or after the Merger, other than liabilities arising from or relating to
Cryovac's operations. New Grace also agreed to retain certain liabilities of
Cryovac and to indemnify the Company against such liabilities. The Company may
remain contingently liable with respect to certain of such liabilities if New
Grace fails to fulfill its indemnity obligations to the Company. Based upon
currently available information, the Company believes that future costs related
to such indemnified liabilities will not have a material adverse effect on the
Company's results of operations or consolidated financial position.

41

<PAGE>

GUARANTEE OF NEW GRACE OUTSTANDING PUBLIC DEBT

The Company is the guarantor of certain outstanding public debt that was assumed by New Grace pursuant to the Transaction Agreements. At December 31, 1998, approximately $32,000 of such debt was outstanding. New Grace has indemnified the Company against any liability arising under such guarantee pursuant to the Transaction Agreements.

TRANSACTION AGREEMENTS

Pursuant to the Transaction Agreements final determinations and accountings are necessary with respect to matters pertaining to the Reorganization and the Merger. The Company believes that the final outcome of such matters will not have a material effect on its consolidated financial position.

NOTE 19 SELECTED PRO FORMA STATEMENT OF EARNINGS INFORMATION (UNAUDITED)

The following table presents selected unaudited pro forma statement of earnings information for the years ended December 31, 1998 and 1997 that has been prepared as if the Reorganization, the Recapitalization and the Merger had occurred on January 1, 1997. Such information reflects pro forma adjustments made in combining the historical results of old Sealed Air and Cryovac as a result of such transactions for the years presented. Such amounts include, among other things, incremental goodwill amortization of approximately $10,300 and $41,200 and incremental interest expense of approximately $20,400 and $81,600 in the first quarter of 1998 and full year 1997, respectively. Such amounts exclude a non-cash inventory charge of approximately $8 million recorded in the second quarter of 1998 resulting from the turnover of certain of the Company's inventories previously stepped-up to fair value in connection with the Merger. This pro forma information is not intended to represent what the Company's actual results of operations would have been for such years, if such transactions had occurred on January 1, 1997.

<TABLE>
<CAPTION>

| (Amounts in thousands, except for per share data) | Year Ended |
| | 1998 Pro Forma |
| --- | --- |
| <S> | <C> |
| Net sales by segment: | |
| Food and Specialty Packaging | $ 1,709,428 |
| Protective Packaging | 1,010,080 |
| Net sales | 2,719,508 |
| Cost of sales | 1,762,957 |
| Gross profit | 956,551 |
| Marketing, administrative and development expenses | 516,269 |
| Goodwill amortization | 47,893 |
| Restructuring and other charges, net | 87,182 |
| Operating profit | 305,207 |

| | | |
|---|---|---|
| Other expense, net | | (82,141) |
| Earnings before income taxes | | 223,066 |
| Income taxes | | 141,574 |
| Net earnings | $ | 81,492 |
| Less:  Preferred stock dividends | | 71,932 |
| Add:   Excess of book value over repurchase price of preferred stock | | 1,798 |
| Net earnings ascribed to common shareholders | $ | 11,358 |
| Earnings per common share (1) | | |
| Basic | $ | 0.14 |
| Diluted | $ | 0.12 |
| Weighted average number of common shares outstanding: | | |
| Basic | | 83,478 |
| Diluted | | 83,754 |

</TABLE>

(1)  For purposes of  calculating  basic and diluted  earnings per common share,
     net earnings for 1998 and 1997 have been reduced by the dividends  ($18,011
     in 1998 for the first  quarter  and  $72,044  in 1997) that would have been
     payable on the  preferred stock (as if  shares  had been  outstanding

                                       42

<PAGE>

     during such periods) to arrive at earnings ascribed to common shareholders.
     The weighted average number of outstanding  common shares used to calculate
     basic earnings per common share is calculated on an equivalent  share basis
     using the shares of common stock  outstanding for the first quarter of 1998
     and for 1997,  adjusted to reflect the terms of the  Recapitalizaiton.  The
     assumed  conversion  of  the  preferred  stock  is  not  considered in the
     calculation of diluted  earnings per common share in either 1998 or 1997 as
     the effect would be anti-dilutive (i.e., would increase earnings per share)
     in each year.

NOTE 20 INTERIM FINANCIAL INFORMATION (UNAUDITED)
<TABLE>
<CAPTION>

| | First | Second | Third |
|---|---|---|---|
| (Amounts in thousands, except for per share data) | Quarter | Quarter | Quarter |
| 1998 | | | |
| <S> | <C> | <C> | <C> |
| Net sales | $ 431,035 | $ 670,005 | $ 684,3 |
| Cost of sales | 290,913 | 442,945 | 443,2 |
| Net earnings(loss) | 27,052 | 35,565 | (54,1 |
| Preferred stock dividends | -- | 18,011 | 17,9 |
| Earnings(loss) per common share - basic (2) | 0.22(3) | 0.21 | (0. |