EXHIBIT B

Filed by the Registrant |X|
Filed by a Party other than the Registrant |_|

Check the appropriate box:
|_| Preliminary Proxy Statement                |_|Confidential. For Use of the
                                                  Commission Only (as per-
                                                  mitted by Rule 14a-6(e)(2))

|X| Definitive Proxy Statement
|_| Definitive Additional Materials
|_| Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

                        Sealed Air Corporation
- ------------------------------------------------------------------------
             (Name of Registrant as Specified in Its Charter)

- ------------------------------------------------------------------------
    (Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)
Payment of Filing Fee (Check the appropriate box):

        |X|    No fee required.

        |_|    Fee computed on table below per Exchange Act Rules 14a-6(i)(1)
               and 0-11.
        (1) Title of each class of securities to which transaction applies:

- ------------------------------------------------------------------------
        (2) Aggregate number of securities to which transaction applies:

- ------------------------------------------------------------------------

        (3) Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee
is calculated and state how it was determined):

- ------------------------------------------------------------------------

        (4) Proposed maximum aggregate value of transaction:

- ------------------------------------------------------------------------

        (5) Total fee paid:

- ------------------------------------------------------------------------

        |_| Fee paid previously with preliminary materials:

- ------------------------------------------------------------------------

        |_| Check box if any part of the fee is offset as provided by Exchange
Act Rule 0- 11(a)(2) and identify the filing for which the offsetting fee was
paid previously. Identify the previous filing by registration statement number,
or the form or schedule and the date of its filing.

        (1) Amount previously paid:
- ------------------------------------------------------------------------

        (2) Form, Schedule or Registration Statement no.:
- ------------------------------------------------------------------------

# EXHIBIT B

global marketing network.

Here are a few points that highlight how New Sealed Air would have looked in 1996:

o  New Sealed Air would have had annual net sales of more than $2.5 billion.

o  Approximately 60% of New Sealed Air's net sales would have come from specialty (primarily food) packaging products and 40% from protective packaging and other products.

o  New Sealed Air would have had operations in 46 countries, with 51% of its revenues generated in the U.S. and 49% outside the U.S.

Following these transactions, New Sealed Air will:

o  be an independent company, initially owned 37% by the existing Sealed Air stockholders and 63% by the existing Grace stockholders;

o  own and operate the businesses of Sealed Air and Grace Packaging; and

o  be obligated to repay the approximately $1.2 billion that will be borrowed and transferred to Grace's specialty chemicals businesses.


New Grace After the Merger

After the spin-off, New Grace will be a highly focused specialty chemicals company. Grace stockholders should review the New Grace Information Statement.

New Grace will:

o  initially be owned 100% by the existing Grace stockholders;

o  own and operate Grace's specialty chemicals businesses; and

o  be essentially debt-free following the approximately $1.2 billion cash transfer from Grace, which will be used to repay borrowings.

                    -------------------------------


Considerations for Sealed Air Stockholders

The Sealed Air stockholders will be asked to approve the merger agreement. The favorable vote of a majority of the outstanding shares of Sealed Air common stock is required to approve the merger.

Recommendation to Sealed Air Stockholders

The Board of Directors of Sealed Air believes the merger is fair to you and in your best interests and recommends that you vote "FOR" the merger proposal.

In reaching its recommendation in favor of the merger, the Sealed Air Board considered the challenges and risks associated with combining the companies and achieving the benefits anticipated from the merger, as discussed in "Certain Risk Factors" beginning on page 22.

What Sealed Air Stockholders Will Receive

If these transactions are completed, Sealed Air stockholders will receive one share of New Sealed Air common stock for each share of Sealed Air common stock that they own.

Sealed Air's Reasons for the Proposed Merger (See page 29 and 31)

Sealed Air believes the merger will:

o   offer a strategic business opportunity to bring together two leading packaging companies with Sealed Air's entrepreneurial management team;

o   combine complementary product lines to create marketing opportunities;

o   bring together innovative technologies and worldwide marketing networks and distribution channels; and

o   create opportunities for efficiencies through the integration of the two companies' operations.

Opinion of Financial Advisor (See page 39)

In deciding to approve the merger, the Sealed Air Board received and considered the opinion of Donaldson, Lufkin & Jenrette Securities Corporation, its financial advisor, as to the fairness of the consideration to be received by its stockholders from a financial point of view. The opinion is attached as Annex C to this Joint Proxy Statement/Prospectus. We encourage you to read the opinion.

-------------------------------

Considerations for Grace Stockholders

The Grace stockholders will be asked:

o   to approve the merger agreement (which will constitute approval of the spin-off, certain charter amendments, the recapitalization of the Grace common stock and the issuance of shares in the merger); and

o   to approve a charter amendment to repeal certain provisions requiring supermajority stockholder approval (see below).

The favorable vote of a majority of the outstanding shares of Grace common stock is required to approve the reorganization and merger. The favorable vote of 80% of the outstanding shares of Grace common stock is required to approve the repeal of the charter provisions requiring supermajority approval.

Recommendation to Grace Stockholders

The Board of Directors of Grace believes the reorganization and merger are fair to you and in your best interests and recommends that you vote "FOR" the proposal to approve the reorganization and merger. As agreed with Sealed Air, the Board recommends that you vote "FOR" the proposal to repeal the charter provisions requiring supermajority approval.

In reaching its recommendation in favor of the proposed transactions, the Grace Board considered the challenges and risks associated with combining the companies and achieving the benefits anticipated from the reorganization and

To protect the tax-free treatment of the reorganization and merger under U.S. federal income tax laws, Sealed Air and Grace have agreed to certain restrictions on New Sealed Air. For two years after the merger:

o    New Sealed Air and its affiliates may not repurchase 20% or more of New Sealed Air's equity securities (subject to certain additional limitations).

o    New Sealed Air and its affiliates may not issue or sell equity securities of New Sealed Air or Grace Packaging, and they may not solicit, support or participate in any tender offer for New Sealed Air equity securities, or approve or permit any business combination or other transaction that (alone or together with the merger) will result in one or more persons obtaining a 50% or greater interest in New Sealed Air.

o    New Sealed Air must continue to operate Grace Packaging's business and may not sell or otherwise dispose of more than 60% of Grace Packaging's assets except in the ordinary course of business.

o    The subsidiaries engaged in Grace Packaging's business may not voluntarily dissolve, liquidate, merge, consolidate or reorganize, subject to certain exceptions.

New Grace will be subject to similar restrictions.

These restrictions may limit the ability of New Sealed Air and New Grace to engage in certain business transactions that otherwise might be advantageous for the companies and their stockholders, and could deter potential acquisitions of control of New Grace or New Sealed Air. The restrictions are designed to protect the tax-free treatment of the reorganization for U.S. federal income tax purposes. Accordingly, New Sealed Air or New Grace may engage in a restricted transaction so long as it (i) obtains a ruling from the Internal Revenue Service ("IRS") or an opinion of tax counsel that the transaction will not adversely affect the tax-free treatment of the reorganization and (ii) indemnifies the other party against adverse tax consequences arising from the transaction. See "Certain United States Federal Income Tax Consequences" beginning on page 34 and "Relationship Between New Sealed Air and New Grace After the Reorganization and Merger--Tax Sharing Agreement" beginning on page 78, 78.

Liabilities of New Grace, Fraudulent Transfer and Related Considerations

Grace's primary U.S. operating subsidiary has significant liabilities relating to previously sold asbestos-containing products. As a result, Grace and the subsidiary are currently defendants in numerous asbestos-related lawsuits and are likely to be named as defendants in additional lawsuits in the future. At September 30, 1997, the liability recorded on Grace's books with respect to the defense and disposition of asbestos-related lawsuits and claims was $910.5 million, including a current liability of $135.0 million. In addition, at September 30, 1997, Grace had recorded a receivable of $295.4 million, reflecting amounts that Grace believes will ultimately be recovered from insurance carriers with respect to its asbestos-related lawsuits and claims. Grace and its subsidiaries also have substantial environmental and other liabilities.

After the merger and related transactions, New Grace will be responsible for all of the asbestos-related liabilities, substantially all of the environmental liabilities (other than certain liabilities relating to Grace Packaging) and other liabilities of Grace and its subsidiaries that are

unrelated to Grace Packaging. Based on currently available information and advice provided by their respective financial, legal and other advisors, Sealed Air and Grace believe that New Grace will be able to satisfy its liabilities as they become due. Nevertheless, claimants might seek to hold New Sealed Air liable for obligations of New Grace. New Grace has agreed to indemnify New Sealed Air for liabilities and costs that New Sealed Air may incur relating to New Grace's liabilities; however, New Grace may not be able to fulfill its indemnity obligations to New Sealed Air.

Claimants may also bring suit seeking recovery from New Sealed Air or its subsidiaries by claiming that the transfers of assets and liabilities in connection with the reorganization of Grace, including the separation of Grace's packaging and specialty chemicals businesses and the cash transfer to and spin-off of New Grace, were "fraudulent transfers". A transfer would be a fraudulent transfer if the transferor received less than reasonably equivalent value and the transferor was insolvent at the time of the transfer, was rendered insolvent by the transfer or was left with unreasonably small capital to engage in its business. A transfer may also be a fraudulent transfer if it was made to hinder, delay or defraud creditors. If any transfers in connection with the reorganization of Grace are found to be fraudulent transfers, the recipient (including New Sealed Air and its subsidiaries) might be required to return the property to the transferor. Similar consequences would result if a court were to find that any transfers were made in violation of laws restricting dividends.

Sealed Air and Grace believe that Grace, New Grace and their subsidiaries are adequately capitalized and will be adequately capitalized after the reorganization, and that none of the transfers contemplated to occur in the reorganization is a fraudulent transfer. Sealed Air and Grace also believe that the reorganization of Grace and the spin-off of New Grace will comply with applicable dividend laws. However, a court applying the relevant legal standards may not reach the same conclusions.

More information regarding Grace's asbestos and other liabilities is included in Grace's filings with the Securities and Exchange Commission ("SEC"). See "Where You Can Find More Information" on page 100 and the New Grace Information Statement.

No Prior Market for New Sealed Air Stock

There is no current public trading market for New Sealed Air common and convertible preferred stock. New Sealed Air will apply to list its common and convertible preferred stock on the New York Stock Exchange, and we expect "when-issued" trading in New Sealed Air common and convertible preferred stock to develop before the merger is consummated. This means that shares can be traded before the share certificates are issued, and before the actual numbers of shares to be issued in the reorganization and merger are determined.

We cannot predict the prices at which New Sealed Air common and convertible preferred stock may trade, either before the merger on a "when-issued" basis or after the merger. Such trading prices will be determined by the marketplace and may be influenced by many factors, including the depth and liquidity of the market for such shares, investor perceptions of New Sealed Air and the industries in which it participates, New Sealed Air's dividend policy and general economic and market conditions. Until an orderly market develops, the trading prices for these shares may fluctuate significantly.

The New Sealed Air common and convertible preferred stock will be freely transferable, except for shares received by Sealed Air or Grace "affiliates", as that term is defined under the Securities Act of 1933, as amended (the "Securities Act"). See "The Reorganization and Merger--Federal

relevant management and board of directors regarding the structure and terms of the Reorganization and Merger and the negotiation of the Transaction Agreements.

In deciding to approve the Reorganization and Merger, the Sealed Air and Grace Boards considered opinions from their respective financial advisors as to the fairness of the Reorganization and Merger to their respective stockholders from a financial point of view.

Opinion of Sealed Air Financial Advisor

Sealed Air asked DLJ, in its role as financial advisor to Sealed Air, to render an opinion to the Sealed Air Board as to the fairness to Sealed Air stockholders, from a financial point of view, of the Exchange Ratio, pursuant to which Sealed Air stockholders would receive one share of New Sealed Air common stock for each share of Sealed Air common stock.

On August 14, 1997, DLJ rendered its written opinion to the effect that, as of such date, based upon and subject to the assumptions, limitations and qualifications set forth in the DLJ Opinion, the Exchange Ratio was fair to Sealed Air stockholders from a financial point of view.

The full text of the DLJ Opinion is attached hereto as Annex C. The summary of the DLJ Opinion set forth in this Joint Proxy Statement/Prospectus is qualified in its entirety by reference to the full text of the opinion of DLJ. Sealed Air stockholders are urged to read the DLJ Opinion carefully and in its entirety for the procedures followed, assumptions made, other matters considered and limits of the review by DLJ in connection with such opinion.

The DLJ Opinion was prepared for the Sealed Air Board and was directed only to the fairness from a financial point of view, as of the date thereof, of the Exchange Ratio to Sealed Air stockholders. DLJ expressed no opinion in the DLJ Opinion as to the prices at which New Sealed Air's securities would actually trade at any time. The DLJ Opinion does not constitute a recommendation to any stockholder of Sealed Air as to how such holder should vote on the Merger at the Sealed Air Special Meeting.

Sealed Air selected DLJ to act as its financial advisor because of DLJ's familiarity with Sealed Air and its qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as its reputation as a nationally recognized investment banking firm engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, leveraged buy-outs and valuations for corporate and other purposes. Sealed Air did not impose any restrictions or limitations upon DLJ with respect to the investigations made or the procedures followed by DLJ in rendering the DLJ Opinion.

In arriving at the DLJ Opinion, DLJ reviewed the Merger Agreement and the Distribution Agreement. DLJ also reviewed financial and other information that was publicly available or furnished to DLJ by Sealed Air and Grace, including information provided during discussions with their respective managements. Included in the information provided during such discussions were certain financial analyses and projections of Grace Packaging and New Grace prepared by the management of Grace and certain financial analyses and projections of Sealed Air and New Sealed Air prepared by the management of Sealed Air. These projections were substantially similar to then publicly available estimates of research analysts with respect to the future financial performance of each company. In addition, DLJ compared certain financial data of Sealed Air and Grace Packaging, under certain assumptions, with publicly

available information concerning various other companies whose securities are traded in public markets, reviewed the historical stock prices and trading volumes of Grace common stock and Sealed Air common stock, reviewed prices and premiums paid in certain other business combinations and conducted such other financial studies, analyses and investigations as DLJ deemed appropriate for purposes of rendering the DLJ Opinion.

In rendering the DLJ Opinion, DLJ relied upon and assumed the accuracy and completeness of all of the financial and other information that was available to it from public sources, that was provided to it by Sealed Air, Grace, their respective managements or other representatives, or that was otherwise reviewed by DLJ. In particular, DLJ relied upon the estimates of management of Sealed Air of the operating efficiencies (the "Synergies") that might be achievable as a result of the Merger (annual increases in EBITDA ranging from approximately $20 million to $100 million in later years) and upon DLJ's discussions of such Synergies with the management of Grace. In supplying information regarding possible operating efficiencies to DLJ, the managements of Sealed Air and Grace advised DLJ that estimates regarding operating efficiencies were necessarily based on incomplete information and subject to significant risks and uncertainties. Accordingly, DLJ performed certain analyses assuming that Synergies would be realized, and certain other analyses assuming that Synergies would not be realized. With respect to the financial analyses and projections supplied to DLJ, DLJ assumed that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the managements of Sealed Air and Grace as to the future operating and financial performance of Sealed Air, Grace Packaging and New Sealed Air. DLJ did not assume responsibility for making any independent evaluation of the assets, liabilities or contingent liabilities of Sealed Air, New Sealed Air, Grace or New Grace, or for making any independent verification of the information reviewed by DLJ. DLJ relied as to certain legal matters on advice of Grace's special counsel and Sealed Air's special counsel, including that the transactions contemplated under the Distribution Agreement would qualify as tax-free transactions under the Code and that the Merger will be tax-free under the Code to Grace, Sealed Air and their respective stockholders.

The DLJ Opinion was necessarily based on economic, market, financial and other conditions as they existed on, and on the information made available to it as of, the date of the DLJ Opinion. The DLJ Opinion states that, although subsequent developments may affect the DLJ Opinion, DLJ does not have any obligation to update, revise or reaffirm its opinion. DLJ did not express any opinion regarding the financial impact of Grace's contingent liabilities on New Grace or New Sealed Air, and was not requested to and did not express any opinion in the DLJ Opinion regarding the financial impact of Grace's contingent liabilities on New Grace and New Sealed Air.

The following is a summary of the presentation made by DLJ to the Sealed Air Board at its August 14, 1997 meeting in connection with the DLJ Opinion. For purposes of the presentation and opinion, DLJ analyzed Grace Packaging as if the Spin-off and Cash Transfer, but not the Merger, had occurred.

Comparable Company Analyses. DLJ compared selected historical and projected operating information and financial ratios for Grace Packaging to selected historical and projected operating information, stock market data and financial ratios for certain publicly traded specialty packaging and specialty chemicals companies, the two market segments with which Sealed Air is usually compared by the investment community. The specialty packaging companies were Sealed Air, Bemis Company, Inc., Sealright Co., Inc. and Sonoco Products Company (collectively, the "Specialty Packaging Comparable Companies"). The specialty chemicals companies were Avery Dennison

provide a different perspective on the transaction and to add to the total mix
of information available. DLJ did not form a conclusion as to whether any
individual analysis, considered in isolation, supported or failed to support an
opinion as to fairness from a financial point of view. Rather, in reaching its
conclusion, DLJ considered the results of the analyses in light of each other
and ultimately reached its opinion based on the results of all analyses taken as
a whole. Accordingly, notwithstanding the separate factors summarized above, DLJ
has indicated to Sealed Air that it believes that its analyses must be
considered as a whole and that selecting portions of its analyses and the
factors considered by it, without considering all analyses and factors, could
create an incomplete view of the evaluation process underlying its opinion. In
performing its analysis, DLJ made numerous assumptions with respect to industry
performance, business and economic conditions and other matters. The analyses
performed by DLJ are not necessarily indicative of actual values or future
results, which may be significantly more or less favorable than suggested by
such analyses.

        Pursuant to the terms of an engagement agreement dated August 14,
1997, Sealed Air (i) has paid DLJ a fee of $3,750,000 ($2,000,000 of which was
payable on account of past financial advisory services unrelated to the
Reorganization and Merger rendered by DLJ to Sealed Air) and (ii) will pay an
additional $11,250,000, payable upon consummation of the Merger. Sealed Air has
also agreed that if the Merger or similar transaction is not consummated and
Sealed Air receives a $150 million termination fee, Sealed Air will pay DLJ
$7,500,000 (in addition to the $3,750,000 fee already paid) in cash upon Sealed
Air's receipt of the termination fee, provided that, if the termination fee is
less than $150 million, DLJ's compensation shall be proportionately reduced. In
addition, Sealed Air agreed to reimburse DLJ, upon request by DLJ from time to
time, for all out-of-pocket expenses (including the reasonable fees and expenses
of counsel) incurred by DLJ in connection with its engagement thereunder and to
indemnify DLJ and certain related persons against certain liabilities in
connection with its engagement, including liabilities under U.S. federal
securities laws. DLJ and Sealed Air negotiated the terms of the fee arrangement,
and the Sealed Air Board was aware of such arrangement, including the fact that
a significant portion of the aggregate fee payable to DLJ is contingent upon
consummation of the Merger. DLJ believes that the terms of this fee arrangement
are customary in transactions of this nature.

        In the ordinary course of business, DLJ and its affiliates may
own or actively trade the securities of Sealed Air and Grace for their own
accounts and for the accounts of their customers and, accordingly, may at any
time hold a long or short position in Sealed Air or Grace securities. See
"Security Ownership of Certain Beneficial Owners" on page 87 for a description
of the security ownership of The Equitable Companies, an affiliate of DLJ. DLJ,
as part of its investment banking services, is regularly engaged in the
valuation of businesses and securities in connection with mergers, acquisitions,
underwritings, sales and distributions of listed and unlisted securities,
private placements and valuations for corporate and other purposes. DLJ has
performed investment banking and other services in the past for Sealed Air
(including delivery of a fairness opinion for Sealed Air in connection with the
$57 million acquisition of Trigon Industries in 1995) and for Grace (including
acting as advisor to Grace in the sale of its remaining interest in The
Restaurant Enterprises Group, Inc. in 1994). In addition, in 1996 DLJ was lead
manager in a $360 million high-yield offering for Fresenius Medical Care AG.
(Fresenius Medical Care AG is the parent company of a predecessor of Grace, but
has always been unrelated to Grace.) DLJ has received usual and customary
compensation for its past services for Sealed Air, Grace, and Fresenius Medical
Care AG.

Opinions of Grace Financial Advisors

Credit Suisse First Boston and Merrill Lynch were retained to act as the Grace Financial Advisors in connection with the Reorganization and Merger. The Grace Financial Advisors were selected by Grace because of their familiarity with Grace and Sealed Air and their respective businesses and their qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as their reputations as internationally recognized investment banking firms. Each of the Grace Financial Advisors has consented to the reprinting of its fairness opinion and the summary of such firm's activities included herein.

At the request of the Grace Board, each of the Grace Financial Advisors delivered a written opinion to the Grace Board on August 14, 1997 to the effect that, as of such date, and based upon the assumptions made, general procedures followed, factors considered and limitations on the review undertaken as set forth in such opinions, the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, were fair, from a financial point of view, to the holders of Grace common stock. In preparing these opinions, these firms performed a variety of financial and comparative analyses and made a detailed presentation to the Grace Board with respect to the Reorganization and Merger. The Grace Board, in accepting the opinions of the Grace Financial Advisors, was aware that the Grace Financial Advisors relied upon certain financial information, projections and other information provided by Grace's management and that the opinions of such firms relied, in part, on certain assumptions and were subject to certain limitations. While the Grace Board did not perform an independent review of the financial information, projections and other information provided to the Grace Financial Advisors, the Grace Financial Advisors and management did review certain financial information and projections with the Grace Board. The Grace Board relied on the Grace Financial Advisors, whom it considered to be experts in such matters, to select appropriate methodologies to determine fairness. No updates of such opinions have been requested because such opinions were provided solely in connection with the decisions of the Grace Board taken on August 14, 1997.

The full texts of the written opinions of Credit Suisse First Boston and Merrill Lynch, which set forth the assumptions made, general procedures followed, factors considered and limitations on the review undertaken by Credit Suisse First Boston and Merrill Lynch in rendering their opinions, are set forth in Annex D to this Joint Proxy Statement/Prospectus and are incorporated herein by reference. The opinions of Credit Suisse First Boston and Merrill Lynch are directed only to the fairness from a financial point of view, as of the date thereof, of the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, to the holders of Grace's existing common stock and do not address the merits of the underlying decision by Grace to engage in the Reorganization and Merger and do not constitute a recommendation to any stockholder of Grace as to how such stockholder should vote on any proposal related to the Reorganization and Merger. The summary of the opinions of Credit Suisse First Boston and Merrill Lynch set forth in this Joint Proxy Statement/Prospectus are qualified in their entirety by reference to the full text of the opinions of Credit Suisse First Boston and Merrill Lynch. Holders of shares of Grace common stock are urged to, and should, read the opinions of Credit Suisse First Boston and Merrill Lynch in their entirety.

Opinion of Credit Suisse First Boston. In arriving at its opinion, Credit Suisse First Boston reviewed certain publicly available business and financial information relating to Grace and Sealed Air, as well as the Merger Agreement, the Distribution Agreement and the forms of related agreements attached as exhibits thereto. Credit Suisse First Boston also reviewed certain other information, including financial forecasts and certain information with respect to potential operating efficiencies which may result from the Merger,

ZONOLITE
Service List - 02/16/01
Page 2


COUNSEL FOR DEFENDANTS (cont'd)

** Rocco Treppiedi
   PERKINS COIE LLP
   221 N. Wall Street, Suite 600
   Spokane, WA  99201
      509/624-2212
      509/458-3399 (fax)

** Donald G. Stone
   David L. Broom
   Curtis L. Shoemaker
   PAINE, HAMBLEN, COFFIN, BROOKE
    & MILLER LLP
   717 West Sprague Avenue, Suite 1200
   Spokane, WA  99201-3505
      509/455-6000
      509/838-0007 (fax)

* Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.      That on February 21, 2001, declarant served the NOTICE OF DEPOSITION OF DEFENDANTS W.R. GRACE & COMPANY – CONN. (A CONNECTICUT CORPORATION) AND W.R. GRACE & COMPANY (A DELAWARE CORPORATION) PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6) by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 21st day of February, 2001, at San Diego, California.

June P. Ito

ZONOLITE
Service List - 02/16/01
Page 1

COUNSEL FOR PLAINTIFF(S)

Mark C. Goldenberg
Elizabeth V. Heller
HOPKINS GOLDENBERG, P.C.
2227 South State Route 157
Edwardsville, IL 62025
    618/656-5150
    618/656-6230 (fax)

John J. Stoia, Jr.
Timothy G. Blood
JoBeth Halper
MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
    619/231-1058
    619/231-7423 (fax)

Christopher A. Seeger
David R. Buchanan
Amy P. Albert
SEEGER WEISS LLP
One William Street
New York, NY 10004-2502
    212/584-0700
    212/584-0799 (fax)

COUNSEL FOR DEFENDANTS

* Deborah G. Solmor
  SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
  333 West Wacker Drive, Suite 2100
  Chicago, IL 60606-1285
    312/407-0700
    312/407-0411 (fax)

* Douglas King
  James H. Ferrick, III
  BRYAN CAVE LLP
  211 North Broadway, Suite 3600
  St. Louis, MO 63102-2750
    314/259-2000
    314/259-2020 (fax)

* Sheila L. Birnbaum
  Bert L. Wolff
  Arthur H. Aizley
  SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
  4 Times Square
  New York, NY 10036
    212/735-3000
    212/735-2000 (fax)

** V.L. Woolston, Jr.
   Thomas L. Boeder
   PERKINS COIE LLP
   1201 Third Avenue, Suite 4800
   Seattle, WA 98101-3099
    206/583-8888
    206/583-8500 (fax)

 * Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

ZONOLITE
Service List - 02/16/01
Page 2


COUNSEL FOR DEFENDANTS (cont'd)

** Rocco Treppiedi
   PERKINS COIE LLP
   221 N. Wall Street, Suite 600
   Spokane, WA  99201
     509/624-2212
     509/458-3399 (fax)

** Donald G. Stone
   David L. Broom
   Curtis L. Shoemaker
   PAINE, HAMBLEN, COFFIN, BROOKE
     & MILLER LLP
   717 West Sprague Avenue, Suite 1200
   Spokane, WA  99201-3505
     509/455-6000
     509/838-0007 (fax)


 * Denotes service via Federal Express Next Day Delivery
** Denotes service via Facsimile and Federal Express Next Day Delivery

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re ZONOLITE ATTIC INSULATION PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL Docket No. 1376 <br> The Honorable Patti B. Saris, Presiding |

| | |
|---|---|
| In re ZONOLITE ATTIC INSULATION PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1376 |
|  | The Honorable Patti B. Saris, Presiding |
| This Document Relates To: |  |
|   ALL ACTIONS. |  |
| BARBANTI, | Superior Court, State of Washington County of Spokane |
|        Plaintiff, | No. 00-2-01756-6 |
| v. | PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS |
| W.R. GRACE & COMPANY-CONN, et al. | W.R. GRACE & COMPANY - CONN. (A CONNECTICUT CORPORATION) AND |
|        Defendants. | W.R. GRACE & COMPANY (A DELAWARE CORPORATION) |

TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff requests that defendants, W.R. Grace & Company - Conn. (a Connecticut corporation) and W.R. Grace & Company (a Delaware corporation) respond to the following Interrogatories, in writing and under oath within 30 days from the date of service.

**I.    DEFINITIONS**

The following definitions shall apply to each of the Interrogatories and are deemed to be incorporated in each:

1.    "Grace Defendants" means W.R. Grace & Company (a Delaware corporation) and W.R. Grace & Company-Conn. (a Connecticut company) (defined below).

2.    "Grace Companies" means the "Grace Defendants," their predecessors, subsidiaries and affiliates, including, but not limited to, Grace Speciality Chemical, Inc., W.R. Grace & Company (a New York corporation), Grace Holdings, Inc., the Zonolite Company, and Cryovac, and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

3.    "Grace-Conn." means W.R. Grace & Company - Conn. (a Connecticut company) and shall include the Grace Companies' specialty chemical business as it existed after the "reorganization", and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person purporting to act on their behalf.

4.    "Sealed Air" shall mean defendant Sealed Air Corporation, its subsidiaries and affiliated entities and any of their directors, officers, agents (including attorneys, accountants, consultants, investment advisors or bankers), employees, representatives and any other person or entity purporting to act on their behalf.

5.    "Reorganization" means the transaction in which the Grace Companies' specialty chemical business was "separated from its packaging business, the packaging business was contributed to one group of wholly owned subsidiaries ("Cryovac") and the specialty chemicals

- 1 -

business was contributed to another group of wholly owned subsidiaries ("Grace-Conn.")," as defined on page 1 of Sealed Air's 1998 10-K. (Relevant portions attached as Ex. A.)

6.    "Recapitalization" refers to the "recapitalization" as defined on page 1 of Sealed Air's 1998 10-K. (Ex. A.)

7.    "Merger" refers to the merger between the Grace Companies' packaging business and Sealed Air as defined on page 1 of Sealed Air's 1998 10-K. (Ex. A.)

8.    "Coordination of benefits" means an arrangements, contractual or otherwise, to discourage multiple payments from the different insurers or under different policies on the same claim.

9.    "Excess insurance" refers to coverage beyond the primary amount of insurance which becomes effective when the primary insurance is exhausted.

10.    "Primary" insurance means that insurance that is not conditioned on any other insurance coverage.

11.    "Reinsurance" means insurance brought by an insurance company for its own protection whereby an insurer reduces its possible maximum loss on a risk by giving a portion of its liability to another insurer, *i.e.*, the reinsurer.

12.    "Including" shall mean "including, but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction, not to limit the request, definition or instruction.

13.    "And" shall mean and/or.

14.    "Or" shall mean and/or.

15.    "Refer," "referring," "discuss," "discussing," "concern," and "concerning" all mean documents which explicitly or implicitly, in whole or in part, compare, were received in conjunction with, or were generated as a result of the subject matter of the request, including all documents which reflect, record, specify, memorialize, relate, describe, consider, concern, constitute, embody, evaluate, analyze, review, report on, comment on, impinge upon or impact the subject matter of the request.

- 2 -

## II.    INTERROGATORIES

INTERROGATORY NO. 1:

For each year from 1963 to 2001, identify all insurance carriers – primary, excess, and reinsurers – that bore the risk of Zonolite's activities or the Grace Companies' liability arising out of the reorganization, recapitalization or merger or arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing Zonolite and other asbestos products.

INTERROGATORY NO. 2:

Describe all layers of insurance coverage for the Grace Companies' liability arising out of the reorganization, recapitalization or merger or arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing of Zonolite and other asbestos products each year from 1963 to 2001 provided by the insurance carriers identified in response to Interrogatory No. 1, including the aggregate amount of such coverage borne by each insurer.

INTERROGATORY NO. 3:

Identify any indemnity agreements, agreements to assume liability, agreements to assume the defense and joint defense agreements entered into by the Grace Companies or its insurers and any other entities that may be financially affected by any of the claims asserted in this litigation by providing the date, parties and duration of such agreements.

INTERROGATORY NO. 4:

With regard to each insurer identified in response to Interrogatory Nos. 1 and 2, identify each policy or contract of insurance covering the Grace Companies' liability including: (a) the date of the policy; (b) the names of all insured; (c) the kinds of events, incidents or conditions covered; (d) the kinds of losses covered, *e.g.*, bodily injury, property damage; whether the coverage was "claims made coverage" or "occurrence coverage"; (f) the commencement and termination dates of such coverage; (g) the aggregate and individual coverage limits (per claim, per incident, or per policy period); and the coordination of benefits provisions of each.

- 3 -

INTERROGATORY NO. 5:

For each insurer and policy identified in response to Interrogatory No. 4, for each year since 1963, please state the total dollar amount of payments made under each policy.

INTERROGATORY NO. 6:

For each insurer and each policy identified in response to Interrogatory No. 4, for each year since 1963, describe all claims made under each policy by or against the Grace Companies, the insured party, the amount of money and form of payment made to or on behalf of the Grace Companies by the insurer on such claims.

INTERROGATORY NO. 7:

If the Grace Companies has entered into any contracts, settlements, releases, commutations or other agreements (defined collectively for the purpose of this interrogatory as "agreement") with its primary or excess insurers or reinsurers which released any such insurer, in whole or in part, from its obligation or potential obligation to provide coverage under one of the policies identified in response to Interrogatory No. 4, describe each such agreement, including the name of the insurer, policy number, amount of potential coverage released, policy term, and consideration received by the Grace Companies in exchange for the agreement.

INTERROGATORY NO. 8:

Identify by name, company name and last known business address and telephone number, all insurance brokers, agents and consultants who, from 1963 to the present have advised the Grace Companies regarding its liability exposures, insurance policies and risk management practices for its activities related to the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing Zonolite and other asbestos products.

INTERROGATORY NO. 9:

If, in any year from 1963 to the present, the Grace Companies retained, self-insured or co-insured for any amount of risk of liability for its activities related to the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing Zonolite and other asbestos products, then for each such year identify the amount of the risk retained, self-insured or

co-insured, and the amounts paid by the Grace Companies as a result of its retained, self-insured or co-insured risk.

INTERROGATORY NO. 10:

For the period of 1963 to the date of your response, identify each judicial or administrative proceeding, action or litigation between the Grace Companies and any insurer identified in the response to Interrogatory No. 4 related to the Grace Companies' insurance coverage for claims arising out of the mining, manufacturing, fabricating, advertising, marketing, selling, distributing, transporting or installing Zonolite and other asbestos products by providing the name of the court, agency, date of filing, case number, parties, and a description of the nature of the dispute, and, if no longer pending, a description of the outcome of the proceeding or litigation and the date it was finally resolved.

DATED: February 21, 2001

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
JOBETH HALPER
THOMAS R. MERRICK
JENNIFER TEMPLETON SCHIRMER


_____
TIMOTHY G. BLOOD

600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

NESS, MOTLEY, LOADHOLT,
  RICHARDSON & POOLE
EDWARD J. WESTBROOK
ROBERT M. TURKEWITZ
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
ELIZABETH J. CABRASER
FABRICE N. VINCENT
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  415/956-1000
415/956-1008 (fax)

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
THOMAS SOBOL
JAN R. SCHLICHTMANN
214 Union Wharf
Boston, MA  02109
Telephone:  617/720-5000
617/720-5015 (fax)

GILMAN AND PASTOR, LLP
DAVID PASTOR
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:  781/231-7850
781/231-7840 (fax)

Plaintiffs' Executive Committee Members

N:\CASES\Zonolite\JPI80594.rog

EXHIBIT A

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Wcz3CDN9y6G4MOFMjNF2CQ+Nb4fe+FGzfMFaN7LlY0uJ2V4VmVQsmtbBugvVTgrl
 u4QoedFlMj3SX6EK/97n3A==

<SEC-DOCUMENT>0000930413-99-000449.txt : 19990331
<SEC-HEADER>0000930413-99-000449.hdr.sgml : 19990331
ACCESSION NUMBER:               0000930413-99-000449
CONFORMED SUBMISSION TYPE:      10-K
PUBLIC DOCUMENT COUNT:          7
CONFORMED PERIOD OF REPORT:     19981231
FILED AS OF DATE:               19990330

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:              SEALED AIR CORP/DE
                CENTRAL INDEX KEY:                   0001012100
                STANDARD INDUSTRIAL CLASSIFICATION:  UNSUPPORTED PLASTICS FILM &
                IRS NUMBER:                          650654331
                STATE OF INCORPORATION:              DE
                FISCAL YEAR END:                     1231

        FILING VALUES:
                FORM TYPE:              10-K
                SEC ACT:
                SEC FILE NUMBER:        001-12139
                FILM NUMBER:            99577149

        BUSINESS ADDRESS:
                STREET 1:               PARK 80 EAST
                CITY:                   SADDLE BROOK
                STATE:                  NJ
                ZIP:                    07663
                BUSINESS PHONE:         2017917600

        MAIL ADDRESS:
                STREET 1:               PARK 80 EAST
                CITY:                   SADDLE BROOK
                STATE:                  NJ
                ZIP:                    07663

        FORMER COMPANY:
                FORMER CONFORMED NAME:  WR GRACE & CO/DE
                DATE OF NAME CHANGE:    19961015

        FORMER COMPANY:
                FORMER CONFORMED NAME:  GRACE HOLDING INC
                DATE OF NAME CHANGE:    19960805
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>10-K
<TEXT>
```

# EXHIBIT A

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
-----------------------
FORM 10-K

(Mark one)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
      EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 1998

OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
      EXCHANGE ACT OF 1934 For the transition period from _____ to _____

Commission File Number 1-12139

SEALED AIR CORPORATION
(Exact name of registrant as specified in its charter)

State or other jurisdiction of incorporation or organization: Delaware
Address of principal executive offices: Park 80 East, Saddle Brook,
 New Jersey 07663-5291
I.R.S. Employer Identification Number: 65-0654331
Registrant's telephone number, including area code: (201) 791-7600
Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, par value $0.10 per share | New York Stock Exchange, Inc. |
| Series A Convertible Preferred Stock, par value $0.10 per share | New York Stock Exchange, Inc. |

Securities registered pursuant to Section 12(g) of the Act:   None

        Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes X No ___

        Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

        The aggregate market value of the registrant's Common Stock held by
non-affiliates of the registrant on March 24, 1999 was approximately
$3,921,000,000.

        The number of outstanding shares of the registrant's Common Stock as of
March 24, 1999 was 83,486,552.

        DOCUMENTS INCORPORATED BY REFERENCE: Portions of the registrant's 1998
Annual Report to Stockholders are incorporated by reference into Parts I and II
of this Form 10-K. Portions of the registrant's definitive proxy statement for
its 1999 Annual Meeting of Stockholders are incorporated by reference into Part
III of this Form 10-K.

<PAGE>

PART I

ITEM 1.  BUSINESS

          Sealed Air Corporation (together with its subsidiaries, the
"Company") is engaged in the manufacture and sale of a wide range of protective,
food and specialty packaging materials and systems throughout the world.

          On March 31, 1998, the Company (formerly known as W. R. Grace
& Co.) and Sealed Air Corporation (US), a Delaware corporation formerly known as
Sealed Air Corporation ("old Sealed Air"), completed a series of transactions as
a result of which:

          (a) The specialty chemicals business of the Company was
     separated from its packaging business, the packaging business
     ("Cryovac") was contributed to one group of wholly owned subsidiaries,
     and the specialty chemicals business was contributed to another group
     of wholly owned subsidiaries ("New Grace"); the Company and Cryovac
     borrowed approximately $1.26 billion under two new revolving credit
     agreements and transferred substantially all of those funds to New
     Grace; and the Company distributed all of the outstanding shares of
     common stock of New Grace to its stockholders. As a result, New Grace
     became a separate publicly owned company that is unrelated to the
     Company. These transactions are referred to below as the
     "Reorganization."

          (b) The Company recapitalized its outstanding shares of common
     stock, par value $0.01 per share, into a new common stock and Series A
     convertible preferred stock, each with a par value of $0.10 per share
     (the "Recapitalization").

          (c) A subsidiary of the Company merged into old Sealed Air
     (the "Merger"), with old Sealed Air being the surviving corporation. As
     a result of the Merger, old Sealed Air became a subsidiary of the
     Company, and the Company was renamed Sealed Air Corporation.

References to "Grace" in this Annual Report on Form 10-K refer to the Company
before the Reorganization, the Recapitalization and the Merger.

SEGMENTS

          The Company operates in two reportable business segments: (i)
food and specialty packaging products and (ii) protective packaging products,
described more fully below. Information concerning the Company's reportable
segments appears in Note 3 of the Notes to Consolidated Financial Statements in
Item 8 of this Annual Report on Form 10-K, which Note is incorporated herein by
reference.

                                    2

<PAGE>

FOOD AND SPECIALTY PACKAGING PRODUCTS

          The Company's principal food and specialty packaging products

are its flexible materials and related products, comprising principally shrink
bag and film products, non-shrink laminates and specialty packaging systems
marketed primarily under the Cryovac (R) trademark for a broad range of
perishable food applications. This segment also includes the Company's rigid
packaging and absorbent pads, principally absorbent pads used for the retail
packaging of meat, fish and poultry, foam trays used by supermarkets and food
processors, and rigid plastic containers for dairy and other food products.

FLEXIBLE MATERIALS AND RELATED SYSTEMS

              The Company produces a variety of high-performance proprietary
flexible films, bags and associated packaging equipment marketed and sold
primarily under the Cryovac (R) trademark in North America, Europe, Latin
America, South Africa and the Asia Pacific region that are used to package a
broad range of perishable foods such as fresh, smoked and processed meat
products, cheese, poultry, prepared foods (including soups and sauces for
restaurants and institutions) and produce. The Company also offers sterilized
medical bags and films for use with medical products and produce bags with
dispensing systems used by customers in supermarket produce departments.

              Cryovac (R) food packaging products include shrink bags,
shrink films sold for food packaging applications and laminated films. Shrink
bags and films are multi-layered shrinkable plastic bags and films that mold
themselves to the shape of the product. Laminates are multi-layered,
non-shrinkable plastic materials used to package perishable foods and
shelf-stable products such as syrups and toppings. Films and bags are sold in
barrier and permeable forms, depending on whether oxygen or other gases can pass
through the material. Offerings include modified atmosphere packaging (MAP) that
is designed to provide a controlled gas environment within a package to extend
shelf life.

              The Company's food packaging films and bags incorporate the
Company's core technologies, including proprietary film processing technology,
resin technology, and packaging and food science expertise. The Company seeks to
maintain technological leadership through a continuous program of research and
development in its core technologies.

              For processed meats and poultry, Cryovac (R) cook-in bags and
laminates withstand high cooking temperatures while retaining product shape,
clarity and weight. For fresh-cut produce, the Company produces films that
permit oxygen to pass through at various rates, thereby matching the varying
respiration rates of different vegetables and permitting longer shelf life.
During 1998, the Company introduced a new low-oxygen packaging film for use with
MAP packaging. The Company's Cryovac (R) films offer a wide variety of other
characteristics, such as anti-fog, clarity, gloss, oxygen barrier or strength,
that meet customer demands in specific food packaging applications.

                                   3

<PAGE>

              The Company's food packaging equipment offerings include:
dispensing and loading units to package foods in shrink, vacuum or vacuum skin
packages using the Company's films and bags; form, fill and seal units to
package foods in pouches made using the Company's films; and bagging systems.
Systems are marketed to the food processing industry under the Cryovac (R)
trademark and other trademarks.

RIGID PACKAGING AND ABSORBENT PADS

The Company manufactures and sells Cryovac (R) polystyrene foam trays that are used by supermarkets and by food processors to protect and display fresh meat, poultry and produce. The Company also manufactures and sells absorbent pads used for food packaging, including its Dri-Loc (R) absorbent pads. The Company's foam trays and absorbent pads are often used together. The Company's case-ready packaging customers, principally meat and poultry processors, purchase trays, pads and specially-designed films and packaging equipment to package centrally meat and poultry products prior to shipment to the supermarket. The Company also manufactures rigid plastic containers, primarily plastic tubs for dairy products such as margarine and yogurt, in Australia that are marketed under the Omicron (TM) trademark.

PROTECTIVE PACKAGING PRODUCTS

The Company's protective packaging products include its cushioning and surface protection products and certain other products. The Company's principal cushioning and surface protection products are air cellular cushioning materials, Cryovac (R) films for non-food applications, Instapak (R) polyurethane foam packaging systems, polyethylene foam sheets and planks, protective and durable mailers and bags, paper-based packaging products, suspension and retention packaging and packaging systems.

CUSHIONING AND SURFACE PROTECTION PRODUCTS

AIR CELLULAR CUSHIONING MATERIALS: The Company manufactures and markets Bubble Wrap (R) air cellular cushioning materials, which are also marketed under various other trademarks, including AirCap (R) and PolyCap (R). These materials consist of air bubbles encapsulated between two layers of plastic film, each containing a barrier layer to retard air loss, that form a pneumatic cushion to protect products from damage through shock or vibration during shipment. The Company's air cellular cushioning materials are used by a wide variety of end users, including both manufacturers and retailers.

CRYOVAC (R) FILMS FOR NON-FOOD APPLICATIONS: The Company manufactures and sells Cryovac (R) films used to shrink-wrap a wide assortment of industrial and consumer products. The Company's proprietary multi-layer films provide features such as strength and clarity. In certain regions the Company also offers shrink-wrap equipment for use with the Company's shrink films.

4

<PAGE>

INSTAPAK (R) SYSTEMS: Instapak (R) polyurethane foam packaging systems consist of proprietary blends of polyurethane chemicals and specially designed dispensing equipment. The Company also manufactures high-performance polyolefin films designed for use with Instapak (R) packaging systems.

Instapak (R) chemicals, films and equipment are marketed as integrated packaging systems to provide protective packaging for a wide variety of products, including computer, electronic, office, medical and communications equipment, compressors and motors, furniture and spare parts, and void-fill packaging of office supplies, books, cosmetics and other small products for distribution. Instapak (R) systems are also used to produce polyurethane foams used in certain non-packaging applications, including Instapak (R) Floral, a foam used as a design base for artificial flower arrangements.

POLYETHYLENE FOAMS: The Company manufactures thin polyethylene

products are sold or used, laws and regulations have been adopted or proposed
that seek to regulate, among other things, recycled or reprocessed content, sale
and disposal of packaging materials. In addition, customer demand for packaging
materials that are viewed as being "environmentally responsible" and that
minimize the generation of solid waste continues to evolve. While these issues
can be a competitive factor in the marketplace for packaging materials, the
Company maintains active programs designed to comply with these laws and
regulations, to monitor their evolution, and to meet such customer demand.

        The Company believes that its packaging materials offer
superior packaging protection, enabling customers to achieve lower package cube
and weight using the Company's packaging materials than with many alternative
packaging methods, thereby reducing the disposal of damaged products as well as
the generation of packaging waste. Because the Company offers both plastic-based
and paper-based protective packaging materials, customers can select the
protective packaging materials that they consider to best meet their performance
and cost needs and

                                    9

<PAGE>

environmental preferences. A number of the Company's protective packaging
product lines incorporate recycled or reprocessed content, and the Company
maintains ongoing efforts to add or increase recycled or reprocessed content in
many of its protective packaging product lines.

        The Company also supports its customers' interests in
eliminating waste by offering or participating in collection programs for
certain of the Company's products or product packaging and for materials used in
certain of the Company's products, and, when possible, materials collected
through these collection programs are reprocessed and either reused in the
Company's protective packaging operations or offered to other manufacturers for
use in other products.

EMPLOYEES

        At December 31, 1998, the Company had approximately 14,700
employees worldwide.

ITEM 2.  PROPERTIES

        The Company's food and specialty packaging products are
produced in 40 manufacturing facilities (15 in North America, 10 in Europe, 5 in
Latin America, 9 in the Asia Pacific region, and 1 in South Africa). Protective
packaging products are produced in 62 manufacturing facilities (29 in North
America, 18 in Europe, 4 in Latin America, and 11 in the Asia Pacific region,
including certain small converting facilities). Several of the Company's
manufacturing facilities serve both segments. The Company occupies other
facilities containing fabricating or converting operations or sales,
distribution, technical, warehouse or administrative offices at a number of
locations in the United States and in various foreign countries.

        In the United States, the Company's food and specialty
products are manufactured at facilities in California, Indiana, Iowa,
Mississippi, Missouri, New York, North Carolina, Pennsylvania, South Carolina,
and Texas. Its protective packaging products are manufactured at facilities in
California, Connecticut, Georgia, Illinois, Massachusetts, Mississippi, New
Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas and

Washington. Because of the light but voluminous nature of the Company's air cellular, polyethylene foam and protective mailer products, significant freight savings may be realized by locating manufacturing facilities for these products near markets. To realize the benefit of such savings, the Company has facilities for manufacturing these products in various locations in proximity to major markets.

        The Company owns the large majority of its manufacturing facilities, certain of which are owned subject to mortgages or similar financing arrangements. The balance of the Company's manufacturing facilities are located in leased premises. The Company's manufacturing facilities are usually located in general purpose buildings in which the Company's specialized machinery for the manufacture of one or more products is contained. The Company believes that its manufacturing facilities are well maintained, suitable for their purposes, and adequate for the Company's needs.

10

<PAGE>

ITEM 3. LEGAL PROCEEDINGS

        The Company is a party to various lawsuits and administrative and other proceedings incidental to its business, including certain federal or state governmental environmental proceedings or private environmental claims relating to the cleanup of Superfund sites or other sites. While it is often difficult to estimate potential environmental liabilities and the future impact of environmental matters, based upon the information currently available to the Company and its experience in dealing with such matters, the Company believes that its potential liability with respect to such sites is not material. The Company believes, after consulting with counsel, that the disposition of its lawsuits and other legal proceedings, including environmental matters, will not have a material effect on the Company's consolidated financial position.

        In connection with the Reorganization, the Recapitalization and the Merger, New Grace agreed to indemnify the Company against all liabilities of Grace, whether accruing or occurring before or after the merger, other than liabilities arising from or relating to Cryovac's operations. New Grace also agreed to retain certain liabilities of Cryovac and to indemnify the Company against such liabilities. The Company may remain liable with respect to certain of such liabilities if New Grace fails to fulfill its indemnity obligations to the Company. Based upon currently available information, the Company believes that future costs related to such indemnified liabilities will not have a material adverse effect on the Company's consolidated financial position.

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

        No matters were submitted to a vote of the Company's stockholders during the fourth quarter of 1998.

11

<PAGE>

EXECUTIVE OFFICERS OF THE REGISTRANT

        The information appearing in the table below sets forth the

current position or positions held by each executive officer of the Company, his or her age as of March 15, 1999, the year in which he or she first was elected to the position currently held with the Company or with old Sealed Air (as indicated in the footnote to the table), and the year in which he or she first was elected an officer of the Company or of old Sealed Air (as indicated in the footnote to the table).

    All of the Company's officers serve at the pleasure of the Board of Directors. All officers have been employed by the Company or its subsidiaries for more than five years except for Mr. Van Riper, who was elected Senior Vice President and Chief Financial Officer of the Company effective July 1, 1998. Previously Mr. Van Riper was a partner in the accounting firm of KPMG LLP, which were the independent accountants for old Sealed Air for many years prior to the Merger and have acted as the independent accountants for the Company since the Merger. There are no family relationships among any of the Company's officers or directors.

| NAME AND CURRENT POSITION | AGE AS OF MARCH 15, 1999 | FIRST ELECTED TO CURRENT POSITION | FIRST ELECTED AN OFFICER |
| --- | --- | --- | --- |
| T. J. Dermot Dunphy Chairman of the Board, Chief Executive Officer and Director | 66 | 1971 | 1971 |
| William V. Hickey President and Chief Operating Officer | 54 | 1996 | 1980 |
| J. Gary Kaenzig, Jr.* Executive Vice President | 53 | 1998 | 1995 |
| Bruce A. Cruikshank Senior Vice President | 55 | 1996 | 1990 |
| Robert A. Pesci Senior Vice President | 53 | 1997 | 1990 |
| Daniel S. Van Riper Senior Vice President and Chief Financial Officer | 58 | 1998 | 1998 |
| Jonathan B. Baker Vice President | 46 | 1994 | 1994 |
| James A. Bixby Vice President | 55 | 1990 | 1990 |
| Leonard R. Byrne* Vice President | 57 | 1998 | 1998 |

12

<PAGE>

| Mary A. Coventry Vice President | 45 | 1994 | 1994 |

```
- ------------------------------------------------------------------------------
<S>                                                 <C>                 <C>
Interest payments, net of amounts capitalized       $      47,997       $
Income tax payments                                        80,069              74,
</TABLE>
```

                                    38

<PAGE>

The consolidated statement of cash flows for the year ended December 31, 1998
excludes the following non-cash transactions that were accounted for as changes
in additional paid-in capital:
<TABLE>
<CAPTION>

<S>
     Issuance of 36,021,851 shares of Series A convertible preferred stock and 40,64
        shares of common stock in connection with the Reorganization and Recapitaliza
     Net assets acquired in the Merger in exchange for 42,624,246 shares of common s
     Liabilities assumed by the Company, net
     Liabilities retained by New Grace
</TABLE>

NOTE 16 EARNINGS PER COMMON SHARE

In calculating basic and diluted earnings per common share for 1998, 1997 and
1996, retroactive recognition has been given to the Recapitalization as if it
had occurred on January 1, 1996 in accordance with SAB No. 98. Accordingly, net
earnings have been reduced for preferred stock dividends (as if such shares had
been outstanding during each period) to arrive at earnings ascribed to common
shareholders. The weighted average number of outstanding common shares used to
calculate basic earnings per common share has been calculated on an equivalent
share basis using the weighted average number of shares of common stock
outstanding for the first quarter of 1998 and for the 1997 and 1996 periods,
adjusted to reflect the terms of the Recapitalization. The weighted average
number of common shares used to calculate diluted earnings per common share also
considers the exercise of dilutive stock options in each year and repurchased
preferred stock in 1998. Except as noted in the table below, the outstanding
preferred stock is not assumed to be converted in the calculation of diluted
earnings per common share for 1998 or 1996 because the treatment of the
preferred stock as the common stock into which it is convertible would be
anti-dilutive (i.e., would increase earnings per common share) in those years.

The following table sets forth the reconciliation of the basic and diluted
earnings per common share computations for years ended December 31, 1998, 1997
and 1996 (shares in thousands).
<TABLE>
<CAPTION>

```
                                                           1998 (a)    1997 (a
- ------------------------------------------------------------------------------
<S>                                                        <C>         <C>
Basic EPS:
NUMERATOR
Net earnings                                               $ 73,007    $173,732
Add: Excess of book value over repurchase price of preferred
        Stock                                                 1,798          --
Less: Preferred stock dividends                              53,921          --
Less: Retroactive recognition of preferred stock dividends   18,011      72,044
- ------------------------------------------------------------------------------
```

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Basic earnings per common share | $ 0.04 | $ 2.54 |

                                    39
<PAGE>

Diluted EPS:
NUMERATOR

| | | |
|---|---|---|
| Earnings ascribed to common shareholders | $ 2,873 | $101,688 |
| Add: Dividends associated with outstanding preferred stock | -- | 72,044 |
| Add: Dividends associated with preferred stock repurchased | 316 | -- |
| Less: Excess of book value over repurchase of preferred stock | 1,798 | -- |
| Earnings ascribed to common shareholders-diluted | 1,391 | 173,732 |

DENOMINATOR

| | | |
|---|---|---|
| Weighted average common shares outstanding - basic | 72,997 | 40,052 |
| Effect of assumed exercise of options | 118 | 917 |
| Effect of assumed conversion of preferred stock | -- | 31,864 |
| Weighted average of preferred stock purchased | 158 | -- |
| Weighted average common shares outstanding - diluted | 73,273 | 72,833 |
| Diluted earnings per common share | $ 0.02 | $ 2.39 |

</TABLE>

(a)  Such  earnings per common share amounts are not  necessarily  indicative of
     the results that would have occurred had Cryovac been a stand-alone company
     prior to the Reorganization, Recapitalization and the Merger.

NOTE 17 CERTAIN TRANSACTIONS WITH GRACE

CASH

Prior to the Merger,  Cryovac used Grace's centralized cash management services.
Under  such  service  arrangements,  excess  domestic  cash  was  invested,  and
disbursements were funded, centrally by Grace on behalf of Cryovac.

SHARED SERVICES AND FACILITIES

Prior to the Merger,  Grace  allocated a portion of its  domestic  and  overseas
regional  corporate  expenses to Cryovac.  These  expenses  reflected  corporate

*3/9/01  34*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE ZONOLITE ATTIC INSULATION ) PRODUCTS LIABILITY LITIGATION ) ———————————————— ) This document relates to:  ) ALL ACTIONS.  ) ———————————————— ) | MDL DOCKET NO. 1376 THE HONORABLE PATTI B. SARIS PRESIDING |
| ———————————————— BARBANTI, ) ) Plaintiff ) ) v. ) ) W.R. GRACE & COMPANY-CONN et al.) Defendant ) ———————————————— ) | SUPERIOR COURT, STATE OF WASHINGTON COUNTY OF SPOKANE |

## NOTICE OF DEPOSITION OF CUSTODIAN OF
## DEFENDANT'S RECORDS PURSUANT TO FED. R. CIV. P. 30

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, plaintiffs will take the deposition upon oral examination of the custodian of records for Custodian of Business Records at W.R. Grace & Company, a Connecticut corporation. The deposition will commence on March 19, 2001 at 9:30 am at the offices of Lieff, Cabraser, Heimann & Bernstein, LLP, 214 Union Wharf, Boston, MA 02109.

With respect to the matters designated for deposition testimony, please see Schedule A of the Subpoena Duces Tecum, attached hereto and incorporated herein, which lists applicable definitions and documents requested.

DATED:  March 9, 2001                    Respectfully,

By:_____

Thomas M. Sobol (BBO No. 471770)
Proposed Class Counsel

Elizabeth J. Cabraser
Thomas M. Sobol
Jan R. Schlichtmann
Hector D. Geribon
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
214 Union Wharf
Boston, MA  02109-1216
Telephone:  (617) 720-5000
Facsimile:  (617) 720-5015

and

Elizabeth J. Cabraser
Fabrice N. Vincent
John Low-Beer
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

By: _____

John G. Stoia, Jr.,
Plaintiffs' Executive Committee and as
Proposed Class Counsel

John J. Stoia, Jr.
Timothy G. Blood
Jobeth Halper
MILBERG WEISS BERSHAD HYNES &
LERACH LLP
600 West Broadway
1800 One America Plaza
San Diego, CA 92101-5050
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

By: _____

David Pastor,
Plaintiffs' Executive Committee and as
Proposed Class Counsel

David Pastor
Edward L. Manchur
John C. Martland
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

By: _____

    Edward J. Westbrook,
    Plaintiffs' Executive Committee and as
    Proposed Class Counsel

Edward J. Westbrook
Robert M. Turkewitz
NESS MOTLEY LOADHOLT
  RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9440

By: _____

    Darrell Scott

Darrell Scott
Michael Black
LUKINS & ANNIS, P.S.
1600 Washington Trust Financial Cntr
717 W Sprague Ave.
Spokane, WA  99201-0466
Telephone: (509) 455-9555
Facsimile: (509) 747-2323

By: ___Rich Lewis___

Richard Lewis

Richard Lewis
COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

and

Steve Toll
Tamara Driscoll
COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.
999 Third Avenue, Suite 3600
Seattle, WA 98104
Telephone: (206) 521-0080
Facsimile: (206) 521-0166

By: ___Allan Mc Carvey___

Allan McGarvey

Allan McGarvey
McGARVEY, HEBERLING, SULLIVAN
 & McGARVEY, P.C.
745 South Main
Kalispell, MT 59901
Telephone: (406) 752-5566
Facsimile: (406) 752-7124