1

1          IN THE UNITED STATES BANKRUPTCY COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                  - - -

4  In re:              :      Chapter 11
                      :

5  W.R. GRACE & CO., et al.,  :      Case No. 01-01139(JJF)
                      :

6          Debtors.       :      Jointly Administered

7                  - - -

8

9              Wilmington, Delaware

           Wednesday, April 18, 2001

10

11               11:30 a.m.

12                - - -

13

14  BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

15

16                - - -

17

18

19

20

21

22

23

24

25

1          MS. JONES:  Good morning, Your Honor.  Laura
2     Davis Jones on behalf of W.R. Grace & Company.
3          Your Honor, first let me start by thanking you
4     with your flexibility on scheduling the hearing, the status
5     hearing for today.  We played around a little bit with Your
6     Honor's calendar, and we appreciate you being flexible on
7     that.
8          Secondly, Your Honor, on behalf of all of us, we
9     do send our condolences for your loss.
10          THE COURT:  Thank you.
11          MS. JONES:  Your Honor, if we could look at the
12     agenda that we forwarded to the Court yesterday, there are
13     just a few matters we would like to cover with the Court.  If
14     I may, I would start with some introductions.
15          Your Honor, I introduce to the Court James
16     Sprayregen and David Bernick, both of the Kirkland & Ellis
17     firm.  I think there are some others that want to make some
18     introductions.
19          THE COURT:  Good morning.  Thank you, Ms. Jones.
20     This is the time.
21          MR. LASTOWSKI:  If I may, Your Honor.  Michael
22     Lastowski of Duane, Morris & Heckscher.  Here today as
23     proposed co-counsel for the Official Committee of Unsecured
24     Creditors, Mr. Robert Raskin of the New York law firm Stroock
25     & Stroock & Lavan.  He is a member in good standing of the

1  Bar of the State of New York.  And I would like to move his

2  admission for purposes of today's hearing.

3            MR. RASKIN:  Thank you, Your Honor.

4            THE COURT:  We will grant that application.

5            MR. JOSEPH:  Your Honor, may it please the Court,

6  Michael Joseph of Ferry & Joseph, proposed local counsel to

7  the Committee of Property Damage Claimants.  I would like to

8  introduce to you Scott Baena of the firm Bilzin, Sumberg,

9  Dunn, Baena, Price & Axelrod.

10           THE COURT:  Thank you, Mr. Joseph.  Good

11  morning.

12           MR. BAENA:  Good morning.

13           MR. KNIGHT:  Good morning, Your Honor.  John

14  Knight from Richards, Layton & Finger.  I am local counsel to

15  Chase Manhattan Bank.  We are the largest unsecured creditor

16  in this case and chair of the Creditors' Committee.  With me

17  today is Ms. Nancy Lazar from Davis, Polk & Wardwell of New

18  York.  I would like to orally move her admission pro hac

19  vice, and I will follow it up with the appropriate papers.

20           THE COURT:  Thank you.  Good morning, welcome.

21           MR. SCHWARTZ:  Good morning, Your Honor.  I

22  hadn't planned on doing this.  On the telephone is my

23  co-counsel for National Medical Care, Inc., David Rosenbloom

24  of McDermott, Will & Emery.  He is in good standing in the

25  State of Illinois.  And I orally move his admission.

1              THE COURT:  Thank you.  Your application is
2    granted.

3              MR. SCHWARTZ:  Thank you.

4              MR. JAMISON:  Your Honor, Bruce Jamison of
5    Prickett Jones.  I am here on behalf of various California
6    plaintiffs who have asbestos claims.  On the phone I hope is
7    Lewis LeClair of the McKool Smith firm in Dallas.  With the
8    Court's permission, I would move his admission pro hac vice
9    orally.  I will follow up with the appropriate papers.

10             THE COURT:  Thank you.  Your application will be
11   granted.

12             MR. YODER:  I may be the last one, Your Honor.
13   Good morning.  Steve Yoder from The Bayard Firm on behalf of
14   the DIP lenders, Bank of America.  Our co-counsel in the case
15   is Latham & Watkins.  We don't have anyone on the phone.  We
16   are here taking care of business today on our own.

17             THE COURT:  All right.  Thank you.

18             MR. SPRAYREGEN:  Good morning, Your Honor.  As
19   Ms. Jones introduced, I am James Sprayregen from Kirkland &
20   Ellis, counsel to the debtors.

21             Your Honor, we have a limited amount of things we
22   would like to try to cover with you this morning.  As the
23   Court knows, this case was filed on April 2nd, and ultimately
24   the reference was withdrawn to this Court.

25             On April 12, as indicated by the plethora of

1    counsel coming to the podium, there were three different
2    committees formed.   There is a commercial committee formed in
3    this case, a property damage, asbestos property damage
4    committee formed, and an asbestos bodily injury committee
5    formed.

6           Just for counting purposes, our expectation is
7    there probably will be a request in the near future, we have
8    heard, for the formation of an equity committee.  So we can
9    expect possibly one more committee to be formed in this case.

10          Your Honor, on the first day, on April 2, there
11   were a number of matters heard by Judge Newsome, a number of
12   first-day orders entered.  I don't propose to review that for
13   the Court.  I believe all the papers have been provided.
14   Unless the Court had questions concerning those, I would just
15   move on to what the open matters are.

16          With respect to that, in particular, there was an
17   adversary proceeding filed and a temporary restraining order
18   entered at that time, where it was extended through April
19   24.   That related to a number of asbestos matters.  I would
20   ask that we need to discuss some issues related to that and
21   the asbestos background, as well as scheduling.  Mr. David
22   Bernick from my firm would propose to address that.

23          THE COURT:  Thank you.

24          MR. BERNICK:  Good morning, Your Honor.  David
25   Bernick, Kirkland & Ellis, for the debtors.

1           We filed with the Court on the first day an

2    informational brief.  If the Court has the time, we would

3    urge the Court take a look at the brief.  It is really our

4    effort to try and define why it is that we are here, what it

5    is that we want to accomplish in this case.  We took some

6    time to lay it out.  We know it is long and a little bit

7    detailed.  But if the Court has the time, we would very much

8    urge that you take a chance to take a look at the brief.  It

9    sets out what we would like to accomplish in this case.

10          What I would like to do this morning, just very

11   briefly, is give you a flavor of that, then turn to one of

12   the matters at hand, which is trying to schedule a

13   preliminary injunction hearing to deal with collateral

14   litigation that is still extant in different parts of the

15   country, to talk about that just very briefly.  Those are the

16   principal points that I want to cover this morning, as well

17   as to answer any questions that Your Honor might have at this

18   time.

19          Without further ado, unless there are questions

20   you have initially, I thought I would at least give an

21   overview of some of the background of the case, if that is

22   appropriate.

23          THE COURT:  All right.

24          MR. BERNICK:  This is a debtor that has gone into

25   11 not because of any fundamental problem in its business or

1   its business operations.  The debtors, and the Grace

2   organization, is a strong, financially solvent organization.

3   Its businesses are very robust.  Obviously, this decision

4   came with a great deal of difficulty because of that fact.

5           We are basically here because of a liability

6   problem, the litigation problem.  That is asbestos.  This is

7   an asbestos case.

8           There are three historical areas where there has

9   been litigation with regard to asbestos.  This is very

10   important to what we want to do in this proceeding, is these

11   three major areas of litigation.  Basically, they arise from

12   a purchase in 1963.

13           Grace purchased a company called Zonolite in

14   1963.  The litigation that has arisen since that time that

15   ultimately brings us here falls into three principal

16   categories.  First, there was a mine called the Libby Mine,

17   in Libby, Montana.  The mine was operated -- and I have it

18   down here -- from 1963 until 1990.  Essentially, what they

19   did is they mined a mineral called vermiculite.  We will talk

20   a little bit about vermiculite a little later on.  It was a

21   vermiculite mine.

22           In the course of taking the vermiculite ore out,

23   there were asbestos-containing materials in the mining

24   process, a material called tremolite, which is a form of

25   asbestos.  Obviously, in the mining and milling and refining

1    process, there were asbestos exposures during the mining
2    operation and the refining operations.

3           Cases started to be prosecuted against the
4    company over time at a fairly low rate.  I have down here
5    about 216 cases ultimately have been pursued relating to the
6    Libby Mine.  That was one area, called the Libby litigation.

7           The second area relates to another product,
8    called Monocoat 3.  Monocoat 3 was an insulation product that
9    was used in largely commercial structures.  It's the
10   insulation that was used on the steel structural beams.  It
11   went on wet and it was cementatious.  It wasn't a dry mix
12   kind of application.  So it went on wet around the beams.

13          The second area of the litigation concerned this
14   product.  And that was property damage claims.  Grace has
15   faced property damage claims for a number of years.  Very
16   substantial litigation, largely over.  Today, there are only
17   seven cases, property damage cases, that are pending.  There
18   have been upwards of a total of 370 cases that have been
19   filed involving literally thousands of buildings.  But the
20   litigation largely has run its course.  It's been extensive.
21   There have been extensive settlements.  There are seven cases
22   that are left, again, involving property damage for this
23   Monocoat 3 product.

24          The third area of the litigation is bodily injury
25   litigation -- that is probably the principal reason that we

1    are here -- again, relating principally to this Monocoat 3

2    product.

3         The company was not a first-tier player in the

4    asbestos bodily injury litigation.  If I could approach the

5    Court, I have got a little chart that might be useful here,

6    if that is appropriate.

7         This is actually pictured in our informational

8    brief as well.  Therefore, it is part of the record.  But if

9    you look to the date that is to the furthest left-hand side,

10   you will see that it is 1982.  That was the same year that

11   Johns Manville actually filed for bankruptcy.  So the first

12   tier or the first wave of the asbestos litigation focused on

13   companies that were the principal manufacturers and suppliers

14   of asbestos, including principally Johns Manville.  By 1982

15   they had already faced this large wave of cases and they had

16   filed for Chapter 11.  Obviously, that first wave didn't

17   include Grace.

18        We don't have superimposed on here either a

19   company like Owens-Corning.  Owens-Corning was probably more

20   of a second-tier player.  If you took a look at the

21   Owens-Corning curve, at the time of 1982 you would see that

22   Owens-Corning curve was already up much further on the

23   scale.  And as the eighties unfolded, particularly in the

24   mid-eighties, you would see the Owens-Corning curve be very

25   high on this chart.  They are kind of a second or

1   first-and-a-half-wave defendant.

2          You will see throughout the 1980s, that was just

3   not true of Grace.  It was not a substantial problem.  It was

4   a problem, but not a substantial problem.  Only when you get

5   to the back end of the 1980s do you start to see the volume

6   of claims grow.  And it was because, although this is

7   something that would have to be determined and studied, is

8   what we call volume and effects.  In 1988 Manville comes out

9   of bankruptcy with payment criteria.  At the time of the

10  initial trust, there aren't payment criteria at all.  There

11  are simply case-by-case resolutions.  But there are a huge

12  volume of claims which start to be present.

13         We believe one of the things going on in the late

14  1980s and early 1990s is you have claims that are being

15  processed against a whole series of companies all at once,

16  kind of a mass volume of claims.  That became even more

17  pronounced in the back end of the 1990s when these trust

18  criteria were put in place.  So when the volume claims

19  business starts to pick up in the late 1980s and early 1990s,

20  at that time Grace starts to see a significant influx of

21  cases.

22         The response to it was, you know, kind of dealing

23  with the problem that didn't seem to go away.  At first Grace

24  basically settled cases because the price that was demanded

25  was extremely cheap.  It was very, very easy to settle cases

1   and not bother with them.

2          By the 1990s, though, the early 1990s, it became

3   clear the volume wasn't going to go away, and Grace actively

4   litigated the cases and was fairly successful in that

5   process.  Out of 63 trials, they won 44.

6          That became an extraordinarily expensive process,

7   to litigate these cases.  If you look at the chart, see the

8   spike that starts in 1995, 1996, by the mid-1990s, Grace had

9   decided to go with what were essentially inventory

10  settlements, where instead of litigating as actively,

11  basically, cases would be bundled up and settled in huge

12  volume.  You can see how the volume starts to come up.

13         On that kind of full-throttle basis, however, the

14  claims ultimately peaked in 1996.  We then see this downward

15  trend begin, that carried throughout all the back end of the

16  1990s.  Year by year the trend is coming down.  And Grace's

17  actuary said, this is what you would expect, given basic

18  actuarial principles, is that the claims would come up and

19  they would come back down.

20         The problem, of course, again, if I might

21  approach one more time, is with the back end of the story.

22  In the last 12 months, 12 to 18 months, the whole picture of

23  Grace's litigation situation changed fairly dramatically.  As

24  you will see, the claims, beginning probably in late '99 but

25  certainly in 2000, spiked dramatically.  We can see no

1    explanation in law or explanation in science or principle of

2    actuarial estimation that says that they should have spiked.

3    They just went through the roof.

4         The demands also increased during this period of

5    time.  In contrast to the prior situation, which was very

6    expensive but basically manageable, that was not a manageable

7    situation.  More than any other reason, the reason we are

8    here today is that the claims process, which was painful and

9    costly but manageable, had come down, and then all of a

10   sudden it spiked up and the company was no longer in a

11   position to manage that liability.

12        At the same time, in the other areas of

13   litigation, there were also adverse developments.  Remember,

14   I talked about that mining site, at Libby, Montana, where

15   they took vermiculite out of the ground.  By the time

16   vermiculite becomes a refined product, it's got very, very

17   little asbestos in it, thousandths of one percent of asbestos

18   in the final vermiculite.

19        One of the applications of vermiculite was to be

20   used for attic fill, which is essentially taking significant

21   amounts of this vermiculite and tucking it away in the attic

22   as an insulation.  It was used residentially for that

23   purpose.

24        In the recent past, a whole new effort to

25   litigate against Grace was initiated, a total of I think

1    eight different class actions, four in state and four in

2    Federal Court had been filed, all seeking to compel

3    essentially the remediation or removal of attic fill from all

4    these residential buildings around the country.

5           That was yet a further development.  Then

6    finally, even at Libby itself there was a class action that

7    sought medical monitoring.  All the different areas where

8    Grace was facing litigation, but in the most pronounced way,

9    with regard to the bodily injury cases, the situation in the

10   last 12 to 18 months involved very, very adversely, and we

11   felt that there was really no choice but to proceed through

12   Chapter 11.

13          As a result of that backdrop, we are here in this

14   case principally to try and define this liability, what is

15   the actual liability that the company faces, and do so in a

16   controlled way and in a federal court with Federal Rules on a

17   consolidated basis, to define the liabilities by focusing on

18   what we think are key criteria for payment and key issues

19   that have to be resolved, so that ultimately we can then

20   provide for the resolution of all those claims in the trust.

21          This approach, elements of this approach were

22   present in the Dow Corning Chapter 11.  I represented Dow

23   Corning as their national trial counsel before the 11, and

24   ultimately negotiated the Chapter 11 plan of reorganization

25   for Dow Corning.  Elements of this approach were present

1    there.

2         We have also taken the same approach in Babcock &

3    Wilcox.  We are counsel to Babcock & Wilcox, which is a

4    bankruptcy pending in New Orleans, again, driven by very

5    similar dynamics and a very similar problem.  That case is

6    now a little bit more advanced.  The reference has been

7    withdrawn to the District Court on tort liability issues.  A

8    bar date has now been set up for personal injury claims, and

9    we are walking down the road to try to define the liability

10   in this case, still in the somewhat early days, but the

11   process is under way.

12        That is essentially where we would like to go

13   here.  We would like to propose to the Court and to the

14   various constituencies the procedures that are necessary to

15   define this liability so that we can then figure out a stream

16   of payments that makes sense and get on with the company's

17   business.  That is why we are here, Your Honor.

18        I know at a point I will hear from counsel for

19   the Tort Claimants Committee, Mr. Inselbuch.  We have been

20   through these issues before down in New Orleans.  We will go

21   through them again.  We look forward to discussing those

22   issues with the Court and with the different constituencies.

23        That is basically the background of why we are

24   here.

25        The only litigation matter that really is

1  outstanding at this time is the TRO and the preliminary

2  injunction hearing.  I don't know if the Court has had the

3  opportunity to take a look at that issue and that matter, or

4  whether I should give the Court a little background on that

5  as well.

6          THE COURT:  I have not looked at the papers on

7  the TRO or the preliminary injunction.  But I am more

8  interested in scheduling it and then having a chance to read

9  the papers.

10         MR. BERNICK:  Sure.  I think the TRO is set to

11 expire on Your Honor's most recent order on the 24th, which

12 would be next Tuesday.  So we would urge the Court set down a

13 hearing.  We are prepared to do that, obviously, in a way

14 that suits the convenience of the Court.  If it is absolutely

15 not possible to do it the early part of next week and slips a

16 few days, that doesn't make us feel tremendously

17 comfortable.  On the other hand, I don't think something

18 catastrophic is going to take place in these other cases if

19 there is a little bit of a gap thereafter.

20         THE COURT:  All right.  Anybody else wish to be

21 heard on the matter of the scheduling of the pending

22 preliminary injunction?

23         So if you could tell me the amount of time,

24 assuming that this is handled as preliminary injunctions are

25 typically handled in this Court, that is largely on papers,

1   with limited live testimony, if any, how much time do you

2   think is required in your view?

3          MR. BERNICK:  I think it ought to be a very

4   simple and straightforward hearing, judging by what happened

5   with Babcock & Wilcox, which is our most recent experience on

6   this, indeed, a lot of it was uncontested.  I would imagine

7   that the whole thing could probably take place in a couple

8   hours, almost at the outside.  I do know that we have at

9   least one -- we have one affidavit that is already on file.

10   I believe there will be another affidavit that we will file.

11   So I think it is largely a question of arguing the matter to

12   the Court based on the briefs, and that would be something

13   that obviously depends upon the Court's desire to entertain

14   that kind of argument.  I don't think that right now we would

15   anticipate that there would be any significant oral

16   testimony.  That may change and I may be advised by counsel

17   otherwise.  But I wouldn't expect it.

18          THE COURT:  Okay.

19          MR. BERNICK:  In light of the fact the committee

20   has just been formed, if it makes sense to do it towards the

21   back end of next week or at some point the week after that,

22   it's been pointed out to me that one of the ways we can try

23   to create a bridge between the expiration of the TRO and the

24   hearing is if the Court would change the TRO into a

25   preliminary injunction, but a temporary one, we can bridge

1  whatever gap would exist in the calendar.

2          THE COURT:  Okay.  Does anybody else have a view

3  with regard to the presentation of the motion?

4          MR. ZALESKI:  Good morning still, Your Honor.

5  Matt Zaleski on behalf of the Asbestos Personal Injury

6  Claimants.

7          Most importantly, I wanted to confirm that Mr.

8  LeClair is still on the phone.  He is the plaintiff's counsel

9  most directly affected by this.  I didn't hear any sort of

10  suggestion as to his availability.  I think he may very well

11  be the single most important player from the opposite side of

12  the room.  If I can confirm Mr. LeClair is still on the

13  phone.

14          MR. LeCLAIR:  Yes, I am here.  Although,

15  unfortunately, the sound comes and goes.  So I haven't been

16  able to hear everything.

17          MR. ZALESKI:  That was my primary concern.

18          Mr. Bernick is correct, you will be hearing from

19  us on the rest of the issues he described earlier.  Thank

20  you.

21          THE COURT:  Anyone else?

22          MR. BAENA:  Scott Baena on behalf of the Property

23  Damage Committee.  If the Court could indulge us, since we

24  are still in formation, only have had an opportunity to

25  discuss these matters one time, fully, as a committee, if we

1    could move this to the week after next, that would really be
2    very helpful to us.  Thank you.
3            THE COURT:  All right.  Anyone else?
4            MS. LAZAR:  Nancy Lazar from Davis Polk on behalf
5    of Chase.
6            There were a lot of first-day orders entered in
7    this case.  We have agreed with the debtor for an extension
8    of time for one week to file any objections with respect to
9    the DIP financing order.  And just in terms of scheduling,
10   you might want to put that somewhere on your calendar as
11   well, in case we can't work things out.
12           Thank you, Your Honor.
13           THE COURT:  All right.  Thank you.  Anyone else
14   interested in being heard about scheduling, either the
15   preliminary injunction or matters carrying over from
16   first-day orders?
17           MR. SPRAYREGEN:  Your Honor, just so you have all
18   the facts in your head in the scheduling, the Official
19   Committee of Unsecured Creditors also asked for an extension
20   of time to object to a number of other first-day orders,
21   too.  And I don't have the full list, but there is a number.
22   They didn't state any particular objections.  But they wanted
23   some more time because they had just been formed.  Objections
24   were due today.  So if there was going to be further
25   scheduling, if there turned out to be objections, we would

1    think about the possibility of having one day for all of
2    these things.
3            THE COURT:  Is your suggestion -- I am really not
4    up to speed on this case in terms of my reading yet.  Are you
5    suggesting that the preliminary injunction be on one day, and
6    then we select a day when we take up objections or matters to
7    be heard that have carried forward from the first-day
8    orders?
9            MR. SPRAYREGEN:  Optimally, one day for
10   everything, and it might be five minutes, for all I know.  I
11   don't know that there is going to be objections.  But
12   optimally.
13           THE COURT:  So you are suggesting there is two
14   levels of attention required and put them on the same day.
15           MR. SPRAYREGEN:  Yes.  With the caveat that if
16   the Court didn't have sufficient time we would look to the
17   preliminary injunction matters first.  Obviously, the DIP
18   financing, if there turns out there are objections, will be
19   critical too.  Everything else we think is very important.
20   But efficiency-wise, one day would be great.
21           THE COURT:  Okay.
22           MR. RASKIN:  Your Honor, Robert Raskin,
23   Stroock & Stroock & Lavan, for the Official Committee.
24           Kirkland & Ellis did courteously give us until
25   next Wednesday to review these papers, which would be the

1    25th, I believe.  A lot of these papers will have additional

2    questions on them.  So if you are talking about having a

3    preliminary injunction on or around the time of the TRO

4    expiring, we may need more time.  It may not be that one day

5    will work for both.  That is not to say, Your Honor, that we

6    will need any day with respect to any objections.

7              THE COURT:  I understand.

8              With the assumption that there is some form of

9    order to extend the current order on the temporary

10   restraining order, and understanding that it would be the

11   same day that we would hear any carryover matters from the

12   first-day orders, how is the afternoon of May the 3rd?  A

13   Thursday?

14             MR. BERNICK:  That would be fine for the debtors,

15   Your Honor.

16             MR. BAENA:  Judge, are you thinking about

17   starting early in the morning?

18             THE COURT:  Actually, I was thinking about

19   starting at 1:30 in the afternoon, and I am going to set time

20   limits once I read the papers on the injunction.  I guarantee

21   the lawyers will be startled at how little time they have to

22   argue orally if their papers are good.  Then I would take up

23   the first-day matters.

24             Pretty much the injunction hearing turns out to

25   be my time to ask questions and get some matters cleared up.

1    I typically come in with very focused areas that I want them

2    to talk about.  If the papers are bad -- I don't expect that

3    in this case, but I just haven't seen them.  I am thinking,

4    sometime around two hours total for the hearing.  And then

5    the rest of the afternoon for anything we have to take up

6    that might form an objection to the first-day carryover.  Is

7    that not enough time?  Or tell me this:  Is late in the day a

8    problem for you, because of travel?

9            MR. BAENA:  Some of us are involved in another

10   matter.  Late in the day is actually best, because then some

11   of us could come during the same day to appear before the

12   Court and not have to stay over the night before.  That

13   particular day some of us are involved in another matter

14   across the street at 3:00 before Judge Walrath.

15           THE COURT:  So if I did like 1:30 to 3:30, then

16   started the second phase at 4:00 o'clock, again, there may

17   not be a need for a lot of time, and we could continue it out

18   till you got here, does that work for you?  Then you only

19   have to come one day for Wilmington.  I am asking, would you

20   rather it just be on another day?

21           MR. BAENA:  It would be best, of course, if it

22   could be the following day, or earlier on the day of the

23   3rd.

24           MR. SPRAYREGEN:  If earlier in the day was

25   available, Your Honor, that would be convenient to the

1   debtors, also.  I don't know if it is convenient to the

2   Court.

3          THE COURT:  How is this:  I have some defendants

4   that are anxious to go to jail that day.  They are scheduled

5   in those morning hours.  I say that, it sounds funny, but if

6   they get caught late in the day, they get in all sorts of

7   institutions they don't want to be in because of transport.

8   If we started this at 8:00, and would going till noontime be

9   enough?

10          MR. BAENA:  Probably.

11          MR. SPRAYREGEN:  I think that would hopefully

12   cover everything.

13          THE COURT:  Okay.  Then you can go to your

14   afternoon hearing with Judge Walrath.

15          MR. BAENA:  And the defendants can go to jail.

16          THE COURT:  Right.  Everybody is happy.

17          So I will just move one of the sentencings from

18   11:00 a.m. till early in the afternoon, as long as I know I

19   am going to be out by 12.  Anybody object to May 3rd,

20   starting at 8:00?

21              Now is the time.

22          We are going to schedule 8 to 12, with the

23   preliminary injunction hearing commencing at 8.  And I will

24   allot time based on my reading of the papers, and I will let

25   you know the allocation of time on Monday, the 30th, for

1    those that will be in the preliminary injunction stage.  It

2    would be highly unusual to go beyond two hours, under any

3    circumstance.

4         So the rest of you can anticipate, if you needed

5    to be heard, being heard sometime around 10 to 10:30.

6         Does that give you enough guidance?

7         MR. BAENA:  Yes, sir, thank you.

8         MR. LeCLAIR:  Your Honor, my question would be on

9    the briefing schedule, as to when you would want our papers

10   in response to the injunction.

11         THE COURT:  I am going to put that in place.  I

12   am hoping to be able to do some reading tomorrow or Friday.

13   So I am hoping to be able to give you a schedule for that

14   Monday of next week.  Is that satisfactory?

15         MR. LeCLAIR:  That is fine, Your Honor.

16         THE COURT:  Okay.

17         MR. SPRAYREGEN:  Also with respect to briefing,

18   to the extent there is any objections filed to the first-day

19   orders by the Official Committee of Unsecured Creditors,

20   their date is Wednesday, April 25th, I don't know whether

21   there will be or whether we would have any desire to reply

22   under the new Local Rules, we would need authority.  I guess

23   I would ask, to the extent there is objections, for authority

24   to file a short reply by whenever is convenient to the Court,

25   April 30th or May 1.

1      THE COURT:  Either one.  Make it May 1.

2      MR. SPRAYREGEN:  Thank you, Your Honor.

3      THE COURT:  You are going to want more time?

4      MR. RASKIN:  It goes back to the other point.

5  The committee just selected counsel last week.  We are going

6  to be interviewing accountants.  There is a lot of economic

7  impact to some of these motions.  We may ask for more time.

8      THE COURT:  In your first request, did I give you

9  enough time for your first request in scheduling my part of

10  it?

11      MR. RASKIN:  Your Honor, depending upon the

12  nature of the potential disputes, if there are any, we should

13  be fine, yes, sir.

14      THE COURT:  If you need time for your objections,

15  you will deal with the debtor.

16      MR. RASKIN:  Yes.  And we might have to go beyond

17  May 3rd.  We will obviously deal with the business

18  contingencies that the debtors have to deal with, also.

19  Hopefully, we will work that out with the debtor.

20      THE COURT:  Okay.  Sounds like we have a

21  schedule.

22      MR. YODER:  Your Honor, it is my understanding

23  the debtor is going to hand up a second interim DIP order

24  today to carry us to that final hearing.  I assume we can

25  schedule, use the May 3rd date as the final hearing for the

1    DIP and perhaps use the objection deadline of the 25th.

2          MR. SPRAYREGEN:  When we got to that on the

3    agenda, that is exactly what I was going to suggest.

4          THE COURT:  We can do that.  We will take that

5    right off the agenda.

6          MR. SPRAYREGEN:  As long as we are a little bit

7    out of order, we originally, when we appeared at the

8    first-day hearing, had a proposed interim DIP.  We assumed

9    that we would have a final hearing approximately 30 days from

10    the filing.  And we had a budget presented, showing the need

11    of a hundred million dollars during that time period.  Judge

12    Newsome thought we might be able to get to a final hearing

13    within the 15 days, so scheduled -- authorized interim DIP

14    for only 15 days and only 50 million dollars.  In extending

15    the time period basically 30 days now, we talked to at least

16    some of the counsel, I am not sure I can represent that there

17    is agreement, but we talked to counsel to extend it further,

18    we would ask to go back to the hundred million dollars that

19    our first-day budget had shown we needed for the 30-day

20    period, which serendipitously is 31 days.

21          The order we were going to present was going to

22    give another interim authority for another 450 million

23    dollars and schedule the final hearing for May 3rd, if that

24    is acceptable to the Court.  I don't know if any parties have

25    any problems with that.

1          THE COURT:  Somebody would have to tell me -- it
2   would be acceptable to me unless somebody can convince me
3   that they were unduly negatively impacted.  And I can't
4   imagine there is anybody here that could do that.  But they
5   ought to speak up now, if they are here.
6          MR. YODER:  The bank is fine as well, Your Honor.
7          THE COURT:  If the bank is fine, and if we
8   understand what the thrust of this case is, I can't imagine
9   anybody has a problem.  Why don't we do that.
10         MS. JONES:  Your Honor, may we approach with a
11  proposed order?
12         THE COURT:  Yes.  Has everybody had a chance to
13  see this?
14         MS. JONES:  Yes, Your Honor.
15         THE COURT:  All right.  Are there any other
16  matters?
17         MR. SPRAYREGEN:  Your Honor, one other matter,
18  just to be made clear from the scheduling.  2B on the agenda
19  was actually a motion for reconsideration of one of the
20  first-day orders.  I am guessing we set the same schedule for
21  that, and the current response date for objections to the
22  other motions, I would suggest that be the debtors' response
23  date to this motion and May 1 be the banks' time to reply.
24  So that is also set for the 3rd.
25         THE COURT:  Does anybody want to be heard on

1    that?

2            All right.  We will do that.

3            MR. SPRAYREGEN:  The only other item on the

4    agenda, Your Honor, I am guessing we should probably deal

5    with your clerk on this, Item 4 was trying to schedule a

6    series of omnibus monthly hearing dates for this case that is

7    convenient to the Court and the parties.  If you would like

8    us to deal directly with the clerk, or the Court...

9            THE COURT:  What we will do is, we will be able

10   to set some omnibus dates in place probably sometime toward

11   the middle or end of next week.  If you want to call

12   chambers, we could give you those dates.  I am not exactly

13   sure this week what it is I am going to be assigned.  So I

14   want to kind of get a view of that.  Then we will be able to

15   set some dates going forward through the summer for you.

16           MR. SPRAYREGEN:  That is fine, Your Honor.  We

17   will do that.  Thank you.

18           THE COURT:  Thank you.

19           MR. BERNICK:  There is one very small matter that

20   we do need to schedule.  We have to serve the summons and

21   notice on the adversary proceeding in support of the request

22   for the preliminary injunction.  We have to fill in a date

23   for a pretrial conference.  If we serve this by Friday of

24   this week, it will require a response to the complaint within

25   35 days, which would put us, basically, towards the back end

1  of May.  So what we would need to have is a date to fill in

2  here for a pretrial conference, presumably sometime in June.

3  This would be a --

4  THE COURT:  Tell me that again now.  You need a

5  pretrial conference in the adversary.

6  MR. BERNICK:  The adversary that we filed to

7  support the request for injunctive relief against the

8  prosecution of other cases that are related to this one.

9  THE COURT:  Right.

10  MR. BERNICK:  The summons and notice calls for a

11  pretrial conference.  We want to be able to serve this by

12  this Friday, because it's only good until this Friday.  And

13  also, this says we need a response date as well.

14  THE COURT:  Why would we have a pretrial

15  conference?

16  MR. BERNICK: The summons and notice has a place

17  for both the response date to the complaint and then for a

18  pretrial conference in connection with the adversary

19  proceeding.

20  THE COURT:  Let me see that.  It looks like a

21  form.

22  MS. JONES:  Your Honor, that was the form that

23  was returned from the Clerk's Office.  Usually it comes back

24  with either a status conference date or a pretrial date or it

25  can come back with just to be determined.  But nothing was

1   filled in.  Also, we did not receive a response date, which

2   is usually 30 days from the summons.

3          MR. BERNICK:  Obviously, Your Honor, we don't

4   feel a pressing need to have a pretrial conference.

5          THE COURT:  This is obviously an excellent form.

6          (Laughter.)

7          THE COURT:  I am just not that up to speed to be

8   able to utilize that excellent form.  So don't worry about

9   that pretrial conference.

10          MR. BERNICK:  We will be happy not to.

11          THE COURT:  It says something about contacting

12  the courthouse.  But once we are actually in need of, I think

13  Ms. Jones is right, it would be a status conference, kind of

14  like a Rule 16, you can write a letter and we will get that

15  scheduled.

16          MR. BERNICK:  Thank you.

17          THE COURT:  That would be better than putting on

18  a pretrial conference.

19          Okay.  I am going to file with the clerk in open

20  court the original and duplicate original of the orders that

21  have been presented.  We will be entering an order on a

22  briefing schedule and setting these dates for the hearings.

23  And then I will anticipate my chambers hearing from counsel

24  middle to the end of next week to get omnibus dates going

25  through the summer for this case.

1          MS. LAZAR:  I just want to clarify the record,

2    the motion that debtors' counsel referred to with respect to

3    reconsideration of the DIP financing, I just want to

4    understand that that is on for May 3rd, for the second part

5    of the hearing that day.

6          THE COURT:  Yes.

7          MS. LAZAR:  I just want to make sure we didn't

8    miss anything.  I am sorry.  There is also another order with

9    respect to the vendor, payment of excess vendor claims with

10   respect to the critical vendor motion.  That also, we

11   preserved our rights with respect to that, and I think that

12   was what you were referring to with respect to replying to,

13   and the scheduling of that.  We would also like that to be

14   heard on the 3rd.

15         MR. SPRAYREGEN:  Your Honor, that actually was

16   the motion I was referring to.  So I can just confirm, both

17   those matters are what we believe is up on the 3rd.

18         THE COURT:  I did have a chance to read some

19   material.  The critical vendor motion, I had a sense, was

20   resolved.  Did I miss something there?  You read Judge

21   McKelvie's case and at least in this district you

22   understood -- what did I not understand?

23         MR. SPRAYREGEN:  Your Honor, we had a critical

24   vendor motion and we asked for a certain amount of money to

25   be made available to be paid on that.  Judge Newsome

1    expressed some concern about the authority for granting that

2    type of a motion, and ultimately took the position that he

3    did not want us to pick and choose amongst trade creditors,

4    asked what the amount of our total trade credit was.

5           We had asked for four and a half million for

6    critical trade.  Our total trade was about 34.3 million, I

7    believe.  And he ultimately ruled that we could either have

8    none of that available to be paid or all of it be paid.  But

9    we couldn't do the four and a half million.

10           So what the debtors did, after conferring, was

11    went with the latter alternative, to have all of it paid.

12    That was the order that Judge Newsome entered.  We then began

13    acting on the order.  In fact, the order went on the website

14    and our trade creditors obviously became aware of it.  We

15    started acting on it ultimately when other people became

16    aware of it, including the bank.  They were concerned that

17    they wanted us to stick with the original critical trade

18    order.  That is how the motion for reconsideration came up.

19           MS. Lazar:  Your Honor, that was what was agreed

20    to on the first day.  That is the precedent in this district

21    at least, that you pay your critical trade vendors.  You

22    don't pay all of your prepetition trade debtors on your first

23    day except under extraordinary circumstances, which do not

24    exist here.

25           THE COURT:  Tell me this:  Who, so the record is

1  clear, today, April 18, who is getting paid?  And under what

2  order?

3          MR. SPRAYREGEN:  Here is what has transpired

4  since then, Your Honor.  Approximately, less than six million

5  dollars has been paid.  And at the request of both the newly

6  formed creditors' committee and the bank group, the debtors

7  have essentially significantly slowed down payments.

8          THE COURT:  So you have an order that paid 34

9  million.  But because of the, at least, unheard objection,

10  you have slowed down to where you have only under that order

11  paid out six million.  But you really only wanted to pay out

12  four and a half million under the Just For Feet opinion.

13          MR. SPRAYREGEN:  Yes.  But the very significant

14  "but," hopefully we will get this resolved before we show up

15  on the 3rd.  The evidence with respect to that would be, the

16  defendant has been put in a very difficult position now, it

17  would have been one thing if the four-and-a-half-million

18  order had been granted and we acted on it.  Once the

19  35-million-dollar order was granted and all our trade

20  creditors became aware of it and have an expectation of

21  payment, the facts have significantly changed.  We haven't

22  agreed to stop payment under that order, because there are

23  some critical trade that are in the four and a half million.

24          THE COURT:  I know that is in your mind, but in

25  your heart, you really don't want to pay.

1          MR. SPRAYREGEN:  I won't tell you what is in my

2    heart right now.

3          MS. Lazar:  We would hope not.

4          THE COURT:  Here is what I am thinking:  I

5    understand your situation, to describe it gently.  Should

6    that come back here quickly before May 3rd?  Or is that okay

7    to hold until May 3rd?

8          MR. SPRAYREGEN:  I think what I could suggest,

9    and the reason why we have significantly slowed it down but

10   not agreed to stop it, is because we understand the parties

11   are just getting organized here.  The committee was just

12   formed.  We actually agreed to make a presentation to the

13   committee and the bank, obviously, as the chairman, as soon

14   as it can be scheduled.  We proposed Friday, as to what we

15   paid, what we propose to pay.  The hope would be before we

16   get back here on May 3, we reach some accommodation.

17         THE COURT:  I am going to stay out of it.  I can

18   save a decision.

19         MS. LAZAR:  After the Friday meeting, if we can't

20   come to some resolution and it looks like 36 million dollars

21   will go out the door, we would like to contact chambers and

22   expedite things if necessary.

23         THE COURT:  You can do that.  You can get in here

24   before May 3rd if you can't come to agreement on Friday.  But

25   you ought to be able to get to agreement, because it's a

1    clear principle in this district, in my view.

2              MS. Lazar:  In our view, it is as well.

3              MR. SPRAYREGEN:  It would be very helpful to get

4    to an agreement.  Even in the absence of a full agreement, I

5    have very high confidence we can get to an agreement to take

6    us to May 3rd.

7              THE COURT:  That is great.  All right.  Thanks

8    for coming.  I am going to recess.  I have another matter.

9              (Court recessed at 12:25 p.m.)

10                        -  -  -

11   Reporter:  Kevin Maurer

12

13

14

15

16

17

18

19

20

21           I hereby certify that the foregoing is a true

22           and accurate transcript from my stenographic
             notes in the proceeding.

23                                Official Court Reporter
                                  U. S. District Court

24

25