## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

FILED

2001 MAY -1  PM 3: 10

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| W. R. GRACE & COMPANY, | : | Case No. 01-01139 JJF |
| | : | |
| Debtor. | : | |

---

| | | |
|---|---|---|
| TIG INSURANCE COMPANY, a | : | |
| California corporation, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Reference No. 159 |
| | : | |
| GARY SMOLKER, an individual, | : | |
| and ALICE SMOLKER, an | : | |
| individual, and DOES 1-10, | : | |
| inclusive, | : | |
| | : | |
| Defendant. | : | |

---

AND RELATED CROSS-ACTIONS    :
CONCERNING HOME SAVING TERMITE:
CONTROL, INC. and W.F. MORRIS :

### MOTION FOR ORDER GRANTING RELIEF FROM AUTOMATIC STAY

### MEMORANDUM OF POINTS AND AUTHORITIES
### I.
### STATEMENT OF REASONS IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY

Moving Parties, Home Saving Termite Control, Inc. and Wayne Morris, ("hereinafter "Moving Parties") have filed a Motion for Relief from Stay which seeks the following relief: (1) an order permitting discovery against Debtor in an ongoing state action; (2) an order permitting Debtor's employees to be called as witnesses in an ongoing state action; and (3) an order permitting Moving Parties to file a cross-complainant for indemnity, but limited solely to the extent of any available insured proceeds.

159

161

## A.    **Background Facts**

There is currently pending before this Court a Petition for Relief under 11 U.S.C.§§ 1101, et seq., relating to the affairs of Debtor, W.R. GRACE & COMPANY (hereinafter "Debtor").  Said petition, entitled In Re W.R. Grace & Company bears the case number 01-01139.   Pursuant to 11 U.S.C.§ 362(a), certain acts or proceedings were stayed by the filing of said Petition, including discovery in a California state action in which Debtor is a party. Further, Moving Parties have a potential claim for indemnity against the Debtor, who manufactured a product (Syloid 244), which moving party has made against the Debtor.  An indemnity cross-complaint will be pursued  in state court upon receiving permission from this Court.   Further Moving,  Parties need to conduct discovery of Grace to defend a personal injury case.

The subject claim and\or potential cross-complaint against Debtor arises out of an incident on October 11 and 12, 1996, in which application of Syloid 244 by HOME SAVING TERMITE CONTROL, INC. (hereinafter "Home Saving"), a termite control company owned and operated by WAYNE MORRIS (hereinafter "Morris"), applied Debtor's product, Syloid 244, to the condominium unit owned by GARY SMOLKER and ALICE SMOLKER (hereinafter "the Smolkers").   The Smolkers allege in their civil lawsuit, that they have sustained personal injuries as a result of exposure to Syloid 244.  Syloid 244 was manufactured and distributed by the Debtor, W.R. GRACE & COMPANY.

On or about July 2, 1997, TIG INSURANCE COMPANY filed a declaratory relief action against the Smolkers seeking a declaration that TIG INSURANCE COMPANY is not responsible to pay any insurance proceeds to the Smolkers. Thereafter, in October of 1997, the Smolkers filed a cross-complaint against HOME SAVING TERMITE CONTROL, INC., WAYNE MORRIS, W.R. GRACE & COMPANY, PACIFIC VILLAS HOMEOWNER'S ASSOCIATION, CAROL KAY and numerous other parties alleging 31 causes of action, including but not limited to a strict products liability cause of action against HOME SAVING TERMITE CONTROL, INC., WAYNE MORRIS, and W.R. GRACE & COMPANY. Cross-Defendant and homeowner, CAROL KAY, filed a cross-complainant against HOME SAVING TERMITE CONTROL, INC., WAYNE MORRIS and W.R. GRACE & COMPANY for indemnity and other related causes of action. The underlying state court action, entitled TIG INSURANCE V. GARY SMOLKER, et al., and related cross-actions, Case No. BC 173952, is filed and being litigated in the Los Angeles Superior Court, Central District. The subject state court action is set to commence **trial on September 17, 2001.**

Prior to the filing of the Chapter 11 Bankruptcy Petition in this Court, Debtor and Movants agreed to cooperate in the state court discovery, make each others witnesses available to testify at trial, and not to file cross-complaints against each other until the underlying trial was heard. However, after Debtor filed its Petition on or about April 2, 2001, Debtor lost its ability to allow and/or make its employees and witnesses available to be

deposed or to submit to a proceeding in a state civil court. Grace Davison is a potential party to an indemnity claim, as Home Saving Termite Control used the Syloid 244 product in a manner similarly used for pest (termite) control purposes via products such as Drione, Dri-Die and Dri-Out. It is uncertain whether Debtor's employees/witnesses will be available or allowed to testify at the state court trial. As a result of protections offered by the automatic stay Debtor does not have to participate in discovery and does not have to participate at trial in the underlying action. Accordingly, without relief from the automatic stay Movants will be forced into the impossible situation of having to defend against a strict products liability action without the ability to conduct discovery of the manufacturer of the allegedly defective product, and without the ability to call any of the manufacturers employees/witnesses to trial. Movants seek to depose Grace employees on issues of manufacturing, sales, marketing and distribution of products containing Syloid 244, as well as toxicological issues of the same.

Wherefore, Moving Parties were forced to bring this Motion for an order granting relief from the automatic stay, for the following reasons:

### B.    Reasons for Granting Relief from Automatic Stay

1.    This Court has jurisdiction over the Motion pursuant to 11 U.S.C.§ 362. The Motion is further governed by Federal Rules of Bankruptcy Procedure, Rules 4001 and 9014.

2.    Moving Parties seek leave to conduct and complete discovery in order to gather necessary evidence to defend against a strict products liability cause of action which Movants must defend in a September 17, 2001, trial.

3.    Moving Parties seek leave to conduct and complete discovery in order determine the existence and extent of Debtor's insurance coverage, if any, and to proceed against Debtor in the state court action on an indemnity cross-complaint, but only to the extent of any insurance proceeds.

4.    Moving Parties agree not to attempt to enforce any judgment obtained in the state court action by levying against the assets of Debtor's bankruptcy estate. Rather, Moving Parties agree to limit their recovery against Debtor, if any, solely to the extent of any insurance proceeds.

5.    Cause exists to lift the stay as it applies to the state court action, sufficient to allow Moving Parties to proceed with an indemnity cross-complaint for the following reasons:

(a)    There has already been significant activity in this state court action. The state court action is set to begin trial in September of 2001, but progress on the defense of the products liability case in state court case has been halted, due to Debtor's bankruptcy. Further, Debtor is an indispensable and necessary party to the state court action as it is the manufacturer of the allegedly defective product.

(b)    Allowing Moving Parties to proceed on an indemnity cross-

complaint and to conduct discovery is necessary to liquidate claims against the Debtor which may not be triable in the bankruptcy court.

(c)  Moving Parties would otherwise be prejudiced by not being able to offer evidence on manufacturing, sales, toxicology and risk benefit issues at the state court trial or reach any of the Debtor's insurance proceeds in the underlying state court action, as Moving Parties would incur significant loss of time and expense in order to pursue an indemnity cross-complaint against the Debtor in a later, separate lawsuit.

(d)  Debtor's estate will not be prejudiced because any judgment obtained against Debtor will be limited to the extent of any insurance proceeds and this product defect case against Grace involving the use of Syloid 244 containing products.

WHEREFORE, Moving Parties respectfully requests that the automatic stay be lifted to allow Moving Parties to conduct discovery in order obtain evidence necessary to defend against the strict products liability claim as set out in Exhibit "A;" to conduct the noticed depositions of Julian Convey and the person most knowledgeable for Grace Davison, (See Exhibit "D"); explore the matter of Debtor's insurance coverage through the state court discovery process; to call Debtor's employees/witnesses at trial should they be in the subpoena power of the trial court; and to pursue a state court indemnity cross-complaint against the Debtor, but only to the extent of any insurance proceeds.

## II.

### THIS COURT IS EMPOWERED TO LIFT THE STAY IN ORDER FOR MOVING PARTIES TO PURSUE DISCOVERY OF CRUCIAL ISSUES AND/OR A CROSS-COMPLAINT IN STATE COURT

11 U.S.C.§ 362 provides in pertinent part:

> "(a) Except as provided in sub-section (b) of this section, a petition filed under § 301, 302, 303 of this titled . . . operates as a stay, applicable to all entities of
> . . .
> (1)    the    commencement    or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.
> . . .
> (d) On request of the party in interest and after notice and hearing, the court shall grant relief from the stay provided under sub-section (a) of this section, such as terminating, annulling, modifying or conditioning such stay
> . . .
> (1) for a cause, including the lack of protection of an interest in a property of such party in interest."

Court's interpreting Congress' intent in enacting 11 U.S.C. Section 362 have held that automatic stays should be lifted in appropriate circumstances. For example, the court in <u>In Re Holtkamp</u> 669B.F.2d 505, 508 (7th Cir. 1982), stated as follows:

> "While we agree that Congress intended that the automatic stay has broad application, legislative history to Section 362 clearly

indicates that Congress recognized
that the stay should be lifted in
appropriate circumstances.
. . . [I]t will often be more
appropriate to permit proceedings to
continue in their place of origin,
when no  great prejudice to the
bankruptcy estate would result, in
order to leave the parties to their
chosen forum and to relieve the
bankruptcy court from many duties
that may be handled elsewhere."
[Citation omitted.]

Further, an automatic stay becomes effective on filing a
petition for bankruptcy.  There is no provision for conducting
discovery of a Debtor, even if insurance proceeds exist, absent a
bankruptcy Court's granting the party desiring discovery, relief
from the automatic stay under 11 USC Section 362.  <u>Weed vs. Fleet
Tire Mart</u>, 6 B.C. 606 (Bakr. S.D. Iowa 1980).

A District Court may allow discovery by co-defendants in a
products liability action by employees who allegedly contracted
diseases from exposure to defective products.  Co-defendants need
to show the discovery is essential to enable the co-defendants to
limit their liability or escape liability altogether.  <u>See</u>, In re
<u>Johns-Manville Corp.</u>, 39 B. R. 659 (S. D. N. Y. 1984).

### III.
### RELIEF FROM THE AUTOMATIC STAY IS PROPER IN THIS CASE AT BAR

**A.**  **Moving Parties May Bring a Motion for Relief of Stay to
Conduct Crucial Discovery and/or Pursue an Indemnity
Claim Limited to Insurance Proceeds**

The court in <u>Holtkamp</u>, <u>supra</u>, interpreting 11 U.S.C.Section
362(d) and its use of the term "party in interest," clearly
established that relief from automatic stay is not limited to

secured creditors.   In <u>Holtkamp</u>, the District Court granted plaintiff's petition to lift the automatic stay so as to allow him to pursue his state court personal injury action.   Defendant appealed, and the Appellate Court held that the District Court acted properly in lifting the automatic stay, stating:

> "Holtkamp's contention that Section 362(d) applies only to secured creditors is not supported by the statutory language or case law. Subsection (d) grants relief from the automatic stay, under certain conditions, to "a party in interest." Had congress intended this section to apply only to secured creditors, it undoubtedly would have so stated.   Further, nothing in the legislative history implies that congress intended the restrictive application Holtkamp urges."

Likewise, Moving Parties herein have a similar interest and desire to lift automatic stay in order to pursue their state court indemnity action.   As in <u>Holtkamp</u>, Moving Parties herein are clearly proper parties to bring this Motion.

**B.   <u>Cause Exists for Lifting the Stay for Movants to Conduct Discovery of Manufacturer/Debtor, Which Otherwise Would Deprive Movant from Presenting Viable Defenses at a Product Defect Trial</u>**

> "Relief from the automatic stay may granted if sufficient cause exists for the stay to be lifted."   <u>In Re Claughton,</u>   1 4 0   B . R . 861(Bankr.W.D.N.C. 1992).

In order to determine whether sufficient "cause" exists to allow litigation to go forward in a non-bankruptcy forum, the court in <u>Claughton</u> calls on bankruptcy courts to evaluate any **potential**

**prejudice** to the person seeking relief from the stay, if the stay is denied, along with the following factors, any one of which can form the proper foundation for lifting the stay:

> "(i)  Whether  modification  of  the stay to allow litigation to conclude in  a  different  form  will  promote <u>judicial economy</u>;
> (ii)   Whether   the   issues   in   the pending   litigation   involve   only <u>state law</u> so that the expertise of the bankruptcy court is unnecessary;
> (iii)  Whether  relief  from  the  stay would  <u>interfere with the bankruptcy case</u>; and
> (iv)   <u>Whether  the  estate  can  be protected properly</u> by a requirement that  creditors  seek  enforcement  of any   judgment   through   bankruptcy court."
> <u>In Re Claughton</u> 140 B.R. at 867-868, emphasis

original.

In addition, the <u>Claughton</u> court stated that:  "when pending litigation involves solely issues of state law, the bankruptcy court should favor relief from the state to allow litigation to go forward in state court."  <u>Id</u>.

Relief from an automatic stay imposed under 11 USC Section 362 will be granted to permit party being sued by persons allegedly injured by a distributor of an asbestos product, to conduct discovery against a co-defendant, product manufacturer, who is protected by a Chapter 11 proceeding.  The party seeking the discovery must indicate that in the absence of the requested discovery, the party will be deprived of possible defenses in the state court action.  <u>In re Johns Manville Corp</u>., 41 BR 926, 931-932

(S.D. N.Y. 1989).

Under the factors enumerated by the Claughton court, "cause" clearly exists for lifting the automatic stay in the instant case. Lifting automatic stay will further the goal of judicial economy by allowing the entire first phase of the state action to be tried at once, with Grace and Home Saving either as defendants or allowing Home Saving to offer evidence of the product, its manufacturing process, sales and marketing throughout the United States and the health risk assessments/toxicology involved therewith. Without this discovery, by way of (1) a production of business records and sales records; (2) deposition testimony of person(s) most knowledgeable, and Julian Convey, Home Savings will be precluded from defending the strict liability claims at trial thereby avoiding multiple and duplicative suits. Further, their would be a wasting of considerable time and expense by all parties involved if the stay is not lifted. Relief from the stay would ensure that the state court action will proceed with all necessary and indispensable parties, and/or all Movants to defend the products liability case. Moreover, the state action involves only state law issues, which do not require the expertise of the bankruptcy court.

Relief from the automatic stay will not interfere with or prejudice the bankruptcy estate, as these Moving Parties agree to pursue a state court indemnity cross-complaint against Debtor solely to the extent of any insurance proceeds which may exist.

Moreover, Moving Parties would otherwise be prejudiced by not being able to reach any of the Debtor's insurance proceeds in the state action.  There has already been significant activity in the state court action.  The state court action is in the later part of the discovery stage, but progress in the case has been interfered with due to Debtor's bankruptcy and Movants inability to defend a strict liability case in which Movant did not manufacture the Syloid 244 product.  Grace was to offer the evidence at trial on the product's issues.

Finally, Debtor is an indispensable and necessary party to the state court action and has maintained a joint defense agreement with Moving Parties throughout most of the state court action. Moving Parties have relied on the joint defense agreement in preparing for trial and will be severely prejudiced if it is forced to proceed through trial in the state court action <u>without</u> the presence of Debtor.  Indeed, it will be virtually impossible for Moving Parties to defend against the underlying state strict products liability action unless it is able to conduct discovery against Debtor to explore whether there is actually a defect in Debtor's product as alleged.

### C.  <u>No Prejudice to the Bankruptcy Estate Will Result from Lifting the Stay for Movant to Conduct Crucial Discovery and/or Pursue Indemnification</u>

Courts have lifted the automatic stay to permit an applicant to pursue a civil action against a debtor where two conditions are met:

> "(1). . . no great prejudice will
> result to the debtor or the debtor's
> estate, and (2) hardship to the
> creditor resulting by continuing the
> stay considerably outweighs the
> hardship to the debtor by
> modification of stay." <u>In Re</u>
> <u>Harris</u>, 85 B.R. 858, 860 (Bankr. D.
> Colo. 1988).

As set forth more fully in Moving Parties proceeding arguments, lifting the stay in this case, will not jeopardize the assets of Debtor's estate, since Moving Parties agreed to pursue discovery of Debtor in their state court indemnity cross-complaint against Debtor, only to the extent of any insurance proceeds which exist. On the other hand, however, Moving Parties would be prejudiced by not being able to reach any of the Debtor's witnesses to offer evidence on the manufacturer, sales, use and marketing of Syloid 244 products and/or reach insurance proceeds of Debtor in the underlying state court action, in that they would be forced to incur significant losses of time and expense in order to pursue an indemnity cross-complaint against Debtor in a later, separate lawsuit. Further, Moving Parties will experience undue prejudice if they are forced to defend against the state strict products liability causes of action without discovery from Grace, and/or the presence, participation of the manufacturer of the alleged defective Syloid 244 product, manufactured by Grace Davison.

## IV.

### CONCLUSION

In light of the foregoing, Moving Parties, HOME SAVING TERMITE

CONTROL, INC. and WAYNE MORRIS, respectfully request this Court to lift the automatic stay to allow Moving Parties to allow discovery of Grace employees and/or produce documents on Syloid 244, to explore the matter of Debtor's insurance coverage, and to pursue a state court indemnity cross-complaint against the Debtor.  Again, Movant agrees to limit its recovery to the extent of any insurance proceeds which may exist for Debtor.

**TYBOUT, REDFEARN & PELL**

SHERRY RUGGIERO FALLON (#2464)
300 Delaware Avenue, Suite 1100
P.O. Box 2092
Wilmington, DE 19899
(302) 658-6901

Of Counsel:

GARY E. YARDUMIAN, ESQUIRE
BRADLEY L. TAYLOR, ESQUIRE
Prindle, Decker & Amaro, LLP
310 Golden Shore, Fourth Floor
Long  Beach,  CA  90801-5511

Attorneys for Cross-Defendants,
Home  Saving  Termite  Control,
Inc. and W.F. Morris

DATED: May 1, 2000

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| W. R. GRACE & COMPANY, | : | Case No. 01-01139 JJF |
| | : | |
| Debtor. | : | |

| | | |
|---|---|---|
| TIG INSURANCE COMPANY, a | : | |
| California corporation, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Reference No. _____ |
| | : | |
| GARY SMOLKER, an individual, | : | |
| and ALICE SMOLKER, an | : | |
| individual, and DOES 1-10, | : | |
| inclusive, | : | |
| | : | |
| Defendant. | : | |

AND RELATED CROSS-ACTIONS    :
CONCERNING HOME SAVING TERMITE:
CONTROL, INC. and W.F. MORRIS :

## ORDER

AND, NOW, TO-WIT, this _____ day of _____,
2001, Moving Parties', Home Saving Termite Control, Inc. and Wayne
Morris, Motion for Order Granting Relief from Automatic Stay
pursuant to 11 U.S.C. § 362, having been presented and heard by the
Honorable Court, relief from the Automatic Stay is hereby **GRANTED**,
as follows:

(1) Moving Parties are permitted to take discovery against
Debtor in an ongoing state action;

(2) Debtors' employees may be called as witnesses in an
ongoing state action; and

(3) Moving Parties may file a cross-complaint for indemnity against the Debtor, to the extent of any available insurance coverage.

_____
Judge

1

## DECLARATION OF GARY E. YARDUMIAN

2  I, Gary E. Yardumian, declare as follows:

3  1.  I am an attorney, duly licensed to practice law in all the courts of the State of California,

4  and am admitted to practice in the United States District Court, Central District of California. I am a

5  partner with the law firm of Prindle, Decker & Amaro LLP, attorneys of record for Moving Parties,

6  HOME SAVING TERMITE CONTROL, INC., and WAYNE MORRIS (hereinafter "Moving Parties").

7  I am the attorney primarily responsible for handling the state court action entitled TIG Insurance

8  Company v. Gary Smolker, et al., Case No. BC 173952.  As such, I am readily familiar with the facts

9  of this case and have personal knowledge of the facts set forth in this declaration. If called upon as a

10  witness, I could, and would, testify competently as follows:

11  2.  I have retained the services of WILL REDFEARN of TYBOUT, REDFEARN & PELL,

12  a member of the bar of this Court to represent HOME SAVING TERMITE CONTROL, INC., and

13  WAYNE MORRIS at the hearing in this action and assist my firm in appearing pro hac vice.. Enclosed

14  herein under separate cover is Moving Parties Motion and Order for Admission Pro Hac Vice.

15  3.  The aforementioned state court action arises out of a October 11 and 12, 1996 application

16  of Syloid 244 at the HOME SAVING TERMITE CONTROL, INC. (hereinafter "Home Saving")

17  applied the Debtor's product, Syloid 244, to the GARY SMOLKER and ALICE SMOLKER (hereinafter

18  "the Smolkers") condominium unit for the purpose of eradicating termites. The Smolkers allege in their

19  civil lawsuit that they have sustained personal injuries as a result of exposure to Syloid 244.

20  4.  Syloid 244 was manufactured and distributed by Debtor, W.R. GRACE & COMPANY

21  (hereinafter "Debtor").

22  5.  On or about July 2, 1997, TIG Insurance Company filed a declaratory relief action against

23  the Smolkers seeking a declaration that TIG Insurance Company is not required to pay for any insurance

24  proceeds to the Smolkers. Thereafter, in October of 1997, the Smolkers filed a cross-complaint against

25  HOME SAVING TERMITE CONTROL, INC., WAYNE MORRIS, W.R. GRACE & COMPANY,

26  PACIFIC VILLAS HOMEOWNER'S ASSOCIATION, CAROL KAY and numerous other parties

27  alleging 31 causes of action, including but not limited to a strict products liability cause of action against

28  HOME SAVING TERMITE CONTROL, INC., WAYNE MORRIS and W.R. GRACE & COMPANY.

LAW OFFICES OF
PRINDLE, DECKER & AMARO LLP

10

LAW OFFICES OF
PRINDLE, DECKER & AMARO LLP

1    Thereafter, cross-defendant and homeowner, CAROL KAY filed a cross-complaint against HOME

2    SAVING TERMITE CONTROL, INC., WAYNE MORRIS and W.R. GRACE & COMPANY for

3    indemnity and other related causes of action.

4        6.    The gravamen of the Smolkers' cross-complaint is that Syloid 244 is a defective product

5    and was negligently applied by Home Saving as a termite control product.  The state court action was

6    filed in the Los Angeles Superior Court Central District.  A true and correct copy of said cross-complaint

7    is attached hereto as Exhibit "A".

8        7.    On or about July 2, 1998, the PACIFIC VILLAS HOMEOWNER'S ASSOCIATION

9    and CAROL KAY filed separate cross-complainants against HOME SAVING TERMITE CONTROL,

10    INC., WAYNE MORRIS and W.R. GRACE & COMPANY for indemnity and other related causes of

11    action.  A true and correct copy of the CAROL KAY cross-complaint is attached hereto as Exhibit "B".

12        8.    Shortly after the Smolkers filed their cross-complaint Moving Parties and Debtor entered

13    into a joint defense agreement to defend against the Smolkers' claims.  One of the provisions of the joint

14    defense agreement provided neither Moving Parties nor Debtor would file a cross-complaint against each

15    other.  Further, the joint defense agreement provided each party would assist in defense costs, and

16    provide cooperation and assistance in discovery and at trial.

17        9.    On or about April 2, 2001, Debtor filed a Chapter 11 petition for bankruptcy relief.  Said

18    bankruptcy petition, entitled In Re W.R. GRACE & COMPANY, bears the case number 01-01139, and

19    is currently pending before this Court.

20        10.    Pursuant to 11U.S.C.§ 362(a), certain acts and proceedings were automatically stayed

21    by the filing of said Petition, including discovery and any claims for indemnity against Debtor in the

22    above-referenced state court action.  Further, the automatic stay removes Debtor from the state court

23    action and precludes their participation at trial in the state court action as a party, as deponents and/or

24    in a cross-complaint for indemnity.

25        11.    On or about April 17, 2001, I spoke telephonically to Brian Porter, counsel for W.R.

26    GRACE & COMPANY, and requested he make W.R. GRACE & COMPANY employees available for

27    deposition. I have not heard back from him regarding such deposition requests and our production of

28    documents via subpoena.

11

12.     On or about April 20, 2001, Brian Porter represented W.R. GRACE & COMPANY would not make any of its employees available for deposition. He also refused to agree to a stipulation which would allow Moving Parties to pursue a cross-complainant, but solely to the extent of any insurance proceeds. Further, he represented W.R. GRACE & COMPANY will oppose any motion for relief from the automatic stay.

13.     I need to depose the person(s) most knowledgeable at W.R. GRACE & COMPANY regarding their product Syloid 244 and Mr. Julian Convey in order to defend against the Smolkers' strict products liability action against HOME SAVING. I need to depose the persons most knowledgeable at W.R. GRACE & COMPANY regarding their product Syloid 244 in order to establish the product Moving Parties applied to the Smolkers' condominium unit was not defective does not create an unreasonable risk of injury to the Plaintiffs in our action, establish its widespread use, sales, lack of claims and its negligible toxicity.

14.     Moving Parties bring the instant Motion in order conduct discovery against W.R. GRACE & COMPANY regarding the alleged defective product it manufactured, Syloid 244. Further, Moving Parties bring the instant Motion to protect their rights to be fully protected compensated for their loss, if any, in the state court action. Attached hereto and incorporated herein by reference as Exhibit "C" are depositions which we intend to pursue, once the stay is relieved. Commissions for Out of State Records to Issue Deposition subpoenas for the production of business records are being sought through the California Superior Court, Judge Fruin.

15.     The deposition of person(s) most knowledgeable for Grace Davison have also been noticed in California as Grace Davison has an office in Southern California. Attached hereto and incorporated herein by reference as Exhibit "D" are true and correct copies of a Notice of Deposition of Grace Davison employee, Greg Ranocchia, and for the person(s) most knowledgeable for Grace Davison.

16.     Trial in the state court action is set to begin September 17, 2001. The state court action is in the later part of the discovery stage, but progress on the state court action has been interfered with, due to Debtor's bankruptcy.

LAW OFFICES OF
PRINDLE, DECKER & AMARO LLP

GEY/SMOLKER/PLEADINGS/MOT-RELIEF.wpd     **MOTION FOR RELIEF FROM AUTOMATIC STAY UNDER 11 U.S.C.§ 362**

17.    Moving Parties will be prejudiced if they are not able to reach any of the Debtor's insurance proceeds in the underlying state court action, because they would incur significant losses in time and expense in order to pursue an indemnity cross-complaint against Debtor in a later, separate lawsuit.

18.    Moving Parties will be prejudiced if they are not able to conduct discovery against W.R. GRACE & COMPANY, because without such discovery Moving Parties will be unable to effectively establish Syloid 244 is not defective.

19.    Furthermore, Moving Parties will experience undue prejudice if they are forced to defend against the state law strict products liability claim at trial without the presence of W.R. GRACE & COMPANY employees/witnesses who are most knowledgeable about the manufacturing and distribution of the alleged defective product.

20.    As stated in the petition, Moving Parties agree not to attempt to enforce any judgment obtained in the state court action by levying against the assets of Debtor's bankruptcy estate.  Rather, Moving Parties agree to limit their recovery against Debtor, if any, solely to the extent of any insurance proceeds.  Consequently, Debtor's bankruptcy estate will not be prejudiced.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April ___, 2001, at Long Beach, California.

_____
GARY E. YARDUMIAN, Declarant

LAW OFFICES OF
PRINDLE, DECKER & AMARO LLP

GEY/SMOLKER/PLEADINGS/MOT-RELIEF.wpd    **MOTION FOR RELIEF FROM AUTOMATIC STAY UNDER 11 U.S.C.§ 362**

1
2
3
4

Gary S. Smolker, SBN 5611,
Alice M. Graham, SBN 83046
Law Offices of Smolker & Graham
4720 Lincoln Blvd., Suite 280
Marina Del Rey, CA  90292-6977
Tel:  (310) 574-9880  Fax: (310) 574-9883

5

Attorneys for Defendants and Cross-complainants
Gary Smolker and Alice Smolker

6
7
8

SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

FOR THE COUNTY OF LOS ANGELES

10
11
12

TIG INSURANCE COMPANY, a California
Corporation,

        Plaintiff,

) Case No. BC 173952
)
) (Honorable Dzintra Janavs, Judge)
) (Department 15)
)

13

vs.

)
)

14
15
16
17

GARY SMOLKER, an individual, and ALICE
SMOLKER, an individual, and DOES 1-10,
inclusive,

        Defendants.

) **FIFTH AMENDED CROSS-COMPLAINT**
) **FOR EQUITABLE RELIEF AND**
) **DAMAGES FOR**
)
)
) 1.  **Breach of Contract,**
) 2.  **Bad Faith Breach of Duty of Good Faith**
) **and Fair Dealing,**

18
19
20
21
22
23
24
25
26
27

——————————————

GARY SMOLKER and ALICE SMOLKER,

        Cross-complainants,

vs.

HOME SAVING TERMITE CONTROL,
INC.; W.F. MORRIS; RIKK THOMPSON;
W.R. GRACE & CO.; GRACE DAVISON;
COREGIS GROUP, INC.; COREGIS
INSURANCE COMPANY; CALIFORNIA
INSURANCE COMPANY; TRUCK
INSURANCE EXCHANGE; TRUCK
UNDERWRITERS ASSOCIATION;

) 3.  **Strict Liability,**
) 4.  **Negligence,**
) 5.  **Nuisance and maintenance of nuisance,**
) 6.  **Abatement of Nuisance,**
) 7.  **Trespass,**
) 8.  **Assault and Battery,**
) 9.  **Wrongful eviction and waste,**
) 10.  **Contribution and imposition of**
) **lien/foreclosure,**
) 11.  **Willful Misconduct,**
) 12.  **Breach of Fiduciary Duty,**
) 13.  **Fraud,**
) 14.  **Misuse of Confidential Information and**
) **Wrongful Interference with Relationships,**
) 15.  **Intentional interference with existing**
) **contractual and advantageous economic**
) **relationship through deceit, and**

28

-1-

FIFTH AMENDED CROSS COMPLAINT

| | |
|---|---|
| FARMERS GROUP, INC.; FARMERS INSURANCE GROUP OF COMPANIES; PACIFIC VILLAS HOMEOWNERS' ASSOCIATION; TIG INSURANCE COMPANY; RELIANCE INSURANCE COMPANY; FRONTIER PACIFIC INSURANCE COMPANY; JAMES W. HOLLAND; JULIE A HOLLAND; LANCE J. ROBBINS; JOSEPH A. BAILEY, II; ANGELA JORDAN VERDUN; GERALD W. IVORY; MATTHEW JOHN FREDERICKS; VIRGINIA A CIPRIANO; ALLSTATE INSURANCE COMPANY; STATE FARM FIRE AND CASUALTY COMPANY; INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, TIG INSURANCE COMPANY OF TEXAS, NATIONWIDE INSURANCE COMPANY, and ROES 1-200, inclusive, | **16. Intentional interference with prospective advantageous economic relationship.** |
| Cross-defendants. | |

Come now cross-complainants, Gary Smolker and Alice Smolker, and file this fifth amended cross-complaint under protest in compliance with restrictions set forth in court orders made on July 23, & 28 and August 2, 1999, by Honorable Dzintra Janavs, Judge Presiding, which the Smolkers contend are an unconstitutional abridgment of their first and fourteenth amendment rights, an abridgment of their right of freedom of speech, an abridgment of their right to petition the government for redress of grievances, an abridgment of due process of law and a denial to the Smolkers of equal protection of the laws; also, the court had no jurisdiction over this case when it made these orders. Gary Smolker and Alice Smolker allege on information and belief, as follows:

### PRELIMINARY FACTS REGARDING MEDICAL PAY CLAIMS

1. From January 1, 1996 and through on or about December 1997, cross-defendant Carol Kay ("KAY") owned an estate in real property commonly known as 15 63rd Ave., Playa del Rey, CA., and resided in her condominium thereat with her husband Samuel Eskenazi ("ESKENAZI"). In or about 1996, cross-defendant KAY and her husband ESKENAZI purchased medical

-2-

payments coverage for the benefit of others (a) injured on their residence premises and any premises used by KAY or ESKENAZI in connection with their private residence, and also purchased medical payment coverage for persons (b) injured off these premises if the bodily injury (i) arose out of a condition of the insured premises or immediately adjoining ways, or (ii) was caused by the activities of KAY or ESKENAZI. KAY and ESKENAZI purchased this coverage for the benefit of others from cross-defendant ALLSTATE INSURANCE COMPANY ("ALLSTATE"), a business entity conducting business in California.

2. KAY'S estate in such real property was a condominium consisting of a separate interest in a residential building on such real property, known as Unit #6, together with an undivided one sixth interest in common in other portions of the same property known as the common areas.  The individual separate units in the condominium and the common area are as shown and defined on the condominium plan recorded on 3-3-77 as Instrument No. 77-219328 in the official records in the office of the County Recorder of Los Angeles County, California (CONDOMINIUM PLAN).

3. The condominium, at 15 63rd St., Playa del Rey,  consists of a multi-story multifamily residential building with a common hallway providing the only ingress and egress to the front door of each individual condominium unit. The common hallway is also the only means of access to the U.S. Mail Box at which mail is delivered for all units in the building. The U.S. Mail Box for this condominium is located in the common hallway.

4. In a condominium, a unit is the separate interest, and the common areas are the entire condominium except the units granted. Thus the owners of a condominium are the grantees of the units, each grantee owning a separate interest in his unit and an interest, as a tenant in common, in the common areas.

5. In 1996 and/or in early 1997, ALLSTATE issued a condominium owner's liability policy, ALLSTATE Policy No. 14321027 ("ALLSTATE POLICY"), containing a medical payments to others provision, denoted Coverage Y Guest Medical Protection in the ALLSTATE POLICY, to KAY and ESKENAZI, providing the coverage described above in paragraph 1 for

-3-

1 the benefit of Gary Smolker and Alice Smolker. Gary Smolker and Alice Smolker are intended

2 beneficiaries of the ALLSTATE POLICY. The medical payment provisions of the ALLSTATE

3 POLICY (Coverage Y) create a direct obligation of ALLSTATE to Gary Smolker and Alice

4 Smolker to pay reasonable expenses incurred for necessary medical, surgical, x-ray and dental

5 services for expenses incurred and services rendered within three years from the date of an

6 occurrence causing bodily injury to which this policy applies, regardless of KAY'S negligence or

7 liability or ESKENAZI'S negligence or liability and without regard to the fault of Gary Smolker

8 or Alice Smolker.

9     6.  While the ALLSTATE POLICY was in effect, Gary Smolker and Alice Smolker

10 incurred medical, x-ray, surgical, dental and hospital expenses for bodily injuries, sustained on the

11 insured premises, covered by the ALLSTATE POLICY and made a timely claim for medical

12 benefits owing to Gary Smolker and Alice Smolker under the ALLSTATE POLICY to

13 ALLSTATE. Gary Smolker's bodily injuries and Alice Smolker's bodily injuries arose out of a

14 condition on the insured premises, and/or arose out of a condition on immediately adjoining ways,

15 and were caused by the activities of KAY and/or ESKENAZI.

16     7.  In or about December 1997, KAY sold and conveyed KAY's interest in KAY's

17 condominium (KAY's separate interest in Unit #6 and undivided one sixth interest in the common

18 areas, as shown and defined on the CONDOMINIUM PLAN) to cross-defendants James Holland

19 and Julie Holland ('HOLLANDS"), who thereafter rented their condominium out to tenants who

20 resided therein during 1997 and 1998. The HOLLANDS took up residence in their condominium

21 in 1999. At the time the HOLLANDS became the owners of KAY's condominium, and

22 continuously thereafter, the HOLLANDS had in effect medical payments coverage they had

23 purchased for the benefit of others, issued by cross defendant State Farm Fire and Casualty

24 Company ("STATE FARM").

25     8.  This coverage is provided as Coverage M - MEDICAL PAYMENTS, in STATE

26 FARM policy No.92-ND-7739-7 ("STATE FARM HOLLAND POLICY"). The STATE FARM

27 HOLLAND POLICY obligates STATE FARM to pay medical expenses for bodily injury caused

28

-4-

by an accident on the premises owned or rented by the HOLLANDS, on ways next to premises the HOLLANDS own or rent, and to pay medical expenses caused because of the HOLLANDS' operations. The STATE FARM HOLLAND POLICY obligates STATE FARM to make medical expense payments regardless of fault. Gary Smolker and Alice Smolker are intended beneficiaries of the STATE FARM HOLLAND POLICY. The medical payment provisions of the STATE FARM HOLLAND POLICY (Coverage M) create a direct obligation of STATE FARM to Gary Smolker and Alice Smolker to pay reasonable medical expenses for necessary medical, surgical, x-ray, dental and hospital services incurred or medically ascertained within one year of the date of the accident.

9. While the STATE FARM HOLLAND POLICY was in effect, Gary Smolker and Alice Smolker incurred medical, x-ray and hospital expenses for bodily injury (A) caused by accidents on the premises owned by HOLLAND, (B) caused by accidents on ways next to premises owned by HOLLAND, and (C) caused by the HOLLANDS' operations, covered by the STATE FARM HOLLAND POLICY and made a timely claim for medical payment benefits owing under the STATE FARM HOLLAND POLICY to STATE FARM.

10. Cross defendant Lance Robbins ("ROBBINS") owns, and at all times material to this action owned, an estate in real property commonly known as 15 63rd Ave., Playa del Rey, CA. At all times material to this action ROBBINS has resided in his condominium thereat with his wife Rachel Robbins. At all times material to this action ROBBINS had in effect medical payments coverage ROBBINS had purchased for the benefit of others issued by STATE FARM. ROBBINS' estate in such property is, and was at all times material to this action, a condominium consisting of a separate interest in a residential building on such property, known as Unit #5, together with an undivided one sixth interest in common in other portions of the same property know as the common areas. Unit #5 and the common area are defined and shown on the CONDOMINIUM PLAN.

11. This coverage is provided as Coverage M - MEDICAL PAYMENTS TO OTHERS, in STATE FARM Policy Number 71-K2-2599-7 ("STATE FARM ROBBINS POLICY"). The

-5-

1  STATE FARM ROBBINS POLICY obligates STATE FARM to pay the necessary medical
2  expenses incurred or medically ascertained within three years from the date of an accident causing
3  bodily injury to (A) any person on such property, and to (B) any person off the insured location, if
4  the bodily injury arises out of a condition of the insured location or the ways immediately
5  adjoining; or is caused by the activities of ROBBINS.  Gary Smolker and Alice Smolker are
6  intended beneficiaries of the STATE FARM ROBBINS POLICY. The medical payment
7  provisions of the STATE FARM ROBBINS POLICY (Coverage M) create a direct obligation of
8  STATE FARM to Gary Smolker and Alice Smolker to pay reasonable expenses incurred or
9  medically ascertained within three years from the date of an accident for necessary medical,
10 surgical, x-ray and dental services causing bodily injury to which this policy applies, regardless of
11 ROBBINS' negligence or liability and without regard to the fault of Gary Smolker or Alice
12 Smolker.

13      12.  While the STATE FARM ROBBINS POLICY was in effect, Gary Smolker and Alice
14 Smolker incurred medical, x-ray, surgical, dental and hospital expenses for bodily injuries,
15 sustained on the insured location, covered by the STATE FARM ROBBINS POLICY and made a
16 timely claim to STATE FARM for medical payment benefits owing under the STATE FARM
17 ROBBINS POLICY.  Gary Smolker's bodily injuries and Alice Smolker's bodily injuries arose
18 out of a condition on the insured premises, and/or immediately adjoining ways, and were caused
19 by the activities of ROBBINS.

20      13. From on or about January 1, 1996 forward, cross-defendant Matthew John Fredericks
21 ("FREDERICKS") owned an estate in real property commonly known as 15 63rd Ave., Playa del
22 Rey, CA., and resided in his condominium thereat with his wife Luchie ("LUCHIE").  In or about
23 1996, cross-defendant FREDERICKS purchased medical payments coverage for the benefit of
24 others (a) injured on these residential premises and any premises used by FREDERICKS and/or
25 LUCHIE in connection with their private residence, and also purchased medical payment
26 coverage for persons (b) injured off these premises if the bodily injury (i) arose out of a condition
27 of the insured premises or immediately adjoining ways, or (ii) was caused by the activities of

28

1  FREDERICKS or LUCHIE. FREDERICKS and LUCHIE purchased this coverage for the
2  benefit of others from cross-defendant INTERINSURANCE EXCHANGE OF THE
3  AUTOMOBILE CLUB ("AUTO CLUB"), a business entity conducting business in California.
4  FREDERICKS' estate in such real property is, and was at all times material to this action, a
5  condominium consisting of a separate interest in a residential building on such real property,
6  known as Unit #1, together with an undivided one sixth interest in common in other portions of
7  the same property known as the common areas. Unit #1 and the common area are shown and
8  defined on the CONDOMINIUM PLAN.

9      14. In or about early 1996, AUTO CLUB issued a condominium owner's/ homeowner's
10  liability policy, AUTO CLUB Policy No. PC 6043964 ("AUTO CLUB POLICY"), containing a
11  medical payments to others provision to FREDERICKS, providing the coverage described above
12  in paragraph 13 for the benefit of Gary Smolker and Alice Smolker. Gary Smolker and Alice
13  Smolker are intended beneficiaries of the AUTO CLUB POLICY. The medical payment
14  provisions of the AUTO CLUB POLICY create a direct obligation of AUTO CLUB to Gary
15  Smolker and Alice Smolker to pay reasonable expenses incurred or medically ascertained for
16  necessary medical, surgical, x-ray and dental services for treatment of bodily injury to which this
17  policy applies, regardless of FREDERICKS' negligence or liability or LUCHIE'S negligence or
18  liability and without regard to the fault of Gary Smolker or Alice Smolker.

19      15. While the AUTO CLUB POLICY was in effect, Gary Smolker and Alice Smolker
20  incurred medical, x-ray, surgical, dental and hospital expenses for bodily injuries, sustained on the
21  insured premises, at the insured location, covered by the AUTO CLUB POLICY and made a
22  timely claim for medical payment benefits under the AUTO CLUB POLICY. Gary Smolker's
23  bodily injuries and Alice Smolker's bodily injuries arose out of a condition on the insured
24  premises, and/or arose out of a condition on immediately adjoining ways, and were caused by the
25  activities of FREDERICKS and/or LUCHIE.

26      16. On or about June 30, 1996, Gary Smolker and Alice Smolker purchased an
27  automobile insurance policy (Policy No. TKA 2308 70 78) from cross-defendant TIG

28

FIFTH AMENDED CROSS COMPLAINT

INSURANCE COMPANY ("TIG AUTO P0LICY"), having a policy period of June 30, 1996 through June 30, 1997. The TIG AUTO POLICY provides medical payments coverage which obligates cross-defendant TIG INSURANCE COMPANY ("TIG") to pay reasonable expenses for medical services rendered and for medical services determined to be needed because of bodily injury caused by an accident and sustained by Gary Smolker or Alice Smolker or any Smolker family member or any other person while occupying the Gary Smolker's or Alice Smolker's automobile, within three years from the date of the accident. On or about June 30, 1997, and thereafter, Gary Smolker and Alice Smolker purchased additional automobile insurance coverage from cross-defendant TIG INSURANCE COMPANY OF TEXAS ("TEXAS") (Policy No. TRA 2308 70 78) under which TEXAS undertook to pay reasonable expenses incurred for necessary medical services because of bodily injuries caused by an accident and sustained by Gary Smolker or Alice Smolker or any Smolker family member or any other person while occupying an automobile owned by Gary Smolker and/or Alice Smolker (coverage provided by this policy is similar to the medical payment coverage obligations and all other obligations under the TIG AUTO POLICY) for policy periods June 30, 1997 through December 30, 1997, December 30, 1997 through June 30, 1998, June 30, 1998 through December 30, 1998, and December 30, 1998 through June 30, 1999 ("TEXAS AUTO POLICY"). Gary Smolker and Alice Smolker also purchased automobile insurance containing medical payments coverage which obligated cross-defendant NATIONWIDE INSURANCE COMPANY ("NATIONWIDE") (Policy No. 23087078) to pay for reasonable expenses incurred for necessary medical services because of bodily injuries sustained by Gary Smolker or Alice Smolker or any Smolker family member or any other person while occupying an automobile owned by Gary Smolker and/or Alice Smolker (coverage provided by this policy is similar to the medical payment obligations and other additional obligations specified in the TIG AUTO POLICY) ("NATIONWIDE AUTO POLICY"). The NATIONWIDE AUTO POLICY has a policy period of June 30, 1998 through December 30, 1998.

17. While the TIG AUTO POLICY, the TEXAS AUTO POLICY, and the NATIONWIDE AUTO POLICY were in full force and effect, Gary Smolker, Alice Smolker, Leah Smolker, and Judi Smolker incurred expenses for necessary medical expenses because of bodily injury caused by accidents while occupying Gary Smolker's and Alice Smolker's insured automobiles, covered by the TIG AUTO POLICY, the TEXAS AUTO POLICY, and the NATIONWIDE AUTO POLICY and made timely claims for medical benefits to TIG, TEXAS and NATIONWIDE.

18. In 1996, cross-defendant Pacific Villas Homeowners' Association ("PACIFIC VILLAS") purchased various poisons, including poisons it is illegal to own use or possess, as agent of and on behalf KAY, ROBBINS, and FREDERICKS, and had these poisons applied throughout the condominium complex located at 15 63rd Avenue, Playa del Rey, CA. Gary Smolker, Alice Smolker, Leah Smolker and Judi Smolker reside, and have resided in this condominium complex for more than ten years.

19. These poisons were applied throughout the condominium complex through holes drilled in walls, ceilings and the cement slab in the garage in a negligent, reckless and illegal manner. For example, holes were drilled in the drop ceiling of the common area hallway and poisonous pesticide dust was injected at a pressure of about 125 pounds per square inch through these holes into the structural space of approximately eighteen to twenty four inches between the drop ceiling and the floor above without sealing the various paths from the structural space for the pesticide dust to be blown back into the atmosphere of the common area hallway. The holes drilled into the ceiling for the purpose of injecting pesticide dust into the structural space between the drop ceiling and the floor above were left unsealed for almost two years.

20. Pesticide dust injected through holes drilled in the drop ceiling of the common area hallway went through one hole and out another into the atmosphere of the common area hallway during the pesticide application process and thereafter settled on the carpet and walls and doors and mailbox in the common area hallway. At the time of the pesticide application, October 1996, various patently obviously pathways already existed, in the drop ceiling, such as light fixtures,

1  recessed lights, and fans and fan grills, for the pesticide injected through holes drilled in the
2  common hallway drop ceiling to be blown back into the atmosphere of the common area hallway.
3  During the pesticide application, and thereafter, pesticide was blown back into the common area
4  hallway atmosphere through openings in light fixtures and fans, open interfaces between the light
5  fixtures and fans and the atmosphere of the common area hallway and the structural space above
6  the drop ceiling, and through the holes drilled in the drop ceiling for the purpose of injecting
7  pesticide into the structural space above the drop ceiling.

8      21. When KAY, ESKENAZI, ROBBINS, FREDERICKS, LUCHIE, JAMES W.
9  HOLLAND, JULIE A. HOLLAND, the HOLLANDS' tenants guests and workers opened their
10  front door, or any other door connected to the common area hallway, they caused pesticide dust
11  to be blown out of the structural void above the common area drop ceiling into the atmosphere of
12  the common area hallway; when they walked in the common area hallway they caused pesticide
13  dust to be blown out of the structural void above the common area hallway drop ceiling into the
14  atmosphere of the common area hallway and caused dust that had settled on the common area
15  hallway carpet and walls to be stirred up and recirculated into the common area atmosphere.  The
16  pesticide dust that got into the common area atmosphere and on the common area carpet and
17  walls got onto Gary Smolker, Alice Smolker, Leah Smolker and Judi Smolker, and thereafter was
18  tracked and blown into the Smolker's home at the condominium complex.  This pesticide
19  poisoned the Smolkers and caused the Smolkers to suffer bodily injury for which they obtained
20  medical attention which caused Gary Smolker and Alice Smolker to incur medical expenses
21  covered by the ALLSTATE POLICY, STATE FARM POLICY, and AUTO CLUB POLICY.

22      22. Gary Smolker and Alice Smolker complained to KAY, ESKENAZI, HOLLANDS,
23  ROBBINS, and FREDERICKS that Gary and Alice Smolker and their children (Leah Smolker
24  and Judi Smolker) had been poisoned and made ill and were being continuously poisoned and
25  made ill by the presence of pesticide in the condominium complex.  Gary Smolker and Alice
26  Smolker complained to and advised KAY, ESKENAZI, HOLLANDS, ROBBINS, and
27  FREDERICKS of the danger presented by the presence of pesticide in the common area carpet, in

28

FIFTH AMENDED CROSS COMPLAINT

1  the atmosphere of the common area hallway, on the walls in the common area hallway, and of the
2  continuing danger presented by allowing holes to remain in the walls and ceiling of the
3  condominium complex that allowed pesticide to enter the atmosphere of the common area
4  hallway and the atmosphere of the Smolkers' home, and of the unreasonable risk of injury
5  presented by not having the common area carpet cleaned and/or replaced and the common area
6  hallway walls and ceilings cleaned ,and of the unreasonable danger presented by allowing holes
7  drilled in the common area  hallway ceiling to remain unsealed and that opening and closing doors
8  in the common area hallway and/or walking the common area hallway caused pressure forces
9  which caused more pesticide to be drawn into the atmosphere of the common area hallway.

10       23. KAY, HOLLANDS, ROBBINS, and FREDERICKS refused to have the holes drilled
11  in the common area hallway drop ceiling sealed for over a year after the Oct. 1996 pesticide
12  treatment in the condominium complex occurred, and refused to have the pesticide that
13  contaminated the common area carpet, walls, ceiling and doors remediated, which created a
14  dangerous condition that contributed to Gary Smolker, Alice Smolker, Leah Smolker, and Judi
15  Smolker being poisoned and being made ill and suffering bodily injury.  Gary and Alice Smolker
16  incurred  medical expenses caused by such bodily injury, covered by the ALLSTATE POLICY,
17  STATE FARM HOLLAND POLICY, STATE FARM ROBBINS POLICY, and AUTO CLUB
18  POLICY.

19       24. After the October 1996 pesticide treatment of the condominium complex, poisonous
20  substances got into the Smolker's insured automobiles and caused bodily injury to Gary Smolker,
21  Alice Smolker, Leah Smolker and Judi Smolker, which resulted in Gary Smolker and Alice
22  Smolker incurring medical expenses covered by the TIG AUTO POLICY, TEXAS AUTO
23  POLICY, and NATIONWIDE AUTO POLICY.

24

25  ### FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT
26  ### BY CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER
27  ### AGAINST CROSS DEFENDANT ALLSTATE

28

-11-

1

2      25. Cross-complainants Gary Smolker and Alice Smolker ("the SMOLKERS") hereby

3  refer to and incorporate each and every allegation contained in paragraphs 1 through 6, and

4  paragraphs 18 through 23 of this fourth amended cross-complaint as though the same were set

5  out at this point.

6      26. ALLSTATE has been aware of the SMOLKERS injuries and that medical expenses

7  incurred by the SMOLKERS' were covered by the ALLSTATE POLICY for approximately one

8  year. In January 1999 the SMOLKERS first discovered the existence of the ALLSTATE

9  POLICY. On or about February 8, 1999, the SMOLKERS submitted a written claim for payment

10  of medical expenses covered under the ALLSTATE POLICY, for medical payment benefits

11  owing to the SMOLKERS. By letter dated Feb. 26, 1999, ALLSTATE acknowledged receipt of

12  the SMOLKERS' claim. The SMOLKERS sent a follow up letter by fax and mail to ALLSTATE

13  on March 3, 1999 requesting payment of medical expense benefits covered by the ALLSTATE

14  POLICY and owing to the SMOLKERS.

15      27. By letter dated March 4, 1999, ALLSTATE set forth ALLSTATE's contentions

16  regarding the facts underlying the SMOLKERS' claim, ALLSTATE's legal analysis of the facts,

17  and ALLSTATE informed the SMOLKERS that ALLSTATE declined to pay medical payment

18  benefits owing to the SMOLKERS. In the March 4, 1999 letter, ALLSTATE misstated the facts

19  and misapplied the law to the facts underlying the SMOLKERS' claim.

20      28. On March 8, 1999, the SMOLKERS faxed and mailed a reply to ALLSTATE's letter

21  dated March 4, 1999, in which the SMOLKERS informed ALLSTATE that ALLSTATE'S letter

22  left out material facts concerning the SMOLKERS' medical payment coverage claim and

23  mischaracterizes the facts underlying the SMOLKERS' claim. In their March 8, 1999 letter, the

24  SMOLKERS set forth all pertinent facts underlying their claim and explained why their claim was

25  covered by the ALLSTATE POLICY.

26      29. ALLSTATE responded to the SMOLKERS' March 8, 1999 letter by letter dated

27  March 22, 1999. Thereafter, more correspondence ensued between the SMOLKERS and

28

-12-

ALLSTATE. ALLSTATE continued to refuse to pay any of the medical expenses covered by the ALLSTATE POLICY. The SMOLKERS wrote and sent further letters to ALLSTATE by fax on March 29, 1999, April 21, 1999, April 24, 1999, April 29, 1999, and May 14, 1999. ALLSTATE responded by letters dated April 1, 1999 and April 23, 1999. The failure and refusal of ALLSTATE to pay any of the SMOLKERS' medical expenses, after request of the SMOLKERS' request to do so, was a breach of the ALLSTATE POLICY.

30. As a direct and proximate result of ALLSTATE's breach of contract the SMOLKERS have been damaged in a sum to be proved at trial in the amount of medical expenses already incurred and in the additional amount of future medical treatments ascertained or unascertained which will be necessary to treat the bodily injury suffered by Gary Smolker, Alice Smolker, Leah Smolker and Judi Smolker. ALLSTATE has been unjustly enriched by the amount of medical expenses ALLSTATE should have already paid and will be unjustly enriched in the future by an additional sum equal to the amount of future medical expenses to be incurred by the SMOLKERS that ALLSTATE should pay but refuses to pay. The amount of unjust enrichment will be proved at time of trial.

31. The SMOLKERS have suffered emotional damages, and loss of earnings and earning capacity as a direct and proximate and foreseeable result of ALLSTATE's breach of contract in an amount to be proved at time of trial.

WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION FOR BREACH OF
## DUTY OF GOOD FAITH AND FAIR DEALING BY
## CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER
## AGAINST CROSS DEFENDANT ALLSTATE

32.  Cross-complainants Gary Smolker and Alice Smolker reallege and incorporate herein by reference each and every allegation contained in paragraphs 25 through 31 of this fifth amended cross-complaint.

33.  Implied in the ALLSTATE POLICY are covenants by ALLSTATE that ALLSTATE would act in good faith and deal fairly, only engage in fair practices in dealing with the SMOLKERS and would treat the SMOLKERS with decency and humanity and not abuse its discretionary power and authority when processing the SMOLKERS' claim for medical benefits, and would do nothing to interfere with the SMOLKERS' rights to receive medical payment benefits under the ALLSTATE POLICY.

34.  At all times since receipt of notice of the SMOLKERS' claim for payment of medical expenses, ALLSTATE has known that the SMOLKERS are entitled to payment of medical expenses and has wrongfully, deliberately and without just cause refused to pay any of the SMOLKERS' medical expenses, in breach of ALLSTATE's covenant of good faith.  In further breach of ALLSTATE'S covenant of good faith, ALLSTATE has informed the SMOLKERS that the SMOLKERS must bring and prosecute a lawsuit to prove the SMOLKERS incurred medical expenses as a direct result of KAY's and/or ESKENAZI'S activities, if the SMOLKERS intend to receive any payment for medical expenses from ALLSTATE.

35.  As a direct and proximate result of ALLSTATE'S bad faith conduct, and breach of fiduciary duties, the SMOLKERS have suffered compensable losses, including benefits withheld, loss of earning capacity and earnings, and have suffered embarrassment and humiliation, anxiety and frustration, and severe mental and emotional distress and discomfort, all to the SMOLKERS damage in amounts not fully ascertainable but within the jurisdiction of this court in an amount to be proved at the time of trial.

36.  Cross-defendant ALLSTATE'S conduct described herein was done willfully with a conscious disregard of the SMOLKERS' rights and with intent to vex, cause unjust hardship to, injure and annoy the SMOLKERS, such as to constitute oppression, fraud and malice under California Civil Code Section 3294 entitling the SMOLKERS, and each of them, to punitive

-14-

1  damages in an amount appropriate to punish and set an example of cross-defendant ALLSTATE

2  by means of punishment.

3      WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as

4  hereinafter set forth.

### THIRD CAUSE OF ACTION FOR BREACH OF CONTRACT
### BY CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER
### AGAINST CROSS DEFENDANT STATE FARM

10     37.  Cross-complainants Gary Smolker and Alice Smolker ("the SMOLKERS") hereby

11  refer to and incorporate each and every allegation contained in paragraphs 1 through 12, and

12  paragraphs 18 through 23 of this fifth amended cross-complaint as though the same were set out

13  at this point.

14     38.  STATE FARM has been aware of the SMOLKERS injuries and that medical

15  expenses incurred by the SMOLKERS' were covered by the STATE FARM HOLLAND

16  POLICY and by the STATE FARM ROBBINS POLICY since on or about early January 1998.

17  In January 1999 the SMOLKERS first discovered the existence of the medical pay benefits under

18  such policies.  On or about January 16, 1999, the SMOLKERS submitted a written claim for

19  payment of medical expenses covered under the STATE FARM HOLLAND POLICY and under

20  the STATE FARM ROBBINS POLICY, for medical payment benefits owing to the

21  SMOLKERS.  By letters dated Feb. 3 and Feb. 4, 1999, STATE FARM acknowledged receipt of

22  the SMOLKERS' claim and requested that the SMOLKERS submit medical bills and reports to

23  support the SMOLKERS' claims for Medical Payments Coverage.  The SMOLKERS mailed and

24  faxed the information requested applicable to medical payments due under the STATE FARM

25  HOLLAND POLICY and under the STATE FARM ROBBINS POLICY to STATE FARM on

26  Feb. 10, 1999.  Thereafter STATE FARM failed and refused to communicate with the

27

28

-15-

1  SMOLKERS about the SMOLKERS' medical payments coverage claims in spite of follow up

2  letters and faxes sent to STATE FARM.

3      39. Finally, by letters dated April 3, 1999 and April 6, 1999, STATE FARM set forth

4  STATE FARM'S contentions regarding the facts underlying the SMOLKERS' claim, STATE

5  FARM'S legal analysis of the facts, and STATE FARM informed the SMOLKERS that STATE

6  FARM declined to pay medical payment benefits owing to the SMOLKERS.  In the April 3 and

7  April 6, 1999 letters, STATE FARM misstated the facts and misapplied the law to the facts

8  underlying the SMOLKERS' claim.

9      40. By return post, the SMOLKERS faxed and mailed a reply to STATE FARM'S letters

10  dated April 3 and April 6, 1999, and follow-up replies to further correspondence from STATE

11  FARM in which the SMOLKERS informed STATE FARM'S that STATE FARM'S letter left

12  out material facts concerning the SMOLKERS' medical payment coverage claim,

13  mischaracterizes the facts underlying the SMOLKERS' claim, and applied the wrong law to the

14  facts underlying the SMOLKERS' claims.  In their reply and follow-up letters, the SMOLKERS

15  set forth all pertinent facts underlying their claim and explained why their claim was covered by

16  the STATE FARM HOLLAND POLICY and by the STATE FARM ROBBINS POLICY.

17      41. STATE FARM responded to the SMOLKERS' reply and follow-up letters.  STATE

18  FARM continued to refuse to pay any of the medical expenses covered by the STATE FARM

19  HOLLAND POLICY and continued to refuse to pay any of the medical expenses covered by the

20  STATE FARM ROBBINS POLICY.  STATE FARM'S refusal to pay any of the SMOLKERS'

21  medical expenses was in breach of the STATE FARM HOLLAND POLICY and in breach of the

22  STATE FARM ROBBINS POLICY.

23      42. As a direct and proximate result of STATE FARM'S breach of contract the

24  SMOLKERS have been damaged in a sum to be proved at trial in the amount of medical expenses

25  already incurred and in the additional amount of future medical treatments ascertained or

26  unascertained which will be necessary to treat the bodily injury suffered by Gary Smolker, Alice

27  Smolker, Leah Smolker and Judi Smolker.  STATE FARM has been unjustly enriched by the

28

-16-

1  amount of medical expenses STATE FARM should have already paid and will be unjustly

2  enriched in the future by an additional sum equal to the amount of future medical expenses to be

3  incurred by the SMOLKERS that STATE FARM should pay but refuses to pay.  The amount of

4  unjust enrichment will be proved at time of trial.

5      43.  The SMOLKERS have suffered emotional damages, and loss of earnings and earning

6  capacity as a direct and proximate and foreseeable result of STATE FARM'S breach of contract

7  in an amount to be proved at time of trial.

8      WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as

9  hereinafter set forth.

10

11           **FOURTH CAUSE OF ACTION FOR BREACH OF**

12           **DUTY OF GOOD FAITH AND FAIR DEALING BY**

13       **CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER**

14           **AGAINST CROSS DEFENDANT STATE FARM**

15

16      44.  Cross-complainants Gary Smolker and Alice Smolker reallege and incorporate herein

17  by reference each and every allegation contained in paragraphs 37 through 43 of this fifth

18  amended cross-complaint.

19      45.  Implied in the STATE FARM HOLLAND POLICY and in the STATE FARM

20  ROBBINS POLICY are covenants by STATE FARM that STATE FARM would act in good

21  faith and deal fairly, only engage in fair practices in dealing with the SMOLKERS and would treat

22  the SMOLKERS with decency and humanity and not abuse its discretionary power and authority

23  when processing the SMOLKERS' claim for medical benefits, and would do nothing to interfere

24  with the SMOLKERS' rights to receive medical payment benefits under the STATE FARM

25  HOLLAND POLICY and would never do anything to interfere with the SMOLKERS rights to

26  receive medical benefits under the STATE FARM ROBBINS POLICY.

27

28

FIFTH AMENDED CROSS COMPLAINT

46. At all times since receipt of notice of the SMOLKERS' claim for payment of medical expenses, STATE FARM has known that the SMOLKERS are entitled to payment of medical expenses and has wrongfully, deliberately and without just cause refused to pay any of the SMOLKERS' medical expenses, in breach of STATE FARM'S covenant of good faith. In further breach of STATE FARM'S covenant of good faith, STATE FARM has informed the SMOLKERS that the SMOLKERS must bring and prosecute a lawsuit to prove the SMOLKERS incurred medical expenses as a direct result of the HOLLANDS' and/or ROBBINS' activities, if the SMOLKERS intend to receive any payment for medical expenses from STATE FARM.

47. As a direct and proximate result of STATE FARM'S bad faith conduct, and breach of fiduciary duties, the SMOLKERS have suffered compensable losses, including benefits withheld, loss of earning capacity and earnings, and have suffered embarrassment and humiliation, anxiety and frustration, and severe mental and emotional distress and discomfort, all to the SMOLKERS damage in amounts not fully ascertainable but within the jurisdiction of this court in an amount to be proved at the time of trial.

48. Cross-defendant STATE FARM'S conduct described herein was done willfully with a conscious disregard of the SMOLKERS' rights and with intent to vex, cause unjust hardship to, injure and annoy the SMOLKERS, such as to constitute oppression, fraud and malice under California Civil Code Section 3294 entitling the SMOLKERS, and each of them, to punitive damages in an amount appropriate to punish and set an example of cross-defendant STATE FARM by means of punishment.

WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT
## BY CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER
## AGAINST CROSS DEFENDANT AUTO CLUB

-18-

49. The SMOLKERS hereby refer to and incorporate by reference each and every allegation contained in paragraphs 3 through 15, and paragraphs 18 through 23 of this fifth amended complaint as thought the same were set out at this point.

50. The SMOLKERS submitted a claim for medical payments owing to the SMOLKERS under the AUTO CLUB POLICY to AUTO CLUB in February 1999. In breach of the AUTO CLUB POLICY, the AUTO CLUB refused to tell the SMOLKERS whether the AUTO CLUB would pay the SMOLKERS' claim and the AUTO CLUB failed and refused to pay the SMOLKERS's claim.

51. As a direct and proximate result of AUTO CLUB'S breach of contract the SMOLKERS have been damaged in a sum to be proved at trial in the amount of medical expenses already incurred and in the additional amount of future medical treatments ascertained or unascertained which will be necessary to treat the bodily injury suffered by Gary Smolker, Alice Smolker, Leah Smolker and Judi Smolker. AUTO CLUB has been unjustly enriched by the amount of medical expenses AUTO CLUB should have already paid and will be unjustly enriched in the future by an additional sum equal to the amount of future medical expenses to be incurred by the SMOLKERS that AUTO CLUB should pay but refuses to pay. The amount of unjust enrichment will be proved at time of trial.

52. The SMOLKERS have suffered emotional damages, and loss of earnings and earning capacity as a direct and proximate and foreseeable result of AUTO CLUB'S breach of contract in an amount to be proved at time of trial.

WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## SIXTH CAUSE OF ACTION FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER AGAINST CROSS DEFENDANT AUTO CLUB

-19-

53. Cross-complainants Gary Smolker and Alice Smolker reallege and incorporate herein by reference each and every allegation contained in paragraphs 49 through 52 of this fifth amended cross-complaint.

54. Implied in the AUTO CLUB POLICY are covenants by AUTO CLUB that would act in good faith and deal fairly, only engage in fair practices in dealing with the SMOLKERS and would treat the SMOLKERS with decency and humanity and not abuse its discretionary power and authority when processing the SMOLKERS' claim for medical benefits, and would do nothing to interfere with the SMOLKERS' rights to receive medical payment benefits under the AUTO CLUB POLICY.

55. At all times since receipt of notice of the SMOLKERS' claim for payment of medical expenses, AUTO CLUB has known that the SMOLKERS are entitled to payment of medical expenses and has wrongfully, deliberately and without just cause refused to pay any of the SMOLKERS' medical expenses, in breach of AUTO CLUB'S covenant of good faith.

56. As a direct and proximate result of AUTO CLUB'S bad faith conduct, and breach of fiduciary duties, the SMOLKERS have suffered compensable losses, including benefits withheld, loss of earning capacity and earnings, and have suffered embarrassment and humiliation, anxiety and frustration, and severe mental and emotional distress and discomfort, all to the SMOLKERS damage in amounts not fully ascertainable but within the jurisdiction of this court in an amount to be proved at the time of trial.

57. Cross-defendant AUTO CLUB'S conduct described herein was done willfully with a conscious disregard of the SMOLKERS' rights and with intent to vex, cause unjust hardship to, injure and annoy the SMOLKERS, such as to constitute oppression, fraud and malice under California Civil Code Section 3294 entitling the SMOLKERS, and each of them, to punitive damages in an amount appropriate to punish and set an example of cross-defendant AUTO CLUB by means of punishment.

FIFTH AMENDED CROSS COMPLAINT

1    WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as

2    hereinafter set forth.

## SEVENTH CAUSE OF ACTION FOR BREACH OF CONTRACT
## AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
## BY CROSS COMPLAINANTS GARY SMOLKER AND ALICE SMOLKER
## AGAINST CROSS DEFENDANTS TEXAS AND NATIONWIDE

58. The SMOLKERS incorporate herein by reference each and every allegation contained in paragraphs 16, 17, and 24 of this fifth amended cross-complaint as though the same were set out at this point.

59. In breach of the TEXAS AUTO POLICY, TEXAS refused to pay medical payment benefits owing to the SMOLKERS. In breach of the NATIONWIDE AUTO POLICY, NATIONWIDE refused to pay medical payment benefits owing to the SMOLKERS. TEXAS' refusal to pay was unreasonable and without just cause, with a conscious disregard of the SMOLKERS' rights and with intent to vex and annoy the SMOLKERS. NATIONWIDE's refusal was unreasonable and without just cause., with a conscious disregard of the SMOLKERS rights and with intent to vex and annoy the SMOLKERS. The SMOLKERS have been injured as a direct and proximate result of the conduct of TEXAS and NATIONWIDE in an amount to be proved at trial.

WHEREFORE, cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## ADDITIONAL PRELIMINARY FACTS REGARDING NEGLIGENCE, NUISANCE, TRESPASS, WASTE, PRODUCT LIABILITY AND WILLFUL MISCONDUCT CLAIMS

-21-

1    60. That certain real property commonly known as 15 63rd Ave., Playa del Rey, CA. is,
2 and at all times material herein was, a condominium project ("CONDOMINIUM COMPLEX")
3 consisting of common areas and six individual condominium units all as more particularly
4 described, depicted and shown on the CONDOMINIUM PLAN.

5    61. Cross-defendant Joseph A. Bailey, II ("BAILEY"), now owns, and, has owned a
6 separate interest in Unit #3 of the CONDOMINIUM COMPLEX together with an undivided one
7 sixth interest in the common areas for more than ten years. Cross-defendant Virginia A. Cipriano
8 ("CIPRIANO"), now owns, and, has owned a separate interest in Unit #1 of the
9 CONDOMINIUM COMPLEX together with an undivided one sixth interest in the common
10 areas, in common with FREDERICKS, since July 1996. Gary Smolker now owns, and, has
11 owned a separate interest in Unit #4 in the CONDOMINIUM COMPLEX together with an
12 undivided one-sixth interest in the common areas for over 20 years. Cross-defendants Gerald W.
13 Ivory ("IVORY") and Angela Jordan Verdun ("VERDUN"), now own, and, have jointly owned a
14 separate interest in Unit #2 of the CONDOMINIUM COMPLEX together with an undivided one
15 sixth interest in the common areas for more than five years.

16    62. At all times material to this action, the owners of individual interests in the
17 CONDOMINIUM COMPLEX, and each of them, delegated control and management of the
18 common areas of the CONDOMINIUM COMPLEX to their homeowners association, PACIFIC
19 VILLAS, which has no ownership interest in the CONDOMINIUM COMPLEX. At all times
20 material to this action, the owners of the common areas of CONDOMINIUM COMPLEX were
21 subject to the same nondelegable duties to control and manage their property as are other
22 property owners.

23    63. The current owners of the common areas of the CONDOMINIUM COMPLEX are
24 the HOLLANDS, ROBBINS, BAILEY, VERDUN, IVORY, FREDERICKS, CIPRIANO, and
25 Gary Smolker, who currently are tenants-in-common owners of the common areas of the
26 CONDOMINIUM COMPLEX.

27

28
-22-

64. The common areas of the CONDOMINIUM COMPLEX have been negligently maintained controlled managed and operated by ROBBINS, BAILEY, VERDUN, IVORY, FREDERICKS, and PACIFIC VILLAS, and each of them, since 1994. CIPRIANO has negligently managed maintained controlled and operated the common areas of the CONDOMINIUM COMPLEX since July 1996. The HOLLANDS have negligently managed maintained controlled and operated the common areas of the CONDOMINIUM COMPLEX since December 1997. The common areas of the CONDOMINIUM COMPLEX were negligently managed maintained controlled and operated by KAY from 1994 through December 1997.

65. As a direct and proximate result of the negligent maintenance, control, management and operation of the common areas of the CONDOMINIUM COMPLEX by the HOLLANDS, ROBBINS, BAILEY, VERDUN, IVORY, FREDERICKS, (collectively "CURRENT OPERATORS") and PACIFIC VILLAS, and each of them, the roof of the CONDOMINIUM COMPLEX now leaks and has leaked for years causing water damage to the SMOLKERS' home when it rains; the common areas are now infested with termites and have been infested with termites for years, eating up the wooden structure of the CONDOMINIUM COMPLEX and depreciating the value of Gary Smolker's condominium unit therein and necessitating future repairs of the wooden members of the structure. As a direct and proximate result of the acts and omissions of cross-defendants, and each of them, there are now hazardous irritating toxic poisonous substances in the common areas and in the SMOLKERS' home. As a direct and proximate result of the acts and omissions of cross-defendants, and each of them, poisonous substances deposited in the structural voids in the common areas of the CONDOMINIUM COMPLEX by HOME SAVING in 1996 have been "blown" out of the structural voids in the common areas into the common area hallway and into the SMOLKERS' home; these poisonous substances have damaged the SMOLKERS' home, the SMOLKERS' personal property, the SMOLKERS' health, and interfered with the SMOLKERS' comfortable enjoyment of their life and property; as a direct result of the of the acts and omissions of cross-defendants, and each of them, these poisonous substances have been and are being deposited on the SMOLKERS, are

1    being inhaled by the SMOLKERS, and being deposited on the SMOLKERS' property.  There is
2    unrepaired water damage in the common areas; an irritating bad odor in the common area hallway
3    and unsightly open holes cut into the common area hallway ceiling, which interfere with the
4    SMOLKERS' use and enjoyment of their home; there is unrepaired earthquake damage, wind
5    damage, termite damage, water damage, dilapidation and poisonous substances in the common
6    areas which have constituted a known hazardous and dangerous condition in the
7    CONDOMINIUM COMPLEX for years.  The common area has been in a continuous dilapidated
8    condition since 1994.  The common area roof has leaked since 1994.  The common areas have
9    been infested with termites since 1994.  The common areas have been contaminated with
10   poisonous substances owned by CURRENT OPERATORS which have come out from behind the
11   walls and ceilings of the common area, during 1999, 1998, and 1997, into the atmosphere of the
12   common area hallway, and into the atmosphere of the SMOLKERS' home.

13        66.  As a direct and proximate result of the negligence of cross-defendant HOME
14   SAVING TERMITE CONTROL, INC.("HOME SAVING"), cross-defendant W.F. MORRIS
15   ("MORRIS"), cross-defendant W.R. GRACE & CO.("GRACE"), cross-defendant GRACE
16   DAVISON ("GRACE DAVISON"), ROBBINS, BAILEY, VERDUN, IVORY, CIPRIANO,
17   FREDERICKS, and PACIFIC VILLAS (collectively "INITIAL PROCURING CAUSE
18   DEFENDANTS"), and each of them, illegal irritating toxic poisonous substances were illegally
19   applied in the common areas of the CONDOMINIUM COMPLEX at the request and under the
20   direction of KAY, ROBBINS, BAILEY, VERDUN, IVORY, FREDERICKS, CIPRIANO and
21   PACIFIC VILLAS (collectively "REQUESTERS"), and each of them, in October 1996 for the
22   purpose of eradicating termites, in violation of *Food & Agriculture* Sections 12993, and 12995
23   and in violation of 7 *US Code* Section 136(a).  Thereafter, cross-defendants, and each of them,
24   failed to exercise reasonable care to prevent the SMOLKERS and the SMOLKERS' home and
25   automobiles from being exposed to the irritating toxic poisonous substances which had been
26   applied in the common areas of the CONDOMINIUM COMPLEX for the purpose of eradicating
27   termites.

28

-24-

67.  MORRIS is a resident of Los Angeles County, and alter ego of HOME SAVING. HOME SAVING is a California corporation which, now and, at all times material to this action, held itself out as being a licensed bonded and insured general contractor and pest control operator.  In October 1996 HOME SAVING was employed by PACIFIC VILLAS, on behalf of REQUESTERS, to eradicate termite infestations in the CONDOMINIUM COMPLEX.  While working for REQUESTERS on this project, in October 1996, HOME SAVING created holes in the common areas and in the SMOLKERS' home through which poisonous substances and water could and did enter into the SMOLKERS' home and through which poisonous substances could and did enter the common area hallway.  HOME SAVING misapplied pesticides in the common areas of the CONDOMINIUM COMPLEX and in the SMOLKERS' home .  During HOME SAVING's application of pesticides, irritating toxic poisonous substances were caused to enter into the common area hallway and into the SMOLKERS' home through holes created by HOME SAVING and through other already existing openings in the walls and ceilings that were plainly visible.  As a direct and proximate result of HOME SAVING's misapplication of pesticides in the CONDOMINIUM COMPLEX irritating toxic poisonous substances also entered into the SMOLKERS' automobiles.  HOME SAVING applied pesticides in the CONDOMINIUM COMPLEX in such a way that irritating toxic poisonous substances would come into the common area hallway and into the SMOLKERS' home after HOME SAVING was done applying pesticides when there were vibrations in the building, and/or or when doors opening on the common area hallway were opened and closed, when people walked in the common area hallway, when a wind blew against the building, or whenever there were pressure changes or temperature changes which created a pressure differential or temperature differential between the pressure or temperature in the wall and ceiling voids of the common areas and in the SMOLKERS's home which created air movements into the SMOLKERS' home or into the common area hallway.

68.  As a direct and proximate result of the acts and omissions of HOLLANDS, ROBBINS, BAILEY, VERDUN, IVORY and FREDERICKS (collectively 'CURRENT RESIDENTS"), and of the acts and omissions of all other cross-defendants, and each of them, in

1   1997, 1998, and 1999, irritating toxic poisonous substances entered into and were deposited on

2   the SMOLKERS' property and persons, and were involuntarily inhaled by the SMOLKERS.

3   CURRENT RESIDENTS, and each of them, caused irritating toxic poisonous substances to be

4   blown into the atmosphere of the common area hallway, on to the walls of the common area

5   hallway, on to the carpet in the common area hallway, into the SMOLKERS' home, to be

6   deposited on the SMOLKERS' furniture furnishings and clothing, and to be deposited on the

7   SMOLKERS.

8       69. The SMOLKERS notified CURRENT RESIDENTS, CIPRIANO, and PACIFIC

9   VILLAS (collectively "CURRENT RESIDENTS PLUS"), and each of them, of the danger

10  presented to the SMOLKERS and to the common areas of the CONDOMINIUM COMPLEX by

11  CURRENT RESIDENTS PLUS' refusal and failure to deal with unsanitary and dangerous

12  conditions in the common areas: leaks, moisture, dryrot, deteriorated (termite eaten) structure,

13  termites, SYLOID 244 in the common areas of the CONDOMINIUM COMPLEX. The

14  SMOLKERS notified all cross-defendants, and each of them, that HOME SAVING had applied a

15  pesticide, SYLOID 244, in the walls and ceilings of the common areas, for the purpose of

16  eradicating termites, which it is against the law to own possess or use for the purpose of

17  eradicating termites. [SYLOID 244 is the trade name of a product manufactured by GRACE

18  DAVISON.] The SMOLKERS notified cross-defendants, and each of them, that HOME

19  SAVING was cited for violating state pest control laws by the State of California for using

20  SYLOID 244, an unregistered economic poison, for pest control purposes, and provided cross-

21  defendants, and each of them, with a copy of the citation issued to HOME SAVING.

22      70. Cross-defendants, and each of them, refused to take steps to prevent and/or to

23  minimize the release of irritating toxic poisonous substances into the atmosphere of the common

24  area hallway, or to minimize or to prevent the release of irritating toxic poisonous substances into

25  the atmosphere of the SMOLKERS' home from the common areas. CURRENT RESIDENTS

26  PLUS, and each of them, refused to take steps do necessary repair work in the common area to

27  prevent water damage to the SMOLKERS' property and to the common areas of the

28

-26-

FIFTH AMENDED CROSS COMPLAINT

1  CONDOMINIUM COMPLEX when it rained, or to clean up water damaged materials in the

2  common area, or to keep the common area hallway carpet clean, or to repair or to clean water

3  damaged carpet and drop ceiling in the common area hallway, or to take steps to prevent the

4  termites infesting the building from continuing to destroy the common areas of the

5  CONDOMINIUM COMPLEX.

6      71. The SMOLKERS are, and at all times herein mentioned were, financially unable to

7  mitigate losses and unable to single handedly properly maintain, repair and operate the common

8  areas of the CONDOMINIUM COMPLEX.

9      72. GRACE is, and at all times herein mentioned was, a Delaware corporation directly

10  doing business in California and also doing business in California through its business unit, and

11  subsidiary corporation, GRACE DAVISON. In or about the second half of 1996, GRACE

12  DAVISON and GRACE, with knowledge of the dangerous propensities of SYLOID 244 (a

13  product consisting of three micron particles of synthetic amorphous silica dust), and its unfitness

14  and danger to human occupants inhabiting an atmosphere containing SYLOID 244, and with

15  knowledge that it was against the law to distribute, sell, offer for sale, hold for distribution,

16  deliver, offer to deliver, release for delivery or manufacture SYLOID 244 for use as a pesticide,

17  sold and delivered SYLOID 244 in the form of 3 micron particles of silica dust to HOME

18  SAVING for use as a pesticide in the CONDOMINIUM COMPLEX; to be applied in the

19  CONDOMINIUM COMPLEX by HOME SAVING via HOME SAVING's "proprietary

20  pesticide sandblasting system." Due to its inherent characteristics, no safe design of SYLOID 244

21  is possible for use of SYLOID 244 as a pesticide in HOME SAVING's "proprietary sandblasting"

22  pest control process.

23      73. SYLOID 244 is an irritating toxic poisonous dust capable of causing dermatitis, lung

24  damage and dried out mucous membranes if it comes in contact with or is inhaled by a human

25  being. At the time of GRACE's and GRACE DAVISON's sales and delivery of SYLOID 244 to

26  HOME SAVING, SYLOID 244 was not registered for use as a pesticide with either the US EPA

27  or with the State of California. In October 1996, HOME SAVING "sandblasted" SYLOID 244,

28

-27-

in the form it was received from GRACE DAVISON and GRACE, into the structural voids of the CONDOMINIUM COMPLEX for the purpose of eradicating existing termite infestations in the CONDOMINIUM COMPLEX, and to prevent future termite infestations, by blasting SYLOID 244 through holes drilled into the walls and ceilings of the CONDOMINIUM COMPLEX at a pressure of around 125 pounds per square inch, with knowledge that the SYLOID 244 blasted into the structure would be directly deposited in the living areas of the SMOLKERS' home, that possession and/or storage of the unregistered pesticide SYLOID 244 in the structural voids of the common areas of the CONDOMINIUM COMPLEX is illegal and would make each condominium unit in the CONDOMINIUM COMPLEX unmarketable.

74. HOME SAVING applied SYLOID 244 received from GRACE DAVISON and GRACE in the CONDOMINIUM COMPLEX in HOME SAVING's customary way, without giving clear written notice to Gary Smolker of work to be performed as required by the *California Business & Profession Code*. As HOME SAVING applied SYLOID 244 in the CONDOMINIUM COMPLEX, SYLOID 244 was directly discharged into the condominium unit owned by Gary Smolker in which the SMOLKERS reside without the SMOLKERS' consent. It was against the law for GRACE DAVISON to manufacture , sell and deliver SYLOID 244 and against the law for GRACE to sell and deliver SYLOID 244 to HOME SAVING for use as a pesticide. It was against the law for HOME SAVING to apply SYLOID 244 in the CONDOMINIUM COMPLEX. *California Food & Agriculture Code* § 12993; *7 US Code* §136a(a). *Business & Professions Code* §§ 8538, 8553, 8638, 8641, 8642, 8643, 8648, 8695. *California Code of Administrative Regulations Title 3 Division 6*, §§ 6600, 6614, 6616. *Penal Code* §§ 374.8 and 594(a).

75. SYLOID 244 is an abrasive desiccant, a "super absorbent and/or adsorbent sponge." SYLOID 244 can capture (absorb or adsorb) molecules and chemicals in the atmosphere or in liquid or solid mediums which any surface of SYLOID 244 comes in contact with. The SYLOID 244 manufactured and sold by GRACE DAVISON and GRACE to HOME SAVING was in the form of respirable silica dust particles, which are invisible to the naked eye. These "invisible"

FIFTH AMENDED CROSS COMPLAINT

particles are capable of entering the human body through inhalation and then compromising the body's immune system. These "invisible" particles are also capable of causing respiratory problems, such as reactive airway disease, pneumoconiosis, and silicosis after they have been inhaled. Silica particles of the size and type constituting SYLOID 244 can enter the lungs and make their way to the alveolar regions of the lungs. The alveolar are small sacks at the end of the respiratory tract, where diffusion of molecules to the blood occurs. Silica particles of the size and type applied by HOME SAVING in the CONDOMINIUM COMPLEX can penetrate through the alveolar lining and injure the endothelium of the neighboring capillary. This injury causes the semi-permeable capillary to become completely permeable, thereby removing the capillaries selectivity. Once the silica particles are in the capillaries, they can break the red blood cells' membranes ultimately causing cell death. The silica surface of the particles applied in the CONDOMINIUM COMPLEX can interact with cell and plasma contents disrupting normal hydrogen bonds causing natural polymers to coagulate and precipitate and causing proteins, which rely on hydrogen bonding for shape and function, to become denatured. As the silica particles absorb water, they dry the mucous membranes and deposit in the lymph nodes and the macrophages. The macrophages are a key part of the immune system's defense. Silica particles applied in the CONDOMINIUM COMPLEX by HOME SAVING can cause macrophages to secret additional unnecessary lysosomal enzymes and can block the immune system's response making people more susceptible to bacterial infection. Infection and inflammation are associated with inhalation of silica particles of the type and size constituting SYLOID 244. Contact with SYLOID 244 dries out mucous membranes, which can cause dry mouth, sore lips, sore throats, burning nostrils, burnt esophagus, etc. Dermal contact with SYLOID 244 can cause dermatitis. Silica is a known carcinogen. As a direct and proximate result of the acts and omissions of cross-defendants, and each of them, the SMOLKERS, and each of them, involuntarily came in contact with SYLOID 244, involuntarily inhaled SYLOID 244, and were injured as a direct and proximate result thereof.

76.  HOME SAVING illegally and negligently applied 30 3/4 pounds of SYLOID 244 in the common areas of the CONDOMINIUM COMPLEX, and negligently applied Dursban in the garage on the SMOLKERS' side of the CONDOMINIUM COMPLEX.  HOME SAVING drilled a series of holes in the walls and ceilings in the SMOLKERS' home, and in other condominium units in the CONDOMINIUM COMPLEX, and in the garage where the SMOLKERS park their automobiles, in an improper manner that was without the SMOLKERS' consent.  Several holes were drilled at a time in walls and ceilings in the CONDOMINIUM COMPLEX.  Thereafter, HOME SAVING exploded SYLOID 244 through these holes under an explosive pressure of approximately 125 pounds per square inch.  As pesticide (SYLOID 244) was blasted into one hole under this explosive pressure, pesticide (SYLOID 244), and other materials that had been in the wall voids and ceiling voids, were exploded out of adjacent hole(s), light sockets, phone jackets and other openings, and were directly discharged into the interior living areas of the SMOLKERS' home, while the pesticide application procedure was on-going.  FREDERICKS, as president of PACIFIC VILLAS and as representative of all co-owners of the common area of the CONDOMINIUM COMPLEX, personally monitored HOME SAVING's work.  FREDERICKS observed HOME SAVING drill holes in the walls and ceilings of the condominium units. FREDERICKS observed HOME SAVING blast pesticide dust into the walls and ceilings of the condominium through the holes HOME SAVING had drilled in the walls and ceilings. FREDERICKS observed clouds of pesticide dust being blasted out of one of the holes drilled by HOME SAVING and out of light sockets and phone jacks and being discharged directly into the living area of individual condominium units, while HOME SAVING was blasting pesticide dust into an adjacent hole.  FREDERICKS understood that pesticide dust was being blasted into the living areas of individual condominium units by HOME SAVING, but did nothing to stop HOME SAVING.

77.  HOME SAVING did not seal openings in the CONDOMINIUM COMPLEX through which pesticide would be exploded and discharged into the living areas of individual condominium units before, during, or after HOME SAVING's pesticide blasting procedure.  No precautions

1   were taken by HOME SAVING to prevent the pesticide blasted by HOME SAVING into the
2   walls and ceilings of the CONDOMINIUM COMPLEX from being discharged directly into the
3   living spaces in individual condominium units.  HOME SAVING did not seal openings through
4   which pesticide could enter into living areas of the CONDOMINIUM COMPLEX.  The explosive
5   pressure force of the HOME SAVING's pesticide blasting procedure created holes and openings
6   in the structure.  HOME SAVING left holes HOME SAVING had created in the walls and
7   ceilings in the SMOLKERS' home and in the common area hallway unsealed.  Holes created by
8   HOME SAVING in the CONDOMINIUM COMPLEX destroyed the integrity of the structure of
9   the CONDOMINIUM COMPLEX.

10          78.  In December 1996, January 1997 and February 1997, the SMOLKERS complained to
11  HOME SAVING that HOME SAVING had introduced irritating poisonous toxic substances in to
12  the SMOLKERS' home; the SMOLKERS asked HOME SAVING to clean up the mess HOME
13  SAVING had made in the SMOLKERS' home, and asked HOME SAVING for information
14  concerning the health effects and toxicological properties of the pesticides HOME SAVING had
15  applied in the CONDOMINIUM COMPLEX .  In December 1996 and January 1997, HOME
16  SAVING personnel returned to the SMOLKERS' home.  During these visits, HOME SAVING
17  personnel negligently performed repair work on the walls and ceilings in the SMOLKERS' home
18  which created an unsightly mess and did not seal all the openings through which pesticide was
19  entering into the SMOLKERS' home, negligently performed clean-up work in such a way as to
20  recirculate SYLOID 244 that had settled onto carpets and hard surfaces in the SMOLKERS'
21  home back into the air in the SMOLKERS' home, and assured the SMOLKERS that they had
22  cleaned up all the pesticide on the SMOLKERS' carpets furniture and furnishings, that they had
23  sealed all the holes through which pesticide was entering into the SMOLKERS' home and that
24  SYLOID 244 was a harmless substance that had no deleterious properties that could possibly
25  cause any physical irritation or annoyance or adverse health effects.  In December 1996 and
26  February 1997, Gary Smolker spoke to cross-defendant RIKK THOMPSON ("THOMPSON");
27  In December 1996, January and February 1997 Gary Smolker spoke to MORRIS.  THOMPSON

28

-31-

1    and MORRIS represented themselves to be HOME SAVING's licensed experts on pesticides and

2    intimately familiar with the pesticides applied by HOME SAVING in the SMOLKERS' home.

3    THOMPSON and MORRIS told Gary Smolker that pesticide injected in the SMOLKERS' home

4    by HOME SAVING was visible to the naked and if it got on the carpets or furniture in the

5    SMOLKERS' home would be visible to the naked eye.  THOMPSON and MORRIS also told

6    Gary Smolker that if the pesticide injected in the SMOLKERS' home got came in contact with

7    human skin or was inhaled it would not cause any irritation, could not cause any adverse health

8    effect to human beings and was harmless to human beings.  THOMPSON and MORRIS gave

9    Gary Smolker a written MATERIAL SAFETY DATA SHEET for SYLOID 244 ("MSDS")

10   which they told Gary Smolker fully described the properties and regulatory approval of the

11   pesticide applied in the SMOLKERS' home by HOME SAVING.  The MSDS indicates SYLOID

12   244 is registered and approved by the US EPA for use as a pesticide.  THOMPSON and

13   MORRIS knew SYLOID 244 was not registered and approved for use as a pesticide by the US

14   EPA or by the State of California, that HOME SAVING had been ordered to stop using SYLOID

15   244 as a pesticide because SYLOID 244 was not registered for use as a pesticide and that

16   someone had had her entire esophagus burnt up by inhaling SYLOID 244 applied in her home

17   when THOMPSON and MORRIS gave Gary Smolker the MSDS and told Gary Smolker that

18   SYLOID 244 was harmless.

19        79.  In March 1997, Gary Smolker notified GRACE and GRACE DAVISON that his

20   home had been contaminated with SYLOID 244, that SYLOID 244 was in the walls cavities

21   surrounding his home, that he was suffering adverse health effects from exposure to SYLOID 244

22   and asked for information concerning the health effects and toxicological properties of SYLOID

23   244, use restrictions on use of SYLOID 244 as a pesticide, or otherwise, whether the

24   SMOLKERS were being exposed to danger under these circumstances, and to be warned about

25   any danger the Smolkers could be exposed to due the presence of SYLOID 244 in their home and

26   in the walls and ceilings surrounding the living areas of their home.  Mr. Smolker also asked

27   GRACE and GRACE DAVISON how to remove the SYLOID 244 that had been discharged into

28

-32-

1  the SMOLKERS' home and from the structural voids in the walls and ceilings surrounding his
2  home. Communications went on between Gary Smolker, on the one hand and GRACE and
3  GRACE DAVISON, on the other hand, during March, April, May and July 1997. During these
4  communications GRACE and GRACE DAVISON failed to take reasonable steps to protect the
5  SMOLKERS from being injured from exposure to SYLOID 244. GRACE and GRACE
6  DAVISON gave Gary Smolker misleading and incorrect information and concealed from Gary
7  Smolker that inhaling SYLOID 244 could cause serious respiratory problems, that SYLOID 244
8  was not registered with the US EPA or the State of California for use as a pesticide, that HOME
9  SAVING had been ordered to cease using SYLOID 244 as a pesticide, and that it was not safe to
10 have SYLOID 244 in the SMOLKERS' home or that the SYLOID 244 in the walls and ceilings
11 would continue to enter the living areas of the SMOLKERS' home whenever the wind blew, the
12 building vibrated, there were temperature changes, etc.

13      80.  In or about March 1997 through July 1997, and repeatedly thereafter, Gary Smolker
14 notified and made claims to various insurance carriers for property damage losses and medical
15 expenses covered by policies issued by these carriers. The SMOLKERS notified each of these
16 carriers that the SMOLKERS were suffering on-going adverse health effects and injuries due to
17 the presence of irritating toxic poisonous substances in the CONDOMINIUM COMPLEX, in
18 their home, and in their automobiles. These insurance carriers were promptly put on notice that
19 any delay in processing the SMOLKERS' claim would result in physical damage to the
20 SMOLKERS and to their property. The insurance carriers notified were cross-defendants Truck
21 Insurance Exchange ("TIE"), Farmers Insurance Group of Companies ("FIG"), California
22 Insurance Company ("CAINCO"), Coregis Insurance Company ("CIC"), Reliance Insurance
23 Company ("RELIANCE"), Frontier Pacific Insurance Company ("FRONTIER"), and TIG. The
24 SMOLKERS asked each of these carriers to explain insurance benefits provided under their
25 respective insurance policies that were, or might be, applicable to the injuries, losses, and
26 expenses suffered by the SMOLKERS and/or to costs necessary to remediate contamination
27 and/or to repair property damage and/or to replace damaged and/or contaminated property.

28

82. The SMOLKERS repeatedly notified REQUESTERS, and each of them, of the injuries the SMOLKERS had suffered and were suffering, of the need to repair the common areas to prevent further injury to the SMOLKERS, that any delay in repairing the common areas would result in physical damage to the SMOLKERS and to their property, and how the individual conduct of REQUESTERS, and each of them, was causing injury to the SMOLKERS. While the HOLLANDS were in escrow to purchase Unit #6 from KAY, or shortly after the HOLLANDS purchased Unit #6 from KAY, the SMOLKERS notified the HOLLANDS of the injuries the SMOLKERS had suffered and were suffering, of the need to repair the common areas to prevent further injury to the SMOLKERS, that any delay in repairing the common areas would result in physical injury to the SMOLKERS and to their property, and thereafter repeatedly notified the HOLLANDS how the HOLLANDS' individual conduct was causing injury to the SMOLKERS.

83. In March 1997 the SMOLKERS submitted a written claim for insurance benefits to TIE and FIG. FIG is a joint venture between a group of companies, including cross-defendants Farmers Group, Inc. ("FGI"), Truck Underwriters Association ("TUA"), and TIE. This group of companies jointly market themselves; jointly sell and administer claims under insurance policies they jointly sell; pool their risks; and jointly administer the businesses of the insurance companies whose policies they sell and administer. FGI is, and at all times material to this action was, the managing partner and chief administrator of the affairs of FIG. In April 1997 Gary Smolker was advised that the claim the SMOLKERS had submitted to TIE and FIG had been transferred to the FIG's environmental claims office for administration and investigation. In May, 1997, Gary Smolker, was contacted by Raymond Holybee, who identified himself as being an environmental claims expert and the managing agent of TIE and FIG in charge of the SMOLKERS' claim. Mr. Holybee said that TIE and FIG would take care of the contamination problem by cleaning up the SMOLKERS' home, starting with having the contamination removed from the carpets and air handling equipment in the SMOLKERS' home. Mr. Holybee also said TIE and FIG would make arrangements with cross-defendants Coregis Group, Inc. ("COREGIS"), CAINCO, CIC, and HOME SAVING to remove contamination from the SMOLKERS' home. At the time TIE and

1  FIG made these commitments, the SMOLKERS had a substantial long term direct relationship

2  with TIE and FIG as intended beneficiaries, direct insured and additional insured under insurance

3  policies FIG and TIE had issued in 1986 and renewed continuously thereafter that were then in

4  force. The SMOLKERS had paid insurance premiums due under these policies since 1986.

5  These policies provide coverage for cost of repair or replacement of damaged common areas,

6  reimbursement for loss of use of common area, and payment of medical expenses for medical

7  expenses incurred with respect to any injury which occurs as a result of PACIFIC VILLAS

8  operation of the CONDOMINIUM COMPLEX.

9          84. In May, 1997, Gary Smolker was contacted by Ms. Carol Trimble, who identified

10  herself as a pesticide expert who worked for CIC and COREGIS. Ms. Trimble told Mr. Smolker

11  that CIC insured HOME SAVING. Ms. Trimble further told Mr. Smolker that CIC, COREGIS,

12  and HOME SAVING wanted to fix the pesticide contamination problem created by HOME

13  SAVING and that Ms. Trimble was in charge of making arrangements to do that. Ms. Trimble

14  said she would answer any questions Mr. Smolker had and she would send an industrial hygienist

15  to the SMOLKERS' home to investigate the SMOLKERS' home and to make recommendations

16  on how to fix the pesticide contamination problem. Ms. Trimble said she would get back to Mr.

17  Smolker that afternoon with answers to questions Mr. Smolker had asked her about the pesticide

18  applied in the SMOLKERS' home. At the time of this conversation, Mr. Smolker understood the

19  SMOLKERS were considered a valuable customer by HOME SAVING and that HOME

20  SAVING and MORRIS had turned over this problem to their insurance carrier because it was

21  beyond HOME SAVING's and MORRIS' abilities to fix the problem because MORRIS had

22  previously explained to Mr. Smolker that MORRIS and HOME SAVING considered the

23  SMOLKERS to be a valuable customer and that MORRIS would turn this problem over to his

24  insurance carrier to take care of if MORRIS was unable to provide fast results that were

25  satisfactory to the SMOLKERS. At the time of this conversation, the SMOLKERS had a

26  substantial relationship with COREGIS and CIC in that COREGIS and CIC administered the

27  affairs of HOME SAVING's general liability carrier, CAINCO, and CIC was personally

28

-35-

1    responsible for the insurance obligations of CAINCO.  HOME SAVING had purchased medical

2    payment coverage for the benefit of others, who were injured in connection with HOME

3    SAVING's operations from CAINCO.

4        85. FIG, TIE, FGI, TUA, COREGIS, CIC, and CAINCO (collectively "PROMISORS"),

5    and each of them were repeatedly invited to inspect the SMOLKERS' home.  As of August, 22,

6    1997 PROMISORS had not yet inspected the SMOLKERS' home.  On August 22, 1997, Gary

7    Smolker received a letter from Ms. Trimble, on behalf of PROMISORS, and each of them,

8    requesting that the SMOLKERS not alter the condition of their home in any way before the

9    SMOLKERS' home was inspected and tested by PROMISORS.  Thereafter, PROMISORS, and

10   each of them, were repeatedly invited to inspect and to test the SMOLKERS' home and to

11   inspect and test the SMOLKERS' personal belongings, but never did so.

12       86. FIG, TIE, FGI, TUA, COREGIS, CIC, and CAINCO (collectively "PROMISORS")

13   did not carry out their investigation and/or repair work in a timely or prudent manner.  In spite of

14   a lot of invitations and communication from the SMOLKERS to PROMISORS, and each of them,

15   PROMISORS never inspected the SMOLKERS' home, never did anything to remove pesticide

16   contamination in the SMOLKERS' home, never did any repair work in the SMOLKERS' home,

17   and never did repair work in the common areas of the CONDOMINIUM COMPLEX.  As a

18   direct and proximate result of the delay of PROMISORS, and each of them, in investigating and

19   processing the SMOLKERS' claim, the SMOLKERS suffered physical damage to their persons

20   and property, incurred medical , x-ray, lab tests, and dental expenses, and suffered loss of and

21   spoliation of evidence.  As a direct and proximate result of the failure of PROMISORS, and each

22   of them, to do promised clean up and remediation work in the SMOLKERS' home, the

23   SMOLKERS suffered physical damage to their persons and property, and incurred medical , x-

24   ray, lab tests, and dental expenses.

25       87.  In July, 1997, Gary Smolker was contacted by Jamie Doody, who identified herself as

26   a managing agent of RELIANCE in charge of taking care of investigation and administration of

27   the SMOLKERS' claim under a bond (Reliance Bond Number B2443649) RELIANCE had

28

-36-

1  issued to protect the general public against losses damages and injuries caused by HOME

2  SAVING. Ms. Doody asked for information which was provided in July 1997. Ms. Doody said

3  RELIANCE would review the SMOLKERS' claim in detail and advise the SMOLKERS of the

4  results of RELIANCE's investigation and of RELIANCE's decision on the SMOLKERS' claim

5  within 30 days. RELIANCE did not carry out its professional functions of claims administration

6  and claims investigation in a timely and prudent manner. RELIANCE refused to inspect the site

7  or the work performed by HOME SAVING. RELIANCE bombarded the SMOLKERS with

8  questions the SMOLKERS had already answered, ignored the answers the SMOLKERS gave to

9  RELIANCE. RELIANCE failed to render a prompt and professional investigation of the

10 SMOLKERS' claim. As a direct and proximate result of RELIANCE's failure to carry out its

11 professional functions of claims administration and claims investigation in a timely and prudent

12 manner the SMOLKERS suffered physical damage to their person and property, incurred medical,

13 x-ray, and dental expenses, and suffered loss of evidence.

14 　　88. In August 1997, Gary Smolker was contacted by FRONTIER concerning the

15 SMOLKERS' claim under Bond No. 824118 which FRONTIER had issued to protect the general

16 public from loss or injury resulting from the conduct of MORRIS in connection with home

17 improvements and/or from fraud in the execution or performance of a construction contract.

18 "Home improvement" means the installation of home improvement goods or the furnishing of

19 home improvement services. Home improvement goods and services include, but are not limited

20 to, termite extermination. *Business & Professions* Code Section 7151.

21 　　89. FRONTIER advised Gary Smolker that FRONTIER would advise Gary Smolker of

22 FRONTIER's position within 60 days. FRONTIER did not carry out its professional functions of

23 claims administration and claims investigation in a timely and prudent manner. FRONTIER was

24 invited to inspect the SMOLKERS' home and to see the home improvement goods and services

25 that had been provided to the SMOLKERS under MORRIS' general contracting license,

26 supervision and control. FRONTIER failed and refused to inspect the SMOLKERS' home. As a

27 direct and proximate result of FRONTIER's failure to carry out its professional functions of

28

-37-

1   through the claims process, 24 hours a day, 7 days a week, 365 days a year including holidays.

2   TIG promised that anytime the SMOLKERS needed help a trained TIG service representative

3   would be there to help the SMOLKERS, and would provide valuable referral services for auto

4   losses and for homeowner's losses.  TIG promised, and undertook, to provide the SMOLKERS

5   with timely response for restoration of damaged property, including but not limited to emergency

6
7   protection of the contents of the SMOLKERS' home, and prompt inspection of all property

8   owned by the SMOLKERS which the SMOLKERS claimed was damaged.

9       91.  On or about March, 1997, and repeatedly thereafter, the SMOLKERS submitted

10  claims to TIG for property damage, medical expenses, expenses for repair of the SMOLKERS'

11
12  home and automobiles necessary to mitigate damages to the SMOLKERS' persons and personal

13  property, living expenses to move out of the SMOLKERS' home until irritating toxic

14  contaminants were removed and contamination was remediated, repair or replacement of the

15  SMOLKERS' automobiles and/or rental expense to rent different automobiles until new

16
17  automobiles were obtained and/or irritating toxic contamination was removed from each of the

18  SMOLKERS' automobiles.  The SMOKERS also requested that a structural engineering

19  inspection be done of their home and requested reimbursement of costs paid by the SMOLKERS

20  for a structural engineering inspection of the SMOLKERS' home.  Each of these claims are, and

21  were, covered by one or more of the insurance policies then in force, which had been issued to the

22
23  SMOLKERS by TIG, which policies are described in paragraphs 16, 17, 24, and 90 hereof.  The

24  SMOLKERS requested prompt inspection of their damaged property, restoration of damaged

25  property and emergency protection of the contents of the SMOLKERS' home and of the

26  SMOLKERS' automobiles.  TIG was immediately and repeatedly put on notice that any delay in

27
28

-39-

investigating or administering the SMOLKERS' claims would result in physical damage to the SMOLKERS and to the SMOLKERS' property. Thereafter, TIG delayed in making an inspection of the damages and injuries suffered by the SMOLKERS and delayed in making an investigation of the cause of damages and injuries suffered by the SMOLKERS. TIG sent unqualified people to inspect the SMOLKERS' home and automobiles. TIG ignored information provided to TIG by the SMOLKERS. TIG refused and failed to respond to questions received from the SMOLKERS concerning the SMOLKERS' claims and insurance benefits provided under insurance policies TIG had issued to the SMOLKERS. The SMOLKERS repeatedly notified TIG of the injuries the SMOLKERS were suffering as a result of TIG's failure to carry out TIG's professional functions of claims administration and investigation in a timely and prudent manner. TIG failed to administer and investigate the SMOLKERS' claims in a timely and prudent manner. As a direct and proximate result of TIG's delay in investigating the SMOLKERS' claim in a prudent manner the SMOLKERS, and each of them, suffered injuries to their person and property, incurred medical, x-ray, and dental expenses, structural engineering expenses, and suffered loss of evidence of the cause of the damages the SMOLKERS had suffered and were suffering.

92. The true names or capacities, whether individual, corporate, associate or otherwise, of cross-defendants ROES 1 through 200, inclusive, and each of them, are unknown to cross-complainants, who therefore sue said cross-defendants by such fictitious names and ask leave to amend this Cross-Complaint to show said cross-defendants' true names and capacities when the same have been ascertained. Cross-complainants are informed and believe, and thereupon allege, that each of the cross-defendants designated herein as a ROES 1 through 160 inclusive is

-40-

negligently, fraudulently, contractually or otherwise legally responsible in some manner for events and happenings herein referred to and negligently or otherwise unlawfully caused or is legally responsible for injuries and damages to cross-complainants as herein alleged; each of the cross-defendants designated herein as ROES 161 through 171 inclusive are insurance carrier who owe medical payment benefits to cross-complaints but whose identity is unknown at this time; each of the cross-defendants designated herein as ROES 172 through 181 became an owner of a condominium unit at the CONDOMINIUM COMPLEX after January 1, 1998 and is an owner of a condominium unit thereat; and each of the cross-defendants designated herein as ROES 182 through 200 own an interest in a condominium unit in the CONDOMINIUM COMPLEX, but their identity an/or interest was unknown to cross-complainants on August 12, 1999.

93. Before October 11, 1996, and before the acts complained about herein effected the SMOLKERS, the SMOLKERS' home was a safe and peaceful place to be, the SMOLKERS were in good health energetic and happy; the SMOLKERS' children were in good health energetic and happy; and the SMOLKERS' business was a success. As a direct and proximate result of the wrongful conduct, acts and/or omission of cross-defendants, and each of them, the SMOLKERS' home stopped being a safe place of peaceful quiet enjoyment where the SMOLKERS could rest, recuperate, and enjoy life. Instead, the SMOLKERS' home became a place of danger and pain, where the SMOLKERS could not rest or recuperate, a place where the SMOLKERS were forced to live in pain misery and worry. When in his home, Gary Smolker was exposed to irritating toxic chemicals that caused Gary Smolker to have such severe sore throats, dried lips, dry mouth, and headaches that were so painful as to be equivalent to being tortured. As a direct and proximate result of the conduct or omission of cross-defendants, and each of them, the health and physical

1  and mental well being of GARY SMOLKER, ALICE SMOLKER and of their two minor

2  daughters has been damaged.  ALICE SMOLKER cries at night, in the morning, and during the

3  day due to the emotional upset caused by this situation.  The SMOLKERS' minor daughters can

4  not stand living in their home, and have missed a lot of school due to not being able to sleep and

5  
6  being in pain due to being irritated by toxic substances in the SMOLKERS' home related to the

7  conduct of cross-defendants, and each of them.  The SMOLKERS' peace of mind has been

8  destroyed.  The SMOLKERS' business has been severely adversely impacted; the SMOLKERS'

9  living standard and the living standard of their minor children has been severely diminished; the

10  SMOLKERS' life style and the life style of their minor children has been severely diminished; the

11  
12  SMOLKERS' have lost the full peaceful use of their home, and have lost the full peaceful use of

13  their automobiles and their personal belongings.  The SMOLKERS' family life, social life and

14  business life have been detrimentally interfered with.  The SMOLKERS are unable to sell their

15  home, or to rent it, and have been compelled to and, have made, repairs to their home and have

16  
17  replaced personal belongings, carpeting and furniture in an attempt to make it possible to live in

18  their home without being in pain.  The SMOLKERS have been compelled to get into litigation

19  with their neighbors in order to arrive at a fix for the pesticide contamination problem.  As a

20  direct and proximate result of the wrongful conduct and/or omissions of cross-defendants, and

21  
22  each of them, the SMOLKERS have suffered from fatigue, physical and emotional pain and burn

23  out, and have been forced to live like "zombies," and the quality of work the SMOLKERS can do

24  for themselves and/or for other people has been gravely diminished.  As a direct and proximate of

25  the conduct of cross-defendants and each of them the SMOLKERS' free time for relaxation,

26  recuperation and fun has been greatly diminished to almost zero.  As a direct and proximate result

27
28

-42-

1   of the wrongful conduct or omission of cross-defendants, and each of them, the SMOLKERS and

2   their children have been exposed to toxic chemicals and have incurred and/or paid medical and

3   dental expenses related to injuries caused by such exposure; and have also paid or incurred related

4   charges for laboratory tests, pathology reports, hospital services, and medicines. The

5   SMOLKERS have paid veterinary expenses related to their dog's exposure to said toxic

6   chemicals. In the future the SMOLKERS will be required to continue to incur and to pay

7   expenses for monitoring of their physical condition, medical care, medical tests and medicines

8   related to their exposure to toxic substances in their home. As a direct and proximate result of

9   the wrongful conduct or omission of cross defendants, and each of them, the SMOLKERS, and

10  each of them, have suffered severe emotional distress and anxiety and frustration and humiliation

11  from being unable to provide the life style they are accustomed to for their children; the

12  SMOLKERS suffered emotional distress from being rendered unable to provide fundamental safe

13  shelter for their children, and have been rendered unable to provide a peaceful safe living

14  environment in their home for themselves and their children. As a direct and proximate result of

15  the wrongful conduct or omission of cross-defendants, and each of them, the SMOLKERS have

16  suffered mental distress and continue to suffer mental distress from watching their children suffer

17  bodily pain and injury caused by the wrongful conduct or omission of cross defendants, and each

18  of them. As a direct and proximate result of the wrongful conduct or omission of cross-

19  defendants, and each of them, the SMOLKERS lost earning capacity and income, and have been

20  and are being deprived of their ability to operate their business; the SMOLKERS have been

21  deprived of the ability to earn a living from their labor, have been deprived of their ability to

22  pursue their careers, have been deprived of their ability to have their normal social life family life

-43-

1  and business life. The SMOLKERS' earning capacity, family life and social life have been

2  significantly damaged. The SMOLKERS have been forced to spend their savings to fund this

3  litigation and to live on borrowed money. The SMOLKERS have been and are being forced to

4  live in fear and dread over what kind of acute physical injuries and chronic physical injuries each

5
6  of them and each of their children have suffered and will suffer in the future due to being exposed

7  to toxic and/or irritating substances in the CONDOMINIUM COMPLEX. The mental trauma of

8  these experiences has caused the SMOLKERS to be unable to sleep, to lose the services of each

9  other, and has interrupted their future plans and planning. As a direct and proximate result of the

10 wrongful conduct or omission of cross-defendants, and each of them, the SMOLKERS were
11
12 compelled to and did dispose of various items of personal property contaminated with irritating

13 toxic substances, hired professional cleaners and maid services to clean various items of personal

14 property and air handling ducts chimney and equipment, hired professional contractors to try to

15 seal various paths of entry of pesticide dust into their home, to repair their deck, to paint the
16
17 interior of their home, etc.. As a direct and proximate result of the wrongful conduct and/or

18 omissions of cross-defendants, and each of them, the SMOLKERS were forced to move out of

19 their home and to replace and repair various items in their home, such as their carpets and blinds,.

20 bedding , towels, beds, head board on their bed, mattresses, couches and other furniture and
21
22 furnishings. As a direct and proximate result of the wrongful conduct and/or omissions of cross-

23 defendants and each of them, the SMOLKERS, and each of them, suffered general and special

24 damages in an amount to be proved at time of trial.

25              **EIGHTH CAUSE OF ACTION FOR STRICT LIABILITY**

26          **AGAINST GRACE, GRACE DAVISON, HOME SAVING AND MORRIS**
27

28

-44-

94. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraphs 18 through 21, 60 through 63, 66 through 76, 79, 92 and 93 of this cross-complaint with the same force and effect as though said paragraphs were set forth fully at this point.

95. At all times herein mentioned cross-defendants, and each of them, sued in this Cause of Action, manufactured, designed, sold, held for delivery, delivered, distributed, mixed, combined, released, dispensed, inspected, failed to inspect, advertised, labeled, instructed, advised, handled and/or assisted in the assembly, marketing, sale, delivery and servicing of SYLOID 244 ("Product") and the component parts thereof so that the same could be purchased and applied as a pesticide in residential structures inhabited by members of the general public and structures visited by the general public.

96. At all times mentioned herein, cross-defendants, and each of them, sued in this Cause of Action, knew that said Product and its component pats were to be purchased and used as a pesticide to eradicate termite infestations in inhabited residential structures, without inspection for defects by PACIFIC VILLAS, and without inspection by members of the general public such as the SMOLKERS, who would be given no warning and were given no warning that SYLOID 244 could be harmful to human health if inhaled or if deposited on a person's skin.

97. Said Product and its component parts hereinabove referenced, were unsafe for their intended use or reasonably foreseeable uses and foreseeable misuses by reason of defects in their design, manufacture, distribution, inspection, labeling, marketing, sale, servicing, and handling so that said Product and its component parts could not be safely used when said Product left the control of each cross-defendant sued in this Cause of Action. Said Product when used as a pesticide in an inhabited residential structure, as it was in this case, did not meet the minimum safety expectations of the product's ordinary ultimate consumers and members of the general public who it was reasonably foreseeable would come in contact with it and inhale it while in a residential structure. Due to its inherent characteristic of being invisible to the naked eye, of small mass, and size, being a respirable dust and dehydrating agent, and capable of causing cancer and lung disease if inhaled or dermatitis if it came in contact with human skin, and having other

FIFTH AMENDED CROSS COMPLAINT

1  adverse toxicological results and effects on humans, no safe design of "said product" is possible
2  for use of said product as a pesticide injected into wall voids in a residential structure as was the
3  custom and intention of HOME SAVING with respect to HOME SAVING's application of such
4  product in the CONDOMINIUM COMPLEX, and GRACE's and GRACE DAVISON's intention
5  in selling said product to HOME SAVING for use as a pesticide. However, the manufacturer,
6  distributor and applicator of "said product" represented it as being inherently safe to Gary
7  Smolker and to its ordinary ultimate consumers. At all times herein mentioned cross-defendants,
8  and each of them, sued in this Cause of Action did not adequately warn the SMOLKERS of
9  deleterious effects that could result from inhaling and/or being (continuously) exposed to
10 SYLOID 244. At all times herein mentioned the risks and deleterious effects of inhaling and/or
11 being continuously exposed to SYLOID 244 were known or scientifically knowable to each
12 cross-defendant sued in this Cause of Action.

13      98. The defective and dangerous character of said Product and its component parts made
14 said Product unsafe for the use and purpose for which said Product and its component parts were
15 intended when they were used and applied as recommended by the cross-defendants, and each of
16 them, sued in this Cause of Action or when used in a reasonably foreseeable manner. Said
17 product is an irritating toxic dust capable of causing dermatitis, lung damage, and dried out
18 mucous membranes during its normal use as a pesticide applied according to HOME SAVING's
19 "proprietary" application method.

20      99. Said Product and its component parts hereinabove referenced, were unsafe by reason
21 of defects in their design, manufacture, labels, warnings and distribution, as hereinabove set forth
22 in this Cause of Action. More specifically, and without limitation, said Product and its component
23 parts hereinabove referenced were unsafe because of defects in the combining, mixing, refining,
24 manufacturing, labeling, distribution and handling of the toxic chemicals which caused said
25 Product, on or about October 11, 1996 and thereafter to injure the SMOLKERS, the
26 SMOLKERS' children, the SMOLKERS' dog, and the SMOLKERS' property. All of said
27 defects caused the SMOLKERS' injuries and damages, including those injuries and damages set

28

-46-

1  forth in paragraph 93 hereof all to the SMOLKERS' damage in an amount to be proved at time of

2  trial. as set forth.

3  100. At all times material hereto, said cross-defendants, and each, failed to warn the

4  SMOLKERS of the defective, faulty, unsafe, hazardous and dangerous character of said Product

5  and failed to warn the SMOLKERS that exposure to or coming in contact with or breathing in

6  said Product could and would cause serious injuries, or that the use or possession of said pesticide

7  was unlawful or that "said product" was not registered as a pesticide with either the US EPA or

8  the State of California Department of Pesticide Regulation.

9  101. The SMOLKERS were not aware of said Product's defects at any at time prior to

10  the initial incidents which occurred on or about Oct. 11, 1996 and which caused injuries to the

11  SMOLKERS, or for a considerable time thereafter while the SMOLKERS were trying to

12  ascertain the health effects and toxicology of synthetic amorphous silica gel/SYLOID 244 and to

13  make arrangements for removal of SYLOID 244 from the SMOLKERS' home and from the

14  common areas of the CONDOMINIUM COMPLEX. Said Product failed to perform as safely as

15  an ordinary user, such as the SMOLKERS, would expect, in that the SMOLKERS were using the

16  product in a manner reasonably foreseeable by the cross-defendants sued in the Cause of Action

17  and for the intended purpose for which the product was specifically supplied to HOME SAVING,

18  which was the purpose the product was specifically supplied to REQUESTERS, namely to

19  prevent future termite infestations and to eradicate existing termite infestations in the common

20  areas of the CONDOMINIUM COMPLEX. As a result of said defect in said Product and its

21  component parts, and as a result of cross-defendants' failure to warn of the deleterious effects of

22  being exposed to said Product or the deleterious effects of inhaling said Product, on or about

23  October 11, 1996, and continuously thereafter the SMOLKERS were caused to sustain those

24  injuries described herein.

25  102. As a direct and proximate result of the defect and exposure of the SMOLKERS, the

26  exposure of the SMOLKERS' children, and the exposure of the SMOLKERS' property to the

27  product as hereinabove alleged and as direct and proximate result of the failure to warn the

28

-47-

1 | SMOLKERS of the dangers posed by the product or how to handle the product, and as a direct
2 | and proximate result of the illegal sale and distribution of the Product and the subsequent
3 | exposure of the SMOLKERS and the SMOLKERS' children and the SMOLKERS' property to
4 | the product, the SMOLKERS sustained injuries to their property, to their business, to their
5 | earning capacity, to their health, to their strength and activity, as well as mental pain and
6 | suffering. The SMOLKERS are informed and believe and based thereon allege that they have and
7 | will continue to sustain in the future injuries to their property, to their health, strength and
8 | activity, and have suffered and will continue to suffer loss of income, loss of earning capacity, loss
9 | of business opportunities, and physical and mental pain and suffering, emotional distress, all to
10 | their general and special damage in a sum within the jurisdiction of this court, to be proved at the
11 | time of trial.

12 | **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as
13 | hereinafter set forth.

### NINETH CAUSE OF ACTION FOR NEGLIGENCE
### AGAINST GRACE AND GRACE DAVISON

16 | 103. The SMOLKERS incorporate herein by reference as though fully set forth herein
17 | Paragraphs 94, 97, 99 and 102 of this cross-complaint with the same force and effect as though
18 | said paragraphs were set forth fully at this point.

19 | 104. It was a violation of state law (*Food & Agriculture* Section 12993) and **negligence**
20 | **per se** for GRACE and/or GRACE DAVISON to manufacture or sell or deliver SYLOID 244
21 | ("Product"), or to possess SYLOID 244 in California for use as a pesticide (*Food and*
22 | *Agriculture* Section 12955). It was a violation of federal law (7 *US Code* Section 136(a)) and
23 | **negligence per se** for GRACE and GRACE DAVISON to distribute, sell, offer for sale, hold for
24 | distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or to
25 | offer to deliver SYLOID 244 to HOME SAVING and/or to PACIFIC VILLAS for use as a
26 | pesticide. HOME SAVING served as GRACE's and GRACE DAVISON's distributor of
27 | SYLOID 244 to PACIFIC VILLAS. The ultimate consumers of the SYLOID 244 manufactured,

28 |

1    sold, and/or distributed and shipped by GRACE and/or GRACE DAVISON in this case
2    (PACIFIC VILLAS, and the SMOLKERS) expected SYLOID 244 to be inherently safe due to
3    representations made by the distributor/applicator HOME SAVING. GRACE and GRACE
4    DAVISON thereafter ratified and backed-up HOME SAVING's claim that SYLOID 244 is an
5    inherently safe product when applied in the atmosphere of a home that can cause no physical
6    injury or adverse health effect if inhaled by a human being or if deposited on a human being. Due
7    to SYLOID 244's inherent characteristics of being a respirable dust and a dehydrating agent, no
8    safe design of SYLOID 244 is possible. It is not safe to inhale or to come in contact with
9    SYLOID 244 in the atmosphere of residence. SYLOID 244 is an irritating  toxic dust capable of
10   causing dermatitis, dry mouth, sore throats, head aches, lung damage, and dried out mucous
11   membranes if it comes in contact with human beings. In connection with the sale and of SYLOID
12   244 to HOME SAVING, who served as GRACE's and GRACE DAVISON's distributor of
13   SYLOID 244 to PACIFIC VILLAS and to the SMOLKERS, and in connection with sale of
14   SYLOID 244 to PACIFIC VILLAS and the application of SYLOID 244 in the SMOLKERS'
15   home and in the common areas of the CONDOMINIUM COMPLEX, adequate warnings of risks
16   and dangers were not given by GRACE or GRACE DAVISON or by HOME SAVING to
17   PACIFIC VILLAS or to the SMOLKERS.

18        **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as
19   hereinafter set forth.

20                    **TENTH CAUSE OF ACTION FOR NEGLIGENCE**
21                    **AGAINST HOME SAVING, MORRIS AND THOMPSON**

22        105.  The SMOLKERS incorporate herein by reference as though fully set forth herein
23   Paragraphs 77, 78, 84 through 86, 103 and 104 of this cross-complaint with the same force and
24   effect as though said paragraphs were set forth fully at this point.

25        106.  It was negligence per se for HOME SAVING to offer to sell, to sell and to deliver
26   SYLOID 244 to PACIFIC VILLAS for use as a pesticide to eradicate existing termite infestations
27   and/or to prevent future termite infestations in the common areas of the CONDOMINIUM

28

-49-

1  COMPLEX. It was negligence per se for HOME SAVING to apply SYLOID 244 in the

2  SMOLKERS' home. It was negligence per se for HOME SAVING to directly discharge

3  pesticides in the SMOLKERS' home without the SMOLKERS' consent. It was negligence per se

4  for HOME SAVING to apply pesticides in the SMOLKERS' home without first giving the

5  SMOLKERS clear written notice of work to be performed by HOME SAVING. It was

6  negligence per se for MORRIS to allow HOME SAVING to use MORRIS' general contractor's

7  license in order for HOME SAVING to be able to pose as a general contractor. It was negligence

8  per se for HOME SAVING not to finish the work in the SMOLKERS' home that HOME

9  SAVING had agreed to do and to abandon the job of sealing holes in the walls and ceiling of the

10  SMOLKERS' home before completing the job. It was negligence per se for MORRIS and

11  THOMPSON to misrepresent the properties of SYLOID 244 to the SMOLKERS and to

12  misrepresent to the SMOLKERS that SYLOID 244 had been approved by the US EPA for use as

13  a pesticide and that SYLOID 244 was not toxic.

14  **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as

15  hereinafter set forth.

16  **ELEVENTH CAUSE OF ACTION FOR NEGLIGENCE AGAINST**

17  **PACIFIC VILLAS, THE HOLLANDS, ROBBINS, BAILEY, VERDUN,**

18  **IVORY, FREDERICKS, AND CIPRIANO ("CURRENT RESIDENTS PLUS")**

19  107. The SMOLKERS incorporate herein by reference as though fully set forth herein

20  Paragraphs 2 through 4, 7, 9, 10, 12, 13, 15, 18 through 23, 60 through 66, 68 through 78, 82,

21  92, 93, 100, and 102 of this cross-complaint with the same force and effect as though said

22  paragraphs were set forth fully at this point.

23  **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as

24  hereinafter set forth.

25  **TWELFTH CAUSE OF ACTION FOR NUISANCE AND MAINTENANCE**

26  **OF A NUISANCE AGAINST CURRENT RESIDENTS PLUS**

27

28

-50-

FIFTH AMENDED CROSS COMPLAINT

108. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraph 107 of this cross-complaint with the same force and effect as though said paragraph was set forth fully at this point.

109. CURRENT RESIDENTS and CIPRIANO own SYLOID 244 located in the common areas of the CONDOMINIUM COMPLEX and in the SMOLKERS' home and automobiles which contaminates the SMOLKERS' property, and except for the HOLLANDS have owned SYLOID 244 located in the common areas of the CONDOMINIUM COMPLEX since 1996. The HOLLANDS have owned SYLOID 244 located in the common areas of the CONDOMINIUM COMPLEX and in the SMOLKERS' home which contaminates the SMOLKERS' property since 1997. The SYLOID 244 owned by CURRENT OWNERS and CIPRIANO, and each of them, located in the common areas and in the SMOLKERS' home and automobiles is, and has been, offensive to the SMOLKERS' senses and has injured the SMOLKERS' health. The SYLOID 244 belonging to CURRENT RESIDENTS and CIPRIANO, and each of them, has physically damaged the SMOLKERS' property and bodies.. The SYLOID 244 belonging to CURRENT OWNERS and CIPRIANO, and each of them, has interfered with the SMOLKERS' free use of the common area hallway and home and automobiles so as to interfere with the SMOLKERS comfortable enjoyment of their life and property, has made it impossible for the SMOLKERS to rent their home, has forced the SMOLKERS to move out of their home for approximately six weeks, has forced the SMOLKERS to replace the contents of their home and to have their deck rebuilt and the interior of their home painted, has made it impossible for Gary Smolker to sell his condominium unit, and has caused Gary Smolker to cease using his automobile except if he has no other way of getting somewhere. The presence of SYLOID 244 belonging to CURRENT OWNERS and CIPRIANO, and each of them, in the CONDOMINIUM COMPLEX, has caused discomfort to the SMOLKERS which has injured the SMOLKERS' health and well being and has adversely effected the SMOLKERS' ability to work, the SMOLKERS' ability to earn a living, and has caused the SMOLKERS to seek and to obtain medical attention and to incur expenses for medical consultation and treatment. The

1  SMOLKERS will incur additional future damages of a similar nature as long as this nuisance
2  continues.  PACIFIC VILLAS has taken no steps at any time to remove SYLOID 244 located in
3  the CONDOMINIUM COMPLEX..  CURRENT OWNERS PLUS have not repaired the leaky
4  roof that has been leaking water into the SMOLKERS' home since 1997, or taken steps to
5  eradicate the termites have infested the common areas of the CONDOMINIUM COMPLEX since
6  1997, except FREDERICKS, VERDUN and IVORY have had HOME SAVING come back to
7  make further applications of pesticides in their individual condominium units.  The presence of
8  SYLOID 244 in the common areas constitutes an illegal and dangerous condition.

9      110.  CURRENT RESIDENTS PLUS, and each of them, have purposefully refused to
10  refrain from conduct that imposes an unreasonable risk of physical injuries on the SMOLKERS.
11  CURRENT RESIDENTS PLUS' conduct, and the conduct of each of them, has been inconsistent
12  with the CONDOMINIUM COMPLEX CC&Rs (governing documents), has not been in
13  furtherance of the purposes of the common interest development (CONDOMINIUM
14  COMPLEX), has not been in good faith, and has not been carried out in a manner in the best
15  interests of PACIFIC VILLAS and its members, or in a manner that CURRENT RESIDENTS
16  PLUS, or any of them believed in good faith upon reasonable investigation was in the best
17  interests of PACIFIC VILLAS or its members.  CURRENT RESIDENTS PLUS' conduct, and
18  the conduct of each of them, has been in reckless disregard of the safety and welfare of the
19  SMOLKERS.  CURRENT RESIDENTS PLUS, and each of them, have breached the fiduciary
20  duty each of them owe to the SMOLKERS to refrain from conduct that imposes an unreasonable
21  risk of injury to the SMOLKERS.

22      **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as
23  hereinafter set forth.

24      **THIRTEENTH CAUSE OF ACTION FOR ABATEMENT OF NUISANCE**
25      **AGAINST CURRENT RESIDENTS PLUS, HOME SAVING,**
26      **MORRIS, GRACE AND GRACE DAVISON**

27

28

111. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraphs 105, and 107 through 110 of this cross-complaint with the same force and effect as though said paragraphs were set forth fully at this point.

112. As a result of the continuing nuisance the SMOLKERS have suffered damages including cost to repair wood portions of the common areas eaten by the termites, lost rental value of their home while the nuisance continues, cost of remediation to minimize and/or remove the poisonous substances in the common areas of the CONDOMINIUM COMPLEX, cost to replace or clean the SMOLKERS' personal property contaminated with poisonous substances up to the time the nuisance is abated. Various items of the SMOLKERS' contaminated personal property can be replaced at reasonable cost. The SYLOID 244 and other pesticides applied by HOME SAVING in the common areas pose(s) a health hazard. If abatement of the SYLOID 244 in the premises is denied the owners of the CONDOMINIUM COMPLEX will be maintaining an illegal condition on the premises and will have contingent liability for anyone who is injured in the future by the SYLOID 244 and/or other poisonous substances in the common areas of the CONDOMINIUM COMPLEX. The most feasible abatement strategy is to order GRACE, GRACE DAVISON, HOME SAVING, and MORRIS to purchase the individual condominium units at their fair market value and to pay relocation costs to each of the individual condominium unit owners and to record a declaration running with the land notifying the public of the contamination in the CONDOMINIUM COMPLEX, and to order GRACE, GRACE DAVISON, HOME SAVING and MORRIS to not allow anyone to occupy the property until they demonstrate to the court's satisfaction that it is safe to occupy the property.

**WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## FOURTEENTH CAUSE OF ACTION FOR TRESPASS
## AGAINST CURRENT RESIDENTS PLUS, HOME SAVING AND MORRIS

-53-

113. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraph 111 of this cross-complaint with the same force and effect as though said paragraph was set forth fully at this point.

114. Residents plus, HOME SAVING, and MORRIS, and each of them, have caused irritating toxic poisonous particulate matter to be deposited on the SMOLKERS' property and on the SMOLKERS' bodies, without the SMOLKERS' consent, which has caused actual physical damage to the SMOLKERS' bodies and actual physical damage to the SMOLKERS' property.

**WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## FIFTEENTH CAUSE OF ACTION FOR ASSAULT AND BATTERY
## AGAINST CURRENT RESIDENTS PLUS, HOME SAVING AND MORRIS

115. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraphs 113 and 114 of this cross-complaint with the same force and effect as though said paragraphs were set forth fully at this point.

**WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## SIXTEENTH CAUSE OF ACTION FOR WRONGFUL EVICTION
## AND WASTE AGAINST CURRENT RESIDENTS PLUS

116. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraph 115 of this cross-complaint with the same force and effect as though said paragraph was set forth fully at this point.

**WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

## SEVENTEENTH CAUSE OF ACTION FOR CONTRIBUTION
## AND IMPOSITION OF LIEN/FORECLOSURE AGAINST
## CURRENT RESIDENTS AND CIPRIANO

-54-

117. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraph 116 of this cross-complaint with the same force and effect as though said paragraph was set forth fully at this point

118. GARY SMOLKER has paid and continues to pay more than his share of the expenses of maintaining and caring for the COMMON AREA and is entitled to and seeks in this cause of action to recover a pro-rata share of his overpayment from the other cotenants FREDERICKS, CIPRIANO, BAILEY, HOLLAND, ROBBINS, IVORY and VERDUN (hereinafter NONCONTRIBUTING COTENANTS) who have been unjustly enriched by GARY SMOLKER's overpayment. Additionally the court is requested to impress and foreclose a lien against the interests of the NONCONTRIBUTING COTENANTS in the COMMON AREA for their individual ratable share of the amount of overpayment by GARY SMOLKER to provide contribution to GARY SMOLKER for reimbursement of each cotenants' ratable share of the overpayment made by GARY SMOLKER in protecting the COMMON AREA. GARY SMOLKER and ALICE SMOLKER have made advances which are, and were at the time made, necessary to preserve the COMMON AREA. GARY SMOLKER and ALICE SMOLKER have had to spend their time and the time of Law Offices of Smolker & Graham, to preserve and protect the COMMON AREA from waste, from continuing to be maintained in a dangerous condition because NONCONTRIBUTING COTENANTS and PACIFIC VILLAS wilfully maintained and operated the common areas in a dangerous condition. Such action, on the parts of the SMOLKERS was, and is, necessary because NONCONTRIBUTING COTENANTS and PACIFIC VILLAS, and each of them, conducted themselves in a manner reasonably calculated to cause physical injury to third parties in conscious disregard of the health and safety of third parties. The SMOLKERS, and each of them, have been aggrieved by the dangerous manner in which NONCONTRIBUTING COTENANTS and PACIFIC VILLAS, and each of them, maintain and operate the common areas, and by waste committed on the common areas by NONCONTRIBUTING COTENANTS and PACIFIC VILLAS, and each of them. Cross-defendants, and each of them named in this cause of action, by their acts and omissions have

1  created and maintained a nuisance and dangerous condition in the common areas, have not taken

2  reasonable steps to abate said nuisance or to remedy or mitigate such dangerous condition, or to

3  mitigate reasonably foreseeable future damages that will be caused by said nuisance and

4  dangerous condition if it is not abated, although each has been requested to abate such nuisance

5  and to remedy such dangerous condition.

6      **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as

7  hereinafter set forth.

8      **EIGHTEENTH CAUSE OF ACTION FOR NEGLIGENCE AGAINST**

9      **COREGIS, CIC, CAINCO, TIE, TUA, FGI, AND FIG**

10      119.  The SMOLKERS incorporate herein by reference as though fully set forth herein

11  Paragraphs 2, 3, 4, 10, 18 through 24, 60 through 86, 92, 93, 111 and 112 of this cross-complaint

12  with the same force and effect as though said paragraphs were set forth fully at this point

13      **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as

14  hereinafter set forth.

15      **NINETEENTH CAUSE OF ACTION**

16      **FOR NEGLIGENCE AGAINST TIG**

17      120.  The SMOLKERS incorporate herein by reference as though fully set forth herein

18  Paragraphs 2 through 4, 10, 16 through 24, 60 through 79, 80, 82, 90 through 93, 104, 106, 109,

19  110, and 112 of this cross-complaint with the same force and effect as though said paragraphs

20  were set forth fully at this point

21      **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as

22  hereinafter set forth.

23      **TWENTIETH CAUSE OF ACTION**

24      **FOR NEGLIGENCE AGAINST RELIANCE**

25      121.  The SMOLKERS incorporate herein by reference as though fully set forth herein

26  Paragraphs 2 through 4, 10, 16 through 24, 60 through 79, 80, 82, 87, 104, 106, 109, 110, and

27

28

FIFTH AMENDED CROSS COMPLAINT

112 of this cross-complaint with the same force and effect as though said paragraphs were set forth fully at this point.

**WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

### TWENTY-FIRST CAUSE OF ACTION FOR NEGLIGENCE
### AGAINST FRONTIER

122. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraphs 2 through 4, 10, 16 through 24, 60 through 79, 80, 82, 88, 89, 104, 106, 109, 110, and 112 of this cross-complaint with the same force and effect as though said paragraphs were set forth fully at this point.

**WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as hereinafter set forth.

### TWENTY-SECOND CAUSE OF ACTION FOR
### BREACH OF CONTRACT AGAINST CAINCO

123. The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraph 119 of this cross-complaint with the same force and effect as though said paragraph was set forth fully at this point.

124. Prior to October 1996, HOME SAVING purchased medical payments coverage for the benefit of others to pay medical expenses caused by an accident because of HOME SAVING's operations. These payments are to be made regardless of fault. HOME SAVING purchased this coverage for the benefit of others from CAINCO.

125. At the end of 1995, CAINCO renewed a written commercial general liability insurance policy issued to HOME SAVING, CAINCO Policy No. PC 913-2999 (CAINCO POLICY), containing a medical payments to others provision, denoted Coverage C Medical Payments, to HOME SAVING, providing the coverage described above in paragraph 124 for the benefit of Gary Smolker and Alice Smolker. Gary Smolker and Alice Smolker are intended beneficiaries of the CAINCO POLICY. The medical payment provisions of the CAINCO

-57-

POLICY (Coverage C) create a direct obligation of CAINCO to Gary Smolker and Alice Smolker to pay reasonable medical expenses incurred for necessary medical, surgical, x-ray and dental services for expenses incurred and services rendered within year from the date of an occurrence causing bodily injury to which this policy applies, regardless of HOME SAVING's negligence or liability and without regard to the fault of Gary Smolker or Alice Smolker.

126. While the CAINCO POLICY was in effect, Gary Smolker and Alice Smolker incurred medical, x-ray, surgical, dental and hospital expenses for bodily injuries, sustained as a result of HOME SAVING's, covered by the CAINCO POLICY and made a timely claim for medical benefits owing to Gary Smolker and Alice Smolker under the CAINCO POLICY to CAINCO. Gary Smolker's bodily injuries and Alice Smolker's bodily injuries were caused by the activities of HOME SAVING.

127. In breach of the CAINCO POLICY, CAINCO denied the existence of the Medical Pay provision of the CAINCO POLICY, CAINCO refused to send the SMOLKERS a copy of the CAINCO policy, and CAINCO refused to pay medical benefits owing to the SMOLKERS.

128. As a direct and proximate result of CAINCO's breach of contract the SMOLKERS were not promptly paid insurance benefits owing; the SMOLKERS had to sue CAINCO in order to obtain benefits owing; and, the SMOLKERS have been damaged in a sum to be proved at trial in the amount of medical expenses already incurred and in the additional amount of future medical treatments ascertained or unascertained which will be necessary to treat the bodily injury suffered by Gary Smolker, Alice Smolker, Leah Smolker and Judi Smolker, which have not yet been paid by CAINCO. CAINCO has been unjustly enriched by the amount of medical expenses CAINCO should have promptly paid and did not pay promptly, and CAINCO will be unjustly enriched in the future by an additional sum equal to the amount of future medical expenses to be incurred by the SMOLKERS that CAINCO should pay but refuses to pay. The amount of unjust enrichment will be proved at time of trial.

1    129. The SMOLKERS have suffered emotional damages, and loss of earnings and

2  earning capacity as a direct and proximate and foreseeable result of CAINCO's breach of contract

3  in an amount to be proved at time of trial.

4    **WHEREFORE,** cross-complainants Gary Smolker and Alice Smolker pray judgment as

5  hereinafter set forth.

6    ### TWENTY-THIRD CAUSE OF ACTION FOR BREACH

7    ### OF DUTY OF GOOD FAITH AND FAIR DEALING AGAINST CAINCO

8    130. The SMOLKERS incorporate herein by reference as though fully set forth herein

9  Paragraphs 123 through 129 of this cross-complaint with the same force and effect as though said

10  paragraphs were set forth fully at this point.

11    131. Implied in the CAINCO POLICY are covenants by CAINCO that CAINCO would

12  act in good faith and deal fairly, only engage in fair practices in dealing with the SMOLKERS and

13  would treat the SMOLKERS with decency and humanity and not abuse its discretionary power

14  and authority when processing the SMOLKERS' claim for medical benefits, and would do

15  nothing to interfere with the SMOLKERS' rights to receive medical payment benefits under the

16  CAINCO POLICY.

17    132. At all times since receipt of notice of the contamination problem in the SMOLKERS

18  home, CAINCO has known the SMOLKERS were entitled to medical payments under the

19  CAINCO policy and that CAINCO had a duty to disclose benefits owing under the CAINCO

20  POLICY to the SMOLKERS. But, CAINCO refused to disclose benefits owing to the

21  SMOLKERS. CAINCO refused to give the SMOLKERS a copy of the CAINCO POLICY.

22  Upon receipt of the SMOLKERS' claim for payment of medical expenses, CAINCO knew that

23  the SMOLKERS were entitled to payment of medical expenses and wrongfully, deliberately and

24  without just cause refused to pay any of the SMOLKERS' medical expenses, and forced the

25  SMOLKERS to sue CAINCO in order to obtain medical payment benefits owing to the

26  SMOLKERS, in breach of CAINCO's covenant of good faith. In further breach of CAINCO's

27  covenant of good faith, CAINCO has informed the SMOLKERS that the CAINCO would

28

-59-

1  promptly investigate the problem in the SMOLKERS' home and take care of it, and demanded

2  that the SMOLKERS not alter the condition of the SMOLKERS' home until CAINCO was done

3  inspecting and testing the SMOLKERS' home, when CAINCO had no intention to promptly

4  investigate the contamination problem in the SMOLKERS' home. Although repeatedly invited to

5  do so, CAINCO never inspected or tested the SMOLKERS' home. CAINCO forced the

6  SMOLKERS to bring and prosecute a lawsuit to receive any payment for medical expenses from

7  CAINCO.

8        133. As a direct and proximate result of CAINCO's bad faith conduct, and breach of

9  fiduciary duties, the SMOLKERS have suffered compensable losses, including benefits withheld,

10  physical injury, property damage, additional medical expenses, loss of strength, loss of earning

11  capacity and earnings, embarrassment and humiliation, anxiety and frustration, and severe mental

12  and emotional distress and discomfort, all to the SMOLKERS damage in amounts not fully

13  ascertainable but within the jurisdiction of this court in an amount to be proved at the time of trial.

14        134. Cross-defendant CAINCO's conduct described herein was done willfully with a

15  conscious disregard of the SMOLKERS' rights and with intent to vex, cause unjust hardship to,

16  injure and annoy the SMOLKERS, such as to constitute oppression, fraud and malice under

17  California Civil Code Section 3294 entitling the SMOLKERS, and each of them, to punitive

18  damages in an amount appropriate to punish and set an example of cross-defendant CAINCO by

19  means of punishment.

20        **WHEREFORE**, cross-complainants Gary Smolker and Alice Smolker pray judgment as

21  hereinafter set forth.

22                  **TWENTY-FOURTH CAUSE OF ACTION**

23             **FOR BREACH OF CONTRACT AGAINST TIE**

24        135. The SMOLKERS incorporate herein by reference as though fully set forth herein

25  Paragraph 119 of this cross-complaint with the same force and effect as though said paragraph

26  was set forth fully at this point.

27

28

136. Prior to October 1996, PACIFIC VILLAS purchased medical payments coverage for the benefit of others to pay medical expenses caused by an accident because of PACIFIC VILLAS' operations. These payments are to be made regardless of fault. PACIFIC VILLAS purchased this coverage for the benefit of others from TIE. The above described medical payment coverage is part of a written commercial policy containing commercial property coverage and liability coverage issued to PACIFIC VILLAS by TIE , TIE Policy Number 09387-08-30 ("TIE POLICY"), in 1986 ,which has been renewed annually ever since. The TIE POLICY was in force at all times material to this action.

137. The medical payments provision of the TIE POLICY issued to PACIFIC VILLAS is denoted Coverage C Medical Payments, and provides the coverage described above in paragraph 136 for the benefit of Gary Smolker and Alice Smolker. Gary Smolker and Alice Smolker are intended beneficiaries of the TIE POLICY. The medical payment provisions of the TIE POLICY (Coverage C) create a direct obligation of TIE to Gary Smolker and Alice Smolker to pay reasonable medical expenses incurred for necessary medical, surgical, x-ray and dental services for expenses incurred and services rendered within year from the date of an occurrence causing bodily injury to which this policy applies, regardless of PACIFIC VILLAS' negligence or liability and without regard to the fault of Gary Smolker or Alice Smolker. The TIE also has property damage coverage which provides for repair of damage to the common areas of the CONDOMINIUM COMPLEX, and also has liability coverage for defense of liability lawsuits brought against Alice Smolker with respect to operations of the CONDOMINUM COMPLEX.

138. While the TIE POLICY was in effect, Gary Smolker and Alice Smolker incurred medical, x-ray, surgical, dental and hospital expenses for bodily injuries, sustained as a result of PACIFIC VILLAS' operations, covered by the TIE POLICY and made a timely claim for medical benefits owing to Gary Smolker and Alice Smolker under the TIE O POLICY to TIE. Gary Smolker's bodily injuries and Alice Smolker's bodily injuries were caused by the activities of PACIFIC VILLAS. While the TIE POLICY was in effect the common areas of the CONDOMINIUM COMPLEX suffered injuries and damages due to wind forces, explosion,

-61-