IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al. | ) | Case No. 01-01139(JJF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**PRELIMINARY INFORMATIONAL BRIEF OF
ZONOLITE ATTIC INSULATION CLASS ACTION PLAINTIFFS (MDL 1376)
IN RESPONSE TO W.R. GRACE & COMPANY'S INFORMATIONAL BRIEF(D.I. 6)**

ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.
William D. Sullivan, (#2820)
Katharine L. Mayer (#3758)
William F. Taylor, Jr. (#2936
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630
Telephone: 302-428-3180
Facsimile: 302-777-7244

McCARVEY, HEBERLING, SULLIVAN
& McGARVEY, P.C.
Allan M. McGarvey
Roger M. Sullivan
Jon L. Herberling
745 S. Main
Kalispell, MT
Telephone: 406-752-5566
Facsimile: 406-752-7124

Attorneys for Zonolite Attic Insulation Class
Action Plaintiffs (MDL1376)

163

165

LUKINS & ANNIS, P.S.
Darrell W. Scott, WSBA #20241
Michael G. Black, WSBA #19218
Tonya R. Hanson, WSBA #29398
1600 Washington Trust Financial Cntr
717 W. Spragur Avenue
Spokane, WA 99201-0466
Telephone: 509-455-9555
Facsimile: 509-747-2323

NESS MOTLEY LOADHOLT
 RICHARDSON & POOLE
Edward J. Westbrook
Robert M. Trukewitz
Edward B. Cottingham, Jr.
Frederick J. Jekel
Christy Gruenloh
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29645

COHEN, MILSTEIN, HAUSFELD
& TOLL
Richard S. Lewis
1100 New York Avenue, N.W,
West Tower, Suite 500
Washington, D.C. 20005-3934
Telephone: 202-408-4600
Facsimile: 202-408-4699

COHEN, MILSTEIN, HAUSFELD
& TOLL
Steven J. Toll
Tamara J. Driscoll, MSBA #4498
999 Third Avenue, Suite 3600
Seattle, WA 98104
Telephone: 206-521-0080
Facsimile: 206-521-0166

LIEFF, CABRASER, HEIMAN & BERNSTIEN,
LLP
Elizabeth j. Cabraser, CSB #083151
Richard M. Heimann, CSB #063607
Donald C. Arbitblit, CSB #12274
Frabrice N. Vincent CSB #160780
Emcarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111
Telephone: 415-956-1000
Facsimile: 415-956-1008

Attorneys for Zonolite Attic Insulation Class
Action Plaintiffs (MDL1376)

## **TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

DISCUSSION ....................................................................................................3

    1.    The Zonolite attic insulation problem...........................................3

        A.    Zonolite attic insulation produces extreme
                levels of airborne asbestos when disturbed. .......................................5

        B.    There is high frequency of dangerous
                disturbance activities by homeowners during
                typical renovation, rewiring, and storage
                activities. ...........................................................................................7

        C.    Homeowners are ignorant of the presence of
                asbestos and the extreme hazard presented by
                disturbing ZAI...................................................................................8

        D.    Summary of the Zonolite attic insulation problem. ...........................8

    2.    Special notice problems for homeowners with ZAI. .....................................9

    3.    Unique administrative issues for the ZAI claimants....................................14

CONCLUSION ..............................................................................................16

## **TABLE OF AUTHORITIES**

**Cases**

*Birting Fisheries, Inc. v. Lane,* 92 F.3d 939 (9th Cir. 1996)................................................. 15

*Branch v. F.D.I.C.,* 223 B.R. 605 (D. Mass. 1998)............................................................. 11

*Certified Class in the Charter Sec. Litig. v. Charter Co.*, 876 F.2d 866, 878 (11th Cir. 1989).................................................................................................................................... 15

*Chemetron v. Jones,* 72 F.3d 341, 348 (3rd Cir. 1995) ........................................................ 10

*City of New York v. New York, New Haven & Hartford Railroad Co.,* 344 U.S. 293, 296 (1953)............................................................................................................................. 10

*Harashe v. Flintkote Co.,* 84 S.W.2d 506, 508 (Mo. Ct. App. 1993) ................................. 7

*Hatch v. Riggs Nat'l Bank,* 361 F.2d 559, 566 (D.C. Cir. 1966) ........................................ 12

*In re American Reserve Corp.,* 840 F.2d 487, 488 (7th Cir. 1988)..................................... 15

*In re Century Boat Co.,* 986 F.2d 154 (5th Cir. 1993) ......................................................... 11

*In re Chicago Pacific Corp.,* 773 F.2d 909 (7th Cir. 1985) ................................................. 10

*In re Forty-Eight Insulations, Inc.,* 58 B.R. 476, 477 (Bankr. N.D.Ill. 1986) .................. 12

*In re Grand Union Company,* 204 B.R. 864, 871 (D.Del. 1997)........................................ 12

*In re Johns-Manville Corp.,* 36 B.R. 743, 747-49, (Bankr. S.D.N.Y. 1984) ..................... 12

*In re Piper Aircraft Corp.,* 168 B.R. 434, 436, 440 ^ n. 12 (S.D.Fla. 1995), *aff'd,*
58 F.3d 1573 (11th Cir. 1995) ............................................................................ 12

*In re Trans World Airlines, Inc.,* 96 F.3d 687, 689-90 (3rd Cir. 1996) ........................ 10,11

*In re UNR Industries, Inc.,* 46 B.R. 671, 675 (Bankr. N.D.Ill. 1985) ................................ 12

*Jones, et al. v. Chemetron Corporation,* 212 F.3d 199, 209 (3rd Cir. 2000) ................ 11,12

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652,
657, 94 L.Ed. 865 (1950) .................................................................................... 12

*Pioneer Investment v. Brunswick,* 507 U.S. 380, 398 (1993) ............................................. 11

*Reid v. White Motor Corp.,* 886 F.2d 1462, 1469 (6th Cir. 1989) ...................................... 15

## **Other**

OSHA Fed. Reg., Vol. 59, No. 15 ..................................................................................... 6

Rule 23(c)(2), F.R.Civ.P ................................................................................................. 15

## __INTRODUCTION__

This Preliminary Informational Brief is offered by the ZAI class action plaintiffs to summarily inform this Court that there is a substantial "other side" to the story presented in the Informational Brief[1] filed by Grace.

The Zonolite attic insulation class claims present a unique challenge to the Bankruptcy Court because of the extreme and ongoing health hazards of Zonolite Attic Insulation, and the homeowners' ignorance of either the hazard or the need to present a claim against Grace. The seriousness of the hazard of Zonolite Attic Insulation (herein "ZAI") is highlighted by the following statements by the investigating governmental agencies:

A.     Assistant Surgeon General Hugh S. Sloan of U.S. Public Health Service wrote to the director of National Institute of Occupational Safety and Health (NIOSH) on August 1, 2000 and reported  that "even minimal handling by workers or residents poses a

---

[1] In a document entitled *W.R. Grace & Company's Informational Brief* (the "Brief"), Grace sets forth its views respecting the reasons for the filing of the Case, and the goals of a chapter 11 case. The Brief further characterizes the ZAI claims as having no merit and deserving of no notice in the claims process. The Brief is a self-serving attempt to tilt the playing field before the ZAI claimants can even be heard on the numerous complex and highly contested issues.

substantial health risk (airborne <u>exposures up to 150 times the current occupational</u>

<u>standards.</u>)"

       B.     The EPA fact sheet dated September 2000 warns homeowners that

"[A]sbestos fibers in vermiculite attic insulation may get into the air . . . and may cause

diseases such as asbestosis, lung cancer and mesothelioma." The EPA recommended "if

you do not need to remodel or disturb the insulation, LEAVE IT ALONE!"

       C.     February 22, 2001 report of preliminary findings by the Agency for Toxic

Substances and Disease Registry (ATSDR) of screening of Libby health residents

reported an astonishing incidence of pleural changes observed in "14 percent for those

who only had vermiculite insulation in their residences."

       A series of class actions are pending against W.R. Grace asserting the need for a

program for immediate notification and containment of the ongoing hazard from exposure

to ZAI. These include the federal court actions consolidated in Multidistrict Litigation

No. 1376 (*Price, et al. v. W.R. Grace*) in which a class certification motion has been fully

briefed, and a Washington State court class action (*Barbanti, et al. v. W.R. Grace*) in

which class certification has been granted.

       In its Information Brief, W.R. Grace & Co. disparages the ZAI class actions, and

proposes procedures which would adversely impact the ability of the holders of these

serious claims to effectively participate in the Case. The purpose of this informational

brief is to provide to the Court an overview of the basis and merit of these actions and to

discuss the special notification and administrative issues which must be addressed by the Bankruptcy Court.

## DISCUSSION

### 1.    The Zonolite attic insulation problem.

W.R. Grace & Company's bald assertion that the ZAI claims lack merit is belied by the findings and recommendations of the state and federal agencies. The ongoing imminent and extreme nature presented by the Zonolite attic insulation problem is best summarized by the reports and recommendations of the United States Public Health Service (USPHS), the Environmental Protection Agency (EPA), and the Agency for Toxic Substances and Disease Registry (ATSDR):

A.    On August 1, 2000, Hugh Sloan, Assistant Surgeon General for the United States Public Health Service, identified a "pressing need" for increased participation and response to the health issues raised by Zonolite attic insulation:

> [E]nd-product vermiculite insulation . . . apparently contained appreciable quantities of asbestos, but were marketed, sold and used throughout the country without adequate labeling or warnings . . . Internal company documentation and recent testing of residential insulation materials reportedly used in over one million homes, reveals that even minimal handling by workers or residents poses a substantial health risk (airborne exposures of up to 150 times the current occupational standards.)

(See Exhibit A attached hereto.)

B.  In September of 2000, the Environmental Protection Agency recognized the

-3-

ongoing danger of homeowners' or workers' exposure to asbestos from disturbing ZAI

from the Libby mine:

> Ore from this mine is known to have asbestos contamination which
> contaminates any products from this ore . . . If disturbed, the asbestos fibers
> in vermiculite attic insulation may get into the air.  These fibers can be
> inhaled and become trapped in the lungs and may cause diseases such as
> asbestosis, lung cancer, and mesothelioma.
> * * *
> **What should I do if I have it?**
>
> Look at the insulation in your attic <u>without disturbing it</u>.  If it appears you
> have vermiculite attic insulation, we recommend the following steps:
>
> 1.    If you do not need to remodel or disturb the insulation,
>        LEAVE IT ALONE!
> * * *
> 3.    If you are planning to remodel or remove your
>        insulation, have the insulation tested first . . . Do not
>        attempt to do this yourself.  You could spread asbestos
>        fibers throughout your home, putting you and your
>        family at risk of inhaling asbestos fibers.

(See Exhibit B attached.)

C.    Medical testing conducted by the ATSDR of nearly 6,000 individuals in

Libby, Montana yielded, in its initial findings, an astonishing incidence of disease for

individuals whose only known exposure was to Zonolite Attic Insulation.  The February

22, 2001 preliminary findings by the Agency for Toxic Substances and Disease Registry

reported that 19 percent of the initial group of participants had pleural abnormalities.

While former W.R. Grace workers had the highest rate of pleural abnormalities, the

testing revealed an astonishing incidence of pleural changes in "14 percent for those who

-4-

only had vermiculite insulation in their residences." (See Exhibit C attached.)

While federal agencies have only recently uncovered the ZAI hazard, W.R. Grace has known since the 1970's that its product was generated extreme levels of asbestos and would be banned:

> **Harm to customers** . . . The highest level of exposures is for attic insulation [with] concentrations of <u>upwards of 15 f/ml</u> . . . in simulated tests.
>
> * * *
>
> **Product bans** . . . We forecast that our vermiculite consumer products, namely attic insulation . . . <u>will eventually be banned</u> by the Consumer Products Safety Commission.

May 24, 1977 Grace Memorandum. (See Exhibit D attached.)

The unique and serious nature of these claims is a function of a) the high level of airborne asbestos generated by disturbance of Zonolite attic insulation; b) the high frequency of dangerous disturbance activities by homeowners during renovation, rewiring, storage, etc.; and c) the lack of knowledge by typical homeowners of the presence of asbestos and dangers of disturbing ZAI.

### A. Zonolite attic insulation produces extreme levels of airborne asbestos when disturbed.

The disturbance of readily airborne asbestos, resulting from typical home maintenance, repair and remodeling, presents a severe health hazard to workers and members of the household. Simulation of typical home maintenance, repair or remodeling activities demonstrated that these common activities result in airborne asbestos levels

-5-

ranging from 6.96 to 12.48 fibers per cc.[2]

This level of airborne asbestos is consistent with Grace's own historical testing which shows that disturbance of ZAI results in high airborne concentrations of asbestos. In 1976, Grace conducted testing of it vermiculite attic fill insulation and determined that "Attic fill tested in excess of the 5 fiber level generally and in excess of the 10 fiber ceiling in some instances." Grace concluded that "This necessitates a binder development program or other remedy." (See Exhibit E attached hereto.) Also in 1976, Grace conducted similar testing involving the pouring of ZAI and analyzed the air samples by transmission electron microscope. All ten samples analyzed exceeded 4.5 f per cc. (See Exhibit F attached hereto.)

These measurements far exceed current Occupational Safety and Health Administration (OSHA) and EPA standards and are unsafe for homeowners and their families. The OSHA permissible exposure limit (PEL) is only 0.1 fibers per cc (f/cc):

> OSHA's risk assessment also showed that reducing exposure to 0.1 f/cc would further reduce, but not eliminate significant risk. The excess cancer risk at the level would be reduced to a lifetime risk of 3.4 per 1,000 workers and a 20 year exposure risk of 2.3 per 1,000 workers.

OSHA Fed. Reg., Vol. 59, No. 153, August 10, 1994, at p.40978.

The measurements of asbestos released from ZAI described above typically exceed this OSHA standard by **50 to 100 times**.

---

[2] See e.g. summaries of testing in Hurst affidavit and Hatfield affidavits.

The dangers posed by even casual homeowner exposure to ZAI are illustrated by the case of *Harashe v. Flintkote Co.,* 848 S.W.2d 506, 508 (Mo. Ct. App. 1993), a case where the plaintiff proved that his asbestos-induced cancer was caused as result of only two heavy exposures to dust from ZAI during the installation and subsequent inspection of vents in his attic as described by the court as follows:

> Plaintiff used the insulation to insulate his attic by pouring the product between the joists of his ceiling. Because of the layout and confined space of the attic, he was required to place his face quite close to the insulation as it was being poured into the spaces between the joists. He testified that the insulation created heavy amounts of dust. Insulating the attic took approximately one day. Thereafter the plaintiff would go to the attic twice a year to check on a vent located there. On those occasions the attic was quite dusty. Several years after the attic work plaintiff bought additional zonolite to insulate between walls. Again in installing this insulation plaintiff came into contact with heavy clouds of dust.

*Harashe,* at 508.

Thus, Grace's assertion of a harmless product and meritless claims have already been disproven by a final court judgment.

> **B.    There is high frequency of dangerous disturbance activities by homeowners during typical renovation, rewiring, and storage activities**.

Do-it-yourself home remodeling and renovation is a commonplace activity engaged in by thousands of ZAI homeowners. These homeowners routinely engage in activity that expose them to asbestos dust from ZAI while they are unaware of the dangers to which they are being exposed. Consideration of the typical nature of such

-7-

renovation activities underscores the frequency to which ZAI homeowners face the extreme levels of asbestos dust described above. Affidavits in ZAI class action litigation of homeowners Price, Prebil, Hatch, Busch, and King reveal typical homeowner renovation activities, including rewiring, shoveling and sweeping and vacuuming the insulation, drilling holes in or removing ceilings, plumbing, cable installation, etc.

As described above, these are the very activities which both plaintiffs' and Grace's testing have proven to cause asbestos levels 50 to 100 times greater than OSHA's 0.1 f/cc safety standard.

> **C.**    **Homeowners are ignorant of the presence of asbestos and the extreme hazard presented by disturbing ZAI**.

Grace's Zonolite attic insulation was primarily installed directly by the homeowners as a "do-it-yourself" product. Grace affirmatively represented to homeowners that ZAI "pours easily and cleanly," does not require "mask, gloves or special equipment," and "[c]ontains no harmful chemicals." In Grace's sales literature and on the bags themselves are depictions of a person pouring the material without any safety precautions whatsoever, and the assurance that the material was "non irritating to the lungs." (See Exhibit G attached hereto.)

Because of these affirmative representations of safety, and because of the lack of publicity or disclosure of the hazard, the vast majority of ZAI homeowners are totally unaware that their attic insulation contains asbestos, let alone that minor disturbance of

-8-

the product will cause extremely dangerous levels of airborne asbestos.

### D.    Summary of the Zonolite attic insulation problem.

The <u>combination</u> of homeowner ignorance, the frequency of insulation disturbing

activities, and the dangerously high levels of asbestos dust in such typical activities

presents a unique problem of notification for this Court.  The ZAI class actions represent

a major element of Grace's liabilities.  If, for example, the cost of containment and/or

remediation of homes contaminated with asbestos-laden ZAI is estimated to average

$9,000.00 to $10,000 per home.  The liability for one million homes is therefore on the

order of many billions of dollars.

However, unique to the ZAI class action claims is the potential to limit or even

reduce the claim by timely notice to homeowners which can <u>prevent</u> disturbance of the

attic insulation and resulting further contamination of the homes, and further disease

among ZAI homeowners.

### 2.    Special notice problems for homeowners with ZAI.

The nature of the ZAI class actions is readily distinguishable from the vast

majority of the 100,000+ typical asbestos claims.  These distinctions present special

opportunities and problems in this bankruptcy.  The ZAI class action involves a single

manufacturer and single defendant: W.R. Grace & Co. (and associated entities).

Implementation of effective injunctive relief in these single defendant cases may well

present an opportunity to reduce the ultimate monetary liability.  Because only one

defendant is involved, appropriate remedies will be effective without regard to the conduct of other asbestos companies.

Conversely, the ubiquitous ignorance of ZAI homeowners presents an unusual notification issue which must be addressed with respect to a) notification of creditors and proof of claims; b) class certification notice; and c) preliminary and/or final injunctive relief. The ZAI class representatives will be asking this Court to consider notification procedures which address all three of these concerns thus satisfying equity and due process demands, and assuring adequate protection of human health.

In its informational brief, Grace states it will seek a bar date, presumably without actual notices to each of the ZAI homeowners. The equitable due process limitations to bar date procedures, together with the need to protect the health of the ZAI homeowners, will prevent Grace's draconian approach. The need to identify claims and provide finality must yield to the paramount concern of due process.

Of course, it is well established that both equity and due process require adequacy of notice under the circumstances, and a reasonable opportunity for creditors to present their claims. Known creditors are entitled to actual notice of bar dates for filing of claims. *City of New York v. New York, New Haven & Hartford Railroad Co.,* 344 U.S. 293, 296 (1953); *In re Chicago Pacific Corp.,* 773 F.2d 909 (7th Cir. 1985). In the absence of actual knowledge or reasonable notice, a known creditor's claim may not be barred. *Chemetron v. Jones,* 72 F.3d 341, 348 (3rd Cir. 1995); *In re Trans World*

-10-

*Airlines, Inc.,* 96 F.3d 687, 689-90 (3rd Cir. 1996); *In re Century Boat Co.,* 986 F.2d 154

(5th Cir. 1993); *Branch v. F.D.I.C.,* 223 B.R. 605 (D. Mass. 1998).  The form and

adequacy of the notice of claim period and bar dates are also subject to due process

scrutiny.  *Pioneer Investment v. Brunswick,* 507 U.S. 380, 398 (1993).  The constrains of

equity and due process will make it impossible to establish a claim "bar date" without

actual notice to the known creditors who have ZAI.

Moreover, in this unique case, three additional compelling factors must be added

to the creditor notification equation.

The first additional factor is the demonstrable ignorance among ZAI homeowners

of the existence of a claim.  Unlike most asbestos claimants whose disease has been

medically verified, the record in the ZAI class actions demonstrate that over 90 percent of

the homeowners do not know that there is asbestos in their attic insulation, let alone the

seriousness of the health hazard or the potential for a claim against W.R. Grace.  Bar date

procedures presume (indeed due process requires) a reasonable opportunity for

bankruptcy creditors to learn of and present their claims.  If a potential claimant lacks

sufficient notice of a bankruptcy case, due process considerations dictate that his or her

claim cannot be discharged therein.  *Jones, et al. v. Chemetron Corporation,* 212 F.3d

199, 209 (3rd Cir. 2000); *In re Trans World Airlines, Inc.*, 96 F.3d 687, 689-90 (3rd Cir.

1996).  Where, as here, there is demonstrable evidence of record that the vast majority of

ZAI homeowners have no way of knowing of the possibility of a claim against Grace, the

-11-

Court must fashion notification procedures which are designed to actually provide a meaningful and effective notice to potential claimants.  Due process requires notice that is "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *In re Grand Union Company,* 204 B.R. 864, 871 (D.Del. 1997). Further, in circumstances similar to this Case, due process considerations have been addressed by the appointment of a class representative to receive notice for and represent the interests of a group of unknown claimants.  *Jones, et al. v. Chemetron Corporation,* 212 F.3d 199, 209 (3rd Cir. 2000); *Hatch v. Riggs Nat'l Bank,* 361 F.2d 559, 566 (D.C. Cir. 1966); *In re Piper Aircraft Corp.,* 168 B.R. 434, 436, 440  n. 12 (S.D.Fla. 1995), *aff'd,* 58 F.3d 1573 (11th Cir. 1995).  *Accord In re Forty-Eight Insulations, Inc.,* 58 B.R. 476, 477 (Bankr. N.D.Ill. 1986); *In re UNR Industries, Inc.,* 46 B.R. 671, 675 (Bankr. N.D.Ill. 1985); *In re Johns-Manville Corp.,* 36 B.R. 743, 747-49, (Bankr. S.D.N.Y. 1984).

    The second concern arises from the fact that the ZAI homeowners' ignorance of their claims is <u>caused by the deliberate actions of Grace</u> to conceal the attic insulation hazard <u>for the express purpose of avoiding such claims</u>.  In the same May 24, 1977 internal memo in which Grace recognized an asbestos exposures "of upwards of 15 f/ml" and in which Grace forecasted that its attic insulation product would "eventually be

-12-

banned by the Consumer Product Safety Commission," Grace considered and rejected

labeling of the product and/or corrections of its misrepresentations of safety in order to

prevent homeowners' knowledge of and presentation of claims:

> Based on the advice of corporate general counsel, we have decided not to
> affix labels on . . . expanded products using Libby ore.
> * * *
> A decision to label our consumer products would eliminate the risk of
> future liability, while exacerbating the risk of claims . . . from past use of
> the product.

(See Exhibit D.)

This decision was part of consistent corporate policy of concealing the hazard of

vermiculite in order to prevent consumer claims. A further example is the exchange of

memos on March 11 and 31, 1969 ("Before any labeling . . . we should indeed study . . .

the consequences . . . by warning people or inadequately warning people. We may be

incurring liability.") (See Exhibit H attached hereto.) Where a class of creditors'

demonstrable ignorance of claims is caused by a debtors' misrepresentation and

deliberate actions designed to prevent such claims, traditional notification and bar date

procedures will not meet the requirements of due process.

Finally, the notification and bar date equation must take into account the ongoing

health hazard and the likelihood of continuing exposures, asbestos disease, and resulting

claims caused by ZAI homeowners' continuing ignorance of the extreme hazards lurking

in their attics. Above all else, this Court must assure that the ZAI class action plaintiffs

-13-

have the opportunity to timely and effectively secure, in MDL 1376 or in adversarial

proceedings within this bankruptcy, the appropriate relief to protect ZAI homeowners

from future exposures to dangerous and life threatening levels of asbestos-laden dust.

The combination of demonstrable ignorance of the claim existence, the affirmative

actions of the debtor to cause such ignorance, and the ongoing exposures and growth of

claims arising from such ignorance presents a unique circumstance for appropriate notice.

As the following discussion will demonstrate, the solution to these unique notification

problems overlap between a) the notice to bankruptcy creditors; b) class notice under

Rule 23; and c) appropriate preliminary and final injunctive relief.

### 3.    Unique administrative issues for the ZAI claimants.

In its informational brief, Grace reveals its intent to challenge the merits (including

causation and scientific basis) of the ZAI class actions in adversarial proceedings.  The

ZAI class action plaintiffs agree that litigation will be necessary to address both the

special forms of relief sought by the plaintiffs as well as the defenses thereto.  This

litigation may be handled in adversarial proceedings within this bankruptcy, or in

continued litigation in MDL 1376, Grace's original choice of forum.  Regardless of where

this litigation proceeds, the constraints of due process and efficient administration dictate

that such proceedings be conducted on a class action basis.  A threshold issue which this

Court must therefore address is how the class certification question should be resolved.

In the *Barbanti* action for homeowners within the state of Washington, a class has

-14-

been certified.  Following close on the heels of *Barbanti* are the consolidated actions in

MDL 1376 where the class motion has been fully briefed.  Plaintiffs in MDL 1376 will

ask this Court to consider the wisdom of permitting the district court in MDL 1376

(Honorable Patti Saris) to move forward with the class certification issue.  Leaving the

certification question until after the filing of adversarial proceedings in this bankruptcy,

and after new rounds of briefing on the class certification issue, will delay the efficient

administration of these claims.

The ZAI class action plaintiffs urge this Court to recognize that the resolution of

class certification with the corresponding service of class notice will have a profound

effect, if not resolve, the notification of creditor and bar date issues described in Grace's

informational brief.  For example, if the nationwide ZAI class action is certified, proof of

claim and bar date issues may be resolved by the filing of class proof of claim.  *Birting

Fisheries, Inc. v. Lane,* 92 F.3d 939 (9th Cir. 1996); *Reid v. White Motor Corp.,* 886 F.2d

1462, 1469 (6th Cir. 1989); *Certified Class in the Charter Sec. Litig. v. Charter Co.*, 876

F.2d 866, 878 (11th Cir. 1989); *In re American Reserve Corp.,* 840 F.2d 487, 488 (7th

Cir. 1988).

Next, certification of a class action for adversarial proceedings invokes the class

notification procedures under Rule 7023, and thereby Rule 23(c)(2), F.R.Civ.P.  Such

notification to members of the class may present the opportunity to adequately address all

of the notice concerns described above.  For example, attached as Exhibit I is a proposed

-15-

form of class notice to be used in the *Barbanti* case for members of the Washington State class. With minor modification, such notice could fulfill the triple function of a) satisfying class notice requirements; b) alerting ZAI homeowners to avoid exposures which would precipitate new claims; and c) informing ZAI homeowners of the status of their claims within this bankruptcy.

Regardless of the means of notification utilized, this Court should recognize the need to satisfy all three of these concerns.

## CONCLUSION

The ZAI class actions present the largest category of claims of any sort in the Case. The merit of these claims is underscored by the findings, reports, and recommendations of several federal agencies. The single most important group of decisions to be addressed by this Court in the Case will be those surrounding the nature and extent of notice, class treatment and remedies to be afforded to the ZAI claimants. The ZAI plaintiffs ask this Court to accept that the ZAI class action claims present a unique challenge for the formulation of an adequate and effective notice to all potential claimants, safeguarding both the claimants' due process rights and legitimate health concerns. Additionally, this Court must recognize that these claims, if remedied appropriately and efficiently, actually present a unique opportunity, through a meaningful notice and class treatment, to reduce the ultimate personal injury asbestos liability faced

-16-

by the Debtors.

Respectfully submitted this ___27th___ day of April, 2001.

ELZUFON AUSTIN REARDON,
TARLOV & MONDELL, P.A.

By: _____
William D. Sullivan, Esq. #2820
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630
(302) 428-3181

and

Elizabeth J. Cabraser
Fabrice N. Vincent
John Low-Beer
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
Embacadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

and

Edward J. Westbrook
Robert M. Turkewitz
NESS MOTLEY LOADHOLT
RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile:  (843) 216-9440

and

-17-

Allan M. McGarvey
Roger M. Sullivan
Jon L. Heberling
McGARVEY, HEBERLING,
SULLIVAN & McGARVEY, P.C.
745 South Main
Kalispell, MT  59901
Telephone:  (406) 752-5566
Facsimile:  (406) 752-7124

and

John J. Stoia, Jr.
Timothy G. Blood
Jobeth Halper
MILBERG WEISS BERSHAD HYNES &
LERACH, LLP
600 West Broadway
1800 One America Plaza
San Diego, CA 92101-5050
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423

and

David Pastor
Edward L. Manchur
John C. Martland
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile:  (781) 231-7840

and

Robert M. Fishman
SHAW GUSSIS DOMANSKIS
FISHMAN & GLANTZ
1144 West Fulton Street, Suite 200
Chicago, Illinois 60607
Telephone: (312) 541-0151

# INDEX OF EXHIBITS

Letter from Hugh S. Sloan, D.S.W.,  to Dr. Linda Rosenstock,
     dated August 1, 2000 ...........................................................................................Exhibit A


Environmental Fact Sheet from the U.S. Environmental Protection
     Agency Region 10, dated September 2000............................................................ Exhibit B


Preliminary Findings of Medical Testing of Individuals Potentially
     Exposed to Asbestoform Minerals Associated with Vermiculite
     in Libby, Montana: An Interim Report for Community Health
     Planning, published by Agency for Toxic Substances and Disease
     Registry, dated February 22, 2001 ........................................................................ Exhibit C


W.R. Grace Memorandum from E.S. Wood to C.E. Brookes and C.N.
     Craf, dated May 24, 1977 .....................................................................................Exhibit D


W.R. Grace Memorandum from R.H. Locke to H.A. Brown, dated
     March 11, 1976 ..................................................................................................... Exhibit E


W.R. Grace Air Sampling Results for Zonolite, dated July 11, 1977................................ Exhibit F


W.R. Grace Sales Literature and Product Labeling Information........................................Exhibit G


W.R. Grace Memorandum from Peter Kostic to A.W. Sterrett,
     dated March 11, 1969 ...........................................................................................Exhibit H


Proposed Form of Class Notice for the matter of *Marco Barbanti,
     individually and on behalf of a class of all others similarly
     situated v. WR Grace & Company-Conn, et. al.,* Case No. 00201756-6,
     Superior Court, State of Washington, County of Spokane ..................................... Exhibit I

APR 27



United States Public Health Service
Region VIII
1961 Stout Street, Room 498
Denver, Colorado 80294-3538

August 1, 2000

Dr. Linda Rosenstock, Director
National Institute for Occupational
 Safety & Health
Hubert H. Humphrey Building Room 715H
200 Independence Ave., S.W.
Washington, DC  20201

Dear Dr. Rosenstock.

I would like to bring to your attention a significant occupational and public health concern regarding the widespread dissemination of amphibole (actinolite-tremolite series) asbestos in Libby, Montana, and potentially in vermiculite end-products used throughout the country. As you may be aware, NIOSH researchers evaluated vermiculite miners, that were exposed to asbestos, in Libby, Montana in the early 1980's. NIOSH investigators found significantly elevated risks of asbestos-related malignant and non-malignant respiratory disease among these workers. Concurrently, Dr. Jim Lockey at the University of Cincinnati identified elevated pulmonary disease among workers with much lower asbestos exposures at a facility processing Libby vermiculite in Ohio. These articles have been included for your information.

In November 1999, Libby became the focus of national attention when it was reported that a number of residents that did not work at the vermiculite mine or processing facilities were suffering from asbestos-related diseases. Subsequently, researchers from the Environmental Protection Agency (EPA), Public Health Service (PHS) Region 8, and Agency for Toxic Substances and Disease Registry (ATSDR) began intensive environmental and public health investigations of the site. Medical screening (e.g., chest x-rays, pulmonary function testing, questionnaires) is currently being conducted on 4200 former workers, family contacts, and others potentially at risk. NIOSH researchers (Dr. Robert Castellan, Dr. Leslie Stayner, Dr. Pat Sullivan, Dr. Vince Castranova, Mr. Ken Wallingford, and Mr. Ralph Zumwalde) have also been providing intermittent technical assistance to these efforts.



EXHIBIT

A

One issue that has very recently come to our attention, is that end-product vermiculite insulation, and most likely other end-products, apparently contained appreciable quantities of asbestos, but were marketed, sold, and used throughout the country without adequate labeling or warnings and were commonly considered to be non-toxic (see enclosed information and video tape). Internal company documentation and recent testing of residential insulation materials, reportedly used in over one million homes, reveals that even minimal handling by workers or residents poses a substantial health risk (airborne exposures up to150 times the current occupational standards (0.1 f/cc)).

Recent discussions between the aforementioned federal partners working at the Libby site identified the pressing need for increased NIOSH participation and response to occupational health issues of concern.

Exemption (b)(5)

If I can be of any further assistance to you in this matter please contact me at (303) 844-7860 or Dr. Aubrey Miller at (303) 844-7857.

Sincerely,

Hugh S. Sloan, D.S.W.
Assistant Surgeon General
Regional Health Administrator

Enclosures



**⊕EPA** **U.S. ENVIRONMENTAL PROTECTION AGENCY REGION 10** **September 2000**

## ASBESTOS IN ATTIC INSULATION

As a result of recent newspaper articles, the U.S. Environmental Protection Agency (EPA) office in Seattle has received a large number of phone calls from citizens concerned about asbestos-containing insulation in their attics. EPA is working hard to gather more information about attic insulation and other products containing vermiculite that may be contaminated with asbestos.

The following information provides a common sense approach to help you find out what kind of attic insulation you have and decide what to do if you have vermiculite attic insulation.

### Background
EPA believes that a number of manufacturers produced attic insulation from vermiculite. One mine in the United States produced over 70 percent of the world's vermiculite before the mine was closed in 1990. Ore from this mine is known to have asbestos contamination which contaminates any products from this ore.

### Why is it a Problem?
If disturbed, the asbestos fibers in vermiculite attic insulation may get into the air. These fibers can be inhaled and become trapped in the lungs and may cause diseases such as asbestosis, lung cancer, and mesothelioma. These diseases may show up many years after exposure to asbestos.

### What Does it Look Like?
Vermiculite is a mineral that is shaped like a small nugget, and varies in color from silver-gold to gray-brown (see picture at right). The asbestos fibers contained in vermiculite attic insulation are generally too small to be seen without magnification. Only a trained technician using careful microscopic examination can see asbestos fibers.



Pieces of Vermiculite Attic Insulation

### What Should I Do if I Have it?
Look at the insulation in your attic without disturbing it. If it appears you have vermiculite attic insulation in your attic, we recommend the following steps:



EXHIBIT

B



1. If you do not need to remodel or disturb the insulation, LEAVE IT ALONE! If it's sealed behind wallboards and floorboards or is isolated in an attic that is vented outside, the best approach is to keep it in place.

2. If you are concerned about asbestos contamination in the living quarters of your home, you can consider air monitoring. This will show if any asbestos has been or is being released from the insulation into the air in your home. The air monitoring must be done by trained professionals.

3. If you are planning to remodel or remove your insulation, have the insulation tested first.

   A. EPA recommends using a trained and certified professional to conduct the tests. Use certified asbestos removal professionals to remove your vermiculite attic insulation using a "negative pressure enclosure" technique. This technique will prevent asbestos fibers and dust from escaping from your attic into the rest of your home. Using professionals is expensive. Do not attempt to do this yourself. You could spread asbestos fibers throughout your home, putting you and your family at risk of inhaling asbestos fibers.

   B. After the vermiculite attic insulation is removed, you may want to consider having air monitoring tests done in your attic and throughout the living areas of your home. This is to ensure that the concentration of asbestos fibers in the home is low or not present.

## How Do I Find a Trained and Certified Asbestos Removal Professional?

A certified asbestos inspector will be able take samples of your insulation, provide you with information on the results, and advise you on what additional tests or options you might consider. Inspectors can be found in the Yellow Pages under "Asbestos Consulting and Testing" or "Asbestos Abatement". Ask the inspector to provide you with the name of the company that trained and certified him or her. Call that company to confirm whether a particular inspector has had the required training and has up-to-date accreditation. Companies that can test the air in your home will be found under the same listings.

## Where Can I Get More Information?

New information can be found on the hotline and websites below as it becomes available.

For current information on asbestos and health related information, contact EPA's TSCA Hotline at 1-202-554-1404, or visit EPA's Region 10 website at *www.epa.gov/R10earth* (click on Index, then Asbestos).

Also visit the federal Agency for Toxic Substances and Disease Registry (ATSDR) website at *www.cdc.atsdr.gov*, or the Washington State Department of Health at *www.doh.wa.gov/ehp/ts*.

# Agency for Toxic Substances and Disease Registry

### Division of Health Studies

### Preliminary Findings of
### Medical Testing of Individuals
### Potentially Exposed To Asbestoform Minerals
### Associated with Vermiculite in Libby, Montana:
### An Interim Report for Community Health Planning

February 22, 2001



**DEPARTMENT OF HEALTH
& HUMAN SERVICES**
Agency for Toxic Substances
and Disease Registry
Atlanta, Georgia 30333



EXHIBIT

C

Preliminary Findings of
Medical Testing of Individuals
Potentially Exposed To Asbestoform Minerals
Associated with Vermiculite in Libby, Montana:
An Interim Report for Community Health Planning

February 22, 2001

Agency for Toxic Substances and Disease Registry
U.S. Department of Health and Human Services
Atlanta, Georgia  30333

Prepared by

Jeffrey Lybarger, M.D.    Principal Investigator
                         Division of Health Studies, ATSDR

Michael Lewin, M.S.    Statistician
                       Division of Health Studies, ATSDR

Aubrey Miller, M.D.    Medical Officer
                       DHHS, Region VIII Office

Susan Kess, M.D.    Medical Officer
                    Division of Toxicology, ATSDR

-ii-

## CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND OF PROJECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Public Health Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Asbestos-Related Diseases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Medical Testing Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Procedures Used for Data Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

RESULTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## INTRODUCTION

A community-based medical testing program was developed to respond to reports of illness among persons exposed to asbestos-contaminated vermiculite in Libby, Montana. This medical testing program, a part of the Libby Community Environmental Health Project, was undertaken by the Agency for Toxic Substances and Disease Registry (ATSDR), an agency of the U.S. Department of Health and Human Services (DHHS), with the cooperation of the DHHS Region VIII Office, the U.S. Environmental Protection Agency (EPA), the Montana Department of Health and Human Services, and the Lincoln County Environmental Health Department. This medical testing program was implemented during July through November of 2000.

The principal goal of the medical testing program is to identify the asbestos-related health effects of participants exposed to asbestos from the vermiculite mine near Libby, Montana, and to refer these individuals for additional medical evaluation. Other important goals of the program are to

(a) provide EPA with information needed to identify and eliminate current exposures to asbestos in the community;

(b) identify the types of illnesses experienced by participants exposed to asbestos in order to better inform local physicians; and

(c) provide the local health care community with an estimate of the additional resources necessary to address health care needs in the Libby area during the next 10–20 years.

*This interim report has been specifically prepared for the residents, public officials, and health care practitioners of Libby, in order to assist them in preparing estimates of the community's additional health care needs and in seeking the resources required to provide the additional care.*

-1-

The data in this interim report provide a summary of the testing program's results for the first 1,078 (18%) of the total 6,144 participants. The reported prevalence of the identified medical abnormalities can be expected to change when the analyses are conducted on the complete, final data of all participants. There may be other limitations in this interim data regarding how representative these 1,078 participants are of all 6,144 participants. These limitations are important to understand in order to avoid drawing inappropriate conclusions from preliminary data.

## BACKGROUND OF PROJECT

### Public Health Concerns

Commercial vermiculite from Zonolite Mountain, located approximately 6 miles from the city of Libby, Montana, was mined and milled from 1924 through 1990. This operation included strip mining for the ore, transporting it by truck to a sorting facility and to processing plants in downtown Libby, expanding the ore by heating, and shipping it by rail as a commercial product. A transfer facility was located at the base of the mountain, approximately 3 miles from Libby. Two expansion ("popping") facilities operated at different time periods in the city; these plants heated vermiculite to expand (or "pop") the crystals.

To date, the toxicity of vermiculite has not been completely studied; however, it is believed that the toxic effects associated with vermiculite exposure are related to the presence of asbestoform minerals present in vermiculite ore and released during mining and processing operations. Ore taken from the Libby mining operation has been documented to be contaminated with asbestoform minerals, including tremolite, actinolite, and others [Atkinson et al.1982 and Lockey 1984]. Asbestos minerals fall into two groups or classes—serpentine and amphibole. Serpentine asbestos contains the mineral chrysotile. Minerals in the amphibole class are actinolite,

-2-

anthophyllite, amosite, crocidolite, and tremolite. For the remainder of this document (unless otherwise specified), the term "asbestos" or "asbestos-related" refers generally to asbestoform minerals associated with vermiculite mined near Libby, Montana.

Previous studies by the National Institute of Occupational Safety and Health (NIOSH) [Amandus et al. 1987a, 1987b, 1987c] and McGill University found that former workers of the mine in Libby had substantial occupational exposure to asbestos. These studies also documented significantly increased rates of pulmonary abnormalities and disease (asbestosis and lung cancer) among former workers [McDonald et al. 1986]. In addition to former workers at the mine, cases of asbestos-related pulmonary impairment have been reported among household contacts of former mine workers. Asbestos-related disease also has reportedly occurred among other residents of the community with no known direct connection with the mining operation. This is extremely unusual and suggests that asbestos exposure occurred in Libby from alternative (non-occupational) exposure pathways. Some potentially important alternative pathways for asbestos exposure that existed in the past might be related to elevated concentrations of asbestos in ambient air [EPA 1982], and recreational exposures to children playing in piles of vermiculite. Currently, some potentially important pathways of exposure may be associated with vermiculite placed in walls and attics as thermal insulation, and for use as a soil amendment or aggregate in driveways and gardens.

In the fall of 1999, the EPA Region VIII Office began an emergency response action to identify and control asbestos contamination in the Libby community. In support of this action, EPA sought assistance from the DHHS Region VIII Office, the Montana Department of Health and Human Services, and the Lincoln County Environmental Health Department to address the public health implications of past human exposure to asbestoform minerals in Libby. Concurrently, Senator Max Baucus (D-Montana) asked DHHS Secretary Shalala for the department's assistance

-3-

in addressing the need for medical testing of Libby residents for possible asbestos-related health effects. This request was referred to ATSDR, the lead DHHS agency responsible for providing this type of assistance.

### Asbestos-Related Diseases

Inhalation of asbestos fibers from asbestoform minerals suspended in air can result in lung diseases, such as asbestosis, mesothelioma, and lung cancer. The risk of developing any one of these diseases depends upon many factors; including the type of fiber, level of exposure, duration of exposure, and smoking history of the exposed individual.

### *Pleural Changes*

Asbestos exposure is associated with several changes in the pleura (lining of the lungs and internal chest wall). These changes include plaques (circumscribed pleural thickening), diffuse pleural thickening, calcifications, and pleural effusions (accumulations of fluid in the pleural space). They indicate past exposure to asbestos, and can often be detected in chest radiographs (CXR), also known as X-rays. On the chest radiographs, these changes appear as areas of either diffuse or circumscribed thickening of the pleura.

The latency of asbestos related *pleural effusions* on chest radiograph is usually less than 20 years and is often the first indication of asbestos-related disease. Pleural effusions, depending on the severity, may be associated with shortness of breath, chest pain, and functional lung impairment. The latency time for development of asbestos-related *pleural plaques* is on average 20 years, with a range of 3 to 57 years. Clinically, circumscribed pleural plaques found on chest radiograph, in the absence of other abnormalities, are viewed as non-symptomatic "markers of exposure" and the majority of cases will not progress to significantly affect lung function. *Diffuse pleural thickening* may also be seen on chest radiograph and, depending on the severity, may be associated with

-4-

cough, shortness of breath, and functional lung impairment. The presence of any of these pleural abnormalities on chest radiograph, associated with asbestos exposure, indicates increased risk for mesothelioma and lung cancer.

### Asbestosis

Asbestos fibers can reach the lower lung, penetrate airway walls, and pass through lung parenchyma to the pleura. They initiate fibrosis by stimulating the persistent release of various inflammatory mediators and fibroblast growth factors. The condition "asbestosis" classically refers to the occurrence of diffuse interstitial fibrosis which results from this persistent inflammatory process in response to asbestos fibers located in the interstitial or parenchyma tissues of the lung. Asbestos fibers located in or near the lung pleura appear to trigger a similar inflammatory process which frequently results in pleural thickening and the formation of calcified plaques.

The latency period (the time interval between exposure and disease) for the onset of disease typically is 10–20 years after the initial exposure, but some cases progress more rapidly. The diagnosis of asbestosis is usually based on the results of a medical and exposure history, physical examination, chest radiographs and other radiographic procedures, and pulmonary-function testing (spirometry). Clinically, asbestosis may present as a dry cough or shortness of breath with exertion. On physical examination, rales (dry crackling sounds) frequently occur with deep inspiration. The disease can vary from asymptomatic, to disabling, to potentially fatal. In advanced stages, clubbing (thickened fingertips) can result.

### Lung Cancer

Exposure to asbestos is associated with an increased risk of developing lung cancer. The risk is related to cumulative asbestos exposure, i.e., the greater the exposure, the greater the risk of

-5-

developing lung cancer. The risk for lung cancer among smokers exposed to asbestos is much higher than it would be if the two risk factors were additive in nature.

Typically, a substantial latency period of 10–40 years occurs between initial exposure and the onset of lung cancer [ATSDR 1995]. The initial symptoms of lung cancer are variable and may include cough, chest pain, and loss of appetite. Lung cancer is often an incidental finding on a chest radiograph taken for another medical purpose.

### *Mesothelioma*

Mesothelioma is a rare and generally fatal cancer of the mesothelial cells of the pleura or peritoneum. The prevalence of mesothelioma is strongly associated with asbestos exposure, but its prevalence does not correlate with the magnitude of the exposure. That is, some cases of the disease have resulted after exposure to relatively low levels of asbestos for short time periods [Becklake 1976]. Often, the latency period is 30–40 years.

Individuals with pleural mesothelioma generally present with chest pain and shortness of breath. The initial symptoms associated with peritoneal mesothelioma are weight loss, and abdominal pain and swelling. These symptoms usually do not appear until the disease is quite advanced. Currently no effective treatment exists for malignant mesothelioma.

## METHODS

### Medical Testing Program

During July through November, 2000, medical testing was provided to former workers of W.R. Grace Company, household contacts of former workers, and individuals who resided, worked, attended school, or participated in activities in the Libby area for 6 months or more before

-6-

December 31, 1990. All 1,078 of the participants included in this interim report were tested in Libby. Medical testing consisted of a verbally administered questionnaire, chest radiographs and simple spirometry testing (a measurement of lung function).

### Questionnaires

A questionnaire was administered to obtain health-related information, including demographic characteristics, residential history, occupational history, behavior patterns that relate to asbestos exposures, and self-reports of illnesses of interest to the community or possibly related to asbestos exposure.

### Chest Radiographs

For adults, the medical test of choice for identifying asbestos-related changes in the parenchyma and pleura of the lungs is the chest radiograph. The advantages include ready availability, low cost, and low radiation dose compared with other techniques [McLoud 1992]. Screening for asbestos-related abnormalities is usually done with a posterior-anterior (P-A) view, or with P-A *and* lateral views. However, physicians treating patients from Libby with asbestos-related pulmonary abnormalities had reported a predominance of pleural disease. Therefore, after consultation with experts in pulmonary medicine, the lateral chest view was replaced with two oblique views, to improve the test's sensitivity for detecting pleural abnormalities.

Chest radiographs for participants 18 or more years of age included posterior-anterior (P-A), right anterior-oblique, and left anterior-oblique views. For safety purposes, women of childbearing age were informed that they should postpone receiving a chest radiograph if they were pregnant. Chest radiograph was not offered to participants under 18 years of age. The equipment and procedures used to obtain the chest radiographs complied with guidelines developed by NIOSH [Sargent 1982]. The radiologist on site assessed the consistency and quality of each chest

-7-

radiograph taken and provided a routine, clinical, radiologic interpretation, which included recording asbestos-related changes on a summary report form. If findings on a chest radiograph suggested the need for immediate medical attention, the on-site radiologist completed a referral form, and the participant was counseled and directed to an appropriate source of medical care.

In addition to evaluation and interpretation by the on-site radiologist, participants' radiographs were evaluated by three physicians who are nationally recognized experts in asbestos-related conditions, as well as certified "B-readers," physicians certified by NIOSH as qualified to interpret radiographs for environmental dust-related diseases. Each B-reader independently examined the chest radiographs to classify them with respect to parenchymal and pleural abnormalities associated with exposure to mineral dusts that cause pneumoconiosis. The classification standards used are those set by the 1980 protocol of the International Labour Office of the World Health Organization (ILO) [ILO 1980]. Because some variability in interpretation of the same radiograph can occur among trained B-readers, researchers often choose to have radiographs reviewed by multiple radiologists who are certified B-readers. Two primary B-readers independently reviewed the chest radiographs taken on participants in the medical testing. The third B-reader independently read each radiograph that had different interpretations by the first two B-readers. The physicians recorded their interpretations on a standard form (developed by the ILO for recording B-readers' interpretations), which was modified to record the results of the oblique-view chest radiographs.

### Spirometry

Spirometry testing provides a safe, well standardized, objective measurement of lung function, and it was offered to all participants, including those less than 18 years of age. The spirometric tests recorded (a) the forced expiratory volume in 1 second (FEV1 ); (b) the volume that can be expired after a maximal inhalation, typically called the forced vital capacity (FVC); and (c) their

-8-

calculated ratio (FEV1/FVC).

The two major types of abnormal ventilation identified by spirometry are called restrictive and obstructive patterns. The obstructive pattern results from decreases in expiratory flow rates. Additionally, both FEV1 and the FEV1/FVC ratio are both decreased. Examples of obstructive diseases are asthma, chronic bronchitis, and emphysema. The restrictive pattern results from decreases in pulmonary air volumes associated with parenchymal disease (as in sarcoidosis or pneumoconiosis) or extraparenchymal disease (as with neuromuscular or chest-wall disorders). In this pattern, the FVC is typically reduced, although the FEV1/FVC could remain normal. Patients with asbestos-related pulmonary impairment typically demonstrate restrictive abnormalities on spirometry testing.

Spirometry testing followed the American Thoracic Society's guidelines and was performed by a qualified technician. Established procedures were followed to ensure correct technique, calibration methods, and maintenance. Qualified medical oversight was established to monitor the test results, to ensure the quality of the results and validity of interpretations. The results were compared with normative population data on the basis of the participant's age, height, and sex.

### Procedures Used for Data Analyses

This medical testing program was designed to identify participants with asbestos-related abnormalities and to refer them for diagnosis and follow-up treatment by private practitioners. The program was not a formal epidemiologic study with comparison groups and random samples. Nevertheless, the data collected provides important information about the prevalence and degree of asbestos-related abnormalities among Libby residents, and about the possible relationships between these abnormalities and each of the several exposure pathways evaluated.

The key outcome variable in this report is the presence of asbestos-related abnormalities on chest radiographs. The presence of abnormalities was classified in two ways (1) abnormalities identified by at least one physician and (2) abnormalities identified by at least two of three B-readers. The second classification is more stringent and also added the requirement that the abnormality was likely related to asbestos. The second classification typically is used in epidemiologic studies of asbestos-related disease. In this analyses, several case definitions were considered on the basis of whether (a) the results were to be used for epidemiologic characterization or clinical referral, (b) the abnormality was interstitial or pleural, and (c) the chest radiograph view used for classification was P-A, oblique, or a combination of these. Other adverse health effects considered were self-reported conditions, malignant outcomes associated with asbestos exposure (such as cancer abnormalities), and restrictive abnormalities (based on the pulmonary function test evaluations). Information is also included in this report that shows the number and proportion of participants with self-reported conditions associated with asbestos. The objective of the data analyses was to characterize the proportion of participants with various health outcomes within exposure. categories in the population tested. In addition, important associations between these health outcomes and the participants' exposure histories were sought.

Questionnaire and chest radiograph data were merged to create a computerized master file that contained demographic data, environmental exposure data, self-reported health data, and medical testing data. The data used for the analyses was interim data for 1,078 study participants. The key risk factors considered were the various exposure pathways (including variables related to occupational exposure), household contact with someone who had occupational exposure, activities thought to have increased the potential for exposure, and other behaviors that involved contact with vermiculite.

For this preliminary analysis, six exposure groups were defined for the 1,078 participants. Group 1 consisted of those 127 (12%) participants who worked at W.R. Grace Company either as a worker or a secondary contractor. Group 2 consisted of 116 (11%) participants who reported occupational exposure to vermiculite but did not work at W.R. Grace Company. Group 3 consisted of 177 (16%) participants who reported being in household contact with a W.R. Grace worker but were otherwise never occupationally exposed. Group 4 consisted of 558 (52%) participants who indicated that they had some form of exposure through recreational activities (e.g. played in vermiculite piles) but were never occupationally exposed to vermiculite nor had household contact with a W.R. Grace worker. Group 5 consisted of 34 (3%) participants who were excluded from Groups 1 through 4 but had lived in a residence containing vermiculite insulation. Group 6 consisted of 53 (5%) of the remaining participants who had no apparent exposure. Although the latter group is composed of participants with no apparent, specific exposure to vermiculite, this group might have had other exposures to vermiculite which were not evaluated in this analysis.

Finally, basic demographic variables and other factors were examined. These included the following: age; sex; smoking status; history of pulmonary disease, lung cancer, autoimmune disease; and various other self-reported health conditions.

## RESULTS

*For this interim report, the analyses were restricted to basic descriptive measures (means, counts, and percentages). It is important to note that the results derived from the interim data might not be representative of results that will be obtained for the complete data set.*

The interim data set was comprised of 1,078 study participants. Of these, 159 were less than 18 years of age, so no chest radiographic tests were conducted. Fourteen study participants were missing complete exposure data, therefore their data is excluded in the exposure groups in the tables that follow. Table 1 summarizes participants' exposure histories, by age group. The largest age group represented was for participants aged 45–64 years.

Table 1. Vermiculite Exposure, by Age Group

|  | 0–18 years | 18–45 years | 45–65 years | 65+ years |
|---|---|---|---|---|
| All exposure groups (1,078) | 159 (15%) | 292 (27%) · | 449 (42%) | 178 (17%) |
| WRG* workers & secondary contractors (127) | 0 (0%) | 21(17%) | 75 (59%) | 31 (24%) |
| No WRG occupational contact (116) | 1 (1%) | 43 (37%) | 51 (44%) | 21 (18%) |
| Household contact (177) | 10 (6%) | 61 (34%) | 76 (43%) | 30 (17%) |
| Recreational (558) | 123 (22%) | 155 (28%) | 211 (38%) | 69 (12%) |
| Residential insulation (34) | 6 (18%) | 5 (15%) | 14 (41%) | 9 (26%) |
| No apparent exposure[†] (53) | 16 (30%) | 5 (9%) | 18 (34%) | 14 (26%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
[†]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Table 2 summarizes the exposure history of participants, by sex. Of the 1,078 participants, 509 (47%) were male, and 569 (53%) were female. Males were much more likely to have potential occupational exposure to vermiculite at the W.R. Grace Company. Eighty-six percent of W.R. Grace workers and secondary contractors were male. In contrast, 76% of those reporting household contacts were female. Sixty-four percent of those reporting no apparent exposures (as defined for this analysis) from occupational, recreational, or household contact were female.

**Table 2. Vermiculite Exposure Groups, by Sex**

| | Male | Female |
|---|---|---|
| All exposure groups (1078) | 509 (47%) | 569 (53%) |
| WRG* workers & secondary contractors (127) | 109 (86%) | 18 (14%) |
| No WRG occupational contact with vermiculite (116) | 81 (70%) | 35 (30%) |
| Household contact (177) | 43 (24%) | 134 (76%) |
| Recreational (558) | 239 (43%) | 319 (57%) |
| Residential insulation (34) | 13 (38%) | 21 (62%) |
| No apparent exposure† (53) | 19 (36%) | 34 (64%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
†No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Tables 3 and 4 summarize participants' radiographic outcomes by exposure group classification. Table 3 summarizes the number and the proportion of participants who had a lung abnormality in their chest radiographs identified by at least one of the four physicians. Although these abnormalities can not be assumed to be asbestos related, the information provides the number of participants who were referred to their private physicians for additional evaluation. (Other participants were referred for physician evaluation for non-asbestos related changes and are not described in this report.) Thirty percent of all participants were referred for a pleural abnormality and 7% for an interstitial abnormality. The proportion was highest among participants reporting to be former W.R. Grace workers and secondary contractors, with 50% having pleural abnormalities and 15% having interstitial abnormalities. In contrast, the proportion of participants in the other five groups with pleural abnormalities ranged from 21% to 33%.

-13-

Table 3.  CXR* Abnormalities (Observed by at Least One Physician), by Exposure Group

|  | Pleural<br>All Views | Interstitial<br>P-A[†] View |
|---|---|---|
| All exposure groups (919) | 276 (30%) | 60 (7%) |
| WRG[‡] workers & secondary contractors (127) | 63 (50%) | 19 (15%) |
| No WRG occupational contact with vermiculite (115) | 38 (33%) | 11 (10%) |
| Household contacts (167) | 49 (29%) | 8 (5%) |
| Recreation (435) | 107 (25%) | 16 (4%) |
| Residential insulation (28) | 6 (21%) | 1 (4%) |
| No apparent exposure[§] (37) | 10 (27%) | 3 (8%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
† P-A = Posterior-anterior.
CXR = Chest radiograph.
‡WRG = W.R. Grace Company.
§No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Table 4 summarizes the number and proportion of participants having a possible asbestos-related interstitial or pleural abnormality identified on the chest radiograph by at least two of the three B-readers (the definition used by researchers for epidemiologic studies). This table presents results for three differing chest radiographic views for pleural abnormalities (i.e., "all Views", "P-A View", "Oblique View") and one chest radiographic view of interstitial abnormalities ("P-A View") for each of the exposure groups.

The abnormalities reported in Table 4 must have been observed by at least two certified B-readers. Consistency of the two reviewers was defined as both reviewers reporting the presence of pleural changes or the presence of interstitial fibrosis with a profusion level of 1/0 or greater (ILO classification). This criteria provided a greater level of significance to the findings when at least two of the certified reviewers agreed to the presence of an abnormality and agreed that the abnormality was consistent with a pneumoconiosis. This criteria is commonly used in health

-14-

surveys and epidemiologic studies. It provides an epidemiologic definition, but it is not a clinical criteria for diagnosis. Although not a clinical diagnosis, these data provide a better estimate of asbestos-related abnormalities.

**Table 4. CXR˙Abnormalities (Identified by at Least Two B-Readers), by Exposure Group**

|  | Pleural, all views | Pleural, P-A[†] view | Pleural, oblique view | Interstitial, P-A[†] view |
|---|---|---|---|---|
| All exposure groups (919) | 170 (19%) | 137 (15%) | 103 (11%) | 11 (1%) |
| WRG[‡] workers & secondary contractors (127) | 47 (37%) | 37 (29%) | 26 (20%) | 6 (5%) |
| No WRG occupational contact with vermiculite (115) | 21 (18%) | 16 (14%) | 12 (10%) | 2 (2%) |
| Household contact (167) | 33 (20%) | 31 (19%) | 20 (12%) | 1 (1%) |
| Recreational (435) | 58 (13%) | 45 (10%) | 40 (9%) | 1 (0%) |
| Residential insulation (28) | 4 (14%) | 4 (14%) | 1 (4%) | 0 (0%) |
| No apparent exposure[§] (37) | 5 (14%) | 3 (8%) | 2 (5%) | 0 (0%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
˙CXR = chest radiograph.
[†]P-A = posterior-anterior view.
[‡]WRG = W.R. Grace Company.
[§]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

The typical radiologic evaluation under the ILO classification uses only one chest radiograph, the back-to-front, or posterior-anterior (P-A) view. This testing program included left and right oblique views to evaluate pleural disease. Only the P-A view was used to evaluate interstitial disease as the pathology is best observed in that view. The proportion of participants with pleural abnormality is provided by the P-A view alone, the oblique views alone, and all views combined, as reported in Table 4. If these proportions are to be compared to other surveys using the ILO system, the best parameter for comparison is the proportion of pleural abnormalities in P-A views.

Nineteen percent of all participants had pleural abnormalities identified on their chest X-rays. Most of the pleural abnormalities were observed in the P-A view, but 30 participants had pleural

-15-

changes observed on the oblique views which were not observed on their P-A views. Again, former W.R. Grace workers and secondary contractors had a higher prevalence of chest radiographic abnormalities for every view, when compared with other exposure groups (statistical significance not evaluated). The two groups classified as "No WRG occupational contact with vermiculite" and "Household contacts" had a similar prevalence of abnormalities which varied by chest radiograph view. Although the prevalence of abnormalities for groups classified as "Residential insulation" and "No apparent exposure" ranged up to 14%, depending on the view, one must be especially cautious about these findings given the small size of the groups. In contrast, interstitial abnormalities were observed only in 11 participants, or 1% of the total number (919) of participants who received chest radiographs.

Table 5 summarizes restrictive abnormalities identified in the pulmonary function tests, by exposure group. Moderate-to-severe changes are defined as a forced vital capacity that is less than 70% of predicted value. This does not include participants who had significant obstructive lung changes, in whom restrictive changes could not be evaluated. Participants who reported they were former workers at W.R. Grace Company, either directly or as secondary contractors, had the highest percentage of restrictive abnormalities of all exposure groups. As with the interstitial changes seen on the chest radiographs, the number of participants with moderate-to-severe restrictive function was much lower.

-16-

**Table 5.  Restrictive Abnormalities in Pulmonary Function, by Exposure Group**

|  | Moderate-to-severe restrictive abnormalities (less than 70% of predicted values) |
|---|---|
| All groups (627) | 10 (2%) |
| WRG* workers & secondary contractors (90) | 5 (6%) |
| No WRG occupational contact with vermiculite (73) | 1 (1%) |
| Household contact (114) | 1 (1%) |
| Recreational (309) | 3 (1%) |
| Residential Insulation (14) | 0 (0%) |
| No apparent exposure† (22) | 0 (0%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
† No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Participants' smoking history and self-reported respiratory symptoms also were examined by exposure groups. Forty-nine percent of study participants reported having smoked cigarettes at some time during their life. Sixty-eight percent of W.R. Grace workers reported having smoked cigarettes, compared with 32% in the "No apparent exposure" group. Sixty-six percent of W.R. Grace workers and secondary contractors reported having had pulmonary disease, compared with 32% in the "No apparent exposure" group. Nine percent of all participants reported having "arthritis, lupus, or scleroderma." The proportion of W.R. Grace workers reporting this condition was 12%, and it was 11% in the "No apparent exposure" group. Additionally, 14% of participants who had been W.R. Grace workers reported having had chest surgery, whereas no more than 5% in any of the other groups reported chest surgery.

Cancer abnormalities also were examined. Thirteen participants had lesions that might be cancer. The percentage of cancer abnormalities was 2% (2 cases) among W.R. Grace workers and 3% (1 case) in the participants with no apparent, specific route of exposure.

## DISCUSSION

Because this is an interim report based upon preliminary data, interpretations of the information need to remain limited. There could be many ways in which this preliminary data might not be a truly representative sample of the entire tested population, so the final rates of abnormalities are likely to change when the final data are analyzed.

An important finding was that 19% of the participants had pleural abnormalities (which were independently observed by two of the certified B-readers). Former W.R. Grace workers had the highest rate of pleural abnormalities (37%) which is, unfortunately, consistent with previous studies and reports.

Thirty-seven (20%) of household contacts of former W.R. Grace workers had pleural abnormalities. Even though the proportion of household contacts with identified pleural abnormalities could change, this finding causes concern, as it might represent an important historic pathway of exposure to asbestos by community residents. The proportion of pleural changes observed in the other exposure groups evaluated is 13% for those who reported contact with vermiculite during recreational activities, 14% for those who only had vermiculite insulation in their residences, and 14% of those with no apparent pathways of exposure. These rates are similar, and they could indicate a background rate for participants with neither occupational nor household-contact exposure. Unfortunately, no directly comparable Montana or U.S. population studies are available to estimate the rate of pleural abnormalities among those in Libby with no work-related exposures. Studies of differing groups within the United States believed to have no substantive work-related asbestos exposures have found the prevalence of pleural abnormalities ranging from 0.02% among blue-collar workers in North Carolina [Castellan 1985], to 0.9% among loggers in Washington and Oregon [Stilbolt 1991], to 1.8% among New Jersey residents

-18-

[Anderson 1979], and 2.3% among patients at Veterans Administration hospitals in New Jersey [Miller JA 1996]. Studies of household contacts of asbestos-exposed workers have reported the prevalence of asbestos-related pleural abnormalities ranging from 3.5% for household contacts of shipyard workers [Kilburn 1985], to 19% for household contacts of workers producing amosite asbestos products [Anderson 1979].

The proportion of interstitial abnormalities and moderate-to-severe restrictive changes on participants' spirometry tests is much smaller. This finding is consistent with clinical reports by physicians in the Libby area that patients frequently present with pleural abnormalities.

Thirteen participants were identified by the chest radiograph reviewers (B-readers) with an abnormality thought to be a possible cancerous lesion. These individuals were contacted and referred to their private physician. At present, ATSDR has not conducted a retrospective survey of referred participants to determine the final diagnosis or disposition of these findings.

Several illnesses were self-reported by participants of which two were of particular interest. First, respiratory disease was reported by 66% of the participants who were former W.R. Grace workers and secondary contractors, compared to 32% of participants in the "No apparent exposure" group. This may represent a greater susceptibility of these participants because of other underlying respiratory conditions, but this group also might be slightly older than other participants, so further analyses must adjust the rates for age in order to determine the importance of this finding.

Second, members of the community also requested that ATSDR report the findings for self-reported "arthritis, lupus, or scleroderma." Eleven percent of the participants self-reported these conditions. The question did not distinguish between arthritis resulting from physical degeneration

-19-

of joints (osteoarthritis), arthritis resulting from an autoimmune pathology (such as rheumatoid arthritis), or other forms of arthritis. Thus, all respondents can not be assumed to be suffering from an autoimmune pathology. In order to clarify this concern, a more specific evaluation of participants reporting these conditions would be needed. The medical literature was searched (1980 through early 2001) for published studies regarding rheumatoid arthritis, systemic lupus erythematosis (SLE), or autoimmune diseases associated with asbestosis exposure. Only a few of these studies reported any association; i.e. three cases of rheumatoid arthritis and one case of SLE were reported with pleural thickening or asbestosis. The authors did not speculate on an association. One article on SLE suggested that there might be some evidence of an epidemiologic association [Mulherin 1993]. Asbestosis has been associated with immunologic changes (hypergammaglobulinemia, anti-nuclear antibodies, and rheumatoid factor). Mulherin states "...it is interesting to speculate that asbestosis may have predisposed to the development of SLE, given the immunological derangements seen in asbestosis." Thus, at the present time, there is only limited information about the association between auto-immune diseases and asbestosis. Also, few studies have been conducted to address Mulherin's hypothesis.

## LIMITATIONS

Information obtained through systematic survey methods or medical testing programs can have many limitations. This is especially true when the information is preliminary, as in this interim evaluation. The information presented in this report represents only 1,078 (18%) participants out of 6,144 who completed the medical testing program. The proportion of participants in this interim report with observed abnormalities can not be assumed to remain the same when the testing program's total 6,144 participants is completed and the data analyzed. The medical testing program was conducted with the principal goal of providing a service-oriented screening program in the community. Therefore, methods used by epidemiologists to limit biases (sources of

-20-

influence on trends within the findings) in the cumulative information of this interim analysis were less stringent than methods used in some epidemiologic studies. No specific effort was taken to *strictly* keep all records in chronological order by testing date. Records may have changed in chronological order by handling by the hospital and local radiologist, mailing to the expert B-readers, the use of the X-rays for clinical evaluations needed before distribution to the B-readers, or by other logistical processes in the handling of records and the creation of the data file. Although participants seen earlier in the testing program are more likely to be included in the 1,078 records summarized for this interim report, they not necessarily the same ones included in this analysis. Also, because this was not an epidemiologic study, no control group was included. These limitations are important to understand in order to avoid drawing inappropriate conclusions from preliminary data.

In other testing programs, it has been observed that the identification of individuals with abnormalities is not necessarily random over time. There could be personal reasons why some individuals seek medical care earlier or why some purposely postpone testing until late in the process. Although some report that the individuals most concerned their health might seek testing earlier, this hypothesis can not be evaluated for this report.

This testing program was not an epidemiologic study. Summary information, such as that reported in this interim report, is expected to be useful for health care planning needs in the community and for understanding the scope and natural history of the illness process to provide support for local health care providers. A perspective on the magnitude of the public health problem in the Libby area can be summarized by examining the prevalence of participants with asbestos-related abnormalities, but judgements about the extent of these abnormalities above expected values are based upon few reports in the scientific literature. Because no control group was included, direct comparisons of the occurrence of abnormalities above the expected value can not be calculated.

-21-

Final estimates of the proportion of participants with asbestos-related abnormalities must await the analyses of the final, complete data for all participants. The information summarized in this interim report is primarily intended to assist the community and its public officials in documenting the need for health care planning and estimating the additional health care services that will be needed in the Libby area in the future.

## CONCLUSIONS

1. These results summarize 1,078 participants, of which 47% were male and 53% female. The age distribution of participants was as follows: 15% were less than 18 years of age, 27% were aged 18–45 years, 42% were aged 46–65 years, and 17% were 65 or more years of age (the total of 101% is due to rounding).

2. The number of participants who reported exposure to vermiculite included the following: 127 were W.R. Grace workers or secondary contractors, 116 had other work related contact with vermiculite, 177 had household contacts with W.R. Grace workers, 558 reported some recreational contact with vermiculite, 34 had vermiculite insulation in their residences, 53 had none of these exposures. (Participants were included in only one group on the basis of their greatest potential for exposure.)

3. Thirty percent of participants had a pleural abnormality that was seen by at least one physician on the chest radiograph. Those individuals were informed that they should have the finding reviewed by their private physician.

4. Nineteen percent of the participants had a pleural abnormality on their chest radiographs which was reported by at least two of the certified specialists (B-readers).

-22-

5. Pleural abnormality rates varied by exposure group: 37% of W.R. Grace workers or secondary contractors, 18% of others reporting occupational exposure to vermiculite, 20% of household contacts, 14% of those who lived in the Libby area and also reported vermiculite insulation in their residences, 16% of those who reported recreational contact with vermiculite, and 14% of other participants with no apparent exposure. (These proportions used the criteria of at least two of the three B-readers.)

6. Lung scarring (interstitial changes) and moderate-to-severe limitations in pulmonary function (restrictive changes) were much less common among the participants evaluated.

7. Lung abnormalities are being observed on the chest radiographs of participants in the medical testing program. Public officials are advised to plan accordingly for the long-term evaluation of participants exposed to vermiculite and for the care of those who may develop severe illness.

8. The findings of illness in participants with large, previously recognized exposures is consistent with clinical reports by Libby area physicians. This information is too preliminary to predict the final risk estimates for participants with lower exposure potential, such as participants with vermiculite insulation in their residences, those with infrequent past contact with vermiculite, or those who resided in the community but had no apparent exposure to vermiculite.

GRACE

Construction Products Division

03629668

PERSONAL AND CONFIDENTIAL

May 24, 1977

To:     C. E. Brookes
        C. N. Graf

From:   E. S. Wood

Subj:   Tremolite in Vermiculite

cc:     R. M. Vining
        B. A. Blessington
        H. C. Duecker
        W. R. Manlon
        J. Y. McCord
        L. Rosenblatt
        B. R. Williams
        J. W. Wolter

The purpose of this memorandum is to discuss in some
the nature of the tremolite problem as it impacts our vermiculite business,
and also to outline our plans for dealing with the problem. These plans
are based on extensive product testing, analysis of alternative confi-
gurations of the Zonolite business, and consultation with legal counsel,
including the Corporate Legal Division.

THE PROBLEM

Tremolite is present as a tramp mineral in our vermiculite
deposits, and while most of it is separated from the vermiculite in the
milling process, small amounts are carried to expanding plants and ul-
timately into finished products. Tremolite is classified as asbestos
and regulated by the Environmental Protection Agency (EPA), the Occupa-
tional Safety and Health Administration (OSHA), the Mining Enforcement and

EXHIBIT
123.1a

15101908

Vol. 69/13 (R 12/10/96)

May 24, 1977

The purpose of this memorandum is to discuss . . .
the tremolite problem as it impacts our vermiculite
business.

* * *

[former Libby employees'] risk of lung cancer is five
times the national average . . .

* * *

Based on the advice of corporate general counsel,
we have decided not to affix labels on . . . expanded
products using Libby ore . . .

* * *

Zonolite Profitability Impact . . .10-50% reduction in
sales volume that would result from a requirement to
label our products . . .

* * *

Harm to customers . . . The highest level of
exposure is for Attic insulation [with] concentrations
of upwards of 15 f/ml . . . in simulated tests . . .

* * *

Product bans . . . We forecast that our vermiculite
consumer products, namely Attic Insulation . . . will
eventually be banned by the Consumer Products
Safety Commission . . .

* * *

A decision to label our consumer products would
eliminate the risk of future liability, while
exacerbating the risk of claims . . .from past use of
the product.

EXHIBIT
D

EXHIBIT
E
tabbies®

> "Both Attic Fill and Masonry Fill exceed the 2 and 5 fibre levels. This necessitates a binder development program or other remedy"

**GRACE**

C...STRUCTION PRODUCTS DIVISION

CONFIDENTIAL

MAR 11 1976

March 11, 1976

To:    H. A. Brown

From:  R. M. Locke

Subj:  Recent Sampling in Connection with Omaha
       Citations 4 and 5 (Product and Waste)

1.  Sampling Conclusions: Based upon these very few, hurried tests which
    would be nice to verify between plants and with more job sites.

    A.  Both Concrete Aggregate and Monokote are under 2 fibre, pro-
        bably due to outdoor use with free air circulation. Only Dallas
        Monokote has been tested, however, and there may be plant to plant
        variations in addition to the job site variations.

    B./C.  Both Attic Fill and Masonry Fill exceed the 2 and 5 fibre levels.
           This necessitates a binder development program or other remedy.

    D.  Horticultural appears to be no problem.

    E./F.  Wetting stoner rock appears to put us below the 2 fibre level
           on waste disposal.

    Other:  The above represent over 80% Libby output. Industrial (not tested
            but 5% of Libby) probably approximates Attic and Concrete Aggre-
            gate depending upon ore size, application geometry, and ventilation.

2.  Using the Omaha extension to 31 December 1976 for action on items 4 and 5,
    a Binder Development Program should be initiated immediately. If the program
    is unsuccessful, uneconomic, requires extensive plant modifications to im-
    plement or runs into timing problems, back-up measures will be necessary.

    Such back-up programs might include: Reformulating Attic Fill; Restricting
    Masonry Fill to S.C. #4 with freight cost penalty in northern markets, or
    substitution of perlite from expanding plants so equipped; Acceleration of
    wet will clean-up potential: Low-vacuum furnace settings; Teflon binding;
    Air allurilation; and other. Some of the above are unlikely. However,
    back-up is the point.

    A review of the West Chicago stoner discharge water spray should be possible
    shortly.

    Last, it should be noted the potential exists that OSHA might inspect another
    plant and a different Regional Office might issue deadlines on product or
    rock earlier than the extended Omaha deadlines (the
    September 30, 1977 deadline for 2 fibre). In that c[...]
    conceivably be cited as a precedent for uniformity at 31 December 1976 and
    30 September 1977.

10042596

H. A. Brown                    -2-                    March 11, 1976



"Attic Fill, tested twice, in its current form creates fibre counts in excess of the 5 fibre level generally and in excess of the 10 fibre ceiling in some instances."

DETAIL

1. Sampling.

Sampling of selected products was done during the last two weeks of February. The samples are not representative of all plants and of all uses of Libby products, but several conclusions may be drawn.

A. Concrete Aggregate and Monokote
(Sampling on jobsites with Dallas-made Libby #4 product)

Contractor employees opening bags, operating mixers, and disposing of bags received the highest exposures, but these were below the July 1st 2 fibre tolerance level (highest exposures were 1.0 to 1.5). Monokote gun operators (who routinely wear respirators) may be subject to 1.0 levels. Contractor employees cleaning up dried Monokote may receive levels between 2 and 5 fibres. The fibre concentrations on the roof (all less than 1 fibre) were probably a result of fibres from the ground mixer area.

In summary, it appears that application of Zonolite Insulating Concrete and Monokote do not create fibre exposures over 5 or 2 with two qualifying remarks: that (a) all sampling was out of doors or in wall-less buildings and (b) the Libby #4 product was from the Dallas plant exclusively (Reference: T&A #48871).

B. Attic Fill

Attic Fill, tested twice, in its current form creates fibre counts in excess of the 5 fibre level generally and in excess of the 10 fibre ceiling in some instances. Wetting with water to approximately 2½ quarts per 1 cu.ft. bag reduces fibre counts to approximately the 2 fibre level. Sampling of Attic Fill 18 hours and 18 months after application indicates essentially no airborne residual fibres in the attic area following prior applications of vermiculite (Reference: T&A #46878 and #48880).

C. Masonry Fill (Asphalt Treated)

Masonry Fill (asphalt treated), tested twice, creates fibre counts in excess of the 5 fibre level generally, and in excess of the 10 ceiling level in some instances. Compared with the Insulating Concrete and Monokote samples (also Libby #4), the geometry of filling a hollow wall from above may be the reason for the higher fibre counts. To some degree the expanding plant may also be part of the reason (Dallas D-18; Trenton Model A).

As was the case with Attic Fill, once pouring ceases, the fibre counts rapidly decline to nearly zero. (Reference: T&A #48880 and #48885).

A test will occur week of 15 to 19 March using the Attic Fill experiment above. If the "snow...... ........ ......... wet Attic Fill occur with Masonry Fill, pouring into block cores may be difficult.

10042597

**GRACE**

CONSTRUCTION PRODUCTS DIVISION

CONFIDENTIAL

MAR 11 1976

7

March 11, 1976

To:    H. A. Brown

From:  R. H. Locke

Subj:  Recent Sampling in Connection with Omaha
       Citations 4 and 5 (Product and Waste)

1.  Sampling Conclusions:  Based upon these very few, hurried tests which
    would be nice to verify between plants and with more job sites,

    A.  Both Concrete Aggregate and Monokote are under 2 fibre, pro-
        bably due to outdoor use with free air circulation.  Only Dallas
        product has been tested, however, and there may be plant to plant
        variations in addition to the job site variations.

    B./C.  Both Attic Fill and Masonry Fill exceed the 2 and 5 fibre levels.
           This necessitates a binder development program or other remedy.

    D.  Horticultural appears to be no problem.

    E./F.  Wetting stoner rock appears to put us below the 2 fibre level
           on waste disposal.

    Other.  The above represent over 80% Libby output.  Industrial (not tested
           but 5% of Libby) probably approximates Attic and Concrete Aggre-
           gate depending upon ore size, application geometry, and ventilation.

2.  Using the Omaha extension to 31 December 1976 for action on items 4 and 5,
    a Binder Development Program should be initiated immediately.  If this program
    is unsuccessful, uneconomic, requires extensive plant modifications to im-
    plement or runs into timing problems, back-up measures will be necessary.

    Such back-up programs might include:  Reformulating Attic Fill; Restricting
    Masonry Fill to S.C. #4 with freight cost penalty in northern markets, or
    substitution of perlite from expanding plants so equipped; Acceleration of
    wet mill clean-up potential; Low-vacuum furnace settings; Teflon binding;
    Air allutriation; and other.  Some of the above are unlikely.  However,
    back-up is the point.

    A review of the West Chicago stoner discharge water spray should be possible
    too.

    Last, it should be noted the potential exists that OSHA might inspect another
    plant and a different Regional Office might issue deadlines on product or
    rock earlier than the extended Omaha deadlines (the same applies to the
    September 30, 1977 deadline for 2 fibre).  In that event, Omaha timing could
    conceivably be cited as a precedent for uniformity at 31 December 1976 and
    30 September 1977.

10042596

H. A. Brown                               -2-                        March 11, 1976

## DETAIL

1. Sampling.

   Sampling of selected products was done during the last two weeks of
   February. The samples are not representative of all plants and of all
   uses of Libby products, but several conclusions may be drawn.

   A. Concrete Aggregate and Monokote
      (Sampling on jobsites with Dallas-made Libby #4 product)

      Contractor employees opening bags, operating mixers, and disposing
      of bags received the highest exposures, but these were below the
      July 1st 2 fibre tolerance level (highest exposures were 1.0 to 1.5).
      Monokote gun operators (who routinely wear respirators) may be
      subject to 1.0 levels. Contractor employees cleaning up dried
      Monokote may receive levels between 2 and 5 fibres. The fibre con-
      centrations on the roof (all less than 1 fibre) were probably a result
      of fibres from the ground mixer area.

      In summary, it appears that application of Zonolite Insulating
      Concrete and Monokote do not create fibre exposures over 5 or 2
      with two qualifying remarks; that (a) all sampling was out of doors
      or in wall-less buildings and (b) the Libby #4 product was from
      the Dallas plant exclusively (Reference: T&A #48571).

   B. Attic Fill

      Attic Fill, tested twice, in its current form creates fibre counts
      in excess of the 5 fibre level generally and in excess of the 10 fibre
      ceiling in some instances. Wetting with water to approximately 2½ quarts
      per 3 cu.ft. bag reduces fibre counts to approximately the 2 fibre level.
      Sampling of Attic Fill 18 hours and 18 months after application indicates
      essentially no airborne residual fibres in the attic area following
      prior applications of vermiculite (Reference: T&A #48878 and #48850).

   C. Masonry Fill (Asphalt Treated)

      Masonry Fill (asphalt treated), tested twice, creates fibre counts in
      excess of the 5 fibre level generally, and in excess of the 10 ceiling
      level in some instances. Compared with the Insulating Concrete and
      Monokote samples (also Libby #4), the geometry of filling a hollow wall
      from above may be the reason for the higher fibre counts. To some
      degree the expanding plant may also be part of the reason (Dallas D-18;
      Trenton Model A).

      As was the case with Attic Fill, once pouring ceases, the fibre counts
      rapidly decline to nearly zero. (Reference: T&A #48880 and #48885).

      A test will occur week of 15 to 19 March using Masonry Fill wetted like
      the Attic Fill experiment above. If the "snowballs" experienced with the
      wet Attic Fill occur with Masonry-Fill, pouring into block cores may be
      difficult.

10042597

H. A. Brown                        -3-                    March 11, 1976

  D. Horticultural tests on consumer use of Ready Earth and Terralite
     Vermiculite indicate essentially no airborne fibres, or less than
     0.1 fibre (Reference: T&A #48890).

  E. Dry Stoner Rock in Omaha creates fibre exposures between 2 and 5
     fibres for an employee transporting it to the dumpster while he
     is doing it. His time weighted average may differ. The contractor
     employee disposing of the waste in the dumpster is exposed to less
     than 1 fibre (0.6) even though in close proximity at the dump
     (Reference: T&A #48877).

  F. Wet Stoner Rock in W. Chicago; conclusions are hampered both by
     all West Chicago samples being Engineering type and by inconsistencies
     in the data versus Omaha. However, it appears the wetted rock may
     be well below the 2 fibre level for employee exposures (Reference:
     T&A #48872).

                                              R. H. Locke

10042598

EX 183.183

## REQUEST FOR TECHNICAL SERVICE

CONFIDENTIAL

| | |
|---|---|
| NUMBER: | 67567  762701 |
| GROUP: | ZONOLITE |
| ACTUAL COST: | $220.00 |
| REPORTING DATE: | July 11, 1976 |

### SUMMARY:

Ten samples were received from Weedsport, New York, and evaluated by standard methods. All ten samples exceeded 4.5 fibers per cc of air.

"All ten samples exceeded 4.5 fibers per cc of air."

### REQUEST FOR TECHNICAL SERVICE

PAGE 1

☐ CONSTRUCTION
☐ PRODUCTS
☐ VISION

| | |
|---|---|
| INDEX: | 67567 |
| GROUP: | Zonolite  762700 |
| DATE: | 7/11/77 |
| CHARGE NO.: | 71-046 |
| REQUESTOR: | F.W. Eaton |
| MARKETING or MANUFACTURING APPROVAL: T.E. Hamilton | |
| DEPT.: | |
| APPROVED: T.C. Broudeau (4) | |

**PROBLEM TITLE:** Environmental Evaluation - Air - Fibrous Materials

**SIGNIFICANCE:** The evaluation of workplace air on a periodic basis is necessary to comply with the air sampling section of the OSHA Asbestos Standard.

**SPECIFIC OBJECTIVE:** Determine fiber counts for filter media.

**SUGGESTED APPROACH:** Phase contrast microscopy.

**DEADLINE (last day information will be of value):** 2 weeks

**DETAILS OF PROBLEM:** Evaluate 10 sim. attic test samples from Weedsport.

ACCEPTED BY RESEARCH DEPT.: *M. Doyle*      DATE: *5-7-76*

ASSIGNED TO: *M. Doyle*

ADDITIONAL COPIES: Original to Library, R.C.Duecker, H.A.Eschenbach E.D.Bross, J.A.Yang, B.R.House, Plant, File: 71-046

CONFIDENTIAL

---

**GRACE**

"SIMULATED ATTIC FILL TESTS"

SIMULATED ATTIC FILL TESTS
SCREENED ILSY 93

### AIR SAMPLING RECORD SHEET

PLANT LOCATION: WEEDSPORT
CONTAMINANT: FIBER
SAMPLING BY: F. W. EATON
DATE: 7/6/77 - 7/8/77

SAMPLING CONDITIONS:
OUTSIDE: MOD. 70°F  SLIGHTWIND
INSIDE DRAFT:
VISIBLE DUST:

HOUSEKEEPING:

| Sample Number | Employee Name | Job Location and Description | Remarks | Pump Number | Pump Off | Pump On | Sampling Time | Flow Rate | Total Sampled Volume | Lab Evalua' |
|---|---|---|---|---|---|---|---|---|---|---|
| SAS2-PF1 | DAVE | POURED ATTIC | 20-96 lb BOARD BOXES | YCG-4 | | | 16 | 1G | 1G | 5.09 |
| 3152-9752 | | | WEST ATTIC DIST. SURROUNDED To SCREENED ICI | YCG-7 | | | 16 | 1G | 1G | 4.81 |

---

**EXHIBIT F**

CONSTRUCTION
PRODUCTS
DIVISION

| | |
|---|---|
| PROBLEM: | 67907 |
| GROUP: | Zonolite 762700 |
| DATE: | 7/11/77 |
| CHARGE NO.: | 71-046 |
| REQUESTOR: | F.W. Eaton |
| MARKETING or MANUFACTURING APPROVAL NAME: | T.E. Hamilton |
| APPROVED: | T. E. Hamilton (LP) |

PAGE 1

REQUEST FOR TECHNICAL SERVICE

PROBLEM TITLE:  Environmental Evaluation - Air - Fibrous Materials

SIGNIFICANCE:  The evaluation of workplace air on a periodic basis is necessary to comply with the air sampling section of the OSHA Asbestos Standard.

SPECIFIC OBJECTIVE:  Determine fiber counts for filter media.

SUGGESTED APPROACH:  Phase contrast microscopy.

DEADLINE (Last day information will be of value):  2 weeks

DETAILS OF PROBLEM:  Evaluate 10 sim. attic test samples from Weedsport

**EXHIBIT**
183.183

ACCEPTED BY RESEARCH DEPT.: _____    DATE: 7/11/77

ASSIGNED TO: M. Doyle

ADDITIONAL COPIES: Original to Library  H.C.Duecker, H.A.Eschenbach, F.W.Eaton, R.M.Vining, E.S.Wood, J.W.Wolter, B.R.Williams, W.R.Hanlon, CPD-T&A, File: 71-046

CONFIDENTIAL

15083050    72-51

REQUEST FOR TECHNICAL SERVICE

CONFIDENTIAL

| NUMBER: | 67567 | 762701 |
|---|---|---|
| GROUP: | ZONOLITE | |
| ACTUAL COST: | $220.00 | |
| REPORTING DATE: | July 11, 1974 | |

SUMMARY:

Ten samples were received from Weedsport, New York, and evaluated
by standard methods.  All ten samples exceeded 4.5 fibers per cc of air.

RELEVENT PRIOR TECHNICAL SERVICE:

CONCLUSIONS:

DATA AND ANALYSIS:

See attachment.

*Maureen A. Doyle*

M. A. Doyle

MAD:mlr
attachment

15083051

72-
52

GRACE

SCREENED 2 by 43

AIR SAMPLING RECORD SHEET

PLANT LOCATION _WEEDSPORT_
CONTAMINANT _FIBER_
SAMPLING BY _E. W. FARR_
DATE: _7/7/77_

SAMPLING CONDITIONS:
OUTSIDE _____
INSIDE DRAFT _____
VISIBLE DUST _____

HOUSEKEEPING: _____

76270

| Employee Name | Job Location and Description | Remarks | Pump Number | Pump Off | Pump On | Sampling Time | Flow Rate | Total Sampled Volume | Lab Evaluati |
|---|---|---|---|---|---|---|---|---|---|
| S-2/F3 DUNE | 2 BOWING MILL | REMAINING 10 PASS EN | | | | 3 | 1.6 | | 11.22 |
| S-2/F4 | | TEST IW. 10.150 | | | | 8 | 1.6 | | 10.15 |
| | | NOTE: MAN RUNNING COMPUTER | | | | | | | |
| | | THAT TEST 10.15666 THAT H | | | | | | | |
| | | CLEAN UP 10.0520 THE CREW REMAIN | | | | | | | |
| | | RAN INTO DIFFERENT CREW IS SEEN | | | | | | | |
| | | AS FURNACE OPERATOR. MAN IN THE | | | | | | | |
| | | HEAT ALTONA TEST 10.156 | | | | | | | |
| | | T.E. THIS IS A FACT IT SCREEN) | | | | | | | |
| | | SEEN US IN FRONT HOUSE SLOW | | | | | | | |
| | | TESTS 10.15-10.156 IN COLIFE 2.56 | | | | | | | |

Laboratory Evaluation By: _Frances A. Sisk_
Date: _7/11/77_

CONFIDENTIAL

Additional Comments: _____

15003052

702703

SIMULATED FIN - FALL TESTS
SCREENED L SY 43

## GRACE

AIR SAMPLING RECORD SHEET

PLANT LOCATION _WEEDSPORT_

CONTAMINANT _FIBER_

SAMPLING BY _E. G. EATON_

DATE: _1/6/77 - 3/2/77_

SAMPLING CONDITIONS:
OUTSIDE FND 70's SHOWERS
INSIDE DRAFT
VISIBLE DUST

HOUSEKEEPING:

| Sample Number | Employee Name | Job Location and Description | Remarks | Pump Number | Pump Off | Pump On | Sampling Time | Flow Rate | Total Sampled Volume | Lab Evalua' |
|---|---|---|---|---|---|---|---|---|---|---|
| S2-BF1 | DUKE | POVEMC ATTIC | 20-YCF RIVER BAGS | ICG-6 | | | 16 | 1.6 | | 5.03 |
| S2-BF2 | | | VERY LITTLE DUST ENTRAINED TO SCREENED LVL | ICG-7 | | | 16 | 1.6 | | 4.51 |
| S4-BF1 | | | SAME AS PASS 2 | | | | 17 | 1.6 | | 4.13 |
| S4-BF2 | | | | | | | 17 | 1.6 | | 3.30 |
| S6-BF1 | | | SAME AS PASS FRONT | | | | 18 | 1.6 | | 9.50 |
| S6-BF2 | | | NOT AS CLEAN | | | | 18 | 1.6 | | 6.17 |
| S8-BF1 | | | 10-YCF FIBER BAGS | | | | 8 | 1.6 | | 11.22 |
| S8-BF2 | | | REMAINING BAGS (4) SAMPLED | | | | 8 | 1.6 | | 12.93 |
| 15083053 | | | ON BASE-FIFTY PASS 2 | | | | | | | |

Additional Comments: ① ALL CYCLONE FINAL REMOVED Laboratory Evaluation by: _Damien O. Boyle_
② SCREENED OVER 14 MESH SCREEN   Date: 3/4/77
③ CG-6 RIGHT SHOWER ICG-7 LEFT.   CONFIDENTIAL





pounded. When insulation decomposes, absorbs moisture, becomes infested with vermin, or loses its insulating efficiency after it is installed, it may have to be removed and replaced. That means cleaning out all the old insulation, putting in new insulation, and repairing the walls or ceilings. It means a lot of trouble and expense.

The only way to be sure that this will not happen to you is to select an insulation of proved permanence. Select Zonolite Insulation. Through rigorous testing and extensive usage over many years, Zonolite has proved that it fulfills completely all of the following requirements for good insulation. No other known material can equal such a record.

1. Dual Insulation Value . . . Insulates both by its air cell construction and its glittering, reflective surface.

2. Uniform Tamper-Proof Density . . . Same density installed in the home as when it leaves the factory.

3. Complete Fill . . . Fills walls solidly leaving no voids. Does not "ball-up" on rough obstructions, nails, wires, or pipes. Cannot be "fluffed up."

4. Light in Weight . . . A bag can be handled easily. A 3-inch layer of Zonolite adds only 1½ pounds per square foot of ceiling.

5. Easy to Install . . . No need for mask, gloves, or special equipment. It pours easily and cleanly. The average home can be insulated in just a few hours.

6. Chemically Inert . . . Contains no harmful chemicals. Will not disintegrate nor deteriorate. Will not corrode any material. Will not stain or plaster. Is practically moisture-proof.

7. Fire-proof . . . Not merely fire "resistant." It melts at about 2400° Fahrenheit.

8. Vermin-proof . . . Mice, rats, insect larvae, or termites will not attack it.

9. Rot-proof . . . Will not decompose nor give off odors. It is a 100% mineral material.

10. Naturally Permanent . . . The permanence of Zonolite is not dependent upon synthetic treatments. Its inherent permanence means efficient insulation for your home forever.

EXHIBIT G

## ZONOLITE NOW...
### Save on fuel, add comfort



ZONOLITE
Vermiculite
Insulating Fill
Easiest of all to install.
Just pour it, level it,
leave it!

**$1.45**

per bag
covers
17 sq. ft. 3" thick

> ## Just pour it, level it, leave it!

V-8, Fo

## ZONOLITE INSULATING FILL



Zonolite Insulating Fill is used to insulate and sound-deaden side-walls and ceilings of all types of buildings. Zonolite Fill has one of the best insulation factors of any insulation on the market ("K" factor .28 B.t.u.).

Zonolite Insulating Fill comes in 4 cu. ft. bags which weigh about 23 lbs. No special installation equipment is needed. Zonolite Fill is poured from the bag, like popcorn. It flows readily around pipes, wiring, etc., to make a complete, uniform fill without tamping, cutting, or nailing.

Zonolite Insulating Fill is a non-conductor of electricity and can be safely installed over or around electrical wiring. It is rot-proof and does not permit tunneling or nesting by rodents. It does not attract vermin or termites. It is safe to handle because it is non-irritating to the skin and lungs.

> ## It is **safe** to handle because it is **non-irritating** to the skin and **lungs**.

Date: March 11, 1969

To: R. W. Sterrett

From: Peter Kostic

cc: R. M. Vining
C. F. Dugan
R. A. Kulberg

The following article which appeared in the March issue of Safety Engineering is for your information. I think it would be well at this time, with the advice of counsel, to consider applying a warning or precautionary label on all containers of products containing vermiculite. This may aid our defense in cases of product liability claims. The attached extra copies are for distribution as you wish.

Firm:

Peter Kostic

WASHINGTON SAFETY REPORT

06191709

DATE: March 31, 1969

TO: Peter Kostic

cc: R. W. Sterrett
R. M. Vining
R. A. Kulberg

Re: Labeling of Vermiculite

Reference is made to your memorandum of March 11 concerning the article from Safety Engineering.

Before any labeling of containers of products containing vermiculite is done we should indeed study carefully the content of the labeling and the consequences of putting a label on the package. By warning people or inadequately warning people we may be incurring liability to which we would not otherwise be subject.

I do not believe that vermiculite could be classified today as a poisonous substance for which labeling may be required.

Charles F. Dugan

CFD/MS

"It would be well at this time, with the advice of counsel, to consider applying a warning or precautionary label on all containers of products containing vermiculite

Before any labeling . . . we should indeed study . . . the consequences . . . By warning people or inadequately warning people we may be incurring liability . . .

EXHIBIT H

EXHIBIT 1

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

MARCO BARBANTI, individually and on behalf of a class of all others similarly situated,

Plaintiffs,

Case No. 002017666

W.R. GRACE & COMPANY-CONN (a Connecticut corporation), W.R. GRACE & COMPANY (a Delaware corporation), W.R. GRACE & CO., a/k/a GRACE, an association of business entities, SEALED AIR CORPORATION (a Delaware corporation), and WILLIAM V. CULVER, resident of the State of Washington,

Defendants.

CLASS ACTION NOTICE

## LEGAL NOTICE TO WASHINGTON RESIDENTS:

# If your home contains loose-fill vermiculite attic insulation, this notice may affect your rights.



Zonolite Attic Insulation is vermiculite shaped like a small nugget varying from silver-gold to gray-brown. It has been described as layered with a glittery, granular appearance that may have a gold, iridescent or brownish cast. Attic vents in the attic, the granules may darken to black or gray. Zonolite Attic Insulation may be found loose, inside an insulated or other items such as rolled fiberglass insulation. Product packaging you encounter may differ from the picture above.

This is a Court-ordered notice to anyone in Washington with loose-fill vermiculite insulation in their attic or walls, sold as Zonolite Attic Insulation.

**Plaintiffs' Class:** A class action lawsuit has been certified by The Spokane County Superior Court. You are in the Class if you own or occupy real property located in the State of Washington in which Zonolite Attic Insulation has been installed. Lead class counsel is Darrell Scott, Lukins & Annis, P.S., Spokane, WA.

**Plaintiffs' Claims:** According to the Plaintiffs, Zonolite Attic Insulation contains readily airborne asbestos fibers that constitute a present threat to public health and safety if disturbed, for example through home repairs or remodeling, storage of belongings in the attic, etc. The Plaintiffs claim that Zonolite Attic Insulation is not reasonably safe in design and/or manufacture. Plaintiffs further allege that Grace defendants have fraudulently concealed assets to avoid liability through transfers to defendant Sealed Air, and that Sealed Air is a successor to the liability of the Grace defendants.

**Defendants' Contentions:** The defendants deny any wrongdoing, deny that the insulation is defective or that it constitutes a present threat to public health and safety. The Court has not ruled on the merits of Plaintiffs' claims or Defendants' positions.

**Relief Sought:** The Plaintiffs seek the establishment of a program funded by Defendant to contain the Zonolite in your home or property and or remove it if necessary. Other equitable relief sought by the Plaintiffs include a trust to provide research and education about health effects of Zonolite exposure and appropriate safety procedures. The Plaintiffs do not seek monetary damages for persons who suffered personal injury. The Plaintiffs have expressly reserved your right to pursue those claims in separate, individual lawsuits.

**Your Rights:** Class Members do not have an automatic right to exclude themselves from this Class and they will be bound by the determinations of the Court. Class Members may, however, seek to participate in this litigation through their own attorney at their own expense. For more information contact class counsel at 1-888-760-7000, or write to ZAI Notice, P.O. Box 285, Spokane, WA 99210-0285, fax to 1-509-363-2512, or send an e-mail to zonolite@lukins.com. **PLEASE DO NOT CONTACT THE COURT OR THE CLERK**

## How to get more information about Zonolite, Vermiculite and Asbestos:

*Call the Environmental Protection Agency ("EPA") at a special vermiculite insulation toll free number by calling 1-800-471-7127, or see the EPA and Washington State Department of Health asbestos and vermiculite web pages at:*

http://www.epa.gov/asbestos.htm
http://epa.gov/asbestos/insulation.htm
http://www.doh.wa.gov/ehp/ts/asbestosvermiculiteinsulation.html

1-888-760-7000
www.zainotice.com



EXHIBIT
I

**End of Exhibits**

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on April 26, 2001, I did serve the foregoing:

Preliminary Information Brief Of Zonolite Attic Insulation Class Action Plaintiff's (MDL1376)

In Response To W.R. Grace & Company's Informational Brief (D.I. 6) upon the parties

identified in the attached service list as indicated.

Under penalty of perjury, I declare that the foregoing is true and correct.

4/27/01
Date

William D. Sullivan

G:\Docs\CLIENT\220000\00001\pleading\00076340.DOC

W. R. Grace 2002 Service List
Case No. 01-1139 (RJN)

**Hand Delivery**
(Counsel to Debtors and Debtors in Possession)
Laura Davis Jones, Esquire
David Carickoff, Esquire.
Pachulski, Stang, Ziehl, Young & Jones
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**Federal Express**
(Counsel to Debtors and Debtors in Possession)
Hamid R. Rafatjoo, Esquire
Pachulski, Stang, Ziehl, Young & Jones
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4100

**Hand Delivery**
(Copy Service)
Parcels, Inc.
Vito I. DiMaio
10th & King Streets
Wilmington, DE 19801

**Hand Delivery**
(Local Counsel to DIP Lender)
Steven M. Yoder, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

**Hand Delivery**
(Local Counsel to Asbestos Claimants)
Matthew G. Zaleski, III, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

**Hand Delivery**
William H. Sudell, Jr., Esquire
Eric D. Schwartz, Esquire
Morris, Nichols Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

**Hand Delivery**
(Counsel for The Chase Manhattan Bank)
Mark D. Collins, Esquire
Deborah E. Spivak, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

**Federal Express**
(Counsel to Debtor)
James H.M. Sprayregen, Esquire
James Kapp, III, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

**Federal Express**
(United States Trustee)
Mark Kenney, Esquire
Office of the United States Trustee
601 Walnut Street, Curtis Center,
Suite 950 West
Philadelphia, PA 19106

**Federal Express**
(Canadian counsel for Debtor)
Derrick Tay, Esquire
Meighen Demers
Suite 1100, Box 11, Merrill Lynch Canada
Tower
Sun Life Center, 200 Kint Street West
Toronto, Ontario M5H 3T4
CANADA

**Federal Express**
(W. R. Grace & Co.)
David B. Siegel
W.R. Grace and Co.
7500 Grace Drive
Columbia, MD 21044

**Federal Express**
(Official Committee of Personal Injury
Claimants)
Elihu Inselbuch, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue 36th Floor
New York, NY 10022

*Federal Express*
(Official Committee of Unsecured Creditors)
Lewis Kruger, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

*Federal Express*
(Official Committee of Property Damage
Claimants)
Scott L. Baena, Esquire
Member
Bilzin Sumberg Dunn Baena Price & Axelrod
LLP
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, Florida 33131

*First Class Mail*
(Counsel to Sealed Air Corporation)
D. J. Baker, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

*First Class Mail*
(Counsel to DIP Lender)
J. Douglas Bacon, Esquire
David S. Heller, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

*First Class Mail*
(Counsel to Asbestos Claimants)
Nancy Worth Davis, Esquire
Ness, Motley, Loadhold, Richardson & Poole
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

*First Class Mail*
Todd Meyer, Esquire
Kilpatrick Stockton
1100 Peachtree Street
Atlanta, GA 30309

*First Class Mail*
Securities & Exchange Commission
15th & Pennsylvania Ave. N.W.
Washington, DC 20020

*First Class Mail*
District Director
IRS
409 Silverside Road
Wilmington, DE 19809

*First Class Mail*
Securities & Exchange Commission
Atlanta Regional Office Branch/Reorganization
3475 Lenox Road, NE, Suite 100
Atlanta, GA 30326-1232

*First Class Mail*
Secretary of Treasurer
P.O. Box 7040
Dover, DE 19903

*First Class Mail*
Secretary of State
Division of Corporations
Franchise Tax
P.O. Box 7040
Dover, DE 19903

*First Class Mail*
James D. Freeman, Esquire
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street
Suite 945-North Tower
Denver, Colorado  80202

*First Class Mail*
Jon L. Heberling, Esquire
McGarvey, Heberling, Sullivan & McGarvey PC
745 South Main Street
Kalispel, MT 59901

*First Class Mail*
Patrick L. Hughes, Esquire
Haynes & Boone LLP
1000 Louisiana Street, Suite 4300
Houston, TX 77002-5012

*First Class Mail*
Charles E. Boulbol, Esquire
26 Broadway, 17th Floor
New York, NY 10004

**First Class Mail**
Ira S. Greene, Esquire
Squadron, Ellenoff, Plesent & Sheinfeld, LLP
551 Fifth Avenue
New York, NY 10176

**First Class Mail**
James A. Sylvester, Esquire
Intercat, Inc.
104 Union Avenue
Manasquan, NJ 08736

**First Class Mail**
Steven J. Johnson, Esquire
Gibson, Dunn & Crutcher LLP
1530 Page Mill Road
Palo Alto, CA 94304-1125

**First Class Mail**
Charlotte Klenke, Esquire
Schneider National, Inc.
P.O. Box 2545
3101 S. Packerland
Green Bay, WI 54306

**First Class Mail**
David S. Rosenbloom, Esquire
Jeffrey E. Stone, Esquire
Lewis S. Rosenbloom, Esquire
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096

**First Class Mail**
Brad Rogers, Esquire
Office of the General Counsel
Pension Benefit Guaranty Corp
1200 K. Street, N. W.
Washington, D.C. 20005-4026

**First Class Mail**
Pamela Zilly
Richard Shinder
David Blechman
Michael Alexander
The Blackstone Group
345 Park Avenue
New York, NY 10154

**First Class Mail**
Josiah Rotenberg
Lazard Freres & Co. LLC
30 Rockefeller Plaza, 60th
New York, NY 10020

**First Class Mail**
(Counsel for The Chase Manhattan)
Stephen H. Case, Esquire
Nancy L. Lazar, Esquire
David D. Tawil, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

**First Class Mail**
Jan M. Hayden
William H. Patrick
Heller, Draper, Hayden, Patrick & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103

**First Class Mail**
Joseph F. Rice
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

**First Class Mail**
Nancy Worth Davis
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

**First Class Mail**
(Counsel for Asbestos Claimants)
Steven T. Baron, Esquire
Member
Silber Pearlman, LLP
2711 North Haskell Avenue, 5th Floor, LLP
Dallas, Texas 75204

*First Class Mail*
Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

*First Class Mail*
(Attorneys for PPG Industries, Inc.)
W.J. Winterstein, Jr., Esquire
John J. Winter, Esquire
William M. Aukamp, Esquire
Eleven Penn Center, 29th Floor
1835 Market Street
Philadelphia, PA 19103

*First Class Mail*
R. Scott Williams
PMG Capital Corp.
Four Falls Corporate Center
West Conshohocken, PA 19428-2961

*First Class Mail*
Alan R. Brayton, Esquire
Brayton & Purcell
222 Rush Landing Road
Novato, CA 94945

*First Class Mail*
Jonathan W. Young, Esquire
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229

*First Class Mail*
Russell W. Budd, Esquire
Alan B. Rich, Esquire
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

*First Class Mail*
Shelby A. Jordan, Esquire
Nathaniel Peter Holzer, Esquire
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78471

*First Class Mail*
Peter Lockwood, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, D.C. 20005

*Hand Delivery*
Michael Joseph, Esquire
Ferry & Joseph, P.A.
824 N. Market Street, #904
P.O. Box 1351
Wilmington, DE 19899-1351

*Hand Delivery*
Michael Lastowski, Esquire
Duane, Morris & Heckscher LLP
1100 North Market Street, Suite 1200
P.O. Box 195
Wilmington, DE 19801