IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


IN RE:                        )
                              )
W.R. GRACE & CO., *et al.*,   )    Case No.01-1139
                              )
        Debtors.              )


United States Federal Courthouse
Courtroom No. 2A
Second Floor
844 North Market Street
Wilmington, Delaware 19801

April 2, 2001
3:00 p.m.


BEFORE:   THE HONORABLE RANDALL J. NEWSOME
          United States Bankruptcy Judge


Transcript of Proceedings


WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

12/97D



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1          THE COURT:  This is W.R. Grace and Company,

2   et al.  Would you like to make your appearances?

3          MS. JONES:  Thank Your, Honor.  Laura Davis

4   Jones, Pachulski, Stang, Ziehl, Young & Jones, on behalf

5   of the debtors.  Your Honor, I would introduce my

6   co-counsel, James Sprayregen of Kirkland & Ellis of

7   Chicago.

8          MR. SPRAYREGEN:  Good afternoon, Your

9   Honor.

10          MS. JONES:  I will let others make their

11   appearances, Your Honor.

12          THE COURT:  Okay.

13          MR. YODER:  Good afternoon, Your Honor.

14   Steven Yoder from The Bayard Firm on behalf of Bank of

15   America as proposed DIP lender.  My co-counsel, Douglas

16   Bacon with the Latham & Watkins firm.

17          THE COURT:  Good afternoon.

18          MR. BACON:  Good afternoon, Your Honor.

19          MR. ZALESKI:  Matthew Zaleski of the law

20   firm of Ashby & Geddes.  I'm here today on behalf of

21   certain asbestos claimants.

22          With me, I would like to introduce for the

23   Court and move orally, if I could, pro hac vice admission

24   of Ms. Nancy Davis of the Ness, Motley, Loadholt,

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    Richardson & Poole firm in South Carolina.

2            THE COURT:  There are undoubtedly rules on

3    admission pro hac vice in this district.  I don't know

4    what they are, but you'll have to follow them.  But for

5    today, certainly, you are admitted.

6            MR. ZALESKI:  I will submit a written form

7    of the motion.

8            THE COURT:  All right.

9            MS. DAVIS:  Thank you.

10            MR. SCHEPACARTER:  Good afternoon. Let me

11    introduce myself to the Court.  My name is Richard

12    Schepacarter with the Office of the United States Trustee

13    here in Delaware.

14            THE COURT:  Good afternoon.

15            MS. JONES:  Your Honor, there are a couple

16    further introductions I would make.  David Bernick here

17    at counsel table of Kirkland & Ellis.

18            MR. BERNICK:  Good afternoon.

19            MS. JONES:  Your Honor, also introduce Jay

20    Kapp, also with Kirkland & Ellis.  David Carickhoff of my

21    firm, and also Hamid Rafatjoo at the end of table, also

22    with my firm.

23            Your Honor, very importantly, I would like

24    to introduce to the Court David Siegal, senior

1   vice-president and general counsel of the debtors and

2   also Brian McGowan, senior vice-president of the debtors.

3           THE COURT:  All right.  We have a number of

4   matters to deal with this afternoon, and I propose to

5   March through them as best I can.  There are numerous

6   applications to employ, and as I understand the rules in

7   this district, those have to go out for a notice period.

8   So I can't really deal with those today.  Obviously you

9   protected your rights by filing the application.  So any

10  delay between the application and the entry of the order

11  is not going to be prejudicial to the applicants.  So

12  there's really nothing to do on those at this point.

13          There is an application here also for

14  ordinary course professionals.

15          MS. JONES:  Your Honor, we would propose to

16  put that out on notice too.

17          If it may help the Court, I would tell,

18  Your Honor, that we spoke at length with the Trustee's

19  office in connection with the motions that are before the

20  Court today.  And on top of the retention motions that

21  Your Honor mentioned, there are a number of other motions

22  we would just seek to put out on notice.

23          THE COURT:  I understand.  We are going to

24  go through each one of them, and I'll give you some

1    comments as we go along.

2                But on this one, the rules are very

3    specific about requiring not individual applications from

4    each counsel or from each professional, but it does

5    require that there be a declaration filed as to

6    disinterestedness.  As I said to the people this morning

7    in a case I had this morning, I'm not going to sign these

8    orders until that's been done.  We are not going to sign

9    the order and then find out whether they are

10   disinterested.  That certainly is putting the cart before

11   the horse.  So they are going to have to comply with the

12   local rule as well as the national rules and statute

13   before I'm going to sign anything.  I don't have a

14   problem with putting all the applications into one

15   package, all the affidavits into one package, but that's

16   the way it's got to be.  Okay?  So we don't need to say

17   anything more about that.

18               Now, there was an -- I think the next order

19   of business is compensation procedures.  You want this

20   noticed out as well?

21               MS. JONES:  Your Honor, we have agreed with

22   the Trustee's office to put that out on notice.

23               THE COURT:  There has been extensive

24   litigation, as I understand, in this district regarding

1  that particular kind of order.  So I would like for the

2  U.S. Trustee to sign off on anything I receive.  All

3  right.

4       MS. JONES:  Your Honor, he has already

5  approved the form of order and motion that we put before

6  the Court.

7       THE COURT:  Okay.

8       MS. JONES:  Your Honor, there was one

9  retention application, if I may back up just for a

10 moment, that the Trustee's office as well as the debtors

11 would encourage the Court to possibly consider today, and

12 that is the retention of R.R. Donnelly & Son as the

13 noticing agent.

14      THE COURT:  And I will do so.  I'll approve

15 that.

16      MS. JONES:  Thank you, Your Honor.

17      THE COURT:  Okay.  The next motion I'll

18 take up dealing with utilities being adequately assured.

19 That, I think, has to go out for notice.

20      MS. JONES:  We planned on doing that.

21      THE COURT:  Motion for entry of an order

22 authorizing debtor to pay sales, use -- this must be the

23 same package of orders that gets put in every case.  They

24 are looking awfully familiar to me at this point.  I

1  don't even understand why you need this.  Aren't you

2  required under 28 U.S.C. Section 959 to pay your taxes

3  anyway?

4       MS. JONES:  You are, Your Honor, but the

5  thinking behind the motion -- and you're right.  This has

6  evolved over, I would say, probably the last several

7  years in this district, and it actually came up at the

8  request of a creditor in a case that I was involved in

9  probably in 1992, '93, who was concerned that there were

10 claims that were incurred prepetition and that somehow we

11 were preferring the governmental entities in paying sales

12 and use tax.  To them, that somehow correlated to a

13 prepetition period.  So we started putting the matter up

14 on motion because, at some level, those sales and use

15 taxes are incurred prepetition and you are seeking to pay

16 a prepetition claim.

17       THE COURT:  It's the same problem you run

18 into with real estate taxes.

19       MS. JONES:  Yes, sir.

20       THE COURT:  Okay.  Do you want that noticed

21 out?  I guess we have to.

22       MS. JONES:  Your Honor, I would actually

23 ask that we be able to pay them in the ordinary course.

24 They obviously had various time lines when those moneys

1  are paid over.   Frankly, I think they pretty much all

2  fall into trust fund type theories anyway and would be

3  priority taxes, if they are even property of this estate.

4  I have run this by the Trustee's office and I know there

5  was no opposition to us continuing to pay these over in

6  the ordinary course.

7            THE COURT:  Anybody have that a problem

8  with that?  There's nobody here that would have a problem

9  with it anyway, but I think that this is appropriate.

10  I'll sign it.

11            I'm just going -- we are going to mark on

12  the top of this, even though it's got holes in it, that

13  this is the original.

14            MS. JONES:  Your Honor, if it's helpful to

15  the Court, we do have court-ready filings for all of the

16  motions.  We can hand them up as we go, whatever.

17            THE COURT:  Why don't you give me that one?

18            MS. JONES:  Your Honor, while we are

19  digging that out, if may we skip to the motion for joint

20  administration of this case.

21            THE COURT:  I didn't see that, but it's

22  granted.

23            MS. JONES:  Thank you, Your Honor.  I also

24  raise it because it was a little presumptuous.  We used a

1 | joint caption.

2 |      Also, we skipped over our motion for an
3 | order granting the debtor additional time to file
4 | schedules and statements.

5 |      THE COURT:  That's granted too.  I read
6 | that one.

7 |      MS. JONES:  Your Honor, if I may approach
8 | with both of those.

9 |      THE COURT:  Yes.

10 |      MS. JONES:  I also have the originals of
11 | Mr. Siegel's affidavit upon which these first day motions
12 | are premised as well as the informational brief, and if I
13 | may, I would like to submit those as well.

14 |      THE COURT:  Actually, you don't need to.
15 | They are in the binders.  I've got three more binders
16 | back in the office I didn't bring with me.  I think they
17 | are in the first binder.  So unless I totally missed
18 | something --

19 |      MS. JONES:  Your Honor, the practice, as I
20 | understand it from the clerk's office -- and we obviously
21 | will go with any way Your Honor wants -- is that they
22 | prefer to have the original documents stamped with the
23 | original signature and so forth so that they can put it
24 | in the docket, and we usually do that through bench

1    filing with the Court.

2              THE COURT:   Fine.   I don't need to sign

3    anything as to the brief.

4              MS. JONES:   That is correct, Your Honor, or

5    on the affidavit.

6              THE COURT:   You want me to sign two of

7    everything, right?

8              MS. JONES:   If you would, sir.

9              THE COURT:   What's the case number?

10             MS. JONES:   It's 1139.   01-1139.

11             THE COURT:   All right.   How far does this

12   extension go?

13             MS. JONES:   60 days, Your Honor, from the

14   petition date.

15             Your Honor, one other housekeeping matter

16   we skipped over, number 8 was my motion pro hac vice with

17   respect to members of the Kirkland & Ellis firm.   I would

18   certify to the Court, as my motion does, that all of

19   these candidates are members in good standing of the bars

20   in which they are admitted to practice.   I would so move

21   their admission and ask you to sign that order.

22             THE COURT:   All right.

23             One thing I would like for you to think

24   about at this point because -- well, I'll just indicate

1   that it may be the case that I will want a case
2   administrator, an additional one hired by the clerk's
3   office and paid for by W.R. Grace & Company, and that
4   that case administrator will be basically your employee
5   but under the sole and direct supervision of the clerk.
6   Now, how we deal with who's going to be on whose payroll,
7   I'm not sure. That's something you'll have to work out
8   with the clerk. But this person will be fully paid for
9   by the debtors and shall be responsible for nothing but
10  the debtors' work unless this person has nothing else to
11  do, in which case the clerk can use his discretion to
12  have him or her do something else. But I think it's an
13  absolute necessity, to this extent at least, that the
14  debtor pays as it goes. So I'm not ready to do anything
15  more than so indicate this afternoon, but you should know
16  that.

17          MS. JONES:   Thank you.

18          THE COURT:   This will have a lot of
19  advantages to it. I've done this in a number of larger
20  cases, and one of the things it does is it allows this
21  person to really do a lot more organizing of documents
22  than they have time to do ordinarily and to track and
23  provide for easier access to motions and motion papers
24  and so forth.

1        MS. JONES:  Your Honor, one of the

2  things -- and maybe we'll get to this when we talk about

3  scheduling and when we can be next before the Court and

4  sending out notice of these motions, but one of the

5  things that occurs to me in looking at the utility motion

6  is, because that does have a 20-day life on it, if you

7  will, under Section 366 of the code --

8        THE COURT:  We are going to do this on

9  negative notice.  If there aren't any objections, then

10  I'm going to sign the order.  I'm not going to have any

11  hearings if there aren't any objections.

12        MS. JONES:  If there would be an objection,

13  can we submit a bridge order?

14        THE COURT:  Well, if there are

15  objections --

16        MS. JONES:  And they are not heard within

17  the 20 days, Your Honor, would be my concern that we be

18  able to have a bridge order.

19        THE COURT:  The 20 days after the 20 days?

20        MS. JONES:  No.  20 days from the petition

21  date.  If I sent out notice --

22        THE COURT:  If there are objections, I

23  suppose I would have to go back and take a look at 366,

24  but in any event, here's what we'll do.  If there are

1    objections, you let me know and we'll deal with it.

2                    MS. JONES:  Understand.  Your Honor, can I

3    assume --

4                    THE COURT:  By the way, as to emergencies,

5    there won't be any unless it is clearly and unmistakably

6    clear that there's an emergency in this or any other case

7    and it may be that you will be called upon to travel back

8    to Oakland.  So if I have to actually have a hearing on

9    something and it can't be done by phone, the Judges in

10   this district have agreed that that's what we'll do if

11   it's necessary.

12                   MS. JONES:  Your Honor, am I to understand

13   that, at this point -- or is it premature to ask whether

14   Your Honor has been assigned to this case?

15                   THE COURT:  This is my case.

16                   MS. JONES:  Thank you, Your Honor.

17                   Your Honor, with respect to the motions

18   that we talked about that will go out on notice, all the

19   retentions and so forth, can we put those on 15 days

20   negative notice?

21                   THE COURT:  I thought the rule was 20?  Is

22   the local rule 15 days?  Actually, there is no notice

23   period for retention applications other than the U.S.

24   Trustee.  So 15 days is fine.



1　　　　　　MS. JONES:  Thank you.

2　　　　　　THE COURT:  All right.  Let's move on to

3　the motion for an order authorizing the debtor to honor

4　certain prepetition obligations.  I don't have a problem

5　with this, but again, you want this noticed out?

6　　　　　　MS. JONES:  No, Your Honor.  We would like

7　to have that approved today for the simple reason I can't

8　think of a more critical time in this debtors' life than

9　for its customers to get what they expect when they

10　expect it without a delay or disruption.  Otherwise they

11　may think that there is something bad about being in a

12　Chapter 11 rather than have this be as seamless as

13　possible.  Your Honor, again, I have addressed this

14　motion with the U.S. Trustee.

15　　　　　　THE COURT:  I'm sure there are other places

16　Grace would rather be than Chapter 11.

17　　　　　　MS. JONES:  I understand that, but we would

18　rather make sure that our customers stay committed and

19　loyal to us as we are to them.

20　　　　　　Your Honor, I have addressed this with the

21　Trustee's offices and I think there is no objection to

22　this.  It is our representation, Your Honor, that we

23　would exercise our business, the debtors' business

24　judgment in connection with honoring the programs and

1    practices as it has in the past in the ordinary course
2    going forward.
3              THE COURT:  Okay.  I will allow this one.
4              MS. JONES:  Thank you, Your Honor.
5              THE COURT:  I'm not even sure it's
6    necessary, frankly.
7              MS. JONES:  It goes back to, I think, the
8    sales and use analysis.
9              THE COURT:  If it's an ordinary course of
10   business program, then it doesn't need any approval from
11   me.  But I'll sign an order if that's what makes
12   everybody happy.
13             MS. JONES:  It does, Your Honor.  Thank
14   you.  If I may approach.
15             THE COURT:  Yes.
16             THE COURT:  All right.  Motion of debtors
17   for entry of an order authorizing but not requiring
18   debtor to pay certain prepetition wages, salaries, et
19   cetera.  I have no problem with this.
20             MS. JONES:  Thank you.
21             THE COURT:  It's my understanding that no
22   one is going to be -- am I correct in understanding that
23   no one will receive more than -- well, this is not as to
24   prepetition wages, is it?

1          MS. JONES:  It is, Your Honor.  And there's
2   no one that's going to exceed the $4,650 number.

3          Your Honor, also I would point out to the
4   Court that, on the employee severance plan, we are
5   putting that out and the executive severance plan, we are
6   putting that out on notice as the motion and order
7   reflects, and also, on the key executive benefit program,
8   we will put out for notice final approval of that as the
9   order and motion reflects and only simply honor it in the
10  interim.  I think it will result in the expenditure of
11  approximately $90,000 if we were about 15 days out.  But
12  we will come back for final approval on that, Your Honor.

13         So everything that we are doing in
14  connection with this motion is, for lack of a better
15  term, with the rank and file.

16         THE COURT:  Needless to say, I haven't had
17  an opportunity to review very much of this, and this is
18  one of the things I have not had an opportunity to fully
19  evaluate.

20         MS. JONES:  Your Honor, we have fully
21  vetted this with the Trustee's office.

22         THE COURT:  But the Trustee office doesn't
23  sign the order, and I do.

24         MS. JONES:  I understand, Your Honor.  I

1    raise that only to say that I believe that the motion
2    fully discloses almost every benefit and program that we
3    are aware of, and that's what accounts for the motion
4    being so long, and I apologize for that but we wanted to
5    make sure that every issue is addressed in there.

6              THE COURT:   Well, let me ask you this, does
7    this motion purport to or seek authority to set up any
8    new retention programs?

9              MS. JONES:   No, sir, it does not.

10             THE COURT:   So these are all existing plans
11   as opposed to plans going forward as an incentive to
12   retain the employees?

13             MS. JONES:   That is correct, Your Honor.

14             THE COURT:   And I assume from having
15   scanned this that these are not all ERISA type programs
16   either.

17             MS. JONES:   That is correct.

18             THE COURT:   Some of them are retirement
19   programs.   Some of them are directed exclusively at
20   certain executives.

21             MS. JONES:   Some are performance programs.

22             THE COURT:   But they're all prepetition.

23             MS. JONES:   That is correct, Your Honor.

24             THE COURT:   And the U.S. Trustee has been

1    over this?

2            MS. JONES:  Yes, Your Honor.  We have fully

3    vetted it with them and with the understanding, as the

4    motion and order reflect, that the key executive benefit

5    program and the key senior executive severance program

6    are put on notice for final approval.  My understanding

7    is the Trustee's office has no objection.

8            THE COURT:  Is that correct?

9            MR. SCHEPACARTER:  Thank you, Your Honor.

10           One of the overriding themes, just to give

11   Your Honor some background, one of the overriding themes

12   that I am going to address today, and I address on first

13   days generally, is that motions which I think need to be

14   granted are those that keep the business running

15   basically from here to here, that are critical to keep

16   the business running.  That is why we have no objection

17   to the rank and file receiving their prepetition wages,

18   that nobody's getting more than 4650 which is the new

19   amount that's been upgraded, and that the other motions

20   with respect to the key employees, the severance and the

21   like and the bonus, are going to go out on notice.  I

22   don't have any problem with, at least just in the

23   interim, that those other items which are basically the

24   policies and the programs which have been in the past are

1   going forward but, again, they are going to be looked at

2   again on another basis at another hearing sometime later.

3   Given that fact, because other creditors -- the committee

4   has not been formed.  Other creditors really don't have

5   the opportunity to look at those programs.  So they need

6   to be able to look at those.  The committee needs to be

7   able to look at those to determine whether they are the

8   best interests, at least, of the creditors.

9           THE COURT:  All right.  I'll sign and

10  order.

11          MS. JONES:  Thank you, Your Honor.  May I

12  approach?

13          THE COURT:  Yes.

14          MS. JONES:  Your Honor, with the cash

15  management order that's next in the line, there were two

16  changes we have made to that as a result of the

17  discussions we have had with the Trustee's office, and if

18  I may, I would tell Your Honor about those.  First, with

19  respect to our request for approval of investment

20  guidelines, we have agreed that, if Your Honor were to

21  enter that order, that, as to the approval of the

22  investment deadlines, it would be an interim order for

23  30 days, and should we need further relief, we would come

24  back before the Court seeking to notice that up.

1          THE COURT:  What exactly are those

2     investment guidelines attached here someplace?

3          MS. JONES:  Your Honor, they are described

4     in our motion if I may.

5          THE COURT:  I assume that this company is

6     probably investing some of their money in reverse repos

7     and all sorts of things that 345(b) wouldn't approve of,

8     is that right?

9          MS. JONES:  Your Honor, there are some

10    investments that are done in the ordinary course to

11    maximize yield that technically would not comply with

12    345.  However, we believe that they still satisfy the

13    spirit of Section 345 in the sense that we are minimizing

14    risk as much as we can, yet maximizing the yield.  Your

15    Honor, obviously W.R. Grace is a very significant company

16    with well established assets and well established track

17    record.  And, Your Honor, the goal is to invest the money

18    as carefully as possible but also to maximize the yield

19    to its creditors.

20         THE COURT:  Well, the spirit of 345(b) is

21    to make sure that the investment is safe.

22         MS. JONES:  Yes, sir.

23         THE COURT:  Whether or not past history

24    proves that all the investments that I can think of that

1  Grace might have their money in are safe can be argued,

2  but I don't expect them to keep them in a passbook

3  account.  That's for sure.  And the U.S. Trustee I

4  suppose -- how is it that you've altered the guidelines

5  again, the investment guidelines?

6              MR. JONES:  Your Honor, with respect to the

7  moneys that are invested what we need to double-check is

8  that there is a collateralization as required by 345 on

9  the accounts.  That should be pretty easy to check.

10             THE COURT:  You know one thing you could do

11 just going forward, just as a little tip, forget about

12 all the first six pages on each of these motions, okay?

13 Once you've read it once, you've read it 100 times.  It

14 just clutters up the docket.  So if I didn't get it the

15 first 16 or 17 times, it's not going to happen.  That's

16 one of the horrors of the word processors.  They can do

17 that sort of the thing.

18             All right.  Now, let me take a quick look

19 at this motion again.

20             MS. JONES:  Your Honor, the --

21             THE COURT:  I have no problem with the

22 maintenance of bank accounts in their present form, and

23 that's really not -- that's really just a detail as far

24 as I'm concerned.  The cash management system, I don't

1    think that needs to be disturbed.  As a matter of fact,

2    you even cited me here.

3              MS. JONES:  Your Honor, the one thing the

4    Trustee's office did ask us to delete on the interim

5    basis -- it kind of goes to the cash management system,

6    so I'll raise it right now -- is the super priority of

7    the status to postpetition intercompany claims.  Your

8    Honor, it's our view that, frankly, that is done for the

9    benefit of creditors because, should there be a meltdown,

10   you don't want to have one debtor's estate fund all the

11   other debtors' estates.  And when you give a super

12   priority status, if you had to unwind it, you could

13   unwind it fairly cleanly.  It has been the position of

14   the Trustee's office in this district that, despite what

15   advantages we might see, they do believe that that is

16   something that should not be granted on first day and

17   have asked us not to seek it on the interim order and not

18   to seek on an interim basis but to seek it only later on.

19             Your Honor, we have been willing to do

20   that.  I will tell you it's my personal experience that,

21   in every case that I'm involved with, we take it off and

22   the creditors'committee has asked us to put it back.

23             THE COURT:  What is the statutory basis for

24   giving intercompany claims super priority status?

1           MS. JONES:  Your Honor, it is a loan under
2      Section 364.

3           THE COURT:  It's a prepetition loan, isn't
4      it?

5           MS. JONES:  No, Your Honor, we are talking
6      postpetition.

7           THE COURT:  Well, how is it that it's a
8      prepetition loan?  It's a claim, but that doesn't make it
9      a loan.

10          MS. JONES:  Your Honor, to the extent that
11     there are intercompany borrowings, what we are seeking
12     is, to the extent we are trying to keep it above the
13     fray, if you will, so it can be easily unwound if
14     necessary.

15          MR. SPRAYREGEN:  Your Honor, James
16     Sprayregen on behalf of the debtors.

17          In the ordinary course of business there
18     are intercompany accounts where money is loaned back and
19     forth, again, in the ordinary course between and among
20     the debtors, and that's what Ms. Jones is referring to as
21     receiving super priority status.

22          THE COURT:  I understand what she's saying,
23     kind of.  I'm just wondering whether or not they are
24     entitled to that kind of status.  You are talking about

```
1    507(b) super priority.

2              MR. SPRAYREGEN:  Your Honor, under
3    section --

4              THE COURT:  You are talking about a super
5    super priority.  You are talking about 364 super
6    priority.

7              MS. JONES:  Yes, sir.

8              THE COURT:  So it would be above even
9    people that are secured lenders, if there were any.

10             MR. SPRAYREGEN:  In this particular case,
11   There are not.  But this would be a subordinated super
12   priority to the DIP lender that we have not yet got.

13             THE COURT:  So you are talking about a
14   super super priority.  I've not heard of such a thing.
15   What would make it something less than super super super
16   priority?  That will take a little more thought on my
17   part before I sign off on an order.

18             MS. JONES:  Your Honor, the order that we
19   have submitted to the Court has deleted that request.
20   Excuse me for just one moment.

21             THE COURT:  As to the investment practices,
22   if the U.S. Trustee is going to sign off and there aren't
23   any objections, I'm willing to go along with the
24   investment practices because that's really more in the
```

1   U.S. Trustee's bailiwick anyway.

2          MS. JONES:  Your Honor, we are willing to

3   and have modified our order to provide that it is only

4   approved on an interim basis for 30 days.

5          THE COURT:  I really don't know why you

6   wouldn't be allowed to run your company owned liability

7   insurance company.  Is there some reason why you

8   wouldn't?

9          MS. JONES:  Not that I can think of.

10         THE COURT:  You can continue to perform

11  under the intercompany agreements but the super priority

12  issue, again, remains completely up in the air.

13         MS. JONES:  Yes, sir.

14         THE COURT:  All right.

15         MR. SCHEPACARTER:  Thank you, Your Honor.

16         Just for some clarification, with respect

17  to the 345(b) interim 30-day waiver, what we would like

18  to have the debtor do is to come into compliance with

19  respect to Section 345(b) within that 30-day period.  If

20  they were unable to do so, they can file, as I believe

21  Ms. Jones indicated, a separate motion asking this Court

22  for relief from 345(b) upon cause shown as is set forth

23  in the statute.

24         As was indicated in this district, Columbia

1    Gas was a case which dealt with that.  It's been

2    overruled by legislation.  So the debtor still needs to

3    show and prove to the Court why it should be excused from

4    345(b).  Hopefully they can come into compliance with

5    345(b) within that 30-day period.  But if they are unable

6    to do so, then it would be required that they file a

7    separate motion and prove why they need that relief.

8                    THE COURT:  Okay.

9                    MR. SCHEPACARTER:  Thank you.

10                   THE COURT:  Next matter is motion

11   establishing reclamation procedures.

12                   MS. JONES:  Your Honor, that we would

13   propose to put out on notice as well.

14                   THE COURT:  You need to, but you know it

15   ought to be more extensive than this.  Frankly, there

16   ought to be a system whereby, what happens when you

17   object to the reclamation claim, we don't get all wrapped

18   up in a bunch of discovery right off the bat but we have

19   an organized procedure for getting it settled.  What I

20   would propose to do is this.  I don't know whether it's

21   on the Northern District of California's web site or not,

22   but you should note that there is such a web site and

23   that there are procedural orders there that are regularly

24   used and there may even be a reclamation order that I

1  have used in previous cases.  But as I recall, the way it

2  works, you make the objection, the reclamation claimant

3  is then required to provide you with whatever information

4  you need in the way of shipping dates and that sort of

5  thing within X number of days, and then you can decide

6  whether to go forward with the objection or whether you

7  want to waive the objection and, if you do, go forward

8  with it.  Then there's a procedural mechanism for

9  basically setting the thing up so it can be heard.

10              MS. JONES:  Your Honor, that sounds

11  extremely similar to the procedure that we have used in

12  the district in a number of large cases where there have

13  been reclamation claims such as the Ameriserve case

14  whereby we started with this procedure so there wasn't a

15  rush on the Court of TROs and so forth and people feeling

16  that they may have waived rights and then, when we got to

17  the point where we filed our report that had the

18  reclamation claims that we deemed valid and those we did

19  not, then we then entered into scheduling orders that

20  dealt with the discovery phase and putting matters before

21  the Court and so forth.

22              Your Honor, we would be glad to look at the

23  Court's proposed procedure on the web site.  If I may,

24  what I would like to do is bench file this motion and put

1  this out on notice.

2        THE COURT:  I think you need to do that in

3  any event, but I was just stating that this will have to

4  be a little more -- and you agree, I guess, this will

5  have to be a little more detailed.  How many reclamation

6  claims do you have?  Do you have a lot of reclamation

7  claimants?

8        MR. SPRAYREGEN:  Your Honor, in this

9  particular case we actually do not expect a large amount.

10        THE COURT:  I didn't think so, no.  Okay.

11        MS. JONES:  Your Honor, may I approach with

12  the bank account, business form motion and order as well

13  as if I could just bench file with the Court, not for any

14  signing, the reclamation.

15        THE COURT:  All right.  Okay.  I'm going to

16  strike the super priority business in here.

17        MS. JONES:  Your Honor, I think we may have

18  handed up to the Court, then, the wrong order because we

19  did do a new order that had that stricken.

20        THE COURT:  Yes.  It does say on page 2,

21  granting super priority status to intercompany loans.

22  Why don't I just strike it?  It will be easier than

23  finding it.

24        MS. JONES:  That's fine.



1          THE COURT:  Motion of debtors for authority
2    to pay in the ordinary course of business prepetition
3    claims relating to shipping charges.  Is this strictly as
4    to shipping charges?

5          MS. JONES:  No, Your Honor.  It's shipping
6    and also warehouses, also customs brokers, and custom
7    fees, Your Honor.

8          THE COURT:  All of whom might have a common
9    lien as to this particular kind of thing?

10         MS. JONES:  Possessory type lien, yes.

11         THE COURT:  So we are not talking about
12   paying off all the prepetition trade creditors?

13         MS. JONES:  No, Your Honor.  We are not.
14   We are talking about, in the exercise of business
15   judgment, looking at those shippers and other
16   warehousemen and other customs brokers who are refusing
17   to release or forward goods and determining what we need
18   to do to be able to get them to release, and if the cost
19   of paying them is less than what it would take to sue
20   them, if you will, to get it back or to succor a delay,
21   we would ask authority to make those payments that are
22   necessary.

23         Your Honor, Mr. Siegel would testify to the
24   Court that everything moves in this company through

1    common carriers.  It is critical that happens on a timely

2    and efficient manner.  If we are not able to have the

3    goods released, our operations could come to a halt at

4    worst or, at a minimum, have very adverse consequences on

5    the operations.  Your Honor, also he would point out that

6    a number of shippers are specialty shippers.  They have

7    some goods that require special handling, and so to be

8    able to replace those shippers would be quite difficult.

9            With respect to the customs duty and

10    customs brokers, again, Your Honor we want to avoid

11    disruption or delay in receipt of imported goods.  We

12    would only pay those that are absolutely necessary and

13    are appropriate in the exercise of our business judgment.

14            THE COURT:  It looks like it falls almost

15    within a de minimis rule as to customs anyway.

16            MS. JONES:  With respect to customs, it's

17    about 30,000.  With respect to the shippers and

18    warehousemen, it was a much more sizable number.

19            THE COURT:  Okay.  I'll sign an order.

20            MS. JONES:  If I may approach, Your Honor.

21            THE COURT:  Yes.

22            MS. JONES:  Your Honor, just clean up, if I

23    may, there were a number of retention motions we passed

24    over.  If I could, I would like to just bench file those

1  with the Court so they are on file.

2            THE COURT:  All right.

3            MS. JONES:  At this point I'm going to

4  yield to Mr. Sprayregen.

5            THE COURT:  Okay.  The next motion is for

6  an order pursuant to Sections 365 and 554.  Doesn't this

7  have to go out on notice?

8            MR. SPRAYREGEN:  Your Honor, there are two

9  parts to this motion, and I think the answer is yes.  One

10  of them is to set up a procedure.  These debtors in their

11  past lives had a number of retail and restaurant

12  businesses.  We have a couple hundred leases.

13            THE COURT:  Del Taco.

14            MR. SPRAYREGEN:  That is one of them, yes.

15            THE COURT:  Is it still in operation?

16            MR. SPRAYREGEN:  I believe it is, but not

17  through us.

18            As a result, we would anticipate, you know,

19  a great number of rejection motions which we didn't think

20  needed -- one motion without a procedure might make

21  sense.  The second part of the motion actually has

22  requests for rejection of a number of leases.  We are

23  not -- in conversation with the United States Trustee, I

24  don't think there was an objection to this procedure

1    being put into effect starting today subject to objection

2    later so we at least have a process.  And as part of that

3    process, the second part being the rejection that we are

4    seeking would not be effective today, would be pursuant

5    to that process, then the rejection is in the process and

6    if it needed to be changed, we could address that at a

7    future hearing.  We would request that as a result,

8    really, of a desire for efficiency in the sense that we

9    lay out what we think will be helpful procedure and

10   present numerous motions before the Court, and we also

11   desire to prevent administrative claims running against

12   the debtors' estate when the debtors have vacated the

13   premises and have determined that it no longer has any

14   value to be extracted from the lease.

15                THE COURT:  Well, you are asking these

16   people, if they have an objection, to object within ten

17   days of the date of the filing of the notice.

18                MR. SPRAYREGEN:  Yes.  That would be the

19   procedure we would set up.

20                THE COURT:  Yes.  I understand that.  But

21   that is practically no time at all after you -- unless

22   you are going to serve the motion at the same time you

23   file it.

24                MR. SPRAYREGEN:  That's exactly what we



1    would do, Your Honor.

2              THE COURT:  Wouldn't it be better if you

3    said ten days from the date of service of the motion?

4              MR. SPRAYREGEN:  That's fine, Your Honor.

5              THE COURT:  So this is going to go out on

6    notice.  I can't put together this kind of a procedure

7    which really varies completely from the national rules

8    without everybody or key people having an opportunity to

9    say yea or nay as to the procedure.  So that's what I am

10   going to require.

11             MS. JONES:  Okay.  We'll adjust the order

12   accordingly.  Maybe while we are doing that, we could

13   move on to the next matter.

14             THE COURT:  Yes.  Motion for authority to

15   file employment agreements and customer lists under seal.

16   Under seal has been the subject of some controversy in

17   this district.  As I recall, there's a published case on

18   file under seal in a bankruptcy case.  If I recall, the

19   District Court didn't look too kindly upon it.

20             MR. SPRAYREGEN:  Your Honor, I don't know

21   the specific case you are referring to, but I know

22   generally that there's been some issues with under seal

23   in this district and elsewhere.  As a result, we tried to

24   be very circumspect in the items that we sought to file

1  under seal.  What we are asking to file under seal are
2  really three different categories, one, our customer list
3  which is very sensitive proprietary information that
4  competitors could make use of and thereby diminish the
5  value of the debtors' estate.  The second is a portion of
6  our vendor list which could be made the same use of.  And
7  the third is four employment agreements that are not
8  otherwise public documents of four individuals.

9            We do note that, for example, being a
10  public company, there are a number of employment
11  agreements and arrangements of the debtor that are public
12  by virtue of the securities laws.  We are not asking that
13  anything public or already out there in the public domain
14  be kept under seal.  We believe the employment agreement
15  information is particularly sensitive.  We obviously are
16  not asking that it be kept from the Court or creditors'
17  committee or U.S. Trustee or, indeed, anybody who signs
18  the appropriate documents and has a reasonable need for
19  the information with the debtors.  But the debtors'
20  employment information, again, can be used to recruit
21  away employees at a very crucial time in the debtors'
22  history, and the information being put out to the world,
23  we do not believe, is beneficial to those employees'
24  morale who do not expect to have that information out

1    there for the world to see.

2         We have tried to make it very, very limited

3    what we are requesting.  We believe that, pursuant to

4    Rule 9018 and Section 107(b), we more than comply with

5    those requisites of those provisions.  We have also, due

6    to the U.S. Trustee expressing a similar concern as the

7    Court has expressed, agreed that, to the extent the Court

8    were to enter the seal order today and any party were to

9    have an objection to it at another time, we would not

10   assert the prior entry of the order as having shifted the

11   burden to the other party to prove the lack of propriety

12   of seal.  That is, it would remain at all times on the

13   debtor, the burden of proving the propriety of the

14   continued sealing.

15        With that, Your Honor, we would submit or

16   respectfully request that that motion be granted.

17        THE COURT:  First of all, when are you

18   going to have to file these employment agreements?

19        MR. SPRAYREGEN:  Well, Your Honor, one of

20   our motions asks for the employment agreements to be

21   assumed, and we were going to be filing those as soon as

22   the seal order is entered so that they are of record,

23   albeit on a sealed basis.

24        THE COURT:  Well, at the point at which you



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    file a motion to assume employment agreements, if a

2    creditor came in and said, well, we want to see them,

3    what basis would I have to say, well, you can't?

4            MR. SPRAYREGEN:  Your Honor, again, this is

5    confidential and proprietary information.

6            THE COURT:  No, this is not, not an

7    employment agreement.  I'm sorry.  You are going to have

8    to cross more of a threshold than what you have done so

9    far before I'm going to find that an employment agreement

10   contains confidential commercial information or research

11   and development information or that it's being sealed to

12   protect a person with respect to scandalous or defamatory

13   matter contained in a paper filed in this case.  You

14   haven't made any showing as to either of those elements

15   and I'm not going to approve this.

16           MR. SPRAYREGEN:  Your Honor, I understand

17   the Court's position.  Part of our problem is somewhat,

18   in filing these not under seal, once the damage is done,

19   the damage is done.

20           THE COURT:  That's true.  But until you can

21   show that there's going to be any damage, there was no

22   basis for me to seal the documents, and I'm not going to

23   do it.

24           MR. SPRAYREGEN:  Your Honor, we'll take

1    that under advisement and determine how to proceed.

2                THE COURT:  Okay.  That's fine.

3                MR. SPRAYREGEN:  Your Honor, is that your

4    ruling with respect to the employment agreement only or

5    the other two items also?

6                THE COURT:  No.  All of it.

7                Okay.  The next motion is a motion for an

8    order pursuant to 11 U.S.C. Section 365 -- that was the

9    one you were referring to?

10               THE COURT:  That's part of those.  Some of

11   those are public employment agreements, and those are

12   mentioned in there.  But then --

13               THE COURT:  Tell me what may be -- and

14   again, I'm at a disadvantage because I haven't had an

15   opportunity to read all this, but tell me what is the

16   difference between a public employment agreement and

17   private employment agreement.

18               MR. SPRAYREGEN:  Your Honor, the U.S.

19   securities laws in the federal filing that the debtors

20   need to make outside of bankruptcy have certain

21   requirements concerning disclosure of compensation

22   arrangements with senior management and, in fact, the

23   exhibit to some of those securities law filings require

24   copies of the employment agreement to be attached.  In

1    fact, there are very specific rules as to how far down
2    the level of the organization those securities laws
3    require that disclosure.    The debtors have complied with
4    that.    As a result, a number of the most senior
5    management employment agreements and detailed employment
6    arrangements are set forth already in the debtors' public
7    securities law filing.

8            Because of those being public, we are not
9    asking that those be sealed, but we believe that there
10   was a determination, even under the U.S. securities laws,
11   that that public filing requirement only goes so far down
12   the list of senior management.    And the people that we
13   are seeking to have sealed here are below that list even
14   under the U.S. securities law.    So that's why we think,
15   as to certain of the seniormost people in the
16   organization, it's fair and appropriate and, in fact, has
17   already been done to disclose their arrangements.    But as
18   we get farther down in the organization, it gets to be
19   much more of a morale and privacy issue.

20           THE COURT:    I just don't understand.    I
21   understand there are morale issues all over Chapter 11
22   cases of any kind.    It doesn't matter how big it is.    But
23   I don't understand what is confidential about at will
24   employment agreements which, as I look at this, is the

1  preponderance here.

2          MR. SPRAYREGEN:  Again Your Honor, there

3  was also --

4          THE COURT:  Especially since in the motion

5  itself you are disclosing pretty much what the agreement

6  is.

7          MR. SPRAYREGEN:  Your Honor, as we've noted

8  also, we are sending out on notice, key employee

9  retention programs that are not going to be approved yet.

10 A debtor entering into a Chapter 11 case of this

11 magnitude is almost for sure being beset by competitors

12 trying to lure away its employees.  This type of

13 information in the public domain is virtually an

14 invitation.

15         THE COURT:  Probably started doing that

16 before you ever filed.  They don't need the employment

17 agreements to do that.

18         MR. SPRAYREGEN:  That's always correct,

19 Your Honor, but we were trying to avoid helping them.

20         THE COURT:  If they are going to leave,

21 they are going to leave.  If they aren't, it's because

22 there's a good reason to stay.  I'm just -- I think I've

23 already ruled I'm not going to seal these.

24         As far as assuming them, these have got to

1    be put out on notice.  So I'm not going to do anything
2    with this.

3              MR. SPRAYREGEN:  I would ask, that to be
4    going out on notice -- that was number 24 -- to go out on
5    notice, although we do need to determine, as a result of
6    the lack of seal, how we handle the rest of the notice.

7              THE COURT:  That takes us up, then, to
8    motion of debtor for authority to provisionally pay in
9    the ordinary course of business prepetition claims of
10   domestic essential trade creditors.

11             MR. SPRAYREGEN:  Your Honor, if I could
12   indulge the Court, if I can go back to 24, would the
13   Court permit, then, the employment agreements themselves
14   not to be filed at all?

15             THE COURT:  I don't see -- as far as I'm
16   concerned, if you can take it in two stages.  You can ask
17   that the employment agreements, if, in fact, you describe
18   them adequately, you can ask that they be assumed, that I
19   give you authority to assume them.  But if a creditor
20   asks you, I want to see the agreements, I think you got
21   to show them to them.

22             MR. SPRAYREGEN:  If the Court accepts my
23   suggestion that, if we had a different view and we wanted
24   to dispute that, that would be an issue for a later day

1   if a creditor has a rational basis.

2           THE COURT:  It would only be an issue if

3   you can show me a whole lot more than you have.

4           MR. SPRAYREGEN:  We understand, Your Honor.

5   Then send out 24 on notice and see if the people ask for

6   the agreement?

7           THE COURT:  That is right.

8           MR. SPRAYREGEN:  Your Honor, if I also

9   might just indulge, on the customer list issue, the

10  customer list issue only arises in a very narrow and

11  discrete circumstance, and that's as a result of the

12  conflicts check done by the professionals to insure their

13  disinterestedness.

14          THE COURT:  Is it all set out in all

15  papers?  I mean, we've got everybody in the world listed

16  in Kirkland & Ellis' retention application alone.  I

17  mean, they got page after page after page of vendors,

18  and I don't know what the exact relationship is with

19  Grace, but certainly this statute requires a

20  particularized need, as the language clearly indicates,

21  before I can go around sealing documents in a public case

22  like this.  That is the spirit of the statute and I'm

23  going to follow it that way.  So unless you can show me a

24  particularized need under one or the other of these two

1   provisions, I'm not going to seal these documents.

2           MR. SPRAYREGEN:   I understand that, Your

3   Honor.   The only thing I was seeking was, with respect to

4   those professional applications, if we can file those

5   without the citations to the actual identities of the

6   customer list.

7           THE COURT:   They are to be filed as they

8   are with all that stuff listed.   I think they have

9   already been filed that way, haven't they?

10          MR. SPRAYREGEN:   Yes, Your Honor, except

11  they did not include the customer list in anticipation of

12  today's motion.   That's my point.

13          THE COURT:   How can anybody reading this,

14  assuming anybody does, which is a big if, how can anybody

15  reading the retention application really know whether

16  they feel like this professional is disinterested without

17  knowing all of the things that were put into Kirkland &

18  Ellis' retention application?

19          MR. SPRAYREGEN:   Your Honor, what we would

20  suggest as a process to handle that with respect to the

21  U.S. Trustee, the creditors' committee, the Court, and

22  other interested parties who had signed confidentiality

23  agreements, anybody could look at that.   If there was a

24  customer or a competitor who it appeared that the only

1    reason was having nothing to do with disinterestedness,

2    we might come before the Court to examine that.  If we

3    just file it without that information --

4              THE COURT:  I'm not going to do that.  I've

5    never heard of it, and I am not willing to seal all those

6    retention applications.  They are to be filed as they

7    are.

8              MR. SPRAYREGEN:  Thank you, Your Honor.

9              Your Honor that gets us to item 25 which

10   are the motions of the debtor for authority to

11   provisionally pay in the ordinary course of business

12   certain prepetition claims of domestic essential trade

13   creditors and to pay or to honor certain obligations to

14   foreign vendors.  Your Honor, the foreign vendor

15   application is perhaps the simplest.  It asks for

16   authority to pay $135,000 in foreign claims.  We believe

17   that, if those claims are not paid, it's not clear that

18   they will be subject to Section 362, an automatic stay,

19   although we would assert on that to be the case.  The

20   extra territorial effect of that stay is open to some

21   question, and there is some risk that the debtors assets

22   in foreign jurisdictions and, in fact, non-debtor

23   affiliates of debtors' assets would become subject to

24   seizure as a result of those payments.  We submit the

1    amount is fairly de minimis also and, as a result, ask

2    for that authority to pay that amount of foreign claims.

3              With respect to the domestic claims, we are

4    asking for authority to pay a capped amount of up to

5    $4.5 million which is approximately one percent or really

6    less than one percent.

7              THE COURT:  What's the total amount of your

8    trade creditors at this point?

9              MR. SPRAYREGEN:  Total amount of overall

10    unsecured --

11              THE COURT:  Not unsecured debt.  That would

12    include the asbestos claimants as well.  I'm talking

13    about your trade debt.

14              MR. SPRAYREGEN:  I'm looking for

15    information not including asbestos claims.

16              THE COURT:  Not including the bank.  I

17    guess there are lines of credit that are not secured.

18              MR. SPRAYREGEN:  Unsecured claims that

19    total about $550 million in all.  So that's about one

20    percent.  Just general trade claims are about

21    $35 million, and the overall payables --

22              MS. JONES: How do I justify -- I'm sorry.

23    I didn't mean to interrupt.  Go ahead.  Overall payables

24    are what?

1          MR. SPRAYREGEN:  Not including the bank

2    debt is about $53 million.

3          Your Honor, what we are seeking and our

4    justification for this motion is --

5          THE COURT:  I understand the justification

6    for it.  And apparently this has been a package of first

7    day orders here.  But this is an extraordinary thing you

8    are asking me to do.  Essentially what you are asking me

9    to approve is for the debtor to pick and choose among its

10   prepetition creditors as to who is more equal than

11   others, who is it that they need more than they need

12   other creditors, who they may or may not pay because they

13   don't need them.  And that really completely violates the

14   whole spirit of not paying any of the prepetition

15   creditors until there's a plan and then treating all of

16   your prepetition unsecured creditors, unless they fall

17   within separate classifications that are appropriate,

18   treating them in an equal fashion.  You know, if it were

19   confirmation of plan time and you sought to pay some of

20   these people in full and pay others nothing, that would

21   never fly, and yet that's what you are asking me to do.

22   You are essentially asking me to approve giving the

23   debtor complete and total discretion to pay postpetition

24   preferences.

1     MR. SPRAYREGEN:  Your Honor, as a general

2 proposition, we are actually trying to do something a

3 little bit different.  It is accurate that we are seeking

4 to pay some what we believe is a minimal level of

5 prepetition claims, but there will be a severe price to

6 the general unsecured creditor whose claim was paid and

7 that would require the re-establishment of postpetition

8 credit in essentially the same amount as payment of the

9 claim and essentially a mechanism to reinflate the trade

10 credit.  So if, at a minimum, if somebody was owed a $100

11 and debtor received authority to pay that $100

12 prepetition claim, the debtor would also get a $100 of

13 trade credit from that creditor, so --

14     THE COURT:  I understand how this is going

15 to work.  So it's the same motion -- I heard this motion

16 this morning.  It's a different case.  And I don't think

17 that -- I don't understand why the debtor wants to do

18 this, and I'm not suggesting there's anything nefarious

19 about it, but I am suggesting that, if anybody challenges

20 it, I think it would get bounced so fast it would make

21 all of our heads spin.  I tell you what I did this

22 morning and this has not got to go out on notice anyway.

23 Hand it in.

24     MR. SPRAYREGEN:  Your Honor, this one we



1  would not ask to go out on notice.

2          THE COURT:  How can I do that before I even

3  have a creditors' committee?

4          MR. SPRAYREGEN:  Your Honor, I would submit

5  to the Court this type of motion, the most valuable time

6  for its use in employment, is actually during the next

7  couple of weeks or so.

8          THE COURT:  Let me tell you what I did this

9  morning.  I authorized the debtor to pay off its trade

10  creditors in full or none of them.  If you want to go out

11  and pay off all your trade creditors, I think that

12  probably -- that's much more justifiable than allowing

13  debtors to pick and choose which of their trade creditors

14  they want to pay because I can't justify that on the

15  basis that, well, some of them are important, maybe some

16  of them aren't, because I'm having a real big problem

17  with that.  I realize this is probably something that's

18  been pretty routinely done here.  Maybe it has.  Maybe it

19  hasn't.  But I'm having a real problem with it.

20          MR. SPRAYREGEN:  For the Court's

21  information, and not necessarily dispositive before the

22  Court, it has been entered in number of other cases.

23          THE COURT:  I'm sure it has.

24          MR. SPRAYREGEN:  In fact, there's an



1   opinion applying the necessity of payment doctrine.

2              THE COURT:  The necessity of payment

3   doctrine, I am quite familiar with.  But that pretty much

4   has to do with employees' prepetition wages.  I don't

5   have a problem if they walk.  But you don't get to choose

6   which employees you are going to pay.

7              MR. SPRAYREGEN:  Your Honor, at least in

8   this district there's a published opinion by District

9   Judge McKelvie in the Just For Feet case on the necessity

10  of payment doctrine being applicable to this type of

11  motion.

12             THE COURT:  Is it applicable in every

13  single case?  What did Judge McKelvie find, that this was

14  absolutely necessary in every case which seems to be

15  pretty much the practice here?

16             MR. SPRAYREGEN:  Your Honor, I can, again,

17  tell the Court that I don't believe it's necessary in

18  every case, and Ms. Jones earlier mentioned the

19  Ameriserve case, for example, we did not obtain that type

20  of relief in what case.  I don't know.  I can't tell the

21  Court that it's asked for in every single case.  It is

22  asked for somewhat frequently.  It is more -- the focus

23  many times seems to be on the amounts and the basis for

24  the amounts being paid to certain general unsecured

1   creditors.

2           THE COURT:  Everybody who's in business

3   wants to pay their key creditors going forward.

4   Everybody -- I mean, that's just the way business

5   operates.  You haven't given me anything in terms of

6   proof or in terms of persuasive evidence that would give

7   me any indication that this case is any different than

8   any other case would be, which is we want to pay the

9   people we want to keep happy, and I can understand that.

10  But that's not the way Chapter 11 is supposed to work.

11          MR. SPRAYREGEN:  Your Honor, if I might,

12  while we are maybe turning to some other things, I can

13  confer with the client as to the Court's suggestion on

14  the 34.3 million.

15          THE COURT:  We will go on.  We'll see if we

16  can't make a little more headway.

17          MR. SPRAYREGEN:  Your Honor, item 26 is

18  debtor --

19          THE COURT:  Let's hold for a second.  I'm

20  looking at another order.

21          (Pause.)

22          THE COURT:  What dates do you want to fill

23  in on this order, Ms. Jones, that being the lease

24  rejection order?



```
 1              MS. JONES:   I'm sorry, Your Honor?
 2              THE COURT:   On page 6 you are saying that
 3   any objection to the position insofar as the rejection of
 4   rejected leases are concerned must be filed so forth and
 5   so on blank.
 6              MS. JONES:   April 17, Your Honor.
 7              THE COURT:   Okay.   When is this going to be
 8   served?
 9              MS. JONES:   Your Honor, all the service
10   will be done by tomorrow at the latest.
11              I did the math wrong.   That was 14 days.
12   If Your Honor wanted 15, I apologize.   It should be April
13   18.
14              THE COURT:   So the record is clear, this
15   provision about 362(a)(7) does not expand your rights
16   vis-a-vis setoffs.   It simply incorporates what the
17   statute says?
18              MS. JONES:   Yes, sir.
19              THE COURT:   Moving on to 26.
20              MR. SPRAYREGEN:   Your Honor, this is the
21   debtors' emergency motion for interim approval of
22   debtor-in-possession financing and requesting final
23   hearing on the request for debtor-in-possession
24   financing.   Just to review, Your Honor, the debtor did
```

1   not have prepetition secured debt.  They have two

2   $250 million unsecured revolvers from the group

3   bank-group agented by Chase and Bank of America.  We also

4   have an approximately $80 million securitization facility

5   that is, as is typical, done through a non-debtor

6   facility.  On the filing of the debtors' petition, the

7   way the securitization facility works is the payments

8   from the receivable securitization into the debtors cease

9   until that securitization is paid off.  That was the

10   debtors source of cash up to the filing today.  That

11   would probably take about 60 days for the receivable

12   securitization facility to run out and collect, which

13   means, for the next 60 days, the debtors' only source of

14   real cash would be access to interim and hopefully final

15   debtor-in-possession financing.

16          The debtor does recite in detail in the

17   motion the debtors' search for DIP financing, the

18   consideration of alternatives, and their selection of

19   Bank of America as the highest and best offer as the DIP

20   that was being offered.  Obviously, in the circumstance

21   of a strong operating company with no material secured

22   debt, the debtors had opportunity to solicit alternative

23   proposals and took full advantage of those opportunities

24   to enter the terms and pricing of the facility that's

1  before the Court today.

2          We do ask in the motion for interim

3  debtor-in-possession financing to use up to $100 million,

4  and that is the amount, as we said in Mr. Siegel's

5  affidavit that we believe is the amount necessary to be

6  used to satisfy the standards under Rule 4001 to avoid

7  irreparable harm to the debtors' businesses and

8  operations.

9          THE COURT:  Let me ask you a couple of

10  questions here.  First of all, I can't remember, does

11  B of A presently -- who is it that extended -- Chase was

12  one part of it, extended the unsecured lines of credit.

13  Who was the other major bank?

14          MR. SPRAYREGEN:  Chase and B of A are

15  co-agents in a facility made up of a number of banks.

16          THE COURT:  All right.  So it's basically

17  the lenders are the same as prepetition lenders.

18          MR. SPRAYREGEN:  No.  This happens to be

19  the same agent, B of A, but a completely different lender

20  and facility and terms.

21          THE COURT:  So this is truly new money

22  coming into the company.

23          MR. SPRAYREGEN:  Correct.  No relation.

24          THE COURT:  This isn't just putting the old

1   debt into a blender and coming out with what looks like a

2   new loan but isn't any new money.

3            MR. SPRAYREGEN:  Correct.  This is brand

4   new money.

5            In fact, in the motion, what we cite is we

6   are seeking up to $250 million or $250 million facility,

7   as I mentioned, $100 million of that on an interim basis.

8   It is subject to a barring base and that is set out in

9   detail with respect to eligible current assets.

10           THE COURT:  This is asset lending, right?

11           MR. SPRAYREGEN:  This is asset lending.

12           There is a carve-out set out for the

13   benefit of the U.S. Trustee fees and professionals in the

14   amount of basically accruals plus 7 1/2 million after

15   defaults.

16           There are proceeds available to be

17   permitted, pursuant to what the Court authorized in the

18   cash management motion, to permit the intercompany

19   accounts to operate back and forth, limited to

20   $15 million.

21           The amount of the fees that are sought to

22   be charged by B of A are set out in detail in the motion,

23   in essence $1.875 million, payable on the date of the

24   entry of interim order.  There was a syndication fee of

1   $1.25 million, also payable on the date of the interim

2   order, and unused line fee of 0.375 percent per annum,

3   and one time administration fee of $150,000.  There is

4   also another customary fee that goes with that credit

5   facility.

6            We do propose that facility to --

7            THE COURT:  Did you say .075 percent?

8            MR. SPRAYREGEN:  I said 0.375.

9            THE COURT:  0.375 percent.  So we are

10  talking about a little more than a third of a percent?

11           MR. SPRAYREGEN:  Correct.

12           THE COURT:  Okay.

13           MR. SPRAYREGEN:  Your Honor, we seek to

14  obtain this credit under Section 364(c)(1), (2), and (3)

15  of the Bankruptcy Code.

16           THE COURT:  You are not priming it, are

17  you?

18           MR. SPRAYREGEN:  Nobody is being primed.

19           And we do submit, based on all of the other

20  proposals we received, that we could not obtain this on

21  lesser terms, i.e. --

22           THE COURT:  How much does the debtor need

23  over the next 15 days?

24           MR. SPRAYREGEN:  Your Honor, we estimated



1    we needed about 100 million over the next 30 days.  If we

2    were to have a final debtor-in-possession financing

3    hearing in 15 days -- if I might take a moment to confer

4    with the company, but I am guessing it would be somewhere

5    in the neighborhood of half that.

6            THE COURT:  Okay.  Why don't you go ahead

7    and do that.

8            (Pause.)

9            MR. SPRAYREGEN:  Half that.

10           THE COURT:  Is there a budget or something

11   I can look at?

12           MR. SPRAYREGEN:  Your Honor, I can present

13   a budget as simply a budget from the debtors books and

14   records if I may approach.

15           THE COURT:  There won't be a cash

16   collateralization by the new lender, correct?

17           MR. SPRAYREGEN:  That is correct, Your

18   Honor.

19           THE COURT:  What is it that the debtor is

20   giving up?  Is the debtor giving up its right -- well, it

21   wouldn't have any causes of action against the lender

22   because it's a new lender.  So we don't have to worry

23   about that.

24           MR. SPRAYREGEN:  That is right.  Even



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  though the order does provide, for example, a creditors'

2  committee has some rights to investigate, although it's

3  some what metaphysical because the liens don't exist

4  until the Court authorizes them.

5        THE COURT:  What about 506(c).

6        MR. SPRAYREGEN:  Your Honor, that would be

7  a final hearing issue.  The way the order reads, it says

8  we waive those rights subsequent to the entry of a final

9  order, which means anybody can object at the final order

10  stage.

11        THE COURT:  And how about what happens, God

12  forbid, that this should go into Chapter 7?  What about

13  the Chapter 7 Trustee fees?

14        MR. SPRAYREGEN:  Your Honor, I believe

15  that -- well, I'll have to ask if I could take a moment.

16  Your Honor, do you mean the trustee's percentage fee?

17        THE COURT:  And the trustee's

18  professionals.

19        MR. SPRAYREGEN:  Is the question, are they

20  inside the carve-out?

21        THE COURT:  Are they a part of the

22  carve-out?  Is there going to be anything -- if the

23  secured lender takes everything and this case goes into

24  Chapter 7, that would mean that you can't pay the

1    administrative priority expenses.

2              MR. SPRAYREGEN:  I'm checking to see if

3    they are in the carve-out but actually we would believe

4    that the value of the debtors' assets far exceed the

5    amount of the DIP loan.

6              THE COURT:  Well, things happen over time.

7    You never know.

8              MR. SPRAYREGEN:  Understood.

9              Your Honor, the way the carve-out reads is

10   it talks about anybody retained under 3327 or 1103(a) by

11   the debtor at that time the creditors' committee is

12   appointed in the Chapter 11 cases.  And  professional

13   fees permitted under Section 330 and 331.

14             THE COURT:  Probably should also include --

15             MR. SPRAYREGEN:  Your Honor, I'm not sure

16   of that.  I would have to confer with the DIP lender

17   because the Chapter 7 -- it would be a default event

18   under the DIP triggering their right to foreclose.

19             THE COURT:  You know, this is -- you have

20   to plan on everything but this is something that can

21   become very important.  And who knows?  Something

22   horrible could happen and this case ends up in Chapter 7

23   but --

24             MR. BACON:  Your Honor, may I be heard?  I

1    didn't mean to interrupt.  May I be heard for a minute?

2    Doug Bacon with Latham & Watkins for Bank of America

3    which is really here as agent.

4            We are going to be a lender as well but we

5    are acting for a group of lenders, and I know we've got

6    issues with this order and I look forward to hearing

7    them.

8            I'm prepared -- I've already made a couple

9    of changes at the U.S. Trustee's behest which I will go

10   over with Your Honor, and there are several things in

11   here.  My philosophy on DIP lending hearings is to

12   accommodate the Court, particularly when we are here with

13   no creditors'committee, and besides the fact we don't

14   have a choice.  But I think it's the right thing to do.

15   And I'm prepared to make some changes to this order, but

16   I need the record to be clear and have a clear

17   understanding with the debtor that one of the conditions

18   to lending beyond the 45 days is we have an acceptable

19   final order.  And while we can make changes today within

20   reason on the fly, I don't want to be prejudiced or to

21   prejudice the rights of my client with respect to

22   whatever order may get entered 45 days from now.

23               THE COURT:  You are not.

24               MR. BACON:  Thank you, Your Honor.

1    On that basis, what I would suggest we do
2 in order to get an interim order, I would be comfortable
3 adding language to paragraph 7 that would include a
4 successor to the debtor in a Chapter 7 within this
5 carve-out for purposes of the preliminary order.

6    MR. SPRAYREGEN:  Your Honor, might I
7 suggest -- not to be difficult, but I think this issue
8 might be a little more complicated in terms of the way we
9 negotiated the order and the credit agreement.  This type
10 of comment was not taken into effect.  Obviously it's
11 highly unlikely that this case would convert to a
12 Chapter 7 between now and final hearing.  If I might ask
13 the Court's indulgence to leave it the way it is for this
14 hearing, allow us to examine the order and negotiate with
15 the banks between now and the final hearing.

16    THE COURT:  Did you need there to be a
17 carve-out in this?  Because you can't operate a Chapter 7
18 if all assets are the bank's.  Like I said, it is a
19 remote possibility but, believe me, it was happened.  And
20 I'm not willing to completely handicap a Chapter 7
21 Trustee if, in fact, this were to happen.

22    MR. SPRAYREGEN:  No.  I understand.

23    THE COURT:  There's another question.  Does
24 the bank take a security interest in all the avoiding

1    actions?

2            MR. SPRAYREGEN:  No.  No security interest.
3    No super priority claim.

4            THE COURT:  All right.  Okay.  Then I'm
5    prepared to approve this for 15 days up to $50 million
6    and no more.

7            MR. SPRAYREGEN:  Your Honor, could I then
8    ask, with respect to a final hearing, would this, again,
9    be a negative notice; in the absence of objections it
10    goes final?

11            THE COURT:  That is right.  Negative
12    notice.

13            MR. SPRAYREGEN:  Could we then also, in
14    case there is an objection in 12 or 13 days, have the
15    hearing date on the fifteenth day in case?

16            THE COURT:  Yeah.  We can do that.  But I
17    don't have my calendar with me.  So I can't tell you
18    exactly what the availability is.  And what we'll do is,
19    we won't have a live hearing.  We'll have a telephonic
20    hearing and we'll do it on the record, of course, but
21    we'll just do it telephonically.  One of the ways we
22    could do that, if everybody wants to be involved, it may
23    be impossible to get everybody on the telephone.  I may
24    have you show up in court and I'll appear by speaker

1    phone.

2              MR. SPRAYREGEN:  At the Court's

3    convenience.

4              THE COURT:  It's odd, but it's been done.

5    We'll deal with that as the time comes.

6              MR. SPRAYREGEN:  If we could mark up the

7    order and submit it in a moment, maybe we could move on.

8              THE COURT:  Why don't we take a recess?

9    We've been in essence almost an hour.

10             MR. BACON:  Your Honor, may I make one

11   suggestion before we start drafting this?

12             THE COURT:  It will wait.  It won't wait?

13             MR. BACON:  I think I have a good idea, but

14   they are going to spend all their time --

15             THE COURT:  Why don't you tell them about

16   the idea while I'm gone.  We'll stand in recess.

17             (Recess taken.)

18             MR. SPRAYREGEN:  Your Honor, with respect

19   to the DIP, I think we may have worked something out with

20   the parties, if I might approach with the draft orders.

21             THE COURT:  All right.

22             MR. SPRAYREGEN:  Your Honor, in the

23   attached interim order, you'll notice some marks that

24   hopefully address the Court's comments and also address

1  several comments that the U.S. Trustee's office had with

2  respect to the order.

3  THE COURT:  Let me read it.

4  Does this provide for the creditors'

5  committee to receive at least five business days' notice

6  of a default.

7  MR. SPRAYREGEN:  Your Honor, I believe it's

8  three business days.

9  THE COURT:  That's not enough time.  There

10  ought to be at least five business days.

11  MR. BACON:  For purposes of the interim

12  order, Your Honor, that would be acceptable to the agent.

13  THE COURT:  I can tell you that probably I

14  won't sign a final order unless that's in there.  I mean,

15  that's the bare minimum as far as I am concerned that the

16  creditors' committee ought to have, or the 20 largest

17  creditors ought to have to do something.  Fact is, it

18  doesn't make much difference anyway, but I believe five

19  business days is practically light speed when it comes to

20  trying to give people notice.

21  (Pause.)

22  MR. SPRAYREGEN:  Your Honor, before we ask

23  you to sign it, a couple of things.  The five-day

24  provision that the Court was asking for, would be at

1    page 13.

2              THE COURT:  I've changed it.

3              MR. SPRAYREGEN:  It was in two places.

4    You've changed --

5              THE COURT:  I didn't see the other one.  I

6    guess where's the other one?

7              MR. SPRAYREGEN:  They are both in the same

8    paragraph, page 13, and carry over on page 13,

9    paragraph 11, two lines from the bottom of paragraph 11.

10             THE COURT:  I got that one.

11             MR. SPRAYREGEN:  And about seven lines from

12   the bottom of the last word.

13             THE COURT:  Seven lines from the bottom on

14   the page?

15             MR. SPRAYREGEN:  No.  Bottom of

16   paragraph 11.

17             THE COURT:  Okay.  I got -- this is where

18   numbered pages come in handy.  I got the one that's the

19   second to the third to the last line of paragraph 11.

20             MR. SPRAYREGEN:  Five lines up from that,

21   up from that, directly under the last word.

22             THE COURT:  Okay.  All right.

23             MR. SPRAYREGEN:  There's a provision on

24   page 3.  There's just a blank that we noticed.  Two lines

1   above the middle of the page above "it is hereby found

2   and concluded" there was a date that should be April 2,

3   blank.

4                THE COURT:  Very good.

5                MR. SPRAYREGEN:  The other, I guess,

6   question for the Court with respect to the Chapter 7

7   issue, the parties conferred during the break and

8   actually have a suggested resolution to that that is not

9   in the order.  With respect to a separate carve-out in

10  the event of a Chapter 7 for Chapter 7 Trustee fees and

11  expenses and its professionals of a million dollars

12  separate and apart from the current carve-out, I think

13  that would work for the parties and the company.  The

14  issue is, the carve-out is a deduction from the

15  availability under the DIP shown.  So any increase in the

16  carve-out is a direct hit to the liquidity.  On the other

17  hand, any maintenance of the carve-out in the same amount

18  when other parties may be part of it, put risk on other

19  parties.

20               THE COURT:  As I understand it, the

21  $7 1/2 million carve-out only occurs after an event of

22  default, is that right?

23               MR. SPRAYREGEN:  Yes.  Chapter 7, for

24  example, would be a direct event of default.

1          THE COURT:  But there would still be

2  presumably another $7 1/2 million left after that, is

3  that right?

4          MR. SPRAYREGEN:  That's correct.

5          THE COURT:  Well, that probably would cover

6  it.

7          MR. SPRAYREGEN:  We don't know.  It's

8  unfortunately --

9          THE COURT:  So you want to add another

10  million onto that?

11          MR. SPRAYREGEN:  Just a separate basket.

12          THE COURT:  I don't think that's probably a

13  very good idea because then the Trustee would be limited

14  to that million and there may be 7 1/2 still available.

15  An event of default is probably going to trigger

16  something in this case.  I mean, it's not going to be

17  pretty.  So it might either be an 11 -- I mean a

18  conversion or a dismissal.  It may not.  Who knows?  But

19  if that's what you've agree to, as long as it's

20  understood that, if that $7 1/2 million is carved out

21  that the Chapter 7 Trustee would be entitled to look at

22  that first before hitting the one million.

23          MR. SPRAYREGEN:  Actually, Your Honor, we

24  were actually suggesting the opposite.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     THE COURT: The one million instead?

2     MR. BACON: I think I can solve this, Your

3 Honor. We're tag-teaming here, if I may, because I'm

4 drafting while he's talking. We have put in language but

5 not in what's in front of Your Honor -- Ms. Jones and I

6 were conferring -- that would give a million-dollar pot

7 for the Trustee. We can simply add to that, plus any

8 amount of the 7 1/2 million that hasn't been utilized

9 prior to the Trustee's appointment.

10     THE COURT: Is that correct?

11     MR. BACON: I don't think it is necessarily

12 following that the default is going to be followed by 7.

13 That covers you but if you guys only burn through three

14 million and you convert to 7, there will be three -- I

15 can't do the math.

16     MR. SPRAYREGEN: That's fine.

17     THE COURT: Let's do it that way.

18     MR. BACON: We'll add that language, Your

19 Honor, whenever we're --

20     MR. SPRAYREGEN: Maybe if we move on to the

21 next matter we can correct the order.

22     THE COURT: You don't want me to sign it?

23     MR. SPRAYREGEN: We don't like to stop a

24 DIP order from being signed.



1        MR. BACON:  I don't think you want me to

2   mark on it after you sign it, Your Honor.

3        THE COURT:  Let me know when it's ready.

4        MR. SPRAYREGEN:  Your Honor, we'll let them

5   work on that and maybe we can move on to item 27.

6        THE COURT:  Right.

7        MR. SPRAYREGEN:  Your Honor, this is a

8   notice procedures motion, and in fact, it's really an

9   interim notice procedures motion.  Due to the debtors'

10  major issues and creditors in these cases being alleged

11  asbestos claimants, there are literally hundreds of

12  thousands of people who may be entitled to notices of

13  certain things in these cases.  They also, many of them,

14  are represented by counsel, or at least to the debtors'

15  knowledge are represented by counsel.  What we are

16  seeking is fairly simple, is for the present purposes,

17  and not to apply to, for example, a bar date motion and

18  not to apply to what the procedures for solicitation of

19  votes on the plan would be, but for present purposes, if

20  there's any notices that need to go out in the interim,

21  that we be permitted to send them to the list we have of

22  counsel for these hundreds of thousands of claimants

23  rather than to the claimants directly, and in fact, we

24  cite in our papers that it's not clear that the debtors,

1  knowing that a number of these persons are represented by

2  counsel would have the right to communicate with them

3  directly under various ethical rules and decisions by

4  Judge Walsh in this district in the Grand Union case.  We

5  do want to reserve the right ultimately to come back with

6  a view as to when the direct notice will be requested and

7  be necessary with respect to bar date issues in

8  particular and other things.  But for the present time,

9  we think we can satisfy the standards of due process,

10  address fairness concerns for alleged claimants and try

11  to be efficient and save the estate money by the

12  procedure suggested in this motion.

13          THE COURT:  So how do you wish to proceed

14  on this motion?  Notice it out?  You want to me to sign

15  it today?

16          MR. SPRAYREGEN:  Again, what we would like

17  for present purposes is to sign it today.  We are happy

18  to notice it out, if the Court desires to, say, the 20

19  largest list.

20          THE COURT:  They are not going to care.  I

21  mean, why would they care?  They are not the ones that

22  are being deprived of the notice.  They are going to get

23  notice.  What are you going to do about the pro se

24  litigants?  I assume there must be some.

1          MR. SPRAYREGEN:  Your Honor, actually I

2     don't know that there are.  I can't tell you that they

3     are not.

4          THE COURT:  If there are 300,000 claims,

5     I'll bet you anything there are probably some pro se

6     litigants in the bunch.

7          MR. SPRAYREGEN:  We are not suggesting for

8     purposes, for example, of a bar date that we not give --

9          THE COURT:  What exactly, are you

10    suggesting?  Because I scanned this.  Again, I haven't

11    had time to read it all, but are you suggesting that once

12    we get through the usual 13 pages of background, are you

13    suggesting that they be -- that this notice procedure

14    apply to all motions or are you suggesting simply that

15    they apply to certain motions or what is it exactly that

16    you want to do because I don't want get a clear sense of

17    it from reviewing this?

18         MR. SPRAYREGEN:  Well, what we are

19    suggesting, until otherwise ordered with respect to any

20    particular matter, that any matter that would require

21    notice to these persons be satisfied by notice pursuant

22    to this motion.  Again, as we said, when we get to the

23    larger matters like bar date, we think we'll readdress

24    and revisit this issue.  But anything between now and

1   then -- and candidly, we're not sure we anticipate what

2   that may be.  But, for example, I guess, I would suggest

3   the notice of the 341 meeting, we are not sure that this

4   need to go out to hundreds of thousands of persons when

5   these people are represented by counsel and will get

6   notice from counsel.  In fact, as I've said, we're not

7   sure we are permitted to communicate with them directly.

8   That would be one example.

9              But between now and there being a change in

10  the order, that we follow the terms of the notice

11  procedures proposed in the order.

12             THE COURT:  Well, I don't think there's any

13  question but that you are permitted to do it.  You are

14  required to do it actually under the rule.

15             Excuse me for just a moment.

16             Okay.  I'm going to let do you this until

17  somebody objects do it.  And if they do, then it's going

18  to all be subject to review.  This is not going to be in

19  any way the last word on the subject is all I'm saying.

20             MR. SPRAYREGEN:  We understand that, Your

21  Honor.  We were not asking that to be the case, so we

22  appreciate that.  May I approach?

23             THE COURT:  Yeah.

24             Do you wish to be heard on this?



1          MR. ZALESKI:  Your Honor, our suggestion --

2  for the record, Matt Zaleski on behalf of certain

3  asbestos claimants -- would be that the order be served

4  out on the law firms as contemplated in that order.  So

5  Your Honor's order would go out and give those parties an

6  opportunity to object.

7          THE COURT:  Well --

8          MR. ZALESKI:  Because you are shifting the

9  costs of distribution and responsibility to those firms.

10  And we would submit that notice at least on the order

11  with a chance to revisit would be appropriate.

12          THE COURT:  I don't want to do a 20-day

13  opportunity here.  If they got a problem with it, they

14  are welcome to come back in.  This is strictly a

15  procedural motion.  A procedure can change any time.  I'm

16  on the record as having said that.  I think that ought to

17  be enough.

18          MR. ZALESKI:  Okay.  That's fine.  Thank

19  you.

20          THE COURT:  Let's move on.

21          MR. SPRAYREGEN:  Your Honor, if I can turn

22  the podium over for items 28 to 30.

23          THE COURT:  That's not even -- 28 is not

24  even addressed to me.  I can't indicate which the motions

1   ought to be withdrawn.

2            MR. SPRAYREGEN:  We understand.  We

3   understand.  In the context of 29 and 30, we thought to

4   let you know what's being asked in 28 and some of the

5   background.

6            THE COURT:  I think I got a fair idea as to

7   how you got there.  With 300,000 some odd asbestos

8   claimants, it is hardly a secret, I think, at this point,

9   but I'll be glad to listen you for a while.

10            MR. BERNICK:  I'm prepared to go on and

11   address the TRO, and then, if the Court wishes --

12            THE COURT:  I'm not, you know, as far as

13   the TRO goes -- that's what you are referring to?

14            MR. BERNICK:  28 is the motion for

15   withdrawal.  Motion to withdraw pertains to a broader

16   subject matter.

17            THE COURT:  The whole case?

18            MR. BERNICK:  That is correct.  The TRO is

19   independent of that.

20            I'm sorry.  I'm David Bernick for the

21   debtor.

22            If the Court wishes, this is the last item

23   on the list and I know the hour is late, but if the Court

24   wishes to, I am prepared to do a little bit to describe

1  why this case was filed and where we intend to go with

2  you.   That, obviously, is also set forth in the

3  informational brief we filed.   The Court could read that.

4  This is our first opportunity to be before Your Honor,

5  and we are more than happy to talk about why we are here

6  and where we are going as well, do that briefly or do

7  that more detailed if the Court wishes.

8          If I can turn first to the TRO, we filed an

9  adversary proceeding this morning, and my understanding

10  is that that does not have to be resubmitted for the

11  Court because it was filed original forum.   May I

12  approach, Your Honor?   These are, in addition, the motion

13  for the TRO and attached memorandum and then an affidavit

14  from Mr. Siegel that is specific to the request for the

15  TRO, and we would file those here before Your Honor.

16          THE COURT:   All right.

17          MR. BERNICK:   Maybe we can get a little bit

18  of credit with the Court.   This motion does not make the

19  usual recitals as to background.

20          THE COURT:   That's refreshing.

21          MR. BERNICK:   I thought we should at least

22  get credit for it and point it out.

23          Essentially there are two basic problems,

24  and we are prepared, if necessary, to call Mr. Siegel to

1   the stand to have him attest to these matters.  We would

2   otherwise proffer his affidavit to the Court in support

3   of the request for the TRO.

4            Essentially, we have two basic problems.

5   One is that we have some pending litigation for what are

6   essentially claims for Grace's liability are being

7   asserted against other entities.  That's problem

8   number 1.  And there are two particular defendants that

9   are involved, types of defendants that are involved.

10  First, there are the claims that are being filed against

11  a company called Sealed Air.

12           And briefly, by way of background, Grace

13  and Sealed Air in 1998 engaged in a transaction that

14  essentially was a spin-off of certain businesses of Grace

15  to Sealed Air.  1998 transaction.  Nothing to do with

16  asbestos and Sealed Air has never, to our knowledge --

17           THE COURT:  They make bubble wrap, don't

18  they?

19           MR. BERNICK:  I'm not quite sure what they

20  make.  That sounds like it makes sense.

21           THE COURT:  They do.  They make bubble wrap

22           MR. BERNICK:  Okay.  The transaction had

23  nothing to do with asbestos.  Sealed Air, to our

24  knowledge, itself has had absolutely nothing to with

1    asbestos.  Yet what's happened is that very, very
2    recently -- there used to be absolutely no real claims
3    against Sealed Air for Grace's asbestos liability.  There
4    were probably a handful of claims.  And obviously in
5    anticipation perhaps of the fact that Grace might be
6    going into Chapter 11, in the very recent past, literally
7    thousands of claims have been filed against Sealed Air.

8            All of those claims are claims that are
9    simultaneously brought against Grace and all of those
10   claims are claims that essentially assert Grace's
11   liability and now is a liability of Sealed Air.  So they
12   are completely and wholly derivative claims.  Again, to
13   our knowledge, there's no basis for any kind of direct
14   asbestos claim against Sealed Air to begin with.  So
15   that's problem number 1.  It is a liability that is
16   Grace's liability, if there is a liability, being
17   asserted as against a non-debtor, Sealed Air.

18           There are, in addition, claims that have
19   been brought historically against individuals who are
20   former employees of the debtor, former employees of
21   Grace.  And once more, the liability that would be
22   asserted is the liability of Grace.  These are people who
23   didn't independently go off and commit acts that are
24   alleged to be tortious.  These are individuals who were

1   employees at the time that they acted and essentially

2   they are being sued probably for strategic reasons in

3   connection with the litigation, but they are being sued

4   for what is essentially Grace's liability.

5           So, in both areas, we have claims that are

6   essentially claims that should have been brought, if at

7   all, against us being brought against other entities.

8   And the request, first request we make is for relief with

9   regard to that type of activity, that is, a claim that

10  asserts our liability against parties that are other than

11  the debtor.

12          We believe that relief is appropriate is

13  under two provisions.  First of all we believe that they

14  should all be stayed under Section 362(a)(1), and the law

15  is very clear on this.  This is not the first time that

16  this type of problem has arisen.  Basically --

17          THE COURT:  Has the Third Circuit adopted

18  the Fourth Circuit's holding in A.H. Robbins on that

19  point?

20          MR. BERNICK:  That's exactly correct.

21  A.H. Robbins --

22          THE COURT:  They have?

23          MR. BERNICK:  They have.

24          THE COURT:  In what case?



1          MR. BERNICK:   That's the McCartney case.

2    Third Circuit is the McCartney case.   It's cited in our

3    brief at page 510 of the McCartney case -- in fact, I

4    think I even have a copy of the case here -- where the

5    rule in the Robbins case -- this is at page 510 of the

6    McCartney decision, which is, for Your Honor's

7    information, 106 F 3rd 506.   And the particular language

8    that appears here that's relevant is at page 510.   And

9    the Court recites the language out of the Robbins and

10   then goes ahead to adopt that holding in connection --

11          THE COURT:   May I see that, please?

12          MR. BERNICK:   Sure.

13          THE COURT:   Okay.

14          MR. BERNICK:   So basically -- and Your

15   Honor is familiar with the language of the case.   The

16   question is whether essentially the liability of the

17   debtor is being asserted, albeit nominally, against

18   another party, essentially the same liability.   That

19   principle was adopted in McCartney.   I think it's been

20   adopted pretty much uniformly every time it's reached a

21   court of appeal.

22          THE COURT:   No.   That's not true at all.

23   The Ninth Circuit, for example, has specifically rejected

24   Robbins.



1        MR. BERNICK:  I believe that the Fourth

2   Circuit obviously is Robbins and the Second Circuit, I

3   believe, adopted the same principal in the Manville case.

4        THE COURT:  But those cases were limited --

5   you know, there's a big difference between saying I can

6   issue a 105 injunction and enjoin people from doing

7   things if you make out the requisite showing which is

8   basically the same elements as a preliminary injunction.

9   That's a separate issue from whether 362 as an automatic

10  stay covers these things.  And by and large, my

11  recollection was, up until I read this case today, that

12  most of the courts of appeals had not adopted Robbins in

13  that respect.  They have not adopted the concept of the

14  automatic stay extending to anybody but debtor.  So we

15  can argue about that later.

16       MR. BERNICK:  It comes out to essentially

17  the same proposition because our request is also framed

18  under Section 105 but --

19       THE COURT:  I understand.

20       MR. BERNICK:  But essentially we argue

21  that, based upon Robbins, based upon the Third Circuit

22  decision in the McCartney case where you do have

23  liability being asserted against the non-party, 362, in

24  fact, ought to apply.  It's a belt and suspenders

1  request.  However, we do make the request under

2  Section 105.

3         A lot of the factors that have been

4  considered in cases involving the request under

5  Section 105 are also present here.  We have the threat of

6  the shared insurance being at risk where a party other

7  than debtor seeks to make claims against a policy that

8  can also be drawn upon by the debtor.  We have a

9  potential for indemnity claims to be made by these

10  parties as well.  And obviously, as Mr. Siegel would

11  testify to this at greater length if called, essentially

12  these are cases where, if they proceed, any discovery

13  would be discovery conducted -- could only be conducted

14  with the assistance of Grace.  We would have Grace

15  employees, Grace evidence submitted in those cases, and

16  obviously those pose the kinds of distractions and risks

17  to current management that have animated the decisions of

18  these cases to grant relief under Section 105.  Last plus

19  factor, last consideration that appears in the cases that

20  the risk of collateral estoppel and the risk of

21  evidentiary taint.  And again, we would advocate to the

22  Court that all those factors are present here.

23         As a consequence, we would make the request

24  for relief under Section 105 as well, which, as the Court



1    has indicated through your remarks, is probably a

2    somewhat broader grant of authority than what appears by

3    the literal terms of 362(a)(1).

4              The elements to get injunctive relief are

5    obviously very familiar to the Court.  There has to be a

6    showing of threat of irreparable harm.  We believe that

7    all the same factors that we've recited here create that

8    threat.  There was a threat of distraction to management

9    which would have an effect on the administration of this

10   case.  There's a threat to the evidentiary record to the

11   extent that these cases are allowed to proceed and they

12   create an evidentiary record.  It is very, very difficult

13   to unwind that record when it comes to Grace's own

14   liability.  So we believe, to the extent that indemnities

15   or insurance policies also are implicated, those are

16   directed properly at the estate and also with the harms

17   that would be felt in this proceeding.

18              Is there a likelihood of success?  That

19   really has been interpreted to bear upon the question of

20   whether the Chapter 11 itself is likely to succeed.  I

21   believe that, we would submit that, this Chapter 11 will,

22   in fact, be successful.  Most, I believe all, the mass

23   tort cases historically have ultimately been resolved and

24   the concern here and what drives our request is to not

1   impair the process of reaching that successful

2   resolution.

3            We don't believe that there's any

4   prejudice --

5            THE COURT:  I'm not so sure -- that's a

6   mouthful to say that all the mass tort cases have been a

7   success.

8            MR. BERNICK:  Well, they have all come --

9            THE COURT:  How about Keene Corporation,

10  was that a success?

11           MR. BERNICK:  Well, mass tort Chapter 11 --

12           THE COURT:  That was a mass tort

13  Chapter 11.  That was an asbestos case.  I wouldn't call

14  that a resounding success as I recall.

15           MR. BERNICK:  It may be so.  I'm thinking,

16  Your Honor, that Manville ultimately which was hotly

17  contested went into --

18           THE COURT:  So was Robbins.  So were some

19  others, I think, that nobody would claim, not even

20  debtors' attorney, that they were a resounding success.

21  But we can argue about that.

22           MR. BERNICK:  Talking about it at this

23  point in time, looking forward, we have a very strong and

24  solvent company here, Your Honor, and we are very

1    comfortable and optimistic with the fact that ultimately

2    it will come to a successful resolution.

3            At this point in time, it's a situation,

4    why impair the process of getting there when the relief

5    is available?  We don't believe that there's any

6    prejudice that will be suffered by issuing the junction.

7    We also believe that, to do so, would be in the public

8    interest.  Essentially what we are aiming for here is to

9    assure that any matters that really pertain to Grace's

10   liability are, in fact, handled in this Court and this

11   Court alone.  So we would ask for entry of the TRO that's

12   attached.  There have been -- actually, I will be very

13   careful in how I characterize the track record here, Your

14   Honor, but there is a fairly considerable track record

15   for injunctive relief of this kind having been entered in

16   mass tort cases.  This type of relief was issued in

17   Manville, in Robbins, Eagle Pitcher.  It was also not

18   directly available in Dow Corning but Dow Corning came do

19   the same ultimate result.  In that case it was

20   accomplished in removal and transfer.  I was involved in

21   that case.  More recently, in the Babcock and Wilcox

22   case, there was again, an injunction issued in connection

23   with that case, and we also found out the same thing took

24   place in connection with the G-1 Holdings case which is

1    the GAF case.

2             A fairly consistent theme in all the cases

3    I'm familiar with and indicated here is that you don't

4    have collateral litigation that goes forward during the

5    pendency of Chapter 11, certainly in its initial stage

6    where it's important to have liability issues focussed on

7    the Chapter 11 proceeding.  So to handle this first

8    problem where claims are asserting what is essentially

9    Grace's liability but against another party, we believe

10   that a declaration should issue under 362(a)(1) and that

11   a TRO issue under Section 105 until there can be a

12   preliminary injunction hearing.

13            The second basic problem is a different

14   kind of problem.  There is a fraudulent conveyance action

15   that's now pending over on the West Coast, and

16   essentially this fraud --

17            THE COURT:  You want to remove it to the

18   Northern District of California, I understand?

19            MR. BERNICK:  We are seeking to remove to

20   the Northern District.

21            THE COURT:  Has it actually been removed?

22            MR. BERNICK:  I don't know.  It was to take

23   place on a simultaneous basis.  I don't know whether

24   that's been done.  So far there's a removal and transfer

1    request actually to bring the case here.

2            In connection with that matter, we are

3    asking, again, for a declaration under Section 362 and

4    under 105 that there would be no future effort to raise

5    fraudulent conveyance issues in collateral litigation,

6    that, if we are successful in getting that case here, a

7    claim for fraudulent conveyance, if it's to be pursued,

8    is pursued here.  We don't want other people trying to

9    raise the same matter elsewhere so that we have to go

10   through the process again.

11           Your Honor is frowning so I'm wondering

12   where I am being unclear.

13           THE COURT:  It's not a question of being

14   unclear, it's a question of whether or not I can do what

15   you are asking me to do.  That's a pretty broad

16   injunction you are asking for, isn't it?

17           MR. BERNICK:  Well, no.  Actually --

18           THE COURT:   You are saying, I want even

19   the people that are thinking about me, I want them -- or

20   I'm going to order that they may not even raise the

21   question of fraudulent transfer in any other court

22   anywhere, even though they haven't done it yet and they

23   haven't threatened to.

24           MR. BERNICK:  Not necessarily they haven't

1    threatened.   We do have the pending case.

2              THE COURT:   One case.   You are not just

3    asking me to stay the continued litigation of that one

4    case.   You are asking me to stay that case and any other

5    case anybody is even thinking about bringing.

6              MR. BERNICK:   That is correct, particularly

7    given -- I would think that this is actually really quite

8    narrow.   It's a very specific set of issues.   They are

9    issues that only the debtor has got the standing and

10   authority to pursue under the --

11             THE COURT:   And this fraudulent transfer

12   action, as I recall, trying to get through these papers a

13   little bit, has to do with Grace having essentially

14   divested itself or spun off certain parts of itself.

15             MR. BERNICK:   There are certain businesses

16   that were spun off in 1996, and again in 1998 -- 1996,

17   1998 -- to Sealed Air.   They took place -- I'm not going

18   to get into the details of how the spin-off took place

19   because that's probably beyond what I know in detail.

20   These are the transactions that involved Fresenius

21   Medical Devices and Sealed Air.   So it's 1996, '98.

22             THE COURT:   Nobody would have standing to

23   bring cases anyway.   The debtors in possession would be

24   the only ones to have standing to bring them.   So why do

1   I need to issue an TRO or injunction?

2           MR. BERNICK:   That's precisely the point.

3   The point is there really is no one else who has the

4   authority.   So building upon that principle --

5           THE COURT:   That isn't the point, sir.   The

6   point is whether I have the authority or not.   Should I

7   go issuing injunctions when they aren't necessary because

8   nobody would have the standing which means no one would

9   have the jurisdiction if someone were to bring such a

10  lawsuit now that there is a bankruptcy case because you

11  are the debtor-in-possession and you are the only ones

12  that have authority to pursue a fraudulent transfer

13  action?

14          MR. BERNICK:   We understand that, Your

15  Honor.   I guess what we are really asking for is, because

16  the asbestos litigation is so dispersed and so diffuse,

17  it saves us perhaps the trouble.

18          THE COURT:   Isn't it stayed anyway?   Isn't

19  it a fact they don't go forward with -- nobody could sue

20  you anyway under the automatic stay?

21          MR. BERNICK:   The automatic stay, that is

22  part of the alternative relief that we seek.

23          THE COURT:   That is an easy one because

24  that's a suit against the debtor, right?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1        MR. BERNICK:  Well, alternatively, under

2   362(a)(1) or (a)(3), either way, we would say that the

3   stay, in fact, should extend to any effort to raise these

4   issues elsewhere.

5        THE COURT:  Well, I should think that's

6   absolutely true since the lawsuit was brought against

7   Grace, wasn't it?

8        MR. BERNICK:  No.  The lawsuit was brought,

9   the fraudulent conveyance case was brought against Sealed

10  Air and Fresenius.

11       THE COURT:  Sealed Air is not a debtor

12  here?

13       MR. BERNICK:  Sealed Air is not a debtor.

14       THE COURT:  It's not listed as debtor.

15       MR. BERNICK:  Right.

16       THE COURT:  So wasn't brought against

17  Grace?

18       MR. BERNICK:  I don't believe that Grace is

19  a defendant.  Grace is a defendant in those cases.

20  That's correct.

21       THE COURT:  I can't imagine how Grace

22  couldn't be since they are the ones doing the

23  transferring.

24       MR. BERNICK:  Yes.  That is correct.  That

1    is correct.

2              THE COURT:   I don't even know why Sealed

3    Air would be a defendant.  But, either way, I don't -- as

4    to somebody suing Grace, that's not going to happen, at

5    least it shouldn't because there's an automatic stay and

6    there was no way around that, regardless even of the

7    Third Circuit's holding in McCartney.  But you want me to

8    enjoin any potential litigation on fraudulent conveyance

9    grounds against Sealed Air which is not a debtor.

10             MR. BERNICK:   That's correct, and then, in

11   the alternative to declare that the stay would apply to

12   this type of claim regardless who is denominated as the

13   defendant.

14             THE COURT:   Okay.  Is that the scope of

15   what you sought here.

16             MR. BERNICK:   That is the scope that we are

17   seeking.

18             THE COURT:   Does anybody else have anything

19   they want to say in this?

20             MR. ZALESKI:   Good afternoon, Your Honor.

21   Again, Matt Zaleski on behalf of asbestos claimants.

22             Your Honor, we believe what, given the

23   inadequacy, the lack of notice, and the sheer utter

24   missing of any immediate damage to these estates, other



1  than the debtors purport that some additional claims will

2  be filed, which in a few weeks they are going to come in

3  and explain how important it is to know the identity of

4  all these people, we submit that there's no need for a

5  temporary retraining order to go out at this point, that

6  notice could be given to these parties.  To the extent

7  that claims rose against Sealed Air since 1998 as the

8  plaintiffs became aware of the transfer of the assets

9  into that entity, I don't think that really suggests any

10  sort of malfeasance.  They are filing the assets and

11  trying to attach the appropriate liability.

12              THE COURT:  I guess I should ask counsel

13  for debtor, who was this TRO served upon, anybody?

14              MR. BERNICK:  No.  We did not give notices

15  for reasons that we explain in our papers.  Essentially,

16  if we give notice, we would be giving notice of the

17  Chapter 11 with all the problems that would entail and

18  also probably be inviting --

19              THE COURT:  You could have called them

20  after you filed.

21              MR. BERNICK:  We filed this morning.

22              THE COURT:  And it is already five o'clock.

23              MR. BERNICK:  They are already here.

24              THE COURT:  One of them is here.  I don't



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  know who they represent.  Certainly they don't represent

2  everybody.

3          MR. ZALESKI:  No.  We do not represent

4  everybody.  And that's precisely the point.  We are

5  trying to keep this issue alive for those who do

6  represent this class who could have been faxed a notice.

7          THE COURT:  Even if I restrained all

8  lawsuits against the debtor and the officers and

9  directors and everybody else involving asbestos

10 litigation anyway, I would only do it for a maximum of

11 20 days.  Then we would have to have a hearing on the

12 preliminary injunction.

13         MR. ZALESKI:  Sealed Air being a

14 non-debtor, what Your Honor is saying is it wouldn't

15 apply to those?

16         THE COURT:  No.  I am saying, even if I did

17 it as to the non-debtor -- I would do as to the

18 non-debtor because that's the whole point of the motion,

19 to try to deep the non-debtors from getting drug into

20 asbestos litigation without cause.

21         MR. ZALESKI:  We believe there is.

22         THE COURT:  To say there really isn't any

23 harm going on here, really, I think can't be accurate

24 because the debtor has to go out and pay every time

1    somebody files a claim or a lawsuit against them, don't

2    they?   They have to go -- what is your arrangement with

3    your insurer?  Are you on retro-policies or are you

4    actually getting a defense out of your insurance policy,

5    or do you have any insurance for this?

6                    MR. BERNICK:  For fraudulent conveyance?

7                    THE COURT:  No.  For asbestos.

8                    MR. BERNICK:  The asbestos litigation that

9    is being pursued against Sealed Air?

10                    THE COURT:  No.  Against you.

11                    MR. BERNICK:  The asbestos litigation that

12    is proceeding directly against Grace is funded by Grace.

13    I think there is some insurance that remains.  So it's

14    still a combination.

15                    THE COURT:  Are you having to -- are you

16    actually getting payments from your insurer or is the

17    insurer just acting as an agent and you're having to pay

18    them on a retroactive basis on your policies?

19                    MR. SIEGEL:  No, Your Honor.  We have

20    settled pretty much all of our insurance coverage

21    litigation and at this time we get about 30 cents, 30 to

22    40 cents on the dollar for every dollar we pay out in

23    asbestos.

24                    THE COURT:  So you are actually getting

1    some reimbursement, then, rather than them just acting as

2    a collection agent.

3            THE COURT:  Sealed Air is not insured?

4            MR. BERNICK:  Sealed Air, I believe counsel

5    for Sealed Air is present here.  Could speak probably

6    more adequately.

7            THE COURT:  Okay.

8            MR. WOLFF:  Your Honor, Bert Wolff from

9    Skadden Arps Slate Meager & Flom in New York.  We

10   represent Sealed Air Corporation.

11           And, Your Honor, at this point, there has

12   been no insurance coverage available for these claims.

13           THE COURT:  Do they have CGL policies?

14           MR. WOLFF:  With asbestos disclaimers,

15   exclusions.  Sealed Air acquired Grace's Cryovac

16   packaging business in 1998.  Your Honor, you are correct.

17   Sealed Air -- we are the bubble wrap people.  Neither

18   Sealed Air nor Cryovac has ever made or distributed any

19   asbestos-containing product.  Cryovac is the protective

20   food packaging business, the shrink wrap that you see

21   over meat and poultry in a supermarket.

22           What we are faced with here, Judge, is the

23   only reason Sealed Air is being named in these suits

24   arises out of a 1998 corporate transaction which involved

1  the Cryovac food packaging business and essentially the
2  plaintiffs are alleging either that Sealed Air is a
3  successor to Grace's asbestos-related products liability
4  or that the 1998 transaction was a fraudulent transfer.
5  And while there is one case that had been specifically
6  denominated as a fraudulent transfer case, the plaintiffs
7  in these other cases where they are also alleging
8  successor liabilities have also asserted fraudulent
9  transfer as well.

10         THE COURT:  Well, just to inform myself, I
11  thought that I had read someplace in these papers and
12  maybe I saw it on the editor, but Sealed Air at one point
13  was acquired by Grace and then it was spun off.  Is that
14  what happened?

15         MR. WOLFF:  Technically, yes.  In manner of
16  actuality, no.  The original Sealed Air Corporation that
17  was formed 40 years ago where these couple of guys
18  developed bubble wrap in a garage was ultimately acquired
19  by the structure of the transaction two years ago by a
20  1996 Delaware holding company that was formed in 1996 as
21  part of the Fresenius transaction and was named W.R.
22  Grace Delaware.  Now, W.R. Grace Delaware, that 1996
23  holding company, is the holding company that is now named
24  Sealed Air Corporation which has two operating companies

1   under it, Sealed Air Corporation U.S., which was the

2   original Sealed Air Corporation and Cryovac, Inc., which

3   is the recipient of the assets from Grace's Cryovac food

4   packaging business.

5            Sealed Air has a full indemnity from the

6   current Grace entities for the asbestos-related

7   liabilities.  And the impossibility of Sealed Air

8   mounting an effective defense is evidenced by the fact

9   that Sealed Air does not possess any evidence that is

10  probative of the underlying asbestos-related product

11  liability claims against Grace.  We do not have access to

12  Grace's underlying asbestos-related documents.  We are

13  not familiar with their product.  We don't have access to

14  their employees or to their other witnesses who would be

15  necessary to defend these types of claims.  And if the

16  plaintiffs were to pursue Sealed Air without a stay for

17  Grace's asbestos liabilities, then it would be

18  essentially, because all the claims are derivative,

19  attempting to have us mount a defense for Grace's

20  products and it will be like shooting a fish in a barrel,

21  cases that should have been won will be lost, cases with

22  damages that should have been diminished will be

23  enhanced.  If a judgment is entered, Sealed Air is going

24  to be looking to Grace to indemnify it for those damages.

1          THE COURT:  Okay.

2          MR. WOLFF:  Thank you.

3          THE COURT:  Thank you.

4          MR. ZALESKI:  Again, Your Honor, those

5    arguments, we do believe, will be more proper in a couple

6    of weeks.  There's nothing immediate that happens between

7    now and the ability to put out notice and ask for a

8    preliminary injunction.  There's no jury out ready to

9    return a judgment.

10          THE COURT:  How do you deal with the

11   McCartney case?  It does sound to me as though these are

12   kind of unusual circumstances, especially when you factor

13   in this indemnity agreement apparently that exists

14   between Sealed Air and Grace?

15          MR. ZALESKI:  I think the lack of immediacy

16   is what warrants giving us a chance to deal with the

17   McCartney case.

18          THE COURT:  But that's just it.  If, in

19   fact, there's no immediacy, then nobody is going to get

20   hurt, then there isn't going to be any harm to your

21   clients or to your client if I issue a ten-day TRO.

22          MR. ZALESKI:  Your Honor, simply stated, we

23   don't know.  We have not had an opportunity -- we first

24   saw these papers less than an hour before the hearing.

1    We have not had an opportunity to talk with plaintiffs

2    counsel that are prosecuting these actions to get a

3    little more of the flair from the plaintiff's side.  The

4    debtors elected not to, in that period of time between

5    eight this morning and the hearing, send these people

6    papers to put them on notice.  I'm simply trying to keep

7    this issue alive until there's a chance for those who

8    know and those are who are affected to respond.

9              One of the claimants, I believe, that we do

10   represent today does have a claim against Sealed Air as

11   one of its potential causes of action.  I'm not sure

12   where in the filing process the litigation is, but we

13   have not had a chance to speak to counsel that is

14   actually handling the action we seek to enjoin at this

15   point.

16             THE COURT:  Why would you sue Sealed Air?

17             MR. ZALESKI:  My understanding of the

18   theory at this point -- and again, I'm not the trial

19   lawyer.  I'm a bankruptcy lawyer for asbestos claimants.

20   There's the theory that would attach liabilities to those

21   assets.  They are prosecuting a -- if it's such a slam

22   dunk easy case for Sealed Air, the 12(b)(6) will take

23   care of it.  It won't cost anybody money.

24             THE COURT:  If they have to do that 300,000



1    times?

2              MR. ZALESKI:  I believe it's a certified

3    class of claimants so it would simply be once.  It

4    appears the class was certified.

5              THE COURT:  In Superior Court in

6    California?

7              MR. ZALESKI:  I have -- we have some notes

8    on that.

9              MS. DAVIS:  Your Honor, let me clarify

10   something in the record.  First, Nancy Worth Davis, Ness,

11   Motley, Loadholt, Richardson & Poole, South Carolina.  I

12   was literally passing through today on my way to

13   Washington and learned of this filing.  I did stop in at

14   local counsel's office to take another hearing for a

15   Chicago court at 11 today.

16             I am not all that familiar with the Sealed

17   Air claims.  I do understand that there are some claims

18   against Sealed Air which may be direct claims.  It is not

19   the class action which is certified which is against

20   Sealed Air, as far as I understand the issue, and again,

21   I am not the person who should be arguing these because

22   this would be one of the tort attorneys in our firm.  I,

23   again, am a bankruptcy attorney in our firm.

24             My understanding, though, is that the one

1    action which presently exists against Sealed Air is not

2    at a point where a decision is about to be made where a

3    two- or three-week difference in time would make a

4    difference in the case or in any decision that is going

5    to be permanent or cause irreparable harm.

6          THE COURT:  It's not a question of a

7    decision.  It's a question of them having to respond to

8    discovery, them having to meet the deadlines for filing

9    motions, the motion to dismiss that you've mentioned.  I

10   don't know what exactly is pending in that litigation.  I

11   don't know how many of these claims have been filed

12   against Sealed Air.  I don't know how many asbestos

13   claims have been filed against Sealed Air, do you?

14         MS. DAVIS:  No, sir, I don't.

15         THE COURT:  Do you?

16         MR. BERNICK:  Yes.  This is set forth in

17   the declaration.  I think there may be a little bit of

18   confusion.  It's my fault for not having made it clear.

19   You have the fraudulent conveyance claim against both

20   Sealed Air and Fresenius.  That is unitary.  It is one

21   case.  We are seeking to remove and transfer that.  We

22   want to prevent any other similar litigation from being

23   prosecuted.

24         But the asbestos claims, asbestos liability



1   claims, I understand to be individual claims, and there
2   are close to 6,000 of those and they are not all swept up
3   in one case.

4           THE COURT:  Against Sealed Air?

5           MR. BERNICK:  Against Sealed Air and
6   against Grace.

7           I further understand that they involve not
8   just one product but multiple products.  There are
9   attic-fill claims.  There were claims based upon spray-on
10  litigation.  To represent to this Court that somehow
11  during this period of time absolutely nothing is going to
12  happen in any of the individual cases and, therefore,
13  there will somehow be --

14          THE COURT:  I don't think she was
15  stretching that point.  I don't know that.

16          MS. DAVIS:  No, sir.  I was referring to --

17          MR. BERNICK:  This is exactly why you would
18  seek a TRO from a stay is to prevent anything from
19  happening.  So we don't have worry about there being
20  something that has to happen in that period of time.

21          THE COURT:  I go back to my original
22  question.  And maybe you can answer it for me.

23          MS. DAVIS:  Yes, Your Honor.

24          THE COURT:  What harm is going to befall



1  the plaintiffs in those 6,000 cases against Sealed Air if

2  I issue a ten-day temporary retraining order?

3         MS. DAVIS:  Since I have no idea where

4  those cases are, Your Honor, I really can't answer that.

5  I do not know what harm will befall, nor what harm,

6  irreparable harm would befall the debtor.  But I would

7  like to show you on the fraudulent conveyance case -- and

8  I understand that, that is, I've learned this the last

9  few months -- that that case could be removed.  I would

10 ask as a clarification, whether that removal action would

11 be also stayed.  In other words, if the case is not going

12 forward, would we leave the case in the status quo

13 rather than do any removal or any changing of the status

14 of the case until we had a full review of all of the

15 facts which we could not have here today?

16        THE COURT:  Let me tell you where I'm at on

17 this.  I'm prepared to issue the temporary restraining

18 order on the 6,000 individual cases.  I'm not prepared to

19 issue anything as to the case that's pending in northern

20 California until I see that.  That is where I think I'm

21 at at this point.  That case is going to get removed out

22 here.  Frankly, I don't have enough in front of me to

23 even make the beginning of a rational determination or

24 reasoned one as to irreparable harm that might befall

1  Sealed Air if I don't stay that individual fraudulent

2  action and all others that may or may not ever be

3  brought, and so I'm not prepared to issue a TRO on that

4  today.

5       MR. BERNICK:  Would you be prepared, if we

6  simply struck out the reference to -- I think we call it

7  the Fresenius litigation or Fresenius suit, would you

8  otherwise be prepared to enter the TRO?

9       THE COURT:  Tell me what the Fresenius suit

10  is.

11       MR. BERNICK:  The Fresenius suit is the

12  fraudulent conveyance.

13       THE COURT:  Yes.  I would be prepared to do

14  that.

15       MR. BERNICK:  Maybe we could mark that up

16  and tender it to the Court.

17       THE COURT:  Is this our last motion?

18       MR. BERNICK:  It's our last motion, and I'm

19  prepared, maybe while people spend a little bit of time

20  on that, again, if Your Honor wishes, to take you through

21  a little bit of background of the case.  If that's for

22  another, that's also for another day, I think I have got

23  five or ten minutes to cover some of that if Your Honor

24  wishes.



1         THE COURT:  Okay.  Go ahead.  Take a few
2    minutes.

3         MS. JONES:  Your Honor, we have marked up
4    the critical trade motion and we are finishing up the
5    financing motion so we can address those to the Court.

6         THE COURT:  Okay.

7         MR. SPRAYREGEN:  There was actually one
8    more motion on the last page of the notice.

9         THE COURT:  Why do you need an order
10   authorizing you to operate your businesses?

11        MR. SPRAYREGEN:  Your Honor, this is really
12   just an order that really repeats Section 362.  The
13   reason that we seek this order -- and this is not an
14   order that we ordinarily seek.  When we do seek it, it is
15   in a situation where a debtor has a number of non-debtor
16   affiliates and a number of non-debtor foreign affiliates
17   whose customers and suppliers don't necessarily
18   completely understand the meaning of Chapter 11, and we
19   have found it helpful to the debtors' operations to be
20   able to provide an order that demonstrates that basically
21   we are allowed to do what the Bankruptcy Code says we are
22   allowed to do under Section 362 and the other provisions
23   of the Code.  And so there is no question that it doesn't
24   give us any rights that we don't already have under the

1   Bankruptcy Code.  And if the Court were not to enter the

2   order, we have all of those rights.  The order we are

3   seeking is merely literally a piece of paper that we

4   could provide to entities, especially foreign entities

5   who are not familiar with the U.S. bankruptcy system.

6           MS. JONES:  One other thing I would add --

7   excuse me, Mr. Sprayregen.  The Trustee's office has

8   asked that we add in language on the order to make it

9   clear that it is limited by Sections 326 and 365 so that

10  it is consistent with the order entered last week by

11  Judge Walrath in the Murphy Marine case, and we have

12  added that language.

13          THE COURT:  I don't think I'm going to

14  enter this.  For one thing the people that would be

15  reading it wouldn't understand it by and large.  If you

16  wanted me to sign an order that said, by and large, you

17  are stayed from taking any actions against the debtor, I

18  might sign it.  But this is so full of legal language

19  that any of your customers probably wouldn't know what

20  you are giving them when you sent it to them.  If you

21  wanted to send it to their lawyers, that's one thing.  If

22  they already talked to their lawyers, they would already

23  know all this.  So I just don't see the need for this.

24  I'm not going to sign it.

1          MR. SPRAYREGEN:   Thank you, Your Honor.

2          MR. BERNICK:   May I approach on this, Your

3     Honor?

4          THE COURT:   Yes.

5          MR. BERNICK:   I have tendered to the

6     Court -- and this is by way of a little bit of background

7     of the case and I know there will be many other occasions

8     for us to discuss the matters before the Court.   I've

9     tendered to the Court two charts that appear in the

10    informational brief that we've filed in connection with

11    this case.   And Your Honor will probably recognize that

12    as that, unfortunately, substantial brief that was one of

13    the first filings in the case.   We've done that here.

14    We've also done it in connection with another Chapter 11

15    in connection with asbestos matters because the effort is

16    to try to give a context to the filing of this case and

17    where it is that we want to go.   But the informational

18    brief includes these charts, and I want to use them just

19    to give a couple remarks on why it is that we filed.

20         As I've said before, Grace is a solvent

21    company.   It's a strong financial company at this point

22    in time, and obviously the decision to file for

23    Chapter 11 under these circumstances was a very difficult

24    decision.



1           THE COURT:   What is the combined yearly

2    sales figures for all of these entities?

3           MR. BERNICK:   About 1.6, 1.5, 1.6 billion.

4           THE COURT:   And without the asbestos

5    litigation, would they be a profitable set of entities?

6           MR. BERNICK:   Yes.   They definitely would

7    be.   Essentially what's happening is the sole motivation.

8    I could probably represent the motivation for the 11 is

9    to try to figure out a way to deal with the asbestos

10   problem.

11          THE COURT:   Tell me a little bit about the

12   asbestos cases.   Where are they pending?

13          MR. BERNICK:   They are pending in --

14          THE COURT:   Where the bulk of them pending?

15          MR. BERNICK:   I think there are a huge

16   number of them that are pending in Texas.   That's a very

17   litigious area.   I think there's probably a collection in

18   New York, in Pennsylvania, in Mississippi, and --

19          MR. SIEGEL:   Ohio.   Some in California.

20          THE COURT:   Now, the two major operating

21   entities here, one is Davison and the other one is

22   Performance, is that right?

23          MR. BERNICK:   Davison and Performance.

24          THE COURT:   Where's Davison located?