1          MR. McGOWAN:  Columbia, Maryland.

2          THE COURT:  That is where their operating

3    facilities are?

4          MR. McGOWAN:  The headquarters.  They have

5    operating facilities, Curtis Bay and Lake Charles,

6    Louisiana.  Curtis Bay is in Maryland.

7          THE COURT:  What about Davison?

8          MR. McGOWAN:  That is Davison I was

9    speaking to, Your Honor.

10          THE COURT:  What about Performance?

11          MR. McGOWAN:  Performance Chemical, that

12    has headquarters in Cambridge, Massachusetts, and they

13    have about 30 plants throughout the United States in

14    Chicago and almost in every state they have a plant.

15          THE COURT:  Okay.  Go ahead.

16          MR. BERNICK:  Asbestos.  Grace has not been

17    a first-tier player in the asbestos litigation for the

18    relatively simple reason that it only entered asbestos in

19    business in 1963.  They acquired a business called

20    Zonolite.  Even with that acquisition, there were a

21    relatively limited number of products that contained

22    added asbestos.  That history, that is, that they are not

23    a first-tear or mainstream player in the asbestos

24    business is reflected, as you see, in the history of

1    claims.  If you take a look at the first chart.

2             THE COURT:  They don't make it anymore, do

3    they?  They don't make products that contain it anymore.

4             MR. BERNICK:  As I understand it, from

5    1963, essentially with the acquisition of Zonolite until

6    1973, they made products that contained added asbestos.

7    Principally it was a form of spray-on insulation that

8    went on wet for large high-rise structures.  There was

9    additional product that was made out of vermiculite.

10   Vermiculite is mined.  It's not actually asbestos, but,

11   as it is mined, it contains asbestos as a contaminant.

12   So it would be mined.  They would have some claim in

13   connection with the mining process but then it will be

14   refined.  By the time it reached the ultimate consumer,

15   from a regulatory, definitional point of view, it is not

16   an asbestos-containing product.  Chemically it contains

17   very, very small trace elements of asbestos.

18             So you are talking about basically a

19   ten-year window of time and relatively limited number of

20   products, and that created the basis for the overwhelming

21   number of claims that have been brought.  They faced

22   property damage claims, claims seeking remediation of

23   asbestos in place.  They faced bodily injury claims.

24   Most recently they faced claims relating to attic fill.

1      THE COURT:  What fill?

2      MR. BERNICK:  Attic fill.  Attic as in

3 attic of a home.

4      THE COURT:  Attic fill.

5      MR. BERNICK:  Because it's a vermiculite

6 product that is loose and poured into the attic rafters

7 as insulator.

8      If you take a look at the first chart what

9 shows is that the first year actually is 1982.  1982 was

10 the year that Manville went into Chapter 11.  As you can

11 see, by 1982, Manville, which was a mainstream player,

12 already had a very substantial asbestos problem.  But

13 there were almost no claims -- I think there were fewer

14 than 100 claims that are pending against Grace as of that

15 point in time.  As the 1980s evolved, the level of the

16 claims grew.  Obviously, it became of concern but it was

17 still a relatively limited population of claims.

18      Once you got into the early 1990s, you have

19 a substantial increase in the volume of claims.  And it

20 is, as you'll see for the first half of the 1990s, the

21 approach that Grace took to that process was to be a

22 pretty aggressive litigator of claims.  As our

23 informational brief sets out, nobody can litigate

24 consistently asbestos liability claims under the --

1          THE COURT:  I was going to read that, but I
2    only had about a half hour.  It was 91 pages long.  So it
3    made it a little tough for me to try to comb my way
4    through it

5          MR. BERNICK:  It was not designed to be
6    consumed during that period of time.  We very much urge
7    the Court to take a look at it.  It's long, but it covers
8    a lot of different areas.  We hope it's relatively
9    succinct.  The back end talks about what it is we hope to
10   do with this case.

11          In the early part of the 1990s, the
12   approach the company took was to continue the litigation
13   process.  It had to settle, but it also sought to
14   litigate.  It's relatively successful.  Won 44 of 63
15   trials, obtained a dismissal of 35,000 -- close to 35,700
16   claims.

17          The back end of the 1990s, the company took
18   a different approach.  It was not that they felt they
19   didn't have liability defenses, but it just became
20   infeasible to continue the litigation process.  Very
21   expensive to litigate on a case-by-case basis, very
22   difficult to have witnesses who can go from court to
23   court to engage in the necessary process of telling the
24   company's story.  And therefore, in the back end of the

1   1990s, the company had no choice but basically to enter

2   into what it called inventory settlements.  These are

3   basically, undertakings, procedures that are adopted with

4   respect to different law firms, different plaintiffs'

5   firms whereby a huge volume of claims are settled on

6   something like similar terms over time.

7           That had certain advantages.  It kept a

8   consistency and control, enabled the company to save

9   transactional costs, but it came with a very substantial

10  price.  And the criteria for the payment of the claims

11  got further watered down.  We'll be educating the Court

12  in this regard.  But the criteria for what constitutes

13  the minimum medical condition was no longer the same

14  criteria that doctors used to diagnose.

15          THE COURT:  If it helps you any, in my

16  former live which is now quite a while ago, I once was

17  involved in the representation of an insurance company on

18  insurance coverage claims involving lots of asbestos

19  companies, and I have personally reviewed a lot of

20  asbestos claims.  So I know a little bit about this.

21  Mesothelioma to asbestosis and so forth and so on.

22          MR. BERNICK:  That's fine.

23          During this period of time -- and I don't

24  know when Your Honor would have been involved, but by the

 1   back end of the 1990s, we are now talking about claims

 2   being processed that, to our viewpoint, what would be

 3   what we will be submitting in this Court no longer meet

 4   any medical criteria sufficient to diagnose disease.  I

 5   don't know to what extent that was a problem or an issue

 6   then.

 7         THE COURT:  I have to say, you're probably

 8   addressing most of this to the wrong guy because I'm not

 9   going to be hearing any of it.  The fact is that the

10   District Court is the only one that has jurisdiction, I

11   think, to hear these kinds of personal injury and tort

12   kinds of claims.

13         MR. BERNICK:  That's fine.  And obviously

14   this is what animates our motion to withdraw reference

15   and our plans for litigating in District Court.

16         The long and short of it is, by the end of

17   the 1990s, the trend was coming down and claims, as you

18   see from the first chart -- and the based upon our

19   actuarial analysis, we believed that both the claims

20   history and underlying epidemiology which drives the

21   actuarial analysis says the trend is downward and we are

22   at the back end of the problem.  The company was

23   encouraged by that, disappointed obviously that the

24   problem had gotten to where it was, but encouraged by the

1  downward trend.

2          Why are we here?  Why we are here is the

3  second chart.  Essentially what's happened in the last 18

4  months, you see very dramatic --

5          THE COURT:  You know, there aren't any

6  numbers on these charts, so I don't know what you mean

7  when you say the second chart.

8          MR. BERNICK:  The second chart is the one

9  that's got the red bar.

10          THE COURT:  Thank you.

11          MR. BERNICK:  As you see, the claims in

12  1999 rose somewhat, but they were not dramatically out of

13  line.  In the year 2000, you can see that there is

14  literally almost a doubling, not quite but almost a

15  doubling in 12 months of the entire filing rate in 1999.

16  And obviously, the company feels that there's no basis,

17  either in the history of sale of its products or its

18  science, for the claims focus all of a sudden shifting to

19  and targeting Grace in this fashion.  But whatever the

20  motivation was, the fact of the matter is that this

21  dramatic increase, this spike essentially, rendered the

22  process of dealing with these claims unmanageable, and

23  not only unmanageable by the company, but started to

24  impair financing.  And it's really this spike, this

1   dramatic development which has not been mitigated this

2   year -- the early returns this year are no better than

3   they were last year.  It left us with no choice but to

4   file the case.

5           And the essence was, what we are trying to

6   accomplish in the case, is to kind of go back and say,

7   now that we are in 11, what are the valid claims that

8   there are against this company so that we don't depend

9   upon what essentially is a privatized system to tell us

10  what our liability and what our payments are, that we

11  have a rationalized basis that has a grounding in science

12  and has a grounding in law that says, here's what the

13  liability is that should be paid and no more so that we

14  can then provide for the funding of that liability.  And

15  that's why, day 1, in order to get the process underway,

16  we've moved to withdraw the reference and we are seeking

17  to embark upon that process in the District Court.

18          The same type of approach is presently

19  underway in the Babcock and Wilcox case which is pending

20  in New Orleans.  The reference there has been withdrawn.

21  A bar date has been set.  Claims forms, special claims

22  form have been developed.  And we are moving down the

23  road later on this year to start to litigate in District

24  Court over what the scope of that company's liability is.

1          That is a different kind of case in some

2    ways, but we are proposing a procedure that is similar in

3    many respects to that process.  We believe that these two

4    companies, that is, Babcock and Wilcox and Grace will not

5    be the last to go down this road.  We think that we know

6    at least one other company we believe is moving down the

7    same road as well.

8          So that is essentially why we are here.  I

9    apologize for the length of the informational brief, but

10   we hope it will be a reference at some point that will be

11   useful to the Court to be very clear about where it is we

12   are heading with the case and why.

13          THE COURT:  All right.  Is there anything

14   further at this point?

15          MR. SPRAYREGEN:  Your Honor, we have the

16   essential trade issue and the final -- I'm sorry --

17   interim DIP financing, and I'm prepared to hand up

18   proposed orders on both, if I may approach.

19          THE COURT:  Marked up TRO?

20          MR. SPRAYREGEN:  Your Honor, that is being

21   marked as we speak, I believe.

22          Your Honor, what we did with the essential

23   trade is, did accept the Court's suggestion on the pay

24   all of the trade, the $34.3 million, I believe it was.

1    And with respect to the DIP, we added in the

2    million-dollar paragraph for carve-out for the Trustee

3    plus the excess of 7 1/2.

4              THE COURT:  All right.  Very good.

5              MR. SPRAYREGEN:  Your Honor, while we are

6    looking, might we get the TRO order back?  You have the

7    original that we needed to mark up.  Thank you.

8              THE COURT:  Okay.

9              MR. BACON:  Your Honor, before I get caught

10   up in the litigation, I would like to confirm in one

11   minute something very important to us relative to the

12   interim financing order that you may have just signed or

13   are about to sign.

14             THE COURT:  I did sign it.

15             MR. BACON:  That order -- and this is an

16   agreement I have with the debtor.  Again, Doug Bacon for

17   Bank of America.

18             That order and the underlying credit

19   agreement both contemplate a final order which is a

20   defined term in their provisions to that final order that

21   we took out in order to facilitate the interim order that

22   are more appropriate for final order.  The order Your

23   Honor signed with our support may become a final order,

24   but the agreement between the agent Bank of America and

1   the debtor is that, notwithstanding that it may become a

2   final order, it is not the final order for purposes of

3   the credit agreement unless the agent agrees in its sole

4   discretion.  In other words, Your Honor --

5              THE COURT:  We are not dealing with final

6   orders today.  That's why they call them an interim

7   order.  So you don't have a problem.

8              MR. BACON:  Yes, Your Honor, but the order

9   does say it may become.

10             THE COURT:  It may, but it is not.

11             MR. BACON:  I just would like the debtor to

12  confirm we have that understanding as well.

13             THE COURT:  Even if they don't have, I do.

14  So that's that.

15             MR. BACON:  Thank you, Your Honor.

16             MR. BERNICK:  Your Honor, to return to the

17  TRO, first a matter of information.  I've just been told

18  that a new fraudulent transfer action has been filed in

19  Massachusetts today in federal district court.  So

20  obviously the problem continues.

21             MS. DAVIS:  Your Honor, I don't think we

22  are responsible for that one.

23             THE COURT:  Are you -- I guess I missed it.

24  Are you responsible for the one in California?

1              MS. DAVIS:  We may be, or a group that we

2       are associated with.

3              THE COURT:  I see.

4              MR. BERNICK:  I'm trying to get to the

5       point of making a proposal to the Court that people can

6       live with and that gives us protection.  The existing

7       Sealed Air and Fresenius cases are in the process, we

8       hope, of being removed and transferred out here.  So,

9       since that ought to take care of, we hope, that

10      particular piece of litigation.  Particularly because of

11      this new piece of information, though, we would ask the

12      Court to include this type of claim, that is, a

13      fraudulent conveyance claim in the order.  And what we

14      are proposing -- and I pencilled it in here on the

15      definition of actions -- is that actions under the order

16      which are the ones that would be enjoined include as C

17      any action other than the existing actions against Sealed

18      Air and/or Fresenius, comma, alleging fraudulent transfer

19      and fraudulent conveyance claims which would have the

20      effect of saying that, with respect to the cases that are

21      being transferred -- I guess also now existing would

22      include Massachusetts, would it not?  If we want to sweep

23      in Massachusetts, we have to say, existing actions

24      against Sealed Air and Fresenius in California.

1        THE COURT:  I'm just not going to do it.

2   I'm not going to do it today.  I'm not going to say I'll

3   never to it, but I'm not going to do it today.  You need

4   to show me more, and I don't know that I have a clear

5   enough understanding.  I certainly understand the

6   individual asbestos claim.  I'm not sure I have a clear

7   enough understanding of all the particulars as to the

8   fraudulent transfer claims, and I'm not going to do it.

9        MR. BERNICK:  To just to help us out, Your

10  Honor, is there something in particular that we should

11  focus on?

12       THE COURT:  I don't know.  I don't know

13  what you should focus on because I don't know enough

14  about it.  That's part of the reason why I'm not doing

15  it.  That's the whole reason why I'm not doing it.

16       MR. BERNICK:  Okay.  I understand, Your

17  Honor.

18       THE COURT:  I don't know that you've shown

19  irreparable harm.  I don't even know what it would be

20  harm about at this point, so I'm not doing it.

21       MR. BERNICK:  Why don't you give us a

22  minute and we'll further amend this order.

23       MR. BAKER:  Your Honor, with some

24  trepidation I have to ask.  Would it be of any assistance

1   to the Court to hear any specific information on behalf

2   of either Sealed Air or Fresenius?

3           THE COURT:  Well, here's my problem.  I

4   don't think even that I got the TRO and the brief until

5   it was presented, it was walked up to the bench today.

6   And I've already signed about 40 more orders based on

7   total lack of information today than I've ever signed in

8   18 years.  I'm not about to issue a TRO based upon what

9   I've heard or what I have in front of me.  I mean, I've

10  got a brief here that must be 40 pages long alone.  And

11  I'm just not prepared to do it today.  Maybe if you came

12  back tomorrow, I might do it if I add a chance to read

13  it, but I'm not going to it today.

14          MR. BAKER: Okay.  We understand, Your

15  Honor.

16          THE COURT:  Don't even ask.  I'm serious.

17  Don't even bring it up again.  I'm done.  I'm not -- this

18  is not negotiable.  No matter how many times you say it,

19  the answer is still going to be no.

20          Do you have an order that I can sign?

21          MR. BERNICK:  Yes.  That was what I wanted

22  to do.

23          THE COURT:  Thank you.

24          MR. BERNICK:  In terms of hearing date for



1   preliminary injunction motion --

2            THE COURT:  We'll deal with that at some

3   point, but I'm not going to deal with it today because I

4   don't have a calendar with me and I don't know when I can

5   do that.  But I can tell you this, I will extend the TRO

6   for the maximum period.  So that gives us at least 20

7   days after that.  You may up having to come out to

8   California.  I don't know because I don't know that I can

9   hold a preliminary injunction hearing over the phone.

10            MR. BERNICK:  This is just a simple

11   solution, Your Honor.  We've stricken out the entire

12   sentence that relates to Fresenius and Sealed Air

13   matters.

14            THE COURT:  We'll have to fill in the blank

15   later.

16            Now, do we have anything else that you want

17   to bring up because I've got one thing that I want to

18   bring up, or two.

19            MS. JONES:  In terms of if there should be

20   a need for a final DIP hearing or if there should be

21   objections to the motions that we started off the hearing

22   with that were put on negative notice, what would be the

23   best procedure for us to obtain a date from the Court

24   whether it was for telephonic hearing or what have you?

1          THE COURT:  You need to call my courtroom

2   deputy in California.  The number is as follows:

3   879-3533.  That's 510 area code.  And then we'll

4   coordinate with the courtroom deputy here.

5          MS. JONES:  Thank you.

6          THE COURT:  Anything else?

7          MS. JONES:  No, Your Honor.  Thank you for

8   your time.

9          THE COURT:  Well, I've got a couple of

10  matters that I want to raise.  The first one has to do

11  with a case management order.  If you look at the

12  Northern District of California web site and you look

13  under large cases on that web site and you click on Crown

14  Vantage which is a paper company, you will find a case

15  management order that I would propose might be used in

16  this case.  I think case management orders make a lot of

17  sense.  They set specific procedures that prevent me from

18  having 91-page briefs, for one thing, because the page

19  limits were 15 in Crown Vantage.  They do lots of other

20  things that make it much easier for the Court to actually

21  make an informed decision about what's going on also

22  gives notice appropriately to other parties.

23          The second issue that I want to raise is

24  probably a fitting way to end the hearing because I've

1    heard and I've looked at enough of the 20 largest

2    creditors and some of the other materials to raise this

3    issue, even though this is my first day in town.  And

4    that is question of venue.  This is a Columbia, Maryland,

5    case that has two New York creditors that hold

6    $500 million in debt.  There are trade creditors, I

7    understand it, among the 20 largest, many of which come

8    from Chicago.  The one thing I don't see is why this case

9    was filed in Delaware.

10           So what I'm going to do -- and I guess this

11   is something totally new here in Delaware -- is I'm

12   hereby issuing an order to show cause why this case

13   should not be transferred pursuant to Section 1412.  And

14   I'm doing it on my own motion.  You have five business

15   days to tell me why I shouldn't do it.

16           Now, nothing that I've worked on this

17   afternoon is going to go unfinished.  In other words, I'm

18   not going to transfer the case until I've gotten

19   everything in place pursuant to the first day orders, the

20   20 days for the cash collateral, and TRO, and so forth.

21   I'm not going to transfer the case willy-nilly, if I

22   transfer it at all, which is why I've talked about the

23   case management procedure, why I've talked about hiring a

24   special deputy.  But I think the issue is an appropriate

1    one to raise, and no one has raised it as of yet, but

2    this is the appropriate time to do so at the beginning of

3    case.  And so I just have.

4              Now, does anybody have any questions?

5              You should submit the briefs to 1300 Clay

6    Street, Room 220, Oakland, California, 94602, and I will

7    decide this matter on those papers.  I will have a

8    decision for you by the end of next week.  Nothing, as

9    I've said, should be construed as in any way jeopardizing

10   anything that's happened here today.  I'm not going to

11   leave this case in the lurch.  I'm not going to leave the

12   financing in the lurch or anything else.  But I'm going

13   to go forward with this.

14             The U.S. Trustee obviously is welcome to

15   participate.

16             Anything further?

17             We will stand adjourned.

18             (Which was all the proceedings had on

19   hearing of said cause on the date aforesaid.)

20

21

22

23

24



State of Delaware    )
                     )
County of New Castle )


C E R T I F I C A T E


        I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that the
foregoing record, pages 1 to 123, inclusive, is a true
and accurate transcript of my stenographic notes taken on
April 2,2001, in the above-captioned matter.

        IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 4th day of April, 2001, at Wilmington.



                          _____
                          Ann M. Calligan

SIGN-IN SHEET

CASE NAME: W. R. Grace & Co.

CASE NO.: 01-1139

COURTROOM NO.: 2A

DATE: 4-2-01

| NAME | LAW FIRM OR COMPANY | CLIENT REPRESENTING |
|---|---|---|
| Laura Davis Jones | Pachulski Stang Ziehl Young Jones | Debtors |
| James Sprayregen | Kirkland & Ellis | Debtors |
| Steve Yoder | The Bayard Firm | Bank of America |
| Douglas Bacon | Latham & Watkins | Bank of America |
| Richard L. Schepacarter | UST | Patricia A. Staiano, UST |
| Matthew Zaleski | McLaughlin + Gordes | James Bond, 50th Bellwin + Estate of Theo. Wynn |
| Mary Davis | Hoss Morley Lowenbach Rewart Poole | (same) |
| D. Benoit | ? | ? |
| Rhonda Thomas | Klett Rooney | — |

PLEASE PRINT OR YOUR APPEARANCE CANNOT BE CORRECTLY NOTED!