ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    **Chapter 11** |
| | ) |
| **W. R. GRACE & CO., et al.,**[1] | )    **Case No. 01-01139 (JFF)** |
| | )    **(Jointly Administered)** |
| | ) |
| **Debtors.** | ) |

## DEBTORS' RESPONSE TO OBJECTION OF CREDIT LYONNAIS, NEW YORK BRANCH, TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS, UNDER 11 U.S.C §§ 105, 362 AND 364, APPROVING POSTPETITION FINANCING AND RELATED RELIEF AND SETTING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c) [DOCKET NO. 25]

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby respond to the Objection (the "Objection") of Credit Lyonnais, New York Branch ("CL"),

to Debtors' Emergency Motion for Interim and Final Orders, under 11 U.S.C. §§ 105, 362 and 364,

Approving Postpetition Financing and Related Relief and Setting Final Hearing Pursuant to

Bankruptcy Rule 4001(c) (the "DIP Motion"). In their response, the Debtors rely on the Affidavit

of Robert M. Tarola, the Senior Vice President and Chief Financial Officer of W. R. Grace & Co,

---

1      The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

attached hereto as Exhibit A (the "Tarola Aff."). In further support of their response, the Debtors respectfully state as follows.

## Objection

1.    In its Objection, CL alleges that the Debtors have not adequately demonstrated their need for debtor in possession financing (or at least, for financing of the magnitude for which authorization is sought in the DIP Motion). CL further alleges that the Debtors' request to obtain financing under the DIP Facility (as such term is defined in the DIP Motion) is "not to allow the Debtors to continue in business. Rather, [it is] to pre-ordain the financial terms for acquisitions as yet undisclosed." Objection at ¶ 16. CL contends that it is inappropriate for the Debtors to utilize debtor in possession financing to fund acquisitions. For the reasons set forth below, CL's arguments must fail, and the Court should grant the Debtors full relief requested in the DIP Motion.

## Response

### Need for Financing

2.    The DIP Motion seeks authorization for the Debtors to borrow up to $250 million under the DIP Facility over the next two years[2]. As demonstrated in the Tarola Affidavit, the Debtors anticipate accessing a significant portion of the DIP Facility for general operating purposes. In addition, if business performance and spending projections are in line with the Debtors' base line expectations, the Debtors may have funds available for strategic acquisitions as well, which is a proper and reasonable use of the borrowed funds. However, if business performance or spending patterns are not as favorable as anticipated, a significantly larger portion of the DIP Facility would

---

2    In fact, the Debtors believe that it may become necessary for them to roll over the DIP Facility to another year.

need to be utilized for operating purposes. CL implies, without citing any relevant authority, that the Debtors have to operate on a "bare bones" budget and, accordingly, that they do not need financing of this size or, indeed, any financing. CL does not support this allegation in any way, other than suggesting that the Debtors should be "accumulating significant cash as a consequence of the statutory prohibition against payment of post-petition interest on unsecured obligations and the application of the automatic stay to asbestos litigation." Objection at ¶ 1.

3.    CL's allegations ignore, however, that the Debtors represent a $1 billion enterprise with the attendant cash needs of a manufacturing business of that size. Prior to commencing these chapter 11 cases, the Debtors were supplementing their operating cash flows to fund these significant cash needs with an aggregate of $500 million in working capital facilities. As CL is fully aware, these prepetition facilities are fully drawn[3], and the Debtors had de minimis cash on hand at the time of their bankruptcy filings. Access to sufficient new credit will therefore be critical to the Debtors' operations postpetition. Tarola Aff. at ¶ 2.

4.    Access to the DIP Facility is necessary for the Debtors to support operating activities and anticipated non-operating expenditures. In particular, the Debtors need to continue funding required and/or permitted legacy obligations (such as environmental remediation costs and retiree obligations) and making capital expenditures based on their operating plans, as well as to incur significant restructuring costs in connection with these chapter 11 cases. Additionally, as set forth in more detail in the DIP Motion, the Debtors will need to fund $65 million of receivables that were previously sold under a securitization facility to Wachovia Bank. Tarola Aff. at ¶ 3.

---

3    Although a portion of the funds borrowed under the prepetition facilities was used to fund costs of litigations that may be stayed by the bankruptcy filing, a significant portion was utilized for liquidity purposes.

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.resp4.wpd    3

5.     The Debtors expect that replacement of the receivables facility, together with expenditures for routine capital, ongoing legacy obligations and chapter 11 costs will exceed cash generated from their operations by nearly $80 million in 2001, and that their cash flow could continue to be negative in 2002 and 2003. The Debtors project that, depending on the outcome of various business assumptions, even prior to any strategic investments, they will need between $80 million and $160 million for liquidity needs over the next two years,[4] and that the DIP Facility will need to be extended or replaced at its stated maturity date. The Debtors have consulted with both their financial advisors and with prospective DIP lenders in determining the appropriate size of the DIP Facility.   Tarola Aff. at ¶ 4.

6.     In addition, availability of postpetition financing is vital not just for the necessary cash and credit support for the Debtors to operate their businesses. Equally important is the sense of confidence that such financing will instill in the Debtors' suppliers and customers. No business of this size can operate with just the minimum of cash necessary for bare survival. The Debtors' suppliers also have to feel confident that the Debtors have sufficient capital to weather any downturn in the economy generally or in the Debtors' own operations to continue providing the Debtors with customary trade terms. In turn, absent the sense that the Debtors have the capability to grow and fund new product developments, many of the Debtors' otherwise loyal customers may look elsewhere to purchase the products in which the Debtors specialize. Many of the Debtors' customers rely on the Debtors for products that are critical to such customers' businesses, accordingly, the

---

4     These numbers reflect the Debtors' annualized cash needs, however, since the Debtors' businesses are seasonal, their cash needs in the first and fourth calendar quarters are likely to be higher. In addition, these numbers do not include the Debtors' potential requirements for standby and documentary letters of credit. Such requirements may account for additional tens of millions of dollars of DIP Facility utilization over the next two years.

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.resp4.wpd   4

customers' confidence in the Debtors' long-term ability to continue supplying and improving such product offerings is absolutely vital. It is, therefore, possible that cancellations of pending orders could follow and the Debtors' ability to secure new orders could be jeopardized. The failure of the Debtors' suppliers and customers to be fully confident at this time, and the resultant loss of customer patronage, could dramatically decrease the Debtors' hopes of reorganizing and reduce their ability to maintain the value of their estates. It is particularly important to rebuild the confidence of the Debtors' suppliers and customers as quickly as possible at this critical juncture in these chapter 11 cases. Until the suppliers and customers are convinced that necessary financing is in place for the Debtors to operate their businesses, these suppliers and customers may be unwilling to honor existing business arrangements or create new ones. The ability of the Debtors to remain viable entities and reorganize under chapter 11 therefore depends upon obtaining the relief requested in the DIP Motion. Tarola Aff. at ¶ 5.

7.      Finally, CL expresses concern for the cost of the DIP Facility and specifically, the amount of the unused line fee. Objection at ¶ 13. However, the unused line fees payable under the DIP Facility are only 3/8 of one percent, an amount that is insignificant to the Debtors, and which should not justify cutting the Debtors' access to necessary financing. Tarola Aff. at ¶ 6.

## Acquisition Ability is Necessary and Proper

8.      As stated more fully in the DIP Motion, as a result of various restructuring programs during the 1990s, the Debtors emerged in 1998 as a specialty chemicals company with market leading businesses. However, their  business portfolio was considered mature, with slow to moderate growth prospects. During 1999, the Debtors embarked on an aggressive growth program to strengthen their market position and accelerate the growth rates of their businesses. This program

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.resp4.wpd   5

consists of both internal growth through new product development and innovative approaches in sales and marketing, and external growth through acquisitions, joint ventures and strategic alliances driven by a newly-established business development group. This growth program has been an essential and integral part of the Debtors' business strategy for the last two years. Tarola Aff. at ¶ 7.

9.      The focus of the external growth program is to acquire businesses that complement and strengthen the Debtors' existing businesses. Strategic acquisitions pursued by the Debtors provide geographic expansion, product line extensions or entry into markets where the Debtors believe an acquisition would be more effective and provide superior financial and business results compared to "grass-roots" development. All of the acquired businesses were immediately integrated with the Debtors' existing businesses, yielding synergies enabling the Debtors to realize earnings and cash accretion. As part of their existing strategy, the Debtors intend to continue to look for opportunities for acquisitions that would be equally beneficial to their businesses and estates. Tarola Aff. at ¶ 8.

10.     The Debtors impose stringent criteria on their acquisitions and subject them to a rigorous approval process, including obtaining Board of Directors approval for transactions with a cost of more than $10 million. Tarola Aff. at ¶ 9. Furthermore, the DIP Facility places additional restrictions on the Debtors' acquisition activity. The DIP Facility provides that the Debtors may make acquisitions only so long as the availability under the DIP Facility is at least $75 million. Going forward, while the Debtors remain under the protection of the Bankruptcy Code, every new acquisition that the Debtors may contemplate will be subject to the approval of this Court. The Debtors will file all appropriate pleadings, describing the terms of the particular acquisition and their

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.resp4.wpd   6

business justification for considering such acquisition. All parties in interest will be given appropriate notice and will have ample opportunity to evaluate the terms and condition of each transaction and to object to such terms and conditions. Accordingly, it is disingenuous for CL to argue that the approval of the DIP Motion somehow "pre-ordains" the financial terms of the Debtors' acquisition program without an opportunity for the parties in interest to review the particulars of such program. On the other hand, it would be inappropriate, and highly detrimental to the Debtors' reorganization efforts, to preclude the Debtors' ability to evaluate, and take advantage of, appropriate business opportunities as they arise. Cutting off the Debtors' access to debtor in possession financing for these purposes will result in such preclusion.

11.    The Debtors believe that, in today's world, a company must grow its businesses to remain strong and competitive. If the Debtors are unable to continue their acquisitions program, thus failing to add new and better products and expand their geographic presence, they would be placed at a competitive disadvantage in an increasingly competitive environment. If there is no confidence in the Debtors' ready access to capital to make acquisitions or enter into joint ventures, the companies that may have otherwise approached the Debtors' with potentially beneficial transactions, may turn instead to the Debtors' competitors, which would seriously impact the Debtors' ability to preserve the value of their estates to the detriment of their creditors and other stakeholders. Tarola Aff. at ¶ 10.

## Argument

12.    The DIP Motion requests authority to obtain postpetition financing under section 364(c) of the Bankruptcy Code. The test for the appropriateness of incurring postpetition indebtedness under section 364(c) has been long established by the courts. In order to justify such

indebtedness, the debtor must demonstrate that (a) it is unable to obtain unsecured credit under §364(b) of the Bankruptcy Code, (b) the credit is necessary to preserve the assets of the estate, and (c) the terms of the credit transaction are fair, reasonable and adequate, given the circumstances of the debtor and the proposed lender. See, e.g., In re Crouse Group, Inc., 71 B.R. 544, 549, modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987)[5].

13.     As has been demonstrated in the DIP Motion and the Affidavit of David B. Siegel, Senior Vice President and General Counsel of W. R. Grace & Co., filed in support of First Day Motions, the Debtors have both (a) adequately "shopped" the DIP Facility and were unable to obtain financing on other terms, and (b) the terms of the DIP Facility are fair and reasonable under the circumstances. CL does not appear to allege that the Debtors have failed to satisfy the first and the third prongs of the Crouse Group test. Rather, CL has alleged that the Debtors have failed to satisfy the second prong of such test, i.e. that postpetition credit is necessary to preserve the assets of the Debtors' estates.

14.     CL urges that "allowances for administrative expenses are narrowly construed." Objection at ¶ 15 (citing In re Molnar Bros., 200 B.R. 555 (Bankr. D.N.J. 1996)). However, Collier on Bankruptcy, that CL acknowledges is the "principal authority on bankruptcy matters" (Objection at ¶ 12), states that "'[p]reserving the estate,' however, should not be interpreted narrowly." Collier on Bankruptcy, 15th ed., ¶503.06[1], p. 503-23. See also Molnar Bros., 200 B.R. 559-560.

---

5     Some courts utilize a slightly different test. The court in In re Western Pacific Airlines, Inc., 223 B.R. 567 (Bankr. D. Colo. 1997), appeal dism'd, 181 F.3d 1191 (10th Cir. 1999), stated that, to prevail on a section 364(c) motion, a debtor must demonstrate that (a) the proposed financing is an exercise of sound and reasonable business judgment, (b) no alternative financing is available on any other basis, and (c) the financing is in the best interests of the estate and creditors. Id. at 572.

15.     It has long been established that "[p]reservation of the estate includes . . . postpetition operation of the business of the debtor." In re Hemingway Transport, Inc., 954 F.2d 1, 5 (1st Cir. 1992). See also In re Southern Soya Corp., 251 B.R. 302 (Bankr. D.S.C. 2000) (and cases cited therein).

16.     Sections 1107 and 1108 of the Bankruptcy Code authorize the debtor in possession to operate the business of the debtor postpetition. Once such authorization has been given, as here, courts generally defer to a debtor in possession's business judgment regarding both the need for, and the proposed use of, funds in the operation of its business, unless such decision is arbitrary and capricious. In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). "Business judgments should be left to the board room and not to [the] Court. Only in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders should the Court scrutinize the actions of the corporation." In re Simasko Production Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (citations omitted). See also Ir re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised [by the debtor] so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); Crouse Group, 71 B.R. at 550 ("a debtor in possession has significant latitude in making judgments about the operation of its business").

17.     Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." Curlew Valley. 14 B.R. at 513-14 (footnotes omitted). Nor should the creditors second-guess the debtor's business judgment. The court in

Simasko was faced with a creditor's objection to the debtor's proposed use of the super-priority debtor in possession financing to fund certain drilling operations. The creditor questioned the economic wisdom of such operations. In overruling the creditor's objection, the Simasko court pointed out that "[t]he discretion to act with regard to business planning activities is at the heart of the debtor's power," and that such discretion should not be disturbed on the basis of a creditor's opinion regarding the providence of a particular business decision. Simasko, 47 B.R. at 449.

18.     Moreover, as long as the funds go to support an "essential activity" of a debtor in possession, the use of such funds is considered to be for the preservation of the debtor's estate. Molnar Bros., 200 B.R. at 559. As part of the Debtors' long term growth strategy, the acquisition activity of the Debtors is, in fact, one of their "essential activities." As stated in the DIP Motion, the Debtors chose the DIP Facility over other financing proposals they considered precisely because the DIP Facility provided the Debtors with the greatest operational flexibility, including acquisition flexibility. DIP Motion at ¶ 31.

19.    The Debtors have exercised sound business judgment in determining that the DIP

Facility and the uses of funds contemplated thereunder (including for potential future acquisitions)

are appropriate and in the best interests of their estates and creditors.  Accordingly, CL's Objection

should be overruled and the DIP Motion should be granted.


Wilmington, Delaware                     Respectfully submitted,
Dated: May 1, 2001

                                         KIRKLAND & ELLIS
                                         James H.M. Sprayregen
                                         James W. Kapp III
                                         Lena Mandel
                                         200 East Randolph Drive
                                         Chicago, Illinois 60601
                                         (312) 861-2000


                                         and


                                         PACHULSKI, STANG, ZIEHL, YOUNG & JONES PC

                                         Laura Davis Jones (#2436)
                                         David W. Carickhoff, Jr. (#3715)
                                         919 North Market Street, 16th Floor
                                         P.O. Box 8705
                                         Wilmington, Delaware 19899-8705 (Courier 19801)
                                         (302) 652-4100

                                         Co-Counsel for the Debtors and Debtors in Possession

# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.,**[1] | ) | **Case No. 01-01139 (JFF)** |
| | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | |

## AFFIDAVIT OF ROBERT M. TAROLA IN SUPPORT OF DEBTORS' RESPONSE TO OBJECTION OF CREDIT LYONNAIS, NEW YORK BRANCH, TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS, UNDER 11 U.S.C. §§ 105, 362 AND 364, APPROVING POSTPETITION FINANCING AND RELATED RELIEF AND SETTING FINAL HEARING
## PURSUANT TO BANKRUPTCY RULE 4001(c) [DOCKET NO. 25]

| | | |
|---|---|---|
| STATE OF MARYLAND | ) | |
| | ) | ss. |
| COUNTY OF HOWARD | ) | |

Robert M. Tarola, being duly sworn, deposes and states:

1.     I am the Senior Vice President and Chief Financial Officer of W. R. Grace & Co., one

of the debtors and debtors in possession in these procedurally consolidated bankruptcy cases (the

---

1       The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.affidavit.wpd

"Debtors"). I am submitting this Affidavit in support of the Debtors' Response to the Objection of

Credit Lyonnais, New York Branch, to Debtors' Emergency Motion for Interim and Final Orders,

Under 11 U.S.C. §§ 105, 362 and 364, Approving Postpetition Financing and Related Relief and

Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c). All facts set forth in this Affidavit are

based on my personal knowledge, upon information supplied to me by others at the Debtors, upon

my review of relevant documents, or upon my opinion based upon my experience and knowledge

of the Debtors' operations, financial condition and their present liquidity crisis. If I were called upon

to testify, I could and would testify competently to the facts set forth herein. I am authorized to

submit this Affidavit.

2.    The Debtors represent a $1 billion enterprise with the attendant cash needs of a

manufacturing business of that size. Prior to commencing these chapter 11 cases, the Debtors were

supplementing their operating cash flows to fund these significant cash needs with an aggregate of

$500 million in working capital facilities. These prepetition facilities are fully drawn[2], and the

Debtors had de minimis cash on hand at the time of their bankruptcy filings. Access to sufficient

new credit will therefore be critical to the Debtors' operations postpetition.

3.    Access to the DIP Facility is necessary for the Debtors to support operating activities

and anticipated non-operating expenditures. In particular, the Debtors need to continue funding

required and/or permitted legacy obligations (such as environmental remediation costs and retiree

obligations) and making capital expenditures based on their operating plans, as well as to incur

significant restructuring costs in connection with these chapter 11 cases. Additionally, as set forth

---

2    Although a portion of the funds borrowed under the prepetition facilities was used to fund costs of
litigations that may be stayed by the bankruptcy filing, a significant portion was utilized for liquidity purposes.

in more detail in the DIP Motion, the Debtors will need to fund $65 million of receivables that were previously sold under a securitization facility to Wachovia Bank.

4.    The Debtors expect that replacement of the receivables facility, together with expenditures for routine capital, ongoing legacy obligations and chapter 11 costs will exceed cash generated from their operations by nearly $80 million in 2001, and that the cash flow could continue to be negative in 2002 and 2003 . The Debtors project that, depending on the outcome of various business assumptions, even prior to any strategic investments, they will need between $80 million and $160 million for liquidity needs over the next two years,[3] and that the DIP Facility will need to be extended or replaced at its stated maturity date.  The Debtors have consulted both with their financial advisors and with prospective DIP lenders in determining the appropriate size of the DIP Facility.

5.    In addition, availability of postpetition financing is vital not just for the necessary cash and credit support for the Debtors to operate their businesses.  Equally important is the sense of confidence that such financing will instill in the Debtors' suppliers and customers.  No business of this size can operate with just the minimum of cash necessary for bare survival.  The Debtors' suppliers also have to feel confident that the Debtors have sufficient capital to weather any downturn in the economy generally or in the Debtors' own operations to continue providing the Debtors with customary trade terms.  In turn, absent the sense that the Debtors have the capability to grow and fund new product developments, many of the Debtors' otherwise loyal customers may look

3    These numbers reflect the Debtors' annualized cash needs, however, since the Debtors' businesses are seasonal, their cash needs in the first and fourth calendar quarters are likely to be higher.  In addition, these numbers do not include the Debtors' potebtial requirements for standby and documentary letters of credit.  Such requirements may account for additional tens of millions of dollars of DIP Facility utilization over the next two years.

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.affidavit.wpd3

elsewhere to purchase the products in which the Debtors specialize. Many of the Debtors' customers rely on the Debtors for products that are critical to such customers' businesses, accordingly, the customers' confidence in the Debtors' long-term ability to continue supplying and improving such product offerings is absolutely vital. It is, therefore, possible that cancellations of pending orders could follow and the Debtors' ability to secure new orders could be jeopardized. The failure of the Debtors' suppliers and customers to be fully confident at this time, and the resultant loss of customer patronage, could dramatically decrease the Debtors' hopes of reorganizing and reduce their ability to maintain the value of their estates. It is particularly important to rebuild the confidence of the Debtors' suppliers and customers as quickly as possible at this critical juncture in these chapter 11 cases. Until the suppliers and customers are convinced that necessary financing is in place for the Debtors to operate their businesses, these suppliers and customers may be unwilling to honor existing business arrangements or create new ones. The ability of the Debtors to remain viable entities and reorganize under chapter 11 therefore depends upon obtaining the relief requested in the DIP Motion.

6.      The unused line fees payable under the DIP Facility are only 3/8 of one percent, an amount that is insignificant to the Debtors, and which should not justify cutting the Debtors' access to necessary financing.

7.      As a result of various restructuring programs during the 1990s, the Debtors emerged in 1998 as a specialty chemicals company with market leading businesses. However, their business portfolio was considered mature, with slow to moderate growth prospects. During 1999, the Debtors embarked on an aggressive growth program to strengthen their market position and accelerate the growth rates of their businesses. This program consists of both internal growth through new product

C:\WINDOWS\Temporary Internet Files\OLK5002\creditl.affidavit.wpd4

development and innovative approaches in sales and marketing, and external growth through acquisitions, joint ventures and strategic alliances driven by a newly-established business development group. This growth program has been an essential and integral part of the Debtors' business strategy for the last two years.

8.      The focus of the external growth program is to acquire businesses that complement and strengthen the Debtors' existing businesses. Strategic acquisitions pursued by the Debtors provide geographic expansion, product line extensions or entry into markets where the Debtors believe an acquisition would be more effective and provide superior financial and business results compared to "grass-roots" development. All of the acquired businesses were immediately integrated with the Debtors' existing businesses, yielding synergies enabling the Debtors to realize earnings and cash accretion. As part of their existing strategy, the Debtors intend to continue to look for opportunities for acquisitions that would be equally beneficial to their businesses and estates.

9.      The Debtors impose stringent criteria on their acquisitions and subject them to a rigorous approval process, including obtaining Board of Directors approval for transactions with a cost of more than $10 million.

TOTAL P.07

10.    The Debtors believe that, in today's world, a company must grow its businesses to remain strong and competitive. If the Debtors are unable to continue their acquisitions program, thus failing to add new and better products and expand their geographic presence, they would be placed at a competitive disadvantage in an increasingly competitive environment. If there is no confidence in the Debtors' ready access to capital to make acquisitions or enter into joint ventures, the companies that may have otherwise approached the Debtors with potentially beneficial transactions, may turn instead to the Debtors' competitors, which would seriously impact the Debtors' ability to preserve the value of their estates to the detriment of their creditors and other stakeholders.

Robert M. Tarola

SUBSCRIBED and SWORN TO before me
this 1st day of May, 2001.

Notary Public
My Commission Expires February 3, 2003

J:\Project Allen\DIP-Financing\creditl.affidavit.wpd

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (RJN) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## **AFFIDAVIT OF SERVICE**

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | )SS |
| COUNTY OF NEW CASTLE | ) |

Patricia E. Cuniff, being duly sworn according to law, deposes and says that she is

employed by the law firm of Pachulski, Stang, Ziehl, Young & Jones P.C., co-counsel for the

Debtors, in the above-captioned action, and that on the 1st day of May, 2001 she caused a copy of

the following document(s) to be served upon the attached service list(s) in the manner indicated:

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

    **1.**     **Debtors' Response to Objection of Credit Lyonnais, New York**

**Branch, to Debtors' Emergency Motion for Interim and Final Orders, Under 11 U.S.C. §§**

**105, 362, and 364, Approving Postpetition Financing and Related Relief and Setting Final**

**Hearing Pursuant to Bankruptcy Rule 4001(c).**

Dated: May 1, 2001

Patricia E. Cuniff

Sworn to and subscribed before
me this 1st day of May, 2001

Notary Public
My Commission Expires:  03-31-02

W. R. Grace 2002 Service List
Case No. 01-1139 (RJN)
Doc. No. 21948
May 1, 2001
11 – Hand Delivery
07 – Federal Express
59 – First Class Mail

(Counsel to Debtors and Debtors in
Possession)
Laura Davis Jones, Esquire
David Carickhoff, Esquire.
Pachulski, Stang, Ziehl, Young & Jones
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

(Counsel to Debtors and Debtors in
Possession)
Hamid R. Rafatjoo, Esquire
Pachulski, Stang, Ziehl, Young & Jones
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4100

*Hand Delivery*
(Copy Service)
Parcels, Inc.
Vito I. DiMaio
10th & King Streets
Wilmington, DE  19801

*Hand Delivery*
(Local Counsel to DIP Lender)
Steven M. Yoder, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

*Hand Delivery*
(Local Counsel to Asbestos Claimants)
William P. Bowden, Esquire
Matthew G. Zaleski, III, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

*Hand Delivery*
William H. Sudell, Jr., Esquire
Eric D. Schwartz, Esquire
Morris, Nichols Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

*Hand Delivery*
(Counsel for The Chase Manhattan Bank)
Mark D. Collins, Esquire
Deborah E. Spivack, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Hand Delivery*
Jeffrey C. Wisler, Esquire
Michelle McMahon, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market Street, 10th Floor
Wilmington, DE 19899

*Hand Delivery*
(Counsel for Ingersoll-Rand Fluid Products)
Francis A. Monaco, Jr., Esquire
Walsh, Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE 19801

**Hand Delivery**
(Counsel for Ingersoll-Rand Fluid Products)
Frederick B. Rosner, Esquire
Walsh, Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

**Hand Delivery**
(Counsel for Property Damage Claimants)
Michael B. Joseph, Esquire
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Hand Delivery**
Bruce E. Jameson, Esquire
Prickett, Jones & Elliott
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

**Hand Delivery**
Mark S. Chehi
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

**Federal Express**
(Counsel to Debtor)
James H.M. Sprayregen, Esquire
James Kapp, III, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

**Federal Express**
(United States Trustee)
Frank J. Perch, Esquire
Office of the United States Trustee
601 Walnut Street, Curtis Center,
Suite 950 West
Philadelphia, PA 19106

**Federal Express**
(Canadian counsel for Debtor)
Derrick Tay, Esquire
Meighen Demers
Suite 1100, Box 11, Merrill Lynch Canada
Tower
Sun Life Center, 200 Kint Street West
Toronto, Ontario M5H 3T4
CANADA

**Federal Express**
(W. R. Grace & Co.)
David B. Siegel
W.R. Grace and Co.
7500 Grace Drive
Columbia, MD 21044

**Federal Express**
(Official Committee of Personal Injury
Claimants)
Elihu Inselbuch, Esquire
Rita Tobin, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue, 36th Floor
New York, NY 10022

**Federal Express**
(Official Committee of Unsecured
Creditors)
Lewis Kruger, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

**Federal Express**
(Official Committee of Property Damage
Claimants)
Scott L. Baena, Esquire
Member
Bilzin Sumberg Dunn Baena Price &
Axelrod LLP
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL 33131

**First Class Mail**
(Counsel to Sealed Air Corporation)
D. J. Baker, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

**First Class Mail**
(Counsel to DIP Lender)
J. Douglas Bacon, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

**First Class Mail**
(Counsel to Asbestos Claimants)
Nancy Worth Davis, Esquire
Ness, Motley, Loadhold, Richardson &
Poole
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

**First Class Mail**
)
Todd Meyer, Esquire
Kilpatrick Stockton
1100 Peachtree Street
Atlanta, GA 30309

**First Class Mail**
Securities & Exchange Commission
15th & Pennsylvania Ave. N.W.
Washington, DC 20020

**First Class Mail**
District Director
IRS
409 Silverside Road
Wilmington, DE 19809

**First Class Mail**
Securities & Exchange Commission
Atlanta Regional Office
Branch/Reorganization
3475 Lenox Road, NE, Suite 100
Atlanta, GA 30326-1232

**First Class Mail**
Secretary of Treasurer
P.O. Box 7040
Dover, DE 19903

**First Class Mail**
Secretary of State
Division of Corporations
Franchise Tax
P.O. Box 7040
Dover, DE 19903

**First Class Mail**
James D. Freeman, Esquire
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street
Suite 945-North Tower
Denver, CO 80202

**First Class Mail**
Jon L. Heberling, Esquire
McGarvey, Heberling, Sullivan &
McGarvey PC
745 South Main Street
Kalispel, MT 59901

**First Class Mail**
Patrick L. Hughes, Esquire
Haynes & Boone LLP
1000 Louisiana Street, Suite 4300
Houston, TX 77002-5012

**First Class Mail**
David S. Heller, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606



*First Class Mail*
Charles E. Boulbol, Esquire
26 Broadway, 17th Floor
New York, NY 10004

*First Class Mail*
Ira S. Greene, Esquire
Squadron, Ellenoff, Plesent & Sheinfeld,
LLP
551 Fifth Avenue
New York, NY 10176

*First Class Mail*
James A. Sylvester, Esquire
Intercat, Inc.
104 Union Avenue
Manasquan, NJ 08736

*First Class Mail*
Steven J. Johnson, Esquire
Gibson, Dunn & Crutcher LLP
1530 Page Mill Road
Palo Alto, CA 94304-1125

*First Class Mail*
Charlotte Klenke, Esquire
Schneider National, Inc.
P.O. Box 2545
3101 S. Packerland
Green Bay, WI 54306

*First Class Mail*
David S. Rosenbloom, Esquire
Jeffrey E. Stone, Esquire
Lewis S. Rosenbloom, Esquire
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096

*First Class Mail*
Brad Rogers, Esquire
Office of the General Counsel
Pension Benefit Guaranty Corp
1200 K. Street, N. W.
Washington, D.C. 20005-4026

*First Class Mail*
Pamela Zilly
Richard Shinder
David Blechman
Michael Alexander
The Blackstone Group
345 Park Avenue
New York, NY 10154

*First Class Mail*
Josiah Rotenberg
Lazard Freres & Co. LLC
30 Rockefeller Plaza, 60th
New York, NY 10020

*First Class Mail*
(Counsel for The Chase Manhattan)
Stephen H. Case, Esquire
Nancy L. Lazar, Esquire
David D. Tawil, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

*First Class Mail*
Jan M. Hayden
William H. Patrick
Heller, Draper, Hayden, Patrick & Horn,
L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103

*First Class Mail*
Joseph F. Rice
Ness, Motley, Loadholt, Richardson &
Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

*First Class Mail*
Nancy Worth Davis
Ness, Motley, Loadholt, Richardson &
Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

*First Class Mail*
(Counsel for Asbestos Claimants)
Steven T. Baron, Esquire
Member
Silber Pearlman, LLP
2711 North Haskell Avenue, 5th Floor, LLP
Dallas, TX 75204

*First Class Mail*
Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

*First Class Mail*
(Attorneys for PPG Industries, Inc.)
W.J. Winterstein, Jr., Esquire
John J. Winter, Esquire
William M. Aukamp, Esquire
Eleven Penn Center, 29th Floor
1835 Market Street
Philadelphia, PA 19103

*First Class Mail*
R. Scott Williams
PMG Capital Corp.
Four Falls Corporate Center
West Conshohocken, PA 19428-2961

*First Class Mail*
Alan R. Brayton, Esquire
Brayton & Purcell
222 Rush Landing Road
Novato, CA 94945

*First Class Mail*
Jonathan W. Young
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229

*First Class Mail*
Russell W. Budd
Alan B. Rich
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

*First Class Mail*
Shelby A. Jordan, Esquire
Nathaniel Peter Holzer. Esquire
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78471

*First Class Mail*
Courtney M. Labson, Esquire
The Mills Corporation
Legal Department
1300 Wilson Boulevard, Suite 400
Arlington, VA 22209

*First Class Mail*
T. Kellan Grant
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229

*First Class Mail*
Cindy Schultz
Ingersoll-Rand Fluid Products
One Aro Center
P.O. Box 151
Bryan, OH 43506

*First Class Mail*
Alan Kolod, Esquire
Moses & Singer LLP
1301 Avenue of the Americas
40th Floor
New York, NY 10019-6076

*First Class Mail*
Mr. Thomas Moskie
Bankers Trust Company
Four Albany Street
Fourth Floor
New York, NY 10006

*First Class Mail*
John P. Dillman, Esquire
Linebarger Heard Goggan Blair
Graham Peña & Sampson, LLP
P.O. Box 3064
Houston, TX 77253-3064

*First Class Mail*
Charles E. Gibson, III
Attorney at Law
620 North Street, Suite 100
Jackson, MS 39202

*First Class Mail*
Paul M. Baisier, Esquire
SEYFARTH SHAW
1545 Peachtree Street
Suite 700
Atlanta, Georgia 30309

*First Class Mail*
Kevin D. McDonald
Wilshire Scott & Dyer, P.C.
One Houston Center
1221 McKinney, Suite 4550
Houston, Texas  77010

*First Class Mail*
Christopher Beard, Esquire
Beard & Beard
306 N. Market Street
Frederick, MD 21701

*First Class Mail*
Bernice Conn, Esquire
Robins, Kaplan, Miller & Ciresi LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067

*First Class Mail*
Steven R. Schlesinger, Esquire
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, NY 11530

*First Class Mail*
Steven J. Kherkher, Esquire
Laurence G. Tien, Esquire
Williams Bailey Law Firm, L.L.P.
8441 Gulf Freeway, Suite #600
Houston, Texas 77017

*First Class Mail*
Kimberly W. Osenbaugh
Preston Gates & Ellis LLP
701-5th Avenue
Suite 5000
Seattle, WA 98104-7078

*First Class Mail*
Lewis T. LeClair, Esquire
McKool Smith
300 Crescent Court, Suite 1500
Dallas, Texas 75201

**First Class Mail**
Delta Chemical Corporation
2601 Cannery Avenue
Baltimore, MD 21226-1595

**First Class Mail**
Steven T. Hoort, Esquire
Ropes & Gray
One International Place
Boston, Massachusetts 02110-2624

**First Class Mail**
Peter Van N. Lockwood, Esquire
Julie W. Davis, Esquire
Trevor W. Swett, III, Esquire
Nathan D. Finch, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005

**First Class Mail**
Peter A. Chapman
24 Perdicaris Place
Trenton, NJ  08618

**First Class Mail**
Paul M. Matheny
The Law Offices of Peter G. Angelos, P.C.
5905 Harford Rd.
Baltimore, MD  21214

**First Class Mail**
Michael J. Urbis
Jordan, Hyden, Womble & Culbreth, P.C.
2390 Central Blvd, Suite G
Brownsville, TX 78520

**First Class Mail**
Mary A. Coventry
Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663

**First Class Mail**
Margery N. Reed, Esquire
Duane, Morris & Heckscher LLP
4200 One Liberty Place
Philadelphia, PA 19103-7396

**First Class Mail**
Attn: Meridee Moore and Kirsten Lynch
Farallon Capital Management, L.L.C.
One Maritime Plaza
Suite 1325
San Francisco, California 94111

**First Class Mail**
John M. Klamann
Klamann & Hubbard
7101 College Blvd., Suite 120
Overland Park, KS 66210