ORIGINAL

FILED

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JFF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

**AFFIDAVIT OF ROBERT M. TAROLA IN SUPPORT OF DEBTORS' RESPONSE TO OBJECTION OF CREDIT LYONNAIS, NEW YORK BRANCH, TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS, UNDER 11 U.S.C. §§ 105, 362 AND 364, APPROVING POSTPETITION FINANCING AND RELATED RELIEF AND SETTING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c) [DOCKET NO. 25]**

| | | |
|---|---|---|
| STATE OF MARYLAND | ) | |
| | ) | ss. |
| COUNTY OF HOWARD | ) | |

Robert M. Tarola, being duly sworn, deposes and states:

1. I am the Senior Vice President and Chief Financial Officer of W. R. Grace & Co., one of the debtors and debtors in possession in these procedurally consolidated bankruptcy cases (the

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

J:\Project Allen\DIP-Financing\creditl.affidavit.wpd

"Debtors"). I am submitting this Affidavit in support of the Debtors' Response to the Objection of Credit Lyonnais, New York Branch, to Debtors' Emergency Motion for Interim and Final Orders, Under 11 U.S.C. §§ 105, 362 and 364, Approving Postpetition Financing and Related Relief and Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c). All facts set forth in this Affidavit are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and their present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit.

2. The Debtors represent a $1 billion enterprise with the attendant cash needs of a manufacturing business of that size. Prior to commencing these chapter 11 cases, the Debtors were supplementing their operating cash flows to fund these significant cash needs with an aggregate of $500 million in working capital facilities. These prepetition facilities are fully drawn[2], and the Debtors had de minimis cash on hand at the time of their bankruptcy filings. Access to sufficient new credit will therefore be critical to the Debtors' operations postpetition.

3. Access to the DIP Facility is necessary for the Debtors to support operating activities and anticipated non-operating expenditures. In particular, the Debtors need to continue funding required and/or permitted legacy obligations (such as environmental remediation costs and retiree obligations) and making capital expenditures based on their operating plans, as well as to incur significant restructuring costs in connection with these chapter 11 cases. Additionally, as set forth

---

[2] Although a portion of the funds borrowed under the prepetition facilities was used to fund costs of litigations that may be stayed by the bankruptcy filing, a significant portion was utilized for liquidity purposes.

in more detail in the DIP Motion, the Debtors will need to fund $65 million of receivables that were previously sold under a securitization facility to Wachovia Bank.

4.  The Debtors expect that replacement of the receivables facility, together with expenditures for routine capital, ongoing legacy obligations and chapter 11 costs will exceed cash generated from their operations by nearly $80 million in 2001, and that the cash flow could continue to be negative in 2002 and 2003. The Debtors project that, depending on the outcome of various business assumptions, even prior to any strategic investments, they will need between $80 million and $160 million for liquidity needs over the next two years,[3] and that the DIP Facility will need to be extended or replaced at its stated maturity date. The Debtors have consulted both with their financial advisors and with prospective DIP lenders in determining the appropriate size of the DIP Facility.

5.  In addition, availability of postpetition financing is vital not just for the necessary cash and credit support for the Debtors to operate their businesses. Equally important is the sense of confidence that such financing will instill in the Debtors' suppliers and customers. No business of this size can operate with just the minimum of cash necessary for bare survival. The Debtors' suppliers also have to feel confident that the Debtors have sufficient capital to weather any downturn in the economy generally or in the Debtors' own operations to continue providing the Debtors with customary trade terms. In turn, absent the sense that the Debtors have the capability to grow and fund new product developments, many of the Debtors' otherwise loyal customers may look

---

[3] These numbers reflect the Debtors' annualized cash needs, however, since the Debtors' businesses are seasonal, their cash needs in the first and fourth calendar quarters are likely to be higher. In addition, these numbers do not include the Debtors' potential requirements for standby and documentary letters of credit. Such requirements may account for additional tens of millions of dollars of DIP Facility utilization over the next two years.

elsewhere to purchase the products in which the Debtors specialize. Many of the Debtors' customers rely on the Debtors for products that are critical to such customers' businesses, accordingly, the customers' confidence in the Debtors' long-term ability to continue supplying and improving such product offerings is absolutely vital. It is, therefore, possible that cancellations of pending orders could follow and the Debtors' ability to secure new orders could be jeopardized. The failure of the Debtors' suppliers and customers to be fully confident at this time, and the resultant loss of customer patronage, could dramatically decrease the Debtors' hopes of reorganizing and reduce their ability to maintain the value of their estates. It is particularly important to rebuild the confidence of the Debtors' suppliers and customers as quickly as possible at this critical juncture in these chapter 11 cases. Until the suppliers and customers are convinced that necessary financing is in place for the Debtors to operate their businesses, these suppliers and customers may be unwilling to honor existing business arrangements or create new ones. The ability of the Debtors to remain viable entities and reorganize under chapter 11 therefore depends upon obtaining the relief requested in the DIP Motion.

6. The unused line fees payable under the DIP Facility are only 3/8 of one percent, an amount that is insignificant to the Debtors, and which should not justify cutting the Debtors' access to necessary financing.

7. As a result of various restructuring programs during the 1990s, the Debtors emerged in 1998 as a specialty chemicals company with market leading businesses. However, their business portfolio was considered mature, with slow to moderate growth prospects. During 1999, the Debtors embarked on an aggressive growth program to strengthen their market position and accelerate the growth rates of their businesses. This program consists of both internal growth through new product

development and innovative approaches in sales and marketing, and external growth through acquisitions, joint ventures and strategic alliances driven by a newly-established business development group. This growth program has been an essential and integral part of the Debtors' business strategy for the last two years.

8. The focus of the external growth program is to acquire businesses that complement and strengthen the Debtors' existing businesses. Strategic acquisitions pursued by the Debtors provide geographic expansion, product line extensions or entry into markets where the Debtors believe an acquisition would be more effective and provide superior financial and business results compared to "grass-roots" development. All of the acquired businesses were immediately integrated with the Debtors' existing businesses, yielding synergies enabling the Debtors to realize earnings and cash accretion. As part of their existing strategy, the Debtors intend to continue to look for opportunities for acquisitions that would be equally beneficial to their businesses and estates.

9. The Debtors impose stringent criteria on their acquisitions and subject them to a rigorous approval process, including obtaining Board of Directors approval for transactions with a cost of more than $10 million.

10. The Debtors believe that, in today's world, a company must grow its businesses to remain strong and competitive. If the Debtors are unable to continue their acquisitions program, thus failing to add new and better products and expand their geographic presence, they would be placed at a competitive disadvantage in an increasingly competitive environment. If there is no confidence in the Debtors' ready access to capital to make acquisitions or enter into joint ventures, the companies that may have otherwise approached the Debtors with potentially beneficial transactions, may turn instead to the Debtors' competitors, which would seriously impact the Debtors' ability to preserve the value of their estates to the detriment of their creditors and other stakeholders.

_____
Robert M. Tarola

SUBSCRIBED and SWORN TO before me
this 1st day of May, 2001.

_____
Notary Public
My Commission Expires February 3, 2003