## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| W. R. GRACE & CO., et al., | Case No. 01-1139 (JJF) |
| Debtors. | Jointly Administered |

**MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR REJECTION, AND (II) ALLOWING AND DIRECTING PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE**

First Union Commercial Corporation ("First Union"), by its undersigned counsel, under Section 365 of Title 11 of the United States Code (the "Bankruptcy Code"), hereby requests that the Court enter an Order, in the form attached hereto, compelling debtors, W. R. Grace & Co., et al. (the "Debtors") (i) to assume or reject the certain equipment lease to which debtor W. R. Grace & Co. – Conn. ("Grace") is a party with First Union and to comply with post-petition obligations under such equipment lease as required by Section 365(d)(10) of the Bankruptcy Code, and (ii) allowing First Union an administrative claim for unpaid rent under the equipment lease, under Section 503(b) of the Bankruptcy Code, and directing the payment of such claim.

In support of the relief requested by this motion, First Union respectfully represents as follows:

### JURISDICTION, VENUE AND STATUTORY AUTHORITY

1.      The Court has subject matter jurisdiction over this motion under and pursuant to

28 U.S.C. §1334.  Venue of this motion is proper before the Court under and pursuant to 28 U.S.C. §1409.

2.      This is a core matter under 28 U.S.C. §§ 157 (b)(2)(A), (b)(2)(B) and (b)(2)(O). If opposed by the Debtors or any other party in interest, the motion would be a contested matter under Federal Rule of Bankruptcy Procedure 9014.

3.      The statutory authority for the relief sought by this motion is contained in Section 365 of the Bankruptcy Code.

## PROCEDURAL BACKGROUND

4.      On April 2, 2001 (the "Petition Date"), Debtors commenced the captioned cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date Debtors have operated as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code.

5.      By prior order of the Court the captioned cases have been procedurally consolidated and are being jointly administered under the above case caption.

6.      In their "First-Day" pleadings filed with the Court and in their press releases regarding the bankruptcy cases Debtors make clear that the reason for the cases is for Debtors to obtain a forum in which, they assert, asbestos claims that have been and will be asserted against them can be resolved and paid in an efficient and fair manner.  *See* Exhibit A attached hereto. Debtors have not pointed to any operational or other business issues that require their reorganization under Chapter 11.  Rather, it is the specter of asbestos litigation, and the actual or

2

potential damage awards resulting therefrom, that has brought Debtors, and forced their non-asbestos creditors, including First Union, to the chapter 11 process.

## **FACTUAL BACKGROUND**

6.      On or about April 12, 1995, Grace and Baltimore Gas & Electric  Company ("BGE") entered into a contract (the "Construction Contract") whereby BGE would acquire and install a power substation and associated equipment (the "Substation") at Grace's facility located at 5500 Chemical Road, Baltimore, Maryland (the "Premises").  A true and correct copy of the Construction Contract is attached hereto as Exhibit B.

7.      The Construction Contract was amended by the Amendment Number One to Agreement dated April 12, 1995, executed by Grace. BGE and First Union's predecessor, Signet Leasing and Financial Corp. ("Signet") on or about December 21, 1995 (the "Amendment").  A true and correct copy of the Amendment is attached hereto as Exhibit C.  The Amendment provided, *inter alia*, for Signet to acquire and lease to Grace the equipment comprising the Substation.

8.      On December 21, 1995, Signet, as lessor, and Grace, as lessee, entered into the certain Equipment Lease Agreement dated as of December 21, 1995 (the "Lease").  In the Lease the parties recite, *inter alia*, that "the parties agree that Lessee shall lease from Lessor the property (the "Equipment") described in the Equipment Schedule(s) to be executed pursuant hereto …subject to the terms set forth herein, in the Riders annexed hereto and in the Equipment Schedule."  A true and correct copy of the Lease is attached hereto as Exhibit D.

9.      On December 21, 1995, Signet, as lessor, and Grace, as lessee, executed Equipment Schedule No. 3059 dated as of December 21, 1995 (the "Equipment Schedule").  A true and correct copy of the Equipment Schedule is attached hereto as Exhibit E.  Attached to the

3

Equipment Schedule is a list of the equipment leased to Grace comprising the Substation (the "Equipment").

10.    Attached hereto as Exhibit F are true and correct copies of the Invoice and the Equipment Bill of Sale issued by BGE to Signet with respect to the installation and sale of the Equipment by BGE to Signet.

11.    Attached hereto as Exhibit G is a true and correct copy of Rider No. 1 to the Lease . Rider No. 1 gives Grace the option, at the end of the Lease term, assuming no defaults exist (and otherwise in accordance with the terms of Rider No. 1 and the Lease), to renew the Equipment Schedule for **all** of the Equipment at its then fair market rental value or to buy **all** of the Equipment at its then fair market value.

12.    Attached hereto as Exhibit H is a true and correct copy of Rider No. 2 to the Lease, a tax indemnity agreement between Signet and Grace, wherein Grace represents and warrants that:

> [I]t is reasonable to assume that the useful life of the Equipment exceeds the lease term ... by the greater of one (1) year or twenty (20) percent of such estimated useful life, and that said Equipment will have a value at the end of the term of such Equipment Schedule ... of at least twenty per cent of the Total Invoice Cost of the Equipment...."

4

13.    Attached hereto as Exhibit I is a true and correct copy of the Real Property

Waiver executed by Grace on or about and dated as of December 21, 1995.  By the Real Property

Waiver, Grace agreed, *inter alia*, that:

(a)    Title to the Equipment was to remain in the lessor;

(b)    The Equipment would remain personal property notwithstanding the "manner or mode" of its attachment to the Premises; and

(c)    Not to assert any lien, claim or interest in the Equipment by virtue of Grace's interest in the Premises.

14.    To give notice to third parties of its ownership and lessor interests in the

Equipment Signet on December 26, 1995 recorded with the State of Maryland a Uniform

Commercial Code financing statement (the "UCC-1").  A true and correct copy of the UCC-1 is

attached hereto as Exhibit J.

15.    By merger with Signet on November 29, 1997, First Union became the successor

to all of Signet's right, title and interest in and to the Lease, the Equipment Schedule, the

Equipment and all other related documents referred to above and attached hereto.  First Union is

the owner and lessor of the Equipment.  A true and correct copy of the Agreement and Plan of

Merger merging Signet into First Union is attached hereto as Exhibit K.

16.    The Lease, Equipment Schedule, the Riders and all other related documents

comprising the written lease agreement between First Union and Grace shall be referred to

hereafter as the "Equipment Lease."

17.    The term of the Equipment Lease is ten years with rent payments due on a

monthly basis, in arrears, on the 21st day of each month.

5

18.     Debtors were current with respect to their rent payment obligations under the Equipment Lease as of the Petition Date, but have not made the payments that have come due on April 21, 2001, or May 21, 2001.

19.     On information and belief, the Equipment is essential to the Debtors' operations at the Premises as the Substation provides all the power used by Grace at the facility.

## RELIEF REQUESTED

20.     By this motion First Union seeks an order (i) compelling Debtors by a near date certain either to assume or reject the Equipment Lease and to comply with  post-petition obligations under the Equipment Lease pending assumption or rejection, and (ii) allowing First Union an administrative claim under Section 503(b) of the Bankruptcy Code for the rent due under the Equipment Lease for the first 59 days of these cases at the rental rate reserved by the Equipment Lease and directing Debtors to pay such amount to First Union.

## ARGUMENT AND AUTHORITIES

### DEBTORS MUST BE COMPELLED TO ASSUME OR REJECT THE EQUIPMENT LEASE

21.     Section 365(d)(2) of the Bankruptcy Code provides that:

> In a case under Chapter 11 ... of this title, the trustee may assume or reject an ... unexpired lease of ... personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such ... lease, may order the trustee to determine within a specified period of time whether to assume or reject such ... lease.

22.     The case law is clear that a debtor should have only a reasonable amount of time under the facts and circumstances in which to decide whether to assume or reject an executory lease or contract. *See Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982); *Matter*

6

*of Holly's, Inc.*, 140 B.R. 643, 682 (Bankr. W.D. Mich. 1992); *Matter of Dunes Casino Hotel*, 63

B.R. 939, 949 (D.N.J. 1986). Such time period is left to the discretion of the bankruptcy court.

*Matter of Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re*

*Monroe Well Service, Inc.*, 83 B.R. 317, 323 (Bankr. E.D. Pa. 1988). Involved in this

determination is the non-debtor contract party's right to certainty with respect to its position in

the case in connection with its property and obligations under the executory contract. *In re*

*Physician Health Corporation*, 2001 Bankr. LEXIS 561, slip op. at 4 (Bankr. D. Del. 2001). *See*

Exhibit L.

23.    Under the facts and circumstances here, Debtors' time to assume or reject should

be shortened. First Union is entitled to the certainty of knowing its position in this case with

respect to the Equipment Lease and the Equipment. This case is not one in which the Debtors'

fundamental business operations must be substantially reorganized. Rather, as set forth in

Debtors' Informational Brief filed on the first day of the cases, the thrust of these cases is

Debtors' attempt to handle asbestos claims. Moreover, it is clear that the Substation Equipment

is vital to the Debtors' continued operations at the Premises. Compelling Debtors to assume or

reject now would in no way create a situation where the Debtors were being forced to

"prematurely" or "precipitously" decide whether to assume or reject a lease.

24.    Accordingly, Debtors should be compelled to assume or reject the Equipment

Lease by a near date certain. First Union requests that Debtors be compelled to assume or reject

within ten (10) days of the date of an order entered by the Court with respect to this Motion.

SL1 170939v1/02995.721

**DEBTORS MUST COMPLY WITH THEIR SECTION 365(D)(10)**
**OBLIGATIONS PENDING ASSUMPTION OR REJECTION**

25.    Section 365(d)(10) of the Bankruptcy Code requires debtors to comply with their

obligations under equipment leases from and after 60 days after the commencement of the

bankruptcy case. *In re Hechinger Investment Company of Delaware, Inc.*, 2001 Bankr. LEXIS

148, slip op. at 20 (Bankr. D. Del. 2001); *In re Eastern Agri-Systems, Inc.*, 258 B. R. 352, 354

(Bankr. E. D. N. C. 2000); *Matter of Kyle Trucking, Inc.*, 239 B. R. 198, 201 (Bankr. N. D. Ind.

1999); *In re Elder-Beerman Stores Corp.*, 201 B.R. 759, 761 (Bankr. S. D. Ohio 1996).

26.    Section 365(d)(10) provides as follows:

> The trustee shall timely perform all of the obligations of the Debtor,
> except those specified in Section 365(b)(2), first arising from or after 60
> days after the order for relief in a case under Chapter 11 of this title under
> an unexpired lease of personal property (other than personal property
> leased to an individual primarily for personal, family, or household
> purposes), until such lease is assumed or rejected notwithstanding Section
> 503(b)(1) of this title, unless the court, after notice and a hearing and
> based on the equities of the case, orders otherwise with respect to the
> obligations or timely performance thereof. This subsection shall not be
> deemed to affect the trustee's obligations under the provision of subsection
> (b) or (f). Acceptance of any such performance thereof. This subsection
> shall not be deemed to affect the trustee's obligations under the provisions
> of subsection (b) or (f). Acceptance of any such performance does not
> constitute waiver or relinquishment of the lessor's rights under such lease
> or under this title.

27.    In *Elder-Beerman*, the Court noted that "Congress adopted Section 365(d)(10) to

"shift to the debtor the burden of bringing a motion [to assume or reject the lease] while allowing

the debtor sufficient breathing room after the bankruptcy petition to make an informed decision."

201 B.R. at 763, *quoting from*, 140 Cong. Rec. H10,752-01 (daily ed, October 4,1994). The

*Elder-Beerman* court also went on to hold that a debtor must perform under

Section 365(d)(10) until the Court grants leave for them to do otherwise. 201 B.R. at 765.

SL1 170939v1/02995.721

28.     The sixtieth day of these cases occurred on May 31, 2001.  After such time

Debtors must comply with their obligations under the Equipment Lease and to the extent they

fail to do so, must be compelled by the Court.

**FIRST UNION SHOULD BE ALLOWED AN ADMINISTRATIVE
CLAIM FOR RENT DUE FOR THE FIRST 59 DAYS OF THE CASE
AND DEBTORS SHOULD BE DIRECTED TO PAY SUCH CLAIM**

29.     It is clear from the caselaw interpreting Section 365(d)(10) that a lessor is entitled

to an administrative claim for the first 59 days prior to the 60th day when Section 365(d)(10)

obligations arise.  *In re D.M Kaye & Sons Transport, Inc.*, 259 B. R. 114, 123 (Bankr. D. S. C.

2001); *In re Russell Cave Company, Inc.*, 247 B. R. 656 (Bankr. E. D. Ky. 2000).  The rent

reserved by the lease is the proper measure of such claim.  *D.M Kaye & Son Transport, Inc.*, 259

B. R. at 123.

30.     The monthly rent under the Equipment Lease is $13,622.80.  The rent due for the

period from the Petition Date to May 21 (the June 21 payment covers the period May 22 through

June 21), is $22,704.67.  First Union is entitled to an administrative claim in such amount.

31.     Further, First Union requests that Debtors be directed to pay its administrative

claim for the period from the Petition Date through May 21st in the amount of $22,704.67 within

ten days of the date of the Court's order with respect to this motion.

32.     It is within the Court's discretion to determine when an administrative claim

should be paid. *In re Verco Indus.*, 20 B.R. 664, 665 (B.A.P. 9th Cir. 1982); *In re Kaiser Steel

Corp.*, 74 B.R. 885, 891 (Bankr. D. Colo. 1990). Where there are sufficient funds in the estate to

pay all administrative expenses in full, immediate payment to an administrative creditor is

appropriate. *In re Standard Furniture Co.*, 3 B.R. 527, 532-33 (Bankr. S.D. Cal. 1980).

33.     First Union submits, as evidenced by certain of the Debtors' requests for relief

(which were granted by the Court), including their motions for authority to make current

payment of fees and expenses to estate professionals and severance and other benefits to certain of Debtors' employees, that there are sufficient funds to pay administrative expenses. What First Union provides to the estates as represented by the Equipment Lease is no less valuable to the estates than professional services and have no less a priority under the Bankruptcy Code distribution scheme. Under the circumstances here, First Union's administrative claim should not be treated differently. First Union should receive its bargained for consideration under the Equipment Lease accruing for the first 59 days of the case.

34.    Second, the reason for these cases is the Debtors' actual or potential asbestos liabilities, not their operational, core business expenses. Debtors can and should be able to deal with such claims while continuing to meet their on-going business obligations and without disrupting their creditor relationships.

35.    Third, on information and belief, the April 21 and May 21 rent payments under the Equipment Lease were not made only because of the timing of the Debtors' bankruptcy filing and not because of an operational or other business reason or due to a financial inability to pay.

36.    Fourth, the Debtors' use of the Equipment provides value to the Debtors and their business operations and Debtors have obtained that value, without compensation to First Union, for the first 59 days of these cases. First Union should not be treated any differently than the Debtors' professionals in these cases who will receive current payment for the services they render to the estates. Simply put, it would be inequitable for Debtors to obtain and retain such value without having to pay the expense they otherwise incurred to obtain such value.

37.    Fifth, while Section 365(d)(10) is designed to provide debtors with a breathing spell to enable them to make decisions with respect to personal property leases, Debtors have had their breathing spell. Under Section 365(d)(10) the obligation to pay rent under personal property leases otherwise due is suspended during the first 59 days of a bankruptcy case to allow

10

a debtor to evaluate the lease to determine whether it wants to retain the equipment leased thereunder. *See Russell Cave Company, Inc.,* 247 B. R. at 659-60. However, nothing in Section 365(d)(10) or anywhere else in the Bankruptcy Code absolves the debtor from such lease obligations.

38.    Debtors' have had their breathing spell and they have not taken action available to them (i.e. rejection of the Equipment Lease) to relieve themselves of their responsibilities thereunder. There no longer is any reason for Debtors to enjoy the deferment of the obligations under the Equipment Lease provided under Section 365(d)(10). Accordingly, Debtors should be made to pay the obligations accruing under the Equipment Lease for the first 59 days of the case.

## NO PRIOR REQUEST/WAIVER OF MEMO OF LAW

38.    First Union has not made any prior request for the relief sought herein. As the issues presented herein are not novel First Union waives its right to file a separate memorandum of law in support of this motion, but reserves the right to file further pleadings in this matter as allowed by the local rules of the Court or as may be requested or allowed by the Court.

SL1 170939v1/02995.721

WHEREFORE, First Union respectfully requests that the relief it seeks hereby be

granted; and requests such other and further relief as the Court deems just and proper.


Dated: June 18, 2001                    **STEVENS & LEE, P.C.**



                                        JOHN D. DEMMY (I.D. No. 2802)
                                        300 Delaware Avenue, Suite 800
                                        Wilmington, DE  19801
                                        Telephone: (302) 425-3308
                                        Telecopier: (302) 654-5181
                                        Email: jdd@stevenslee.com

                                        *Attorneys for First Union Commercial Corporation*

Dated:  June 18, 2001

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| W. R. GRACE & CO., et al., | Case No. 01-1139 (JJF) |
| Debtors. | Jointly Administered |

**ORDER GRANTING MOTION OF FIRST UNION COMMERCIAL
CORPORATION FOR AN ORDER (I) COMPELLING DEBTORS TO
ASSUME OR REJECT EQUIPMENT LEASE AND TO COMPLY WITH
POST-PETITION LEASE OBLIGATIONS UNDER SECTION 365(D)(10) OF
THE BANKRUPTCY CODE PENDING ASSUMPTION OR REJECTION,
AND (II) ALLOWING AND DIRECTING PAYMENT OF AN
ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL CORPORATION
FOR UNPAID RENT FOR THE PERIOD APRIL 2, 2001 THROUGH MAY 21, 2001**

Upon consideration of the motion (the "Motion) of First Union Commercial Corporation

("First Union") for an order compelling debtors W. R. Grace & Co., et al. (the "Debtors") to

assume or reject a certain equipment lease, to comply with their post-petition obligations under

such lease pending assumption or rejection and for allowance and payment of an administrative

claim (Docket Item___) (the "Motion"), and the Court, having found that notice of the Motion

and the hearing on the Motion was proper and adequate under Title 11 of the United States Code

(the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure, and the Court, having

found that the relief sought by the Motion is just and proper and in the best interests of the

Debtors and their estates, and with all capitalized terms not defined herein having the meanings

given them in the Motion, it is hereby,

ORDERED, that the Motion is GRANTED as set forth below; and it is further

ORDERED, that Debtors shall have until _____, 2001, in which to file a motion

seeking either to reject, assume, or assume and assign the Equipment Lease (a "Determination

SL1 171026v1/02995.721

Motion"); and it is further

ORDERED, that a hearing on the Determination Motion shall be held on _____;
and it is further

ORDERED, that Debtors shall under Section 365(d)(10) of the Bankruptcy Code comply
with all obligations under the Equipment Lease pending the Court's ruling on the Determination
Motion, including without limitation making the payments due on June 21, 2001 and each
succeeding 21st day of each month thereafter; and it is further

ORDERED, that First Union is hereby allowed an administrative claim under Section
503(b) of the Bankruptcy Code in the amount of $22,704.67 and that Debtors shall pay such
claim on or before _____; and it is further

ORDERED, that this Order is without prejudice to any and all other claims held by First
Union against Debtors under the Equipment Lease, relating to the Equipment or otherwise.


_____
The Honorable Joseph J. Farnan, Jr.
United States District Court Judge

SL1 171026v1/02995.721

**MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE**

# EXHIBIT A

Contact:
Media Relations:
William Corcoran
(410) 531-4203
OR
Thomas M. Daly, Jr.
Kekst and Company
(212) 521-4800

Investor
Relations:
Francine Gilbert
(410) 531-4283
OR
Bridget Sarikas
(410) 531-4194

## W.R. GRACE & CO. FILES VOLUNTARY CHAPTER 11 PETITION TO RESOLVE ASBESTOS CLAIMS

*-- Company's Businesses Will Continue to Operate as Usual --*
*-- Continued Emphasis on Premier Customer Service and Company's Values --*

**COLUMBIA, Maryland, April 2, 2001** - W. R. Grace & Co. (NYSE: GRA) today announced that the Company has voluntarily filed for reorganization under Chapter 11 of the United States Bankruptcy Code in response to a sharply increasing number of asbestos claims. This Chapter 11 filing includes 60 of Grace's domestic entities. None of the Company's foreign subsidiaries are included in this filing.

The filing, made today in the U.S. Bankruptcy Court in Wilmington, Delaware, will enable the Company to continue to operate its businesses in the usual manner under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it. The Company intends to work closely with asbestos claimants and other creditors to develop a plan of reorganization that will both address valid asbestos claims in a fair and consistent manner and establish a sound capital structure for long-term growth and profitability.

The Company also announced that it has obtained $250 million in debtor-in-possession financing from Bank of America, N.A.. Following the court's approval, the Company can use these funds to help meet the future needs and obligations associated with operating its business, including payment under normal terms to suppliers and vendors for all goods and services that are provided after today's filing.

The Company expects that employees will continue to be paid in the normal manner, and their benefits will not be disrupted. The Company's qualified pension plan for retirees and vested current and former employees is fully funded and protected by federal law.

Grace's Chairman, President, and Chief Executive Officer Paul J. Norris said, "This is a voluntary decision that, although very difficult, was absolutely necessary for us. We believe that the state court system for dealing with asbestos claims is broken, and that Grace cannot effectively defend itself against unmeritorious claims. The best forum available to Grace to achieve predictability and fairness in the claims settlement process is through a federal court-supervised Chapter 11 filing. By filing now, we are able to both obtain a comprehensive resolution of the claims we are facing and preserve the inherent value of our businesses. Under Chapter 11, litigation will be stayed and Grace will be able to address all of the valid claims against it in a fair and consistent manner in one proceeding. In the meantime, we will continue to operate our business in the usual

manner, meeting all of our responsibilities to customers, employees, suppliers, and business partners. There is no other forum currently existing that would allow us to accomplish all of these objectives."

Mr. Norris continued, "Until recently, Grace was able to settle claims through direct negotiations. The filings of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in claims, which we believe is due to a surge in unmeritorious claims. Trends in case filings and settlement demands, which show no signs of returning to historic levels, have increased the risk that Grace will not be able to resolve its pending and future asbestos claims under the current system."

"Moreover, the recent Chapter 11 filings of Babcock & Wilcox, Pittsburgh-Corning, Owens Corning, Armstrong, and GAF are resulting in a significant increase in damages sought by claimants from Grace. Grace will now seek, through the court-supervised Chapter 11 process, to identify and implement a reasonable and just procedure for making payments to creditors and claimants determined to have valid claims against the Company."

Mr. Norris added that, "Grace is a fundamentally sound company with strong cash flow. We have a clear leadership position in all of our major markets, many of them in industries vital to the economy. Over the past several years, the senior management and employees together have led the Company to many significant achievements, including streamlining the Company's operations and driving growth and productivity through our strategic growth initiatives and Six Sigma."

"We are confident that, once we can finally resolve this difficult issue, the Company can leverage its inherent value and strong cash flow to emerge from reorganization as a strong, financially sound enterprise. In the meantime, we will operate as we always have, providing premier quality products and customer service. We urge Congress to pass legislation to address what the Supreme Court has described as an 'elephantine mass of asbestos cases' that defies customary judicial administration."

Grace's asbestos liabilities largely stem from commercially purchased asbestos added to some of its fire protection products. The Company ceased to add any asbestos to its products in 1973. Grace is a co-defendant with many other companies in asbestos litigation, and has claims filed against it across the country. The Company to date has received over 325,000 asbestos personal injury claims, and has paid $1.9 billion to manage and resolve asbestos-related litigation. For the year 2000, asbestos-related claims against the Company were up 81% from the prior year with even higher increases for the first three months of 2001. Five other major companies involved in asbestos-related litigation have voluntarily filed for Chapter 11 under the US Bankruptcy Code since January 1, 2000, bringing the total to 26 companies since 1982.

In light of the Chapter 11 filing, Grace's Annual Meeting of Stockholders, scheduled for May 10, 2001, has been cancelled.

**Grace** is a leading global supplier of catalysts and silica products, specialty construction chemicals and building materials, and container products. With annual sales of approximately $1.6 billion, Grace has over 6,000 employees and operations in nearly 40

countries. For more information, visit Grace's web site at www.grace.com or call the Grace
Financial Reorganization hotline at 1-800-472-2399 (for international calls use your
incountry AT&T Direct Access Number).

*This announcement contains forward-looking statements that involve risks and uncertainties, as well as
statements that are preceded by, followed by or include the words "believes," "plans," "intends", "targets",
"will," "expects," "anticipates," or similar expressions. For such statements, Grace claims the protection of the
safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.
Actual results may differ materially from the results predicted, and reported results should not be considered
as an indication of future performance. Factors that could cause actual results to differ from those contained
in the forward-looking statements include those factors set forth in Grace's most recent Annual Report on
Form 10-KA and quarterly reports on Form 10-Q, which have been filed with the SEC.*

###

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE



# EXHIBIT B

# AGREEMENT

THIS AGREEMENT entered into this ___*12th*___ day of ___*April*___ 19 _95_

by and between GRACE DAVISON, W. R. GRACE & CO.-CONN., (hereinafter called "Owner"), and

___BALTIMORE GAS AND ELECTRIC COMPANY ("BGE")___

party of the second part (hereinafter called "Contractor").

WITNESSETH:    That in consideration of the covenants and agreements herein contained and the mutual benefits to be derived herefrom the parties hereto hereby covenant and agree as follows:

ARTICLE I:       SCOPE OF WORK
        Sec. 1    Contractor agrees to furnish all labor, material, tools and equipment, to supply proper and adequate supervision at all times, and to do all things necessary to insure completion of the work outlined below (hereinafter the "Work") as expeditiously as possible.
        Sec. 2    Contractor shall employ and be responsible to see that all subcontractors shall employ at all times only workers and mechanics who are competent and who will work in harmony with each other and with the employees of the Owner; provided, however, Contractor shall not subcontract Work or any part thereof without the prior written consent of Owner.
        Sec. 3    Contractor warrants and represents that it has the workers, and is in a position to proceed immediately with the performance of the Work and that no other jobs undertaken by Contractor will be given priority over the Work.
        Sec. 4    For purposes hereof, the term, "Work" shall include all those matters set forth in Exhibit A attached hereto:

ARTICLE II:      PAYMENT
        Sec. 1    The Owner shall pay the Contractor for the performance of this Agreement, subject to additions and reductions as provided herein, as follows:


I.      COMPLETE AND FINAL COST: Nine Hundred, Sixty-Five Thousand Dollars
        ($965,000.00)
II.     TERMS OF PAYMENT:       See Exhibit A attached hereto
III.    COMPLETION DATE:    BGE will utilize its best efforts to be completed on or before June 30, 1995.



        Sec. 2    No payment or payments made during the progress of the Work shall be construed as an approval or acceptance of defective work or inferior materials.

ARTICLE III:     CHANGES IN SCOPE OF WORK
        Owner may increase or decrease the scope of the Work by the addition or elimination of one or more items. The Contractor will submit to Owner within 15 days after receipt of a request for an addition or change to the Work, a detailed statement of the additional costs resulting from such request, together with a statement of any proposed additional fee, if any, representing Contractor's charges for each addition or change requested. No additional fee will be payable in respect of any reduction in the Scope of the Work nor in connection with additions to the Work which do not increase the Scope of the Work. Owner will, within 15 days after receipt from Contractor of the statements referred to above, notify Contractor in writing of exceptions, if any, to such statements and Owner and Contractor agree to negotiate in good faith and to exercise their best efforts to reach a mutual agreement promptly as to the estimated additional costs and, where applicable, additional fee. No addition or change to the Work shall be commenced until such mutual agreement is reached. If Contractor fails to notify Owner that an additional fee will be payable in connection with an addition or change to the Work requested by Owner and incorporates such addition or change into the Work, the Owner will not be obligated to pay an additional fee in connection therewith.

1

In conjunction with but subordinate to this Agreement Owner shall issue a purchase order to the Contractor. Amendments to this order shall be the means by which changes, additions to, or deletions from the Work specified in Exhibit A shall be authorized by Owner. All such purchase order amendments shall be marked Exhibit A (numbered consecutively) and designated as an amendment to this Agreement.

**ARTICLE IV:**    *FACILITIES SUPPLIED BY OWNER*

Owner will supply, when readily available at the site of the Work and at no extra cost to Owner, electric service, water, steam and other utilities, but arrangements for same shall be completed before the Work begins.

**ARTICLE V:**    *OWNERSHIP OF DRAWINGS*

All drawings, tracings, reproductions and sketches pertaining to the Work shall be and remain the property of Owner, and shall be returned to Owner upon request. All drawings, tracings, reproductions and sketches pertaining to the Work prepared by the Contractor and the Owner shall become the sole property of the Owner.

**ARTICLE VI:**    *PERMITS AND REGULATIONS*

Contractor shall, at his expense, secure all permits and licenses required for the prosecution of the Work and shall comply with all federal, state, county and city laws, ordinances and regulations having a bearing on the Work covered hereunder. If it is observed by Contractor that the plans and specifications are at variance with any federal, state, county or city law, regulation or ordinance, he shall notify Owner so that necessary changes may be made. Owner shall execute any documents and take any actions that are reasonably necessary to enable Contractor to comply with this Article VI.

**ARTICLE VII:**    *CONTRACTOR'S INSURANCE*

Sec. 1 Indemnification. The Contractor shall indemnify and hold harmless the Owner, its agents and employees against any and all liability, damage, loss and expense, including reasonable attorneys' fees, which may accrue to or be sustained by the Owner, its agents and employees on account of any claim, suit or action made or brought against the Owner, its agents or employees for the death of or injury to any person (including, but not limited to the employees of the Contractor or any of its subcontractors), and for damages to or destruction of property (including the Work and all other existing property of the Owner) arising in whole or part from any and all acts or omissions, whether negligent or otherwise, of the Contractor, any of its subcontractors, the officers, agents or employees of either, or anyone for whose acts the Contractor or its subcontractors may be liable, while engaged in the performance of the Work or while in or about the building or premises of the Owner, provided, however, that the Owner shall have the right, without relieving the Contractor of any obligations hereunder, to participate in the defense of any suit if the Owner so elects. It is hereby agreed by the Owner and the Contractor that this provision is intended to and does indemnify the Owner against any liability caused by or resulting from the joint and combined negligence of the Owner, its agents or employees, and the Contractor, any of its subcontractors, the officers, agents, or employees of either or anyone for whose acts the Contractor or its subcontractors may be liable; provided, however, that this provision is not intended to, and does not indemnify the Owner against any liability caused by or resulting from the sole negligence of the Owner or its employees.

Sec. 2 Insurance. During the performance of the Work and until Acceptance of the Work, Contractor and any subcontractors shall maintain with respect to their operations hereunder insurance as set forth in paragraphs A through E below. Such insurance shall be evidenced by insurance certificate which (1) shall be in form and substance satisfactory to Owner, (2) shall provide that they may not be cancelled or modified unless at least thirty (30) days' written notice shall have been given to Owner, and (3) shall be issued by carriers of recognized responsibility.

A. *Worker's Compensation Insurance*

Worker's Compensation Insurance required in connection with the performance of the Work for (1) employees of Contractor whose salaries or wages are chargeable as part of the Cost of the Work, and (2) employees of subcontractors.

B. *Employer's Liability or Similar Insurance*

Employer's Liability or Similar Insurance for damages because of bodily injury by accident or disease, including death at any time resulting therefrom sustained by employees of Contractor and subcontractors, while engaged in the performance of the Work, subject to the following limits as to Contractor and each subcontractor separately; $100,000 for any one accident and $100,000 in the aggregate for disease.

C. *Commercial General Liability Insurance*

Standard primary Commercial General Liability Insurance with Contractual Liability Coverage for Bodily Injury Liability and Property Damage Liability incurred in connection with the performance of the Work, with limits to be agreed upon, plus excess General Liability Insurance effected with carriers which, subject to Owner's approval, may be selected by Contractor; provided, however, that such primary and excess insurance combined shall be in not less than the following amounts:

With respect to Contractor and any subcontractors:
Bodily Injury Accident:       $1,000,000 each person;  $1,000,000 each accident
Property Damage Liability:    $1,000,000 each accident

D. *Business Automobile Liability Insurance*

Standard Business Automobile Liability Insurance for bodily injury liability and property damage liability incurred in connection with the performance of the Work to cover Contractor's (and any subcontractor's) licensed, owned, non-owned, and hired motor vehicles used in the performance of the Work, subject to the following limits:

Bodily Injury Liability:

$1,000,000 each person

$1,000,000 each accident

Property Damage Liability:

$1,000,000 each accident

E. Self Insurance

It is understood and agreed that Contractor is self insured for part or all of the risks assumed by Contractor under this Agreement in lieu of maintaining part or all of the insurance coverage required under this Agreement.

ARTICLE VIII:    *TITLE, PROTECTION OF PERSONNEL, PROPERTY AND WORK*

Sec. 1    The Contractor shall be solely responsible for the safety of the Work and of all equipment and materials to be used therein until final completion of the same and shall promptly, at its own expense, repair any damage to the same, however caused. The Contractor shall properly guard the Work to prevent any person or persons being injured by it or by the conditions of the site and shall, in all respects, comply with any and all provisions of the law or of local ordinances relating to the maintenance of danger signals, barriers, lights, etc., in and about all excavations or other parts of the Work where the same are required.

Sec. 2    Title to and risk of loss in respect of all equipment and materials and other matters purchased by Contractor and becoming part of the Work shall be and remain the Contractor's responsibility until acceptance of the Work.

ARTICLE IX:    *CLEANLINESS*

It shall be the duty of Contractor at all times to keep the premises clean, to keep the roadways open and to prevent the accumulation of rubbish. The Agreement shall not be considered complete nor the final payment due until Contractor has completely cleared away all debris, rubbish, borrowed earth or other accumulations to the reasonable satisfaction of Owner.

ARTICLE X:    *TERMINATION OF AGREEMENT*

Owner may terminate this Agreement at any time by written notice to Contractor. Any such termination shall be effective in the manner specified in such notice and shall be without prejudice to any claims which Owner may have against Contractor. Upon receipt of such notice, Contractor shall, unless directed otherwise, immediately discontinue the Work hereunder and shall thereafter perform only such services in connection with the Work as Owner may direct. Upon such termination, final settlement of all claims of Contractor arising out of the Agreement shall be made as follows: Owner shall pay Contractor for

3

all unpaid amounts accrued or incurred to the date of such termination for Work required or approved by Owner, provided, however, that if this Agreement is terminated due to the fault or omission of Contractor, Owner will not be required to make any payment to Contractor nor shall the Contractor be entitled to receive any payment on account of the amounts withheld by Owner pursuant to Article II hereof. Owner reserves all rights and remedies to take any action it deems appropriate to hold Contractor liable for any losses or damages to Owner resulting from termination of this Agreement due to the fault or omission of Contractor.

## ARTICLE XI:    RELEASE OF WAIVER

Neither the final payment nor any retained percentages of any payments shall become due until the Contractor shall have delivered to the Owner satisfactory releases or waivers of all claims, liens, and claims for liens of Contractor laborers and material men, and of all other persons, firms, associations or corporations who may have performed any labor or furnished any materials under or in connection with the performance of this Agreement.

## ARTICLE XII:    SUBCONTRACTORS

Contractor shall be responsible to Owner for all actions of all subcontractors on the job as to their workmanship, responsibility, observance of law, securing all permits and for whatever service Contractor may expect the subcontractor to render.

## ARTICLE XIII:    MISCELLANEOUS

Sec. 1    Independent Contractor. Contractor shall be an independent contractor with respect to the performance of the Work and neither Contractor nor any subcontractor, nor the employees of either, shall be deemed to be the servants, employees or agents of Owner.

Sec. 2    Subcontracts. Contractor shall not subcontract or assign parts of the Work without the prior written consent of Owner, which consent shall not be unreasonably withheld by Owner.

Sec. 3    Compliance with Rules and Regulations. The Contractor shall be responsible for enforcement of all project rules and regulations and contractual obligations with its subcontractors, and shall terminate any subcontractor who refuses to comply with the said rules and regulations. The Contractor shall assume full responsibility for the performance of all subcontractors unless the Owner gives a written waiver.

Sec. 4    Compliance with Applicable laws. In the performance of the Work, Contractor shall require all subcontractors to comply with all applicable laws, ordinances, regulations, orders and acts of any government or agency thereof.

Sec. 5    Claims, Liens, Attachments and Encumbrances. Contractor shall hold Owner harmless from any and all claims of Contractor's subcontractors and from claims for material, labor and services in connection with the performance of the Work if such claims results in the subjection of the Work or any other assets of Owner to any lien, attachment or encumbrance. Contractor and Owner shall each promptly notify the other of all such claims of which it may have knowledge.

Sec. 6    Force Majeure. Any delays in or failure of performance by Contractor or Owner shall not constitute default hereunder or give rise to any claims for damages if and to the extent such delays or failures of performance are caused by acts of God or the public enemy; expropriation or confiscation of facilities, compliance with any order or request of any governmental authority, acts of war (whether declared or not declared), rebellion or sabotage or damage resulting therefrom, fires, floods, explosion, accidents, breakdown, riots or strikes or other concerted acts of workers, whether direct or indirect; provided such causes are not within the control of the Contractor or Owner and provided such causes were not reasonably foreseeable at the time of the execution of the Agreement or could not be avoided by the exercise of reasonable diligence. Contractor and Owner shall use their best efforts to overcome any delay resulting from the above.

Sec. 7    Continuous Prosecution of the Work. This Agreement contemplates continuous prosecution of the Work by Contractor.

Sec. 8    Bonds. For Work totaling $100,000 or more. Owner waives need for BGE to obtain bonds.

Sec. 9    Notices or other Communications. Unless otherwise provided herein, any notice, request, demand or other communication required or permitted to be given pursuant to the Agreement shall be in writing and may be given by hand delivery or fax as follows:

Owner

GRACE DAVISON
W. R. GRACE & CO.-CONN.
5500 Chemical Road
Baltimore, MD 21226-1698
Attn: C. D. Rabensburg

4

Contractor

With a copy to:    S. Wolf or C. Smith
Baltimore Gas & Electric Company
Legal Department, 17th floor
Telephone (410) 234-5628 or (410) 234-5314
Fax No.:  (410) 234-5690

or to such other address as may be specified in a written notice given by one party to the other.

Sec. 10  Successors and Assigns.  Neither Owner nor Contractor shall assign the Agreement or any part thereof without the prior written consent of the other party hereto; provided however, that the Agreement shall be assignable to and shall bind and inure to the benefit of any Affiliate of Owner (which shall as part of any such assignment become the beneficial owner of the Work), or of any Affiliate of Contractor.

Sec. 11  Entire Agreement; Amendments; Waivers; etc.  This Agreement sets forth the full and complete understanding of the parties hereto and supersedes all prior agreements, representations and understandings oral or written relating to the subject matter hereof.

No amendment, modification or supplement to this Agreement shall be binding unless it is in writing and duly executed and delivered by each of the parties hereto.

The rights of Contractor or Owner to enforce any provision of this Agreement shall not be affected by its prior failure to require performance of the same or any other provision by the other party to this Agreement; nor shall any right under this Agreement be deemed to have been waived unless the waiver be in writing and signed.

Unless otherwise expressly provided herein, no right or remedy conferred by this Agreement is intended to be exclusive of any other right or remedy, and each and every other right or remedy shall be cumulative and shall be in addition to every other right or remedy given by the Agreement or existing at law or in equity or otherwise.

No person other than Owner and Contractor shall have any rights under this Agreement.

In the event of any conflict between the terms of this Agreement and any of the Exhibits or Attachments hereto, the terms of this Agreement shall govern and determine the rights of the parties hereto.

Sec. 12  Removal of Employees.  The Owner may require the Contractor to dismiss from the Work such employee or employees as the Owner deems incompetent, careless or otherwise objectionable.

Sec. 13  Titles and Captions.  The index, titles and captions in this Agreement are inserted only as a matter of convenience and in no way define or limit this Agreement or the intent of any provision thereof.

Sec. 14  Governing Laws.  This Agreement shall be construed under, and the performance of the parties shall be governed by, the laws of the State of Maryland.

ARTICLE XIV:    CONFIDENTIALITY

Contractor agrees not to reveal any of Owner's information contained in flow sheets, process specifications, drawings, descriptions, records, or other data to anyone without the prior written consent of Owner and agrees to hold in confidence the whole or any part of the design and process of the proposed work which has not been sufficiently disseminated to become public information, and Contractor agrees not to incorporate any of the features contained in the aforesaid materials, or other information supplied by Owner in any Work for others unless it has Owner's prior written consent.  Contractor further agrees that any information as aforesaid which is supplied to Contractor in connection with this Work will be returned to Owner upon termination of the Work.

ARTICLE XV:    GUARANTEE

The Contractor warrants and represents that all the engineering, design, construction, workmanship and materials supplied or produced by it in connection with the performance of this Agreement shall be free of defects for a period ending one year after completion of such work by Contractor and acceptance thereof by Owner.  Contractor's liability arising out of or in connection with the Work shall be limited to the correction, in accordance with this Article, of deficiencies which are reported in writing to

5

Contractor within thirty (30) days after discovery thereof and in no event later than one (1) year following the date of completion of the Work. At Contractor's expense, Contractor shall reperform services which are deficient because of Contractor's failure to perform such Work in accordance with this Agreement. Such reperformance, repair or replacement shall be Contractor's sole liability and Owner's exclusive remedy for deficient work.

There are no warranties or remedies which extend beyond those expressed herein, and Contractor disclaims and Owner waives any implied warranties or warranties imposed by law, including, but not limited to, warranties of merchantability, fitness for a particular purpose, and custom and usage.

**ARTICLE XVI:**    *CANCELLATION OF PRIOR AGREEMENT*

This Agreement cancels and supersedes the Agreement between the parties dated November 16, 1994.

**ARTICLE XVII:**    *EQUAL EMPLOYMENT OPPORTUNITY CONTRACT COMPLIANCE*

If this Agreement is for an amount less than $50,000 the following shall be applicable: GRACE Davison, W. R. Grace & Co.-Conn. is an Equal Opportunity Employer. Pursuant thereto, the provisions of Section 202 of Executive Order 11246 are incorporated herein by reference and shall be applicable to this Agreement unless this Agreement is exempted under rules, regulations or orders of the Secretary of Labor.

If this Agreement is for an amount of $50,000 or more the following is applicable: It is hereby agreed that the attached provisions, which are also set forth in Section 202 of Executive Order 11246, are made a part of this contract.

\*        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BALTIMORE GAS AND
ELECTRIC COMPANY

By _____ *Q. F. Wood*

*Vice President Sales & Marketing*
(Typed or Printed)

GRACE DAVISON
W. R. GRACE & CO.-CONN.

By _____
James R. Hyde, President

\* Rider I attached hereto is made a part of this Agreement.

6

## RIDER I
### to Agreement between
### GRACE DAVISON, W. R. GRACE & CO.-CONN.
### and
### BALTIMORE GAS AND ELECTRIC COMPANY

The following terms shall be added to and become a part of the Agreement:

### Environmental Responsibilities

1.    Owner is in compliance with all applicable federal, state and local environmental laws and regulations including, but not limited to, the Federal Water Pollution Control Act (33 U.S.C. Sections 1251-1387), as amended, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 U.S.C. Section 9601-9675), as amended, and the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901-6992K), as amended, which are applicable to its site at 5500 Chemical Road, Baltimore, Maryland.

2.    Owner has inspected the real property where Contractor will perform the Work under this Agreement and has reviewed its records concerning such property. Such inspection and review indicate that there are no hazardous substances or hazardous wastes on or beneath the surface of the property where the Work will be performed.

3.    Owner shall be responsible, at its sole expense, for the disposal of any hazardous waste or contaminated material present on the property where the Work will be performed. Contractor shall be responsible, at its sole expense, for the disposal of any hazardous waste or contaminated material brought onto the property by Contractor.

4.      Owner shall be responsible, at its sole expense, for additional costs that Contractor may incur which result from or are incidental to the presence of contamination at the site where the Work will be performed, including but not limited to additional costs for treatment and disposal of contaminated water.  In addition, Owner shall be responsible for reporting all incidents of spills or releases of hazardous substances at the site to the appropriate regulatory authorities.

## SCHEDULE A

See:   (1)    W. R. Grace, FCC Project Electric Utilities SSOE 931381 scope of work document dated January 11, 1995, and

     (2)    Letter from Robert P. Lewis, II to Marvin J. Odesky dated March 9, 1995.

**ENERGY PROJECTS & SERVICES**

Baltimore Gas and Electric Company
P.O. Box 1475
Baltimore, Maryland 21203-1475



March 9, 1995

Marvin J. Odesky
Director of Engineering
W. R. Grade & Company
P.O. Box 2117
Baltimore, MD  21203-2117

Re:  Proposed Agreement
Installation New Substation
FCC Catalyst Plant

Dear Mr. Odesky:

Attached is a copy of the revised contract you forwarded to me on February 22, 1995.  It has been marked to show a few additional changes.  In addition, below is the final cost and terms of payment that should be incorporated into the contract.  Please note the comment concerning the interest rate.

The final cost for this project as described in the W.R. Grace, FCC Project Electric Utilities SSOE 931381 scope of work document dated January 11, 1995, Section 01010, Article 3 (copy attached) is $965,000.  Construction financing is included.  BGE anticipates that permanent lease-based financing will be provided based upon the following terms:

- Ten year term facilities agreement (lease).
- Interest rate would be calculated at 296 basis points over like term Treasury bonds and the deal will be priced when the lease is scheduled to begin.

The lease structure is intended to be considered an operating lease for the purpose of W.R. Grace financial reporting requirements.  Based upon $965,000 project costs and an interest rate of 10.60% for 120 months, the monthly payment will be $13,075/month.

Please incorporate our comments into the contract and return for completion.  If you have any questions, please contact me at (410)265-4636.

Very truly yours,

Robert P. Lewis, II
Director
Energy Projects & Services

:ptm
Enclosures
cc: J. L. Tillman

wrg309

**W.R. GRACE**
**DAVISON CHEMICAL DIVISION**
**CURTIS BAY PLANT**

**FCC PROJECT**

**ELECTRICAL UTILITIES**

**SSOE 931381**

**JANUARY 11, 1995**

GRACE DAVISON
CURTIS BAY PLANT
FCC PROJECT

SSOE 931381

SECTION 01010

SCOPE OF WORK

1.  PURPOSE

1.1  The purpose of this document is to briefly describe the general scope of the Electrical Utilities package. This document is not meant to be all inclusive but is intended as a clarification.

1.2  The Contractor is responsible for all of the work as defined in Exhibit A.

2.  SPECIAL CONDITION

2.1  All drawings included in this package which are for reference only have been manually stamped. The Contract is not required to perform any work indicated on these drawings.

2.2  Reference to block numbers is as indicated in the first two digits of the drawing numbers.

2.3  Contractor to obtain all necessary trade permits. The general building permit, erosion control permit, and all air and water discharge permits will be obtained by the Owner.

3.  SCOPE

3.1  Provide all necessary labor and material for the 13.8 KV service from the 15 KV distribution gear (at the horseshoe) to, and including, the 5 KV and 480 Volt substation for the new FCC building, this work is to include, but not limited to:

3.1.1  Addition to existing 15 KV switchgear at the horseshoe distribution center.

3.1.2  Installation of Owner furnished 15 KV triplexed cable.

3.1.3  5 KV substation. /3A

3.1.4  480 Volt double ended substation. /3

3.1.5  Substation building.

3.1.6  Installation of Owner furnished power factor correction centers.

GRACE DAVISON
CURTIS BAY PLANT
FCC PROJECT

SSOE 931381

3.1.7    Power distribution board.

3.1.8    Miscellaneous electrical items.

3.1.9    Grounding.

END OF SECTION

466  3-93;

5004                                    FEDERAL LAWS

# EXECUTIVE ORDERS

## Government Contractors and Subcontractors

## Executive Order 11246

[¶3675]

[Executive Order 11246, signed September 24, 1965, effective October 24, 1965, 30 F.R. 12319; superseded in part by Executive Order 11478, signed August 8, 1969, amended, Executive Order 11375, signed October 13, 1967; Executive Order 12086, signed October 5, 1978, effective October 8, 1978, 43 F.R. 46501.]

[¶3676] [Authority]

Under and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States, it is ordered as follows:

[¶3677] PART I—NONDISCRIMINATION IN GOVERNMENT EMPLOYMENT

Part I of Executive Order 11246 of September 24, 1965, and those parts of Executive Order 11375 of October 13, 1967, which apply to federal employment, are superseded by Executive Order 11478, at §3711.

[¶3678] PART II—NONDISCRIMINATION IN EMPLOYMENT BY GOVERNMENT CONTRACTORS AND SUBCONTRACTORS

[¶3679] Subpart A—Duties of the Secretary of Labor

Sec. 201. The Secretary of Labor shall be responsible for the administration and enforcement of Parts II and III of this Order. The Secretary shall adopt such rules and regulations and issue such orders as are deemed necessary and appropriate to achieve the purposes of Parts II and III of this Order. [Sec. 201 reads as amended by Executive Order 12086, signed October 5, 1978 and effective October 8, 1978.]

[¶3680] Subpart B—Contractors' Agreements

Sec. 202. Except in contracts exempted in accordance with Section 204 of this Order, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"During the performance of this contract, the contractor agrees as follows:

"(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

"(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

"(3) The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

"(4) The contractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

"(5) The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

"(6) In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part, and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

"(7) The contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions, including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States." [Subparagraph 7 reads as amended by Executive Order 12086, signed October 5, 1978 and effective October 8, 1978.]

[¶3681] [Compliance Reports]

Sec. 203. (a) Each contractor having a contract containing the provisions prescribed in Section 202 shall file, and shall cause each of his subcontractors to file, Compliance Reports with the contracting agency or the Secretary of Labor as may be directed. Compliance Reports shall be filed within such times and shall contain such information as to the practices, policies, programs, and employment policies, programs, and employment statistics of the contractor and each subcontractor, and shall be in such form, and to such extent as the Secretary of Labor may prescribe.

(b) Bidders or prospective contractors or subcontractors may be required to state whether they have participated in any previous contract subject to the provisions of this Order, or any preceding similar Executive order, and in that event to submit, on behalf of themselves and their proposed subcontractors, Compliance Reports prior to or as an initial part of their bid or negotiation of a contract.

(c) Whenever the contractor or subcontractor has a collective bargaining agreement or other contract or understanding with a labor union or an agency referring workers or providing or supervising apprenticeship or training for such workers, the Compliance Report shall include such information as to such labor union's or agency's practices and policies affecting compliance as the Secretary of Labor may prescribe: Provided, That to the extent such information is within the exclusive possession of a labor union or an agency referring workers or providing or supervising apprenticeship or training and such labor union or agency shall refuse to furnish such information to the contractor, the contractor shall so certify to the Secretary of Labor as part of its Compliance Report and shall set forth what efforts he has made to obtain such information. [Subparagraph (c) reads as amended by Executive Order 12086, signed October 5, 1978 and effective October 8, 1978.]

(d) The Secretary of Labor may direct that any bidder or prospective contractor or subcontractor shall submit, as part of his Compliance Report, a statement in writing, signed by an authorized officer or agent on behalf of any labor union or any agency referring workers or providing or supervising apprenticeship or other training, with which the bidder or prospective contractor deals, with supporting information, to the effect that the signer's practices and policies do not discriminate on the grounds of race, color, religion, sex or national origin, and that the signer either will affirmatively cooperate in the implementation of the policy and provisions of this Order or that it consents and agrees that recruitment, employment, and the terms and conditions of employment under the proposed contract shall be in accordance with the purposes and provisions of the Order. In the event that the union, or the agency shall refuse to execute such a statement, the Compliance Report shall so certify and set forth what efforts have been

¶3680

ENERGY PROJECTS & SERVICES

Baltimore Gas and Electric Company
P.O. Box 1475
Baltimore, Maryland 21203-1475



May 23, 1995

Grace Davison
W. R. Grace & Co.-Conn.
Mr. C. D. Rabensburg
5500 Chemical Road
Baltimore, MD 21226-1698

Dear Mr. Rabensburg:

Subject:  W. R. Grace - Change Order #1

As you are aware, significant differences exist between what W. R. Grace's Plant Electrician, Pat Carroll, requested and that which was specified by S.S.O.E., your consultant. We submitted equipment drawings prepared in accordance with the original specifications from S.S.O.E.. S.S.O.E. returned the drawings approved with a notation to review them with your plant electrician. Mr. Carroll requested several changes in scope that were not included in S.S.O.E.'s original design specifications. At your request, we asked Powercon to provide an estimated cost and delivery schedule for those modifications (copy of Powercon's change proposal attached).

Based upon the information provided at that meeting, our quote to cover the ı changes requested by Mr. Carroll is $125,044. Delivery will be approximately 14 weeks after release to manufacture.

| | |
|---|---|
| Original Agreement Price | $ 965,000 |
| Change Order #1 | $ 125,044 |
| Revised Agreement Price | $1,090,044 |

Please call me if you have any questions (410)265-4636.

Very truly yours,

Robert P. Lewis, II
Director, Energy Projects and
Services

RPLII/ptm
Attachment

cc:    M. Odesky
       C. Smith
       File

Written authorization is needed to proceed with the attached changes. If you concur with these changes, and agree to the revised Agreement price of $1,090,044, please sign in the space provided.

_____          _____
Authorized Signature                  Date  5/24/95

1551 FLORIDA AVENUE
P.O. BOX 477
SEVERN, MARYLAND 21144



BALTIMORE    410-551-6500
WASHINGTON   202-621-7400
TLX 87-478
FAX    410-551-8451

# CHANGE PROPOSAL

NO. <u>28004 C/O #</u>

| CUSTOMER   BGE | | ORDER NO.   9964DX | DATE:   5/12 |
|---|---|---|---|
| S.O. #   26004 | MATERIAL | | |

☐ PHONE CONVERSATION          END USER ___ W. R. Grace ___
☒ MEETING
☐ WRITTEN                     REQUESTED BY:  Pat Carrol

### DESCRIPTION

Increase ampacity of switchgear, provide electrical operated breakers and epic system similar to existing switchgear, consisting of the following:

A.  Change switchgear from seven sections to nine sections overall length.  Increase from 162" L to 214".

B.  Increase bus ampacity from 3200A to 4000A

C.  Change the main breakers (2) from 3200AF manually operated shunt trip to 4000AF, electrically operated.

D.  Change the tie breaker (1) from 2000AF manually operated to 4000A, electrically operated

E.  Change feeder breakers (13) from manually operated to electrically operated

F.  Add an additional feeder breaker per customer's returned marked prints.

G.  Delete the power leader monitor and the electric power meters (2) and provide a G.E. FPU monitor epic microversa trip similar to the existing system at W. R. Grace.

Price will   ☐ NOT CHANGE      ☒ INCREASE    ☐ DECREASE      IN THE AMOUNT OF $ _____

### DEPARTMENTS AFFECTED

☐ SALES          ☐ ELEC. ENGRG.      ☐ PROD. PLANNING      ☐ PURCHASING
☐ VENDOR         ☐ MECH. ENGRG.      ☐ MANUFACTURING       ☐ FINANCE

Written authorization is needed to proceed with the above.  Upon receipt of authorization, Powercon will supply a new drawing transmittal and shipping schedule.

SIGNATURE
DEPARTMENT
AUTHORIZED BY: _____
DATE: _____

1851 FLORIDA AVENUE
P.O. BOX 477
SEVERN, MARYLAND 21144



BALTIMORE    410-551-5500
WASHINGTON   202-521-7400
TLX 87-475
FAX    410-551-5451

# CHANGE PROPOSAL

**PAGE 2**                                      NO. _25004 C/O #_

| CUSTOMER | BGE | | ORDER NO. | 9964DX | DATE: | 5/12 |
|---|---|---|---|---|---|---|
| S.O. # | 25004 | MATERIAL | | | | |

☐ PHONE CONVERSATION     END USER _____
☐ MEETING
☐ WRITTEN                 REQUESTED BY: _____

**DESCRIPTION**

H.   Add fourteen (14) circuit breaker control switches, green and
red breaker position indicating lights.

I.   1 lot engineer and labor to incorporate the above.

Powercon's price to revise for additions and deletions is $125,044.00.

Note:
The low voltage switchgear is on hold pending authorization to proceed.

Price will  ☐ NOT CHANGE   ☒ INCREASE   ☐ DECREASE   IN THE AMOUNT OF $   125,044.00

**DEPARTMENTS AFFECTED**

☒ SALES          ☒ ELEC. ENGRG.        ☒ PROD. PLANNING      ☒ PURCHASING
☒ VENDOR         ☒ MECH. ENGRG.        ☒ MANUFACTURING       ☒ FINANCE

Written authorization is needed to
proceed with the above. Upon receipt
of authorization, Powercon will supply
a new drawing transmittal and
shipping schedule.

SIGNATURE _____ Gil Meile
DEPARTMENT   Sales
AUTHORIZED BY: _____
DATE:        5/12/95

**ENERGY PROJECTS & SERVICES**

Baltimore Gas and Electric Company
P.O. Box 1475
Baltimore, Maryland 21203-1475

*H. Bertram Wilson, CFA*
*(410) 265 - 4753*

August 21, 1995



Mr. Marvin J. Odesky
Director of Engineering
W. R. Grace & Co.
P. O. Box 2117
Baltimore, MD  21203-2117

Dear Marv:

   The executed commitment letter for the substation operating lease has been delivered to Signet Bank. In order to finalize the lease commitment with Signet, a $1,000 fee is required. BGE has issued a check for $1,000 to Signet on W.R. Grace's behalf, a copy of which is attached. This amount will be added to the total project price and financed under the terms and conditions of the lease.

   Please acknowledge this addition to the total project price below and return this letter to me in the enclosed envelope.

Sincerely,

H. Bertram Wilson

HBW/lh

Attachment

Enclosure

Agreed and Accepted

Marvin J. Odesky

Dated:

8|23|95

**BALTIMORE GAS AND ELECTRIC COMPANY**

CHECK DATE: 08/21/95   CHECK NO. 1901506

| OUR REF. NO. | INVOICE | PURCHASE ORDER | INV. DATE | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|
| S42700 | ATTN: STEPHEN D CREE. FEE TO SECURE W.R. GRACE LEASE | | 08/18/95 | | $1,000.00 |
| | ACCT. NO 53930400 | | | | |
| | | | | TOTALS> | $1,000.00 |

VENDOR CODE $$

DETACH THIS PORTION
BEFORE DEPOSITING CHECK

53 BW

**BGE**

**BALTIMORE GAS AND ELECTRIC COMPANY**
BALTIMORE, MARYLAND 21203-1642

| DATE |
|---|
| 08/21/95 |

| AMOUNT |
|---|
| ******$1,000.00 |

CHECK NUMBER
1901506

PAY   One Thousand and 00/100 Dollars

TO THE
ORDER
OF

SIGNET LEASING FINANCIAL CORP**
7 ST PAUL ST, 3RD FLOOR
BALTIMORE, MARYLAND 21202

VOID AFTER ONE HUNDRED EIGHTY DAYS FROM DATE OF CHECK

Nations Bank
NATIONSBANK OF NORTH CAROLINA, N.A.
ASHEVILLE, NORTH CAROLINA

⑈000190150⑈ ⑉053107989⑉ 4800456 73⑈

ENERGY PROJECTS & SERVICES

Baltimore Gas and Electric Company
P.O. Box 1475
Baltimore, Maryland 21203-1475

*H. Bertram Wilson, CFA*
*(410) 265 - 4753*



November 30, 1995

Marvin J. Odesky
Director or Engineering
W. R. Grace & Co.-Conn.
5500 Chemical Road
Baltimore, MD  21226-1698

**RE:  CHANGE ORDER NO.  3**

Dear Marv:

The items listed on the attached list were provided in addition to the scope of work set forth in the contract dated April 12, 1995, and modified by change orders Nos. 1 and 2.  On September 28, 1995, Mr. Rabensburg and Mr. Bambarger met and agreed to this revised scope of work at an additional price of $33,800.  The revised contract price for the substation and associated work is now $1,124,844.

Please acknowledge this addition to the total project price below and return this letter to me in the enclosed envelope.

Sincerely,

H. Bertram Wilson

HBW/lh

Enclosure

Agreed and Accepted

Authorized Signature

Dated

12/1/95

**Change Order No. 3**
**Scope of Work**

1. Place and compact additional fill materials in the area of the substation building, material required to bring site to finish grade.

2. Cable tray in building, price differential between fiber glass tray and metal tray, fiber glass was not specified in original specification.

3. 5" PVC coated conduit, change in scope due to routing problems.

4. 480 Volt distribution panels, change in scope due to drawing revisions.

5. Overhead door wind loading requirements, additional costs associated with reinforcing of door to comply with wind load requirements.

6. 120/208 Volt panels additional breakers installed due to drawing revisions.

**ENERGY PROJECTS & SERVICES**

Baltimore Gas and Electric Company
P.O. Box 1475
Baltimore, Maryland 21203-1475

*H. Bertram Wilson, CFA*
*(410) 265 - 4753*



November 30, 1995

Marvin J. Odesky
Director or Engineering
W. R. Grace & Co.-Conn.
5500 Chemical Road
Baltimore, MD  21226-1698

**RE:  CHANGE ORDER NO. 4**

Dear Marv:

One additional 480V L.V. electrically operated breaker 1600AF, 800AT will be
provided in addition to the scope of work set forth in the contract dated April 12,
1995, and modified by change orders Nos. 1 through 3.  On November 16, 1995, you
and Mr. Bambarger met and agreed to this revised scope of work at an additional
price of $17,171.  This price includes the purchase and delivery to the site of the
equipment described above and does not include installation or testing.  This
equipment has been ordered and delivery to the site is expected in 4 - 6 weeks.  The
revised contract price for the substation and associated work is now $1,142,015.

Please acknowledge this addition to the total project price below and return this
letter to me in the enclosed envelope.

Sincerely,

*H. Bertram Wilson*

H. Bertram Wilson

HBW/lh

Agreed and Accepted

Authorized Signature

Dated

12/1/95

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE



# EXHIBIT C

**AMENDMENT NUMBER ONE TO AGREEMENT DATED APRIL 12,1995**

THIS AMENDMENT NUMBER ONE (the "Agreement") is made as of the 21st day of December, 1995 among Grace Davison, W.R. Grace and Company - Conn ("Grace"), Signet Leasing and Financial Corporation ("Signet"), and Baltimore Gas and Electric Company ("Contractor").

Contractor and Grace entered into an agreement dated April 12, 1995 pursuant to which Contractor agreed to install a substation and related equipment which agreement has been amended by change orders numbers 1 through 4 (collectively the "Original Agreement"). Title to the substation and related equipment currently resides with Contractor. Contractor and Grace desire to amend the Original Agreement so that title to the substation and related equipment passes to Signet upon payment by Signet of the sums due under Article 2 of the Original Agreement and Signet desires to assume the obligation of Grace to pay Contractor for such equipment under the Original Agreement (the "Obligations").

NOW, THEREFORE, for adequate consideration receipt of which is hereby acknowledged, and in order to induce Contractor to consent to the assumption of the Obligations by Signet, the parties hereto agree as follows:

1. Contractor and Signet hereby amend Article VIII Section 2 of the Original Agreement by deleting the last four words of such section "until acceptance of the work" and inserting in lieu thereof "and will pass to Signet Leasing and Financial Corporation from Contractor upon payment by Signet therefor." Except as otherwise amended herein all the terms and conditions of the Original Agreement shall remain in full force and effect.

2. Contractor hereby consents, upon the terms, covenants, and conditions set forth herein, to the assumption of the Obligations by Signet.

3. Effective upon the date of this Agreement, Signet hereby assumes the Obligations, and hereby covenants, promises, and agrees to pay all sums payable under the Original Agreement, at the times, in the manner, and in all respects as provided in the Original Agreement. Any and all other rights, duties, liabilities and obligations under the Original Agreement not assumed by Signet shall remain with Grace.

4.    Grace hereby represents and warrants to Contractor and Signet that there are no defenses or offsets to the enforcement of this Agreement and/or the Original Agreement and the work has been completed to Grace's satisfaction.

5.    Grace and Signet represent that they are duly authorized to execute this Agreement and that this Agreement has been duly authorized, executed and delivered and is a valid instrument, legally binding and enforceable in accordance with its terms.

6.    Signet hereby acknowledges that it has received a copy of the Original Agreement and has read all of its provisions.

7.    This Agreement may not be amended, changed, or modified except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

8.    This Agreement shall be binding upon and shall inure to the benefit of the parties to this Agreement and their respective successors and assigns; provided, however, that the Obligations of Signet under this Agreement or the Original Agreement may not be assigned or transferred without the prior written consent of the other parties to this Agreement and any purported assignment or transfer without such consent shall be void and without effect; provided further that no such consent shall be required in the event of an assignment by Contractor to (a) surviving or successor company in the event of a merger or consolidation, or (b) a company owned by Contractor, that owns the Contractor, or that is owned by another company which also owns the Contractor, whether directly or indirectly.

9.    This Agreement and the Original Agreement constitute the entire agreement of the parties hereto with respect to the matters set forth herein. The Original Agreement is incorporated into this Agreement as if fully set forth herein. Any provision of this Agreement which may be contrary to law shall not invalidate any of its other provisions. This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland.

10.    This Agreement may be executed in counterparts, all of which when taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the duly authorized representatives of the parties hereto have hereunto caused this Agreement to be executed under seal as of the day and year first above written.

ATTEST:                    GRACE DAVISON, W.R. GRACE & COMPANY - CONN

_____     By: _____ (SEAL)
                            James R. Hyde, President

ATTEST:                    SIGNET LEASING AND FINANCIAL CORPORATION

_____     By: _____ (SEAL)
                            Michael D. Turnau

ATTEST:                    BALTIMORE GAS AND ELECTRIC COMPANY

H. Bertram Wihr     By: _____ (SEAL)

comml/asi&asu.doc                    3                    3

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE



# EXHIBIT D

# SIGNET LEASING AND FINANCIAL CORPORATION

## EQUIPMENT LEASE AGREEMENT

THIS EQUIPMENT LEASE AGREEMENT (the "Lease") is made as of the 21 day of December, 1995, by and between SIGNET LEASING AND FINANCIAL CORPORATION, its successors and assigns ("Lessor"), and W.R. GRACE & CO. - CONN. , its successors and permitted assigns ("Lessee").

The parties agree that Lessee shall lease from Lessor the property (the "Equipment") described in the Equipment Schedule(s) to be executed pursuant hereto (collectively, the "Equipment Schedule"), subject to the terms set forth herein, in the Riders annexed hereto and in the Equipment Schedule. The definitions and construction of certain of the terms used herein are provided in Section 19 hereof.

1. **TERM.** The term of lease with respect to any item of the Equipment shall consist of the term set forth in the Equipment Schedule relating thereto; provided, however, that this Lease shall be effective from and after the date of execution hereof.

2. **RENT.** Lessee shall pay Lessor the rental installments in the aggregate amounts specified in the Equipment Schedule, without prior notice or demand, and all other amounts payable pursuant to this Lease (such installments and other amounts, the "rent"). Each Equipment Schedule constitutes a non-cancelable net lease, and Lessee's obligation to pay rent, and to otherwise perform its obligations under this Lease, each such Equipment Schedule and all of the other documents and agreements entered in connection herewith (collectively, the "Lease Documents"), are and shall be absolute and unconditional and shall not be affected by any right of setoff, counterclaim, recoupment, deduction, defense or other right which Lessee may have against Lessor, the manufacturer or vendor of the Equipment (the "Suppliers"), or anyone else, for any reason whatsoever. Rental installments are payable as and when specified in the Equipment Schedule by mailing the same to Lessor at its address specified pursuant to this Lease; and payments of rent shall be effective upon receipt. Timeliness of Lessee's payment and the other performance under the Lease Documents is of the essence. If any rent is not paid on the due date, Lessor may collect, and Lessee agrees to pay, a charge calculated as the product of the late charge rate specified in the Equipment Schedule (the "Late Charge Rate") and the amount in arrears for the period such amount remains unpaid.

3. **REPRESENTATIONS AND WARRANTIES OF LESSEE.** Lessee represents and warrants that: (a) Lessee is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation. (b) The execution, delivery and performance of the Lease Documents: (1) have been duly authorized by all necessary corporate action on the part of Lessee; (2) do not require the approval of any stockholder, trustee or holder of any obligations of Lessee except such as have been duly obtained; and (3) do not and will not contravene any law, governmental rule, regulation or order now binding on Lessee, or the charter or by-laws of Lessee, or contravene the provisions of, or constitute a default under, or result in the creation of any lien or encumbrance upon the property of Lessee under, any indenture, mortgage, contract or other agreement to which Lessee is a party or by which it or its property is bound. (c) Each of the Lease Documents, when entered into, will constitute legal, valid and binding obligations of Lessee enforceable against Lessee, in accordance with the terms thereof. (d) There are no pending actions or proceedings to which Lessee is a party, and there are no other pending or threatened actions or proceedings of which Lessee has knowledge, before any court, arbitrator or administrative agency, which, either individually or in the aggregate, would adversely affect the financial condition of Lessee, or the ability of Lessee to perform its obligations or remain in compliance with the Lease Documents. Further, Lessee is not in default under any obligation for borrowed money, for the deferred purchase price of property or any lease agreement which, either individually or in the aggregate, would have the same such effect. (e) Under the Federal Tax Code, the Equipment consists solely of personal property and not fixtures. (f) The financial statements of Lessee (copies of which have been furnished to Lessor) have been prepared in accordance with generally accepted accounting principles consistently applied ("GAAP"), and fairly present Lessee's financial condition and the results of its operations as of the date of and for the period covered by such statements, and since the date of such statements there has been no material adverse change in such conditions or operations. (g) The address stated below the signature of Lessee is the chief place of business and chief executive office of Lessee; and Lessee does not conduct business under a trade, assumed or fictitious name.

4. **FINANCIALS, FURTHER ASSURANCES AND NOTICES.** Lessee covenants and agrees as follows: (a) Lessee will furnish Lessor (1) within one hundred twenty (120) days after the end of each fiscal year of W. R. Grace & Co., a balance sheet of W. R. Grace & Co. as at the end of such year, and the related statement of income and statement of cash flows of W. R. Grace & Co. for such fiscal year, prepared in accordance with GAAP, all in reasonable detail and certified by independent certified public accountants of recognized standing selected by Lessee (which shall be a "Big 6" accounting firm); (2) within forty-five (45) days after the end of each quarter, a balance sheet of W. R. Grace & Co. as at the end of such quarter, and the related statement of income and statement of cash flows of W. R. Grace & Co. for such quarter, prepared in accordance with GAAP; and (3) within thirty (30) days after the date on which they are filed, all regular periodic reports, forms and other filings required to be made by W. R. Grace & Co. to the Securities and Exchange Commission, if any. (b) Lessee will promptly execute and deliver to Lessor such further documents, instruments and assurances and take such further action as Lessor from time to time may reasonably request in order to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor under the Lease Documents. (c) Lessee shall provide written notice to Lessor: (1) thirty (30) days prior to any contemplated change in the name or address of the chief executive office of Lessee; (2) promptly upon the occurrence of any Default (as hereinafter defined) or event which, with the lapse of time or the giving of notice, or both, would become a Default (a "default"; except as used in Sections 15 and 16); and (3) promptly upon Lessee becoming aware of any alleged violation of applicable law relating to the Equipment or this Lease.

5. CONDITIONS PRECEDENT. Lessor's obligations under each Equipment Schedule, including its obligation to purchase and lease any Equipment to be leased thereunder, are conditioned upon Lessor's determination that all of the following have been satisfied: (a) Lessor having received the following, in form and substance satisfactory to Lessor: (1) evidence as to due compliance with the insurance provisions hereof; (2) Uniform Commercial Code financing statements and all other filings and recordings as required by Lessor; (3) certificate of Lessee's Secretary certifying: (i) resolutions of Lessee's Board of Directors duly authorizing the leasing of the Equipment hereunder and the execution, delivery and performance of this Lease and the Equipment Schedule and all related instruments and documents, and (ii) the incumbency and signature of the officers of Lessee authorized to execute such documents; and (4) an opinion of counsel for Lessee as to each of the matters set forth in sub-parts (a) through (d) of Section 3 hereof; (5) the only manually executed original of the Equipment Schedule and all other Lease Documents; (6) all purchase documents pertaining to the Equipment (collectively, the "Supply Contract"); and (7) such other documents, agreements, instruments, certificates, opinions, assurances, as Lessor reasonably may require. (b) All representations and warranties provided in favor of Lessor in any of the Lease Documents shall be true and correct on the effective date of such Equipment Schedule with the same effect as though made as of such date (Lessee's execution and delivery of the Equipment Schedule shall constitute an acknowledgment of the same). (c) There shall be no default or Default under the Equipment Schedule or any other Lease Documents. The Equipment shall have been delivered to and accepted by Lessee, and shall be in the condition and repair required hereby; and on the effective date of the Equipment Schedule, Lessor shall have received good title to the Equipment to be leased thereunder, free and clear of any lien, claim or encumbrance of any kind.

6. DELIVERY; INSPECTION AND ACCEPTANCE BY LESSEE. Upon delivery, Lessee shall inspect and, to the extent the Equipment conforms to the condition required by the applicable Supply Contract, accept the Equipment and shall execute and deliver to Lessor an Equipment Schedule containing a complete description of the item of Equipment accepted; whereupon, as between Lessor and Lessee, the same shall be deemed to have been finally accepted by Lessee pursuant to this Lease. All expenses incurred in connection with Lessor's purchase of the Equipment (including shipment, delivery and installation) shall be the responsibility of Lessee and shall be paid upon demand. If Lessee shall, for reasonable cause, refuse to accept delivery of any item of the Equipment, Lessee will be assigned all rights and shall assume all obligations as purchaser of the Equipment.

7. USE AND MAINTENANCE. (a) Lessee shall (1) use the Equipment solely in the conduct of its business, for the purpose for which the Equipment was designed, in a careful and proper manner (and shall not permanently discontinue use of the Equipment); (2) operate, maintain, service and repair the Equipment, and maintain all records and other materials relating thereto, (i) in accordance and consistent with (A) all maintenance and operating manuals or service agreements, whenever furnished or entered into, including any subsequent amendments or replacements thereof, issued by the Supplier or service provider, (B) the requirements of all applicable insurance policies, (C) the Supply Contract, so as to preserve all of Lessee's and Lessor's rights thereunder, including all rights to any warranties, indemnities or other rights or remedies, (D) all applicable laws, and (E) the prudent practice of other similar companies in the same business as Lessee, but in any event, to no lesser standard than that employed by Lessee for comparable equipment owned or leased by it; and (ii) without limiting the foregoing, so as to cause the Equipment to be in good repair and operating condition and in at least the same condition as when delivered to Lessee hereunder, except for ordinary wear and tear resulting despite Lessee's full compliance with the terms hereof; (3) not change the location of any Equipment as specified in the Equipment Schedule without the prior written consent of Lessor; (4) not attach or incorporate the Equipment to or in any other item of equipment in such a manner that the Equipment may be deemed to have become an accession to or a part of such other item of equipment; and (5) cause each principal item of the Equipment to be continually marked, in a plain and distinct manner, with the name of Lessor followed by the words "Owner and Lessor," or other appropriate words designated by Lessor on labels furnished by Lessor. (b) Lessee, within a reasonable time, will replace any parts of the Equipment which become worn out, lost, destroyed, damaged beyond repair or otherwise permanently rendered unfit for use, by replacement parts which are free and clear of all liens, encumbrances or rights of others and have a value, utility and remaining useful life at least equal to the parts replaced. Title to all parts, improvements and additions to the Equipment immediately shall vest in Lessor, without cost or expense to Lessor or any further action by any other person, and such parts, improvements and additions shall be deemed incorporated in the Equipment and subject to the terms of this Lease as if originally leased hereunder. Except to the extent the same are replaced in accordance with this Section 7(b), Lessee shall not detach or otherwise remove any parts originally or from time to time attached to the Equipment, if such parts are essential to the operation of the Equipment or cannot be detached from the Equipment without materially interfering with the operation of the Equipment or adversely affecting the value, utility and remaining useful life which the Equipment would have had without the addition thereof. Lessee shall not make any material alterations to the Equipment without the prior written consent of Lessor. (c) Upon forty-eight (48) hours' notice, Lessee shall afford Lessor access to the premises where the Equipment is located for the purpose of inspecting such Equipment and all applicable records at any reasonable time during normal business hours; provided, however, if a default or Default shall have occurred and then be continuing, no notice of any inspection by Lessor shall be required.

8. DISCLAIMER OF WARRANTIES. LESSOR IS NOT A SELLER, SUPPLIER OR MANUFACTURER (AS SUCH TERMS ARE DEFINED OR USED, AS THE CASE MAY BE, IN THE UNIFORM COMMERCIAL CODE), OR DEALER, NOR A SELLER'S OR A DEALER'S AGENT. THE EQUIPMENT IS LEASED HEREUNDER "AS IS", AND LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS LIABILITY FOR, AND LESSEE HEREBY WAIVES ALL RIGHTS AGAINST LESSOR RELATING TO, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS OF ANY KIND WITH RESPECT TO THE EQUIPMENT, EITHER EXPRESS OR IMPLIED, ARISING BY APPLICABLE LAW OR OTHERWISE, INCLUDING ANY OF THE SAME RELATING TO OR ARISING IN OR UNDER (a) *MERCHANTABILITY OR FITNESS FOR PARTICULAR USE OR PURPOSE*, (b) COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OR TRADE OR (c) TORT (WHETHER OR NOT ARISING FROM THE ACTUAL, IMPLIED OR IMPUTED NEGLIGENCE OF LESSOR OR STRICT LIABILITY) OR THE UNIFORM COMMERCIAL CODE (INCLUDING ARTICLE 2A, AS HEREINAFTER DEFINED; AND, WITHOUT LIMITING THE FOREGOING, INCLUDING, (i) ANY WARRANTIES CONTAINED IN §§ 2A-210, 211, 212 AND 213, (ii) ANY RIGHT TO DEEM LESSOR IN DEFAULT PURSUANT THERETO AND (iii) ALL OF LESSEE'S RIGHTS AND REMEDIES UNDER §§ 2A-508 THROUGH 521) OR OTHER APPLICABLE LAW WITH RESPECT TO THE EQUIPMENT, INCLUDING ITS TITLE OR FREEDOM FROM LIENS, FREEDOM FROM TRADEMARK, PATENT OR

CONDITION, MANUFACTURE, DESIGN, SERVICING OR COMPLIANCE WITH APPLICABLE LAW; it being agreed that all such risks, as between Lessor and Lessee, are to be borne by Lessee; and Lessor's agreement to enter into this Lease and any Equipment Schedule is in reliance upon the freedom from and complete negation of liability or responsibility for the matters waived and disclaimed herein. Lessor is not responsible for any direct, indirect, incidental or consequential damage to or losses resulting from the installation, operation or use of the Equipment or any products manufactured thereby. All assignable warranties made by the Supplier to Lessor are hereby assigned to Lessee for and during the term of this Lease and Lessee agrees to resolve all such claims directly with the Supplier. Provided that no default or Default has occurred and is then continuing, Lessor fully shall cooperate with Lessee with respect to the resolution of such claims, in good faith and by appropriate proceedings at Lessee's expense. Any such claim shall not affect in any manner the unconditional obligation of Lessee to make rent payments hereunder.

9. FEES AND TAXES. (a) To the extent permitted by law, Lessee shall file any necessary report and return for, shall pay promptly when due, shall otherwise be liable to reimburse Lessor (on an after-tax basis) for, and agrees to indemnify and hold Lessor harmless from: (i) all titling, recordation, documentary stamp and other fees; and (ii) taxes (other than taxes calculated solely on the basis of net income), assessments and all other charges or withholdings of any nature (together with any penalties, fines or interest thereon); arising at any time upon or relating to the Equipment or this Lease or the delivery, acquisition, ownership, use, operation or leasing or other disposition of the Equipment, or upon the rent, whether the same be assessed to Lessor or Lessee (any of the foregoing, an "Imposition"). (b) If any report, return or property listing, or any Imposition is, by law, required to be filed by, assessed or billed to, or paid by, Lessee, Lessee at its own expense will do all things required to be done by Lessor (to the extent permitted by law) in connection therewith and is hereby authorized by Lessor to act on behalf of Lessor in all respects, including the contest or protest, in good faith and by appropriate proceedings, of the validity of any Imposition, or the amount thereof. Lessor agrees fully to cooperate with Lessee in any such contest, and Lessee agrees promptly to indemnify Lessor for all reasonable expenses incurred by Lessor in the course of such cooperation. An Imposition or Claim (as hereinafter defined) therefor shall be paid, subject to refund proceedings, if failure to pay would adversely affect the title or rights of Lessor. Provided that no default or Default has occurred and is continuing, if Lessor obtains a refund of any Imposition which has been paid (by Lessee, or by Lessor and for which Lessor has been reimbursed by Lessee), Lessor shall promptly pay to Lessee the net amount of such refund to the extent actually received. Lessee will cause all billings of such charges to Lessor to be made to Lessor in care of Lessee and will, in preparing any report or return required by law, show the ownership of the Equipment in Lessor, and shall send a copy of any such report or return to Lessor. If Lessee fails to pay any such charges when due, except any Imposition being contested in good faith and by appropriate proceedings as above provided for a reasonable period of time, Lessor at its option may do so, in which event the amount so paid (including any penalty or interest incurred as a result of Lessee's failure), plus interest thereon at the Late Charge Rate, shall be paid by Lessee to Lessor with the next periodic payment of rent. (c) As used herein, the term "Lessor" shall mean and include Lessor and the consolidated Federal taxpayer group of which Lessor is a member.

10. INTENT, TITLE AND LIENS. (a) The parties intend and agree that the Equipment shall remain personal property, and that Lessor's title thereto not be impaired, notwithstanding the manner in which it may be affixed to any real property. Lessee shall obtain and deliver to Lessor (to be recorded at Lessee's expense), from any person having an interest in the property where the Equipment is to be located, waivers of any lien, encumbrance or interest which such person might have or hereafter obtain or claim with respect to the Equipment. (b) It is the express intention of the parties hereto that (1) each Equipment Schedule, incorporating by reference the terms of this Lease, constitutes a true "lease" and a "finance lease" as such terms are defined in the Uniform Commercial Code Article 2A - Leases ("Article 2A") (whether or not Article 2A is then in effect in the State) and not a sale or retention of security interest; and (2) title to the Equipment shall at all times remain in Lessor, and Lessee shall acquire no ownership, property, rights, equity, or interest other than a leasehold interest, solely as Lessee subject to the terms and conditions hereof (c) Lessee may not dispose of any of the Equipment except to the extent expressly provided herein, notwithstanding the fact that proceeds constitute a part of the Equipment. Lessee further agrees to maintain the Equipment free from all claims, liens, attachments, rights of others and legal processes ("Liens") of creditors of Lessee or any other persons, other than Liens for fees, taxes, levies, duties or other governmental charges of any kind, Liens of mechanics, materialmen, laborers, employees or suppliers and similar Liens arising by operation of law incurred by Lessee in the ordinary course of business for sums that are not yet delinquent or are being contested in good faith by negotiations or by appropriate proceedings which suspend the collection thereof (provided, however, that such proceedings do not involve any substantial danger (as determined in Lessor's sole reasonable discretion) of the sale, forfeiture or loss of the Equipment or any interest therein). Lessee will defend, at its own expense, Lessor's title to the Equipment from such claims, Liens or legal processes. Lessee shall also notify Lessor immediately upon receipt of notice of any Lien affecting the Equipment in whole or in part.

11. INSURANCE. Lessee shall obtain and maintain all-risk insurance coverage with respect to the Equipment insuring against, among other things: casualty coverage, including loss or damage due to fire and the risks normally included in extended coverage, malicious mischief and vandalism, for not less than the greater of the full replacement value or the Stipulated Loss Value (as defined in Section 12 hereof); and public liability coverage, including both personal injury and property damage with a combined single limit per occurrence of not less than the amount specified in the Equipment Schedule, with no deductible. All said insurance shall be in form (including all endorsements required by Lessor) and amount and with companies reasonably satisfactory to Lessor. All insurance for loss or damage shall provide that losses, if any, shall be payable to Lessor as loss payee and Lessee shall utilize its best efforts to have all checks relating to any such losses delivered promptly to Lessor. Lessor shall be named as an additional insured with respect to all such liability insurance. Lessee shall pay the premiums therefor and deliver to Lessor evidence satisfactory to Lessor of such insurance coverage. Lessee shall cause to be provided to Lessor, not less than fifteen (15) days prior to the scheduled expiration or lapse of such insurance coverage, evidence satisfactory to Lessor of renewal or replacement coverage. Each insurer shall agree, by endorsement upon the policy or policies issued by it or by independent instrument furnished to Lessor, that (a) it will give Lessor thirty (30) days' prior written notice of the effective date of any material alteration or cancellation of such policy; and (b) insurance as to the interest of any named additional insured or loss payee other than Lessee shall not be invalidated by any actions, inactions, breach of

warranty or conditions or negligence of Lessee or any person other than Lessor with respect to such policy or policies. The proceeds of such insurance payable as a result of loss of or damage to the Equipment shall be applied as required by the provisions of Section 12 hereof.

12. LOSS AND DAMAGE. Lessee assumes the risk of direct and consequential loss and damage to the Equipment from all causes. Except as provided in this Section for discharge upon payment of Stipulated Loss Value, no loss or damage to the Equipment or any part thereof shall release or impair any obligations of Lessee under this Lease. Lessee agrees that Lessor shall not incur any liability to Lessee for any loss of business, loss of profits, expenses, or any other Claims resulting to Lessee by reason of any failure of or delay in delivery or any delay caused by any non-performance, defective performance, or breakdown of the Equipment, nor shall Lessor at any time be responsible for personal injury or the loss or destruction of any other property resulting from the Equipment. In the event of loss or damage to any item of Equipment which does not constitute a Total Loss (as hereinafter defined), Lessee shall, at its sole cost and expense, promptly repair and restore such item of the Equipment to the condition required by this Lease. Provided that no default or Default has occurred and is continuing, upon receipt of evidence reasonably satisfactory to Lessor of completion of such repairs, Lessor will apply any net insurance proceeds received by Lessor on account of such loss to the cost of repairs. Upon the occurrence of the actual or constructive total loss of any item of the Equipment, or the loss, disappearance, theft or destruction of any item of the Equipment or damage to any item of the Equipment to such extent as shall make repair thereof uneconomical or shall render such item of the Equipment permanently unfit for normal use for any reason whatsoever, or the condemnation, confiscation, requisition, seizure, forfeiture or other taking of title to or use of any item of the Equipment or the imposition of any Lien thereon by any governmental authority (as established to the reasonable satisfaction of Lessor; any such occurrence being herein referred to as a "Total Loss"), during the term of this Lease, Lessee shall give prompt notice thereof to Lessor. On the next date for the payment of rent, Lessee shall pay to Lessor the rent due on that date plus the Stipulated Loss Value of the item or items of the Equipment with respect to which the Total Loss has occurred and any other sums due hereunder with respect to that Equipment (less any insurance proceeds or condemnation award actually paid). Upon making such payment, this Lease and the obligation to make future rental payments shall terminate solely with respect to the Equipment or items thereof so paid for and (to the extent applicable) Lessee shall become entitled thereto "AS IS WHERE IS" without warranty, express or implied, with respect to any matter whatsoever. Lessor shall deliver to Lessee a bill of sale transferring and assigning to Lessee without recourse or warranty, all of Lessor's right, title and interest in and to the Equipment. Lessor shall not be required to make and may specifically disclaim any representation or warranty as to the condition of the Equipment or any other matters. As used in this Lease, "Stipulated Loss Value" shall mean the product of the Total Invoice Cost (designated on the appropriate Equipment Schedule) of the Equipment and the applicable percentage factor set forth on the Schedule of Stipulated Loss Values attached to the Equipment Schedule. Stipulated Loss Value shall be determined as of the next date on which a payment of rent is or would be due after a Total Loss or other termination of an Equipment Schedule, after payment of any rent due on such date, and the applicable percentage factor shall be that which is set forth with respect to such rent payment. After payment of the final payment of rent due under the original term of this Lease and during any renewal term thereof, Stipulated Loss Value shall be determined as of the date of termination of such Equipment Schedule (absent any renewal thereof) or, if during a renewal term, on the next date on which a payment of rent is or would be due after a Total Loss or other termination of such renewal term, after payment of any rent due on such date, and the applicable percentage factor shall be the last percentage factor set forth on the Schedule of Stipulated Loss Values attached to such Equipment Schedule.

13. REDELIVERY. Upon the expiration or earlier termination of the term of any Equipment Schedule (or of any renewal thereof, if applicable), Lessee shall, at its own expense, return the Equipment to Lessor within ten (10) days (a) in the same condition as when delivered to Lessee hereunder, ordinary wear and tear resulting from proper use thereof excepted, (b) in such operating condition as is capable of performing its originally intended use, (c) having been used, operated, serviced and repaired in accordance with, and otherwise complying with, Section 7 hereof, and (d) free and clear of all Liens whatsoever except Liens resulting from claims against Lessor not relating to the ownership of such Equipment. Lessee shall return the Equipment by delivering it to such place within the Continental United States as Lessor shall specify. In addition to Lessor's other rights and remedies hereunder, if the Equipment is not returned in a timely fashion, or if repairs are necessary to place any items of Equipment in the condition required in this Section, Lessee shall continue to pay to Lessor per diem rent at the last prevailing lease rate under the applicable Equipment Schedule with respect to such items of Equipment, for the period of delay in redelivery, or for the period of time reasonably necessary to accomplish such repairs together with the cost of such repairs, as applicable. Lessor's acceptance of such rent on account of such delay or repair does not constitute a renewal of the term of the related Equipment Schedule or a waiver of Lessor's right to prompt return of the Equipment in proper condition.

14. INDEMNITY. Lessee assumes and agrees to indemnify, defend and keep harmless Lessor, and any assignee of Lessor's rights, obligations, title or interests under any Equipment Schedule, its agents and employees ("Indemnitees"), from and against any and all Claims (other than such as may directly and proximately result from the gross negligence or willful misconduct of, such Indemnitees; provided, however, that Lessee expressly agrees to indemnify each such Indemnitee where the Claims arise in whole or in part from the simple negligence of such Indemnitee), by paying (on an after-tax basis) or otherwise discharging same, when and as such Claims shall become due, including Claims arising on account of (a) any Lease Document, or (b) the Equipment, or any part thereof, including the ordering, acquisition, delivery, installation or rejection of the Equipment, the possession, maintenance, use, condition, ownership or operation of any item of Equipment, and by whomsoever owned, used or operated, during the term of any Equipment Schedule with respect to that item of Equipment, the existence of latent and other defects (whether or not discoverable by Lessor or Lessee) any claim in tort for negligence or strict liability, and any claim for patent, trademark or copyright infringement, or the loss, damage, destruction, removal, return, surrender, sale or other disposition of the Equipment, or any item thereof, or for whatever other reason whatsoever. It is the express intention of both Lessor and Lessee, that the indemnity provided for in this Paragraph 14 includes the agreement by Lessee to indemnify the Indemnitees from the consequences of such Indemnitees' own simple negligence, whether that negligence is the sole or concurring cause of the Claims, and to further indemnify such

Indemnitees whereof Lessor which Lessee Indemnitees shall give Lessor prompt notice of any Claim hereby indemnified against and Lessee shall be entitled to control the defense thereof, so long as no default or Default has occurred and is then continuing; provided, however, that Lessor shall have the right to approve defense counsel selected by Lessee. For the purposes of this Lease, the term "Claims" shall mean all claims, allegations, harms, judgments, good faith settlements entered into, suits, actions, debts, obligations, damages (whether incidental, consequential or direct), demands (for compensation, indemnification, reimbursement or otherwise), losses, penalties, fines, liabilities (including strict liability), charges that Lessor has incurred or for which it is responsible, in the nature of interest, Liens, and costs (including attorneys' fees and disbursements and any other legal or non-legal expenses of investigation or defense of any Claim, whether or not such Claim is ultimately defeated or enforcing the rights, remedies or indemnities provided for hereunder, or otherwise available at law or equity to Lessor), of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, by or against any person.

15. DEFAULT. (a) A default shall be deemed to have occurred hereunder and under an Equipment Schedule ("Default") if (1) Lessee shall fail to make any payment of rent hereunder or under an Equipment Schedule within ten (10) days after the same shall have become due; or (2) Lessee shall fail to obtain and maintain the insurance required herein; (3) Lessee shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by it under any Lease Document and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (i) actual knowledge thereof by any officer of Lessee, or (ii) written notice thereof to Lessee by Lessor; or (4) Lessee shall (i) be generally not paying its debts as they become due; or (ii) take action for the purpose of invoking the protection of any bankruptcy or insolvency law, or any such law is invoked against or with respect to Lessee or its property, and any such petition filed against Lessee is not dismissed within sixty (60) days; or (5) Lessee shall make or permit any unauthorized Lien against, or assignment or transfer of, this Lease, the Equipment or any interest therein; or (6) any certificate, statement, representation, warranty or audit contained herein or furnished with respect hereto by or on behalf of Lessee proving to have been false in any material respect at the time as of which the facts therein set forth were stated or certified, or having omitted any substantial contingent or unliquidated liability or Claim against Lessee; or (7) Lessee shall be in default under any material obligation for borrowed money, for the deferred purchase price of property or any lease agreement, and the applicable grace period with respect thereto shall have expired; or (8) Lessee shall have terminated its corporate existence, consolidated with, merged into, or conveyed or leased substantially all of its assets as an entirety to any person (such actions being referred to as an "Event"), unless such person is organized and existing under the laws of the United States or any state, and not less than sixty (60) days prior to such Event: (i) such person executes and delivers to Lessor an agreement satisfactory in form and substance to Lessor, in its sole discretion, containing such person's effective assumption, and its agreement to pay, perform, comply with and otherwise be liable for, in a due and punctual manner, all of Lessee's obligations having previously arisen, or then or thereafter arising, under any and all of the Lease Documents; and (ii) Lessor is satisfied as to the creditworthiness of such person, and as to such person's conformance to the other standard criteria then used by Lessor for such purposes; or (9) there occurs a default or anticipatory repudiation under any guaranty executed in connection with this Lease; or (10) if Lessee is a privately held corporation and effective control of Lessee's voting capital stock, issued and outstanding from time to time, is not retained by the present stockholders (unless Lessee shall have provided sixty (60) days' prior written notice to Lessor of the proposed disposition of stock and Lessor shall have consented thereto in writing); or (11) if Lessee is a publicly held corporation and, as a result of or in connection with a material change in the ownership of Lessee's capital stock, Lessee's Debt to Tangible Net Worth equals or exceeds twice the ratio of Lessee's Debt to Tangible Net Worth as of the date of this Lease, without the prior written consent of Lessor. As used herein, "Debt" shall mean Lessee's total liabilities which, in accordance with GAAP, would be included in the liability side of a balance sheet; and "Tangible Net Worth" shall mean Lessee's tangible net worth including the sum of the par or stated value of all outstanding capital stock, surplus and undivided profits, less any amounts attributable to goodwill, patents, copyrights, mailing lists, catalogs, trademarks, bond discount and underwriting expenses, organization expense and other intangibles. Accounting terms used herein shall be as defined, and all calculations hereunder shall be made, in accordance with GAAP. (b) The occurrence of a Default with respect to any Equipment Schedule shall, at the sole discretion of Lessor, constitute a Default with respect to any or all Equipment Schedules to which it is then a party. Notwithstanding anything set forth herein, Lessor may exercise all rights and remedies hereunder independently with respect to each Equipment Schedule.

16. REMEDIES. Without limiting Lessor's other rights hereunder, if Lessee shall fail to pay any amount of rent hereunder or under any Equipment Schedule within sixty (60) days after the same shall have become due, Lessee shall automatically be deemed to be in default hereunder and under said Equipment Schedule and all of Lessee's rights, but not its obligations, under such Equipment Schedule and in and to the Equipment leased thereunder automatically shall be cancelled, whereupon Lessee's right to possess and use such Equipment immediately shall cease; and Lessee hereby agrees that the foregoing shall occur without act or notice as a condition thereto, and any such requirement of any act or notice under applicable law is hereby expressly and irrevocably waived to the extent permitted thereunder. Upon the occurrence of any other Default under the provisions of Section 15 (including the failure to make any payment of rent as and when due), Lessor may, at its option, declare this Lease and such Equipment Schedule to be in default. At any time after cancellation of an Equipment Schedule or after declaration by Lessor that such Equipment Schedule is in default, Lessor may, in addition to any other remedies provided herein or by applicable law, exercise one or more of the following remedies as Lessor in its sole discretion shall elect:

(a) Require Lessee to assemble any or all of the Equipment at the location to which the Equipment was delivered or the location to which such Equipment may have been moved by Lessee or such other location in reasonable proximity to either of the foregoing as Lessor shall designate; and/or to return promptly, at Lessee's expense, any or all of the Equipment to Lessor at the location, in the condition and otherwise in accordance with all of the terms of Section 13 hereof; and/or take possession of and render unusable by Lessee any or all of the Equipment, wherever it may be located, without any court order or other process of law and without liability for any damages occasioned by such taking of possession (other than to premises) (any such taking of possession shall constitute an automatic cancellation of the Equipment Schedule pertaining thereto, as it applies to those items taken without further notice, and such taking of possession shall not prohibit Lessor from exercising its other remedies hereunder).

(b)  Sell, re-lease or otherwise dispose of any or all of the Equipment, whether or not in Lessor's possession, in a commercially reasonable manner at public or private sale with notice to Lessee (the parties agreeing that ten (10) days' prior written notice shall constitute adequate notice of such sale), with the right of Lessor to purchase and apply the net proceeds of such disposition, after deducting all costs of such disposition (including but not limited to costs of transportation, possession, storage, refurbishing, advertising and brokers' fees), to the obligations of Lessee pursuant to this sub-part (b), with Lessee remaining liable for any deficiency and with any excess being retained by Lessor; or retain any or all of the Equipment; and recover from Lessee damages, not as a penalty, but herein liquidated for all purposes as follows:

(1)  if Lessor elects to dispose of the Equipment under an Equipment Schedule pursuant to a lease which is substantially similar to this Lease and such Equipment Schedule:  an amount equal to the sum of (A) any accrued and unpaid rent under this Lease and such Equipment Schedule as of the date of commencement (the "Commencement Date") of the term of the new lease, and (B) (i) the present value as of the Commencement Date of the total rent for the then remaining term of such Equipment Schedule, minus (ii) the present value as of the Commencement Date of the rent under the new lease applicable to that period of the new lease term which is comparable to the then remaining term of such Equipment Schedule, and (C) any incidental damages allowed under Article 2A, less expenses saved by Lessor in consequence of the Default ("Incidental Damages");

(2)  if Lessor elects to retain the Equipment or to dispose of the Equipment under an Equipment Schedule by sale, by re-lease (pursuant to a lease which is not substantially similar to this Lease and such Equipment Schedule), or otherwise:  an amount equal to the sum of (A) any accrued and unpaid rent as of the date Lessor repossesses the Equipment or such earlier date as Lessee tenders possession of the Equipment to Lessor, (B) (i) the present value as of the date determined under clause (A) of the total rent for the then remaining term of such Equipment Schedule, minus (ii) the present value, as of that certain date which may be determined by taking a reasonable opportunity to repossess and remarket the Equipment, of the "market rent" (as computed pursuant to Article 2A) at the place where the Equipment was located on that date, computed for the same lease term, and (C) any Incidental Damages (provided, however, that if the measure of damages provided is inadequate to put Lessor in as good a position as performance would have, the damages shall be the present value of the profit, including reasonable overhead, Lessor would have made from full performance by Lessee, together with any incidental damages allowed under Article 2A, due allowance for costs reasonably incurred and due credit for payments or proceeds of disposition);

(3)  if, with respect to an Equipment Schedule, Lessor has not repossessed the Equipment, or if Lessor has repossessed the Equipment or Lessee has tendered possession of the Equipment to Lessor and Lessor is unable after reasonable effort to dispose of the Equipment at a reasonable price or the circumstances reasonably indicate that such an effort will be unavailing:  an amount equal to the sum of (A) accrued and unpaid rent as of the date of entry of judgment in favor of Lessor, (B) the present value as of the date determined under clause (A) of the rent for the then remaining term of such Equipment Schedule, and (C) any Incidental Damages.  Lessor may dispose of the Equipment at any time before collection of a judgment for damages.  If the disposition is before the end of the remaining term of such Equipment Schedule, Lessor's recovery against Lessee for damages will be governed by sub-part (b)(1) or (2) (as applicable), and Lessor will cause an appropriate credit to be provided against any judgment for damages to the extent that the amount of the judgment exceeds the applicable recovery pursuant to sub-part (b)(1) or (2).

(c)  In lieu of the damages specified in sub-part (b), with respect to each applicable Equipment Schedule, Lessor may recover from Lessee, as liquidated damages for loss of a bargain and not as a penalty, an amount calculated as the sum of:  (1) the greater of either (A) the Stipulated Loss Value of the Equipment (determined as of the next date on which a payment is or would have been due after the occurrence of the subject Default), together with all other sums due under such Equipment Schedule as of such determination date or (B) all sums due and to become due under such Equipment Schedule for the full term thereof (including any tax indemnities becoming due as a result of the Default, and any mandatory purchase or renewal options which Lessee has contracted to pay) (provided that all sums becoming due after the occurrence of such Default shall be discounted to present value as of the date of payment by Lessee) plus Lessor's estimated residual interest in the Equipment; plus (2) the amount of all commercially reasonable costs and expenses incurred by Lessor in connection with repossession, recovery, storage, repair, sale, re-lease or other disposition of the Equipment, including reasonable attorneys' fees and costs incurred in connection therewith or otherwise resulting from the Default; minus (3) if Lessor has repossessed the Equipment, the amount calculated pursuant to clause (B) (ii) of sub-part (b)(1) or (2) (as applicable).  Notwithstanding the foregoing, in the event such Equipment Schedule and Lessee's rights thereunder automatically are cancelled pursuant to the first sentence of this Section 16, the amounts payable under clause (1) of this paragraph (c) automatically shall become due and payable on the date of such cancellation, without notice or demand, except as otherwise may be provided in writing by Lessor.

(d)  Cancel such Equipment Schedule as to any or all of the Equipment.

(e)  Proceed by appropriate court action, either at law or in equity (including an action for specific performance), to enforce performance by Lessee or to recover damages associated with such Default; or exercise any other right or remedy available to Lessor at law or in equity.

All amounts to be present valued shall be discounted at a rate equal to the discount rate of the Federal Reserve Bank of Richmond in effect on the applicable date.  Unless otherwise provided above, a cancellation of any Equipment Schedule shall occur only upon written notice by Lessor to Lessee and only with respect to such items of the Equipment as Lessor specifically elects to cancel in such notice.  Except as to such items of the Equipment with respect to which there is a cancellation, this Lease and the Equipment Schedules not so cancelled shall remain in full force and effect and Lessee shall be and remain liable for the full performance of all its obligations hereunder and thereunder.  Lessee shall be liable for all reasonable legal fees and other expenses incurred by reason of any default or Default or the exercise of Lessor's remedies, including all expenses incurred in connection with the return of any Equipment in accordance with the terms of Section 13 hereof or in placing such Equipment in the condition required by said Section, and all other pre-judgment and post-judgment enforcement related activities.  No right or remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and shall be in addition to any other remedy referred to above or otherwise available at law or in equity, and may be exercised concurrently or

17. **ASSIGNMENT.** (a) WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR (WHICH SHALL NOT UNREASONABLY BE WITHHELD), LESSEE WILL NOT ASSIGN, TRANSFER OR ENCUMBER ANY OF ITS RIGHTS OR OBLIGATIONS HEREUNDER OR UNDER ANY EQUIPMENT SCHEDULE, OR ITS LEASEHOLD INTEREST, SUBLET THE EQUIPMENT OR OTHERWISE PERMIT THE EQUIPMENT TO BE OPERATED OR USED BY, OR TO COME INTO OR REMAIN IN THE POSSESSION OF, ANYONE BUT LESSEE. No assignment or sublease, whether authorized in this Section or in violation of the terms hereof, shall relieve Lessee of its obligations, and Lessee shall remain primarily liable, hereunder and under each Equipment Schedule. Any unpermitted assignment, transfer, encumbrance, delegation or sublease by Lessee shall be void *ab initio*. (b) LESSOR MAY AT ANY TIME ASSIGN ANY OR ALL OF ITS RIGHTS, OBLIGATIONS, TITLE AND INTERESTS HEREUNDER AND UNDER ANY EQUIPMENT SCHEDULE, TO ANY OTHER PERSON. If Lessee is given notice of any such assignment, Lessee shall acknowledge receipt thereof in writing. Any such assignee shall have and be entitled to exercise any and all rights and powers of Lessor hereunder, but such assignee shall not be obligated to perform any of the obligations of Lessor hereunder (other than the covenant of quiet enjoyment specified in Section 18(c) hereof). Lessee will pay all rent and other amounts payable by Lessee hereunder to such assignee, notwithstanding any defense or claim of whatever nature, whether by reason of breach or otherwise which it may now or hereafter have against Lessor; it being understood that in the event of a default or breach by Lessor, that Lessee shall pursue any rights on account thereof solely against Lessor. Lessee agrees that any such assignment shall not materially change Lessee's duties or obligations under the Lease or any Equipment Schedule nor materially increase Lessee's risks or burdens. Upon such assignment and except as may otherwise be provided therein all references in this Lease to Lessor shall include such assignee. (c) Subject always to the foregoing, this Lease and each Equipment Schedule inure to the benefit of, and are binding upon, the successors and assigns of the parties hereto and thereto, as the case may be.

18. **MISCELLANEOUS.** (a) This Lease, the Riders annexed hereto, each Equipment Schedule and any commitment letter between the parties, constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and shall not be rescinded, amended or modified in any manner except by a document in writing executed by both parties. (b) Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. (c) The representations, warranties and covenants of Lessee herein shall be deemed to be continuing and to survive the execution and delivery of this Lease, each Equipment Schedule and any other Lease Documents. Each execution by Lessee of an Equipment Schedule shall be deemed a reaffirmation and warranty that there shall have been no material adverse change in the business or financial condition of Lessee from the date of execution hereof. With respect to each Equipment Schedule, the obligations of Lessee under Sections 7, 8, 9, 10, 13 and 14 hereof, together with any of Lessee's obligations under the other provisions of this Lease (as incorporated therein) which have accrued but not been fully satisfied, performed or complied with prior to the cancellation or termination of such Equipment Schedule, shall survive the cancellation or termination thereof to the extent necessary for the full and complete performance of such obligations. (d) Lessor represents and covenants to Lessee that Lessor has full authority to enter into this Lease and any other Lease Documents to which it may become a party, and so long as no default or Default occurs with respect to an Equipment Schedule, neither Lessor nor any person authorized by Lessor shall interfere with Lessee's right to peaceably and quietly possess and use the Equipment during the term thereof, subject to the terms and provisions hereof. (e) If Lessee fails to perform any of its obligations hereunder with respect to an Equipment Schedule, Lessor shall have the right, but shall not be obligated, to effect such performance, and the amount of any out of pocket and other reasonable expenses of Lessor incurred in connection with such performance, together with interest thereon at the Late Charge Rate, shall be payable by Lessee upon demand. Lessor's effecting such compliance shall not be a waiver of Lessee's default. (f) Lessee irrevocably appoints Lessor as Lessee's attorney-in-fact (which power shall be deemed coupled with an interest) to execute, endorse and deliver any documents and checks or drafts relating to or received in payment for any loss or damage under the policies of insurance required by the provisions of Section 11 hereof, but only to the extent that the same relates to the Equipment. (g) LESSOR AND LESSEE HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH LESSOR AND/OR LESSEE MAY BE PARTIES ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS LEASE. LESSEE AUTHORIZES LESSOR TO FILE THIS PROVISION WITH THE CLERK OR JUDGE OF ANY COURT HEARING ANY SUCH CLAIM. IT IS HEREBY AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS LEASE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE PARTIES AND THE PARTIES HEREBY ACKNOWLEDGE THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. LESSOR AND LESSEE FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED IN THE SIGNING OF THIS LEASE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. (h) All notices (excluding billings and communications in the ordinary course of business) hereunder shall be in writing, personally delivered, delivered by overnight courier service, sent by facsimile transmission (with confirmation of receipt), or sent by certified mail, return receipt requested, addressed to the other party at its respective address stated below the signature of such party or at such other address as such party shall from time to time designate in writing to the other party; and shall be effective from the date of receipt. (i) This Lease and all of the other Lease Documents shall not be effective unless and until accepted by execution by an officer of Lessor at the address, in the State of Maryland (the "State"), as set forth below the signature of Lessor. THIS LEASE AND ALL OF THE OTHER LEASE DOCUMENTS, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER, SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF THE STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT. The parties agree that any action or proceeding arising out of or relating to this Lease may be

commenced in any state or Federal court in the State, and agree that a summons and complaint commencing an action or proceeding in any such court shall be properly served and shall confer personal jurisdiction if served personally or by certified mail to it at its address hereinbelow set forth, or as it may provide in writing from time to time, or as otherwise provided under the laws of the State. (j) This Lease and all of the other Lease Documents may be executed in any number of counterparts and by different parties hereto or thereto on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together consist of but one and the same instrument; provided, however, that to the extent that this Lease and/or the Equipment Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest herein or therein may be created through the transfer or possession of this Lease in and of itself without the transfer or possession of the original of such Equipment Schedule and incorporating the Lease by reference; and no security interest in this Lease and an Equipment Schedule may be created by the transfer or possession of any counterpart of such Equipment Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

   19. DEFINITIONS AND RULES OF CONSTRUCTION. (a) The following terms when used in this Lease or in any of the Equipment Schedules have the following meanings: (1) "applicable law" or "law": any law, rule, regulation, ordinance, order, code, common law, interpretation, judgment, directive, decree, treaty, injunction, writ, determination, award, permit or similar norm or decision of any governmental authority; (2) "business day": any day, other than a Saturday, Sunday, or legal holiday for commercial banks under the laws of the state of the governing law of this Lease; (3) "Code" or "Uniform Commercial Code": the Uniform Commercial Code as in effect in the State or in any other applicable jurisdiction; and any reference to an article (including Article 2A) or section thereof shall mean the corresponding article or section (however termed) of any such other applicable version of the Uniform Commercial Code; (4) "governmental authority": any federal, state, county, municipal, regional or other governmental authority, agency, board, body, instrumentality or court, in each case, whether domestic or foreign; and (5) "person": any individual, corporation, partnership, joint venture, or other legal entity or a governmental authority, whether employed, hired, affiliated, owned, contracted with, or otherwise related or unrelated to Lessee or Lessor. (b) The following terms when used herein or in any of the Equipment Schedules shall be construed as follows: "herein," "hereof," "hereunder," etc.: in, of, under, etc. this Lease or such other Lease Document in which such term appears (and not merely in, of, under, etc. the section or provision where the reference occurs); "including": containing, embracing or involving all of the enumerated items, but not limited to such items unless such term is followed by the words "and limited to," or similar words; and "or": at least one, but not necessarily only one, of the alternatives enumerated. Any defined term used in the singular preceded by "any" indicates any number of the members of the relevant class. Any Lease Document or other agreement or instrument referred to herein means such agreement or instrument as supplemented and amended from time to time. Any reference to Lessor or Lessee shall include their permitted successors and assigns. Any reference to a law shall also mean such law as amended, superseded or replaced from time to time. Unless otherwise expressly provided herein to the contrary, all actions that Lessee takes or is required to take under any Lease Document shall be taken at Lessee's sole cost and expense, and all such costs and expenses shall constitute Claims and be covered by Section 14 hereof. To the extent Lessor is required to give its consent or approval with respect to any matter, the reasonableness of Lessor's withholding of such consent shall be determined based on the then existing circumstances; provided, that Lessor's withholding of its consent shall be deemed reasonable for all purposes if (i) the taking of the action that is the subject of such request, might result (in Lessor's discretion), in (A) an impairment of Lessor's rights, title or interests hereunder or under any Equipment Schedule or other Lease Document, or to the Equipment, or (B) expose Lessor to any Claims, or (ii) to the extent Lessee fails to provide promptly to Lessor any filings, certificates, opinions or indemnities specified by Lessor to Lessee in writing.

   IN WITNESS WHEREOF, the parties hereto have caused this Lease to be duly executed, under seal, as of the day and year first above set forth.

SIGNET LEASING AND FINANCIAL CORPORATION
Lessor

By: _Michael S. Furey_____[SEAL]
Name:_____
Title:__A V P_____

   7 St. Paul Street
   Baltimore, Maryland 21202
   Facsimile: (410) 783-6150

Attn:_____


W.R. GRACE & CO. - CONN.
Lessee

By: _James R. Hyde_____[SEAL]
Name:__James R. Hyde_____
Title:___Senior Vice President_____

   ___One Town Center Road_____
   ___Boca Raton, Florida 33486_____
   _____

   Facsimile:_____

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE



# EXHIBIT E

# SIGNET LEASING AND FINANCIAL CORPORATION

**EQUIPMENT SCHEDULE NO.** 3059

This Equipment Schedule (this "Equipment Schedule") is entered into between Signet Leasing and Financial Corporation ("Lessor") and W.R. GRACE & CO. - CONN. ("Lessee"), effective as of the date set forth below, pursuant to that certain Equipment Lease Agreement dated as of December 21, 1995, between Lessor and Lessee (the "Lease"). Capitalized terms used without definition in this Equipment Schedule and certain other terms that are not capitalized shall have the meanings ascribed to them in the Lease, to the extent defined therein. The provisions of the Lease, solely as they relate to the Equipment leased hereunder, are hereby incorporated into and shall be deemed a part of this Equipment Schedule. This Equipment Schedule shall be deemed a separate instrument of lease.

1.    **EQUIPMENT.**

(a) The Equipment leased hereunder shall include the personal property described in the schedule attached hereto and made a part hereof.

(b) The "Total Invoice Cost" of the Equipment is equal to $ 1,142,015.00.

2.    **TERM.** Upon and after the date of execution hereof, the Equipment shall be hereby leased by Lessor to Lessee on the terms and conditions of the Lease, this Equipment Schedule and any other Lease Documents entered into in connection herewith. A full term of lease with respect to said Equipment shall commence on the date hereof and shall extend for One hundred twenty (_120_) months from December 21, 1995 (the "Base Lease Commencement Date").

3.    **RENT.**

(a) During the period from the date hereof to the Base Lease Commencement Date (the "Interim Term"), the pro-rated daily rent for said Equipment shall be $_____N/A_____ per day; computed as ___N/A___% of the Total Invoice Cost specified above. This pro-rated payment shall be made on the last day of the month for each month during the Interim Term.

(b) From and after the Base Lease Commencement Date, the monthly rent for said Equipment during the term of this Equipment Schedule shall be $ 13,622.80 , computed as _1.19282_% of the Total Invoice Cost specified above. Rent payments shall be made, in _arrears_, on the _21_ day of the month for each month during the term of this Equipment Schedule.

4.    **LESSEE'S CONFIRMATION.** (a) Lessee hereby confirms and warrants to Lessor that the Equipment: (i) was duly delivered to Lessee at the location specified in Section 5 hereof; (ii) has been received, inspected and determined to be in compliance with all applicable specifications set forth in the Supply Contract and that the Equipment is hereby accepted for all purposes of the Lease, hereof and of the Supply Contract; and (iii) is a part of the "Equipment" referred to in the Lease and is taken subject to all terms and conditions therein and herein provided. (b) Lessee acknowledges and agrees that: (i) Lessor did not select, manufacture or supply the Equipment; (ii) Lessor acquired the Equipment in connection with the Lease and this Equipment Schedule; and (iii) Lessee received a copy of the Supply Contract by which Lessor acquired the Equipment before executing this Equipment Schedule.

5.    **LOCATION OF EQUIPMENT.** The location of the Equipment is specified on the Schedule of Equipment attached hereto.

6.    **LATE CHARGE RATE.** The Late Charge Rate shall be one and one-half (1 ½) percent per month of the amount in arrears for the period such amount remains unpaid (provided, however, that if such rate exceeds the highest rate permitted by applicable law, then the Late Charge Rate shall be the highest rate permitted by applicable law).

7.    **SCHEDULE OF STIPULATED LOSS VALUES.** The Schedule of Stipulated Loss Values attached hereto is incorporated herein by reference, and shall be applicable solely to the Equipment described in this Equipment Schedule.

8.    **RECOVERY PROPERTY CLASS.** The class of property to which the Equipment is assigned (as referenced in Section 2 of the Tax Indemnity Rider to the Lease) is _15_-year property.

9.    **PUBLIC LIABILITY INSURANCE.** The amount of public liability insurance referenced in Section 11 of the Lease is $10,000,000.00.

10. **INTEREST RATE PROVISION.** Without prejudicing the generality of Section 10(b) of the Lease, Lessor and Lessee agree as follows: (a) As used in the Lease or in any other Lease Document, the term "Maximum Legal Rate of Interest", "highest rate permitted by law," or any similar term, shall mean and refer to the maximum rate of non-usurious interest, if any, that Lessor may from time to time charge Lessee and in regard to which Lessee would be prevented successfully from raising the claim or defense of usury under applicable law as now, or to the extent permitted by law, as may hereafter be, in effect (said law permitting the highest rate being herein referred to as the "Interest Law"). (b) It is the intention of Lessor and Lessee to conform strictly to the Interest Law applicable to this transaction. (c) Accordingly, it is agreed that notwithstanding any provision to the contrary in this Equipment Schedule or any other Lease Document, the aggregate of all interest and any other charges or consideration constituting interest, if any, under applicable Interest Law that is taken, reserved, contracted for, charged or received under this Equipment Schedule or under any other Lease Document or otherwise on or in connection with any indebtedness shall under no circumstance exceed the maximum amount of interest allowed by the applicable Interest Law. (d) If any usurious interest in such respect is provided for, or shall be adjudicated to be so provided for, in this Equipment Schedule or in any other Lease Document or otherwise, or if the acceleration of the maturity of any indebtedness or if the prepayment by Lessee of any indebtedness results in Lessee having paid any interest in excess of that permitted by applicable law, then in such event (i) the provisions of this Paragraph 10 shall govern and control, (ii) neither Lessee nor Lessee's successors or assigns or any other party liable for the payment of any such indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest allowed by the Interest Law applicable to any such indebtedness, (iii) any excess shall be deemed a mistake and cancelled

automatically and, if theretofore paid, shall be credited on any such indebtedness by Lessor (or if, said indebtedness shall have been paid in full, refunded to Lessee), and (iv) the effective rate of interest shall be automatically subject to reduction to the Maximum Legal Rate of Interest allowed under such Interest Law as now or hereafter construed by courts of appropriate jurisdiction. (e) All sums paid or agreed to be paid to Lessor for the use, forbearance or detention of any indebtedness shall, to the extent permitted by the Interest Law applicable to any such indebtedness, be amortized, prorated, allocated and spread throughout the full term of any such indebtedness until paid in full so that the rate or amount of interest, if any, on account of said indebtedness does not exceed the applicable usury ceiling. (f) The right to accelerate the maturity of any indebtedness does not include the right to accelerate any interest which is not otherwise accrued on the date of such acceleration, and Lessor does not intend to collect unearned interest in the event of acceleration. (g) Notwithstanding any provision contained in the Lease or any other Lease Document, the total amount of interest, if any, that Lessee may become obligated to pay and that Lessor is entitled to receive with respect to any indebtedness shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the Maximum Legal Rate of Interest on principal amounts actually advanced to or for the account of Lessee.

DATE OF EXECUTION:   December 21, 1995.

SIGNET LEASING AND FINANCIAL CORPORATION
Lessor

By: _Michael D. Furr_ [SEAL]
Name:_____
Title: _K U P_____

W.R. GRACE & CO. - CONN._____
Lessee

By: _James W. Hyde_ [SEAL]
Name:_____James R. Hyde_____
Title:_____Senior Vice President_____

THE ONE AND ONLY ORIGINAL OF THIS EQUIPMENT SCHEDULE IS MARKED "ORIGINAL" AT THE TOP OF THIS PAGE AND SHALL CONSTITUTE THE ONLY CHATTEL PAPER ORIGINAL FOR THE PURPOSES OF ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE. EACH OTHER SIGNED VERSION IS MARKED "DUPLICATE".

# SIGNET LEASING AND FINANCIAL CORPORATION

**SCHEDULE OF EQUIPMENT**

Lessee: _____ W.R. GRACE & CO. - CONN._____

Approved by _____ ✓          Page No. __1__ of __2__ total pages
        (Lessee to initial each page)

Attached to Bill of Sale dated                   Equipment located at:
_December 21_, 19 95                              _5500 Chemical Road_
        and/or                                   Street No.
Equipment Schedule No. __01__                     _Baltimore_                    MD
                                                 City          County       State  ZIP Code

| Manufacturer and/or Vendor Name & Invoice No. | Description | Invoice Cost |
|---|---|---|
| **ITEM NO. 1**<br><br>POWERCON | 2 - Sets of 13KV distribution switchgear each including:<br><br>    1 - Transition Cubicle<br>    1 - Future Switch and Fuse Cubicle<br>    1 - Switch and Fuse Cubicle Equipped<br>        with SM-5 Expulsion Fuses<br><br>*Reference Map A for Site Location*<br>*Reference Map B for Detailed View* | |
| **ITEM NO. 2**<br><br>MISCELLANEOUS VENDORS | Cable installation hardware and pole framing.<br><br>*Reference Maps A and C for Site Locations* | |
| **ITEM NO. 3**<br><br>ROB ROY | 1 - Lot of PVC coated steel conduit and associated mounting hardware.<br><br>*Reference Map C for Site Location* | |
| **ITEM NO. 4**<br><br>C-K SYSTEMS, INC. | Pre-engineered 1-story building 43' X 63' with overhead door and ventilation system lighting, electrical wiring.<br><br>*Reference Map C for Site Location*<br>*Reference Map D for Building and Ventilation System Detail* | |

# SIGNET LEASING AND FINANCIAL CORPORATION

**SCHEDULE OF EQUIPMENT**

Lessee: _____ W.R. GRACE & CO. - CONN.

Approved by _____ ✓   Page No. ___2___ of __2___ total pages
(Lessee to initial each page)

Attached to Bill of Sale dated
December 21 _____, 19 95
and/or
Equipment Schedule No. __01__

Equipment located at:
5500 Chemical Road
Street No.
Baltimore _____ MD
City            County        State   ZIP Code

| Manufacturer and/or Vendor Name & Invoice No. | Description | Invoice Cost |
|---|---|---|
| **ITEM NO. 5** | | |
| POWERCON | 1 - Indoor double ended 13KV/480/277V Substation consisting of 2-15KV indoor metal enclosed duplex switches with common fuses and arrestors close coupled to 2-2000/2800 KVA, 13.2KV transformers with power monitor and spare fuses. | |
| | 1 - 480V L.V. breaker 1600AF, 800AT electrically operated. | |
| POWERCON | 1 - Indoor single ended substation 13KV/4160/2400V consisting of 1-15KV indoor metal enclosed duplex switches with common fuse and arrestors close coupled to a 2500 / 3500 KVA transformer with power monitor and spare fuses. | |
| | *Reference Map E for Equipment Location in Building Identified in Item 4* | |
| | | $1,142,015 |

MAK:357241.1:09/22/95 (BLCD/%)

# SIGNET LEASING AND FINANCIAL CORPORATION

**SCHEDULE OF EQUIPMENT**

Lessee: _____ W.R. GRACE & CO. - CONN. _____

Approved by _____
            (Lessee to initial each page)

Page No. _____ of _____ total pages

Attached to Bill of Sale dated
_____, 19___
         and/or

Equipment located at:

Equipment Schedule No. __01__

Street No. _____

City                County              State    ZIP Code

| Manufacturer and/or Vendor Name & Invoice No. | Description | Invoice Cost |
|---|---|---|
| | | |

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE



# EXHIBIT F

**ENERGY PROJECTS & SERVICES**

Baltimore Gas and Electric Company
P.O. Box 1475
Baltimore, Maryland 21203-1475



December 21, 1995

# INVOICE

### SIGNET LEASING AND FINANCIAL CORPORATION
### 7 ST. PAUL STREET, 3RD FLOOR
### BALTIMORE, MARYLAND 21202

ATTN: MICHAEL S. FURNARI

Install substation and associated equipment per attached equipment list pursuant to contract between W. R. Grace and Co.-Conn. and Baltimore Gas and Electric Company dated April 12, 1995, amended December 21, 1995, and modified by change orders 1 - 4 (copies attached).

**Total Due:**      **$1,142,015.00**

Remit by Wire Transfer:       Signet Bank
Baltimore, Maryland
ABA 052000016
Account:  440-039-7289
BGE Energy Projects & Services, Inc.

Terms:  Due on Receipt

## EQUIPMENT BILL OF SALE

THIS EQUIPMENT BILL OF SALE is given by Baltimore Gas and Electric Company (herein the "Seller") to SIGNET LEASING AND FINANCIAL CORPORATION, its successors and assigns (herein the "Buyer").

### WITNESSETH:

THAT FOR ONE MILLION ONE HUNDRED FORTY TWO THOUSAND FIFTEEN DOLLARS ($1,142,015) AND OTHER GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Seller does hereby bargain, sell, assign, transfer and set over to Buyer, its successors and assigns, the items of equipment listed on the schedule attached hereto (being referred to herein as "Equipment").

TO HAVE AND TO HOLD said Equipment, unto Buyer, its successors and assigns, forever.

SELLER represents and warrants that it has good and marketable title to said Equipment conveyed hereunder and it is hereby transferring to Buyer good and valid title thereto free and clear of any and all encumbrances, liens, charges or defects. Seller further represents and warrants that the Equipment sold hereunder is transferable by Seller by its sole act and deed and that all corporate action required to authorize, approve and validate such transfer has been duly and lawfully taken.

AND Seller covenants that it will from time to time on demand execute any and all such further instruments which Buyer and its successors and assigns, may deem necessary, desirable or proper to effect the complete transfer of the Equipment or any interest therein unto Buyer and its successors and assigns, or to better evidence the right, title and interest of Buyer, it successors and assigns.

IN WITNESS WHEREOF,, Seller has caused this instrument to be duly executed, under seal, as of the 21st day of December, 1995.

SELLER

By: _RWenderlich_ (SEAL)

Name: _Raymond L. Wenderlich_

Title: _Manager, Energy Sales & Services Dept._

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE

# EXHIBIT G

# SIGNET LEASING AND FINANCIAL CORPORATION

RIDER NO. 01

To and part of Equipment Lease Agreement dated as of the 21 day of December, 1995 (the "Lease"), between SIGNET LEASING AND FINANCIAL CORPORATION, its successors and assigns ("Lessor"), and W.R. GRACE & CO. - CONN. ("Lessee").

A. OPTION TO RENEW.  Provided that Lessee is not then in Default, Lessee shall have the option to renew the Equipment Schedule(s), at the expiration of the term thereof, with respect to all but not less than all of the Equipment leased thereunder, on the terms and conditions of such Equipment Schedule(s), for a negotiated renewal term at a periodic rent equal to the Fair Market Rental Value of such Equipment determined at the time of renewal.  If Lessee desires to exercise this option it shall give Lessor written notice of its intention to exercise this option to renew at least two hundred forty (240) days before expiration of the term of such Equipment Schedule(s).  Thereafter, Lessee shall engage in negotiations with Lessor to determine the periodic rent to be paid during the renewal term.  Not less than one hundred eighty (180) days before expiration of the term of such Equipment Schedule(s), Lessee shall give Lessor written notice of its election to renew on the terms mutually agreed upon during negotiations.  Such election shall be effective with respect to all of the Equipment leased under the Equipment Schedule(s).  For purposes of this Section, "Fair Market Rental Value" shall be deemed to be an amount equal to the rental, as installed and in use, obtainable in an arms' length transaction between a willing and informed lessor and a willing and informed lessee under no compulsion to lease (and assuming that, as of the date of determination, the Equipment is in at least the condition required by Section 13 of this Lease).  If (prior to one hundred eighty (180) days before expiration of the term of such Equipment Schedule(s)) the parties are unable to agree on the Fair Market Rental Value of the Equipment, then (at least one hundred twenty (120) days before expiration of the term thereof) Lessor and Lessee shall at Lessee's expense obtain appraisal values from three independent appraisers (other than American Appraisal Associates, Inc.) (one to be selected by Lessor, one by Lessee, and the other by the two selected by Lessor and Lessee; each of whom must be associated with a professional organization of equipment or personal property appraisers, such as the American Society of Appraisers) and the average Fair Market Rental Value as determined by such appraisers shall be binding on the parties hereto.  If, prior to ninety (90) days before the expiration of the term of such Equipment Schedule(s), the appraisers selected by Lessor and Lessee are unable to agree on the third appraiser, then American Appraisal Associates, Inc. will be selected to provide the third appraisal value.

B. OPTION TO PURCHASE.  Provided that no Default has then occurred under or with respect to an Equipment Schedule, Lessee shall have the option to purchase, upon the expiration of the term of such Equipment Schedule, or of any subsequent renewal term, if applicable, but not less than all of the Equipment leased thereunder upon the following terms and conditions:  If Lessee desires to exercise this option it shall give Lessor written notice of its intention to exercise this option to purchase at least two hundred forty (240) days before expiration of the term of such Equipment Schedule.  Thereafter, Lessee shall engage in negotiations with Lessor to determine the Purchase Price for the Equipment.  Not less than one hundred eighty (180) days before expiration of the term of such Equipment Schedule, Lessee shall give Lessor written notice of its election to purchase on the terms mutually agreed upon during negotiations.  Such election shall be effective with respect to all of the Equipment leased under the Equipment Schedule.  Thereupon, at the expiration of the term of the Equipment Schedule, Lessee shall pay to Lessor in cash the Purchase Price for the Equipment so purchased, determined as hereinafter provided.  The Purchase Price of the Equipment shall be an amount equal to its then Fair Market Value, together with all taxes and charges upon sale.  For purposes of this Section, "Fair Market Value" shall be deemed to be an amount equal to the sale price of the Equipment, as installed and in use, obtainable in an arms' length transaction between a willing and informed buyer and a willing and informed seller under no compulsion to sell (and assuming that, as of the date of determination, the Equipment is in at least the condition required by Section 13 of this Lease).  If the parties are unable to agree on the Fair Market Value of the Equipment, then the appraisal procedure set forth in Section A hereof shall be followed.  Notwithstanding any election of Lessee to purchase, the provisions of this Lease and such Equipment Schedule shall continue in full force and effect until the passage of ownership of all of the Equipment leased thereunder upon the date of purchase.  On the date of purchase, Lessor shall deliver to Lessee a bill of sale transferring and assigning to Lessee without recourse or warranty, all of Lessor's right, title and interest in and to the Equipment.  Lessor shall not be required to make and may specifically disclaim any representation or warranty as to the condition of the Equipment or any other matters.

SIGNET LEASING AND FINANCIAL CORPORATION
Lessor


By: _Michael D. Furm_[SEAL]
Name: _____
Title: _A○C_____

W.R. GRACE & CO. - CONN.
Lessee


By: _Jenny Whyte_ [SEAL]
Name: _James R. Hyde_
Title: _Senior Vice President_

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE

# EXHIBIT H

# SIGNET LEASING AND FINANCIAL CORPORATION

**RIDER NO. 02**

To and part of Equipment Lease Agreement dated as of the 21 day of December, 1995 (the "Lease"), between SIGNET LEASING AND FINANCIAL CORPORATION, its successors and assigns ("Lessor"), and W.R. GRACE & CO. - CONN. ("Lessee").

TAX INDEMNITY.

(1) Lessee represents and warrants that: (a) it believes that it is reasonable to estimate that the useful life of the Equipment exceeds the lease term (including any interim and fixed rental renewal periods) of the Equipment Schedule relating thereto by the greater of one (1) year or twenty (20) percent of such estimated useful life, and that said Equipment will have a value at the end of the term of such Equipment Schedule, including any fixed rate renewal period, of at least twenty (20) percent of the Total Invoice Cost of the Equipment, without including in such value any increase or decrease for inflation or deflation during the original lease term (all as evidenced by the certificate of a qualified party to be provided at Lessee's expense to Lessor prior to the commencement of the lease term); and (b) the Equipment is, and will be used by Lessee so as to remain, property eligible for the MACRS Deductions (as defined below).

(2) If (a) Lessor in computing its taxable income or liability for tax, shall lose, or shall not have, or shall lose the right to claim, or there shall be disallowed or recaptured for Federal and/or state income tax purposes, in whole or in part, the benefit of MACRS Deductions; or (b) Lessor shall become liable for additional tax as a result of Lessee having added an attachment or made an alteration to the Equipment, including without limitation, any such attachment or alteration which would increase the productivity or capability of the Equipment so as to violate the provisions of Rev. Proc. 75-21, 1975-1 C.B. 715, or Rev. Proc. 79-48, 1979-2 C.B. 529 (as either or both may hereafter be modified or superseded); or (c) the statutory full-year marginal Federal tax rate (including any surcharge) for corporations is other than thirty-five (35) percent; hereinafter referred to as a "Loss"; then Lessee shall pay Lessor the Tax Indemnification Payment as additional rent and Lessor shall revise the Schedule(s) of Stipulated Loss Values to reflect the Loss. As used herein, "MACRS Deductions" shall mean the deductions under Section 167 of the Internal Revenue Code of 1986, as now or hereafter amended (the "Code"), determined in accordance with the modified Accelerated Cost Recovery System with respect to the Total Invoice Cost of any item of the Equipment using the accelerated method set forth in Section 168(b)(1) or 168(b)(2) of the Code as in effect on the date of this Lease for property assigned to the class of property specified in the Equipment Schedule pertaining thereto; "Lessor" shall be deemed to include the consolidated Federal taxpayer group of which Lessor is a member; and "Tax Indemnification Payment" shall mean such amount as, after consideration of (i) all taxes required to be paid by Lessor in respect of the receipt thereof under the laws of any governmental or taxing authority in the United States, and (ii) the amount of any interest or penalty which may be payable by Lessor in connection with the Loss, shall be required to cause Lessor's after-tax net return (the "Net Return") to be equal to, but no greater than, the Net Return computed consistently with current tax laws (and with the assumption that Lessor is taxed at the highest marginal Federal and state tax rates) as of the date of this Lease that would have been available to Lessor had the Loss not occurred.

(3) Lessor shall be responsible for, and shall not be entitled to a Tax Indemnification Payment by Lessee on account of, any Loss arising solely as a direct result of the occurrence of any one or more of the following events: (a) the failure of Lessor to timely and properly claim MACRS Deductions in the tax return of Lessor other than as a result of changes in the Code or applicable regulations unless in the reasonable opinion of Lessor's tax counsel there is no basis for such claim; or (b) the failure of Lessor to have sufficient taxable income before application of the MACRS Deductions to offset the full amount of such MACRS Deductions other than as a result of changes in the Code or applicable regulations; or (c) any event which by the terms of the Lease requires payment by Lessee of the Stipulated Loss Value if such payment is thereafter actually made to Lessor, to the extent that such payment reimburses Lessor for amounts otherwise payable by Lessee pursuant hereto; or (d) a disqualifying disposition due to sale of any item of the Equipment or the Equipment Schedule relating thereto by Lessor prior to a Default.

(4) Lessor promptly shall notify Lessee in writing of such Loss and Lessee shall pay to Lessor the Tax Indemnification Payment within thirty (30) days of such notice. For these purposes, a Loss shall occur upon the earliest of: (a) the happening of any event (such as disposition or change in use of any item of the Equipment) which will cause such Loss, (b) the payment by Lessor to the Internal Revenue Service or state taxing authority of the tax increase (including an increase in estimated taxes) resulting from such Loss; (c) the date on which the Loss is realized by Lessor; or (d) the adjustment of the tax return of Lessor to reflect such Loss.

(5) The obligations of Lessee under this Section, which accrue during the term of an Equipment Schedule, shall survive the expiration or termination of the Lease and such Equipment Schedule.

SIGNET LEASING AND FINANCIAL CORPORATION
Lessor

By: _Michael A Furman_ [SEAL]
Name: _____
Title: _R V P_

W.R. GRACE & CO. - CONN.
Lessee

By: _James R. Hyde_ [SEAL]
Name: _James R. Hyde_
Title: _Senior Vice President_

New
12/21/95

**MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE**

# EXHIBIT I

# SIGNET LEASING AND FINANCIAL CORPORATION

**REAL PROPERTY WAIVER**

THIS WAIVER, Made as of the _____ day of _____, 1995, by and between SIGNET LEASING AND FINANCIAL CORPORATION, its successors and assigns (hereinafter the "Lessor"), and the undersigned.

The undersigned has an interest in the premises more specifically described on the attached schedule (the "Premises"), as _____ _____. The Premises are now occupied in whole or in part by W.R. GRACE & CO. - CONN. (hereinafter the "Lessee"), and Lessee desires to lease from Lessor certain equipment which is already on or is to be delivered to or installed on the Premises, all of said equipment being more fully described on the schedule attached hereto (hereinafter collectively the "Equipment"), all of which Equipment is now or hereafter may become subject to an Equipment Schedule between Lessor and Lessee (the "Equipment Schedule"), incorporating by reference an Equipment Lease Agreement (hereinafter the "Agreement") between Lessor and Lessee; to be used in connection with the business of Lessee as now or hereafter conducted.

Lessor is willing to lease the Equipment to Lessee, provided that the undersigned recognizes Lessor's title and interest in and to the Equipment.

NOW, THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) in hand paid, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby consents and agrees as follows:

1. Title to the Equipment is to be leased to Lessee by Lessor is and shall remain in Lessor.

2. All the Equipment may be kept, installed, maintained, used and operated in the Premises; and shall remain personal property notwithstanding the manner or mode of the attachment of such Equipment to the realty and shall not become fixtures.

3. The undersigned waives and agrees not to assert any lien, claim or interest which the undersigned may now have or hereafter may acquire against or in the Equipment by virtue of the undersigned's interest in the real property, or otherwise.

4. In the event of default by Lessee in the performance of any of its obligations pursuant to the Equipment Schedule or any extension or renewal of said Equipment Schedule, Lessor may: (a) abandon the Equipment in place, (b) assemble the Equipment and conduct an auction of the Equipment on the Premises, or (c) remove the Equipment from the Premises in accordance with the terms and conditions of said Agreement.

5. Lessor may, without affecting the validity of this Waiver, extend the time of the payment of any rental or the performance of any of the other terms and conditions of the Equipment Schedule, without the consent of, and without giving notice thereof to, the undersigned.

6. This Waiver shall inure to the benefit of the successors and assigns of Lessor and shall be binding upon the heirs, personal representatives, successors and assigns of the undersigned.

IN WITNESS WHEREOF, the undersigned has caused this Waiver to be duly executed as of the day and year first above written.

ATTEST:

W. R. GRACE & CO.—CONN.

By: _James R. Hyde_____

James R. Hyde
**Senior Vice President**

STATE OF __MARYLAND_____ :

__CITY__ ~~COUNTY~~ OF __BALTIMORE_____ SS:

The undersigned, a Notary Public within and for said County, in the State aforesaid, duly commissioned and acting, hereby certifies that on this __21st__ day of __December__, 1995, personally appeared before me __JAMES R. HYDE__ _____, to me personally known and known to be the person who signed the foregoing Waiver, who, being by me duly sworn and being informed of the contents of said Waiver, stated and acknowledged on oath that he signed, sealed and delivered same with authority as his free and voluntary act and deed, for the uses, purposes and considerations therein mentioned and set forth.

My Commission Expires:
__December 1, 1998__

_Mollie K. Sprinkle_____
Notary Public
Mollie K. Sprinkle

*[Notary Seal: MOLLIE K. SPRINKLE — NOTARY PUBLIC — Carroll County]*

# SIGNET LEASING AND FINANCIAL CORPORATION

### SCHEDULE OF EQUIPMENT

Lessee: _____ W.R. GRACE & CO. - CONN. _____

Approved by _____        Page No. __1__ of __2__ total pages
      (Lessee to initial each page)

Attached to Bill of Sale dated                 Equipment located at:
December 21____, 19 95                          5500 Chemical Road
      and/or                                    Street No.
Equipment Schedule No. __01__                   Baltimore                        MD
                                                City            County        State  ZIP Code

| Manufacturer and/or Vendor Name & Invoice No. | Description | Invoice Cost |
|---|---|---|
| **ITEM NO. 1**<br><br>POWERCON | 2 - Sets of 13KV distribution switchgear each including:<br><br>    1 - Transition Cubicle<br>    1 - Future Switch and Fuse Cubicle<br>    1 - Switch and Fuse Cubicle Equipped<br>        with SM-5 Expulsion Fuses<br><br>*Reference Map A for Site Location*<br>*Reference Map B for Detailed View* | |
| **ITEM NO. 2**<br><br>MISCELLANEOUS VENDORS | Cable installation hardware and pole framing.<br><br>*Reference Maps A and C for Site Locations* | |
| **ITEM NO. 3**<br><br>ROB ROY | 1 - Lot of PVC coated steel conduit and associated mounting hardware.<br><br>*Reference Map C for Site Location* | |
| **ITEM NO. 4**<br><br>C-K SYSTEMS, INC. | Pre-engineered 1-story building 43' X 63' with overhead door and ventilation system lighting, electrical wiring.<br><br>*Reference Map C for Site Location*<br>*Reference Map D for Building and*<br>*Ventilation System Detail* | |

# SIGNET LEASING AND FINANCIAL CORPORATION

**SCHEDULE OF EQUIPMENT**

Lessee: _____ W.R. GRACE & CO. - CONN.

Approved by _____
      **(Lessee to initial each page)**

Page No. _____ 2 ___ of ___ 2 ___ total pages

Attached to Bill of Sale dated
December 21 _____ , 19 95
    and/or
Equipment Schedule No. __01__

Equipment located at:
5500 Chemical Road
Street No.
Baltimore               MD
City        County        State   ZIP Code

| Manufacturer and/or Vendor Name & Invoice No. | Description | Invoice Cost |
|---|---|---|
| **ITEM NO. 5** | | |
| POWERCON | 1 - Indoor double ended 13KV/480/277V Substation consisting of 2-15KV indoor metal enclosed duplex switches with common fuses and arrestors close coupled to 2-2000/2800 KVA, 13.2KV transformers with power monitor and spare fuses. | |
| | 1 - 480V L.V. breaker 1600AF, 800AT electrically operated. | |
| POWERCON | 1 - Indoor single ended substation 13KV/4160/2400V consisting of 1-15KV indoor metal enclosed duplex switches with common fuse and arrestors close coupled to a 2500 / 3500 KVA transformer with power monitor and spare fuses. | |
| | *Reference Map E for Equipment Location in Building Identified in Item 4* | |
| | | $1,142,015 |

# SIGNET LEASING AND FINANCIAL CORPORATION

## INSTRUCTIONS WITH RESPECT TO THE COMPLETION
## OF REAL PROPERTY WAIVERS

The enclosed Real Property Waiver(s) should be presented to each landlord, mortgagee or other party holding an interest in the real property on which the subject equipment will be located. This form is suitable for use by an individual, a partnership or a corporation. The recording officer will not accept the form for recordation unless each of the following requirements have been satisfied:

1. The form must be dated in the first paragraph and the date used in the acknowledgment must be the same as the date inserted in the first paragraph.

2. The name of the individual signing the form must be printed beneath the signature and, if the individual is signing the form in a representative capacity (that is, as an officer of a corporation, as a trustee, as an agent, or as a partner) the capacity in which the individual is signing must also be indicated below the signature.

3. If the individual is signing the form in a representative capacity, the name of the entity on whose behalf the form is executed must be typed or printed above the signature.

4. The signature must be witnessed or attested, as applicable.

5. The acknowledgment must be completed by a notary and all blanks must be filled in. The acknowledgment must be signed by the notary and the notary must affix the notarial seal.

Please provide a complete metes and bounds description of the real property with the executed Real Property Waiver(s).

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE

# EXHIBIT J

## STATE OF MARYLAND

**FINANCING STATEMENT** FORM UCC-1                    Identifying File No. _____

### ALL INFORMATION MUST BE TYPEWRITTEN OR PRINTED IN INK.    SIGNATURES MUST BE IN INK

| | |
|---|---|
| If transaction or transactions wholly or partially subject to recordation tax indicate amount of taxable debt here. $ _____ | If this statement is to be recorded in land records check here. ☐ |

This financing statement Dated _____ is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

1. **DEBTOR**

   Name_____ W. R. Grace & Co. _____

   Address_____ 5500 Chemical Road, Baltimore, MD _____

2. **SECURED PARTY**

   Name_____ Signet Leasing & Financial Corp. _____

   Address_____ 7 St. Paul Street, 3rd Fl. _____ 53608241

   _____ Baltimore, MD  21202 _____

   Person And Address To Whom Statement Is To Be Returned If Different From Above.

3. Maturity date of obligation (if any)_____

4. This financing statement covers the following types (or items) of property: (list)

   ┌─────────────────────────────┐
   │ Name and address of Assignee │
   │                              │
   See Schedule A                 │
   │                              │
   └─────────────────────────────┘

   **• This is a True Lease - Filing for information purposes only - not subject to Recordation Taxes**

### CHECK ☒ THE LINES WHICH APPLY

5. ☐ (If collateral is crops) The above described crops are growing or are to be grown on: (describe real estate)

   ☐ (If collateral is goods which are or are to become fixtures) The above described goods are affixed or to be affixed to: (describe real estate)

   ☐ (Proceeds of collateral are also covered)
   ☐ (Products of collateral are also covered)

W. R. Grace & Co.

_James R. Hyde (signature)_
(Signature of Debtor)

James R. Hyde
Type or Print Above Name on Above Line

_____
(Signature of Debtor)

_____
Type or Print Above Signature on Above Line

Signet Leasing & Financial Corp.

_Michael S. Furman (signature)_  A-P
(Signature of Secured Party)

Michael S. Furman
Type or Print Above Signature on Above Line

RECORDED ON  DEC 26, 1995 AT 09:33 AM
IN THE FINANCING RECORDS OF THE MD. ST.
DEPARTMENT OF ASSESSMENTS AND TAXATION
ID # 153608241   RECEIPT # 124B2100243
SEE BOTTOM OF PAGE FOR LIBER & FOLIO
RECORDING FEE                    20.00
RECORDATION TAX
EXPEDITED FEE

EQUIP. LIST ATTACHED ON          3773  0011

**MARYLAND**
**STATE DEPARTMENT OF ASSESSMENTS AND TAXATION**
**301 W. PRESTON ST. BALTIMORE, MARYLAND 21201 / PHONE (410) 225-1340**

CF
FINANCING STATEMENT , DEBTOR AND
, SECURED PARTY

| YOUR ACCOUNT NUMBER WITH THIS OFFICE IS |
| --- |
| 15360824I |

| ACKNOWLEDGEMENT NUMBER |
| --- |
| 124R2100243 |

THIS IS TO ADVISE THAT THE

W. R. GRACE & CO.
SIGNET LEASING & FINANCIAL CORP.

HAS BEEN RECEIVED AND APPROVED BY THE STATE DEPARTMENT OF ASSESSMENTS AND
TAXATION THIS 26TH DAY OF DECEMBER , 1995, AT 9:33 A.M. AND
WILL BE RECORDED.

FEE PAID                           AMOUNT

RECORDING FEE ..             20.00.
EXPEDITING FEE ...           .00.
RECORDATION TAX ..          .00.
COPY FEE ........            .00.

TOTAL →          $20.00

DIES OR CERTIFICATION WERE
THEY WILL BE FORTHCOMING

THIS IS NO
A BILL

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE



EXHIBIT K

## AGREEMENT AND PLAN OF MERGER

### merging

### SIGNET LEASING AND FINANCIAL CORPORATION
(a Maryland corporation and
referred to hereinafter as the "Merging Corporation")

### into

### FIRST UNION COMMERCIAL CORPORATION
(a North Carolina corporation and
referred to hereinafter as the "Surviving Corporation")

This Agreement and Plan of Merger (hereinafter "Plan") is entered into between the Merging Corporation and the Surviving Corporation pursuant to Section 3-109 of the Maryland General Corporation Law and Section 55-11-01 of the North Carolina Business Corporation Act.

**Section 1.      The Merger.**

At 12:01 A.M. on November 29, 1997 (the "Effective Time"), the Merging Corporation shall be merged (hereinafter the "Merger") with and into the Surviving Corporation. At the Effective Time, the separate existence the Merging Corporation shall cease and the existence of the Surviving Corporation shall continue.

**Section 2.      Name of Surviving Corporation; Articles of Incorporation, Bylaws, Directors and Officers.**

The name of the Surviving Corporation shall be "First Union Commercial Corporation". The Articles of Incorporation and Bylaws of the Surviving Corporation shall be the Articles of Incorporation and Bylaws of the Surviving Corporation as in effect immediately prior to the Effective Time. Until their successors are elected and qualified, the directors and officers of the Surviving Corporation after the Effective Time shall be the directors and officers of the Surviving Corporation in office immediately prior to the Effective Time.

**Section 3.      Conversion and Exchange of Shares.**

At the Effective Time:

(a)     all of the outstanding shares of common stock of the Merging Corporation shall be canceled; and

(b)     the outstanding shares of common stock of the Surviving Corporation shall not be converted, exchanged or in any manner altered as a result of the Merger and shall remain outstanding as shares of common stock of the Surviving Corporation.

There are no other classes of stock outstanding of the Merging Corporation or the Surviving Corporation.

RT.NC:411641

**Section 4.    Effect of the Merger.**

All of the assets of the Merging Corporation as they exist at the Effective Time shall pass to, vest in, and become assets of the Surviving Corporation.  All of the liabilities of the Merging Corporation as they exist at the Effective Time shall become liabilities of the Surviving Corporation in accordance with applicable law.

**Section 5.    Amendment; Term**

This Plan may be amended at any time prior to the Effective Time by an amendment signed by the parties hereto and may be terminated or abandoned at any time prior to the Effective Time by the Surviving Corporation in writing, without the consent or joinder of the other party hereto.

IN WITNESS WHEREOF, the Merging Corporation and the Surviving Corporation have caused this Plan to be executed as of the 29th day of November, 1997 by their duly authorized officers.

Surviving Corporation:
**FIRST UNION COMMERCIAL CORPORATION**

By: _____
Name:  Robert L. Andersen
Title:    Senior Vice President

Attest: _____
Name:  Lisa P. Clontz
Title:    Assistant Secretary


Merging Corporation:
**SIGNET LEASING AND FINANCIAL CORPORATION**

By: _____
Name:  Robert L. Andersen
Title:    Senior Vice President

Attest: _____
Name:  Lisa P. Clontz
Title:    Assistant Secretary

PULNC:41164-1

MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN
ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE AND
TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS
UNDER SECTION 365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR
REJECTION, AND (II) ALLOWING AND DIRECTING
PAYMENT OF AN ADMINISTRATIVE CLAIM FOR FIRST UNION COMMERCIAL
CORPORATION FOR UNPAID RENT UNDER THE EQUIPMENT LEASE

# EXHIBIT L

Source: All Sources : Area of Law - By Topic : Bankruptcy : Cases and Court Rules : US Supreme Court, USAPP,
DIST and Bankruptcy Courts Cases ⓘ
Terms: motion pre/2 compel pre/2 assum! and executory pre/2 contract  (Edit Search)

*2001 Bankr. LEXIS 561, ***

IN RE: PHYSICIAN HEALTH CORPORATION, et al., Debtor.

Chapter 11, Case No. 00-4482 (MFW)

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

2001 Bankr. LEXIS 561

May 9, 2001, Decided

**DISPOSITION:  [*1]** Motion of HHC Medical Group, Inc. to compel the Debtors to Assume
or Reject the Practice Management Agreement DENIED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Debtors, a health corporation and its affiliates, sought
Chapter 11 bankruptcy relief. A physician practice group moved to compel debtors to
assume or reject the practice management agreement between it and debtors.

**OVERVIEW:** Debtors managed physician practice groups. After filing for bankruptcy,
debtors entered into agreements with many of the practice groups to reject or
terminate the management agreements. In the motion before the court, one practice
group sought to compel debtors to assume or reject their agreement within a certain
time period. The court declined to do so. There was insufficient evidence of any pre-
petition breach of the agreement by debtors. Even if debtors were in default of the
agreement pre-petition, it was not a legally cognizable reason to compel debtors to
decide on an expedited basis whether to assume or reject that agreement. There was
also insufficient evidence of a post-petition breach of the agreement. The practice
group failed to establish a compelling reason for debtors to decide whether to assume or
reject its contract on an expedited basis. Debtors were performing under the contract.
There was no evidence that debtors were being dilatory in addressing which contracts
to keep and which to divest. Further, there was no evidence that the practice group was
being prejudiced by the delay in debtors' decision.

**OUTCOME:** The physician practice group's motion was denied.

**CORE TERMS:** default, post-petition, pre-petition, management fees, performing, stock,
executory contract, confirmation, accounts receivable, management fee, negotiating,
settlement, terminate, divest, paying, plan of reorganization, contracting party, accelerate,
non-debtor, forcing, Federal Rule of Bankruptcy Procedure, insufficient evidence, presented
testimony, convincing evidence, right to terminate, compelling reason, convincing, refuted

## CORE CONCEPTS - ◆ Hide Concepts

▨ Bankruptcy Law : Executory Contracts

⚖ 11 U.S.C.S. § 365(d)(2) permits a debtor to assume or reject an **executory contract** at any time before confirmation of a plan of reorganization. Permitting the debtor to make its decision as late as the plan confirmation date enables the debtor to carefully evaluate the possible benefits and burdens of an **executory contract.** It is vitally important to all interested parties that the debtor make a prudent assumption or rejection decision. However, the court, on request of a party to that contract, may order the debtor to decide earlier. 11 U.S.C.S. § 365(d)(2). In deciding whether to accelerate the debtor's decision, the court must balance the interests of the contracting party against the interests of the debtor and its estate.

📖 Bankruptcy Law : Executory Contracts

⚖ If a debtor determines to assume an **executory contract,** it is obligated to cure any defaults or provide adequate assurance that the defaults would be cured. 11 U.S.C.S. § 365(b)(1). If the debtor determines to reject the contract, the other party would simply have a pre-petition claim for the default. 11 U.S.C.S. § 365(g)(1).

📖 Bankruptcy Law : Executory Contracts

⚖ The non-debtor party to an agreement cannot be permitted to extricate itself from an apparently unfavorable agreement by forcing the debtor to precipitously assume or reject the agreement, when the non-debtor is receiving precisely what it bargained for.

📖 Bankruptcy Law : Creditor Claims & Objections

⚖ The interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many.

📖 Bankruptcy Law : Executory Contracts

⚖ 11 U.S.C.S. § 365, concerning a debtor's power to assume or reject open contractual commitments, applies to all **executory contracts,** regardless of the length of time left on the contract.

**COUNSEL:** Norman L. Pernick, Esquire, J. Kate Stickles, Esquire, SAUL EWING REMICK & SAUL LLP, Neil B. Glassman, Esquire, Charlene D. Davis, Esquire, Christopher A. Ward, Esquire, THE BAYARD FARM, Wilmington, DE, for Debtors.

Jeff J. Marwil, Esquire, Mark K. Thomas, Esquire, Dawn M. Canty, Esquire, KATTEN MUCHIN ZAVIS, Chicago, IL, for Debtors.

David M. Fournier, Esquire, PEPPER HAMILTON, LLP, Wilmington, DE, for HHC Medical Group.

Peter D. Kerth, Esquire, GALLOP, JOHNSON & NEUMAN, L.C., St. Louis, MO, for HHC Medical Group.

Mark D. Collins, Esquire, Christopher D. Loizides, Esquire, RICHARDS LAYTON & FINGER, Wilmington, DE, for BNP Paribas.

Jacqueline Marcus, Esquire, WEIL GOTSHAL & MANGES LLP, New York, NY, for BNP Paribas.

David B. Stratton, Esquire, PEPPER HAMILTON, LLP, Wilmington, DE, for S.N.Y., Inc.

Madlyn Gleich Primoff, Esquire, David Fleischer, Esquire, Stephen A. Weisbrod, Esquire, PAUL HASTINGS JANOFSKY & WALKER, LLP, New York, NY, for S.N.Y., Inc.

Case 01-01139-AMC    Doc 533    Filed 06/18/01    Page 83 of 95

Bonnie Glantz Fatell, Esquire, BLANK ROME COMISKY & MCCAULEY, LLP, Wilmington, **[*2]** DE, for Official Committee of Unsecured Creditors.

Michael S. Fox, Esquire, Adam H. Friedman, Esquire, TRAUB, BONACQUIST & FOX LLP, New York, NY, for Official Committee of Unsecured Creditors.

Richard Schepacarter, Esquire, OFFICE OF U.S. TRUSTEE, Philadelphia, PA.

Montague S. Claybrook, PARENTE RANDOLPH, Wilmington, DE, Chapter 7 Trustee.

**JUDGES:** Mary F. Walrath, United States Bankruptcy Judge.

**OPINIONBY:** Mary F. Walrath

**OPINION: OPINION** n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Before the Court is the Motion of HHC Medical Group, Inc. ("HHC") to compel Physician Health Corporation and its affiliates ("the Debtors") to Assume or Reject the Practice Management Agreement between the Debtors and HHC. The Motion is opposed by the Debtors, the pre- and post-petition lenders, and the Official Committee of Unsecured **[*3]** Creditors ("the Committee"). For the reasons set forth below, we deny the Motion.

I. FACTUAL BACKGROUND

The Debtors filed voluntary petitions under chapter 11 on December 7, 2000. The Debtors are in the business of managing physician practice groups. As of the filing of their petitions, the Debtors managed 28 practice groups. Since the filing, the Debtors have entered into agreements with many of the practice groups to reject or terminate the management agreements.

On March 13, 2001, HHC filed a Motion seeking to compel the Debtors to decide whether to assume or reject their Practice Management Agreement ("the PMA"). The PMA had been executed by the Debtors and HHC on or about April 11, 1997, and had been amended several times since then.

A hearing was held on the Motion on April 5, 2001, and post-trial submissions, including designations from depositions, were submitted by the parties.

II. DISCUSSION

Section 365(d)(2) permits a debtor to assume or reject an **executory contract** at any time before confirmation of a plan of reorganization. "Permitting the debtor to make its decision as late as the plan confirmation date enables the debtor to carefully evaluate the **[*4]** possible benefits and burdens of an [**executory contract**]. It is vitally important to all interested parties that the debtor make a prudent assumption or rejection decision. . . ." In re Wheeling-Pittsburgh Steel Corp., 54 B.R. 385, 388 (Bankr. W.D. Pa. 1985). However, the court, on request of a party to that contract, may order the debtor to decide earlier. 11

U.S.C. § 365(d)(2). In deciding whether to accelerate the debtor's decision, the court must balance the interests of the contracting party against the interests of the debtor and its estate. See, e.g., Mayer Pollock Steel Corp. v. London Salvage & Trading Co., Ltd. (In re Mayer Pollock Steel Corp.), 157 B.R. 952, 965 (Bankr. E.D. Pa. 1993); In re Dunes Casino Hotel, 63 B.R. 939, 949 (D.N.J. 1986)(citing In re GHR Energy Corp., 41 B.R. 668, 676 (Bankr. D. Mass. 1984)).

HHC asserts that the Debtors should be ordered to decide whether to assume or reject its PMA within fifteen days. It offers several reasons for granting this relief. First, it asserts that the Debtors are, and have been, in default of the PMA. Second, HHC asserts that the [*5] Debtors have been negotiating with several other practice groups and have agreed to reject their PMAs in exchange for a settlement payment. Since HHC may terminate its PMA in May, 2002, HHC asserts that it is clear that the Debtors will also reject HHC's PMA. In the meantime, HHC asserts that the Debtors continue to collect a management fee without performing any of the required services under the PMA.

The Debtors oppose the Motion. In particular, they dispute the allegations of HHC regarding their alleged defaults of the PMA. They also assert that they are acting expeditiously to determine how to deal with their various practice groups and that they should be permitted to proceed with this process in accordance with their business judgment rather than at the whim of the other contract parties. They assert that HHC has failed to establish any compelling reason why the Debtors should deal with their contract first.

A. Breach of Contract

1. Pre-petition breaches

At trial, HHC presented testimony of numerous allegations of default of the PMA by the Debtors. However, each allegation was refuted by testimony presented by the Debtors. Essentially, HHC asserts that the management [*6] services being performed by the Debtors under the PMA are the same services which HHC did itself with the same employees and same assets before the PMA was executed. However, the PMA itself contemplated that many of the services would continue to be performed by the same individuals, who became employees of the Debtors. HHC asserted that it had expected additional services because of the Debtors' purported expertise in the area. However, HHC could point to no obligation under the PMA that the Debtors were not performing.

In contrast, the Debtors presented evidence of additional work being performed by their employees for HHC, particularly in the accounting area. Although HHC stated that it does not find the financial statements prepared by the Debtors to be helpful, it did not dispute that those statements were being prepared. Further, HHC conceded that the Debtors had presented it with an opportunity to participate in an oncology trial, which HHC had declined.

HHC asserted that, under the PMA, they transferred ownership in their own equipment and accounts receivable to the Debtors, without any investment by the Debtors in their practice group. This was refuted by the Debtors, who [*7] presented testimony that they purchased in excess of $ 600,000 in new equipment for HHC. In addition, the Debtors testified that they did honor their obligations to HHC by using the accounts receivable generated by the practice group to cover all its expenses, although under the PMA the accounts receivable belong to the Debtors. In fact, the Debtors testified that, according to their records, there is owed over $ 860,000 to the Debtors under the PMA which reflects that they have been exceeding their obligations to HHC.

The Debtors also presented compelling evidence to refute HHC's allegations that the

Debtors have been in default of the PMA since it was executed in 1997. In August, 2000, the PMA was amended by the parties to increase the management fee that HHC was to pay to the Debtors from $ 367,500 to $ 750,000 per year. (See Exhibits M-1 and M-2.) This change was made at the suggestion of HHC, in exchange for the issuance of additional stock of the Debtors to HHC and HHC's right to terminate the agreement early. (See Exhibit R-1.) The Debtors posit that, if the Debtors were in default of the PMA, HHC would not have agreed to increase the management fees it was paying to **[*8]** the Debtors.

We agree with this conclusion. The amendment was executed by the parties after the Debtors were allegedly in default (HHC asserts that the Debtors have been in default of the PMA since it was executed). There is no suggestion in the amendment that the Debtors were in default; in fact, the agreement by HHC to increase the management fees it was paying (and to increase its stock in the Debtors) suggests the contrary.

Further, even if HHC had established a pre-petition default of the PMA, that fact would not be a reason to compel the Debtors to decide more quickly whether to assume or reject the contract. If there was a breach of the PMA pre-petition, HHC would have a claim for that breach. ☃If the Debtors determined to assume that contract, they would be obligated to cure any defaults or provide adequate assurance that the defaults would be cured. 11 U.S.C. § 365(b)(1). If the Debtors determined to reject the contract, HHC would simply have a pre-petition claim for the default. 11 U.S.C. § 365(g)(1).

We find insufficient evidence of any pre-petition breach of the PMA by the Debtors. Further, we conclude that, even if the Debtors **[*9]** were in default of the PMA pre-petition, it is not a legally cognizable reason to compel the Debtors to decide on an expedited basis whether to assume or reject that agreement.

2. Post-petition breaches

With respect to the allegations of post-petition continuing breach of the PMA, we do not find convincing evidence that the Debtors are not performing under that contract. n2 Until the bankruptcy petition was filed, HHC appears to have been satisfied with the Debtors' performance, as evidenced by the lack of any notice of default and by the fact that HHC entered into an amendment whereby it agreed to pay more in management fees. HHC has presented no convincing evidence of a change in the Debtors' performance of the PMA post-petition. Every allegation of post-petition breach was met with convincing testimony by the Debtors of performance.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Some courts have held that even a post-petition breach of an **executory contract** is not sufficient cause to compel a debtor to assume or reject the contract before confirmation. See, e.g., In re El Paso Refinery, L.P., 220 B.R. 37, 44 (Bankr. W.D. Tex. 1998)(quoting Krafsur v. UOP (In re El Paso Refinery, L.P.), 196 B.R. 58, 72 (Bankr. W.D. Tex. 1996)).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*10]**

It appears that HHC is now simply dissatisfied with the bargain it struck with the Debtors, which gave it stock in the Debtors (apparently worthless now that the Debtors are in bankruptcy). However, this is no reason to grant the relief requested. As the Court in Wheeling-Pittsburgh Steel concluded in similar circumstances: ☃"[The non-debtor] cannot be permitted to extricate itself from what it now apparently finds to be an unfavorable agreement by forcing [the debtor] to precipitously assume or reject the Lease Agreement when [the non-debtor] is receiving precisely what it bargained for." 54 B.R. at 389.

We find insufficient evidence of a post-petition breach of the PMA to compel the Debtors to make an earlier decision on whether to assume or reject the contract.

B. Settlements with other Practice Groups

HHC asserts that, given the settlements that the Debtors are negotiating with other practice groups, and the fact that its PMA may be terminated in May, 2002, it is clear that the Debtors will reject its PMA. Therefore, HHC asks that we compel the Debtors to do so quickly, thereby saving HHC the $ 62,000 management fee it pays the Debtors each month. **[*11]**

The Debtors acknowledge that they are negotiating with other practice groups. However, they assert that these negotiations are occurring in the context of the Debtors' overall assessment of the market and their business plan. They ask for sufficient time to make a reasoned analysis. While the Debtors acknowledge that they do have to divest some of their practice groups in order to reduce their debt level, they state that the determination of which groups to divest involves numerous business factors and should not be reliant on which practice group wants to have its contract dealt with first. In the interim, the Debtors testified that the fees being received from HHC represent 15% of their revenues and are necessary for their cash flow while in bankruptcy, if not for their successful emergence from bankruptcy.

We agree with the Debtors that HHC has failed to establish a compelling reason for the Debtors to decide whether to assume or reject its contract now. The Debtors are performing under the contract. The Debtors are evaluating and analyzing their businesses and making progress in deciding which contracts to keep and which to divest. n3 The bankruptcy case is only five months old. **[*12]** There is no evidence that the Debtors are being dilatory in addressing these issues, which must be resolved before a plan of reorganization can be filed. Further, there is no evidence that HHC is being prejudiced by the delay in the Debtors' decision. Cf. In re Taber Farm Assoc., 115 B.R. 455, 457 (Bankr. S.D.N.Y. 1990)(court granted debtor an additional 120 days to decide whether to assume or reject contract, even though other party to the contract was receiving no income and was unable to sell its land until the debtor's decision was made).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 As of the hearing, the Debtors had already filed ten motions for approval of settlements with practice groups.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The desire to be first is not a convincing reason to compel the Debtors to accelerate their decision. See, e.g., Public Svc. Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Svc. Co. of New Hampshire), 884 F.2d 11, 14-15 (1st Cir. 1989)("interests of the creditors collectively and the bankrupt estate as **[*13]** a whole will not yield easily to the convenience or advantage of one creditor out of many"); Hiser v. Blue Cross of Greater Philadelphia (In re St. Mary Hosp.), 89 B.R. 503, 513-14 (Bankr. E.D. Pa. 1988)(after balancing the respective harms to the debtor and other contracting party, the court concluded that "the interests of the Debtor here in denying a precipitous assumption or rejection appear to us much greater than the interests of HHS in forcing a prompt resolution").

HHC also asserts that, since it can terminate the agreement in May, 2002, there is no possibility of a long term relationship with the Debtors. n4 While this may be true, it is irrelevant to a determination of whether to compel the Debtors to assume or reject the

agreement. ⚓Section 365 applies to all **executory contracts,** regardless of the length of time left on the contract.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 HHC also asserts that the Third Amendment to the PMA gave it the right to terminate early and to acquire back its equipment in exchange for the Debtors' stock. It fears that the Debtors will eliminate this right by rejecting the PMA. It does not dispute the Debtors' right to reject the contract but complains about paying the Debtors $ 750,000 in management fees between now and May, 2002, when it knows the Debtors will ultimately reject the PMA. However, the Debtors note that to obtain the management fees, they will have to continue to perform under the PMA.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*14]**

III. CONCLUSION

For the foregoing reasons, we deny the **motion** of HHC to **compel** the Debtors to **assume** or reject its PMA.

An appropriate order is attached.

BY THE COURT:

Dated: May 9, 2001

Mary F. Walrath

United States Bankruptcy Judge

**ORDER**

AND NOW, this **9TH** day of **MAY, 2001,** upon consideration of the Motion of HHC Medical Group, Inc. to compel the Debtors to Assume or Reject the Practice Management Agreement between the Debtors and HHC, it is hereby

**ORDERED** that the Debtors' Motion is **DENIED.**

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

Source:   All Sources : Area of Law - By Topic : Bankruptcy : Cases and Court Rules : US Supreme Court, USAPP,        DIST and Bankruptcy Courts Cases ⓘ
Terms:   **motion pre/2 compel pre/2 assum! and executory pre/2 contract**   (Edit Search)
View:   Full
Date/Time:   Thursday, June 14, 2001 - 10:19 AM EDT

About LEXIS-NEXIS | Terms and Conditions

## CERTIFICATE OF SERVICE

I, John D. Demmy, hereby certify that on June 18, 2001, a true and correct copy

of the foregoing MOTION OF FIRST UNION COMMERCIAL CORPORATION FOR AN

ORDER (I) COMPELLING DEBTORS TO ASSUME OR REJECT EQUIPMENT LEASE

AND TO COMPLY WITH POST-PETITION LEASE OBLIGATIONS UNDER SECTION

365(D)(10) OF THE BANKRUPTCY CODE PENDING ASSUMPTION OR REJECTION,

AND (II) ALLOWING AND DIRECTING PAYMENT OF AN ADMINISTRATIVE CLAIM

FOR FIRST UNION COMMERCIAL CORPORATION FOR UNPAID RENT UNDER THE

EQUIPMENT LEASE was served on the parties listed on the attached service list via United

States first class mail, postage pre-paid.

JOHN D. DEMMY

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

Laura Davis Jones Esquire
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
Wilmington, DE  19801

Steven M. Yoder, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

William H. Sudell, Jr., Esquire
Eric D. Schwartz, Esquire
Morris, Nichols Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

Jeffrey C. Wisler, Esquire
Michelle McMahon, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market Street, 10th Floor
Wilmington, DE 19899

Frederick B. Rosner, Esquire
Walsh, Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

Bruce E. Jameson, Esquire
Prickett, Jones & Elliott
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

James H.M. Sprayregen, Esquire
James Kapp, III, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Hamid R. Rafatjoo, Esquire
Pachulski, Stang, Ziehl, Young & Jones
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4100

William P. Bowden, Esquire
Matthew G. Zaleski, III, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Mark D. Collins, Esquire
Deborah E. Spivack, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Francis A. Monaco, Jr., Esquire
Walsh, Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE 19801

Michael B. Joseph, Esquire
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

Mark S. Chehi
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899-0636

Frank J. Perch, Esquire
Office of the United States Trustee
601 Walnut Street, Curtis Center,
Suite 950 West
Philadelphia, PA 19106

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

Derrick Tay, Esquire
Meighen Demers
Suite 1100, Box 11, Merrill Lynch Canada Tower
Sun Life Center, 200 Kint Street West
Toronto, Ontario M5H 3T4
CANADA

David B. Siegel
W.R. Grace and Co.
7500 Grace Drive
Columbia, MD 21044

Elihu Inselbuch, Esquire
Rita Tobin, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue, 27th Floor
New York, NY 10022

Lewis Kruger, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

Scott L. Baena, Esquire
Bilzin Sumberg Dunn Baena Price & Axelrod LLP
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL 33131

D. J. Baker, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

J. Douglas Bacon, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

Nancy Worth Davis, Esquire
Ness, Motley, Loadhold, Richardson & Poole
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Todd Meyer, Esquire
Kilpatrick Stockton
1100 Peachtree Street
Atlanta, GA 30309\

Securities & Exchange Commission
15th & Pennsylvania Ave. N.W.
Washington, DC 20020

District Director
IRS
409 Silverside Road
Wilmington, DE 19809

Securities & Exchange Commission
Atlanta Regional Office Branch/Reorganization
3475 Lenox Road, NE, Suite 100
Atlanta, GA 30326-1232

Secretary of Treasurer
P.O. Box 7040
Dover, DE 19903

Secretary of State
Division of Corporations
Franchise Tax
P.O. Box 7040
Dover, DE 19903

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

James D. Freeman, Esquire
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street
Suite 945-North Tower
Denver, CO  80202

Jon L. Heberling, Esquire
McGarvey, Heberling, Sullivan & McGarvey PC
745 South Main Street
Kalispel, MT 59901

Patrick L. Hughes, Esquire
Haynes & Boone LLP
1000 Louisiana Street, Suite 4300
Houston, TX 77002-5012

David S. Heller, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

Charles E. Boulbol, Esquire
26 Broadway, 17th Floor
New York, NY 10004

Ira S. Greene, Esquire
Squadron, Ellenoff, Plesent & Sheinfeld, LLP
551 Fifth Avenue
New York, NY 10176

James A. Sylvester, Esquire
Intercat, Inc.
104 Union Avenue
Manasquan, NJ 08736

Steven J. Johnson, Esquire
Gibson, Dunn & Crutcher LLP
1530 Page Mill Road
Palo Alto, CA 94304-1125

Charlotte Klenke, Esquire
Schneider National, Inc.
P.O. Box 2545
3101 S. Packerland
Green Bay, WI 54306

David S. Rosenbloom, Esquire
Jeffrey E. Stone, Esquire
Lewis S. Rosenbloom, Esquire
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096

Brad Rogers, Esquire
Office of the General Counsel
Pension Benefit Guaranty Corp
1200 K. Street, N. W.
Washington, D.C. 20005-4026

Pamela Zilly
Richard Shinder
David Blechman
The Blackstone Group
345 Park Avenue
New York, NY 10154

Josiah Rotenberg
Lazard Freres & Co. LLC
30 Rockefeller Plaza, 60th
New York, NY 10020

Stephen H. Case, Esquire
Nancy L. Lazar, Esquire
David D. Tawil, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

Jan M. Hayden
William H. Patrick
Heller, Draper, Hayden, Patrick & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103

Steven T. Baron, Esquire
Silber Pearlman, LLP
2711 North Haskell Avenue, 5th Floor, LLP
Dallas, TX 75204

W.J. Winterstein, Jr., Esquire
John J. Winter, Esquire
William M. Aukamp, Esquire
Eleven Penn Center, 29th Floor
1835 Market Street
Philadelphia, PA 19103

Alan R. Brayton, Esquire
Brayton & Purcell
222 Rush Landing Road
Novato, CA 94945

Russell W. Budd
Alan B. Rich
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

Courtney M. Labson, Esquire
The Mills Corporation
Legal Department
1300 Wilson Boulevard, Suite 400
Arlington, VA 22209

Cindy Schultz
Ingersoll-Rand Fluid Products
One Aro Center
P.O. Box 151
Bryan, OH 43506

Joseph F. Rice
Nancy Worth Davis
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

R. Scott Williams
PMG Capital Corp.
Four Falls Corporate Center
West Conshohocken, PA 19428-2961

Jonathan W. Young
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229

Shelby A. Jordan, Esquire
Nathaniel Peter Holzer. Esquire
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78471

T. Kellan Grant
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229

Alan Kolod, Esquire
Moses & Singer LLP
1301 Avenue of the Americas
40th Floor
New York, NY 10019-6076

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

Mr. Thomas Moskie
Bankers Trust Company
Four Albany Street
Fourth Floor
New York, NY 10006

Charles E. Gibson, III
Attorney at Law
620 North Street, Suite 100
Jackson, MS 39202

Kevin D. McDonald
Wilshire Scott & Dyer, P.C.
One Houston Center
1221 McKinney, Suite 4550
Houston, Texas  77010

Bernice Conn, Esquire
Robins, Kaplan, Miller & Ciresi LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067

Steven J. Kherkher, Esquire
Laurence G. Tien, Esquire
Williams Bailey Law Firm, L.L.P.
8441 Gulf Freeway, Suite #600
Houston, Texas 77017

Lewis T. LeClair, Esquire
McKool Smith
300 Crescent Court, Suite 1500
Dallas, Texas 75201

Steven T. Hoort, Esquire
Ropes & Gray
One International Place
Boston, Massachusetts 02110-2624

John P. Dillman, Esquire
Linebarger Heard Goggan Blair
Graham Peña & Sampson, LLP
P.O. Box 3064
Houston, TX 77253-3064

Paul M. Baisier, Esquire
SEYFARTH SHAW
1545 Peachtree Street
Suite 700
Atlanta, Georgia 30309

Christopher Beard, Esquire
Beard & Beard
306 N. Market Street
Frederick, MD 21701

Steven R. Schlesinger, Esquire
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, NY 11530

Kimberly W. Osenbaugh
Preston Gates & Ellis LLP
701-5th Avenue
Suite 5000
Seattle, WA 98104-7078

Delta Chemical Corporation
2601 Cannery Avenue
Baltimore, MD 21226-1595

Peter Van N. Lockwood, Esquire
Julie W. Davis, Esquire
Trevor W. Swett, III, Esquire
Nathan D. Finch, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

Peter A. Chapman
24 Perdicaris Place
Trenton, NJ  08618

Paul M. Matheny
The Law Offices of Peter G. Angelos, P.C.
5905 Harford Rd.
Baltimore, MD  21214

Michael J. Urbis
Jordan, Hyden, Womble & Culbreth, P.C.
2390 Central Blvd, Suite G
Brownsville, TX 78520

Mary A. Coventry
Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663

Margery N. Reed, Esquire
Duane, Morris & Heckscher LLP
4200 One Liberty Place
Philadelphia, PA 19103-7396

Attn: Meridee Moore and Kirsten Lynch
Farallon Capital Management, L.L.C.
One Maritime Plaza
Suite 1325
San Francisco, California 94111

John M. Klamann
Klamann & Hubbard
7101 College Blvd., Suite 120
Overland Park, KS 66210

Joseph T. Kremer, Esquire
Lipsiptz, Green, Fahringer, Roll, Salisbury & Cambri
LLP
42 Delaware Avenue, Suite 300
Buffalo, NY 14202

Peter S. Goodman, Esquire
Andrews & Kurth, L.L.P.
805 Third Avenue
New York NY  10022

Mary M. MaloneyHuss, Esquire
Wolf Block Schorr and Solis-Choen LLP
920 King Street, Suite 300
One Rodney Square
Wilmington, DE  19801

Daniel A. Speights, Esquire
Speights & Runyan
200 Jackson Avenue, East
P.O. Box 685
Hampton, SC  29924

Selinda A. Melnik, Esquire
Smith, Katzenstein & Furlow, LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, DE  19899

Dorine Vork, Esquire
Stibbe, P.C.
350 Park Avenue
New York, NY  10022

Anne Marie P. Kelley, Esquire
Dilworth Paxson, LLP
LibertyView-Suite 700
457 Haddonfield Road
Cherry Hill, NJ  08002

W.R. Grace Co. 01-01139 (JJF)
2002 Service List
June 18, 2001

Michael T. Kay, Esquire
The Dow Chemical Company
2030 Dow Center
Midland, MI  48674
Attn: Nancy Draves

Peninsula Capital Advisors, L.L.C.
404B East Main Street
Second Floor
Charlottesville, VA  22902
Attn: Ted Weschler