ORIGINAL

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' MEMORANDUM IN SUPPORT OF
## MOTION FOR ENTRY OF CASE MANAGEMENT ORDER,
## MOTION TO ESTABLISH BAR DATE,
## MOTION TO APPROVE CLAIM FORMS,
## AND MOTION TO APPROVE NOTICE PROGRAM

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet Baer
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG &
JONES P.C.
Laura Davis Jones
David Carickhoff
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in
Possession



# INTRODUCTION

As outlined more fully in its Informational Brief, Grace initiated these Chapter 11 cases to define the scope of its liability for asbestos-related claims, utilizing procedures that have been developed to resolve mass-tort liability within the bankruptcy system.  This Memorandum and accompanying motions set forth the factual and legal foundation for a comprehensive case management order that can be used to structure the bar date and litigation phases of this case.

Specifically:

- **Section I:  The Types of Claims Against Debtors and the Associated Issues to Be Litigated in these Cases.**  This section identifies various categories of claims against Grace and the threshold issues Grace seeks to litigate.

- **Section II:  Chapter 11 Procedures for Determining the Validity of Submitted Claims.**  This section discusses the procedures available for resolving the threshold issues identified in Section I.  The first step in resolving the disputed claims is the establishment of a bar date.  After the bar date has passed, Grace will file omnibus objections and initiate summary judgment proceedings to resolve threshold issues that govern the validity of categories of claims.

- **Section III:  Proposed Proof of Claim Forms Tailored to Elicit Information Necessary to Resolve Threshold Issues Concerning the Validity of Submitted Claims.**  Section III discusses Grace's proposed proof of claim forms.  This section describes the relationship between the information elicited on the forms and the threshold issues Grace intends to litigate.

- **Section IV:  Debtors' Proposed Notice and Publication Program.**  This section discusses Grace's proposed notification program, which is similar to that approved in other recent asbestos bankruptcies.

- **Section V:  Qualifications and Role of Proposed Notice Agent.**  Section V describes Grace's proposed notice agent, Katherine Kinsella, the president of Kinsella Communications, Ltd.  Ms. Kinsella is a nationally-recognized specialist with extensive experience in developing similar notification campaigns.

- **Section VI:  Proposed Case Management Schedule.**  Section VI sets forth a specific schedule for the bar date and litigation phases of these cases.  It is also reflected in the attached proposed case management order.  Under the terms of the Debtors' proposed case management order, litigation on claim objections would proceed simultaneously along three tracks:  (1) Zonolite Attic Insulation; (2) Other Asbestos Property Damage Litigation; and, (3) Asbestos Personal Injury Litigation.

- **Section VII:  Management of Other Claims.**  This section briefly addresses two other types of claims:  Libby, Montana property damage claims and fraudulent conveyance claims arising from the Fresenius and Sealer Air transactions.

Prompt establishment of a bar date and approval of the proof of claim forms, implementation of a court-approved program to provide claimants with notice of their claims, and the subsequent initiation of litigation to resolve threshold issues are all essential steps in defining Grace's liability for submitted claims.  The proposed case management order provides the necessary structure for each of these phases of the litigation.

## TABLE OF CONTENTS

Tab I.      THE TYPES OF CLAIMS AGAINST DEBTORS AND THE ASSOCIATED ISSUES TO BE LITIGATED IN THESE CASES. . . . . . . . . . . . . . . . . . . . . . . 1

Tab II.     CHAPTER 11 PROCEDURES FOR DETERMINING THE VALIDITY OF SUBMITTED CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tab III.    GRACE'S PROPOSED PROOF OF CLAIM FORMS ARE TAILORED TO ELICIT INFORMATION NECESSARY TO CLAIMS LITIGATION, ESTIMATION, AND PAYMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Tab IV.    DEBTORS' PROPOSED NOTICE AND PUBLICATION PROGRAM. . . . . . 34

Tab V.     QUALIFICATIONS AND ROLE OF PROPOSED NOTICE AGENT. . . . . . . 43

Tab VI.    PROPOSED CASE MANAGEMENT SCHEDULE. . . . . . . . . . . . . . . . . . . . 45

Tab VII.   MANAGEMENT OF OTHER CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## **TABLE OF AUTHORITIES**

## **CASES**

*Abdullah v. Acands, Inc.*, 30 F.3d 264  (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Appletree Square I, Ltd. Partnership v. W.R. Grace & Co.*, 29 F.3d 1283 (8th Cir. 1994) . . . . . 9

*Aymond v. Texaco, Inc.*, 554 F.2d 206 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bank of America v. Nickele*, 1998 WL 181827 (E.D. Pa. Apr. 16, 1998) . . . . . . . . . . . . . . . . . . 51

*Bragg v. Owens-Corning Fiberglass Corp.*, 734 A.2d 643 (D.C. 1999) . . . . . . . . . . . . . . . . . . . 16

*Cawein v. Flintkote Co.*, 610 N.Y.S.2d 487 (N.Y. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chemetron v. Jones*, 72 F.3d 341 (3d Cir. 1995);
      *cert. denied*, 517 U.S. 1137 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Daubert, et ux., etc., et al. v. Merrell Dow Pharmaceuticals, Inc.*,
      509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068 (6th Cir. 1993);
      *cert. denied*, 510 U.S. 1193 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673 (3d Cir. 1964),
      *cert. denied*, 382 U.S. 812 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246 (E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . 17

*Hagen v. Celotex Corp.*, 816 S.W.2d 667 (Mo. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429 (7th Cir. 1996) . . . . . . . . . . . . . . . 15

*In re 1606 New Hampshire Ave. Associates*, 85 B.R. 298 (Bankr. E.D. Pa. 1988) . . . . . . . . . . 51

*In re A.H. Robins Co.*, 59 B.R. 99 (Bankr. E.D. Va. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re A.H. Robins Co.*, 862 F.2d 1092 (4th Cir. 1988) .............................. 25, 26

*In re A.H. Robins Co.*, 89 B.R. 555 (E.D. Va. 1988) ................................. 20, 23

*In re A.H. Robins Co., Inc.*, 251 B.R. 312 (Bankr. E.D. Va. 2000) ....................... 46

*In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1416 (E.D.N.Y. 1985) .......... 27

*In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972,*
    549 F.2d 1006 (5th Cir. 1977) ............................................. 24

*In re Amdura Corp.*, 170 B.R. 445 (D. Col. 1994) .................................... 35

*In re Best Prods. Co.*, 140 B.R. 353 (Bankr. S.D.N.Y. 1992) ........................... 21

*In re Brooks Fashion Stores, Inc.*, No. 92 Civ. 1571, 1994 WL 132280 .................. 36

*In re Canvas Specialty, Inc.*, 261 B.R. 12 (Bankr. C.D. Cal. 2001) ....................... 2

*In re Celotex Corp.*, 204 B.R. 586 (Bankr. M.D. Fla. 1996) ..................... 21, 23, 26

*In re Celotex Corp.*, 245 B.R. 174 (Bankr. M.D. Fla. 2000) ............................ 46

*In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.,*
    1999 WL 387322 (E.D. Pa. 1999) ......................................... 27

*In re Dow Corning Corp.* (*Dow Corning I*), 211 B.R. 545 (Bankr. E.D. Mich. 1997) ..... 21, 22

*In re Dow Corning Corp.*, 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997) .................. 22

*In re Dow Corning Corp.*, 142 F.3d 433, 1998 WL 180594 (6th Cir. Apr. 6, 1998) ......... 21

*In re Eagle-Picher Indus., Inc.* 158 B.R. 713 (Bankr. S.D. Ohio 1993) ................... 26

*In re Eagle-Picher Indus., Inc.*, 137 B.R. 679 (Bankr. S.D. Ohio 1992) ............ 20, 36, 46

*In re Food Lion, Inc.*, 1998 WL 322682 (4th Cir. 1998) ............................... 27

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................. 15, 23, 27

*In re Joint E.&S. Asbesto. Litig.*, 878 F. Supp. 473 (S.D.N.Y. 1995) ..................... 27

*In re Keene Corp.*, 188 B.R. 905 (Bankr. S.D. N.Y. 1995) ............................. 35

*In re Kolstad*, 928 F.2d 171 (5th Cir.), *cert. denied*, 502 U.S. 958 (1991) ................. 20

*In re Manville Forest Prods. Corp.*, 89 B.R. 358 (Bankr. S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . 20

*In re National Gypsum Co.*, 257 B.R. 184 (Bankr. N.D. Tex. 2000) . . . . . . . . . . . . . . . . . . . 9, 46

*In re New York City Asbestos Litig.*, 142 F.R.D. 60 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . 27

*In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1995 WL 925678
    (E.D. Pa. Feb. 1, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1996 WL 900350
    (E.D. Pa. June 10, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 704702
    (E.D. Pa. Aug. 22, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Penn Central Transportation Company,* 771 F.2d 762 (3rd Cir. 1985);
    *cert. denied,* 474 U.S. 1033 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Standard Insulations, Inc.*, 138 B.R. 947 (Bankr. W.D. Mo. 1992) . . . . . . . . . . . . . . . . . 25

*In re The Babcock & Wilcox Co. (Babcock I)*, No. CIV A 00-0558,
    2000 WL 422372 (E.D. La. Apr. 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 26, 27

*In re The Babcock & Wilcox Co. (Babcock II)*, No. 00-10992,
    2000 WL 1511175 (E.D. La. Oct. 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200 (M.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . 4

*In re TMI Litig. Consol. Proceedings*, 927 F. Supp. 834 (M.D. Pa. 1996);
    *aff'd in part, rev'd in part,* 193 F.3d 613 (3d Cir. 1999),
    *amended,* 199 F.3d 158 (3d Cir. 2000), *cert. denied,* 120 S. Ct. 2238 (2000) . . . . . . . . . 4

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999); *cert. denied,* 120 S. Ct. 2238 (2000) . . . . . . . . . 4

*Jones v. Chemetron Corp.*, 212 F.3d 199 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*LTV Steel Company, Inc. v. Board of Education (In re Chateaugay Corp.)*,
    93 B.R. 26 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*,
    125 F.3d 9 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424 (1997) . . . . . . . . . . . . . . . . . . . . 17, 18

*Money v. Manville Corp. Asbestos Disease Compensation Trust Fund*,
    596 A.2d 1372 (Del. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998);
   *cert. denied*, 526 U.S. 1064 (1999) ......................................... 3, 4

*Mullane v. Central Bank & Trust Co.*, 339 U.S. 306 (1950) ................... 34, 35, 36, 37

*NCR Corp. v. United States Mineral Products Co.*, 649 N.E.2d 175 (Ohio 1995) ........... 9

*O'Connor v. Boeing North American, Inc.*, 92 F. Supp. 1026 (C.D. Cal. 2000) ............. 9

*Prudential Ins. Co. v. United States Gypsum Co.*, 828 F. Supp. 287 (D. N.J. 1993) .......... 9

*Roseville Plaza Ltd. Partnership v. U.S. Gypsum Co.*, 31 F.3d 397 (6th Cir. 1994) .......... 9

*Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir.),
   *cert. denied*, 474 U.S. 864 (1985) ......................................... 17

*Simmons v. Pacor, Inc.*, 674 A.2d 232 (Pa. 1996) .................................... 18

*Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999) .................................. 3

*Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581 (5th Cir. 1983);
   *cert. denied*, 465 U.S. 1102 (1984) ......................................... 15

*Wright v. Willamette Indus.*, 91 F.3d 1105 (8th Cir. 1996) ............................ 4

## STATUTES AND REGULATIONS

11 U.S.C. § 1111(a) ................................................................. 20

11 U.S.C. § 502(a) .................................................................. 21

40 C.F.R. § 763.83 .................................................................. 1

40 C.F.R. § 61.141 .................................................................. 1

40 Fed. Reg. 48, 293 (1975) ......................................................... 10

55 Fed. Reg. 48, 406 ................................................................ 10

Bankruptcy Rule 3001(a) ............................................................. 25

Bankruptcy Rule 3003(c)(2) .......................................................... 36

Bankruptcy Rule 3003(c)(3) .......................................................... 20

Bankruptcy Rule 3007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bankruptcy Rule 7042 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Bankruptcy Rule 9017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Civ. Proc. § 338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code Ann. § 12-301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FED R. EVID. 104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Bankr. P. 2002(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Federal Rule of Civil Procedure 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Rule of Civil Procedure 42(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Federal Rule of Evidence 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 16

Federal Rule of Evidence 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

N.Y. C.P.L.R. § 214-c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

### OTHER AUTHORITY

American Industrial Hygiene Association, "AIHA Position Statement on the Removal of
Asbestos-Containing Materials (ACM) from Buildings," *Am. Ind. Hyg. Assoc. J.* 52:
A-324 (June 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

American Medical Association, "Council Report: Asbestos Removal, Health Hazards, and the
EPA," *JAMA* 266 (5): 696-97 (Aug. 7, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cabraser, Elizabeth J., *Diet Drug Litigation Update*,
16 No. 9 PROD. LIAB. L. & STRATEGY 6 (03/98) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Cooper, Edward F., *The (Cloudy) Future of Class Actions*,
40 ARIZ. L. REV. 923, 947 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Agency For Toxic Substances and Disease Registry, U.S. Department of Health
and Human Services, February 22, 2001 *Preliminary Findings of
Medical Testing of Individuals Potentially Exposed to Asbestoform
Minerals Associated With Vermiculite in Libby, Montana: An Interim
Report for Community Health Planning* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Health Effects Institute's 1991 Report: *Asbestos in Public and Commercial Buildings* . . . . . . 12

Lee, R. J., Van Orden, D. J., Corn, M. and Crump, K.S.,
   "Exposure to Airborne Asbestos in Buildings," *Regulatory Toxicology And Pharmacology* 16, 93-107 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ludwig Enters CMOs on Product ID Questionnaire, More In Re Latex Allergy,*
   12/2/97 Andrews Med. Devices Litig. Rep. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

MANUAL FOR COMPLEX LITIGATION § 33.27 (Federal Judicial Center 3d ed. 1995) . . . . . . . . 29

McGovern, Francis E., *Resolving Mature Mass Tort Litigation,*
   69 B.U. L. REV. 659, 677 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

McGovern, Francis E., *The Alabama DDT Settlement Fund,*
   53 LAW & CONTEMP. PROBS. 61, 62-63 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

McGovern, Francis E., *Toward a Functional Approach for Managing Complex Litigation,*
   53 U. CHI. L. REV. 394, 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS,
REPORT ON MASS TORT LITIGATION 2, Feb. 15, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

U.S. EPA Region 8 Press Release: "Asbestos in Libby – EPA Action Update #4"
   (March 20, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

U.S. EPA Region 8 Press Releases, "Asbestos in Libby – EPA Action Update #3"
   (Jan. 31, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

U.S. EPA's Office of Pollution Prevention and Toxics, Sept. 2000 Fact Sheet . . . . . . . . . . . . . 5

## I.    THE TYPES OF CLAIMS AGAINST DEBTORS AND THE ASSOCIATED ISSUES TO BE LITIGATED IN THESE CASES.

The asbestos litigation against Grace falls into the three general categories noted above.  With respect to each category, the claims will implicate one or more fundamental issues. The following section briefly outlines those issues.

### A.    Zonolite Attic Insulation Claims.

As noted in the Debtors' Informational Brief, Grace's attic insulation product – Zonolite Attic Insulation ("ZAI") – is expanded loose-fill vermiculite.  Vermiculite is *not* a form of asbestos and has no known toxic properties; it is an inert mineral that when thermally expanded serves as an effective insulator.  Grace never added asbestos to ZAI, but it may contain trace quantities of asbestos as a mineralogical impurity – minute fractions of 1%.  For that reason, ZAI does not meet the regulatory definition of an asbestos-containing product.  *See, e.g.*, 40 C.F.R. § 61.141; 40 C.F.R. § 763.83.[1]

Aside from a small number of personal injury claims, ZAI was not the subject of any major litigation prior to 2000.  In that year, eight class action lawsuits were filed against Grace in the wake of publicity about EPA's investigation of vermiculite in Libby, Montana.[2]

---

[1]    Under federal regulations, "materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials."

[2]    Of the eight lawsuits, four are state class actions:  *Barbanti v. W.R. Grace & Co.–Conn.*, No. 00201756-6 (Spokane Cty., Wash.); *Daily v. W.R. Grace & Co.–Conn.*, No. 00-L-656 (Madison Cty., Ill.); *McMurchie v. W.R. Grace & Co.–Conn.*, No. PI 00-0015072 (Hennepin Cty., Minn.); and *Harris v. W.R. Grace & Co.*, No. 833392-2 (Alameda Cty., Ca.).  Four are federal class action lawsuits transferred and coordinated by the Judicial Panel on Multidistrict Litigation in *In re: Zonolite Attic Insulation Products Liability Litigation*, MDL No. 1376 (D. Mass.); *Lindholm v. W.R. Grace & Co.*, No. 00 CV 10323 (D. Mass.); *Price v. W.R. Grace & Co.*, No. CV 00-71-M (D. Mt.); *Hunter v. W.R. Grace & Co.*, No. 00-569 (S.D. Ill.); *Walsh v. W.R. Grace & Co.* (Hennepin Cty., Minn. Filed Oct. 6, 2000).  A ninth lawsuit was filed in 2001 by an individual
(continued...)

Substantive litigation in the class action lawsuits has, thus far, been limited to the

*Barbanti* case, a certified class action in Washington state.[3]  In *Barbanti*, plaintiffs' counsel

moved for preliminary injunction and an emergency class notice of a statewide hazard – and lost.

After an evidentiary hearing in which the court considered expert reports, depositions, testing

results, and expert testimony, the court rejected plaintiffs' motion for a preliminary injunction,

finding no showing of an imminent hazard that would justify an emergency warning to the class.

The court identified the following scientific disputes that precluded a finding of an imminent

product hazard:  "There are factual disputes about the quantity of asbestos in vermiculite;

whether or not there is any threshold level of exposure, which would not be dangerous, the

quantity of asbestos fibers found in the air of the homes tested and the testing protocols used."

(December 20, 2000 Memorandum Opinion, at 3).

As exemplified by the *Barbanti* preliminary injunction decision, all of the ZAI

claims hinge on the same scientific issues, including the levels of asbestos in ZAI, the exposure

levels of airborne asbestos fibers in attics with ZAI, and the health risks of those exposures.

The admissibility of any evidence on these issues is governed by applicable

federal law.  *See, e.g.*, Bankruptcy Rule 9017 (Federal Rules of Evidence apply to bankruptcy

proceedings); *In re Canvas Specialty, Inc.*, 261 B.R. 12, 16 (Bankr. C.D. Cal. 2001) ("This new

language [of Federal Rule of Evidence 702, amended December 1, 2000] governs the

---

[2]  (...continued)
       and removed by Grace to federal court, *Nelson v. W.R. Grace & Co.–Conn.*, No. BDV 01-110
       (Cascade Cty., Montana).

[3]  Initial document and deposition discovery has also taken place in the MDL 1376 action in Boston
federal court.

admissibility of the evidence here at issue."). The assessment of whether proffered expert testimony is admissible under Federal Rules of Evidence 702 and 703 is a preliminary question for the court. *See* FED R. EVID. 104(a); *Daubert, v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

Expert opinion evidence must be rejected where "there is simply too great an analytical gap between the data and the opinion offered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 2238 (2000); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) ("[T]he district court did not abuse its discretion in finding that the 'analytical gap' between [the expert's] causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide."), *cert. denied*, 526 U.S. 1064 (1999).

Under *Daubert*, claimants must first come forward and demonstrate to the court that their evidence is admissible. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993) (affirming grant of summary judgment on *Daubert* grounds), *cert. denied*, 510 U.S. 1193 (1994). The "proponent of the expert testimony" must "prove by a preponderance of the evidence that the testimony is reliable." *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999).

In order to survive judicial scrutiny under *Daubert*, claimants must provide reliable scientific evidence demonstrating that exposure to Grace products is linked to disease.

3

Evidence linking a specific chemical or toxin to disease is inadmissible unless there is "an established scientific connection between exposure and illness," including "information on the level of exposure necessary for a person to sustain injuries. . . ." *Moore*, 151 F.3d at 278. Indeed, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).[4]

Grace maintains that the ZAI claimants will be unable to meet their *Daubert* burden. Scientific testing of the air in homes with ZAI has found either no asbestiform fibers or almost non-detectable levels. For example:

- In *Barbanti*, air tests of the plaintiff's house found one (1) asbestos fiber inside the house, equal to the one (1) fiber found in the air tested outside the house.[5]

- In tests by the Environmental Protection Agency ("EPA") of homes in Libby, Montana containing ZAI, the highest asbestos air concentration was .00003 f/cc. This is 3,000 times lower than the permissible occupational exposure level of 0.1 f/cc, eight hours a day, 50 weeks per year for 45 years set by the Occupational

---

[4] *See also Wright v. Willamette Indus.*, 91 F.3d 1105, 1106 (8th Cir. 1996) ("a plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance. . ." ); *In re TMI Litig. Consol. Proceedings*, 927 F. Supp. 834, 868-69 (M.D. Pa. 1996) (excluding cancer study where record did not "support the fundamental assumption . . . that doses were significantly higher than originally estimated"), *aff'd in part, rev'd in part*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000), *cert. denied*, 120 S. Ct. 2238 (2000); *In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200, 203 (M.D. Pa. 1996) (excluding expert testimony where expert's study, "standing alone, cannot speak to the issue of whether the observed tree damage resulted form radiation exposure" and thus, could not assist the jury in "determining whether or not persons (and trees) in the TMI area at the time of the accident were exposed to radiation").

[5] *Barbanti*, Nov. 30, 2000 Transcript, Testimony of Richard J. Lee, at 51-56.

Safety and Health Administration ("OSHA").  In fact, most of the EPA's air samples did not find any asbestos fibers at all.[6]

- The EPA has stated:  "Current risk assessments for consumer use of vermiculite products show reasonably low risk for products with <1% asbestos."[7]

- According to tests run by plaintiffs' expert in the *Barbanti* case, the time-weighted average exposure in an attic would be .05 to 0.1 f/cc.[8]  At these levels, a homeowner would have to be exposed at least eight hours a day for 12,000 days in order to experience any risk of an asbestos-related disease.[9]

- In *Barbanti*, plaintiffs' expert agreed under oath that undisturbed ZAI is not a hazard.[10]

Typically, ZAI remains isolated and undisturbed for years.  Under normal conditions there is essentially no asbestos exposure from ZAI.[11]  But even if a homeowner were to disturb the attic insulation for a continuous eight-hour time period (assuming the disruption were to create an exposure level as high as 0.1 f/cc), exposure would have to continue for 50 years in order to reach the 5-fiber-years-per-cubic-centimeter threshold level for mesothelioma risk.[12]

The Preliminary Informational Brief filed by the putative MDL 1376 class action representatives shows how questionable the science behind their claims really is.  That brief

---

[6]    *Id.,* at 62-63.

[7]    U.S. EPA's Office of Pollution Prevention and Toxics, Sept. 2000 Fact Sheet, at 3, ¶ 5.

[8]    *Barbanti*, Nov. 30, 2000 Transcript, Testimony of Richard J. Lee, at 76-77.

[9]    *Id.*, Testimony of Dr. William Hughson, at 7-8.

[10]    *Barbanti*, August 24, 2000 Deposition of Richard L. Hatfield, at 161.

[11]    *Barbanti*, Nov. 30, 2000 Transcript, Testimony of Dr. William Hughson, at 6-7.

[12]    *Id.*, at 7-8.  *In accord,* testimony of Dr. Morton Corn (former OSHA Assistant Secretary).

5

emphasizes, for example, the "astonishing incidence of pleural changes observed" by the ATSDR

in Libby residents with "vermiculite insulation in their residences." (April 27, 2001 Preliminary

Informational Brief Of Zonolite Attic Insulation Class Action Plaintiffs, at 2) But the reported

ATSDR finding that 14% (4 out of 28 persons) of those exposed to residential insulation had

"pleural changes" of some type is not "astonishing" at all, because the same report found that

those residents with "no apparent exposure"-- meaning no vermiculite insulation in their homes

and no other identified asbestos exposure -- had the identical 14% (5 out of 37 persons) incidence

of pleural changes. (*Id.*, Ex. B, February 22, 2001 ATSDR Report, at 15, Table 4, Column for

"Pleural, all views")

   For these reasons, Debtors believe that after the ZAI claims are filed and Grace

files its omnibus objections, litigation of the ZAI claims should first address the threshold

*Daubert* issue of whether there is sufficient reliable, scientific evidence that ZAI poses a health

risk.

   **B.**  **Traditional Asbestos Property Damage Claims.**

   Prior to the recent filing of the ZAI class action lawsuits, the property damage

litigation against Grace had nearly run its course. Only seven claims remained as of the petition

date, and the Debtors expect that any additional claims will likely be barred by the statute of

limitations, or will be rejected based on other threshold defenses.

   Since Grace received its first asbestos property damage claim in 1982, subsequent

property damage cases have predominately related to Grace's Monokote-3 ("MK-3") product.

"MK-3" was the brand name for the spray fireproofing product being sold by Zonolite when

Grace acquired the company in 1963.[13]  MK-3 was a wet-sprayed, cementitious fireproofing product marketed for application to the skeletal steel-beam structure of commercial buildings, usually high-rise buildings, during construction.   Unlike the widespread use of dry-spray alternatives, after initial mixing, MK-3 bound and encapsulated the asbestos.

Effective on July 4, 1973, EPA banned the spraying of products such as MK-3 that contained more than 1% asbestos.  By that date, Grace had completed the transition to substitute products with no added asbestos:  MK-4 and MK-5.

In addition to MK-3, Grace manufactured other products containing asbestos or vermiculite.  Some were similar to MK-3; others were expanded vermiculite-based products.[14]  Fewer claims have been brought for these products.

Since 1982, when the first claim was filed, 370 non-ZAI asbestos property damage lawsuits have been filed against Grace.  Ninety-eight percent of the cases that have ever been filed have now been resolved.  Of the seven unresolved cases, only five were active as of the petition date:

- One has been on the suspense calendar since 1990 in the United States District Court for the Eastern District of Louisiana.

- Grace was awaiting a dismissal order in the second case due to product misidentification.

---

[13]  Sixty percent of MK-3 was gypsum – a naturally-occurring mineral mined and sold by the Gypsum companies – which acted as the binding, cementitious component of the product.  MK-3 contained roughly 30% vermiculite and 10% added chrysotile asbestos purchased from asbestos producers.

[14]  Examples of these other products include acoustical plaster products (e.g., "Zonocoustic," "Spra-Wyt," "Zonolite Acoustical Plastic," and "Econo-White"), Zonolite High-Temperature Cement, and Zonolite Masonry-Fill.

7

- One was awaiting a decision by Ohio's Supreme Court after the appellate court affirmed the trial court's grant of summary judgment for Grace on statute of limitations grounds.

- A fourth case was on appeal in New York state after the trial court entered a verdict against Grace, despite the jury's apportionment of 62% liability to plaintiffs.

- Three cases were in pretrial litigation. One of those three cases, *Prudential Ins. Co. v. United States Gypsum Co.* (D.N.J. Nos. 87-4227, 4238) was dismissed last week on the basis that all of the asserted federal claims against Grace's co-defendants were time barred.

One reason there are almost no active cases is that only four new cases have been filed since 1995, and none since 1998.

In the event that new property damage claims are filed, Debtors believe they will be barred by threshold defenses. These include:

**1.    The statute of limitations defense.**

Based on the small number of cases pending as of the petition date and the length of time since the last case was filed, Debtors do not expect many additional claims to be filed. Debtors believe those that are filed will be subject to a statute of limitations defense.

The statute of limitations period for asbestos property damage claims is typically three years. *See, e.g.,* Cal. Civ. Proc. § 338; D.C. Code Ann. § 12-301; N.Y. C.P.L.R. § 214-c. In turn, the majority of states apply the discovery rule to determine when the limitations period begins to run. *See, e.g., NCR Corp. v. United States Mineral Products Co.,* 649 N.E.2d 175, 177, 178 n.3 (Ohio 1995) (majority of courts resolving the limitations issue in asbestos removal litigation have applied the discovery rule). Under the discovery rule, a cause of action accrues

when a plaintiff knows or should know that the asbestos either (i) contaminated the building, or

(ii) posed a hazard requiring abatement – the discovery rule does not require the actual detection

of asbestos fibers in the property to trigger the limitations period. *Appletree Square I, Ltd.*

*Partnership v. W.R. Grace & Co.,* 29 F.3d 1283 (8th Cir. 1994); *Roseville Plaza Ltd. Partnership*

*v. United States Gypsum Co.,* 31 F.3d 397 (6th Cir. 1994); *NCR Corp. v. United States Mineral*

*Products Co.,* 649 N.E.2d at 178.

   Grace stopped manufacturing MK-3 in 1973. Beginning in the late-1960s there

was widespread publicity about the dangers of exposure to asbestos. Throughout the 1970s and

1980s there was also widespread publicity concerning the presence of asbestos in fireproofing

materials such as MK-3. For that reason, property claimants have been on constructive notice of

their claims for the last 20 years. *See, e.g., O'Connor v. Boeing North American, Inc.,* 92 F.

Supp. 2d 1026, 1043 (C.D. Cal. 2000) ("Where publicity and information concerning an issue is

generally available, the Court may impute knowledge of that information to the plaintiff");

*Prudential Ins. Co. v. United States Gypsum Co.,* 828 F. Supp. 287, 298-99 (D. N.J. 1993)

("There is no equitable reason to toll the statute of limitations for a party who reasonably should

know a claim exists . . . [M]ost statute of limitations questions involve questions about what the

defendant *should* have known").

   In addition, claimants will have been on notice of their claims for as much as 25

years, sometimes more, as a result of federal asbestos regulations. In October 1975, EPA

expanded its NESHAP regulations to require the identification of, and appropriate responses to,

friable asbestos fireproofing during building renovations. 40 Fed. Reg. 48, 293 (1975). In 1990

9

(55 Fed. Reg. 48, 406), these NESHAP rules were extended to some non-friable asbestos-containing materials. All those who made renovations to their buildings would have been on actual notice of their claim had they complied with these regulations. 40 Fed. Reg. 48,293 (1975). Additional claimants would be on constructive notice.

### 2. *Res judicata* defense based on prior class settlements.

Several of the property damage cases that Grace settled prior to the petition date were class actions covering thousands of buildings and large groups of claimants. These class settlements included a nationwide elementary and secondary schools class and a class of colleges and universities. After the bar date, Debtors will identify those filed claims that were already the subject of a class settlement, and move the Court for their disallowance.

### 3. Lack of reliable scientific evidence of causation.

While asbestos insulation can pose a hazard to construction workers during mixing and application, that does not mean there was or is any hazard to building occupants after installation. After acquiring Zonolite, Grace commissioned wind tunnel tests starting in the mid-1960s that verified the bond strength of MK-3 and confirmed the absence of any surface erosion even under extreme air flow conditions. Grace conducted another round of testing in 1970 to reconfirm the safety of MK-3.[15]

---

[15] In 1964, Boyle Engineering Laboratory utilized a wind tunnel test to determine whether high-velocity air streams could erode MK-3. The test subjected MK-3 to a 104.8 m.p.h. air stream for 87 hours. The test showed no surface erosion. In 1965, the Robert M. Hunt Engineering Company tested the bond strength of MK-3 and found that MK-3 would not come off an applied surface. In 1970, Bowser and Morner Testing Laboratories conducted another wind tunnel test of MK-3, and again found no surface erosion and no particulate releases.

Since the first MK-3 property damage case was filed in the early 1980s, hundreds of buildings with the product have been sampled and analyzed by Grace's expert R. J. Lee. For example, Lee published his results in 1992 from tests performed for Grace and other asbestos defendants in cases in which asbestos removal was alleged to be necessary to protect the health of occupants. R. J. Lee, D. R. Van Orden, M. Corn and K. S. Crump, "Exposure to Airborne Asbestos in Buildings," *Regulatory Toxicology And Pharmacology* 16, 93-107 (1992). Based on 2,892 air samples from 315 public, commercial, school and university buildings, the study found that the average ambient levels of asbestos fibers in these buildings were far below federal action levels:

> The data reported herein indicate that average ambient levels in buildings containing ACM [asbestos containing materials] are far below (typically on the order of 1000-fold less) federal action levels. It should also be kept in mind that the action levels themselves are considerably below any levels that have been shown to cause disease in humans.

*Id.,* at 106. The levels found in commercial buildings, where Monokote claims would typically arise, were by far the lowest for all building types. *Id.,* at 99, Table 1. Indeed, Grace's ambient air testing of buildings alleged to be contaminated by Monokote generally shows that the asbestos levels inside the building are essentially the same as those outside the building.

Similar results were found by the independent Health Effects Institute (HEI) in its comprehensive 1991 report *Asbestos in Public and Commercial Buildings*. This report for the U.S. Environmental Protection Agency found, after reviewing evidence of very low airborne asbestos concentrations in buildings, that "there does not appear to be sufficient justification on grounds of risk to the health of general occupants for arbitrarily removing intact ACM from well-

11

maintained buildings." (*Id*, at 1-12)  HEI thus agreed with EPA, in its July 1990 "Managing

Asbestos in Place": "Based upon available data, the average airborne asbestos levels in buildings

seem to be very low.  Accordingly, the health risk to most building occupants also appears to be

very low." (*Id.*, at vii) [16]

Debtors therefore believe the property damage claimants will be unable to meet

the *Daubert* criteria for establishing reliable, scientific evidence of a product risk sufficient to

warrant remediation.

### C.    Asbestos Personal Injury Claims.

As set forth in the Informational Brief, the reason Debtors were forced to seek

protection under Chapter 11 is that they have experienced since 1999 a spike in personal injury

claims that is unsupported by any principle of science or law:

---

[16] EPA and HEI's views were echoed by the American Industrial Hygiene Association, "AIHA Position Statement on the Removal of Asbestos-Containing Materials (ACM) from Buildings," *Am. Ind. Hyg. Assoc. J.* 52: A-324-27 (June 1991); and by the American Medical Association, "Council Report: Asbestos Removal, Health Hazards, and the EPA," *JAMA* 266 (5): 696-97 (Aug. 7, 1991).



Asbestos Bodily Injury Claims

As set forth in the Informational Brief, the reason Debtors were forced to seek

Chapter 11 protection is that they have experienced since 1999 a spike in personal injury claims

that is unsupported by any principle of science or law:

This claims spike bears no relation to the actual trend of disease. For example,

data from the National Cancer Institute's Surveillance, Epidemiology and End Results ("SEER")

13



National Mesothelioma Death Rate

program shows that, far from trending upward, mesothelioma deaths have declined since 1992.

Despite these trends, since 1999 Grace's mesothelioma claims have increased sharply.   A similar spike occurred in the proportion of reported lung cancer cases resulting in claims against Grace during 1999.

The absence of any correlation between the recent spike in claims and the actual number of mesothelioma and lung cancer cases is important to understanding the trends in other claims. Mesothelioma and lung cancer have the longest latency periods between initial exposure and the onset of disease. Thus, the incidence of all other diseases should be declining, not increasing. But since at least the mid-1990s, and especially in the last few years, the relative proportion of non-malignant disease claims to mesothelioma and lung cancer claims against Grace and other asbestos defendants has dramatically increased.

Put simply, the actual rates of disease are going down, but the number of claims against Grace are skyrocketing. While some of the claims being asserted against Grace may be valid, three issues need to be addressed before potentially valid claims can be identified.

### 1.    There must be proof of exposure to Grace's products.

State law uniformly requires that no claim should proceed without credible evidence of exposure to Grace's asbestos products. Plaintiffs bear the burden of identifying a Grace product as the source of their exposure. *See, e.g., Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996) ("a plaintiff must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product."); *Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581 (5th Cir. 1983) (affirming summary judgment in asbestos case as to defendants whose products plaintiff could not recall using), *cert. denied*, 465 U.S. 1102 (1984); *Aymond v. Texaco, Inc.,* 554 F.2d 206, 210-11 (5th Cir. 1977) (affirming directed verdict for manufacturer where plaintiff did not establish that manufacturer's product caused the injuries); *Cawein v. Flintkote Co.,* 610 N.Y.S.2d 487, 488 (N.Y. App. 1994) ("It is not

enough, however, that a bag or bags of Flintkote fiber be seen in the plant; it must be shown that plaintiff was exposed to asbestos fibers released from defendant's products."). Given the limited use of Grace's products, only a small fraction of workers exposed to asbestos were ever exposed to Grace's asbestos.

      2.      **Grace's products must be a substantial causative factor of disease.**

Mere exposure is not enough. To meet their burden of proof, claimants must present scientific evidence establishing that their exposure to Grace's asbestos products was a substantial causative factor in their developing an asbestos related disease. *See, e.g., Bragg v. Owens-Corning Fiberglass Corp.*, 734 A.2d 643, 650 (D.C. 1999) ("expert medical testimony is almost always required to prove causation. . ."); *Money v. Manville Corp. Asbestos Disease Compensation Trust Fund*, 596 A.2d 1372, 1377 (Del. 1991) (holding that "a plaintiff must introduce direct competent expert medical testimony that a defendant's asbestos product was a proximate cause of the plaintiff's injury," because "[t]he causal nexus between exposure to an asbestos product. . . and a particular asbestos-related disease is not a matter of common knowledge."); *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 670 (Mo. 1991) ("In a case of this kind the plaintiff must establish the causal relationship by expert testimony.").

In satisfying this state law burden of proving causation, the claimants must introduce evidence before this Court that meets the *Daubert* standards for applicability, scientific validity and reliability incorporated into Rules 702 and 703 of the Federal Rules of Evidence.

Debtors intend to introduce evidence that the number of cases that will satisfy this causation standard will be modest. First, because Grace's products were installed using wet

application methods, asbestos exposure levels for even those workers who directly applied the

product were low.[17]  Second, most of those who are asserting claims against Grace had jobs that

involved insufficient exposure to cause disease.

### 3.    There must be a medically reliable diagnosis of clinical disease.

No claim should be pursued where the claimant has not suffered actual clinical

disease.  In order to recover, a claimant "must properly plead" and prove "proximate cause,

injury and damage." *Abdullah v. Acands, Inc.*, 30 F.3d 264, 269 n.6  (1st Cir. 1994).  Further,

"subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss

or damage . . . required to sustain a cause of action under generally applicable principles of tort

law." *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.), *cert. denied*, 474 U.S.

864 (1985).  *See also Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 273 (E.D. Pa. 1994)

("Based on the testimony of the Settling Parties' experts, the Court finds that pleural changes

alone will in the vast majority of the cases cause no symptoms, no change in physiology, and will

not have any effect on the individual's lifespan."), *vacated*, 83 F.3d 610 (3d Cir. 1996), *aff'd*, 521

U.S. 591 (1997).

As the Supreme Court recently observed in ruling that unimpaired claims are not

compensable under the Federal Employers' Liability Act, the substantive tort law of most states

affords no cause of action for mere exposure to a toxin.  *Metro-North Commuter R. Co. v.*

---

[17]  For example, in 1970 Tabershaw-Cooper conducted an industrial hygiene test to measure asbestos exposures during MK-3 application for pumping unit workers, those applying MK-3, workers in the general area of application, and the general public.  The test showed that exposures were well below the then-recommended threshold levels of 5 fibers/milliliter of air, based on time-weighted averages over 8-hour work days, 5 days a week.  In the general area of application, workers were typically exposed to .01 to .0002 of the recommended threshold level.

17

*Buckley*, 521 U.S. 424, 425 (1997). *See also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613, 621 n.15 (1997). Indeed, the Court observed that "with only a few exceptions, common-law courts have denied recovery [to those exposed to asbestos or other toxins] who . . . are disease and symptom free." *Metro-North*, 521 U.S. at 425. *See also Simmons v. Pacor, Inc.*, 674 A.2d 232, 238 (Pa. 1996) (denying recovery for pleural asbestos claims). Accordingly, claims not properly supported by a medically reliable diagnosis of clinical disease should be disallowed.

18

# EXHIBIT 1

# EXHIBIT 2

## II.    CHAPTER 11 PROCEDURES FOR DETERMINING THE VALIDITY OF SUBMITTED CLAIMS.

As Grace outlined in its Informational Brief, Chapter 11 is not merely a process for distributing available funds to claimants regardless of claim merit. Rather, the threshold task in Chapter 11 is to determine the validity of asserted claims. To this end, courts have developed procedures that can be used to define and resolve mass-tort liability within the bankruptcy system.

Certain of these procedures were automatically employed upon the filing of Grace's Chapter 11 petition. The automatic stay provisions of the Bankruptcy Code, for example, preclude collateral litigation which may affect the outcome of these Chapter 11 cases. Similarly, Grace's Chapter 11 filing allowed for consolidation of all claims before one court which can apply a single set of procedural and evidentiary rules to assure consistent treatment of claims.

Additional procedures can now be employed to determine the scope of Grace's liability for submitted asbestos claims. The first stage in this process is defining the universe of pending claims and objections. Chapter 11 provides for the establishment of a bar date for the filing of claims followed by the filing by the debtor of any objections to the submitted claims. After all claims and objections have been identified, the Court may then proceed to determine the validity of the submitted claims. Grace will seek to litigate common threshold issues concerning the validity of whole categories of claims. Rule 42 trials may then be employed, if necessary, to adjudicate the validity of any unresolved claims. In this manner, Grace's liability for the various

categories of asbestos claims may be defined and resolved in a manner that is both rational and fair.

**A.    Establishment of a Bar Date to Define the Universe of Submitted Claims.**

The first step in determining the validity of submitted tort claims under Chapter 11 is identification of the universe of asserted claims and objections.  Because the asbestos claims against Grace are "disputed," "contingent," and/or "unliquidated" under 11 U.S.C. § 1111(a), claimants must file a proof of claim by a deadline, or bar date, established by the Court.  *See also* Bankruptcy Rule 3003(c)(3) ("The court shall fix . . . the time within which proofs of claim or interest may be filed.").

The bar date serves the important purpose of "enabl[ing] a debtor and his creditors to know, reasonably promptly, what parties are making claims against the estate and in what general amounts."  *In re Kolstad*, 928 F.2d 171, 173 (5th Cir. 1991), *cert. denied*, 502 U.S. 958 (1991). *See also Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 17 (1st Cir. 1997) ("The purpose behind the claims bar date in bankruptcy . . . is to provide the debtor and its creditors with finality and to insure the swift distribution of the liquidated estate.") (quotations omitted); *In re Manville Forest Prods. Corp.*, 89 B.R. 358, 374 (Bankr. S.D.N.Y. 1988) ("Congress intended the bar date in a chapter 11 case to be a mechanism providing the debtor and its creditors with finality.").

The prompt establishment of a bar date is essential in Chapter 11 cases such as these, involving the resolution of thousands of asserted tort claims.  *See, e.g., In re Eagle-Picher Indus., Inc.*, 137 B.R. 679, 681 (Bankr. S.D. Ohio 1992) (observing that in the context of an

asbestos mass-tort bankruptcy setting a prompt bar date "fixing the number and identity of such claimants will lend considerable assistance to the process of arriving at a value of the claims of this class."); *In re The Babcock & Wilcox Co.* (*Babcock II*), No. 00-10992, 2000 WL 1511175, *1 (E.D. La. Oct. 6, 2000) (setting bar date for asbestos claims); *In re Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (noting that court established an asbestos personal injury bar date); *In re Dow Corning Corp.* (*Dow Corning I*), 211 B.R. 545, 554 (Bankr. E.D. Mich. 1997) (bar date set for claimants alleging that breast implants caused disease); *In re Dow Corning Corp.*, 142 F.3d 433, 1998 WL 180594, at *1 (6th Cir. Apr. 6, 1998) (same); *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000) (bar date established for toxic tort claims asserted by individuals in vicinity of nuclear waste dump); *cf. In re Best Prods. Co.*, 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992) (noting that personal injury claimants are not entitled to any special dispensation regarding the bar date in Chapter 11 reorganizations).

**B.    Submission of Omnibus Objections to Asserted Claims.**

Once the bar date passes, Grace will file omnibus objections to the submitted claims. *See* 11 U.S.C. § 502(a); Bankruptcy Rule 3007; *In re The Babcock & Wilcox Co.* (*Babcock I*), No. CIV A 00-0558, 2000 WL 422372, *2 (E.D. La. Apr. 17, 2000); *Dow Corning I*, 211 B.R. at 554 (omnibus objections to silicone-gel breast implant claims). The objections will raise the common threshold issues described in Section I.

21

C.    **Litigation Of Common Threshold Issues Concerning the Validity of Submitted Claims.**

Well-developed procedures exist within Chapter 11 for providing "a single, uniform, fair and efficient resolution" of disputed claims.[18]

1.    **Summary judgment proceedings.**

Grace will submit summary judgment motions seeking rulings concerning the validity of various categories of claims.  After considering Grace's motions and any responsive pleadings, the district court may grant summary judgment to dispose of invalid claims.  *In re The Babcock & Wilcox Co.*, 2000 WL 422372, at *4 (E.D. La. Apr. 17, 2000); *In re A.H. Robins Co.*, 59 B.R. 99, 102 (Bankr. E.D. Va. 1986); *In re Dow Corning Corp.*, 211 B.R. 545, 560 (Bankr. E.D. Mich. 1997); *In re Dow Corning Corp.*, 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997) ("Summary judgment will serve to weed out those claims which do not present a genuine issue of material fact, and for which the debtor is entitled to judgment as a matter of law.").

The threshold issues raised in these motions will relate to certain broad subsets, or all, of the disputed claims.  As noted, for example, in Section I above, Grace intends to raise through *Daubert*/summary judgment motions threshold issues concerning the validity of claims based on unreliable scientific evidence of product risk, disease and/or causation.

_____

[18]  *See, e.g.*, Edward H. Cooper, *The (Cloudy) Future of Class Actions*, 40 ARIZ. L. REV. 923, 947 (1998).  Through the bankruptcy procedures, the district court will avoid the inconsistencies and inequitable distributions that have plagued attempts to resolve asbestos claims through traditional tort and settlement procedures.  As commentators have recognized, for example, "[t]he ordinary tort-law requirement that a claim be supported by an injury has been lost in asbestos. . . .  Today, given the volume of claims and the disappearance of any effective injury requirement, defendants are paying those who are not really injured."  REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS, REPORT ON MASS TORT LITIGATION, Feb. 15, 1999 (comments of John Aldock, App. B, 12/8/98 Notes, p. 2).

Similarly, Grace intends to litigate issues governed by general principles of bankruptcy law.  For example, Grace will ask the Court to disallow claims for punitive damages on the grounds that awarding such damages "would prevent the fair and equitable treatment" of claims and "would frustrate the fair distribution of . . .assets" from the bankruptcy estate. *See In re Celotex Corp.*, 204 B.R. 586, 613 (Bankr. M.D. Fla. 1996); *see also In re A.H. Robins Co.*, 89 B.R. 555, 562 (E.D. Va. 1988) ("The presence of a 'wild card' in the form of punitive damages would constitute the death knell of any feasible reorganization plan."); *In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986) ("To allow recovery of punitive damages . . . would be to risk the depletion of Trust assets to the benefit of known victims at the expense of future claimants."), *aff'd in part, rev'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988).

Thus, in ruling on Grace's motions, the Court will be in a position to resolve common threshold issues that affect the validity of whole categories of claims.

### 2.    Rule 42 common issue trials.

Should the Court deny any of Grace's motions for summary judgment, the remaining issues may be adjudicated using Rule 42 common issue trials.  Through Bankruptcy Rule 7042, Federal Rule of Civil Procedure 42 specifically applies in adversary proceedings under Chapter 11.

Rule 42(a) "confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate causes for trial as may facilitate the administration of justice." *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir.

1964), *cert. denied*, 382 U.S. 812 (1965).  This "broad grant of authority" found in Rule 42 "has

been applied liberally" to avoid unnecessary costs or delay by resolving common issues in

unified proceedings.  *See* Fed. R. Civ. P. 42(a); *In re Air Crash Disaster at Florida Everglades

on Dec. 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977).  Rule 42 is therefore an appropriate and

efficient mechanism for resolving any remaining common issues concerning the validity of the

asserted claims.

**EXHIBIT 3**

III.    **GRACE'S PROPOSED PROOF OF CLAIM FORMS ARE TAILORED TO ELICIT INFORMATION NECESSARY TO CLAIMS LITIGATION, ESTIMATION, AND PAYMENT.**

Grace has crafted proof of claim forms that will provide specific, factual information necessary for litigation, estimation and liquidation of claims. Grace seeks approval of four specific proof of claim forms: (i) Asbestos Personal Injury Claimants (Ex. A filed herewith); (ii) Zonolite Attic Fill Claimants (Ex. B filed herewith); (iii) Asbestos Property Damage Claimants (Ex. C filed herewith); and (iv) Non-Asbestos Claimants (Ex. D filed herewith). Grace also seeks approval of general instructions to be provided with all proof of claim forms (Ex. E filed herewith).

A.    **Specialized Claims Forms Have Been Utilized in a Variety of Contexts To Elicit Information Concerning The Validity Of Claims.**

The proof of claim form may be used to provide information critical in determining the validity of submitted claims. As is detailed more fully below, determination of the validity of various categories of claims ensures that only meritorious claims receive payment. The "claims allowance process" in bankruptcy is "similar" to "[s]ummary judgment . . . in that one purpose is to isolate and dispose of factually unsupported claims." *In re Standard Insulations, Inc.*, 138 B.R. 947, 954 (Bankr. W.D. Mo. 1992).

Prior mass-tort bankruptcies have used such specialized proof of claim forms. *See, e.g., In re A.H. Robins Co.*, 862 F.2d 1092 (4th Cir. 1988) (approving required questionnaire accompanying official claim form); *In re Babcock & Wilcox Co.*, Case No. 00-0558 (Bankr. E.D. La.), October 30, 2000 Order at 4, filed herewith as Ex I ("The form and content of the Babcock & Wilcox Special Claims Form . . .are authorized by Bankruptcy Rule 3001(a) and are

25

otherwise fair and reasonable."); *In re Eagle-Picher Indus., Inc.* 158 B.R. 713, 716 (Bankr. S.D.

Ohio 1993) (referencing court-approved asbestos proof of claim form); *In re Celotex Corp.,* 204

B.R.586, 593 (Bankr. M.D. Fla. 1996) (discussing court-approved special asbestos proof of claim

form).

   The court in *Robins*, for example, required claimants to complete an extensive

questionnaire as part of the proof of claim before the court considered whether to allow or

disallow claims. *See In re A.H. Robins Co.*, 862 F.2d 1092 (4th Cir. 1988) (approving required

questionnaire accompanying official claim form). Among other things, "[t]he court

questionnaire was designed to give Robins an opportunity to object to any claim that was facially

invalid."[19] Consequently, it elicited basic background information, "information of the

claimant's use of the Dalkon Shield, the type of injury alleged and the names of physicians or

clinics visited by the claimant." *Id.* at 1093. Completion of the questionnaire, which was "part

of the requirement of a 'Proof of Claim'" was an "essential step" in perfection of the claim. *Id.* at

1095-96 & n.4.

   Most recently, the court in the Babcock & Wilcox Chapter 11 cases approved a

modified proof of claim form for asbestos personal injury claims designed to facilitate in ruling

on "motions for summary judgment on threshold liability issues." *See In re The Babcock &*

*Wilcox Co.*, 2000 WL 422372, at *5 (E.D. La. 2000); *In re Babcock & Wilcox Co.*, Case No. 00-

0558 (Bankr. E.D. La.), October 30, 2000 Order at 4, attached hereto as Ex.___ (approving claim

form). Among other things, the proof of claim form requires the submission of information

---

[19] Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. REV. 659, 677 (1989).

necessary for resolution of common issues such as "the appropriate standard of liability, the availability of punitive damages, the validity of claims by unimpaired individuals, the validity of claims based on unreliable scientific evidence of disease and/or causation, the appropriate statute of limitations, and the applicability of the sophisticated purchaser and government contractor defense." *In re The Babcock & Wilcox Co.*, 2000 WL 422372, at *4 (E.D. La. 2000).

Extensive claim documentation requirements have also been used in the process of liquidating asbestos personal injury claims, the most notable example being the *Johns-Manville* case. *See In re Joint E.&S. Asbestos. Litig.*, 878 F. Supp. 473, 585-587 (S.D.N.Y. 1995).

Finally, similar procedures have been employed in the mass-tort context outside of Chapter 11 in order to streamline discovery and litigation.[20]  In the *Diet Drugs* litigation, for example, the court authorized the use of questionnaires for purposes of assembling "considerable detail regarding each plaintiff in respect to its claim against each defendant" in order to

---

[20]  *See, e.g., In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1995 WL 925678, at *1 (E.D. Pa. Feb. 1, 1995) (attaching questionnaire); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 704702, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*, 1999 WL 387322 (E.D. Pa. 1999); *Ludwig Enters CMOs on Product ID Questionnaire, More In Re Latex Allergy*, 12/2/97 Andrews Med. Devices Litig. Rep. 10 (discussing use of 42-page questionnaire seeking identification of manufacture, individuals who could corroborate use, documents supporting claims, medical information, and education and employment information in *In re Latex Gloves Prods. Liab. Litig.*, MDL Docket No. 1148 (E.D. Pa.)); *In re Food Lion, Inc.*, 1998 WL 322682, at *11 (4th Cir. 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim"); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1416 (E.D.N.Y. 1985) (Weinstein, J.) (ordering questionnaires "sent to all claimants" seeking dates and location of service to determine extent of exposure); *In re New York City Asbestos Litig.*, 142 F.R.D. 60, 63, 65 (E.D.N.Y. 1992) (mentioning use of a "questionnaire process designed to elicit all information necessary for settlement" of asbestos claims).

"minimize time consuming and expensive exchanges of discovery by hundreds of plaintiffs"

while addressing the "subsidiary goal" of requiring each plaintiff "to personally participate in the

assembly of the documents and facts that would enable both plaintiffs and their counsel on the

one hand, and defendants against whom claims were made on the other, to be able to assess with

a sound level of reliability the nature of not only the claims being made, but the factual

foundation supporting such claims." 1999 WL 387322, at *1.[21]

In the *Bone Screw* litigation, the court similarly authorized a questionnaire to

obtain "extensive factual information concerning each plaintiff early on in each plaintiff's case"

in lieu of "more extensive and tedious discovery." *In re Orthopedic Bone Screw Prod. Liab.

Litig.*, 1996 WL 900350, at *1 (E.D. Pa. June 10, 1996).

Finally, in resolving litigation regarding exposure to DDT, the court developed a

procedural framework that involved "general discovery of all plaintiffs, during which they were

required to . . . complete[] a fifty-four page questionnaire" that "obtained standard information on

background, demographics, DDT exposure, and personal and medical histories," followed by

"traditional in-depth discovery of twenty randomly selected plaintiffs," and the resolution of

legal issues based on the information obtained from the questionnaires in the form of "motions to

dismiss, motions for summary judgment, and motions in limine."[22]  Similar data collection

---

[21]  *See also* Elizabeth J. Cabraser, *Diet Drug Litigation Update*, 16 No. 9 PROD. LIAB. L. & STRATEGY 6 (03/98) (discussing use of "a comprehensive plaintiffs' questionnaire/fact summary, consisting of a series of objective questions and information requests that will serve in lieu of formal interrogatories" and will "facilitate the flow of essential information and will avoid burdening the court with discovery disputes.").

[22]  Francis E. McGovern, *The Alabama DDT Settlement Fund*, 53 LAW & CONTEMP. PROBS. 61, 62-63 (continued...)

procedures have been utilized specifically to resolve asbestos-related claims outside of Chapter 11.[23]

**B.     Grace's Proposed Claims Forms Will Elicit Information Necessary to the Resolution of Threshold Issues Concerning the Claims.**

Looking to such precedents, Grace has designed three proposed asbestos proof of claim forms for the Court's consideration.  In developing these forms, the Debtors have sought to balance the inconvenience imposed on the claimants in providing the requested information against the need to determine the factual basis for each claim and to streamline claims litigation.

**1.     Zonolite Attic Insulation Proof of Claim Form.**

Grace's proposed Zonolite Attic Fill Claim Form requests information necessary to determine whether each actually involves a product manufactured by Grace.  For example, the form asks for any test results or purchase documents that would support the identification of Grace's ZAI product in the claimant's property.

---

[22]  (...continued)
(1990).

[23]  Such questionnaires have been used specifically to resolve asbestos-related claims. *See, e.g.,* Francis E. McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. CHI. L. REV. 394, 399 (1986) ("In the Ohio asbestos litigation (OAL), Judge Thomas D. Lambros appointed law professors Eric Green and Francis McGovern to develop a case management plan for each category of asbestos cases (for example, insulation cases, suits by plant workers, suits by brake repairers).  The goals were to streamline pleading and discovery practice and to set time schedules for completion of all major aspects of case preparation.  Working closely with counsel and drawing on materials generated by national organizations or in other asbestos litigation, the masters developed two sets of standardized documents: questionnaires for plaintiffs to provide information about their claims, and discovery forms for interrogatories, document production requests, and witness disclosures."); MANUAL FOR COMPLEX LITIGATION § 33.27, at 325-26 n.1077 (Federal Judicial Center 3d ed. 1995) ("[I]n the Ohio Asbestos Litigation special masters worked with the parties to develop standard forms with information that would be relevant in both settlement and trial.").

Similarly, the claim form elicits information relevant to whether there is any increased risk attributable to ZAI.  The form, for example, requests information concerning where the product is located; when the product was installed; the use of the structure where the product is located; if located in a residential attic, whether the product is covered by other types of insulation or building materials and what the attic is used for; whether the ZAI has been disturbed, and if so when and for what purpose; and whether the claimant has covered the product, such as with plywood flooring, or removed the product from the structure.  All of these items are factors to be considered in determining whether there is any increased risk and whether a claimant has standing to bring a claim based on Grace's ZAI product.

### 2.      Asbestos Property Damage Proof of Claim Form.

Much like the ZAI claim form, the Property Damage form requests product identification information necessary to determine whether a claim actually involves a Grace product.

The form also elicits information relevant to whether there is any increased risk attributable to Grace's product, including:  a description of the building involved (e.g., residential, commercial or industrial, number of stories, square footage); information concerning usage of the building; date of building construction and product installation; the results of any asbestos air, bulk and dust samples taken inside and/or outside of the building; a description of any renovation(s) or asbestos abatement or containment work performed in the building; and the disclosure of any documents relating to the asbestos products in the building, including the

30

purchase of the asbestos products, the maintenance of the asbestos products and any remediation or containment of the asbestos products.

The Property Damage form also seeks information relevant to the statute of limitations defense, including the date when the claimant first learned that the building contained asbestos, the date when the claimant first learned that the building contained Grace asbestos products, and information about any renovation work that would be subject to asbestos regulations. The claim form also elicits information necessary to determine whether claims are barred based on prior litigation, such as prior involvement in litigation.

Finally, a separate section of the form applies to property damage claimants located in Libby, Montana, who are basing their claims on alleged environmental releases of asbestos in connection with the Libby mine. For those claimants, the following information is requested: when the claimant purchased the property; the claimant's use of the property; whether any resident of the property was employed by Grace at the Zonolite mine or any other vermiculite processing or transportation facility; if so, information concerning where the Grace employee worked and the dates of employment at each location; the dates and results of any asbestos sampling on the property, whether or not performed by the claimant; the dates and results of any sampling for other contaminants on the property; and a description of any remediation or containment work performed on the property. This information is relevant to the nature, severity and extent of the alleged property contamination, the source of the contamination, and the claimant's alleged damages from loss of use or enjoyment of the property.

31

### 3.    Asbestos Personal Injury Proof of Claim Form.

This form requires submission of information about the claimant's medical diagnosis, including the date of first diagnosis, the nature of the diagnosis, and the medical records relating to the diagnosis.  Similarly, for all claimants asserting that exposure to asbestos caused them diminished lung function or lung impairment, the form requires submission of the results of any medical tests in which a medical doctor measured the claimant's lung function or capacity, and copies of those reports and tests.  All claimants must submit copies of any x-rays or CT scans performed in the last two years and reports of their interpretation, including the claimant's ILO rating and ILO form along with the mailing addresses, telephone numbers, and area of specialty of the medical professionals identified in the foregoing responses.

The form also requires the submission of information concerning alternative causes of disease, including non-occupational exposures.  Similarly, the form asks for smoking history.

The claim form further elicits information concerning the claimant's general and occupational exposures to asbestos, and to Grace's asbestos products in particular.  This includes a description of each occupational position and job location in which exposure to Grace's products occurred, the specific Grace product that the claimant was exposed to, the specific job performed by the worker while he was exposed to Grace's product, and the duration of exposure to Grace's product at each job location.

Finally, the claim form elicits information necessary to determine if claims are barred by the doctrine of *res judicata*, such as information concerning any prior asbestos-related

lawsuits or workers' compensation claims filed by the claimant and any settlements or judgments. If the claim was allegedly settled by Grace prior to the petition date, the form requires submission of the release executed by or on behalf of the claimant and the executed agreement, as well as information about any other settlement payments received by the claimant.

> 4.    **Claim Form For Other Claims.**

Debtors' proposed claim form for all other claims, defined as "Non-Asbestos Claims" is filed herewith as Ex. D. It is modeled after Official Bankruptcy Form 10. It has been modified slightly to be more appropriate to the Debtors' cases. The modifications are essentially as follows:

- The form directs creditors to file specialized claim forms if they have claims for asbestos personal injury, asbestos property damage, Zonolite Attic Insulation or Settled Claims.

- It requests the name of the particular debtor against whom the claim is made.

- The "basis for claim" boxes are modified slightly to more accurately reflect claims that may be filed in the Debtors' cases.

- It eliminates references to claims that are only applicable in individual debtor cases.

- It references and attaches modified instructions which, among other things, define the types of claims which may be asserted against the Debtors, identifies the 62 Debtors by name and d/b/a, identifies the Debtors' claims agent, and eliminates instructions that would only be appropriate in individual debtor cases.

# EXHIBIT 4

## IV.    DEBTORS' PROPOSED NOTICE AND PUBLICATION PROGRAM.

In order to assure that all known and unknown potential creditors have notice of the bar date and the opportunity to file proofs of claim, the Debtors have developed a detailed and comprehensive notice program.  This notice program was designed with the assistance of Katherine Kinsella, a nationally recognized specialist in notification campaigns in the mass-tort and product liability arena, targets the holders of all types of claims that have been or could be asserted against the Debtors.  A copy of the Debtors' Notification Plan is attached as Exhibit F. By this motion, the Debtors request approval of the Notification Plan.

### A.    Law Governing The Content Of A Bar Date Notice.

To comport with the requirements of due process under Bankruptcy Rule 2002(a)(7), the Debtors must give notice to claimants regarding the bar date.  As outlined by the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), a notice program must be "reasonably calculated under all circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314.  The notice to be sent to potential claimants "must be of such a nature as [to] reasonably convey the required information" and "it must afford a reasonable time for those interested to make their appearance." *Id.*

The courts have developed general guidelines for the content of a bar date notice. Such bar date notice must include notice of (i) the bar date; (ii) any impending hearings so that notice recipients can take steps to safeguard their interests; (iii) information on the effect of not filing a proof of claim by the bar date; and (iv) to the extent not all claims are being barred,

34

information on who must file a claim. *In re Amdura Corp.,* 170 B.R. 445, 452 (D. Colo. 1994); *see also In re Keene Corp.,* 188 B.R. 903, 908 (Bankr. S.D. N.Y. (1995).

While the purpose of the notice requirement is to advise individuals who will be affected by the outcome of any proceeding of the impending hearing so that they can take steps to safeguard their interests, the notice requirement need not advise them of the basis of their claims. In the case of *In re Penn Central Transp. Co.,* 771 F.2d 762 (3rd Cir. 1985), *cert. denied,* 474 U.S. 1033 (1985), the Third Circuit considered whether to grant appellants leave to pursue antitrust conspiracy actions against the debtors after they had missed the bar date. In upholding the bar date, the Court held that the debtor was required to notify potential creditors that they might have claims against the debtor but was not required to advise creditors that they may have claims *based specifically upon certain causes of actions* - such as antitrust conspiracy actions - that might be affected by the bar date. *Id.* at 768.

The recent case of *In re Babcock & Wilcox, et al.* (Case No.00-0558 (Bankr. E.D. La., Order dated August 25, 2000 ("*Babcock Order*") filed herewith as Exhibit H)) is confirmation of the principles set forth in *Mullane, supra,* and followed by the courts thereafter. In an unpublished order, after extensive discussions and objections by the various creditor constituencies, the court approved the bar dates for asbestos personal injury claims and asbestos property damage claims. The approved notice: (a) set forth the bar date; (b) advised creditors whether they were subject to the bar date; (c) advised creditors whether they must file a proof of claim; (d) alerted such creditors to the consequences of failing to timely file a proof of claim as set forth in Bankruptcy Rule 3003(c)(2); (e) specified the form to be used in filing a proof of

35

claim; (f) set forth the address to which proofs of claim must be sent for filing; and (g) notified

such creditors that proofs of claim must be filed with original signatures. The notice also

included a reference to a web site and a toll-free number for potential claimants to call to obtain

information and the court approved-proof of claim form. (*Babcock Order*.)

**B.    Law Governing Dissemination Of Notice.**

The permissible method of conveying notice depends upon whether the claimant

is known or unknown. The debtors must give actual notice of the claims bar date to known

claimants. *In re Eagle-Picher*, 137 B.R. 679, 682 (Bankr. S.D. Ohio 1992). Known claimants

include those whose identity is actually known to the debtors and those claimants whose identity

the debtors can reasonably ascertain. *Chemetron v. Jones*, 72 F.3d 341, 347 (3d Cir. 1995), *cert.*

*denied*, 517 U.S. 1137 (1996).

Unknown claimants are those claimants whose identity a debtor could not

reasonably ascertain. *Id.* The debtors' obligation with regard to unknown claimants is to

undertake reasonably diligent efforts to determine the identity and claims of the claimants. The

debtors are not obliged to "'undertake impracticable and extended searches . . . in the name of

due process.'" *In re Brooks Fashion Stores, Inc.*, No. 92 Civ. 1571, 1994 WL 132280, at *2

(quoting *Mullane*, 339 U.S. 306, 314 (1950).

In the bankruptcy context specifically, courts have applied the *Mullane* standard to

determine whether bar date notices satisfy due process and have found publication notice of the

type proposed by the Debtors herein sufficient to apprise known claimants of their rights. 339

U.S. 306, 314 (1950). In *Chemetron*, 72 F.3d at 348, the court held that the debtors, chemical

manufacturers who were responsible for radioactive contamination at certain landfills, were not required to provide actual notice of the bar date to "anyone who potentially could have been affected by their actions" because such claimants are "unknown" claimants. *Id.* This group of unknown claimants included former residents and occasional visitors to the neighborhood that contained the toxic site. The court found that notice published in *The New York Times* and *The Wall Street Journal* was reasonably calculated under the circumstances to reach the unknown claimants and satisfied due process. *Id.* at 348.

Consistent with these holdings and with due process, the Bankruptcy Rules specifically provide that notice by publication may be used when the court "finds that notice by mail is impracticable or that it is desirable to supplement the notice." Fed. R. Bankr. P. 2002(1). What constitutes adequate delivery of notice by publication depends upon the individual facts and circumstances of each case. It does not, however, require publication in every conceivable newspaper or medium that a possible unknown creditor may read or otherwise be exposed to. *Chemetron*, 72 F.3d at 348-49.

In reviewing notice programs for notice by publication, courts require debtors to provide greater specificity than merely identifying the media that the debtors expect to use. *Eagle-Picher*, 37 B.R. at 682. In *Eagle-Picher*, where the debtor faced mass-tort litigation claims for personal injuries related to asbestos exposure, the court required that the debtor develop and design a comprehensive notice program like that designed by the Debtors' notice expert in this case. The *Eagle-Picher* court ordered the debtors to prepare a "specific detailed program of notice by publication," including such elements as: the identification of media to be used;

"explanation [of] why such media are to be [used] and why other media are not to be [used]; the frequency of any publication and/or broadcast;" and a program of publication of notice "based on real lead times for the particular media involved as to when the program is to begin." *Id.* The court also stated that it expected that any such notice program would be submitted to the official committees for comment prior to filing a motion with the court. *Id.*

Again, *Babcock* is instructive. The publication notice to the unknown claimants approved therein was designed to reach 94% of its core demographic group, males aged 55 and over, an average of 4.4 times each. *(Babcock* Order at 13). The court found that this reach (the proportion of the relevant population reached by the notice program) and frequency (the average number of contacts per person within the target population) was comparable to the reach and frequency of other asbestos-related notice programs. *Id.* Methods of publication used by the debtors included newspapers, magazines, trade publications, television and web sites located in the United States, England, Canada, the Philippines and the U.S. territories of Puerto Rico, Guam and the Virgin Islands. Notice was also published in leading publications read by asbestos litigators, notice was given to known attorneys of current claimants, messages were posted to web sites and notices were mailed to trade organizations in which potential claimants may be members.

In providing notice to unknown asbestos-property damage claimants and other unknown claimants, other than asbestos-personal injury related claimants, this Court, in *In re Armstrong World Industries, et al.*, Case No. 00-04471 (JJF) (Bankr. D. Del. Order dated April 18, 2001 at p. 7, filed herewith as Exhibit I) approved a publication program. The

*Armstrong* program provided for notice to be published twice in a weekday edition of *The Wall Street Journal*, *The New York Times* and *USA Today* at least 30 days prior to the claims bar date. This notice was also to be published in a series of trade publications which list was approved by the Court. Notice was to be further published in the Sunday edition of a series of local newspapers specific to certain regions where unknown claimants are likely to reside. (*Armstrong Order* at p. 7).

### C.   Debtors' Proposed Notice And Plan for Dissemination.

The Debtors, in conjunction with their notice expert, have developed an extensive notice program for both known and unknown claimants (the "Notification Plan"). The Notification Plan employs four primary methods in providing notice: (a) direct notice by mail to all identifiable claimants and their counsel; (b) broad national published notice through the use of national paid and earned media vehicles; (c) national notice through trade publications; and (d) direct notice by mail to third parties who are likely to have contact with personal injury claimants. Debtors seek approval of the Notification Plan by separate Application and the retention of its notice expert to implement that plan.

Specifically, the Debtors propose to mail a copy of the bar date notice package, which consists of the bar date notice, the bar date order and the appropriate proof of claim form to the following:

- All readily identifiable asbestos personal injury claimants with pending asbestos-related claims against the Debtors (where addresses and names of claimants are known by the Debtors and are reasonably retrievable), as well as their counsel of record;

39

- All readily identifiable asbestos property damage claimants with pending asbestos property damage claims against the Debtors (where addresses and names of claimants are known by the Debtors and are reasonably retrievable), as well as their counsel of record;

- All identifiable Zonolite Attic Insulation claimants with pending claims against the Debtors (where addresses and names of claimants are known by the Debtors and are reasonably retrievable), and their counsel of record;

- All counsel of record for asbestos personal injury claims filed against the Debtors *historically;*

- All residents of Libby, Montana;

- All identifiable persons and entities who hold non-asbestos claims against the Debtors, and their counsel of record, if any;[24]

- All individuals who call the toll-free telephone number or write and request a copy of the bar date notice package from the official claims agent as a result of seeing the notice in the media. To the extent that the claimants' names and addresses are not reasonably retrievable by the Debtors, actual notice will be mailed to the claimants' attorneys, if known by the Debtors.

Unknown claimants are those potential claimants for whom the Debtors do not have names, addresses or both, or as to when the names and addresses are not reasonably retrievable.[25] Notice to "unknown claimants" will be provided by publication. Upon entry of the

---

[24] The Debtors do not seek to require that present or former employees file proofs of claim in order to preserve workers compensation benefits. However, the Debtors do require that such employees file a proof of claim if they wish to proceed against the Debtors outside of the workers' compensation system. Accordingly, the Debtors will give notice of the bar date to all present and former employees who are currently asserting asbestos claims against the Debtors, whether such claims are being asserted in a workers compensation system or directly against the Debtors outside of such a system.

[25] This category of claimants includes, among others, persons who formerly asserted a claim against the Debtors that was settled and released, and former claimants whose claims were rejected. While such individuals may have held claims that were settled and released over the course of the past two decades in which the Debtors settled tens of thousands of claims, it is merely speculative to believe such

(continued...)

Order Establishing the Bar Date, the Debtors will implement a comprehensive publication notice

program that will include providing notice to areas where claims have arisen or where potential

claimants may now be located including: (a) the entire United States of America; (b) Canada; (c)

Guam; (d) Puerto Rico; and (e) the U. S. Virgin Islands. Publication notice will be disseminated

using the following forms: (1) newspapers; (2) magazines; (3) trade and professional

publications; (4) television (network and cable); and (5) web sites. Notice will also be provided

directly to trade organizations in which potential claimants may be members and through other

third parties who are likely to have contact with personal injury claimants. In addition, a toll-free

number will be established for potential claimants to call for information and for a Court-

approved proof of claim form, as described herein.

      The Debtors' Notification Plan that describes the scope of the publication notice

program, publications to be used, target groups to be reached, frequency of reaching such groups,

costs associated with the plan, and a variety of other details regarding the scope and manner in

which the Notification Plan will be implemented is filed herewith as Exhibit F. In selecting the

target audiences for purposes of buying and purchasing media, the notice expert examined the

demographics of affected claimants. The target audiences selected were as follows:

    •    Primary Target - Men 65+, blue collar workers, encompassing Asbestos Personal
        Injury Claimants.

---

[25] (...continued)
individuals would at this point in time hold "current" claims. Likewise, if a claim was rejected by the
Debtors and then never pursued by the claimant, the Debtors have no reason to believe that such claimant
holds a "current" claim.

- Secondary Target - Adults 35+, encompassing homeowners, commercial property owners, and holders of other claims.

The Notification Plan contains a media program, using broadcast televison, national consumer magazines, newspaper supplements, and national and local newspapers, which is designed to deliver the following reach and frequency of exposure measurements: (a) **96.9%** of Men 65+ with an estimated average of 5.3 opportunities to see the notice; and (b) **95.4%** of Adults 35+ with an estimated average of 4.3 opportunities. These frequency and reach figures are consistent with similar notice programs approved by the courts, including the *Armstrong* and *Babcock* programs described herein and other asbestos, mass-tort and product liability programs designed by Debtors' notice expert and approved by courts.

A copy of the form of the bar date notice to be sent to known claimants is filed herewith as Exhibit G. A copy of the print notice for publication of the bar date for all claims is Exhibit 9 to the Notification Plan, and a television notice of the bar date for all claims is Exhibit 8 to the Notification Plan.

**EXHIBIT 5**

## V.    QUALIFICATIONS AND ROLE OF PROPOSED NOTICE AGENT.

As noted above, the Notification Plan outlined herein and filed as Exhibit F has been assembled with the advice and direction of Katherine Kinsella, the president of Kinsella Communications, Ltd.  Ms. Kinsella is a leading expert in the design, preparation, and dissemination of legal notice in class actions and bankruptcies.  Ms. Kinsella is a nationally-recognized specialist in class action notification campaigns in the mass-tort and product liability arenas.  By separate Application, the Debtors seek the approval of the Court to retain Ms. Kinsella.

Ms. Kinsella is especially qualified to assist the Debtors in its notice program in that she has developed and directed some of the largest and most complex national notification programs in the country.  The scope of her work includes notification programs in asbestos, tobacco, infant formula, polybutylene plumbing, home siding products, antitrust, securities and consumer fraud.  Her firm has designed and implemented, or consulted on, over 95 notification programs involving non-readily identifiable class members and placed over $80 million in media notice.

Ms. Kinsella is particularly experienced in noticing asbestos health claimants, having done so in the following cases:

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y.)

*In re The Celotex Corp.* Nos. 90-10061-8BI and 90-10017-8BI

*In re Raytech Corp.*, No. 5-89-00293 (Bankr. D. Conn.)

43

*Ahearn v. Fibreboard Corp.*, No. 6:93 cv 529 (E.D. Tex.), and

*Georgine v. Amchem, Inc.*, No. 93-CV-0215 (E.D. Pa.).

Ms. Kinsella has also developed notice programs for the following key mass-tort

and product liability cases:

> *In re Nasdaq Market-Makers Antitrust Litigation*, No. M21-68 (RWS), 94 Civ. 3996 (RWS), M. D. L. No. 1203 (securities antitrust class action);
>
> *Naef v. Masonite Corp.,* No. CV-94-4033) (Ala. Cir. Ct. Mobile County) (hardboard siding class action);
>
> *In re: Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114, C 95-3178 VRW (N.D. Dist. Cal.) (oriented strand board class action);
>
> *Cosby v. Masonite Corp.,* No. CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding products liability class action);
>
> *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing products liability class action); and
>
> *Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 CA 20 (Fla. Cir. Ct., Dade County) (tobacco-injury class action).

Based on her professional qualifications and her extensive experience as a notice

expert in major and complex bankruptcy cases, Debtors recommend that the Court approve Ms.

Kinsella as the notice expert for these cases.

44

**EXHIBIT 6**

## VI.    PROPOSED CASE MANAGEMENT SCHEDULE.

Pursuant to the Court's direction, Grace has crafted the following proposed schedule for litigating the various asbestos-related claims at issue in these Chapter 11 cases. Prior to filing this Memorandum, Grace circulated its proposed schedule to the creditor committees for their review.

### A.    Proposed Schedule For The Notice Program, Bar Date And Preliminary Claims Report.

Grace proposes the following schedule for its notice program, the implementation of a claims bar date, and the submission of a preliminary report by Grace to the Court describing the nature of the various categories of submitted claims:

- **August 1, 2001 - October 1, 2001:  Execution of notice program.**  Grace expects to serve all notices and complete its publication program within two months of Court approval.

- **April 1, 2002:  Claims bar date.**  Grace proposes that the bar date for all claims be six months after the completion of the publication program.  Assuming the Court issues its ruling by August 1, 2001, the notice and publication program can be executed by October 1st, and the bar date would be April 1, 2002.

- **June 1, 2002:  Debtors' preliminary claims report.**  Two months after the bar date, Grace will make a preliminary report to the Court and the committees, categorizing and summarizing the submitted claims.

After this first stage in the cases has been completed and the universe of claims has been identified, the parties may then engage in litigation to resolve common threshold issues concerning the validity of the submitted claims.

- **Proposed Schedule for the Litigation of Threshold Issues.**

Grace proposes separate schedules for the different categories of claims. The proposed schedules are as follows.

### 1.    ZAI Litigation Track.

Grace proposes an expedited schedule to resolve any claims associated with its ZAI product. As discussed more fully above, Grace maintains that there is not sufficient, reliable scientific evidence to support claims that ZAI is associated with any increased risk of disease. Grace proposes the following schedule for resolution of this issue by the Court.

- **May 1, 2002: Appointment of a ZAI Litigation Committee.** Following expiration of the bar date, Grace proposes that the Court appoint a Litigation Committee to represent claimants in the common issues litigation.[26]

- **May 1, 2002 - January 1, 2003: Discovery regarding product risk.** The parties may then conduct discovery concerning scientific issues relating to the allegation that ZAI poses an unreasonable risk of harm.

- **January 1, 2003: Omnibus objections and *Daubert*/summary judgment motions.** Grace will then file an omnibus objection and related *Daubert*/summary judgment motions, based upon the absence of a reliable scientific basis for the alleged risk of harm.

- **February 1, 2003: Claimants' response.** Grace proposes a one-month period by which time claimants must file their response to Grace's motion.

- **February 15, 2003: Debtors' reply.** Grace proposes a two-week window for filing its reply.

---

[26] In cases involving large numbers of torts claimants, bankruptcy courts have routinely appointed special committees to represent those claimants in common issue litigation. *See In re National Gypsum Co.*, 257 B.R. 184 (Bankr. N.D. Tex. 2000) ( personal injury trust advisory committee); *In re Celotex Corp.*, 245 B.R. 174 (Bankr. M.D. Fla. 2000) (Asbestos Health Creditors' Committee and Asbestos Property Damage Claimants' Committee); *In re A.H. Robins Co., Inc.*, 251 B.R. 312 (Bankr. E.D. Va. 2000) (Dalkon Shield Claimants' Committee); *In re Eagle-Picher Industries, Inc.*, 137 B.R. 679 (Bankr. S.D. Ohio 1992) (Injury Claimants' Committee).

- **March, 2003:  Hearing on Grace's summary judgment motions.**  The Court may then conduct a hearing and rule on Grace's summary judgment motions.

- **Second Quarter, 2003:  Bench trial.**  Should the Court determine that there is a dispute concerning some material issue of fact and deny Grace's summary judgment motions, the Court can conduct a common issue bench trial under FRCP 42 to resolve the threshold issue concerning whether ZAI involves an unreasonable increase risk of disease.

2.    **Asbestos Property Damage Litigation Track.**

Asbestos property damage claims unrelated to ZAI may be resolved on a parallel litigation track.

- **June 1, 2002:  Debtors' identification of claims subject to threshold** defenses.  As a part of its preliminary report to the Court, Grace will identify:  (1) pending cases that could continue to be litigated in other courts, subject to regular reporting to the Court; (2) claims subject to statute of limitations defenses; (3) claims subject to *res judicata* defenses; and (4) claims subject to a *Daubert* motion, based upon the lack of a reliable scientific basis for the alleged product risk.  Grace will file appropriate objections to these claims.

- **September 1, 2002 - March 2003:  Summary judgment motions and discovery on a *res judicata* defense.**  Within three months of the issuance of the preliminary claims report, Grace will file a summary judgment motion with respect to a *res judicata* defense.  Subsequent discovery and briefing may be completed in time for a hearing in March 2003.

- **September 1, 2002 - March 2003:  Discovery and *Daubert* proceedings on the scientific basis for Monokote product risk claims and statute of limitations defenses.**  Grace's proposed schedule allows discovery to proceed until February 1, 2003.  Grace will then file its *Daubert*/summary judgment motions on March 15, 2003.  The motions may then be heard after any responsive briefing.

- **Second Quarter, 2003:  Bench trial.**  Any claims that remain unresolved after the Court rules on Grace's summary judgment motions, may be set for a bifurcated bench trial pursuant to FRCP 42.  The first phase of the trial would resolve common issues such as statute of limitations, *res judicata* and product risk.  The second phase would encompass remaining issues, and would take place after further case-specific discovery.

47

Thus, as with the ZAI claims, resolution of other asbestos property damage claims will be

accomplished through identification of threshold issues, summary judgment proceedings to

resolve the validity of claims, and if necessary, common issues trials to resolve any remaining

claims.

       3.       **Asbestos Personal Injury Litigation Track.**

      While the threshold issues involved in resolution of personal injury claims may

differ somewhat from those implicated by the property damage claims, litigation may proceed in

parallel with the previously-identified litigation tracks.

- **July 1, 2002:  Appointment of a Personal Injury Litigation Committee.**
  Debtors propose that the Court appoint a Litigation Committee to represent
  asbestos personal injury claimants in common-issues litigation.

- **September 1, 2002:  Completion of debtors' initial claim audit.**  During the
  first five months after the bar date, Grace will audit the completeness and
  reliability of  submitted personal injury claims.

- **September 1, 2002:  Objections to and motion to disallow incomplete claims.**
  Grace will move to disallow incomplete claims identified in the audit.  Grace
  proposes that claimants respond to its motion for disallowance by October 1, 2002
  and that Grace file any reply by October 15, 2002.  The Court may then hold a
  hearing and rule on Grace's motion for disallowance of incomplete claims.

- **January 1, 2003:  Omnibus objections and motion for summary judgment.**
  Grace plans to file omnibus objections and move for summary judgment with
  respect to common issues affecting the remaining claims.  Grace intends to raise,
  among others, the following threshold issues concerning the validity of submitted
  claims:  (a) the absence of exposure to Grace's products; (b) the absence of a
  reliable, scientific basis for claiming that exposure to Grace's asbestos products
  was a substantial contributing factor in causing disease among specified job
  occupations; and; (c) the absence of a medically reliable diagnosis of clinical
  asbestos-related illness.

- **January 1, 2003 - July 1, 2003:  Discovery related to summary judgment motions.**  Grace proposes a six-month period during which any discovery related to its submitted summary judgment motions could take place.

- **July 1, 2003:  Claimants' response.**  After the completion of discovery, claimants may then respond to Grace's summary judgment motions.

- **August 1, 2003:  Debtors' reply.**  Grace proposes that it be allowed one month to file its reply.

- **August, 2003:  Hearing on *Daubert*/summary judgment motions.**  The Court may then hold hearings on Grace's summary judgment motions to resolve common threshold issues regarding the validity of the submitted claims.

- **Third Quarter, 2003:  Trial.**  Should the Court deny any of Grace's motions for summary judgment, Grace will seek to litigate remaining issues through a common issues trial pursuant to FRCP 42.

The proposed schedules tailored for resolution of the various categories of claims through

parallel litigation tracks will ensure the orderly and efficient resolution of these Chapter 11 cases.

49

## VII.   MANAGEMENT OF OTHER CLAIMS

Two other types of claims that were pending as of the petition date need to be briefly addressed: the Libby, Montana property damage case; and, fraudulent conveyance claims arising from the 1996 Fresenius and the 1998 Sealed Air transactions.

### A.   Libby, Montana Property Damage Claims.

Grace operated the Zonolite Mountain vermiculite mine from 1963 (when Grace acquired the assets of Zonolite Company) until the closure of the mine in 1990. The mine is located 10 miles north of the town of Libby, Montana, where many of Grace's workers lived.

A putative class action was filed against Grace on February 22, 2000, seeking recovery for asbestos contamination damages caused to property owners within 12 miles of the Libby courthouse. (*Tennison v. W.R. Grace & Co.*, D. Mont., No. CV-00-36-M-DWM) No activity occurred in the case prior to the petition date.

There are two threshold questions that need to be answered before case management decisions can be made about these claims: (1) the identity of any property damage claimants; and (2) where, if at all, there is property contamination. The first question can be answered only by setting a bar date. The second question can be answered only after sampling has been performed and the test results analyzed.

EPA performed asbestos sampling in Libby in 1999 and 2000. However, the information disclosed by the Agency raises questions as to whether any widespread contamination of any third-party property has occurred at all. Of 35 locations sampled by EPA, only a few had detectable asbestos fibers in soil, dust, or air of the type found at the Libby mine.

EPA's on-scene coordinator concluded after analyzing these results that: "None of the results from the soil, insulation and dust samples point to obvious candidates for cleanup."[27]

The reported EPA sampling results thus underscore the need to determine first which particular properties are even contaminated.  Case management then can be addressed.

**B.      Fraudulent Conveyance Cases.**

Debtors described the Fresenius and Sealed Air transactions and the three fraudulent conveyance lawsuits in their motion for a preliminary injunction staying those lawsuits, which the Court granted on May 3, 2001.  Two initial case management questions were raised by these claims:  where should they proceed; and who should evaluate the merits of the claims and determine whether they should be pursued.

**1.      The Court should stay with its initial decision to litigate these cases in Delaware.**

Grace demonstrated in its preliminary injunction papers that courts have generally recognized that claims such as these that seek to recover assets of the estate should proceed in the "home court," where the bankruptcy cases reside.  *See, e.g., Bank of America v. Nickele*, 1998 WL 181827, at *5 (E.D. Pa. Apr. 16, 1998) ("A presumption has developed that civil proceedings should be tried in the "home" court, namely, the court where the bankruptcy case itself is pending."); *In re 1606 New Hampshire Ave. Assocs.*, 85 B.R. 298, 305 (Bankr. E.D. Pa. 1988) ("We are most reluctant to allow pieces to be severed from a case, requiring litigation in several jurisdictions, rather than the desired goal of 'centering' administration of an entire case in

---

[27] U.S. EPA Region 8 Press Releases, "Asbestos in Libby – EPA Action Update #3" (Jan. 31, 2000), and  "Asbestos in Libby – EPA Action Update #4" (March 20, 2000).

one jurisdiction."); *LTV Steel Company, Inc. v. Board of Education (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988) (The court where the bankruptcy is pending "should be the forum to decide whether a property is property of the estate.") .

Maintaining these claims in the home court is particularly important here for several reasons. The first is the alleged magnitude of the claims. The Property Damage Committee has asserted that these claims may be the most significant asset of the estates. While Debtors disagree with that assessment, the fact that it is being made demonstrates the importance of any such litigation remaining in this Court. The very fact that there is an issue about this matter means it will be difficult to reach a consensus with the Property Damage Committee about these claims until they are litigated.

Moreover, given the inter-relationship between the fraudulent conveyance claims and the asbestos liability issues, the claims are "interwoven" into the bankruptcy cases as a whole, as the Court recognized during the May 3rd hearing:

> What I would really like to see you do, and the purpose of me having you in is, you are probably going to be litigating in Delaware. And I have not made any decisions, but it's a bankruptcy case, they're interwoven.

(May 3, 2001 Hearing Transcript at 82)  The Debtors agree with the Court's assessment.

Finally, given the asserted importance of the fraudulent conveyance issues, questions of convenience should not be a factor in the selection of venue. But Delaware is in fact a convenient forum for the Debtors, Sealed Air, Fresenius and nearly all of the other parties. All of the defendants are headquartered and incorporated on the East Coast (except for one, a

52

German corporation), and all of the investment bankers, asbestos consultants and other professionals who advised on the transactions were based on the East Coast.

With the benefit of these considerations, the Court stated on May 3rd that:

> Unless there's some persuasive, convincing force or reason to send you around the world, you are probably here. And what you really ought to focus on is what you want decided and when you want to get to trial. It will make a lot more sense in the context of not only the litigation that's out there, but of the bankruptcy also.

*Id.* No such persuasive showing to transfer venue has been made. The fraudulent conveyance claims should stay here.

### 2.      Appointment of a representative plaintiff.

Assuming that the fraudulent conveyance claims remain with this Court, the next question to be resolved is who should be responsible for determining how to proceed with the claims. This issue was raised at a prior hearing. Debtors' position will be set forth in its response to the Property Damage Committee's motion to be appointed as the representative plaintiff for these claims.

53

## CONCLUSION

For the foregoing reasons, Debtors move the Court to enter the proposed case management order, establish an April 1, 2002 claims bar date, approve the proposed claim forms and approve the proposed notice program.

Dated: June 27, 2001

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet Baer
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones (#2436)
Hamid Rafatjoo (CA Bar No. 181564)
David W. Carickhoff, Jr. (#3715)
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (RJN) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## AFFIDAVIT OF SERVICE

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | )SS |
| COUNTY OF NEW CASTLE | ) |

Patricia E. Cuniff, being duly sworn according to law, deposes and says that she is

employed by the law firm of Pachulski, Stang, Ziehl, Young & Jones P.C., co-counsel for the

Debtors, in the above-captioned action, and that on the 27th day of June, 2001 she caused a copy

of the following document(s) to be served upon the attached service list(s) in the manner

indicated:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

1.    **Debtors' Memorandum in Support of Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve Claim Forms, and Motion to Approve Notice Program.**

Dated: June 27, 2001

_Patricia E. Cuniff_
Patricia E. Cuniff

Sworn to and subscribed before
me this 27th day of June, 2001

_____
Notary Public
My Commission Expires: _02/11/02_

W. R. Grace 2002 Service List
Case No. 01-1139 (RJN)
Doc. No. 22588
June 27, 2001
16 – Hand Delivery
07 – Overnight Delivery
120 – First Class Mail

(Counsel to Debtors and Debtors in
Possession)
Laura Davis Jones, Esquire
David Carickhoff, Esquire.
Pachulski, Stang, Ziehl, Young & Jones
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

(Counsel to Debtors and Debtors in
Possession)
Hamid R. Rafatjoo, Esquire
Pachulski, Stang, Ziehl, Young & Jones
10100 Santa Monica Boulevard, Suite 1100
Los Angeles, CA 90067-4100

*Hand Delivery*
(Copy Service)
Parcels, Inc.
Vito I. DiMaio
10th & King Streets
Wilmington, DE 19801

*Hand Delivery*
(Local Counsel to DIP Lender)
Steven M. Yoder, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

*Hand Delivery*
(Local Counsel to Asbestos Claimants)
William P. Bowden, Esquire
Matthew G. Zaleski, III, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

*Hand Delivery*
William H. Sudell, Jr., Esquire
Eric D. Schwartz, Esquire
Morris, Nichols Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

*Hand Delivery*
(Counsel for The Chase Manhattan Bank)
Mark D. Collins, Esquire
Deborah E. Spivack, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Hand Delivery*
Jeffrey C. Wisler, Esquire
Michelle McMahon, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market Street, 10th Floor
Wilmington, DE 19899

*Hand Delivery*
(Counsel for Ingersoll-Rand Fluid Products)
Francis A. Monaco, Jr., Esquire
Walsh, Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE 19801

*Hand Delivery*
(Counsel for Ingersoll-Rand Fluid Products)
Frederick B. Rosner, Esquire
Walsh, Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE  19801

*Hand Delivery*
(Counsel for Property Damage Claimants)
Michael B. Joseph, Esquire
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE  19899

*Hand Delivery*
Bruce E. Jameson, Esquire
Prickett, Jones & Elliott
1310 King Street
P.O. Box 1328
Wilmington, DE  19899

*Hand Delivery*
Mark S. Chehi
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899-0636

*Hand Delivery*
Joseph Grey, Esquire
Stevens & Lee
300 Delaware Avenue, Suite 800
Wilmington, DE  19801

*Hand Delivery*
(Counsel to Official Committee of
Unsecured Creditors)
Michael R. Lastowski, Esquire
Duane, Morris & Heckscher LLP
1100 North Market Street, Suite 1200
Wilmington, DE  19801-1246

*Hand Delivery*
Laurie Selber Silverstein, Esquire
Monica Leigh Loftin, Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899

*Hand Delivery*
Mary M. MaloneyHuss
Wolf, Block, Schorr and Solis-Cohen LLP
920 King Street, Suite 300
One Rodney Square
Wilmington, DE  19801

*Hand Delivery*
Selinda A. Melnik, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, DE  19899

*Overnight Delivery*
(Counsel to Debtor)
James H.M. Sprayregen, Esquire
James Kapp, III, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL  60601

*Overnight Delivery*
(United States Trustee)
Frank J. Perch, Esquire
Office of the United States Trustee
601 Walnut Street, Curtis Center,
Suite 950 West
Philadelphia, PA  19106

**Overnight Delivery**
(Canadian counsel for Debtor)
Derrick Tay, Esquire
Meighen Demers
P.O. Box 8705, Box 11, Merrill Lynch
Canada Tower
Sun Life Center, 200 Kint Street West
Toronto, Ontario M5H 3T4
CANADA

**Overnight Delivery**
(W. R. Grace & Co.)
David B. Siegel
W.R. Grace and Co.
7500 Grace Drive
Columbia, MD 21044

**Overnight Delivery**
(Official Committee of Personal Injury
Claimants)
Elihu Inselbuch, Esquire
Rita Tobin, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue, 36th Floor
New York, NY 10022

**Overnight Delivery**
(Official Committee of Unsecured
Creditors)
Lewis Kruger, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

**Overnight Delivery**
(Official Committee of Property Damage
Claimants)
Scott L. Baena, Esquire
Member
Bilzin Sumberg Dunn Baena Price &
Axelrod LLP
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL 33131

**First Class Mail**
(Counsel to Sealed Air Corporation)
D. J. Baker, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

**First Class Mail**
(Counsel to DIP Lender)
J. Douglas Bacon, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

**First Class Mail**
(Counsel to Asbestos Claimants)
Nancy Worth Davis, Esquire
Ness, Motley, Loadhold, Richardson &
Poole
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

**First Class Mail**
Todd Meyer, Esquire
Kilpatrick Stockton
1100 Peachtree Street
Atlanta, GA 30309

**First Class Mail**
Securities & Exchange Commission
15th & Pennsylvania Ave. N.W.
Washington, DC 20020

**First Class Mail**
District Director
IRS
409 Silverside Road
Wilmington, DE 19809

**First Class Mail**
Securities & Exchange Commission
Atlanta Regional Office
Branch/Reorganization
3475 Lenox Road, NE, Suite 100
Atlanta, GA 30326-1232

*First Class Mail*
Secretary of Treasurer
P.O. Box 7040
Dover, DE  19903

*First Class Mail*
Secretary of State
Division of Corporations
Franchise Tax
P.O. Box 7040
Dover, DE  19903

*First Class Mail*
James D. Freeman, Esquire
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street
Suite 945-North Tower
Denver, CO  80202

*First Class Mail*
Jon L. Heberling, Esquire
McGarvey, Heberling, Sullivan &
McGarvey PC
745 South Main Street
Kalispel, MT  59901

*First Class Mail*
Patrick L. Hughes, Esquire
Haynes & Boone LLP
1000 Louisiana Street, Suite 4300
Houston, TX  77002-5012

*First Class Mail*
David S. Heller, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL  60606

*First Class Mail*
Charles E. Boulbol, Esquire
26 Broadway, 17th Floor
New York, NY  10004

*First Class Mail*
Ira S. Greene, Esquire
Squadron, Ellenoff, Plesent & Sheinfeld,
LLP
551 Fifth Avenue
New York, NY  10176

*First Class Mail*
James A. Sylvester, Esquire
Intercat, Inc.
104 Union Avenue
Manasquan, NJ  08736

*First Class Mail*
Steven J. Johnson, Esquire
Gibson, Dunn & Crutcher LLP
1530 Page Mill Road
Palo Alto, CA  94304-1125

*First Class Mail*
Charlotte Klenke, Esquire
Schneider National, Inc.
P.O. Box 2545
3101 S. Packerland
Green Bay, WI  54306

*First Class Mail*
David S. Rosenbloom, Esquire
Jeffrey E. Stone, Esquire
Lewis S. Rosenbloom, Esquire
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL  60606-5096

*First Class Mail*
Brad Rogers, Esquire
Office of the General Counsel
Pension Benefit Guaranty Corp
1200 K. Street, N. W.
Washington, D.C.  20005-4026

*First Class Mail*
Pamela Zilly
Richard Shinder
David Blechman
Michael Alexander
The Blackstone Group
345 Park Avenue
New York, NY  10154

*First Class Mail*
Josiah Rotenberg
Lazard Freres & Co. LLC
30 Rockefeller Plaza, 60th
New York, NY  10020

*First Class Mail*
(Counsel for The Chase Manhattan)
Stephen H. Case, Esquire
Nancy L. Lazar, Esquire
David D. Tawil, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017

*First Class Mail*
Jan M. Hayden
William H. Patrick
Heller, Draper, Hayden, Patrick & Horn,
L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103

*First Class Mail*
Joseph F. Rice
Ness, Motley, Loadholt, Richardson &
Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465

*First Class Mail*
Nancy Worth Davis
Ness, Motley, Loadholt, Richardson &
Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465

*First Class Mail*
(Counsel for Asbestos Claimants)
Steven T. Baron, Esquire
Member
Silber Pearlman, LLP
2711 North Haskell Avenue, 5th Floor, LLP
Dallas, TX  75204

*First Class Mail*
Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA  31208-3708

*First Class Mail*
(Attorneys for PPG Industries, Inc.)
W.J. Winterstein, Jr., Esquire
John J. Winter, Esquire
William M. Aukamp, Esquire
Eleven Penn Center, 29th Floor
1835 Market Street
Philadelphia, PA  19103

*First Class Mail*
R. Scott Williams
PMG Capital Corp.
Four Falls Corporate Center
West Conshohocken, PA  19428-2961

*First Class Mail*
Alan R. Brayton, Esquire
Brayton & Purcell
222 Rush Landing Road
Novato, CA  94945

*First Class Mail*
Jonathan W. Young
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL  60606-1229

*First Class Mail*
Russell W. Budd
Alan B. Rich
Baron & Budd, P.C.
3102 Oak Lawn Avenue, P.O. Box 8705
Dallas, TX  75219

*First Class Mail*
Shelby A. Jordan, Esquire
Nathaniel Peter Holzer. Esquire
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX  78471

*First Class Mail*
Courtney M. Labson, Esquire
The Mills Corporation
Legal Department
1300 Wilson Boulevard, Suite 400
Arlington, VA  22209

*First Class Mail*
T. Kellan Grant
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL  60606-1229

*First Class Mail*
Cindy Schultz
Ingersoll-Rand Fluid Products
One Aro Center
P.O. Box 151
Bryan, OH  43506

*First Class Mail*
Alan Kolod, Esquire
Moses & Singer LLP
1301 Avenue of the Americas
40th Floor
New York, NY  10019-6076

*First Class Mail*
Mr. Thomas Moskie
Bankers Trust Company
Four Albany Street
Fourth Floor
New York, NY  10006

*First Class Mail*
John P. Dillman, Esquire
Linebarger Heard Goggan Blair
Graham Peña & Sampson, LLP
P.O. Box 3064
Houston, TX  77253-3064

*First Class Mail*
Charles E. Gibson, III
Attorney at Law
620 North Street, Suite 100
Jackson, MS  39202

*First Class Mail*
Paul M. Baisier, Esquire
SEYFARTH SHAW
1545 Peachtree Street
Suite 700
Atlanta, Georgia  30309

*First Class Mail*
Kevin D. McDonald
Wilshire Scott & Dyer, P.C.
One Houston Center
1221 McKinney, Suite 4550
Houston, Texas  77010

*First Class Mail*
Christopher Beard, Esquire
Beard & Beard
306 N. Market Street
Frederick, MD  21701

*First Class Mail*
Bernice Conn, Esquire
Robins, Kaplan, Miller & Ciresi LLP
2049 Century Park East, Suite 3700
Los Angeles, CA  90067

*First Class Mail*
Steven R. Schlesinger, Esquire
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, NY 11530

*First Class Mail*
Steven J. Kherkher, Esquire
Laurence G. Tien, Esquire
Williams Bailey Law Firm, L.L.P.
8441 Gulf Freeway, Suite #600
Houston, Texas 77017

*First Class Mail*
Kimberly W. Osenbaugh
Preston Gates & Ellis LLP
701-5th Avenue
Suite 5000
Seattle, WA 98104-7078

*First Class Mail*
Lewis T. LeClair, Esquire
McKool Smith
300 Crescent Court, Suite 1500
Dallas, Texas 75201

*First Class Mail*
Delta Chemical Corporation
2601 Cannery Avenue
Baltimore, MD 21226-1595

*First Class Mail*
Steven T. Hoort, Esquire
Ropes & Gray
One International Place
Boston, Massachusetts 02110-2624

*First Class Mail*
Peter Van N. Lockwood, Esquire
Julie W. Davis, Esquire
Trevor W. Swett, III, Esquire
Nathan D. Finch, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005

*First Class Mail*
Peter A. Chapman
24 Perdicaris Place
Trenton, NJ 08618

*First Class Mail*
Paul M. Matheny
The Law Offices of Peter G. Angelos, P.C.
5905 Harford Rd.
Baltimore, MD 21214

*First Class Mail*
Michael J. Urbis
Jordan, Hyden, Womble & Culbreth, P.C.
2390 Central Blvd, Suite G
Brownsville, TX 78520

*First Class Mail*
Mary A. Coventry
Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663

*First Class Mail*
Attn: Meridee Moore and Kirsten Lynch
Farallon Capital Management, L.L.C.
One Maritime Plaza
Suite 1325
San Francisco, California 94111

*First Class Mail*
John M. Klamann
Klamann & Hubbard
7101 College Blvd., Suite 120
Overland Park, KS 66210

*First Class Mail*
Joseph T. Kremer, Esquire
Lipsiptz, Green, Fahringer, Roll, Salisbury
& Cambria, LLP
42 Delaware Avenue, Suite 300
Buffalo, NY 14202

*First Class Mail*
Paul D. Henderson, Esquire
Dies, Dies & Henderson
1009 W. Green Avenue
Orange, TX  77630

*First Class Mail*
Robert Jacobs, Esquire
Maria Rosoff Eskin
Jacobs & Crumplar, P.A.
2 East 7th Street
P.O. Box 1271
Wilmington, DE  19899

*First Class Mail*
Elizabeth S. Kardos, Esquire
Gibbons, Del Deo, Dolan Griffinger &
Vecchione, PC
One Riverfront Plaza
Newark, NJ  07102-5497

*First Class Mail*
Thomas J. Noonan, Jr.
c/o R& S Liquidation Company
5 Lyons Mall PMB #530
Basking Ridge, NJ  07920-1928

*First Class Mail*
)
Harry Lee, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036

*First Class Mail*
(Counsel for Public Service Electric and Gas
Company)
William E. Frese, Esquire
Attn:  Sheree L. Kelly, Esquire
80 Park Plaza, T5D
P.O. Box 570
Newark, NJ  07101

*First Class Mail*
(Counsel to Official Committee of
Unsecured Creditors)
William S. Katchen, Esquire
Duane, Morris & Heckscher LLP
1 Riverfront Plaza, 2nd Floor
Newark, NJ  07102

*First Class Mail*
(Tennessee Department of Environment and
Conservation – Superfund)
Paul G. Sumers, Esquire
TN Attorney General's Office, Bankr. Unit
P.O. Box 20207
Nashville, TN  37202-0207

*First Class Mail*
(Counsel for numerous asbestos claimants)
Damon J. Chargois, Esquire
Foster & Sear, L.L.P.
360 Place Office Park
1201 N. Watson Road, Suite 145
Arlington, TX  76006

*First Class Mail*
(Counsel for Berry & Berry)
C. Randall Bupp, Esquire
Plastiras & Terrizzi
24 Professional Center Parkway
Suite 150
San Rafael, CA  94903

*First Class Mail*
Anton Volovsek
Rt2 – Box 200 #42
Kamiah, Idah  83536-9229

*First Class Mail*
Peter S. Goodman, Esquire
Andrews & Kurth LLP
805 Third Avenue
New York, New York  10022

*First Class Mail*
Jonathan H. Alden, Esquire
Assistant General Counsel
3900 Commonwealth Boulevard, MS 35
Tallahassee, Floria  32399-3000

*First Class Mail*
Credit Lyonnais
1301 Avenue of the Americas
New York, New York  10019-0602

*First Class Mail*
State Library of Ohio
c/o Michelle T. Sutter
Revenue Recovery
101 E. Town Street, Second Floor
Columbus, OH  43215

*First Class Mail*
Rosa Dominy
Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA  31208-3708

*First Class Mail*
Robert Jacobs, Esquire
Jacobs & Crumplar, P.A.
2 East 7th Street
P.O. Box 1271
Wilmington, DE  19899

*First Class Mail*
Greif Bros. Corp.
250 East Wilson Bridge Rd.
Suite 175
Worthington, OH  4308

*First Class Mail*
(Counsel for SAP America, Inc.)
Stephanie Nolan Deviney
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ  08108

*First Class Mail*
Barbara M. Cook, County Solicitor
Katherine L. Taylor, Senior Assistant
County Solicitor
Howard County Office of Law
George Howard Building
3430 Courthouse Drive
Ellicott City, Maryland  21043

*First Class Mail*
Danice Sims
P.O. Box 66658
Baton Rouge, Louisiana  70896

*First Class Mail*
M. Diane Jasinski, Esquire
Michael D. Hess
Corporation Counsel of the City of New
York
100 Church Street, Room 6-127
New York, New York  10007

*First Class Mail*
Janet Napolitano
Robert R. Hall
Russell W. Savory
1275 West Washington Street
Phoenix, Arizona  85007-1278

*First Class Mail*
Russell W. Savory
Gotten, Wilson & Savory, PLLC
200 Jefferson Avenue, Suite 900
Memphis, Tennessee  38103

*First Class Mail*
Credit Manager
Belz Enterprises
100 Peabody Place, Suite 1400
Memphis, Tennessee  38103

*First Class Mail*
James P. Ruggeri
Scott A. Shail
Hogan & Harton L.L.P.
555 Thirteenth Street,.N.W.
Washington, D.C. 20004-1109

*First Class Mail*
Steven R. Bourne, Esquire
Nutter, McClennen & Fish, LLP
One International Place
Boston, MA 02110-2699

*First Class Mail*
Judy D. Thompson, Esquire
S. Andrew Jurs, Esquire
Poyner & Spruill, L.L.P.
100 North Tryon Street, Suite 4000
Charlotte, North Carolina 28202-4010

*First Class Mail*
Daniel H. Slate, Esquire
Hughes Hubbard & Reed LLP
350 South Grand Avenue
Los Angeles, CA 90071-3442

*First Class Mail*
Andrea L. Hazzard, Esquire
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482

*First Class Mail*
Mr. James A. Bane
KMCC 204029
P.O. Box 710
Keen Mountain, VA 24624

*First Class Mail*
Authur Stein, Esquire
1041 W. Lacey Road
P.O. Box 1070
Forked River, NJ 08731-6070

*First Class Mail*
Robert H. Rosenbaum, Esquire
M. Evan Meyers, Esquire
Meyers, Rodbell & Rosenbaum, P.A.
Berkshire Building
6801 Kenilworth Avenue, Suite 400
Riverdale, Maryland 20737-1385

*First Class Mail*
Maggie De La Rosa
Provost * Umphrey
Law Firm, L.L.P.
490 Park Street
Beaumont, Texas 77701

*First Class Mail*
Anne Marie P. Kelley, Esquire
Dilworth Paxson, LLP
LibertyView – Suite 700
457 Haddonfield Road
P.O. Box 2570
Cherry Hill, NJ 08034

*First Class Mail*
Richard M. Meth, Esquire
Herrick, Feinstein LLP
2 Penn Plaza, 11th Floor
Newark, New Jersey 07105

*First Class Mail*
Kevin James
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612-1413

*First Class Mail*
Dorine Vork, Esquire
Stibbe, P.C.
350 Park Avenue
New York, New York 10022

*First Class Mail*
Suexirda Prayaga
7365 MacLeod Lane
Ofallon, Missouri 63366

*First Class Mail*
Bart Hartman
Treasurer – Tax Collector
Attn: Elizabeth Molina
1600 Pacific Highway, Room 162
San Diego, CA 92101

*First Class Mail*
Shelley Bethea Gillette & Clark
3850 E. Baseline Road, Suite 125
Mesa, Arizona 85206

*First Class Mail*
David Aelvoet, Esquire
Linebargerheard Goggan Blair
Graham Pena & Sampson LLP
1000 Tower Life Building
San Antonio, TX 78205

*First Class Mail*
Robert Cimino, Esquire
Suffolk County Attorney
Attn: Diane Leonardo Beckmann, Asst.
County
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788-0099

*First Class Mail*
David Balsley, Jr.
535 Smithfield Street, Suite 619
Pittsburg, PA 15222-2302

*First Class Mail*
Robert T. Aulgur, Jr., Esquire
P.O. Box 617
Odessa, DE 19730
(Attorney for Toyota Motor Credit)

*First Class Mail*
James S. Carr, Esquire
Christena A. Lambrianakos, Esquire
101 Park Avenue
New York, NY 10178
(Counsel for Delco Development Company)

*First Class Mail*
Michael T. Kay, Esquire
Nancy Draves, Esquire
The Dow Chemical Company
2030 Dow Center
Midland, MI 48674
(Counsel for Dow Chemical Company,
Hampshire Chemical Corporation and Union
Carbide Corporation)

*First Class Mail*
Anne Marie P. Kelley, Esquire
Dilworth Paxson, LLP
Liberty View – Suite 700
457 Haddonfield Road
Cherry Hill, New Jersey 08002

*First Class Mail*
Ronald S. Beacher, Esquire
Pitney, Hardin, Kipp & Szuch LLP
711 Third Avenue, 20th Floor
New York, New York 10017-4014
(Attorneys for General Electric Capital
Corporation)

*First Class Mail*
Attn: Diane Stewart
Peoples First Community Bank
P.O. Box 59950
Panama City, Florida 32412-0950

*First Class Mail*
Michael B. Willey, Esquire
Legal Services, 27th Floor
312 8th Avenue North
Nashville, Tennessee 37243
(Counsel for Commissioner of Revenue)

*First Class Mail*
Jeffrey L. Glatzer, Esquire
Anderson, Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York 10020-1182

*First Class Mail*
Thomas V. Askounis, Esquire
Askounis & Borst, P.C.
303 East Wacker Drive
Suite 1000
Chicago, IL  60601

*First Class Mail*
Attn: Ted Weschler
Peninsula Capital Advisors, L.L.C.
404 East Main Street
Second Floor
Charlottesville, VA  22902

*First Class Mail*
E. Katherine Wells, Esquire
South Carolina Department of Health and
Environmental Control
2600 Bull Street
Columbia, South Carolina  29201-1708

*First Class Mail*
Jeffrey Kaufman, Esquire
Gerald F. Ellesdorfer, Esquire
Kaufman & Logan LLP
111 Pine Street, Suite 1300
San Francisco, CA  94111

*First Class Mail*
Michael H. Pinkerson, Esquire
James M. Garner, Esquire
Sher Garner Cahill Richter Klein McAlister
& Hilbert, L.L.C.
909 Poydras Street, Suite 2800
New Orleans, LA  70112

*First Class Mail*
William H. Johnson, Esquire
Norfolk Southern Corporation
Law Department
Three Commercial Place
Norfolk, VA  23510-9242

*First Class Mail*
Pillsbury Winthrop LLP
Lynn M. Ryan, Esquire
One Battery Park Plaza
New York, NY  10004-1490
(Counsel for Wells Fargo Bank Minnesota,
National Association)

*First Class Mail*
Pillsbury Winthrop LLP
Craig Barbarosh, Esquire
650 Town Center Drive, 7th Floor
Costa Mesa, CA  92626-7122
(Counsel for Wells Fargo Bank Minnesota,
National Association)