# EXHIBIT A

1 | Marc Toberoff (CA State Bar No. 188547)
*mtoberoff@toberoffandassociates.com*
2 | Douglas Fretty (CA State Bar No. 279829)
*dfretty@toberoffandassociates.com*
3 | TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
4 | Malibu, CA 90265
Telephone: (310) 246-3333
5 | Facsimile: (310) 246-3101

6 | Attorneys for Plaintiff Lesia Anson

7 | **UNITED STATES DISTRICT COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA**

9 |

| | |
|---|---|
| LESIA ANSON, an individual, | Case No.: 2:17-cv-08360-GW (KSx) |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | [1] COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 101 *ET SEQ.*); |
| HARVEY WEINSTEIN, BOB WEINSTEIN, THE WEINSTEIN COMPANY, LLC, a limited liability company; DIMENSION FILMS, a corporation, MIRAMAX, LLC, a limited liability company, LIONSGATE ENTERTAINMENT CORPORATION, ENTERTAINMENT ONE LTD., a Canadian corporation, BLUMHOUSE PRODUCTIONS, LLC, a Delaware limited liability company, and DOES 1 through 10, inclusive, | [2] CONTRIBUTORY COPYRIGHT INFRINGEMENT; [3] VICARIOUS COPYRIGHT INFRINGEMENT; [4] COPYRIGHT INFRINGEMENT (CANADA); [5] COPYRIGHT INFRINGEMENT (SPAIN); [6] VIOLATION OF LANHAM ACT (15 U.S.C. § 1125(a)(1)(B)); [7] VIOLATION OF CALIFORNIA BUS. AND PROF'L CODE §§ 17200 *ET SEQ.* and 17500 *ET SEQ*; and CALIFORNIA COMMON LAW UNFAIR COMPETITION; and |
| Defendants. | [8] DECLARATORTY RELIEF (28 U.S.C. § 2201). |
| | <u>DEMAND FOR JURY TRIAL</u> |

FIRST AMENDED COMPLAINT

1    Plaintiff LESIA ANSON (hereinafter, the "Plaintiff"), by and through her

2 attorney of record, hereby alleges as follows:

3    **JURISDICTION AND VENUE**

4    1.    This is a civil action for copyright infringement and injunctive

5 relief under the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.*

6 (hereinafter, "the Copyright Act"), for unfair competition under the Lanham Act,

7 15 U.S.C. § 1125(a), for declaratory relief under the Declaratory Judgment Act,

8 28 U.S.C. § 2201, and related state law claims.

9    2.    This Court has original subject matter jurisdiction over the claims

10 set forth in this complaint pursuant to the Copyright Act, 17 U.S.C. § 101 *et*

11 *seq.*, 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b), and the Declaratory

12 Judgment Act, 28 U.S.C.§ 2201.

13    3.    This Court has supplemental jurisdiction over the related state

14 claims herein pursuant to 28 U.S.C. § 1367 (a) in that these claims form part of

15 the same case and controversy as the federal claims herein.

16    4.    This Court has personal jurisdiction over the defendants in that

17 defendants are regularly doing business in the State of California and in this

18 District, and because a substantial portion of the relevant acts complained of

19 herein occurred in the State of California and in this District.

20    5.    Venue is proper in the United States District Court for the Central

21 District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a)

22 because the wrongful acts that give rise to the claims herein below occurred in

23 this District and because defendants THE WEINSTEIN COMPANY,

24 DIMENSION FILMS, MIRAMAX, LLC, LIONSGATE ENTERTAINMENT

25 CORPORATION, ENTERTAINMENT ONE LTD., and BLUMHOUSE

26 PRODUCTIONS, LLC (hereinafter collectively, the "Defendants"), have places

27 of business or maintain offices in this District.

28

## NATURE OF THE ACTION

6.    Plaintiff LESIA ANSON is the widow and heir of Jay Anson (hereinafter, the "Author"), author of the best-selling fictional novel The Amityville Horror (hereinafter, the "Novel"), and she is the proprietor of the copyright in the Novel.

7.    Defendants THE WEINSTEIN COMPANY and DIMENSION FILMS are very tightly controlled by the brothers HARVEY WEINSTEIN and BOB WEINSTEIN, as was MIRAMAX previously. These are sophisticated entertainment companies whose core businesses are based on the value, exploitation and enforcement of copyrights.

8.    This case arises out of Defendants' unlawful production and recent release of a theatrical sequel motion picture entitled *Amityville: The Awakening* (formerly known as *The Amityville Horror: The Lost Tapes*) – a work clearly derived from the Novel, and promoted by Defendants as *a sequel* to the successful 1979 and 2005 films, entitled *The Amityville Horror,* based on the Novel.

9.    In fact, the WEINSTEINS previously co-financed and co-distributed *The Amityville Horror* (2005), and, as such, were intimately familiar with the Novel and the film franchise it launched. Yet so brazen and unbridled were the WEINSTEINS' desire to hijack the Novel and franchise that they never even attempted to license from Plaintiff the requisite underlying rights, a license they could well have afforded. To make matters worse, the *Amityville Horror* sequel film they illegally produced was of such poor quality, and consequently performed so miserably at the box office, that it substantially damaged the value of Plaintiff's intellectual property. Evidently, HARVEY and BOB WEINSTEIN believe they are perched above the law, and can willfully misappropriate another's property with impunity. As this case will demonstrate, they are soundly mistaken.

**PARTIES**

1

2     10.   Plaintiff LESIA ANSON is an individual and citizen of, and resides

3 in, the State of Florida, in the County of Alachua, and is and at all times has

4 been a citizen of the United States.

5     11.   Plaintiff is informed and believes and based thereon alleges that

6 Defendant THE WEINSTEIN COMPANY LLC (hereinafter "TWC") is a

7 limited liability company organized and existing under the laws of the State of

8 Delaware, which has its corporate headquarters in the State of New York, and

9 which regularly conducts significant ongoing business in the State of California

10 and in the County of Los Angeles.

11     12.   Plaintiff is informed and believes and based thereon alleges that

12 Defendant DIMENSION FILMS (hereinafter "DIMENSION") is a division of

13 Defendant TWC, which has its corporate headquarters in the State of New York,

14 and which regularly conducts significant ongoing business in the State of

15 California and in the County of Los Angeles, and that DIMENSION is a wholly-

16 owned division of Defendant TWC.

17     13.   Plaintiff is informed and believes and based thereon alleges that

18 Defendant MIRAMAX, LLC (hereinafter "MIRAMAX") is a limited liability

19 company organized and existing under the laws of the State of Delaware, which

20 has its principal place of business in the State of California and in the County of

21 Los Angeles, and that MIRAMAX was previously owned and controlled by

22 HARVEY WEINSTEIN and BOB WEINSTEIN.

23     14.   Plaintiff is informed and believes and based thereon alleges that

24 Defendant HARVEY WEINSTEIN is an individual and citizen of, and resides in

25 the State of New York, and is and at all times has been a citizen of the United

26 States. Plaintiff is further informed and believes and based thereon alleges that

27 HARVEY WEINSTEIN regularly conducts significant ongoing business in the

28 State of California and in the County of Los Angeles. Plaintiff is further

1  informed and believes and based thereon alleges that HARVEY WEINSTEIN is
2  a founder, principal and co-owner of Defendants TWC and DIMENSION, and
3  was the founder, and previously, a principal and an owner of Defendant
4  MIRAMAX.
5      15.   Plaintiff is informed and believes and based thereon alleges that
6  Defendant BOB WEINSTEIN is an individual and citizen of, and resides in the
7  State of New York, and is and at all times has been a citizen of the United
8  States.  BOB WEINSTEIN is the brother of HARVEY WEINSTEIN, and for
9  decades, and at all times relevant hereto, was HARVEY WEINSTEIN'S close
10 business partner.  Plaintiff is further informed and believes and based thereon
11 alleges that BOB WEINSTEIN, like HARVEY WEINSTEIN, regularly
12 conducts significant ongoing business in the State of California and in the
13 County of Los Angeles. Plaintiff is further informed and believes and based
14 thereon alleges that BOB WEINSTEIN is a co-founder, co-principal and co-
15 owner of Defendants TWC and DIMENSION, and was the co-founder, and
16 previously, the co-principal and co-owner of Defendant MIRAMAX.
17     16.   Plaintiff is informed and believes and based thereon alleges that at
18 all time relevant hereto Defendants HARVEY WEINSTEIN and his brother
19 BOB WEINSTEIN (hereinafter collectively, the WEINSTEINS) closely owned
20 and controlled TWC and DIMENSION, and that all significant business and
21 legal affairs of TWC and DIMENSION, regarding the subject matter of this
22 action were knowingly made, determined and substantially controlled by the
23 WEINSTEINS personally.
24     17.   Plaintiff is informed and believes and based thereon alleges that
25 Defendants TWC, DIMENSION, HARVEY WEINSTEIN and BOB
26 WEINSTEIN are, and at all times material hereto were, the alter-egos of each
27 other and there exists and has existed at all times material hereto a unity of
28 interest and ownership among such Defendants such that any separateness has

1  ceased to exist in that Defendants, and/or each of them, used assets of the other

2  Defendants, and/or each of them, for its and/or their separate, individual

3  purposes, and caused valuable assets, property, rights and/or interests to be

4  transferred to each other without adequate consideration.

5       18.   Plaintiff is informed and believes and based thereon alleges that at

6  all times relevant hereto Defendant Lions Gate Entertainment Corporation d.b.a.

7  Lionsgate (hereinafter, "LIONSGATE") is an American, Canadian domiciled

8  company formed in Vancouver, British Columbia, and has its principal place of

9  business in the State of California and in the County of Los Angeles.

10      19.   Plaintiff is informed and believes and based thereon alleges that at

11  all times relevant hereto Defendant Entertainment One Ltd. (hereinafter,

12  "ENTERTAINMENT ONE") is a Canadian distributor based in Toronto,

13  Canada which does ongoing business in the State of California and in the

14  County of Los Angeles.

15      20.   Plaintiff is informed and believes and based thereon alleges that at

16  all times relevant hereto Defendant Blumhouse Productions, LLC (hereinafter,

17  "BLUMHOUSE") is a limited liability company organized and existing under

18  the laws of the State of Delaware, which has its corporate headquarters in the

19  State of California and in the County of Los Angeles.

20      21.   Plaintiff is informed and believes and based thereon alleges that the

21  fictitiously named Defendants captioned hereinabove as Does 1 through 10,

22  inclusive, and each of them (hereinafter "DOE(S)") were in some manner

23  responsible or legally liable for the actions, damages, events, transactions and

24  circumstances alleged herein.  The true names and capacities of such fictitiously

25  named defendants, whether individual, corporate, associate, or otherwise are

26  presently unknown to Plaintiff, and Plaintiff will amend this Complaint to assert

27  the true names and capacities of such fictitiously named Defendants when the

28  same have been ascertained.  For convenience, each reference herein to a named

1  Defendant or to Defendants shall also refer to the Doe Defendants and each of

2  them.

3      22.    Plaintiff is informed and believes and based thereon alleges that

4  each of the Defendants was the agent, partner, servant, employee, or employer of

5  each of the other Defendants herein, and that at all times herein mentioned, each

6  of the Defendants was acting within the course and scope of such employment,

7  partnership and/or agency and that each of the Defendants is jointly and

8  severally responsible for the damages hereinafter alleged.

9              **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

10      23.    Plaintiff LESIA ANSON is the widow and heir of Jay Anson

11  (hereinafter, the "Author") the author of the world-famous novel, <u>The</u>

12  <u>Amityville Horror</u> (hereinafter, the "Novel"). Although marketed as "A True

13  Story," the Novel is clearly a work of fiction, replete with fantastic literary

14  creations (*e.g.*, room(s) which are the sources of evil, ceilings and walls oozing

15  green slime, plagues of flies in the dead of winter, demonic possessions, people

16  levitating and floating away, a young woman transformed into a toothless old

17  hag and then back to her natural state, a child talking to the supernatural spirit

18  form of an enormous flying pig with red eyes, etc.)

19      24.    The Novel was registered for copyright on July 29, 1977

20  (Registration number A00000883095) and was first published on or about

21  September 13, 1977.  The Author died on March 12, 1980. Subsequent to the

22  Author's death, the copyright to the Novel was duly renewed by Plaintiff, as the

23  Author's widow, on December 23, 2004 (Registration number RE0000925090).

24  Attached hereto as Exhibit "A" is a true and correct copy of Plaintiff's renewal

25  registration certificate from United States Copyright Office for the Novel.

26      25.    In 1979 a theatrical feature-length motion picture entitled *The*

27  *Amityville Horror* based upon and derived from duly licensed rights in the Novel

28  (hereinafter, the "1979 Amityville Horror Film") was produced by Professional

1    Films, Inc. ("PFI") and distributed by American International Pictures ("AIP").

2         26.    In 2005 a theatrical feature-length motion picture remake, based

3    upon and derived from the Novel and the 1979 Amityville Horror Film, also

4    entitled *The Amityville Horror* (hereinafter, the "2005 Amityville Horror Film")

5    was co-produced, co-financed and co-distributed by Defendant DIMENSION

6    and MGM (MGM was purportedly the successor to PFI and AIP) (the derivative

7    1979 Amityville Horror Film and 2005 Amityville Horror Film are hereinafter

8    collectively, the "Derivative Amityville Horror Films").

9         27.    Plaintiff is informed and believes and based thereon alleges that in

10    or about 2005, DIMENSION was used as a label within MIRAMAX to produce

11    and release genre films like the 2005 Amityville Horror Film; that in or about

12    1993, MIRAMAX had been purchased by the Walt Disney Company

13    ("Disney"), and that the WEINSTEINS continued to operate MIRAMAX until

14    they left the company on or about September 30, 2005.

15         28.    Plaintiff is informed and believes and based thereon alleges that

16    under the terms of the WEINSTEINS' departure from Disney they took

17    Defendant DIMENSION with them and made it a wholly-owned division of

18    Defendant TWC, but that DIMENSION'S interests in all films which it had been

19    produced or released prior to October 1, 2005, including the 2005 Amityville

20    Horror Film, remained the property of Defendant MIRAMAX.

21         29.    Plaintiff is informed and believes and based thereon alleges that on

22    or about December 3, 2010 MIRAMAX was sold by Disney to Filmyard

23    Holdings, a joint venture of Colony Capital, Tutor-Saliba Corporation, and the

24    Qatar Investment Authority; and that on or about March 2, 2016, MIRAMAX

25    was sold to beIN Media Group, a Qatari entertainment company owned by Al

26    Jazeera Media Network.

27         30.    On or about September 27, 2017, Defendants TWC and

28    DIMENSION announced their release of a feature-length motion picture entitled

1  *Amityville: The Awakening* written and directed by Frank Khalfoun (hereinafter,

2  the "2017 Amityville Horror Sequel Film"). Thereafter, the 2017 Amityville

3  Horror Sequel Film was streamed on Google Play from October 12 to November

4  8, 2017, and released in theatres on October 28, 2017.

5      31.    Plaintiff is informed and believes and based thereon alleges that the

6  2017 Amityville Horror Sequel Film is scheduled to be released by Defendant

7  LIONSGATE in Blu-Ray, DVD and digital HD on November 14, 2017.

8      32.    After its theatrical bow on October 28, 2018, the 2017 Amityville

9  Horror Sequel Film was widely reported to be "a sequel to the 1979's The

10  Amityville Horror"; "a reboot of the classic 1979 original movie 'The

11  Amityville Horror'"; "a direct sequel to The Amityville Horror – the 1979 horror

12  [film]" etc., just as the WEINSTEINS, TWC and DIMENSION had intended

13  and promoted it, and, on information and belief, none of the Defendants took

14  any action to correct this intended public impression.

15      33.    The 2017 Amityville Horror Sequel Film is a cinematic mess and

16  received dreadful reviews (*e.g.*, a "squashed green tomato" and 20% score on

17  *Rotten Tomatoes*).

18      34.    Plaintiff is informed and believes and based thereon alleges that

19  Defendants' botched 2017 Amityville Horror Sequel Film suffered  one of the

20  worst opening weekends of all time, grossing only $742 from 10 theaters or an

21  average of $74 per theater.

22      35.    Plaintiff is informed and believes and based thereon alleges that in

23  or about 2011, DIMENSION and MIRAMAX had entered into a pact to produce

24  and distribute sequel motion pictures derived from MIRAMAX'S better-known

25  films, like the 2005 Amityville Horror Film; that the 2017 Amityville Horror

26  Sequel Film was developed pursuant this and that a prior iteration of this

27  intended sequel was entitled *The Amityville Horror: The Lost Tapes*.

28      36.    Plaintiff is informed and believes and based thereon alleges that the

1 | credited production companies of the 2017 Amityville Horror Sequel Film

2 | include Defendants DIMENSION and MIRAMAX, the same parties -- currently

3 | or previously owned by the WEINSTEINS -- that were involved in the 2005

4 | Amityville Horror Film based upon the Novel, and that the sequel film is

5 | distributed by Defendants TWC and/or DIMENSION.

6 |     37.    Defendant BLUMHOUSE is an additional credited production

7 | company of the 2017 Amityville Horror Sequel Film.  Plaintiff is informed and

8 | believes that BLUMHOUSE co-produced the 2017 Amityville Horror Sequel

9 | Film in collaboration with the WEINSTEINS, TWC, DIMENSION, and

10 | MIRAMAX and in that capacity participated in the development, production,

11 | marketing, and distribution of the film.

12 |     38.    Plaintiff is informed and believes and based thereon alleges that

13 | DIMENSION'S principal BOB WEINSTEIN, having directly participated in the

14 | 2005 Amityville Horror Film, announced during the Cannes Film Festival in a

15 | press release regarding its planned The Amityville Horror sequel film that "[w]e

16 | are thrilled to return to the mythology of The Amityville Horror with a new and

17 | terrifying vision that will satisfy our existing fans … ," and that a producer of

18 | the intended The Amityville Horror sequel film employed by DIMENSION

19 | added: "I'm thrilled to be working with Bob to reinvent one of the all-time great

20 | horror franchises … ."

21 |     39.    Plaintiff is informed and believes and based thereon alleges that

22 | based on the WEINSTEINS' and DIMENSION'S press releases, promotion and

23 | advertising of their new Amityville Horror film, the 2017 Amityville Horror

24 | Sequel Film was widely anticipated and considered to be, both within and

25 | outside the entertainment industry as *a sequel* to their 2005 Amityville Horror

26 | Film as specifically intended by the WEINSTEINS and a continuation of the

27 | film franchise derived from the Novel. Plaintiff is further informed and believes

28 | and based thereon alleges that for instance, and without limitation, TWC /

1  DIMENSION'S Canadian licensee Defendant ENTERTAINMENT ONE falsely

2  promoted the 2017 Amityville Horror Sequel Film as "a revival of the popular

3  franchise" promulgating misrepresentations by the WEINSTEINS, TWC and

4  DIMENSION.

5       40.    Plaintiff is further informed and believes and based thereon alleges

6  that Defendants TWC, DIMENSION, and/or BLUMHOUSE own the foreign

7  distribution rights to the 2017 Amityville Horror Sequel Film and intend to

8  distribute this film in all foreign territories outside the United States, including

9  Canada and Spain, and that they have concluded and/or are in the process of

10  entering into purported licenses with third parties to do so.

11       41.    Plaintiff is informed and believes and thereon alleges that

12  Defendants DIMENSION, TWC, and BLUMHOUSE intend to exploit ancillary

13  products (*e.g.*, merchandising and publications) derived from the 2017

14  Amityville Horror Sequel Film, and thus, the Novel, without Plaintiff's

15  permission, and that they have concluded and/or are in the process of entering

16  into licenses with third parties to do so.

17       42.    The title of the 2017 Amityville Horror Sequel Film, *AMITYILLE-

18  THE AWAKENING*, clearly evokes a *sequel* motion picture; *i.e.*, the

19  reawakening of the house, and the supernatural evil forces that reside therein,

20  depicted in the Novel and Derivative Amityville Horror Films.  Plaintiff is

21  informed and believes that due to Defendants' press releases and promotion of

22  the 2017 Amityville Horror Sequel Film, it is and will continue to be perceived

23  both by members of the entertainment business and the general public as a

24  legitimate sequel to the Derivative Amityville Horror Films based on the Novel.

25       43.    The 2017 Amityville Horror Sequel Film, like Defendants' 2005

26  Amityville Horror Film is substantially similar to the Novel and contains

27  substantially similar literary elements to those of the Novel, as further shown

28  below. As such, Defendants' exploitation of their 2017 Amityville Horror

1  Sequel Film and ancillary rights and products knowingly exploits and infringes
2  Plaintiff's copyright in the Novel, including Plaintiff's motion picture rights in
3  the Novel, including sequel motion picture rights, merchandising rights in the
4  Novel, and Plaintiff's right under copyright to authorize derivative works based
5  upon the Novel.

6      44.   Defendants TWC, DIMENSION and LIONSGATE also widely
7  distributed various promotional trailers (hereinafter, the "Trailer(s)") for their
8  2017 Amityville Horror Sequel Film which likewise infringed and continue to
9  infringe Plaintiff's copyright in the Novel. One Trailer even conspicuously
10  features the Novel, clipped from the 2017 Amityville Horror Sequel Film, with
11  "THE AMITYVILLE HORROR by Jay Anson", prominently displayed on its
12  cover.

13      45.   Plaintiff is informed and believes and based thereon alleges that
14  Defendants, having produced, co-financed and co-distributed the 2005
15  Amityville Horror Film based upon the Novel, were very well acquainted with
16  the Novel and knew or should have known that their 2017 Amityville Horror
17  Sequel Film qualified as a derivative work of the Novel, and exploited many of
18  the Novel's protected literary elements. Yet at no time prior to producing their
19  2017 Amityville Horror Sequel Film did Defendants TWC, DIMENSION,
20  MIRAMAX or BLUMHOUSE contact Plaintiff to license, or even inquire as to
21  the status of sequel motion picture and ancillary rights to the Novel.

22      46.   On October 10, 2017, Plaintiff's counsel sent Defendants a written
23  cease and desist letter placing Defendants on further written notice of what was
24  already abundantly clear to them – they lacked the proper chain-of-title and
25  authority to exploit the 2017 Amityville Horror Sequel Film because they lacked
26  the requisite rights to the Novel from which their sequel film was obviously
27  derived. Defendants nonetheless blithely proceeded with their plans to release
28  and distribute the 2017 Amityville Horror Sequel Film without the underlying

1    rights to do so.

2        47.    Defendants clearly had access to the original Novel. In fact, both

3    their shooting script for the infringing 2017 Amityville Horror Sequel Film and

4    the film itself includes numerous direct references to the Novel including

5    characters reviewing the Novel and discussing its contents, as shown in more

6    detail below.

7        48.    The 2017 Amityville Horror Sequel Film makes express references

8    to the Novel and the Derivative Amityville Horror Films. For instance, as the

9    lead protagonist watches the 1979 Amityville Horror Film with her school

10    friends, scenes in that film derived from the Novel are shown. The derivative

11    2005 Amityville Horror Film is also mentioned and its DVD cover bearing the

12    title THE AMITYVILLE HORROR is shown. The 2017 Amityville Horror

13    Sequel Film displays the Novel and its cover, with the title THE AMITYVILLE

14    HORROR" imposed on the house's now iconic "face" with half-moon windows,

15    and the name of the Novel's sole Author, "Jay Anson," prominently displayed.

16          **Overwhelming Similarities Between the Novel and the**

17              **2017 Amityville Horror Sequel Film**

18        49.    Numerous elements from Defendants' 2017 Amityville Horror

19    Sequel Film, from beginning to end, including without limitation the characters,

20    relationships, themes, setting, story, plot devices, and the interplay and

21    sequencing of these elements, are substantially similar to and derived from

22    original elements in the Novel that are copyright protectable.

23        50.    Even the most cursory review of the 2017 Amityville Horror Sequel

24    Film reveals glaring and substantial similarities to the Novel.  Set forth below

25    are some of the more obvious similarities.

26    | **The Amityville Horror Novel** | **The 2017 Amityville Horror** |
      | --- | --- |
27    |  | **Sequel Film** |
28    | A. The title of the Novel is <u>The</u> | The film was originally entitled |

| | |
|---|---|
| Amityville Horror, as was the title of the derivative 1979 film and the title of the derivative 2005 film, in which Defendants WEINSTEINS, DIMENSION and MIRAMAX all participated. | The Amityville Horror: The Lost Tapes, and then Amityville: The Awakening; itself suggesting a derivative sequel to the Novel and the Derivative Amityville Horror Films. |
| B. Documentary or forensic framing of the story at the beginning and end of the Novel. | Documentary or forensic framing of the story at the beginning and end of the 2017 Amityville Horror Sequel Film. |
| C. The prologue to the Novel starts with documentary-style television news footage describing how, in November 1974, Ronald DeFeo had taken a high-powered rifle and methodically shot to death his entire family at 112 Ocean Avenue in Amityville, New York (hereinafter the "DeFeo Murders"). | The prologue to the 2017 Amityville Horror Sequel Film consists of documentary-style television news footage describing how, in November 1974, Ronald DeFeo had taken a high-powered gun and methodically shot to death his entire family at 112 Ocean Avenue in Amityville, New York. |
| D. The setting is the same house at 112 Ocean Avenue in Amityville, with the now iconic half-moon quarter windows that make the house look like a face, and when illuminated at night, like a | The setting is the same house at 112 Ocean Avenue in Amityville. Although the actual house has not had the iconic half-moon quarter windows in decades, and the 2017 Amityville Horror Sequel Film |

FIRST AMENDED COMPLAINT

14

| | | |
|---|---|---|
| 1 | Halloween "pumpkin face" – The | takes place in the present, its house |
| 2 | Amityville Horror house. | includes and emphasizes the half- |
| 3 | | moon windows to capitalize on the |
| 4 | | Novel, the Derivative Amityville |
| 5 | | Horror Films and franchise. |
| 6 | | |
| 7 | E. The DeFeo Murders led to the | The DeFeo Murders led to the |
| 8 | haunting of The Amityville Horror | haunting of the Amityville Horror |
| 9 | house. The overall story revolves | house. The overall story revolves |
| 10 | around a new family that moves | around a new family that moves |
| 11 | into The Amityville Horror house. | into The Amityville Horror House. |
| 12 | The supernatural demonic forces | The supernatural demonic forces |
| 13 | inhabiting the house terrify its new | inhabiting the house terrify its new |
| 14 | residents, causing them to lose a | residents, causing them to lose a |
| 15 | grip on reality, and to turn on one | grip on reality, and to turn on one |
| 16 | another. | another. |
| 17 | | |
| 18 | F. Thematically, there are dark | Thematically, there are dark |
| 19 | unknowable supernatural forces in | unknowable supernatural forces in |
| 20 | the world, and in particular demons | the world, and in particular demons |
| 21 | which historically occupy earthly | which historically occupy earthly |
| 22 | settings and prey on negative | settings and prey on negative |
| 23 | human emotions and frailties. | human emotions and frailties. |
| 24 | | |
| 25 | G. Thematically, we cannot | Thematically, we cannot |
| 26 | understand or control the | understand or control the |
| 27 | supernatural which can readily | supernatural which can readily alter |
| 28 | alter our state of consciousness and | our state of consciousness and blur |

FIRST AMENDED COMPLAINT

| | | |
|---|---|---|
| 1 | blur the lines between our | the lines between our subconscious |
| 2 | subconscious and reality. | and reality. |
| 3 | | |
| 4 | H. Time is modern and seasonally, | Time is modern and seasonally, it |
| 5 | it is the end of the year. | is the end of the year. |
| 6 | | |
| 7 | I. The mood is dark, brewing and | The mood is dark, brewing and |
| 8 | increasingly frightening. | increasingly frightening. |
| 9 | | |
| 10 | J. The story begins with a new | The story begins with a new family |
| 11 | family pulling into the driveway | pulling into the driveway of the |
| 12 | of the house at 112 Ocean | house at 112 Ocean Avenue, and |
| 13 | Avenue, and moving in. | moving in. |
| 14 | | |
| 15 | K. On a lamp post at the end of the | The same "High Hopes" sign is |
| 16 | paved driveway is a small sign | later seen stored in the basement of |
| 17 | bearing the name "High Hopes." | the house (even though it was |
| 18 | This was the actual sign of the | reputedly destroyed after the |
| 19 | DeFeo family (although it was | DeFeo Murders). |
| 20 | reputedly destroyed after the | |
| 21 | DeFeo Murders). | |
| 22 | | |
| 23 | L. As the family is moving in, there | As the family is moving in, there |
| 24 | are boxes around and the furniture | are boxes around and the furniture |
| 25 | and personal items are put into | and personal items are put into |
| 26 | place over the course of the story. | place over the course of the story. |
| 27 | | |
| 28 | M. The biological father is not | The biological father is not present, |

| | |
|---|---|
| present, the biological mother is present, the family has three children, and one of these children is a little girl ("Missy") who is 5 years old, has blonde hair, and is portrayed as very sweet, naive and innocent. | the biological mother is present, the family has three children, and one of these children is a little girl ("Juliet") who looks 5 years old, has blonde hair, and is portrayed as very sweet, naive and innocent. |
| N. The family has a large mangy dog with a male human name, uncommon for a pet: "Harry." | The family has a large mangy dog with a male human name, uncommon for a pet: "Larry." |
| O. The mother ("Kathy") is quite religious and a devout Christian. | The mother ("Joan") was quite religious and a devout Christian; and later she reverts to her faith. |
| P.  Harry, the dog, is the first to sense unseen forces. Thereafter, throughout the story, the dog reacts to unseen evil by barking, growling, pawing the ground, and/or whimpering, surprising family members. | Larry, the dog, is the first to sense unseen forces. Thereafter, throughout the story, the dog reacts to unseen evil by barking, growling, pawing the ground, and/or whimpering, surprising family members. |
| Q. Several features of the house are focused on as notable: the half-moon quarter windows, the boathouse outside, and later, the | Several features of the house are focused on as notable: the half-moon quarter windows, the remains of the boathouse outside, |

| | | |
|---|---|---|
| 1 | secret hidden room in the | and later, the secret hidden room in |
| 2 | basement. | the basement. |
| 3 | | |
| 4 | R. The lead protagonist looks out a | The lead protagonist looks out a |
| 5 | window wearily and notices that | window wearily and notices that |
| 6 | the dog is restless at the boathouse. | the dog is restless at the boathouse. |
| 7 | | |
| 8 | S. The lead protagonist senses that | The lead protagonist exclaims "I |
| 9 | something is very weird about the | have a weird feeling about this |
| 10 | house. Otherworldly whispering is | house." Otherworldly whispering is |
| 11 | heard in the house. | heard in the house. |
| 12 | | |
| 13 | T. There are inexplicable house flies | There are inexplicable house flies |
| 14 | in the winter which soon appear to | in the winter which soon appear to |
| 15 | be the harbinger of a supernatural | be the harbinger of a supernatural |
| 16 | evil force. | evil force. |
| 17 | | |
| 18 | U. The house has cold spots and foul | The house has cold spots and foul |
| 19 | smells, sometimes without any | smells, sometimes without any |
| 20 | apparent source. | apparent source. |
| 21 | | |
| 22 | V. At night, the lead protagonist feels | At night, the lead protagonist feels |
| 23 | the sudden need to wander through | the sudden need at night to wander |
| 24 | the house. | through the house. |
| 25 | | |
| 26 | W. The lead protagonist does | The lead protagonist does research |
| 27 | research on the DeFeo Murders at | on the DeFeo Murders at school |
| 28 | the library viewing microfiche of | viewing old newspaper accounts |

| | | |
|---|---|---|
| 1 | newspaper accounts. | online. |
| 2 | | |
| 3 | X. Family members start sleeping | Family members start sleeping |
| 4 | together as they become | together as they become |
| 5 | increasingly frightened by weird | increasingly frightened by weird |
| 6 | events in the house. | events in the house. |
| 7 | | |
| 8 | Y. As the evil force emerges so does | As the evil force emerges so does a |
| 9 | a threatening black *swarm* of | threatening black *swarm* of buzzing |
| 10 | buzzing house flies. | house flies. |
| 11 | | |
| 12 | Z. A priest who counsels the family, | A doctor who counsels the family, |
| 13 | but is set in his ways, makes a | but is set in his ways, makes a |
| 14 | professional visit to the house and | professional visit to the house and |
| 15 | is challenged by the evil | is challenged by the evil |
| 16 | supernatural force. Terrified, he | supernatural force. Terrified, he |
| 17 | abruptly departs the house, without | abruptly departs the house, without |
| 18 | an explanation to the family, never | an explanation to the family, never |
| 19 | to return. | to return. |
| 20 | | |
| 21 | AA. The lead protagonist wakes up | The lead protagonist wakes up |
| 22 | regularly at 3:15 a.m. (the time we | regularly at 3:15 a.m. (the time we |
| 23 | are told the DeFeo Murders took | are told the DeFeo Murders took |
| 24 | place), followed by mysterious, | place), followed by mysterious, |
| 25 | unexplainable and often very | unexplainable and often very |
| 26 | frightening visions and events. | frightening visions and events. |
| 27 | | |
| 28 | BB. 3:15 a.m. is when the house | We are told "3:15 a.m., that's when |

| | |
|---|---|
| supernaturally comes alive. | the house comes alive." |
| CC. In the middle of the night the lead protagonist is repeatedly awakened, seemingly driven into a state of altered consciousness by a supernatural evil force, unable to distinguish reality from nightmares; and as the story unfolds, the line becomes progressively blurred. | In the middle of the night the lead protagonist is repeatedly awakened, seemingly driven into a state of altered consciousness by a supernatural evil force, unable to distinguish reality from nightmares; and as the story unfolds, the line becomes progressively blurred. |
| DD. Windows and doors of the house open, slam shut, and lock all on their own. The opening windows startle and chill family members, letting in the cold winter air. Door openings portend the arrival of supernatural evil forces and doors and windows slamming shut and locking prevent family members from escaping. | Windows and doors of the house open, slam shut, and lock all on their own. The opening windows startle and chill family members, letting in the cold winter air. Door openings portend the arrival of supernatural evil forces and doors and windows slamming shut and locking prevent family members from escaping. |
| EE. The mother is increasingly on edge, and quick to lose her temper and level accusations at her children. | The mother is increasingly on edge, and quick to lose her temper and level accusations at her child Belle. |

| | |
|---|---|
| FF. The mother, angered, violently beats her children, seemingly for the first time, and the following day expresses guilt and regret about it. The mother's mental state deteriorates under the influence of supernatural forces. | The mother angered hits her daughter Belle, seemingly for the first time, and the following day expresses guilt and regret about it. Later, as the mother's mental state deteriorates under the influence of supernatural forces, she knocks her daughter unconscious. |
| GG. The lead protagonist is drawn to the boathouse; sees an ominous shadow lurking there and is driven to repeatedly check the boathouse at night. | Juliet is drawn to the remains of the boathouse, and when she wanders there she is confronted by the vision of a dead body floating in the water. |
| HH. Harry, the dog, has a particular interest in the boathouse, sensing unseen evil forces there. Later at the boathouse the dog panics and strangles itself after jumping a fence on a leash. | Harry, the dog, has a particular interest in the boathouse, sensing unseen evil forces there. Later at the boathouse deck the dog is found dead and bloody, floating in the water. |
| II. Kathy is on the first floor and senses someone is staring at her, she looks up, suddenly sees the little girl Missy and  she exclaims: "Missy! You scared me half to death. What's the matter? What are you doing up so early?" | Belle is on the first floor and senses a presence, she jumps when she suddenly sees the little girl Juliet and she exclaims: "Juliet you can't sneak up on people like that. What are you doing up." |

FIRST AMENDED COMPLAINT

21

| | | |
|---|---|---|
| 1 | | |
| 2 | JJ. The innocent Missy repeatedly has | The innocent Juliet repeatedly has |
| 3 | private friendly chit-chats with the | private friendly chit-chats with the |
| 4 | supernatural being which has taken | supernatural being which has taken |
| 5 | a form she is comfortable with. | a form she is comfortable with. |
| 6 | Missy views this as completely | Juliet views this as completely |
| 7 | normal, however, it is portrayed as | normal, however, it is portrayed as |
| 8 | an infiltration and a threat to | an infiltration and a threat to |
| 9 | Missy's safety. | Juliet's safety. |
| 10 | | |
| 11 | KK. At night, Kathy has visions | At night, Belle has visions |
| 12 | of impending violence and murder. | of impending violence and murder. |
| 13 | | |
| 14 | LL. Kathy sees a nightmare image of | Belle sees a nightmare image of |
| 15 | DeFeo. | DeFeo. |
| 16 | | |
| 17 | MM. Kathy is confronted by the | Belle is confronted by the fleeting |
| 18 | fleeting but terrifying image of a | but terrifying image of a |
| 19 | supernatural demonic being. | supernatural demonic being. |
| 20 | | |
| 21 | NN. Repeated references to the "evil" | Belle exclaims "this house is evil" |
| 22 | that grips the house. A house | and elsewhere "this house is really |
| 23 | visitor exclaims: "There's | bad"! |
| 24 | something bad in here, Kathy." | |
| 25 | | |
| 26 | OO. We are informed that the house | We are informed that the house |
| 27 | was associated with occult rituals. | was associated with occult ritual. |
| 28 | | |

FIRST AMENDED COMPLAINT
22

| | | |
|---|---|---|
| 1 | PP. The mother enters a walk-in | The little girl Juliet enters a walk-in |
| 2 | closet, is suddenly confronted by a | closet and is suddenly confronted |
| 3 | sour smell and the fact the crucifix | by a supernatural demonic being. |
| 4 | she had hung is now upside down | |
| 5 | due to some demonic force. | |
| 6 | | |
| 7 | QQ. The mother is both | The mother is both psychologically |
| 8 | psychologically and physically | and physically seduced in an illicit |
| 9 | seduced in an illicit fashion by the | fashion by the supernatural evil |
| 10 | supernatural evil entity. | entity. |
| 11 | | |
| 12 | RR. Walls in the house suddenly and | Walls in the house suddenly and |
| 13 | inexplicably ooze thick green | inexplicably ooze thick dark red |
| 14 | slime. | blood. *See also* Trailer. |
| 15 | SS. As supernatural tensions increase, | As supernatural tensions increase, |
| 16 | the lead protagonist is jarred by the | the lead protagonist is jarred by the |
| 17 | clap of thunder, as a terrible flash | clap of thunder, as a terrible flash |
| 18 | of lightening outside lights up the | of lightening outside lights up the |
| 19 | bedroom window. | bedroom window. |
| 20 | | |
| 21 | TT. Family members see terrifying | Belle's friend says that the house |
| 22 | images at night and have trouble | "messes with your head until |
| 23 | distinguishing their dreams from | you're unable to tell the difference |
| 24 | reality. The lead protagonist | between dreams and reality." |
| 25 | exclaims: "I wasn't dreaming I tell | |
| 26 | you!" | |
| 27 | | |
| 28 | UU. As supernatural tensions | As supernatural tensions increase it |

FIRST AMENDED COMPLAINT

23

| | | |
|---|---|---|
| 1 | increase it starts to rain very | starts to rain very heavily. |
| 2 | heavily. | |
| 3 | | |
| 4 | VV. Kathy in her bedroom is afraid | Belle in her bedroom suddenly sees |
| 5 | that if she looks up into *the mirror* | the terrifying image of a |
| 6 | she will see the supernatural evil | supernatural demonic being *in the* |
| 7 | being whose presence she senses. | *mirror*. |
| 8 | | |
| 9 | WW. A supernatural voice shouts | A family member, possessed by a |
| 10 | "GET OUT!" | supernatural force, spells out on a |
| 11 | | special monitor: "G E T  O U T"! |
| 12 | | |
| 13 | XX. Kathy's face is shockingly | In a Trailer for the 2017 Amityville |
| 14 | transformed into a frighteningly | Horror Sequel Film, Belle sees |
| 15 | withered 90-year old; when she | herself in a bathroom mirror, her |
| 16 | runs to the bathroom mirror she is | face shockingly transformed into a |
| 17 | no longer a crone, but has deep | frightening visage with hollow eye |
| 18 | ugly lines running down her | sockets, as black flies buzz around |
| 19 | cheeks. | her. |
| 20 | | |
| 21 | YY. A spirit with a large demonic | A large demonic pig's head with |
| 22 | pig's head and beady red eyes | beady red eyes appears outside a |
| 23 | appears outside a window of the | window, scaring Belle.  It turns out |
| 24 | house, scaring Kathy. | to be Belle's friend wearing a |
| 25 | | mask, in reference to the scene in |
| 26 | | the Novel. |
| 27 | | |
| 28 | ZZ. In the 1979 Amityville Horror | The lead protagonist and her school |

| | |
|---|---|
| Film based on the Novel, the lead protagonist breaks through a brick wall in the basement with a pick axe, revealing the hidden "Red Room." | friends watch this 1979 film scene on television, and later the lead protagonist breaks through a brick wall in the basement with a pick axe, revealing the hidden "Red Room." |
| AAA. We are informed that in pre-colonial times Shinnecock Indians left the sick and mad to die on the property; that they believed it to be infested with demons; and that in the late 1600's a devil worshipper from Salem, Mass. practiced witchcraft and was buried on the property. | Belle views the 1979 Amityville Horror Film which informs her and us that "this house is built on sacred ground, devil worship, demons ..." |
| BBB. Unseen supernatural forces in the house appear to cause electronic equipment to suddenly stop working. | Unseen supernatural forces in the house appear to cause electronic equipment to suddenly stop working. |
| CCC. As the lead protagonist conveys and receives information over the phone regarding the strange activities in the house, the phone suddenly goes dead. | As the lead protagonist receives information from a DVD player / television as to the strange activities in the house both suddenly go dead. |

| | | |
|---|---|---|
| 1 | DDD. The potential sudden blowing | The potential sudden blowing of a |
| 2 | of a fuse causes the lead | fuse causes the lead protagonist to |
| 3 | protagonist to venture in the dark, | venture in the dark, with an iphone |
| 4 | with a flashlight, down steps into | flashlight, down steps into the |
| 5 | the basement to check the house's | basement to check the house's fuse |
| 6 | fuse box, and is confronted by an | box, and is confronted by an awful |
| 7 | awful stench. | stench. |
| 8 | | |
| 9 | EEE. In the basement, the lead | In the basement, the lead |
| 10 | protagonist sees the fleeting | protagonist sees the fleeting |
| 11 | bearded visage of the murderer | bearded visage of the murderer |
| 12 | Ron DeFeo! | Ron DeFeo! |
| 13 | | |
| 14 | FFF. The basement of the house | The basement of the house contains |
| 15 | contains a small hidden room with | a small hidden room with red walls |
| 16 | red walls which is called the "Red | which is called the "Red Room," |
| 17 | Room," and it is said to be the | and it is said to be the source of |
| 18 | source of evil in the house. | evil in the house. |
| 19 | | |
| 20 | GGG. The Novel contains floor plans | Belle is given a copy of the Novel, |
| 21 | of the house, one showing the | which she leafs through and turns |
| 22 | basement and location of the | to the floor plan showing the |
| 23 | hidden "Red Room." | basement and location of the |
| 24 | | hidden "Red Room." Later, she |
| 25 | | holds a copy of this floor plan. |
| 26 | | |
| 27 | HHH. The "Red Room" lies behind | The "Red Room" lies behind wood |
| 28 | wood paneling; the lead | paneling and when the lead |

| | |
|---|---|
| 1  protagonist tears off the wood and | protagonist tears off the wood, she |
| 2  peers inside, revealing a small | faces *the brick wall*. After breaking |
| 3  creepy room with red walls, and | through the wall she peers inside, |
| 4  the room emits a vile stench. It is | revealing a small creepy room with |
| 5  noted "[t]hat's how blood smells." | walls covered in red blood, and the |
| 6  The lead later exclaims that he will | room emits a vile stench. |
| 7  wall off the Red Room's entrance | |
| 8  *with bricks*! | |

III. In the middle of the night a shadowy figure approaches a child's bed as the child sleeps.

In the middle of the night a shadowy figure approaches Belle's bed as she sleeps.

JJJ. The family tries to flee the house, but supernatural forces prevent them from leaving. The lead protagonist exclaims: "It [the house] won't let us go."

Belle and Juliet try to flee the house but supernatural forces prevent them from leaving. Belle exclaims: "It [the house"] won't let us leave!" *See also* Trailer.

KKK. Towards the end of the story, the mother Kathy has a crucifix with which she unsuccessfully tries to banish the evil force.

Towards the end of the story, the mother Joan has a crucifix with which she unsuccessfully tries to banish the evil force.

LLL. The DeFeo Murders are portrayed as potentially linked to an unidentified supernatural force. Kathy has a nightmare of DeFeo

Joan, the mother, is shot at close range and killed by her son, who has been possessed by a supernatural evil force.

1 shooting at close range and killing

2 his mother (not the other family

3 members he shot).

4

5 MMM. The new family that moved  What is left of the new family that

6  into the house is so terrorized that moved into the house are so

7  they flee, leaving everything  terrorized that they flee, leaving

8  behind.    everything behind.

9

10 NNN. The Novel ends with a  The 2017 Amityville Horror Sequel

11  documentary-style epilogue  Film ends with documentary news

12  regarding the strange events that footage regarding the strange

13  have befallen 112 Ocean Avenue, events which have once again

14  Amityville, New York.  befallen 112 Ocean Avenue,

15      Amityville, New York.

16   51.  The 2017 Amityville Horror Sequel Film makes direct references to

17 the Novel and the Derivative Amityville Horror Films. For instance, as the lead

18 protagonist watches the 1979 Amityville Horror Film with her school friends,

19 and scenes in that film derived from the Novel are shown. The 2005 Amityville

20 Horror Film is also mentioned and its DVD cover is shown. The 2017

21 Amityville Horror Sequel Film similarly displays the Novel and its cover, with

22 the title "THE AMITYVILLE HORROR" imposed on the house's now iconic

23 "face" with half-moon windows, and the name of the Novel's sole Author, "Jay

24 Anson," prominently displayed.

25   52.  Plaintiff is informed and believes and based thereon alleges that

26 Defendants will continue to prepare, produce, copy, distribute or exploit, and/or

27 authorize others to prepare, produce, copy, distribute or exploit the infringing

28 2017 Amityville Horror Sequel Film and ancillary derivative works which copy

1    and exploit the Novel in violation of the Copyright Act.

2        53.    As a direct and proximate result of Defendants' actions Plaintiff

3    will suffer imminent and irreparable harm, much of which cannot be reasonably

4    or adequately measured or compensated in damages.

5                              **FIRST CLAIM FOR RELIEF**

6        **(Copyright Infringement against all Defendants and DOES 1-10, excluding**

7                                **ENTERTAINMENT ONE)**

8        54.    Plaintiff re-alleges and incorporates by reference paragraphs 1

9    through 51 inclusive, as though fully set forth herein.

10        55.    The Novel is a wholly original work and copyrightable subject

11    matter under the laws of the United States.

12        56.    The Novel was produced and distributed in strict conformity with

13    the provisions of the Copyright Act and all other laws governing copyright.

14        57.    The Novel was registered by its author Jay Anson for copyright on

15    July 29, 1977 under registration number A00000883095, and subsequent to the

16    author's death on March 12, 1980, such copyright was duly renewed by

17    Plaintiff, the author's widow, on December 23, 2004 under registration number

18    RE0000925090.

19        58.    By their exploitation and release of the 2017 Amityville Horror

20    Sequel Film, a motion picture indisputably derived from the Novel, Defendants

21    knowingly and willfully infringed, and will continue to infringe, Plaintiff's

22    copyright and rights under copyright in the Novel.

23        59.    Each infringement by Defendants and/or other parties of the Novel

24    constitutes a separate and distinct act of infringement.

25        60.    Plaintiff placed Defendants on notice of their infringement, yet

26    Defendants continue to infringe Plaintiff's rights under copyright, in willful

27    disregard of and indifference to Plaintiff's rights.

28        61.    As a direct and proximate result of Defendants' copyright

---

1  infringement, Plaintiff has suffered and will continue to suffer severe injuries

2  and harm, much of which cannot be reasonably or adequately measured or

3  compensated in money damages if such wrongful conduct is allowed to continue

4  unabated. The ongoing harm this wrongful conduct will continue to cause

5  Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages

6  include, but are not limited to loss of customers, diversion of trade, dilution of

7  goodwill, injury to her business reputation, and the diminution of the value of

8  her intellectual property.

9      62.    Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary

10 injunction, during the pendency of this action, and to a permanent injunction,

11 enjoining Defendants, their officers, agents and employees, and all persons

12 acting in concert with them, from engaging in such further violations of the

13 Copyright Act.

14     63.    Plaintiff is further entitled to recover from Defendants the damages,

15 including pre-judgment interest it sustained and will sustain, and any income,

16 gains, profits, and advantages obtained by Defendants as a result of their

17 wrongful acts alleged hereinabove, in an amount which cannot yet be fully

18 ascertained, but which shall be assessed at the time of trial.

19     64.    Alternatively, Plaintiff is entitled to the maximum statutory

20 damages recoverable, or for such other amounts as may be proper, pursuant to

21 17 U.S.C. § 504.

22     65.    Plaintiff is further entitled to her attorney's fees and full costs

23 pursuant to 17 U.S.C. § 505.

24 //

25 //

26 //

27 //

28 //

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement against all Defendants and DOES 1-10, excluding ENTERTAINMENT ONE)

66. Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 1 through 65 inclusive, as though fully set forth herein.

67. Plaintiff is informed and believes, and on that basis alleges, that Defendants induced, caused, or materially contributed to the copyright infringement by others of the Novel as alleged herein. Plaintiff is informed and believes, and on that basis alleges, that Defendants knew or had reason to know that the conduct of such other parties infringed Plaintiff's copyright and rights under copyright.

68. Each infringement by Defendants and/or other parties of the Novel constitutes a separate and distinct act of infringement.

69. As a direct and proximate result of Defendants' contributory copyright infringement, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to loss of customers, diversion of trade, dilution of goodwill, injury to her business reputation, and the diminution of the value of her intellectual property.

70. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction, enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act.

1    71.    Plaintiff is further entitled to recover from Defendants the damages,

2  including pre-judgment interest it sustained and will sustain, and any income,

3  gains, profits, and advantages obtained by Defendants as a result of their

4  wrongful acts alleged hereinabove, in an amount which cannot yet be fully

5  ascertained, but which shall be assessed at the time of trial.

6    72.    Alternatively, Plaintiff is entitled to the maximum statutory

7  damages recoverable, or for such other amounts as may be proper, pursuant to

8  17 U.S.C. § 504.

9    73.    Plaintiff is further entitled to her attorney's fees and full costs

10  pursuant to 17 U.S.C. § 505.

11                  **THIRD CLAIM FOR RELIEF**

12  **(Vicarious Copyright Infringement against all Defendants and DOES 1-10,**

13                  **excluding ENTERTAINMENT ONE)**

14    74.    Plaintiff re-alleges and incorporates by reference paragraphs 1

15  through 73 inclusive, as though fully set forth herein.

16    75.    Plaintiff is informed and believes and thereon alleges that

17  Defendants, and each of them, if not directly liable for infringement of

18  Plaintiff's copyright in the Novel, are vicariously liable for said infringements.

19  Plaintiff is informed and believes and thereon alleges that Defendants had the

20  right and ability to supervise the infringing conduct of others, including without

21  limitation the infringing conduct of co-Defendants and internet users who have

22  viewed the 2017 Amityville Horror Sequel Film via an online streaming and/or

23  downloading service.

24    76.    Plaintiff is informed and believes and thereon alleges that

25  Defendants possessed a direct financial interest in the infringing conduct of such

26  other parties.

27    77.    Each infringement by Defendants and/or other parties of the Novel

28  constitutes a separate and distinct act of infringement.

78. As a direct and proximate result of Defendants' vicarious copyright infringement, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to loss of customers, diversion of trade, dilution of goodwill, injury to her business reputation, and the diminution of the value of her intellectual property.

79. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction, enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act.

80. Plaintiff is further entitled to recover from Defendants the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

81. Alternatively, Plaintiff is entitled to the maximum statutory damages recoverable, or for such other amounts as may be proper, pursuant to 17 U.S.C. § 504.

82. Plaintiff is further entitled to her attorney's fees and full costs pursuant to 17 U.S.C. § 505.

### FOURTH CLAIM FOR RELIEF

**(Copyright Infringement under the Canadian Copyright Act against all Defendants and DOES 1-10)**

83. Plaintiff re-alleges and incorporates herein by this reference

1  paragraphs 1 through 82 inclusive, as though fully set forth herein.

2      84.    Jay Anson, the author of the Novel, died on March 12, 1980.

3      85.    Pursuant to Section 14 (1) of the Canadian Copyright Act, R.S.C.,

4  c. C-42, where, as here, the author is the first owner of a work's copyright, no

5  assignment of copyright or any interest therein made after June 4, 1921, other

6  than an assignment by will, is operative beyond 25 years after the date of the

7  author's death, and at the end of such 25-year period the rights granted

8  automatically revert to the Author's heirs.

9      86.    Accordingly, on March 12, 2005 (25 years after the Author's death)

10  all rights in his Novel under copyright in Canada automatically reverted by

11  operation of law to the Author's heirs, including Plaintiff.

12      87.    Accordingly, on March 12, 2005 all rights in his Novel under

13  copyright in Canada automatically reverted by operation of law to the Author's

14  heirs, including Plaintiff.

15      88.    Plaintiff is informed and believes and based thereon alleges that

16  Defendant ENTERTAINMENT ONE is the distributor of the infringing 2017

17  Amityville Horror Sequel Film under license from Defendants TWC,

18  DIMENSION, and/or BLUMHOUSE.

19      89.    The current or pending exploitation and distribution of the 2017

20  Amityville Horror Sequel Film in Canada by Defendants, their agents, assigns or

21  licensees knowingly infringes or will infringe Plaintiff's Canadian copyright in

22  the Novel and rights under copyright.

23      90.    Plaintiff placed Defendants on notice of their infringement, yet

24  Defendants continue with their plans to exploit their infringing 2017 Amityville

25  Horror Sequel Film in Canada in willful disregard of and indifference to

26  Plaintiff's rights.

27      91.    As a direct and proximate result of Defendants' copyright

28  infringement and/or contributory infringement, Plaintiff has suffered and will

1  continue to suffer severe injuries and harm, much of which cannot be reasonably

2  or adequately measured or compensated in money damages if such wrongful

3  conduct is allowed to continue unabated. The ongoing harm this wrongful

4  conduct will continue to cause Plaintiff is both imminent and irreparable.

5  Plaintiff's injuries and damages include, but are not limited to loss of customers,

6  diversion of trade, dilution of goodwill, injury to her business reputation, and the

7  diminution of the value of her intellectual property.

8      92.    Plaintiff is entitled to a preliminary injunction, during the pendency

9  of this action, and to a permanent injunction, enjoining Defendants, their

10  officers, agents and employees, and all persons acting in concert with them, or

11  under a purported license from any of the Defendants, from engaging in such

12  further violations of the copyright laws of Canada including the distribution of

13  the infringing 2017 Amityville Horror Sequel Film in Canada.

14      93.    Plaintiff is further entitled to recover from Defendants the damages,

15  including pre-judgment interest she sustained and will sustain, and any income,

16  gains, profits, and advantages obtained by Defendants as a result of their

17  wrongful acts alleged hereinabove, in an amount which cannot yet be fully

18  ascertained, but which shall be assessed at the time of trial.

19      94.    Alternatively, Plaintiff is entitled to the maximum statutory

20  damages recoverable, or for such other amounts as may be proper, pursuant to

21  the Canadian Copyright Act.

22      95.    Plaintiff is further entitled to her attorney's fees and full costs.

23  **FIFTH CLAIM FOR RELIEF**

24  **(Copyright Infringement under the Copyright Act of Spain against all**

25  **Defendants and DOES 1-10)**

26      96.    Plaintiff re-alleges and incorporates herein by this reference

27  paragraphs 1 through 95 inclusive, as though fully set forth herein.

28      97.    Pursuant to Article 6 of Spain's Copyright Act 1879 (Ley de 10 de

1   enero de 1879, de la propiedad intellectual, Gaceta de Madrid num. 12 of

2   January 12, 1879, *http://derecho-internet.org/node/365*)( hereinafter, the "1879

3   Act"), Spain's Intellectual Property Law 22/1987 which took effect on

4   December 7, 1987, and Spain's Royal Legislative Decree 1/1996 of April 12,

5   1996, any assignment of a work's copyright or rights under copyright concluded

6   before December 7, 1987 is by operation of law automatically terminated 25

7   years after the death of the work's author, and automatically reverts to the

8   author's heirs.

9       98.    Accordingly, on March 12, 2005 (25 year after the Author's death)

10  all rights in his Novel under copyright in Spain automatically reverted by

11  operation of law to the Author's heirs, including Plaintiff.

12      99.    The current or pending exploitation and distribution of the 2017

13  Amityville Horror Sequel Film in Spain by Defendants, their agents, assigns or

14  licensees knowingly infringes or will infringe Plaintiff's Spanish copyright in

15  the Novel and rights under copyright.

16      100.   Plaintiff placed Defendants on notice of their infringement, yet

17  Defendants continue with their plans to exploit their infringing 2017 Amityville

18  Horror Sequel Film in Spain in willful disregard of and indifference to Plaintiff's

19  rights.

20      101.   As a direct and proximate result of Defendants' copyright

21  infringement and/or contributory infringement, Plaintiff has suffered and will

22  continue to suffer severe injuries and harm, much of which cannot be reasonably

23  or adequately measured or compensated in money damages if such wrongful

24  conduct is allowed to continue unabated. The ongoing harm this wrongful

25  conduct will continue to cause Plaintiff is both imminent and irreparable.

26  Plaintiff's injuries and damages include, but are not limited to loss of customers,

27  dilution of goodwill, injury to her business reputation, and the diminution of the

28  value of her intellectual property.

---

FIRST AMENDED COMPLAINT

36

1    102.  Plaintiff is entitled to a preliminary injunction, during the pendency

2  of this action, and to a permanent injunction, enjoining Defendants, their

3  officers, agents and employees, and all persons acting in concert with them, or

4  under a purported license from any of the Defendants, from engaging in such

5  further violations of the copyright laws of Spain, including the distribution of the

6  infringing 2017 Amityville Horror Sequel Film in Spain.

7    103.  Plaintiff is further entitled to recover from Defendants the damages,

8  including pre-judgment interest she sustained and will sustain, and any income,

9  gains, profits, and advantages obtained by Defendants as a result of their

10  wrongful acts alleged hereinabove, in an amount which cannot yet be fully

11  ascertained, but which shall be assessed at the time of trial.

12    104.  Plaintiff is further entitled to her attorney's fees and full costs.

13    ## SIXTH CLAIM FOR RELIEF

14    **(Violation of the Lanham Act § 15 U.S.C. § 1125(a)(1)(B)**

15    **Against All Defendants and DOES 1-10, excluding**

16    **ENTERTAINMENT ONE)**

17    105.  Plaintiff re-alleges and incorporates by reference paragraphs 1

18  through 53 inclusive, as though fully set forth herein.

19    106.  This Fifth Claim for Relief is for violation of Section 1125(a)(1)(**B**)

20  of the Lanham Act, not Section 1125(a)(1)(**A**).  It pertains to Defendants' false

21  advertising and false promotion of its 2017 Amityville Horror Sequel Film (i) as

22  *a sequel* to their 2005 Amityville Horror Film and to the 1979 Amityville Horror

23  Film and (ii) as a part of this film franchise, and, as such, this claim is

24  independent of and does not rely upon Plaintiff's copyright in the Novel or

25  Defendants' copyright infringement alleged hereinabove.

26    107.  Plaintiff is informed and believes and thereon alleges that

27  Defendants have misrepresented to their licensees, potential licensees and to

28  members of the public, *in Defendants' commercial marketing, promotion and*

1   *advertising*, that the 2017 Amityville Horror Film is a bona fide *sequel* to their

2   2005 Amityville Horror Film and to the 1979 Amityville Horror Film and *a*

3   *continuation of this film franchise*, with a willful intention to mislead and

4   misrepresent the nature, characteristics and qualities of Defendants' goods,

5   services or commercial activities.

6       108.   Plaintiff is informed and believes and thereon alleges that

7   Defendants used such false claims or misleading descriptions, representations

8   and wrongful omissions of fact in interstate commerce in order to induce others

9   to enter into contracts or other forms of business arrangements with Defendants

10   to exploit the 2017 Amityville Horror Sequel Film and other products derived

11   therefrom, and to falsely induce consumers to see the film.

12       109.   Such use of false or misleading descriptions or representations of

13   fact in interstate commerce is in opposition to the protection of the public

14   interest.

15       110.   Defendants' wrongful conduct has proximately caused and will

16   continue to cause Plaintiff substantial injury and damage including, without

17   limitation, loss of customers, dilution of goodwill, injury to her business

18   reputation, lost profits and diminution of the value of her interests in the Novel,

19   the Derivative Amityville Horror Films, and related derivative products and

20   commercial activities.  The ongoing harm this wrongful conduct will cause to

21   Plaintiff is both imminent and irreparable, and the amount of damage sustained

22   by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to

23   continue unabated.

24       111.   By reason of the foregoing, Defendants have violated and are

25   continuing to violate the Lanham Act, 15 U.S.C. § 1125(a)(1)**(B)**.

26       112.   Plaintiff is entitled to an injunction, during the pendency of this

27   action, and permanently, restraining Defendants, their officers, agents and

28

1   employees, and all persons acting in concert with them from engaging in any
2   further violations of the Lanham Act.

3       113.   Plaintiff has no adequate remedy at law with respect to these
4   ongoing violations of the Lanham Act.

5       114.   Plaintiff is further entitled to recover from Defendants under 15
6   U.S.C § 1117(a) up to three times the damages she sustained and will sustain
7   and any income, gains, profits, and advantages obtained by Defendants as a
8   result of their wrongful acts and omissions alleged hereinabove, plus reasonable
9   attorneys' fees and costs, in an amount which cannot yet be fully ascertained,
10  but which shall be assessed at the time of trial.

11                  **SEVENTH CLAIM FOR RELIEF**
12  **(Unfair Competition Under California Business and Professions Code,**
13  **§§ 17200 *et seq*. and California Common Law - Against All Defendants and**
14                  **DOES 1-10, excluding ENTERTAINMENT ONE)**

15      115.   Plaintiff re-alleges and incorporates herein by reference the
16  allegations set forth in paragraphs 1 through 53, inclusive, and 105 through 114,
17  inclusive, as though fully set forth herein.

18      116.   This Sixth Claim for Relief pertains to Defendants' false
19  advertising, marketing and promotion of the 2017 Amityville Horror Sequel
20  Film: (i) as *a sequel* to their 2005 Amityville Horror Film and to the 1979
21  Amityville Horror Film and (ii) as a part of this film franchise, and, as such, this
22  claim is independent of and does not rely upon Plaintiff's copyright in the Novel
23  or Defendants' copyright infringement alleged hereinabove.

24      117.   Plaintiff is informed and believes and thereon alleges that
25  Defendants have misrepresented to their licensees, potential licensees and to
26  members of the public, *in Defendants' commercial marketing, promotion and
27  advertising*, that the 2017 Amityville Horror Film is a bona fide *sequel* to their
28  2005 Amityville Horror Film and to the 1979 Amityville Horror Film and *a*

1  *continuation of this film franchise*, with a willful intention to mislead and

2  misrepresent the nature, characteristics and qualities of Defendants' goods,

3  services or commercial activities.

4      118.   Defendants' public misrepresentations in their advertising,

5  marketing and promotion was both intended to deceive, cause confusion and

6  mistake and was likely to deceive, cause confusion and mistake, all contrary to

7  the public interest.

8      119.   Defendants' wrongful conduct, acts, and omissions alleged

9  hereinabove constitute unlawful, unfair business practices and unfair

10  competition under California Business and Professions Code §§ 17200 *et seq.*,

11  and under the common law.

12      120.   As a direct and proximate result of Defendants' conduct, acts, and

13  omissions alleged hereinabove, Plaintiff is entitled to restitution of the income,

14  gains, compensation, profits and advantages obtained, received or to be received

15  by Defendants, or any of them, arising from their unauthorized exploitation of

16  Plaintiff's Novel, and in which Plaintiff possesses an ownership interest;

17  Plaintiff is entitled to an order requiring Defendants, jointly and severally, to

18  render an accounting to ascertain the amount of such proceeds.

19      121.   As a direct and proximate result of Defendants' wrongful conduct,

20  acts and omissions alleged hereinabove, Plaintiff has been damaged, and

21  Defendants have been and will continue to be unjustly enriched, in an amount

22  that shall be assessed at trial for which restitution and/or restitutionary

23  disgorgement is appropriate.  Such restitution and/or restitutionary disgorgement

24  should include a declaration by this Court that Defendants are jointly and

25  severally the constructive trustee(s) for the benefit of Plaintiff and an order that

26  Defendants convey to Plaintiff all of the gross revenues received or to be

27  received by Defendants arising from their unauthorized exploitation of

28  Plaintiff's Novel.

1  122. Defendants' wrongful conduct, acts and omissions have

2 proximately caused and will continue to cause Plaintiff substantial injury and

3 damage including, without limitation, loss of customers, dilution of goodwill,

4 injury to Plaintiff's reputation, and diminution of the value of Plaintiff's rights.

5 The harm this wrongful conduct will cause to Plaintiff is both imminent and

6 irreparable, and the amount of damage sustained by Plaintiff will be difficult to

7 ascertain if such wrongful conduct is allowed to continue without restraint.

8  123. Pursuant to California Business and Professions Code § 17203

9 Plaintiff is entitled to an injunction, during the pendency of this action, and

10 permanently enjoining Defendants, their officers, agents and employees, and all

11 persons acting in concert with them, from engaging in such further acts of unfair

12 business practices and unfair competition.

13  124. Plaintiff has no adequate remedy at law with respect to Defendants'

14 ongoing unlawful conduct.

15     **EIGHTH CLAIM FOR RELIEF**

16    **(Declaratory Relief - Against All Defendants)**

17  125. Plaintiff re-alleges and incorporates herein by this reference

18 paragraphs 1 through 124 inclusive, as though fully set forth herein.

19  126. By reason of the foregoing facts, an actual and justiciable

20 controversy has arisen and now exists between Plaintiff and Defendants in that

21 Plaintiff contends and Defendants deny that Defendants infringed and will

22 continue to infringe on Plaintiff's copyrights under Federal copyright law, 17

23 U.S.C. §§ 101 *et seq.*

24  127. Plaintiff desires a judicial determination of this issue.

25  128. A declaration of the Court is necessary and appropriate pursuant to

26 the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., so that Plaintiff may

27 ascertain her rights with respect to the 2017 Amityville Horror Sequel Film.

28

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

### ON THE FIRST CLAIM FOR RELIEF

1. For an order preliminarily during the pendency of this action and thereafter, permanently, (i) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from infringing the copyrights in the Novel, in any manner, and (ii) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, distribution and/or exploitation of the infringing 2017 Amityville Horror Sequel Film and ancillary products based thereon, derived from the Novel, without Plaintiff's express written consent.

2. For compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

3. For an accounting and restitution to Plaintiff of all gains, profits and advantages Defendants have derived from their production, distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film, ancillary exploitations based thereon, and from their copyright infringement of the Novel;

4. In the alternative to actual damages, for statutory damages pursuant to 17 U.S.C. §504(c), which election Plaintiff shall make prior to the rendering of final judgment herein; and

5. For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 *et seq*., which the Court may deem just and proper.

<u>ON THE SECOND CLAIM FOR RELIEF</u>

6.    For an order preliminarily during the pendency of this action and thereafter, permanently, (i) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from infringing the copyrights in the Novel, in any manner, and (ii) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, distribution and/or exploitation of the infringing 2017 Amityville Horror Sequel Film and ancillary products based thereon, derived from the Novel, without Plaintiff's express written consent.

7.    For an award of Defendants' profits and Plaintiff's compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

8.    In the alternative to actual damages, for an award of statutory damages pursuant to 17 U.S.C. §504(c), which election Plaintiff shall make prior to the rendering of final judgment herein;

9.    For an order requiring that Defendants provide a complete accounting and for the restitution to Plaintiff of all monies, gains, profits and advantages Defendants have derived from their production, distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary exploitations based thereon, and from their copyright infringement of the Novel;

10.    For an order imposing a constructive trust over all monies, gains, and profits Defendants derive from their production, distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary exploitations based thereon, and from their copyright infringement of the Novel; and

11.    For such other and further relief and remedies available under the

1   Copyright Act, 17 U.S.C. §§ 101 *et seq.*, which the Court may deem just and

2   proper.

### ON THE THIRD CLAIM FOR RELIEF

4       12.   For an order preliminarily during the pendency of this action and

5   thereafter, permanently, (i) enjoining Defendants, their officers, agents,

6   employees, licensees and assigns, and all persons acting in concert with them,

7   from infringing the copyrights in the Novel, in any manner, and (ii) enjoining

8   Defendants, their officers, agents, employees, licensees and assigns, and all

9   persons acting in concert with them, from engaging in or authorizing the

10  production, reproduction, distribution and/or exploitation of the infringing 2017

11  Amityville Horror Sequel Film and ancillary products based thereon, derived

12  from the Novel, without Plaintiff's express written consent.

13      13.   For an award of Defendants' profits and Plaintiff's compensatory

14  and consequential damages, according to proof in an amount determined at

15  trial, together with interest thereon as provided by law;

16      14.   In the alternative to actual damages, for an award of statutory

17  damages pursuant to 17 U.S.C. §504(c), which election Plaintiff shall make

18  prior to the rendering of final judgment herein;

19      15.   For an order requiring that Defendants provide a complete

20  accounting and for the restitution to Plaintiff of all monies, gains, profits and

21  advantages Defendants have derived from their production, distribution and

22  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

23  ancillary exploitations based thereon, and from their copyright infringement of

24  the Novel;

25      16.   For an order imposing a constructive trust over all monies, gains,

26  and profits Defendants derive from their production, distribution and

27  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

28  ancillary exploitations based thereon, and from their copyright infringement of

FIRST AMENDED COMPLAINT

44

1   the Novel; and

2       17.   For such other and further relief and remedies available under the

3   Copyright Act, 17 U.S.C. §§ 101 *et seq.*, which the Court may deem just and

4   proper.

5                    ON THE FOURTH CLAIM FOR RELIEF

6       18.   For an order preliminarily during the pendency of this action and

7   thereafter, permanently, (i) enjoining Defendants, their officers, agents,

8   employees, licensees and assigns, and all persons acting in concert with them,

9   from infringing the copyrights in the Novel, in any manner in Canada, and (ii)

10  enjoining Defendants, their officers, agents, employees, licensees and assigns,

11  and all persons acting in concert with them, from engaging in or authorizing the

12  reproduction, distribution and/or exploitation of the infringing 2017 Amityville

13  Horror Sequel Film and ancillary products based thereon, derived from the

14  Novel, in Canada, without Plaintiff's express written consent.

15      19.   For an award of Defendants' profits and Plaintiff's compensatory

16  and consequential damages, according to proof in an amount determined at

17  trial, together with interest thereon as provided by law;

18      20.   In the alternative to actual damages, for an award of statutory

19  damages pursuant to the Canadian Copyright Act, which election Plaintiff shall

20  make prior to the rendering of final judgment herein.

21      21.   For an order requiring that Defendants provide a complete

22  accounting and for the restitution to Plaintiff of all monies, gains, profits and

23  advantages Defendants have derived from their distribution and exploitation of

24  the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary

25  exploitations based thereon, and from their copyright infringement of the Novel

26  in Canada;

27      22.   For an order imposing a constructive trust over all monies, gains,

28  and profits Defendants derive from their production, distribution and

---

FIRST AMENDED COMPLAINT

45

1  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

2  ancillary exploitations based thereon, and from their copyright infringement of

3  the Novel in Canada; and

4      23.    For such other and further relief and remedies available, which the

5  Court may deem just and proper.

6                    ON THE FIFTH CLAIM FOR RELIEF

7      24.    For an order preliminarily during the pendency of this action and

8  thereafter, permanently, (i) enjoining Defendants, their officers, agents,

9  employees, licensees and assigns, and all persons acting in concert with them,

10  from infringing the copyrights in the Novel, in any manner in Spain and (ii)

11  enjoining Defendants, their officers, agents, employees, licensees and assigns,

12  and all persons acting in concert with them, from engaging in or authorizing the

13  production, reproduction, distribution and/or exploitation of the infringing 2017

14  Amityville Horror Sequel Film and ancillary products based thereon, derived

15  from the Novel in Spain, without Plaintiff's express written consent.

16      25.    For an award of Defendants' profits and Plaintiff's compensatory

17  and consequential damages, according to proof in an amount determined at

18  trial, together with interest thereon as provided by law;

19      26.    For an order requiring that Defendants provide a complete

20  accounting and for the restitution to Plaintiff of all monies, gains, profits and

21  advantages Defendants have derived from their production, distribution and

22  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

23  ancillary exploitations based thereon, and from their copyright infringement of

24  the Novel in Spain;

25      27.    For an order imposing a constructive trust over all monies, gains,

26  and profits Defendants derive from their production, distribution and

27  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

28  ancillary exploitations based thereon, and from their copyright infringement of

1   the Novel in Spain; and

2       28.   For such other and further relief and remedies which the Court may

3   deem just and proper.

4   <u>ON THE SIXTH CLAIM FOR RELIEF</u>

5       29.   For an order preliminarily during the pendency of this action and

6   thereafter permanently enjoining Defendants, their officers, agents, employees,

7   licensees and assigns and all persons acting in concert with them, from

8   engaging in such further violations of the Lanham Act, 15 U.S.C. §

9   1125(a)(1)(B) as alleged hereinabove;

10       30.   For treble compensatory and consequential damages according to

11   proof in an amount to be determined at trial;

12       31.   For an accounting of any and all unlawful proceeds received and to

13   be received by Defendants;

14       32.   For the imposition of a constructive trust for the benefit of Plaintiff

15   on any and all unlawful proceeds received and to be received by Defendants;

16   and

17       33.   For such other and further relief and remedies available under the

18   Lanham Act, 15 U.S.C. § 1125, which the Court may deem just and proper.

19   <u>ON THE SEVENTH CLAIM FOR RELIEF</u>

20       34.   For an accounting of any and all unlawful proceeds received and to

21   be received by Defendants;

22       35.   For the imposition of a constructive trust for the benefit of Plaintiff

23   on any and all unlawful proceeds received and to be received by Defendants;

24       36.   For restitution to Plaintiff of any and all unlawful proceeds received

25   and to be received by Defendants;

26       37.   For an order preliminarily during the pendency of this action and

27   thereafter, permanently, enjoining Defendants, their officers, agents,

28   employees, licensees and assigns, and all persons acting in concert with them,

1   from engaging in such further unfair business practices and unfair competition

2   under California Business and Professions Code §§ 17200 *et seq.*, and/or

3   §§17500 *et seq.*, as alleged hereinabove; and

4       38.   For such other and further relief and remedies available under

5   California Business and Professions Code, §§ 17200 *et seq.* and §§ 17500,

6   which the Court may deem just and proper.

7                 ON THE EIGHTH CLAIM FOR RELIEF

8       39.   For a declaration:

9           a.   That Defendants have by their foregoing acts infringed upon

10  and are likely to continue to infringe upon the copyrights of the Novel and

11  Plaintiff's copyright interests therein;

12          b.   That the preparation, production, reproduction, distribution

13  and/or exploitation, by Defendants, their licensees and/or assigns of the 2017

14  Amityville Horror Sequel Film and further derivative works or products based

15  on the Novel, including, but not limited to, theatrical motion pictures, are

16  prohibited as infringements of Plaintiff's copyright(s); and

17          c.   That Defendants had/have no authority to confer licenses or

18  grants on others to reproduce, distribute or exploit the 2017 Amityville Horror

19  Sequel Film or to prepare, distribute or exploit other derivative works or

20  products based on the 2017 Amityville Horror Sequel Film and derived from the

21  Novel.

22                 ON ALL CLAIMS FOR RELIEF

23      40.   For Plaintiff's costs of suit;

24      41.   For interest at the highest lawful rate on all sums awarded Plaintiff

25  other than punitive damages;

26      42.   For reasonable attorneys' fees; and

27      43.   For such other and further relief as the Court deems just and

28  appropriate.

1    Dated: December 13, 2017        TOBEROFF & ASSOCIATES, P.C.

2

3                              By:    */s/ Marc Toberoff*
                                      Marc Toberoff

4                      Attorneys for Plaintiff LESIA ANSON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY TRIAL DEMANDED**

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Complaint that is triable by a jury.


Dated: December 13, 2017          TOBEROFF & ASSOCIATES, P.C.


                                  By: ____*/s/ Marc Toberoff*____
                                          Marc Toberoff

                                  Attorneys for Plaintiff LESIA ANSON