# EXHIBIT A

May 21, 2007

IP Management f/s/o Marc Toberoff
C/o Intellectual Properties Worldwide
2049 Century Park East, Suite 2720
Los Angeles, CA  90067
Attn.: Marc Toberoff

Re:     "Piranha"— Marc Toberoff Producing Services Agreement

Gentlemen:

This letter agreement ("Agreement") will confirm the agreement reached between, on the one hand, Dimension Films, a division of The Weinstein Company, LLC ("TWC") or a production/development entity to be designated by TWC (together "Company") and, on the other hand, IP Management ("Lender") f/s/o Marc Toberoff ("Artist") in connection with Artist's producing services in connection with the motion picture project tentatively entitled "Piranha" (the "Picture").  The terms of the agreement are as follows:

1.      Conditions Precedent: Company shall have no obligation under this Agreement unless and until: (i) Company approves in its sole discretion the chain-of-title to the Picture and acquires the screenplay in connection with the Picture written by Peter Goldfinger and Josh Stolberg; and (ii) Company has received fully-executed originals of: (a) this Agreement and the attached exhibits, each attached hereto and incorporated herein by this reference; (b) that certain Assignment Agreement dated as of April 6, 2007, between, on the one hand, Company, and, on, the other hand,  Piranha Pictures, LLC, Chiller Films, LLC, Relativity Media, LLC, IPW and Atmosphere in connection with the assignment to Company of all underlying rights in connection with the remake rights to the original motion picture entitled "Piranha" ("Assignment Agreement").  The aforementioned subparagraphs (i) and (ii) shall collectively be referred to herein as the "Conditions Precedent."

2.      Development and Production Services:  In connection with the Picture, Lender shall cause Artist to render all customary development services for producers of first-class motion pictures which shall include, without limitation, supervising the writing services of all writers engaged by Company in connection with the development of the Picture.  Artist's development services hereunder shall be rendered on a non-exclusive basis, provided there is no material interference with the full performance of Lender's and Artist's obligations.  If Company (in the exercise of its sole discretion) elects to proceed with the production of the Picture, then Lender shall cause Artist to render all services customarily rendered by individual producers in the motion picture industry for first-class motion pictures in connection with the pre-production, production, and post production of the Picture. Artist's services of shall be rendered on a non-exclusive basis, provided that Artist's services to third parties shall not materially interfere with Artist's services on the Picture, commencing as of the commencement of principal photography of the Picture and continuing until the completion of principal photography of the Picture.  Time is of the essence in connection with respect to all producing services during the development and production periods as well as all delivery obligations related to the Picture hereunder.

3.      Development Fee:  If Lender and Artist are not otherwise in material breach hereof, Lender shall be entitled to the sum of $25,000 (the "Development Fee"), which amount shall be fully applicable against the Fixed Compensation, and which amount shall become payable to Lender One Hundred Percent (100%) upon satisfaction of the Conditions Precedent.

4.     <u>Fixed Compensation</u>:  If the Picture is produced and Lender and Artist are not otherwise in material breach or default hereof, Lender shall be entitled to an amount equal to $600,000 ("Fixed Compensation") which such Fixed Compensation shall be fully applicable against and shall reduce any "Contingent Compensation" as such term is defined in below Paragraph 4.  The Fixed Compensation shall be payable pursuant to the customary 20:60:10:10 payout schedule (i.e., 20% payable weekly during the eight (8) weeks preceding principal photography; 60% payable weekly during principal photography; 10% payable upon dubbing and scoring; and 10% payable upon complete delivery of the Picture to Company) and shall constitute an all inclusive "flat" fee such that no additional compensation shall be payable by reason of overtime, overages, Sundays, holidays, etc.  Artist shall be "pay or play" for Artist's Fixed Compensation upon the last to occur of: (i) one (1) of the principal cast members become unconditionally "pay or play" for their fixed compensation; and (ii) the director of the Picture becomes unconditionally "pay or play" for the director's fixed compensation; provided, however, that Artist shall be deemed "pay or play" for the Fixed Compensation no later than upon commencement (if ever) of principal photography of the Picture.  Artist's Fixed Compensation in connection with the Picture shall be no less favorable than the fixed compensation accorded to Mark Canton in connection with the Picture.

5.     <u>Contingent Compensation</u>:  If the Picture is produced and Lender and Artist are not in material breach hereof, Lender shall be entitled to receive the "Contingent Compensation"(subject to the applicability and recoupment of the Fixed Compensation) in an amount equal to 2% of 100% of "Adjusted Defined Receipts" of the Picture, if any.  For the purposes hereof, "Adjusted Defined Receipts" shall be defined, computed, paid and accounted for in accordance with the terms and conditions of Company's "Exhibit DRCB", and the Rider thereto.  Company's "Exhibit DRCB" is herein incorporated in its entirety by this reference. For the purpose of calculating Artist's Contingent Compensation payable hereunder with respect to Video Devices (as defined in said Exhibit), the percentage set forth in Paragraphs 1.1.A.3. (A) and  1.1.A.3. (B) of "Exhibit DRCB shall be 25% in lieu of the percentage set forth therein.  Artist's Contingent Compensation participation amount set forth herein and definition in connection with the Picture shall be no less favorable than the contingent compensation participation amount and definition accorded to Mark Canton in connection with the Picture.

6.     <u>Vesting</u>:  If (i) prior to the time, if ever, that Artist becomes "pay or play" for Artist's Fixed Compensation hereunder, Lender's engagement and Artist's services are terminated by Company "without cause" (i.e., for any reason other than Lender's or Artist's material breach or default, or Artist's mental or physical disability hereunder) or an event of force majeure and (ii) subsequent to such "without cause" termination, Company thereafter commences principal photography of the Picture (it being agreed that Company shall have no obligation to commence principal photography of the Picture), then Company shall pay to Lender an amount equal to: (A) one-hundred percent (100%) of the Fixed Compensation payable to Artist pursuant to above Paragraph 4. and (B) Artist shall be reinstated to render producing services on a "pay or play" basis in accordance with the terms set forth in this Agreement.  In addition, if the above conditions (i) and (ii) are satisfied, Company agrees to accord Artist credit in accordance with terms set forth in Paragraph 6. below. At such time (if ever) that Artist becomes "pay or play" for Artist's Fixed Compensation in accordance with the terms set forth in this Agreement, one hundred percent (100%) of Artist's Contingent Compensation shall be deemed vested pursuant to this Paragraph 6.

7.     <u>Credit</u>:  Subject to any applicable guild requirements and Company's standard exclusions and exceptions (including artwork title exceptions) set forth herein, and provided that the Picture is produced and Lender and Artist are not otherwise in material breach or default hereof, then Company shall accord the following credits:

(i)  <u>Producer Credit</u>:  A " Produced By" credit Artist on screen, on a shared card in the main titles (unless the Picture is in end title format) and in the billing block portion of paid ads issued or controlled by Company in which the regular billing block appears and in the billing block portion of so-called excluded ads issued or controlled by Company in which any other individual producer in connection with

the Picture if at all, is accorded in such billing block, other than in award, nomination or congratulatory ads, and ads announcing a personal appearance in which no person other than the person awarded, nominated, congratulated or appearing is mentioned and group, institutional list or voice over paid ads (collectively "Special Ads"). Artist's "Produced By" credit may be shared, in Company's sole discretion. Artist's "Produced By" credit shall appear in no less than second position among all of the "Produced By" credits. The size and type of Artist's "Produced By" credit shall be no less favorable than the size and type of any "Produced By" credit accorded to any other individual producer rendering services on the Picture. In the event that the "Produced By" credit accorded to Mark Canton appears on a separate card, then Artist's "Produced By" credit shall likewise appear on a separate card.

(ii) Production Company Credit: A production company credit in substantially the form of "An IPW Production" on screen, in the main titles (unless the Picture is in end title format) and in the billing block portion of paid ads issued or controlled by Company in which the regular billing block appears and in the billing block portion of so-called excluded ads issued or controlled by Company in which any other production company credit or the director's "film by" credit is accorded in such billing block, other than in Special Ads, above or before the regular (not artwork) title of the Picture in such billing block. Such credit may be shared. Artist's production company credit shall appear in no less than second position among all production company credits. The size and type of such credit on screen shall be no less than the greater of a) 100% of the size of the type of any other production company credit accorded to any other producer or the "film by" credit accorded to the director in connection with the Picture (but not any such credit of the Picture's financier or distributor) or b) 35% of the size of the type of the on-screen title of the Picture. The size and type of such credit appearing in the billing block portion of paid ads and excluded ads shall be no less than the greater of x) 100% of the size of the type of any other production credit accorded to any other producer (but not any of the Picture's financier or distributor) or the "film by" credit accorded to the director in connection with the Picture in such billing block or y) 35% of the size of the type of the regular title of the Picture appearing in the billing block portion of paid and excluded ads. Artist's production company credit may be shared, in Company's sole discretion.

(iii) Executive Producer Credit: Subject to Company's receipt of a Certificate of Employment and Credit Rider executed by J. Todd Harris ("Harris"), Company shall accord an individual "Executive Produced By" credit to Harris which such credit shall appear on screen in the main titles (unless the Picture is in end title format) and in the billing block portion of paid ads issued or controlled by Company in which the regular billing block appears. The size and type of Harris's "Executive Produced By" credit shall be no less favorable than the size and type of any "Executive Produced By" credit accorded to any other executive producer rendering services on the Picture.

All other characteristics of such credit (e.g., size, style, position, etc.) shall be in Company's sole discretion. No casual or inadvertent failure by Company, nor any failure by any third party, to comply with the terms of this Paragraph 7. shall constitute a breach hereof, provided however, that upon receipt of written notice from Artist specifying a failure to accord credit as specified hereunder, Company shall use reasonable efforts to cure prospectively such material failure with regard to ads created and/or positive prints manufactured after the date of Company's receipt of such notice. Company shall use reasonable efforts to notify its subdistributors of the credit obligations set forth herein, however, any breach by Company's subdistributors to accord properly such credit shall not constitute a breach by Company.

8.    First Opportunity: Provided that the Picture is produced by Company and Lender and Artist are not in material breach hereof, if Company elects, in its sole discretion, to produce a theatrical prequel or sequel to and/or theatrical remake or any theatrical motion picture based upon the Picture (collectively, a "Theatrical Production"), or a television series pilot or first episode and/or mini-series and/or MOW based upon the Picture (collectively, a "T.V. Production"), or a Direct-to-Video production based upon the Picture (collectively "Subsequent Production") then Artist shall have the first opportunity to render

producing services in connection with: (a) such Theatrical Production or Direct-to-Video Production, as applicable, on terms to be negotiated in good faith with the financial terms of such engagement to be no less favorable than the financial terms hereunder, provided that the budget of such Theatrical Production or Direct-to-Video Production, as applicable, is not less than 90% of the budget of the Picture (if the budget of such Theatrical Production is less than 90% of the budget of the Picture, then the fixed compensation (but not the contingent compensation) payable to Lender for the Theatrical Production or Direct-to-Video Production, as applicable, shall be reduced proportionately by the ratio that the budget of the applicable subsequent production bears to the budget of the Picture; and further provided, that if Artist elects not to produce, is unavailable, or no agreement is reached within thirty (30) business days after Artist's receipt of written notice of start of negotiations therefor, then Company shall have the right to engage another producer and shall have no further obligation to Artist with respect to such services hereunder with respect to such Subsequent Production; and (b) such T.V. Production upon terms to be negotiated in good faith subject to network or other buyer approval which Company shall use good faith reasonable efforts to obtain; provided, however, that in the event no agreement is reached within thirty (30) business days following Artist's receipt of Company's written notice of the commencement of negotiations, the network or other broadcaster fails to approve Artist or Artist elects not to render producing services or is unavailable, Company shall have the right to engage another producer(s) and shall have no further obligation to Artist with respect to such services hereunder with respect to such Subsequent Production.  Artist shall have the rights described in this Paragraph 8. for each and every Subsequent Production.

9.    Travel and Expenses:  If Company requires any individual Artist to travel more than fifty (50) miles from Artist's then principal place of residence (currently Los Angeles, CA) for the purposes of rendering services hereunder, then Artist shall be entitled to receive a proratable (at 1/7 thereof per day) weekly allowance, in lieu of all living or other expenses, of $2,750 per week in major metropolitan cities (i.e., New York, London and Tokyo), $2,250 per week in other major metropolitan cities (e.g., San Francisco and Toronto), $2,000 per week in other locations, plus one (1) first-class, if available, round trip transportation. If Artist is required by Company to stay at such distant location in excess of fourteen (14) consecutive days, then Artist shall be entitled, on a one-time basis, to one (1) additional business class round-trip transportation, if used, for a non-business companion.  In addition, Artist shall be entitled to first-class ground transportation shared with above-the-line personnel to and from sets, locations, residences, and airports.  Company shall not be responsible for any other expenses or perquisites of Lender or Artist.  All travel arrangements, including but not limited to the acquisition of airline tickets, booking of accommodations, etc., shall be made through Company's location or travel department, unless prior written approval is obtained from a Company business affairs executive.  Artist's travel and expenses perquisites shall be no less favorable than the travel and expenses perquisites contractually accorded to Mark Canton in connection with the Picture.

10.    Approvals And Controls: Company shall retain all approvals and controls, including the right to designate the production manager, estimator and location auditor, and the right to initiate action at any time and in any respect in connection with the Picture. Notwithstanding the foregoing, Company shall meaningfully consult with Artist as practicable regarding the key creative matters with respect to the Picture (e.g., writers, location cast, key crew, locations, schedule and final screenplay) and regarding the initial U.S. theatrical release pattern and marketing campaign for the Picture, provided that with respect to all matters hereunder, Company's decision shall be final and binding.  Any inadvertent failure by Company to consult with Artist hereunder shall not constitute a breach by Company of the provisions hereof.

11.    Promotional Films:  Company contemplates filming and exploiting films including, without limitation, "behind-the-scenes" or "making-of" productions, (jointly and severally "Promotional Rights") about the production of the Picture produced hereunder.  Artist hereby agrees and consents to such

filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind-the-scenes photography and filmed interviews with Artist) and hereby grants to Artist the right to use Artist's name, voice and likeness which Artist shall be given the opportunity to approve in customary industry fashion in connection with such Promotional Rights for no additional consideration inasmuch as the compensation payable to Artist under this Agreement for the Picture shall be deemed to include compensation for all rights granted pursuant to this Paragraph 11. Company shall use all reasonable efforts to notify Artist in advance of the making of any such promotional films hereunder.

12.     Ownership and Distribution:  The results and proceeds of Lender's and Artist's services hereunder and in connection with the Picture shall be deemed a work-made-for-hire specially ordered or commissioned by Company.  Company shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, the Picture, and all elements therein for all now known or hereafter existing uses, media, and forms including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, any computer-assisted media (including, but not limited to Internet, CD-Rom, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised), character, sequel, remake, merchandising and all subsidiary, ancillary and allied rights therein, and the foregoing is inclusive of an irrevocable full assignment to Company thereof.  Lender, on behalf of itself and Artist, hereby waives or grants to Company any "moral rights" or "droits morals" in any jurisdiction in and to the Picture.

13.     No Obligation To Use:  Company is not obligated to produce, distribute, and/or exploit the Picture or, if commenced, to continue the production, distribution, or exploitation of the Picture in any territory.  Regardless of whether or not Company elects to produce, distribute and/or exploit the Picture (or to commence same), Company is not obligated to use the services in whole or in part of Lender or Artist hereunder.

14.     Employment Eligibility:  Lender and Artist acknowledge that any offer of employment hereunder is subject to and contingent upon Artist's ability to prove his identity and employment eligibility as required by the Immigration Reform and Control Act of 1986.  Accordingly, Artist hereby agrees: (i) to complete and execute Section 1 ("Employee Information and Verification") of an Employment Eligibility Verification ("Form I-9") at the time of execution of this Agreement or commencement of services, whichever is earlier; and (ii) to deliver, in person, to Company said Form I-9, together with documentation of the employment eligibility of Artist, within three (3) business days of execution of this Agreement or commencement of services, whichever is earlier.  If Artist fails to complete and deliver the Form I-9 as provided above, Company shall have the right, if Lender or Artist fails to cure such breach within three (3) business days of receiving written notice to such effect, to terminate the Agreement and thereupon Artist's engagement hereunder shall cease and terminate and neither party shall have any right, duty or obligation to the other under this Agreement except such as shall have accrued prior to the effective date of termination.

15.     Representations, Warranties and Undertakings:

        a.  Lender and Artist hereby jointly and severally represent, warrant and undertake to Company as follows: (i) Lender and Artist have full right, power and authority to enter into and perform this Agreement and to the best of Lender and Artist's knowledge no rights of any third parties are or will be violated by Lender's and Artist's entering into or performing this Agreement; (ii) Lender and Artist are not subject to any conflicting obligations or disabilities and neither Lender nor Artist has done or omitted to do and will not do or omit to do any act or thing by license, grant or otherwise which shall or is likely to (as determined by Company in its good faith business judgment) impair, encumber or hinder the development, production and exploitation of the Picture by Company or the full performance of Lender's

v.7                                    5

and Artist's obligations and services hereunder; (iii) neither Lender nor Artist has accepted or paid, nor will Lender or Artist accept or pay or agree to accept or pay any money, service or other consideration (as defined in Section 507 of the Federal Communications Act of 1934, as amended) for the inclusion of any matter in the Picture, other than payment by Company to Lender hereunder; (iv) there is a valid and subsisting written agreement between Lender and Artist whereby Artist is obligated to render services exclusively to Lender throughout at least the full term of this Agreement; and (v) Lender is authorized under said written agreement to enter into this Agreement with Company, to furnish Artist's services to Company, to grant to Company the rights herein set forth, and to authorize the payments by Company to Lender specified in this Agreement.

b.        Lender and Artist hereby agree to fully and effectively indemnify Company, its affiliates and licensees from and against any loss, liability, cost, damage or expense (including reasonable outside attorney's fees and expenses) incurred directly or indirectly by reason of any breach of the foregoing representations, warranties or covenants by Lender or Artist.

c.        Company hereby agrees to fully and effectively indemnify Lender and Artist from and against any loss, liability, cost, damage or expense (including reasonable outside reasonable attorney's fees and expenses) arising as a result of Company's development, production, distribution, advertising and/or exploitation of the Picture, except for any or such loss, liability etc. arising out of circumstances for which Lender and/or Artist are required to indemnify Company hereunder.

16.      <u>Delivery/Specifications</u>:  To the extent within Artist's control:

Artist shall deliver the completed Picture to Company in accordance with a post production schedule approved by Company. "Delivery" shall be deemed to have occurred only upon Artist's delivery to Company of an answer print which conforms to all of Company 's standard delivery requirements, which requirements include, but are not limited to, those contained in the remainder of this Paragraph. If Company (in the exercise of its sole discretion) elects to proceed to production and Lender and Artist render producing services on the Picture, the Picture shall conform to the final version of the Screenplay approved by Company, except for any minor non-material changes as may be necessitated by the exigencies of production and such material changes, if any, as may be pre-approved by Company in writing; shall be of first class technical quality and photographed in the English language, in color in 35mm film and capable of being projected with an aspect ratio of 1:2.35 (Cinemascope) with no hard matte; shall be delivered with a running time, inclusive of main and end titles (with end titles not to exceed 3 minutes), of no less than 95 minutes and no more than 110 minutes; shall be capable of receiving a MPAA rating no more restrictive than "R" (unless Company agrees to a more restrictive rating), shall be produced using only first-class facilities and equipment for photographs, recording, film processing, scoring, dubbing and all other aspects of production and post-production, shall be completely finished, fully edited and titled and fully synchronized with language, dialogue, sound and music.  Upon delivery of the Picture, there shall be no liens (other than the customary SAG lien if the Picture is SAG, provided that the Picture shall not be SAG without Company's prior written approval) against the Picture and all costs of its production (including, but not by way of limitation any and all music costs and/or licenses) shall be paid.  The production shall be run with standard financial controls, including, without limitation, double signatures required on all fundings to the production and on all production checks. There shall be no material changes in the specifications without Company's prior written approval. Delivery shall  be made in accordance with Company's standard delivery schedule with a review period of forty-five (45) days from Company's receipt of all items. Company acknowledges that the delivery and specifications requirements of this Paragraph 16. shall be no more restrictive than those of the Director of the Picture.

17.     <u>Videocassette/DVD/Soundtrack</u>:  If Lender and Artist are not otherwise in material breach hereof then Company shall furnish Artist with a videocassette, DVD copy and soundtrack of the Picture, at no charge, promptly following Artist's written request therefor after the date, if ever, videocassette, DVD and/or soundtrack copies of the Picture are available to the general public; provided however that Artist executes Company's then applicable use-restriction agreement in connection therewith.

18.     <u>Errors And Omissions Insurance</u>:  Lender and Artist shall be covered as additional insureds under any Errors and Omissions insurance policy and general liability insurance policy which Company may obtain for the Picture, during the development, production and the customary period of distribution of the Picture, subject to the limitations, restrictions and terms of said policies.  Lender acknowledges that there shall be no obligation to obtain or maintain any such coverage in connection with the Picture.  The provisions of this Paragraph 18. shall not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement hereunder.

19.     <u>Premiere</u>:  Provided that Lender and Artist fully are not otherwise in material breach hereof, each individual comprising of Artist and one (1) non-business guest each shall be each invited to any film festivals where the Picture is in competition, and one (1) U.S. premiere, if any, of the Picture and if such premiere is more than fifty (50) miles away from Artist's then principal residence (currently Los Angeles, California), each individual comprising of Artist one (1) non-business guest shall receive first-class round-trip air and ground transportation, if available and used for this purpose, first-class accommodations and expenses in accordance with Company's then existing policy.

20.     <u>No Injunctive Relief</u>:  Lender and Artist's sole and exclusive remedy for Company's breach hereof (including any term pertaining to credit) shall be solely an action for damages.  Lender and Artist hereby irrevocably waive and relinquish any right they might otherwise have to seek and/or obtain equitable or injunctive relief for any reason.

21.     <u>Further Assurances</u>:  At Company's request, Lender shall cause Artist to execute any and all additional documents and instruments (not inconsistent with the terms hereof) reasonably deemed by Company to be necessary or desirable to effectuate the purposes of this Agreement.  Company shall provide Lender and Artist with copies of additional documents executed by Lender and Artist, if any.  Lender and Artist hereby appoint Company, or its nominee, as Lender's and/or Artist's irrevocable attorney-in-fact, with the right but not the obligation, for the sole benefit of Company, and at Company's expense, to bring, prosecute, defend and appear in suits, actions, and proceedings of any nature concerning all copyrights in and to the Picture, all products of Lender's and/or Artist's services hereunder, and all renewals thereof, or concerning any infringement of any such copyright or renewal copyright, or any interference with any of the rights herein granted to Company; and to take such action as Company may deem advisable to enforce, protect, and/or defend any of the rights, privileges and property herein granted to Company under any and all such copyrights and renewals thereof, as well as any of the rights, licenses, privileges, warranties and agreements contained and/or set forth in any of the documents herein referred to, insofar as the same relate to the rights, privileges and property herein granted to Company; and to litigate, collect and give receipt for all damages arising from any infringement of any such rights.  Any such action may be taken by Company in the name of Lender and/or Artist or otherwise, and Company may join Lender and/or Artist as a party plaintiff or defendant in any such suit, action or proceeding.  The foregoing power of attorney shall be deemed a power coupled with an interest.

22.     <u>Notices</u>:  Any notice pertaining hereto shall be in writing.  Any such notice due hereunder shall be served by delivering said notice: (i) by hand with an appropriate receipt obtained; (ii) by overnight mail by a nationally recognized carrier; (iii) by facsimile with confirmation of receipt; or (iv) by sending

v.7                                             7

it by certified or registered mail return receipt requested, postage or applicable fee prepaid, addressed as follows:

To Artist:          Intellectual Properties Worldwide
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Attn.: Marc Toberoff
Fax: (310) 277-2104

To Company:     c/o The Weinstein Co., LLC
5700 Wilshire Blvd.
Los Angeles, CA 90036
Attn.: Andrew Kramer, EVP, Business and Legal Affairs
Fax: (323) 965-9053

cc:             The Weinstein Co., LLC
375 Greenwich Street, 4th Floor
New York NY 10013
Attn.: Sarah Sobel, SVP, Business and Legal Affairs
Fax:    (212) 965-4682

or to such other address as the parties hereto may hereafter designate in writing, and the date of notice shall be deemed to be made or given on the date of sending (if sent on a business day or otherwise the next business day) when sent by fax or by hand, on the next business when sent by overnight mail and three (3) business days after mailing when sent by certified or registered mail. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

23.     <u>Cross Default.</u> Any material breach or default by Artist of this Agreement and/or of the Assignment Agreement may at Company's election, be deemed a material breach or default hereunder and//or a material breach or default of any or all such agreements.

24.     <u>Turnaround:</u> If Company abandons the Picture, or if principal photography of the Picture has not commenced within six (6) years from the date hereof, then Company shall notify Artist in writing of such abandonment and Artist and Mark Canton shall be entitled to a shared turnaround right for a period commencing upon the earlier of: (a) Company's notice to Artist of abandonment or (b) the expiration of the aforementioned six (6) year period, and expiring eighteen (18) months thereafter, subject to Company's standard terms and conditions as set forth in its Exhibit "T" attached hereto and made a part hereof.

25.     <u>Miscellaneous:</u> All other terms and conditions of this Agreement shall be in accordance with usual and customary terms and conditions for agreements of this kind within the motion picture industry, subject to good faith negotiations in accordance with industry standard parameters for producer agreements of this type and consistent with the budgetary limitations of the Picture and Artist's stature as a producer in the motion picture industry. This Agreement shall be governed by New York law and shall be subject to the jurisdiction of the Federal and State Courts of New York County. This letter agreement may be executed in one or more counterparts, and when executed by each of the parties signatory hereto,

v.7                      8

said counterparts shall constitute a valid, binding agreement.  An executed counterpart returned by facsimile shall be deemed an original.

Sincerely yours,

THE WEINSTEIN COMPANY, LLC

By:      _____

Its:      _____

ACCEPTED AND AGREED:

IP MANAGEMENT

By:      _____

Its:      _____

COUNTERSIGNED:

_____

MARC TOBEROFF

v.7                                           9

Exhibit A

<u>CERTIFICATE OF EMPLOYMENT</u>

Dimension Films, a division of The Weinstein Company, LLC ("TWC"), or a development/production entity to be designated by TWC (together, "Company"), whose address is 375 Greenwich Street, New York, NY 10013 has engaged IP Management, Fed. I.D 20-3943729 ("Employer") f/s/o Marc Toberoff ("Employee") to render producing services on a motion picture project tentatively entitled "Piranha" (the "Picture"). The principal terms and conditions of Company's and Employee's engagement for the Picture are set forth in that certain agreement ("Agreement") dated as of May 21, 2007, between, on the one hand, Company, and, on the other hand, Employer and Employee and are incorporated herein by this reference.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Employer and Employee do hereby acknowledge, certify and agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Employer and/or Employee in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Employer and/or Employee which in any way relate to the Picture or to the material on which the Picture will be based (collectively, the "Material"), are and shall be deemed to be works made for hire for Company. Accordingly, Company is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised. If under any applicable law the fact that the Material is a work made for hire is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Employer and/or Employee under such applicable law, Employer and Employee hereby assign and transfer to Company the Rights and, in connection therewith, any and all right, title and interest of Employer or Employee in the Picture and any other works now or hereafter created containing the Material.

Employer and Employee hereby grant Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Company may in its sole discretion determine. To the fullest extent allowable under any applicable law, Employer and Employee hereby irrevocably waive or assign to Company their so-called "moral rights" or "droit moral". Employer and Employee expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Employer or Employee of "moral rights" or "droit moral" is not effective, then Employer and Employee agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

Employer and Employee will, upon reasonable request, execute, acknowledge and deliver to Company any and all documents consistent herewith which Company may reasonably deem necessary to evidence and effectuate all or any of Company's rights hereunder. Employer and Employee hereby irrevocably appoint Company as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Employer and Employee

fail to execute, acknowledge and deliver within five (5) business days of Company's request therefor. The appointment shall be a power coupled with an interest. Copies of any such documents executed on Employer and Employee's behalf by Company shall promptly be forwarded to Employer and Employee's representatives.

Employer and Employee hereby grant to Company the right to issue and authorize publicity concerning Employee, and to use Employee's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture. Employer and Employee shall exercise approvals hereunder reasonably and within five (5) days after request by Company, or such approvals shall be deemed given.

Employer and Employee warrant that the Material is or will be original with Employee or is in the public domain throughout the world, and is not and will not be based in whole or in part on the life of any real person except as approved in writing by Producer, and, to the best of Employer's and Employee's knowledge (in the exercise of reasonable prudence), does not and will not infringe upon or violate any copyright of, or infringe upon or violate the right of privacy or any other right of, any person; and that Employer and Employee are free to grant all rights granted and make all agreements made by them herein; and that Employer is a corporation duly organized and existing under the laws of the state of its incorporation. Employer and Employee agree to hold Producer and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Producer or any of its successors, licensees or assigns may suffer or incur by reason of the breach of any of the warranties made in this paragraph. If Producer so elects, Producer shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies. Producer shall have the sole right to control the legal defense of any such claims, litigation, etc. including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation. The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Producer shall defend, indemnify and hold harmless Employer and Employee against any and all liability, damages, costs and expenses, including reasonable attorneys' fees, in connection with any claim or action (other than those arising out of a breach of Employer's and/or Employee's warranties hereunder or out of any criminal, malicious or willful acts by Artist) respecting material supplied to Employer and/or Employee by Producer or in connection with activities regarding the Producer's development, production, distribution or exploitation of the Picture, provided that (i) Employee cooperates fully with Producer in the defense of any such claim or legal action at no cost or charge to Producer other than the reimbursement to Employer of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action excluding legal fees; (ii) Producer shall have the right to select and retain any legal counsel in connection with the defense of any such claim or legal action and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action.

Employer and Employee hereby covenant and agree that Employer and Employee shall not have or be deemed to have any lien, charge or other encumbrance upon any of the rights conveyed to Company herein or proceeds derived therefrom, and that no act of or omission by Company, nor any other act, omission or event of any kind, shall terminate or otherwise adversely affect Company's ownership of the rights conveyed herein. Employer's and Employee's sole remedy for

v.7                                    11

any such breach or alleged breach shall be an action at law to recover such damages as may have been actually suffered by them as a result thereof.

Executed as of May 21, 2007.

ACCEPTED AND AGREED:

IP MANAGEMENT

By: _____

Its: _____

COUNTERSIGNED:

_____
MARC TOBEROFF

State of California

County of _____

    On _____, before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

    WITNESS my hand and official seal.

                                                  _____
                                                  Notary Public

Exhibit B

INDUCEMENT

Reference is hereby made to that certain agreement (the "Agreement") dated as of May 21, 2007, by and between, on the one hand, Dimension Films, a division of The Weinstein Company, LLC (or a production/development entity to be designated) (together, "Company") and, on the other hand, IP Management ("Lender") for the producing services of Marc Toberoff ("Artist") on a motion picture tentatively entitled "Piranha" (the "Picture").

A.       I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof.  I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement in so far as they relate to me, even if the employment between me and Lender should hereafter expire, terminate or be suspended.  I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

B.       Unless I am deemed substituted for the Lender as a direct party to the Agreement pursuant to Paragraph D below, I shall look solely to Lender and not to Producer for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

C.       In the event of a breach or threatened breach of the Agreement by Lender or by me, Producer may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

D.       I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation.  If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Producer's election, be deemed to be employed directly by Producer for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

E.       I will indemnify Producer for and hold it harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable attorney's fees) which may be obtained against, imposed upon or suffered by Producer or which Producer may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required or permitted to be deducted and withheld from the compensation of any employee under the laws of any state or province or otherwise pursuant to U.S. or Canadian law, and/or any amendments thereof and/or any other applicable statutes heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee.

F.       If Producer shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

G.       For purposes of any and all Workers' Compensation statutes, laws or regulations ("Workers' Compensation"), I acknowledge that an employment relationship exists between Lender and me, Producer being my special employer under the Agreement.  Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Producer or

v.7                                                    13

Producer's affiliated companies and their respective officers, agents, and employees (including without limitation, any other special employee and corporation or other entity furnishing to Producer or an affiliate producer the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

_____

Marc Toberoff ("Artist")

## EXHIBIT T

## (TURNAROUND)

This Exhibit T is incorporated into that Agreement dated as of May 21, 2007, between, one the one hand, Dimension Films, a division of The Weinstein Company, LLC (together "Company") and, on the other hand, IP MANAGEMENT f/s/o Marc Toberoff ("Producer") to render producing services as a team in connection with the motion picture project tentatively entitled "Piranha" (the "Picture").

11.  If Company elects to abandon the Picture, then Producer and Mark Canton together shall have eighteen (18) months from the date of abandonment (the "Turnaround Period") to place the Picture elsewhere and acquire all of Company's right, title and interest in and to the Picture, (collectively, the "Property"), subject to all existing agreements, obligations, liabilities, and commitments pertaining thereto, by reimbursing Company as provided below and complying with all other terms and conditions herein.

2.  If, during the Turnaround Period, the Picture is placed elsewhere for development, production, or otherwise, Producer shall: (i) pay Company or cause Company to be paid contemporaneously therewith an amount equal to (a) all costs, expenses, advances, and payments (collectively, "Costs") in connection with the Picture, plus (b) Company's supervisory fee of fifteen percent (15%) of the Costs, plus (c) interest on the aggregate sum of clauses (a) and (b) computed weekly from the week in which an item of Costs was incurred until repaid to Company as herein provided at an annual rate equal to one hundred twenty-five percent (125%) of the U.S. prime rate of the Bank of America, as such rate may vary from time to time; (ii) deliver to Company within the Turnaround Period written undertakings by Producer and by a party having financial responsibility satisfactory to Company, pursuant to which Producer and such party: (a) agree to pay to Company a sum equal to five percent (5%) of one hundred percent (100%) of the net proceeds derived from each motion picture and/or other production of any kind based on the Property; such net proceeds share shall be defined, computed, accounted for and paid in accordance with the most favorable terms applicable to any other participant in the gross receipts of the motion picture or other production (or, if there are none, then such definition shall be subject to good faith negotiations between Company and such third party financier and/or distributor of such motion picture or other production), but in no event shall Company's net proceeds share be subject to any so-called overbudget penalty or cross-collateralization provisions nor shall allocation to or recoupment of Producer's overhead apply as to Company; and (b) assume and agree to indemnify Company and hold Company harmless of and from all obligations, claims, demands, actions, costs, expenses (including reasonable attorney's fees) and liability of every kind arising out of any contracts or commitments which may have been made in connection with the Property prior to the date thereof; and (iii) deliver to Company Assumption Agreements in the form prescribed by the Writers Guild of America Basic Agreement, Screen Actors Guild of America Basic Agreement and the Directors Guild of America Basic Agreement, as applicable, which are in effect at the time. Upon satisfaction of all the foregoing terms and conditions, Company will quitclaim its right, title, and interest in the Property to Producer subject to the terms and conditions hereof.

3.  During the Turnaround Period (and for a period of sixty (60) days following Producer's compliance with all of the terms and conditions of paragraph 2 above), Producer shall serve notice on Company of any changed, additional, or new elements pertaining to the Picture (e.g., a change of lead actor, director, a material change in the screenplay or a storyline not previously discussed with Company, a change in the budget, or a change in the financial terms of the deal less favorable to Producer than those contained in the Agreement or than those last presented to Company (collectively, "Changed Elements"). Company shall have ten (10) business days within which to accept such Changed Elements and thereby terminate the Turnaround Period. Company shall not be required to accept any such Changed Elements which

cannot be as easily met by one person as another. Notwithstanding the foregoing, if such Changed Elements consist of additional writing commissioned by Producer (or any successor, licensee or assignee thereof) prior to Producer's compliance with all of the terms and conditions in paragraph 2 above, then the Turnaround Period shall terminate immediately, and Company shall have the right (but not the obligation), at any time after such termination of the Turnaround Period, to acquire all right, title and interest in and to such additional writing by paying to Producer (or said third party, if applicable) the actual direct cost thereof. If Company does not exercise said right, neither Company nor Producer will use any of such additional material developed by Producer, but Producer acknowledges that screenplays thereafter developed by Company, because they stem from the same source material, may be similar to such additional writing. If Company accepts such Changed Elements and resumes active development of the Picture, then Producer shall resume rendering services under the terms and conditions contained in the Agreement.

4.   If, during the Turnaround Period, the Picture is placed with a third party ("Third Party") for development, production or otherwise ("Third Party Agreement"), Company shall have the option to co-finance the Picture as follows, and such Third Party Agreement (and any quitclaim of Company's right, title and interest in the Picture pursuant to Exhibit "T") shall be subject to the following:

Lender will provide to Company written notice setting forth the final budget, final script, director and actors to portray the principal cast members for the Picture. Company shall then have twenty (20) business days following receipt of such written notice, budget and script to elect whether or not to co-finance the Picture with the Third Party. Notwithstanding the foregoing, after the initial election, if there is a material change in the final budget (increase or decrease of 5%), material change to the final screenplay or change of director and/or lead cast, then Lender shall notify Company in writing and Company shall have an additional option for ten (10) business days from receipt of such notice to elect whether or not to co-finance the Picture. If Company elects not to co-finance the Picture with such changed element, then Company shall have a lien on the Picture for any and all sums contributed by Company as set forth below, which sum shall be payable out of the budget of the Picture upon commencement of principal photography or when the Picture is abandoned (whichever occurs first). Lender and/or the Third Party will not offer the right to co-finance the Picture and/or to acquire distribution rights (in whole or in part) to any third party prior to offering Company the opportunity to exercise its co-financing rights in accordance with the foregoing.

If Company elects to co-finance the Picture, Company shall contribute 50% of the costs of pre-production, production and post-production of the Picture on a "cash flow" basis over such periods and Company shall have the right to distribute the Picture throughout the world, excluding the U.S. and Canada.

In the event Company co-finances the Picture, gross receipts received by or credited to Company and the Third Party in connection with the Picture shall be divided between Company and the Third Party in the following manner on an on-going basis: (a) Company and the Third Party shall deduct from the gross receipts each derives from exploitation of the Picture all of its distribution costs; (b) once one party has recouped all of its distribution costs, if the other party has not recouped its distribution costs, then all gross receipts from the recouped party shall be paid to the un-recouped party until both have fully recouped all distribution costs; and (c) thereafter, each party shall pay the other party 50% of the gross receipts derived in its respective territory. Company and the Third Party shall enter into a co-financing agreement incorporating the above terms and such additional terms as shall be negotiated between Company and the Third Party in good faith based on the applicable provisions of recent Company co-financing agreements.

v.7                                            16

For the sake of clarity and avoidance of doubt, any Third Party Agreement shall be subject to, and include a provision that the Third Party shall assume all, obligations of Lender pursuant to Exhibit "T" as modified by this Amendment.

5.  If, after Producer has complied with the terms and conditions of paragraph 2 above, the Picture actually is financed by an entity which is neither a major theatrical distributor of motion pictures nor a major independent company which is a party to an exclusive distribution deal with a major distributor, then Company shall have the right of first-look/last-refusal for any and all rights of distribution in the Picture in accordance with the following procedures:

a.  Company shall have "first look" at the Picture (i.e., the Picture shall not be exhibited to any third party for the purpose of negotiating for the disposition of any distribution rights therein before the Picture is exhibited to Company). The Picture shall be exhibited to Company as soon as possible after completion (prior to the answer print, if practicable).

b.  Company shall have a period of ten (10) business days after viewing the Picture to notify Producer whether or not Company elects to negotiate to acquire said rights. If Company serves notice on Producer that Company does not elect to so negotiate, then Producer may dispose of said rights in the Picture.

c.  If Company serves notice on Producer that Company elects to so negotiate, then Producer (or the financier, if applicable) shall negotiate exclusively with Company in good faith with respect to Company's acquisition of said rights in the Picture.

d.  If such negotiations do not result in an agreement between Producer and Company within a period of thirty (30) days from the commencement thereof, then Producer shall serve Company with a final written offer stating the terms and conditions upon which Producer will transfer such rights to Company (the "Offer"). If Company does not accept such Offer within five (5) business days, then Producer may negotiate elsewhere for the disposition of such rights, but Company may meet any third party's bona fide offer which Producer is willing to accept which is less favorable to Producer than the Offer (the "Outside Offer"). Producer shall serve Company with written notice of any such Outside Offer, specifying all the terms and conditions thereof and the name of the third party offering the same. Company shall have a period of fifteen (15) business days from receipt of such notice of the Outside Offer to notify Producer of Company's election to meet the Outside Offer; provided, however, that Company shall not be required to meet any terms which cannot be met as easily by one person as another. If Company elects to meet the Outside Offer, then Producer will promptly execute written agreements conveying to Company such rights upon the terms and conditions specified in the Outside Offer.

e.  If Company does not acquire such rights under the foregoing provisions, then Producer (or the financier, if applicable) may sell or otherwise dispose of such rights, but only upon the terms and conditions specified in the Offer (or Outside Offer, as the case may be). If Producer (or the financier, if applicable) is willing to accept any terms and conditions which are less favorable to Producer than those set forth in the Offer (or Outside Offer, as the case may be), or Producer proposes to deal with a different third party, then Producer shall again serve Company with notice of same in accordance with the procedures set forth in subparagraph d. above.

6.  Notwithstanding the foregoing, Company may give notice to Producer during the Turnaround Period that Company elects to reinstate the development of the Picture, and Producer's turnaround right shall be deemed revoked if Company gives said notice to Producer at any time prior to Producer's exercise of said turnaround right by compliance with all of the terms and conditions contained herein.

7.  If at any time (whether before, during, or after the Turnaround Period), Company or Producer fails to extend or exercise an option, if any, to any underlying property upon which the Picture is to be based, then: (i) Producer's rights hereunder shall terminate upon the earlier of the expiration of such option or the Turnaround Period; and (ii) any rights which Producer may thereafter acquire in such underlying property, whether directly or indirectly, shall be deemed held in trust by Producer for Company's benefit until Company is fully paid, as provided in paragraph 2.

8.  Producer acknowledges and agrees that unless Producer has exercised said turnaround right by complying with all of the terms and conditions contained herein, neither Producer, nor Producer's successors or assigns, shall have the right to develop or produce, or to enter into any agreement with any third party for the development, production, financing and/or distribution of, the Picture or any screenplay or other material developed in connection therewith, for so long as Company has any rights (including option rights) therein. The Turnaround Period shall terminate immediately upon any violation of this paragraph.

9.  If the Picture is not placed elsewhere and/or if Producer has not complied with the terms and conditions above (including, without limitation, complete payment to Company) by the expiration of the Turnaround Period, then Producer's rights hereunder respecting the Property and the Picture shall terminate and Company's ownership of the Property and the Picture and all underlying properties and rights encompassed therein shall be absolute as between Company and Producer. Company, upon expiration of the Turnaround Period, may use, dispose, and otherwise exploit the Property and the Picture as Company determines in its sole discretion, without any further obligation to Producer.

10.  During the Turnaround Period, there shall be a first and prior lien on the Picture in favor of Company until Company is fully reimbursed as specified herein.

END OF EXHIBIT

v.7

19

# EXHIBIT "DRCB"

This Exhibit is attached to and made part of the Agreement dated as of _____ between THE WEINSTEIN COMPANY LLC (or development or production entity designated by The Weinstein Company LLC ("TWC") and _____ ("Participant") relating to the motion picture project currently entitled "_____" or such other project(s) or production(s) described therein (the "Picture").

## <u>NOTE:  PLEASE READ CAREFULLY</u>

**This Exhibit DRCB sets forth the contractual formula to be used solely for the definition, computation, and accounting of Defined Receipts and payment, if any, of Participant's Defined Receipts Contingent Bonus as provided in the Agreement. Participant understands and agrees that:  (i)  the defined terms shall have the meanings described in this Exhibit DRCB; (ii) the words or defined terms used herein may not necessarily correspond in any way to generally accepted accounting principles or any other definitions associated with the practices of accounting or auditing; (iii) there is no guarantee whatsoever that, and it is uncertain whether, any Defined Receipts Contingent Bonus will become payable to Participant, regardless of the level of income, revenues, profits and/or receipts, if any, that TWC, Affiliates or Related Parties, or any distributor or exhibitor realizes from the exploitation of the Picture; (iv) Participant shall be entitled to the payment of Defined Receipts Contingent Bonus amounts only in accordance with the terms hereof, and Participant acknowledges and understands that any such payment is entirely speculative; (v) Participant has been represented by counsel or other representative(s) of their choice in the negotiation of the terms of the Agreement and this Exhibit DRCB; (vi) Participant has a full understanding of the terms of the Agreement and this Exhibit DRCB; (vii) TWC's, Affiliates' and Related Parties' accountings for financial reporting, tax reporting or other purposes are not prepared in the same manner as accountings pursuant to this Exhibit DRCB; (viii) no fiduciary relationship whatsoever exists between TWC and Participant, including without limitation, arising from the obligation of TWC to account for Defined Receipts and potentially to pay a Defined Receipts Contingent Bonus to Participant; (ix) the terms of this exhibit are part of a comprehensive negotiated agreement that contains both economic and non-economic terms; and, which taken as a whole, is the product of an arm's length give and take negotiation whether or not changes have been made to this Exhibit DRCB; and (x) no representations whatsoever, expressed or implied, have been made to Participant that are contrary to this Paragraph.**

**Initialed: _____ (Participant)**

## DEFINED RECEIPTS CONTINGENT BONUS FORMULA

"Adjusted Defined Receipts" shall mean the remaining Defined Receipts (as defined in Paragraph 1.1.A of the attached Schedule 1, subject to the exclusions set forth in Paragraph 1.1.B of said Schedule), after the deduction of the Defined Receipts Deductions set forth in Paragraph 1.1.C of the attached Schedule 1.

Participant's "Defined Receipts Contingent Bonus" shall be Participant's percentage or share (as set forth in and subject to the applicable terms of the Agreement to which this Exhibit DRCB is attached) of the Adjusted Defined Receipts.

The terms used in this Defined Receipts Contingent Bonus Formula are defined in, and the Defined Receipts Contingent Bonus hereunder shall be accounted for, pursuant to the terms and conditions of the attached Schedule 1.

## SCHEDULE 1

1. **DEFINITIONS**

 1.1. **Defined Receipts**

 A. "Defined Receipts" means the aggregate of all receipts actually received by TWC on behalf of the Picture in U.S. dollars in the U.S. or in a foreign currency which are not Restricted Funds, only from:

 1. TWC's direct distribution of the Picture in theatres and on television ("TV"), including theatrical and non-theatrical exhibitions, and free, cable and pay TV exhibitions.

 2. Distribution of the Picture by a Subdistributor. With respect to distribution through Subdistributors the following alternative methods of calculation shall apply to the receipts derived therefrom and the distribution costs and fees relating thereto, whichever alternative TWC elects from time to time as to each such Subdistributor: either (a) all such receipts received and earned by the Subdistributor, and all distribution costs of the Subdistributor relating to the Picture, to the extent reported to TWC, shall be treated as though such receipts were earned by TWC and such distribution costs were distribution costs of TWC, and the applicable TWC distribution fee shall include the Subdistributor's distribution fee; or (b) TWC's share of such receipts actually earned and received by TWC from such Subdistributor shall be included in Defined Receipts upon which share TWC shall be entitled to the applicable TWC distribution fee.

 3. Manufacture and distribution of audio-visual cassettes, video discs and all electronic, digital and/or optical storage and/or transmission formats, any analog or digital reproductions, or any similar device and/or format embodying the complete Picture in linear form, whether now known or hereafter devised ("Video Devices"); provided that Defined Receipts for Video Devices sold by TWC or by any Subdistributor (whether or not an affiliate of TWC) whose revenues and distribution costs are treated as revenues and distribution costs of Company in accordance with paragraph 1.1.A.2., above, shall be: (A) 20% of (1) the "net wholesale receipts" (as defined below) actually received by Company or any such Subdistributor licensed by Company, from the exploitation of the Picture's home video rights for "rental priced" home videos actually sold and paid for and not returned (less rebates, credits and taxes) and (2) sums actually received by Company through any so-called "revenue-sharing programs" involving all such Video Devices, computed after deducting from the total of such monies the deductible items set forth in (a) through (d) below; and (B) 10% of (1) the net wholesale receipts actually received by Company or such Subdistributor from the exploitation of the Picture's home video rights for sell-through and repriced home video rights for sell-through and

repriced home videos actually sold and paid for and not returned (less rebates, credits and taxes).

As used in this paragraph 1.1.A.3., the term "net wholesale receipts" shall mean the wholesale selling price derived from the sale at the wholesale level of Video Devices during the applicable accounting period, less the aggregate of the following items (prorated in accordance with the standard practice of TWC): (a) all adjustments such as returns and other credits, allowances, rebates and refunds, (b) deposits, advances and periodic payments until earned or forfeited, (c) sales, excise and remittance taxes, however denominated, and duties, (d) costs of marketing and advertising such Video Devices, and (e) subdistribution fees charged, not to exceed 5%.

 4. "Flat Sale" licenses for the theatrical exhibition of the Picture for a specified period for any territory or area (excluding the U.S. and Canada) in consideration of the payment of a specified amount not calculated by a percentage of receipts of the applicable licensee.

 5. Compensatory receipts (less all costs and fees) from copyright infringers of the Picture.

 6. Receipts from theater box office operated by TWC in connection with four-wall or road show exhibitions of the Picture to the extent receipts from all such exhibitions taken as a whole exceed costs incurred for all such exhibitions.

 7. The royalties as provided in Schedules A (Music) and B (Soundtrack Records, Merchandising/Publishing), which are attached hereto and incorporated herein by this reference.

 B. **Defined Receipts Exclusions**

The following are not included in Defined Receipts:

 1. Box office or other amounts retained by any theater or other exhibition venue (except as specified in Paragraph 1.1.A.6 hereof) for their own account; and receipts of: broadcasters and other transmitters by all means now known or hereafter devised; wholesale or retail distributors, licensors or sellers of Video Devices, audio devices and other products; book or music publishers; merchandisers and retailers; or any other similar Person, whether or not any or all such excluded Persons are owned, operated or controlled by TWC, Affiliates or Related Parties.

 2. Amounts received from advance payments or security deposits unless earned by exhibition or broadcast, or (subject to Paragraph 1.1.A.2) unconditionally non-returnable, and refunds, rebates or adjustments granted to other Persons by TWC.

Exhibit DRCB

2

3.   Amounts payable in foreign currency and not received by TWC in the U.S. due to remittance restrictions ("Restricted Funds"). Restricted Funds shall not be included in Defined Receipts nor accounted for unless and until they have been received by TWC in U.S. dollars in the U.S. or expended by TWC in the territory in which held, except as provided in 1.1.B.3(a) below.

(a) If any Defined Receipts Contingent Bonus becomes payable to Participant under this Agreement, Participant may notify TWC in writing that Participant desires to have included in Participant's Defined Receipts Contingent Bonus, Participant's share of Restricted Funds in a particular territory and designate a bank or other representative in such country, to whom payment may be made for Participant's account. Upon TWC's receipt of such notice and all required permissions, such payment shall be made to Participant's representative at Participant's expense. Upon payment of Participant's share of Restricted Funds, TWC shall have no further obligation to account for such Restricted Funds whether as Defined Receipts or otherwise.

(b) On Participant's written request, TWC shall report to Participant the amount of Restricted Funds (if any) which under this Paragraph 1.1.B.3 have not yet been included in Defined Receipts as of the closing date of the most recent statement which has been furnished to Participant under Paragraph 2.1 below.

4.   Amounts collected in connection with the distribution of the Picture as taxes or for payment of taxes (e.g., admission, sales, use or value added taxes, etc.).

5.   Amounts collected from exhibition of the Picture contributed to charitable organizations.

6.   Receipts from remakes, prequels, sequels, radio or TV series or other derivative uses of the Picture or any element thereof.

7.   Salvage value or receipts derived from print stocks, film or tape clips, stock footage, stills, props, sets, wardrobe, or other items included in Cost of Production/Acquisition except and only any sums received from the sale of cars purchased specifically in connection with the Picture and sold within six months after completion of photography, which sums shall be included in the Defined Receipts of the Picture.

C.   Defined Receipts Deductions

"Defined Receipts Deductions" means the aggregate of all costs, expenses and charges paid, advanced or incurred by TWC or a Subdistributor, on a continuing basis, directly or indirectly, in connection with the distribution, exhibition and exploitation of the Picture including without limitation:

1.       Theatre Level Advertising Expenses

"Theatre Level Advertising Expenses" shall mean all payments made, sums expended or credits allowed by TWC in connection with advertising and exploitation at the theatre level (whether or not TWC shares with the exhibitor the cost of such advertising and exploitation). "Theatre Level Advertising" shall include, but not be limited to, advertising in newspapers, on radio and television, personal appearances by actors and other production personnel in connection with or for the Picture, salaries and expenses of TWC's publicity-advertising personnel and field exploitation persons, all of which shall be appropriately allocated (in TWC's business judgment) to the Picture to the extent that such expenses shall be paid or incurred in connection with advertising at the theatre level.

2.       Conversion

Conversion to U.S. dollars and remittance of Defined Receipts to the U.S., including costs and fees of contesting the imposition of restrictions.

3.       Checking

Checking attendance and receipts, and investigating unauthorized use of the Picture, whether payable to or incurred by TWC employees or other Persons.

4.       Collections

Collection of Defined Receipts including attorneys' and auditors' fees and costs, and liability incurred by TWC in connection therewith.

5.       Residuals

All costs incurred and payments paid or payable, as required by applicable collective bargaining agreements by reason of exhibition of the Picture or any part thereof in any media, or equivalent payments. Any such payments made to or on behalf of Participant shall be deducted against Participant's Defined Receipts Contingent Bonus (if any) to the extent not prohibited by the applicable collective bargaining agreement. Any payments under this Exhibit DRCB made to Participant prior to payment of residuals shall constitute a credit against such residuals to the extent not prohibited by the applicable collective bargaining agreement; provided that any such credit, when applicable, shall not be taken a second time against Participant.

6.       Trade Dues/Piracy

The allocable portion, as determined in TWC's business judgment, of dues, assessments, legal fees and costs (including antitrust and piracy matters), and contributions to the MPAA, AMPTP or similarly constituted or substitute Persons throughout the universe.

7.       Licenses

All licenses, duties, customs charges, fees or any other amounts in addition to those referred to herein incurred in connection with the licensing of the Picture for exhibition and other uses of the Picture.

8.       Taxes

Taxes and governmental fees of any nature, and however characterized, including costs of contesting them, and interest and penalties thereon (other than TWC or Subdistributor corporate income taxes), imposed directly or indirectly on the Picture or any part thereof or on the

Defined Receipts or the license, distribution or exhibition of the Picture, or collection, conversion or remittance of monies connected therewith. Foreign remittance and withholding taxes charged to the Picture shall be determined as follows: the then-current effective tax rate for a particular country and distribution medium shall be multiplied by the Defined Receipts from such country and distribution medium. TWC shall be entitled to claim or receive, and in no event shall Participant be entitled, directly or indirectly, to claim, share or participate in or otherwise receive or derive any and all tax or other benefits of any kind or nature arising out of, in connection with or otherwise accruing in respect of any and all taxes (however denominated) described in this Paragraph 8, including without limitation, and all tax credits or deductions directly or indirectly attributable thereto or based thereon. In no event shall Defined Receipts Deductions or Cost of Production/Acquisition be reduced, or Defined Receipts be increased, by the amount of any such tax (however denominated) recouped by TWC because of the manner in which such taxes are elected to be treated by TWC in filing net income, corporate, franchise, excess profits or similar tax returns.

### 9. Copyright and Royalties

Copyright, trademark and patent costs in connection with the Picture and royalties payable with respect thereto, including without limitation, royalties payable to manufacturers of recording and reproducing equipment.

### 10. Other Versions

Preparing, making, delivering and using foreign, radio, TV, home video or any other media versions of the Picture, or titles thereof, or making changes required by censorship and rating considerations, or for any other purpose.

### 11. Reissue Costs

All costs directly related to the theatrical reissue of the Picture.

### 1.2. **Miscellaneous Definitions**

#### A. Includes

"Includes" (and equivalents "included" or "including") and "such as", are illustrative and not intended to be limiting.

#### B. Person

Any corporation, partnership or other business entity or natural person.

#### C. TWC

For the purposes hereof, "TWC" means The Weinstein Company and any owned or controlled subsidiaries of The Weinstein Company engaged in the business of theatrical, non-theatrical and television distribution of motion pictures. TWC shall not include: any theatrical exhibitor, radio or television transmitter or broadcaster; any satellite, cable or other pay television operator, nor any Person transmitting the Picture to such operators or any one else by any method or delivery system; any wholesale distributor or retailer of video discs, videocassettes or similar devices; any book or music publisher; any producer or distributor of audio products; any merchandiser; or any other similar Person, whether or not any of the foregoing excluded Persons are owned in whole or in part, operated or controlled by TWC.

#### D. Affiliate

For purposes of this Exhibit DRCB, "Affiliate" shall mean any entity (other than TWC) that is a subsidiary of The Weinstein Company (i.e., an entity of which The Weinstein Company owns, directly or indirectly through one or more intermediaries, more than 50% of the voting stock) and each other entity which, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, The Weinstein Company . For purposes of this definition, the terms "control," "controls," and "controlled" mean the power to direct the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

#### E. Related Party

For purposes of this Exhibit DRCB, "Related Party" shall mean any entity (other than an entity included in the definitions of TWC and Affiliate) which The Weinstein Company owns directly or indirectly through one or more intermediaries, more than 10% of the voting stock.

#### F. Subdistributor

A Subdistributor is a person other than TWC licensed by TWC for the distribution of the Picture with an obligation to report receipts and expenses to TWC. An Affiliate of TWC (other than owned or controlled subsidiaries) shall be deemed a Subdistributor if it distributes the Picture in one or more countries or media.

#### G. Territory

1. U.S. is the United States, together with any other countries licensed by or through the distributing organization(s) servicing the U.S. for TWC.

2. Canada is Canada, together with any other countries licensed by or through the distributing organization(s) servicing Canada for TWC.

3. The United Kingdom (U.K.) is United Kingdom of Great Britain and Northern Ireland, Republic of Ireland, Channel Islands, Isle of Man, Gibraltar, Malta.

4. Foreign is all countries (other than U.S., U.K. and Canada) and any other areas in the universe.

5. All foregoing references to countries include their territories and possessions, and political subdivisions.

6. Distribution to armed forces, airlines, ships and other means of transportation shall be included in the territory of their respective national origin.

#### H. Agreement

"Agreement" is the agreement to which this exhibit is attached, together with this exhibit, and any other attached amendments, exhibits and schedules.

### 2. ACCOUNTING

### 2.1. Statements

TWC shall give Participant quarterly summary statements relating to the calculation of Participant's Defined Receipts Contingent Bonus for the first two years after the date established by TWC as the date of first general release of the Picture in the U.S. (or if there is no U.S. general release, then upon general release outside the U.S.); semiannually for the next two years; and annually thereafter if any Defined Receipts Contingent Bonus is payable to Participant or, if none due, only on Participant's written request, provided such request is made not more than once per year. Statements shall be issued within 90 days after the end of each TWC accounting period and accompanied with payment of any amount shown due Participant. Notwithstanding the foregoing, if the Picture has been made available for U.S. TV syndication and the first statement thereafter issued shows that more than $500,000 in Defined Receipts would be needed before Participant would be entitled to receive Defined Receipts Contingent Bonus, TWC shall have no further obligation to render statements to Participant. If the Picture is generally reissued in the U.S. theatrically, then TWC shall resume quarterly statements for one year from the date of such reissue and thereafter in accordance with the above.

### 2.2. Incontestability

Statements are subject to correction or amendment by TWC at any time. Should TWC make any overpayment to Participant hereunder for any reason, TWC shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by TWC to Participant or for Participant's account, or may demand repayment from Participant in which event Participant shall repay the same when demand is made. Each statement and all matters of accounting and methodology are conclusive and binding on Participant 24 months after each statement is issued, unless Participant objects in writing within that 24 month period, specifying in detail the particular items on the statement and the nature of the objection(s). If the objections are raised timely, but are not resolved, Participant may initiate a claim with respect to such objections, provided such claim is instituted within 6 months following the date of the initial written objection or prior to the expiration of the period of the applicable statute of limitations, whichever occurs first. Participant may not institute or maintain a claim against TWC with respect to any item or transaction on a statement, whether in a lawsuit, an arbitration or any other proceeding unless Participant has first provided TWC with a timely and detailed written objection to such item or transaction. TWC must keep books of account for any given transaction on a statement for 24 months after the initial reporting of such transaction. All time periods referred to in this paragraph commence upon issuance of the first statement on which any particular transaction is reflected, and the reappearance of a transaction in cumulative statements shall not cause the running of any time period to toll or recommence.

### 2.3. Books

The items reflected in the statements, to the extent they have not become incontestable or have not been previously examined, may be examined at Participant's expense, once in each 12 month period (the first of which commences upon issuance of the first statement hereunder). Such statements may only be examined by a national firm of reputable CPA's, the selection of which is subject to TWC's approval not to be unreasonably withheld. TWC shall make available for examination those books of account with respect to the distribution of the Picture. Each examination of any statement or statements for a particular accounting period must be concluded within the earlier of six months following commencement or an aggregate of 30 examination days. A copy of the report of such examination shall be delivered by Participant to TWC when it is made available to Participant. Participant shall have no right to inspect or copy any tax return of TWC or any Subdistributor, Affiliate or any Related Party, or require the production of any such tax return or any information contained therein.

### 2.4. Withholdings

All amounts payable to Participant under this Agreement shall be subject to all applicable present and future laws and regulations requiring the reporting, deduction or withholding of payments for taxes or otherwise. TWC shall have the right to make such deductions and withholdings, and the payment or reporting thereof to the governmental agency concerned in connection with TWC's good faith determination of such laws and regulations shall constitute payment hereunder to Participant. TWC shall not be liable to Participant for the making of, or failure to make, such reports, deductions and/or withholdings or the payment thereof to the governmental agency concerned. In any such event, Participant shall have the sole responsibility for bringing and maintaining any claims against third parties regarding such reporting, deductions or withholdings.

### 2.5. Address

All statements shall be deemed issued when mailed to Participant at the address for notices under this Agreement.

### 2.6. Reserves

TWC shall have the right from time to time and in its business judgment to establish and adjust reserves for any distribution costs, uncollected accounts or other items which TWC believes in its business judgment will be deductible from or credited against Defined Receipts hereunder. TWC agrees to liquidate reserves within an appropriate period of time within TWC's business judgment.

### 2.7. Tax Credits

TWC shall have the sole right to take whatever credits (including investment tax credits), deductions or other benefits that may be available throughout the universe, with respect to taxes and excises payable in any way in connection with the Picture or otherwise, without any accounting, credit or payment obligation to Participant.

## 3. ADDITIONAL TERMS

### 3.1. Arbitration

TWC and Participant agree that any dispute between them concerning the rights and obligations of

TWC and Participant under this Exhibit DRCB, whether sounding in contract or tort, may only be adjudicated in accordance with the following procedure:

A. Either (i) TWC and Participant shall mutually select an arbitrator, or (ii) if they cannot agree on such arbitrator, TWC and Participant shall each select one arbitrator and those two arbitrators shall then select a third arbitrator.

B. The parties shall arbitrate the dispute in accordance with the then-prevailing Commercial Arbitration Rules of the American Arbitration Association (except to the extent expressly set forth elsewhere in this Exhibit DRCB) and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

### 3.2. **No Representation**

TWC has no obligation to distribute the Picture and if it does so, Participant acknowledges that TWC has no obligation to maximize Defined Receipts and has not made any representations with respect to the likelihood or amount of Defined Receipts or Defined Receipts Contingent Bonus, if any, which will or may be derived from distribution of the Picture.

### 3.3. **Control of Exploitation and Marketing**

A. As between TWC and Participant, TWC shall have exclusive and perpetual control of the distribution, marketing, advertising, publicizing, exploitation, sale or other disposition of the Picture and may distribute, or withhold or withdraw the Picture from distribution at its sole discretion with respect to one or more territories or media. TWC may distribute the Picture with other pictures whether or not TWC has any interest in such other pictures.

B. For all purposes under this Exhibit DRCB, allocations of Defined Receipts, costs, rights and other matters relating to the Picture and other motion pictures shall be allocated by TWC in its business judgment and in accordance with TWC's prevailing business practice.

C. With respect to trailers and shorts exhibited with the Picture outside of the U.S. and Canada, Defined Receipts shall be reduced by 3% for trailers and 5% for shorts.

D. As between TWC and Participant, TWC owns all rights to the Picture and its Defined Receipts , including the right to encumber, transfer or dispose of them and Participant shall have no right, title or interest therein. Participant acknowledges that its sole right under this Exhibit is a contractual right to contingent compensation in the form of, and measured by, the Defined Receipts Contingent Bonus Formula.

E. TWC, its agents and assigns, in its and their business judgment, shall be entitled to distribute the Picture on a percentage basis or make flat sales, make and cancel contracts, adjust and settle disputes, and give allowances and rebates to distributors, licensees, exhibitors or other Persons whether or not any such entity is owned, operated or controlled by TWC, Affiliates or Related Parties.

F. TWC shall have complete discretion in determining the extent, if any, to which it will audit or check payments or charges to TWC or assert claims with respect thereto.

G. Participant acknowledges that TWC is part of a large, diversified international group of affiliated companies engaged in a variety of business activities. TWC has informed Participant that it frequently enters into business transactions with Affiliates and Related Parties, and Participant acknowledges and agrees that TWC is entitled (but is not obligated) to, and may, in its sole discretion, enter into agreements or other arrangements with Affiliates and Related Parties in connection with any or all rights relating to the Picture, including, without limitation, all exploitation rights and all subsidiary, ancillary or other rights relating thereto (the "Exploitation Rights"). Participant hereby acknowledges and agrees that TWC is under no obligation, express or implied, to offer the Exploitation Rights or any part thereof to unaffiliated or unrelated third parties, whether in lieu of or in addition to offering such rights to Affiliates and Related Parties, or to otherwise seek or secure any business arrangements with any unaffiliated or unrelated third parties with respect thereto. Without limiting the generality of any other provision of the Agreement, Participant hereby waives any right to make any claim or seek any relief, whether at law or in equity (specifically including injunctive relief), asserting the existence and/or breach of any such express or implied obligation.

In addition, Participant acknowledges and agrees that any agreement or other arrangement by TWC with an Affiliate or Related Party regarding the Exploitation Rights shall be conclusively presumed to be fair, reasonable and unobjectionable unless Participant shall establish that such agreement or other arrangement is on financial terms which, taken as a whole, are materially less favorable economically to TWC than the terms of Similar Transactions generally entered into by TWC with unaffiliated or unrelated third parties; or if there are no such unaffiliated or unrelated Similar Transactions, then by TWC with Affiliates or Related Parties (as applicable); or if there are no such Similar Transactions with Affiliates or Related Parties, then by Affiliates with any other Affiliate or Related Party (any such materially less favorable agreement or arrangement being hereinafter referred to as a "Less Favorable Arrangement"). For purposes hereof, the term "Similar Transactions" shall mean agreements or other arrangements relating to motion pictures similar to the Picture (including TWC or non-TWC Pictures) which involve rights which are comparable to the Exploitation Rights or any relevant part thereof. TWC and Participant agree that in any arbitration between them under Paragraph 3.1 above, concerning whether TWC has entered into a Less Favorable Arrangement, the arbitrator(s) shall select an independent national accounting firm with entertainment accounting expertise who shall be present with the arbitrator(s) during the arbitration proceedings, and, on the basis of the evidence presented (including any expert testimony presented by the parties and admitted into evidence), shall provide a written report to the arbitrator(s) solely on the issue of whether there was a Less Favorable Transaction; and the above referenced records and report shall be kept in strictest confidence by the accounting firm and disclosed only to the arbitrator(s) who shall have authority, subject to a protective order maintaining the confidentiality of the

information to the fullest extent permitted by law, to disclose to the parties only those relevant portions of the report indispensable to the adjudication of the issue. If pursuant to Paragraph 3.1 above, the arbitrator(s) conclude(s) that TWC has entered into a Less Favorable Arrangement with an Affiliate or Related Party, Participant's sole and exclusive remedy shall be the right to receive an adjustment on the next accounting statement when due, including any additional payments that may be required, pursuant to Paragraph 2.1 hereof, modified to the extent required to render such Less Favorable Arrangement not a Less Favorable Arrangement.

### 3.4.   Sales of All Rights

A.   If after completion and delivery of the Picture to TWC, TWC sells all its right, title and interest in the Picture (other than to an Affiliate or through merger or consolidation), Participant may elect that:

1.   The net sum received by TWC shall constitute Defined Receipts hereunder but further income of purchaser in connection with the Picture shall not be included in Defined Receipts, or,

2.   The net sum received by TWC shall not be included in Defined Receipts and all receipts and expenses (other than the purchase price paid to TWC) of the purchaser relating to the Picture shall be treated for purposes of accounting to Participant, as though they were receipts and expenses of TWC, provided that upon assumption by purchaser of such obligation, the sale shall be considered a novation and TWC shall thereafter have no obligation of any kind to Participant.

B. Participant's election shall be made within 7 days after TWC notifies Participant in writing that it proposes to make such sale and identifies the purchaser and purchase price. If TWC does not receive written notice of Participant's notice, then TWC shall have the right, but not the obligation, to make such election on Participant's behalf.

### 3.5.   Assignment by Participant

A.   Participant may assign Participant's right to receive its Defined Receipts Contingent Bonus hereunder in whole or in part, at any time after the release of the Picture, subject to TWC's approval not to be unreasonably withheld and provided that such assignment does not subject TWC to any additional liability in connection with the assignment. However, in no event shall TWC be obligated to account to more than one Person. In any event, TWC's obligation to pay in accordance with any assignment, or designation of a disbursing agent, shall be conditioned on TWC's receipt of written notice thereof, in form satisfactory to TWC, and TWC's payment in accordance therewith shall satisfy TWC's payment obligations to Participant hereunder. Participant's right to examine TWC's books of account shall not be assignable without TWC's prior written consent and in any event shall be limited to one Person.

B.   TWC shall have the right of first refusal with respect to any proposed assignment of Participant's right to receive Defined Receipts Contingent Bonus hereunder upon equivalent terms (to the extent economically matchable) offered to Participant by a bona fide third party. Participant shall notify TWC of the terms of any such proposed assignment and TWC shall have 7 business days within which to elect to accept such terms. Participant shall make no change in such terms which are adverse to Participant's interest without giving TWC the opportunity to accept such changed terms. If TWC does not elect to accept such terms, then Participant shall be free to accept the proposed terms of assignment from such bona fide third party provided that if such proposed

Exhibit DRCB

assignment is not concluded within 30 days following the expiration of the 7 business day period referred to above, TWC's right of first refusal under this Paragraph 3.5.B shall revive and shall apply to each subsequent offer received by Participant. This Paragraph 3.5.B shall not apply to family gifts.

3.6.    **General Terms**

A.    This Agreement is not for the benefit of any third party and shall not create a partnership, joint venture, agency, trust or fiduciary obligation between TWC and Participant or make Participant TWC's agent or create a relationship between TWC and Participant other than creditor-debtor to the extent amounts are due hereunder.

B.    TWC may, in its business judgment, commingle Defined Receipts with any other funds.

C.    Nothing in this Exhibit DRCB or the Agreement shall give Participant the right to a lien on the Picture or Defined Receipts.

D.    Participant shall not be entitled to interest or any other gain which may accrue as a result of TWC's obligation to pay Participant's Defined Receipts Contingent Bonus (or part thereof) even in the event of a dispute between Participant and TWC concerning the interpretation of this Exhibit DRCB, non-payment hereunder or otherwise.

E.    Headings are for convenience only and are of no effect in construing the contents of this Agreement.

F.    Participant waives any right at law or equity to revoke, terminate, diminish or enjoin any rights granted or acquired by TWC hereunder by reason of a claimed non-payment of monies allegedly due and payable hereunder, it being agreed that Participant's sole remedy for any such alleged non-payment shall be limited to a claim for any such money that is due and payable hereunder.

**END OF EXHIBIT DRCB**

**SCHEDULE "A"**
**REFERRED TO IN PARAGRAPH 1.1.A.7 OF EXHIBIT DRCB**

**MUSIC PUBLISHING**

1.  A royalty equal to sixteen-and-two thirds percent ($16^{2/3}\%$) of Music Publishing Contingent Proceeds ("MPCP") received by TWC from the exploitation of music publishing rights (i.e., mechanical reproduction, public performance, sheet music/folios and synchronization) to the original music and/or lyrics written specifically for and synchronized in the Picture as generally released (the "Music") shall be included in Defined Receipts.

2.  Music Publishing Defined Receipts ("MPDR") shall mean all monies actually received by TWC with respect to the Music excluding any advance, guarantee or minimum royalty payment received by TWC in connection with any subpublishing, collection, licensing or other agreement, unless such payment is specifically attributable to the Music.

3.  MPCP shall mean MPDR less the following:
    (a)    Ten percent (10%) of MPDR, as an administration fee to TWC.

    (a)    Royalties or other monies payable by TWC to the composer(s) and/or lyricist(s) of the Music.

    (b)    All additional shares of MPDR payable by TWC to such composer(s), lyricist(s) and/or any other third party co-publishers, administrators or other participants.

    (c)    Collection or other fees customarily and actually charged by The Harry Fox Agency, Inc., or any other collection agent used by TWC.

    (d)    Copyright registration fees and the costs of transcribing lead sheets.

    (e)    All other administration and exploitation expenses incurred with respect to the Music including, without limitation, the costs of producing demonstration records, advertising and promotion expenses, costs or amounts payable to third-party publishers, co-publishers, administrators, publishing participants, subpublishers, licensees, trustees or collection agents, attorneys' and accountants' fees directly related to the Music, and damages and expenses incurred by reason of infringement claims, but excluding rents, overhead, salaries and other similar general expenses.

4.  If Participant is entitled to receive a direct royalty or other type of payment with respect to the Music, then no portion of MPCP will be included in Defined Receipts.

**THE WEINSTEIN COMPANY**
**MUSIC PUBLISHING**
**SCHEDULE "A" TO EXHIBIT DRCB**

Exhibit DRCB                                                                    9

### SCHEDULE "B"
### REFERRED TO IN PARAGRAPH 1.1.A.7 OF EXHIBIT DRCB

1.      **SOUNDTRACK RECORDS:**  In the event TWC receives any royalties in respect of the soundtrack album(s) ("Album") and/or other  "phonorecords" (as that term is defined in the U.S. Copyright Act of 1976, 17 U.S.C. Sections 101, et. seq.) derived from the soundtrack of the Picture ("Soundtrack Records"), then TWC agrees that such royalties will be computed as follows for inclusion in Defined Receipts:

        1.1     If an Affiliate distributes Soundtrack Records, then the royalty included in Defined Receipts shall equal $2^{1/2}$ % ("Royalty Rate") of 90% of the suggested retail list price (or the equivalent wholesale royalty) for net sales of the Album through normal retail channels in the United States ("USNRC Sales").  The Royalty Rate shall be otherwise defined, computed, reduced and accounted for on the same basis that the Affiliate customarily accounts to third party recipients including, without limitation, in respect of foreign sales, configurations variations, taxes, flat fee licensing, coupling, singles, free goods, packaging deductions, royalty base and all other reductions and deductions.  Royalties hereunder shall only be included in Defined Receipts prospectively after the recoupment from the aggregate royalty payable (or accrued against advances or other charges) by TWC in respect of Soundtrack Records (including royalties payable to Participants, producers, record companies, film personnel, music supervisors, musicians and the royalty payable pursuant to this Schedule B) of the following:        (i) all recording costs of the master recordings embodied in Soundtrack Records; (ii) any re-recording costs of master recordings which are re-recorded for Soundtrack Records; and (iii) all costs of converting the master recordings in the Picture from motion picture recordings to phonograph record use (including, re-recording costs, reuse fees, editing, sweetening, etc.).

        1.2     In the event that TWC receives its royalties from the exploitation of Soundtrack Records by a third party distributor, then the royalty to be included in Defined Receipts shall be the "Soundtrack Contingent Proceeds" (as defined below).

        1.3.    "Soundtrack Contingent Proceeds" shall mean all revenues received by TWC from the exploitation of Soundtrack Records, if any, as set forth in the applicable Soundtrack Records agreement after deduction of the following costs and third party royalties:

                (a)     A sum equivalent to the actual dollar amount (including any fixed cash amounts, advances and/or royalties) actually paid to all third party performers and/or participants with respect to the music/soundtrack contained in Soundtrack Records and/or the Picture, including without limitation, cash payments and/or royalties payable to Participants, producers, record companies, film personnel, music supervisors and musicians.

                (b)     A sum equivalent to all artwork costs for Soundtrack Records to the extent such artwork costs are paid by or charged to TWC, remixing and remastering costs, re-recording costs, reuse fees, license fees and similar costs attributable to the recording/production and/or licensing of the master recordings embodied on Soundtrack Records, except to the extent such costs are included in the negative cost of the Picture and to the extent such Soundtrack Records costs and fees have actually been incurred directly or indirectly by TWC.

                (c)     Any legal fees or related expenses incurred by TWC for outside legal counsel engaged at TWC's election to: document and/or negotiate the applicable Soundtrack Records agreement; in protecting or defending TWC's rights, privileges and benefits with respect to Soundtrack Records and/or any master recordings recorded/acquired for the Picture and/or Soundtrack Records; and/or in connection with any dispute involving any release/distribution agreement pertaining to Soundtrack Records.

(d)    In the event the Soundtrack Records distributor pays TWC any nonreturnable advance against royalties, a reasonable reserve shall be applied towards (i) third party payments payable prior to the Soundtrack Record distributor's recoupment of such advance at the "net" Participant rate; and (ii) unrecouped costs incurred by TWC in respect of any Soundtrack Records and/or in excess of the budgeted cost of the music for the Picture.

1.4.    Notwithstanding the foregoing, no royalties shall be included hereunder for any so-called "storyteller" or "read-along" phonorecords or for any phonorecords embodied in other merchandise or for any audiovisual devices now known or hereafter devised.

1.5.    If Participant is entitled to receive a direct royalty or other type of payment with respect to    Soundtrack Records, then no royalties from Soundtrack Records will be included in Defined Receipts.

2.    <u>MERCHANDISING/PUBLISHING</u>.  With respect to items of merchandising (including interactive games and other products and services) and book publication (including children's storytelling recordings, as distinguished from soundtrack records, but excluding souvenir programs and similar publications) based on the Picture, then:

2.1    For items sold by a licensee of TWC, the royalties TWC receives from such licensee shall be included in Defined Receipts of the Picture after first deducting (i) a percentage deduction of:  fifty percent (50%), inclusive of subdistributor fees, for items sold in the U.S.; sixty-five percent (65%), inclusive of subdistributor fees, for items sold outside the U.S.; and fifteen percent (15%) plus any subdistributor's fees for any book novel; and (ii) out-of-pocket costs and royalties to third parties; or

2.2    For items are sold by TWC at the wholesale or retail level, at TWC's discretion, either:  (i)  an amount equal to seven (7%) of the wholesale price of such items sold by TWC at the wholesale level (less a reasonable allowance for returns); or (ii)  an amount equal to seven percent (7%) of fifty percent (50%) of the gross retail revenues of such items sold by TWC at the retail level (less a reasonable allowance for returns) shall be included in Defined Receipts of the Picture after first deducting (a) a percentage deduction of fifty percent (50%) for items sold in the U.S.; sixty-five percent (65%) for items sold outside the U.S.; and fifteen percent (15%) with respect to any book novel; and (b) out-of pocket costs and royalties to third parties.

2.3    In no event shall any items of merchandise be treated as falling under both provisions 2.1 or 2.2 above.

2.4    If Participant is entitled to receive a direct royalty or other type of payment with respect to the   exercise of merchandising and book publication rights, then no royalties therefrom will be included in Defined Receipts.

<b>THE WEINSTEIN COMPANY<br>
SOUNDTRACK RECORDS/MERCHANDISING/PUBLISHING<br>
SCHEDULE "B" TO EXHIBIT DRCB</b>

Exhibit DRCB