# EXHIBIT B

April 25, 2011

IP Management f/s/o Marc Toberoff
c/o Intellectual Properties Worldwide
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Attn.: Marc Toberoff

Re:   "Piranha 3DD"— Marc Toberoff Producing Services Agreement

Gentlemen:

    This letter agreement ("Agreement") will confirm the agreement reached between, on the one hand, Dimension Films, a division of The Weinstein Company, LLC ("TWC") or a production/development entity to be designated by TWC (together "Company") and, on the other hand, IP Management ("Lender") f/s/o Marc Toberoff ("Artist") in connection with Artist's producing services in connection with the motion picture project tentatively entitled "Piranha 3DD" (the "Picture").

    Reference is hereby made to that certain Producing Services Agreement ("Prior Agreement") dated as of May 21, 2007, between Company and Lender for the services of Artist in connection with the motion picture entitled "Piranha 3D" ("Prior Picture"). This Agreement is being entered into pursuant to the terms of Paragraph 8 of the Prior Agreement.

    For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    <u>Conditions Precedent</u>: Company shall have no obligation under this Agreement unless and until Company has received fully-executed originals of this Agreement and the attached exhibits, each attached hereto and incorporated herein by this reference.

2.    <u>Fixed Compensation</u>: If the Picture is produced and Lender and Artist are not otherwise in material breach or default hereof, Lender shall be entitled to an amount equal to the fixed compensation that Lender received for the Prior Picture reduced proportionately by that ratio that the ingoing direct cost net budget (i.e., the final Company approved ingoing direct cost budget excluding any contingency allowance, financing costs, interest, completion bond fees, bank charges, supervisory fees, overhead charges and the net amount of all labor rebates, labor and/or production tax subsidies and/or incentives) ("Budget") of the Picture bears to the Budget of the Prior Picture. Company represents that the application of the foregoing formula results in fixed compensation for the Picture in the amount of $138,000 ("Fixed Compensation"). Without limiting Lender's rights under Exhibit "DRCB" and the rider thereto referenced in Paragraph 3 below, on a one-time basis, Lender shall have the right to view a copy of the Budget of the Prior Picture and a copy of the Budget of the Picture during normal business hours at Company's office solely for the purpose of verifying that the foregoing calculation of the Fixed Compensation is accurate. Such Fixed Compensation shall be fully applicable against and shall reduce any "Contingent Compensation" as such term is defined in below Paragraph 3. The Fixed Compensation shall be payable pursuant to the customary 20:60:10:10 payout schedule (i.e., 20% payable weekly during the eight (8) weeks preceding principal photography; 60% payable weekly during principal photography; 10% payable upon dubbing and scoring; and 10% payable upon complete delivery of the Picture to Company) and shall constitute an all inclusive "flat" fee such that no additional compensation shall be payable by reason of overtime, overages, Sundays, holidays, etc. Artist shall be "pay or play" for Artist's Fixed Compensation upon the last to occur of: (i) one (1) of the principal cast members become

unconditionally "pay or play" for their fixed compensation; and (ii) the director of the Picture becomes unconditionally "pay or play" for the director's fixed compensation; provided, however, that Artist shall be deemed "pay or play" for the Fixed Compensation no later than upon commencement (if ever) of principal photography of the Picture.

3. <u>Contingent Compensation</u>: If the Picture is produced and Lender and Artist are not in material breach hereof, Lender shall be entitled to receive the "Contingent Compensation" (subject to the applicability and recoupment of the Fixed Compensation) in an amount equal to 2% of 100% of "Adjusted Defined Receipts" of the Picture, if any. For the purposes hereof, "Adjusted Defined Receipts" shall be defined, computed, paid and accounted for in accordance with the terms and conditions of "Exhibit DRCB" and the Rider thereto attached to and incorporated into the Prior Agreement. Such "Exhibit DRCB" and the Rider thereto are herein incorporated in their entirety by this reference. For the purpose of calculating Artist's Contingent Compensation payable hereunder with respect to Video Devices (as defined in said Exhibit), the percentage set forth in Paragraphs 1.1.A.3. (A) and 1.1.A.3. (B) of "Exhibit DRCB" shall be 25% in lieu of the percentage set forth therein.

4. <u>Vesting</u>: If (i) prior to the time, if ever, that Artist becomes "pay or play" for Artist's Fixed Compensation hereunder, Lender's engagement and Artist's services are terminated by Company "without cause" (i.e., for any reason other than Lender's or Artist's material breach or default, or Artist's mental or physical disability hereunder) or an event of force majeure and (ii) subsequent to such "without cause" termination, Company thereafter commences principal photography of the Picture (it being agreed that Company shall have no obligation to commence principal photography of the Picture), then Company shall pay to Lender an amount equal to: (A) one-hundred percent (100%) of the Fixed Compensation payable to Artist pursuant to above Paragraph 2. and (B) Artist shall be reinstated to render producing services on a "pay or play" basis in accordance with the terms set forth in this Agreement. In addition, if the above conditions (i) and (ii) are satisfied, Company agrees to accord Artist credit in accordance with terms set forth in Paragraph 5. below. At such time (if ever) that Artist becomes "pay or play" for Artist's Fixed Compensation in accordance with the terms set forth in this Agreement, one hundred percent (100%) of Artist's Contingent Compensation shall be deemed vested pursuant to this Paragraph 3.

5. <u>Credit</u>: Subject to any applicable guild requirements and Company's standard exclusions and exceptions (including artwork title exceptions) set forth herein, and provided that the Picture is produced and Lender and Artist are not otherwise in material breach or default hereof, then Company shall accord the following credits:

(i) <u>Producer Credit</u>: A " Produced By" credit Artist on screen, on a shared card in the main titles (unless the Picture is in end title format) and in the billing block portion of paid ads issued or controlled by Company in which the regular billing block appears and in the billing block portion of so-called excluded ads issued or controlled by Company in which any other individual producer in connection with the Picture if at all, is accorded in such billing block, other than in award, nomination or congratulatory ads, and ads announcing a personal appearance in which no person other than the person awarded, nominated, congratulated or appearing is mentioned and group, institutional list or voice over paid ads (collectively "Special Ads"). Artist's "Produced By" credit may be shared, in Company's sole discretion. Artist's "Produced By" credit shall appear in no less than second position among all of the "Produced By" credits. The size and type of Artist's "Produced By" credit shall be no less favorable than the size and type of any "Produced By" credit accorded to any other individual producer rendering services on the Picture. In the event that the "Produced By" credit accorded to Mark Canton appears on a separate card, then Artist's "Produced By" credit shall likewise appear on a separate card.

(ii) <u>Production Company Credit</u>: A production company credit in substantially the form of "An IPW Production" on screen, in the main titles (unless the Picture is in end title format) and in the billing block portion of paid ads issued or controlled by Company in which the regular billing block appears and

in the billing block portion of so-called excluded ads issued or controlled by Company in which any other production company credit or the director's "film by" credit is accorded in such billing block, other than in Special Ads, above or before the regular (not artwork) title of the Picture in such billing block. Such credit may be shared. Artist's production company credit shall appear in no less than second position among all production company credits. The size and type of such credit on screen shall be no less than the greater of a) 100% of the size of the type of any other production company credit accorded to any other producer or the "film by" credit accorded to the director in connection with the Picture (but not any such credit of the Picture's financier or distributor) or b) 35% of the size of the type of the on-screen title of the Picture. The size and type of such credit appearing in the billing block portion of paid ads and excluded ads shall be no less than the greater of x) 100% of the size of the type of any other production credit accorded to any other producer (but not any of the Picture's financier or distributor) or the "film by" credit accorded to the director in connection with the Picture in such billing block or y) 35% of the size of the type of the regular title of the Picture appearing in the billing block portion of paid and excluded ads. Artist's production company credit may be shared, in Company's sole discretion.

All other characteristics of such credit (e.g., size, style, position, etc.) shall be in Company's sole discretion. No casual or inadvertent failure by Company, nor any failure by any third party, to comply with the terms of this Paragraph 7. shall constitute a breach hereof, provided however, that upon receipt of written notice from Artist specifying a failure to accord credit as specified hereunder, Company shall use reasonable efforts to cure prospectively such material failure with regard to ads created and/or positive prints manufactured after the date of Company's receipt of such notice. Company shall use reasonable efforts to notify its subdistributors of the credit obligations set forth herein, however, any breach by Company's subdistributors to accord properly such credit shall not constitute a breach by Company.

6. **First Opportunity**: Provided that the Picture is produced by Company and Lender and Artist are not in material breach hereof, if Company elects, in its sole discretion, to produce a theatrical prequel or sequel to and/or theatrical remake or any theatrical motion picture based upon the Picture (collectively, a "Theatrical Production"), or a television series pilot or first episode and/or mini-series and/or MOW based upon the Picture (collectively, a "T.V. Production"), or a Direct-to-Video production based upon the Picture (collectively "Subsequent Production") then Artist shall have the same rights with respect thereto as set forth in Paragraph 8 of the Prior Agreement.

7. **Travel and Expenses**: If Company requires Artist to travel more than fifty (50) miles from Artist's then principal place of residence (currently Los Angeles, CA) for the purposes of rendering services hereunder (including in connection with Artist's attending any U.S. previews or U.S. test screenings of the Picture), then Artist shall be entitled to receive one (1) business-class, if available, round trip transportation, reasonable hotel accommodations (taking into account the budgetary requirements of the Picture), a per diem of $60 and non-exclusive ground transportation (shared with above-the-line personnel) to and from sets, locations, residences, and airports. If Artist is required by Company to stay at such distant location in excess of fourteen (14) consecutive days, then Artist shall be entitled, on a one-time basis, to one (1) additional business-class round-trip transportation, if used, for a non-business companion. All travel arrangements, including but not limited to the acquisition of airline tickets, booking of accommodations, etc., shall be made through Company's location or travel department, unless prior written approval is obtained from a Company business affairs executive.

8. **Approvals And Controls**: Company shall retain all approvals and controls, including the right to designate the production manager, estimator and location auditor, and the right to initiate action at any time and in any respect in connection with the Picture. Notwithstanding the foregoing, Company shall meaningfully consult with Artist as practicable regarding the key creative matters with respect to the Picture (e.g., writers, location cast, key crew, locations, schedule and final screenplay) and regarding the initial U.S. theatrical release pattern and marketing campaign for the Picture, provided that with respect to

all matters hereunder, Company's decision shall be final and binding. Any inadvertent failure by Company to consult with Artist hereunder shall not constitute a breach by Company of the provisions hereof.

9. <u>Promotional Films</u>: Company contemplates filming and exploiting films including, without limitation, "behind-the-scenes" or "making-of" productions, (jointly and severally "Promotional Rights") about the production of the Picture produced hereunder. Artist hereby agrees and consents to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind-the-scenes photography and filmed interviews with Artist) and hereby grants to Artist the right to use Artist's name, voice and likeness which Artist shall be given the opportunity to approve in customary industry fashion in connection with such Promotional Rights for no additional consideration inasmuch as the compensation payable to Artist under this Agreement for the Picture shall be deemed to include compensation for all rights granted pursuant to this Paragraph 9. Company shall use all reasonable efforts to notify Artist in advance of the making of any such promotional films hereunder.

10. <u>Ownership and Distribution</u>: The results and proceeds of Lender's and Artist's services hereunder and in connection with the Picture shall be deemed a work-made-for-hire specially ordered or commissioned by Company. Company shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, the Picture, and all elements therein for all now known or hereafter existing uses, media, and forms including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, any computer-assisted media (including, but not limited to Internet, CD-Rom, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised), character, sequel, remake, merchandising and all subsidiary, ancillary and allied rights therein, and the foregoing is inclusive of an irrevocable full assignment to Company thereof. Lender, on behalf of itself and Artist, hereby waives or grants to Company any "moral rights" or "droits morals" in any jurisdiction in and to the Picture.

11. <u>No Obligation To Use</u>: Company is not obligated to produce, distribute, and/or exploit the Picture or, if commenced, to continue the production, distribution, or exploitation of the Picture in any territory. Regardless of whether or not Company elects to produce, distribute and/or exploit the Picture (or to commence same), Company is not obligated to use the services in whole or in part of Lender or Artist hereunder.

12. <u>Employment Eligibility</u>: Lender and Artist acknowledge that any offer of employment hereunder is subject to and contingent upon Artist's ability to prove his identity and employment eligibility as required by the Immigration Reform and Control Act of 1986. Accordingly, Artist hereby agrees: (i) to complete and execute Section 1 ("Employee Information and Verification") of an Employment Eligibility Verification ("Form I-9") at the time of execution of this Agreement or commencement of services, whichever is earlier; and (ii) to deliver, in person, to Company said Form I-9, together with documentation of the employment eligibility of Artist, within three (3) business days of execution of this Agreement or commencement of services, whichever is earlier. If Artist fails to complete and deliver the Form I-9 as provided above, Company shall have the right, if Lender or Artist fails to cure such breach within three (3) business days of receiving written notice to such effect, to terminate the Agreement and thereupon Artist's engagement hereunder shall cease and terminate and neither party shall have any right, duty or obligation to the other under this Agreement except such as shall have accrued prior to the effective date of termination.

13. <u>Representations, Warranties and Undertakings</u>:

a. Lender and Artist hereby jointly and severally represent, warrant and undertake to Company as follows: (i) Lender and Artist have full right, power and authority to enter into and perform this Agreement and to the best of Lender and Artist's knowledge no rights of any third parties are or will be violated by Lender's and Artist's entering into or performing this Agreement; (ii) Lender and Artist are not subject to any conflicting obligations or disabilities and neither Lender nor Artist has done or omitted to do and will not do or omit to do any act or thing by license, grant or otherwise which shall or is likely to (as determined by Company in its good faith business judgment) impair, encumber or hinder the development, production and exploitation of the Picture by Company or the full performance of Lender's and Artist's obligations and services hereunder; (iii) neither Lender nor Artist has accepted or paid, nor will Lender or Artist accept or pay or agree to accept or pay any money, service or other consideration (as defined in Section 507 of the Federal Communications Act of 1934, as amended) for the inclusion of any matter in the Picture, other than payment by Company to Lender hereunder; (iv) there is a valid and subsisting written agreement between Lender and Artist whereby Artist is obligated to render services exclusively to Lender throughout at least the full term of this Agreement; and (v) Lender is authorized under said written agreement to enter into this Agreement with Company, to furnish Artist's services to Company, to grant to Company the rights herein set forth, and to authorize the payments by Company to Lender specified in this Agreement.

b. Lender and Artist hereby agree to fully and effectively indemnify Company, its affiliates and licensees from and against any loss, liability, cost, damage or expense (including reasonable outside attorney's fees and expenses) incurred directly or indirectly by reason of any breach of the foregoing representations, warranties or covenants by Lender or Artist.

c. Company hereby agrees to fully and effectively indemnify Lender and Artist from and against any loss, liability, cost, damage or expense (including reasonable outside reasonable attorney's fees and expenses) arising as a result of Company's development, production, distribution, advertising and/or exploitation of the Picture, except for any or such loss, liability etc. arising out of circumstances for which Lender and/or Artist are required to indemnify Company hereunder.

14. Delivery/Specifications: To the extent within Artist's control:

Artist shall deliver the completed Picture to Company in accordance with a post production schedule approved by Company. "Delivery" shall be deemed to have occurred only upon Artist's delivery to Company of an answer print which conforms to all of Company's standard delivery requirements, which requirements include, but are not limited to, those contained in the remainder of this Paragraph. If Company (in the exercise of its sole discretion) elects to proceed to production and Lender and Artist render producing services on the Picture, the Picture shall conform to the final version of the Screenplay approved by Company, except for any minor non-material changes as may be necessitated by the exigencies of production and such material changes, if any, as may be pre-approved by Company in writing; shall be of first class technical quality and photographed in the English language, in color in 35mm film and capable of being projected with an aspect ratio of 1:2.35 (Cinemascope) with no hard matte; shall be delivered with a running time, inclusive of main and end titles (with end titles not to exceed 3 minutes), of no less than 95 minutes and no more than 110 minutes; shall be capable of receiving a MPAA rating no more restrictive than "R" (unless Company agrees to a more restrictive rating), shall be produced using only first-class facilities and equipment for photographs, recording, film processing, scoring, dubbing and all other aspects of production and post-production, shall be completely finished, fully edited and titled and fully synchronized with language, dialogue, sound and music. Upon delivery of the Picture, there shall be no liens (other than the customary SAG lien if the Picture is SAG, provided that the Picture shall not be SAG without Company's prior written approval) against the Picture and all costs of its production (including, but not by way of limitation any and all music costs and/or licenses) shall be paid. The production shall be run with standard financial controls, including, without

limitation, double signatures required on all fundings to the production and on all production checks. There shall be no material changes in the specifications without Company's prior written approval. Delivery shall be made in accordance with Company's standard delivery schedule with a review period of forty-five (45) days from Company's receipt of all items. Company acknowledges that the delivery and specifications requirements of this Paragraph 16. shall be no more restrictive than those of the Director of the Picture.

15. **Videocassette/DVD/Soundtrack**: If Lender and Artist are not otherwise in material breach hereof then Company shall furnish Artist with a videocassette, DVD copy and soundtrack of the Picture, at no charge, promptly following Artist's written request therefor after the date, if ever, videocassette, DVD and/or soundtrack copies of the Picture are available to the general public; provided however that Artist executes Company's then applicable use-restriction agreement in connection therewith.

16. **Errors And Omissions Insurance**: Lender and Artist shall be covered as additional insureds under any Errors and Omissions insurance policy and general liability insurance policy which Company may obtain for the Picture, during the development, production and the customary period of distribution of the Picture, subject to the limitations, restrictions and terms of said policies. Lender acknowledges that there shall be no obligation to obtain or maintain any such coverage in connection with the Picture. The provisions of this Paragraph 18. shall not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement hereunder.

17. **Premiere**: Provided that Lender and Artist fully perform all services and obligations hereunder and are not otherwise in material breach hereof, Artist and one (1) non-business guest each shall be each invited to any film festivals where the Picture is in competition, and all U.S. celebrity premieres, if any, of the Picture and if any one (1) such premiere as determined by Company is more than fifty (50) miles away from Artist's then principal residence (currently Los Angeles, California), Artist and one (1) non-business guest shall receive business-class round-trip transportation, if available and used for this purpose, and Artist only shall receive reasonable accommodations and expenses in accordance with Company's then existing policy.

18. **No Injunctive Relief**: Lender and Artist's sole and exclusive remedy for Company's breach hereof (including any term pertaining to credit) shall be solely an action for damages. Lender and Artist hereby irrevocably waive and relinquish any right they might otherwise have to seek and/or obtain equitable or injunctive relief for any reason.

19. **Further Assurances**: At Company's request, Lender shall cause Artist to execute any and all additional documents and instruments (not inconsistent with the terms hereof) reasonably deemed by Company to be necessary or desirable to effectuate the purposes of this Agreement. Company shall provide Lender and Artist with copies of additional documents executed by Lender and Artist, if any. Lender and Artist hereby appoint Company, or its nominee, as Lender's and/or Artist's irrevocable attorney-in-fact, with the right but not the obligation, for the sole benefit of Company, and at Company's expense, to bring, prosecute, defend and appear in suits, actions, and proceedings of any nature concerning all copyrights in and to the Picture, all products of Lender's and/or Artist's services hereunder, and all renewals thereof, or concerning any infringement of any such copyright or renewal copyright, or any interference with any of the rights herein granted to Company; and to take such action as Company may deem advisable to enforce, protect, and/or defend any of the rights, privileges and property herein granted to Company under any and all such copyrights and renewals thereof, as well as any of the rights, licenses, privileges, warranties and agreements contained and/or set forth in any of the documents herein referred to, insofar as the same relate to the rights, privileges and property herein granted to Company; and to litigate, collect and give receipt for all damages arising from any infringement of any such rights. Any such action may be taken by Company in the name of Lender

and/or Artist or otherwise, and Company may join Lender and/or Artist as a party plaintiff or defendant in any such suit, action or proceeding. The foregoing power of attorney shall be deemed a power coupled with an interest.

20. <u>Notices</u>: Any notice pertaining hereto shall be in writing. Any such notice due hereunder shall be served by delivering said notice: (i) by hand with an appropriate receipt obtained; (ii) by overnight mail by a nationally recognized carrier; (iii) by facsimile with confirmation of receipt; or (iv) by sending it by certified or registered mail return receipt requested, postage or applicable fee prepaid, addressed as follows:

To Artist:     Intellectual Properties Worldwide
               2049 Century Park East, Suite 2720
               Los Angeles, CA 90067
               Attn.: Marc Toberoff
               Fax: (310) 277-2104

To Company:    c/o The Weinstein Company LLC
               9100 Wilshire Blvd., Suite 700W
               Beverly Hills, California 90212
               Attn.: Andrew Kramer, President, Business and Legal Affairs
               Fax: (310) 550-5759

or to such other address as the parties hereto may hereafter designate in writing, and the date of notice shall be deemed to be made or given on the date of sending (if sent on a business day or otherwise the next business day) when sent by fax or by hand, on the next business when sent by overnight mail and three (3) business days after mailing when sent by certified or registered mail. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

21. <u>Cross Default.</u> Any material breach or default by Artist of this Agreement and/or of the Assignment Agreement (as defined in the Prior Agreement) and/or of the Prior Agreement, may at Company's election, be deemed a material breach or default hereunder and/or a material breach or default of any or all such agreements.

**[*THE REMINDER OF THIS PAGE IS INTENTIONALLY BLANK.*]**

22.   **Miscellaneous:** All other terms and conditions of this Agreement shall be in accordance with usual and customary terms and conditions for agreements of this kind within the motion picture industry, subject to good faith negotiations in accordance with industry standard parameters for producer agreements of this type and consistent with the budgetary limitations of the Picture and Artist's stature as a producer in the motion picture industry. This Agreement shall be governed by New York law and shall be subject to the jurisdiction of the Federal and State Courts of New York County. This letter agreement may be executed in one or more counterparts, and when executed by each of the parties signatory hereto, said counterparts shall constitute a valid, binding agreement. An executed counterpart returned by facsimile shall be deemed an original.

Sincerely yours,

THE WEINSTEIN COMPANY LLC

By: _____

Its: Andrew J. Kramer
President
Business & Legal Affairs

ACCEPTED AND AGREED:

IP MANAGEMENT

By: _____

Its: Managing Member

COUNTERSIGNED:

_____
MARC TOBEROFF

Exhibit A

CERTIFICATE OF EMPLOYMENT

Dimension Films, a division of The Weinstein Company LLC ("TWC"), or a development/production entity to be designated by TWC (together, "Company"), whose address is 375 Greenwich Street, New York, NY 10013 has engaged IP Management, Fed. I.D 20-3943729 ("Employer") f/s/o Marc Toberoff ("Employee") to render producing services on a motion picture project tentatively entitled "Piranha 3DD" (the "Picture). The principal terms and conditions of Company's and Employee's engagement for the Picture are set forth in that certain agreement ("Agreement") dated as of April 25, 2011, between, on the one hand, Company, and, on the other hand, Employer and Employee and are incorporated herein by this reference.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Employer and Employee do hereby acknowledge, certify and agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Employer and/or Employee in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Employer and/or Employee which in any way relate to the Picture or to the material on which the Picture will be based (collectively, the "Material"), are and shall be deemed to be works made for hire for Company. Accordingly, Company is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised. If under any applicable law the fact that the Material is a work made for hire is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Employer and/or Employee under such applicable law, Employer and Employee hereby assign and transfer to Company the Rights and, in connection therewith, any and all right, title and interest of Employer or Employee in the Picture and any other works now or hereafter created containing the Material.

Employer and Employee hereby grant Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Company may in its sole discretion determine. To the fullest extent allowable under any applicable law, Employer and Employee hereby irrevocably waive or assign to Company their so-called "moral rights" or "droit moral". Employer and Employee expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Employer or Employee of "moral rights" or "droit moral" is not effective, then Employer and Employee agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

Employer and Employee will, upon reasonable request, execute, acknowledge and deliver to Company any and all documents consistent herewith which Company may reasonably deem necessary to evidence and effectuate all or any of Company's rights hereunder. Employer and Employee hereby irrevocably appoint Company as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Employer and Employee

Piranha 3DD / Marc Toberoff
Producer Agreement v.05                          9

fail to execute, acknowledge and deliver within five (5) business days of Company's request therefor. The appointment shall be a power coupled with an interest. Copies of any such documents executed on Employer and Employee's behalf by Company shall promptly be forwarded to Employer and Employee's representatives.

Employer and Employee hereby grant to Company the right to issue and authorize publicity concerning Employee, and to use Employee's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture. Employer and Employee shall exercise approvals hereunder reasonably and within five (5) days after request by Company, or such approvals shall be deemed given.

Employer and Employee warrant that the Material is or will be original with Employee or is in the public domain throughout the world, and is not and will not be based in whole or in part on the life of any real person except as approved in writing by Producer, and, to the best of Employer's and Employee's knowledge (in the exercise of reasonable prudence), does not and will not infringe upon or violate any copyright of, or infringe upon or violate the right of privacy or any other right of, any person; and that Employer and Employee are free to grant all rights granted and make all agreements made by them herein; and that Employer is a corporation duly organized and existing under the laws of the state of its incorporation. Employer and Employee agree to hold Producer and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Producer or any of its successors, licensees or assigns may suffer or incur by reason of the breach of any of the warranties made in this paragraph. If Producer so elects, Producer shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies. Producer shall have the sole right to control the legal defense of any such claims, litigation, etc. including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation. The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Producer shall defend, indemnify and hold harmless Employer and Employee against any and all liability, damages, costs and expenses, including reasonable attorneys' fees, in connection with any claim or action (other than those arising out of a breach of Employer's and/or Employee's warranties hereunder or out of any criminal, malicious or willful acts by Artist) respecting material supplied to Employer and/or Employee by Producer or in connection with activities regarding the Producer's development, production, distribution or exploitation of the Picture, provided that (i) Employee cooperates fully with Producer in the defense of any such claim or legal action at no cost or charge to Producer other than the reimbursement to Employer of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action excluding legal fees; (ii) Producer shall have the right to select and retain any legal counsel in connection with the defense of any such claim or legal action and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action.

Employer and Employee hereby covenant and agree that Employer and Employee shall not have or be deemed to have any lien, charge or other encumbrance upon any of the rights conveyed to Company herein or proceeds derived therefrom, and that no act of or omission by Company, nor any other act, omission or event of any kind, shall terminate or otherwise adversely affect Company's ownership of the rights conveyed herein. Employer's and Employee's sole remedy for

any such breach or alleged breach shall be an action at law to recover such damages as may have been actually suffered by them as a result thereof.

Executed as of April 25, 2011.

          ACCEPTED AND AGREED:

          IP MANAGEMENT,
By: _[signature]_

Its: _Managing Member_

COUNTERSIGNED:

_[signature]_
MARC TOBEROFF

State of California

County of _____

    On _____, before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

    WITNESS my hand and official seal.

_____
Notary Public

Exhibit B

INDUCEMENT

Reference is hereby made to that certain agreement (the "Agreement") dated as of April 25, 2011, by and between, on the one hand, Dimension Films, a division of The Weinstein Company LLC (or a production/development entity to be designated) (together, "Company") and, on the other hand, IP Management ("Lender") for the producing services of Marc Toberoff ("Artist") on a motion picture tentatively entitled "Piranha 3DD" (the "Picture").

A.   I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof. I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement in so far as they relate to me, even if the employment between me and Lender should hereafter expire, terminate or be suspended. I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

B.   Unless I am deemed substituted for the Lender as a direct party to the Agreement pursuant to Paragraph D below, I shall look solely to Lender and not to Producer for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

C.   In the event of a breach or threatened breach of the Agreement by Lender or by me, Producer may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

D.   I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation. If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Producer's election, be deemed to be employed directly by Producer for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

E.   I will indemnify Producer for and hold it harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable attorney's fees) which may be obtained against, imposed upon or suffered by Producer or which Producer may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required or permitted to be deducted and withheld from the compensation of any employee under the laws of any state or province or otherwise pursuant to U.S. or Canadian law, and/or any amendments thereof and/or any other applicable statutes heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee.

F.   If Producer shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

G.   For purposes of any and all Workers' Compensation statutes, laws or regulations ("Workers' Compensation"), I acknowledge that an employment relationship exists between Lender and me, Producer being my special employer under the Agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Producer or

Producer's affiliated companies and their respective officers, agents, and employees (including without limitation, any other special employee and corporation or other entity furnishing to Producer or an affiliate producer the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

_____
Marc Toberoff ("Artist")