**ORIGINAL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 01-01139 |
| | ) | |
| W.R. GRACE & CO., et al. | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |

**ZONOLITE PLAINTIFFS' OBJECTION TO DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF BAR DATE, APPROVAL OF PROOF OF CLAIM FORMS AND APPROVAL OF NOTICE PROGRAM (DOCKET NO. 536); MOTION TO EXTEND THE TIME TO OBJECT OR RESPOND TO SUCH MOTIONS; JOINDER IN MOTION FOR CONTINUANCE BY OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS; INDEPENDENT MOTION TO CONTINUE THE HEARING ON DEBTORS' MOTION; AND REQUEST FOR CONSIDERATION AND BRIEFING REGARDING CLASS TREATMENT**

The Zonolite plaintiffs Barbanti and Price, on behalf of themselves, the certified Washington class in Barbanti, and the proposed nationwide class (MDL 1376) of persons whose homes are contaminated with Zonolite Attic Insulation (hereinafter the "ZAI plaintiffs", collectively), hereby join in the motion for continuance by the Official Committee of Asbestos Property Damage Claimants (the "PD Committee"), and independently move for entry of an Order: (1) continuing the hearing on Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program (the "Case Management Motions"), and (2) extending the date by which the Zonolite Plaintiffs and PD Committee must object or otherwise respond to the relief requested in the Case Management Motions. The ZAI plaintiffs also request that the court establish a briefing schedule on the issue of class action treatment, within bankruptcy, of the ZAI plaintiffs' claims nationwide.

The ZAI plaintiffs strongly oppose, and need additional time to brief their opposition to, the Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of Proof of Claim Forms and Approval of Notice Program (the Debtor Motion) and related class issue implicated by these proceedings because the complicated, prejudicial and very recently received Debtors' proposal would severely prejudice the interests of the many thousands of persons nationwide with asbestos-contaminated Zonolite Attic insulation.

ZAI residents across the country are totally ignorant of the existence of asbestos contamination of their Zonolite insulation; are completely unaware of the urgent need to take precautions to minimize their asbestos exposure by avoiding activities which would disturb the asbestos (such as keeping children out of the attic or other areas with insulation); and, as a result, are entirely unable to protect themselves under the proceedings proposed by the Debtor because they do not know that they have asbestos, do not know they have a potential claim and, as a result, cannot and will not be in a position to ever file any significant number of individual claims.

Instead, the best and only practicable means of protecting the due process rights of ZAI residents is to permit representative plaintiffs to pursue relief on a class basis. The class/collective relief sought is the creation of a reasonable fund to be used for a Zonolite asbestos notification, education and remediation program necessary to preserve health and safety and avoid needless future asbestos exposures, further contamination and injuries and death.

### Preliminary Facts

Pursuant to the Notice accompanying the Case Management Motions — which were not received by counsel until July 2, 2001 — parties in interest were required to object or otherwise respond to the Case Management Motions on July 13, 2001. The Debtors have agreed

to adjourn the hearing on the Case Management Motions until August 2, 2001, and the return

date for the Committees is until to July 25, 2001.  The Debtors subsequently and unreasonably

refused, however, to any extension of time for the ZAI Plaintiffs' opposition.

A.    **Asbestos-Contaminated Zonolite**

Zonolite Attic Insulation is an asbestos-contaminated product formerly

manufactured and sold by W.R. Grace and its predecessor in interest, the Zonolite Company.

Zonolite Attic Insulation was marketed from approximately 1930 through 1984 and sold by

Grace as a safe, harmless "do-it-yourself" product for installation by homeowners in residential

homes.  It is estimated that Zonolite Attic Insulation presently resides in the attics and walls of

hundreds of thousands or millions of homes nationwide.

Critically, the source of vermiculite used to manufacture Zonolite Attic Insulation

was W.R. Grace's vermiculite mine located near Libby, Montana.  W.R. Grace's Libby

vermiculite mine, closed in 1990, had two distinctions:  first, it was the largest producer of

vermiculite in the world; second, vermiculite from the mine was uniquely, naturally, and

tragically contaminated with extremely hazardous "tremolite" asbestos.

Opportunities for exposure of families to dangerous levels of tremolite asbestos

released through disturbance of this product occur in innumerable contexts.  Children are

exposed whenever they play in their attic and whenever they play anywhere in a home which has

been remodeled without observance of appropriate asbestos-containment procedures.  Because of

the age of homes in which Zonolite Attic Insulation is installed, these homes are particularly

subject to remodeling and renovation projects.

The risks associated with Zonolite Attic Insulation due to exposure to airborne

tremolite have only recently come to the attention of a handful of homeowners and to public

health agencies. Results from testing performed in *Barbanti v. W.R. Grace, et al.* involving

routine home remodeling and renovation activities in homes containing Zonolite Attic Insulation

and were supplied to public health agencies due to the disturbing public health and safety

implications of those findings. The risks posed by Zonolite Attic Insulation to an unsuspecting

public caused Assistant Surgeon General Hugh S. Sloan to write the Director of the National

Institute for Occupational Safety and Health on August 1, 2000:

> One issue that has very recently come to our attention, is that
> end-product vermiculite insulation, and most likely other end-
> products, apparently contained appreciable quantities of
> asbestos, but were marketed, sold, and used throughout the
> country without adequate labeling or warnings and were
> commonly considered to be non-toxic (see enclosed
> information and video tape.) Internal company
> documentation and recent testing of residential insulation
> materials, reportedly used in over one million homes,
> reveals that **even minimal handling by workers or residents
> poses a substantial health risk (airborne exposures up to
> 150 times the current occupational standards (0.1 f/cc)).**

Vincent Declaration Ex. 1 (all exhibit references are to the accompanying Vincent Declaration)

(emphasis added).

Moreover, medical screening results, first reported on February 22, 2001 by the

United States Agency for Toxic Substances and Disease Registry (ATSDR), indicate that, of the

one thousand and seventy eight Libby community members (persons who lived or worked in the

vicinity of Libby, Montana) whose screening test results were already available, 30% already

show clinical lung abnormalities. *Preliminary Findings of Medical Testing of Individuals*

*Potentially Exposed to Asbestoform Minerals Associated with Vermiculite in Libby, Montan: An*

*Interim Report for Community Health Planning* by the Department of Health and Human

Services, Agency for Toxic Substances and Disease Registry ("ATSDR"), Declaration Exhibit 2.

Notably, many of those in whom lung abnormalities were found lived in homes insulated with Zonolite insulation. *Id.* Specifically, 34 of the 1,078 tested residents reported that their potential exposure consisted of vermiculite insulation in their homes, and the chest x-rays of 14% of these insulation-only exposure participants showed scarring. *Id.*

**B.     What Do Homeowners Know about the Risks of Zonolite Attic Insulation?**

Importantly, homeowners remain unaware that Zonolite Attic Insulation contains asbestos and remain unadvised that the product poses a risk to them and that simple steps can be taken to minimize exposure. To the contrary, product literature represented Zonolite Attic Insulation to be a friendly and harmless substance that was "100% vermiculite," was "non-irritating to the lungs," that it "contained no harmful chemicals," that it required no use of protective "masks, gloves or special equipment" and that installation of the material was a "fun family type project." Declaration Exs. 3-5.

While the Environmental Protection Agency and Washington Department of Health, subsequent to the bringing of the *Barbanti* action, have issued internet advisories regarding the risks posed by Zonolite Attic Insulation, a scientifically conducted consumer survey of Washington homeowners has demonstrated that only four in every 100 homeowners has received any information, from any source, concerning potential health hazards from Zonolite Attic Insulation. GMA Research Report, Declaration Ex. 5 and Ex. 6. See also testimony of Don Morgan, pp. 82-83, Declaration Ex. 7. A substantial percentage of homeowners, in fact, would not recognize Zonolite Attic Insulation if they were to encounter it.[1]

---

[1]The ZAI plaintiffs reserve the right to later present any new nationwide survey results they wish to conduct, another justification for the requested continuance.

C.    **What Claims Have Been Brought and What Relief Has Been Sought?**

Risks associated with Zonolite Attic Insulation have prompted the filing of a number of class-based civil actions against W.R. Grace. Two of these actions, *Barbanti v. W.R. Grace, et al.* and *Price v. W.R. Grace, et al.*, are noteworthy for purposes of conceptualizing the scope of class proceedings in bankruptcy necessary to protect the due process rights of the ZAI Plaintiffs.

1.    BARBANTI v. W.R. GRACE, ET AL.

*Barbanti v. W.R. Grace, et al.*, was filed on March 24, 2000, and is a Washington State class action which seeks equitable Grace-funded programmatic relief pertaining to Zonolite Attic Insulation. Following extensive discovery and briefing, on September 21, 2000, the Court heard oral argument on Plaintiff's Motion for Class Certification. The Court issued its Memorandum Decision on November 28, 2000, certifying the matter as a class action and appointing Marco Barbanti as representative of the class. *Barbanti*, which remains the only certified Zonolite Attic Insulation class action, involves a class composed of all Washington State homeowners whose homes are fitted with Zonolite Attic Insulation. The Order Granting Class Certification is attached as Declaration Ex. 8.

2.    MDL 1376

The Judicial Panel on Multidistrict Litigation, through transfer order dated December 7, 2000, transferred four pending federal Zonolite Attic Insulation cases to the District of Massachusetts. These matters have been collectively designated MDL 1376.

One of these actions, *Price v. W.R. Grace, et al.*, was designated as the lead action in MDL 1376. *Price v. W.R. Grace, et al.* involves a class of all homeowners whose homes are fitted with Zonolite Attic Insulation, other than individuals residing in the State of Washington.

Plaintiffs in *Price* filed their Motion for Class Certification on January 23, 2001. Briefing on

class certification was completed prior to Grace's April 2, 2001, bankruptcy filing. Hearing on

class certification was to have been held on April 25, 2001.

**D.**     **Homeowners Are Ignorant of the Presence of Asbestos and the Extreme
         Hazard Presented by Disturbing ZAI And Are Entitled To Pursue Collective
         Relief for All Homeowners**

Grace's Zonolite attic insulation was primarily installed directly by the

homeowners as a "do-it-yourself" product. Grace affirmatively represented to homeowners that

ZAI "pours easily and cleanly," does not require "mask, gloves or special equipment," and

"[c]ontains no harmful chemicals." In Grace's sales literature and on the bags themselves are

depictions of a person pouring the material without any safety precautions whatsoever, and the

assurance that the material was "non irritating to the lungs."

Because of these affirmative representations of safety, and because of the lack of

publicity or disclosure of the hazard, the vast majority of ZAI homeowners are totally unaware

that their attic insulation contains asbestos, let alone that minor disturbance of the product will

cause extremely dangerous levels of airborne asbestos, with respect to which the EPA has long

declared that there is no safe level of exposure.

As Henry Anderson, M.D., a leading figure in the area of asbestos exposure has

testified:

> In order to safeguard public health, I believe it is essential that homeowners with
> Zonolite Attic Insulation be warned about the presence of asbestos in this product,
> be advised not to disturb the material, and be instructed on the precautions
> necessary to avoid exposure and contamination when conducting activities that
> disturb the material. Ultimately abatement performed by professionals may be
> necessary to prevent hazardous exposures.

Anderson Aff., Declaration Ex. 9.

Richard Hatfield, senior asbestos consultant at Materials Analytical Services and former technical advisor to the United State Environmental Protection Agency similarly has testified:

> Based on my experience and my testing, it is my opinion that homeowners need to be warned about: 1) the presence of asbestos in Zonolite Attic Insulation; 2) the potential hazards associated with disturbing Zonolite Attic Insulation and asbestos dust from the insulation; 3) the need for strict safety precautions when working around this material; and 4) the need for work that disturbs the insulation and dust from the insulation to be conducted by persons specifically trained to work around asbestos; 5) and if the disturbance of the Zonolite attic insulation cannot be controlled it should be removed prior to conducting additional work activities which would disturb the insulation.

Hatfield Aff., Declaration Ex. 10; see also Hurst Aff., Declaration Ex. 11.

E.    **Summary of the Zonolite Attic Insulation Problem**

The combination of homeowner ignorance, the frequency of insulation disturbing activities, and the dangerously high levels of asbestos dust in such typical activities presents a unique problem for this Court. The ZAI class actions represent a major element of Grace's liabilities. If, for example, the cost of containment and/or remediation of homes contaminated with asbestos-laden ZAI is estimated to average $1,000.00[2] to $10,000 per home, the liability for

---

[2]Plaintiffs understand that in Washington State, where the Barbanti Class was earlier certified, licensed asbestos contractors are offering to remove Zonolite from residences and encapsulate/seal affected areas at the cost of $1,000 per home. While plaintiffs have not had the chance to evaluate the process used by these contractors, it is anticipated that similar economics of scale are readily developable nationwide.

the covering and/or substantially contributing to the costs of remediating one million homes is substantial yet feasible.

However, unique to the ZAI class action claims is the opportunity for this Court to adopt class action proceedings and recognize class claims which if ultimately determined in favor of plaintiffs on the merits, will potentially <u>prevent</u> future harm and future injuries or death by permitting folks to avoid needless asbestos exposures and thereby limit future injuries. Only timely notice to homeowners can <u>prevent</u> disturbance of the attic insulation, further contamination of the homes, and further disease among ZAI homeowners.

### 1.    <u>Special Notice Problems for Homeowners with ZAI</u>

The nature of the ZAI class actions is readily distinguishable from the vast majority of the typical Grace personal injury and property damage asbestos claims. These distinctions present special opportunities and problems in this bankruptcy which justify careful consideration and full briefing. The ZAI class actions involve a single manufacturer and single main defendant: W.R. Grace & Co. (and associated entities). Implementation of effective relief in these single defendant cases present an opportunity to reduce the ultimate monetary liability by avoiding physical injuries. Because only one defendant is involved, appropriate remedies will be effective without regard to the conduct of other asbestos companies.

Conversely, the ubiquitous ignorance of ZAI homeowners presents an unusual notification issue which must be addressed with respect to (a) notification of creditors and proof of claims; (b) class certification notice; and (c) preliminary and/or final injunctive relief. The ZAI class representatives will be asking this Court to consider notification procedures which

address all three of these concerns thus satisfying equity and due process demands, and assuring

adequate protection of human health.

Grace seeks a bar date without <u>actual</u> notices to each of the ZAI homeowners.

The equitable due process limitations to bar date procedures, together with the need to protect the

health of the ZAI homeowners strongly contradict Grace's draconian approach.  The need to

identify claims and provide finality must yield to the paramount concern of due process.

Of course, it is well established that both equity and due process require adequacy

of notice under the circumstances, and a reasonable opportunity for creditors to present their

claims.  Known creditors are entitled to <u>actual</u> notice of bar dates for filing of claims.  <u>City of</u>

<u>New York v. New York, New Haven & Hartford Railroad Co.</u>, 344 U.S. 293, 296 (1953); <u>In re</u>

<u>Chicago Pacific Corp.</u>, 773 F.2d 909 (7th Cir. 1985).  In the absence of actual knowledge or

reasonable notice, a known creditor's claim may not be barred.  <u>Chemetron v. Jones</u>, 72 F.3d

341, 348 (3rd Cir. 1995); <u>In re Trans World Airlines, Inc.</u>, 96 F.3d 687, 689-90 (3rd Cir. 1996);

<u>In re Century Boat Co.</u>, 986 F.2d 154 (5th Cir. 1993); <u>Branch v. F.D.I.C.</u>, 223 B.R. 605 (D.

Mass. 1998).  The form and adequacy of the notice of claim period and bar dates are also subject

to due process scrutiny.  <u>Pioneer Investment v. Brunswick</u>, 507 U.S. 380, 398 (1993).  The

constrains of equity and due process will make it impossible to establish a claim "bar date"

without actual notice to the known creditors who have ZAI.  The fair alternative is a nationwide

class action/class proof of claim.[1]

Moreover, in this unique case, <u>three additional compelling factors</u> must be added

to the creditor notification equation.

_____

[1]As the representative of a certified Washington class, plaintiff <u>Barbanti</u> already is
entitled to file a class proof of claim for Washington residents.

The first additional factor is the demonstrable ignorance among ZAI homeowners of the <u>existence</u> of a claim. Unlike most asbestos claimants, whose disease has been medically verified, the record in the ZAI class actions demonstrate that over 90 percent of the homeowners do not know that there is asbestos in their attic insulation, let alone the seriousness of the health hazard or the potential for a claim against W.R. Grace.

Bar date procedures presume (indeed due process requires) a reasonable opportunity for bankruptcy creditors to learn of and present their claims. If a potential claimant lacks sufficient notice of a bankruptcy case, due process considerations dictate that his or her claim cannot be discharged therein. <u>Jones, et al. v. Chemetron Corporation</u>, 212 F.3d 199, 209 (3rd Cir. 2000); <u>In re Trans World Airlines, Inc.</u>, 96 F.3d 687, 689-90 (3rd Cir. 1996).

Where, as here, there is demonstrable evidence of record that the vast majority of ZAI homeowners have no way of knowing of the possibility of a claim against Grace, the Court must consider fashioning notification procedures which are designed to actually provide a meaningful and effective notice to potential claimants. Due process requires notice that is "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); <u>In re Grand Union Company</u>, 204 B.R. 864, 871 (D.Del. 1997).

Further, in circumstances similar to this Case, due process considerations have been addressed by the appointment of a class representative to receive notice for and represent the interests of a group of unknown claimants. <u>Jones, et al. v. Chemetron Corporation</u>, 212 F.3d 199, 209 (3rd Cir. 2000); <u>Hatch v. Riggs Nat'l Bank</u>, 361 F.2d 559, 566 (D.C. Cir. 1966); <u>In re Piper Aircraft Corp.</u>, 168 B.R. 434, 436, 440 n. 12 (S.D.Fla. 1995), aff'd, 58 F.3d 1573 (11th Cir.

1995).  Accord In re Forty-Eight Insulations, Inc., 58 B.R. 476, 477 (Bankr. N.D.Ill. 1986); In re

UNR Industries, Inc., 46 B.R. 671, 675 (Bankr. N.D.Ill. 1985); In re Johns-Manville Corp., 36

B.R. 743, 747-49, (Bankr. S.D.N.Y. 1984).

   The second concern arises from the fact that the ZAI homeowners' ignorance of

their claims is caused by the deliberate actions of Grace to conceal the attic insulation hazard for

the express purpose of avoiding such claims.  In the same May 24, 1977 internal memo in which

Grace recognized an asbestos exposures "of upwards of 15 f/ml" and in which Grace forecasted

that its attic insulation product would "eventually be banned by the Consumer Product Safety

Commission," Grace considered and rejected labeling of the product and/or corrections of its

misrepresentations of safety in order to prevent homeowners' knowledge of and presentation of

claims:

> Based on the advice of corporate general counsel, we have decided not to affix
> labels on . . . expanded products using Libby ore.

* * *

> A decision to label our consumer products would eliminate the risk of future
> liability, while exacerbating the risk of claims . . . from past use of the product.

(See Declaration Ex. 12) (emphasis added).

   This decision was part of consistent corporate policy of concealing the hazard of

vermiculite in order to prevent consumer claims.  A further example is the exchange of memos

on March 11 and 31, 1969 ("Before any labeling . . . we should indeed study . . . the

consequences . . . by warning people or inadequately warning people.  We may be incurring

liability.") (See Declaration Ex. 13) (emphasis added)  Where a class of creditors' demonstrable

ignorance of claims is caused by a debtors' misrepresentation and deliberate actions designed to

-12-

prevent such claims, traditional notification and bar date procedures will not meet the requirements of due process.

Finally, the notification and bar date equation must take into account the ongoing health hazard and the likelihood of continuing exposures, asbestos disease, and resulting claims caused by ZAI homeowners' continuing ignorance of the extreme hazards lurking in their attics. Above all else, this Court must assure that the ZAI class action plaintiffs have the opportunity to timely and effectively secure appropriate group relief to protect ZAI homeowners from needless future exposures to dangerous and life threatening levels of asbestos-laden dust.

The combination of demonstrable ignorance of the claim existence, the affirmative actions of the debtor to cause such ignorance, and the ongoing exposures and growth of claims arising from such ignorance presents a unique circumstance for appropriate notice. As the following discussion will demonstrate, the solution to these unique notification problems overlap between (a) the notice to bankruptcy creditors; (b) class certification and notice under Rule 23; and (c) appropriate preliminary and final relief.

## 2.    Unique Administrative Issues for the ZAI Claimants

The ZAI class action plaintiffs agree that litigation is necessary to address both the special forms of relief sought by the plaintiffs as well as the defenses thereto. The constraints of due process and efficient administration dictate that such proceedings be conducted on a class basis. A threshold issue which this Court must therefore address is how the class certification question should be resolved.

In the Barbanti action for homeowners within the state of Washington, a class has been certified. Following close on the heels of Barbanti are the consolidated actions in MDL

1376 where the class motion has been fully briefed. Leaving the certification question open any longer will delay the efficient administration of these claims.

The ZAI class action plaintiffs urge this Court to recognize that the resolution of class certification with the corresponding service of class notice will have a profound effect, if not resolve, the notification of creditor and bar date issues described in Grace's informational brief. For example, if the nationwide ZAI class action is certified, proof of claim and bar date issues may be resolved by the filing of class proof of claim. Birting Fisheries, Inc. v. Lane, 92 F.3d 939 (9th Cir. 1996); Reid v. White Motor Corp., 886 F.2d 1462, 1469 (6th Cir. 1989); Certified Class in the Charter Sec. Litig. v. Charter Co., 876 F.2d 866, 878 (11th Cir. 1989); In re American Reserve Corp., 840 F.2d 487, 488 (7th Cir. 1988).

Next, certification of a class action for adversarial proceedings invokes the class notification procedures under Rule 7023, and thereby Rule 23(c)(2), Fed. R. Civ. P. Such notification to members of the class may present the opportunity to adequately address all of the notice concerns described above. For example, an advanced draft of the form of notice to be used in the Barbanti case for members of the Washington State class was earlier developed. With minor modification, such notice could fulfill the triple function of (a) satisfying class notice requirements; (b) alerting ZAI homeowners to avoid exposures which would precipitate new claims; and (c) informing ZAI homeowners of the status of their claims within this bankruptcy.

Regardless of the means of notification utilized, this Court should recognize the need to carefully consider satisfying all three of these concerns.

## 2.   Class Proceedings Are the Only Solution

A major issue and potential problem, of a scope never previously addressed in any bankruptcy proceedings, is the existence in this proceeding of many thousands, or even millions,

of homeowners/residents now living in homes with <u>current asbestos contamination</u> of which they are entirely ignorant.

While all such homeowners are properly characterized as persons with "current claims"[1] in the context of a class wide proceeding seeking an order creating a Debtor-funded asbestos notification, education and remediation program, only a class proceeding can protect the due process/Fifth Amendment rights of these claimants since they do not now know that they have any potential claims.

As a matter of course, classes are regularly certified under the Bankruptcy Code. *See In re Whittaker*, 882 F.2d 791, 793, n. 1 (3d Cir., 1989) (declining to review bankruptcy court's class certification). One of the goals of the class action is to aggregate common claims in a single forum. *See id.*; *see also American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 553-54 (1974). This policy is served through the mechanism of the bankruptcy proceeding itself, independent of the class action rules. The Supreme Court in *American Pipe* stated that the class action serves purposes other than judicial economy. One of its most important functions is to make possible the maintenance of many small claims "that would otherwise lie dormant." *In re American Reserve Corp.*, 840 F.2d 487, 489 (7th Cir.1988). The class action increases the likelihood that the small claimant will be represented and thereby "serves a deterrent function by ensuring that wrongdoers bear the costs of their activities." *Id.* Since there are significant

---

[4]/Zonolite insulation, unlike the Debtors' encapsulated Monocoate products, is <u>loose-fill</u> insulation meaning that the asbestos is already loose and has already invaded the residence so that present contamination can already be presumed. In the alternative, the Zonolite Plaintiffs seek additional time to address the issue of whether all of the Zonolite claimants' property claims can or should be viewed as potential "future claims," in which case representatives and special estimation mechanisms would need to be considered. Regardless of how the claims are ultimately addressed, the undersigned would seek an order appointing them to serve as counsel for the ZAI Plaintiffs.

opportunity costs associated with identifying and investigating claims and since many potential litigants with small claims are unaware of the full scope of their rights in bankruptcy, the class action may be the only practical means of permitting small claims to be brought.

As the *American Reserve* court observed, "for many small claims, it is class actions or nothing." *Id.* To deny the use of a class claim would frustrate this policy and, as a practical matter, leave the majority of small claimants in bankruptcy proceedings without a remedy. This is particularly true in Zonolite, where virtually no one knows they even have asbestos contamination and have a potential claim.

Congress has provided in Bankruptcy Rule 7023 that "Rule 23 of the Federal Rules of Civil Procedure applies in adversary proceedings." *See In re Zenith Laboratories, Inc., 104 B.R. 659, 663 (D.N.J. 1989)* (holding class proof of claims should be permitted in adversary proceedings when bankruptcy judge has applied Fed.R.Civ.P. 23 to contested matter). While the Third Circuit, in a case involving a SIPA liquidation under the former Bankruptcy Act, expressed concerns about certifying a class in a bankruptcy case, *see Securities and Exchange Comm'n. v. Aberdeen Securities Co., 480 F.2d 1121, 1128 (3d Cir. 1973); see also S.E.C. v. Securities Planners Ltd. Inc., Civil Action No. 71-656-M (D.Mass.1972)*, the vast majority of courts who have recently considered the issue have concluded that class proofs of claim are now regularly permitted in a bankruptcy proceeding. *See In re Zenith Labs., 104 B.R. at 653.* Before a class claim may be filed and a class representative is recognized, an order directing that Bankruptcy Rule 7023 shall be applied to the proceeding must be sought and obtained.

Class proofs of claim, followed by consolidated treatment of the merit of class members' claims for unified equitable relief, would advance the interests of the debtor and all creditors by assuring timely resolution of a class of claims having significant implications for

Grace's reorganization. The precise identities of homeowners whose homes are fitted with

Zonolite Attic Insulation, a community whose membership remains unknown, as it must, and

determinations of individual identities need not be ascertained except during the implementation

stage of relief. This presents no barrier to resolutions of Zonolite Attic Insulation claims since

valuation of the relief sought, such as the costs of a meaningful nationwide warning program,

development and dissemination of appropriate operations and maintenance practices materials,

and determination of the number of homes fitted with Zonolite, together with the types,

frequency, and costs of appropriate abatement or removal work, may be ascertained through use

of individuals having expertise in appropriate fields.

Unfortunately, the program proposed by the Debtors totally fails to take account

of, and entirely fails to deal with, the special vulnerability and ignorance of Zonolite residents.

## CONCLUSION

The ZAI class actions present the potentially largest category of claims facing the

Debtors. The merit of these claims is underscored by the findings, reports, and recommendations

of several federal agencies. The single most important group of decisions to be addressed by this

Court in the Case will be those surrounding the nature and extent of notice, class treatment and

remedies to be afforded to the ZAI claimants. The ZAI plaintiffs ask this Court to accept that the

ZAI class action claims present a unique challenge for the formulation of an adequate and

effective notice to all potential claimants that, safeguards both the claimants' due process rights

and legitimate health concerns. Additionally, this Court must recognize that these claims, if

remedied appropriately and efficiently, actually present a unique opportunity, through a

meaningful notice and class treatment, to reduce and avoid future personal injuries and deaths

and thereby lessen the ultimate personal injury asbestos liability faced by the Debtors.

While the ZAI Plaintiffs, like the PD Committee, believe that the Debtors' Case Management Motions are prejudicial, ill-conceived and imprudent generally, the Zonolite Plaintiffs require additional time to object to the Case Management Motions and to brief the complicated due process issue implicated in these proceedings. Although the Debtors repeatedly characterize their proposals as having been addressed and embraced in other bankruptcy cases, neither Zonolite claims nor other truly analogous claims were implicated in those cases. The Debtors' proposals are of first impression and unprecedented in the present context.

Accordingly, to prevent manifest injustice, the Zonolite Plaintiffs respectfully seeks an additional thirty (30) days to object and respond to the Case Management Motions and request that the court also establish a ZAI class certification briefing schedule.

## **Notice**

Notice of this Motion has been given to: (i) the United States Trustee; (ii) counsel to the Debtors; (iii) counsel to the DIP Lenders; (iv) counsel to the official committees appointed in these chapter 11 cases; and (v) all those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002. In light of the nature of the relief requested, the Zonolite Plaintiffs submit that no further notice is required.

## **No Prior Request**

No prior application for the continuance requested herein has been made to this or any other Court.

WHEREFORE, the Zonolite Plaintiffs respectfully request that the Court enter an order continuing the hearing on the Case Management Motions filed by the Debtors for a period of not less than thirty (30) days from August 2, 2001, and further, extending for a like period the date by which the Zonolite Plaintiffs must object or respond to the Case Management Motions, establish a class certification briefing schedule, and grant such other and further relief as is just and proper.

Dated: July 13, 2001
     Wilmington, Delaware

               Paul Price
               By his attorneys,

               ELZUFON AUSTIN REARDON,
                 TARLOV & MONDELL, P.A.

               By:_____
               William D. Sullivan, Esq. #2820
               300 Delaware Avenue, Suite 1700
               P.O. Box 1630
               Wilmington, DE 19899-1630
               (302) 428-3181

               and

               Elizabeth J. Cabraser,
               Plaintiffs' Executive Committee MDL 1376
               <u>Barbanti</u> Class Counsel

               Elizabeth J. Cabraser
               Fabrice N. Vincent
               John Low Beer
               LIEFF, CABRASER, HEIMANN
               & BERNSTEIN, LLP
               Embarcadero Center West, 30th Floor
               275 Battery Street
               San Francisco, CA 94111
               Telephone: (415) 956 1000
               Facsimile:  (415) 956 1008

Thomas M. Sobol
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
214 Union Wharf
Boston, MA 02109-1216
Telephone: (617) 720-5000
Facsimile: (617) 720-5015

and

Edward J. Westbrook,
Plaintiffs' Executive Committee MDL 1376
Barbanti Class Counsel

Edward J. Westbrook
Robert M. Turkewitz
NESS MOTLEY LOADHOLT
RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216 9000
Facsimile:  (843) 216 9440

and

Allan M. McGarvey
Allan M. McGarvey
Roger M. Sullivan
Jon L. Heberling
McGARVEY, HEBERLING,
SULLIVAN & McGARVEY, P.C.
745 South Main
Kalispell, MT  59901
Telephone:  (406) 752-5566
Facsimile:  (406) 752 7124

John G. Stoia, Jr.,
Plaintiffs' Executive Committee MDL 1376
John J. Stoia, Jr.
Timothy G. Blood
Jobeth Halper
MILBERG WEISS BERSHAD HYNES &
LERACH, LLP
600 West Broadway
1800 One America Plaza
San Diego, CA 92101 5050
Telephone: (619) 231 1058
Facsimile:  (619) 231 7423

and

LUKINS & ANNIS, P.S.
Darrell W. Scott
Michael G. Black
Mischelle R. Fulgham
Tonya R. Hanson
1600 Washington Trust Financial Center
717 W Sprague Ave.
Spokane, WA  99201-0466
Telephone: (509) 455-9555
Facsimile: (509) 747-2323

Attorneys for Plaintiffs and
Barbanti Class Counsel

and

David Pastor,
Plaintiffs' Executive Committee MDL 1376

David Pastor
Edward L. Manchur
John C. Martland
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231 7850
Facsimile:  (781) 231 7840

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on July 13, 2001, I did serve the foregoing: ZONOLITE PLAINTIFFS' OBJECTION TO DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF BAR DATE, APPROVAL OF PROOF OF CLAIM FORMS AND APPROVAL OF NOTICE PROGRAM (DOCKET NO. 536); MOTION TO EXTEND THE TIME TO OBJECT OR RESPOND TO SUCH MOTIONS; JOINDER IN MOTION FOR CONTINUANCE BY OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS; INDEPENDENT MOTION TO CONTINUE THE HEARING ON DEBTORS' MOTION; AND REQUEST FOR CONSIDERATION AND BRIEFING REGARDING CLASS TREATMENT upon the parties identified below in the manner specified.

### VIA HAND DELIVERY

Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young & Jones
919 Market Street, Suite 1600
Wilmington, DE 19801

Michael S. Joseph, Esquire
Ferry & Joseph P.A.
824 Market Street, Suite 904
Wilmington, DE 19899

Matthew G. Zaleski, III, Esquire
Campbell & Levine, LLC
Chase Manhattan Centre, 15th Floor
1201 N. Market Street
Wilmington, DE 19801

Frank J. Perch, Esquire
Office of the US Trustee
844 N. King Street
Wilmington, DE 19801

Michael R. Lastowski, Esquire
Duane, Morris & Heckscher, LLP
110 N. Market Street, Suite 1200
Wilmington, DE 19801

**VIA FEDERAL EXPRESS**

Scott L. Baena, Esquire
Bilzin, Sumberg, Dunn,
Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL 33131

Elihu Inselbuch, Esquire
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

James H.M. Sprayregen, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601

Lewis Kruger, Esquire
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Under penalty of perjury, I declare that the foregoing is true and correct.

_____7/13/01_____
Date

_____
William D. Sullivan

in addressing the need for medical testing of Libby residents for possible asbestos-related health effects. This request was referred to ATSDR, the lead DHHS agency responsible for providing this type of assistance.

### Asbestos-Related Diseases

Inhalation of asbestos fibers from asbestoform minerals suspended in air can result in lung diseases, such as asbestosis, mesothelioma, and lung cancer. The risk of developing any one of these diseases depends upon many factors; including the type of fiber, level of exposure, duration of exposure, and smoking history of the exposed individual.

### *Pleural Changes*

Asbestos exposure is associated with several changes in the pleura (lining of the lungs and internal chest wall). These changes include plaques (circumscribed pleural thickening), diffuse pleural thickening, calcifications, and pleural effusions (accumulations of fluid in the pleural space). They indicate past exposure to asbestos, and can often be detected in chest radiographs (CXR), also known as X-rays. On the chest radiographs, these changes appear as areas of either diffuse or circumscribed thickening of the pleura.

The latency of asbestos related *pleural effusions* on chest radiograph is usually less than 20 years and is often the first indication of asbestos-related disease.  Pleural effusions, depending on the severity, may be associated with shortness of breath, chest pain, and functional lung impairment. The latency time for development of asbestos-related *pleural plaques* is on average 20 years, with a range of 3 to 57 years.  Clinically, circumscribed pleural plaques found on chest radiograph, in the absence of other abnormalities, are viewed as non-symptomatic "markers of exposure" and the majority of cases will not progress to significantly affect lung function.  *Diffuse pleural thickening* may also be seen on chest radiograph and, depending on the severity, may be associated with

cough, shortness of breath, and functional lung impairment. The presence of any of these pleural abnormalities on chest radiograph, associated with asbestos exposure, indicates increased risk for mesothelioma and lung cancer.

*Asbestosis*

Asbestos fibers can reach the lower lung, penetrate airway walls, and pass through lung parenchyma to the pleura. They initiate fibrosis by stimulating the persistent release of various inflammatory mediators and fibroblast growth factors. The condition "asbestosis" classically refers to the occurrence of diffuse interstitial fibrosis which results from this persistent inflammatory process in response to asbestos fibers located in the interstitial or parenchyma tissues of the lung. Asbestos fibers located in or near the lung pleura appear to trigger a similar inflammatory process which frequently results in pleural thickening and the formation of calcified plaques.

The latency period (the time interval between exposure and disease) for the onset of disease typically is 10–20 years after the initial exposure, but some cases progress more rapidly. The diagnosis of asbestosis is usually based on the results of a medical and exposure history, physical examination, chest radiographs and other radiographic procedures, and pulmonary-function testing (spirometry). Clinically, asbestosis may present as a dry cough or shortness of breath with exertion. On physical examination, rales (dry crackling sounds) frequently occur with deep inspiration. The disease can vary from asymptomatic, to disabling, to potentially fatal. In advanced stages, clubbing (thickened fingertips) can result.

*Lung Cancer*

Exposure to asbestos is associated with an increased risk of developing lung cancer. The risk is related to cumulative asbestos exposure, i.e., the greater the exposure, the greater the risk of

developing lung cancer. The risk for lung cancer among smokers exposed to asbestos is much higher than it would be if the two risk factors were additive in nature.

Typically, a substantial latency period of 10–40 years occurs between initial exposure and the onset of lung cancer [ATSDR 1995]. The initial symptoms of lung cancer are variable and may include cough, chest pain, and loss of appetite. Lung cancer is often an incidental finding on a chest radiograph taken for another medical purpose.

*Mesothelioma*

Mesothelioma is a rare and generally fatal cancer of the mesothelial cells of the pleura or peritoneum. The prevalence of mesothelioma is strongly associated with asbestos exposure, but its prevalence does not correlate with the magnitude of the exposure. That is, some cases of the disease have resulted after exposure to relatively low levels of asbestos for short time periods [Becklake 1976]. Often, the latency period is 30–40 years.

Individuals with pleural mesothelioma generally present with chest pain and shortness of breath. The initial symptoms associated with peritoneal mesothelioma are weight loss, and abdominal pain and swelling. These symptoms usually do not appear until the disease is quite advanced. Currently no effective treatment exists for malignant mesothelioma.

## METHODS

### Medical Testing Program

During July through November, 2000, medical testing was provided to former workers of W.R. Grace Company, household contacts of former workers, and individuals who resided, worked, attended school, or participated in activities in the Libby area for 6 months or more before

-6-

December 31, 1990. All 1,078 of the participants included in this interim report were tested in Libby. Medical testing consisted of a verbally administered questionnaire, chest radiographs and simple spirometry testing (a measurement of lung function).

## Questionnaires

A questionnaire was administered to obtain health-related information, including demographic characteristics, residential history, occupational history, behavior patterns that relate to asbestos exposures, and self-reports of illnesses of interest to the community or possibly related to asbestos exposure.

## Chest Radiographs

For adults, the medical test of choice for identifying asbestos-related changes in the parenchyma and pleura of the lungs is the chest radiograph. The advantages include ready availability, low cost, and low radiation dose compared with other techniques [McLoud 1992]. Screening for asbestos-related abnormalities is usually done with a posterior-anterior (P-A) view, or with P-A *and* lateral views. However, physicians treating patients from Libby with asbestos-related pulmonary abnormalities had reported a predominance of pleural disease. Therefore, after consultation with experts in pulmonary medicine, the lateral chest view was replaced with two oblique views, to improve the test's sensitivity for detecting pleural abnormalities.

Chest radiographs for participants 18 or more years of age included posterior-anterior (P-A), right anterior-oblique, and left anterior-oblique views. For safety purposes, women of childbearing age were informed that they should postpone receiving a chest radiograph if they were pregnant. Chest radiograph was not offered to participants under 18 years of age. The equipment and procedures used to obtain the chest radiographs complied with guidelines developed by NIOSH [Sargent 1982]. The radiologist on site assessed the consistency and quality of each chest

radiograph taken and provided a routine, clinical, radiologic interpretation, which included recording asbestos-related changes on a summary report form. If findings on a chest radiograph suggested the need for immediate medical attention, the on-site radiologist completed a referral form, and the participant was counseled and directed to an appropriate source of medical care.

In addition to evaluation and interpretation by the on-site radiologist, participants' radiographs were evaluated by three physicians who are nationally recognized experts in asbestos-related conditions, as well as certified "B-readers," physicians certified by NIOSH as qualified to interpret radiographs for environmental dust-related diseases. Each B-reader independently examined the chest radiographs to classify them with respect to parenchymal and pleural abnormalities associated with exposure to mineral dusts that cause pneumoconiosis. The classification standards used are those set by the 1980 protocol of the International Labour Office of the World Health Organization (ILO) [ILO 1980]. Because some variability in interpretation of the same radiograph can occur among trained B-readers, researchers often choose to have radiographs reviewed by multiple radiologists who are certified B-readers. Two primary B-readers independently reviewed the chest radiographs taken on participants in the medical testing. The third B-reader independently read each radiograph that had different interpretations by the first two B-readers. The physicians recorded their interpretations on a standard form (developed by the ILO for recording B-readers' interpretations), which was modified to record the results of the oblique-view chest radiographs.

### *Spirometry*

Spirometry testing provides a safe, well standardized, objective measurement of lung function, and it was offered to all participants, including those less than 18 years of age. The spirometric tests recorded (a) the forced expiratory volume in 1 second (FEV1 ); (b) the volume that can be expired after a maximal inhalation, typically called the forced vital capacity (FVC); and (c) their

calculated ratio (FEV1/FVC).

The two major types of abnormal ventilation identified by spirometry are called restrictive and obstructive patterns. The obstructive pattern results from decreases in expiratory flow rates. Additionally, both FEV1 and the FEV1/FVC ratio are both decreased. Examples of obstructive diseases are asthma, chronic bronchitis, and emphysema. The restrictive pattern results from decreases in pulmonary air volumes associated with parenchymal disease (as in sarcoidosis or pneumoconiosis) or extraparenchymal disease (as with neuromuscular or chest-wall disorders). In this pattern, the FVC is typically reduced, although the FEV1/FVC could remain normal. Patients with asbestos-related pulmonary impairment typically demonstrate restrictive abnormalities on spirometry testing.

Spirometry testing followed the American Thoracic Society's guidelines and was performed by a qualified technician. Established procedures were followed to ensure correct technique, calibration methods, and maintenance. Qualified medical oversight was established to monitor the test results, to ensure the quality of the results and validity of interpretations. The results were compared with normative population data on the basis of the participant's age, height, and sex.

**Procedures Used for Data Analyses**

This medical testing program was designed to identify participants with asbestos-related abnormalities and to refer them for diagnosis and follow-up treatment by private practitioners. The program was not a formal epidemiologic study with comparison groups and random samples. Nevertheless, the data collected provides important information about the prevalence and degree of asbestos-related abnormalities among Libby residents, and about the possible relationships between these abnormalities and each of the several exposure pathways evaluated.

The key outcome variable in this report is the presence of asbestos-related abnormalities on chest radiographs. The presence of abnormalities was classified in two ways (1) abnormalities identified by at least one physician and (2) abnormalities identified by at least two of three B-readers. The second classification is more stringent and also added the requirement that the abnormality was likely related to asbestos. The second classification typically is used in epidemiologic studies of asbestos-related disease. In this analyses, several case definitions were considered on the basis of whether (a) the results were to be used for epidemiologic characterization or clinical referral, (b) the abnormality was interstitial or pleural, and (c) the chest radiograph view used for classification was P-A, oblique, or a combination of these. Other adverse health effects considered were self-reported conditions, malignant outcomes associated with asbestos exposure (such as cancer abnormalities), and restrictive abnormalities (based on the pulmonary function test evaluations). Information is also included in this report that shows the number and proportion of participants with self-reported conditions associated with asbestos. The objective of the data analyses was to characterize the proportion of participants with various health outcomes within exposure categories in the population tested. In addition, important associations between these health outcomes and the participants' exposure histories were sought.

Questionnaire and chest radiograph data were merged to create a computerized master file that contained demographic data, environmental exposure data, self-reported health data, and medical testing data. The data used for the analyses was interim data for 1,078 study participants. The key risk factors considered were the various exposure pathways (including variables related to occupational exposure), household contact with someone who had occupational exposure, activities thought to have increased the potential for exposure, and other behaviors that involved contact with vermiculite.

For this preliminary analysis, six exposure groups were defined for the 1,078 participants. Group 1 consisted of those 127 (12%) participants who worked at W.R. Grace Company either as a worker or a secondary contractor. Group 2 consisted of 116 (11%) participants who reported occupational exposure to vermiculite but did not work at W.R. Grace Company. Group 3 consisted of 177 (16%) participants who reported being in household contact with a W.R. Grace worker but were otherwise never occupationally exposed. Group 4 consisted of 558 (52%) participants who indicated that they had some form of exposure through recreational activities (e.g. played in vermiculite piles) but were never occupationally exposed to vermiculite nor had household contact with a W.R. Grace worker. Group 5 consisted of 34 (3%) participants who were excluded from Groups 1 through 4 but had lived in a residence containing vermiculite insulation. Group 6 consisted of 53 (5%) of the remaining participants who had no apparent exposure. Although the latter group is composed of participants with no apparent, specific exposure to vermiculite, this group might have had other exposures to vermiculite which were not evaluated in this analysis.

Finally, basic demographic variables and other factors were examined. These included the following: age; sex; smoking status; history of pulmonary disease, lung cancer, autoimmune disease; and various other self-reported health conditions.

## RESULTS

*For this interim report, the analyses were restricted to basic descriptive measures (means, counts, and percentages). It is important to note that the results derived from the interim data might not be representative of results that will be obtained for the complete data set.*

The interim data set was comprised of 1,078 study participants. Of these, 159 were less than 18 years of age, so no chest radiographic tests were conducted. Fourteen study participants were missing complete exposure data, therefore their data is excluded in the exposure groups in the tables that follow. Table 1 summarizes participants' exposure histories, by age group. The largest age group represented was for participants aged 45–64 years.

**Table 1.  Vermiculite Exposure, by Age Group**

|  | 0–18 years | 18–45 years | 45–65 years | 65+ years |
|---|---|---|---|---|
| All exposure groups (1,078) | 159 (15%) | 292 (27%) | 449 (42%) | 178 (17%) |
| WRG* workers & secondary contractors (127) | 0 (0%) | 21(17%) | 75 (59%) | 31 (24%) |
| No WRG occupational contact (116) | 1 (1%) | 43 (37%) | 51 (44%) | 21 (18%) |
| Household contact (177) | 10 (6%) | 61 (34%) | 76 (43%) | 30 (17%) |
| Recreational (558) | 123 (22%) | 155 (28%) | 211 (38%) | 69 (12%) |
| Residential insulation (34) | 6 (18%) | 5 (15%) | 14 (41%) | 9 (26%) |
| No apparent exposure[†] (53) | 16 (30%) | 5 (9%) | 18 (34%) | 14 (26%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
[†]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Table 2 summarizes the exposure history of participants, by sex. Of the 1,078 participants, 509 (47%) were male, and 569 (53%) were female. Males were much more likely to have potential occupational exposure to vermiculite at the W.R. Grace Company. Eighty-six percent of W.R. Grace workers and secondary contractors were male. In contrast, 76% of those reporting household contacts were female. Sixty-four percent of those reporting no apparent exposures (as defined for this analysis) from occupational, recreational, or household contact were female.

**Table 2. Vermiculite Exposure Groups, by Sex**

|  | Male | Female |
|---|---|---|
| All exposure groups (1078) | 509 (47%) | 569 (53%) |
| WRG* workers & secondary contractors (127) | 109 (86%) | 18 (14%) |
| No WRG occupational contact with vermiculite (116) | 81 (70%) | 35 (30%) |
| Household contact (177) | 43 (24%) | 134 (76%) |
| Recreational (558) | 239 (43%) | 319 (57%) |
| Residential insulation (34) | 13 (38%) | 21 (62%) |
| No apparent exposure[†] (53) | 19 (36%) | 34 (64%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
[†]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Tables 3 and 4 summarize participants' radiographic outcomes by exposure group classification. Table 3 summarizes the number and the proportion of participants who had a lung abnormality in their chest radiographs identified by at least one of the four physicians. Although these abnormalities can not be assumed to be asbestos related, the information provides the number of participants who were referred to their private physicians for additional evaluation. (Other participants were referred for physician evaluation for non-asbestos related changes and are not described in this report.) Thirty percent of all participants were referred for a pleural abnormality and 7% for an interstitial abnormality. The proportion was highest among participants reporting to be former W.R. Grace workers and secondary contractors, with 50% having pleural abnormalities and 15% having interstitial abnormalities. In contrast, the proportion of participants in the other five groups with pleural abnormalities ranged from 21% to 33%.

**Table 3.  CXR[*] Abnormalities (Observed by at Least One Physician), by Exposure Group**

| | Pleural<br>All Views | Interstitial<br>P-A[†] View |
|---|---|---|
| All exposure groups (919) | 276 (30%) | 60 (7%) |
| WRG[‡] workers & secondary contractors (127) | 63 (50%) | 19 (15%) |
| No WRG occupational contact with vermiculite (115) | 38 (33%) | 11 (10%) |
| Household contacts (167) | 49 (29%) | 8 (5%) |
| Recreation (435) | 107 (25%) | 16 (4%) |
| Residential insulation (28) | 6  (21%) | 1 (4%) |
| No apparent exposure[§] (37) | 10  (27%) | 3 (8%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
+P-A = Posterior-anterior.
CXR = Chest radiograph.
‡WRG = W.R. Grace Company.
§No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Table 4 summarizes the number and proportion of participants having a possible asbestos-related interstitial or pleural abnormality identified on the chest radiograph by at least two of the three B-readers (the definition used by researchers for epidemiologic studies). This table presents results for three differing chest radiographic views for pleural abnormalities (i.e., "all Views", "P-A View", "Oblique View") and one chest radiographic view of interstitial abnormalities ("P-A View") for each of the exposure groups.

The abnormalities reported in Table 4 must have been observed by at least two certified B-readers. Consistency of the two reviewers was defined as both reviewers reporting the presence of pleural changes or the presence of interstitial fibrosis with a profusion level of 1/0 or greater (ILO classification). This criteria provided a greater level of significance to the findings when at least two of the certified reviewers agreed to the presence of an abnormality and agreed that the abnormality was consistent with a pneumoconiosis. This criteria is commonly used in health

-14-

surveys and epidemiologic studies. It provides an epidemiologic definition, but it is not a clinical

criteria for diagnosis. Although not a clinical diagnosis, these data provide a better estimate of

asbestos-related abnormalities.

**Table 4. CXR*Abnormalities (Identified by at Least Two B-Readers), by Exposure Group**

| | Pleural, all views | Pleural, P-A[†] view | Pleural, oblique view | Interstitial, P-A[†] view |
|---|---|---|---|---|
| All exposure groups (919) | 170 (19%) | 137 (15%) | 103 (11%) | 11 (1%) |
| WRG[‡] workers & secondary contractors (127) | 47 (37%) | 37 (29%) | 26 (20%) | 6 (5%) |
| No WRG occupational contact with vermiculite (115) | 21 (18%) | 16 (14%) | 12 (10%) | 2 (2%) |
| Household contact (167) | 33 (20%) | 31 (19%) | 20 (12%) | 1 (1%) |
| Recreational (435) | 58 (13%) | 45 (10%) | 40 (9%) | 1 (0%) |
| Residential insulation (28) | 4 (14%) | 4 (14%) | 1 (4%) | 0 (0%) |
| No apparent exposure[§] (37) | 5 (14%) | 3 (8%) | 2 (5%) | 0 (0%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*CXR = chest radiograph.
[†]P-A = posterior-anterior view.
[‡] WRG = W.R. Grace Company.
[§]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

The typical radiologic evaluation under the ILO classification uses only one chest radiograph, the

back-to-front, or posterior-anterior (P-A) view. This testing program included left and right

oblique views to evaluate pleural disease. Only the P-A view was used to evaluate interstitial

disease as the pathology is best observed in that view. The proportion of participants with pleural

abnormality is provided by the P-A view alone, the oblique views alone, and all views combined,

as reported in Table 4. If these proportions are to be compared to other surveys using the ILO

system, the best parameter for comparison is the proportion of pleural abnormalities in P-A views.

Nineteen percent of all participants had pleural abnormalities identified on their chest X-rays.

Most of the pleural abnormalities were observed in the P-A view, but 30 participants had pleural

changes observed on the oblique views which were not observed on their P-A views. Again, former W.R. Grace workers and secondary contractors had a higher prevalence of chest radiographic abnormalities for every view, when compared with other exposure groups (statistical significance not evaluated). The two groups classified as "No WRG occupational contact with vermiculite" and "Household contacts" had a similar prevalence of abnormalities which varied by chest radiograph view. Although the prevalence of abnormalities for groups classified as "Residential insulation" and "No apparent exposure" ranged up to 14%, depending on the view, one must be especially cautious about these findings given the small size of the groups. In contrast, interstitial abnormalities were observed only in 11 participants, or 1% of the total number (919) of participants who received chest radiographs.

Table 5 summarizes restrictive abnormalities identified in the pulmonary function tests, by exposure group. Moderate-to-severe changes are defined as a forced vital capacity that is less than 70% of predicted value. This does not include participants who had significant obstructive lung changes, in whom restrictive changes could not be evaluated. Participants who reported they were former workers at W.R. Grace Company, either directly or as secondary contractors, had the highest percentage of restrictive abnormalities of all exposure groups. As with the interstitial changes seen on the chest radiographs, the number of participants with moderate-to-severe restrictive function was much lower.

Table 5.  **Restrictive Abnormalities in Pulmonary Function, by Exposure Group**

|  | Moderate-to-severe restrictive abnormalities (less than 70% of predicted values) |
|---|---|
| All groups (627) | 10 (2%) |
| WRG* workers & secondary contractors (90) | 5 (6%) |
| No WRG occupational contact with vermiculite (73) | 1 (1%) |
| Household contact (114) | 1 (1%) |
| Recreational (309) | 3 (1%) |
| Residential Insulation (14) | 0 (0%) |
| No apparent exposure† (22) | 0 (0%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
† No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Participants' smoking history and self-reported respiratory symptoms also were examined by exposure groups. Forty-nine percent of study participants reported having smoked cigarettes at some time during their life. Sixty-eight percent of W.R. Grace workers reported having smoked cigarettes, compared with 32% in the "No apparent exposure" group. Sixty-six percent of W.R. Grace workers and secondary contractors reported having had pulmonary disease, compared with 32% in the "No apparent exposure" group. Nine percent of all participants reported having "arthritis, lupus, or scleroderma." The proportion of W.R. Grace workers reporting this condition was 12%, and it was 11% in the "No apparent exposure" group. Additionally, 14% of participants who had been W.R. Grace workers reported having had chest surgery, whereas no more than 5% in any of the other groups reported chest surgery.

Cancer abnormalities also were examined. Thirteen participants had lesions that might be cancer. The percentage of cancer abnormalities was 2% (2 cases) among W.R. Grace workers and 3% (1 case) in the participants with no apparent, specific route of exposure.

-17-

# DISCUSSION

Because this is an interim report based upon preliminary data, interpretations of the information need to remain limited. There could be many ways in which this preliminary data might not be a truly representative sample of the entire tested population, so the final rates of abnormalities are likely to change when the final data are analyzed.

An important finding was that 19% of the participants had pleural abnormalities (which were independently observed by two of the certified B-readers). Former W.R. Grace workers had the highest rate of pleural abnormalities (37%) which is, unfortunately, consistent with previous studies and reports.

Thirty-seven (20%) of household contacts of former W.R. Grace workers had pleural abnormalities. Even though the proportion of household contacts with identified pleural abnormalities could change, this finding causes concern, as it might represent an important historic pathway of exposure to asbestos by community residents. The proportion of pleural changes observed in the other exposure groups evaluated is 13% for those who reported contact with vermiculite during recreational activities, 14% for those who only had vermiculite insulation in their residences, and 14% of those with no apparent pathways of exposure. These rates are similar, and they could indicate a background rate for participants with neither occupational nor household-contact exposure. Unfortunately, no directly comparable Montana or U.S. population studies are available to estimate the rate of pleural abnormalities among those in Libby with no work-related exposures. Studies of differing groups within the United States believed to have no substantive work-related asbestos exposures have found the prevalence of pleural abnormalities ranging from 0.02% among blue-collar workers in North Carolina [Castellan 1985], to 0.9% among loggers in Washington and Oregon [Stilbolt 1991], to 1.8% among New Jersey residents

[Anderson 1979], and 2.3% among patients at Veterans Administration hospitals in New Jersey [Miller JA 1996]. Studies of household contacts of asbestos-exposed workers have reported the prevalence of asbestos-related pleural abnormalities ranging from 3.5% for household contacts of shipyard workers [Kilburn 1985], to 19% for household contacts of workers producing amosite asbestos products [Anderson 1979].

The proportion of interstitial abnormalities and moderate-to-severe restrictive changes on participants' spirometry tests is much smaller. This finding is consistent with clinical reports by physicians in the Libby area that patients frequently present with pleural abnormalities.

Thirteen participants were identified by the chest radiograph reviewers (B-readers) with an abnormality thought to be a possible cancerous lesion. These individuals were contacted and referred to their private physician. At present, ATSDR has not conducted a retrospective survey of referred participants to determine the final diagnosis or disposition of these findings.

Several illnesses were self-reported by participants of which two were of particular interest. First, respiratory disease was reported by 66% of the participants who were former W.R. Grace workers and secondary contractors, compared to 32% of participants in the "No apparent exposure" group. This may represent a greater susceptibility of these participants because of other underlying respiratory conditions, but this group also might be slightly older than other participants, so further analyses must adjust the rates for age in order to determine the importance of this finding.

Second, members of the community also requested that ATSDR report the findings for self-reported "arthritis, lupus, or scleroderma." Eleven percent of the participants self-reported these conditions. The question did not distinguish between arthritis resulting from physical degeneration

of joints (osteoarthritis), arthritis resulting from an autoimmune pathology (such as rheumatoid arthritis), or other forms of arthritis. Thus, all respondents can not be assumed to be suffering from an autoimmune pathology. In order to clarify this concern, a more specific evaluation of participants reporting these conditions would be needed. The medical literature was searched (1980 through early 2001) for published studies regarding rheumatoid arthritis, systemic lupus erythematosis (SLE), or autoimmune diseases associated with asbestosis exposure. Only a few of these studies reported any association; i.e. three cases of rheumatoid arthritis and one case of SLE were reported with pleural thickening or asbestosis. The authors did not speculate on an association. One article on SLE suggested that there might be some evidence of an epidemiologic association [Mulherin 1993]. Asbestosis has been associated with immunologic changes (hypergammaglobulinemia, anti-nuclear antibodies, and rheumatoid factor). Mulherin states "...it is interesting to speculate that asbestosis may have predisposed to the development of SLE, given the immunological derangements seen in asbestosis." Thus, at the present time, there is only limited information about the association between auto-immune diseases and asbestosis. Also, few studies have been conducted to address Mulherin's hypothesis.

## LIMITATIONS

Information obtained through systematic survey methods or medical testing programs can have many limitations. This is especially true when the information is preliminary, as in this interim evaluation. The information presented in this report represents only 1,078 (18%) participants out of 6,144 who completed the medical testing program. The proportion of participants in this interim report with observed abnormalities can not be assumed to remain the same when the testing program's total 6,144 participants is completed and the data analyzed. The medical testing program was conducted with the principal goal of providing a service-oriented screening program in the community. Therefore, methods used by epidemiologists to limit biases (sources of

influence on trends within the findings) in the cumulative information of this interim analysis were less stringent than methods used in some epidemiologic studies. No specific effort was taken to *strictly* keep all records in chronological order by testing date. Records may have changed in chronological order by handling by the hospital and local radiologist, mailing to the expert B-readers, the use of the X-rays for clinical evaluations needed before distribution to the B-readers, or by other logistical processes in the handling of records and the creation of the data file. Although participants seen earlier in the testing program are more likely to be included in the 1,078 records summarized for this interim report, they not necessarily the same ones included in this analysis. Also, because this was not an epidemiologic study, no control group was included. These limitations are important to understand in order to avoid drawing inappropriate conclusions from preliminary data.

In other testing programs, it has been observed that the identification of individuals with abnormalities is not necessarily random over time. There could be personal reasons why some individuals seek medical care earlier or why some purposely postpone testing until late in the process. Although some report that the individuals most concerned their health might seek testing earlier, this hypothesis can not be evaluated for this report.

This testing program was not an epidemiologic study. Summary information, such as that reported in this interim report, is expected to be useful for health care planning needs in the community and for understanding the scope and natural history of the illness process to provide support for local health care providers. A perspective on the magnitude of the public health problem in the Libby area can be summarized by examining the prevalence of participants with asbestos-related abnormalities, but judgements about the extent of these abnormalities above expected values are based upon few reports in the scientific literature. Because no control group was included, direct comparisons of the occurrence of abnormalities above the expected value can not be calculated.

-21-

Final estimates of the proportion of participants with asbestos-related abnormalities must await the analyses of the final, complete data for all participants. The information summarized in this interim report is primarily intended to assist the community and its public officials in documenting the need for health care planning and estimating the additional health care services that will be needed in the Libby area in the future.

## CONCLUSIONS

1. These results summarize 1,078 participants, of which 47% were male and 53% female. The age distribution of participants was as follows: 15% were less than 18 years of age, 27% were aged 18–45 years, 42% were aged 46–65 years, and 17% were 65 or more years of age (the total of 101% is due to rounding).

2. The number of participants who reported exposure to vermiculite included the following: 127 were W.R. Grace workers or secondary contractors, 116 had other work related contact with vermiculite, 177 had household contacts with W.R. Grace workers, 558 reported some recreational contact with vermiculite, 34 had vermiculite insulation in their residences, 53 had none of these exposures. (Participants were included in only one group on the basis of their greatest potential for exposure.)

3. Thirty percent of participants had a pleural abnormality that was seen by at least one physician on the chest radiograph. Those individuals were informed that they should have the finding reviewed by their private physician.

4. Nineteen percent of the participants had a pleural abnormality on their chest radiographs which was reported by at least two of the certified specialists (B-readers).

5.  Pleural abnormality rates varied by exposure group: 37% of W.R. Grace workers or secondary contractors, 18% of others reporting occupational exposure to vermiculite, 20% of household contacts, 14% of those who lived in the Libby area and also reported vermiculite insulation in their residences, 16% of those who reported recreational contact with vermiculite, and 14% of other participants with no apparent exposure. (These proportions used the criteria of at least two of the three B-readers.)

6.  Lung scarring (interstitial changes) and moderate-to-severe limitations in pulmonary function (restrictive changes) were much less common among the participants evaluated.

7.  Lung abnormalities are being observed on the chest radiographs of participants in the medical testing program. Public officials are advised to plan accordingly for the long-term evaluation of participants exposed to vermiculite and for the care of those who may develop severe illness.

8.  The findings of illness in participants with large, previously recognized exposures is consistent with clinical reports by Libby area physicians. This information is too preliminary to predict the final risk estimates for participants with lower exposure potential, such as participants with vermiculite insulation in their residences, those with infrequent past contact with vermiculite, or those who resided in the community but had no apparent exposure to vermiculite.



# ATSDR
AGENCY FOR TOXIC SUBSTANCES
AND DISEASE REGISTRY

# Libby Medical Testing
# Interim Report

## February, 2001

**Background:**

The Agency for Toxic Substances and Disease Registry (ATSDR), in cooperation with the Environmental Protection Agency, the U.S. Department of Health and Human Services, the Montana Department of Public Health and Human Services, and the Lincoln County Environmental Health Department organized a community based medical testing program. The testing program was in response to reports of illness among persons exposed to asbestos contaminated vermiculite in Libby, Montana.

This testing program was a part of the **Libby Community Environmental Health Project**. The medical testing was done between July and November, 2000.

**Q. What did the medical testing program do?**

**A.** The program was designed to give each participant current information about the health of the lungs. Principal goals of the program were to identify health effects likely to be asbestos related and to refer people exposed to asbestos from the Libby vermiculite mine for additional care.

**Q. Why did ATSDR prepare this report?**

- To keep the community informed about the ongoing progress of the program.

- To help the community, public officials, and healthcare providers plan for long-term health care by estimating the magnitude of the need for future health care services.

**Q. Who was included in this report?**

**A.** This report included only 1,078 participants, or 18% of the total number of participants in the medical testing program.

- **47%** were male; **53%** were female
- **15%** were under 18 years of age
- **27%** were aged 18-45
- **42%** were aged 46-65
- **17%** were over 65 years of age.

**Q. What type of exposure to asbestos did the people included in this report have?**

**A.** A breakdown of the **1,078 participants**, according to their reported type of exposure to vermiculite shows:

- **127** are former W.R. Grace workers

- **116** had work-related contact with vermiculite

- **177** had household contacts with W.R. Grace workers

- **558** had recreational contact with vermiculite

- **34** had vermiculite insulation in their homes

- **53** had no known exposure to vermiculite.

(Participants above were listed in only one exposure category, based upon the greatest exposure potential.)

EXHIBIT_____

Q. What are the conclusions of the interim report?

Of the 1,078 participants

- 95% reported some contact with vermiculite
- 30% of adults tested had scarring of the chest wall seen by at least one physician on the chest x-ray
- 19% of adults tested had scarring seen by at least two of the certified x-ray specialists (B-readers) on the chest x-ray.

Each exposure group had different rates of scarring of the chest wall (seen by at least two B-readers). The number of people in each group who showed scarring were:

- 37% of WR Grace workers or secondary contractors
- 20% of household contacts
- 18% of those who reported occupational exposure to vermiculite
- 14% of those who have vermiculite insulation in their homes
- 14% of other participants
- 13% of those who had recreational contact with vermiculite.

Only 1 to 5% had interstitial changes, such as scarring of the lung tissue itself.

Only 1 to 6% had moderate to severe limits in pulmonary function (restrictive changes making it difficult to breathe).

Q. What does ATSDR recommend?

A. The chest x-rays of 30% of this small number of participants in the medical testing program showed lung abnormalities. Public health and other officials should plan for

☞ The long-term evaluation of people exposed to vermiculite, and

☞ The care of those who may develop severe illnesses resulting from vermiculite exposure.

Q. What are the limitations of this report?

A. The report summarizes the results of only 18% of the participants. It may not be representative of all participants. The final conclusions based on the results of all 6,144 testing participants may be very different.

# For More Information Please Contact

**Dan Strausbaugh, ATSDR** Montana representative at 406-293-2728 or 2729.

**Dan Holcomb, ATSDR** community involvement contact toll-free in Atlanta, GA at 1-888-42-ATSDR (1-888-422-8737).

**Medical Testing Program** at 1-800-439-8308. For those outside of the Libby area requesting information on their eligibility for asbestos testing.

**EPA/TSCA Hotline Service** at 202-554-1404. For information on asbestos and other toxic substances.

**ATSDR's Web Site at www.atsdr.cdc.gov**



# Workers with Disease - 1969

**% With Lung Disease** vs **Years of Exposure**

- 17% 1-5 years
- 29% 6-10 years
- 45% 11-15 years
- 58% 16-20 years
- 92% 21-25 years

Per Exh. 130.4 Grace Headquarters In-house Study

02146519

<u>PERSONAL AND CONFIDENTIAL</u>

STUDY TO DETERMINE

RELATIONSHIP BETWEEN

YEARS OF EMPLOYMENT, AGE, SMOKING HABITS

AND CHEST X-RAY FINDINGS

ZONOLITE/LIBBY EMPLOYEES

cc: <u>H. A. Brown</u>
    E. D. Lovick
    R. A. Kulberg

EXHIBIT

130.4

021·16520

Number of employees studies - 135

Number of employees showing lung disease - 45
·(For purposes of this study, this includes those definitely showing lung disease as well as the "possible" or "suspected").

Those who now smoke as well as those who have kicked the habit are class-ified as smokers.

By "years worked" is meant the number of years worked at Zonolite/Libby.


## TABLE A

Of the 45 who have lung disease:

        24 smoke cigeretts
         3 smoke pipe or cigar
        15 smoked at one time but not now
         3 never smoked


## TABLE B

Of the 45 who have lung disease, years worked is as follows:

| less than 1 year | 0 | |
| 1-5 years | 11 | (or 17% of all employees in this g |
| 6-10 " | 6 | (or 29%) |
| 11-15 " | 9 | (or 45%) |
| 16-20 " | 7 | (or 58%) |
| 21-25 " | 11 | (or 92%) |
| 26-30 " | 1 | (or 33%) |


## TABLE C

Age vs. years worked

| AGE | less than 1 year | 1-5 years | 6-10 yrs. | 11-15 yrs. | 16-20 yrs | 21-25 yrs | 26-30 y |
|---|---|---|---|---|---|---|---|
| less than 20 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| 20-25 | 1 | 9 | 1 | 0 | 0 | 0 | 0 |
| 26-30 | 0 | 15 | 3 | 0 | 0 | 0 | 0 |
| 31-35 | 0 | 12 | 3 | 0 | 0 | 0 | 0 |
| 36-40 | 0 | 8 | 2 | 2 | 4 | 0 | 0 |
| 41-45 | 0 | 3 | 4 | 3 | 2 | 1 | 0 |
| 46-50 | 0 | 5 | 4 | 8 | 3 | 2 | 0 |
| 51-55 | 0 | 8 | 1 | 2 | 2 | 3 | 1 |
| 56-60 | 0 | 4 | 3 | 4 | 0 | 6 | 1 |
| 61-65 | 0 | 0 | 0 | 1 | 1 | 0 | 1 |
| | 1 | 66 | 2 | | | | |

02146521

## TABLE D

| Years Worked | Smokers Showing Lung Disease | Non-smokers showing Lung Dis | Smokers Showing Normal Lungs | Non-Smokers Showing Normal Lun |
|---|---|---|---|---|
| less than 1 | 0 | | 1 | 0 |
| 1-5 | 11   25% | | 44 | 11 |
| 6-10 | 6   50% | | 12 | 3 |
| 11-15 | 9 | | 9 | 0 |
| 16-20 | 7 | | 4 | 0 |
| 21-25 | 10 | | 2 | 0 |
| 26-30 | 1 | | 1 | 1 |
| | 44 ? | 3 | 73 | 15 |
| | 42   56% | 3   26% | 75 | 15 |

## TABLE E

| AGE | Number of Employees Having Lung Disease | Number of Smokers in Each Age Group |
|---|---|---|
| less than 20 | 0 | 1 |
| 20-25 | 0 | 8 |
| 26-30 | 2 | 15 |
| 31-35 | 0 | 13 |
| 36-40 | 6 | 13 |
| 41-45 | 2 | 11 |
| 46-50 | 13 | 21 |
| 51-55 | 6 | 16 |
| 56-60 | 12 | 18 |
| 61-65 | 3 | 3 |

## SUMMARY

The majority (88%) of employees at Libby smoke or have smoked. Of the 12% non-smoker group, only five have worked in excess of three years. There is no real group for control or comparison purposes. A true correlation between smoking and exposure to dusty work atmosphere, and its effects on the lungs, therefore, cannot be made.

Although 17% of our 1 to 5 years service group have or are suspect of lung disease, there is a marked rise (45%) beginning with the 11th year of service, climbing to 92% in the 21 to 25 years service gorup. This suggests that chances of getting lung disease increase as years of exposure increase.

It is noted that of the 45 employees who have or are suspect of lung disease:

      2 have worked only 1 year
      2 have worked only 2 years
      3 have worked 3 years
      3 have worked 4 years

It would be well to take a good look at our pre-employment chest X-Ray program to make sure applicants with lung conditions are not hired.

Peter Kostic

021-6522

| NAME | AGE | YEARS WORKED | SMOKING HABITS | HOW LONG | WHAT NOW | X-RAY STATUS |
|---|---|---|---|---|---|---|
| | 25 | 0 mo. | cigs. 1/2 pack/day | 6 years | still does | normal |
| | 62 | 14 | cigs. 1 pack/day | 45 years | still does | Fibrosis both lung fields |
| | 36 | 1 | cigs. 1/2 pack/day | 7 years | still does | normal |
| | 60 | 3 | cigs. 1 pack/day | 10 years | quit 1 yr. ago | pulmonary emphysema & fibrosis |
| | 24 | 1 | none | never | --- | normal |
| | 57 | 24 | cigs. 1 pack/day | 20 years | quit 17 yrs. ago | fibrosis both lungs |
| | 28 | 1 | cigs. 1/2 pack/day | 12 years | still does | normal |
| | 49 | 19 | pipe smoker | 15 years | quit 2 yrs. ago | normal |
| | 57 | 22 | cigs. 15/day | 2 years | still does | fibrosis, both lungs. |
| | 28 | 2 | none | never | --- | normal |
| | 36 | 4 | cigs. 45/day | 21 years | still does | possible fibrosis & emphysema |
| | 61 | 27 | cigs. 6/day | 25 years | still does | possible emphysema |
| | 52 | 2 | cigs. ? | 4 years | still does | normal |
| | 24 | 1 | cigs. 1 pack/day | 7 years | still does | normal |
| | 54 | 3 | cigs. 20-30/day | 35 years | still does | normal |
| | 52 | 12 | cigs. 1 pack/day | 30 years | still does | normal |
| | 48 | 12 | cigars 10/day | 19 years | quit 4 yrs. ago | normal |
| | 56 | 11 | cigs. 1 pack/day | 25 years | quit 4 yrs. ago | possible very minimal fibrosis |
| | 31 | 1 | cigs. 1/2 pack/day | 14 years | still does | normal |
| | 28 | 3 | cigs. 2-1/2 packs/day | 10 years | quit 6 mo. ago | normal |
| | 42 | 21 | cigs. 1 pack/day | 15 years | still does | fibrosis, both lungs. |

02146523

| NAME | AGE | YEARS WORKED | SMOKING HABITS | HOW LONG | WHAT NOW | X-RAY STATUS |
|------|-----|--------------|----------------|----------|----------|--------------|
| | 51 | 1 | cigs 1/2 pack/day | 20 years | quit 1-1/2 yrs. ago | normal |
| | 36 | 20 | cigs 1/2 pack/day | 10 years | quit 6 mo. ago | fibrosis, left lung |
| | 24 | 2 | none | never | --- | normal |
| | 48 | 10 | cigs 1 pack/day | 30 years | still does | emphysema & fibrosis, lt. lu[ng] |
| | 46 | 2 | cigs 1/2 pack/day | 30 years | still does | normal |
| | 34 | 2 | cigs 1 pack/day | 15 years | still does | normal |
| | 49 | 11 | cigs 1 pack/day | 23 years | quit 7 yrs. ago | normal |
| | 54 | 4 | cigs 1 pack/day | 20 years | still does | fibrosis, both lungs |
| | 51 | 23 | cigs 1-1/2 packs/day | 30 years | quit 6 mo. ago | possible fibrosis, both lung[s] |
| | 48 | 1 | none | never | --- | normal |
| | 42 | 9 | cigs 1 pack/day | 7 years | still does | normal |
| | 54 | 32 | cigs 3 packs/day | 30 years | quit 8 years ago | normal (office work) |
| | 33 | 4 | cigs 1 pack/day | 15 years | still does | normal |
| | 45 | 11 | pipe smoker | 20 years | still does | normal |
| | 46 | 23 | cigs 1 pack/day | 18 years | quit 10 yrs. ago | questionable fibrosis, both lungs. |
| | 52 | 3 | cigs 2½/day | 30 years | still does | poss. emphysema and questionable fibrosis |
| | 38 | 4 | cigs 1 pack/day | 15 years | still does | normal |
| | 22 | 3 | none | never | --- | normal |
| | 41 | 10 | none | never | --- | normal |
| | 47 | 15 | cigs 1 pack/day | 27 years | still does | fibrosis, both lungs |
| | 45 | 1 | cigs 1-1/2 pack/day | 4 years | quit 2 yrs. ago | normal |
| | 41 | 7 | none | never | --- | minimal fibrosis, both lungs |

| NAME | AGE | YEARS WORKED | SMOKING HABIT | HOW LONG | WHAT NOW | X-RAY STATUS |
|---|---|---|---|---|---|---|
| | 42 | 14 | cigs 1 pack/day | 25 years | still does | normal |
| | 55 | 21 | cigs 1 pack/day | 20 years | quit 5 years ago | fibrosis, both lungs |
| | 31 | 1 | cigs 10-15/day | 10 years | still does | normal |
| | 30 | 1 | cigs 1/2 pack/day | 5 years | still does | calcification, both lungs |
| | 40 | 2 | none | never | --- | normal |
| | 29 | 9 | cigs 1-1/4 packs/day | 10 years | still does | minimal fibrosis, rt. lung |
| | 31 | 2 | cigs 1/2 pack/day | 2 years | still does | normal |
| | 37 | 8 | cigs 1-1/2 packs/day | 15 years | still does | normal |
| | 18 | 1 | none | never | --- | normal |
| | 56 | 14 | "never smoked much" | --- | quit | questionable minimal fibrosis |
| | 47 | 13 | cigars & pipe | 3 years | quit 3 years ago | normal |
| | 28 | 5 | cigs 1 pack/day | 2 years | quit 9 yrs. ago | normal |
| | 50 | 10 | smokes cigars | ? | still does | possible fibrosis, both lungs |
| | 54 | 1 | none | never | --- | normal |
| | 38 | 19 | cigs 1 pack/day | 20 years | still does | questionable minor fibrosis, left lung |
| | 38 | 13 | cigs 1 pack/day | 12 years | still does | normal |
| | 57 | 4 | cigs 1 pack/day | 45 years | still does | normal |
| | 37 | 19 | none | never | --- | minimal fibrosis, both lungs |
| | 56 | 9 | --- | --- | quit 29 yrs. ago | minimal fibrosis, both lungs |
| | 37 | 9 | cigs 15/day | 20 years | still does | normal |
| | 40 | 15 | cigs 3/day | 35 years | still does | fibrosis, both lungs |

02146525

| NAME | AGE | YEARS WORKED | SMOKING HABIT | HOW LONG | WHAT NOW | X-RAY STATUS |
|---|---|---|---|---|---|---|
| | 31 | 3 | cigs 1 pack/day | 12 years | still does | normal |
| | 29 | 1 | cigs 1 pack/day | 14 years | still does | normal |
| | 63 | 18 | --- | --- | quit 8 yrs. ago | fibrosis, both lungs |
| | 42 | 7 | pipe smoker | 25 years | still does | normal |
| | 53 | 25 | pipe smoker | 10 years | quit 14 years ago | normal |
| | 27 | 2 | cigs 1 pack/day | 0 years | quit 2 yrs ago | normal |
| | 19 | 1 | cigs 1 pack/day | 5 years | still does | normal |
| | 56 | 4 | pipe smoker | 30 years | quit 6 wks. ago | possible early emphysema |
| | 23 | 2 | cigs 1 pack/day | 11 years | quit 1 year ago | normal |
| | 47 | 12 | cigs 12/day | 30 years | still does | normal |
| | 29 | 1 | cigs | 10 years | still does | normal |
| | 52 | 20 | cigs 1 pack/day | 35 years | still does | normal |
| | 28 | 2 | cigs 1 pack/day | 12 years | still does | normal |
| | 56 | 25 | cigs 1-1/2 packs/day | 40 years | still does | normal |
| | 53 | 2 | cigs - "very few" | --- | quit 34 yrs. ago | normal |
| | 44 | 2 | cigs 5-6/day | 6 mo. | still does | normal |
| | 39 | 2 | cigs 1/3 pack/day | 28 years | quit 1 year ago | normal |
| | 32 | 6 | cigs 2 packs/day | 10 years | still does | normal |
| | 47 | 5 | cigs 2 packs/day | 20 years | still does | minimal fibrosis both lungs |
| | 32 | 3 | cigs 15/day | 10 years | still does | normal |
| | 48 | 21 | cigs 1/2 to 1 pack/day | 30 years | quit 6 mo. ago | fibrosis both lungs |

02146526

| NAME | AGE | YEARS WORKED | SMOKING HABITS | HOW LONG | WHAT NOW | X-RAY STATUS |
|---|---|---|---|---|---|---|
| | 39 | 2 | was a cig smoker | 15 years | quit 7 yrs. ago | possible early emphysema |
| | 54 | 1 | cigs 1 pack/day | 30 years | still does | questionable fibrosis and emphysema |
| | 25 | 2 | cigs 15/day | 5 years | still does | normal |
| | 30 | 2 | cigs 1-1/2 packs/day | 10 years | still does | normal |
| | 49 | 6 | cigs 1 pack/day | 15 years | quit 4 mo. ago | normal |
| | 26 | 1 | cigs 1 pack/day | 12 years | quit 2 wks. ago | normal |
| | 28 | 3 | cigs 1½/day | 10 years | still does | normal |
| | 43 | 11 | was pipe & cigar smoker | 15 years | quit 8 mo. ago | normal |
| | 40 | 10 | cigs 1 pack/day | 20 years | still does | fibrosis, both lungs |
| | 30 | 10 | cigs 15/day | 10 years | still does | normal |
| | ? | 7 | none | never | --- | normal |
| | 31 | 1 | cigs 25/day | 10 years | quit 5 mo. ago | normal |
| | 49 | 2 | cigars 20 day | 35 years | still does | fibrosis & emphysema both lungs |
| | 58 | 25 | cigs 6/days | 20 years | quit 6 yrs. ago | possible minimal fibrosis both lungs |
| | 50 | 8 | cigs 1 pack/day | 25 years | still does | emphysema and minimal fibrosis both lungs |
| | 60 | 3 | cigs 1 pack/day | 40 years | still does | emphysema both lungs |
| | 56 | 23 | cigs 1 - 1½ packs/day | 25 years | still does | fibrosis left lung possible, early emphysema |
| | 34 | 1 | none | never | --- | normal |
| | 34 | 2 | cigs 1 pack/day | 10 years | still does | normal |
| | 34 | 10 | none | never | --- | normal |
| .ey, Donald A. | 60 | 9 | cigs 1 pack/day | 15 years | quit 4 mo. ago | normal |

02146527

| NAME | AGE | YEARS WORKED | SMOKING HABITS | HOW LONG | WHAT NOW | X-RAY STATUS |
|------|-----|--------------|----------------|----------|----------|--------------|
| | 24 | 3 | cigs 1 pack/day | 10 years | still does | normal |
| | 45 | 7 | cigs 10-20/day | 2 years | quit 6 years ago | normal |
| | 56 | 7 | cigs 1 pack/day | 19 years | quit 20 years ago | normal |
| | 37 | 13 | none | never | --- | tumor mass left lung |
| | 36 | 1 | cigs 1 pack/day | 20 years | still does | normal |
| | 28 | 1 | cigs 1/2 pack/day | 10 years | still does | normal |
| | 49 | 17 | smokes cigs | 25 years | still does | fibrosis, both lungs |
| | 35 | 6 | cigs 1 pack/day | 15 years | still does | normal |
| | 49 | 19 | cigs 1/2 pack/day | 40 years | still does | possible emphysema, both lungs |
| | 42 | 18 | cigs 1 pack/day | 30 years | quit 11 years ago | normal |
| | 47 | 12 | cigs 1 pack/day | 29 years | quit 1 year ago | fibrosis, both lungs |
| | 31 | 2 | cigs 1 pack/day | 13 years | still does | normal |
| | 47 | 1 | cigs 1-1/2 packs/day | 15 years | still does | normal |
| | 29 | 1 | cigs 18/day | 15 years | still does | normal |
| | 23 | 4 | cigs 15/day | 7 years | still does | normal |
| | 32 | 15 | cigs 1 pack/day | 3 years | quit 4 years ago | normal |
| | 58 | 15 | "moderate cigarette smoker" | 40 years | still does | normal |
| | 38 | 1 | cigs 1-1½ packs/day | 10 years | still does | normal |
| | 56 | 24 | cigs 1-1/2 packs/day | 40 years | still does | fibrosis, both lungs |
| | 54 | 14 | cigs 5-6, cigars 2/day | 36 years | still does | normal |
| | 23 | 6 | cigs 1 pack/day | 0 years | still does | normal |

02146528

| NAME | AGE | YEARS WORKED | SMOKING HABITS | HOW LONG | WHAT NOW | X-RAY STATUS |
|---|---|---|---|---|---|---|
| | 59 | 26 | smoked at one time | ? | quit 20 years ago | normal |
| | 24 | 5 | cigs 1/2 pack/day | 5 years | still does | normal |
| | 52 | 19 | cigs 2-3 /day | ? | still does | emphysema and fibrosis both lungs |
| | 56 | 15 | cigs 2 packs/day | 43 years | still does | emphysema and fibrosis both lungs |
| | 49 | 11 | cigs 1 pack/day | 10 years | quit 2 yrs. ago | fibrosis both lungs |
| | 52 | 3 | cigs 1 pack/day | 30 years | still does | normal |
| | 43 | 3 | cigs 1 pack/day | 10 years | quit 10 years ago | normal |

# ZONOLITE DIVISION

02146529

**RECEIVED**

DEC 2 9 1969

CONSTRUCTION PRODUCTS DIVISION
H. A. B.

TO    H. A. Brown    DATE    December 23, 1969

FROM    E. D. Lovick    SUBJECT    Radiological Interpretation of
X-Rays - Libby Employees

CC: Peter Kostic

I have received a copy of Larry Parks' letter of December 16 as well as letters from both you and Peter Kostic. I have talked with the radiologist who interprets our X-rays concerning the advisability of having these followed up at six-month intervals rather than twelve-month intervals. He was rather surprised that this would be recommended for he says that he does not believe anything could be accomplished by these being taken at six-month intervals.

The thing that we are looking for in these is such that any change is very gradual as has been pointed out. Even a different in technique can change the apparent results of what the interpretation of the X-rays is. He did state that it is possible for tumors or such that can be rather fast-growing to show up at 6-month intervals, but not the fibrotic conditions which we are concerned with. What Mr. Parks may not realize is that results of these interpretations are also turned over to the employees' personal physician and in the event that their personal doctor feels that further checkups or examinations should be given, arrangements are made for these people to follow up on their own initiative. This year there have been several cases of employees being sent to Spokane for additional examinations. It has always been our contention that this is the way it should be handled.

Peter points out in his letter that we don't know what to do in the event there is a change any way. I believe that this is correct. My opinion would be that there should be no change in the annual schedule.

Dr. Little stated that it would be possible for him to recommend specifically that some of these people have a follow-up rather than relying on the employee's personal doctor. Even in the event that he did this, it would seem to me that we should still have to leave it up to the employee's personal physician to to see that the follow-up is made at whatever time is recommended if it is to be in less than a year.

EDLovick/jbg

**GRACE**



K 2.1.3
LIBRARY 1969 PROOTR
D5 BOX 50

*From the desk of*
**H. A. BROWN**

To:

— — 02146518

*Set up meeting*
*with Parts.*

McGARVEY, HEBERLING, SULLIVAN & McGARVEY, P.C.
745 South Main
Kalispell, MT 59901

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111

NESS MOTLEY LOADHOLT RICHARDSON & POOLE
151 Meeting Street, Suite 600
P.O. Box 1137
Charleston, SC 29402

LUKINS & ANNIS, P.S.
1600 Washington Trust Financial Center
717 W Sprague Ave.
Spokane, WA 99201-0466

COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
999 Third Avenue, Suite 3600
Seattle, WA 98104

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF MONTANA

## MISSOULA DIVISION

| | |
|---|---|
| SUSAN B. GRENFELL and GAYLA R. CODY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>W.R. GRACE & COMPANY (a Delaware corporation); W.R. GRACE & COMPANY-CONN (a Connecticut corporation); W.R. GRACE & CO., a/k/a GRACE, an association of business entities; SEALED AIR CORPORATION (a Delaware corporation),<br><br>Defendants. | No. *CV 00-36-M-DWM*<br><br>**CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF IN THE FORM OF MEDICAL MONITORING AND FOR PUNITIVE DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

FILED
'00 FEB 22 PM 4:
LOU ALEKSICH JR CLERK
BY_____
DEPUTY CLERK

## **INTRODUCTION**

1.     W. R. Grace & Company traded lives for profit by knowingly exposing individuals to dangerous levels of tremolite asbestos.

2.     In the wake of W. R. Grace's corporate practices, residents of the Libby, Montana area are in immediate need of a comprehensive long-term medical diagnostic program that ensures the early detection and treatment of the often fatal diseases caused by tremolite exposure.

3.     Plaintiffs Susan B. Grenfell and Gayla R. Cody bring this action to achieve this end, and to protect, preserve, and restore the health and well-being of present and former residents of the Libby, Montana area, whose physical well-being and constitutional right to a healthful environment have been impaired by defendants.  This action is likewise brought on behalf of similarly situated workers and their families at the Libby vermiculite processing plant, who were subjected to dangerous levels of tremolite asbestos from defendants' operations in Libby, Montana.

4.     In particular, plaintiffs seek a Court order creating and implementing an independently supervised, defendant-funded medical monitoring program, under the continuing jurisdiction of the Court, for the benefit of all class members, which includes each of the following components: 1) appropriate medical screening programs necessary to ensure the early detection and treatment of each of the major forms of tremolite exposure induced illness, including asbestosis, lung cancer and mesothelioma; 2) maintenance and operation of a medical registry that includes all relevant health data ; 3) accumulation and appropriate dissemination of medical data (personal identifiers excluded) to promote important medical research to advance such subjects as new treatments for the commonly deadly diseases caused by tremolite; 4) funding of beneficial

medical research and dissemination of information to health care providers pertaining to the early

detection and possible treatments for the unique natural history and course of tremolite asbestos

induced diseases; and (5) an assessment of punitive damages against the Defendants to be used for

the benefit of the Libby area community.

## PARTIES

5.    Plaintiff Susan B. Grenfell is a current and longtime resident of Libby,

Montana who was exposed to asbestos by the contamination of her childhood home and the Libby

environment.  There is a reasonable medical necessity for her to undergo long-term medical

monitoring to ensure early detection and treatment for tremolite-induced disease, including

asbestosis, lung cancer and mesothelioma.

6.    Plaintiff Gayla R. Cody is a current resident of Selah, Washington and was

previously a longtime resident of Libby, Montana who was exposed to asbestos by contamination

of her childhood home and the Libby environment.   There is a reasonable medical necessity for

him to undergo long-term medical monitoring to ensure early detection and treatment for

tremolite-induced disease, including asbestosis, lung cancer and mesothelioma.

7.    Defendant W.R. Grace & Company (Delaware) has its principal place of

business in Columbia, Maryland and is incorporated in the State of Delaware.  It is a successor

corporation which is liable for the actions of predecessor companies, including W.R. Grace &

Co.-Conn., W.R. Grace & Co., a New York corporation, Grace Holding, Inc., Montana

Vermiculite Company, and Zonolite Company with respect to the claims and allegations of this

complaint.

8.    Defendant W.R. Grace & Company (Connecticut) has its principal place of

business in Columbia, Maryland, and is incorporated in the State of Connecticut.  At all times

relevant to this complaint, W.R. Grace & Company's (Connecticut) business has included the mining and processing of vermiculite within the state of Montana. W.R. Grace & Company (Delaware) and W.R. Grace & Company (Connecticut), and the association of business entities doing business under the name W.R. Grace & Co. and/or GRACE are hereinafter jointly referred to as "the Grace Defendants."

9.    W.R. Grace & Co., also known as GRACE, is an association of corporations, conglomerates, holding companies, and other business entities and persons transacting business under the common name "W.R. Grace & Co." and/or "GRACE." The associated persons so conducting business include Grace Holding, Inc., a Delaware corporation, W.R. Grace and Co., a New York corporation, W.R. Grace & Co., a Delaware corporation, W.R. Grace and Co.-Conn., a Connecticut corporation, and other corporations, subsidiaries and business entities.

10.    Defendant Sealed Air Corporation, formerly W.R. Grace & Co., is a Delaware corporation and is the successor to the assets and liabilities of W.R. Grace & Co. Its principal place of business is in Saddle Back, New Jersey. In 1998, W.R. Grace & Co. essentially transferred two-thirds of its assets by combining with a smaller entity named Sealed Air and renaming the new entity Sealed Air Corporation. The creation of Sealed Air Corporation was done solely in an attempt to fraudulently shield the major assets of W.R. Grace & Co. from expected asbestos claims and claimants.

## JURISDICTION AND VENUE

11.    There is complete diversity of citizenship between the named Plaintiffs and the Defendants.

12.    The amount in controversy exceeds $75,000.00, exclusive of interest and costs, as to the claims of each Plaintiff and every member of the proposed Plaintiff classes.  The classes additionally have an undivided interest in obtaining injunctive/equitable relief, including a medical monitoring program and punitive damages.

13.    This Court has subject matter jurisdiction over this action and personal jurisdiction over each of the parties pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

14.    Venue is proper in this District and Division, in which the plaintiffs and the classes resided at all material times, and in which the mining and processing operations and properties that are the source of the subject exposure and the cause of plaintiffs' claims are located.

## COMMON FACTUAL ALLEGATIONS

15.    Defendant W.R. Grace & Company, W.R. Grace & Company-CONN and GRACE (hereinafter collectively referred to as "Grace") (and its predecessor in interest, Zonolite Company) was a nationwide manufacturer of insulation, fireproofing and acoustical materials. One of the principal ingredients used in Grace's products was vermiculite.

16.    Grace mined, operated, processed, milled, expanded and sold vermiculate and vermiculite-containing products beginning in the 1930's.

17.    The vermiculite deposits mined by Grace at Libby, Montana contained significant concentrations of tremolite asbestos fiber, averaging approximately ten to twenty percent (10%-20%).

18.    During the process of milling and expanding vermiculite ore at Libby, substantial amounts of asbestos were liberated into the air and/or transported with the waste rock to tailings piles.  Asbestos also remained in the expanded vermiculite ore.

19.    Respirable asbestos fibers are microscopic in size and invisible to the naked eye.  As a result, respirable asbestos fibers cannot be detected without the use of sophisticated microscopic equipment by highly trained personnel.

20.    Asbestos is virtually indestructible in the natural environment.  Once it is extracted from the ground and reduced to individual fibers, asbestos fibers can remain airborne for long periods of time and be a continued source of exposure.  This occurs as a result of the re-entrainment cycle, whereby asbestos fibers continually settle on surfaces and become re-entrained as a result of ordinary activities.

21.    Tremolite asbestos is a known human carcinogen.  Inhalation of asbestos fibers can lead to mesothelioma, a diffuse cancer which spreads over the lung lining surface (pleura), lung cancer, asbestosis, and other diseases which are serious, progressive, and often fatal.  Defendants are responsible for the release and transport of hazardous tremolite asbestos into the Libby community since mining operations began.

22.    Due to the latency period for asbestos diseases, individuals who inhale asbestos fiber often do not exhibit clinical symptoms until twenty to forty (20 to 40) years after inhalation.

23.    Defendants' operations at the Libby vermiculite mine have caused the release and transport of hazardous tremolite asbestos fibers into the surrounding community.

24.    As a direct, proximate and legal result of the defendants' wrongdoing, the Plaintiffs and the members of the Classes are and were exposed to dangerous tremolite asbestos and put at heightened risk of sustaining pulmonary injury, making periodic medical examinations and diagnostic testing necessary.  This need for medical monitoring, caused by Defendants' wrongful conduct and ultra-hazardous activity is exclusive of, and distinct from any personal

injury from a diagnosed asbestos related disease.  No personal injury claims are asserted in this action.

25.    During the time Grace owned its Libby mine, the tremolite waste deposits eroded and have continued to erode, releasing hazardous tremolite asbestos and creating a contamination problem in the surrounding community.

26.    Prior to Grace commencing its mining activities, residents of the Libby community enjoyed a safe healthful environment.  The land upon which Grace mined vermiculite was covered with vegetation.

27.    In the course of mining vermiculite at the Libby mine, Grace acquired extensive knowledge of the hazards of asbestos in occupational and non-occupational settings.

28.    Grace's knowledge of asbestos hazards is derived from several sources, including the experience of the Zonolite Company.

29.    In 1963 when Grace bought the Zonolite company, Grace assumed all debts and all liabilities of the Zonolite company.

30.    Well before 1963, Zonolite officials had learned that the vermiculite at Libby was contaminated with tremolite asbestos and that Libby vermiculite miners and workers mixing vermiculite with asbestos to make Zonolite construction products were suffering asbestos disease.

31.    The Montana State Board of Health inspected the Libby vermiculite mine on a frequent basis in the 1950's and 1960's, finding serious asbestos health hazards at the facility which continued through the decades.

32.    In August 1956, the Montana State Board of Health informed Libby officials that the asbestos contaminant at Libby "is of considerable toxicity."

33.    In April 1963, the Montana State Board of Health reported to Zonolite that the airborne dust generated at the Libby facility contained 40% asbestos, presenting "a serious dust concentration."

34.    In 1964, the Montana State Board of Health wrote Grace informing it of recent medical articles on asbestos disease in non-worker settings, and warning of "possible wide-spread carcinogenic air pollution."

35.    As early as October 1964 Grace had been informed that asbestos was suspected of causing not only lung cancer, but mesothelioma. Grace was told that medical researchers believed "it also was possible that the dust from products containing asbestos might be exposing people generally to some risk of cancers. . . . Ordinary wear and tear, they said, might release dust into the atmosphere."

36.    In 1965, a Grace manager wrote that "the City of Libby has an air pollution problem" contributed to by the "operation of the expanding plant which is downtown."

37.    In 1965, the Grace manager at Libby stated that on many days the air in downtown Libby was at the maximum limit for asbestos dust.

38.    In January 1965, Grace's Libby manager reviewed the decade of reports on the Libby operation and concluded "I can only say that it presents a very sorry record."

39.    In 1967, Grace evaluated the possibility of liability to the general public in Libby and recognized that asbestos disease may be contracted "at any point a dust condition may exist."

40.    In correspondence with its insurance carrier regarding a Libby employee suffering from asbestos disease, Grace reported that dust was being exhausted from the Libby mill and permeating outside areas.

41.    By 1968, Grace knew that its Libby vermiculite expanding plant was contributing approximately seven to nine tons of tremolite-containing dust to the air in the Libby community.

42.    In January 1968, Grace met with Johns-Manville officials to share ideas on how to deal with its asbestos problem at the Libby mine.  Knowing that thirty-two (32) of its Libby employees already showed abnormal chest x-rays, Grace hoped to "be able to keep them on the job until they retire, thus precluding the high cost of total disability."

43.    In 1968 Grace managers circulated an article from the New Yorker on asbestos, including a review of medical articles on asbestos disease in communities and homes from transport of asbestos dust home on clothes.

44.    In 1968 Grace managers circulated a report of a visit to a mill which "closely resembles our dry mill at Libby", where there was excellent dust control and no "dust-laden air", and where $3 million had been spent on dust control. Accordingly, Grace knew that dust control was feasible at the Grace mine and mill in Libby.

45.    In 1959 and 1964 local doctors in Libby proposed a study of populations exposed to asbestos. Grace refused.

46.    In 1965 a consultant for Grace's insurance company proposed a broad study of populations exposed to asbestos. Grace refused.

47.    In January 1968, Grace discussed internally the need to minimize dust exposure to its workers, and stated "If we minimize their exposure to a dust not exceeding 5 mppcf chances are we may be able to keep them on the job until they retire, thus precluding to high cost of total disability."  Grace was aware of the view of the Industrial Hygiene Foundation "that any exposure to asbestos dust is hazardous" with many doctors supporting the view "that

there is a definite relationship between asbestos dust and certain types of cancer."  Grace was also

aware that asbestos exposure recommendations should be used only as guides and "should not be

regarded as fine lines between safe and dangerous concentrations."

48.    In June 1968, the Public Health Service sought the names of former

employees at the Libby mine for research on asbestos disease.  When the Grace official dealing

with the Public Health Service contacted his superiors for permission to release the names he was

told "we should not give any listing of employees . . . unless there is a legal requirement to do so."

When a Grace official argued that there "may be some good reasons why we should agree to

participate in their study", his Grace superiors told him "we have run this through Cambridge

[headquarters] again and, the answer is still the same.  They do not choose to divulge this

information."  Grace would not agree to participate in the study until it was assured that no

harmful results would be published.  No study of the Libby workers was done for another decade.

49.    A Grace in-house study in 1969 showed a lung disease rate of 92% in

Libby workers with over 20 years at the mine.  Grace did not disclose this study to the public or

the medical community.

50.    In March 1969, Grace's Safety Administrator reported to other Grace

officials on an article discussing the danger to "bystanders who unknowingly breathe in the

poisonous [asbestos] dust from construction jobs that could result in mesothelioma."  In light of

this information and, in particular, the "disturbing factor in mesothelioma" and "the rather indirect

exposure a number of its victims had," the Safety Administrator proposed:

> I think it would be well at this time, with the advice of counsel, to
> consider applying a warning or precautionary label or statement on
> all containers of products containing vermiculite.  This may aid our
> defense in cases of product liability claims.

51.     Grace ignored this recommendation and put no warning label on its vermiculite-based products for years.

52.     In July 1969, a confidential "vermiculite report" was sent to Peter Grace, the Chairman and President of the Board of W.R. Grace. This report discussed the seriousness of the hazards of tremolite asbestos contained in the Libby ore. It stated that the tremolite remained in the concentrate when shipped and that the "tremolite asbestos is a definite health hazard at both the Libby operation and at the expanding plants using the ore."

53.     On December 1, 1969, Grace's Manager of Construction Products wrote that Grace had "an ethical obligation to get [asbestos] out" of its vermiculite-containing fireproofing and concluded "it has been much too long already that we have been looking at this problem."

54.     On December 2, 1969, the same Grace official reported on a speech by Dr. Irving I. Selikoff he had attended in which Dr. Selikoff discussed not only the hazard of asbestos spraying but:

> Also, he noted the concern of possible long-term danger to building occupants from prolonged minute dusting of fibers through the buildings' air distribution systems . . . The charge is very serious and responsible people are listening all across the country.

55.     In May 1970, a publication entitled "Walls and Ceilings" reported on a major speech by Dr. Selikoff in which he emphasized the danger of asbestos fibers once introduced into buildings:

> Entire buildings are sometimes "contaminated for life" because asbestos fibers are left loose on pipes, columns and beams and these "dead spaces" are often used as return air ducts for the building's circulation system, which exposes occupants of the building in constant peril.

56.    In March 1971, the Administrator of the Environmental Protection Agency listed asbestos as one of the first three "hazardous air pollutants" designated under the Clean Air Act.

57.    In a comprehensive review of its plant operations in 1971, a Grace pollution control engineer was asked whether Grace facilities were doing all they should with respect to pollution "in their vermiculite expansion plants in view of the twenty notices of pollution control violations." The Grace engineer admitted that "improved particulate emission controls will not normally be considered until a citation is issued by local authorities". Describing the Grace headquarters' plan to resist overall compliance, the official noted:

> They plan to tackle them singly, as they are forced to comply, and buy as much time as possible. Since enforcement of laws varies widely from state to state, this approach makes some sense and appears to be working.

58.    Grace's Safety Director visited the Libby facility in late 1971 and found a poor response to safety concerns. As he stated, "the implication was that there are no priorities to safety."

59.    Grace continued for years to try to keep its Libby problems under wraps through its "no talk policy." A Libby manager was reprimanded for having discussed asbestos with an outsider. Grace headquarters stated that, "our present policy is to tell no one anything, no visitors, or discussion of our operations."

60.    In May 1973, Grace attended a conference at which Dr. Selikoff and Dr. Art Langer advocated a zero fiber level and stated that the "threshold limit value" (TLV) for asbestos was not a safe level.

61.    Grace managers deceived workers about the hazards of asbestos at the Libby facility, telling them they could "eat a ton of it" without harm, and that it was not harmful, just nuisance dust.

62.    An in-house Grace study performed prior to 1977 showed ex-workers had a 5 times higher rate of lung cancer than normal.  Grace did not disclose this study to the public or the medical community.

63.    In 1977 a Grace funded study on asbestos disease in hamsters showed a strong connection to mesothelioma.  This study was not disclosed to the public or medical community.  Grace misrepresented to doctors and to the workers that tremolite asbestos had not been associated with mesothelioma.

64.    A 1979 internal Grace memo noted the question was "raised as to whether there was any plan to notify past employees of the hazards they were exposed to during their time of employment with us."  Grace answered there was no such program.

65.    In 1978 a local Libby doctor proposed a health study on Grace Libby workers and their families.  Grace refused. The local doctor who was Lincoln County Health Officer at the time, persisted and a Grace official observed "he is going to blow the whistle."

66.    The Libby mine continued to have problems with Public Health officials. In 1979, the mine was issued one hundred and seventy-eight citations by the Secretary of Labor.

67.    In 1980, Grace learned that NIOSH was planning to conduct an epidemiological study of Grace's Libby vermiculite mining operation.  Grace was concerned and, "indicated this study could create a lot of loose talk with serious implications and have a deleterious, unjustified and pointless impact on Grace's vermiculite business."  Grace favored a

strategy of trying to delay the study, publish a "pre-emptive epidemiological study," and attempt to apply political pressure to have the study turned off.

68.    A 1982 Grace report regarding the Tremolite Fiber Binding Report, concluded that efforts to bind the tremolite to the vermiculite had been unsuccessful. Grace had scanning electron microscope photographs of tremolite fibers on the surface of the vermiculite. Referring to these photographs, a Grace official concluded "It is not difficult to visualize how many of the tremolite fibers could be abraded or scrubbed off the vermiculite by mechanical means."

69.    A 1983 Grace memo reported that "The first NIOSH protocol, submitted by a different team headed by John Dement, had some items similar to those that the McDonald's contains. Chip didn't want NIOSH looking at those things until we did a quick and dirty and maybe never. Also, John Dement was a real problem: wise, somewhat nasty, and arrogant."

70.    Handwritten notes from a March 15, 1983 meeting in Montreal between J.C. McDonald, A.D. McDonald, Patrick Sebastian and Grace officials concluded that tremolite can cause mesothelioma. The researchers also noted that Libby had more lung cancers than normal.

71.    Grace managers in Libby were aware that men went home covered with toxic asbestos dust from the 1950's to 1990, when the mine and mill closed, and to 1993 when demolition was accomplished. This toxic asbestos dust contaminated homes and buildings in the Libby vicinity.

72.    In 1973 federal inspectors found the Grace shower and locker facilities inadequate. There was one shower for over 150 workers. In 1983 Grace evaluated the cost of showers and coveralls for the workers and declined to provide them. The workers continued to

return from work into their homes and into the community with asbestos dust on their work clothing up to 1993.

73.    Grace failed to warn plaintiffs that tremolite asbestos dust from its mining and expanding operation and from its vermiculite insulation material was deleterious, poisonous, carcinogenic and potentially very harmful to Libby-area residents.

74.    Grace failed to perform adequate testing to determine the danger of its operations and its vermiculite insulation in place and during normal maintenance, renovation and, ultimately, demolition, when Grace had actual knowledge of the hazardous characteristics of asbestos.

75.    Grace provided no instructions on the proper care (if possible) for asbestos-containing vermiculite insulation to avoid its hazards and contaminating fiber release.

76.    While mining, processing and selling vermiculite with tremolite asbestos, safe alternative sources of vermiculite with little or no asbestos were available from various sources. Further, substitutes for vermiculite, such as perlite and polystyrene, were also available.

77.    On January 19, 2000, for the first time, the Grace Defendants partially, and inadequately, acknowledged the health risks to present and future residents of the Libby area by announcing the creation of a limited medical monitoring program providing $250,000/year to screen residents for disease.  Unfortunately, the medical monitoring program announced and proposed by the Grace Defendants is wholly incapable of protecting present and former Libby area residents because the proposed program:

   a.    fails to include independent judicial oversight and enforcement mechanisms over the use and amount of funds available to conduct medical monitoring and,

instead, permits the Grace Defendants to completely control the use, amount and availability of medical screening funds;

       b.    fails to include sufficient funds to permit the specific medical screening necessary to detect tremolite exposure specific asbestos disease processes;

       c.    fails to include a medical data registry component;

       d.    lacks a beneficial medical research component addressing the unique pathology and nature of tremolite induced disease processes and the necessity for the development of special medical treatments and research; and

       e.    fails to formally involve the medical physicians and researchers most knowledgeable about tremolite exposure and appropriate protocol for detection of diseases related to tremolite exposure.

       78.    As a result of defendants' ongoing, active, and fraudulent concealment of the dangerous, harmful, and damaging nature of their mining and processing conduct and activities, that is, contamination with and exposure to tremolite asbestos, Plaintiffs and the Classes were not and could not reasonably have been apprised and informed of the material facts and predicates of the claims asserted herein until Fall of 1999, within one year of the filing of this complaint.  Grace's intentional and continuing concealment and suppression of the foregoing information and additional information, as yet unknown to Plaintiffs and the Classes, prevented plaintiffs from learning and acting on their claims and rights until shortly before the filing of this complaint.

## CLASS ACTION ALLEGATIONS

79.    Plaintiffs bring this action as a class action for equitable, injunctive and declaratory relief pursuant to the Federal Rules of Civil Procedure 23(b)(1) and 23(b)(2) on behalf of two plaintiff classes consisting of and defined as:

(a) all residents and former residents of the Libby, Montana area (defined for purposes of this action as residents within a twelve (12) air mile radius of the Courthouse in Libby, Montana) who have resided therein for one year or more dating from January 1, 1930 through the present (the "Resident Class");

(b) all employees, and members of their households, who worked for one year or more at the vermiculite processing plant in Lincoln County, Montana (the "Worker Class");

Excluded from the classes and class claims in this action are (1) all claims for personal injury or death for asbestos related diseases previously diagnosed; (2) all claims by any person that has already commenced an individual action for asbestos related personal injury or death; (3) all current employees of any of the Defendants, and any of their parents or subsidiaries; and (4) the judicial officer(s) to whom this case is assigned, and members of their immediate families.

80.    Plaintiffs are members of the Classes they seek to represent.  The members of each of the classes, numbering in the many thousands, are so numerous that their individual joinder as plaintiffs is impracticable.

81.    There are many questions of law and fact common to each of the Classes including, but not limited to:

a.    Whether defendants negligently exposed Class members to tremolite asbestos;

b.    Whether defendants' conduct in exposing Class members to tremolite asbestos violated Class members' rights under the Montana Constitution;

c.    Whether defendants concealed from Class members critical information about the existence, nature and hazards of tremolite asbestos contamination in the Libby, Montana area;

d.    Whether defendants negligently operated, terminated, remediated, tested, cleaned-up and/or warned of the hazards of vermiculite extraction and distribution operations and their relation to tremolite asbestos contamination in the Libby, Montana area;

e.    Whether exposure to tremolite asbestos puts Class members at increased risk over that of the unexposed population, of sustaining serious pulmonary diseases including asbestosis, lung cancer and mesothelioma;

f.    Whether Class members' increased risk of sustaining pulmonary injury makes periodic diagnostic testing and medical examinations (medical monitoring) reasonably necessary; and whether such testing is effective;

g.    Whether the medical monitoring program offered by the Grace Defendants is wholly inadequate, among other things, for failing to:  provide judicial oversight and enforcement mechanism and continuing jurisdiction; provide for collection and dissemination of medical health research information (personal identifiers excluded); support medical health research into the particularly hazardous and unique nature and natural course of tremolite induced disease; include the participation of the most qualified medical health professionals; and adequately protect workers, and their family members;

h.    Whether defendants' misconduct justifies the imposition of punitive damages; and

i.    Whether defendants participated directly or indirectly in a joint enterprise, concerted action or common course of conduct to accomplish the torts alleged below.

82.    The claims of the named Plaintiffs are typical of the claims of the Classes in that the named plaintiffs and the members of the Classes were exposed to tremolite contaminated ore originating from the Libby, Montana area, which has resulted in recent public health warnings disclosing, for the first time, the need for medical screening for those exposed and for beneficial medical research necessary to protect against future disease.

83.    Notice can be provided to class members by first class mail and/or by published notice using techniques and forms of notice similar to those customarily used in toxic-related class action tort litigation.

84.    Plaintiffs seek injunctive, equitable and declaratory relief in the form of a Court-ordered, independently supervised, medical monitoring program funded by the defendants, to assist Plaintiffs and the Classes in the early detection and treatment of tremolite asbestos induced disease.  Plaintiffs also seek additional injunctive, equitable and declaratory relief in the form of beneficial medical research necessary to prevent future injury.

85.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because defendants have acted, and refused to act, on grounds generally applicable to the classes, making appropriate preliminary and final injunctive and declaratory relief consisting of medical monitoring, beneficial medical research and environmental remediation and restoration for the benefit of Plaintiffs and the Classes.

86.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1) because, inter alia, the prosecution of separate actions by or against individual members of the Classes would create a risk of incompatible standards of conduct for defendants and inconsistent or varying adjudications for all parties.

87.    Plaintiffs will fairly and adequately represent and protect the interests of the

members of the Classes.  Plaintiffs have retained the following counsel competent and experienced

in complex class actions and products liability litigation:

a.    McGarvey, Heberling, Sullivan & McGarvey, PC, is an AV-rated

law firm that has practiced law in Lincoln County for more than 45 years.  The firm represents

hundreds of Libby asbestos victims and family members, and is currently prosecuting over 125

lawsuits in state and federal courts for such victims.  The firm has brought some of the leading

class action claims in Montana, including a lawsuit to abate the fluoride pollution from the

Anaconda Aluminum Company in 1970, and a $100 million profit sharing lawsuit against the

Columbia Falls Aluminum Company, resolved in 1997.  For over 45 years the firm has fought to

protect the health and safety of the citizens of northwest Montana, many of whom are business

associates, neighbors and friends.  The law firm of McGarvey, Heberling, Sullivan & McGarvey,

P.C. is uniquely situated and qualified to protect and advance the interests of the Libby area

community and its citizens.

b.    Lieff, Cabraser, Heimann & Bernstein, LLP, ("Lieff, Cabraser") is

an AV-rated forty-three attorney firm with offices in San Francisco, California, and New York,

New York.  For the past 27 years Lieff, Cabraser, Heimann & Bernstein, LLP has concentrated

its practice in the field of complex civil litigation, representing plaintiffs in products liability, tort,

consumer, antitrust, environmental, investment fraud and employment cases throughout the

United States.  Lieff, Cabraser has tried and/or settled over 120 class actions.  Lieff, Cabraser has

served as court-appointed Plaintiff Lead or Class Counsel in coordinated, multi-district, and

complex litigation in all federal circuits and 25 states.  Lieff, Cabraser's recent experience in

medical monitoring litigation includes In re GCC Richmond Works Cases, J.C.C.P. No. 2906.
Lieff, Cabraser served as Lead Class Counsel in coordinated litigation arising out of the release of
a massive toxic sulfuric acid cloud that exposed and potentially injured 50,000 residents of
Richmond, California on July 26, 1993.  The Coordination Trial Court granted final approval to a
$180 million class settlement, including settlement of punitive damages and equitable medical
relief for the benefit of exposed residents and their community.  Lieff, Cabraser obtained medical
monitoring relief, business loss, and property damage/diminution recoveries in In re Sacramento
River Spill Cases I and II, J.C.C.P. Nos. 2617, 2620, in coordinated proceedings arising out of the
July 14, 1991 Southern Pacific train derailment and toxic spill near Dunsmuir, California.  Four
plaintiff classes were certified and approximately $16 million has been distributed for the benefit
of the community.  Lieff, Cabraser, together with Cohen Milstein Hausfeld & Toll, P.L.L.C.,
serves on the court-appointed Plaintiffs' Management Committee and is class counsel for the
multi-state medical monitoring class certified in August 1999 in In re: Diet Drugs (Phentermine,
Fenfluramine, Dexfenfluramine) Products Liability Litigation, MDL No. 1203 (E.D. Pa., Bechtle,
J.).  Pending for approval in these MDL proceedings is a $3.75 billion class settlement that
includes a medical monitoring fund of $1 billion for medical screening and diagnostic services,
research, and administration.  Final approval is set for May, 2000.  Together with Lukins &
Annis, Lieff, Cabraser obtained medical monitoring certification for a class of Washington state
residents exposed to these diet drugs in St. Johns v. American Home Products Corp.,
No. 97-2-06368-4 (Spokane County Superior Court).  The Washington State Court of Appeals
and Supreme Court have denied Defendants' petitions for reconsideration and reversal of the class
certification order and the trial court's determination that the Washington product liability statute
supports a medical monitoring claim.

c.    Ness, Motley, Loadholt, Richardson & Poole is one of the nation's leading asbestos litigation firms, having litigated asbestos cases for over two decades.  In the last 15 years, Ness, Motley has handled numerous asbestos class actions and asbestos property damage actions.  The firm was counsel in the first successful asbestos property damage trial which resulted in a landmark actual and punitive damage verdict against W.R. Grace.  City of Greenville v. W.R. Grace & Co., 640 F. Supp. 559 (D.S.C. 1986), aff'd, 827 F.2d 975 (4th Cir. 1987), reh'g denied, 840 F.2d 219 (4th Cir. 1988).  The firm has been class counsel for national asbestos property damage against W.R. Grace.  See, e.g., In re Asbestos School Litigation, Master File No. 83-0268 (E.D. Pa. 1988) [nationwide asbestos property damage class action for elementary and secondary schools].  Ness, Motley has also successfully litigated ground breaking cases regarding asbestos contamination from W.R. Grace's vermiculite products.  See Harashe v. The Flintkote Co., 848 S.W.2d 506 (Mo. Ct. App. 1993) [mesothelioma resulting from Grace's asbestos-contaminated Libby vermiculite].  During the past 15 years, Ness, Motley has litigated more asbestos property damage cases against W.R. Grace than any firm in the country.  It has successfully defended its asbestos verdicts against W.R. Grace in various appellate courts.  See, e.g., State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co., 834 F. Supp. 1052 (C.D. Ill. 1993), aff'd, 24 F.3d 955 (7th Cir. May 17, 1994), reh'g denied, 24 F.3d 955 (7th Cir. June 16, 1994), cert. denied, 115 S. Ct. 298 (1994).  Ness, Motley has also resolved hundreds of asbestos property damage cases and thousands of asbestos personal injury cases with W.R. Grace.  Ness, Motley is constantly preparing to try or in trial on asbestos cases against W.R. Grace.  Over the years, Ness, Motley has developed a working relationship with W.R. Grace's outside counsel and corporate counsel, enabling the parties to streamline trial and pre-trial procedures, and approach

settlement discussions realistically.  No other firm has the breadth and depth of experience litigating asbestos cases against Grace that Ness, Motley does.

        d.      Lukins & Annis is a forty-five attorney firm having offices in Spokane, Washington, Moses Lake, Washington, and Coeur d'Alene, Idaho, and represents clients principally located in the Washington, Idaho, Montana area.  Lukins & Annis' "Class Action Practice Group," chaired by Darrell W. Scott, has represented plaintiffs in a wide range of class litigation involving exposure to hazardous substances, dangerous products, and other tort based liabilities.  Subjects of recent class litigation include dangerous diet pharmaceuticals, hazardous indoor air quality in public schools, consumer exposure to defective in-wall heaters, deceptive business practices involving argon-filled windows, and actions involving wildland fires caused by electrical utility company practices.  Attorney Darrell W. Scott has served as lead class counsel or co-lead class counsel in eight certified class actions in the past eight years.

        e.      Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT") regularly litigates plaintiffs' class actions, particularly antitrust, securities and business class actions, environmental toxic tort actions, consumer protection and product liability class actions, and civil rights and employment discrimination cases.  The firm was selected by both federal and state judges in Alaska, to be co-lead counsel for plaintiffs in perhaps the largest environmental case ever filed in the United States, In re The Exxon Valdez Litigation, No. A89-095 Civ. (Consolidated) (D. Alaska), which resulted in a jury verdict of $5.2 billion (appeal pending).  The firm served as class counsel in Roberts v. Texaco, Inc., 94-Civ-2015 (S.D.N.Y.), a landmark case which resulted in the largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief).  CMHT was co-lead counsel in Wagner v. Anzon (Pa. Ct. Common Pleas, Philadelphia Cty, 1994), where CMHT secured a multi-million-dollar settlement

to provide personal injury and property compensation and to provide cleanup of a Philadelphia neighborhood contaminated by years of lead emissions from a lead pigment factory. CMHT was also co-lead counsel in <u>Hunter v. Pneumo Abex</u>, Civ. No. L98-1062 (Cir. Ct. City of Portsmouth, Va., 1999), where CMHT won a multi-million-dollar settlement on behalf of residents of a housing project who had been poisoned as children by lead wastes and emissions from a foundry. CMHT has also been lead counsel in a number of suits to obtain medical monitoring relief for communities exposed to toxic chemicals and/or hazardous waste, for example: (1) <u>Harman, et al. v. Rohm & Haas. et al.</u>, Civ. No. L-1375-95 (N.J. Sup. Ct., Gloucester Cty.) (CMHT succeeded in obtaining certification for a medical monitoring class of residents exposed to volatile organic compounds and heavy metals emitted from the Lipari Landfill Superfund site); (2) <u>Yslava et al. v. Hughes. et al.</u>, Civ. No. 91-525-TUC-ROS, 92-564-TUC-ROS (D. Ariz.) (CMHT represented residents of South Tucson whose drinking water was contaminated with TCE by a Hughes Aircraft Company facility. A multi-million-dollar settlement was reached that provides individual personal injury compensation and a medical monitoring fund); and (3) <u>Bocook. et al. v. Ashland Oil</u>, Civ. No..3:91-0839 (S.D.W.Va.) (CMHT resolved claims brought on behalf of residents of a West Virginia town which had been polluted by air emissions from a large oil company and reached a settlement which provided medical expense compensation and damages.)

### FIRST CAUSE OF ACTION
### (Violation Of The Montana Constitution)

88.   Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

89.   Plaintiffs and members of the Classes have the following inalienable rights, under the Montana Constitution, Article II, § 3:

> All persons are born free and have certain inalienable rights. They
> include the right to a clean and healthful environment and the rights
> of pursuing life's basic necessities, enjoying and defending their
> lives and liberties, acquiring, possessing and protecting property,
> and seeking their safety, health and happiness in all lawful ways.

90.    The Plaintiffs and members of the Classes have the further constitutional rights under the Montana Constitution, Article IX, Section 1:

> The state and each person shall maintain and improve a clean and
> healthful environment in Montana for present and future
> generations.

91.    The past, present and continuing tremolite asbestos contaminations caused by Defendants violate the inalienable right of Plaintiffs and Classes to a clean and healthful environment and to maintenance of their homes and properties in clean and healthful condition for themselves and for their children and future generations.

92.    As a direct, proximate and legal result of Defendants' violation of these inalienable enumerated rights of Plaintiffs and the Classes under the Montana Constitution, Plaintiffs and the Classes have been exposed to dangerous tremolite asbestos, warranting and requiring medical monitoring for purposes of diagnosis, to obtain timely and necessary medical treatment, to preserve and protect their health and to mitigate any future damages.

93.    Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief, consisting of independently supervised medical screening programs and beneficial medical research, as more particularly described in the Prayer below.

## SECOND CAUSE OF ACTION
### (Negligence)

94.    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

95.     Defendants owed Plaintiffs and the Classes a duty to act with reasonable care so as not to jeopardize the Classes' health, welfare and right to a clean and healthful environment.

96.     Defendants breached their duty of care by:

a.      failing to properly operate the Zonolite Mountain vermiculite operations that caused the release of tremolite;

b.      failing to properly cease and/or shut down the operations at Zonolite Mountain;

c.      failing to properly clean up and remediate the tremolite contamination in and around the Zonolite Mountain operations;

d.      failing to properly test for and detect tremolite contamination in and around the Zonolite Mountain operations;

e.      failure to properly test for and detect tremolite contamination in and about the town of Libby, Montana and the County of Lincoln, Montana;

f.      failing to exercise reasonable care to supervise and train the personnel assigned to operate, remediate and test the Zonolite Mountain facilities;

g.      failure to adequately warn members of the Classes of the existence of past, present and future tremolite contamination in and about Zonolite Mountain and the town of Libby, Montana and County of Lincoln, Montana; and/or

h.      failure to protect and warn the Classes, including residents, workers, and their households, of the health hazards of tremolite asbestos exposure and the need for medical monitoring.

97. As a direct, proximate and legal result of the foregoing acts, or failures to act, Plaintiffs and the Classes require medical monitoring as alleged herein.

98. Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief, consisting of independently supervised medical screening programs and beneficial medical research, as more particularly described in the Prayer, below.

## THIRD CAUSE OF ACTION
### (Private And Public Nuisance Allegations)

99. Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

100. Plaintiffs and the Resident Class have proprietary interests in certain real and personal property located in Lincoln County, Montana.

101. The continuing misconduct of Defendants, and each of them, constitutes a nuisance in that it is specially and generally exposed Plaintiffs and the Resident Class to tremolite asbestos contamination potentially injurious to the health and offensive to the senses of Plaintiffs and the Resident Class, and specially interfered with, unlawfully obstructed and disturbed their comfortable enjoyment of the right to a clean and healthful environment.

102. As a direct, proximate and legal result of Defendants' conduct and trespass, Plaintiffs and the Resident Class require medical monitoring as alleged herein.

103. Plaintiffs therefore pray for relief on behalf of themselves and the Resident Class in the form of the requested injunctive relief, consisting of independently supervised medical screening programs and beneficial medical research, as more particularly described in the Prayer below.

## FOURTH CAUSE OF ACTION

**(Trespass)**

104.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth here and further allege as follows:

105.    Defendants committed the wrongful act of trespass by knowingly causing dust and minerals to invade the property of the Plaintiffs and the Resident Class.

106.    The trespassing dust and minerals were contaminated with asbestos and asbestos-contaminated vermiculite and tremolite dust.

107.    As a direct, proximate and legal result of Defendants' trespass, the Plaintiffs and the Class members require medical monitoring as alleged herein.

108.    Plaintiffs therefore pray for relief on behalf of themselves and the Class in the form of the requested injunctive relief consisting of independently supervised medical screening programs and beneficial medical research, as more particularly described in the Prayer below.

## FIFTH CAUSE OF ACTION
**(Negligent Trespass)**

109.    Plaintiffs reallege and hereby incorporate the above paragraphs.

110.    Defendants wrongfully committed a negligent trespass by negligently causing dust and minerals to invade the property of the Plaintiffs and the Resident Class and thereby causing harm.

111.    The trespassing dust and minerals were contaminated with asbestos and asbestos-contaminated vermiculite and tremolite dust.

112.    As a direct, proximate and legal result of Defendants' negligence, the Plaintiffs and the Class members encountered continuing and increasing injurious exposures, and the risk of injury to their persons and thereby require medical monitoring as alleged herein.

113.    Plaintiffs therefore pray for relief on behalf of themselves and the Class in the form of the requested injunctive relief consisting of independently supervised medical screening programs and beneficial medical research, as more particularly described in the Prayer below.

## SIXTH CAUSE OF ACTION
### (Strict Liability)

114.    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

115.    Defendants' activities, including but not limited to, the former ownership of Zonolite Mountain, former operation of Zonolite Mountain vermiculite mining operations and dissemination of contaminated dust and minerals are ultra-hazardous activities in that:

a.    there exists a high degree of prior, present and continuing contamination in the form of exceedingly toxic tremolite asbestos, which is believed to have an unacceptable risk of continuing to contaminate Libby, Montana area residents and workers, and their household members, who processed tremolite contaminated vermiculite shipped from Zonolite Mountain; and

b.    there is a strong likelihood that the harm resulting from prior, present and future exposure to tremolite asbestos will be great.

116.    Grace is a former manufacturer, seller, distributor and/or supplier of tremolite asbestos contaminated vermiculite products, including home and building insulation products.

117.    Grace's tremolite asbestos-contaminated vermiculite products constituted defective and unreasonably dangerous products because, when these products left the hands of the

manufacturer and/or suppliers, their foreseeable risks and dangers exceeded the benefits associated with the products.

118.    Grace's tremolite asbestos contaminated vermiculite products also constituted defective, unreasonably dangerous products due to inadequate warnings and/or failure to warn. At all times relevant, Grace knew, should have known, should have warned, and did not adequately warn, that its products carried serious risks of causing disease, including asbestosis, lung cancer and mesothelioma, in exposed persons.

119.    As a direct, proximate and legal result of Defendants' ultrahazardous activities, distribution of unreasonably dangerous and defective products, and failure to warn, Plaintiffs and the Classes require medical monitoring as alleged herein.

120.    Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief, consisting of independently supervised medical screening programs and beneficial medical research, as more particularly described in the Prayer below.

### SEVENTH CAUSE OF ACTION
**(Fraud, Constructive Fraud, Concealment, Misrepresentation, and Deceit)**

121.    Plaintiffs incorporate and reallege each allegation set forth above.

122.    Defendants knew that the Plaintiffs and the Class members were exposed to hazardous asbestos from Defendants' properties, conduct and operations that would cause and was in fact causing exposure to dangerous dust and minerals, placing Plaintiffs and Class members at increased risk of pulmonary disease far above the risks of an unexposed population.

123.    Defendants deceived, concealed material facts from, and made material misrepresentations to Plaintiffs and the Class, and otherwise knowingly misled the Plaintiffs and

the Class members so that they were unaware of the presence and/or hazards presented by the asbestos contaminating their homes and environment.

124.    Defendants' conduct constituted fraud, constructive fraud, concealment, deceit, and misrepresentation.

125.    As a direct, proximate and legal result of Defendants' concealment, deception and misrepresentation, the Plaintiffs and the Class encountered continuing and increasing injurious exposure and risk of injury to their persons resulting in the need for medical monitoring as alleged herein.

126.    Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief, consisting of independently supervised medical screening programs and beneficial medical research, and punitive damages, as more particularly described in the Prayer below.

## EIGHTH CAUSE OF ACTION
### (Battery)

127.    Plaintiffs hereby incorporate and reallege each allegation stated above.

128.    Defendants knowingly exposed Plaintiffs and the Classes to hazardous asbestos with the knowledge that such exposure would cause and was causing the injuries alleged herein so as to commit a battery upon the persons of the Plaintiffs and the Class members.

129.    Defendants knew that Plaintiffs and the Class members were exposed and/or continued to be exposed to such injurious asbestos exposures.

130.    Defendants knowingly withheld, concealed and/or misrepresented the hidden hazards of such asbestos exposure so as to cause the Plaintiffs and Class members to unwittingly suffer continuing contamination and dangerous exposures. Defendants thereby committed a battery upon the persons of the Plaintiffs and the Class members.

131.   As a direct, proximate and legal result of Defendants' battery, the Plaintiffs and the Class members encountered continuing and increasing injurious exposures, and the risk of injury to their persons and thereby require medical monitoring as alleged above.

132.   Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief consisting of independently supervised medical screening programs and beneficial medical research, and punitive damages, as more particularly described in the Prayer below.

### NINTH CAUSE OF ACTION
### (Punitive Damages)

133.   Plaintiffs hereby incorporate and reallege each allegation set forth above.

134.   Defendants' conduct was knowing, intentional, systematic, fraudulent and malicious, such that punitive damages should be assessed against Defendants in a reasonable amount sufficient to punish, deter, and make example of Defendants' conduct.

135.   Plaintiffs therefore pray for relief on behalf of themselves and the Class in the form of punitive damages, as more particularly described in the Prayer, below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for judgment against Defendants, jointly and separately and the following relief:

1.   An order certifying the proposed Classes and any appropriate subclasses and appointing Plaintiffs and their undersigned counsel of record and any additional class representatives necessary to adequately represent the Classes;

2.   An order creating and establishing an independently supervised, defendant-funded medical monitoring program under the continuing jurisdiction of the Court that includes the following components: 1) appropriate medical screening programs necessary to ensure the

early detection of major forms of tremolite exposure induced illnesses, including asbestosis, lung

cancer and mesothelioma; 2) maintenance and operation of a Libby area registry for all relevant

health data; 3) accumulation and dissemination of medical data (personal identifiers excluded) for

beneficial medical research purposes to aid in developing new treatments for the unique courses of

disease induced by tremolite exposure; 4) beneficial medical research, including funding, reporting

and provision of treatment related information to health care providers pertaining to the natural

history and course of the tremolite asbestos induced diseases;

      3.     An assessment of punitive damages in an amount sufficient to punish, deter

and make example of defendants' conduct, to be used for the benefit of the Libby community, as

determined by the Court in the exercise of its equity jurisdiction;

      4.     Attorneys' fees and costs, including but not limited to, costs of Class notice

and medical monitoring administration; and

      5.     Any and all other relief as this Court may deem just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: February 22, 2000

McGARVEY, HEBERLING, SULLIVAN &
McGARVEY, P.C.

By: _____

Jon L. Heberling
Roger M. Sullivan
Allan M. McGarvey
745 South Main
Kalispell, MT  59901
Telephone:  (406) 752-5566
Facsimile:  (406) 752-7124

Elizabeth J. Cabraser, CSB # 083151
Richard M. Heimann, CSB # 063607
Donald C. Arbitblit, CSB # 122744
Fabrice N. Vincent, CSB # 160780
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Edward J. Westbrook
Robert M. Turkewitz
Edward B. Cottingham, Jr.
Frederick J. Jekel
Christy Gruenloh
NESS MOTLEY LOADHOLT RICHARDSON
& POOLE
151 Meeting Street, Suite 600
P.O. Box 1137
Charleston, SC  29402
Telephone:  (803) 720-9000
Facsimile:  (803) 577-7513

NANCY SWEENEY
CLERK-DISTRICT COURT

FEB 1 2 20 PM 2:00

FILED VICKY McLEAN
BY _____
         DEPUTY

1  Darrell W. Scott
   Michael G. Black
2  Mischelle R. Fulgham
   Tonya R. Hanson
3  LUKINS & ANNIS, P.S.
   1600 Washington Trust Financial Center
4  717 W Sprague Ave.
   Spokane, WA 99201-0466
5  Telephone: (509) 455-9555
   Facsimile: (509) 747-2323
6
   Richard M. Heimann
7  Elizabeth J. Cabraser
   Donald C. Arbitblit
8  Fabrice Vincent
   LIEFF, CABRASER, HEIMANN &
9  BERNSTEIN, LLP
   Embarcadero Center West, 30th Floor
10 275 Battery Street
   San Francisco, CA 94111
11 Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
12
   Attorneys for Plaintiffs
13

14        MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY
15

| | |
|---|---|
| 16  ANDY DORRINGTON, on behalf of himself and<br>all others similarly situated; MARVIN SATHER,<br>on behalf of himself and all others similarly<br>17  situated. | CASE NO. ADV-2000-078 |
| 18                        Plaintiffs, | CLASS ACTION COMPLAINT FOR<br>INJUNCTIVE RELIEF IN THE FORM OF<br>MEDICAL MONITORING AND<br>ENVIRONMENTAL REMEDIATION AND |
| 19      v. | RESTORATION |
| 20  W.R. GRACE & COMPANY (a Delaware<br>corporation); W.R. GRACE & COMPANY-<br>21  CONN (a Connecticut corporation); KOOTENAI<br>DEVELOPMENT COMPANY (a Montana<br>22  corporation); EARL D. LOVICK (a Montana<br>Resident, deceased), by and through his estate<br>23  and personal representative BONITA P.<br>LOVICK; and DOES 1 THROUGH 20, | |
| 24                        Defendants. | |

25

26

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION: 1

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL3\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

## I.     INTRODUCTION

1.1     W. R. Grace & Company traded lives for profit by knowingly exposing individuals to dangerous levels of tremolite asbestos.

1.2     In the wake of W. R. Grace's corporate practices, residents of the Libby, Montana area, and families who worked at vermiculite processing plants across the county, are in immediate need of a comprehensive long-term medical diagnostic program that ensures the early detection and treatment of the often fatal diseases caused by tremolite exposure.

1.3     Plaintiffs Andy Dorrington and Marvin Sather bring this action to achieve this end, and to protect, preserve, and restore the health, well-being, and property interests of present and former residents of Lincoln County, Montana, whose physical well-being and constitutional right to a clean and healthful environment have been impaired by defendants. This action is likewise brought on behalf of similarly situated workers and their families in scores of vermiculite processing plants across the United States, who were also subjected to dangerous levels of tremolite originating from defendants' operations in Libby, Montana.

1.4     In particular, plaintiffs seek a Court order creating and implementing an independently supervised, defendant-funded medical monitoring program, under the continuing jurisdiction of the Court, for the benefit of all class members, which includes each of the following components: 1) appropriate medical screening programs necessary to ensure the early detection and treatment of each of the major forms of tremolite exposure induced illness, including asbestosis, lung cancer and mesothelioma; 2) maintenance and operation of a medical registry that includes all relevant health data ; 3) accumulation and appropriate dissemination of de-identified medical data to promote important medical research to advance such subjects as new treatments for the commonly deadly diseases caused by tremolite; and 4) funding of beneficial medical research and dissemination of information to health care providers pertaining to the early detection and possible treatments for the unique natural history and course of tremolite asbestos induced diseases.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  2

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA  99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

1.5    This action further seeks a court order establishing the creation of an independently

supervised environmental screening and remediation fund and program which will ensure the

remediation and restoration of tremolite asbestos contaminated areas and properties, and ensure

adequate protection against continued harmful tremolite exposures resulting from W. R. Grace's

mining practices in Libby, Montana.

## II.     PARTIES

2.1    Plaintiff Andy Dorrington is a current and long-time resident of Libby, in Lincoln

County, Montana.  Andy Dorrington was raised in Libby.  Andy Dorrington raises his own family

in Libby. Andy Dorrington's father worked for W. R. Grace.  His father died of asbestosis.  Andy

Dorrington was routinely exposed to tremolite contaminated vermiculite, typically in the form of

asbestos dust, which migrated into and upon Andy Dorrington's immediate environment through

the air he breathed and the water he drank, and which deposited itself upon surfaces and things he

routinely encountered while growing up in Libby, Montana.  On and off, while going to school,

Andy Dorrington worked at W. R. Grace's vermiculite facilities on Zonolite Mountain.  In view of

the recently disclosed and continuing public health threat caused by tremolite exposure, there is a

reasonable medical necessity for Andy Dorrington to undergo long-term medical monitoring to

ensure early detection and treatment for tremolite-induced disease, including asbestosis, lung

cancer and mesothelioma.

2.2    Plaintiff Marvin Sather is a current resident of Spokane, Washington.  Marvin

Sather was raised in Libby, Montana. He resided in Libby, Montana for some forty-five years,

raised his family there, and for some twenty-two years taught high school in Libby.  As a child,

Marvin would help his father transport vermiculite from W. R. Grace's facilities for use in the

family garden.  As a child, he played in vermiculite tailing piles that mounded alongside the

railroad track in Libby.  Marvin helped his father pour vermiculite into the ceiling of their home for

purposes of insulation. Marvin Sather did not know, as did W. R. Grace & Company, that W.R.

Grace's vermiculite was contaminated with dangerous levels of tremolite asbestos.  In view of the

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION: 3

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL1\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

1  recently disclosed and continuing public health threat caused by tremolite exposure, there is a

2  reasonable medical necessity for Marvin Sather to undergo long-term medical monitoring to ensure

3  early detection and treatment for tremolite-induced disease, including asbestosis, lung cancer and

4  mesothelioma.

5      2.3    Defendant W.R. Grace & Company (Delaware) has its principal place of business in

6  Columbia, Maryland and is incorporated in the State of Delaware. At all times relevant to this

7  complaint, W.R. Grace & Company's (Delaware) business has included the mining and processing

8  of vermiculite within the state of Montana.

9      2.4    Defendant W.R. Grace & Company (Connecticut) has its principal place of business

10 in Columbia, Maryland, and is incorporated in the State of Connecticut. At all times relevant to this

11 complaint, W.R. Grace & Company's  (Connecticut) business has included the mining and

12 processing of vermiculite within the state of Montana. W.R. Grace & Company (Delaware) and

13 W. R. Grace & Company (Connecticut) are hereinafter jointly referred to as "the Grace

14 Defendants."

15     2.5    Defendant Kootenai Development Company ("Kootenai Development") is a

16 Montana Corporation. Its principal place of business is Libby, Montana. Since at least 1994,

17 defendant Kootenai Development has done business and continues to do business in the State of

18 Montana. Kootenai Development's principal asset is real property located in Lincoln County,

19 Montana. In 1994, defendant Kootenai Development purchased the former vermiculite mining

20 operations on Zonolite Mountain from the Grace Defendants and it continues to own that site to

21 this day.

22     2.6    Earl Lovick (deceased) was a resident of Lincoln County, Montana. Earl Lovick

23 died on April 15, 1999. Lovick was employed in a variety of management positions, including

24 plant manager for the Grace Defendants at their Zonolite Mountain facilities throughout their

25 ownership of that facility. Bonita P. Lovick is the personal representative for the Estate of Earl

26 Lovick.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION: 4

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

2.7    Does 1 through 20 are persons, entities, companies and/or corporations, whose true identities are not yet known, liable for the wrongful conduct enumerated and described below.

### III.    JURISDICTION AND VENUE

3.1    This court has subject matter jurisdiction over this action and personal jurisdiction over each of the parties.

3.2    Venue in this action is proper in Lewis and Clark County, State of Montana.

### IV.    COMMON FACTUAL ALLEGATIONS

4.1    Tremolite has the distinction of being among the rarest and most deadly forms of asbestos. It is odorless, tasteless, and highly toxic at levels that are invisible to the eye. It is possible to knowingly expose large populations to deadly levels of tremolite without their knowing it.

4.2    Tremolite is an especially deadly form of asbestos because it consists of tiny needle like fibers that are sharply pointed and easily penetrate and lodge in the linings of the lungs. Human lungs are unable to remove tremolite asbestos that has speared itself into lung tissue and the tremolite spears cannot be washed out of the lung tissues by blood. As a result, affected lung areas become inflamed, in time heavily scarred, and ultimately nonfunctional. For those who undergo this disease process, it becomes increasingly more difficult to breathe. Ultimately, the person suffocates.

4.3    The sinister effects of tremolite exposure are compounded by the fact that diseases caused by tremolite have long latency periods. It is not uncommon for persons to be first diagnosed with potentially fatal diseases forty or more years following their initial exposure to tremolite.

4.4    Recent and still emerging public disclosures demonstrate that the Grace Defendants engaged in a pattern of unsafe mining, processing, and shipping practices, as well as inadequate and insufficient follow-up remediation, testing, and warnings in connection with tremolite-laced vermiculite originating from the Grace Defendants' facilities in Libby, Montana. These corporate

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  5

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA  99204-0466
(509) 455-9555

\\SPOKANE1\VOL1\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

1  practices jeopardized and continue to jeopardize public health, necessitating the implementation of

2  long-term medical monitoring to detect the advent of disease and the implementation of remedial

3  measures to forestall continued tremolite exposure.

4    4.5 From approximately 1930 until 1963, Zonolite Company operated a small

5  vermiculite mining and processing plant on Zonolite Mountain, located a few miles outside of

6  Libby, in Lincoln County, Montana.

7    4.6 In 1963, the Grace Defendants purchased the Zonolite Company and assumed

8  responsibility for operations at the vermiculite facilities. The Grace Defendants assumed the

9  liability of Zonolite Company.

10    4.7 Following its purchase, the Grace Defendants rapidly and substantially expanded

11  vermiculite ore production on Zonolite Mountain and for approximately the next three decades

12  extracted millions of tons of vermiculite ore.  Vermiculite ore from Zonolite Mountain was

13  processed by the Grace Defendants in Libby, as well as shipped to scores of processing plants

14  throughout the United States.

15    4.8 The Grace Defendants had actual knowledge, at the time of their purchase of

16  Zonolite Company, that the vermiculite ore originating from Zonolite Mountain was heavily

17  contaminated with tremolite asbestos.  The Grace Defendants were aware of reliable estimates that

18  ore originating from Zonolite Mountain regularly contained in excess of 20% tremolite.

19    4.9 At all times material to facts alleged in this complaint, defendants had actual

20  knowledge that tremolite asbestos was extremely hazardous and that exposure to even minuet

21  levels of tremolite causes potentially fatal diseases, including asbestosis, lung cancer, and

22  mesothelioma.

23    4.10 The Grace Defendants were aware of confidential medical tests by Zonolite

24  Company that demonstrated that a substantial portion of Zonolite Company's workforce had

25  contracted lung disease as a result of exposure to tremolite from the Zonolite Mountain facilities.

26

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION: 6

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

4.11    During their operations in Libby, Montana, the Grace Defendants conducted medical testing on workers to assess the health impacts of tremolite exposure. Grace's tests revealed high incidents of lung disease among workers. Grace concealed these ongoing health effects from those exposed and from the public at large.

4.12    The Grace Defendants conducted animal tests to assess the health effects of exposure to tremolite originating from its facilities at Zonolite Mountain. Those tests demonstrated to the Grace Defendants that tremolite originating from Zonolite Mountain caused deadly diseases, including mesothelioma. The Grace Defendants concealed these results from the public and from public agencies having responsibility to protect public health and welfare.

4.13    Despite this knowledge, the Grace Defendants chose to elevate corporate profit over community safety and exposed substantial populations to dangerous levels of tremolite, while failing to warn those populations of the risks to which they were exposed.

4.14    The Grace Defendants knew that their mining and processing operations in Libby and elsewhere, generate substantial quantities of dust containing dangerous levels of tremolite. The Grace Defendants knowingly exposed their workers and invitees to its facilities to such tremolite dust.

4.15    The Grace Defendants' mining and processing operations resulted in the routine discharge of tremolite, which was released, and transported through the air and water, and which traveled readily through the Libby, Montana area. Tremolite from the Grace Defendants' operations was carried and disbursed in the air that the residents of Libby breathed. It was carried and disbursed in the clothing of the Grace Defendants' workers. It was carried in the winds that often blew from the Grace Defendants' facilities into Libby. Tremolite dust from the Grace Defendants' facilities often coated vehicles, homes, schoolyards, and properties in nearby Libby, Montana, where children would write their names in the tremolite-contaminated dust.

4.16    The Grace Defendants knowingly permitted tremolite-laced vermiculite to be transported from its facilities for use in homes as insulation, for use in playgrounds, and for use at

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  7

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\L0889\PLEADINGS\COMPLAINT2 DOC 2/1/00

school facilities. Tremolite-contaminated vermiculite waste residue piles and tailings were permitted to collect in and around Libby. Children growing up in Libby played in such tailing piles.

4.17   Tremolite was further transported throughout Lincoln County in the form of vermiculite soil amendments deposited into the yards and soil of homes in Lincoln County.

4.18   The Grace Defendants, further, transported tremolite contaminated ore to at least thirty (30) vermiculite processing plants throughout the United States, which processed tons of tremolite contaminated vermiculite ore originating from Libby, Montana. Workers at such plants and members of their immediate households were similarly exposed to dangerous levels of tremolite, which migrated in workers' clothing and vehicles.

4.19   Hazardous tremolite fiber residue was also regularly released, and is believed likely to be released further, now and in the future, in Lincoln County as a by-product of vermiculite insulation installed in homes in Lincoln County. Tremolite asbestos also contaminated roofing and road materials commonly installed and remaining in Lincoln County, Montana. Each of these forms of tremolite contamination is believed to require remedial testing, warning and potential remediation and restoration.

4.20   Throughout the entire period in which they operated vermiculite ore mining operations in Lincoln County, Montana, and continuing through the present time, the Grace Defendants and defendant Lovick took active and affirmative steps to conceal the risks and fact of tremolite exposure and contamination affecting present and former residents of Lincoln County, Montana and workers, and their households, who processed the contaminated ore. For example, although the company's own internal memorandum acknowledged the health risks of tremolite since the early 1960's and acknowledged, since at least 1965, the fact that air monitoring measured tremolite contamination in nearby Libby, it was not until January, 2000 that the Grace Defendants first publicly disclosed the existence of health risks to present and former residents of Libby Montana and of Lincoln County, Montana.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION: 8

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

4.21    Defendant Lovick materially misrepresented the health risks to members of Classes, to the public and its governmental agencies charged with responsibility for public health and safety. Lovick conspired with the Grace Defendants to conceal and cover up evidence of health risks associated with ore mined by the Grace Defendants at Zonolite Mountain.

4.22    On January 19, 2000, for the first time, the Grace Defendants acknowledged the health risks to present and future residents of Lincoln County, Montana by announcing the creation of a limited medical monitoring program providing $250,000/year to screen residents for disease. Unfortunately, the medical monitoring program announced and proposed by the Grace Defendants is wholly incapable of protecting present and former Lincoln County residents because:

(a)    the proposed program fails to include independent judicial oversight and enforcement mechanisms over the use and amount of funds available to conduct medical monitoring and, instead, permits the Grace Defendants to completely control the use, amount and availability of medical screening funds, akin to permitting a fox to protect a chicken coop;

(b)    the proposed program fails to include sufficient funds to permit the specific medical screening necessary to detect tremolite exposure specific asbestos disease processes;

(c)    the proposed program fails to include a medical data registry component;

(d)    the proposal lacks a beneficial medical research component addressing the unique pathology and nature of tremolite induced disease processes and the necessity for the development of special medical treatments and research;

(e)    the proposed medical monitoring program fails to formally involve the medical physicians and researchers most knowledgeable about tremolite exposure and appropriate protocol for detection of diseases related to tremolite exposure;

(f)    the proposed program fails to protect workers, and their households, who processed tremolite asbestos contaminated vermiculite shipped from Lincoln County, Montana.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  9

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W. SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

4.23    Defendant Kootenai Development Company has failed to take appropriate actions to remediate continuing contamination at Zonolite Mountain and has cooperated with the Grace Defendants in falsely minimizing the extent of prior and continuing contamination potential.

## V.    CLASS ACTION ALLEGATIONS

5.1    Plaintiffs bring this action as a class action for equitable, injunctive and declaratory relief pursuant to Montana Rules of Civil Procedure 23(b)(1) and 23(b)(2) on behalf of two plaintiff classes consisting of and defined as:

(1)    all residents and former residents of Lincoln County, Montana who have resided in Lincoln County for one year or more dating from January 1, 1930 through the present (the "Resident Class"); and

(2)    all employees, and members of their households, which employees worked for one year or more at a vermiculite processing plant in the United States which processed one ton or more of vermiculite ore originating from Zonolite Mountain in Lincoln County, Montana (the "Worker Class").

5.2    Plaintiffs are members of the classes they seek to represent.  The members of each of the classes, numbering in the many thousands, are so numerous that their individual joinder as plaintiffs is impracticable.

5.3    There are many questions of law and fact common to the class including, but not limited to:

(a)    Whether defendants negligently exposed class members to tremolite asbestos;

(b)    Whether defendants' conduct in exposing class members to tremolite asbestos violated class members' rights under the Montana Constitution;

(c)    Whether defendants concealed from class members critical information about the existence, nature and hazards of tremolite asbestos contamination in Lincoln County, Montana;

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  10

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\1388YV\PLEADINGS\COMPLAINT2.DOC 2/1/00

(d)     Whether defendants negligently operated, terminated, remediated, tested, cleaned-up and/or warned of the hazards of vermiculite extraction and distribution operations and their relation to tremolite asbestos contamination in Lincoln County, Montana;

(e)     Whether exposure to tremolite asbestos puts class members at increased risk of sustaining serious pulmonary diseases including asbestosis, lung cancer and mesothelioma;

(f)     Whether class members' increased risk of sustaining pulmonary injury makes periodic diagnostic testing and medical examinations (medical monitoring) reasonably necessary; and whether such testing is effective;

(g)     Whether the medical monitoring program offered by the Grace Defendants is wholly inadequate, among other things, for failing to:  provide judicial oversight and enforcement mechanism and continuing jurisdiction; provide for collection and dissemination of de-identified medical health research information, support medical health research into the particularly hazardous and unique nature and natural course of tremolite induced disease; include the participation of the most qualified medical health professionals; and protect workers, and their family members, at tremolite contaminated vermiculite ore processing plants;

(h)     Whether continuing tremolite contamination continues to exist in Lincoln County, Montana;

(i)     Whether continuing tremolite contamination warrants environmental restoration and remediation efforts; and

(j)     Whether defendants participated directly or indirectly in a joint enterprise, concerted action or common course of conduct to accomplish the torts alleged below.

5.4     The claims of the named Plaintiffs are typical of the claims of the class in that the named plaintiffs and the members of the class were exposed to tremolite contaminated ore originating from Libby, Montana, which has resulted in recent public health warnings disclosing, for the first time, the need for medical screening for those exposed and for beneficial medical research and environmental remediation necessary to protect against future disease.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  11

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA  99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

5.5     Plaintiffs will fairly and adequately represent and protect the interests of the members of the classes.  Plaintiffs have retained counsel competent and experienced in complex class actions and products liability litigation.

5.6     Notice can be provided to class members by first class mail to Libby, Montana, property holders and to workers identified from defendants' or third parties' records, and/or by published notice using techniques and forms of notice similar to those customarily used in toxic-related class action tort litigation.

5.7     Plaintiffs seek injunctive, equitable and declaratory relief in the form of a Court-ordered, independently supervised, medical monitoring program funded by the defendants, to assist Plaintiffs and the Classes in the early detection and treatment of tremolite asbestos induced disease. Plaintiffs also seek additional injunctive, equitable and declaratory relief in the form of beneficial medical research and environmental remediation and restoration necessary to prevent future injury.

5.8     Class certification is appropriate pursuant to Montana R. Civ. P. 23(b)(2) because defendants have acted, and refused to act, on grounds generally applicable to the classes, making appropriate preliminary and final injunctive and declaratory relief consisting of medical monitoring, beneficial medical research and environmental remediation and restoration for the benefit of Plaintiffs and the Classes.

5.9     Class certification is also appropriate under Montana R. Civ. Proc. 23(b)(1) because, *inter alia*, the prosecution of separate actions by or against individual members of the Classes would create a risk of incompatible standards of conduct for defendants and inconsistent or varying adjudications for all parties.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  12

\\SPOKANE\VOL1\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

## VI.   FIRST CAUSE OF ACTION

### VIOLATION OF THE MONTANA CONSTITUTION

6.1   Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

6.2   The Grace Defendants and Kootenai Development Company are present and former owners and/or operators of Zonolite Mountain, the source of tremolite asbestos contamination affecting present and former residents of Lincoln County, Montana, including workers at plants who processed the contaminated ore.

6.3   Plaintiffs and members of the Resident Class have the following inalienable rights, under the Montana Constitution, Art. II, § 3:

> All persons are born free and have certain inalienable rights.  They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways.

6.4   The past, present and continuing tremolite asbestos contamination of Zonolite Mountain, violate the inalienable right of Plaintiffs and the Resident Class to a clean and healthful environment.

6.5   As a proximate and direct cause of the violation of the inalienable enumerated rights of Plaintiffs and the Resident Class under the Montana Constitution, Plaintiffs and the Resident Class have suffered and will suffer damages.

6.6   Plaintiffs therefore pray for relief on behalf of themselves and the Resident Class in the form of the requested injunctive relief consisting of independently supervised medical screening programs, beneficial medical research and environmental remediation and restoration relief, as more particularly described in the Prayer, below.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  13

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 97201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

## VII.    SECOND CAUSE OF ACTION

## NEGLIGENCE

7.1    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

7.2    Defendants owed Plaintiffs and the Classes a duty to act with reasonable care so as not to jeopardize the Classes' health, welfare and right to a clean and healthful environment.

7.3    Defendants breached their duty of care by:

(a)    failing to properly operate the Zonolite Mountain vermiculite operations that caused the release of tremolite;

(b)    failing to properly cease and/or shut down the operations at Zonolite Mountain;

(c)    failing to properly clean up and remediate the tremolite contamination in and around the Zonolite Mountain operations;

(d)    failing to properly test for and detect tremolite contamination in and around the Zonolite Mountain operations;

(e)    failure to properly test for and detect tremolite contamination in and about the town of Libby, Montana and the County of Lincoln, Montana;

(f)    failing to exercise reasonable care to supervise and train the personnel assigned to operate, remediate and test the Zonolite Mountain facilities;

(g)    failure to adequately warn members of the Resident Class of the existence of past, present and future tremolite contamination in and about Zonolite Mountain and the town of Libby, Montana and County of Lincoln, Montana; and/or

(h)    failure to protect and warn the Worker Class, including workers, and their households, of the health hazards and need for medical monitoring.

7.4    The foregoing acts, or failures to act, were the proximate and legal cause of injuries and damages to Plaintiffs and the Classes, specifically, they caused the Classes to be exposed to

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  14

LAW OFFICES
· LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
In     I   HINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

tremolite asbestos and with corresponding increased risk of injury and damages from tremolite-related disease. Defendants' negligent conduct caused Plaintiffs and the Classes the need for medical monitoring to diagnose and treat any injury and thereby mitigate their damages.

7.5    Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief consisting of independently supervised medical screening programs, beneficial medical research and environmental remediation and restoration relief, as more particularly described in the Prayer, below.

VIII.    THIRD CAUSE OF ACTION

PRIVATE AND PUBLIC NUISANCE ALLEGATIONS

8.1    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

8.2    Plaintiffs and the Resident Class have proprietary interests in certain real and personal property located in Lincoln County, Montana.

8.3    The past, present and continuing conduct of Defendants, and each of them, constitutes a nuisance in that it is specially and generally injurious to the health and offensive to the senses of Plaintiffs and the Resident Class, and specially interfered with, unlawfully obstructed and disturbed their comfortable enjoyment of the right to a clean and healthful environment and enjoyment of their property.

8.4    Plaintiffs therefore pray for relief on behalf of themselves and the Resident Class in the form of the requested injunctive relief consisting of independently supervised medical screening programs, beneficial medical research and environmental remediation and restoration relief, as more particularly described in the Prayer, below.

IX.    FOURTH CAUSE OF ACTION

TRESPASS

9.1    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth here and further allege as follows:

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  15

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL1\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

9.2     At all times relevant to this Complaint, Plaintiffs and the Resident Class were in lawful possession of certain real and personal property in Lincoln County.

9.3     Defendants intentionally and/or recklessly committed the wrongful act of trespass by causing tremolite asbestos contaminated vermiculite, tremolite dust and tremolite contaminated products to invade the real and personal property of Plaintiffs and the Resident Class.

9.4     Defendants' conduct and trespass were the legal cause of the injuries and damages to the real and personal properties of Plaintiffs and the Resident Class.

9.5     Plaintiffs therefore pray for relief on behalf of themselves and the Resident Class in the form of the requested injunctive relief consisting of independently supervised medical screening programs, beneficial medical research and environmental remediation and restoration relief, as more particularly described in the Prayer, below.

## X.   FIFTH CAUSE OF ACTION

## STRICT LIABILITY FOR ULTRA HAZARDOUS ACTIVITY

10.1    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth here and further allege as follows:

10.2    Defendants' activities, including but not limited to, the present and/or former ownership of Zonolite Mountain, former operation of Zonolite Mountain vermiculite mining operations and dissemination of contaminated ore nationwide are ultra-hazardous activities in that:

(a)     there exists a high degree of prior, present and continuing contamination in the form of exceedingly toxic tremolite asbestos, which is believed to have an unacceptable risk of continuing to contaminate residents of and real and personal properties located in Lincoln County, Montana and workers, and their household members, who processed tremolite contaminated vermiculite shipped from Zonolite Mountain;

(b)     there is a strong likelihood that the harm resulting from prior, present and future exposure to tremolite asbestos will be great;

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  16

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL1\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

10.3  Defendants' actions were the legal cause of the injuries and damages suffered by Plaintiffs and the Classes as more fully described above.

10.4  Plaintiffs therefore pray for relief on behalf of themselves and the Classes in the form of the requested injunctive relief consisting of independently supervised medical screening programs, beneficial medical research and environmental remediation and restoration relief, as more particularly described in the Prayer below.

XI  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for judgment against Defendants, jointly and separately and the following relief:

11.1  An order certifying the proposed Classes and any appropriate subclasses and appointing Plaintiffs and their undersigned counsel of record and any additional class representatives necessary to adequately represent the Classes;

11.2  An order creating and establishing an independently supervised, defendant-funded medical monitoring program under the continuing jurisdiction of the Court that includes the following components: 1) appropriate medical screening programs necessary to ensure the early detection of major forms of tremolite exposure induced illnesses, including asbestosis, lung cancer and mesothelioma; 2) maintenance and operation of a Lincoln County registry for all relevant health data; 3) accumulation and dissemination of de-identified medical data for beneficial medical research purposes to aid in developing new treatments for the unique courses of disease induced by tremolite exposure; 4) beneficial medical research, including funding, reporting and provision of treatment related information to health care providers pertaining to the natural history and course of the tremolite asbestos induced diseases.

11.3  A court order establishing the creation of an independently supervised environmental screening and remediation fund and program which will ensure the remediation and restoration of tremolite asbestos contaminated areas and properties, so as to ensure adequate protection against any additional tremolite exposures to residents of Lincoln County, Montana.

CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  17

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA  99201-0466
(509) 455-9555

\\SPOKAN51\VOL2\DWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

11.4    Attorneys' fees and costs, including but not limited to, costs of Class notice and medical monitoring administration;

11.5    Any and all other relief as this Court may deem just and appropriate.


### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


DATED this 31st day of January, 2000.

LUKINS & ANNIS, P.S.


By _____

Michael G. Black, MSBA #3508
Darrell W. Scott, WSBA# 20241
Mischelle R. Fulgham, WSBA #22210
Tonya R. Hanson, WSBA #29398


Richard M. Heimann
Elizabeth J. Cabraser
Donald C. Arbitblit
Fabrice Vincent
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA  94111
(415) 956-1000
(415) 956-1008 - Facsimile


Attorneys for Individual and Representative
Plaintiffs


**CLASS ACTION COMPLAINT FOR INJUNCTIVE
RELIEF IN THE FORM OF MEDICAL MONITORING
AND ENVIRONMENTAL REMEDIATION:  18**

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA  99201-0466
(509) 455-9555

\\SPOKANE1\VOL\NDWS\CLIENT.DWS\LIBBY\PLEADINGS\COMPLAINT2.DOC 2/1/00

# GARLINGTON, LOHN & ROBINSON, PLLP

DAVID C. BERKOFF
STEPHEN R. BROWN
GARY B. CHUMRAU
TERRENCE F. DALY
CANDACE C. FETSCHER
LUCY T. FRANCE
GEORGE D. GOODRICH
GARY L. GRAHAM
GREGORY L. HANSON
DEAN A. HOISTAD
WILLIAM EVAN JONES
MAUREEN H. LENNON
SHERMAN V. LOHN
BRADLEY J. LUCK
ROBERT C. LUKES
TERRY J. MACDONALD

**ATTORNEYS AT LAW**
199 WEST PINE • P. O. BOX 7909
MISSOULA, MONTANA 59807-7909
406-523-2500
TELEFAX 406-523-2595

CHARLES E. MCNEIL
ANITA HARPER POE
SHANE N. REELY
LARRY E. RILEY
SUSAN P. ROY
ROBERT E. SHERIDAN
W. DENNIS STARKEL
PETER J. STOKSTAD
WILLIAM T. WAGNER
KELLY M. WILLS

R. H. "TY" ROBINSON
OF COUNSEL

J. C. GARLINGTON
1908 - 1995

March 3, 2000

Darrell W. Scott, Esq.
Lukins & Annis, P.S.
1600 Washington Trust Financial Center
717 W. Sprague Ave.
Spokane, WA 99201-0466

RE: Dorrington v. W.R. Grace

Dear Mr. Scott:

W.R. Grace has delivered to us a copy of the Summons and Complaint which had been delivered to the United States Corporation Company for service upon Grace. We are enclosing a copy of the Summons that was served on them. As you will note, that Summons is directed to Mr. Lovick. Presumably, there was a mix-up in the documents that were provided.

If you have any questions, please let us know.

Very truly yours,

GARLINGTON, LOHN & ROBINSON, PLLP

By    GARY L. GRAHAM
Gary L. Graham
Direct Line (406) 523-2543
E-mail address: glgraham@garlington.com

GLG/ld
Enclosure
c: Richard Heimann, Esq.



1  Darrell W. Scott
   Michael G. Black
2  Mischelle R. Fulgham
   Tonya R. Hanson
3  LUKINS & ANNIS, P.S.
   1600 Washington Trust Financial Center
4  717 W Sprague Ave.
   Spokane, WA  99201-0466
5  Telephone: (509) 455-9555
   Facsimile: (509) 747-2323
6
   Richard M. Heimann
7  Elizabeth J. Cabraser
   Donald C. Arbitblit
8  Fabrice Vincent
   LIEFF, CABRASER, HEIMANN &
9  BERNSTEIN, LLP
   Embarcadero Center West, 30th Floor
10 275 Battery Street
   San Francisco, CA  94111
11 Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
12
   Attorneys for Plaintiffs
13

14     MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY
15
16 ANDY DORRINGTON, on behalf of himself and
   all others similarly situated; MARVIN SATHER,    CASE NO. ADV-2000- 078
17 on behalf of himself and all others similarly
   situated.
                                                    DOROTHY McCARTER
18                                     Plaintiffs,    Presiding Judge

19        v.                                        SUMMONS

20 W.R. GRACE & COMPANY (a Delaware
   corporation); W.R. GRACE & COMPANY –
21 CONN (a Connecticut corporation); KOOTENAI
   DEVELOPMENT COMPANY (a Montana
22 corporation); EARL D. LOVICK (a Montana
   Resident, deceased), by and through his estate
23 and personal representative BONITA P.
   LOVICK; and DOES 1 THROUGH 20,
24
                                      Defendants.
25

26

   SUMMONS:  1

                                LAW OFFICES
                            LUKINS & ANNIS
                       A PROFESSIONAL SERVICE CORPORATION
                   1600 WASHINGTON TRUST FINANCIAL CENTER
                              717 W SPRAGUE AVE.
                          SPOKANE, WA  99201-0466
                              (509) 455-9555

\\SPOKANE1\VOL2\15DOC\PCAP0134-DWS.DOC 1/31/00

**THE STATE OF MONTANA TO THE ABOVE-NAMED DEFENDANT:**

**EARL D. LOVICK (a Montana resident, deceased), by and through his estate and personal representative BONITA P. LOVICK**

**YOU ARE HEREBY SUMMONED** to answer the Class Action Complaint for Injunctive Relief in the Form of Medical Monitoring and Environmental Remediation and Restoration in the action which is filed in the office of the Clerk of this Court, a copy of which is herewith served upon you, and to file your Answer and serve a copy thereof upon the plaintiffs' attorney within twenty (20) days after the service of this Summons, exclusive of the date of service; and, in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Witness my hand and seal of said Court this 31st day of January 2000.

Nancy Sweeney
Clerk of the District Court

By _Shelly Callen_
Deputy    Clerk of the District Court

ATTORNEY FOR PLAINTIFFS:
LUKINS & ANNIS, P.S.

By _____
Michael G. Black, MSBA #3508
Darrell W. Scott, WSBA# 20241
Mischelle R. Fulgham, WSBA #22210
Tonya R. Hanson, WSBA #29398

Richard M. Heimann
Elizabeth J. Cabraser
Donald C. Arbitblit
Fabrice Vincent
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111
(415) 956-1000

SUMMONS: 2

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL7\15DOC\PCAP0134-DWS.DOC 1/31/00

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on July 13, 2001, I did serve the foregoing: REPLY DECLARATION OF FABRICE N. VINCENT IN SUPPORT OF MEDICAL MONITORING CLAIMANTS' OBJECTION TO DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF BAR DATE, APPROVAL OF PROOF OF CLAIM FORMS AND APPROVAL OF NOTICE PROGRAM (DOCKET NO. 536); JOINDER IN THE MOTIONS FOR CONTINUANCE AND MOTION FOR CONTINUANCE; AND REQUEST FOR CONSIDERATION AND BRIEFING REGARDING CLASS TREATMENT upon the parties identified below in the manner specified.

### VIA HAND DELIVERY

Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young & Jones
919 Market Street, Suite 1600
Wilmington, DE 19801

Michael S. Joseph, Esquire
Ferry & Joseph P.A.
824 Market Street, Suite 904
Wilmington, DE 19899

Matthew G. Zaleski, III, Esquire
Campbell & Levine, LLC
Chase Manhattan Centre, 15th Floor
1201 N. Market Street
Wilmington, DE 19801

Frank J. Perch, Esquire
Office of the US Trustee
844 N. King Street
Wilmington, DE 19801

Michael R. Lastowski, Esquire
Duane, Morris & Heckscher, LLP
110 N. Market Street, Suite 1200
Wilmington, DE 19801

**VIA FEDERAL EXPRESS**

Scott L. Baena, Esquire
Bilzin, Sumberg, Dunn,
Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL  33131

Elihu Inselbuch, Esquire
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY  10022

James H.M. Sprayregen, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois  60601

Lewis Kruger, Esquire
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY  10038-4982

Under penalty of perjury, I declare that the foregoing is true and correct.

_____7/13/01_____
Date

William D. Sullivan