IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 01-01139(JJF) |
| | ) | (Jointly Administered) |
| W.R. GRACE & CO., et al. | ) | |
| | ) | |
| Debtors. | ) | Chapter 11 |

### DECLARATION OF FABRICE N. VINCENT IN SUPPORT OF ZONOLITE PLAINTIFFS' JOINDER IN MOTION FOR CONTINUANCE BY OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS AND INDEPENDENT MOTION TO CONTINUE THE HEARING ON DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM, AND MOTION TO EXTEND THE TIME TO OBJECT OR RESPOND TO SUCH MOTIONS

FABRICE VINCENT, makes the following declaration:

1.      My name is Fabrice Vincent.  I am over the age of 18 and am competent to testify in Court.  I am a partner at Lieff, Cabraser, Heimann & Bernstein, LLP and one of the attorneys working for Class Representative Marco Barbanti, who was appointed by the United States Trustee to the Official Committee of Asbestos Property Damage Claimants.  I am also counsel of record in Barbanti and in the Price action (MDL 1376), both currently stayed by virtue of the bankruptcy proceedings.  This declaration is made based on my own personal knowledge and/or belief.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a letter dated August 1, 2000, from Hugh Sloan, United States Public Health Service Assistant Surgeon General, to Linda Rosenstock, Director of the National Institute for Occupational Safety & Health regarding Libby, Montana, vermiculite.

ORIGINAL

165.ZON

3.     Attached as Exhibit 2 is a true and correct copy of the February 22, 2001 Agency for Toxic Substances and Disease Registry Preliminary Findings.

4.     Attached hereto as Exhibit 3 is a true and correct copy of a Zonolite Attic Insulation advertisement.

5.     Attached hereto as Exhibit 4 is a true and correct copy of a Zonolite Attic Insulation advertisement.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the Preliminary Results of a Washington Statewide Survey dated October 19, 2000, conducted in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action by GMA Research Corporation.

7.     Attached hereto as Exhibit 6 is a true and correct copy of the final Summary Report dated October 2000, of the Washington State Survey conducted by GMA Research Corporation in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action.

8.     Attached hereto as Exhibit 7 is a true and correct copy of pages 82-83 of the deposition of Donald Morgan of GMA Research corporation, taken in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action on November 15, 2000.

9.     Attached hereto as Exhibit 8 is a true and correct copy of the Order Granting Plaintiff's Motion for Class Certification Pursuant to CR 23(b)(2) filed on December 19, 2000, in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action.

10.     Attached hereto as Exhibit 9 is a true and correct copy of the Affidavit of Henry A. Anderson, M.D., in support of Plaintiff's Application for Preliminary Injunction and Emergency Notice to Class Members filed on June 1, 2000, in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action.

11.     Attached hereto as Exhibit 10 is a true and correct copy of the Affidavit of Richard Hatfield filed in support of Plaintiff's Application for Preliminary Injunction and Emergency Notice to Class Members on June 1, 2000, in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action. Attached hereto as Exhibit 2 is a true and correct copy of an internal W.R. Grace, Cambridge Division, memo dated April 19, 1977 regarding Tremolite content in Zonolite products.

12.     Attached hereto as Exhibit 11 is a true and correct copy of the Affidavit of Donald Hurst filed in support of Plaintiff's Application for Preliminary Injunction and Emergency Notice to Class Members on June 1, 2000, in the <u>Barbanti v. W.R. Grace, et. al.</u> Washington state class action.

13.     Attached hereto as Exhibit 12 is a true and correct copy of an internal W.R. Grace, Cambridge Division, memo dated May 24, 1977.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a March 11, 1969 internal W.R. Grace, Cambridge Division, memorandum re the Washington Safety Report and a March 31, 1969 W.R. Grace internal memorandum referencing same.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed this 12th day of July, 2001, in San Francisco, California.

FABRICE N. VINCENT

165.ZON





# United States Public Health Service
### Region VIII
#### 1961 Stout Street, Room 498
#### Denver, Colorado 80294-3538

August 1, 2000

Dr. Linda Rosenstock, Director
National Institute for Occupational
    Safety & Health
Hubert H. Humphrey Building Room 715H
200 Independence Ave., S.W.
Washington, DC   20201

Dear Dr. Rosenstock,

I would like to bring to your attention a significant occupational and public health concern regarding the widespread dissemination of amphibole (actinolite-tremolite series) asbestos in Libby, Montana, and potentially in vermiculite end-products used throughout the country. As you may be aware, NIOSH researchers evaluated vermiculite miners, that were exposed to asbestos, in Libby, Montana in the early 1980's. NIOSH investigators found significantly elevated risks of asbestos-related malignant and non-malignant respiratory disease among these workers. Concurrently, Dr. Jim Lockey at the University of Cincinnati identified elevated pulmonary disease among workers with much lower asbestos exposures at a facility processing Libby vermiculite in Ohio. These articles have been included for your information.

In November 1999, Libby became the focus of national attention when it was reported that a number of residents that did not work at the vermiculite mine or processing facilities were suffering from asbestos-related diseases. Subsequently, researchers from the Environmental Protection Agency (EPA), Public Health Service (PHS) Region 8, and Agency for Toxic Substances and Disease Registry (ATSDR) began intensive environmental and public health investigations of the site. Medical screening (e.g., chest x-rays, pulmonary function testing, questionnaires) is currently being conducted on 4200 former workers, family contacts, and others potentially at risk. NIOSH researchers (Dr. Robert Castellan, Dr. Leslie Stayner, Dr. Pat Sullivan, Dr. Vince Castranova, Mr. Ken Wallingford, and Mr. Ralph Zumwalde) have also been providing intermittent technical assistance to these efforts.

**EXHIBIT
P-159**

Barbanti v. Grace

EXHIBIT  4
Plaintiffs Reply re: Mtn
For Preliminary Injunction

EXHIBIT __1__

One issue that has very recently come to our attention, is that end-product vermiculite insulation, and most likely other end-products, apparently contained appreciable quantities of asbestos, but were marketed, sold, and used throughout the country without adequate labeling or warnings and were commonly considered to be non-toxic (see enclosed information and video tape). Internal company documentation and recent testing of residential insulation materials, reportedly used in over one million homes, reveals that even minimal handling by workers or residents poses a substantial health risk (airborne exposures up to 150 times the current occupational standards (0.1 f/cc)).

Recent discussions between the aforementioned federal partners working at the Libby site identified the pressing need for increased NIOSH participation and response to occupational health issues of concern.

*Exemption (6X5)*

If I can be of any further assistance to you in this matter please contact me at (303) 844-7860 or Dr. Aubrey Miller at (303) 844-7857.

Sincerely,

Hugh S. Sloan, D.S.W.
Assistant Surgeon General
Regional Health Administrator

Enclosures

# Agency for Toxic Substances and Disease Registry

Division of Health Studies

**Preliminary Findings of
Medical Testing of Individuals
Potentially Exposed To Asbestoform Minerals
Associated with Vermiculite in Libby, Montana:
An Interim Report for Community Health Planning**

February 22, 2001



DEPARTMENT OF HEALTH
& HUMAN SERVICES
Agency for Toxic Substances
and Disease Registry
Atlanta, Georgia  30333

EXHIBIT _2_

# Preliminary Findings of
## Medical Testing of Individuals
## Potentially Exposed To Asbestoform Minerals
## Associated with Vermiculite in Libby, Montana:
## An Interim Report for Community Health Planning

February 22, 2001

**Agency for Toxic Substances and Disease Registry**
**U.S. Department of Health and Human Services**
**Atlanta, Georgia  30333**

Prepared by

| | |
|---|---|
| Jeffrey Lybarger, M.D. | Principal Investigator<br>Division of Health Studies, ATSDR |
| Michael Lewin, M.S. | Statistician<br>Division of Health Studies, ATSDR |
| Aubrey Miller, M.D. | Medical Officer<br>DHHS, Region VIII Office |
| Susan Kess, M.D. | Medical Officer<br>Division of Toxicology, ATSDR |

# CONTENTS

INTRODUCTION ............................................... 1

BACKGROUND OF PROJECT ................................. 2

    Public Health Concerns ..................................... 2

    Asbestos-Related Diseases ................................... 4

METHODS ................................................. 6

    Medical Testing Program .................................... 6

    Procedures Used for Data Analyses ........................... 9

RESULTS ................................................. 11

DISCUSSION .............................................. 18

LIMITATIONS ............................................. 20

CONCLUSIONS ........................................... 22

# INTRODUCTION

A community-based medical testing program was developed to respond to reports of illness among persons exposed to asbestos-contaminated vermiculite in Libby, Montana. This medical testing program, a part of the Libby Community Environmental Health Project, was undertaken by the Agency for Toxic Substances and Disease Registry (ATSDR), an agency of the U.S. Department of Health and Human Services (DHHS), with the cooperation of the DHHS Region VIII Office, the U.S. Environmental Protection Agency (EPA), the Montana Department of Health and Human Services, and the Lincoln County Environmental Health Department. This medical testing program was implemented during July through November of 2000.

The principal goal of the medical testing program is to identify the asbestos-related health effects of participants exposed to asbestos from the vermiculite mine near Libby, Montana, and to refer these individuals for additional medical evaluation. Other important goals of the program are to

(a) provide EPA with information needed to identify and eliminate current exposures to asbestos in the community;

(b) identify the types of illnesses experienced by participants exposed to asbestos in order to better inform local physicians; and

(c) provide the local health care community with an estimate of the additional resources necessary to address health care needs in the Libby area during the next 10–20 years.

*This interim report has been specifically prepared for the residents, public officials, and health care practitioners of Libby, in order to assist them in preparing estimates of the community's additional health care needs and in seeking the resources required to provide the additional care.*

The data in this interim report provide a summary of the testing program's results for the first 1,078 (18%) of the total 6,144 participants. The reported prevalence of the identified medical abnormalities can be expected to change when the analyses are conducted on the complete, final data of all participants. There may be other limitations in this interim data regarding how representative these 1,078 participants are of all 6,144 participants. These limitations are important to understand in order to avoid drawing inappropriate conclusions from preliminary data.

## BACKGROUND OF PROJECT

### Public Health Concerns

Commercial vermiculite from Zonolite Mountain, located approximately 6 miles from the city of Libby, Montana, was mined and milled from 1924 through 1990. This operation included strip mining for the ore, transporting it by truck to a sorting facility and to processing plants in downtown Libby, expanding the ore by heating, and shipping it by rail as a commercial product. A transfer facility was located at the base of the mountain, approximately 3 miles from Libby. Two expansion ("popping") facilities operated at different time periods in the city; these plants heated vermiculite to expand (or "pop") the crystals.

To date, the toxicity of vermiculite has not been completely studied; however, it is believed that the toxic effects associated with vermiculite exposure are related to the presence of asbestoform minerals present in vermiculite ore and released during mining and processing operations. Ore taken from the Libby mining operation has been documented to be contaminated with asbestoform minerals, including tremolite, actinolite, and others [Atkinson et al.1982 and Lockey 1984]. Asbestos minerals fall into two groups or classes—serpentine and amphibole. Serpentine asbestos contains the mineral chrysotile. Minerals in the amphibole class are actinolite,

anthophyllite, amosite, crocidolite, and tremolite. For the remainder of this document (unless otherwise specified), the term "asbestos" or "asbestos-related" refers generally to asbestoform minerals associated with vermiculite mined near Libby, Montana.

Previous studies by the National Institute of Occupational Safety and Health (NIOSH) [Amandus et al. 1987a, 1987b, 1987c] and McGill University found that former workers of the mine in Libby had substantial occupational exposure to asbestos. These studies also documented significantly increased rates of pulmonary abnormalities and disease (asbestosis and lung cancer) among former workers [McDonald et al. 1986]. In addition to former workers at the mine, cases of asbestos-related pulmonary impairment have been reported among household contacts of former mine workers. Asbestos-related disease also has reportedly occurred among other residents of the community with no known direct connection with the mining operation. This is extremely unusual and suggests that asbestos exposure occurred in Libby from alternative (non-occupational) exposure pathways. Some potentially important alternative pathways for asbestos exposure that existed in the past might be related to elevated concentrations of asbestos in ambient air [EPA 1982], and recreational exposures to children playing in piles of vermiculite. Currently, some potentially important pathways of exposure may be associated with vermiculite placed in walls and attics as thermal insulation, and for use as a soil amendment or aggregate in driveways and gardens.

In the fall of 1999, the EPA Region VIII Office began an emergency response action to identify and control asbestos contamination in the Libby community. In support of this action, EPA sought assistance from the DHHS Region VIII Office, the Montana Department of Health and Human Services, and the Lincoln County Environmental Health Department to address the public health implications of past human exposure to asbestoform minerals in Libby. Concurrently, Senator Max Baucus (D-Montana) asked DHHS Secretary Shalala for the department's assistance

-3-

in addressing the need for medical testing of Libby residents for possible asbestos-related health effects. This request was referred to ATSDR, the lead DHHS agency responsible for providing this type of assistance.

## Asbestos-Related Diseases

Inhalation of asbestos fibers from asbestoform minerals suspended in air can result in lung diseases, such as asbestosis, mesothelioma, and lung cancer. The risk of developing any one of these diseases depends upon many factors; including the type of fiber, level of exposure, duration of exposure, and smoking history of the exposed individual.

### *Pleural Changes*

Asbestos exposure is associated with several changes in the pleura (lining of the lungs and internal chest wall). These changes include plaques (circumscribed pleural thickening), diffuse pleural thickening, calcifications, and pleural effusions (accumulations of fluid in the pleural space). They indicate past exposure to asbestos, and can often be detected in chest radiographs (CXR), also known as X-rays. On the chest radiographs, these changes appear as areas of either diffuse or circumscribed thickening of the pleura.

The latency of asbestos related *pleural effusions* on chest radiograph is usually less than 20 years and is often the first indication of asbestos-related disease. Pleural effusions, depending on the severity, may be associated with shortness of breath, chest pain, and functional lung impairment. The latency time for development of asbestos-related *pleural plaques* is on average 20 years, with a range of 3 to 57 years. Clinically, circumscribed pleural plaques found on chest radiograph, in the absence of other abnormalities, are viewed as non-symptomatic "markers of exposure" and the majority of cases will not progress to significantly affect lung function. *Diffuse pleural thickening* may also be seen on chest radiograph and, depending on the severity, may be associated with

cough, shortness of breath, and functional lung impairment. The presence of any of these pleural abnormalities on chest radiograph, associated with asbestos exposure, indicates increased risk for mesothelioma and lung cancer.

*Asbestosis*

Asbestos fibers can reach the lower lung, penetrate airway walls, and pass through lung parenchyma to the pleura. They initiate fibrosis by stimulating the persistent release of various inflammatory mediators and fibroblast growth factors. The condition "asbestosis" classically refers to the occurrence of diffuse interstitial fibrosis which results from this persistent inflammatory process in response to asbestos fibers located in the interstitial or parenchyma tissues of the lung. Asbestos fibers located in or near the lung pleura appear to trigger a similar inflammatory process which frequently results in pleural thickening and the formation of calcified plaques.

The latency period (the time interval between exposure and disease) for the onset of disease typically is 10–20 years after the initial exposure, but some cases progress more rapidly. The diagnosis of asbestosis is usually based on the results of a medical and exposure history, physical examination, chest radiographs and other radiographic procedures, and pulmonary-function testing (spirometry). Clinically, asbestosis may present as a dry cough or shortness of breath with exertion. On physical examination, rales (dry crackling sounds) frequently occur with deep inspiration. The disease can vary from asymptomatic, to disabling, to potentially fatal. In advanced stages, clubbing (thickened fingertips) can result.

*Lung Cancer*

Exposure to asbestos is associated with an increased risk of developing lung cancer. The risk is related to cumulative asbestos exposure, i.e., the greater the exposure, the greater the risk of

developing lung cancer. The risk for lung cancer among smokers exposed to asbestos is much higher than it would be if the two risk factors were additive in nature.

Typically, a substantial latency period of 10–40 years occurs between initial exposure and the onset of lung cancer [ATSDR 1995]. The initial symptoms of lung cancer are variable and may include cough, chest pain, and loss of appetite. Lung cancer is often an incidental finding on a chest radiograph taken for another medical purpose.

*Mesothelioma*

Mesothelioma is a rare and generally fatal cancer of the mesothelial cells of the pleura or peritoneum. The prevalence of mesothelioma is strongly associated with asbestos exposure, but its prevalence does not correlate with the magnitude of the exposure. That is, some cases of the disease have resulted after exposure to relatively low levels of asbestos for short time periods [Becklake 1976]. Often, the latency period is 30–40 years.

Individuals with pleural mesothelioma generally present with chest pain and shortness of breath. The initial symptoms associated with peritoneal mesothelioma are weight loss, and abdominal pain and swelling. These symptoms usually do not appear until the disease is quite advanced. Currently no effective treatment exists for malignant mesothelioma.

## METHODS

### Medical Testing Program

During July through November, 2000, medical testing was provided to former workers of W.R. Grace Company, household contacts of former workers, and individuals who resided, worked, attended school, or participated in activities in the Libby area for 6 months or more before

December 31, 1990. All 1,078 of the participants included in this interim report were tested in Libby. Medical testing consisted of a verbally administered questionnaire, chest radiographs and simple spirometry testing (a measurement of lung function).

### Questionnaires

A questionnaire was administered to obtain health-related information, including demographic characteristics, residential history, occupational history, behavior patterns that relate to asbestos exposures, and self-reports of illnesses of interest to the community or possibly related to asbestos exposure.

### Chest Radiographs

For adults, the medical test of choice for identifying asbestos-related changes in the parenchyma and pleura of the lungs is the chest radiograph. The advantages include ready availability, low cost, and low radiation dose compared with other techniques [McLoud 1992]. Screening for asbestos-related abnormalities is usually done with a posterior-anterior (P-A) view, or with P-A *and* lateral views. However, physicians treating patients from Libby with asbestos-related pulmonary abnormalities had reported a predominance of pleural disease. Therefore, after consultation with experts in pulmonary medicine, the lateral chest view was replaced with two oblique views, to improve the test's sensitivity for detecting pleural abnormalities.

Chest radiographs for participants 18 or more years of age included posterior-anterior (P-A), right anterior-oblique, and left anterior-oblique views. For safety purposes, women of childbearing age were informed that they should postpone receiving a chest radiograph if they were pregnant. Chest radiograph was not offered to participants under 18 years of age. The equipment and procedures used to obtain the chest radiographs complied with guidelines developed by NIOSH [Sargent 1982]. The radiologist on site assessed the consistency and quality of each chest

radiograph taken and provided a routine, clinical, radiologic interpretation, which included recording asbestos-related changes on a summary report form. If findings on a chest radiograph suggested the need for immediate medical attention, the on-site radiologist completed a referral form, and the participant was counseled and directed to an appropriate source of medical care.

In addition to evaluation and interpretation by the on-site radiologist, participants' radiographs were evaluated by three physicians who are nationally recognized experts in asbestos-related conditions, as well as certified "B-readers," physicians certified by NIOSH as qualified to interpret radiographs for environmental dust-related diseases. Each B-reader independently examined the chest radiographs to classify them with respect to parenchymal and pleural abnormalities associated with exposure to mineral dusts that cause pneumoconiosis. The classification standards used are those set by the 1980 protocol of the International Labour Office of the World Health Organization (ILO) [ILO 1980]. Because some variability in interpretation of the same radiograph can occur among trained B-readers, researchers often choose to have radiographs reviewed by multiple radiologists who are certified B-readers. Two primary B-readers independently reviewed the chest radiographs taken on participants in the medical testing. The third B-reader independently read each radiograph that had different interpretations by the first two B-readers. The physicians recorded their interpretations on a standard form (developed by the ILO for recording B-readers' interpretations), which was modified to record the results of the oblique-view chest radiographs.

### Spirometry

Spirometry testing provides a safe, well standardized, objective measurement of lung function, and it was offered to all participants, including those less than 18 years of age. The spirometric tests recorded (a) the forced expiratory volume in 1 second (FEV1); (b) the volume that can be expired after a maximal inhalation, typically called the forced vital capacity (FVC); and (c) their

calculated ratio (FEV1/FVC).

The two major types of abnormal ventilation identified by spirometry are called restrictive and obstructive patterns. The obstructive pattern results from decreases in expiratory flow rates. Additionally, both FEV1 and the FEV1/FVC ratio are both decreased. Examples of obstructive diseases are asthma, chronic bronchitis, and emphysema. The restrictive pattern results from decreases in pulmonary air volumes associated with parenchymal disease (as in sarcoidosis or pneumoconiosis) or extraparenchymal disease (as with neuromuscular or chest-wall disorders). In this pattern, the FVC is typically reduced, although the FEV1/FVC could remain normal. Patients with asbestos-related pulmonary impairment typically demonstrate restrictive abnormalities on spirometry testing.

Spirometry testing followed the American Thoracic Society's guidelines and was performed by a qualified technician. Established procedures were followed to ensure correct technique, calibration methods, and maintenance. Qualified medical oversight was established to monitor the test results, to ensure the quality of the results and validity of interpretations. The results were compared with normative population data on the basis of the participant's age, height, and sex.

**Procedures Used for Data Analyses**

This medical testing program was designed to identify participants with asbestos-related abnormalities and to refer them for diagnosis and follow-up treatment by private practitioners. The program was not a formal epidemiologic study with comparison groups and random samples. Nevertheless, the data collected provides important information about the prevalence and degree of asbestos-related abnormalities among Libby residents, and about the possible relationships between these abnormalities and each of the several exposure pathways evaluated.

The key outcome variable in this report is the presence of asbestos-related abnormalities on chest radiographs. The presence of abnormalities was classified in two ways (1) abnormalities identified by at least one physician and (2) abnormalities identified by at least two of three B-readers. The second classification is more stringent and also added the requirement that the abnormality was likely related to asbestos. The second classification typically is used in epidemiologic studies of asbestos-related disease. In this analyses, several case definitions were considered on the basis of whether (a) the results were to be used for epidemiologic characterization or clinical referral, (b) the abnormality was interstitial or pleural, and (c) the chest radiograph view used for classification was P-A, oblique, or a combination of these. Other adverse health effects considered were self-reported conditions, malignant outcomes associated with asbestos exposure (such as cancer abnormalities), and restrictive abnormalities (based on the pulmonary function test evaluations). Information is also included in this report that shows the number and proportion of participants with self-reported conditions associated with asbestos. The objective of the data analyses was to characterize the proportion of participants with various health outcomes within exposure. categories in the population tested. In addition, important associations between these health outcomes and the participants' exposure histories were sought.

Questionnaire and chest radiograph data were merged to create a computerized master file that contained demographic data, environmental exposure data, self-reported health data, and medical testing data. The data used for the analyses was interim data for 1,078 study participants. The key risk factors considered were the various exposure pathways (including variables related to occupational exposure), household contact with someone who had occupational exposure, activities thought to have increased the potential for exposure, and other behaviors that involved contact with vermiculite.

For this preliminary analysis, six exposure groups were defined for the 1,078 participants. Group 1 consisted of those 127 (12%) participants who worked at W.R. Grace Company either as a worker or a secondary contractor. Group 2 consisted of 116 (11%) participants who reported occupational exposure to vermiculite but did not work at W.R. Grace Company. Group 3 consisted of 177 (16%) participants who reported being in household contact with a W.R. Grace worker but were otherwise never occupationally exposed. Group 4 consisted of 558 (52%) participants who indicated that they had some form of exposure through recreational activities (e.g. played in vermiculite piles) but were never occupationally exposed to vermiculite nor had household contact with a W.R. Grace worker. Group 5 consisted of 34 (3%) participants who were excluded from Groups 1 through 4 but had lived in a residence containing vermiculite insulation. Group 6 consisted of 53 (5%) of the remaining participants who had no apparent exposure. Although the latter group is composed of participants with no apparent, specific exposure to vermiculite, this group might have had other exposures to vermiculite which were not evaluated in this analysis.

Finally, basic demographic variables and other factors were examined. These included the following: age; sex; smoking status; history of pulmonary disease, lung cancer, autoimmune disease; and various other self-reported health conditions.

## RESULTS

*For this interim report, the analyses were restricted to basic descriptive measures (means, counts, and percentages). It is important to note that the results derived from the interim data might not be representative of results that will be obtained for the complete data set.*

The interim data set was comprised of 1,078 study participants. Of these, 159 were less than 18 years of age, so no chest radiographic tests were conducted. Fourteen study participants were missing complete exposure data, therefore their data is excluded in the exposure groups in the tables that follow. Table 1 summarizes participants' exposure histories, by age group. The largest age group represented was for participants aged 45–64 years.

Table 1. Vermiculite Exposure, by Age Group

|  | 0–18 years | 18–45 years | 45–65 years | 65+ years |
|---|---|---|---|---|
| All exposure groups (1,078) | 159 (15%) | 292 (27%) | 449 (42%) | 178 (17%) |
| WRG* workers & secondary contractors (127) | 0 (0%) | 21(17%) | 75 (59%) | 31 (24%) |
| No WRG occupational contact (116) | 1 (1%) | 43 (37%) | 51 (44%) | 21 (18%) |
| Household contact (177) | 10 (6%) | 61 (34%) | 76 (43%) | 30 (17%) |
| Recreational (558) | 123 (22%) | 155 (28%) | 211 (38%) | 69 (12%) |
| Residential insulation (34) | 6 (18%) | 5 (15%) | 14 (41%) | 9 (26%) |
| No apparent exposure[†] (53) | 16 (30%) | 5 (9%) | 18 (34%) | 14 (26%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
[†]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Table 2 summarizes the exposure history of participants, by sex. Of the 1,078 participants, 509 (47%) were male, and 569 (53%) were female. Males were much more likely to have potential occupational exposure to vermiculite at the W.R. Grace Company. Eighty-six percent of W.R. Grace workers and secondary contractors were male. In contrast, 76% of those reporting household contacts were female. Sixty-four percent of those reporting no apparent exposures (as defined for this analysis) from occupational, recreational, or household contact were female.

**Table 2.  Vermiculite Exposure Groups, by Sex**

|  | Male | Female |
|---|---|---|
| All exposure groups (1078) | 509 (47%) | 569 (53%) |
| WRG* workers & secondary contractors (127) | 109 (86%) | 18 (14%) |
| No WRG occupational contact with vermiculite (116) | 81 (70%) | 35 (30%) |
| Household contact (177) | 43 (24%) | 134 (76%) |
| Recreational (558) | 239 (43%) | 319 (57%) |
| Residential insulation (34) | 13 (38%) | 21 (62%) |
| No apparent exposure[†] (53) | 19 (36%) | 34 (64%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
[†]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Tables 3 and 4 summarize participants' radiographic outcomes by exposure group classification.

Table 3 summarizes the number and the proportion of participants who had a lung abnormality in

their chest radiographs identified by at least one of the four physicians. Although these

abnormalities can not be assumed to be asbestos related, the information provides the number of

participants who were referred to their private physicians for additional evaluation. (Other

participants were referred for physician evaluation for non-asbestos related changes and are not

described in this report.) Thirty percent of all participants were referred for a pleural abnormality

and 7% for an interstitial abnormality. The proportion was highest among participants reporting

to be former W.R. Grace workers and secondary contractors, with 50% having pleural

abnormalities and 15% having interstitial abnormalities. In contrast, the proportion of participants

in the other five groups with pleural abnormalities ranged from 21% to 33%.

**Table 3.  CXR[*] Abnormalities (Observed by at Least One Physician), by Exposure Group**

|  | Pleural<br>All Views | Interstitial<br>P-A[†] View |
|---|---|---|
| All exposure groups (919) | 276 (30%) | 60 (7%) |
| WRG[‡] workers & secondary contractors (127) | 63 (50%) | 19 (15%) |
| No WRG occupational contact with vermiculite (115) | 38 (33%) | 11 (10%) |
| Household contacts (167) | 49 (29%) | 8 (5%) |
| Recreation (435) | 107 (25%) | 16 (4%) |
| Residential insulation (28) | 6  (21%) | 1 (4%) |
| No apparent exposure[§] (37) | 10  (27%) | 3 (8%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
†P-A = Posterior-anterior.
CXR = Chest radiograph.
‡WRG = W.R. Grace Company.
§No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Table 4 summarizes the number and proportion of participants having a possible asbestos-related interstitial or pleural abnormality identified on the chest radiograph by at least two of the three B-readers (the definition used by researchers for epidemiologic studies). This table presents results for three differing chest radiographic views for pleural abnormalities (i.e., "all Views", "P-A View", "Oblique View") and one chest radiographic view of interstitial abnormalities ("P-A View") for each of the exposure groups.

The abnormalities reported in Table 4 must have been observed by at least two certified B-readers. Consistency of the two reviewers was defined as both reviewers reporting the presence of pleural changes or the presence of interstitial fibrosis with a profusion level of 1/0 or greater (ILO classification). This criteria provided a greater level of significance to the findings when at least two of the certified reviewers agreed to the presence of an abnormality and agreed that the abnormality was consistent with a pneumoconiosis. This criteria is commonly used in health

-14-

surveys and epidemiologic studies. It provides an epidemiologic definition, but it is not a clinical criteria for diagnosis. Although not a clinical diagnosis, these data provide a better estimate of asbestos-related abnormalities.

**Table 4.  CXR*Abnormalities (Identified by at Least Two B-Readers), by Exposure Group**

|  | Pleural, all views | Pleural, P-A[†] view | Pleural, oblique view | Interstitial, P-A[†] view |
|---|---|---|---|---|
| All exposure groups (919) | 170 (19%) | 137 (15%) | 103 (11%) | 11 (1%) |
| WRG[‡] workers & secondary contractors (127) | 47 (37%) | 37 (29%) | 26 (20%) | 6 (5%) |
| No WRG occupational contact with vermiculite (115) | 21 (18%) | 16 (14%) | 12 (10%) | 2 (2%) |
| Household contact (167) | 33 (20%) | 31 (19%) | 20 (12%) | 1 (1%) |
| Recreational (435) | 58 (13%) | 45 (10%) | 40 (9%) | 1 (0%) |
| Residential insulation (28) | 4 (14%) | 4 (14%) | 1 (4%) | 0 (0%) |
| No apparent exposure[§] (37) | 5 (14%) | 3 (8%) | 2 (5%) | 0 (0%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*CXR = chest radiograph.
[†]P-A = posterior-anterior view.
[‡]WRG = W.R. Grace Company.
[§]No apparent exposure (non-WRG worker, no household contact, no recreational contact).

The typical radiologic evaluation under the ILO classification uses only one chest radiograph, the back-to-front, or posterior-anterior (P-A) view. This testing program included left and right oblique views to evaluate pleural disease. Only the P-A view was used to evaluate interstitial disease as the pathology is best observed in that view. The proportion of participants with pleural abnormality is provided by the P-A view alone, the oblique views alone, and all views combined, as reported in Table 4. If these proportions are to be compared to other surveys using the ILO system, the best parameter for comparison is the proportion of pleural abnormalities in P-A views.

Nineteen percent of all participants had pleural abnormalities identified on their chest X-rays. Most of the pleural abnormalities were observed in the P-A view, but 30 participants had pleural

-15-

changes observed on the oblique views which were not observed on their P-A views. Again, former W.R. Grace workers and secondary contractors had a higher prevalence of chest radiographic abnormalities for every view, when compared with other exposure groups (statistical significance not evaluated). The two groups classified as "No WRG occupational contact with vermiculite" and "Household contacts" had a similar prevalence of abnormalities which varied by chest radiograph view. Although the prevalence of abnormalities for groups classified as "Residential insulation" and "No apparent exposure" ranged up to 14%, depending on the view, one must be especially cautious about these findings given the small size of the groups. In contrast, interstitial abnormalities were observed only in 11 participants, or 1% of the total number (919) of participants who received chest radiographs.

Table 5 summarizes restrictive abnormalities identified in the pulmonary function tests, by exposure group. Moderate-to-severe changes are defined as a forced vital capacity that is less than 70% of predicted value. This does not include participants who had significant obstructive lung changes, in whom restrictive changes could not be evaluated. Participants who reported they were former workers at W.R. Grace Company, either directly or as secondary contractors, had the highest percentage of restrictive abnormalities of all exposure groups. As with the interstitial changes seen on the chest radiographs, the number of participants with moderate-to-severe restrictive function was much lower.

Table 5.   Restrictive Abnormalities in Pulmonary Function, by Exposure Group

|  | Moderate-to-severe restrictive abnormalities (less than 70% of predicted values) |
|---|---|
| All groups (627) | 10 (2%) |
| WRG* workers & secondary contractors (90) | 5 (6%) |
| No WRG occupational contact with vermiculite (73) | 1 (1%) |
| Household contact (114) | 1 (1%) |
| Recreational (309) | 3 (1%) |
| Residential Insulation (14) | 0 (0%) |
| No apparent exposure† (22) | 0 (0%) |

Note: Percentages may not total 100 due to rounding. Participants with incomplete records may not be included in some distributions.
*WRG = W.R. Grace Company.
† No apparent exposure (non-WRG worker, no household contact, no recreational contact).

Participants' smoking history and self-reported respiratory symptoms also were examined by exposure groups. Forty-nine percent of study participants reported having smoked cigarettes at some time during their life. Sixty-eight percent of W.R. Grace workers reported having smoked cigarettes, compared with 32% in the "No apparent exposure" group. Sixty-six percent of W.R. Grace workers and secondary contractors reported having had pulmonary disease, compared with 32% in the "No apparent exposure" group. Nine percent of all participants reported having "arthritis, lupus, or scleroderma." The proportion of W.R. Grace workers reporting this condition was 12%, and it was 11% in the "No apparent exposure" group. Additionally, 14% of participants who had been W.R. Grace workers reported having had chest surgery, whereas no more than 5% in any of the other groups reported chest surgery.

Cancer abnormalities also were examined. Thirteen participants had lesions that might be cancer. The percentage of cancer abnormalities was 2% (2 cases) among W.R. Grace workers and 3% (1 case) in the participants with no apparent, specific route of exposure.

-17-

## DISCUSSION

Because this is an interim report based upon preliminary data, interpretations of the information need to remain limited. There could be many ways in which this preliminary data might not be a truly representative sample of the entire tested population, so the final rates of abnormalities are likely to change when the final data are analyzed.

An important finding was that 19% of the participants had pleural abnormalities (which were independently observed by two of the certified B-readers). Former W.R. Grace workers had the highest rate of pleural abnormalities (37%) which is, unfortunately, consistent with previous studies and reports.

Thirty-seven (20%) of household contacts of former W.R. Grace workers had pleural abnormalities. Even though the proportion of household contacts with identified pleural abnormalities could change, this finding causes concern, as it might represent an important historic pathway of exposure to asbestos by community residents. The proportion of pleural changes observed in the other exposure groups evaluated is 13% for those who reported contact with vermiculite during recreational activities, 14% for those who only had vermiculite insulation in their residences, and 14% of those with no apparent pathways of exposure. These rates are similar, and they could indicate a background rate for participants with neither occupational nor household-contact exposure. Unfortunately, no directly comparable Montana or U.S. population studies are available to estimate the rate of pleural abnormalities among those in Libby with no work-related exposures. Studies of differing groups within the United States believed to have no substantive work-related asbestos exposures have found the prevalence of pleural abnormalities ranging from 0.02% among blue-collar workers in North Carolina [Castellan 1985], to 0.9% among loggers in Washington and Oregon [Stilbolt 1991], to 1.8% among New Jersey residents

-18-

[Anderson 1979], and 2.3% among patients at Veterans Administration hospitals in New Jersey [Miller JA 1996]. Studies of household contacts of asbestos-exposed workers have reported the prevalence of asbestos-related pleural abnormalities ranging from 3.5% for household contacts of shipyard workers [Kilburn 1985], to 19% for household contacts of workers producing amosite asbestos products [Anderson 1979].

The proportion of interstitial abnormalities and moderate-to-severe restrictive changes on participants' spirometry tests is much smaller. This finding is consistent with clinical reports by physicians in the Libby area that patients frequently present with pleural abnormalities.

Thirteen participants were identified by the chest radiograph reviewers (B-readers) with an abnormality thought to be a possible cancerous lesion. These individuals were contacted and referred to their private physician. At present, ATSDR has not conducted a retrospective survey of referred participants to determine the final diagnosis or disposition of these findings.

Several illnesses were self-reported by participants of which two were of particular interest. First, respiratory disease was reported by 66% of the participants who were former W.R. Grace workers and secondary contractors, compared to 32% of participants in the "No apparent exposure" group. This may represent a greater susceptibility of these participants because of other underlying respiratory conditions, but this group also might be slightly older than other participants, so further analyses must adjust the rates for age in order to determine the importance of this finding.

Second, members of the community also requested that ATSDR report the findings for self-reported "arthritis, lupus, or scleroderma." Eleven percent of the participants self-reported these conditions. The question did not distinguish between arthritis resulting from physical degeneration

of joints (osteoarthritis), arthritis resulting from an autoimmune pathology (such as rheumatoid arthritis), or other forms of arthritis. Thus, all respondents can not be assumed to be suffering from an autoimmune pathology. In order to clarify this concern, a more specific evaluation of participants reporting these conditions would be needed. The medical literature was searched (1980 through early 2001) for published studies regarding rheumatoid arthritis, systemic lupus erythematosis (SLE), or autoimmune diseases associated with asbestosis exposure. Only a few of these studies reported any association; i.e. three cases of rheumatoid arthritis and one case of SLE were reported with pleural thickening or asbestosis. The authors did not speculate on an association. One article on SLE suggested that there might be some evidence of an epidemiologic association [Mulherin 1993]. Asbestosis has been associated with immunologic changes (hypergammaglobulinemia, anti-nuclear antibodies, and rheumatoid factor). Mulherin states "...it is interesting to speculate that asbestosis may have predisposed to the development of SLE, given the immunological derangements seen in asbestosis." Thus, at the present time, there is only limited information about the association between auto-immune diseases and asbestosis. Also, few studies have been conducted to address Mulherin's hypothesis.

## LIMITATIONS

Information obtained through systematic survey methods or medical testing programs can have many limitations. This is especially true when the information is preliminary, as in this interim evaluation. The information presented in this report represents only 1,078 (18%) participants out of 6,144 who completed the medical testing program. The proportion of participants in this interim report with observed abnormalities can not be assumed to remain the same when the testing program's total 6,144 participants is completed and the data analyzed. The medical testing program was conducted with the principal goal of providing a service-oriented screening program in the community. Therefore, methods used by epidemiologists to limit biases (sources of

influence on trends within the findings) in the cumulative information of this interim analysis were less stringent than methods used in some epidemiologic studies. No specific effort was taken to *strictly* keep all records in chronological order by testing date. Records may have changed in chronological order by handling by the hospital and local radiologist, mailing to the expert B-readers, the use of the X-rays for clinical evaluations needed before distribution to the B-readers, or by other logistical processes in the handling of records and the creation of the data file. Although participants seen earlier in the testing program are more likely to be included in the 1,078 records summarized for this interim report, they not necessarily the same ones included in this analysis. Also, because this was not an epidemiologic study, no control group was included. These limitations are important to understand in order to avoid drawing inappropriate conclusions from preliminary data.

In other testing programs, it has been observed that the identification of individuals with abnormalities is not necessarily random over time. There could be personal reasons why some individuals seek medical care earlier or why some purposely postpone testing until late in the process. Although some report that the individuals most concerned their health might seek testing earlier, this hypothesis can not be evaluated for this report.

This testing program was not an epidemiologic study. Summary information, such as that reported in this interim report, is expected to be useful for health care planning needs in the community and for understanding the scope and natural history of the illness process to provide support for local health care providers. A perspective on the magnitude of the public health problem in the Libby area can be summarized by examining the prevalence of participants with asbestos-related abnormalities, but judgements about the extent of these abnormalities above expected values are based upon few reports in the scientific literature. Because no control group was included, direct comparisons of the occurrence of abnormalities above the expected value can not be calculated.

Final estimates of the proportion of participants with asbestos-related abnormalities must await the analyses of the final, complete data for all participants. The information summarized in this interim report is primarily intended to assist the community and its public officials in documenting the need for health care planning and estimating the additional health care services that will be needed in the Libby area in the future.

## CONCLUSIONS

1.  These results summarize 1,078 participants, of which 47% were male and 53% female. The age distribution of participants was as follows: 15% were less than 18 years of age, 27% were aged 18–45 years, 42% were aged 46–65 years, and 17% were 65 or more years of age (the total of 101% is due to rounding).

2.  The number of participants who reported exposure to vermiculite included the following: 127 were W.R. Grace workers or secondary contractors, 116 had other work related contact with vermiculite, 177 had household contacts with W.R. Grace workers, 558 reported some recreational contact with vermiculite, 34 had vermiculite insulation in their residences, 53 had none of these exposures. (Participants were included in only one group on the basis of their greatest potential for exposure.)

3.  Thirty percent of participants had a pleural abnormality that was seen by at least one physician on the chest radiograph. Those individuals were informed that they should have the finding reviewed by their private physician.

4.  Nineteen percent of the participants had a pleural abnormality on their chest radiographs which was reported by at least two of the certified specialists (B-readers).

5. Pleural abnormality rates varied by exposure group: 37% of W.R. Grace workers or secondary contractors, 18% of others reporting occupational exposure to vermiculite, 20% of household contacts, 14% of those who lived in the Libby area and also reported vermiculite insulation in their residences, 16% of those who reported recreational contact with vermiculite, and 14% of other participants with no apparent exposure. (These proportions used the criteria of at least two of the three B-readers.)

6. Lung scarring (interstitial changes) and moderate-to-severe limitations in pulmonary function (restrictive changes) were much less common among the participants evaluated.

7. Lung abnormalities are being observed on the chest radiographs of participants in the medical testing program. Public officials are advised to plan accordingly for the long-term evaluation of participants exposed to vermiculite and for the care of those who may develop severe illness.

8. The findings of illness in participants with large, previously recognized exposures is consistent with clinical reports by Libby area physicians. This information is too preliminary to predict the final risk estimates for participants with lower exposure potential, such as participants with vermiculite insulation in their residences, those with infrequent past contact with vermiculite, or those who resided in the community but had no apparent exposure to vermiculite.



# ATSDR
### AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY

# Libby Medical Testing Interim Report

## February, 2001

**Background:**

The Agency for Toxic Substances and Disease Registry (ATSDR), in cooperation with the Environmental Protection Agency, the U.S. Department of Health and Human Services, the Montana Department of Public Health and Human Services, and the Lincoln County Environmental Health Department organized a community based medical testing program. The testing program was in response to reports of illness among persons exposed to asbestos contaminated vermiculite in Libby, Montana.

This testing program was a part of the **Libby Community Environmental Health Project.** The medical testing was done between July and November, 2000.

**Q. What did the medical testing program do?**

**A.** The program was designed to give each participant current information about the health of the lungs. Principal goals of the program were to identify health effects likely to be asbestos related and to refer people exposed to asbestos from the Libby vermiculite mine for additional care.

**Q. Why did ATSDR prepare this report?**

- To keep the community informed about the ongoing progress of the program.

- To help the community, public officials, and healthcare providers plan for long-term health care by estimating the magnitude of the need for future health care services.

**Q. Who was included in this report?**

**A.** This report included only 1,078 participants, or 18% of the total number of participants in the medical testing program.

- **47%** were male; **53%** were female
- **15%** were under 18 years of age
- **27%** were aged 18-45
- **42%** were aged 46-65
- **17%** were over 65 years of age.

**Q. What type of exposure to asbestos did the people included in this report have?**

**A.** A breakdown of the **1,078 participants,** according to their reported type of exposure to vermiculite shows:

- **127** are former W.R. Grace workers

- **116** had work-related contact with vermiculite

- **177** had household contacts with W.R. Grace workers

- **558** had recreational contact with vermiculite

- **34** had vermiculite insulation in their homes

- **53** had no known exposure to vermiculite.

(Participants above were listed in only one exposure category, based upon the greatest exposure potential.)

EXHIBIT _____

**Q. What are the conclusions of the interim report?**

Of the 1,078 participants

- 95% reported some contact with vermiculite
- 30% of adults tested had scarring of the chest wall seen by at least one physician on the chest x-ray
- 19% of adults tested had scarring seen by at least two of the certified x-ray specialists (B-readers) on the chest x-ray.

Each exposure group had different rates of scarring of the chest wall (seen by at least two B-readers). The number of people in each group who showed scarring were:

- 37% of WR Grace workers or secondary contractors
- 20% of household contacts
- 18% of those who reported occupational exposure to vermiculite
- 14% of those who have vermiculite insulation in their homes
- 14% of other participants
- 13% of those who had recreational contact with vermiculite.

Only 1 to 5% had interstitial changes, such as scarring of the lung tissue itself.

Only 1 to 6% had moderate to severe limits in **pulmonary function** (restrictive changes making it difficult to breathe).

**Q.  What does ATSDR recommend?**

**A.**  The chest x-rays of 30% of this small number of participants in the medical testing program showed lung abnormalities. Public health and other officials should plan for

☞ The long-term evaluation of people exposed to vermiculite, and

☞  The care of those who may develop severe illnesses resulting from vermiculite exposure.

**Q.  What are the limitations of this report?**

**A.**    The report summarizes the results of only 18% of the participants. It may not be representative of all participants. The final conclusions based on the results of all 6,144 testing participants may be very different.

# For More Information Please Contact

**Dan Strausbaugh, ATSDR Montana** representative at 406-293-2728 or 2729.

**Dan Holcomb, ATSDR** community involvement contact toll-free in Atlanta, GA at 1-888-42-ATSDR (1-888-422-8737).

**Medical Testing Program** at 1-800-439-8308. For those outside of the Libby area requesting information on their eligibility for asbestos testing.

**EPA/TSCA Hotline Service** at 202-554-1404. For information on asbestos and other toxic substances.

**ATSDR's Web Site at www.atsdr.cdc.gov**





IF YOU ARE BUILDING A HOME, don't take chances with just "insulation." Be sure of permanent, efficient performance. Select Zonolite, the material that fulfills all the requirements for good insulation.

If your present home is not insulated, don't shiver through another winter nor swelter through another summer. Let your present winter fuel dollars pay for a complete Zonolite installation ... now!

Why not talk to your lumber dealer today? He'll be glad to tell you all about it.

*Permanent For the Entire Home*

"No need for mask

...It pours...cleanly.

. . . Contains no harmful chemicals."

pounded. When insulation decomposes, absorbs moisture, becomes infested with vermin, or loses its insulating efficiency after it is installed, it may have to be removed and replaced. That means cleaning out all the old insulation, putting in new insulation, and repairing the walls or ceilings. It means a lot of trouble and expense.

The only way to be sure that this will not happen to you is to select an insulation of proved permanence. Select Zonolite Insulation. Through rigorous testing and extensive usage over many years, Zonolite has proved that it fulfills completely all of the following requirements for good insulation. No other known material can equal such a record.

1. **Dual Insulation Value** . . . Insulates both by its air cell construction and its glittering, reflective surface.
2. **Uniform Tamper-Proof Density** . . . Same density installed in the home as when it leaves the factory.
3. **Complete Fill** . . . Fills walls solidly leaving no voids. Does not "ball-up" on rough obstructions, nails, wires, or pipes. Cannot be "balled up."
4. **Light in Weight** . . . A bag can be handled easily. A 3-inch layer of Zonolite adds only 1½ pounds per square foot or ceiling.
5. **Easy to Install** . . . No need for mask, gloves, or special equipment. It pours easily and cleanly. The average house can be insulated in just a few hours.
6. **Chemically Inert** . . . Contains no harmful chemicals. Will not disintegrate nor deteriorate. Will not corrode any material. Will not stain wall or plaster. Is practically moisture-proof.
7. **Fire-proof** . . . Not merely fire "resistant." It melts at about 2400° Fahrenheit.
8. **Vermin-proof** . . . Mice, rats, insect larvae, or termites will not attack it.
9. **Rot-proof** . . . Will not decompose nor give off odors. It is a 100% mineral material.
10. **Naturally Permanent** . . . The permanence of Zonolite is not dependent upon synthetic treatments. Its inherent permanence means efficient insulation for your home forever.



EXHIBIT 3

# ZONOLITE NOW...

## Save on fuel, add comfort

## Just pour it, level it, leave it!



**ZONOLITE** Vermiculite Insulating Fill

Easiest of all to install. Just pour it, level it, leave it!

**$1.45**

per bag covers 17 sq. ft. 3" thick

V-8, Fo

## ZONOLITE INSULATING FILL



Zonolite Insulating Fill is used to insulate and sound-deaden side-walls and ceilings of all types of buildings. Zonolite Fill has one of the best insulation factors of any insulation on the market ("K" factor .28 B.t.u.).

Zonolite Insulating Fill comes in 4 cu. ft. bags which weigh about 23 lbs. No special installation equipment is needed. Zonolite Fill is poured from the bag, like popcorn. It flows readily around pipes, wiring, etc., to make a complete, uniform fill without tamping, cutting, or nailing.

Zonolite Insulating Fill is a non-conductor of electricity and can be safely installed over or around electrical wiring. It is rot-proof and does not permit tunneling or nesting by rodents. It does not attract vermin or termites. It is safe to handle because it is non-irritating to the skin and lungs.

## It is safe to handle because it is non-irritating to the skin and lungs.


EXHIBIT

EXHIBIT 4

CONFIDENTIAL

**Washington Statewide Survey**
**Preliminary Results, Sample of 286 Home Owners**
**October 19, 2000**
**Confidential**

### 1. How long have you lived in your current residence?

4.2%   Less than 1 year
11.2%  1 but less than 3
14.3%  3 but less than 5
22.7%  5 but less than 10
23.4%  10 but less than 20
24.1%  20 or more years

### 2. In which of the following age groups are you? (READ)

1.0%   18-24
10.1%  25-34
24.8%  35-44
26.2%  45-54
14.3%  55-64
23.4%  65+

### 3. Gender:

48.3%  Male
51.7%  Female

### 4. Have you ever heard of Vermiculite attic insulation?

41.6%  Yes
56.3%  No
2.1%   Don't Know

### 5. Do you think you would recognize Vermiculite attic insulation if you saw it? (Asked of those aware)

58.8%  Yes
30.3%  No
10.9% Don't Know

GMA RESEARCH CORPORATION

**EXHIBIT**
**P-155**

Barbanti v. Grace

EXHIBIT
A

EXHIBIT 5



CONFIDENTIAL

6. Have you ever heard of a brand of Vermiculite attic insulation called Zonolite attic insulation?

11.9% Yes
86.0% No
2.1% Don't Know

7. Have you seen or heard any special announcements or advisories regarding the handling or disturbance of Vermiculite attic insulation?

21.0% Yes
77.3% No
1.8% Don't Know

7.1 If Yes, what do you recall?

(Verbatims will be provided)

8. Have you seen or heard any special announcements or advisories by the Environmental Protection Agency (The EPA) concerning Vermiculite attic insulation?

8.7% Yes
88.1% No
3.2% Don't Know

8.1 If Yes, what do you recall?

(Verbatims will be provided)

9. Have you seen or heard any special announcements or advisories by the Washington State Department of Health concerning Vermiculite attic insulation?

2.8% Yes
92.3% No
4.9% Don't Know

9.1 If Yes, what do you recall?

(Verbatims will be provided)

2

CONFIDENTIAL

10. Have you received information from any source regarding the potential health hazards from Vermiculite attic insulation?

4.9%   Yes
93.4%  No
1.8%   Don't Know

10.1 If Yes, what do you recall?

(Verbatims will be provided)

11. Are you aware of any special precautions that homeowners should take if they have Vermiculite attic insulation?

11.5%  Yes
87.1%  No
1.4%   Don't Know

11.1 If Yes, what precautions?

(Verbatims will be provided)

12. Do you have access to the Internet?

65.0%  Yes
35.0%  No

13. Have you visited an Environmental Protection Agency (EPA) web site in the past 12 months?

8.1%   Yes
91.4%  No
0.5%   Don't Know

14. Have you visited the Washington State Department of Health web site in the past 12 months?

5.9%   Yes
93.6%  No
0.5%   Don't Know

3

GMA RESEARCH CORPORATION

# WASHINGTON STATE SURVEY

**Summary Report**
**October 2000**
**#24873**

## PREPARED FOR:

Lukins & Annis, PS
717 W Sprague Ave
Suite 1600
Spokane, WA 99201

## PREPARED BY:

GMA Research Corporation
Mountain Pacific Building
11808 Northup Way – Suite 270
Bellevue, Washington 98005-1922
(425) 827-1251
FAX (425) 828-6778

EXHIBIT __6__

EXHIBIT
P-177

Barbanti v. Grace

GMA RESEARCH CORPORATION

# CONTENTS

Research Objectives.................................................................................................... 1

Methodology ......................................................................................................... 3

Key Findings ..................................................................................................... 5

Data Highlights and Observations ....................................................................... 7

Sample Profile......................................................................................................28

GMRA RESEARCH CORPORATION

## RESEARCH OBJECTIVES

GMRA E S E A R C H
CORPORATION

# RESEARCH OBJECTIVES

### Research Objectives:

- To determine the public's awareness and knowledge of Vermiculite attic insulation
- To determine the public's awareness and knowledge of a particular brand of Vermiculite attic insulation, called Zonolite attic insulation.
- To measure awareness of announcements and advisories regarding Vermiculite Attic Insulation
- To measure the public's awareness of special precautions to be taken if they have Vermiculite Attic Insulation.

GMA RESEARCH CORPORATION

**METHODOLOGY**

# METHODOLOGY

## Interview Technique

Telephone interviews were conducted by GMA Research Corporation, located in Bellevue, Washington.

## Respondent Qualifications

All respondents were homeowners, residing in Washington State, 18 years of age or older.

## Sample Size

N=427.  A sample size of n=427 has a maximum margin of error of ± 5.0 percentage points at a 95% confidence level.

## Sample Source and Method

A random file of both listed and unlisted telephone numbers of people who reside in Washington State residents were contacted to complete the survey.

## Length of Interview

The average length of the interview was 6 minutes.

## Interviewing Dates and Times

Interviewing was conducted from October 18th through October 19th, 2000 during evening calling hours.

GMA RESEARCH CORPORATION

**KEY FINDINGS**

GMA **RESEARCH**
CORPORATION

## KEY FINDINGS

- More than half of the 427 people surveyed (56%), said that they had never heard of Vermiculite Attic Insulation, while (43%) said that they had heard of Vermiculite Attic Insulation before.

- Of the 183 people who said they had heard of Vermiculite Attic Insulation, (54%) said they thought they would recognize the insulation, while (35%) said that they wouldn't.

- Eighty-Five (85%) said that they had never heard of a particular brand of Vermiculite Attic Insulation, called Zonolite Attic Insulation.

- Eighty (80%) of the people surveyed, said they didn't recall hearing any announcements or advisories regarding the handling or disturbance of Vermiculite Attic Insulation.

- Almost 9 out of 10 people surveyed (88%) don't recall hearing any EPA announcements or advisories concerning Vermiculite Attic Insulation.

- More than 9 out of 10 of the people surveyed said that they hadn't heard any announcements/advisories made by the Washington State Department of Health concerning Vermiculite Attic Insulation..

- (94%) of the people surveyed said they had not received any information regarding potential health hazards associated with Vermiculite Attic Insulation.

- Close to 9 out of 10 people surveyed (89%) said they were unaware of any special precautions that Homeowners that own B=Vermiculite Attic Insulation should take.

- Two Thirds of the people surveyed (66%) said they had Internet Access.

- Of those who said they have Internet Access, only (6%) said they have visited an Environmental Protection Agency (EPA) website, while only (5%) said that they had visited the Washington State Department of Health Website in the past 12 months.

GMRA RESEARCH
CORPORATION

## DATA HIGHLIGHTS AND OBSERVATIONS

G M R A E S E A R C H
C O R P O R A T I O N

# DATA HIGHLIGHTS AND OBSERVATIONS (Continued)

- ## Awareness of Vermiculite Attic Insulation

    More than half of the 427 homeowners surveyed (56%), said that they had never heard of Vermiculite Attic Insulation, while (43%) said they had heard of Vermiculite Attic insulation.

    *Question:*    *Have you ever heard of Vermiculite Attic Insulation?*



GMRA ESEARCH CORPORATION

# DATA HIGHLIGHTS AND OBSERVATIONS

- ## Recognize Vermiculite Attic Insulation:

    Of the (43%) who said that they had heard of Vermiculite Attic Insulation, a little more that half (54%) said that they would be able to recognize Vermiculite Insulation if they saw it, while (35%) said that they wouldn't recognize vermiculite attic insulation if they saw it.

    *Question*      *Do you think you would recognize Vermiculite Attic Insulation if you saw it?*



GMA RESEARCH CORPORATION

## DATA HIGHLIGHTS AND OBSERVATIONS (Continued)

- **Ever Heard of Zonolite Attic Insulation:**

  Eighty five percent (85%) said that they had not heard of a particular brand of Vermiculite Attic Insulation, called Zonolite Attic Insulation.  While, only (11%) of the people surveyed, said that they had heard of Zonolite Attic Insulation:

  *Question*   *Have you ever heard of a brand of Vermiculite Attic Insulation called Zonolite Attic Insulation?*



G M R A E S E A R C H
C O R P O R A T I O N

# DATA HIGHLIGHTS AND OBSERVATIONS

- ## Announcements or advisories regarding the handling or disturbance of Vermiculite Attic Insulation:

About (80%) say they didn't recall hearing any announcements or advisories regarding the handling or disturbance of Vermiculite attic insulation, while, 19% do recall hearing such announcements or advisories. Those who did recall hearing the announcement or advisory were asked a follow up question of what they recall.

*Question*     *Have you seen or heard of any announcements or advisories regarding the handling or Disturbance of Vermiculite Attic Insulation*



GMA RESEARCH CORPORATION

---

- **What people recall seeing or hearing regarding the handling of Vermiculite Attic Insulation:**

---

## Verbatim Responses

It has asbestos and I saw some warning about be careful with it.

Techniques of use.

It has asbestos in it.

Some was manufactured with asbestos.

I think they said to just leave it alone.

That some of it was contaminated with asbestos.

Probably on the news.

A dangerous health hazard.

Nasty stuff.

Vermiculite is related to asbestos.

Just heard that they are having problems with it.

From TV if you have this kind of insulation don't touch it or disturb it .

No.

It has the possibility of containing asbestos.

Dangerous to your lungs.

The source said do not use it.

That it could be harmful to you especially if you breathe it.

Well, It's supposed to be harmful.

Oh, just what I have read in the paper and seen on television.

I recall it as a negative, or a problem.

It was a new product that was out.

Just what my husband has been telling me.

It has asbestos characteristics to it.

I just remember hearing about it and seeing it on TV.

I recall working with it.

You should contact an Abatement Company for removal. Most people would try to vacuum or
     shovel it and you shouldn't do that. It should be treated the same as asbestos

It has been banned, I haven't used it for a long time.

Hard on the lungs, you can get lung cancer. That's all that I know about it.

Like, it can be hazardous to your health.

I read an article about a family that worked in a Vermiculite mine, in a magazine, the family had
     cancer as a result of it.

All they talked about was soil and installation.

Don't disturb it because it has asbestos in it.

That it could contain E-coli.

That it has asbestos in it.

People were ill.

G M R A E S E A R C H
C O R P O R A T I O N

# Verbatims, Continued:

Found asbestos particles in it and that you should be aware of that fact.

That it's supposed to be hazardous.

It's a sticky wicket, you need to be careful.  I don't have it though.

There was some danger in the product of this type.

It's supposed to be dangerous but I don't know why.

Asbestos bites.

They said they had some problems when they were handling it.  They said you have to wear
gloves and a mask when you handle it.  I don't recall what all it said, it has been a long
time.  They said it is best to wear a mask when you are handling it.

Do not disturb unless wearing a mask.

Something to do about hazardous to your health.

It is in the potting soil.

It has asbestos in it.

From the news, oh boy not all that much, just that the makers were in trouble because the product
was causing cancer.

Asbestos is in older homes.

It has asbestos in it.

Don't touch it.

It has something bad in it, but it has been a long time since I have heard anything.

A News show, about how asbestos was mixed with vermiculite.

It has asbestos in it.

They contain small levels of asbestos.

It had possible asbestos.

You blow it in, and vacuum it out.

Not to mess around with it.

That it is suppose to have fibers that are dangerous, like asbestos.

It's not really good for you.

The discovery of asbestos in it.

It contains asbestos.

This was a warning about vermiculite insulation for homeowners that already have it.

That it appears to contain asbestos and is considered hazardous and can cause cancer.

That it is dangerous the way that is was packaged.

Uh, asbestos related issues.

I heard recently that vermiculite was hazardous, but not necessarily in the context of attic
insulation.

Don't let it become airborne.

Just that some of it has, uh, asbestos.

They said it was hazardous to handle, but I think it is asinine.

I don't remember.

It should be removed, that it might be dangerous, and that it is produced in Washington State.

I don't know where.  It might have been TV.

It causes respiratory problems and needs to be handled carefully.

Might have asbestos.

GMA RESEARCH CORPORATION

## Verbatims, Continued:

It goes into attics.  You need to wear a safety mask and something to protect your skin.

In the Newspaper I read it was made here in Washington.  They've got some health hazard.

I recall an article in the paper that said it was asbestos and there is something in it and if it is disturbed and you inhale the dust you are prone to a kind of lung cancer.

It was something you shouldn't have in your attic.

Just that it causes cancer.

Class action newsletter or a newspaper story is how I recognized it.  The time was the 70's but I am not sure.  It was a class action lawsuit or some sort of lawsuit.

# DATA HIGHLIGHTS AND OBSERVATIONS

- **EPA Announcement/Advisories concerning Vermiculite Attic Insulation:**

Almost 9 out of 10 people surveyed (88%), don't recall hearing any EPA announcements or advisories concerning Vermiculite Attic Insulation.  Those who did hear an EPA announcement/advisory were asked what they heard.

*Question:*    *Have you seen or heard any announcements or advisories by the Environmental Protection Agency (The EPA) concerning Vermiculite Attic Insulation?*



GMA RESEARCH CORPORATION

> • **What Environmental Protection Agency (EPA) announcement/advisories concerning Vermiculite Attic Insulation they recall?**

## Verbatim Responses

It was in a newsletter at work.

From the Montana Deal.

I don't recall what I heard, but I heard something about it.

That was what it was on the News.

That it contains asbestos.

Don't use it.  It's being removed from places.

About the asbestos.

They said it was not healthy.

I don't really know it's just bad stuff.

Precautions and necessary procedures are used in disposing of it.

No Response.

Not sure.

That it's bad.

I thought it has to do with a hazard.

Well, the fact that it is hazardous.

I seem to remember reading something in the paper regarding the EPA and vermiculite.

Don't mess with it.

It is bad.  They claim that it is cancer causing.

On television I think I saw a discussion of this type of product.

Asbestos based, be careful.

It is cancer producing.  It gathers moisture and that it goes in gardens.

No response.

Very little.

Just the same.

Possible of hazardous reoccurrence of health problems.

Caution about asbestos.

It could be unhealthy if installed in the house.

Vermiculite is a health hazard if you use it improperly.

I think it is hazardous.

It's similar to the soil.

Something about potting soil that has vermiculite.

Health hazards.

On TV.

I can't remember, there is so much BS going on.

They did not want it handled or buried or something but I think they were a bunch of
environmentalist who did not know what they were talking about.

It's strong stuff.

## Verbatims, Continued

Concerned about two or three kinds of insulation but I would check it out.
Well, make sure you don't breath it or move it.
It can cause cancer.  Get rid of it.
I don't remember.

G M R A E S E A R C H
C O R P O R A T I O N

## DATA HIGHLIGHTS AND OBSERVATIONS

- **Announcements/Advisories by Washington State Department of Health concerning Vermiculite Attic Insulation:**

More than 9 out of 10 people surveyed (92%), hadn't heard any announcements/advisories made by the Washington State Department of Health concerning Vermiculite Attic Insulation.

*Question:*    *Have you seen or heard any announcements or advisories by the Washington State Department of Health concerning Vermiculite Attic Insulation?*



GMRA ESEARCH
CORPORATION

| Announcements/Advisories from Washington State Department of Health Concerning Vermiculite Attic Insulation: |
|---|

## Verbatim Responses

Be very careful it has a chemical in it.
I heard it was also contained in potting soil.
Almost nothing.
I don't recall but do remember seeing information.
I'm not sure.
They should not be used.
Don't touch it.
If you worked out in that area you would be exposed to it and your plants can die.
Asbestos particles.
Nothing.  I'm not paying much attention.

GMRA ESEARCH CORPORATION

## DATA HIGHLIGHTS AND OBSERVATIONS

- **Received information from any source regarding potential health hazards from Vermiculite Attic Insulation:**

Ninety Four percent (94%) of the 427 people surveyed said that they had not received any information regarding potential health hazards associated with Vermiculite Attic Insulation:

*Question*      *Have you received information from any source regarding potential health hazards from Vermiculite Attic Insulation?*



I.D. NO. _____

| CONFIDENTIAL | | PRIVILEGED |

# L U K I N S  &  A N N I S, P.S.

1600 Washington Trust Financial Center · 717 W Sprague Ave. · Spokane, WA 99201-0466
**FAX NUMBER: (509) 747-2323**

## IF THERE ARE PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL:
### (509) 455-9555

| ADDRESSEE | Mr. Fabrice Vincent | Fax No. | (415) 956-1008 |
| | Lieff Cabraser Heimann & Bernstein | Telephone | (415) 956-1000 |

| FROM | Kristy Bergland | Date | July 12, 2001 |
| Pages (Including Cover Sheet) | 31 | Client No. | 19572-011 |
| Return to | Samantha | | 544 |
| | Name | | Ext. |

**MESSAGE:**

Pursuant to your request, attached are exhibits 3 and 6-12 from the draft Informational Brief. Please let me know if you want these federal expressed out tonight, or if you need the videotapes references in the Hurst and Hatfield Affidavits.

# THIS IS PART 2 OF 6

Sent By:  Samantha

\\SPOKANE\VOL2\DWS\CLIENT.DWS\GRACE BANKRUPTCY\ADMIN\FABRICE FAX 071201.DOC  7/12/01

THIS FAX CONTAINS CONFIDENTIAL, PRIVILEGED INFORMATION INTENDED ONLY FOR THE ADDRESSEE. DO NOT READ, COPY, OR DISSEMINATE IT UNLESS YOU ARE THE ADDRESSEE. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US (COLLECT) AT (509) 455-9555 AND MAIL THE ORIGINAL MESSAGE VIA U.S. POSTAL SERVICE TO US AT THE ABOVE ADDRESS.

SPOKANE ● COEUR d'ALENE ● MOSES LAKE

> **•  Received information from any source regarding potential health hazards from Vermiculite Attic Insulation:**

## Verbatim Responses

An article on the Internet when I was surfing around.

The asbestos contamination.

I read it in the paper and saw it on television.

It is poor for your health, and for the environment.

Just that they explained all about it in the newspaper.

From the newspapers sighting the incidents of people that have been harmed, physically from breathing vermiculite.

People disturbing the attic insulation and becoming ill on the news.

We don't have it.  Illnesses associated with asbestos particles.  I wondered whether it was just in the insulation or in the vermiculite used in the soil.

I don't know.

It is bad.

The information I saw, I believe, it was a package of it but it has been a long time so I don't recall a lot of it.  We are talking about the last time that I saw any of that stuff, it was 20 years ago.  I don't know where, thinking... it might have..., I really don't know.

From the news.

I heard it was found in playground sand and was recalled.

The asbestos is in the product.

It was on the TV news.

Gave descriptions of the product by special handling.

Don't know.

GMRA RESEARCH CORPORATION

## DATA HIGHLIGHTS AND OBSERVATIONS

- **Special Precautions Homeowners that own Vermiculite Attic Insulation should Take**

Close to 9 out of 10 people surveyed (89%), said that they were unaware of any special precautions that Homeowners that have Vermiculite Attic Insulation should take.

*Question*        *Are you aware of any special precautions that homeowners should take if they have Vermiculite Attic Insulation?*



GMRA E S E A R C H
CORPORATION

| • **Special Precautions Homeowners that own Vermiculite Attic Insulation should Take** |
|---|

# Verbatim Responses

Don't move it.  If you want to take it out of your house hire someone to do it.

Mask and gloves.

You shouldn't handle it or breathe it.

If you don't know what's in it don't disturb it, and have it tested.  Don't disturb it or it might
    break down.

Have it removed professionally.

Have it removed professionally.

I think what I've heard is that if you do remove it, it should be done professionally and be
    removed properly.

Don't spray it around a working stove, it's suppose to be flame retarding.

Not to disturb it and if you have it removed you should have special people come in and do it.

Call somebody.

Windows should be open or the house should have air circulation.

I learned from my husband that I should cover up my whole body and wear a face mask if I were
    handling it or were around vermiculite insulation.

Don't disturb it.

All depends on what your doing.

Should wear gloves, mask, and hair protection.

I don't know the procedures as they are spelled out.  I do recall reading about it in the Tacoma
    paper.  But Abatement Company should be contacted.

Get an approved person to take it out, as with asbestos.

Don't mess with it.

Leave it alone.

Wear a mask, paper suit, plastic boots, and shower off after use.

Get it taken out by someone else.

Yes, I guess they should get rid of it.

Other than wear respirator type mask, no.

You don't get in it you wear a respirator.

They should know what they are doing.

That there is potential of contamination.

Have a mask, and gloves when you're putting it in.

Yes, don't disturb it; especially in it's dry form.

Gloves and facemask.

Dad said don't mess with it, you could get glass in your lungs.

Stay as far away as possible.

I suppose get it removed by calling a professional.

Do not go near or disturb it.

GMA RESEARCH
CORPORATION

# Verbatims Continued

Get rid of it; seal off the attic from the rest of the house.

Just don't disturb it.

I've heard that about Vermiculite itself. It's not necessarily the attic insulation.

I just know them.

Not to disturb it or breathe it.

Houses built in a certain period of time may have it but do not remove it.

Don't mess with it or breath it.

You should not disturb it.

I would image it would follow any other but wear a mask, eye protection and proper clothing. Long sleeve shirts, pants, and collar up your neck if possible. Just what I learned from over the years of watching TV and reading.

Don't handle it. It was a newspaper story you see now an again but it wasn't a different mail piece. Don't disturb it was my recollection some sort of asbestos fiber. I'm thinking that there was a remedy to completely take it out.

GMRA RESEARCH CORPORATION

# DATA HIGHLIGHTS AND OBSERVATIONS

- **Internet Access:**

Two Thirds (66%) of the people surveyed mentioned having access to the Internet.

*Question:*     *Do you have access to the Internet?*



GMA RESEARCH CORPORATION

## DATA HIGHLIGHTS AND OBSERVATIONS (Continued)

- ### Visited an Environmental Protection Agency (EPA) website in past 12 months

   More than 9 out of 10 people surveyed (93%), who said they had Internet access, said they hadn't visited an EPA website in past 12 months.

   *Question*    *Have you visited an Environmental Protection Agency (EPA) Web Site in the past 12 months?*



GMRA E S E A R C H
CORPORATION

## DATA HIGHLIGHTS AND OBSERVATIONS (Continued)

- **Visited Washington State Department of Health Website in past 12 months:**

More than 9 out of 10 people surveyed (95%). Who have Internet access,
Said they hadn't visited the Washington State Department of Health Website
in past 12 months.

*Question*    *Have you visited the Washington State Department of Health Web Site in the past 12 months?*



G M R A E S E A R C H
                C O R P O R A T I O N

**SAMPLE PROFILE**

G M R A E S E A R C H
C O R P O R A T I O N

## SAMPLE PROFILE

- **How long residing at current residence:**

Twenty four % (24%) of people surveyed said that they have lived in their current residence for 10-20 years.  Twenty three % (23%) mentioned they have lived in their current residence for 20 years or longer, while twenty one (21%) mention that they've lived in their current residence for 5-10 years.

*Question:      How long have you lived in your current residence?*



G M R A  E S E A R C H
C O R P O R A T I O N

## SAMPLE PROFILE

- ### Age of respondents interviewed?

Almost Thirty percent (28%) said that they were between the ages of 45-54, while twenty three percent (23%) said they were between the ages of 35 and 44. Twenty one percent said they were 65 years of age or older.

*Question:* **Into which of the following age groups are you?**



GMRA RESEARCH CORPORATION

# SAMPLE PROFILE

- ## Gender of people interviewed:

Fifty three % (53%) of the people surveyed were females, while (47%) of the people surveyed were males.

*Question*        *Record Gender*



GMA RESEARCH CORPORATION

**FILE NO.: 9A07FC5**

1    SUPERIOR COURT OF THE STATE OF WASHINGTON

2          FOR SPOKANE COUNTY

3          - - -

4  MARCO BARBANTI, individually and  )
    on behalf of a class of all others )
5  similarly situated,  )
          )
6          Plaintiff,  )
          )
7       vs.  ) No. 00201756-6
          )
8  W.R. GRACE & COMPANY-CONN (a  )
    Connecticut corporation); W.R. GRACE )
9  & COMPANY (a Delaware corporation); )
    W.R. GRACE & CO., a/k/a GRACE, an  )
10  association of business entities;  )
    SEALED AIR CORPORATION (a  )
11  Delaware corporation); and WILLIAM )
    V. CULVER, resident of the State of )
12  Washington,  )
          )
13          Defendants.  )
          )

14

15          DEPOSITION OF

16          RONALD L. MORGAN

17          SEATTLE, WASHINGTON

18          NOVEMBER 15, 2000

19

20
    ATKINSON-BAKER, INC.
21  CERTIFIED SHORTHAND REPORTERS
    330 North Brand Boulevard, Suite 250
22  Glendale, California 91203
    (818) 551-7300
23
    REPORTED BY:  JEANNE' E. COLE, CA CSR No. 8970;
24          WA CSR No. CO-LE-*J-E367LM

25  File No:  9A07FC5

EXHIBIT 7    1

1   vermiculite attic insulation.  And 9 out of 10, rounded,

2   don't recall hearing any EPA announcements or advisories

3   concerning vermiculite attic insulation.

4         And, similarly, 9 out of 10 that we surveyed said

5   that they hadn't heard any announcements or advisories made

6   by the Washington State Department of Health concerning

7   vermiculite attic insulation.

8         And then, more than that, 94 percent of the people

9   surveyed said that they had not received any information

10   regarding potential health hazards associated with

11   vermiculite attic insulation.

12         Nine out of 10 people that the home owners we

13   surveyed said that they were unaware of any of special

14   precautions that home owners that -- basically, any special

15   precautions that home owners should take regarding

16   vermiculite attic insulation.

17         That equals is a typo in the report.

18         Two-thirds of the people surveyed said that they

19   had Internet access that we saw.  Of those that had Internet

20   access, 6 percent said they had visited an EPA site in the

21   last 12 months.  Five percent said they had visited a

22   Department of Health web side.

23         So those are the summaries of observation

24   contained in the summary report.

25         Q.   Given the original purpose of your survey, what

1   conclusions do you draw from these key findings?

2        A.   Certainly, looking at it from the standpoint of

3   awareness, that there is very little awareness regarding the

4   recall of or basically hearing any announcements or

5   advisories regarding the handling or disturbance of

6   vermiculite.  80 percent of the people that we surveyed said

7   they didn't recall any.  So that's very high.  Or very low

8   awareness, measuring on the basis of awareness.  Even more

9   so with the EPA announcements or the Department of Health,

10  Washington State Department of Health, that very few people

11  were aware or thought they were aware of any announcement.

12  And even fewer people said that they had received any

13  information.  So, certainly, there was very low awareness

14  out there and very low recall regarding these particular

15  topics.

16            MR. TURKEWITZ:  I have no further questions.

17            THE COURT:  Counsel.

18            MR. CAMERON:  Your Honor, Doug Cameron of the Reed

19  Smith Law Firm on behalf of Grace.  May I approach the

20  witness to make sure that the exhibits that I'm using are in

21  our notebook?

22            THE COURT:  Certainly.

23                      CROSS EXAMINATION

24  BY MR. CAMERON:

25        Q.   Morning, Mr. Morgan.

ORIGINAL FILED
DEC 19 2000
SUPERIOR COURT
SPOKANE COUNTY, WA

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

| | |
|---|---|
| MARCO BARBANTI, individually and on behalf of a class of all others similarly situated,<br><br>                                    Plaintiff,<br><br>        v.<br><br>W.R. GRACE & COMPANY-CONN (a Connecticut corporation); W.R. GRACE & COMPANY (a Delaware corporation); W.R. GRACE & CO., a/k/a GRACE, an association of business entities; SEALED AIR CORPORATION (a Delaware corporation); and WILLIAM V. CULVER, resident of the State of Washington,<br><br>                                    Defendants. | NO. 00-2-01756-6<br><br>CLASS ACTION<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION PURSUANT TO CR 23(b)(2)<br><br>Motion No. 1 |

1. BASIS

THIS MATTER came before the Court for hearing on the 21st day of September, 2000, on Plaintiffs' Motion for Class Certification. All parties were represented by counsel.

In deciding the Motion, the Court considered the oral argument of counsel together with the documents identified in the attached Memorandum Decision.

2. FINDINGS

This Court issued its written Memorandum Decision on this matter on November 28, 2000, and the Court hereby adopts its findings and ruling issued on that date. The Memorandum

ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION PURSUANT TO CR 23(b)(2): 1
(Motion No. 1)

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99204-0466
(509) 455-9555

J:\DWS\CLIENT DWSLJBB\YIWA ZONOLITE INSULATION\PLEADINGS\ORDERCLASSCERT.DOC (7/19/01)

EXHIBIT B

Decision is attached to this Order and fully incorporated herein by reference. In particular, the Court expressly finds:

1). That the numerosity requirement has been met based on the evidence presented;

2). That named plaintiff's claims present questions of law and fact common to the class;

3). That the claims of the above-named plaintiff are typical of the claims of the class he seeks to represent;

4). That named plaintiff and his counsel can fairly and adequately represent the interests of the class; and

5). That the action brought by plaintiff is equitable in character and is properly certified under Civil Rule 23(b)(2).

### 3. ORDER

THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' Motion is Granted and that this action may be maintained as a class action pursuant to CR 23 and its subdivision CR 23(b)(2) with respect to the claims asserted in the Class Action Complaint against W. R. Grace & Company-Conn., W. R. Grace & Company, W. R. Grace & Co., a/k/a Grace, an association of business entities, Sealed Air Corporation, and William V. Culver. (The Court has not made a finding as to the existence or non-existence of the entity sued as "W.R. Grace & Co. a/k/a Grace, an association of business entities").

The Class shall be composed of and defined as: All owners or occupiers of real property located in the state of Washington in which Zonolite Attic Insulation has been installed.

DONE IN OPEN COURT this 19th day of December , 2000.

KATHLEEN M. O'CONNOR
_____
KATHLEEN M. O'CONNOR
JUDGE

ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION PURSUANT TO CR 23(b)(2): 2
(Motion No. 1)

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99201-0466
(509) 455-9555

I:\DWS\CLIENT DWSI\HHY\WA ZONOLITE INSULATION\PLEADINGS\ORDERCLASSCERT.DOC 12/19/00

1

2   Presented by:
    LUKINS & ANNIS, P.S.

3

4

5   By:
    DARRELL W. SCOTT, WSBA# 20241
    Attorneys for Plaintiff

6   Approved as to Form and Notice

7   Of Presentment Waived:

8   PERKINS, COIE, LLP

9

10  By:  Approved telephonically by V.L. Woolston 12/19/00

11     V. L. Woolston, Jr., WSBA #9453
       Rocco N. Treppiedi, WSBA #9137

12     Attorneys for Defendants Grace

13

14  PAINE, HAMBLEN, COFFIN, BROOKE & MILLER

15

16  By:  Approved telephonically by David Broom 12/19/00

17     Donald G. Stone, WSBA #7547
       David L. Broom, WSBA #02096

18     Attorneys for Defendants Sealed Air Corporation

19

20

21

22

23

24

25

26

ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION PURSUANT TO CR 23(b)(2):  3
(Motion No. 1)

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99201-0466
(509) 455-9555

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

MARCO BARBANTI, ETAL,                )
                                     )   Case No.: No. 00-2-01756-6
          Plaintiff,                 )
                                     )
     vs.                             )   MEMORANDUM DECISION (MOTION #1)
                                     )
W. R. GRACE & CO. ETAL,              )
                                     )
          Defendant                  )
_____)

This matter came before the court for oral argument on September 21, 2000, on Plaintiffs' Motion for Class Certification Pursuant to CR 23(b)(2). The following pleadings were considered by the court:

1.  Plaintiffs' Motion for Class Certification Pursuant to CR 23(b)(2)

2.  Brief in Support of Class Certification

3.  Declaration of Kristy L. Bergland

4.  Declaration of Richard S. Lewis

5.  Declaration of Allan M. McGarvey

6.  Affidavit of Darrell W. Scott

7.  Declaration of Fabrice Vincent

8.  Declaration of Edward J. Westbrook

9.  Plaintiffs' Supplemental Submission in Support of Class Certification

10. Declaration of Fabrice N. Vincent and attachments thereto

11. Grace Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification Pursuant to CR 23(b)(2) and 23(b)(3)

12. Declaration of Rocco N. Treppiedi and attachments thereto

MEMORANDUM DECISION (MOT. #1): 1

13. Affidavit of Donald J. Hurst (submitted by Plaintiffs in support of the application for
Preliminary Injunction and submitted by Defendants' in support of their opposition to
Plaintiff's Class Certification motion) and attachments thereto

14. Defendant Sealed Air Corporation's Joinder in Grace's Argument and Brief in Opposition to
Plaintiffs' Motion for Class Certification Pursuant to CR 23(b)(2) and 23(b)(3)

15. Plaintiffs' Reply in Support of Motion for Class Certification.

## STATEMENT OF FACTS

Plaintiff Barbanti brings this action on behalf of a purported class of all owners and occupiers of real property located in the State of Washington in which Zonolite Attic Insulation has been installed.  Defendants' are alleged to be the manufacturers of this product.  The claims asserted include product liability claims under the Washington Products Liability Act (WPLA), RCW 7.72 and violations of the Consumer Protection Act (CPA), RCW 19.86.

Plaintiffs' are seeking injunctive relief as well as compensation for property damage suffered by class members.  Plaintiffs are not seeking compensatory damages for any illness a class member may have contracted as a result of exposure to Zonolite Attic Insulation nor are they seeking to establish a medical-monitoring regime.

## DISCUSSION

In Washington the process of class certification is governed Civil Rule CR 23.  At the outset the plaintiffs must demonstrate that they meet the four requirements of CR 23(a):

> One or more members of a class may sue or be sued as representative
> parties on behalf of all only if (1) the class is so numerous that joinder
> of all members is impractical; (2) there are questions of law or fact
> common to the class; (3) the claims or defenses of the representative

1        parties are typical of the claims or defenses of the class, and (4) the

2        representative parties will fairly and adequately protect the interests

3        of the class.

4        Subsection one is known as "numerosity". The only evidence presented with respect to

5   this section was plaintiffs' reference to a 1985 EPA publication which estimated Zonolite was

6   installed in 900,000 homes between 1974 and 1984. From that number plaintiffs' estimate at

7   least 18,800 Washington homes may contain this insulation. Plaintiffs' argue this is a

8   conservative number as this product was on the market for many years. The defendants' did not

9   challenge this number. The numerosity requirement has been met.

10       Subsection two is known as "commonality" and requires evidence questions of law or

11  fact common to the class. Plaintiffs' focus on a common course of conduct by the  defendants

12  towards all potential class members i.e., a pattern of alleged misrepresentations in advertising the

13  product, failure to warn, etc. as meeting this requirement.

14       Also, plaintiffs' seek equitable relief for the class as a whole in the areas of  warnings,

15  education, and remediation, not individual relief. Plaintiffs' do acknowledge in their

16  supplemental brief that there maybe some potential class members who are already aware of the

17  alleged problems with Zonolite Attic Insulation and have expended money to remove the

18  insulation. The injunctive relief suggested by the plaintiffs would include a defendant-funded

19  remediation program where, presumably, class members would apply for funds to remove the

20  insulation.

21       However, plaintiffs assert the fact there may be some compensation for remediation does

22  not detract from the nexus of common facts particularly with respect to the liability issues,  I

23  agree. The issue of monetary damages is more properly considered in connection with the

24  analysis of whether CR 23(b)(1) or (2) or CR 23(b)(3) applies, not to commonality. The

25  commonality requirement has been met.

MEMORANDUM DECISION (MOT. #1): 3

1      Subsection three is "typicality". Does the plaintiff's complaint arise from the same

2  conduct on the part of the defendant that other putative class members may have experienced? It

3  does. Are there any unique defenses applicable to the plaintiff which would unduly prolong

4  prosecution of the case from the perspective of putative class members? There does not appear

5  to be. A number of cases have been cited which stand for the proposition that " . . . challenging

6  the same unlawful conduct that affects both the named plaintiff and the rest of the putative class

7  usually satisfies the typicality requirement, despite disparities in individual factual scenarios."

8  *Cullen v. Whitman Med. Corp.*, 188 F.R.D.226, 230 (E.D. Pa. 1999). The typicality requirement

9  has been met.

10      Subsection four is the adequacy of representation and refers to both the class counsel and

11  the class representative(s). Class counsel are very experienced in class action litigation and

12  defendants have not taken issue with plaintiffs' counsels' ability to provide adequate legal

13  representation. Rather the focus is whether Mr. Barbanti, as class representative, can adequately

14  represent the class.

15      Defendants' assert Mr. Barbanti is an inadequate class representative because: (1) he has

16  a conflict of interest with putative class members because he alleged only limited statutory

17  claims; (2) he does not have a claim under the CPA; (3) he is engaging in "claim splitting"; (4)

18  he lacks standing to request injunctive relief because he knew Zonolite contained asbestos before

19  he began the lawsuit; and (5) he lacks credibility.

20      Plaintiff responds that a class representative is not required to assert every possible claim

21  and some claims are not suitable for a class action resolution. This is particularly true of

22  personal injury claims. In a class action, the concept of "claim splitting" is less of a concern than

23  it would be in an individual action. It can be more efficient to manage some issues in a class

24  action setting, i.e. liability issues, and this will not preclude individual litigation of other claims,

25  i.e. personal injury claims.

MEMORANDUM DECISION (MOT. #1): 4

1    With respect to the "standing" argument, this court is not aware of any Washington

2    jurisdictional authority which would prohibit the court from granting plaintiffs' requested relief

3    of a warning to the public simply because Mr. Barbanti knew Zonolite may have contained

4    asbestos.

5    The issue of Mr. Barbanti's credibility was raised in connection with his personal

6    response to the discovery of Zonolite Attic Insulation in some of his properties and his alleged

7    failure to inspect all of his properties or timely warn his tenants. This fact issue has yet to be

8    adjudicated by the court and, if true, has not precluded the plaintiffs from pressing for the

9    hearing of the Motion for Preliminary Injunction.

10    The adequacy of representation has been met.

11    After finding the initial four requirements of CR 23(a) have been met, the court next turns

12    to the applicability of CR 23(b)(1) or (2) and/or CR 23(b)(3). Plaintiffs' assert as they are

13    primarily requesting injunctive relief, CR 23(b)(2) is appropriate. Defendants' allege that the

14    primary purpose of this litigation is monetary, i.e. to compensate persons who remove Zonolite

15    Attic Insulation.

16    Plaintiffs' complaint indicates it is seeking injunctive relief and other equitable remedies

17    including a notification program, development of safety procedures and remediation techniques.

18    In it's Supplemental Submission plaintiffs' characterize as "incidental" requests for damages

19    some class members may make for expenses already incurred to remove Zonolite. It also

20    acknowledges that there may be damage claims if they are successful in obtaining equitable

21    relief.

22    The question is what is the primary purpose of the litigation. This court accepts the

23    plaintiffs' assertion that equitable relief is the primary purpose although monetary damage claims

24    would not be unexpected if plaintiffs prevail. The purpose of class action litigation is to allow

25    individuals, who have common causes of action, to pool their resources and pursue legal relief

MEMORANDUM DECISION (MOT. #1): 5

1  which would otherwise be unavailable due to the cost of litigation and the individual amount of

2  damages involved.

3      It is also a benefit to both plaintiffs and defendants that putative class members litigate

4  the class issues in one proceeding to avoid inconsistent adjudications.  Defendants have raised

5  the concern that legal actions involving Zonolite are relatively new and there is no "track record"

6  of court decisions as a reason for finding class certification is premature.  That position flies

7  squarely in the face of CR 23(b)(1)(A) which recognizes that in cases affecting substantial

8  numbers of persons, defendants should not be subjected to inconsistent standards of conduct

9  imposed by multiple court decisions.

10      Finally, defendants rightly point out that asbestos is heavily regulated by federal agencies

11  and Zonolite is under review by the EPA.  Arguably, the resources of a federal regulatory agency

12  are greater than a state superior court and this court has considered that fact.  However, federal

13  regulation does not preclude class litigation or preempt the court's ability to take jurisdiction.

14      Therefore, the plaintiff' Motion for Class Certification under CR 26(b)(2) is granted.  Ms.

15  Scott, please prepare the appropriate order, secure lead counsels' signatures and/or note the order

16  for presentment.

17      Dated this 28th day of November, 2000.

18

19

20  KATHLEEN M. O'CONNOR
    SUPERIOR COURT JUDGE

21

22

23

24

25

MEMORANDUM DECISION (MOT. #1): 6

1

2

3

4

5

6              SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

7    MARCO BARBANTI, individually and on
     behalf of a class of all others similarly situated,

8                                                        NO. 00-2-01756-6
                                       Plaintiff,
9                                                        AFFIDAVIT OF HENRY A. ANDERSON,
                                                         M.D., IN SUPPORT OF PLAINTIFF'S
     v.                                                  APPLICATION FOR PRELIMINARY
10                                                       INJUNCTION AND EMERGENCY
     W.R. GRACE & COMPANY-CONN (a                        NOTICE TO CLASS MEMBERS
11   Connecticut corporation); W.R. GRACE &
     COMPANY(a Delaware corporation); W.R.
12   GRACE & CO., a/k/a GRACE, an association of
     business entities; SEALED AIR
13   CORPORATION (a Delaware corporation); and
     WILLIAM V. CULVER, resident of the State of
14   Washington,

15                                    Defendants.

16       SEE ATTACHED.

17

18

19

20

21

22

23

24

25

26                                      EXHIBIT 9                    293

AFFIDAVIT OF HENRY A. ANDERSON, M.D.:

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\WA ZONOLITE INSULATION\PLEADINGS\AFFIDAVIT COVER PAGE.DOC 5/31/00

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

MARCO BARBANTI, individually and on
behalf of a class of all others similarly situated,

                             Plaintiffs,

        v.

W.R. GRACE & COMPANY-CONN (a
Connecticut corporation); W.R. GRACE &
COMPANY (a Delaware corporation); W.R.
GRACE & CO., a/k/a GRACE, an
association of business entities; SEALED
AIR CORPORATION (a Delaware
corporation); and WILLIAM V. CULVER,
resident of the State of Washington,

                           Defendants.

No. 00201756-6

**AFFIDAVIT OF
HENRY A. ANDERSON, M.D.**

STATE OF WISCONSIN  )
                      ) ss.:
COUNTY OF DANE      )

      HENRY A. ANDERSON, M.D., being duly sworn, deposes and says:

      1.      I am a physician and epidemiologist, and I am currently Chief Medical Officer and
State Epidemiologist for Environmental and Occupational Disease with the Wisconsin Division of
Public Heath in Madison, Wisconsin.  I am also an Adjunct Professor with the University of
Wisconsin, with appointments in the Department of Preventive Medicine, University of Wisconsin
Medical School and in the Institute for Environmental Studies Center for Human Systems.  I am the
designated USEPA lead contact/ State School Asbestos Coordinator for the state of Wisconsin.

      2.      In 1968, I graduated from Stanford University with a B.A. Degree and I received my
M.D. Degree from the University of Wisconsin Medical School in Madison in 1972.  After
completing a one-year straight medical internship in the Department of Medicine, Montefiore Hospital

1

and Medical Center, Bronx, New York, I became a resident in occupational medicine at the Environmental Sciences Laboratory, Mt. Sinai School of Medicine in New York City. After I completed my residency in 1976, I remained at the Mt. Sinai School of Medicine participating in asbestos-related clinical research until 1980. Under the direction of Dr. Irving J. Selikoff, numerous epidemiological studies on the health effects of asbestos exposure were undertaken during the time I was present at the Mt. Sinai School of Medicine. Before leaving the Mt. Sinai School of Medicine as Assistant Professor of Community Medicine in June 1980, I examined over eight hundred persons who were suspected to have asbestos-associated diseases and reviewed the chest x-rays of several thousand others. To facilitate clinical studies of asbestos workers, I became a "B" reader for the interpretation of x-rays for pneumoconiosis.

3.      During my tenure with the Environmental Sciences Laboratory at the Mt. Sinai School of Medicine, I developed a particular interest in the study of asbestos-related disease among family members of asbestos-exposed workers. In the early 1970's, I initiated, and became the principal investigator of a study of family members of asbestos factory workers in Patterson, New Jersey who worked in that facility from 1941 to 1945. There were two purposes of the study. The first was to see whether or not the family members had the stigmata of asbestosis and the second was to determine whether or not any of the family members died of asbestos-related diseases.

4.      The study found that, of those family members who were examined, thirty-five percent of them demonstrated asbestos-associated radiographic abnormalities. Furthermore, of the family members of persons who worked at the asbestos facility between 1941 and 1945, three of these family members died of mesothelioma, a virulent cancer of the pleura and peritoneum that is caused by asbestos. The study concluded that family members of asbestos workers, who would have only been exposed indirectly to asbestos, were at a greatly increased risk for the development of asbestos-associated diseases. These family members contracted disease not by occupational exposure to asbestos, but as a result of intermittent, peak exposures due to the reintrainment of settled dust, either from the workers who came home with dust on their clothing, or from settled dust on household furnishings, including carpeting, sofas and chairs. The study demonstrated that non-occupational, low-level exposures to asbestos, such as the exposure one would have to a worker's clothes, could cause mesothelioma. This study resulted in several published articles authored by me on the subject

2

295

of asbestos-associated diseases among family members, and these articles are listed on my curriculum vitae which is appended to this affidavit (See attachment A).   These follow-up studies show that asbestos exposure in the household places family members at risk for mesothelioma and lung cancer.

5.     I was the principal investigator and author of a published epidemiological study involving asbestos-related cancer deaths of Wisconsin residents.  In this study, we reviewed the death certificates and cancer reporting system reports on state residents and identified those who had died of mesothelioma, a form of cancer of the pleura.  Mesothelioma is a sentinel disease, which means that asbestos exposure is the only known cause.  The study identified many mesothelioma cases among Wisconsin workers whose only known exposure to asbestos was working in buildings with asbestos-containing materials.

6.     Along with Dr. Ruth Lillis, I participated in the investigation of asbestos-associated diseases among industrial building maintenance workers.  This study found a significant prevalence of asbestosis among these persons, and the study also reported mesothelioma among these workers. I am familiar with other published studies on the incidence of asbestos-associated diseases among building maintenance and custodial workers from various municipal school districts.  The authors of these studies concluded that exposure to asbestos in public schools caused asbestos-associated x-ray changes in maintenance and custodial workers.  I find these studies to be reliable and to contain information useful in the formation of my opinions on the dangers from low level exposures to asbestos.

7.     As a physician and epidemiologist who has been personally involved in research of asbestos-associated diseases, I have come to the following opinions regarding asbestos exposure in homes.  These opinions are expressed to a reasonable degree of medical certainty:

    (a)    Inhalation of all types of asbestos, including tremolite, actinolite and anthophyllite asbestos is capable of causing a number of serious and deadly diseases, including asbestosis, lung cancer and mesothelioma.

    (b)    These diseases involve a latent process, meaning that symptoms or disease will not be manifest at the time of exposure, but rather after a considerable period of time has passed.  In the case of mesothelioma and lung cancer, the latency period is typically 15–40 years. Furthermore, in the case of mesothelioma, once the disease is

3

diagnosed there is no known cure and the treatment options are
limited.

(c)    Any exposure to asbestos adds to the risk of developing asbestos
       disease. There is no known level of exposure to asbestos below which
       it can be said with scientific certainty that no risk of developing
       asbestos disease exists.

(d)    Friable asbestos in homes can present a hazard to homeowners and
       contractors because disturbance of the material during ordinary
       activities, such as remodeling, can result in asbestos fibers becoming
       airborne. Once airborne, asbestos fibers can be inhaled by persons in
       the home. Fibers not inhaled will eventually settle and contaminate
       surfaces.

(e)    When asbestos in settled dust is disturbed, it is reintrained into the air
       and may remain suspended for extended periods of time, resulting in
       additional continuing exposure. Settled dust reintrainment is an
       important avenue of exposure for individuals who would not
       otherwise be exposed to asbestos.

(f)    Asbestos fibers are invisible to the naked eye and can only be identified
       through use of sophisticated microscopic equipment by highly trained
       professionals.

(g)    I have reviewed the results W.R. Grace's testing of its Zonolite Attic
       Insulation during installation, as well as the results of air and dust
       testing conducted by Fulcrum Environmental and Materials Analytical
       Services in homes with Zonolite Attic Insulation. In my opinion, the
       results show that disturbance of asbestos-contaminated Zonolite Attic
       Insulation presents a significant hazard potential to homeowners and
       contractors.

(h)    Peak episodic exposures to asbestos entail significant risk of disease.
       The hazard of these peak episodic exposures is aggravated and
       worsened when the release or disturbance occurs in an enclosed space
       such as an attic.

(i)    Routine home maintenance, repairs and remodeling in and around
       asbestos-contaminated insulation should only be done by professionals
       trained in the use of personal protective equipment such as respirators
       and other safety techniques pertaining to isolation of the disturbance
       and preventing release to living spaces.

4

297

(j)     In order to safeguard public health, I believe it is essential that homeowners with Zonolite Attic Insulation be warned about the presence of asbestos in this product, be advised not to disturb the material, and be instructed on the precautions necessary to avoid exposure and contamination when conducting activities that disturb the material. Ultimately abatement performed by professionals may be necessary to prevent hazardous exposures.

Further Affiant sayeth not.

_____
HENRY A. ANDERSON, MD

Subscribed and sworn to before me, a
Notary Public of the State of Wisconsin,
this _25th_ day of _May_ , 2000, by
HENRY A. ANDERSON, MD

State of Wisconsin
County of Dane

Terry Ellen Mead
Notary Public
My commission is continuous

5

298

# CURRICULUM VITAE

## HENRY A. ANDERSON, M.D.

Home:    200 Lakewood Blvd        Office:    1414 E Washing-ton Ave Rm 96
              Madison WI  53704                  Madison WI 53703
              608-241-1227                        608-266-1253

Date of birth: December 10, 1945        FAX:     608-267-4853
Wisconsin MD Lisc# 18539                         ANDERHA@DHFS.STATE.WI.US

## PROFESSIONAL HISTORY

| | |
|---|---|
| 10/91 – current | Chief Medical Officer for Occupational & Environmental Health<br>Wisconsin Division of Health, Madison. |
| 6/80 – current | State Epidemiologist for Occupational and Environmental Disease<br>Wisconsin Division of Health, Madison. |
| 6/89 – current | Adjunct Professor, Institute for Environmental Studies<br>University of Wisconsin, Madison. |
| 6/89 – current | Adjunct Professor of Preventive Medicine<br>University of Wisconsin Medical School, Madison. |
| 6/80 – current | Lecturer, Department of Community Medicine<br>Mount Sinai School of Medicine, New York |
| 6/80 – 10/91 | Chief, Section of Environmental and Chronic Disease Epidemiology<br>Wisconsin Division of Health, Madison. |
| 6/85 – 6/89 | Adjunct Associate Professor, Institute for Environmental Studies<br>University of Wisconsin, Madison. |
| 6/85 – 6/89 | Adjunct Associate Professor of Preventive Medicine<br>University of Wisconsin Medical School, Madison. |
| 6/80 – 6/85 | Adjunct Assistant Professor of Preventive Medicine<br>University of Wisconsin Medical School, Madison. |
| 1/78 – 6/80 | Assistant Professor of Community Medicine Environmental Sciences Laboratory<br>Mount Sinai School of Medicine, New York |

EXHIBIT

A

| 1/77 – 6/80 | Clinical Assistant, Department of Medicine
Mount Sinai School of Medicine, New York |
|---|---|
| 1/77 – 1/78 | Instructor, Department of Community Medicine
Mount Sinai School of Medicine, New York |
| 1/76 – 1/77 | Assistant, Department of Community Medicine
Mount Sinai School of Medicine, New York |
| 1/76 – 1/77 | Research Fellow, Department of Medicine
Mount Sinai School of Medicine, New York |
| 6/73 – 6/76 | Research Fellow, Department of Community Medicine
Mount Sinai School of Medicine, New York |
| 6/73 – 6/76 | Resident in Occupational and Environmental Medicine
Environmental Sciences Laboratory
Mount Sinai School of Medicine, New York |
| 6/72 – 6/73 | Straight Medical Internship, Department of Medicine
Montefiore Hospital and Medical Center, Bronx, NY |

## ACADEMIC RECORD

| 1968 | B.A., Stanford University, Stanford, CA |
|---|---|
| 1972 | M.D., University of Wisconsin Medical School, Madison. |

## SPECIALTY BOARD CERTIFICATION

| 1977 | American Board of Preventive Medicine
Sub-specialty - Occupational and Environmental Medicine |
|---|---|
| 1983 | Fellow, American College of Epidemiology |
| 1985 | Certified "B" Reader for Pneumoconiosis Radiographs under Federal Mine Safety and Health Act of 1977 and its amendments.  Recertified July 1989, July 1993, July 1997. |

300

# BIBLIOGRAPHY

1.    Lilis R, Anderson H, Nicholson WJ, Daum S, Fischbein AS, Selikoff IJ.  Prevale-nce of disease
      among vinyl chloride and polyvinyl chloride workers.  Ann NY Acad Sci 246:22-41, 1975.

2.    Anderson HA, Daum SM, Fischbein AS, Selikoff IJ.  Household-contact asbestos neoplastic risk.
      Ann NY Acad Sci 271:311-23, 1976.

3.    Lilis R, Anderson HA, Miller A, Selikoff IJ.  Pulmonary changes among vinyl chloride
      polymeriza-tion workers.  Chest 69:299S-303S, 1976.

4.    Lorimer WV, Lilis R, Nicholson WJ, Anderson H, Fischbein A, Daum S, Rom W, Rice
      C, Selikoff IJ.  Clinical studies of styrene workers: initial findings.  Environ Health
      Perspect 17:171-81, 1976.

5.    Daum SM, Anderson HA, Lilis R, Lorimer WV, Fischbein AS, Miller A, Selikoff IJ.
      Pulmonary changes among titanium workers.  R Soc Med Sec Occup Med 70.1:31-32,
      1977.

6.    Lilis R, Anderson H, Miller A, Selikoff IJ.  Modifications pulmonaires et exposition au
      chlorure et polychlorure de vinyle.  Med et Hyg 35, Geneve, 1542-45, 1977.

7.    Lilis R, Fischbein A, Diamond S, Anderson HA, Blumberg WE, Eisinger J, Selikoff IJ.
      Lead effects among secondary lead smelter workers with blood lead levels below 80
      @g/100 ml.  Arch Environ Health 32.6:256-266, 1977.

8.    Lilis R, Fischbein A, Eisinger J, Blumberg WE, Diamond S, Anderson HA, Rom W, Rice
      C, Sarkozi L, Kon S, Selikoff IJ.  Prevalence of lead disease among secondary lead
      smelter workers and biological indicators of lead exposure.  Environ Res 14:255-85,
      1977.

9.    Rom W, Anderson HA.  Case report.  Clinical Notes on Respiratory Diseases 15-16,
      Summer 1977.

10.   Valciukas JA, Lilis R, Anderson H, Wolff M.  Central nervous system dysfunction in a farm
      population accidentally exposed to polybrominated biphenyls: results of a clinical field survey.
      Activ Nerv Sup (Praha) 19.Suppl 2:434, 1977.

11.   Anderson HA, Chahinian P, Churg J, Daum S, Hammond EC, Rabin C, Seidman H.  Part
      III: Neoplastic effects.  In: Asbestos and Disease (Selikoff IJ and Lee DHK, eds.)
      241-336.  Acad Press, New York, 1978.

12.   Lilis R, Anderson HA, Valciukas JA, Freedman S, Selikoff IJ.  Comparison of findings
      among residents on Michigan dairy farms and consumers of produce purchased from
      these farms.  Environ Health Perspect 23:105-09, 1978.

13.   Anderson HA, Wolff MS, Fischbein AS, Selikoff IJ.  Investigation of the health status of
      Michigan Chemical Corporation employees.  Environ Health Perspect 23:187-91, 1978.

14.    Anderson HA, Rosenman KD, Snyder J. Carcinoembryonic antigen (CEA) plasma levels in Michigan and Wisconsin dairy farmers. Environ Health Perspect 23:193-97, 1978.

15.    Valciukas JA, Li-lis R, Wo-lff MS, Anderson HA. Comparative neurobehavioral study of a polybrominated biphenyl-exposed population in Michigan and a nonexposed group in Wiscon-sin. Environ Health Perspect 23:199-210, 1978.

16.    Anderson HA, Lilis R, Selikoff IJ, Rosenman KD, Valciukas JA, Freedman S. Unan-ticipated prevalence of symptoms among dairy farmers in Michigan and Wiscon-sin. Environ Health Perspect 23:217-26, 1978.

17.    Wolff MS, Haymes N, Anderson HA, Selikoff IJ. Family clustering of PBB and DDE values among Michigan dairy farmers. Environ Health Perspect 23:315-19, 1978.

18.    Anderson HA, Holstein EC, Daum SM, Sarkozi L, Selikoff IJ. Liver function tests among Michigan and Wisconsin dairy farmers. Environ Health Perspect 23:333-39, 1978.

19.    Anderson HA, Selikoff IJ. Pleural reactions to environmental agents. Fed Proc 37.11:2496-2500, 1978.

20.    Anderson HA, Snyder J, Lewinson T, Woo C, Lilis R, Selikoff IJ. Levels of CEA among vinyl chloride and polyvinyl chloride exposed workers. Cancer 42:1560-67, 1978.

21.    Bekesi JG, Holland JF, Anderson HA, Fischbein AS, Rom W, Wolff MS, Selikoff IJ. Lymphocyte function of Michigan dairy farmers exposed to polybrominated biphenyls. Science 199:1207-09, 1978.

22.    Naseem SM, Tishler PV, Anderson HA, Selikoff IJ. Aryl hydrocarbon hydroxylase in asbestos workers. Am Rev Respir Dis 118:693-700, 1978.

23.    Lorimer WV, Lilis R, Fischbein A, Daum S, Anderson H, Wolff MS, Selikoff IJ. Health status of styrene-polystyrene polymerization workers. Scand J Work Environ & Health 4.Suppl 2:220-26, 1978.

24.    Wolff MS, Anderson HA, Rosenman KD, Selikoff IJ. Equilibrium of polybrominated biphenyl (PBB) residues in serum and fat of Michigan residents. Bull Environ Contam Toxicol 21:775-81, 1979.

25.    Wolff MS, Aubrey B, Anderson HA, Camper F, Nikaido MN, Daum SM, Haymes N, Selikoff IJ. Analysis of adipose tissue and serum from PBB (polybrominated biphenyl)-exposed workers. J Environ Pathol Toxicol 2:1397-1411, 1979.

26.    Valciukas JA, Lilis R, Anderson HA, Wolff MS, Petrocci M. The neurotoxicity of polybrominated biphenyls: results of a medical field survey. Ann NY Acad Sci 320:337-67, 1979.

27.    Anderson HA, Wolff MS, Lilis R, Holstein EC, Valciukas JA, Anderson KE, Petrocci M, Sarkozi L, Selikoff IJ. Symptoms and clinical abnormalities following ingestion of polybrominated- biphenyl-contaminated food products. Ann NY Acad Sci 320: 684-702, 1979.

4

28.    Bekesi JG, Anderson HA, Roboz JP, Roboz J, Fischbe-in A, Selikoff IJ, Holland JF.
       Immunologic dysfunction among PBB-exposed Michigan dairy farmers.  Ann NY Acad Sci
       320:717-28, 1979.

29.    Bekesi JG, Roboz J, Anderson HA, Roboz JP, Fischbein AS, Selikoff IJ, Holland JF.
       Impaired immune function and identification of polybrominated biphenyls (PBB) in blood
       compartments of exposed Michigan dairy farmers and chemical workers.  Drug Chem
       Toxicol 1979; 2.1,2:179-91, 1979.

30.    Lilis R, Daum S, Anderson H, Sirota M, Andrews G, Selikoff IJ.  Asbestos disease in
       maintenance workers of the chemical industry.  Ann NY Acad Sci 330:127-35, 1979.

31.    Anderson HA, Lilis R, Daum SM, Selikoff IJ.  Asbestosis among household contacts of
       asbestos factory workers.  Ann NY Acad Sci 330:387-99, 1979.

32.    Anderson HA, Selikoff IJ.  Asbestos-as-sociated radiographic changes among household
       contacts of amosite asbestos workers.  In: Induced Disease: Drug, Irradiation, Occupation
       (Leslie Preger, ed.) 253-73.  Grune and Stratton, New York, 1979.

33.    Anderson H, Lilis R, Daum S, Fischbein A, Selikoff IJ.  Household exposure to asbestos and
       risk of subsequent disease.  In: Dusts and Disease. (Lemen R and Dement JM, eds.)
       145-56.  Pathotox Publishers, Park Forest South, IL, 1979.

34.    Rosenman KD, Anderson HA, Selikoff IJ, Wolff MS, Holstein E.  Spermatogenesis in men
       exposed to the fire retardant polybrominated biphenyls (PBB).  Fertility and Sterility
       32.2:209-13, 1979.

35.    Selikoff IJ, Anderson, HA.  A survey of the general population of Michigan for health effects
       of polybrominated biphenyl exposure.  Report to the Michigan Department of Public Health,
       Environmental Sciences Laboratory, Mount Sinai School of Medicine, New York, 1979.

36.    Lilis R, Daum S, Anderson H, Andrews G, Selikoff IJ.  Asbestosis among maintenance
       workers in the chemical industry and oil refinery workers.  In: Biological Effects of Mineral
       Fibers, Vol. 2, IARC Pub. 30:795-810, Lyon, France, 1980.

37.    Miller A, Elliott JC, Thornton JC, Warshaw R, Geiger M, Anderson H.  Com-parison of
       spirometry performed on the same subjects by two teams using similar instruments: an
       investigation of variability in prevalence of impairment.  Environ Res 21:229-34, 1980.

38.    Valciukas JA, Lilis R, Singer R, Fischbein A, Anderson HA, Glickman L.  Lead exposure and
       behavioral changes: comparison of four occupational groups with different levels of lead
       absorption.  Am J Ind Med 1.3/4:421-26, 1980.

39.    Anderson, HA.  Irritant gases and fumes.  In: Public Health and Preventive Medicine, 11th
       ed. (Last, JM, ed.) 11th Edn, 760-70.  Appleton Century Crofts, New York, 1980.

40.    Wolff MS, Anderson HA, Selikoff IJ.  Human tissue burdens of halogenated aromatic
       chemicals in Michigan.  JAMA 247.15:2112-16, 1982.

41.    Eckmann AD, Dally KA, Hanrahan LP, Anderson HA.  Comparison of the chromotropic acid
       and modified pararosaniline methods for the determination of formaldehyde in air.  Environ
       Inter 8:159-66, 1982.

42.    Chanda JJ, Anderson HA, Glamb RW, Lomatch DL, Wolff MS, Voorhees JJ, Selikoff IJ.
       Cutaneous effects of exposure to Polybrominated Biphenyls (PBBs): the Michigan PBB
       incident.  Environ Res 29:97-108, 1982.

43.    Miller A, Thornton JC, Warshaw R, Anderson H, Teirstein AS, Selikoff IJ.  Single breath
       diffusing capacity in a representative sample of the population of Michigan, a large industrial
       state: predicted values, lower limits of normal and frequencies of abnormality by smoking
       history.  Am Rev Respir Dis 127:270-77, 1983.

44.    Anderson HA, Selikoff IJ. Lilis R, Seidman H.  Morbidity and mortality among household
       contacts of amosite asbestos exposed factory workers.  Proc World Symposium on
       Asbestos.  Pub. Canadian Asbestos Information Centre, Montreal, Canada 349-62, 1983.

45.    Anderson HA.  Asbestos: the public health perspective on state of the art.  Proc
       Environmental epidemiology and toxicology: practical applications at the state level.  ASTHO
       Foundation, Kensington, MD 69:39-42, 1983.

46.    Weiss H, Anderson HA.  A practical method of determining public health priorities in
       response to groundwater chemical contamination: the experience of the Wisconsin Division
       of Health.  Proc Internatl Mtg Israel Ecol Soc, Jerusalem in Develop Ecol Environ Quality
       2:205-13, 1983.

47.    Anderson HA, Dally KA, Hanrahan LP, Eckmann AD, Kanarek MS, Rankin J.  The
       epidemiology of mobile home formaldehyde vapor concentration and residents' health
       status. EPA-905/1-83-001.  Feb 1983.

48.    Moses M, Lilis R, Crow KD, Thornton J, Fischbein A, Anderson HA, Selikoff IJ.  Health
       status of workers with past exposure to 2,3,7,8-tetrachlorodibenzo-p-dioxin in the
       manufacture of 2,4,5-trichloro-phenoxyacetic acid: comparison of findings with and without
       chloracne.  Am J Ind Med 5:161-82, 1984.

49.    Goldberg RL, Anderson HA.  Occupational noise-induced hearing loss in Wisconsin.  Wis
       Med J 83:13-15, 1984.

50.    Hanrahan LP, Dally KA, Anderson HA, Kanarek MS, Rankin J.  Formaldehyde vapor in
       mobile homes: a cross sectional survey of concentrations and irritant effects.  Am J Public
       Health 74.9:1026-27, 1984.

51.    Anderson HA.  Utilization of adipose tissue biopsy in characterizing human halogenated
       hydrocarbon exposure.  Environ Health Perspect 60:127-31, 1985.

52.    Kilburn KH, Lilis R, Anderson HA, Boylen CT, Einstein HE, Johnson S-JS, Warshaw R.
       Asbestos disease in family contacts of shipyard workers.  Am J Public Health 75.6:615-17,
       1985.

304

53.     Hastreiter RJ, Lambo AM, Anderson HA.  Public health officials' perceptions of dental caries preventive methods.  J Public Health Dent 45.3:180-86, 1985.

54.     Anderson HA.  Evolution of environmental epidemiologic risk assessment.  Environ Health Perspect 62:389-92, 1985.

55.     Hanrahan LP, Anderson HA, Dally KA, Eckmann AD, Kanarek MS.  Formaldehyde concentrations in Wisconsin mobile homes.  J Air Pollution Control Assoc 35:1164-67, 1985.

56.     Anderson HA, Belluck D, Sinha SK.  Public health related groundwater standards: summary of scientific support documentation for NR 140.10, Wisconsin DHSS, DOH, 1985.

57.     Anderson HA.  The role of state and territorial epidemiologists.  Proc US Dept of Labor, Bureau of Labor Statistics Symposium towards improved measurement and reporting of occupational illness and disease, Albuquerque, NM, Dec 11-12, 1985.

58.     Fiore, MC, Anderson HA, Hong R, Golubjatnikov R, Seiser JE, Nordstrom D, Hanrahan L, Belluck D.  Chronic exposures to aldicarb-contaminated ground-water and human immune function.  Environ Res 41:633-45, 1986.

59.     Ziamik M, Otto W, Sieger T, Gannon C, Anderson H.  Ammonia contamination in a milk processing plant - Wisconsin.  MMWR 35.17:274-5, 1986.

60.     Kilburn KH, Lilis R, Anderson HA, Miller A, Warshaw RH.  Interaction of asbestos, age and cigarette smoking in producing radiographic evidence of diffuse pulmonary fibrosis.  Am J Med 80:377-81, 1986.

61.     Anderson HA, Hanrahan LP, Jensen M, Laurin D, Yick W, Wiegman, P.  Wisconsin Vietnam veteran mortality study: proportionate mortality ratio results: standardized mortality ratio results.  Final report WI DHSS, DOH, Section of Environmental and Chronic Disease Epidemiology, March 1986.

62.     Saftlas AF, Blair A, Cantor KP, Hanrahan L, Anderson HA.  Cancer and other causes of death among Wisconsin farmers.  Am J Ind Med 11:119-29, 1987.

63.     Rogan WJ, Gladen BC, Ragan NB, Anderson HA.  US prevalence of occupational pleural thickening: a look at chest x-rays from the first national health and nutrition examination survey.  Am J Epidemiol 126.5:893-900, 1987.

64.     Sauter SL, Chapman LJ, Knutson SJ, Anderson HA.  Case example of wrist trauma in keyboard use.  Applied Ergonomics 18.3:183-86, 1987.

65.     Miller A, Thornton JC, Selikoff IJ, Anderson HA.  Clinical respiratory abnormalities in Michigan: prevalence of clinical respiratory abnormalities by sex and smoking history in a representative sample of the adult population.  Chest 94.6:1187-94, 1988.

66.     Horvath EP, Anderson H, Pierce WE, Hanrahan L, Wendlick JD.  Effects of formal-dehyde on the mucous membranes and lungs: a study of an industrial population.  JAMA 259.5:701-707, 1988.

67.     Olson LJ, Anderson HA, Jones VB.  Landspreading dioxin-contaminated paper mill sludge: a complex problem.  Arch Environ Health 43.2:186-89, 1988.

68.     Martin JR, Muir DCF, Moore E, Edwards AC, Becklake M, Morgan KW, Anderson H, Edstrom H, Rusted IE, Segovia J.  Pneumoconiosis in iron ore surface mining in Labrador. JOM 30.10:780-84, 1988.

69.     Schmidt J, Rubenstein M, Sonzogni W, Schirmer J, Anderson H.  PCB contamination of ceiling tiles - Madison, Wisconsin.  MMWR 37.2:17-19, 1988.

70.     Belluck DA, Anderson HA.  Wisconsin's risk assess-ment based numerical ground-water standards program.  Proc Agrichemicals and groundwater protection: resources and strategies for state and local management, Freshwater Foundation, Navarre, MN, 239-53, 1989.

71.     Salmi LR, Weiss HB, Peterson PL, Spengler RF, Sattin RW, Anderson HA.  Fatal farm injuries among young children.  Pediatrics 83.2:267-71, 1989.

72.     Fiore BJ, Anderson HA, Hanrahan LP, Olson LJ, Sonzogni, WC.  Sport fish consumption and body burden levels of chlorinated hydrocarbons: a study of Wisconsin anglers.  Arch Environ Health 44.2:82-88, 1989.

73.     Anderson, HA.  General population exposure to environmental concentrations of halogenated biphenyls.  In: Halogenated Biphenyls, Terphenyls, Naphthalenes, Dibenzodioxins and Related Products (Kimbrough RD and Jensen AA, eds.) 2nd Edn, 325-344.  Elsevier, Amsterdam, 1989.

74.     Bunge M, Anderson HA, Davis JP.  Injuries associated with ultraviolet tanning devices - Wisconsin.  MMWR 38.19:333-35, 1989.

75.     Remington PL, Anderson HA.  Trends in cigarette smoking - Wisconsin, 1950-1988.  MMWR 38.44:752-54, 1989.

76.     Anderson HA, Higgins D, Hanrahan LP.  Project SENSOR: Occupational disease and injury surveillance.  Wis Med J 88:35-38, 1989.

77.     Anderson HA.  When domestic water is no longer potable.  Health Environ Digest 3.6:4-5,1989.

78.     Anderson H, Belluck D.  Exercising discretion.  Environ Risk, pub Wis DNR:28, 1989.

79.     Schirmer J, Anderson HA.  Surveillance for occupational lung disease related to dust exposure in Wisconsin: the pneumoconioses and malignant mesothelioma.  Wis Epidem Bull 11.2:1-3, 1989.

80.     Mirkin IR, Anderson HA, Hanrahan L, Hong R, Golubjatnikov R, Belluck D.  Changes in T-lymphocyte distribution associated with ingestion of aldicarb-contamined drinking water: a follow-up study.  Environ Res 51:35-50, 1990.

81.    Mirkin IR, Remington, PL, Moss, M, Anderson, H. Liver cancer in Wisconsin; the potential for prevention. Wis Med J 89.2:49-53, 1990.

82.    Anderson HA, Remington PL, Hanrahan LP, Haskins LK. Surveillance of environmental disease: the Wisconsin initiative. Wis Med J 89.3:120,122-,124, 1990.

83.    Anderson HA, Belluck, DA, Olson, LJ. Final public health related groundwater standards: summary of scientific support documentation for NR 140.10 – cycle 3, Wisconsin DHSS, DOH, August 1990.

84.    Akgulian NA, Moss ME, Remington PL, Anderson HA, Shultz JM. Alcohol-related disease impact - Wisconsin, 1988. MMWR 39.11:178-80,185-87, 1990.

85.    Fiore BJ, Hanrahan LP, Anderson, HA. State health department response to disease cluster reports: a protocol for investigation. Am J Epidemiol 132:S14-S22, 1990.

86.    Hanrahan LP, Mirkin I, Olson J, Anderson HA, Fiore BJ. SMRFIT: a statistical analysis system (SAS) program for standardized mortality ratio analyses and Poisson regression model fits in community disease cluster investiga-tions. Am J Epidemiol 132:S116-S122, 1990.

87.    Sitter RR, Hanrahan LP, Demets D, Anderson, HA. A monitoring system to detect increased rates of cancer incidence. Am J Epidemiol 132:S123-S130, 1990.

88.    Young MR, Anderson DE, Anderson HA. Professional education for evaluating environmental exposure. Wis Med J 89.8:471-74, 1990.

89.    Schirmer J, Anderson HA, Haskins L, Hanrahan L, Olson J. Epidemiologic surveillance by a state Health Department using the ILO classification system for pneumoconioses. DHHS (NIOSH) Pub 90-108 Part 1:807-12, 1990.

90.    Remington PL, Anderson, DE, Manering MC, Peterson, EA, Anderson H. The PRECEDES project: background and methods. Wis Med J 89.12:695-96, 1990.

91.    Sonzogni W, Maack L, Gibson T, Degenhardt D, Anderson H, Fiore B. Polychlorinated biphenyl congeners in blood of Wisconsin sport fish consumers. Arch Environ Contam Toxicol 20:56-60, 1991.

92.    Schirmer J, Anderson H, Peterson, DE. Childhood lead exposure in Wisconsin in 1990. Wi Med J 90.1:31,33-35, 1991.

93.    Remington P, Anderson H, Hanrahan, Haskins, L. Risk factors for lung cancer: a pilot study in five counties. Wi Med J 90.3:122,124, 1991.

94.    Hanrahan LP, Higgins D, Anderson H, Haskins L, Tai S. Project SENSOR: Wisconsin surveillance of occupational carpal tunnel syndrome. Wi Med J 90.2:80,82-83, 1991.

95.    Anderson HA, Goldring J, Knobeloch L. Groundwater protection. The Department of Health and Social Service role past present and future. Proc. Wisconsin Groundwater conference. Univ. of Wisconsin, Stevens Point, Wi. 15-16, 1991.

96.    Saryan LA. Schirmer J, Anderson HA.  Fatal pediatric poisoning from leaded paint -
        Wisconsin, 1990.  MMWR 40.12:193-95, 1991.

97.    Knobelock L, Anderson HA. Baum L.  Acute effect of indoor exposure to paint containing
        bis(tributyltin) oxide - Wisconsin, 1991.  MMWR 40.17:280-281, 1991.

98.    Zvara JA, Anderson DE, Remington PL, Anderson H.  Data-based cancer control programs:
        a public health response.  WI Med J 90.5:235-36, 1991.

99.    Reding D, Anderson H, Lappe K, Hanrahan L, Haskins, L.  Wisconsin farmers' cancer
        control project.  Wi Med J 90.7:443-45, 1991.

100.   Anderson HA, Hanrahan L, Phillips JL.  Malignant mesothelioma in Wisconsin, 1959-1989.
        Wi Med J 90.8:479-80, 1991.

101.   Windau J, Rosenman K, Anderson H, Hanrahan L, Rudolph L, Stanbury M, Stark A.  The
        identification of occupational lung disease from hospital discharge data.  JOM
        33.10:1060-66, 1991.

102.   Anderson HA, Hanrahan LP, Schirmer J, Higgins D, Sarow P.  Mesothelioma among
        employees with likely contact with in-place asbestos-containing building  materials.  Ann NY
        Acad Sci 643:550-572, 1991.

103.   Peterson DE, Zeger SL, Remington PL, Anderson HA.  The effect of state cigarette tax
        increases on cigarette sales, 1955 to 1988.  Am J Pub Health 82.1:94-96, 1992.

104.   Hanrahan LP, Higgins D, Haskins L, Anderson H.  Project FACE:  Wisconsin surveillance of
        fatal occupational injuries.  Wi Med J 91.1:43-46, 1992.

105.   Anderson HA, Goldring, JM, Knobeloch, LM.  Final public health related groundwater
        standards: summary of scientific support documentation for NR 140.10 - cycle 4, Wisconsin
        DHSS, DOH, February 1992.

106.   Raemisch RF, Listug DL, Norwick JM, Black J, Loveland R, Krause H, Anderson HA,
        Remington P.  Cigarette smoking bans in county jails - Wisconsin, 1991.  MMWR
        41.6:101-103, 1992.

107.   Peterson DE, Remington PL, Anderson HA.  Letter to Ed Re: Vasectomy and the risk of
        prostate cancer.  Am J Epidemiol:135.3:324-25, 1992.

108.   Smith W, Anderson T, Anderson HA, Remington PL.  Nitrogen dioxide and carbon monoxide
        intoxication in an indoor ice arena - Wisconsin, 1992. MMWR 41.21:383-385, 1992.

109.   Anderson HA, Goldring, JM, Knobeloch, LM.  Recommended groundwater enforcement
        standards and preventive action limits: summary of scientific support documentation for NR
        140.10 - cycle 5, Wisconsin DHSS, DOH, October 1992.

110.   Pezzino G, Remington PL, Anderson H, Lantz PM, Peterson DE.  Impact of a smoke-free
        policy on prisoners in Wisconsin, United States.  Tobacco Control I:180-184, 1992.

111.  Anderson HA, Hanrahan LP, Higgins, DN, Sarow, PG. A radiographic survey of public school building maintenance and custodial employees. Environ Res 59:159-166, 1992.

112.  Dar E, Kanarek MS, Anderson HA, Sonzogni, WC. Fish consumption and reproductive outcomes in Green Bay, Wisconsin. Environ Res 59:189-201, 1992.

113.  Anderson HA. Surveillance - Agriculture-Related Diseases, Injuries and Hazards. Proc. DHSS (NIOSH) Pub No. 92-105, 1992.

114.  Burke T, Anderson H et al. Role of exposure databases in risk management. Arch Environ Health 47.6:421-429, 1992.

115.  Anderson HA, Higgins D, Hanrahan LA, Sarow. Adult occupational lead exposure in Wisconsin. Wi Med J 92.3:136-40, 1993.

116.  Pezzino G, Remington PL, Anderson, HA. Prevalence and characteristics of weight loss attempts in Wisconsin, 1989. Wi Med J 92.8, 481-82, 1993.

117.  Anderson H, Hanrahan L. Silicosis Surveillance - Wisconsin, 1987-1990. MMWR 42.SS-5:23-28, 1993.

118.  Knobeloch K, Krenz K, Anderson H, Hovel C. Methemoglobinemia in an Infant - Wisconsin, 1992. MMWR 42.:12, 217-218, 1993.

119.  Hanrahan LP, Higgins D, Anderson H, Smith M. Wisconsin occupational carpal tunnel syndrome surveillance: the incidence of surgically treated cases. Wi Med J 92.12, 685-689, 1993.

120.  Goldring JM, James DS, Anderson HA. Chapter 9: Chronic Lung Diseases. In: Chronic Disease Epidemiology and Control (Bronwson RC, Remington PL and Davis JR, eds.) 169-197. American Public Health Association, Washington DC, 1993.

121.  Goldring J, Hanrahan L, Anderson H. Asthma hospitalizations in Wisconsin: public health implications. Wi Med J 93:2. 63-67, 1993.

122.  Anderson, HA, Amrhein, JF, Shubat, P, Hesse, J. Protocol for a uniform Great Lakes sport fish consumption advisory. Great Lakes Sport Fish Advisory Task Force, Council of Great Lakes Goveroners, Chicago, IL, September, 1993.

123.  Peterson DE, Kanarek MS, Kuykendall MA, Diedrich JM, Anderson HA, Remington PL, Sheffy TB. Fish consumption patterns and blood mercury levels in Wisconsin Chippewa Indians. Arch Environ Health 49.1:53-58, 1994.

124.  Bongard J, Savage R, Dern R, Bostrum H, Kazmierczak J, Keifer S, Anderson H, Davis JP.Cryptosporidium infections associated with swimming pools - Dane County, Wisconsin, 1993. MMWR 43.31:561-63, 1994.

125.  Knobeloch L, Goldring J, LeMay W, Anderson H. Prilocaine-induced methemoglobinemia - Wisconsin, 1993. MMWR 43.35:655-657, 1994.

11

126.  Knobeloch L, Ziarnik M, Howard J, Theis B, Farmer D, Anderson H, Proctor M.
      Gastrointestinal upsets associated with ingestion of copper-contaminated water.  Environ
      Health Perspect 102.11:2-5, 1994.

127.  Pezzino F, Remington PL, Anderson HA, Hanrahan LP, Peterson DE.  Smoking as a
      contributing cause of death in Wisconsin, United States, 1990.  Tobacco Control; 3:120-123,
      1994.

128.  Peterson DE, Remington PL, Kuykendall MA, Kanarek MS, Diedrich JM, Anderson HA.
      Behavioral risk factors of Chippaewa Indians living on Wisconsin reservations.- Public
      Health Reports 109.6,820-823, 1994-.

129.  Stanbury M, Rosenman KD, Anderson HA.  Guidelines: minimum and comprehensive
      state-based activities in occupational safety and health.  DHSS (NIOSH) Publication No.
      95-107, 1995.

130.  Moss ME, Kanarek MS, Anderson HA, Hanrahan LP, Remington PL. Osteosarcoma,
      seasonality, and environmental factors in Wisconsin, 1970-1989. Arch Environ Health
      50.3:235-214, 1995.

131.  Anderson HA, Hanrahan LH, Goldring J, Delaney B.  An investigation of health concerns
      attributed to reformulated gasoline use in southeastern Wisconsin: Phase 1 - Final Report.
      Wisconsin DHSS, DOH, BPH, May 30, 1995.

132.  Knobeloch LM, Ziarnik M, Anderson HA, Dodson VN. Imported Seabass as a source of
      Mercury exposure: a Wisconsin case study. Environ Health Perspect 103.6:604-606, 1995.

133.  Anderson HA, Hanrahan LH, Goldring J, Delaney B.  An investigation of health concerns
      attributed to reformulated gasoline use in southeastern Wisconsin: Phase 2, telephone
      registered health concerns - Final Report.  Wisconsin DHSS, DOH, BPH, September 18,
      1995.

134.  Thacker SB, Stroup DF, Parrish RG, Anderson HA.  Surveillance in environmental public
      health: issues, systems, and sources. Am J Public Health, 86:633-638, 1996.

135.  Anderson HA, Falk C, Fiore B, Hanrahan L, Humphrey HEB, Kanarek M, Long T, Mortehsen
      K, Shelley T, Sonzogni W, Steele G, Tilden J. Consortium for the health assessment of
      Great Lakes sport fish consumption. Toxicol and Industrial Health, 12, Nos. 3/4, 369-373,
      1996.

136.  Anderson H, Forrester WR, Perrotta DM, Air Pollution and Respiratory Health Br, NCEH.
      Asthma surveillance programs in public health departments - United States.  MMWR
      45.37:802-804, 1996.

137.  Hanrahan L, Anderson HA, Haskins, LK, Olson J, Lappe, K, Reding, D. Wisconsin farmer
      cancer m-ortality, 1981 to 1990: selected malignancies. Journal of Rural Health ,
      12:4:273-277, 1996.

138.    Knobeloch LM, Anderson HA, Morgan J, Nashold R.  Heat-related illness and death, Wisconsin, 1995. Wi Med J 96:5. 33-38, 1997.

139.    Fox, JL, Gruetzmacher GR, Anderson HA, Moen T, Lupo J, Ingram-Stewart V, Barry J. Health hazard evaluation: hypersensitivity pneumonitis. OSHA Consultation Program Study No. 6114-0, WDHFS, DOH, BP H, PO Box 309, Madison, Wi., April 1997.

140.    Brown CM, Anderson H, Etzel RA. Asthma: the states challenge.  Public Health Reports 112.3, 198-205, 1997.

141.    Tilden J, Hanrahan L, Anderson HA, Palit C, Olson J, MacKenzie W, and the Great lakes Consortium. Health Advisories for Consumers of Great Lakes Sport-Fish: Is the Message Being Received? Environ Health Perspect 105.12, 1997.

142.    DeVoto E, Fiore BJ, Millikan R, Anderson HA, Sheldon L, Sonzogni WC, Longnecker MP. Correlations among human blood levels of specific PCB congeners and implications for epidemiologic studies. Am J Ind Med. 32:606-613, 1997.

143.    Morris RD, Naumova EN, Goldring J, Hersch M, Munasinghe RL, Anderson H.  Childhood asthma surveillance using computerized billing records: a pilot study.  Public Health Reports 112.6, 506-512, 1997.

144.    Anderson HA, Falk C, Hanrahan L, Olson J, Burse V, Needham L, Paschal D, Patterson D, Hill R, and the Great Lakes Consortium. Profiles of Great Lakes critical pollutants: a sentinel analysis of human blood and urine. Environ Health Perspect 106:279-289, 1998.

145.    Zeitz P, Anderson H, Hughes B. Monitoring environmental disease - United States, 1997. MMWR 47.25:522-525, 1998.

146.    Zacharisen MC, Kadambi AR, Schlueter DP, Kurup VP, Shack JB, Fox, JL, Anderson HA, Fink, JN. The spectrum of respiratory disease associated with exposure to metal working fluids. JOEM 40:7 640-647, 1998.

147.    Knobeloch LM, Korthof S, Anderson HA.  Never on a Saturday (or a Sunday): the case against using weekend urine specimens to assess arsenic exposure. Wi Med J 97:10, 46-48, 1998.

148.    Anderson HA, Hanrahan LP, Falk C, Tilden J, Olson J, and the Great Lakes Consortium. Sport fish consumption: an important route of exposure to persistent chemical pollutants. Eur J Oncol, 3:4, 321-327, 1998.

149.    Anderson HA, Schirmer J, Hanrahan LP, Higgins D, Sarow P. Asbestosis and mesothelioma surveillance: a paper manufacturing company sentinel event investigation. Eur J Oncol, 3:4, 379-383, 1998.

150.    Fox JL, Anderson HA, Moen T, Gruetzmacher G, Hanrahan L, Fink JN. Metal working fluid-associated hypersensitivity pneumonitis: an outbreak investigation and case-control study. Am J Ind Med. 35:58-67, 1999.

311

151.    Schubert C, Knobeloch L, Kanarek M, Anderson HA. Public response to elevated nitrate in drinking water wells in Wisconsin. Arch Environ Health 54:4, 242-247, 1999.

152.    Falk C, Hanrahan L, Anderson HA, Kanarek MS, Draheim L, Needham L, Patterson DJr and the Great Lakes Consortium. Body burden levels of dioxin, furans, and PCBs among frequent consumers of Great Lakes sport fish, Academic Press, S19-S25, 1999.

153.    Hanrahan LP, Falk, C, Anderson HA, Draheim L, Kanarek MS, Olson J and the Great Lakes Consortium. Serum PCB and DDE levels of frequent great lakes sport fish consumersBa first look. Academic Press, S26-S37, 1999.

154.    Anderson H, Knobeloch L, Warzecha C. Public health hazard surveillance and response to arsenic contamination. In: Arsenic Exposure and Health Effects (Chappel WR, Abemathy CO and Calderon RL, eds.), 367-372, Elsevier, Amsterdam, 1999.

February 2000- current

# SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

MARCO BARBANTI, individually and on            )
behalf of a class of all others similarly situated,    )
                                               )
                              Plaintiffs,       )    No. 00201756-6
                                               )
                    v.                         )
                                               )
W. R. GRACE & COMPANY-CONN (a                  )    **AFFIDAVIT OF**
Connecticut corporation); W. R. GRACE &        )    **RICHARD HATFIELD**
COMPANY (a Delaware corporation); W. R.        )
GRACE & CO., a/k/a GRACE, an association        )
of business entities; SEALED AIR               )
CORPORATION (a Delaware corporation); and      )
WILLIAM V. CULVER, resident of the State       )
of Washington,                                 )
                                               )
                              Defendants.       )

STATE OF GEORGIA        )
                        ) ss:
COUNTY OF FORSYTH       )

1.    Richard Hatfield, being first duly sworn, deposes and states as follows:

2.    I have personal knowledge of the facts stated herein, except where otherwise stated.

3.    I have obtained a Bachelor of Science degree in geology from North Carolina State University.

4.    I am currently the senior asbestos consultant at Materials Analytical Services (hereinafter "MAS"). Previously, I was employed by Law Engineering as Assistant Vice President and Senior Corporate Consultant from December 1987 to August 1996. Prior to that, I was Director of Services for McCrone Environmental Services for five (5) years.

5.    I am currently a member of the Environmental Information Association, and have served on the United States EPA Peer Review Committee and the ASTM D-22 Committee.

220

EXHIBIT  10

6.      For more than twenty (20) years, I have consulted on issues regarding asbestos and buildings, beginning around 1979 when I was a Technical Advisor to the U.S. EPA regarding its "Asbestos in Schools" program.

7.      During the last twenty (20) years, I have been involved in the assessment and testing of asbestos in buildings, and have inspected hundreds of buildings for asbestos. During this time, I have served as an expert witness in litigation involving asbestos in buildings, and have testified for both building owners and asbestos manufacturers.

8.      I am certified by the Environmental Protection Agency to inspect buildings for asbestos-contained materials and to manage asbestos in buildings. I am also certified by NIOSH to sample and evaluate airborne asbestos dust.

9.      I have taught courses required by EPA regarding asbestos and have given numerous talks at asbestos conferences regarding the assessment and evaluation of asbestos-containing materials in buildings. I am appending my curriculum vitae as **Attachment A**.

10.     I am familiar with testing performed in July 1993 by MAS in which MAS found asbestos in bags of Grace's Zonolite Attic Insulation. In its report dated July 26, 1993, MAS concluded that tremolite-actinolite was found to be associated with the vermiculite and as free respirable fibers in the fine dust. I am appending the report as **Attachment B**.

11.     In February 2000, I was hired to make a determination as to whether Grace's vermiculite attic insulation in homes contained asbestos, and to conduct an assessment of whether Grace's attic insulation in homes can release asbestos fibers and create an asbestos contamination problem.

12.     I collected and arranged to have analyzed bulk samples of raw vermiculite ore and vermiculite that had been milled by W.R. Grace. I also collected and arranged to have analyzed bulk

221

samples of attic insulation from eleven different locations in Libby, Montana. All of these samples were analyzed by Materials Analytical Services and found to contain tremolite\actinolite asbestos. The results of analysis are contained in **Attachment C.**

13.     In addition to collecting bulk samples, I collected and arranged to have analyzed samples of settled dust in three homes with W.R. Grace's Zonolite Attic Insulation in Libby, Montana. Specifically, these dust samples were collected from the homes of Walter Mason, Shelly Spencer and Diane Walker. Notably, all of these samples were analyzed by Materials Analytical Services and found to contain tremolite\actinolite and anthophyllite asbestos fibers. The asbestos dust concentrations ranged from approximately 400,000 asbestos structures per square foot to approximately 41,000,000 asbestos structures per square foot. The results of analysis are set forth in **Attachment D.** Based on my experience and the results of this testing, it is my opinion that W.R. Grace's Zonolite Attic Insulation has released asbestos fibers, which has settled on surfaces and created a potential asbestos contamination hazard.

14.     I also conducted testing to simulate renovation activities that ordinarily take place in homes with W.R. Grace's Zonolite Attic Insulation. I was placed in contact with Marco Barbanti, who owns rental properties with Grace's Zonolite Attic Insulation in    Spokane, Washington. Mr. Barbanti explained to me in detail renovation work he had previously conducted and future renovation work he planned to conduct at his rental property located at 1301 West Mallon. I was placed in contact with Mr. Barbanti's handyman, Ed O'Conner, who explained the procedure that he used in the past and intended to use to install a bathroom heater fan in the attic of Mr. Barbanti's house. In order to access an area on top of the ceiling, Mr. O'Conner would use a tin pan to scoop the vermiculite from the top of the ceiling in the area where the heater fan unit was to be installed and transfer the vermiculite to an area of the attic out of the way of the work activities. He then

222

would sweep up the residue dust and debris from the surface of the ceiling and placed it to the side.

Until recently Mr. Barbanti and his handyman were unaware of any potential asbestos hazard that

W.R. Grace's Zonolite Attic Insulation posed and therefore did not take any safety precautions in

conducting this work in the past.

15.     The work as described above was conducted in Mr. Barbanti's attic to allow for the

installation of a ceiling mounted heater fan unit. The attic area was isolated from the balance of the

house. While the attic work was performed personal and area air samples were collected. The work

activities were also videotaped. A copy of the videotape is appended as **Attachment E**. The video

depicts the work as it was conducted. The lighting for the videotape was a spotlight. A spotlight

used in this manner in a dark area created what is commonly referred to as the "Tyndall light

phenomena". With the aid of this type of lighting, one can see dust particulate smaller than what

would normally be visible with the naked eye. Most people have seen the "Tyndall light

phenomena" when sun light streams through a window in a darkened room and dust particulate

become suddenly visible. During the work activities of moving the vermiculite attic insulation air

samples were collected on the workers and in the attic space.

16.     The air samples were analyzed by Materials Analytical Services and the results are

appended as **Attachment F**. The levels ranged from 6.96 str/cc to 12.48 str/cc. These levels greatly

exceed the EPA clearance level of 0.01 f/cc, the OSHA permissible exposure limit of 0.1 f/cc, and

OSHA's peak exposure limit of 1 f/cc in a 30-minute period.

17.     I have reviewed reports of simulated testing of Zonolite Attic Insulation conducted

by Grace in the 1970s. In particular, I have reviewed Grace's testing dated March 11, 1976, July 11,

1976, April 27, 1979 and March 1980. The elevated asbestos airborne concentrations during the

223

testing that I performed simulating renovation activities are consistent with the elevated concentrations that Grace achieved during installation.

18.    I also collected a sample of the fine dust from the top of the ceiling below the vermiculite insulation. The dust sample was analyzed by Materials Analytical Services. The results of analysis indicate that the asbestos dust concentration on the surface was approximately 47,000,000 structures per square foot. (See Attachment G). In my opinion, the results demonstrate that the fine dust from the vermiculite insulation is contaminated with asbestos. Further, in my opinion disturbance of this dust will result in elevated concentrations of asbestos in the air.

19.    Based on my testing conducted in Libby, Montana and Spokane, Washington, it is my opinion to a reasonable degree of scientific certainty that Grace's Zonolite Attic Insulation contains asbestos. It is also my opinion to a reasonable degree of scientific certainty that disturbance of Grace's Zonolite Attic Insulation involving ordinary renovation activities, such as removing or moving the vermiculite material and sweeping it up, results in dangerously high airborne concentrations of asbestos fibers exceeding the EPA clearance level of 0.01 f/cc, the OSHA PEL of 0.1 f/cc, and OSHA's peak or execution limit of 1 f/cc.

20.    The OSHA permissible exposure limit ("PEL") of 0.1 f/cc is applicable to contractors working in the home. As an occupational standard, the OSHA Regulation was intended to apply to healthy workers who are familiar with asbestos and the necessary precautions to minimize exposure. The OSHA Regulation was not intended to apply to family members, including children involved in ordinary household activities, including maintenance, repair and remodeling activities in the home.

21.    The EPA clearance level of 0.01 fibers per cubic centimeters (f/cc) was intended to insure proper asbestos decontamination of an area following abatement. The sampling

224

procedure involves collection of air samples while surfaces in the abated space are being aggressively disturbed using a leaf blower. The EPA clearance testing recognizes the problems associated with asbestos dust on surfaces and that settled dust can be reentrained and cause an exposure problem.

22.    It is my opinion to a reasonable degree of scientific certainty that asbestos can be released from Grace's Zonolite Attic Insulation and creates a contamination hazard in homes.

23.    Based on my experience and my testing, it is my opinion that homeowners need to be warned about: 1) the presence of asbestos in Zonolite Attic Insulation; 2) the potential hazards associated with disturbing Zonolite Attic Insulation and asbestos dust from the insulation; 3) the need for strict safety precautions when working around this material; and 4) the need for work that disturbs the insulation and dust from the insulation to be conducted by persons specifically trained to work around asbestos;  5) and if the disturbance of the Zonolite attic insulation cannot be controlled it should be removed prior to conducting additional work activities which would disturb the insulation.

Further Affiant sayeth not.

_RICHARD L. HATFIELD_

Subscribed and sworn to before me,
a Notary Public of the State of
Georgia, this 26th day of May ,
2000, by Richard L. Hatfield, who is
personally known to me.

My Commission Expires:_____

NOTARY PUBLIC, Gwinnett County, Georgia
My Commission Expires June 30, 2003

225

# CURRICULUM VITAE

Richard L. Hatfield
Senior Consultant
MAS, Inc.
3945 Lakefield Court
Suwanee, Georgia  30024
Work Telephone:  (770) 866-3200

## EDUCATION

1974      Received Bachelor of Science degree; Experimental Statistics, North Carolina State University.

1978      Received Bachelor of Science degree; Geology, North Carolina State University.

## CAREER SUMMARY

Mr. Hatfield joined Materials Analytical Services in 1996 as a Senior Consultant to perform consulting services for asbestos and other environmental and materials related problems.

Mr. Hatfield joined Law Engineering in 1978 and was assigned to the U.S. EPA's "Asbestos in Schools" program in 1979.  With the completion of that program and the initial attention of building managers toward the asbestos problems, Mr. Hatfield continued to assist Law by consulting with clients and developing methods to solve asbestos problems.

In 1982, Mr. Hatfield was recruited by a prominent laboratory, McCrone Environmental, to develop and manage their Atlanta based company.  Their goal was to provide quality field and laboratory services for the asbestos abatement industry.  These services included building surveys, air and project monitoring, consulting, expert testimony, and extensive analytical and microscopy services.   During this time, the company, McCrone Environmental Services, was recognized as a leader in the specialized fields of light and electron microscopy.

During 1987, some significant changes in the industry were made, notably the formulation of Law Associates, Inc. and its subsidiary electron microscopy laboratory, Materials Analytical Services, Inc.  Later in 1987, Mr. Hatfield returned to the Law Companies Group by joining Law Associates to help develop its consulting services and assist the laboratory in the development of special analytical services.

226



EXHIBIT

A

Hatfield

Richard L. Hatfield
Page 2

## ASBESTOS RELATED EXPERIENCE

Mr. Hatfield has been actively engaged in asbestos related services since 1979 when he served as a Technical Field Advisor for U.S. EPA's "Asbestos in Schools Program". While serving on this program, Mr. Hatfield assisted in the formulation of New York State, New Jersey and the City of New York asbestos programs. He helped with training state and local government personnel, contractors and the general public in regulations, building surveys and in work procedures associated with the discovery, control and removal of asbestos-containing materials.

Upon completion of the EPA's project, Mr. Hatfield returned to Law and began its development of asbestos related services, particularly its analytical services. Mr. Hatfield's knowledge and experience has been sought to further many other's education in dealing with asbestos-related problems. It should be noted that Mr. Hatfield's teaching experience began as a prime instructor in some of the earliest and most recognized training programs.

While directing McCrone Environmental, Mr. Hatfield began serving as an expert witness in property damage, "cost recovery" litigation. Utilizing the expertise of the microscopy laboratory, Mr. Hatfield developed procedures for the identification of asbestos-containing products and special methods for evaluation asbestos contamination in buildings. In addition to individual property damage cases, Mr. Hatfield testified at the Johns Manville Hearing for Property Damage settlements in Washington, D.C.

Upon returning to Law, Mr. Hatfield had been involved with management and training of project engineers, consulting with a broad spectrum of clients and the development of special analytical services for the laboratory, Materials Analytical Services. Working closely with Dr. Longo and the other microscopists, Mr. Hatfield shared his procedures and experience to further develop analytical testing services for building evaluation and property damage litigation.

Mr. Hatfield's knowledge and experience has been sought to further many other's education in dealing with asbestos-related problems. In addition to lecturing, Mr. Hatfield has twice taught the NIOSH Course No. 582, "Sampling and Evaluating Airborne Asbestos Dust" for the University of Alabama in Birmingham, and was appointed as an expert advisor to EPA's negotiated rule-making committee to promulgate new regulations for asbestos in schools. These regulations are known as the Asbestos Hazard Emergency Response Act (AHERA) regulations. Additionally, Mr. Hatfield has participated in the U.S. EPA's Peer Review of research projects.

Richard L. Hatfield
Page 3

## PUBLICATIONS AND PRESENTATIONS

Hatfield, R.L., Krewer, J.A., and Longo, W.E., "A Study of the Reproducibility of the Micro-Vac Technique as a Tool for the Assessment of Surface Contamination in Buildings with Asbestos Containing Materials" (M.E. Beard and H.L. Rook) in Advances in Environmental Measurement Methods for Asbestos, ASTM #STP 1342,301, January 2000.

Keyes, D. L., Chessan, J., Ewing, W. M., Faas, J. C., Hatfield, R. L., Hayes, S. M., Longo, W. E. and Millette, J. R. "Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above and Suspended Ceiling" Am. Ind. Hyg. Assoc. J. (52) Nov. 1991

Keyes, D. L., Chessan, J., Hayes, S. M., Hatfield, R. L., Ewing, W. M., Longo, W. E. and Millette, J. R. "Re-Entrainment of Asbestos from Dust in a Building with Acoustical Plaster" Environmental Choice, Technical Support, Volume I, (6), 1992.

Ewing, W. M., Chesson, J., Dawson, T. A., Ewing, E. M., Hatfield, R. L., Hays, S. M., Keyes, D. L., Longo, W. E., Millette, J. R., and Spain, W. H. "Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing" Environmental Choices Technical Supplement, Volume I, (2), 1993.

## PROFESSIONAL MEMBERSHIPS

1)    American Industrial Hygiene Association

2)    ASTM D-22 Committee

3)    Environmental Information Association

5)    National Institute of Building Sciences



MATERIALS
ANALYTICAL
SERVICES

# ANALYSIS OF ZONOLITE ATTIC INSULATION

Submitted to:

J. Conard Metcalf

Williams & Trine

September 10, 1993

By:  Sean Fitzgerald
William E. Longo, Ph.D.

PLAINTIFF'S
EXHIBIT
1
96A3.0

EXHIBIT
B

Raleigh Office:
2406 Blue Ridge Road • Suite 105
Raleigh North Carolina 27607

Atlanta Office:
3597 Parkway Lane • Suite 25
Norcross, Georgia 30092
(404) 448-3200 • FAX (404) 136



**MATERIALS
ANALYTICAL
SERVICES**

## MICROANALYSIS PROJECT REPORT

**CLIENT:**  J. Conard Metcalf

**INSTITUTION:** Williams & Trine, P.C.

**PROJECT:**  Zonolite Product Analysis

**MAS NO.:**  M7099-1

**DATE:**  July 26, 1993

**PREPARATION BY:**  Sean Fitzgerald

**ANALYSIS BY:**  Sean Fitzgerald

**P.O. NUMBER:**  N/A

<u>**SUMMARY:**</u> The objective of this study was to determine the presence or absence of tremolite/actinolite asbestos in Zonolite Attic Insulation that was manufactured by W.R. Grace.

<u>**DESCRIPTION:**</u> In August of 1991, Materials Analytical Services, Inc. (MAS) received one 12 pound bag labeled "Zonolite Attic Insulation, All Mineral Vermiculite", as a known reference material. In July of 1993, the Zonolite Attic Insulation was retrieved from the MAS archive storage room and analyzed by optical microscopy, scanning electron microscopy (SEM) and transmission electron microscopy (TEM).

<u>**PREPARATION AND ANALYSIS:**</u> After removing a random sample of the vermiculite for testing, the zonolite bag was photographed front and back as shown in figures 1 and 2. The Zonolite bag was essentially received in our laboratory in an undamaged condition, but due to the deterioration of the plastic over time, the Zonolite bag fell apart during handling for the photography and had to be re-constructed. The remaining loose vermiculite material (figure 3), was placed in a large plastic specimen bag for storage. The removed sub-sample of vermiculite was inspected with an Olympus SZ Zoom Stereo Microscope at magnifications from 7X to 40X, as shown in figures 4 and 5. In one of the vermiculite pellets, a fibrous grayish mineral was observed associated with the vermiculite material as shown by the arrows in both figures 4 and 5. Samples of the vermiculite material were then prepared for both SEM and TEM.

The SEM preparation was performed by placing one of the vermiculite pellets containing the associated fibrous mineral onto a SEM stub with double-sided carbon tape and carbon paint. The sample was then carbon-coated in a Hitachi Vacuum Evaporator. The SEM analysis was performed using a Hitachi S-800 Field Emission SEM with a Tracor Northern EDXA system. The SEM photomicrographs shown in figures 6 through 11 further show the fibrous mineral intergrowth in between the vermiculite leaves for that particular sample. The EDXA spectra of the fibrous mineral was consistent with tremolite-actinolite (see figures 12 and 13).

Atlanta Office:
3597 Parkway Lane • Suite 250
Norcross, Georgia 30092

Raleigh Office:



**MATERIALS
ANALYTICAL
SERVICES**

J. Conard Metcalf
Page 2

The TEM preparation of the vermiculite sample was performed by suspending between 10 - 30 mg of the fine vermiculite dust fraction in reagent alcohol that was then filtered onto a 0.2 $\mu$m polycarbonate (PC) filter. The filter was dried, carbon coated, and a section of the filter was placed on a 200 mesh TEM grid. The PC filter material was dissolved in a chloroform Jaffe washer and the final TEM prep was examined in a JEOL 1200 EX II TEM. The TEM photomicrographs in figures 14 and 16 show that the tremolite-actinolite structures found had an aspect ratio greater than 3:1, and therefore can be classified as an asbestiform structure as specified by current Federal regulations. A Tracor Northern system was used to obtain EDXA spectra, as shown in figure 18, and a selected area electron diffraction (SAED) pattern was recorded as shown in figure 17. The EDXA and SAED information was used to positively identify the fibrous mineral found in the vermiculite samples as asbestiform tremolite-actinolite.

## DISCUSSION AND CONCLUSION

It is well known that in some areas of the country where vermiculite where vermiculite deposits are found, asbestiform tremolite-actinolite can also be found as an associated mineral. However, there has been some suggestion that during the processing of the vermiculite ore at the manufacturing plant, the asbestiform tremolite-actinolite is somehow removed and the final vermiculite product that is then sold to the consumer, is tremolite-actinolite free.

This study was designed to test that theory by taking a known sample of a processed vermiculite product (Zonolite Attic Insulation as manufactured by W.R. Grace), and determine if it contained asbestiform tremolite-actinolite.

Our analysis showed that there was tremolite-actinolite found in with the vermiculite in the Zonolite Attic Insulation product (figures 5 through 11). The tremolite-actinolite was found both associated with vermiculite and as free respirable fibers in the fine dust as shown in figures 14 through 16.

It is therefore our conclusion that the tremolite-actinolite does remain associated with the vermiculite after the ore is fully processed and can be found with the finished product, as demonstrated with the W.R. Grace Zonolite Attic Insulation.

231



**FIGURE 1**



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



FIGURE 10

FIGURE 11

236



**FIGURE 12**



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17

239

**MATERIALS ANALYTICAL SERVICES, INC.**
3945 LAKEFIELD COURT
SUWANEE, GEORGIA 30024
(770) 866-3200

**Client Name:**                    McGarvey, Heberling, Sullivan & McGarvey, P.C.

**Client Job Number / Name:**       Vermiculite Samples from Libby, Montana: Various
                                    Locations

**MAS Project Number:**             M22964

**Date:**                           February 10, 2000

**Analytical Protocol:**            EPA document 600/R-93/116, "Method for the
                                    Determination of Asbestos in Bulk Building
                                    Materials"

| CLIENT SAMPLE NUMBER | MAS SAMPLE NUMBER | LOCATION | MATERIAL | ASBESTOS ANALYSIS |
|---|---|---|---|---|
| #1 | M22964-001 | 214 Colorado Ave | Raw ore | Actinolite/Tremolite Present |
| #2 | M22964-002 | 214 Colorado Ave | Milled ore | Actinolite/Tremolite Present |
| #3 | M22964-003 | 35 McKay Ave | Attic insulation | Actinolite/Tremolite Present |
| #4 | M22964-004 | 3724 Hwy 2 South | Attic insulation | Actinolite/Tremolite Present |
| #5 | M22964-005 | 106 Voves Ave | Attic insulation in garage | Actinolite/Tremolite Present |
| #6 | M22964-006 | 1406 Utah Ave | Attic insulation | Actinolite/Tremolite Present |
| #7 | M22964-007 | Vacant rental Nevada St | Attic insulation | Actinolite/Tremolite Present |
| #8 | M22964-008 | 512 W. 6th | Attic insulation | Actinolite/Tremolite Present |
| #9 | M22964-009 | 310 E. 5th | Attic insilation | Actinolite/Tremolite Present |
| #10 | M22964-010 | 1020 California St | Attic insulation | Actinolite/Tremolite Present |
| #11 | M22964-011 | 2261 Hwy 2 South | Unosed vermiculite insulation taken from factory packaged bag | Actinolite/Tremolite Present |
| #12 | M22964-012 | 347 Voves Ave | Attic insulation | Actinolite/Tremolite Present |
| #13 | M22964-013 | 226 Spencer Rd, from opening in wall | Wall insulation | Actinolite/Tremolite Present |

240

aleigh Office:
6 Hutton Street • Suite 101
leigh, NC 27606

**EXHIBIT**



Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024

7708663259; 02/10/00 4:56PM;JetFax #437;Page 3/29
7708663259

# Materials Analytical Services, Inc.
## 3945 Lakefield Court
## Suwanee, GA 30024
## (770) 866-3200

### Summary of Microvac Dust Analysis by
### Transmission Electron Microscopy (TEM)

| | |
|---|---|
| **Date:** | **February 10, 2000** |
| **Client Name:** | **McGarvey, Heberling, Sullivan & McGarvey, P.C.** |
| **Client Job Number/Name:** | **Libby, MT** |
| **MAS Project Number:** | **M22963** |

Reviewer: _____

| Client Sample Number | MAS Sample Number | Sample Location | Number of Asbestos Structures | Asbestos Concentration Str/sq.ft. | Asbestos Concentration Str/Cm² |
|---|---|---|---|---|---|
| 1 | 001 | Mason, Walter - Dust sample #1 from floor of attic apartment storage area (2 x 38 cm) | 8 | 32.7 million | 35.2 thousand |
| 2 | 002 | Mason, Walter - Dust sample #2 from unused rolled sheet metal ducting surface (10 x 10 cm) | 11 | 10.2 million | 10.9 thousand |
| 3 | 003 | Spencer, Shelly - Dust sample #3 light dust taken from to of wooden closer shelf from children's bedroom (13 x 12 cm) | 2 | 399.7 thousand | 430.3 |
| 4 | 004 | Spencer, Shelly - Dust sample #4 medium dust taken from surface of plastic covered cardboard child's game on closet shelf (15 x 8 cm) | 5 | 6.4 million | 6.9 thousand |
| 5 | 005 | Spencer, Shelly - Dust sample #5 heavy dust taken from wooden support ledger of closet shelf (4 x 18 cm) | 4 | 17.3 million | 18.6 thousand |
| 8 | 006 | Walker, Diane - Dust sample #6 taken from walkboards in attic including crushed vermiculite where homeowner routinely travels when working in attic (10 x 10 cm) | 13 | 41.1 million | 44.2 thousand |
| 7 | 007 | Walker, Diane - Dust sample #7 taken from two wooden lips of attic access hatch when in open position into bedroom (2 x 28 cm) | 13 | 22.8 million | 24.6 thousand |

241

RECEIVED TIMEFEB. 10. 5:06PM

EXHIBIT

P
Hatfield

# TEM DUST ANALYSIS  M22963 '001

**McGarvey, Heberling, Sullivan & McGarvey**

Client Sample ID: 1

| | | | |
|---|---|---|---|
| Sample Area/ Volume: | 76 cm2 | Date Analyzed: | 2/4/00 |
| Filter Type: | MCE 47mm | Analyst: | William Stark |
| Pore size: | 0.45 | Scope Number: | 3 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 KV |
| Sample type: | Dust | Indicated Mag: | 25 KX |
| Analysis type: | Dust | Screen Mag: | 20 KX |
| Grid Acceptance: | YES 30 % | Grid bar: | 5674 |

| | | | | | |
|---|---|---|---|---|---|
| Str < 5μm: | 4 | Number of grids: 2 | #1: 114 | #3: 112 | Average Grid Size: 0.012935 |
| Str ≥ 5μm: | 4 | Number of openings: 10 | #2: 114 | #4: 115 | Total Area Analyzed: 0.129 |
| Total Str: | 8 | | | | |

| | | | |
|---|---|---|---|
| Volume Filtered | 5 ml | Str / sqr ft | 3.268E+07 | Str / cm2 | 3.517E+04 |
| Dilution Factor | 33.33333 | Str / sqr ft >=5 | 1.634E+07 | Str / cm2 >=5 | 1.759E+04 |

| Set | SquareID | Type | Structure | Length | Width | Morph | SABD | EDS |
|---|---|---|---|---|---|---|---|---|
| 1 | D4-G7 | AC | M-B | 24.00 | 1.00 | X | X | Print Out |
| | F9 | | NSD | | | | | |
| 2 | D6 | TR | M-B | 4.50 | 0.60 | X | X | Print Out |
| | C10 | | NSD | | | | | |
| 3 | A6 | AC | M-B | 13.00 | 1.00 | X | X | |
| 4 | A6 | AC | M-B | 5.50 | 0.20 | X | X | |
| 5 | D5-A2 | C | M-F | 1.20 | 0.02 | X | X | Print Out |
| | C4 | | NSD | | | | | |
| 6 | G3 | AC | F | 5.40 | 0.20 | X | M33130 | |
| 7 | G3 | AC | F | 2.30 | 0.15 | X | X | |
| 8 | E6 | TR | M-F | 4.00 | 0.30 | X | X | |

M22963 '001  Sample Comments:

7709563259;
7708663259

02/10/00 4:57PM;JetFax #437;Page 5/29

MATERIALS ANALYTICAL SERVICES          FRI 04-FEB-00  10:34
Cursor: 0.000KeV = 0          ROI (SIKα) 1.580: 1.820=1238



0.000                              VFS = 255     10.240
ES     M22963-001: ACTINOLITE EDS

243

;nt by:    7708663259;    02/10/00  4:57PM;JetFax_#437;Page 6/29
7708663259

MATERIALS ANALYTICAL SERVICES          FRI 04-FEB-00   13:58
Cursor: 0.000keV = 0        RGI (SIKα) 1.650  R.628=492



0.000                                  VFS = 128    10.240
    24    M22963-001; TREMOLITE EDS

244

.ent by:                     7708663259;              02/10/00  4:57PM;JetFax #437;Page 7/29
                             7708663259



MATERIALS ANALYTICAL SERVICES              THU 10 FEB 00    13:53
Cursor: 0.000keV = 0         ROI (SIKa) 1.650: 1.820=124

0.000                              VFS = 32      10.240
   38     M22963-001: CHRYSOTILE EDS

ent by:    7708663259;    02/10/00  4:57PM; JetFax #437;Page 8/29
7708663259

# TEM DUST ANALYSIS    M22963   002

**McGarvey, Heberling, Sullivan & McGarvey**

| | | Client Sample ID: | 2 |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 100 cm2 | Date Analyzed: | 2/4/00 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Dust | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES    25 % | Grid_box: | 5674 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Str < 5um: | 6 | Number of grids: | 2 | #1: 114 | #3: 114 | Average Grid Size: | 0.012996 |
| Str ≥5um: | 5 | Number of openings: | 10 | #2: 114 | #4: 114 | Total Area Analyzed: | 0.130 |
| Total Str: | 11 | | | | | | |

| | | | |
|---|---|---|---|
| Volume Filtered 10 ml | Str / sqr ft | 1.020E+07 | Str / cm2  1.098E+04 |
| Dilution Factor  10 | Str / sqr ft  >=5 | 4.636E+06 | Str / cm2  >=5  4.990E+03 |

| Str: | Square ID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B4-G3 | AN | M-F | 6.00 | 0.30 | X | X | Print Out |
| 2 | E2 | AN | M-F | 10.00 | 0.50 | X | X | X |
| 3 | E2 | AN | F | 4.00 | 0.20 | X | X | X |
| 4 | E2 | AN | F | 1.00 | 0.10 | X | X | X |
| 5 | E2 | TR | F | 8.00 | 0.30 | MC4342 | X | Print Out |
| 6 | C5 | AN | M-F | 12.00 | 0.50 | X | X | X |
| | B8 | | NSD | | | | | |
| 7 | G9 | AN | F | 2.00 | 0.20 | X | X | X |
| 8 | B5-B9 | AN | M-F | 10.00 | 0.50 | X | X | X |
| 9 | B6 | AN | M-F | 4.00 | 0.30 | X | X | X |
| | D9 | | NSD | | | | | |
| 10 | F10 | AN | F | 4.00 | 0.20 | X | X | Print Out |
| 11 | J6 | AN | F | 3.00 | 0.20 | X | X | X |

M22963 002    Sample Comments:

246

MATERIALS ANALYTICAL SERVICES                    FRI 04 FEB 00   09:39
Cursor: 0.180KeV = 2



0.000                                      VFS = 128     10.240
   16      M22963-002;  ANTHOPHYLLITE

247

MATERIALS ANALYTICAL SERVICES            FRI 04-FEB-00   09:48
Cursor: 0.000KeV = 0



0.000                                VFS = 64      10.240
14      M22963-002;   TREMOLITE/ACTINOLITE

248

cnt by:                                    7708663259;          02/10/00  4:58PM;JetFax #437;Page 11/29
                                           7708663259

MATERIALS ANALYTICAL SERVICES            FRI 04-FEB-00  10:14
Cursor: 0.140KeV = 0



0.000                              VFS = 64        10.240
   7    M22963-002;  ANTHOPHYLLITE

RECEIVED TIMEFEB. 10.   5:06PM

# TEM DUST ANALYSIS   M22963   003

**McGarvey, Heberling, Sullivan & McGarvey**

Client Sample ID:   3

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 156 cm2 | Date Analyzed: | 2/4/00 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Dust | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES   15 % | Grid_box: | 5874 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Str < 5um: | 0 | Number of grids: | 2 | #1: 114 | #3: 113 | Average Grid Size: 0.012883 |
| Str ≥5um: | 2 | Number of openings: | 10 | #2: 114 | #4: 113 | Total Area Analyzed: 0.129 |
| Total Str: | 2 | | | | | |

Volume Filtered   30   ml
Dilution Factor   3.333333

| | | | |
|---|---|---|---|
| Str / sqr ft | .3.997E+05 | Str / cm2 | 4.303E+02 |
| Str / sqr ft  >=5 | 3.997E+05 | Str / cm2  >=5 | 4.303E+02 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | A1-B7 | | NSD | | | | | |
| | G3 | | NSD | | | | | |
| | D3 | | NSD | | | | | |
| | A3 | | NSD | | | | | |
| 1 | C6 | AN | F | 6.00 | 0.30 | X | X | Print Out |
| | A2-D3 | | NSD | | | | | |
| | B5 | | NSD | | | | | |
| | D8 | | NSD | | | | | |
| | G9 | | NSD | | | | | |
| 2 | H6 | AN | F | 8.00 | 0.40 | X | X | X |

M22963   003   Sample Comments:

250



MATERIALS ANALYTICAL SERVICES          FRI 04 FEB 00  10:56
Cursor: 0.000KeV = 0

9      M22963-003;  ANTHOPHYLLITE

RECEIVED TIMEFEB. 10.   5:06PM.

ent by:                                   7708663259;                02/10/0  4:58PM; JetFax  #437;Page 14/29

                                          7708663259

# TEM DUST ANALYSIS          M22963   004

**McGarvey, Heberling, Sullivan & McGarvey**

| | | | | Client Sample ID: | | 4 |
|---|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 120 cm2 | | Date Analyzed: | 2/4/00 |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Dust | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES    15 % | | Grid  box: | 5674 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Str < 5um: | 4 | | Number of grids: | 2 | #1: 114 | #3: 114 | Average Grid Size: | 0.012906 |
| Str ≥5um: | 1 | | Number of openings: | 10 | #2: 114 | #4: 114 | Total Area Analyzed: | 0.130 |
| Total Str: | 5 | | | | | | | |

Volume Filtered   6   ml

Dilution Factor   16.66667

| | | | | |
|---|---|---|---|---|
| Str / sqr ft | 6.439E+06 | | Str / cm2 | 6.931E+03 |
| Str / sqr ft >=5 | 1.288E+06 | | Str / cm2 >=5 | 1.386E+03 |

| Set: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | E1-G8 | | NSD | | | | | |
| | B5 | | NSD | | | | | |
| | F4 | | NSD | | | | | |
| | D3 | | NSD | | | | | |
| | A3 | | NSD | | | | | |
| 1 | D1-B6 | AN | F | 3.00 | 0.20 | X | X | Print Out |
| | C4 | | NSD | | | | | |
| 2 | F3 | AN | F | 4.00 | 0.20 | M24343 | X | X |
| | H5 | | NSD | | | | | |
| 3 | G7 | AN | F | 2.00 | 0.20 | X | X | Print Out |
| 4 | G7 | AN | F | 15.00 | 0.50 | X | X | X |
| 5 | G7 | AN | F | 4.00 | 0.30 | X | X | X |

M22963   004    Sample Comments:

252

MATERIALS ANALYTICAL SERVICES                    FRI 04-FEB-00   12:47
Cursor: 0.000keV = 0



0.000                                        VFS = 64          10.240
   7     M22963-004;   ANTHOPHYLLITE

RECEIVED TIMEFEB. 10.   5:06PM

7708663259;          02/10/0    4:59PM;JetFax  #437;Page 16/29
7708663259

MATERIALS ANALYTICAL SERVICES                    FRI 04-FEB-00  12:53
Cursor: 0.000KeV = 0



0.000                                    VFS = 64      10.240
  6      M22963-004;  ANTHOPHYLLITE

254

# TEM DUST ANALYSIS          M22963   005

**McGarvey, Heberling, Sullivan & McGarvey**
*

Client Sample ID:          5

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 72 cm2 | | Date Analyzed: | 2/4/00 |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Dust | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES    25 % | | Grid box: | 5874 |

| | | | | |
|---|---|---|---|---|
| Str < 5um: | 1 | Number of grids: 2  #1: 114  #3: 114 | Average Grid Size: | 0.012939 |
| Str ≥5um: | 3 | Number of openings: 10  #2: 114  #4: 113 | Total Area Analyzed: | 0.129 |
| Total Str: | 4 | | | |

Volume Filtered    3  ml
Dilution Factor    33.33333

| | | | |
|---|---|---|---|
| Str / sqr ft | 1.725E+07 | Str / cm2 | 1.856E+04 |
| Str / sqr ft  >=5 | 1.293E+07 | Str / cm2  >=5 | 1.392E+04 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | B6-B8 | | NSD | | | | | |
| 1 | F10 | AN | F | 5.00 | 0.30 | X | X | Print Out |
| | B7 | | NSD | | | | | |
| 2 | C9 | AN | F | 2.00 | 0.20 | X | X | X |
| | F3 | | NSD | | | | | |
| 3 | B7-C8 | AN | F | 8.00 | 0.50 | X | X | X |
| 4 | D6 | AN | F | 6.00 | 0.30 | X | X | X |
| | B3 | | NSD | | | | | |
| | E1 | | NSD | | | | | |
| | R4 | | NSD | | | | | |

M22963   005    Sample Comments:

255

ent by: 7708663259; 02/10/0 :59PM; JetFax #437;Page 18/29
7708663259

MATERIALS ANALYTICAL SERVICES    FRI 04-FEB-00  13:22
Cursor: 0.180KeV = 1



0.000                              VFS = 32      10.240
   12    M22963-005;  ANTHOPHYLLITE

256

# TEM DUST ANALYSIS

# M22963 006

**McGarvey, Heberling, Sullivan & McGarvey**

Client Sample ID: 6

| | | |
|---|---|---|
| Sample Area/ Volume: | 100 cm2 | |
| Filter Type: | MCE 47mm | |
| Pore size: | 0.45 | |
| Effective Filter Area: | 1297 | |
| Sample type: | Dust | |
| Analysis type: | Dust | |
| Grid Acceptance | YES | 30 % |

| | | |
|---|---|---|
| Date Analyzed: | 2/4/00 | |
| Analyst: | William Stark | |
| Scope Number: | 3 | |
| Accelerating Voltage: | 100 | KV |
| Indicated Mag: | 25 | KX |
| Screen Mag: | 20 | KX |
| Grid_box: | 5674 | |

| | |
|---|---|
| Str < 5um: | 6 |
| Str ≥5um: | 7 |
| Total Str: | 13 |

| Number of grids: | 2 | #1: 112 | #3: 114 | Average Grid Size | 0.012713 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: 112 | #4: 113 | Total Area Analyzed: | 0.127 |

| | |
|---|---|
| Volume Filtered | 3 ml |
| Dilution Factor | 33.33333 |

| Str / sqr ft | 4.107E+07 | Str / cm2 | 4.421E+04 |
|---|---|---|---|
| Str / sqr ft >=5 | 2.212E+07 | Str / cm2 >=5 | 2.381E+04 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | D6-16 | AC | M-F | 3.50 | 0.18 | X | X | Print Out |
| 2 | F4 | AC | F | 3.20 | 0.20 | X | X | |
| 3 | F4 | AC | B | 9.80 | 0.50 | X | X | |
| 4 | C2 | AC | B | 18.00 | 1.00 | X | X | |
| 5 | A4 | AC | B | 13.40 | 0.80 | X | X | |
| 6 | A4 | AC | B | 5.80 | 0.40 | X | X | |
| 7 | C8 | AC | F | 4.40 | 0.22 | X | X | Print Out |
| 8 | D7-H8 | AC | M-F | 1.80 | 0.20 | X | X | |
| 9 | E9 | AC | B | 7.20 | 0.18 | X | X | |
| 10 | E9 | AC | M-F | 1.80 | 0.10 | X | X | |
| 11 | B6 | AC | M-B | 16.00 | 0.60 | X | X | Print Out |
| 12 | C4 | AC | M-F | 3.60 | 0.35 | X | X | |
| 13 | F3 | AC | M-F | 6.20 | 0.20 | X | X | |

M22963 006 Sample Comments:

257

ent by:                    7708663259;                    02/10/0  5:00PM;JetFax #437;Page 20/29
                           7708663259



MATERIALS ANALYTICAL SERVICES          FRI 24-FEB-00  14:34
Cursor: 0.000KeV = 0          RCI (SIKα) 1.650: 1.920=6445

0.000                                      VFS = 2048    10.240
  158      M22963-006: ACTINOLITE EDS

RECEIVED TIME FEB. 10.  5:06PM

MATERIALS ANALYTICAL SERVICES          FRI 04-FEB-00   14:42
Cursor: 0.000keV = 0          ROI (SIKα) 1.660: 1.920=2618



0.000                                            VFS = 512      10.240
   60      M22963-006: ACTINOLITE EDS

MATERIALS ANALYTICAL SERVICES          FRI 04-FEB-00   15:00
Cursor( 0.000keV = 0          ROI (SIKa) 1.650: 1.820=1175



0.000                                   VFS = 256    10.240
26      M22953-006: ACTINOLITE EDS

260

# TEM DUST ANALYSIS    M22963    007

| McGarvey, Heberling, Sullivan & McGarvey | Client Sample ID: | 7 |
|---|---|---|

| | | | |
|---|---|---|---|
| Sample Area/ Volume: | 176 cm2 | Date Analyzed: | 2/4/00 |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon |
| Pore size: | 0.45 | Scope Number: | 2 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100    KV |
| Sample type: | Dust | Indicated Mag: | 25    KX |
| Analysis type: | Dust | Screen Mag: | 20    KX |
| Grid Acceptance | YES    25 % | Grid_box: | 5674 |

| Str < 5um: | 8 | Number of grids: | 2 | #1: 114 | #3: 114 | Average Grid Size: | 0.012996 |
|---|---|---|---|---|---|---|---|
| Str ≥5um: | 5 | Number of openings: | 10 | #2: 114 | #4: 114 | Total Area Analyzed: | 0.130 |
| Total Str: | 13 | | | | | | |

| Volume Filtered | 3 ml | Str / sqr ft | 2.283E+07 | Str / cm2 | 2.457E+04 |
|---|---|---|---|---|---|
| Dilution Factor | 33.33333 | Str / sqr ft >=5 | 8.780E+06 | Str / cm2 >=5 | 9.451E+03 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C9-E9 | C | F | 6.00 | 0.04 | X | X | Print Out |
| 2 | E9 | C | M-F | 3.00 | 0.04 | X | X | |
| | E7 | | NSD | | | | | |
| 3 | F5 | C | M-F | 8.00 | 0.04 | X | X | |
| 4 | C1 | C | F | 2.00 | 0.04 | X | X | |
| 5 | C2 | C | M-F | 3.00 | 0.04 | X | X | |
| 6 | B5 | AN | F | 4.00 | 0.34 | X | X | Print Out |
| 7 | B5 | C | F | 2.00 | 0.04 | X | X | |
| 8 | D9-G3 | C | M-B | 4.00 | 0.20 | X | X | |
| 9 | G3 | C | F | 5.00 | 0.04 | X | X | |
| 10 | D4 | C | F | 1.50 | 0.03 | X | X | |
| 11 | B6 | C | F | 4.00 | 0.04 | X | X | Print Out |
| 12 | B6 | C | F | 8.00 | 0.04 | X | X | |
| | C9 | | NSD | | | | | |
| 13 | E8 | C | M-F | 5.00 | 0.04 | X | X | |

M22963    007    Sample Comments:

MATERIALS ANALYTICAL SERVICES          FRI 04-FEB-00   16:30
Cursor: 0.140KeV = 5



0.000                                  VFS = 32       10.240
   17       M22963-007;   CHRYSOTILE

RECEIVED TIMEFEB. 10.   5:06PM

MATERIALS ANALYTICAL SERVICES                    FRI 04-FEB-00   16:43
Cursor: 0.140KeV = 0



0.000                                            VFS = 32    10.240
7      M229E3-007;   ANTHOPHYLLITE

263

MATERIALS ANALYTICAL SERVICES                FRI 04-FEB-00  16:51
Cursor: 0.140keV = 2



0.000                                        VFS = 16      10.240
    12    M22963-007;  CHRYSOTILE

# TEM DUST ANALYSIS    M22963   008

**McGarvey, Heberling, Sullivan & McGarvey**

Client Sample ID:    8

| | | | |
|---|---|---|---|
| Sample Area/Volume: | **0 cm2** | Date Analyzed: | 2/5/00 |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon |
| Pore size: | 0.45 | Scope Number: | 2 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 KV |
| Sample type: | Dust | Indicated Mag: | 25 KX |
| Analysis type: | Dust | Screen Mag: | 20 KX |
| Grid Acceptance: | YES   1 % | Grid_box: | 5674 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Str < 5um: | 0 | Number of grids: 2 | #1: 114 | #3: 114 | Average Grid Size: | 0.012996 |
| Str ≥5um: | 0 | Number of openings: 10 | #2: 114 | #4: 114 | Total Area Analyzed: | 0.130 |
| Total Str: | 0 | | | | | |

Volume Filtered   30 ml

Dilution Factor   3.333333

| Str / sqr ft | 0.000E+00 | Str / cm2 | 0.000E+00 |
|---|---|---|---|
| Str / sqr ft >=5 | 0.000E+00 | Str / cm2 >=5 | 0.000E+00 |

| Site: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | C10-G7 | | NSD | | | | | |
| | F9 | | NSD | | | | | |
| | D8 | | NSD | | | | | |
| | A6 | | NSD | | | | | |
| | C3 | | NSD | | | | | |
| | D10-H8 | | NSD | | | | | |
| | F7 | | NSD | | | | | |
| | D9 | | NSD | | | | | |
| | C4 | | NSD | | | | | |
| | E3 | | NSD | | | | | |

M22963   008   Sample Comments:

265



N.G.S. INC.
M24343 100.0KV  X15K  500

266

Sent By:    7708663259;    02/10/    5:03PM; JetFax #437;Page 29/29
7708663259



267

RECEIVED
3

**MAS**

# Materials Analytical Services, Inc.
## 3945 Lakefield Court
## Suwanee, GA  30024
## (770) 866-3200

## Summary of Microvac Dust Analysis by
## Transmission Electron Microscopy (TEM)

| | |
|---|---|
| **Date:** | 3/21/00 |
| **Client Name:** | Richard Hatfield |
| **Client Job Number/Name:** | Vermiculite Demonstration, Spokane, Washington |
| **MAS Project Number:** | M23236 (Dust) & M23237 (Air) |

### AIR SAMPLES

| MAS ID | Sample ID & Location | Total Asbestos Str/cc |
|---|---|---|
| M23237-001 | #1 Background Outside | BTL * |
| M23237-002 | #2 Paul Liss (right) | 9.75 |
| M23237-003 | #3 Paul Liss (left) | 6.96 |
| M23237-004 | #4 Area (on pipe) | 12.48 |
| M23237-005 | #5 Blank | 0 |

\* BTL = Below Detection Limit

### DUST SAMPLES

| MAS ID | Sample ID & Location | Asbestos Concentration str/sq. ft. | Asbestos Concentration str/cm$^2$ |
|---|---|---|---|
| M23236-001 | #1 Dust from Attic Under the Vermiculite | 46.8 Million | 50.3 Thousand |

Raleigh Office:
616 Hutton Street • Suite 101
Raleigh, NC 27606
(919) 829-7041 • FAX (919) 829-5518



EXHIBIT
F
Hatfield

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259



Richard Hatfield

MAS Corporate

3945 Lakefield Court

Suwanee, GA   30024

MAS Project # M23237

Samples were received on 3/16/00

Referencing your    Job Name:    Vermiculite Demonstration

Job. Number:

PO. Number:

Enclosed are the results for the indirect prep samples listed below:

| Sample # | Location | Volume | Sample # | Location | Volume |
|----------|----------|-----------|----------|----------|--------|
| 001 | 1 | 32 Liters | | | |
| 002 | 2 | 32 Liters | | | |
| 003 | 3 | 32 Liters | | | |
| 004 | 4 | 32 Liters | | | |
| 005 | 5 | 0 Liters | | | |

Sincerely

*Richard Hatfield*

Richard Hatfield

Senior Consultant

Enc:

¹ This report relates only to items tested as received, and may not be used to claim endorsement by NVLAP or any other U.S. government agency. This report may not be reproduced except in full with the approval of Materials Analytical Services, Inc. (MAS). MAS assumes that samples were collected by qualified personnel using proper procedures. MAS does not assume any responsibility for analyses reported as structures/cm3 on samples collected by non-laboratory personnel.
NVLAP #123500



Richard Hatfield

MAS Corporate

3945 Lakefield Court

Suwanee, GA  30024


MAS Project # M23237

Samples were received on 3/16/00

Referencing your    Job Name:    Vermiculite Demonstration

                    Job. Number:

                    PO. Number:


Enclosed are the results for the indirect prep samples listed below:

| Sample # | Location | Volume | Sample # | Location | Volume |
|----------|----------|-----------|----------|----------|--------|
| 001 | 1 | 32 Liters | | | |
| 002 | 2 | 32 Liters | | | |
| 003 | 3 | 32 Liters | | | |
| 004 | 4 | 32 Liters | | | |
| 005 | 5 | 0 Liters | | | |


Sincerely

*Richard Hatfield*

Richard Hatfield

Senior Consultant

Enc:

¹ This report relates only to items tested as received, and may not be used to claim endorsement by NVLAP or any other U.S. government agency. This report may not be reproduced except in full with the approval of Materials Analytical Services, Inc. (MAS). MAS assumes that samples were collected by qualified personnel using proper procedures. MAS does not assume any responsibility for analyses reported as structures/cm3 on samples collected by non-laboratory personnel.
NVLAP #1235 00

# MAS Indirect TEM ANALYSIS M23237-001

| CLIENT NAME: | MAS Corporate | | CLIENT SAMPLE ID: | 1 |
|---|---|---|---|---|
| Sample Area/ Volume: | 32 Liters | Date Analyzed: | 3/17/00 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES 5 % | Grid box Number: | 5698 | |

| Str < 5um: | 0 |
|---|---|
| Str ≥ 5um: | 0 |
| Total str: | 0 |
| Str / cc > 5: | 0.0000 /cc |

| Number of grids: | 2 | #1: | 113 | #3: | 114 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 112 | #4: | 114 |

| Average Grid Size: | 0.012826 |
|---|---|
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | | |
|---|---|---|---|---|
| 1/ 1.3 | 30 | 4.446667 | Detect_cc: | 1.41 |
| | | | Total cc: | 0.00 |

| Str#: | Square ID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | A9-G3 | | NSD | | | | | |
| | E2 | | NSD | | | | | |
| | C1 | | NSD | | | | | |
| | A5 | | NSD | | | | | |
| | C8 | | NSD | | | | | |
| | A10-A4 | | NSD | | | | | |
| | C5 | | NSD | | | | | |
| | D7 | | NSD | | | | | |
| | C9 | | NSD | | | | | |
| | B10 | | NSD | | | | | |

M23237 001 Sample Comments:

271

# MAS Indirect TEM ANALYSIS M23237-002

| CLIENT NAME: MAS Corporate | | CLIENT SAMPLE ID: | 2 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Sample Area/ Volume: | **32 Liters** | Date Analyzed: | 3/17/00 |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon |
| Pore size: | 0.45 | Scope Number: | 2 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 KV |
| Sample type: | Air | Indicated Mag: | 25 KX |
| Analysis type: | Dust | Screen Mag: | 20 KX |
| Grid Acceptance | YES    18 % | Grid box Number: | 5698 |

| | | | | | |
|---|---|---|---|---|---|
| Str < 5um: | 3 | Number of grids: | 2 | #1: 114 | #3: 113 |
| Str ≥ 5um: | 4 | Number of openings: | 10 | #2: 114 | #4: 114 |
| Total str: | 7 | | | | |
| Str / cc > 5: | 5.5717 /cc | Average Grid Size: | 0.012939 | | |
| | | Total Area Analyzed: | 0.129 | | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 1.39 |
|---|---|---|---|---|
| 1/ 1.3 | 30 | 4.446667 | Total cc: | 9.75 |

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C9-H9 | AN | F | 4.00 | 0.30 | X | M24348 | Print Out |
| | E8 | | NSD | | | | | |
| 2 | C7 | AN | B | 5.00 | 0.40 | M24350 | X | X |
| 3 | B5 | TR | B | 3.00 | 0.40 | M24349 | X | Print Out |
| 4 | D3 | AN | M-F | 7.00 | 0.30 | X | X | X |
| | C10-F3 | | NSD | | | | | |
| | C2 | | NSD | | | | | |
| 5 | B6 | AN | F | 10.00 | 0.40 | X | X | X |
| 6 | B6 | AN | F | 28.00 | 0.30 | X | X | Print Out |
| 7 | E8 | AN | F | 3.00 | 0.40 | X | X | X |
| | G7 | | NSD | | | | | |

M23237 002    Sample Comments:

MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  11:38
Cursor: 0.060keV = 0



0.000                                    VFS = 64      10.240
159      M23237-002;  ANTHOPHYLLITE

273



MATERIALS ANALYTICAL SERVICES                FRI 17-MAR-00  11:45
Cursor: 0.000KeV = 0

0.000                                        VFS = 64    10.240
    9     M23237-002;  TREMOLITE



MATERIALS ANALYTICAL SERVICES
Cursor: 0.000KeV = 0                    FRI 17-MAR-00  12:08

0.000
    5      M23337-002;  ANTHOPHYLLITE       VFS = 64    10.240

# MAS Indirect TEM ANALYSIS  M23237-003

| | | | |
|---|---|---|---|
| **CLIENT NAME:** MAS Corporate | | **CLIENT SAMPLE ID:** | 3 |

| | | | |
|---|---|---|---|
| Sample Area/Volume: | **32** Liters | Date Analyzed: | 3/17/00 |
| Filter Type: | MCE 47mm | Analyst: | William Stark |
| Pore size: | 0.45 | Scope Number: | 3 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 KV |
| Sample type: | Air | Indicated Mag: | 25 KX |
| Analysis type: | Dust | Screen Mag: | 20 KX |
| Grid Acceptance | YES  20 % | Grid box Number: | 5698 |

| | |
|---|---|
| Str < 5um: | 3 |
| Str ≥ 5um: | 2 |
| Total str: | 5 |
| Str / cc > 5: | 2.7858 /cc |

| | | | | | |
|---|---|---|---|---|---|
| Number of grids: | 2 | #1: 114 | #3: 115 |
| Number of openings: | 10 | #2: 112 | #4: 114 |

| | |
|---|---|
| Average Grid Size: | 0.012939 |
| Total Area Analyzed: | 0.129 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 1.39 |
|---|---|---|---|---|
| 1/ 1.3 | 30 | 4.446667 | Total cc: | 6.96 |

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B6-B3 | C | M-F | 0.80 | 0.02 | X | X | Print Out |
| 2 | E4 | AC | M-F | 8.00 | 0.80 | X | X | Print Out |
| | H2 | | NSD | | | | | |
| | I6 | | NSD | | | | | |
| 3 | F7 | AC | M-F | 4.50 | 0.40 | X | X | Print Out |
| | C6-J9 | | NSD | | | | | |
| | H8 | | NSD | | | | | |
| 4 | G6 | AC | M-F | 1.60 | 0.20 | X | X | Print Out |
| 5 | D2 | AC | M-B | 19.00 | 0.40 | X | X | Print Out |
| | E8 | | NSD | | | | | |

M23237 003    Sample Comments:

MATERIALS ANALYTICAL SERVICES                    FRI 17-MAR-00   13:34
Cursor: 0.000KeV = 0              ROI (SIKα) 1.660: 1.820=0/sec



0.000
53       M23237-003; ACTINOLITE EDS          VFS = 1024    10.240

277



MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  13:41
Cursor: 0.000KeV = 0        ROI (SIKα) 1.660: 1.820=0/sec

0.000                          VFS = 256      10.240
  12     M23237-003; ACTINOLITE EDS

MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  13:46
Cursor: 0.000KeV = 0        ROI (SIKα) 1.660: 1.820=0/sec



0.000                              VFS = 256    10.240
   21      M23237-003; ACTINOLITE EDS

279

# MAS  Indirect TEM ANALYSIS  M23237-004

| | | | | |
|---|---|---|---|---|
| CLIENT NAME:  MAS Corporate | | | CLIENT SAMPLE ID: | 4 |

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 32  Liters | Date Analyzed: | 3/17/00 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES  18 % | Grid box Number: | 5698 | |

| | |
|---|---|
| Str < 5um: | 8 |
| Str ≥ 5um: | 1 |
| Total str: | 9 |
| Str / cc > 5: | 1.3868 /cc |

| | | | | |
|---|---|---|---|---|
| Number of grids: | 2 | #1: 114 | #3: 114 | |
| Number of openings: | 10 | #2: 114 | #4: 114 | |

| | |
|---|---|
| Average Grid Size: | 0.012996 |
| Total Area Analyzed: | 0.130 |

| Filter used | Dilution | Dilution Factor | | |
|---|---|---|---|---|
| 1/ 1.3 | 30 | 4.446667 | Detect_cc: | 1.39 |
| | | | Total cc: | 12.48 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B1-I9 | AN | M-F | 3.00 | 0.20 | X | X | Print Out |
| | H6 | | NSD | | | | | |
| 2 | G4 | AN | F | 2.00 | 0.20 | X | X | X |
| 3 | F2 | C | M-F | 1.50 | 0.04 | X | X | Print Out |
| 4 | F2 | AN | F | 4.00 | 0.20 | X | X | X |
| | C4 | | NSD | | | | | |
| 5 | B2-F2 | C | M-F | 1.00 | 0.03 | X | X | |
| 6 | F2 | AN | F | 2.00 | 0.20 | X | X | X |
| 7 | F2 | AN | F | 6.00 | 0.04 | X | X | Print Out |
| | I5 | | NSD | | | | | |
| 8 | G7 | TR | F | 3.00 | 0.40 | X | X | Print Out |
| 9 | E9 | AN | F | 4.00 | 0.20 | X | X | X |
| | D6 | | NSD | | | | | |

M23237 004    Sample Comments:

MATERIALS ANALYTICAL SERVICES                FRI 17-MAR-00  13:45
Cursor: 0.000keV = 0



0.000                                    VFS = 32        10.240
     6     M23237-004:   TREMOLITE/ACTINOLITE

MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  13:40
Cursor: 0.000KeV = 0



0.000                              VFS = 64    10.240
    8     M23237-004;  ANTHOPHYLLITE

282



MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  13:31
Cursor: 0.000keV = 0

0.000                                  VFS = 32      10.240
    S    M23237-004;  CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  13:20
Cursor: 0.000KeV = 0



0.000                    AT                    VFS = 32      10.240
   10      M33237-004;  ANTHOPHYLLITE

# MAS   Indirect TEM ANALYSIS   M23237-005

| CLIENT NAME: | MAS Corporate | | CLIENT SAMPLE ID: | 5 |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 0 | Liters | Date Analyzed: | 3/17/00 |
| Filter Type: | 30 | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 100 | | Accelerating Voltage: | 100 KV |
| Sample type: | Air | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES | 2 % | Grid box Number: | 5698 |

| | | | | |
|---|---|---|---|---|
| Str < 5um: | 0 | Number of grids: | 2 | #1: 114   #3: 114 |
| Str ≥ 5um: | 0 | Number of openings: | 10 | #2: 114   #4: 114 |
| Total str: | 0 | | | |
| Str / cc > 5: | #Error | /cc | Average Grid Size: | 0.012996 |
| | | | Total Area Analyzed: | 0.130 |

| Filter used | Dilution | Dilution Factor | | |
|---|---|---|---|---|
| 1/ 13 | 30 | 0 | Detect_cc: | #Div/0! |
| | | | Total cc: | #Error |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | E6-E8 | | NSD | | | | | |
| | G10 | | NSD | | | | | |
| | J6 | | NSD | | | | | |
| | H4 | | NSD | | | | | |
| | F3 | | NSD | | | | | |
| | E7-H8 | | NSD | | | | | |
| | E7 | | NSD | | | | | |
| | C5 | | NSD | | | | | |
| | B7 | | NSD | | | | | |
| | D9 | | NSD | | | | | |

M23237 005     Sample Comments:

285

MATERIALS ANALYTICAL SERVICES, INC.
CHAIN OF CUSTODY FORM

PAGE ___ OF ___

JOB NAME/P.O.: Vermiculite Dimonstration (Spokane WH)

MAS PROJ. NO.: _____

REC'D FROM: _____
VIA: _____

INITIATED BY: Air Samples

DATE INITIATED: 3/4/00

| SAMPLE NO. | SAMPLE DESCRIPTION | INITIATE COC DATE REC'D | FIRST TRANSFER TRANS TO | DATE SENT | MODE TRANS | REC'D BY | DATE REC'D | SECOND TRANSFER TRANS TO | DATE SENT | MODE TRANS | REC'D BY | DATE REC'D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Background outside 3/4/00 1:57-2:13 | 3/4/00 | MAS | Hand 3/6/00 | | | | | | | | |
| 2. | Bulk Diss (right) 2:37-2:53 | 3/4/02 | MAS | Hand 3/6/02 | | | | | | | | |
| 3. | Bulk Diss (Left) 2:37-2:53 | 3/4/02 | MAS | Hand 3/6/02 | | | | | | | | |
| 4. | Area Sep (on pigs) 2:37-2:53 | 3/4/02 | MAS | Hand 3/6/02 | | | | | | | | |
| 5. | Blank | 3/4/00 | MAS | Hand 3/6/02 | | | | | | | | |

FORM N.COCXX

**MAS**

## Materials Analytical Services, Inc.
### 3945 Lakefield Court
### Suwanee, GA 30024
### (770) 866-3200

### Summary of Microvac Dust Analysis by
### Transmission Electron Microscopy (TEM)

**Date:**                          3/21/00

**Client Name:**                   Richard Hatfield

**Client Job Number/Name:**        Vermiculite Demonstration, Spokane, Washington

**MAS Project Number:**            M23236 (Dust) & M23237 (Air)

### AIR SAMPLES

| MAS ID | Sample ID & Location | Total Asbestos Str/cc |
|---|---|---|
| M23237-001 | #1 Background Outside | BTL * |
| M23237-002 | #2 Paul Liss (right) | 9.75 |
| M23237-003 | #3 Paul Liss (left) | 6.96 |
| M23237-004 | #4 Area (on pipe) | 12.48 |
| M23237-005 | #5 Blank | 0 |

\* BTL = Below Detection Limit

### DUST SAMPLES

| MAS ID | Sample ID & Location | Asbestos Concentration str/sq. ft. | Asbestos Concentration str/cm$^2$ |
|---|---|---|---|
| M23236-001 | #1 Dust from Attic Under the Vermiculite | 46.8 Million | 50.3 Thousand |

**EXHIBIT**

G1
Hatfield

igh Office:
... Hutton Street • Suite 101
Raleigh, NC 27606
(919) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259



Richard Hatfield
MAS Corporate
3945 Lakefield Court
Suwanee, GA   30024

MAS Project # M23236

Samples were received on 3/16/00

Referencing your     Job Name:     Vermiculite Demo
                     Job. Number:
                     PO. Number:

Enclosed are the results for the dust samples listed below:

| # | Location | Volume | # | Location | Volume |
|---|----------|--------|---|----------|--------|
| 001 | 1 | 100   cm2 | | | |

Sincerely

*Richard Hatfield*

Richard Hatfield
Senior Consultant

Enc:
[1] The samples were prepared and analyzed using counting rules in general accordance with NIST NVLAP and AHERA regulations as published in the Federal Register, October 30, 1987, EPA 40 CFR Part 763. The analytical method used has been outlined in MAS SOP #MT-007, AHERA ASBESTOS ANALYSIS PROCEDURE USING TEM.
[1] This report relates only to items tested as received, and may not be used to claim endorsement by NVLAP or any other U.S. government agency. This report may not be reproduced except in full with the approval of Materials Analytical Services, Inc. (MAS). MAS assumes that samples were collected by qualified personnel using proper procedures. MAS does not assume any responsibility for analyses reported as structures/cm3 on samples collected by non-laboratory personnel.
NVLAP #1235 00

288

# TEM DUST ANALYSIS                M23236    001

| MAS Corporate | Client Sample ID: | 1 |
|---|---|---|
| Vermiculite Demo | | |

| | | | |
|---|---|---|---|
| Sample Area/ Volume: | 100 cm2 | Date Analyzed: | 3/17/00 |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon |
| Pore size: | 0.45 | Scope Number: | 2 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 KV |
| Sample type: | Dust | Indicated Mag: | 25 KX |
| Analysis type: | Dust | Screen Mag: | 20 KX |
| Grid Acceptance | YES      15 % | Grid_box: | 5698 |

| | | | |
|---|---|---|---|
| Str < 5um: | 3 | Number of grids: 2  #1: 113  #3: 114 | Average Grid Size: 0.012882 |
| Str ≥5um: | 2 | Number of openings: 10  #2: 114  #4: 113 | Total Area Analyzed: 0.129 |
| Total Str: | 5 | | |

| | | | |
|---|---|---|---|
| Volume Filtered | 1 ml | Str / sqr ft 4.677E+07 | Str / cm2 5.034E+04 |
| Dilution Factor | 100 | Str / sqr ft  >=5 1.871E+07 | Str / cm2  >=5 2.014E+04 |

### TEM DATA

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | D9-I6 | AN | F | 8.00 | 0.40 | X | X | Print Out |
| 2 | G3 | AN | F | 2.00 | 0.08 | X | X | X |
| 3 | D4 | C | F | 25.00 | 0.10 | X | X | Print Out |
| | C6 | | NSD | | | | | |
| | F7 | | NSD | | | | | |
| | D10-G4 | | NSD | | | | | |
| 4 | E6 | AN | F | 3.00 | 0.10 | X | X | X |
| | C8 | | NSD | | | | | |
| | F8 | | NSD | | | | | |
| 5 | D5 | AN | M-F | 1.00 | 0.10 | X | X | X |

M23236_001

289

MATERIALS ANALYTICAL SERVICES                    FRI 17-MAR-00   14:40
Cursor: 0.000keV = 0



0.000                                    VFS = 64      10.240
    9      M23237-004;  ANTHOPHYLLITE

290

MATERIALS ANALYTICAL SERVICES          FRI 17-MAR-00  14:45
Cursor: 0.000keV = 0



0.000                                  VFS = 16      10.240
   6      M23237-004;  CHRYSOTILE

291

**MATERIALS ANALYTICAL SERVICES, INC.**
**CHAIN OF CUSTODY FORM**

PAGE ___ OF ___

JOB NAME/P.O.: Vermiculite

MAS PROJ. NO.: _____

REC'D FROM: Dianna Stan (Spokane Wa)

VIA: _____

INITIATED BY: _____

DATE INITIATED: 5/13/00

| SAMPLE NO. | SAMPLE DESCRIPTION | INITIATE COC DATE REC'D | FIRST TRANSFER TRANS TO | DATE SENT | MODE TRANS | REC'D BY | DATE REC'D | SECOND TRANSFER TRANS TO | DATE SENT | MODE TRANS | REC'D BY | DATE REC'D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dust from ATTIC unclr vermiculited Insulation 100m x 10 cm | | | | | | | | | | | |

292

1
2
3
4
5
6
7

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

8  MARCO BARBANTI, individually and on
   behalf of a class of all others similarly situated,
9
   Plaintiffs,
10
   v.
11
   W.R. GRACE & COMPANY-CONN (a
12  Connecticut corporation); W.R. GRACE &
   COMPANY (a Delaware corporation); W.R.
13  GRACE & CO., a/k/a GRACE, an association of
   business entities; SEALED AIR
14  CORPORATION (a Delaware corporation); and
   WILLIAM V. CULVER, resident of the State of
15  Washington,
16  Defendants.

NO. 00201756-6

AFFIDAVIT OF DONALD J. HURST IN
SUPPORT OF PLAINTIFF'S
APPLICATION FOR PRELIMINARY
INJUNCTION AND EMERGENCY
NOTICE TO CLASS MEMBERS

17
18  STATE OF WASHINGTON )
                        ) ss.:
19  COUNTY OF SPOKANE   )

20       Donald J. Hurst, being first duly sworn, deposes and states as follows:

21       1.    I am president of Fulcrum Environmental Consulting, with offices in Spokane,

22  Washington and Yakima, Washington.

23       2.    My educational background includes a Bachelor of Science degree and a Masters

24  Degree in geology from the University of Wyoming. Part of my training involved the geology of

25  various minerals, including asbestos.

26                                                                                          195

AFFIDAVIT OF DONALD J. HURST: 1          EXHIBIT 11

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\WA ZONOLITE INSULATION\PLEADINGS\HURST AFFIDAVIT.DOC 5/31/00

3.    I have numerous certifications regarding the assessment, testing and abatement of asbestos.   These asbestos certifications include AHERA Inspector/Management Planner and Project Designer, NIOSH Proficiency and Analytical Testing, EPA Bulk Analysis Quality Assurance Testing Program, OSHA 40 Hour Hazardous Materials and EPA  Hazardous Materials Emergency Response Certification, OSHA 8 Hour Hazardous Materials and EPA Hazardous Materials Emergency Response refresher course.  Additionally, I have been certified by the State of California as a registered environmental assessor.

4.    I have been involved with a number of organizations that address asbestos, including the Environmental Information Association (former Member of Advisory Council), Spokane County Air Pollution Control Authority (current Member of Advisory Council), Montana State Asbestos Rules Advisory Committee (former Member).

5.    I have conducted training sessions regarding asbestos assessment, testing and abatement, and I have authored articles regarding asbestos.

6.    A substantial amount of work performed by Fulcrum Environmental Consulting, Inc. involves asbestos consulting.  As president, I have been involved in all aspects of project performance, work plan and development, field investigation, analytical protocol, risk assessment and reporting regarding asbestos.  I have been the project manager for numerous asbestos related projects, including projects involving the assessment and abatement of asbestos in all types of buildings in the Northwest.  I am appending my curriculum vitae as **Attachment A.**

7.    In April 2000, Fulcrum Environmental Consulting was hired by the Class Counsel in the case of <u>Marco Barbanti, et al. v. W.R. Grace & Co., et al.</u>, No. 00201756-6.  I was asked to

AFFIDAVIT OF DONALD J. HURST: 2

196

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL7\DWS\CLIENT.DWS\J88Y\WA ZONOLITE INSULATION\PLEADINGS\HURST AFFIDAVIT.DOC 5/22/00

conduct an exposure assessment for homes with W.R. Grace's vermiculite attic insulation.

Specifically, I was asked to:

    1)    assess possible airborne fiber concentrations that result from specific activities that may take place in homes;

    2)    assess possible contamination of adjacent areas resulting from those activities;

    3)    identify reasonable safety precautions to be taken in order to prevent and minimize asbestos exposure; and

    4)    identify options for remedial action and estimate the cost of those options.

    8.    I was placed in contact with Randy Hatch who was in the middle of a renovation project at his home in Liberty Lake, just outside of Spokane, Washington. Mr. Hatch and his wife Susan were conducting remodeling work to their home in preparation for moving into the home. Upon learning about the potential problems relating to asbestos and vermiculite attic insulation, Mr. Hatch and his wife ceased work and agreed to allow their home to be tested in order to assess the problem.

    9.    I interviewed Mr. Hatch in detail and learned that the remodeling work conducted by him and his wife included removing and relocating interior walls, removing part of the ceiling, removal of loose insulation to enable renovation, work area housekeeping, and cutting various openings into the ceilings for plumbing, electrical wiring, and electrical fixtures.

    10.    On March 31, 2000, I collected bulk samples from Mr. Hatch's home and arranged to have it analyzed by Microlab Northwest. The results of the analysis indicated that the fine dust contained slightly less than 1% of asbestos on a count basis, and approximately 1/10 of 1% of asbestos by weight. The analysis report is appended as **Attachment B**.

197

AFFIDAVIT OF DONALD J. HURST: 3

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\LIBBY\WA ZONOLITE INSULATION\PLEADINGS\HURST AFFIDAVIT.DOC 5/22/00

11.     On April 12, 2000, I conducted a simulation of the activities previously performed by Mr. Hatch and collected air samples in order to determine the exposure levels that occurred.

12.     The activities conducted were intended to closely simulate the work performed by Mr. Hatch and included the demolition of walls, the drilling of holes into the ceiling, the shoveling and vacuuming of the attic insulation, and sweeping/vacuuming of the dust and emptying of the vacuum into bags.

13.     The simulation activities were videotaped and I prepared a narrative for that videotape. A true and accurate copy of the narrated videotape is appended as **Attachment C**.

14.     The asbestos air concentrations that resulted from the simulation activities are appended as **Attachment D**.   Notably, all personal samples documented fiber concentrations in excess of the .1 fibers/cc permissible exposure limit set by OSHA, and range from .31 to 5.6 fibers/cc.

15.     The air samples were also analyzed by a transmission electron microscope, which has greater sensitivity and a substantially higher resolution that allows one to identify the types of fibers present in the air.  The results of the analysis of personal samples by transmission electron microscope ranged from less than 0.18 to 6.4 s/cc (actinolite).  (<u>See</u> **Attachment D**)

16.     I have reviewed reports of simulated testing of Zonolite Attic Insulation conducted by Grace in the 1970s.  In particular, I have reviewed Grace's testing dated March 11, 1976, July 11, 1976, April 27, 1979 and March 1980.  Based on the Grace test results that I reviewed, the asbestos airborne concentrations during the testing that I performed simulating renovation activities appear to be consistent with the concentrations that Grace achieved during installation.

198

AFFIDAVIT OF DONALD J. HURST: 4

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466

17.    Additionally, surface dust samples were collected at Mr. Hatch's home. The results are appended as **Attachment E**, and document the presence of asbestos (actinolite-tremolite) fibers in surface dust obtained from 20 of 21 sample locations in the Hatch residence. In the one sample in which the presence of asbestos was not confirmed, actinolite-tremolite was indicated in the sample but not specifically identifiable due to other constituents obscuring optical information.

18.    Based on my experience and testing, it is my opinion to a reasonable degree of scientific certainty that disturbance of Grace's vermiculite attic insulation during ordinary renovation activities results in airborne levels of asbestos substantially higher than allowed by regulation without training and respiratory protection.

19.    Further, it is my opinion that Grace's vermiculite attic insulation is capable of releasing asbestos fibers into the air and contaminating indoor air and resulting in accumulation of asbestos-containing dust on horizontal surfaces.

20.    It is my opinion, based on my experience and testing of Mr. Hatch's house, that horizontal surfaces within the house are contaminated with asbestos from the vermiculite attic insulation.

21.    It is my opinion that future activities in this home can resuspend this dust and result in exposure to airborne fibers. Accordingly, it is my recommendation that non-porous surfaces in the house be cleaned by wet-wiping and HEPA vacuuming, and that porous surfaces be removed and disposed of as asbestos-contaminated dust if cleaning is not effective.

22.    Based on my experience and my testing, it is my opinion that all activities conducted in the vicinity of Grace's vermiculite attic insulation that can disturb the insulation

199

AFFIDAVIT OF DONALD J. HURST: 5

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\DWS\CLIENT.DWS\J.HB\YWA ZONOLITE INSULATION\PLEADINGS\HURST AFFIDAVIT.DOC 5/22/00

itself or the surrounding dust could create an exposure hazard and should be conducted utilizing strict safety precautions to prevent exposure.

23.    Based on my experience, the activities should be conducted by persons specially trained in asbestos work practices and should not be conducted by homeowners who are not specifically trained to use the necessary safety precautions when working around asbestos.    The safety precautions necessary would include the use of respirators commensurate with the level of exposure indicated by testing, setting up of containment and negative air, wetting down of the material and surfaces in the vicinity of the material, use of HEPA vacuum cleaners, and decontamination of personnel and materials exposed during work activities.

24.    Based on my experience and my testing, it is my opinion that homeowners need to be warned about: 1) the presence of asbestos in Zonolite Attic Insulation; 2) the potential hazards associated with disturbing Zonolite Attic Insulation and asbestos dust from the insulation; 3) the need for strict safety precautions when working around this material; and 4) that work involving disturbance of insulation and dust from the insulation should be conducted by persons specifically trained to work around asbestos.

Further Affiant sayeth not.

_____
DONALD J. HURST

SUBSCRIBED AND SWORN TO (or affirmed) before me this 25th day of May, 2000.

_____ (Signature)
Notary Public

Darrell W. Scott    (Print Name)

My appointment expires: 10/18/02

(Seal or Stamp)

200

AFFIDAVIT OF DONALD J. HURST: 6

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE\VOL2\DWS\CLIENT.DWS\LIHBY\WA ZONOLITE INSULATION\PLEADINGS\HURST AFFIDAVIT.DOC 5/22/00

Resume

## DONALD J. HURST          FULCRUM ENVIRONMENTAL CONSULTING

### PRINCIPAL-IN-CHARGE

**EDUCATION:**   B.S., Geology, University of Wyoming, Laramie, WY, 1981.

M.S., (Sedimentary Tectonics) Geology, University of Wyoming, Laramie, WY, 1984.

Contract Management and Administration, Montana Department of State Lands, Missoula, MT, 1985.

Industrial Hygiene Techniques and Hands-on Laboratory for Measuring and Evaluating Environmental Pollutants, Northwest Center for Occupational Health and Safety, Seattle, WA, 1987.

Comprehensive Review of Industrial Hygiene Practices, Midwest Institute of Occupational Safety and Health, Minneapolis, MN 1988.

Principles of Hazardous Materials Chemistry, Hazardous Waste Conference, Seattle, WA 1989.

Essentials of Environmental Liability and Superfund Law, Montana Continuing Legal Education Association, Billings, MT 1990.

Comprehensive Introduction to Underground Storage Tanks Procedures and Practices, Colorado School of Mines, 1990.

### REPRESENTATIVE EXPERIENCE:

1990 - Present        Fulcrum Environmental Consulting, Inc.                    **Principal-in-Charge**

Mr. Hurst is President of Fulcrum Environmental Consulting. He has overall administrative responsibility for projects, including oversight of Fulcrum's subconsultants and subcontractors. As Principal-in-Charge, his administrative responsibilities include performance schedules, quality control, contract negotiations, and payment requests.

In addition, Don's technical involvement includes peer review of all aspects of project performance, work plan development, field investigation, analytical protocol, risk assessment, and reporting. He is directly involved with oversight of field investigations including hazardous materials investigations, subsurface sampling, and report generation. Representative experience includes:

**XHIBIT**

201

A

- Project manager for AHERA management plans and 3-year reinspection audit for nine school districts in eastern Washington which encompassed 368 buildings and 6,500,000 ft² of interior space.

- Project manager for design and management for Boundary County Community Hospital asbestos abatement project. Project spanned three years and two architectural firms. Major concerns critical to the project's success were minimizing total abatement costs while achieving renovation goals, ensuring effective coordination between contractors, and managing patient/staff safety concerns.

- Project manager to provide asbestos management services for the remodel of the Frederick and Nelson (F&N) building. Project design called for complete interior demolition of the building leaving only structural support intact. Coordination of asbestos removal with the demolition contractor was critical to prevent delays in project scheduling. The asbestos abatement was completed on time, within budget, and with no change orders.

- Project manager for pre-abatement scoping and asbestos survey for two buildings on the EWU campus scheduled for remodel and demolition. Earlier survey work documented ACMs that required removal prior to remodeling. Need for pre-remodel removal of other ACMs was less clear. As part of the survey, regulatory status and need for removal of questionable ACMs were determined. The results of the inspection were incorporated into the remodel/renovation conceptual design scope of work.

- Project manager for project design, work specifications, and on-site services in close cooperation with multiple West Valley School District architects and construction management teams associated with the District's on-going $20 million modernization. Asbestos has been removed from over 220,000 ft² of building space scheduled for demolition or remodel.

- Project manager for major renovation of two Grant County P.U.D. facilities. Each facility was composed of several separate buildings fused together with multiple renovations. Hazard quantification was further complicated by complex and rapidly evolving modernization plans. Primary concerns were to ensure that renovation schedule was not unexpectedly or unfavorably impacted by asbestos abatement and that occupants remaining in the facility were not affected by abatement.

- Project Manager to integrate asbestos abatement into the general demolition plan of an old junior high school. The school was built in 1924 and had over 81,000 ft² of space. Timing was critical to prevent delay of demolition to allow the construction of a new Albertson's outlet. The project objective was to incorporate pre-demolition removal of friable asbestos into the general demolition contractor's scope of work with minimum impact on demolition and construction schedule. ACMs were categorized as either requiring specialized removal or removal with demolition.

- Project manager for numerous projects in eastern Washington and northern Idaho for Washington Water Power Co. Projects included discovery, preliminary assessment and site inspection, remedial design, and remedial oversight of numerous contaminants including petroleum products, PCB, metals, and asbestos.

- Project manager for system-wide audit of hazardous waste streams generated by 14 natural gas pipeline compressor stations and maintenance bases in Idaho, Washington, and Oregon for Pacific Gas Transmission Co.

- Project manager for development of an Oil Spill Contingency Plan and Spill Prevention Countermeasure and Control Plan for a 5.5 million gallon oil products storage facility in Spokane, Washington, for a confidential client.

- Project manager for Phase I, II, III Environmental Site Assessment for site location planning in eastern Washington for Walgreens, Inc.

- Project manager for preliminary assessment of environmental degradation of developed property adjacent to historical landfill and clay mining and brick manufacturing facility in Sandpoint, Idaho, for First Bank of Idaho.

- Project manager for site discovery, emergency cleanup, Phase II site investigation, and remediation oversight associated with deposit of arsenic-based herbicide in historical landfill in Prichard, Idaho, for United States Forest Service.

- Project manager for discovery, preliminary assessment, site inspection, and remedial planning of petroleum and heavy metals contamination at railroad servicing and maintenance facilities in Spokane, Washington, for Metropolitan Mortgage and Securities, Inc.

- Project manager for preliminary assessment of undeveloped property adjacent to historical landfill location in Osborne, Idaho, for First Security Bank of Idaho.

- Project manager for preliminary assessment, site inspection, and remedial design at diamond drill bit manufacturing facility in Spokane, Washington, for Diamond Drill/Blue Bore, Inc.

- Project manager for discovery, preliminary assessment, and site inspection of abandoned railroad and heavy industry property in Spokane, Washington, for Northbank Properties.

- Project manager for engineering evaluation and cost analysis, remedial design, and development of plans and specifications for removal of heavy metals and organic pesticides at Wenatchee, Washington, for Northwest Architectural Co.

Hurst - Page 4

| 1984 - 1990 | Bison Engineering, Inc., | Engineering Geologist |

- Project manager for AHERA inspection and management plans for 2,200,000 ft$^2$ of occupied building space for the Renton Public Schools. Unique aspects of the project included utilization of Bison's Computerized Asbestos Data Management System (CADMS) was integral to risk analyses and control program cost projections.

- Project manager for AHERA inspection/management plans and subsequent abatement project management for approximately 2,000,000 ft$^2$ of occupied building space in rural North Dakota.

- Project manager for project design, work specifications and project management services for asbestos & lead-based paint abatement for the Great Falls Housing Authority. Comprehensive renovation had been designed and bid when architect recognized that asbestos containing materials and lead-based paint would severely impact project viability.

- Project manager for project design, work specifications, and on-site monitoring and supervisory services for Montana State Mental Hospital, asbestos abatement project. Inmates at the hospital are considered high security, extremely mobile, and mischievous. With the exception of areas to be abated, the hospital facility needed to remain accessible and functioning throughout abatement activity. Special work boundary construction considerations were incorporated into project design to accommodate these diverse project needs.

- Quality assurance officer for hazardous wastes and air toxics study on abandoned mine tailings from the Wickes Smelter, Corbin-Wickes Mining District, Montana, for the Montana Department of State Lands.

- Geologist on environmental assessment of the precipitated calcium carbonate (PCC) process at the Tacoma Lime Plant for Continental Lime, Inc.

- Project manager for air quality and toxic metal analysis of abandoned mine tailings at Corbin Flats, Jefferson County, Montana, for the Montana Department of State Lands. Detailed review of historical mining and milling processes was completed during the study.

- Project manager for Phase II drilling associated with site investigation of leaking underground storage tank system located in West Yellowstone, Montana, for Loomis Enterprises, Inc.

- Project manager for exposure monitoring and risk assessment of lead exposures associated with babbitt manufacturing in Columbia Falls, Montana, for Stoltz Lumber.

- Project manager for Phase II investigation of subsurface conditions associated with suspected leaks from Underground Storage Tanks at the Lolo and Savenak Work Centers, Montana, for the United States Forest Service.

- Project manager for preliminary assessment and feasibility study of soil and groundwater contamination at airport facilities in Helena, Montana, for the Helena Regional Airport.

204

Hurst - Page 5

| 1984 | NRS, Inc., | Engineering Geologist |

- Geologist in charge of determining the age, provenance, sedimentology, and distribution of gold-bearing deposit to aid mine planning. Utilization of drill hole data to analyze bedrock irregularities and hydrologic conditions for the Chinese Diggings Mine at Boulder, Montana.

- Geologist providing initial geologic interpretation and expertise in the mine plan development and permit preparation for a placer gold mine at Lincoln, Montana.

| 1983 | University of Wyoming, | Research Associate |

- Research of chronology and structural development of Wind River Mountain fault system.

| 1981 - 1983 | Empire Laboratories, | Field/Lab Technician |

- Numerous project studies into soil stability and materials integrity associated with foundations, roads, and pond embankments.

| 1979 - 1980 | Cooper and Clark Engineers, | Field Technician |

- Project Field Manager for evaporation pond construction of in-site uranium mine.
- Project field manager of structural inspection of railroad overpass construction.


**CERTIFICATIONS:**

- Registered Geologist, States of Wyoming and Oregon
- Trainer for Asbestos Worker and Contractor/Supervisor
- AHERA Inspector/Management Planner
- AHERA Project Designer
- NIOSH Proficiency in Analytical Testing (PAT) No. 59601-002
- EPA Bulk Analyses Quality Assurance Testing Program No. 8204
- Registered Environmental Assessor, California
- OSHA 40-Hour Hazardous Materials and EPA Hazardous Materials Emergency Response
- OSHA 8-Hour Hazardous Materials and EPA Hazardous Materials Emergency Response Refresher Course
- IFCI Certified Washington State Underground Storage Tank Assessor

**PROFESSIONAL
AFFILIATIONS/
AWARDS:**

      Member, Environmental Assessment Association
      Member, Montana Mining Association
      Member, Montana Geological Society
      Member, Wyoming Geological Society
      Member, American Association of Petroleum Geologists
      Member, Advisory Council, Environmental Assessment Association
      Member, Spokane County Air Pollution Control Authority, Advisory Committee
      Member, Montana State Asbestos Rules, Advisory Committee 1989
      Member, National Asbestos Council, 1988
      Recipient, Gulf Oil Company Scholarship, 1982
      Recipient, S. H. Knight Fieldwork Scholarship, 1981

**PUBLICATIONS:**

      "Legislation Revises Asbestos in School Requirements", Montana School Boards Association Bulletin, 1986.

      "Stratigraphy and Tectonic Significance of the Tunp Conglomerate in the Fossil Basin, Southwestern Wyoming", Mountain Geologist, 1985.

      "Early Eocene Tectonics and Sedimentation in Northern Fossil Basin, Wyoming Overthrust Belt", AAPG-SEPM Sectional Conference, Salt Lake City, 1984 (co-author).

      "Impingement of Thrust Belt Development on Foreland Structures," AAPG Regional Conference, Reno, Nevada, 1984 (co-author).

APR-10-2000 07:19 AM   MICROLAB NW                425 885 9419          P.01

# MICROLAB NORTHWEST

7609 140TH PL. NE
REDMOND, WA 98052
PHONE: (425) 885-9419

## LABORATORY REPORT

TO: Chad Trent
    Fulcrum Environmental Consulting
    107 South Cedar Street
    Spokane, WA 99204
PHONE: (509) 459-9220   FAX: (509) 459-9219
SUBJECT: Identification of Asbestos
SPECIMEN: Three Zonolite Samples.
REFERENCE:

REPORT #: 851-00
DATE: April 10, 2000

### INTRODUCTION

Three samples of "Zonolite" insulation were received in small ziplock bags for an evaluation of the asbestos minerals present. The samples were marked as "#070-01", "#070-02", and "#070-03". The samples were processed one at a time to prevent any cross contamination. Each sample was placed in a flat bottomed plastic container and gently shaken to allow the fines to settle to the bottom of the container. The larger particles of vermiculite were then poured back into the plastic bag and a tapelift of the fines was made for quantitative analysis and for general characterization of the minerals present. Four mounts were made of each sample for this analysis. Samples of the fines were also analyzed in individual refractive index standard liquids to characterize the fibrous minerals in more detail. The more detailed optical analysis was conducted using polarized light and phase contrast dispersion staining.

### RESULTS

All of the samples contained significant amounts of fibrous minerals. The most common fibrous mineral was asbestiform tremolite-actinolite. This mineral is one of the controlled asbestos minerals. The optical properties ranged from the iron poor tremolites to the higher iron content actinolites. The refractive indices along the length ranged from 1.635 to 1.645, and normal to the length of 1.605 to 1.623. Extinctions varied from about 11 degrees oblique to about 18 degrees oblique. Some anthophyllite was also detected but at much lower levels. The anthophyllite was characterized as having parallel extinction, orthogonal cleavage, and refractive indices ranging through 1.620 to 1.640 normal to the fiber length and 1.640 to 1.665 parallel to the length. If the fiber was not large enough to exhibit orthogonal cleavage it was not considered as anthophyllite. This is also a controlled asbestos mineral. There were a variety of other fibrous minerals present, including fibrous talc, that are not specifically cited as a controlled asbestos mineral though the health effects may be similar.

The quantification was done by point counting though this method is not appropriate of this sample. The majority of fibers counted were very small, typically less than a three orders of magnitude less in volume than the other particles counted. In this case the point count over

207

EXHIBIT
B

APR-10-2000 07:20 AM   MICROLAB NW                          425 885 9419          P.01

estimates the fiber content significantly due to the difference in shape and size of the non-fibrous minerals present.  At least two hundred particles were counted on each of the four slides for each sample.  The results are not representative of the entire sample but rather only the fines.  All of the fibers counted were fibrous minerals though they may not all have been a controlled asbestos mineral.  Only two the fibers counted represented large bundles of tremolite-actinolite asbestos.  The remaining fiber counts were predominantly tremolite-actinolite fibers that had diameters of less than a micrometer.

| SAMPLE | TOTAL COUNT | FIBER COUNT | % ASBESTOS COUNT* |
|--------|-------------|-------------|-------------------|
| 070-01 | 842 | 8 | 0.95% |
| 070-02 | 887 | 7 | 0.79% |
| 070-03 | 812 | 8 | 0.98% |

* Percent by weight is less than a tenth of this value

The exposure to the dust from handling these materials would be enriched in fibrous minerals, predominantly tremolite-actinolite asbestos.

**CONCLUSION**

The samples all contain tremolite-actinolite asbestos as the dominant fibrous mineral.  The amount of asbestos present in the sample is well below one percent by weight.  Exposure to the dust from protracted handling of this material would be expected to exceed OSHA exposure limits.

Thank you for this opportunity to be of service.  If I can provide any further assistance please contact me.

Signed: _____

E. R. Crutcher, Consultant

| Sample ID # | Sample Description | | Volume (liters) | PCM Analytical Results | TEM Analytical Results |
|---|---|---|---|---|---|
| | Type | Description/Simulation | | | |
| 0070-01 | General Area Sample | Obtained while preparing containment | 695.80 | 0.016 fibers/cc | None Detected (<0.0087 S/cc) |
| 0070-02 | Work Area | Wall Demolition | 205.80 | 0.452 fibers/cc | None Detected (<0.1953 S/cc) [1] |
| 0070-03 | Personal | Wall Demolition | 41.60 | 1.096 fibers/cc | 0.5830 S/cc Actinolite |
| 0070-04 | Work Area | Drilling (prior to penetrating to attic) | 156.80 | 0.380 fibers/cc | None Detected (<0.0387 S/cc) |
| 0070-05 | Personal Sample | Drilling (prior to penetrating to attic) | 33.28 | 0.310 fibers/cc | None Detected (<0.1822 S/cc) |
| 0070-06 | Work Area | Drilling (during penetration to attic) and routing wire in attic | 78.40 | 1.302 fibers/cc | 0.3867 S/cc Actinolite |
| 0070-07 | Personal | Drilling (during penetration to attic) and routing wire in attic | 12.48 | Overloaded | 6.4410 S/cc Actinolite [1] |
| 0070-08 | Work Area (in attic) | Shoveling insulation in attic | 421.40 | 0.826 fibers/cc | 1.4307 Actinolite [1] |
| 0070-09 | Personal | Shoveling insulation in attic | 145.60 | 2.644 fibers/cc | 0.1692 S/cc Actinolite |
| 0070-10 | Work Area (in first floor containment) | Shoveling and vacuuming insulation in attic | 87.36 | 2.612 fibers/cc | None Detected (<0.4601 S/cc) [1] |
| 0070-11 | Personal | Vacuuming in attic | 31.20 | 5.614 fibers/cc | 0.9872 S/cc Actinolite |
| 0070-12 | Work Area | Emptying shop-vac, sweeping and vacuuming debris in containment | 55.62 | 4.064 fibers/cc | 2.8905 S/cc Actinolite [J] |
| 0070-13 | Personal | Emptying shop-vac, sweeping and vacuuming debris in containment | 37.44 | Overloaded | 3.2729 S/cc Actinolite [J] |
| 0070-21 | General Area Sample | Obtained after removal of containment | 1225.00 | 0.004 fibers/cc | None Detected (<0.0025 S/cc) |
| 0070-22 | General Area Sample | Obtained after removal of containment | 1225.00 | 0.004 fibers/cc | None Detected (<0.0049 S/cc) |

209

EXHIBIT

D

# EMSL Analytical, Inc.

*382 South Abbott Avenue*
*Milpitas, CA 95035*
*Phone: (408) 934-7010    Fax: (408) 934-7015*



Attn.: Chad Trent
Fulcrum Environmental Consulting, Inc.
South 107 Cedar
Spokane, WA  99201

Monday, April 17, 2000

Ref Number:    CA002469
Analysis Date:  4/17/2000

## PHASE CONTRAST MICROSCOPY (PCM) FIBER COUNT BY NIOSH METHOD 7400, ISSUE 2, 4TH EDITION, 8/15/94

### Project: Asbestos Investigation

| Sample | Location | Sample Date | Volume (liters) | Fibers | Fields | fibers/ mm³ | LOD fib/cc | fibers/cc |
|--------|----------|-------------|-----------------|--------|--------|-------------|------------|-----------|
| 0070-01 |  |  | 695.80 | 22.0 | 100 | 28.03 | 0.004 | 0.016 |
| 0070-02 |  |  | 205.80 | 110.0 | 58 | 241.6 | 0.013 | 0.452 |
| 0070-03 |  |  | 41.60 | 93.0 | 100 | 118.47 | 0.065 | 1.096 |
| 0070-04 |  |  | 156.80 | 102.0 | 64 | 154.69 | 0.017 | 0.380 |
| 0070-05 |  |  | 33.28 | 21.0 | 100 | 26.75 | 0.081 | 0.310 |
| 0070-06 |  |  | 78.40 | 102.0 | 49 | 265.18 | 0.034 | 1.302 |

Nonette Patron

Analyst

Approved
Signatory

Disclaimer: LOD – Limit of Detection. This method assumes the limit of detection is 7 fibers/mm². The laboratory is not responsible for data reported in fibers/cc, which is dependent on volume collected by non-laboratory personnel. This report relates only to the samples reported above. This report may not be reproduced, except in full, without written approval by EMSL.

Analysis performed by EMSL Milpitas (ELAP #1820)

# *EMSL Analytical, Inc.*

*382 South Abbott Avenue*
*Milpitas, CA 95035*
*Phone: (408) 934-7010    Fax: (408) 934-7015*



Attn.:  Chad Trent
Fulcrum Environmental Consulting, Inc.
South 107 Cedar
Spokane, WA  99201

Monday, April 17, 2000

Ref Number:    CA002469
Analysis Date:  4/17/2000

## PHASE CONTRAST MICROSCOPY (PCM) FIBER COUNT BY NIOSH METHOD 7400, ISSUE 2, 4TH EDITION, 8/15/94

### Project: Asbestos Investigation

| Sample | Location | Sample Date | Volume (liters) | Fibers | Fields | fibers/mm² | LOD fib/cc | fibers/cc |
|--------|----------|-------------|-----------------|--------|--------|------------|------------|-----------|
| 0070-07 | | | 12.48 | Sample Was Overloaded | | | | |
| 0070-08 | | | 421.40 | 142.0 | 20 | 904.46 | 0.006 | 0.826 |
| 0070-09 | | | 145.60 | 157.0 | 20 | 1000 | 0.019 | 2.644 |
| 0070-10 | | | 87.36 | 107.0 | 23 | 592.63 | 0.031 | 2.612 |
| 0070-11 | | | 31.20 | 100.0 | 28 | 454.96 | 0.086 | 5.614 |
| 0070-12 | | | 55.62 | 106.0 | 23 | 587.09 | 0.048 | 4.064 |

Nonette Patron

Analyst

Approved
Signatory

Disclaimer:  LOD = Limit of Detection. This method assumes the limit of detection is 7 fibers/mm². The laboratory is not responsible for data reported in fibers/cc, which is dependent on volume collected by non-laboratory personnel. This report relates only to the samples reported above. This report may not be reproduced, except in full, without written approval by EMSL.

Analysis performed by EMSL Milpitas (ELAP #1620)

2

# EMSL Analytical, Inc.

382 South Abbott Avenue
Milpitas, CA 95035
Phone: (408) 934-7010    Fax: (408) 934-7015



Attn.: Chad Trent
Fulcrum Environmental Consulting, Inc.
South 107 Cedar
Spokane, WA 99201

Monday, April 17, 2000

Ref Number:    CA002469
Analysis Date:    4/17/2000

## PHASE CONTRAST MICROSCOPY (PCM) FIBER COUNT BY NIOSH METHOD 7400, ISSUE 2, 4TH EDITION, 8/15/94

### Project: Asbestos Investigation

| Sample | Location | Sample Date | Volume (liters) | Fibers | Fields | fibers/ mm² | LOD fib/cc | fibers/cc |
|--------|----------|-------------|-----------------|--------|--------|-------------|------------|-----------|
| 0070-13 | | | 37.44 | Sample Was Overloaded | | | | |
| 0070.21 | | | 1225.00 | 10.0 | 100 | 12.74 | 0.002 | 0.004 |
| 0070-22 | | | 1225.00 | 10.5 | 100 | 13.38 | 0.002 | 0.004 |

Nonette Patron

Analyst

Approved
Signatory

Disclaimer: LOD = Limit of Detection. This method assumes the limit of detection is 7 fibers/mm². The laboratory is not responsible for data reported in fibers/cc, which is dependent on volume collected by non-laboratory personnel. This report relates only to the samples reported above. This report may not be reproduced, except in full, without written approval by EMSL.

Analysis performed by EMSL Milpitas (ELAP #1620)

3

# EMSL Analytical, Inc.



382 South Abbott Avenue
Milpitas, CA 95035
Phone: (408) 934-7010    Fax: (408) 934-7015

Attn.: Chad Trent
Fulcrum Environmental Consulting, Inc.
South 107 Cedar
Spokane, WA 99201

Tuesday, April 18, 2000

Ref Number:  CA002497

## Asbestos Fiber Analysis by Transmission Electron Microscopy (TEM), Selected Area Electron Diffraction (SAED), and Energy Dispersive X-Ray Microanalysis (EDX) - Performed by EPA Level II Method

### Basic TEM Summary Report

Project: Asbestos Investigation

| Sample | Volume (liters) | Asbestos Type(s) | # STRUCTURES Asbestos | # STRUCTURES Non-Asb. | Analytical Sensitivity (S/cc) | Asbestos Concentration (S/mm³) | Asbestos Concentration (S/cc) |
|---|---|---|---|---|---|---|---|
| 0070-01 | 695.80 | None Detected | 0 | 8 | 0.0087 | <15.75 | <0.0087 |
| 0070-02 | 205.80 | Overloaded | | 0 | | | |
| 0070-03 | 41.60 | Actinolite | 4 | 8 | 0.1457 | 62.99 | 0.5830 |
| 0070-04 | 156.80 | None Detected | 0 | 4 | 0.0387 | <15.75 | <0.0387 |
| 0070-05 | 33.28 | None Detected | 0 | 4 | 0.1822 | <15.75 | <0.1822 |

Ronald K. Mahoney

Analyst

Approved
Signatory

Disclaimer: The laboratory is not responsible for data recorded in structures/cc, which is dependent on volume collected by non-laboratory personnel. This report may not be reproduced, except in full, without written approval by EMSL. This report must not be used to claim product endorsement by NVLAP or any agency of the U.S. Government. This report relates only to the samples reported above. Quality control data (including 95% confidence limits and laboratory and analysts' accuracy and precision) is available upon request.

213

# EMSL Analytical, Inc.

382 South Abbott Avenue
Milpitas, CA 95035
Phone: (408) 934-7010    Fax: (408) 934-7015



Attn.: Chad Trent
Fulcrum Environmental Consulting, Inc.
South 107 Cedar
Spokane, WA 99201

Tuesday, April 18, 2000

Ref Number:  CA002497

### Asbestos Fiber Analysis by Transmission Electron Microscopy (TEM), Selected Area Electron Diffraction (SAED), and Energy Dispersive X-Ray Microanalysis (EDX) - Performed by EPA Level II Method

#### Basic TEM Summary Report

### Project: Asbestos Investigation

| Sample | Volume (liters) | Asbestos Type(s) | # STRUCTURES Asbestos | # STRUCTURES Non-Asb. | Analytical Sensitivity (S/cc) | Asbestos Concentration (S/mm²) | Asbestos Concentration (S/cc) |
|--------|-----------------|------------------|----------|----------|------------------------|-----------|---------|
| 0070-06 | 78.40 | Actinolite | 5 | 186 | 0.0773 | 78.74 | 0.3867 |
| 0070-07 | 12.48 | Overloaded | | 0 | | | |
| 0070-08 | 421.40 | Overloaded | | 0 | | | |
| 0070-09 | 145.60 | Actinolite | 8 | 48 | 0.0212 | 64.00 | 0.1692 |
| 0070-10 | 87.36 | Overloaded | | 0 | | | |

Ronald K. Mahoney

Analyst

Approved
Signatory

Disclaimer: The laboratory is not responsible for data reported in structures/cc, which is dependent on volume collected by non-laboratory personnel. This report may not be reproduced, except in full, without written approval by EMSL. This report must not be used to claim product endorsement by NVLAP or any agency of the U.S. Government. This report relates only to the samples reported above. Quality control data (including 95% confidence limits and laboratory and analysts' accuracy and precision) is available upon request.



# EMSL Analytical, Inc.

382 South Abbott Avenue
Milpitas, CA 95035
Phone: (408) 934-7010    Fax: (408) 934-7015

Attn.: Chad Trent
Fulcrum Environmental Consulting, Inc.
South 107 Cedar
Spokane, WA 99201

Tuesday, April 18, 2000

Ref Number:  CA002497

## Asbestos Fiber Analysis by Transmission Electron Microscopy (TEM), Selected Area Electron Diffraction (SAED), and Energy Dispersive X-Ray Microanalysis (EDX) - Performed by EPA Level II Method

### Basic TEM Summary Report

### Project: Asbestos Investigation

| Sample | Volume (liters) | Asbestos Type(s) | # STRUCTURES Asbestos | # STRUCTURES Non-Asb. | Analytical Sensitivity (S/cc) | Asbestos Concentration (S/mm²) | Asbestos Concentration (S/cc) |
|--------|-----------------|------------------|-----------|----------|-------------------------------|--------------------------------|-------------------------------|
| 0070-11 | 31.20 | Actinolite | 10 | 117 | 0.0987 | 80.00 | 0.9872 |
| 0070-12 | 55.62 | Overloaded | | 0 | | | |
| 0070-13 | 37.44 | Overloaded | | 0 | | | |
| 0070.-21 | 1225.00 | None Detected | 0 | 0 | 0.0025 | <6.00 | <0.0025 |
| 0070-22 | 1225.00 | None Detected | 0 | 7 | 0.0049 | <15.75 | <0.0049 |

Ronald K. Mahoney
Analyst

Approved
Signatory

Disclaimer: The laboratory is not responsible for data reported in structures/cc, which is dependent on volume collected by non-laboratory personnel. This report may not be reproduced, except in full, without written approval by EMSL. This report must not be used to claim product endorsement by NVLAP or any agency of the U.S. Government. This report relates only to the samples reported above. Quality control data (including 95% confidence limits and laboratory and analysts' accuracy and precision) is available upon request.

215

# *EMSL Analytical, Inc.*



*Address 382 South Abbott Ave.*
*Address Milpitas, CA 95035*
*Phone: 408/934-7010    Fax: 408/934=7015*

Wednesday, April 19, 2000

**Client Name:** Fulcrum Environmental Consulting, Inc.
**Address :** South 107 Cedar
**Address:** Spokane, WA
**Phone:** 509/459-9220
**Fax:** 509/459-9219

**Project:** Asbestos Investigation / 0700
**Attention:** Chad Trent
**Ref Number:** CA002540
**Page:**      1 of 1

## TEM Level II Analysis, Indirect Preparation

| SAMPLE ID | | ASBESTOS DETECTED | | | ANALYTICAL SENSITIVITY (s/cc) | ASBESTOS CONCENTRATION (s/cc) |
|---|---|---|---|---|---|---|
| | | STRUCTURES | | TYPE(S) | | |
| | | < 5 | ≥ 5 | | | |
| 0070-02 | | 0 | 0 | ND | 0.1953 | < 0.1953 |
| 0070-07 | | 0 | 2 | Actinolite | 3.2205 | 6.4410 |
| 0070-08 | | 1 | 14 | Actinolite | 0.0954 | 1.4307 |
| 0070-10 | | 0 | 0 | ND | 0.4601 | < 0.4601 |
| 0070-12 | | 0 | 4 | Actinolite | 0.7227 | 2.8905 |
| 0070-13 | | 0 | 3 | Actinolite | 1.0910 | 3.2729 |

216

Analyst

Laboratory Manager

Comments: Preliminary Report

*CA002497 — level #*

**EMSL Analytical, Inc.**              **CHAIN OF CUSTODY**                    **Asbestos**

*CA002540 — Resuspended Samples*

EMSL Representative:   Will Gray
Your Company Name:   Fulcrum Environmental          EMSL-Bill to:   Fulcrum Environmental
Street:                           107 South Cedar           Street:                           107 South Cedar Street
City/State:   Spokane, WA      Zip:   99204-0625     City/State:   Spokane, WA      Zip:   99204-0625

Phone Results to:     Fulcrum Environmental          Fax Results to:      Fulcrum Environmental
Name:                        Chad Trent                     Name:                       Chad Trent
Telephone #:               (509) 459-9220               Fax #:                       (509) 459-9219
Project Name/Number:   Asbestos Investigation/00070   Purchase Order #:   00070

**MATRIX**                                                **TURNAROUND**

| | | | | | |
|---|---|---|---|---|---|
| X Air | ☐ Floor Tile | ☐ Soil | ☐ 6-10 Days | ☐ 72 Hours | X 24 Hours | ☐ Same Day* |
| ☐ Bulk | ☐ Drinking Water | ☐ Dust | ☐ 5 Days | ☐ 48 Hours | ☐ 12 Hours | ☐ 6 Hours |
| ☐ Wipe | ☐ Wastewater | | *S.D. - A.M. Delivery by Fed. Ex.-Results by Mid-Night or Earlier. | | |

| SAMPLE NUMBER | TOTAL TIME (minutes) | FLOW RATE (liters/min) | TOTAL LITERS | ANALYSIS NIOSH 7400 (PCM) | ANALYSIS AHERA Level 2 (TEM) | COMMENTS |
|---|---|---|---|---|---|---|
| 0070-01 | 71 | 9.80 | 695.8 | X | X | Analyze all samples PCM |
| 0070-02 | 21 | 9.80 | 205.8 | X | X | with method NIOSH 7400 |
| 0070-03 | 20 | 2.08 | 41.6 | X | X | and TEM with method |
| 0070-04 | 16 | 9.80 | 156.8 | X | X | AHERA Level . Any samples |
| 0070-05 | 16 | 2.08 | 33.28 | X | X | which cannot be analyzed |
| 0070-06 | 8 | 9.80 | 78.4 | X | X | by NIOSH 7402 will need to |
| 0070-07 | 6 | 2.08 | 12.48 | X | X | be analyzed using the |
| 0070-08 | 43 | 9.80 | 421.4 | X | X | indirect method. |
| 0070-09 | 70 | 2.08 | 145.6 | X | X | |
| 0070-10 | 42 | 2.08 | 87.36 | X | X | |
| 0070-11 | 15 | 2.08 | 31.2 | X | X | Please contact Chad Trent |
| 0070-12 | 18 | 3.09 | 55.62 | X | X | prior to conducting analysis |
| 0070-13 | 18 | 2.08 | 37.44 | X | X | using the indirect method. |
| 0070-21 | 125 | 9.80 | 1225 | X | X | |
| 0070-22 | 125 | 9.80 | 1225 | X | X | |

Client Sample # (s)   0070-01                to   0070-22                     Total Samples:   15

Relinquished:   *Chad Trent*          Date:   4-12-00   Time:   11:45

Received:   *Maria V. Fya*            Date:   4-14-00   Time:   9:15 a.m.

Received:                              Date:                    Time:

217

## MICROLAB NORTHWEST

7609 140TH PL. NE
REDMOND, WA 98052
PHONE: (425) 885-9419

## LABORATORY REPORT

TO: Chad Trent
Fulcrum Environmental Consulting
107 South Cedar Street
Spokane, WA 99204

REPORT #: 860a-00
DATE:   April 26, 2000

PHONE: (509) 459-9220  FAX: (509) 459-9219
SUBJECT:  Particle Identification
SPECIMEN:  Seven Sets of Tapelift Samples
REFERENCE:

### INTRODUCTION

Seven sets of three each tapelift samples were received for an identification of asbestos if present. The tapelifts were marked as "070-TP01" through "070-TP21". The tapelifts were placed on clean microscope slides and immersed in acetone for about two hours and then removed. The slides with the tapelifts were rinsed with clean acetone as they were removed from the immersion tank. The tapelifts were allowed to dry for ten minutes and then mounted using a synthetic resin (Eukitt). The completed mounts were analyzed using analytical light microscopy.

### RESULTS

Tremolite-actinolite asbestos was identified in every sample with the single exception of sample #7. In sample #7 a number of fibrous minerals were present and some of those were probably asbestos, but that could not be confirmed because of the limitation of the optics imposed by the adhesive in the mount. Every fiber identified as asbestos in these samples had refractive indices much higher than the adhesive/resin, had oblique extinction between 11 and 18 degrees, exhibited fibril structure, had a birefringence of about 0.02, showed a positive sign of elongation, and exhibited molecular asymmetry (darker in the NW and SE quadrant). This combination is unique for the tremolite-actinolite series.

### CONCLUSION

Tapelift samples #1 through #6 and #8 through #21 contained tremolite-actinolite asbestos. Sample #7 probably contained asbestos but a fiber in the proper orientation to confirm asbestos was not seen among the numerous fibrous minerals present.

Thank you for this opportunity to be of service. If I can provide any further assistance please contact me.

Signed: _____

E. R. Crutcher, Consultant

218

EXHIBIT
E

# GRACE

Construction Products Division

<u>PERSONAL AND CONFIDENTIAL</u>              0362966S

To:    C. E. Brookes                    May 24, 1977
       C. N. Graf

From:  E. S. Wood

Subj:  Tremolite in Vermiculite

       cc:  R. M. Vining
            B. A. Blessington
            H. C. Duecker
            W. R. Hanlon
            W. F. McCord
            L. Rosenblatt
            B. R. Williams
            J. W. Wolter


        The purpose of this memorandum is to discuss in some detail

the nature of the tremolite problem as it impacts our vermiculite business,

and also to outline our plans for dealing with the problem.  These plans

are based on extensive product testing, analysis of alternative confi-

gurations of the Zonolite business, and consultation with legal counsel,

including the Corporate Legal Division.

<u>THE PROBLEM</u>

        Tremolite is present as a tramp mineral in our vermiculite

deposits, and while most of it is separated from the vermiculite in the

milling process, small amounts are carried to expanding plants and ul-

timately into finished products.  Tremolite is classified as asbestos

and regulated by the Environmental Protection Agency (EPA), the Occupa-

tional Safety and Health Administration (OSHA), the Mining Enforcement and

EXHIBIT

*183.12*

15101908

EXHIBIT <u>12</u>

C. E. Brookes/C. N. Graf                    -2-                    May 24, 1977

**03629669**

Safety Administration (MESA), the Consumer Product Safety Act (CPSA), and
the Toxic Substances Control Act (TSCA) as a carcinogen.  Although we have
been working since 1971 to reduce tremolite in our product, in our expanding
plants, and in our mills, we have felt until now that tremolite was mis-
classified by OSHA and others as a form of asbestos.  This was based on our
understanding of the difference in physical characteristics of tremolite
compared to other fibrous forms of commercial asbestos, as well as outside
studies such as the animal study sponsored by Johnson & Johnson on a
tremolite talc which showed no carcinogenicity.

       Two recent developments have changed our views on this subject.
First, an in-house study of mortality rates among ex-employees at Libby
indicates that their risk of lung cancer is five times the national average.
In this connection, we have experienced asbestosis in 41.5% of the workers
(with over 10 years' service) in Libby, as well as in 28% of the workers (with
over 10 years' service) exposed to Libby ore in the expanding plants.  (The
experience at Libby is confused because all of the aforementioned workers
were exposed to high dust count levels in the old dry mill.  The present
Libby dust environment with the new mill represents a major change in this
respect.  Fiber counts have dropped from a level of above 30 f/ml on the
average to a level below 5 f/ml.  Also, the expanding plant employees
mentioned have also been exposed to commercial asbestos in the manufacture
of MK for a number of years.)  Secondly, with respect to national safety
regulations, the prior distinctions between "commercial asbestos" and "non-
commercial asbestos" (tramp contaminants) are being erased as the general
nature of the hazard of exposure to fibrous materials is more thoroughly studied.

C. E. Brookes/C. N. Graf                    -3-                    May 24, 1977

03629670

A great deal of controversy exists over what constitutes a safe level of exposure to a carcinogen. Most people would agree that safe levels are very difficult to establish. One view, taken by most regulating agencies, is that since no safe level can be unequivocally demonstrated, carcinogens must be eliminated where there are acceptable substitutes. Where the carcinogen cannot be eliminated by substitution, exposure must be controlled at the lowest level which can be technically achieved and reliably monitored. The opposing group makes a strong case that no unusual health risks have been rigorously documented for asbestos exposures below 5 f/ml (8-hour time weighted average), much less the present standard of 2 f/ml, or proposed standard of .5 f/ml. In the presence of such controversy it is difficult to determine what posture is appropriate for us in establishing limits of exposure for our employees and customers. A more detailed discussion of the health hazards associated with asbestos exposure is contained in Appendix I.

The exposure problems that we have seen to date are limited to the fibrous type of tremolite that occurs in the Libby deposits. The tremolite associated with our deposits in and around Enoree, South Carolina is largely non-fibrous. Since we have no evidence of asbestosis or other excess health risk associated with asbestos exposure among employees working in South Carolina, we do not believe that the levels of exposure to our employees or customers utilizing material from South Carolina creates a health hazard of any kind. In the case of material from Libby, we believe that lower levels of exposure are required to assure the safety and well-being of our employees. Moreover, regulations already proposed, when put into effect, will mandate lower levels.

15101910

C. E. Brookes/C. H. Graf

03663376

PROPOSED ACTIONS

1. Fiber Control

As a result of the existing and expected regulations, we are moving ahead on a faster than planned schedule with requests for $1,271,000 in fiber control capital spending originally budgeted through the end of 1978 for the Libby mill and various vermiculite expanding plants. We will also request authorization to spend $298,000 over and above that which was budgeted, again principally for fiber control projects. The individual projects are listed in detail in Appendix II.

Insofar as fiber reduction is concerned, our experience to date indicates that removal of tremolite fibers at the mill is a preferred method of reducing employee and customer exposure levels. Immediate temporary steps have been taken to reduce the level of fines which have been recycled into the ore shipped from Libby. It is too early to assess the benefit of these changes, although taken alone they are r _ expected to eliminate the need for a fiber reduction program at the expanding plants and a fiber-binding program for consumer products. The cost of permanent equipment to collect and dispose of these fines is included in the overall Libby fiber reduction program discussed below.

The present MESA standard in effect at Libby is 5 f/ml (8-hour TWA). The Federal Metal and Non-Metal Mine Safety Advisory Committee has recommended that MESA lower the present standard to 2 f/ml, although the timing of such a change is uncertain. Our objective is to bring all Libby fiber counts below 2 f/ml by January 1, 1978. To meet this objective we will be proceeding with $718,000 in capital spending over the next few months (budgeted

15076208

03629671

at $605,000 in the 1977 capital budget).  Included in this amount will be
$331,000 of spending against RCA 12-2 (budgeted for this year at $204,000)
for mill-related fiber and dust segregation, collection and disposal equip-
ment.  The remaining $387,000 (budgeted at $401,000 for 1977) will be
directed at mine area dust control and vehicular dust control equipment.
Authorization for this spending is being requested under separate RCA's
and shop orders.

For the long term, research is being carried on at North
Carolina State, aimed at improved separation techniques that appear to
be effective in clean-up of our finer grades (No. 3 and No. 4).  Un-
fortunately, this approach does not seem to be effective for the coarse
grades (No. 1 and No. 2) which are used almost exclusively for Attic
Insulation (hence the need for a binder development for Attic Insulation).
Laboratory scale results indicate that a reduction of over 90% in the
level of fibrous tremolite in fine grades may be achievable.  This would
appear to be the preferred long-term solution to tighter fiber exposure
levels both at our expanding plants and in the customer use environment
for the greatest volume of our products ($28.3 million out of a total $35.5
million of expanded vermiculite sales and ore sales to outsiders using
Libby ore in 1977).

A series of changes primarily in ore handling facilities will
be made at eight expanding plants which do not presently meet the OSHA
standard of 2 f/ml (8-hour TWA).  These changes will total $943,000 of
capital as follows:  Denver ($50,000); Newark ($114,000); Phoenix ($110,000);

15101911

C. E. Brookes/C. N. Graf                    -6-                    May 24, 1977

03629672

Dallas ($50,000); Portland ($107,000); Dearborn ($197,000); and Omaha

($315,000).  Since the steps taken to reduce fiber counts to 2 f/ml,

with proper plant maintenance, can generally bring fiber counts below

1 f/ml with appropriate peripheral equipment, we expect to achieve a

level of 1 f/ml at all expanding plants by mid-1978.  An additional

$93,000 of capital will be required for peripheral equipment to meet

1 f/ml at the following plants:  Easthampton ($17,000); St. Louis ($26,000);

Little Rock ($50,000).  These changes will be handled through a series

of individual plant RCA's or shop orders, with the exception of Omaha

spending which has already been approved under RCA E76-317 ($247,000

approved by the President on November 26, 1976), and RCA E76-311 ($68,000

approved by the CPD President on September 27, 1976).  Excluding Omaha,

the expanding plant capital spending totals $721,000 versus budgeted 1977

and 1978 figures totaling $666,000.

In part, these changes are being undertaken now since they re-

present relatively small capital increments (above what would be required

to reach the present mandatory levels) that will yield substantially lower

exposure levels to our employees.  However, it is clear that the levels

which we propose meeting will eventually be embodied in stricter state

and federal standards.  Moreover, it is clear that the Federal Government

policy for the long run will be directed to achieving the lowest level

which is technically feasible and which does not have an adverse impact on

the economy as a whole.

15101912

C. E. Brookes/C. N. Graf                -7-                May 24, 1977

03629673

Standards as low as '.1 f/ml have been proposed by the National Institute for Safety and Health (NIOSH). While this was a proposal that has been made without regard for its economic impact or technical feasibility, it is indicative of the general philosophy behind control of substances defined as carcinogens.

2. Product Labeling

Based on the advice of corporate general counsel, we have decided not to affix asbestos warning labels on any of our expanded products which, in their normally intended use, do not expose customers to fiber levels above those permitted by OSHA. Thus, no products made from South Carolina ore will require labeling. Subject to the results of additional job-site tests, no present expanded products using Libby ore will require labeling, with the possible exception of industrial grades for which we may not be able to identify and test all end uses. This policy is consistent with the posture of Johns-Manville, the largest supplier of asbestos products in the U.S. and a leader in the field of asbestos safety and health precautions. Effective July 1, 1977, all new packaging purchased will include a general dust warning label printed on the package.

In the case of consumer products, we are operating under the presumption that the present controversy over regulation of materials containing asbestos will be resolved by the Consumer Product Safety Commission (CPSC) in favor of a complete ban on consumer products containing asbestos fibers unless they can be shown to be "bound". Recent action of the CPSC

C. E. Brookes/ C. N. Graf                    -8-                    May 24, 1977

03629674

in proposing a ban on drywall joint compounds containing asbestos, arti-
fical fireplace logs using free asbestos fibers, and spackling compounds
containing tremolitic talcs tends to support our presumption of an eventual
ban on unbound asbestos-containing consumer products.

Equipment is being installed at 14 key plants at a projected
cost of $130,000 (average of $9,300 per plant) using individual, locally
approved shop orders.  This equipment will permit us to apply a binder
for our two major consumer products -- Attic Insulation and Horticultural
Vermiculite.  Simultaneously with the installation of the equipment, we
are in the process of choosing an appropriate binder and level of treat-
ment with the objective of reducing the use exposure for these products
to a level of 1 f/ml maximum exposure and .2 f/ml on an 8-hour time
weighted average basis.  These are levels chosen because we think they are
technically achievable and are close (within a factor of 2) to the level
which NIOSH proclaims to be the lowest level which can be reliably monitored.

It should be emphasized that these steps are being taken to
comply with the extremely stringent projected regulations, and not because
we feel that the use of these products creates a serious risk for consumers.

Considering the brief and irregular pattern  of use, we do not
believe that asbestos exposure from our products causes an increased risk
of health problems.  However, there is a fringe of expert opinion, most
prominently and articulately represented by a well-publicized expert from
Mt. Sinai (Dr. Selikoff) suggesting that even brief exposures, presumably
at high levels, can later produce mesothelioma.  Mesothelioma is a rare form

15101914

C. E. Brookes/ C. N. Graf                -9-                May 24, 1977

**03629675**

of lung cancer linked to asbestos exposure.  For this reason, and the ex-
pected stiff regulation of asbestos-containing materials in consumer
products, we feel that it is prudent to develop a treatment for our con-
sumer products, even though it is anticipated this will increase our cost
of manufacture by up to 15%.

Even though we will not be labeling most of our products, we
intend to notify customers who inquire that small amounts of tremolite are
present in our end products with the exception of our mixed products.  In
the case of mixed products (MONOKOTE and soil mixes), tremolite is detectable
only through the use of internally developed analytical procedures which
require elaborate techniques not commonly recognized or employed in the
scientific community for detection of asbestos.  For this reason, we are
taking the position with all but authorized government authorities that our
mixed products are "non-asbestos" products.  Obviously, in responding to
government inquiries we intend to provide specific data, which we have, that
identifies trace levels of tremolite even in mixed products.  It is our
belief, for purposes of the law, that the amount of fibrous tremolite present
in our mixed products is de minimis.

Requests for written statements concerning the presence of
asbestos in our products from customers will be answered by indicating that
we have small amounts of tremolite present in the product and by referring
them to the OSHA regulations covering asbestos-containing products.

1510101F

C. E. Brookes/C. N. Graf                    -10-                    May 24, 1977

**03629676**

ZONOLITE PROFITABILITY IMPACT

Comparative financial analyses have been completed for the
present Zonolite business and several alternative configurations which
could be forced by future regulatory activity and/or our ability to meet
future fiber standards.  The base case and alternative case assumptions
and financial comparisons are presented in Appendix III.  The following
table summarizes key financial statistics for:  1.) the Zonolite 1977
budget and forecast, prepared in October 1976; 2.) a 1977 re-estimate
completed in January 1977 reflecting adjustments to sales and gross margins
based on the economic outlook at that time (used as the "base case" in
Appendix III); 3.) a "most likely" future case reflecting additional
capital spending for fiber control, additional costs for binder treatment
in certain products, withdrawal of certain consumer products such as Attic
Insulation in the U.S., and labeling of the remaining consumer products
(Case B in Appendix III).

| ($000) | 1977 | | | 1980 | | |
|---|---|---|---|---|---|---|
| | Budget | Base Case | Case B(1) | Budget | Base Case | Case B |
| Net Sales | $65,719 | $63,495 | $57,303 | $92,639 | $92,281 | $80,232 |
| Operating Profit | 5,201 | 4,183 | 3,033 | 8,278 | 8,512 | 6,065 |
| Profit After Tax | 2,779 | 2,556 | 2,018 | 5,305 | 5,373 | 3,758 |
| Total Capital Employed | $31,573 | $30,891 | $29,937 | $37,613 | $37,215 | $34,328 |
| % Return on TCE | 9.0% | 8.5% | 7.0% | 14.3% | 14.6% | 11.2% |

(1) Case B presented in 1977 is for comparative purposes only.  The full-year
    impact of assumptions in Case B would not actually be experienced in 1977.

15101916

C. E. Brookes/C. N. Graf                    -11-                        May 24, 1977

03629677

Our projections indicate that even with the loss of our con-
sumer business (assuming the Canadian Attic Insulation business continues)
Zonolite continues to be a viable business albeit at lower than forecasted
returns.

More selective internal use of South Carolina ore in place of
Libby ore can largely eliminate the 10-50% reduction in sales volume that
would result from a requirement to label our products as containing as-
bestos. The reduction in sales from labeling is primarily the result
of our being the first labeled product on a construction job site which
would force contractors to comply with impractical OSHA regulations.

ALTERNATIVE APPROACHES

Considering the large potential liability that results from the
sale of products that contain even a small amount of contaminant defined
by the government as a carcinogen, it is reasonable to question whether
there are alternatives to the proposed action. Our exposure to law suits
cannot be ignored. In addition, we are forecasting a continued demand for
no return capital to be invested in the business in order to meet increasingly
tighter standards for asbestos fiber exposure, independent of whether a
proven risk exists or not. Two obvious alternatives would be to seek divest-
ment of the business or to close Libby and retrench to South Carolina where
the health issues are minimal (but not eliminated).

Divestment of Zonolite has been considered in the past and been
judged impractical. It is felt that no buyer could be found, capable of
continuing to operate the business (with adequate capital resources) to give
us an acceptable price for the business as compared to other alternatives.

15101917

C. E. Brookes/C. N. Graf                    -12-                    May 24, 1977

03629678

Closing of Libby and retrenching to South Carolina would require a drastic change in the basis on which the business is run. It is likely that we would be operating a regional business in the East, Midwest, and Southeast, rather than the present national business for Zonolite products. This alternative, if required, would be expected to produce a high return but substantially lower after-tax profits. For example, our projection for 1980 for a regional business, without Libby, shows after-tax profit of 2.6 million dollars giving a 15.2% return on the 17.2 million dollar Total Capital Employed. (This case is presented as Case C in Appendix III.) Large asset write-offs and interim operating losses would be incurred to convert to this regional business basis.

We now believe the most likely case for 1980, retaining Libby, but recognizing the possible loss of consumer businesses to be a 3.8 million dollar after-tax profit, generating an 11.2% return on 34.3 million dollars of Grace Capital Employed.

Our forecast indicates that continuing to operate Libby and continuing to conduct a national business is a preferred alternative unless large amounts of capital are required to meet drastically tightened asbestos fiber exposure levels. Our best estimate is that a 1 f/ml standard for Libby would require 3.6 million dollars of additional capital. A tightening of the OSHA regulations covering our expanding plants to a level of .1 f/ml would require 6 million dollars of additional capital. Based on our present assessment of what is technically required, a move to the standards of .1 f/ml in the expanding plants and 1.0 f/ml in Libby would make it uneconomical to continue operating Libby.

15101918

C. E. Brookes/ C. N. Graf                    -13-                    May 24, 1977

03629679

In the absence of such extreme (and unlikely) tightening of standards, our projections indicate that the best course is continued operation of Zonolite from two mine locations.

RISKS

There are seven specific risks associated with tremolite in our workplaces and products which we assess as follows:

1. Harm to customers.

We do not feel that our products create a hazard for normal end uses. The highest level of exposure is for Attic Insulation and Masonry Insulation. The high concentrations of upwards of 15 f/ml (15 minute maximum) for Attic Insulation and 12 f/ml (15 minute maximum) for Masonry Insulation that were observed in simulated tests early in 1976 have not been confirmed by the results of more recent testing in actual field use. (The present OSHA ceiling limit is 10 f/ml for any 15 minute period.) The maximum concentration in the case of Masonry Insulation observed in recent testing was 3.65 f/ml (15 minute maximum) and in the case of Attic Insulation was 4.28 (15 minute maximum). However, we have observed very large variations in simulated test results such that further improvement in Attic Insulation, in particular, may be necessary to be assured that we reliably fall below 10 f/ml maximum exposure during use. Due to the products' short and irregular periods of use, it seems unlikely that we would exceed the 2 f/ml, 8-hour time weighted average, OSHA standard with Attic Insulation or Masonry Insulation.

15101919

C. E. Brookes/C. N. Graf                    -14-                    May 24, 1977

**03629680**

All other products appear to be well below permitted levels, in most instances by a good margin.  (See Appendix IV for representative test results.)

2. <u>Harm to employees</u>.

The present level of exposure for our Libby employees (up to 5 f/ml TWA), while materially better than the harmful exposures before the new wet mill, still represents concern to us.  Therefore, we will be undertaking an employee education program as well as further reduction in the fiber levels to 2.0 f/ml, in order to reduce the risk of harm to our Libby employees' health.

The reduction to 1 f/ml in the expanding plants, which we expect to accomplish by mid-1978, should give us a comfortable margin of safety in concluding that there is very low risk to our employees in the expanding plant work environments.

The risk to expanding plant employees using South Carolina ore, as well as to the mine/mill employees in South Carolina, is negligible.

3. <u>Product bans</u>.

There is a high risk that our products will be banned in several significant uses.

We forecast that our vermiculite consumer products, namely Attic Insulation, Horticultural Vermiculite, and Pool Base, will eventually be banned by the Consumer Product Safety Commission, and this has been assumed in the 1980 financial projections (Appendix III).  We place our chances at 50:50 of binding the tremolite such that we could effectively argue that no fibers will be released during use.

15101920

C. E. Brookes/C. N. Graf                -15-                May 24, 1977

**03629681**

There is also a high risk (30%) during the next 18 months that
MONOKOTE fireproofing will be considered to fall within the ban in
selected states (California, New York, Minnesota, Massachusetts, and
Illinois) of fireproofing products containing asbestos, although it would
appear that this is an unintended ban.  Legislators in those states simply
failed to consider trace tramp minerals when wording the prohibition
against a product containing <u>any</u> asbestos for sprayed applications.  We
are actively working on a vermiculite free fireproofing material for
introduction in mid-1978.

4.  <u>Label requirements</u>.

We believe that a decision to affix asbestos warning labels
to our products would result in substantial sales losses.  This view is
shared by Johns-Manville in the case of their labeled construction products.
It is further supported by J-M's experience with their tremolite talcs.

Based upon advice from corporate counsel, our products do not
require labels if the OSHA limits are not exceeded in their intended use.
This is also J-M's position for their own products.  We believe that all
of our products fall below the limits established by OSHA and that we will
be able to continue to fall below more stringent standards being projected,
thus avoiding the need to label our products.

Secondly, any change in interpretation which would require a
labeling of selected products, such as Masonry Insulation, can probably
be avoided by redistribution of the cleaner South Carolina ore and with-
drawal from selected isolated territories.

15101921

C. E. Brookes/C. N. Graf               -16-               May 24, 1977

**03629682**

Continued programs aimed at cleaning up the product should allow us to meet the projected tighter limits that may be imposed by OSHA in 1978 and 1980.

5.  **Increasingly restrictive standards and higher capital requirements to meet the more stringent future standards.**

We believe there is a very high risk that standards will become more restrictive requiring additional capital for continued operation of Libby and of expanding plants using Libby ore. In addition to the 1.9 million dollars which we propose to spend between now and mid-1978 to comply with asbestos fiber safety standards, an additional one million dollars is expected to be needed by 1980 in order to meet a projected OSHA standard of .5 f/ml.

There is a risk, which we place at less than a 20% chance, that additional investment of up to 10 million dollars would be required in order to reach a level of 1 f/ml at Libby ($3.7 MM) and .1 f/ml at expanding plants using Libby ore ($6.3 MM). Such a development would probably result in a decision to close Libby and the retrenchment of our business to a regional basis supplied entirely out of South Carolina. (See Appendix III, Case C for details of the financial impact of a decision to close Libby.)

6.  **Adverse publicity**

There is a risk that Grace will attract adverse publicity from national media concerning the presence of asbestos in vermiculite. This

15101922

C. E. Brookes/C. N. Graf            -17-              May 24, 1977

**03629683**

information is already being circulated within government agencies, such as OSHA and has been reported on a local basis in connection with the Louisa County dispute over the mining of vermiculite ore.  Future steps, such as the development of a case for continued sale of Attic Insulation to the Consumer Product Safety Commission, will increase the risk of widespread adverse publicity.

7.  <u>General liability to employees, customers, and the public</u>.

　　　　　Liability to employees is limited by the Workmen's Compensation Laws.  However, we should expect increased Workmen's Compensation rates in Libby as the number of disabilities increase among employees who have been exposed in the past to the high fiber concentrations of the old dry mill.  Liability among expanding plant employees and the South Carolina mine/mill employees appears minimal.

　　　　　The risk of liability to customers is heightened by the decision not to label our products.  Under the strict liability criteria, we may be liable to customers who can demonstrate they (1) were exposed to asbestos fibers and (2) sustained personal harm.  Based on advice of corporate counsel, this risk is categorized as moderate.  Moreover, it seems unlikely that <u>bona fide</u> cases of personal harm could be well documented considering the pattern of use and exposure levels of our customers.

　　　　　General public liability, stemming from the sale of consumer products, is a low-level risk with very high potential liability if it develops.  While we have no evidence of any adverse effect of our products on consumers, neither can we offer convincing evidence that they are ab-

C. E. Brookes/C. N. Graf                -18-                May 24, 1977

**03629684**

solutely safe.  Making such a case is handicapped by the number of
"experts" who claim that there is no safe level with the inference that
any exposure is potentially hazardous.  This leaves us open to liability
without a good defense over a broad range of alleged hazards.  A decision
to label our consumer products would eliminate the risk of future lia-
bility, while exacerbating the risk of claims (mostly not bona fide) from
past use of the product.

                                        E. S. Wood

ESW/CGR
Attachments

APPENDIX I

03629685

MEDICAL EVIDENCE ON THE EFFECT OF ASBESTOS EXPOSURE

Exposure to high concentrations of asbestos fibers results in increased risk to health of three different types:

Asbestosis is a scarring of the lungs that is a chronic condition appearing first in chest x-rays, usually after 5 or more years of exposure. It can be reliably diagnosed from x-rays and is specifically identified with exposure to asbestos fibers.

Lung cancer (bronchogenic carcinoma) can develop as a result of exposure to asbestos fibers or to other causes (such as smoking). It is difficult to diagnose due to the long latency period between initial exposure to asbestos and development of symptoms. Furthermore, since there are a number of causes of lung cancer, it is more difficult to establish a cause-effect relationship between exposure to asbestos fibers and lung cancer. Nonetheless, a great deal of work has been done which convincingly indicates a relationship between an excess risk of lung cancer and exposure to high concentrations of asbestos (above 5 f/ml). A combination of exposure to high concentrations of asbestos fibers and smoking is more damaging than either alone. One study among asbestos workers has shown that smokers have eight times the risk of lung cancer than non-smokers have.

Mesothelioma is a rare form of cancer which can occur either in the lungs or in the stomach. It can be specifically diagnosed only by taking a biopsy of the affected organ. It is specifically associated with asbestos exposure. Around 85% of cases diagnosed as mesothelioma occur in patients who have a history of exposure to asbestos.

APPENDIX I

APPENDIX I                              -2-

**03629686**

Although there is disagreement between experts on this point,
the determination of an increased risk of asbestosis may also be indica-
tive of an increased risk of lung cancer.

For purposes of assessing the risk to our employees, the only
practical indicator is the incidence of confirmed cases of asbestosis.
This is due to the extreme difficulty of determining the cause of cancer
in any group of people considering the long latency period and general
lack of specificity between lung cancer and any single cause.  The ex-
ception to this would be cases of mesothelioma.  However, we have no
reports of mesothelioma even at Libby.

As a result of the particular philosophy employed by govern-
ment agencies to regulate carcinogens, as well as the experimental diffi-
culty of establishing safe levels, very little scientific work is available
to help identify the health risk posed by exposure to <u>low levels</u> of
asbestos fibers (under 5 f/ml).

There are three sources of information outside CPD which purport
to indicate that asbestos fibers cause increased health risks even at low
concentrations.

The first is a study among hard rock miners in Idaho (Gillam et al.)
which indicates an increased risk of lung cancer in the presence of asbestos
fiber exposures of around 0.24 f/ml.  However, this study is confounded by
the presence of other potentially carcinogenic materials, notably arsenic-
containing compounds and radon daughters.  A still unpublished study of a
larger group of the same miners (McDonald et al.) has indicated no increased

APPENDIX I                           -3-

03629687

mortality risk from silicosis.  This particular evidence of a hazard
associated with low level exposures would seem to be seriously impugned.

A second purported indication of the hazard associated with
low exposure levels is an increased risk of lung cancer among relatives
of asbestos miners.  However, more recent measurements indicate that
fiber exposures in home environments of asbestos workers can be high and
therefore this probably does not represent a low level exposure environment.

The third collection of evidence is of mesothelioma (not other
asbestos-related diseases) in individuals and in animals exposed to high
concentrations for brief periods of time (as little as 8 hours).  The
cases in men are few in number typically involving one or two individuals
with unknown but probably very high exposure concentrations.  Due to the
small number of cases, definite cause-effect relationships cannot be drawn.
The cases among animals are at extremely high dosage levels in species
which are especially sensitive and,therefore, extrapolation to the effects
on man are not well-founded.

In spite of the lack of hard evidence, there is a respected
group of professional researchers who express the opinion that exposure
to levels as low as 2 f/ml (8-hour TWA) create an increased risk of cancer
in man after 30 or more years of exposure.

Results of our own in-house epidemiological studies indicate
that conditions which existed in the old dry mill in Libby (34 f/ml TWA)
and in unregulated expanding plants using Libby ore (29 f/ml TWA) created
a health hazard to our employees.  Among present employees with 10 or more

15101927

APPENDIX I                              -4-

03629688

years of service who would have been exposed to the conditions in the old
Libby dry mill, 41.5% exhibit asbestosis. Moreover, there is a five-fold
increased risk of lung cancer among retired and ex-employees who worked in
the Libby mine (as compared to the general population).

We are encouraged by the absence of any new cases of asbestosis
found at the last annual check-up at Libby.

Among expanding plant employees, the high employee turnover
and variety of past exposures make conclusions difficult. Among 9 employees
with 10 or more years' service in plants which have not used Libby ore, there
is no incidence of asbestosis, even though several of these plants have
previously used commercial asbestos in some products. Among 14 employees
with ten or more years of service in expanding plants which have used Libby
ore, 28% exhibit asbestosis. However, any cause-effect conclusions are
confounded by the fact that all of these plants have used commercial asbestos
in the past.

Chest x-rays for the 77 employees at our Enoree mine/mill give
no indication of adverse health effects from exposure to the lower level
of tremolite fibers (0.8 f/ml) found in South Carolina. While there is
incidence of positive chest x-rays in 12 employees (16% of total), only
one case is consistent with exposure to asbestos. That particular employee
worked for a great number of years exposed to commercial asbestos in another
Zonolite location. Of the 12 positive chest x-rays, 5 stem from previous
cotton spinning mill exposure which produces "brown lung" disease. There
is no indication of excess mortality due to lung cancer among the South

15101928

APPENDIX I                    -5-

03629689

Carolina mine employees.  Since the South Carolina mine has only operated
for 29 years, there is still the possibility of extremely long latency
periods before excess mortality would be observed.

As very little published medical evidence exists for tremolite
exposures, as opposed to the commercial forms of asbestos, we have
sponsored animal studies on tremolite and a mixture of vermiculite and
tremolite to determine whether tremolite is carcinogenic.  The test animals
have concluded 400 days of treatment and are scheduled to terminate after
730 days.  While no definite conclusions can be drawn from the results to
date, indications are that our tremolite creates less of a problem than
commercial asbestos.  As we have not yet completed the "critical" period
of the animal studies, between 370 and 450 days, the lack of a significant
difference in mortality between the test animals and the control group is
not yet meaningful.  Results of this study should be complete and available
by October 1978.

We have sought and obtained advice from several outside profes-
sionals with respect to what tremolite levels create a hazard.

Dr. William E. Smith of Fairleigh Dickinson University has
responded (Appendix V), indicating that notwithstanding the "new evidence"
presented by OSHA and NIOSH there is no convincing evidence of an excess
risk to health from low level asbestos fiber exposures (below 5 f/ml).

Dr. MacMahon, Professor of Epidemiology at Harvard University,
has questioned the conclusions of a leading epidemiologist, Dr. Selikoff
of Mt. Sinai, that exposures to low levels are potentially hazardous.  More-

15101929

APPENDIX I                    -6-                    03629690

over, he indicates that an unpublished study of shipyard workers in the
Pearl Harbor Navy Yard who have been tracked since 1943, indicates no
excess risk of cancer mortality contradicting the evidence presented by
Selikoff.  He derides Selikoff's statements with respect to low exposure
level hazards as being unprofessional and not well-founded scientifically.

Dr. Enterline of the University of Pittsburgh has proposed a
mathematical model which closely fits the observed relationship between
mortality rate and time of exposure among the group of 17,000 shipyard
workers studied by Selikoff.  We are in the process of using this model
to predict the effect of exposure levels of 1 or 2 f/ml.  Even assuming
that tremolite fibers are as biologically active as commercial chrysotile
asbestos (an unduly pessimistic assumption), preliminary indications are
that the increased mortality risk from lung cancer as a result of a 50-year
exposure to 2 f/ml is only 10% above those not exposed to asbestos fibers.

Discussions with Johns-Manville revealed that two "modern"
asbestos fabricating plants (one in Texas and one in California), built
in 1956-57, show no cases of asbestos-related disease among their employees.
Exposures at these plants have been consistently below 10 f/ml (8-hour TWA),
probably in the 2-5 f/ml range, with exposures during the 70's consistently
below 2 f/ml.  This suggests no excess health risk at concentrations up to
5 f/ml (8-hour TWA).

Amidst such conflicting scientific opinion, any conclusions which
we draw must necessarily contain large elements of personal judgment and at
least some level of uncertainty.  Nevertheless, we must establish levels of

15101930

APPENDIX I                                -7-

**03629691**

exposure calculated to protect both employees and customers from excess

health hazards.  Accordingly, we have concluded that in a regulated and

monitored environment such as our plants, a reduction in exposure to 1 f/ml

creates a worthwhile margin of safety over the present OSHA standard of 2 f/ml

for our employees.  A level of 1 f/ml is not expected to have an adverse health

effect.  A level of 2 f/ml, while probably not hazardous, does not have an

acceptable margin of safety and will be reduced if economically feasible.

No customers or employees will be exposed knowingly to concentrations above

a level of 2 f/ml without adequate warning of the potential hazards involved.

Johns-Manville also selects 2 f/ml as a limit below which there is "no

excess risk of asbestos-related disease" (compared to those who are not

exposed to asbestos)'.

    In unmonitored environments, involving daily use of our products,

such as construction sites, a typical exposure from our products of .5 f/ml

(TWA) is not considered a hazard.

    With the exception of mixed horticultural products, exposure

levels for users of our product are above background levels.  It is not

likely that any improvement which we may make will reduce the exposure of

users to levels as low as background.  However, our long-range objective

will be to reduce customer exposure levels to "the lowest limit at which

asbestos fiber concentrations can be reliably monitored".  According to

NIOSH, this level is .1 f/ml on an 8-hour time weighted average basis and

.5 f/ml for any 15-minute period.

15101931

APPENDIX II

CAPITAL SPENDING SUMMARY

TREMOLITE FIBER COMPLIANCE

($000)

03629692

|  | Capital Amount | Capital Budget 1977 | 1978 |
|---|---|---|---|
| **Expanding Plants - OSHA @ 1.0 f/ml & 5.0 f/ml** | | | |
| Denver - Ore Handling | $ 50 | $ | $ 85 |
| Newark - Ore Handling | 114 | 80 | |
| Phoenix - Ore Handling | 110 | | 85 |
| Dallas - Dust Cont. on MK and SM | 50 | 35 | |
| Portland - Ore Storage & Handling | 107 | 101 | |
| Dearborn - Ore Storage & Handling | 197 | 192 | |
| Easthampton - Rock Handling | 17 | 18 | |
| St. Louis - Vent System | 26 | 33 | |
| Little Rock - Ore Handling | 50 | 37 | |
| TOTAL EXP. PLANTS - OSHA | 721 | 496 | 170 |
| **Expanding Plants - Product Binder Equipment** | | | |
| 14 Plants @ $9,300 per plant | $ 130 | - | - |
| **Libby - To Achieve 2.0 f/ml[a]** | | | |
| **Mill** | | | |
| RCA #12-2 | 331 | 204 | |
| **Mine** | 225 | 225 | |
| **Hauling & Loading & Screen Plant Trucks** | 162 | 176 | |
| TOTAL AT LIBBY | $ 718 | $ 605 | $ - |
| TOTAL SPENDING | $1,569 | $1,101 | $ 170 |

(a) See page 2 for Libby detail.

RRB/ccr

15101932

**GRACE**

Construction Products Division

03629693

PERSONAL and CONFIDENTIAL

March 28, 1977

To:  W. R. Hanlon        H. A. Eschenbach
     B. R. Williams       W. F. McCord
     J. W. Wolter         R. C. Abernathy
     W. R. Wright         R. R. Benanto
     R. E. Schneider      H. C. Duecker
     F. W. Eaton          B. A. Blessington
     R. H. Locke

From: E. S. Wood

Subj: Guidelines for Handling of Tremolite Contamination
      In our Mines, Plants, and Products

        cc:  R. M. Vining
             L. Rosenblatt
             W. M. Bush, Jr.
             O. M. Favorito
             R. L. Oliverio/Libby


        Plans have now been laid for handling a variety of external
developments related to tremolite asbestos in our mines, expanding
plants, products, and customer environments. We must now proceed to
implement some of the work plans which have been developed.

        Please plan to attend a meeting at 8:30 AM in the Directors'
Conference Room on Thursday, March 31st. The purpose of this meeting
will be to discuss what actions we will be taking over the next twelve
months.

        By way of background, you should know our position on several
important legal and business issues. The following are three key points:

        1.  We will not expose our customers and employees to
            environments which have been formally defined as
            hazardous by the U. S. Government without proper
            caution as to the nature of the hazard. We will
            take all reasonable and practical steps to minimize
            or eliminate unreasonable risks which may be
            associated with the manufacture and use of our
            products including, where appropriate, instructions
            for proper use of our products.

15101933

To list                          -2-                    March 28, 1977
Subj:  Guidelines .....

03629694

2.  The tremolite asbestos fiber count limits in
    effect and enumerated in OSHA (or MESA) regulations
    will be the guide to whether a health hazard exists.
    If the product in reasonable use exposes the user
    to counts in excess of OSHA limits, caution labels
    will be affixed to the product.

3.  Customer, user, or government agency inquiries with
    respect to tremolite in our plants, products, or use
    environments will receive straightforward and candid
    responses with respect to the data and measurements
    which we have gathered and which are relevant to their
    respective situations.

As you know, there is a great deal of controversy both in the
medical and governmental communities as to what constitutes a hazard and
what appropriate regulatory steps should be taken.  This is particularly
true for products used by consumers.  We have reason to believe that this
issue will be clarified by the Consumer Products Safety Commission within
the next several months.  By that time we want to have any tremolite
asbestos fibers in our consumer products "bound" and fiber counts in their
intended use below 0.2 f/ml (8 hr TWA) and 1.0 f/ml (15 min. maximum).
You should be aware that this is a rapidly changing situation and that
requirements are still unpredictable.

Attached is an agenda for our meeting of Thursday, March 31st.

E. S. Wood

ESW/CGR
Attachment

15101934

AGENDA

for

Thursday, March 31, 1977                    **03629695**


1.  Legal and Medical Issues

    a.  CPA

    b.  OSHA/MESA

    c.  General Obligations


2.  Continuing data gathering requirements and responsibilities

    a.  Plants and mines

    b.  Users

    c.  "No asbestos" case for MONOKOTE vs. Glass Fibers in
        key states


3.  Financial and engineering requirements/work plans

    a.  Immediate and short-term -- authorized to proceed

        (1)  Water treatment for Terra-Lite Vermiculite
             and Attic Fill

        (2)  Remove and dispose of "fines" at Libby

        (3)  Define cost (capital and operating) and
             effectiveness of binders for AF, TV and MF

        (4)  Determine effectiveness of air elutriation by
             pilot trials

        (5)  Engineering design for items in b.

    b.  Appropriations to be justified and requested:

        (1)  Installation of permanent binder addition equip-
             ment in expanding plants

        (2)  Get all expanding plants to 2.0 f/ml (8 hr TWA)
             by 1/1/78

15101935

03629696

AGENDA (continued)                    2.

(3)  Get Libby to 2.0 f/ml (8 hr TWA) by 1/1/78

(4)  Get all expanding plants to 1.0 f/ml (8 hr TWA)
     by 7/1/78.

4.  Customer, governmental, and media communications

    a.  Grace policy on comments to media -- DON'T DO IT,
            LET NY HANDLE.

    b.  Responsibility and guidelines for customer and govern-
            mental communications

        (1)  Salesmen and plant managers -- verbal communications

        (2)  Product and Q.C. managers -- routine written customer
             and governmental communications covered by guidelines

        (3)  General Sales Managers -- unusual governmental and
             customer communications covered by guidelines

        (4)  Exec. VP -- any communication not covered by guide-
             lines.

5.  R&D Work Plans

    a.  Vermiculite free substitutes

        (1)  MONOKOTE

    b.  Modifications for commercial use

        (1)  MF treatment to 1.0 (TWA); 5.0 (Max.)

        (2)  AF treatment to 0.1 (TWA); 2.0 (Max.)

        (3)  TV treatment to 0.1 (TWA); 2.0 (Max.)

        (4)  Thin ZIC RD design

        (5)  Bark ash sources for MM products

        (6)  3300 for high humidity urethane foam fireproofing

        (7)  External fireproofing

        (8)  Other?

15101936

<u>AGENDA</u> (continued)                    3.

03629697

   c. Modifications to have "on the shelf"

     (1) Vermiculite free Redi-Earth

     (2) High yield (200% on vermiculite) ZIG

     (3) Glass free MONOKOTE for decks

     (4) Vermiculite free MM.

6. Document Contingency Plans

   a. Remaining air and product assay samples .

   b. Revised customer and press releases.

     (1) MONOKOTE withdrawal

     (2) AF withdrawal

     (3) AF labeling

   c. Financial Impact Cases

     (1) Eliminate inconsistencies

     (2) Document and issue summaries

     (3) Additional years?

ESW/CGR
3-28-77                                      15101937

APPENDIX II                         -2-

                                              03629698

### DETAILS OF LIBBY FIBER REDUCTION SPENDING

| | Capital Amount | 1977 Capital Budget |
|---|---|---|
| **MILL** | | |
| **RCA #12-2** | | |
| Final Cleaner System 20 x 65 | $100 | $ 90 |
| Modif. of Dryer Cyclone & Disp. System | 40 | |
| Wash & Screen Hammermill Product | 25 | |
| Skip Dust Collection | 55 | 55 |
| Screen Plant Baghouse Disposal | 20 | |
| Dust Disposal at Mud Dam | 10 | |
| Screen Plant Truck Dump Disposal | 12 | 12 |
| Screen Plant Shuttle Truck Dust Collection | 12 | |
| Screen Plant Control Room & Conveyors | 11 | 11 |
| Dust Wall - Transfer Point | 3 | 3 |
| Permanent Dust Disposal from Dryer BH | 10 | |
| Mill Lab Vent | 5 | 5 |
| Rework Dryer Belt BH System | 20 | 20 |
| Seal Between Dryer & Wet Mill | 8 | 8 |
| TOTAL MILL | $331 | $204 |
| **MINE** | | |
| Paving - Garage Area | 50 | 50 |
| Paving - Transfer Point Area | 50 | 50 |
| Revamp Mobile Equip. Air. Cond. | 75 | 75 |
| Dust Control - Drills | 20 | 20 |
| Mine Vacuum Station | 10 | 10 |
| Wash Rack - Garage Area | 20 | 20 |
| TOTAL MINE | $225 | $225 |
| **HAULING, LOADING, MISC. VEHICLES** | | |
| Temporary Dust Truck & Hopper | $ 15 | $ |
| Screen Plant Super Sucker | 10 | |
| Haul Truck Enclosures | 22 | 22 |
| Dust Control - Load Out | 15 | 15 |
| Permanent Dust Disposal Truck | 100 | |
| TOTAL | $162 | $ 37 |
| Unidentified Projects | | 139 |
| TOTAL LIBBY @ 2.0 f/ml | $718 | $605 |

RRB:cgr
5-24-77

                                           15101938

# GRACE

**Construction Products Division**

**03629699**

TO:      E. S. Wood

FROM:    R. R. Benanto

CC:      Distribution List

May 6, 1977

SUBJECT:  Zonolite Study –
          Financial Impact of
          Contingency Plans

The following pages summarize the assumptions, and financial impacts of the various case assumptions developed during the Zonolite Contingency planning study performed in March.  For each case, the impact on the following areas are presented:

        1.)  Overall case assumptions
        2.)  Market & Product Impacts
        3.)  Impact on Mines & Ore Allocation
        4.)  Expanding & Polystyrene Plant Impact
        5.)  Selling Expenses
        6.)  Capital Spending
        7.)  Summary of Financial Implications

All cases are compared to the Zonolite "Base Case" in 1977 and 1980.  The "Base Case" reflects the 1977 Budget & Forecast adjusted for the re-estimate in BPD/Ag sales and margins made in January, 1977.

*Ron*

R. R. Benantq

RRB:mhr
Att.

03629700

-2-

CASE A - Major Labelling Program and Withdrawal of All Consumer Products

I.  **Overall Case Assumptions**

   A.  Fiber Counts to 1.0 OSHA (12/77) and 2.0 MESA (12/77)
   B.  Withdraw all Consumer Products
   C.  Lose Canada
   D.  Label all Libby Products except ZIC, MK, and Mixed Horticultural.

II.  **Market & Product Impacts**

   A.  Withdrawal

   Withdrawal from the Attic business results in simultaneous withdrawal of all Glass Fiber sales and a significant impact on dealer Plainboard sales (ranging from 20% loss in 1977 to 31% in 1980).

   Withdrawal from Horticultural Consumer market results in total loss of consumer Terra-lite and mixed product sales.  These consumer sales losses are partially offset by increases (20% in 1977 and 30% in 1980) in horticultural perlite sales to consumer through substitution of perlite.

   B.  Labelling

   Only products produced from Libby ore would be labelled.  The estimated impact of labelling products varies from product to product and is summarized as follows:

   Masonry Fill - 20% drop in volume in 1977 and continued declines of 10% per year until by 1980 the volume is only 50% of 1977B volume.

   Plaster Ag - 50% drop in 1977 and another 50% drop in 1978 so that by 1980 the volume is only 25% of 1977 volume.

   Misc. Expanded - An immediate drop of 10% in 1977, but a gradual rebound in volume of 4% per year so that by 1980 Misc. Expanded volume is only 2% off of the Base Case.

   Ag Bag & Bulk - Declines from 30% off of Base Case volume in 1977 to 70% below Base Case volumes in 1980.

   Terralite (Professional) - Decline of 50% in 1977 and an additional 20% off of 1977 volume by 1980.  However, this impact is also partially offset by improved Horticultural Perlite sales to the professional market (20% in 1977 and 30% in 1980) and a 10-15% increase in non-labelled Horticultural Professional mixes (eg. Metro-mix).  The latter favorable impact results from additional substitution of vermiculite with perlite and mixed products.

151 01

**03629701**

### C. Ore Sales

<u>Licensees</u> – Demand reflected downward, particularly in coarse sizes, to reflect their withdrawal of Attic Fill. Finer size demand was left unchanged (primarily MK and ZIC) with the exception of a slight overall negative impact due to Masonry Fill.

<u>Independents</u> – Unchanged.

<u>Scott</u> – Due to Scott's desire to avoid labelling Turf-Builder, Scott demand would fall by 30% in 1977 and continue to decline to 20% of Base case levels by 1980. The basic assumption here is that Scott would attempt to maintain their "natural" image and avoid labelling by substituting as much South African or Virginia Vermiculite ore as they could obtain. In addition, Scott has the ability to convert to a polyurethane process as a substitution and already produces such a product with an existing plant.

<u>Gypsum Companies</u> – Labelling impact reflects a 5% reduction in demand from 1977 to 1981.

<u>Canada</u> – Loss of all Canadian ore shipments precipitated by their withdrawal from Attic Fill.

### III. Impact on Mines & Ore Allocation

In order to minimize the impact of lost sales due to labelled products made from Libby ore, the ore allocation plan reflects a maximization of the South Carolina mine output. Virtually all Masonry Fill demand was shifted to be supplied by South Carolina (except for Portland), so that the labelling impact on Masonry Fill in Case A was minimized. However, this required the transfer of approximately 23,000 tons to S.C. from Libby, in 1977 and over 26,000 tons by 1980. By 1980, the shift in Masonry Fill alone brought Enoree's output to 135,000 tons, or full capacity. Although some Ag Bag & Bulk & Terra-lite could be temporarily transferred from Libby to S.C. until 1978, for consistency, the 1977 volumes reflect only transferring Masonry Fill. Masonry Fill was chosen as the primary beneficiary of the ore allocation switch based on its more favorable margin contribution per ton of ore versus Ag Bag & Bulk, the extent of the impact on Masonry Fill due to labelling, and the amount of Masonry Fill currently being supplied from Libby.

South Carolina mine volume is reflected at 120,000 tons in 1977 (versus 96,000 tons in 1977 Budget) and in 1980 is at full capacity of 135,000 tons. Actually it becomes capacitated in late 1978. Overhead levels have not been adjusted at Enoree and its DMC is assumed to stay at Budget & Forecast levels. The most favorable impact at Enoree is the impact of the additional tonnage on depletion.

Libby volume is dramatically affected under the Case A allocation scheme. From a 1977 Base Case of 229,000 tons, Libby loses the following volumes: 34,500 tons of Canada, 23,000 tons of Masonry Fill shifted, 16,000 tons of Attic Fill, 8,000 tons lost to Scott, and 22,500 tons lost due to labelling. Libby's Case A 1977 volume is 125,000 in 1977 and 128,000 tons in 1980 (volume growth in non-labelled products is offset by continuing impact of volume lost due to labelling).

-4-                                03629702

At these low volume levels, it was estimated that Libby's DMC would still be able to remain at the $26.50/ton budgeted level of DMC. However, fixed overhead expense reductions were not sufficient to offset Libby's gross margin loss due to volume and resulted in net-income after-tax losses of approximately $750,000 in 1977 and 1980. However, even with these operating losses, Libby would generate approximately $750,000 to $1,000,000 in cash from operations for these years before any capital expenditures, which would be minimal due to the low volume levels. Libby would not receive any depletion credits in these years under these circumstances.

In order to operate at such low volume levels, Libby would be forced to operate the mill on a 4-day week for 37 weeks of the year and would be shut down for 15 weeks during the year. This analysis did not account for other potential negative affects caused by the resultant high turnover of management and skilled personnel that would likely follow from such an operation.

Overhead Expense Levels would be reduced by $886,000 in 1977 as follows:

| | | |
|---|---|---|
| Factory Overhead | - $622,000 | - Reduction in the Overhead Dept. ($366K) depreciation ($47K), non-standard expense ($78K), and mine and mill supervision ($100K). |
| G&A | - $145,000 | - Reductions in engineering and clerical headcount. |
| R&D | - $119,000 | - Reduction in Prospecting & mill process research costs. |

IV.  **Expanding & Polystyrene Plant Impact**

With the exception of closing the L.A. plant (assumed in all cases, including the Base Case), no expanding or polystyrene plants were assumed to be closed in Case A.

V.  **Selling Expenses**

Case A selling expense reductions amounted to $1,070,000 in 1977, including $900,000 in BPD and $170,000 in Ag/Hort. These reductions reflect sales headcounts, marketing headcount, and other selling expense reductions (e.g., advertising).

VI.  **Capital Spending**

A.  **Expanding Plants**

The 1977 Capital Budget and Forecast included $1.0 mm in Capital Spending, sufficient to bring seven expanding plants within a 2.0 f/ml OSHA standard. To meet the 1.0 f/ml standard assumed in this case, an additional $200,000 capital over the Base Case Capital Spending has been reflected. However, this was offset by Capital Spending reductions of approximately $600,000 per year over 1977 to 1981 at the expanding plants. These reductions reflect cancellation of the need for most expansion projects (e.g., furnace capacity expansion) and the stretching out of major replacements (e.g., furnace replacements).

15101942

-5-

03629703

B. __Libby__

      The $515,000 capital required to meet a 2.0 f/ml standard for MESA had also already been reflected in the Base Case capital.  In addition, due to the very low volume levels at Libby, major reductions in projected capital spending plans were assumed.  These total $5,000,000 over the 1977-1980 period and include eliminations of mine garage, haul truck capacity increases, mill process improvements and capacity increases (e.g., #5 unit), office expansion, etc.  These reductions also reflect delays in the need for major replacements of mining equipment scheduled over the forecast period.

      The impact of these capital spending reductions at the plants and Libby on Net Fixed Assets amount to $664,000 less than Base Case in 1977 and $6,270,000 less in 1980.

15101943

-6-                    03629704

VII. <u>Summary of Financial Implications</u> ($000)

|  |  | Variance Fav/(Unfav) vs. Base Case | | | |
|---|---|---|---|---|---|
|  |  | 1977 | | 1980 | |
|  |  | Amount | % | Amount | % |
| A.) | <u>Gross Sales</u> (Impact in 1977) |  |  |  |  |
|  | BPD (attic $3,638; Glass $623; Poly $544 and Ag Products $932) | $ (6,037) | (12.2)% | $(10,318) | (14.4)% |
|  | AG (Terra-Lite $1,542; Mixer $705) | (2,563) | (24.6) | (4,638) | (30.6) |
|  | Ore (Scott $300; Canada $1,835) | (2,784) | (44.5) | (5,578) | (61.2) |
|  | TOTAL | $(11,384) | (17.2)% | $(20,534) | (21.4)% |
| B.) | <u>Gross Margin on Net</u> | (4,640) | (17.3) | (8,903) | (22.1) |
| C.) | Factory Overhead (primarily Libby reductions) | 622 | 5.5 | 2,281 | 16.8 |
| D.) | Operating Expense (BPD/Ag Selling $1,070 and the remainder at Libby) | 1,334 | 10.1 | 2,513 | 13.8 |
| E.) | Pre-Tax Profit | (2,684) | 67.8 | (4,109) | 48.3 |
| F.) | <u>Taxes</u> |  |  |  |  |
|  | Before ITC and Depletion | 1,359 | 67.5 | 2,117 | 48.5 |
|  | ITC | (23) | (6.2) | (140) | (49.1) |
|  | Depletion After-Tax | 82 | 33.7 | (462) | (47.2) |
|  | TOTAL TAXES | $ 1,418 | 100.0% | $ 1,515 | 48.9% |
| G.) | Net Income After-Tax | $(1,266) | (49.5)% | (2,594) | (46.0)% |
| H.) | <u>TCE</u> |  |  |  |  |
|  | Working Capital Due to Lower Sales | 1,349 |  | 2,767 |  |
|  | Net Fixed Assets | 664 |  | 5,270 |  |
|  | TOTAL | $ 2,013 | 6.5% | $ 8,037 | 21.6% |
| I.) | % Return on TCE | (3.8)% Pts. |  | (4.8)% Pts. |  |

A more detailed comparison is shown following the case discussions in Exhibit 1-3.

**03629705**

CASE B - Selective Consumer Product Withdrawal; Labelling all other Consumer Products.

    I.   Overall Case Assumptions .

        A.  OSHA to 1.0 f/ml by 12/77 and 0.5 f/ml by 12/80
            MESA to 2.0 f/ml by 12/77

        B.  Withdraw only Attic, Pool Cushion, Glass Fiber, and Santoquin.

        C.  Label all other consumer products; Ag/Bag if on Libby.

        D.  Avoid labelling by bringing tremolite in products to lower levels, e.g., treatment, use of South Carolina ore, etc.

        E.  Canada stays in Attic business.

   II.  Market & Product Impacts

        A.  Withdrawal

            Withdraw from Attic business results in simultaneous withdrawal of Glass Fiber and a significant impact on dealer Plainboard sales (same as CASE A).

            Withdrawal of Pool Cushion and Santoquin have no impact on other Ag sales.

        B.  Labelling

            Only consumer Products and Ag Bag & Bulk from Libby ore would be labelled.  Labelling impact is summarized below:

            Ag Bag & Bulk - Same as CASE A.

            Terra-lite Consumer - 15% reduction versus Base Case in 1977 and eventually 50% of Base Case volume by 1980.  Offset by 30% increase in Hort. Perlite.

            Soil Mixes - Consumer - 15% reduction versus Base Case in 1977 and down to 25% off Base Case volume by 1980.

        C.  Treated Products

            To avoid labelling, Masonry Fill, Misc. expanded, and Plaster Aggregate are treated with a water or water/oil solution to achieve fiber standards in finished products.  This treatment results in 6.0% yield penalty on coarse Libby ore sizes and 3.0% penalty on Libby sizes 3 & 4.

-8-

03629706

D.  **Ore Sales**

   **Licensees, Independents, Gypsum Co.** - As in CASE A.

   **Canada** - Base Case levels.

   **Scott** - South Carolina ore more available than in CASE A (see Ore Section III below), and allows Scott demand to be met totally from South Carolina.  However, it is assumed that they will continue to use more South African ore and at best Zonolite retains 22,000 tons (versus 26,000 tons in 1977 Budget) of Scott business through 1981.

III.  **Impact on Mines & Ore Allocation**

   Since the treatment of Libby ore for Masonry Fill precludes the CASE A need to shift Masonry Fill to South Carolina ore, the South Carolina mine has capacity available to meet all O. M. Scott demand. (Without this move, Scott demand would be only 8,000 tons in 1980 on Libby ore while 1980 demand would be 22,000 tons if supplied with South Carolina ore).

   The South Carolina mine demand will thus, continue to be high with it reaching 116,000 tons in 1977 and 132,000 tons (or full capacity) by 1980.  DMC and overhead levels are as assumed in CASE A.  Also, as in CASE A, the additional volume results in increased tax depletion at Enoree versus the Base Case.

   Libby volume is at 177,000 tons in 1977 (versus a Base Case of 229,000 tons) and grows to 208,000 tons in 1980.  The 52,000 ton reduction versus the Base Case in 1977 results from volume losses in:  Attic Fill 16,000 tons, and Outsiders (excl. Canada) 10,000 tons.  The reduction also reflects the shift of 26,000 tons of Scott ore to South Carolina.

   At these volume levels, Libby's DMC is estimated to remain at 1977 Budget & Forecast levels.  In 1977, Libby's net income would be a loss of $422,000 but by 1980, Libby would generate a net income of $500,000 with the volume reaching 208,000 tons.  However, the Libby operation would still represent a substantial cut-back.  In 1977, the mill would operate a 5-day week for 41½ weeks (or a 4-day week for the full year) and still face a 2½ month shutdown.  Once again, as in CASE A, there has been no attempt to quantify the potentially negative impact of such a cut-back operation on turnover of valuable skilled and management people.  By 1979, or 1980, the volume levels would once again be sufficient to represent just about a full-scale operation with only a 3-4 week shutdown required.

   Overhead expense levels would be reduced by $276,000 in 1977 as follows:

   Factory Overhead:   -  $187,000  -  Reductions in Overhead dept.
   R&D                 -  $ 89,000  -  Mill Process Research cut-backs.

15101044

-9-                                03629707

IV.  Expanding & Polystyrene Plant Impact

Same as CASE A.

V.   Selling Expenses

Same reduction in 1977 as CASE A, however, due to additional sales growth
(Masonry Fill, consumer Ag/Hort) selling expenses have been assumed to increase
commensurably with sales.

VI.  Capital Spending

A.  Expanding Plants

To meet a 1.0 f/ml standard by 1978 and a 0.5 by 1980, a total of
$1.2 million over the $1.0 mm included in the Base Case has been reflected in
capital spending.  However, this $1.2 million is offset by an average of $300,000
per year in decreased capital spending at expanding plants over the four-year period
due to delays in capacity expansion projects and replacement furnace delays result-
ing from the lower sales volumes.

B.  Libby

The $515,000 capital required to meet a 2.0 f/ml standard for MESA
has already been reflected in the Base Case capital.  However, the reduced volumes
at Libby would enable significant capital spending decreases over the 1977-1981
period.  These reductions are estimated to be $1,500,000 over the four-year period
and represent the haul truck capacity increases, No. 5 circuit, mill office expan-
sion and delays in the need to replace mining equipment.

The impact of these capital spending reductions on Net Fixed Assets
amount to $180,000 in 1977 and $1,200,000 in 1980.

-10-                                    03629708

VII.  Summary of Financial Implications ($000)

| | Variance Fav/(Unfav) vs Base Case | | | |
|---|---|---|---|---|
| | 1977 | | 1980 | |
| A.) Gross Sales (Impact in 1977) | Amount | % | Amount | % |
| BPD (Attic $3,638, Glass Fiber $623; Poly $544; and Ag Products $370) | $(5,175) | (10.4)% | $ (9,365) | (13.0)% |
| Ag (Pool Cushion $270, Mixes $129, T.L. - $93, Ag Bag/Bulk $108) | (751) | (7.2) | (1,760) | (11.6) |
| Ore | (563) | (9.0) | (1,355) | (14.9) |
| TOTAL | $(6,489) | (9.8)% | $(12,480) | (13.0)% |
| B.) Gross Margin on Net | $(2,466) | (9.2)% | $ (4,681) | (11.6)% |
| C.) Factory Overhead (primarily Libby) | 187 | 2.0 | 503 | 3.7 |
| D.) Operating Expense | 1,129 | 8.5 | 1,731 | 9.5 |
| E.) Pre-Tax Profit | $(1,150) | (29.1)% | $ (2,447) | (28.7)% |
| F.) Taxes | | | | |
| Before ITC & Depletion | 569 | 28.3 | 1,261 | 28.9 |
| ITC | (30) | (8.1) | (30) | (10.5) |
| Depletion After-Tax | 73 | 30.0 | (399) | (40.8) |
| TOTAL TAXES | $ 612 | 43.7% | $ 832 | 26.8% |
| G.) Net Income After-Tax | $ (538) | (21.0)% | $(1,615) | (30.1)% |
| H.) TCE | | | | |
| Net Working Capital due to Lower Sales | $ 774 | | $ 1,687 | |
| Net Fixed Assets | 180 | | 1,200 | |
| TOTAL | $ 954 | 3.1% | $ 2,887 | 7.8% |
| I.) % Return on TCE | (1.5)% Pts. | | (3.4)% Pts. | |

  A more detailed comparison is shown following the Case discussions in Exhibits 1-3.

15101948

-11-

03629709

CASE C - Withdrawal of Consumer Products and Most Unfavorable Outside Regulatory
          Action.

I.   Overall Case Assumptions

     A.   Fiber Counts to 0.1 f/ml (OSHA) by 12/80 and MESA to 1.0 f/ml by 12/80.

     B.   Withdraw consumer products, and temporarily lose MK before substitution
          by 7/78 in California.

     C.   Lose Canada

     D.   Close Libby and reformulate to husband ore or go to regional "Zonolite
as is" strategy around Enoree orh only.

          After withdrawal of consumer products, the loss of Canada, and high
capital impact needed to meet more stringent OSHA and MESA standards ($10 million)
resulting in closings of many expanding plants, the resultant low volumes of Libby
ore would no longer make continued operation there feasible.  Therefore, by 1980,
CASE C resulted in an Enoree only situation.  This situation was analyzed under (1)
a national strategy and (2) a regional strategy and is presented in the following
pages.

15101040

-12-

03629710

## CASE C - National Strategy

### I. General Scenario

Zonolite would be limited to vermiculite ore shipped from Enoree and would be capacitated at 130,000 tons. Thus the scarce resources were utilized on products and plants contributing the most favorable Zonolite margin per ton of concentrate. In addition, it was assumed that certain products would be reformulated with vermiculite substituted or extended (e.g., high yield ZIC) to stretch the limited ore capacity.

### II. Market & Product Impacts

#### A. Reformulation

Concrete Aggregate - Reformulated to contain a high yield ZIC. This reformulation would cover the 1980 Base Case Sales volume with 50% of the ore required. Sales price and margin (except impact of ore freight and cost from Enoree) were left unchanged from Base Case. This may be a somewhat conservative assumption since it implies that a high yield additive would replace vermiculite and cost as much as $0.70 per 4 cu.ft. bag in 1980 dollars.

MONOKOTE - MONOKOTE is dramatically impacted in this case due to the withdrawal from California and the subsequent ripple effect of this into the other regions. In California, MONOKOTE volume would fall by 83% in 1978 but then double by 1980 so that the non-vermiculite product amounted to only 31% of 1980 Base Case volume in California. The Texas, Midwest, Southern, and Florida regions would all be impacted by the California withdrawal in 1978 by about a 30% reduction from Base Case. Growth from there to 1980 would only be about 5% with a substitute product so that in these regions, 1980 volume would be 2/3 of 1980 Base Case. Eastern Region volume impact would be off by 43% from Base Case volumes in 1980. In all Regions, the substitute product was assumed to retain the same price and margins as a vermiculite product.

Soil Mixes - All consumer soil mixes and Professional soil mixes would be reformulated without vermiculite and result in a 10% volume loss versus Base Case in 1980 as a result of the reformulation. Prices and margins would be the same as Base Case. This also may be conservative since it implies that a bark ash substitute for example, would be just as costly as vermiculite. However, there would be long-term supply questions associated with bark ash.

#### B. Withdrawal

Attic, (and its impact in Poly sales), Terra-lite Consumer, Pool Cushion, Santoquin would all be withdrawn.

#### C. Mine Capacity Constraint Impact on Demand

Masonry Fill demand would still be met nationally from plants remaining open (see Section IV). However, ore capacity constraints necessitated using price as a mechanism to reduce demand and thus, the overall gross sales impact on Masonry Fill. (Masonry Fill was chosen due to its price sensitivity and relatively low margin contribution per ton of concentrate). Overall, Masonry Fill sales are off $1,270,000 (14.4%) versus 1980 Base Case, resulting from 4% higher prices ($0.10 per bag) and overall volume being down by 18%. This volume decline was 30% at areas where plants were closed and 6% at open plants due to the higher prices.

15101950

-13-                    036<u>2</u>9711

Ag Bag & Bulk demand would be met at Base Case volumes with the exception of the Pacific and Texas Regions where it would be discontinued.

### D.  Outside Ore Sales

No outside ore sales would be continued.  The Enoree mine capacity would be applied totally to internal product usage.  In addition, the Canadian business is assumed closed in this case.

## III.  Impact on Mines

All Zonolite vermiculite needs would be supplied from Enoree.  Enoree's DMC per ton, Overhead, and Capital Spending levels were all kept at Base Case for 1980.  However, the ore freight impact and favorable DMC of S.C. vs. Libby were reflected in the Zonolite margins.

S. C. volume was assumed to be capacitated in 1980 at 130,000 tons.  A subset of CASE C (national strategy) would have been to identify the capital cost and benefits of a S.C.mill expansion, but this was not investigated in this study.

Total 1980 Base Case mine volume shipped to expanding plants would have been 242,000 tons.  This amount was reduced to 130,000 tons as follows:

| | |
|---|---:|
| Total 1980 Base Case mine Shipments to Expanding Plants | 242,000 tons |
| Withdrawal of Attic | (19,900) |
| "       of Consumer T.L. and mixes & Other Ag. | (7,300) |
| Impact of High Yield ZIC | (40,300) |
| Substitution for MK & Soil Mixes | (36,600) |
| Ag Bag & Bulk from Texas & Pacific | (6,700) |
| Masonry Fill Lost to Closed Plants | (7,000) |
| Yield Impact | 5,800 |
| | 130,000 |

## IV.  Expanding & Polystyrene Plant Impact

The following plants were assumed closed based on their relative margin contribution, overhead levels, and the estimated capital requirement to comply with a 0.1 f/ml OSHA  restriction by 1980.

15101951

-14-

03629712

|  | Capital Required to get to 0.1 f/ml |
|---|---|
| Tampa | $  83.0 |
| Dearborn | 440.0 |
| Muirkirk | 232.0 |
| Minneapolis | 220.0 |
| Denver | 208.0 |
| Omaha | 459.0 |
| L. A. | 328.0 |
| Newark | 293.0 |
| San Antonio | 275.0 |
|  | $2,538.0 |

Demand at the closed plants was assumed to be met from the nearest operating plant for vermiculite and non-vermiculite substitute products.  This inter-plant transfer freight penalty amounts to $800,000 in 1980, or, $0.44/bag (ranging from $.20/bag to serve Tampa to $0.83/bag to serve Denver) on a total of 1.8 million bags.  This number is reflected in sales deductions and accounts for the higher level (5.5% vs 4.1% in other cases) of deductions as a % of Net Sales.

Also note that due to the minimal impact on Poly sales (only the dealer effect on Plainboard, approximately 9% of total Poly Sales) no poly plants were assumed to be closed.

V.  Operating Expenses

Selling Expenses

The same cut-back in selling expenses as used in CASE A was used to reflect the withdrawal from consumer products.  Although CASE C (national strategy) is $11,025,000 lower in sales versus CASE A, no additional selling expense reductions were assumed since: a) $3.7 million of the reduction is due to Outside Ore Sales and Ag Bag & Bulk which have no directly identifiable selling expense, b) $7.6 million of the loss is due to MONOKOTE and the Base Case selling expense levels have been assumed to reflect the attempt to recapture market position lost due to the California MK withdrawal and substitution.

15101952

-15-

**03629713**

<u>G&A</u>

G&A reductions versus Base Case reflects the elimination of Libby in 1980 ($1,256,000) and an additional  unidentified $300,000 reduction due to reduced number of plants and sales.

<u>R&D</u>

R&D reductions versus Base Case reflect the elimination of Libby in 1980 ($243,000).  Although sales are less and major R&D effort to find vermiculite substitutes occurred before 1980, other R&D expense is left at Base Case levels to reflect: a) ongoing new product development, b) continued R&D expense to monitor substitutions, and c) the fact that most sales decreases are not in areas where heavy R&D expenditures have occurred.

VI.  <u>Capital Spending</u>

Libby Capital Spending, of course, has been eliminated due to its closing. Enoree & Poly plant capital spending levels were left at Base Case amounts.  The major capital spending impact versus the Base Case occur at the expanding plants.

| | Fav/(Unfav) | |
|---|---|---|
| | ·Total Spending vs. Base Case over 1977-1980 ($000) | 1980 Net Book Value Impact ($000) |
| Capital to achieve 0.1 f/ml at Retained Expanding Plants | $(4,636) | $(3,969) |
| Eliminated Capital Spending at Closed Plants | 2,100 | 1,858 |
| Delays beyond 1980 in Exp. Plant Expansion | 700 | 530 |
| Net Book Value of Closed Plants | - | 350 |
| Total Exp. Plants | $(1,836) | $(1,231) |
| Libby Capital Spending | 6,856 | 10,805 |
| Total Zonolite | $ 5,020 | $ 9,574 |

In addition to the above, closing Tampa and eliminating the national ore hopper car fleet servicing Libby, capitalized leases totalling $933,000 (after-tax cost of interest $39,000) would be discontinued.

15101953

-16-

03629714

VII.  Summary of Financial Implications ($000)

| | Variance Fav/(Unfav) vs: Base Case 1980 | |
|---|---|---|
| | Amount | % |
| **A.)  Gross Sales** (Impact in 1980) | | |
| BPD (Attic $5,280; MK $7,607; Poly $1,366; Glass Fiber $1,985; MF $1,270, Ag Prod- $1,658) | $(19,166) | (26.7)% |
| Ag (Consumer $3,221) | (2,380) | (15.7) |
| Ore Sales | (9,119) | (100.0) |
| TOTAL | $(30,665) | (31.9)% |
| | | |
| **B.)  Deductions** | | |
| Due to volume | $    802 | 20.6% |
| Transfer Freight | (800) | - |
| | $    . 2 | - % |
| **C.)  Gross Margin on Net** | $(14,484) | (36.0)% |
| **D.)** Factory Overhead (Libby $4,590; closed plants ($1,149) | 6,139 | 45.2 |
| **E.)** Operating Expenses (BPD/Ag Selling $1,900; Libby G&A $1,256,000; Div. OH $300) | 3,699 | 20.4 |
| **F.)** Other Expense | 39 | 100.0 |
| **G.)  Pre-Tax Profit** | $  (4,607) | (54.1)% |
| | | |
| **H.)  Taxes** | | |
| Before ITC & Depletion | 2,373 | 54.4 |
| ITC | (112) | (39.3) |
| Depletion | (477) | (48.7) |
| TOTAL TAXES | 1,784 | 57.5 |
| **I.)  Net Income After-Tax** | $  (2,823) | (52.5)% |
| **J.)  TCE** | | |
| Working Capital Due to Lower Sales | $  4,181 | |
| Net Fixed Assets (Section VI) | 10,507 | |
| Deferred Taxes | (1,087) | |
| Other Assets | 82 | |
| | $ 13,683 | 36.8% |
| **K.)  % Return on TCE** | (3.6)% Pts. | |

15101954

-17-

## CASE C - Regional Strategy 03629715

### I. General Scenario

Zonolite would be limited to vermiculite ore shipped from Enoree and would be capacitated at 130,000 tons. The limited vermiculite resource was utilized by applying it to existing vermiculite products (no re-formulations or extenders) and utilizing the highest contribution plants and minimizing the capital expenditures required to meet a 0.1 f/ml OSHA standard. The net effect was to localize the Zonolite business to the most profitable expanding plants located closest to the Enoree ore source. Therefore, the regional strategy included the entire Southern and Florida regions and the larger plants extending into the East and Midwest Regions. NO Inventory Transfers were assumed. If a plant was closed, then no attempt was made to ship into the vacated market from nearby plants with the exception of Professional soil mixes, which continued to serve the areas now met from TR, West Chicago, and Jacksonville.

### II. Market & Product Impacts

#### A. Consumer Product Withdrawal

Attic (and its impact on Poly & Glass Fiber), Terra-lite consumer, Consumer soil mixes, Pool Cushion, and Santoquin would all be withdrawn. Unlike Case C (National Strategy), consumer soil mixes were not reformulated. Horticultural Perlite to Consumer market increase vs. Base Case by 30% in 1980 to offset loss of vermiculite business.

#### B. Impact of Plant Closing on Sales

BPD - Base Case volume and prices were used at all plants remaining open. Demand from closed plants was not filled. Therefore, remaining BPD sales amounted to Base Case levels in the Southern & Florida Regions plus the portion in Midwest and Eastern Regions retained with the remaining plants. Total sales in Texas and Pacific were taken out and all Attic and Glass Fiber sales for BPD, of course, were withdrawn in all regions. The impact of plant closings by product are as follows:

| | 1980 ($000) | | % Variance due to plant closings |
| BPD Vermiculite (ex. Attic) | Base Case | Case C (Reg) | Fav/(Unfav) |
| --- | --- | --- | --- |
| Concrete Aggregate | $13,739 | $8,477 | (38.3)% |
| Masonry Fill | 8,790 | 5,109 | (41.9) |
| MONOKOTE (No re-formulation) | 16,233 | 6,820 | (42.0) |
| Misc. Exp. | 2,410 | 1,023 | (57.6) |
| Dealer Conc. | 553 | 279 | (49.5) |
| Plaster Agg. | 342 | 174 | (49.1) |
| Mine Sealant (all met from New Castle) | 1,589 | 1,589 | - |
| Other BPD vermiculite | 83 | - | - |
| Ag Products (Texas & Pacific Region Plants closed) | 2,894 | - | (100.0) |
| BPD Vermiculite | $46,633 | $23,554 | (49.5)% |

-18-

03629716

BPD Poly

Insulperm sales were retained in the Southern and Florida Regions and reduced in relation to Concrete Aggregate losses in the East and Midwest. No sales in Pacific and Texas. 1980 Reduction of $1,323,000 or 30.2%.

Billets & Other Poly sales were retained in the Southern and Florida Regions and reduced in relation to plant closings in other regions. No sales in Pacific and Texas.

Plainboard sales were reduced due to impact of Attic withdrawal and plant closings in East and Midwest. Sales retained in total in Florida and Southern Regions. Total sales eliminated in Texas and Pacific Regions. 1980 Reduction - $2,590,000 or 33.2%.

Custom molded - All Pacific Region sales eliminated in amount of $750,000.

Ag/Hort

Terra-Lite - Consumer Products withdrawn in total. Professional Terra-lite retained in South and Florida and reduced in relation to plant closings in East and Midwest. 1980 Reduction - $1,785,000 or 45.1%. $1,130,000 of total reduction was due to elimination of consumer products, $655,000 of reduction due to plant closings or 23.2% of Base Case Professional sales.

Soil Mixes - Consumer soil mixes withdrawn in total without substitution and resulted in the only reduction in Soil Mixes of $1,454,000. Professional soil mixes were retained without reformulation at Base Case volumes and would continue to be made from West Chicago, Jacksonville, TR, and New Castle (mixing capacity expansion done in 1979). Therefore, Professional mixes would continue to be sold in all areas as in Base Case even though some areas would no longer have expanding plants and would require a greater degree of direct shipments to customers. Because of this increase in freight cost to customers, no increase in Professional soil mix demand over the Base Case due to decrease in Professional Terra-Lite has been reflected as was done in CASE A.

CPBA & Ag Bag & Bulk were reduced as a result of plant closings. These impacts are reduction of $576,000 (27.8%) in Ag Bag & Bulk and $171,000 (21.4%) in CPBA versus the Base Case.

III. Impact on Mines

All Zonolite vermiculite needs would be supplied from Enoree. Enoree DMC per ton, overhead, and Capital Spending levels were all kept at Base Case for 1980. However, the ore freight impact and favorable DMC of S.C. vs. Libby, were reflected in the Zonolite margins.

-19-                                      03629717

S.C. volume was assumed to be capacitated in 1980 at 130,000 tons.  A sub-set of CASE C (regional strategy) would have been to identify the capital cost and benefits of a S.C. mill expansion, but this was not investigated in this study.

Total 1980 Base Case mine volume shipped to expanding plants would have been 242,000 tons.  This amount was reduced to 130,000 tons as follows:

| | |
|---|---:|
| Total 1980 Base Case Mine Shipments to Expanding Plants | 242,000 tons |
| Withdrawal of Attic | (19,900) |
| "   of Consumer T.L. and mixes & Other Ag. | (7,300) |
| "   from Pacific Region | (38,800) |
| "   from Texas Region | (13,800) |
| Plant Closings in Eastern & Midwest Region | (32,200) |
| | 130,000 |

IV.   **Expanding & Polystyrene Plant Impact**

The following 19 plants were assumed closed under a regional Zonolite strategy:

| | Capital Required to meet 0.1 f/ml ($000) |
|---|---:|
| Dearborn | $440.0 |
| Weedsport | 125.0 |
| Easthampton | 232.0 |
| Muirkirk | 232.0 |
| Minneapolis | 220.0 |
| Denver | 208.0 |
| Omaha | 459.0 |
| Milwaukee | 158.0 |
| L. A. | 328.0 |
| Newark | 293.0 |
| Portland | 315.0 |
| Phoenix | 313.0 |
| Santa Ana | 213.0 |
| Oklahoma City | 123.0 |
| San Antonio | 275.0 |
| Dallas | 417.0 |
| Houston Poly | - |
| Auburn Poly | - |
| South Gate Poly | - |
| | $4,351.0 |

Elimination of the above plants leaves all expanding & Poly plants in the Southern and Florida Regions along with Trenton, High Point, and New Castle from the East and St. Louis, Wilder, and West Chicago in the Midwest.  Also remaining would be the New Castle and Milwaukee Poly plants.  The plants remaining total 18 (14 vermiculite and 4 Polystyrene).

-20-

03629718

V.  **Operating Expenses**

**Selling Expenses**

Selling expenses reflect regional selling expenses at CASE C sales levels (10.5% of BPD net sales and 13.0% of Ag/Hort and 11.9% overall).  In addition, divisional selling expenses totalling $1.3 million (versus Base Case of $2.4 million) have been added to reflect continuing divisional marketing and sales management under the modified regional strategy.  This number was not calculated as a percentage of sales but was derived based on input from BPD sales and marketing management.

**G&A**

G&A expense includes Enoree at Base Case levels ($425,000) and $1,802,000 reflecting 4.2% of net sales, consistent with Zonolite's Base Case G&A expenses as a percentage of net sales (excluding Libby expenses of $1,256,000).

**R&D**

R&D expenses include Enoree and LOU at Base Case levels ($302,000) and $472,000 reflecting 1.1% of Case C net sales, a percentage relationship consistent with Base Case R&D levels relative to BPD and Ag net sales.

VI.  **Capital Spending**

Capital Spending at Libby, closed expanding and poly plant, and delayed expansion projects at remaining plants were all taken away versus Base Case capital levels.  The offset to there decreases includes capital spending to meet a 0.1 f/ml OSHA standard at remaining plants.  Capital Spending and Net Book Value Impact vs. the Base Case follows:

|  | Fav/(Unfav) | |
| --- | --- | --- |
|  | Total Spending vs: Base Case over 1977-1980 | 1980 Net Book Value Impact |
| Capital to Achieve 0.1 f/ml at Retained Expanding Plants | $(3,244) | $(2,617) |
| Eliminated Capital Spending at Closed Plants | 4,481 | 3,254 |
| Delays beyond 1980 in Expansion Projects | 434 | 202 |
| Net Book Value of Closed Plants | — | 1,512 |
| Libby Capital Spending | 6,856 | 10,805 |
| Total Zonolite | $8,527 | $13,156 |

In addition, closing Libby allows elimination of capitalized leases on national ore hopper car fleet and total value of $683,000 ($28,000 after-tax cost of interest).

15101958

-21-

03629719

VII. Summary of Financial Implications ($000)

| | | Variance Fav/(Unfav) vs: Base Case | |
| --- | --- | --- | --- |
| | | 1980 | |
| A.) | Gross Sales (Impact in 1980) | Amount | % |
| | BPD (Consumer withdrawals - $7,870; Plant Closings - $29,480) | $(37,350) | (52.0)% |
| | Ag (Consumer - $3,321; closings $1,214) | (4,535) | (29.9) |
| | Ore | (9,119) | (100.0) |
| | | $(51,004) | (53.0)% |
| B.) | Gross Margin on Net | (21,386) | (53.1) |
| C.) | Factory Overhead (Libby $4,590 and Plants - $2,651) | 7,841 | 57.7 |
| D.) | Operating Expenses (Selling - $5,426; G&A 3,004 & R&D $671) | 9,101 | 50.1 |
| E.) | Other Expense | 39 | 100.0 |
| F.) | Pre-Tax Profit | (4,405) | (51.8)% |
| G.) | Taxes | | |
| | Before ITC & Depletion | $ 2,269 | 52.0% |
| | ITC | (183) | (64.2) |
| | Depletion | (477) | (48.7) |
| | | $ 1,609 | 51.9% |
| H.) | Net Income After Tax | $(2,796) | (52.0)% |
| I.) | TCE | | |
| | Working Capital Due to Lower Sales | $ 6,912 | |
| | Net Fixed Assets (Section VI) | 13,839 | |
| | Deferred Taxes | (800) | |
| | Other Assets | 82 | |
| | Total | $20,033 | 53.8% |
| J.) | % Return on TCE | 0.6 Pts. | |

A more detailed comparison is shown following the Case discussion in Exhibits 1-3.

15101959

## SCHEDULE I

### SUMMARY OF CASE ASSUMPTIONS ON PRODUCTS

03629720

| | CASE A | CASE B | CASE C Regional | CASE C National |
|---|---|---|---|---|
| Attic Insulation | Withdraw → | | | |
| Concrete Aggregate | No Impact → | | | High Yield Conc. |
| Masonry Fill | Label Libby | Treat Libby | Sales Losses due to Plant Closings | Plant Closings |
| MONOKOTE | No Impact → | | | Mkt. Losses & Reformulations. |
| Misc. Expanded | Label Libby | Treat Libby | | No Impact |
| Dealer Concrete | No Impact → | | | No Impact |
| Plaster Aggregate | Label Libby | Treat Libby | | No Impact |
| Terra-Lite - BPD | Drop Cons. Label Libby | Label Consumer | | Drop Consumer. |
| Soil Mixes - BPD | Drop Cons. | Label Consumer | | Drop Consumer |
| Pool Cushion | Withdraw → | | | |
| Ag Bag/Bulk - BPD | Label Libby | Label Libby | Plant Closings | Plant Closin |
| Mine Sealant | No Impact → | | | |
| Other BPD Vermiculite | No Impact → | | | |
| Insulperm | No Impact → | | Parallels Concrete | No Impact |
| Plainboard | Impact of Attic Loss | | | |
| Billets | No Impact → | | Sales Losses due to Plant Closings | No Impact |
| Custom | No Impact | | | No Impact |
| Other Poly | No Impact → | | | No Impact |
| Nails | No Impact → | | Parallels Concrete | No Impact |
| All Other BPD | Drop Glass → | | | |
| Terra-lite | Drop Consumer; Label Prof. | Label Consumer | Drop Consumer | Drop Consumer. |
| Soil Mixes | Drop Consumer; Inc. Prof. | Label Consumer | Drop Consumer | Drop Consumer & Reformula |
| CPBA | Label | Label | Plant Closings | Label |
| Pool Cushion | Withdraw → | | | |
| Ag Bag & Bulk | Label Libby | Label Libby | Plant Closings | |
| Verxite | No Impact → | | | |
| Santoquin | Withdraw → | | | |
| Other as Verm. | Drop Cons. | No Impact | Drop Cons. → | |
| Perlite (Hort.) | Increase | Inc. Cons. | Inc. Consumer | No Impact |
| Ore to O.M. Scott | Decrease | Decrease | Discontinued → | |
| " " Gypsum Cos. | Decrease | Decrease | Discontinued → | |
| " " Canada | Discontinued | Inc. G. S. | Discontinued → | |
| " " Other Outsiders | Decrease | Decrease | Discontinued → | |

15101960

Case 01-01139-AMC    Doc 675    Filed 07/13/01    Page 258 of 273

03629721

Schedule 2.

GROSS SALES COMPARISON

($000)

| | 1977 Base Case | 1977 Case A | 1977 Case B | 1980 Base Case | 1980 Case A | 1980 Case B | Case C Mat. Strat. | Case C Reg. Strat. |
|---|---|---|---|---|---|---|---|---|
| Attic Ins. | $3,638 | $ | $ | $5,280 | $ | $ | $13,739 | $8,477 |
| Concrete Agg. | 8,962 | 8,962 | 8,962 | 13,739 | 13,736 | 13,736 | 7,520 | 5,109 |
| Masonry Fill | 6,374 | 6,318 | 6,374 | 8,790 | 8,700 | 8,790 | 8,626 | 6,820 |
| Monobote | 11,092 | 11,092 | 11,092 | 16,233 | 16,233 | 16,233 | 2,410 | 1,023 |
| Misc. Exp. | 2,004 | 1,818 | 2,004 | 2,410 | 2,384 | 2,410 | 553 | 279 |
| Dealer Conc. | 476 | 476 | 476 | 553 | 553 | 553 | 342 | 174 |
| Plaster Ag. | 272 | 211 | 272 | 342 | 199 | 342 | 446 | - |
| Terralite | 533 | 189 | 272 | 632 | 134 | 540 | 790 | - |
| Soil Mixes | 934 | 660 | 900 | 1,110 | 775 | 1,060 | - | - |
| Pool Cushion | 33 | - | - | 40 | - | - | - | - |
| Ag Bag/Bulk | 936 | 655 | 655 | 1,112 | 560 | 560 | - | - |
| Mine Sealant | 500 | 500 | 500 | 1,589 | 1,589 | 1,589 | 1,589 | 1,589 |
| Other BPD Vermiculite | 63 | 63 | 63 | 83 | 83 | 83 | 83 | 83 |
| Sub-Total BPD Vermiculite | 35,817 | **,944 | **,806 | 51,913 | 44,946 | 45,899 | 36,098 | 23,554 |
| Insulperm | 2,554 | 2,554 | 554 | 4,379 | 4,379 | 4,379 | 4,379 | 3,056 |
| Plainboard | 5,802 | 5,258 | 5,258 | 7,810 | 6,444 | 6,444 | 6,444 | 5,220 |
| Billets | 480 | 480 | 480 | 692 | 692 | 692 | 692 | 116 |
| Custom | 507 | 507 | 507 | 750 | 750 | 750 | 750 | - |
| Other Poly | 943 | 943 | 943 | 1,414 | 1,414 | 1,414 | 1,414 | 744 |
| Sub-Total BPD Poly | 10,286 | 9,742 | 9,742 | 15,045 | 13,679 | 13,679 | 13,679 | 9,136 |
| Nails | 1,198 | 1,198 | 1,198 | 1,793 | 1,793 | 1,793 | 1,793 | 1,260 |
| All Other BPD | 2,330 | 1,710 | 1,710 | 3,145 | 1,160 | 1,160 | 1,160 | 596 |
| Total BPD | 49,631 | 43,594 | 44,456 | 71,896 | 61,578 | 62,531 | 52,730 | 34,546 |
| Terralite | 2,427 | 885 | 2,334 | 3,954 | 890 | 3,391 | 2,824 | 2,169 |
| Soil Mixes | 4,023 | 3,318 | 3,899 | 5,127 | 4,200 | 4,775 | 4,614 | 3,623 |
| CPBA | 531 | 425 | 425 | 800 | 660 | 659 | 800 | 629 |
| Pool Cushion | 270 | - | - | 355 | - | - | - | - |
| Ag. Bag & Bulk | 1,485 | 1,339 | 1,339 | 1,933 | 1,484 | 1,484 | 1, 933 | 1,357 |
| Vermite | 222 | 222 | 222 | 284 | 284 | 284 | 284 | 284 |
| Santoquin | 50 | - | - | 72 | - | - | - | - |
| Other Ag. Verm. | 57 | 40 | 57 | 380 | 70 | 375 | 70 | 70 |
| Sub-Total Ag. Verm. | 9,064 | 8,229 | 8,276 | 12,905 | 7,588 | 10,968 | 10,525 | 8,182 |
| Perlite | 1,361 | 1,633 | 1,398 | 2,253 | 2,932 | 2,430 | 2,253 | 2,441 |
| All Other Ag. | - | - | - | - | - | - | - | - |
| Total Ag. | 10,425 | 7,862 | 9,674 | 15,158 | 10,520 | 13,398 | 12,778 | 10,623 |
| Ore to O. M. Scott | 1,171 | 874 | 1,061 | 1,708 | 297 | 1,246 | - | - |
| Ore to Gypsum Cos. | 1,193 | 1,133 | 1,133 | 1,698 | 1,330 | 1,330 | - | - |
| Ore to Canada | 1,835 | - | 1,366 | 2,892 | - | 3,047 | - | - |
| Ore to other outsiders | 2,061 | 1,469 | 2,537 | 2,821 | 1,914 | 2,141 | - | - |
| Total Ore | 6,260 | 3,476 | 5,697 | 9,119 | 3,541 | 7,764 | - | - |
| Total Zonolite | 66,316 | 54,932 | 59,827 | 96,173 | 75,639 | 83,693 | 65,508 | 45,169 |

15101961

15101962

Schedule 3

03629722

## PROFITABILITY & RETURN ON TCE COMPARISON
### ZONOLITE
### ($000)

| | 1977 | | | 1980 | | | CASE C | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | BASE CASE | CASE A | CASE B | BASE CASE | CASE A | CASE B | MAT. STRAT. | REG. STRAT. |
| Gross Sales | $66,316 | $54,932 | $59,827 | $96,173 | $75,639 | $83,693 | $65,508 | $45,169 |
| Sales Deductions | 2,821 | 2,230 | 2,524 | 3,892 | 3,125 | 3,461 | 3,890 | 2,258 |
| Net Sales | 63,495 | 52,702 | 57,303 | 92,281 | 72,514 | 80,232 | 61,618 | 42,911 |
| Direct Mfg. Cost | 36,646 | 30,493 | 32,920 | 52,012 | 41,148 | 44,644 | 35,833 | 24,028 |
| Gross Margin | 26,849 | 22,209 | 24,383 | 40,269 | 31,386 | 35,588 | 25,785 | 18,883 |
| G.M. on Gross % | 44.7% | 44.5% | 45.0% | 45.8% | 45.6% | 46.7% | 45.3% | 46.8% |
| G.M. on Net % | 42.3% | 42.1% | 42.6% | 43.6% | 43.3% | 44.4% | 41.9% | 44.0% |
| Factory O.H. | 9,397 | 8,773 | 9,210 | 13,581 | 11,300 | 13,078 | 7,442 | 5,740 |
| Gross Profit | 17,452 | 13,436 | 15,173 | 26,688 | 20,066 | 22,510 | 18,343 | 13,143 |
| Selling | 8,419 | 7,341 | 7,329 | 11,500 | 9,600 | 10,100 | 9,600 | 6,074 |
| G & A | 4,101 | 3,954 | 4,101 | 5,231 | 4,724 | 5,000 | 3,675 | 2,227 |
| R & D | 749 | 637 | 660 | 1,445 | 1,339 | 1,345 | 1,202 | 774 |
| Operating Expense | 13,269 | 11,933 | 12,740 | 18,176 | 15,663 | 16,445 | 14,477 | 9,075 |
| Operating Profit | 4,183 | 1,491 | 3,033 | 8,512 | 4,403 | 6,065 | 3,866 | 4,068 |
| Other Inc./(Exp.) | (227) | (221) | (227) | (39) | (39) | (39) | - | - |
| Pre-Tax Profit | 3,956 | 1,277 | 2,806 | 8,473 | 4,364 | 6,026 | 3,866 | 4,068 |
| Taxes on Income (Before ITC & Depletion) | 2,014 | 655 | 1,445 | 4,364 | 2,247 | 3,103 | 1,991 | 2,095 |
| ITC | 371 | 348 | 341 | 285 | 145 | 255 | 173 | 102 |
| Depletion Credits | 243 | 325 | 316 | 979 | 517 | 580 | 502 | 502 |
| Total Taxes | 1,400 | (18) | 788 | 3,100 | 1,585 | 2,268 | 1,316 | 1,491 |
| Profit After Tax | $2,556 | $1,290 | $2,018 | $5,373 | $2,779 | $3,758 | $2,550 | $2,577 |
| Total Capital Employed | $30,891 | $28,672 | $29,937 | $37,215 | $29,178 | $34,328 | $23,532 | $17,182 |
| % Return on TCE | 8.5% | 4.7% | 7.0% | 14.6% | 9.8% | 11.2% | 11.0% | 15.2% |

APPENDIX IV

RESPIRABLE TREMOLITE FIBER EXPOSURES FOR
ZONOLITE FINISHED PRODUCTS IN INTENDED USES

03629723

| Product | Grade of Ore Used | 8 Hour TWA Exposure (f/ml) Using S.C. Ore (f/ml) | 8 Hour TWA Exposure (f/ml) Using Libby Ore (f/ml) | Maximum 15 Minute Exposure (f/ml) Using S.C. Ore (f/ml) | Maximum 15 Minute Exposure (f/ml) Using Libby Ore (f/ml) |
|---|---|---|---|---|---|
| **STANDARDS** | | | | | |
| Present OSHA | | 2.0 | 2.0 | 10.0 | 10.0 |
| Proposed OSHA | | 0.5 | 0.5 | 5.0 | 5.0 |
| Proposed NIOSH | | 0.1 | 0.1 | 0.5 | 0.5 |
| **PURE VERMICULITE** | | | | | |
| ATTIC INSULATION | #1 | - | 0.58 | - | 4.28 |
| | #2 | - | N/A | - | N/A |
| MASONRY INSULATION | #3 | 0.03 | 0.07 | 0.21 | 3.11 |
| | #3 | ٦.02 | 0.19 | 0.61 | 3.65 |
| ZIC - CHARGER MAN | #3 | | 0.55 | - | 1.14 |
| | #4 | 0.02 | 0.45 | 0.14 | 1.66 |
| | #4/5 | 0.02 | - | 0.11 | - |
| **HORTICULTURAL VERMICULITE** | | | | | |
| Professional Use | #2 | - | 1.06 | - | 1.62 |
| | #3 | 0.07 | N/A | 0.16 | N/A |
| Consumer Use | #3 | <0.05 | <0.035 | <0.29 | <0.14 |
| **MIXED PRODUCTS** | | | | | |
| MK 4 - NOZZLE | #3 | N/A | ≤0.18 | N/A | ≤0.29 |
| MK 5 - NOZZLE | #3 | ≤0.10 | ≤0.31 | ≤0.25 | ≤0.52 |
| REDI-EARTH - Professional Use | #3 | 0.02 | 0.04 | 0.07 | 0.07 |
| Consumer Use | #3 | <0.04 | <0.04 | 0.29 | <0.14 |

ESW/CGR
5-12-77

15101963

# Fairleigh Dickinson University

### RUTHERFORD   TEANECK   MADISON

FLORHAM-MADISON CAMPUS .
285 Madison Avenue
Madison, New Jersey
Area Code 201
377-4700

APPENDIX V

31 March 1977

Dr. Heyman C. Duecker
Vice President-Research
Construction Products Division
W.R. Grace & Company
62 Whittemore Avenue
Cambridge, Mass.  02140

03629724

Dear Dr. Duecker:

This responds to your letter of the 18th in which you ask for comment on a NIOSH report of December 1976 that recommends a revision of the asbestos standard to 0.1 fiber $> 5\mu$ per cc.

As I read this document, it does not present evidence for hazard from either a 5 fiber or 2 fiber per cc standard. Essentially, it argues that risks from low level exposures to asbestos are indicated by reports of mesotheliomas associated with brief or with non-occupational exposures, such as "household" exposures of persons living in the houses of asbestos workers, but levels of such exposures are not stated. That "household" exposures have been substantial was indicated by Dr. Selikoff at a Conference on Environmental Cancer that I attended in Washington last week.

The NIOSH report mentions mesotheliomas in individuals with history of asbestos exposure for only one day. Such cases could, of course, be unrelated to asbestos, as indicated in the NIOSH statement (Page III-7) that approximately 15 per cent of mesotheliomas are not known to be related to exposure to asbestos.

An earlier NIOSH report (Gillam et al) has been cited as showing tumor response to low levels of asbestos. In referring to this, the 1976 NIOSH report (III-10) states: "In a study of a group of miners exposed to amphibole fibers in the cummingtonite-grunerite ore series, Gillam et al (1976) have demonstrated mortality from malignant respiratory disease three times that of the general population."

Referring to the same study, a 1975 OSHA report said: "Gillam et al (1975), studying the mortality and reviewing the chest x-rays of 439 underground metal miners exposed to an asbestiform mineral, found three times the risk of malignant respiratory disease than expected. The fiber concentrations averaged 0.24 fibers/ml." (Federal Register, Oct. 9, 1975 pages 47652-47665. Refer to page 47656).

15101964

03629725

The claim by Gillam et al for an increased incidence of cancer in the cited miners has not been born out by a more extensive study by McDonald et al (copy attached).

You no doubt have a copy of the above cited 1975 OSHA document. On an enclosed copy of it, I have marked paragraphs that attempt to quantitate exposures to asbestos in relation to occurrence of asbestosis and/or cancer. It should be noted that the level of exposure in the cited British factory in the period 1933-1968 was an estimated level and that no evidence is offered that a 2 fiber level had actually been achieved in the period after 1968.

The 1976 NIOSH report (II-7, II-Table 6) cites a study by Wagner on inhalation exposures of rats to various preparations of asbestos and notes that tumors were found after exposures of only one day. A copy of Wagner's paper is attached. It states that the one-day exposure was 7 hours exposure to dusts containing 9.7 to 14.7 mg per cubic meter of the tested preparations of asbestos.

In March 1976, NIEHS held a 3-day Conference on Extrapolation of Data from Animals to Man. A report on that conference by its chairman is enclosed. I attended that conference and enclose copies of 3 papers that seem of particular pertinence.

The first is a paper by Rall (Director, NIEHS) which addresses the question of threshold levels for carcinogens.

The second is a paper by Enterline and Henderson "A Model for Extrapolating to Low Levels of Asbestos Exposure."

The third is by Hardin Jones. He brings out the point that thresholds for carcinogens should be viewed not only in terms of yield of tumors but also latent period, i.e. that safe levels can be achieved by considering exposures with latent periods longer than the life span.

I understand that CONSAD Research Corp., contractor for inflationary impact study on proposed revision to asbestos standard, is also looking at technical feasibility and economic implications of a 0.1 fiber per cc limit.

Trusting that these remarks may be of interest,

Very sincerely,

*William E. Smith, M.D.
Director
Health Research Institute

WES/clc

Enclosures

See addendum (page 3)

15101965

Addendum                                          03629726

        The enclosed papers from the NIEHS Conference on
Extrapolation of Data from Animals to Man are offered
merely to provide detail on some current thinking on
that subject.

        Perhaps a "bottom-line" attitude that seems to be
developing in the regulatory agencies was expressed last
week by Eula Bingham at the conference I covered in
Washington. Dr. Bingham, the new Asst. Secretary of Labor
for Occupational Safety and Health, said, according to my
notes, "We are ignorant as to whether there is a safe level
for carcinogens. The lowest feasible level seems to be the
prudent path."

        On this theme, the NIOSH document that you sent me
contains a statement on page VI-2 that the asbestos standard
"should be set at the lowest level detectable by available
analytical techniques, an approach consistent with NIOSH's
most recent recommendations for other carcinogens."

        This approach, or enactment of "zero" levels for
carcinogens, would, of course, mean that investment of
time and money to achieve any particular level would be
precarious; since improvements in sensitivity of analytical
techniques could unpredictably change the picture.

        Enclosed is an announcement of a seminar in Washington
on 12-13 April on Federal Regulation of Environmental
Carcinogens. The list of speakers may suggest someone that
you could contact for comment or advice. Paul Kotin from
Johns-Manville is scheduled to give the lead-off address.

        Would it be agreeable for me to send a copy of this
letter to Dr. Allan Harvey at R.T. Vanderbilt Co. ?

15101972

03629732

TABLE I — TREMOLITE LEVELS IN BUILDING PRODUCTS END USES

**SOUTH CAROLINA**

| Product (Ore) | | Product Assay % | Fiber Count Date - Location | | |
|---|---|---|---|---|---|
| | | | Min. | Max. | TWA |
| PK 4 (#3) | Mixer | < 0.05 % | TO BE SCHEDULED | | |
| | Nozzle | | | | |
| | Clean-up | | | | |
| MK 4 (#3) | Mixer | | 3/2/77 - Montgomery | | |
| | Nozzle | | ≤0.07 | ≤0.048 | |
| | Clean-up | | ≤0.05 | ≤0.25 | ≤0.102 |
| MS 5 (#3) | Mixer | < 0.08 | 3/2/77 - Montgomery | | |
| | Nozzle | | ≤0.07 | ≤0.048 | |
| | Clean-up | | ≤0.05 | ≤0.25 | ≤0.102 |
| Masonry Fill (#3) | | 0.05* | 3/3/77 - Columbus | | |
| | | | 0.10 | 0.21 | 0.027 |
| Masonry Fill (#4) | | 2.86* | 3/16/77 - W. Palm Beach | | |
| | | | < 0.17 | 0.61 | 0.018 |
| ZIC (#4) | Charger | 0.48* | 3/16/77 - Miami | | |
| | Mixer | | < 0.05 | 0.14 | 0.030 |
| | Deck | | < 0.05 | 0.06 | 0.017 |
| | | | < 0.06 | 0.12 | 0.061 |
| ZiC (4/5 blend) | Charger | 2.83* | 3/2/77 - Montgomery | | |
| | Mixer | | < 0.05 | 0.11 | 0.07 |
| | Deck | | | | |
| ZIC (#5) | Charger | — | | | |
| | Mixer | — | | | |
| | Deck | — | | | |
| 5500 (#3) | | — | | | |
| Mine Sealant (#3) | | — | | | |

**Libby**

| Product Assay % | Fiber Count Date - Location | | |
|---|---|---|---|
| | Min. | Max. | TWA |
| < 0.10 % | 3/8/77 - Dallas | | |
| | ≤0.003 | ≤0.285 | ≤0.116 |
| | ≤0.190 | ≤0.285 | ≤0.176 |
| | 3/11/77 - Burbank | | |
| | < 0.19 | 0.13 | 0.019 |
| | 0.16 | 0.38 | 0.196 |
| < 0.11* | 3/9/77 - San Diego** | | |
| | ≤0.23 | ≤0.38 | ≤0.248 |
| | 0.29 | ≤0.52 | ≤0.311 |
| 0.25* | 3/10/77 - Oakland City | | |
| | < 0.19 | 3.11 | 0.071 |
| 0.01 | TO BE SCHEDULED | | |
| 0.34 | TO BE SCHEDULED | | |
| — | | | |
| — | 3/5/77 - Oakland City | | |
| | 0.12 | 1.14 | 0.546 |
| | < 0.09 | 0.31 | 0.085 |
| < 0.07 | TO BE SCHEDULED | | |
| — | TO BE SCHEDULED | | |

**Fiber Count Date - Location**

| Product Assay % | Fremont | | |
|---|---|---|---|
| | Min. | Max. | TWA |
| | 3/11/77 - Fremont | | |
| | < 0.15 | 0.12 | 0.01 |
| | < 0.16 | < 0.30 | < 0.018 |
| | < 0.19 | 2.13 | 0.25 |
| | 1/26/77 - Westminster | | |
| | < 0.05 | 0.19 | 0.06 |
| | 0.05 | 0.21 | 0.07 |
| | — | 0.03 | 0.02 |

* Samples assayed of products actually used on job site.

** New fiber count technique used to eliminate gypsum fibers.

FSC/CGR
4-?-77

15101973

TABLE II - TREMOLITE LEVELS IN HORTICULTURAL PRODUCTS END USES

03629733

**SOUTH AMBOY**

| Product (Ore) | Product Assay-% | Prof. Fiber Count Date - Location | | | Consumer Fiber Count Date - Location | | |
|---|---|---|---|---|---|---|---|
| | | Min. | Max. | TWA | Min. | Max. | TWA |
| Hort. Verm. (#2) | - | 3/11/77 - Cambridge | - | - | 3/11/77 & 3/18/77-Cambr. | - | - |
| Hort. Verm. (#3) | 4.32,0.016 ** <0.16 | 3/11/77 - Cambridge | 0.16 | 0.070 | <0.14 | <0.29 | <0.05 |
| Red-Earth (#3) | 0.048 * | 3/12/77 - Cambridge <0.04 | 0.07 | 0.018 | 3/11/77 & 3/18/77-Cambr. <0.14 | 0.29 | 0.015 |
| Metro-Mix 200 (#3) | 0.398 * | 3/10/77 - Cambridge - | <0.03 | <0.015 | - | - | - |
| Metro-Mix 300 (#3) | 0.081 * | TO BE SCHEDULED | - | - | - | - | - |
| Metro-Mix 350 (#3) | 0.156 * | TO BE SCHEDULED | - | - | - | - | - |
| Turf Builder (#4 light) | - | - | - | - | - | - | - |
| Turf Builder (#4 dark) | - | - | - | - | - | - | - |
| Versite (#4 Carrier Grade) | <0.003 | - | - | - | - | - | - |

**LIBBY**

| Product (Ore) | Product Assay-% | Prof. Fiber Count Date - Location | | | Consumer Fiber Count Date - Location | | |
|---|---|---|---|---|---|---|---|
| | | Min. | Max. | TWA | Min. | Max. | TWA |
| Hort. Verm. (#2) | 0.035 * | 3/11/77 - Cambridge 0.81 | 1.62 | 1.063 | - | - | - |
| Hort. Verm. (#3) | 0.029 | TO BE SCHEDULED | - | - | 3/10/77 & 3/18/77-Cambridge <0.14 | <0.14 | <0.035 |
| Red-Earth (#3) | <0.02 * | 3/12/77 - Cambridge 0.07 | 0.07 | 0.035 | 3/10/77 & 3/18/77-Cambridge <0.14 | <0.14 | <0.035 |
| Metro-Mix 200 (#3) | <0.034 * | 3/10/77 - Cambridge <0.03 | 0.07 | 0.018 | - | - | - |
| Metro-Mix 300 (#3) | - | - | - | - | - | - | - |
| Metro-Mix 350 (#3) | - | - | - | - | - | - | - |
| Turf Builder (#4 light) | <0.009 * | - | - | - | - | 0.15 | 0.037 |
| Turf Builder (#4 dark) | <0.009 * | - | - | - | - | 0.17 | 0.043 |
| Versite (#4 Carrier Grade) | - | - | - | - | - | - | - |

* Samples assayed of products actually used on simulated job site.

** professional vermiculite was 4.32%; Consumer vermiculite was %6%.

TABLE III  (Continued)            -2-                    03629734

D.  Masonry Fill  (FWE)

From visiting job sites and talking with masonry contractors, 1 hour is
generally the maximum time spent pouring MF.  Pouring conditions vary
from job-to-job and from contractor-to-contractor.  A few conditions are
as follows:

1.  Lay block/brick part way  -  Pour MF

2.  Lay block and pour MF at scaffold height.
    Several men pouring so as not to tie up scaffold.

3.  Lay all block/wall, fill w/MF and Cap.


The following are jobs sampled:

| Construction | # Bags | # Men | Total Time/ Da. (Min.) | Location |
|---|---|---|---|---|
| Block Core | 28 | 2 | 41 | West Palm Beach |
| Block Core | 33 | 1 | 85 | Columbus, GA. |
| Brick Cavity | 100 | 1 | 34 | Oklahoma City |
| Block Core | 75 | 2 | 71 | Dallas |

$$TWA = \frac{1}{8}$$

FWE:mem
4-4-77

15101974

TABLE IV -- GUIDELINES FOR RESPONDING TO REQUESTS REGARDING ASBESTOS IN OUR PRODUCTS

| | SOUTH CAROLINA | | LIBBY | |
|---|---|---|---|---|
| | Frequency | Amount | Frequency | Amount |
| MONOKOTE | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible |
| ZIC | Samples contain tremolite; Predominantly non-asbestos form | Small | Samples contain tremolite | Minute" |
| HF | Samples contain tremolite; Predominantly non-asbestos form | Small | Samples contain tremolite | Minute ? |
| AF | Samples contain tremolite; Predominantly non-asbestos form | - | Samples contain tremolite | Minute |
| Ind | Samples contain tremolite; Predominantly non-asbestos form | Small | Some samples may contain tremolite | Very small ? |
| TV | Samples contain tremolite; Predominantly non-asbestos form | Small | Samples contain tremolite | Minute |
| RE | Some samples may contain tremolite; Predominantly non-asbestos form | Minute | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible |
| MM | Some samples may contain tremolite; Predominantly non-asbestos form | Minute | Most samples contain no detectable tremolite; Occasionally one may contain tremolite | Negligible |

03629735

15101975

TABLE IV.

-2-

DEFINITIONS:

| Small | 1.0 - 6.0% |
| Very Small | 0.5 - 1.0 |
| Minute | Less than 0.5 |
| Trace | Detectable, but not quantifiable |
| Negligible | Not detected by normal analytical procedures in the sample as manufactured. |

ESW/CGR
1-30-77

0362.9736

15101976

TABLE V - MK-4  W/LIBBY #3   03629737   2/31/77

| DATE (1977) | JOB SITE LOCATION | JOB | FIBER COUNT (f/ml) | | | COMMENTS |
|---|---|---|---|---|---|---|
| | | | MIN | MAY | TWA | |
| | | | <0.15 | <0.23 | <0.14 | |
| | HYATT REGENCY | MIXED | <0 | 0.073 | 0.050 | T |
| 3/8 | DALLAS | NOZZLE | 0.0 | 0.07 | 0.118 | |
| | | | <0.150 | <0.235 | <0.174 | |
| | | | | | | |
| | | | | | | |
| | SO. COUNTY HALL | MIXED | 0.0<0.15 | 0.12 | <0.08 | |
| 3/10 | OF JUSTICE | NOZZLE | <0.16 | <0.30 | <0.130 | |
| | FREMONT CALIF | CLEAN UP | 0.0<0.17 | 2.13 | <0.250 | |
| | | | | | | |
| | | | | | | |
| | CALIF FEDERAL | MIXED | 0.0<0.17 | 0.13 | 0.079 | |
| 3/11 | SAVINGS & LOAN | NOZZLE | 0.16 | 0.38 | 0.196 | |
| | BURBANK CALIF | | | | | |
| | | | | | | |
| | | | | | | |
| | WESTMINSTER | MIXED | 0.0<0.05 | 0.19 | 0.069 | |
| 1/26 | COURT BLDG | NOZZLE | 0.05 | 0.21 | 0.078 | √ |
| | WESTMINSTER CA | CLEAN UP | | 0.03 | 0.024 | |

15101977

To: R. W. Sterrett

From: Peter Kostic

Date: March 11, 1969

cc: R. H. Vining
    C. P. Dugan
    R. A. Kulberg

The following article which appeared in the March issue of Safety Engineering is for your information. I think it would be well at this time, with the advice of counsel, to consider applying a warning or precautionary label or statement on all containers of products containing vermiculite. This may aid our defense in cases of product liability claims. The attached extra copies are for distribution as you wish.

*Peter Kostic*
Peter Kostic

PK:vag



WASHINGTON SAFETY REPORT

◼ Congressman Edward J. Patten of New Jersey has introduced R 2503, "a bill to promote the safety of workers engaged in making asbestos products for shipment in commerce, and for other purposes. It is substantially the same as the Asbestos Safety bill he introduced, September 14, 1967.

Last year when hearings were conducted on the proposed occupational Health and Safety Act, Dr. Irving J. Selikoff of the Mt. Sinai School of Medicine testified in favor of the bill before the House Select Subcommittee on Labor. He is one of this country's greatest experts on asbestosis, his research covering not only workers in asbestos, but members of their families and persons living near asbestos plants or facilities using asbestos products.

Dr. Selikoff told of studies he had made of some 632 members of two New York-New Jersey Asbestos Workers Union locals. According to medical yardsticks, over a 19-year period, 203 should have died. In fact, 255 did die. Of that number, 37 could have been expected to die of cancer. In fact, 95 died of cancer.

In addition, a disease which was considered so rare it was not separately coded in the International Classification of Causes of Death has been unmistakably associated with asbestos and the number of cases has increased significantly. This is *mesothelioma*—a highly malignant tumor.

One disturbing factor in mesothelioma is the rather indirect exposure a number of its victims had. In some cases studied in London, 31 had worked with asbestos, but nine merely lived in the household of an asbestos worker! Eleven people lived within ½ mile of an asbestos factory!

Early in 1968, Dr. Maxwell Borow reported in the "Journal of the American Medical Association" on 17 mesothelioma cases in New Jersey. Fifteen were asbestos workers, two lived near an asbestos factory.

Dr. Selikoff's statement told of other studies in South Africa. There were additional remarks by these doctors regarding the possible exposure of all construction workers and of the bystander who unknowingly breathes in the poisonous dust.

The call of Congressman Patten against asbestosis has not gone unheeded. Johns-Manville, the U.S. Public Health Service, the International Association of Heat & Frost Insulators and Asbestos Workers, and the Mt. Sinai School of Medicine have joined together in an effort to eliminate or at least measurably reduce the exposure of some 200,000 asbestos workers. This will certainly result in greater protection to the entire construction industry and the general public too.

PLAINTIFF'S EXHIBIT C-55

EXHIBIT 13

06191709

TO:   Peter Kostic                          DATE:   March 31, 1969

        cc:  R. W. Sterrett
             R. M. Vining
             R. A. Kulberg

Re:   <u>Labeling of Vermiculite</u>


            Reference is made to your memorandum of March 11
concerning the article from Safety Engineering.

            Before any labeling of containers of products
containing vermiculite is done we should indeed study carefully
the content of the labeling and the consequences of putting a
label on the package.  By warning people or inadequately warning
people we may be incurring liability to which we would not
otherwise be subject.

            I do not believe that vermiculite could be classified
today as a poisonous substance for which labeling may be
required.

                                    Charles F. Dugan

                                    Charles F. Dugan

CFD/MS

PLAINTIFF'S
EXHIBIT
G-55.5

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on July 13, 2001, I did serve the foregoing: DECLARATION OF FABRICE N. VINCENT IN SUPPORT OF ZONOLITE PLAINTIFFS' OBJECTION TO DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF BAR DATE, APPROVAL OF PROOF OF CLAIM FORMS AND APPROVAL OF NOTICE PROGRAM (DOCKET NO. 536); MOTION TO EXTEND THE TIME TO OBJECT OR RESPOND TO SUCH MOTIONS; JOINDER IN MOTION FOR CONTINUANCE BY OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS; INDEPENDENT MOTION TO CONTINUE THE HEARING ON DEBTORS' MOTION; AND REQUEST FOR CONSIDERATION AND BRIEFING REGARDING CLASS TREATMENT upon the parties identified below in the manner specified.

### VIA HAND DELIVERY

Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young & Jones
919 Market Street, Suite 1600
Wilmington, DE 19801

Frank J. Perch, Esquire
Office of the US Trustee
844 N. King Street
Wilmington, DE 19801

Michael S. Joseph, Esquire
Ferry & Joseph P.A.
824 Market Street, Suite 904
Wilmington, DE 19899

Michael R. Lastowski, Esquire
Duane, Morris & Heckscher, LLP
110 N. Market Street, Suite 1200
Wilmington, DE 19801

Matthew G. Zaleski, III, Esquire
Campbell & Levine, LLC
Chase Manhattan Centre, 15th Floor
1201 N. Market Street
Wilmington, DE 19801

**VIA FEDERAL EXPRESS**

Scott L. Baena, Esquire
Bilzin, Sumberg, Dunn,
Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL  33131

Elihu Inselbuch, Esquire
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY  10022

James H.M. Sprayregen, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois  60601

Lewis Kruger, Esquire
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY  10038-4982

Under penalty of perjury, I declare that the foregoing is true and correct.

_7/13/01_
Date

_William D. Sullivan_
William D. Sullivan