UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | |
| | : | Chapter 11 |
| W.R. GRACE & CO., *et al.* | : | |
| | : | Case Number 01-1139 (JJF) |
| Debtors | : | |
| | : | (Jointly Administered) |

Hearing Date: TBD
Objection Deadline: August 27, 2001

**UNITED STATES TRUSTEE'S OBJECTION TO FIRST AND SECOND INTERIM APPLICATIONS, AND FIRST INTERIM QUARTERLY APPLICATION, OF BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS (Docket Nos. 609 and Unknown)[1]**

In support of her Objection to (a) the First Interim Application of Bilzin Sumberg Dunn Baena Price & Axelrod LLP ("Bilzin") for Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee of Asbestos Property Damage Claimants from April 9, 2001 through May 31, 2001 (the "First Application"), (b) the Second Interim Application of Bilzin Sumberg Dunn Baena Price & Axelrod LLP for Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee of Asbestos Property Damage Claimants from June 1, 2001 through June 30, 2001 (the "Second Application"), and (c) Bilzin's First Interim Quarterly Application for Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee of Asbestos Property Damage Claimants, which aggregates the amounts sought pursuant to the First and

---

[1] Although the Second Application and the Quarterly Application have been served on the UST, the docket does not yet reflect the filing thereof.

Second Applications (the "Quarterly Application") (together, the "Applications"), Patricia A. Staiano, the United States Trustee (UST) for Region 3, by undersigned counsel, avers:

## INTRODUCTION

1. Pursuant to 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the above-referenced Comment and Objection.

2. Pursuant to 28 U.S.C. § 586(a)(3)(A), the UST is charged with reviewing fee applications submitted under section 330 and "filing with the court comments with respect to such application[s] and, if the United States Trustee considers it to be appropriate, objections to such application[s]." *See In re Busy Beaver Building Ctrs.*, 19 F.3d 833, 842 (3d Cir. 1994) (section 586(a)(3) gives United States trustee "discretion" to review fee applications).

3. Pursuant to 11 U.S.C. § 307, the UST has standing to prosecute the above-referenced Objection.

## BASIS FOR RELIEF

4. Sections 331 and 330 of the Bankruptcy Code govern interim requests for compensation by section 327 and section 1103 professionals.

5. Section 330(a)(3) of the Bankruptcy Code provides that, "in determining the amount of compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the service was rendered toward the completion of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

6. Section 330(a)(2) provides that "[t]he court may, on its own motion or on the motion of the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested."

7. Section 330(a)(4) provides that:

(A) Except as provided in subparagraph (B)[relating to chapter 12 and chapter 13 cases], the court shall not allow compensation for —

    (i) unnecessary duplication of services; or

    (ii) services that were not —

        (I) reasonably likely to benefit the debtor's estate; or

        (II) necessary to the administration of the case.

8. A section 327 or section 1103 professional seeking compensation under sections 331 and/or 330 has the burden of proving that the services rendered were reasonable and that they were reasonably likely to benefit the estate. *See Ferrara & Hantman v. Alvarez (In re Engel)*, 124 F.3d 567, 573 (3d Cir. 1997).

9. Federal Rule of Bankruptcy Procedure 2016(a) requires an entity seeking interim or final compensation and reimbursement of necessary expenses to file an application "setting

forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested."

10. Local Bankruptcy Rule 2016-2 sets forth this Court's specific requirements regarding the form of fee applications.

## GROUNDS FOR RELIEF

11. The First Application reflects that between April 12, 2001 (the date of Bilzin's retention by the Official Committee of Asbestos Property Damage Claimants (the "PD Committee")) and May 31, 2001, the Applicant performed 781.9 hours of services for which it seeks compensation in the amount of $194,578.50 in fees and reimbursement of expenses of $29,181.11 incurred in connection with those services. The Second Application reflects 907.3 hours of professional time logged from June 1 to June 30, 2001 and seeks compensation for $195,611.50 in fees and $14,086.94 in reimbursement of expenses.

12. The Applications reflect that during the covered period, Bilzin staffed its engagement as counsel for the PD Committee with eighteen (18) attorneys, comprising nine (9) partners and nine (9) associates, as well as five (5) law clerks and four (4) paralegals.

13. As set forth in greater detail below, Bilzin's overstaffing of its engagement as PD Committee counsel with an excessive number of attorneys, law clerks and paralegals resulted in what appears to be substantial duplication of effort.

14. Review of the Applications indicates that a total of at least $46,459.50 in fees in the First Application and $94,897 in fees on the Second Application (a grand total of $141,464.50 out of $389,683.75 in total fees sought) are excessive, inappropriately charged to

the estate or are inadequately described and documented. These objectionable fees can be broken into several categories as set forth below.[2]

**General Background Research**

15. According to promotional materials contained on Bilzin's internet web site which identifies Bilzin's attorneys and the departments in which they practice, the aforementioned staffing included the firm's entire insolvency department plus more than one-half of Bilzin's litigation department. *See* pages from Bilzin's website attached as Exhibit A.

16. These promotional materials highlight (indeed, tout) Bilzin's experience, expertise and indeed preeminence in bankruptcy practice, including specifically, among other things, its representation of the Official Property Damage Claimants Committee in the *Celotex* chapter 11 case and representation of the Official Committee of Bondholders in the *Hillsborough Holdings* case.[3] Bilzin further advertises that its lawyers "have developed special expertise in a variety of highly complex areas, including . . . asbestos."

17. Additionally, the PD Committee's application to employ Bilzin, which appears to have been prepared by Bilzin, highlights Bilzin's qualifications, stating on page 12 thereof that "[t]he Applicant is an established law firm and its members and associates working on this case are experienced in matters of this kind and are well known to this Court," and further promotes that firm's qualification to serve as counsel to the PD Committee:

---

[2] These categories do not overlap. In other words, no single entry has been placed in more than one category of objection.

[3] *Hillsborough Holdings* was the Chapter 11 case of Celotex's parent company in which the Celotex asbestos claimants sought to pierce the corporate veil; thus, it is also an asbestos-related case.

5

The Firm's restructuring and bankruptcy group has extensive experience with routine and complex in-court and out-of-court reorganizations, placing substantial emphasis on creditors' rights, corporate, banking and financial matters. The Firm has considerable experience in reorganization cases before this Court and others and is uniquely well qualified to act as counsel for the Committee. Thus, the Committee believes that the Firm possesses expertise in the areas of law relevant to the Consolidated Cases and that the Firm is well qualified to represent the Committee herein.

18. In the context of the above representations, it is inexplicable that Bilzin devoted many hours of time and billed the estate thousands of dollars on general background research regarding asbestos claims in bankruptcy. The Applications contain numerous time entries related to researching the legislative history of 11 U.S.C. § 524(g), which addresses the effect of a discharge on certain asbestos claims. Six professionals billed many hours to a generic research project typically described as "docket research on bankruptcies in asbestos litigation" or some variant thereof. The total amount of fees billed for the legislative history and "bankruptcies in asbestos litigation" research is $6712.00.

**The Bar Date Project**

19. Closely related to Bilzin's generic research is a massive project in which three attorneys, two paralegals and a summer associate logged $35,088.00 (of which a staggering $20,237.50 was billed during the time period of the First Application) researching and writing memoranda on how the claims bar date was arrived at in previous asbestos cases. A great deal of this time, including significant portions of the attorney time, was spent on the ministerial task of simply finding and compiling the pleadings, motions and orders in the other cases.

20. Notwithstanding the significance of the issue, the amount of time that has already been devoted to this project in the first three months of the case, with more surely to come, is

patently excessive and constitutes "reinventing the wheel." The setting of a bar date is not an unusual development in a Chapter 11 case. To the extent the asbestos context complicates the question, there are still only a small number of "moving parts" to this issue, i.e. (i) when the bar date is set, (ii) whether different types of claims have different bar dates, and (iii) how the noticing campaign is structured. To date Bilzin has expended over $35,000 to accomplish only a generic restatement of the history of asbestos cases, rather than significantly addressing any of those issues in the context of this case. There is a defined universe of prior asbestos cases in which this issue has arisen in the past and it should not take six professionals and $35,000 of time to compile information <u>which Bilzin should already mostly have in its files</u> given its involvement in *Celotex* and *Hillsborough* and its alleged "special expertise" in asbestos.

21.     The need for such rudimentary bankruptcy research with respect to asbestos cases and bar dates is fundamentally inconsistent with Bilzin's self-proclaimed experience, expertise and preeminence in bankruptcy practice and its prior representation of the PD Committee in the *Celotex* bankruptcy.

22.     Bilzin's expenditure of significant attorney time performing rudimentary bankruptcy research suggests that these chapter 11 estates are being used to underwrite the education and training of Bilzin attorneys after the firm was peddled to the PD Committee and all other parties in interest as being already experienced in asbestos bankruptcy cases and therefore well-qualified to represent the PD Committee.

23.     General research on law well known to bankruptcy practitioners – especially those having the experience and expertise claimed by Bilzin – should not be charged to the estate. *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 838 (Bankr. D. Vt. 1987). Similarly, time spent

educating the firm's attorneys in rudimentary bankruptcy law and improving their skills is a cost of doing business and should not be charged to a particular client or estate. *In re St. Pierre*, 4 B.R. 184, 186 (Bankr. D. R.I. 1980).

24.     Bilzin's use of multiple attorneys and paralegals to perform simultaneous research on the same topics further suggests unnecessary duplication of effort, on rudimentary research which, in the first place, appears to have been undertaken to benefit the firm by training its personnel rather than to benefit the PD Committee and its constituents.

**The Preliminary Injunction Matter**

25.     The Application also reflects that Bilzin attorneys spent an extraordinary number of hours reviewing, analyzing, researching and otherwise paying "attention to" the debtors' motion for temporary restraining order and preliminary injunction to stay actions against certain non-debtor entities. Bilzin professionals (at least eight lawyers) billed $41,809.00 in fees on the injunction matter in the First Application and $11,220.50 in the Second Application.[4]

26.     For $41,000 plus in fees, all that occurred in the first two months of the case was that the PD Committee filed a <u>nine-page</u> response to the motion for injunction, and at a hearing on May 3, 2001, the PD Committee <u>did not oppose</u> the entry of an injunction so long as Debtors were not then seeking to enjoin the commencement of future suits against non-debtors.

27.     Subsequently, the Debtors moved to extend the injunction to bar future actions and the PD Committee opposed this. The PD Committee's opposition (*see* Docket No. 47 in Adversary Proceeding No 01-771, an eleven-page document) seeks to preserve the ability of

---

[4]     These amounts <u>do not include</u> time billed relating to the issue of whether the Debtors' fraudulent conveyance claims against Sealed Air and Fresenius should be assigned to the Committees. The UST is not objecting to the devotion of time to that issue which directly relates to the Committee's rights in the case.

claimants to commence new actions against non-debtors, arguing that enjoining such new actions is constitutionally impermissible. In other words, the thrust of both of Bilzin's pleadings was to preserve the ability of claimants to sue and recover money from third parties outside of the bankruptcy.

28. Although such legal services might advance the interests of property damage claimants <u>in non-bankruptcy proceedings</u>, opposing the entry of an injunction staying actions against non-debtor affiliates of the debtors was not reasonably likely to benefit the debtors' estates (indeed, the debtors contend that the entry of the injunction is *necessary* to avoid harm to the estates), nor was it necessary to aid in the administration of these chapter 11 cases. Rather, opposing the injunction protects the PD Committee members' self-interest in being able to pursue recoveries against non-debtors. It is inappropriate for Bilzin to seek payment from the debtors' estates for such non-bankruptcy services.

29. In order to be "necessary" and therefore compensable from an estate, services must be performed "in furtherance of an official committee's duties under section 1103." *In re Eagle-Picher Industries, Inc.*, 167 B.R. 102, 103, *quoting In re Heck's Properties, Inc.*, 151 B.R. 739 (S.D. W. Va. 1992). A distinction must be made between services which benefit the property damage claimants individually and services for which the bankruptcy estate should pay. *Eagle-Picher Industries, supra*, 167 B.R. at 103. The entry of an injunction staying future actions against non-debtor affiliates of the debtors might affect the interests of property damage claimants in non-bankruptcy proceedings, but would not affect the efforts of the PD Committee to participate in plan formulation. *Id.* at 104. Accordingly, the estates should not bear the cost of Bilzin's efforts to impose entry of the injunction.

**The Informational Brief Project**

30.     Two attorneys and two law clerks billed the estate $7745.00 to review and analyze Debtors' Informational Brief filed with the "first day" pleadings.  The UST submits that this project is another example of overstaffing and "reinventing the wheel":

(a)     The first 11 pages of the Informational Brief are devoted to a description of the asbestos products manufactured by Grace.  This subject should not require a great deal of analysis because Bilzin's clients are already familiar with Grace's products through their pre-petition litigation.

(b)     Pages 12 through 27 of the brief are devoted to a short survey of the history of asbestos litigation going back to the 1970's, and pages 40 through 51 are a general survey of asbestos bankruptcies going back to *Manville*.  Since Bilzin claims a "special expertise" in asbestos, this should be very familiar territory to which Bilzin should not have needed to devote much time.

(c)     Pages 28 to 39 recount Grace's experience in asbestos litigation, of which <u>one page</u> relates to property damage claims.  Additionally, pages 56 through 62 discuss property damage claims.  Notably, of the thousands of dollars and tens of hours that Bilzin attorneys spent analyzing the brief, only a single time entry of 1.6 hours on June 13, 2001 specifically relates to property damage claims.  Bilzin appears not to have made use of its own knowledge base that it presumably has on the subject of asbestos litigation generally, nor the knowledge and expertise of the Asbestos Personal Injury Claimants Committee.

Case 01-01139-AMC  Doc 814  Filed 08/27/01  Page 11 of 14

**Multi-Person Conferences**

31.   The Application contains additional evidence of overstaffing in the form of numerous multi-person intra-office conferences and meetings. The UST has identified $16,747.50 in time billed for meetings and conferences involving three or more Bilzin professionals. Many of these conferences appear to have been occasioned by the need to coordinate the numerous attorneys working on the matter, a task that would not become necessary if the matter were not so overstaffed and fragmented. It also appears that there is a practice of having three or four attorneys sit in on committee conference calls (the exact duration of which becomes questionable since the several attorneys do not bill consistently for the same call).

**Inadequately Described Time Entries**

32.   The Applications contain numerous vague entries from which the nature and necessity of services cannot be determined. For example (but not by way of limitation), the Applications contain numerous entries consisting only of "attention to pleadings," "attention to docket" or "attention to administrative matters." The UST is unable to ascertain the meaning of the vague phrase "attention to" without information as to what in particular Bilzin was directing its attention.[5] Payment of $20,269.50 is sought for Bilzin's "attention" and for other inadequately described entries. The UST and the estates should not be required to speculate as to the meaning of "attention to" or other vague descriptions, all of which preclude determination of the nature and necessity of the services for which Bilzin seeks compensation.

---

[5]   For example, do these entries refer to the Debtors' "administrative matters" or, perhaps, to the firm's internal administration?

33.     The Application also contains entries which do not adequately describe or explain the purpose of the work performed. For example but again not by way of limitation, one of Mr. Sakalo's time entries for April 30, 2001 reads as follows: "Eemail [sic.] to S. Baena re multiple issues (1.2); attention to and review of various pleadings and dockets." No information is provided regarding what issues were being addressed or what pleadings were being reviewed and given "attention."

34.     Considering Bilzin's alleged expertise in bankruptcy matters, the need to describe its services adequately in its applications should be well known to them.

**Other Billings for Services Not Benefitting the Estate**

35.     The Applications include $1765.00 billed for researching contingent fees. Since these services are not tied to any objection made to the retention of any professional in the case on a contingent fee basis, it appears they must relate to the fees of counsel for committee members or to a desire on Bilzin's part to obtain a contingent fee, neither of which conveys any evident benefit on the estate.

36.     The Application also contains a time entry for 4 hours to "research and read cases regarding whether a governmental entity may serve on a creditors' committee." These services rendered no benefit to the estates.

**Expense Reimbursements**

37.     The Applications contain expense items which are neither broken down nor substantiated. For example, there are numerous entries for "travel expenses" aggregating $9,187.64. Most or all of those entries do not identify the traveler, the places of origin and destination, the purpose of the travel or the individual expenses incurred.

38.  Similarly, the Application lists long distance telephone charges of $620 for "conference calls while in Europe," without explanation of the necessity or legitimacy of that expense.  The UST is unable to determine whether the caller was in Europe on PD Committee business or instead on non-PD Committee business, in which event the cost of such conference calls is not properly chargeable to the estates.

39.  Because of the inadequacy of description of the expense reimbursements, the UST cannot determine with certainty how much of the remaining expense claims relate to the fees that have been objected to as set forth above.

**Conclusion**

40.  The excessive amounts of time expended by Bilzin for the services rendered, the overstaffing, the performance of unnecessary services which do not benefit the estates or aid in the administration of these cases, and Bilzin's failure to substantiate expenses incurred are all symptomatic of a lack of appropriate billing judgment by a professional who knows that his or her fees and costs will be paid by a third party (the estates) rather than directly by the client, and that he or she will not be held accountable to or questioned by the client regarding the fee billings.  Corporate clients outside of bankruptcy typically would not tolerate this level of overstaffing, billing for basic background research and the like.  *See, e.g.,* Crossing The Bar: If You Think Insurers Are Tight, Try Being One of Their Lawyers, *Wall Street Journal*, February 9, 1999, p. A1; Log a Box, Scan Mail: Is It All Billable Time?, *Wall Street Journal*, January 6, 1998, p. B1; Not So Fast: It Only Seems Like Legal Fees Are Still Skyrocketing, *Wall Street Journal*, May 27, 1998, p. A1.

41.  The UST leaves Bilzin to its burdens of proof and reserves her discovery rights.

WHEREFORE the UST requests that this Court issue an order denying the Application and/or granting such other relief that this Court deems appropriate.

>Respectfully submitted,
>
>**PATRICIA A. STAIANO**
>**UNITED STATES TRUSTEE**

Dated: August 27, 2001          BY:   **/s/ Frank J. Perch, III**
                                Frank J. Perch III, Esquire
                                Trial Attorney
                                J. Caleb Boggs Federal Building
                                844 King Street, Suite 2313, Lockbox 35
                                Wilmington, DE 19801
                                (302) 573-6491
                                (302) 573-6497 (Fax)