# EXHIBIT A

AMERICAN PROPERTY INVESTORS XI

Landlord

CHOMERICS, INC.

Tenant

## LEASE

DATED:        July  22 , 1981

PREMISES:     Woburn, Massachusetts

| Section | Caption | Page |
|---|---|---|
| 30 | WAIVER OF TRIAL BY JURY AND WAIVERS BY GUARANTORS | 47 |
| 31 | NET LEASE; NON-TERMINABILITY | 48 |
| 32 | MISCELLANEOUS PROVISIONS | 49 |
| 33 | DEFINITIONS | 55 |
| 34 | TENANT'S OPTION TO PURCHASE | 57 |
| 35 | RIGHT OF FIRST REFUSAL | 58 |
| 36 | TENANT'S OBLIGATION TO PURCHASE | 61 |
| 37 | FINANCING ADDITIONAL IMPROVEMENTS | 62 |

THIS LEASE entered into this          day of July, 1981, by
and between AMERICAN PROPERTY INVESTORS XI, a California limited
partnership, having an office located at 666 Third Avenue, New
York, New York 10017 (hereinafter called the "Landlord") and
CHOMERICS, INC., a Delaware Corporation, having an office located
at 77 Dragon Court, Woburn, Massachusetts 01888 (hereinafter
called the "Tenant").

Upon the terms and subject to the conditions herein-
after set forth, the Landlord leases to the Tenant and the Tenant
leases from the Landlord, the property hereinafter described:

1.  THE LEASED PREMISES.

(a)  The property hereby leased to the Tenant is the
tract or tracts of land (the "Land") situated in the City of Wo-
burn and Commonwealth of Massachusetts more particularly . -
scribed in Schedule "A" annexed hereto and by this referen e made
 . ; it hereof, together with the buildings and oth: im,r  ents
 '.. .: hereafter located thereon (collectively the ' im,ro.
ments").

The Land and Improvements leased hereunder. togr ha-
.... ... appurtenances thereto, hereinafter sometir · cc    . e-
ly referred to as the "Leased Premises", are demise   .   .  .-
 ... to (a) · e rights of any parties in possession  .t. .  .:.
 ·e ?·'?'.:. .:ate of the title thereof as of .he co...ent.     · :
the term of this Lease, (b) any state of facts which an accurate
survey or physical inspection thereof might show, (c) all zoning
regulations, restrictions, rules and ordinances, building re-
strictions and other laws and regulations now in effect or here-
after adopted by any governmental authority having jurisdiction,
and (d) with respect to the Improvements, their condition ·· ·f
the commencement of the term of this Lease, without representa-
tion or warranty by Landlord.  Tenant represents to Landlord that
Tenant has examined the title to and the physical condition of
the Leased Premises prior to the execution and delivery of this

had found the same to be satisfactory for all purposes he... , and Tenant accepts the title and condition of the Leased Premises in their respective, present condition "as is".

Landlord makes no representation or warranty with respect to the condition of the Leased Premises or its fitness or availability for any particular use, and Landlord shall not be liable for any latent or patent defect therein.

2.    TERM AND EXTENSION OPTIONS.

(a)  The initial term of this Lease shall be for a period commencing on the date of this Lease and terminating on January 31, 2005, or on such earlier date upon which said term may expire or be terminated pursuant to any of the conditions of limitation or other provisions of this Lease or pursuant to the provisions of any present or future constitution, law, statute, ordinance, rule, regulation, other governmental order or controlling judicial determination of any federal, state, local, municipal or other governmental body, agency or authority having or asserting jurisdiction and all departments, commissions, boards and officers thereof (collectively the "Laws").

(b)  Provided the Tenant shall keep, observe and perform all of the terms, covenants and conditions of this Lease on Tenant's part to be kept, observed and performed, and unless Tenant shall notify Landlord, in writing, by registered mail, return receipt requested, not less than twelve (12) months prior to the expiration of the then existing term hereof, that Tenant elects for the term of this Lease not be extended, the term of this Lease shall be extended for four (4) consecutive periods, the first of which shall be for eighteen (18) months and the remainder periods shall be for ten (10) Lease Years each (each hereinafter referred to as the First, Second, etc. Extended Terms, respectively). This Lease, as extended, shall be upon the same terms, covenants and conditions as are contained herein, except as to the duration of the term hereof and any other provisions of this Lease which by their terms are applicable only to any por-

expiration of the

Fo. Extended Term, any further option of extension.

(c) The expression "the Initial Term" shall mean the period described in Section 2(a) as the initial term.

(d) Upon the extension of the term of this Lease as provided herein, Landlord and Tenant agree to execute and deliver, upon the request of either party, a supplemental agreement, in recordable form, setting forth the term of this Lease as extended.

## 3.   FIXED ANNUAL MINIMUM RENTAL.

Tenant covenants to pay Landlord, without previous demand therefor and without any setoff or deduction whatsoever a net fixed annual minimum rent (the "Minimum Rental") for each year of the term of this Lease, payable in equal monthly installments, in arrears on or before the first (1st) day of each and every calendar month during the term of this Lease as set forth on Schedule "C" annexed hereto and by this reference made a part hereof. In the event that the term of this Lease does not commence on the first day of a calendar month, the installment to Minimum Rental for the partial calendar month at the commencement of the term of this Lease shall be prorated on the basis of the number of days of the term within such calendar month. Landlord may, at its option, direct Tenant to pay all or any portion the Minimum Rental directly to the holder of any Mortgage and to pay the balance, if any, of the Minimum Rental to Landlord.

## 4.   UTILITIES.

Tenant shall furnish, at its own expense, all utilities of every type and nature required by it in its use of the Leased Premises and shall pay or cause to be paid, when due, all bills for water, sewerage, heat, gas, electricity and other utilities, if any, used on, in connection with, or chargeable against the Leased Premises until the termination of this Lease and all bills for utility charges relating to the Leased Premises or the use thereof and imposed on users of utilities, whether or not such charges shall relate to services or benefits available to the

Te: . ..iring the term of this Lease) the Tenant shall indem-
nify and save harmless the Landlord from and against any loss,
cost and expense in connection therewith.

5.    ADDITIONAL RENT.

(a)  It is the purpose and intent of the Landlord and
Tenant that the rent payable hereunder shall be absolutely net to
the Landlord so that this Lease shall yield, net to the Landlord,
the rents specified herein in each year during the term of this
Lease.

(b)  Tenant covenants to pay, before any fine, penalty,
interest or cost may be added thereto for the non-payment there-
of, as additional rent, all taxes, assessments (including but not
limited to, all assessments for public improvements or benefits,
whether or not commenced or completed within the term of this
Lease but if any assessment in payable in installments, Tenant
shall only be liable to pay those installments which become due
during the term of this Lease), water, sewer and other rents.
rates and charges, charges for public utilities, excises, levies,
license and permit and inspection fees and other governmental
charges, general and special, ordinary and extraordinary, fore-
seen and unforeseen, of any kind and nature whatsoever, which it
any, time prior to or during the term of this Lease may have  an
or may be assessed, levied, confirmed, imposed upon, or grow
be due, due or payable out of or in respect of, or become a
the Leased Premises or any part thereof or any appurtena  to
thereto, any personal property, the rent and income received by
Tenant from subtenants, any use, possession or occupation of the
Leased Premises, or rentals or sales therefrom or activity con-
ducted therein, such franchises as may be appurtenant to the use
or occupation of the Leased Premises, this transaction or any
document to which Tenant is a party creating or transferring any
right, title or interest or estate in the Leased Premises (all of
the foregoing, together with any and all penalties and/or
interest thereon, being hereinafter sometimes collectively re-

sometimes referred to as an "Imposition"). Nothing herein con-
tained shall require Tenant to pay income or profits taxes asses-
sed against Landlord, or any capital levy, corporation franchise,
excess profits, estate, succession, inheritance or transfer taxes
of Landlord, unless such taxes are imposed or levied upon or
assessed as a total or partial substitute for, or in lieu of, any
other Imposition required to be paid by Tenant pursuant to this
Section 5(b), in which event same shall be deemed Impositions and
shall be paid by Tenant; provided, however, that if at any time
during the term of this Lease, the method of taxation shall be
such that there shall be levied, assessed or imposed on Landlord
a capital levy, gross receipts or other tax directly on the rents
received therefrom and/or a franchise tax or an assessment, levy
or charge measured by or based, in whole or in part, upon such
rents, the Leased Premises (including but not limited to the
acquisition, leasing, use, or value thereof) or the present or
any future Improvements on the Leased Premises or the construc-
tion thereof and/or measured in whole or in part by Landlord's
income from the Leased Premises if in computing such income there
is not allowed as a deduction any significant portion of the
depreciation or interest deductions allowed for federal income
tax purposes, then all such taxes, assessments, levies and
charges, or the part thereof so measured or based, shall be
deemed to be included within the term "Imposition" for the pur-
poses hereof, but only to the extent that such taxes would be
payable if the Leased Premises were the only property of Land-
lord, and Tenant shall pay and discharge the same as herein pro-
vided in respect of the payment of Impositions. Tenant shall
furnish to Landlord, promptly after payment of any Impositions,
official receipts or other satisfactory proof evidencing payment
of such Imposition.   In addition, Tenant shall furnish to Land-
lord, semi-annually, throughout the term of this Lease, a
certificate executed by an executive officer of Tenant, stating

...ure to pay such Impositions or failure to provide proof of such payment or failure to deliver any such certificate, as above provided, Landlord shall have the right, at Landlord's option, to require Tenant to: (i) promptly deposit with Landlord funds for the payment of current Impositions required to be paid by Tenant hereunder; and (ii) also deposit one-twelfth (1/12th) of the current annual Impositions or those of the preceding years if the current amounts thereof have not been fixed, on the first day of each month in advance, except that all additional funds required for any payments thereof shall also be deposited as aforesaid on the first day of the final month during which or at the end of which a payment is due and payable without interest or penalty.

(c) In addition to the foregoing, Tenant shall deposit with Landlord, simultaneous with the payment of each monthly installment of Minimum Rental due hereunder, and at least one (1) full calendar month in advance, an amount equal to the monthly escrow deposits for Impositions, insurance premiums and all other amounts required to be deposited under any Mortgage.

6.  USE.

(a)  Tenant shall be permitted to use the Leased Premises for any and all lawful purposes, subject, however, to zoning ordinances, Laws, the orders, rules and regulations of the Board of Fire Insurance Underwriters and any similar bodies having or asserting jurisdiction thereof now in effect or hereafter adopted by any governmental authority having or asserting jurisdiction, and such conditions, restrictions and other encumbrances, if any, to which the Leased Premises are subject at the time of execution and delivery hereof.

(b)  Tenant shall not use or occupy or permit the Leased Premises to be used or occupied, nor do or permit anything to be done in or on the Leased Premises or any part thereof, in a manner that would in any way violate any certificate of occupancy affecting the Leased Premises or make void or voidable any in-

-6-

balance then in force with respect thereto, or that may make it
impossible to obtain fire or other insurance thereon required to
be furnished hereunder by Tenant, or that will cause or be likely
to cause structural injury to any of the Improvements, or that
will constitute a public or private nuisance or waste.  Nothing
contained in this Lease and no action or inaction by Landlord
shall be deemed or construed to mean that Landlord has granted to
Tenant any right, power or permission to do any act or to make
any agreement that may create, give rise to, or be the foundation
for, any right, title, interest, lien, charge or other encum-
brance upon the estate of Landlord in the Leased Premises.

### 7.   COMPLIANCE WITH LAWS AND AGREEMENTS.

(a)   Tenant shall, throughout the term of this Lease,
and at Tenant's sole cost and expense, promptly comply, or cause
compliance:  (i) with all Laws, whether present or future, fore-
seen or unforeseen, ordinary or extraordinary, and whether or not
the same shall be presently within the contemplation of Landlord
and Tenant or shall involve any change of governmental policy, or
require structural or extraordinary repairs, alterations, or
additions, and irrespective of the cost thereof, which may be
applicable to the Leased Premises, and (ii) with any agreements,
contracts, easements and restrictions affecting the Leased Prem-
ises or any part thereof or the ownership, occupancy of a
thereof existing on the date hereof or hereafter created or
Tenant, or consented to or requested by Tenant.

(b)   Except as expressly provided in subsection 12(f)
of this Lease, no abatement, diminution or reduction in Minimum
Rental, additional rent or any other charges required to be paid
by Tenant pursuant hereto shall be claimed by or allowed to
Tenant for any inconvenience or interruption, cessation, or loss
of business caused directly or indirectly, by any present or
future Laws, or by priorities, rationing or curtailment of labor
or materials, or by war, civil commotion, strikes or riots, or
any manner or thing resulting therefrom, or by any other cause or

beyond the control of Landl    r Tenant, nor shall this
    be affected by any such caus    .nd, except as expressly
provided in subsection 12(f) of this Lease, no diminution in the
amount of the space used by Tenant caused by legally required
changes in the construction, equipment, fixtures, motors,
machinery, operation or use of the Leased Premises shall entitle
Tenant to any abatement, diminution or reduction of the rent or
any other charges required to be paid by Tenant pursuant to the
terms of this Lease.

8.    MAINTENANCE AND REPAIR.

(a)   Tenant shall promptly throughout the term of this
Lease at Tenant's cost and expense, take good care of and main-
tain the Leased Premises and all roadways, sidewalks, curbs and
trackage rights, if any (to the extent the same are subject to
Tenant's control) on, adjacent and appurtenant thereto, in good
order and repair, and shall promptly remove all accumulated snow,
ice and debris from any and all roadways, sidewalks and curbs
located upon or appurtenant to the Leased Premises and from any
and all other sidewalks and curbs adjacent to the Leased Premises
(to the extent the same are subject to Tenant's control).

(b)   Tenant shall not commit or suffer to be committed
any waste upon or about the Leased Premises, and shall promptly
at its cost and expense, make all necessary replacements, re-
decorations, renewals and repairs to the Leased Premises and ap-
purtenances there to, whether interior or exterior, structural or
non-structural, ordinary or extraordinary, and foreseen or un-
foreseen, ordinary wear and tear excepted. Repairs, restora-
tions, renewals and replacements shall, to the extent possible,
be at least equivalent in quality to the original work or the
property replaced, as the case may be. Tenant shall not make any
claim or demand upon or bring any action against the Landlord for
any loss, cost, injury, damage or other expense caused by any
failure or defect, structural or non-structural, of the Leased
Premises or any part thereof.

(c) Landlord shall not under any circumstances be required to build any improvements on the Leased Premises, or to make any repairs, replacements, alterations or renewals of any nature or description to the Leased Premises or to any of the Improvements, whether interior or exterior, ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever in connection with this Lease or to inspect or maintain the Leased Premises in any way. Tenant hereby waives the right to make repairs, replacements, renewals or restorations at the expense of Landlord pursuant to any Laws.

9. **CHANGES, ALTERATIONS AND NEW CONSTRUCTION BY THE TENANT.**

(a) Tenant, at its sole cost and expense, shall have the right at any time and from time to time during the term of this Lease to make changes and alterations to the building or buildings on the Leased Premises or to construct new buildings thereon or replace any building or buildings damaged or destroyed

.. of the foregoing are hereinafter collectively called "Tenant Changes" and any of the foregoing is called a "Tenant Change"), subject, however, in all cases, to the following:

(i) Landlord's prior written consent shall be required in each instance of any Tenant's Change involving the structure or exterior of any building (which consent shall not be unreasonably withheld; it shall not be unreasonable for Landlord to withhold such consent if the same shall be in violation of any Mortgage or if any Mortgagee shall not give its consent to the same);

(ii) In addition to the consent required under Section 9(a)(i) above, any Tenant Change or Tenant Changes, whether or not structural or exterior, involving an estimated cost of more than One Hundred Thousand ($100,000.00) Dollars shall require the prior written consent of the Landlord and any Mortgagee, (which consent shall not be unreasonably withheld; it shall not be unreasonable for Landlord to withhold such consent if the same shall be in violation of any Mortgage or if any Mortgagee shall not

be given or

w.    ...d by Landlord within fourteen (14) days after receipt by Landlord of all by documents required under this Lease to be supplied by Tenant in connection with such Tenant Change, if the cost of such Tenant's Changes is less than $250,000.00 or within thirty (30) days if the cost of such Tenant's Change equals or exceeds $250,000.00.  Failure of Landlord to respond in writing within the above stated periods of time shall be deemed to be consent by Landlord to any such Tenant Change(s).

(iii)    No Tenant Change shall be undertaken until the Tenant shall have procured and paid for all required permits and authorizations of all municipal departments and governmental subdivisions having jurisdiction; and, at Tenant's expense, the Landlord shall join in application for such permits and authorizations whenever such action is necessary;

(iv)    Any Tenant Change involving an estimated cost of more than One Hundred Thousand ($100,000.00) Dollars shall be conducted under the supervision of a licensed architect o engineer selected by Tenant and shall be made in accordance with detailed plans and specifications (the "Plans and Specifications") and cost estimates prepared by such architect o. .. ... and approved in writing by the Landlord, which approval Land ... o agrees not unreasonably to withhold;

.v.    Any Tenant Change shall be made promptly and in a good workmanlike manner and in compliance with all applicable permits and authorizations and building and zoning laws and all Laws and in accordance with the orders, rules and regulations of the Board of Fire Insurance Underwriters and any other body hereafter exercising similar functions having or asserting jurisdiction over the Leased Premises;

(vi)    The cost of any Tenant Change shall be paid in cash or its equivalent by the Tenant, so that the Leased Premises shall at all times be free of liens for labor or materials supplied or claimed to have been supplied to the Leased Premises.

-10-

immediately upon in-
corporation into the Leased Premises be and become the property
of the Landlord, subject to the leasehold rights of the Tenant
hereunder;

(viii)    Tenant shall carry all necessary Worker's Compen-
sation Insurance and shall furnish Landlord with evidence of any
and all such coverage;

(ix)    If any Tenant Change involving an estimated cost
in excess of One Hundred Thousand ($100,000.00) Dollars is under-
taken by Tenant pursuant to the provisions of Section 11 or 12 of
this Lease, then each request for payment shall be made on seven
(7) days prior notice to Landlord and Mortgagee and shall be ac-
companied by a certificate to be made by the supervising archi-
tect or engineer, stating (a) that all of the work completed has
been done in compliance with the approved Plans and Specifica-
tions, (b) that the sum requested is justly required to reimburse
the Tenant for payments by the Tenant, to, or is justly due to,
the contractor, subcontractors, materialmen, laborers, engineers,
architects or other persons rendering services or materials for
the work (giving a brief description of such services and mate-
rials), and that, when added to all sums previously paid out by
the Landlord, it does not exceed ninety (90%) percent of the
value of the work done to the date of such certificate, with
final payment of the balance of the cost of the work to be made
for y-three (/, days after certification by the supervising
architect or engineer and by the Mortgagee's architect as to com-
pletion in accordance with the approved Plans and Specifications,
and (c) that the amount of such proceeds remaining in the hands
of the Landlord will be sufficient on completion of the work to
pay for the same in full (giving in such reasonable detail as
Landlord may require an estimate of the cost of such completion);

(x)    If any Tenant Change involving an estimated cost
in excess of One Hundred Thousand ($100,000.00) Dollars is under-
taken by Tenant pursuant to the provisions of Section 11 or 12 of
this Lease, then each request for reimbursement shall be accom-

-11-

and Mortgagee covering that part of the work for which payment or reimbursement is being requested and by a search prepared by a title company or licensed abstractor or by other evidence, satisfactory to Landlord and Mortgagee, that there has not been filed with respect to any part of the Leased Premises any mechanics' or other lien or instrument for the retention of title in respect of any of the work not discharged of record;

(xi)    If any Tenant Change involving an estimated cost in excess of One Hundred Thousand ($100,000.00) Dollars is undertaken by Tenant pursuant to the provisions of Section 11 or 12 of this Lease, then the request for any payment after the work has been completed shall be accompanied by a copy of any certificate or certificates required by law to render occupancy of the Leased Premises and all portions thereof legal;

(xii)   No Tenant Change shall tie-in or connect the Leased Premises or any Improvements thereon with any property outside the Leased Premises without the prior written consent of the Landlord, which consent shall not be unreasonably withheld;

(xiii)  No Tenant Change shall reduce the value of the Leased Premises or impair the structural integrity of any building comprising a part of the Leased Premises;

(xiv)   In connection with any replacement of a building or buildings not undertaken pursuant to the provisions of Section 12 hereof, Landlord may as a condition of its consent require Tenant to post a completion or performance bond or other security reasonably satisfactory to Landlord to insure the completion of such replacement; and

(xv)    At the request of Tenant at the time of the undertaking of any Tenant's Change, Landlord shall state in writing whether the Tenant's Change in question will be required by Landlord to be removed from the Leased Premises by Tenant at the expiration or sooner termination of the term of this Lease, as provided in Section 22.

-12-

(b)   Notwithstanding any ` ; to the contrary contained in this Lease, Tenant shall not, without Landlord's prior written approval, make any alteration or change to the Leased Premises which would decrease the size of or decrease the square foot floor area of any building comprising a part of the Leased Premises.

10.   INDEMNITY AND PUBLIC LIABILITY INSURANCE.

(a)   Tenant shall at all times indemnify Landlord for, defend Landlord against, and save Landlord harmless from, any liability, loss, cost, injury, damage or other expense whatsoever that may occur or be claimed by or with respect to any person(s) or property on or about the Leased Premises and resulting directly or indirectly from the use, misuse, occupancy, possession or unoccupancy of the Leased Premises by Tenant or any concessionaires, subtenants or other persons claiming through or under Tenant, or their respective agents, employees, licensees., ... vivees, guests or other such persons, or from the condition of the Leased Premises. Tenant shall, at its cost and expens ( defend against any and all such actions, claims and demands and shall indemnify Landlord for all costs, expenses and liabilities it may incur in connection therewith. Landlord shall not in ...ant whatsoever be liable for any injury or damage to the leased premises or to the Tenant or to any concessionaires, subtenants or other persons claiming through or under Tenant, or ti, r respective agents, employees, licensees, invitees, guests or other such persons or to any property of any such persons. Tenant shall not make any claim or demand upon or institute any action against the Landlord as a result of such injury or damage.

(b)   Tenant, at its cost and expense, shall obtain and maintain in force throughout the term of this Lease, comprehensive general liability insurance against any loss, liability or damage on, about or relating to the Leased Premises, with limits of not less than One Million ($1,000,000.00) Dollars for death or injuries to one person and not less than Three Million ($3,000,000.00) Dollars for death or injuries to two or more per-

Hundred Thousand (9,..,000.00) Dollars for damage to property which insurance may contain a deductible not to exceed $10,000.00 per casualty occurrence. Any such insurance obtained and maintained by Tenant shall name both Landlord and Tenant as the insured parties therein and shall be obtained and maintained from and with a reputable and financially sound insurance company(ies) reasonably acceptable to Landlord, authorized to issue such insurance in the State in which the Leased Premises is located.

(c)  The policies of insurance required hereunder shall contain an agreement by the insurer that it will not cancel or modify such policy except after fifteen (15) days prior written notice to Landlord by certified mail, return receipt requested. Not less than thirty (30) days prior to the expiration of any such insurance policy, Tenant shall deliver to Landlord a certificate evidencing the replacement or renewal thereof.

(d)  Tenant shall furnish Landlord with duplicate original(s) or original certificate(s) of such insurance policies, including renewal and replacement policies, together with written evidence that the premiums therefor have been paid. It is understood and agreed that said policies may be blanket policies covering other locations operated by Tenant, its affiliates or subsidiaries, provided that such blanket policies otherwise comply with the provisions of this Section 10.

(e)  Tenant shall comply with the requirements of any Mortgages relating to the insurance and to the proceeds of insurance maintained and required to be maintained by Tenant pursuant to the provisions of Section 10 and 11 of this Lease.

11.   INSURANCE FOR DAMAGE OR DESTRUCTION AND
      WORKER'S COMPENSATION

(a)  The Tenant shall, throughout the term of this Lease, at its own cost and expense, obtain and maintain in full force and effect and in the name of Tenant, Landlord and, if so requested by Landlord, any Mortgagees (except that Landlord and

-14-

gagee need not be named on workers' compensation pol-
icy);

(i)    all risks insurance, including but not limited to col-
lapse, loss or damage occasioned by fire, the perils included in
the so-called extended coverage endorsement, vandalism and mali-
cious mischief, and water damage and containing Replacement Cost,
Agreed Amount and Demolition and Increased Cost due to Ordinance
endorsements covering the Improvements and all replacements and
additions thereto, and all fixtures, equipment and other personal
property therein, the foregoing coverage shall be provided in
amounts sufficient to provide one hundred (100%) percent of the
full replacement cost of the Improvements (which insurance may
contain a deductible not to exceed $10,000.00 per casualty
occurrence) and shall be determined from time to time, but not
more frequently than once in any thirty-six (36) calendar months,
at Tenant's expense, at the request of the Landlord, by any
appraiser selected by Tenant and approved by Landlord and the
insurance carrier;

(ii) if a sprinkler system shall be located in the Leased
Premises, sprinkler leakage insurance in amounts reasonably
satisfactory to Landlord and any Mortgagees;

(iii)   such other insurance and in such amounts as may from
time to time be required by the holder of the Existing Mortgage
and the Replacement Mortgage and as may be reasonably required by
any other Mortgagee;

(iv) Boiler and Machinery Broad Form policy covering explo-
sion insurance in respect of steam and pressure boilers and simi-
lar apparatus, if any, located on the Leased Premises in an
amount equal to one hundred (100%) percent of the full replace-
ment cost of the Improvements (which insurance may contain a
deductible not to exceed $10,000.00 per casualty occurrence);

(v)  war risk insurance as and when such insurance is ob-
tainable from the United States Government or any agency or in-
strumentality thereof, and a state of war or national or public
emergency exists or threatens, and in an amount not less than the
full insurable value of the Leased Premises;

-15-

(vi) Worker's Compensation insurance subject to statutory limits or better in respect of any work or other operations on or about the Leased Premises;

(vii) such other insurance with respect to the Leased Premises and in such amounts as Landlord from time to time may reasonably request against such other insurable hazards which at the time in question are commonly insured against in the case of property similar to the Leased Premises; and

(viii) during the performance of any construction, broad form Builder's All-Risk insurance.

(b) All such insurance shall:

(i) be obtained from and maintained with reputable and financially sound insurance company(ies) reasonably acceptable to Landlord and any Mortgagees, authorized to issue such insurance in the State in which the Leased Premises are located;

(ii) be reasonably satisfactory to Landlord and be satisfactory to any Mortgagees;

(iii) except for rent insurance, if any, provide that the proceeds of any loss shall be payable to Landlord, or if Landlord so requests to any Mortgagees, for the purposes set forth in this Lease;

(iv) contain an agreement by the insurer that it will not cancel or modify such policy except after ten (10) days' prior written notice to Landlord and any Mortgagees by certified mail, return receipt requested; and

(v) provide that any loss otherwise payable thereunder shall be payable notwithstanding any act or negligence of Landlord or Tenant which might, absent such agreement, result in a forfeiture of all or part of the payment of such loss.

(c) Not less than thirty (30) days prior to the expiration of any such insurance policy, Tenant shall deliver to Landlord a certificate evidencing the replacement or renewal thereof.

(d) The Tenant shall furnish Landlord and any Mortgagees with duplicate original(s) or original certificate(s) together with true copy(ies) of all such insurance policies,

-16-

including renewal and replacement policy(ies), together with written evidence that the premiums therefor have been paid. It is understood and agreed that said policies may be blanket policies covering other locations operated by Tenant, its affiliates or subsidiaries, provided that such blanket policies otherwise comply with the provisions of this Section 11, and provided further that such policies shall provide for a reserved amount thereunder with respect to the Leased Premises so as to assure that the amount of insurance required by the provisions of this Section 11 will be available notwithstanding any losses with respect to other property covered by such blanket policies.

(e)  If any portion of the Leased Premises is damaged or destroyed by fire or other casualty, Tenant shall forthwith give notice thereof to Landlord and Tenant shall, except as provided in subsection (k) hereof, at its cost and expense, as soon as reasonably possible with all due diligence after such damage or destruction (but in no event later then six (6) months after such damage or destruction) commence to repair, restore, rebuild or replace the damaged or destroyed Improvements, fixtures or equipment, and complete the same as soon as reasonably possible, but in no event later than eighteen (18) months after the commencement thereof, to the same character and condition they were in prior to such damage or destruction and having the same appearance except for such changes in design or materials as may be required by Law. The Landlord, in such event, shall, to the extent and at the times the insurer and any Mortgagees make the proceeds of the insurance available, reimburse the Tenant for the costs of making such repairs, restoration, rebuilding and replacements, provided further that said reimbursements need be made only under such conditions that any Mortgagee may require, and provided further that said reimbursements need be made only under such conditions that the Landlord and any Mortgagees are assured that at all times the Leased Premises shall be free of liens or claims of liens by reason of such work, and provided further that the portion of the proceeds paid out at any time

shall not exceed the value of the actual work and materials
incorporated in the repaired, restored, rebuilt or replaced
Leased Premises, that the conditions described in Section 9 are
complied with, and that no insurer claims any rights of
participation and/or assignment of rights with respect to the
indebtedness secured by any Mortgage. To the extent, if any,
that the proceeds of insurance made available as aforesaid are
insufficient to pay the entire cost of making such repairs, re-
storation, rebuilding and replacements, and notwithstanding the
expiration or termination of the term of this Lease, the Tenant
shall pay the amount by which such costs exceed the insurance
proceeds made available as aforesaid. Any surplus of insurance
proceeds over the cost of restoration shall be the property of
the Tenant, but subject to the rights of any Mortgagee to receive
such surplus pursuant to the provisions of any Mortgage. If
there shall occur a loss or damage to the Leased Premises in
excess of fifteen (15%) percent of the replacement cost of the
entire Leased Premises and if upon the date of completion of such
work there shall be less than three (3) years remaining in the
then term of this Lease or if the term of this Lease shall expire
before the completion of such restoration, Landlord and Tenant
agree that, not withstanding the provisions of Section 2(b)
hereof, and only if the term of this Lease is not extended to at
least the third (3.d) anniversary of the completion date of such
work pursuant to the provisions of Section 2(b) hereof, the term
of this Lease shall be automatically extended to the third (3rd)
anniversary of the completion date of such work. Should such
loss or damage occur subsequent to twelve (12) months prior to
the then expiration of the term of this Lease and Tenant has not
exercised its right to extend the term of this Lease pursuant to
Section 2 (b) hereof, Tenant shall have the right to extend the
term of this Lease by notice to Landlord given within sixty (60)
days of the date of such loss or damage. Upon such completion
date, Landlord and Tenant agree to execute and deliver, in
recordable form, a supplemental agreement setting forth the date

th the term of this Lease is .   ded as aforesaid.  Should
such loss or damage occur subsequent to twelve (12) months prior
to the then expiration date of the term of this Lease and should
Tenant not elect to extend within said sixty (60) day period as
aforesaid so that the term of this Lease is automatically extended as
aforesaid, then notwithstanding the provisions of Section 2(b) hereof,
Tenant shall have no further right or option to extend the term
of this Lease.

(f)  In the event of any damage to or destruction of
the Leased Premises, Tenant shall promptly notify Landlord and
any Mortgagees and shall file prompt proof of loss to the rele-
vant insurance company(ies).  Tenant shall have the right to set-
tle and adjust such loss with the relevant insurance company, but
any such settlement shall be subject to Landlord's approval,
which approval shall not be unreasonably withheld.  If Tenant
does not settle such loss as aforesaid within six (6) months from
the date of loss Landlord shall thereafter have the right to set-
tle such loss without the consent or approval of Tenant and
Tenant shall be bound by any such settlement.

(g)  The obligation to pay the rent provided for herein
and to otherwise perform Tenant's obligations hereunder shall
continue unabated by reason of such damage or destruction; that
is, there shall be no abatement or diminution of rent or release
from any of Tenant's obligations hereunder by reason of such dam-
age or destruction regardless of the period of time, if any,
during which the Leased Premises or any part thereof remain
untenantable, any Laws to the contrary notwithstanding, except to
the extent Landlord shall actually receive the proceeds of rent
insurance as its sole property.

(h)  The provisions and requirements of Section 9 shall
apply with respect to any repairing, restoring, rebuilding or
replacing made pursuant hereto; and same shall be made in accor-
dance with the Plans and Specifications to the extent same is
practicable.

(i)  As to any loss or damage which may occur upon the
property of a party hereto and be collected under any insurance

the other from any and
all liability for such loss or damage to the extent of such
amounts collected.

(j) Except for business interruption insurance, Tenant
shall not take out separate insurance concurrent in form or con-
tributing in the event of loss with that required to be furnished
by Tenant under Sections 10 and 11 of this Lease, unless Land-
lord, and with respect to the insurance described in Section 11,
any Mortgagees designated by Landlord, are included therein as
named insureds, with loss payable as in said Sections provided.
Tenant shall immediately notify Landlord whenever any such sepa-
rate insurance is taken out and shall deliver to Landlord dupli-
cate original(s) thereof, or original certificate(s) evidencing
the same with true copies thereof, as provided in this Lease.

(k) Notwithstanding the provisions of subsection (e
of this Section 11, if during the last twelve (12) months of the
term of this Lease, as such term may have been extended, there
shall occur a loss or damage to the Leased Premises in excess of
fifty (50) percent of the replacement cost of the entire Leased
Premises, the Landlord shall have the right, exercisable upon
written notice to Tenant within sixty (60) days of the occurrence
of the damage or destruction, to cancel the term of this Lease
upon a date set forth in Landlord's notice. If any Mortgage
shall be in effect upon the date of Landlord sending such
cancellation notice, any cancellation of this Lease by Landlord
as aforesaid, shall be of no force or effect whatsoever unless
accompanied by the written consent thereto of all Mortgagees.
Should Landlord make such election, Tenant shall pay to Landlord
on or before the cancellation date selected by Landlord as afore-
said, the aggregate of (x) the entire cost of making the repairs,
restoration, rebuilding and replacement of the Leased Premises as
required by this Lease as if this Lease had not been cancelled
based upon the original plans and specifications for the Improve-
ments, and (y) all of the Minimum Rental which would have been
payable by Tenant through the stated termination date of this

-20-

(z) all other
sums then due and payable under this Lease to and including the
cancellation date selected by Landlord as aforesaid. Should the
parties fail to agree upon the sum payable pursuant to subsection
(x) above, such issue shall be submitted to arbitration in the
City of Boston, Massachusetts before the American Arbitration
Association and judgment may be entered upon the award of the
arbitrators in such proceeding.

    12.    CONDEMNATION AND REJECTABLE OFFER.

        (a)  In the event that at any time during the term of
this Lease, title to the whole or materially all of the Leased
Premises shall be taken by the exercise of the right of condemna-
tion or eminent domain or by agreement between the Landlord and
those authorized to exercise such right, this Lease shall ter-
minate and expire on the date of such taking (herein called the
"Taking Date") and the rent provided to be paid by the Tenant
shall be apportioned and paid to the Taking Date.

        (b)  If (i) twenty-five (25%) percent or more of the
main building on the Leased Premises shall be taken, or
(ii) twenty-five (25%) percent or more of the parking accommoda-
tions shall be taken, or (iii) all reasonable means of ingress
and egress to and from the Leased Premises are permanently elim-
inated by reason of such a taking, then and in any of such
events, Landlord and Tenant shall each have the right to ter-
minate this Lease as of on the next date for payment of Minimum Rent
occurring at least one hundred twenty (120) days after notice to
the other given within ninety (90) days after the Taking Date;
provided, however, that Tenant may not terminate this Lease by
reason of any such reduction of the parking accommodations if
prior to the actual reduction Landlord shall have provided sub-
stitute parking areas adjacent to or in the immediate vicinity of
the Leased Premises, which, together with the remaining parking
accommodations, are sufficient to produce accommodations equal to
seventy-five (75%) percent of the accommodations existing prior
to such taking and which substitute parking areas comply with

-21-

(c)   If and when it shall be established that this Lease shall terminate pursuant to the provisions of subsection (a) or (b) of this Section 12, then Tenant shall (i) be deemed to have hereby made an irrevocable offer (the "Offer") to purchase the Leased Premises and Landlord's right to the award payable in connection with such taking as of the Taking Date, at a price (the "Purchase Price") determined in accordance with Schedule B attached hereto, and (ii) if less than the entire Leased Premises shall have been taken, and Tenant elects to cancel as a result thereof Tenant shall deliver to Landlord a certificate of Tenant, signed by the President or any Vice President thereof, stating that, in the judgment of the Board of Directors of Tenant, the portion of the Leased Premises or the means of ingress and egress so taken is sufficient to fulfill the conditions set forth in subdivisions (i), (ii) or (iii) of subsection (b) of this Section 12. Notwithstanding the foregoing, in the event that this Lease shall terminate pursuant to the provisions of this Section 12 during any Extended Term to which the Initial Term is extended pursuant to any provisions of this Lease, then the foregoing provisions of this subsection (?(c) shall be inapplicable and of no force or effect.

(d)   If Landlord desires to accept the Offer it will notify Tenant of such acceptance (the "Acceptance Notice") and the procedures specified in subsection (e) hereof shall be applicable except that the Closing Date shall be a date specified by Landlord in the Acceptance Notice which date shall be not less than thirty (30) days nor more than sixty (60) days from the date thereof but in no event shall the Closing Date be prior to the Taking Date. If Landlord shall reject the Offer by notice given to Tenant not later than the tenth (10th) day prior to the Taking Date, then, except with respect to obligations and liabilities of Tenant under this Lease, actual or contingent, which have arisen on or prior to the Taking Date, this Lease shall terminate on the Taking Date upon payment by Tenant of all installments of Minimum

-22-

and all other sums then due payable under this Lease including the Taking Date. thing herein contained to the contrary notwithstanding, if the Taking Date occurs, and any Mortgages are then in effect, any rejection by Landlord of the Offer shall be of no force or effect whatsoever unless accompanied by the written consent thereto of all Mortgagees.

(e)    If Landlord shall not have rejected the Offer as provided in subsection (d) above, or if Landlord makes such rejection without the consent (if required) of any Mortgagees, then Tenant shall forthwith give written notice thereof (the "Final Notice") to Landlord, and if such rejection is not made and/or such consent is not given, as the case may be, within five (5) days after Landlord's receipt of the Final Notice from Tenant, then Landlord shall be conclusively presumed to have accepted the Offer, and on a date (the "Closing Date") which shall be specified by Tenant in the Final Notice, but not more than thirty (30) days from the date of the Final Notice, Landlord shall transfer, convey or assign to Tenant or its designee upon the terms and provisions set forth in subsections 23(a) and 23(b) hereof, all of Landlord's right, title and interest, if any, in (i) the Leased Premises, and (ii) the "Net Award" (as hereinafter defined), (whether or not such "Net Award" or any part thereof shall have been received by Landlord). Concurrently with such transfer, conveyance or assignment, Tenant shall pay the purchase price thereof to Landlord together with all installments of Minimum Rental and all other sums then due and payable under this Lease to and including such Closing Date minus, however, any part of the Net Award which may theretofore have been received by Landlord. In the event of the termination of this Lease pursuant to this Section 12, and only if Tenant shall have purchased the Leased Premises pursuant to this Section 12, Tenant or its designee shall be entitled to the "Net Award" payable in connection with such taking (the entire award less all of Landlord's expenses related thereto being herein called the "Net Award") and Tenant shall succeed to all of Landlord's rights in any negotia-

Notwithstand-

ing, anything contained in this Lease to the contrary (i) in the
event of the termination of this Lease pursuant to this
Section 12, and if Tenant shall not have purchased the Leased
Premises pursuant to the provisions of this Section 12, or
(ii) if this Lease is terminated pursuant to the provisions of
this Section 12 after the expiration of the Initial Term of this
Lease, then, in either of such events, Landlord shall be entitled
to the entire award payable in connection with such taking.

(f)  In the event of any taking of the Leased Premises
and if this Lease shall not terminate as provided in subsections
12(a) and 12(b) above, then this Lease shall continue unaffected
(except as hereinafter specifically otherwise provided) and the
Landlord shall be entitled to all awards, damages, consequential
damages and compensation for such taking and the Tenant shall not
be entitled to share in any such award or have any claim against
Landlord for any part thereof, provided: (i) Landlord shall, to
the extent the Net Award paid for the Improvements on the Leased
Premises is made available to Landlord, by the condemning
authority and any Mortgagee, reimburse Tenant for its cost of
demolition, repair rebuilding and restoration to return the
improvements to a tenantable condition, as and when expended, and
paid in like manner and subject to the provisions and conditions
contained in Section 9 above, which provisions and conditions
shall be deemed to apply to such demolition, repair, rebuilding
and restoration; and (ii) the Minimum Rental payable by Tenant to
Landlord under Section 3 hereof, from and after the date of
restoration of the Leased Premises, shall be reduced by an amount
equal to the product obtained by mutiplying the amount of the Net
Award retained by Landlord, if any, after restoration of the
Leased Premises by Tenant, as provided herein, by 11.75%. In the
event of any taking which does not result in a termination of
this Lease, Tenant shall promptly make such demolition, repair,
rebuilding and restoration as are necessary to return the Leased
Premises to a tenantable condition (in accordance with the Plans

-24-

able), and in

t    vent that the cost of such dem.....tion, repair, rebuilding
and restoration shall exceed the Net Award collected by the Land-
lord, the Tenant shall pay the deficiency. Notwithstanding the
provisions of this subsection (f), in the event any Mortgagee
elects not to apply the condemnation proceeds for restoration of
the Leased Premises, but elects to apply the Net Award in reduc-
tion of its Mortgage, Tenant shall nevertheless be required to
demolish, repair, rebuild and restore the Leased Premises as
provided herein and shall be required to use its own funds for
such purposes without reimbursement therefore, in whole or in
part, by Landlord, such Mortgagee or any other party.

(g)   In the event Landlord is advised of an impending
condemnation, the Landlord shall give notice of such fact to the
Tenant and the Tenant, at its election, shall be entitled to
participate in any negotiations or litigation with the condemning
authority.

(h)   Notwithstanding the foregoing, Tenant, at its cost
and expense, shall be entitled to separately claim, in any con-
demnation proceeding, any damages payable for movable trade fix-
tures paid for and installed by Tenant (or any persons claiming
under Tenant) without any contribution or reimbursement ther .c.
by Landlord, and for Tenant's loss of business, and for Ten.a  's
relocation costs; provided Landlord's award is not reduced c
otherwise adversely affected thereby.

13.   REMOVAL OF TENANT'S PROPERTY.

Provided the Tenant is not then in default hereunder,
the Tenant shall have the right, at any time during the term of
this Lease, to remove "Tenant's Property", consisting of machi-
nery, trade equipment, business and trade fixtures, and other
trade equipment placed, installed, supplied or made by it in or
on the Leased Premises at Tenant's cost and expense (without any
contribution or reimbursement therefor by Landlord), and which
may be removed without material injury to the Leased Premises;
provided, however, that any damage to the Leased Premises or any

-25-

repaired by the Tenant's cost and expense. As used herein and hereafter, the term "Tenant's Property" shall not include or be deemed to include any item now or hereafter installed in or on the Leased Premises that is an integral part of the building, including, without limiting the generality of the foregoing, heating, ventilating, and air conditioning plants and systems, electrical and plumbing fixtures and systems and other like equipment and fixtures, if any. Upon request of Tenant, Landlord agrees to confirm in writing, in form reasonably acceptable to Landlord, that Landlord's interest in Tenant's Property is as set forth in this Section 13 and that Landlord waives any other rights under this Lease in Tenant's Property.

14. SUBORDINATION, NON-DISTURBANCE, NOTICE TO LESSORS AND MORTGAGEES.

(a) This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate in all respects to all ground and underlying leases of all or any portions of the Leased Premises, now or hereafter existing, and to all Mortgages which may now or hereafter affect all or any portions of the Leased Premises and/or any of such leases, to each and every advance made or hereafter to be made under such Mortgages, and to all renewals, modifications, replacements and extensions of such leases and Mortgages and spreaders and consolidations of such Mortgages; provided, that, as to any such leases and Mortgages that become liens of record after the date of this Lease (i) the lessors and/or Mortgagees thereunder shall each enter into a non-disturbance agreement, in favor of Tenant, to provide that in the event its said Mortgage shall be foreclosed or its said lease shall be terminated, as the case may be, and provided that Tenant is not then in default hereunder, this Lease shall not terminate on account thereof so long as the Tenant continues to pay the rents reserved in this Lease and otherwise performs and observes all of the terms, covenants, conditions and provisions of this Lease to be performed and observed by or on behalf of Tenant

-26-

under, and (ii) such leases at. Mortgages shall provide
(or the lessors thereunder and/or the holders thereof, as the
case may be, shall separately agree) that so long as Tenant is
not in default under this Lease beyond any period herein permit-
ted to cure same, the proceeds of any insurance on the Leased
Premises payable by reason of fire or other insured casualty and
of any award for any partial taking by eminent domain (not resul-
ting in termination of this Lease as herein provided), shall
first be applied in payment of the cost of restoring the Leased
Premises after such injury or taking, before any part of such
proceeds or award shall be paid to any such lessors as its or
their property and before any part of such proceeds or award
shall be applied on account of any part of such mortgage debts.
The provisions of this subsection (a) shall be self-operative and
no further instrument of subordination shall be required.  In
confirmation of such subordination, Tenant shall promptly execute
and deliver any instruments that Landlord, the lessor of any such
lease or the holder of any Mortgage, or any of their respective
successors in interest, may reasonably request to evidence such
subordinations, and Tenant hereby irrevocably appoints Landlord
the attorney-in-fact of Tenant to execute and deliver such in-
strument on behalf of Tenant, should Tenant refuse or fail to do
so promptly after request, such power being coupled with an
interest.  The lease(s) to which, at the time in question, this
Lease is subject and subordinate are hereinafter sometimes called
"Superior Lease(s)" and the Lessor(s) of a Superior Lease or its
(their) successor(s) in interest, at the time in question, is
(are) sometimes hereinafter called "Superior Lessor(s)".  If any
Superior Lease (or a memorandum thereof) or any Mortgage shall
not be recorded, the subordination provided for in this Section
shall not be effective unless and until Tenant shall have re-
ceived notice from Landlord or from the Superior Lessors or the
Mortgagees thereunder (as the case may be) of the existence of
such Superior Lease or Mortgage (as the case may be).  If any
Mortgagees shall, from time to time, so require, this Lease shall

-27-

be   or in lien to the lien of its    their respective Mort-

gages.

(b)   In the event of any act or omission of Landlord
which would give Tenant, subject to the provision of Section 31
hereof, any right against the Landlord, immediately or after
lapse of a period of time, Tenant shall not exercise such right
(i) until it has given written notice of such act or omission to
each Mortgagee and each Superior Lessor whose name and address
shall previously have been furnished to Tenant in writing, and
(ii) unless such act or omission shall be one which is not ca-
pable of being remedied by Landlord or any Mortgagee or Superior
Lessor within a reasonable period of time, until a reasonable
period for remedying such act or omission shall have elapsed fol-
lowing the giving of such notice and following the time when all
such Mortgagees and Superior Lessors shall have become entitled
under such Mortgages or Superior Leases, as the case may be, to
remedy the same (which reasonable period shall in no event be
less than the period to which Landlord would be entitled under
this Lease or otherwise, after similar notice, to effect such
remedy), provided any such Mortgagee or Superior Lessor shall
with due diligence give Tenant written notice of its intention to
and shall commence and continue to remedy such act or omission
but nothing herein contained shall obligate any Mortgagee or
Superior Lessor to do so unless it so elects.

(c)   If a Superior Lessor or a Mortgagee shall succeed
to the rights of Landlord under this Lease, whether through pos-
session or foreclosure action or delivery of a new lease or deed,
then at the request of such party so succeeding to Landlord's
rights (herein sometimes called "Successor Landlord") and upon
such Successor Landlord's written agreement to accept Tenant's
attornment which such Successor Landlord shall agree to accept if
so requested by Tenant, Tenant shall attorn to and recognize such
Successor Landlord as Tenant's landlord under this Lease, and
shall promptly execute and deliver any instrument that such Suc-
cessor Landlord may reasonably request to evidence such attorn-

ment. Tenant hereby irrevocably appoints Landlord the attorney-
in-fact of Tenant to execute and deliver such instrument on be-
half of Tenant, should Tenant refuse or fail to do so promptly
after request, such power being coupled with an interest.  Upon
such attornment this Lease shall continue in full force and ef-
fect as, and as if it were, a direct lease between the Successor
Landlord and Tenant upon all of the terms, covenants and condi-
tions set forth in this Lease, and all such terms, covenants and
conditions shall be applicable after such attornment except that
the Successor Landlord shall:

(i)  not be liable for any previous act or omission of Land-
lord under this Lease,

(ii) not be subject to any offset, not expressly provided
for in this Lease, which shall have theretofore accrued or which
may thereafter accrue to Tenant against Landlord, and

(iii)     not be bound by any previous modification of this
Lease, not expressly provided for in this Lease, other than a
modification of this Lease executed by Landlord and Tenant prior
to the execution of any Superior Lease or Mortgage, or by any
previous prepayment of more than one months Minimum Rental, un-
less such modification or prepayment shall have been expressly
approved in writing by the Superior Lessor(s) or the Mortgagee(s)
through or by reason of which the Successor Landlord shall have
succeeded to the rights of Landlord under this Lease.

15.   NON-WAIVER.

Neither a failure by the Landlord to exercise any of
its options hereunder, nor failure to enforce its rights or seek
its remedies upon any default, nor the acceptance by the Landlord
of any rent accruing before or after any default, shall effect or
constitute a waiver of the Landlord's right to exercise such op-
tion, to enforce such right, or to seek such remedy with respect
to that default or to any prior or subsequent default.  The rem-
edies provided in this Lease shall be cumulative and shall not in
any way abridge, modify or preclude any other rights or remedies
to which the Landlord may be entitled either at law or in equity.

-29-

If the Tenant pays the rent it is obligated hereunder
to pay, and observes all other terms, covenants and conditions
hereof, it may peaceably and quietly have, hold and enjoy the
Leased Premises during the term of this Lease, subject, however,
to all the terms of this Lease. No failure by Landlord to comply
with the foregoing covenant shall give Tenant any right to cancel
or terminate this Lease or to abate, reduce or make any deduction
from or offset against any rent or any other sum payable under
this Lease, or to fail to perform any other obligations of Tenant
hereunder.

### 17. ASSIGNMENT AND SUBLETTING.

(a)   Tenant shall not sublet the Leased Premises, nor
any part thereof, nor assign, or otherwise dispose of this Lease
or any interest therein, or any part thereof, without (except as
provided in subsection (g) below) Landlord's and any Mortgagee's
prior written consent in each of the foregoing cases, which con-
sent, by the Landlord, however, to an assignment of this Lease,
or subletting of all or a portion of the Leased Premises, shall
not be unreasonably withheld, provided the following conditions
are complied with:

(i)   Any assignment shall transfer to the assignee all or
the Tenant's rights in, and interests under, this Lease.

(ii)  At the time of any assignment and/or subletting, this
Lease must be in full force and effect without any breach or de-
fault thereunder on the part of the Tenant.

(iii)   Any assignee shall assume, by written, recordable
instrument, in form and content satisfactory to Landlord, the due
performance of all of Tenant's obligations under this Lease in-
cluding any accrued obligations at the time of the assignment.  A
copy of the assignment and assumption agreement, both in form and
content satisfactory to Landlord, fully executed and acknowledged
by the assignee, together with a certified copy of a properly
executed corporate resolution (if the assignee be a corporation)
authorizing such assumption agreement, shall be sent to Landlord

-30-

wit..in ten (10) days from the effective date of such assignment.

(iv) A copy of any sublease fully executed and acknowledged
by the Tenant and the sublessee, shall be mailed to Landlord
within ten (10) days from effective date of such subletting.

(v) Such assignment and/or subletting shall be subject to
all the provisions, terms, covenants and conditions of this Lease
and the Tenant-assignor (and any guarantor(s) of th's Lease) and
such assignee(s) shall continue to be and remain liable here-
under, it being expressly understood and agreed that no assign-
ment or subletting of the Leased Premises shall, in any way, re-
lieve Tenant or any subsequent assignee(s) from the performance
of any of the agreements, terms, covenants and conditions of this
Lease.

(vi) Each sublease permitted under this Section shall con-
tain provisions to the effect that (A) such sublease is only for
the actual use and occupancy by the sublessee, and (B) such sub-
lease is subject and subordinate to all of the terms, covenants
..nd conditions of this Lease and to all of the rights of Landlord
thereunder, and (C) in the event this Lease shall terminate be-
fore the expiration of such sublease, the subtenant thereunder
will, at Landlord's option, attorn to Landlord and waive any
rights the subtenant may have to terminate the sub'ease or to
surrender possession thereunder, as a result of the termination
of this Lease.

(b) Notwithstanding anything contained in this Lease
to the contrary and notwithstanding any consent by Landlord to
any sublease of the Leased Premises or to any assignment of this
Lease, no subtenant shall assign its sublease nor further sub-
lease the Leased Premises, or any portion thereof, and no assig-
nee shall further assign its interest in this Lease nor sublease
the Leased Premises, or any portion thereof, without Landlord's
prior written consent in each of such cases.

(c) Notwithstanding anything contained in this Lease
to the contrary, except that the provisions of this
subsection (c) shall not apply to a sublease permitted pursuant

-31-

to subsection (g) of this Section 17, should Tenant desire to assign this Lease or sublet all or any part of the Leased Premises in excess of 25% of the gross floor area of the Leased Premises or sublease a portion of the Leased Premises, which when added to space then sublet by Tenant, would result in more than 25% of the gross floor area of the Leased Premises being sublet, it shall give written notice of its intention to do so to Landlord fifty (50) days or more before the effective date of such proposed subletting or assignment and Landlord may, at any time within thirty (30) days after the receipt of such notice from Tenant, cancel this Lease by giving Tenant written notice (the "Cancellation Notice") of its intention to do so, in which event such cancellation shall become effective upon the date specified by Landlord, but not less than thirty (30) days nor more than ninety (90) days after its receipt by Tenant, with the same force and effect as if said cancellation date were the date originally set forth as the expiration date of the term of this Lease, except that Tenant may, by written notice to Landlord, sent by no later then fifteen (15) days after receipt of Landlord's Cancellation Notice, nullify Landlord's cancellation of this Lease by agreeing not to proceed with the proposed transaction with the proposed subtenant or assignee and by providing evidence to Landlord, satisfactory to Landlord, that the proposed transaction with the proposed subtenant or assignee will not proceed. If any Mortgage shall be in effect upon the date of Landlord sending the Cancellation Notice, any cancellation of this Lease by Landlord, as aforesaid, shall be of no force or effect whatsoever unless accompanied by the written consent thereto of all Mortgagees. Should this Lease be cancelled, Landlord may enter into a direct lease with the proposed subtenant or assignee or with any other persons as Landlord may desire.

(d) Tenant's failure to comply with all of the provisions and conditions of this Section 17 and all of the subsections hereof shall (whether or not Landlord's consent is required under this Section), at Landlord's option, render any purported

ass ..ment or subletting null and vc.. and of no force and ef-

fect.

(e)   Tenant may not mortgage, pledge or otherwise en-
cumber its leasehold estate hereunder, and any attempt to mort-
gage, pledge or otherwise encumber such estate shall be null and
void and of no force and effect.

(f)   The Tenant may consolidate with or merge into any
other corporation, convey or transfer all or substantially all of
its assets to any other corporation, or permit any other corpora-
tion to consolidate with or merge into it upon condition that:

(i)   the corporation which results from such con-
solidation or merger or the transferee to which such sale shall
have been made (the "Surviving Corporation") is a corporation
under the laws of any State of the United States and the Surviv-
ing Corporation shall have a net worth, computed in accordance
with generally accepted accounting principles, consistently ap-
plied, at least equal to the net worth of Tenant on the day im-
mediately preceding such consolidation, merger or transfer; and

(ii) the Surviving Corporation shall expressely
and unconditionally assume by written agreement in recordable
form all obligations of the Tenant hereunder and shall be obli-
gated to perform all such obligations of the Tenant hereunder to
the same extent as if the Surviving Corporation had originally
executed and delivered this Lease; and

(iii)      no rights of Landlord under this Lease
shall be affected or reduced by such consolidation, merger, con-
veyance or transfer.

Tenant covenants that it will not merge or consolidate
or sell or otherwise dispose of all or substantially all of its
assets unless there shall be compliance with all of the foregoing
provisions of this subsection (f) and unless the instrument re-
ferred to in subparagraph (ii) above shall have been delivered to
Landlord.

(g)   Notwithstanding the provisions of the introductory
paragraph of subsection (a) of this Section 17 to the contrary,

-33-

Ten_nt may sublet the Leased Premise. or any part thereof to a
corporation, the stock of which is wholly owned by Tenant, with-
out Landlord's prior written consent, but upon compliance with
all other term and conditions of this Section 17.

18.  ENTRY BY LANDLORD.

Landlord, any Superior Lessor(s) and any Mortgagee(s),
and their respective duly authorized representatives shall have
the right to enter the Leased Premises at all reasonable times,
subject to reasonable security measures imposed by Tenant,  for
the purposes of:

(a) inspecting the conditions of same, and making such
repairs, alterations, additions, or improvements thereto as may
be necessary or desirable if Tenant fails to do so as required
hereunder (but the Landlord shall have no du:y whatsoever to make
any such inspections, repairs, alterations, additions, or im-
provements); and

(b) exhibiting the same to persons who may wish to
purchase or lease the same, and, during the last six '6) mon*h.
of the term of this Lease, placing a notice of reasonable size on
the Leased Premises offering the same or any part thereof for
sal* or for rent.

19.  TENANT'S DEFAULT.

The following shall be defined and deemed as an 'F·· t
of defaele': (a) if Tenant shall default in the payment of the
Minimum Rent.l, any additional rent or any sum of money requir d
to be paid by Tenant hereunder, and if Tenant shall fail to cure
said default within five (5) business days after receipt of no-
tice of such default from Landlord (provided, however, that Land-
lord need give such notice and Tenant shall have such times to
cure not more than two (2) times in any twelve (12) month
peri·4): ·r, (b) if Tenant shall default in the performance or
observance of any other term, covenant or condition to be per-
formed or observed by Tenant under this Lease and if Tenant shall
fail to cure said default within twenty (20) days after receipt
of notice of said default from Landlord, or if said default does

-34-

not involve the payment of a sum of money and shall reasonably
require longer than twenty (20) days to cure, if Tenant shall
fail to commence to cure said default within twenty (20) days
after receipt of notice thereof and continuously prosecute the
curing of the same to completion with due diligence by no later
than ninety (90) days after receipt of notice of said default from
Landlord, or (c) if Tenant shall make an assignment of its prop-
erty for the benefit of creditors or shall institute any pro-
ceedings relating to it or its property under any bankruptcy or
insolvency laws of any jurisdiction or shall petition to any
court for, or consent to, the appointment of a receiver, trustee
or assignee of it or any part of its property, or (d) if an order
for relief under any provisions of the Bankruptcy Reform Act of
1978 shall be entered against Tenant, or (e) if Tenant shall be
declared bankrupt or insolvent according to law, or (f) if any
bankruptcy or insolvency proceedings shall be commenced against
Tenant and shall not be dismissed within sixty (60) days there-
after, or (g) if a receiver, trustee, or assignee shall be ap-
pointed without the consent of Tenant in any bankruptcy or insol-
vency proceedings of Tenant or the property of Tenant and shall
not be discharged within ninety (90) days thereafter, or (h) if
Tenant shall be liquidated or dissolved, or shall begin proceed-
ings toward its liquidation or dissolution, or shall, in any man-
ner, permit the divestiture of substantially all of its assets,
or (i) if, as a result of any failure by Tenant to perform or
observe any of the terms, covenants or conditions to be performed
or observed by it under this Lease, a breach or default shall
have occurred and be continuing under any Superior Lease or Mort-
gage. The word "Tenant" as used in subsections (c), (d), (e),
(f), (g), (h) and (i) of this Section 19 shall mean the then
holder of the Tenant's interest in this Lease hereunder and/or
any Guarantor(s) and/or other persons who or which are liable for
Tenant's obligations under this Lease. The words "Landlord" and
"Tenant" as used in subparagraph (c) of this Section 19 shall
mean any person, firm or entity controlled by, under common con-

-35-

trc with, or controlling the Landlc or the "Tenant" (as defin-
ed in the preceding sentence) under this Lease, respectively; and
for the purpose of interpreting this sentence the word "control"
shall be deemed to mean capable of directing the business activi-
ties and direction of such person, firm or entity.  Any defaults
in Tenant's liabilities or obligations under this Lease oc-
casioned by any acts or failures to act by any persons having or
claiming any right, title and interest in or to the Leased
Premises by, through or under Tenant, shall be deemed the default
of Tenant hereunder.  If this Lease is terminated pursuant to
this Section 19, Tenant waives (i) the benefit of any Laws
exempting property from liability for rent or for debt, and
(ii) the service of any notice which may be required by any Laws.

In case of the occurrence of any Event of Default here-
inbefore provided, the Landlord shall have the immediate right or
reentry and may remc.: all persons and property from the Leased
Premises by summary proceedings, force or otherwise.  In addi-
tion, in the event of the occurrence of any Event of Default
(whether or not Landlord shall elect to reenter or to take pos-
session pursuant to legal proceedings or pursuant to any notice
provided for oy Laws) Landlord shall have the right, at its or
ften. to terminate this Lease on not less than two (2) days
notice to tenant and upon the giving of said notice, this Lease
and the term hereof shall cease and expire on the date set forth
in said notice as if said date were the then expiration date of
the term of this Lease as the same may have been extended pur-
suant to the provisions of this Lease and/or it may from time to
time, whether or not this Lease be terminated, make such alter-
ations and repairs as may be reasonably necessary in order to
relet the Leased Premises or any part(s) thereof for such term or
terms (which may extend beyond the term of this Lease) and at
such rental(s) and upon such other terms and conditions as Land-
lord in its sole discretion may deem advisable; upon each such
reletting all rentals received by the Landlord from such
reletting shall be applied, first, to the payment of any

-36-

indebtedness (other than rents due hereunder) of Tenant to
Landlord, second, to the payment of any costs and expenses of
such reletting, including, without limitation, brokerage fees (at
no greater than customary rates in the area in which the Leased
Premises is located) and reasonable attorneys' fees and of the
cost of such alterations and repairs, third, to the payment of
rents due and unpaid hereunder; and the residue, if any, shall be
held by Landlord and applied in payment of future rents and other
payments required to be made by Tenant hereunder as the same may
become due and payable hereunder, with the right reserved to
Landlord to bring such action(s) or proceeding(s) for the
recovery of any deficits remaining unpaid without being obliged
to await the end of the term for a final determination of
Tenant's account; and the commencement or maintenance of any one
or more actions shall not bar Landlord from bringing other or
subsequent actions for further accruals pursuant to the
provisions of this Section. If such rentals received from such
reletting during any month be less than that to be paid during
that month by Tenant hereunder, Tenant shall pay any such
deficiency to Landlord. Such deficiency shall be calculated and
paid monthly subject to Landlord's right of action(s) or proceed-
ing(s) as aforesaid. No such reentry or taking possession of the
Leased Premises by Landlord shall be construed as an election on
its part to terminate this Lease unless a written notice of such
intention be given to Tenant or unless the termination thereof be
decreed by a court of competent jurisdiction. Notwithstanding
any such reletting without termination, Landlord may at any time
thereafter elect to terminate this Lease for such previous
breach. Should Landlord at any time terminate this Lease for any
breach, in addition to any other remedies it may have, it may
recover from Tenant all damages it may incur by reason of such
breach as damages for loss of the bargain and not as a penalty,
including the cost of recovering the Leased Premises, reasonable
attorneys' fees, and including the worth, at the time of such
termination, of the excess, if any, of the amount of rental and

cha. as equivalent to the rental and charges reserved in this
Lease for the remainder of the then term of this Lease, over the
aggregate rental value of the Leased Premises for the remainder
of such term, all of which shall be immediately due and payable
from Tenant to Landlord. If any Laws shall validly limit the
amount of the damages provided for in the immediately preceding
sentence to less than the amount above agreed upon, Landlord
shall be entitled to the maximum amount allowable under such
Laws. In the event the Tenant does not comply with its obliga-
tions under this Lease, Landlord shall also have the right to
appropriate injunctive relief. The rights and remedies whether
herein or anywhere else in this Lease provided shall be cumula-
tive, and the exercise of any one right or remedy shall not pre-
clude the exercise of or act as a waiver of any other right or
remedy of Landlord hereunder, or which may be existing at law, or
in equity or by statute or otherwise.

20.   TAX APPEALS AND CONTESTS.

(a)  Tenant shall have the right, at its cost and ex-
pense, to contest the amount or validity, in whole or in part, of
any Imposition of any kind by appropriate proceedings diligently
conducted in good faith, but no such contest shall be carried on
or maintained by Tenant after the time limit for the payment of
any Imposition unless the Tenant, at its option: (i) shall pay
the amount involved under protest; or (ii) shall procure and
maintain a stay of all proceedings to enforce any collection of
any Imposition, together with all penalties, interest, costs and
expenses, by a deposit of a sufficient sum of money, or by such
undertaking, as may be required or permitted by law to accomplish
such stay; or (iii) shall deposit with Landlord or any Superior
Lessor or Mortgagee, as security for the performance by the
Tenant of its obligations hereunder with respect to such Imposi-
tions, such security in amounts equal to such contested amount or
such reasonable security as may be demanded by the Landlord or
any Superior Lessor or Mortgagee to insure payment of such con-
tested Imposition and all penalties, interest, costs and expenses

-38-

which may accrue during the period of the contest. Such sums shall be invested for the benefit of Tenant in any interest bearing instrument or account selected by Landlord, or any Superior Lessor or Mortgagee and reasonably acceptable to Tenant. Upon the termination of any such proceedings, it shall be the obligation of Tenant to pay the amount of such Imposition or part thereof, as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including counsel fees), interest, penalties or other liabilities in connection therewith, whereupon the Landlord shall arrange to have returned to the Tenant, with any interest earned thereon as aforesaid, all amounts, if any, held by or on behalf of Landlord which were deposited by the Tenant in accordance with the provisions hereof.

(b)   Tenant shall have the right, at its cost and expense, to seek a reduction in the valuation of the Leased Premises as assessed for tax purposes and to prosecute any action or proceeding in connection therewith. Provided Tenant is not in default hereunder, Tenant shall be authorized to collect any tax refund of any tax paid by Tenant obtained by reason thereof and to own at the same. Should Tenant be in default hereunder, Landlord shall collect any such tax refund as its own funds and shall apply such tax refund to the cost of curing any default of Tenant hereunder and to Landlord's damages as provided here in. by law and any excess shall be paid to Tenant.

(c)   Landlord agrees that whenever Landlord's cooperation is required in any of the proceedings brought by Tenant as aforesaid, Landlord will reasonably cooperate therein, provided same shall not entail any cost, liability or expense to Landlord and Tenant will pay, indemnify and save Landlord harmless of and from, any and all liabilities, losses, judgments, decrees, costs and expenses (including all reasonable attorneys' fees and expenses) in connection with any such contest and will, promptly after the final settlement, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be deter-

mined to be payable therein or in connection therewith, and
Tenant shall perform and observe all acts and obligations, the
performance of which shall be ordered or decreed as a result
thereof. No such contest shall subject Landlord or any Superior
Lessor or Mortgagee to the risk of any material civil liability
or the risk of any criminal liability, and Tenant shall give such
reasonable indemnity or security to Landlord, any Superior Lessor
and any Mortgagee as may reasonably be demanded by any of them to
insure compliance with the foregoing provisions of this
Section 20.

21.   SIGNS.

Tenant may, during the term of this Lease, upon obtain-
ing any and all necessary permits from governmental authorities,
paint or erect and maintain, at its cost and expense, signs of
such dimensions and materials as it may reasonably deem appro-
priate in or about the Leased Premises. Such signs shall, at the
option of the Landlord, be removed by Tenant upon the termination
of its occupancy of the Leased Premises.

22.   SURRENDER OF PREMISES.

Except in the case of: (i) a condemnation described in
subsection 12(a), (ii) a casualty which is not repaired, restor-
ed, rebuilt or replaced as described in subsection 11(k) hereof
and (iii) a Tenant Change permitted by Landlord pursuant to the
provisions of subsection 2(a)(xv) hereof to remain, at the
expiration or sooner termination of the term of this Lease,
Tenant shall surrender the Leased Premises in the same condition
as the Leased Premises were in upon delivery of possession
thereto under this Lease, reasonable wear and tear excepted, and
shall surrender all keys for the Leased Premises to Landlord at
the place then fixed for the payment of rent and shall inform
Landlord of all combinations on locks, safes and vaults, if any,
in the Leased Premises. Tenant shall at such time remove all
Tenant's Property, as well as  any alterations or improvements,
if requested to do so by Landlord, and shall repair any damage to
the Leased Premises caused thereby, and any or all of such pro-

perty not so removed shall, at Landlord's option, become the ex-
clusive property of Landlord or be disposed of by Landlord, at
Tenant's cost and expense, without further notice to or demand
upon Tenant.  If the Leased Premises be not surrendered as and
when aforesaid, Tenant shall indemnify Landlord against loss or
liability resulting from the delay by Tenant in so surrendering
the Leased Premises including, without limitation, any claims
made by any succeeding occupant founded on such delay.  Tenant's
obligation to observe or perform this covenant shall survive the
expiration or other termination of the term of this Lease.

### 23.   PROCEDURE UPON PURCHASE.

(a)  In the event of the purchase of the Leased Prem-
ises or any portion thereof by Tenant pursuant to any provision
of this Lease, Landlord need not transfer and convey to Tenant or
its designee any better title thereto than existed on the date of
the commencement of this Lease, and Tenant shall accept such ti-
tle, subject, however, to all liens, encumbrances, charges, ex-
ceptions and restrictions on, against or relating to the Leased
Premises and to all applicable Laws, but free of the lien of and
security interest created by any Mortgages and free of any liens
encumbrances, charges, exceptions and restrictions which have
been created by or resulted from acts or omissions (or alleged
acts or omissions) of Landlord during the term of this lease
which were not consented to or requested by Tenant.  However,
Tenant shall have the right, at its option, to take title subject
to any Mortgage then existing, subject to any consent or approval
by the holder thereof which may be provided in any Mortgage.

In the event any such liens, encumbrances, charges
exceptions or restrictions shall exist, Landlord shall be
obligated to correct such default in title.  If Landlord fails to
comply with the foregoing provisions by the Closing Date, and
provided Tenant is not in default under the Lease, Tenant shall
have the option of discharging or bonding any such lien, charge,
exception, restriction, or encumbrance and Landlord agrees to
reimburse Tenant for all reasonable losses, costs, damages and

e\. ...es resulting therefrom, incl\... reasonable attorneys
fees, together with interest thereon (at a rate equal to the
"Maximum Rate"), promptly upon demand.

(b)  Upon the Closing Date for any such purchase by
Tenant of the Leased Premises or any portion thereof pursuant to
any provisions of this Lease, Tenant shall pay to Landlord, or to
any persons designated by Landlord in a written notice delivered
by Landlord to Tenant not less than three (3) days prior to the
Closing Date, by certified check, bank check or in federal funds,
as Landlord may designate, at Landlord's address set forth above,
or at any other place within the continental United States desig-
nated by Landlord, the Purchase Price therefor specified herein,
and the following shall then occur:

(i)  Landlord shall deliver to Tenant ᵣ deed which describes
the Leased Premises or the portion thereof then being sold to
Tenant and conveys and transfers the title thereto which is de-
scribed in subsection 23(a) above;

(ii) Landlord shall deliver to Tenant such other instruments
as shall be necessary to transfer to Tenant or its designee any
other property then required to be sold by Landlord to Tenant
pursuant to this Lease;

(iii)  Tenant shall pay (or reimburse Landlord for) all
costs, fees and charges incident to such conveyance and transfer
including, without limitation, reasonable counsel fees, escro-
ᵗes, recording fees, title insurance premiums, Mortgage prepay-
ment penalties and all applicable federal, state and local taxes
(other than any income or franchise taxes levied upon or assessed
against Landlord) which may be incurred or imposed by reason of
such conveyance and transfer and by reason of the delivery and/or
recording of such deed and such other instruments.

(iv) Upon the completion of such purchase pursuant to the
provisions of Sections 12 and 36 hereof and the payment of the
Purchase Price, but not prior thereto (whether or not any delay
in the completion of or the failure to complete such purchase
shall be the fault of Landlord), this Lease and all obligations

-42-

... (including the obligation     pay the Minimum Rental
additional charges) shall term.     with respect to the
Leased Premises, except with respect to actual or contingent
obligations and liabilities of Tenant under this Lease which
arose on or prior to the Closing Date.

(v)  If, on the Closing Date, Landlord shall be unable to
convey title to the Leased Premises as herein stipulated, then
Landlord shall use reasonable efforts to remove any defects in
title and the time for performance hereunder shall be extended
for a period of sixty (60) days.

Notwithstanding anything herein contained to the contrary,
Tenant shall have the right at the original Closing Date or at
the extended time for performance:

> (1)  to elect to accept such title as the Landlord can
> deliver to the Leased Premises in their then
> condition and to pay therefor the purchase price
> without deduction, in which case Landlord shall
> convey such title; or
>
> (2)  to use any portion of the Purchase Price otherwise
> payable as provided herein for the purpose of dis-
> charging any liens, encumbrances, charges, excep-
> tions, restrictions and security interest created
> by any Mortgages which are prepayable and in eff of
> any liens, encumbrances, charges, exceptions and
> restrictions which have been created by or result-
> ed from acts or omissions of Landlord during the
> term of the Lease which were not consented to or
> requested by Tenant.

24.  "LANDLORD" DEFINED.

(a)  The term "Landlord" as used in this Lease refers
only the owner of the Leased Premises, for the time being, so
that in the event of any sale or other transfer of the Leased
Premises, Landlord shall be and hereby is entirely freed and re-
lieved of all liabilities and obligations of Landlord hereunder,
and it shall be deemed without further agreement between the par-
ties and any successor of Landlord, that such successor has as-
sumed and agreed to perform and observe all liabilities and ob-
ligations of Landlord hereunder.

(b)  Notwithstanding anything contained herein to the
contrary, it is specifically understood and agreed that there
shall be no personal or corporate liability on Landlord in res-

-43-

provisions of this Lease, and in the event of a breach or default by Landlord of any of its liabilities and obligations under this Lease, Tenant and any persons claiming by, through or under Tenant shall look solely to the equity of the Landlord in the Leased Premises for the satisfaction of Tenant's and such persons' remedies and claims for damages.

25. TENANT'S PAYMENTS.

Each and every payment and expenditure, other than Minimum Rental and other than costs for any additions, alterations, repairs, replacements and improvements to the Improvements, which are required to be paid by Tenant under this Lease shall be deemed to be additional rent hereunder, whether or not the provisions requiring payment of such amounts specifically so state, and shall be payable, unless otherwise provided in this Lease, on demand by Landlord and in the case of the non-payment of any such amount, Landlord shall have, in addition to all of its other rights and remedies, all of the rights and remedies available to Landlord hereunder or by Laws in the case of non-payment of Minimum Rental. Unless expressly otherwise provided in this Lease, the performance and observance by Tenant of all the terms, covenants and conditions of this Lease to be performed and observed by Tenant hereunder shall be performed and observed by Tenant at Tenant's sole cost and expense. Tenant agrees to pay or reimburse Landlord, on demand, for any reasonable costs and expenses that may be incurred by Landlord in connection with its review of any instruments or documents requested by Tenant pursuant to this Lease or relating to the Leased Premises including but not limited to the costs and expenses of making such investigations as the Landlord shall deem appropriate and the reasonable legal fees and disbursements of Landlord's counsel. All payments of Minimum Rental hereunder shall be made to Landlord by check or wire transfer of federal funds, as Landlord may direct, at the address set forth in the beginning hereof unless otherwise provided herein or at such other address as may be designated by Landlord.

-44-

If Tenant shall fail to fully comply with any of its
liabilities or obligations under this Lease (including, without
limitation, its obligations to make repairs, maintain various
policies of insurance, comply with all Laws and pay all Imposi-
tions and bills for utilities other than such Impositions and
bills for utilities which are being appealed or contested by
Tenant in accordance with the provisions of Section 20 hereof),
then five (5) days after the receipt of written notice by Tenant
of such breach  (except that prior written notice shall not be
required in the event of an emergency) Landlord shall have the
right, at its option, to cure such breach at Tenant's cost and
expense.  Tenant agrees to reimburse Landlord (as additional
rent) for all losses, costs, damages and expenses resulting
therefrom or incurred in connection therewith, together with in-
terest thereon (at a rate equal to the "Maximum Rate"), promptly
upon demand.

27.   COVENANT AGAINST LIENS.

(a.   If, because of any act or omission (or alleged act
or omission) of Tenant, any mechanic's or other lien, charge or
order for the payment of money or other encumbrances shall be
filed or imposed against Landlord, any Superior Lessor, any Mort-
gagee and/or any portion of the Leased Premises (whether or not
such lien, charge, order or encumbrance is valid or enforceable
as such, Tenant shall, at its cost and expense, cause same to be
discharged of record or bonded within ten (10) days after notice
to Tenant of the filing or imposition thereof; and Tenant shall
indemnify and defend Landlord against and save Landlord harmless
from all losses, costs, damages, expenses, liabilities, suits,
penalties, claims, demands and obligations, including, without
limitation, reasonable counsel fees, resulting therefrom.  If
Tenant fails to comply with the foregoing provisions, Landlord
shall have the option of discharging or bonding any such lien,
charge, order or encumbrance, and Tenant agrees to reimburse
Landlord (as additional rent) for all losses, costs, damages, and

-45-

tion therewith, together with interest thereon (at a rate equal to the "Maximum Rate"), promptly upon demand.

(b) All materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter furnishing any labor, services, materials, supplies or equipment to Tenant with respect to any portion of the Leased Premises, are hereby charged with notice that they must look exclusively to Tenant to obtain payment for same. Notice is hereby given that the Landlord shall not be liable for any labor, services, materials, supplies or equipment furnished or to be furnished to the Tenant upon credit, and that no mechanic's or other lien for any such labor, services, materials, supplies or equipment shall attach to or affect the estate or interest of the Landlord in and to the Leased Premises.

28.   WAIVER OF REDEMPTION.

It being clearly understood by Tenant that Landlord is unwilling to enter into any lease of the Leased Premises for a term of more than five (5) years unless the statutory rights of redemption after a dispossess proceeding and to a second further trial after an action in ejectment shall be waived by Tenant (unless such second or further trial results from an Appellate Court decision reversing the decision of the first trial) and Tenant being willing to waive all such rights of redemption conferred by statute in order that it may secure a lease of more than five (5) years, Tenant covenants and agrees that in the event of an action for ejectment or any other action or proceeding to dispossess, terminating this Lease, the right of redemption provided or permitted by any Laws, and the right to any second or further trial provided or permitted by any Laws, shall be and hereby are expressly waived (unless such second or further trial results from an Appellate Court decision reversing the decision of the first trial). Tenant hereby expressly waives the service of any notice in writing of intention to reenter as provided for or may be provided for in and by the laws of the State in which the Leased Premises is located, as the same may from time to time exist.

-46-

29.   LANDLORD'S AND TENANT'S CERTIFICATES.

Landlord and Tenant shall, each without charge at any time and from time to time, within ten (10) days after request by the other party, certify by written instrument, duly executed, acknowledged and delivered to any ground lessor, Mortgagee, assignee of any Mortgagee or purchaser, or any proposed Mortgagee, or proposed assignee or sub-tenant of Tenant or any other person, firm or corporation specified by Landlord or Tenant:

(a)   That this Lease and all "Guarantees" (hereinafter defined) are unmodified and in full force and effect (or, if there has been modification, that the same is in full force and effect as modified and stating the modifications);

(b)   Whether or not there are then existing any breaches or defaults by the other party under any of the terms of this Lease and specifying such breach or default or any setoffs, defenses, credits or counterclaims  against the enforcement of any of the agreements, terms, covenants or conditions of this Lease or of any Guarantees upon the part of the Landlord or Tenant or any said Guarantors, as the case may be, to be performed or complied with (and, if so, specifying the time and the steps being taken to remedy the same); and

(c)   The dates, if any, to which the rental(s) and other charges under this Lease have been paid in advance.

(d)   The date of commencement of the initial term and the expiration date of the then term of this Lease.

(e)   The names of all lessees or occupants of the Leased Premises or any part thereof, the terms of their respective leases or tenancies, the space occupied and the rentals paid.

Tenant shall cause any and all of its said certifications which refer to any Guarantors or Guarantees to be executed and acknowledged by the relevant Guarantors.

30.   WAIVER OF TRIAL BY JURY AND WAIVERS BY GUARANTORS.

Landlord and Tenant do hereby waive trial by jury in any action, proceeding or counterclaim brought by either against

th'    er, upon any matters whatsoe    rising out of or in any
way  connected with this Lease, Tenan  , use or occupancy of the
Leased Premises, and/or any claim of injury or damage. It is
further mutually agreed that in the event Landlord commences any
summary proceeding for non-payment of Minimum Rental or addition-
al rent, Tenant will not interpose any counterclaim of whatever
nature or description in any such proceeding. Each and every
Guarantor, if any, shall with respect to the liabilities and ob-
ligations under its Guarantee, be deemed to have agreed to waive,
with respect to its Guarantee and this Lease, all rights which
are waived by Tenant under this Lease.

31.    NET LEASE: NON-TERMINABILITY.

This is an absolutely net lease, and, except as other-
wise specifically provided in Section 12 hereof, this Lease shall
not terminate nor shall Tenant have any right to terminate this
Lease; nor shall Tenant be entitled to any abatement, deduction,
deferment, suspension or reduction of, or setoff, defense or
counterclaim against, any rentals, charges, or other sums payable
by Tenant under this Lease; nor shall the respective obligations
of Landlord and Tenant be otherwise affected by reason of damage
to or destruction of the Leased Premises from whatever cause, any
taking by condemnation, eminent domain or by agreement between
landlord and those authorized to exercise such rights, the lawful
or unlawful prohibition of Tenant's use of the Leased Premises,
the interference with such use by any persons, corporations or
other entities, or by reason of any eviction by paramount title,
or by reason of Tenant's acquisition of ownership of the Leased
Premises otherwise than pursuant to an express provision of this
Lease, or by reason of any default or breach of any warranty by
Landlord under this Lease or any other agreement between Landlord
and Tenant, or to which Landlord and Tenant are parties, or fc-
any other cause whether similar or dissimilar to the foregoing,
any Laws to the contrary notwithstanding; it being the intention
that the obligations of Landlord and Tenant hereunder shall be
separate and independent covenants and agreements and that the

-48-

at which such written notices, exercise of options or elections, communications, requests, or other documents or demands are to be mailed, by giving the other party(ies) written notice of such changed address, pursuant to the terms hereinabove set forth. At Landlord's option, which may be exercised at any time hereafter, Tenant shall send copies of any and all said notices and other communications designated by Landlord, to any Mortgagees and Superior Lessors designated by Landlord, in the same manner as notices are required to be sent to Landlord, and at such address(es) as Landlord may from time to time designate by notice to Tenant.

(b)  RELATIONSHIP OF THE PARTIES.  It is the intention of the parties hereto to create the relationship of Landlord and Tenant, and no other relationship whatsoever, and unless expressly otherwise provided herein, nothing herein shall be construed to make the parties hereto liable for any of the debts, liabilities or obligations of the other party.

(c)  APPLICABILITY.  Whenever a provision in this Lease is stated to apply to the term of this Lease, or words of similar import, the same shall be deemed to mean and include any Extended Terms as well, unless specific reference is made to such provision as having applicability only to all or any portions of the Initial Term and/or any Extended Term or Extended Terms.

(d)  GOVERNING LAWS.  This Lease shall be governed exclusively by the provisions hereof and by the laws of the State in which the Leased Premises is located as the same may from time to time exist.

(e)  INVALIDITY OF PARTICULAR PROVISIONS.  If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease

-50-

(f) <u>WAIVER</u>. Failure on the part of either party to
complain of any action or non-action on the part of the other
party, no matter how long the same may continue, shall never be
deemed to be a waiver by either party of any of its rights here-
under. Acceptance by Landlord of Minimum Rental, additional rent
or any other charges paid by Tenant hereunder shall not be or be
deemed to be a waiver by Landlord of any default by Tenant,
whether or not Landlord knows of such default. No waiver at any
time of any of the provisions hereof by either party shall be
construed as a waiver of any of the other provisions hereunder
and a waiver at any time of any of the provisions hereof shall
not be construed as a waiver at any subsequent time of the same
provisions.

(g) <u>COUNTERPARTS</u>. This Lease may be executed in
several counterparts, each of which shall be deemed an original,
, ? such . ontaspsts shall constitute but one and the same in-
strument.

(h) <u>SOLE AGREEMENT</u>. This Lease sets forth all the
promises, understandings, agreements, conditions and understandings
between Landlord and Tenant relative to the Leased Premises, and
there are no promises, agreements, conditions or understandings,
either oral or written, express or implied between them, other
than as herein set forth. Except as herein otherwise provided,
no subsequent alteration, amendment, change or addition to this
Lease shall be binding upon Landlord or Tenant, unless reduced to
writing and signed by the party(ies) to be charged therewith.

(i) <u>SHORT FORM OF LEASE</u>. A short form of Lease for
recording purposes only, in form satisfactory to the Landlord's
counsel, shall, simultaneously with the execution hereof, be exe-
cuted by Landlord and Tenant.

(j) <u>CAPTIONS</u>. The captions of the several Sections
and subsections of this Lease and table of contents are not a
part of the context hereof and shall be ignored in construing

th...  :ase.  They are intended onl_  aids in locating various provisions hereof.

(k)  SUCCESSORS AND ASSIGNS.  Except as may be express-
ly otherwise provided herein, the terms, covenants and conditions
hereof shall inure to the benefit of and shall be binding upon
Landlord and its successors and assigns and the terms, covenants
and conditions hereof shall inure to the benefit of and shall be
binding upon Tenant and its successors and permitted assigns.

(1)  NO MERGER.  There shall be no merger of this
Lease, or the leasehold estate created by this Lease, with any
other estate or interest in the Leased Premises, or any part
thereof, by reason of the fact that the same person, firm, cor-
poration or other entity may acquire or own or hold, directly or
indirectly, (i) this Lease or the leasehold estate created by
this Lease, or any interest in this Lease or in any such lease-
hold estate, and (ii) any such other estate or interest in the
Leased Premises or any part thereof; and no such merger shall
occur unless and until all persons, corporations, firms and other
entities having an interest (including a security interest) in
(i) this Lease or the leasehold estate created by this Lease; and
(ii) any such other estate or interest in the Leased Premises  r
any part thereof, shall join in a written instrument effecting
a ch merger and shall duly record the same.

(m)  RIGHTS OF SUPERIOR LESSOR.  Any rights provided
herein for the benefit of any Mortgagees shall apply with equal
force and effect for the benefit of any Superior Lessors as if
expressly so stated in each instance.

(n)  REPORTS.  Tenant agrees to furnish to Landlord and
to any Mortgagee, promptly after the same are available, copies
of all reports, financial statements (including, but not limited
to, annual balance sheets, income statements and surplus state-
ments, certified by independent certified public accountants) and
registration statements which the Tenant and each Guarantor, if
any:  (i) files with or otherwise sends to the Securities and
Exchange Commission, whether pursuant to the Securities Act of

-52-

15.    is amended, or the Securities    Exchange Act of 1934 includ-
ing, without limitation, Annual Report on Form 10-K, Quarterly
Report on Form 10-Q, Current Report on Form 8-K and Proxy State-
ments and other soliciting materials; (ii) files with any securi-
ties exchange; (iii) sends to or makes available to its
shareholders; and (iv) within ninety (90) days after the end of
each Tenant's fiscal years, a balance sheet and statement of
profit and loss, setting forth with the second such fiscal year
in comparative form the figures for the previous fiscal year,
together with satisfactory financial statements of Tenant all in
the form of which is filed with the Federal Securities and
Exchange Commission, or in substantially similar form if not so
filed, and certified as complete and correct, by Tenant and by an
independent Certified Public Accountant.

        In addition to the foregoing, Tenant shall obtain and
deliver to Landlord, (a) with reasonable promptness, such other
information respecting the operation of the Leased Premises or
the financial condition and affairs of Tenant or any Guarantors,
as Landlord may from time to time reasonably request, and (b) to-
gether with the annual reports of each Guarantor as required a-
bove, an Officer's Certificate of such Guarantor stating that to
the best of the signer's knowledge and belief after making due
inquiry, neither Tenant nor such Guarantor is in default in the
performance or observance of any of the agreements, terms, cove-
nants or conditions of this Lease or the Guarantee upon the part
of Tenant or the Guarantor, as the case may be, to be performed
or observed (or, if so, specifying the same and the steps being
taken to remedy the same).

        (o)  OWNERSHIP OF LEASED PREMISES.  Tenant acknowledges
that the Leased Premises are the property of Landlord and that
Tenant has only the right to the possession and use thereof upon
the terms, covenants and conditions set forth in this Lease.

        (p)  ENCROACHMENTS, RESTRICTIONS, ETC.  If any of the
Improvements shall, at any time, encroach upon any property,
street or right of way adjoining or adjacent to the Leased Prem-

-53-

is, or shall violate the agreement or conditions contained in
any restrictive covenant or other agreement affecting the Leased
Premises, or any part thereof, or shall hinder or obstruct any
easement or right-of-way to which the Leased Premises are sub-
ject, or shall impair the rights of others under such easement or
right-of-way, then promptly upon the request of the Landlord at
the behest of any persons affected by any such encroachment, vio-
lation, hindrance, obstruction or impairment, Tenant shall, at
its cost and expense, either (i) obtain valid and effective waiv-
ers or settlements of all claims, liabilities and damages result-
ing from each such encroachment, violation, hindrance, obstruc-
tion or impairment, whether the same shall affect Landlord or
Tenant, or (ii) make such changes in the Improvements and take
such other actions as shall be necessary to remove such encroach-
ments, hindrances or obstructions and to end such violations or
impairments, including, if necessary, but only with Landlord's
prior written consent, the alteration or removal of any of the
Improvements. Any such alteration or removal consented to by
Landlord shall be made by Tenant in accordance with the require-
ments of Section 9, above. Tenant's obligations under this sub-
section 33(r) shall survive the expiration or sooner termination
of this Lease.

(q) ACCEPTANCE OF SURRENDER. No surrender to Landlord
of this Lease or of the Leased Premises, or any part thereof, or
of any interest therein, shall be valid or effective unless
agreed to and accepted in writing by Landlord and consented to in
writing by any and all Mortgagees and Superior Lessors, and no
act or omission by Landlord or any representative or agent of
Landlord, other than such a written acceptance by Landlord, con-
sented to as aforesaid, shall constitute an acceptance of any
such surrender.

(r) RULE AGAINST PERPETUITIES. If the provisions of
Section 34 of 35 of this Lease would, in the absence of the
limitation imposed by this sentence, be invalid or unenforceable
as being in violation of the rule against perpetuities or any

-54-

otf . le of law relating to the v. of interest in or the
suspension of the power of alienation of property, then the
affected provisions of Section 34 and 35 of this Lease shall be
effective only during the period which shall end twenty (20)
years and six (6) months after the date of death of the last
survivor of the descendants of John D. Rockefeller the 2nd alive
on the date of the execution and delivery of this Lease.

33.   DEFINITIONS.

For the purposes of this Lease, the following defini-
tions shall be applicable:

Acceptance Notice - as defined in Section 12(d).

Closing Date - as defined in Section 12(e).

Control - as defined in Section 19.

Event of Default - as defined in Section 19.

Existing Mortgage - That certain Mortgage dated
November 17, 1980 held by State Street Bank and Trust Company and
assigned to Union Mutual Life Insurance Company in the original
principal sum of $3,500,000.00, as amended.

Final Notice - as defined in Section 12(e).

First, Second, etc., Extended Terms - as defined in
Section 2(b).

Guarantee - any agreements or undertakings, written or
otherwise, by virtue of which any Guarantors guaranty the perfor-
mance or observance of any or all of the terms, covenants or con-
ditions to be performed or observed by Tenant under this Lease.

Guarantor - any persons, firms or entities who or which
guaranty the performance or observance of any or all of the
terms, covenants or conditions to be performed or observed by
Tenant under this Lease.

Impositions - as defined in Section 5(b).

Improvements - as defined in Section 1.

Initial Term - as defined in Section 2(c).

Landlord - as defined in Section 24.

Laws - as defined in Section 2(a).

**Lease Year** - Any twelve (. .onth period during the initial term of this Lease and any Extended Term commencing on the first day of the first full calendar month of the term of this Lease.

**Leased Premises** - as defined in Section 1.

**Maximum Rate** - an annual rate of interest equal to the Prime Rate plus two (2%) percent but in no event in excess of the maximum lawful rate permitted to be charged by a Landlord against a defaulting Tenant for monies advanced by reason of a Tenant's default.

**Minimum Rental** - as defined in Section 3.

**Mortgage** - any Mortgage, deed of trust or other security interest now existing or hereafter created on all or any portion of Landlord's interest in this Lease and/or the Leased Premises, provided such Mortgage, deed of trust or other security interest shall comply with the provisions of Section 14 hereof.

**Mortgagee** - the holder of any Mortgage.

**Net Award** - as defined in Section 12(e).

**Offer** - as defined in Section 12(c).

**Person-Persons** - any individual(s), partnership(s), firm(s), corporation(s), business trust(s), estate(s), representative(s) or other entities of any nature or description whatsoever.

**Plans and Specifications** - as defined in Section 9(c)(iv).

**Prime Rate** - the rate being charged at the time in question by The Chase Manhattan Bank (National Association) (or successor by merger or otherwise) for short-term ninety (90) day unsecured loans made to its preferred customers.

**Purchase Price** - as defined in Section 12(c).

**Replacement Mortgage** - Any Mortgage obtained by Landlord in replacement of, or as an extension or renewal of, the Existing Mortgage, in the event the holder of the Existing Mortgage elects to call the loan secured thereby at the end of the fifteenth (15th) Loan Year, as defined in the Existing Mortgage.

-56-

Successor Landlord - as defined in Section 14(c).

Superior Lease - any lease of all or any portions of the Leased Premises made by and between any persons, firms or entities, as lessor, and any Landlord hereunder, as lessee.

Superior Lessor - the Lessor under any Superior Lease.

Taking Date - as defined in Section 12(a).

Tenants Change(s) - as defined in Section 9(a).

Tenant's Property - as defined in Section 13.

34. TENANT'S OPTION TO PURCHASE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Tenant shall have the right, on the following terms and conditions, at its option, to elect to purchase the Leased Premises from Landlord at the end of the tenth (10th) Lease Year and at the end of the fifteenth (15th) Lease Year by giving Landlord written notice of such election not less than six (6) months prior to the purchase date selected by Tenant as aforesaid, provided, however, that Tenant shall have no such right so long as Tenant is in default in the performance or observance of any of the terms, covenants or conditions to be performed or observed by Tenant under this Lease. The purchase price payable by Tenant for the Leased Premises shall be $8,646,000 if Tenant elects to purchase at the end of the tenth (10th) Lease Year and $10,478,500 if Tenant elects to purchase at the end of the fifteenth (15th) Lease Year. Upon the exercise of such option, and upon request of Tenant, Landlord agrees to deliver to Tenant, in recordable form, an acknowledgement that such option has been exercised and that a valid contract of sale exists for the purchase and sale of the Leased Premises in accordance with the provision of this Lease. The provisions of Section 23 hereof shall be applicable in the event of any transfer of title pursuant to the provisions of this Section 34; except to the extent that the provisions of Section 23 conflict with any of the provisions of this Section 34, then the provisions of this Section shall control. If Tenant shall elect to purchase the Leased Premises in accordance with the provisions of this Section 34, then (i) the closing of title shall be at the

en. | the tenth (10th) Lease Year c .fteenth (15th) Lease Year, as the case may be, at Landlord's office in New York City at 10:30 a.m., and (ii) Tenant's notice of its said election shall be effective only if Tenant shall deliver to Landlord therewith Tenant's certified check made payable to Landlord in the amount of Fifty Thousand ($50,000) Dollars as a good faith deposit (the "Deposit") for the performance by Tenant of its obligations to purchase the Leased Premises in accordance with the provisions of this Lease. The Deposit shall be invested in any interest bearing instrument or account selected by Landlord and reasonably acceptable to Tenant. Upon the closing of title to the Leased Premises the Deposit, together with any interest earned thereon as aforesaid, will be applied towards the purchase price payable by Tenant; or, if the purchase of the Leased Premises does not close in accordance with the provisions of this Lease on account of Landlord's default and if Tenant shall not be in default under this Lease, then, in addition to all other .ights and remedies Tenant may have hereunder, at law or in equity, including, without limitation, specific performance, the Deposit together with any interest earned thereon as aforesaid will be returned to Tenant; or, if such purchase is not consummated on account of Tenant's default, then, in addition to all other rights and remedies Landlord may have hereunder, at law and in equity, Landlord may retain the Deposit together with any interest earned thereon as aforesaid.

## 35. TENANT'S RIGHT OF FIRST REFUSAL.

In the event that Landlord shall enter into a bona fide agreement to sell the Leased Premises during the term of this Lease and provided Tenant shall not be in default in the performance or observance of any of the terms, covenants or conditions to be observed or performed by Tenant under this Lease, Tenant shall have the right of first refusal to purchase the Leased Premises, in accordance with and subject to the following conditions:

-58-

(a)  Landlord shall send to Tenant a notice accompanied by a copy of the written agreement to sell the Leased Premises (the "First Refusal Offer Notice").

(b)  If Tenant is interested in purchasing the Leased Premises for the price and upon the terms and conditions set forth in the First Refusal Offer Notice, it shall send to Landlord a written notice of such acceptance (the "First Refusal Acceptance") within fifteen (15) days of the First Refusal Offer Notice, which First Refusal Acceptance, to be valid and effective must be accompanied by a contract deposit to Landlord equal to the greater of (i) $300,000.00 or (ii) the contract deposit provided for in the First Refusal Offer Notice, if any.  The contract deposit shall be invested in an interest bearing instrument or account selected by Landlord and reasonably acceptable to Tenant for Tenant's benefit.

(c)  If Tenant so sends the First Refusal Acceptance together with said contract deposit, Landlord shall consummate the sale to Tenant at the price and upon all of the terms and conditions set forth in the First Refusal Offer Notice.  Failure of Tenant to send the First Refusal Acceptance to Landlord within said fifteen (15) day period shall be conclusively deemed a waiver by Tenant of its right of first refusal and Landlord may consummate the transaction set forth in the First Refusal Offer Notice or may consummate a transaction at a higher price upon the same terms and conditions set forth in the First Refusal Offer Notice or at a higher  price but upon terms and conditions less favorable to the prospective purchaser, for a period of six (6) months from the date of sending the First Refusal Offer Notice. If Landlord does not consummate the sale within said six (6) month period, this right of first refusal set forth herein shall again be applicable, and the foregoing procedure shall be repeated.

Closing Date") which
shall be specified by Tenant in the First Refusal Acceptance, but
be not less than thirty (30) nor more than ninety (90) days from
the date of the First Refusal Acceptance, Landlord shall trans-
fer, convey or assign to Tenant or its designee as provided in
Section 23 hereof, all of Landlord's right, title and interest in
the Leased Premises. Concurrently with such transfer, conveyance
or assignment, Tenant shall pay the purchase price as set forth
in the First Refusal Offer Notice to Landlord together with all
installments of Minimum Rental and all other sums then due and
payable under this Lease to and including such First Refusal
Closing Date.

(e) Notwithstanding anything to the contrary contained in
this Section 35, the provisions of this Section 35 shall not app-
ly to any of the following (herein called an "Exempt Transfer"):

(i) any sale or transfer to the then holder of a Mort-
gage covering the Leased Premises, or a nominee of such
holder, or to any other person, firm or corporation, who or
which shall acquire title to the Leased Premises as a result
of foreclosure of any Mortgage or as a result of delivery of
a deed in lieu of foreclosure;

(ii) any sale or transfer by the then Landlord under
this Lease to any (x) wholly-owned subsidiary of the then
landlord, or (y) any corporation which owns all the stock of
the then landlord, or (z) any wholly-owned subsidiary of any
corporation which owns all the stock of the then landlord;
and

(iii) any change in the form of business entity of
the Landlord under this Lease to such new entity provided
such new entity's ownership and control remain the same.

Notwithstanding the occurrence of an Exempt Transfer
described in subsection (ii) or (iii) above, the right of first

-60-

re     .l pursuant to this Section 35      .11 remain applicable
during the term of this Lease in accordance with the terms and
provisions of this Section 35.  Upon the occurrence of an Exempt
Transfer described in subsection (i) above, the provisions of
this Section 35 shall thereafter be void and of no further force
or effect.

### 36.    TENANT'S OBLIGATION TO PURCHASE.

(a)   If Landlord is unable to obtain a Replacement
Mortgage which Landlord is willing to accept and if an officer of
the Landlord shall certify to Tenant that it cannot obtain such a
Replacement Mortgage after applying to at least two (2) lending
sources or if the  Replacement Mortgage selected by Landlord
fails to close for  any reason reasonably beyond the control of
Landlord, Tenant agrees that it shall, upon sixty  (60) days
written notice from Landlord, at Tenant's election,  either (x)
purchase Landlord's interest in the Leased Premises for a
purchase price of $7,308,138.00 and upon Tenant selecting  this
alternative, it shall be deemed that Tenant shall have  made an
irrevocable offer to purchase as aforesaid, or (y)  either (a)
purchase the Existing Mortgage from the holder thereof or, (b) if
the holder of the Existing Mortgage shall refuse to assign . e
Existing Mortgage to Tenant, Tenant shall pay the indebtedness
due under the Existing Mortgage and Tenant shall obtain a
satisfaction of the Existing Mortgage.  Upon such payment,
Landlord shall execute and deliver to Tenant, and Tenant shall
accept from Landlord, mortgage loan documents identical in all
respects to the Existing Mortgage except only that the Mortgagee
shall be Tenant, the interest rate shall be at a rate mutually
acceptable to Landlord and Tenant, but in no event less than the
then market rate of interest for similar loans, and the term of
the loan shall be as though the holder of the Existing Mortgage
had elected not to call the loan.  Such mortgage shall be a
Replacement Mortgage.  Should Tenant elect the option set forth
in (y) (a) above, the Tenant agrees that the Existing Mortgage
shall then continue in full force and effect upon all of the

-61-

..s and conditions contained th.. ..n as if the loan had not been called by the holder thereof. Tenant agrees to notify Landlord within thirty (30) days of its receipt of Landlord's aforesaid notice of the alternative selected by Tenant as aforesaid. Should Tenant fail to send such notice within such time, Landlord shall thereafter have the right to require Tenant to perform either of the obligations set forth in subsection (x) or (y) above, and such election by Landlord shall be binding upon Tenant. Any such purchase pursuant to subsection (x) above shall be made in accordance with the provisions of Section 23 hereof. In the event Tenant shall default in performing its obligations set forth in (x) or (y) above, (whichever shall be applicable) Tenant shall be liable for all actual and consequential damages suffered by Landlord and Landlord shall have the right to obtain specific performance of Tenant's aforesaid obligatio... In the event Landlord fails to fulfill its obligations set forth in (x) above and if Tenant shall not be in default under thir Lease, then Tenant shall have all the rights and remedies he..under, at law or in equity, including without limitation specific performance.

(b) Landlord and Tenant agree that upon the ... .. the of an Exempt Transfer described in subsection (i) of Section 35(e), the provisions of this Section 36 shall thereafter be of and of no further force or effect.

37.   FINANCING ADDITIONAL IMPROVEMENTS.

(a)   Should Tenant, during the initial term or any Extended Term of this Lease, alter, remodel, add to or construct new improvements pursuant to the provisions of Section 9 hereof or should Tenant undertake to demolish, repair, rebuild and restore the Leased Premises pursuant to the provisions of Section 12(f) without receiving reimbursement therefore, as provided in the last sentence of Section 12(f) (the "New Structures") and providing the cost thereof is Five Hundred Thousand ($500,000.00) Dollars or more, Tenant may, on or prior to completion of the New Structures, offer to accept payment from Landlord for the cost

-62-

t  .eof.  Should Landlord in its s... discretion, accept Tenant's offer, which acceptance shall be made in writing sixty (60) days of the date of such offer, Landlord and Tenant shall enter into good faith negotiations looking toward the execution and delivery of a written agreement of modification of this Lease, which agreement shall provide for (i) payment by Landlord to Tenant of such cost within ninety (90) days of the date of L ndlord's acceptance of such offer or the date of completion of said New Structures whichever shall be the later, (ii) an increase in the annual rentals during the remainder of the initial term and, to the extent necessary, during any Extended Term (Tenant's options for which may be exercised as a part of such agreement) sufficient to amortize Landlord's costs of acquiring the New Structures over a period of not less than the then remaining term of this Lease including any exercised Extended Terms (herein referred to as the "amortization period") to be at the election of and as specified by Tenant, together with a rate of return on the unamortized balance of such costs, and such other terms as shall be agreed upon between Landlord and Tenant but which shall, in the aggregate, be no less favorable than the prevailing interest rate and terms for first mortgage financings, in a principal amount equal to Landlord's total costs, for property located in similar areas of the United States and of quality comparable to the New Structures, for borrowers with credit rankings equivalent to that of Tenant at that time, but having due regard for the fact that such financing would be only for the cost of the New Structures rather than for the Leased Premises as an entirety, (iii) an increase in the annual Minimum Rental for any portion of any Extended Term which will remain after the expiration of the amortization period equal to seven (7%) per centum of the cost of the New Structures, and (iv) sucn other changes and amendments of this Lease as may be necessary and appropriate in view of such payment by Landlord to Tenant.  It is contemplated that Landlord will finance One Hundred (100%) per centum of such cost by the issuance and sale of notes (the

-62-

"F       .cing") secured by a Mortgage _  ,ect to any then existing
Mortgages, which will provide for an amortization period and an
interest rate equal to those provided for in subsection (ii) of
this Section 37 and that the changes and amendments to this Lease
will be of such nature as will permit Landlord to sell such
notes.  Tenant shall pay all costs and expenses incurred by Land-
lord in connection with said lease modification and the Financing
including but not limited to closing costs, brokerage fees, taxes
and recording charges and legal expenses.

Should Tenant's offer to accept payment for the New
Structures not be accepted by Landlord within said sixty (60) day
period, or should Landlord and Tenant be unable to agree upon the
terms of the modification of this Lease for any reason whatso-
ever, neither Landlord or Tenant shall have any liability or
obligation to the other and Tenant shall have the right to
construct the New Structures at Tenant's sole cost and expense,
pursuant to the provisions of Section 9 hereof.

(b)   Landlord and Tenant agree that upon the occurrence
of an Exempt Transfer described in subsection (i) of Section

RGP
050001414
072181

35(e), the provisions of this Section 37 shall thereafter be void
and of no further force or effect.

IN WITNESS WHEREOF, the parties hereto have duly exe-
cuted this instrument under seal as of the day and year first
above written.

W I T N E S S E S :          AMERICAN PROPERTY INVESTORS XI,
                                a California limited
                                partnership

                             By:   ELEVENTH PROPERTIES MANAGEMENT
                                   CORP.

_____

_____      By: _____
                                  Vice-President

                             Attest: _____

_____      CHOMERICS, INC.

_____      By: _____

                             Attest: _____

Uniform
API

STATE OF               )
                       )  SS.:
COUNTY OF              )

On this        day of. July, 1981, before me,   the undersigned officer, personally
appeared                              and                            ,       the

                       and                      of Eleventh Properties Management

Corp., a corporation, which corporation is the general partner of American Property
Investors XI, a limited partnership, and that as such officers, being authorized so to do,
executed the foregoing instrument for the purposes therein contained by signing the  name
of  the  corporation  as  such  officers,    on  behalf  of  the  limited  partnership,  and
acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and  official seal.

_____
Notary Public

My Commission Expires:

Massachusetts

STATE OF          )
                  ) SS.:
COUNTY OF         )

On this      day of July, 1981, before me,  the undersigned officer, personally appeared                    and                    , who acknowledged themselves to be the              and              of CHOMERICS, INC., a corporation, and that as such officers, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation as such officers and acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires

The Real Estate referred to is described as follows:

two parcels of land, with improvements thereon, situated in Woburn, Middlesex County, Massachusetts, being more particularly bounded and described as follows:

## PARCEL ONE (Registered Parcel)

A certain parcel of registered land situate in Woburn, Middlesex County, Massachusetts, being more particularly bounded and described as follows:

| | |
|---|---|
| EASTERLY | by lands now or formerly of Stanley S. Newberg et al and of John H. Kellogg et al Trustees, two hundred fifty-one and 84/100 (251.84) feet; |
| SOUTHERLY | by Lot 1 as shown on plan hereinafter mentioned, two hundred seven and 96/100 (207.96) feet; |
| WESTERLY | by land now or formerly of William F D'Annolfo et al Trs., two hundred ninety-three and 25/100 (293.25) feet; |
| NORTHERLY | by Lot 4, as shown on said plan one hundred fifty-six and 82/100 (156.82) feet; |
| EASTERLY | by Lot 4, as shown on said plan, forty (40) feet; |
| NORTHERLY | by Lot 4, as shown on said plan, fifty (50) feet. |

Said parcel is shown as Lot 5 on plan No. 36990.

All of said boundaries are determined by the Land Court to be located as shown on subdivision plan no. 36990.. approved by the Land Court, a copy of which is filed in the Land Registration Office for the South Registry District of Middlesex County.

Lot 5 was formerly all of Lot 2 and a portion of Lot 3 on Land Court Plan No. 36990B.

Said parcel is conveyed together with the right of way in common with others entitled thereto to use Dragon Court for all surface and subsurface purposes for which highways, streets and ways are now or may hereafter customarily be used in the City of Woburn.

Said parcel is conveyed subject to and with the benefit of the easements, rights, reservations, restrictions, agreements and other matters as set forth or referenced in Certificates of Title Numbers 151073 and 157453 as filed with the Middlesex South Registry District of the Land Court, Book 885, Page 123 and Book 917, Page 103 respectively, to which reference may be had for Grantor's title to said parcel.

## PARCEL TWO (Unregistered Parcel)

A certain parcel of land in Woburn, Middlesex County, Massachusetts, situated on the easterly side of Commonwealth Avenue, shown as Lot 14 on a plan entitled "Plan of Land in Woburn, Mass.", dated July 8, 1981, by Dana F. Perkins and Assoc., Inc. and recorded herewith (the "Plan") which parcel is bounded and described according to said plan as follows:

NORTHWESTERLY by the sideline of Commonwealth Avenue by a curved line measuring two hundred twelve and 06/100 (212.06) feet;

WESTERLY by the sideline of Commonwealth Avenue by a straight line measuring three hundred seventy and 86/100 (370.86) feet;

NORTHERLY by land of Arthur J. Epstein, et. al., three hundred thirty-nine and 35/100 (339.35) feet;

EASTERLY by land of the Grantor by two lines measuring respectively one hundred thirty-one and 07/100 (131.07) feet and one hundred twenty two and 84/100 (122.84) feet;

EASTERLY by Parcel One herein conveyed two hundred fifty-two and 19/100 (252.19) feet; and

SOUTHERLY by land of John L. Marshall, four hundred fifty-six and 04/100 (456.04) feet.

Said parcel contains, according to said Plan, 3.934 acres. No part of the fee and soil of Commonwealth Avenue as shown on said Plan is hereby granted.

said parcel is conveyed toget...   with the right of way
in common with others entitled thereto for all purposes for
which public or private ways may now or hereafter commonly
be used in the City of Woburn from said parcel in and to
Commerce Way over Commonwealth Avenue.

Said parcel also is conveyed subject to and with the
benefit of the easements, rights, reservations,
restrictions, agreements and other matters as set forth in
the deed from Leonard Tamasi to Chomerics, Inc., dated
April 17, 1980 and recorded with said Deeds, Book 13947,
Page 515.

Upon the purchase of the Leased Premises, on any month-ly payment date, pursuant to Section 12(b) of this Lease, the purchase price payable shall be the sum of Seven Million Three Hundred Eight Thousand One Hundred Thirty-Eight ($7,308,138.00) Dollars.

(A)  The Minimum Rental due and payable under this Lease shall be at the following annual rates:

### Initial Term

| | | |
|---|---|---|
| July   , 1981 through | July 31, 1986 | $   924,938.00 |
| August 1, 1986 through | July 31, 1991 | 944,997.00 |
| August 1, 1991 through | July 31, 1996 | 966,059.00 |
| August 1, 1996 through | July 31, 2001 | 988,175.00 |
| August 1, 2001 through | January 31, 2005 | 1,011,396.00 |

### Extension Terms

| | | |
|---|---|---|
| February 1, 2005 through | July 31, 2006 | $ 1,011,396.00 |
| August 1, 2006 through | July 31, 2011 | 1,035,778.00 |
| August 1, 2011 through | July 31, 2016 | 1,061,380.00 |
| August 1, 2016 through | July 31, 2021 | 1,088,261.00 |
| August 1, 2021 through | July 31, 2026 | 1,116,487.00 |
| August 1, 2026 through | July 31, 2031 | 1,146,123.00 |
| August 1, 2031 through | July 31, 2036 | 1,177,242.00 |

(B)  In addition, the aforesaid Minimum Rental shall be increased by an amount equal to:

(a)  the increase after the date of this Lease in the annual interest and/or principal payments due under the Existing Mortgage pursuant to the terms of the Note secured thereby; and

(b)  the difference between the annual constant payments of interest and/or principal due under any Replacement Mortgage (the "Replacement Debt Service") and the annual constant payments of interest and/or principal due under the Existing Mortgage at the end of the fifteenth (15th) Loan Year, as defined in the Existing Mortgage (the "Existing Debt Service").

-67-

fifty (50%)
perce... of such excess.

Any such increase or decrease in the Minimum Rental pursuant
to this paragraph (B) shall be effective upon the effective date
of the increase or decrease provided for in subsection (a) or (b)
above.

## EXHIBIT B

## PLANS AND SPECIFICATIONS FOR SUBLANDLORD'S WORK

GSDocs-773770-5
07/07/99 11:40 AM

# EXHIBIT C

## SUBLEASE PREMISES

GSDocs-773770-5
07/07/99 11:40 AM

EXHIBIT C
SUBLEASE PREMISES



## EXHIBIT D

## INSURANCE REQUIREMENTS

(a)     Throughout the Term, Subtenant shall, at Subtenant's sole cost and expense, effect and maintain, with insurance companies acceptable to and approved by Sublandlord and Overlandlord, the following insurance coverages with respect to the Demised Premises: (i) "All Risk" property insurance, including sprinkler leakage and earthquake (if applicable), covering Subtenant's property in an amount not less than the full replacement value of Subtenant's property; (ii) if at any time Subtenant's property or any part thereof is within an area designated "flood prone" pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Prevention Act of 1973 (42 U.S.C. 4001-4128) (collectively the "National Flood Insurance Program") or any amendments or supplements thereto or substitutions therefor, Subtenant shall obtain flood insurance in such amounts as Sublandlord or Overlandlord may require and shall in any event comply with the National Flood Insurance Program as set forth in the foregoing legislation; (iii) rental value insurance in an amount sufficient to meet the rental payments for twelve (12) months; (iv) comprehensive general liability insurance in an amount not less than $3,000,000 combined single limit each occurrence for bodily injury and property damage, including but not limited to premises liability, blanket contractual liability, personal injury and products liability insurance coverage; (v) workers' compensation coverage in compliance with the Workers' Compensation Act of the sate where the Demised Premises is located and employer's liability insurance with a limit of not less than $1,000,000 per occurrence for any accident/disease; (vi) umbrella and excess liability insurance with a limit of not less than $2,000,000; and (vii) such other insurance as Sublandlord or Overlandlord may require.

(b)     The umbrella and excess liability insurance shall provide additional limits of liability to the comprehensive general liability insurance required under subsection (a)(iv) and the employer's liability insurance required under subsection (a)(v) above. All liability insurance shall designate Sublandlord and Overlandlord as additional insureds. All insurance required under this Article shall provide that no cancellation or material change or reduction thereof shall be effective until at least thirty (30) days after Sublandlord has received written notice thereof. All insurance required under this Article shall be primary and not excess or contributory with any insurance, co-insurance or self-insurance maintained by Sublandlord or Overlandlord.

(c)     Certificates of insurance evidencing the insurance required thereunder shall be delivered to Sublandlord and Overlandlord on or before the Commencement Date and on or before policy anniversary or inception dates. If such certificates shall not be delivered, then Sublandlord or Overlandlord may procure and/or pay for the same and the amounts so paid by Sublandlord or Overlandlord, with interest thereon at the highest lawful rate, shall be added to the installment of monthly rent becoming due on the first of the next succeeding month and shall be collected as an additional charge.

GSDocs-773770-5
07/07/99 11:40 AM

GSDocs-773770-5
07/07/99 11:40 AM

EXHIBIT E
FIRST FLOOR SPACE





EXHIBIT F
THIRD FLOOR SPACE

THIRD FLOOR SPACE

"TENANT NAME"
EXHIBIT  G
LANDLORD'S SERVICES

## I. CLEANING (Public Areas Only)

### A. General
1. All cleaning work will be performed between 8 a.m. and 12 midnight, Monday through Friday, unless otherwise necessary for stripping, waxing, etc.
2. Abnormal waste removal (e.g., computer installation paper, bulk packaging, wood or cardboard crates, refuse from cafeteria operation, etc.) shall be Tenant's responsibility.

### B. Daily Operations (5 times per week)
1. Tenant Areas
   a. Empty and clean all waste receptacles; wash receptacles as necessary
   b. Vacuum all rugs and carpeted areas.
   c. Empty, damp-wipe and dry all ashtrays.
2. Lavatories
   a. Sweep and wash floors with disinfectant.
   b. Wash both sides of toilet seats with disinfectant.
   c. Wash all mirrors, basins, bowls, urinals.
   d. Spot clean toilet partitions.
   e. Empty and disinfect sanitary napkin disposal receptacles.
   f. Refill toilet tissue, towel, soap, and sanitary napkin dispensers.
3. Public Areas
   a. Wipe down entrance doors and clean glass (interior and exterior).
   b. Vacuum elevator carpets and wipe down doors and walls.
   c. Clean water coolers.

### C. Operations as Needed (but not less than every other day)
1. Public Areas
   a. Buff all resilient floor areas.

### D. Weekly Operations
1. Tenant Areas, Lavatories, and Public Areas
   a. Hand-dust and wipe clean all horizontal surfaces with treated cloths to include furniture, office equipment, window sills, door ledges, chair rails, baseboards, convector tops, etc., within normal reach.
   b. Remove finger marks from private entrance doors, light switches, and doorways.
   c. Sweep all stairways.

### E. Monthly Operations
1. Tenant and Public Areas
   a. Thoroughly vacuum seat cushions on chairs, sofas, etc.
   b. Vacuum and dust grillwork.
2. Lavatories
   a. Wash down interior walls and toilet partitions.

### F. As Required and Weather Permitting
1. Entire Building
   a. Clean inside of all windows.
   b. Clean outside of all windows.

### G. Yearly
1. Tenant and Public Areas
   a. Strip and wax all resilient tile floor areas.

II. **HEATING, VENTILATING, AND AIR CONDITIONING**
1. Heating, ventilating, and air conditioning (hereinafter called "HVAC") as required to provide reasonably comfortable temperatures for normal business day occupancy (excepting holidays); Monday through Friday from 8:00 a.m. to 6:00 p.m. and Saturday from 8:00 a.m. to 12:00 p.m.
2. If the Tenant shall require HVAC at any other time (hereinafter called "After Hours"), the Landlord shall furnish HVAC After Hours service upon reasonable advance notice from the Tenant and the Tenant shall pay as Additional Rent the then established reasonable charges of the Landlord. In the event more than one tenant in the office building shall request After HVAC at the same time or times, the Landlord shall use their best efforts to pro-rate the charges therefore among all users.
3. The Landlord shall not be responsible if the normal operation of the office building HVAC system shall fail to maintain reasonable temperatures within the Tenant's Premises or any portion thereof: a. which shall have an electrical load in excess of five (5) watts per square foot of usable area for all purposes or which shall have a human occupancy factor in excess of one (1) person per one hundred (100) square feet of usable area; or b. because of any design or arrangement or partitioning or other improvements to the Tenant's Premises; or c. if the Tenant fails to cooperate fully with the Landlord at all times and abide by regulations and requirements which the Landlord may reasonably prescribe for the proper functioning and protection of the HVAC system.
4. The Tenant shall not use or permit the use of any portion of the Premises for the preparation of foods or the conduct of any other activity which would permit fumes or odors to enter the HVAC system.
5. Maintenance of any additional or special air conditioning equipment and the associated operating cost will be at Tenant's expense.

III. **WATER**
Hot water for lavatory purposes and cold water for drinking, lavatory and toilet purposes.

IV. **ELEVATORS (if Building has Elevators)**
Elevators for the use of all tenants and the general public for access to and from all floors of the Building. Programming of elevators (including, but not limited to, service elevators) shall be as Landlord from time to time determines best for the Building as a whole.

V. **RELAMPING OF LIGHT FIXTURES**
Tenant will reimburse Landlord for the cost of lamps, ballasts and starters and the cost of replacing same within the Premises.

VI. **CAFETERIA AND VENDING INSTALLATIONS**
1. Any space to be used primarily for lunchroom or cafeteria operation shall be Tenant's responsibility to keep clean and sanitary, it being understood that Landlord's approval of such use must be first obtained in writing.
2. Vending machines or refreshment service installations by Tenant must be approved by Landlord in writing and shall be restricted in use to employees and business callers. All cleaning necessitated by such installations shall be at Tenant's expense.

VII. **ELECTRICITY**
1. The Landlord will provide electrical energy for lighting of both land and common areas as well as equipment necessary to provide services included in this Lease. Tenant electricity (lights and plugs) will be separately metered and use thereof will be the sole responsibility of the Tenant within the Tenant's Premises.
2. The Tenant covenants that at no time shall the use of electrical energy in the Premises exceed the capacity of the existing feeders and wiring installations then serving the Premises. The Tenant shall not make any alterations in or additions to the wiring installations in the Premises or the size, type and number of business machines, office equipment or other appliances in or serving the Premises without prior written approval of



the Landlord.  Approval of the Landlord for such additions or alterations shall not be unreasonably withheld, provided the Tenant shall pay all costs of any additional risers or equipment required for such additional requirements and approval of the Landlord may be conditioned upon the Tenant's agreement to pay to the Landlord, as Additional Rent, the cost of the additional electrical energy to be made available to the Premises and any other costs incurred by the Landlord in connection therewith.

③

## ASSIGNMENT OF LEASE AND ASSUMPTION AGREEMENT

ASSIGNMENT OF LEASE AND ASSUMPTION AGREEMENT made as of the 30th day of September, 1994 between CHOMERICS, INC., a Delaware corporation ("Assignor"), having an office at 77 Dragon Court, Woburn, Massachusetts 01888-4014, and W. R. GRACE & CO.-CONN., a Connecticut corporation, having an office at One Town Center Road, Boca Raton, Florida 33486-1010 ("Assignee").

### W I T N E S S E T H:

WHEREAS, Assignor is the tenant under that certain lease (the "Lease") dated July 22, 1981 between American Real Estate Holdings Limited Partnership (successor to American Property Investors XI), as landlord, and Assignor, as tenant (the "Lease"); and              BK 4360  PG 319

WHEREAS, Assignor desires to assign the Lease to Assignee, which is the parent and holder of all of the outstanding capital stock of Assignor.

NOW, THEREFORE, in consideration of the sum of Ten ($10.00) Dollars in hand paid by Assignee to Assignor, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Assignor assigns to Assignee the estate of Assignor as tenant created by the Lease, together with (a) all of Assignor's right, title and interest in, to and under the Lease and the premises demised thereby, which premises are more particularly described in the Lease, (b) any and all rights to extend, renew or purchase the Lease and (c) any and all other rights and options granted to Assignor as the tenant thereunder, to have and to hold the same unto Assignee, its successors and assigns, from and after the effective date hereof, subject to the obligation to pay rent and to perform the other provisions, terms, covenants and conditions contained in the Lease.

2.     Assignee accepts this assignment of the Lease from Assignor and assumes the obligation to observe and perform all of the provisions, terms, covenants and conditions to be performed by Assignor thereunder from and after the effective date hereof with the same force and effect as if Assignee had executed the Lease originally as the tenant.

3.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.     The effective date of this Agreement is the 30th day of  September , 1994.

MARGINAL REC...    ...QUESTED

BOOK 14360   PAGE 319

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

CHOMERICS, INC., a Delaware corporation

By: _____
Name: Donald H. Kohnken
Title: President


W. R. GRACE & CO.-CONN., a Connecticut corporation

By: _____
Name: Bernd A. Schulte
As its: Vice President


STATE OF FLORIDA      )
COUNTY OF PALM BEACH  )

        The foregoing instrument was acknowledged before me this 26 day of September, 1994 by Donald H. Kohnken, as the President of Chomerics, Inc., a Delaware corporation, on behalf of the corporation. He is personally known to me.

_____
Notary Public

SUSAN K. ROBIN
MY COMMISSION EXPIRES
December 20, 1994
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF FLORIDA      )
COUNTY OF PALM BEACH  )

        The foregoing instrument was acknowledged before me this 26 day of September, 1994 by Bernd A. Schulte, as the Vice President of W. R. Grace & Co.-Conn, a Connecticut corporation, on behalf of the corporation. He is personally known to me.

_____
Notary Public

h:\shared\capplega\wp\chomeric\asnlease.asm



SUSAN K. ROBIN
MY COMMISSION EXPIRES
December 20, 1994
BONDED THRU NOTARY PUBLIC UNDERWRITERS

- 2 -