# EXHIBIT C

ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made this ____ day of _____, 2001, by and between W.R. GRACE & CO.-CONN. ("Assignor"), a Connecticut corporation, with an office at 7500 Grace Drive, Columbia, Maryland 21044-4098 and ATLANTIC BOSTON CONSTRUCTION, INC., a Massachusetts corporation, having a mailing address c/o Cummings Properties, 200 West Cummings Park, Woburn, MA 01801-6396 ("Assignee").

W I T N E S S E T H:

WHEREAS, Assignor is the owner and holder of the tenant's interest in and to that certain lease dated July 22, 1981, by and between American Property Investors XI, as landlord, and Chomerics, Inc. ("Chomerics") as tenant (as amended from time to time, the "Lease") for the premises, consisting of a certain parcel of land with the buildings and other improvements located thereon commonly known as 78 Dragon Court, Woburn, Massachusetts (collectively, the "Premises"), which Premises are more particularly described in the Lease;

WHEREAS, pursuant to an Assignment of Lease and Assumption Agreement dated as of September 30, 1994, Chomerics assigned its interest under said Lease to Assignor.  American Real Estate Holdings Limited Partnership (the "Landlord") is the successor in interest to American Property Investors XI;

WHEREAS, Assignor is party to that certain Foster Road Ramp License Agreement (as amended from time to time, the "License") dated September 30, 1994, by and between Assignor, as licensor, and Chomerics, as licensee, under which Assignor granted to Chomerics the right to use a certain Foster Road Ramp and a non-exclusive license to use common areas as defined therein; Parker-Hannifin Corporation is the successor in interest to Chomerics under the License;

WHEREAS, Assignor is party to that certain Sublease (as amended from time to time, the "Magnetic Testing Sublease") dated September 30, 1994 by and between Assignor, as sublessor, and Chomerics, as sublessee, under which Assignor demised to Chomerics a certain magnetic testing facility containing approximately 1,680 square feet as more particularly described therein;

WHEREAS, Assignor is party to that certain Sublease (as amended from time to time, the "CMGI Sublease") dated July 27, 1999, by and between Assignor, as sublessor, and CMGI, Inc., successor in interest to iCast Corporation and Zinezone Corporation, as sublessee, for certain space in the Building as more particularly described therein;

WHEREAS, Assignor is party to that certain Sublease (as amended from time to time, the "Zaiq Sublease") dated July 2, 1998, by and between Assignor, as sublessor and Zaiq Technologies, Inc., formerly known as ASIC Alliance Corporation ("Zaiq"), as sublessee, for certain space in the Building as more particularly described therein;

WHEREAS, Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, all of Assignor's right, title and interest in and to the Lease, the License, the Magnetic Testing Sublease, the CMGI Sublease and the Zaiq Sublease;

WHEREAS, this Agreement is being entered into pursuant to an Order (the "Order") of the United States Bankruptcy Court for the District of Delaware dated _____, 2001 in Case No. 01-01139 (JJF) (Jointly Administered) approving this Agreement and the transactions contemplated herein; and

WHEREAS, Assignor desires to assign all of Assignor's right, title, and interest in and to the Lease, the License, the Magnetic Testing Sublease, the CMGI Sublease and the Zaiq Sublease to Assignee, and Assignee desires to accept such assignment and assume the obligations of the tenant under the Lease, the licensor under the License and the sublessor under the Magnetic Testing Sublease, CMGI Sublease and Zaiq Sublease (collectively, the "Subleases") from and after the date hereof, on the terms and conditions hereinafter set forth;

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, and the mutual covenants herein contained, the parties agree as follows:

1. Assignor hereby assigns, sets over and transfers unto Assignee, to have and to hold from and after the date hereof (the "Effective Date"), all of the right, title and interest of Assignor in, to and under the Lease and the leasehold estate created thereby (including, without limitation, all options to renew and any and all purchase options or rights of first refusal) for the balance of the term of the Lease, subject to and upon the rents, covenants, conditions, provisions and agreements contained therein, and Assignee hereby accepts such assignment and assumes the performance and observation of and agrees to be bound by all of the terms, covenants, agreements, provisions and conditions of the Lease on the tenant's part to be performed and observed under the Lease for the period from and after the Effective Date.

2. Assignor hereby assigns, sets over and transfers unto Assignee, to have and to hold from and after the Effective Date, all of the right, title and interest of Assignor in, to and under the License and Subleases for the balance of the term of the License and Subleases, subject to and upon the covenants, conditions, provisions and agreements contained therein, and Assignee hereby accepts such assignment and assumes the performance and observation of and agrees to be bound by all of the terms, covenants, agreements, provisions and conditions of the License and the Subleases on the part of the licensor or sublandlord, as the case may be, to be performed and observed under the License and Subleases for the period from and after the Effective Date.

3. Assignor hereby agrees that it shall be and is responsible for the payment of any and all cure amounts necessary to be paid under the Lease, License and Subleases as required to be paid by the Order which are due and owing prior to the Effective Date (including all rent, additional rent, taxes, insurance and CAM charges) and the same shall remain the obligations of Assignor.  Notwithstanding the foregoing, Assignee shall be responsible for the payment of any tenant improvement allowance and brokerage commission payable by reason of the occupancy of all or any part of the third floor of the Premises by Zaiq Technologies, Inc., whenever the same shall be due and owing.

4. In consideration for Assignor's assignment to Assignee of the Lease, License and Subleases as set forth herein, Assignee has paid to Assignor the sum of One Thousand Dollars ($1,000.00) in readily available funds, and shall pay to Assignor no later than ninety (90) days after the end of each calendar year, commencing with the year ending December 31, 2001, and continuing until the expiration of the term of the Lease and all extensions thereof, one-half of all Net Profits as provided below, if any.

"Net Profits" for any calendar year shall mean the difference of (i) Gross Revenues (defined below) for and with respect to such year minus (ii) the sum of (a) all Operating Expenses (defined below) for and with respect to such year plus (b) any Operating Loss Carry Forward (defined below) carried forward, as provided below, from previous calendar year(s).

Net Profits shall be calculated and distributed on an annual basis.  Not later than ninety (90) days after the expiration of each calendar year during the term of the Lease (which term shall include, for the purposes of this Section 4, the partial calendar year following the Effective Date and the partial calendar year at the end of the term of the Lease), Assignee shall prepare and deliver to Assignor a statement (the "Annual Statement") of Net Profits for such year, certified by an executive officer of Assignee and setting forth in reasonable detail Gross Revenues, Operating Expenses, and Operating Loss Carry Forward for such year.  Assignee shall maintain at its principal business offices books and records maintained in accordance with generally accepted accounting principles with respect to Gross Revenues, Operating Expenses, and Operating Loss Carry Forward for at least three (3) years after the close of the applicable year.  Nothing herein shall require Assignee to prepare any audited financial statements.  Assignor shall have the right at its expense, however, to examine such books and records with respect to any calendar year during the term of the Lease for a period of three (3) years after the close of such year.  If such examination shows that Net Profits for such year are other than as stated in the Annual Report for such year, Assignor shall notify Assignee in writing thereof, and  the parties shall attempt to agree upon the Net Profits.  If the parties fail to agree upon the amount of Net Profits for such year within

one hundred twenty (120) days after Assignor so notifies Assignee, then such amount shall be determined by arbitration conducted by a single arbitrator in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Such arbitrator shall have at least ten (10) years experience with commercial real estate in the Boston metropolitan area and shall be instructed to render his or her decision within sixty (60) days after the submission of such dispute to arbitration.  The determination of such arbitrator shall be conclusive and binding upon the parties.  Upon final resolution of Net Profits, a payment shall be made to Assignor or Assignee, as the case may be, so that the Net Profits for such year shall be divided equally between Assignor and Assignee.

"Gross Revenues" shall mean the gross amount of all rents and other sums received by or on behalf of Assignee for and with respect to the Premises, including, without limitation, all rent, additional rent, and other sums payable under any subleases, licenses or occupancy agreements of any nature (including, without limitation, the License and the Subleases), and any antenna or sign licenses or similar agreements.  Gross Revenues shall be calculated on a cash basis, except that amounts received from any subtenants as compensation for the early termination of such subtenant's sublease shall not be recognized in whole when paid, but shall be deemed to be received monthly at the monthly rental rate under such sublease until the total amount of such payment has been recognized.

"Operating Expenses" shall mean all costs and expenses reasonably incurred by Assignee in the operation, insuring, repair, equipping, maintenance, replacement, management, cleaning and protection (collectively, "the Operation") of the Premises, including, but not limited to, the following:

    (a)    All rent and other amounts paid under the Lease;

    (b)    Costs incurred by Assignee for wages, salaries and other compensation for services, payroll, social security, unemployment and similar taxes, worker's compensation insurance, disability benefits, pensions, hospitalization, retirement plans and group insurance, uniforms and working clothes and the cleaning thereof, and expenses imposed on Assignee or its agents (collectively, "Employment Costs") related to employment of day and night supervisors, janitors, handymen, carpenters, engineers, firemen, mechanics, electricians, plumbers, guards, cleaners and other personnel employed directly in the Operation of the Premises; provided, however, that Employment Costs of personnel who work less than full-time in connection with the Operation of the Premises shall be equitably adjusted;

(c) The cost of services, materials and supplies furnished or used in the Operation of the Premises;

(d) The amounts paid to managing agents and for legal and other professional fees relating to the Operation of the Premises, including but not limited to such fees paid in connection with (x) negotiations for or the enforcement of leases; and (y) seeking abatements of taxes; provided, however, that management fees shall not exceed the rates set forth in the Building Management Agreement attached hereto as Schedule K or prevailing market rates, whichever is greater;

(e) Insurance premiums;

(f) Costs for electricity, steam, and other utilities required in the Operation of the Premises;

(g) Water and sewer use charges;

(h) All costs related to snow and ice removal and landscaping;

(i) Amounts paid to independent contractors for services, materials and supplies furnished for the Operation of the Premises; and

(j) Expenses relating to leasehold improvements;

(k) Real estate taxes;

(l) Rental payments under leases of equipment used in connection with the Operation of the Property (e.g., HVAC equipment) and interest actually paid to third parties on account of sums borrowed by Assignee to fund capital expenditures on the Premises.

(m) All other expenses incurred in connection with the Operation of the Premises, provided, however, that no item of expense shall be counted more than once (e.g., to the extent that real estate taxes are included as an amount payable under the Lease, the same shall not be included separately under item (k) above).

Operating Costs may be incurred directly or by way of reimbursement, and shall include taxes applicable thereto. Except as expressly provided in the next sentence, Operating Costs shall be calculated on an accrual basis. Notwithstanding the foregoing, with respect to capital expenses incurred by Assignee and includable as Operating Costs, Assignee may elect either to include the entire amount of such expense in Operating Costs in the year actually paid by Assignee or to amortize such expense over the useful life of the applicable item(s) and include only the annual depreciation

thereof in Operating Costs for each applicable year. The following shall be excluded from Operating Costs:

(a) Employment Costs of employees, officers, and executives of Assignee not directly employed in the Operation of the Premises (i.e., above the level of Premises Manager) and other costs and expenses associated with the Operation of the Premises but allocable to other properties (e.g., where a service is provided at a single cost to both the Premises and another property of Assignee, an equitable allocation shall be made to exclude the cost fairly attributable to such other property);

(b) All other overhead costs of Assignee;

(c) Depreciation; and

(d) Interest on indebtedness.

"Operating Loss" shall mean the amount, if any, by which Operating Expenses for any calendar year exceed Gross Revenues for such year. Except as expressly provided in this Section with respect to the inclusion of Operating Loss Carry Forward in the calculation of Net Profits, Assignee shall be solely responsible for any Operating Loss from and after the Effective Date.

"Operating Loss Carry Forward" for any calendar year shall mean the sum of (i) the Operating Loss, if any, for such year, plus (ii) the aggregate amount, if any, of the Operating Loss carried forward from all previous calendar years.

5. Assignor hereby unconditionally, absolutely and irrevocably agrees to indemnify and hold Assignee harmless against and from any and all costs, claims, obligations, damages, penalties, causes of action, losses, injuries, liabilities and expenses, including, without limitation, reasonable attorneys' fees, arising (i) by reason of or in connection with Assignor's failure to perform the tenant's obligations under the Lease, the licensor's obligations under the License, or the sublessor's obligations under any of the Subleases, but in all cases only to the extent arising or accruing prior to the Effective Date, or (ii) from the breach of any warranty or representation made by Assignor under Sections 7 or 8 of this Assignment.

6. Assignee hereby unconditionally, absolutely and irrevocably agrees to indemnify and hold Assignor harmless against and from any and all costs, claims, obligations, damages, penalties, causes of action, losses, injuries, liabilities and expenses, including, without limitation, reasonable attorneys' fees, arising by reason of or in connection with Assignee's failure to perform the tenant's obligations under the Lease, the licensor's

obligations under the License, or the sublessor's obligations under any of the Subleases, but in all cases only to the extent arising or accruing on and after the Effective Date.

7. Assignor hereby assigns, sets over and transfers unto Assignee, to have and hold from and after the Effective Date, in accordance with the terms of the Subleases, as applicable, any and all cash security deposits currently in the possession of Assignor, and all of Assignor's interest in and to any and all letters of credit or other similar instruments issued by a subtenant in favor of Assignor, as sublessor. Assignor shall execute and provide to Assignee on or before the Effective Date any documents that are required to transfer to Assignee Assignor's interest in and to any letters of credit or other similar instruments. Assignor warrants and represents to Assignee that the amounts set forth on Schedule A annexed hereto for the security deposits are complete and accurate, and that no sublessee or licensee has prepaid any rent or other charges beyond the current month, (other than to the extent a security deposit includes prepayment of last month's rent) and Assignee hereby agrees to accept such cash security deposits and letter(s) of credit and agrees to be bound by all of the terms, covenants, agreements, provisions and conditions of the Subleases with respect thereto.

8. Assignor hereby represents and warrants to Assignee:

    (a) that the copies of the Lease, the License, the Magnetic Testing Sublease, the CMGI Sublease and the Zaiq Sublease, including without limitation, all amendments, attached hereto as Schedules B through F attached hereto, respectively, are complete and accurate in all respects, and there are no further amendments or extensions thereof; that the Lease, the License and said Subleases are all in full force and effect, without any notice of termination or material default except as may be set forth in Schedule G attached hereto (Notwithstanding any other provision of this Assignment, the cure of any default, if any, set forth in Schedule G shall remain the responsibility of Assignor, and Assignor retains the right to contest any such default.); and that there are no written or oral provisions, understandings or commitments, including any for the payment of any brokerage commissions or fees except as provided in Section 3 above, arising out of or concerning the Lease, the License and said Subleases, and any extensions or renewals thereof, other than as expressly set forth in the Lease, the License or said Subleases;

    (b) that neither Assignor nor its predecessor in interest under the Lease has entered into any subleases, licenses or other occupancy agreements for the use of space at the Premises that remain in

        effect as of the date hereof, other than the License, the Magnetic Testing Sublease, the CMGI Sublease, and the Zaiq Sublease;

    (c)    that neither Assignor nor its predecessor in interest under the Lease has entered into any contracts or agreements for the provision of goods or services to the Premises that are not terminable by Assignor (whether by rejection or otherwise) on or before the Effective Date; and that Assignee will terminate or reject any such contracts or agreements on or before the Effective Date hereof;

    (d)    that there are no other agreements to which Assignor is a party affecting Assignor's leasehold interest, subleasing, subtenancies or operation of the Premises which are not referenced herein.

9. Assignor agrees diligently to use commercially reasonable efforts to obtain: (i) from the Landlord an estoppel certificate in form and substance substantially equivalent to that set forth on Schedule H attached hereto; (ii) from the subtenants under each of the Subleases estoppel certificates in form and substance substantially equivalent to that set forth on Schedule I attached hereto; and from the licensee under the License an estoppel certificate in form and substance substantially equivalent to that set forth on Schedule J attached hereto, and to deliver all of the same to Assignee on or before the Effective Date.

10. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

11. None of the covenants and agreements set forth in this Agreement is for the benefit of, and none of the same shall be enforceable by, any person or entity other than the parties hereto, their respective successors and assigns, it being the intention of the parties hereto that no third party is intended to be a beneficiary of or with respect to such covenants and agreements, other than the parties hereto, their respective successors and assigns. Notwithstanding the foregoing, the parties agree that Landlord will be provided with an original executed counterpart of this Agreement and that Landlord shall be entitled to rely upon this document as confirmation of the identity of the holder of tenant's interest under the Lease.

12. Assignor and Assignee each warrant and represent to the other that no financial adviser, broker, agent or finder has been retained by it in connection with this Agreement or any transaction contemplated hereby, nor are they aware that any such party is entitled to any fee or other compensation on account of this Agreement or any transaction contemplated hereby, and Assignor and Assignee each agree to indemnify and hold the other harmless against and from all losses or claims based on or arising out of any assertion by any such party that it is entitled to any

fee or compensation due to an agreement made by such party and the indemnitor in violation of the forgoing.

13. All understandings and agreements heretofore had between Assignor and Assignee with respect to the transactions contemplated hereby are merged in this Agreement, which alone fully and completely expresses the parties' total agreement with respect to the transactions contemplated hereby.

14. Any party hereto may execute this document by facsimile signature which facsimile signature shall be deemed to be an original signature.

15. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

16. Time is of the essence with respect to all provisions of this Agreement. All provisions of this Agreement shall survive Closing.

17. This Agreement, and the offer to purchase letter dated August 15, 2001, constitute the entire Agreement between the parties hereto with respect to the subject matter hereof and supersede any and all written or oral agreements with respect hereto. This Agreement may be amended or modified only by an instrument signed by all of the parties hereto. This Agreement shall be construed in accordance with the laws of the Commonwealth of Massachusetts.

18. On the Effective Date and effective as of 11:59 P.M. of the day prior to the Effective Date, Assignor and Assignee shall make all normal and customary real estate prorations consistent with the terms and conditions of this Agreement, including real estate taxes, water, sewer and utility charges, rents and other charges payable under the Lease, and income and expenses under the Subleases and License. All state and local transfer fees and taxes and recording fees shall be the responsibility of Assignee.

19. Assignor and Assignee have each been represented by legal counsel in the preparation of this Agreement and the rule of construction that documents be construed against the drafter shall not apply to this Agreement.

20. Assignor and Assignee shall execute herewith a Notice of Assignment in substantially the same form as attached hereto as Schedule L, and Assignee shall promptly record the Notice of Assignment and provide Assignor with a copy of the Notice of Assignment with evidence of recordation.

21. Notwithstanding anything contained herein to the contrary, Assignor shall remain responsible for all remediation and other work required under law

        or under the Lease with respect to the fuel oil release at the Premises described in that certain "Immediate Response Action Completion & Response Action Outcome Statement", RTN3-20469, dated July 16, 2001, prepared by Lessard Environmental, Inc., a copy of which has been provided to Assignee.

22.     The following schedules are incorporated in this Assignment and Assumption Agreement by this reference:

        Schedule A:  Schedule of Security Deposits
        Schedule B:  Lease
        Schedule C:  License
        Schedule D:  Magnetic Testing Sublease
        Schedule E:  CMGI Sublease
        Schedule F:  Zaiq Sublease
        Schedule G:  Default Notices
        Schedule H:  Landlord Estoppel Form
        Schedule  I:  Subtenant Estoppel Form
        Schedule J:  Licensee Estoppel Form
        Schedule K:  Building Management Agreement
        Schedule L:  Notice of Assignment

    IN WITNESS WHEREOF,  the parties hereto have duly executed this Assignment and Assumption Agreement as a sealed instrument as of the day and the year first above written.

                W.R. GRACE & CO. – CONN.

                By:_____
                    Name: _____
                    Title: _____

                ATLANTIC BOSTON CONSTRUCTION, INC.

                By: _____
                    Name: _____
                    Title: _____

STATE OF                      )
                                       ) ss.
COUNTY OF                  )

        On the ____ day of _____ in the year 2001 before me, the undersigned, a notary public in and for said State, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                                     _____
                                                     Notary Public


STATE OF                      )
                                       ) ss.
COUNTY OF                  )

        On the ____ day of _____ in the year 2001 before me, the undersigned, a notary public in and for said State, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                                     _____
                                                   Notary Public