# EXHIBIT T

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

INTERFAITH COMMUNITY
ORGANIZATION, et al.,

       Plaintiffs,

v.

HONEYWELL INTERNATIONAL INC., et al.,

       Defendants.

Civil Action No. 95-2097 (DMC)

---

## BRIEF OF DEFENDANT HONEYWELL INTERNATIONAL INC. IN OPPOSITION TO THE MOTION BY DEFENDANTS W.R. GRACE & CO. AND W.R. GRACE LTD. FOR SUMMARY JUDGMENT ON ALL OF HONEYWELL'S CROSS-CLAIMS.

---

**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey 07068-1791
(973) 597-2500
Attorneys for Defendant
  Honeywell International Inc.

## TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................................. iii

Preliminary Statement.............................................................................................................1

Statement Of Facts. .................................................................................................................2

      A.    The Site. .................................................................................................2

      B.    Honeywell's Relationship To The Site. ......................................................2

      C.    The Grace Defendants' Relationship To The Site And Knowledge Of Site Conditions. ...................................................................2

Under The Direction Of NJDEP, Honeywell Has Committed And Expended Significant Resources To Investigate And Remediate This Site. .......................................................6

W.R. Grace & Co. Is A Successor-In-Interest To Daylin And ECARG, Inc. Is Not An Operating Entity .................................................................................................................7

Legal Argument .......................................................................................................................8

    I     W.R. GRACE LTD. LACKS STANDING TO ASSERT ANY CROSS-CLAIMS. ...................................................................................................8

    II    AS OWNER OF THE SITE, W.R. GRACE & CO. IS LIABLE IN CONTRIBUTION TO HONEYWELL UNDER CERCLA §113. ........................9

      A.    W.R. Grace & Co. Is A Responsible Party Under CERCLA §107(A). ..........................................................................................10

            1.    W.R. Grace & Co. Is The Alter Ego Of Daylin And ECARG, Inc. ...............................................................................10

            2.    W.R. Grace & Co. Is Derivatively Liable As Owner Of The Site. ...............................................................................11

            3.    W.R. Grace & Co. Is Not A Statutory Innocent Purchaser. .......................................................................................13

      B.    W.R. Grace & Co. Has Admitted The Remaining Elements Of Honeywell's CERCLA § 113 Claim. ..................................................15

    III   W.R. GRACE & CO. IS LIABLE UNDER THE NEW JERSEY SPILL COMPENSATION AND CONTROL ACT. ..........................................15

Page

IV     W.R. GRACE & CO. IS LIABLE TO HONEYWELL UNDER THE
       NEW JERSEY JOINT TORTFEASORS ACT. .....................................................18

V      HONEYWELL HAS PROPERLY ASSERTED DECLARATORY
       JUDGMENT CLAIMS AGAINST W.R. GRACE & CO......................................18

Conclusion. .............................................................................................................................20

## TABLE OF AUTHORITIES

Page

**CASES**

Allen v. Wright, 468 U.S. 737 (1984).............................................................................................8

Analytical Measurements, Inc. v. Keuffel & Esser Co.,
    843 F. Supp. 920 (D.N.J. 1993) ...........................................................................................15

Angleton v. Pierce, 574 F. Supp. 719 (D.N.J. 1983), aff'd 734 F.2d 3
    (3d Cir. 1984), cert. den. sub nom, Gerlber v. Marsh, 105 S. Ct. 245 (1985) ....................9

Aralac v. Hat Corp., 166 F.2d 286 (3d Cir. 1948) .........................................................................19

Bress v. L.F. Dommerich & Co., Inc., 94 N.J. Super. 282 (App. Div. 1967)................................19

Brotherhood of Locomotive Engineers v. Springfield Terminal Railway Co.,
    210 F.3d 18 (1st Cir. 2000)...................................................................................................12

Carter-Jones Lumber Company v. LTV Steel Company,
    237 F.3d 745 (6th Cir. 2001) ...............................................................................................12

Exxon Research and Engineering Co. v. United States,
    44 Fed. Cl. 597 (Fed. Cl. 1999) ...........................................................................................10

Judice's Sunshine Pontiac, Inc. v. General Motors Corp.,
    418 F. Supp. 1212 (D.N.J. 1976) ...........................................................................................9

Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.,
    976 F.2d 1338 (9th Cir. 1992) .............................................................................................17

In re Kimber Petroleum Corp., 110 N.J. 69 (1988) .......................................................................17

Lansford-Coaldale Joint Water Authority v. Tonolli Corp.,
    4 F.3d 1209 (3d Cir. 1993)...................................................................................................11

Marsh v. N.J. Department of Environmental Protection, 152 N.J. 137 (1997) .............................16

Marsh v. New Jersey Spill Compensation Fund,
    286 N.J. Super. 620 (App. Div. 1996) .................................................................................17

McCormick-Morgan, Inc. v. Teledyne Industries, Inc.,
    134 F.R.D. 275 (N.D. Ca. 1991)..........................................................................................10

Page

Hatco Corp. v. W.R. Grace & Co., 801 F. Supp. 1309 (D.N.J.),
     vacated on other grounds, 59 F.3d 400 (3d Cir. 1995) .......................................................14

New Castle County v Halliburton NUS Corp.,
     111 F.3d 116 (3d Cir. 1997).................................................................................................13

N.J. Department of Environmental Protection v. Ventron Corp.,
     94 N.J. 473 (1983) ...............................................................................................................16

New Jersey Assoc'n for Retarded Citizens v. Human Services,
     89 N.J. 234 (1982) ...........................................................................................................18, 19

New Jersey Turnpike Authority v. PPG Indus. Inc.,
     197 F.3d 96 (3d Cir. 1999).....................................................................................................13

Pepe v. General Motors Acceptance Corp.,
     254 N.J. Super. 662 (App. Div. 1992) certif. den. 130 N.J. 11 (1993)................................9

Redwing Carriers v. Saraland Apartments, 94 F.3d 1498 (11th Cir. 1996) .....................................17

SC Holdings, Inc. v. A.A.A. Realty Co.,
     935 F. Supp. 1354 (D.N.J. 1996) ....................................................................................10, 13

Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp.,
     257 F.2d 485 (3d Cir. 1958)...................................................................................................18

Tanglewood East Homeowners v. Charles-Thomas, Inc.,
     849 F.2d 1568 (5th Cir. 1988) ...............................................................................................17

U.S. v. CDMG Realty Co., 96 F.3d 706 (3d Cir. 1996) ...........................................................10, 13

## STATUTES

42 U.S.C.§ 9607(a) ...........................................................................................................................10

42 U.S.C. §9607(1)(a)........................................................................................................................13

42 U.S.C. §9607(b)(3) .......................................................................................................................13

42 U.S.C. § 96123(g)(2) .....................................................................................................................18

42 U.S.C. §9623(g)(2) ..........................................................................................................................1

28 U.S.C. §2201..................................................................................................................................2

Page

28 U.S.C. §2202 ................................................................................................................2

N.J.S.A. 58:10-23.11 et seq. ...........................................................................................6

N.J.S.A. 58:10-23.11f(a)(2) .....................................................................................15, 16

N.J.S.A. 58:10-23.11g(c)(1) ..........................................................................................16

N.J.S.A. 58:10-23.11b(d) ...............................................................................................16

N.J.S.A. 2A:53A-3 ....................................................................................................1, 18

N.J.S.A. 2A:16-50 et seq. .........................................................................................1, 18

N.J.A.C. 7:1E-1-6 ..........................................................................................................16

## MISCELLANEOUS

Fed. R. Civ. P. 17(a) .......................................................................................................8

Fed. R. Civ. P. 30(b)(6)..................................................................................................10

H.R. Conf. Rep. No. 99-962 at 186-188 ........................................................................13

Johnson, Liability of Parent or Successor Corporation, or Corporate Shareholders, in
Action Pursuant to Comprehensive Environmental Response, Compensation, and
Liability Act (CERCLA) (42 U.S.C. §§9601-9675), 121 A.L.R. Fed. at 189 ...............12

v

## PRELIMINARY STATEMENT.

Defendants W.R. Grace Co. and W.R. Grace Ltd. (collectively "the Grace Defendants") have moved for summary judgment with respect to all cross-claims asserted by defendant Honeywell International Inc.[1]  Honeywell opposes that application only so far as it applies to defendant W.R. Grace & Co. provided that the Court acknowledge that defendant W.R. Grace Ltd. lacks standing to assert any cross-claims against Honeywell.

As the alter ego of Daylin and ECARG, Inc., W.R. Grace & Co. is the current owner and operator of the former Roosevelt Drive-In Site in Jersey City, New Jersey (hereinafter the "Site"). Furthermore, ECARG is a mere corporate shell whose only role is to hold title to the Site in W.R. Grace & Co.'s transparent attempt to avoid CERCLA §107(a) liability for the Site. The Court should pierce ECARG's corporate veil and hold W.R. Grace liable as an owner of the Site. Similarly, because both Daylin and ECARG are "in any way responsible" for discharges at the Site, W.R. Grace & Co. is also liable to Honeywell for contribution under the New Jersey Spill Compensation and Control Act. As a result, W.R. Grace & Co.'s motion for summary judgment on Honeywell's CERCLA § 113 and New Jersey Spill Compensation and Control Act claims should be denied.

Finally, because Honeywell can demonstrate substantive claims against W.R. Grace & Co., W.R. Grace & Co.'s motion to dismiss Honeywell's claims under the New Jersey Joint Tortfeasors Contribution Law (N.J.S.A. 2A:53A-3), CERCLA's declaratory judgment provision (42 U.S.C. § 9623(g)(2)), New Jersey's Uniform Declaratory Judgment Law (N.J.S.A.

---

[1]    On April 2, 2001, W.R. Grace & Co. and ECARG, Inc. filed for relief under Chapter 11 of the Bankruptcy Code. (See: Declaration of Michael J. Caffrey dated May 4, 2001, Ex. D.) During the April 20, 2001 status conference in this case, counsel for the Grace Defendants represented that W.R. Grace & Co. and ECARG, Inc. would be moving in the bankruptcy proceeding for relief from the automatic stay provision. (See: Caffrey Decl., ¶33.) To date, however, Honeywell has not received an Order or other communication from the Bankruptcy Court indicating that the stay has been lifted. Id.

2A:16-50 et seq.) and the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202), W.R. Grace & Co.'s motion for summary judgment on those cross-claims must also be denied.

## STATEMENT OF FACTS.

### A.    The Site.

The Site at issue in this case is located in Jersey City, New Jersey. It consists of approximately 34 acres located just west of Route 440. Immediately to the north is the Jersey City Incinerator Authority, Jersey City Sewerage Authority and Jersey City Public Works; to the south the Site is abutted by Kellogg Street whose commercial tenants include various trucking terminals, an oil company and a concrete plant. (Ex. 1).[2]

### B.    Honeywell's Relationship To The Site.

Until 1954, Mutual Chemical Company of America ("Mutual") owned and operated a chromate production facility on the east side of Route 440. (Amended Complaint, ¶¶32 and 38.) Prior to closing this facility in 1954, the State of New Jersey granted to Mutual certain riparian rights to deposit COPR, a waste material from its operations, into the tidal marshlands of the Hackensack River. (Ex. 2; Amended Complaint, ¶¶34 and 38.) During the fifty years prior to the facility's closure, the State-authorized disposal of COPR caused the formation of a 34 acre parcel which consists, almost entirely, of COPR. (Id.) In December 1954, Mutual sold the Site to Amy Joy Realty Corporation ("Amy Joy") for construction of a drive-in movie theater which was completed in 1955. (Id., ¶38.)

### C.    The Grace Defendants' Relationship To The Site And Knowledge Of Site Conditions.

In 1965, Amy Joy subdivided the Site and leased a portion to Goodrich Associates ("Goodrich") for the construction of a commercial building (hereinafter "the Groundlease"). (Ex. 3.) Diana Stores Corporation ("Diana") entered into a sublease with Goodrich for the

---

[2]    Exhibits 1-30 referenced herein are attached to the Declaration of Michael J. Caffrey dated June 13, 2001. Exhibits 31-64 are attached to the Second Declaration of Michael J. Caffrey dated July 10, 2001.

construction and operation of a retail store on the leased portion of the Site (hereinafter the "Sublease"). (Ex. 4, Art. I.)

In preparation for construction, Goodrich hired Site Engineers (N.J.), Inc. to perform a soil and foundation investigation in 1965 which revealed the presence of "Fill-Greenish Brown" extending to a depth below fifteen feet at the Site. (Ex. 5.)[3] Goodrich began construction of the building in 1966. (Ex. 4, Art. VI, § 2.) As part of its lease obligation, Goodrich was required to move fill displaced from the construction to fortify the Drive-In movie screen on the non-leased portion of the Site, which was having stabilization problems. (Ex. 3, Art. V, § 4.)

In 1967, Diana Stores and Goodrich entered into a joint venture agreement to conduct commercial activities at the leased portion of the Site (hereinafter "Joint Venture"). (Ex. 7.) In 1969, Diana Stores was merged into Daylin. (Ex. 8.)

By 1973, COPR had caused heaving and structural problems to the foundation of the building.[4] (Ex. 10.) Ingvald Moe, a structural engineer, was hired by Diana Stores to supervise the repairs, and he subsequently served as Daylin's engineer after the merger of Diana into Daylin. (Ex. 11, T 24:16-19.) Moe determined that structural columns of the building were severely out of location, rotated and moved vertically, pulling the columns free of the sockets that attached them to the foundation piles. (Ex. 11, T 92: 2-15.)

As part of the repairs, part of the slab flooring was removed and Moe observed that the fill subgrade contained a yellow residue of hard, fine grained material. (Ex. 11, T 30: 9-15; T 117: 1-10.) Moe understood that the fill at the leased portion of the Site was COPR. (Ex.

---

[3]    Documents relating to the 1965 investigation were provided to Daylin prior to Daylin's 1981 acquisition of the Site. (Ex. 6.)

[4]    Daylin, as successor in interest to Diana, commenced an action against Goodrich and Goodrich Building in Superior Court of New Jersey, to recover damages from the inadequate and improper construction. (Ex. 9.) The suit was subsequently settled and under the 1973 settlement agreement, Ingvald Moe was designated as the licensed engineer to supervise the structural repair work. Id.

11, T 92:20 to 93:6, T 113:7-13; T 116;7-20.) He communicated his findings, using the term "chrome ore residue", to Samuel Rayburn of Daylin and recommended the hiring of a soils engineer, Howard Greenspan of Newark Testing Laboratory, Inc., to further investigate. (Ex. 11, T 117:19 to 118:6, T 92:20-25.)

As part of the repairs, a portion of the fill beneath the building was replaced and moved to another location. (Ex. 11, T 48:6-8). The floor slab, subbase fill and fill around the pile clusters were removed by Apollo Construction. (Ex. 11, T 71:20 to 72:2; T 75:21-25). The interior fill was hand loaded into front end loaders and moved around the site. Id.

On January 11, 1974, Moe received Newark Testing Laboratory's report that concluded the COPR was the cause of the structural problems. (Ex. 10.) The report also confirmed that (i) the fill beneath the building in certain areas extended to a depth of 23 feet; (ii) the chemical analysis of the fill indicated the presence of chromates and chromium salts; and (iii) the fill can "hydrate rapidly and cause large volume expansion." (Id.)

In 1979, W.R. Grace & Co. and W.R. Grace Ltd. acquired all of Daylin's stock. (Ex. 12.) Moe continued to provide Daylin with additional information concerning the presence of COPR and the structural problems it was causing to the building at the leased portion of the Site. On June 18, 1980, Moe wrote to Daylin regarding the liability issues associated with the structural defects of the Goodrich building. (Ex. 13, p. 104.)[5] On August 7, 1980, Daylin prepared an internal memorandum containing an attachment from Moe on the liability of other parties associated with the structural problem at the building. (Id., p. 50.)

---

[5] Honeywell does not have this memorandum as the Grace Defendants claim it as privileged. It is unclear how the Grace Defendants can claim a letter from Moe, an engineer, to Seymour Dorner, an executive, is privileged. However, the Court has previously ruled that Honeywell may not depose the Grace defendants on their privilege log that was first produced on February 23, 2001. (See: Order dated April 20, 2001.) Notwithstanding, by asserting privilege over a letter from Moe to Daylin, the Grace Defendants are estopped from denying that they are bound by Daylin's knowledge of the problems at the Site in 1980 (or earlier).

Daylin executives understood the significance of the information reported by Moe.  For example, after viewing a photo of the substrata beneath the building, one Daylin executive concluded on June 2, 1980 that "[i]t is obvious that failure to 'muck' this stuff out is a prime reason for our present problems." (Ex. 14.)

Daylin acquired both the leased and non-leased portions of the Site in 1981 in a two-step transaction.[6]  Daylin arranged for Louis Feil to purchase the Site from General Cinema Corporation, the successor-in-interest to Amy Joy, for $1,100,000. (Ex. 16.)  In June 1981, Feil sold the Site to Daylin for $1,200,000. (Ex. 17.)  At the time of Daylin's purchase, W.R. Grace & Co. paid Louis Feil, paid for real estate tax adjustments, paid the New Jersey Transfer Tax, and paid for the title insurance premium and searches. (Ex. 18.)

Prior to Daylin's purchase in 1981, State and Federal agencies also had become involved at the Site.  Specifically, the New Jersey Department of Environmental Protection ("NJDEP") and United States Environmental Protection Agency ("USEPA") had started investigations in 1980. (Exs. 19 and 20.).  Both reports confirm the existence and nature of the COPR at the Site months prior to Daylin's 1981 acquisition. (Id.)  For example, in August 1980, NJDEP commenced an investigation of the Site in response to a complaint concerning "fluorescent green runoff from the property." (Ex. 19.)  Furthermore, during its preliminary site investigation, USEPA observed that the north and south streams had a yellowish-green color, approximately thirty-five (35) fifty-five (55) gallon drums dumped at the Site labeled "flammable liquids", piles of construction debris, an abandoned tank car, and a six acre parking lot covered with stains and small pools of yellowish liquid.[7] Id.

---

[6]  Others interested in 1981 in purchasing the non-leased portion of the Site were aware of the environmental problems. (Ex. 15.)

[7]  Despite these uncontroverted facts, the Grace Defendants initially contended in this litigation that they did not become aware of the COPR at the Site until 1983. (The Grace Defendants' Answer, ¶68.)  Subsequently, the Grace Defendants' admitted in discovery that they first learned of the COPR during the first half of 1982. (Ex. 21, Nos. 13-15.)  They have yet to admit that they knew of the contamination before the 1981 purchase.

In 1986, the Site was transferred by Daylin to Channel Home Centers, Inc.[8] who later changed its name to Channel Holdings, Inc. in 1992. Thereafter, the property was transferred to Channel Home Centers Realty Corporation, who then transferred it to ECARG,[9] Inc. in 1995. (Ex. 24.) W.R. Grace & Co. and W.R. Grace, Ltd. never directly held title to the Site. In fact, W.R. Grace Ltd.'s sole connection to the Site (and this litigation) is as a former minority shareholder of Daylin.

### UNDER THE DIRECTION OF NJDEP, HONEYWELL HAS COMMITTED AND EXPENDED SIGNIFICANT RESOURCES TO INVESTIGATE AND REMEDIATE THIS SITE.

In December 1988, the New Jersey Department of Environmental Protection ("NJDEP") issued a Directive to Honeywell to perform an Interim Remedial Measure investigation ("IRM") at the Site pursuant to the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. 58:10-23.11, et seq. (See: Declaration of Michael J. Caffrey dated April 4, 2000, Ex. D (hereinafter "2000 Caffrey Decl.").) The Directive ordered Honeywell to undertake interim remedial actions at several sites where Mutual's COPR had allegedly been deposited, including the Site. Id. Honeywell implemented the IRM with the oversight and approval of NJDEP. Id. To date, Honeywell has expended in excess of $6,000,000 at the Site. (Walerko Cert., ¶2.)

---

[8]    In 1982, Daylin merged with Grace Retail Corporation ("Grace Retail"), a wholly owned subsidiary of W.R. Grace & Co., with Grace Retail the surviving entity. (The Grace Defendants' Answer to Amended Cross-claims of Honeywell, ¶21.) In 1986, Grace Retail assigned its interests in the Joint Venture to ECARG, Inc., a wholly owned subsidiary of W.R. Grace & Co. and changed its name to Channel Home Centers, Inc. (Ex. 22.) As part of the leverage buyout, Grace Retail apparently was supposed to transfer ownership of the Site to ECARG. (Answer and Cross-Claims of the Grace Defendants, ¶¶43-44.) Attorneys for Grace Retail even prepared an indenture purporting to transfer the Site to ECARG but the document was never signed. (Ex. 23.) The transfer never occurred and Channel Home Centers, Inc. retained title to the Site. (Answer and Cross-Claims of The Grace Defendants, ¶¶ 43-44.)

[9]    "ECARG" is "Grace" spelled backwards.

Thereafter, Honeywell entered into an ACO with NJDEP to investigate and remediate the Site (and other properties). (2000 Caffrey Decl., Ex. B, ¶12.) The ACO establishes a process for conducting remedial investigation feasibility studies ("RI/FS") at each site and selecting an appropriate remedial action. (2000 Caffrey Decl., Ex. B, ¶¶19-52.) Honeywell has committed $10 million to conduct RI/FS's for sites addressed in the ACO, including the Site. (2000 Caffrey Decl., Ex. B, ¶¶ 35, 36.) Honeywell also has committed $50 million (plus any monies remaining from the $10 million RI/FS fund) to remediate sites addressed in the ACO, including the Site. (2000 Caffrey Declaration, Ex. B, ¶¶35, 36.[10])

## W.R. GRACE & CO. IS A SUCCESSOR-IN-INTEREST TO DAYLIN AND ECARG, INC. IS NOT AN OPERATING ENTITY

Although Daylin acquired title to the Site in 1981, throughout this litigation, the Grace Defendants have continually represented to this court that the Grace Defendants acquired title to the Site in 1981, effectively characterizing themselves as the successor-in-interest to Daylin. (See: Grace Defendants' Second Amended Cross-Claims filed November 1999, ¶73 ("Grace purchased the Site unaware of the risks and harms of Chromium Wastes or Chromium Contamination at or near the Site"); Grace Defendants' January 24, 2000 Brief in Opposition to Honeywell's Motion to Dismiss Grace's Second Amended Cross Claims ("Grace acquired the 440 Site and retail department store in 1981 ..."); Grace Defendants' Third Amended Cross-Claims, ¶74 (alleging that "Grace purchased the Site unaware of the risks and harms of Chromium Wastes or Chromium Contamination at or near the Site").)[11] In this litigation, the

---

[10] These amounts are in addition to any costs associated with performing the IRM.

[11] The Grace Defendants have also served discovery requests characterizing themselves as the successor-in-interest to Daylin. See: Fourth Set of Interrogatories of the Grace Defendants (No. 28 "Do you contend that Grace paid fair market value for the Site when Grace purchased it in 1981"; No. 29 "Do you contend that Grace received any type of discount or reduction in price when it purchased the Site in 1981 to reflect the presence of any Material or Environmental Condition at the site?").

Grace Defendants also withheld under the attorney-client and/or attorney work product privileges numerous documents received and/or sent by counsel for Diana and/or Daylin. (See: Ex. M at pg.1 (letter from M. Bunis Esq. to Daylin attorneys, dated 1/2/73); p. 9 (opinion letter from N. Howard Esq. to Daylin attorney); p. 9 (letter from N. Howard Esq. to Daylin attorney providing legal advice regarding Sublease to Diana); p. 43 (letter from Daylin counsel to Daylin counsel).)

ECARG is not an operating company, does not operate a business and shares the same address as W.R. Grace & Co. (Ex. 29, T 46:2-23; T 57:11-24.) ECARG, has no employees, generates no income and its sole asset is the Site. W.R. Grace & Co., rather than ECARG, controls all aspects relating to the Site. W.R. Grace & Co. paid the taxes on the Site to the City of Jersey City. (Ex. 30.) W.R. Grace & Co. entertains inquiries regarding the sale of the Site. (Id.) Further, W.R. Grace & Co. controlled and paid for remediation and investigation activities at the former car wash site and for the demolition of the Goodrich building. (Id.)

## LEGAL ARGUMENT

### I.

### W.R. GRACE LTD. LACKS STANDING TO ASSERT ANY CROSS-CLAIMS.

Honeywell does not oppose the Grace Defendants' application as it applies to W.R. Grace Ltd. provided that the Court acknowledge that W.R. Grace Ltd. lacks standing to assert any cross-claims against Honeywell. Honeywell has moved for summary judgment on all cross-claims asserted by W.R. Grace Ltd.

W.R. Grace Ltd. does not have standing to assert any of the Grace Defendants' cross-claims against Honeywell because it is not a real party in interest and is asserting legal rights held by ECARG, Inc. A party lacks standing to maintain an action in federal court if they are not the real party in interest. Fed. R. Civ. P. 17(a); Allen v. Wright, 468 U.S. 737, 751 (1984) ("the doctrine of standing embraces several judicially self-imposed limits in the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's

legal rights.")  When standing is called into question, a court should ask whether the plaintiff is the proper person to bring the litigation.  Angleton v. Pierce, 574 F. Supp. 719 (D.N.J. 1983), aff'd, 734 F.2d 3 (3d Cir. 1984), cert. den. sub nom, Gelber v. Marsh, 105 S. Ct. 245 (1985).

Under New Jersey law, parent corporations as "shareholders cannot sue for injuries arising from the diminution in value of their shareholdings resulting from wrongs allegedly done to their corporation." Pepe v. General Motors Acceptance Corp., 254 N.J. Super. 662, 666 (App. Div. 1992), certif. den., 130 N.J. 11 (1993) (citing Kauffman v. Dreyfuss Fund Inc., 434 F.2d 727, 732 (3d Cir. 1970), cert. den., 401 U.S. 974 (1971)); Judice's Sunshine Pontiac, Inc. v. General Motors Corp., 418 F.Supp. 1212, 1219 (D.N.J. 1976).  "Nor can stockholders assert individual claims for … other income lost because of injuries assertedly done to their corporations." Pepe v. General Motors Acceptance Corp., 254 N.J. Super. at 666 (citing Pitchford v. PEPI, Inc., 531 F.2d 92, 96-98 (3d Cir. 1975), cert. den., 426 U.S. 935 (1976)).

W.R Grace Ltd. has never held title to the Site (Ex. 21, ¶¶14 and 161.)  At all relevant times, the Site has been owned by either Daylin or ECARG.  W.R. Grace Ltd.'s only connection to the Site is that it previously owned twenty-five percent (25%) of Daylin's stock. (Ex. 21, ¶76.)  Since W.R. Grace Ltd. no longer has any connection to the Site as a shareholder or otherwise, it cannot allege any harm.  Therefore, W.R. Grace Ltd. lacks standing because it is not a proper entity to maintain any cross-claims against Honeywell.

## II.

### AS OWNER OF THE SITE, W.R. GRACE & CO. IS LIABLE IN CONTRIBUTION TO HONEYWELL UNDER CERCLA §113.

Pursuant to CERCLA §113(f), any person may seek contribution from any other person who is liable or potentially liable under §107(a).  In order to establish §107(a) CERCLA liability, a plaintiff must prove:

(1)    that the defendant falls within one of four categories of "responsible parties";

(2)    that "hazardous substances" were disposed of at a "facility";

(3)    that there has been a "release" or "threatened release" of hazardous substances from the facility into the environment; and

(4)    that the release or threatened release has required or will require the plaintiff to incur "response costs."

42 U.S.C. §9607(a); U.S. v. CDMG Realty Co., 96 F.3d 706, 712 (3d Cir. 1996) (citations omitted); SC Holdings, Inc. v. A.A.A. Realty Co., 935 F.Supp. 1354, 1361 (D.N.J. 1996).

**A.    W.R. Grace & Co. Is A Responsible Party Under CERCLA § 107(a).**

W.R. Grace & Co.'s argument that its only relationship to the Site is through its stock ownership of Daylin and ECARG is without merit. As set forth below, as the alter ego of both Daylin and ECARG, W.R. Grace & Co. is the current operator and owner of the Site and a responsible party under CERCLA § 107(a). W.R. Grace & Co. has controlled all aspects relating to the Site since the Site was acquired under Daylin's name in 1981. Furthermore, W.R. Grace is derivatively liable as the current owner of the Site.[12]

**1.    W.R. Grace & Co. Is The Alter Ego Of Daylin And ECARG, Inc.**

Although Daylin acquired title to the Site in 1981, throughout this litigation, the Grace Defendants have continually represented to this court that the Grace Defendants acquired title to the Site in 1981, effectively confirming that W.R. Grace is the alter ego of and successor-

---

[12]    W.R. Grace & Co.'s argument that because Honeywell's Fed. R. Civ. P. 30(b)(6) corporate designee was unable to fully recall the legal and quasi legal basis for W.R. Grace & Co.'s liability to Honeywell under CERCLA §113 Honeywell cannot prevail despite sufficient facts supporting its claim is simply incorrect as a matter of law. A 30(b)(6) corporate designee deposition is inappropriate for the type of quasi-legal questions being posed by counsel for the Grace Defendants. Where a party seeks information regarding the "bases for the contentions made and for the positions taken by [an adverse corporate party]," contention interrogatories are the more suitable form of discovery, as opposed to a 30(b)(6) deposition. See McCormick-Morgan, Inc. v. Teledyne Industries, Inc., 134 F.R.D. 275, 285-87 (N.D. Ca. 1991); see also Exxon Research and Engineering Co. v. United States, 44 Fed. Cl. 597, 601-03 (Fed. Cl. 1999). Moreover, the information sought by the Grace Defendants during the corporate designee 30(b)(6) deposition was initially in the possession, custody and/or control of the Grace Defendants and either produced in this or other litigation matters relating to the Site.

in-interest to Daylin. Furthermore, the Grace Defendants have also represented to the Court, through its pleadings and filings, that there is no distinction between W.R. Grace & Co. and ECARG, Inc. The Grace Defendants have utilized this lack of distinction in pleadings, responses to discovery and in briefs in opposition to motions filed by Honeywell in this case. See: The Grace Defendants Answer to Amended Cross-Claims ("Defendants/Cross-Claimants W.R. Grace & Co., W.R. Grace Ltd. and ECARG, Inc. (collectively "Grace") hereby answer..."); The Grace Defendants Third Amended Cross-Claims ("Defendants/Cross-Claimants W.R. Grace & Co., W.R. Grace Ltd. and ECARG, Inc. ("Grace") bring these Third Amended Cross-Claims..."); W.R. Grace's Responses to Interrogatories ("W.R. Grace & Co., W.R. Grace Ltd. and ECARG, Inc. (collectively "Grace") provide the following responses..."). The Grace Defendants have also withheld under the attorney-client and/or attorney work product privileges numerous documents received and/or sent by counsel for Daylin.

### 2.    W.R. Grace & Co. Is Derivatively Liable As Owner Of The Site.

This Court should pierce ECARG, Inc.'s corporate veil and hold W.R. Grace & Co. liable as owner of the site. "The determination whether a corporation has exercised sufficient control to [pierce the corporate veil] requires an inherently fact-intensive inquiry, involving consideration of the totality of the circumstances presented." Lansford-Coaldale Joint Water Authority v. Tonolli Corp., 4 F.3d 1209, 1222 (3d Cir. 1993). "The factors courts should consider focus on the extent of the corporation's involvement in the other corporation's day-to-day operations and its policy-making decisions." Id. The Third Circuit opined that "there is no reason not to hold a corporation liable when it exercises substantial management control over an affiliated corporation." Lansford-Coaldale, 4 F.3d at 1222. The factors courts consider in determining whether to pierce the corporate veil include: "(1) inadequate capitalization in light of the purposes for which the corporation was organized; (2) extensive or pervasive control by the shareholder or shareholders; (3) intermingling of the corporation's properties or accounts with those of its owners; (4) failure to observe corporate formalities and separateness; (5)

siphoning of funds from the corporation; (6) absence of corporate records; and (7) nonfunctioning officers and directors." Johnson, Liability of Parent or Successor Corporation, or Corporate Shareholders, in Action Pursuant to Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §§9601-9675), 121 ALR Fed. at 189 (discussing United States v. Kayser-Roth Corp., 724 F. Supp. 15 (D.C.R.I. 1989), aff'd, 910 F.2d 24 (1st Cir.)). "[T]he rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity." Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co., 210 F.3d 18, 26 (1st Cir. 2000). However, "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." Carter-Jones Lumber Company v. LTV Steel Company, 237 F.3d 745, 749 (6th Cir. 2001).

ECARG, Inc. is a mere shell whose only role is to hold title to the Site in W.R. Grace & Co.'s transparent attempt to avoid CERCLA §107 liability for the Site. During the relevant time period, 1986 to the present, W.R. Grace & Co. has exercised total control over ECARG, Inc. Frank Brennan, a former W.R. Grace & Co. Senior Vice-President and Treasurer confirmed that ECARG, Inc. was not an operating subsidiary. (Ex. 29, T 46:2-23; T 57:11-24). He noted that ECARG, Inc. had no employees, generated no income and was controlled by employees of W.R. Grace & Co. Id. Furthermore, even though he was the Vice President of ECARG, Inc. during the relevant time period, he had no responsibilities in connection with the operations of ECARG, Inc. For legal documents relating to ECARG, Inc., he explained that W.R. Grace & Co.'s legal staff would prepare various documents and that he would execute such documents without any understanding of "what ECARG was, why ECARG was" or the details and ramifications of what he was signing. Id.

W.R. Grace & Co. has admitted that in 1983 it was aware of the presence of the chromium fill at the Site. Even though ECARG, Inc. apparently had no other assets and was not an operating entity, W.R. Grace & Co. nevertheless attempted an "intra corporate transaction" to transfer title to the Site to ECARG, Inc. in 1986 in a transparent attempt to avoid its CERCLA

§107 liability for the site. Because ECARG, Inc. had no independent existence, assets or employees, and was totally controlled by W.R. Grace & Co., the Court should pierce ECARG, Inc.'s corporate veil and hold W.R Grace & Co. liable as an owner of the Site.

**3.      W.R. Grace & Co. Is Not A Statutory Innocent Purchaser.**

W.R. Grace & Co. is a potentially responsible party as current owner of the Site unless it can demonstrate that it is a statutory "innocent purchaser" under §107(b)(3). 42 U.S.C. §§ 9607(1)(a), 9607(b)3; New Castle County v. Halliburton NUS Corp., 111 F.3d 116 (3d Cir. 1997) (citing United States v. CDMG Realty Co., 96 F.3d 706, 721 (3d Cir. 1996)); H.R. Conf. Rep. No. 99-962 at 186-188 (reprinted in U.S.C.C.A.N. 3276, 3279-81); New Jersey Turnpike Authority v. PPG Indus, Inc., 197 F.3d at 96 (3d Cir. 1999). CDMG Realty, 96 F.3d at 713 (citing 42 U.S.C. § 9607(a)(1)-(4); SC Holdings Inc. v. A.A.A. Realty Co., 935 F.Supp. 1354, 1361 (D.N.J. 1996). However, W.R. Grace & Co. cannot assert that it was an innocent purchaser because the Grace Defendants knew or should have known of the COPR at the Site prior to acquiring the Site in 1981. Therefore, W.R. Grace & Co. falls within one of the categories of potentially responsible parties.

The undisputed facts demonstrate that Daylin, W.R. Grace & Co.'s alter ego, was aware that the extensive fill at the Site consisted of chromium ore processing residue prior to its 1981 acquisition and that the fill was the cause of the structural problems at the Site. Daylin was told by its own engineer, Ingvald Moe, that the fill at the Site contained chromium ore residue. (Ex. 11, T 92:20-25.) At the request of Moe, a soils investigation was performed and concluded that the chromium contaminated fill beneath the Site was the cause of the structural problems at the Goodrich building. (Ex. 11.) Moe continued to advise Daylin as to the liability issues associated with the structural defects of the Goodrich building and, using the information provided by Moe, Daylin prepared an internal memorandum, dated August 7, 1980, on the liability of other parties associated with the Goodrich building defects. (Ex. 13, pp. 50, 104.)

Prior to the acquisition of the Site, a Daylin executive concluded: "[i]t is obvious that failure to 'muck' this stuff out is a prime reason for our present problems." (Ex. 14.)

Furthermore, Daylin should have learned about the COPR if they had in fact conducted any inquiry. The environmental problems at the Site were obvious to anyone who went to the Site. For example, contemporaneous government investigations revealed the obvious environmental concerns, including yellowish-green runoff, abandoned drums, labeled flammable liquids, abandoned tank car, and exterior debris at the Site just months prior to Daylin's acquisition of the Site. (Ex. 19.) Others interested in 1981 in purchasing the non-leased portion of the Site were aware of the environmental problems. (Ex. 15.)

The above facts demonstrate that Daylin knew and should have known about the COPR at the Site and that, had Daylin had conducted any inquiry, they would have learned about the COPR at the Site. In Hatco Corp. v. W.R. Grace & Co., Grace asserted that Hatco knew or should have known at least eight years before it filed its action that its site was extensively polluted with hazardous substances, and that the pollution was due to Grace's acts while it owned the Hatco facility arguing that Hatco received notice of the contamination by an Amended Administrative Order, detailing environmental contamination, that was issued by the NJDEP. 801 F.Supp. 1309 (D.N.J.), vacated on other grounds, 59 F.3d 3d 400 (3d Cir. 1995). This Court concluded that the Amended Administrative Order put Hatco on direct and express notice of facts evidencing contamination and triggering the statute of limitations. Id. at 1323-24. Further, the Court held that to the extent the Amended Order did not address specifically every problem that was discovered at the site, it triggered a duty on Hatco's part to "exercise ... reasonable diligence and intelligence" to investigate and discover those problems. Id. at 1324 (citing Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 419 (1987)).

In Hatco, a single Order was held sufficient to provide notice of contamination. Here, the Grace Defendants received notice of facts evidencing chromium contamination through many different avenues, including their own engineer, that revealed the presence of chromium fill at the Site.

**B.      W.R. Grace & Co. Has Admitted The Remaining Elements of Honeywell's CERCLA § 113 Claim.**

The Grace Defendants, in their Answer To Honeywell's Amended Cross-Claims, acknowledge that chromium, is a "hazardous substance" as defined in CERCLA §104(14).  (The Grace Defendants' Answer to Amended Cross-Claims of Honeywell International, Inc., dated February 13, 2001, ¶39).  The Grace Defendants also admit that the Site was a "facility" as defined in CERCLA §109(9), and that there has been a "release" or "threatened release" of chromium from the Site.  (The Grace Defendants' Answer to Amended Cross-Claims of Honeywell International Inc., dated February 13, 2001, ¶¶38,40).

Finally, it is not controverted that Honeywell has incurred significant response costs at the Site.  Accordingly, W.R. Grace & Co. is liable in contribution to Honeywell under CERCLA §113 for past and future response costs incurred at the Site.

### III.

### W.R. GRACE & CO. IS LIABLE UNDER THE NEW JERSEY SPILL COMPENSATION AND CONTROL ACT.

New Jersey's Spill Compensation and Control Act ("Spill Act") enables parties to recover environmental clean-up costs associated with the clean up and removal of discharged hazardous substances.  See Analytical Measurements, Inc. v. Keuffel & Esser Co., 843 F.Supp. 920, 930 (D.N.J. 1993) (holding that costs are clearly associated with the clean up and removal of discharged hazardous substance and thus are recoverable under the Spill Act).  The Spill Act's contribution provision provides:

> [w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. . . .N.J. Stat. Ann. §58:10-23.11f.a(2) (West 2000) (emphasis added).

The Spill Act defines "clean up and removal costs," as:

> all costs associated with a discharge... in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damages to the public health, safety, or welfare...

N.J. Stat. Ann. 58:10-23.11b(d).

The Spill Act imposes strict liability on "[a]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance." N.J.S.A. 58:10-23.11g(c)(1); Marsh v. N.J. Dept. of Environmental Protection, 152 NJ 137, 145-146 (1997); N.J. Dep't. of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 494 (1983). The Act sets forth a private right of contribution for clean up costs against "persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance" N.J.S.A. 58:10-23.11f(a)(2). Under the regulations which implement the Act, persons "in any way responsible" is defined to include, among others, "[a]ny person whose act ... results or has resulted in a discharge; each owner or operator ... of any facility, ... from which a discharge has occurred; any person who ... controls any hazardous substance which is discharged; [and] any person who has indirectly or directly caused a discharge ... or who has allowed a discharge to occur ...." N.J.A.C. 7:1E-1.6. "Discharge" is defined as "any intentional or unintentional action or omission ... resulting in the releasing, pumping, pouring, emitting, emptying or dumping of a hazardous substance...." Id.

W.R. Grace & Co. is a person "in any way responsible" under the Spill Act because, as set forth above, it is the alter ego of Daylin which caused a discharge of chromium contaminated fill at the Site and allowed discharges to occur at the Site. N.J.A.C. 7:1E-1.6. The movement of soil by Daylin's joint venture partner from the Goodrich building construction site to the Drive-In screen is clearly a discharge under the Spill Act. Furthermore, through its engineer, Ingvald Moe, Daylin arranged for COPR to be removed from beneath the floor of the Goodrich Building and moved to other locations at the Site. This movement of soil around the

-16-

Site constitutes disposal. See e.g., Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir. 1988) (disposal may occur when "hazardous materials are moved, dispersed or released during landfill excavations and fillings"); Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp., 976 F.2d 1338, 1339-42 (9th Cir. 1992) (contractor allegedly had excavated tainted soil during the construction of a housing development at the former site of a shipbuilding plant and had allegedly spread this soil over other portions of the property); Redwing Carriers v. Saraland Apartments, 94 F.3d 1498, 1512 (11th Cir. 1996) ("disposal may occur when a party disperses contaminated soil during the course of grading and filling a construction site.") Thus, Daylin's affirmative conduct makes its alter ego, W.R. Grace & Co., a person "in any way responsible" for chromium contamination at the Site under the Spill Act.

The Grace Defendants admit that under the Spill Act, W.R. Grace & Co. is a "person," that chromium at the Site is a "hazardous substance," and that the Site is a "facility." (The Grace Defendants' Answer to Amended Cross-Claims of Honeywell International, Inc., dated February 13, 2001,¶ 51,53,54). Accordingly, since W.R. Grace & Co. falls within the categories of persons "in any way responsible" for the chromium contamination at the Site, Honeywell may seek contribution against it for its cleanup and removal costs.

As the alter ego of Daylin and ECARG, W.R. Grace & Co. is also responsible for Daylin and ECARG's failure to mitigate the discharges of hazardous materials from the Site. Marsh v. New Jersey Spill Compensation Fund, 286 N.J. Super. 620, 627-28 (App. Div. 1996) (when a party knows or should have known of a potential source of pollution on their property, the owner may be held responsible if more than a de minimus quantity of hazardous material is discharged at the property); In re Kimber Petroleum Corp., 110 N.J. 69, 85 (1988) ("A party even remotely responsible for causing contamination will be deemed a responsible party under the Spill Act").

Neither Daylin nor ECARG took any steps to mitigate the obvious hazardous materials flowing from the Site. For example, in August 1980, NJDEP commenced an investigation of the Site in response to a complaint concerning "fluorescent green runoff from the

property." Furthermore, during its preliminary site investigation, USEPA observed that the north and south streams had a yellowish-green color, approximately thirty-five (35) fifty-five (55) gallon drums dumped at the Site labeled "flammable liquids", piles of construction debris, an abandoned tank car; and a six acre parking lot covered with stains and small pools of yellowish liquid. Honeywell's implementation of the IRM mitigated the discharge of hazardous materials from the Site. As the alter ego of Daylin and ECARG, W.R. Grace & Co. is in any way responsible for the hazardous materials being discharged from the Site.

## IV.

### W.R. GRACE & CO. IS LIABLE TO HONEYWELL UNDER THE NEW JERSEY JOINT TORTFEASORS ACT.

Honeywell's cross-claim against Grace & Co. under the Joint Tortfeasors Contribution Law (N.J.S.A. 2A:53A-3) is well supported by the facts. The Joint Tortfeasors Law allows a defendant to cross-claim a codefendant for joint liability if both are found to be joint tortfeasors. Here, Honeywell has demonstrated that the Grace defendants are tortfeasors under CERCLA § 113 and the New Jersey Spill Act and therefore are subject to New Jersey's contribution laws.

## V.

### HONEYWELL HAS PROPERLY ASSERTED DECLARATORY JUDGMENT CLAIMS AGAINST W.R. GRACE & CO.

Similarly, Honeywell's cross-claims under CERCLA's declaratory judgment provision (42 U.S.C. § 96123(g)(2)), New Jersey's Uniform Declaratory Judgment Law (N.J.S.A. 2A:16-50 et seq., and the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202) are also supported by the facts. The declaratory judgment laws should be given liberal interpretation. New Jersey Assoc'n for Retarded Citizens v. Human Services, 89 N.J. 234, 241 (1982); Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp., 257 F.2d 485 (3d Cir. 1958). To sustain a declaratory judgment action, a party need only demonstrate an actual controversy or

dispute between the parties has been raised by the pleadings, that both parties have a sufficient stake in the outcome of the proceedings, and that the claims are properly before the court. New Jersey Assoc'n, 89 N.J. at 241; Bress v. L.F. Dommerich & Co., Inc., 94 N.J. Super. 282, 284 (App. Div. 1967) (stating that a concrete, contested issue is all that is necessary to sustain a declaratory judgment action). Honeywell has demonstrated a concrete, actual controversy between the parties and the claims are properly before this Court. Furthermore, Honeywell has overwhelmingly sustained its burden of proving its substantive CERCLA § 113 and New Jersey Spill Act claims and therefore is entitled to declaratory judgment in its favor. Aralac v. Hat Corp., 166 F.2d 286 (3d Cir. 1948).

## CONCLUSION.

For the foregoing reasons, defendant Honeywell International Inc. respectfully ask this Court to enter an Order denying the motion by defendant W.R. Grace & Co. for summary judgment as to all cross-claims asserted against it by Honeywell. A modified proposed form of Order is enclosed herewith.

Respectfully submitted,

**LOWENSTEIN SANDLER PC**
Attorneys for Defendant
Honeywell International Inc.

David W. Field (DWF 2775)
James Stewart (JS6329)
Michael J. Caffrey (MJC3483)

Dated: July 10, 2001