# EXHIBIT W

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

FILED

HACKENSACK RIVERKEEPER, INC.
1000 River Road - T090C
Teaneck, New Jersey 07666

WILLIAM SHEEHAN
323 Centre Avenue
Secaucus, New Jersey 07094

Plaintiffs,

v.

HONEYWELL INTERNATIONAL, INC.(formerly
known as AlliedSignal, Inc.)
101 Columbia Road
Morristown, New Jersey 07692

RONED REALTY OF JERSEY CITY, INC.
3 Horizon Rd. Apt. 1020
Fort Lee, New Jersey 07024

RONED REALTY OF UNION CITY, INC.
74 Route 17
Hasbrouck Heights, New Jersey  07604

Defendant.

AT 8:30   3/27/00
WILLIAM T. WALSH, CLK

HON.

Civil No. 00-1451 (JAG)

## COMPLAINT

## INTRODUCTION

1.    This is a citizen's suit brought to clean up the Roosevelt Drive In site in Jersey City,

New Jersey, the dumping site of the hazardous waste, including hazardous chromium-bearing waste,

generated by the Chromate Plant on Route 440 and transported across the street to the Roosevelt

Drive In site.

2.    This citizen's suit is brought under Section 7002(a)(1)(A) of the Resource

Conservation and Recovery Act (hereafter "RCRA"), 42 U.S.C. 6972(a)(1), Section 7002(a)(1)(B)

of RCRA, 42 U.S.C. 6972(a)(1)(B), and Section 505 of the Federal Water Pollution Control Act

(hereafter "the Water Act"), 33 U.S.C. 1365, to remedy the storage and/or disposal of hazardous waste, including hazardous chromium-bearing waste, by defendants in violation of RCRA at a site known as the Roosevelt Drive In site in Jersey City, New Jersey, and to remedy the discharge of pollutants to surface waters, namely the Hackensack River, without a permit, in violation of the Water Act. To remedy defendants' violations, plaintiffs seek a declaratory judgment, injunctive relief, and civil penalties. Plaintiffs also seek the award of costs, including attorneys' and expert witness's fees.

## DEFINITIONS

3.     "Honeywell" shall refer to defendant Honeywell International, Inc. and its predecessors, including AlliedSignal, Inc. (hereafter "AlliedSignal") and Mutual Chemical Company of America (hereafter "Mutual").

4.     "Chromate Plant" shall mean the chromate chemical production plant that was located on West Side Avenue and Route 440, in Jersey City, New Jersey, across Route 440 from the Roosevelt Drive In site.

5.     "Facility" shall refer to the Roosevelt Drive In site.

6.     "Roosevelt Drive In site" shall refer to the property designated as lots 14D, 14H, and 14J, Tax Block 1290A, Jersey City, Hudson County, New Jersey. Lot 14D is owned by one of defendants, Roned Realty of Jersey City, Inc. or Roned Realty of Union City, Inc. Lots 14H and 14J are owned by Ecarg, Inc. Ecarg, Inc. has not been named as a defendant in this suit because it has not controlled, and does not control, the daily operations at the Roosevelt Drive In site. Honeywell has functioned as the operator of the Roosevelt Drive In site and has controlled the relevant day to day operations at the facility.

7.     "Roned" shall refer jointly to defendant Roned Realty of Jersey City, Inc. and

defendant Roned Realty of Union City, Inc.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction of claims brought under RCRA pursuant to Section 7002(a) of RCRA, 42 U.S.C. 6972(a). This Court has subject matter jurisdiction of claims brought under the Water Act, pursuant to Section 505(a) of the Water Act, 33 U.S.C. 1365(a).

9.    On December 20, 1999 plaintiffs Hackensack Riverkeeper, Inc. and William Sheehan gave notice to defendant Honeywell as follows:

10.    Pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), the hazardous waste, including chromium-bearing waste, stored and/or disposed of at the Roosevelt Drive In site constitutes an imminent and substantial endangerment to health and the environment in violation of Section 7002(a)(1)(B);

11.    Pursuant to Section 7002(b)(1) of RCRA, 42 U.S.C. 6972(b)(1), defendant Honeywell is storing and/or disposing of hazardous waste, including hazardous chromium-bearing waste, at the Roosevelt Drive In site without a permit in violation of Section 3005 of RCRA, 42 U.S.C. 6925; and

12.    Pursuant to Section 505(b) of the Water Act, 33 U.S.C. 1365(b), defendant Honeywell is discharging pollutants to the Hackensack River without a permit in violation of Sections 301(a) and 402 of the Water Act, 33 U.S.C. 1311(a), 1342. A copy of this notice is attached as Appendix A.

13.    On December 20, 1999, plaintiffs Hackensack Riverkeeper, Inc. and William Sheehan gave notice to defendant Roned as follows:

3

14.    Pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), the hazardous waste, including chromium-bearing waste, stored and/or disposed of at the Roosevelt Drive In site constitutes an imminent and substantial endangerment to health and the environment in violation of Section 7002(a)(1)(B);

15.    Pursuant to Section 7002(b)(1) of RCRA, 42 U.S.C. 6972(b)(1), defendant Roned is storing and/or disposing of hazardous waste, including hazardous chromium-bearing waste, at the Roosevelt Drive In site without a permit in violation of Section 3005 of RCRA, 42 U.S.C. 6925; and

16.    Pursuant to Section 505(b) of the Water Act, 33 U.S.C. 1365(b), defendant Roned is discharging pollutants to the Hackensack River without a permit in violation of Sections 301(a) and 402 of the Water Act, 33 U.S.C. 1311(a), 1342. A copy of this notice is attached as Appendix A.

17.    More than 90 days have passed since notice was served that the storage and/or disposal of hazardous wastes at the Roosevelt Drive In site constitutes a substantial and imminent endangerment to health and the environment in violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), and, to the best of plaintiffs' knowledge, the United States Environmental Protection Agency (hereafter "EPA") has not commenced and is not diligently prosecuting any action under Section 7003 of RCRA, 42 U.S.C. 6973, or under Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (hereafter "CERCLA"), 42 U.S.C. 9606; is not engaging in a removal action under Section 104 of CERCLA, 42 U.S.C. 9604; has not incurred costs to initiate a Remedial Investigation and Feasibility Study (hereafter "RI/FS") under Section 104 of CERCLA, 42 U.S.C. 9604, and is not diligently proceeding with a remedial action under CERCLA; and has not obtained a court order or issued an administrative order under Section 106 of CERCLA, 42 U.S.C. 9606, or under Section 7003 of RCRA, 42 U.S.C. 6973,

4

pursuant to which a responsible party is diligently conducting a removal action. a RI/FS. or proceeding with a remedial action.

18.    More than 90 days have passed since notice was served that the storage and/or disposal of hazardous wastes at the Roosevelt Drive In site constitutes a substantial and imminent endangerment to health and the environment in violation of Section 7002(a)(1)(B) of RCRA. 42 U.S.C. 6972(a)(1)(B). and, to the best of plaintiffs' knowledge. the State has not commenced and is not diligently prosecuting any action under Section 7002(a)(1)(B) of RCRA. 42 U.S.C. 6972(a)(1)(B); is not actually engaging in a removal action under Section 104 of CERCLA, 42 U.S.C. 9604; and has not incurred costs to initiate a RI/FS under Section 104 of CERCLA. 42 U.S.C. 9604, and is not diligently proceeding with a remedial action under CERCLA.

19.    More than 60 days have passed since notice was served that defendants are storing and/or disposing of hazardous waste at the Roosevelt Drive In site without a permit in violation of Section 3005 of RCRA, 42 U.S.C. 6925, and, to the best of plaintiffs' knowledge. neither EPA nor the State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with the permit requirements of RCRA.

20.    More than 60 days have passed since notice was served that defendants are discharging pollutants to the Hackensack River in violation of Section 301(a) and 402 of the Water Act, 33 U.S.C. 1311(a), 1342, and, to the best of plaintiffs' knowledge, neither EPA nor the State has commenced and is diligently prosecuting a civil or criminal judicial action to redress the violations.

21.    To the best of plaintiffs' knowledge. EPA has not commenced an administrative civil penalty action under Section 309(g)(6) of the Water Act. 33 U.S.C. 1319(g)(6). to penalize defendants for the unpermitted discharge of pollutants to the Hackensack River from the Roosevelt Drive In site.

22.     Venue is appropriate in the District of New Jersey, pursuant to Section 7002(a) of RCRA, 42 U.S.C. 6972(a), and Section 505(c)(1) of the Water Act, 33 U.S.C. 1365(c)(1), because the violations complained of occurred within this District.

## PARTIES

### Plaintiffs

23.     Plaintiff Hackensack Riverkeeper, Inc. sues on behalf of itself, its officers, directors, advisers, trustees, and employees. Hackensack Riverkeeper, Inc. is a not-for-profit public interest corporation organized under the laws of the State of New Jersey, with its principal place of business in Teaneck, New Jersey. Founded in 1997, Hackensack Riverkeeper, Inc. is a member of the Water Keeper's Alliance, an international organization of watershed advocates who work together to guarantee attainment of the "fishable and swimable" goals of the Water Act.

24.     Hackensack Riverkeeper, Inc.'s purpose is to protect, preserve, and restore the Hackensack River and its living resources and to increase public awareness of the lower Hackensack River watershed as a vital natural and recreational resource. In an effort to achieve this goal, Hackensack Riverkeeper, Inc. works in partnership with educators to develop curricula, materials, and programs to educate the public relating to this purpose.

25.     Hackensack Riverkeeper, Inc. operates the Eco-Cruise, Eco-Walk, and the Hackensack Riverkeeper Canoe Project programs. Eco-Cruises are boat tours of the Hackensack River and Meadowlands. Eco-Walks are guided field trips to unique habitat areas within the Hackensack River watershed. The Hackensack Riverkeeper Canoe Project is a recreational canoe rental facility, which also hosts various canoeing events and competitions. Hackensack Riverkeeper, Inc.'s funding depends, in large part, on donations resulting from the Eco-Cruise, Eco-Walk, and Hackensack Riverkeeper Canoe Project programs.

6

26.     The Eco-Cruise. Eco-Walk, and Hackensack Riverkeeper Canoe Project programs attract visitors who are taught about the Hackensack River. This directly increases public awareness of the lower Hackensack River watershed as a vital natural and recreational resource. The success of these programs depends on the physical, aesthetic, recreational, biological, and chemical health, viability, and safety of the river. When the River is harmed by pollution, including chromium pollution, fewer people are interested in visiting the River. Consequently, Hackensack Riverkeeper, Inc. obtains less revenues.

27.     The hazardous waste contamination of the Roosevelt Drive In site and its impact on the quality of the waters of the Hackensack River directly affect the economic interests of Hackensack Riverkeeper, Inc., its officers, directors, advisers, trustees, and employees. Defendants' violations have adversely affected, are adversely affecting, and will continue adversely to affect, the economic interests of Hackensack Riverkeeper, Inc., its officers, directors, advisers, trustees, and employees.

28.     Plaintiff William Sheehan is a salaried employee of Hackensack Riverkeeper, Inc. The success of the Hackensack Riverkeeper program depends on the physical, aesthetic, recreational, biological, and chemical health, viability, and safety of the river. If the program is unsuccessful, Hackensack Riverkeeper, Inc. is likely to have severe financial problems. Mr. Sheehan therefore has a financial stake in the physical, aesthetic, recreational, biological, and chemical health, viability, and safety of the Hackensack River.

29.     Mr. Sheehan has been a recreational user of the Hackensack River for most of his life. As a child, Mr. Sheehan visited the River for recreational purposes, including nature walks along the river. His recreational and financial uses of the River have increased to include boating, fishing, and birdwatching. For at least the last two years, continuing to date, Mr. Sheehan has visited

7

the Hackensack River in a personal capacity on an almost-daily basis. His regular activities on the River include boating, fishing, and bird-watching.

30.    William Sheehan frequently notices murky water, riverbank discharges, and foul odors while navigating the Hackensack River. If the water were not impacted by discharges and foul odors. Mr. Sheehan would dive and swim in the River.

31.    In 1992, the New Jersey Department of Health banned the eating of Bluefish, Striped Bass, White Perch, Blue-clawed Crabs, and various other Hackensack River species due to pollution, including heavy metal contamination. Chromium, such as that discharged from the Roosevelt Drive In Site, is a heavy metal. If it were not for this ban, and his concern about health risks associated with the River and chromium contamination. Mr. Sheehan would continue to eat these species and to enjoy greater use of the Hackensack River.

32.    The hazardous waste contamination of the Roosevelt Drive In site and its impact on the quality of the waters of the Hackensack River affect the health, economic, recreational, aesthetic and environmental interests of Mr. Sheehan. Defendants' violations have adversely affected, are adversely affecting, and will continue adversely to affect, the health, economic, recreational, aesthetic and environmental interests of Mr. Sheehan.

## Defendants

33.    Mutual owned and operated the Chromate Plant until Mutual was acquired by AlliedSignal. On or about August 12, 1954, Allied Chemical and Dye Corporation acquired all the stock of Mutual. In December 1954, Mutual, then a subsidiary of AlliedSignal, sold the Roosevelt Drive In site to Amy Joy Realty Corporation for the construction of an outdoor theater. On or about February 23, 1955, Allied Chemical and Dye Corporation filed an application for a Certificate of Dissolution of Mutual. On or about February 28, 1955, the New Jersey Secretary of State issued a

Certificate of Dissolution of Mutual. On or about March 1, 1955, Allied Chemical and Dye Corporation and the trustees on dissolution of Mutual executed a merger agreement. In this agreement, Allied Chemical and Dye Corporation agreed to pay, perform, or otherwise discharge, all obligations of Mutual and agree to exonerate, indemnify, and save harmless Mutual against all liability. After the merger, Mutual became the Mutual Chemical Division of the Allied Chemical and Dye Corporation and continued its chromate chemical manufacturing operations at its plant in Baltimore, Maryland. On or about April 28, 1958, Allied Chemical and Dye Corporation changed its name to Allied Chemical Corporation. On or about April 27, 1981, Allied Chemical Corporation changed its name to Allied Corporation. In 1985, Allied Corporation and the Signal Companies, Inc. combined to form AlliedSignal, Inc. On or about December 1, 1999, pursuant to an Agreement and Plan of merger dated June 4, 1999, AlliedSignal, Inc. merged with Honeywell, Inc. to form Honeywell International, Inc.

34.    Honeywell International, Inc. is directly responsible and liable for the debts and liabilities of AlliedSignal, Inc., Allied Corporation, and Allied Chemical Corporation. Honeywell International, Inc. is the successor by acquisition and merger of AlliedSignal and Mutual and is therefore directly or vicariously liable for the liabilities of AlliedSignal, Inc., Allied Corporation, Allied Chemical Corporation and Mutual. The five companies shall hereafter be referred to jointly as "Honeywell."

35.    On or about December 30, 1954, Honeywell sold the site on which the Chromate Plant was located. Defendant Honeywell's Chromate Plant was the generator of the chromium-bearing waste present at the Roosevelt Drive In site and, by virtue of the interim remediation work and ongoing remediation studies it has performed and is conducting at the site. Honeywell is also the operator of the site.

9

36.     Defendants Roned Realty of Jersey City, Inc. and Roned Realty of Union City, Inc. are corporations organized under the laws of the State of New Jersey with their principal place of business in Hasbrouck Heights, New Jersey. A company referred to in the records of the Jersey City Assessor's office as Roned Realty Corp. owns the portion of the Roosevelt Drive In site designated as lot 14D in Tax Block 1290A, Jersey City, Hudson County, New Jersey. Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that either defendant Roned Realty of Jersey City, Inc. or defendant Roned Realty of Union City, Inc. is the owner and operator of lot 14D.

## FACTS

### I

### WASTE FROM THE CHROMATE PLANT

37.     The Chromate Plant extracted chromium from chromium ores to produce chromate chemicals. The process generated waste that is referred to herein as chromium-bearing waste. Honeywell has estimated that the Chromate Plant produced 969,500 tons of chromium-bearing waste, containing between three to seven percent total chromium. Honeywell transported chromium-bearing waste from the Chromate Plant through a pipeline over Route 440 onto the Roosevelt Drive In site. In addition to chromium-bearing waste, Honeywell dumped unknown amounts of other refuse from the Chromate Plant at the Roosevelt Drive In site. Approximately one third of the chromium in the chromium-bearing waste deposited at the Roosevelt Drive In site is hexavalent chromium. By December 5, 1953, waste at the Roosevelt Drive In site was in a pile covering an area of approximately 10 acres and measuring from 10 to 30 feet high. Between 1952 and 1954, Honeywell sold chromium-bearing waste from the Roosevelt Drive-In site to be used as fill. In

1954, Honeywell graded the remaining chromium-bearing waste at the Roosevelt Drive In site in preparation for selling the site.

## II

## THE DISCHARGE OF POLLUTANTS TO SURFACE WATER FROM THE ROOSEVELT DRIVE IN SITE

38.    Approximately halfway down the length of the Roosevelt Drive In site, along both the northern and southern perimeters respectively, lies a contoured man-made drainage channel. These drainage channels have been lined with a layer of polyvinyl chloride, a layer of another geotextile, and gravel. On the northern perimeter, the mouth of a large pipe connects to the top of this channel. These channels serve as a conduit, carrying pollutants, including chromium-polluted water, from the site, into outfall boxes at the River's edge, where the pollutants are then discharged into the Hackensack River. The drainage channels collect storm water and carry this polluted run-off into the River. In addition, at high tide, backwater from the River enters the drainage channels, and pollutants are carried back into the River through these channels. Pollutants, including chromium, are discharged from these drainage channels at the Roosevelt Drive In site into the River.

39.    Groundwater flow at the Roosevelt Drive In site moves from east to west, from Route 440 to the Hackensack River. Pollutants consisting of the hazardous substances in the soil at the site leach into the groundwater. This polluted water is then discharged from the site into the River.

III

## THE RISK TO HUMAN HEALTH AND THE ENVIRONMENT OF CHROMIUM-BEARING WASTE

40.     The chromium-bearing waste contaminating the Roosevelt Drive In site consists chiefly of two valence states of chromium. hexavalent and trivalent chromium.

41.     Chromium is a carcinogen.  Chromium in surface soil may be blown into the air and then inhaled.  Inhalation of hexavalent chromium causes lung cancer.  There is no safe level of exposure to hexavalent chromium by inhalation.  Inhalation of hexavalent chromium can cause irritation to the nose. ranging in severity from a running nose to having ulcers and holes in the nasal septum.  It may also cause asthma.

42.     Skin contact with hexavalent chromium in large quantities causes irritant dermatitis that burns the skin and leaves ulcers and scars.  In smaller quantities. hexavalent chromium causes allergic contact dermatitis. with symptoms such as severe redness and swelling of the skin.

43.     Ingestion of large amounts of hexavalent chromium may cause stomach upsets. ulcers, convulsions, kidney and liver damage, and even death.

44.     While less toxic. trivalent chromium may in large enough quantities cause some of the same health problems caused by hexavalent chromium.

45.     Chromium is toxic to plant. animal life, and aquatic life.  The contamination at the Roosevelt Drive In site adversely affects plant and animal life exposed to those sites. The discharge of chromium into the Hackensack River. through storm water runoff and discharges into the Hackensack River. adversely affects aquatic life.

12

IV

## HONEYWELL'S KNOWLEDGE OF THE RISK OF HARM TO HUMAN HEALTH AND THE ENVIRONMENT POSED BY ITS CHROMIUM-BEARING WASTE

46.     The first case report of respiratory cancer associated with employment in

chromium-compound-related industries appeared in 1890. By 1932, over 250 chrome poisoning

cases were pending concerning the Chromate Plant. At the latest. Honeywell knew or should

have known by 1937 of the risk posed by the waste produced at the Chromate Plant. In an April

12, 1937, letter, Honeywell admitted the waste from the Chromate Plant contained chromic

oxides. including calcium chromate. Calcium chromate is recognized as one of the most

carcinogenic chromium compounds.

47.     In an internal memorandum dated May 14, 1937, Honeywell admitted that its

chromium-bearing waste contains compounds "ordinarily poisonous to plant growth."

48.     In 1948, the results of a study initiated by the chromate manufacturing industry

that showed a significant association between chromium exposure and respiratory cancer were

published. Honeywell employees were included in a health study conducted by the United States

Public Health Service that concluded in a report in 1953 that employees exposed to chromate

chemicals had suffered from nasal perforations. skin ulcers. and lung cancer. The report setting

forth the results of the study was sent to Honeywell.

49.     The Industrial Hygiene Foundation of America. Inc. studied workers at the

Chromate Plant from December 31, 1947. to July 1, 1954. It informed Honeywell in a 1957

report on the health risks from chromate chemical exposure. including "penetrating ulcers" (a risk

recognized "for over a hundred years"). perforations of the nasal septum. allergic dermatitis. and

lung cancer.

50.    In a September 21, 1976, Patent (No. 3,981,965) for a method of suppressing water pollution from chromate chemical production waste, Honeywell stated that bleeding of wetted chromium compounds is objectionable because "chromium compounds are toxic and constitute a serious pollutant." Furthermore, some chromium compounds "have sufficient solubility to pollute the environment by such bleeding long after they have been discarded." When "stockpiles are exposed to the elements and wetted by rain, these [chromium] salts are gradually leached from the residue over long periods of time to pollute the ground water."

51.    As a consequence of investigating the waste from its Baltimore, Maryland, facility, Honeywell knew by 1979 that the waste produced by its chromate chemical production process contained toxic trivalent and hexavalent chromium compounds.

52.    In 1983, Honeywell informed the New Jersey Department of Environmental Protection that the Roosevelt Drive In site was contaminated with chromium-bearing waste used as fill.

V

## HONEYWELL'S FAILURE TO CLEAN UP THE ROOSEVELT DRIVE IN SITE

53.    Despite its continuous knowledge of the presence of chromium-bearing waste at the Roosevelt Drive In and its knowledge of the risks posed by that waste, Honeywell did not take any action to clean up the site until 1989 when it completed an Interim Remedial Measure, which consisted of regrading the site and placing a polyvinyl chloride cover over exposed portions.

54.    In 1991 and 1992, a Honeywell contractor installed a new wooden bulkhead at the site. In February 1993, when the polyvinyl chloride cover was damaged by high winds, Honeywell installed a new cover.

14

55.     On June 17, 1993, Honeywell entered into an Administrative Consent Order (hereafter the "ACO") with the State of New Jersey. The ACO requires Honeywell to conduct a remedial investigation and feasibility study for 18 sites, including the Roosevelt Drive In site. The ACO requires Honeywell to spend a sum of money equal to $50 million, plus the difference between $10 million and any lower amount that Honeywell spends on the RI/FS studies (hereafter referred to as "the remediation fund"), for remediating the sites subject to the order. If the remediation cost for all the sites exceeds the remediation fund, the ACO specifies that Honeywell may refuse to fund remediation for any site to the extent that it will put the total remediation cost in excess of the remediation fund, if Honeywell disagrees with the remedial action proposed by the State.

56.     Honeywell has not committed itself specifically to remediate the Roosevelt Drive In site.

57.     Despite the interim remedial action and the ACO described above, chromium-earing waste continues to be present in the environment at the Roosevelt Drive In site and continues to be released into the environment.

## VI

## RONED'S FAILURE TO CLEAN UP THE PORTION OF THE ROOSEVELT DRIVE IN SITE WHICH IT OWNS

58.     In 1987 and 1988, Roned completed an Interim Remedial Action at its property, placing a one foot soil cover and asphalt cover over parts of the site. Roned has taken no action to clean up the portion of the Roosevelt Drive In Site which it owns.

59.     Despite Roned's continuous knowledge since at least 1987 of the presence of

chromium-bearing waste at the lot 14D portion of the Roosevelt Drive-in site. chromium-bearing waste continues to be present in the environment at the site and continues to be released into the environment.

## CLAIMS

### First Claim

### (Substantial and Imminent Endangerment)

60.     Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), provides that any person may commence a civil action against any person, including a past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

61.     Defendant Honeywell is a past owner of the Roosevelt Drive In site and has contributed to the past and present handling, storage, transportation, and disposal of solid and hazardous waste at the site. Defendant Roned is a past and present owner of the Roosevelt Drive In site and has contributed to the past and present handling, storage, and disposal of solid and hazardous waste at the site.

62.     The hazardous waste, including chromium-bearing waste, at the Roosevelt Drive In site, may present an imminent and substantial endangerment to health or the environment.

63.     Defendants have violated Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), because the hazardous waste contamination at the Roosevelt Drive In site may present a substantial and imminent endangerment to the health or the environment.

16

## Second Claim

### (Storage and/or Disposal of Hazardous Waste without a Permit)

64.     Section 7002(a)(1)(A) of RCRA, 42 U.S.C. 6972(a)(1)(A), provides that any person may commence a civil action against any person who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order effective pursuant to RCRA.

65.     Section 3005 of RCRA, 42 U.S.C. 6925, provides that owning or operating a facility for the treatment, storage, or disposal of hazardous waste is prohibited except in accordance with a permit issued pursuant to Section 3005.

66.     Defendant Honeywell has operated the facility at the Roosevelt Drive In site by virtue of its supervision of Interim Remedial Measures there from 1989 to the present. Defendant Roned owns and operates the portion of the site consisting of lot 14D.

67.     Defendants have stored and/or disposed of, and continue to store and/or dispose of, hazardous waste, including hazardous chromium-bearing waste, at the Roosevelt Drive In site. Defendants do not possess a permit pursuant to Section 3005 of RCRA, 42 U.S.C. 6925, to store and/or dispose of hazardous waste at the Roosevelt Drive In site.

68.     Defendants have violated Sections 3005 and 7002(a)(1)(A) of RCRA, 42 U.S.C. 6925, 6972(a)(1)(A), by storing and/or disposing of hazardous waste at the Roosevelt Drive In site without a permit.

## Third Claim

### (Discharge of Pollutants into the Waters of the United States without a Permit)

69.     Sections 505(a) and 505(f)(6) of the Water Act, 33 U.S.C. 1365(a) and 1365(f)(6),

authorize citizens to enforce "an effluent standard or limitation," including effluent standards, limitations, permits, and permit conditions set forth in Sections 301 and 402 of the Water Act, 33 U.S.C. 1311 and 1342.

70.     Section 301(a) of the Water Act, 33 U.S.C. 1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with enumerated sections of the Water Act.  Section 301(a) prohibits, inter alia, such discharges in violation of, or not authorized by, the terms and conditions of an NPDES permit issued pursuant to Section 402 of the Water Act, 33 U.S.C. 1342.  Section 402(k) provides that compliance with the terms and conditions of a permit issued pursuant to that section shall be deemed compliance with, inter alia, Section 301 of the Water Act.

71.     Defendant Honeywell has operated the facility at the Roosevelt Drive In site by virtue of its supervision of Interim Remedial Measures there from 1989 to the present. Defendant Roned owns and operates the portion of the site consisting of lot 14D.

72.     The storm water runoff, surface water runoff, and other water discharged from the Roosevelt Drive In site into the Hackensack River is contaminated with pollutants, including toxic chromium-bearing waste.  Defendants do not possess a National Pollutant Discharge Elimination System (hereafter "NPDES") permit or a New Jersey Pollutant Discharge Elimination System (hereafter "NJPDES") permit, issued pursuant to Section 1342 of the Water Act, 33 U.S.C. 1342, authorizing discharges of pollutants from the Roosevelt Drive In site.

73.     Defendants have violated Sections 301(a) and 402 of the Water Act, 33 U.S.C. 1311(a), 1342, by discharging hazardous waste into the Hackensack River without a permit.

## RELIEF

Wherefore, plaintiffs respectfully request this Court to grant the following relief:

A.    Issue a declaratory judgment that defendants have violated, and continue to be in violation of, Sections 3005, 7002(a)(1)(A), and 7002(a)(1)(B) of RCRA, 42 U.S.C. 6925, 6972(a)(1)(A), 6972(a)(1)(B), and Sections 301(a), and 402 of the Water Act, 33 U.S.C. 1311, 1342;

B.    Enjoin defendants to remove and properly to dispose of the hazardous waste they have stored and/or disposed of at the Roosevelt Drive In site and the hazardous waste which has migrated from the Roosevelt Drive In site to adjoining properties and permanently to remediate the Roosevelt Drive In site and adjacent properties affected by the hazardous waste stored and/or disposed of at the site;

C.    Enjoin defendants to cease all discharges of pollutants from point sources at the Roosevelt Drive In site that are not in compliance with a NPDES or NJPDES permit;

D.    Order defendants to pay appropriate civil penalties for the storage and/or disposal of hazardous waste at the Roosevelt Drive In site without a permit pursuant to Section 7002(a) of RCRA, 42 U.S.C. 6972(a);

E.    Order defendants to pay appropriate civil penalties for the discharge of pollutants to the Hackensack River without a permit pursuant to Section 505(a) of the Water Act, 33 U.S.C. 1365;

F.    Enjoin defendants to undertake a long-term public health screening process to evaluate the health impacts of exposure to chromium waste as to each individual who may have suffered prolonged or repeated exposure to the waste at the site;

G.    Order such other injunctive relief as the Court deems appropriate, including restitution and mitigation;

19

H.    Award plaintiffs their costs, including reasonable attorneys' and expert witness' fees,

as authorized by Section 7002(e) of RCRA, 42 U.S.C. 6972(e), and Section 505(d) of the Water Act,

33 U.S.C. 1365(d); and

I.    Award such other relief as this Court deems appropriate.

Respectfully submitted,

BRUCE J. TERRIS  (BT 9359)
CAROLYN SMITH PRAVLIK  (CSP 4481)
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, D.C.  20005-4632
(202) 682-2100

EDWARD LLOYD  (EL 2633)
416 Clark Street
South Orange, New Jersey 07079
(973) 353-5695

March 24, 2000