# Exhibit A

## Final Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

GIBSON BRANDS, INC., *et al.*,

Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

:    Chapter 11
:
:    Case No. 18-11025 (CSS)
:
:    Jointly Administered
:
:    **Relates to Docket Nos. 726, 728, 742,**
x    **774, 822, 830, 831, 835, 842, 843,**
     **844, 845, 846, 849, 850**

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER CONFIRMING THE DEBTORS' FIFTH AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION**

The above captioned debtors and debtors in possession (collectively, the "Debtors"),

having:[2]

a. commenced, on May 1, 2018 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b. continued to operate and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c. filed, on June 20, 2018, the *Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 301]; the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 302]; and the *Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule, and (E) Granting Related Relief* [Docket No. 303];

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042); Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign).  The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

[2] All capitalized terms used but otherwise not defined in these findings of fact, conclusions of law, and order (collectively, this "Confirmation Order") shall have the meanings set forth in the Plan (as defined herein).  The rules of interpretation set forth in Article I.A. of the Plan shall apply to this Confirmation Order.

d.  filed, on July 12, 2018, the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 424]; and the *Disclosure Statement for Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 426];

e.  filed, on July 24, 2018, the *Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 482]; and  the *Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 484];

f.  filed, on August 1, 2018, the *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [Docket Nos. 516, 565]; and the *Disclosure Statement for Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [Docket Nos. 518, 566];

g.  caused the Solicitation Packages and Confirmation Hearing Notice (as defined in the Disclosure Statement Order) and the deadline for objecting to Confirmation of the Plan to be distributed on August 8, 2018, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials* [Docket No. 588] (the "August 8 Solicitation Affidavit");

h.  caused the Confirmation Hearing Notice to be published on August 10, 2018, in the national edition of the *New York Times,* as evidenced by the *Affidavit of Publication* [Docket No. 578] (the "Publication Affidavit");

i.  filed, on September 6, 2018, the *Debtors' Motion for Entry of an Order (I) Approving Disclosure Statement Addendum, (II) Approving Amended Solicitation Procedures Solely With Respect to Class 6 and Class 8, and (III) Granting Other Related Relief* [Docket No. 724]; the *Addendum to Disclosure Statement for Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [Docket Nos. 724-3, 777]; that certain Plan Modification Agreement dated September 6, 2018 [Docket No. 724-4]; *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [Docket Nos. 724-4, 726] (the "Fourth Amended Plan");

j.  caused the Amended Solicitation Packages and notice of the Amended Solicitation Procedures (each as defined in the Amended Solicitation Procedures Order) and the extended deadline for objecting to Confirmation of the Plan to be distributed on September 15, 2018, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and Amended Solicitation Procedures Order, as evidenced by, among other things, the *Supplemental Affidavit of Service of Solicitation Materials* [Docket No. 814] and the *Corrected Supplemental Affidavit of Service of Solicitation Materials* [Docket No. 854] (collectively with the August 8 Solicitation Affidavit and the Publication Affidavit, the "Solicitation Affidavits");

k.  filed, on September 24, 2018, the *Notice of Filing of Plan Supplement for the Debtors' Fourth Amended Joint Plan of Reorganization* [Docket No. 812] (as may be further amended and supplemented from time to time, the "Plan Supplement");

l.  filed, on October 1, 2018, the *Debtors' Fifth Amended Joint Plan of Reorganization* [Docket No. 842] (as may be further amended from time to time, the "Plan");

m.  filed, on October 1, 2018, the *Declaration of Brian Fox in Support of Confirmation of the Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 846] (the "Fox Declaration"); the *Declaration of Alan J. Carr in Support of Confirmation of Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 845] (the "Carr Declaration"); *Declaration of Jeffrey Finger in Support of Confirmation of Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 844] (the "Finger Declaration") (collectively, the "Confirmation Declarations"); and *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 849] (the "Daloia Declaration" or the "Voting Report"), and each of the foregoing declarants having been made available for cross-examination at the Confirmation Hearing and each of the foregoing declarations having been admitted into evidence;

n.  filed, on October 1, 2018, the *Debtors' Memorandum of Law in Support of an Order Confirming the Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 850] (the "Confirmation Brief").

This Court having:

a.  entered, on August 2, 2018, the *Order (A) Approving The Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule, and (E) Granting Related Relief* [Docket No. 533] (the "Disclosure Statement Order");

b.  entered, on September 13, 2018, the *Order (I) Approving Disclosure Statement Addendum, (II) Approving Amended Solicitation Procedures Solely With Respect to Class 6 and Class 8, and (III) Granting Other Related Relief* [Docket No. 767] (the "Amended Solicitation Procedures Order" and together the Disclosure Statement Order, "Solicitation Procedures Orders");

c.  set October 2, 2018, at 1:00 p.m., prevailing Eastern Time, as the date and time for the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

d.  reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Plan Supplement, the Confirmation Declarations, the Voting Report, the Confirmation Hearing Notice, the Solicitation Affidavits, the Ballots, and all filed pleadings, exhibits, statements, and comments regarding Confirmation, including all objections, statements, and reservations of rights;

e.  held the Confirmation Hearing;

f.  heard the statements and arguments made by counsel in respect of Confirmation;

g.  considered all oral representations, affidavits, testimony, documents, filings, and other evidence regarding Confirmation, and having admitted the same into evidence at the Confirmation Hearing;

h.  overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated herein; and

i.  taken judicial notice of all pleadings and other documents filed, all orders, entered, and all evidence and arguments presented in the Chapter 11 Cases.

NOW, THEREFORE, the Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation has been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and all evidence presented at the Confirmation Hearing establish just cause for the relief granted herein, and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact and conclusions of law and Orders:

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.    Findings of Fact and Conclusions of Law.**

1.    The findings of fact and the conclusions of law set forth and incorporated in this Confirmation Order constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

**B.    Jurisdiction and Venue.**

2.    The Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court*

*for the District of Delaware,* dated February 29, 2012. The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. Venue in the Court was proper as of the Petition Date and remains proper under 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).

### C.      Eligibility for Relief.

3.      The Debtors were on the Petition Date and continue to be entities eligible for relief under section 109 of the Bankruptcy Code, and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

### D.      Commencement and Joint Administration of the Chapter 11 Cases.

4.      On the Petition Date, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On May 2, 2018, the Court entered an order [Docket No. 60] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

### E.      Committee Appointment

5.      On May 9, 2018, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code, which Committee consists of (a) TKL Products Corp., (b) Grover Musical Products, Inc., (c) EDC, Inc., (d) Advance Plating, Inc., (e) Philips, (f) Guoguang Electronic Co., Ltd., and (g) Tronical GmbH.

**F.**    **Bankruptcy Rule 3016.**

6.    The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b).

**G.**    **Judicial Notice.**

7.    The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Court, including, without limitation, all pleadings and other documents filed and orders entered thereon.  The Court also takes judicial notice of all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of the Chapter 11 Cases.

**H.**    **Plan Supplement.**

8.    The documents identified in the Plan Supplement were filed as required and notice of such documents was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Plan, the Solicitation Procedures Orders, the Bankruptcy Code, and the Bankruptcy Rules.  The Plan Documents, including the Plan Supplement, and the documents related thereto, are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, the Debtors reserve the right to alter, amend, update, or modify such documents in accordance with the terms of the Restructuring Support Agreement, the Plan, this Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

**I.**    **Solicitation Procedures Orders.**

9.    On August 2, 2018 and September 13, 2018, respectively, the Court entered the Solicitation Procedures Orders, which, among other things:  (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the

Bankruptcy Code and Bankruptcy Rule 3017; (b) approved procedures for the solicitation and tabulation of votes on the Plan (the "Solicitation Procedures"); (c) approved the Solicitation Packages (defined below); (d) set the deadline to vote to accept or reject the Plan (the "Voting Deadline") as September 14, 2018 at 5:00 p.m. (prevailing Eastern Time) for Holders of Claims in all Classes other than Class 6 and Class 8, and September 27, 2018 at 5:00 p.m. (prevailing Eastern Time) for Holders of Claims in Class 6 and Class 8; (e) set September 27, 2018 at 5:00 p.m. (prevailing Eastern Time) as the deadline for objecting to the Plan (the "Plan Objection Deadline"); and (f) set October 2, 2018, at 1:00 p.m. (prevailing Eastern Time) as the date and time for the Confirmation Hearing.  The period during which the Debtors solicited acceptances to the Plan is a reasonable and adequate period of time for creditors to have made an informed decision to accept or reject the Plan.

**J.    Solicitation and Notice.**

10.    The Plan, Disclosure Statement, Solicitation Procedures Orders, notice of the Confirmation Hearing, and an appropriate ballot (collectively, the "Ballots") for voting on the Plan or a notice of non-voting status (in substantially the forms approved pursuant to the Solicitation Procedures Orders) and additional materials detailed in the Solicitation Procedures Orders (collectively, the "Solicitation Packages") were transmitted and served in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Orders to each Holder of a Claim or Equity Interest.  The solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith, and was in compliance with sections 1125, 1126, and all other applicable sections of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, and all other applicable rules, laws, and regulations.  As evidenced by the Solicitation Affidavits, all parties required to be given notice of the Confirmation Hearing

(including the deadline for filing and serving objections to Confirmation) have been provided due, proper, timely, and adequate notice and have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.

**K.    Voting Report.**

11.    Prior to the Confirmation Hearing, the Debtors filed the Voting Report.  As set forth in the Voting Report, the procedures used to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Orders, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations.

12.    As set forth in the Plan, Holders of Claims in Classes 5, 6, 7 and 8 (collectively, the "Voting Classes") for each of the Debtors were eligible to vote on the Plan pursuant to the Solicitation Procedures.  In addition, Holders of Claims or Equity Interests in Classes 1, 2, 3, 4 and 11 are Unimpaired and conclusively presumed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims in Class 9 either are Unimpaired, in which case they are conclusively presumed to accept the Plan, or Impaired, in which case they are deemed to reject the Plan, and therefore, are not entitled to vote to accept or reject the Plan. Holders of Equity Interests in Classes 10 and 12 (together with holders of Claims in Class 9, to the extent Impaired under the Plan, the "Deemed Rejecting Classes") are Impaired under the Plan, are entitled to no recovery under the Plan, and are therefore deemed to have rejected the Plan.

13.    As evidenced by the Voting Report, each of the four Voting Classes voted to accept the Plan for each Debtor.

**L.    Burden of Proof.**

14.    The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance

of the evidence, which is the applicable evidentiary standard for Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code, to the extent applicable, by clear and convincing evidence.

## M.   **Background Facts**

15.    Based upon the Confirmation Declarations, the facts set forth therein with respect to: (i) the Debtors' corporate structure, assets and liabilities; (ii) the events leading to the commencement of the Chapter 11 Cases; (iii) the actions taken during the Chapter 11 Cases; (iv) the negotiations that occurred and the settlements reached that provided the foundation of the Plan; (v) the Debtors' projections, liquidation analysis, valuation and the allocation of that value among the Classes under the Plan; (vi) the classification of Claims and Equity Interests, their treatment under the Plan, the solicitation of votes and the results thereof; and (vii) the transactions contemplated to implement the Plan, including the New Exit ABL Facility, the proposed new officers and directors of the Reorganized Debtors (as disclosed in the Plan Supplement), the Amended Organizational Documents for the Reorganized Debtors (as disclosed in the Plan Supplement), and the payment of fees and expenses incident to the Chapter 11 Cases (including in connection with the New Exit ABL Facility), are uncontroverted, are incorporated herein by reference and establish the factual predicates supporting confirmation of the Plan.

## N.   **Plan Settlements.**

16.        Based upon the Confirmation Declarations, the Global Settlement incorporated into the Plan avoids costly, lengthy, and uncertain litigation over many complex issues, including (i) valuation and allocation of value, (ii) the allowance of GSO's and Philips' claims against the Debtors' Estates, and (iii) the claims against GSO and the Specified Persons that are being settled.  The Debtors' and their Estates' likelihood of success on each of these issues was not certain and their consensual resolution pursuant to the Global Settlement will

provide a significantly superior outcome to the Debtors and their stakeholders in the form of greater and more certain recoveries for creditors, without the cost and delay of complex, difficult, and protracted litigation.

17.    Moreover, by settling with GSO in a manner that allows them to recover Profits Interests in Class 7 on account of GSO's claims against Gibson Holdings but with GSO not asserting any claim in Class 6, GSO's recovery in Class 7 is not dilutive to creditors (other than the Holders of the Prepetition Secured Notes who are the only other creditors in Class 7 and are party to the Global Settlement).  Similarly, the Prepetition Secured Noteholders' agreement not to seek a distribution in Class 6 increases recoveries for all Class 6 creditors.

18.    In addition, by resolving the threatened litigation that was preserved under the Third Amended Plan as against certain of the Debtors' directors, the Reorganized Debtors will benefit from not having the indemnity costs, insurance premium increases and distraction associated with such claims.

## O.    MODIFICATIONS TO THE PLAN

### 1.    Plan Modifications.

19.    The Plan contains certain modifications as compared to the Fourth Amended Plan (the "Plan Modifications").  Except as provided for by law, contract, or prior order of this Court, none of the modifications made since the commencement of solicitation adversely affects the treatment of any Claim or Equity Interest under the Plan.  The filing with the Court of the Plan as modified by the Plan Modifications constitutes due and sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, none of these modifications require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code (especially in light of previously provided disclosures), nor do they require that Holders of Claims be afforded an

opportunity to change previously cast acceptances or rejections of the Plan. The Plan as modified and attached hereto shall constitute the Plan submitted for Confirmation by the Court.

**2.      Presumed Acceptance of Plan as Modified.**

20.      In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are presumed to have accepted the Plan as modified by the Plan Modifications. No Holder of a Claim or Equity Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

**P.      Compliance with the Bankruptcy Code (11 U.S.C. §§ 1125 and 1127).**

21.      The Debtors have complied with section 1125 with respect to the Disclosure Statement and the Plan. The requirements of section 1127 of the Bankruptcy Code have been satisfied.

**Q.      Good Faith, Best Interests, Fair and Equitable.**

22.      The Restructuring Transactions under the Plan enable the Debtors to emerge from chapter 11 with new owners, a deleveraged balance sheet, and cash and liquidity to operate. The Plan was proposed in good faith and the consummation of the Plan is in the best interests of all stakeholders and is fair and equitable.

## II. CONFIRMATION

**A.      Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129).**

23.      The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code.

**1.      Compliance with Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

24.      As required by section 1129(a)(1) of the Bankruptcy Code, the Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123.

### (ii)     Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1)).

25.     The classification of Claims and Equity Interests under the Plan is proper under the Bankruptcy Code.  Article III of the Plan designates Classes of Claims and Equity Interests, other than Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be designated.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class.  Valid reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan.  The Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### (iii)     Specified Unimpaired and Impaired Classes (11 U.S.C. §§ 1123(a)(2), 1123(a)(3) and 1123(b)(1)).

26.     Article III of the Plan specifies that Claims and Equity Interests in Classes 1, 2, 3, 4 and 11 are Unimpaired.  Article III of the Plan also specifies the treatment of each Impaired Class under the Plan, which are Classes 5, 6, 7, 8, 10 and 12.  The Plan, therefore, satisfies sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code and the impairment or unimpairment of Claims and Equity Interests under the Plan is permitted under section 1123(b)(1) of the Bankruptcy Code.  Holders of Claims in Class 9 are deemed to accept or deemed to reject the Plan depending on whether such Claims are reinstated or canceled and released without any distribution on account of such Claims.

### (iv)     No Discrimination (11 U.S.C. § 1123(a)(4)).

27.     Article III of the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the Holder of a particular Claim or Equity Interest has

agreed to a less favorable treatment with respect to such Claim or Equity Interest. The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### (v)    Implementation of the Plan (11 U.S.C. § 1123(a)(5)).

28.    The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for the Plan's implementation, including, without limitation:  (a) the good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan; (b) the cancellation of all agreements, instruments, Securities and other documents evidencing any Claim or Equity Interest and any rights of any Holder in respect thereof (except to the extent set forth in the Plan); (c) consummation of the Restructuring Transactions, including generally allowing for all corporate action necessary to effectuate the Restructuring Transactions; (d) funding distributions under the Plan through Cash on hand, proceeds of the New Exit ABL Facility, and issuance of the Profits Interests, New Common Stock and the New Warrants; (e) entry into, and the incurrence of new indebtedness under, the New Exit ABL Facility, including payment of the Deposit as defined in and required under the Commitment Letter dated October 1, 2018 with respect to the New Exit ABL Facility (the "ABL Deposit") immediately upon the Court's approval of the Plan; (f) vesting of assets in the Reorganized Debtors; (g) exemption from transfer taxes pursuant to section 1146 of the Bankruptcy Code; and (h) the appointment and selection of officers and directors of the Reorganized Debtors. The Plan, therefore, satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### (vi)    Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).

29.    Article V.N. of the Plan provides that the Amended Organizational Documents will prohibit the issuance of non-voting equity securities, and the Amended Organizational Documents filed with the Plan Supplement include such prohibition (other than Gibson Europe

B.V., which is not a U.S. corporation and is subject to Dutch law). The Plan, therefore, satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

### (vii)   Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).

30.     Article V.O. of the Plan describes the manner of selection of directors and officers of the Reorganized Debtors.   Such provisions are entirely consistent with the interests of creditors, equity security holders, and public policy.   Exhibit D of the Plan Supplement provides the disclosures regarding directors and officers.   The Plan, therefore, satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### (viii)   Discretionary Contents of the Plan (11 U.S.C. § 1123(b)).

31.     The other provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code.   The Plan, therefore, satisfies the requirements of section 1123(b) of the Bankruptcy Code.

### (b)   Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).[3]

32.     Article VI of the Plan governs the assumption or rejection of the Debtors' Executory Contracts and Unexpired Leases that were not previously assumed or rejected pursuant to an order of the Court.

33.     As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amounts, all Executory Contracts and Unexpired Leases of the Debtors that the Debtors have identified on the *Notice of Potential Assumption of Executory Contracts and Unexpired Leases and Cure Amounts* [Docket No. 701], the *Second Amended Notice of Potential Assumption of Executory Contracts and Unexpired Leases and Cure Amounts* [Docket No. 793], and the *Third Amended Notice of Potential Assumption of Executory Contracts and Unexpired*

---

[3] Section 1123(b)(1) of the Bankruptcy Code is addressed in Section II.A.1II.A.1(iii) above.

*Leases and Cure Amounts* [Docket No. 803], will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including employment agreements) and Unexpired Leases that (a) have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto, (b) have been previously assumed or rejected by order of the Bankruptcy Court, (c) are the subject of a separate motion Filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date for assumption or rejection, (d) are identified on the Rejected Executory Contract/Unexpired Lease List [Docket No. 812-8]; or (e) are the subject of a Cure Objection [Docket Nos. 728, 774, 822].

34.    Entry of this Confirmation Order by the Court shall constitute an order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

35.    To the extent a Cure Objection was not resolved consensually prior to the Confirmation Hearing, the Debtors or the Reorganized Debtors, as the case may be, shall schedule a hearing to determine the Cure amount within 60 days following the Confirmation Hearing, or such other date as may be agreed to with the counterparty or ordered by the Bankruptcy Court.   Within ten (10) days following the Bankruptcy Court's entry of an Order determining any Cure amounts for such Executory Contract or Unexpired Lease, the Debtors or the Reorganized Debtors, as the case may be, may elect to reject such Executory Contract or Unexpired Lease by filing with the Bankruptcy Court a notice of such rejection (a "Rejection Notice") and such rejection shall be effective as of the date the Rejection Notice is filed.   For the avoidance of doubt, if a Rejection Notice is not filed within such ten (10) day period, such

Executory Contract or Unexpired Lease shall be deemed to have been assumed as of the

expiration of such period and the Cure amount shall be paid within ten (10) days thereafter.   In

the event the Debtors or the Reorganized Debtors, as the case may be, and the counterparty

consensually resolve a Cure Objection (or fail to do so) prior to the Court's determination of

such Cure Objection, the Debtors or the Reorganized Debtors, as the case may be, shall be

permitted to, as applicable, either  (i) assume the Executory Contract or Unexpired Lease by

filing a notice of such assumption (which notice shall be in form and substance reasonably

acceptable to the counterparty), in which case the assumption shall be effective as of the date

such notice is filed and the Cure amount shall be paid within ten (10) days following such date;

or (ii) reject the Executory Contract or Unexpired Lease by filing a Rejection Notice, in which

case such rejection shall be effective as of the date the Rejection Notice is filed.

**(c)**   **Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action (11 U.S.C. § 1123(b)(3)).**

36.   **Compromise and Settlement**.  Pursuant to Bankruptcy Rule 9019 (as applicable)

and in consideration for the distributions and other benefits provided pursuant to the Plan, the

provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests,

and controversies relating to the contractual, legal, and subordination rights that a Holder of a

Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any

distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of this

Confirmation Order shall constitute the Court's approval of the compromise or settlement of all

such Claims, Equity Interests, and controversies, as well as a finding by the Court that such

compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of

Claims and Equity Interests and is fair, equitable, and reasonable.  In accordance with the

provisions of the Plan, pursuant to Bankruptcy Rule 9019 (as applicable), without any further

notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

37.     **Debtor Release**.  Each of the Released Parties has made a substantial contribution to the Plan and to the Debtors' reorganization, and the Debtor Release is an essential component of the Plan.  Each of the Voting Classes voted to accept the Plan, as set forth in the Voting Report.  Accordingly, and for the reasons set forth herein and in the Confirmation Brief, the Debtor Release is: (1) a reasonable exercise of the Debtors' business judgment; (2) in exchange for the good and valuable consideration provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by Article X.B of the Plan; (4) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors asserting any claim or Cause of Action released pursuant to the Debtor Release.

38.     **Releases by Holders of Claims and Equity Interests** (**the "Third Party Release"**).  For the reasons set forth on the record of the Confirmation Hearing, including the Court's ruling reflected on pages 60 through 67 of the transcript of the Confirmation Hearing attached hereto as **Exhibit B**, the Third Party Release in Article X.C of the Plan is approved.

39.     **Exculpation**.     The exculpation provided by Article X.E of the Plan ("Exculpation") for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of these Chapter 11 Cases.   The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes to accept or reject the Plan and the distribution of the Securities pursuant to the Plan.

-17-

40.     **Injunction**.  The injunction provisions set forth in Article X.G of the Plan (the "Injunction") are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third Party Release, and the Exculpation provisions in the Plan.  Such injunction provisions are appropriately tailored to achieve those purposes. Accordingly, the Injunction is approved.

41.     **Subordinated Claims**.  The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date the Reorganized Debtors may (1) compromise and settle (directly or through the Distribution Agent) Claims against the Reorganized Debtors (subject to Article VIII.D.2 of the Plan) and (2) compromise and settle Causes of Action against other Entities that were not released or waived under the Plan.

42.     **Preservation of Rights of Action**.  The provisions set forth in Article X.F of the Plan regarding the preservation of Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, their respective Estates, and holders of Claims and Equity Interests.

(d)     **Other Appropriate Provisions (11 U.S.C. § 1123(b)(6)).**

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (A) distributions to Holders of Claims and Interests, (B) allowance of certain Claims, (C) indemnification obligations, (D)

releases by the Debtors of certain parties, (E) releases by certain third parties, (F) exculpations of certain parties, and (G) retention of Court jurisdiction, thereby satisfying the requirements of section 1123(b)(6).

**2.  The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

43.    The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128, and Bankruptcy Rules 3017, 3018, and 3019.

44.    As set forth in greater detail in the Voting Report, votes to accept or reject the Plan were solicited by the Debtors and their agents after the Court approved the Disclosure Statement pursuant to section 1125(a) of the Bankruptcy Code and entered the Solicitation Procedures Orders.

45.    As set forth in greater detail in the Voting Report, the Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Solicitation Procedures Orders, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in Article X.E of the Plan.

46.    The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not, and on account of such

distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made thereunder, so long as such distributions are made consistent with and pursuant to the Plan.

**3.      Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).**

47.     The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with healthy, deleveraged balance sheets and sufficient liquidity to operate.  The Plan, and the transactions incorporated therein are the result of intense arm's length negotiations and settlement discussions and have been proposed in good faith and for a proper purpose.  In determining that the Plan satisfies section 1129(a)(3), the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its Confirmation. Pursuant to Bankruptcy Rule 3020(b)(2) and in the absence of objections to the Plan on the grounds that the Plan does not satisfy section 1129(a)(3) of the Bankruptcy Code, the Court hereby rules that the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**4.      Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

48.     Payments made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court as reasonable.  The Plan, therefore, satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

5.        **Directors, Officers, and Insiders (11. U.S.C. § 1129(a)(5)).**

49.        The Reorganized Debtors' initial directors and officers, to the extent known, have been disclosed at or prior to the Confirmation Hearing and, to the extent not known, will be determined in accordance with the Amended Organizational Documents.  The proposed officers and directors for the Reorganized Debtors are qualified, and their appointment to, or continuance in, such roles is consistent with the interests of Holders of Claims and Equity Interests and with public policy.  Accordingly, the Plan, in conjunction with the Plan Supplement, satisfies the requirements of section 1129(a)(5).

6.        **No Rate Changes (11 U.S.C. § 1129(a)(6)).**

50.        The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

7.        **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

51.        Each Holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.  The Liquidation Analysis (as defined in the Disclosure Statement), and the other evidence related thereto, as supplemented by any evidence proffered or adduced at or prior to the Confirmation Hearing, are persuasive and credible.  The methodology used and assumptions made in the Liquidation Analysis, as supplemented by any evidence proffered or adduced at or prior to the Confirmation Hearing, are reasonable.  The Plan, therefore, satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

8.      **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**

52.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  Classes 1, 2, 3, 4 and 11 are Unimpaired Classes of Claims or Equity Interests, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  Classes 5, 6, 7 and 8 are the Impaired Classes entitled to vote on the Plan, each of which voted to accept the Plan.  Classes 10 and 12 are Impaired Classes that will not receive or retain any property under the Plan; such classes are not entitled to vote on the Plan, and thus are deemed to reject the Plan (as defined above, the "Deemed Rejecting Classes").  Class 9 is a Class of Intercompany Claims, which Intercompany Claims are either (a) cancelled, and thus Impaired and deemed to reject the Plan or (b) reinstated, and thus Unimpaired and presumed to have accepted the Plan.

9.      **Deemed Rejecting Classes (11 U.S.C. § 1129(b)).**

53.     Because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code.  Thus, although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes, as described further below.

10.     **Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code (11 U.S.C. § 1129(a)(9)).**

54.     The treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims as set forth in Article II of the Plan is in accordance with the requirements of section 1129(a)(9) of the Bankruptcy Code.  The Plan, therefore, satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**11.    Acceptance by at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)).**

55.    As set forth in the Voting Report, all Voting Classes are Impaired and each Voting Class has voted to accept the Plan by the requisite number and amount of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code) at each Debtor.  The Plan, therefore, satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**12.    Feasibility of the Plan (11 U.S.C. § 1129(a)(11)).**

56.    Based upon the evidence proffered or adduced at or prior to the Confirmation Hearing, and in the Fox Declaration, Confirmation Brief, and financial projections attached to the Fox Declaration, the Plan is feasible and Confirmation is not likely to be followed by the Reorganized Debtors liquidating or requiring further financial reorganization.   The Plan, therefore, satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**13.    Payment of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)).**

57.    Article XIII.C of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).  The Plan, therefore, satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**14.    Retiree Benefits (11 U.S.C. § 1129(a)(13)).**

58.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to section 1114 of the Bankruptcy Code.  The Debtors have not obligated themselves to provide retiree benefits as the term is defined in section 1114 of the Bankruptcy Code and therefore the requirements under section 1129(a)(13) of the Bankruptcy Code are inapplicable.

**15.   Non-applicability of Certain Sections (11 U.S.C. §§ 1129(a)(14), (15), and (16)).**

59.     The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations.   Therefore, sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

**16.   Confirmation of Plan Over Nonacceptance of Impaired Classes (11 U.S.C. § 1129(b)).**

60.     The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because:  (x) each Voting Class voted to accept the Plan; (y) the Plan satisfies all requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8); and (z) the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes.  First, there is no Class of equal priority receiving more favorable treatment than the Deemed Rejecting Classes. Second, there is no Class of Claims or Equity Interests junior to the Deemed Rejecting Classes that will receive or retain any property under the Plan on account of such Claims or Equity Interests.  To the extent Class 9 Intercompany Claims are reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Claims, and will not alter the treatment provided for any other Holder of any Claim or Equity Interest.  The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

**17.   Only One Plan (11 U.S.C. § 1129(c)).**

61.     Other than the Plan (including previous versions thereof), no other plan has been filed for the Debtors in the Chapter 11 Cases.  The Plan, therefore, satisfies the requirements of section 1129(c) of the Bankruptcy Code.

-24-

### 18. Principal Purpose of the Plan (11 U.S.C. § 1129(d)).

62. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act, 15 U.S.C. § 77e. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### 19. Not a Small Business Case (11 U.S.C. § 1129(e)).

63. These Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

### B. Satisfaction of Confirmation Requirements.

64. Based upon the foregoing, the Plan satisfies the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

### C. Good Faith Solicitation (11 U.S.C. § 1125(e)).

65. Based on the record in the Chapter 11 Cases, the Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the Plan, including, but not limited to, any action or inaction in connection with their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in Article X.E of the Plan on the terms set forth therein.

### D. New Exit ABL Facility.

66. Based on evidence adduced at the Confirmation Hearing, including the Finger Declaration and the Confirmation Brief, the proposed terms and conditions of the New Exit ABL Facility are fair and reasonable. The New Exit ABL Facility and the proceeds from it are essential elements of the Plan and the Debtors' ability to emerge from chapter 11, and entry into

and consummation of the transactions contemplated by the New Exit ABL Facility and related documents, including execution of the New Exit ABL Facility Documents and payment of the ABL Deposit immediately upon the Bankruptcy Court's approval of the Plan,  are in the best interests of the Debtors, the Estates, and Holders of Claims and Equity Interests and are approved in all respects.  The Debtors have exercised reasonable business judgment consistent with their fiduciary duties in connection with the New Exit ABL Facility and the proposed terms and conditions thereunder have been negotiated in good faith and at arm's-length by the parties thereto, and without intent to hinder, delay, or defraud any creditor of the Debtors, and each party thereto may rely upon the provisions of this Confirmation Order in closing and performance under the New Exit ABL Facility.  The proposed terms and conditions of the New Exit ABL Facility, and the financial accommodations extended thereunder, are fair and reasonable, do not conflict with applicable law, and are supported by reasonably equivalent value and fair consideration, and are approved.  The Debtors have provided sufficient and adequate notice of the New Exit ABL Facility to all parties in interest in the Chapter 11 Cases.

**E.**     **New Common Stock.**

67.     The issuance and distribution of the New Common Stock is an essential element of the Plan and the Debtors' ability to emerge from chapter 11, and is in the best interests of the Debtors, the Estates, and Holders of Claims and Equity Interests and is approved in all respects.

**F.**     **Profits Interests**

68.     The Profits Interests being provided to Holders of Allowed Claims in Class 6 and 7 are on account of their Allowed Claims.  The terms and conditions of the Profits Interests, including the administration thereof by the Reorganized Debtors, are fair and reasonable, and the issuance and distribution of the Profits Interests is approved in all respects.

**G.    D&O Tail.**

69.    The Debtors have provided for the funding of the D&O Tail Policy as required under the Plan.

**H.    Plan Value**

70.    The enterprise value of the Debtors and the Plan Value set forth in the Finger Declaration support the treatment of Claims and Equity Interests under the Plan.

**I.    Plan Implementation.**

71.    Article V of the Plan details the means for implementation of the Plan.  These actions to be taken to implement the Plan have been adequately disclosed, are necessary to implement the Plan and provide for the treatment of the Allowed Claims, are fair and reasonable, and are in the best interests of the Debtors' Estates.

**J.    Conditions to Effective Date.**

72.    Entry of this Confirmation Order shall satisfy the applicable condition to the Effective Date as set forth in Article IX.B of the Plan; *provided* that this Confirmation Order shall not have been stayed, modified, or vacated on appeal.  The conditions precedent to the Effective Date set forth in Article IX.B of the Plan may be waived only in accordance with Article IX.C of the Plan, and without any formal action other than proceeding to confirm the Plan.

### III. ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, JUDGED, AND DECREED THAT:**

**A.    Findings of Fact and Conclusions of Law.**

73.    The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy

Rule 9014.  To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

B.    **Confirmation.**

74.    The Plan, attached hereto as **Exhibit A**, including all exhibits thereto and the Plan Supplement, is approved in its entirety and confirmed under section 1129 of the Bankruptcy Code.  The terms of the Plan and the Debtors' entry into the agreements comprising the Plan Documents and related documents and the performance thereunder, including, without limitation, the New Exit ABL Facility, the New Warrants, the New Common Stock Agreement, the Amended Organizational Documents, the funding of the Distribution Account and the Professional Fee Reserve and the issuance of the New Common Stock and the Profits Interests and the administration of the same are hereby approved and authorized.  The Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including entry into the Plan Documents.  The terms of the Plan, the Plan Documents (including the Plan Supplement) and all exhibits thereto, shall be effective and binding as of the Effective Date.

75.    Notwithstanding anything herein to the contrary, the Bankruptcy Court has not been asked to approve, nor is it authorizing, approving or directing the execution of the Management Employment and Consulting Agreements, which agreements are not obligations of the Debtors' Estates, provided further, however, nothing herein shall alter the conditions precedent to consummation of the Plan in Article IX.B of the Plan.

C.    **Objections.**

76.    All objections to Confirmation of the Plan have been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Confirmation Order.  To the extent that

any objections (including any reservations of rights contained therein) to Confirmation of the Plan (other than the payment or amount of the cure amounts with respect to any assumed Executory Contract or Unexpired Lease) have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted herein, or otherwise resolved as stated by the Debtors on the record of the Confirmation Hearing, all such objections are overruled on the merits.

**D.**     **References to and Omissions of Plan Provisions.**

77.     References in this Confirmation Order to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference, and that the Plan Supplement and all exhibits and schedules thereto, and all other agreements, instruments or other documents filed in connection with the Plan, and/or executed or to be executed in connection with the transactions contemplated by the Plan and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications are approved in their entirety.

**E.**     **Headings.**

78.     Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**F.**     **Classifications.**

79.     The terms of the Plan shall govern the classification of Claims and Equity Interests for purposes of the distributions to be made thereunder.  The classifications set forth on

the Ballots tendered to or returned by the holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Equity Interests under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim or Equity Interest as representing the actual classification of such Claim or Equity Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

**G.      General Settlement of Claims and Equity Interests.**

80.      As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims and Equity Interests and controversies resolved pursuant to the Plan. Distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

81.      The transactions contemplated by the Global Settlement as detailed in the Plan Modification Agreement and incorporated into the Plan are fair and reasonable, meet the standard for approval of compromises under Bankruptcy Rule 9019 and are approved in their entirety.

**H.      Approval of Restructuring Transactions.**

82.      This Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**I.**     **New Exit ABL Facility and Approval of New Exit ABL Facility Documents.**

83.     Confirmation of the Plan shall be deemed to constitute approval of the New Exit ABL Facility and the New Exit ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, including payment of the ABL Deposit immediately upon Bankruptcy Court approval of the Plan, and authorization of the Reorganized Debtors to enter into and execute the New Exit ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Exit ABL Facility.  If the Debtors enter into the New Exit ABL Facility on the Effective Date, then, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New Exit ABL Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Exit ABL Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be expressly permitted under the New Exit ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

**J.**     **Issuance of New Common Stock, New Warrants, Profits Interests and Related Documentation.**

84.     As set forth in Article V.I.1 of the Plan, from and after the Effective Date, Reorganized Gibson shall be authorized to and shall issue the New Common Stock to certain Holders of Allowed Claims, without further notice to or order of the Bankruptcy Court, act or

action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  All Holders of Claims that receive New Common Stock under the Plan, and any Person receiving any rights exercisable into New Common Stock, in the form of the New Warrants, or pursuant to the Management Incentive Plan, or otherwise, and all transferees of such Persons (including transferees of transferees) shall be deemed to have executed the New Common Stock Agreement and shall by bound thereby without any further action by the Debtors or any other party (regardless of whether any such Person actually executes the New Common Stock Agreement).  Confirmation of the Plan shall be deemed to constitute approval of the New Common Stock Agreement, and the New Common Stock Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms.

85.     The New Common Stock in Reorganized Gibson issued pursuant to the Plan in exchange for the DIP Facility Claims, the DIP Backstop Premium, the Exit Premium, and the Allowed Class 5 Prepetition Secured Notes Claim, shall be exempt from any registration requirements under any securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and by section 1145 of the Bankruptcy Code.

86.     The Profits Interests issued pursuant to the Plan in exchange for Allowed Class 6 Claims and Allowed Class 7 ITLA Guaranty Claims shall be exempt from any registration requirements under any securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and by Section 1145 of the Bankruptcy Code.

87.     The New Common Stock, New Warrants and Profits Interests issued to officers, employees and consultants of the Reorganized Debtors pursuant to the Management

Employment and Consulting Agreements and the Management Incentive Plan shall be exempt from any registration requirements under any applicable securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

88.     Without limiting the effects of section 3(a)(9) and section 4(a)(2) of the Securities Act, Rules 506 and 701 under the Securities Act, and section 1145 of the Bankruptcy Code, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Exit ABL Facility Documents, the New Common Stock, Profits Interests and any other agreement or document related to or entered into in connection with any of the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

89.     The New Common Stock shall constitute a single class of Equity Securities in Reorganized Gibson and, other than as contemplated by the DIP Facility, DIP Backstop Premium, the Exit Premium, the Management Employee and Consulting Agreements, and the Management Incentive Plan, there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Gibson as of the Effective Date. From and after the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Gibson will be that number of shares of New Common Stock as may be designated in the Amended Organizational Documents.

90.     In addition, under section 1145 of the Bankruptcy Code, the New Common Stock shall be freely tradeable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Amended Organizational Documents; (d) the New Common Stock Agreement, and (e) applicable regulatory approval, if any.

91.     In connection with the distribution of New Common Stock, New Warrants, and Profits Interests, the Reorganized Debtors shall take all actions reasonably necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including, when applicable, withholding from distributions a portion necessary, or requiring Holders of such securities to contribute the Cash necessary, to satisfy tax withholding obligations including income, social security and Medicare taxes, and Reorganized Gibson shall pay such withheld taxes to the appropriate Governmental Unit.

**K.     Amended Organizational Documents.**

92.     Confirmation of the Plan shall be deemed to constitute approval of the Amended Organizational Documents.  The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, by-laws and other organizational documents of the Debtors that are Reorganized Debtors to satisfy the provisions of the Plan and the Bankruptcy Code, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions

-34-

thereof required or contemplated by the Plan; and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law and the New Common Stock Agreement.  To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors are authorized to file their respective Amended Organizational Documents with the applicable Secretaries of State or other applicable authorities in their respective states, provinces or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces or countries of incorporation or formation.

**L.**    **Exemption from Certain Transfer Taxes and Recording Fees.**

93.    To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and this Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the New Exit ABL Facility Documents, as applicable; (ii) the issuance of the New Common Stock and the New Warrants; (iii) the maintenance or creation of security or any Lien as contemplated by the New Exit ABL Facility Documents, as applicable;

(iv) assignments executed in connection with any transaction occurring under the Plan; and (v) the Church Street Sale.

**M.     Directors and Officers of the Reorganized Debtors.**

94.     The New Board will initially consist of directors and officers who have been identified in the Plan Supplement to the extent known, and such directors and officers shall be deemed elected or appointed, as applicable, and authorized to serve as directors and officers of each of the Reorganized Debtors pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor.  Such appointment and designation is hereby approved and ratified as being in the best interests of the Debtors and creditors and consistent with public policy, and such directors and officers hereby are deemed elected and appointed, as applicable, to serve in their respective capacities as of the Effective Date without further action of the Bankruptcy Court, the Reorganized Debtors, or their Equity Security holders.

95.     Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Reorganized Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

**N.     Directors and Officers Insurance Policies.**

96.     Upon the Effective Date, the Reorganized Debtors shall have in full force and effect D&O Liability Insurance Policies for current and former directors and officers of the Debtors and the Non-Debtor Subsidiaries materially consistent with the Debtors' D&O Liability Insurance Policies as in effect immediately prior to the Petition Date.  To the extent, and as

permitted by applicable law, as required to implement the preceding sentence, the Reorganized Debtors will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code in effect as of immediately prior to the Petition Date.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of this Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors or current and former directors and officers of the Debtors and the Non-Debtor Subsidiaries (including the Supporting Principals) under the D&O Liability Insurance Policies.

97.     Further, on or as soon as practicable before the Effective Date, the Debtors shall purchase tail coverage for all current and former directors and officers (including the Supporting Principals) with a term of six (6) years from the Effective Date, which tail coverage shall be materially consistent with the D&O Liability Insurance Policies prior to the Petition Date (the "Tail Policy") and satisfactory to the Supporting Principals.

98.     The Reorganized Debtors shall maintain the D&O Liability Insurance Policies (including the Tail Policy) for all current and former directors and officers of the Debtors and the Non-Debtor Subsidiaries in accordance with its terms to the maximum extent of the coverage available for the indemnitees under such policies.  Upon receipt of a notice of a claim or proceeding with respect to which coverage under the Tail Policy D&O Liability Insurance Policies could apply, the Reorganized Debtors shall give prompt notice of such claim or the commencement of such proceeding to the insurer(s) in accordance with the procedures set forth in the applicable policies.

O.    **Corporate Action.**

99.    Upon the Effective Date, each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the Global Settlement thereunder, including: (i) the distribution of the Securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors; (ii) the execution and implementation of the Restructuring Transactions pursuant to the Plan Documents; (iii) the issuance and administration of the Profits Interests; (iv) the funding of the Distribution Account and the Professional Fee Reserve Account; (v) the execution and Filing of the Amended Organizational Documents; (vi) the transfer of the assets of, and the liquidation of, the Excluded Debtor Subsidiaries; and (vii) the change of the corporate name of Debtor Cakewalk, Inc. to Guitar Liquidation Corporation or any similar name, the filing of all necessary corporate documents to implement the same, and the appointment of Debtor Cakewalk, Inc. as the Distribution Agent for Allowed Administrative Claims, and Class 6, 7 and 8 Allowed Claims, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of the Debtors or the Reorganized Debtors or the Non-Debtor Subsidiaries, as applicable, or by any other Person (except for those expressly required pursuant to the Plan or the Restructuring Support Agreement).

100.    Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor will be deemed to have been so approved and will be in

effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Security holders, directors, managers or members of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person (except as expressly required pursuant to the Restructuring Support Agreement).

101.    All matters provided for in the Plan involving the legal or corporate structure of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, or Excluded Non-Debtor Subsidiary (other than the GI Entities that are represented by a GI Representative), as applicable, and any legal or corporate action required by each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary or Excluded Non-Debtor Subsidiary (other than the GI Entities that are represented by a GI Representative), as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, or Excluded Non-Debtor Subsidiary, as applicable, or by any other Person (except as expressly required pursuant to the Restructuring Support Agreement). On the Effective Date, the appropriate officers of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, are authorized to issue, execute, deliver, and consummate the transactions contemplated by the contracts, agreements, documents, guarantees, pledges, consents, Securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as

applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person (except as expressly required pursuant to the Restructuring Support Agreement).   The secretary and any assistant secretary, or other authorized person, of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, will be authorized to certify or attest to any of the foregoing actions.

**P.      Effectuating Documents; Further Transactions.**

102.    On and after the Effective Date, the Reorganized Debtors, and the officers and members of the New Board are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, and the Securities issued pursuant to the Plan.

**Q.      Professional Fee Reserve Account.**

103.    On the Effective Date, the Debtors will establish the Professional Fee Reserve Account and fund into the Professional Fee Reserve Account Cash equal to the Professional Fee Claim Reserve Amount for the benefit of the Professionals.   The Professional Fee Reserve Account shall only be available to satisfy the Allowed Professional Fee Claims.   The DIP Agent, the DIP Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the Prepetition ABL/Term Loan Agent and the Prepetition ABL/Term Loan Lenders: (i) shall not preclude the use of the Debtors' Cash to fund the Professional Fee Reserve Account in the amount of the Professional Fee Claim Reserve Amount, (ii) shall not foreclose on the Professional Fee Reserve Account, (iii) shall subordinate their security interests, Liens, and Claims (including any superpriority Claim) in the Professional Fee Reserve Account to the

payment of the Allowed Professional Fee Claims, (iv) shall only have a security interest, Lien and superpriority Claim upon and to, and the right of enforcement against, such remaining amount in the Professional Fee Reserve Account after payment of the Allowed Professional Fees, and (v) waive, and shall have no right to seek, disgorgement with respect to the payment of any Allowed Professional Fees; *provided*, *however*, that the Reorganized Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Reserve Account over the aggregate Allowed Professional Fee Claims of the Professionals.

104.    The Professional Fee Reserve Amount shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

**R.    Treatment of Executory Contracts and Unexpired Leases.**

105.    The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article VI of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption of such Executory Contracts and Unexpired Leases) are hereby approved in their entirety.

**S.    Contracts and Leases Entered Into After the Petition Date.**

106.    Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the Confirmation Date will survive, subject to the occurrence of the Effective Date and the provisions of the Plan governing the assumption of Executory Contracts and Unexpired Leases.

**T.**    **Reservation of Rights.**

107.    Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, nor the Debtors' delivery of a notice of proposed assumption and proposed cure amount to applicable contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

**U.**    **Workers' Compensation Programs.**

108.    Except as otherwise provided in the Plan, as of the Effective Date, the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Reorganized Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance.   All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

**V.**    **Distributions Under the Plan.**

109.    The procedures governing distributions contained in Article VII of the Plan shall be, and hereby are, approved in their entirety.

**W.**     **Procedures for Resolving Disputed, Contingent, and Unliquidated Claims.**

110.    The procedures for resolving disputed, contingent, and unliquidated claims, which procedures are contained in Article VIII of the Plan, shall be, and hereby are, approved in their entirety.

**X.**     **Conditions to Effective Date.**

111.    The Plan shall not become effective unless and until the conditions set forth in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.  If the Confirmation or Consummation of the Plan does not occur prior to termination of the Restructuring Support Agreement on October 31, 2018 at 11:59 p.m. (ET), the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

**Y.**     **The Discharge, Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

112.    The release, exculpation, discharge, injunction, and related provisions set forth in Article X of the Plan shall be, and hereby are, approved and authorized in their entirety, including, but not limited to:

      a.    **Releases by the Debtors**.  The Debtor Release provisions set forth in Article X.B of the Plan are hereby approved and incorporated herein by reference.

      b.    **Third Party Releases**.  The Third Party Release provisions set forth in Article X.C of the Plan are hereby approved and incorporated herein by reference.

     c.     **Discharge of Claims**.  The discharge provisions set forth in Article X.D. of the Plan are hereby approved and incorporated herein by reference.

     d.     **Exculpation**.  The Exculpation provisions set forth in Article X.E of the Plan are hereby approved and incorporated herein by reference.

     e.     **Injunction**.  The Injunction provisions set forth in Article IX.G of the Plan are hereby approved and incorporated herein by reference.

     f.     **Liens**.  The release of liens provisions set forth in Article V.M of the Plan are hereby approved and incorporated herein by reference.

**Z.**     **Setoffs and Recoupment.**

113.  The Debtors and the Reorganized Debtors, as applicable, or such entity's designee (including the Distribution Agent) may, but shall not be required to, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Debtors and Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtors possess against such Holder.

**AA.**     **Retention of Jurisdiction.**

114.  Upon the Effective Date this Court shall retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, as set forth in Article XII of the Plan.

**BB.**     **Effect of Confirmation on Modifications.**

115.  Entry of this Confirmation Order shall be deemed approval of all modifications or amendments to the Plan since the solicitation thereof pursuant to section 1127(a) of the

Bankruptcy Code and a determination that such modifications do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**CC.**     **Immediate Binding Effect.**

116.     Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  Entry of this Confirmation Order shall constitute a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

**DD.**     **Additional Documents.**

117.     Pursuant to Article XIII.I of the Plan, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, and such documents shall be included in the Plan Documents.  The Debtors and all Holders of Allowed Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**EE.**     **Payment of Statutory Fees.**

118.    All outstanding fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as reasonably practicable.

**FF.**     **Notice of Entry of Confirmation Order, Occurrence of Effective Date and Related Bar Dates.**

119.    The *Notice of (I) Entry of Confirmation Order, (II) Occurrence of Effective Date, and (III) Related Bar Dates*, substantially in the form attached hereto as **Exhibit C** (the "Notice of Effective Date") is hereby approved.   Except as otherwise provided in Article II.A of the Plan or the Claims Bar Date Order, and except with respect to Administrative Expense Claims that are Professional Fee Claims, DIP Claims, or the ABL Deposit, requests for payment of Allowed Administrative Expense Claims must be Filed and served on the Reorganized Debtors **no later than thirty (30) days after the Effective Date** or such other date as approved by order of the Court, pursuant to the procedures specified in the Notice of Effective Date; *provided*, that the Administrative Expense Claims Bar Date does not apply to Administrative Expense Claims (i) arising in the ordinary course of business or (ii) for self-insured health care expenses.

**GG.**     **Reservation of Rights.**

120.    The Plan shall have no force or effect unless and until the Court enters this Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

**HH.**   **Successors and Assigns.**

121.   Except as may otherwise be provided in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

**II.**   **Governing Law.**

122.   Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

**JJ.**   **Nonseverability of Plan Provisions Upon Confirmation.**

123.   This Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (x) valid and enforceable pursuant to its terms; (y) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (z) nonseverable and mutually dependent.

**KK.**   **Plan Supplement.**

124.    The Plan Documents, including the documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Debtors at the Confirmation Hearing (including all exhibits and attachments thereto and documents referred to therein), and the execution, delivery, and performance thereof by the Debtors and the Reorganized Debtors, are authorized when they are finalized, executed, and delivered.   Without further order or authorization of this Court, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Documents, including the documents contained in or referenced in the Plan Supplement, and any amendments, modifications, and supplements thereto, that are consistent with the Plan.   Execution versions of the documents comprising or contemplated by the Plan Documents, including the documents contained in or referenced in the Plan Supplement, and any amendments, modifications, and supplements thereto, shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all mortgages, Liens, deeds of trust, pledges, and security interests purported to be created thereby.

**LL.**   **Return of Adequate Assurance Deposit.**

125.    On the Effective Date, all funds in the Utility Deposit Account (as defined in the Utilities Order) established by the Debtors pursuant to the *Final Order Pursuant to 11 U.S.C. §§ 150(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Service* [Docket No. 158]

(the "Utilities Order") shall be returned to the Debtors and vest in the Reorganized Debtors free and clear of any liens, claims, or interests.

## MM.  **Dissolution of the Committee.**

126.    On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases, *provided, however*, that the Committee's Professionals may prosecute any remaining interim and/or final applications for payment of Professional Fee Claims.

127.    On the Effective Date the Creditors' Oversight Committee shall be formed pursuant to Article XIII.B of the Plan, which Creditors' Oversight Committee shall have the consultation and approval rights and provided for under the Plan, *provided, however*, the Creditors' Oversight Committee shall bear its own costs and expenses and none of the Debtors, the Estates, or the Reorganized Debtors shall have any liability for the fees and expenses of the Creditors' Oversight Committee.

## NN.  **Governmental Approvals Not Required.**

128.    Except as otherwise specifically provided herein, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and Disclosure Statement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

**OO.    Plan and Confirmation Order Mutually Dependent.**

129.    This Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

**PP.    Reversal.**

130.    If any of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by a subsequent order of the Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under, or in connection with, the Plan prior to receipt of written notice of such order by the Debtors, including without limitation the payment of any Administrative Expense Claims or Allowed Claims or the execution and implementation of the New Exit Facility Documents, including the payment of the ABL Deposit provided for therein.  Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such acts or obligations incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the Effective Date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, all documents relating to the Plan, and any amendments or modifications to any of the foregoing.

**QQ.    Confirmation Order Supersedes.**

131.    It is hereby ordered that this Confirmation Order shall supersede any Bankruptcy Court order issued prior to the Confirmation Date that expressly conflicts with this Confirmation Order.

**RR.**   **Recording.**

132.    The Debtors and the Reorganized Debtors hereby are authorized to deliver a notice or short form of this Confirmation Order, with the Plan attached (in a form complying with any applicable non-bankruptcy rules or regulations), to any state or local recording officer, and such officer must accept for filing such documents or instruments without charging any stamp tax, recording tax, personal property transfer tax, mortgage, or other similar tax.  Such notice (a) shall have the effect of an order of this Court and (b) shall constitute sufficient notice of the entry of this Confirmation Order to such filing and recording officers.   The Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

**SS.**   **Term of Injunctions or Stays.**

133.    Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**TT.**   **Documents, Mortgages, and Instruments.**

134.    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

**UU.**    **Authorization to Consummate.**

135.    The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to the satisfaction or waiver (by the required parties) of the conditions precedent to the Effective Date set forth in Article IX.B of the Plan.

**VV.**    **Substantial Consummation.**

136.    On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**WW.**    **Closing of Chapter 11 Case**

137.    From and after the Effective Date, Debtor Cakewalk, Inc. shall be entitled to change its name to Guitar Liquidation Corporation or any similar name and the caption of its Chapter 11 Case shall be adjusted accordingly upon the filing of notice of such corporate name change on the Bankruptcy Court's docket.    The Reorganized Debtors shall be entitled to prosecute claims and defenses and appoint Cakewalk, Inc. as the Distribution Agent to make distributions, and attend to other wind-down affairs on behalf of each of the other prior Debtors. The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case of Cakewalk, Inc.

**XX.**    **Effectiveness of All Actions.**

138.    All actions authorized to be taken pursuant to the Plan and the Plan Supplement shall be effective on, prior to, or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or stockholders of the Debtors or Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

139.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and the New Exit ABL Facility, and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Documents, the Plan Supplement, the Disclosure Statement, the New Exit ABL Facility Documents, and any documents, instruments, Securities, or agreements, entered into in connection therewith, and any amendments or modifications thereto.

**YY.    Conflicts Between This Confirmation Order and the Plan.**

140.    In the event of an inconsistency between the express terms of the Plan and the Disclosure Statement, the Plan Supplement and any other instrument or document created or executed pursuant to the Plan, the express terms of the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern, and any such provisions of this Confirmation Order shall be deemed a modification of the Plan.

**ZZ.    Waiver of Stay.**

141.    For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

AAA.  **Final Order.**

142.     This Confirmation Order is a Final Order which shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the period in which an appeal must be filed shall commence upon the entry hereof.   In the absence of any Person obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan.

BBB.  **U.S. Department of Justice Provision**

143.     Notwithstanding any provision to the contrary in the Plan, this Order or any other Plan Document:   As to the United States, nothing in the Plan Documents shall: (1) discharge any debt described in Section 1141(d)(6) of the Bankruptcy Code; (2) affect the rights of the United States to assert setoff and recoupment and such rights are expressly preserved; (3) require the United States to File an Administrative Expense Claim in order to receive payment for any liability described in Section 503(b)(1)(B) and (C) as provided in Section 503(b)(1)(D) of the Bankruptcy Code, if such liability exists; (4) affect or impair the exercise of the United States' police and regulatory powers against the Debtors, the Reorganized Debtors or any non-Debtor; (5) except to the extent provided in Section 1125(e) of the Bankruptcy Code, release, enjoin or discharge any non-Debtor from any claim, liability, suit or cause of action of the United States nor shall anything in the Plan Documents enjoin the United States from bringing any claim, suit, cause of action or other proceeding against any non-Debtor for any liability whatsoever; or (6) be construed as a compromise or settlement of any claim, liability, suit, cause of action or interest of the United States.   Administrative Expense claims of the United States shall accrue interest and penalties as provided by non-bankruptcy law until paid in full.   To the extent the Priority Tax Claims of the United States (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code), if any, are not paid in full in cash on the Effective Date, then such Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate

and method set by applicable non-bankruptcy law and shall be paid in accordance with Section 1129(a)(9) of the Bankruptcy Code.  Moreover, nothing in the Plan Documents shall effect a release, discharge or otherwise preclude any claim whatsoever against any Debtor or any of the Debtors' Estates by or on behalf of the United States for any tax liability arising a) out of pre-petition or post-petition tax periods for which a required return has not been filed or b) as a result of a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period, provided, however, any such claims shall be subject to applicable law. Further, nothing in the Plan Documents shall enjoin the United States from amending any claim against any Debtor or any of the Debtors' Estates with respect to any tax liability a) arising out of pre-petition or post-petition tax periods for which a required tax return has not been filed or b) from a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period.  Any tax liability arising a) out of pre-petition or post-petition tax periods for which a required return has not been filed or b) as a result of a pending audit or audit which may be performed with respect to any pre-petition or post-petition tax period shall be paid in accordance with 1129(a)(9)(A) and (C) of the Bankruptcy Code to the extent such tax liabilities are otherwise entitled to the priorities under section 507 of the Bankruptcy Code referenced in 1129(a)(9)(A) and (C) of the Bankruptcy Code.  Without limiting the foregoing but for the avoidance of doubt: (i) nothing contained in the Plan Documents shall be deemed to determine the tax liability of any person or entity, including, but not limited to, the Debtors and the Reorganized Debtors, nor shall the Plan Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment

-55-

except as provided under Section 505 of the Bankruptcy Code; and (ii) nothing shall affect or impair any rights or causes of action that the United States has or may have against any surety under any customs bond pursuant to applicable non-bankruptcy law, nor shall anything in the Plan Documents preclude or prohibit the ability of the United States to make demand on, be paid by, or otherwise pursue any surety that is jointly and severally liable for any debt owed to the United States.  Nothing in the Plan Documents or this Order shall abridge any rights of the United States under Bankruptcy Rule 3003.

Dated:  October __, 2018
Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GIBSON BRANDS, INC.,[1] *et al.*, | Case No. 18-11025 (CSS) |
| Debtors. | Jointly Administered |

---

## DEBTORS' FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

Dated:  October 1, 2018

GOODWIN PROCTER LLP
Michael H. Goldstein (admitted *pro hac vice*)
Gregory W. Fox (admitted *pro hac vice*)
Barry Z. Bazian (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Telephone: (212) 813-8800
Email: mgoldstein@goodwinlaw.com
      gfox@goodwinlaw.com
      bbazian@goodwinlaw.com

PEPPER HAMILTON LLP
David M. Fournier (DE 2812)
Marcy J. McLaughlin (DE 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: fournied@pepperlaw.com
      mclaughlinm@pepperlaw.com

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042), Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign).  The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms ................................................................................................... 2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS ............................................................................................................ 20

    A.    Administrative Expense Claims ...................................................................... 20

    B.    Professional Fee Claims .................................................................................. 21

    C.    DIP Facility Claims ......................................................................................... 22

    D.    Priority Tax Claims ......................................................................................... 22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ..................................................................... 23

    A.    Summary ......................................................................................................... 23

    B.    Elimination of Vacant Classes ....................................................................... 24

    C.    Voting; Presumptions ..................................................................................... 24

    D.    Cramdown ....................................................................................................... 24

    E.    Classification and Treatment of Claims and Equity Interests .......................... 24

    F.    Special Provision Governing Unimpaired Claims ............................................ 31

    G.    Subordinated Claims ....................................................................................... 31

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ........................................ 31

    A.    Voting Classes ................................................................................................ 31

    B.    Acceptance by Impaired Classes of Claims ..................................................... 31

    C.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................ 31

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 32

    A.    General Settlement of Claims .......................................................................... 32

    B.    Corporate Existence ........................................................................................ 33

C.   Vesting of Assets in the Reorganized Debtors ....................................34

D.   The New Exit ABL Facility and the New Take-Out Facility ...........................35

E.   Authorized Financing....................................................................36

F.   Treatment of Vacant Classes ........................................................36

G.   Management Incentive Plan............................................................36

H.   Management Employment and Consulting Agreements .................................36

I.   Sources of Consideration for Plan Distributions .................................37

1.   Issuance of New Common Stock, New Warrants and Related
     Documentation................................................................37

2.   Intercompany Claims.......................................................38

J.   Church Street Sale.........................................................38

K.   Non-Debtor Subsidiaries................................................38

L.   ITLA Guaranty Claims Against Certain Non-Debtors .......................38

M.   Release of Liens, Claims and Equity Interests...........................39

N.   Certificate of Incorporation and Bylaws...............................39

O.   Directors and Officers of Reorganized Gibson...........................39

P.   Corporate Action...........................................................40

Q.   Cancellation of Documents; Prepetition ABL/Term Loan Agreement;
     DIP Facility; Prepetition Indenture ..................................41

R.   Cancellation of Existing Instruments Governing Security Interests..................42

S.   Equity Interests in Subsidiaries; Corporate Reorganization ..............42

T.   Restructuring Transactions ............................................42

U.   Plan Supplement, Other Documents and Orders and Consents Required
     Under the Restructuring Support Agreement .....................................42

V.   Effectuating Documents; Further Transactions .................................42

W.   Transaction Expenses........................................................43

X.      Books and Records Retention; Cooperation and Access to Books and
        Records ..................................................................................................43

Y.      Profits Interests ........................................................................................44

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ...................................................................................................45

A.      Assumption and Rejection of Executory Contracts and Unexpired
        Leases ......................................................................................................45

B.      Notice of Cure Amounts ...........................................................................46

C.      Rejection of Executory Contracts or Unexpired Leases ...........................47

D.      Claims on Account of the Rejection of Executory Contracts or
        Unexpired Leases .....................................................................................47

E.      Director and Officer Insurance Policies ....................................................47

F.      Indemnification Provisions .......................................................................48

G.      Compensation and Benefit Programs .......................................................48

H.      Workers' Compensation Benefits .............................................................49

I.      Insurance Policies ....................................................................................49

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ............................................49

A.      Dates of Distributions ..............................................................................49

B.      Distribution Agent ...................................................................................50

C.      GI Representatives ....................................................................................50

D.      Cash Distributions ....................................................................................51

E.      Rounding of Payments .............................................................................51

F.      De Minimis Distribution ...........................................................................51

G.      Distributions on Account of Claims Allowed After the Effective Date ............51

H.      General Distribution Procedures ...............................................................51

I.      Address for Delivery of Distributions .......................................................52

J.      Undeliverable Distributions and Unclaimed Property ........................................52

K.      Withholding Taxes ...............................................................................................52

L.      Setoffs ..................................................................................................................52

M.     Surrender of Cancelled Instruments or Securities .............................................53

N.      Lost, Stolen, Mutilated or Destroyed Securities ................................................53

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
          UNLIQUIDATED AND DISPUTED CLAIMS ............................................54

A.      Filing of Proofs of Claim ....................................................................................54

B.      Disputed Claims and Equity Interests .................................................................54

C.      Procedures Regarding Disputed Claims ..............................................................54

D.      Allowance of Claims ...........................................................................................54

1.       *Allowance of Claims* .........................................................................................54

2.       *Prosecution of Objections to Claims* .................................................................55

3.       *Estimation* .........................................................................................................55

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION  AND
          CONSUMMATION OF THE PLAN ............................................................55

A.      Conditions Precedent to Confirmation of the Plan .............................................55

B.      Conditions Precedent to Consummation of the Plan ..........................................56

C.      Waiver of Conditions ..........................................................................................57

E.      Effect of Non-Occurrence of Conditions to Confirmation and
          Consummation .....................................................................................................57

ARTICLE X. RELEASE, INJUNCTION AND RELATED PROVISIONS ............................58

A.      General .................................................................................................................58

B.      Release by Debtors ..............................................................................................58

C.      Release by Holders of Claims and Equity Interests ............................................59

D.      Discharge of Claims ............................................................................................59

E.      Exculpation ................................................................................................ 60

F.      Preservation of Rights of Action ................................................................ 60

G.      Injunction .................................................................................................. 61

ARTICLE XI. BINDING NATURE OF PLAN ................................................................ 62

ARTICLE XII. RETENTION OF JURISDICTION ........................................................ 62

ARTICLE XIII. MISCELLANEOUS PROVISIONS ...................................................... 64

A.      Dissolution of the Committee ..................................................................... 64

B.      Creditors' Oversight Committee ................................................................. 64

C.      Payment of Statutory Fees ......................................................................... 64

D.      Modification of Plan .................................................................................. 64

E.      Revocation of Plan ..................................................................................... 64

F.      Entire Agreement ....................................................................................... 65

G.      Votes Solicited in Good Faith .................................................................... 65

H.      Terms of Injunctions or Stays .................................................................... 65

I.      Additional Documents ................................................................................ 65

J.      Notice of Effective Date ............................................................................. 65

K.      Closing of Chapter 11 Cases ..................................................................... 65

L.      Successors and Assigns .............................................................................. 66

M.      Reservation of Rights ................................................................................. 66

N.      Further Assurances .................................................................................... 66

O.      Severability ................................................................................................ 66

P.      Service of Documents ................................................................................. 67

Q.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
        the Bankruptcy Code .................................................................................. 68

R.      Governing Law ........................................................................................... 68

S.      Tax Reporting and Compliance ........................................................... 69

T.      Schedules ........................................................................................... 69

U.      No Strict Construction ....................................................................... 69

V.      Controlling Document ........................................................................ 69

## DEBTORS' FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

GIBSON BRANDS, INC. and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), propose the following fifth amended joint chapter 11 plan of reorganization (the "Plan"), which supersedes in all respects the plans of reorganization the Debtors filed on June 20, 2018, July 12, 2018, July 24, 2018, August 1, 2018, August 9, 2018, and September 6, 2018 in the above-captioned chapter 11 cases, for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors.  This is a single Plan for all of the Debtors with respect to the classification, treatment and voting of Claims against, and Equity Interests in the Debtors.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of the Plan.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Disclosure Statement (as such term is defined herein), distributed contemporaneously herewith, for a discussion of the Debtors' history, business, results of operations, historical financial information, events leading up to commencement of these Chapter 11 Cases, projections and properties, and for a summary overview and analysis of this Plan and the treatment of Claims and Equity Interests provided for herein.  There also are Exhibits, Plan Schedules, Plan Documents and other agreements and documents that will be Filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement, and the Disclosure Statement.  All such Exhibits, Plan Documents, Plan Schedules and other agreements and documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the Restructuring Support Agreement, and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its Consummation.

The classification and treatment of Claims against, and Equity Interests in, the Debtors and the Plan Distribution under this Plan are on a Debtor by Debtor basis.  To the extent Claims against, and Equity Interests in, more than one Debtor are classified in one Class, the Class shall be deemed to include sub-classes for each such Debtor.  If the Plan cannot be confirmed as to some or all of the Debtors, then, without prejudice to the respective parties' rights under the Restructuring Support Agreement, and subject to the terms set forth herein and therein, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor and confirm the Plan as to the remaining Debtors.  The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Equity Interests as set forth in Article III hereof.

Notwithstanding any rights of approval that may exist pursuant to the Restructuring Support Agreement or otherwise as to the form or substance of the Disclosure Statement, the Plan or any other document relating to the transactions contemplated hereunder or thereunder, none of the Supporting Noteholders, the Supporting Principals, or the Ad Hoc Committee of Secured Notes, and none of their respective representatives, members, financial or legal advisors, or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form

or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*ABL Revolver Claims*" means the claims of the ABL Revolver Lenders under the Prepetition ABL/Term Loan Agreement.

2.      "*ABL Revolver Lenders*" means those banks, financial institutions and other parties identified as lenders that provided revolving loans to the Debtors pursuant to the Prepetition ABL/Term Loan Agreement as of and prior to the Petition Date.

3.      "*Accrued Professional Compensation*" means all Professional Fee Claims to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount).  To the extent that any amount of a Professional's fees or expenses are reduced by Final Order, or the Professional otherwise agrees to reduce its fees and expenses, then at such time those reduced amounts shall no longer constitute Accrued Professional Compensation.

4.      "*Ad Hoc Committee of Secured Notes*" means those certain beneficial holders of Prepetition Secured Notes represented by the Ad Hoc Committee of Secured Notes Professionals, and identified from time to time in a statement Filed in the Chapter 11 Cases pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.

5.      "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) a Professional Fee Claim; (c) the Transaction Expenses; (d) the DIP Facility Claims, including the fees and expenses of the DIP Agent and the DIP Lenders, including their respective professional and advisory fees and expenses; (e) the Prepetition 507(b) Claims; and (f) all fees and charges assessed against the Debtors' Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

6.      "*Administrative Expense Claims Bar Date*" means the Business Day which is thirty (30) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

7.     "*Administrative Expense Claims Objection Bar Date*" means the Business Day which is one hundred and twenty (120) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

8.     "*Ad Hoc Committee of Secured Notes Professionals*" means, collectively, (a) Paul, Weiss; (b) PJT Partners; (c) Young Conaway Stargatt & Taylor, LLP, as local counsel to the Ad Hoc Committee of Secured Notes; (d) Anderson Mori & Tomotsune, as Japanese counsel to the Ad Hoc Committee of Secured Notes; and (e) any other professionals that may be retained by the Ad Hoc Committee of Secured Notes.

9.     "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

10.     "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that has been allowed by a Final Order; (b) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors (with such consent as required pursuant to the Restructuring Support Agreement) prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Reorganized Debtors on or after the Effective Date; or (iii) in accordance with the Schedules, subject to any limitations on allowance imposed by section 502 of the Bankruptcy Code, or applicable law, (including as a result of a timely Filed objection that is not yet the subject of a Final Order); (c) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) a Claim that is Allowed pursuant to the terms of this Plan, including <u>Article VIII.D.2</u>.

11.     "*Allowed Claim* or *Allowed Equity Interest*" when used in reference to a particular Class means a Claim or an Equity Interest of such Class that has been Allowed.

12.     "*Allowed Class 5 Prepetition Secured Notes Claim*" means an Allowed Class 5 Claim equal to the amount of the Allowed Prepetition Secured Notes Claim that is Secured as determined, without offset, counterclaim or defense of any kind, as of the Effective Date, in accordance with Section 506 of the Bankruptcy Code, and consistent with Plan Value.

13.     "*Allowed ITLA Guaranty Claim*" means an Allowed Class 6 and Class 7 General Unsecured Claim against each of the Debtors in favor of the ITLA Agent on behalf of the ITLA Lenders equal to $29,935,898.

14.     "*Allowed Philips Class 6 Claim*" means an Allowed Class 6 General Unsecured Claim against Debtor Gibson in favor of Philips equal to $57,200,000.

15.     "*Allowed Prepetition Secured Notes Claim*" means a Claim against each Debtor except Baldwin Piano, Inc. and Wurlitzer Corp in favor of the Prepetition Indenture Trustee on behalf of the Prepetition Secured Noteholders equal to (a) the sum of:  (i) $375,000,000, consisting of the outstanding principal amount of Obligations, under, and as defined in, the Prepetition Indenture as of the Petition Date, (ii) $8,227,865.00, consisting of accrued and unpaid interest on the Prepetition Secured Notes as of the Petition Date, and (iii) all other Obligations under, and as defined in, the Prepetition Indenture, which shall be fixed in a liquidated amount as may be agreed by the Debtors, the Required Supporting Noteholders, and the Prepetition Indenture Trustee (or in the absence of an agreement, as set by the Bankruptcy Court) on or prior to the Confirmation Date.

16.     "*Allowed Unsecured Prepetition Notes Deficiency Claim*" means an Allowed Class 6 Claim against each Debtor except Baldwin Piano, Inc. and Wurlitzer Corp in favor of the Prepetition Indenture Trustee on behalf of the Prepetition Secured Noteholders equal to $133,000,000.

17.    "*Amended Organizational Documents*" means the amended and restated certificate of incorporation and by-laws or other applicable organizational documents of the Reorganized Debtors, which shall be Filed with the Plan Supplement and which shall be consistent with the terms of the Restructuring Support Agreement and this Plan.

18.    "*Applicable Shares*" has the meaning ascribed to such term in <u>Article V.Y</u> of this Plan.

19.    "*Assets*" means all of the right, title, and interest of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

20.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code, including actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code, or under applicable nonbankruptcy law.

21.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

22.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

23.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

24.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

25.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

26.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including under alter ego or veil piercing theories or theories of similar effect), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including Avoidance Actions); (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including any fraudulent transfer or similar claims.

27.    "*Change in Control*" shall have the meaning given to such term in the Plan Supplement.

28.    "*Chapter 11 Cases*" means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code, and styled *In re Gibson Brands, Inc., et al.*, Case No. 18-11025 (CSS).

29.     "*China Guitar*" means Gibson's wholly-owned subsidiary, Qingdao Gibson Musical Instrument Co.

30.     "*Church Street Property*" means that certain parcel of real property owned by Gibson located at 1117 Church Street, Nashville, Tennessee.

31.     "*Church Street Sale*" means, subject to the approval of the Required Supporting Noteholders in their sole and absolute discretion, the sale of the Church Street Property free and clear of all claims, liens and encumbrances under this Plan pursuant to sections 105, 363, 503, 507, 1123, and 1146 of the Bankruptcy Code, Rules 2002, 6004, 9007 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1, 9006-1 and 9013-1 of the Local Rules.

32.     "*Church Street Sale Procedures*" means the Bidding Procedures as defined in that certain *Order (A) Approving Bidding and Sale Procedures for the Sale of the Church Street Property, (B) Authorizing the Debtors to Enter into a Stalking Horse Agreement and to Provide Bid Protections Thereunder, (C) Scheduling the Hearing to Approve the Sale and (D) Approving the Form and Manner of Notice Thereof* entered by the Bankruptcy Court on August 20, 2018 [Docket No. 622].

33.     "*Claim*" means any "claim," as defined in section 101(5) of the Bankruptcy Code against any Debtor.

34.     "*Claims Bar Date*" means, as applicable, (a) 5:00 p.m. prevailing Eastern Time on August 20, 2018, (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Claims Bar Date Order, the Confirmation Order, or such other order entered by the Bankruptcy Court.

35.     "*Claims Bar Date Order*" means that certain *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* entered by the Bankruptcy Court on June 8, 2018 [Dkt. No. 255], as may be amended from time to time.

36.     "*Claims Register*" means the official register of Claims maintained by Prime Clerk LLC.

37.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

38.     "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

39.     "*Committee*" means the official committee of unsecured creditors in the Chapter 11 Cases appointed pursuant to section 1102 of the Bankruptcy Code.

40.     "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

41.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

42.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

43.     "*Consummation*" means the occurrence of the Effective Date.

44.     "*Convenience Claim Election*" means a timely election by a Holder of a General Unsecured Claim to reduce its aggregate Allowed Claim to $40,000 and agree to the classification and treatment of its Allowed Claim as a Class 8 Allowed Convenience Class Claim made in connection with, and pursuant to the procedures approved by the Bankruptcy Court governing, voting on the Plan.

45.     "*Convenience Class Cap*" means $1,000,000 in the aggregate or such greater amount, if any, that is approved in writing by the Required Supporting Noteholders not later than five (5) days prior to the deadline to vote to accept or reject the Plan.

46.     "*Convenience Class Claim*" means a General Unsecured Claim that is either (a) an Allowed Claim in an amount that is equal to or less than $40,000, or (b) an Allowed Claim in an amount that is greater than $40,000, but with respect to which the Holder of such Allowed Claim voluntarily and irrevocably reduces the aggregate amount of such Allowed Claim to $40,000 pursuant to a Convenience Claim Election.

47.     "*Creditors' Oversight Committee*" means the three member committee appointed upon the Effective Date, which shall be comprised of the following three members of the Committee:  (i) Advanced Plating, Inc., (ii) TKL Products Corp. and (iii) Philips, *provided, however*, Philips shall be a member of the Creditors' Oversight Committee solely with respect to the resolution of Disputed Claims and distributions to Holders of Allowed Class 6 Claims.

48.     "*Cure*" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to: (x) (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and (y) provide such cure and compensation as required pursuant to section 1124(2) of the Code.

49.     "*Debtor(s)*" means, individually, Gibson Brands, Inc., Cakewalk, Inc., Consolidated Musical Instruments, LLC, Gibson Café & Gallery, LLC, Gibson International Sales LLC, Gibson Pro Audio Corp., Neat Audio Acquisition Corp., Gibson Innovations USA, Inc., Gibson Holdings, Inc., Baldwin Piano, Inc., Wurlitzer Corp., and Gibson Europe B.V.

50.     "*Debtor(s) in Possession*" means, individually, each Debtor, as debtor in possession in its Chapter 11 Case and, collectively, all Debtors, as debtors in possession in the Chapter 11 Cases.

51.     "*Definitive Documents*" has the meaning assigned to such term in the Restructuring Support Agreement.

52.     "*Dilutive Event*" has the meaning ascribed to such term in <u>Article V.Y</u> of this Plan.

53.     "*Dilutive Issuance*" has the meaning ascribed to such term in <u>Article V.Y</u> of this Plan.

54.     "*DIP Agent*" means the administrative agent and collateral agent under the DIP Facility, and any successors thereto.

55.     "*DIP Backstop Party*" means KKR Credit Advisors (US) LLC, Melody Capital Partners, L.P., Grantham, Mayo Van Otterloo & Co., LLC, and Silver Point Capital Fund, L.P. and/or certain funds or accounts managed, advised or controlled by, or by any subsidiary or Affiliate of, any of the foregoing.

56.      "*DIP Backstop Premium*" means the backstop fee provided for in the DIP Facility and the DIP Orders, earned by, and to be paid to, the DIP Backstop Parties.

57.      "*DIP Facility*" means that certain senior secured superpriority post-petition credit facility made available to the Debtors pursuant to the DIP Facility Term Sheet, the DIP Facility Loan Agreement and the DIP Orders.

58.      "*DIP Facility Claim*" means any Claim of the DIP Agent, any DIP Lender, and any DIP Backstop Party arising from, under or in connection with, the DIP Facility, including arising from or in connection with the refinancing of the Prepetition ABL/Term Loan Facility pursuant to the DIP Facility and the DIP Orders.

59.      "*DIP Facility Loan Agreement*" means that certain Debtor-in-Possession Term Loan Agreement, dated as of May 4, 2018, among the Debtors, the DIP Agent, and the DIP Lenders thereto from time to time, together with all exhibits, supplements, schedules and appendices thereto (as amended, modified, waived, or supplemented from time to time in accordance with its terms) and in form and substance materially consistent with the DIP Facility Term Sheet as modified by the DIP Orders.

60.      "*DIP Facility Term Sheet*" means that certain DIP Facility Term Sheet annexed as Annex B to the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance therewith and in accordance with the terms of the Restructuring Support Agreement, the DIP Facility Loan Agreement and the DIP Orders).

61.      "*DIP Lenders*" means the banks, financial institutions and other parties identified as lenders in the DIP Facility Loan Agreement, and their successors and permitted assigns.

62.      "*DIP Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

63.      "*Disclosure Statement*" means the Solicitation version of that certain *Disclosure Statement for Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 566], as amended, supplemented, or modified from time to time (including as amended, supplemented and modified by the Disclosure Statement Addendum) that describes this Plan, including all Exhibits and schedules thereto and references therein.

64.      "*Disclosure Statement Addendum*" means that certain Addendum to Disclosure Statement for Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization, dated as of September 6, 2018.

65.      "*Disproportionate Dilutive Event*" has the meaning ascribed to such term in Article V.Y of this Plan.

66.      "*Disputed*" means a Claim or Equity Interest, or any portion thereof: (a) that is the subject of a Filed objection or request for estimation or that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order; or (b) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by Final Order; *provided, however*, that any Claim that is expressly Allowed by this Plan in Article III shall not be Disputed.

67.      "*Distribution Account*" has the meaning ascribed to such term in Article III.E.6 of this Plan.

68.      "*Distribution Agent*" means Debtor Cakewalk, Inc. or any party designated by Debtor Cakewalk, Inc. to serve as distribution agent under this Plan, except that, for purposes of

distributions under this Plan:  (i) the DIP Agent will be and shall act as the Distribution Agent for Holders of Allowed DIP Facility Claims; and (ii) the Prepetition Indenture Trustee will be or may direct another to act as the Distribution Agent for Holders of Allowed Prepetition Secured Notes Claims.

69.    "*Distribution Record Date*" means the date for determining which Holders of prepetition Claims are eligible to receive distributions hereunder, which date shall be the Confirmation Date.

70.     "*D&O Liability Insurance Policies*" means any and all insurance policies for directors' and officers' liability maintained by the Debtors immediately prior to the Petition Date, maintained by the Debtors during the Chapter 11 Cases, and the Tail Policy.

71.    "*Domestic Term Loan Claims*" means the claims of the Domestic Term Loan Lenders arising from, based upon, or relating to the Prepetition ABL/Term Loan Agreement and any Prepetition 507(b) Claims of the Domestic Term Loan Lenders and the Prepetition ABL/Term Loan Agent.

72.    "*Domestic Term Loan Lenders*" means those banks, financial institutions and other parties identified as lenders that provided term loans to the Debtors pursuant to the Prepetition ABL/Term Loan Agreement prior to and as of the Petition Date.

73.    "*DTC*" means the Depository Trust Company.

74.    "*Effective Date*" means the Business Day on which all conditions precedent specified in Article IX.B of this Plan have been satisfied (or waived in accordance with Article IX.C of this Plan).

75.    "*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

76.    "*EQ*" means Gibson's wholly-owned subsidiary, Qingdao Epiphone Musical Instrument Co., Ltd.

77.    "*Equity Interest*" means any Equity Security in any Debtor, including all issued, unissued, authorized or outstanding shares of stock or limited company interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include:  (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights.  The term "Equity Interest" also includes any Claim that is determined to be subordinated to the status of an Equity Security, whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

78.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

79.    "*Estates*" means the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

80.    "*Excluded Non-Debtor Subsidiaries*" means the following Entities:  (i) GI BV Parent, (ii) the GI Entities, (iii) Baldwin (Dongbei) Piano & Musical Instrument Co., Ltd., and (iii) EQ.

81.    "*Excluded Debtor Subsidiaries*" means (i) Gibson Innovations USA, Inc., (ii) Cakewalk Inc., (iii) Wurlitzer Corp., and (iv) Baldwin Piano Inc.

82.     "*Exculpated Parties*" means, collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (d) the current and former officers, directors and employees of the Debtors and Reorganized Debtors, and (e) Professionals retained by the foregoing (a) through (c).

83.     "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

84.     "*Exhibit*" means an exhibit annexed hereto, to the Plan Supplement or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

85.     "*Existing Executive Compensation Agreements*" means, as to David Berryman and Henry Juszkiewicz, all employment, services, separation, retention, incentive, bonus or similar agreement or arrangement with any of the Debtors.

86.     "*Exit Premium*" has the meaning assigned to such term in the DIP Facility.

87.     "*File*," "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

88.     "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, and (II) Granting Adequate Protection to Prepetition Secured Parties* [Dkt. No. 220].

89.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors in accordance with the Restructuring Support Agreement, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed to be legally binding and effective, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

90.     "*Financial Projections*" means the business plan and financial projections for fiscal years 2019 through 2023 attached as Exhibit E to the Disclosure Statement.

91.     "*General Unsecured Claim*" means any prepetition Claim against any Debtor that is not a/an:  (a) DIP Facility Claim; (b) Administrative Expense Claim; (c) Priority Tax Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Allowed Class 5 Prepetition Secured Notes Claim; (g) ABL Revolver Claim; (h) Domestic Term Loan Claim; (i) Gibson Holdings Claim; (j) Convenience Class Claim; or (k) Intercompany Claim.  For the avoidance of doubt, Allowed Unsecured Prepetition Notes Deficiency Claims are classified as General Unsecured Claims by this Plan.

92.     "*Gibson*" means Gibson Brands, Inc., a Debtor in the Chapter 11 Cases.

93.     "*Gibson Japan*" means Gibson's wholly-owned subsidiary, Kabushiki Kaisha Gibson Guitar Corporation Japan.

94.     "*Gibson Holdings*" means Gibson Holdings, Inc.

95.     "*Gibson Holdings Claim*" means a Claim that is not a Secured Claim against Gibson Holdings, Inc., including ITLA Guaranty Claims and Allowed Unsecured Prepetition Notes Claims against Gibson Holdings.

96.     "*GI BV Parent*" means Gibson GI Holding, B.V.

97.     "*GI Entity*" means any direct or indirect subsidiary of GI BV Parent.

98.     "*GI Representative*" means any trustee, receiver, liquidator, administrator, curator, receiver, or other representative for any of the GI Entities as of the Effective Date.

99.     "*GI Representative Estate Distribution*" has the meaning ascribed to such term in Article VII.C of this Plan.

100.     "*Governmental Bar Date*" means 5:00 p.m. prevailing Eastern Time on October 29, 2018, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

101.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

102.     "*GSO*" means, collectively, GSO Capital Partners LP, GSO Capital Solutions Fund II AIV-I LP and GSO Capital Solutions Fund II AIV-IV LP.

103.     "*GSO Turned Over Distribution*" has the meaning ascribed to such term in Article VII.C of this Plan.

104.     "*Holder*" means any Person holding a Claim against, or Equity Interest in, any Debtor.

105.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

106.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims.

107.     "*Intercompany Claims*" means any Claims of a Debtor against any other Debtor.

108.     "*Interim DIP Order*" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties and (III) Scheduling Final Hearing* [Dkt. No. 71].

109.     "*ITLA*" means that certain International Term Loan Agreement, dated as of February 15, 2017, (as amended, supplemented, or otherwise modified, from time to time), by and among Gibson Innovations Limited, as Borrower, Gibson Brands, Inc., as Company, Gibson GI Holding B.V. as Dutch Parent, the guarantors identified therein, Elavon Financial Services DAC, UK Branch, as ITLA Agent, and the lender parties signatory thereto

110.    "*ITLA Agent*" means Elavon Financial Services DAC, UK Branch, solely in its capacity as agent under the ITLA.

111.    "*ITLA Claims Motions*" means, together, the (i) *Debtors' Motion for Entry of an Order (I) Estimating the Amount That GSO is Entitled to Receive Under the Plan on Account of a "Single Satisfaction" of its ITLA Claim, (II) Ordering that GSO's ITLA Claim Should Not Receive Any Distributions Under the Debtors' Plan Until GSO Accounts for its Recoveries from the Gibson Innovations Liquidations and (III) Granting Certain Related Relief* [Dkt. No. 487] and (ii) *Debtors' Motion for Entry of an Order (I) Declaring That GSO's ITLA Gibson Holdings Claim Equals Zero Dollars, and (II) Granting Certain Related Relief* [Docket No. 489].

112.    "*ITLA Guaranty Claim*" means any Claim of the agent or lenders under the ITLA, to the extent such Claim is guaranteed by any of the Debtors.

113.    "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement or waterfall or value allocation priority that has the practical effect of creating a security interest, in respect of such asset.

114.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

115.    "*Management Employment and Consulting Agreements*" means the employment and/or consulting agreements between Gibson and David Berryman or Henry Juszkiewicz, which shall be Filed prior to the Effective Date and shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

116.    "*Management Incentive Plan*" means an employee management incentive plan in a form to be Filed with the Plan Supplement to be implemented on the Effective Date that shall provide for grants of options and/or restricted units of New Common Stock reserved for management, directors, officers, and other key employees of the Debtors in an amount of up to 12% of the New Common Stock, which shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).  The primary participants in and the structure of the Management Incentive Plan, including the amount, form, exercise price, allocation and vesting of such equity-based awards with respect to such primary participants, shall be determined by the New Board of Reorganized Gibson.

117.    "*New Board*" means the initial board of directors of the Reorganized Debtors, and their Affiliates, as described in Article V.N hereto.

118.    "*New Common Stock*" means the shares of New Common Stock in Reorganized Gibson, par value $0.001 per share, to be issued on the Effective Date in accordance with the terms of this Plan.

119.    "*New Common Stock Agreement*" means the agreement to be entered into by all Holders of New Common Stock, which shall provide for reasonable and customary protections of minority shareholders as negotiated in accordance with the Restructuring Support Agreement and substantially in the form Filed with the Plan Supplement (as amended, modified, waived, or supplemented from time to time in accordance with its terms), and which shall be in form and substance acceptable to the Required Supporting Noteholders.

120.    "*New Exit ABL Facility*" means, if applicable, a new asset based revolving credit facility to be provided to the Reorganized Debtors on the Effective Date by the New Exit ABL Facility

Lenders pursuant to the New Exit ABL Facility Documents, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

121.    "*New Exit ABL Facility Agent*" means, if applicable, the administrative agent and collateral agent under the New Exit ABL Facility, and its successors and assigns.

122.    "*New Exit ABL Facility Documents*" means, if applicable, the credit agreement governing the New Exit ABL Facility, and the related commitment letter, notes, guarantees, security documents, and intercreditor agreement, as applicable, which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders and materially consistent with the forms Filed with the Bankruptcy Court on or before ten (10) days prior to the commencement of the Confirmation Hearing or such later date on or prior to the Effective Date as may be agreed by the Debtors and the Required Supporting Noteholders  (as the same may be amended, modified, waived, or supplemented from time to time in accordance with its terms).

123.    "*New Exit ABL Facility Lenders*" means, if applicable, the banks, financial institutions and other parties identified as lenders in the New Exit ABL Facility Documents from time to time.

124.    "*New Exit ABL Term Sheet*" means, if applicable, the term sheet summarizing the general terms and conditions of the New Exit ABL Facility, which shall be Filed with the Bankruptcy Court on or before September 24, 2018, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

125.    "*New Take-Out Facility*" means, if applicable, a new term loan facility to be provided to the Reorganized Debtors upon the Effective Date by the DIP Lenders pursuant to the New Take-Out Facility Documents, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

126.    "*New Take-Out Facility Agent*" means, if applicable, the administrative agent and collateral agent under the New Take-Out Facility, and its successors and assigns.

127.    "*New Take-Out Facility Documents*" means, if applicable, the credit agreement governing the New Take-Out Facility, and the related notes, guarantees, security documents, and intercreditor agreement, as applicable, which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders and materially consistent with the forms Filed with the Bankruptcy Court on or before ten (10) days prior to the commencement of the Confirmation Hearing or such later date on or prior to the Effective Date as may be agreed by the Debtors and the Required Supporting Noteholders (as the same may be amended, modified, waived, or supplemented from time to time in accordance with its terms).

128.    "*New Take-Out Facility Lenders*" means, if applicable, the DIP Lenders, and such other banks, financial institutions and other parties identified in the New Take-Out Facility Documents from time to time.

129.    "*New Take-Out Facility Term Sheet*" means, if applicable, the term sheet summarizing the general terms and conditions of the New Take-Out Facility, which shall be Filed with the Bankruptcy Court on or before September 24, 2018, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

130.    "*New Warrants*" means the warrants to be issued pursuant to the Management Employment and Consulting Agreements.

131.    "*Non-Debtor Subsidiaries*" means a direct or indirect subsidiary of Gibson that is not a Debtor or an Excluded Non-Debtor Subsidiary.

132.    "*Ordinary Course Professionals Order*" means the *Order Pursuant to Section 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Retain and Compensate Professionals Employed in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date* [Dkt. No. 163].

133.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

134.    "*Other Secured Claim*" means any Secured Claim other than a DIP Facility Claim, an Allowed Prepetition Secured Notes Claim or a Prepetition ABL/Term Loan Secured Claim.

135.    "*Paul, Weiss*" means the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, in its capacity as counsel to the Ad Hoc Committee of Secured Notes.

136.    "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

137.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

138.    "*Philips*" means Koninklijke Philips N.V.

139.    "*Pillsbury*" means the law firm of Pillsbury Winthrop Shaw Pittman LLP, in its capacity as counsel to the Supporting Principals.

140.    "*PJT Partners*" means the financial advisory firm of PJT Partners, LLP, in its capacity as financial advisor to the Ad Hoc Committee of Secured Notes.

141.    "*Plan*" means this *Debtors' First Amended Joint Chapter 11 Plan of Reorganization*, including the Exhibits and Plan Schedules and all other supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

142.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Equity Interests under this Plan.

143.    "*Plan Documents*" means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, the New Exit ABL Facility Documents (if any), the New Take-Out Facility Documents (if any), the New Warrants, the New Common Stock Agreement, the Amended Organizational Documents, and the Management Incentive Plan, each of which shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

144.    "*Plan Modification Agreement*" means that certain Plan Modification Agreement dated as of September 6, 2018 among the Debtors, the Ad Hoc Committee of Secured Notes, the Committee, GSO, Philips and the Supporting Principals.

145.    "*Plan Schedules*" means all schedules annexed either to the Plan Supplement or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

146.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including the Exhibits, Plan Documents and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which (other than the New Warrants) shall be Filed with the Bankruptcy Court no later than September 24, 2018 (unless otherwise ordered by the Bankruptcy Court).  The documents that comprise the Plan Supplement shall be subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents, and shall be in form and substance consistent with the Restructuring Support Agreement.

147.    "*Plan Value*" means the value of the New Common Stock in Reorganized Gibson on the Effective Date as determined by the Bankruptcy Court in connection with the Confirmation Hearing.

148.    "*Prepetition 507(b) Claims*" means those certain super-priority Administrative Expense Claims granted pursuant to Paragraph 16(c) of the Final DIP Order.

149.    "*Prepetition ABL/Term Loan Agent*" means Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Prepetition ABL/Term Loan Agreement, and its successors and assigns.

150.    "*Prepetition ABL/Term Loan Professional Fees*" means the reasonable fees, costs, and out-of-pocket expenses incurred by the professionals employed by the Prepetition ABL/Term Loan Lenders and Prepetition ABL/Term Loan Agent and as provided for in the DIP Orders.

151.    "*Prepetition ABL/Term Loan Lenders*" means the ABL Revolver Lenders and the Domestic Term Loan Lenders under the Prepetition ABL/Term Loan Agreement.

152.    "*Prepetition ABL/Term Loan Agreement*" means the Amended and Restated Loan Agreement, dated as of February 15, 2017, by and among Gibson, Gibson International Sales LLC, Gibson Innovations USA, Inc., and Gibson Pro Audio Corp., as borrowers, the other subsidiaries of Gibson that are guarantors and grantors thereunder, the Prepetition ABL/Term Loan Agent, and the Prepetition ABL/Term Loan Lenders (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

153.    "*Prepetition ABL/Term Loan Secured Claim"* means any Claim of the Prepetition ABL/Term Loan Lenders or the Prepetition ABL/Term Loan Agent arising under the Prepetition ABL/Term Loan Agreement and the documents ancillary thereto

154.    "*Prepetition Indenture*" means that certain Indenture, dated as of July 31, 2013, by and among Gibson, each of the other guarantors and grantors thereunder, and the Prepetition Indenture Trustee under which Gibson issued the Prepetition Secured Notes (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

155.    "*Prepetition Indenture Trustee*" means Wilmington Trust, National Association, as successor to Wells Fargo Bank, National Association, a national banking association, in its capacity as indenture trustee and collateral agent under the Prepetition Indenture, or any successor trustee.

156. "*Prepetition Indenture Trustee Fees*" means the reasonable fees, costs and out-of-pocket expenses incurred by the Prepetition Indenture Trustee and the professionals employed by the Prepetition Indenture Trustee and as provided for in the DIP Orders.

157. "*Prepetition Secured Noteholders*" means the Holders of the Prepetition Secured Notes and their successors and permitted assigns.

158. "*Prepetition Secured Notes*" means the 8.75% Senior Secured Notes due 2018 issued by Gibson pursuant to the Prepetition Indenture.

159. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

160. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim in a particular Class bears to (b) the aggregate Allowed amount of all Claims in such Class, unless this Plan provides otherwise.

161. "*Professional*" means (a) any Person employed in the Chapter 11 Cases pursuant to section 327, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code, excluding, for the avoidance of doubt, any Person employed by the Supporting Noteholders, the Supporting Principals, the Ad Hoc Committee of Secured Notes, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, the Prepetition ABL/Term Loan Lenders, the DIP Agent, or the DIP Lenders.

162. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for any Professional, whether accrued, contingent or unpaid, for fees and expenses (including transaction fees) for legal, financial advisory, accounting or other services and reimbursement of expenses of each Professional that is awardable and allowable under sections 328, 330 or 331 of the Bankruptcy Code or otherwise Allowed after the Petition Date and prior to and including the Effective Date.

163. "*Professional Fees Bar Date*" means the Business Day that is thirty (30) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

164. "*Professional Fee Reserve Account*" means a segregated account for the benefit of the Professionals to be funded on the Effective Date in an amount sufficient to pay the Professional Fee Reserve Amount.

165. "*Professional Fee Reserve Amount*" means an amount sufficient to pay the Debtors' reasonable estimate, as of the Effective Date, of the Allowed Professional Fee Claims, and which amount shall be funded into the Professional Fee Reserve Account on the Effective Date.

166. "*Profits Interest*" means a derivative economic interest in the proceeds of a number of TEAC Shares calculated by dividing (x) the aggregate dollar amount, as applicable, of Profits Interests to which either (i) Class 6 Claims, (ii) Class 7 Claims, or (iii) Mr. Juszkiewicz, respectively, are entitled to receive under the Plan Documents or the Management Employment and Consulting Agreements (as applicable) by (y) 0.3154, which corresponds to the trading price of a single TEAC Share on the Tokyo Stock Exchange as of the close of business on August 30, 2018 (JPY35.00), translated into U.S. dollars at the spot rate of exchange prevailing at the close of business on August 30, 2018 (110.9800 USD/JPY), as published by Bloomberg.

167. "*Profits Interests Distributions*" has the meaning ascribed to such term in <u>Article V.Y</u> of this Plan.

168.    "*Proof of Claim*" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

169.    "*Reinstated*" means, with respect to any Claim, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

170.    "*Rejected  Executory Contract/Unexpired Lease List*" means the list, if any, and any amended list, if any, as determined by the Debtors in accordance with the Restructuring Support Agreement, identifying Executory Contracts and/or Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, and which shall be Filed with the Plan Supplement and shall be acceptable to the Debtors and the Required Supporting Noteholders.

171.    "*Related Persons*" means, with respect to any Person, such Person's Affiliates and each of such Person's and its Affiliates' predecessors, successors, assigns, Affiliates, subsidiaries, managed accounts or funds, and all of their respective current and former officers, directors, principals, employees, shareholders, members, partners, agents, managers, managing members, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case, acting in such capacity, and any Person claiming by or through any of them, and each of such Person's respective heirs, executors, estates, servants and nominees.

172.    "*Released Parties*" means, collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agent, (d) the DIP Lenders, (e) the DIP Backstop Parties, (f) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (g) the Ad Hoc Committee of Secured Notes and each of its members, (h) each of the Supporting Noteholders, (i) the New Exit ABL Facility Lenders, (j) the New Take-Out Facility Lenders (if any), (k) the New Exit ABL Facility Agent, (l) the New Take-Out Facility Agent (if any), (m) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (n) the Specified Persons, (o) Philips, (p) GSO, (q) the ITLA Agent, (r) the Prepetition ABL/Term Loan Agent, and (s) the Related Persons of each of the foregoing (a) through (r).

173.    "*Releasing Parties*" means, collectively, each in its capacity as such: (a) the Debtors, (b) the Reorganized Debtors, (c) Holders of Claims that vote to accept the Plan, (d) Holders of Claims that are Unimpaired under the Plan, (e) Holders of Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and that, if entitled to do so, do not indicate that they opt out of granting the releases set forth in Article X, (f) Holders of Claims that vote to reject the Plan but do not indicate that they opt out of granting the releases set forth in Article X, (g) the DIP Agent, (h) the DIP Lenders, (i) the DIP Backstop Parties, (j) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (k) the Ad Hoc Committee of Secured Notes and each of its members, (l) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (m) the Specified Persons, (n) the New Exit

ABL Facility Lenders, (o) the New Take-Out Facility Lenders (if any); (p) the New Exit ABL Facility Agent; (q) the New Take-Out Facility Agent (if any), (r) Philips, (s) GSO, (t) the ITLA Agent, (u) the Prepetition ABL/Term Loan Agent, and (v) the Related Persons of each of the foregoing (a) through (u) other than the GI Representatives and any GI Entity represented by a GI Representative.

174.     "*Reorganized Debtors*" means (i) Reorganized Gibson and (ii) each other Debtor, as reorganized pursuant to this Plan on and after the Effective Date, but excluding the Excluded Debtor Subsidiaries.

175.     "*Reorganized Gibson*" means Gibson, as reorganized pursuant to this Plan on and after the Effective Date.

176.     "*Required Lenders*" has the meaning assigned to such term in the DIP Facility.

177.     "*Required Supporting Noteholders*" means (a) as long as the Ad Hoc Committee of Secured Notes controls more than 50% of the principal amount of the Prepetition Secured Notes, the Ad Hoc Committee of Secured Notes, and (b) if the Ad Hoc Committee of Secured Notes controls less than 50% of the principal amount of the Prepetition Secured Notes, Supporting Noteholders controlling at least 50.1% of the principal amount of the Prepetition Secured Notes, in the case of each of (a) and (b), as applicable, at the time such action, consent, approval or waiver is solicited.

178.     "*Restructuring*" means the financial restructuring of the Debtors, the principal terms of which are set forth in this Plan, the Disclosure Statement, the Plan Supplement and the Restructuring Support Agreement.

179.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of April 30, 2018, by and among the Debtors, the Supporting Noteholders, and the Supporting Principals, including the First Amendment to the Restructuring Support Agreement, dated May 4, 2018, the Second Amendment to the Restructuring Support Agreement, dated June 12, 2018, the Third Amendment to the Restructuring Support Agreement, dated August 1, 2018, and the Fourth Amendment to the Restructuring Support Agreement, dated September 6, 2018 (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

180.     "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreement; (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Plan Documents, and the Restructuring Support Agreement; and (d) all other actions that are necessary or appropriate and consistent with the Plan, the Plan Documents, and the Restructuring Support Agreement.  The Restructuring Transactions may include a taxable transfer of substantially all or a part of the Debtors' assets or Entities to a newly-formed Entity (or an Affiliate or Subsidiary of such Entity) formed and controlled by certain Holders of Claims against the Debtors and, in such case, some or all of the New Common Stock (and/or other Equity Interests) issued to such Holders of Claims pursuant to the Plan may comprise stock (and/or other Equity Interests) of such new Entity (or an Affiliate or Subsidiary of such Entity), *provided, however*, any such transfer shall not affect the treatment of any other Holders of Allowed Claims against the Debtors.

181.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtors with the Bankruptcy Court.

182.    "*SEC*" means the Securities and Exchange Commission, or any successor agency.

183.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

184.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

185.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

186.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

187.    "*Servicer*" means an indenture trustee, owner trustee, pass-through trustee, subordination agent, agent, servicer or any other authorized representative of creditors of the Debtors recognized by the Debtors or the Reorganized Debtors.

188.    "*Settlement Order*" means that certain *Order Approving: (I) Exercise of Purchase Option, Releases in Connection Therewith and Related Relief; and (II) Payment of Certain 503(b)(9) Claims*, entered by the Bankruptcy Court on August 20, 2018 [Docket No. 619].

189.    "*Solicitation*" means the solicitation of votes of those parties entitled to vote to accept or reject the Plan.

190.    "*Specified Persons*" means the Supporting Principals, Alan Carr, and Solomon Picciotto.

191.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including such taxes on prime contracting and owner-builder sales), privilege taxes (including privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

192.    "*Subsidiaries*" means the Debtors other than Gibson.

193.    "*Supporting Noteholders*" means those beneficial Holders of the Prepetition Secured Notes that are parties to the Restructuring Support Agreement, together with their respective successors and permitted assigns, and other beneficial Holders of the Prepetition Secured Notes, that subsequently become party to the Restructuring Support Agreement in accordance with the terms thereof.

194.    "*Supporting Principals*" means, together, Henry Juszkiewicz and David Berryman.

195.     "*Tail Policy*" has the meaning ascribed to such term in <u>Article VI.E</u> of this Plan.

196.     "*Take-Out Equity Option*" has the meaning ascribed to such term in <u>Article II.C.iii</u> of this Plan.

197.     "*Task Force*" has the meaning ascribed to such term in <u>Article V.X</u> of this Plan

198.     "*TEAC*" means TEAC Corp.

199.     "*TEAC Shares*" means the Equity Securities issued by TEAC owned by Gibson Holdings.

200.     "*Third Amended Plan*" shall mean the Solicitation version of that certain *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization*, Filed on August 9, 2018 [Docket No. 565].

201.     "*Transaction Expenses*" means the fees, costs and expenses incurred by (i) the Ad Hoc Committee of Secured Notes Professionals, (ii) one primary counsel and one local counsel for the DIP Agent as provided for in the DIP Orders, (iii) the Prepetition Indenture Trustee Fees, (iv) the Prepetition ABL/Term Loan Agent Professional Fees, and (v) Pillsbury and one local counsel to the Supporting Principals; *provided that* the fees and expenses payable to the Supporting Principals and their professionals will be subject to an aggregate cap of $100,000.00, *provided, further* that the Transaction Expenses (i) shall be payable without the requirement or need to file any retention applications, fee applications, or any other applications in the Chapter 11 Cases or obtain any order from the Bankruptcy Court with respect thereto, (ii) shall be Allowed in full as Administrative Expense Claims without the filing of a Professional Fee Claim, and (iii) shall not be subject to any offset, defense, counterclaim, reduction, or credit.

202.     "*Transfer*" means, with respect to any security or the right to receive a security or to participate in any offering of any security, (i) the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such security or right or the beneficial ownership thereof, (ii) the offer to make such a sale, transfer, constructive sale, or other disposition, and (iii) each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing. The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such security or right, (ii) entering into or acquiring an offsetting derivative contract with respect to such security or right, (iii) entering into or acquiring a futures or forward contract to deliver such security or right, or (iv) entering into any transaction that has substantially the same effect as any of the foregoing. The term "beneficially owned" or "beneficial ownership" as used in this definition shall include, with respect to any security or right, the beneficial ownership of such security or right by a Person and by any direct or indirect subsidiary of such Person.

203.     "*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

204.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

205.     "*Voting Classes*" means Classes 5, 6, 7, and 8 under this Plan.

## ARTICLE II.
## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

A.  **Administrative Expense Claims**

Unless paid prior to the Effective Date, including pursuant to the Settlement Order with respect to pre-Effective Date payment of Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code, on the later of the Effective Date, or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each case, as soon as reasonably practicable thereafter, and in the case of an Allowed Professional Fee Claim subject to the provisions of Article II.B, each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as may be agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; *provided, however*, that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

Pursuant to the Settlement Order, 50% of then known outstanding undisputed Allowed Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code are to be paid within three (3) Business Days of the Bankruptcy Court's entry of the Settlement Order, with the other 50% of such undisputed Allowed Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code being paid on the Effective Date.  If any asserted Administrative Expense Claim arising under section 503(b)(9) of the Bankruptcy Code has not been Allowed as of the Effective Date, the Reorganized Debtors shall, in good faith, file an objection to such Claim within thirty (30) days after the Effective Date or such Claim will be deemed to be Allowed in the amount asserted and paid by the Reorganized Debtors within ten (10) days of such Claim becoming an Allowed Claim.

Except as otherwise provided in this Article II.A or the Claims Bar Date Order, and except with respect to Administrative Expense Claims that are Professional Fee Claims or DIP Claims, requests for payment of Allowed Administrative Expense Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Expense Bar Date; *provided*, that the Administrative Expense Claims Bar Date does not apply to Professional Fee Claims or Administrative Expense Claims (i) arising in the ordinary course of business or (ii) for self-insured health care expenses.

Objections to requests for payment of Administrative Expense Claims that are Filed with the Bankruptcy Court (other than Professional Fee Claims and DIP Claims) must be Filed and served on the requesting party by the Administrative Expense Claims Objection Bar Date.

For the avoidance of doubt, (i) all fees and expenses of the DIP Agent, including, without limitation, DIP Agent Professional Fees, shall be paid in full, in Cash, on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), by the Debtors or the Reorganized Debtors, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Expense Claims Bar Date; and (ii) all claims for self-insurance health care expense retention amounts by employees of the Debtors, shall be paid in full, in Cash, on or after the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), by the Debtors or the Reorganized Debtors, without the requirement to file a claim or motion with the Bankruptcy Court or a formal request for payment by the Administrative Expense Claims Bar Date.

**HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH**

**ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE EXPENSE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

**B.**     **Professional Fee Claims**

1.     Professional Fee Reserve Account

On the Effective Date, the Debtors will establish the Professional Fee Reserve Account and fund into the Professional Fee Reserve Account Cash equal to the Professional Fee Claim Reserve Amount for the benefit of the Professionals. The Professional Fee Reserve Account shall only be available to satisfy the Allowed Professional Fee Claims. The DIP Agent, the DIP Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the Prepetition ABL/Term Loan Agent and the Prepetition ABL/Term Loan Lenders: (i) shall not preclude the use of the Debtors' Cash to fund the Professional Fee Reserve Account in the amount of the Professional Fee Claim Reserve Amount, (ii) shall not foreclose on the Professional Fee Reserve Account, (iii) shall subordinate their security interests, Liens, and Claims (including any superpriority Claim) in the Professional Fee Reserve Account to the payment of the Allowed Professional Fee Claims, (iv) shall only have a security interest, Lien and superpriority Claim upon and to, and the right of enforcement against, such remaining amount in the Professional Fee Reserve Account after payment of the Allowed Professional Fees, and (v) waive, and shall have not right to seek, disgorgement with respect to the payment of any Allowed Professional Fees; *provided*, *however*, that the Reorganized Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Reserve Account over the aggregate Allowed Professional Fee Claims of the Professionals.

2.     Final Fee Applications and Payment of Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within thirty (30) days after the Effective Date, and serve on the Debtors, the Reorganized Debtors, the U.S. Trustee, and counsel to the Ad Hoc Committee of Secured Notes, an application for final allowance of such Professional Fee Claim; and *provided* that the Reorganized Debtors will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full in Cash; and *provided further*, that any professional that may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Debtors, the Reorganized Debtors, the U.S. Trustee, counsel to the Ad Hoc Committee of Secured Notes, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, the Ad Hoc Committee of Secured Notes and the party requesting payment of a Professional Fee Claim).

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals when such Claims are Allowed by a Final Order by the Reorganized Debtors, including from the Professional Fee Reserve Account.

The Professionals shall reasonably estimate their Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors and counsel to the Ad Hoc Committee of Secured Notes no later than ten (10) calendar days prior to the Effective Date; provided, however, that such estimate shall not be considered a representation with respect to the fees and expenses of such Professional, and such Professionals are not bound to any extent by the estimates.  If any of the Debtors' Professionals fails to provide an estimate or does not provide a timely estimate, the Debtors may estimate the unbilled fees and expenses of such Professional, in consultation with the Ad Hoc Committee of Secured Notes.  The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Reserve Amount, but the Professional Fee Reserve Amount shall not limit the amount of Professional Fees that may be Allowed by the Bankruptcy Court or limit the obligation of the Reorganized Debtors to pay Professional Fees in the amounts Allowed by the Bankruptcy Court.

## C.     **DIP Facility Claims**

On the Effective Date in full and final satisfaction, settlement, discharge and release of, and in exchange for, all DIP Facility Claims, the DIP Facility Claims shall be:

(i)     at the election of the Required Lenders, refinanced in whole or in part with the proceeds of the New Take-Out Facility;

(ii)     to the extent that the DIP Facility Claims are not refinanced in full with the proceeds from a New Take-Out Facility in accordance with clause (i) of this Article II.C, at the election of the Required Lenders, exchanged in full for New Common Stock at a price per share equal to 80% of Plan Value, subject to dilution for any New Common Stock issued:  (A) to the DIP Backstop Parties on account of the DIP Backstop Premium; (B) in accordance with the Management Incentive Plan; (C) on account of the Exit Premium; and (D) upon the exercise of the New Warrants (collectively, the "Take-Out Equity Option"); or

(iii)     indefeasibly paid, in full, from a combination of some or all of:  (A) the proceeds of the New Take-Out Facility; and/or (B) the Take-Out Equity Option;

and, in any case, the DIP Facility Loan Agreement and all related loan documents, and all Liens and security interests granted to secure the DIP Facility Claims, will be deemed to be terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors to effectuate the foregoing.  Notwithstanding the foregoing, the DIP Facility Loan Agreement shall continue in effect solely for the purpose of preserving the DIP Agent's and the DIP Lenders' right to any contingent or indemnification obligations of the Debtors pursuant and subject to the terms of the DIP Facility Loan Agreement or DIP Orders.

## D.     **Priority Tax Claims**

On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and acceptable to the Required Supporting Noteholders. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.    Summary**

All Claims and Equity Interests, except Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for purposes of classification, voting, confirmation, treatment and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The classification and treatment of Claims and Equity Interests in this Article III does not limit or impair the releases, injunctions or exculpations provided for in Article X of the Plan, or any right or remedy of a Holder of a Claim or Equity Interest to enforce the terms and provisions of this Plan or any of the Plan Documents.

The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

The classification and treatment of Claims against, and Equity Interests in, the Debtors are on a Debtor by Debtor basis.  To the extent Claims against, and Equity Interests in, more than one Debtor are classified in one Class, the Class shall be deemed to include sub-classes for each such Debtor.

### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | ABL Revolver Claims | Unimpaired | Deemed to Accept |
| 4 | Domestic Term Loan Claims | Unimpaired | Deemed to Accept |
| 5 | Allowed Prepetition Secured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims – (Other than Class 7, 8 and 9 Claims) | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims Against Gibson Holdings | Impaired | Entitled to Vote |
| 8 | Convenience Class Claims | Impaired | Entitled to Vote |
| 9 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept/ Deemed to Reject |
| 10 | Equity Interests in Gibson | Impaired | Deemed to Reject |
| 11 | Equity Interests in Subsidiaries (Other than Excluded Debtor Subsidiaries) | Unimpaired | Deemed to Accept |
| 12 | Equity Interests in Excluded Debtor | Impaired | Deemed to Reject |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
|       | Subsidiaries | | |

### B.    Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### C.    Voting; Presumptions

Only Holders of Allowed Claims in Classes 5, 6, 7 and 8 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 5, 6, 7, and 8 will receive ballots containing detailed voting instructions.

Holders of Allowed Claims or Equity Interests in Classes 1, 2, 3, 4, and 11 are Unimpaired under the Plan and accordingly are deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Claims in Class 9 are either Impaired by reason of neither receiving nor retaining any property under the Plan, or Unimpaired under the Plan, and accordingly are either deemed to reject the Plan or accept the Plan, respectively.  Therefore, each Holder of a Class 9 Claim is not entitled to vote to accept or reject the Plan.

Holders of Allowed Equity Interests in Classes 10 and 12 shall neither receive nor retain any property under the Plan and accordingly are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### D.    Cramdown

If any Class of Claims or Equity Interests is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may, subject to the terms of the Restructuring Support Agreement, (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code, or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### E.    Classification and Treatment of Claims and Equity Interests

1.    Class 1 – Other Priority Claims

- *Classification*:  Class 1 consists of the Other Priority Claims.

- *Treatment*:  On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date, or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the

election of the Debtors (with the consent of the Required Supporting Noteholders) or Reorganized Debtors which election shall be consistent with the Restructuring Support Agreement:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Secured Claims

- *Classification*:  Class 2 consists of the Other Secured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date, or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors (with the consent of Required Supporting Noteholders) or Reorganized Debtors which election shall be consistent with the Restructuring Support Agreement:  (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) return of the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment rendering such Claim Unimpaired.  Except with respect to Claims that are treated in accordance with the preceding clause (C), each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Unimpaired, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 – ABL Revolver Claims

- *Classification*:  Class 3 consists of ABL Revolver Claims.

- *Allowance*:  All ABL Revolver Claims that are Secured have been paid in full in Cash prior to the Confirmation Hearing or have been Cash collateralized and thus shall be Allowed in the amount of $0.

- *Treatment*:

    (i)      On the Effective Date each Holder of an Allowed Class 3 Claim shall neither receive nor retain any property (other than retaining

Cash collateral securing any outstanding letters of credit and any Cash received in repayment of such ABL Revolver Claims pursuant to the DIP Orders) and any and all ABL Revolver Claims shall be deemed paid in full, satisfied, settled, discharged and released and all prepetition letters of credit outstanding on the Effective Date shall be terminated and replaced with new letters of credit issued under the New Exit ABL Facility, or, at the election of the Debtors (with the consent of the Required Supporting Noteholders), shall be secured by Cash collateral equal to 103% of the face amount of such letters of credit. On the Effective Date, all Liens securing the ABL Revolver Claims (other than any Liens on Cash collateral securing any outstanding letters of credit) shall be automatically released, terminated, void and of no further force or effect.

(ii)    All unpaid reasonable and necessary fees and out-of-pocket expenses of the Prepetition ABL/Term Loan Agent and the Prepetition ABL/Term Loan Lenders shall be paid in full in Cash on the Effective Date, without the need to file any application with, or obtain any order (other than the Confirmation Order) from, the Bankruptcy Court.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

4.      Class 4 –Domestic Term Loan Claims

- *Classification*:  Class 4 consists of the Domestic Term Loan Claims.

- *Allowance*: All Domestic Term Loan Claims that are Secured have been paid in full in Cash prior to the Confirmation Hearing pursuant to the exercise of the Purchase Option pursuant to the Settlement Order and thus shall be Allowed in the amount of $0.

- *Treatment*:

(i)     On the Effective Date, all Allowed Domestic Term Loan Claims shall neither receive nor retain any property (other than retaining Cash received in repayment of such Domestic Term Loan Claims pursuant to the DIP Orders and the Settlement Order) and all Domestic Term Loan Claims shall be deemed paid in full, satisfied, settled, discharged and released.  On the Effective Date, all Liens securing the Domestic Term Loan Claims shall be automatically released, terminated, void and of no further force or effect.

(ii)    All accrued and unpaid Prepetition ABL/Term Loan Professional Fees shall be paid in full in Cash on the Effective Date, without the need to file any application with, or obtain any order (other than the Confirmation Order) from, the Bankruptcy Court.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan.

5.      Class 5 – Allowed Prepetition Secured Notes Claims

- *Classification*:  Class 5 consists of the Allowed Prepetition Secured Notes Claims.

- *Allowance*:  The Claims of the Holders of the Prepetition Secured Notes shall be Allowed Class 5 Prepetition Secured Notes Claims, allocated as applicable among the Debtors (which, for the avoidance of doubt, does not include Baldwin Piano, Inc. or Wurlitzer Corp.).  For the avoidance of doubt, the Holders of the Prepetition Secured Notes shall have an Allowed Class 6 General Unsecured Claim in the amount of the Allowed Unsecured Prepetition Notes Deficiency Claim and shall participate in Class 7 as set forth herein.

- *Treatment*:

    (i)      On the Effective Date, the Allowed Class 5 Prepetition Secured Notes Claims shall be exchanged for New Common Stock equal to 100% of the New Common Stock authorized and outstanding as of the Effective Date, prior to, and subject to, dilution for the issuance of New Common Stock: (A) on account of the DIP Facility Claims, if applicable; (B) to the DIP Backstop Parties on account of the DIP Backstop Premium; (C) on account of the Exit Premium; (D) in accordance with the Management Incentive Plan; and (E) upon the exercise of the New Warrants.

    (ii)      On the Effective Date, each Holder of an Allowed Class 5 Prepetition Secured Notes Claim shall receive from the Distribution Agent its Pro Rata share of New Common Stock, in full and final satisfaction, settlement, discharge and release of, and in exchange for its Allowed Class 5 Prepetition Secured Notes Claim, in accordance with the Plan and pursuant to the Prepetition Indenture.

    (iii)      On the Effective Date, all Liens securing the Allowed Prepetition Secured Notes Claims shall be automatically released, terminated, void and of no further force or effect.

    (iv)      All unpaid fees and expenses of the Ad Hoc Committee of Secured Notes Professionals and the Prepetition Indenture Trustee Fees shall be paid in full in Cash on the Effective Date, without the need to file any application with, or obtain any order (other than the Confirmation Order) from, the Bankruptcy Court.

- *Impairment and Voting*:  Class 5 is Impaired, and Holders of Allowed Prepetition Secured Notes Claims are entitled to vote to accept or reject the Plan.

6.     Class 6 – General Unsecured Claims (other than Class 7, 8 and 9 Claims)

- *Classification*:  Class 6 consists of the General Unsecured Claims (other than Class 7, 8 and 9 Claims), including the Allowed ITLA Guaranty Claim, the Allowed Unsecured Prepetition Notes Deficiency Claim and the Allowed Philips Class 6 Claim.

- *Allowance*:  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or non-bankruptcy law that the Debtors had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by order of the Bankruptcy Court. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, no General Unsecured Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

- *Treatment*:  On, or as soon as reasonably practicable after the earlier of: (a) the Effective Date, or (b) such date as the General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed Class 6 Claim, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive its Pro Rata share of (i) Cash equal to $4,250,000, which shall be paid by the Debtors into a segregated bank account of Cakewalk, Inc. on the Effective Date (the "Distribution Account"), and (ii) $4,000,000 of Profits Interests, *provided, however*, that the Allowed Unsecured Prepetition Notes Deficiency Claim and the Allowed ITLA Guaranty Claim shall not participate in the distributions under this Article III.E.6.

- *Impairment and Voting*:  Class 6 is Impaired, and the Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

7.     Class 7– General Unsecured Claims Against Gibson Holdings

- *Classification*:  Class 7 consists of the General Unsecured Claims against Gibson Holdings.  The Claims of the Holders of the Prepetition Secured Notes and the ITLA Guaranty Claims shall be Allowed Class 7 General Unsecured Claims against Gibson Holdings.

- *Allowance*:  The Gibson Holdings Claims shall be comprised of the Allowed ITLA Guaranty Claim and the Allowed Prepetition Secured Notes Claim.

- *Treatment*:

    (i)     The Holders of Gibson Holdings Claims based upon the Prepetition Secured Notes Claim shall receive their Pro Rata share of Profits Interests in 100% of the TEAC Shares that are not otherwise allocable to the Profits Interests distributed on account of Allowed Claims under this Plan or Profits Interests that are to be issued to Mr. Juszkiewicz pursuant to his

Management Employment and Consulting Agreement, *provided, however, that* at the election of the Required Supporting Noteholders, the Holders of Gibson Holdings Claims in Class 7 on account of the Allowed Prepetition Secured Notes Claims may, prior to or after the Effective Date, waive the Prepetition Secured Noteholders' recovery in Class 7 and instead treat such Holders' recovery in Class 5 as being also on account of their Gibson Holdings Claims in Class 7, *provided further, however*, that any such waiver of recovery in Class 7 by the Required Supporting Noteholders shall not result in a greater distribution of Profits Interests to any other Person.  For the avoidance of doubt, the total number of TEAC Shares subject to Profits Interests shall not exceed the total number of TEAC Shares.

(ii)     The Holders of the Gibson Holdings Claims based upon the ITLA Guaranty Claim shall receive $6,250,000 of Profits Interests.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

8.      Class 8 – Convenience Class Claims

- *Classification*:  Class 8 consists of the Convenience Class Claims.  For the avoidance of doubt, neither the ITLA Agent nor GSO have any Class 8 Convenience Class Claims.

- *Allowance*:  Notwithstanding any provisions of the Plan to the contrary, a Convenience Class Claim will be deemed Allowed, without offset, counterclaim or defense of any kind if it is (i) set forth in a timely Filed Proof of Claim that is not validly objected to (ii) listed on the Schedules, or (iii) set forth in a timely and valid Convenience Claim Election, in each case of not more than up to an amount equal to $40,000 per Claim.

- *Treatment*:  Except to the extent that a Holder of an Allowed Convenience Class Claim agrees to a less favorable treatment, within thirty (30) days following the Effective Date or the date that such Convenience Class Claim becomes Allowed, each Holder of an Allowed Convenience Class Claim shall receive, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for such Allowed Convenience Class Claim, Cash in an amount equal to up to 50% of the Allowed Convenience Class Claim, *provided, however*, that, to the extent the Cash necessary to pay all Allowed Convenience Class Claims exceeds the Convenience Class Cap, Allowed Convenience Class Claims shall instead receive their Pro Rata share of Cash up to the Convenience Class Cap in an amount less than or equal to 50% of their Allowed Convenience Class Claim.

- *Impairment and Voting*:  Class 8 is Impaired, and Holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

9.      Class 9 – Intercompany Claims

- *Classification*:  Class 9 consists of the Intercompany Claims.

- *Treatment*:  On the Effective Date, all Class 9 Intercompany Claims shall be, at the option of the Company with the consent of the Required Supporting Noteholders, either:  (a) Reinstated, (b) converted into equity, or (c) cancelled, and may be compromised, extinguished, or settled after the Effective Date.

- *Impairment and Voting*:  Holders of Class 9 Intercompany Claims are either (i) Unimpaired, and such Holders of Class 9 Intercompany Claims conclusively are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and such Holders of Class 9 Intercompany Claims shall receive nothing on account of such Claims and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Class 9 Intercompany Claim is not entitled to vote to accept or reject the Plan.

10.    Class 10 – Equity Interests in Gibson

- *Classification*:  Class 10 consists of the Equity Interests in Gibson.

- *Treatment*:  All Class 10 Equity Interests in Gibson will be deemed cancelled upon the Effective Date and will be of no further force or effect, whether surrendered for cancellation or otherwise, and the Holders of all Class 10 Equity Interests in Gibson shall neither retain nor receive any property under the Plan on account of such Equity Interests.

- *Impairment and Voting*:  Class 10 is Impaired and the Holders of Class 10 Equity Interests in Gibson are deemed to reject the Plan.

11.    Class 11 – Equity Interests in Subsidiaries (Other Than Excluded Debtor Subsidiaries)

- *Classification*:  Class 11 consists of the Equity Interests in Subsidiaries (Other Than Excluded Debtor Subsidiaries).

- *Treatment*:  Pursuant to <u>Article V.B of the Plan</u>, on the Effective Date Reorganized Gibson will own 100% of the Equity Interests in the other Debtors and its Non-Debtor Subsidiaries, except for (a) the Excluded Debtor Subsidiaries (other than Cakewalk, Inc.), and (b) the Excluded Non-Debtor Subsidiaries.

- *Impairment and Voting*:  Class 11 is Unimpaired, and the Holders of Class 11 Equity Interests are not entitled to vote to accept or reject the Plan, and are deemed to accept the Plan.

12.    Class 12– Equity Interests in Excluded Debtor Subsidiaries

- *Classification*:  Class 12 consists of the Equity Interests in Excluded Debtor Subsidiaries.

- *Treatment*:  On the Effective Date, the Debtors' Equity Interests in the Excluded Debtor Subsidiaries shall be, and shall be deemed to be, cancelled and will be of no further force or effect.  The Debtors' shall neither receive nor retain any property on account of their cancelled Equity Interests in the Excluded Debtor Subsidiaries.

- *Impairment and Voting*:  Class 12 is Impaired, and the Holders of Class 12 Equity Interests are not entitled to vote to accept or reject the Plan, and are deemed to reject the Plan.

**F.**      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

**G.**      **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to, and the Plan hereby implements in all respects, the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors, with the consent of the Required Supporting Noteholders, reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

# ARTICLE IV.
## ACCEPTANCE OR REJECTION OF THE PLAN

**A.**      **Voting Classes**

Each Holder of an Allowed Claim as of the applicable voting record date in the Voting Classes (Classes 5, 6, 7 and 8) will be entitled to vote to accept or reject the Plan.

**B.**      **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**C.**      **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors (subject to the terms of the Restructuring Support Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all Impaired Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and within the range of reasonableness.  All distributions made to Holders of Allowed Claims and Allowed Equity Interests in any Class are intended to be and shall be final.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, allowance of Claims, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

In particular, pursuant to a global settlement reached among the Debtors, the Ad Hoc Committee of Secured Notes, the Committee, Philips, GSO and the Supporting Principals embodied in the Plan Modification Agreement, pursuant to Bankruptcy Rule 9019 (as applicable) and section 1123 of the Bankruptcy Code, in consideration for the classification, allowance of Claims, distributions, releases and other benefits provided under this Plan, the Plan now provides that:

(i)     Upon the Effective Date, the Debtors shall waive with prejudice all Causes of Action (including Avoidance Actions) against Philips, GSO, the ITLA Agent and the Specified Persons;

(ii)     The treatment of Class 6 has been amended from the Third Amended Plan to include the improved treatment provided for under Article III.E.6 of this Plan and the provisions regarding the Profits Interests set forth in Article V.Y of this Plan;

(iii)     Philips shall receive the Allowed Philips Class 6 Claim, which shall share Pro Rata with all other Holders of Allowed Class 6 Claims (other than the Holders of the Allowed ITLA Guaranty Claim and the Allowed Unsecured Prepetition Notes Deficiency Claim, which shall not participate in any recoveries under Class 6 but shall instead receive the treatment provided to such Holders under Classes 5 and 7 of this Plan (as applicable)) and, as of the Effective Date the Debtors shall withdraw their objection to Philips' proof of claim [Docket No. 502] with prejudice;

(iv)     The ITLA Agent (on behalf of GSO) shall receive the Allowed ITLA Guaranty Claim, which shall receive the treatment provided under Class 7 of this Plan and, as of the Effective Date, the Debtors shall withdraw the ITLA Claims Motions with prejudice;

(v)     The concept of a post-Effective Date "Litigation Trust" to pursue Causes of Action against GSO, the ITLA Agent and the Specified Persons has been removed from the Plan;

(vi)     Philips shall be a member of the Creditors' Oversight Committee solely with respect to the resolution of Disputed Claims and distributions to Allowed Class 6 Claims.  The Creditors Oversight Committee's consent shall be required with respect to the settlement of Disputed Class 6 Claims with a proposed or asserted allowed amount in excess of $3,000,000, which rights shall be solely exercised by unanimous vote;

(vii)     Philips, GSO and the ITLA Agent have agreed to support and vote in favor of the Plan (including by changing any previously cast vote to reject the Plan);

(viii)     Philips, GSO and the ITLA Agent have agreed to not opt out of the third party releases provided under Article X of this Plan;

(ix)     GSO and the ITLA Agent have agreed to the release of any ITLA Guaranty Claims against China Guitar, EQ and Gibson Japan provided for under Article V.L of this Plan;

(x)      Upon the Effective Date, Philips, GSO and the ITLA Agent shall waive with prejudice any and all claims against (a) the Specified Persons, (b) the officers and directors of the Debtors, the Non-Debtor Subsidiaries, and the Excluded Non-Debtor Subsidiaries, and (c) the Non-Debtor Subsidiaries and the Excluded Non-Debtor Subsidiaries (other than the GI Entities and GI BV Parent);

(xi)     The Supporting Principals have agreed that the Management Employment and Consulting Agreements shall be drafted such that (a) the aggregate amount of New Common Stock to be received upon exercise of the New Warrants received by Messrs. Juszkiewicz and Berryman under such agreements shall be reduced from 4.5% to 3.45%; and (b) Mr. Juszkiewicz shall receive $650,000 and not $1,500,000 of Profits Interests under such agreement otherwise consistent with the Restructuring Support Agreement;

(xii)    Mr. Juszkiewicz shall be re-nominated to the Board of Directors of TEAC in 2019 for an additional one-year term if the Reorganized Debtors continue to control board seats of TEAC at that time;

(xiii)   The Debtors have agreed, pursuant to the Restructuring Support Agreement, to retain an operations consultant.  Mr. Juszkiewicz has delegated to the Chief Restructuring Officer and such operations consultant (once retained), all responsibilities as chief executive officer of the Debtors as of the first Business Day following the Bankruptcy Court approving the Disclosure Statement Addendum, *provided, however*, Mr. Juszkiewicz will continue to receive all of his base salary compensation and benefits through the Effective Date consistent with his compensation during the pendency of the Chapter 11 Cases;

(xiv)    Philips, GSO, the ITLA Agent and the Specified Persons have been added as "Released Parties" and "Releasing Parties" hereunder;

(xv)     The Debtors, the Committee, the Ad Hoc Committee of Secured Notes, Philips and GSO have agreed that the Debtors will no longer actively market their assets or otherwise provide information to any potential counterparty with respect to an Alternative Transaction or provide access to the Debtors or their professionals to such potential counterparty as contemplated under paragraph 34 of the Disclosure Statement Order, subject to the Restructuring Support Agreement; and

(xvi)    The Debtors, the Committee, the Ad Hoc Committee of Secured Notes, Philips and GSO have agreed that all pending discovery propounded among them shall be suspended and no party shall have any obligation to respond to any such discovery, including document requests and deposition notices.  In the event that the Bankruptcy Court denies confirmation of the Plan, the parties' respective rights to undertake discovery shall be preserved.

**B.      Corporate Existence**

The Debtors (except for the Excluded Debtor Subsidiaries other than Cakewalk, Inc.) and the Non-Debtor Subsidiaries (except for the Excluded Non-Debtor Subsidiaries) will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization and, with respect to Gibson and Gibson Holdings, pursuant to the Amended Organizational Documents.  For the avoidance of doubt, Gibson shall continue to own 100% of the equity of Gibson Holdings after the Effective Date.  On or after the Effective Date, without prejudice to the

rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may take such action not inconsistent with the Restructuring Transactions, the Restructuring Support Agreement or the Plan and as permitted by applicable law and such organizational documents, as the Reorganized Debtors and the Non-Debtor Subsidiaries may determine is reasonable and appropriate, including causing any of them to:  (i) be merged into another; (ii) be dissolved; (iii) change its legal name; or (iv) close a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

From and after the Effective Date, the Excluded Debtor Subsidiaries (other than Cakewalk, Inc.), and the Excluded Non-Debtor Subsidiaries (other than the GI Entities) shall cease to exist and shall be deemed to be dissolved and liquidated without further action, filing or approval, *provided, however*, that (i) Cakewalk Inc. shall not dissolve and liquidate on the Effective Date but shall instead cease to exist and shall be deemed to be dissolved and liquidated without further action upon the closing of its Chapter 11 Case after the conclusion of the claims allowance and distribution process, and (ii) at the election of Reorganized Gibson, EQ shall either (a) be dissolved and liquidated, (b) be merged with a Non-Debtor Subsidiary or (c) be revested as a subsidiary of Reorganized Gibson.  Claims against, and Equity Interests in, the Excluded Debtor Subsidiaries are classified, and shall receive such treatment as provided for in Article III of the Plan.  Any property of the Excluded Debtor Subsidiaries shall revest in the Reorganized Debtors as they may determine, free and clear of all Claims, Equity Interests and Liens, except as otherwise set forth in this Plan.  The assets of the Excluded Non-Debtor Subsidiaries (other than the GI Entities and EQ to the extent Reorganized Gibson elects to merge or revest EQ pursuant to sections (ii)(b) or (c) of this paragraph) will be abandoned as provided for in the Plan.  The liabilities of the Excluded Non-Debtor Subsidiaries are not affected by this Plan.

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan and that is consistent with the Restructuring Support Agreement, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto; (iv) reincorporation (including, consistent with the Restructuring Support Agreement, reincorporating, merger, consolidation, or conversion pursuant to applicable law); (v) the Restructuring Transactions; and (vi) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## C.   **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates (including Causes of Action not otherwise released and/or exculpated pursuant to Articles X.B and X.E of the Plan, but excluding:  (i) the Equity Interests in the Excluded Debtor Subsidiaries; (ii) the Equity Interests in, or assets of, the Excluded Non-Debtor Subsidiaries (except EQ to the extent Reorganized Gibson elects not to dissolve EQ pursuant to Article V.B of this Plan); and (iii) Avoidance Actions) and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees,

disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

On the Effective Date, (A) the Equity Interests in the Excluded Debtor Subsidiaries and the Equity Interests in the Excluded Non-Debtor Subsidiaries (except EQ to the extent Reorganized Gibson elects not to dissolve EQ pursuant to Article V.B of this Plan): (i) shall be cancelled, eliminated, extinguished and of no further force or effect; (ii) shall be finally and forever relinquished and waived by the Holder thereof; and (iii) shall not revest in the Reorganized Debtors; and (B) any assets owned by such (i) Excluded Debtor Subsidiaries shall vest in the Reorganized Debtors as determined by the Reorganized Debtors and (ii) Excluded Non-Debtor Subsidiaries shall be abandoned in accordance with section 554 of the Bankruptcy Code or otherwise to the creditors of such Excluded Non-Debtor Subsidiaries and shall be deemed assigned to and for the benefit of the creditors of such Excluded Non-Debtor Subsidiaries or otherwise liquidated for the benefit of such creditors.

On the Effective Date, all Avoidance Actions (i) shall be finally and forever relinquished and waived by the Debtors; and (ii) shall not revest in the Reorganized Debtors.

## D.   **The New Exit ABL Facility and the New Take-Out Facility**

The Debtors shall use their best efforts to enter into the New Exit ABL Facility on or before the Effective Date. The New Exit ABL Facility, if applicable, shall be generally described in the New Exit ABL Term Sheet and the New Exit ABL Facility Documents, if applicable, shall be in form and substance acceptable to the Required Supporting Noteholders. The Confirmation Order shall be deemed approval of the New Exit ABL Facility and the New Exit ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Exit ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Exit ABL Facility. If the Debtors enter into the New Exit ABL Facility on the Effective Date, then, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New Exit ABL Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Exit ABL Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Exit ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

At the option of the Required Lenders and subject to the Take-Out Equity Option, the DIP Facility may be refinanced with the New Take-Out Facility. The New Take-Out Facility, if applicable, shall be generally described in the New Take-Out Facility Term Sheet and the New Take-Out Facility Documents, if applicable, will be in form and substance acceptable to the Required Supporting Noteholders. The Confirmation Order shall be deemed approval of the New Take-Out Facility and the New Take-Out Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Take-Out Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Take-Out Facility. If the Debtors enter into the New Take-Out Facility on the Effective Date, then, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New Take-Out Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted thereunder in accordance with the terms of the New Take-Out Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such

Liens and security interests as may be permitted under the New Take-Out Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

The New Exit ABL Facility and the New Take-Out Facility, as applicable, shall provide, as of the Effective Date, sufficient funding, together with the Debtors' Cash on hand and their future revenues, to satisfy the DIP Facility Claims on the Effective Date in accordance with the Plan and the Restructuring Support Agreement, fund the treatment provided to Allowed Claims under the Plan, and fund the Debtors' ongoing operations.

## E.      Authorized Financing

On the Effective Date, the applicable Reorganized Debtors shall be and are authorized to execute and deliver, as applicable, the New Exit ABL Facility Documents and the New Take-Out Facility Documents (each, as applicable), and any related loan documents, and shall be and are authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, subject to the lien limitations set forth herein.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash and financing necessary for the Reorganized Debtors to make payments and distributions required pursuant to the Plan will be obtained from the New Exit ABL Facility and the New Take-Out Facility Documents (each, as applicable), and the Reorganized Debtors' Cash balances, including Cash from operations.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

## F.      Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.B of this Plan shall receive no Plan Distribution.

## G.      Management Incentive Plan

On the Effective Date, Reorganized Gibson will adopt and implement the Management Incentive Plan, which will provide for grants of options and/or restricted units/New Common Stock reserved for management, directors, and employees in an amount of up to 12% of the New Common Stock outstanding as of the Effective Date.  The primary participants of the Management Incentive Plan, and its terms, including the amount, form, exercise price, allocation and vesting of such equity-based awards with respect to such primary participants, shall be determined by the New Board.  The form and substance of any documentation with respect to the Management Incentive Plan shall be in form and substance (i) consistent with the terms of the Restructuring Support Agreement and (ii) acceptable to the Required Supporting Noteholders.  For the avoidance of doubt, the Supporting Principals will not be participants in the Management Incentive Plan.

## H.      Management Employment and Consulting Agreements

As of the Effective Date, Reorganized Gibson and Messrs. Juszkiewicz and Berryman will enter into the Management Employment and Consulting Agreements, which shall be Filed with the Bankruptcy Court prior to the Effective Date, *provided, however*, for the avoidance of doubt, the Bankruptcy Court has not been asked to approve, nor is it approving the Management Employment and Consulting Agreements, which agreements are not obligations of the Debtors' Estates, *provided further, however*,

nothing in this Article V.H shall alter the conditions precedent to consummation of the Plan in Article IX.B.

## I.      Sources of Consideration for Plan Distributions

1. Issuance of New Common Stock, New Warrants and Related Documentation

From and after the Effective Date as set forth in this Plan, Reorganized Gibson will be authorized to and will issue the New Common Stock to certain Holders of Allowed Claims, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  It is anticipated that, from and after the Effective Date, Reorganized Gibson will remain a private company.  All Holders of Claims that receive New Common Stock under the Plan, and any Person receiving any rights exercisable into New Common Stock, in the form of the New Warrants, or pursuant to the Management Incentive Plan, or otherwise, and all transferees of such Persons (including transferees of transferees) shall be deemed to have executed the New Common Stock Agreement without any further action by the Debtors or any other party (regardless of whether any such Person actually executes the New Common Stock Agreement).

The New Common Stock in Reorganized Gibson issued pursuant to the Plan in exchange for the DIP Facility Claims, the DIP Backstop Premium, the Exit Premium, and the Allowed Class 5 Prepetition Secured Notes Claim, and the Profits Interests issued pursuant to the Plan in exchange for Allowed Class 6 Claims and Allowed Class 7 ITLA Guaranty Claims shall be exempt from any registration requirements under any securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and by Section 1145 of the Bankruptcy Code.  The New Common Stock, New Warrants and Profits Interests issued to officers, employees and consultants of the Reorganized Debtors pursuant to the Management Employment and Consulting Agreements and the Management Incentive Plan shall be exempt from any registration requirements under any securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.  Without limiting the effects of section 3(a)(9) and section 4(a)(2) of the Securities Act, Rules 506 and 701 under the Securities Act, and section 1145 of the Bankruptcy Code, all financing documents, agreements, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Exit ABL Facility Documents, the New Take-Out Facility Documents, the New Common Stock, Profits Interests and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

The New Common Stock shall constitute a single class of Equity Securities in Reorganized Gibson and, other than as contemplated by the DIP Facility, DIP Backstop Premium, the Exit Premium, the Management Employee and Consulting Agreements, and the Management Incentive Plan, there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Gibson as of the Effective Date.  From and after the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Gibson will be that number of shares of New Common Stock as may be designated in the Amended Organizational Documents.

In connection with the distribution of New Common Stock and New Warrants, the Reorganized Debtors will take all actions reasonably necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including, when applicable, withholding from distributions a portion of the New Common Stock, selling such securities, or requiring Holders of such securities to contribute the Cash necessary to satisfy tax withholding obligations including income, social security and

Medicare taxes, and Reorganized Gibson shall pay such withheld taxes to the appropriate Governmental Unit.

2. Intercompany Claims.

On the Effective Date, all intercompany claims of any of the Debtors against the GI Entities shall be transferred to Reorganized Gibson.

## J.   Church Street Sale

Subject to the approval of the Required Supporting Noteholders in their sole and absolute discretion, on or after the occurrence of the Effective Date, Reorganized Gibson may close upon the Church Street Sale pursuant to the Church Street Sale Procedures and pursuant to sections 105, 363, 503, 507, 1123, and 1146 of the Bankruptcy Code, Rules 2002, 6004, 9007 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1, 9006-1 and 9013-1 of the Local Rules.  Any Church Street Sale shall be free and clear of all claims, liens and encumbrances pursuant to sections 105(a), 363(f), and 1123(a)(5)(D) of the Bankruptcy Code.  As provided in Article XIII.Q of this Plan, pursuant to section 1146(a) of the Bankruptcy Code the Church Street Sale shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States.  The net proceeds of any Church Street Sale shall, as determined by the Required Supporting Noteholders in their sole and absolute discretion, be used to repay any obligations then due and owing under the New Exit ABL Facility at the time of the closing or shall be retained by Reorganized Gibson for working capital purposes.

## K.   Non-Debtor Subsidiaries

The Debtors reserve the right to commence a chapter 11 case for any of its Non-Debtor Subsidiaries, in each case as may be necessary and appropriate solely to implement the Plan.

## L.   ITLA Guaranty Claims Against Certain Non-Debtors

**In exchange for the treatment of the Allowed ITLA Guaranty Claim under this Plan and the releases provided hereunder to GSO and the ITLA Agent, on the Effective Date GSO and the ITLA Agent shall grant the releases provided for under Article X.C of this Plan, including with respect to the ITLA Guaranty Claim against China Guitar, EQ and Gibson Japan.**

**If GSO (or any of its successors or assignees) recover any claims against any of the GI Entities, any of their successors, assigns, or estates, or any other Person (other than through this Plan), on account of claims arising under the ITLA in excess of $23,685,898 (*i.e.*, the Allowed ITLA Guaranty Claim less $6,250,000 on account of the Profits Interests received on account of the ITLA Guaranty Claim in Class 7) plus accrued and unpaid interest, fees, expenses, and any other amounts payable under the terms of the ITLA, in each case to the extent such obligations are valid and enforceable under applicable law, such excess funds shall be transferred to the Reorganized Debtors within three business days of such recovery; provided that if, at the time such excess funds are received by GSO (or any of its successors or assigns), the Profits Interests have not been fully liquidated, GSO (or its successors or assigns) shall have the option to transfer Profits Interests received on account of the ITLA Guaranty Claim in Class 7 to the Reorganized Debtors in lieu of cash in the amount of such excess.  GSO shall reasonably consult with the Reorganized Debtors, following a request by the Reorganized Debtors, with respect to their recoveries on account of the ITLA from the GI Entities.**

**Notwithstanding the discharge of the ITLA Guaranty Claims against the Debtors, the Non-Debtor Subsidiaries, and the Excluded Non-Debtor Subsidiaries (other than the GI Entities and GI BV Parent) hereunder or any other provisions of this Plan, GSO and the ITLA Agent may pursue claims for all obligations under the ITLA against the GI Entities and GI BV Parent.**

## M.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the commencement of distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors, at the sole cost and expense of the Reorganized Debtors.

## N.    Certificate of Incorporation and Bylaws

The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, by-laws and other organizational documents of the Debtors that are Reorganized Debtors to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law.  Further, Holders of New Common Stock and the New Warrants and their transferees shall be required to become parties to the New Common Stock Agreement. To the extent required under this Plan or applicable non-bankruptcy law, the Reorganized Debtors shall file their respective Amended Organizational Documents with the applicable Secretaries of State or other applicable authorities in their respective states, provinces or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces or countries of incorporation or formation.

## O.    Directors and Officers of Reorganized Gibson

The New Board shall consist of such number of directors, and such initial directors, as determined by the Required Supporting Noteholders in their sole and absolute discretion, which determination will be disclosed in a Plan Document Filed on or before five (5) days prior to the commencement of the Confirmation Hearing.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers identified in the Plan Supplement, which shall include a new chief executive officer approved by the New Board and the Required Supporting Noteholders.  Except as set forth in the Plan and the Plan Supplement, any other directors or officers of the Debtors shall be deemed removed as of the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors and the Non-Debtor Subsidiaries and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors and the Non-Debtor Subsidiaries. The existing board of directors of the Debtors will be deemed to have resigned and been removed from

the board of directors of the Debtors and the board of directors of any applicable Non-Debtor Subsidiaries on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

**P.**     **Corporate Action**

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or the Non-Debtor Subsidiaries and as applicable or by any other Person (except for those expressly required pursuant to the Plan or the Restructuring Support Agreement).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or members of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person (except as expressly required pursuant to the Restructuring Support Agreement).

All matters provided for in the Plan involving the legal or corporate structure of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, or Excluded Non-Debtor Subsidiary (other than the GI Entities that are represented by a GI Representative), as applicable, and any legal or corporate action required by each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary or Excluded Non-Debtor Subsidiary (other than the GI Entities that are represented by a GI Representative), as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, or Excluded Non-Debtor Subsidiary, as applicable, or by any other Person (except as expressly required pursuant to the Restructuring Support Agreement).  On the Effective Date, the appropriate officers of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person (except as expressly required pursuant to the Restructuring Support Agreement).  The secretary and any assistant secretary, or other authorized person, of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, will be authorized to certify or attest to any of the foregoing actions.

**Q.   Cancellation of Documents; Prepetition ABL/Term Loan Agreement; DIP Facility; Prepetition Indenture**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect, including any relating to the Equity Interests in Gibson; *provided, however*, that nothing in this Plan shall cancel, discharge, or otherwise affect the ITLA and the rights of GSO and the ITLA Agent thereunder against the GI Entities or the GI BV Parent. The Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan and the obligations of the Debtors and the Non-Debtor Subsidiaries thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  Notwithstanding any such cancellation and discharge, the DIP Facility Documents, the Prepetition Indenture, and the Prepetition ABL/Term Loan Agreement, and the ITLA  shall continue in effect to the extent necessary to:  (1) allow Holders of DIP Facility Claims, Allowed Prepetition Secured Notes Claims, Domestic Term Loan Claims, and ITLA Guaranty Claims, respectively, to receive Plan Distributions under this Plan as provided herein and for enforcing any rights hereunder or thereunder against parties other than the Debtors, the Reorganized Debtors or their Related Persons (other than the GI Entities and GI BV Parent); (2) allow the Reorganized Debtors, the DIP Agent, the Prepetition Indenture Trustee, and the ITLA Agent, as applicable, to make distributions pursuant to the Plan; (3) allow the DIP Agent, the Prepetition Indenture Trustee, and the ITLA Agent, as applicable, to receive distributions under the Plan on account of the DIP Facility Claims, the Allowed Prepetition Secured Notes Claims, and the ITLA Guaranty Claims, respectively, for further distribution in accordance with the DIP Facility Documents, the Prepetition Indenture, and the ITLA, respectively; (4) allow the DIP Agent, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, and the ITLA Agent to enforce any obligations owed to each of them under this Plan or the Confirmation order and to seek compensation and/or reimbursement of fees and expenses in accordance with the Plan; (5) permit the DIP Agent, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, and the ITLA Agent, as applicable to appear before the Bankruptcy Court or any other court; (6) permit the DIP Agent, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, and the ITLA Agent, as applicable, to exercise rights and obligations relating to the interests of the DIP Lenders, the Prepetition Secured Noteholders, and GSO, as applicable, to the extent consistent with this Plan and the Confirmation Order; (7) except as otherwise provided for in the Plan, preserve any rights of the DIP Agent, the Prepetition Indenture Trustee and the Prepetition ABL/Term Loan Agent, and the ITLA Agent, as applicable, to payment of fees, expenses, and indemnification obligations as against any parties other than the Debtors or the Reorganized Debtors, and any money or property distributable to the beneficial Holders under the relevant instrument, including any rights to priority of payment or to exercise charging liens; and (8) permit the DIP Agent, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, and the ITLA Agent to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that the preceding provisos shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or this Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan; *provided*, *further*, *however*, that nothing in this section shall effect a cancellation of any New Common Stock or New Warrants.

Except as provided pursuant to this Plan and the Confirmation Order, the DIP Agent, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, and their respective agents, successors, and assigns, as applicable, shall be discharged of all of their obligations associated with the DIP Facility, the Prepetition Indenture, and the Prepetition ABL/Term Loan Agreement, respectively.

R.      **Cancellation of Existing Instruments Governing Security Interests**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall promptly deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents; *provided* that a Holder of an Allowed Other Secured Claim shall only be required to deliver such Collateral and provide such termination statements, instruments or other releases to the Debtors or Reorganized Debtors, as applicable, to the extent that such Holder's Allowed Other Secured Claim is not otherwise satisfied by the surrender of such Collateral to such Holder pursuant to Article III.E.2 of this Plan.

S.      **Equity Interests in Subsidiaries; Corporate Reorganization**

On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, (i) the certificates and all other documents representing the Equity Interests in the Subsidiaries (other than the Excluded Debtor Subsidiaries) and the Non-Debtor Subsidiaries (other than the Excluded Non-Debtor Subsidiaries) shall be deemed to be in full force and effect, and (ii) the certificates and all other documents representing the Equity Interests in the Excluded Debtor Subsidiaries and the Excluded Non-Debtor Subsidiaries (other than the GI Entities) shall be deemed to be cancelled, terminated and of no further force or effect.

T.      **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors (with the consent of the Required Supporting Noteholders) or Reorganized Debtors, as applicable, may take all actions consistent with this Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

U.      **Plan Supplement, Other Documents and Orders and Consents Required Under the Restructuring Support Agreement**

So long as the Restructuring Support Agreement has not been terminated, the documents to be Filed as part of the Plan Supplement and the other documents and orders referenced herein, or otherwise to be executed in connection with the transactions contemplated hereunder, shall be subject to the consents and the approval rights, as applicable, set forth in the Restructuring Support Agreement.  To the extent that there is any inconsistency between the Restructuring Support Agreement, on the one hand, and the Plan, on the other hand, as to such consents and the approval rights and the Restructuring Support Agreement has not been terminated, then the consents and the approval rights required in the Restructuring Support Agreement shall govern.  For the avoidance of doubt, the consent rights set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, the other Plan Documents, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein.

V.      **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the New Board are authorized to and may issue, execute, deliver, file or record such contracts, Securities,

instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan, and the Securities issued pursuant to this Plan.

## W.     Transaction Expenses

The fees and expenses incurred by the Ad Hoc Committee of Secured Notes, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, the Prepetition ABL/Term Loan Lenders, and the Supporting Principals will be paid pursuant to the terms hereof and of the Restructuring Support Agreement or any applicable orders entered by the Bankruptcy Court on or before the Effective Date; *provided that*, for the avoidance of doubt, the fees and expenses payable to the Supporting Principals and their professionals will be subject to an aggregate cap of $100,000.00 (unless otherwise agreed to by the Required Supporting Noteholders).  Nothing herein shall require such professionals (or the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, the Ad Hoc Committee of Secured Notes, the Prepetition ABL/Term Loan Lenders, or the Supporting Principals) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

## X.     Books and Records Retention; Cooperation and Access to Books and Records

Until a final order of judgment or settlement has been entered with respect to any Causes of Action initiated within two years after the Effective Date, and until the deadline to object to Claims, the Reorganized Debtors and/or any transferee of the Debtors' or the Reorganized Debtor's books, records, documents, files, electronic data (in whatever format, including native format), or any tangible objects shall preserve and maintain such books and records relevant or potentially relevant to the Causes of Action and the Disputed Class 6 Claims, within the provisions of the Federal Rules of Civil Procedure, as if the Debtors or the Reorganized Debtors were parties to the applicable litigation or contested matter. Notwithstanding the foregoing, if the Reorganized Debtors determine that they no longer have any need for such books and records, they may destroy or abandon such books and records only if permitted to do so as a result of a final, non-appealable order of the Bankruptcy Court, entered after a hearing on reasonable notice to parties-in-interest, and counsel of record for all plaintiffs and defendants in such actions.

In addition, to minimize potential claims against these estates and against D&O Liability Insurance Policies and as part of the settlements embodied in this Plan, upon the Effective Date, Reorganized Gibson shall designate certain employees of the Reorganized Debtors, or shall establish a task force, (collectively, the "Task Force") with respect to the matters described in the following sentence. The Task Force shall continue or otherwise undertake (in such fashion and for such duration as is reasonably determined by the Reorganized Debtors) activities in connection with:  (i) responding to reasonable inquiries and reasonably consulting with and providing cooperation relating to the foreign liquidation proceedings for the GI Entities and GI BV Parent, including from the GI Representatives or the local directors, officers or secured creditors for such entities, in a manner consistent with the Debtors' cooperation prior to the Effective Date to the extent reasonably practicable; (ii) seeking to recover on the Reorganized Debtors' claims against the GI Entities and GI BV Parent; and (iii) limiting claims against the Debtors, *provided, however*, that the Reorganized Debtors shall have no obligation to incur any unreasonable expense in connection with the foregoing clauses (i)-(iii).  The Task Force will include those employees of the Debtors currently working on the matters described in the preceding sentence and the Reorganized Debtors shall reasonably consult with those individuals, and advisors that the Debtors have engaged, or the Reorganized Debtors may retain in their reasonable discretion after the Effective Date, in connection with the matters described in the preceding sentence.

**Y.**    **Profits Interests**

Holders of Profits Interests shall receive, in full and final satisfaction of such Profits Interests, (a) 100% of the gross proceeds (net of brokers' and financial advisor fees and expenses, commissions, and any withholding taxes) of any liquidity event resulting from the sale or other monetization of the TEAC Shares subject to such Profits Interest (the "Applicable Shares") and (b) 100% of the cash proceeds received in the form of distributions issued by TEAC on account of the Applicable Shares, in each case, within 10 business days of such liquidity event (clauses (a) and (b) together, "Profits Interests Distributions"). If the TEAC Shares owned by Reorganized Gibson Holdings are sold at different prices in the same day, distributions to holders of Profits Interests shall be based on the weighted average sale price for that day. If Reorganized Gibson Holdings monetizes less than all of the TEAC Shares owned by it at any time, a Pro Rata portion of such monetized shares (based on the total amount of TEAC Shares owned by Reorganized Gibson Holdings) shall be treated as Applicable Shares. The Profits Interests (and the obligations of the Reorganized Debtors with respect thereto) shall be created pursuant to this Plan, Plan Supplement and Confirmation Order, and there shall be no other instrument memorializing such interests. Reorganized Gibson Holdings shall record the Profits Interests in book entry form and shall update such book entry in the event that any holder of Profits Interests informs Reorganized Gibson in writing (in accordance with Article XIII.P of this Plan) that it has transferred part or all of its Profits Interests to another Person (such notice to include the name of the transferee(s) and the number of Profits Interests assigned to each transferee). The Profits Interests shall be freely assignable separately from the underlying Claim, subject to applicable law, and this Plan and the Confirmation Order shall provide that the Profits Interests are issued under section 1145(a)(1) of the Bankruptcy Code, as applicable.

The Profits Interests shall be subject to dilution as a result of issuances or other dilutive events by TEAC, if any, affecting the Applicable Shares, including any stock dividend, stock split, non-cash distribution or dividend, or Dilutive Issuance (defined below) (any of the foregoing, a "Dilutive Event"); *provided, however*, that, in the event of (A) a Dilutive Event that (i) disproportionately and adversely affects the amount of Profits Interests Distributions to which a holder of Profits Interests is entitled pursuant to this paragraph Y as compared to other Persons holding the TEAC Shares or interests in the TEAC Shares or (ii) disproportionately and adversely affects Reorganized Gibson Holdings' ownership percentage in TEAC as compared to other shareholders of TEAC, or (B) a Dilutive Issuance to Reorganized Gibson Holdings, any holder of Profits Interests, or, in each case, any of their respective controlled or controlling affiliates (each, a "Disproportionate Dilutive Event"), Reorganized Gibson and Reorganized Gibson Holdings agree that the dollar amount of Profits Interests Distributions, if any, made in respect of the applicable Profits Interests shall be increased so that such Profits Interests Distributions include the relative value that was not received by the holders of such Profits Interests as a result of the Disproportionate Dilutive Event. A "Dilutive Issuance" shall mean a direct or indirect sale or issuance (including the issuance of options or convertible securities) by TEAC of shares of its common stock at a discount to the market price of the shares of common stock of TEAC based on the 10-day volume-weighted average price per share of common stock of TEAC immediately prior to such sale or issuance.

In connection with a Change in Control of Reorganized Gibson Holdings or Reorganized Gibson, Reorganized Gibson shall (a) offer to purchase each Profits Interest for a Pro Rata share of the greater of (i) the trading price of TEAC Shares on the Tokyo Stock Exchange as of the date of such Change in Control, and (ii) the weighted average sale price of TEAC Shares actually realized by Reorganized Gibson Holdings on the date of such Change in Control, or (b) exchange the Profits Interests for Applicable Shares. Reorganized Gibson Holdings shall not dispose of or otherwise monetize the TEAC Shares other than in an arm's-length transaction to a party not affiliated with the Reorganized Debtors or the Prepetition Secured Noteholders, unless such transaction is approved by the holders of at least two-thirds of the Profits Interests (other than Prepetition Secured Noteholders who hold Profits Interests, if any).

The Reorganized Debtors shall exercise commercially reasonable efforts to investigate opportunities for a value maximizing sale of the TEAC Shares in good faith following the Effective Date (including the hiring of a financial advisor if determined by the Reorganized Debtors in their sole discretion to be appropriate and subject to subsection (a) above regarding gross proceeds), and shall regularly consult with Philips, GSO (for as long as each holds its respective Profits Interests) and the Creditors' Oversight Committee regarding such opportunities, including providing them within 90 days of the Effective Date with a general plan/strategy to liquidate the TEAC Shares..

# ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.  Assumption and Rejection of Executory Contracts and Unexpired Leases

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amounts, all Executory Contracts and Unexpired Leases of the Debtors that are Reorganized Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including employment agreements) and Unexpired Leases that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

- have been previously assumed or rejected by order of the Bankruptcy Court;

- are the subject of a separate motion Filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date for assumption or rejection; or

- are identified  in the Rejected Executory Contract/Unexpired Lease List.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Except as provided in the preceding sentence, or as otherwise provided for in section 365 of the Bankruptcy Code, or as expressly provided for in any Final Order, the Reorganized Debtors' assumption of an Executory Contract or Unexpired Lease under this Plan shall not modify the rights of the counterparty to such Executory Contract or Unexpired Lease and the provisions of Article X.C of this Plan shall not be deemed to be a release of any such rights.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article VI.A of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Except with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections (defined below), any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Notwithstanding any other provision in the Plan or Confirmation Order, with respect to any Unexpired Lease of nonresidential real property assumed by the Debtors or the Reorganized Debtors, nothing in the Plan or in the Confirmation Order shall modify the Debtors' or Reorganized Debtors' obligation to pay:  (1) amounts owed under the assumed Unexpired Lease of non-residential real property that are not accrued for the period prior to the Confirmation Date, including for common area maintenance, insurance, taxes, and similar charges; and any regular or periodic ordinary course year-end adjustments and reconciliations of such charges provided for under the terms of the Unexpired Lease, any percentage rent, any other obligations, including indemnification obligations (if any) that arise from third-party claims asserted with respect to or arising from the Debtors' use and occupancy of the premises prior to the Effective Date for which the Debtors had a duty to indemnify such Landlord pursuant to any Unexpired Lease, or (2) any unpaid Cure amounts (including post-assumption obligations under such assumed Unexpired Lease) as determined by the Bankruptcy Court.

## B.  Notice of Cure Amounts

The Debtors will serve upon counterparties to Executory Contracts and Unexpired Leases a notice (the "Assumption Notice") by no later than August 30, 2018, stating that the Debtors may potentially assume the Executory Contracts and Unexpired Leases identified therein in connection with the Plan.  The Assumption Notice will: (a) include a schedule of all Executory Contracts and Unexpired Leases, and the applicable Cure amount, if any, for each Executory Contract and Unexpired Lease; (b) describe the procedures for filing objections to the assumption or rejection of, or the proposed Cure amount for, an Executory Contract or Unexpired Lease; and (c) describe the process by which related disputes will be resolved by the Bankruptcy Court.  To the extent the Debtors amend the Assumption Notice (an "Amended Assumption Notice"), the Debtors shall cause the Amended Assumption Notice, which shall identify the revisions made, to be mailed to the affected counterparties as soon as reasonably practicable.

The Debtors submit that the Financial Projections attached as Exhibit E to the Disclosure Statement constitute adequate assurance of the Reorganized Debtors' future performance of Executory Contracts and Unexpired Leases that may be assumed in connection with the Plan pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Debtors will provide additional information with respect to adequate assurance of future performance of an Executory Contract or Unexpired Lease to any counterparty to an Executory Contract or Unexpired Lease that so requests provided that such request is received by the Debtors no later than ten (10) days after service of the Assumption Notice.

Unless otherwise ordered by the Bankruptcy Court, non-Debtor counterparties to Executory Contracts and Unexpired Leases identified in the Assumption Notice or affected by the Amended Assumption Notice, as applicable, shall have until 14 calendar days after the date on which the Assumption Notice or the Amended Assumption Notice, as applicable, was mailed to the counterparty to file an objection to the Debtors' proposed assumption, rejection, or Cure Amount, of such Executory Contract or Unexpired Lease.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or rejection of such Executory Contract or Unexpired Lease or to the Cure amount set forth in the Assumption Notice or Amended Assumption Notice, as applicable, will be deemed to have consented and forever released and waived any objection to the proposed assumption or rejection of the Executory Contract or Unexpired Lease and to the Cure amount set forth on the Assumption Notice or Amended Assumption Notice, as applicable.

The Bankruptcy Court will hear and determine any objections to the assumption or rejection of Executory Contracts and Unexpired Leases at the Confirmation Hearing, except for objections solely as to Cure amounts ("Cure Objections").  The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption or rejection, as the case may be, of Executory Contracts and Unexpired

Leases (including Executory Contracts or Unexpired Leases that are the subject of Cure Objections) pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  To the extent a Cure Objection is not resolved consensually prior to the Confirmation Hearing, the Debtors or the Reorganized Debtors, as the case may be, shall schedule a hearing to determine such Cure amount within 60 days following the Confirmation Hearing, or such other date as may be agreed to with the counterparty or ordered by the Bankruptcy Court.  Within ten (10) days following the Bankruptcy Court's entry of an Order determining any Cure amounts for such Executory Contract or Unexpired Leases, the Debtors or the Reorganized Debtors, as the case may be, may elect to reject such Executory Contract or Unexpired Lease by filing with the Bankruptcy Court a notice of such rejection (a "Rejection Notice").  For the avoidance of doubt, if a Rejection Notice is not Filed within such ten (10) day period, such Executory Contract or Unexpired Lease will be deemed to have been assumed.  Any applicable Cure payments with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections shall be made within ten (10) days following the assumption of such Executory Contract or Unexpired Lease.

### C.   Rejection of Executory Contracts or Unexpired Leases

Executory Contracts and Unexpired Leases (i) identified in the Rejected Executory Contract/Unexpired Lease List (as may be amended prior to the Confirmation Hearing) or (ii) to which an Excluded Debtor Subsidiary is a party (unless specifically listed on an Assumption Notice), shall be deemed rejected as of the Effective Date.  Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice shall be deemed rejected as of the date on which the Rejection Notice is filed. The Confirmation Order will constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123 of the Bankruptcy Code approving the rejection of the Executory Contracts and Unexpired Leases (a) identified in the Rejected Executory Contract/Unexpired Lease List, as of the Effective Date; (b) that are the subject of a Rejection Notice, as of the date on which such Rejection Notice is Filed.

### D.   Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed in the manner set forth in the Claims Bar Date Order, (a) with respect to Executory Contracts and Unexpired Leases identified in the Rejected Executory Contract/Unexpired Lease List, within thirty (30) days after the Effective Date; or (b) with respect to Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice, within thirty (30) days after the date on which such Rejection Notice was served on the counterparty.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so may be forever barred, estopped and enjoined from asserting such Claim, and such Claim may not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property may be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

### E.   Director and Officer Insurance Policies

Upon the Effective Date, the Reorganized Debtors shall have in full force and effect D&O Liability Insurance Policies for all current and former directors and officers of the Debtors and the Non-

Debtor Subsidiaries materially consistent with the Debtors' D&O Liability Insurance Policies as in effect immediately prior to the Petition Date. To the extent, and as permitted by applicable law, as required to implement the preceding sentence, the Reorganized Debtors will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code in effect as of immediately prior to the Petition Date. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors or current and former directors and officers of the Debtors and the Non-Debtor Subsidiaries (including the Supporting Principals) under the D&O Liability Insurance Policies.

Further, on or as soon as practicable before the Effective Date, the Debtors shall purchase tail coverage for all current and former directors and officers (including the Supporting Principals) with a term of six (6) years from the Effective Date, which tail coverage shall be materially consistent with the D&O Liability Insurance Policies prior to the Petition Date (the "Tail Policy").

### F.   Indemnification Provisions

Notwithstanding anything in Article X.C and D of the Plan to the contrary, all indemnification provisions existing as of the Petition Date (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) shall be extinguished and discharged pursuant to the Plan except to the extent necessary to preserve coverage under the D&O Liability Insurance Policies for the current and former directors, managers, and officers of the Debtors and the Non-Debtor Subsidiaries (including the Specified Persons).

### G.   Compensation and Benefit Programs

Except as otherwise provided in the Plan, the Rejected Executory Contract/Unexpired Lease List, or a separate Final Order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (other than equity incentive plans that will be replaced by the Management Incentive Plan and any benefits, severance and change in control provisions that are modified by the Management Employment and Consulting Agreements), life, and accidental death and dismemberment insurance plans (other than equity incentive plans that will be replaced by the Management Incentive Plan and any benefits, severance and change in control provisions that are modified by the Management Employment and Consulting Agreements), are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of the Chapter 11 Cases or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

For the avoidance of doubt, notwithstanding the foregoing, the Existing Executive Compensation Agreements shall be included in the Rejected Executory Contract/Unexpired Lease List and rejected by the Reorganized Debtors, and except for the indemnity obligations assumed pursuant to Article VI.F of the Plan, the counterparties to such Existing Executive Compensation Agreements shall be deemed to waive and release any and all Claims they may have against the Debtors pursuant to the terms of such Existing Executive Compensation Agreements.

### H.  Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Reorganized Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance.  All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### I.  Insurance Policies

Other than the insurance policies otherwise discussed herein, all other insurance policies to which any Debtor that is a Reorganized Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.  Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Reorganized Debtors.

At the close of business on the Distribution Record Date, the transfer ledgers for the Equity Interests in Gibson and the DIP Facility Claims shall be closed, and there shall be no further changes in the record Holders of such Claims or Equity Interests.  The Reorganized Debtors, the Distribution Agent, the DIP Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the Transfer of any Equity Interests in Gibson, or DIP Facility Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the transfer ledgers as of the close of business on the

Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions, *provided, however*, that the Distribution Record Date shall not apply to publicly-held securities (including the Prepetition Secured Notes).

## B.   **Distribution Agent**

Except as provided herein, all distributions under the Plan shall be made by Cakewalk, Inc. as Distribution Agent, or by such other Entity designated by the Debtors as a Distribution Agent herein, on the Effective Date or thereafter.  The Reorganized Debtors, or such other Entity designated by the Debtors to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents that are necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

Upon the Effective Date, the Equity Interests that are cancelled and extinguished under the Plan, and the Equity Interests that remain outstanding under the Plan, shall be so cancelled and extinguished, or remain outstanding, as applicable, automatically, without further act, distribution or Filing of the Debtors or the Reorganized Debtors.

All costs and expenses of the Distribution Agent, including any attorneys' fees or other litigation costs associated with Disputed Claims or Equity Interests shall be paid solely from the Distribution Account and the Reorganized Debtors shall have no further obligation to fund any such costs or expenses beyond the Cash being contributed to the Distribution Account on the Effective Date.

## C.   **GI Representatives**

To the extent that any GI Entity, or any representative of a GI Entity, is determined to have an Allowed Claim against the Debtors and receives a distribution under this Plan from the Debtors' Estates on account thereof (a "GI Entity Plan Distribution"), and GSO (or any of its affiliates) then receives a recovery from such GI Entity Plan Distribution on account of the ITLA, GSO (or its applicable affiliates) shall promptly (within five (5) Business Days) turn over to the Distribution Agent the share of such distribution that GSO (or its applicable affiliates) received on account of the ITLA (the "GSO Turned Over Distribution").  If the Distribution Agent receives a GSO Turned Over Distribution, it shall cause such funds to be deposited in the Distribution Account for distribution to Holders of Allowed Claims in the Class from which the applicable GI Entity Plan Distribution was originally made, less the costs and expenses incurred by GSO and the Reorganized Debtors in collecting the GSO Turned Over Distribution. The Reorganized Debtors shall have the sole and exclusive authority to enforce the right to receive the GSO Turned Over Distribution in trust for the benefit of the Holders of Allowed Claims.  The Reorganized Debtors shall reasonably consult with the Creditors' Oversight Committee with respect to any GSO Turned Over Distribution.  The Debtors, the Debtors' Estates, and the Reorganized Debtors reserve all of their rights and remedies, including defenses, offsets, recoupment and counterclaims, against any Claim asserted by any of the GI Entities, or any of their representatives, against the Debtors.

On August 20, 2018, a Proof of Claim was Filed against Gibson Brands, Inc. by "Dr. Christoph Mogen as Insolvency Administrator on the Assets of Gibson Innovations Germany GMBH" (the "German Administrator Claim") in the amount of $21,170,357.77, which claim has been designated as claim number 259.  The Debtors objected to the German Administrator Claim on August 30, 2018 [Docket No. 693].  Notwithstanding anything to the contrary in this Plan, the releases set forth in Article X.B of this Plan shall not result in the release of the German Administrator Claim and such Claim shall be

dealt with through the Disputed Claims process under this Plan. Promptly after the Effective Date, GSO shall inform the GI Representative for Gibson Innovations Germany GMBH in writing that GSO prefers that it withdraw its proof of claim in Gibson's Chapter 11 Case.

## D. **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## E. **Rounding of Payments**

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar or distribution of a fraction of a share of New Common Stock or New Warrants, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share of New Common Stock or New Warrants, as applicable (with a half share or greater rounded up and less than a half share rounded down). The total number of shares of New Common Stock and New Warrants to be distributed in connection with this Plan shall be adjusted as necessary to account for the rounding provided for in this Article VII.E. No consideration shall be provided in lieu of fractional shares or warrants. Neither the Reorganized Debtors nor the Distribution Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or one (1) New Warrant. New Common Stock and New Warrants that are not distributed in accordance with this Article VII.E shall be returned to, and ownership thereof shall vest in, the Reorganized Debtors.

## F. *De Minimis* **Distribution**

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer or the Distribution Agent shall have any obligation to make any Plan Distributions in Cash with a value of less than $25, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article XIII.P hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to Reorganized Gibson. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## G. **Distributions on Account of Claims Allowed After the Effective Date**

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## H. **General Distribution Procedures**

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

I.      **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims to the extent provided for under the Plan, shall be made: (1) at the address set forth on any Proofs of Claim Filed by such Holders (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address change delivered to the Debtors; (3) at the addresses in the Debtors' books and records; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Notwithstanding the foregoing, distributions to the DIP Lenders and beneficial holders of Prepetition Secured Notes shall be made to the DIP Agent and the Prepetition Indenture Trustee, respectively.

J.      **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address within one (1) year from the date of the distribution.

Any Entity that fails to claim any Cash or New Common Stock within one (1) year from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

K.      **Withholding Taxes**

In connection with the Plan, to the extent applicable, any party issuing any instrument or making any distribution described in the Plan shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Debtors and the Reorganized Debtors shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

As a condition to receiving any distribution under the Plan, the Debtors and the Reorganized Debtors (to the extent they do not already have such information in their books and records) may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number, IRS Form W-9 or IRS Form W-8 (as applicable), and such other information and certification as may be deemed necessary for the Debtors and the Reorganized Debtors to comply with applicable tax reporting and withholding laws.  Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  In connection with the distribution of the New Common Stock and the New Warrants, the Reorganized Debtors may take whatever actions are reasonably necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including withholding from distributions a portion of the New Common Stock or the New Warrants, selling such securities or requiring such Holders to contribute the Cash necessary to satisfy the tax withholding obligations.

L.      **Setoffs**

The Debtors and the Reorganized Debtors, as applicable, or such entity's designee (including the Distribution Agent) may, but shall not be required to, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Debtors and Reorganized

Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtors possess against such Holder.

## M.   Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Debtors, Cakewalk, Inc. or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.  The DIP Agent will send such notices and take such other actions as are reasonably requested by the Debtors or the Reorganized Debtors to effect the cancellation of the DIP Facility and to implement the Plan Distributions on account of the DIP Facility Claims to the DIP Lenders.  The Prepetition Indenture Trustee will exercise reasonable best efforts to take actions as are reasonably requested by the Debtors or the Reorganized Debtors to effect the cancellation of the Prepetition Secured Notes held by DTC, including sending notices and taking similar actions, and to implement the Plan Distributions on account of the Allowed Prepetition Secured Notes Claims.

Notwithstanding anything in this Plan to the contrary, in connection with any distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under this Plan with Holders of New Common Stock in a manner consistent with the customary practices of DTC used in connection with such distributions.  All New Common Stock to be distributed under this Plan shall be issued in the names of such Holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Common Stock is permitted to be held through DTC's book-entry system; and *provided, further*, that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized Gibson will take all such reasonable actions as may be required to cause distributions of the New Common Stock under this Plan.

## N.   Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Gibson or any other applicable Distribution Agent:  (x) evidence reasonably satisfactory to Reorganized Gibson and any other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Gibson or any other applicable Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with Article VII.M of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Gibson and other applicable Distribution Agent.

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

### A.    Filing of Proofs of Claim

Except as otherwise provided for in the Plan, in accordance with the Bankruptcy Code, the Bankruptcy Rules and orders of the Bankruptcy Court, including the Claims Bar Date Order, Holders of Claims shall be required to file a Proof of Claim on or prior to the Claims Bar Date, including with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases or as otherwise provided under the Plan.

### B.    Disputed Claims and Equity Interests

The Debtors, in consultation with counsel to the Ad Hoc Committee of Secured Notes, or the Reorganized Debtors, as the case may be, may file (directly or through the Distribution Agent) with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Equity Interest or any other appropriate motion or adversary proceeding with respect thereto.  All such objections shall be litigated to Final Order, *provided, however*, that (prior to the Effective Date) the Debtors and (after the Effective Date) the Reorganized Debtors (directly or through the Distribution Agent) may compromise, settle, withdraw or resolve any objections to Claims or Equity Interests, subject to approval by the Bankruptcy Court, if effected before the Effective Date, and subject to Article VIII.D.2 of this Plan if effected after the Effective Date.

### C.    Procedures Regarding Disputed Claims

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation among the Debtors and the Required Supporting Noteholders, or the Reorganized Debtors, as applicable, and the Holder of the Claim.

### D.    Allowance of Claims

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, the Debtors, the Reorganized Debtors or the Distribution Agent, as applicable, shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable, and in accordance therewith.

#### 1.    *Allowance of Claims*

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan by orders of the Bankruptcy Court.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order and the DIP Orders), no Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.      *__Prosecution of Objections to Claims__*

After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Reorganized Debtors (directly or through the Distribution Agent), will have the authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise*, provided, however*, that the Creditors' Oversight Committee's consent shall be required with respect to the settlement of Disputed Class 6 Claims with a proposed or asserted allowed amount in excess of $3,000,000, which consent rights shall be solely exercised by unanimous vote.  Unless a different deadline is set forth in the Plan, the Reorganized Debtors shall be required to file Post-Effective Date objections to Proofs of Claim by the later of (a) six (6) months from the Effective Date and (b) six (6) months from the date such Proof of Claim was filed, subject to any extension of such deadline (i) agreed between the Reorganized Debtors and the Holder of such Claim or (ii) otherwise granted by the Bankruptcy Court on request of the Reorganized Debtors made on or prior to the expiration of such deadline or extended deadline, which request shall automatically extend the deadline pursuant to Local Rule 9006-2 pending the Bankruptcy Court ruling on such request, *provided, however*, that any request by the Reorganized Debtors to extend such deadline shall be served upon the Holders of Claims that are not yet Allowed at the time such request is made.  Any Proof of Claim that is not Disputed as of such deadline or extended deadline shall automatically be Allowed in the amount asserted in such Proof of Claim.  From and after the Effective Date, the Debtors (subject to the prior written consent of the Required Supporting Noteholders) or the Reorganized Debtors, as the case may be, may settle or compromise any Disputed Claim with approval of the Bankruptcy Court.  The Debtors (prior to the Effective Date) and the Reorganized Debtors (after the Effective Date) will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises.

3.      *__Estimation__*

After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Debtors and the Reorganized Debtors (directly or through the Distribution Agent) may (but are not required to), at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      __Conditions Precedent to Confirmation of the Plan__

Confirmation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of <u>Article IX.C</u> of the Plan of the following:

- the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect in accordance with its terms;

- Philips and the Holder of the ITLA Guaranty Claim shall not have breached the Plan Modification Agreement or traded, sold or otherwise transferred any of their

Claims against the Debtors, unless such transferee agreed in writing to support the Plan, and does not object to the Plan;

- the Bankruptcy Court will have entered a Final Order approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, which order shall be in form and substance consistent with the terms of the Restructuring Support Agreement;

- the Bankruptcy Court will have entered the Settlement Order, which shall have become a Final Order;

- all outstanding Transaction Expenses due and owing as of the Confirmation Hearing shall have been paid in full, in Cash; and

- there shall be no event of default under the DIP Facility or the DIP Orders.

## B.    Conditions Precedent to Consummation of the Plan

Consummation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C of the Plan of the following:

- the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect in accordance with its terms;

- Philips and the Holder of the ITLA Guaranty Claim shall not have breached the Plan Modification Agreement or traded, sold or otherwise transferred any of their Claims against the Debtors, unless such transferee agreed in writing to support the Plan, and does not object to the Plan;

- all outstanding Transaction Expenses due and owing as of the Effective Date shall have been paid in full, in Cash;

- there shall be no event of default under the DIP Facility or the DIP Orders;

- the Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order, and shall be in form and substance consistent with the Restructuring Support Agreement;

- all Definitive Documents, Plan Documents, Plan Schedules, Exhibits, and related schedules, documents, and supplements in connection with the Plan, including the Management Employment and Consulting Agreements, shall  have been Filed, and shall each be in form and substance consistent with the terms of the Restructuring Support Agreement and shall otherwise be acceptable to the parties with consent rights in respect thereof pursuant to the terms of the Restructuring Support Agreement;

- all actions, documents and agreements necessary to implement and consummate the Plan, including without limitation, entry into the Definitive Documents and the Amended Organizational Documents, and the transactions and other matters contemplated thereby, shall have been effected or executed;

- the New Exit ABL Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the New Exit ABL Facility Documents shall have occurred;

- the New Take-Out Facility Documents, if applicable, shall been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the New Take-Out Facility Documents shall have occurred;

- the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable;

- all authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including the Amended Organizational Documents, will have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent Consummation of the Restructuring Transactions;

- the Tail Policy shall be in full force and effect; and

- the Professional Fee Reserve Account shall have been established and funded in Cash in accordance with Article II.B.1 of this Plan.

**C.      Waiver of Conditions**

The conditions to Confirmation and Consummation of the Plan set forth in this Article IX may be waived in accordance with the Restructuring Support Agreement without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, *provided, however*, that the consent of the Committee shall be required for any waiver of any conditions that adversely impact or affect: (i) the proposed treatment of Classes 6 and 8 of the Plan, including the timing and method of distributions to such Classes, or (ii) the payment terms and timing with respect to Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code under the Settlement Order.  The failure of the Debtors or Reorganized Debtors, the Required Supporting Noteholders or the Supporting Principals to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

**D.      Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**E.      Effect of Non-Occurrence of Conditions to Confirmation and Consummation**

If the Confirmation or Consummation of the Plan does not occur prior to termination of the Restructuring Support Agreement, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

# ARTICLE X.
## RELEASE, INJUNCTION AND RELATED PROVISIONS

## A.    General

Except as otherwise provided for in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date the Reorganized Debtors may (1) compromise and settle (directly or through the Distribution Agent) Claims against the Reorganized Debtors (subject to <u>Article VIII.D.2</u> of this Plan) and (2) compromise and settle Causes of Action against other Entities.

## B.    Release by Debtors

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, including the preserved Causes of Action, except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates and (to the extent enforceable under applicable law) their Related Persons (other than the GI Representatives and any GI Entity represented by a GI Representative) from any and all Causes of Action whatsoever, including any derivative claims asserted or that could have been asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Orders, this Plan, the Restructuring Support Agreement and the term sheets attached thereto, the Definitive Documents, or any related agreements, instruments, or other documents, or the Solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence related to the Debtors taking place on or before the Effective Date; <u>provided</u> <u>that</u> nothing in the Plan shall be construed to release the Released Parties from gross negligence, willful misconduct or intentional fraud as determined by a Final Order; <u>provided</u>, <u>further</u>, <u>that</u> this <u>Article X.B</u> shall not be deemed to release any Cause of Action of the Debtors or the Debtors' Estates arising from, related to, or connected with the Non-Debtor Subsidiaries or the Excluded Non-Debtor Subsidiaries, including against any GI Representative; <u>provided</u>, <u>further</u>, <u>that</u> this <u>Article X.B</u> shall not be deemed to release any Cause of Action of (i) a GI Entity (or its GI Representative, if applicable) against any other GI Entity (or its GI Representative, if applicable) or (ii) by any Related Person of the Debtors who timely submitted a notice opting out of granting the releases set forth in this <u>Article X</u>.**

**C.**     **Release by Holders of Claims and Equity Interests**

As of the Effective Date, for good and valuable consideration, except as specifically set forth elsewhere in the Plan, the Releasing Parties (subject to **Article VII.C** of this Plan) conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and the Specified Persons and their respective property from any and all Claims, Equity Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Equity Interest or that any Holder of a Claim or an Equity Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, or the Restructuring Support Agreement, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Equity Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Restructuring documents or related agreements, instruments or other documents, including the DIP Orders, this Plan, the Restructuring Support Agreement and the term sheets attached thereto, the Definitive Documents, or any related agreements or instruments, or the Solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, _provided that_ nothing in the Plan shall be construed to release the Released Parties from any claims based upon gross negligence, willful misconduct or intentional fraud as determined by a Final Order, and _provided further that_ the releases provided by any GI Entity not represented by a GI Representative under this **Article X.C** shall be limited to the extent enforceable under applicable law, and _provided further that_ this **Article X.C** shall not be deemed to release any claim or Cause of Action (i) Philips, GSO or the ITLA Agent may have against any of the GI Entities, including against any GI Representative, but shall be deemed to release any claim or Cause of Action Philips, GSO or the ITLA Agent may have against the current or former officers, directors, employees, agents, advisors, accountants, attorneys, bankers and consultants of the GI Entities, (ii) any GI Entity (or its GI Representative, if applicable) may have against any other GI Entity (or its GI Representative, if applicable), (iii) or by any Related Person of the Debtors who timely submitted a notice opting out of granting the releases set forth in this **Article X**.

**D.**     **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, _provided, however_, that nothing in this Article X.D shall be deemed to release or discharge any claim or Cause of Action Philips, GSO or the ITLA Agent may have against any of the GI Entities and GI BV Parent, including against any GI Representative.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature

whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## E.    Exculpation

Except as otherwise provided in this Plan or the Confirmation Order, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement, the Restructuring Support Agreement, the Plan, or the Solicitation of votes for, or confirmation of, the Plan; the funding or Consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing, *provided, however*, that nothing in this Article X.E shall exculpate (i) the GI Entities, the GI BV Parent or the GI Representatives with respect to the assets, liabilities, operations and businesses of the GI Entities and the GI BV Parent, or (ii) any Exculpated Party from any claims based upon gross negligence, willful misconduct or intentional fraud as determined by a Final Order.  This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

In addition to the foregoing, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Debtors, the Reorganized Debtors, the Ad Hoc Committee of Secured Notes (and its members), GSO and Philips shall neither have, nor incur any liability to any Entity on account of solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, or purchase of securities under the Plan; *provided, however*, that the foregoing "Exculpation" in this sentence shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, willful misconduct or gross negligence

## F.    Preservation of Rights of Action

1.    Maintenance of Causes of Action

Except as otherwise provided in this Article X or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding Filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and will have the exclusive right (except as otherwise provided in Article VIII.D.2 of this Plan and subject to section 502(a) of the Bankruptcy Code) to enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2.    Avoidance Actions

On the Effective Date, all Avoidance Actions (i) shall be finally and forever relinquished and waived by the Debtors and the Committee; and (ii) shall not revest in the Reorganized Debtors.

3.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised, or settled pursuant to the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action for later

adjudication by the Debtors or the Reorganized Debtors (including Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan (including and for the avoidance of doubt, the releases contained in this Article X) or any other Final Order (including the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

G. **Injunction**

**Upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Equity Interest extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as may be agreed to by the Debtors and a Holder of a Claim against or Equity Interest in a Debtor, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Equity Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in this Article X.G of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

**Notwithstanding any other provision in the Plan or Confirmation Order, including with respect to any Executory Contract or Unexpired Lease, whether assumed or rejected by the Debtors or the Reorganized Debtors, nothing in the Plan or in the Confirmation Order shall modify any existing rights and defenses under the Bankruptcy Code and applicable state laws to exercise rights of setoff or recoupment by Holders of Claims, including parties to Executory Contracts and Unexpired Leases.**

## ARTICLE XI.
## BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; *provided, however*, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

(iii)   resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including (a) Cure amounts; (b) those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(iv)    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided* that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)   enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(viii)  resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan; *provided*, *however*, that any dispute arising under or in connection with the New Exit ABL Facility Documents, or the New Take-Out Facility Documents, shall be dealt with in accordance with the provisions of the applicable document;

(ix)    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

(x)     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

(xi)    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(xii)   enter and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code, including the Church Street Sale;

(xiii)  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the allowance and/or payment of Claims pursuant to the Plan;

(xiv)   consider any modifications of this Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(xv)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvi)   enforce the terms and conditions of this Plan and the Confirmation Order;

(xvii)  enforce all orders previously entered by the Bankruptcy Court;

(xviii) resolve any cases, controversies, suits or disputes with respect to the release, exculpation, injunction and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(xix)   enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xx)    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; *provided*, *however*, that any dispute arising under or in connection with the New Exit ABL Facility Documents, or the New Take-Out Facility Documents, shall be dealt with in accordance with the provisions of the applicable document;

(xxi)   hear any other matter not inconsistent with the Bankruptcy Code; and

(xxii)    enter an order concluding or closing the Chapter 11 Cases.

# ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A.    Dissolution of the Committee

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases, *provided, however*, that the Committee's Professionals may prosecute any remaining interim and/or final applications for payment of Professional Fee Claims.

### B.    Creditors' Oversight Committee

On the Effective Date, there shall be formed a Creditors' Oversight Committee.  For the two (2) years following the Effective Date, Reorganized Gibson shall hold a conference call with the Creditors' Oversight Committee to discuss the Claims allowance/dispute process and the Reorganized Debtors' business operations no less frequently than once per calendar quarter.  For the avoidance of doubt, the Creditors' Oversight Committee shall bear its own costs and expenses and none of the Debtors, the Estates, or the Reorganized Debtors shall have any liability for the fees and expenses of the Creditors' Oversight Committee.

### C.    Payment of Statutory Fees

All outstanding fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date. All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as reasonably practicable.

### D.    Modification of Plan

Subject to the terms of the Restructuring Support Agreement:  (a) the Debtors reserve the right in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Holder's Claim.  The Debtors must obtain the consent of GSO and/or Philips (such consent not to be unreasonably withheld) to (i) any modifications to the Plan, (ii) any Plan Supplement documents, and (iii) any provisions of the Confirmation Order, in each case that materially impact the treatment GSO or Philips are to receive under the Plan, respectively, or deviate from the Plan Modification Agreement.

### E.    Revocation of Plan

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan, or if confirmation of this Plan or Consummation of this Plan does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this

Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## F.    Entire Agreement

Except as otherwise described herein, and without limiting the effectiveness of the Restructuring Support Agreement and any related agreements thereto, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## G.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their Related Persons will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan, and, therefore, such parties, individuals, and the Reorganized Debtors will not have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan.

## H.    Terms of Injunctions or Stays

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## I.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtors and all Holders of Allowed Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

## J.    Notice of Effective Date

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## K.    Closing of Chapter 11 Cases

Prior to the Effective Date, the Debtors shall file a motion seeking entry of an order closing as of the Effective Date each of the Debtors' Chapter 11 Cases other than the case of *In re Cakewalk, Inc.* (Case No. 18-11028 (CSS)). From and after the Effective Date, Debtor Cakewalk, Inc. shall be entitled to change its name to Guitar Liquidation Corporation or any similar name and the caption of its Chapter 11 Case shall be adjusted accordingly upon the filing of notice of such corporate name change on the Bankruptcy Court's docket. The Reorganized Debtors  shall be entitled to prosecute claims and defenses

and appoint Cakewalk, Inc. as the Distribution Agent to make distributions, and attend to other wind-down affairs on behalf of each of the other prior Debtors as if such Debtors' estates continued to exist solely for that purpose. The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case of Cakewalk, Inc.

**L.**     **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including the Reorganized Debtors. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**M.**     **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and Consummation of the Plan. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**N.**     **Further Assurances**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**O.**     **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter

and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted, *provided, however,* that any such altered form must be consistent with the Restructuring Support Agreement.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**P.**     **Service of Documents**

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:


If to the Debtors:

Gibson Brands, Inc.
309 Plus Park Blvd.
Nashville, TN 37217
Fax: 615-469-3429
E-mail:         Bruce.Mitchell@gibson.com


Attention:      General Counsel


With copies to:

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Fax: 212-355-3333
Email:         mgoldstein@goodwinlaw.com
               gfox@goodwinlaw.com
               bbazian@goodwinlaw.com

Attention:      Michael H. Goldstein
               Gregory W. Fox
               Barry Z. Bazian

         - and -

Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Fax: 302-421-8390

Email:          fournied@pepperlaw.com
                mclaughm@pepperlaw.com

Attention:      David M. Fournier
                Marcy J. McLaughlin

If to the Ad Hoc Committee of Secured Notes or the Reorganized Debtors:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Fax: 212-492-0545
E-mail:         bhermann@paulweiss.com
                rbritton@paulweiss.com
                kcairns@paulweiss.com

Attention:      Brian S. Hermann
                Robert Britton
                Kellie A. Cairns

        - and -

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Fax: 302-571-6600
E-mail:         pmorgan@ycst.com

Attention:      Pauline K. Morgan

**Q.**      **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, including the New Exit ABL Facility Documents or the New Take-Out Facility Documents, as applicable; (ii) the issuance of the New Common Stock and the New Warrants; (iii) the maintenance or creation of security or any Lien as contemplated by the New Exit ABL Facility Documents or the New Take-Out Facility Documents, as applicable; (iv) assignments executed in connection with any transaction occurring under the Plan, and (v) the Church Street Sale.

**R.**      **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, including the New

Exit ABL Facility Documents and the New Take-Out Facility Documents, as applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of New York, without giving effect to the principles of conflicts of law of such jurisdiction; *provided* that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, shall be governed by the laws of the state of organization of the applicable Debtor or Reorganized Debtor, as applicable.

## S.       Tax Reporting and Compliance

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors are for all taxable periods ending after the Petition Date through, and including, the Effective Date.

## T.       Schedules

All Exhibits, Plan Schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.  After any Exhibits, Plan Schedules, or the Plan Supplement is Filed, copies of such documents shall be available upon written request to the Debtors' counsel or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/gibson or the Bankruptcy Court's website at http://www.ded.uscourts.gov/.

## U.       No Strict Construction

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Supporting Noteholders and the Supporting Principals, and their respective professionals. Each of the foregoing was represented by counsel of its choice that either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits and Plan Schedules, and the agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits and Plan Schedules, and the documents ancillary and related thereto.

## V.       Controlling Document

In the event of an inconsistency between the express terms of this Plan and the Disclosure Statement, the Plan Supplement and any other instrument or document created or executed pursuant to this Plan, the express terms of this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

[Remainder of Page Intentionally Blank]

Dated:  October 1, 2018
           Nashville, Tennessee

Respectfully submitted,

Gibson Brands, Inc.
and each of its Debtor Subsidiaries


By:  _/s/ Brian J. Fox_____
        Name:  Brian J. Fox
        Title:    Chief Restructuring Officer

**[Signature Page to Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization]**

**<u>Exhibit B</u>**

**Confirmation Hearing Transcript Excerpt**

1          UNITED STATES BANKRUPTCY COURT
2                DISTRICT OF DELAWARE

3                              .    Chapter 11
    IN RE:                     .
4                              .    Case No. 18-11025 (CSS)
    GIBSON BRANDS, INC., *et al.*,   .
5                              .
                               .    Courtroom No. 6
6                              .    824 N. Market St
                               .    Wilmington, Delaware 19801
7                              .
                  Debtors.     .    October 2, 2018
8    . . . . . . . . . . . . . . . .    1:00 P.M.

9                    TRANSCRIPT OF HEARING
          BEFORE HONORABLE CHRISTOPHER SONTCHI
10              UNITED STATES BANKRUPTCY JUDGE

11
    APPEARANCES:
12
    For the Debtors:          Michael Goldstein, Esquire
13                            GOODWIN PROCTER LLP
                              620 Eighth Avenue
14                            New York, New York 10018

15  For U.S. Trustee:         Linda Casey, Esquire
                              OFFICE OF U.S. TRUSTEE
16                            844 King Street
                              Wilmington, Delaware 19801
17

18

19
    Audio Operator:           LESLIE MURIN
20
    Transcription Service:    Reliable
21                            1007 N. Orange Street
                              Wilmington, Delaware 19801
22                            Telephone: (302) 654-8080
                              E-Mail: gmatthews@reliable-co.com
23
    Proceedings recorded by electronic sound recording:
24  transcript produced by transcription service.

25

1      And right now, the confirmation order has both and

2  specifically says that it's a consensual release.  So, if the

3  -- if Your Honor finds that it is an appropriate

4  nonconsensual release and can bind people who didn't get

5  actual notice, then that's one thing; however, if Your Honor

6  finds that it's consensual, then that's where the actual

7  notice comes in and how can a party provide consent if they

8  didn't receive actual notice that they're being requested for

9  that consent.  And so, that's the issue there.

10      THE COURT:  All right.  Thank you.

11      MR. GOLDSTEIN:  Your Honor, may I just make one?

12      THE COURT:  Quickly.

13      MR. GOLDSTEIN:  Quickly.  With respect to the

14  point about the confirmation order talking about

15  nonconsensual releases, I don't think we have an objection to

16  that clarification.  I think I understand Ms. Casey's point

17  on that from a drafting perspective; I think it depends on

18  how the Court rules.

19      And with respect to the 22 categories, I -- it

20  sounds like I may have misunderstood that.  But the one point

21  that I wanted to clarify is with respect to the 22 releasing

22  parties specifically named, those are all the major

23  stakeholders in this case and they did get notice.

24      THE COURT:  All right.  Thank you.

25      Well, thank you very much for your thoughtful

1  discussions.  I'll start with an overarching comment.  Look,

2  we live in a litigious society and lawyers, among others,

3  make a lot of money living in a litigious society, but the

4  reason that every case has this issue of third-party releases

5  has to do with the society in which we live.

6        And it really has to do with effectuating, in a

7  practical way, the discharge and the renegotiation and

8  adjustment of debt.  And the concern, as I see it, is that

9  you're going to spend a tremendous amount of money, effort,

10  negotiation, to take this company through rehabilitation to

11  save the company, to readjust the debts, and having done all

12  that, you're going to leave a little hole for a billion-

13  dollar litigation that could crash the company.  That's my

14  understanding, based on my experience, of why this matters

15  and why this is sought so often, and I think appropriately

16  so.

17        Of course, on the other side, we have concepts

18  that are critical to the interpretation of law and I would

19  say the most unflaggingly important principle that I deal

20  with on a day-to-day basis is absolutely due process and

21  ensuring that parties who are being affected by the Court's

22  rulings receive due process of law and that includes notice

23  and an opportunity to object.

24        So, I see a couple of things going on here, and

25  first, I'll deal with the idea of consensual releases.  We

1   also live in a free society both, politically, religiously,

2   and economically, and if a party wants to release another

3   party from liability, often in exchange from receiving the

4   same release back, they are able to do that.  And you can do

5   a lot in Bankruptcy Court on consent, and that includes

6   third-party releases.

7         The trick here is what constitutes consent.  And

8   Ms. Casey, always a professional, has made this argument many

9   times and lost many times, but continues the good fight and I

10  appreciate that.  I have ruled numerous times that "check the

11  box" isn't required for a creditor to deemed -- to have been

12  deemed to consent to something, that it's sufficient to say,

13  Here's your notice, this is what's going to happen and if you

14  don't object, you'll have been deemed to consent.

15        That's not a unique proposition in the law.  That

16  occurs in a hundred different facets in the law, every day,

17  throughout the country and I don't think it's particularly

18  controversial.

19        So, here we have two sort of -- well, three -- so,

20  three, sort of, twists on that.  One, unimpaired creditors

21  are unimpaired creditors who don't -- who aren't sent a

22  ballot -- but, correct me if I'm wrong, Mr. Goldstein; they

23  got a notice?

24        MR. GOLDSTEIN:  They did get a notice.

25        THE COURT:  Okay.  Unimpaired creditors who didn't

1   get a ballot but did get a notice are deemed to consent to

2   the release unless they object.  And I find that, yes, they

3   are consenting to the release.  The fact that they're

4   unimpaired really deals with how you can or can't treat them

5   under 1129.

6          But the notice issue is sort of no different from

7   any other creditor, impaired or not; you don't have to have a

8   ballot in order to be on a notice that you might be relating

9   something in the context of a plan.  And I don't think that

10  it -- providing a third-party release on a notice to a

11  creditor un-impairs an otherwise -- excuse me -- impairs an

12  otherwise unimpaired creditor.

13         With regard to the solicited creditors where the

14  ballots were returned, again, it's a little trickier, right,

15  because they didn't get actual notice.  They didn't get

16  actual notice because either they didn't update the debtor on

17  their location or the debtor got it wrong and had the wrong

18  address, had a street address -- this happens to me all the

19  time.  I don't get mail at home; I have a P.O. Box.  So,

20  people think they send me things at home and I never get

21  them.  So, you know, this can happen.

22         But I think that it's fair to find that a

23  creditor, or any party who's got a commercial relationship

24  with a company, and they want to stay in touch with that

25  company in connection with that commercial relationship,

1  needs to have an address that works with that commercial

2  company.  And I think it's fair to argue or assert that the

3  debtor did the best that the debtor could to provide notice

4  and whatever fault in the delivery of that notice, there's no

5  specific allegation that it was the debtors' fault.  I think

6  it's fair to assume that the debtor either simply moved or

7  didn't give a correct address.  So, as a constructive matter,

8  I believe the actions taken by the debtor are sufficient to

9  constitute consent.

10         With regard to related persons, this is a little

11  trickier, frankly, because related persons didn't necessarily

12  get notice, as Ms. Casey puts out.  So, say I'm Entity A, a

13  fund -- say I'm Cerberus, I'm Entity A and I got the notice

14  of the bankruptcy.  All of my affiliates, attorneys, bankers,

15  hair stylists, whatever -- they're all releasing Gibson.

16         Now, at the same time, I believe they're getting a

17  release from Gibson.  They may not care, but they're getting

18  a release from Gibson.

19         And the question is, since they didn't get actual

20  notice as the agent of the principal, can they give up, on a

21  consensual basis, their claims?  And I think you have to

22  bifurcate that into two pieces.

23         The principal combined an agent in connection with

24  the principal's business, but not with regard to the agent's

25  business.  So, any claims that would be assertible by the

1    agent as a result of its relationship through the -- of the

2    principal, the principal can release.  But independent claims

3    of the agent against the debtor cannot be released without --

4    on a consensual basis, without getting actual consent from

5    that party.  So, we bifurcated it.

6          So, claims -- derivative or not; it doesn't

7    necessarily have to be derivative -- but claims related to

8    the principals who was given consent, the principal's claims

9    that an agent might be able to assert in some way are

10   consensual releases by the agent.  But independent claims

11   that the agent might have against Gibson cannot be released

12   on a consensual basis because they didn't get -- there's no

13   evidence they got sufficient notice.

14         So, that takes us to the nonconsensual release

15   language and law.  And here, I think this is a close issue,

16   but I think it falls in favor of the debtors -- necessity.

17   First of all, at this point, we're talking about how many

18   angels are on the head of a pin?  I mean, we are so far

19   removed from reality, only lawyers could have this

20   discussion.

21         But I think -- going back to my preliminary

22   comment about why we have these releases to begin with, I

23   think it is necessary for the reorganization of this debtor,

24   that the net of releasees and releasors and claims being

25   released is cast as wide as possible.

1         Fair and equitable, again, these are attenuated

2    claims.  I think it's fair and equitable to allow them to be

3    released.  So, say there's a Goodwin Procter associate, who

4    works way too hard, by the way, who loves music and has a

5    Gibson guitar.  And it turns out Gibson made a -- for the

6    first time ever, made a crappy guitar and he doesn't like it.

7    He's annoyed.  He calls them up and says, I want a new

8    guitar.  This one is no good.

9         And the person who answers the phone somehow has

10   read the confirmation order --

11      (Laughter)

12         THE COURT:  -- and says, I'm sorry, you released

13   that claim.  I mean, that's the effect of what Ms. Casey is

14   talking about.  That claim is released under these -- under

15   this language.

16         Is it fair and equitable to allow that claim to be

17   released?  And I think the answer is a close one, but I'll

18   say in this instance under these specific facts and this

19   specific case, I would say yes, because it's important to

20   reorganize the business.  This has been a very difficult

21   case, as you know.  Thank God most of this happened outside

22   of my purview, so congratulations.  Thank you.  But I know a

23   lot of work went into it and, you know, there'll always be

24   the opportunity for that associate, who's a very clever

25   person, otherwise, he wouldn't be working where he is, to

1  find a way around it.

2        I mean, that's no real answer, I suppose, but I

3  think the broadness of that release is, nonetheless, first,

4  unlikely to be pursued; second, probably not a huge amount of

5  dollars values involved in these kinds of claims; and, third,

6  they have to bow to the greater good, if you will, of

7  reorganizing the business.  And I think there are specific

8  findings on this record supported by what's in the

9  confirmation order, but also, what is has been put on the

10  record in the affidavits, declarations, proffers, et cetera,

11  in support of the plan.

12        So, I will allow the consensual releases under the

13  normal consent process and the un-consensual [sic] releases

14  or nonconsensual releases, with regard to the direct claims

15  of related persons, agents under the law in Continental.  And

16  I think you should negotiate to make sure the order -- as

17  Mr. Goldstein says, he's open to that -- to make sure the

18  order properly reflects that ruling.

19        MR. GOLDSTEIN:  And we'll work with Ms. Casey to

20  add language on the nonconsensual findings in that regard,

21  Your Honor.

22        Your Honor, I think Mr. Britton wants to come to

23  the podium.

24        MR. BRITTON:  Thank you.  Good evening, Your

25  Honor, Bob Britton, Paul, Weiss, Rifkind, Wharton & Garrison,

## Exhibit C

**Notice of Effective Date**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

GIBSON BRANDS, INC., *et al.*,

     Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:  Chapter 11
:
:  Case No. 18-11025 (CSS)
:
:  Jointly Administered
:
:

## NOTICE OF (I) ENTRY OF CONFIRMATION ORDER, (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES

     **PLEASE TAKE NOTICE THAT** on October [•], 2018, the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed the *Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 842] (the "Plan"), which was attached as <u>Exhibit A</u> to the *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. [•]] (the "Confirmation Order").[2]

     **PLEASE TAKE FURTHER NOTICE THAT** the Effective Date, as defined in the Plan, occurred on **[_____], 2018**.

     **PLEASE TAKE FURTHER NOTICE THAT** pursuant to Article VI.D of the Plan, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed in the manner set forth in the Claims Bar Date Order, (a) with respect to Executory Contracts and Unexpired Leases identified in the Rejected Executory Contract/Unexpired Lease List [Docket No. 812-8], **by no later than _____, 2018** (which is 30 days after the Effective Date); or (b) with respect to Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice, within thirty (30) days after the date on which such Rejection Notice was served on the counterparty.  Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so may be forever barred, estopped and enjoined from asserting such Claim, and such Claim may not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property may be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042); Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); and Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign).  The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Confirmation Order.

otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan. All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

**PLEASE TAKE FURTHER NOTICE THAT** except as otherwise provided in Article II.A of the Plan or the Claims Bar Date Order, and except with respect to Administrative Expense Claims that are Professional Fee Claims, DIP Claims, or the ABL Deposit, requests for payment of Allowed Administrative Expense Claims must be Filed and served on the Reorganized Debtors **by no later than _____, 2018** (which is 30 days after the Effective Date); *provided*, that the Administrative Expense Claims Bar Date does not apply to Professional Fee Claims or Administrative Expense Claims (i) arising in the ordinary course of business or (ii) for self-insured health care expenses.

**PLEASE TAKE FURTHER NOTICE THAT** Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, **by no later than _____, 2018** (which is 30 days after the Effective Date), and serve on the Debtors, the Reorganized Debtors, the U.S. Trustee, and counsel to the Ad Hoc Committee of Secured Notes, an application for final allowance of such Professional Fee Claim; and *provided* that the Reorganized Debtors will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full in Cash; and *provided further*, that any professional that may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan and its provisions, including the release, exculpation and injunction provisions, are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan, and whether or not such Holder or Entity voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan, the Confirmation Order, and other documents and materials filed in the Chapter 11 Cases are available free of charge on the website maintained by Prime Clerk, the Debtors' claims and noticing agent, at https://cases.primeclerk.com/gibson or by contacting Prime Clerk via email at gibsoninfo@primeclerk.com, by phone at (844) 240-1258 or, if calling from outside the United States or Canada, at (929) 477-8085.

*[Remainder of page intentionally left blank]*

2

Dated: _____, 2018
      Wilmington, Delaware

PEPPER HAMILTON LLP

_____
David M. Fournier (DE 2812)
Marcy J. McLaughlin (DE 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: fournierd@pepperlaw.com
      mclaughlinm@pepperlaw.com

- and -

GOODWIN PROCTER LLP
Michael H. Goldstein (admitted *pro hac vice*)
Gregory W. Fox (admitted *pro hac vice*)
Barry Z. Bazian (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 813-8800
Email: mgoldstein@goodwinlaw.com
      gfox@goodwinlaw.com
      bbazian@goodwinlaw.com

*Counsel for Debtors and Debtors in Possession*