# Exhibit A

EXECUTION VERSION

**THE WEINSTEIN COMPANY HOLDINGS LLC**
375 GREENWICH STREET
NEW YORK, NEW YORK 10013

As of October 20, 2015

Mr. Harvey Weinstein
c/o Arnie Herrmann
Citrin, Cooperman
529 Fifth Avenue
New York, NY 10017

Dear Harvey:

This letter agreement sets forth the revised terms and conditions of your continued employment with The Weinstein Company Holdings LLC (the "Company"). Upon your acceptance and execution hereof, this letter agreement shall constitute a binding agreement between us (the "Agreement").

1.    **Term**.  Your present employment agreement shall continue until December 31, 2015. The term of your new employment hereunder shall commence as of January 1, 2016 (the "Effective Date") and shall continue thereafter for three years until December 31, 2018. That period shall hereinafter be referred to as the "Employment Term."

2.    **Duties/Responsibilities/Reporting**.

a.    General. Subject to the terms of the Third Amended and Restated Limited Liability Company Agreement of the Company dated as of October 21, 2005, the "LLC Agreement") and in accordance with the terms therein, you shall have (i) such duties and responsibilities as are consistent with the traditional positions of President and Chief Executive Officer of major motion picture companies and (ii) the title of Co-Chairman of the Company, and together with Robert Weinstein, as Co-Chairmen, shall equally share authority over all operations and the overall direction of the Company. All other employees of the Company and its affiliates and subsidiaries shall report directly to you and Robert Weinstein (or indirectly

1

through such other personnel as you and Robert Weinstein may designate). Both of you shall report solely and directly to the Board of Representatives of the Company (the "Board").

      b.    Services. Except as herein otherwise specified, during the Employment Term you shall devote a substantial majority of your business time and efforts to the affairs of the Company.

3.    **Exclusivity**. Except as otherwise provided herein, your personal professional services shall be exclusive to the Company. Moreover, you shall not make any investments after the date hereof other than as permitted in Paragraphs 3(a), (b), (c) and (d) below. The foregoing two (2) sentences of this Paragraph 3 shall be collectively referred to herein as the "Exclusivity Provisions." The following are exceptions to, and shall not be considered violations of, Paragraph 2, the Exclusivity Provisions or Paragraph 11 below, and, in the case of the activities referenced in Paragraphs 3(a), (b) and (c) below, only for so long as such activities do not materially interfere with your service to the Company:

      a.    Excluded Projects. You shall be permitted to spend a portion of your business time managing the projects and investments set forth on Schedule I hereto (the "Excluded Projects") in addition to such other projects and investments as are permitted hereunder;

      b.    Investments. You shall be permitted to own, manage and perform services in connection with investments that you or members of your family or your charitable trusts or foundations (directly or indirectly) own as of the date hereof and own, manage and perform services in connection with such future personal investments that, except as permitted hereunder, do not require devotion of a substantial amount of your personal professional services, which shall include, without limitation, passive investment interests or limited partnership interests and, other than the Excluded Projects, do not compete with the Company's business when the investment is made, provided, however, that you may own directly or indirectly up to 5% of a publicly held company, limited partnership interests or other passive investment interests in private companies even if it does compete with the Company's business; and

2

WEINCO_BK-001667

c.   <u>Charitable Activities</u>.  You shall be permitted to spend a portion of your business time engaging in charitable or other non-profit activities.

4.   **Compensation**.

a.   <u>Base Salary</u>.  For all services rendered under this Agreement, you shall be entitled to receive a total annual base salary from the Company of $2,626,275, payable in 12 equal monthly installments.  You shall not be entitled to any other benefits, compensation or perquisites other than the benefits, compensation and perquisites set forth below.

On January 1, 2017 and on each January 1 thereafter during the Employment Term (each such January 1, an "<u>Adjustment Date</u>"), your base salary shall be subject to an increase by a percentage equal to the percentage of the increase from the prior January 1 to such Adjustment Date in the Consumer Price Index for all Urban Consumers, all items, selected large cities, for the New York/Northeastern New Jersey area, as published by the Bureau of Labor Statistics of the U.S. Department of Labor.

b.   For each year of the Employment Term that you are employed by the Company, you shall be entitled to 25 percent of the annual net profits bonus pool set forth in Exhibit "A" hereto (the "<u>Annual Bonus Pool</u>"), subject to your continued employment through the end of the applicable year to which the bonus relates.  The funding of the Annual Bonus Pool will occur, and the related bonus payments, if any, will be made, as soon as practicable following the completion of the Company's financial statements relating to the applicable fiscal year.  Any amounts that are not allocated to you or the other Co-Chairman pursuant to your respective employment agreements will be allocated to other employees of the Company by you and the other Co-Chairman, with the allocation of the Annual Bonus Pool to be approved by the Board, with such approval not to be unreasonably withheld or delayed.

5.   **Benefits**.  In addition to the foregoing, you shall be entitled to vacation days and/or personal days (as determined by you) and consistent with the amount of days taken by other senior level executives and you shall be entitled to participate in such other medical, dental and life insurance, 401(k), pension and other benefit plans as the Company may have or establish

3

from time to time.  All benefits you may be entitled to as an employee of the Company shall be on a most favored nations basis with any executive of the Company.

6.  **Business Expenses**.  In addition to the foregoing, during the Employment Term, you shall be reimbursed for such travel and other expenses, including those referred to below, incurred in the performance of your duties hereunder as are customarily reimbursed for Presidents and Chief Executive Officers of major motion picture companies, provided that, unless approved by the Board, such amounts do not exceed the amounts budgeted therefor in the then applicable annual budget.  The Company shall reimburse up to $_____ of your costs and expenses (including reasonable legal fees) in connection with entering into this Agreement.  You shall be entitled to expend up to $500,000 per year on private air travel.  When not flying private, your business-related air travel shall be first class.  You shall be entitled to take guests on such trips at the Company's expense to attend a premiere or industry function, or for such other business-related travel as you determine necessary, provided that, unless approved by the Board (with such approval not to be unreasonably withheld or delayed), such expenses do not exceed the amounts budgeted therefor in the then applicable annual budget.  You shall be entitled to utilize any corporate jet which the Company may own (including a fractional ownership in any such jet) for personal use, subject to its availability as determined by the Company and your prompt reimbursement of the actual costs therefor to the Company.  You shall be entitled to an allowance for (or at your request the Company shall provide) a first-class car and a driver, limousine transportation and first class private business travel expenses, including hotel suites and per diems.  You shall be entitled to the services of such reasonable security personnel as you request.

7.  **Indemnification**.  You shall be fully indemnified and held harmless by the Company to the fullest extent permitted by law from any claim, liability, loss, cost or expense of any nature (including attorney's fees of counsel selected by you, judgments, fines, any amounts paid or to be paid in any settlement, and all costs of any nature) incurred by you (all such indemnification to be on an "after tax" or "gross-up" basis), which arises, directly or indirectly, in whole or in part out of any alleged or actual conduct, action or inaction on your part in or in connection with or related in any manner to your status as an employee, agent, officer, corporate director, member, manager, shareholder, partner of, or your provision of services to, the

4

WEINCO_BK-001669

Company or any of its affiliated entities, or any entity to which you are providing services on behalf of the Company unless such claim, liability, loss, cost or expense is a result of you not acting in good faith on behalf of the Company or such other entities. You shall be entitled to a presumption that you acted in good faith. To the maximum extent allowed by law, all amounts to be indemnified hereunder including reasonable attorneys' fees shall be promptly advanced by the Company until such time, if ever, as it is determined by final decision pursuant to Paragraph 25 below that you are not entitled to indemnification hereunder (whereupon you shall reimburse the Company for all sums theretofore advanced). For avoidance of doubt, you shall not be entitled to be indemnified or held harmless by the Company for amounts you are required to pay to reimburse the Company pursuant to this Agreement, including, without limitation, under Paragraphs 8 and 11 hereof.

In addition, you shall fully indemnify and hold the Company harmless from any claim, liability, loss, cost or expense of any nature (including attorney's fees of counsel selected by you (subject to the Company's approval, with such approval not to be unreasonably withheld or delayed), judgments, fines, any amounts paid or to be paid in any settlement, and all costs of any nature) resulting from any claim, action or incident that was described in your personnel file reviewed by Rodgin Cohen.

8.    **Annual Picture Limitations**. Subject to Paragraph 9(b), you will not commit the Company to produce, acquire or distribute more than five (5) feature pictures in any calendar year of the Employment Term without the written pre-approval of the Board (except, it is understood and agreed that, solely in calendar year 2016, you may produce, acquire or distribute up to six (6) feature pictures) (each of the feature pictures described in this sentence that you authorize in writing, an "Authorized Picture"). You understand and agree that no employee of the Company will be authorized to issue or approve any payment of any kind in connection with any picture produced, acquired or distributed in excess of the foregoing maximum number of films without such Board pre-approval (an "Unauthorized Picture"). Should you make any commitment for the Company to produce, distribute or acquire an Unauthorized Picture, the following shall apply:

5

a.      The Board may direct the Company to refuse to produce, acquire or distribute the Unauthorized Picture, notwithstanding any agreement with a third party calling for such production, acquisition or distribution, in which event, you will hold the Company harmless from any and all claims arising in connection with the Company's refusal, as well as from attorneys fees and costs in respect thereof.  In addition, the Board may advise all parties to an Unauthorized Picture that you were not authorized to enter into the agreement and that the Company is not bound to the agreement and will not abide by it.

b.      If the Board permits the Company to produce, acquire or distribute the Unauthorized Picture, you will indemnify and hold Company harmless from any loss it may incur as a result of the production, acquisition or distribution of the Unauthorized Picture.

c.      Without limiting its other rights or remedies, the Company may withhold any and all sums payable to you for any reason until the full amount due from you hereunder has been received.

d.      You shall only be liable pursuant to sub-clauses (a)-(c) above for Unauthorized Pictures that you have specifically authorized to be produced, distributed, or acquired.

9.      **Overhead Reduction; Expense Management**.

a.      You shall use your best efforts to reduce the Company's overhead for 2016 to between $40 million and $45 million, for 2017 to between $37.5 million and $42.5 million, and for 2018 to between $35 million and $40 million.  Without limiting the generality of the foregoing, prior to November 1st of 2015, 2016 and 2017, you will submit in writing to the Board your specific and detailed written suggestions on how these overhead reductions can be achieved during the following year, with particular reference to how your own actions and decisions can reduce overhead.

b.      The individual budget for each Authorized Picture (the "Authorized Picture Budget") shall be included in the annual budget for the applicable fiscal year and any expenditure in excess of 10% of the Authorized Picture Budget is subject to the prior written approval of the Board.  If the prints and advertising ("P&A") expenses for an Authorized Picture

6

reflected in the Authorized Picture Budget is exceeded by more than 10%, you agree to indemnify and hold the Company harmless for all P&A expenses in excess of the P&A expenses provided for in the Authorized Picture Budget. Without limiting its other rights or remedies, the Company may withhold any and all sums payable to you for any reason until the full amount due from you hereunder has been received. For the avoidance of doubt, other than the remedies with respect to P&A expenses described above, you shall have no other liability for an Authorized Picture that otherwise exceeds its Authorized Picture Budget.

10.    **Asset Sale**. In the event of any sale of any of the Company's assets during the years 2016 and 2017, you will use your best efforts to cause the Company to retain in the Company the first $100 million of sale proceeds to promote the Company's financial security and wellbeing.

11.    **Covenants**.

a.    <u>Non-Competition</u>. Except as provided otherwise, during the Employment Term, you shall not directly or indirectly engage in or participate as an officer, employee or corporate director for, or provide services in any other capacity to, any motion picture studio directly competitive with that of the Company. Notwithstanding the foregoing, in the event that your employment with the Company is terminated by the Company in breach of this Agreement, or you terminate your employment for good reason, the provisions of this Paragraph 11(a) shall no longer be applicable to you. For purpose hereunder, a "motion picture studio directly competitive with that of the Company" shall mean an entity whose primary business purpose is the development and production of live action motion pictures, but shall not include any entity that has material business or assets other than the development and production of live action motion pictures, so long as you do not provide any services to the motion picture business of such entity.

b.    <u>Confidential Information</u>. You agree that you shall not, during the Employment Term or at any time thereafter, directly or indirectly use for your own purposes, or disclose to or for any benefit of any third party, any trade secret or other confidential or proprietary information of the Company or any of its controlled affiliates (except as may be required by law or in the performance of your duties hereunder consistent with the Company's

7

WEINCO_BK-001672

policies). Notwithstanding the foregoing, (A) confidential information shall be deemed not to include information which (i) is or becomes generally available to the public other than as a result of a disclosure by you or any other person who directly or indirectly receives such information from you or at your direction or (ii) is or becomes available to you on a non-confidential basis from a source which you reasonably believe is entitled to disclose it to you, and (B) you may continue to use knowledge acquired by you during the Employment Term concerning the motion picture industry and the participants in that industry, including but not limited to their abilities, characteristics and compensation.

c. <u>Company Ownership</u>. Except as otherwise herein provided as with respect to your services under Paragraph 3 hereof, the results and proceeds of your services hereunder, including, without limitation, any works of authorship resulting from your services during your employment and any works in progress, shall be works-made-for-hire and the Company shall be deemed the sole owner throughout the universe of any and all rights of whatsoever nature therein, with the right to use the same in perpetuity without any further payment to you whatsoever. If, for any reason, any of such results and proceeds shall not legally be a work-for-hire and/or there are any rights which do not accrue to the Company under the preceding sentence, then you hereby irrevocably assign and agree to assign irrevocably any and all of your right, title and interest thereto, including, without limitation, any and all copyrights, patents, trade secrets, trademarks and/or other rights of whatsoever nature therein, whether or not now or hereafter known, existing, contemplated, recognized or developed by the Company, and the Company shall have the right to use the same in perpetuity throughout the universe in any manner the Company may deem useful or desirable to establish or document the Company's exclusive ownership of any and all rights in any such results and proceeds, including, without limitation, the execution of appropriate copyright and/or patent applications or assignments. To the extent you have any rights in the results and proceeds of your services that cannot be assigned in the manner described above, you unconditionally and irrevocably waive the enforcement of such rights. This Paragraph 11(c) is subject to, and shall not be deemed to limit, restrict, or constitute any waiver by the Company of any rights of ownership to which the Company may be entitled by operation of law by virtue of the Company or any of its controlled affiliates being your employer.

8

WEINCO_BK-001673

d.    <u>Return of Property</u>.  All documents, data, recordings, or other property, whether tangible or intangible, including, without limitation, all information stored in electronic form, obtained or prepared by or for you, in each case to the extent they are readily identifiable as being directly related to your services hereunder (but excluding your personal files, Rolodexes and similar records in your office), shall remain the exclusive property of the Company.  In the event of the termination of your employment for any reason, and subject to any other provisions hereof, all such property in your possession shall, on request of the Company, be returned by you to the Company, at the Company's sole cost and expense, as soon as reasonably practical.  The Company acknowledges that all of the artwork, memorabilia, and any other items personally owned by you in your office, as well as all of your personal files, Rolodexes and similar records in your office, are so personally owned by you and may be removed at any time by you.

e.    <u>Promise Not To Solicit</u>.  Unless your employment with the Company is terminated by the Company in breach of this Agreement, or you terminate your employment for good reason, you will not during the period of the Employment Term, induce or attempt to induce any employees of the Company (or those of any of its controlled affiliates) to stop working for the Company or any of its controlled affiliates or to work for any of the Company's or its controlled affiliates' competitors; <u>provided</u> that this Paragraph 11(e) shall not prohibit you from employing anyone upon the termination of this Agreement, so long as you do not engage in conduct violative of this subparagraph 11(e).

f.    <u>Related Party Transactions</u>.  You acknowledge and agree that (i) you will not enter into any transactions with the Company and (ii) except with respect to secretarial and other non-core Company services, you may not use Company employees, property or resources for any non-Company project, in each case without the prior written approval of the Board (the "<u>Members</u>") excluding you for purposes of this vote.

g.    <u>Board Information Rights</u>.  You acknowledge and agree that, except as otherwise provided by the Board, you and the other executives and employees of the Company have a duty to provide the Board with all information requested by the Board (including, without limitation, individual representatives of the Board) with respect to the business, operations, financial results, corporate transactions, prospects, and affairs of the Company reasonably

9

necessary to fulfill the Board's fiduciary duties.  Failure to provide the Board within a reasonable period with such information regarding the business, operations, financial results, prospects and affairs of the Company, including, without limitation, information relating to acquisitions, divestitures and any other potential or actual corporate transaction, that is (a) reasonably requested in writing to you by the Board and (b) accessible to you, will be considered a material breach of this Agreement.

    h. <u>Settlements</u>.  You acknowledge and agree that (i) the settlement of any pending or threatened litigation by the Company that would result in a liability to the Company of $1,000,000 or more may only be entered into with the prior written approval of a majority of the Board, and (ii) you will inform the Board promptly once you become aware that the Company or any of its executives or employees are in discussions to enter into any such settlement.  You further acknowledge and agree that you will report to the Board (at least quarterly) the settlement of any pending or threatened litigation by the Company that would result in a liability to the Company of less than $1,000,000.

    i. <u>Code of Conduct</u>.  You shall abide by the Company's Code of Conduct as in effect on the date hereof (and any amended Code of Conduct, provided that you approve the amendment), which shall apply to all of the Company's employees and directors.

    i. In the event that you violate the Company's Code of Conduct, other than a violation relating to business expenses, you shall, in addition to any consequences set forth herein, be subject to the following.

    (a) If the Company is obligated to make a payment to satisfy a claim that you have treated someone improperly in violation of the Company's Code of Conduct (an "<u>Obligated Payment</u>"), you will be required to reimburse the Company for the entire amount of the Obligated Payment and the costs and expenses incurred by the Company in connection with such claim.  For purposes of this provision, an Obligated Payment is either where the payment is required by a fully litigated award or where the payment is made in settlement of the claim and either the Company and you agree that it was a reasonable settlement, or, in the absence of such agreement, the payment is determined to be a reasonable settlement in expedited JAMS arbitration.

10

      

(b)    You and the Company recognize that, in addition to being indemnified for the amount of payments the Company is obligated to make as a result of your misconduct, such misconduct can cause significant damage to the Company which is difficult or impossible to measure.  Accordingly, if your misconduct results in the Company making an Obligated Payment to a person damaged by such misconduct, in addition to the indemnification set forth in subparagraph i.(a) above, you will pay the Company liquidated damages of $250,000 for the first such instance, $500,000, for the second such instance, $750,000 for the third such instance, and $1,000,000 for each such additional instance.

ii.    As promptly as possible at the end of each calendar year, all expenses paid by, on behalf of, and/or at your request shall be audited by the Company. If the audit shows that you have personally paid more business expenses than the Company has paid your personal expenses, the Company shall promptly reimburse you for the difference. To the extent the audit shows that the Company has paid more personal expenses than you have paid business expenses, you shall promptly reimburse the Company the difference.   You and the Company recognize that if Company funds are used to pay for your personal expenses, the Company can be damaged in an amount that is difficult or impossible to determine beyond receiving the reimbursement provided for above.  Accordingly, if the audit provided for above shows that the Net Personal Expenses then owed by you to the Company for personal expenses (i.e., the excess of personal expenses paid by the Company over business expenses paid by you) is greater than the amount the Company owes you for any reason, including for amounts loaned, advanced, or deposited, then in addition to reimbursing the company for the Net Personal Expenses paid by the company, you will pay as liquidated damages  the amount by which such Net Personal Expenses exceeds the amount the company then owes to you.

12.    **Incapacity**.

a.    In the event you suffer total mental or physical disability and cannot substantially perform your duties at any time during the Employment Term, the Board of Representatives may at any time after such disability has continued for ninety (90) consecutive days require the Company to give you written notice that it intends, subject to applicable state and federal law, to suspend this Agreement.  Upon receipt of such notice, prior to any suspension

11

hereunder, you shall be entitled to an expedited arbitration to determine whether or not you suffer total disability and have done so for at least ninety (90) consecutive days, <u>provided</u> that you request such arbitration within ten (10) business days of receipt of such notice from the Company.  If you do not so request such an arbitration, or if the arbitrator rules that you are so disabled, you shall be placed on a "medical payroll," meaning you will remain employed for the first twenty-six (26) weeks of consecutive absence commencing at the end of the later of the ten (10) day period or upon the conclusion of the arbitration.  Thereafter, if you are not able to resume your duties hereunder, your employment will be terminated.

b.    Upon termination of employment as provided in Paragraph 12(a), you shall remain entitled to receive your Base Salary, all medical, dental, life insurance and other benefits for a period of 12 months following the date of such termination (but not to exceed the end of the then current Employment Term); _provided_ if the Board does not notify you, within six (6) months of such termination, of its agreement to pay all medical, dental, life insurance and other benefits during the remainder of the then current Employment Term, all of your obligations under Paragraph 11 shall terminate at the end of the period of 12 months following the date of such termination of employment.

13.    **Death**.  If you die prior to the end of the Employment Term, this Agreement shall be terminated as of the date of death and your beneficiary or estate shall be entitled to receive your Base Salary and all other benefits under the plans, policies and other provisions discussed in Paragraph 5, pro-rated up to the date on which the death occurs and for 12 months thereafter, but not to exceed the end of the then current Employment Term.

14.    **Termination for Cause**.  The Company may, at its option and upon resolution by the Board, terminate this Agreement at any time for "cause."  If your employment is terminated for cause, the Company shall thereafter have no further obligation to pay the unearned Base Salary or provide unvested benefits under this Agreement.  For purposes of this Agreement, "cause" shall mean only: (i) a willful failure or refusal by you to follow the reasonable and lawful instructions of the Board with respect to any matter for which the approval of the Board is required under Section 7.06 of the LLC Agreement or your knowingly taking any action with respect to any matter for which the approval of the Board is required under Section 7.06 of the

12

LLC Agreement without obtaining prior Board approval; (ii) the perpetuation by you of a material fraud against the Company is determined by final decision pursuant to Paragraph 25 below, it being agreed that the Company shall be entitled to an expedited arbitration with respect to such matters; (iii) a conviction for a felony involving fraud, dishonesty or moral turpitude, after the exhaustion of all possible appeals; (iv) an indictment for a felony involving fraud, dishonesty or moral turpitude, if it is determined by a vote of the majority of the Board, including the vote of at least one of the Co-Chairmen, that such indictment is reasonably expected to cause serious harm to the Company; (v) a willful violation of the Code of Conduct if it is determined by a vote of a majority of the Board, including the vote of at least one of the Co-Chairmen, that such violation has caused serious harm to the Company; or (vi) a material breach by you of Paragraphs 2(b), 3, 11(a), 11(b), 11(c), 11(e), 11(f) or 11(h) hereof; provided that, in the case of each of clauses (i), (v) and (vi) above, the Board has first notified you in writing, within a reasonable time after it acquires knowledge of facts giving rise to the right to terminate your employment, of such action or omission by you, specifying in reasonable detail the facts supporting such determination, and you have not cured the particular action or omission complained of within thirty (30) days following the receipt of such notice; provided, further, if the particular action or omission complained of is capable of being cured, but not within thirty (30) days following the receipt of such notice, you may commence the cure within such thirty (30) day period and diligently continue your efforts to cure thereafter; and provided further for the avoidance of doubt, the payment by you of any costs incurred by the Company as a result of a violation of paragraphs 2(b), 3, or 11(a), 11(b), 11(c), 11(e), 11(f) or 11(h) shall constitute a cure of such violations.

15.    **Termination For Good Reason**. You shall be entitled to terminate employment for good reason, for the purpose of this Paragraph 15, in the event of (i) a material breach of this Agreement by the Company, (ii) any material reduction of your title or duties not agreed to by you in writing, (iii) the cancellation, without replacement, or a material reduction in coverage of a Director's and Officer's liability insurance policy, and (iv) without limiting the generality or effect of the foregoing, a material breach by the Company of any or all of the covenants, warranties, agreements and obligations set forth in this Agreement, unless such failure is caused by your material breach of the terms of this Agreement, or unless such failure to comply is waived in writing by you. Notwithstanding anything to the contrary contained herein, you will

13

give the Company written notice prior to terminating this Agreement pursuant to the foregoing sentence, setting forth in reasonable detail the facts of any alleged breach and the conduct required to cure such breach. The Company shall have thirty (30) days from the receipt of such notice within which to cure (provided that such particular action or omission is so capable of being cured). In the event of your voluntary termination for good reason, you will receive continuation of Base Salary and benefits as specified herein, until the end of the Employment Term. At the end of the Employment Term, you shall have the right to take over and continue, at your option and at your own expense, any benefits which by the terms of such benefit plans may be assumed.

16. **Change of Control.** In the event of a "change of control," you shall be entitled to terminate this Agreement and discontinue providing any services hereunder. For purposes of this Agreement, "change of control" shall mean the occurrence of any of the following events:

a. a transaction or series of related transactions resulting in a change of ownership of at least 50% of the equity interests in the Company;

b. approval by the Board of the liquidation or dissolution of the Company; or

c. sale of all or substantially all of the assets of the Company.

17. **No Mitigation.** In the event this Agreement is terminated for any reason prior to its expiration you shall not be required to mitigate your damages hereunder, nor shall the Company be entitled to offset from any sums owing to you hereunder any amounts received by you from any third party.

18. **Notices**. All notices required to be given hereunder shall be given in writing, by personal delivery or by mail and confirmed by fax at the respective addresses of the parties hereto set forth above, or at such address as may be designated in writing by either party, and in the case of the Company, to the attention of the general counsel of the Company. Any notice given by mail shall be deemed to have been given three (3) business days following such mailing.

14

WEINCO_BK-001679

19.    **Assignment**.  This is an Agreement for the performance of personal services by you and may not be assigned by you (other than the right to receive payments which may be assigned to a company, trust or foundation owned or controlled by you) or by the Company, and any purported assignment in violation of the foregoing shall be deemed null and void.

20.    **New York Law**.  This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely therein, without regard to the conflict of laws provisions thereof.

21.    **No Implied Contract**.  The parties intend to be bound only upon execution of this Agreement and no negotiation, exchange or draft or partial performance shall be deemed to imply an agreement.  Neither the continuation of employment or any other conduct shall be deemed to imply a continuing agreement upon the expiration of this Agreement.

22.    **Entire Understanding**.  This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained, and can be changed only by a writing signed by both parties hereto.

23.    **Void Provisions**.  If any provision of this Agreement, as applied to either party or to any circumstances, shall be adjudged by a court to be void or unenforceable, the same shall be deemed stricken from this Agreement and shall in no way affect any other provision of this Agreement or the validity or enforceability of this Agreement.  In the event any such provision (the "Applicable Provision") is so adjudged void or unenforceable, you and the Company shall take the following actions at the Company's cost in the following order: (i) seek judicial reformation of the Applicable Provision; (ii) negotiate in good faith with each other to replace the Applicable Provision with a lawful provision; and (iii) have an arbitration as provided in Paragraph 25 hereof determine a lawful replacement provision for the Applicable Provision; provided, however, that no such action pursuant to either of clauses (i) or (iii) above shall increase in any respect your obligations pursuant to the Applicable Provision.

24.    **Survival / Modification of Terms**.  Except as otherwise provided herein, your obligations under Paragraph 11 hereof shall remain in full force and effect for the entire period provided therein notwithstanding the termination of this Agreement pursuant to Paragraph 14

15

CONFIDENTIAL                                                                              WEINCO_BK-001680

hereof or otherwise. The Company's obligations under Paragraphs 6 (with respect to expenses theretofore incurred), 7 and 28 hereof shall survive indefinitely the termination of this Agreement regardless of the reason for such termination. Further, Paragraphs 4(b), 12(b), 13, 15 and 17 will continue to govern your (or your beneficiaries' or estate's) entitlement, if any, to benefits after the termination of this Agreement, and Paragraph 25 will continue to govern any Claims (as defined below) by one party against the other.

25. **Arbitration of Disputes**. Any controversy or claim by you against the Company or any of its parent companies, subsidiaries, affiliates (and/or officers, directors, employees, representatives or agents of the Company and such parent companies, subsidiaries and/or affiliates), or any controversy or claim against you by the Company, in all such cases, arising from, out of or relating to this Agreement, the breach thereof, or the employment or termination thereof of you by the Company which would give rise to a claim under federal, state or local law (including, but not limited to, claims based in tort or contract, claims for discrimination under state or federal law, and/or claims for violation of any federal, state or local law, statute or regulation) (individually and/or collectively, "Claim[s]") shall be submitted to an impartial mediator ("Mediator") selected jointly by the parties. Both parties shall attend a mediation conference in New York, New York and attempt to resolve any and all Claims. If the parties are not able to resolve all Claims, then upon written demand for arbitration to the other party, which demand shall be made within a reasonable time after the Claim has arisen, any unresolved Claims shall be determined by final and binding arbitration in New York, New York, in accordance with the rules and procedures of JAMS, including the right to an appeal before JAMS's appellate panel. The result of any such arbitration shall be binding but shall not be made public (including by filing a petition to confirm the arbitration award), unless necessary to confirm such arbitration award after non-payment of the award for a period of at least fifteen (15) days after notice of the arbitrator's decision. Each party shall pay the fees of their respective attorneys (except as otherwise awarded by the arbitrator), the expenses of their witnesses, and all other expenses connected with presenting their Claims or defense(s); provided however, that if you prevail on at least one material matter in dispute, the Company shall pay all such fees and expenses. Other costs of arbitration shall be borne by the Company. Except as set forth below, should you or the Company pursue any Claim covered by this Paragraph 25 by any method other than said arbitration, the responding party shall be entitled to recover from the other party all

16

damages, costs, expenses, and reasonable outside attorneys' fees incurred as a result of such action. The provisions contained in this Paragraph 25 shall survive the termination of your employment with the Company. For the avoidance of doubt, the Non-Class W Members, acting by at least a seventy-five percent (75%) vote, may enforce the terms of this Agreement on behalf of the Company and the Company shall pay all costs and expenses incurred by relating to or arising from actions taken in connection therewith.

26.    **Equitable Relief**. Notwithstanding anything to the contrary in Paragraph 25 above, (i) you acknowledge that the Company shall be entitled, in addition to any other remedies it may have at law, to seek the remedies of injunction, and other equitable relief for a breach by you of Paragraphs 11(a), (b), (c), (d) or (e) of this Agreement and (ii) the Company acknowledges that you shall be entitled, in addition to any other remedies you may have at law, to seek the remedies of injunction, and other equitable relief for any breach by the Company of this Agreement. This provision shall not, however, be construed as a waiver of any of the rights which the Company and/or you may have for damages or otherwise.

27.    **Miscellaneous**. You agree that the Company may deduct and withhold from your compensation hereunder the amounts required to be deducted and withheld under the provisions of all applicable statutes heretofore or hereafter enacted requiring then withholding of compensation.

28.    **Distributions**. Notwithstanding anything to the contrary in the LLC Agreement, as promptly as practicable following the end of each year hereafter, the Company shall distribute to its Members (other than the Class C Members) in accordance with their respective Relative Percentage Interests an amount equal to the cash balances of the Company and its Subsidiaries as of the close of business on the last day of such year minus (i) any liquidity or reserve requirements under financing or contractual arrangements (including, without limitation, any indemnification obligations of the Company to the extent of any claims made for which a reserve is required) and (ii) any amounts that either the Board or the Principals determine reasonably necessary to provide for funding of future liabilities and expenditures of the Company for the next Fiscal Year or to make future Tax Distributions with respect to such Fiscal Year, and provided, further, that the Company shall not be required to make any distribution to the extent

17

prohibited by any agreement to which the Company is a party or applicable law.  Capitalized terms used, but not defined, in this Paragraph 28, shall have the meanings set forth in the LLC Agreement.

If the foregoing correctly sets forth your understanding, please sign one copy of this letter and return it to the undersigned, whereupon this letter shall constitute a binding agreement between us.

Very Truly Yours,

THE WEINSTEIN COMPANY HOLDINGS LLC

By:_____
    Name:    Harvey Weinstein
    Title:    Manager

By:_____
    Name:    Robert Weinstein
    Title:    Manager

ACCEPTED AND AGREED AS OF
OF THE DATE FIRST WRITTEN ABOVE:

_____
    Harvey Weinstein

CONFIDENTIAL    WEINCO_BK-001683

prohibited by any agreement to which the Company is a party or applicable law.  Capitalized terms used, but not defined, in this Paragraph 28, shall have the meanings set forth in the LLC Agreement.

If the foregoing correctly sets forth your understanding, please sign one copy of this letter and return it to the undersigned, whereupon this letter shall constitute a binding agreement between us.

Very Truly Yours,

THE WEINSTEIN COMPANY HOLDINGS LLC

By:_____
    Name:    Harvey Weinstein
    Title:     Manager

By:_____
    Name:    Robert Weinstein
    Title:     Manager

ACCEPTED AND AGREED AS OF
OF THE DATE FIRST WRITTEN ABOVE:

_____
    Harvey Weinstein

18

WEINCO_BK-001684

## Schedule I

**Excluded Activities and Rights**

A.     Generally

1.  All "personal investing activities" including, without limitation, past and future investments in other businesses, such as real estate and restaurant investing; investments in securities or other instruments for wealth management purposes; and estate planning activities.
2.  Personally owned film projects and other investments as described in Section B below.
3.  All producing services provided by either or both of the Weinsteins in connection with any Co-Financed Project (as defined in the Acquisition Agreement) as contemplated by Section 13(b) of the Acquisition Agreement.
4.  All Co-Financed Project Producing Compensation (as defined in the Acquisition Agreement) as contemplated by Section 13(b) of the Acquisition Agreement, subject to the terms of this Agreement.
5.  All theatrical stage activities, including without limitation, all theater projects detailed in Schedule I to the Acquisition Agreement.  Notwithstanding Section 9.02 of the LLC Agreement, you are permitted to pursue these ventures without offering a right of first refusal to the Company.[1]
6.  All activities related to books, magazines and other publications, including without limitation all publishing projects detailed in Schedule J to the Acquisition Agreement.

B.     Specific Projects/Income Streams

1.  *Kids*. This movie was released in 1995 by Shining Excalibur, a special purpose entity set up by the Weinsteins for this film.
2.  *Dogma*. This Kevin Smith movie was released in 1999 and is owned by STK, LLC a special purpose entity owned by the Weinsteins.
3.  Elegant Films. This company is owned individually by Harvey Weinstein. Its collection consists of distribution rights in the following films: *El Cid, Circus World, Fall of the Roman Empire, 55 Days at Peking, The Little Twins Big Adventures, The Little Twins Tales of Enchantment, Go Hugo Go, Hugo the Movie Star, How the Toys Saved Christmas, The Animal Train, Guys & Dolls Off the Record, The Who's Tommy: the Amazing Journey and Belly Talkers.*
4.  All income from *Lord of the Rings*.
5.  All income from *The Chronicles of Narnia*.
6.  All income from *Addicted to Love*.
7.  All income from *Memoirs of a Geisha*.
8.  All income from *Cinderella Man*.
9.  *Fahrenheit 9/11*. This film is owned by The Fellowship Adventure Group.
10. All income from the investment in Ago restaurant.

---

[1] Approved by the Board of Directors of the Company at a meeting on March 4, 2015, as reflected in the minutes for such meeting, which notes that the Board "resolved that the Company is not in the theatrical stage business."

CONFIDENTIAL                                                          WEINCO_BK-001685

11. All income from A Band Apart (a commercial production company).
12. All income from Niche Media.
13. Ownership and all income from the NC-17 version of *Kill Bill*.
14. All proceeds from auction(s) of Miramax film memorabilia.
15. God of Cookery, King of Comedy.
16. Hardboiled, Bullet in the Head.
17. Tommy Video: The Making of the Rock Opera.
18. All income from The Brothers Grimm.
19. ~~The Burning~~
20. Playing for Keeps

2

CONFIDENTIAL

WEINCO_BK-001686

## Exhibit "A"

<u>Annual Bonus Pool</u>

The Annual Bonus Pool will be funded by amounts equal to (i) 100% of the first $2,000,000 of annual Net Income (as determined by the Company and certified by the Board) of the Company's annual Net Income in excess of $10,000,000 and (ii) 20% of the Company's annual Net Income in excess of $12,000,000. For the avoidance of doubt, no portion of the first $10,000,000 of the Company's annual Net Income will be funded into the Annual Bonus Pool. The funding of the Annual Bonus Pool will be determined by the Board (or any committee of the Board to which the Board has unanimously delegated authority) as soon as practicable following the completion of the Company's financial statements with respect to the applicable fiscal year.

CONFIDENTIAL