Payment Bonds at no increase in cost to the Owner for this portion of the Work in the event Owner elects to award this Work to the Contractor.

In the event Owner elects to replace areas of metal roof decking and deteriorated plywood, Contractor shall furnish and install new materials in accordance with the following unit prices. The unit prices include all labor, material, equipment and all other things necessary to fully and properly replace the damaged and deteriorated areas.

    Metal Roof Decking:                         $18.00 per square foot
    5/8" Thick Pressure Treated Plywood:     $ 4.95 per square foot

The following listed documents are applicable to the foregoing work:

A. Drawings: Refer to Attachment A, List of Drawings
B. Specifications:
   - EPCOT Building Codes, latest edition, and all other applicable codes and regulations
   - Design Standard for the Attachment of Overhead Objects, Rev. 1, dated 1/23/95, 19 pages
   - Typical Fence Detail Types I, II, III, and IV, dated 9/16/92 (4 pages)
   - Section 01010    Summary of Work, 28 pages, dated February 25, 1999
   - Section 01018    Owner Furnished Products, 3 pages, dated February 25, 1999
   - Section 01041    Project Coordination, 4 pages, dated February 25, 1999
   - Section 01045    Cutting and Patching, 3 pages, dated February 25, 1999
   - Section 01061    Applicable Building Codes, 1 page, dated February 25, 1999
   - Section 01070    Abbreviations, Definitions and Standards, 6 pages, dated February 25, 1999
   - Section 01202    Progress Meetings, 5 pages, dated February 25, 1999
   - Section 01310    Construction Schedule, 9 pages, dated February 25, 1999
   - Section 01315    Contract Time, Sequencing and Timing of Work, 2 pages, dated February 25, 1999
   - Section 01340    Shop Drawings, Product Data, and Samples, 7 pages, dated February 25, 1999
   - Section 01370    Schedule of Values, 3 pages, dated February 25, 1999
   - Section 01400    Quality Control, 6 pages, dated February 25, 1999
   - Section 01410    Testing Laboratory Services, 2 pages, dated February 25, 1999
   - Section 01500    Temporary Construction Facilities, 4 pages, dated February 25, 1999
   - Section 01568    Erosion Control, 4 pages, dated February 25, 1999
   - Section 01630    Substitutions and Product Options, 2 pages, dated February 25, 1999
   - Section 01640    Product Handling and Protection, 1 page, dated February 25, 1999
   - Section 01700    Project Closeout, 5 pages, dated February 25, 1999
   - Section 01710    Cleaning, 3 pages, dated February 25, 1999
   - Section 01720    Project Record Documents, 3 pages, dated February 25, 1999
C. Special Contract Conditions, 3 pages dated February 25, 1999
D. General Conditions of the Contract for Construction, pages 1 through 19, February 1998, ed.
E. Contractor's Guarantee, 1 page
F. Performance Bond, 1 page
G. Payment Bond, 1 page
H. Change Order form June, 1990, ed.
I. Close-out Change Order form June, 1990, ed.
J. Addendum No. 1, Disney's Grand Floridian Beach Resort & Spa Construction Packages No. 2, 3, & 4, Roof Replacement, 3 pages, dated March 17, 1999.
K. Addendum No. 2, Disney's Grand Floridian Beach Resort & Spa Construction Packages No. 2, 3, & 4, Roof Replacement, 4 pages, dated March 19, 1999.

The Contractor shall further provide and pay for all related facilities described in any of the Contract Documents, including all work expressly specified therein and such additional work as may be reasonably inferred therefrom, saving and excepting only such items of work as are specifically stated in the Contract Documents not to be the obligation of the Contractor. The totality of the obligations imposed upon the Contractor by this Article and by all other provisions of the Contract Documents, as well as the structures to be built and the labor to be performed, is herein referred to as the "Work".

## Article 3
## OWNER'S REPRESENTATIVE

The Owner's authorized representative (herein referred to as the "Owner's Representative") shall be **Facility Asset management** whose mailing address is Post Office Box 10000, Lake Buena Vista, Florida 32830-1000, ATTN: Steve Coole provided, however, that the Owner may, without liability to the Contractor, unilaterally amend this Article from time to time by designating a different person or organization to act as its representative and so advising the Contractor in writing, at which time the person or organization so designated shall be the Owner's Representative for purposes of this Contract.

## Article 4
## THE ARCHITECT/ENGINEER

The Architect/Engineer for the Project (herein referred to as the "A/E") is WDW Architecture and Facilities Engineering whose mailing address is P.O. Box 10000, Lake Buena Vista, FL 32830-1000.

## Article 5
## TIME OF COMMENCEMENT AND COMPLETION

5.1. The Contractor shall commence the Work promptly upon receipt of written notice to proceed from the Owner and shall complete all work on or before **August 17, 2000** (such period of time is herein referred to as the "Contract Time") and in accordance with such interim milestone dates (herein referred to as the "Milestones") as may be specified in the Contract Documents. The Contract Time and any such Milestones are of the essence of the Contract.

5.2. If any work is performed by the Contractor prior to the execution of this Agreement based on receipt of written notice to proceed, all such Work performed shall be in accordance with and governed by the Contract Documents.

5.3. The Contractor acknowledges that the Owner has made no warranties to the Contractor, expressed or implied, that the Contractor will be able to follow a normal, orderly sequence in the performance of the Work or that there will be no delays in, or interference with, the Work.

## Article 6
## CONTRACT SUM

6.1. Provided that the Contractor shall strictly and completely perform all of its obligations under the Contract Documents, and subject only to additions and deductions by Change Order or as otherwise provided in the General Conditions, the Owner shall pay to the Contractor, in current funds and at the times and in the installments hereinafter specified, the sum of **Three Million Six Hundred Thirty Eight Thousand Forty Five Dollars ($3,638,045.00)** (herein referred to as the "Contract Sum") to cover the Contractor's profit and general overhead and all costs and expenses of any nature whatsoever (including, without limitation, taxes, labor and materials), foreseen or unforeseen, and any increases in said costs and expenses, incurred by the Contractor in connection with the performance of the Work, all of which costs and expenses shall be borne solely by the Contractor.

6.2.　　Also included within the Contract Sum is **Ten Dollars ($10.00)** to be paid by the Owner to the Contractor as the specific consideration for those provisions contained in the Contract Documents which provide for indemnity and/or guarantee among the Owner, the Owner's Representative, the A/E, their respective parent companies, the subsidiary, related and affiliated companies of each, as well as the officers, directors, agents and employees of each, the Contractor, any Subcontractor, Sub-subcontractor, or any combination of the foregoing, whereby any such person is granted indemnification from liability for damages to persons or property caused in whole or in part by any act, omission or default of any of the above named persons arising from the Contract or its performance. The said specific consideration for such indemnification is paid to the Contractor by the Owner on behalf of the Owner, the Owner's Representative, the A/E, their respective parent companies, the subsidiary, related and affiliated companies of each, and the officers, directors, agents and employees of each, and is allocated to, and shall be deemed to have been paid out of, the first installment of the Contract Sum payable hereunder.

Article 7
APPLICATIONS FOR PAYMENT

The Contractor shall, on the twenty-fifth (25th) day of each calendar month (herein referred to as the "Payment Application Date"), deliver to the Owner an Application for Payment in accordance with the provisions of Article 9 of the General Conditions. Before submitting the first Application for Payment, Contractor shall submit (and resubmit until approval is obtained) to the Owner's Representative for approval the "Schedule of Values", generally following the Uniform Construction Index (CSI) cost analysis format but further broken down by facility, labor and material, all as required by the Owner's Representative. Each item in the "Schedule of Values" shall only include its proper share of overhead and profit. The Schedule of Values, when approved by the Owner's Representative, shall be used as a basis for the Contractor's Application for Payment.

Article 8
PROGRESS PAYMENTS AND FINAL PAYMENT OF THE CONTRACT SUM

8.1.　　Based on the Contractor's Application for Payment, the Schedule of Values submitted by the Contractor and approved by the Owner, and the approval of the Application for Payment issued by the Owner pursuant to Article 9 of the General Conditions, the Owner shall make monthly payments to the Contractor on account of the Contract Sum. Such monthly payments shall be made on or before the fifteenth (15th) day of each calendar month or the twentieth (20th) day after receipt by the Owner of the Contractor's Application for Payment, of such documentation, in proper form, to substantiate the amount owed and of such other documentation as the Owner may require pursuant to Article 9 of the General Conditions, whichever is later; provided, however, that the Owner shall have no obligation to make payment as aforesaid if it has withheld approval thereof as permitted under Subparagraph 9.3.1. of the General Conditions or if the Contractor has not submitted to the Owner with its Application for Payment all required documentation. Each such monthly payment shall be in an amount equal to ninety percent (90%) of the net amount allowed the Contractor for labor, materials and equipment incorporated or used in the Work (or suitably stored at the Job Site if the Owner has agreed in advance to pay for such stored materials and equipment) through the Payment Application Date, as indicated in the Owner's approval of the Application for Payment, after deducting any sums withheld by the Owner pursuant to the Contract Documents and the aggregate of all previous payments to the Contractor on account of the Contract Sum. Upon Substantial Completion of the Work, as determined by the Owner, the Owner shall pay to the Contractor a sum sufficient to increase the aggregate payments theretofore made to the Contractor on account of the Contract Sum to ninety percent (90%) of the Contract Sum, less such retainage as the Owner shall determine is necessary for all incomplete Work, unsettled claims or other matters for which the Owner is permitted to withhold under the General Conditions.

8.2.　　Final payment, constituting the entire unpaid balance of the Contract Sum, shall be paid by the Owner to the Contractor within fourteen (14) days after completion of those items set forth in the Punch List, including, without limitation, approval by the Owner's Representative of the final Application for Payment, and execution by the Contractor of the Close-out Change Order, the form of which is attached hereto as Exhibit I, in accordance with the General Conditions; provided, however, that final payment shall in no event be due unless and until the Contractor shall have complied with all provisions of the Contract Documents, including those contained in Subparagraph 9.4.2. of the General Conditions.

Article 9
CONTRACTOR'S REPRESENTATIONS, WARRANTIES AND COVENANTS

9. The Contractor hereby represents and warrants to the Owner that:

(a) it is duly licensed to observe and perform the terms, covenants, conditions and other provisions on its part to be observed or performed hereunder;

(b) it is experienced and skilled in the construction and work of the type described in, or required by, the Contract Documents;

(c) all equipment and materials used in connection with the Work shall be new (except if otherwise required by the Specifications) and the equipment, the materials and the Work shall be of the best quality, free from faults and defects and shall strictly conform to the Contract Documents; and

(d) it has, by careful examination satisfied itself as to: (i) the nature, location and character of the Job Site including, without limitation, the surface and subsurface conditions of the land and all structures and obstructions thereon, both natural and manmade, surface water conditions of the Job Site and the surrounding area and, to the extent pertinent to the Work, all other conditions; (ii) the nature, location and character of the general area in which the Job Site is located including, without limitation, its climatic conditions, the availability and cost of labor and the availability and cost of materials, tools and equipment; (iii) the quality and quantity of all materials, supplies, tools, equipment, labor and professional services necessary to complete the Work in the manner required by the Contract Documents; and (iv) all other matters or things which could in any manner affect the performance of the Work. Without limitation on the foregoing, the Contractor recognizes the physical and operational restrictions on carrying on of the Work in or about the Project.

9.2. The Contractor accepts the relationship of trust and confidence established by this Agreement between it and the Owner. It covenants with the Owner that it shall: furnish its best skill and judgment and cooperate with the Owner in furthering the interests of the Owner; furnish efficient business administration and superintendence and an adequate supply of workmen, equipment, tools and materials at all times; and perform the work in the best and soundest way and in the most expeditious and economical manner consistent with the best interests of the Owner.

Article 10
TERMINATION

Termination of the Contract by the Owner, with or without cause, and by the Contractor are provided for in Article 15 of the General Conditions. If the Owner terminates the Contract pursuant to Paragraph 15.2. of the General Conditions, and the unpaid balance of the Contract Sum exceeds the costs and expenses incurred by or on behalf of the Owner in finishing the Work, including compensation for any additional architectural, engineering, management and administrative services, such excess shall, upon the completion of the Work, be paid to the Contractor. If such costs exceed such unpaid balance, the Contractor shall pay the difference to the Owner upon demand.

Article 11
USE OF OWNER'S NAME/CONFIDENTIALITY

The Contractor, by virtue of this Contract, shall acquire no right to use, and shall not use, the name of the Owner or the name "Disney" (either alone or in conjunction with or as a part of any other work, mark or name) or any marks, fanciful characters or designs of The Walt Disney Company or any of its related, affiliated or subsidiary companies: in any advertising, publicity or promotion; to express or imply any endorsement of the Contractor's Work or services; or in any other manner whatsoever (whether or not similar to the foregoing uses hereinabove specifically prohibited). The Contractor may, during the course of its engagement hereunder, have access to, and acquire knowledge of or from, material, data, strategies, systems or other information relating to the Work, the Project or

WDW-1
003005

the Owner, or its parent, affiliated, or related companies, which may not be accessible or known to the general public. Any such knowledge acquired by the Contractor shall be kept confidential and shall not be used, published or divulged by the Contractor to any other person, firm or corporation, or in any advertising or promotion regarding the Contractor or its Work or services, or in any other manner or connection whatsoever without first having obtained the written permission of the Owner, which permission the Owner may withhold in its sole discretion.

Article 12
LEGAL PROCEEDINGS

12.1. The Contract Documents shall be construed and interpreted in accordance with the laws of the State of Florida and shall constitute the entire and sole understanding of the parties hereto notwithstanding any prior oral or written statements, instructions, agreements, representations, or other communications.

12.2. Any legal proceeding of any nature brought by either party against the other to enforce any right or obligation under this Contract, or arising out of any matter pertaining to this Contract or the Work to be performed hereunder, shall be submitted for trial, without jury, before the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida; or, if the Circuit Court does not have jurisdiction, then before the United States District Court for the Middle District of Florida (Orlando Division); or if neither of such courts shall have jurisdiction, then before any other court sitting in Orange County, Florida having subject matter jurisdiction. The parties consent and submit to the jurisdiction of any such court and agree to accept service of process outside the State of Florida in any matter to be submitted to any such court pursuant hereto, and expressly waive all rights to trail by jury regarding any such matter.

12.3. In the event that any provision of any of the Contract Documents is judicially construed to be invalid by a court of competent jurisdiction, such provision shall then be construed in a manner allowing its validity or, if this leads to an impracticable result, shall be stricken but, in either event, all other provisions of the Contract Documents shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed effective as of the day and year first above written.

OWNER

WALT DISNEY WORLD CO.

Authorized Signature _____  Date: 5-11-99

Print Name/Title    George Leckie

Director, Procurement Services

CONTRACTOR

MCENANY ROOFING

Authorized Signature _____  Date: 5/3/99

Print Name/Title    Mike McEnany

CONTRACTOR'S CORPORATE SEAL

_____

_____

-or-

WITNESSES:

(1) _____

(2) _____

ATTACHMENT A
List of Drawings
CONTRACT NUMBER: 99DE-0904

PROJECT: DISNEY'S GRAND FLORIDIAN RESORT AND SPA-ROOF REPLACEMENT

| Sheet No. | Sheet Title | | Date |
|---|---|---|---|
| 200 | Overall Project Roof Plan | | 02/22/99 |
| 201 | Sago Cay (Building No.20) Roof Plan | | 02/25/99 |
| 202 | Main Building Roof Plan (Partial) | | 02/25/99 |
| 203 | Main Building Roof Plan (Partial) | | 02/25/99 |
| 204 | Main Building Roof Plan (Partial) | | 12/03/98 |
| 205 | Conch Key (Building No.3) Roof Plan | | 02/25/99 |
| 206 | Sugar loaf Key (Building No. 4) Roof Plan | | 02/25/99 |
| 207 | Boca Chica Key (Building No.5) Roof Plan | | 12/03/98 |
| 208 | Big Pine Key (Building No.6) Roof Plan | | 02/22/99 |

**The Following Drawings are Issued for Information Only**

| Sheet No. | Sheet Title | | Date |
|---|---|---|---|
| AM2.1 | Monorail Station, Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.2 | Monorail Station, Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.3 | Main Bldg., Bldg. 1, Bldg. Elevation | Revision 15 | 10/07/86 |
| AM2.4 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.5 | Main Bldg., Bldg. 1, Bldg. Elevation | Revision 15 | 10/07/88 |
| AM2.6 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.7 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.8 | Main Bldg., Bldg. 1, Bldg. Elevation | Bulletin II | 06/01/88 |
| AM2.9 | Bldg. 1, Sections | Revision 9 | 06/17/86 |
| AM2.10 | Bldg. Sections | Bulletin Ii | 04/22/86 |
| AM2.1 | Lodge Bldg. "2" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.2 | Lodge Bldg. "2" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.6 | Lodge Bldg. "3" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.7 | Lodge Bldg. "3" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.11 | Lodge Bldg. "4" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.12 | Lodge Bldg. "4" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.15 | Lodge Bldg. "5" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.17 | Lodge Bldg. "6" Exterior Elevations | Bulletin II | 06/01/99 |
| AM2.18 | Lodge Bldg. "6" Exterior Elevations | Bulletin II | 06/01/99 |
| A-1 | Pool Bldg., Bldg. 7, floor, sections, elevations | Bulletin II | 06/01/99 |
| A8 | Seafood Lounge Bldg. "9" sections, elevations | TD 106R-4 | 05/15/87 |
| A-11 | Boat Bldg., Bldg "10", plans & elevations | TD126 | 06/04/87 |
| A-16 | Pargo Bldg., Bldg "12", elevations | JRG923BC | 10/01/86 |
| A-19 | Boat Dock, Bldg. "15" | Revision 15 | 10/07/86 |

**8 ½ x 11 Details (Bound at the end of Project manual)**

| Sheet No. | Sheet Title |
|---|---|
| 1.01 | Eave Flashing with Gutter (Typical) |
| 1.02 | Balcony/Dormer Step Flashing |
| 1.03 | Ridge Flashing Isometric and Section (Typical) |
| 1.04 | Valley Underlayment (Typical) |
| 1.05 | Hip Ridge Flashing (Typical) |
| 1.06 | Dormer Isometric (Flashing Conditions) |
| 1.07 | Crown Cap at Turrets |
| 1.08 | Rake Condition (Typical) |
| 1.09 | Guest Balcony Isometric (Valley and Step Flashing) |
| 10 | Transition – Shingle to Mod. Bit. System (Pargo Building) |
| 2.01 | Guest Balcony Rail Flashing 9Turret Gables0 |
| 2.02 | Flashing at Headwall (Typical) |
| 2.03 | Guest Balcony Rail Flashing (Typical Gable) |
| 2.04 | Transition Fabrication at Guest Balcony |
| 2.05 | Termination of Gutter at Wall |
| 2.06 | Expansion Joint Flashing |
| 2.07 | End Termination at Side Wall Flashing |
| 2.08 | Step Flashing at Side Wall |
| 2.09 | Valley Metal Flashing and Section |
| 3.01 | Edge Metal Profiles at Shingles |
| 3.02 | Edge Metal Lap JOINT AT Rake Condition (Typical) |
| 3.03 | Guest Balcony Wall to Rack Transition Fabrication |
| 3.04 | Edge metal Splice joint Cleat Detail |
| 3.05 | Turret Balconies Corner Flashing Fabrication |
| 3.06 | Valley metal Flashing |
| 3.07 | Outside Corner Eave Drip |
| 3.08 | Hip Transition Flashing |
| 3.09 | Expansion Flashing Fabrication |
| 4.01 | Gutter Expansion Joint Replacement |
| 4.02 | Gutter Fabrication Replacement |
| 4.03 | Gutter End Closure Fabrication |
| 5.01 | Light Strip Mounts |
| 5.02 | Ship's Ladder Mount |
| 5.03 | Roof Transition and Light Fixture Mount |
| 5.04 | Lightning Conductor Penetration |
| 5.05 | Drain Outlet |
| 5.06 | Chimney Flashing |
| 5.07 | Fastener Layout for Plywood |
| 5.08 | Exterior Corridor (Balcony) Flashing |

AGREEMENT NO. 99DE-1313

PROJECT: DISNEY'S GRAND FLORIDIAN RESORT AND SPA-ROOF REPLACEMENT QUALITY CONTROL SERVICES

EXECUTED
JUN - 1999

## AGREEMENT FOR PROFESSIONAL SERVICES

THIS AGREEMENT, made and entered into this **May 2, 1999**, between **Walt Disney World Co.** (herein referred to as the "Owner"), whose mailing address is P.O. Box 10000, Lake Buena Vista, FL 32830-1000, and **A/R/C Associates, Incorporated** (herein referred to as the "Consultant"), whose mailing address is 601 N. Fern Creek Ave. Su 100, , Orlando, FL 32803-4899.

### WITNESSETH

WHEREAS, Owner desires to employ the services of Consultant to perform the hereinafter described services in connection with Disney's Grand Floridian Resort And Spa-Roof Replacement Quality Control Services (hereinafter referred to as the "Project"), and Consultant desires to be so employed.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and obligations herein contained, the parties agree as follows:

Scope of Services.

    a. The nature, scope and schedule of services (hereinafter referred to as the "Basic Services") to be performed by Consultant under this Agreement, to the satisfaction of Owner, shall be as follows:

See attached Exhibit A incorporated herein by reference.

    b. Owner may, from time to time, authorize Consultant in writing to perform, in which event Consultant shall perform, services in connection with the Project which are outside the scope of those Basic Services set forth above. Any such services shall hereinafter be referred to as "Additional Services" and shall be governed by the provisions of this Agreement.

    c. Owner shall have the right at any time during the course of this Agreement to amend, modify, or reduce Consultant's Scope of Services as set forth above. Owner shall be entitled to an appropriate reduction in the fee as set forth in Article 4 of this Agreement, for any reduction in Consultant's Scope of Services.

    2. Time for Completion. Consultant shall commence the Basic Services upon execution of this Agreement by Consultant and Owner or upon receipt from Owner of written notice to proceed, whichever is earlier, and shall complete the same in accordance with the following schedule (hereinafter referred to as the "Schedule"), it being understood and agreed that time is of the essence of this Agreement:

See attached Exhibit B incorporated herein by reference.

Consultant shall accelerate performance of its Basic Services and Additional Services in the manner directed by Owner in the event Owner, in its sole discretion, determines that such acceleration is necessary to maintain the Schedule. If acceleration is required as a result of delays caused solely by Consultant, acceleration shall be at no cost to Owner. If acceleration is required as a result of delays partially caused by Consultant, such portion of any delay partially caused by Consultant shall not be compensated as an Additional Service, and such other portion of any such delay shall be compensated as an Additional Service.

RECEIVED
JUN 22

WDW-1
000990

Exhibit B

3. <u>Project Construction Budget</u>. - Not Applicable.

4. <u>Fees</u>.

    a. The Owner shall pay to Consultant, for its Basic Services as set forth in this Agreement, a not-to-exceed fee based on the hourly rates of Consultant's personnel, as set forth in Exhibit E, attached hereto and incorporated herein by reference. The total of all such hourly rates multiplied by the total hours incurred by Consultant in performance of its Basic Services hereunder shall not exceed the amount of **Fifty Four Thousand Dollars ($54,000.00) DOLLARS**. In addition to the above, the Owner shall pay the Consultant for Reimbursable Expenses in an amount not to exceed **Two Thousand One Hundred Dollars ($2,100.00) DOLLARS** as defined below.

    b. Progress payments shall be made monthly based upon actual services or hours completed plus Reimbursable Expenses. Consultant shall deliver to Owner, in the form approved by Owner, an invoice on the first day of each calendar month for services rendered during the preceding month plus Reimbursable Expenses. Subject to the hourly rates, the not-to-exceed fee, and the Reimbursable Expense Guidelines set forth below, Owner shall pay each approved invoiced amount within 30 days from receipt of such invoice.

    c. Reimbursable Expenses shall include only the following actual and necessary costs and expenses reasonably and properly incurred by Consultant in connection with the services rendered under this Agreement:

Expenses are limited to reimbursement for mileage only, at the rate of $0.31 per mile as approved by Owner.

    d. Consultant shall provide all supporting documentation with respect to its monthly invoice, as required by the Owner, in connection with all services performed and Reimbursable Expenses incurred.

    e. Consultant shall be compensated for any services beyond those set forth in Articles 1, 2, and 3 as Additional Services, in such an amount as the parties shall mutually agree in advance. Consultant shall not be entitled to compensation for Additional Services unless Consultant has notified Owner in writing prior to performing such Additional Services, and has received prior written authorization from Owner.

    f. All invoices should reference the Agreement number and be returned to the following address:

WALT DISNEY WORLD®, Facility Asset Management
Attention: Steve Coole
P.O. Box 10000
Lake Buena Vista, FL 32830-1000

5. <u>Books and Records</u>. Consultant shall maintain comprehensive books and records relating to any services performed under this Agreement, which shall be retained by Consultant for a period of at least four (4) years from and after the completion of any services hereunder. Owner, or its authorized representatives, shall have the right to audit such books and records at all reasonable times upon prior notice to Consultant.

6. Ownership of Documents.

   a. Title to all plans, drawings, specifications, ideas, concepts, designs, sketches, models, artwork, programs, software, reports, or other tangible work product produced, originally developed, or submitted to Owner by Consultant, pursuant to this Agreement shall be and remain the sole and exclusive property of Owner when produced.

   b. The Consultant shall deliver all such original work product to Owner upon completion thereof unless it is necessary for Consultant in Owner's sole discretion, to retain possession for a longer period of time. Upon early termination of Consultant's services hereunder, Consultant shall deliver all such original work product whether complete or not. Owner shall have all rights to use any and all work product. Consultant shall retain copies for its permanent records, provided the same are not used without Owner's prior express written consent. Consultant agrees not to recreate any designs, or any other tangible work product contemplated by this Agreement, or portions thereof, originally developed under, which if constructed or otherwise materialized, would be reasonably identifiable with the tangible work product originally developed by Consultant pursuant to this Agreement, or the project. If said work product is used by Owner for any purpose other than that purpose which is intended by this Agreement, the Owner shall indemnify Consultant from any and all claims and liabilities which may result from such re-use, in the event Consultant does not consent to such re-use.

   c. Owner exclusively retains all manufacturing rights to all materials or designs developed under this Agreement. To the extent the services performed under this Agreement produce or include copyrightable or patentable materials or designs, such materials or designs are work made for hire for Owner as the author, creator, or inventor thereof upon creation, and Owner shall have all rights therein including, without limitation, the right of reproduction, with respect to such work. Consultant hereby assigns to Owner any and all rights Consultant may have including, without limitation, the copyright, with respect to such work. The Consultant acknowledges that Owner is the motivating factor for, and for the purpose of copyright or patent, has the right to direct and supervise the preparation of such copyrightable or patentable materials or designs.

7. Confidentiality of Material. Consultant may, during the course of its engagement hereunder, have access to, be provided or acquire knowledge of or from, material, data, strategies, systems or other information relating to the Project or Owner, or its parent, affiliated, or related companies, which may not be accessible or known to the general public. All such information shall remain Owner's exclusive property and all such knowledge acquired by Consultant shall not be used, published or divulged by Consultant to any other person, firm or corporation, or in any advertising or promotion regarding Consultant or its services, or in any other manner or connection whatsoever without first having obtained the written permission of Owner, which permission Owner may withhold in its sole discretion.

8. Insurance; Indemnification.

   a. Consultant shall, throughout the performance of its services pursuant to this Agreement maintain, {and in the case of item (iv) below,} for a period of one year from the date of completion of Consultant's services under this Agreement, or for a period of one year from the date of Substantial Completion of the construction of the Project, whichever is later:

   (i) Occurrence basis commercial general liability insurance (including broad form contractual coverage), with minimum limits of $1,000,000.00 per occurrence and $1,000,000.00 per annual aggregate liability for protection from claims for bodily injury (including death) and property damage which may arise from or in connection with the performance of Consultant's services hereunder or from or out of any act or omission of Consultant, its Subconsultants, and their officers, directors, agents, and employees;

   (ii) Automobile liability insurance with minimum limits of $1,000,000.00 per occurrence and $1,000,000.00 per annual aggregate;

WDW-1
000992