THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: W.R. Grace & Co., et al., | ) CHAPTER 11 |
| | ) |
| DEBTORS, | ) BANKRUPTCY NO. 01-01139 (JJF) |
| | ) (Jointly Administered) |
| MRS. JACKIE LEWIS, BONNIE LEWIS, | ) |
| THOMAS LEWIS, PAMELA TELLESCH, | ) |
| WAYNE TELLESCH, BRIDGET LOEHNER, | ) |
| DENNIS LOEHNER, AND MRS. JANE ZAJAC, | ) |
| on behalf of themselves and all others similarly | ) |
| situated, | ) |
| | ) |
| Plaintiffs, | ) ADVERSARY COMPLAINT |
| v. | ) |
| | ) |
| W.R. GRACE & COMPANY (a Delaware | ) |
| Corporation); W.R. GRACE & COMPANY- | ) |
| CONN (a Connecticut Corporation); W.R. GRACE | ) Adversary No. 01-_____ |
| & COL., a/k/a/ GRACE, an association of business | ) |
| entities; and SEALED AIR CORPORATION (a | ) |
| Delaware Corporation), NATIONAL MEDICAL | ) |
| CARE, INC.; FRESENIUS A.G.; FRESENIUS | ) |
| U.S.A., INC. and FRESENIUS NATIONAL | ) |
| MEDICAL CARE, INC., a/k/a FRESENIUS | ) |
| MEDICAL CARE HOLDINGS, INC., | ) |
| | ) |
| Defendants. | |

## CLASS ACTION COMPLAINT SEEKING
## ZONOLITE ATTIC INSULATION RELIEF

The plaintiffs, Mrs. Jackie Lewis, Bonnie Lewis, Thomas Lewis, Pamela Tellesch,

Wayne Tellesch, Bridget Loehner, Dennis Loehner and Mrs. Jane Zajac (Plaintiffs), on behalf of

themselves and all others similarly situated and, as Plaintiffs in the above-captioned adversary

proceeding, allege for their complaint, upon knowledge of their own acts and upon information

and belief as to all other matters, as follows:

## Introduction

1.      This is an adversary proceeding under Fed. R. Bankr. P. 7001 (7) and (9) and Fed. R. Bankr. P. 7065,  brought on behalf of thousands of property owners in the United States and its territories whose properties contain Zonolite Attic Insulation (ZAI), an asbestos-containing loose fill product that unknowingly contaminates the properties of its consumers and that was manufactured solely by the debtor, W.R. Grace & Co. (Grace) and related entities. [1]  This adversary proceeding seeks to achieve three salient goals of this Chapter 11 case.

2.      First, this adversary proceeding seeks nationwide class certification of the Zonolite claims in order to achieve the fair and efficient adjudication of ZAI matters consistent with the constitutional and statutory due process rights of many tens of thousands American property owners and those exposed to ZAI.  Only through the exercise of powers granted by Rule 23 of the Federal Rules of Civil Procedure may the shared ends of efficiency, finality and fairness be achieved.  Particularly where, as here, almost all of the thousands exposed to ZAI have *no* information *whatsoever* about the ZAI contamination issues, nor of the public health issues surrounding it, nor of the widespread nature of ZAI, nor even of its presence (or lack thereof) in a particular home, Rule 23 as the only available tool that will provide an efficient,

---

[1]    The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecaig, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-g II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Crop., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

00101161

final and fair resolution of the claims.

3.      Second, this adversary proceeding seeks creation, on behalf of the nationwide

Class, of a reasonable program designed to notify and educate owners of ZAI contaminated

property and to enable them to take preventative and restorative measures to eliminate the

dangers posed by exposure to ZAI created by Grace and related entities.  Paramount among the

objectives of the adversary proceeding is the dissemination of health and safety warnings

through an on-going educational campaign to ensure that American property owners are apprized

of the dangers associated with asbestos contaminated insulation, thus averting potential injury

and permitting persons to take reasonable precautionary measures to protect themselves and

others at risk of exposure.  Educational programs would also provide ZAI consumers with

information as to the  necessary precautions required to minimize asbestos exposure and further

contamination of their properties.  The remediation component will ensure the availability of

appropriate, uniform operation and maintenance of abatement activities.   Absent such relief,

Americans with ZAI contaminated property will unknowingly and needlessly expose themselves

and others to unsafe levels of airborne asbestos.  It is highly likely that, in time, exposure to this

deadly carcinogen  will be manifested by a multitude of often fatal diseases.

4.      Third, this adversary proceeding seeks to hold Grace's related entities, Sealed Air

Corporation (Sealed Air) and National Medical Care, Inc. and its successors (NMC), directly

liable to ZAI property owners.  Given the magnitude of the wrongful conduct of Grace and its

related entities of Sealed Air and NMC – manufacture and distribution of known asbestos-

containing ZAI for decades to American property owners – and the clear necessity to abate the

hazard currently posed by the continued use of the product; adjudication of direct and fraudulent

transferred liability against Grace, Sealed Air and NMC is necessary to resolve all claims of

3

those individuals exposed to ZAI contaminated properties.

## Parties

5.      Plaintiff, Mrs. Jackie Lewis, is a resident of Vincennes, Indiana and owner of real property in Indiana where Zonolite Attic Insulation has been installed.  Mrs. Jackie Lewis is prepared to serve as representative of a Class of all others similarly situated.

6.      Plaintiffs, Bonnie Lewis and Thomas Lewis, are residents of Vincennes, Indiana and owners of real property in Indiana where Zonolite Attic Insulation has been installed. Bonnie Lewis and Thomas Lewis are also prepared to serve as representative of a Class of all others similarly situated.

7.      Plaintiffs, Pamela Tellesch andWayne Tellesch, are residents of Cutbank, Montana and owners of real property in Montana where Zonolite Attic Insulation has been installed.  Pamela Tellesch and Wayne Tellesch are also prepared to serve as representative of a Class of all others similarly situated.

8.      Plaintiffs, Dennis Loehner and Bridget Loehner, are residents of South Milwaukee, Wisconsin and owners of real property in Wisconsin where Zonolite Attic Insulation has been installed.  Dennis Loehner and Bridget Loehner are also prepared to serve as representative of a Class of all others similarly situated.

9.      Plaintiff, Mrs. Jane Zajac, is a resident of Milwaukee, Wisconsin and owner of real property in Milwaukee, Wisconsin where Zonolite Attic Insulation has been installed.  Mrs. Jane Zajac is also prepared to serve as representative of a Class of all others similarly situated.

10.      Defendant, W.R. Grace & Company-Conn (Grace Connecticut), is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of

4

business in Columbia, Maryland.  At all times relevant to facts alleged in this Complaint, Grace

Connecticut, or its predecessor in interest, engaged in the business of mining manufacturing,

marketing, distributing, and selling Zonolite Attic Insulation throughout the United States,

including throughout Montana.

11.     Defendant, W.R. Grace & Company (Delaware) (hereinafter "Grace Delaware"),

is a corporation organized and existing under the laws of the State of Delaware, with its principal

place of business in Columbia, Maryland.  Grace Delaware is an alter ego of Grace Connecticut

and it is a successor corporation that is liable for the actions of predecessor companies, including

W.R. Grace & Co.-Conn., W.R. Grace & Co., a New York corporation, Grace Holding, Inc.,

Montana Vermiculite Company, and Zonolite Company with respect to the claims and

allegations of this complaint.  At times relevant to facts alleged in this Complaint, Grace

Delaware was, *de facto*, a manufacturer and seller of Zonolite Attic Insulation throughout the

United States, including Montana.

12.     Defendant, W. R. Grace & Co., a/k/a GRACE, is an association of corporations,

conglomerates, holding companies, and other business entities and persons transacting business

in Montana under the common name "W.R. Grace & Co." and/or "GRACE."  The associated

entities so conducting business include Grace Holding, Inc., a Delaware corporation, W.R. Grace

and Co., a New York corporation, W.R. Grace & Co., a Delaware corporation, W.R. Grace and

Co.-Conn., a Connecticut corporation, and other corporations, subsidiaries and business entities.

This association of business entities is hereinafter referred to as "the Grace Association".

13.     Defendant, Sealed Air Corporation (Sealed Air), is a Delaware corporation and a

successor corporation which is liable for the actions of predecessor companies, including W.R.

Grace & Co., a Delaware corporation (Old Grace), W.R. Grace & Co.-Conn., W.R. Grace & Co.,

00101161

a New York corporation, Grace Holding, Inc., Montana Vermiculite Company, and Zonolite Company with respect to the claims and allegations of this complaint. Sealed Air's principal place of business is in Saddle Brook, New Jersey. W.R. Grace created Sealed Air in order to fraudulently shield the assets of the above-named defendants from anticipated liability for asbestos claims including the claims asserted in this Complaint. Sealed Air does business in the State of Montana.

14.    Grace Connecticut, Grace Delaware, the Grace Association, and Sealed Air are hereinafter collectively referred to as "Grace."

15.    Defendant National Medical Care, Inc. (NMC), is a New York corporation with its corporate headquarters located at 1610 Trapelo Road, Waltham, Massachusetts. At all times relevant to the facts alleged in this complaint, National Medical Care, Inc., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company), engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation. Defendant National Medical Care, Inc. is a successor corporation liable for the actions of its predecessor corporations and was created in order to fraudulently shield the assets of those predecessor corporations.

16.    Defendant Fresenius A.G. is a foreign corporation with its corporate headquarters located at Bordenberg 14, 61440 Oberursel, Germany. At all times relevant to the facts alleged in this complaint, Fresenius A.G., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite

00101161

Company) engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation.  Defendant Fresenius A.G. is a successor corporation liable for the actions of predecessor corporations and was created in order to fraudulently shield the assets of its predecessor corporations.

17.    Defendant Fresenius U.S.A., Inc. is a Delaware corporation with its corporate headquarters located at 2637 Shadelands Dr., Walnut Creek, California 94598.  At all times relevant to the facts alleged in this complaint, Fresenius U.S.A., Inc., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation.  Defendant Fresenius U.S.A., Inc. is a successor corporation liable for the actions of its predecessor corporations and was created in order to fraudulently shield the assets of its predecessors corporations.

18.    Defendant Fresenius Medical Care, A.G. is a German Corporation with its principal place of business at Gluckensteinweg 5, 61343 Bad Homburg, Germany.  At all times relevant to the facts alleged in this complaint, Fresenius Medical Care, A.G., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation.  Defendant Fresenius Medical Care A.G. is a successor corporation liable for the actions of its predecessor corporations and was created in order to fraudulently shield the assets of its predecessor

00101161

corporations.

19.     Defendant Fresenius National Medical Care, Inc., a/k/a Fresenius Medical Care Holdings, Inc., is the name of the reorganized entity created through the fraudulent conveyances described herein; a New York Corporation headquarters in Massachusetts.  At all times relevant to the facts alleged in this complaint, Fresenius National Medical Care, Inc., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation.  Defendant Fresenius National Medical Care, Inc. is a successor corporation liable for the actions of its predecessor corporations and was created in order to fraudulently shield the assets of those predecessor corporations.

## Jurisdiction and Venue

20.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § § 157 and 1334.  This adversary proceeding is a non-core proceeding pursuant to 28 U.S.C. § 157.

21.     This Court has personal jurisdiction over each of the parties.

22.     Venue of this action in this district is proper pursuant to 28 U.S.C. § 1409.

8

23.     The relief requested herein is predicated on Fed. R. Bankr. P. 7065 and Fed R.

Civ. P. 23.

## Facts

### The Manufacture and Distribution of ZAI

24.     Grace, Sealed Air and NMC were the manufacturers, distributors, and sellers of

Zonolite Attic Insulation.

25.     Zonolite Attic Insulation is chiefly composed of expanded vermiculite ore.

26.     The predominant source of vermiculite ore used by Grace in the production of

Zonolite Attic Insulation was Grace's vermiculite mine located on Zonolite Mountain near

Libby, Montana.

27.     Grace transported vermiculite ore from Zonolite Mountain to expansion plants

throughout the United States for purposes of manufacturing the finished insulation product,

Zonolite Attic Insulation.

28.     Zonolite Attic Insulation manufactured, distributed, and sold by Defendants was

purchased and installed in attics of thousands of homes, businesses, and other properties located

throughout the State of Montana and the United States.

29.     Plaintiffs are owners of real property in which Zonolite Attic Insulation

manufactured and sold by Defendants was installed, which insulation was manufactured from

vermiculite ore originating from Grace's Libby, Montana mine.

30.     Zonolite Attic Insulation manufactured by Defendants from Libby vermiculite ore

is contaminated with asbestos, including tremolite, a rare and exceedingly deadly form of

asbestos.

9

31.     Zonolite Attic Insulation is a loose-fill type insulation.  Asbestos contained in Zonolite Attic Insulation takes the form of microscopic dust that is readily suspended, re-suspended, and lofted into the air upon the slightest disturbance of Zonolite Attic Insulation.  Once suspended, asbestos fibers maintain their fog-like airborne status for extended periods of time, are readily transported by natural air currents, and represent a continuing source of exposure.

32.     Tremolite asbestos itself consists of sharp, microscopic needle-like fibers that are readily inhaled and easily pierce and lodge in the lining of the lungs.  The lungs are unable to remove tremolite asbestos that penetrates the lung tissue, and fibers are not washed out of the lung tissue by blood.  As a result, the assaulted lung areas become inflamed, in time heavily scarred, and ultimately fail to function.  For persons inflicted with this slow and lingering disease process, it becomes increasingly difficult to breathe.  Ultimately, the person suffocates.

33.     Asbestos is a virtually indestructible substance.  There is no known safe level of exposure to asbestos.

34.     Asbestos is a known human carcinogen.  Inhalation of asbestos fibers, either through chronic exposure or one-time heavy exposure, can lead to mesothelioma (a diffuse cancer which spreads over the lung lining surface), lung cancer, asbestosis, and other pulmonary diseases that are progressive and often fatal.

35.     Disturbance of Zonolite Attic Insulation exposes individuals to heavy doses of airborne asbestos sufficient to cause mesothelioma, lung cancer, asbestosis, and other serious pulmonary diseases.

36.     At all times material to allegations made in this Complaint, Defendants had actual knowledge that Zonolite Attic Insulation manufactured from Libby, Montana  Digi Int'l, Inc.

Sec. Litig., 6 F. Supp. 2d 1089, 1103 (D. Minn. 1998), vermiculite was dangerously contaminated with asbestos.

37.    At all times material to allegations made in this Complaint, Defendants had actual knowledge that exposure to Zonolite Attic Insulation in the ordinary use of that product, exposed users to dangerous levels of asbestos dust.

38.    Zonolite Attic Insulation manufactured by Defendants has caused asbestos contamination to real property in which that product has been installed.

39.    Individuals engaged in ordinary activities commonly associated with property ownership disturb Zonolite Attic Insulation, lofting dangerous levels of asbestos into the air they breathe.  Such activities include use of attic spaces for storage of personal belongings, home maintenance activities that involve accessing attic space, home remodeling, installing or replacing of electrical fixtures, upgrading of attic insulation, and use of attic spaces by children for play.

40.    Asbestos dust contaminated in Zonolite Attic Insulation can readily migrate from attic spaces into living spaces in homes, constituting a present threat to persons occupying those homes.  As such, individuals engaged in the ordinary use and enjoyment of their real property in which Zonolite Attic Insulation is installed are exposed to levels of asbestos threatening to their health and safety.

41.    Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are often unaware that Zonolite Attic Insulation is even present within their home.  Further, persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that Zonolite Attic Insulation contains dangerous levels of asbestos and are unaware of the health risks associated with asbestos.

00101161

42.     Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that disturbing of Zonolite Attic Insulation exposes individuals to dangerous levels of asbestos.  Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that Zonolite Attic Insulation has contaminated their real property.  Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that they must exercise extreme caution where contact with Zonolite Attic Insulation is possible so as to avoid exposure to asbestos dust contained in Zonolite Attic Insulation.

43.     While consumers remain essentially unaware of the substantial dangers posed by Zonolite Attic Insulation, Defendants and/or their predecessor corporations were aware of such dangers and engaged in an intentional pattern and practice of concealing the dangers associated with Zonolite Attic Insulation.

44.     From approximately 1930 until 1963, Zonolite Company operated the vermiculite mining and processing plant on Zonolite Mountain.  Grace acquired the Libby vermiculite mine from Zonolite Company in 1963.  Grace had actual knowledge at the time of its purchase that the vermiculite ore mined from Zonolite Mountain, and used to manufacture Zonolite Attic Insulation, was heavily contaminated with tremolite asbestos.  Grace was aware of reliable estimates that ore originating from Zonolite Mountain regularly contained in excess of 20% asbestos.

45.     At all times material to facts alleged in this Complaint, Defendants and their predecessor corporations had actual knowledge that asbestos was extraordinarily dangerous and that exposure to even minuscule levels of asbestos causes potentially fatal diseases, including asbestosis, lung cancer, and mesothelioma.

46.     Grace was aware of secret medical tests by Zonolite Company that demonstrated

12

that a substantial portion of Zonolite Company's workforce had contracted lung diseases as a result of exposure to the asbestos contained in the vermiculite used to manufacture Zonolite Attic Insulation.  These included the July 20, 1959 report to Raymond Bleich, and August 25, 1964 report to Joseph Kelley, a January 29, 1965 report from Dr. Spicer, and a December 23, 1969 in-house study showing lung disease in 92% of long-term workers.

47.    In the 1970's, Grace conducted internal tests confirming high incidents of lung disease among workers exposed to vermiculite used in the manufacture of Zonolite Attic Insulation including an in-house study reported in a May 24, 1977 memorandum showing these workers' risk of cancer was "five times the national average."

48.    Despite actual knowledge of the health risks associated with Zonolite Attic Insulation, Defendants and/or their predecessor corporations continued to aggressively manufacture, promote, distribute, and sell Zonolite Attic Insulation while concealing and/or failing to disclose the substantial risks of disease associated with asbestos exposure.

49.    Defendants and/or their predecessor corporations conducted secret animal tests that demonstrated an association between tremolite asbestos and mesothelioma including Dr. W. Smith's biological testing (final report May 25, 1978).  Despite those findings confirmed by its own tests, Grace publicly denied the existence of a relationship between tremolite asbestos exposure and mesothelioma including in a letter dated May 8, 1979 to county health officer Dr. Richard Irons.

50.    Despite knowledge of the unreasonable risks to human health, Defendants or their predecessor corporations intentionally chose to not warn the public of health risks associated with Zonolite Attic Insulation including an advised decision "not to affix labels" on attic insulation products (May 24, 1977).  This decision to conceal from the public such health risks

was predicated on a calculation of the financial reward to Defendants or their predecessors corporations should the public be kept uninformed.  Written analysis of the financial consequences include a May 24, 1977 "Zonolite Profitability Impact" projecting a "10-50% reduction in sales volume that would result from a requirement to label our products as containing asbestos."

51.     Until Grace withdrew Zonolite Attic Insulation from the market in 1984, Defendants and/or their predecessor corporations affirmatively and actively engaged in steps to conceal the toxicity and dangers of Zonolite Attic Insulation from the public and government agencies charged with police powers to protect public health and safety.

52.     In the 1970s, state and federal officials cited various plants belonging to Grace for excessive asbestos exposures levels including those summarized in the September 21, 1971 memo to R.M. Coquillette.  Defendants and/or their predecessor corporations did not normally consider controls to abate these levels "until a citation issued" and only then would each plant be addressed  "singly as they are forced to comply."

53.     Defendants and/or their predecessors corporations, falsely and/or misleadingly represented to government officials that Zonolite Attic Insulation had been treated with a binder (a substance that would prevent deadly tremolite fibers from being released into the air) while, in fact, no such binder had been successfully developed or applied to Defendants' Zonolite Attic Insulation product.

54.     Defendants and/or their predecessor corporations failed to test adequately or properly the use of a binder in preventing hazardous exposure to asbestos.

55.     Although Defendants and/or their predecessor corporations publicly represented that Zonolite Attic Insulation posed no health hazard, internal Grace memoranda, including a

14

May 24, 1977 memo from Wood to Brooks and Graf, demonstrate that Grace knew that Zonolite

Attic Insulation posed an unreasonable risk to human health with exposure "concentrations

upward of 15 f/ml" and that Grace anticipated that Zonolite Attic Insulation would "eventually

be banned" by government agencies.

56.      As early as 1977, Grace drafted a press release, stating that it was

"sufficiently concerned about the entire issue of asbestos and associated health hazards to

discontinue this product (Zonolite Attic Insulation)."  Despite actual knowledge by Defendants

and/or their predecessor corporations that Zonolite Attic Insulation posed a substantial hazard to

the consuming public, they determined to withhold this important press release to conceal the

health hazards associated with Zonolite Attic Insulation, and to continue to aggressively sell

Zonolite Attic Insulation for an additional seven years.

57.      Defendants and/or their predecessor corporations had superior knowledge, as

compared with the consuming public and government enforcement agencies, with respect to the

health dangers posed by Zonolite Attic Insulation, but concealed their knowledge of the health

dangers associated with their product because they believed that asbestos contained in Zonolite

Attic Insulation would remain undetected.

58.      As a proximate result of the conduct of the Defendants and/or their predecessor

corporations, there is a present, compelling, and immediate need to provide appropriate warnings

to the public of the health dangers associated with Zonolite Attic Insulation.  Necessary warnings

include:

a).      Warning that Zonolite Attic Insulation contains tremolite, an especially

dangerous form of asbestos, and that persons should avoid exposure to Zonolite Attic Insulation;

b).      Warning that disturbing Zonolite Attic Insulation exposes individuals to

00101161

hazardous levels of asbestos;

    c).    Warning that persons should not enter or use attic spaces in properties believed to contain Zonolite Attic Insulation, together with advisories on how to identify Zonolite Attic Insulation;

    d).    Warning that tests should be conducted on properties where Zonolite Attic Insulation has been disturbed and that disturbance poses a threat that asbestos may have been transported to living spaces of the property; and

    e).    Warning that property owners and occupants where Zonolite Attic Insulation has been installed should not engage in remodeling or other activities that involve the disturbance of Zonolite Attic Insulation until an asbestos containment plan has been established by qualified asbestos abatement personnel.

59.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, real properties of Plaintiffs and Class members have been contaminated with asbestos, requiring the development and implementation of an appropriate operations and maintenance program to limit further exposure to dangerous levels of asbestos.

60.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, Plaintiffs and Class members will incur substantial costs of property remediation, restoration, and asbestos abatement.

61.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, owners of real property containing Zonolite Attic Insulation have been deprived of the use and quiet enjoyment of their real property.

62.    Plaintiffs and members of the Class possess property interests in claims against various Defendants and/or their predecessor corporations for harms arising out of

conduct asserted in the Complaint.  Defendants and their predecessor corporations knowingly

caused injury to the property interests of Plaintiffs and Class members, including through actions

to fraudulently shield assets of one another for purposes of evading asbestos liability.

63.    Nationwide, experts estimate that at least 21 million American workers

have been exposed to "significant" amounts of asbestos at the workplace since 1940.  Millions

others have been exposed through environmental contact or contact with relatives who have

worked with the products.  Because of its injurious propensities, such exposure, in human terms,

has meant that literally tens of thousands of people fall ill or die from asbestos-related diseases

every year.  In legal terms, it has translated into a myriad of lawsuits that have drained judicial

resources.

<u>The Corporate Reorganizations</u>

64.    Aware of its potential risk of asbestos liability of enormous proportions, Grace

initiated corporate restructuring transactions during the last decade specifically designed to

shield assets from actual or potential judgments.

<u>The 1996 Fraudulent Transfer</u>

65.    On February 4, 1996, Grace and Fresenius A.G. signed an Agreement

and Plan of Reorganization and other related agreements. This transaction was designed to strip

out and segregate NMC and other good assets from Grace's specialty chemicals business and

asbestos exposure, thus leaving Grace without sufficient capital to pay its asbestos victims and

creditors.

66.    Briefly stated, the September 28 and 29, 1996 transactions unfolded as

follows:

a)    Before the transactions, NMC was a wholly-owned subsidiary of Grace-

Conn. (Grace Chemicals), which in turn was a wholly-owned subsidiary of the parent company

Grace;

      b)     Grace-Conn. transferred the stock of NMC to its parent Grace, thus

making Grace-Conn. and NMC equal sibling subsidiaries of Grace;

      c)     Grace then transferred the Grace-Conn. stock to a newly-formed

subsidiary of Grace, Grace Holding Company, Inc.;

      d)     Grace then spun-off and gave to its shareholders this brand new

subsidiary, Grace Holding Company, Inc., as a totally separate company.  Thus, Grace's sole

asset became NMC;

      e)     Grace (and, of course, NMC) then merged with Fresenius Medical Care

A.G., a wholly-owned subsidiary of Fresenius A.G.  Grace's shareholders effectively received

44.8% of the stock of the new entity, Fresenius National Medical Care (FNMC), and Grace

ceased to exist; and

      f)     Grace Holding Company Inc. was renamed W. R. Grace & Co., a

Delaware corporation.

    67.    The effect of this series of transactions is that Grace-Conn. – the entity with

carrying full responsibility for the asbestos liability and the "new" W. R. Grace & Co. – is totally

stripped of, and segregated from, its profitable former subsidiary NMC.  W. R. Grace & Co. was,

therefore, left with full responsibility for satisfying Grace's asbestos liabilities, but, as intended,

was left undercapitalized and did not receive fair value for its now lost assets.

    68.    In SEC Form S-4 regarding these 1996 transactions, Grace

expressly recognized that the transactions may constitute a fraudulent transfer.  In a section titled

"Fraudulent Transfer and Related Considerations," Grace acknowledged its exposure when it

stated:

> Under applicable law, the NMC Distribution would constitute a
> 'fraudulent transfer' if (a)New Grace or Grace Chemicals is
> insolvent, (b) the effect of the NMC Distribution would render
> New Grace or Grace Chemicals insolvent, (c) the NMC
> Distribution would leave New Grace or Grace Chemicals
> unreasonably small capital, or (d) New Grace or Grace Chemicals
> intended to incur, or believed it would incur, debts beyond its
> ability to pay as such debts mature. . . .  Grace believes that, based
> on the factors considered in connection with the NMC
> Distribution, the NMC Distribution will not be a fraudulent
> transfer and will be made out of surplus in accordance with
> applicable law.  There is no certainty, however, that a court would
> reach the same conclusion in determining that New Grace and
> Grace Chemicals have satisfied the applicable standards.  In this
> regard, it should be noted that Grace Chemicals has had, and is
> expected to continue to have, significant liabilities arising out of
> asbestos-related litigation and claims . . . .  If, in a lawsuit filed by
> an unpaid creditor or a representative of unpaid creditors or a
> trustee in bankruptcy, a court were to find that, at the time the
> NMC Distribution was consummated or after giving effect thereto,
> either New Grace or Grace Chemicals, as the case may be, (a) was
> insolvent, (b) was rendered insolvent by reason of the NMC
> Distribution, (c) was engaged in a business or transaction for
> which its remaining assets constituted unreasonably small capital,
> or (d) intended to incur, or believed it would incur, debts beyond
> its ability to pay as such debts matured, then such court might
> require FNMC or NMC to fund certain liabilities of New Grace or
> Grace Chemicals, as the case may be, for the benefit of New
> Grace's or Grace Chemicals' creditors.  The same consequences
> would also apply were a court to find that the NMC Distribution
> was not made out of the surplus of Grace Chemicals.

69.     As Grace fully expected, the 1996 "NMC Distribution" rendered

Grace insolvent – with unreasonably limited capital reserves.  Grace intended and believed that

following, and as a result of, the NMC Distribution transactions, it would have debts beyond its ability

to pay such debts as they matured.

### The 1998 Fraudulent Transfer

70.     In August 1997, Grace – consisting of the pared-down former W.R.

Grace-Conn.– entered into an agreement with Sealed Air to effect another fraudulent conveyance

transaction structured almost identically to Grace's 1996 fraudulent conveyance transactions involving

Fresenius.  In this instance, Grace segregated its packaging business from its chemical subsidiary's

asbestos liability, thus further diminishing Grace's capital and its ability to pay its asbestos victims and

creditors.

  71.  Briefly stated, the March 1998 transaction unfolded as follows:

    a)  Before the transactions, Grace consisted of a specialty chemicals business

and a packaging business;

    b)  Grace separated its specialty chemicals business and a packaging business

into two separate subsidiaries;

    c)  Grace then transferred the stock of Grace-Conn. (it specialty chemicals

company) to a newly formed subsidiary of Grace, Grace Specialty Chemicals, Inc.;

    d)  Grace then spun-off to its shareholders this brand new subsidiary, Grace

Specialty Chemicals, as a totally separate company.  This left Grace with its packaging business

as its sole asset;

    e)  Grace (with its sole asset the packaging company) then merged with and

became

Sealed Air Corporation, a company outside the Grace family of companies; and

    f)  Grace's shareholders effectively received 63% of the stock of Sealed Air

Corporation.

  72.  The result of these transactions is that Grace has been completely and

intentionally severed  and from, its profitable, formerly affiliated packaging business.  The new

W. R. Grace & Co. remains solely responsible for satisfying Grace's asbestos liabilities, but is

purposefully undercapitalized because its assets have been channeled to its affiliates.

73.    In another Form S-4 filing with the SEC, Grace acknowledged – as it had

with regard to its September 1996 series of transactions – that its March 1998 series of

transactions constitute a fraudulent transfer:

> Claimants may also bring suit seeking recovery from New Seale
> Air or its subsidiaries by claiming that the transfers of assets and
> liabilities in connection with the reorganization of Grace, including
> the separation of Grace's packaging and specialty chemicals
> businesses and the cash transfer to and spin-off of New Grace,
> were 'fraudulent transfers.'  A transfer would be a fraudulent
> transfer if the transferor received less than reasonably equivalent
> value transferor was insolvent at the time of the transfer, was
> rendered insolvent by the transfer or was left with unreasonably
> small capital to engage in its business.  A transfer may also be a
> fraudulent transfer if it was made to hinder, delay or defraud
> creditors.  If any transfers in connection with the reorganization of
> Grace are found to be fraudulent transfers, the recipient (including
> New Sealed Air and its subsidiaries) might be required to return
> the property in the transferor.

74.    Grace represented that the newly-formed W. R. Grace & Co. would be

adequately capitalized and purported to believe that the transfers effected in the 1998 transactions were not

fraudulent.  Grace admitted, however, in this SEC filing that "a court applying the relevant legal standards

may not reach the same conclusion."

75.    Valued by the market at more than $6 billion, the 1998 transactions

provided substantial value to Grace's shareholders, who received 100% of the second "new" W. R. Grace &

Co., a premier global specialty chemicals company.   The shareholders also received common and preferred

stock representing approximately 63% of the "new" Sealed Air – the company combining Grace's former

Cryovac business with Sealed Air's protective packaging business.

76.    As a result of the 1996 and 1998 fraudulent transfer transactions, the so-

called W. R. Grace & Co. entity, holding all liability for all of Grace's asbestos claims, is a mere shadow of

its former self.  Virtually all the conglomerate's assets have been successfully and illegally secured from

asbestos claims liability.  Thus, the asbestos liabilities facing Grace far exceed Grace's fraudulently

diminished worth and far exceed Grace's ability to pay its debts as they mature.

Claims Known to Grace When Undertaking Transfers

77.     As of 1996, Grace was aware that it faced tremendous exposure in the

asbestos litigation against it.   As of December 31, 1996, Grace reported its aggregate accrued asbestos

liabilities to be $994.1 million.  That amount included all pending personal injury and property damage

claims as well as personal injury claims Grace expected to be filed through 2001.

78.     Grace's asbestos litigation exposure has increased over time.  According to its

Form-10K filed with the SEC on March 28, 2000, as of December 31, 1999, W. R. Grace &

Company was a defendant named in approximately 50,342 asbestos-related lawsuits involving

105,670 claims for personal injury.  This number represented an increase over its exposure at the

end of 1998, when 45,086 lawsuits involving 97,017 claims for personal injury were pending.

79.     In that same form 10-K, Grace noted that judgments had been entered

against it in seven cases for a total of $60.3 million and that it had settled 203 cases for a total of

$603.8 million.  Grace estimated that its gross aggregate accrual for asbestos liabilities as of

December 21, 1999 was $1.084 billion.

80.     At all times mentioned herein, Defendants knew of Grace's massive asbestos

liability.  With intent to defraud contingent creditors such as Plaintiffs and the Class, Defendants

intentionally, willfully, maliciously and fraudulently took the actions herein alleged to defraud

and unjustifiably deny the rights of the Plaintiffs and the Class as a whole.

**Class Action Allegations**

81.     Plaintiffs bring this action as a class action for injunctive and equitable

22

relief pursuant to Federal Rules of Civil Procedure 23(b)(3) as to monetary relief and pursuant to

23(b)(2) as to all declaratory, injunctive and other equitable relief on behalf of themselves and a

defined Class of similarly situated individuals. The Class is defined as:

> All owners or occupiers of real property located in the United
> States and/or its territories in which Zonolite Attic Insulation has
> been installed.  Excluded from the Class are (i) the Debtors, as
> captioned above, in this Chapter 11 case, their present and former
> officers, directors, affiliated entitites and family members; (ii) the
> class as certified in Barbanti v. W.R. Grace & Co., No. 00-2-
> 01756-6, (Wash. Sup. Ct. Nov. 28, 2000) (granting class
> certification); (iii) the class certified in Anderson v. W.R. Grace &
> Co., 92-CP-25-279 (S.C. Comm. Pleas, Hampton Co.); and
> (iv) any other currently certified state class of owners and/or
> occupiers of real property in which ZAI insulation has been
> installed in connection with the certification of claims against these
> defendants.

82.     The members of the Class are so numerous that their joinder is impracticable.

83.     There are questions of law and fact common to the Class.  Members of the Class

share a well-defined community of interest in the questions of law and fact that affect members

of the Class and the questions predominate over questions solely affecting individual members.

Illustrative common issues of law and fact include, but are not limited to, the following:

A.     With respect to the manufacture, distribution and sale of Zonolite Attic

Insulation:

i.     Whether Zonolite Attic Insulation designed, manufactured, and

sold by said Defendants and/or their predecessor corporations is not reasonably safe in its design

and/or manufacture in that it contains dangerous levels of readily-airborne asbestos;

ii.     Whether said Defendants and/or their predecessors knowingly and

intentionally failed to provide adequate warnings in connection with Zonolite Attic Insulation;

iii.     Whether asbestos, contained in Zonolite Attic Insulation and

00101161

installed in homes, constitutes a present threat to public health and safety;

iv.     Whether Zonolite Attic Insulation installed in homes constitutes a present threat to health and safety in that owners and occupants, engaged in their ordinary use and enjoyment of their properties will be exposed to dangerous levels of asbestos;

v.     Whether owners and occupiers of properties containing Zonolite Attic Insulation are installed are unaware of, or unappreciative of, dangers posed by this product, unaware of safeguards that must be taken to avoid harmful exposure to asbestos, unaware of operations and maintenance practices appropriate to properties where Zonolite Attic Insulation is installed, and unaware of the necessity to, and prudent means by which to, engage in such activities as testing, remediation, removal, or abatement;

vi.     Whether said Defendants and/or their predecessor corporations concealed from consumers and government agencies responsible for public health, material information concerning the health hazards associated with Zonolite Attic Insulation;

vii.     Whether said Defendants and/or their predecessor corporations made public announcements, statements, or representations concerning Zonolite Attic Insulation that were untrue, deceptive, or misleading;

viii.     Whether said Defendants and/or their predecessor corporations made public announcements, statements, or representations with respect to Zonolite Attic Insulation that had a capacity to deceive a substantial portion of the consuming public.

ix.     Whether the practices of said Defendants and/or their predecessor corporations representing Zonolite Attic Insulation as asbestos free and safe constitute unfair or deceptive business practices;

x.     Whether preliminary injunctive relief (including

24

warnings to the public) is warranted regarding the dangers of exposure to Zonolite Attic Insulation;

xi.    Whether members of the Class have suffered harm to their property interests in that the presence of Zonolite Attic Insulation requires property owners and property occupants to restrict the use and quiet enjoyment of their property;

xii.    Whether Defendants' conduct with respect to Zonolite Attic Insulation warrants punitive damages.

B.    With respect to the corporate restructuring transactions of 1996 and 1998:

i.    Whether Defendants and/or their predecessor corporations fraudulently conveyed assets in violation of the Uniform Fraudulent Transfer Act;

ii.    Whether Defendants and/or their predecessor corporations fraudulently conveyed assets in violation of the common law of fraudulent conveyance;

iii.    Whether Defendants and/or their predecessor corporations conspired to fraudulently transfer assets in violation of Plaintiffs' and the Class members' rights;

iv.    Whether Defendants and/or their predecessor corporations depleted or dissipated Grace's assets;

v.    Whether Defendants and/or their predecessor corporations conspired to deplete or dissipate Grace's assets;

vi.    Whether Grace received a reasonably equivalent value in exchange for the assets it transferred to Defendants;

vii.    Whether Grace was engaged, or was about to be engaged, in business in which its remaining assets after the transfer were unreasonably inadequate;

viii.    Whether Grace intended to incur or reasonably believed it would

25

incur debts beyond its ability to pay as they became due;

               ix.     Whether Defendants and/or their predecessor corporations made the transfers as herein alleged with actual intent to hinder, delay or defraud the Plaintiffs and the Class.

84.     The claims of Plaintiffs arise from the same events and course of conduct by Defendants that give rise to the claims of the other Class members.  Plaintiffs are members of the Class they seek to represent and possess the same interests and have suffered the same injuries as other Class members making Plaintiffs' claims typical of the claims of the Class generally.

85.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex class actions and products liability litigation.

86.     Class certification is appropriate pursuant to Rule 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class and class-wide adjudication of Class members' claims is superior to other available methods for the fair and efficient adjudication of this controversy.  The superiority of proceeding on a Rule 23(b)(3) basis is particularly the case where, as here, the fair, efficient and final resolution of a plan of reorganization ought to resolve all issues affecting Zonolite Attic Insulation matters.

87.     Class certification is appropriate pursuant to Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Class, in that Defendants and their predecessor corporations have concealed and failed to disclose hazards associated with Zonolite Attic Insulation, rendering millions of homeowners unaware of present dangers in their homes and causing harm and hardship even to those aware of the presence of this toxic product.

Furthermore, Defendants and their predecessor corporations have engaged in fraudulent

corporate restructuring transactions designed to illegally shield the assets of W.R. Grace & Co.,

Inc. from individuals, including Plaintiffs and the Class, harmed by tremolite asbestos containing

Zonolite Attic Insulation.  Defendants' common course of conduct makes appropriate

preliminary and final injunctive and declarative relief.

## Claims for Relief

88.     Plaintiffs hereby assert each and every cause of action and remedy at law or in

equity supported by facts alleged in this Complaint.  The causes of action and remedies at law

and in equity include, but are not limited to, each of the following:

## First Claim for Relief
### (Strict Liability)

89.     Plaintiffs hereby reallege and incorporate each allegation contained in the

preceding paragraphs of this complaint.

90.     Zonolite Attic Insulation is not reasonably safe in design and not reasonably safe

in its manufacture in that it contains readily-loftable asbestos, exposing owners and occupiers of

property to unreasonable dangers of injury and damage.

91.     Zonolite Attic Insulation manufactured by Defendants is defective in its design

and formulation in that it poses dangers beyond that contemplated by an ordinary consumer,

which dangers proximately caused harm to Plaintiffs and Class members.

92.     Zonolite Attic Insulation was not accompanied by appropriate or adequate

warnings and not accompanied by appropriate or adequate instructions concerning the safe use,

handling, or installation of the product, proximately causing harm to Plaintiffs and Class

members.

93.     Zonolite Attic Insulation manufactured by Defendants was defective due to

00101161

inadequate post-marketing warnings and/or instructions in that Defendants acquired actual

knowledge of risks to health posed by Zonolite Attic Insulation, but failed to provide adequate

warnings to users, consumers, or the public, proximately causing harm to Plaintiffs and Class

members.

94.     As a direct, proximate and legal result of defendants dangerous product as

described herein, Defendants are strictly liable for injury sustained by, and will continue to be

sustained by, Plaintiffs and class members.  Injuries suffered include, but are not limited to,

contamination of real and personal property, costs of testing, costs of property remediation, costs

of asbestos containment, costs of asbestos abatement, and costs and hardship resulting from

reasonable effort to avert harm including interference with Class members' use and enjoyment of

real property.

### Second Claim for Relief
**(Negligence)**

95.     Plaintiffs hereby reallege and incorporate each allegation contained in the

preceding paragraphs of this complaint.

96.     Defendants had a duty to exercise reasonable care in the manufacture, testing,

distribution, and sale of Zonolite Attic Insulation including a duty to ensure that its product did

not pose unreasonable risk of harm to consumers and users and a duty to warn consumers and

users of the nature, degree and consequences of exposure to Defendants' asbestos laden Zonolite

Attic Insulation.

97.     Defendants failed to exercise reasonable care in the manufacture, testing,

distribution, warning, and sale of Zonolite Attic Insulation.

98.     As a direct, proximate and legal result of Defendants' negligence, Plaintiffs and

members of the Class sustained and continue to sustain injuries including, but not limited to,

28

contamination of real and personal property, costs of testing, costs of property remediation, costs

of asbestos containment, costs of asbestos abatement, and costs and hardship resulting from

reasonable effort to avert harm, including interference with Class members' use and enjoyment

of real property.

## Third Claim for Relief
### (Fraud, Deceit, Nondisclosure)

99.    Plaintiffs hereby reallege and incorporate each allegation contained in the

preceding paragraphs of this complaint.

100.    Defendants knew that the properties of the Plaintiffs and the Class members were

contaminated with asbestos contained in Defendants' Zonolite Attic Insulation.

101.    Defendants deceived, concealed material facts and made material

misrepresentations to Plaintiffs and the Class and otherwise knowingly misled the Plaintiffs and

the Class members so that they were unaware of the presence and/or hazards presented by the

asbestos contaminating their homes.

102.    Defendants engaged in a practice of issuing material misrepresentations of fact

regarding the safety of Zonolite Attic Insulation and tremolite, including misrepresentations to

consumers, governmental officials, and the general public.

103.    Defendants knew that the representations regarding Zonolite Attic Insulation and

tremolite were untrue and/or recklessly or negligently made such representations without regard

to their falsity.

104.    Standardized misrepresentations include, but are not limited to, the

misrepresentation that tremolite is not hazardous, that Zonolite Attic Insulation – sold as a "do-it-

yourself" home insulation product – is safe, that pouring, handling, and distributing the Zonolite

Attic Insulation is "clean" and presents no need for a protective mask, that Zonolite Attic

00101161

Insulation "contains no harmful chemicals," and that Zonolite Attic Insulation is a "non-asbestos product."

105.    Defendants' misrepresentations, concealment and suppression of facts were intended to induce the Plaintiffs and Class members to purchase Zonolite Attic Insulation and/or forbear claims for damages or remediation.

106.    Defendants had a duty to disclose to Plaintiffs and Class members the fact of asbestos content and/or hazards presented by the asbestos contaminating the Zonolite Attic Insulation and their homes.

107.    Plaintiffs and the Class members have been unaware of the dangers posed by Zonolite Attic Insulation's asbestos content and also were incapable of discovering the hazards presented by the presence of the Zonolite Attic Insulation in their homes.

108.    Plaintiffs and the Class members justifiably relied upon Defendants' failure to disseminate information known to Defendants as to the dangers of Zonolite Attic Insulation that resulted in their inability to act or refrain from acting to mitigate the danger and thereby suffered damage.

109.    As a direct, proximate and legal result of Defendants' deceit, the Plaintiffs and Class members have sustained and will continue to sustain injury to their property including, but not limited to, contamination of real and personal property, costs of testing, costs of property remediation, costs of asbestos containment, costs of asbestos abatement, and costs and hardship resulting from reasonable efforts to avert harm including interference with Plaintiffs and Class members' use and enjoyment of real property.

**Fourth Claim for Relief**
**(Direct, Successor and Fraudulent Transfer Liability)**

110.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully

30

00101161

set forth herein.

111.    Each of the non-Grace defendants is directly liable to the class for violation of each of the first, second and third claims for relief.

112.    Alternatively, each of the non-Grace defendants is liable to the class as a successor in interest for purposes of ascribing tort liability for violation of the first, second and third claims for relief.

113.    At all times as alleged herein, Plaintiffs and Class members were creditors under the Uniform Fraudulent Transfer Act against a debtor, Grace, for contingent claims arising from injuries suffered due to asbestos exposure.  In relevant part, the Act provides that a creditor is any "person who has a claim."  A claim under the Act is defined as " a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

114.    The distribution of assets from Grace to FNMC and Sealed Air, respectively, were fraudulent transfers.  The transfers were made with the intent to hinder the ability of the Plaintiffs and the Class to recover.  Grace did not receive reasonably equivalent value for the transferred assets.  Indeed, Grace's remaining assets after the transfers were unreasonably circumscribed.  As a result of the transfers, Grace was rendered insolvent and unable to pay its debts as they matured.  Grace transferred its assets with the intent and belief that the transactions would deprive the Plaintiffs and Class members of recovery for their asbestos claims.

115.    Defendants acted intentionally, fraudulently, maliciously and without regard for the legitimate rights of the Plaintiff Class and thus the Class is entitled to exemplary damages.

116.    Knowing of the contingent tort liability faced by Grace resulting from the numerous asbestos-related litigations pending at the time of the corporate transactions at issue,

00101161

transferees as herein described did not accept the transfer of assets in good faith.

117.    At the time it made these transfers of assets herein described, Grace and each of the Defendants had actual intent to hinder and defraud Plaintiffs' and the Class' collection of their contingent claims against Grace.  Defendants possessed such knowledge by virtue of their long history of dealing with asbestos litigation and knowledge of Grace's massive future asbestos liability.

## Fifth Claim for Relief
### (Dissipation of Assets of Grace)

118.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

119.    This Court should declare that FNMC and Sealed Air are liable for Grace's asbestos liabilities, to the extent of the assets FNMC and Sealed Air received from the former W.R. Grace & Co. as a result of the 1996 and 1998 transactions described above.  FNMC and Sealed Air were aware of Plaintiffs' and the Class' claims and potential claims against Grace but were not dissuaded from stripping Grace of valuable assets that otherwise would have been available to pay the liabilities of Grace.  These transactions were wrongful distributions of assets.

## Sixth Claim for Relief
### (Conspiracy to Dissipate Assets of Grace)

120.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

121.    Defendants conspired with Grace to denude, deplete and dissipate Grace's assets.  Thus, they are liable for Grace's asbestos liabilities to the extent of the value of the assets of the former W.R. Grace & Co., including subsidiaries, that each received as a result of the 1996 and 1998 transactions, respectively.

00101161

## Seventh Claim for Relief
### (Common Law Conspiracy)

122.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

123.    Grace made the transfer of assets as herein described with the intent to defraud Plaintiffs and the class.

124.    Defendants and each of them knowingly participated in the unlawful plan herein described and agreed to aid Grace in carrying out its fraudulent conveyances.

125.    Each of the Defendants had knowledge of the conspiracy and its unlawful purpose.

126.    As alleged herein, Defendants agreed and knowingly and willfully conspired between themselves to defraud Plaintiffs in the collection of their claims against Grace arising from contingent asbestos liability.

127.    Under this conspiracy, Defendants agreed that Grace would fraudulently transfer assets among themselves as more fully detailed above.

128.    Each of the Defendants engaged in the conspiratorial conduct in furtherance of the conspiracy and agreement alleged herein.

129.    As a proximate result of the wrongful acts herein alleged, Plaintiffs and the Class have been damaged.

130.    At all times mentioned herein, Defendants knew of Grace's massive asbestos liability and the financial risks Grace faced – especially given that they had effectively drained Grace of its financial resources.  With intent to defraud contingent creditors such as Plaintiffs and the Class, defendants intentionally, willfully,  maliciously and fraudulently did the things herein alleged to defraud  and oppress Plaintiffs and the Class.  Plaintiffs and the Class are

00101161

therefore entitled to an award of punitive damages.

## Eighth Claim for Relief
### (Punitive Damages)

131.    Defendants' conduct as alleged herein was fraudulent and malicious such that punitive damages should be assessed against the Defendants in an amount sufficient to punish, deter and make example of the wrongful conduct.

## Ninth Claim for Relief
### (Equitable Relief)

132.    Plaintiffs and members of the Class have no complete, speedy, or adequate remedy at law with respect to present and continuing dangers to public health and safety posed by Defendants' product.

133.    Absent preliminary and final injunctive relief, Plaintiffs, Class members, and the public at large, will suffer irreparable injury, including:

A.    Unknowing exposure to hazardous levels of asbestos.

B.    Risks of contracting serious and commonly fatal diseases caused by exposure to asbestos.

C.    Unknowing and inadvertent contamination of real and personal property with hazardous levels of asbestos.

D.    Risks of engaging in ordinary uses of real property that spread dangerous levels of asbestos and expose persons to hazardous levels of asbestos.

134.    Plaintiffs and Class members are entitled to preliminary and final injunctive relief appropriate to safeguarding the public and themselves from exposure to Defendants' product.

00101161

## Request for Judgment

WHEREFORE, Plaintiffs requests that this Court enter an order, decree, and judgment in favor of the Class and against Defendants, and each of them, as follows:

1.      Conduct appropriate proceedings in connection with the *Zonolite Claimants' Motion to Dismiss the Debtors' Chapter 11 Bankruptcy Case*, and thereafter enter an order granting the motion and dismissing the Debtors' bankruptcy petition with prejudice;

2.      In the event the motion to dismiss is denied, an order: (a) certifying this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3) as to monetary relief, and pursuant to Fed. R. Civ. P. 23(b)(2) as to all declaratory, injunctive and other equitable relief, or appropriate subclasses or issues thereof pursuant to Fed. R. Civ. P. 23(c)(4); (b) appointing named Plaintiffs as Class Representatives; and (c) designating undersigned counsel as counsel for the Class;

3.      Under claims for relief one through four, interim and final orders establishing a Defendant-funded Court-supervised identification program which, through use of Defendants' records, sales records, publication, and other means, will identify homes and buildings containing Zonolite Attic Insulation, together with a testing program to verify the suspected existence of Zonolite Attic Insulation in homes and other buildings.  Pursuant to claims for relief one, two, three and four, the Court should enter a final judgment in the full amount of damages suffered by the Class.

4.      Under claims for relief one through four, interim and final orders establishing a remediation, education and notification program that issues timely and pertinent warnings and information to property owners, public and private health agencies, and members of the building trades, including:

00101161

a.      Warning that Zonolite Attic Insulation contains asbestos and that persons should avoid exposure to Zonolite Attic Insulation;

b.      Pertinent advisories regarding how to locate and identify Zonolite Attic Insulation;

c.      Warning that disturbance of Zonolite Attic Insulation exposes individuals to hazardous levels of asbestos;

d.      Warning that persons should not enter areas containing Zonolite Attic Insulation without taking appropriate safety precautions;

e.      Warning that tests should be conducted on properties where Zonolite Attic Insulation has been disturbed or where asbestos dust from Zonolite Attic Insulation may have been transported into living spaces; and

f.      Warning that property owners and occupants should not engage in remodeling or other building activities that risk disturbance of Zonolite Attic Insulation, and that such remodeling and building activities should be performed only by qualified personnel and in accordance with an asbestos containment plan.

Pursuant to claims for relief one, two, three and four, the Court should enter a final judgment in the full amount of damages suffered by the Class.

5.      Under claims for relief one through four, a final order establishing a  Defendant-funded Court-supervised health and safety research and education trust, which conducts pertinent research and disseminates relevant findings to Class members, to public and private health agencies, to professional building trades associations, and to property owners, the missions of the trust to include development of a specialized operations and maintenance program that sets forth

00101161

safety procedures and re-mediation techniques appropriate to Zonolite Attic Insulation

contamination.  Pursuant to claims for relief one, two, three and four, the Court should enter a

final judgment in the full amount of damages suffered by the Class.

6.      A final order establishing a re-mediation and containment program that will

provide to Class members:

> a.      Information, techniques, procedures, and protocols for safe containment of
>
> the asbestos hazards during anticipated activities of repair, remodeling, storage, or
>
> other use of attic space, venting ceiling fans, etc;
>
> b.      Training, equipment, funding, and other assistance necessary to ensure a
>
> safe environment in homes and other buildings during and following repair,
>
> maintenance, remodeling, and other activities which disturb Zonolite Attic
>
> Insulation;
>
> c.      Training, equipment, funding, and other assistance necessary to contain
>
> and control asbestos hazards from undisturbed Zonolite Attic Insulation so as to
>
> ensure a safe environment in homes and other buildings during normal anticipated
>
> use.

7.      Under claims for relief five through seven, an order requiring each Defendant to

account for all assets of the former W.R. Grace & Co. and any proceeds from the distribution of

such assets in connection with the 1996 and 1998 transactions.

8.      Under claims for relief five through seven, a declaration that the 1996 and 1998

transactions constitute fraudulent transfers and an order rescinding those transactions.

9.      Under claims for relief five through seven, an order requiring disgorgement of all

ill-gotten gains resulting from said transactions, including all assets transferred and all fees

00101161

received in connection with those transactions; in the alternative, an Order establishing a

constructive trust on all assets transferred in connection with the 1996 and 1998 transactions.

      10.     Under claims for relief five through seven, a determination that Defendants are

jointly and severally responsible for damages equal to the full fair market value of all assets

transferred in connection with the 1996 and 1998 transactions, as well as for exemplary damages.

      11.     Under claims for relief five through seven, an award of punitive damages against

Defendants sufficient to punish, deter and make example of the wrongful conduct;

      12.     An award of attorneys' fees and costs of suit as allowed by law; and

      13.     Such other and further relief as the Court may deem necessary and proper.

## **JURY DEMAND**

      Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 16th day of November 2001.

                            Thomas M. Sobol
                            LIEFF, CABRASER, HEIMANN &
                            BERNSTEIN, LLP
                            175 Federal Street, 7th Floor
                            Boston, MA 02110-2221
                            Phone: (617) 720-5000
                            Fax: (617) 720-5015

                            Elizabeth J. Cabraser, CSB # 083151
                            Fabrice N. Vincent, CSB # 160780
                            LIEFF, CABRASER, HEIMANN &
                            BERNSTEIN, LLP
                            Embarcadero Center West, 30th Floor
                            275 Battery Street
                            San Francisco, CA  94111
                            Telephone:  (415) 956-1000
                            Facsimile:  (415) 956-1008

00101161

Darrell W. Scott, WSBA# 20241
Michael G. Black, WSBA #19218
Mischelle R. Fulgham, WSBA #22210
Tonya R. Hanson, WSBA #29398
LUKINS & ANNIS, P.S.
1600 Washington Trust Financial Cntr
717 W Sprague Ave.
Spokane, WA  99201-0466
Telephone: (509) 455-9555
Facsimile: (509) 747-2323

Edward J. Westbrook
Robert M. Turkewitz
Edward B. Cottingham, Jr.
NESS MOTLEY LOADHOLT RICHARDSON
& POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9440

Jon L. Heberling
Allan M. McGarvey
McGARVEY, HEBERLING, SULLIVAN &
McGARVEY, P.C.
745 South Main
Kalispell, MT  59901
Telephone:  (406) 752-5566
Facsimile:  (406) 752-7124

And

ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.

/s/ William D. Sullivan
William D. Sullivan, Esquire (#2820)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630
Telephone (302) 428-3181
Facsimile (302) 428-3180

Attorneys for Plaintiffs

00101161

00101161