IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                              )          Chapter 11
                                                    )
W.R. Grace & Co., et al.,                           )          Case No. 01-01139
                                                    )          (Jointly Administered)
                Debtors.                            )
_____                )
                                                    )
This Document Relates to:                           )
                                                    )
All Actions.                                        )
_____                )

## MEMORANDUM OF LAW IN SUPPORT OF ZONOLITE CLAIMANTS' MOTION TO DISMISS THE BANKRUPTCY CASE

### I.    INTRODUCTION

The Zonolite Attic Insulation Claimants ("ZAI Claimants"), pursuant to section 1112(b) of Title 11 of the United States Code ("Bankruptcy Code"), move this Court for the entry of an order dismissing this Chapter 11 case filed by W.R. Grace & Co., *et al.* ("Grace" or "Debtor").

On April 2, 2001, Grace, a self-proclaimed financially healthy company, filed for Chapter 11 protection in the Bankruptcy Court in bad faith, seeking to improperly use bankruptcy simply to rapidly conclude litigation it faced, a goal that has been soundly rejected as an invalid reorganizational purpose. Indeed, Grace has publicly admitted that the sole purpose of its filing the petition is to determine "the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations." See W.R. Grace's Informational Brief ("Info Brief"), at 1 (attached hereto

026.wrg                                          - 1 -

as Exhibit A).

Grace's use of the statutory bankruptcy process is merely a litigation tactic meant to serve the improper purpose of unfairly impairing the due process rights of tort and property damage claimants and improperly discounting the value of their claims. Compelling evidence supports the conclusion that Grace has no valid reorganizational purpose for this case, and that it is attempting to prevent the ZAI Claimants from adequately pursuing their claims by rapidly forcing a conclusion to the litigation against it in bankruptcy.

Grace is effectively attempting to continue its business and not to effectuate a valid reorganization. This tactic was condemned by the Third Circuit's decision in In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999), and is well outside of the legitimate scope of the bankruptcy laws. This case is remarkably similar to SGL Carbon, although even more compelling an instance of abuse of bankruptcy. In SGL Carbon, the debtor was a financially healthy carbon and graphite manufacturing company that filed bankruptcy in order to escape potentially crippling effects of a pending civil antitrust judgment against it. See id. at 166-67. The Third Circuit held that "the distractions of litigation" do not constitute a valid reason for filing bankruptcy. The appellate court ruled that the debtor had filed in bad faith and dismissed the petition because Chapter 11 is intended for valid reorganization of "financially troubled businesses," and not to permit financially solvent companies to "rapidly conclude litigation to enable a continuation of their business." Id. at 169.

Grace claims that it is a financially stable company that has been litigating both state and federal claims in an efficient and orderly manner for years without bankruptcy. In fact, Grace has repeatedly acknowledged its fiscal strength before the Court and maintains that any potential

- 2 -

exposure to the many asbestos claim is readily covered by the over $1 billion reserve that Grace has established for just such liabilities. Therefore, Grace's invocation of the bankruptcy process is simply a transparent attempt to wield bankruptcy law as a litigation weapon to unfairly devalue and/or trump the due process rights of tort and property damage victims and claimants. This bankruptcy is simply not an honest and legitimate attempt at reorganization. For these reasons, Grace's Chapter 11 case should be dismissed.

## II.   FACTS

### A.   Grace's Involvement With Asbestos-Containing Products.

Zonolite Attic Insulation ("ZAI") is an asbestos-contaminated, loose-fill attic insulation product formerly manufactured and sold by W.R. Grace and its predecessor in interest, the Zonolite Company. ZAI was marketed from approximately 1930 through 1984 and was sold by Grace as a "do-it-yourself" product for installation by homeowners in residential homes. It is estimated that ZAI presently resides in the attics and walls of hundreds of thousands, or even millions, of homes nationwide.

ZAI is a product derived from the raw material vermiculite. Critically, the source of vermiculite used to manufacture ZAI was Grace's vermiculite mine located near Libby, Montana. Grace's Libby mine, closed in 1990, had two distinct characteristics. First, it was the largest source of raw vermiculite in the world. Second, and tragically, vermiculite from the mine was uniquely, naturally, and unavoidably contaminated with extremely hazardous tremolite asbestos.

Exposure risks for American families to dangerous levels of tremolite asbestos released through disturbance of this product can and do occur in innumerable contexts. Children are likely exposed when they play in the attic or play anywhere in a home which is remodeled

026.wrg   - 3 -

without asbestos containment procedures. Family members entering attic space for storage or home repairs are directly at risk. Furthermore, given the typical age of homes in which ZAI is installed, those homes are particularly subject to current remodeling and renovation projects that involve working in and around ZAI. Those projects can necessarily disturb ZAI and spread the tremolite it contains throughout the home and the air that residents must breathe.

The risks associated with ZAI due to exposure to airborne tremolite have only recently come to the attention of a handful of homeowners and to public agencies. The vast majority of homeowners with ZAI in their residences likely do not know of its presence or of the dangers posed to their families by the tremolite asbestos fibers it contains. Results from testing involving routine remodeling and renovation activities in homes containing ZAI were recently supplied to public health agencies to publicize the disturbing public health and safety implications raised by the studies.

**B.    Grace Claims to Be a Financially Healthy Company Not in Need of Reorganization.**

**1.    Overview of Grace's Business.**

Grace was founded over 140 years ago as a trading and shipping company that, over time, developed into one of the largest manufacturing enterprises in the world. Grace acquired, and later divested or ceased operating, a multitude of different companies and product lines, including retail stores, restaurants, oil and gas exploration, coal interests, industrial chocolates, book distribution, water treatment chemicals, kidney dialysis clinics and consumer goods. With annual sales of approximately $1.6 billion, Grace now has over 6000 employees and operations in nearly 40 countries. See Press Release, W.R. Grace & Co., Grace News (Apr. 23, 2001). The

026.wrg                            - 4 -

current business of Grace is described by Chief Executive Officer Paul Norris as "a premier specialty chemicals and materials company, applying innovative technologies to provide value-added products and services to global markets." <u>See</u> W.R. Grace Website Welcoming Statement, available at http://63.111.43.9/bigframes-welcome_stat.html.

### a.    <u>Grace Has Reported Strong and Increasing Business While Continuing to Fund Numerous Business Expenditures.</u>

Statistics show that over the past five years, Grace has continued to increase revenue and improve earnings from its operations, as seen in the chart below. In fact, Grace itself has created a readily-accessible record of its performance success over that time period. Going back the last five years, Grace has made numerous statements regarding the strength of its business performance, none of which indicate the need for a bankruptcy reorganization had arisen.



|  | 1996 (1) | 1997 (2) | 1998 (3) | 1999 (3) | 2000 (3) |
|---|---|---|---|---|---|
| Sales (4) | $1,767 | $1,533 | $1,583 | $1,608 | $1,647 |
| Sales Growth | -6.9% | -13.2% | 3.2% | 1.6% | 2.4% |

*(1) Source: Company's 1998 Form 10-K*
*(2) Source: Company's 1999 Form 10-K*
*(3) Source: Company's 2000 Form 10-K*

In 1999 Grace stated that it was "continuing to target revenue growth of 5-7% and long-term earnings growth of 12-15%." <u>See</u> W.R. Grace Form 10K, 1999; <u>see also</u> W.R. Grace Form 10K, 1995-2000 (excerpts of which are attached hereto as <u>Exhibits B - H</u>). A year earlier, in

1998, Grace Chairman, President, and CEO Paul J. Norris proclaimed that "Grace's earnings performance remained solid" and that the completion of a company-wide productivity review would "allow us to drive further profitability improvements in 1999 and beyond." See W.R. Grace Form 10K, 1998. In 1997, then-CEO Albert J. Costello reported that the two largest Grace businesses, the Cryovac and Grace Divisions both "had earnings growth of 13 percent, even after the substantial impact of currency translation." See W.R. Grace Form 10K, 1997. Costello went on, "At the beginning of 1997, we set three corporate financial objectives: a 14 percent operating margin, capital spending below $300 million, and operating free cash flow of $150 million. We achieved all of these targets." Id. In 1996, Grace reported "a 12 percent improvement in operating earnings in the 1996 fourth quarter compared to 1995" and that "we expect to deliver higher profits and cash flow in 1997." See W.R. Grace Form 10K, 1996.

Furthermore, Grace acts like a company that suffers no financial distress. Grace paid $87.2 million in dividends between 1996 and 2000. See W.R. Grace Form 10K, 1996, 1997, 2000. Grace further completed treasury stock repurchases totaling over $1.8 billion between 1996 and 2000, with over $224 million occurring between 1998 and 2000. Id.

### b.   Grace Remains Competitive in the Marketplace.

Over the past year, Grace's profitability has been at a level comparable that of companies engaged in the same industries that form Grace's core businesses. Competitor firms include Air Products and Chemicals, Inc.; Cabot Corporation; Cytec Industries, Inc.; Engelhard Corporation; Great Lakes Chemical Corporation; Hercules, Inc.; International Flavors & Fragrances, Inc.; and OM Group, Inc. Not only is Grace operating at a competitive level with these similar business corporations, but it is doing so in a manner that contemplates a projected increase in productivity

026.wrg                                                                  - 6 -

and profitability. The strong performance of Grace vis-a-vis competitor corporations is illustrated by the charts below, which show the results of Grace's core operations as compared with those of competitor corporations.



| | LTM Sales Growth (1) | EBIT Margin | EBITDA Margin | CapEx/Sales (2) | ROA (3) |
|---|---|---|---|---|---|
| | 2.4% | 12.7% | 18.0% | 3.8% | 5.2% |
| Group | 15.4% | 12.7% | 18.5% | 6.4% | 5.7% |

| | | | | | | PEER GROUP COMPANIES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company Symbol | GRACE | Mean | APD | CBT | CYT | EC | GLK | HPC | DF | OMG | ROH | SOI |
| Last Twelve Months | 3/31/01 | | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 | 3/31/01 |
| Sales ($millions) | $1,666.5 | $2,653.6 | $5,813.9 | $1,618.0 | $1,499.8 | $5,970.1 | $1,676.3 | $3,056.0 | $1,576.5 | $1,662.8 | $975.1 | $887.7 |
| LTM Sales Growth | 2.4% | 15.4% | 13.4% | 50% | 3.5% | 30.4% | 7.7% | -7.5% | 9.4% | 80.2% | 10.3% | 2.1% |
| EBIT Margin | 12.7% | 12.7% | 13.9% | 12.1% | 10.5% | 5.5% | 7.8% | 13.1% | 15.4% | 17.5% | 15.4% | 15.6% |
| EBITDA Margin | 18.0% | 18.5% | 24.1% | 19.8% | 17.1% | 7.4% | 13.7% | 20.8% | 20.8% | 22.8% | 19.9% | 20.0% |
| Inventory Turnover | 6.1 x | 5.1 x | 10.2 x | 4.3 x | 6.7 x | 13.3 x | 3.1 x | 5.9 x | 2.2 x | 1.9 x | 1.9 x | 1.7 x |
| CapEx/Sales | 3.8% | 6.4% | 11.0% | 7.6% | 5.2% | 2.4% | 9.5% | 5.2% | 3.3% | 6.9% | 6.1% | 5.9% |
| ROA | 5.2% | 5.7% | 7.2% | 6.4% | 10.5% | 5.5% | 5.9% | 3.1% | 6.4% | 7.6% | 3.9% | 0.8% |

### c.    Grace Has No Significant Debt.

Since 1996, Grace has divested itself of significant assets, generating in the process proceeds. The ZAI Claimants contend these divestitures were fraudulent transfers that drastically reduced the size of Grace as a going concern. This much smaller Grace, however, has reduced its total outstanding debt and improved its credit statistics, as seen in the following chart showing Grace's outstanding debt over a five-year period. Although the debt figures for the year 2000 reflect some increase, that rise is not significant. These figures reveal that Grace's debt before

bankruptcy was neither extraordinary nor crippling, and thus lobby against a Chapter 11 filing.

| ($ millions) | 1995 | | 1996 | | 1997 | | 1998 | | 1999 | | 2000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bank Borrowings | $ | 599.6 | $ | 450.9 | $ | 370.2 | $ | 75.0 | $ | 89.7 | $ | 400.0 |
| Commercial Paper | | 45.7 | | 77.8 | | 34.0 | | - | | - | | - |
| 8% Notes | | 300.0 | | 276.0 | | 276.0 | | 5.7 | | 5.7 | | 5.7 |
| 7.4% Notes | | 287.0 | | 248.7 | | 248.7 | | 24.7 | | 24.7 | | - |
| 7.75% Notes | | 131.0 | | 119.0 | | 119.0 | | 2.0 | | 2.0 | | 2.0 |
| Other | | 570.5 | | 215.8 | | 24.4 | | 6.0 | | 14.1 | | 14.2 |
| | $ | 1,933.8 | $ | 1,388.2 | $ | 1,072.3 | $ | 113.4 | $ | 136.2 | $ | 421.9 |
| Interest Expense | $ | 71.3 | $ | 71.6 | $ | 25.3 | $ | 20.2 | $ | 16.1 | $ | 28.1 |
| EBITDA/Interest Expense | | 5.9x | | 8.6x | | 7.9x | | 12.8x | | 19.2x | | 10.8x |
| Debt/EBITDA | | 4.6x | | 2.3x | | 5.4x | | 0.4x | | 0.4x | | 1.4x |

## 2.   Grace's Response to the Asbestos Litigation.

In its Informational Brief and other submitted papers, Grace articulated that its potential

asbestos liability stems from four types of asbestos-related claims. Those claims are: (1) bodily

injury claims alleging health effects from exposure to Grace's asbestos-containing products; (2)

claims alleging personal injury and property damage from exposure to asbestos in connection

with the mining and processing of vermiculite at Grace's mine in Libby, Montana; (3) property

damage claims generally seeking payment for the cost of removing or containing asbestos in

buildings; and (4) claims regarding Zonolite Attic Insulation seeking damages and other

equitable relief. In Grace's own words, "Historically, Grace has faced a substantial but

predictable volume of asbestos-related litigation. See Info Brief at 28.

### a.   Grace's ZAI Litigation Remains Manageable.

The ZAI litigation claims are several class-based civil actions against Grace seeking

Grace-funded equitable relief pertaining to its asbestos-containing product, Zonolite Attic

Insulation. Originally, the ZAI litigation included approximately nine actions filed against

Grace. At the time of Grace's Chapter 11 filing, however, there were only two remaining ZAI

proceedings seeking to hold Grace accountable for its actions.

The first was MDL 1376, the lead case of which is *Price et al. v. W.R. Grace & Company*

*et al.,* No. CV-0071-M-DWM, transferred from the District of Montana.[1]   Prior to the case

transfer, both the Plaintiffs and Grace had submitted papers, examples of which are attached as

Exhibits I - O, arguing for consolidation of the pending ZAI litigation into MDL 1376 before

Massachusetts District Judge Patti Saris. Thus, in a very real sense, MDL 1376 was the forum of

choice not only for the those who filed ZAI lawsuits, but also for Grace as well. Furthermore, at

the time of the filing of the Bankruptcy, the MDL Court was conducting proceedings regarding

the issue of class certification for a national class of property owners with ZAI, with *Price* as the

lead case.

The second case, *Barbanti v. W.R. Grace & Company-Conn., et al,* No. 00-2-01756-6 in

the Superior Court for the State of Washington in the County of Spokane, had proceeded beyond

class certification of a statewide class, and was in the discovery stage of litigation when the

bankruptcy was filed. During the pendency of these cases, Grace never contended that the ZAI

litigation was unmanageable or that the tort process was not working in this context. In fact,

when presented with these actions, Grace thought that the most efficient and best way to manage

the federal litigation was through the MDL process.

---

[1]MDL 1376 has combined for purposes of discovery and pretrial proceedings pursuant to
28 U.S.C. §1407 the following matters: 1) Price et al. v. W.R. Grace & Company et al., No. CV-
9:0071-M-DWM, transferred from the District of Montana; 2) Lindholm v. W.R. Grace &
Company et al., No. CV 1:00-10323 PBS, transferred from the District of Massachusetts; 3)
Goldstein et al. v. W.R. Grace & Company-Conn. et al, No. 1:CV 00-10873 PBS, also from the
District of Massachusetts; and 4) Hunter v. W.R. Grace & Co. et al., No. 3:00-569-GPM,
transferred from the District Court for the Southern District of Illinois.

At best, it is the merits of the ZAI litigation, not the process for resolving it, that pose significant difficulties to Grace. The MDL was advancing the ZAI litigation toward an efficient resolution before the disruption caused by the filing of the Grace bankruptcy. The MDL1376 Case Management Order ("CMO"), attached hereto as Exhibit P , outlined an orderly process for resolving the federal ZAI litigation. Pursuant to that CMO, both sides of the ZAI litigation had thoroughly briefed the issue of class certification (examples of such briefing are attached hereto as Exhibits Q- T), and decision on class certification was scheduled for April 25, 2001 (approximately just three weeks after the date of the bankruptcy petition).

Discovery was advancing efficiently before the MDL court, and had by the date of the bankruptcy petition included the promulgation of the following: interrogatories and requests for production of documents by both sides in February and March 2001; briefing on the issue of a protective order by both sides in March 2001, and initial responses to discovery requests by Grace in March 2001. Under the MDL CMO, the deadline for Grace to produce documents would have been May 18, 2001; the close of fact discovery would have occurred last month on October 31, 2001; a hearing on summary judgment papers was scheduled to be held on April 5, 2002; and the trial would have commenced by June 5, 2002, less than seven months from now.

### b.   Grace's Asbestos Property Damage Litigation Remains Manageable.

It is Grace's own statement that it had reduced the number of property cases to a minimum by the time the bankruptcy was filed. There is ample evidence which shows that from the mid-1990's to the present, the number of property damage cases, as well as the average settlement and judgment amounts, have reduced considerably over time. In fact, in Grace's

026.wrg                                    - 10 -

opinion "it is probable that recoveries from its insurance carriers, along with other sources of funds, will be available to satisfy the property damage and bodily injury cases and pending claims. See W.R. Grace Form 10-K, 1999.

Below are two charts that provide a five-year history of the reduction of property damage claims against Grace. Over the past five years, Grace has had a total of four new property damage claims filed against it, the most recent in 1998. Grace has settled seven claims in the past two years, with only seven claims remaining outstanding in December 2000. It is apparent from these figures that Grace could easily continue to manage these cases as it has in the past with no significant difficulty.



Property Damage

| | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Claims Outstanding | 31 | 18 | 14 | 11 | 7 |
| Average Settlement | $7.4 | $2.6 | $22.3 | $5.3 | $23.3 |

| | Outstanding as of December 31, | | | | |
|---|---|---|---|---|---|
| Property Damage Claims | 1996 | 1997 | 1998 | 1999 | 2000 |
| Claims outstanding, beginning of year | 47 | 31 | 18 | 14 | 11 |
| New claims | 1 | 1 | 2 | - | - |
| Settlements | (9) | (9) | (5) | (3) | (4) |
| Dismissals | (5) | (4) | (1) | - | - |
| Judgements | (3) | (1) | - | - | - |
| Claims outstanding, end of year | 31 | 18 | 14 | 11 | 7 |
| *Cumulative Settlements / Judgements ($millions)* | | | | | |
| Claims | 193 | 202 | 207 | 210 | 214 |
| Aggregate amount of settlements | $ 510.8 | $ 536.9 | $ 648.2 | $ 664.1 | $ 757.1 |
| Average settlement | 7.4 | 2.6 | 22.3 | 5.3 | 23.3 |

026.wrg                                    - 11 -

### c.   Grace's Government Litigation Remains Manageable.

There are several ongoing Environmental Protection Agency ("EPA") court and administrative actions pending against Grace presently. Throughout the course of this litigation, the United States has confronted and refuted Grace's many misstatements and omissions regarding the effects of ZAI as well as Grace's incorrect and misleading characterization of the findings of the ongoing EPA investigation into asbestos contamination in Libby, Montana. See Department of Justice's ("DOJ") Response to Debtors' Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve Claim Form, and Motion to Approve Notice Program ("Response"). The chart below establishes the necessity and value of the pending asbestos litigation by juxtaposing Grace's numerous misleading statements about the worth and merit of pending asbestos litigation with the statements made by the United States.

| GRACE | UNITED STATES |
|---|---|
| "[S]cientific testing of the air in homes with [zonolite attic insulation ('ZAI') has found either no asbestiform fibers or almost non detectable levels." | "This is incorrect and misleading on several levels." |
| EPA testing of homes in Libby, Montana containing ZAI showed, "the highest asbestos air concentration was .00003 f/cc." | "Debtors misstate the findings of EPA's 'passive' air sampling in certain Libby homes, the apparent basis of Debtors' contention. In fact, EPA's early testing found asbestos fibers in amounts 10 to 100 times higher than the level Debtors acknowledge in their Memorandum." |
| "[S]cientific testing of the air in homes with [zonolite attic insulation ('ZAI') has found either no asbestiform fibers or almost non detectable levels." | Debtors' own expert on asbestos issues evaluated the samples collected in EPA's passive sampling and found the fiber level to be up to 300 times higher than that acknowledged in Debtors' Memorandum. |

| | |
|---|---|
| "[S]cientific testing of the air in homes with [zonolite attic insulation ('ZAI') has found either no asbestiform fibers or almost non detectable levels." | As Grace is aware, EPA has conducted 'active' sampling at homes in Libby that indicates exposure levels at 10,000 to 100,000 times higher than the exposure level Debtors reference in their Memorandum. |
| The exposure level that EPA has found in Libby homes "is 3,000 times lower than the permissible occupational exposure level of 0.1 f/cc, eight hours a day, 50 weeks per year for 45 years set by the occupational Safety and health Administration (OSHA)." (Debtors' Mem. At 4-5.) | Debtors' misstatement of the finding of EPA's passive sampling infects this conclusion. Less obviously, Debtors imply that an OSHA standard that governs workplace exposure applied to household exposure - or is as least relevant to household exposure. This is wrong. |
| Of the 35 locations sampled by EPA in 1999 and 2000, "only a few had detectable asbestos fibers in soil, dust, or air of the type found at the Libby mine." (Debtors' Mem. At 50.) | Debtors' assessment of the scope of the Libby contamination is based only on the limited testing performed by early 2000 rather than that whole body of data available, and this approach is "inexplicable" and "has been overtaken by events." |
| EPA's on-scene coordinator in early 2000 concluded that "[n]one of the results from the soil, insulation and dust samples point to obvious candidates for cleanup." (Debtors' Mem. At 52.) | Debtors make "broad assertions" based on "early data" often "measuring narrow exposure circumstances." EPA "has now tested over 100 houses in Libby, and many other industrial areas [and two] areas of significant contamination have been identified and cleaned up, seven other cleanups are taking place this summer and EPA anticipates that ongoing analysis of other locations in and near Libby will lead to additional cleanup actions." "Debtors simply cannot pretend that there may not be a significant asbestos contamination problem in Libby." |
| ZAI "may contain trace quantities of asbestos as a mineralogical impurity - minute fractions of 1%. For that reason, ZAI does not meet the regulatory definition of an asbestos-containing product" citing the definition section of the National Emission Standard for Asbestos, 40 C.F.R. § 61.141, and the Asbestos in School regulations, 40 C.F.R. § 763.83. | "The National Emissions Standard for Asbestos. . . regulations expressly do not apply to asbestos-containing materials in residential structures of four or fewer units. . . More significantly, the regulations Debtors cite are not determinative of whether the presence of asbestos in attic insulation or elsewhere poses a hazard to human health or the environment. EPA has already determined that asbestos levels at nine locations in Libby are substantial enough to warrant cleanup pursuant to the Comprehensive environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. Review of additional locations is ongoing." |

026.wrg

- 13 -

Despite Grace's repeated misstatements about its potential environmental exposure,

Grace has nonetheless assessed its environmental liability and stated last year that it "believes

that the resolution of pending environmental proceedings will not have a material adverse effect

on the consolidated financial position or liquidity of Grace." See W.R. Grace Form 10K, 2000.

The environmental liability chart below demonstrates that Grace has in fact not been materially

affected by the litigation.  Grace has made $167 million in cash payments over the past five years

for environmental remediation and continues to have an environmental liability of $175 million.

Overall, the government litigation over time has continued to move ahead in its ordinary course

and has not affected Grace's ability to manage its business or return a profit.



Furthermore, Grace and the EPA have recently negotiated a Consent Decree (attached

hereto as Exhibit U) which, if approved, eliminates the need for Grace to incur payments of

various fines and penalties to the EPA in exchange for Grace's funding a unique Supplemental

Environmental Project through the establishment of a Health Care Project to benefit the medical

care of Libby, Montana residents.  The Consent Decree requires a payment of $2.75 million by

026.wrg                                   - 14 -

Grace to fund the project, and provides that such payment "shall fully satisfy, release and discharge all civil liability...for the violations alleged in the Complaint in this action... ."

### d.    Grace's Asbestos Personal Injury Litigation Remains Manageable.

A review of Grace's personal injury claim history indicates that Grace has efficiently, manageably, and predictably handled its exposure related to such litigation during the last half-decade. As seen in the summary charts below, while Grace's total number of pending personal injury claims has risen by some degree each year from 1996 through December 2000, a closer look at the statistics reveals that Grace has managed this area of its litigation exposure quite efficiently and at predictable cost.



Overall, there has been a ten percent increase in outstanding claims against Grace from 1996 through 2000. However, Grace has acknowledged that it is not defending those claims; rather, Grace has undertaken inventory settlements since the mid-1990s. See Info Brief at 29-30.

Thus, it is clear that the problem with regard to Grace's personal injury litigation is of Grace's own making and does not rest with "undeserving plaintiffs" or circumstances beyond Grace's control.

Through 1999, the official position of Grace was that it was capable of managing its litigation. In reviewing Grace's financial statements and annual reports, it appears that Grace was managing the litigation in an appropriate and efficient manner, and it could reasonably estimate the total amount of potential claims. Cumulatively, Grace has achieved dismissal of 35,500 claims (embodied in 16,200 separate cases) from 1996 through 2000, for which Grace did not pay even one dollar in settlements or judgments. During the same period, Grace has resolved 151,800 claims cumulatively (brought in 53, 400 individual cases), for a total payment of $561.8 million in settlements or judgments. Most importantly, though, Grace has managed a significant reduction in its inventory of pending claims from year to year, as seen in the chart below.



As seen in the chart, 91,500 individual personal injury claims were pending against Grace during at the end of 1996; during the next year, 1,900 claims were dismissed and 23,000 claims settled or were otherwise resolved. These dismissals, settlements, and resolutions represented a reduction in total claim inventory of 27.2%. Similarly, Grace reduced its inventory of pending personal injury cases by 21.6% in 1998 (20,900 claims dismissed or resolved), by 18.9% in 1999 (18,300 claims dismissed or resolved), and by 28.03 % in 2000 (29,600 claims dismissed or resolved).

### e.    Grace Had Estimated and Capped Its Expected Asbestos Liability, Had Anticipated a Reduced Total Liability, and Had Set Aside a Large and Still-Existent Cash Reserve.

Grace contends that there was a large upswing in claims in the year 2000 and early 2001 that gave rise to the bankruptcy and the need for relief. See W.R. Grace Amended Complaint for Declaratory and Injunctive Relief ("Grace Complaint"), at 5. During this time, Grace not only provided quantified estimates of its current and future exposure, but those estimates actually decreased. Meanwhile, for the fiscal year 1999, Grace reported a net income of over $135 million. See Grace Complaint, at 6. Further, despite stating a net loss for the year 2000, caused principally by the increase of the asbestos litigation reserve by $208 million, Grace claims to be a financially healthy conglomerate, which continues to grow its core business and seeks to expand into emerging business opportunities.

Grace has argued that the various asbestos claims pending against it are without merit and do not present a realistic risk of liability exposure to it. See Info Brief at 32. Nevertheless, Grace has established a reserve as of December 31, 2000, in the amount of $1,105,900,000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims

026.wrg                                                                  - 17 -

then-pending, as well as all bodily injury claims expected to be filed in the future.  Grace submits

that the over $1.1 billion reserve, still far from depletion, now adequately covers the scope and

breadth of all pending and future asbestos claims against it.  See W.R. Grace Form 10-K, 2000,

at 43.

The charts below summarizes Grace's yearly forecasts of the ultimate costs of all present

and future personal injury claims expected to be asserted against Grace.

| ($millions) | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Beginning Asbestos Reserve | $ 882.3 | $ 994.1 | $ 855.9 | $ 1,194.1 | $ 1,084.0 |
| Additional Reserve | 348.4 | - | 576.9 | - | 293.1 |
| Dismissed / Settled Cases | (236.6) | (138.2) | (238.7) | (110.1) | (271.2) |
| Ending Asbestos Reserve | $ 994.1 | $ 855.9 | $ 1,194.1 | $ 1,084.0 | $ 1,105.9 |
| Period for Recorded Liability | 1997-2001 | 1998-2002 | 1999-2039 | (1) | (1) |

Notes
(1) All future cases except liability case concerning attic fill insulation



Grace Estimates of Total Asbestos - Related Liabilities

*1996-1997 estimates w ere of pending claims plus a five-year horizon on bodily injury claims.
- all other estimates show n w ere of all-time liability

This data is significant in particular because it clearly demonstrates that, in the last half-decade,

even Grace has estimated that its ultimate asbestos liability would *decrease*. See W.R. Grace

Form 10K, 1996-2000. In 1996 and 1997, Grace's estimates were based on a five year forecast

of liability, and Grace's projected liability figures decreased under that formulation from year-to-

year. As of 1998, apparently confident of its management of pending and anticipated asbestos

litigation, Grace changed its estimates to reflect expected asbestos liability for all time, including

all yet-to-be-filed cases. Under this formulation, which Grace used from 1998 through 2000,

Grace's liability decreased from 1998 to 1999, and decreased as well during each of the first

three quarters of 2000 before finally increasing slightly during the fourth quarter of 2000 (to a

figure that was nonetheless over $835 million *lower* than the figure of anticipated asbestos all-

time liability reported just two years earlier in 1998). See also W.R. Grace 10Q Reports (March

2000, June 2000, and September 2000) attached hereto as Exhibits V-X. As recently as 1999,

Grace declared it "probable" that recoveries from insurance carriers and other sources of funds

would be available to satisfy the then-pending property damage and bodily injury claims as well

as the bodily injury claims expected ever to be filed. See W.R. Grace Form 10K, 1999.

## C.    Grace's Actions Further Demonstrate Intended Bad Faith.

Not only has Grace failed to establish any discernible financial basis or valid

reorganizational purpose justifying bankruptcy protection in this case, but Grace has also

affirmatively demonstrated bad faith in its conduct and timing with respect to the filing this

bankruptcy.

### 1.    Bad Faith As To the ZAI Litigation.

#### a.    Grace Filed this Bankruptcy in an Attempt To Thwart Class Certification in MDL 1376.

The facts strongly indicate that Grace filed its bankruptcy petition as a litigation tactic so

as to thwart the mounting trend toward class certifications and ultimate resolution it faced in the ZAI cases. As of the petition filing date, the *Barbanti* class had been certified as a Washington state class. See *Barbanti* Order Granting Motion for Certification, attached hereto as Exhibit Y. However, in the broader class certification picture, it is clear that Grace faced an imminent turning point in the ZAI litigation as the issue of national class certification was to have been decided later in April 2001, the very month in which the bankruptcy petition was filed.

Grace was just three weeks away from a crucial class certification decision that would affect the remaining universe of ZAI litigation when it decided to file its bankruptcy petition. The issue of class certification had been thoroughly briefed in the District of Montana, and again in front of the MDL 1376 court. A motion and related papers seeking certification of a national class had been filed in the *Price* action in the District Court for the District of Montana on July 25, 2000 and November 3, 2000. Further, papers were filed in the MDL transferee district, the District of Massachusetts, on January 23, 2001. These papers fully briefed the issue of class certification of a Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) class action in the ZAI litigation. Various exhibits submitted for consideration in conjunction with these papers included fifty-one jurisdiction summaries of negligence standards, strict liability standards, and fraud by nondisclosure and fraudulent concealment standards.

In opposition, Grace (and the related defendants in fraudulent transfer claims) submitted a thorough set of briefs and related papers presenting their position on the issue of class certification. Such submissions included, *inter alia*, a full brief in opposition to class certification submitted by Grace to the MDL transferee court on February 22, 2001. The facts and the law had been thoroughly briefed and ample time had passed to permit the court's consideration of the issue of class certification. According to the MDL 1376 Pretrial Case Management Order, the hearing on Plaintiffs' motions for class certification was to be held on

April 25, 2001, barely three weeks after the date on which Grace chose to file its bankruptcy

petition. The evidence clearly indicates that, after voluminous briefing on both sides of the issue,

a decision on class certification was imminent when Grace filed its petition for bankruptcy. This

reality makes it all the more evident that Grace's bankruptcy filing was precipitated by the

pending certification and not financial difficulties.

### b.    Grace Filed this Bankruptcy as an Attempt To Thwart Ongoing Discovery.

Evidence further indicates that Grace filed bankruptcy so as to halt the efficient and

rapidly-progressing MDL discovery. At the time of the bankruptcy filing, discovery was well

underway in the ZAI MDL proceeding. A large, and increasing, number of double-captioned

discovery documents had been promulgated by both sides in the months leading up to the filing

of the Grace bankruptcy petition.

Grace served its Rule 26 Initial Disclosure Statement on February 15, 2001 and made a

number of discovery promises in the weeks and days preceding the filing of the bankruptcy, all

the time knowing that it would nevertheless file for bankruptcy. For example, in the Case

Management Order, dated February 9, 2001, Grace was ordered to produce several types of

responsive discovery documents and disks "so as to effectuate rolling production form this date

forward."

In the weeks prior to the bankruptcy filing, Grace must have been undergoing massive

document preparations in advance of the bankruptcy filing. Yet, between February 26, 2001 and

April 2, 2001, Grace and the Plaintiffs exchanged over *twenty* separate pieces of correspondence

regarding various discovery issues and points of negotiation. In fact, as recently as March 29,

2001, counsel for Grace sent correspondence to plaintiffs' counsel, attached hereto as Exhibit Z,

promising a production on April 2, 2001 (the date on which the bankruptcy was filed instead) of

electronically-imaged discovery documents, the production of which was ordered by the court. As late as the last business day before the bankruptcy filing, counsel for Grace was still engaging in discovery delay tactics, as memorialized in correspondence dated March 30, 2001 and attached hereto as Exhibit AA purporting to negotiate further the scope of a Confidentiality Agreement that was to govern further discovery.

The evidence strongly suggests that Grace used the automatic stay of bankruptcy as a tool to frustrate the discovery process and an attempt at forum shopping. Further, the Case Management Order established in the MDL proceeding would have led to an orderly resolution of the case by early 2002, potentially with a finding of liability against Grace. Instead, Grace's forum shopping and bankruptcy filing has disrupted that ongoing and efficient process, an outcome that simply cannot have been accidental or unintended.

## 2.    Bad Faith As To The Government Litigation.

The misrepresentations of fact made by Grace regarding Zonolite and other asbestos litigation (discussed at length above) and Grace's filing of a misleading "Informational Memorandum" and similar documents demonstrates that Grace is simply trying to inappropriately influence the court as a fact finder in Grace's favor. Grace's bad faith vis-a-vis the United States is further demonstrated by its failure to comply with the Code and Bankruptcy Form 7 insofar as Grace is required to identify various potential environmental liabilities.

In its disclosure sheet, the DOJ sought an order compelling Grace to supplement statements of its financial affairs filed with the Court. In its incomplete Statements of Financial Affairs, Grace omitted its response to Question 17, which required Grace to divulge any "writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law," to indicate any "notice to a governmental unit of a release of Hazardous Material," and to list any "judicial or administrative proceedings, including settlements or orders,

under any Environmental Law . . . ." See 11 U.S.C., Official Bankruptcy Form 7.

The government twice asked Grace to supplement its Statements of Financial Affairs, but Grace refused to concede that a response to Question 17 was required or even existed. Instead, the DOJ has been forced to move this Court for an order compelling Grace's compliance with the Bankruptcy Rules. See Motion of the United States for Entry of an Order Compelling Debtors to Supplement Statements of Financial Affairs and related documents ("DOJ Compel Motion"), attached hereto a  Exhibit BB.

### D.    Grace's Mishandling of the  Personal Injury Tort Claims.

Grace's declarations of its potential future bankruptcy in the months preceding the filing of the bankruptcy petition aided the upswing in the number of personal injury claims filed. Such an upswing was a predictable result of the likelihood of an upcoming bankruptcy filing, and Grace cannot use its public statements about the possibility of a bankruptcy filing to prod the increased filing of litigation and then point toward that increase in litigation activity as a reason justifying the bankruptcy in the first instance.

### 1. .    Grace's Public Declaration of Future Bankruptcy Likely Led to the Increase in Claims.

Publicity in the latter part of 2000 regarding speculation of an impending Grace bankruptcy likely contributed to a short-term panic effect on the filing of bodily injury claims against Grace. In late 2000, several nationwide articles appeared speculating on the eventual bankruptcy of Grace. For example, when Owens Corning filed for Bankruptcy Court protection in early October of 2000, Grace management chose not to diffuse speculation over an eventual Grace bankruptcy, but instead was quoted in the Wall Street Journal as stating that Grace did not "know what, if any effect" the Owens Corning bankruptcy would have on Grace. See Joseph B. White and Jim VandeHei, *Owens Corning files for Chapter 11, Citing Escalating Asbestos-*

*Liability Claims*, WALL STREET JOURNAL, Oct., 2000, at A3. Similarly, in late December of 2001, Grace again was featured in the Journal as one of four companies which was "[h]aunt[ed]" by the "[specter of costly asbestos litigation." See Gregory Zuckerman, *Specter of Costly Asbestos Litigation Haunts Companies*, WALL STREET JOURNAL, Dec. 27, 2000, at C1. In late January of 2001, Grace itself issued a statement that it would "have to seriously consider reorganization under Chapter 11 . . . ." See Susan Warren, *Grace Considers Chapter 11 Filing Amid Rising Asbestos Litigation*, WALL STREET JOURNAL, Jan. 30, 2001, at A4.

Given the rising concern of an eventual Grace bankruptcy in late 2000 and early 2001 – which Grace incited – it is not surprising that there was a short-term spike in claims. Further, given that Grace Management participated in this stampeding effect, Grace's effort to use that increase in claims as a necessary ground for its bankruptcy filing is circular and improper. Put simply, if there was any necessity for Grace to file bankruptcy, it was based on the months of prognostication by Grace about its possible or eventual need to file Chapter 11. The consequences of those prognostications included a temporary, short-term increase in bodily injury claims, which cannot possibly be a logical and justifiable basis for the bankruptcy itself

## 2.    The 1999 and 2000 Rise in Bodily Injury Claims Remains Manageable.

Despite the modest increase in newly-filed bodily injury claims in 1999, as well as the larger increase in those claims in 2000, throughout both years, asbestos-related bodily injury claims against Grace remained manageable. This fact is established by contemporaneous statements by Grace Management quoted in its filings before this court. See Info Brief.

By early 1999, Grace Management was so confident in its management of asbestos-bodily injury claims, and it was so certain of the predictability of future claims, that Grace changed its accrual method for asbestos-related liabilities. Whereas in previous years, Grace's estimation of

accrual considered only liabilities for existing claims and claims predicted to be filed within five

years, in early 1999, Grace began to publish a statement of accrued liabilities for all-time

asbestos-related liabilities. From early 1999 through 2000, Grace continued to publish global

asbestos-related liability estimates, effectively communicating to shareholders and the public at

large that it could quantify and absorb its asbestos-related liability exposure. Furthermore, in

addition to quantifying estimated asbestos-related liability exposure, Grace also estimated

available insurance and tax benefits to be achieved by the payment of asbestos claims.

Accordingly, the actual financial exposure to Grace was many hundreds of millions of dollars

less than the gross accrual amount.

## III.   **ARGUMENT**

Grace's Chapter 11 petition was filed in bad faith and was not intended to effectuate a

valid reorganization. Grace's motivation behind its filing of the petition is solely to prevent the

claimants from pursuing their claims in state and federal court. The Third Circuit's decision in In

re SGL Carbon, Corp. 200 F.3d 154 (3d Cir. 1999) governs in this situation. There, the court

addressed a nearly identical situation to the Grace bankruptcy, finding that the bankruptcy at

issue was filed in bad faith and was subject to dismissal. Similar to the position taken by the

debtor in SGL Carbon, Grace has filed under Chapter 11 for the primary purpose of obtaining an

advantage in litigation. Such an action "is not within the legitimate scope of the bankruptcy

laws." SGL Carbon, 200 F.3d at 169.

### A.   **SGL Carbon and the "Good Faith" Requirement for Chapter 11 Petitions.**

In SGL Carbon, the Third Circuit considered a bankruptcy quite similar to that of W.R.

Grace and established a good faith requirement for Chapter 11 bankruptcy filings. SGL Carbon,

faced with pending class action antitrust litigation, petitioned for bankruptcy under Chapter 11.

In its disclosure statement, SGL Carbon discussed only its pending litigation as a reason for the

filing. SGL Carbon also made claims in press releases that it was a financially healthy company. The creditors filed a motion to dismiss, arguing that the bankruptcy was a litigation tactic intended to frustrate the antitrust claims. Although the district court found that a good faith standard applied, it nonetheless denied the motion, finding that the bankruptcy petition furthered Chapter 11 purposes because the pending litigation both placed the corporation's operations in peril by distracting the management and was potentially ruinous insofar as its resolution might eventually force the company out of business. Id. at 158.

On appeal, the Third Circuit reversed, holding that SGL Carbon's Chapter 11 petition had been filed in bad faith and was subject to dismissal pursuant to 11 U.S.C. § 1112(b). The Court first held as a threshold issue that, "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith." Id. at 160. The Court also stated that once the issue of good faith is raised, the debtor has the burden of establishing that the bankruptcy filing was made in good faith. SGL Carbon, 200 F.3d at 162 n.10 citing In re Fox, 232 B.R. 229, 233 (Bankr. D. Kan. 1999) and Stage I Land Co. v. United States, 71 B.R. 225, 229 (D. Minn. 1986) and 7 COLLIER ON BANKRUPTCY at 1112-1153. With these parameters in place, the Court found that the a finding of good faith on the facts and circumstances at issue was clearly erroneous. Id., 200 F.3d at 162.

In making its determination, the Third Circuit considered each of the separate justifications that had been raised by the debtor supporting the bankruptcy filing. Id. at 162-163. The consideration undertaken by the Third Circuit is particularly instructive for the case of the Grace bankruptcy. The SGL Carbon Court found that the debtor had failed to establish that distractions to management threatened the company because, *inter alia*, the business had met financial targets in preceding months, the corporate officers insisted that the company was financially healthy, and the Chairman denied a material effect on the company's business. Id. at

162. The Court also found that the record lacked evidence that a litigation judgment might force the company out of business because, *inter alia*, the company had a large estimated book value that was mostly unencumbered, the company had a largely intact litigation reserve, and the company's estimated value of the litigation was reasonable and within the company's means. Id. at 163.

The Third Circuit found that the "absence of a valid reorganizational purpose and the consequent lack of good faith" was evident because the company's financial disclosure documents gave no indication of a need to reorganize under Chapter 11, because the company had a net worth (assets over liabilities) of over $100 million and no difficulty meeting debts as they came due, and because there was no evidence of the company's having difficulty raising or borrowing money or having impaired access to capital markets. Id. at 166. The court examined the company's statements that it was "financially healthy," that its "normal business operations would continue, and that it was experiencing "healthy and growing success." Id. The court found a dismissal of the bankruptcy was warranted, because

> The mere possibility of a future need to file, without more, does not establish that a petition was filed in "good faith." ... SGL Carbon, by its own account, and by all objective indicia, experienced no financial difficulty at the time of filing nor any significant managerial distraction. Although SGL Carbon may have to file for bankruptcy in the future, such an attenuated possibility standing alone is not sufficient to establish the good faith of its present petition.

Id. at 164 (citations omitted).

## B.   Grace's Bad Faith Filing of the Chapter 11 Petition.

### 1.   Grace Cannot Meet Its Burden of Showing Good Faith Filing Under the Totality of the Circumstances.

Under the SGL Carbon analysis, Grace bears the burden of demonstrating that its Chapter 11 petition was filed in good faith once the issue of a "bad faith filing" is raised. SGL Carbon,

200 F.3d at 162 n.10. In addition, a factual finding of bad faith is the result of the court's consideration of the totality of the circumstances, including the timing of the filing of the petition and the debtor's honesty and candor about its ability to organize. See In re Little Creek Development Co., 779 F.2d 1068, 1072 (5th Cir. 1986) (relying "on a conglomerate of factors rather than on any single datum"); see also In re Can-Alta Properties, Ltd., 87 B.R. 89, 91 (9th Cir. BAP 1988). Further, courts have rejected the argument that the ability to reorganize precludes dismissal for bad faith. See In re Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1395 (11th Cir. 1988) (holding "[t]he possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith").

All of the facts and circumstances leading up to the filing of this bankruptcy petition, and the conduct of Grace during this case should be considered by the Court in determining whether the Chapter 11 filing should be dismissed for cause for bad faith pursuant to 11 U.S.C. § 1129(a)(3). These facts include: 1) Grace's professed and only reason for bankruptcy as one of an intention to liquidate all tort claims; 2) Grace's delay and mishandling of the tort claims prior to the filing of the complaint; 3) Grace's filing of bankruptcy - though claiming to be solvent - to obstruct, delay, and stay the ongoing, pending state and federal court actions; 4) Grace's forum shopping to have the bankruptcy court, rather than the state and federal courts, determine the validity of Plaintiffs' claims; and 5) Grace's failure to have a valid reorganizational purpose before filing the bankruptcy petition.

In light of these facts, under SGL Carbon, the court must consider the totality of the circumstances in determining whether good faith was present in Grace's filing. The ZAI Claimants maintain that the filing was a litigation tactic, rather than a valid effort to reorganize, as Grace is a major company with significant economic strength evidenced, *inter alia*, through its own financial statements. Grace, like SGL Carbon, faced no immediate or near-term financial

026.wrg                                      - 28 -

consequences at the time of filing the Chapter 11 petition warranting a reorganization, instead making repeated admissions regarding its stability and profitability. Grace's filing and prosecution of this Chapter 11 case is conclusively in bad faith.

### a.    Grace's Attempt to Impede Pending Litigation Is Proof of Bad Faith.

SGL Carbon is merely one of numerous cases holding that it constitutes bad faith to file bankruptcy to impede, delay, forum shop, or obtain a tactical advantage regarding litigation ongoing in a nonbankruptcy forum – whether that forum is a state court of federal district court. See, e.g., In re Start Engines Inc., 219 B.R. 264 (finding bankruptcy filed in bad faith because the petition filed for improper purpose of delaying a state court action); In re St. Paul Self Storage Ltd. Partnership, 185 B.R. 580 (9th Cir. BAP 1995) (finding bad faith for debtor to file bankruptcy one day prior to a hearing in a creditor's discovery motion in state court litigation); In re Phoenix, 849 F.2d at 1393 (holding bad faith for debtor to file bankruptcy the day before state court was to appoint receiver).

Here, Grace filed bankruptcy mere weeks prior to a decision on the fully-briefed issue of class certification in MDL 1376 and before the *Barbanti* matter could go to trial, thereby deliberately prevented the continuing and normal operation of the litigation process in the nonbankruptcy forums. Grace's obvious forum shopping clearly constitutes bad faith and the proper sanction for such conduct is dismissal of the case.

### b.    Grace's Use of Chapter 11 for Strategic Advantage Rather Than for Reorganization Is Proof of Bad Faith.

The SGL Carbon court focused on 11 U.S.C. § 1112(b) in concluding that the use of Chapter 11 by a financially sound company to gain strategic advantage in connection with pending civil antitrust claim litigation was a "significant departure from the use of chapter 11 to validly reorganize a financially troubled business." See id., 200 F.3d at 166.

### (1)     Grace's Repeated Admissions of Stability.

Similar to SGL Carbon, Grace offers no pretense for its decision to commence this

bankruptcy proceeding. Like SGL Carbon, Grace made repeated admissions of stability and

profitability, over several years preceding its bankruptcy petition filing, showing that it was not

suffering from immediate or serious financial or managerial difficulties as of the date of filing,

nor that it "was encountering financial stress at the time." See id., 200 F.3d at 164. In fact, as

Grace's Chairman, President and Chief Executive Officer, Paul J. Norris, stated in his April 23,

2001 Press Release and May 8, 2001 announcement:

> Grace's decision on April 2, 2001 to seek Chapter 11 protection as
> a way to define and resolve asbestos-related claims was executed
> with no disruption to [our] customers. We continue to remain
> focused on growth and productivity and are anticipating a stronger
> second half of the year.

See Grace's April 2001 Press Release.

***

> Grace is a fundamentally sound company with strong cash flow.
> [Grace has] a clear leadership role in all of [our] major markets,
> many of them in industries vital to the economy.

See Grace's May 2001 Announcement.

### (2)     Grace's Failure to Discount All Creditors.

Grace's submissions and public filings also fail to indicate "a valid reorganizational

purpose" behind the petition. In SGL Carbon, the bankruptcy filing contained a proposed

organizational plan under which only one type of creditor would be required to accept less than

full cash payment for its account. Here, just as in SGL Carbon, it appears that only the asbestos

creditors will receive less than 100 cents on the dollar and the non-asbestos creditors will be

treated in a accord with Grace's normal business operations. See Info Brief. In fact, Grace's

stated purpose for bankruptcy is to insulate these other creditors and Grace's business operations

from any fallout from the asbestos claims.

The clearest demonstration of the disparate treatment of the asbestos and non-asbestos creditors is found in Grace's motions and memoranda filed in support of the Case Management Order, the establishment of a bar date, and the approval of a notice program. In those supporting documents, Grace proposes an elaborate process for identifying, categorizing, attacking and disposing of all asbestos claims, known and unknown. Yet, the non-asbestos claimants are conspicuously omitted. This attempt to "manage" and manipulate the litigation of the asbestos claims is precisely the sort of bad faith that SGL Carbon sanctioned by way of dismissal. Grace's stated justification for its use of bankruptcy was directly addressed and flatly rejected by the Third Circuit in SGL Carbon. See id. at 157.

Predictably, Grace, like SGL Carbon, will "play[] down the litigation tactics behind its Chapter 11 petition and instead claim[] it was forced into Chapter 11 by serious economic difficulty stemming from the litigation." SGL Carbon, 200 F.3d at 167. Grace, will assuredly rely on prior mass-tort-related bankruptcies to argue its "automatic" entitlement to file based on the asbestos litigation. As the Third Circuit held in SGL Carbon, however, bankruptcy relief is never automatic, and always depends upon the debtor's good faith. Grace's stated reasons for its petition belie even the suggestion of the good faith requirement.

## IV.  CONCLUSION

Applicable law precludes Grace, a strong, growing and vibrant company, from availing itself of the bankruptcy option as a tactical litigation device. Relying solely upon Grace's own statements and positions, there is no need for financial reorganization and this Chapter 11 is no more than a transparent attempt to subvert the substantive rights of asbestos claimants. As such, the requisite good faith for relief in bankruptcy is lacking and this petition should be dismissed. Accordingly, the Zonolite Attic Insulation Claimants respectfully move this Court to dismiss this

026.wrg                              - 31 -

Chapter 11 case for cause and for such other relief as the Court deems just and appropriate.

DATED this ___ day of November 2001.

Thomas Sobol by W.V.

Thomas M. Sobol
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
175 Federal Street, 7th Floor
Boston, MA 02110-2221
Phone: (617) 720-5000
Fax:    (617) 720-5015


And

ELZUFON AUSTIN REARDON,
TARLOV & MONDELL, P.A.

William D. Sullivan, Esq. #2820
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630
(302) 428-3181

Attorneys for Zonolite Attic Insulation
Claimants