IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) | Chapter 11 |
|  | ) |  |
| In re: | ) | Case No. 01-01139 (JJF) |
|  | ) | (Jointly Administered) |
| W. R. GRACE & CO., et al., | ) |  |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |

## AFFIDAVIT OF FRANCINE F. RABINOVITZ

BEFORE ME, the undersigned authority, personally appeared Francine F. Rabinovitz, who after being duly sworn states as follows:

1.  My name is Francine Rabinovitz, and I am over the age of eighteen and am competent to testify to the matters herein.  I have personal first hand knowledge of the matters stated in this declaration and, if called to testify, could and would testify competently thereto.  A true and correct copy of my curriculum vitae is attached as Exhibit 1.

2.  I am Executive Vice President of Hamilton, Rabinovitz & Alschuler, Inc. ("HR&A"), a policy analysis, finance and management consulting firm. I am also Professor Emerita in the School of Policy, Planning and Development at the University of Southern California. I hold a Ph.D. from MIT in what today is called Policy Analysis, with a minor concentration in Urban and Regional Planning.  This combination of

training and teaching focused on the application of social science methods to policy problems. For many years their application was often to real estate and land use related issues. This is relevant here because of the specific need to apply analytic skills to property damage estimation. I have written and contributed to numerous works in which my analytical skills were applied to property problems. To take one leading example, I served for seven years (1985-1992) as court appointed Referee for the Los Angeles Superior Court in <u>Federation of Hillside and Canyon Associations v. City of Los Angeles</u>, a case impacting some 300,000 of the 800,000 parcels in Los Angeles.

3.   I have also often served as an expert on estimation of claims in the context of asbestos bankruptcies. I was the estimation expert for the Representative of Unknown Future Claimants in the Celotex bankruptcy in 1996. I also constructed a cash flow model that was used to establish the feasibility of the proposed reorganization plan. HR&A then served as a consultant to the Celotex Asbestos Trust for personal injury claims, setting up its discounted cash payment program and performing other implementation activities prior to the hiring of a full time CEO.  In 1998, I served as consultant to the DynCorp corporation, the owner of former asbestos installer and distributor Fuller-Austin Co., to review the estimation of asbestos claims and cash flow associated with its "pre-packaged" bankruptcy.  I am the expert for the Futures Representative in the re-calculation of the pro rata share in the Manville Asbestos Trust, and my Affidavit has been submitted to the Court for retention as the estimation consultant to the Representative of Future Claimants, former Judge Thomas McMonagle, in the Owens Corning bankruptcy.  I was previously an expert for the Manville Trust in its litigation against the tobacco industry.  I

also serve as the estimation consultant to PPG Industries, shareholders in the Pittsburgh Corning bankruptcy.

4.   I have also served as an estimation expert in other mass tort cases outside the context of asbestos injuries. HR&A served as consultants to the Dow Chemical Company in the Agent Orange litigation, and helped to conduct the research which was instrumental to the settlement of the litigation. Since 1997 I have been the estimation expert for the Dow Chemical Company shareholders in the Dow Corning bankruptcy.  I was also the estimation expert for Aetna Life and Casualty in the A.H. Robins (Dalkon Shield) bankruptcy. My estimate of the value of several hundred thousand filed, but unresolved claims was specifically cited in the opinion of the Fourth Circuit Court of Appeal as credible testimony, in part leading it to accept the trial court's valuation of those claims. In that case, which involves the only Trust whose liability I have estimated which has completed its distributions to claimants and then closed, the projected resource needs which I had estimated and the court adopted, were sufficient to cover the liabilities and expenses of the more than 300,000 claimants with no reduction in payments.

5.   Since 1995 I have also been a consultant to the U.S. Department of State, developing the sampling and estimation methodology which has been implemented by the U.S. Department of Defense Audit Agency in <u>Islamic Republic of Iran vs. the US</u>, the litigation between the U.S. and Iran over the estimated costs associated with Iranian participation in the U.S. Foreign Military Sales Program prior to the Iranian revolution.

My testimony to the International Court of Claims in the Hague has been videotaped for presentation next year.

6.   While a large part of my asbestos related work has been with respect to bankruptcies, I have also provided valuations for other purposes.  In 1983, I served as a court appointed expert in the Ohio Asbestos Litigation for Hon. Thomas Lambros, Federal District Judge in Cleveland and Hon. Thomas McMonagle, then Judge in the Cuyahoga County Court of Common Pleas, who at that time had all asbestos cases pending in both the Federal and State dockets for that area.  Based on data coded from a sample of resolved asbestos cases provided by plaintiffs' attorneys by order of the court, I developed a system which estimated the value of open cases from closed cases.  This system was used to value and settle more than 100 individual cases of alleged asbestos injury then crowding the dockets of these courts.

7.   I have also worked in several capacities on issues involving the costs and process of handling asbestos and other torts from an administrative and financial perspective.   In 1982, I participated in an HR&A study funded by twelve property casualty insurance carriers to explore mechanisms for reducing the overhead costs associated with the handling of asbestos mass tort litigation.  The report that HR&A filed originated the concept of a common facility for resolving mass tort claims against multiple defendants.  I also participated in the negotiations that led to the signing of the so-called Wellington Agreement among asbestos defendants and their insurers, and the formation of the Asbestos Claims Facility in 1983. I am co-author of the Report

537765                                        4

emanating from this work, "Reducing the Overhead Costs of Asbestos Litigation:   A Time for Action", published in the <u>Journal of Products Liability</u> in 1983.

8.   In addition, I have managed a series of projects in which HR&A served as consultants to the property casualty industry with respect to methods by which claim handlers value and negotiate claims for auto, medical malpractice, workers compensation and product liability, including Aetna Life and Casualty (1981 and ff.), CIGNA (1983, 1985, 1986), USAA (mid 1980s), TransAmerica (1990), the Insurance Services Office (ISO) (1986-88) and the Hawaii Insurance Rating Bureau (1987). HR&A studies of the role of information in debates in state legislatures on tort reform led in part to the formation of the Institute for Civil Justice at the Rand Corporation, to which HR&A partners served as consultants for many years. HR&A studies of the impact of changing state tort liability laws on the future values of a variety of types of claims also helped ISO take positions on these changes across the nation.

9.   I served as a court appointed expert in <u>Crawford v. Board of Education</u>, the Los Angeles school desegregation case, from 1979 to 1981, leading a team of experts and then managing the preparation of a computer aided HR&A estimate of the probable consequences of alternative plans for school desegregation. I was also Special Monitor for the Superior Court overseeing the implementation of the court ordered desegregation plan. I have supervised modeling work for Special Masters in cases involving fishing rights and workplace integration, and for public and private clients in cases involving rent

control, housing discrimination, the delivery of welfare benefits, contracting disparities, vote dilution, water rights and trademark infringement.

10. In May, 2001 I was engaged in the chapter 11 of W.R. Grace & Co., et al. (the "Debtors") by the Official Committee of Asbestos Property Damage Claimants (the "PD Committee") as an expert and consultant on the development of procedures for and the estimation of asbestos claims.   This Affidavit is being furnished for the Court's consideration in connection with the establishment of case management procedures.  It is my understanding that the PD Committee favors the implementation of an estimation process pursuant to 11 U.S.C. § 502(c).  The purpose of this Affidavit is to describe such processes in the context of an asbestos bankruptcy generally and then to describe the process I believe should be implemented in this case specifically.

11. In my experience, before any reorganization plan can be implemented, the liabilities of the Debtor must be estimated.  In fact, every asbestos related bankruptcy and every other mass tort bankruptcy that has occurred since the Johns-Manville bankruptcy has incorporated a process for estimation of claim value as a necessary step in the development of a plan of reorganization.  Contrary to the Debtors' statements in their reply in support of their case management motion, estimations have been used both in cases where liability has not been contested and in cases where liability has been contested.   A prime example of the latter is the A.H. Robbins (Dalkon Shield) bankruptcy.  In that case:

(a) Databases were assembled reflecting injuries and settlement amounts in resolved cases both from the insurer (Aetna) and the debtor (Robins).  Information from a random sample of these resolved cases, reflecting all the data available, were prepared in electronic form to create a "resolved case database."  In addition, because the number of claims received by the bar date (about 300,000) far exceeded the number the debtor had expected (i.e., approximately 25,000, on the basis of which projections bankruptcy protection was sought), an additional data set containing injury information was collected from a sample of pending cases.  The data on current claims was meant to answer the question: Are the current claims radically different from the claims resolved prior to the bankruptcy or do they reflect the same injuries and medical documentation?  This data was collected under the supervision of a Special Master.

(b) All of these databases were provided to a set of six experts representing the different parties in the case, including Robins, the official committees, and Aetna. Each expert conducted separate analyses of these data within a court specified time frame and other court established rules such as, for example, confidentiality restrictions.

(c) The court then convened an estimation hearing.  All of the experts answered a set of common questions, such as estimating how many women in the bar date defined claims universe would receive compensation, estimating the values of claims for different conditions, calculating additions or subtractions for statute of limitations considerations, and for nonuser claimants (children, and husbands claiming loss of consortium).

(d) The court also considered the debtor's defense that causes of the underlying condition (pelvic inflammatory disease), that the claimants alleged was caused by the Dalkon Shield, was "confounded" because it could also result from other causes (e.g., chlamydia, sexually transmitted diseases). The court heard expert medical testimony on this issue and concluded that information on claimants' sexual histories could be collected from a sample of claimants. This allowed the debtor's defense on disease causation to also be "valued" as part of the estimation process.

(e) As in the Grace case, there was also debate on how to handle product identification. Should women who could not submit a medical record showing that a Dalkon Shield had been implanted (the records of many college clinics where the product had been made available had, it was alleged, been destroyed as a matter of routine), be excluded or should this fact be treated as an indicator to lower claim values but not to exclude the claims?

(f) Each expert, under court order, prepared and circulated a report to all other parties, was deposed by all parties, testified and was then subject to cross examination. In addition, the court (a Federal district judge and a bankruptcy judge sitting together) inquired of each expert about changes in their assumptions on a number of the defenses (e.g., what would the financial consequences be to the estimate of excluding women who provided no documentation except an affidavit of product use?).

537765

8

(g) The court then announced its first estimate, which was upheld on appeal.

12. Interestingly, even in the Dow Corning bankruptcy, which the Debtors repeatedly refer to as the model for their program, both the debtor and the tort claimants committee advocated the use of an estimation process as an integral component of their proposed case management plans.   And, although Judge Spector rejected both sides' proposed processes of estimation in favor of liquidation, he stated that his decision was motivated in part by his desire to encourage the parties to agree on a consensual plan of reorganization.   Moreover, Judge Spector's written opinion expressly states that "with nonpersonal injury claims [i.e., property damage claims], estimation is often justified because it can entirely eliminate the need for liquidation." In re Dow Corning Corp., 211 B.R. 545, 566 (Bank. E.D. Mich. 1997).   Ironically, even in the Dow Corning bankruptcy, an estimation process was utilized by the agreement of the parties as a part of the hearing to confirm the reorganization plan.   Like the estimate in the Robins case, this estimate was based on historical data, including a set of resolved claim values from claims involving similar products made by three other manufacturers.   Indeed, part of the estimation by Dr. Fred Dunbar (who I understand has been engaged by Grace) of the likely outcome of claims where claimants reject settlements, was also derived from the history of the Dalkon Shield program.

13. To date, the vast bulk of attention and contention concerned with estimation in the bankruptcy courts which have handled asbestos cases has been in respect of the estimation of personal injury claims.   In this case, while I will follow closely the

estimates produced by my able colleagues, Dr. Dunbar for the Debtors and Dr. Peterson for the Personal Injury Claimants Committee, my concern is not with personal injury but with the estimation of property damage liability.  Moreover, in view of the determination by certain Zonolite claimants to seek national class certification, I have limited my analysis to "traditional" property damage claims relating to other Grace products such as MK-3.

14. Significantly, I believe that the estimation of property damage claim values is subject to fewer variables, and therefore will likely be easier than estimation of personal injury claim values.  Unlike personal injury claims, it does not appear that the property damage claims will be "complicated" by the necessity to consider future claims.

15. In addition, I believe that the existing database for generating estimates of the costs of abatement[1] of properties affected by Grace asbestos products is extensive and detailed. In stark contrast to the situation in such prior cases as the Celotex bankruptcy, where there was literally no data on the characteristics of personal injury claimants who had been compensated in the past by Celotex for injuries sustained as a consequence of their exposure to Celotex asbestos products,[2] Grace indicates that there exists a wealth of detailed historical information on property damage claims against Grace.  These include data on a substantial body of closed claims, both settled and tried to verdict, on which to

---

[1]I will use the word "abatement" as a catchall here to cover a series of processes including survey and assessing asbestos in buildings, operation and maintenance programs, encapsulation, enclosure and removal and replacement.

[2]See Dr. Francine F. Rabinovitz, HR&A, Inc. "Estimation Value of Future Claims Against Celotex," U.S. Bankruptcy Court, Middle District of Florida, Tampa Division, Feb. 19. 1996.

base analysis and projection of the value of claims in bankruptcy.    Grace reports in its informational brief that prior to the bankruptcy there were 379 property damage lawsuits against it related to Monokote MK-3, covering thousands of buildings.   In addition, counsel for the members of the PD Committee have advised me that they have brought lawsuits against Grace for non-Monokote products such as Zonolite Acoustical Plaster, masonry fill and ceiling products.   I am further advised that non-Monokote property damage litigation may well have exceeded the number of suits for MK-3.   Grace further reports that 207 of the MK-3 cases have been settled, 140 have been dismissed or are the subject of summary judgment, and 16 have been tried to verdict.   It also reports that as of February 1, 2001 there were seven property damage lawsuits involving Monokote MK-3 pending.[3]   The data available on this body of claims and lawsuits should thus constitute an excellent starting point for projecting average and total property damage claim value.

16. There is also detailed data on buildings contaminated by Grace products in the claims databases of the Celotex/Carey Canada Asbestos Property Damage Claims Facility and, in all likelihood, the Manville Property Damage Trust database. Such data was assembled as a consequence of claims against Manville and Carey Canada for fibre production, which was then used by Grace to manufacture its asbestos containing products.[4]

---

[3]Debtors' Memorandum in Support of Motion for Entry of Case Management Order, Motion to Establish a Bar Date, Motion to Approve Claim Forms and Motion to Approve Notice Program, the U.S. Bankruptcy Court for the District Court of Delaware, In Re W.R. Grace Co. et. al., undated but received July 1, 2001. p. 7.

[4]Mr. W. D. Hilton, Jr., Administrator of the Celotex Property Damage Claims Facility, has confirmed the existence of data on buildings with Grace products. These claims arise, as Grace itself notes, because Grace purchased asbestos from others. See Motion, op.cit. p. 7 fn. 13.

17. Finally, there have been several excellent analyses which quantify the costs of inspection, testing, development of management plans, operations and maintenance programs, and remediation and abatement of asbestos in buildings of different types. These use model building concepts, in which the costs for various typical buildings specified by size, construction and amount of suspect material have been carefully estimated.[5]

18. Consistent with other mass tort bankruptcies, this data should be complemented by the testimony and other evidence that the Debtors state would be applicable to their statute of limitations and "science" defenses.  This would allow the Court to consider the Debtors' evidence and defenses in direct juxtaposition with the almost 30 years of property damage claims history that the Debtors have experienced.

19. Commentators[6] have observed that neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure provide specific guidelines for the process of claims estimation.  The dominant view is that the bankruptcy courts may therefore use whatever method of estimation is best suited to the particular unliquidated damages at

---

[5]See for example Dale Keyes, Ph.D., QEP, William Ewing, CIH, Steve Hayes, PE, CIH, "Estimated Costs Associated with Asbestos-Containing Materials in Buildings in the US," a report introduced as evidence in the hearings on Confirmation of the Celotex Plan of Reorganization, Sept. 3, 1996.  Additionally, a Cost Model for abatement costs was developed by Mr. Hilton in the Celotex case, utilizing a study performed for him by Gobbell Hays Partners, Inc., architectural, environmental and engineering consultants.  At the election of Celotex property damage claimants, the Cost Model is utilized in lieu of actual abatement costs for purposes of quantifying the claims of such claimants.

6  Laurie S. Dix and Morton D. Dubin, Orrick, Herrington & Sutcliffe, LLP, "Legal Framework for the Estimation of Personal Injury Claims in Chapter 11 Bankruptcies", Asbestos Bankruptcy Conference, June, 2001.

537765

issue.  The estimation methods used by courts have included processes ranging from summary jury trials to full evidentiary hearings.

20. The accuracy of the estimation process that I believe should be utilized in this case will undoubtedly be enhanced by the analyses I anticipate will be offered by my able and experienced colleagues, Drs. Dunbar and Peterson, retained by the Debtors and the Official Committee of Asbestos Personal Injury Claimants, respectively.  I am confident that together with the expected evidence and arguments presented during the estimation hearing, our collective opinions should allow the Court to determine an accurate estimation of the value of property damage (and personal injury) claims.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Francine F. Rabinovitz

STATE OF _____                )
                                  )  SS
COUNTY OF _____            )

    The foregoing instrument was acknowledged before me this _____ day of November, 2001, by Francine F. Rabinovitz who is personally known to me or who has produced _____ as identification.

_____
NOTARY PUBLIC, State of _____
at Large
(Print Name)_____
My commission expires:       (Commission No.)_____