IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et al.* | ) | Case No. 01-1139 (JJF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**VERIFIED STATEMENT OF PROFESSOR ELIZABETH WARREN IN ACCORDANCE WITH SECTION 1103 OF THE BANKRUPTCY CODE AND RULE 2014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, Elizabeth Warren, being duly sworn, deposes and says:

1. My name is Elizabeth Warren. I am the Leo Gottlieb Professor of Law at Harvard Law School.

2. On or about October 23, 2001, the Official Committee of Asbestos Personal Injury Claimants (the "Committee") filed its Supplemental Application Pursuant to Federal Rule of Bankruptcy Procedure 2014(a) for Entry of an Order *Nunc Pro Tunc* as of August 1, 2001, Under Sections 327(a) and 1103 of the Bankruptcy Code Authorizing Employment of Professor Elizabeth Warren as Special Bankruptcy Consultant to Caplin & Drydale, Chartered, National Counsel for the Official Committee of Asbestos Claimants (the "Application"), seeking to retain me as special bankruptcy consultant to the Committee to work with the Committee's national counsel Caplin & Drysdale. I offer this affidavit to supplement that Application.

3. My experience in the bankruptcy field reaches across a broad range of topics and issues. I began work on mass tort bankruptcies in the early 1980s when I started teaching mass tort bankruptcies in my bankruptcy classes and advanced seminars at the University of Texas. In 1984, I wrote the initial drafts of a chapter on mass tort bankruptcies for my casebook with Professor Westbrook, *The Law of Debtors and Creditors* (Little Brown 1985). I taught that chapter and

{D0000940:1}

continued to research and update the materials contained in it for the next sixteen years. The latest edition of the casebook, *The Law of Debtors and Creditors* (4th edition Aspen 2001), includes sections dealing with mass tort bankruptcies, future claims, conflicts among claimant classes, and a several other issues that arise with special force in asbestos bankruptcies.

4. In the late 1980s and early 1990s, I helped design and implement judicial education programs dealing with mass tort bankruptcies. I served for nine years on the Federal Judicial Center's Bankruptcy Education Committee. Many of the Federal Judicial Center programs in those years included a section on issues relevant to mass tort bankruptcies. There was also at least one invitation-only program specifically developed to deal exclusively with mass tort bankruptcies. I served on the planning committee for each of these programs. I attended many of the programs and spoke at several of them on a wide range of topics, including mass tort bankruptcies.

5. In the early 1990s, I worked as a member of the National Bankruptcy Conference on its Code Review Project on the bankruptcy system. My specific assignment was to develop a recommendation to Congress on how to deal with mass tort bankruptcies. I wrote several drafts of that report, with the thoughtful advice and suggestions of the Mass Tort committee of the NBC. I presented the report to the Conference, leading a discussion and modifying the recommendations based on that discussion. Twice I returned to the Conference at its annual meetings with modified versions. The Conference finally adopted the third report. That report was published in the Conference's recommendations to Congress in The National Bankruptcy Conference, REFORMING THE BANKRUPTCY CODE, *Future Claims* 281 (Final Report May 1, 1994). The mass tort recommendations were revisited by the Conference after section 524(g) was added to the Bankruptcy Code in 1994. I continued to lead discussions in the Conference about the future claims issues. The National Bankruptcy Conference's second comprehensive recommendation to Congress,

REFORMING THE BANKRUPTCY CODE, *Future Claims* 33 (Final Report May 1, 1997), included the future claims recommendations developed by my committee and endorsed by the Conference.

6. In 1993 and 1994 when Congress was considering amending the Bankruptcy Code to deal with mass tort bankruptcies, I provided assistance to various Congressional staff people. I tried to help them understand the issues involved and to evaluate the various statutory proposals as they arose.

7. In 1994, Congress established the National Bankruptcy Review Commission. At the time the Commission was formed, mass tort bankruptcies were chief among the items on its agenda. Congress had recently passed 11 U.S.C. § 524(g) dealing with mass tort problems exclusively in the asbestos industry, but several people in Congress hoped that the Commission would develop a more comprehensive approach to replace that section. In 1995, Congressman Mike Synar was appointed to lead the Commission. When Congressman Synar asked me to be the Adviser to the Commission, he specifically asked if I would develop proposals and write a report for the Commission on mass tort bankruptcies. I agreed. When the Commission formed working groups, I assisted the mass tort group, supervised the research on the subject, developed an agenda to consider mass tort issues, prepared a number of position papers, invited witnesses and participants to Commission meetings, and helped craft a proposal that was ultimately adopted unanimously by the Commissioners. That report is now published as part of the Commission's final report. REPORT OF THE NATIONAL BANKRUPTCY REVIEW COMMISSION, *Treatment of Mass Future Claims in Bankruptcy 2.1.1* (October 20, 1997).

8. In the past few years, I have continued my academic research on mass tort bankruptcies. I gave an address, for example, in 1999 at the Manhattan Institute on the connection between bankruptcy and mass tort reform. The Institute asked for permission to publish those

remarks. In 1993, I organized and moderated a conference that brought together academics, judges, and practitioners at the University of Pennsylvania on the subject of mass torts and bankruptcy. In 1995, I spoke at the Federal Reserve Bank in Philadelphia about mass tort bankruptcies. From 1995 through 2000, I have taught the subject of mass tort bankruptcies at Harvard's Practicing Law Institute as part of the course on Business Bankruptcy. I have taught the issues related to mass tort bankruptcies in my advanced Chapter 11 seminars at the University of Texas, the University of Pennsylvania and the University of Texas. At Harvard Law School I have supervised senior honors theses and master's theses on mass torts in bankruptcy. Each time I have spoken or supervised a student, I have reviewed the published cases and scholarly literature on mass tort bankruptcies.

9. Every year since 1983, I have given a lecture at the University of Texas in the annual bankruptcy program. My topic, shared with Professor Jay Westbrook, has always been, "Recent Developments". To prepare for this, I read the even-numbered volumes of the bankruptcy reporter that have been published during the year while Professor Westbrook reads the odd-number volumes. We both write squibs on interesting cases, and then write on four or five topics each in greater detail. Those longer pieces become the basis for an oral presentation as well. In several of those years, I have spoken on one or another topics related to mass tort bankruptcies. Both the squibs and the extended discussions are published each year by the CLE program sponsors.

10. I have consulted with a number of companies on mass tort issues. I served in an advisory capacity to Dow Chemical, the parent company of Dow Corning, in the early days of the Dow Corning bankruptcy. I have assisted the Johns Manville Trust and the National Gypsum Trust in appellate litigation. I have been an expert witness on behalf of the National Gypsum Trust and the Fuller Austin trust. These trusts were formed as part of the confirmation of a plan of reorganization in mass tort asbestos bankruptcies. I have assisted in the preparation for petitions for

certiorari to the United States Supreme Court in two cases involving future claims, one in an environmental context and one in an employee liability context. I have argued a case on behalf of Fairchild Aviation, an airplane manufacturer facing future claims liability. I have filed an amicus brief in future claims litigation involving Piper Aircraft.

11. The application states that I will not be a member, associate or of counsel to the firm of Caplin & Drysdale. Harvard Law School expressly prohibits faculty members from forming such relationships. The law school policy is unambiguous: "Faculty members should not be partners in law firms or be held out as 'of counsel'". Harvard Law School, Faculty Manual 2001-2002 (August 1, 2001). I believe this policy is fairly standard in law schools throughout the country, although it is not strictly enforced at all schools. It is, however, strictly enforced at Harvard Law School. The statement "to avoid conflicts with Caplin & Drysdale's non-bankruptcy clients" in para. 6 of my original Verified Statement that accompanied the Application did not refer to any specific present or potential conflicts related to this or any other pending case, but rather was intended as a general statement that my adherence to Harvard's rules against formal associations with law firms would preclude me from having to concern myself with whether my role in working with Caplin & Drysdale in this or any of the other asbestos-related bankruptcy cases could be deemed to create a relationship with Caplin & Drysdale such that its non-bankruptcy clients would be considered to be my clients for conflicts purposes.

12. I do not share any compensation with Harvard Law School or Harvard University that I receive when I consult. Neither Harvard Law School nor Harvard University has any financial interest of any kind in my employment. Harvard University understands that faculty members may participate in a broad range of outside activities, and it specifically acknowledges the benefits that consulting and advising may produce. See Appendix A, Harvard Law School Guidelines for

Reporting. The university also understands that faculty will be compensated for such work. It asks for no part of the compensation received, but instead imposes a limit on the amount of time that faculty members may spend in such consulting activities. *See* Appendix A.

13. Harvard University limits the time each faculty member spends on outside activities to twenty percent of a faculty member's total professional effort. *See* Appendix A. The University requires that each faculty member report annually the time spent on outside activities. Outside activities requiring reporting include litigation and litigation related activities, advising, consulting, counseling, lectures and conferences, and commissioned research. While Harvard University has extensive rules governing the reporting outside activities, it asks for no information of any kind about the identity of those on with whom a faculty member consults or on whose behalf such work is undertaken. Reporting forms have only the time spent and the type of activity; there is no space available to report the identities of any of the involved parties. I have made no disclosures to Harvard University or Harvard Law School about my outside activities other than the time spent, and I expect to make no such disclosures in the future.

14. I am an employee of Harvard University; my compensation is fixed by Harvard Law School. I do not share in any way in the proceeds or receipts of Harvard University or Harvard Law School. I do not represent Harvard University or Harvard Law School as counsel. With the exception of a few private donors whom I know personally and what I occasionally read in the newspapers, I do not know who donates to Harvard University or Harvard Law School. I do not know what companies are included within Harvard University's investment portfolio. I have no information to suggest that W.R. Grace & Co. or any of its debtor affiliates is one of Harvard University's donors or in Harvard University's investment portfolio.

15. My hourly rate in this case is $675. My customary billing rate is $700. I have been working, writing, teaching, lecturing, and consulting in the bankruptcy field for twenty-two years. My fee is commensurate with other professionals of similar experience. I do not share in partnership profits. I sharply limit the time I spend on paid consultation, spending the remainder of my time either on my university work or on uncompensated writing, research, lecturing and various pro bono activities.

16. I will maintain strict billing records to account for time spend in the service of the Committee in these proceedings. When I undertake any work at the request of Caplin & Drysdale, I will ask for the name of the committee on whose behalf I will be working, and I will maintain records that will distinguish such time and work from any other case or matter upon which I work, including but not limited to the other asbestos-related bankruptcies on which I am working with Caplin & Drysdale. From September 12, 2001, when the Supplemental Affidavit of Elihu Inselbuch Pursuant to Section 327(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, I have spent not spent any hours hours working on matters involving the W.R. Grace & Co. bankruptcy cases.

_____
Elizabeth Warren

SWORN to and subscribed before me this ___ day of December, 2001.

_____
Notary Public