IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) | Chapter 11 |
|  | ) ) | Case No. 01-01139 (JJF) (Jointly Administered) |
| W. R. GRACE & CO., et al., | ) ) |  |
| Debtors. | ) ) ) |  |
| _____ | ) |  |

## AFFIDAVIT OF W. D. HILTON, JR.

BEFORE ME, the undersigned authority, personally appeared W. D. Hilton, Jr., who, after being duly sworn, states as follows:

1. My name is W. D. Hilton, Jr. I am over the age of eighteen and am competent to testify to the matters herein, which are based upon my personal knowledge.

### BACKGROUND AND EXPERIENCE

2. Attached as Exhibit A is my curriculum vitae showing my experience, education and background. For the purposes of this testimony, I believe it is important to discuss my over eight years of involvement in asbestos-related bankruptcies and settlements, and in particular, my experience with the processing, review and determination of over 8000 asbestos-related property damages claims.

### ASBESTOS-RELATED BANKRUPTCIES AND SETTLEMENTS

*National Gypsum Settlement Trust*

3. I was confirmed as a trustee of the NGC Settlement Trust ("NGCST") on March 9, 1993, by Judge Stephen A. Felsenthal of the U. S. Bankruptcy Court for the

1

Northern District of Texas—Dallas Division.  I became the Managing Trustee as of July 1, 1993, the  Effective Date of the Plan of Reorganization of the National Gypsum Company (the "NG Plan").

4. As the chief executive of the NGCST, I organized the trust office, hired employees, engaged professionals, served as President of Asbestos Claims Management Corporation  ("ACMC") (successor by change of name only to the National Gypsum Company), was a member and Chair of the Board of Directors of The Austin Company, a subsidiary of the NGCST, and became a member of four creditors' committees involving eight insolvent insurance companies which were insurers of National Gypsum.

5. My duties as Managing Trustee of the NGCST also required me to plan, implement and manage the National Gypsum Property Damage Claims Facility (the "NG PD Facility").  The planning for the facility included the limitations imposed by the Proof of Claim form filed by property damage claimants by June 30, 1992 (see Exhibit B). This form was filed by each entity (<u>not</u> on a building by building basis) to establish its right and to later participate in the actual claims resolution process when the claims resolution procedures (the "NG CRP") were developed and the NG Plan confirmed.  In essence, this was the "key to the NG PD Facility door."

6. I developed a comprehensive Claim Form and Instructions in late 1993 in accordance with the provisions of the NG CRP (see Exhibits C & D).  The comprehensive Claim Form filing deadline was one year after the Effective Date—July 1, 1994.

7. During 1994 and 1995, the facility reviewed and determined almost 3000 claims that resulted in Allowed Costs of $276 million. Approximately 50% of the filed claims were disallowed.

8. The National Gypsum bankruptcy is the only confirmed proceeding, of which I am aware, in which a debtor with significant asbestos liabilities (bodily injury and/or property damage) does not enjoy protection under section 524(g) of the Bankruptcy Code. The NG Plan was pre-524(g), and did not provide for the Trust (which had responsibility for the debtor's asbestos liabilities) to own the majority of stock in the successor operating company. The successor operating company, therefore, was not eligible for retroactive 524(g) protection as was the case in Manville and UNR.

9. Unlike any other of the established asbestos trusts, the NG Plan provided for bodily injury liabilities of National Gypsum to be adjudicated in the tort system. When it became apparent that the Trust would not have the funds to continue to resolve bodily injury claims in the tort system and a question arose concerning the liability of the new National Gypsum Company for the bodily injury claims, ACMC left the tort system under a stay provision of the NG Plan.

10. The effect of this unique non-524(g) result is to bring the former debtor, ACMC, to the brink of yet a second bankruptcy to permit a determination of the appropriate use of the remaining assets of the NGCST, This put the operating company that emerged from the NG Plan, new National Gypsum Company, in a position of having massive potential exposure in the tort system under state successor liability laws and the prospect of its own bankruptcy to deal with this potential liability.

*The Celotex Bankruptcy*

11. In November 1996, I was qualified by Judge E. Thomas Baynes, Jr. of the U. S. Bankruptcy Court for the Middle District of Florida—Tampa Division and testified as an expert during the Celotex confirmation hearings regarding (i) the fairness of the Asbestos Property Damage Claims Resolution Procedures (the "CX APDCRP") and (ii) the implementation of the Celotex Property Damage Claims Facility (the "Celotex PD Facility").

12. Subsequently, I was confirmed as the Property Damage Claims Administrator of the Celotex Asbestos Settlement Trust by Judge Baynes. In this role, I had the responsibility of planning, implementing and managing the Celotex PD Facility beginning in April 1997. To effectively manage this facility, I established Trust Services, Inc. ("TSI") as further described in Exhibit E to this affidavit.

13. Consistent with the NGC PD Facility, the planning for the Celotex PD Facility included the limitations imposed by the Proof of Claim form which the property damage claimants were required to file before the July 26, 1993 bar date, almost three years after the Celotex bankruptcy was commenced (see Exhibit F). This form was used to establish each entity's right to later participate in the actual claims resolution process when the CX APDCRP were developed and the Celotex Plan confirmed, another three years after the bankruptcy bar date. In essence, this was the "key to the Celotex PD Facility door".

14. As Property Damage Claims Administrator of the Trust, I developed the comprehensive Claim Form and Instructions which were utilized by the Claims Facility

to process the claims in accordance with the provisions of the CX APDCRP (see Exhibits G & H).

15.  Almost 5000 claims were filed with the Celotex PD Facility by the Claim Form filing deadline of January 29, 1999. The extremely rigorous and complex determination process for these claims is expected to be completed by December 31, 2001, more than eleven years after the bankruptcy case was filed. Currently, approximately 61% of the determined claims have been disallowed. The Allowed Costs of the allowed claims total over $1.6 billion. Most of 2002 will be used for the continuation of the claims reconsideration and arbitration processes available at the initiation of property damage claimants.

### *Texas Political Entities Class*

16.  In June 1997, I was appointed by Judge Joe J. Fisher of the U. S. District Court for the Eastern District of Texas—Beaumont Division as the PDCA for the first of three settlements with the Texas Political Entities Class. The settling defendant in this action, W.R. Grace, concurred in my appointment after review and examination. The distribution of these settlement funds was administered through a claims process much like the processes used for the NG PD Facility and the CX PD Facility. Two of the three projects have been completed and all funds have been distributed. The third is currently in process.

### *Eagle-Picher Bankruptcy*

17.  In May 1999, I was appointed by Judge Burton Pearlman of the U. S. Bankruptcy Court for the Southern District of Ohio—Western Division as the PDCA for

5

the Eagle-Picher Property Damage Trust administered by the National Association of Attorneys General. The claims resolution process was completed in 2000.

### *Fuller-Austin Bankruptcy*

18.  In November 1998, the Plan of Reorganization of Fuller-Austin Insulation Company was confirmed by Judge Joseph J. Farnan, Jr. of the U.S. District Court of Delaware, sitting in bankruptcy, establishing the Fuller-Austin Asbestos Settlement Trust ("FAST") under section 524(g) of the Bankruptcy Code. I was confirmed as one of three trustees and subsequently named as the Managing Trustee. Since the Effective Date of December 11, 1998, the operations of FAST have been implemented as part of the services provided by TSI to each of the entities previously described. I have managed the ongoing insurance coverage litigation and the establishment of a bodily injury claims facility to handle the claims filed against Fuller-Austin. Fuller-Austin had no property damage claims.

### ANALYSIS AND OPINIONS OF GRACE'S CASE MANAGEMENT PROPOSAL

19.  As part of my engagement by the Official Committee of Asbestos Property Damage Claimants (the "PD Committee"), I have reviewed (i) the Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of the Proof of Claim Forms and Approval of Notice Program (the "CMO Motion"), (ii) the Memorandum in Support Thereof, (iii) the Exhibits to (i), (iv) the PD Committee's Response to the CMO Motion, (v) the Debtors' Reply to the PD Committee's Response, and (vi) the Exhibits to (v). My review and resulting opinions are expressed with respect to property damage ("PD") issues.

### *PD and Zonolite Claim Forms*

20. The case management process Debtors seek to establish and the proof of claim forms that Debtors want approved do not facilitate an orderly process to determine the validity and quantum of claims. In particular, they fail to meet the necessary requirements of first determining the identity of the creditor/claimants, then establishing a set of claims resolution procedures ("CRP") under which claims are determined and finally designing a comprehensive claim form, with instructions to process the claims.

21. While the proposed Asbestos Property Damage Proof of Claim Form and Zonolite Attic Insulation Proof of Claim Form could be used to identify creditor/claimants, the forms are unnecessarily burdensome at this stage of chapter 11 and the need for this level of detail is premature. The proof of claim form should be the "key to the door" for the creditor/claimant, not the detailed claim form that should be required for determination (allowance or disallowance) of the claim for each building.

22. The proposed process and proposed Claim Forms appear to be a "ready-fire-aim" approach designed to elicit information to disallow claims rather than determine them based on a thoughtfully negotiated set of CRP.

23. Although there are no CRP to use as a guide, the proposed Claim Forms, when compared to the NG CRP or the CX APDCRP, would not be sufficient for the allowance and payment of claims, let alone quantification of property damage claims.

24. It is not clear from the instructions whether failure to answer every question will cause a claim to be declared invalid, but I presume that to be the case from the tenor of the Debtors' arguments in the CMO Motion. Such a result is especially harsh

since there are many questions in the Claim Forms that are not necessary for the determination of a claim.

25. The proposed Claim Forms are overkill for the determination of the identity of property damage creditor/claimants for purposes of voting and participation in the bankruptcy process and the subsequent claims resolution process. A much simplified form, such as Form 10. Proof of Claim as used in the National Gypsum bankruptcy, is sufficient for this purpose if the Court determines that there should be a PD bar date and proof of claim form requirement which, in my opinion, is not necessary.

26. After the adoption by the Court of the CRP, a comprehensive claim form should be developed by an expert to set out the proof and evidence required for the allowance of a claim. The comprehensive claim form is a product of and responsive to the CRP. It cannot and should not precede the drafting and adoption of the CRP. It must be clear and concise; it must be accompanied by detailed instructions; and, it should be available for submission in electronic format for reasons of accuracy and efficiency.

27. The proposed Claim Forms are just as defective for use as the comprehensive claim form as they are overkill in being used as a proof of claim to identify creditor/plaintiffs. These forms are oriented toward gathering information to disallow claims against Grace rather than requiring the information necessary to assess the validity and quantum of damage of PD claims. There are no inquiries concerning the quantity of Grace ACM installed in the building, the quantity or cost of abatement or removal nor the quantity of remaining Grace ACM. Even if the claim withstood the scrutiny likely to be given during the review by the Debtors, there is insufficient

information in the proposed Claim Forms to determine the allowable amounts owed by Grace.

28. The claims resolution process requires not only the provision of the right information, but it also requires systems, processes and people that can fairly and equitably evaluate the validity of a claim. It is a process that is much more complex, on a per claim basis, than the processing of bodily injury claims. I have been involved in both aspects of these efforts with asbestos settlements trusts.

29. The property damage claim process requires the review of voluminous documents, depending upon the requirements of the CRP, including support for a legally viable cause of action under the law of the applicable jurisdiction (necessitating the application of the statute of limitation and applicable defenses under the specific laws of every jurisdiction in which affected buildings are located), product identification, quantity and cost of abatement and replacement of the ACM. It is a process that can literally takes months for the full and fair evaluation of a single claim. Deficiencies must be vetted and resolved. In some cases, inspections must be made if there is a question of the evidence presented. Ultimately, a decision must be made by the property damage claims administrator to either allow or disallow the claim and, if the former, the allowable costs that are justified by the documents examined.

30. Facilities I have operated have now resolved in excess of 8000 property damage claims through the processes described in this Affidavit. From that experience, I can state unequivocally that the Claim Forms proposed to purportedly assist this Court to determine the validity of individual building claims will not provide either appropriate or sufficient information to make such determinations.

*Opinion that Independent Processing and Review of PD Claims is Possible*

31. From my experience with the above-mentioned asbestos trusts and settlements, I am confident that it is possible to establish an independent processing and review of the property damage claims that is cost effective and fair to both the claimants and the Debtors and without unduly burdening the Court.

32. At TSI I have established a corporate structure for the review, processing and determination of claims in a low cost, efficient, and thorough manner. Every property damage claim that arrives at TSI is reviewed by a completeness reviewer, a claims analyst, the project manager, the claims director and me before a determination of the claim is issued consistent with the procedures adopted in reorganization or at settlement.

33. Depending on the type, stage and duration of each project, TSI has employed between 9 and 20 analysts to review and process claims. Upon each analyst's employment and assignment to a certain project, the analyst will receive a full week of training at the direction of the project manager to familiarize the analyst with TSI procedures and project requirements. (For illustrative purposes, attached as Exhibit I is a copy of the Celotex Claims Handling Manual developed by TSI and provided to its claims analysts handling Celotex property damage claims). The analyst then undergoes an additional 90-day supervision period by the project manager and claims director to ensure the analyst is meeting the required standards for accurate and effective review of the claims.

34. At the first stage, when a claim is submitted to TSI, a completeness review is conducted to determine whether all required information has been provided by the

claimant. If the information is incomplete a notice of deficiency will be sent to the claimant providing a time period within which the claimant must comply and correct the deficiency. In most instances, the applicable claims resolution procedures authorize the extension of deadlines for the submission of evidence in recognition of the fact that the gathering of such information is complicated and difficult, in part, due to the fact that in many circumstances the required proof is not easy to locate. For example, proof of product identification oftentimes depends upon records that are 40 years old. If the claimant fails to provide the information or correct the deficiency, the claim will ultimately be disallowed.

35. Once all the required information for each claim is received, the claims analyst will begin review of the claim. It is the obligation of the analyst to investigate the claim, evaluate the evidence submitted, confirm the accuracy of the information submitted and, ultimately, analyze the claim. If the analyst discovers deficiencies or has questions regarding the claim, the analyst will inform the claimant and an opportunity is provided for the claimant to explain or provide additional information to support its claim. When the analysis is completed, the analyst recommends whether the claim should be allowed, allowed at a reduced amount or disallowed. For each recommendation, the analyst includes the specific allowed costs to which the claimant is entitled based (i) on past actual abatement costs or (ii) a calculation that takes into account the ACM installed in the building, the square footage involved in the abatement, the building type, and any unique conditions (modifiers) that would increase or decrease the abatement costs. The latter methodology [(ii) above] is based on a cost model developed at my direction by professional architects and engineers. (See Exhibit J)

36. Once each week all the analysts assigned to a project meet for a roundtable discussion with the project manager and claims director to address the issues and questions the analysts have encountered in processing the claims. This meeting also assists in providing the analysts with additional information regarding the specific types of claims and reaching consistent recommendations.

37. After the analyst makes a recommendation, the project manager and claims director jointly review the claim. The purpose of the additional review is to ensure the claim information is accurate and that the claim receives consistent and fair review. If there is agreement by the claims director and project manager with the analyst's recommendation, the claim is sent to me for final review and determination. If there is a disagreement, the analyst, the project manager and the claims director discuss the claim and the information submitted jointly. Thereafter, the claims director will make the final recommendation to me as to whether the claim should be allowed in full, allowed at a reduced amount or disallowed.

38. After receiving the recommendation from the claims director, I review the claim and make the ultimate determination. I often meet with the claims director and, at times, with the project manager to discuss the claims process as well as specific claims.

39. In the Celotex bankruptcy, under the APDCRP, if a claimant disagrees with my ultimate determination, the claimant may request reconsideration of the claim. At that point the claim is reviewed by two analysts from TSI and a member of the Property Damage Advisory Committee appointed by the Bankruptcy Court upon confirmation of the Celotex plan of reorganization. The panel will then issue a determination on reconsideration as to whether the claim should be allowed or

disallowed.  Should the claimant disagree with the panel's determination, the claimant may then request binding dispute resolution before an independent arbitrator, who ultimately determines whether or not the claim should be allowed.  At that arbitration, I defend the determination as to why the claim was disallowed or allowed in a reduced amount.  Pursuant to the order of confirmation in Celotex, my determinations allowing property damage claims are judgments against the Celotex Asbestos Settlement Trust.  This truncated review process eliminates years of appeals in the court system and attendant expense.

40.    From my experience in resolving Grace property damage claims in the Texas Political Entities Class Settlement and my experience with the Celotex (which engendered claims based upon the presence of Carey Canada asbestos fiber in Grace ACM) and National Gypsum bankruptcies, I believe that the property damage claims involved in this bankruptcy could be effectively and correctly determined through a claims resolution process, thereby avoiding the need for this Court to resolve the multitudinous and complex property damage claims likely to be filed in this case.

FURTHER AFFIANT SAYETH NAUGHT.

_____<br>W. D. HILTON, JR.

STATE OF TEXAS            )
                          ) SS
COUNTY OF                 )

    The foregoing instrument was acknowledged before me this _____ day of November, 2001, by W. D. Hilton, Jr. who is personally known to me or who has produced _____ as identification.

                         _____
                         NOTARY PUBLIC, State of Texas at Large

                         (Print Name)__
My commission expires:            (Commission No.)___