IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-1139 (JJF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**STATUS REPORT OF W. R. GRACE AND PROPOSAL
OF PRIORITIES FOR LITIGATION IN THIS COURT**

In anticipation of the status conference set for this Thursday, W. R. Grace submits the following review of significant activities in the case to date and, in recognition of the many demands on the Court's time, its suggestion for prioritizing litigation which Grace seeks to pursue in the District Court.

In the months that have passed since this Chapter 11 case was filed, the central task that must be addressed if a successful resolution of this case is to be achieved has not changed. That task was described on the first day of the case: "to determine the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations." W. R. Grace's Informational Brief (Docket No. 6), at 1. Also on the first day, Grace proposed in broad outlines a process for pursuing the necessary litigation in the District Court. In early proceedings before Judge Farnan, the Court requested Grace and the other parties develop a specific proposal for any necessary litigation. This Grace did in late June, by proposing a comprehensive Case Management Order which set out a roadmap for the litigation that is critical to this case. As a result of developments not within Grace's control (indeed over Grace's objections), briefing was not completed until the Fall and a hearing was not scheduled until November 21, 2001. That hearing was cancelled two

hours before its scheduled commencement, when it was announced that the Chapter 11 case was being reassigned.

While, as shown below, other significant matters are pending as well, Grace's No. 1 priority is a Case Management Order so that resolution of the central litigation issues in this case can be resolved.

I. **BACKGROUND OF THE FILING OF THIS CASE AND GRACE'S INFORMATIONAL BRIEF**

In an effort both to provide transparency to Grace's plans in the case and to set an example of promptitude, Grace filed an Informational Brief on April 2, 2001, the first day of the case, (i) laying out in detail the reasons for Grace's filing for bankruptcy protection, (ii) defining the task ahead, and (iii) importantly, identifying the litigation procedures that would progress the case. Excerpts of the Informational Brief, which was extensive, are attached hereto as Exhibit 1.

As Grace's submission reflected, asbestos related litigation brought against Grace historically fell into three categories:

- Personal Injury Claims: These were claims for personal injury arising from exposure to products manufactured by Grace that contained asbestos, principally a wet spray-on fireproofing product used in high rise structures called Monokote 3.

- Property Damage Claims: These were claims brought by owners of buildings seeking damages for abatement/remediation alleged to be necessitated by the fact that Monokote 3 and other construction products manufactured by Grace contained asbestos.

- Zonolite Attic Insulation: This litigation began in 2000 and arose from claims that a vermiculite insulation material sold by Grace and used in residential attics contained trace amounts of asbestos and should be removed.

The posture of these three different types of litigation at the time Grace filed for bankruptcy was varied. The traditional property damage litigation had run its course and

only seven cases remained pending. By contrast, the Zonolite Attic Insulation litigation was in its infancy – no property damage claim had been adjudicated on the merits and a claim for preliminary injunctive relief had been denied on the merits.

The personal injury claims loomed very large. As has been described and decried by a broad spectrum of courts (including the Supreme Court), experts and congressional committees, the asbestos personal injury litigation process has been fundamentally broken for a number of years. See Exhibit 1, at 21-26.

Notwithstanding these circumstances, Grace had seen personal injury litigation against it rise in the mid 1990's and then fall to the point that, while it was demonstrably unmerited at current levels, it was manageable. This held until the developments of late 1999 and 2000. During this period, claims surged no less than 81%, as reflected in this chart:



See also Exhibit 1, at 38-40.

Although this wave of claims had no scientific, medical, or legal basis, it threatened Grace's financial health and core businesses. See Id., at 2. This wave carried Grace into Chapter 11.

Grace had been prepared to live with the scope of the personal injury litigation that predated the developments of 1999-2000 by negotiating settlements of cases without litigating the issues involved in determining Grace's real liability. But the stunning expansion of the litigation both threatened the health of Grace's core business and starkly posed the question -- what was Grace's real legal liability? Chapter 11 was the only course available that provided Grace both with protection and the procedures necessary to answer this question with finality.

The Informational Brief went on to review those procedures and propose the following basic path for the case:

- Centralizing the asbestos related litigation in the Delaware District Court. This was necessary in order to protect Grace from developments in collateral litigation and to avoid piecemeal and conflicting adjudication of issues important to the Chapter 11 case. The appropriate procedure was to stay and enjoin collateral litigation

- Maintaining jurisdiction in the District Court. This was necessary in order to avoid jurisdictional issues that might arise in litigation of personal injury claims and because the expected disputes over liability called for the type of litigation in which the District Court was most skilled. The appropriate procedure was to withdraw the reference.

- Mustering all claims before the District Court. This was necessary in order to fully and consistently determine Grace's liability. The appropriate procedure was to establish a claims bar date and require the completion of special claim forms.

- Deciding key, common issues of liability. This was necessary to filter out the wheat from the chaff, the valid from the invalid. The appropriate procedure was common issue litigation under Rule 42 and the deployment of Daubert

standards under Rule 702 of the Federal Rules of Evidence – both of which rules are fully applicable to contested claims in bankruptcy.

As delineated below, Grace promptly set about putting these procedures in motion.

## II. GRACE'S MOTION FOR A STAY, TRO AND PRELIMINARY INJUNCTION

Contemporaneous with the filing of their Chapter 11 petitions, Grace and its affiliates filed an adversary proceeding seeking to stay asbestos-related litigation against various Affiliated Entities[2] whose purported liability was solely derivative of Grace's liability. See Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related and Fraudulent Transfer Claims Against Affiliated Entities (Adv. Pro. No. A-01-771, Docket No. 2). A temporary restraining order was entered on April 2, 2001, enjoining the commencement or prosecution of Asbestos Actions[3] against these Affiliated Entities. On April 12, 2001, the court extended the TRO until April 24, 2001. On April 18, 2001, the Court set this matter for a preliminary injunction hearing on May 3, 2001, and entered a preliminary injunction barring the commencement or prosecution of Asbestos Actions against the Affiliated Entities until that time.

On May 3, 2001, the Court granted the Debtors' motion for a preliminary injunction, as modified in their reply brief, and issued a preliminary injunction preventing

---

2 "Affiliated Entities" were defined in the Debtors' motion for a temporary restraining order to include certain subsidiaries and affiliates of W. R. Grace & Co. that are not chapter 11 debtors, including Advanced Refining Technologies LLC, Advanced Refining Technologies LP, Advanced Refining Technologies Management, Inc., Carbon Dioxide Slurry Systems LP, Construction Products Dubai, Inc., Grace Asia Pacific, Inc., Grace Chemicals, Inc., Grace Collections, Inc., Grace Germany Holdings, Inc., Grace Foundation Inc., Grace Management Services, Inc., Grace Offshore Turnkey, Grace Receivables Purchasing, Inc., and Ichiban Chemical Co., Inc., Grace Canada, Inc. as well as Debtors' current and former officers, directors and employees.

3 "Asbestos Actions" were defined in the Debtors' motion for a temporary restraining order to include all pending asbestos-related actions.

the prosecution of currently pending asbestos-related actions and fraudulent transfer actions against certain affiliates of the Debtors. The order varied in some respects from the TRO. The May 3rd preliminary injunction broadened the stay to cover claims against certain insurance carriers and financial advisors of Grace who had been named in asbestos or fraudulent transfer-related litigation. See Order of May 3, 2001, at 2-3. At the same time, the preliminary injunction no longer extended the stay to other non-filing subsidiaries of Grace that had not previously been named as defendants in asbestos-related litigation. Id. Finally, the preliminary injunction no longer prevented the commencement of future asbestos actions against Affiliated Entities. Id.

The passage of time and further developments exposed certain gaps in the preliminary injunction and, on June 1, 2001, Grace moved to modify the injunction. See Debtors' Motion to Modify the Preliminary Injunction (Adv. Pro. No. A-01-771, Docket No. 36). The motion sought additional, minor modifications to the preliminary injunction that were consistent with the principles underlying the previous preliminary injunction. These supplemental matters fell into three categories. ***First***, Grace sought to expand the injunctive relief to include co-defendants in several other, non-asbestos cases in which Grace may have indemnity obligations to the co-defendants. ***Second***, Grace sought to reinstate preliminary injunctive relief against current actions pending against non-filing subsidiaries as well as Grace's current and former officers, directors and employees. ***Third***, Grace sought to reinstate preliminary injunctive relief against the commencement of new asbestos-related actions against Affiliated Entities. A further hearing was held on June 21, 2001. Following the hearing, Grace submitted supplemental information concerning the matters it sought to stay with the Court on June 27, 2001. See Debtors'

Supplemental Information In Support of Motion To Modify (Adv. Pro. No. A-01-771, Docket No. 56). No ruling has been issued on the motion to modify the preliminary injunction.

### III. WITHDRAWAL OF THE REFERENCE AND THE COURT'S REQUEST FOR A LITIGATION PLAN

Grace moved to withdraw the reference on the first day of the case. See Motion for Partial Withdrawal of the Reference, Docket No. 3. The reference was withdrawn for the entire case on April 6, 2001. See Order Entered by U.S.D.C. Chief Judge Sue L. Robinson Reassigning Case Nos. 01-1139 thru 01-1200 to U.S.D.C. Judge Joseph J. Farnan, Jr. (Docket No. 66).

Shortly thereafter, on May 3, 2001, Judge Farnan noted the fact that the case involved litigation and suggested that a proposed litigation schedule would facilitate progress in the case by stating:

> What I would really like to see you do, and the purpose of me having you in is, you are probably going to be litigating in Delaware. And I have not made any decisions, but it's a bankruptcy case, they're interwoven. Unless there's some persuasive, convincing force or reason to send you around the world, you are probably here. And what you really ought to focus on is what you want decided and when you want to get to trial. It will make a lot more sense in the context of not only the litigation that's out there, but of the bankruptcy also. (May 3, 2001 Hearing Transcript at 82).

Grace responded. By early June, Grace had assembled a proposed case management schedule and circulated the same for comment. Grace's motion for entry of a case management order was filed on June 26, 2001, and set for hearing on July 19, 2001. At the request of both tort committees, Grace agreed to move the hearing to August 2, 2001. The Property Damage Committee asked for still more time and the matter was set over until the Fall.

Ultimately, a hearing was set for November 21. Objections were filed by the Property Damage Committee on September 7, 2001, and are attached hereto for the Court's convenience as Exhibit 2. The Personal Injury Committee filed its objections on September 10, 2001, a copy of which is attached hereto for the Court's convenience as Exhibit 3.

Grace filed a comprehensive reply on November 10, 2001. The reply, attached hereto as Exhibit 4, (i) provided an analysis of Grace's historical claims (and an update on developments in other asbestos litigation) that further underscored the need to define Grace's legal liability and supported Grace's vision for this bankruptcy (Id., at 8-16), (ii) described how the tort committees' proposal of "estimation" as a replacement for rule-based litigation only perpetuated the problems that led to Grace's bankruptcy (Id., at 17-25), (iii) clarified the common issues Grace proposed to litigate and the litigation "tracks" created by the Case Management Order for that litigation (Id., at 26-54), (iv) described revisions made to Grace's proposed notice program in response to certain criticisms made by the committees and rebutted other criticisms they had made (Id., at 65-73) and (v), finally, further justified the special claim forms proposed by Grace (Id., at 74-82).

As noted above, the November 21, 2001 hearing was cancelled on that day. Excepting only Grace's response to a belated brief by the U.S. Trustee and depositions of two witnesses, there are no loose ends. Both of these outstanding items can be completed and the matter can then be heard at the Court's convenience right after the first of the year.[4]

---

[4] The Property Damage Committee filed a motion for a protective order in relation to the Property Damage Committee's inability to produce two witnesses for depositions prior to the November 21, 2001 hearing of the Case Management Order. Due to the cancellation of the November 21, 2001 hearing, the relief requested in the motion is now moot.

## IV.  FRAUDULENT CONVEYANCE CLAIM

Fraudulent conveyance claims attacking transactions consummated by Grace in 1996 and 1998 were pending against Grace at the time that it filed for bankruptcy. It has been the announced position of Grace since the early days of this proceeding that the claims are without merit and should not be pursued. While, under the law, Grace could have pressed to have its judgement on the matter be dispositive, it recognized that an issue of bias inevitably would be raised and therefore proposed that someone else should determine whether the claim was worth pursuing.

Before Grace could recommend anyone to the Court, the two tort committees moved for authority to prosecute the claim. See Joint Motion by the Official Committees of Asbestos Property Damage and Asbestos Personal Injury Claimants for Authority to Prosecute Fraudulent Transfer Claims (Docket No. 527). Grace objected that the Committee's role as a representative of tort claimants created a clear bias in favor of finding significant pre-petition liability and, therefore, a bias in favor of asserting a fraudulent conveyance claim. See Debtors' Opposition to the Joint Motion by the Asbestos Property Damage and Personal Injury Committees for Authority to Prosecute Fraudulent Transfer Claims (Docket No. 658). Grace recommended designation of the Unsecured Creditors Committee to investigate the viability of the fraudulent conveyance claim and to report back to the court.

While the motion for authority to prosecute was pending, the Property Damage Committee filed a further motion to retain certain counsel on a contingency basis to handle the litigation. See Joint Application by the Official Committees of Asbestos Property Damage and Asbestos Personal Injury Claimants for Approval of Employment

of Cozen O'Connor and McKool Smith as Co-Special Counsel to the Asbestos Committees (Docket No. 1009). Grace has objected. See Debtors' Opposition to the Joint Application By the Asbestos Property Damage and Personal Injury Committees for Approval of Law Firms to Prosecute the Fraudulent Transfer Claims (Docket No. 1038).

VI. **ACTIVITIES OF CERTAIN ZONOLITE ATTIC INSULATION CLAIMANTS**

As noted above, one category of pre-petition litigation comprises property damage litigation brought on behalf of homeowners with vermiculite insulation in their attics. Counsel who have been involved in pursuing such litigation have attempted to pursue their own litigation in the bankruptcy, separate and apart from the committees.

At the outset of the case, certain counsel advocated the continuation of pre-petition litigation against Grace and others outside of Delaware. Judge Farnan decline to approve this course. May 3, 2001 Hearing Transcript at 57-59.

The months passed. Then, days before the long awaited Case Management Order hearing, certain attic insulation claimants initiated two new lines of litigation. First, they moved to dismiss the case, on the purported grounds that Grace did not need to file for bankruptcy after all. See Motion to Dismiss Case Pursuant to 11 U.S.C. Section 1112(b) Filed by Zonolite Attic Insulation Class Plaintiffs (Docket No. 1140). Predicated on the assumption that Grace should not be in Chapter 11, the same claimants then initiated what they denominated as an adversary proceeding against Grace. In actuality, the alleged adversary complaint is simply the revival in the bankruptcy proceeding of the pre-petition litigation which has been enjoined by the automatic stay of section 362 of the Bankruptcy Code. See Complaint by Jackie Lewis, Bonnie Lewis, Thomas Lewis, Pamela Tellesch, Wayne Tellesch, Bridget Loehner, Dennis Loehner, Jane Zajac against

W. R. Grace & Co., W. R. Grace & Co.-Conn., W. R. Grace & Co. a/k/a Grace, Sealed Air Corporation, National Medical Care, Inc., Fresenius A.G., Fresenius U.S.A. Inc., Fresenius National Medical Care, Inc. a/k/a Fresenius Medical Care Holdings, Inc. (Docket No. 1138). Grace will be responding both to the motion to dismiss and the purported adversary on or before December 21, 2001.

### VII. PROPOSED PRIORITIES AND WITHDRAWAL OF REFERENCE

Based upon the foregoing history, Grace proposes the following:

Case Management Order: Grace strongly urges that the first order of business be the Case Management Order. Put bluntly, Grace has been anxious to advance this case since the day it was filed and has taken the initiative at all points – yet it still cannot get out of the gate. Grace proposes that the reference be withdrawn to this Court with regard to all matters relating to whether and to what extent Grace is liable to personal injury and property damage claimants.

Fraudulent Conveyance: Whether this claim should be pursued is an issue that has been pending for some time. It calls for an assessment of whether the prosecution of such a claim is in the best interests of the estate given the merits of the claim, cost of prosecution, and the likelihood of any recovery. Grace believes that these issues fall squarely within the traditional purview of the Bankruptcy Court and proposes that all matters relating to the fraudulent conveyance claim remain before Judge Fitzgerald.

Preliminary Injunction: Grace's motion to modify has been under submission since June 1, 2001. The reference should be withdrawn as to all matters concerning the stay of non-bankruptcy litigation, and the Court can decide the pending motion as submitted.

<u>Zonolite Attic Insulation Matters</u>: Because both the motion to dismiss and the new adversary proceeding relate to Grace's tort liability, they fall within the proposal to withdraw the reference described above. Briefing should be completed by December, and the matter can be heard anytime thereafter.

Wilmington, Delaware
Dated: December 14, 2001

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
James W. Kapp III
Samuel A. Schwartz
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

_____
Laura Davis Jones (#2436)
David W. Carickhoff, Jr. (#3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and
Debtors in Possession