# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                    )    Chapter 11

                            )

W. R. GRACE & CO., et al.,[1]     )    Case No. 01-0___ (___)

                            )    (Jointly Administered)

                            )

         Debtors.          )

### W.R. GRACE & COMPANY'S
### INFORMATIONAL BRIEF

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL,
YOUNG& JONES P.C.
Laura Davis Jones
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

– Co-Counsel for the Debtors and Debtors in Possession –

Dated: April 2, 2001

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

This brief sets out the background for Grace's decision to file for Chapter 11 protection and defines the central task that must be addressed if a successful resolution of this case is to be achieved.   That task is to determine the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations.  Contemporaneous with the filing of this brief, Grace is filing a motion to withdraw the bankruptcy reference and maintain the District Court's control over this central task. The motion is the first step in moving this case forward.

Grace's decision to file was compelled by two fundamental developments outside of its control.

First, the tort system long ago ceased to provide any realistic opportunity to define the actual responsibility of any manufacturer of asbestos products, including Grace, for asbestos-related claims.  As the Supreme Court recently observed, the tort system is besieged by an "elephantine mass of asbestos cases" that "defies customary judicial administration."[2] The situation is "a disaster of major proportions to both the victims and the producers of asbestos products" alike.[3]

Lacking a properly functioning tort system, litigants developed what is essentially a privatized claims resolution business.  That business lacks the integrity assured by the rules of evidence and the rule of law.  But it has provided until recently a workable (albeit patently

---

[2] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

[3] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991). *See also Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 265 (E.D. Pa. 1994) (observing that the Judicial Conference Report "was a ringing condemnation of the asbestos litigation process in the tort system"), *vacated*, 83 F.3d 610 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997).

coercive and exorbitantly costly) means for companies who are not major players in the asbestos world to attempt to manage their asbestos litigation.

Second, and much more recently, the privatized claims process itself was turned against surviving asbestos defendants, dramatically increasing their exposure to asbestos claims and thereby destroying their already attenuated programs for managing claims. As other companies involved in asbestos litigation have gone bankrupt, the claims against Grace in particular have skyrocketed – without apparent connection to any new principle of liability or accepted principle of science. In 2000 alone, asbestos claims against Grace increased 81% over the prior year, reaching a total of nearly 49,000 claims for 2000. Year to date trends for 2001 are even worse. The asbestos litigation no longer merely siphons off Grace's profits – it threatens Grace's financial health and its core businesses.

Chapter 11 now affords the only solution for Grace. Other paths to resolution have been foreclosed. The Supreme Court has restricted class action settlements under Rule 23. Congress has failed to enact legislation to address the problem.

And Chapter 11 procedures can be tailored in this case to produce a fair and efficient resolution of legitimate claims while screening out meritless ones. Chapter 11 should not merely be a process for distributing available funds to claimants regardless of claim merit. Rather, the threshold task in Chapter 11 is to determine the validity of asserted claims. While that task is daunting in mass-tort bankruptcies, the courts have developed procedures that can be used to define and resolve mass-tort liability within the bankruptcy system. These include:

2

- Procedures for the consolidation of all claims before one court which can apply one set of procedural and evidentiary rules.

- Procedures to stay and enjoin any collateral litigation which may affect the issues in controversy.

- Procedures to define the population of all current claimants and to obtain information regarding their claims on a reliable and consistent basis.

- Procedures to decide threshold liability issues, including compliance with the precepts first set forth by the Supreme Court in *Daubert* and recently adopted in the Federal Rules.

- Procedures for developing the criteria for the settlement of valid claims through a post-confirmation trust.

Application of these procedures is the first and critical step to regaining control over the central question that is simply unanswerable outside of Chapter 11: Which claims should be paid by the debtor and which claims are invalid and should not be paid? And in Chapter 11, this question can be answered, not under the threat of being taken to trial in massive numbers of cases prosecuted in the forum most attractive to a particular plaintiffs' lawyer, but through a systematic proceeding that is designed to determine actual liability under the law.

This Informational Brief is designed to make what is admittedly a complex case more transparent by setting forth at the outset Grace's overall proposal for how the case should proceed. More specifically, Section I describes the Grace products that are at issue in the asbestos litigation. Section II identifies the historical problems that now preclude use of the tort system to efficiently and fairly resolve asbestos claims. Section III traces recent developments in asbestos litigation and the consequent dramatic increase in claims against Grace. Section IV explains why and how Chapter 11 provides the only means to define Grace's asbestos liability. Finally, Section V sets out Grace's general blueprint for the Chapter 11 process in this case.

I.    **THROUGH A CORPORATE ACQUISITION IN 1963, GRACE BEGAN MANUFACTURING CERTAIN PRODUCTS CONTAINING VARYING AMOUNTS OF ASBESTOS.**

Grace was a late entrant into the asbestos business; its participation in the industry in any meaningful way began with the purchase of the Zonolite Company ("Zonolite") in 1963.

A.    **The state of the asbestos industry prior to Grace's purchase of Zonolite.**

Use of asbestos in the United States, however, had begun almost 100 years earlier, in the 1860s, when asbestos was first employed commercially as an insulator.[4] In the following decades, asbestos was incorporated in tens of thousands of products commonly found at work and in the home. Indeed, the "wide-ranging applications" for asbestos and its "ample and accessible supplies" led to "its pervasiveness in many sectors of the American economy during the twentieth century."[5] As a consequence of "man's utilization of asbestos, coupled with the natural occurrence of the mineral, asbestos fibers are found in the air we breathe, the food we eat, and the water we drink."[6]

---

[4] *In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. 710, 735 (E.D.N.Y. 1991), *vacated*, 982 F.2d 721 (2d Cir. 1992), *modified*, 993 F.2d 7 (2d Cir. 1993).

[5] *Id.* at 736. *See also* JAMES S. KAKALIK ET AL., COSTS OF ASBESTOS LITIGATION 3 (Rand Inst. 1983) (observing that asbestos "is an excellent insulator and is also commonly used in asbestos-cement products (e.g., pipe), brake linings, a number of roofing products, and flooring products. It has been used in millions of buildings in the U.S. and in hundreds of millions of automobiles.").

[6] ASBESTOS: AN INFORMATION RESOURCE, DHEW (NIH) Pub. No. 78-1681, at 1 (Richard J. Levine ed. 1978). *See also id.* at 55 (noting that "[a]sbestos is . . . found as a contaminant in the ambient air"); *id.* at 62 ("Drinking water is one of the possible routes by which humans are exposed to asbestos."); *id.* at 64 (foods that may become contaminated with asbestos because of asbestos filters used in their processing include: beer, wine, liquors, fruit juices, sugar, lard, vegetable oil, cider, condiments, mouthwashes, syrups, tonics, and vinegar."); Andrew Churg, *Nonneoplastic Diseases Caused by Asbestos*, *in* PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 213, 219, 224-29 (Andrew Churg & Francis H.Y. Green eds. 1988) (observing that most urban dwellers' lungs contain hundreds of thousands or millions of asbestos fibers per gram of dry lung tissue).

Both government and industry bodies issued guidelines governing and permitting the use of asbestos beginning in the 1930s. Those guidelines indicated that the potential health hazards associated with asbestos could be controlled by "maintaining a modest level of exposure."[7] After considering such evidence, government health authorities such as the United States Public Health Service issued guidelines governing permissible exposure to asbestos in the workplace.[8]

Beginning in the mid-1960s, however, the work of Dr. Irving Selikoff and others raised serious concern within the scientific community regarding the safety of asbestos exposure levels permitted by existing exposure guidelines. The federal government responded by issuing additional requirements. In 1970, Congress established the Occupational Safety and Health Administration ("OSHA") to regulate health hazards in the workplace. Almost immediately after its creation, OSHA promulgated an initial regulation limiting asbestos exposure. 36 Fed. Reg. 10466, 10506 (table G-3) (May 29, 1971). Soon thereafter, prompted by union petitions expressing a concern that permissible exposure levels were still too high, OSHA revised its regulations to limit asbestos exposure even further and to require special handling of asbestos products. *See* 36 Fed. Reg. 23207 (Dec. 7, 1971) (emergency temporary standard); 37 Fed. Reg.

---

[7] *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1093 (5th Cir. 1973) ("[I]t was known in the 1930's that inhaling asbestos dust caused asbestosis and that the danger could be controlled by maintaining a modest level of exposure."), *cert. denied*, 419 U.S. 869 (1974).

[8] W.C. DREESSEN ET AL., A STUDY OF ASBESTOSIS IN THE ASBESTOS TEXTILE INDUSTRY, PUBLIC HEALTH BULLETIN No. 241, at ix (U.S. Public Health Service 1938). *See also Borel*, 493 F.2d at 1084 ("The U.S. Public Health Service fully documented the significant risk involved in asbestos textile factories in a report by Dreessen et al., in 1938. The authors urged precautionary measures and urged elimination of hazardous exposures." (footnote omitted)).

5

11318 (June 7, 1972) (final standard). OSHA's asbestos regulations became progressively more restrictive, effectively precluding the use of asbestos in most commercial applications.[9]

**B.    In 1963, Grace entered the business of manufacturing certain asbestos-containing products.**

Grace purchased the assets of Zonolite in 1963 and merged them with what is now Grace's Construction Products division. Zonolite mined, milled and processed vermiculite from a mine ten miles north of Libby, Montana (the "Libby Mine"). It also added commercial asbestos in manufacturing building products such as acoustical plaster and fireproofing insulation.

**1.    The operation of the vermiculite mine in Libby, Montana.**

Vermiculite is a mineral that expands into popcorn-like, low-density pieces when heated. This expanded – or exfoliated – vermiculite is light-weight, fire-resistant and serves as a good insulator. Vermiculite is itself an inert mineral that is non-asbestos and has no known toxic properties.

When mined, vermiculite ore in the Libby Mine deposit contained a secondary mineral – fibrous asbestiform tremolite.[10] The ore was mined from relatively deep open-pits. The asbestos content of ore from the pits was as high as 30%. Grace mined the ore and then

---

[9] *In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. at 737 ("Because of the increased awareness of dangers and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's.").

[10] Fibrous asbestiform tremolite impurities in vermiculite are atypical and not characteristic of most vermiculite deposits. It is believed that the depth of the ore deposit in Libby is correlated to the amount of impurities, whereas most vermiculite deposits – such as those at Grace's Enoree, South Carolina mine – are relatively shallow.

milled it into a concentrate through a crushing, screening, washing, and flotation separation process.

After milling, the vermiculite concentrate contained 1-3% asbestos, typically less than 1%. At Grace's "expansion plants," the concentrate was passed through vertical furnaces at temperatures approaching 2,000 degrees, which resulted in the further reduction of asbestos content. The heating process transformed embedded moisture into steam, causing vermiculite to "pop" or expand into the light-weight material used commercially. When finished, expanded vermiculite – which typically contained a fraction of 1% asbestos – was bagged and sold for various uses under the Zonolite trade name.

Grace operated the Libby Mine from 1963 until 1990. Prior to Grace's purchase of Zonolite (and before the hazards of asbestos were fully known), asbestiform tremolite dust levels in the air at the Libby Mine were high. After acquiring the mine and learning of the working conditions there, Grace implemented a series of major steps over time that reduced asbestiform tremolite exposures to the lowest feasible levels. Grace also started a medical program to educate employees about the hazards of asbestiform tremolite and to monitor their exposure levels and health. Grace's improvements included, among other things:

- Construction of a new mill to convert processing of vermiculite from a dry to a wet process, thereby reducing dust levels.

- Construction of a new screening plant that minimized dust levels when sizing ore concentrate.

- Installation of an air scrubbing system at points where dry ore was handled.

- Enclosing the cabs of all mining equipment with air filtering systems.

7

- Installation of water injection and dust collection systems to convert to an all wet drilling process.

- Establishing an air sampling and employee medical monitoring program with annual chest x-rays for all of its employees.

- The application of dust suppressants on all roads in the area.

With these improvements, Grace lowered asbestiform tremolite dust levels from approximately 50 fibers per cubic centimeter of air ("f/cc") in 1963, to less than 1 f/cc in 1975 and down to .066 f/cc in 1985 – many times lower than required by government standards.

### 2.   Grace's attic insulation product: Refined vermiculite, not asbestos.

One of the principal commercial products made from Grace's vermiculite was Zonolite Attic Insulation ("ZAI"). ZAI was simply expanded loose-fill vermiculite which was poured into attics and rafters. ZAI contained, at most, *trace* quantities of asbestos – minute fractions of 1%.

Specifically, as noted above, vermiculite is *not* a form of asbestos and has no known toxic properties; it is an inert mineral that when milled and thermally expanded serves as an effective insulator. Asbestos was never added to ZAI. Instead, Grace acted to remove asbestos contaminants from the ore during the milling and expansion process. Grace's efforts were so successful in limiting asbestos impurities to trace levels that ZAI does not meet the regulatory definition of an asbestos-containing product. *See, e.g.,* 40 C.F.R. §§ 61.141 and 763.83.[11]

---

[11] Under federal regulations, "materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials."

8

Today, Grace believes ZAI is safe and effectively asbestos-free. The asbestos levels of homes with ZAI are no higher than levels found in normal breathing air. Typically, ZAI remains isolated and undisturbed for years in attics, in many cases under a layer of plywood or a top layer of fiberglass insulation. Under these normal living conditions there is essentially no asbestos exposure from ZAI.[12] But even if a homeowner were to disturb the attic insulation for a continuous eight-hour time period (and were thereby to create an exposure level as high as 0.1 f/cc), exposure would have to continue for fifty years in order to reach the 5 fiber years per cc threshold level for mesothelioma risk.[13]

### 3.   The Monokote-3 fireproofing product: This contained added asbestos, but was applied wet in commercial large steel buildings.

Asbestos was added to certain fireproofing products made by Grace. Monokote-3 ("MK-3") was the brand name for the spray fireproofing product being sold by Zonolite when Grace acquired the company in 1963. Sixty percent of MK-3 was gypsum – a naturally occurring mineral mined and sold by the Gypsum companies – which acted as the binding, cementitious component of the product. MK-3 contained roughly 30% vermiculite and 10% added chrysotile asbestos purchased from asbestos producers.

MK-3 was marketed to provide fire protection for the enclosed steel beams of large commercial structures, predominantly high-rise buildings. MK-3 provided such protection in two ways. First, MK-3 insulation prevented steel from heat-softening, thereby protecting high-rise structures from collapse during fires. Second, MK-3 prevented the spread of fire,

---

[12]  Testimony of Dr. William Hughson in *Barbanti v. W.R. Grace & Co.*, No. 00201756-6 (Wash. Super. Ct. Spokane County), November 30, 2000 Transcript at 6:1-7:6.

[13]  *Id.* at 7:15-8:22.

9

affording occupants the chance to escape to safety and firefighters the opportunity to control the fire.

There were two types of spray fireproofing product used in the construction industry generally: (1) dry-sprayed mineral fiber marketed by competitors of Grace and (2) the wet-sprayed plaster – or cementitious – product marketed by Grace.[14] In the case of the dry-sprayed mineral fiber product, bags of dry fiber material were put through a blowing machine at the point of application. The blowing machine fluffed and separated the material and it was blown dry through a mist of water that was controlled by the worker applying the material.

By contrast, Grace's MK-3 was a wet-sprayed, cementitious type. MK-3 was mixed in a conventional automatic mixer with a prescribed amount of water on the ground. The mixing of water with gypsum created a thick, adhesive cementitious mix. The mix was placed in the hopper of a plaster pump and pumped through a chamber to the high-rise floor on which it was being applied. At the point of application, compressed air was injected into the mix at the nozzle and a ½ to ¾ inch thick coating of material was sprayed wet onto steel beams, where it began to harden immediately.

Due to the nature of the product, the dry-sprayed type of fireproofing material could produce dust during application. By contrast, after initial mixing, because MK-3 was applied wet and its cementitious nature bound and encapsulated the asbestos, MK-3 produced no such dust during application.

---

[14] To be marketed, all fireproofing products must meet standards established by Underwriter's Laboratories. Underwriter's Laboratories designated MK-3 as "cementitious".

4.   **Other vermiculite and asbestos-containing products.**

In addition to the products described above, for certain periods of time, Grace

manufactured other products containing asbestos or vermiculite. Some were similar to MK-3.

Others were expanded vermiculite-based products. The products included:

- Acoustical plaster, sold under such trade names as "Zonocoustic", "Spray-White", "Zonolite Acoustical Plastic", "Econo-White" and Zonolite texture finish products. These products were clay and vermiculite based plaster, similar to MK-3, for wall and ceiling applications;

- Zonolite High-Temperature Cement, in essence, an insulating concrete style of MK-3;

- Zonolite Masonry-Fill, expanded vermiculite manufactured as insulation fill for the holes in cinder blocks;

- Roof deck cementitious products, similar to MK-3; and

- A variety of other expanded vermiculite products.

These products were manufactured for limited periods of time and, due to lack of demand, were

not widely sold.

5.   **The phase-out of asbestos.**

After the Zonolite business was acquired, Grace began to develop a suitable

replacement for asbestos in its products. This process took several years, as it proved difficult to

find a material that possessed the characteristic strengths of asbestos. In 1970, Grace began

selling Monokote-4 ("MK-4"), a spray fireproofing product free of commercially added asbestos.

In 1972, Grace developed Monokote-5 ("MK-5"), which was also free of commercial asbestos

and had better bonding strength.

11

Effective July 4, 1973, the EPA banned the spraying of surfacing products containing asbestos in amounts greater than 1%. The ban did not cover MK-3 as a product, just the *spray* application. Nonetheless, with the 1973 ban, Grace ceased selling MK-3 and replaced it with MK-5.

Grace stopped manufacturing ZAI in 1984. Grace concluded that it could no longer compete with fiberglass insulation products that were cheaper to produce and were more effective insulators. In 1990, as Grace's need for expanded vermiculite fell, Grace closed the Libby Mine but continued to sell vermiculite from its mine in Enoree, South Carolina.

## II.   THE TORT SYSTEM LONG AGO CEASED TO PROVIDE A FAIR OR PRACTICAL MEANS FOR RESOLVING THE HUGE INVENTORY OF ASBESTOS CLAIMS.

Even though its products generated little or no asbestos dust, or in the case of vermiculite, contained only trace levels of naturally occurring asbestos impurities, Grace has not been able to avoid the morass of litigation spawned by asbestos. And it is beyond any debate that the tort system has failed to effectively and fairly resolve that litigation. Put bluntly, the system has long been in a state of "crisis."[15] The "avalanche of litigation"[16] has been

---

[15] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (observing that there is "an asbestos-litigation crisis"); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996) ("This case arises against the background of an asbestos litigation crisis."), *aff'd*, 521 U.S. 591 (1997); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 554 (1992) ("It has become increasingly apparent in the last few years that the asbestos crisis facing the judicial system in the United States has reached epidemic proportions.").

[16] *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

characterized again and again as a "serious problem,"[17] a "dilemma,"[18] and a "disaster."[19] Indeed,

"[n]o mass tort litigation . . . has received more intense criticism than the litigation concerning

exposure to asbestos."[20]

These problems have not just corroded the basic ground rules of in-court

litigation. As discussed below, they have also given rise to an equally flawed process for claims

resolution outside of court.

A.    **How the problem came about.**

The relevant history is easily recited, albeit the solution to the problem still has

not been found. In the mid-1970s, federal and state courts experienced the first substantial influx

of tort cases seeking recovery for asbestos-related occupational disease.[21] After the Fifth Circuit

---

[17] *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[18] *Jenkins*, 782 F.2d at 470.

[19] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 14 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[20] Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 GEO. L. J. 1983, 2017 (1999). *See also* Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 541 (1992) ("Most commentators agree that tort litigation today is a highly unsatisfactory system for resolving claims arising out of workers' exposure to asbestos."); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged - A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 590 (1992) ("The traditional tort system, in connection with asbestos litigation, has been marked by high transaction costs, excessive delays in providing compensation to injured plaintiffs, unequal recoveries among identically injured victims, litigious parties and a judicial system clogged by an avalanche of cases. All of these problems clearly indicate that something must be done and that the traditional approach to tort cases has failed in the asbestos context." (footnotes omitted)); *In re Asbestos Litig.*, 829 F.2d at 1235, 1261 ("Asbestos litigation poses a serious problem for American tort law, . . . with its inefficiencies, high costs, and inconsistent judgments.").

[21] *See* DEBORAH R. HENSLER ET AL., ASBESTOS IN THE COURTS: THE CHALLENGE OF MASS TOXIC
(continued...)

in *Borel v. Fibreboard Paper Products Corp.*[22] affirmed a $68,000 jury verdict based on a theory of strict liability for failure to warn of a dangerous product, asbestos claims grew into the largest area of product liability litigation in history. Plaintiffs sought recovery from asbestos miners, manufacturers, and suppliers of asbestos products.[23]

By the 1980s the asbestos litigation was growing out of control.[24] By 1982, as many as 20,000 claimants had filed lawsuits, and $1 billion had been spent in litigation expenses and compensation.[25] Inordinate delays and excessive transaction costs became common. Similarly-situated plaintiffs experienced widely disparate outcomes in the courts. Aggregation of claims within the tort system led to even more irrational outcomes. By the time Johns-Manville Corporation, the nation's leading asbestos manufacturer and the leading target of asbestos lawsuits,[26] filed for bankruptcy protection in 1982, it had become clear that the judicial system could not effectively cope with the wave of new claims.

---

[21] (...continued)
TORTS vii (Rand Inst. 1985).

[22] 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974).

[23] *See* JAMES S. KAKALIK ET AL., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES 5 (Rand Inst. 1984).

[24] *See Jenkins*, 782 F.2d at 470 ("Courts, including those in our own circuit, have been ill-equipped to handle this 'avalanche of litigation'"); *Georgine*, 157 F.R.D. at 263 ("By the early to mid-1980's, . . . major problems began to appear on the horizon in the asbestos litigation.").

[25] JAMES S. KAKALIK ET AL., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES v (Rand Inst. 1984).

[26] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988); Lester Brickman, *The Asbestos Claims Management Act of 1991: A Proposal to the United States Congress*, 13 CARDOZO L. REV. 1891, 1917 n.13 (1992) ("Before bankruptcy, Manville bore the brunt of asbestos litigation; it had the largest market share of asbestos-product sales and was assessed the highest percentage of liability by the tort system.").

14

In 1990, Chief Justice Rehnquist appointed a distinguished panel of judges to serve on a Judicial Conference Committee charged with examining the growing asbestos litigation problem. After extensive study, the Committee reported in 1991 that the "situation has reached critical dimensions and is getting worse." Characterizing the state of asbestos litigation as "a disaster of major proportions to both the victims and the producers of asbestos products," the Committee concluded that the courts were "ill-equipped" to address the mass of claims in an effective manner.[27]

Since then, the asbestos litigation problem has degenerated even further.[28] Indeed, the Supreme Court recently observed that both the federal and state judicial systems labor under the weight of an "elephantine mass of asbestos cases" that "defies customary judicial administration." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

As the Court indicated in *Ortiz*, the problems plaguing the asbestos litigation landscape are myriad. The underlying causes likewise are numerous, but include the following:

1.    **The number of claims is simply overwhelming.**

As the Judicial Conference Committee observed, one of the "most objectionable aspects of asbestos litigation" is that "dockets in both federal and state courts continue to

---

[27] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991).

[28] *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 15 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School) ("The judiciary has been handling the asbestos litigation for a generation, and its management of the litigation has contributed to what is now called a crisis but may better deserve to be termed a disaster.").

grow."[29]  Prior to 1980, plaintiffs had filed approximately 950 asbestos cases in the federal

District Courts.[30]  By 1985, 37,000 cases had been filed, a four-fold increase in the filing rate

over the preceding five-year period.[31]  Since then, the filings have continued to grow.  In the last

five years, new claims against major asbestos producers have averaged approximately 40,000 *per*

*year*.[32]  Today, the total number of pending claims is unreported but is in the hundreds of

thousands, the vast bulk of which Grace believes are without merit.

    2.      **Aggregation has exacerbated the problem, not alleviated it.**

       The "sheer number of asbestos cases" has led to a whole host of

"distort[ions of] the traditional process" for resolving tort claims.[33]  Unrelenting docket pressure,

for example, has resulted in attempts to aggregate and resolve claims on a collective basis.  But it

turns out that "mass consolidations only serve to magnify the irrationality of the litigation system

---

[29]  REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991); *id.* at 7 ("The tide of asbestos personal injury and wrongful death litigation in federal and state courts in the 1970s and 1980s continues to rise unabated and has not begun to crest.").  *See also Amchem*, 521 U.S. at 598 (quoting the Judicial Conference Report).

[30]  TERENCE DUNGWORTH, PRODUCT LIABILITY AND THE BUSINESS SECTOR: LITIGATION TRENDS IN FEDERAL COURTS 36 (Rand Inst. 1988).

[31]  DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 3 (Rand Inst. 1991) (computations based on the federal statistical data base).  *See also Georgine*, 157 F.R.D. at 263 ("Although by this time state and federal courts were already burdened by many asbestos claims, amazingly 1986 saw the rate of filing of new asbestos suits quadruple.").

[32]  *See The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Dean Paul Verkuil, Cardozo School of Law) ("[L]awsuits continue to arrive at a rate of over 40,000 per year, and over 200,000 cases are now pending."); *id.* ("The rate of new filings and the growing number of pending cases vividly demonstrate a basic fact – the asbestos litigation problem is not getting better, it is getting worse.").

[33]  REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS TO THE JUDICIAL CONFERENCE OF THE UNITED STATES 23 (Feb. 25, 1999).

that awards massive amounts to the unimpaired while threatening the ability of seriously ill people to obtain compensation in the future." [34]  And the very process of aggregation can generate additional cases.[35]  As one commentator put it, "[j]udges who move large numbers of highly elastic mass torts through their litigation process at low transaction costs create the opportunity for new filings.  They increase the demand for new cases by their high resolution rates and low transaction costs.  If you build a superhighway, there will be a traffic jam."[36]

> 3.   **Claims are brought on behalf of claimants who suffer no asbestos-related impairment.**

Moreover, in many courts, the majority of pending asbestos claims are brought by individuals who merely have some marker of asbestos exposure, such as pleural plaques, but who suffer no asbestos-related impairment at all.  By the mid-1980s, 40-60% of the outstanding claims were filed by people with some form of pleural plaques (non-impairing fibrosis of the

---

[34] *Fairness in Asbestos Compensation Act of 1999*, H.R. 1283, 106th Cong., 1st Sess. § 2(11), at 5.

[35] REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS TO THE JUDICIAL CONFERENCE OF THE UNITED STATES 16 (Feb. 15, 1999).

[36] Francis E. McGovern, *The Defensive Use of Federal Class Actions in Mass Torts*, 39 ARIZ. L. REV. 595, 606 (1997).  As Professor McGovern further stated: "Until 1980, Maryland devoted a small amount of judicial resources to asbestos litigation, resulting in a backlog of over 2000 cases.  The trial court then decided to adopt an innovative, common-issue trial so that individual cases could be streamlined.  This decision encouraged plaintiffs' counsel to file an additional 6500 cases, most of which probably would not have been filed absent the common-issue trial . . . .  Thus, by attempting to accommodate the cases that had been filed, the trial court created an elastic procedure that invited massive additional filings." Francis E. McGovern, *An Analysis of Mass Torts for Judges*, 73 TEX. L. REV. 1821, 1839-40 (1995) (footnotes omitted).  *See also* Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1826-27 (1992) ("The more successful courts became in devising ways to more quickly and assuredly compensate the meritorious, the larger the number of unmeritorious claims that were able to enter the system.").

Saran Wrap-like pleural membrane lining the lungs).[37]  While plaintiffs often assert that pleural

plaques are indicators of future disease, the opinion within the medical community is that benign

pleural abnormalities do not result in impairment.[38]  Indeed, "[t]he benign conditions of the

pleura that are produced by asbestos are seldom of any lasting importance."[39]

---

[37] *See In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 931. Data from 1992 indicate that such claims have grown and presently "account for sixty to seventy percent of new asbestos claims filed." Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1853 (1992). Compounding the problem is the fact that pleural plaques are often misdiagnosed. *Id.* at 1852-53 ("Not infrequently the diagnosis of pleural plaque is erroneous." (citing Howard Frumkin et al., *Radiologic Detection of Pleural Thickening*, 142 AM. REV. RESPIRATORY DIS. 1325 (1990)). *See also* Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. REV. 659, 674 (1989) ("Significant variances also existed in the parties' medical data. For example, the defendants' medical experts had generally found that many plaintiffs suffered only from pleural plaques or thickening of pulmonary membranes through their analysis of radiographic evidence. Plaintiffs' doctors, however, often found interstitial fibrosis, a much more serious and advanced condition, from similar evidence.").

[38] *See, e.g.*, W. RAYMOND PARKES, OCCUPATIONAL LUNG DISORDERS 455 (3d ed. 1994); ANDREW CHURG & FRANCIS H.Y. GREEN, PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 234 (1988); Robert Jones et al., *The Radiographic Pleural Abnormalities in Asbestos Exposure: Relationship to Physiologic Abnormalities*, 3 J. THORACIC IMAGING 57-66 (1988); Theresa McCloud et al., *Diffuse Pleural Thickening in an Asbestos-Exposed Population: Prevalence and Causes*, 144 AM. J. ROENTGENOLOGY 8-18 (1985); *see also In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1567 (D. Haw. 1990) ("In virtually all pleural plaque and pleural thickening cases, plaintiffs continue to lead active, normal lives, with no pain or suffering, no loss of the use of an organ or disfigurement due to scarring."); AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, DIVISION OF HEALTH STUDIES, *Preliminary Findings of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana*, p. 4 ("Clinically, circumscribed pleural plaques found on chest radiographs, in the absence of other abnormalities, are viewed as non-symptomatic 'markers of exposure' and the majority of cases will not progress to significantly affect lung function.")

[39] RICHARD DOLL & JULIAN PETO, ASBESTOS: EFFECTS ON HEALTH OF EXPOSURE TO ASBESTOS 2 (1985). *See also In re Asbestos Prods. Liab. Litig. (No. VI)*, Civ. A. No. MDL 875, 1996 WL 539589, at *1 (E.D. Pa. Sept. 16, 1996) ("Only a very small percentage of the cases filed have serious asbestos-related afflictions," and as a result they "are prone to be lost in the shuffle with pleural and other non-malignancy cases.").

Consequently, many current claimants are not and will never be sick.[40]

Nonetheless, such unimpaired claimants often receive compensation, depleting resources that

would otherwise be available to compensate legitimate claims. As Justice Breyer recently

summed up, "up to one-half of asbestos claims are now being filed by people who have little or

no physical impairment. Many of these claims produce substantial payments (and substantial

costs) even though the individual litigants will never become impaired."[41]

Mass screening programs have facilitated the filing of huge numbers of claims by

those who are unimpaired.[42] As Judge Weinstein observed when presiding over the Johns-

Manville bankruptcy, some plaintiffs' attorneys "have filed all of their cases without regard to

---

[40] *See* Christopher F. Fdley, Jr. & Paul C. Weiler, *Asbestos: A Multi-Billion-Dollar Crisis*, 30 HARV. J. LEGIS. 383, 384 (1993) ("Tens of thousands of [the asbestos] claims have been made, many successfully, by individuals who are understandably worried about their exposure to asbestos but who are not now and never will be afflicted with disease."). *See also Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. 77, 94 (Oct. 24, 1991) (testimony of Professor Lester Brickman) (observing that in the *Cimino* case, of 2300 claimants who were re-examined by doctors for the defense, 50% showed no signs of asbestos exposure).

[41] *Amchem*, 521 U.S. at 629 (Breyer, J., concurring in part and dissenting in part) (quoting Christopher F. Edley, Jr. & Paul C.Weiler, *Asbestos: A Multi-Billion Dollar Crisis*, 30 HARV. J. LEGIS. 383, 384, 393 (1993)).

[42] *Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. 77, 100 (Oct. 24, 1991) (testimony of Professor Lester Brickman) ("[P]leural plaque claims account for approximately 80% of new asbestos claim filings and represent a substantial percentage of previously filed claims. The existence of tens of thousands of such claims is accounted for by mass screenings of industrial workers financed by plaintiffs' lawyers and usually done with the active assistance of local union officials. Often, mobile x-ray vans brought to plant sites are used for the screenings."); Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 564 (1992) ("Another probable reason for the large number of unimpaired claims relates to the practice of some labor unions and plaintiffs' lawyers who engage in aggressive claim-solicitation campaigns on a mass basis designed to multiply the number of filed cases, thereby increasing the pressure on defendants to settle cases wholesale.").

19

the extent of injury."[43] Working in conjunction with unions, they have "arranged through the use

of medical trailers and the like to have x-rays taken of thousands of workers without

manifestations of disease and then filed complaints for those that had any hint of pleural

plaque."[44] Certain plaintiffs' counsel have candidly acknowledged that such practices have

burdened the courts with unmeritorious claims. For example, Ron Motley observed in the early

1990s that: "[t]here are gross abuses of our system. We have lawyers who have absolutely no

ethical concerns for their own clients that they represent – we have untrammeled screenings of

marginally exposed people and the dumping of tens of thousands of cases in our court system,

which is wrong [and] should be stopped."[45] The scatter that can take place when asbestos-related

conditions are claimed was captured in a profile created several years ago by the late Judge Carl

Rubin. Judge Rubin appointed his own medical experts to evaluate claimants in 65 pending

asbestos cases. Although all the plaintiffs claimed some asbestos-related condition, the court-

appointed experts found that in fact only 15% had asbestosis, 20% had pleural plaques, and 65%

had no asbestos-related condition whatsoever.[46]

---

[43] *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 748. *See also Eagle-Picher Indus. v. American Employers' Ins. Co.*, 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed. Moreover, many diagnoses are made by physicians not well schooled in the American Thoracic Society's criteria for the diagnosis of asbestosis, and the medical literature does not provide standards for judging the diagnosability of asbestos-related disease.").

[44] *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 748.

[45] AN ADMINISTRATIVE ALTERNATIVE TO TORT LITIGATION TO RESOLVE ASBESTOS CLAIMS, TRANSCRIPT OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES 15 (Oct. 31, 1991) (remarks of Ronald L. Motley).

[46] Rubin & Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35 (1991).