In another example, a federal district judge in Kansas found that medical screeners departed from accepted medical standards by diagnosing asbestos-related "injuries" that failed to meet minimum American Thoracic Society diagnostic criteria. As a result, the court concluded that "many, if not most" of the cases were "without merit."[47] *See also In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1566 (D. Haw. 1990) (cases are often diagnosed based on "subjective declarations of shortness of breath, tiredness and general lassitude," rather than objectively observable clinical findings).

### B. Litigating asbestos cases today: Litigation of claims no longer is a real alternative.

The avalanche of claims precludes litigation on a case-by-case basis, and litigation of claims has imposed costs so high they make such litigation prohibitive. Even when claims are litigated, the outcomes are arbitrary, inconsistent, and driven by systemic weaknesses such as rampant forum shopping.

#### 1. The backlog within the tort system precludes litigation on a case-by-case basis.

As the Judicial Conference Report observed, "[i]t is unrealistic to believe that individual trials can provide relief."[48] This is because "[t]he local trial of an individual asbestos claim takes so long that trying each claim separately would require all the civil trial time for the

---

[47] *See Raymark Indus. v. Stemple*, 1990 WL 72588, at *2, *8, *22 (D. Kan. 1990). The court found that, despite the fact that the American Thoracic Society criteria for diagnosing asbestosis indicate "that a doctor should consider only fibrosis with a profusion of 1/1 or greater," the medical screeners reported that workers had asbestos-related "injuries" with only a 1/0 reading – a reading that has no clinical significance – on the International Labour Organization (ILO) scale. Overall, the court concluded that the screening program produced a "steady flow of faulty claims" and a "fraud on the court."

[48] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 19 (Mar. 1991).

foreseeable future to the exclusion of all other cases in districts with heavy asbestos dockets."[49] As the Fifth Circuit has observed, "[t]raditional methods of litigation are ill-designed to handle such a volume of cases, for their sheer number is inundating the courts." Case-by-case adjudication, the court stated, would "delay decision for years if not decades, burden both claimants and manufacturers with massive litigation costs, leave claimants uncertain about the possibilities of eventual recovery and manufacturers unable to determine their financial exposure," as well as clog the court system generally.[50] Any attempt to resolve the litigation on a case-by-case basis would "bankrupt both the state and federal court systems."[51]

2. **Litigation entails exorbitant and inequitable costs.**

Further, transaction costs are unconscionably high. Approximately sixty cents of every dollar paid by asbestos defendants is consumed to pay lawyers' and others' fees, resulting in transaction costs exceeding claimants' recovery "by nearly two to one."[52]

---

[49] *Id. See also* Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective*, 80 CORNELL L. REV. 941, 958 (1995) ("The number of individual claims currently pending and reasonably anticipated in the future is in some mass tort litigations so large that it is simply not practicable to provide individual trials in the traditional fashion.").

[50] *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1146 (5th Cir. 1985). As one court remarked in calculating the time it would take to resolve all of the cases pending before it, "[i]f the Court could somehow close thirty cases a month, it would take six and one-half years to try these cases and there would be pending over 5,000 untouched cases at the present rate of filing." *Cimino v. Raymark Indus.*, 751 F. Supp. 649, 652, 666 (E.D. Tex. 1990) (noting that "plaintiffs are facing a 100% confidence level of being denied access to the courts"), *aff'd in part, vacated in part*, 151 F.3d 297 (5th Cir. 1998).

[51] JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 141 (1995) (quoting Spencer Williams, *Mass Tort Class Actions: Going, Going, Gone?*, 98 F.R.D. 323, 324 (1983)).

[52] *Ortiz*, 527 U.S. at 821 n.1. *See also id.* at 867 (Breyer, J., dissenting) ("'[O]f each dollar that asbestos defendants pay, those costs consume an estimated 61 cents, with only 39 cents going to victims.'"); *Amchem*, 521 U.S. at 632 (Breyer, J., dissenting) (same); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 749 (estimating that the percentage of all funds expended in asbestos litigation that
(continued...)

22

And the imposition of duplicative punitive damages awards during the course of asbestos litigation adds more inequitable costs. The award of punitive damages against asbestos producers such as Johns-Manville for their "outrageous misconduct"[53] was designed both to punish and deter companies from repeating such conduct. Punitive damages, however, have more than deterred, punishing companies "many times over" for conduct that long ago stopped.[54] In essence, recipients of punitive damages awards in the early litigation have received a windfall at the expense of future claimants who may suffer from asbestos-related disease but will no longer be able to seek full compensation from asbestos producers whose resources have been depleted. Indeed, this was the conclusion of the Judicial Conference Report which determined that "[m]eritorious claims may go uncompensated while earlier claimants enjoy a windfall unrelated to their actual damages."[55]

---

[52] (...continued)
were used to compensate claimants was only 30%, with 70% expended on transaction costs); REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991) (observing that "transaction costs exceed the victims' recovery by nearly two to one").

[53] See PAUL BRODEUR, OUTRAGEOUS MISCONDUCT: THE ASBESTOS INDUSTRY ON TRIAL 141-46 (1985) (claiming that executives at Johns-Manville suppressed evidence of harmful effects of asbestos exposure).

[54] See DEBORAH R. HENSLER ET AL., ASBESTOS IN THE COURTS: THE CHALLENGE OF MASS TOXIC TORTS 117 (Rand Inst. 1985) ("[T]here are controls over the level of punitive damages in some individual cases, but there are no controls over the cumulative effect of these cases. Therefore, there is no way to even roughly ensure that the social function of punitive damages has not been exceeded many times over, an undesirable result in itself, regardless of its effect on future claimants, owners, employees, and customers of the affected businesses.").

[55] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 32 (Mar. 1991); id. at 32 ("[M]ultiple judgments for punitive damages in the mass tort context against a finite number of defendants with limited assets threaten fair compensation to pending claimants and future claimants who awaited their recovery, and threaten the economic viability of the defendants."); In re Collins, 233 F.3d 809, 812 (3d Cir. 2000) (quoting Judicial Conference Report and observing that
(continued...)

23

### 3. Even when claims are adjudicated, the results are arbitrary, inconsistent, and tainted by forum shopping.

When cases finally proceed to trial, the tort system often produces "lottery-like" outcomes.[56] The "results of jury verdicts are capricious and uncertain."[57] Differences in the application of statutes of limitation, rulings regarding apportionment of damages, admissibility of evidence, the availability of punitive damages, and other substantive aspects of asbestos litigation have led to similarly-situated plaintiffs receiving widely disparate compensation.[58]

Examples abound where claimants asserting speculative "future claims" for "unconfirmed" disease have received millions, while others suffering from actual illness as a

---

[55] (...continued)
"[t]he continued hemorrhaging of available funds deprives current and future victims of rightful compensation"), *petition for cert. filed* (U.S. Mar. 1, 2001) (No. 00-1376).

[56] *See In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. at 749 ("The disparities [in asbestos litigation] are enormous. . . . Trials are much like a lottery with substantially higher verdicts in New York City, East Texas and parts of California than other parts of the country."); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Dean Paul R. Verkuil, Cardozo School of Law) ("[T]his system has come to resemble a lottery: Some plaintiffs–those with good lawyers who appear before favorable juries–hit the jackpot with punitive damages and generous compensatory recoveries, while others settle for meager awards or get nothing at all."); Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 560 (1992) ("Such a strong, persistent pattern of disparate outcomes in similar cases obviously offends our most fundamental notions of fairness. For that reason, this pattern is profoundly demoralizing to many asbestos claimants and their families.").

[57] *In re School Asbestos Litig.*, 789 F.2d 996, 1001 (3d Cir. 1986), *cert. denied*, 479 U.S. 852 (1986) (noting that there are "uneven, inconsistent and unjust results" in asbestos cases); *Georgine*, 157 F.R.D. at 262 ("Results of jury verdicts are capricious and uncertain. Sick people and people who died a terrible death from asbestos are being turned away from the courts, while people with minimal injuries who may never suffer severe asbestos disease are being awarded hundreds of thousands of dollars, and even in excess of a million dollars. The asbestos litigation often resembles the casinos 60 miles east of Philadelphia, more than a courtroom procedure.").

[58] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 6 (Rand Inst. 1991).

24

result of asbestos exposure have received nothing or have had to wait years before they are compensated.[59] For example, in 1998 a Texas state court jury awarded $15.6 million in compensatory damages and $100 million in punitive damages to a group of twenty-one plaintiffs whose claimed illness ranged from "mild" to "asymptomatic" asbestosis. Indeed, three of the plaintiffs had no symptoms at all, but nonetheless received millions in "future damages" for their "unconfirmed" disease.[60] In a recent case in Mississippi state court, two plaintiffs who allegedly suffered from asbestosis but whose "disease" could not be detected by x-ray examinations were awarded between $2 and $3.5 million each.[61] Similarly, a Texas jury recently awarded 22 plaintiffs $35 million for "future physical impairment" and "future medical costs."[62] Finally,

---

[59] See *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Dean Paul R. Verkuil, Cardozo School of Law) ("On the surface, of course, large judgments may be viewed as lottery-like winnings to those lucky enough to receive them. But these judgments are not benign. Viewed systematically, disproportionate judgments overcompensate present plaintiffs at the cost of future ones who may be more deserving."); Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1834 (1992) (noting that "some claimants who roll the trial dice receive nothing while others, including substantial numbers of the unimpaired, hit the jackpot").

[60] *Aaron v. Abex Corp.*, No. 94-C-2110-2 (Dist. Ct., Brazoria Cty. Feb. 19, 1998); *Carborundum Co. Hit with $115.6 Million Verdict in 21 Texas Cases*, 13 MEALEY'S LITIG. REP.: ASBESTOS 5-6 (Mar. 6, 1998). See also *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283* 106th Cong. (1999) (statement of Prof. Christopher Edley, Jr. Harvard Law School, discussing the case).

[61] *Cosey v. E.D. Bullard Co.*, No. 95-0069 (Miss. Dist. Ct., Jefferson Cty., June 12, 1998); *Mississippi Jury Awards $48.5 Million in 12 Cases*, ANDREWS ASB. LITIG. REP., at 1 (July 18, 1998). See also *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School).

[62] See *Two Asbestos Defendants Hit With $35 Million Verdict*, 23 No. 4 ANDREWS ASB. LITIG. REP. 3 (Mar. 1, 2001). In another Texas case a plaintiff with lung cancer who "never worked directly with asbestos products" but showed no sign of asbestosis was awarded $19.3 million. *Texas Jurors Award $19.3 Million to Widow in "No-Marker" Case*, 15 No. 3 MEALEY'S LITIG. REP.: ASBESTOS 4 (Mar. 3, 2000). See also *Seven Plaintiffs Awarded $19.25 Million by Texas Jury*, 22 No. 7 ANDREWS ASB. LITIG. REP. 3 (May 4, 2000) (award despite evidence that "none of the seven workers had asbestos-related diseases"); *2 Texas Juries Award Tyler Pipe Employees $26 Million for Occupational Exposure*, 15 No.
(continued...)

only a few weeks ago a single plaintiff diagnosed with asbestosis was awarded $18 million by another Texas jury, despite evidence that no sales of defendant's product were ever made to the plant where the plaintiff worked.[63]

Forum shopping has contributed to the arbitrary outcomes produced within the tort system.[64] Cases have shifted from the federal courts toward the state courts since, as Professor Edley recently testified, "[a]sbestos lawyers perceive the federal system as an unfavorable forum for the majority of claimants – those who are not sick."[65] Further, cases have shifted toward particular state courts perceived as favorable to plaintiffs. Recently for example, asbestos cases reportedly have "migrat[ed] en masse" to certain counties in Mississippi because of favorable long-arm jurisdictional rules and because "[j]uries in those counties rarely, if ever, rule against plaintiffs in product liability cases, and defendants do not have the right to perform medical exams on any claimants."[66]

---

[62] (...continued)
15 MEALEY'S LITIG. REP.: ASBESTOS 4 (September 1, 2000) (award despite evidence "company never had or used asbestos materials").

[63] See Texas Jury Finds Insulation Maker Liable for $18 Million, 23 No. 4 ANDREWS ASB. LITIG. REP. 3 (Mar. 1, 2001).

[64] Lester Brickman, The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?, 13 CARDOZO L. REV. 1819, 1827 n.34 (1992) ("Forum shopping is widespread in asbestos litigation."); Francis E. McGovern, Resolving Mature Mass Tort Litigation, 69 B.U. L. REV. 659, 664 (1989) ("Part of the reason for the clogged East Texas trial docket was that jury verdicts in personal injury cases in East Texas are generally high, particularly in asbestos cases.").

[65] The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283, 106th Cong. at 4 (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School) (observing that "[t]he judge in charge of asbestos claims within the federal multidistrict litigation system, Judge Charles Weiner, of the Eastern District of Pennsylvania, gives priority to the sick.").

[66] S. Labaton, Top Asbestos Makers Agree to Settle 2 Large Lawsuits, N. Y. TIMES (Jan. 23, 2000).

## C. Settling cases today: The privatized claims resolution business also has failed.

Because traditional tort system litigation is not a practical option for resolving claims, a de facto privatized claims resolution system has emerged. Companies simply have no choice but to settle claims on a mass basis.[67] But the mass settlements are not governed by traditional principles of liability, which require proof that the defendant's product actually caused injury and a medically-valid disease diagnosis. Facing the threat of widely dispersed litigation in unfavorable courts, defendants inevitably agree to settlement programs not based upon actual liability.

Of course, over the long term, this has only served to expand the litigation problem. Unimpaired claimants have been allowed to "free-ride" on the claims of the truly impaired because the tort system has encouraged the "parasitic fusion of strong and weak cases."[68] Another result is that claim volumes grow because there is no real restriction on the flow of claims into the system. Yet another is that claims are asserted against a laundry list of companies without any real demonstration that the claimant was hurt by any one of them.

---

[67] *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir.) (observing that aggregation exposes the defendant to "intense pressure to settle"), *cert. denied*, 516 U.S. 867 (1995); *id.* at 1304 ("The number of asbestos cases was so great as to exert a well-nigh irresistible pressure to bend the normal rules."); *Recent Case*, 109 HARV. L. REV. 870 (1996) ("[C]ourts faced with the delay and docket-crowding promised by [mass tort class actions] tend to encourage settlement."); Francis E. McGovern, *Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 U.C.L.A. L. REV. 1851, 1858 (1997) ("plaintiffs' attorneys rush to their favorite judges and demand draconian procedures to pressure defendants to make block settlements."); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 NW. U. L. REV. 469, 521 (1994) ("Often the pressure for block settlements comes from plaintiffs' attorneys who hope to get something for a large mass of questionable cases. Some attorneys . . . will take almost any case without regard to its merit, hoping for a global settlement.") (footnote omitted).

[68] John A. Siliciano, *Mass Torts and the Rhetoric of Crisis*, 80 CORNELL L. REV. 990, 1010 (1995).

## III. RECENT DEVELOPMENTS HAVE DEPRIVED GRACE OF THE ABILITY TO MANAGE ITS LITIGATION AND THREATEN ITS CORE BUSINESS.

Historically, Grace has faced a substantial but predictable volume of asbestos-related litigation. In recent months, however, as companies have been forced into bankruptcy – a number of which were Grace's codefendants in asbestos litigation – the number of claims against Grace has risen dramatically. This influx of new claims now threatens Grace's core business operations.

### A. Historically, Grace was able to contain and manage its asbestos litigation without impairing its core business.

Historically, Grace has faced three types of asbestos-related claims: (1) bodily injury claims alleging health effects from exposure to Grace's asbestos containing products, such as MK-3; (2) claims alleging bodily injury from exposure to naturally occurring asbestos in connection with the mining and processing of vermiculite at Grace's mine in Libby, Montana; and (3) property damage claims ostensibly seeking payment for the cost of removing or containing asbestos-containing products in commercial buildings. The history of each type of litigation is, briefly, as follows:

#### 1. Claims for bodily injury from asbestos products.

Bodily injury claims are the immediate cause of this Chapter 11. The vast majority arise from alleged exposure to MK-3, which Grace stopped manufacturing in 1973 – nearly thirty years ago. While Grace does not believe that the volume of claims filed against the company historically is indicative of its true liability, before the recent and dramatic increase in claim filings, Grace had been able to manage these claims principally through settlement and chose to follow that course.

In 1977, Grace received its first claim for bodily injury arising from an asbestos product. Thereafter, during the late 1970s, Grace was sporadically named in asbestos-related bodily injury lawsuits. These lawsuits were relatively insignificant in number and were efficiently managed and resolved. In fact, by 1982 the total volume of claims against Grace was less than 100.

The landscape changed when Johns-Manville filed for bankruptcy in 1982. Thereafter, not a single month passed without Grace receiving a claim, and the claim volume grew. By the end of 1984, Grace had been served with approximately 1,000 lawsuits. By the end of 1990, this number increased to approximately 28,000, and by the end of 1995, nearly 75,000 lawsuits had been filed against Grace. To defend just these bodily injury claims, Grace had incurred cumulative defense costs of over $101 million by the end of 1995.

While Grace considered many of these claims to be meritless, out of necessity Grace implemented a program in the mid-1990s to settle rather than litigate as many claims as possible. This policy was not prompted by trial losses (as of February 28, 2001, Grace had won 44 of the 63 bodily injury claims tried to verdict. It had also obtained additional orders of dismissal for 35,698 claims prior to trial). Instead, Grace adopted an inventory settlement policy because the costs of litigating the huge number of claims being filed was simply prohibitive.

Under this process, Grace negotiated inventory settlements with individual plaintiff law firms pursuant to which it agreed to pay a certain amount of money for each defined category of alleged asbestos-related injuries (for example mesothelioma, lung cancer, other cancers and pleural thickening). For the same disease, however, claim amounts varied significantly by jurisdiction and by plaintiff law firm. Moreover, for economic reasons, Grace

29

was forced to accept a claimant's simple attestation of exposure to a Grace product. Grace could not afford to investigate the validity or reliability of the attestation, the level of exposure or determine if the claimant actually was exposed to other manufacturers' products. Likewise, on the medical side, Grace could not determine other factors that might have contributed to the diagnosed disease. Nor could it seek to contest causation by looking into the claimant's smoking history or into whether a lung cancer had spread from another, non-respiratory organ.

As noted above, Grace pursued the policy of inventory settlements into the late 1990s because it had no alternative. Moreover, this policy appeared financially feasible to Grace. Both its own claims experience and the best actuarial projections showed that new claims were on a downward slope. The following chart shows the annual number of asbestos bodily injury claims served on Grace through 1998, recorded in the year they were actually received by the company:



Asbestos Bodily Injury Claims

As depicted above, Grace's 1997 bodily injury claims fell 21.3% from the 1996 peak; 1998 registered an additional 30.8% reduction from 1997 claims volume. Grace's outside actuarial

consultants advised the company that, based on recognized and accepted actuarial models, the company could expect to see a continuation in this downward trend into the future.

### 2. Lawsuits arising from the Libby Mine.

In 1967, Grace received the first workers' compensation claim from an employee at the Libby Mine. In around 1984, Grace received the first civil complaint. Complaints came in slowly and gradually until 1990, when Grace closed the mine and was no longer a local employer. Thereafter, complaints increased.

In the 1990's, the general nature of the complaints changed from former employee suits to those brought by family members who had been exposed to asbestos dust brought home on an employee's clothing. After 1995, Grace began to receive complaints from non-employee present and former residents near the mine, alleging health effects from asbestos exposure. In general, claims received prior to 1996 were for individuals with diagnosed asbestosis, whereas beginning in 1996 individuals bringing claims generally did not have any form of diagnosed impairment.

In total, 216 cases have been filed arising from the Libby Mine and, of these, 122 are pending. Of the 94 closed cases, 83 were settled for nearly $22 million and 11 were dismissed. The vast majority of the cases have alleged bodily injury.

Recently, however, a medical monitoring class action on behalf of everyone living in Libby and a property contamination class action covering all property within a twelve mile radius of the Libby courthouse have been filed. In addition, a medical screening program has been implemented by the government for residents and former residents of Libby, Montana.

3. **Property damage claims.**

Grace was served with its first property damage complaint in 1983. Subsequent cases have almost universally related to Grace's MK-3 product. There are a limited number of claims for Grace's acoustical plaster and masonry fill products. Cumulatively, Grace has faced 379 property damage lawsuits covering thousands of buildings. Of these, over 300 were filed before 1990.

Grace believes these cases were largely without merit and that it was improperly targeted, in some cases due to product misidentification. For example, in a 1992 case, *In re State of West Virginia Public Building Asbestos Litigation*, a trial judge indicated he would direct a verdict against Grace after the close of plaintiff's case but before Grace had begun its defense on the grounds that asbestos surface products were "hazardous". After Grace presented its evidence, the judge entered a directed verdict on liability against Grace. The jury, however, concluded that the evidence failed to establish identification of a Grace product and awarded $0 in damages, whereupon the court set aside the jury's judgment.

Nonetheless, Grace has been able to manage its property damage litigation. Of the 370 total cases, 207 were settled for approximately $700 million in total; 140 cases were either dismissed or a defense summary judgement order was entered; 9 were tried and won; and 7 were tried and lost with approximately $60 million in awarded damages.

As of February 1, 2001, there were only seven property damage lawsuits pending, all involving allegations concerning MK-3. Two are on appeal and one on a suspense calendar. Grace was awaiting a dismissal order in a fourth case due to product misidentification, and the remaining three cases were proceeding.

B. **Even as Grace was attempting to resolve its asbestos liability, it is apparent now that fundamental flaws in the claims resolution process were destined to undermine the orderly resolution of claims.**

While Grace historically was able to manage its asbestos-related liability, the private claims process had fundamental flaws that have now rendered it untenable for Grace.

1. **An increasing number of bankruptcies created pressure to shift the litigation target to secondary players.**

Numerous companies faced with asbestos bodily injury claims have been forced to seek refuge under Chapter 11.[69] In 1993, asbestos plaintiffs' lawyers Ron Motley and Joseph Rice observed that "seventeen (17) former asbestos defendants – representing one-half to three-quarters of the original liability share – have gone into bankruptcy."[70] The depletion of resources that would otherwise be available to compensate asbestos claimants has, in turn, prompted the plaintiffs' bar to initiate a new wave of litigation to meet ever-increasing demands.[71] As a result, "[t]he number of companies involved in asbestos litigation has . . . increased, as defendants seek

---

[69] *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 2 (1999) (statement of Dean Paul R. Verkuil, Cardozo School of Law) ("Today, I understand that at least twenty-five companies have been forced into Chapter 11 proceedings as a result of asbestos litigation.").

[70] *See* Ronald L. Motley & Joseph F. Rice, *The Carlough Settlement –Blueprint for a Sane Resolution of the Asbestos Problem*, MEALEY'S LITIG. REP.: ASBESTOS at 24, 25 (July 2, 1993), quoted in Ann E. Cohen, *Mass Tort Litigation After Amchem*, 2/25/98 ALI-ABA 269, at 277; *see also* REPORT OF THE NATIONAL BANKRUPTCY REVIEW COMMISSION 315 (Oct. 20, 1997) ("The bankruptcy system offers a structured system to manage multiple liabilities and has provided a forum for companies with massive liabilities to attempt to do so. At least 15 asbestos manufacturers, including UNR, Amatex, Johns-Manville, National Gypsum, Eagle-Picher, Celotex, and Raytech, have reorganized or liquidated in attempts to address massive numbers of known and unknown asbestos claimants using Chapter 11 of the Bankruptcy Code.").

[71] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991) (observing that "future claimants may lose altogether"); *Amchem*, 521 U.S. at 637 (Breyer, J., concurring in part and dissenting in part) (quoting the Judicial Conference Report).

33

to spread their losses and plaintiffs search for new and previously untapped sources of compensation."[72] As Judge Weinstein observed, "a newer generation of peripheral defendants are becoming ensnarled in the litigation" as plaintiffs' attorneys seek "to expand the number of those with assets available to pay for asbestos injuries."[73] This, despite the fact that "[t]he extent of liability, possible defenses and value of the claims against these new defendants is unknown."[74] By 1986, close to 500 corporations had been named as lead defendants in federal asbestos cases.[75]

More recently, increased claims filings and demands have been made against secondary players who had modest roles and had survived the earlier waves of the litigation. In 1999, the sums demanded by plaintiffs for settlement of claims rose dramatically. Pressure was increased as plaintiffs' attorneys became more aggressive. "[C]ompanies in a vast number of industries . . . experienced a significant increase in the volume of asbestos lawsuits."[76]

---

[72] Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 561 (1992).

[73] *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 747.

[74] *Id. See also* Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., (Apr. 12, 2000), at B1 ("You have to look under every stone. . . . The deeper you dig into the industry, the more you find.") (quoting plaintiff attorney James Early). The Judicial Conference Report warned of such developments when it concluded that "exhaustion of assets threatens and distorts the process" of compensating asbestos claimants. REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991).

[75] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 5 (1991) (citing TERENCE DUNGWORTH, PRODUCT LIABILITY AND THE BUSINESS SECTOR: LITIGATION TRENDS IN FEDERAL COURTS 26 (Rand Inst. 1988)).

[76] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform (Nov. 28, 2000); Paul M. Sherer, *New Credit Aids Federal-Mogul in Asbestos Battle*, WALL ST. J., Jan. 4, 2001, at A10
(continued...)

The inevitable was not long in the making: a new wave of Chapter 11 filings soon followed in 1999 and 2000. Thus, faced with significant increases in settlement demands, Babcock & Wilcox, a boiler manufacturer, was forced to seek protection within the bankruptcy system.[77] Despite the fact that its connection to asbestos was circumscribed, hundreds of thousands of asbestos claims had been filed against it. As settlement demands increased in late 1999, the company was compelled to seek refuge under Chapter 11.[78]

Pittsburgh Corning followed Babcock in April 2000.[79] Soon thereafter in October, Owens Corning, one of the major producers of asbestos products, sought protection under Chapter 11. Although Owens Corning had undertaken a significant effort in the late 1990's to establish a national system for the resolution of its asbestos claims, the company was

---

[76] (...continued)
(observing that "[p]laintiffs' attorneys have become more aggressive, targeting companies with even passing links to asbestos"); Richard B. Shmitt, *How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial*, WALL ST. J., Mar. 5, 2001, at A1 ("The Internet has been a further engine for growth... Several lawyers use the Web to refer big asbestos-injury cases to other lawyers, earning what are, in essence, brokerage fees."); Gregory Zuckerman, *Specter of Costly Asbestos Litigation Haunts Companies*, WALL ST. J., Dec. 27, 2000, at C1 ("Plaintiffs' attorneys have become more aggressive, by targeting all kinds of companies with a passing link to asbestos."); *Time to Bring Order to Asbestos Litigation*, ENG. NEWS-RECORD, Dec. 18, 2000, at 148 ("Like dominoes falling in a row, [companies] are filing for Chapter 11 protection to survive the crushing load of these lawsuits, which in turn pushes the lawsuits further down into the industry.").

[77] Melanie Trottman, *Babcock Files for Protection of Chapter 11*, WALL ST. J., Feb. 23, 2000, at A10; Alan Sayre, *Babcock & Wilcox Seeks Bankruptcy*, AP ONLINE (Feb. 22, 2000).

[78] *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy*, MEALEY'S LITIG. REP.: ASBESTOS, Mar. 3, 2000, at 18.

[79] Jim McKay, *140,000 Asbestos Lawsuits Force Filing*, PITTSBURGH POST-GAZETTE, Apr. 18, 2000, at F1 ("Pittsburgh Corning Corp. yesterday filed for Chapter 11 protection from creditors, saying bankruptcy is the only way it can reasonably deal with 140,000 lawsuits seeking damages over asbestos insulation.").

still overwhelmed by new claims.[80] Despite its efforts to manage its liability, "[p]laintiffs attorneys who didn't enter into the national settlement continued to bring suits and demand larger payments."[81]

Armstrong World Industries filed for Chapter 11 protection in December of last year,[82] as did engineering firm Burns & Roe.[83] And in January G-I followed suit after paying $1.5 billion to settle more than 500,000 asbestos claims.[84]

---

[80] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform, Nov. 28, 2000, at 2 (observing that Owens Corning "underestimated the size of its liability, the number and severity of claims that sought to participate in the program, and, most important, the number of likely opt-outs").

[81] Queena Sook Kim, *Firms Hit By Asbestos Litigation Take Bankruptcy Route*, WALL ST. J., Dec. 21, 2000, at B4. *See also Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE (10/5/00) (citing "a flurry of recent new filings from plaintiff lawyers not participating in the NSP"); John Seewer, *Owens Corning Seeks Bankruptcy*, CHICAGO SUN-TIMES 4, Oct. 5, 2000, at 4 (citing the "cost of resolving claims, combined with new legal filings" as reason for bankruptcy).

[82] *See* Jonathan D. Glater, *For Armstrong, Bankruptcy is Lesser of Two Evils*, N.Y. TIMES, Dec. 12, 2000, at C4; Queena Sook Kim, *Armstrong Holdings Unit Files Under Chapter 11*, WALL ST. J., Dec. 7, 2000, at A4; *Armstrong World Industries Seeks Bankruptcy Protection Reorganization: Firm Threatened by Mounting Asbestos Liability Claims Will Develop New Strategy*, L.A. TIMES, Dec. 7, 2000, at C3.

[83] *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-RECORD, Dec. 18, 2000, at 22 (citing "spike" in plaintiff demands and new filings).

[84] *See* Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases*, WALL ST. J., Jan. 8, 2001, at B12 ("Repeating a refrain common among companies with asbestos liability, G-I said that despite settling more than 500,000 claims to the tune of $1.5 billion, there was no ebb in the tide of personal-injury claims. In fact, G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection*, 14 ASBESTOS & LEAD ABATEMENT REP., Feb. 1, 2001 ("Almost 70,000 claims were filed against the company last year, nearly double the number filed in 1996.").

The string of companies seeking resolution of their asbestos-related liability through Chapter 11, coupled with the increasing pressures placed upon those companies remaining outside the system, have led many observers to predict that there is "no end in sight."[85]

### 2. There was no practical check on the accelerated claims filings and increased demands against non-bankrupt companies.

Many of the companies recently entering the bankruptcy system have cited dramatic increases or "spikes" in the claims filed against them and in settlement demands.[86] These increases bear no apparent relation to changes in liability or trends in disease. Yet, there is no mechanism in place to stem the new filings and escalating settlement demands against the companies that remained outside of bankruptcy.

For all the reasons catalogued above, defendants have no effective recourse in the courts. Indeed, the threat of high volume litigation in unfavorable jurisdictions is precisely what

---

[85] *See* Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 8, Nov. 11, 2000 ("According to our industry sources, without legislative action many more companies will also be forced to file for bankruptcy within the next two years owing to rising costs per claim."); Jeff St. Onge, *Owens Corning Bankruptcy Shows Scope of Asbestos Issue*, DAILY BANKRUPTCY REV., Oct. 9, 2000 ("A flood of asbestos lawsuits since the mid-1960s have produced specialty law firms that are fleshing out new clients and cases at an awesome rate. With an ever-increasing tide of lawsuits, growing by 50,000 a year by one estimate, the asbestos issue seems destined to throw several more companies into bankruptcy.").

[86] *See, e.g., Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE, Oct. 5, 2000 ("[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participated in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."); *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-RECORD, Dec. 18, 2000, at 22 (noting that "'the number of cases brought against the company increased markedly'"); Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases*, WALL ST. J., Jan. 8, 2001, at B12 ("G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection*, ASBESTOS & LEAD ABATEMENT REP., Feb. 1, 2001 (citing "nearly double the number [of claims] filed in 1996" as reason for bankruptcy).

37

empowers claimants and their lawyers to shift and escalate their settlement demands essentially at will. The criteria used in resolving claims have also proven to be a problem rather than a cure. They have failed to screen out invalid claims, which continue to inundate the system.

Finally, the lack of a unified docket and lack of coordination among claimants' counsel, who often "have highly individualistic styles and different approaches toward discovery and trial," make resolution of the problem through negotiation impossible. *See* MANUAL FOR COMPLEX LITIGATION § 33.24, at 317 (Federal Judicial Center 3d ed. 1995). Indeed, the rate of new filings has been spurred by the "arrival of new plaintiff firms that apparently desire to move large numbers of cases to generate substantial fees."[87] This dynamic apparently was fatal to Owens Corning's National Settlement Program.

C.    **In recent months, claims against Grace suddenly skyrocketed and now have forced Grace into Chapter 11.**

The filing of this case is merely the latest development in the same story: Grace too faced increased filings in 1999 and – as the new bankruptcies were filed – the unchecked, uncontrolled claims process shifted its sights to Grace, and the claims volume took off.

More specifically, as noted above, claims against Grace peaked in 1996 and showed an established, steady downward trend. The trend was not temporary. It lasted for years. As shown in the following figure, the trend ended in 1999, with a 28% increase in that year. And that increase was only a prelude to the 81% increase experienced in the year 2000:

---

[87] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 3, Nov. 28, 2000.



Asbestos Bodily Injury Claims

These trends have continued into the beginning of this year. Claims were served in January of this year at a rate 374% higher than January of 2000. February 2001 claims were served at a rate 207% higher than February of 2000.

Even as bodily injury claims volume was shifted to Grace, numerous nation-wide and individual state class action lawsuits have been filed concerning Grace's attic insulation product, a product that was never before the subject of litigation. In the last year or so, nine lawsuits have been filed seeking removal of ZAI from the attics of residential homes.[88] This,

---

[88] Of the nine pending lawsuits, four are state class actions: *Barbanti v. W.R. Grace & Co. - Conn.*, No. 00201756-6 (Spokane Cty., Wash.); *Daily v. W.R. Grace & Co. - Conn.*, No. 00-L-656 (Madison Cty., Ill.); *McMurchie v. W.R. Grace & Co. - Conn.*, No. PI 00-0015072 (Hennepin Cty., Minn.); and *Harris v. W.R. Grace & Co.*, No. 833392-2 (Alameda Cty., Ca.). Four are federal class action lawsuits transferred and coordinated by the Judicial Panel on Multidistrict Litigation in *In re: Zonolite Attic Insulation Products Liability Litigation*, MDL No. 1376 (D. Mass.): *Lindholm v. W.R. Grace & Co.*, No. 00 CV 10323 (D. Mass.); *Price v. W.R. Grace & Co.*, No. CV 00-71-M (D. Mt.); *Hunter v. W.R. Grace & Co.*, No. 00-569 (S.D. Ill.); *Walsh v. W.R. Grace & Co.* (Hennepin Cty., Minn. Filed Oct. 6, 2000). The ninth is an individual lawsuit that has been removed to federal court, *Nelson v. W.R. Grace & Co. - Conn.*, No. BDV 01-110 (Cascade Cty., Montana).

despite the fact that, as is detailed more fully below, the evidence shows that the asbestos levels in homes with ZAI are no higher than ambient levels in the normal air everyone breathes.