## D. Establishment of a Notice Program[25]

Axiomatically, the establishment of a bar date and the determination of whether it is applicable to all claimants---assuming *arguendo* that the Court does so---depends upon the ability of the Debtors to effectively notify property damage claimants. The Debtors and their expert, Katherine Kinsella, have seemingly devoted great energy and resources to developing a notification program ostensibly to ensure the broadest circulation of the fact of the proposed bar date. However, upon closer scrutiny, the proposed program fails of its intended purpose; worse yet, the program may be intentionally deficient to minimize the number of claimants actually heeding the call to file proofs of claim by the bar date. See, Mullane v. Central Hanover Trust Co., 339 U.S. 306, 315 (1950).

For purposes of this analysis, it is important to distinguish between the various types of property damage claims against the Debtors' estates.

### 1. Zonolite Claims

Zonolite Attic Insulation is an asbestos contaminated product that was marketed from approximately 1930 through 1984[26] and sold by Grace as a safe, harmless "do-it-yourself" product for installation in residences by homeowners. Unfortunately, however, Grace's Zonolite Attic Insulation was composed of asbestos contaminated vermiculite from Grace's Libby, Montana vermiculite mine. Despicably, that fact and the fact that

---

[25] By this response and memorandum, the PD Committee does not intend to analyze and comment upon proposed case management procedures that principally concern personal injury or future personal injury claimants. As to the former, we expect that the Official Committee of Asbestos Personal Injury Claimants will do so. As addressed elsewhere herein, unless and until a legal representative is appointed, future personal injury claimants will not have an effective spokesperson.

[26] Zonolite was sold by distributors and retailers long after that.

disturbance of the product could result in the release of asbestos fibers, was concealed by Grace.

The PD Committee estimates that Zonolite Attic Insulation continues to be in the attics and walls of hundreds of thousands or millions of homes nationwide. Importantly, homeowners remain unaware that Zonolite Attic Insulation is in their homes or that the product can contaminate their homes with asbestos fibers. Indeed, a scientifically conducted consumer survey conducted by GMA Research of just Washington state homeowners demonstrated that only four in every 100 homeowners has received any information, from any source, concerning potential health hazards from Zonolite Attic Insulation despite advisories issued by the Environmental Protection Agency and the Washington Department of Health. Moreover, detection by homeowners is particularly difficult since  most homeowners would not recognize Zonolite Attic Insulation  if they were to encounter it;[27] the product has often been covered by walls and floor boards; and, the product was oftentimes installed by prior owners.

Most importantly, Zonolite Attic Insulation poses grave risks of exposure and contamination when it is disturbed. Thus, the tragic possibilities are endless if notification requires a homeowner to tamper with walls or floors to discover whether Zonolite Attic Insulation is the insulation under such surfaces thereby disturbing the asbestos contaminated material.

---

[27] In an internal memo dated May 24, 1977, Grace recognized asbestos exposures "of upwards of 15f/ml" from Zonolite Attic Insulation and forecasted that the product would be banned. According to the memo, "[b]ased on the advice of corporate general counsel, [Grace] decided not to affix labels on...expanded products using Libby ore," because "[a] decision to label our consumer products would eliminate the risk of future liability, while exacerbating the risks of claims...from past use of the product."

The Debtors' proposed notification program for Zonolite Attic Insulation claimants[28] simply ignores the idiosyncrasies of the product and the claimants. Small v. United States of America, 136 F.3d 1334,1336 (C.A. D.C., 1998) ("in an increasingly populous and mobile nation, newspaper notices have virtually no chance of alerting an unwary person that he must act now or forever lose his rights..."). The Debtors place too much emphasis on "reaching" relevant groups and do not pay enough attention to the message being conveyed. In fact, there is no discussion whatsoever of the content of the Debtors' notice in the Debtors' Case Management Proposal or its Memorandum in support thereof.

As more particularly set forth in the affidavit of Todd Hilsee (attached as Exhibit A) of Hilsoft Notifications, the PD Committee's notification expert, the Debtors' notification plan suffers from numerous deficiencies in respect of Zonolite Attic Insulation claimants, including the following:

- The Debtors' notice targets too many audiences with a single communication and is therefore ineffective in reaching any particular audience;

- The Debtors' notice treats all claimants as though indistinguishable and ineffectively speaks to all of them;

- The Debtors' notice fails to describe or depict the appearance of the product;

- The Debtors' notice assumes that claimants are aware they have claims when, in fact, they have no such knowledge;

- The text of the Debtors' notice is not easily understood by the average homeowner;

---

[28] Notification of Zonolite Attic Insulation claimants presumes that such claimants ought be required to file proofs of claim. As discussed elsewhere, there is no necessity for filing more than class proofs of such claims.

28

- The Debtors' plan has too narrow a geographic focus; and,

- The Debtors' proposal fails to deal with the danger of disturbing the product.

### 2. Traditional Property Damage Claims

As for traditional property damage claims, which the Debtors mischaracterize as being solely related to Monokote-3,[29] the Debtors' misplace their reliance on this Court's approval of a notification program in In re Armstrong World Industries, et al., Case No. 00—4471 (JJF) (Bankr. D. Del. Order dated April 18, 2001). First, per the debtor in that case, unlike the Grace cases, "asbestos property damage claims simply are not material in the context of" the Armstrong chapter 11 cases. *Motion of Debtors For Order Vacating Appointment By United States Trustee of Official Committee of Asbestos–Related Property Damage Claimants,* August 21, 2001 at 10.

Second, even the Debtors apparently recognize that the Armstrong notice program (*i.e.*, publication of notice twice in a weekday edition of *The Wall Street Journal, The New York Times* and *USA Today* at least 30 days prior to the claims bar date) would fall woefully short of constitutionally required notice in this case where asbestos property damage claims against Grace entailed more than $696 million in settlement payments and judgments in excess of $60 million through December 31, 2000.

In this case, traditional property damage claimants are principally comprised of owners of commercial, institutional and governmental buildings and facilities throughout the world in which Grace asbestos containing products or materials have been installed. While the Debtors consistently point to the fact that there were only "seven unresolved" lawsuits pending at the date of the bankruptcy, only five of which were "active," they fail to point out that those lawsuits relate to potentially thousands of contaminated buildings

---

[29] See footnote 9.

and some are class actions. They also fail to address the as yet unasserted claims of the various states, governmental subdivisions and private property owners that are not barred by statutes of limitations.

Grace is the first chapter 11 implicating material asbestos property damage claims since the confirmation of a plan of reorganization establishing a qualified asbestos trust pursuant to 11 U.S.C. §524(g) in the chapter 11 of The Celotex Corporation and Carey Canada, Inc. in 1996. In re The Celotex Corporation et al., Case No. 90-10016-8B1 (Bankr. M.D. Fla.). There too, substantial disagreement existed as to the value of asbestos property damage claims ranging from several hundred million dollars to more than a billion dollars. It now appears that those claims will exceed $2 billion. In that case, claims which were not subject of pending lawsuits at the petition date were, in fact, subsequently asserted and allowed by the property damage claims administrator.

Thus, it is not a forgone conclusion that "what you see is what you get" and the notification program must be developed in such a way as to ensure that it effectively informs prospective asbestos property damage claimants. Moreover, even if we were to assume that every property owner had knowledge of this case, they are nonetheless entitled to reasonable notice before their claims are forever barred. New York v. N.H. & H.R. Co., 344 U.S. 293, 297 (1953). The Debtors' proposal falls short of the mark.

Again, referring to Mr. Hilsee's affidavit:

- The Debtors' notice proposal fails to inform of the wide-ranging types of property damage occasioned by Grace products;

30

- The Debtors' notice proposal fails to enumerate or describe Grace products giving rise to property damage claims;[30]

- The Debtors' proposal fails to give effective notice outside the United States; and,

- The Debtors' notice proposal does not focus on "reaching" administrators or owners of hospitals, airports, hotels, or other special use properties notoriously contaminated by asbestos.

Thus, if the Court were inclined to impose a bar date and the requirement for filing proofs of claims on any of the asbestos claimants, it must first determine whether the Debtors' proposed notification program can be meaningfully revamped[31] and, if so, cause that to be done. Mullane v. Central Hanover Bank & Trust, 339 U.S. at 314 (due process requires that notice be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their claims.").

## E. Approval of Proof of Claim Forms

As part of its Case Management Proposal, Grace has "crafted" proof of claim forms[32] that it contends "may be used to provide information critical in determining the validity of submitted claims." (Debtors' Case Management Proposal Memorandum at 25). While the Debtors point to numerous cases that purportedly stand for the

---

[30] The PD Committee has reason to believe that the even Grace's "asbestos-free" Monokote 4 and 5 contained harmful levels of asbestos.

[31] Per Mr. Hilsee's affidavit, it is not at all clear, for the reasons set forth therein, that a notification program can be developed to overcome the procedural and substantive due process concerns engendered by the nature of Grace's asbestos property damage claims. Mr. Hilsee and the PD Committee will nonetheless continue to endeavor to evaluate and, if possible, formulate a truly effective notification program.

[32] We only concern ourselves here with asbestos property damage claims forms attached as Exhibits B and C to the Debtors' Case Management Proposal Memorandum.

31

proposition that other courts have authorized modified forms to elicit "extensive" information, the PD Committee is unaware of any authority which warrants the forms which the Debtors propose to require property damage claimants to complete in the Grace cases; assuming, of course, the Court requires asbestos claimants to file proofs of claim at all.

In fact, the PD Committee finds it deliciously ironic that the Debtors rely on the decision in In re Babcock & Wilcox Co., 2000 WL 422372, at *4 (E.D. La. 2000), as the "most recent" authority for a modified proof of claim form for asbestos personal injury cases.[33] (Debtors' Case Management Proposal Memorandum at 26). The decision in Babcock & Wilcox is remarkable for at least two reasons. First, the proof of claim form proposed by the debtor in that case for asbestos property damage claims was no more than Official Form 10 with "slight modifications." August 25, 2000 Order and Reason, In re Babcock & Wilcox Co. at 15, attached as Exhibit B.

Second, the decision to which the Debtors refer was actually the third opinion of that district court on the subject.[34] In its first decision, however, the court observed:

> Rule 3001(a) requires that the proof of claim substantially conform to the relevant official form, which in this case is Official Form 10. Official Form 10 is a one-page document that merely requires the creditor's name, address and telephone number; the basis for the claim; the date the debt was incurred or a judgment obtained, if any; the total amount of the claim; a statement indicating whether the claim is secured or unsecured; and copies of supporting documents.

Id. at 16-17.

---

[33] Babcock & Wilcox is also represented by Kirkland & Ellis, Grace's bankruptcy counsel.

[34] We would have expected Grace's counsel---also counsel for Babcock & Wilcox---to have brought this to our and the Court's attention. Fortunately, because property damage claims were not meaningfully implicated in many of the asbestos cases since Celotex, the PD Committee and its counsel have been carefully studying pleadings and interviewing parties in interest in those cases.

Accordingly, the court *rejected* the debtors' proposed proof of claim form[35] for asbestos personal injury claims which sought information concerning the debtors' threshold defenses to those claims. The court stated:

> The Court finds that the proposed claim form is unnecessarily detailed and would amount to an undue burden on parties who wish to assert claims. The 21 – page Manville Trust form relied on by debtors is not a proof of claim form required to meet a bar date but a claim form used by the trust to evaluate each claim individually for the purposes of liquidation and payment. The Court is therefore not persuaded that the extensive information requested in the Manville Trust form is an appropriate model for a proof of claim that will subject claimants to a bar date.
>
> The Court therefore finds that the claim form must be substantially modified. As indicated, disputed claims must establish, at a minimum, the ground on which they base debtors' liability. In this case, that entails establishing a claimant's exposure to asbestos from debtors' products and the injuries that resulted from that exposure. *The court will therefore allow debtors to ask questions that go to this prima facie evidence of liability.*

Id. at 21-22 (emphasis supplied).

The court thereupon directed the debtors to delete any requirements for the submission of death certificates or medical reports; the precise date of diagnoses; detailed information concerning exposure; and, identification of the precise debtor to whom exposure is attributed. Id. at 22-27. In short, the court insisted that the proof of claim contain minimal information concerning the claim.

In its second decision, the court once again rejected the debtors' proposed form since it was likewise impermissibly onerous. October 6, 2000 Order and Reasons, In re Babcock & Wilcox Co., at 3, attached as Exhibit C. The court observed that the offensive

---

[35] Babcock & Wilcox contended that its proposed form emanated from the forms used in *Johns-Manville* and in *Celotex*. As the court observed in the following excerpt, the Johns-Manville form was that of its claims facility, not the form required by the bankruptcy court. In Celotex, the proof of claim form proved to be valueless and a new form was promulgated after the effective date of the plan of reorganization by the Celotex Asbestos Trust property damage claims facility.

33

aspects of the form "may in effect, if not by design, discourage the filing of claims, which is not the function of a proof of claim form." Id.

The opinions in Babcock & Wilcox are instructive and make our point. First and foremost, in the case of asbestos property damage claims, Official Form 10 was deemed sufficient. Second, the court made it abundantly clear that minimal information establishing mere "prima facie evidence of liability" is sufficient. Finally, the court rebuked the debtors for the inclusion of any information or requirement that might discourage the filing of claims.

Here, the Debtors' proposed proof of claim forms for traditional property damage claims and Zonolite Attic Insulation claims are in stark contrast to those approved in Babcock & Wilcox, and therefore, should not be authorized. The forms do no more than attempt to facilitate the Debtors' analysis of defenses to filed claims. There is simply no authority for the proposition that sections 501 and 502 of the Bankruptcy Code permit the use of proof of claims for discovery purposes. In fact, however, the proposed forms would not even facilitate the Debtors' impermissible purposes since the proposed forms fail to take into account significant differences in the formulation of so-called threshold issues from jurisdiction to jurisdiction. Most importantly, the forms are the epitome of undue burdensomeness, both in terms of the detailed information sought and the lack of clarity.

In short, the proposed forms are well nigh impossible to complete--- whether by design or by effect---and would serve to discourage claimants from filing claims against the Debtors' estates.

34

Making matters worse is the fact that buried in the exceedingly confusing instructions for "Who Should Use This Form" is the unprecedented requirement that a claimant file a separate form for each property subject of its claim. In contrast, the Debtors' own Schedules of Liabilities list disputed and unliquidated known claims by the claimants' names and not separately by the buildings subject of their claims. Thus, under Bankruptcy Rule 3003(c)(3), holders of disputed and unliquidated claims are only required to file "a proof of claim."

Also, as a practical matter, such an imposition could be overwhelming. The Debtors apparently assume that every claimant is already aware that it has a claim which might also explain why the Debtors have devised a notification program that merely gives notice of the bar date rather than increasing the level of awareness that building owners may have claims against the Debtors that must be asserted by the bar date. There is no basis for such an assumption nor is one offered. Thus, under the Debtors' proposal, a building owner learning for the first time that if it has Grace products it may have a claim, would be compelled to inspect its buildings---all of them---and file separate claims by the bar date. In the case of a state or another owner of many buildings, that process could take months, or longer, when all that is really relevant to the process (without conceding the process is appropriate in the first place) is for the property owner which knows it bought Grace products to simply put the estate on notice of its claim.

Finally, the Debtors altogether fail to provide any proposed form for class proofs of claim. Surely, the Debtors do not propose, for example, that Marco Barbanti, the class representative for Washington Zonolite Attic Insulation claimants be required to file separate proofs of claim for each member of that certified mandatory non-opt out class

35

containing the information sought by the Debtors in their proposed Zonolite proof of claim, building by building. To so require would have the practical effect of disallowing the claims of all class members who as yet remain unidentified.

## F. A More Sensible Approach

The imposition of the ritualistic requirement that asbestos property damage claimants file proofs of claim simply serves no useful purpose. In every prior asbestos bankruptcy implicating section 524(g), the allowance or disallowance of such claims has been relegated to the asbestos trust's claims facilities for determination. And in each of those cases the claims facilities have made such determinations pursuant to claims procedures that entail the filing of thorough proofs of claims, promulgated in the course of the confirmation process, together with supporting documentation and evidence. It makes little sense and defies the notion of avoiding burdensome and exclusionary claims techniques to impose a redundant claims form requirement.

In this case, the critical exercise is estimating the universe of present and future asbestos claims. That is an empirical determination---especially in respect of Zonolite and future claims---that derives no benefit from the filing of proofs of claim. Rather, the analysis is virtually altogether derived from the Debtors' historical pay-out experience, and other anecdotal information, discounted, if appropriate, by some quantitative measure of anticipated applicable defenses. Should the estimation analysis result in the conclusion that the Debtors' assets are insufficient to cover its asbestos liabilities, the actual value of those claims makes little difference. In that instance, section 524(g) leaves it to the

ensuing trust to ensure that all asbestos claims—whether present or future—are paid "in substantially the same manner." 11 U.S.C. §524(g)(2)(B)(ii)(V). In fact, section 524(g) imposes upon the trust an obligation to periodically *estimate* all such claims in order to provide such assurance. Id.

## G. The Disposition of Threshold Issues

The Debtors' Case Management Proposal attempts to add some sense of legitimacy and thoughtfulness by rolling out a seemingly comprehensive schedule of events by month, day and year that extends well into 2003. Nonetheless, the proposal leaves a great deal of uncertainty as to what we will actually be doing or, more importantly, why we are doing it in the first place, which brings us back to the inquiry whether this chapter 11 is a legitimate exercise in reorganization. In regard to the latter, Grace's proposal concerning so-called "common threshold issues" is especially revealing and calls into question its real motivations.

In SGL Carbon, the Third Circuit was presented with the issue of

> (w)hether on the facts of this case, a Chapter 11 bankruptcy petition filed by a financially healthy company in the face of potentially significant civil antitrust liability complies with the requirements of the Bankruptcy Code.

Id.

The debtor was the wholly owned North American subsidiary of the largest manufacturer of carbon and graphite products in the world. Following an investigation by the United States Department of Justice into alleged price fixing by graphite manufacturers, various steel producers filed class action lawsuits against the debtor and

37

other manufacturers. These suits spawned additional actions so that at the time the debtor filed its petition in this Court, it was a defendant in one certified class action, six other federal district court actions and one Canadian court action.

The day after it commenced the proceedings, one debtor issued a press release in which it proclaimed its financial health and explained that it filed for bankruptcy "to protect itself against excessive demands by plaintiffs in civil antitrust litigation and in order to achieve an expeditious resolution of the claims against it." (Id. at 158). Contemporaneous with the press release, the debtor also conducted a conference call with securities analysts in which it stated that the debtor's "Chapter 11 petition was 'fairly innovative (and) creative' because 'usually Chapter 11 is used as a protection against serious insolvency or credit problems which is not the case [with SGL Carbon's petition].'" (Id. at 159).

The Official Committee of Unsecured Creditors[36] moved to dismiss the case on the grounds that it was a "litigation tactic designed to frustrate the prosecution of the civil antitrust claims proceeding against [SGL Carbon] and preserve [SGL Carbon's] equity from those claims." In re SGL Carbon Corp. 233 B.R. 285, 287 (D.Del.1999). After conducting a modified evidentiary hearing, this Court denied the Committee's motion to dismiss. This Court assumed that 11 U.S.C. §1112(b) imposes a duty of good faith upon bankruptcy petitioners and that this duty requires that the bankruptcy reorganization be designed to facilitate the restructuring of a debtor's finances. (Id. at 288). Nevertheless, this Court determined that the debtor's petition was valid because "plaintiffs' litigation was imperiling SGL Carbon's operation by distracting its management, was potentially ruinous and could eventually force the company out of business." Id. at 291.

---

[36] Eight of the nine Committee members were antitrust claimants against the debtor.

38

On appeal, the Third Circuit reversed. Significantly, the Third Circuit agreed with this Court's assumption that good faith is an essential requirement for a valid chapter 11 petition, and held that "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. §1112(b) unless it is filed in good faith." In re SGL Carbon, 200 F.3d at 160.

The Third Circuit also agreed with this Court that the requirement of good faith mandates that the bankruptcy serve "a valid reorganizational purpose." Id. at 163.

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers---the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.---that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business the exercise of these powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

Id. at 165, 166.

The Court stated that "filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,'" and thus endorsed those decisions that dismissed chapter 11 petitions on this basis. In re HBA East, Inc., 87 B.R. 248 (Bankr.E.D.N.Y.1988)("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith"); In re Marsch, 36 F.3d at 825, 828; (the debtor filed a chapter 11 petition merely to obtain a tactical litigation advantage and the court ruled "the purpose for which the petition was filed was not consonant with the purpose of the Bankruptcy Code" and the case was dismissed); Furness v. Lilienfield, 35

B.R. at 1006, 1013 ("The Bankruptcy Code's provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

After analyzing the debtor's public filings and press releases, the Third Circuit concluded that the petition "was not motivated by a desire to reorganize or rehabilitate SGL Carbon's business...but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms." In re SGL Carbon Corp., 200 F.3d at 167. It thus held that the petition lacked a valid reorganizational purpose and was subject to dismissal for lack of good faith under 11 U.S.C. §1112(b).

The Court relied on the statements of the debtor and its officials that the company did not need to reorganize under chapter 11, considering that it was "financially healthy, would continue its 'normal business operations' despite bankruptcy,' and was experiencing 'healthy and growing success.'" Id. at 166. The Court also determined that there was no evidence that the debtor "had difficulty meeting its debts as they came due, that it had any overdue debts, or that it had defaulted on any debts." Id.

With respect to the debtor's contention that adverse judgments in the antitrust actions could cause the debtor financial ruin, the Court found no evidence to support this claim. Id. at 163. To the contrary, the Court determined that at the time of filing, the debtor had an untouched reserve, and "no evidence was presented with respect to the amount sought by the antitrust plaintiffs beyond SGL Carbon's repeated characterization of their being 'unreasonable.'" Id.

The Court acknowledged that companies have been permitted to seek bankruptcy protection "when faced with pending litigation that poses a serious threat to the

companies' long term viability," but observed that "[i]n those cases, debtors experienced serious financial and/or managerial difficulties at the time of filing." Id. at 164.

The Court noted that in In re Johns-Manville Corp., 36 B.R. 727 (B.K.S.D.N.Y. 1984), which the debtor relied on to support its filing, an increase in asbestos claims "forced the debtor to either book a $1.9 billion reserve thereby triggering potential default on a $450 million debt which in turn could have forced partial liquidation, or file a Chapter 11 petition." Id. at 730. SGL Carbon by contrast---like Grace---faced no such financial consequences at the time of filing. "Although SGL Carbon may have to file for bankruptcy in the future, such an attenuated possibility standing alone is not sufficient to establish the good faith of its present petition." SGL Carbon, 200 F.3d at 164.

The Third Circuit also questioned the debtor's reliance on Johns-Manville because the court in that case expressed a very narrow view of the "good faith" requirement, and suggested that a petitioner lacks good faith "only if filed by a creditor-less company formed as a sham solely for the purpose for filing a bankruptcy petition, by a company that never operated legitimately, or by a company wishing to forestall tax liability or deed of trust papers." Id. (citing In re Johns-Manville, 36 B.R. at 737-738).

In reaching its decision that the debtor's motivation to improve its litigation position precluded it from meeting the good faith requirement under 11 U.S.C. § 1112(b), the Third Circuit acknowledged the impact of the Supreme Court's decision in Ortiz v. Fiberboard Corp., 527 U.S. 815 (1999), and Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997).

> [W]e are cognizant that it is growing increasingly difficult
> to settle large scale litigation...We recognize that
> companies that face massive potential liability and
> litigation costs continue to seek ways to rapidly conclude

41

> litigation to enable a continuation of their business and to
> maintain access to the capital markets.

SGL Carbon, 200 F.3d at 168.

The Court also appreciated the attraction that the Bankruptcy Code provided for

such companies. Nevertheless, the Court recognized that necessary limits that had to be

placed on the reach of the Code in order to ensure its integrity and to protect the rights of

the parties involved.

> As evidenced by SGL Carbon's actions in this case, the
> Bankruptcy Code presents an inviting safe harbor for such
> companies. But this lure creates the possibility of abuse
> which must be guarded against to protect the integrity of
> the bankruptcy system and the rights of all involved in such
> proceedings. Allowing SGL Carbon's bankruptcy under
> these circumstances seems to us a significant departure
> from the use of Chapter 11 to validly reorganize financially
> troubled businesses.

Id.

Thus, were we to accept all of Grace's self aggrandizement of its business, which

we have no reason to doubt, as well as the correctness of its view that all asbestos claims

are without merit for scientific or procedural reasons, then SGL Carbon would require

this case to be dismissed if the purpose of this chapter 11 was shown to be Grace's effort

to merely rearrange the landscape of asbestos litigation. When viewed against the

backdrop that Grace depicts about itself and the validity of asbestos claims, the Debtors'

Case Management Proposal presents a veritable Hobson's choice for Grace: Get out of

the asbestos litigation business or get out of this Court.

The only justification we can conceive of for this chapter 11 is that Congress

facilitated the bankruptcy remedy for asbestos companies---arguably, for solvent

companies, as well as insolvent ones---upon its enactment of section 524(g). We note,

however, that Congress has persistently refused to extend the same relief to other industries confronted with mass tort liabilities. The inescapable conclusion, borne out by the results in every asbestos bankruptcy since the enactment of section 524(g), is that those asbestos companies which choose this course of action must exit chapter 11 via the establishment of qualified asbestos trusts and the trusts are charged with the determination and payment of asbestos claims, not the debtors. Thus, the only issue for the debtors is how they fund the trusts. At the risk of being repetitive, that issue does not and cannot entail litigation of the liquidated amounts of asbestos claims in the bankruptcy courts; it merely entails the estimation of those claims.

The Debtors' proposal that we now embark upon consolidated discovery and hearings on motions for summary judgment based on scientific evidence, statutes of limitations and principles of *res judicata*, are unnecessary, ill conceived, time consuming and expensive. They are unnecessary because section 524(g) provides a claims resolution mechanism and the process of estimation can statistically and empirically accommodate these theories. Indeed, the proposal is inconsistent with section 524(g) calling into question the propriety of Grace's invocation of bankruptcy in the first instance. They are ill conceived because each claim is subject to the laws of the state in which it arose, not some notion of federal common law. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law."); Grogan v. Garner, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law."). It is ludicrous to even suggest that asbestos claims

43

that are wholly factually unrelated can be heaped into "various categories" and then determined en mass under different state law theories of preclusion which are entirely dependent upon the nuances of each state's laws, as well as the facts of each claim, when the touchstone of summary judgment is that there are no material facts in dispute.

Moreover, Grace's proposal for the consolidation of the so-called "common threshold issues" is entirely inconsistent with the positions it has taken in actions brought against it prior to bankruptcy. For example, in <u>Dayton Independent School District</u>,[37] 82 Texas Public School Districts sought to recover the cost of abating asbestos containing material in approximately 600 public buildings. Grace vigorously opposed the schools' efforts to consolidate their claims for trial pursuant to Rule 42. In its pleadings opposing the court's trial format to initially try the claims of just 5 school districts on certain common issues pursuant to Rule 42, Grace represented to the court as follows:

> It may prove true that for some theories, like negligence, a school in Dallas purchased MonoKote MK-3 for its building at the same time that Dayton ISD allegedly purchased that product for its school. This coincidence is now difficult to predict. It is essential to understand, however, that any judgment of liability for those coincident schools will be based upon the determination of all of the elements of negligence (<u>e.g.</u>, duty to warn, failure to warn, demonstrated harm, proximate causation of harm, absence of intervening cause, comparative fault calculations, etc.). thus, what will be adjudicated for the claim of Dallas ISD with respect to its school that purchased MonoKote MK-3 in 1961 will differ as to liability from what will be adjudicated for the claim of Dayton ISD for its 1961 constructed school.
> Further, with respect to strict liability, the issue to be adjudicated for liability is equally fragmented over time and by specific facts developed as to each separate building... .
> Thus, the issue of defectiveness will necessarily vary building by building even within each school district.

---

[37] See, footnote 3.

In each building, the issues will be whether the asbestos fibers, if any, found in the air came from a ceiling product (as opposed to ambient air, pipe and boiler insulation, floor tiles, etc.) and whether they pose a detectable and unreasonable danger. The condition of the material in each building is thus essential evidence for each claim of strict liability, just as the Dayton officials believed in 1984... . Further, the elements of strict liability include as well injury and comparative causation. Building conditions and maintenance are thus conspicuously relevant. Moreover, even in a design defect claim, state of the art evidence is admissible and relevant to the technological environment as of the time of sale. (citations omitted). The dimension of time therefore joins the splintering of claims by building conditions even under strict liability.

\*\*\*

It is not practical, in this procedural, legal and factual environment, to carve out artificial, theoretical questions for common resolution as those general questions will not be the basis of any liability adjudication. The creation of such general questions would resolve nothing for the five plaintiffs in the initial trial.

Moreover, Article III of the Constitution empowers federal courts to hear and determine "cases and controversies." "The case or controversy requirement of Article III of the Constitution is fundamental, and dictates that legal issues be presented in the context of actual cases and not in the abstract." (citation omitted)... .

\*\*\*

The splintering out of abstract questions as to some aspect of a claim would also defeat the Seventh Amendment requirement that interrelated issues be tried to a single jury.

\*\*\*

45

It is also possible for parties to agree that a "test case" be litigated which will be treated by the parties as determinative of particular issues in other cases. This procedural device requires the agreement of the parties who thereby waive their rights to jury trial of other claims. For all of the reasons set out above, Grace and [United States Gypsum] expressly decline to treat the initial trial as a "test case." The issues for each plaintiff and for each building are simply too fact-specific to admit of resolution in a fashion divorced from the particular facts that establish the adverse legal claims of the parties.

Submission by W. R. Grace & Co. and United States Gypsum Company Regarding Common Issues at 7-14, Dayton Independent School District, et al. v. W. R. Grace & Co.' et al., attached as Exhibit D (emphasis added).

Likewise, in its opposition to class certification in Kirbyville Independent School District, et al. v. Asbestospray Corporation, et al.,[38] in which the State of Texas, its agencies, public colleges and universities, as well as 352 other governmental entities sought to recover abatement costs for approximately 500 buildings, Grace argued:

Once the individual members of the putative class have identified the products contained in their buildings, to recover damages, they will also have to show how much of that product is present, where it is located, the condition of the product and the potential hazards posed by that product as installed in that particular building, including the friability of the asbestos as installed, and the asbestos level in the air in each building. Whether asbestos-containing materials installed in buildings are hazardous cannot be answered in the abstract or in a vacuum. (citation omitted). Rather determining whether defendants' products pose any hazard - which is obviously an essential element of plaintiff's case - requires a site specific, building by building analysis... .

\*\*\*

In some cases, the defenses to liability raised by the defendant have been held to raise a common issue of sufficient importance to provide a basis for class certification. (citation omitted). However, in the present case, no defense raises an issue common to the class as a whole. A variety of defenses will

---

[38] Id.

be available to certain of the defendants in response to certain of the plaintiffs' claims, and in each case, the particular defense will depend on the particular individual facts applicable to the specific parties involved. For example, as to all plaintiffs, many claims may be reduced or eliminated by virtue of an analysis of comparative fault or intervening cause. Each individual member of the proposed class is likely to have had different levels of knowledge concerning asbestos that each acquired at different times. Further, in many cases, engineers and architects participated in the decisions to install asbestos-containing materials and decided what type of asbestos-containing product to use, and in what quantities, in the various buildings to members of the proposed class. Those sophisticated agents may well be partially responsible for the damages, if any, that plaintiffs allegedly suffered.

Issues of timing that are relevant to statutes of limitations and repose defenses are also individual in character and incapable of being decided on a class-wide basis. The date of the installation of the asbestos will differ from plaintiff to plaintiff and even from building to building. Thus, the availability of the statute of repose as a defense to plaintiffs' claims will have to be decided on an individual basis. With regard to the statute of limitations, some of the individual class members may be protected by Section 16.061 of the Texas Civil Practice and Remedies Code, which provides that the claims of certain public entities will not be barred by statutes of limitations, while others cannot rely on Section 16.061. Thus, the applicability of the statutes of limitations raises individual issues of both fact and law.

The "state of the art" defense is also not a predominant common question here. The precise outlines of the "state of the art" will differ from defendant to defendant depending on the state of knowledge of each defendant and the time period during which asbestos-containing materials were installed in particular buildings. It is clear that the "state of the art" defense will thus be highly dependent on individual facts.

Defendant W. R. Grace & Co.-Conn.'s Opposition to Plaintiffs' Motion For Class Certification at 33-35, Kirbyville Independent School District, etc. v. Asbestospray Corporation, et al.,[39] attached as Exhibit E.

Ever the alchemist in its bankruptcy laboratory, transforming their previous "good faith" representations to the courts presiding in the underlying cases, Grace now takes the

---

[39] Id.

opposite view that it can uniformly dispose of "common threshold issues" such as statutes of limitations and causation as to all categories of asbestos property damage claims.[40]

Adding insult to injury, is the Debtors' notion that the Court appoint a "Litigation Committee" to represent Zonolite Attic Insulation claimants in this folly. (Debtors' Case Management Proposal Memorandum at 46). Testimony to the Debtors' intellectual dishonesty in respect of this proposal is its promotion of the fiction that the bankruptcy courts in other asbestos and mass tort cases "have routinely appointed special committees to represent [the interests of asbestos and mass tort] claimants in common issue litigation." (Id. at footnote 26). None of the committees referred to by the Debtors to make their point were appointed for the purpose the Debtors contend; they were appointed for the same purposes served by the PD Committee, the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Unsecured Creditors in this case. See, 11 U.S.C. §1103(c).

Furthermore, the appointment of a "Litigation Committee" would merely serve to reverse the certification of class representatives in pending Zonolite Attic Insulation class actions that already have been certified, such as Barbanti and Anderson Memorial Hospital, as well as derail any legitimate effort to certify other pending Zonolite Attic Insulation class actions. The PD Committee is unaware of any authority conferred upon this Court to undo the appointment of a class representative. In fact, it occurs to us that this was the Debtors' hidden agenda by this unprecedented proposal, once again calling

---

[40] See, In re Chambers Development Company, 148 F.3d 214, 229 (3rd Cir. 1998) ("Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in (cont'd) the same or in a previous proceeding...designed to prevent litigants from playing fast and loose with the courts.").

into question whether the Debtors had a legitimate reorganization purpose when they filed these chapter 11 cases.

## H. Rule 42 Common Issue Trials

The Debtors' Case Management Proposal sheds little if any light on the purpose or the scope of the proposed Rule 42 trials it would have this Court convene upon the conclusion of the ill begotten summary judgment hearings. Then again, since these trials are not proposed to commence until the Second Quarter of 2003, and given all of the mischief and comic possibilities which would precede the trials under the other aspects of the Debtors' Case Management Proposal, the Debtors may be well advised to leave for another day greater definition of this ultimate event.

Without further illumination, the PD Committee is unable to fully assess this proposal. However, all of the concerns we have expressed concerning the propriety and wisdom of approaching this asbestos bankruptcy proceeding as though a consolidated litigation in defiance of section 524(g), ample precedent from prior asbestos bankruptcies, and the fundamental Constitutional and state law rights of asbestos claimants, are likewise applicable to this proposal.

The only common issue worthy of a Rule 42 trial is the estimation of the Debtors' asbestos property damage claims. In relatively short order, The PD Committee can be in a position to present the testimony and evidence of its estimation experts and witnesses to the Court. We are under the impression that the Debtors have likewise engaged such an expert of their own. If not, they certainly can do so. An estimation trial can be concluded

49

in less than one month whereupon the parties can begin in earnest to "reorganize" these Debtors availing themselves of section 524(g) of the Bankruptcy Code.[41] Such an elegantly simple solution---free of pretense or subterfuge---portends a far better and efficient result for all constituencies of the Debtors' estates, and promotes judicial economy. Most importantly, it will also legitimize the Debtors' invocation of chapter 11.

## IV. CONCLUSION

While Grace would have everyone believe that it was forced into chapter 11 by the onslaught of asbestos litigation, Grace's long and shameful journey to bankruptcy court actually began with its own decisions to mine asbestos and manufacture asbestos containing products and then, to continue to do so well after it learned that its activities and products caused injuries and damage. Grace apparently chooses to stay its course and to continue to erect roadblocks for those who have for far too long doggedly pursued it. Each and every element of the Debtors' Case Management Proposal represents another barrier. Respectfully, the Court should and must bring this breathtaking trip to a screeching halt.

WHEREFORE, the Official Committee of Asbestos Property Damage Claimants respectfully urges this Court to (1) deny the Debtors' Case Management Proposal; (2) enter a Case Management Order establishing deadlines and schedules for the estimation

---

[41] The PD Committee would also urge the Court to promptly appoint a Legal Representative for future claimants. Neither of the Official Asbestos Committees appointed in this case represent the interests of (cont'd) future claimants. See, *Georgine v. Amchem Prods.*, 83 F.3d 610, 630-31 (3d Cir. 1996). Practically, as well as legally, no real progress towards confirmation of a plan of reorganization can occur until a Legal Representative has been appointed. 11 U.S.C. §524 (h). The appointment of a Legal Representative is the only constitutionally permissible means of ensuring the right of future claimants to due process, as well as to obtain a channeling injunction applicable to future claims. See generally, Ralph R. Mabey & Jamie Andre Gavrin, Symposium on Bankruptcy: Chapter 11 Issues: Constitutional Limitations on the Discharge of Future Claims In Bankruptcy, 44 S.C.L. Rev. 745, 784 (1993).

of asbestos property damage claims; (3) appoint a Legal Representative for future claimants; and (4) grant such further relief as it deems just and appropriate.

Dated: September 7, 2001

Respectfully submitted,

BILZIN SUMBERG DUNN BAENA
PRICE & AXELROD LLP
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
Telephone: (305) 374-7580

Scott L. Baena (Admitted Pro Hac Vice)

and

FERRY & JOSEPH, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899
Telephone: (302) 575-1555

By: _____

Michael B. Joseph
(Del. Bar No. 392)
Theodore J. Tacconelli
(Del. Bar No. 2678)

CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY
DAMAGE CLAIMANTS

526835

51