# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                              )          Chapter 11
                                    )
W.R. GRACE & CO., et.al.,           )          Case No. 01-01139 (JJF)
                                    )
Debtors.                            )          Jointly Administered

## OPPOSITION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF NOTICE PROGRAM

CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax:    (212) 644-6755

One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5088
Telefax:    (202) 429-5088

CAMPBELL & LEVINE, LLC
Chase Manhattan Centre
1201 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone:   (302) 426-1900
Telefax:     (302) 426-9947


Counsel for the Official Committee of
Asbestos Personal Injury Claimants

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iv

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND ..........................................................................................................6

III.  DISCUSSION ..............................................................................................................9

    A.    DEBTORS CONTEMPLATED SUMMARY JUDGMENT
        PROCEEDINGS DO NOT WARRANT A BAR DATE OR AN
        ONEROUS PROOF OF CLAIM FORM .............................................................10

        1.    Debtors' First Two Issues For Summary Resolution – Exposure
            And Causation – Are Questions Of Fact That Must Be
            Determined As To "Individuals, Not Groups" .........................................11

        2.    Debtors Also Cannot Obtain Summary Judgment As To The
            Third Issue Of Whether Thousands Of Individual Claimants
            Suffer From A "Clinical Asbestos-Related Disease" .................................14

    B.    BECAUSE PERSONAL INJURY CLAIMS WILL BE HANDLED
        BY A TRUST TO BE CREATED UNDER 11 U.S.C. § 524(g),
        DEBTORS' "ESTIMATION AND LIQUIDATION" CONCERNS
        ARE UNFOUNDED............................................................................................16

        1.    The Section 524(g) Trust, Not This Court, Will Liquidate The
            Asbestos Personal Injury Claims After The Close Of These
            Chapter 11 Proceedings ...........................................................................16

        2.    The Information Sought By Debtors' Proposed Claim Form Is
            Neither Necessary Nor Useful For Purposes Of Estimating
            Debtors' Asbestos Personal Injury Liabilities .........................................19

         3.    No Other Court In A Mass Tort Bankruptcy Has Ever
            Required A Proof Of Claim Form As Onerous As That Which
            Debtors Purpose ........................................................................................20

    C.    MOST IMPORTANTLY, DEBTORS' PROPOSALS WOULD
        EXTINGUISH THOUSANDS OF VALID ASBESTOS PERSONAL
        INJURY CLAIMS FOR NO LAWFUL REASONS............................................24

1.    Debtors' Proposals Are A Trap Whereby Thousands Of Valid Asbestos Personal Injury Claims Will Be Barred Forever..................................................................................25

    a.    The Proof Of Claim Form Is So Massive And Technically Flawed That It Is Impossible to Complete.................26

    b.    The Production Of Medical Documents That Debtors Demand Is More Extensive And Intrusive Than That Required In Full Discovery In The Tort System...........................27

    c.    Many Claimants And Their Lawyers Will Not Even Have The Information Demanded ...................................................28

2.    The Costs To Debtors' Estate Will Be Staggering And The Delays In This Proceeding Substantial ......................................................30

3.    Under Debtors' Proposal, An Estimated 200,000 Claimants Would Have To Complete The Claim Form, Which Would Take Over 600,000 Person Hours And Cost Over $24 Million.................31

4.    The Alleged Spike In Debtors' Claims Filings Does Not Warrant Their Proposed Bar Date And Proof Of Claim Process ........................................................................................................31

5.    There Is Much More A Sensible Way To Approach This Matter .............32

D.    A CLOSE LOOK AT THE DETAILS OF DEBTORS' PROPOSED CASE MANAGEMENT ORDER MAKES STRIKINGLY PLAIN THE INESCAPABLE FLAWS IN DEBTORS' SCHEME ...................................33

1.    There Is No Support In The Law For Denying Claimants The Right To Choose Their Own Lawyers And Forcing Them To Be Represented By An Appointed "Personal Injury Litigation Committee" ...........................................................................34

2.    There Is No Support In The Law For Permanently Disallowing Claims For "Incompleteness"...............................37

3.    At Bottom, Debtors' Proposal Contemplates The Impossible: Full-Blown Discovery Of 200,000 Individual Tort Claims Within Six Months.................................................................................39

4. Because Debtors' Scheme Would Still Leave Recovery Of
Damages To The § 524(g) Trust After Years Of Jury Trials.
The Trust Should Simply Be Allowed To Handle The
Entirety Of The Claims Process. As Congress Intended ...........................40

IV. CONCLUSION .......................................................................................................42

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................10, 36

*Butner v. United States*, 440 U.S. 48 (1979) ................................................................................11

*Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) ..................................... 3, 9, 11-14, 41

*Dunn v. Hovic*, 1 F.3d 1371 (3d Cir. 1993) ..................................................................................10

*Eagle v. Shell Oil Co.*, 133 F.R.D. 600 (D. Colo. 1990) ................................................................37

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985) ......................................................................36

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982) .........................................................................36

*Government of India v. Cook*, 569 F.2d 737 (2d Cir. 1989) ..........................................................35

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D. Ind. 1995) ..............................................................36

*In re Babcock & Wilcox Co.*, No. 00-0558, slip op. at 21 (E.A. La. Aug. 25, 2000) .....................22

*In re Babcock & Wilcox Co.*, 2000 WL 1511175, at *1 (E.D. La. Oct. 6, 2000) ...........................22

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997) ............................................................12

*In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*,
   1999 WL 387322 (E.D. Pa. 1999) .....................................................................................23

*In re Eagle-Picher Indus., Inc.*, 137 B.R. 679 (Bankr. S.D. Ohio 1992) ............................20, 24, 33

*In re Eagle-Picher Indus., Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995) ............................21, 24, 33

*In re Fibreboard*, 898 F.2d 706 (5th Cir. 1990) ......................................................................11, 12

*In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
   693 F.2d 847 (9th Cir. 1982) ........................................................................................35, 36

*In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1996 WL 900350
   (E.D. Pa. June 10, 1996) ...................................................................................................23

In re Orthopedic Bone Screw Prod. Liab. Litig., 1997 WL 704702
(E.D. Pa. Aug. 22, 1997)...................................................................................................23

In re Stone & Webster Incorporated, Case No. 00-2142 (RRM).
(D. Del., July 18, 2000)....................................................................................................33

International Bus. Machs. v. Fernstrom Storage and Van Co.
(In re Fernstrom Storage and Van Co.), 938 F.2d 731 (7th Cir. 1991).........................17, 18

Malcolm v. National Gypsum Co., 995 F.2d 346 (2d Cir. 1993)......................................................12

Metro-North Commuter R.R. v. Buckley, 521 U.S. 424 (1997).................................................14

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999).........................................................................18

PGH Int'l v. Gabor Shoes AG (In re PGH Int'l, Inc.),
222 B.R. 401 (D. Conn. 1998)........................................................................................35

Raleigh v. Stoecker, 120 S. Ct. 1951 (2000)..........................................................................3, 11

Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss),
67 F.3d 1394 (9th Cir. 1995).........................................................................................18

Richardson-Merrell, Inc. v. Koller, 472 U.S. 424 (1985)..............................................................34

Schweitzer v. Consolidated Rail Corp., 758 F.2d 936 (3d Cir. 1985)...........................................14

Simmons v. Pacor, Inc., 674 A.2d 232 (Pa. 1996)......................................................................15

Simmons v. Savell (In re Simmons), 765 F.2d 547 (5th Cir. 1985)...................................17, 25, 38

Sterling v. Velsicol Chemical Corp., 855 F.2d 1188 (6th Cir. 1988)..............................................12

Summer v. Fuller, 718 F. Supp. 1523 (N.D. Ga. 1989)..............................................................35

Verbyke v. Owens-Corning Fiberglas Corp., 84 Ohio App. 3d 388,
616 N.E.2d 1162 (Ct. App. 1992)...................................................................................15

## STATUTES AND REGULATIONS

11 U.S.C. § 501(a) ............................................................................................................17

11 U.S.C. § 502...............................................................................................................25

11 U.S.C. § 502(a) ...........................................................................................................17

11 U.S.C. § 502(c) ................................................................................................................3, 9, 13, 19

11 U.S.C. § 524(g) ..................................................................................................................... passim

11 U.S.C. § 524(h) ...........................................................................................................................18

11 U.S.C. § 1111(a) .........................................................................................................................17

11 U.S.C. § 1126 ..............................................................................................................................16

11 U.S.C. § 1126(c) ...........................................................................................................................4

11 U.S.C. § 1126(d) ...........................................................................................................................4

28 U.S.C. § 157(b) ...........................................................................................................................13

28 U.S.C. § 1411 .............................................................................................................4, 11, 13, 24

28 U.S.C. § 1411(a) .........................................................................................................................41

Bankruptcy Rule 3001(a) .............................................................................................................4, 24

Bankruptcy Rule 3002(a) .................................................................................................................17

Bankruptcy Rule 3003(c) ............................................................................................................17, 24

Bankruptcy Rule 7056 .....................................................................................................................11

Bankruptcy Rule 7056(c) .................................................................................................................39

Fed. R. Civ. P. 23 ........................................................................................................................35, 36

Fed. R. Civ. P. 56 ........................................................................................................................11, 39

## OTHER AUTHORITIES

*Collier on Bankruptcy*, § 502.2 ........................................................................................................17

3 *Collier on Bankruptcy*, ¶ 501.01 ...................................................................................................17

7 *Collier on Bankruptcy*, ¶ 1111.02[1] (15th Ed. 1985) .................................................................17

Michael Moss and Adrianne Appel, *Company's Silence Countered Safety*
*Fears About Asbestos*, N.Y. TIMES, July 9, 2001, at A10 .............................................................6-8

## I.   INTRODUCTION

In their Motion, Debtors seek approval of an unprecedented package of extraordinarily
expensive, burdensome and time-consuming bar date, proof of claim, notice and case
management programs, each of which is designed to eliminate from their pool of creditors large
numbers of legitimate asbestos personal injury claimants represented by the Official Committee
of Asbestos Personal Injury Claimants (the "Committee"). Because Debtors' proposals have no
support in the law and are grossly unjust by any measure, and because they would accomplish
nothing at enormous cost to the estate, they should be rejected.

The particulars of Debtors' plan are lengthy. Debtors first propose a vaguely-defined
print and media program for notifying potential claimants of their proposed bar date and proof of
claim procedures within 60 days of Court approval. *Debtors' Memorandum In Support of
Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve
Claim Forms, and Motion to Approve Notice Program* ("Mem."), at 45. Debtors would go on to
require as many as 200,000 individuals with asbestos personal injury claims to file on or before
April 1, 2002 (regardless of when, or even whether, they received notice) a proposed proof of
claim form that demands more information than is required to prosecute a full-blown jury trial in
the tort system. *Notice of Debtors' Motion for Entry of Case Management Order, Establishment
of a Bar Date, Approval of the Proof of Claim Forms and Approval of Notice Program*
("Motion"), at 2.

Next, Debtors would allow themselves 60 days, until June 30, 2002, to "audit the
completeness and reliability" of the claims, and they would submit an initial audit report to the
Court and interested parties by September 1, 2002. Motion at 9. On or about July 1, 2002, a so-
called "Personal Injury Litigation Committee" would be appointed to "represent Asbestos

Personal Injury Claimants in common issues litigation." *Id.* Then. by September 1. 2002. Debtors would file a motion to disallow "incomplete claims." *Id.*[1]

As for those claims that survived the threshold audit for "completeness." Debtors would file an "omnibus" summary judgment motion by January 1, 2003. in which they would seek global rulings as to the purported absence of particularized evidence across thousands of individual claims. *Id.* at 9–10. Specifically, the motion would focus on three issues. which by their very terms raise substantial questions of material fact: (i) whether the thousands of individual asbestos personal injury claims in question present sufficient evidence that the claimants were exposed to one or more asbestos-containing Grace products: (ii) whether the claimants' injuries were caused by exposure to such a product: and (iii) whether the claimants have "clinical" asbestos-related illnesses. *Id.* at 10, 9. Debtors would then allow for discovery until July 1, 2003. with a hearing on the summary judgment motion contemplated in August 2003. *Id.* at 10. If the Court found material facts in dispute (an absolute certainty, given the fact-intensive nature of asbestos personal injury claims). an "FRCP 42 common issue bench trial" would be conducted in the third quarter of 2003. *Id.*

As discussed in more detail below. Debtors' extraordinary proposal should be flatly rejected. To begin with. the very idea that this Court could force upon tens of thousands of claimants a single "Personal Injury Litigation Committee" to represent them in defending against motions to disallow their claims is absurd. Claimants have the right to choose their own lawyers. But notably. once it is deprived of this draconian measure. Debtors' entire scheme swiftly

---

[1]    It is unclear from Debtors' papers whether the Asbestos Personal Injury Litigation Committee would be permitted to file an omnibus response to the Debtors' objections and motion to disallow "incomplete claims." or whether individual claimants would have an opportunity to be heard on whether their claims should be barred, all within the 30 days allowed.

unravels. Surely. no one would argue that the filing and hearing of tens of thousands of oppositions to Debtors' proposed motions is a more efficient means of resolving these claims than proceeding with estimation of such unliquidated claims as is contemplated by section 502(c)(1) of the Bankruptcy Code (the "Code").

Nor, for that matter, is there any precedent for the idea that "incomplete" claims may be dismissed outright. The Code assumes that proofs of claim are valid and puts the burden on Debtors to make an evidentiary showing to the contrary. And even if there were some authority for turning this statutory principle on its head, at best, Debtors' proposed motion to disallow could succeed only in requiring claimants to submit additional information.

Moreover, as a general matter. Debtors' plan must be rejected because the main justification for it -- the need to gather information to support summary judgment motions that have no chance of succeeding -- is baseless. Notwithstanding the pages Debtors devote to decrying "the significant legal barriers" to resolution of asbestos claims "within the tort system," *W.R. Grace & Company's Informational Brief* ("Informational Brief") at 40, the fact remains that state tort law governs the substance of asbestos personal injury claims in bankruptcy. *Raleigh v. Stoecker.* 120 S. Ct. 1951, 1953 (2000). And it strains credulity even to suggest that, *as a matter of law in all fifty states*, large numbers of individuals have no legitimate claim here. Further, the federal Court of Appeals case law addressing this very issue makes plain that the three issues that Debtors have identified as susceptible to disposition by an omnibus summary judgment motion raise *individual* issues of fact and law that can only be addressed on an *individual* claim basis. *See Cimino v. Raymark Indus., Inc..* 151 F.3d 297 (5th Cir. 1998). Finally. the proposal that claims surviving summary judgment (which would undoubtedly be the vast majority of such

claims) can be resolved by a common issue bench trial simply ignores the claimants' jury trial rights established by 28 U.S.C. § 1411.

In any event, a bar date procedure for asbestos personal injury claimants is wholly unnecessary in light of section 524(g) of the Bankruptcy Code which, if its requirements are met, channels present and future asbestos claims into a trust created by the Court that will liquidate and pay those claims *after* confirmation. Given the special treatment of asbestos claims under this statutory provision, the only useful purpose served by a bar date for asbestos-related personal injury claims is to implement the voting procedures required by sections 1126 (c) and (d), and 524(g)(1)(B)(i)(IV)(bb) of the Code.

In addition, if Debtors' bar date and proof of claim proposal is approved, the resultant costs to claimants and the estate -- as well as the delays to these proceedings -- would be enormous. According to the Committee's expert on claims estimation analysis and procedures, Dr. Mark A. Peterson, as many as 200,000 asbestos personal injury claimants would have to spend an estimated 600,000 person-hours at a cost of over $24 million to fill out the 11-page proof of claim form which, for claimants who worked at only 20 occupations and sites combined over their entire careers, contains *over 800 questions* seeking information that in large part will not even be *available* to claimants and their lawyers. Peterson Aff., at ¶¶ 24, 29, 31.[2] The vast majority of courts that have presided over previous asbestos and other mass tort bankruptcies, in contrast, have refused to order the completion of anything beyond the Form 10. *Id.* at ¶¶ 9, 10. Indeed, the Bankruptcy Rules expressly provide that the proof of claim form "shall conform substantially" to that simple, one-page questionnaire. Bank. R. 3001(a); Peterson Aff., at ¶ 9.

---

[2] An affidavit prepared by Dr. Peterson setting forth his curriculum vitae and opinion regarding Debtors' proposed bar date and proof of claim procedures (hereinafter "Peterson Aff.") was filed contemporaneously herewith and is incorporated by reference herein as Exhibit A.

:D0000459 1 ;

- 4 -

Worse yet. Debtors' proposed form is so ambiguous. confusing, and massive that it virtually guarantees omissions and good-faith errors.  Consequently, the claims of those individuals who are unable to provide "complete" information (a group likely to include most of the claimants subject to the bar date) would be barred forever under Debtors' proposal. regardless of whether the claims could have been successfully prosecuted in the tort system. This result clearly violates the spirit if not the letter of the Bankruptcy Code.

In sum, the bar date, proof of claim, notice and case management proposals in Debtors' motion so unfairly and improperly prejudice the rights of the Committee's constituency to pursue their asbestos personal injury claims in this Chapter 11 proceeding that they should be rejected out-of-hand.  Debtors should not be allowed, and asbestos personal injury victims should not be required. to waste huge amounts of time and money on a program whose purposes are so patently improper.  Nor should this Chapter 11 proceeding be delayed for what will clearly be several years while Debtors' wasteful program runs its course.  As explained in detail below, Debtors' scheme assumes complete discovery and jury trials before this Court on the "validity" of an estimated 200,000 claims. This is impossible.  Moreover, payment of damages would fall to the section 524(g) trust anyway.  Rather than spend an exorbitant amount of the Court's time and the estate's money on an endeavor that would serve no useful or legitimate purpose, Debtors should get down to the business of estimation now, to be followed by plan confirmation in due course. and allow the subsequent allowance and payment of claims to be carried out by a section 524(g) trust as Congress envisaged.  The Committee thus requests that Debtors' motion be denied.

## II.  BACKGROUND

According to Debtors. W.R. Grace's "meaningful" participation in the asbestos industry

began with the purchase of the Zonolite Company in 1963. Informational Brief at 4.[3]  Zonolite

produced a material called vermiculite from a mine in Libby, Montana. *Id.* at 6.  When mined,

vermiculite ore contained tremolite, a form of asbestos, in amounts as high as 30%.  *Id.*

According to Grace, after milling, the vermiculite contained 1-3% asbestos.  *Id.*  In turn,

vermiculite made up roughly 30% of the chief fireproofing product being sold by Zonolite when

Grace acquired it.  That product, Monokote-3 ("MK-3"), also contained 10% asbestos added in

chrysotile form.  *Id.*  Grace's MK-3 was wet-sprayed through a blowing machine to provide fire

protection for enclosed steel beams in large commercial structures.  *Id.* at 10, 9.

In 1970, Grace began selling Monokote-4 ("MK-4") and, in 1972, Monokote-5 ("MK-5"),

the latter of which replaced MK-3 completely in 1973. *Id.* at 12. Debtors characterize both

products as "free of commercially added asbestos." *Id.* at 11. However, a company research

executive in 1973 reportedly wrote that, on average, 0.2 to 0.5 percent asbestos remained in

Monokote by virtue of the tremolite in the vermiculite ore, a figure that could be higher

depending on how the tremolite was distributed. *See* Michael Moss and Adrianne Appel,

*Company's Silence Countered Safety Fears About Asbestos*. *N.Y. Times*. July 9, 2001, at A10

(attached as Exhibit B).  Other Grace records reportedly show independent laboratory

measurements of as much as 5 percent asbestos in Monokote at that time. *Id.* The company

apparently never did produce a Monokote product "that was truly asbestos free" until 1980. *Id.*

---

[3]     This background section is based on Debtors' filings, and an article in the *New York
Times*. There has not yet been discovery to determine in more detail the nature of Grace's
asbestos liability.

As of 1977, however, "Monokote was America's leading fireproofing material," with Grace reportedly estimating that it was used on "60 percent to 80 percent of the roughly 150,000 steel-frame structures built during the 1970's and 80's." *Id.* Although *The New York Times* reports that Grace initially claimed that tremolite posed no health risk, contemporaneous company memoranda show that more than 40 percent of the Libby mine workers were contracting asbestos-related diseases after 10 years of work, as were 28 percent of Grace's processing workers. *Id.* One in 10 hamsters injected with tremolite from Libby in connection with research commissioned by Grace in 1976 reportedly developed tumors. *Id.* The same article reports that Grace's records show reformulated Monokote shedding triple the number of asbestos fibers than is allowed under current labor-safety rules. *Id.* Federal researchers reportedly estimate that these levels would lead to more than 10 deaths for each 1,000 workers who used the spray daily over their working careers. *Id.* And, importantly, the spray was reportedly used at over 100,000 construction projects, exposing as many as 40 workers in various occupations at any one job site. *Id.*

Apparently, the first public disclosure by the company of the fact that MK-5 contained *any* trace of a harmful substance was in 1986, when Grace mentioned tremolite in safety sheets sent to companies using Monokote. *Id.* Up to that point, documents reportedly show that Grace "weighed the risks and stayed the course" by telling customers who inquired that Monokote contained no asbestos. *Id.* The *Times* reports that, "[i]n the silence, workers using the reformulated Monokote say they stopped wearing the cumbersome respirators designed to block asbestos fibers." *Id.* "'With the asbestos-free, we wore paper masks,' said Harry D. Starratt, a retired sprayer from Andover, Mass. 'There was never supposed to be harm in it.'" *Id.* Notably,

"'[u]ntil speaking with a reporter. Mr. Starratt did not even know that the new Monokote also had some asbestos. and he has no way of knowing if it compounded his health problems." *Id.*[2]

Against this backdrop of deceit. Grace seeks to extinguish all claims of asbestos personal injury victims who fail to file on or before April 1. 2002. a proof of claim that includes. for example. dates for. and a description of. *each* job. *each* job site. *each* asbestos-containing product used at *each* job, and the reasons for claimant's belief that it was a Grace product. Though this proposal poses massive problems for an individual who applied MK-3 at dozens, or perhaps hundreds, of job sites prior to 1973, without discovery. it is a virtually impossible task for those who used MK-4 or MK-5 with the explicit understanding -- promoted by W.R. Grace -- that the products were asbestos-free.

As *The New York Times* puts it, "since asbestos-related disease takes upwards of 40 years to develop. the clock is still ticking for them. the ones who worked construction only after they thought asbestos was history." *Id.* In other words. although many legitimate claimants may not even know their asbestos illness was caused by asbestos exposure to Grace asbestos precisely because W.R. Grace led them to believe Monokote was asbestos-free. Debtors seek to permanently penalize them for their failure to file a proof of claim package so complete that they conceivably could be ready for trial on the bar date itself.

---

[2]     Debtors make the spurious allegation that they were forced to seek Chapter 11 protection because "they have experienced since 1999 a spike in personal injury claims that is unsupported by any principle of science or law." Mem. at 13. Grace knows better than anyone that this one-year increase resulted from the unprecedented unfavorable publicity it received in 2000 about its continued mining and sales of asbestos-containing vermiculite throughout most of the 1980s, more than ten years after other manufacturers withdrew their asbestos-containing products from the market. Asbestos victims throughout the country only filed claims when they finally became aware of Grace as a manufacturer of asbestos-containing products. Peterson Aff.. at ¶ 23.

:D00000440 1 :

- 8 -

By the same token. Debtors' suggestion that "omnibus" summary judgment is available regarding whether *overall* these workers were exposed to a Grace product, whether there is a reliable scientific basis for claiming that such exposure was a substantial contributing factor in the causation of asbestos-related disease, and/or whether these individuals suffer from any asbestos-related illness, fails the "straight-face" test. The sheer number of job sites, the multiple means of exposure, the presence of competitors who marketed other forms of spray fireproofing, and the intricacies of medical science as it relates to illness, causation and individual medical and job histories make obvious that these claims are each highly fact-intensive and complex. Indeed, the Fifth Circuit in *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 315 (5th Cir. 1998), flatly rejected the precise argument Debtors advance here.

## III.  DISCUSSION

In support of their motion. Debtors contend that the proposed bar date and proof of claim procedures -- which would take over a year to complete even under Debtors' optimistic case management scenario -- are necessary to "provide specific, factual information necessary to claims litigation. estimation and liquidation of claims." Mem. at 25. Because Debtors' proposed "claims litigation" will by necessity fail. because the information sought is not necessary for the estimation of claims under section 502(c) of the Code for plan drafting and confirmation purposes. and because the liquidation of claims of asbestos personal injury victims will be carried out by a section 524(g) trust pursuant to a channeling injunction. Debtors' costly and time-consuming programs must be rejected.

### A.    DEBTORS' CONTEMPLATED SUMMARY JUDGMENT PROCEEDINGS DO NOT WARRANT A BAR DATE OR AN ONEROUS PROOF OF CLAIM FORM.

As demonstrated by the prominence given the issue in their brief, Debtors' primary justification for the excruciating detail of their proposed proof of claim form is an "omnibus" summary judgment motion they hope to file as to those personal injury claimants who survive Debtors' audit of their proof of claim form for "completeness and reliability." Motion at 9; *see generally* Mem. at Tab I. Debtors identify three issues for which they intend to seek summary judgment: (i) the absence of exposure to Grace's products; (ii) the absence of a reliable, scientific basis for claiming that exposure to Grace's asbestos products was a substantial contributing factor in the causation of the asbestos-related disease; and/or (iii) the absence of a "clinical" asbestos-related disease. Motion at 9.[5]

It is indisputable that the asbestos personal injury claims Debtors seek to dispose of on these grounds are state law claims. As the Supreme Court recognized in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610-11 & n.14 (1997), the laws of the fifty states (in addition to the laws of those other jurisdictions where claimants reside) are not uniform with respect to the issues

---

[5]     Debtors also indicate that they intend to ask the Court to disallow claims for punitive damages. Mem. at 23. The Committee submits that, as an initial matter, there is no basis for disallowing punitive damages as a matter of law in tort and thus in bankruptcy, particularly in a case in which the defendant claims to be solvent. *See, e.g., Dunn v. Hovic*, 1 F.3d 1371, 1376 (3d Cir. 1993) (affirming punitive damages award against manufacturer in asbestos case where jury could reasonably have concluded that defendant acted with reckless indifference to the rights of others in failing to warn plaintiff installers about dangers of asbestos-containing insulation). Moreover, because liability for punitive damages is based on *Debtors'* behavior, and not that of claimants, the particularized information sought by Debtors' proposed proof of claim would be entirely irrelevant to any summary judgment motion on the issue of punitive damages and, therefore, unnecessary. However, the Committee does note further that, assuming (as the Committee does) that Debtors are hopelessly insolvent, the Committee would contemplate that any plan to which it would consent would not pay punitive damages unless and until compensatory damages were paid in full.

regularly presented in asbestos personal injury cases. In bankruptcy cases, moreover, state law

"governs the substance of claims," *Raleigh v. Stoecker*, 530 U.S. 15, 15 (2000) (citing *Butner v.*

*United States*, 440 U.S. 48, 57 (1979)), and personal injury claimants have the same jury trial

rights that they have under applicable non-bankruptcy law. 28 U.S.C. § 1411. Although

summary judgment is available pursuant to Bankruptcy Rule 7056 (which incorporates Fed. R.

Civ. P. 56), the moving party still must sustain the burden of showing that there is no genuine

issue of material fact and that it is entitled to a judgment as a matter of law. This, as

demonstrated below, Debtors cannot do.

### 1. Debtors' First Two Issues For Summary Resolution — Exposure And Causation — Are Questions Of Fact That Must Be Determined As To "Individuals, Not Groups".

Debtors first suggest that their excessive proof of claim form is necessary to provide

factual support for an omnibus summary judgment motion on the issues of individual exposure to

asbestos and causation of individual claimants' asbestos-related disease. Curiously missing from

Debtors' papers, however, is a citation to *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir.

1998), which, relying on its predecessor, *In re Fibreboard*, 893 F.2d 706 (5th Cir. 1990), is the

seminal case on the question of whether tort issues like causation are amenable to "omnibus"

resolution across scores of individual claims. The answer is a resounding "No."

*Cimino* was a consolidated class action of some 3,031 personal injury and wrongful death

damage suits against several manufacturers of asbestos-containing insulation products and some

of their suppliers. The trial plan implemented consisted of three phases, the second of which was

designed to address asbestos exposure by having a jury determine which jobs at twenty-two

sample job sites involved exposure to which defendants' asbestos products for a period of

{D0000459.1}

sufficient length to cause injury, harm, or disease. *Id.* at 303.[6]  In the third phase, two juries

determined for 160 sample cases whether the plaintiffs suffered from an asbestos-related injury

or disease and, if so, what damages they incurred. *Id.*  The results of the 160 sample cases were

extrapolated, in their respective disease categories, to the 2,128 remaining cases. *Id.* at 309.  On

appeal, defendant Pittsburgh Corning attacked the trial plan on the basis that it failed to properly

try and determine individual causation. *Id.* at 311.

 The court agreed with Pittsburgh Corning, holding that "under [state] substantive law

causation of plaintiffs injury by defendant's product and plaintiff's resultant damages must be

determined *as to 'individuals, not groups.'" Id.* at 313 (quoting *Fibreboard,* 893 F.2d at 712)

(emphasis added).  The court noted that, "[w]ith one exception,[7] . . . we are aware of no appellate

decision approving such a group, rather than individual, determination of cause in a damage suit

for personal injuries to individuals at widely different times and places." *Id.* at 316.  This is

because there must be a determination as to "'each individual plaintiff . . . that his or her specific

injuries or damages were proximately caused by [asbestos].'" *Id.* at 317 (quoting *Sterling v.

Velsicol Chemical Corp.,* 855 F.2d 1188, 1200 (6th Cir. 1988)).  *See also Malcolm v. National

Gypsum Co.,* 995 F.2d 346, 350-53 (2d Cir. 1993) (disapproving consolidation for trial of forty-

eight asbestos cases because too many different individual exposures, jobs, job sites, and

diseases involved).

---

[6]  The parties entered into a stipulation regarding these issues midway through the third
phase. 151 F.3d at 315.

[7]  In *In re Chevron U.S.A., Inc.,* 109 F.3d 1016 (5th Cir. 1997), the trial plan contemplated
"bellwether verdicts" as to individual causation and damages issues for use in encouraging
settlement only.  The holding, however, prevented any preclusive use of the unitary trial results
in cases other than those of the thirty selected plaintiffs. *Cimino,* 151 F.3d at 318 (distinguishing
*Chevron*).

So too. in this matter. Debtors' proposition that "omnibus" summary judgment is feasible regarding exposure and causation as to thousands of asbestos personal injury victims is. in a word, preposterous. At the end of 2000, Debtors had pending 124,907 asbestos personal injury claims against them. Peterson Aff., at ¶ 29. If those claims are sought to be individually disallowed, as Debtors suggest here. rather than estimated under 11 U.S.C. § 502(c) and channeled to a trust under 11 U.S.C. § 524(g) for subsequent resolution, each of these claimants has a right to individual resolution of his or her claim under 28 U.S.C. §§ 157(b)(5) and 1411. As the *Cimino* court explained, a single causation ruling could not lawfully resolve whether, for example, individuals in various jobs at various job sites had the same exposure to various products; whether individuals had the same susceptibility to asbestos-related disease in the various jobs and sites; whether any individual plaintiff was in fact exposed to injurious quantities of asbestos from any particular product; whether any individual plaintiff's exposure was in fact the cause of his or her illness: whether and to what extent asbestos exposure was uniform or similar for any given job at any one or more job site; or whether the health effects of the same exposure to asbestos are the same as between different individuals. *See* 151 F.3d at 315-16. A motion that proposed to uniformly resolve each of these issues for thousands of individual claims would just be frivolous.

Further. even if omnibus findings of fact were feasible as to tens of thousands of individual claims. no proof of claim form could possibly establish the requisite undisputed material facts. Were these claims litigated to judgment. discovery relating to exposure and causation for each case would necessarily entail the live testimony of individual claimants, third parties. and medical experts. as well as documentary evidence -- all of which would be subject to impeachment or rebuttal. If a similarly thorough development of facts in a given plaintiff's case

could be achieved through answers to a one-time voluminous questionnaire. there would be no need for discovery in the tort system. Debtors' proposed omnibus motion. therefore. cannot justify their excessively burdensome form.

> ### 2. Debtors Also Cannot Obtain Summary Judgment As To The Third Issue Of Whether Thousands Of Individual Claimants Suffer From A "Clinical Asbestos-Related Disease".

To the extent Debtors' third issue for litigation relates to whether individuals' particular impairments are "asbestos-related," it mirrors the second, and *Cimino* disposes of it. Causation simply cannot be determined on a group basis. To the extent Debtors seek to attack asbestos personal injury claimants universally on the question whether they suffer an injury at all (versus whether the injury is asbestos-related), their goal is equally unattainable. The cases Debtors cite indicate they intend to challenge not only so-called "exposure-only" claims (*i.e.*, claims in which individuals exposed to asbestos have not manifested an identifiable injury) but also so-called "pleural" claims (*i.e.*, claims in which individuals exposed to asbestos manifest scarring or thickening of the lining of the lungs but still experience normal breathing functions).

The "exposure-only" issue, however, is simply a red herring. Because such claims are generally not compensable in the tort system, Debtors cannot seriously be heard to argue that any significant numbers of them will be at issue in this bankruptcy[8] other than in the form of the so-

---

[8]     Nor do the cases Debtors cite suggest otherwise. *Metro-North Commuter R.R. v. Buckley*, 521 U.S. 424 (1997), and *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir. 1985), address whether mere exposure to asbestos gives rise to a compensable claim under the Federal Employers' Liability Act ("FELA"), which is not at issue here. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609-10 & n. 14 (1997), contains dictum indicating that state law generally does not afford recovery to exposure-only asbestos victims.

{D0000459.1}

- 14 -

called medical monitoring *class action* claims which, by definition, would not be litigated individually.[9]

In support of their proposed challenge to ban "pleural" claims, on the other hand, Debtors cite a single case from a single state — Pennsylvania -- *Simmons v. Pacor, Inc.*, 674 A.2d 232 (Pa. 1996), for the proposition that individuals with pleural thickening but no lung impairment cannot as a matter of state law recover in tort. To begin with, Debtors are of course subject to claims in 49 other states, the District of Columbia, Puerto Rico and foreign countries. The vast majority of those jurisdictions do not limit the type of asbestos-related personal injury claims on which plaintiffs can recover. *See, e.g., Verbyke v. Owens-Corning Fiberglas Corp.*, 84 Ohio App.3d 388, 395-96, 616 N.E.2d 1162 (Ct. App. 1992) (nonsymptomatic pleural plaque or pleural thickening is a compensable injury). Moreover, for a high percentage of plaintiffs, venue does not lie in one jurisdiction alone. Depending on state venue provisions and choice of law rules, even residents of Pennsylvania may bring pleural claims in states where Debtors do business.

Moreover, the *Simmons* court made clear that those plaintiffs "are not precluded from subsequently commencing an action for an asbestos-related injury when symptoms develop and physiological impairment begins." *Id.* at 237. Thus, even assuming *arguendo* that all pleural claims should be barred as of the proposed bar date (which they clearly cannot be), eliminating them from the pool of claimants prior to confirmation would have no meaningful impact with respect to claims estimation and liquidation (a matter discussed in more detail below). Such

---

[9]     The Debtors will undoubtedly seek to defeat any medical monitoring actions on the merits and, whether they are successful or not, the outcome is unlikely to involve the filing of proofs of claim by the putative class members.

claims would simply be treated as "future claims," for which Debtors acknowledge no bar date or proof of claim form should be filed. Motion at 3.

In sum, neither a bar date nor a proof of claim filing is necessary at this time to allow Debtors to establish -- to the extent they can -- what kinds of "unimpaired" claims are barred in which jurisdictions, and whether claimants could nonetheless recover in light of venue and choice of law rules. Mem. at 17. There is thus no "claims litigation" justification for imposing their expensive and arduous proof of claim on tens of thousands of asbestos personal injury victims, and Debtors' motion should be denied.

> ### B. BECAUSE PERSONAL INJURY CLAIMS WILL BE HANDLED BY A TRUST TO BE CREATED UNDER 11 U.S.C. § 524(g), DEBTORS' "ESTIMATION AND LIQUIDATION" CONCERNS ARE UNFOUNDED.

Debtors also attempt to justify their request for a bar date and burdensome proof of claim form by vaguely referring to "estimation and liquidation" concerns. Mem. at 25. Their cavalier assertion that asbestos personal injury claimants *must* submit to a proof of claim process of unprecedented unfairness in order to serve Debtors' "estimation and liquidation" needs, however, seriously overstates the relevant law.

> #### 1. The Section 524(g) Trust, Not This Court, Will Liquidate The Asbestos Personal Injury Claims After The Close Of These Chapter 11 Proceedings.

Because all present and future asbestos claims will be resolved by a trust *after* confirmation, the purposes behind the bar date and proof of claims provisions of the Bankruptcy Code and Rules are inapposite here. To the extent proofs of claim should be required of asbestos personal injury claimants in this proceeding at all, they are necessary only to meet the voting requirements of sections 1126 and 524(g). In this regard, Form 10 -- the use of which is generally accepted, if not mandated, by the Bankruptcy Rules anyway -- amply suffices.

{D0000459.1}

- 16 -

Debtors argue, however, that holders of asbestos personal injury claims "must file a proof of claim by a deadline" because such claims are "'disputed,' 'contingent,' and/or 'unliquidated' under 11 U.S.C. § 1111(a)." Mem. at 20 (*citing* Bank. R. 3003(c)(3)). To begin with, however, as evidenced by Debtors' easy admission that "no proof of claim form should be filed" for at least three categories of claims (including the unliquidated claims of future asbestos personal injury victims), Motion at 3, it is indisputable that the Bankruptcy Rules' call for a bar date and proof of claim filings is subject to a rule of reason. Bank. R. 3002(a), 3003(c)(2).

Indeed, "[s]trictly speaking, there is *no* provision in chapter 11 or elsewhere in the Code requiring a creditor . . . to file a claim in order to share in distributions." 7 *Collier on Bankruptcy* ¶ 1111.02[1], at 1111-5 (15th ed. 1985) (emphasis added); *see also Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 551 (5th Cir. 1985) ("[N]o creditor is required to file a proof of claim."). Although section 501(a) of the Code allows creditors of the bankruptcy estate "to file proofs of claim" by a date certain. *International Bus. Machs. v. Fernstrom Storage and Van Co. (In re Fernstrom Storage and Van Co.)*, 938 F.2d 731, 734 (7th Cir. 1991). "[a] proof of claim should be filed *only* when some purpose would be served."[10] *Simmons*, 765 F.2d at 551 (citing 3 *Collier on Bankruptcy* ¶ 501.01, at 501-3; emphasis added). In other words, proofs of claim are proper only if they provide "information essential to the distribution of the estate's assets or the

---

[10]    Section 502(a) of the Code provides that proofs of claim or interest filed under section 502(a) are automatically allowed unless objection is interposed. 11 U.S.C. § 502(a); *see also Collier on Bankruptcy* § 502.02, at 502-9. In turn, under section 1111(a), all scheduled claims are automatically deemed "filed" within the meaning of section 502, unless they are scheduled as disputed, contingent or unliquidated. 11 U.S.C. § 1111(a); *see also Collier on Bankruptcy* § 1111.02, at 1111-5. Debtors appear to argue that, because section 1111 excludes disputed, contingent or unliquidated claims from "per se" filed status, a proof of claim form *must* be filed as to those claims. Of course, the statute itself says no such thing, and for the reasons set forth above, even if such a rule could be inferred from section 1111, other provisions of the Code make plain that asbestos personal injury claims would not fall within it.

formulation of an equitable plan of reorganization." *Fernstrom Storage and Van Co.*, 938 F.2d at 734.[11]

Here, it is clear that Debtors' proposed proof of claim form (and an accompanying bar date) would serve no "essential" purpose. First, Debtors can hardly dispute that a bar date and proof of claim serves no "liquidation" function in this instance. As the Supreme Court noted in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), "Congress in the Bankruptcy Reform Act of 1994, Pub. L. 103-394 § 111(a), amended the Bankruptcy Code to enable a debtor in a Chapter 11 reorganization in certain circumstances to establish a trust toward which the debtor may channel future asbestos related liability." *Id.* at 860 (citing 11 U.S.C. § 524(g), (h)); *see also Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1402 n.6 (9th Cir. 1995) ("The numerous requirements of § 524(g) make it clear that this subsection constitutes a narrow rule specifically designed to apply in asbestos cases only, where there is a trust mechanism and the debtor can prove, among other things, that it is likely to be subject to future asbestos claims . . . .").

Under section 524(g), a statutory provision tailored *precisely to address asbestos claims*, personal injury claims are *not* liquidated in bankruptcy, but are subsequently resolved by a trust established under the plan or reorganization. As in all other mass tort bankruptcies, the trust's claims resolution procedures will require a limited amount of claim information, the scope of which will be determined by the trust pursuant to the confirmed plan. Peterson Aff., at ¶ 44.

---

[11]     Debtors' "finality" plea is illusory. *See* Mem. at 20. Unlike with *any other* type of claim, claims involving asbestos liability are channeled to a trust for analysis and ultimate resolution after confirmation of a plan. *See* 11 U.S.C. 524(g). Requiring proofs of claims by a bar date, therefore, could serve no finality function here.

And here, less is more. The experience of other asbestos trusts shows that, by looking only at limited, critical information, those trusts do a more complete job of reviewing claims. *Id.*

In addition, Section 502(c) of the Bankruptcy Code requires that, if the liquidation of certain unliquidated claims would unduly delay the administration of the case, those claims *must* be estimated. 11 U.S.C. § 502(c). Asbestos personal injury claims against Grace -- potentially numbering in the tens of thousands -- plainly implicate this "estimation" provision. Because Debtors' proposals for proceeding with liquidation of these claims would be enormously expensive and time-consuming, under section 502(c) such claims must be estimated -- *not* individually liquidated. Accordingly, Debtors' "liquidation" justification for the extraordinarily unfair bar date and proof of claims process sought here wholly fails.

2. **The Information Sought By Debtors' Proposed Claim Form Is Neither Necessary Nor Useful For Purposes Of Estimating Debtors' Asbestos Personal Injury Liabilities.**

Debtors' contention that their unprecedented proof of claim form and accompanying bar date are "essential" for "estimation" reasons is equally unfounded. Mem. at 20. As a threshold matter, Debtors routinely settled thousands of asbestos personal injury claims prior to filing for bankruptcy, with 124,907 claims still pending as of December 2000. Peterson Aff., at ¶ 24. Debtors thus already have in their own records a myriad of information concerning the types and severity of asbestos-related disease levels that characterize asbestos personal injury claims filed against them. Neither Debtors' nor the Committee's experts need the vast amount of additional claims information requested by the proposed proof of claim form to analyze the nature and scope of Debtors' present and future asbestos personal injury liabilities. *Id.* at ¶¶ 42-43. Indeed, it is significant that Debtors settled those claims *without having collected* the information they now would demand as a minimum requirement for the consideration of claims. *Id.*

{D0000454 1 }