In addition, for the reasons discussed below, the final pool of data from the proof of claim forms will clearly be incomplete and, at least to some extent, inaccurate, and thus of little use for purposes of estimating or allowing asbestos personal injury claims. Peterson Aff., ¶¶ 42-43. Even if all persons with claims against Debtors could provide all requested data (an impossibility), however, the data could not be used in a reliable statistical estimation process. Much of what is requested on Debtors' proposed form was not sought by Debtors in their past settlements. As a result, one could not determine for estimation purposes whether there is a correlation between the characteristics of past claimants and the characteristics of claimants who file proofs of claim by the proposed bar date. *Id.* ¶ 43. Debtors' estimation justification thus falls flat.

### 3.   No Other Court In A Mass Tort Bankruptcy Has Ever Required A Proof Of Claim Form As Onerous As That Which Debtors Propose.

Notably, in twenty bankruptcies involving mass tort claims to date, no court has found justification sufficient to require claimants to file by a bar date a proof of claim form that begins to rival that proposed by Debtors here. *See* Peterson Aff., at ¶¶ 8-9. Indeed, the courts in the *Manville, UNARCO, Raytech, National Gypsum* and *Fuller-Austin* bankruptcies did not even establish bar dates or proofs of claim other than for voting on the plan. Instead, all of these plans required claimants to file claims with the trusts by an established date *after* the plans became effective. *Id.* at ¶ 10.

Moreover, Debtors cite only one reported asbestos bankruptcy case that even involved a conflict over the establishment of a bar date. *In re Eagle-Picher Indus., Inc.,* 137 B.R. 679 (Bankr. S.D. Ohio 1992). However, the *Eagle-Picher* court explicitly stated that "[a] bar date in a Chapter 11 case is by no means absolute." *Id.* at 680–81. Although the court nonetheless

established a bar date. when it came time to estimate the universe of claims against the debtor.
the court made no use of either the bar date or the proofs of claim filed in its analysis and
resolution of that issue. *In re Eagle-Picher Indus.. Inc..* 189 B.R. 681. 682-83. 687 (Bankr. S.D.
Ohio 1995).

And contrary to Debtors' representation. Mem. at 25-26, in both the *Eagle-Picher* and
*Celotex* bankruptcies, the courts commented that they did *not* have the authority to order
completion of any proof of claim other than the standard form. Peterson Aff., at ¶ 9. Although
the *Celotex* court went on to approve a two-page form, it allowed claimants to submit the
Official Form 10 as an alternative. *Id.* Moreover, even the modified form in *Celotex* was
dramatically shorter, fairer and less burdensome than that which Debtors promote in this case.
*See* Celotex Proof of Claim Form (attached as Exhibit C). (Accordingly, in the event the Court
finds Form 10 insufficient here. the Committee respectfully urges the Court to adopt the *Celotex*
form alternative instead.)

In the *Dow Corning* bankruptcy. as well, the court refused to approve an extensive
questionnaire requested by the debtor. stating that it doubted whether or not it could require
completion of any proof of claim other than the standard form.[12] Peterson Aff.. at ¶ 12. The
court subsequently approved a simple, two-page proof of claim that identified the claimant and
her attorney. the type and manufacturer of the claimed implant product. dates of implantation and
removal. and whether the claim was for a present or future injury to the claimant or another
person. *Id.*

Quoting out of context, Debtors go on to suggest that the court in the *Babcock & Wilcox*
bankruptcy approved a proof of claim form similar to that urged here. *See* Mem. at 26. That

---

[12]     In *Dow Corning.* the debtor had the same counsel as counsel for Debtors in this matter.
:D00004501 :

- 21 -

court. however. found the proposed proof of claim form -- which in its original iteration was substantially identical to that propounded here -- "unnecessarily detailed and an undue burden on parties who wish to assert claims." *In re Babcock & Wilcox Co.*. No. 00-0558. slip op. at 21 (E.D. La. Aug. 25, 2000) (attached as Exhibit D). In a subsequent opinion. the court found numerous provisions "unnecessary to the purposes of a proof of claim form" and deemed the requirement that claimants authorize release of medical records and social security numbers "language [that] may in effect. *if not by design.* discourage the filing of claims. which is not the function of the proof of claim form." *In re Babcock & Wilcox Co.*. 2000 WL 1511175, at *1 (E.D. La. Oct. 6, 2000) (emphasis added).

Although the debtor in that case tried to justify its proposed proof of claim by raising seven issues on which it intended to seek summary judgment, and managed to get that court to approve a substantially reduced -- but still burdensome -- proof of claim form. *Babcock & Wilcox* is hardly persuasive precedent in this matter. That bankruptcy is already 18 months old, and the bar date has since expired. At *no time* to date. however. have Babcock & Wilcox or their counsel (who is also counsel to Debtors in this case) made any showing that the debtor would be able to file a sustainable summary judgment motion that would cover a significant enough number of cases to produce anything useful. Thus. the mere fact that the *Babcock & Wilcox* court approved a proof of claim form beyond the Form 10 does not inform the issue in this case. And in any event. the Committee submits that the form ultimately approved in *Babcock & Wilcox* was improper for the same reasons set forth here.

Debtors also misconstrue the proof of claim rulings in the *Manville* and *A.H. Robins* bankruptcies. *See* Mem. at 25-27. There was no bar date or proof of claim during the *Manville* bankruptcy for claims allowance purposes. Instead. the *Manville* reorganization plan established

a deadline 18 months after the effective date for claimants to file claims and submit relevant information to the settlement trust established post-confirmation. Peterson Aff., at ¶ 10. In the *A.H. Robins* bankruptcy, contrary to Debtors' assertions, the court did *not* "require claimants to complete an extensive questionnaire as part of the proof of claim before the court considered whether to allow or disallow claims." Mem. at 26. Having invited people to send letters indicating their interest in making claims, the court required the over 200,000 claimants to complete nothing more than a two-page questionnaire seeking limited information about the nature of each claim and the period of use of the Dalkon Shield. Peterson Aff., at ¶ 11. The questionnaire *did not* seek proof of injury or other information sufficient to evaluate the nature of injuries. *Id.* Instead, in order to estimate the characteristics and value of all Dalkon Shield claims, the court then required that a randomly-sampled 2,500 claimants complete a more extensive questionnaire about their injuries and use of the product. *Id.* The questionnaire was therefore *not* employed as a litmus test for the allowance or disallowance of claims, as Debtors would have their proposed proof of claim form used in this case.

Finally, the Committee notes that, notwithstanding Debtors' extensive discussion of the unpublished decisions in *In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*, 1999 WL 387322 (E.D. Pa. 1999), and *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1996 WL 900350 (E.D. Pa. June 10, 1996), those cases are startlingly inapposite. Neither were bankruptcy cases. In *In re Diet Drugs*, the court sought to ease discovery by directing plaintiffs in a multi-defendant class action to file an initial "fact sheet" setting forth information that would nonetheless "be required to be developed into admissible form." 1999 WL 387322 at *1. Similarly, *In re Orthopedic Bone Screw* set forth a discovery and pretrial order, 1996 WL 900350 at *1, which included a plaintiff questionnaire "in lieu of responding to an initial set of

:D0000259.1 :

- 23 -

defendants' interrogatories." *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1997 WL 704702 (E.D. Pa. Aug. 22, 1997). It left all other discovery intact. Obviously, neither the "fact sheet" nor the questionnaire functioned to cut off valid claims, as Debtors would urge here. The same is true for the numerous other cases Debtors cite in footnote 20 of their brief.

In any event, as the *Eagle-Picher* decision cited indicates, the only role for a bar date and proof of claim here is to serve "the vital function of . . . determining voting rights on a Chapter 11 plan . . . ." *In re Eagle-Picher Indus., Inc.*, 137 B.R. 679 (Bankr. S.D Ohio 1992). Consistent with that end, the Bankruptcy Rules provide that "[a] proof of claim *shall* conform substantially to the appropriate Official Form." Bankr. R. 3001(a) (emphasis added). Nothing further should be required.[13]

## C.   MOST IMPORTANTLY, DEBTORS' PROPOSALS WOULD EXTINGUISH THOUSANDS OF VALID ASBESTOS PERSONAL INJURY CLAIMS FOR NO LAWFUL REASON.

Aside from its legal deficiencies, Debtors' proposal attempts to change the proof of claim process from one that merely identifies claims into one that permanently bars them. Indeed, it is a certainty that, while the Seventh Amendment to the Constitution protects plaintiffs' right to a trial by jury in the tort system, as does 28 U.S.C. § 1411 in this bankruptcy case, under Debtors' plan, thousands of deserving asbestos personal injury victims would forever lose their right to pursue relief in this bankruptcy because, through no fault of their own, they could not or did not timely file Debtors' monstrous proof of claim form. Even assuming *arguendo* some "litigation, liquidation, or estimation" purpose would be served by Debtors' proposal, no principal of law or

---

[13]   The Committee notes that, as this case is nowhere near the point where a vote on a section 524(g) plan is imminent, the Court may postpone addressing the bar date, notice, and proof of claim issues with respect to voting until the parties are closer to filing a consensual reorganization plan than they are today. Bankr. R. 3003(c).

fundamental fairness could validate such a draconian measure. Accordingly, Debtors' instant motions should be denied.

### 1.   Debtors' Proposals Are A Trap Whereby Thousands Of Valid Asbestos Personal Injury Claims Will Be Barred Forever.

To begin with, it is clear that under normal bankruptcy rules, "[a] proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of the claim." *Simmons*, 765 F.2d at 551-52. Such a claim is therefore allowed, absent objection. If an objection is made, *the party objecting* bears the burden of producing "evidence tending to defeat the claim that is of a probative force equal to that of the creditor's proof of claim." *Id.* at 552. After notice and a hearing, a court determines the amount of the claim. 11 U.S.C. § 502.

Under Debtors' proposed proof of claim program, in contrast, an "incomplete" proof of claim would be prima facie evidence of a claim's *invalidity*, in direct contravention of the statute, and claimants would be forced to defend against Debtors' motion to disallow their claims without any opportunity for discovery at a hearing held a scant 45 days after Debtors' audit for "completeness and reliability." Motion at 9.

Further, while section 524(g) trusts allow for the filing of claims *as they ripen* and become thoroughly documented, Debtors' proposal would freeze all claims for technical evaluation at an arbitrary point in time, when many are far from fully developed. Peterson Aff., at ⁋ 41. Rather than tasking themselves with the submission of *any* evidence tending to defeat the claim, Debtors would assign themselves the role of determining whether the questions they selected and formatted were answered to their satisfaction. Debtors' self-serving proposal thus virtually guarantees that thousands of valid claims will be doomed for failure.

a.    The Proof Of Claim Form Is So Massive And
Technically Flawed That It Is Impossible to Complete.

Debtors' proposed proof of claim and instructions are also so technically flawed as a data-collection instrument that completion of the form at all, let alone completion of it in a manner that is consistent across 200,000 possible claims, is -- in a word -- impossible. The eleven-page form would require answers to over 170 questions for the very simplest of claims, *i.e.*, those involving only one occupation at one site with one asbestos-related disease diagnosed only once by one doctor, and this number would increase with the addition of each fact. *See* Peterson Aff., at ¶ 14. Thus, claimants who worked at a combination of 20 occupations and sites (a modest number for construction workers) would need to complete some 800 questions. Each claimant must repeatedly answer the same 33 questions for every job site where the claimant was exposed to asbestos, whether or not the asbestos was from a Grace product, and separately again for each different job category at each site. *Id.*

Moreover, the questions and instructions are rife with redundancy, ambiguity and error. This is a critical issue, as Debtors obviously plan to take advantage of these flaws to the prejudice of claimants who are unable to complete the form. The form specifically states that "[i]f a section is left blank it will be interpreted to mean that the injured party does not have the specified injuries, conditions, or test results in that section." *Exhibits to (1) Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of the Proof of Claim Forms and Approval of Notice Program, and (2) Memorandum in Support Thereof ("Debtors' Exhibits),* Exhibit A at 3. Thus, if a claimant cannot answer a question within Debtors' obligatory format, Debtors will argue to the Court that the claimant cannot support his claim.

However, the form itself contains numerous questions that are themselves wide-open to interpretation. For example, the form's branching questions (*i.e.*, if your answer to question 1 is

"yes," you must answer question 2), fail to indicate where the claimant is to look for the subsequent question. Peterson Aff., at ¶ 15a. Its medical questions, moreover, ask for items like "additional" data from "ILO tests,"[14] or information about "alternative or non-asbestos cause," without specifying what kind of information Debtors have in mind. *Id.* at ¶¶ 15e-f. Confusing questions about third-party exposure ask merely that the claimant "describe below." *Id.* at ¶ 15k. With each of these vague queries, Debtors would be free under their proposal to deem responses "incomplete" for failure to divine what the question was seeking. And the list goes on and on.

### b.    The Production Of Medical Documents That Debtors Demand Is More Extensive And Intrusive Than That Required In Full Discovery In The Tort System.

In addition to being confusing, Debtors' proposed proof of claim form is breathtaking in its scope, particularly with respect to the medical information it demands. For example, the form requires medical records of every doctor who diagnosed any asbestos-related disease or identified an "alternative or non-asbestos cause." *Debtors' Exhibits*, at 7. Because of the breadth of this demand, claimants would have to submit *all* records for *any* matter that could conceivably fall within the undefined term, "alternative or non-asbestos cause," in order to save their claim from disposal for "incompleteness" on this issue. *See* Peterson Aff., at ¶ 18.

Debtors' form would also require production of *seven types* of medical records for every diagnosis of every claimed asbestos disease, and for every medical event in which a "'doctor identified an alternative or non-asbestos cause of a claimed asbestos disease,'" as well as "'any record involv[ing] any history of smoking.'" Peterson Aff., at ¶ 19. No claimant or law firm has such records. Claimants have doctors' reports documenting the claimed disease, but they do not

---

[14]    *E.g.*, tests performed according to standards formulated by the International Labor Organization.

{D0000459:1}

- 27 -

have all the medical records backing up the report. and they certainly do not have complete records of a claimant's entire medical history. *Id.* The proposed form further requires claimants to submit all x-rays and x-ray reports taken within the last two years. X-rays. however. cannot be copied and must be retained by claimants for litigation with other defendants.

### c.   Many Claimants And Their Lawyers Will Not Even Have The Information Demanded.

In order to gather empirical data for use in analyzing Debtors' plan. the Committee conducted a pretest of their proposed proof of claim to estimate the likely success and some of the costs and time demands of their proposal. Such pretests are standard procedures for evaluating and modifying large-scale data collection efforts like that proposed by Debtors. Peterson Aff., at ¶ 27. The utility of pretests should not be overlooked. as they allow courts to rely on something other than mere argument by lawyers in deciding whether to authorize such a massive and expensive undertaking as that which Debtors propose.

Notably. the Committee's pretest revealed. among other things. that claimants typically do not have the information demanded. *Id.* Yet here again. without even having conducted their own pretest to determine the feasibility of their proposals. Debtors would afford themselves authority to seek dismissal of any such claims for "incompleteness."

For *79 percent* of the claims pretested. for example. claimants did not have information identifying the asbestos-containing products and materials used at *each* job site. Peterson Aff.. at ¶ 34. This result is not surprising. Few construction workers have comprehensive knowledge of the specific products to which they were exposed over a career of working at various job sites. Lawyers must carefully reconstruct this information during discovery through documents and other workers' testimony. For all tens of thousands of claimants who have counsel. Debtors would expect this labor-intensive process to take place (without discovery tools) simultaneously

{D0000459.1 }

by the bar date. For those who do not, their claims would be, in Debtors' view, fatally incomplete.

Similarly, forty-two percent of claimants pretested could not provide required data about the location and ownership of work sites. *Id.* Indeed, because such information is not needed to establish W.R. Grace's liability or rebut any defenses, it is not maintained as part of a litigation file in asbestos cases. *Id.*

Medical information required by Debtors' proof of claim is even less likely to be available to claimants. The files for two-thirds of the claims pretested did not include all required information regarding the identity, description and location of doctors, nor did the claimants have such information in their possession. Peterson Aff., at ¶ 36. More than half lacked all the medical reports demanded. *Id.*

Moreover, for claims that will arise shortly before the bar date, completion of the proof of claim form was not feasible at all. Based on recent filing rates against Grace, an estimated 2,500 to 4,000 claims will arise within a month before the bar date, and at least 15,000 to 24,000 within six months before. Peterson Aff., at ¶ 37. But *none* of the six claims that originated within the month prior to the pretest had the required information about work histories or product identifications. *Id.* Two-thirds of the claims arising within the prior six months lacked the required product identification, and twenty-two percent did not have all the information sought about the claimant's work history. *Id.*

The medical questions were also unanswerable for newly identified cases, because the required data had not been developed. Not one claim that arose within the prior month had the required information about doctors, medical tests and reports, and two-thirds of them lacked x-rays or information about alternative causes. *Id.* ¶ 38. Debtors' proposed process would treat

these claimants as if they will never have medical examinations or obtain test results in the future. These claims, in Debtors' view, are meritless. In reality, however, information about asbestos claims develop over time as claimants get additional medical examinations or the severity of their illnesses progress. *Id.* ¶ 40.

> ## 2.    The Costs To Debtors' Estate Will Be Staggering And The Delays In This Proceeding Substantial.

The cost implications of the Debtors' proposed proof of claim program are also staggering. The costs to the estate, for one, cannot be even be estimated inasmuch as Debtors have not disclosed how they plan to handle collection, data-entry and analysis of the information provided on the proof of claim forms. It is clear, however, that costs to the estate for these purposes would have a multiplier effect, as every party -- the Committee, Debtors, the Legal Representative, the Unsecured Creditors Committee, the Property Damage Claimants Committee, and the Equity Committee – would need to obtain and analyze the data. The parties would additionally have to retain expensive medical coders and doctors to wade through the hundreds of thousands of pages of medical records. Peterson Aff., at ¶ 30.

Debtors' proof of claim process would also consume years and endlessly delay resolution of the bankruptcy. Claimants' law firms simply cannot complete all proofs of claims within any reasonable period. Many firms represent thousands of claimants, some tens of thousands. A law firm with 5,000 claims, for example, would have to devote over 10 paralegals full-time for one year to complete the forms. *Id.* Obviously, no firm has an excess capacity of 10 people with the requisite training to devote to this project. After the proofs of claim are received, the data must be entered, cleaned, organized and analyzed, a process that will consume years more. Moreover, the vast and ambiguous data and medical reports will provide a source of endless disputes about the facts and their legal significance for tens of thousands of individual claims, stimulating

further controversies and generating more delays. Lastly, as described below. Debtors' scheme in practical terms will mean lengthy discovery and thousands of jury trials that could take years to complete, with little or nothing accomplished in the end. but at an enormous expense to the estate.

3.   **Under Debtors' Proposal, An Estimated 200,000 Claimants Would Have To Complete The Claim Form, Which Would Take Over 600,000 Person Hours And Cost Over $24 Million.**

As for the costs to claimants. Dr. Peterson estimates that more than 200,000 such individuals would be required to complete Debtors' form by the proposed bar date. a process that "would place an enormous and expensive burden on the Debtors' estate, on claimants and their attorneys and on the Court." Peterson Aff., at ¶¶ 25, 26. In particular, the Committee's pretest indicates that completion of the preparation and filing of Debtors' proof of claim for this many claimants would require over 600,000 person-hours (390 person-years), at a cost of over $24 million to claimants and well-over a year of time. *Id.* Such use of claimants' resources is nonsensical. Deserving claimants and their lawyers would wind up spending huge sums of money just to notify Debtors of their claims, but then immediately find themselves facing a motion for perfunctory dismissal of the claims because those notices were, in Debtors' view, "incomplete." Such a proposal simply cannot withstand even the most cursory scrutiny.

4.   **The Alleged Spike In Debtors' Claims Filings Does Not Warrant Their Proposed Bar Date And Proof Of Claims Process.**

Moreover. Debtors' suggestion that the onerous proof of claim form is necessary because there is purportedly "[no] correlation between the recent spike in claims and the actual number of mesothelioma and lung cancer cases" is grossly misleading. Mem. at 15. Most victims of asbestos-related disease, both cancers and nonmalignancies. have never filed claims against

:D0000459.1 :

- 31 -

Grace. Peterson Aff., at ¶ 23. Even in year 2000 when Grace received 48,000 claims, the number of cancer claims filed against Debtors almost certainly represented less than half the number of persons who fell ill to or died of an asbestos-related cancer that year. *Id.*

Rather, Grace received more claims in 2000 because a larger fraction -- but still a fraction -- of persons killed and injured by its asbestos-containing products finally sued Debtors. Because most injuries do not result in claims, Grace's "skyrocketing" year 2000 claims means only that a few more of the many persons sick from asbestos-related disease filed claims against it that year. Debtors' concern about the number of claims going up while rates of disease are going down would thus be troubling only if every previous illness or death had resulted in a claim against Grace.

Significantly, virtually every asbestos defendant has experienced similar one to two-year spikes generated by unique events like Grace's year 2000 media disaster. *Id.* And these spikes were often followed by comparably sharp declines in claims. *See* Chart of Annual Filings against 12 Asbestos Defendants (attached as Exhibit E). With Debtors' bankruptcy filing, it is impossible to know whether Grace would have enjoyed such a decline in claims, as well.

### 5.    There Is A Much More Sensible Way To Approach This Matter.

While the information sought by Debtors' proof of claim is not necessary or helpful for the estimation and allowance of claims (and is mostly inaccessible in any event), there exist other sources of information for use in the estimation process. Like other asbestos defendants, Debtors likely maintain an electronic database of its asbestos claims. Debtors have not yet provided any such claims database to the Committee or to the Court. Yet it is important to understand its utility and limitations before undertaking anything that approaches the expensive and time-consuming proof of claim process proposed by Debtors.

{D0006459 1 }

- 32 -

At a minimum, a claims database can be used to identify specific types of claims at to which Debtors might legitimately seek summary judgment. Such a database, moreover, could be supplemented by information from databases maintained by other asbestos trusts. Three claims facilities maintain data about asbestos claims submitted to the Manville, UNR, Eagle-Picher and Celotex Trusts. Peterson Aff., at ¶ 46. These databases have been made available in bankruptcies of other asbestos defendants and have been enormously useful in supplementing information critical for estimating claims. *Id.*

If the Court is persuaded that a bar date for asbestos personal injury claims is warranted for other than voting purposes, however, the Form 10 should be adopted, as was the case in the *Eagle-Picher* and *Celotex* bankruptcies. Indeed, this court approved the use of Form 10 for the filing of claims against Stone & Webster, Inc., despite the fact that a large number of those claims were based on exposure to asbestos-containing products. *See In re Stone & Webster Incorporated.* Case No. 00-2142 (RRM), Order Establishing Bar Date and Cure Claims Bar Date for Filing Proofs of Claims and Proofs of Cure Claims and Approving Form and Manner of Notices Thereof (D. Del., July 18, 2000) (attached as Exhibit F). Alternatively, Debtors have provided no reason to consider seriously a customized proof of claim form that is any more extensive than that used as an alternative to the standard form in the Celotex bankruptcy. *See* Exhibit C.

### D. A CLOSE LOOK AT THE DETAILS OF DEBTORS' PROPOSED CASE MANAGEMENT ORDER MAKES STRIKINGLY PLAIN THE INESCAPABLE FLAWS IN DEBTORS' SCHEME.

In the final section of their brief, Debtors submit a schedule for implementing their proposed notice, bar date and proof of claim procedures. What might appear to be only a matter of "housekeeping," however, actually serves to put in bold relief the insurmountable problems

inherent in the very proposals the schedule is meant to implement. Because it is not possible --
as a matter of law or common sense -- to find *no* material facts in dispute as to causation across
tens of thousands of personal injury claims, it is not possible to achieve the measures Debtors
envision by the proposed deadlines. At the very least, until the Court decides whether there will
even be a bar date, and if so whether the proof of claim form will be anything other than Form
10, it cannot reasonably set a schedule for the filing and processing of claims.

> 1.   **There Is No Support In The Law For Denying Claimants The
> Right To Choose Their Own Lawyers And Forcing Them
> To Be Represented By An Appointed "Personal Injury
> Litigation Committee".**

The first event on Debtors' "Asbestos Personal Injury Litigation Track" is the
appointment of a "Personal Injury Litigation Committee" ("PIL Committee") on July 1, 2002 "to
represent asbestos personal injury claimants in common-issues litigation." Mem. at 48. In other
words, Debtors propose that the tens of thousands of asbestos personal injury claimants -- each
of whom in the tort system would be entitled to hire a lawyer of his or her own choosing to file
an individual complaint and proceed with individualized discovery and trial -- would have no
choice in bankruptcy but to be represented by an appointed "PLI Committee" in litigation aimed
at dismissing their claims with prejudice prior to confirmation.

As a threshold matter, there is no authority in the Bankruptcy Code for telling claimants
that they must be jointly represented by appointed attorneys in defending motions to disallow
their claims. More importantly, the proposal clashes with Supreme Court authority expressly
acknowledging individuals' right to choose their own attorney in civil actions. *See Richardson-
Merrell, Inc. v. Koller*, 472 U.S. 424, 438, 441, 442 (1985). As Justice Brennan explained, "[a]
fundamental premise of the adversary system is that individuals have the right to retain the
attorney of their choice to represent their interests in judicial proceedings." *Id.* at 441 (Brennan,

{D0000459.1 }

- 34 -

J., concurring). Justice Stevens, writing in dissent, agreed. *Id.* at 442 ("Everyone must agree that the litigant's freedom to choose his own lawyer in a civil case is a fundamental right.") (Stevens, J., dissenting).[15] Even in the class action context, where multiple plaintiffs or defendants are jointly represented, this basic principle is unchallenged. *See In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 850 (9th Cir. 1982) (denying class certification due in part to inadequate representation and noting that "[t]he district judge may well be better able to choose a good lawyer than some of the plaintiffs may be, but the right of litigants to choose their own counsel is a right not lightly to be brushed aside.").

Indeed, Debtors appear to be treating *their own* attempt to invalidate large numbers of asbestos personal injury claims prior to confirmation as if it were a class action filed on the claimants' behalf. Far from seeking class-wide relief, however, asbestos personal injury claimants vigorously reject any concept of "omnibus" dismissal of claims here. And even if this were a class action, individual plaintiffs would be entitled to opt out of the class and pursue separate complaints against Grace. Fed. R. Civ. P. 23(c)(2).

Moreover, under Fed. R. Civ. P. 23, certification of the class is allowed only if the court finds, among other things, that there are "questions of law and fact common to the class" and that "the representative parties will fairly and adequately protect the interests of the class." *Id.* at 23(a)(2) and (4). Assuming *arguendo* that there existed some sort of authority for the appointment of claimants' lawyers without their consent, it is noteworthy that Debtors would not

---

[15]  *See also PGH Int'l v. Gabor Shoes AG (In re PGH Int'l, Inc.)*, 222 B.R. 401 (D. Conn. 1998) ("This Court is not unmindful of its duty to 'be solicitous of a client's right freely to choose . . . counsel.'") (quoting *Government of India v. Cook*, 569 F.2d 737, 739 (2d Cir. 1978)); *Summer v. Fuller*, 718 F. Supp. 1523, 1524 (N.D. Ga. 1989) ("While counsel for an opposing party may seek to veto a party's choice of attorney, based on ethical considerations, she has no right to affirmatively choose the attorney for the opposing party.").

even have the Court undertake something akin to the rigorous Rule 23 analysis before doing so.

Courts, including the Supreme Court, have flatly rejected such an errant approach to class

certification. *See, e.g., General Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982) (finding that a Title

VII class may only be certified "after rigorous analysis" of the prerequisites of Rule 23(a));

*Eisenberg v. Gagnon,* 766 F.2d 770, 786-87 (3d Cir. 1985) (remanding case to district court for

further evaluation of Rule 23(a) prerequisites and clarification "of the factors considered and the

weight accorded to them in making [its] discretionary ruling" denying class certification); *In re*

*Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d at 850 (denying class

certification in mass tort action because the prerequisites — commonality, typicality, and

adequacy of representation -- were not satisfied).

Finally, even under a Rule 23 analysis, a class action could not be maintained because it

would be impossible for the "PLI Committee" to adequately protect the interests of each class

member in opposing an omnibus motion. Each claimant's history and evidence of exposure,

causation and illness is unique. No lawyer could even begin to draft common pleading on the

issue of "incompleteness" or on the issues of exposure or causation with respect to thousands of

claimants. Indeed, the Supreme Court refused to certify a class of asbestos personal injury

victims because Rule 23 could not be satisfied. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591,

117 S.Ct. 2231, 2250 (1997) ("[A]ny overarching dispute about the health consequences of

asbestos cannot satisfy . . . Rule 23 . . . ."). *See also In re Northern Dist. of Cal. Dalkon Shield*

*IUD Prods. Liab. Litig.,* 693 F.2d at 850 (finding that commonality was a problem because the

"50 jurisdictions in which these cases [arose did] not apply the same punitive damages

standards"); *Hurd v. Monsanto Co.,* 164 F.R.D. 234 (S.D. Ind. 1995) (denying class certification

in toxic waste exposure action because "[e]ach putative class member's susceptibility to injury"

varied; accordingly, "no single proximate cause inquiry applie[d] equally to each putative class
member [and] no one set of operative facts establishe[d] liability."); *Eagle v. Shell Oil Co.*, 133
F.R.D. 600, 603 (D. Colo. 1990) (denying class certification in toxic waste exposure action
"[b]ecause the factual and legal issues of [defendants'] liability in the instant case . . . differ[ed]
dramatically from one plaintiff to the next").

The upshot of this, of course, is that if the Court properly declines to force an appointed
"PLJ Committee" of lawyers on the thousands of individual claimants in the so-called "common
issues litigation," Debtors' proposal will involve the filing of tens of thousands of oppositions to
Debtors' proposed omnibus motion for summary judgment. However, the enormous expense and
delays that would follow from such an onslaught of pleadings would be entirely avoidable
inasmuch as Debtors' proposed motion would be meritless in the first place. Indeed, if the Court
properly refuses to accept Debtors' plan to deny claimants the right to pick their own lawyers,
Debtors' entire menu of bar date and proof of claim proposals must be rejected.

## 2.    There Is No Support In The Law For Permanently Disallowing Claims For "Incompleteness".

Next, Debtors propose to afford themselves five months from the bar date to complete an
audit of the "completeness and reliability of personal injury claims." Mem. at 48. First and
foremost, it is anyone's best guess what Debtors have in mind when referring to "completeness"
and "reliability." As explained above, the claim form is so massive and vague that it ensures that
Debtors -- who will no doubt apply a subjective definition of completeness during an audit that is
anything but objective in its purpose -- will inevitably find thousands of claims "incomplete."
How they plan to test "reliability" based on claimants' written submission alone, moreover, is a
mystery, unless they intend again to apply their own subjective (and obviously biased) standards
that have no grounding in the law. And even if an audit made sense, there is no way any party

:D0000459 1 ;

- 37 -

could conduct a meaningful review of approximately 200,000 claims, each containing answers to a minimum of 170 questions and attaching detailed medical reports that must be reviewed by experts, in five months. Without a ruling on the requirement and size of the proof of claim form, a schedule for processing claims is plainly premature.

Perhaps more importantly, the notion that Debtors could succeed in *disallowing* claims that conveniently failed their own audit -- versus requiring that claimants simply complete the proof of claim forms -- is nowhere in the Bankruptcy Code. Indeed, as explained above, the Code considers filed proofs of claims prima facie evidence of the claims' *validity*, and puts the onus *on Debtors* of producing evidence to defeat them. *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 551-52 (5th Cir. 1985). Yet here, Debtors would allow claimants a mere 30 days to respond to a motion to disallow permanently their claims for failure to complete them to Debtors' satisfaction.

Presumably, given the timing of the appointment of the "PLI Committee," Debtors anticipate that thousands of claimants would have to jointly file a single response to their motion to disallow for incompleteness, rather than rely on their own attorneys to file something tailored to their individual claims. Clearly, for the same reasons that defeat an omnibus motion for summary judgment, omnibus litigation of the completeness of claims is absurd. Theoretically, there are hundreds of thousands -- if not millions -- of different ways that the anticipated 200,000 proofs of claim could be incomplete. Some may lack social security numbers, some may fail to attach medical records, some may fail to list the dates of work at particular job sites, some may be simply illegible, etc. And, of course, the combinations of these variables, along with purported problems with "reliability," rapidly overwhelm any attempt to conceptualize what form this motion for incompleteness could take. In turn, there is simply no way the "PLI

{D0000450 1 }

- 38 -

Committee" could adequately defend against such a motion on behalf of up to 200,000

claimants, even if they had 30 months instead of the 30 days Debtors suggest. Thus again, any

serious consideration of the details of Debtors' scheme unveils how outlandish it really is.

### 3. At Bottom, Debtors' Proposal Contemplates The Impossible: Full-Blown Discovery Of 200,000 Individual Tort Claims Within Six Months.

Having blocked off two-plus months for a hearing and ruling on the motion to disallow,

Debtors go on to propose that their omnibus summary judgment motion be filed by January 1,

2003, followed by "related" discovery and an opposition filed by the "PLI Committee" in six

months. Mem. at 48-49. As an initial matter, it bears emphasis that in the tort system summary

judgment motions normally *follow* discovery by both sides. Debtors, however, apparently

believe that they can identify undisputed questions of material fact based on the proofs of claim

alone. They would require claimants, in contrast, to await discovery to file an omnibus

opposition due on the same day discovery closes. This makes no sense. If the dispositive

motions Debtors intend to file address questions of law, no factual development (including the

filing of behemoth-like proofs of claim forms) would be necessary. In this case, for example,

Debtors conceivably could litigate whether certain state courts deny recovery for "pleural"

claims as a matter of law right now (though, as explained above, this would not get Debtors very

far, as claimants can usually file in more than one venue).

If, on the other hand, Debtors plan to file a motion under the Bankruptcy Rules'

equivalent of Fed. R. Civ. P. 56, the operative question is whether "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine question of material fact and that the moving party is entitled to a judgment

as a matter of law." Fed. Bankr. R. 7056(c). The Rule plainly contemplates that such a motion

is ripe for filing *only after discovery is completed*, taking into account all the evidence in the record. Otherwise. one could not reasonably argue that *no* questions of fact exist. because the facts requisite to making such an argument had not yet been identified. And at a minimum. of course. claimants could not be expected to file anything simultaneous with the close of such intensive discovery.

The ineluctable conclusion of this analytic exercise is unsurprising: Debtors' proposals are totally unworkable. They would essentially have the Court order full discovery on 200.000 tort claims to be completed in six months. Obviously, this is impossible. Surely. moreover. this Court does not want to become a *de facto* state court trial judge versed in the tort law of over fifty jurisdictions with its docket consisting of personal injury cases for the next decade or two.

Alternatively, the notion that discovery could be manageably limited to issues for which Debtors intend to seek summary judgment is nonsense. First. the scope of Debtors' omnibus objections is undefined. so any discovery order setting forth time limits would be shooting in the dark. Second, even if the motions were limited to the three issues identified in Debtors' brief, there would be little left to litigate after discovery is complete. Exposure. causation and injury essentially cover the key elements of these claims under tort law.

> 4. **Because Debtors' Scheme Would Still Leave Recovery Of Damages To The Section 524(g) Trust after Years Of Jury Trials. The Trust Should Simply Be Allowed To Handle The Entirety Of The Claims Process. As Congress Intended.**

Finally. Debtors propose that the Court hold hearings on the omnibus summary judgment motion and "litigate remaining issues though a common issues trial pursuant to FRCP 42" in the "Third Quarter" of 2003. Mem. at 49. As explained in Part III.B. *supra*. Debtors' proposed summary judgment motions have zero chance of succeeding. because issues of exposure. causation and injury cannot be resolved on a group basis. Thus. after the years of discovery that

are inescapable under Debtors' plan. this Court would end up mired in years of trial. And under 28 U.S.C. § 1411(a). which retains in bankruptcy the "right to trial by jury . . . under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." moreover. these trials would be before juries -- juries charged with determining the "validity" of claims. And again. because issues of exposure. causation and the existence of illness are heavily fact-specific, a single jury trial on tens of thousands of claims is both inconceivable and impossible. *See Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998).

Lastly. even after the extraordinary time and expense of discovery and trial, recovery of individual damages, presumably, would still be left for the section 524(g) trust to resolve. Given that the alternative course is to proceed forthwith with estimation. followed by confirmation. and to allow the resulting section 524(g) trust to handle the entirety of the asbestos personal injury claim process. as Congress intended. it is beyond peradventure that Debtors' unprecedented proposals should be rejected outright as a huge waste of time and money. After all. the whole premise of Debtors' motion is. presumably, to streamline this bankruptcy by siphoning off a significant portion of claims that are somehow prima facie invalid. It is unimaginable. however, how this could possibly be accomplished. To the contrary, it is painfully evident that Debtors' attempt to relieve themselves of the core liability at issue in this bankruptcy would be, first, unlawful and, second, too impractical to warrant serious consideration by this Court.

# IV.  CONCLUSION

Accordingly, for the reasons stated herein, Debtors' motion should be denied in all

respects.

CAMPBELL & LEVINE, LLC

/s/ Matthew G. Zaleski, III
Matthew G. Zaleski, III (I.D. No. 3557)
Chase Manhattan Centre
1201 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone:    (302) 426-1900
Telefax:        (302) 426-9947

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax:      (212) 644-6755

-and-

Peter Van N. Lockwood
Julie W. Davis
Kimberly N. Brown
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5088
Telefax:      (202) 429-5088

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

Dated:  September 10, 2001