

Asbestos claims against other defendants have increased as well. Equitas' March, 2001 Annual Report confirms that "[m]ost other defendants [in addition to the Manville Trust] also reported significant increases in the number of claims filed in 2001. The majority of these new claims have been filed on behalf of unimpaired persons." Likewise, a May 30, 2001 Tillinghast report estimates that average annual non-Center for Claims Resolution asbestos claims nearly doubled from 30,000 in 1998-99 to almost 60,000 in 2000.

**B.    Grace's Analysis Of The 1997 And 2000 Claims Further Confirms The Need For Litigation To Define Grace's Liability.**

Grace recently has completed an analysis of 500 randomly-selected claim files from its 1997 and 2000 filings. Grace augmented the medical data and occupational exposure information in these claims files by obtaining information that the same claimants filed with the Manville Trust

-11-

and the Center for Claims Resolution. *See* attached Claims Report, Exhibit K. The combined data from that survey confirms that the vast majority of the 1997 claims were invalid or of doubtful validity, and that valid year 2000 claims are even more scarce.

### 1. The Vast Majority Of The Claims Provide No Evidence Of Impairment.

The recent surge in claims against Grace is *not* due to an increase in the most serious and best documented claims, *i.e.*, cancer claims, but overwhelmingly is due to non-malignant claims. Based upon Grace's statistical survey, less than 7% of the 1997 claims were for mesothelioma, lung cancer, or other cancers. Seventeen percent of the claims included so little information that the type of disease could not even be determined. And the remaining 76% were for non-malignant conditions.

The percentage of malignant claims declined even further in 2000. Less than 6% of the claims were for cancer. More than 30% of the year 2000 claims presented so little information that no disease could be identified. The remaining 64% were for non-malignant conditions.

Analysis of diagnostic data relating to the sampled claims shows the same picture: no new wave of disease is responsible for the new wave of claims. Two diagnostic tests are widely used in combination to diagnose non-malignant injury: "ILO" readings of chest x-rays and Pulmonary Function Tests. X-rays are used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs. The physician grades the x-ray on a scale of 0/0 (no abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour Organization ("ILO"). The American Thoracic Society has set an ILO rating of 1/1 as the minimum

needed to support a diagnosis of asbestosis.[8] Since injury caused by the inhalation of asbestos fibers should affect both lungs equally, the x-ray findings should be bilateral.

Even an ILO rating of 1/1 does not establish any actual impairment in lung function. According to the American Medical Association, a second set of tests, Pulmonary Function Testing ("PFT"), is "the quantitative basis on which the evaluation of respiratory system impairment rests."[9] Two measurements of expiration function are taken: forced vital capacity (FVC) and forced expiratory volume in the first second ($FEV_1$). A third test, measuring the diffusing capacity of carbon monoxide in a single breath ($D_{co}$), is also performed. These results then are compared to normal predicted values calculated based on the gender, race, height and weight of the patient. For a diagnosis of "mild impairment," the AMA requires an FVC or $FEV_1$ result of 79% or less, or a $D_{co}$ result of 69% or less.[10]

When these diagnostic criteria are applied to Grace's 1997 and 2000 sample claims, the claims are found to be grossly wanting. Even if the 33 cancer claims in the 1997 sample are excluded, less than 2.8 % of the remaining claims presented ILO ratings of 1/1 or higher and PFT results meeting the AMA criteria for "mild impairment." Similarly, only 3.3% of the 2000 sample claims satisfied both standards.

In sum, the vast majority of the non-malignant claimants in both years failed to present the minimum medical evidence needed to substantiate *any* injury at all.

---

[8] American Thoracic Society ("ATS"), *The Diagnosis of Non-Malignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. (1986) 134: 363-367.

[9] *AMA Guides to the Evaluation of Permanent Impairment*, § 5.2, p. 159 (4th ed. 1998).

[10] *Id.*, at Table 8, p. 162.

### 2. Most Claims Fail To Establish Exposure To Grace's Products.

The recent sampling of Grace's 1997 and 2000 claims also shows that very few claimants can establish any actionable exposure to Grace's asbestos products, either because they provide no exposure information or because the claimants worked in industries and occupations in which exposure to Grace's products would have been unlikely or impossible.

Half of the claims provide no exposure information whatsoever. Of the 1997 sample claims, 236 (47%) provide no information about the site or location where the alleged exposure occurred, the worker's employer or industry, or the Grace product to which he was exposed. Fifty-two percent of the 2000 sample claims fail to provide any of that critical information. Even when Grace attempted to fill in these gaps by cross-referencing the claimant's Social Security number to the Manville Trust and CCR databases, it was unable to identify the industry involved for 20% of the 1997 sample claims, and 29% of the 2000 claims. And, of course, the Manville Trust and CCR data provide no information about any exposures to Grace products.

For the other half of the claims, the meager exposure information that is provided rarely implicates Grace. For example, Grace's Monokote-3 fireproofing product was applied by plasterers primarily at high rise steel construction sites. Yet, only two of the 500 sample 1997 claims and only one of the year 2000 claims were filed by plasterers. Indeed, only 8% of the 1997 Grace sample claimants and 3% of the 2000 claimants identified themselves as construction workers. Even after the Manville and CCR data was used to identify as many of the "unknown" claimants as possible, only 16% of the 1997 sample claims, and 12% of the 2000 claims, were found to be filed by construction workers.

The majority of the sample claims in which the claimant's industry can be identified (using the combined information from the Grace claim file as well as the Manville and CCR databases) were filed by workers who should not have been exposed to any Grace products:

| Grace Sample Claim Distribution By Percentage Of Known Industries | | |
|---|---|---|
| Industry | 1997 | 2000 |
| Iron/Steel Aluminum Production | 25% | 18% |
| Non-asbestos products Mfg. | 9% | 20% |
| Petro/Chemical Mfg. | 14% | 7% |
| Utility/Power Plants | 9% | 5% |
| Shipbuilding | 4% | 8% |
| Railroad | 2% | 6% |
| Auto Maintenance | 2% | 6% |
| Tire/Rubber Mfg. | 0% | 5% |
| Marine | 1% | 1% |
| Non-Grace Asb. Mining or Mfg. | 1% | 1% |
| Other Inapplicable Indus. | 17% | 12% |
| Totals | 86% | 88% |

Not surprisingly, most of these claimants submit no information about exposure to any Grace product. When an attempt is made to implicate a Grace product, the product identification often makes no sense. For example, seven sample claimants from the Kaiser Steel plant in Chicago claimed to have been exposed at that plant to "Zonolite Spra-Tex," a *decorative* ceiling product that never would be used in a steel works. Others at the same plant listed "Zonolite Monokote," the fireproofing product used in *commercial* high-rise buildings.

Many of these new claims appear to be the result of recent mass "screenings" and claim recruiting efforts at large industrial plants. For example, during the Fall of 2000, a single

-15-

plaintiffs' law firm submitted 1,672 claims to Grace, nearly all of which were for steelworkers in Pennsylvania, West Virginia and Ohio. On January 31, 2001, that same law firm submitted 66 claims from a single plant, the U.S. Steel works in Gary, Indiana. Fifty of those 66 claims shared seven common "diagnosis" dates between May 17th and June 16th of 2000. The next month, this same firm submitted 353 additional steelworker claims from the Gary plant, raising the number of claims submitted in January-February, 2000 from that single plant to 419. Most of these claims again shared common "diagnosis" dates between April and June of 1999, indicating they were the product of mass screenings.

As detailed in Grace's Informational Brief, these trends are the result of the indiscriminate filing of asbestos claims against an ever-increasing number of defendants. As will be discussed in further detail below, even the PI Committee's expert Mark Peterson concedes in his affidavit that "few plaintiffs" recall the specific products to which they were exposed, and that no product identification information was available in 79% of the sample Grace claim files the Committee reviewed *at the claimants' own law firms.* (Peterson Aff. ¶ 34)

## II. ESTIMATION CANNOT DEFINE GRACE'S LEGAL LIABILITY AND WILL IMPEDE RATHER THAN ADVANCE THIS CASE.

Both the PD Committee and the PI Committee have argued that estimation can supplant litigation and thus move the cases along to confirmation of a plan and creation of a settlement trust under 11 U.S.C. § 524(g). *See* PD Cmte. Brf. at 43; PI Cmte. Brf. at 9, 16, 18. Put bluntly, these arguments are an attempt to leap over the central issue here: whether the Debtors have actual legal liability under the federal rules and substantive law — a liability that is squarely contested in this case.

### A. Estimation Based On Historical Settlements Can Never Address Legal Liability, And It Will Perpetuate The Problems This Case Must Resolve.

The contention that the Debtors' "liability" can be extrapolated statistically from their historical settlements is no more an extreme version of tabloid law — that settlements are an admission of liability. In fact, the Debtors' pre-petition claims settlements were not made because the claims were valid; rather, they were made because the tort system offered no means of limiting settlements to valid claims. Trying more cases would have been prohibitively expensive and beyond the capacity of the courts in any event.

But the Court need not parse this history because the Federal Rules are clear and dispositive: settlements cannot be used to establish liability. Liability must be proven the old-fashioned way: by evidence on each element of a substantive cause of action. Federal Rule of Evidence 408[11] expressly bars using evidence of a settlement to prove liability. *See* FED. R. EVID. 408 ("Evidence of . . . furnishing or offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim . . . *is not admissible to prove liability for*

---

[11] Federal Rule of Bankruptcy Procedure 9017 states that "[t]he Federal Rules of Evidence . . . apply in cases under the Code."

. . . *the claim or its amount.*") (emph. added); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1247 (3d Cir.), *cert. denied sub nom., Moyer Packing Co. v. Petruzzi's IGA Supermarket, Inc.*, 510 U.S. 994 (1993) (evidence of settlement in two antitrust actions inadmissible under Fed.R.Evid. 408); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 275 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 471 U.S. 1002 (1985) (consent decision in electronics products "dumping" proceeding was not admissible in related civil judicial proceeding).[12]

Thus, as a matter of law, Grace's settlement history and estimation based on that history cannot be considered in adjudicating Grace's actual legal liability to any group of claimants. Instead, the proper time for estimation in a mass tort case, if estimation is to be employed, is *after* the Debtors' liability has been determined and the pool of valid claims against the Debtors has been defined. This sequence is mandated by the Debtors' basic right to seek disallowance of claims and the Code's adoption of ordinary litigation procedures for that process.

This sequence also has been acknowledged in two recent mass tort bankruptcies where liability was disputed and estimation was nonetheless proposed as an alternative to litigation. *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997); *In re The Babcock & Wilcox Co.*, No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000).

In *Dow Corning*, the bankruptcy court rejected competing motions for estimation where liability for breast implant claims was vigorously disputed. In a decision to which we return

---

[12] *See also New Jersey Turnpike Authority v. PPG Indus., Inc.*, 16 F.Supp.2d 460, 473 (D.N.J. 1998) (entering an administrative consent order for environmental cleanup claims cannot be used as evidence of liability in a CERCLA cost recovery action); *In re Dow Corning Corp.*, 250 B.R. 298, 342 (Bankr. E.D. Mich 2000) ("the Debtor's tentative offer to settle with breast implant claimants has no bearing on whether it will be found liable in tort . . ."); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (held improper in asbestos personal injury case for trier of fact to consider amounts of settlements with settling defendants as proof of the amount of claim against non-settling defendants).

later on, Judge Spector noted that liquidation (litigation) of personal injury claims is necessary and estimation cannot eliminate that requirement:

> While estimation may be a somewhat abbreviated form of liquidation, they are still essentially duplicative processes. With nonpersonal injury claims, estimation is often justified because it can entirely eliminate the need for liquidation. However, the present motions deal with estimating the value of personal injury claims and, absent settlement, liquidation simply cannot be avoided. As a result, proceeding directly to liquidation will have the salutary effect of saving time, money and eliminating potential negative side effects that could easily result from the estimation process.

*Id.* at 566. The focus in the *Dow Corning* case then turned to *Daubert* and summary judgment motions, which were pending at the time the case was resolved.

More recently in *Babcock*, the district court early on granted a motion for partial withdrawal of the reference from the bankruptcy court, matters concerning the asbestos personal injury claims because "it makes sense to withdraw the reference with respect to threshold liability issues in order to have these issues addressed before a court with undisputed jurisdiction" and because "[d]istrict courts are more familiar with these types of issues than bankruptcy courts." *In re The Babcock & Wilcox Co.*, No. CIV. A. 00-0558, 2000 WL 422372, at *4 (E.D. La. Apr. 17, 2000) (citing *In re Dow Corning Corp.*, 215 B.R. 526, 529 (Bankr. E.D.Mich.1997).

Shortly thereafter, over the objections of the various tort committees, the district court in *Babcock* ordered that a bar date be set for the asbestos personal injury claims and approved the use of tailored proof of claim forms because "[a]scertaining the number and identity of present claimants will assist in valuing the claims in this class [asbestos personal injury claims], by facilitating the *claims allowance **and*** estimation processes . . . in turn assist[ing] the parties in the negotiation and formulation of a viable reorganization plan." *In re The Babcock & Wilcox Co.*, Case No. 00-0558 (E.D. La.), Aug. 25, 2000 Order and Reasons at 8 (emph. added).

In the meantime, after the bar date process was in place, the tort committees filed a motion to initiate estimation procedures in the bankruptcy court *before* any data from the bar date process could be used in the claims allowance and disallowance process before the district court. *See* 12/27/00 Motion by The Asbestos' Claimants' Committee; 2/15/01 Futures Representative's Response And Joinder. The bankruptcy court took the matter under advisement and recently denied the motion for estimation, observing that estimation of claims during the pendency of, *inter alia*, the asbestos claims analysis before the district court, was not prudent when such matters "indicate that progress is being made on the case . . ." *See* September 21, 2001 Order and Reasons at 2.

Likewise, if estimation is employed in this case, it should only be initiated *after* the Debtors' actual liability is established, *not before*. A rush to estimate claims at this point not only flies in the face of the Federal Rules of Evidence and the Code's provisions for disputing claims, it also would perpetuate the problems that forced these Debtors into Chapter 11 in the first place.

### B.  Estimation Without Litigation Is Futile: Estimation Cannot Be Used To Cramdown On Equity Where Liability Is Contested.

Nor will leapfrogging liability disputes facilitate confirmation of a plan. A consensual plan apparently cannot be achieved here without initiating litigation. And a cramdown on equity is barred as a matter of law where liability remains at issue.

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan over the objection of a debtor's shareholders only if the plan is "fair and equitable." As the leading commentator explains, a major component of the

> "fair and equitable" requirement is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim. Once the participant receives or retains property equal to its claim, it may receive no more.

\* \* \*

> With respect to this part of Section 1129(b), the House Report provided that "one requirement applies generally to all classes before the court may confirm under [Section 1129(b)]. No class may be paid more than in full."

7 *Collier on Bankruptcy* ¶ 1129.04[4][a] at 1129-89 to 1129-90 (15th ed. Revised. 1999) (citing H.R. Rep. 595, 95th Cong. 1st Sess. 414 (1977)).

In view of this requirement, the estimation requested by the PD and PI Committees has no value as a predicate for a cramdown plan. It is beyond dispute that Grace's shareholders would be entitled to a finding of the actual value of asserted asbestos claims, based on all available defenses, before any conclusion could be reached as to whether a proposed plan contemplated a distribution to asbestos claimants greater than their claims merited. The proposed estimation sought by the PD and PI Committees could not resolve that issue.

Again *Dow Corning* is instructive. *Dow Corning*, 211 B.R. at 562. In that case, Bankruptcy Judge Spector struggled with a similar situation involving a "mass tort bankruptcy where liability has been disputed by the debtor." *Id.* at 554. Judge Spector initially noted that the debtor's dispute of its liability made its situation different from other mass tort cases where liability was not disputed. *Id.* As a result of that fact,

> [c]ase law provides little guidance on how to . . . value the pending personal injury claims. In substantially all of the mass tort bankruptcy cases which preceded this one, the major questions were how much would be needed to satisfy the thousands of tort claims; how best to raise the money; and what would be the best methodology to fairly apportion those funds among the claimants.

*Id.* Ultimately, because liability was disputed in *Dow Corning*, Judge Spector denied estimation motions of both the debtor and the tort committee noting:

> [w]e . . . do not irrevocably foreclose the possibility of estimating unliquidated tort claims, say as part of a confirmed consensual plan of reorganization. But if this case deteriorates into litigation Armageddon, let this be a start to the design of the battlefield. *Id.* at 562.

-21-

### C. The Committees Misinterpret § 524(g) Of The Bankruptcy Code.

The PD and PI Committees also argue that the Debtors are not entitled to undertake the basic claims allowance and disallowance process because the trust mechanism found in § 524(g) supercedes the Debtors' right to contest liability for broad categories of putative asbestos claims. PI Cmte. Brf. at 16, 18; PD Cmte. Brf. at 43. This assertion is wrong.

*First*, § 524(g) is not the exclusive mechanism for a successful reorganization of companies with asbestos liabilities. Section 524(g) merely sets forth certain tests which, if satisfied, will guarantee the effectiveness of a channeling injunction to protect the debtor and other entities from present and future asbestos claims and demands. The legislation is explicit that § 524(g) does not limit or supercede a court's authority to issue injunctions or exercise other powers in connection with a plan of reorganization outside of the scope of § 524(g). Specifically, the general statute contains the following rule of construction:

> Rule of Construction. -- Nothing in subsection (a) [regarding supplemental injunctions under § 524(g)], or in the amendments made by subsection (a), shall be construed to modify, impair, or supercede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization.

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111(b), 108 Stat. 4107, 4117 (1994); *see also 4 Collier on Bankruptcy*, § 524.07[2], at 524-44, 524-45. Thus, it is incorrect for the Committees to urge that §524(g) preempts other procedures to determine a debtors' asbestos liability.

*Second*, there is nothing in the language of § 524(g) itself that even addresses (much less forecloses) a claims allowance and disallowance process *prior* to confirmation of a Chapter 11 plan. Section 524(g)(2)(B)(i) of the Bankruptcy Code contemplates the establishment of a trust and

an injunction to be implemented in connection with the trust pursuant to a plan of reorganization. where such trust, among other things.

> (1) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death. or property damage actions seeking recovery for damages allegedly caused by the presence of. or exposure to. asbestos or asbestos-containing products;

11 U.S.C. 524(g)(2)(B)(i)(I). The language providing that the trust "assume the liabilities" of the debtor does not even speak to whether "liabilities" can be defined through a pre-confirmation claims allowance and disallowance process. Nor does it mean that the Debtors must abandon their defenses to contested liability or must cede to the trust the authority to litigate such defenses post-confirmation. To do so would mean that the Debtors would have no way of knowing how to properly fund or size such a trust in light of their actual liability. If, as the Debtors' contend, their ultimate asbestos liability is less than their net worth, then they are not insolvent, and any plan in these cases would need to protect the rights of the Debtors' equity holders as well as creditors.

Moreover, a § 524(g) trust cannot be created unless the plan is approved by at least 75% of those claimants voting. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). If the Committees' view were correct, and the Debtors could not engage in any pre-confirmation claims allowance and disallowance. then the success or failure of the § 524(g) trust would lie in the hands of claimants whose claims may be entirely meritless. This cannot be the intended result.

D. **The PI Committee's Promise To Expedite This Case Is Less Than Forthright.**

The PI Committee asserts that "[b]ecause Debtors' proposals for proceeding with liquidation of these [asbestos personal injury] claims would be enormously expensive and time-consuming. under section 502(c) such claims must be estimated — not individually liquidated." PI Cmte. Brf. at 19. However, the PI Committee fails to demonstrate how or why any resolution of

these cases through an estimation proceeding will be any less burdensome or lengthy than the procedures proposed in the Debtors' Motion. "Estimation" *sounds* faster, but, until liability issues have been resolved, there is no pool of claims to estimate and the promise of speed is unsupportable.

A full analysis of whether a contested estimation is likely to save any time is, again, found in *Dow Corning*. *See In re Dow Corning Corp.*, 211 B.R. at 555-68. Not only did the court find that estimation could not supplant litigation where liability for personal injury claims has disputed, but the bankruptcy court also exposed the inefficiency of contested estimation, finding that litigation was preferable because of all of the following problems:

(1) "the very real concern that estimates may prove to be inaccurate would be eliminated";

(2) "none of the time delay or expense associated with litigation over the question of how best to estimate the tort claims would be incurred";

(3) "time delay and expense associated with the estimation process itself would be avoided";

(4) perceived delays associated with claims liquidation are speculative — "there is no guarantee that estimation would in fact move matters along significantly faster";

(5) engaging in a rationale allowance and liquidation process would not result in any greater disruption of the debtor's business or significant increase in costs, than an estimation proceeding; and

(6) in the context of a mass tort case the effect of estimation can well be impermissibly to eliminate a claimant's rights without the due process associated with the liquidation process. *Id.* at 563-68.

The same considerations noted by Judge Spector in *Dow Corning* apply in this case. The Committees are asking this Court to use estimation based upon the Debtors' settlement history and the claims data for unrelated prior asbestos bankruptcies without regard to the threshold issue of whether the claims have legal validity. PI Cmte. Brf. at 19, 33; PD Cmte. Brf. at 36. Moreover,

such estimates would most likely prove to be inaccurate, would vehemently be objected to by the Debtors, and litigation regarding how best to estimate would ensue. In addition, estimation based on settlement history is impossible for certain of the Debtors' potential claims such as Zonolite claims for which no such data exists. There is no Zonolite claims settlement history and no prior liability determinations concerning the product — this is simply a new type of claim asserted against the Grace. *See* Debtors' Case Management Motion at 1-2.

III. THE LITIGATION PROTOCOL PROPOSED BY GRACE IS FOCUSED, LEGALLY SOUND AND MANAGEABLE.

As amplified below, Grace has identified very specific issues appropriate for common resolution and very specific procedures for addressing those issues. Far from being "unprecedented," as the PD Committee claims, the approach taken by Grace was used in the *Dow Corning* case, and the procedures proposed in the pending motion currently are being used in the *Babcock* bankruptcy. Moreover, these procedures come right out of the rules and are grounded in well-established, non-Chapter 11 precedent. Although earlier asbestos bankruptcies did not employ these procedures, this was by agreement of the parties. Recent events have demonstrated that the liability problems that were set aside by agreement in those cases did not disappear, and they now threaten the viability of the post-confirmation trusts.

Before responding to the tort committees' specific objections (*see* Section IV below), this Section first describes in more detail the issues to be litigated and the litigation plan for each issue. This Section is organized according to the three main types of asbestos claims brought against Grace (ZAI property claims, MK-3 or traditional asbestos property claims, and personal injury claims) and explains the protocol proposed for each type of claim. Section IV then addresses the objections.

A. ZAI: The PD Committee's Effort To Create A Whole New Area Of Liability Rests And Falls On Common Issues.

As set forth in Grace's opening brief, the facts are these. ZAI, an expanded loose-fill vermiculite (which has no known toxic properties), contains trace amounts of an asbestiform mineral that are far below even 1%, the level that the EPA and OSHA use to define "asbestos-containing"

material. *See, e.g.*, 40 C.F.R. § 61.141; 40 C.F.R. § 763.83.[13] From their inception, neither OSHA nor the EPA ever challenged the manufacture of ZAI or regulated ZAI due to its minuscule asbestos content. In addition, ZAI never has been the subject of a government warning. ZAI was not the subject of any property damage litigation until 2000, when the tide of asbestos claims against Grace grew. In fact, the only such litigation that reached the merits prior to the bankruptcy was the preliminary injunction and emergency class notice effort in the *Barbanti* case — which failed. *See Barbanti v. W.R. Grace & Co.-Conn.*, No. 00201756-6 (Spokane Cty., Wash. 2001).

These basic facts point to the threshold issue of whether ZAI poses any unreasonable risk at all. That is a classic *Daubert* summary judgment issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993). As discussed below, *Daubert* requires that scientific evidence pass tests of reliability before it can even be considered by the trier of fact. Here, if *Daubert* proceedings lead the Court to conclude that ZAI claimants lack reliable scientific evidence demonstrating that ZAI poses an unreasonable risk to humans, that finding would be dispositive of ZAI property claims on several grounds, including absence of product defect, causation and the economic loss doctrine. The ZAI litigation therefore may be resolved through *Daubert* and summary judgment proceedings.

Notably, the PD Committee provides no alternative proposal for litigating ZAI claims, and simply ignores all questions of whether, and to what extent, Grace should be liable for any ZAI claims.

---

[13] The EPA and OSHA have most recently used these standards in reassuring those working or living near the World Trade Center site that they are safe from asbestos danger. *See, e.g.*, "EPA and OSHA Web Sites Provide Environmental Monitoring Data from World Trade Center and Surrounding Areas," http://www.epa.gov/epahome/wtc/data_summary.htm (visited Oct. 4, 2001); EPA-OSHA Fact Sheet: Environmental Information from Ground Zero at the World Trade Center Site, http://www.epa.gov/epahome/wtc/data/epa-osha02.htm (visited Oct. 4, 2001).

1. *Daubert* Proceedings Should Be Used To Determine Whether There Is Reliable Scientific Evidence Demonstrating that ZAI Poses An Unreasonable Risk.

*Daubert* effected a major change in the law by assigning trial courts a "gatekeeping role" with regard to scientific evidence. *See Daubert*, 509 U.S. at 589-590, 597. *Daubert* bars "subjective belief" and "unsupported speculation" – that is, junk science – from entering the courtroom under the guise of expert testimony. *Id.* at 593-94. The Supreme Court set forth the following non-exclusive factors for trial courts to use in deciding whether science is admissible: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *See id.* at 593-94. In addition, the trial court must determine whether the proffered evidence is relevant, that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case" and is a good "fit." *Id.* at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

Importantly, where, as here, the *Daubert* inquiry involves complicated scientific issues, the courts can appoint scientific experts under Rule 706 to assist in the "gatekeeping" role. Indeed, the Supreme Court has encouraged the use of scientific experts in complex cases. In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) the Court upheld the trial court's grant of summary judgment based in part on the failure of plaintiffs' experts to provide sufficient evidence of disease causation. In a concurring opinion, Justice Breyer recognized the difficulties that complex cases impose on judges and cited with favor the New England Journal of Medicine's proposal for experts to assist courts in the gatekeeping process: "'a judge could better fill this gatekeeper function if he

-28-

or she had help from scientists. Judges should be strongly encouraged to make greater use of their inherent authority . . . to appoint experts.'" *Id.* at 149-50. Such independent experts can – by virtue of their scientific knowledge – play a critical role in advising the court and informing the decision-making process.[14]

In the multi-district litigation regarding breast implants, for example, a 706 panel was assembled and ultimately issued a report that was highly instrumental in the subsequent resolution of that litigation.

Here, under *Daubert*, ZAI claimants must provide scientifically reliable evidence demonstrating that ZAI poses an unreasonable risk. Grace expects *Daubert* proceedings to establish that there is no reliable scientific evidence demonstrating that ZAI poses a unreasonable risk.

    2.    **A Finding Under *Daubert* That Claimants Lack Reliable Scientific Evidence Demonstrating ZAI Risk Would Be Dispositive Of ZAI Property Claims.**

If the ZAI claimants do not produce reliable scientific evidence of unreasonable risk, summary judgment should be granted on several grounds: (a) absence of product defect; (b) lack of causation; and (c) application of the economic loss doctrine.

    a.    **Product Defect**

By definition, a useful product free from unreasonable risk does not suffer from a product defect.[15] Although there are three different tests for finding a design defect—"risk-utility,"

---

[14] A panel of medical and scientific experts was used in the breast implant litigation and has been proposed in other pending Chapter 11 proceedings, including the *Babcock* bankruptcy and *In re Federal Mogul*, Case No. 01-10578 (Bankr. D. Del.).

[15] Under the generally accepted Restatement (Third) of Torts, a product may be defective under any of three theories: (1) a manufacturing defect, (2) a failure to warn or to instruct, or (3) a design defect. This section focuses on a design defect, because it is clear that ZAI does not suffer from a manufacturing defect (wherein a product fails to perform its intended purpose or does not match the design of others in its line) and is not
(continued...)

"reasonable alternative design" and "consumer expectations" — a product that poses no unreasonable risk cannot be considered defective under any of those tests.

First, the risk-utility test balances the likelihood and seriousness of injury from the product against the usefulness of the product. *See Cinnaminson Township Bd. of Educ. v. National Gypsum Co.*, Civ. No. 80-1842 (AET), 1989 WL 5820, at *2 (D.N.J. Jan. 25, 1989); *see also* RESTATEMENT (THIRD) OF TORTS, *Prod. Liab.* § 2(b). If ZAI poses no unreasonable risk, the balance clearly weighs in favor of its usefulness, and the product is not defective.

Likewise, under a reasonable-alternative-design analysis, a manufacturer has a duty to use a safer alternative design only if one reasonably is available. *See* Restatement (Third) of Torts, *Prod. Liab.* § 2(b). If ZAI poses no unreasonable risk to building occupants, any alternative design is not "safer."

Finally, under a consumer-expectations analysis,[16] a product is defective if it is unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. *See, e.g., Falk v. Keene Corp.*, 782 P.2d 974, 977 (Wash. 1989). As a matter of law and logic, reasonable

---

[15] (...continued)
defective under a failure-to-warn theory (which rests upon a predicate finding that there is something against which the consumer must be warned).

[16] The consumer-expectations analysis has been falling out of favor with courts, and it appears in the Restatement (Second) but not the Restatement (Third). The test likewise has been widely criticized in academic circles. *See, e.g.*, James A. Henderson, Jr. & Aaron D. Twerski, *Closing the American Products Liability Frontier*, 66 N.Y.U. L. Rev. 1263, 1294-95 (1991). The analysis also makes less sense for ZAI claims, as consumers did not usually select the ZAI product.