The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale. As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[35]

In the face of these problems, two things must be shown for ILO readings to be admissible under *Daubert*: (1) a minimum reading of 1/1; and (2) multiple readings of each radiograph to ensure consistency and reproducibility.

While the requirements on reliability and reproducibility under *Daubert* can only be satisfied in this way, these threshold showings also are fully consistent with the diagnostic criteria for asbestosis. The fact that a 1/0 reading represents only "suspect" disease, combined with the variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting. The "authoritative consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[36] Thus, to make a scientifically reliable showing that a claimant has asbestosis, a chest radiograph must demonstrate that the claimant has a score of 1/1 or higher.

---

[34] (...continued)
Organization. Geneva 1980 at 20. NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ("1980 ILO Report") There is also the perception some B-readers systematically bias readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992)

[35] H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

[36] *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM.REV. RESP. DIS., 134:363-68 (1986).

ILO classifications below 1/1 further fail to meet *Daubert* requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter. *Daubert* forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error. *Daubert*, 509 U.S. at 590, 594.[37] Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. *See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 236 n. 14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); *Raymark Indus., Inc. v. Stempel*, No. 88-1014-K, 1990 WL 72588, at *7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

As for readings of 1/1 or higher, the variability problem may be reduced but still remains. Each B-reader brings an individual level experience and bias to what indisputably is a subjective process of interpretation. Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified B-reader. The ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are made for each radiograph."[38] Other experts agree. As Dr. Ducatman has stated, "[a]t present, individual diagnoses, *legal decisions* and population assessments ought to rely on multiple readings."[39]

---

[37] Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard. The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher. *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136: 1516-17 (1987).

[38] 1980 ILO Report at 20.

[39] Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emph. added).

Accordingly, Grace proposes the use of independent, court-appointed scientific experts under Rule 706 to assist in ensuring the accuracy of ILO readings of asbestos personal injury claimants. An outside panel could be recommended by the National Academy of Sciences (or a similar impartial authoritative organization) and approved by the Court for this purpose.

### *Pulmonary Function Tests*

PFTs are the best tool to determine whether an asbestos claimant has a physical impairment. Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction. But such tests are reliable only if performed accurately, and they are particularly subject to manipulation. For this reason, the ATS has issued comprehensive standards governing PFTs.[40] Inaccurate or poorly performed tests can result in improper diagnoses. Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[41]

Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests require full patient cooperation and effort. "Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test

---

[40] ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies*, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[41] *Id.*

correctly.[42] Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[43]

In order to survive a *Daubert* challenge, claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the ATS standards and experience in performing and interpreting PFT tests, can review existing tests to determine whether they were conducted properly. For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether Forced Vital Capacity (FVC) test was properly conducted. A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other. If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

Another important check is whether the spirometer was set to record for the full length of time recommended by the ATS. Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present. Appropriate predictive values must also be used to identify what constitutes abnormality and normality.

With respect to FVC curves and other spirometric tracings, an independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

---

[42] Fitzgerald et al., *Office Evaluation of pulmonary Function: Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[43] ATS *Standardization of Spirometry—1987 Update*, AM. REV. RESP. DIS. 136: 1285-98 (1987).

2.  **Grace Has Proposed A Straightforward Litigation Protocol For Personal Injury Claims.**

Grace's litigation protocol for personal injury claims streamlines the process of adjudicating claims while preserving legitimate personal injury claimants' right to a jury trial. Grace intends to file exemplar objections and summary judgment motions to each category of disputed claims — e.g., claims alleging exposure at a site not served by Grace, claims alleging mere site exposure, instead of direct work with a Grace product, and so forth. These objections and summary judgment motions will present Grace's factual and legal arguments as to product identification, dose, and compensable injury. Each exemplar objection will be served by first-class mail to the holders of the disputed claims, who will have thirty days to file a response. Because the Proof of Claim form requires provision of most of the information needed, wide-scale discovery should not be necessary. Any Rule 706 expert work then can proceed. Incorporated in the resolution of these summary judgment issues may be the submission of expert reports on disease diagnosis, extent of injury, and causation, allowing the parties to engage in *Daubert* proceedings regarding the reliability of scientific evidence to support personal injury claims.

Once the Court rules on the exemplar objections/motions in a particular category, Grace will file omnibus objections and summary judgment motions for all similarly situated claims, which will be served by first-class mail on the holders of the disputed claims at the address provided on the Proof of Claim form. To the extent that claimants elect to contest the Debtors' objection, such claimants will have thirty days to file a response showing cause why the Court's exemplar rulings do not govern their situation. In *Babcock & Wilcox*, the court approved the use of similar omnibus objection procedures to resolve over 49,000 claims based on alleged pre-petition settlements with B&W. Pursuant to the court's order, B&W periodically objects to "exemplar" claims within

particular pre-defined categories. If the court sustains the exemplar objections, B&W files omnibus objections to other claimants who fit within the same category. Each of the claimants subject to the omnibus objection then has the opportunity to show cause why his or her claim should not be subject to the particular objection category. Although the B&W omnibus objection procedure is not yet complete, thus far, the categorical objection process has resulted in the resolution of over ten thousand claims without further court involvement.

## IV. THE OBJECTIONS TO THE LITIGATION PROTOCOL MISCHARACTERIZE PRIOR ASBESTOS BANKRUPTCY CASES AND MISSTATE GRACE'S POSITIONS.

Labeling Grace's proposals as "novel" and "unprecedented," the PD and PI Committees lodge essentially four objections against Grace's proposed litigation protocol:

(1) The issues surrounding asbestos claims against Grace are too individual for common resolution.

(2) The proposed protocol is novel and departs from the "prototypical asbestos bankruptcy."

(3) The proposed protocol does not allow for each claimant to be represented by the counsel of his or her own choice.

(4) Grace opposes appointment of a futures representative.

In this section, the Debtors respond to each objection.

### A. The Issues Here Are Not Too Individual For Common Resolution, And Grace Has Never Argued To The Contrary.

The PD Committee's primary argument against Grace's proposed litigation protocol is that Grace opposed class certification in a number of cases long ago, on the basis that individual issues precluded class certification. The PD Committee quotes extensively from Grace briefs filed in class action proceedings in *Dayton Independent School District v. W.R. Grace & Co.* and in *Kirbyville Independent School District v. Asbestospray Corp.* in service of the argument that Grace opposed elsewhere what it proposes here. This contention lacks merit for three reasons.

*First*, the PD Committee's objection confuses litigating a class action — which is what was proposed in the *Dayton* and *Kirbyville* cases — with resolving common issues. A class action is a far different procedure than a mass-tort bankruptcy. Because this is not a class action, no finding of predominance is required. Further, because this is a bankruptcy proceeding, all current claimants will be present before the Court. Thus, instead of allowing a few named plaintiffs to

-57-

litigate on behalf of all, each claimant can be required, through the claim form, to support his or her own claim. Resolution of issues common to groups of claimants will adjudicate the claims directly, not through a representative.

*Second*, there were and remain good reasons why class certification in the prior cases was inappropriate in the prior cases. In *Dayton*, for example, Grace opposed a plan to try certain claims commonly for five out of eighty-two public school districts in the proposed class. The *Dayton* case involved not just a single product but many; not just Grace, but many other asbestos defendants as well; and varying claims not just for replacement but also for contamination.

*Third*, the cases cited by the PD Committee objectors are outdated. *Daubert* had not been decided at the time of those earlier cases, and the constructive notice and statute of limitations arguments that are key to MK-3 cases had not yet ripened. Furthermore, the state of technological advancement and diagnostic procedures has improved markedly in the intervening years, making possible threshold determinations of risk that were not feasible before.

The PD Committee's reliance on *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) for the proposition that no issues in an asbestos case may be litigated on a common basis also is misplaced. In *Cimino*, a multi-product class action brought against several asbestos manufacturers and suppliers, the district court adopted a three-phase litigation procedure which resulted in significant liability for one of the defendants.

In Phase I, a jury determined (i) which if any of each defendant's products was defective, (ii) what each defendant knew or should have known of the risk; (iii) whether each defendant was guilty of gross negligence in marketing the offending products, and (iv) punitive damages multipliers for each defendant guilty of gross negligence. *Cimino*, 151 F.3d at 301. In Phase II, the parties entered into a stipulation approving a special verdict form and agreeing that

-58-

some plaintiffs had been exposed to defendants' products. *See id.* at 306-07. In Phase III, two juries determined, for 160 "sample" cases only, two damages issues: (i) whether the plaintiffs suffered from an asbestos-related injury or disease and, (ii) if so, the amount of damages. *See id.* at 303. In the Phase III trial,

> "[T]he juries were told to assume that the claimants had sufficient exposure." Indeed, for the most part evidence of exposure and its likely or possible results was not allowed. Simply stated, whether there was exposure to Pittsburgh Corning's — or any other defendant's — asbestos, and, if so, whether that exposure was a cause of any of the 160 sample plaintiffs' illness, disease, or damages, was neither litigated nor determined in any of the Phase III trials.

*Id.* at 305.

Despite the fact that causation had not been shown for any individual or group of individuals, the trial court "extrapolated" from the "sample" cases and allowed all claimants to recover based upon the injuries they claimed. The Fifth Circuit found that this procedure was unacceptable, violated Pittsburgh Corning's Seventh Amendment rights, and did not comport with Texas substantive law or the Fifth Circuit's prior decision in *In re Fibreboard*, 893 F.2d 706 (5th Cir. 1990). *See Cimino*, 151 F.3d at 303.

*Cimino* plainly does *not* stand for the proposition that *no* common issues can be adjudicated in asbestos cases, but only for the proposition that (beyond general causation) *individual* causation is an essential element of liability and cannot be proven *by the plaintiff* through *extrapolation*. Indeed, in Phase I of *Cimino*, most of the defendants were eliminated based on rulings regarding common issues concerning the alleged defectiveness of their products. This phase was not deemed problematic by the appellate court. Thus, the court implicitly approved the sort of common-issue adjudication proposed by Grace here. With respect to Phase III, the court merely

ruled it was impermissible to adjudicate remaining issues of "individual causation" for only a sample of the plaintiffs and then extrapolate those results to the remainder. *Id.* at 311.[44]

Here, Grace has proposed no such sampling and "extrapolation." Rather, Grace proposes the use of Rule 42 to resolve issues that are common to specific categories of claims. The issues Grace has identified for consolidated resolution here are exactly the sort of threshold, common issues that have been deemed the proper subject of consolidated resolution in asbestos cases such as *Cimino*[45] and in other mass-tort contexts as well. For example, in *Dow Corning*, the court indicated that consolidation of breast implant disease claims for purposes of a "single, generic causation trial" was appropriate. 211 B.R. at 580. Consolidation under such circumstances was warranted to adjudicate "a threshold issue which, depending on its resolution, could obviate the need for further proceedings." *Id.* at 583. In *Dow Corning*, the common issues that warranted consolidated resolution related to whether silicone in breast implants caused disease. *See id.* at 598.

---

[44] In its decision, the court distinguished between common issues of "generic causation" such as whether a "combination of chemical contaminants and the plaintiffs' exposure to them had the capacity to cause the alleged harm" and issues relating to "individual proximate cause." *Cimino*, 151 F.3d at 317 (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988)). The concurrence in *Cimino* specifically stated that under the court's ruling, a plan that involved consolidation of the litigation for purposes of adjudicating common causation and exposure issues "on a craft and work site basis during the relevant time periods" would be permissible. *Id.* at 337 (Garza, J., concurring). The court could then "simply plug[] each plaintiff into a craft, work site, and time period" to resolve the causation issue. *Id.*

[45] Contrary to the Committees' implication, asbestos cases have been consolidated in the past. *See, e.g., Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir. 1990) (upholding consolidation), *cert. denied*, 498 U.S. 920 (1990); *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1497 (11th Cir. 1985) ("The cases here [involving asbestos litigation] present precisely the kind of tort claims a court should consider consolidating for trial."); *Owens-Corning Fiberglass Corp. v. James*, 646 So.2d 669, 674 (Ala. 1994) (observing that "common questions of law and fact existed in these cases, both with respect to initial legal liability and with respect to medical causation"); *In re Minnesota Personal Injury Asbestos Cases*, 481 N.W.2d 24, 26 (Minn. 1992) (observing that consolidation of asbestos cases was appropriate because "[i]t is likely that there will also be common issues of law, including those relating to the connection between exposure to asbestos and disease").

Here, Grace proposes consolidated litigation of similar common issues relating to asbestos in various products it manufactured.

The fact that the asbestos claims may implicate other, individualized issues is no objection to consolidation. Rule 42 merely requires the existence of a common issue of fact or law — not that all issues relating to the consolidated claims be generic or common issues. *See* 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2384 (1995) ("Consolidation is not barred simply because the plaintiffs may be relying on different legal theories or because there are some questions not common to all actions; the critical consideration, as in other contexts under the federal rules, is whether there is at least one common question . . . ."). Thus, as the *Dow Corning* court recognized, consolidation under Rule 42 in the mass-tort context is particularly appropriate to resolve threshold issues relating to the validity of claims, given that resolution of such common issues at the outset may "obviate the need for further proceedings" involving "factors that are more individual in nature." 211 B.R. at 583, 594.[46]

### B. The Proposed Protocol Is Neither Unprecedented Nor Impermissibly Novel.

The Committee also argues against Grace's protocol on the grounds that it does not look like the "prototypical asbestos bankruptcy." This argument misses the mark. Grace's protocol is comprised of litigation procedures taken right out of the rules. There is no question but that there is ample precedent outside of Chapter 11 for the use of *Daubert*, Rule 56, and Rule 42 to resolve common issues of science. (*See* § 3 above).

---

[46] *See Dow Corning*, 211 B.R. at 581 (given "potential obstacles to class certification, it is perhaps fortunate that the Federal Rules of Civil Procedure provide for an alternative form of collective litigation" under "Rule 42").

And there is additional precedent in the context of Chapter 11. As also noted above in Section 3, precedent is readily found in the *Dow Corning* and *Babcock* cases. Debtors in even more recent asbestos reorganizations also have indicated that they will follow this type of litigation path for defining the scope of liability. *See, e.g.*, Debtors' Info. Br. 28-29, *In re Federal-Mogul Global Inc.*, Case No. 01-10578 (Bankr. D. Del. Oct. 1, 2001) (proposing resolution of common issues that bear upon the validity of asbestos-related claims); Debtors' Info. Br.18-24, *In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del. June 25, 2001) (same).

That the Chapter 11 precedent is recent is no accident. Mass-tort bankruptcies have evolved in light of the failures — and successes — that emerged from their predecessors. Earlier cases that have been resolved without defining liability have involved consensual reorganizations. Many of these reorganizations, however, have run into problems. In the Johns-Manville reorganization, for example, the Trust allowed all claimants to go back into the tort system, who proceeded to litigate in every corner of the county, forcing the Trust to spend in litigation costs what it should have been using to compensate claimants. *See* Frank Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future*, 17 Cardozo L. Rev. 583, 602–03 (1996). The Trust quickly became insolvent, and in return for an agreement from plaintiffs to pay only 10 cents on the dollar, the Trust agreed to a new grid system for paying claims with loose criteria for disease proof that ducked the issue of claim validity. Almost immediately after the grid system was activated, the Trust was inundated with unexpected numbers of new nonmalignancy claims that it had reason to believe were questionable if not downright fraudulent.

Recently, as a result of this surge of claims against which the Trust had no defense (having negotiated away the right to deny such claims), the Trust has been forced to lower the

percentage it pays out on claims. Similar reductions have occurred in payouts by the UNR and Eagle Picher trusts.

### C. The PI Committee's Argument That Each Claimant Is Entitled To His Own Counsel Misses The Mark.

#### 1. Grace's Proposal Does Not Preclude Participation By Counsel For Claimants Who Are Not On The Committee.

The PI Committee calls Grace's proposal to establish a Personal Injury Litigation Committee ("PIL Committee") an attempt to strip tort claimants of a fundamental right to hire counsel of their choice. *See* PI Cmte. Brf. at 34-35.[47] The accusation that Grace will force counsel upon unsuspecting claimants is incorrect and ignores the fact that the Bankruptcy Code specifically allows for and recognizes the importance of establishing claimant committees.

The need to create multiple creditor committees in complex cases has been recognized since the Bankruptcy Code's inception. *See In re Dow Corning Corp.*, 194 B.R. 121, 142 (Bankr.E.D.Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (Bankr.E.D.Mich. 1997). A court is authorized to appoint committees in addition to those required under §1102(a)(1) as long as each committee adequately represents its constituents. *See id.* at 141-42. To determine whether a committee provides adequate representation, a court should consider "(a) the nature of the case; (b) identification of the various groups of creditors and their interests; (c) the composition of the committee; and (d) the ability of the committee to properly function." *See id.*

---

[47] It is important to note that in each case that the PI Committee cites in support of its contention that an individual's right to choose her counsel is fundamental, the facts are significantly different than those here, and the court explicitly state that the right to choose one's counsel is a qualified one. *See Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) ("To be sure, that right is qualified"); *PGH Int'l v. Gabor Shoes AG (In re PGH Int'l)*, 222 B.R. 401, 408 (Bankr. D. Conn. 1998) ("Yet, at a minimum, that right must be balanced against the need to maintain the highest standards of the profession.").

-63-

This case warrants creation of a PIL Committee. First, the complexity of this bankruptcy case and the sheer magnitude of the asserted claims counsels the appointment of litigation committees.

Second, the personal injury claimants make up a clearly-identifiable group, most of whom claim the same or similar injuries, making committee representation ideal.

Third, the PIL Committee would be comprised of attorneys representing the full spectrum of claimants in order fairly to represent each type of claimant. In the unlikely event that a particular claimant was not fairly represented, his or her counsel would not be precluded from appearing and objecting upon a showing of unique circumstances such that representation by the committee was inadequate.

Finally, the ability of the PIL Committee to function properly could be evaluated as the process continues to ensure that each claimant is adequately represented.

### 2. Proceedings In Babcock & Wilcox Confirm That The Committee Approach Works.

Once again, the experience of the *Babcock* bankruptcy is instructive. There, over 50,000 claimants filed proofs of claim alleging that they had settled individual cases against Babcock & Wilcox and thus had contractual claims to enforce, as opposed to pure personal injury claims. When litigation was initiated over these "settled claims," the B&W court faced the same challenge presented here — how efficiently to handle such massive numbers of claims. The B&W Asbestos Claimant's Committee — much like the PIL that Grace proposes here — took on the task of representing the interests of the "settled claims" group of claimants in determining the validity of their claims. Nonetheless, consistent with Grace's observations above, many claimants have had their own counsel appear for them where individual issues have arisen.

**D.    Debtors Do Not Oppose Appointment Of A Futures Representative.**

A final issue raised by the PD and PI Committees easily is resolved. Contrary to the PD and PI Committees' assertion, Debtors *do* support and indeed will seek (at the proper time) appointment of a futures representative.

## V. THE PROPOSED NOTICE PLAN COMPLIES WITH DUE PROCESS AND IS REASONABLE.

Grace has proposed a multimillion dollar Notice Plan designed to reach 96.5% of the target demographic group of PI claimants (men 65+) and 95.4% of the target demographic group of PD and ZAI claimants (adult 35+). The Plan is structured to provide potential claimants a reasonable opportunity to file their claims by the bar date. The Plan affords claimants due process and should be approved.

### A. The Objections To The Plan Wrongly Presume That The Notice Should Educate And Warn.

The PD Committee objects that the Notice Plan does not adequately reach or educate the "unwary claimant," such as homeowners who do not know that they have ZAI in their attics. But, for purposes of complying with due process, a bar date notice need not "warn" potential claimants of the alleged health hazard associated with Grace products or "educate" them as to any potential claim they may have against Grace. Grace is only required to provide reasonable *notice* to potential claimants of the bar date.

The Supreme Court ruled in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) that notice must "apprise interested parties of the pendency of the action" and "afford them an opportunity to present their objections." Such notice must include: (i) a prominently announced date; (ii) disclosure of any impending hearings so that recipients can take steps to safeguard their interests; (iii) an explanation of the bar date's significance, including the consequence of not filing a timely proof of claim; and (iv) a clear definition of what claims are being barred. *See In re Amdura Corp.*, 170 B.R. 445, 452 (D. Colo. 1994); *In re Keene Corp.*, 188 B.R. 903, 908 (Bankr. S.D. N.Y. (1995); *see also, Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 390 (1993). The notice also should advise how claimants can obtain additional

information. *Richison et al. v. American Cemwood Corp. et al.*, No. 5532, Order Granting Final Approval To Class Action Settlement, and Judgment, Final Order and Decree Thereon (Sup. Ct. San Joaquin Cty, CA. May 26, 2000).

There is no precedent for requiring bar date notices to "educate" or "warn" potential claimants further. To the contrary, the courts have consistently held that a bar date notice need not advise claimants of the basis of their claims. *See, In re Penn Central Transp. Co.*, 771 F.2d 762, 768 (3d Cir. 1985), *cert. denied*, 474 U.S. 1033 (1985) (debtor was not required to advise creditors that they may have claims *based specifically upon certain causes of actions* - such as antitrust conspiracy actions). *See also, Amdura*, 170 B.R. at 453 (bar date need not advise of the "nature" of their potential claimants' interests.).

Warning of potential danger of debtor's products is not appropriate unless the requirements for an injunction are met on the merits. In the class action case of *German v. Federal Home Loan Mortgage Corp.*, 168 F.R.D. 145, 160-161 (S.D.N.Y. 1996), the court held that plaintiffs were not entitled to early notice of the dangers of lead paint in public housing. The court found that the plaintiffs' "warning" notice improperly sought to imply an early liability determination before any trial on the merits. Such a notice was rejected because it could lead to the "undesirable solicitation of claims." (citing *Hormel v. United States*, 17 F.R.D. 303 (S.D.N.Y. 1955)).

Prior to Grace's Chapter 11 filing, the plaintiffs in *Marco Barbanti, et al v. W. R. Grace & Company - Conn*, No. 00-2-01756-6 (Sup. Ct., Wa. Spokane Co. Order dated Jan. 31, 2001) ("*Barbanti Order*") requested a class notice be sent warning of the alleged dangers of ZAI. In denying this "warning" notice, the Barbanti court held:

> At this time I do not believe that plaintiff has demonstrated an emergency which would justify the court sanctioning a notice, and in effect, prejudge the case. There are factual disputes about the quantity of asbestos in vermiculite;

whether or not there is any threshold level of exposure, which would not be dangerous; the quantity of asbestos fibers found in the air of the homes tested and the testing protocols used.

*Barbanti Order* at 3. The PD Committee and the ZAI plaintiffs should not obtain through the Notice Plan relief that requires an adjudication on the merits.

The Grace Notice Plan is just that: a means to notify potential claimants of the bar date. The notice may be very general and must be "scrupulously neutral." *Grunin v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975); *also see Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982). The notice should describe the proceedings "in objective, neutral terms, that, insofar as possible, may be understood by the average absentee" claimant. *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977). Courts recognize that notices can practicably contain only a limited amount of information and have approved "very general description[s]" of the bar date and its consequences. *See, Grunin* at 122. In fact, an overly-detailed notice has been found to be unduly expensive and potentially confusing. *Nissan Motor*, 552 F.2d at 1104.

### B. Concerns With Respect To The Specific Content Of The Bar Date Notices Have Been Addressed.

The PD Committee exerts itself to explain the importance of particular aspects of a notice, such as the headline. But the Committee's objections dwell on stylistic matters, not due process issues. These stylistic concerns easily are remedied. Grace has incorporated the legitimate points in the revised short form notices, TV spot and long form notice attached as Exhibits B (8), (9) and (13) and D.

Specifically, the PD Committee argues that: (a) the headline is too broad and not specific enough to get the attention of claimants; (b) the notices are directed at claims rather than claimants; (c) the combined notice is confusing; (d) the notices fail to educate and warn; and (e) the

-68-

TV spot is unintelligible and lacks visuals. The PD Committee also objects to the limited description of ZAI and the lack of pictures. With respect to non-ZAI claims, the PD Committee suggests that the notices should target more than just commercial building owners.

In a cooperative effort to communicate the necessary messages in the most effective manner possible, Grace has modified its various notices and TV spot. The headlines of the short form and trade notices have been revised to be more prominent and more specifically directed at potential claimants. The short form and trade notices have been redirected at claimants instead of claims. Likewise, the content of the notices have been revised to clearly distinguish types of claimants and claims using subheadings, product descriptions, and simple language to avoid any confusion. The notices have been revised to more fully describe ZAI and how it can be visually identified by claimants. The revised description of ZAI is essentially the same as the parties agreed to use in *Barbanti*. (Exhibit A, Kinsella Aff. ¶ 14). A picture of ZAI also has been added.

The non-ZAI portion of the notices have been revised to clarify the types of buildings which may give rise to an asbestos property damage claim.[48] They also have been re-worded to more fully describe Grace's non-ZAI products. As such, the short form notices give the "basic information" required and urge potential claimants with questions to call the special toll free number, or go to the special website and obtain the full bar date package. *See, Carlough v. Amchem Products*, 158 F.R.D. 314, 330 (E.D. Pa. 1993).

---

[45] The Committee argues that the notices are not properly directed at schools. While the notices are directed to owners and operators of public buildings, which would include schools, Grace notes that the great majority of public and private schools have already settled any claims they have against Grace with respect to "asbestos containing products" in two national class actions that were filed and settled, namely *In re Asbestos School Litigation*, No. 83-0268 (E.D. Pa) and *Central Wesleyan College v. W. R. Grace*, 2:84-1860-8 (D.S.C.), as well as other actions filed by school districts.

-69-

In accommodating the PD Committee's objections, Grace has not provided (and need not provide) separate notices to separate types of claimants. Grace seeks to notify personal injury, property damage, ZAI and all other claimants of the bar date. In analyzing the demographics of all these claimant groups, Grace's notice expert, Kathy Kinsella, determined that there are two primary demographic targets that include the vast majority of all claimants. Kinsella developed a plan that effectively reaches these groups without the necessity of separate media campaigns to reach the claimant groups individually. (Kinsella Aff. ¶ 9 Ex. A). Providing separate notices for each claimant group would be unnecessary and wasteful.

In analyzing the reasonableness of bar date notices, the court must balance the needs of notification of potential claimants with the interests of existing creditors and claimants. *See, Vancouver Women's Health Collective Society, v. Robbins Company, Inc.*, 820 F 2d 1359, 1364 (4th Cir. 1987) ("A bankrupt estate's resources are always limited and the bankruptcy court must use discretion in balancing these interests" in deciding the adequacy of a Notice Plan.) Courts recognize that combining notices reduces "the costs of the litigation and thereby prevents an unnecessary depletion of" estate assets. *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d at 1106. The balance of competing interests here strongly favors a combined notice plan to take advantage of the similar demographics of the potential claimants.

Instead of publishing separate notices for each type of claimant, Grace has redesigned its notices to more fully describe the different types of Grace products which may be the subject of claims and the different type of claims that a claimant may hold. Since the bar date for all claimants is the same, the combined notice will cause no confusion. Grace's use of a combined notice is similar to that in *Babcock & Wilcox*, where the PD Committee's expert, Todd Hilsee, prepared a