combined notice for the debtors' for both property damage as well as personal injury claimants. A copy of that notice is attached hereto as Exhibit C.

The PD Committee also criticizes the Grace TV spot as being "unintelligible" and lacking in appropriate visuals. These criticisms are premature, because the TV spot is still in a conceptual stage. When fully produced, it will include visuals of both ZAI and non-ZAI products. (Kinsella Aff. ¶ 12.) As the Court outlined in *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 330 (E.D. Pa. 1993), a 30-second television spot should be designed to catch the attention of potential claimants, alert them to the existence of the bar date, encourage them to look to other sources for more information and provide information as to where complete notice packets can be obtained. The TV spot has been revised along the same lines as the summary bar date notice.

**C. The Notice Plan Effectively Reaches Potential Claimants.**

In addition to the content of the notices, the Court must also review the designed reach of the Notice Plan. Due process requires that the "best notice practicable under the circumstances" be given. *Mullane*, 339 U.S. at 317. The fact that some potential claimants must be given notice by publication "is not necessarily fatal." *In re Domestic Air Transportation Antitrust Litigation*, 141 F.R.D. 534, 539 (N.D. Ga. 1992). In this respect, the PD Committee makes few specific criticisms of the Plan. The Committee's focus is on the content of the notice, arguing that the reach will be irrelevant if the notices lack a meaningful message. As detailed above, the content modifications made by Grace address those concerns.

The Committee's objections to the reach of the Notice Plan are that it: (a) is too costly; (b) contains inflated reach calculations; (c) fails to address schools and ZAI claimants in Canada; and (d) fails to cover non-ZAI sales in the Pacific Rim countries. The Medical Monitoring

claimants (Libby, Montana residents) object generally to the Notice Plan as "failing to address" their claims. None of these objections have merit.

Notably, the PD Committee fails to provide any constructive suggestions to enhance the reach of the Plan. For example, while Grace believes that the cost of the Notice Plan is appropriate, Grace would be happy to reduce the costs of the Plan and has invited the Committee to describe how they believe that can be accomplished. The PD Committee's criticisms of the reach calculations are unfounded. The reach calculations were complied using data from Media Mark Research and Nielsen Media Research, two nationally accredited media and marketing research firms, that are the leading sources of such information in the advertising industry. The combined reach estimates for print and television advertising were calculated with a Telmar Software product that is also used widely throughout the advertising industry to calculate estimates of this type. (Kinsella Aff. ¶ 20.)

The Notice Plan has been modified in order to address potential ZAI claimants in Canada. (Kinsella Aff. ¶ 21). The Notice Plan for *non*-ZAI claimants in Canada is adequate. No property damage claims have been filed against Grace in Canada since Grace won a favorable ruling in *Privest Properties, et al. v. The Foundation Company of Canada et al., C884875*. In that case, the Supreme Court of Canada sustained the judgment of the trial court dismissing plaintiff's claims against Grace and finding, among other things, that Grace's MK-3 product was not an inherently dangerous product. With respect to personal injury claimants in Canada, the Canadian workers compensation system provides claimants the appropriate redress for their injuries. The Notice Plan structured for Canada is not directed at personal injury claimants.

The reach of the Notice Plan for the Pacific Rim has not been adjusted. Grace's records do not indicate that Grace sold asbestos containing products outside of the United States and

Canada, except for some extremely small amounts of MK-3. For a period of time in the 1950's, 1960's, 1970's and early 1980's, Grace did sell some vermiculite products to various parties in the Persian Gulf region and Asia, but these sales constituted no more than about 1% of its total sales of vermiculite products. Further, Grace's records suggest that the workers installing Grace's vermiculite products for these projects were from around the world. As a result, there is no possible way for Grace to provide notice to such potential claimants. (Kinsella Aff. ¶ 24).

The Committee also argues that Grace is seeking to require potential claimants to touch or disturb asbestos products in order to file claims, forcing claimants to choose between disturbing the product in order to avoid exposure to the product and foregoing the right to file a claim. The Committee is wrong. Most, if not all, product owners or managers already know the product information needed to file a proof of claim, without even examining the product. And, to the extent that actual inspection of the product is necessary, Grace has provided sufficient description of the product so that a claimant can tell from looking at it if it is a Grace product. ZAI, for example, is easily distinguishable from other loose fill insulation products made from material other than vermiculite.

The Medical Monitoring Claimants simply are wrong in contending that the Notice Plan fails to address their claims. First, the Plan expressly provides that the Bar Date Notice Package will be mailed to all residents of the Libby, Montana area. (at 15). In addition, the Notice will be published in the Libby Montana newspaper, the *The Missoulia Independent*, in Parade and USA Weekend carried in seven different local newspapers in Montana as well as relevant trade and consumer publications. The notices specifically disclose that the bar date applies to holders of claims "caused by asbestos in products manufactured by Grace or from vermiculite mined, milled or processed by Grace." The notices also clearly provide that the bar date applies to *any* claims

against Grace. Thus, the Medical Monitoring Claimants have been fully addressed in the Notice Plan. (Kinsella Aff. ¶ 26.)

The Notice Plan, as amended, provides potential claimants with adequate information with respect to the bar date and the claims being barred. It informs potential claimants of the effect of not filing a claim by the bar date and will be sent to all known claimants[49] and published in appropriate media so as to reach unknown claimants. Multi-faceted notice programs like that proposed in this case have been approved by many courts and utilized successfully for similar purposes in large consumer or product class actions where most class members are not individually identified. *See Cox v. Shell Oil Company*, case no. 18,844, Final Order Approving Class Action Settlement at 13 (Chancery Ct. Obion Cty. Tenn, Feb. 9, 1996) (citing *In re Domestic Air Transportation Antitrust Litigation*, 141 F.R.D. 534 (E.D. Pa. 1992)). The Notice Plan, as revised, is consistent with the many notice plans that have been approved in previous Chapter 11 Bankruptcy cases, complies with due process and should be sustained.

---

[49] In preparation for sending actual notice to claimants, Grace has discovered that it does not have the addresses for known asbestos personal injury claimants and ZAI claimants in its database. Grace only has the addresses of claimants' counsel. As a result, Grace is requesting that counsel for claimants assist in sending out such actual notices as outlined on Exhibits E and F.

## VI. THE PROPOSED PROOF OF CLAIM FORMS ARE NECESSARY AND APPROPRIATE.

The Claim forms are key to the central task of this case. They supply the necessary factual predicate for defining the Debtors' liability. To that end, the proposed claim forms have been carefully tailored to achieve this goal — without being unreasonably burdensome. In objecting to the forms, the Committees are essentially demanding that their predicted 200,000 claims be accepted at face value, with no scrutiny of Grace's actual liability and no requirement that the claimant show actual asbestos-related injury until *after* a reorganization plan is confirmed and a trust is established to pay claims. The Committee's proposal would thus require this Court to ignore the assertion of illegitimate claims, and indeed would ratify and reward the filing of claims lacking a good faith basis.

### A. The Personal Injury Claim Form Asks For Necessary Information And Is Not Unreasonably Burdensome.

Grace's proposed Personal Injury Claim form is needed in order to decide whether the claimant actually was exposed to Grace's asbestos products, whether that exposure was sufficient to cause injury, and whether the claimant in fact suffered injury. The PI Committee's estimate that it would take a paralegal three hours to complete the form is an exaggeration. But even if this estimate is accurate, three hours is not an unreasonable burden.

#### 1. Prior Cases Provide Ample Support For Grace's Tailored Requests.

There is ample authority for this approach. First, as noted above, detailed claims forms have been approved by numerous asbestos trusts for the payment of claims. The 21-page Manville claim form is more extensive than Grace's proposed form. The individualized review forms for the Celotex, Eagle-Picher and UNR Trusts are similar to Grace's form.

Second, detailed claim forms or questionnaires repeatedly have been approved outside of Chapter 11 in order to streamline the litigation of mass tort cases. For example, the MDL court which administered the Dow Corning breast implant multi-district litigation approved a much more extensive and burdensome 42-page "Plaintiff Questionnaire" that required disclosure of information about plaintiffs' current and former addresses, family members, prior marriages, educational and employment history (including all absences for medical reasons), medical history (including all surgeries and hospitalizations and all visits to treating doctors), prescription drug history, claimed damages, prior lawsuits, prior communications with defendants, a listing of all witnesses who could support the claim, and a request for an extensive list of documents (including medical records, diaries, journals, logs, product identification records, medical bills, and documentation of lost wages or income), and releases authorizing the disclosure of medical and employment records.

As noted in Grace's opening brief, detailed questionnaires also were approved in the orthopedic bone screw product liability litigation, the "Phen-fen" product liability case, the latex allergy product liability case, an asbestos product liability case and the "Agent Orange" litigation, among others.[50]

---

[50] *See, e.g., In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1995 WL 925678, at *1 (E.D. Pa. Feb. 1, 1995) (attaching questionnaire); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 704702, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*, 1999 WL 387322 (E.D. Pa. 1999); *Ludwig Enters CMOs on Product ID Questionnaire, More In re Latex Allergy*, 12/2/97 Andrews Med. Devices Litig. Rep. 10 (discussing use of 42-page questionnaire seeking identification of manufacture, individuals who could corroborate use, documents supporting claims, medical information, and education and employment information in *In re Latex Gloves Prods. Liab. Litig.*, MDL Docket No. 1148 (E.D. Pa.)); *In re Food Lion, Inc.*, 1998 WL 322682, at *11 (4th Cir. 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim"); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1416 (E.D.N.Y. 1985), (Weinstein, J.) *aff'd in part, rev'd in part on other grounds*, 818 F.2d 179 (1987) (ordering questionnaires "sent to all claimants" seeking dates and location of service to determine extent of exposure); *In re New York City Asbestos Litig.*, 142 F.R.D. 60, 63, 65 (E.D.N.Y. 1992) (mentioning use of a "questionnaire process (continued...)

Further precedent for this approach is provided by the widespread adoption of "*Lone Pine*" orders by both state and federal courts managing multi-plaintiff toxic tort claims. The term "Lone Pine order" originated in a New Jersey case, *Lore v. Lone Pine Corp.*, No. L-33606-85 (N.J. Super. Ct. 1986) in which the trial court directed plaintiffs to provide expert opinions supporting their personal injury and property damage claims against a neighboring landfill, including specific causation evidence. Last year, the Fifth Circuit rejected the argument that such "pre-discovery" orders imposed too high a burden on plaintiffs at the threshold stage of litigation. The court held that such orders mitigate the burdens of mass tort litigation on the courts and defendants, and merely require plaintiffs to disclose the causation and damages evidence they should have assembled *before* filing their claims:

> *Lone Pine* orders are designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation. In federal courts, such orders are issued under the wide discretion afforded district judges over the management of discovery under Fed.R.Civ.P. 16.
>
> * * *
>
> The scheduling orders issued below essentially required that information which plaintiffs should have had before filing their claims pursuant to Fed. R. Civ. P. 11(b)(3). Each plaintiff should have had at least some information regarding the nature of his injuries, the circumstances under which he could have been exposed to harmful substances, and the basis for believing that the named defendants were responsible for his injuries.

*Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000) (affirming dismissal of radiation exposure personal injury cases for failure to comply with *Lone Pine* order). *See also Martinez v. City of San Antonio*, 40 S.W.3d 587, 591-92 (Tex. Ct. App. 2001) (rejecting challenge to *Lone Pine* order and to "no evidence" summary judgment dismissal of toxic tort claims alleging personal

---

[50] (...continued)
designed to elicit all information necessary for settlement" of asbestos claims).

injuries from lead exposure based on failure to present causation evidence); *In re Love Canal Actions*, 547 N.Y.S.2d 174, 177 (N.Y. Super. 1989) (entering *Lone Pine* order requiring toxic tort plaintiffs to document their chemical exposure and medical injury claims prior to any further prosecution of the claims).

Third, and most importantly, this approach was approved by the court in the *Babcock* case, the first major asbestos bankruptcy case to confront the recent surge in claims. In that case, the debtors initially proposed a more extensive proof of claim form than ultimately was adopted by the court. As in Grace, the personal injury committee opposed the inclusion of any substantive information in the claim form, arguing the time and expense of compiling that information was "prohibitive." (8/25/00 Order and Reasons at 21) The court agreed with the debtors that the claim form "must establish, at a minimum, the ground on which they [the claimants] base debtors' liability to them. In this case, that entails establishing a claimant's exposure to asbestos from debtors' products and the injuries that resulted from that exposure." (*Id.* at 22) The court thus authorized the debtors in the form "to ask questions that go to this prima facie evidence of liability" and approved debtors' requests for:

- Diagnostic reports supporting the claimed asbestos injuries;

- PFT and ILO results;

- The total number of years of asbestos exposure and the year of first and last exposure;

- The specific locations where the claimant was exposed to debtors' boilers, and the industry and occupation codes associated with each such location.

While the court in *Babcock* declined to approve additional questions,[51] subsequent events in the *Babcock* case underscore the need for the information sought by the Debtors there, and which Grace seeks in its proposed form here. Specifically, based on the pre-petition filing rate, about 50,000 current claims should have arisen in the 18 months between the B&W petition date and the July 30, 2001 claim bar date. Even allowing for some acceleration in the filing of claims due to the bar date, the more than 222,000 claims that were filed far surpassed any reasonable projection. The vast majority of those claims appear to be invalid, for many of the same reasons that apply to the 1997 and 2000 Grace sample claims. As with Grace, over 90% of the B&W claims are for non-malignant "asbestosis", yet more than half of those claims submitted either no x-ray results or an ILO reading below the American Thoracic Society standard for that disease. More than half of the claimants also failed to submit any PFTs, or submitted PFTs within the normal range established by the American Medical Association.

The majority of the B&W claims also presented no evidence of any actual exposure to B&W's product (boilers with asbestos insulation). Based on a sample of the B&W claims, the Debtors found that 68% of the claims failed to allege the claimant had even worked at a location where B&W's boilers were present. Where such allegations were made, 44% named locations where B&W's boilers had never been installed.

Finally, tens of thousands of the B&W claims already had been paid in full, or were duplicative, or were unsigned, or submitted none of the required medical records, or left entire sections of the form blank.

---

[51] The court expressed concerns that requiring further information could deter the filing of claims by placing an "undue burden on parties who wish to assert claims" and eliminated several questions from the debtors' proposed form. (*Id. at* 21-25). As discussed below, subsequent events have underscored the need for sufficiently detailed forms.

The major plaintiff law firms responsible for the mass filings of these invalid claims in the *Babcock* case will play the same role in the *Grace* cases. These recent developments thus underscore the critical need for the submission of the requested medical and exposure information in the Grace proof of claim form.

**2. The Requests For Medical Information Are Reasonable.**

The proposed claim form asks for the following medical information:

- The claimant's diagnosis, including the name of the diagnosing physician, the date of the diagnosis, and any non-asbestos causes identified in the diagnosis.
- The results of any x-rays and Pulmonary Function Tests.
- Basic information on the claimant's smoking history, if any.
- Copies of the medical records relating to the diagnosis, along with any other x-ray or CT scan test results taken in the prior two years.

Each of these requests is essential to determining the validity of the claim. The diagnosis identifies the nature of the claim. X-ray tests (and the physician's ILO rating of those results) are needed to link the diagnosis to asbestos exposure. For non-malignant claims, PFT results are essential to establish actual impairment. Requiring disclosure of all x-rays and CT scan taken in the past two years assures full rather than selective disclosure of the relevant tests. As detailed in Part I, above, submission of this medical information is particularly important given the high proportion of pre-petition claims with little or no supporting medical tests.

The PI Committee does not dispute the ultimate need for disclosure of this information before any claim payment is made. Other asbestos proof of claim forms, including those issued by the Manville Trust, as well as the "individualized review" forms issued by the Celotex,

Eagle-Picher, and UNR trusts, require similar information. Since more than half of those who assert claims against Grace are also asserting claims against the Manville Trust and other asbestos trusts, the additional burden of completing the Grace form will be minimal. (The paralegals in the "pretest" described in Peterson's affidavit apparently did not utilize the information already compiled for other asbestos trusts. This alone would substantially reduce Peterson's three-hour estimate for completing the Grace form.)

**3. The Requests For Exposure Information Here Are Necessary And Are Not Unreasonably Burdensome.**

The requested exposure information is essential to determining the validity of any submitted claims, as well as for estimating the ultimate magnitude of valid claims. Claimants who were occupationally exposed are asked to disclose:

- The time periods in which they were exposed to Grace's products as well as those of other defendants.
- Their industry, occupation and employer(s);
- The site locations where they were exposed to Grace's products;
- The name(s) of the Grace products and how close they were to those products while they were being installed.

This information is needed to ascertain the basis for Grace's alleged liability. Information on the claimant's exposure to other asbestos products also is essential to determining whether it was exposure to Grace's products that caused the claimant's injury.

Ironically, the PI Committee's arguments that it would be too "burdensome" to collect the requested information proves that the vast majority of the pre-petition claims have been filed against Grace with no good-faith factual basis, and that the asbestos plaintiffs' law firms intend

to continue these tactics in asserting claims in these Chapter 11 cases. Peterson's affidavit admits that "few plaintiffs" recall being exposed to "specific asbestos products", and that the "assembly" of evidence from "documents, co-workers and only some time by the plaintiff himself" to support a claim of exposure to Grace's products is a "labor-intensive" and "burdensome" process that plaintiff lawyers defer until "the time of trial or discovery. . . ." (Peterson Aff. ¶34)

**B. The Property Damage And ZAI Proof Of Claim Forms Are Appropriate.**

The PD Committee objects to the Property Damage and ZAI proof of claim forms as being unreasonably burdensome and confusing. These objections are unfounded. While the *Babcock* property damage proof of claim form may only have been a slightly revised version of Official Form 10, the debtor in that case was not particularly concerned with property damage claims. Only a handful of property damage cases had ever been brought against *Babcock*. Further, the *Babcock* product was used for such a narrow purpose that any legitimate property damage claims could more easily be identified. By contrast, for Grace, property damage claims traditionally have played a large role in asbestos-related litigation. And, for Grace, with the advent of the ZAI claims, property damage concerns necessitate gathering more information than was necessary in *Babcock*.

The Property Damage and ZAI proof of claim forms are not long and are not burdensome. They request simple and straightforward information that is necessary in order to determine if the claimant has a legitimate basis for a claim against the Debtors. Further, the requirement that a claimant file a separate claim form for each property owned is not unreasonable or unduly burdensome. The information requested of claimants as to each property is not complicated and does not involve any kind of extensive inspection. It is information that would readily be know by any property owner or manager. The Committees' specific concerns regarding schools is unfounded since most schools' claims have already been settled in the *Asbestos Schools*

*Litigation*, the *Wesleyan* class action, and other actions filed by school districts as outlined previously.

The Committee also suggests that preparation of a proof of claim requires that potential claimants touch or disturb asbestos products. As outlined in Section V herein, this is not true. The type of information requested can be provided by most owners based on their knowledge of their property without even looking for the product. To the extent that a potential claimant believes he needs to look at the product, the claimant does not need to touch or otherwise disturb the product in order to determine if he believes he has a claim against Grace.

In examining the proof of claim forms, Debtors have discovered a few areas where they believe the language should be modified slightly. In addition, Debtors have added the description of the ZAI product to the ZAI claim form. Attached hereto as Exhibits I and J are revised Property Damage and ZAI proof of claim forms.

**C. The Non-Asbestos Proof Of Claim Form, Definitions And Instructions Have Been Modified Slightly.**

Finally, the Official Committee of Unsecured Creditors ("UCC") has requested that Grace revise the Non-Asbestos Proof of Claim Form, Instructions and accompanying definitions. The UCC is concerned that the fact that a bar date is being set for *all claims*, including trade claims, is lost among the extensive information provided for asbestos related claims. Attached hereto as Exhibits I and J are a revised Non-Asbestos Proof of Claim Form and instructions and revised General Instructions that address the UCC's concerns and are also consistent with the PD Committee's objections.

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program be granted.

Dated: November 9, 2001

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

______________________________
Laura Davis Jones
David Carickhoff
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in Possession