**EXHIBIT I**

# GRACE

PERSONAL AND CONFIDENTIAL                03629668

To:    C. E. Brookes                               May 24, 1977
       C. N. Graf

From:  E. S. Wood

Subj:  Tremolite in Vermiculite

       cc:  R. M. Vining
            B. A. Blessington
            H. C. Duecker
            W. R. Hanlon
            W. F. McCord
            L. Rosenblatt
            B. R. Williams
            J. W. Wolter

The purpose of this memorandum is to discuss in some detail
the nature of the tremolite problem as it impacts our vermiculite business,
and also to outline our plans for dealing with the problem. These plans
are based on extensive product testing, analysis of alternative confi-
gurations of the Zonolite business, and consultation with legal counsel,
including the Corporate Legal Division.

THE PROBLEM

Tremolite is present as a tramp mineral in our vermiculite
deposits, and while most of it is separated from the vermiculite in the
milling process, small amounts are carried to expanding plants and ul-
timately into finished products. Tremolite is classified as asbestos
and regulated by the Environmental Protection Agency (EPA), the Occupa-
tional Safety and Health Administration (OSHA), the Mining Enforcement and

C. E. Brookes/C. N. Graf          -2-          May 24, 1977

03629669

Safety Administration (MESA), the Consumer Product Safety Act (CPSA), and
the Toxic Substances Control Act (TSCA) as a carcinogen.  Although we have
been working since 1971 to reduce tremolite in our product, in our expanding
plants, and in our mills, we have felt until now that tremolite was mis-
classified by OSHA and others as a form of asbestos.  This was based on our
understanding of the difference in physical characteristics of tremolite
compared to other fibrous forms of commercial asbestos, as well as outside
studies such as the animal study sponsored by Johnson & Johnson on a
tremolite talc which showed no carcinogenicity.

        Two recent developments have changed our views on this subject.
First, an in-house study of mortality rates among ex-employees at Libby
indicates that their risk of lung cancer is five times the national average.
In this connection, we have experienced asbestosis in 41.5% of the workers
(with over 10 years' service) in Libby, as well as in 28% of the workers (with
over 10 years' service) exposed to Libby ore in the expanding plants.  (The
experience at Libby is confused because all of the aforementioned workers
were exposed to high dust count levels in the old dry mill.  The present
Libby dust environment with the new mill represents a major change in this
respect.  Fiber counts have dropped from a level of above 30 f/ml on the
average to a level below 5 f/ml.  Also, the expanding plant employees
mentioned have also been exposed to commercial asbestos in the manufacture
of MK for a number of years.)  Secondly, with respect to national safety
regulations, the prior distinctions between "commercial asbestos" and "non-
commercial asbestos" (tramp contaminants) are being erased as the general
nature of the hazard of exposure to fibrous materials is more thoroughly studied.

C. E. Brookes/C. N. Graf                    -3-                    May 24, 1977

03629670

A great deal of controversy exists over what constitutes a safe level of exposure to a carcinogen. Most people would agree that safe levels are very difficult to establish. One view, taken by most regulating agencies, is that since no safe level can be unequivocally demonstrated, carcinogens must be eliminated where there are acceptable substitutes. Where the carcinogen cannot be eliminated by substitution, exposure must be controlled at the lowest level which can be technically achieved and reliably monitored. The opposing group makes a strong case that no unusual health risks have been rigorously documented for asbestos exposures below 5 f/ml (8-hour time weighted average), much less the present standard of 2 f/ml, or proposed standard of .5 f/ml. In the presence of such controversy it is difficult to determine what posture is appropriate for us in establishing limits of exposure for our employees and customers. A more detailed discussion of the health hazards associated with asbestos exposure is contained in Appendix I.

The exposure problems that we have seen to date are limited to the fibrous type of tremolite that occurs in the Libby deposits. The tremolite associated with our deposits in and around Enoree, South Carolina is largely non-fibrous. Since we have no evidence of asbestosis or other excess health risk associated with asbestos exposure among employees working in South Carolina, we do not believe that the levels of exposure to our employees or customers utilizing material from South Carolina creates a health hazard of any kind. In the case of material from Libby, we believe that lower levels of exposure are required to assure the safety and well-being of our employees. Moreover, regulations already proposed, when put into effect, will mandate lower levels.

15101910



C. L. Brookes/C. N. Graf.

03663376

PROPOSED ACTIONS

1. Fiber Control

As a result of the existing and expected regulations, we are
moving ahead on a faster than planned schedule with requests for $1,271,000
in fiber control capital spending originally budgeted through the end of
1978 for the Libby mill and various vermiculite expanding plants. We will
also request authorization to spend $298,000 over and above that which was
budgeted, again principally for fiber control projects. The individual
projects are listed in detail in Appendix II.

Insofar as fiber reduction is concerned, our experience to date
indicates that removal of tremolite fibers at the mill is a preferred
method of reducing employee and customer exposure levels. Immediate tem-
porary steps have been taken to reduce the level of fines which have been
recycled into the ore shipped from Libby. It is too early to assess the
benefit of these changes, although taken alone they are r " expected to
eliminate the need for a fiber reduction program at the expanding plants
and a fiber-binding program for consumer products. The cost of permanent
equipment to collect and dispose of these fines is included in the overall
Libby fiber reduction program discussed below.

The present MESA standard in effect at Libby is 5 f/ml (8-hour TWA).
The Federal Metal and Non-Metal Mine Safety Advisory Committee has recommended
that MESA lower the present standard to 2 f/ml, although the timing of such
a change is uncertain. Our objective is to bring all Libby fiber counts
below 2 f/ml by January 1, 1978. To meet this objective we will be pro-
ceeding with $713,000 in capital spending over the next few months (budgeted

15076208

C. E. Brookes/C. N. Graf                    -5-                     May 24, 1977

03629671

at $605,000 in the 1977 capital budget). Included in this amount will be
$331,000 of spending against RCA 12-2 (budgeted for this year at $204,000)
for mill-related fiber and dust segregation, collection and disposal equip-
ment. The remaining $387,000 (budgeted at $401,000 for 1977) will be
directed at mine area dust control and vehicular dust control equipment.
Authorization for this spending is being requested under separate RCA's
and shop orders.

          For the long term, research is being carried on at North
Carolina State, aimed at improved separation techniques that appear to
be effective in clean-up of our finer grades (No. 3 and No. 4). Un-
fortunately, this approach does not seem to be effective for the coarse
grades (No. 1 and No. 2) which are used almost exclusively for Attic
Insulation (hence the need for a binder development for Attic Insulation).
Laboratory scale results indicate that a reduction of over 90% in the
level of fibrous tremolite in fine grades may be achievable. This would
appear to be the preferred long-term solution to tighter fiber exposure
levels both at our expanding plants and in the customer use environment
for the greatest volume of our products ($28.3 million out of a total $35.5
million of expanded vermiculite sales and ore sales to outsiders using
Libby ore in 1977).

          A series of changes primarily in ore handling facilities will
be made at eight expanding plants which do not presently meet the OSHA
standard of 2 f/ml (8-hour TWA). These changes will total $943,000 of
capital as follows:  Denver ($50,000); Newark ($114,000); Phoenix ($110,000);

15101911

C. E. Brookes/C. N. Graf                    -6-                    May 24, 1977

03629672

Dallas ($50,000); Portland ($107,000); Dearborn ($197,000); and Omaha
($315,000). Since the steps taken to reduce fiber counts to 2 f/ml,
with proper plant maintenance, can generally bring fiber counts below
1 f/ml with appropriate peripheral equipment, we expect to achieve a
level of 1 f/ml at all expanding plants by mid-1978. An additional
$93,000 of capital will be required for peripheral equipment to meet
1 f/ml at the following plants:  Easthampton ($17,000); St. Louis ($26,000);
Little Rock ($50,000). These changes will be handled through a series
of individual plant RCA's or shop orders, with the exception of Omaha
spending which has already been approved under RCA E76-317 ($247,000
approved by the President on November 26, 1976), and RCA E76-311 ($68,000
approved by the CPD President on September 27, 1976). Excluding Omaha,
the expanding plant capital spending totals $721,000 versus budgeted 1977
and 1978 figures totaling $666,000.

        In part, these changes are being undertaken now since they re-
present relatively small capital increments (above what would be required
to reach the present mandatory levels) that will yield substantially lower
exposure levels to our employees. However, it is clear that the levels
which we propose meeting will eventually be embodied in stricter state
and federal standards. Moreover, it is clear that the Federal Government
policy for the long run will be directed to achieving the lowest level
which is technically feasible and which does not have an adverse impact on
the economy as a whole.

C. E. Brookes/C. N. Graf              -7-              May 24, 1977

03629673

Standards as low as .1 f/ml have been proposed by the National
Institute for Safety and Health (NIOSH). While this was a proposal that
has been made without regard for its economic impact or technical feasi-
bility, it is indicative of the general philosophy behind control of
substances defined as carcinogens.

2.  Product Labeling

Based on the advice of corporate general counsel, we have
decided not to affix asbestos warning labels on any of our expanded
products which, in their normally intended use, do not expose customers
to fiber levels above those permitted by OSHA. Thus, no products made
from South Carolina ore will require labeling. Subject to the results of
additional job-site tests, no present expanded products using Libby ore
will require labeling, with the possible exception of industrial grades
for which we may not be able to identify and test all end uses. This
policy is consistent with the posture of Johns-Manville, the largest
supplier of asbestos products in the U.S. and a leader in the field of
asbestos safety and health precautions. Effective July 1, 1977, all new
packaging purchased will include a general dust warning label printed on
the package.

In the case of consumer products, we are operating under the
presumption that the present controversy over regulation of materials con-
taining asbestos will be resolved by the Consumer Product Safety Commission
(CPSC) in favor of a complete ban on consumer products containing asbestos
fibers unless they can be shown to be "bound". Recent action of the CPSC

C. E. Brookes/ C. N. Graf                -8-                    May 24, 1977

**03629674**

in proposing a ban on drywall joint compounds containing asbestos, arti-
fical fireplace logs using free asbestos fibers, and spackling compounds
containing tremolitic talcs tends to support our presumption of an eventual
ban on unbound asbestos-containing consumer products.

Equipment is being installed at 14 key plants at a projected
cost of $130,000 (average of $9,300 per plant) using individual, locally
approved shop orders.  This equipment will permit us to apply a binder
for our two major consumer products -- Attic Insulation and Horticultural
Vermiculite.  Simultaneously with the installation of the equipment, we
are in the process of choosing an appropriate binder and level of treat-
ment with the objective of reducing the use exposure for these products
to a level of 1 f/ml maximum exposure and .2 f/ml on an 8-hour time
weighted average basis.  These are levels chosen because we think they are
technically achievable and are close (within a factor of 2) to the level
which NIOSH proclaims to be the lowest level which can be reliably monitored.

It should be emphasized that these steps are being taken to
comply with the extremely stringent projected regulations, and not because
we feel that the use of these products creates a serious risk for consumers.

Considering the brief and irregular pattern of use, we do not
believe that asbestos exposure from our products causes an increased risk
of health problems.  However, there is a fringe of expert opinion, most
prominently and articulately represented by a well-publicized expert from
Mt. Sinai (Dr. Selikoff) suggesting that even brief exposures, presumably
at high levels, can later produce mesothelioma.  Mesothelioma is a rare form

C. E. Brookes/ C. N. Graf                    -9-                    May 24, 1977

03629675

of lung cancer linked to asbestos exposure. For this reason, and the ex-
pected stiff regulation of asbestos-containing materials in consumer
products, we feel that it is prudent to develop a treatment for our con-
sumer products, even though it is anticipated this will increase our cost
of manufacture by up to 15%.

Even though we will not be labeling most of our products, we
intend to notify customers who inquire that small amounts of tremolite are
present in our end products with the exception of our mixed products. In
the case of mixed products (MONOKOTE and soil mixes), tremolite is detectable
only through the use of internally developed analytical procedures which
require elaborate techniques not commonly recognized or employed in the
scientific community for detection of asbestos. For this reason, we are
taking the position with all but authorized government authorities that our
mixed products are "non-asbestos" products. Obviously, in responding to
government inquiries we intend to provide specific data, which we have, that
identifies trace levels of tremolite even in mixed products. It is our
belief, for purposes of the law, that the amount of fibrous tremolite present
in our mixed products is de minimis.

Requests for written statements concerning the presence of
asbestos in our products from customers will be answered by indicating that
we have small amounts of tremolite present in the product and by referring
them to the OSHA regulations covering asbestos-containing products.

1510101 5

C. E. Brookes/C. N. Graf                    -10-                    May 24, 1977

**03629676**

ZONOLITE PROFITABILITY IMPACT

Comparative financial analyses have been completed for the present Zonolite business and several alternative configurations which could be forced by future regulatory activity and/or our ability to meet future fiber standards. The base case and alternative case assumptions and financial comparisons are presented in Appendix III. The following table summarizes key financial statistics for: 1.) the Zonolite 1977 budget and forecast, prepared in October 1976; 2.) a 1977 re-estimate completed in January 1977 reflecting adjustments to sales and gross margins based on the economic outlook at that time (used as the "base case" in Appendix III); 3.) a "most likely" future case reflecting additional capital spending for fiber control, additional costs for binder treatment in certain products, withdrawal of certain consumer products such as Attic Insulation in the U.S., and labeling of the remaining consumer products (Case B in Appendix III).

| ($000) | 1977 | | | 1980 | | |
| | Budget | Base Case | Case B(1) | Budget | Base Case | Case B |
|---|---|---|---|---|---|---|
| Net Sales | $65,719 | $63,495 | $57,303 | $92,639 | $92,281 | $80,232 |
| Operating Profit | 5,201 | 4,183 | 3,033 | 8,278 | 8,512 | 6,065 |
| Profit After Tax | 2,779 | 2,556 | 2,018 | 5,305 | 5,373 | 3,758 |
| Total Capital Employed | $31,573 | $30,891 | $29,937 | $37,613 | $37,215 | $34,328 |
| % Return on TCE | 9.0% | 8.5% | 7.0% | 14.3% | 14.6% | 11.2% |

(1) Case B presented in 1977 is for comparative purposes only. The full-year impact of assumptions in Case B would not actually be experienced in 1977.

15101916

C. E. Brookes/C. N. Graf                -11-                . May 24, 1977

03629677

Our projections indicate that even with the loss of our con-
sumer business (assuming the Canadian Attic Insulation business continues)
Zonolite continues to be a viable business albeit at lower than forecasted
returns.

More selective internal use of South Carolina ore in place of
Libby ore can largely eliminate the 10-50% reduction in sales volume that
would result from a requirement to label our products as containing as-
bestos. The reduction in sales from labeling is primarily the result
of our being the first labeled product on a construction job site which
would force contractors to comply with impractical OSHA regulations.

ALTERNATIVE APPROACHES

Considering the large potential liability that results from the
sale of products that contain even a small amount of contaminant defined
by the government as a carcinogen, it is reasonable to question whether
there are alternatives to the proposed action. Our exposure to law suits
cannot be ignored. In addition, we are forecasting a continued demand for
no return capital to be invested in the business in order to meet increasingly
tighter standards for asbestos fiber exposure, independent of whether a
proven risk exists or not. Two obvious alternatives would be to seek divest-
ment of the business or to close Libby and retrench to South Carolina where
the health issues are minimal (but not eliminated).

Divestment of Zonolite has been considered in the past and been
judged impractical. It is felt that no buyer could be found, capable of
continuing to operate the business (with adequate capital resources) to give
us an acceptable price for the business as compared to other alternatives.

15101917

C. E. Brookes/C. N. Graf          -12-          May 24, 1977

03629678

Closing of Libby and retrenching to South Carolina would require a drastic change in the basis on which the business is run. It is likely that we would be operating a regional business in the East, Midwest, and Southeast, rather than the present national business for Zonolite products. This alternative, if required, would be expected to produce a high return but substantially lower after-tax profits. For example, our projection for 1980 for a regional business, without Libby, shows after-tax profit of 2.6 million dollars giving a 15.2% return on the 17.2 million dollar Total Capital Employed. (This case is presented as Case C in Appendix III.) Large asset write-offs and interim operating losses would be incurred to convert to this regional business basis.

We now believe the most likely case for 1980, retaining Libby, but recognizing the possible loss of consumer businesses to be a 3.8 million dollar after-tax profit, generating an 11.2% return on 34.3 million dollars of Grace Capital Employed.

Our forecast indicates that continuing to operate Libby and continuing to conduct a national business is a preferred alternative unless large amounts of capital are required to meet drastically tightened asbestos fiber exposure levels. Our best estimate is that a 1 f/ml standard for Libby would require 3.6 million dollars of additional capital. A tightening of the OSHA regulations covering our expanding plants to a level of .1 f/ml would require 6 million dollars of additional capital. Based on our present assessment of what is technically required, a move to the standards of .1 f/ml in the expanding plants and 1.0 f/ml in Libby would make it uneconomical to continue operating Libby.

15101918

C. E. Brookes/ C. N. Graf          -13-              May 24, 1977

03629679

In the absence of such extreme (and unlikely) tightening of
standards, our projections indicate that the best course is continued
operation of Zonolite from two mine locations.

RISKS

There are seven specific risks associated with tremolite in
our workplaces and products which we assess as follows:

1.  Harm to customers.

We do not feel that our products create a hazard for normal end
uses.  The highest level of exposure is for Attic Insulation and Masonry
Insulation.  The high concentrations of upwards of 15 f/ml (15 minute
maximum) for Attic Insulation and 12 f/ml (15 minute maximum) for Masonry
Insulation that were observed in simulated tests early in 1976 have not
been confirmed by the results of more recent testing in actual field use.
(The present OSHA ceiling limit is 10 f/ml for any 15 minute period.)
The maximum concentration in the case of Masonry Insulation observed in
recent testing was 3.65 f/ml (15 minute maximum) and in the case of Attic
Insulation was 4.28 (15 minute maximum).  However, we have observed very
large variations in simulated test results such that further improvement
in Attic Insulation, in particular, may be necessary to be assured that we
reliably fall below 10 f/ml maximum exposure during use.  Due to the
products' short and irregular periods of use, it seems unlikely that we
would exceed the 2 f/ml, 8-hour time weighted average, OSHA standard with
Attic Insulation or Masonry Insulation.

15101919

C. E. Brookes/C. N. Graf                    -14-                    May 24, 1977

03629680

All other products appear to be well below permitted levels, in most instances by a good margin.  (See Appendix IV for representative test results.)

2.  Harm to employees.

The present level of exposure for our Libby employees (up to 5 f/ml TWA), while materially better than the harmful exposures before the new wet mill, still represents concern to us.  Therefore, we will be undertaking an employee education program as well as further reduction in the fiber levels to 2.0 f/ml, in order to reduce the risk of harm to our Libby employees' health.

The reduction to 1 f/ml in the expanding plants, which we expect to accomplish by mid-1978, should give us a comfortable margin of safety in concluding that there is very low risk to our employees in the expanding plant work environments.

The risk to expanding plant employees using South Carolina ore, as well as to the mine/mill employees in South Carolina, is negligible.

3.  Product bans.

There is a high risk that our products will be banned in several significant uses.

We forecast that our vermiculite consumer products, namely Attic Insulation, Horticultural Vermiculite, and Pool Base, will eventually be banned by the Consumer Product Safety Commission, and this has been assumed in the 1980 financial projections (Appendix III).  We place our chances at 50:50 of binding the tremolite such that we could effectively argue that no fibers will be released during use.

15101020

C. E. Brookes/C. N. Graf          -15-          May 24, 1977

03629681

There is also a high risk (30%) during the next 18 months that MONOKOTE fireproofing will be considered to fall within the ban in selected states (California, New York, Minnesota, Massachusetts, and Illinois) of fireproofing products containing asbestos, although it would appear that this is an unintended ban. Legislators in those states simply failed to consider trace tramp minerals when wording the prohibition against a product containing any asbestos for sprayed applications. We are actively working on a vermiculite free fireproofing material for introduction in mid-1978.

4. Label requirements.

We believe that a decision to affix asbestos warning labels to our products would result in substantial sales losses. This view is shared by Johns-Manville in the case of their labeled construction products. It is further supported by J-M's experience with their tremolite talcs.

Based upon advice from corporate counsel, our products do not require labels if the OSHA limits are not exceeded in their intended use. This is also J-M's position for their own products. We believe that all of our products fall below the limits established by OSHA and that we will be able to continue to fall below more stringent standards being projected, thus avoiding the need to label our products.

Secondly, any change in interpretation which would require a labeling of selected products, such as Masonry Insulation, can probably be avoided by redistribution of the cleaner South Carolina ore and with-drawal from selected isolated territories.

15101921

C. E. Brookes/C. N. Graf                -16-              May 24, 1977

03629682

Continued programs aimed at cleaning up the product should allow us to meet the projected tighter limits that may be imposed by OSHA in 1978 and 1980.

5.  Increasingly restrictive standards and higher capital requirements
    to meet the more stringent future standards.

We believe there is a very high risk that standards will become more restrictive requiring additional capital for continued operation of Libby and of expanding plants using Libby ore. In addition to the 1.9 million dollars which we propose to spend between now and mid-1978 to comply with asbestos fiber safety standards, an additional one million dollars is expected to be needed by 1980 in order to meet a projected OSHA standard of .5 f/ml.

There is a risk, which we place at less than a 20% chance, that additional investment of up to 10 million dollars would be required in order to reach a level of 1 f/ml at Libby ($3.7 MM) and .1 f/ml at expanding plants using Libby ore ($6.3 MM). Such a development would probably result in a decision to close Libby and the retrenchment of our business to a regional basis supplied entirely out of South Carolina. (See Appendix III, Case C for details of the financial impact of a decision to close Libby.)

6.  Adverse publicity

There is a risk that Grace will attract adverse publicity from national media concerning the presence of asbestos in vermiculite. This

C. E. Brookes/C. N. Graf            -17-            May 24, 1977

**03629683**

information is already being circulated within government agencies, such
as OSHA and has been reported on a local basis in connection with the
Louisa County dispute over the mining of vermiculite ore. Future steps,
such as the development of a case for continued sale of Attic Insulation
to the Consumer Product Safety Commission, will increase the risk of
widespread adverse publicity.

7. <u>General liability to employees, customers, and the public.</u>

Liability to employees is limited by the Workmen's Compensation
Laws. However, we should expect increased Workmen's Compensation rates
in Libby as the number of disabilities increase among employees who have
been exposed in the past to the high fiber concentrations of the old dry
mill. Liability among expanding plant employees and the South Carolina
mine/mill employees appears minimal.

The risk of liability to customers is heightened by the decision
not to label our products. Under the strict liability criteria, we may be
liable to customers who can demonstrate they (1) were exposed to asbestos
fibers and (2) sustained personal harm. Based on advice of corporate
counsel, this risk is categorized as moderate. Moreover, it seems unlikely
that bona fide cases of personal harm could be well documented considering
the pattern of use and exposure levels of our customers.

General public liability, stemming from the sale of consumer
products, is a low-level risk with very high potential liability if it
develops. While we have no evidence of any adverse effect of our products
on consumers, neither can we offer convincing evidence that they are ab-

C. E. Brookes/C. N. Graf                    -18-                    May 24, 1977

03629684

solutely safe. Making such a case is handicapped by the number of
"experts" who claim that there is no safe level with the inference that
any exposure is potentially hazardous. This leaves us open to liability
without a good defense over a broad range of alleged hazards. A decision
to label our consumer products would eliminate the risk of future lia-
bility, while exacerbating the risk of claims (mostly not bona fide) from
past use of the product.

E. S. Wood

ESW/CGR
Attachments

APPENDIX I                    03629685

MEDICAL EVIDENCE ON THE EFFECT OF ASBESTOS EXPOSURE

APPENDIX I

Exposure to high concentrations of asbestos fibers results in increased risk to health of three different types:

Asbestosis is a scarring of the lungs that is a chronic condition appearing first in chest x-rays, usually after 5 or more years of exposure. It can be reliably diagnosed from x-rays and is specifically identified with exposure to asbestos fibers.

Lung cancer (bronchogenic carcinoma) can develop as a result of exposure to asbestos fibers or to other causes (such as smoking). It is difficult to diagnose due to the long latency period between initial exposure to asbestos and development of symptoms. Furthermore, since there are a number of causes of lung cancer, it is more difficult to establish a cause-effect relationship between exposure to asbestos fibers and lung cancer. Nonetheless, a great deal of work has been done which convincingly indicates a relationship between an excess risk of lung cancer and exposure to high concentrations of asbestos (above 5 f/ml). A combination of exposure to high concentrations of asbestos fibers and smoking is more damaging than either alone. One study among asbestos workers has shown that smokers have eight times the risk of lung cancer than non-smokers have.

Mesothelioma is a rare form of cancer which can occur either in the lungs or in the stomach. It can be specifically diagnosed only by taking a biopsy of the affected organ. It is specifically associated with asbestos exposure. Around 85% of cases diagnosed as mesothelioma occur in patients who have a history of exposure to asbestos.

APPENDIX I                                    -2-

03629686

Although there is disagreement between experts on this point,
the determination of an increased risk of asbestosis may also be indica-
tive of an increased risk of lung cancer.

For purposes of assessing the risk to our employees, the only
practical indicator is the incidence of confirmed cases of asbestosis.
This is due to the extreme difficulty of determining the cause of cancer
in any group of people considering the long latency period and general
lack of specificity between lung cancer and any single cause. The ex-
ception to this would be cases of mesothelioma. However, we have no
reports of mesothelioma even at Libby.

As a result of the particular philosophy employed by govern-
ment agencies to regulate carcinogens, as well as the experimental diffi-
culty of establishing safe levels, very little scientific work is available
to help identify the health risk posed by exposure to low levels of
asbestos fibers (under 5 f/ml).

There are three sources of information outside CPD which purport
to indicate that asbestos fibers cause increased health risks even at low
concentrations.

The first is a study among hard rock miners in Idaho (Gillam et al.)
which indicates an increased risk of lung cancer in the presence of asbestos
fiber exposures of around 0.24 f/ml. However, this study is confounded by
the presence of other potentially carcinogenic materials, notably arsenic-
containing compounds and radon daughters. A still unpublished study of a
larger group of the same miners (McDonald et al.) has indicated no increased

03629687

mortality risk from silicosis. This particular evidence of a hazard
associated with low level exposures would seem to be seriously impugned.

A second purported indication of the hazard associated with
low exposure levels is an increased risk of lung cancer among relatives
of asbestos miners. However, more recent measurements indicate that
fiber exposures in home environments of asbestos workers can be high and
therefore this probably does not represent a low level exposure environment.

The third collection of evidence is of mesothelioma (not other
asbestos-related diseases) in individuals and in animals exposed to high
concentrations for brief periods of time (as little as 8 hours). The
cases in men are few in number typically involving one or two individuals
with unknown but probably very high exposure concentrations. Due to the
small number of cases, definite cause-effect relationships cannot be drawn.
The cases among animals are at extremely high dosage levels in species
which are especially sensitive and, therefore, extrapolation to the effects
on man are not well-founded.

In spite of the lack of hard evidence, there is a respected
group of professional researchers who express the opinion that exposure
to levels as low as 2 f/ml (8-hour TWA) create an increased risk of cancer
in man after 30 or more years of exposure.

Results of our own in-house epidemiological studies indicate
that conditions which existed in the old dry mill in Libby (34 f/ml TWA)
and in unregulated expanding plants using Libby ore (29 f/ml TWA) created
a health hazard to our employees. Among present employees with 10 or more

15101927

03629688

years of service who would have been exposed to the conditions in the old

Libby dry mill, 41.5% exhibit asbestosis. Moreover, there is a five-fold

increased risk of lung cancer among retired and ex-employees who worked in

the Libby mine (as compared to the general population).

We are encouraged by the absence of any new cases of asbestosis

found at the last annual check-up at Libby.

Among expanding plant employees, the high employee turnover

and variety of past exposures make conclusions difficult. Among 9 employees

with 10 or more years' service in plants which have not used Libby ore, there

is no incidence of asbestosis, even though several of these plants have

previously used commercial asbestos in some products. Among 14 employees

with ten or more years of service in expanding plants which have used Libby

ore, 28% exhibit asbestosis. However, any cause-effect conclusions are

confounded by the fact that all of these plants have used commercial asbestos

in the past.

Chest x-rays for the 77 employees at our Enoree mine/mill give

no indication of adverse health effects from exposure to the lower level

of tremolite fibers (0.8 f/ml) found in South Carolina. While there is

incidence of positive chest x-rays in 12 employees (16% of total), only

one case is consistent with exposure to asbestos. That particular employee

worked for a great number of years exposed to commercial asbestos in another

Zonolite location. Of the 12 positive chest x-rays, 5 stem from previous

cotton spinning mill exposure which produces "brown lung" disease. There

is no indication of excess mortality due to lung cancer among the South

APPENDIX I                                    -5-

03629689

Carolina mine employees. Since the South Carolina mine has only operated
for 29 years, there is still the possibility of extremely long latency
periods before excess mortality would be observed.

As very little published medical evidence exists for tremolite
exposures, as opposed to the commercial forms of asbestos, we have
sponsored animal studies on tremolite and a mixture of vermiculite and
tremolite to determine whether tremolite is carcinogenic. The test animals
have concluded 400 days of treatment and are scheduled to terminate after
730 days. While no definite conclusions can be drawn from the results to
date, indications are that our tremolite creates less of a problem than
commercial asbestos. As we have not yet completed the "critical" period
of the animal studies, between 370 and 450 days, the lack of a significant
difference in mortality between the test animals and the control group is
not yet meaningful. Results of this study should be complete and available
by October 1978.

We have sought and obtained advice from several outside profes-
sionals with respect to what tremolite levels create a hazard.

Dr. William E. Smith of Fairleigh Dickinson University has
responded (Appendix V), indicating that notwithstanding the "new evidence"
presented by OSHA and NIOSH there is no convincing evidence of an excess
risk to health from low level asbestos fiber exposures (below 5 f/ml).

Dr. MacMahon, Professor of Epidemiology at Harvard University,
has questioned the conclusions of a leading epidemiologist, Dr. Selikoff
of Mt. Sinai, that exposures to low levels are potentially hazardous. More-

03629690

over, he indicates that an unpublished study of shipyard workers in the
Pearl Harbor Navy Yard who have been tracked since 1943, indicates no
excess risk of cancer mortality contradicting the evidence presented by
Selikoff. He derides Selikoff's statements with respect to low exposure
level hazards as being unprofessional and not well-founded scientifically.

Dr. Enterline of the University of Pittsburgh has proposed a
mathematical model which closely fits the observed relationship between
mortality rate and time of exposure among the group of 17,000 shipyard
workers studied by Selikoff. We are in the process of using this model
to predict the effect of exposure levels of 1 or 2 f/ml. Even assuming
that tremolite fibers are as biologically active as commercial chrysotile
asbestos (an unduly pessimistic assumption), preliminary indications are
that the increased mortality risk from lung cancer as a result of a 50-year
exposure to 2 f/ml is only 10% above those not exposed to asbestos fibers.

Discussions with Johns-Manville revealed that two "modern"
asbestos fabricating plants (one in Texas and one in California), built
in 1956-57, show no cases of asbestos-related disease among their employees.
Exposures at these plants have been consistently below 10 f/ml (8-hour TWA),
probably in the 2-5 f/ml range, with exposures during the 70's consistently
below 2 f/ml. This suggests no excess health risk at concentrations up to
5 f/ml (8-hour TWA).

Amidst such conflicting scientific opinion, any conclusions which
we draw must necessarily contain large elements of personal judgment and at
least some level of uncertainty. Nevertheless, we must establish levels of

03629691

exposure calculated to protect both employees and customers from excess
health hazards.  Accordingly, we have concluded that in a regulated and
monitored environment such as our plants, a reduction in exposure to 1 f/ml
creates a worthwhile margin of safety over the present OSHA standard of 2 f/ml
for our employees.  A level of 1 f/ml is not expected to have an adverse health
effect.  A level of 2 f/ml, while probably not hazardous, does not have an
acceptable margin of safety and will be reduced if economically feasible.
No customers or employees will be exposed knowingly to concentrations above
a level of 2 f/ml without adequate warning of the potential hazards involved.
Johns-Manville also selects 2 f/ml as a limit below which there is "no
excess risk of asbestos-related disease" (compared to those who are not
exposed to asbestos).

        In unmonitored environments, involving daily use of our products,
such as construction sites, a typical exposure from our products of .5 f/ml
(TWA) is not considered a hazard.

        With the exception of mixed horticultural products, exposure
levels for users of our product are above background levels.  It is not
likely that any improvement which we may make will reduce the exposure of
users to levels as low as background.  However, our long-range objective
will be to reduce customer exposure levels to "the lowest limit at which
asbestos fiber concentrations can be reliably monitored".  According to
NIOSH, this level is .1 f/ml on an 8-hour time weighted average basis and
.5 f/ml for any 15-minute period.

APPENDIX II

CAPITAL SPENDING SUMMARY

TREMOLITE FIBER COMPLIANCE

($000)

03629692

| | Capital Amount | Capital Budget 1977 | 1978 |
|---|---|---|---|
| Expanding Plants - OSHA @ 1.0 f/ml & 5.0 f/ml | | | |
| Denver - Ore Handling | $    50 | $ | $   85 |
| Newark - Ore Handling | 114 | 80 | |
| Phoenix - Ore Handling | 110 | | 85 |
| Dalles - Dust Cont. on MK and 5M | 50 | 35 | |
| Portland - Ore Storage & Handling | 107 | 101 | |
| Dearborn - Ore Storage & Handling | 197 | 192 | |
| Easthampton - Rock Handling | 17 | 18 | |
| St. Louis - Vent System | 26 | 33 | |
| Little Rock - Ore Handling | 50 | 37 | |
| TOTAL EXP. PLANTS - OSHA | 721 | 496 | 170 |
| Expanding Plants - Product Binder Equipment | | | |
| 14 Plants @ $9,300 per plant | $   130 | - | - |
| Libby - To Achieve 2.0 f/ml[a] | | | |
| Mill | | | |
| RCA #12-2 | 331 | 204 | |
| Mine | 225 | 225 | |
| Hauling & Loading & Screen Plant Trucks | 162 | 176 | |
| TOTAL AT LIBBY | $  718 | $  605 | $  - |
| TOTAL SPENDING | $1,569 | $1,101 | $ 170 |

(a) See page 2 for Libby detail.

RRM/cor

15101932

**EXHIBIT  J**

CAMBRIDGE

To: R. W. Sterrett

Date: March 11, 1969

From: Peter Kostic

cc: R. H. Vining
C. P. Dugan
R. A. Kulberg


The following article which appeared in the March issue of Safety Engineering is for your information. I think it would be well at this time, with the advice of counsel, to consider applying a warning or precautionary label or statement on all containers of products containing vermiculite. This may aid our defense in cases of product liability claims. The attached extra copies are for distribution as you wish.

*Peter Kostic*

Peter Kostic

PK:tag



WASHINGTON SAFETY REPORT

Congressman Edward J. Patten of New Jersey has introduced 2503, "a bill to promote the safety of workers engaged in making asbestos products for shipment in commerce, and for other purposes. It is substantially the same as the Asbestos Safety bill he introduced September 14, 1967.

Last year when hearings were conducted on the proposed occupational Health and Safety Act, Dr. Irving J. Selikoff of the Mt. Sinai School of Medicine testified in favor of the bill before the House Select Subcommittee on Labor. He is one of this country's greatest experts on asbestosis, his research covering not only workers in asbestos, but members of their families and persons living near asbestos plants or facilities using asbestos products.

Dr. Selikoff told of studies he had made of some 632 members of two New York-New Jersey Asbestos Workers Union locals. According to medical yardsticks, over a 19-year period, 203 should have died. In fact, 255 did die. Of that number, 37 could have been expected to die of cancer. In fact, 95 died of cancer.

In addition, a disease which was considered so rare it was not separately coded in the International Classification of Causes of Death has been unmistakably associated with asbestos and the number of cases has increased significantly. This is mesothelioma—a highly malignant tumor.

One disturbing factor in mesothelioma is the rather indirect exposure a number of its victims had. In some cases studied in London, 31 had worked with asbestos, but nine merely lived in the household of an asbestos worker! Eleven people lived within ½ mile of an asbestos factory!

Early in 1966, Dr. Maxwell Borow reported in the "Journal of the American Medical Association" on 17 mesothelioma cases in New Jersey. Fifteen were asbestos workers, two lived near an asbestos factory.

Dr. Selikoff's statement told of other studies in South Africa. There were additional remarks by these doctors regarding the possible exposure of all construction workers and of the bystander who unknowingly breathes in the poisonous dust.

The call of Congressman Patten against asbestosis has not gone unheeded. Johns-Manville, the U.S. Public Health Service, the International Association of Heat & Frost Insulators and Asbestos Workers, and the Mt. Sinai School of Medicine have joined together in an effort to eliminate or at least measurably reduce the exposure of some 200,000 asbestos workers. This will certainly result in greater protection to the entire construction industry and the general public too.

06191709

TO:  Peter Kostic                    DATE:  March 31, 1969

        cc:  R. W. Sterrett
             R. M. Vining
             R. A. Kulberg

Re:    Labeling of Vermiculite

        Reference is made to your memorandum of March 11
concerning the article from Safety Engineering.

        Before any labeling of containers of products
containing vermiculite is done we should indeed study carefully
the content of the labeling and the consequences of putting a
label on the package.  By warning people or inadequately warning
people we may be incurring liability to which we would not
otherwise be subject.

        I do not believe that vermiculite could be classified
today as a poisonous substance for which labeling may be
required.

                                    Charles F. D...

                                    Charles F. Dugan

CFD/MS