III.    THE LITIGATION PROTOCOL PROPOSED BY GRACE IS FOCUSED, LEGALLY SOUND AND MANAGEABLE.

As amplified below, Grace has identified very specific issues appropriate for common resolution and very specific procedures for addressing those issues. Far from being "unprecedented," as the PD Committee claims, the approach taken by Grace was used in the *Dow Corning* case, and the procedures proposed in the pending motion currently are being used in the *Babcock* bankruptcy. Moreover, these procedures come right out of the rules and are grounded in well-established, non-Chapter 11 precedent. Although earlier asbestos bankruptcies did not employ these procedures, this was by agreement of the parties. Recent events have demonstrated that the liability problems that were set aside by agreement in those cases did not disappear, and they now threaten the viability of the post-confirmation trusts.

Before responding to the tort committees' specific objections (*see* Section IV below), this Section first describes in more detail the issues to be litigated and the litigation plan for each issue. This Section is organized according to the three main types of asbestos claims brought against Grace (ZAI property claims, MK-3 or traditional asbestos property claims, and personal injury claims) and explains the protocol proposed for each type of claim. Section IV then addresses the objections.

A.    ZAI: The PD Committee's Effort To Create A Whole New Area Of Liability Rests And Falls On Common Issues.

As set forth in Grace's opening brief, the facts are these. ZAI, an expanded loose-fill vermiculite (which has no known toxic properties), contains trace amounts of an asbestiform mineral that are far below even 1%, the level that the EPA and OSHA use to define "asbestos-containing"

material. *See, e.g.*, 40 C.F.R. § 61.141; 40 C.F.R. § 763.83.[13] From their inception, neither OSHA nor the EPA ever challenged the manufacture of ZAI or regulated ZAI due to its minuscule asbestos content. In addition, ZAI never has been the subject of a government warning. ZAI was not the subject of any property damage litigation until 2000, when the tide of asbestos claims against Grace grew. In fact, the only such litigation that reached the merits prior to the bankruptcy was the preliminary injunction and emergency class notice effort in the *Barbanti* case — which failed. *See Barbanti v. W.R. Grace & Co.-Conn.*, No. 00201756-6 (Spokane Cty., Wash. 2001).

These basic facts point to the threshold issue of whether ZAI poses any unreasonable risk at all. That is a classic *Daubert* summary judgment issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90 (1993) . As discussed below, *Daubert* requires that scientific evidence pass tests of reliability before it can even be considered by the trier of fact. Here, if *Daubert* proceedings lead the Court to conclude that ZAI claimants lack reliable scientific evidence demonstrating that ZAI poses an unreasonable risk to humans, that finding would be dispositive of ZAI property claims on several grounds, including absence of product defect, causation and the economic loss doctrine. The ZAI litigation therefore may be resolved through *Daubert* and summary judgment proceedings.

Notably, the PD Committee provides no alternative proposal for litigating ZAI claims, and simply ignores all questions of whether, and to what extent, Grace should be liable for any ZAI claims.

---

[13] The EPA and OSHA have most recently used these standards in reassuring those working or living near the World Trade Center site that they are safe from asbestos danger. *See, e.g.*, "EPA and OSHA Web Sites Provide Environmental Monitoring Data from World Trade Center and Surrounding Areas," http://www.epa.gov/epahome/wtc/data_summary.htm (visited Oct. 4, 2001); EPA-OSHA Fact Sheet: Environmental Information from Ground Zero at the World Trade Center Site, http://www.epa.gov/epahome/wtc/data/epa-osha02.htm (visited Oct. 4, 2001).

1.   **Daubert Proceedings Should Be Used To Determine Whether There Is Reliable Scientific Evidence Demonstrating that ZAI Poses An Unreasonable Risk.**

*Daubert* effected a major change in the law by assigning trial courts a "gatekeeping role" with regard to scientific evidence. *See Daubert*, 509 U.S. at 589-590, 597. *Daubert* bars "subjective belief" and "unsupported speculation" – that is, junk science – from entering the courtroom under the guise of expert testimony. *Id.* at 593-94. The Supreme Court set forth the following non-exclusive factors for trial courts to use in deciding whether science is admissible: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *See id.* at 593-94. In addition, the trial court must determine whether the proffered evidence is relevant, that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case" and is a good "fit." *Id.* at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

Importantly, where, as here, the *Daubert* inquiry involves complicated scientific issues, the courts can appoint scientific experts under Rule 706 to assist in the "gatekeeping" role. Indeed, the Supreme Court has encouraged the use of scientific experts in complex cases. In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) the Court upheld the trial court's grant of summary judgment based in part on the failure of plaintiffs' experts to provide sufficient evidence of disease causation. In a concurring opinion, Justice Breyer recognized the difficulties that complex cases impose on judges and cited with favor the New England Journal of Medicine's proposal for experts to assist courts in the gatekeeping process: "'a judge could better fill this gatekeeper function if he

-28-

or she had help from scientists. Judges should be strongly encouraged to make greater use of their inherent authority . . . to appoint experts.'" *Id.* at 149-50. Such independent experts can – by virtue of their scientific knowledge – play a critical role in advising the court and informing the decision-making process.[14]

In the multi-district litigation regarding breast implants, for example, a 706 panel was assembled and ultimately issued a report that was highly instrumental in the subsequent resolution of that litigation.

Here, under *Daubert*, ZAI claimants must provide scientifically reliable evidence demonstrating that ZAI poses an unreasonable risk. Grace expects *Daubert* proceedings to establish that there is no reliable scientific evidence demonstrating that ZAI poses a unreasonable risk.

> ### 2.    A Finding Under *Daubert* That Claimants Lack Reliable Scientific Evidence Demonstrating ZAI Risk Would Be Dispositive Of ZAI Property Claims.

If the ZAI claimants do not produce reliable scientific evidence of unreasonable risk, summary judgment should be granted on several grounds:  (a) absence of product defect; (b) lack of causation; and (c) application of the economic loss doctrine.

> #### a.    Product Defect

By definition, a useful product free from unreasonable risk does not suffer from a product defect.[15] Although there are three different tests for finding a design defect—"risk-utility,"

---

[14] A panel of medical and scientific experts was used in the breast implant litigation and has been proposed in other pending Chapter 11 proceedings, including the *Babcock* bankruptcy and *In re Federal Mogul*, Case No. 01-10578 (Bankr. D. Del.).

[15] Under the generally accepted Restatement (Third) of Torts, a product may be defective under any of three theories: (1) a manufacturing defect, (2) a failure to warn or to instruct, or (3) a design defect. This section focuses on a design defect, because it is clear that ZAI does not suffer from a manufacturing defect (wherein a product fails to perform its intended purpose or does not match the design of others in its line) and is not defective under a failure-to-warn theory (which rests upon a predicate finding that there is something against
(continued...)

"reasonable alternative design" and "consumer expectations" — a product that poses no unreasonable risk cannot be considered defective under any of those tests.

First, the risk-utility test balances the likelihood and seriousness of injury from the product against the usefulness of the product. *See Cinnaminson Township Bd. of Educ. v. National Gypsum Co.*, Civ. No. 80-1842 (AET), 1989 WL 5820, at *2 (D.N.J. Jan. 25, 1989); *see also* RESTATEMENT (THIRD) OF TORTS, *Prod. Liab.* § 2(b). If ZAI poses no unreasonable risk, the balance clearly weighs in favor of its usefulness, and the product is not defective.

Likewise, under a reasonable-alternative-design analysis, a manufacturer has a duty to use a safer alternative design only if one reasonably is available. *See* Restatement (Third) of Torts, *Prod. Liab.* § 2(b). If ZAI poses no unreasonable risk to building occupants, any alternative design is not "safer."

Finally, under a consumer-expectations analysis,[16] a product is defective if it is unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. *See, e.g., Falk v. Keene Corp.*, 782 P.2d 974, 977 (Wash. 1989). As a matter of law and logic, reasonable

---

[15] (...continued)
which the consumer must be warned).

[16] The consumer-expectations analysis has been falling out of favor with courts, and it appears in the Restatement (Second) but not the Restatement (Third). The test likewise has been widely criticized in academic circles. *See, e.g.,* James A. Henderson, Jr. & Aaron D. Twerski, *Closing the American Products Liability Frontier*, 66 N.Y.U. L. Rev. 1263, 1294-95 (1991). The analysis also makes less sense for ZAI claims, as consumers did not usually select the ZAI product.

consumers will accept a useful product that poses no unreasonable risk.[17]  Thus, under any of the

three tests, ZAI would not be a defective product if it poses no unreasonable risk.

### b.   Causation

If there is no reliable scientific evidence establishing any unreasonable health risk

from ZAI, claimants cannot demonstrate that any defect in ZAI has caused actionable injury.  *See,*

*e.g., Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 69-70 (Tex. 1989) (plaintiffs bear the burden of

proving causation); *Magistrini v. One Hour Martinizing Dry Cleaning*, 109 F. Supp. 2d 306, 311

(D. N.J. 2000) ("Plaintiff must demonstrate that the defect in the product was a proximate cause of

the injury.").

### c.   Economic Loss

Another issue common to ZAI claims is whether claimants can recover economic

losses in the absence of tort damages.  The "economic loss doctrine," which arises from the Uniform

Commercial Code and is accepted across all jurisdictions, bars recovery in tort of purely economic

losses — *i.e.*, those arising from repair or replacement of commercial goods or from consequential

damages.  Even if a product fails to perform adequately, the economic loss doctrine precludes claims

in tort where the only losses are product failure and the consequential damages of product failure.

*See, e.g., Adams-Arapahoe Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992).  Here, ZAI

---

[17] Among other things, products whose asbestos emissions fall within applicable regulatory guidelines are not defective.  *See, e.g., Dartez v. Fibreboard Corp.*, 765 F.2d 456, 470 (5th Cir. 1985) ("Compliance with . . . government safety standards constitutes strong evidence that a product is not defective."); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985) (same).  Similarly, such exposures do not meet the tort-law threshold of causation.  *See, e.g., Dartez*, 765 F.2d at 470-71 (evidence of causation insufficient where product's asbestos emissions below OSHA permissible exposure levels); *Gideon*, 761 F.2d at 1145 (citing OSHA standards and concluding that defendant's asbestos gaskets, textile products and packing materials were not a substantial factor in causing disease: "there was no evidence that the inhalation of the relatively small amounts of asbestos fibers possibly released during the handling of Raymark products was a substantial factor in causing [the plaintiff's] present condition"); *Quick v. Murphy Oil Co.*, 643 So.2d 1291, 1296-97 (La. App. Ct. 1994) (defendant's asbestos-containing products were not "a substantial cause" of plaintiff's disease where "asbestos emissions were below the threshold values established by OSHA").

has functioned adequately as insulation for decades. If, as Grace contends, there is no reliable

scientific evidence of unreasonable product risk, then no claimant can establish separate tort damages

from the product. Claims for repair and replacement of the product would be barred as a matter of

law.

> **3.    Grace Has Proposed A Straightforward Litigation Protocol For ZAI Claims.**

Grace has proposed a fair and expeditious procedure for resolution of ZAI claims.

The protocol is as follows:

- Once the bar date has passed, the Court would appoint a ZAI litigation committee.

- The parties will then litigate the issue of whether reliable scientific evidence demonstrates that ZAI poses an unreasonable a risk. The Court can determine whether to appoint an expert panel.

- At the conclusion of discovery, Grace will file an omnibus objection and *Daubert* summary judgment motions.[18]

Courts have routinely granted summary judgment to toxic tort defendants after

excluding expert causation evidence under *Daubert*. *See, e.g., Allison v. McGhan Medical Corp.*,

184 F.3d 1300, 1304 (11th Cir. 1999) (upholding grant of summary judgment in breast implant case

given "inability to establish liability without the experts" after testimony excluded under *Daubert*);

*Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1419 (9th Cir.1998) (upholding grant of summary judgment

after expert testimony that brain shunt manufactured by defendant was defective and that silicone

components in the shunt made plaintiff ill); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 195-

---

[18] Once an objection is lodged, the underlying burden is on the claimant to show, by a preponderance of the evidence, that the claim is valid. "[T]he claimant in any objection hearing retains the burden of persuasion. . . . [Once a sufficient objection to a claim is made] the burden of proof must then be met by the claimant by a preponderance of the evidence." *9 Collier on Bankruptcy* ¶ 3001.09[2] at 3001–26 (15th ed. revised); *accord In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992); *In re Consumers Realty & Dev. Co.*, 238 B.R. 418, 423 (8th Cir. B.A.P. 1999).

96 (5th Cir. 1996) (trial court properly excluded scientifically invalid expert testimony asserting that exposure to ethylene oxide caused cancer); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996) (plaintiff expert's "proposed testimony concerning cotton rat study does not satisfy Rule 702's 'standard of evidentiary reliability,' as interpreted by *Daubert*, because [expert's] testimony would consist of 'unsupported speculation'"); *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp.2d 1347, 1371 (N.D. Ga. 2001) ("exclud[ing] the expert's testimony and grant[ing] summary judgment"); *Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp.2d 1015 (E.D. Mo. 2000)(granting summary judgment where testimony of plaintiff's experts that plaintiff's post-partum ingestion of the drug Parlodel caused her injury was not sufficiently reliable to be admissible under *Daubert*), *aff'd*, 252 F.3d 986 (8th Cir. 2001); *Hollander v. Sandoz Pharms. Corp.*, 95 F. Supp.2d 1230, 1232 (W.D. Okla. 2000) (granting summary judgment where "plaintiffs evidence of causation fails the test for scientific reliability set forth in *Daubert*); *Cuevas v. E.I. DuPont de Nemours & Co.*, 956 F. Supp. 1306, 1312-13 (S.D. Miss. 1997) (testimony of treating physicians and toxicologist regarding temporal relationship between alleged exposure to spray and plaintiff's medical condition inadmissible under *Daubert* or Rule 702).[19]

Although Grace maintains that ZAI property damage claims are invalid and should be disallowed on summary judgment, if the Court denies any motions for summary judgment, the issue of risk may still be resolved on a consolidated basis in a bench trial. Federal Rule of Civil

---

[19] Bankruptcy courts have likewise excluded expert testimony under *Daubert* before ruling on the merits of the parties' claims and defenses. *See, e.g., In re Canvas Specialty, Inc.*, No. LA 00-33180, 2001 WL 336463, at *3-*4 (Bankr. C.D. Cal. Mar. 28, 2001); *In re Husting Land & Dev., Inc.*, 255 B.R. 772, 780-81 (Bankr. D. Utah 2000); *In re Dow Corning Corp.*, 237 B.R. 364 (Bankr. E.D. Mich. 1999). As a bankruptcy court recently explained in excluding one party's expert and granting summary judgment for the other party, "when dealing with expert testimony in a summary judgment motion (as well as at trial), the trial court does have the ability – indeed, the duty – to determine if expert testimony should be admitted in the first instance." *In re Bonham*, 251 B.R. 113, 133 (Bankr. D. Alaska 2000) (emphasis omitted).

Procedure 42(a) allows for just such a procedure, giving the Court a "broad grant of authority" and power "to expedite the trial and eliminate unnecessary repetition and confusion." *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977); *see also In re Fibreboard Corp.*, 893 F.2d 706, 708 (5th Cir. 1990).

Courts in a variety of circumstances have consolidated claims under Rule 42 to resolve common, threshold issues. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 & n.5 (3d Cir. 1997) (observing that "exercising its discretion under Federal Rule of Civil Procedure 42(b)," district court ordered consolidated trial on "issues of exposure, causation, medical monitoring, and property damages" which served "the interests of judicial economy"); *In re Dow Corning*, 211 B.R. 545, 583 (Bankr. E.D. Mich. 1997) (consolidation of breast implant tort claims for generic causation trial appropriate to resolve "a threshold issue which, depending on its resolution, could obviate the need for further proceedings"); *In re Bendectin Litig.*, 857 F.2d 290, 317 (6th Cir.1988) (affirming consolidated trial on causation and observing: "Many courts have ... permitted separate issue trials when the issue first tried would be dispositive of the litigation. . . . [T]he plaintiffs can never win a case if they can't prove the [defendant's] drug caused the problem. That is a central issue in this case.... [A]ll claims depended upon the answer to a single question: Does Bendectin, taken in therapeutic doses cause birth defects?"), *cert. denied*, 488 U.S. 1006 (1989); *In re Beverly Hills Supper Club Fire Litig.*, 695 F.2d 207, 217 (6th Cir. 1982) (affirming consolidation under Rule 42 for trial on causation), *cert. denied*, 461 U.S. 929 (1983).

**B.    MK-3 Property Damage Claims:  Again There Are Threshold Liability Issues.**

The second claim category, MK-3 property damage claims, likewise can be adjudicated efficiently by focusing on common issues. As noted in Grace's opening brief, there has

been extensive litigation regarding MK-3. Few claims remain, and if and to the extent that a significant number of new claims are made in the bankruptcy proceedings, it is now possible to address such claims initially on an aggregated basis.

Specifically, common issue litigation is called for in two areas. *First*, the statute of limitations defense — based on the doctrine of constructive notice — could dispose of all or most MK-3 claims. Past litigation and regulatory history show that building owners and others have known for years about the characteristics of MK-3. In such circumstances, courts have found that constructive (and sometimes actual) knowledge triggers the statute of limitations and precludes claims. *Second*, MK-3 claims, like those involving ZAI, turn on the issue of risk. Although MK-3 has been the subject of significant litigation in the past, none of those claims was tested under *Daubert*. Now, however, the parties have both substantial data and a developed *Daubert* doctrine and can address the issue of whether reliable scientific evidence shows that MK-3 poses a demonstrably unreasonable risk to building occupants. As with ZAI, if there is no reliable scientific evidence of unreasonable risk, Grace is entitled to summary judgment on the common issues of product defect, causation, and economic loss.

### 1.    The Statute Of Limitations

The first issue appropriate for resolution at the summary judgment stage is whether MK-3 claims are barred by the statute of limitations. The PD Committee does not quarrel with Grace's description of the history of MK-3 regulation and litigation. MK-3 was a spray-applied, cementitious fireproofing product marketed primarily for application to the skeletal steel-beam structure of commercial buildings during construction. MK-3 contained more than 1% asbestos, and as of July 4, 1973, the EPA banned the spraying of such products. By that date, however, Grace already had made a transition to substitute products MK-4 and MK-5, which had no commercially

added asbestos. Also in 1973, the EPA issued the National Emission Standard for Hazardous Air

Pollutants (Asbestos, Beryllium, and Mercury). Although that standard originally applied only to

demolition of commercial buildings, it was amended two years later to include renovation as well.

*See Prudential Ins. Co. of America v. United States Gypsum Co.*, 146 F. Supp. 2d 643, 667 (D.N.J.

2001). Such EPA decisions and standards made public and commercial building owners aware of

MK-3, its characteristics, and the EPA's position.

      The crucial question for common resolution is whether building owners can be

charged with constructive knowledge of their claims, thereby triggering the statute of limitations.[20]

This very topic — the legal impact of the long-pervasive knowledge concerning potential hazards

of asbestos use in commercial buildings — recently was analyzed in detail in the *Prudential*

*Insurance Co.* case, 146 F. Supp. 2d 643 (D.N.J. 2001). There, building owners brought claims

against manufacturers of asbestos-containing products seeking to recover costs of monitoring and/or

removing the products from the buildings. The court found that the statute of limitations had run

on the building owners' claims because they had constructive notice and should have known of the

products' asbestos properties when the EPA issued numerous advisories about them years earlier.

*See id.* at 666 (given "the EPA's repeated warnings about the potential hazards of in-place asbestos,

the court . . . .concludes that such events should have triggered Prudential's inquiry into the hazards

posed by asbestos"). Notably, the court determined that such inquiry notice trumped the building

owners' claim that they had no actual notice of asbestos hazards: "While Prudential demonstrates

that a dispute exists as to whether it actually knew of its injuries, it does not demonstrate that such

---

[20] The limitations period for asbestos property damage claims is typically three years. *See, e.g.*, Cal. Code Civ. Pro. § 338; D.C. Code Ann. § 12-301; N.Y. C.P.L.R. § 214-c.

a dispute exists as to whether it *should have* known of its injuries prior to October 11, 1983." *Id.* at 669. (emph. added)

The conclusions reached in *Prudential* should be fully applicable here. Asbestos-related litigation and environmental advisories have been reported nationally for years. *See Prudential,* 146 F. Supp. 2d at 671 ("With the rising public awareness of asbestos hazards, most any building owner would be hard pressed to justify no reasonable knowledge of the hazard [by 1983]."). Moreover, the doctrine of constructive notice that was applied in *Prudential* is recognized broadly across jurisdictions. Thus, it is within this Court's power to determine the date by which a reasonable claimant knew or should have known of potential claims. Such a finding properly can eliminate entire classes of MK-3 claims — even if the statutes of limitation vary among jurisdictions.

2.    **Product Defect, Causation And Economic Loss**

The issues of product defect, causation and economic loss apply as readily to MK-3 claims as they do to ZAI claims. Extensive analysis and extensive litigation have revealed no reliable scientific evidence demonstrating that MK-3 in commercial settings poses any unreasonable risk of harm to building occupants or maintenance workers. Notably, a comprehensive 1992 study published by a Grace expert in a peer reviewed journal summarized the analysis of 2892 air samples from 315 public, commercial, residential, school and university buildings. Exposure to asbestos was found to be virtually nonexistent and far below federal standards.

> The data reported herein indicate that average ambient levels in buildings containing [asbestos-containing materials] are far below (typically on the order of 1000-fold less) federal action levels. It should also be kept in mind that the action levels themselves are considerably below any levels that have been shown to cause disease in humans. Further the data presented herein indicate that many of the indoor locations sampled have airborne fiber levels that are below the 0.01 USEPA clearance level.

R.J. Lee et al., *Exposure to Airborne Asbestos in Buildings*, 16 Regulatory Toxicology and Pharmacology 93, 106 (1992). The authors noted that their findings confirmed those of several earlier studies, including the EPA's own public buildings study. *See id.*

Under *Daubert*, claimants must come forward with reliable scientific evidence demonstrating an unreasonable risk from MK-3. Grace submits that claimants will not be able to make this threshold showing, and therefore will not be able to establish existence of a product defect or causation. By the same token, claimants will be unable to establish non-economic (*i.e.* tort) damages, thereby precluding recovery pursuant to the economic loss doctrine.

### 3. Grace Has Proposed A Straightforward Litigation Protocol For MK-3 Property Damage Claims.

As with ZAI claims, Grace has proposed a legally sound and efficient protocol for the resolution of MK-3 claims:

- After the bar date passes, Grace will move for summary judgment on (a) the issue of statute of limitations based upon constructive notice, and (b) *res judicata*;

- The statute of limitations motion can be decided as a matter of law and can eliminate those claims not filed within three years (or the appropriate statutory period) from the date of constructive notice. The *res judicata* motion can be decided as a matter of law based upon prior settlements.

- If any claims survive the statute of limitations and *res judicata* motions, proceedings under *Daubert*, Rule 56 and Rule 42 would be held to determine whether reliable scientific evidence demonstrates that MK-3 poses an unreasonable risk to occupants of commercial buildings; and

- If claims survive the foregoing process, and are not otherwise resolved, case-specific adjudication can commence.

C.    **Personal Injury Claims: Many Claims Fail To Meet Basic Legal Requirements.**

The third and final category of claims to be resolved — personal injury claims — also lends itself to common issue adjudication. The task of any personal injury litigation protocol must be to separate valid claims from those brought by the uninjured or those whose injuries were not caused by Grace's products. Based upon Grace's litigation history and sample claims it already has analyzed, many claimants will be unable to meet the basic requirements of a cause of action for personal injury.

1.    **Certain Legal Requirements Are Suitable For Adjudication On A Common Basis.**

Claimants bear the burden of proving injury and causation by a preponderance of the evidence. *See, e.g., Vigiolto v. Johns-Manville Corp.*, 643 F. Supp. 1454 (W.D. Penn. 1986), *aff'd*, 826 F.2d 1058 (3d Cir. 1987); *See also Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581 (5th Cir. 1983); *Marshall v. Celotex Corp.*, 651 F. Supp. 389, 394-95 (E.D. Mich. 1987); *Gaulding v. Celotex Corp.*, 772 S.W.2d 66 (Tex. 1989). Grace submits that summary judgment proceedings on the common issues of (a) product identification and exposure, (b) dose sufficient to cause disease, (c) compensable injury and (d) lack of reliable diagnostic evidence will demonstrate that many claimants are unable to establish these basic elements of a personal injury claim.

a.    **Product Identification And Product Exposure**

As set forth in Part I of this brief, product identification is a massive problem with regard to the personal injury claims against Grace. The recent sampling of 1997 and 2000 claims shows that few claimants worked in industries and occupations in which they could even have been exposed to Grace asbestos products. Under the law, the inability to demonstrate actionable exposure to Grace product dooms any such claim.

There can be no personal injury claim unless the plaintiff establishes exposure to defendant's product or material. *See generally* PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) (an essential element of a plaintiff's case is "the identification of the named defendant as the manufacturer or supplier of the defective product"). In asbestos cases, the claimant must establish first that he or she worked at a job site where the defendant's asbestos was present. "It is axiomatic that, if the defendant never sold asbestos to any of the locations where [the claimant] was allegedly employed, no cause of action lies against defendant." *Outlaw v. Keene Corp.*, No. 88-9490 1990, U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990).

Product identification has been highly controversial in asbestos cases in the tort system, as reflected by widely reported incidents of witness coaching[21] and of testimony "abruptly shift[ing]" in response to bankruptcy filings.[22] Grace intends to move for summary judgment against any claimant who cannot produce any identification of a Grace product as his or her work site.

---

[21] *See, e.g.,* L. Brickman & R. Rotunda, *When Witnesses Are Told What to Say*, WASH. POST, Jan. 13, 1998, at A15; Rogers, *Witness Preparation Memos Raise Questions About Ethical Limits*, 14 ABA/BNA LAWYERS MANUAL ON PROF. CONDUCT 48, 48-50 (1998) (20-page document from one plaintiffs' asbestos law firm "provides detailed information about asbestos products and packaging; instructs witnesses how to deal with questions and issues at the deposition; gives a list of health symptoms that could enhance damages; and provides general information and advice about being deposed. The document does not mention a witness's obligation to tell the truth."); *Accidental Exposure*, HARPER'S, 296 (1772) (1/1/98) (containing text of the memo); 30 TEX. TECH. L. REV. 1471, 1476 (1999) (former Texas Supreme Court justice terming the memorandum a "cancer on the legal system").

[22] Notably, when major asbestos producers such as Johns-Manville sought Chapter 11 protection years ago, claims — and testimony — shifted away from the primary manufacturers to more peripheral defendants who remained outside Chapter 11. Whereas "prebankruptcy testimony in Philadelphia Naval Yard Cases put Manville's share of product use as high as 80 percent, postbankruptcy testimony had Manville exposure accounting for a quarter or less of the volume of asbestos-containing materials encountered by plaintiffs." L. Brickman, *The Asbestos Claim Management Act of 1991*, 13 CARDOZO L. REV. 1891, 1917 n.13 (1992); *see also id.* at 1894 n.13 (noting that after the Johns-Manville filing, "plaintiffs' testimony (and that of their witnesses) abruptly shifted from a predominantly Manville exposure frame to a predominantly 'other defendants' exposure").

b.    **Exposure Sufficient To Cause Disease**

A second significant problem, arising both in prior litigation and in the sample claims noted above, is the lack of evidence of dose and exposure sufficient to cause harm. In toxic tort cases, merely working at a site where an asbestos product was present does not give rise to a cause that is sustainable under the Federal Rules of Evidence. The plaintiff must show that he or she was exposed to defendant's allegedly hazardous product or material and that such exposure proximately caused injury.

It is a fundamental tenet of science that "the dose makes the poison."[23] Any substance can be harmful in a large enough dose. Conversely, many substances that are known to be harmful at high doses – such as aspirin – are harmless at lower doses. This is true with asbestos as with all other chemicals. Virtually every person in North America has been exposed to asbestos. Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[24] According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

---

[23] This principle, first articulated by Paracelsus in the sixteenth century, is one of the foundations of modern toxicology. In the words of Paracelsus: "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison." *See* Casarett and Doull's *Principles of Toxicology:* THE BASIC SCIENCE OF POISONS at 14 (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

[24] "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs." A. Churg, *Nonneoplastic Disease Caused by Asbestos,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 293.

Hence, not every person who worked near a Grace asbestos product can demonstrate causation of injury. Here again, threshold determinations must be made under *Daubert*. The whole concept that "the dose makes the poison" is incorporated into the court's gatekeeping function under *Daubert*. A claimant thus has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (*i.e.*, general causation) and (2) the claimant himself was in fact exposed to the requisite dose (*i.e.*, specific causation).[25] "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996). Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chemical Co.*, 151 F.3d 269, 278 (5th Cir. 1998) *(en banc)*, *cert. denied*, 526 U.S. 1064 (1999). Unless and until the claimant establishes the existence of a harmful dose – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to *guess* whether that particular claimant's exposure was sufficient to cause disease. Guesswork is insufficient under *Daubert* or any other rule of evidence. In *Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." As the court explained: "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork.

---

[25] *See Reference Guide on Epidemiology*, in Federal Judicial Center REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.")

Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.* at 781.

It will be the claimants' burden to demonstrate through reliable scientific evidence the levels of exposure sufficient to cause both malignant and non-malignant asbestos-related disease. It will be their burden also to prove the occupational activities where the claimants' exposures to a Grace product reached such levels.

Following *Daubert* proceedings, Grace expects to move for summary judgment on all claims where the occupational activity that involved exposure to Grace products has not been proven (through evidence meeting *Daubert* standards) sufficient to cause the claimed disease.

c.    **Lack Of Compensable Injury**

Grace also intends to move for summary judgment against those claims which do not provide evidence of a legally cognizable injury.   Courts universally require the plaintiff to demonstrate "that the defendant had a duty of care which [was] breached, and that the breach proximately caused *legally cognizable injury.*" *See, e.g., Faya v. Almaraz*, 329 Md. 435, 448, 620 A.2d 327 (1993) (emph. added)." The mere prospect of future harm, without any actual current harm, is not a legally cognizable personal injury. "Actual loss or damage resulting to the interests of another" is a necessary element of a negligence cause of action. "The threat of future harm, not yet realized, is not enough." PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[26] A "mere change or alteration in some physical person, object or thing" does *not* constitute a legally compensable harm. "Physical changes or alterations may be either beneficial, detrimental or of no

---

[26] This law also bars claims for medical monitoring costs.  Medical monitoring claims present no present injury, only the risk of future injury.  By definition, a risk of future injury is not compensable.

consequence to a person." A person suffers harm only "[i]n so far as physical changes have a detrimental effect" on that person. *Id.* § 7 cmt. b.

As is clear from the claims submitted to Grace historically, many claimants complain of "injury" from mere exposure to Grace products, but without any health problems or symptoms. Others complain of harmless pleural plaques or asymptomatic pleural thickening. Such conditions, however, are not compensable.

### *Pleural Plaques*

Pleural plaques are opaque, rounded lesions of the pleura, which is a filmy, plastic wrap-like tissue membrane that surrounds certain inner surfaces as well as the exterior of the lungs.[27] Pleural plaques are clinically harmless and do not cause injury or impair lung function. They have been described in the medical literature as nothing more than "spots" that can be observed on a lung x-ray, since "by themselves, plaques do not cause loss of function or symptoms."[28] Specifically, pleural plaques do *not* cause shortness of breath, impair lung function, cause chest pain, cause any abnormal physical symptoms, decrease life expectancy, or cause any known complications.[29] In

---

[27] *See generally* American Thoracic Society (ATS), *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. 134: 363-68, 364 (1996). Pleural plaques typically are seen in the *parietal* pleura, which lines the inner chest wall, inner surface of the rib cage and diaphragm, as opposed to the *visceral* pleura, which surrounds the entire lung. Pleural plaques should generally be bilateral, that is, observed in both lungs.

[28] According to Dr. Murphy, who headed the ATS committee that established criteria for diagnosing asbestosis, pleural plaques have been referred to as "beauty spots on the roentgenogram" or "markers of exposure" because "by themselves, plaques do not cause loss of function or symptoms." AM. REV. RESP. DIS. 136: 1516-17 (1987) (citations omitted). *See also* L. Brickman, *The Asbestos Litigation Crisis*, 13 CARDOZO L. REV. 1819, 1848 (1992), *citing* Gaensler, *Asbestos-Related Pleural Plaques: Much Ado About Very Little*, DRI Seminar 10/16-18/91 ("The investigators who initially described the connection between exposure to asbestos and pleural plaques called such lesions 'harmless scurrilous beauty marks on the chest film' because they found them neither associated with loss of function or symptoms nor precancerous. An extensive review of the literature 35 years later has revealed nothing to contradict these original impressions.")

[29] *See* K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994)
(continued...)

short, there is a medical consensus that pleural plaques are "an isolated radiographic finding" that "do not by themselves produce clinically significant reductions in pulmonary function."[30]

Although some pleural plaques can become calcified and enlarged, "[e]ven strikingly large and bulky plaques do not cause measurable functional impairment, and when these patients complain of dyspnea the usual cause is asbestosis or chronic obstructive lung disease."[31]  As Dr. Browne has written in a leading text, "[w]hether calcified or not, pleural plaques alone are symptomless; dyspnea [shortness of breath], chest pain, abnormal physical signs and impairment of lung function are absent."[32]  Nor do pleural plaques increase the risk that the patient may contract an actual disease associated with asbestos.  Pleural plaques are not precursors of lung cancer, mesothelioma or asbestosis.[33]

### Pleural Thickening

---

[29] (...continued)
at 458 ("Plaques themselves have no effect on life expectancy and are not known to give rise to any complications.")

[30] *See* Jones, et al., *The radiographic pleural abnormalities in asbestos exposure: Relationship to physiologic abnormalities*, J. THORACIC IMG. 3: 57-65 (1988).  *See also* A. Churg, *Neoplastic Asbestos-Induced Disease,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 339 (pleural disease "is still seen with considerable frequency, but it generally has little or no functional import"); Matters of Health and Safety Arising from the Use of Asbestos in Ontario, Toronto, Ontario Ministry of the Attorney General 1984 (hereinafter "*Ontario Royal Commission*") at 103. (Plaques are "not associated with clinical and functional abnormalities").

[31] Gaensler et al., *Thoracic Surgical Problems in Asbestos-Related Disorders*, ANN. THORACIC SURG. 40:82-96, 93 (1985).

[32] K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 455.

[33] *Id.* at 451, 458-59. *See also* A. Churg, *Nonneoplastic Disease Caused by Asbestos*, in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE, at 310 (Churg & Green, ed. 2d 1998) ("There is no evidence that plaques or diffuse pleural fibrosis are in any way precursors of mesothelioma"); W. Weiss, *Asbestos-related Pleural Plaques and Lung Cancer*, CHEST 103: 185-59 (1993) ("[T]he weight of the evidence favors the conclusion that persons with asbestosis-related pleural plaques do not have an increased risk of lung cancer in the absence of parenchymal asbestosis").

Pleural thickening is less common than pleural plaques. It typically affects the visceral pleura, the membrane surrounding the lungs. It can range from a thin, milky discoloration to a thicker fibrosis easily seen on x-ray. Pleural thickening is usually asymptomatic, although extensive diffuse thickening may have an adverse effect on lung function.

### Courts Have Found That Pleural Plaques, Pleural Thickening And Asymptomatic Asbestosis Are Not Legal Injuries

The majority of courts that have considered the issue have found that pleural plaques and asymptomatic pleural thickening do not cause injury, harm, loss or detriment. They merely reflect a subclinical change in lung tissue, which is not actionable. "A mere change in the lining of the lung does not constitute an impairment or worsening of a bodily function, nor does it prevent the exercise of a bodily function." *In re Asbestos Litigation*, No. 87-09-24, 1994 WL 721763, at *3 (Del. Super. June 14, 1994), *rev'd on other grounds*, 670 A.2d 1339 (Del. Super. Ct. 1995). *See also, Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) ("[m]ere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone *is not a functional impairment or harm,* and therefore, *do not constitute a legally compensable injury.*"); *Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) (cause of action for asbestos-related personal injury "does not arise until the asbestos fibers inhaled into the lungs cause functional impairment"), *citing ACandS, Inc. v. Abate*, 710 A.2d 944, 981-982 (Md. Ct. Spec. 1998), *cert. denied*, 713 A.2d 979 (1998) ("the condition known as pleural plaques, or even generalized pleural thickening, *unaccompanied by disabling consequences or physical impairment,* is not a compensable injury as a matter of law"); *Simmons v. Pacor, Inc.*, 674 A.2d 232, 236-37 (Pa. 1996) (Because scarring of lung tissue is a "mere physical change that was unaccompanied by any detrimental effect," plaintiffs

suffered no harm and could not recover for asymptomatic pleural thickening.); *In re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563, 1567 (D. Haw. 1990) ("A claimant's subjective testimony as to shortness of breath and fatigue without more is not sufficient ....Plaintiff must show a compensable harm by adducing objective testimony of a *functional impairment* due to asbestos exposure."); *Wright v. Eagle-Picher Indus., Inc.*, 565 A.2d 377 (Md. 1989) (pleural plaques are non-compensable injury when unaccompanied by any symptoms or functional impairment) (all emph. added)

Likewise, in *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), the Maine Supreme Court concluded that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" *Id.* at 543. The *Bernier* court was quoting from a FELA case, *Schweitzer v Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985), *cert. denied*, 474 U.S. 864, 106 St. 183 (1985). As the U.S. Supreme Court has recognized in FELA cases, "the words 'physical impact' do not encompass every form of 'physical contact'. And, in particular, they do not include a contact that amounts to no more than an exposure." *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424, 432 (1997); *see also Amendola v. Kansas City Southern Railway Co.*, 699 F.Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers alone did not represent physical injury sufficient to support a claim).

Courts also have found that asymptomatic asbestosis is not a legally cognizable injury. For example, in *Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz. App. 1987), the court granted summary judgment to an asbestos mill owner with regard to subclinical asbestosis claims because subclinical injuries do not amount to physical harm. "[U]ntil the asbestosis manifests itself

one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one

hundred percent debilitating." Consequently, the court stated, "[w]e see no reason to depart from

traditional tort concepts and allow recovery for injuries before any disease becomes manifest." *Id.*

at 31. The court reasoned that a contrary rule would give rise to a cause of action for countless

plaintiffs who are healthy and might never manifest injury. Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting
> in windfalls for those who never take ill and insufficient compensation for
> those who do. Requiring manifest injury as a necessary element of an
> asbestos-related tort action avoids these problems and best serves the
> underlying purposes of tort law: the compensation of victims who have
> suffered.

*Id.* at 30, (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985)).

Similarly, in *Taylor v. Owens-Corning Fiberglas Corp.*, 666 A.2d 681, 687 (Pa.

Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer discernible

physical symptoms to have a compensable injury." Several of the plaintiffs whose cases had been

consolidated in *Taylor* had been diagnosed with asbestosis but had no symptoms attributable to

asbestos exposure. The court found that none of the plaintiffs had an injury sufficient to sustain a

legal cause of action. "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering,

no loss of an organ function . . . ,' he does not have a compensable injury." *Id.* (quoting *Giffear v.

Johns Manville Corp.*, 632 A.2d 880, 887 (Pa. Super. 1993)).

Given this precedent, Grace will ask the Court to decide that claims of "injury"

predicated on pleural plaques, asymptomatic asbestosis or any other subclinical condition are not

compensable.

#### d.    Claims Supported By Unreliable Diagnostic Data Cannot Survive *Daubert* Scrutiny

A further problem with asbestosis claims is that they turn on diagnostic assessments that are neither reproducible nor reliable unless they meet specific standards and are appropriately verified. A claimant must demonstrate that the test method performed in his or her case is reliable and admissible. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742, 745 (3d Cir.1994), *cert. denied sub nom General Elec. Co. v. Ingram*, 513 U.S. 1190 (1995) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible). The scientific method relied upon may not be based on subjective speculation. *Daubert*, 509 U.S. at 590. The methodology must be real and it must produce consistent results, meaning, it must be reproducible. *See id.* at 590, n. 9. Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. *See, e.g., Metropolitan St. Louis Equal Housing Opp'y Council v. Gordon Gundaker Real Estate Co.*, 130 F.Supp.2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

In the asbestos context, data from two types of test results, while widely used to support mass claim filings, can be unreliable, manipulable and not reproducible: (1) ILO scores — which are based on subjective interpretations of lung x-rays — have been shown to be highly unreliable unless independent doctors make multiple corroborative readings, and (2) lung function testing, known as a pulmonary function test ("PFT"), is highly manipulable and must be reproduced in accordance with defined procedures before a claimant can be deemed to have a real impairment. While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not

followed.   In the latter case, such test data will lack sufficient reliability, reproducibility and
scientific validity to be admissible under *Daubert*.

This is not merely an academic concern for Grace.  As discussed in Part I above, the
recent surge in claims against Grace has come after mass screenings were performed by a small
number of plaintiff firms.   ILO and PFT tests have yielded massive numbers of claims for
nonmalignant conditions.   The task of determining whether these claims are supported will be
difficult (but necessary) to ensure that only claims that are based upon reliable science are permitted
to proceed.   Again, appointment of a Rule 706 panel may be appropriate to assist the Court in
performing its role as a "gatekeeper" under *Daubert*.  Independent experts also could be enlisted to
advise the Court in screening procedures necessary to assure that only claims supported by reliable
diagnostic data *per se* are allowed to go forward.

### ILO Tests

There are two major and interconnected problems with ILO scores – variability and
subjectivity.   Numerous studies have shown that lung x-rays are interpreted with tremendous
variability by different readers (inter-observer variability) and even by the same reader at different
times (intra-observer variability).  The ILO itself acknowledges that "there is significant variation
in repeated readings of the same radiograph, not only from reader to reader, but also between
readings by the same reader."[34]

---

[34]  *ILO 1980 International Classification of Radiographs of the Pneumoconioses* International Labour
Organization, Geneva 1980 at 20. NIOSH has further acknowledged that "[r]ecently, the [B-reader] program
has been criticized, the main concern being that variability among readers is excessive despite the training
and certification.   ("1980 ILO Report") There is also the perception some B-readers systematically bias
readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute
for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992)

The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale. As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[35]

In the face of these problems, two things must be shown for ILO readings to be admissible under *Daubert*: (1) a minimum reading of 1/1; and (2) multiple readings of each radiograph to ensure consistency and reproducibility.

While the requirements on reliability and reproducibility under *Daubert* can only be satisfied in this way, these threshold showings also are fully consistent with the diagnostic criteria for asbestosis. The fact that a 1/0 reading represents only "suspect" disease, combined with the variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting. The "authoritative consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[36] Thus, to make a scientifically reliable showing that a claimant has asbestosis, a chest radiograph must demonstrate that the claimant has a score of 1/1 or higher.

ILO classifications below 1/1 further fail to meet *Daubert* requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter. *Daubert* forbids analyses based on "subjective speculation" and on

---

[35] H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

[36] *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS., 134:363-68 (1986).

data where the results have such an enormous known rate of error. *Daubert*, 509 U.S. at 590, 594.[37]

Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use.

*See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 236 n. 14 (1st Cir. 1987) ("a

reading of 1/0 is too uncertain to be used to diagnose a particular case."); *Raymark Indus., Inc. v.

Stempel*, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a

reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

        As for readings of 1/1 or higher, the variability problem may be reduced but still

remains. Each B-reader brings an individual level experience and bias to what indisputably is a

subjective process of interpretation. Consequently, the only way to ensure that a radiographic

reading is reliable and reproducible is to have it examined by more than one certified B-reader. The

ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are

made for each radiograph."[38] Other experts agree. As Dr. Ducatman has stated, "[a]t present,

individual diagnoses, *legal decisions* and population assessments ought to rely on multiple

readings."[39]

        Accordingly, Grace proposes the use of independent, court-appointed scientific

experts under Rule 706 to assist in ensuring the accuracy of ILO readings of asbestos personal injury

claimants. An outside panel could be recommended by the National Academy of Sciences (or a

similar impartial authoritative organization) and approved by the Court for this purpose.

---

[37] Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard. The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher. *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136: 1516-17 (1987).

[38] 1980 ILO Report at 20.

[39] Ducatman et al., *B-Readers and Asbestos Medical Survelillance*, JOM 30:644-47, 646 (1988) (emph. added).

*Pulmonary Function Tests*

PFTs are the best tool to determine whether an asbestos claimant has a physical impairment. Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction. But such tests are reliable only if performed accurately, and they are particularly subject to manipulation. For this reason, the ATS has issued comprehensive standards governing PFTs.[40] Inaccurate or poorly performed tests can result in improper diagnoses. Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[41]

Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests require full patient cooperation and effort. "Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly.[42] Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[43]

In order to survive a *Daubert* challenge, claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the

---

[40] ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies*, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[41] *Id.*

[42] Fitzgerald *et al.*, *Office Evaluation of pulmonary Function: Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[43] ATS *Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136: 1285-98 (1987).

ATS standards and experience in performing and interpreting PFT tests, can review existing tests to determine whether they were conducted properly. For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether Forced Vital Capacity (FVC) test was properly conducted. A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other. If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

Another important check is whether the spirometer was set to record for the full length of time recommended by the ATS. Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present. Appropriate predictive values must also be used to identify what constitutes abnormality and normality.

With respect to FVC curves and other spirometric tracings, an independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

> ### 2.   Grace Has Proposed A Straightforward Litigation Protocol For Personal Injury Claims.

Grace's litigation protocol for personal injury claims streamlines the process of adjudicating claims while preserving legitimate personal injury claimants' right to a jury trial. Grace intends to file exemplar objections and summary judgment motions to each category of disputed claims — e.g., claims alleging exposure at a site not served by Grace, claims alleging mere site exposure, instead of direct work with a Grace product, and so forth. These objections and summary judgment motions will present Grace's factual and legal arguments as to product identification, dose, and compensable injury. Each exemplar objection will be served by first-class mail to the holders

of the disputed claims, who will have thirty days to file a response. Because the Proof of Claim form requires provision of most of the information needed, wide-scale discovery should not be necessary. Any Rule 706 expert work then can proceed. Incorporated in the resolution of these summary judgment issues may be the submission of expert reports on disease diagnosis, extent of injury, and causation, allowing the parties to engage in *Daubert* proceedings regarding the reliability of scientific evidence to support personal injury claims.

Once the Court rules on the exemplar objections/motions in a particular category, Grace will file omnibus objections and summary judgment motions for all similarly situated claims, which will be served by first-class mail on the holders of the disputed claims at the address provided on the Proof of Claim form. To the extent that claimants elect to contest the Debtors' objection, such claimants will have thirty days to file a response showing cause why the Court's exemplar rulings do not govern their situation. In *Babcock & Wilcox*, the court approved the use of similar omnibus objection procedures to resolve over 49,000 claims based on alleged pre-petition settlements with B&W. Pursuant to the court's order, B&W periodically objects to "exemplar" claims within particular pre-defined categories. If the court sustains the exemplar objections, B&W files omnibus objections to other claimants who fit within the same category. Each of the claimants subject to the omnibus objection then has the opportunity to show cause why his or her claim should not be subject to the particular objection category. Although the B&W omnibus objection procedure is not yet complete, thus far, the categorical objection process has resulted in the resolution of over ten thousand claims without further court involvement.

IV.    THE OBJECTIONS TO THE LITIGATION PROTOCOL MISCHARACTERIZE PRIOR ASBESTOS BANKRUPTCY CASES AND MISSTATE GRACE'S POSITIONS.

Labeling Grace's proposals as "novel" and "unprecedented," the PD and PI Committees lodge essentially four objections against Grace's proposed litigation protocol:

(1)    The issues surrounding asbestos claims against Grace are too individual for common resolution.

(2)    The proposed protocol is novel and departs from the "prototypical asbestos bankruptcy."

(3)    The proposed protocol does not allow for each claimant to be represented by the counsel of his or her own choice.

(4)    Grace opposes appointment of a futures representative.

In this section, the Debtors respond to each objection.

A.    The Issues Here Are Not Too Individual For Common Resolution, And Grace Has Never Argued To The Contrary.

The PD Committee's primary argument against Grace's proposed litigation protocol is that Grace opposed class certification in a number of cases long ago, on the basis that individual issues precluded class certification. The PD Committee quotes extensively from Grace briefs filed in class action proceedings in *Dayton Independent School District v. W.R. Grace & Co.* and in *Kirbyville Independent School District v. Asbestospray Corp.* in service of the argument that Grace opposed elsewhere what it proposes here. This contention lacks merit for three reasons.

*First*, the PD Committee's objection confuses litigating a class action — which is what was proposed in the *Dayton* and *Kirbyville* cases — with resolving common issues. A class action is a far different procedure than a mass-tort bankruptcy. Because this is not a class action, no finding of predominance is required. Further, because this is a bankruptcy proceeding, all current claimants will be present before the Court. Thus, instead of allowing a few named plaintiffs to

litigate on behalf of all, each claimant can be required, through the claim form, to support his or her own claim. Resolution of issues common to groups of claimants will adjudicate the claims directly, not through a representative.

*Second*, there were and remain good reasons why class certification in the prior cases was inappropriate in the prior cases. In *Dayton*, for example, Grace opposed a plan to try certain claims commonly for five out of eighty-two public school districts in the proposed class. The *Dayton* case involved not just a single product but many; not just Grace, but many other asbestos defendants as well; and varying claims not just for replacement but also for contamination.

*Third*, the cases cited by the PD Committee objectors are outdated. *Daubert* had not been decided at the time of those earlier cases, and the constructive notice and statute of limitations arguments that are key to MK-3 cases had not yet ripened. Furthermore, the state of technological advancement and diagnostic procedures has improved markedly in the intervening years, making possible threshold determinations of risk that were not feasible before.

The PD Committee's reliance on *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) for the proposition that no issues in an asbestos case may be litigated on a common basis also is misplaced. In *Cimino*, a multi-product class action brought against several asbestos manufacturers and suppliers, the district court adopted a three-phase litigation procedure which resulted in significant liability for one of the defendants.

In Phase I, a jury determined (i) which if any of each defendant's products was defective, (ii) what each defendant knew or should have known of the risk; (iii) whether each defendant was guilty of gross negligence in marketing the offending products, and (iv) punitive damages multipliers for each defendant guilty of gross negligence. *Cimino*, 151 F.3d at 301. In Phase II, the parties entered into a stipulation approving a special verdict form and agreeing that

some plaintiffs had been exposed to defendants' products. *See id.* at 306-07. In Phase III, two juries

determined, for 160 "sample" cases only, two damages issues: (i) whether the plaintiffs suffered

from an asbestos-related injury or disease and, (ii) if so, the amount of damages. *See id.* at 303. In

the Phase III trial,

> "[T]he juries were told to assume that the claimants had sufficient exposure."
> Indeed, for the most part evidence of exposure and its likely or possible
> results was not allowed. Simply stated, whether there was exposure to
> Pittsburgh Corning's — or any other defendant's — asbestos, and, if so,
> whether that exposure was a cause of any of the 160 sample plaintiffs' illness,
> disease, or damages, was neither litigated nor determined in any of the Phase
> III trials.

*Id.* at 305.

Despite the fact that causation had not been shown for any individual or group of

individuals, the trial court "extrapolated" from the "sample" cases and allowed all claimants to

recover based upon the injuries they claimed. The Fifth Circuit found that this procedure was

unacceptable, violated Pittsburgh Corning's Seventh Amendment rights, and did not comport with

Texas substantive law or the Fifth Circuit's prior decision in *In re Fibreboard*, 893 F.2d 706 (5th

Cir. 1990). *See Cimino*, 151 F.3d at 303.

*Cimino* plainly does *not* stand for the proposition that *no* common issues can be

adjudicated in asbestos cases, but only for the proposition that (beyond general causation) *individual*

causation is an essential element of liability and cannot be proven *by the plaintiff* through

*extrapolation.* Indeed, in Phase I of *Cimino*, most of the defendants were eliminated based on

rulings regarding common issues concerning the alleged defectiveness of their products. This phase

was not deemed problematic by the appellate court. Thus, the court implicitly approved the sort of

common-issue adjudication proposed by Grace here. With respect to Phase III, the court merely

ruled it was impermissible to adjudicate remaining issues of "individual causation" for only a sample of the plaintiffs and then extrapolate those results to the remainder. *Id.* at 311.[44]

Here, Grace has proposed no such sampling and "extrapolation." Rather, Grace proposes the use of Rule 42 to resolve issues that are common to specific categories of claims. The issues Grace has identified for consolidated resolution here are exactly the sort of threshold, common issues that have been deemed the proper subject of consolidated resolution in asbestos cases such as *Cimino*[45] and in other mass-tort contexts as well. For example, in *Dow Corning*, the court indicated that consolidation of breast implant disease claims for purposes of a "single, generic causation trial" was appropriate. 211 B.R. at 580. Consolidation under such circumstances was warranted to adjudicate "a threshold issue which, depending on its resolution, could obviate the need for further proceedings." *Id.* at 583. In *Dow Corning*, the common issues that warranted consolidated resolution related to whether silicone in breast implants caused disease. *See id.* at 598.

---

[44] In its decision, the court distinguished between common issues of "generic causation" such as whether a "combination of chemical contaminants and the plaintiffs' exposure to them had the capacity to cause the alleged harm" and issues relating to "individual proximate cause." *Cimino*, 151 F.3d at 317 (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988)). The concurrence in *Cimino* specifically stated that under the court's ruling, a plan that involved consolidation of the litigation for purposes of adjudicating common causation and exposure issues "on a craft and work site basis during the relevant time periods" would be permissible. *Id.* at 337 (Garza, J., concurring). The court could then "simply plug[] each plaintiff into a craft, work site, and time period" to resolve the causation issue. *Id.*

[45] Contrary to the Committees' implication, asbestos cases have been consolidated in the past. *See, e.g., Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir. 1990) (upholding consolidation), *cert. denied*, 498 U.S. 920 (1990); *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1497 (11th Cir. 1985) ("The cases here [involving asbestos litigation] present precisely the kind of tort claims a court should consider consolidating for trial."); *Owens-Corning Fiberglass Corp. v. James*, 646 So.2d 669, 674 (Ala. 1994) (observing that "common questions of law and fact existed in these cases, both with respect to initial legal liability and with respect to medical causation"); *In re Minnesota Personal Injury Asbestos Cases*, 481 N.W.2d 24, 26 (Minn. 1992) (observing that consolidation of asbestos cases was appropriate because "[i]t is likely that there will also be common issues of law, including those relating to the connection between exposure to asbestos and disease").

Here, Grace proposes consolidated litigation of similar common issues relating to asbestos in various products it manufactured.

The fact that the asbestos claims may implicate other, individualized issues is no objection to consolidation. Rule 42 merely requires the existence of a common issue of fact or law — not that all issues relating to the consolidated claims be generic or common issues. *See* 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2384 (1995) ("Consolidation is not barred simply because the plaintiffs may be relying on different legal theories or because there are some questions not common to all actions; the critical consideration, as in other contexts under the federal rules, is whether there is at least one common question . . . ."). Thus, as the *Dow Corning* court recognized, consolidation under Rule 42 in the mass-tort context is particularly appropriate to resolve threshold issues relating to the validity of claims, given that resolution of such common issues at the outset may "obviate the need for further proceedings" involving "factors that are more individual in nature." 211 B.R. at 583, 594.[46]

**B.    The Proposed Protocol Is Neither Unprecedented Nor Impermissibly Novel.**

The Committee also argues against Grace's protocol on the grounds that it does not look like the "prototypical asbestos bankruptcy." This argument misses the mark. Grace's protocol is comprised of litigation procedures taken right out of the rules. There is no question but that there is ample precedent outside of Chapter 11 for the use of *Daubert*, Rule 56, and Rule 42 to resolve common issues of science. (*See* § 3 above).

And there is additional precedent in the context of Chapter 11. As also noted above in Section 3, precedent is readily found in the *Dow Corning* and *Babcock* cases. Debtors in even

---

[46] *See Dow Corning*, 211 B.R. at 581 (given "potential obstacles to class certification, it is perhaps fortunate that the Federal Rules of Civil Procedure provide for an alternative form of collective litigation" under "Rule 42").

more recent asbestos reorganizations also have indicated that they will follow this type of litigation path for defining the scope of liability. *See, e.g.*, Debtors' Info. Br. 28-29, *In re Federal-Mogul Global Inc.*, Case No. 01-10578 (Bankr. D. Del. Oct. 1, 2001) (proposing resolution of common issues that bear upon the validity of asbestos-related claims); Debtors' Info. Br.18-24, *In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del. June 25, 2001) (same).

That the Chapter 11 precedent is recent is no accident. Mass-tort bankruptcies have evolved in light of the failures — and successes — that emerged from their predecessors. Earlier cases that have been resolved without defining liability have involved consensual reorganizations. Many of these reorganizations, however, have run into problems. In the Johns-Manville reorganization, for example, the Trust allowed all claimants to go back into the tort system, who proceeded to litigate in every corner of the county, forcing the Trust to spend in litigation costs what it should have been using to compensate claimants. *See* Frank Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future*, 17 Cardozo L. Rev. 583, 602–03 (1996). The Trust quickly became insolvent, and in return for an agreement from plaintiffs to pay only 10 cents on the dollar, the Trust agreed to a new grid system for paying claims with loose criteria for disease proof that ducked the issue of claim validity. Almost immediately after the grid system was activated, the Trust was inundated with unexpected numbers of new nonmalignancy claims that it had reason to believe were questionable if not downright fraudulent.

Recently, as a result of this surge of claims against which the Trust had no defense (having negotiated away the right to deny such claims), the Trust has been forced to lower the percentage it pays out on claims. Similar reductions have occurred in payouts by the UNR and Eagle Picher trusts.

C.    **The PI Committee's Argument That Each Claimant Is Entitled To His Own Counsel Misses The Mark.**

      1.    **Grace's Proposal Does Not Preclude Participation By Counsel For Claimants Who Are Not On The Committee.**

The PI Committee calls Grace's proposal to establish a Personal Injury Litigation Committee ("PIL Committee") an attempt to strip tort claimants of a fundamental right to hire counsel of their choice. *See* PI Cmte. Brf. at 34-35.[47] The accusation that Grace will force counsel upon unsuspecting claimants is incorrect and ignores the fact that the Bankruptcy Code specifically allows for and recognizes the importance of establishing claimant committees.

The need to create multiple creditor committees in complex cases has been recognized since the Bankruptcy Code's inception. *See In re Dow Corning Corp.*, 194 B.R. 121, 142 (Bankr.E.D.Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (Bankr.E.D.Mich. 1997). A court is authorized to appoint committees in addition to those required under §1102(a)(1) as long as each committee adequately represents its constituents. *See id.* at 141-42. To determine whether a committee provides adequate representation, a court should consider "(a) the nature of the case; (b) identification of the various groups of creditors and their interests; (c) the composition of the committee; and (d) the ability of the committee to properly function." *See id.*

This case warrants creation of a PIL Committee. First, the complexity of this bankruptcy case and the sheer magnitude of the asserted claims counsels the appointment of litigation committees.

---

[47] It is important to note that in each case that the PI Committee cites in support of its contention that an individual's right to choose her counsel is fundamental, the facts are significantly different than those here, and the court explicitly state that the right to choose one's counsel is a qualified one. *See Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) ("To be sure, that right is qualified"); *PGH Int'l v. Gabor Shoes AG (In re PGH Int'l.)*, 222 B.R. 401, 408 (Bankr. D. Conn. 1998) (Yet, at a minimum, that right 'must be balanced against the need to maintain the highest standards of the profession.").

Second, the personal injury claimants make up a clearly-identifiable group, most of whom claim the same or similar injuries, making committee representation ideal.

Third, the PIL Committee would be comprised of attorneys representing the full spectrum of claimants in order fairly to represent each type of claimant. In the unlikely event that a particular claimant was not fairly represented, his or her counsel would not be precluded from appearing and objecting upon a showing of unique circumstances such that representation by the committee was inadequate.

Finally, the ability of the PIL Committee to function properly could be evaluated as the process continues to ensure that each claimant is adequately represented.

> 2.    **Proceedings In Babcock & Wilcox Confirm That The Committee Approach Works.**

Once again, the experience of the *Babcock* bankruptcy is instructive. There, over 50,000 claimants filed proofs of claim alleging that they had settled individual cases against Babcock & Wilcox and thus had contractual claims to enforce, as opposed to pure personal injury claims. When litigation was initiated over these "settled claims," the B&W court faced the same challenge presented here — how efficiently to handle such massive numbers of claims. The B&W Asbestos Claimant's Committee — much like the PIL that Grace proposes here — took on the task of representing the interests of the "settled claims" group of claimants in determining the validity of their claims. Nonetheless, consistent with Grace's observations above, many claimants have had their own counsel appear for them where individual issues have arisen.

.

.

D.     Debtors Do Not Oppose Appointment Of A Futures Representative.

A final issue raised by the PD and PI Committees easily is resolved.  Contrary to the PD and PI Committees' assertion, Debtors *do* support and indeed will seek (at the proper time) appointment of a futures representative.

V.    **THE PROPOSED NOTICE PLAN COMPLIES WITH DUE PROCESS AND IS REASONABLE.**

Grace has proposed a multimillion dollar Notice Plan designed to reach 96.5% of the target demographic group of PI claimants (men 65+) and 95.4% of the target demographic group of PD and ZAI claimants (adult 35+). The Plan is structured to provide potential claimants a reasonable opportunity to file their claims by the bar date. The Plan affords claimants due process and should be approved.

A.    **The Objections To The Plan Wrongly Presume That The Notice Should Educate And Warn.**

The PD Committee objects that the Notice Plan does not adequately reach or educate the "unwary claimant," such as homeowners who do not know that they have ZAI in their attics. But, for purposes of complying with due process, a bar date notice need not "warn" potential claimants of the alleged health hazard associated with Grace products or "educate" them as to any potential claim they may have against Grace. Grace is only required to provide reasonable *notice* to potential claimants of the bar date.

The Supreme Court ruled in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950) that notice must "apprise interested parties of the pendency of the action" and "afford them an opportunity to present their objections." Such notice must include: (i) a prominently announced date; (ii) disclosure of any impending hearings so that recipients can take steps to safeguard their interests; (iii) an explanation of the bar date's significance, including the consequence of not filing a timely proof of claim; and (iv) a clear definition of what claims are being barred. *See In re Amdura Corp.,* 170 B.R. 445, 452 (D. Colo. 1994); *In re Keene Corp.,* 188 B.R. 903, 908 (Bankr. S.D. N.Y. (1995); *see also, Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 390 (1993).  The notice also should advise how claimants can obtain additional

information. *Richison et al. v. American Cemwood Corp. et al.*, No. 5532, Order Granting Final Approval To Class Action Settlement, and Judgment, Final Order and Decree Thereon (Sup. Ct. San Joaquin Cty, CA. May 26, 2000).

There is no precedent for requiring bar date notices to "educate" or "warn" potential claimants further. To the contrary, the courts have consistently held that a bar date notice need not advise claimants of the basis of their claims. *See, In re Penn Central Transp. Co.*, 771 F.2d 762, 768 (3d Cir. 1985), *cert. denied*, 474 U.S. 1033 (1985) (debtor was not required to advise creditors that they may have claims *based specifically upon certain causes of actions* - such as antitrust conspiracy actions). *See also, Amdura*, 170 B.R. at 453 (bar date need not advise of the "nature" of their potential claimants' interests.).

Warning of potential danger of debtor's products is not appropriate unless the requirements for an injunction are met on the merits. In the class action case of *German v. Federal Home Loan Mortgage Corp.*, 168 F.R.D. 145,160-161 (S.D.N.Y. 1996), the court held that plaintiffs were not entitled to early notice of the dangers of lead paint in public housing. The court found that the plaintiffs' "warning" notice improperly sought to imply an early liability determination before any trial on the merits. Such a notice was rejected because it could lead to the "undesirable solicitation of claims." (citing *Hormel v. United States*, 17 F.R.D. 303 (S.D.N.Y. 1955)).

Prior to Grace's Chapter 11 filing, the plaintiffs in *Marco Barbanti, et al v. W. R. Grace & Company - Conn*, No. 00-2-01756-6 (Sup. Ct., Wa. Spokane Co. Order dated Jan. 31, 2001) ("*Barbanti Order*") requested a class notice be sent warning of the alleged dangers of ZAI. In denying this "warning" notice, the Barbanti court held:

> At this time I do not believe that plaintiff has demonstrated an emergency which would justify the court sanctioning a notice, and in effect, prejudge the case. There are factual disputes about the quantity of asbestos in vermiculite;

whether or not there is any threshold level of exposure, which would not be dangerous; the quantity of asbestos fibers found in the air of the homes tested and the testing protocols used.

*Barbanti Order* at 3. The PD Committee and the ZAI plaintiffs should not obtain through the Notice

Plan relief that requires an adjudication on the merits.

The Grace Notice Plan is just that: a means to notify potential claimants of the bar

date. The notice may be very general and must be "scrupulously neutral." *Grunin v. International*

*House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975); *also see Weinberger v. Kendrick*, 698 F. 2d

61, 70 (2d Cir. 1982). The notice should describe the proceedings "in objective, neutral terms, that,

insofar as possible, may be understood by the average absentee" claimant. *In re Nissan Motor Corp.*

*Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977). Courts recognize that notices can practicably

contain only a limited amount of information and have approved "very general description[s]" of the

bar date and its consequences. *See, Grunin* at 122. In fact, an overly-detailed notice has been found

to be unduly expensive and potentially confusing. *Nissan Motor*, 552 F.2d at 1104.

**B.    Concerns With Respect To The Specific Content Of The Bar Date Notices Have Been Addressed.**

The PD Committee exerts itself to explain the importance of particular aspects of a

notice, such as the headline. But the Committee's objections dwell on stylistic matters, not due

process issues. These stylistic concerns easily are remedied. Grace has incorporated the legitimate

points in the revised short form notices, TV spot and long form notice attached as Exhibits B (8),

(9) and (13) and D.

Specifically, the PD Committee argues that: (a) the headline is too broad and not

specific enough to get the attention of claimants; (b) the notices are directed at claims rather than

claimants; (c) the combined notice is confusing; (d) the notices fail to educate and warn; and (e) the

-67-

TV spot is unintelligible and lacks visuals. The PD Committee also objects to the limited description of ZAI and the lack of pictures. With respect to non-ZAI claims, the PD Committee suggests that the notices should target more than just commercial building owners.

In a cooperative effort to communicate the necessary messages in the most effective manner possible, Grace has modified its various notices and TV spot. The headlines of the short form and trade notices have been revised to be more prominent and more specifically directed at potential claimants. The short form and trade notices have been redirected at claimants instead of claims. Likewise, the content of the notices have been revised to clearly distinguish types of claimants and claims using subheadings, product descriptions, and simple language to avoid any confusion. The notices have been revised to more fully describe ZAI and how it can be visually identified by claimants. The revised description of ZAI is essentially the same as the parties agreed to use in *Barbanti*. (Exhibit A, Kinsella Aff. ¶ 14). A picture of ZAI also has been added.

The non-ZAI portion of the notices have been revised to clarify the types of buildings which may give rise to an asbestos property damage claim.[48] They also have been re-worded to more fully describe Grace's non-ZAI products. As such, the short form notices give the "basic information" required and urge potential claimants with questions to call the special toll free number, or go to the special website and obtain the full bar date package. *See, Carlough v. Amchem Products*, 158 F.R.D. 314, 330 (E.D. Pa. 1993).

---

[48] The Committee argues that the notices are not properly directed at schools. While the notices are directed to owners and operators of public buildings, which would include schools, Grace notes that the great majority of public and private schools have already settled any claims they have against Grace with respect to "asbestos containing products" in two national class actions that were filed and settled, namely *In re Asbestos School Litigation*, No. 83-0268 (E.D. Pa) and *Central Wesleyan College v. W. R. Grace*, 2:84-1860-8 (D.S.C.), as well as other actions filed by school districts.

In accommodating the PD Committee's objections, Grace has not provided (and need not provide) separate notices to separate types of claimants. Grace seeks to notify personal injury, property damage, ZAI and all other claimants of the bar date. In analyzing the demographics of all these claimant groups, Grace's notice expert, Kathy Kinsella, determined that there are two primary demographic targets that include the vast majority of all claimants. Kinsella developed a plan that effectively reaches these groups without the necessity of separate media campaigns to reach the claimant groups individually. (Kinsella Aff. ¶ 9 Ex. A). Providing separate notices for each claimant group would be unnecessary and wasteful.

In analyzing the reasonableness of bar date notices, the court must balance the needs of notification of potential claimants with the interests of existing creditors and claimants. *See, Vancouver Women's Health Collective Society, v. Robbins Company, Inc.*, 820 F 2d 1359, 1364 (4th Cir. 1987) ("A bankrupt estate's resources are always limited and the bankruptcy court must use discretion in balancing these interests" in deciding the adequacy of a Notice Plan.) Courts recognize that combining notices reduces "the costs of the litigation and thereby prevents an unnecessary depletion of" estate assets. *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d at 1106. The balance of competing interests here strongly favors a combined notice plan to take advantage of the similar demographics of the potential claimants.

Instead of publishing separate notices for each type of claimant, Grace has redesigned its notices to more fully describe the different types of Grace products which may be the subject of claims and the different type of claims that a claimant may hold. Since the bar date for all claimants is the same, the combined notice will cause no confusion. Grace's use of a combined notice is similar to that in *Babcock & Wilcox*, where the PD Committee's expert, Todd Hilsee, prepared a

-69-

combined notice for the debtors' for both property damage as well as personal injury claimants. A copy of that notice is attached hereto as Exhibit C.

The PD Committee also criticizes the Grace TV spot as being "unintelligible" and lacking in appropriate visuals. These criticisms are premature, because the TV spot is still in a conceptual stage. When fully produced, it will include visuals of both ZAI and non-ZAI products. (Kinsella Aff. ¶ 12.) As the Court outlined in *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 330 (E.D. Pa. 1993), a 30-second television spot should be designed to catch the attention of potential claimants, alert them to the existence of the bar date, encourage them to look to other sources for more information and provide information as to where complete notice packets can be obtained. The TV spot has been revised along the same lines as the summary bar date notice.

C.      **The Notice Plan Effectively Reaches Potential Claimants.**

In addition to the content of the notices, the Court must also review the designed reach of the Notice Plan. Due process requires that the "best notice practicable under the circumstances" be given. *Mullane*, 339 U.S. at 317. The fact that some potential claimants must be given notice by publication "is not necessarily fatal." *In re Domestic Air Transportation Antitrust Litigation*, 141 F.R.D. 534, 539 (N.D. Ga. 1992). In this respect, the PD Committee makes few specific criticisms of the Plan. The Committee's focus is on the content of the notice, arguing that the reach will be irrelevant if the notices lack a meaningful message. As detailed above, the content modifications made by Grace address those concerns.

The Committee's objections to the reach of the Notice Plan are that it: (a) is too costly; (b) contains inflated reach calculations; (c) fails to address schools and ZAI claimants in Canada; and (d) fails to cover non-ZAI sales in the Pacific Rim countries. The Medical Monitoring

claimants (Libby, Montana residents) object generally to the Notice Plan as "failing to address" their claims. None of these objections have merit.

Notably, the PD Committee fails to provide any constructive suggestions to enhance the reach of the Plan. For example, while Grace believes that the cost of the Notice Plan is appropriate, Grace would be happy to reduce the costs of the Plan and has invited the Committee to describe how they believe that can be accomplished. The PD Committee's criticisms of the reach calculations are unfounded. The reach calculations were complied using data from Media Mark Research and Nielsen Media Research, two nationally accredited media and marketing research firms, that are the leading sources of such information in the advertising industry. The combined reach estimates for print and television advertising were calculated with a Telmar Software product that is also used widely throughout the advertising industry to calculate estimates of this type. (Kinsella Aff. ¶ 20.)

The Notice Plan has been modified in order to address potential ZAI claimants in Canada. (Kinsella Aff. ¶ 21). The Notice Plan for *non*-ZAI claimants in Canada is adequate. No property damage claims have been filed against Grace in Canada since Grace won a favorable ruling in *Privest Properties, et al. v. The Foundation Company of Canada et al., C884875*. In that case, the Supreme Court of Canada sustained the judgment of the trial court dismissing plaintiff's claims against Grace and finding, among other things, that Grace's MK-3 product was not an inherently dangerous product. With respect to personal injury claimants in Canada, the Canadian workers compensation system provides claimants the appropriate redress for their injuries. The Notice Plan structured for Canada is not directed at personal injury claimants.

The reach of the Notice Plan for the Pacific Rim has not been adjusted. Grace's records do not indicate that Grace sold asbestos containing products outside of the United States and

-71-

Canada, except for some extremely small amounts of MK-3. For a period of time in the 1950's, 1960's, 1970's and early 1980's, Grace did sell some vermiculite products to various parties in the Persian Gulf region and Asia, but these sales constituted no more than about 1% of its total sales of vermiculite products. Further, Grace's records suggest that the workers installing Grace's vermiculite products for these projects were from around the world. As a result, there is no possible way for Grace to provide notice to such potential claimants. (Kinsella Aff. ¶ 24).

The Committee also argues that Grace is seeking to require potential claimants to touch or disturb asbestos products in order to file claims, forcing claimants to choose between disturbing the product in order to avoid exposure to the product and foregoing the right to file a claim. The Committee is wrong. Most, if not all, product owners or managers already know the product information needed to file a proof of claim, without even examining the product. And, to the extent that actual inspection of the product is necessary, Grace has provided sufficient description of the product so that a claimant can tell from looking at it if it is a Grace product. ZAI, for example, is easily distinguishable from other loose fill insulation products made from material other than vermiculite.

The Medical Monitoring Claimants simply are wrong in contending that the Notice Plan fails to address their claims. First, the Plan expressly provides that the Bar Date Notice Package will be mailed to all residents of the Libby, Montana area. (at 15). In addition, the Notice will be published in the Libby Montana newspaper, the *The Missoulia Independent*, in Parade and USA Weekend carried in seven different local newspapers in Montana as well as relevant trade and consumer publications. The notices specifically disclose that the bar date applies to holders of claims "caused by asbestos in products manufactured by Grace or from vermiculite mined, milled or processed by Grace." The notices also clearly provide that the bar date applies to *any* claims

against Grace. Thus, the Medical Monitoring Claimants have been fully addressed in the Notice Plan. (Kinsella Aff. ¶ 26.)

The Notice Plan, as amended, provides potential claimants with adequate information with respect to the bar date and the claims being barred. It informs potential claimants of the effect of not filing a claim by the bar date and will be sent to all known claimants[49] and published in appropriate media so as to reach unknown claimants. Multi-faceted notice programs like that proposed in this case have been approved by many courts and utilized successfully for similar purposes in large consumer or product class actions where most class members are not individually identified. *See Cox v. Shell Oil Company*, case no. 18,844, Final Order Approving Class Action Settlement at 13 (Chancery Ct. Obion Cty. Tenn, Feb. 9, 1996) (citing *In re Domestic Air Transportation Antitrust Litigation*, 141 F.R.D. 534 (E.D. Pa. 1992)). The Notice Plan, as revised, is consistent with the many notice plans that have been approved in previous Chapter 11 Bankruptcy cases, complies with due process and should be sustained.

---

[49] In preparation for sending actual notice to claimants, Grace has discovered that it does not have the addresses for known asbestos personal injury claimants and ZAI claimants in its database. Grace only has the addresses of claimants' counsel. As a result, Grace is requesting that counsel for claimants assist in sending out such actual notices as outlined on Exhibits E and F.

## VI.    THE PROPOSED PROOF OF CLAIM FORMS ARE NECESSARY AND APPROPRIATE.

The Claim forms are key to the central task of this case. They supply the necessary factual predicate for defining the Debtors' liability. To that end, the proposed claim forms have been carefully tailored to achieve this goal — without being unreasonably burdensome. In objecting to the forms, the Committees are essentially demanding that their predicted 200,000 claims be accepted at face value, with no scrutiny of Grace's actual liability and no requirement that the claimant show actual asbestos-related injury until *after* a reorganization plan is confirmed and a trust is established to pay claims. The Committee's proposal would thus require this Court to ignore the assertion of illegitimate claims, and indeed would ratify and reward the filing of claims lacking a good faith basis.

### A.    The Personal Injury Claim Form Asks For Necessary Information And Is Not Unreasonably Burdensome.

Grace's proposed Personal Injury Claim form is needed in order to decide whether the claimant actually was exposed to Grace's asbestos products, whether that exposure was sufficient to cause injury, and whether the claimant in fact suffered injury. The PI Committee's estimate that it would take a paralegal three hours to complete the form is an exaggeration. But even if this estimate is accurate, three hours is not an unreasonable burden.

#### 1.    Prior Cases Provide Ample Support For Grace's Tailored Requests.

There is ample authority for this approach. First, as noted above, detailed claims forms have been approved by numerous asbestos trusts for the payment of claims. The 21-page Manville claim form is more extensive than Grace's proposed form. The individualized review forms for the Celotex, Eagle-Picher and UNR Trusts are similar to Grace's form.

Second, detailed claim forms or questionnaires repeatedly have been approved outside of Chapter 11 in order to streamline the litigation of mass tort cases. For example, the MDL court which administered the Dow Corning breast implant multi-district litigation approved a much more extensive and burdensome 42-page "Plaintiff Questionnaire" that required disclosure of information about plaintiffs' current and former addresses, family members, prior marriages, educational and employment history (including all absences for medical reasons), medical history (including all surgeries and hospitalizations and all visits to treating doctors), prescription drug history, claimed damages, prior lawsuits, prior communications with defendants, a listing of all witnesses who could support the claim, and a request for an extensive list of documents (including medical records, diaries, journals, logs, product identification records, medical bills, and documentation of lost wages or income), and releases authorizing the disclosure of medical and employment records.

As noted in Grace's opening brief, detailed questionnaires also were approved in the orthopedic bone screw product liability litigation, the "Phen-fen" product liability case, the latex allergy product liability case, an asbestos product liability case and the "Agent Orange" litigation, among others.[50]

---

[50] *See, e.g., In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1995 WL 925678, at *1 (E.D. Pa. Feb. 1, 1995) (attaching questionnaire); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 704702, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*, 1999 WL 387322 (E.D. Pa. 1999); *Ludwig Enters CMOs on Product ID Questionnaire, More In re Latex Allergy*, 12/2/97 Andrews Med. Devices Litig. Rep. 10 (discussing use of 42-page questionnaire seeking identification of manufacture, individuals who could corroborate use, documents supporting claims, medical information, and education and employment information in *In re Latex Gloves Prods. Liab. Litig.*, MDL Docket No. 1148 (E.D. Pa.)); *In re Food Lion, Inc.*, 1998 WL 322682, at *11 (4th Cir. 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim"); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1416 (E.D.N.Y. 1985), (Weinstein, J.) *aff'd in part, rev'd in part on other grounds*, 818 F.2d 179 (1987) (ordering questionnaires "sent to all claimants" seeking dates and location of service to determine extent of exposure); *In re New York City Asbestos Litig.*, 142 F.R.D. 60, 63, 65 (E.D.N.Y. 1992) (mentioning use of a "questionnaire process designed to elicit all information necessary for settlement" of asbestos claims).

Further precedent for this approach is provided by the widespread adoption of "*Lone Pine*" orders by both state and federal courts managing multi-plaintiff toxic tort claims. The term "Lone Pine order" originated in a New Jersey case, *Lore v. Lone Pine Corp.*, No. L-33606-85 (N.J. Super. Ct. 1986) in which the trial court directed plaintiffs to provide expert opinions supporting their personal injury and property damage claims against a neighboring landfill, including specific causation evidence.    Last year, the Fifth Circuit rejected the argument that such "pre-discovery" orders imposed too high a burden on plaintiffs at the threshold stage of litigation. The court held that such orders mitigate the burdens of mass tort litigation on the courts and defendants, and merely require plaintiffs to disclose the causation and damages evidence they should have assembled *before* filing their claims:

> *Lone Pine* orders are designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation. In federal courts, such orders are issued under the wide discretion afforded district judges over the management of discovery under Fed.R.Civ.P. 16.
>
> *            *            *
>
> The scheduling orders issued below essentially required that information which plaintiffs should have had before filing their claims pursuant to Fed. R. Civ. P. 11(b)(3). Each plaintiff should have had at least some information regarding the nature of his injuries, the circumstances under which he could have been exposed to harmful substances, and the basis for believing that the named defendants were responsible for his injuries.

*Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000) (affirming dismissal of radiation exposure personal injury cases for failure to comply with *Lone Pine* order). *See also Martinez v. City of San Antonio*, 40 S.W.3d 587, 591-92 (Tex. Ct. App. 2001) (rejecting challenge to *Lone Pine* order and to "no evidence" summary judgment dismissal of toxic tort claims alleging personal injuries from lead exposure based on failure to present causation evidence); *In re Love Canal Actions*, 547 N.Y.S.2d 174, 177 (N.Y. Super. 1989) (entering *Lone Pine* order requiring toxic tort

plaintiffs to document their chemical exposure and medical injury claims prior to any further prosecution of the claims).

Third, and most importantly, this approach was approved by the court in the *Babcock* case, the first major asbestos bankruptcy case to confront the recent surge in claims. In that case, the debtors initially proposed a more extensive proof of claim form than ultimately was adopted by the court. As in Grace, the personal injury committee opposed the inclusion of any substantive information in the claim form, arguing the time and expense of compiling that information was "prohibitive." (8/25/00 Order and Reasons at 21) The court agreed with the debtors that the claim form "must establish, at a minimum, the ground on which they [the claimants] base debtors' liability to them. In this case, that entails establishing a claimant's exposure to asbestos from debtors' products and the injuries that resulted from that exposure." (*Id.* at 22) The court thus authorized the debtors in the form "to ask questions that go to this prima facie evidence of liability" and approved debtors' requests for:

- Diagnostic reports supporting the claimed asbestos injuries;

- PFT and ILO results;

- The total number of years of asbestos exposure and the year of first and last exposure;

- The specific locations where the claimant was exposed to debtors' boilers, and the industry and occupation codes associated with each such location.

While the court in *Babcock* declined to approve additional questions,[51] subsequent events in the *Babcock* case underscore the need for the information sought by the Debtors there, and

---

[51] The court expressed concerns that requiring further information could deter the filing of claims by placing an "undue burden on parties who wish to assert claims" and eliminated several questions from the debtors' proposed form. (*Id. at* 21-25). As discussed below, subsequent events have underscored the need for sufficiently detailed forms.

which Grace seeks in its proposed form here.    Specifically, based on the pre-petition filing rate, about 50,000 current claims should have arisen in the 18 months between the B&W petition date and the July 30, 2001 claim bar date. Even allowing for some acceleration in the filing of claims due to the bar date, the more than 222,000 claims that were filed far surpassed any reasonable projection. The vast majority of those claims appear to be invalid, for many of the same reasons that apply to the 1997 and 2000 Grace sample claims. As with Grace, over 90% of the B&W claims are for non-malignant "asbestosis", yet more than half of those claims submitted either no x-ray results or an ILO reading below the American Thoracic Society standard for that disease. More than half of the claimants also failed to submit any PFTs, or submitted PFTs within the normal range established by the American Medical Association.

The majority of the B&W claims also presented no evidence of any actual exposure to B&W's product (boilers with asbestos insulation). Based on a sample of the B&W claims, the Debtors found that 68% of the claims failed to allege the claimant had even worked at a location where B&W's boilers were present. Where such allegations were made, 44% named locations where B&W's boilers had never been installed.

Finally, tens of thousands of the B&W claims already had been paid in full, or were duplicative, or were unsigned, or submitted none of the required medical records, or left entire sections of the form blank.

The major plaintiff law firms responsible for the mass filings of these invalid claims in the *Babcock* case will play the same role in the *Grace* cases. These recent developments thus underscore the critical need for the submission of the requested medical and exposure information in the Grace proof of claim form.

2.      **The Requests For Medical Information Are Reasonable.**

The proposed claim form asks for the following medical information:

- The claimant's diagnosis, including the name of the diagnosing physician, the date of the diagnosis, and any non-asbestos causes identified in the diagnosis.

- The results of any x-rays and Pulmonary Function Tests.

- Basic information on the claimant's smoking history, if any.

- Copies of the medical records relating to the diagnosis, along with any other x-ray or CT scan test results taken in the prior two years.

Each of these requests is essential to determining the validity of the claim. The diagnosis identifies the nature of the claim. X-ray tests (and the physician's ILO rating of those results) are needed to link the diagnosis to asbestos exposure. For non-malignant claims, PFT results are essential to establish actual impairment. Requiring disclosure of all x-rays and CT scan taken in the past two years assures full rather than selective disclosure of the relevant tests. As detailed in Part I, above, submission of this medical information is particularly important given the high proportion of pre-petition claims with little or no supporting medical tests.

The PI Committee does not dispute the ultimate need for disclosure of this information before any claim payment is made. Other asbestos proof of claim forms, including those issued by the Manville Trust, as well as the "individualized review" forms issued by the Celotex, Eagle-Picher, and UNR trusts, require similar information. Since more than half of those who assert claims against Grace are also asserting claims against the Manville Trust and other asbestos trusts, the additional burden of completing the Grace form will be minimal. (The paralegals in the "pretest" described in Peterson's affidavit apparently did not utilize the information already compiled for other

-79-

asbestos trusts. This alone would substantially reduce Peterson's three-hour estimate for completing the Grace form.)

3.    **The Requests For Exposure Information Here Are Necessary And Are Not Unreasonably Burdensome.**

The requested exposure information is essential to determining the validity of any submitted claims, as well as for estimating the ultimate magnitude of valid claims. Claimants who were occupationally exposed are asked to disclose:

- The time periods in which they were exposed to Grace's products as well as those of other defendants.

- Their industry, occupation and employer(s);

- The site locations where they were exposed to Grace's products;

- The name(s) of the Grace products and how close they were to those products while they were being installed.

This information is needed to ascertain the basis for Grace's alleged liability. Information on the claimant's exposure to other asbestos products also is essential to determining whether it was exposure to Grace's products that caused the claimant's injury.

Ironically, the PI Committee's arguments that it would be too "burdensome" to collect the requested information proves that the vast majority of the pre-petition claims have been filed against Grace with no good-faith factual basis, and that the asbestos plaintiffs' law firms intend to continue these tactics in asserting claims in these Chapter 11 cases. Peterson's affidavit admits that "few plaintiffs" recall being exposed to "specific asbestos products", and that the "assembly" of evidence from "documents, co-workers and only some time by the plaintiff himself" to support a

claim of exposure to Grace's products is a "labor-intensive" and "burdensome" process that plaintiff lawyers defer until "the time of trial or discovery. . . ." (Peterson Aff. ¶34)

### B.    The Property Damage And ZAI Proof Of Claim Forms Are Appropriate.

The PD Committee objects to the Property Damage and ZAI proof of claim forms as being unreasonably burdensome and confusing. These objections are unfounded. While the *Babcock* property damage proof of claim form may only have been a slightly revised version of Official Form 10, the debtor in that case was not particularly concerned with property damage claims. Only a handful of property damage cases had ever been brought against *Babcock*. Further, the *Babcock* product was used for such a narrow purpose that any legitimate property damage claims could more easily be identified. By contrast, for Grace, property damage claims traditionally have played a large role in asbestos-related litigation. And, for Grace, with the advent of the ZAI claims, property damage concerns necessitate gathering more information than was necessary in *Babcock*.

The Property Damage and ZAI proof of claim forms are not long and are not burdensome. They request simple and straightforward information that is necessary in order to determine if the claimant has a legitimate basis for a claim against the Debtors. Further, the requirement that a claimant file a separate claim form for each property owned is not unreasonable or unduly burdensome. The information requested of claimants as to each property is not complicated and does not involve any kind of extensive inspection. It is information that would readily be know by any property owner or manager. The Committees' specific concerns regarding schools is unfounded since most schools' claims have already been settled in the *Asbestos Schools Litigation*, the *Wesleyan* class action, and other actions filed by school districts as outlined previously.

The Committee also suggests that preparation of a proof of claim requires that potential claimants touch or disturb asbestos products. As outlined in Section V herein, this is not true. The type of information requested can be provided by most owners based on their knowledge of their property without even looking for the product. To the extent that a potential claimant believes he needs to look at the product, the claimant does not need to touch or otherwise disturb the product in order to determine if he believes he has a claim against Grace.

In examining the proof of claim forms, Debtors have discovered a few areas where they believe the language should be modified slightly. In addition, Debtors have added the description of the ZAI product to the ZAI claim form. Attached hereto as Exhibits I and J are revised Property Damage and ZAI proof of claim forms.

C.    **The Non-Asbestos Proof Of Claim Form, Definitions And Instructions Have Been Modified Slightly.**

Finally, the Official Committee of Unsecured Creditors ("UCC") has requested that Grace revise the Non-Asbestos Proof of Claim Form, Instructions and accompanying definitions. The UCC is concerned that the fact that a bar date is being set for *all claims*, including trade claims, is lost among the extensive information provided for asbestos related claims. Attached hereto as Exhibits I and J are a revised Non-Asbestos Proof of Claim Form and instructions and revised General Instructions that address the UCC's concerns and are also consistent with the PD Committee's objections.

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program be granted.

Dated: November 9, 2001

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones (2436)
David W. Carickhoff, Jr. (3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in Possession

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## EXHIBITS TO DEBTORS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF A BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM

EXHIBIT  M