2

*EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996*

Copyright 1996 Disclosure Incorporated
EdgarPlus

COMPANY: **W R GRACE** & CO
CROSS-REFERENCE: FRESENIUS NATIONAL MEDICAL CARE HLDG INC
TICKER: D.WYW
EXCHANGE: OTH

FORM-TYPE: 10-K

DOCUMENT-DATE: **December** 31, 1995
FILING-DATE: March 30, 1996

Full text Company info Contents Other Return

\* \* \* \* \* \* \* \* \* \* \* \* \* \* **TEXT OF FILING** \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

1

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1995

Commission file number 1-3720

W. R. GRACE & CO.

Incorporated under the Laws of the   I.R.S. Employer Identification No.
State of New York                    13-3461988

ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
407/362-2000
SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
| --- | --- |
| Common Stock, $1 par value | New York Stock Exchange, Inc. |

Search - 20 Results - co(wr or w r or w.r. w/l grace) and date is 1995     http://www.lexis.com/research/retrieve?...S&_md5=2f13adcabfa206e19bde08f3cf532230

Common Stock Purchase Rights        Chicago Stock Exchange,
                                    Incorporated

7-3/4% Notes Due 2002
(issued by W. R. Grace & Co.-Conn.,     New York Stock
                                    Exchange, Inc.
a wholly owned subsidiary) and
related Guarantees

## SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:

                        None

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange
Act of 1934 during the preceding 12 months and (2) has been subject to
such filing requirements for the past 90 days.  Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be
contained, to the best of registrant's knowledge, in the Proxy
Statement incorporated by reference in Part III of this Form 10-K or
any amendment to this Form 10-K. ---

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates was approximately $6.0 billion at February 1, 1996.

At March 1, 1996, 98,038,423 shares of W. R. Grace & Co. Common
Stock, $1 par value, were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

            Document            Where Incorporated


    Proxy Statement for Annual Meeting to be
        held May 10, 1996 (specified portions)     Part III


                        2




## TABLE OF CONTENTS


                            Page


PART I

Item 1. Business                    1

Introduction                                                    1
Strategic Restructuring and Other Growth
   Initiatives                                              1
Description of Business                                5
Discontinued Operations                           13
Research Activities                              16
Environmental, Health and Safety Matters                   17
Item 2. Properties                               18
Item 3. Legal Proceedings                       18
Item 4. Submission of Matters to a Vote of
   Security Holders                               32
Executive Officers                               32


PART II


Item 5. Market for Registrant's Common Equity
   and Related Stockholder Matters                      33
Item 6. Selected Financial Data                      35
Item 7. Management's Discussion and Analysis
   of Financial Condition and Results of
   Operations                                    35
Item 8. Financial Statements and Supplementary
   Data                                      35
Item 9. Changes in and Disagreements with
   Accountants on Accounting and Financial
   Disclosure                                    35


PART III


Item 10. Directors and Executive Officers of
   the Registrant                                35
Item 11. Executive Compensation                      36
Item 12. Security Ownership of Certain
   Beneficial Owners and Management                      36
Item 13. Certain Relationships and Related
   Transactions                                  36


PART IV


Item 14. Exhibits, Financial Statement
   Schedules, and Reports on Form 8-K                      36

Signatures                                       43

Financial Supplement                                 F-1


3


PART I

Analysis of Results of Operations and Financial Condition" in the
Financial Supplement for additional information concerning
environmental matters.


14


ITEM 2. PROPERTIES.


Grace operates manufacturing and other types of plants and facilities
(including office and other service facilities) throughout the world,
some of which are shared by two or more of Grace's product lines.
Grace considers its major operating properties to be in good operating
condition and suitable for their current use.  Although Grace believes
that, after taking planned expansion into account, the productive
capacity of its plants and other facilities is generally adequate for
current operations and foreseeable growth, it conducts ongoing,
long-range forecasting of its capital requirements to assure that
additional capacity will be available when and as needed (see
information regarding Grace's capital expenditures in "Management's
Discussion and Analysis of Results of Operations and Financial
Condition" and on page F-27 of the Financial Supplement).  Accordingly,
Grace does not anticipate that its operations or income will be
materially affected by the absence of available capacity.

Additional information regarding Grace's properties is set forth in
Item 1 above and in Notes 1, 9 and 12 to the Consolidated Financial
Statements in the Financial Supplement.


ITEM 3.  LEGAL PROCEEDINGS.


Asbestos Litigation.  Grace is a defendant in lawsuits relating to
previously sold asbestos-containing products and anticipates that it
will be named as a defendant in additional asbestos-related


15


lawsuits in the future.  Grace was a defendant in approximately 40,800
asbestos-related lawsuits at year-end 1995 (47 involving claims for
property damage and the remainder involving approximately 92,400 claims
for personal injury), as compared to approximately 38,700 lawsuits at
year-end 1994 (65 involving claims for property damage and the
remainder involving approximately 67,900 claims for personal injury).
In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek, among other things, to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings.  Through year-end 1995, 129 asbestos property damage cases were dismissed with respect to Grace without payment of any damages or settlement amounts; judgments were entered in favor of Grace in 10 cases (excluding cases settled following appeals of judgments in favor of Grace and a case in which the plaintiff was granted a new trial on appeal); Grace was held liable for a total of $74.7 million in 7 cases (2 of which are on appeal); and 177 property damage suits and claims were settled for a total of $421.8 million.

Included in the asbestos property damage lawsuits pending against Grace and others at year-end 1995 were the following class actions: (1) a Pennsylvania state court action (Prince George Center, Inc.  v. U.S. Gypsum Company, et al., Court of Common Pleas of Philadelphia County), certified in 1992, covering all commercial buildings in the United States leased in whole or in part to the United States government on or after May 30, 1986; (2) an action, conditionally certified by the United States Court of Appeals for the Fourth Circuit in 1993 and pending in the United States District Court for the District of South Carolina, covering all public and private colleges and universities in the United States whose buildings contain asbestos materials (Central Wesleyan College, et al. v. W.  R.  Grace, et al.); and (3) a purported class action (Anderson Memorial Hospital, et al. v. W.  R. Grace & Co., et al.), filed in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuits described above and any building owned by the federal or any state government.  In December 1995, Grace entered into an agreement to settle the claims under Prince George Center, Inc.  v. U.S. Gypsum Company, et al.  The terms of the settlement agreement (which is subject to judicial review and approval after class members have an opportunity to be heard) are not expected to have a significant effect on Grace's consolidated results of operations or financial position.  In July

16

1994, the claims of most class members in Anderson Memorial Hospital, et al., v. W.  R.  Grace & Co., et al.  were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state.  The plaintiffs have requested that the court reconsider its decision.  In August 1994, Grace entered into an agreement to settle In re: Asbestos School Litigation, a nationwide class action brought in 1983 in the United States District Court for the Eastern District of Pennsylvania on behalf of all public and private elementary and secondary schools in the United States that contain friable asbestos materials (other than schools that "opted out" of the class).  The terms of the settlement agreement (which were approved by the District Court in September 1995) are not expected to have a significant effect on Grace's consolidated results of operations

or financial position.

The remaining asbestos lawsuits pending at year-end 1995 involved claims for personal injury. Through year-end 1995, approximately 10,100 personal injury lawsuits involving 24,500 claims were dismissed with respect to Grace without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 23,700 such suits involving 29,600 claims were disposed of for a total of $109 million (see "Insurance Litigation" below). However, as a result of various trends (including the insolvency of other former asbestos producers and cross-claims by co-defendants in asbestos personal injury lawsuits), the costs incurred in disposing of such lawsuits in the past may not be indicative of the costs of disposing of such lawsuits in the future.

In 1991, the Judicial Panel on Multi-District Litigation consolidated in the United States District Court for the Eastern District of Pennsylvania, for pre-trial purposes, all asbestos personal injury cases pending in the federal courts, including approximately 7,000 cases then pending against Grace; 3,600 new cases involving 7,200 claims against Grace have subsequently been added to the consolidated cases. To date, no action has been taken by the court handling the consolidated cases that would indicate whether the consolidation will affect Grace's cost of disposing of these cases or its defense costs.

Grace's ultimate exposure with respect to its asbestos-related lawsuits and claims will depend on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. As discussed below under "Insurance Litigation," a May 1994 decision of the U.S. Court of Appeals for the Second Circuit limited the amount of insurance

17

coverage available with respect to property damage lawsuits and claims. Because Grace's insurance covers both property damage and personal injury lawsuits and claims, the May 1994 decision has had the concomitant effect of reducing the insurance coverage available with respect to Grace's asbestos personal injury lawsuits and claims. However, in Grace's opinion, it is probable that recoveries from its insurance carriers, along with other funds, will be available to satisfy the property damage and personal injury lawsuits and claims pending at year-end 1995, as well as personal injury lawsuits and claims expected to be filed through 1998. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated results of operations or financial position. See "Insurance Litigation" below and Note 2 to the Consolidated Financial Statements in the Financial Supplement for additional information.

Environmental Proceedings. Grace (together with other companies) has been designated a "potentially responsible party" ("PRP") by the United States Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 1995, proceedings were pending with respect

to approximately 30 sites as to which Grace has been designated a PRP.
Federal law provides that all PRPs may be held jointly and severally
liable for the costs of investigating and remediating a site. Grace is
also conducting investigatory and remediation activities at sites under
the jurisdiction of state and/or local authorities.

In addition, in 1989, Hatco Corporation ("Hatco"), which purchased the
assets of a Grace chemical business in 1978, instituted a lawsuit
against Grace in the United States District Court for the District of
New Jersey (Hatco Corporation v. W. R. Grace & Co.-Conn.) seeking
recovery of cleanup costs for waste allegedly generated at a New Jersey
facility during the period of Grace's ownership. Grace subsequently
filed a lawsuit against its insurance carriers seeking indemnity
against any damages assessed against Grace in the underlying lawsuit,
as well as defense costs. In decisions rendered during 1993, the
District Court ruled that Grace is responsible for a substantial
portion of Hatco's costs. In July 1995, the United States Court of
Appeals for the Third Circuit reversed the decisions of the District
Court and remanded the lawsuit to the District Court for further
proceedings. Specifically, the Court of Appeals (a) reversed the
District Court's ruling that Grace is responsible for a substantial
portion of Hatco's costs and (b) ruled that in the remand proceeding
the burden of proof would be on Hatco to establish that it had not
released Grace from the asserted liabilities. In an earlier

18

decision, the District Court had resolved, in a manner favorable to
Grace, certain legal issues regarding Grace's right to insurance
coverage; however, the ultimate liability of Grace's insurance carriers
will be determined at trial, should a trial be necessary after the
remand proceedings described above. Remediation costs, and Grace's
share, if any, of such costs, will be determined once ongoing site
investigations are completed and a remediation plan is approved by the
State of New Jersey. As a result of the above factors, the amount that
Grace may be required to pay to Hatco, if any (which Grace expects will
be partially offset by recoveries from insurance carriers), cannot be
reliably estimated at this time.

In November 1995, Grace received a letter from the United States
Department of Energy ("DOE") inquiring as to Grace's willingness to
contribute to the continued cleanup of a former Grace property located
in Wayne, New Jersey. The letter asserted that Grace has a legal duty
to pay for the site's cleanup and that the total cost of cleanup may
exceed $100 million. The operations conducted by Grace at the Wayne
site (from 1955 to 1970) included work done on radioactive materials
under contract with the United States government for the "Manhattan
Project" and with the United States Atomic Energy Commission. In 1975,
the United States Nuclear Regulatory Commission inspected the site,
concluded that it was decontaminated in accordance with applicable
regulations and released it for unrestricted use. In 1984, pursuant to
a request from the DOE, Grace transferred the Wayne property to the DOE
and made a cash payment as a contribution towards the DOE's cleanup
efforts at the site, which was acknowledged by the DOE as fulfilling

any obligation Grace had to contribute to DOE's cleanup effort. As a result of these transactions, Grace believes it has no further obligation to contribute to the DOE's cleanup activities.

In March 1993, an action was filed in the United States District Court for the Southern District of Texas against Grace Drilling Company, a subsidiary of the Company the business and assets of which have since been sold, and several other defendants, for alleged violations of the Clean Water Act and the Rivers and Harbors Act (U.S. v. Fina Oil and Chemical Co., et al.). The government alleges that seagrasses and seabeds around a drilling rig operated by Fina Oil and Chemical Co. were damaged in connection with the placing, servicing and removal of the rig. The government is seeking injunctive relief requiring the defendants to restore the damaged areas and to compensate for temporary loss of the seagrass habitat, as well as civil penalties of up to $25,000 per day of violation and attorneys' fees.

Grace is also a party to other proceedings involving federal, state and/or local government agencies and private parties

19

regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. As a voluntary participant in the EPA Toxic Substances Control Act Compliance Audit Program, Grace agreed to undertake a corporate-wide audit of compliance with Section 8 of such Act and to pay a stipulated civil penalty for each study or report that EPA alleges should have been, but was not, submitted to the EPA as required under such Section. Although final review of the audit is not complete, Grace believes it will be required to pay the EPA penalties aggregating from $250,000 to $400,000 for information discovered in the course of the audit. In addition, Grace has voluntarily reported to the EPA violations of certain notification and related requirements under such Act, and penalties may be assessed against Grace in connection therewith; however, the amount of such penalties cannot be determined at this time.

Grace believes that the liabilities for environmental remediation costs that have been recorded in the Consolidated Financial Statements are adequate. In addition, Grace is presently involved in litigation with its insurance carriers seeking to hold them responsible for certain amounts for which Grace may be held liable with respect to such costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain. For further information, see Note 12 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Insurance Litigation. Grace is involved in litigation with certain insurance carriers with respect to asbestos-related claims and environmental liabilities. Its asbestos-related insurance actions consist of a case styled Maryland Casualty Co. v. W. R. Grace & Co.,

pending in the United States District Court for the Southern District
of New York; Dayton Independent School District v. United States
Mineral Products Company, et al., pending in the United States District
Court for the Eastern District of Texas; Independent School District
No. 197, et al. v. W. R. Grace & Co. and Accident & Casualty
Insurance Co., et al., pending in the First Judicial District in
Minnesota; The County of Hennepin v. Central National Insurance
Company, et al., pending in the Fourth Judicial District in Minnesota;
Ecolab, Inc. v. Central National Insurance Co., pending in the
District Court for Ramsey County, Minnesota; and American Employers'
Insurance Co., American Re-Insurance Co., Commercial Union Insurance
Co., and Unigard Security Insurance Co. v. W. R. Grace & Co.,
Continental Casualty Co., and Maryland Casualty Co., which is pending
in the New York state courts; Grace's insurance actions relating to
environmental liabilities consist of

20

Maryland Casualty Co. v. W. R. Grace & Co., pending in the United
States District Court for the Southern District of New York; and Hatco
Corp. v. W. R. Grace & Co.-Conn., pending in the United States
District Court for the District of New Jersey. The relief sought by
Grace in these actions would provide insurance to partially offset
Grace's estimated exposure with respect to the actions' subject matter,
including amounts previously expended by Grace to defend claims and
satisfy judgments and settlements (see Note 2 to the Consolidated
Financial Statements in the Financial Supplement). The factual bases
underlying these actions are the nature of the underlying
asbestos-related and environmental claims, the language of the
insurance policies sold by the carriers to Grace and the drafting
history of those policies.

In 1991 (in an asbestos-related case involving Maryland Casualty Co.),
the United States District Court for the Southern District of New York
determined that coverage for property damage is triggered by the
"discovery of damage" during the period covered by the relevant policy.
In September 1993, the United States Court of Appeals for the Second
Circuit reversed the District Court's ruling as to a "discovery of
damage" trigger for such claims and, instead, ruled that coverage for
these claims is triggered based on the date of installation of
asbestos-containing materials. In January 1994, the United States
Court of Appeals for the Second Circuit granted Grace's petition for a
rehearing concerning the September 1993 decision, and in May 1994, the
Court issued a new decision confirming its September 1993 decision. As
a result, Grace recorded net noncash charges totaling $300 million
after taxes in 1993 and 1994 to reflect the reduction in asbestos
property damage insurance coverage. Subsequently, the Second Circuit
refused to rehear its decision, and the United States Supreme Court
denied Grace's petition for a writ of certiorari with respect to that
decision.

In 1991 and 1994, a Mississippi court held that certain of Grace's
excess insurance carriers are obligated to defend and indemnify Grace,
determining that, for purposes of insurance coverage, damage to

search - 20 Results - co(wr or w r or w.r. w/l grace) and date is 1995     http://www.lexis.com/research/retrieve?...S&_md5=2f13adcabfa206e19bde08f3cf532230

buildings from asbestos-containing products occurs at the time such products are put in place and that the damage continues as long as the building contains the products (referred to as a "continuous trigger"); Grace subsequently settled with each of the insurance carriers, and an appeal of the Mississippi court's decision was dismissed. In 1992, the Minnesota court referred to above reached a similar decision in interpreting Grace's insurance policies. In January 1994, the Minnesota court entered judgment against certain of Grace's carriers in the amount of $14.2 million, but that judgment was reversed by the Minnesota Court of Appeals in January 1995. After the Minnesota Supreme Court

21

denied review of this decision, the parties agreed to settlements in 1995 and early 1996.

Prior to 1993, Grace received payments totaling $97.7 million from insurance carriers, the majority of which represented the aggregate remaining obligations owed to Grace by those carriers for primary-level insurance coverage written for the period June 30, 1962 through June 30, 1987. In 1993 and 1994, Grace settled with insurance carriers for a total of $300.2 million (portions of which were paid or will be paid in subsequent years) in reimbursement for amounts expended by Grace in connection with asbestos-related litigation. In 1995, Grace settled with a primary-level insurer for $100 million, and with other insurers for a total of $200.3 million, including future payments of approximately $70 million. As a result of these settlements, insurance litigations were dismissed as to the primary-level product liability insurance coverage previously sold by the relevant insurers to Grace; however, litigations continue as to certain excess-level carriers.

In a 1995 settlement included in the amounts set forth above, Grace settled with an affiliated group of excess-level carriers that had agreed to a settlement in 1993, had made a series of payments under that agreement and had subsequently notified Grace that it would no longer honor the agreement. Pursuant to the 1995 settlement, the group of carriers paid Grace $44 million in 1995, and agreed to make additional payments totaling $60.2 million in 1996 and 1997. Pursuant to a settlement with another group of carriers, Grace received $26.8 million in 1995 and $9.7 million in early 1996. Grace will also continue to receive payments under these agreements based on future cash outflows for asbestos-related litigation and claims; such payments are estimated to represent approximately $237.3 million of the asbestos-related receivable of $321.2 million at December 31, 1995.

See Note 2 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Fumed Silica Plant Litigation. In 1993, Grace initiated legal action in the Belgian courts against the Flemish government to recover losses resulting from the closing of Grace's fumed silica plant in Puurs, Belgium. Grace is seeking damages in excess of four billion Belgian

francs (approximately $135.5 million at the December 29, 1995 exchange
rate), plus interest and lost profits. This claim was dismissed at the
trial court level and is now being appealed by Grace. The trial court
also determined that Grace should repay approximately 239 million
Belgian francs (approximately $8.1 million at the December 29, 1995
exchange rate) plus

22

interest to the Flemish government for previously received investment
grants; this decision is also being appealed by Grace. Also pending is
an arbitration involving the engineering company that was responsible
for the design and construction of the fumed silica plant. The outcome
of this proceeding may affect the action filed against the Flemish
government.

Shareholder Litigation. Commencing in March 1995, five lawsuits were
brought against the Company and members of its Board of Directors (as
well as J. P. Bolduc, who resigned as President and Chief Executive
Officer and a director of the Company in March 1995) in New York State
Supreme Court, New York County. These lawsuits were consolidated in
the case entitled Weiser, et al. v. Grace, et al. The consolidated
amended complaint in this lawsuit, which purports to be a derivative
action (i.e., an action brought on behalf of the Company), alleges,
among other things, that the individual defendants breached their
fiduciary duties to the Company (a) by providing J. Peter Grace, Jr.
(the Chairman and a director of the Company until his death in April
1995) with certain compensation arrangements upon his voluntary
retirement as the Company's Chief Executive Officer in 1992 and (b) by
approving Mr. Bolduc's severance arrangements, and that Messrs. Grace
and Bolduc breached their fiduciary duties by accepting such benefits
and payments. The lawsuit seeks unspecified damages, the cancellation
of all allegedly improper agreements, the cancellation of the
non-employee director retirement plan, the return of all remuneration
paid to the present and former directors who are defendants while they
were in breach of their fiduciary duties to the Company, an award of
attorneys' and experts' fees and costs and such other relief as the
Court may deem appropriate.

In March 1996, two purported shareholder derivative class actions were
filed in New York State Supreme Court, New York County, against the
Company and Albert J. Costello, the Company's Chairman, President and
Chief Executive Officer, alleging that the defendants breached their
fiduciary duties to the Company's shareholders by failing to
investigate and consider fully a proposal by Hercules, Incorporated to
acquire or merge with Grace (Izes, etc. v. W. R. Grace & Company, et
al. and Polikoff, etc. v. W. R. Grace & Company, et al.). The
lawsuits seek injunctive relief ordering defendants to carry out their
fiduciary duties by considering and evaluating such proposal,
unspecified monetary damages, costs and counsel fees and such other
relief as the Court deems proper.

Securities and Exchange Commission Investigation. The Company has been
notified that the Securities and Exchange Commission has issued a
formal order of investigation with respect to the

23

Company's prior disclosures regarding benefits and retirement arrangements provided to J. Peter Grace, Jr., and certain matters relating to J. Peter Grace III, a son of J. Peter Grace, Jr. The Company is cooperating fully with the investigation.

NMC - OIG Investigation. On October 17, 1995, NMC received five investigative subpoenas from the Office of the Inspector General of the United States Department of Health and Human Services ("OIG"). The subpoenas call for the production of extensive documents relating to various aspects of NMC's business. A letter accompanying the subpoenas stated that they had been issued in conjunction with an investigation being conducted by the OIG, the United States Attorney for the District of Massachusetts and others, concerning possible violations of federal laws relating to health care payments and reimbursements. The five subpoenas cover the following areas: (a) NMC's corporate management, personnel and employees, organizational structure, financial information and internal communications; (b) NMC's dialysis services business, principally medical director contracts and compensation; (c) NMC's treatment of credit balances resulting from overpayments received under the Medicare ESRD program and its payment of supplemental medical insurance premiums on behalf of indigent patients; (d) NMC's LifeChem laboratory business, including documents relating to testing procedures, marketing, customers, competition and certain overpayments totaling approximately $4.9 million that were received by LifeChem from the Medicare program with respect to laboratory services rendered between 1989 and 1993; and (e) NMC's Homecare Division and, in particular, information concerning the intradialytic parenteral nutrition ("IDPN") business, including billing practices related to various services, equipment and supplies and payments made to third parties as compensation for administering IDPN therapy.

NMC is cooperating with the OIG investigation and has made, and is expected to continue to make, extensive production of documents and information in response to the subpoenas. The results of the investigation and its impact, if any, cannot be predicted at this time. In the event that a U.S. government agency believes that any wrongdoing has occurred, civil and/or criminal proceedings could be instituted, and if any such proceedings were to be instituted and the outcome were unfavorable, NMC could be subject to fines, penalties and damages or could become excluded from government reimbursement programs. Any such result could have a material adverse effect on NMC's financial position or the results of operations of NMC and Grace.

Under the terms of the proposed transaction with Fresenius AG described above under "Strategic Restructuring and Other Growth

24

Initiatives," any liability arising as a result of the OIG

investigation would remain the responsibility of NMC.

NMC - OBRA 93 Litigation.  The Omnibus Budget Reconciliation Act of
1993 ("OBRA 93") affected the payment of benefits under Medicare and
employer health plans for certain eligible ESRD patients.  In July
1994, the Health Care Financing Administration ("HCFA") issued an
instruction to Medicare claims processors to the effect that Medicare
benefits for the patients affected by OBRA 93 would be subject to a new
18-month "coordination of benefits" period.  This instruction had a
positive impact on NMC's dialysis revenues because, during the 18-month
coordination of benefits period, the patient's employer health plan was
responsible for payment, which was generally at a rate higher than that
provided under Medicare.

In April 1995, HCFA issued a new instruction, reversing its original
instruction in a manner that would substantially diminish the positive
effect of the initial instruction on NMC's dialysis business.  Under
the new instruction, no 18-month coordination of benefits period would
arise, and Medicare would remain the primary payor.  HCFA further
proposed that its new instruction be effective retroactive to August
1993, the effective date of OBRA 93.  Consequently, NMC may be required
to refund payments received from employer health plans for services
provided after August 1993 under HCFA's original instruction and to
re-bill Medicare for the same services, which would result in a
cumulative reduction of net revenues to NMC totaling approximately $120
million as of December 31, 1995.  Effective July 1, 1995, NMC ceased to
recognize the incremental revenue realized under the original
instruction, which has resulted in a material reduction in NMC's
operating earnings in comparison to prior periods in which NMC
recognized such incremental revenue.  However, NMC continued to bill
the employer health plans as primary payors through December 31, 1995,
at which time NMC commenced billing Medicare for the patients affected
by OBRA 93.

In May 1995, NMC filed suit in the United States District Court for the
District of Columbia seeking a declaratory judgment with respect to
HCFA's instructions relating to OBRA 93 (National Medical Care, Inc.,
et al.  v. Shalala).  In June 1995, the court granted NMC's motion for
a preliminary injunction to preclude HCFA from retroactively enforcing
its new instruction.  The litigation is continuing with respect to
NMC's request to permanently enjoin HCFA's new instruction, both
retroactively and prospectively.  While there can be no assurance that
a permanent injunction will be issued, NMC believes that it will
ultimately prevail in its claim that the retroactive reversal by HCFA
of its original instruction

25

relating to OBRA 93 was impermissible under applicable law.  If HCFA's
revised instruction is upheld, NMC's business, financial position and
results of operations would be materially adversely affected,
particularly if the revised instruction is applied retroactively.

NMC - IDPN Proceedings.  NMC administers IDPN therapy to chronic

dialysis patients who suffer from severe gastrointestinal malfunctions. Since late 1993, Medicare claims processors have applied medical coverage interpretations in a manner that has sharply reduced the number of IDPN claims approved for payment as compared to prior periods. NMC believes that the reduction in IDPN claims currently being paid by Medicare represents an unauthorized policy coverage change. Accordingly, NMC and other IDPN providers are pursuing various administrative and legal remedies, including administrative appeals, to address this reduction. In November 1995, NMC filed a complaint in the United States District Court for the Middle District of Pennsylvania (NMC Homecare, Inc. v. Shalala) seeking a declaratory judgment and injunctive relief to prevent the implementation of this policy coverage change.

NMC management believes that its IDPN claims are consistent with published Medicare coverage guidelines and ultimately will be approved for payment. Such claims represent substantial accounts receivable of NMC, amounting to $93 million as of December 31, 1995, and currently increasing at the rate of approximately $5 million per month. If NMC is unable to collect its IDPN receivable, or if IDPN coverage is reduced or eliminated, depending on the amount of the receivable that is not collected and/or the nature of the coverage change, NMC's business, financial position and results of operations could be materially adversely affected.

As previously reported, in May 1995 the Medicare claims processors circulated a draft coverage policy which, if implemented in the form proposed, would have limited or precluded continued coverage of parenteral and enteral nutrition ("PEN") therapies, including IDPN therapy. In March 1996, NMC received a copy of a revised final version of the new coverage policy, which is expected to become effective for services billed on and after July 1, 1996. While the new policy permits continued coverage of IDPN and other PEN therapies, and while the potential impact of the new policy is subject to further analysis, NMC believes that the new policy would make it substantially more difficult to qualify patients for future coverage by, among other things, requiring certain patients to undergo onerous and/or invasive tests in order to qualify for coverage. NMC, together with other interested parties, plans to seek to effect certain changes in the new policy, and NMC is considering changes to its patient qualification procedures in

26

order to comply with the policy. However, if NMC is unable to achieve changes in the new policy, if physicians and patients fail to accept the new qualification procedures and/or if patients fail to qualify under such procedures, the policy could significantly reduce the number of patients eligible for Medicare coverage of IDPN and other PEN therapies, which would have a material adverse effect on NMC's financial position and results of operations.

NMC - Import Alerts. In 1993, the United States Food and Drug

Administration ("FDA") issued import alerts with respect to (a) hemodialysis bloodlines manufactured at NMC's facility in Reynosa, Mexico and (b) hemodialyzers manufactured in NMC's Dublin, Ireland facility. Products subject to FDA import alerts may not enter the United States until the FDA approves the quality assurance systems of the facility at which such products are manufactured. In January 1994, NMC entered into a consent decree providing that the importation of bloodlines and hemodialyzers could resume upon certification by NMC that the relevant facility complies with FDA regulations and successful completion of an FDA inspection to verify such compliance. The consent decree also required NMC to certify, and be inspected for, compliance with applicable FDA manufacturing requirements at all of its United States manufacturing facilities.

NMC submitted all required certifications for its United States and non-United States facilities in accordance with the timetable specified in the consent decree, and the bloodline import alert was lifted in March 1994. The Dublin hemodialyzer import alert was lifted in December 1995. No fines or penalties have been imposed on NMC as a result of the FDA's actions or in connection with the consent decree.

NMC - Grand Jury Investigations. NMC has received multiple subpoenas from a federal grand jury in the District of New Jersey investigating, among other things, (a) NMC's efforts to persuade the United States Food and Drug Administration to lift a January 1991 import hold issued with respect to NMC's Dublin, Ireland facility, (b) whether NMC sold defective products, (c) the manner in which NMC handled customer complaints and (d) the development of a new dialyzer product line. Grace has also received two subpoenas relating to this investigation. NMC and Grace have made extensive document production in response to these subpoenas and have fully cooperated with the grand jury in response to these subpoenas. In February 1996, the United States Attorney for the District of New Jersey notified NMC that it is a target of the New Jersey grand jury investigation, insofar as it relates to possible violations of federal criminal law in connection with efforts to affect the January 1991 import hold referred to above; the material element of the import hold was lifted in 1992.

27

In addition, in December 1994, a subsidiary of NMC received a subpoena from a federal grand jury in the Eastern District of Virginia investigating the contractual relationships between subsidiaries of NMC that provide dialysis services and third parties that provide medical directorship and related services to those subsidiaries. NMC has made document production in response to this subpoena.

The outcome of these investigations and their impact, if any, on NMC's business, financial condition and results of operations cannot be predicted at this time.

Shareholder Actions relating to NMC. In 1995, nine purported class action lawsuits were brought against the Company and certain of its officers and directors in various federal courts. These lawsuits are

being consolidated in the case entitled Murphy, et al. v. W. R.
Grace & Co., et al., which is pending in the United States District
Court for the Southern District of New York. The first amended class
action complaint in this lawsuit, which purports to be a class action
on behalf of all persons and entities who purchased the Company's
publicly traded securities during the period from March 13, 1995
through October 17, 1995, generally alleges that the defendants
concealed information, and issued misleading public statements and
reports, concerning NMC's financial position and business prospects, a
proposed spin-off of NMC and the matters that are the subject of the
investigations described above in "NMC - OIG Investigation" and "NMC -
Grand Jury Investigations," in violation of federal securities laws.
The lawsuit seeks unspecified damages, attorneys' and experts' fees and
costs and such other relief as the Court deems proper.

In October 1995, a purported derivative lawsuit was filed in the United
States District Court for the Southern District of Florida, Northern
Division, against the Company, certain of its directors and its former
President and Chief Executive Officer, alleging that such individuals
breached their fiduciary duties by failing to properly supervise the
activities of NMC in the conduct of its business (Bennett v. Bolduc, et
al.). In December 1995, the plaintiff in this action filed a new
action, based on similar allegations, in the United States District
Court for the Southern District of New York (Bennett v. Bolduc, et
al.). The Florida action has been dismissed in favor of the action
filed in the Southern District of New York. A second action making
similar allegations was filed in October 1995 in New York State Supreme
Court, New York County (Bauer v. Bolduc, et al.). The Company has been
advised that this action will be dismissed or stayed in favor of the
Bennett action, which has been consolidated, for discovery purposes
only, with the Murphy action described above. The com-

28

plaint in the Bennett action seeks unspecified damages, attorneys' and
experts' fees and costs and such other relief as the Court deems
proper.

In February 1996, a purported class action was filed in New York State
Supreme Court, New York County, against the Company, certain of its
directors and a former director, alleging that the defendants breached
their fiduciary duties in connection with the Company's agreement to
combine NMC with Fresenius AG's worldwide dialysis business, as
described in Item 1 above under "Strategic Restructuring and Other
Growth Initiatives" (Rosman v. W. R. Grace & Co., et al.). The
lawsuit seeks injunctive relief ordering defendants to carry out their
fiduciary duties and preventing or rescinding the transaction or any
related transactions with Fresenius AG, unspecified monetary damages,
an award of attorneys' and experts' fees and costs and such other
relief as the Court may deem just and proper.

See Note 7 to the Consolidated Financial Statements for additional
information concerning litigation involving NMC.

chemicals business (see discussion below), and, to a lesser extent, funds generated by operations. Grace expects to apply a substantial portion of the cash proceeds generated by these transactions to the reduction of borrowings. Any net excess is expected to be applied to the repurchase of shares of the Company's Common Stock and selected strategic acquisitions that complement existing businesses.

In the third quarter of 1995, Grace announced that its Board of Directors had authorized management to pursue options to maximize the value of its Grace Dearborn water treatment and process chemicals business. In March 1996, Grace announced that it had entered into a definitive agreement to sell Grace Dearborn to Betz Laboratories, Inc. for $632.0 million. The transaction is expected to be completed in the second quarter of 1996.

In October 1995, in anticipation of the then pending spin-off of NMC, the Company's Board of Directors declared a quarterly cash dividend of 12.5 cents per share on the Company's Common Stock, a reduction from the previous quarterly cash dividend of 35 cents per share. At that time, the Board also approved a policy of paying dividends at a rate of 20% - 30% of the prior year's net earnings and authorized the repurchase of up to 10 million shares of the Company's Common Stock. In February 1996, after entering into the definitive agreement to combine NMC with FWD, the Board increased the number of shares that may be repurchased to 20% of the Company's outstanding Common Stock (see "Statement of Operations: Discontinued Operations" above and Note 7 to the Consolidated Financial Statements).

ASBESTOS-RELATED MATTERS

As reported in Note 2 to the Consolidated Financial Statements, Grace is a defendant in lawsuits relating to previously sold asbestos-containing products and is involved in related litigation with certain of its insurance carriers. In 1995, Grace received $97.0 million under settlements with certain insurance carriers, net of amounts paid for the defense and disposition of asbestos-related property damage and personal injury litigation. During the fourth quarter of 1995, Grace recorded a noncash pretax charge of $275.0 million ($178.7 million after-tax), primarily to reflect the estimated costs of defending against and disposing of personal injury lawsuits and claims expected to be filed through 1998. The balance sheet at December 31, 1995 includes a receivable due from insurance carriers, a portion of which is subject to litigation, of $321.2 million. Grace has also recorded notes receivable of $130.0 million ($118.4 million after discounts) for amounts to be received in 1996 to 1999 pursuant to settlement agreements previously entered into with certain insurance carriers.

Although the amounts to be paid in 1996 in respect of asbestos-related lawsuits and claims cannot be precisely estimated, Grace expects that it will be required to expend approximately $40.0 million (pretax) in 1996 to defend against and dispose of such lawsuits and claims (after giving effect to payments to be received from certain insurance carriers, as discussed above and in Note 2 to the Consolidated Financial Statements). As indicated therein, the amounts reflected in the Consolidated Financial Statements with respect to the probable cost of defending against and disposing of asbestos-related lawsuits and

claims and probable recoveries from insurance carriers represent
estimates; neither the outcomes of such lawsuits and claims nor the
outcomes of Grace's continuing litigations with certain of its
insurance carriers can be predicted with certainty.

ENVIRONMENTAL MATTERS

Grace incurs costs to comply with environmental laws and regulations
and to fulfill its commitment to industry initiatives and Grace
standards.  Worldwide expenses of continuing operations related to the
operation and maintenance of environmental facilities and the disposal
of hazardous and nonhazardous wastes totalled $43.5 million, $35.7
million and $40.7 million in 1995, 1994 and 1993, respectively.  Such
costs are estimated to be approximately $45.0 million and $47.0 million
in 1996 and 1997, respectively.  In addition, worldwide capital
expenditures for continuing operations relating to environmental
protection totalled $14.9 million in 1995, compared to $21.5 million
and $19.3 million in 1994 and 1993, respectively.  Capital expenditures
to comply with environmental initiatives in future years are estimated
to be $20.0 million and $17.0 million in 1996 and 1997, respectively.
Grace has also incurred costs to remediate environmentally impaired
sites.  These costs were $31.3 million, $30.8 million and $44.4 million
in 1995, 1994 and 1993, respectively.  These amounts have been charged
against previously established reserves.  Future cash outlays for
remediation costs are expected to total $30.0 million in 1996 and $20.0
million in 1997.  Expenditures have been funded from internal sources
of cash and are not expected to have a significant effect on liquidity.


Grace accrues for anticipated costs associated with investigatory and
remediation efforts relating to the environment in accordance with
Statement of Financial Accounting Standards No. 5, "Accounting for
Contingencies," which requires estimating the probability and amount of
future costs.  At December 31, 1995, Grace's liability for
environmental investigatory and remediation costs related to continuing
and discontinued operations totalled approximately $280.3 million,
which amount does not take into account any discounting for future
expenditures or possible future insurance recoveries.  The measurement
of the liability is evaluated quarterly based on currently available
information.  In 1995 and 1994, periodic provisions were recorded for
environmental and plant closure expenses, which include the costs of
future environmental investigatory and remediation activities.
Additionally, in the fourth quarter of 1995 and first quarter of 1994,
Grace recorded pretax provisions of $77.0 million and $40.0 million
($50.0 million and $26.0 million after-tax), respectively, principally
to provide for future costs related to remediation activities required
at former manufacturing sites.

76

77

FINANCIAL INSTRUMENTS Grace enters into interest rate agreements and foreign exchange forward and option contracts to manage exposure to fluctuations in interest and foreign currency exchange rates.

The cash differentials paid or received on interest rate agreements are accrued and recognized as adjustments to interest expense. Gains and losses realized upon settlement of these agreements (recorded as other liabilities and other assets, respectively) are deferred and either amortized to interest expense over a period relevant to the agreement if the underlying hedged instrument remains outstanding, or recognized immediately if the underlying hedged instrument is settled. Cash flows related to the agreements are classified as operating activities in the Consolidated Statement of Cash Flows, consistent with the interest payments on the underlying debt.

Gains and losses on foreign currency forward and option contracts offset gains and losses resulting from the underlying transactions. Gains and losses on contracts that hedge specific foreign currency commitments are deferred and recorded in net income in the period in which the related transaction is consummated. Gains and losses on contracts that hedge net investments in foreign subsidiaries are recorded in the cumulative translation adjustments account in shareholders' equity.

EARNINGS PER SHARE Primary earnings per share are computed on the basis of the weighted average number of common shares outstanding. Fully diluted earnings per share assume the issuance of common stock equivalents related to employee stock options and, prior to 1994, the conversion of convertible debt (with an increase in net income for the after-tax interest savings).

46

## 2. ASBESTOS AND RELATED INSURANCE LITIGATION

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products and anticipates that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 40,800 asbestos-related lawsuits at December 31, 1995 (47 involving claims for property damage and the remainder involving approximately 92,400 claims for personal injury), as compared to approximately 38,700 lawsuits at December 31, 1994 (65 involving claims for property damage and the remainder involving approximately 67,900 claims for personal injury).

PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek, among other things, to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through December 31, 1995, 129 asbestos property damage cases were dismissed with respect to Grace without payment of any damages or settlement amounts; judgments were entered in favor of Grace in 10 cases (excluding cases settled following appeals of judgments in

favor of Grace and a case in which the plaintiff was granted a new trial on appeal); Grace was held liable for a total of $74.7 in 7 cases (2 of which are on appeal); and 177 property damage suits and claims were settled for a total of $421.8.

Included in the asbestos property damage lawsuits pending against Grace and others at year-end 1995 was a class action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in a U.S. District Court in South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials.

In July 1994, a South Carolina state court judge dismissed the claims of most class members from another purported nationwide class action asbestos property damage lawsuit. In his ruling, the judge held that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

In December 1995, Grace entered into an agreement to settle a Pennsylvania state court action, certified as a class action in 1992, covering all commercial buildings in the U.S. leased in whole or in part to the U.S. government on or after May 30, 1986. The terms of the settlement agreement (which is subject to judicial review and approval after class members have an opportunity to be heard) are not expected to have a significant effect on Grace's consolidated results of operations or financial position.

PERSONAL INJURY LITIGATION

Through December 31, 1995, approximately 10,100 asbestos personal injury lawsuits involving 24,500 claims were dismissed with respect to Grace without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 23,700 such suits involving 29,600 claims were disposed of for a total of $109.0.

ASBESTOS-RELATED LIABILITY

Subject to the factors discussed below, Grace estimates that its probable liability with respect to the defense and disposition of asbestos property damage and personal injury lawsuits and claims pending at December 31, 1995 and 1994 (and, in the case of the 1995 estimate, personal injury lawsuits and claims expected to be filed through 1998), is as follows:

| December 31, | 1995 | 1994 |
| --- | --- | --- |
| Current liability for asbestos-related litigation (1) | $100.0 | $100.0 |
| Noncurrent liability for asbestos-related litigation | 722.3 | 612.4 |
| Total asbestos-related liability | $822.3 | $712.4 |

(1) Included in "Other current liabilities" in the Consolidated Balance Sheet.

In the fourth quarter of 1995, Grace recorded a noncash pretax charge of $260.0 ($169.0 after-tax) for asbestos-related liabilities, primarily to reflect the estimated costs to defend against and dispose of personal injury claims expected to be filed through 1998; Grace believes that it now has adequate experience to reasonably estimate the number of personal injury claims to be filed through 1998 and the costs of defending against and disposing of these claims. Other components of the 1995 provision include increases in the estimated costs of defending against and disposing of certain property damage cases pending at year-end 1995 and personal injury lawsuits and claims filed during 1995.

While personal injury cases and claims are generally similar to each other (differing only in the type of asbestos-related illness allegedly suffered by the plaintiff), Grace's estimated liability for such cases and claims is influenced by numerous variables that are difficult to predict (including the insolvency of other former asbestos producers, cross-claims by co-defendants, the rate at which new cases and claims are filed and the defense and disposition costs associated with these cases and claims). Consequently, actual costs may vary from any estimate. For these reasons, Grace believes that it is not possible to reasonably estimate the number of cases and claims to be filed after 1998 or the costs of defending against and disposing of such cases and claims.

Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure; thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of such cases in the future. In addition, in property damage cases, information regarding product identification on a building-by-building basis (i.e., whether or not Grace products were actually used in the construction of the building), the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide the only meaningful guidance as to potential future costs. However, much of this information is not yet available in some of the property damage cases currently pending against Grace. Accordingly, it is not possible to estimate with precision the costs of defending against and disposing of these cases. Further, Grace believes that the number of property damage cases to be filed in the future and the costs associated with these filings are not estimable.

ASBESTOS-RELATED INSURANCE RECEIVABLE

Grace's ultimate exposure with respect to its asbestos-related lawsuits and claims will depend on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. The following table shows Grace's total estimated insurance recoveries in reimbursement for past and estimated future payments to defend against and dispose of asbestos-related litigation and claims:

| December 31, | 1995 | 1994 |
|---|---|---|
| Notes receivable from insurance carriers - current, net of discounts of $4.3 in 1995 (1) | $ 62.0 | $127.0 |
| Notes receivable from insurance carriers - noncurrent, net of discounts of $7.3 in 1995 (2) | 56.4 | 60.0 |
| Asbestos-related insurance receivable | 321.2 | 512.6 |
| | ------ | ------ |
| Total amounts due from insurance carriers | $439.6 | $699.6 |
| | ====== | ====== |

(1) Included in "Notes and accounts receivable, net" in the Consolidated Balance Sheet.

(2) Included in "Other assets" in the Consolidated Balance Sheet.

At December 31, 1995, settlements with certain insurance carriers provided for the future receipt by Grace of $130.0, which Grace has recorded as notes receivable (both current and noncurrent) of $118.4, after discounts. In 1995, Grace received a total of $257.3 pursuant to settlements with insurance carriers in reimbursement for monies previously expended by Grace in connection with asbestos-related litigation; of this amount, $127.0 was received pursuant to settlements entered into in 1993 and 1994, which had previously been classified as notes receivable.

During 1995, Grace settled with an affiliated group of carriers that had agreed to a settlement in 1993, had made a series of payments under that agreement and had subsequently notified Grace that it would no longer honor the agreement. Pursuant to the 1995 settlement, the group of carriers paid Grace $44.0 in 1995 and agreed to make additional payments totalling $60.2 in 1996 and 1997 (which Grace has recorded as notes receivable, after discounts, of $54.5). Pursuant to a settlement with another group of carriers, Grace received $26.8 in 1995 and expects to receive an additional payment of $9.7 in 1996. Under both settlements, Grace will continue to receive payments based on future cash outflows for asbestos-related litigation and claims; such payments are estimated to represent approximately $237.3 of the asbestos-related receivable of $321.2 at December 31, 1995.

47

As a result of these settlements and a reassessment of its insurance receivable, Grace recorded a noncash net pretax charge of $15.0 ($9.7 after-tax) during the fourth quarter of 1995 to reflect a reduction in the receivable, primarily due to lower than anticipated settlements with insurance carriers and a discount on notes receivable in connection with prior settlements, partially offset by an increase in expected future reimbursements of costs to defend against and dispose

of property damage cases pending at year-end 1995 and personal injury claims to be filed through 1998.

INSURANCE LITIGATION

Grace continues to seek to recover from its excess insurers the balance of the payments it has made with respect to asbestos-related litigation. As part of this effort, Grace continues to be involved in litigation with certain of its insurance carriers (having previously settled with certain primary and excess carriers, as discussed above). For the period October 1962 through June 1985 --the most relevant period for asbestos-related litigation --Grace purchased, on an annual basis, as much as eight levels of excess insurance coverage. (In general, excess policies provide that when claims paid exhaust coverage at one level, the insured may seek payment from the carriers at the next higher level.) For that 23-year period, the first six levels of excess insurance available from the insurance companies that Grace believes to be solvent (based primarily upon reports from a leading independent insurance rating service) provide nominal coverage of approximately $1,200.0 (including the amounts reflected in the receivable discussed above). However, (a) a portion of the personal injury lawsuits and claims pending at year-end 1995 and expected to be filed against Grace through 1998 will likely relate to periods for which no excess coverage is available; and (b) even where such excess coverage is available, the number of personal injury lawsuits and claims expected to be filed against Grace in the future is not expected to be sufficient to result in significant payments under such coverage. Further, as a result of the May 1994 decision of the U.S. Court of Appeals for the Second Circuit, discussed below, a significant portion of the nominal excess coverage is not available in connection with property damage lawsuits. In addition, $142.0 of the $1,200.0 relates to excess coverage written by a group of insurance carriers that, while currently solvent, has experienced financial difficulties in recent years. This group of carriers settled with Grace in 1995 (as discussed above). The asbestos-related receivable of $321.2 at December 31, 1995 includes $54.7 to be paid by this group; management believes this amount is fully collectible.

As previously reported, in September 1993 the U.S. Court of Appeals for the Second Circuit ruled that, under New York law (which governs a significant portion of the policies that provide Grace's asbestos-related insurance coverage), such coverage is triggered based on the date of installation of asbestos-containing materials. As a result of this decision (which had the effect of reducing the amount of insurance coverage available to Grace with respect to asbestos property damage litigation and claims), Grace recorded a noncash pretax charge of $475.0 ($300.0 after-tax) in the 1993 third quarter. Grace reversed $316.0 ($200.0 after-tax) of the pretax charge in the 1993 fourth quarter after the court withdrew its September 1993 decision and agreed to rehear the case, but reinstated the $316.0 pretax charge ($200.0 after-tax) in the second quarter of 1994, when the court issued a new decision confirming its September 1993 decision. Because Grace's insurance covers both property damage and personal injury lawsuits and claims, the May 1994 decision has had the concomitant effect of reducing the insurance coverage available with respect to Grace's asbestos personal injury lawsuits and claims. However, in Grace's opinion, it is probable that recoveries from its insurance carriers

(including amounts reflected in the receivable discussed above), along with other funds, will be available to satisfy the personal injury and property damage lawsuits and claims pending at December 31, 1995, as well as personal injury lawsuits and claims expected to be filed through 1998.  Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated results of operations or financial position.

48

## 3. ACQUISITIONS AND DIVESTMENTS

### ACQUISITIONS

During 1995, Grace made acquisitions totalling $260.8 (inclusive of cash acquired and debt assumed), all of which involved cash purchases of kidney dialysis centers and medical imaging facilities by National Medical Care, Inc.  (NMC), Grace's principal health care subsidiary. Acquisitions in the first quarter of 1995, prior to the classification of NMC as a discontinued operation (see Note 7), totalled $41.1 (inclusive of cash acquired and debt assumed).  Acquisitions by NMC subsequent to the first quarter of 1995 are presented as an investing activity and are included in "Increase in net assets of discontinued operations" in the Consolidated Statement of Cash Flows.

In 1994, Grace made acquisitions totalling $351.7 (inclusive of cash acquired and debt assumed), primarily in health care.  Grace acquired Home Nutritional Services, Inc.  for approximately $131.8 (inclusive of cash and assumed debt totalling $30.4) and acquired kidney dialysis centers and other health care businesses during 1994 for an aggregate of approximately $145.3 in cash.  1994 acquisitions also included construction chemicals businesses and a European flexible packaging business.

In 1993, Grace acquired Home Intensive Care, Inc.  for approximately $129.0 in cash and acquired other health care businesses for an aggregate of $115.0 in cash and $3.8 in common stock.  Additionally, during 1993 Grace acquired Latin America's largest water treatment business for approximately $57.6 in cash.

### DIVESTMENTS

During 1995, Grace realized gross proceeds of $58.8 (inclusive of debt assumed by the buyers) from divestments, including payments received in connection with divestments completed in prior years.  The operations divested in 1995 consisted of three small units of Grace's construction products business, the composite materials business (previously classified as a discontinued operation), Grace's transportation services business and various investments.

In 1994, Grace realized gross proceeds of $646.2 (inclusive of debt assumed by the buyers) from divestments, including payments received in connection with divestments completed in prior years.  Substantially

**3**

Laura Nickerson - LEXIS(R)-NEXIS(R) Email Request (711`0`32159157) (part 1 of 3)

1

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended

December 31, 1996
Commission file number 1-12139

W. R. GRACE & CO.
Incorporated under the Laws of the   I.R.S. Employer Identification No.
State of Delaware                    65-0654331

ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
561/362-2000
SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|                          | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS      | WHICH REGISTERED         |
| --- | --- |
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

PAGE 2
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

| 7-3/4% Notes Due 2002 (issued by W. R. Grace & Co.-Conn., a wholly owned subsidiary) and related Guarantees | New York Stock Exchange, Inc. |
| --- | --- |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (including its
predecessor) (1) has filed all reports required to be filed by Section
13 or 15(d) of the Securities Exchange Act of 1934 during the preceding
12 months and (2) has been subject to such filing requirements for the
past 90 days.

Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be
contained, to the best of registrant's knowledge, in the Proxy

Statement incorporated by reference in Part III of this Form 10-K or
any amendment to this Form 10-K.  X

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates was approximately $3.8 billion at January 31, 1997.

At February 28, 1997, 74,048,314 shares of W. R. Grace & Co. Common
Stock, $.01 par value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Document      Where Incorporated

Proxy Statement for Annual Meeting to be
held May 9, 1997 (specified portions)

2

TABLE OF CONTENTS

Page

PART I

Item 1. Business                                         1
        Introduction and Overview              1
        Products and Markets                   4
        Discontinued Operations                11
        Research Activities                    12
        Patents and Other Intellectual Property Matters    12
        Environmental, Health and Safety Matters       13
Item 2. Properties                             14
                        PAGE 3
        EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

Item 3. Legal Proceedings                      14
Item 4. Submission of Matters to a Vote of Security Holders    22

Executive Officers                             22

                PART II

Item 5. Market for Registrant's Common Equity and Related
        Stockholder Matters                    23
Item 6. Selected Financial Data                25
Item 7. Management's Discussion and Analysis of Financial
        Condition and Results of Operations    25
Item 8. Financial Statements and Supplementary Data        25
Item 9. Changes in and Disagreements with Accountants on
        Accounting and Financial Disclosure    25

                PART III

Item 10. Directors and Executive Officers of the Registrant    25
Item 11. Executive Compensation                26

Item 12.  Security Ownership of Certain Beneficial
             Owners and Management                    26
Item 13   Certain Relationships and Related Transactions        26

                    PART IV

Item 14.  Exhibits, Financial Statement Schedules, and Reports
             on Form 8-K                    26

Signatures                                  33

Financial Supplement                        F-1

                    3


PART I


ITEM 1. BUSINESS.

INTRODUCTION AND OVERVIEW

W. R. Grace & Co., through its subsidiaries, is one of the world's
leading packaging and specialty chemicals companies. Grace's core
businesses are packaging, catalysts and other silica-based products,
and construction products. It began operating these core businesses in
1954, when it acquired both the Dewey and Almy Chemical Company and the
Davison Chemical Company. Grace believes that each of its core
businesses is an industry leader, offers high value-added products,
employs leading technology, and has a global presence. Grace's
products and systems serve highly specialized market segments;
accordingly, competition tends to be based primarily on technological
capability, customer service, product quality, and, to a lesser extent,
                    PAGE 4
            EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997


price. These products and systems also generally represent an
important component (but a relatively small portion of the cost) of the
end products or processes in which they are used. Grace believes that
it provides highly differentiated, superior products and services
through investments in research and development, facilities that enable
Grace to take advantage of expanding global opportunities, and
technology platforms capable of providing multiple products to
anticipate and satisfy customer needs.

As used in this Report, the term "Company" refers to W. R. Grace &
Co., a Delaware corporation, and the term "Grace" refers to the Company
and/or one or more of its subsidiaries and, in certain cases, their
respective predecessors. Grace's principal executive offices are
located at One Town Center Road, Boca Raton, Florida 33486-1010, and
its telephone number is 561/362-2000. At year-end 1996, Grace had
approximately 17,400 full-time employees worldwide in its continuing
operations

Statements

ITEM 3  LEGAL PROCEEDINGS.

PAGE 17
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

ASBESTOS LITIGATION.  Grace is a defendant in property damage and
personal injury lawsuits relating to previously sold
asbestos-containing products, and anticipates that it will be named as
a defendant in additional asbestos-related lawsuits in the future.
Grace was a defendant in approximately 41,500 asbestos-related lawsuits
at year-end 1996 (31 involving claims for property damage and the
remainder involving approximately 91,500 claims for personal injury),
as compared to approximately 40,800 lawsuits at year-end 1995 (47
involving claims for property damage and the remainder involving
approximately 92,400 claims for personal injury).  In most of these
lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the
defendants absorb the cost of removing, containing or repairing the
asbestos-containing materials in the affected buildings.  Through 1996,
135 asbestos property damage cases were dismissed without payment of
any damages or settlement amounts; judgments were entered in favor of
Grace in 9 cases (excluding cases settled following appeals of
judgments in favor of Grace); judgments were entered in favor of the
plaintiffs in 7 cases for a total of $60.3 million (none of which is on
appeal); and 186 property damage cases were settled for a total of
$450.5 million.

Included in the asbestos property damage cases pending against Grace
and others at year-end 1996 were the following class actions: (a) an
action, conditionally certified by the U.S. Court of Appeals for the
Fourth Circuit in 1993 and pending in the U.S. District Court for the
District of South Carolina, covering all public and private colleges
and universities in the U.S. whose buildings contain asbestos
materials (CENTRAL WESLEYAN COLLEGE, ET AL. V. W. R. GRACE, ET
AL.); and (b) a purported class action (ANDERSON MEMORIAL HOSPITAL, ET
AL. V. W. R. GRACE & CO., ET AL.), filed in 1992, in the Court of
Common Pleas for Hampton County, South Carolina, on behalf of all
entities that own, in whole or in part, any building containing
asbestos materials manufactured by Grace or one of the other named
defendants, other than buildings subject to the class action lawsuit
described above and any building owned by the federal or any state
government.  In July 1994, the claims of most class members in ANDERSON
MEMORIAL HOSPITAL, ET AL., V. W. R. GRACE & CO., ET AL. were
dismissed due to a ruling that a South Carolina statute prohibits
nonresidents from pursuing claims in the South Carolina state courts
with respect to buildings located outside the state.  The plaintiffs
have requested that the court reconsider its decision.  In December
1995, Grace entered into an agreement to settle the claims under PRINCE
GEORGE CENTER, INC. V. U.S. GYPSUM COMPANY, ET AL., a class action
covering all commercial buildings in the U.S. leased, in whole or in
part, to the U.S. government on or after May 30, 1986.  The terms of
the settlement agreement (which were approved by the Court of Common

Pleas of Philadelphia County in July 1996) are not expected to have a
significant effect on Grace's consolidated results of operations or
financial position.

Through year-end 1996, approximately 11,800 personal injury lawsuits
involving 27,400 claims were dismissed without payment of any damages
or settlement amounts (primarily on the basis that Grace products were
                                  PAGE 18
                EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

not involved), and approximately 30,500 such suits involving 66,200
claims were disposed of for a total of $186 million (see "Insurance
Litigation" below).

In 1991, the Judicial Panel on Multi-District Litigation consolidated
in the U.S. District Court for the Eastern District of Pennsylvania,
for pre-trial purposes, all asbestos personal injury cases pending in
the U.S. federal courts, including approximately 7,000 cases then
pending against Grace; 3,600 new cases involving 7,200 claims against
Grace have subsequently been added to the consolidated cases. To date,
no action has been taken by the court handling the consolidated cases
that would indicate whether the consolidation will affect Grace's cost
of disposing of these cases or its defense costs.

Grace previously purchased insurance policies with respect to its
asbestos-related lawsuits and claims. Grace has settled with and been
paid by its primary insurance carriers with respect to both property
damage and personal injury cases and claims. With one minor exception,
Grace also has settled with its excess insurance carriers that wrote
policies available for property damage cases; those settlements involve
amounts paid and to be paid to Grace. In addition, Grace has settled
with many excess insurance carriers that wrote policies available for
personal injury claims. Grace is currently in litigation with certain
remaining excess insurance carriers whose policies generally represent
layers of coverage Grace has not yet reached. Such policies are
believed by Grace to be available for asbestos-related personal injury
lawsuits. Insurance coverage for asbestos-related liabilities has not
been commercially available since 1985.
                                  9
Grace's aggregate accrual for asbestos liabilities at December 31, 1996
was $994.1 million; this amount reflects all asbestos-related property
damage and personal injury cases and claims then pending (except for
one property damage case as to which liability is not yet estimable
because Grace has not yet been able to obtain sufficient information
through discovery proceedings), as well as personal injury claims
expected to be filed through 2001. Grace's ultimate exposure with
respect to its asbestos-related cases and claims will depend on the
extent to which its insurance will cover damages for which it may be
held liable, amounts paid in settlement and litigation costs. At
December 31, 1996, Grace had recorded a receivable of $331.3 million,
the amount Grace estimated to be the probable recovery from its
insurance carriers with respect to pending and projected asbestos cases
and claims. A May 1994 decision of the U.S. Court of Appeals for the
Second Circuit limited the amount of insurance coverage available to
Grace with respect to property damage cases. Because Grace's insurance
covers both property damage and personal injury cases and claims, the

May 1994 decision has had the concomitant effect of reducing the
insurance coverage available with respect to Grace's asbestos personal
injury claims. However, in Grace's opinion (which is not based on a
formal opinion of counsel), it is probable that recoveries from its
insurance carriers, along with other funds, will be available to
satisfy the property damage and personal injury cases and claims
pending at year-end 1996, as well as personal injury claims expected to
be filed in the foreseeable future. Consequently, Grace believes that
the resolution of its asbestos-related litigation will not have a
                              PAGE 19
            EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

material adverse effect on its consolidated financial position.

See "Insurance Litigation" below and Note 2 to the Consolidated
Financial Statements for additional information.

ENVIRONMENTAL PROCEEDINGS. Grace (together with certain other
companies) has been designated a "potentially responsible party"
("PRP") by the U.S. Environmental Protection Agency ("EPA") with
respect to absorbing the costs of investigating and remediating
pollution at various sites. At year-end 1996, proceedings were pending
with respect to approximately 30 sites as to which Grace has been
designated a PRP. Federal law provides that all PRPs may be held
jointly and severally liable for the costs of investigating and
remediating a site. Grace also is conducting investigatory and
remediation activities at sites under the jurisdiction of state and/or
local authorities.

In November 1995, Grace received a letter from the U.S. Department of
Energy ("DOE") inquiring as to Grace's willingness to contribute to the
continued cleanup of a former Grace property located in Wayne, New
Jersey. The letter asserted that Grace has a legal duty to pay for the
cleanup and that the total cost of the cleanup may exceed $100 million.
The operations conducted by Grace at the Wayne site (from 1955 to 1970)
included work done on radioactive materials under contract with the
U.S. government. In 1975, the U.S. Nuclear Regulatory Commission
inspected the site, concluded that it was decontaminated in accordance
with applicable regulations and released it for unrestricted use. In
1984, pursuant to a request from the DOE, Grace transferred the Wayne
property to the DOE and made a cash payment as a contribution towards
the DOE's cleanup efforts at the site, which was acknowledged by the
DOE as fulfilling any obligation Grace had to contribute to DOE's
cleanup effort, while preserving the rights and liabilities of the
parties under other existing applicable laws. Grace believes that the
resolution of the DOE's claim will not have a material adverse effect
on its consolidated financial position.

In March 1993, an action was filed in the U.S. District Court for the
Southern District of Texas against Grace Drilling Company, a subsidiary
of Grace, the business and assets of which have since been sold, and
several other defendants, for alleged violations of the Clean Water Act
and the Rivers and Harbors Act (U.S. V. FINA OIL AND CHEMICAL CO., ET
AL.). The government alleged that seagrasses and seabeds around a
drilling rig operated by Fina Oil and Chemical Co. were damaged in
connection with the placing, servicing and removal of the rig. In

February 1997, the U.S. District Court approved a decree under which
Grace agreed to pay $700,000 in penalties and $1.6 million towards a
restoration project to settle this action, all of which is expected to
be paid by Grace's insurance carriers on its behalf.

Grace is a party to additional proceedings involving federal, state
and/or local government agencies and private parties regarding Grace's
compliance with environmental laws and regulations. These proceedings
are not expected to result in significant sanctions or in any material
liability. However, Grace may incur material liability in connection
with future actions of governmental agencies and/or private parties

PAGE 20
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

relating to past or future practices of Grace with respect to the
generation, storage, handling, discharge or disposition of hazardous
wastes and other materials.

Grace believes that the liabilities for environmental remediation
costs, including costs relating to environmental proceedings, that have
been recorded in the Consolidated Financial Statements are adequate.
In addition, Grace is presently involved in litigation with its
insurance carriers seeking to hold them responsible for certain amounts
for which Grace may be held liable with respect to such costs. The
outcome of such litigation, as well as the amounts of any recoveries
that Grace may receive in connection therewith, is presently uncertain.
However, Grace believes that the resolution of pending environmental
proceedings will not have a material adverse effect on its consolidated
financial position, results of operations or liquidity. For further
information, see "Environmental,
Health and Safety Matters" under Item 1 above and "Management's
Discussion and Analysis of Results of Operations and Financial
Condition."

INSURANCE LITIGATION. Grace is involved in litigation with certain of
its insurance carriers with respect to asbestos-related insurance
claims and environmental liabilities. The relief sought by Grace in
these actions would provide insurance that would partially offset
Grace's estimated exposure with respect to amounts previously expended,
and that may be expended in the future, by Grace to defend claims,
satisfy judgments and fund settlements. Grace has settled all of its
asbestos-related insurance coverage actions, with the exception of
MARYLAND CASUALTY CO. V. W. R. GRACE & CO., pending in the U.S.
District Court for the Southern District of New York. In April 1996,
as a result of rulings in this action favorable to Grace with respect
to its asbestos-related property damage liabilities, the insurers
agreed to the entry of summary judgment in favor of Grace; however, the
insurers have stated that they intend to appeal the District Court's
rulings The District Court has not yet addressed Grace's claims for
insurance coverage for its asbestos-related personal injury
liabilities Grace's only environmental insurance coverage action is
pending in the U.S. District Court for the Southern District of New
York and is also styled MARYLAND CASUALTY CO. V. W. R. GRACE & CO.
See Note 2 to the Consolidated Financial Statements and "Management's
Discussion and Analysis of Results of Operations and Financial
Condition" for additional information.

10

Prior to 1993, Grace received from insurance carriers asbestos-related payments totaling $97.7 million, the majority of which represented the aggregate remaining obligations owed to Grace by those carriers for primary-level insurance coverage written for the period June 30, 1962 through June 30, 1987. In 1993 and 1994, Grace settled with insurance carriers for a total of $300.2 million (portions of which were paid or will be paid in subsequent years), in reimbursement for amounts expended by Grace in connection with asbestos-related litigation. In 1995, Grace settled with a primary-level insurer for $100 million, and with other insurers for a total of $200.3 million, including future payments of approximately $70 million. In 1996, Grace settled with additional excess-level insurers for a total of $110.5 million

PAGE 21
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

(including $19.2 million to be received over the next five years) with respect to both products liability and other coverage. As a result of these settlements, Grace's asbestos-related insurance claims have been dismissed as to the primary-level product liability insurance coverage previously sold by the relevant insurers to Grace, as well as to many of Grace's excess-level liability insurers. However, litigation continues in New York federal court as to certain excess-level carriers that have not settled.

FUMED SILICA PLANT LITIGATION. In 1993, Grace initiated legal action in the Belgian courts against the Flemish government to recover losses resulting from the closing of Grace's fumed silica plant in Puurs, Belgium. Grace is seeking damages in excess of four billion Belgian francs (approximately $126.1 million at the December 31, 1996 exchange rate), plus interest and lost profits. This claim was dismissed at the trial court level and is now being appealed by Grace. The trial court also determined that Grace should repay approximately 239 million Belgian francs (approximately $7.5 million at the December 31, 1996 exchange rate), plus interest, to the Flemish government for previously received investment grants; this decision is also being appealed by Grace. In July 1996, Grace received a favorable arbitration ruling, under which the engineering company responsible for the design and construction of the fumed silica plant was ordered to pay damages to Grace; the damage award is not material to Grace.

U.S. JUSTICE DEPARTMENT LAWSUIT. The U.S. Justice Department has intervened in a QUI TAM lawsuit, originally filed in June 1995, pending in the U.S. District Court for the Northern District of California (UNITED STATES EX REL. ROBERT COSTA AND RONALD THORNBURG, ET AL., V. BAKER & TAYLOR, INC., ET AL.). The complaint in this lawsuit alleges that Baker & Taylor Books, a book wholesaler sold by Grace in 1992, overcharged public schools, libraries and federal agencies during the last ten years, including the period during which Baker & Taylor Books was owned by Grace. Grace, Baker & Taylor, Inc. (the entity that currently operates Baker & Taylor Books) and one of the current shareholders of Baker & Taylor, Inc. have been named as defendants. The lawsuit seeks unspecified damages, punitive damages and civil penalties, as well as attorneys' fees and expenses and such other relief as the Court may deem proper. At this time, Grace is unable to determine the liability, if any, to which it may be subject as a result

service debt. Also, it is not subject to distortion (as traditional
debt/equity or debt/capital ratios are) following a major share
repurchase program such as those Grace has executed. At the targeted
debt/EBITDA level of 1.6 to 2 0, Grace benefits from the tax advantages
of debt financing on its overall weighted average cost of capital while
retaining the financial flexibility to invest in the continued growth
of its core businesses. Grace believes it can safely exceed its target
leverage range on a short-term basis to meet its investment needs. The
cash received and to be received from divestments is being used to
reduce debt and repurchase shares to bring the capital structure within
the target range. At December 31, 1996, the debt/EBITDA ratio was 2.3,
outside the target range primarily due to the timing of the share
repurchases ahead of cash divestment proceeds. It is expected that the
ratio will be within the target range in 1997.
                                    52
In May 1996, Grace entered into a revolving credit agreement, expiring
May 1997, providing for total borrowings of $1.85 billion, and
terminated three previous agreements providing for total borrowings of
$850 million. During the fourth quarter of 1996, Grace reduced the
borrowings available under this new credit agreement to $650 million,
reflecting the completion of the NMC transaction  In addition, Grace
continues to have $350 million available under a separate long-term
facility expiring on September 1, 1999. Thus, Grace had committed
borrowing facilities totaling $1.0 billion, of which $471.3 million was
available, at the end of 1996.

In October 1996, Grace announced that it expected to divest four
noncore businesses by late 1996 or 1997. The businesses to be sold
were Grace's cocoa business, Amicon, TEC Systems and Grace's specialty
polymers business. As noted above, in December 1996, Grace completed
the sale of Amicon and announced that it had entered into a definitive
agreement to sell its cocoa business. In February 1997, Grace
completed the sale of the cocoa business and entered into an agreement
to sell its specialty polymers business. Grace expects to complete the
sale of its specialty polymers business in the second quarter of 1997
and the sale of TEC Systems in 1997.

ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold
asbestos-containing products. In 1996, Grace paid $2.1 million for the
defense and disposition of asbestos-related property damage and
personal injury litigation, net of amounts received under settlements
with insurance carriers. During the fourth quarter of 1996, Grace
recorded a noncash pretax charge of $229.1 million ($148.9 million
after-tax), primarily to reflect the estimated costs of defending
against and disposing of personal injury claims expected to be filed
through 2001. The estimated costs used to determine the amount of this
charge have not been discounted to their present values, and the time
period over which the associated cash is actually expended is likely to
extend beyond 2001. The balance sheet at year-end 1996 includes a
receivable of $331.3 million due from insurance carriers. Grace also
has recorded notes receivable of $55.9 million ($48.5 million after
discounts) for amounts to be received from 1997 to 2001 pursuant to
settlement agreements previously entered into with insurance carriers.
                                PAGE 42

EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

Although the total amounts to be paid in 1997 with respect to
asbestos-related claims (after giving effect to payments to be received
from insurance carriers), cannot be precisely estimated, Grace expects
that it will be required to expend approximately $75-$100 million
(pretax) in 1997 to defend against and dispose of such claims (after
giving effect to anticipated insurance recoveries).  The amounts with
respect to the probable cost of defending against and disposing of
asbestos-related claims and probable recoveries from insurance carriers
represent estimates and are on an undiscounted basis; the outcomes of
such claims cannot be predicted with certainty.  See Note 2 to the
Consolidated Financial Statements for further information concerning
asbestos-related lawsuits and claims.

ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from environmental
laws and regulations.  Worldwide expenses of continuing operations
related to the operation and maintenance of environmental facilities
and the disposal of hazardous and nonhazardous wastes totaled $44.5
million in 1996, $42.6 million in 1995 and $35.0 million in 1994.  Such
costs are estimated to be $45.0 million in 1997 and $47.0 million in
1998.  In addition, worldwide capital expenditures for continuing
operations relating to environmental protection totaled $17.1 million
in 1996, compared to $14.9 million and $21.5 million in 1995 and 1994,
respectively.  Capital expenditures to comply with environmental
initiatives in future years are estimated to be $13.0 million in 1997
and $12.0 million in 1998.  Grace also has incurred costs to remediate
environmentally impaired sites.  These costs were $20.3 million in
1996, $31.3 million in 1995 and $30.8 million in 1994.  These amounts
have been charged against previously established reserves.  Future cash
outlays for remediation costs are expected to total $23.0 million in
1997 and $26.0 million in 1998.  Expenditures have been funded from
internal sources of cash and are not expected to have a significant
effect on liquidity.

Grace accrues for anticipated costs associated with investigatory and
remediation efforts where an assessment has indicated that a loss is
probable and can be reasonably estimated.  In the fourth quarter of
1995 and the first quarter of 1994, Grace recorded pretax provisions of
$77.0 million and $40.0 million ($50.0 million and $26.0 million
after-tax), respectively.  The 1995 provision related principally to
increased cost estimates associated with five former manufacturing
sites.  At December 31, 1996, Grace's liability for environmental
investigatory and remediation costs related to continuing and
discontinued operations totaled $256.4 million, as compared to $280.3
million at December 31, 1995  These accruals do not take into account
any discounting for the time value of money.  Additionally, Grace is in
litigation with certain excess insurance carriers regarding the
applicability of the carriers' policies to environmental remediation
costs; given the uncertainties inherent in this litigation, Grace has
not recorded a receivable with respect to such insurance coverage
(except in one instance where a settlement with a carrier has been
reached).

PAGE 43
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

Grace's environmental liabilities are reassessed whenever circumstances
become better defined and/or remediation efforts and their costs can be
better estimated. These liabilities are currently evaluated quarterly,
based on available information, including the progress of remedial
investigation at each site, the current status of discussions with
regulatory authorities regarding the method and extent of remediation
at each site and the apportionment of costs among potentially
responsible parties  As some of these issues are decided (the outcomes
of which are subject to uncertainties) and/or new sites are assessed
and costs can be reasonably estimated, Grace will continue to review
and analyze the need for adjustments to the recorded accruals.
However, Grace believes that it is adequately reserved for all probable
and estimable environmental exposures.

                          53
                          54


ITEM 8. FINANCIAL STATEMENTS
AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial
Statement Schedule and Exhibits on page F-1 of the Financial
Supplement.

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

PRICE WATERHOUSE LLP                    February 3, 1997
One East Broward Boulevard
Ft. Lauderdale, FL  33301

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF W. R. GRACE & CO.

In our opinion, the consolidated financial statements appearing on
pages 14

through F-24 of this report present fairly, in all material respects,
the

financial position of W. R  Grace & Co. and subsidiaries at December
31, 1996 and 1995, and the results of their operations and their cash
flows for each of the three years in the period ended December 31,
1996, in conformity with generally accepted accounting principles.
These financial statements are the responsibility of management; our
responsibility is to express an opinion on these financial statements
based on our audits. We conducted our audits of these statements in
accordance with generally accepted auditing standards which require
that we plan and perform the audit to obtain reasonable assurance about
whether the financial statements are free of material misstatement. An
audit includes examining, on a test basis, evidence supporting the
amounts and disclosures in the financial statements, assessing the
accounting principles used and significant estimates made by

currencies and, from time to time, net investments in foreign
subsidiaries. Gains or losses on hedges of transactional exposures are
recorded as adjustments to gains or losses on the underlying
transactions. Gains or losses on hedges of foreign
currency-denominated firm commitments are deferred and recorded as part
of the basis in the transaction in the period in which the transaction
is consummated. Gains and losses on forward contracts that hedge net
investments in foreign subsidiaries are recorded in the cumulative
translation adjustments account in shareholders' equity. Cash flows
related to foreign currency forward and option contracts are classified
within operating activities in the Consolidated Statement of Cash
Flows.

OTHER INCOME Other income consists of interest income, equity in
earnings of affiliated companies, gains on sales of investments and
other items.

EARNINGS PER SHARE Earnings per share are computed on the basis of the
weighted average number of common shares outstanding.

2.  ASBESTOS AND RELATED INSURANCE LITIGATION

Grace is a defendant in property damage and personal injury lawsuits
PAGE 54
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

relating to previously sold asbestos-containing products and
anticipates that it will be named as a defendant in additional
asbestos-related lawsuits in the future.  Grace was a defendant in
approximately 41,500 asbestos-related lawsuits at December 31, 1996 (31
involving claims for property damage and the remainder involving
approximately 91,500 claims for personal injury), as compared to
approximately 40,800 lawsuits at December 31, 1995 (47 involving claims
for property damage and the remainder involving approximately 92,400
claims for personal injury).

PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the
defendants absorb the cost of removing, containing or repairing the
asbestos-containing materials in the affected buildings.  Each property
damage case is unique in that the age, type, size and use of the
building, and the difficulty of asbestos abatement, if necessary, vary
from structure to structure.  Thus, the amounts involved in prior
dispositions of property damage cases are not necessarily indicative of
the amounts that may be required to dispose of cases in the future.
Information regarding product identification, the amount of product in
the building, the age, type, size and use of the building, the
jurisdictional history of prior cases and the court in which the case
is pending provide meaningful guidance as to the range of potential
costs.  Some of this information is not yet available in the property
damage cases currently pending against Grace, it is not
possible to estimate with precision the costs of defending against and
disposing of these cases.  In accordance with SFAS No. 5, Grace has
recorded an accrual for all existing property damage cases for which
sufficient information is available to form a range of estimated

exposure. At December 31, 1996 and 1995, estimates were not accrued
for one and four cases, respectively, due to insufficient information.
Grace believes that the number of property damage cases to be filed in
the future and the costs associated with these filings are not
estimable.

Through December 31, 1996, 135 asbestos property damage cases were
dismissed without payment of any damages or settlement amounts;
judgments were entered in favor of Grace in nine cases (excluding cases
settled following appeals of judgments in favor of Grace); judgments
were entered in favor of the plaintiffs in seven cases for a total of
$60.3 (none of which is on appeal); and 186 property damage cases were
settled for a total of $450.5. Property damage case activity for 1996
and 1995 is as follows:

29

| December 31, | 1996 | 1995 |
| --- | --- | --- |
| Cases outstanding, beginning of year | 47 | 65 |
| New cases filed | 1 | 5 |
| Settlements | (9) | (18) |
| Dismissals | (5) | (4) |
| Judgments, net | (3) | (1) |
| | -- | -- |
| Cases outstanding, end of year | 31 | 47 |

PAGE 55
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

PERSONAL INJURY LITIGATION

Personal injury claims are generally similar to each other (differing
primarily in the type of asbestos-related illness allegedly suffered by
the plaintiff). However, Grace's estimated liability for such claims
is influenced by numerous variables, including the solvency of other
former asbestos producers, cross-claims by co-defendants, the rate at
which new claims are filed, the jurisdiction in which the filings are
made, and the defense and disposition costs associated with these
claims.

Through December 31, 1996, approximately 11,800 asbestos personal
injury lawsuits involving 27,400 claims were dismissed without payment
of any damages or settlement amounts (primarily on the basis that Grace
products were not involved), and approximately 30,500 lawsuits
involving 66,200 claims were disposed of for a total of $186.0.
Personal injury claim activity for 1996 and 1995 is as follows:

| December 31, | 1996 | 1995 |
| --- | --- | --- |
| Claims outstanding, beginning of year | 92,436 | 67,889 |
| New claims | 30,274 | 34,306 |
| Claims under amended complaints (1) | 8,298 | 2,120 |
| Settlements | (36,630) | (9,585) |
| Dismissals | (2,866) | (2,288) |
| Judgments, net | (1) | (6) |

| | | |
|---|---|---|
| Claims outstanding, end of year | 91,511 | 92,436 |

30

(1) Of the 8,298 claims shown, approximately 1,500 were filed under
amended complaints in 1996. The remaining claims relate to disputed
filings that were submitted to local counsel in prior years but were
not reported to Grace until 1996, when a majority of such claims was
settled.

ASBESTOS-RELATED LIABILITY

Subject to the factors discussed above, Grace estimates that its
probable liability is as follows with respect to the defense and
disposition of asbestos property damage and personal injury cases and
claims at December 31, 1996 and 1995:

| December 31, | 1996(1) | 1995(2) |
|---|---|---|
| Current liability for asbestos-related | | |
| litigation (3) | $135.0 | $100.0 |
| Noncurrent liability for | | |
| asbestos-related litigation | 859.1 | 722.3 |
| | | |
| Total asbestos-related liability (4) | $994.1 | $822.3 |

(1) Reflects property damage and personal injury cases and claims
pending at December 31, 1996, as well as personal injury claims
expected to be filed through 2001. See discussion below.
                              PAGE 56
               EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997


(2) Reflects property damage and personal injury cases and claims
pending at December 31, 1995, as well as personal injury claims
expected to be filed through 1998. See discussion below.

(3) Included in "other current liabilities" in the Consolidated Balance
Sheet.

(4) Excludes one property damage case at December 31, 1996 as to which
the liability is not yet estimable because Grace has not yet been able
to obtain sufficient information through discovery proceedings.

Prior to 1995, Grace recorded noncash charges to reflect its estimate
of the costs of defending against and disposing of the asbestos
property damage and personal injury cases and claims then pending. In
the fourth quarter of 1995, Grace determined that it had adequate
experience to reasonably estimate the costs of defending against and
disposing of asbestos personal injury claims to be filed during the
three-year period 1996-1998 and recorded a noncash charge of $260.0
($169.0 after-tax), primarily to reflect such anticipated filings.
Based on certain developments during 1996, Grace determined in the 1996
fourth quarter that it had adequate experience to reasonably estimate
the costs of defending against and disposing of asbestos personal
injury claims to be filed during the five-year period 1997-2001 and
recorded a noncash charge of $348.4 ($226.4 after-tax), primarily to
reflect such anticipated filings. The 1996 provision also reflects

increases in the estimated costs of defending against and disposing of
personal injury claims pending at year-end 1996, and the 1995 provision
also reflects increases in the estimated costs of defending against and
disposing of certain property damage cases pending at year-end 1995 and
personal injury claims filed during 1995. However, as discussed above,
these estimates are not necessarily indicative of actual costs. Based
on the factors discussed above, Grace does not believe that it can
reasonably estimate the number and defense and disposition costs of
personal injury claims that may be brought against Grace after 2001.
The accruals recorded for future cases and claims are not discounted to
their present values; further, the actual cash payments related to
future cases and claims are expected to continue beyond 2001.

ASBESTOS-RELATED INSURANCE RECEIVABLE

Grace previously purchased insurance policies with respect to its
asbestos-related lawsuits and claims. The following tables display the
activity in Grace's notes receivable and asbestos-related insurance
receivable accounts during 1996 and 1995:
                     31

|  | 1996 | 1995 |
|---|---|---|
| NOTES RECEIVABLE | | |
| Notes receivable from insurance carriers, beginning of year, net of discount of $11.6 in 1996 (1995 - $15.0) | $118.4 | $ 187.0 |
| Proceeds from asbestos-related insurance | | |

PAGE 57
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

|  | 1996 | 1995 |
|---|---|---|
| settlements | (93.3) | (127.0) |
| Current year asbestos-related insurance settlements | 19.2 | 55.0 |
| Current year amortization, net | 4.2 | 3.4 |
| Notes receivable from insurance carriers at year-end, net of discount of $7.4 (1995 - $11.6) (1) | $ 48.5 | $ 118.4 |
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning of year | $321.2 | $ 512.6 |
| Proceeds from asbestos-related insurance settlements | (91.2) | (130 3) |
| Adjustments to asbestos-related insurance receivable (2) | 119.3 | (15.0) |
| Transfers from asbestos-related insurance receivable to notes receivable from insurance carriers | (19.2) | (55.0) |

Other                                    1.2      8.9

Asbestos-related insurance receivable, end
  of year (1)                         $331.3  $ 321.2

Total amounts due from insurance carriers      $379.8  $ 439.6

(1) See Note 7 for classification between current portion (classified
in "notes and accounts receivable, net") and noncurrent portion
(classified in "other assets") in the Consolidated Balance Sheet.

(2) Reflects noncash adjustments to receivable in conjunction with
increases in asbestos-related liability and lower than estimated
proceeds from settlements with insurance carriers caused by reduced
coverage available for certain years.  See discussion below.

Notes receivable from insurance carriers represent amounts due from
insurance carriers in reimbursement for amounts previously paid by
Grace in defending and disposing of asbestos cases and claims; payments
under these notes will be received through 2001.  These notes do not
bear stated interest rates and, therefore, have been discounted using a
weighted average interest rate of 6.7% (which Grace estimates as its
borrowing rate for the terms of the notes).  Installments due in 1997
are classified as "current" in the Consolidated Balance Sheet.

The asbestos-related insurance receivable at December 31, 1996
predominantly represents amounts expected to be received from carriers
under settlement agreements in reimbursement for defense and
disposition costs to be paid by Grace in the future in connection with
property damage and personal injury cases and claims pending at
                              PAGE 58
          EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

year-end 1996 and personal injury claims expected to be filed through
2001 (through 1998 as of December 31, 1995)

In the fourth quarter of 1996, Grace recorded a noncash pretax benefit
of $119.3 ($77.5 after-tax), primarily representing the additional
insurance proceeds Grace expects to receive in reimbursement for the
cash outflows associated with personal injury claims expected to be
filed against Grace through 2001.
                              32
As a result of fourth quarter 1995 insurance settlements and a
reassessment of its insurance receivable, Grace recorded a noncash net
pretax charge of $15.0 ($9.7 after-tax) during the fourth quarter of
1995.  This charge reflected a reduction in the receivable, primarily
due to lower than estimated proceeds from settlements with insurance
carriers (caused by the reduced coverage available for certain years)
and a discount on notes receivable received in connection with prior
settlements, partially offset by an increase in expected future
reimbursements of costs to defend against and dispose of property
damage cases pending at year-end 1995 and personal injury claims to be
filed through 1998.

Certain of Grace's insurance carriers have become insolvent.  From time

to time, Grace has been successful in collecting funds from insolvent
carriers. However, since recovery from these carriers is not probable,
Grace has not accrued a related receivable

INSURANCE LITIGATION

Grace has settled with and been paid by its primary insurance carriers
with respect to both property damage and personal injury cases and
claims. With one minor exception, Grace has also settled with its
excess insurance carriers that wrote policies available for property
damage cases; those settlements involve amounts paid and to be paid to
Grace. In addition, Grace has settled with many excess insurance
carriers that wrote policies available for personal injury claims.
Grace is currently in litigation with certain remaining excess
insurance carriers whose policies generally represent layers of
coverage Grace has not yet reached and, therefore, are not reflected in
the asbestos-related insurance receivable referred to above. Such
policies are believed by Grace to be available for asbestos-related
personal injury lawsuits. Insurance coverage for asbestos-related
liabilities has not been commercially available since 1985.

In September 1993 the U.S. Court of Appeals for the Second Circuit
ruled that, under New York law (which governs a significant portion of
the policies that provide Grace's asbestos-related insurance coverage),
coverage for asbestos property damage cases is triggered based on the
date of installation of asbestos-containing materials. This decision
was initially reversed in the fourth quarter of 1993 but subsequently
confirmed in the second quarter of 1994. As a result of this decision
(which had the effect of reducing the amount of insurance coverage
available to Grace with respect to asbestos lawsuits) Grace recorded a
noncash pretax charge of $316.0 ($200.0 after-tax) in the second
quarter of 1994.

PAGE 59
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 28, 1997

Grace's ultimate exposure with respect to its asbestos-related cases
and claims will depend on the extent to which its insurance will cover
damages for which it may be held liable, amounts paid in settlement and
litigation costs. In Grace's opinion, it is probable that recoveries
from its insurance carriers (including amounts reflected in the
receivable discussed above), along with other funds, will be available
to satisfy the property damage and personal injury cases and claims
pending at December 31, 1996, as well as personal injury claims
expected to be filed in the foreseeable future. Consequently, Grace
believes that the resolution of its asbestos-related litigation will
not have a material adverse effect on its consolidated financial
position.

3. ACQUISITIONS AND DIVESTMENTS

ACQUISITIONS

During 1996, Grace acquired a manufacturer of flexible packaging, a
producer of can coatings and closure sealants for the rigid container
industry, and kidney dialysis centers purchased by NMC prior to

(including office and other service facilities) throughout the world,
some of which are shared by two or more of Grace's product lines.
Grace considers its major operating properties to be in good operating
condition and suitable for their current use. Although Grace believes
that, after taking planned expansion into account, the productive
capacity of its plants and other facilities is generally adequate for
current operations and foreseeable growth, it conducts ongoing,
long-range forecasting of its capital requirements to assure that
additional capacity will be available when and as needed (see
information regarding Grace's capital expenditures in "Management's
Discussion and Analysis of Results of Operations and Financial
Condition" and on page F-27 of the Financial Supplement). Accordingly,
Grace does not anticipate that its operations or income will be
materially affected by the absence of available capacity.

Additional information regarding Grace's properties is set forth in
Item 1 above and in Notes 1, 9 and 12 to the Consolidated Financial
Statements in the Financial Supplement.


ITEM 3. LEGAL PROCEEDINGS.

Asbestos Litigation. Grace is a defendant in lawsuits relating to
previously sold asbestos-containing products and anticipates that it
will be named as a defendant in additional asbestos-related

                              15

lawsuits in the future. Grace was a defendant in approximately 40,800
asbestos-related lawsuits at year-end 1995 (47 involving claims for
property damage and the remainder involving approximately 92,400 claims
for personal injury), as compared to approximately 38,700 lawsuits at
year-end 1994 (65 involving claims for property damage and the
remainder involving approximately 67,900 claims for personal injury).
In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek, among other
things, to have the defendants absorb the cost of removing, containing
or repairing the asbestos-containing materials in the affected
buildings. Through year-end 1995, 129 asbestos property damage cases
were dismissed with respect to Grace without payment of any damages or
settlement amounts; judgments were entered in favor of Grace in 10
cases (excluding cases settled following appeals of judgments in favor
of Grace and a case in which the plaintiff was granted a new trial on
appeal); Grace was held liable for a total of $74.7 million in 7 cases
(2 of which are on appeal); and 177 property damage suits and claims
were settled for a total of $421.8 million.

Included in the asbestos property damage lawsuits pending against Grace
and others at year-end 1995 were the following class actions: (1) a
Pennsylvania state court action (Prince George Center, Inc. v. U.S.
Gypsum Company, et al., Court of Common Pleas of Philadelphia County),
                            PAGE 127
          EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

certified in 1992, covering all commercial buildings in the United
States leased in whole or in part to the United States government on or
after May 30, 1986; (2) an action, conditionally certified by the
United States Court of Appeals for the Fourth Circuit in 1993 and
pending in the United States District Court for the District of South
Carolina, covering all public and private colleges and universities in
the United States whose buildings contain asbestos materials (Central
Wesleyan College, et al. v. W. R. Grace, et al.); and (3) a
purported class action (Anderson Memorial Hospital, et al. v. W. R.
Grace & Co., et al.), filed in 1992 in the Court of Common Pleas for
Hampton County, South Carolina, on behalf of all entities that own, in
whole or in part, any building containing asbestos materials
manufactured by Grace or one of the other named defendants, other than
buildings subject to the class action lawsuits described above and any
building owned by the federal or any state government. In December
1995, Grace entered into an agreement to settle the claims under Prince
George Center, Inc. v. U.S. Gypsum Company, et al. The terms of the
settlement agreement (which is subject to judicial review and approval
after class members have an opportunity to be heard) are not expected
to have a significant effect on Grace's consolidated results of
operations or financial position. In July

16

1994, the claims of most class members in Anderson Memorial Hospital,
et al., v. W. R. Grace & Co., et al. were dismissed due to a ruling
that a South Carolina statute prohibits nonresidents from pursuing
claims in the South Carolina state courts with respect to buildings
located outside the state. The plaintiffs have requested that the
court reconsider its decision. In August 1994, Grace entered into an
agreement to settle In re: Asbestos School Litigation, a nationwide
class action brought in 1983 in the United States District Court for
the Eastern District of Pennsylvania on behalf of all public and
private elementary and secondary schools in the United States that
contain friable asbestos materials (other than schools that "opted out"
of the class). The terms of the settlement agreement (which were
approved by the District Court in September 1995) are not expected to
have a significant effect on Grace's consolidated results of operations
or financial position.

The remaining asbestos lawsuits pending at year-end 1995 involved
claims for personal injury. Through year-end 1995, approximately
10,100 personal injury lawsuits involving 24,500 claims were dismissed
with respect to Grace without payment of any damages or settlement
amounts (primarily on the basis that Grace products were not involved),
and approximately 23,700 such suits involving 29,600 claims were
disposed of for a total of $109 million (see "Insurance Litigation"
below). However, as a result of various trends (including the
insolvency of other former asbestos producers and cross-claims by
co-defendants in asbestos personal injury lawsuits), the costs incurred
in disposing of such lawsuits in the past may not be indicative of the
costs of disposing of such lawsuits in the future.

In 1991, the Judicial Panel on Multi-District Litigation consolidated
in the United States District Court for the Eastern District of

PAGE 128
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

Pennsylvania, for pre-trial purposes, all asbestos personal injury
cases pending in the federal courts, including approximately 7,000
cases then pending against Grace; 3,600 new cases involving 7,200
claims against Grace have subsequently been added to the consolidated
cases.  To date, no action has been taken by the court handling the
consolidated cases that would indicate whether the consolidation will
affect Grace's cost of disposing of these cases or its defense costs.

Grace's ultimate exposure with respect to its asbestos-related lawsuits
and claims will depend on the extent to which its insurance will cover
damages for which it may be held liable, amounts paid in settlement and
litigation costs.  As discussed below under "Insurance Litigation," a
May 1994 decision of the U.S.  Court of Appeals for the Second Circuit
limited the amount of insurance

17

coverage available with respect to property damage lawsuits and claims.
Because Grace's insurance covers both property damage and personal
injury lawsuits and claims, the May 1994 decision has had the
concomitant effect of reducing the insurance coverage available with
respect to Grace's asbestos personal injury lawsuits and claims.
However, in Grace's opinion, it is probable that recoveries from its
insurance carriers, along with other funds, will be available to
satisfy the property damage and personal injury lawsuits and claims
pending at year-end 1995, as well as personal injury lawsuits and
claims expected to be filed through 1998.  Consequently, Grace believes
that the resolution of its asbestos-related litigation will not have a
material adverse effect on its consolidated results of operations or
financial position.  See "Insurance Litigation" below and Note 2 to the
Consolidated Financial Statements in the Financial Supplement for
additional information.

Environmental Proceedings.  Grace (together with other companies) has
been designated a "potentially responsible party" ("PRP") by the United
States Environmental Protection Agency ("EPA") with respect to
absorbing the costs of investigating and remediating pollution at
various sites.  At year-end 1995, proceedings were pending with respect
to approximately 30 sites as to which Grace has been designated a PRP.
Federal law provides that all PRPs may be held jointly and severally
liable for the costs of investigating and remediating a site.  Grace is
also conducting investigatory and remediation activities at sites under
the jurisdiction of state and/or local authorities.

In addition, in 1989, Hatco Corporation ("Hatco"), which purchased the
assets of a Grace chemical business in 1978, instituted a lawsuit
against Grace in the United States District Court for the District of
New Jersey (Hatco Corporation v. W.  R.  Grace & Co.-Conn.) seeking
recovery of cleanup costs for waste allegedly generated at a New Jersey
facility during the period of Grace's ownership.  Grace subsequently
filed a lawsuit against its insurance carriers seeking indemnity
against any damages assessed against Grace in the underlying lawsuit,
as well as defense costs.  In decisions rendered during 1993, the

District Court ruled that Grace is responsible for a substantial
portion of Hatco's costs. In July 1995, the United States Court of
                              PAGE 129
            EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

Appeals for the Third Circuit reversed the decisions of the District
Court and remanded the lawsuit to the District Court for further
proceedings. Specifically, the Court of Appeals (a) reversed the
District Court's ruling that Grace is responsible for a substantial
portion of Hatco's costs and (b) ruled that in the remand proceeding
the burden of proof would be on Hatco to establish that it had not
released Grace from the asserted liabilities. In an earlier

                              18

decision, the District Court had resolved, in a manner favorable to
Grace, certain legal issues regarding Grace's right to insurance
coverage; however, the ultimate liability of Grace's insurance carriers
will be determined at trial, should a trial be necessary after the
remand proceedings described above. Remediation costs, and Grace's
share, if any, of such costs, will be determined once ongoing site
investigations are completed and a remediation plan is approved by the
State of New Jersey. As a result of the above factors, the amount that
Grace may be required to pay to Hatco, if any (which Grace expects will
be partially offset by recoveries from insurance carriers), cannot be
reliably estimated at this time.

In November 1995, Grace received a letter from the United States
Department of Energy ("DOE") inquiring as to Grace's willingness to
contribute to the continued cleanup of a former Grace property located
in Wayne, New Jersey. The letter asserted that Grace has a legal duty
to pay for the site's cleanup and that the total cost of cleanup may
exceed $100 million. The operations conducted by Grace at the Wayne
site (from 1955 to 1970) included work done on radioactive materials
under contract with the United States government for the "Manhattan
Project" and with the United States Atomic Energy Commission. In 1975,
the United States Nuclear Regulatory Commission inspected the site,
concluded that it was decontaminated in accordance with applicable
regulations and released it for unrestricted use. In 1984, pursuant to
a request from the DOE, Grace transferred the Wayne property to the DOE
and made a cash payment as a contribution towards the DOE's cleanup
efforts at the site, which was acknowledged by the DOE as fulfilling
any obligation Grace had to contribute to DOE's cleanup effort. As a
result of these transactions, Grace believes it has no further
obligation to contribute to the DOE's cleanup activities.

In March 1993, an action was filed in the United States District Court
for the Southern District of Texas against Grace Drilling Company, a
subsidiary of the Company the business and assets of which have since
been sold, and several other defendants, for alleged violations of the
Clean Water Act and the Rivers and Harbors Act (U.S. v. Fina Oil and
Chemical Co., et al.). The government alleges that seagrasses and
seabeds around a drilling rig operated by Fina Oil and Chemical Co.
were damaged in connection with the placing, servicing and removal of
the rig. The government is seeking injunctive relief requiring the
defendants to restore the damaged areas and to compensate for temporary

loss of the seagrass habitat, as well as civil penalties of up to
$25,000 per day of violation and attorneys' fees.

Grace is also a party to other proceedings involving federal, state
                          PAGE 130
          EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

and/or local government agencies and private parties

                    19

regarding Grace's compliance with environmental laws and regulations.
These proceedings are not expected to result in significant sanctions
or in any material liability.  As a voluntary participant in the EPA
Toxic Substances Control Act Compliance Audit Program, Grace agreed to
undertake a corporate-wide audit of compliance with Section 8 of such
Act and to pay a stipulated civil penalty for each study or report that
EPA alleges should have been, but was not, submitted to the EPA as
required under such Section.  Although final review of the audit is not
complete, Grace believes it will be required to pay the EPA penalties
aggregating from $250,000 to $400,000 for information discovered in the
course of the audit.  In addition, Grace has voluntarily reported to
the EPA violations of certain notification and related requirements
under such Act, and penalties may be assessed against Grace in
connection therewith; however, the amount of such penalties cannot be
determined at this time.

Grace believes that the liabilities for environmental remediation costs
that have been recorded in the Consolidated Financial Statements are
adequate.  In addition, Grace is presently involved in litigation with
its insurance carriers seeking to hold them responsible for certain
amounts for which Grace may be held liable with respect to such costs.
The outcome of such litigation, as well as the amounts of any
recoveries that Grace may receive in connection therewith, is presently
uncertain.  For further information, see Note 12 to the Consolidated
Financial Statements and "Management's Discussion and Analysis of
Results of Operations and Financial Condition" in the Financial
Supplement.

Insurance Litigation.  Grace is involved in litigation with certain
insurance carriers with respect to asbestos-related claims and
environmental liabilities.  Its asbestos-related insurance actions
consist of a case styled Maryland Casualty Co.  v. W.  R.  Grace & Co.,
pending in the United States District Court for the Southern District
of New York; Dayton Independent School District v. United States
Mineral Products Company, et al., pending in the United States District
Court for the Eastern District of Texas; Independent School District
No.  197, et al.  v. W   R.  Grace & Co.  and Accident & Casualty
Insurance Co., et al., pending in the First Judicial District in
Minnesota; The County of Hennepin v. Central National Insurance
Company, et al., pending in the Fourth Judicial District in Minnesota;
Ecolab, Inc.  v. Central National Insurance Co., pending in the
District Court for Ramsey County, Minnesota; and American Employers'
Insurance Co., American Re-Insurance Co., Commercial Union Insurance
Co., and Unigard Security Insurance Co.  v. W.  R.  Grace & Co.,
Continental Casualty Co., and Maryland Casualty Co., which is pending

in the New York state courts; Grace's insurance actions relating to
environmental liabilities consist of

20

Maryland Casualty Co. v. W. R. Grace & Co., pending in the United
PAGE 131
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

States District Court for the Southern District of New York; and Hatco
Corp. v. W. R. Grace & Co.-Conn., pending in the United States
District Court for the District of New Jersey. The relief sought by
Grace in these actions would provide insurance to partially offset
Grace's estimated exposure with respect to the actions' subject matter,
including amounts previously expended by Grace to defend claims and
satisfy judgments and settlements (see Note 2 to the Consolidated
Financial Statements in the Financial Supplement). The factual bases
underlying these actions are the nature of the underlying
asbestos-related and environmental claims, the language of the
insurance policies sold by the carriers to Grace and the drafting
history of those policies.

In 1991 (in an asbestos-related case involving Maryland Casualty Co.),
the United States District Court for the Southern District of New York
determined that coverage for property damage is triggered by the
"discovery of damage" during the period covered by the relevant policy.
In September 1993, the United States Court of Appeals for the Second
Circuit reversed the District Court's ruling as to a "discovery of
damage" trigger for such claims and, instead, ruled that coverage for
these claims is triggered based on the date of installation of
asbestos-containing materials. In January 1994, the United States
Court of Appeals for the Second Circuit granted Grace's petition for a
rehearing concerning the September 1993 decision, and in May 1994, the
Court issued a new decision confirming its September 1993 decision. As
a result, Grace recorded net noncash charges totaling $300 million
after taxes in 1993 and 1994 to reflect the reduction in asbestos
property damage insurance coverage. Subsequently, the Second Circuit
refused to rehear its decision, and the United States Supreme Court
denied Grace's petition for a writ of certiorari with respect to that
decision.

In 1991 and 1994, a Mississippi court held that certain of Grace's
excess insurance carriers are obligated to defend and indemnify Grace,
determining that, for purposes of insurance coverage, damage to
buildings from asbestos-containing products occurs at the time such
products are put in place and that the damage continues as long as the
building contains the products (referred to as a "continuous trigger");
Grace subsequently settled with each of the insurance carriers, and an
appeal of the Mississippi court's decision was dismissed. In 1992, the
Minnesota court referred to above reached a similar decision in
interpreting Grace's insurance policies. In January 1994, the
Minnesota court entered judgment against certain of Grace's carriers in
the amount of $14.2 million, but that judgment was reversed by the
Minnesota Court of Appeals in January 1995. After the Minnesota
Supreme Court

21

denied review of this decision, the parties agreed to settlements in
1995 and early 1996.

Prior to 1993, Grace received payments totaling $97.7 million from
insurance carriers, the majority of which represented the aggregate
remaining obligations owed to Grace by those carriers for primary-level
                              PAGE 132
              EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

insurance coverage written for the period June 30, 1962 through June
30, 1987.  In 1993 and 1994, Grace settled with insurance carriers for
a total of $300.2 million (portions of which were paid or will be paid
in subsequent years) in reimbursement for amounts expended by Grace in
connection with asbestos-related litigation.  In 1995, Grace settled
with a primary-level insurer for $100 million, and with other insurers
for a total of $200.3 million, including future payments of
approximately $70 million.  As a result of these settlements, insurance
litigations were dismissed as to the primary-level product liability
insurance coverage previously sold by the relevant insurers to Grace;
however, litigations continue as to certain excess-level carriers.

In a 1995 settlement included in the amounts set forth above, Grace
settled with an affiliated group of excess-level carriers that had
agreed to a settlement in 1993, had made a series of payments under
that agreement and had subsequently notified Grace that it would no
longer honor the agreement.  Pursuant to the 1995 settlement, the group
of carriers paid Grace $44 million in 1995, and agreed to make
additional payments totaling $60.2 million in 1996 and 1997.  Pursuant
to a settlement with another group of carriers, Grace received $26.8
million in 1995 and $9.7 million in early 1996.  Grace will also
continue to receive payments under these agreements based on future
cash outflows for asbestos-related litigation and claims; such payments
are estimated to represent approximately $237.3 million of the
asbestos-related receivable of $321.2 million at December 31, 1995.

See Note 2 to the Consolidated Financial Statements and "Management's
Discussion and Analysis of Results of Operations and Financial
Condition" in the Financial Supplement for additional information.

Fumed Silica Plant Litigation.  In 1993, Grace initiated legal action
in the Belgian courts against the Flemish government to recover losses
resulting from the closing of Grace's fumed silica plant in Puurs,
Belgium.  Grace is seeking damages in excess of four billion Belgian
francs (approximately $135.5 million at the December 29, 1995 exchange
rate), plus interest and lost profits.  This claim was dismissed at the
trial court level and is now being appealed by Grace.  The trial court
also determined that Grace should repay approximately 239 million
Belgian francs (approximately $8.1 million at the December 29, 1995
exchange rate) plus

22

interest to the Flemish government for previously received investment
grants; this decision is also being appealed by Grace.  Also pending is

an arbitration involving the engineering company that was responsible
for the design and construction of the fumed silica plant. The outcome
of this proceeding may affect the action filed against the Flemish
government.

Shareholder Litigation. Commencing in March 1995, five lawsuits were
brought against the Company and members of its Board of Directors (as
well as J. P. Bolduc, who resigned as President and Chief Executive
Officer and a director of the Company in March 1995) in New York State
Supreme Court, New York County. These lawsuits were consolidated in
                                PAGE 133
            EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

the case entitled Weiser, et al. v. Grace, et al. The consolidated
amended complaint in this lawsuit, which purports to be a derivative
action (i.e., an action brought on behalf of the Company), alleges,
among other things, that the individual defendants breached their
fiduciary duties to the Company (a) by providing J. Peter Grace, Jr.
(the Chairman and a director of the Company until his death in April
1995) with certain compensation arrangements upon his voluntary
retirement as the Company's Chief Executive Officer in 1992 and (b) by
approving Mr. Bolduc's severance arrangements, and that Messrs. Grace
and Bolduc breached their fiduciary duties by accepting such benefits
and payments. The lawsuit seeks unspecified damages, the cancellation
of all allegedly improper agreements, the cancellation of the
non-employee director retirement plan, the return of all remuneration
paid to the present and former directors who are defendants while they
were in breach of their fiduciary duties to the Company, an award of
attorneys' and experts' fees and costs and such other relief as the
Court may deem appropriate.

In March 1996, two purported shareholder derivative class actions were
filed in New York State Supreme Court, New York County, against the
Company and Albert J. Costello, the Company's Chairman, President and
Chief Executive Officer, alleging that the defendants breached their
fiduciary duties to the Company's shareholders by failing to
investigate and consider fully a proposal by Hercules, Incorporated to
acquire or merge with Grace (Izes, etc. v. W. R. Grace & Company, et
al. and Polikoff, etc. v. W. R. Grace & Company, et al.). The
lawsuits seek injunctive relief ordering defendants to carry out their
fiduciary duties by considering and evaluating such proposal,
unspecified monetary damages, costs and counsel fees and such other
relief as the Court deems proper.

Securities and Exchange Commission Investigation. The Company has been
notified that the Securities and Exchange Commission has issued a
formal order of investigation with respect to the

                                23

Company's prior disclosures regarding benefits and retirement
arrangements provided to J. Peter Grace, Jr., and certain matters
relating to J. Peter Grace III, a son of J. Peter Grace, Jr. The
Company is cooperating fully with the investigation.

NMC - OIG Investigation  On October 17, 1995, NMC received five

investigative subpoenas from the Office of the Inspector General of the
United States Department of Health and Human Services ("OIG")  The
subpoenas call for the production of extensive documents relating to
various aspects of NMC's business.  A letter accompanying the subpoenas
stated that they had been issued in conjunction with an investigation
being conducted by the OIG, the United States Attorney for the District
of Massachusetts and others, concerning possible violations of federal
laws relating to health care payments and reimbursements. The five
subpoenas cover the following areas: (a) NMC's corporate management,
personnel and employees, organizational structure, financial
information and internal communications; (b) NMC's dialysis services
business, principally medical director contracts and compensation; (c)

PAGE 134
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

NMC's treatment of credit balances resulting from overpayments received
under the Medicare ESRD program and its payment of supplemental medical
insurance premiums on behalf of indigent patients; (d) NMC's LifeChem
laboratory business, including documents relating to testing
procedures, marketing, customers, competition and certain overpayments
totaling approximately $4.9 million that were received by LifeChem from
the Medicare program with respect to laboratory services rendered
between 1989 and 1993; and (e) NMC's Homecare Division and, in
particular, information concerning the intradialytic parenteral
nutrition ("IDPN") business, including billing practices related to
various services, equipment and supplies and payments made to third
parties as compensation for administering IDPN therapy.

NMC is cooperating with the OIG investigation and has made, and is
expected to continue to make, extensive production of documents and
information in response to the subpoenas.  The results of the
investigation and its impact, if any, cannot be predicted at this time.
In the event that a U.S. government agency believes that any
wrongdoing has occurred, civil and/or criminal proceedings could be
instituted, and if any such proceedings were to be instituted and the
outcome were unfavorable, NMC could be subject to fines, penalties and
damages or could become excluded from government reimbursement
programs. Any such result could have a material adverse effect on
NMC's financial position or the results of operations of NMC and Grace.

Under the terms of the proposed transaction with Fresenius AG described
above under "Strategic Restructuring and Other Growth

24

Initiatives," any liability arising as a result of the OIG
investigation would remain the responsibility of NMC.

NMC - OBRA 93 Litigation. The Omnibus Budget Reconciliation Act of
1993 ("OBRA 93") affected the payment of benefits under Medicare and
employer health plans for certain eligible ESRD patients.  In July
1994, the Health Care Financing Administration ("HCFA") issued an
instruction to Medicare claims processors to the effect that Medicare
benefits for the patients affected by OBRA 93 would be subject to a new
18-month "coordination of benefits" period.  This instruction had a
positive impact on NMC's dialysis revenues because, during the 18-month

coordination of benefits period, the patient's employer health plan was
responsible for payment, which was generally at a rate higher than that
provided under Medicare.

In April 1995, HCFA issued a new instruction, reversing its original
instruction in a manner that would substantially diminish the positive
effect of the initial instruction on NMC's dialysis business. Under
the new instruction, no 18-month coordination of benefits period would
arise, and Medicare would remain the primary payor. HCFA further
proposed that its new instruction be effective retroactive to August
1993, the effective date of OBRA 93. Consequently, NMC may be required
to refund payments received from employer health plans for services
provided after August 1993 under HCFA's original instruction and to
re-bill Medicare for the same services, which would result in a
PAGE 135
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

cumulative reduction of net revenues to NMC totaling approximately $120
million as of December 31, 1995. Effective July 1, 1995, NMC ceased to
recognize the incremental revenue realized under the original
instruction, which has resulted in a material reduction in NMC's
operating earnings in comparison to prior periods in which NMC
recognized such incremental revenue. However, NMC continued to bill
the employer health plans as primary payors through December 31, 1995,
at which time NMC commenced billing Medicare for the patients affected
by OBRA 93.

In May 1995, NMC filed suit in the United States District Court for the
District of Columbia seeking a declaratory judgment with respect to
HCFA's instructions relating to OBRA 93 (National Medical Care, Inc.,
et al. v. Shalala). In June 1995, the court granted NMC's motion for
a preliminary injunction to preclude HCFA from retroactively enforcing
its new instruction. The litigation is continuing with respect to
NMC's request to permanently enjoin HCFA's new instruction, both
retroactively and prospectively. While there can be no assurance that
a permanent injunction will be issued, NMC believes that it will
ultimately prevail in its claim that the retroactive reversal by HCFA
of its original instruction

25

relating to OBRA 93 was impermissible under applicable law. If HCFA's
revised instruction is upheld, NMC's business, financial position and
results of operations would be materially adversely affected,
particularly if the revised instruction is applied retroactively.

NMC - IDPN Proceedings. NMC administers IDPN therapy to chronic
dialysis patients who suffer from severe gastrointestinal malfunctions.
Since late 1993, Medicare claims processors have applied medical
coverage interpretations in a manner that has sharply reduced the
number of IDPN claims approved for payment as compared to prior
periods. NMC believes that the reduction in IDPN claims currently
being paid by Medicare represents an unauthorized policy coverage
change. Accordingly, NMC and other IDPN providers are pursuing various
administrative and legal remedies, including administrative appeals, to
address this reduction. In November 1995, NMC filed a complaint in the

United States District Court for the Middle District of Pennsylvania
(NMC Homecare, Inc  v. Shalala) seeking a declaratory judgment and
injunctive relief to prevent the implementation of this policy coverage
change.

NMC management believes that its IDPN claims are consistent with
published Medicare coverage guidelines and ultimately will be approved
for payment.  Such claims represent substantial accounts receivable of
NMC, amounting to $93 million as of December 31, 1995, and currently
increasing at the rate of approximately $5 million per month.  If NMC
is unable to collect its IDPN receivable, or if IDPN coverage is
reduced or eliminated, depending on the amount of the receivable that
is not collected and/or the nature of the coverage change, NMC's
business, financial position and results of operations could be
materially adversely affected.

PAGE 136
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

As previously reported, in May 1995 the Medicare claims processors
circulated a draft coverage policy which, if implemented in the form
proposed, would have limited or precluded continued coverage of
parenteral and enteral nutrition ("PEN") therapies, including IDPN
therapy.  In March 1996, NMC received a copy of a revised final version
of the new coverage policy, which is expected to become effective for
services billed on and after July 1, 1996.  While the new policy
permits continued coverage of IDPN and other PEN therapies, and while
the potential impact of the new policy is subject to further analysis,
NMC believes that the new policy would make it substantially more
difficult to qualify patients for future coverage by, among other
things, requiring certain patients to undergo onerous and/or invasive
tests in order to qualify for coverage.  NMC, together with other
interested parties, plans to seek to effect certain changes in the new
policy, and NMC is considering changes to its patient qualification
procedures in

26

order to comply with the policy.  However, if NMC is unable to achieve
changes in the new policy, if physicians and patients fail to accept
the new qualification procedures and/or if patients fail to qualify
under such procedures, the policy could significantly reduce the number
of patients eligible for Medicare coverage of IDPN and other PEN
therapies, which would have a material adverse effect on NMC's
financial position and results of operations.

NMC - Import Alerts.  In 1993, the United States Food and Drug
Administration ("FDA") issued import alerts with respect to (a)
hemodialysis bloodlines manufactured at NMC's facility in Reynosa,
Mexico and (b) hemodialyzers manufactured in NMC's Dublin, Ireland
facility.  Products subject to FDA import alerts may not enter the
United States until the FDA approves the quality assurance systems of
the facility at which such products are manufactured.  In January 1994,
NMC entered into a consent decree providing that the importation of
bloodlines and hemodialyzers could resume upon certification by NMC
that the relevant facility complies with FDA regulations and successful

completion of an FDA inspection to verify such compliance. The consent
decree also required NMC to certify, and be inspected for, compliance
with applicable FDA manufacturing requirements at all of its United
States manufacturing facilities.

NMC submitted all required certifications for its United States and
non-United States facilities in accordance with the timetable specified
in the consent decree, and the bloodline import alert was lifted in
March 1994. The Dublin hemodialyzer import alert was lifted in
December 1995. No fines or penalties have been imposed on NMC as a
result of the FDA's actions or in connection with the consent decree.

NMC - Grand Jury Investigations. NMC has received multiple subpoenas
from a federal grand jury in the District of New Jersey investigating,
among other things, (a) NMC's efforts to persuade the United States
Food and Drug Administration to lift a January 1991 import hold issued
with respect to NMC's Dublin, Ireland facility, (b) whether NMC sold
defective products, (c) the manner in which NMC handled customer
                            PAGE 137
            EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

complaints and (d) the development of a new dialyzer product line.
Grace has also received two subpoenas relating to this investigation.
NMC and Grace have made extensive document production in response to
these subpoenas and have fully cooperated with the grand jury in
response to these subpoenas. In February 1996, the United States
Attorney for the District of New Jersey notified NMC that it is a
target of the New Jersey grand jury investigation, insofar as it
relates to possible violations of federal criminal law in connection
with efforts to affect the January 1991 import hold referred to above;
the material element of the import hold was lifted in 1992.

                            27

In addition, in December 1994, a subsidiary of NMC received a subpoena
from a federal grand jury in the Eastern District of Virginia
investigating the contractual relationships between subsidiaries of NMC
that provide dialysis services and third parties that provide medical
directorship and related services to those subsidiaries. NMC has made
document production in response to this subpoena.

The outcome of these investigations and their impact, if any, on NMC's
business, financial condition and results of operations cannot be
predicted at this time.

Shareholder Actions relating to NMC. In 1995, nine purported class
action lawsuits were brought against the Company and certain of its
officers and directors in various federal courts. These lawsuits are
being consolidated in the case entitled Murphy, et al. v. W R.
Grace & Co., et al., which is pending in the United States District
Court for the Southern District of New York. The first amended class
action complaint in this lawsuit, which purports to be a class action
on behalf of all persons and entities who purchased the Company's
publicly traded securities during the period from March 13, 1995
through October 17, 1995, generally alleges that the defendants
concealed information, and issued misleading public statements and

reports, concerning NMC's financial position and business prospects, a
proposed spin-off of NMC and the matters that are the subject of the
investigations described above in "NMC - OIG Investigation" and "NMC -
Grand Jury Investigations," in violation of federal securities laws.
The lawsuit seeks unspecified damages, attorneys' and experts' fees and
costs and such other relief as the Court deems proper.

In October 1995, a purported derivative lawsuit was filed in the United
States District Court for the Southern District of Florida, Northern
Division, against the Company, certain of its directors and its former
President and Chief Executive Officer, alleging that such individuals
breached their fiduciary duties by failing to properly supervise the
activities of NMC in the conduct of its business (Bennett v. Bolduc, et
al.).  In December 1995, the plaintiff in this action filed a new
action, based on similar allegations, in the United States District
Court for the Southern District of New York (Bennett v. Bolduc, et
al.).  The Florida action has been dismissed in favor of the action
filed in the Southern District of New York.  A second action making
similar allegations was filed in October 1995 in New York State Supreme
Court, New York County (Bauer v. Bolduc, et al.).  The Company has been
                           PAGE 138
          EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

advised that this action will be dismissed or stayed in favor of the
Bennett action, which has been consolidated, for discovery purposes
only, with the Murphy action described above.  The com-

                    28

plaint in the Bennett action seeks unspecified damages, attorneys' and
experts' fees and costs and such other relief as the Court deems
proper.

In February 1996, a purported class action was filed in New York State
Supreme Court, New York County, against the Company, certain of its
directors and a former director, alleging that the defendants breached
their fiduciary duties in connection with the Company's agreement to
combine NMC with Fresenius AG's worldwide dialysis business, as
described in Item 1 above under "Strategic Restructuring and Other
Growth Initiatives" (Rosman v. W.  R.  Grace & Co., et al.).  The
lawsuit seeks injunctive relief ordering defendants to carry out their
fiduciary duties and preventing or rescinding the transaction or any
related transactions with Fresenius AG, unspecified monetary damages,
an award of attorneys' and experts' fees and costs and such other
relief as the Court may deem just and proper.

See Note 7 to the Consolidated Financial Statements for additional
information concerning litigation involving NMC.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

This Item is inapplicable, as no matters were submitted to a vote of
the Company's security holders during the fourth quarter of 1995.

immediately if the underlying hedged instrument is settled. Cash flows
related to the agreements are classified as operating activities in the
Consolidated Statement of Cash Flows, consistent with the interest
payments on the underlying debt.

Gains and losses on foreign currency forward and option contracts
offset gains and losses resulting from the underlying transactions.
Gains and losses on contracts that hedge specific foreign currency
commitments are deferred and recorded in net income in the period in
which the related transaction is consummated. Gains and losses on
contracts that hedge net investments in foreign subsidiaries are
recorded in the cumulative translation adjustments account in
shareholders' equity.

EARNINGS PER SHARE Primary earnings per share are computed on the basis
of the weighted average number of common shares outstanding. Fully
diluted earnings per share assume the issuance of common stock
equivalents related to employee stock options and, prior to 1994, the
conversion of convertible debt (with an increase in net income for the
after-tax interest savings).

46

## 2.  ASBESTOS AND RELATED INSURANCE LITIGATION

Grace is a defendant in lawsuits relating to previously sold
asbestos-containing products and anticipates that it will be named as a
defendant in additional asbestos-related lawsuits in the future. Grace
was a defendant in approximately 40,800 asbestos-related lawsuits at
December 31, 1995 (47 involving claims for property damage and the
remainder involving approximately 92,400 claims for personal injury),
as compared to approximately 38,700 lawsuits at December 31, 1994 (65
involving claims for property damage and the remainder involving
approximately 67,900 claims for personal injury).

PAGE 173
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek, among other
things, to have the defendants absorb the cost of removing, containing
or repairing the asbestos-containing materials in the affected
buildings. Through December 31, 1995, 129 asbestos property damage
cases were dismissed with respect to Grace without payment of any
damages or settlement amounts; judgments were entered in favor of Grace
in 10 cases (excluding cases settled following appeals of judgments in
favor of Grace and a case in which the plaintiff was granted a new
trial on appeal); Grace was held liable for a total of $74.7 in 7 cases
(2 of which are on appeal); and 177 property damage suits and claims
were settled for a total of $421.8.

Included in the asbestos property damage lawsuits pending against Grace
and others at year-end 1995 was a class action, conditionally certified
by the U.S. Court of Appeals for the Fourth Circuit in 1993 and
pending in a U.S. District Court in South Carolina, covering all

public and private colleges and universities in the U S   whose
buildings contain asbestos materials.

In July 1994, a South Carolina state court judge dismissed the claims
of most class members from another purported nationwide class action
asbestos property damage lawsuit.  In his ruling, the judge held that a
South Carolina statute prohibits nonresidents from pursuing claims in
the South Carolina state courts with respect to buildings located
outside the state.  The plaintiffs have requested that the court
reconsider its decision.

In December 1995, Grace entered into an agreement to settle a
Pennsylvania state court action, certified as a class action in 1992,
covering all commercial buildings in the U.S.  leased in whole or in
part to the U.S.  government on or after May 30, 1986.  The terms of
the settlement agreement (which is subject to judicial review and
approval after class members have an opportunity to be heard) are not
expected to have a significant effect on Grace's consolidated results
of operations or financial position.

PERSONAL INJURY LITIGATION

Through December 31, 1995, approximately 10,100 asbestos personal
injury lawsuits involving 24,500 claims were dismissed with respect to
Grace without payment of any damages or settlement amounts (primarily
on the basis that Grace products were not involved), and approximately
23,700 such suits involving 29,600 claims were disposed of for a total
of $109.0.

ASBESTOS-RELATED LIABILITY

Subject to the factors discussed below, Grace estimates that its
probable liability with respect to the defense and disposition of
asbestos property damage and personal injury lawsuits and claims
pending at December 31, 1995 and 1994 (and, in the case of the 1995
estimate, personal injury lawsuits and claims expected to be filed
                                        PAGE 174
            EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

through 1998), is as follows:

| December 31, | 1995 | 1994 |
|---|---|---|
| Current liability for asbestos-related litigation (1) | $100.0 | $100.0 |
| Noncurrent liability for asbestos-related litigation | 722.3 | 612.4 |
| Total asbestos-related liability | $822.3 | $712.4 |

(1) Included in "Other current liabilities" in the Consolidated Balance
Sheet.

In the fourth quarter of 1995, Grace recorded a noncash pretax charge
of $260.0 ($169.0 after-tax) for asbestos-related liabilities,
primarily to reflect the estimated costs to defend against and dispose
of personal injury claims expected to be filed through 1998; Grace
believes that it now has adequate experience to reasonably estimate the

number of personal injury claims to be filed through 1998 and the costs
of defending against and disposing of these claims. Other components
of the 1995 provision include increases in the estimated costs of
defending against and disposing of certain property damage cases
pending at year-end 1995 and personal injury lawsuits and claims filed
during 1995.

While personal injury cases and claims are generally similar to each
other (differing only in the type of asbestos-related illness allegedly
suffered by the plaintiff), Grace's estimated liability for such cases
and claims is influenced by numerous variables that are difficult to
predict (including the insolvency of other former asbestos producers,
cross-claims by co-defendants, the rate at which new cases and claims
are filed and the defense and disposition costs associated with these
cases and claims). Consequently, actual costs may vary from any
estimate. For these reasons, Grace believes that it is not possible to
reasonably estimate the number of cases and claims to be filed after
1998 or the costs of defending against and disposing of such cases and
claims.

Each property damage case is unique in that the age, type, size and use
of the building, and the difficulty of asbestos abatement, if
necessary, vary from structure to structure; thus, the amounts involved
in prior dispositions of property damage cases are not necessarily
indicative of the amounts that may be required to dispose of such cases
in the future. In addition, in property damage cases, information
regarding product identification on a building-by-building basis (i.e.,
whether or not Grace products were actually used in the construction of
the building), the age, type, size and use of the building, the
jurisdictional history of prior cases and the court in which the case
is pending provide the only meaningful guidance as to potential future
costs. However, much of this information is not yet available in some
of the property damage cases currently pending against Grace.
Accordingly, it is not possible to estimate with precision the costs of
defending against and disposing of these cases. Further, Grace
believes that the number of property damage cases to be filed in the
future and the costs associated with these filings are not estimable.

PAGE 175
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

ASBESTOS-RELATED INSURANCE RECEIVABLE

Grace's ultimate exposure with respect to its asbestos-related lawsuits
and claims will depend on the extent to which its insurance will cover
damages for which it may be held liable, amounts paid in settlement and
litigation costs. The following table shows Grace's total estimated
insurance recoveries in reimbursement for past and estimated future
payments to defend against and dispose of asbestos-related litigation
and claims:

| December 31, | 1995 | 1994 |
|---|---|---|
| Notes receivable from insurance carriers - current, net of discounts of $4.3 in 1995 (1) | $ 62.0 | $127.0 |

| | | |
|---|---|---|
| Notes receivable from insurance carriers - noncurrent, net of discounts of $7.3 in 1995 (2) | 56.4 | 60.0 |
| Asbestos-related insurance receivable | 321.2 | 512.6 |
| | ------ | ------ |
| Total amounts due from insurance carriers | $439.6 | $699.6 |
| | ====== | ====== |

(1) Included in "Notes and accounts receivable, net" in the Consolidated Balance Sheet.

(2) Included in "Other assets" in the Consolidated Balance Sheet.

At December 31, 1995, settlements with certain insurance carriers provided for the future receipt by Grace of $130.0, which Grace has recorded as notes receivable (both current and noncurrent) of $118.4, after discounts. In 1995, Grace received a total of $257.3 pursuant to settlements with insurance carriers in reimbursement for monies previously expended by Grace in connection with asbestos-related litigation; of this amount, $127.0 was received pursuant to settlements entered into in 1993 and 1994, which had previously been classified as notes receivable.

During 1995, Grace settled with an affiliated group of carriers that had agreed to a settlement in 1993, had made a series of payments under that agreement and had subsequently notified Grace that it would no longer honor the agreement. Pursuant to the 1995 settlement, the group of carriers paid Grace $44.0 in 1995 and agreed to make additional payments totalling $60.2 in 1996 and 1997 (which Grace has recorded as notes receivable, after discounts, of $54.5). Pursuant to a settlement with another group of carriers, Grace received $26.8 in 1995 and expects to receive an additional payment of $9.7 in 1996. Under both settlements, Grace will continue to receive payments based on future cash outflows for asbestos-related litigation and claims; such payments are estimated to represent approximately $237.3 of the asbestos-related receivable of $321.2 at December 31, 1995.

47

PAGE 176
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

As a result of these settlements and a reassessment of its insurance receivable, Grace recorded a noncash net pretax charge of $15.0 ($9.7 after-tax) during the fourth quarter of 1995 to reflect a reduction in the receivable, primarily due to lower than anticipated settlements with insurance carriers and a discount on notes receivable in connection with prior settlements, partially offset by an increase in expected future reimbursements of costs to defend against and dispose of property damage cases pending at year-end 1995 and personal injury claims to be filed through 1998.

INSURANCE LITIGATION

Grace continues to seek to recover from its excess insurers the balance
of the payments it has made with respect to asbestos-related
litigation.  As part of this effort, Grace continues to be involved in
litigation with certain of its insurance carriers (having previously
settled with certain primary and excess carriers, as discussed above)
For the period October 1962 through June 1985 --the most relevant
period for asbestos-related litigation --Grace purchased, on an annual
basis, as much as eight levels of excess insurance coverage.  (In
general, excess policies provide that when claims paid exhaust coverage
at one level, the insured may seek payment from the carriers at the
next higher level.) For that 23-year period, the first six levels of
excess insurance available from the insurance companies that Grace
believes to be solvent (based primarily upon reports from a leading
independent insurance rating service) provide nominal coverage of
approximately $1,200.0 (including the amounts reflected in the
receivable discussed above).  However, (a) a portion of the personal
injury lawsuits and claims pending at year-end 1995 and expected to be
filed against Grace through 1998 will likely relate to periods for
which no excess coverage is available; and (b) even where such excess
coverage is available, the number of personal injury lawsuits and
claims expected to be filed against Grace in the future is not expected
to be sufficient to result in significant payments under such coverage.
Further, as a result of the May 1994 decision of the U.S. Court of
Appeals for the Second Circuit, discussed below, a significant portion
of the nominal excess coverage is not available in connection with
property damage lawsuits.  In addition, $142.0 of the $1,200.0 relates
to excess coverage written by a group of insurance carriers that, while
currently solvent, has experienced financial difficulties in recent
years.  This group of carriers settled with Grace in 1995 (as discussed
above).  The asbestos-related receivable of $321.2 at December 31, 1995
includes $54.7 to be paid by this group; management believes this
amount is fully collectible.

As previously reported, in September 1993 the U.S. Court of Appeals
for the Second Circuit ruled that, under New York law (which governs a
significant portion of the policies that provide Grace's
asbestos-related insurance coverage), such coverage is triggered based
on the date of installation of asbestos-containing materials.  As a
result of this decision (which had the effect of reducing the amount of
insurance coverage available to Grace with respect to asbestos property
damage litigation and claims), Grace recorded a noncash pretax charge
of $475.0 ($300.0 after-tax) in the 1993 third quarter.  Grace reversed
                              PAGE 177
              EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

$316.0 ($200.0 after-tax) of the pretax charge in the 1993 fourth
quarter after the court withdrew its September 1993 decision and agreed
to rehear the case, but reinstated the $316.0 pretax charge ($200.0
after-tax) in the second quarter of 1994, when the court issued a new
decision confirming its September 1993 decision.  Because Grace's
insurance covers both property damage and personal injury lawsuits and
claims, the May 1994 decision has had the concomitant effect of
reducing the insurance coverage available with respect to Grace's
asbestos personal injury lawsuits and claims.  However, in Grace's
opinion, it is probable that recoveries from its insurance carriers
(including amounts reflected in the receivable discussed above), along

with other funds, will be available to satisfy the personal injury and property damage lawsuits and claims pending at December 31, 1995, as well as personal injury lawsuits and claims expected to be filed through 1998. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated results of operations or financial position.

48

## 3. ACQUISITIONS AND DIVESTMENTS

### ACQUISITIONS

During 1995, Grace made acquisitions totalling $260.8 (inclusive of cash acquired and debt assumed), all of which involved cash purchases of kidney dialysis centers and medical imaging facilities by National Medical Care, Inc. (NMC), Grace's principal health care subsidiary. Acquisitions in the first quarter of 1995, prior to the classification of NMC as a discontinued operation (see Note 7), totalled $41.1 (inclusive of cash acquired and debt assumed). Acquisitions by NMC subsequent to the first quarter of 1995 are presented as an investing activity and are included in "Increase in net assets of discontinued operations" in the Consolidated Statement of Cash Flows.

In 1994, Grace made acquisitions totalling $351.7 (inclusive of cash acquired and debt assumed), primarily in health care. Grace acquired Home Nutritional Services, Inc. for approximately $131.8 (inclusive of cash and assumed debt totalling $30.4) and acquired kidney dialysis centers and other health care businesses during 1994 for an aggregate of approximately $145.3 in cash. 1994 acquisitions also included construction chemicals businesses and a European flexible packaging business.

In 1993, Grace acquired Home Intensive Care, Inc. for approximately $129.0 in cash and acquired other health care businesses for an aggregate of $115.0 in cash and $3.8 in common stock. Additionally, during 1993 Grace acquired Latin America's largest water treatment business for approximately $57.6 in cash.

### DIVESTMENTS

During 1995, Grace realized gross proceeds of $58.8 (inclusive of debt assumed by the buyers) from divestments, including payments received in connection with divestments completed in prior years. The operations
PAGE 178
EdgarPlus FORM-TYPE: 10-K FILING-DATE: March 30, 1996

divested in 1995 consisted of three small units of Grace's construction products business, the composite materials business (previously classified as a discontinued operation), Grace's transportation services business and various investments.

In 1994, Grace realized gross proceeds of $646.2 (inclusive of debt assumed by the buyers) from divestments, including payments received in connection with divestments completed in prior years. Substantially all of the businesses divested during 1994 had previously been