**4**

4

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K
## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1997 Commission file number 1-13953

# GRACE SPECIALTY CHEMICALS, INC.
## (TO BE RENAMED W.R. GRACE & CO.)

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

## ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
### 561/362-2000

## SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
| --- | --- |
| Common Stock, $.01 par value }<br>Preferred Share Purchase Rights } | New York Stock Exchange, Inc. |

## SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [ ] No [X]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in the Proxy Statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of Grace Specialty Chemicals, Inc. voting stock held by nonaffiliates was $0 at March 23, 1998.

At March 23, 1998, 1,000 shares of Grace Specialty Chemicals, Inc. Common Stock were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

```
              DOCUMENT                               WHERE INCORPORATED
              --------                               ------------------
     Annual Report on Form 10 -K of W. R. Grace & Co.
for the year ended December 31, 1997 (specified portions)    Parts I, II, III and I

     Information Statement of Grace Spec iality
Chemicals, Inc. dated February 13, 1998                         Part III
(specified portions)
```

## TABLE OF CONTENTS

PART  I

Item 1.  Business.....................................................................
Item 2.  Properties..................................................................
Item 3.  Legal Proceedings...........................................................
Item 4.  Submission of Matters to a Vote of Security Holders.........................

PART  II

Item 5.  Market for the Registrant's Common Equity and Related Stockholder Matters..
Item 6.  Selected Financial Data.....................................................
Item 7.  Management's Discussion and Anal ysis of Financial
         Condition and Results of Operations.........................................
Item 7A. Quantitative and Qualitative Disclosures About Market Risk..................
Item 8.  Financial Statements and Supplementary Data.................................
Item 9.  Changes in and Disagreements wit h Accountants on
         Accounting and Financial Disclosure.........................................

PART  III

Item 10. Directors and Executive Officers of the Registrant..........................
Item 11. Executive Compensation......................................................
Item 12. Security Ownership of Certain Beneficial Owners and Management..............
Item 13. Certain Relationships and Related Transactions..............................

PART  IV

Item 14. Exhibits, Financial Statement Sc hedules, and Reports on Form 8 -K...........

Signatures...........................................................................

## PART I

## ITEM 1. BUSINESS

At the date of this Report, Grace Specialty Chemicals, Inc. ("New Grace") is a wholly owned subsidiary of W. R. Grace & Co., a Delaware corporation ("Grace"), and New Grace has no assets. In August 1997, Grace entered into a definitive agreement with Sealed Air Corporation ("Sealed Air") to combine Grace's flexible packaging business with Sealed Air. Grace will effect this transaction by transferring its specialty chemicals businesses to New Grace, spinning off New Grace to Grace shareholders ("Spin-off") and merging a subsidiary of Grace with Sealed Air. For a further description of the specialty chemicals businesses to be transferred to New Grace and the transaction with Sealed Air, see Item 1 of the Annual Report on Form 10-K of Grace for the year ended December 31, 1997 ("Grace 1997 10-K"), which is incorporated in this Report by reference.

## ITEM 2. PROPERTIES

New Grace currently owns no properties. For information with respect to New Grace's properties following the Spin-off, see Item 2 of the Grace 1997 10-K, which is incorporated in this Report by reference.

## ITEM 3. LEGAL PROCEEDINGS

New Grace is not currently a party to any legal proceedings. For information with respect to the legal proceedings to which New Grace and/or its subsidiaries will be parties, or as to which they may otherwise be financially responsible, following the Spin-off, see Item 3 of the Grace 1997 10-K, which is incorporated in this Report by reference.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the security holders of New Grace during the fourth quarter of 1997.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

On August 12, 1997, New Grace issued 1,000 shares of its common stock to Grace, its direct parent, for consideration of $1,000. In the opinion of New Grace, this transaction is exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) thereof, in that such transaction did not involve any public offering. In connection with the Spin-off, New Grace will be recapitalized and Grace will distribute shares of the recapitalized common stock of New Grace ("Common Stock") to Grace shareholders, resulting in their ownership of 100% of the Common Stock. The Common Stock has been authorized for listing on the New York Stock Exchange under the symbol "GRA."

---

New Grace's Board of Directors has determined that a dividend of one Preferred Share Purchase Right ("Right") of New Grace will be paid in respect of each share of Common Stock to the holder thereof at the time of the Spin-off. Pursuant to the Rights Agreement relating thereto ("Rights Agreement"), the

| | |
|---|---|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | DEC 31 1997 |
| PERIOD START | JAN 01 1997 |
| PERIOD END | DEC 31 1997 |
| CASH | 1,000 |
| SECURITIES | 0 |
| RECEIVABLES | 0 |
| ALLOWANCES | 0 |
| INVENTORY | 0 |
| CURRENT ASSETS | 1,000 |
| PP&E | 0 |
| DEPRECIATION | 0 |
| TOTAL ASSETS | 1,000 |
| CURRENT LIABILITIES | 0 |
| BONDS | 0 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 1,000 |
| OTHER SE | 0 |
| TOTAL LIABILITY AND EQUITY | 1,000 |
| SALES | 0 |
| TOTAL REVENUES | 0 |
| CGS | 0 |
| TOTAL COSTS | 0 |
| OTHER EXPENSES | 0 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 0 |
| INCOME PRETAX | 0 |
| INCOME TAX | 0 |
| INCOME CONTINUING | 0 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | 0 |
| EPS PRIMARY | 0 |
| EPS DILUTED | 0 |

## Exhibit 99

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
## THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1997 Commission file number 1-12139

## W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0654331

### ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
561/362-2000

### SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:

```
                                                NAME OF EACH EXCHANGE ON
       TITLE OF EACH CLASS                      WHICH REGISTERED
     - - - - - - - - - - - - -                  - - - - - - - - - - - - -

Common Stock, $.01 par value            }    New York Stock Exchange, Inc.
Preferred Stock Purchase Rights         }

7-3/4% Notes Due 2002                   }
(issued by W. R. Grace & Co.-Conn.,     }    New York Stock Exch ange, Inc.
a wholly owned subsidiary) and          }
related Guarantees                      }
```

### SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in the Proxy Statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.[ ]

The aggregate market value of W. R. Grace & Co. voting stock held by nonaffiliates was approximately $5.9 billion at January 31, 1998.

At February 28, 1998, 75,351,985 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

None

## TABLE OF CONTENTS

PART I

Item 1.          Business...............................................................
                 Introduction and Overview .......................................
                 Products and Markets.............................................
                 Discontinued Operations.........................................
                 Research Activities.............................................
                 Patents and Other Intellectual Property Matters ...............
                 Environmental, Health and Safety Matters.......................
Item 2.          Properties.........................................................
Item 3.          Legal Proceedings................................................
Item 4.          Submission of Matters to a Vote of Security Holders..............


PART II

Item 5.          Market for Registrant's Common Equity and Related Stockholder Matt
Item 6.          Selected Financial Data..........................................
Item 7.          Management's Discussion  and Analysis of Financial
                 Condition and Results of Operations.............................
Item 7A.         Quantitative and Qualitative Disclosures About Market Risk........
Item 8.          Financial Statements and Supplementary Data......................
Item 9.          Changes in and Disagree ments with Accountants on
                 Accounting and Financial Disclosure.............................


PART III

Item 10.         Directors and Executive Officers of the Registrant...............
Item 11.         Executive Compensation...........................................
Item 12.         Security Ownership of Certain Beneficial Owners and Management....
Item 13.         Certain Relationships and Related Transactions...................


PART IV

Item 14.         Exhibits, Financial Sta tement Schedules, and Reports on Form 8 -K..

Signatures..................................................................................

Financial Supplement.......................................................................

## PART I

**Item 1. Business.**

## INTRODUCTION AND OVERVIEW

W. R. Grace & Co., through its subsidiaries, is one of the world's leading specialty chemicals companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace primarily operates through the following three business units:

See "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

## PATENTS AND OTHER INTELLECTUAL PROPERTY MATTERS

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications, as well as know-how and other proprietary information. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance that Grace's patents, patent applications or other intellectual property will provide sufficient proprietary protection.

- 8 -

In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

## ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

Manufacturers of specialty chemical products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 1998 and 1999, for (i) the operation and maintenance of environmental facilities and the disposal of wastes with respect to continuing operations; (ii) capital expenditures for environmental control facilities relating to continuing operations; and (iii) site remediation:

(i) (ii) (iii)

| [S] | Operation of Facilities and Waste Disposal | Capital Expenditures | Site Remediation |
|---|---|---|---|
|  |  | (in millions) |  |
|  | [C] | [C] | [C] |
| 1995 | $34 | $12 | $31 |
| 1996 | 33 | 10 | 20 |
| 1997 | 36 | 7 | 34 |
| 1998 (est.) | 33 | 8 | 41 |
| 1999 (est.) | 33 | 7 | 23 |

Additional material environmental costs may arise as a result of future legislation or other developments. Grace's earnings, competitive position and other capital expenditures have not been, and are not expected to be, materially adversely affected by compliance with environmental requirements. See Note 11 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

With the goal of continuously improving Grace's environmental, health and safety ("EHS")

performance, Grace established its Commitment to Care(TM) initiative (based on the Responsible Care (R) program of the Chemical Manufacturers Association) in 1994 as the program under which all Grace EHS activities are to be implemented. To the extent applicable, Commitment to Care extends the basic elements of Responsible Care to all Grace locations worldwide, embracing specific performance

- 9 -

objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention.

See Item 3 below for information concerning environmental proceedings to which Grace is a party and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning environmental matters.

## ITEM 2. PROPERTIES.

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by two or more of Grace's business units, and after the disposition of the Packaging Business, some plants and facilities may also be shared with the combined business of Sealed Air and the Packaging Business. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See Note 18 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Additional information regarding Grace's properties is set forth in Item 1 above and in Notes 1, 8 and 11 to the Consolidated Financial Statements.

## ITEM 3. LEGAL PROCEEDINGS.

ASBESTOS LITIGATION. Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 40,600 asbestos-related lawsuits at December 31, 1997 (18 involving claims for property damage and the remainder involving approximately 96,900 claims for personal injury), as compared to approximately 41,500 lawsuits at year-end 1996 (31 involving claims for property damage and the remainder involving approximately 91,500 claims for personal injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through December 31, 1997, 139 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 195 property

damage cases were settled for a total of $476.6 million.

- 10 -

Included in the asbestos property damage cases pending against Grace and others at December 31, 1997 were the following class actions: (i) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials (CENTRAL WESLEYAN COLLEGE, ET AL. V. W. R. GRACE, ET AL.); and (ii) a purported class action (ANDERSON MEMORIAL HOSPITAL, ET AL. V. W. R. GRACE & CO., ET AL.), filed in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

Through December 31, 1997, approximately 12,700 personal injury lawsuits involving 29,300 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 38,900 such suits involving approximately 89,200 claims were disposed of for a total of $255.6 million. See "Insurance Litigation" below.

In 1991, the Judicial Panel on Multi-District Litigation consolidated in the U.S. District Court for the Eastern District of Pennsylvania, for pre-trial purposes, all asbestos personal injury cases pending in the U.S. federal courts, including approximately 7,000 cases then pending against Grace; 3,600 new cases involving 7,200 claims against Grace have subsequently been added to the consolidated cases. To date, no action has been taken by the court handling the consolidated cases that would indicate whether the consolidation will affect Grace's cost of disposing of these cases or its defense costs.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace also has settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace's aggregate accrual for asbestos liabilities at December 31, 1997, was $855.9 million; this amount reflects all asbestos-related property damage and personal injury cases and claims then pending (except for two property damage cases as to which liability is not yet estimable because Grace has not yet been able to obtain sufficient information through discovery proceedings), as well as personal injury claims expected to be filed through 2002. Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the number and nature of claims filed and the extent to which insurance will cover damages for which it may be liable, amounts paid in settlement and litigation costs. At December 31, 1997, Grace had recorded a receivable of $282.4 million, the amount Grace estimated to

- 11 -

be the probable recovery from its insurance carriers with respect to pending and projected asbestos cases and claims, as well as notes receivable from insurance carriers of $31.3 million. A May 1994 decision of the U.S. Court of Appeals for the Second Circuit limited the amount of insurance coverage available to Grace with respect to property damage cases. Because Grace's insurance covers both property damage and personal injury cases and claims, the May 1994 decision has had the concomitant effect of reducing the insurance coverage available with respect to Grace's asbestos personal injury claims. However, in Grace's opinion (which is not based on a formal opinion of counsel), it is probable that recoveries from its insurance carriers, along with other funds, will be available to satisfy the property damage and personal injury cases and claims pending at December 31, 1997, as well as personal injury claims expected to be filed in the foreseeable future. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated financial position.

See "Insurance Litigation" and Note 2 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

ENVIRONMENTAL PROCEEDINGS. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 1997, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities.

In November 1995, Grace received a letter from the U.S. Department of Energy ("DOE") inquiring as to Grace's willingness to contribute to the continued cleanup of a former Grace property located in Wayne, New Jersey. The letter asserted that Grace has a legal duty to pay for the cleanup and that the total cost of cleanup may exceed $100 million. The operations conducted by Grace at the Wayne site (from 1955 to 1970) included work done on radioactive materials under contract with the U.S. government. In 1975, the U.S. Nuclear Regulatory Commission inspected the site, concluded that it was decontaminated in accordance with applicable regulations and released it for unrestricted use. In 1984, pursuant to a request from the DOE, Grace transferred the Wayne property to the DOE and made a cash payment as a contribution towards the DOE's cleanup efforts at the site, which was acknowledged by the DOE as fulfilling any obligation Grace had to contribute to the DOE's cleanup effort while preserving the rights and liabilities of the parties under other existing applicable laws. Grace believes that the resolution of the DOE's claim (as well as related claims by other U.S. governmental agencies) will not have a material adverse effect on its consolidated financial position.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies

- 12 -

or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge or disposition of hazardous wastes and other materials.

Grace believes that the liabilities for environmental remediation costs, including costs relating to environmental proceedings, that have been recorded in Grace's historical financial statements are adequate. In addition, Grace is presently involved in litigation with its insurance carriers, seeking reimbursement from them for certain amounts for which Grace may be held liable with respect to such costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain. However, Grace believes that the resolution of pending environmental proceedings will not have a material adverse effect on the consolidated financial position or liquidity of Grace. For further information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

INSURANCE LITIGATION. Grace is involved in litigation with certain of its insurance carriers with respect to asbestos-related insurance claims and environmental liabilities. The relief sought by Grace in these actions would provide insurance that would partially offset Grace's estimated exposure with respect to amounts previously expended, and that may be expended in the future, by Grace to defend claims, satisfy judgments and fund settlements. Grace has settled all of its asbestos-related insurance coverage actions, with the exception of MARYLAND CASUALTY CO. V. W. R. GRACE & CO., pending in the U.S. District Court for the Southern District of New York, in which Grace is asserting claims for insurance coverage for its asbestos-related personal injury liabilities.

Pursuant to settlements with primary-level and excess-level insurance carriers, Grace received payments totaling $310.9 million prior to 1995, as well as payments totaling $257.3 million in 1995, $184.5 million in 1996 and $68.7 million in 1997. Grace expects to receive additional amounts from insurance carriers and has recorded receivables to reflect the expected amounts, as discussed above under "Asbestos Litigation." As a result of these settlements, Grace's asbestos-related insurance claims have been dismissed as to the primary-level product liability insurance coverage previously sold by the relevant insurers to Grace, as well as to many of Grace's excess-level liability insurers.

Grace's only two environmental insurance coverage actions are pending in the U.S. District Court for the Southern District of New York. The first is styled MARYLAND CASUALTY CO. V. W. R. GRACE & CO. Litigation continues in this case as to certain primary-level and excess-level carriers that have not settled with respect to claims for environmental property damage. The second case, entitled UNIGUARD V. W. R. GRACE, was filed on December 17, 1997. This declaratory judgment action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination.

See "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

FUMED SILICA PLANT LITIGATION. In 1993, Grace and certain of its subsidiaries initiated legal action in the Belgian courts against the Flemish government to recover losses resulting from the closing of one subsidiary's fumed silica plant in Puurs, Belgium. The action seeks damages in excess of four billion Belgian francs (approximately $107.8 million at the December 31, 1997 exchange rate), plus interest and

- 13 -

lost profits. This claim was dismissed at the trial court level and is now being appealed. The trial court also determined that a subsidiary should repay approximately 239 million Belgian francs (approximately $6.4 million at the December 31, 1997 exchange rate), plus interest, to the Flemish government for previously received investment grants; this decision is also being appealed.

U.S. JUSTICE DEPARTMENT LAWSUIT. The U.S. Justice Department has intervened in a QUI TAM lawsuit, originally filed in June 1995, pending in the U.S. District Court for the Northern District of California (UNITED STATES EX
REL. ROBERT COSTA AND RONALD THORNBURG, ET AL. V. BAKER & TAYLOR, INC., ET AL.). The complaint in this lawsuit alleges that Baker & Taylor Books, a book wholesaler sold by Grace in 1992, overcharged public schools, libraries and federal agencies during the last ten years, including the period during which Baker & Taylor Books was owned by Grace. Grace and Baker & Taylor, Inc. (the entity that currently operates Baker & Taylor Books) have been named as defendants. The lawsuit seeks unspecified damages, punitive damages and civil penalties, as well as attorneys' fees and expenses and such other relief as the Court may deem proper. At this time, Grace is unable to determine the liability, if any, to which it may be subject as a result of this lawsuit.

STOCKHOLDER LITIGATION. W. R. Grace & Co., a New York corporation subsequently renamed Fresenius Medical Care Holdings, Inc. ("Grace New York"), and former members of the Grace New York Board of Directors (as well as J. P. Bolduc, who resigned as president and chief executive officer and a director of Grace New York in March 1995) were named as defendants in a case entitled WEISER, ET AL. V. GRACE, ET AL. pending in New York State Supreme Court, New York County. The consolidated amended complaint in this lawsuit, which purports to be a derivative action (i.e., an action brought on behalf of Grace New York), alleges, among other things, that the individual defendants breached their fiduciary duties to Grace New York (i) by providing J. Peter Grace, Jr. (the chairman and a director of Grace New York until his death in April 1995) with certain compensation arrangements upon his voluntary retirement as Grace New York's chief executive officer in 1992 and (ii) by approving Mr. Bolduc's severance arrangements, and that Messrs. Grace and Bolduc breached their fiduciary duties by accepting such benefits and payments. The lawsuit seeks unspecified damages, the cancellation of all allegedly improper agreements, the cancellation of a retirement plan for nonemployee directors (which was terminated by Grace in 1997), the return of all remuneration paid to the directors who are defendants while they were in breach of their fiduciary duties to Grace New York, attorneys' and experts' fees and costs, and such other relief as the Court deems proper. A motion to intervene in the case by the California Public Employees' Retirement System was granted by the Court in September 1996. Grace appointed a special committee of independent directors to investigate the allegations made in the WEISER action. In March 1998, the special committee filed a motion to dismiss the WEISER action on the grounds that it is without merit and that the prosecution of the action is not in the best interests of the Company and its shareholders.

Under the terms of the Distribution Agreement ("NMC Distribution Agreement") entered into in connection with the reorganization of Grace New York in September 1996 (the "NMC Transaction") described in Note 1 to the Consolidated Financial Statements in the Financial Supplement, Grace remains financially responsible for any liabilities incurred by Grace New York and others as a result of this lawsuit, including the fees and disbursements of counsel for Grace and, subject to certain conditions, counsel for the individual defendants (including certain current and former directors of Grace). The discussions of the NMC Distribution Agreement appearing above and in the following paragraphs do not purport to be complete and are qualified in their entirety by reference to the NMC Distribution

- 14 -

Agreement, which was filed as an exhibit to the Joint Proxy Statement-Prospectus of Grace New York dated August 2, 1996.

SECURITIES AND EXCHANGE COMMISSION INVESTIGATION. In April 1996, Grace New York received a formal order of investigation issued by the U.S. Securities and Exchange Commission ("SEC") directing an investigation into, among other things, whether Grace New York violated the U.S. federal securities laws by filing periodic reports with the SEC that contained false and misleading financial information. Pursuant to this formal order of investigation, Grace and Grace New York have provided information to the SEC relating to reserves (net of applicable taxes) established by Grace New York and its subsidiary, National Medical Care, Inc. ("NMC"), during the period from January 1, 1990 to 1996 ("Covered Period"). In connection with the preparation of the NMC Form 10 filed with the SEC in September 1995, Grace reversed previously unallocated reserves established at NMC in 1990, 1991, 1992 and 1993 that are a subject of this investigation. Also in connection with the preparation of such Form 10, Grace established reserves in an approximately equal amount with respect to investments in Cross Country Healthcare Personnel, Inc. and in NMC's German renal products manufacturing facilities.

Under the terms of the NMC Distribution Agreement, Grace remains financially responsible for any liabilities incurred by Grace New York and others as a result of the investigation described above, including the fees and disbursements of counsel for Grace and, subject to certain conditions, counsel for certain former directors and officers of Grace.

CLAIMS RELATING TO NMC. Grace New York and certain of its officers and directors were named as defendants in a lawsuit entitled MURPHY, ET AL. V. W. R. GRACE & CO., ET AL., which is pending in the U.S. District Court for the Southern District of New York. The first amended class action complaint in this lawsuit, which purports to be a class action on behalf of all persons and entities who purchased Grace New York's publicly traded securities during the period from March 13, 1995 through October 17, 1995 (the "Class Period"), generally alleges that the defendants concealed information, and issued misleading public statements and reports, concerning NMC's financial position and business prospects, a proposed spin-off of NMC and the matters that are the subject of investigations of NMC by the Office of the Inspector General of the U.S. Department of Health and Human Services (the "OIG"), in violation of U.S. federal securities laws. The lawsuit seeks unspecified damages, attorneys' and experts' fees and costs and such other relief as the Court deems proper.

Grace New York and certain of its former officers and directors were also named as defendants in a purported derivative action in the U.S. District Court for the Southern District of New York (BENNETT V. BOLDUC, ET AL.), alleging that such individuals breached their fiduciary duties by failing to properly supervise the activities of NMC in the conduct of its business. The BENNETT action seeks unspecified damages, attorneys' and experts' fees and costs and such other relief as the Court deems proper. A third derivative action relating to NMC, entitled BAUER V. BOLDUC, ET AL., was filed in October 1995 in the Supreme Court of the State of New York for the County of New York. The Bauer action has been stayed in favor of the BENNETT action.

Grace and other defendants in the MURPHY, BENNETT AND BAUER actions have agreed with the plaintiffs to settle those actions. The agreement provides for the establishment of a fund of approximately $32 million (less plaintiffs' attorneys' fees) to compensate a class of stockholders consisting of purchasers of Grace New York stock during the Class Period. As part of the settlements, the insurance carrier for the directors and officers will cause $10 million to be paid to Grace on behalf of

- 15 -

the individual defendants named in the MURPHY, BENNETT and BAUER actions. The settlements are contingent upon court approval. The net payment to be made by Grace in connection with these settlements will be charged against previously established reserves.

Under the terms of the NMC Distribution Agreement, Grace remains financially responsible for any liabilities incurred by Grace New York and others as a result of the lawsuits described above, including the fees and disbursements of counsel for Grace and, subject to certain conditions, counsel for the individual defendants (including certain former directors and officers of Grace). The NMC Distribution Agreement also provides generally for certain cross-indemnities designed to place with Grace New York (which has become a subsidiary of Fresenius AG, a German corporation not affiliated with Grace) financial responsibility for the liabilities of the health care businesses formerly owned by Grace New York (including, without limitation, all liabilities relating to compliance or noncompliance with U.S. food and drug law, medical and Medicare billing and reimbursement law and other health care matters) and to place with Grace financial responsibility for the other liabilities of Grace New York and its other subsidiaries (including, without limitation, liabilities relating to the manufacture or sale of asbestos-containing materials by the specialty chemicals businesses). Grace and Grace New York have asserted claims against each other for indemnity with respect to claims asserted by third parties pursuant to the terms of these provisions.

See Note 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning certain litigation and proceedings involving NMC.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 1997.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-29); under the heading "Quarterly Summary and Statistical Information - Unaudited" opposite the captions "Dividends declared per common share" and "Market price of common stock" (page F-28); and in Note 12 to the Consolidated Financial Statements (page F-22).

Each share of the Company's Common Stock, par value $.01 per share ("Common Stock"), has an attendant Preferred Stock Purchase Right ("Right"). The Rights are not and will not become exercisable unless and until certain events occur (as described below). Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights will become exercisable on the earlier to occur of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the then outstanding shares of Common Stock or (b) 10 business days (or such later date as may be fixed by the Company's

- 16 -

Grace has entered into foreign currency forward and option contracts to hedge transactions and firm commitments denominated in foreign currencies and net investments in foreign subsidiaries. Gains or losses on hedges of transactional exposures are recorded as adjustments to gains or losses on the underlying transactions. Gains or losses on hedges of foreign currency-denominated firm commitments are deferred and recorded as part of the basis in the transaction in the period in which the transaction is consummated. Gains and losses on forward contracts that hedge net investments in foreign subsidiaries are recorded in "Cumulative translation adjustments" in Shareholders' Equity. Cash flows related to foreign currency forward and option contracts are classified within "Operating Activities" in the Consolidated Statement of Cash Flows.

Other Income: Other income consists of interest income, equity in earnings of affiliated companies, gains on sales of investments and other items.

F-9

Earnings Per Share: Effective December 31, 1997, Grace adopted SFAS No. 128, "Earnings per Share," which supersedes Accounting Principles Board Opinion (APB) No. 15, "Earnings per Share," and establishes new standards for computing earnings per share. SFAS No. 128 requires the presentation of basic and diluted earnings per share in place of primary and fully diluted earnings per share. At December 31, 1997, all prior periods were restated to reflect the new basic and diluted earnings per share amounts required by SFAS No. 128.

## 2. Asbestos and Related Insurance Litigation

Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 40,600 asbestos-related lawsuits at December 31, 1997 (18 involving claims for property damage and the remainder involving approximately 96,900 claims for personal injury), as compared to approximately 41,500 lawsuits at December 31, 1996 (31 involving claims for property damage and the remainder involving approximately 91,500 claims for personal injury).

Property Damage Litigation
The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Some of this information is not yet available in the property damage cases currently pending against Grace. Accordingly, it is not possible to estimate with precision the costs of defending against and disposing of these cases. In accordance with SFAS No. 5, "Accounting for Contingencies," Grace has recorded an accrual for all existing property damage cases for which sufficient information is available to form a range of estimated exposure. At December 31, 1997, estimates were not accrued for two cases, due to insufficient information. Grace believes that the number of property damage cases to be filed in the

future and the costs associated with such filings are not estimable.

Through December 31, 1997, 139 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases (none of which is on appeal) for a total of $60.3; and 195 property damage cases were settled for a total of $476.6. Property damage case activity for 1997 and 1996 was as follows:

```
-----------------------------------------------------------------------------

-----------------------------------------------------------------------------
Cases outstanding, beginning of year..........................................
New cases filed...............................................................
Settlements...................................................................
Dismissals....................................................................
Judgments.....................................................................

    Cases outstanding, end of year...........................................

-----------------------------------------------------------------------------
```

### Personal Injury Litigation

Personal injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other former asbestos producers, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims.

Through December 31, 1997, approximately 12,700 asbestos personal injury lawsuits involving 29,300 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 38,900 lawsuits involving 89,200 claims were disposed of for a total of $255.6. Personal injury claim activity for 1997 and 1996 was as follows:

```
-----------------------------------------------------------------------------

-----------------------------------------------------------------------------
Claims outstanding, beginning of year.........................................
New claims....................................................................
Claims under amended complaints...............................................
Settlements...................................................................
Dismissals....................................................................
Judgments.....................................................................

    Claims outstanding, end of year..........................................

-----------------------------------------------------------------------------
```

(1) Of the 8,298 claims shown, approximately 1,500 were filed under amended complaints in 1996. The remaining claims relate to disputed filings that were submitted to local counsel in prior years but were not reported to Grace until 1996, when a majority of such claims was settled.

### Asbestos-Related Liability

Based upon and subject to the factors discussed above, Grace estimates that its probable liability with

respect to the defense and disposition of asbestos property damage and personal injury cases and claims was as follows at December 31, 1997 and 1996:

```
--------------------------------------------------------------------------
--------------------------------------------------------------------------
Current liability for asbestos -related litigation (3)..........................
Noncurrent liability for asbestos -related litigation...........................

    Total asbestos- related liability.........................................

--------------------------------------------------------------------------
```

(1) Reflects property damage and personal injury cases and claims pending at December 31, 1997, as well as personal injury claims expected to be filed through 2002. See discussion below.
(2) Reflects property damage and personal injury cases and claims pending at December 31, 1996, as well as personal injury claims expected to be filed through 2001. See discussion below.
(3) Included in "Other current liabilities" in the Consolidated Balance Sheet.
(4) The increase versus 1996 primarily relates to a 1997 property damage settlement to be paid in 1998 and personal injury group settlements to be paid in 1998.
(5) Excludes two property damage cases at December 31, 1997 as to which the liability is not yet estimable because Grace has not yet been able to obtain sufficient information through discovery proceedings.

Prior to 1995, Grace recorded noncash charges to reflect its estimated costs of defending against and disposing of the asbestos property damage and personal injury cases and claims then pending. In the fourth quarter of 1995, Grace determined that it had adequate experience to reasonably estimate the costs of defending against and disposing of asbestos personal injury claims to be filed during the three-year period 1996-1998 and recorded a noncash charge of $260.0 ($169.0 after-tax), primarily to reflect such anticipated filings. Based on certain developments during 1996, Grace determined in the 1996 fourth quarter that it had adequate experience to reasonably estimate the costs of defending against and disposing of asbestos personal injury claims to be filed during the five-year period 1997-2001 and recorded a noncash charge of $348.4 ($226.4 after-tax), primarily to reflect such anticipated filings. The 1996 provision also reflected increases in the estimated costs of defending against and disposing of personal injury claims pending at year-end 1996, and the 1995 provision also reflected increases in the estimated costs of defending against and disposing of certain property damage cases pending at year-end 1995 and personal injury claims filed during 1995. Based on developments and trends in 1997, Grace concluded that no additional charge would be necessary to cover the estimated costs of defending against and disposing of asbestos-related personal injury claims to be filed during the five-year period 1998-2002. However, as discussed above, these estimates are not necessarily indicative of actual costs. Based on the factors discussed above, Grace does not believe that it can reasonably estimate the number and defense and disposition costs of personal injury claims that may be brought against Grace after 2002. The accruals recorded for future cases and claims are not discounted to their present values; further, the actual cash payments related to future cases and claims are expected to continue beyond 2002.

Asbestos-Related Insurance Receivable
Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during 1997 and 1996 was as follows:

---

---

Notes Receivable
Notes receivable from insurance carriers, beginning of year, net of discount of
    $7.4 in 1997 (1996 - $11.6)...............................................
Proceeds received under asbestos-related insurance settlements.....................
Current year asbestos-related insurance settlements...............................
Current year amortization of discount.............................................

    Notes receivable from insurance carriers, end of year, net of discount of
    $4.8 (1996 - $7.4) (1).................................................

Insurance Receivable
Asbestos-related insurance receivable, beginning of year..........................
Proceeds received under asbestos-related insurance settlements.....................
Adjustments to asbestos-related insurance receivable (2)..........................
Transfers from asbestos-related insurance receivable to notes receivable from insura
Other.............................................................................

    Asbestos-related insurance receivable, end of year (1)......................

    Total amounts due from insurance carriers...............................

---

(1) See Note 7 for classification between current portion (classified in "Notes and accounts receivable,
net") and noncurrent portion (classified in "Other assets") in the Consolidated Balance Sheet.
(2) Reflects noncash adjustments to receivable in conjunction with increases in asbestos-related liability.
See discussion below.

F-11

Notes receivable from insurance carriers represent amounts due from insurance carriers in
reimbursement for amounts previously paid by Grace in defending against and disposing of asbestos
cases and claims; payments under these notes will be received through 2001. These notes do not bear
stated interest rates and, therefore, have been discounted using a weighted average interest rate of
6.7%. Installments due in 1998 are classified as "current" in the Consolidated Balance Sheet. The
asbestos-related insurance receivable at December 31, 1997 predominantly represents amounts expected
to be received from carriers under settlement agreements in reimbursement for defense and disposition
costs to be paid by Grace in the future in connection with property damage and personal injury cases and
claims pending at year-end 1997 and personal injury claims expected to be filed through 2002 (through
2001 at December 31, 1996). In the fourth quarter of 1996, Grace recorded a noncash pretax benefit of
$119.3 ($77.5 after-tax), primarily representing the additional insurance proceeds Grace expects to
receive in reimbursement for the cash outflows associated with personal injury claims expected to be
filed against Grace through 2001. As a result of fourth quarter 1995 insurance settlements and a
reassessment of its insurance receivable, Grace recorded a noncash net pretax charge of $15.0 ($9.7
after-tax) during the fourth quarter of 1995. This charge reflected a reduction in the receivable, primarily
due to lower than estimated proceeds from settlements with insurance carriers (caused by the reduced
coverage available for certain years) and a discount on notes receivable received in connection with

prior settlements, partially offset by an increase in expected future reimbursements of costs to defend against and dispose of property damage cases pending at year-end 1995 and personal injury claims to be filed through 1998. Certain of Grace's insurance carriers have become insolvent. From time to time, Grace has been successful in collecting funds from insolvent carriers. However, since recovery from these carriers is not probable, Grace has not accrued a related receivable.

Insurance Litigation

Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, it is probable that recoveries from its insurance carriers (including amounts reflected in the receivable discussed above), along with other funds, will be available to satisfy the property damage and personal injury cases and claims pending at December 31, 1997, as well as personal injury claims expected to be filed in the foreseeable future. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated financial position.

---

## 3. Discontinued Operations

---

Packaging Business Transaction

In August 1997, Grace and Sealed Air entered into a definitive agreement to combine the Packaging Business with Sealed Air (see Note 1). The Company's shareholders and Sealed Air's shareholders approved this transaction on March 20, 1998 and March 23, 1998, respectively. As a result, Grace classified the Packaging Business as a discontinued operation as of December 31, 1997. Accordingly, the operations of the Packaging Business are included in "Income/(loss) from discontinued operations" in the Consolidated Statement of Operations. The separation of the Packaging Business from the Specialty Chemicals Businesses, the Spin-off and the Merger (all of which are expected to be completed by March 31, 1998) will consist of the following steps:
* Grace will separate the Packaging Business and the Specialty Chemicals Businesses into separate groups of subsidiaries.
* The Company and a Packaging Business subsidiary will borrow funds under a new credit agreement and will make a cash transfer of $1,200 (subject to adjustment) to W. R. Grace & Co.-Conn. (Grace Connecticut), a subsidiary of the Company that owns and operates the Specialty Chemicals Businesses. Grace Connecticut will use the transferred funds to repay substantially all of its debt (see Note 9). The Company and the Packaging Business subsidiary will remain responsible for the borrowings under the new credit agreement. * The Company will transfer the stock of Grace Connecticut to New Grace, making Grace Connecticut a subsidiary of New Grace.
* The Company will distribute the shares of New Grace common stock to the Company's shareholders, completing the Spin-off.
* The Company (then owning only the Packaging Business) will be recapitalized, so that each share of the Company's common stock will be exchanged for a fraction of a share of common stock and a

MTNs (including the costs of settling the related interest rate swap agreements). The amount will vary depending upon the extent to which Notes and MTNs are purchased. Sealed Air is to reimburse Grace Connecticut for a portion of these costs.

Grace believes that cash flow generated from future operations and committed borrowing facilities will be sufficient to meet its cash requirements for the foreseeable future.

Asbestos-Related Matters

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 1997, Grace paid $74.1 million for the defense and disposition of asbestos-related property damage and personal injury litigation, net of amounts received under settlements with insurance carriers. During the fourth quarter of 1996, Grace recorded a noncash pretax charge of $229.1 million ($148.9 million after-tax), primarily to reflect the estimated costs of defending against and disposing of personal injury claims expected to be filed through 2001. The estimated costs used to determine the amount of this charge were not discounted to their present values, and the time period over which the associated cash is actually expended is likely to extend beyond 2001. Based on developments and trends in 1997, Grace concluded that no additional charge would be necessary to cover the estimated costs of defending against and disposing of asbestos-related personal injury claims to be filed during the five-year period 1998-2002. The balance sheet at December 31, 1997 includes a receivable of $282.4 million due from insurance carriers. Grace also has recorded notes receivable of $36.1 million ($31.3 million after discounts) for amounts to be received from 1998 to 2001, pursuant to settlement agreements previously entered into with insurance carriers.

F-36

Although the total amount to be paid in 1998 with respect to asbestos-related claims (after giving effect to payments to be received from insurance carriers) cannot be precisely estimated, Grace expects that it will be required to expend approximately $150-$170 million (pretax) in 1998 to defend against and dispose of such claims (after giving effect to anticipated insurance recoveries). The 1998 expenditures include a 1997 property damage settlement to be partially paid in 1998 and personal injury group settlements, effected in 1997, to be paid in 1998. The amounts with respect to the probable cost of defending against and disposing of asbestos-related claims and probable recoveries from insurance carriers represent estimates and are on an undiscounted basis; the outcomes of such claims cannot be predicted with certainty.

In May 1997, the Texas legislature adopted legislation that had the effect of making it more difficult for out-of-state residents to file asbestos personal injury claims in Texas state courts. Although the rate of filing asbestos claims in Texas during the second half of 1997 was lower than that of the first half of 1997, the effect of this legislation on Grace's ultimate exposure with respect to its asbestos-related cases and claims cannot be predicted with certainty.

In December 1997, Grace and the U.S. Department of Energy's Brookhaven National Laboratory announced the development of a new product capable of dissolving asbestos in installed fireproofing material previously produced by Grace without diminishing the existing fire-resistive performance of the fireproofing material on columns and beams. It is anticipated that the new product will create significant cost savings in comparison to current asbestos abatement techniques. The new product is expected to be commercially available in early 1998. Grace is not yet able to determine the effect the new product will have on its exposure with respect to its property damage litigation cases.

See Note 2 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims.

Environmental Matters

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and

disposition of hazardous wastes and other materials. Worldwide expenses of continuing operations related to the operation and maintenance of environmental facilities and the disposal of hazardous and nonhazardous wastes totaled $35.8 million in 1997, $32.7 million in 1996 and $34.0 million in 1995. Such costs are estimated to be $33.1 million in 1998 and $33.2 million in 1999. In addition, worldwide capital expenditures for continuing operations relating to environmental protection totaled $7.2 million in 1997, compared to $10.4 million in 1996 and $12.2 million in 1995. Capital expenditures to comply with environmental initiatives in future years are estimated to be $8.3 million in 1998 and $7.3 million in 1999. Grace also has incurred costs to remediate environmentally impaired sites. These costs were $33.9 million in 1997, $20.3 million in 1996 and $31.3 million in 1995. These amounts have been charged against previously established reserves. Future cash outlays for remediation costs are expected to total $41.0 million in 1998 and $23.0 million in 1999. Expenditures have been funded from internal sources of cash and are not expected to have a significant effect on liquidity.

Grace accrues for anticipated costs associated with investigatory and remediation efforts where an assessment has indicated that a liability has been incurred and the amount of loss can be reasonably estimated. In the fourth quarter of 1995, Grace recorded a pretax provision of $77.0 million ($50.0 million after-tax) related principally to increased cost estimates associated with five former manufacturing sites. At December 31, 1997, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $230.2 million, as compared to $256.4 million at December 31, 1996. These accruals do not take into account any discounting for the time value of money.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. As some of these issues are decided (the outcomes of which are subject to uncertainties) or new sites are assessed and costs can be reasonably estimated, Grace will continue to review and analyze the need for adjustments to the recorded accruals. However, Grace believes that it is adequately reserved for all probable and estimable environmental exposures.

Grace is in litigation with certain excess insurance carriers regarding the applicability of the carriers' policies to environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage (except in one instance where Grace settled with the carriers).

## Year 2000 Computer Systems Compliance

Grace has reviewed the software systems and related applications used in each of its operating business segments and geographic regions to assess its requirements regarding the "Year 2000 Issue," which generally refers to the inability of systems hardware and software to correctly identify two-digit references to specific calendar years, beginning with 2000. The Year 2000 Issue can affect a company directly (i.e., in its internal data-based operations or processing) or indirectly (e.g., if its suppliers' and customers' systems are not "Year 2000-Compliant"). As a result of its review, Grace is (1) purchasing and implementing new software applications that a major international supplier of financial and business information software systems has certified to be Year 2000-Compliant, (2) upgrading existing systems by installing new software releases that are similarly certified and (3) using Grace personnel, or contracting with outside programming services, to modify coding and to make other changes necessary to achieve compliance.

**5**

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K
### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1998 Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

### 1750 CLINT MOORE ROAD, BOCA RATON, FLORIDA 33487-2707
### 561/362-2000

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|  |  |  |
|---|---|---|
| TITLE OF EACH CLASS | | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
| Common Stock, $.01 par value<br>Preferred Stock Purchase Rights | }<br>} | New York Stock Exchange, Inc. |
| 7-3/4% Notes Due 2002<br> (issued by W. R. Grace & Co.-Conn.,<br>a wholly owned subsidiary) and<br>related Guarantees | }<br>}<br>}<br>} | New York Stock Exchan ge, Inc. |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in the Proxy Statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of W. R. Grace & Co. voting stock held by nonaffiliates was approximately $904 million at March 12, 1999.

At March 12, 1999, 71,523,877 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

W. R. Grace & Co. is incorporating by reference into Part III of this Annual Report on Form 10-K specified portions of its Proxy Statement for its Annual Meeting of Shareholders to be held May 11, 1999.

---

### TABLE OF CONTENTS

PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 1.    Business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 Introduction and Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 Products and Markets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 Discontinued Operations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 Research Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 Patents and Other Intellectual Property Matters. . . . . . . . .
                Environmental, Health and Safety Matters. . . . . . . . . . . . . . . . . . .
    Item 2.    Properties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 3.    Legal Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 4.    Submission of Matters to a Vote of Security Holders. . . . . . . . .
    Executive Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

PART II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 5.    Market for Registrant's Common Equity and Related Shareholde
    Item 6.    Selected Financial Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 7.    Management's Disc ussion and Analysis of Financial
                 Condition and Results of Operations. . . . . . . . . . . . . . . . . . . . .
    Item 7A.   Quantitative and Qualitative Disclosures About Market Risk. .
    Item 8.    Financial Statements and Supplementary Data. . . . . . . . . . . . . . . .
    Item 9.    Changes in and Di sagreements with Accountants on
                 Accounting and Financial Disclosure. . . . . . . . . . . . . . . . . . . .

PART III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 10.   Directors and Executive Officers of the Registrant. . . . . . . . .
    Item 11.   Executive Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 12.   Security Ownership of Certain Beneficial Owners and Manageme
    Item 13.   Certain Relationships and Related Transactions. . . . . . . . . . . . .

PART IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Item 14.   Exhibits, Financial Statement Schedules, and Reports on Form

SIGNATURES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
FINANCIAL SUPPLEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

### PART I

## ITEM 1. BUSINESS.

### INTRODUCTION AND OVERVIEW

W. R. Grace & Co., through its subsidiaries, is one of the world's leading specialty chemicals companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace primarily operates through the following three business units:

and emergency response, distribution, process safety and pollution prevention.

See Item 3 below for information concerning environmental proceedings to which Grace is a party.

## ITEM 2. PROPERTIES.

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by two or more of Grace's business units, and since the disposition of the Packaging Business, some plants and facilities are shared with Sealed Air Corporation. Grace considers its major operating properties to be in good oper ating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See Note 17 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Additional information regarding Grace's properties is set forth in   Item 1 above and in Notes 1, 8 and 11 to the Consolidated Financial Statements.

## ITEM 3. LEGAL PROCEEDINGS.

Asbestos Litigation. Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 45,100 asbestos-related lawsuits at December 31, 1998 (14 involving claims for property damage and the remainder involving approximately 97,000 claims for personal injury), as compared to approximately 40,600 lawsuits at year-end 1997 (18 involving claims for property damage and the remainder involving approximately 96,900 claims for personal injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through December 31, 1998, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 200 property damage cases were settled for a total of $587.9 million.

10

Included in the asbestos property damage cases pending against Grace and others at December 31, 1998 were the following class actions: (i) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials, which Grace has moved to decertify (Central Wesleyan College, et al. v. W. R. Grace, et al.); and (ii) a purported class action (Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al.), filed

in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

Cumulatively through December 31, 1998, approximately 13,700 personal injury lawsuits involving 30,700 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 43,900 such suits involving approximately 108,700 claims were disposed of for a total of $347.3 million. See "Insurance Litigation" below.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace also has settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-related personal injury claims. Since 1996, Grace had been accruing for all current asbestos-related personal injury claims and those expected to be asserted over the ensuing five year period. Based on Grace's experience and recent trends in asbestos personal injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future personal injury claims expected to be asserted, and now will accrue for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1998 was $1,194.1 million; this amount reflects all asbestos-related property damage and personal injury cases and claims then pending (except for one property damage case as to which liability is not yet estimable because Grace has not yet been able to obtain sufficient information through discovery proceedings), as well as all personal injury claims expected to be filed in the future. Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the actual number and nature of claims filed and the extent to which insurance will cover damages for which it may be liable, amounts paid in settlement and litigation costs.

11

At December 31, 1998, Grace had recorded a receivable of $425 million, as well as notes receivable of $18 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims, including all projected personal injury cases as described above.

A May 1994 decision of the U.S. Court of Appeals for the Second Circuit limited the amount of insurance coverage available to Grace with respect to property damage cases. Because Grace's insurance covers both property damage and personal injury cases and claims, the May 1994 decision has had the concomitant effect of reducing the insurance coverage available with respect to Grace's asbestos

personal injury claims. However, in Grace's opinion (which is not based on a formal opinion of counsel), it is probable that recoveries from its insurance carriers, along with other funds, will be available to satisfy the property damage and personal injury cases and claims pending at December 31, 1998, as well as personal injury claims expected to be filed in the future. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated financial position.

See "Insurance Litigation" and Note 2 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 1998, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities.

In November 1995, Grace received a letter from the U.S. Department of Energy ("DOE") inquiring as to Grace's willingness to contribute to the continued cleanup of a former Grace property located in Wayne, New Jersey. The operations conducted by Grace at the Wayne site (from 1955 to 1970) included work done on radioactive materials under contract with the U.S. government. In 1998, Grace and the U.S. government executed a consent decree in settlement of this claim. Under the terms of the decree, Grace would pay $31.77 million to the U.S. government. Grace has placed $25.77 million into an escrow account pending approval of the decree by the United States District Court in New Jersey.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies

12

or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge or disposition of hazardous wastes and other materials.

Grace believes that the liabilities for environmental remediation costs, including costs relating to environmental proceedings, that have been recorded in Grace's historical financial statements are adequate. In addition, Grace has been involved in litigation with its insurance carriers, seeking reimbursement from them for certain amounts for which Grace may be held liable with respect to such costs. In 1998, Grace entered into a settlement agreement with one of its carriers and received payment of $57 million. One proceeding with another carrier is still pending. The outcome of this litigation, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain. However, Grace believes that the resolution of pending environmental proceedings will not have a material adverse effect on the consolidated financial position or liquidity of Grace. For further

information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Insurance Litigation. Grace is involved in litigation with certain of its insurance carriers with respect to asbestos-related insurance claims and environmental liabilities. The relief sought by Grace in these actions would provide insurance that would partially offset Grace's estimated exposure with respect to amounts previously expended, and that may be expended in the future, by Grace to defend claims, satisfy judgments and fund settlements. Grace has settled all of its asbestos-related insurance coverage actions, with the exception of Maryland Casualty Co. v. W. R. Grace & Co. (filed April 13, 1988), pending in the U.S. District Court for the Southern District of New York, in which Grace is asserting claims for insurance coverage for its asbestos-related personal injury liabilities.

Pursuant to settlements with primary-level and excess-level insurance carriers, Grace received payments totaling $568.2 million prior to 1996, as well as payments totaling $184.5 million in 1996, $68.7 million in 1997 and $74.0 in 1998. Grace expects to receive additional amounts from insurance carriers and has recorded receivables to reflect the expected amounts, as discussed above under "Asbestos Litigation." As a result of these settlements, Grace's asbestos-related insurance claims have been dismissed as to the primary-level product liability insurance coverage previously sold by the relevant insurers to Grace, as well as to many of Grace's excess-level liability insurers.

Grace's only two environmental insurance coverage actions are pending in the U.S. District Court for the Southern District of New York. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed June 21, 1988). Litigation continues in this case as to a certain primary-level carrier that has not settled with respect to claims for environmental property damage. The second case, entitled Uniguard v. W. R. Grace, was filed on December 17, 1997. This declaratory judgment action seeks a determination concerning the liability of one excess carrier for personal injury claims as a result of environmental contamination.

See "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

13

Fumed Silica Plant Litigation. In 1993, Grace and certain of its subsidiaries initiated legal action in the Belgian courts against the Flemish government to recover losses resulting from the closing of one subsidiary's fumed silica plant in Puurs, Belgium. The action seeks damages in excess of four billion Belgian francs (approximately $116 million at the December 31, 1998 exchange rate), plus interest and lost profits. This claim was dismissed at the trial court level and is now being appealed. The trial court also determined that a subsidiary should repay approximately 239 million Belgian francs (approximately $6.9 million at the December 31, 1998 exchange rate), plus interest, to the Flemish government for previously received investment grants; this decision is also being appealed.

U.S. Justice Department Lawsuit. The U.S. Justice Department has intervened in a qui tam lawsuit, originally filed in June 1995, pending in the U.S. District Court for the Northern District of California (United States ex rel. Robert Costa and Ronald Thornburg, et al. v. Baker & Taylor, Inc., et al.). The complaint in this lawsuit alleges that Baker & Taylor Books, a book wholesaler sold by Grace in 1992, overcharged public schools, libraries and federal agencies during the last ten years, including the period during which Baker & Taylor Books was owned by Grace. Grace and Baker & Taylor, Inc. (the entity that currently operates Baker & Taylor Books) have been named as defendants. The lawsuit seeks unspecified damages, punitive damages and civil penalties, as well as attorneys' fees and expenses and

such other relief as the Court may deem proper. At this time, Grace is unable to determine the liability, if any, to which it may be subject as a result of this lawsuit.

Shareholder Litigation. W. R. Grace & Co., a New York corporation subsequently renamed Fresenius Medical Care Holdings, Inc. ("Grace New York"), and former members of the Grace New York Board of Directors (as well as J. P. Bolduc, who resigned as president and chief executive officer and a director of Grace New York in March 1995) were named as defendants in a case entitled Weiser, et al. v. Grace, et al. pending in New York State Supreme Court, New York County. The consolidated amended complaint in this lawsuit, which purports to be a derivative action (i.e., an action brought on behalf of Grace New York), alleges, among other things, that the individual defendants breached their fiduciary duties to Grace New York (i) by providing J. Peter Grace, Jr. (the chairman and a director of Grace New York until his death in April 1995) with certain compensation arrangements upon his voluntary retirement as Grace New York's chief executive officer in 1992 and (ii) by approving Mr. Bolduc's severance arrangements, and that Messrs. Grace and Bolduc breached their fiduciary duties by accepting such benefits and payments. The lawsuit seeks unspecified damages, the cancellation of all allegedly improper agreements, the cancellation of a retirement plan for nonemployee directors (which was terminated by Grace in 1997), the return of all remuneration paid to the directors who are defendants while they were in breach of their fiduciary duties to Grace New York, attorneys' and experts' fees and costs, and such other relief as the Court deems proper. A motion to intervene in the case by the California Public Employees' Retirement System was granted by the Court in September 1996. Grace appointed a special committee of independent directors to investigate the allegations made in the Weiser action. In March 1998, the special committee filed a motion to dismiss the Weiser action on the grounds that it is without merit and that the prosecution of the action is not in the best interests of the Company and its shareholders. The motion is pending.

Under the terms of the Distribution Agreement ("NMC Distribution Agreement") entered into in connection with the reorganization of Grace New York in September 1996 (the "NMC Transaction") described in Notes 1 and 3 to the Consolidated Financial Statements in the Financial Supplement, Grace

14

---

remains financially responsible for any liabilities incurred by Grace New York and others as a result of this lawsuit, including the fees and disbursements of counsel for Grace and, subject to certain conditions, counsel for the individual defendants (including certain current and former directors of Grace). The discussions of the NMC Distribution Agreement appearing above and in the following paragraphs do not purport to be complete and are qualified in their entirety by reference to the NMC Distribution Agreement, which was filed as an exhibit to the Joint Proxy Statement-Prospectus of Grace New York dated August 2, 1996.

Securities and Exchange Commission Lawsuit. In April 1996, Grace New York received a formal order of investigation issued by the U.S. Securities and Exchange Commission ("SEC") directing an investigation into, among other things, whether Grace New York violated the U.S. federal securities laws by filing periodic reports with the SEC that contained false and misleading financial information. On December 22, 1998, the SEC filed an action against the Company. The complaint alleges that from 1991 through 1995, Grace New York deferred reporting income earned by its subsidiary, National Medical Care, Inc. ("NMC"), primarily to smooth earnings of the Grace New York health care group in violation of the antifraud, reporting and books and records provisions of the Securities Exchange Act of 1934. Grace New York's outside auditor, Price Waterhouse LLP, was aware of the reserves and issued unqualified opinions on the consolidated financial statements in each of the years in question. The allegations of the SEC complaint do not challenge any of the Company's recent financial statements.

The Company intends to vigorously contest the allegation of fraud and does not expect the litigation to have a material impact on earnings.

Under the terms of the NMC Distribution Agreement, Grace remains financially responsible for any liabilities incurred by Grace New York and others as a result of the investigation and suit described above, including the fees and disbursements of counsel for Grace and, subject to certain conditions, counsel for certain former directors and officers of Grace.

Liabilities Relating to NMC. The NMC Distribution Agreement provides generally for certain cross-indemnities designed to place with Grace New York (which has become a subsidiary of Fresenius AG, a German corporation not affiliated with Grace) financial responsibility for the liabilities of the health care businesses formerly owned by Grace New York (including, without limitation, all liabilities relating to compliance or noncompliance with U.S. food and drug law, medical and Medicare billing and reimbursement law and other health care matters) and to place with Grace financial responsibility for the other liabilities of Grace New York and its other subsidiaries (including, without limitation, liabilities relating to the manufacture or sale of asbestos-containing materials by the specialty chemicals businesses). Grace and Grace New York have asserted claims against each other for indemnity with respect to claims asserted by third parties pursuant to the terms of these provisions.

See Note 3 to the Consolidated Financial Statements for additional information concerning certain litigation and proceedings involving NMC.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 1998.

15

---

## EXECUTIVE OFFICERS

The Company's current executive officers are listed below. Executive officers are elected to serve until the following annual meeting of the Company's Board of Directors. The next annual meeting of the Company's Board of Directors is scheduled to be held on May 11, 1999.

| Name and Age | Office |
|---|---|
| Robert J. Bettacchi (56) | Senior Vice President |
| Kathleen A. Browne (43) | Vice President and Controller |
| Larry Ellberger (51) | Senior Vice President and Chief Financial Officer |
| James R. Hyde (60) | Senior Vice President |
| W. Brian McGowan (49) | Senior Vice President |
| Paul McMahon (41) | Vice President and Treasurer |

purposes.

OTHER INCOME: Other income consists of interest income, equity in earnings of affiliated companies, gains on sales of investments and other items.

## 2. ASBESTOS AND RELATED INSURANCE LITIGATION

Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 45,100 asbestos-related lawsuits at December 31, 1998 (14 involving claims for property damage and the remainder involving approximately 97,000 claims for personal injury), as compared to approximately 40,600 lawsuits at December 31, 1997 (18 involving claims for property damage and the remainder involving approximately 96,900 claims for personal injury).

F-9

## PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Some of this information is not yet available in the property damage cases currently pending against Grace. Accordingly, it is not possible to estimate with precision the costs of defending against and disposing of these cases. In accordance with SFAS No. 5, "Accounting for Contingencies," Grace has recorded an accrual for all existing property damage cases for which sufficient information is available to form a range of estimated exposure. At December 31, 1998, an estimate was not accrued for one case, due to insufficient information. Grace believes that the number of property damage cases to be filed in the future and the costs associated with such filings are not estimable.

Through December 31, 1998, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases (none of which is on appeal) for a total of $60.3; and 200 property damage cases were settled for a total of $587.9. Property damage case activity for 1998 and 1997 was as follows:

|  | 1998 | 1997 |
|---|---|---|
| Cases outstanding, beginning of year..... ......... | 18 | 31 |
| New cases filed............................ ......... | 2 | 1 |
| Settlements................................. ......... | (5) | (9) |
| Dismissals................................. ......... | (1) | (4) |
| Judgments................................. ......... | -- | (1) |
|  | --- | --- |
| Cases outstanding, end of year...... ......... | 14 | 18 |

==                    ==

## PERSONAL INJURY LITIGATION

Personal injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other former asbestos producers, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims.

Through December 31, 1998, approximately 13,700 asbestos personal injury lawsuits involving 30,700 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 43,900 lawsuits involving 108,700 claims were disposed of for a total of $347.3. Personal injury claim activity for 1998 and 1997 was as follows:

|                                            | 1998      | 1997      |
| ------------------------------------------ | --------- | --------- |
| Claims outstanding, beginning of year....  | 96,933    | 91,511    |
| New claims................................ | 20,993    | 30,339    |
| Settlements............................... | (19,503)  | (22,957)  |
| Dismissals................................ | (1,399)   | (1,955)   |
| Judgments................................. | (7)       | (5)       |
| Claims outstanding, end of year.....       | 97,017    | 96,933    |

## ASBESTOS-RELATED LIABILITY

In the fourth quarter of 1996, Grace recorded a noncash net pretax charge of $229.1 ($148.9 after-tax) after estimated insurance recoveries of $119.3, for the estimated costs of defending against and disposing of asbestos personal injury claims expected to be filed during the five-year period 1997-2001. Based on experience with, and recent trends in, asbestos personal injury litigation, Grace believes it can reasonably forecast the number and ultimate cost of present and future personal injury claims expected to be asserted through 2039. The change in the accrual period for asbestos-related personal injury litigation resulted in a fourth quarter noncash net pretax charge of $376.1 ($244.4 after-tax) after estimated insurance recoveries of $200.8. The provision consists of an addition of $576.9 to the asbestos liability for personal injury indemnity and defense costs, partially offset by expected recoveries from insurance carriers. The asbestos liability (including personal injury and property damage), net of insurance recoveries, is $751.1 at December 31, 1998. The personal injury asbestos accrual as of December 31, 1998 is based on Grace's best estimate of the full cost of resolving these liabilities through 2039.

F-10

Based upon and subject to the factors discussed above, Grace estimates that its probable liability with respect to the defense and disposition of asbestos property damage and personal injury cases and claims was as follows at December 31, 1998 and 1997:

| | 1998 | 1997 |
|---|---|---|
| Current liability for asbestos-related litigation ......... | $  93.0 | $ 236 |
| Noncurrent liability for asbestos-related litigation....... | 1,101.1 | 619 |
| Total asbestos-related liability..................... | $1,194.1 | $ 855 |

## ASBESTOS-RELATED INSURANCE RECEIVABLE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during 1998 and 1997 was as follows:

NOTES RECEIVABLE
Notes receivable from insurance carriers, beginning of year, net of discount of $4.8
Proceeds received under asbestos-related insurance settlements......................
Current year amortization of discount............................................

    Notes receivable from insurance carriers, end of year, net of discount of $2.3

INSURANCE RECEIVABLE
Asbestos-related insurance receivable, beginning of year...........................
Proceeds received under asbestos-related insurance settlements.....................
Increase in asbestos-related insurance receivable.................................

    Asbestos-related insurance receivable, end of year ...........................


    Total amounts due from insurance carriers................................
    Less current asbestos receivable.........................................

    Noncurrent asbestos receivable...........................................

Notes receivable from insurance carriers represent amounts due from insurance carriers in reimbursement for amounts previously paid by Grace in defending against and disposing of asbestos cases and claims; payments under these notes will be received through 2001. These notes do not bear stated interest rates and, therefore, have been discounted using a weighted average interest rate of 6.7%. Installments due in 1999 are classified as "current" in the Consolidated Balance Sheet. The asbestos-related insurance receivable represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate to property damage and personal injury cases and claims pending at year-end 1998 and personal injury claims expected to be filed through 2039 (through 2002 at December 31, 1997). Certain of Grace's insurance carriers have become insolvent. From time to time, Grace has been

successful in collecting funds from insolvent carriers, which were not previously accrued. As discussed above, in the fourth quarter of 1996, Grace recorded a noncash pretax benefit of $119.3 ($77.5 after-tax), primarily representing the additional insurance proceeds Grace expects to receive in reimbursement for the cash outflows associated with personal injury claims expected to be filed against Grace through 2001. Grace also recorded a noncash pretax benefit of $200.8 ($130.5 after-tax) in the fourth quarter of 1998, representing estimated recoveries from insurance carriers in reimbursement for indemnity and defense costs for personal injury claims expected to be filed against Grace through 2039.

## INSURANCE LITIGATION

Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, it is probable that recoveries from its insurance carriers (including amounts reflected in the receivable discussed above), along with other funds, will be available to satisfy the property damage and personal injury cases and claims pending at December 31, 1998, as well as personal injury claims expected to be filed in the future. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated financial position.

F-11

## 3. DISCONTINUED OPERATIONS

## PACKAGING BUSINESS TRANSACTION

As discussed in Note 1 above, the Spin-off and the Merger were completed on March 31, 1998. Prior to the Spin-off and the Merger, Old Grace and a Packaging Business subsidiary borrowed $1,258.8 (inclusive of $2.2 of bank fees) and made a cash transfer of $1,256.6 to Grace, which used the transferred funds to repay substantially all of Grace's debt (see Note 9). The borrowed funds are shown as a net financing activity of discontinued operations in the Consolidated Statement of Cash Flows. In the Merger and a related recapitalization, for each Old Grace common share outstanding at the close of trading on March 31, 1998, each shareholder received .536 shares of New Sealed Air common stock and .475 shares of New Sealed Air convertible preferred stock. Upon the completion of the Spin-off and the Merger, the shareholders of Old Grace owned (a) 100% of the specialty chemicals businesses (through their ownership of 100% of the Company's outstanding shares) and (b) approximately 63% of New Sealed Air, on a fully diluted basis.

The Packaging Business transaction resulted in an adjustment to shareholders' equity of $196.4, representing Grace's investment in the Packaging Business less the $1,258.8 of borrowings discussed above.

For further information, see the Company's Joint Proxy Statement/Prospectus dated February 13, 1998 and the New Grace Information Statement dated February 13, 1998.

## HEALTH CARE
## NMC

Merger described in Notes 1 and 3. In connection with the Packaging Business transaction, Grace received $1,256.6 million in cash, which was used to repay substantially all of its debt. On March 31, 1998, Grace used $600.0 million of the cash transfer to repay bank borrowings. On April 1, 1998, Grace repaid $611.3 million principal amount of Notes pursuant to a tender offer, $3.5 million principal amount of MTNs and $6.0 million of sundry indebtedness. As a result of this extinguishment of debt, Grace incurred an after-tax charge of $35.3 million for premiums paid in excess of the Notes' principal amounts and other costs related to the purchase of the Notes and MTNs (including the costs of settling related interest rate swap agreements). These costs are presented as an extraordinary item in the Consolidated Statement of Operations. Net cash used for financing activities in 1997 was $621.3 million, primarily relating to reductions of debt, the repurchase of 6.3 million shares of stock, and the payment of dividends, partially offset by proceeds from the exercise of employee stock options. Total debt was $113.4 million at December 31, 1998, a decrease of $958.9 million from December 31, 1997.

Grace has targeted a ratio of debt to EBITDA (earnings before interest, taxes, depreciation and amortization, restructuring and asbestos charges and gains on sales of businesses) of less than 1.0. This ratio represents a long-term target that may be exceeded to meet specific needs on a short-term basis. At December 31, 1998, the debt/EBITDA ratio was .37.

At December 31, 1998, Grace had committed borrowing facilities totaling $850.0 million, consisting of $600.0 million under a 364-day facility expiring in May 1999 (extendible for successive 364-day periods at the discretion of Grace and the lenders) and $250.0 million under a long-term facility expiring in May 2003. These facilities also support the issuance of commercial paper and bank borrowings, of which $75.0 million was outstanding at December 31, 1998. The aggregate amount of net unused and unreserved borrowings under short-term and long-term facilities at December 31, 1998 was $775.0 million.

In April 1998, the Company's Board of Directors approved a program to repurchase up to 20% of the Company's outstanding shares in the open market (approximately 15,165,000 shares). Through December 31, 1998, the Company had acquired 5,149,100 shares of common stock for $83.1 million under the program (an average price per share of $16.14). Cash payments for settled share repurchases were $82.2 million through December 31, 1998.

In 1997, Grace substantially completed a share repurchase program initiated in 1996 by acquiring 6,306,300 shares of common stock for $335.9 million, or an average price of $53.26 per share. In 1996, Grace acquired 21,058,500 shares of common stock for $1,319.3 million, or an average price of $62.65 per share. Prior to year-end 1997 and 1996, Grace retired substantially all of the treasury stock acquired in those years using the cost method. Average prices per share for shares repurchased in 1997 and 1996 are not comparable to 1998 due to the Packaging Business transaction (see Notes 1 and 3).

Grace believes that cash flow generated from future operations and committed borrowing facilities will be sufficient to meet its cash requirements for the foreseeable future.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 1998, Grace paid $164.7 million for the defense and disposition of asbestos-related property damage and personal injury litigation, net of amounts received under settlements with insurance carriers. During the fourth quarter of 1998, Grace recorded a noncash pretax charge of $576.9 million ($375.0 million after-tax), primarily to reflect the estimated costs of defending against and disposing of personal injury claims expected to be filed through 2039. The charge to the litigation reserve was offset by an adjustment for expected recoveries from insurance carriers of $200.8 million ($130.5 million after-tax). The balance sheet at December 31, 1998 includes total amounts due from insurance carriers of $443.0 million which

includes notes receivable of $20.3 million ($18.0 million after discounts) for amounts to be received through 2001, pursuant to settlement agreements with insurance carriers.

F-35

Grace has periodically evaluated projections for the ultimate asbestos personal injury liability and has determined the change in accrual period from "5-years forward" estimates to a full cost period extending to 2039 for personal injury indemnity and defense costs based on experience and trends in litigation. Grace continues to accrue for property damage cases currently asserted, as in the past.

Although the total amount to be paid in 1999 with respect to asbestos-related claims (after giving effect to payments to be received from insurance carriers) cannot be precisely estimated, Grace expects that the net expenditure for 1999 will range from $35.0-$55.0 million (pretax) to defend against and dispose of such claims. The 1998 expenditures included a 1997 property damage settlement partially paid in 1998 and personal injury group settlements resolved in 1997 and paid in 1998. The amounts with respect to the probable cost of defending against and disposing of asbestos-related claims and probable recoveries from insurance carriers represent estimates and are on an undiscounted basis; the outcomes of such claims cannot be predicted with certainty.

In May 1997, the Texas legislature adopted legislation that had the effect of making it more difficult for out-of-state residents to file asbestos personal injury claims in Texas state courts. Although the rate of filing asbestos claims in Texas during the second half of 1997 was lower than that of the first half of 1997, and decreased by 70% in 1998, the effect of this legislation on Grace's ultimate exposure with respect to its asbestos-related cases and claims cannot be predicted with certainty.

See Note 2 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Worldwide expenses of continuing operations related to the operation and maintenance of environmental facilities and the disposal of hazardous and nonhazardous wastes totaled $38.2 million in 1998, $35.8 million in 1997 and $32.7 million in 1996. Such costs are estimated to be $35-$40 million in both 1999 and 2000. In addition, worldwide capital expenditures for continuing operations relating to environmental protection totaled $6.3 million in 1998, compared to $7.2 million in 1997 and $10.4 million in 1996. Capital expenditures to comply with environmental initiatives in future years are estimated to be approximately $9.0 million in 1999 and $6.0 million in 2000. Grace also has incurred costs to remediate environmentally impaired sites. These costs were $37.7 million in 1998, $33.9 million in 1997 and $20.3 million in 1996. These amounts have been charged against previously established reserves. Future pretax cash outlays for remediation costs are expected to average $35 to $40 million over the next few years. Expenditures have been funded from internal sources of cash and are not expected to have a significant effect on liquidity.

Grace accrues for anticipated costs associated with investigatory and remediation efforts where an assessment has indicated that a liability has been incurred and the amount of loss can be reasonably estimated. In the fourth quarter of 1998, Grace recorded a net pretax gain of $38.2 million ($24.8 million after-tax) related to environmental issues. Grace entered into a settlement with one of its insurance carriers which provided for a $57.6 million lump-sum cash payment to Grace for previously incurred costs related to environmental remediation. Netted against this gain is a $19.4 million ($12.6 million after-tax) charge to reflect a change in the environmental remediation strategy for a particular site. It is

expected that the cash associated with this incremental charge will be spent over the next several years. At December 31, 1998, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $240.5 million, as compared to $258.8 million at December 31, 1997.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. As some of these issues are decided (the outcomes of which are subject to uncertainties) or new sites are assessed and costs can be reasonably estimated, Grace will continue to review and analyze the need for adjustments to the recorded accruals. However, Grace believes that it is adequately reserved for all probable and estimable environmental exposures.

Grace is in litigation with certain excess insurance carriers regarding the applicability of the carriers' policies to environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

## YEAR 2000 COMPUTER SYSTEMS COMPLIANCE

### OVERVIEW

Grace has reviewed its Year 2000 compliance efforts by business segment. Each business segment and Grace Corporate has appointed a project leader to coordinate a comprehensive review of all systems used by Grace to determine to what extent Grace may be affected by the failure of its systems to be Year 2000 compliant. In addition, the project leader for Grace Corporate also functions as Grace's overall project director, reporting directly to the chief executive officer.

F-36

Grace is reviewing both its information technology ("IT") and non-information technology ("non-IT") systems for Year 2000 compliance. IT systems include hardware, infrastructure, local and wide area networks, software, application systems, electronic data exchange and interfaces. Non-IT systems cover process control and manufacturing support equipment, laboratory systems, instruments and scales, telecommunications, and facility and utility support systems. Non-IT systems include systems containing date dependent software as well as embedded date dependent chip technology. Grace is targeting to achieve Year 2000 compliance for all of its critical IT and non-IT systems by mid-1999.

### GRACE'S CURRENT STATE OF YEAR 2000 READINESS

Inventory

Grace has completed an inventory of its IT and non-IT systems that could potentially be affected by the Year 2000 issue for each of its business segments and Grace Corporate, with the exception of three joint venture operations and a few small sales offices which will be completed during March 1999. All inventoried systems have been prioritized as being either critical or non-critical. A critical system is one where failure to be Year 2000 compliant may have a material adverse effect on health and safety, the environment or on Grace's financial condition or results of operations. A non-critical system is one where failure to be Year 2000 compliant could produce brief business interruptions or system failures that may be remedied promptly but are not reasonably likely to have any such material adverse effect.