**6**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

## FORM 10-K/A

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1999 Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

### 7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098

410/531 -4000

```
SECURITIES REGISTERED  PURSUANT TO SECTION
             12(B) OF T HE ACT:
```

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 par value<br>Preferred Stock Purchase Rights } | New York Stock Exchange, Inc. |
| 7-3/4% Notes Due 2002<br>(issued by W. R. Grace & Co.-Conn.,<br>a wholly owned subsidiary) and<br>related Guarantees } | New York Stock Exchang e, Inc. |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in the Proxy Statement incorporated by reference in Part III of the previously filed 1999 Form 10-K. [X]

The aggregate market value of W. R. Grace & Co. voting stock held by nonaffiliates was approximately $668,308,406 at March 13, 2000.

At March 13, 2000, 67,186,224 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

W. R. Grace & Co. is incorporating by reference into Part III of the previously filed 1999 Annual Report on Form 10-K specified portions of its Proxy Statement for its Annual Meeting of Stockholders held May 10, 2000.

---

## PORTIONS AMENDED

The Registrant hereby amends Part II -- Items 6, 7, 7A and 8 and Part IV -- Item 14 contained in its report on Form 10-K for the fiscal year ended December 31, 1999 for the restatement of the Registrant's consolidated financial statements as of December 31, 1999 and 1998, and for the year ended December 31, 1998. Except as set forth in Items 6, 7, 7A, 8 and 14 below, no other changes are made to the Registrant's report on Form 10-K for the fiscal year ended December 31, 1999.

---

## TABLE OF CONTENTS

```
PART II.....................................................................
        Item 6.     Selected Financial Data...................................
        Item 7.     Management's Discussion and Analysis of Results of Operations
        Item 7A.    Quantitative and Qualitative Disclosures About Market Risk....
        Item 8.     Financial Statements and Supplementary Data..................

PART IV.....................................................................
        Item 14.    Exhibits, Financial Statement Schedules, and Reports on Form 8

SIGNATURES..................................................................

FINANCIAL SUPPLEMENT........................................................
```

---

## PART II

## ITEM 6. SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-29 of the Financial Supplement) and in Notes 3, 4, 11, 14 and 16 to the Consolidated Financial Statements (pages F-10, F-12, F-17, F-20 and F-22 of the Financial Supplement) which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-42 of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 1995-1999.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

| | | |
|---|---|---|
| Net (loss) ............. | (183.6) | (229.1) |
| Basic earnings per share: | | |
| Continuing operations . | (2.00) | (2.61) |
| Net (loss) ............ | (2.46) | (3.07) |
| Diluted earnings per share: | | |
| Continuing operations . | (2.00) | (2.61) |
| Net (loss) ............ | (2.46) | (3.07) |
| CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME (LOSS): | | |
| Comprehensive (loss) .. | (184.9) | (230.4) |

The restatement has no effect on the Consolidated Statement of Operations for the years ended December 31, 1999 and 1997, or the Consolidated Statement of Cash Flows for the years ended December 31, 1999, 1998 and 1997. The restatement does not affect the financial position or results of operations of Grace's operating segments as previously reported.

## 3. ASBESTOS-RELATED LITIGATION

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in 50,342 asbestos-related lawsuits at December 31, 1999 (11 involving claims for property damage and the remainder involving 105,670 claims for bodily injury), as compared to 45,086 lawsuits at December 31, 1998 (14 involving claims for property damage and the remainder involving 97,017 claims for bodily injury).

**PROPERTY DAMAGE LITIGATION**

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all existing property damage cases for which sufficient information is available to form a reasonable estimate of such exposure.

Through December 31, 1999, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million; and 203 property damage cases were settled for a total of $603.8 million.

| PROPERTY DAMAGE CASE ACTIVITY | 1999 | 1998 |
|---|---|---|
| Cases outstanding, beginning of year ........................ | 14 | 18 |
| New cases filed .............. | -- | 2 |
| Settlements ................. | (3) | (5) |
| Dismissals .................. | -- | (1) |
| Judgments ................... | -- | -- |
| Cases outstanding, end of year | 11 | 14 |

## BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other former asbestos producers, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace given demographic assumptions of possible exposure to asbestos products manufactured by Grace.

F-10

Through December 31, 1999, approximately 14,700 asbestos bodily injury lawsuits involving approximately 32,800 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 48,200 lawsuits involving approximately 124,900 claims were disposed of (through settlement and judgments) for a total of $410.3 million. Bodily injury claim activity for 1999 and 1998 was as follows:

| BODILY INJURY CLAIM ACTIVITY | 1999 | 1998 |
|---|---|---|
| Claims outstanding, beginning of year ........................ | 97,017 | 96,933 |
| New claims ................... | 26,941 | 20,993 |
| Settlements ................. | (16,174) | (19,503) |
| Dismissals .................. | (2,109) | (1,399) |
| Judgments ................... | (5) | (7) |
| Claims outstanding, end of year | 105,670 | 97,017 |

## ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its experience with, and recent trends in, asbestos litigation. These estimates include property damage and bodily injury indemnity as well as defense costs. Grace regularly evaluates its financial exposure to asbestos-related lawsuits and

the adequacy of related recorded liabilities. The amounts recorded at each balance sheet date reflect Grace's best estimate of probable and estimable liabilities in all material respects. However, changes to estimates of probable liabilities may occur as actual experience is gained over time. In the fourth quarter of 1998, a change in the accrual period for asbestos-related bodily injury litigation resulted in a noncash net pre-tax charge of $376.1 million ($244.4 million after-tax). The provision consisted of an addition of $576.9 million to the asbestos liability primarily for bodily injury indemnity and defense costs, partially offset by expected recoveries from insurance carriers of $200.8 million ($130.5 million after-tax).

```
==========================================  ========= =========
ESTIMATED LIABILITY FOR ASBESTOS-RELATED
   LITIGATION (Dollars in millions)           1999      1998
==========================================  ========= =========

Asbestos-related liability expected to
   be satisfied within one year......      $   199.3 $   95.5
Asbestos-related liability  expected
   to be satisfied after one year....          884.7 1,104.4
                                           --------- ---------
Total asbestos-related liability ...       $1,084.0 $1,19 9.9
==========================================  ========= =========
```

The current portion of Grace's asbestos-related liability is based on management's estimate of indemnity payments and defense costs expected to be paid within one year.

## ASBESTOS-RELATED INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during 1999 and 1998 was as follows:

```
==========================================  ========= =========
ESTIMATED INSURANCE RECOVERY ON
ASBESTOS-RELATED LIABILITIES
      (Dollars in millions)                   1999      1998
==========================================  ========= =========
NOTES RECEIVABLE
Notes receivable from insurance
   carriers, beginning of year, net of
   discount of $2.3 (1998 - $4.8)  ..      $   18.0 $   31.3
Proceeds received under
   asbestos-related insurance
   settlements ...................             (14.2)    (15.8)
Current year amortization of discount           1.5       2.5
-------------------------------------      --------- ---------
   Notes receivable from insurance
   carriers, end of year, net of
   discount of $0.8
      (1998 - $2.3) .................           5.3      18.0

-------------------------------------      --------- ---------
INSURANCE RECEIVABLE
Asbestos-related insurance receivable,
   beginning of  year ..............          425.0     282.4
Proceeds received under
   asbestos-related insurance                 (58.9)    (58.2)
```

```
   settlements ......................
Increase in asbestos-related insurance
   receivable .......................          --        200.8
---------------------------------------    ---------  ---------
Asbestos-related insurance
   receivable, end of year .........       366.1      425.0
---------------------------------------    ---------  ---------
Total amounts due from insurance
   carriers .........................       371.4      443.0
Expected to be realized within one
   year .............................       (75.2)     (66.7)
---------------------------------------    ---------  ---------
Expected to be realized after one
   year .............................    $  296.2  $  376.3
=======================================    =========  =========
```

Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for bodily injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related bodily injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate to property damage and bodily injury cases and claims pending at year-end 1999 and bodily injury claims expected to be filed in the future.

F-11

Notes receivable from insurance carriers do not bear stated interest rates and, therefore, have been discounted using a weighted average interest rate of 6.7%. Installments due in 2000 are classified as "current" in the Consolidated Balance Sheet. Payments under these notes will be received through 2001.

Grace's ultimate exposure with respect to its asbestos-related cases and claims partly depends on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, it is probable that recoveries from its insurance carriers (including amounts reflected as an asset discussed above), along with other funds, will be available to satisfy the property damage and bodily injury cases and claims pending at December 31, 1999, as well as bodily injury claims expected to be filed in the future.

## 4. DISCONTINUED OPERATIONS

## PACKAGING BUSINESS TRANSACTION

As discussed in Note 1, the Spin-off and the Merger were completed on March 31, 1998. Prior to the

## 14. COMMITMENTS AND CONTINGENT LIABILITIES

### ASBESTOS

In February 2000, a class action lawsuit was filed in U.S. District Court in Boston, Massachusetts against the Company on behalf of all owners of homes containing Zonolite(R) attic fill insulation, a product previously sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. While Grace has not completed its investigation of the claims described in this lawsuit, and therefore is not able to assess the extent of any possible liability related to this matter, it believes that this product is safe for its intended purpose and poses little or no threat to human health.

### ENVIRONMENTAL

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigatory and remediation efforts where an assessment has indicated that a liability has been incurred and the amount of loss can be reasonably estimated. These accruals do not take into account any discounting for the time value of money. At December 31, 1999, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $215.5 million, as compared to $240.5 million at December 31, 1998. In the fourth quarter of 1998, Grace entered into a settlement with one of its insurance carriers which provided for a $57.6 million ($37.4 million after-tax) lump-sum cash payment to Grace for previously incurred costs related to environmental remediation. Also during the fourth quarter of 1998, Grace recorded a $19.4 million ($12.6 million after-tax) charge to reflect a change in the environmental remediation strategy for a particular site. The 1998 activity reflects a net pre-tax benefit of $38.2 million ($24.8 million after-tax) related to environmental issues.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. As some of these issues are decided (the outcomes of which are subject to uncertainties) or new sites are assessed and costs can be reasonably estimated, Grace will continue to review and analyze the need for adjustments to the recorded accruals. However, Grace believes that it is adequately reserved for all probable and estimable environmental exposures. Grace's classification of its environmental reserves between current and noncurrent liabilities is based on expected future cash outlays.

Grace is in litigation with two excess insurance carriers regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

Grace made cash payments of $25.0 million in 1999, $36.9 million in 1998 and $37.3 million in 1997 to remediate environmentally impaired sites. These amounts have been charged against previously

established reserves.

In February 2000, a class action lawsuit was filed in U.S. District Court in Missoula, Montana against Grace on behalf of all owners of real property situated within 12 miles from Libby, Montana that are improved private

F-20

---

properties. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. While Grace has not completed its investigation of the claims, and therefore is not able to assess the extent of any possible liability related to this lawsuit, it has no reason to believe that its former activities caused damage to the environment or property.

## CONTINGENT RENTALS

Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $140.0 million, and are fully offset by anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that the risk of significant loss from these lease obligations is remote.

## INCOME TAXES

Grace has received notification from the Internal Revenue Service (IRS) on two matters. As a result of recent tax legislation, beginning in 1998, interest costs on policy loans for corporate-owned life insurance are not deductible for tax purposes. Furthermore, the IRS has asserted that Grace's past interest deductions are not allowable. The Company is contesting the IRS's position on the grounds that these insurance policies and related loans had, and continue to have, an important and valid business purpose to fund current and future obligations of Grace.

In the other matter, the IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 related to CCHP, Inc., a subsidiary of Grace, that formerly held Grace's interest in Cross County Staffing. The assessments were made in connection with a meal and incidental expense per diem plan for travelling nurses. In July of 1999, Grace sold the business and assets of CCHP but retained the potential tax liability. The matter is currently in the U.S. Court of Claims, where both CCHP and the Department of Justice are conducting discovery.

Grace has received notification from a foreign taxing authority assessing tax deficiencies plus interest relating to the purchase and sale of foreign bonds in 1989 and 1990. This assessment is related to the Bekaert Group which Grace sold in 1991 but retained liability for tax deficiencies attributable to tax periods prior to the sale. The matter is currently before the foreign tax authorities where protests have been filed but no decision has been rendered.

## NATIONAL MEDICAL CARE

```
Asbestos-related litigation, net
    of insurance recovery.........      (42.8)       (164.7)
Environmental remediation.........      (25.0)        (36.9)
Postretirement benefits...........      (19.6)        (21.0)
Retained obligations and other....      (71.7)          5.9
---------------------------------------  -------   ----------
NET CASH FLOW FROM NONCORE
    ACTIVITIES ..................... $    61.7    $  (289.0)
=======================================  =======   ==========
```

1   The Company also has committed, unused credit facilities of $410 million at
    December 31,1999.


2 Includes investing activities of discontinued operations.

The table above displays the 1999 and 1998 book value of Grace's noncore liabilities and the assets available to fund required payments. Each liability has different characteristics, risks and expected liquidation profile. Taken together, these liabilities represent $1,600.0 million of Grace's total liabilities as reflected on its balance sheet at December 31, 1999. Assets available to fund noncore liabilities consist of cash and cash equivalents, net cash value of life insurance where Grace is the beneficiary, property and investments not used in core operations, insurance coverage for asbestos-related litigation and net tax assets related to noncore liabilities. These assets, in the aggregate, total $1,044.3 million at December 31, 1999. The net liability position of $555.7 million at December 31, 1999 reflects a $150.6 million, or 21.3% reduction from December 31, 1998.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 1999, Grace paid $42.8 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers. At December 31, 1999 Grace's balance sheet reflects a net liability after insurance and after recorded tax benefits of $454.9 million, which represents management's best estimate (in conformity with generally accepted accounting principles) of the undiscounted net cash outflows in satisfaction of Grace's current and expected asbestos-related litigation. The net present value of such net liability (based on cash flow projections that are inherently imprecise but represent management's best current estimate) is approximately $350 million (discounted at
5.2% - estimated after-tax investment rate) at December 31, 1999.

During the fourth quarter of 1998, Grace recorded a noncash pre-tax charge of $576.9 million ($375.0 million after-tax), primarily to reflect the estimated costs of defending against and disposing of total bodily injury claims expected to be filed against Grace. The charge to the litigation reserve was offset by an adjustment for expected recoveries from insurance carriers of $200.8 million ($130.5 million after-tax) and recorded tax assets of $131.6 million for the future tax benefit arising from asbestos-related payments.

The Consolidated Balance Sheet at December 31, 1999 includes total amounts due from insurance carriers of $371.4 million pursuant to settlement agreements with insurance carriers and net tax assets of $257.7 million related to future net tax deductions for asbestos-related matters.

Grace expects that the net expenditures over the next three years will range from $40.0 to $80.0 million annually (after tax benefits) to defend against and dispose of such claims. The amount of spending in

2000 is expected to be higher

F-36

than 1999 due to the timing and adjudication of certain cases. Such amounts are estimates of the probable cost of defending against and disposing of asbestos-related claims and probable recoveries from insurance - the ultimate outcome of such matters cannot be predicted with certainty and estimates may change as experience evolves over time.

See Note 3 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Expenses of continuing operations related to the operation and maintenance of environmental facilities and the disposal of hazardous and nonhazardous wastes totaled $31.1 million in 1999, $38.2 million in 1998 and $35.8 million in 1997. Such costs are estimated to be between $33 and $38 million in each of 2000 and 2001. In addition, capital expenditures for continuing operations relating to environmental protection totaled $5.7 million in 1999, compared to $6.3 million in 1998 and $7.2 million in 1997. Capital expenditures to comply with environmental initiatives in future years are estimated to be approximately $7 million in each of 2000 and 2001. Grace also has incurred costs to remediate environmentally impaired sites. These costs were $25.0 million in 1999, $36.9 million in 1998 and $37.3 million in 1997. These amounts have been charged against previously established reserves. At December 31, 1999, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $215.5 million, as compared to $240.5 million at December 31, 1998. Future pre-tax cash outlays for remediation costs are expected to average between $38 and $43 million over the next few years.

In the fourth quarter of 1998, Grace recorded a net pre-tax gain of $38.2 million ($24.8 million after-tax) related to environmental issues. Grace entered into a settlement with one of its insurance carriers which provided for a $57.6 million lump-sum cash payment to Grace for previously incurred costs related to environmental remediation. Netted against this gain is a $19.4 million ($12.6 million after-tax) charge to reflect a change in the environmental remediation strategy for a particular site.

Grace is in litigation with two excess insurance carriers regarding the applicability of the carriers' policies to environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

See Note 14 to the Consolidated Financial Statements for further information concerning environmental matters.

## POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertains to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred.

7

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF

# THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2000 Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

### 7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|---|
| Common Stock, $.01 par value | } | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | } | |
| 7-3/4% Notes Due 2002 | } | |
| (issued by W. R. Grace & Co.-Conn., | } | New York Stock Exchange, Inc. |
| a wholly owned subsidiary) and | } | |
| related Guarantees | } | |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of W. R. Grace & Co. voting stock held by nonaffiliates was approximately $135,346,000 at March 12, 2001.

At March 12, 2001, 65,456,505 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

None.

TABLE OF CONTENTS

PART I................................................. .................................................1

    Item 1.  Business.............................. .................................................1
                Chapter 11 Filing....... ...................................1
                Business Overview....... ...................................1
                Products And Markets.... ...................................4
                Discontinued Operations. ...................................9
                Research Activities..... ...................................9
                Patents And Other Intell ectual Property Matters..............9
                Environmental, Health An d Safety Matters.....................10
    Item 2.  Properties............................ .................................11
    Item 3.  Legal Proceedings.......................................................11
    Item 4.  Submission of Matters to a V ote of Security Holders..............15

PART II................................................. .................................................16

    Item 5.  Market for Registrant's Comm on Equity and Related
                Shareholder Matters...... .................................16
    Item 6.  Selected Financial Data.... .................................17
    Item 7.  Management's Discussion and  Analysis of Results of Operations
                and Financial Condition... .................................18
    Item 7A. Quantitative and Qualitative  Disclosures About Market Risk.......18
    Item 8.  Financial Statements and Sup plementary Data.....................18
    Item 9.  Changes in and Disagreements  with Accountants on Accounting
                and Financial Disclosure.. .................................18

PART III................................................. .................................................18

    Item 10. Directors and Executive Offi cers of the Registrant..............18
    Item 11. Executive Compensation.......................................20
    Item 12. Security Ownership of Certai n Beneficial Owners and Management...31
    Item 13. Certain Relationships and Re lated Transactions...................33

PART IV................................................. .................................................33

    Item 14. Exhibits, Financial Statemen t Schedules, and Reports on
                Form 8-K.................................. ...............33

SIGNATURES.............................................. .................................................39

FINANCIAL SUPPLEMENT.................................... .................................F -1

## PART I

## ITEM 1. BUSINESS

### CHAPTER 11 FILING

On April 2, 2001, W. R. Grace & Co. ("Grace" or the "Company") and 61 of its United States subsidiaries and affiliates filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in United States Bankruptcy Court for the District of Delaware. The cases were consolidated for the purpose of joint administration and were assigned case numbers 01-1139 through 01-1200. None of the Company's foreign subsidiaries were included in the filing.

The filing was made in response to a sharply increasing number of asbestos-related bodily injury claims. Under Chapter 11, Grace expects to continue to operate its businesses as debtor-in-possession under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it.

Prior to 2000, Grace was able to settle asbestos-related claims through direct negotiations. The filings of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in bodily injury claims, which Grace believes is due to a surge in unmeritorious claims. Trends in case filings and settlement demands, which show no signs of returning to historic levels, and which have been exacerbated by the Chapter 11 filings of several co-defendants in asbestos bodily injury litigation, increased the risk that Grace would not be able to resolve its pending and future asbestos claims under the current state court system.

Grace has concluded that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims settlement process. By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

Grace's asbestos-related litigation and Chapter 11 filing is further discussed in Item 3 of this Report, and in Notes 1 and 3 to Grace's Consolidated Financial Statements for the three years in the period ended December 31, 2000 ("Consolidated Financial Statements") and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

### BUSINESS OVERVIEW

W. R. Grace & Co., through its subsidiaries, is one of the world's leading specialty chemicals companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace primarily operates in the following two business segments:

o Davison Chemicals manufactures catalysts and silica-based products. Davison Chemicals' catalysts include (1) fluid cracking catalysts and additives used by petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; (2) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities; and (3) polyolefin catalysts and catalyst supports that

# ITEM 3. LEGAL PROCEEDINGS

Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (15 involving claims for property damages, including 8 relating to Grace's former attic insulation product, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving claims for property damage, none of which relates to attic insulation, and the remainder involving 105,670 claims for bodily injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through December 31, 2000, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing Zonolite(R) attic fill insulation, a product previously sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. Since Lindholm was filed, eight additional purported class action lawsuits have been filed against Grace in various state and federal courts asserting similar claims and seeking similar damages to those in Lindholm. One of the purported federal class actions has been consolidated with

11

Lindholm, and all the purported federal class actions have been transferred to the U.S. District Court for the Eastern District of Massachusetts. Purported class actions in California, Minnesota, Illinois and Washington were pending in state courts at the time of Grace's Chapter 11 filing. While Grace has not completed its investigation of the claims described in these lawsuits, Grace believes that this product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through December 31, 2000, approximately 16,200 bodily injury lawsuits involving approximately 35,500 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 53,400 lawsuits involving approximately 151,800 claims were disposed of for a total of $561.8 million.

Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31, 2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending (except for the cases and claims related to Grace's attic fill litigation as described above), as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the

recorded liability.)

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $821.4 million prior to 1998, as well as payments totaling $74.0 million in 1998, $73.1 million in 1999, and $85.6 million in 2000. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded receivables to reflect the amounts expected to be recovered as asbestos-related claims are paid. At December 31, 2000, Grace had recorded a receivable of $369.3 million, as well as notes receivable of $2.7 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims.

During 2000, the number of bodily injury claims made against Grace increased significantly compared to 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation have petitioned for reorganization under Chapter 11 of the U.S. Bankruptcy Code. These developments and events

12

---

have caused an environment that increases the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11 of the U.S. Bankruptcy Code, Grace filed for protection under Chapter 11 on April 2, 2001. As a result of the Chapter 11 filing, all asbestos-related litigation against Grace has been stayed.

See Item 1 of this Report and Notes 1 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 2000, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under

the jurisdiction of state and/or local authorities.

The EPA is conducting an investigation of the air, water and soil quality in and around Libby, Montana. This investigation was triggered by newspaper reports of excessive levels of asbestos-related disease related to Grace's former vermiculite mining activities in the area. The EPA, which commenced such investigation in 1999, has recently questioned the reliability of its analytical methods, and announced a program of additional testing in the yards and homes of Libby area residents. These investigations are not expected to result in material liability to Grace.

In February 2000, a purported class action lawsuit was filed in U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of real property situated within 12 miles of Libby, Montana that are improved private properties. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. Grace has no reason to believe that its former activities caused damage to the environment or property.

In October 2000, a purported class action lawsuit was filed in U.S. District Court for Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values of residents in the vicinity of a former vermiculite expanding plant in Minneapolis. Grace is presently cooperating with regulatory authorities and the present owners to investigate this former plant site. The EPA has commenced a program to remove suspected vermiculite

13

processing by-products from driveways at about 45 homes in the area. These activities are not expected to result in material liability to Grace.

The EPA is investigating approximately 50 vermiculite expanding plants operated by Grace and may be investigating approximately 285 other plants operated by third parties that handled vermiculite concentrate supplied by Grace. Active investigative or remediation activities are ongoing at five locations. Grace does not have sufficient information at this time to determine the extent of any possible liability related to this investigation.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge or disposition of hazardous wastes and other materials.

Grace is a party to three environmental insurance coverage actions pending in the U.S. District Court for the Southern District of New York. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed June 21, 1988). Litigation continues in this case as to a primary-level carrier that has not settled with respect to claims for environmental property damage. The second case, entitled Uniguard v. W. R. Grace, was filed on December 17, 1997. This declaratory judgment action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. In June 2000, a separate lawsuit was filed against Grace by one of its former primary insurance carriers seeking coverage determinations regarding 45 claims (Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co.-Conn.). Most of these claims involve alleged environmental property damage at sites once owned and operated by Grace or at waste sites that

allegedly received waste materials from plants operated by Grace, including Grace's claims for coverage regarding certain claims involving its former vermiculite mining operation in Libby, Montana. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

Grace believes that the liabilities for environmental remediation costs, including costs relating to environmental proceedings, that have been recorded in Grace's historical financial statements are adequate and, irrespective of the outcome of the insurance litigations referred to above, Grace believes that the resolution of pending environmental proceedings will not have a material adverse effect on the consolidated financial position or liquidity of Grace. For further information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Abner Class Action. Grace has been named in a putative class action suit filed in September 2000 in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius A.G. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who presently have lawsuits on file that are pursuing personal injury or wrongful death claims against any of the defendants. The other defendants in the suit have all

14

asserted claims against Grace for indemnification. The amended complaint also names "Does 1-100" as defendants and alleges that those unidentified individuals are responsible "in some manner" for the wrongs alleged. While this lawsuit has been stayed as to Grace as a result of Grace's Chapter 11 filing, Grace believes that the suit is without merit.

Tax Claims. In 1988 and 1990, Grace acquired whole life insurance policies ("COLI") on the lives of certain of its employees as part of a strategy to fund the cost of post-retirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The Internal Revenue Service ("IRS") is challenging the deductions for interest on such loans claimed by Grace and similarly situated companies. In 2000 Grace paid approximately $21.2 million of tax and interest related to COLI deductions taken in 1990 through 1992. Grace is currently under audit for the 1993-96 tax years. During those years Grace deducted approximately $122.1 million in interest attributable to the COLI policies. In 1996 legislation was enacted that phased out the tax benefits for COLI-related interest deductions over a three-year period ending in 1998. During those years, Grace deducted approximately $41.1 million in COLI-related interest. Grace is contesting the IRS's position on the grounds that Grace had and continues to have a valid business purpose for acquiring the COLI policies, that the COLI policies have economic substance and that the interest deductions claimed were in compliance with tax laws in effect at the time.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 related to a subsidiary of Grace that formerly held a majority interest in Cross Country Staffing. The assessments were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel, which was in effect through 1999. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, for per

diem and expense allowance plans. The matter is currently pending in the U.S. Court of Claims.

For further information, see Note 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations under Financial Condition" in the Financial Supplement to this Report.


## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2000.

15

---

## PART II


## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-32); under the heading "Quarterly Summary and Statistical Information - Unaudited" opposite the caption "Market price of common stock" (page F-31); and in Note 16 to the Consolidated Financial Statements (page F-25).

On March 31, 1998, the Company paid a dividend, in respect of each share of the Company's Common Stock, par value $.01 per share ("Common Stock"), of one Preferred Stock Purchase Right ("Right"). The Rights are not and will not become exercisable unless and until certain events occur (as described below). Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights will become exercisable on the earlier to occur of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the then outstanding shares of Common Stock or (b) 10 business days (or such later date as may be fixed by the Company's Board of Directors) after an Acquiring Person commences (or announces the intention to commence) a tender offer or exchange offer that would result in such Acquiring Person becoming the beneficial owner or 20% or more of the then outstanding shares of Common Stock. Holders of Rights, as such, have no rights as shareholders of the Company; consequently, such holders have no rights to vote or receive dividends, among other things.

When the Rights become exercisable, each Right will initially entitle the holder to buy from the Company one hundredth of a share of the Company's Junior Participating Preferred Stock, par value $.01 per share ("Junior Preferred Stock"), for $100, subject to adjustment ("exercise price"). If a person or group becomes an Acquiring Person, each Right will entitle the holder to receive upon exercise, in lieu of shares of Junior Preferred Stock, that number of shares of Common Stock having a market value of two times the exercise price of the Right. If, at any time after a person or group becomes an Acquiring Person, the Company is acquired in a merger or other business combination of 50% or more of the Company's consolidated assets or earning power is sold, each Right not owned by an Acquiring Person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price.

shown as a reduction of net sales) to costs of goods sold and selling expenses in accordance with the Emerging Issues Task Force Consensus No. 00-10, "Accounting for Shipping and Handling Revenues and Costs." The effect of the reclassification on the accompanying Consolidated Statement of Operations was as follows:

| (Dollars in millions) | YEAR ENDED DECEMBER 31, 1999 | | YEAR ENDED DECEMBER 31, 1998 | |
| --- | --- | --- | --- | --- |
| | AS PREVIOUSLY REPORTED | AS CURRENTLY REPORTED | AS PREVIOUSLY REPORTED | AS CURRENTLY REPORTED |
| Net sales............ | $1,471.9 | $1,550.9 | $1,463.4 | $1,546.2 |
| Cost of goods sold... | 856.2 | 929.3 | 883.4 | 961.7 |
| Selling, general and administrative expenses | 321.3 | 327.2 | 321.4 | 325.9 |

F-13

## 3. ASBESTOS-RELATED LITIGATION

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (7 involving claims for property damage, 8 involving attic insulation, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at December 31, 1999 (11 involving claims for property damage and the remainder involving 105,670 claims for bodily injury).

## PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all outstanding property damage cases for which sufficient information is available to form a reasonable estimate of such exposure.

Through December 31, 2000, out of 370 asbestos property damage cases filed, 140 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in 9 cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in 7 cases for a total of $60.3 million; 207 property damage cases were settled for a total of $696.8 million; and 7 cases remain outstanding. No new cases have been filed since 1998.

| PROPERTY DAMAGE CASE ACTIVITY | 2000 | 1999 |
|---|---|---|
| Cases outstanding, beginning of year.. | 11 | 14 |
| New cases filed ...................... | -- | -- |
| Settlements ......................... | (4) | (3) |
| Dismissals .......................... | -- | -- |
| Judgments ........................... | -- | -- |
| Cases outstanding, end of year.. | 7 | 11 |

## ATTIC INSULATION LITIGATION

Through December 31, 2000, Grace was a defendant in eight class action lawsuits brought on behalf of owners of homes containing Zonolite attic fill insulation. These lawsuits seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. This former attic insulation product has never previously been the subject of property damage litigation. Grace believes that this product was safe for its intended purpose.

## BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other former asbestos producers, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace given demographic assumptions of possible exposure to asbestos products manufactured by Grace.

Through December 31, 2000, approximately 16,200 asbestos bodily injury lawsuits involving approximately 35,500 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 53,400 lawsuits involving approximately 151,800 claims were disposed of (through settlement and judgments) for a total of $561.8 million.

Bodily injury claim activity for 2000 and 1999 was as follows:

| BODILY INJURY CLAIM ACTIVITY | 2000 | 1999 |
|---|---|---|
| Claims outstanding, beginning of year ................... | 105,670 | 97,017 |
| New claims ........................ | 48,786 | 26,941 |
| Settlements ....................... | (26,950) | (16,174) |
| Dismissals ........................ | (2,598) | (2,109) |
| Judgments ......................... | (1) | (5) |
| Claims outstanding, end of year....... | 124,907 | 105,670 |

F-14

## ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its experience with, and recent trends in, asbestos litigation. Its recorded liabilities cover indemnity and defense costs for pending property damage cases and for pending and projected future bodily injury claims. As a result of the recent developments discussed in Note 1, Grace's evaluation of its recorded liability for asbestos-related litigation as of December 31, 2000 led to a fourth quarter adjustment of $293.1 million ($190.8 million net of tax) to account for an unexpected increase in the number of claims filed, new risk factors and recent cost experience. In the fourth quarter of 1998, a change in the accrual period for asbestos-related bodily injury litigation resulted in an adjustment of $576.2 million ($374.9 million after tax).

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace adjusted its recorded insurance receivable in the fourth quarter of 2000 by $85.1 million ($55.6 million after tax) to reflect the additional amounts expected to be recovered in respect of the recorded asbestos-related liability. In 1998, the insurance receivable was adjusted by $200.2 million ($130.5 million after tax) for the same reason.

The net amount of the adjustments recorded during the fourth quarter of 2000 ($208.0 million after insurance recovery) reflects adverse experience in the latter part of 2000 versus certain underlying assumptions used to estimate Grace's liability for asbestos-related litigation. The net amount of the 1998 adjustment was $376.1 million pre-tax. After the 2000 adjustment, Grace's recorded liability for asbestos-related litigation is $1,105.9 million gross and $733.9 million net of insurance recovery.

| ESTIMATED LIABILITY FOR ASBESTOS -RELATED LITIGATION (Dollars in millions) | 2000 | 1999 |
|---|---|---|
| Asbestos-related liability expected to be satisfied within one year...................................... | $ 178.4 | $ 199.3 |
| Asbestos-related liability expected to be satisfied after one year........................................ | 927.5 | 884.7 |
| Total asbestos-related liability ............... | $ 1,105.9 | $ 1,084.0 |

The current portion of Grace's asbestos-related liability is based on management's estimate as of the respective balance sheet date of indemnity payments and defense costs expected to be paid within one year. The amounts recorded at each balance sheet date reflect Grace's estimate as of the balance sheet date, based on measures governed by generally accepted accounting principles, of probable and estimable liabilities for asbestos-related litigation in all material respects. However, due to the Filing and the uncertainties of the asbestos-related litigation, actual amounts could differ materially from the recorded liability.

## ASBESTOS INSURANCE

Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be

paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate to property damage and bodily injury cases and claims pending at year-end 2000 and bodily injury claims expected to be filed in the future.

Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during 2000 and 1999 was as follows:

| ESTIMATED INSURANCE RECOVERY ON ASBESTOS -RELATED LIABILITIES (Dollars in millions) | 2000 | 1999 |
|---|---|---|
| NOTES RECEIVABLE | | |
| Notes receivable from insurance carriers, beginning of year, net of discount of $0.8 (1999 - $2.3) | $    5.3 | $ 18.0 |
| Proceeds received under asbestos -related insurance settlements | (3.2) | (14.2) |
| Current year amortization of discount | 0.6 | 1.5 |
| Notes receivable from insurance carriers, end of year, net of discount of $0.2 (1999 - $0.8) | 2.7 | 5.3 |
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning o f year | 366.1 | 425.0 |
| Proceeds received under asbestos -related insurance settlements | (82.4) | (58.9) |
| Increase in asbestos-related insurance receivable | 8 5.6 | -- |
| Asbestos-related insurance receivable, end of year | 369.3 | 366.1 |
| Total amounts due from insurance carriers | 372.0 | 371.4 |
| Expected to be realized within one year | (83.8) | (75.2) |
| Expected to be realized after one year | $   288.2 | $ 296.2 |

F-15

4. DISCONTINUED OPERATIONS

**PACKAGING BUSINESS TRANSACTION**

As discussed in Note 1, the Spin-off and the Merger were completed on March 31, 1998. Prior to the

## SUBSEQUENT EVENT - VOLUNTARY BANKRUPTCY FILING

On April 2, 2001, W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case numbers 01-1139 through 01-1200. Grace's non-U.S. operating subsidiaries were not a part of the Filing.

The Filing was made in response to a sharply increasing number of asbestos-related bodily injury claims. These claims are discussed in more detail in Note 3 to the Consolidated Financial Statements. Under Chapter 11, the Debtors expect to continue to operate their businesses as debtors-in-possession under court protection from their creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against them.

Background of Filing - On January 29, 2001, Grace announced that recent developments in asbestos-related litigation had led to a fourth quarter charge of $208.0 million (net of expected insurance recovery). The charge was made to account for probable and estimable costs related to several adverse developments in Grace's asbestos litigation during 2000, including: a significant increase in bodily injury claims; higher than expected costs to resolve bodily injury and certain property damage claims; and new class-action lawsuits alleging damages from a former attic insulation product not previously subject to property damage litigation. After this adjustment, Grace's recorded liability for asbestos-related litigation at December 31, 2000 is $1,105.9 million gross and $733.9 million net of insurance recovery. The estimated gross liability represents an undiscounted stream of payments in decreasing amounts over approximately 40 years. However, due to the Filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.

Grace also announced on January 29, 2001 that it was reviewing the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11. As a result of that review, the Board of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims settlement process. By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

Consequence of Filing - As a consequence of the Filing, all pending litigation against the Debtors is stayed and no party may take any action to realize its pre-petition claims except pursuant to order of the Bankruptcy Court. It is the Debtors' intention to address all of their pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. However, it is currently impossible to predict with any degree of certainty how the plan will treat asbestos and other pre-petition claims and the impact the Filing and any reorganization plan may have on the shares of common stock of Grace. Generally, under the provisions of the Bankruptcy Code, holders of equity interests may not participate under a plan of reorganization unless the claims of creditors are satisfied in full under the plan or unless creditors accept a reorganization plan that permits holders of equity interests to participate. The formulation and implementation of the plan of reorganization could take a significant period of time.

The accompanying Consolidated Financial Statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, such realization of certain Debtors' assets and liquidation of certain Debtors' liabilities are subject to significant uncertainty. Further, a plan of

reorganization could materially change the amounts

F-33

___

and classifications reported in the consolidated financial statements, which do not give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

All of the Debtor's pre-petition debt is now in default due to the Filing. Accordingly, the accompanying Consolidated Balance Sheet as of December 31, 2000 reflects the classification of the Debtors' pre-petition debt as current.

The Debtors have negotiated a debtor-in-possession revolving credit facility with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term of 2 years and bears interest at either Bank of America's prime rate or a formula based on the LIBOR rate plus 2.00% to 2.25%. The Bankruptcy Court issued an interim approval of the DIP facility, which allows the Debtors to draw on the DIP facility for 15 days in an amount not to exceed $50 million.

The Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations, including claims of trade creditors to a specified amount and employee wages and benefits in the ordinary course of business.

Accounting Impact - Beginning in the second quarter of 2001, Grace will be required to follow Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise will be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. Obligations of Grace subsidiaries not covered by the Filing will remain classified on the consolidated balance sheet based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

Pro-Forma Balance Sheet Information (Unaudited) - The condensed balance sheet of the Debtors as if the Debtors had filed petitions for reorganization under Chapter 11 at December 31, 2000 is as follows:

```
==================================================== ======================== =============
PRO-FORMA CONDENSED BALANCE SHEET OF DEBTORS
---------------------------------------------------- ------------------------
(UNAUDITED)                                                                   DECEMBER 31,
(Dollars in millions)                                                         2000
---------------------------------------------------- ------------------------ -------------
Current Assets:
   Cash and cash equivalents...........................................   $    37.5
   Notes and accounts receivable, net.....................................      32.8
   Inventories............................................................      75.2
   Other current assets...................................................      81.2
                                                                          ---------------
       Total current assets...............................................     226.7
   Properties and equipment, net..........................................     410.0
   Asbestos-related insurance receivable..................................     372.0
   Deferred income taxes..................................................     482.6
   Loans to non-debtor entities...........................................     407.0
```

```
Investment in non-debtor entities.......................        148.3
Other noncurrent assets............... .................        414.3
                                                            ---------------
    Total assets........................ .............       $2,460.9
                                                            ===============
Liabilities Subject to  Compromise:
  Debt.........................................................  $  409.1
  Asbestos-related liability ................................    1,105.9
  Other liabilities....................... ..................      955.4
                                                            ---------------
    Total liabilities....................... ..............      2,470.4
Equity.........................................................     (9.5)
                                                            ---------------
    Total liabilities and equity....... .................    $2,460.9
                                                            ===============
```

## CONTINUING OPERATIONS

Set forth below is a chart that lists key operating statistics and percentage changes for the years ended December 31, 2000, 1999 and 1998. Immediately following the chart is an overview of the matters affecting the comparison of 2000 and 1999. Each of these items should be referenced when reading management's discussion and analysis of the results of continuing operations. The chart below, as well as the financial information presented throughout this discussion, divides Grace's financial results between "core operations" and "noncore activities." Core operations comprise the financial results of Davison Chemicals, Performance Chemicals and the costs of corporate activities that directly or indirectly support business operations. In contrast, noncore activities comprise all other events and transactions that are not directly related to the generation of operating revenue or the support of core operations. Grace's financial strategy is to maximize returns and cash flows from core operations to fund business growth and to provide resources to satisfy its obligations that remain from past businesses, products and events.

F-34

```
=================================================================================== =
ANALYSIS OF CONTINUING OPERATIONS
(Dollars in millions)
------------------------------------------ ------------------------------------------ -
NET SALES:
     Davison Chemicals..................................................      $
     Performance Chemicals..............................................

TOTAL GRACE SALES - CORE OPERATIONS.......................................      $
                                                                               =
PRE-TAX OPERATING INCOME:
     Davison Chemicals..................................................      $
     Performance Chemicals..............................................
     Corporate operating costs..........................................


PRE-TAX INCOME FROM CORE OPERATIONS.......................................      -

PRE-TAX (LOSS) INCOME FROM NONCORE ACTIVITIES.............................      -
```

Interest expense................................................................

Interest income................................................................

(LOSS) INCOME FROM CONTINUING OPERATIONS  BEFORE
    INCOME TAXES...............................................................
(Provision for) benefit from income taxes......................................

(LOSS) INCOME FROM CONTINUING OPERATIONS......................................


KEY FINANCIAL MEASURES:
    Pre-tax income from core operations as a
       percentage of sales.....................................................
    Pre-tax income from core operations before
       Depreciation and amortization...........................................
       As a percentage of sales................................................

| % Change Fav(Unfav) | 1998 (a) | % Change Fav(Unfav) |
|---|---|---|
| 4.4% | $    761.4 | (1.4%) |
| 1.7% | 784.8 | 1.9% |
| 3.0% | $  1,546.2 | 0.3% |
| 5.9% | $    107.5 | 15.6% |
| (9.7%) | 78.1 | 35.5% |
| 23.1% | (53.8) | 3.3% |
| 5.0% | 131.8 | 35.1% |
| NM | (340.1) | NM |
| (74.5%) | (19.8) | 18.7% |
| 131.0% | 4.9 | (14.3%) |
| NM | (223.2) | NM |
| NM | 28.5 | NM |
| NM | $   (194.7) | NM |
| 0.2pts | 8.5% | 3.0pts |
| 2.8% | $    223.9 | 19.4% |
| -- | 14.5% | 2 .7 pts |

|  | 2 000 | 1999 | % Change |
|---|---|---|---|
| PRODUCTIVITY INDEX | | | |
| COST PER $ OF SALES ON A CONSTANT $ BASIS WITH 1998 AS BASE YEAR: | | | |
| Davison Chemicals .......... | $ 0.794 | $ 0.828 | 4.1% |
| Performance Chemicals....... | 0.829 | 0.859 | 3.5% |
| Corporate operating cost.... | 0.024 | 0.034 | 29.4% |
| Total core operations....... | $ 0.848 | $ 0.877 | 3.3% |

Grace is targeting pre-tax income from core operations in 2001 to improve by approximately 5% to 10% over 2000. The Davison Chemicals business is expected to continue to be adversely affected by high natural gas and raw material costs and the Performance Chemicals business is likely to be affected by continued softness of construction activity and increasing petroleum-based costs. A large factor in profit improvement will be the continued success of Grace's productivity initiatives, including Six Sigma projects.

## PRE-TAX (LOSS) INCOME FROM NONCORE ACTIVITIES

The net loss from noncore activities totaled $188.4 million for 2000 compared to net income from noncore activities of $37.2 million for 1999. The 2000 results included a net asbestos charge (after expected insurance recovery) of $208.0 million. This charge was necessary to account for adverse developments in the latter part of 2000 (see "Subsequent Event - Voluntary Bankruptcy Filing" above). The 2000 net loss also includes $15.0 million of accruals for legal and environmental matters related to the Company's former operations in Libby, Montana and legal fees related to certain tax matters. Income in 1999 included an $18.5 million gain from the settlement of notes received as partial consideration when Grace sold its printing products business in 1994; a $4.8 million gain from sales of noncore real estate; and a $4.4 million gain from the sale of a corporate aircraft. The remainder of the year-over-year change after adjusting for these unusual items in 2000 and 1999 consists of

F-36

increased income generated on the Company's pension assets ($24.3 million in 2000 compared to $12.7 million in 1999) and increased revenue from sales of marketable securities ($19.0 million in 2000 compared to $9.3 million in 1999). The net loss from noncore activities of $340.1 million in 1998 was primarily due to an adjustment in the fourth quarter of $376.1 million (net of insurance recovery) for asbestos-related litigation offset by insurance recovery of $38.2 million related to environmental remediation.

## INTEREST AND INCOME TAXES

Net interest expense for 2000 was $18.4 million, an increase of 54.6% from net interest expense of $11.9 million in 1999. This increase was attributable to increased average borrowings under the Company's revolving credit facilities during 2000 to fund acquisitions, capital expenditures and noncore

the aggregate, totaled $1,003.1 million at December 31, 2000.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 2000, Grace paid $196.2 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers, compared to net expenditures in 1999 of $42.8 million. At December 31, 2000, Grace's balance sheet reflects a gross liability of $1,105.9 million and a liability net of insurance recovery of $733.9 million, which represents management's estimate as of the balance sheet date (in conformity with generally accepted accounting principles) of the undiscounted net cash outflows in satisfaction of Grace's current and expected asbestos-related claims.

The Consolidated Balance Sheet at December 31, 2000 includes total amounts due from insurance carriers of $372.0 million pursuant to settlement agreements with insurance carriers and net deferred tax assets of $264.0 million related to future net tax deductions for asbestos-related matters. The recovery of amounts due from insurance carriers is consistent with the timing of payment of an asbestos claim. Recovery of the tax benefits, however, is dependent on other factors such as profitability of the Company's U. S. subsidiaries and, given the Company's current net operating loss carryforward position, such benefits are unlikely to be utilized for the foreseeable future.

In the fourth quarter of 2000, Grace recorded a charge of $208.0 million (net of expected insurance recovery) to account for several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims; higher than expected costs to resolve certain property damage and bodily injury claims; and defense costs related to new class-action lawsuits alleging damages from a former attic insulation product not previously subject to property damage litigation. In addition, over the past year, five codefendant companies in asbestos bodily injury

F-41

litigation have petitioned for bankruptcy court protection, contributing to the risk that Grace will be subject to more claims than previously projected, with higher settlement demands.

See Notes 1 and 3 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Expenses of continuing operations related to the operation and maintenance of environmental facilities and the disposal of hazardous and nonhazardous wastes totaled $26.4 million in 2000, $31.1 million in 1999 and $38.2 million in 1998. Such costs are estimated to be between $25 and $30 million in each of 2001 and 2002. In addition, capital expenditures for continuing operations relating to environmental protection totaled $4.0 million in 2000, $5.7 million in 1999 and $6.3 million in 1998. Capital expenditures to comply with environmental initiatives in future years are estimated to be between $5 million and $7 million in each of 2001 and 2002. Grace also has incurred costs to remediate environmentally impaired sites. These costs were $47.2 million in 2000, $25.0 million in 1999 and $36.9 million in 1998. These amounts have been charged against previously established reserves. At December 31, 2000, Grace's liability for environmental investigatory and

remediation costs related to continuing and discontinued operations totaled $174.9 million, as compared to $215.5 million at December 31, 1999. Future pre-tax cash outlays for remediation costs are expected to average between $25 and $40 million over the next few years.

## POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertain to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred.

An amendment, effective January 1, 2001, to the structure of the retiree-paid premiums for postretirement medical benefits requires all retirees and beneficiaries covered by the postretirement medical plan to contribute a minimum of 20% of the calculated premium for that coverage.

## RETAINED OBLIGATIONS OF DIVESTED BUSINESSES

The principal retained obligations of divested businesses relate to contractual indemnification and to contingent liabilities not passed on to the new owner. At December 31, 2000, Grace had recorded $78.1 million to satisfy such obligations. Of this total, $10.9 million is expected to be paid over periods ranging from 2 to 10 years. The remainder represents estimates of probable cost to satisfy specific contingencies expected to be resolved over the next few years.

## LIQUIDITY AND CAPITAL RESOURCES

## LIQUIDITY POSITION

Borrowing capacity, which existed at December 31, 2000, is no longer available and the outstanding balance on the bank borrowings as of December 31, 2000 of $400.0 million is callable, however it has been stayed as a result of the Filing. Similarly, the accounts receivable securitization program has been terminated subsequent to December 31, 2000. However, Grace does have access to a DIP facility with Bank of America, N.A. in the aggregate amount of $250 million. In addition, Grace has cash and cash equivalents of $191.9 million and cash value of life insurance (net) of $104.3 million as of December 31, 2000 (cash and cash equivalents of $123.3 million and cash value of life insurance (net) of $64.1 million at March 31, 2001). Management believes that the DIP facility and the existing liquid assets will be sufficient to meet the operating needs of Grace over the next year.

## CASH FLOW

Grace's net cash flow from core operations was $36.6 million in 2000 compared to $154.8 million in 1999. The decrease of $118.2 million during 2000 was principally the result of cash paid for businesses acquired and unfavorable working capital movements. The pre-tax cash outflow of noncore activities was $263.2 million in 2000 compared to an inflow of $64.2 million in 1999. The large variance between years was caused by several items. In 1999, Grace realized $225.2 million in proceeds from sales of noncore assets, principally the divestment of Cross Country Staffing. Also, in 2000, asbestos related spending was unfavorable by $153.5 million due to higher settlement costs for both property damage and bodily injury claims. The timing of these expenditures

| | | | | |
|---|---|---:|---|---:|
| **BOOK VALUE OF ASSETS AVAILABLE TO FUND NO NCORE OBLIGATIONS:** | | | | |
| Cash and other financial assets .......... ...... | $ | 327.2 | $ | 345.8 |
| Properties and investments ............... ...... | | 8.2 | | 8.8 |
| Asbestos-related insurance receivable ........ | | 372.0 | | 371.4 |
| Tax assets, net............................ ...... | | 295.7 | | 318.3 |
| ASSETS AVAILABLE TO FUND NONCORE OBLIGATI ONS | | 1,003.1 | | 1,044.3 |
| Noncore liabilities: | | | | |
| Asbestos-related liabilities................... | | (1,105.9) | | (1,084.0) |
| Environmental remediation..................... | | (174.9) | | (215.5) |
| Postretirement benefits..................... | | (189.1) | | (201.4) |
| Retained obligations and other.......... ...... | | (78.1) | | (99.1) |
| TOTAL NONCORE LIABILITIES.................. ...... | | (1,548.0) | | (1,600.0) |
| NET NONCORE LIABILITY..................... ...... | $ | (544.9) | $ | (555.7) |
| **CASH FLOWS:** | | | | |
| Pre-tax (loss) income from noncore activities .. | $ | (188.4) | $ | 37.2 |
| Provision for asbestos-related litigation, net of insurance recovery................. ...... | | 208.0 | | -- |
| Proceeds from noncore asset sales ....... ...... | | 9.6 | | 171.1 |
| Other changes............................. ...... | | (8.7) | | 15.0 |
| Cash spending for: | | | | |
| Asbestos-related litigation, net of insurance recovery........................ ...... | | (196.2) | | (42.8) |
| Environmental remediation............... ...... | | (47.2) | | (25.0) |
| Postretirement benefits.................. ...... | | (23.0) | | (19.6) |
| Retained obligations and other........ ...... | | (17.3) | | (71.7) |
| NET CASH FLOW FROM NONCORE ACTIVITIES ... ...... | $ | (263.2) | $ | 64.2 |

The Company has a number of financial exposures originating from past businesses, products and events, the largest of which is asbestos-related liabilities (discussed below and in detail in Notes 1 and 3 to the Consolidated Financial Statements). These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. Grace's current core operations, together with other available assets, are being managed to generate sufficient cash flow to fund these obligations over time.

The table above displays the 2000 and 1999 book value of Grace's noncore liabilities and the assets available to fund such liabilities. The Filing could materially change the amounts reported in the table above, which does not give any adjustments to the carrying value of assets or liabilities that might be necessary as a consequence of a plan of reorganization. Each noncore liability has different characteristics, risks and expected liquidation profile. Taken together, these liabilities represent $1,548.0 million of Grace's total liabilities as reflected on its balance sheet at December 31, 2000. Assets available to fund noncore liabilities consist of cash and cash equivalents, net cash value of life insurance where Grace is the beneficiary, property and investments not used in core operations, insurance coverage for asbestos-related litigation and net tax assets related to noncore liabilities. These assets, in

8

*MLT*

BEFORE THE JUDICIAL PANEL ON

MULTIDISTRICT LITIGATION

In re:                                    )        MDL Docket No. _____
                                          )
ZONOLITE ATTIC INSULATION                 )
LITIGATION                                )
                                          )
_____       )

## MOTION FOR TRANSFER AND COORDINATION
## OR CONSOLIDATION UNDER 28 U.S.C. § 1407



Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

[Additional Counsel Listed on Signature Page]

Attorneys for Individual and Representative
Plaintiffs Paul Price, John Prebil, and Margery
Prebil

the same conduct, _inter alia_, the defendants' duty to create a comprehensive, court-supervised asbestos notification, education and remediation program as described above.

17. Two additional Zonolite class actions are also pending in state courts. _Daily et al. v. W.R. Grace & Co. et al._, is pending in the Circuit Court, Third Judicial Circuit, Madison County, Illinois, Case No. 00L656, and was filed on behalf of Illinois and Missouri homeowners with Zonolite insulation. _Barbanti v. W.R. Grace & Co. et al._, is pending in Spokane County Superior Court, Case No. 002011756-6, and was filed on behalf of Washington residents with Zonolite insulation.

18. Plaintiff in the _Hunter_ action has received notice of a proposed transfer of that action for property damage and equitable relief to the Eastern District of Pennsylvania, as a tag-along action to the pending MDL 875 asbestos personal injury actions. Plaintiffs oppose the consolidation of the above-described Zonolite actions with MDL 875, because there are disparate factual and legal questions: the Zonolite litigation involves only property damage claims, while asbestos personal injury and death actions claims are at issue in MDL Docket No. 875.

19. Early transfer and coordination or consolidation of pretrial proceedings of the Zonolite attic insulation cases in a single district which can focus exclusively on the issues unique to Zonolite litigation: specifically, the urgent need for early warning to homeowners, and prompt remediation to prevent future injury, will promote the convenience of the parties and witnesses and the just and efficient conduct of the action. It will also avoid the potential for duplication of discovery and inconsistent rulings, particularly on class action issues and, on the part of the common defendants, exposure to multiple injunctive claims arising out of the same general course of conduct. The result will be a significant saving of time and expense, the

expedited, comprehensive and consistent implementation of early equitable relief, development of a consistent law of the case and the fair and economical adjudication of the actions.

DATED: August 17, 2000                              Respectfully submitted,


By: _Elizabeth J. Cabraser_
        Elizabeth Cabraser   by RV.

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

McGARVEY, HEBERLING,
SULLIVAN & McGARVEY
745 South Main
Kalispell, MT  59901
Telephone:  (406) 752-5566
Facsimile:  (406) 752-7124

NESS MOTLEY LOADHOLT
RICHARDSON & POOLE
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC  29465
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9440

LUKINS & ANNIS, P.S.
1600 Washington Trust Financial Center
717 W Sprague Ave.
Spokane, WA  99201-0466
Telephone: (509) 455-9555
Facsimile: (509) 747-2323

COHEN, MILSTEIN,
HAUSFELD & TOLL, P.L.L.C.
999 Third Avenue, Suite 3600
Seattle, WA  98104
Telephone:  (206) 521-0080
Facsimile:  (206) 521-0166

MOTION FOR TRANSFER AND COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407

COHEN, MILSTEIN
HAUSFELD & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, DC 20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Attorneys for Individual and Representative
Plaintiffs Paul Price, John Prebil, and
Margery Prebil

# ZONOLITE NOW...

## Save on fuel, add comfort

## Just pour it, level it, leave it!



ZONOLITE
Vermiculite
Insulating Fill
Easiest of all to install.
Just pour it, level it,
leave it!

**$1.45**

per bag
covers
17 sq. ft. 3" thick

V-8, Fo

## ZONOLITE INSULATING FILL



Zonolite Insulating Fill is used to insulate and sound-deaden side-walls and ceilings of all types of buildings. Zonolite Fill has one of the best insulation factors of any insulation on the market ("K" factor .23 B.t.u.).

Zonolite Insulating Fill comes in 4 cu. ft. bags which weigh about 23 lbs. No special installation equipment is needed. Zonolite Fill is poured from the bag, like popcorn. It flows readily around pipes, wiring, etc., to make a complete, uniform fill without tamping, cutting, or nailing.

Zonolite Insulating Fill is a non-conductor of electricity and can be safely installed over or around electrical wiring. It is rot-proof and does not permit tunneling or nesting by rodents. It does not attract vermin or termites. It is safe to handle because it is non-irritating to the skin and lungs.

## It is safe to handle because it is non-irritating to the skin and lungs.

EXHIBIT 32

EXHIBIT





"No need for mask ...It pours...cleanly."

". . . Contains no harmful chemicals."

IF YOU ARE BUILDING A HOME, don't take chances with just "insulation." Be sure of permanent, efficient performance. Select Zonolite, the material that fulfills all the requirements for good insulation. If your present home is not insulated, don't shiver through another winter nor swelter through another summer. Let your present wasted fuel dollars pay for a complete Zonolite installation... now! Why not talk to your lumber dealer today? He'll be glad to tell you all about it.

*Permanent as the Earth itself*



pounded. When insulation decomposes, absorbs moisture, becomes infested with vermin, or loses its insulating efficiency after it is installed, it may have to be removed and replaced. That means cleaning out all the old insulation, putting in new insulation, and repairing the walls or ceilings. It means a lot of trouble and expense.

The only way to be sure that this will not happen to you is to select an insulation of proved permanence. Select Zonolite Insulation. Through rigorous testing and extensive usage over many years, Zonolite has proved that it fulfills completely all of the following requirements for good insulation. No other known material can equal such a record.

1. Dual Insulation Value ... Insulates both by its air cell construction and its glittering, reflective surfaces.
2. Uniform Tamper-Proof Density ... Same density installed in the home as when it leaves the factory.
3. Complete Fill ... Fills walls solidly leaving no voids. Does not "ball-up" on rough obstructions, nails, wires, or pipes. Cannot be "fluffed up."
4. Light in Weight ... A bag can be handled easily. A 4-inch layer of Zonolite adds only 1½ pounds per square foot of ceiling.
5. Easy to Install ... No need for mask, gloves, or special equipment. It pours easily and cleanly. The average home can be insulated in just a few hours.
6. Chemically Inert ... Contains no harmful chemicals. Will not disintegrate nor deteriorate. Will not corrode any material. Will not stain wall or plaster. Is practically moisture-proof.
7. Fire-proof ... Not merely fire "resistant." It melts at about 2400° Fahrenheit.
8. Vermin-proof ... Mice, rats, insect larvae, or termites will not attack it.
9. Rot-proof ... Will not decompose nor give off odors. It is a 100% mineral material.
10. Naturally Permanent ... The permanence of Zonolite is not dependent upon synthetic treatments. Its inherent permanence means efficient insulation for your home forever.



EXHIBIT 2

EXHIBIT 3
Emergency Notice



### United States Public Health Service
#### Region VIII
1961 Stout Street Room 498
Denver, Colorado 80294-3538

August 1, 2000

Dr. Linda Rosenstock, Director
National Institute for Occupational
Safety & Health
Hubert H. Humphrey Building Room 715H
200 Independence Ave., S.W.
Washington, DC  20201

Dear Dr. Rosenstock,

I would like to bring to your attention a significant occupational and public health concern regarding the widespread dissemination of amphibole (actinolite-tremolite series) asbestos in Libby, Montana, and potentially in vermiculite end-products used throughout the country. As you may be aware, NIOSH researchers evaluated vermiculite miners, that were exposed to asbestos, in Libby, Montana in the early 1980's. NIOSH Investigators found significantly elevated risks of asbestos-related malignant and non-malignant respiratory disease among these workers. Concurrently, Dr. Jim Lockey at the University of Cincinnati identified elevated pulmonary disease among workers with much lower asbestos exposures at a facility processing Libby vermiculite in Ohio. These articles have been included for your information.

In November 1999, Libby became the focus of national attention when it was reported that a number of residents that did not work at the vermiculite mine or processing facilities were suffering from asbestos-related diseases. Subsequently, researchers from the Environmental Protection Agency (EPA), Public Health Service (PHS) Region 8, and Agency for Toxic Substances and Disease Registry (ATSDR) began intensive environmental and public health investigations of the site. Medical screening (e.g., chest x-rays, pulmonary function testing, questionnaires) is currently being conducted on 4200 former workers, family contacts, and others potentially at risk. NIOSH researchers (Dr. Robert Castellan, Dr. Leslie Stayner, Dr. Pat Sullivan, Dr. Vince Castranova, Mr. Ken Wallingford, and Mr. Ralph Zumwalde) have also been providing intermittent technical assistance to these efforts.

EXHIBIT 3

One issue that has very recently come to our attention, is that end-product vermiculite insulation, and most likely other end-products, apparently contained appreciable quantities of asbestos, but were marketed, sold, and used throughout the country without adequate labeling or warnings and were commonly considered to be non-toxic (see enclosed information and video tape). Internal company documentation and recent testing of residential insulation materials, reportedly used in over one million homes, reveals that even minimal handling by workers or residents poses a substantial health risk (airborne exposures up to 150 times the current occupational standards (0.1 f/cc)).

Recent discussions between the aforementioned federal partners working at the Libby site identified the pressing need for increased NIOSH participation and response to occupational health issues of concern. Suggestions for NIOSH consideration include: 1) the need for further characterization of current worker exposures (e.g., construction/insulation workers, nursery workers) that occur when handling vermiculite end-products; 2) nationwide (i.e., "Hazard Alert") warning to workers of the potential dangers associated with these products; 3) possible epidemiologic or clinical investigations of appropriate groups that may currently or formally be at increased risk; and 4) a collaborative update of the original NIOSH Libby cohorts by NIOSH and ATSDR investigators to help understand the clinical progression of disease, morbidity, and mortality associated with this unique, and perhaps more toxic, form of asbestos. This information would be of great value, not only to those in Libby, but also for those at risk throughout the country.

If I can be of any further assistance to you in this matter please contact me at (303) 844-7560 or Dr. Aubrey Miller at (303) 844-7857.

Sincerely,

Hugh S. Sloan, D.S.W.
Assistant Surgeon General
Regional Health Administrator

Enclosures

cc:   Dr. Henry Falk, Associate Administrator, ATSDR
      Mr. Max Dodson, Assistant Regional Administrator, USEPA Region 8
      Regional Director, DHHS, Region VIII
      Principal Deputy ASH, OPHS, DHHS

## Table C.
### U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 1998 and 1999

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | Percent Change | 1998 | 1999 | Percent Change | 1998[1] | 1999 | Percent Change |
| TOTAL | 256,787 | 260,271 | 1.4 | 262,301 | 272,526 | 3.9 | 262,573 | 250,318 | -4.7 |
| DC | 3,365 | 3,577 | 6.3 | 3,264 | 3,167 | -3.0 | 2,847 | 3,257 | 14.4 |
| 1ST | 7,150 | 6,927 | -3.1 | 6,760 | 7,211 | 6.7 | 8,012 | 7,778 | -3.6 |
| ME | 793 | 768 | -3.2 | 752 | 728 | -3.2 | 411 | 451 | 9.7 |
| MA | 3,263 | 3,352 | 2.7 | 3,113 | 3,479 | 11.8 | 3,766 | 3,639 | -3.4 |
| NH | 749 | 668 | -10.8 | 744 | 717 | -3.6 | 602 | 553 | -8.1 |
| RI | 689 | 624 | -9.4 | 609 | 680 | 11.7 | 704 | 648 | -8.0 |
| PR | 1,656 | 1,515 | -8.5 | 1,542 | 1,607 | 4.2 | 2,529 | 2,437 | -3.6 |
| 2ND | 24,891 | 29,443 | 18.3 | 25,460 | 25,257 | -0.8 | 29,619 | 33,805 | 14.1 |
| CT | 2,763 | 2,729 | -1.2 | 2,808 | 2,966 | 5.6 | 3,908 | 3,671 | -6.1 |
| NY,N | 2,114 | 2,118 | 0.2 | 2,044 | 2,150 | 5.6 | 3,028 | 2,988 | -1.3 |
| NY,E | 8,190 | 8,701 | 6.2 | 8,222 | 7,949 | -3.3 | 8,911 | 9,663 | 8.4 |
| NY,S | 9,870 | 13,773 | 39.5 | 10,144 | 10,199 | 0.5 | 11,387 | 14,961 | 31.4 |
| NY,W | 1,490 | 1,711 | 14.8 | 1,720 | 1,524 | -11.4 | 2,012 | 2,199 | 9.3 |
| VT | 464 | 411 | -11.4 | 522 | 461 | -11.7 | 373 | 323 | -13.4 |
| 3RD | 21,398 | 20,925 | -2.2 | 21,974 | 20,824 | -5.2 | 18,254 | 18,355 | 0.6 |
| DE | 793 | 961 | 21.2 | 661 | 778 | 17.7 | 892 | 1,075 | 20.5 |
| NJ | 6,292 | 6,387 | 1.5 | 6,603 | 6,285 | -4.8 | 5,409 | 5,511 | 1.9 |
| PA,E | 8,625 | 7,795 | -9.6 | 9,038 | 8,185 | -9.4 | 6,762 | 6,372 | -5.8 |
| PA,M | 2,173 | 2,368 | 9.0 | 2,088 | 2,263 | 8.4 | 1,663 | 1,768 | 6.3 |
| PA,W | 3,036 | 2,970 | -2.2 | 3,095 | 2,959 | -4.4 | 2,959 | 2,970 | 0.4 |
| VI | 479 | 444 | -7.3 | 489 | 354 | -27.6 | 569 | 659 | 15.8 |
| 4TH | 20,840 | 20,719 | -0.6 | 21,144 | 20,518 | -3.0 | 13,998 | 14,199 | 1.4 |
| MD | 4,619 | 4,044 | -12.5 | 4,603 | 4,373 | -5.0 | 3,102 | 2,773 | -10.6 |
| NC,E | 1,568 | 1,451 | -7.5 | 1,535 | 1,322 | -13.9 | 998 | 1,127 | 12.9 |
| NC,M | 1,229 | 1,123 | -8.6 | 1,293 | 1,080 | -16.5 | 858 | 901 | 5.0 |
| NC,W | 1,068 | 1,043 | -2.4 | 1,109 | 1,076 | -3.0 | 1,041 | 1,008 | -3.2 |
| SC | 4,142 | 4,354 | 5.1 | 4,373 | 4,063 | -7.1 | 3,078 | 3,369 | 9.5 |
| VA,E | 4,497 | 5,051 | 12.3 | 4,522 | 4,812 | 6.4 | 2,038 | 2,277 | 11.7 |
| VA,W | 1,780 | 1,797 | 1.0 | 1,898 | 1,839 | -3.1 | 1,272 | 1,230 | -3.3 |
| WV,N | 622 | 653 | 5.0 | 604 | 632 | 4.6 | 533 | 554 | 3.9 |
| WV,S | 1,315 | 1,203 | -8.5 | 1,207 | 1,321 | 9.4 | 1,078 | 960 | -11.0 |

130

EXHIBIT 4

## Table C. (September 30, 1999—Continued)

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | Percent Change | 1998 | 1999 | Percent Change | 1998[1] | 1999 | Percent Change |
| **5TH** | **30,720** | **32,959** | **7.3** | **34,210** | **32,723** | **-4.4** | **34,649** | **34,885** | **0.7** |
| LA,E | 3,705 | 3,915 | 5.7 | 3,846 | 4,094 | 6.4 | 2,968 | 2,789 | -6.0 |
| LA,M | 1,113 | 1,166 | 4.8 | 2,913 | 1,076 | -63.1 | 8,763 | 8,853 | 1.0 |
| LA,W | 2,425 | 2,521 | 4.0 | 2,677 | 2,462 | -7.3 | 2,232 | 2,271 | 1.7 |
| MS,N | 1,182 | 1,174 | -0.7 | 1,236 | 1,196 | -3.2 | 1,058 | 1,036 | -2.1 |
| MS,S | 2,258 | 2,429 | 7.6 | 2,375 | 2,108 | -7.9 | 1,987 | 2,228 | 12.1 |
| TX,N | 5,611 | 5,676 | 1.2 | 5,726 | 5,704 | -0.4 | 3,925 | 3,897 | -0.7 |
| TX,E | 4,842 | 5,334 | 10.2 | 5,052 | 5,543 | 9.7 | 5,899 | 5,690 | -3.6 |
| TX,S | 6,409 | 7,485 | 16.8 | 6,850 | 7,228 | 5.5 | 5,501 | 5,758 | 4.7 |
| TX,W | 3,175 | 3,259 | 2.6 | 3,535 | 3,212 | -9.1 | 2,316 | 2,363 | 2.0 |
| **6TH** | **33,197** | **26,845** | **-19.1** | **32,682** | **26,148** | **-20.0** | **34,522** | **35,219** | **2.0** |
| KY,E | 2,350 | 2,258 | -3.9 | 2,564 | 2,311 | -9.9 | 1,903 | 1,850 | -2.8 |
| KY,W | 1,573 | 1,611 | 2.4 | 1,620 | 1,596 | -1.4 | 1,362 | 1,375 | 1.0 |
| MI,E | 9,829 | 6,569 | -33.2 | 6,142 | 6,228 | 1.4 | 18,781 | 19,122 | 1.8 |
| MI,W | 1,610 | 1,591 | -1.2 | 1,879 | 1,677 | -10.8 | 1,153 | 1,067 | -7.5 |
| OH,N | 9,721 | 6,833 | -29.7 | 12,084 | 5,909 | -51.1 | 3,346 | 4,270 | 27.6 |
| OH,S | 3,117 | 3,137 | 0.6 | 3,100 | 3,389 | 6.3 | 3,581 | 3,329 | -7.0 |
| TN,E | 1,841 | 1,758 | -4.5 | 2,052 | 1,941 | -5.4 | 1,922 | 1,739 | -9.5 |
| TN,M | 1,575 | 1,576 | 0.1 | 1,538 | 1,482 | -3.7 | 1,395 | 1,489 | 6.7 |
| TN,W | 1,581 | 1,512 | -4.4 | 1,615 | 1,613 | -0.1 | 1,079 | 978 | -9.4 |
| **7TH** | **18,269** | **19,066** | **4.4** | **18,733** | **19,077** | **1.8** | **15,184** | **15,173** | **-0.1** |
| IL,N | 8,878 | 9,491 | 6.9 | 8,816 | 9,446 | 7.1 | 7,556 | 7,601 | 0.6 |
| IL,C | 1,270 | 1,192 | -6.2 | 1,248 | 1,203 | -3.6 | 1,170 | 1,159 | -1.0 |
| IL,S | 1,341 | 1,335 | -0.5 | 1,524 | 1,305 | -14.4 | 1,119 | 1,149 | 2.7 |
| IN,N | 1,867 | 1,926 | 3.2 | 1,904 | 2,166 | 13.8 | 1,770 | 1,530 | -13.6 |
| IN,S | 2,608 | 2,808 | 7.7 | 2,950 | 2,657 | -9.9 | 2,119 | 2,270 | 7.1 |
| WI,E | 1,383 | 1,494 | 8.0 | 1,360 | 1,456 | 7.1 | 1,127 | 1,165 | 3.4 |
| WI,W | 922 | 820 | -11.1 | 931 | 844 | -9.4 | 323 | 299 | -7.4 |
| **8TH** | **14,936** | **13,783** | **-7.7** | **15,731** | **14,598** | **-7.2** | **13,191** | **12,376** | **-6.2** |
| AR,E | 2,248 | 2,382 | 6.0 | 2,436 | 2,389 | -1.9 | 2,125 | 2,118 | -0.3 |
| AR,W | 1,072 | 1,018 | -5.0 | 1,158 | 1,093 | -5.6 | 693 | 618 | -10.8 |
| IA,N | 597 | 637 | 6.7 | 639 | 640 | 0.2 | 598 | 595 | -0.5 |
| IA,S | 1,036 | 1,075 | 3.8 | 1,062 | 1,044 | -1.7 | 995 | 1,026 | 3.1 |
| MN | 3,001 | 2,138 | -28.8 | 2,764 | 2,454 | -11.2 | 2,476 | 2,160 | -12.8 |
| MO,E | 2,568 | 2,382 | -7.3 | 2,872 | 2,655 | -7.6 | 2,570 | 2,297 | -10.6 |
| MO,W | 2,563 | 2,398 | -6.4 | 2,919 | 2,578 | -11.7 | 2,162 | 1,982 | -8.3 |
| NE | 1,123 | 964 | -14.2 | 1,090 | 1,003 | -8.0 | 942 | 903 | -4.2 |
| ND | 284 | 331 | 16.5 | 329 | 312 | -5.2 | 234 | 253 | 8.1 |
| SD | 444 | 458 | 3.2 | 462 | 430 | -6.9 | 396 | 424 | 7.1 |

## Table C. (September 30, 1999—Continued)

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | Percent Change | 1998 | 1999 | Percent Change | 1998[1] | 1999 | Percent Change |
| **9TH** | 39,010 | 43,777 | 12.2 | 38,812 | 39,615 | 2.1 | 34,298 | 38,460 | 12.1 |
| AK | 503 | 757 | 50.5 | 608 | 544 | -10.5 | 495 | 708 | 43.0 |
| AZ | 3,214 | 3,073 | -4.4 | 3,526 | 3,146 | -10.8 | 3,503 | 3,430 | -2.1 |
| CA,N | 6,234 | 6,800 | 9.1 | 6,171 | 6,569 | 6.4 | 5,060 | 5,291 | 4.6 |
| CA,E | 3,863 | 4,196 | 8.6 | 3,481 | 3,885 | 11.6 | 4,378 | 4,689 | 7.1 |
| CA,C | 11,721 | 15,061 | 28.5 | 10,800 | 11,710 | 8.4 | 9,139 | 12,490 | 36.7 |
| CA,S | 2,591 | 3,018 | 16.5 | 3,583 | 2,852 | -20.4 | 1,835 | 2,001 | 9.0 |
| HI | 1,075 | 918 | -14.6 | 1,108 | 1,147 | 3.5 | 1,472 | 1,243 | -15.6 |
| ID | 547 | 597 | 9.1 | 675 | 581 | -13.9 | 610 | 626 | 2.6 |
| MT | 660 | 661 | 0.2 | 686 | 696 | 1.5 | 763 | 728 | -4.6 |
| NV | 2,926 | 2,670 | -8.8 | 2,647 | 2,737 | 3.4 | 2,504 | 2,437 | -2.7 |
| OR | 2,201 | 2,366 | 7.5 | 2,220 | 2,255 | 1.6 | 1,890 | 2,001 | 5.9 |
| WA,E | 689 | 625 | -9.3 | 718 | 580 | -10.1 | 482 | 510 | 7.7 |
| WA,W | 2,631 | 2,853 | 8.4 | 2,457 | 2,742 | 11.6 | 2,043 | 2,154 | 5.4 |
| GUAM | 71 | 116 | 63.4 | 66 | 83 | 25.8 | 61 | 94 | 54.1 |
| NMI | 84 | 66 | -21.4 | 66 | 80 | 21.2 | 63 | 49 | -22.2 |
| **10TH** | 11,562 | 11,580 | 0.2 | 11,747 | 12,015 | 2.3 | 10,895 | 10,460 | -4.0 |
| CO | 2,854 | 2,713 | -5.0 | 2,787 | 2,873 | 3.1 | 2,824 | 2,664 | -5.7 |
| KS | 1,812 | 1,891 | 4.4 | 1,944 | 1,884 | -3.1 | 1,636 | 1,643 | 0.4 |
| NM | 1,692 | 1,578 | -6.7 | 1,671 | 1,713 | 2.5 | 1,648 | 1,513 | -0.2 |
| OK,N | 1,049 | 1,118 | 6.6 | 1,146 | 1,162 | 1.4 | 1,011 | 967 | -4.4 |
| OK,E | 678 | 703 | 3.7 | 692 | 773 | 11.7 | 502 | 432 | -14.0 |
| OK,W | 1,992 | 2,051 | 3.0 | 2,063 | 2,047 | -0.8 | 1,366 | 1,370 | 0.3 |
| UT | 1,079 | 1,170 | 8.4 | 1,070 | 1,176 | 9.9 | 1,451 | 1,445 | -0.4 |
| WY | 406 | 356 | -12.3 | 374 | 387 | 3.5 | 457 | 426 | -6.8 |
| **11TH** | 31,449 | 30,670 | -2.5 | 31,784 | 51,373 | 61.6 | 47,104 | 26,401 | -44.0 |
| AL,N | 6,693 | 3,795 | -43.3 | 5,657 | 23,811 | 320.9 | 24,080 | 4,064 | -83.1 |
| AL,M | 1,505 | 1,533 | 1.9 | 1,510 | 1,496 | -0.9 | 1,436 | 1,473 | 2.6 |
| AL,S | 1,344 | 1,261 | -6.2 | 1,202 | 1,487 | 23.7 | 1,273 | 1,047 | -17.8 |
| FL,N | 1,608 | 1,627 | 1.2 | 1,734 | 1,684 | -2.9 | 1,478 | 1,421 | -3.9 |
| FL,M | 6,434 | 7,005 | 8.9 | 6,652 | 7,263 | 9.2 | 6,078 | 5,820 | -4.3 |
| FL,S | 6,754 | 6,936 | 2.7 | 7,448 | 7,166 | -3.8 | 5,894 | 5,664 | -3.9 |
| GA,N | 4,587 | 4,412 | -3.8 | 4,466 | 4,822 | 8.0 | 4,204 | 3,794 | -9.8 |
| GA,M | 1,249 | 1,406 | 12.6 | 1,712 | 1,417 | -17.2 | 1,590 | 1,579 | -0.7 |
| GA,S | 1,275 | 2,695 | 111.4 | 1,403 | 2,227 | 58.7 | 1,071 | 1,539 | 43.7 |

NOTE: PENDING CASES EXCLUDE ASBESTOS CASES TRANSFERRED TO PA,E UNDER ORDER 875 OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION.
[1]REVISED

## Table C-1.
## U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Period Ending September 30, 1999

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 |
| **TOTAL** | 262,573 | 260,271 | 272,526 | 250,318 | 45,078 | 65,443 | 61,309 | 49,212 | 217,495 | 194,828 | 211,217 | 201,106 |
| DC | 2,847 | 3,577 | 3,167 | 3,257 | 1,618 | 2,066 | 1,861 | 1,823 | 1,229 | 1,511 | 1,306 | 1,434 |
| **1ST** | 8,012 | 6,927 | 7,211 | 7,728 | 1,521 | 1,727 | 1,798 | 1,450 | 6,491 | 5,200 | 5,413 | 6,278 |
| ME | 411 | 768 | 728 | 451 | 89 | 178 | 175 | 92 | 322 | 590 | 553 | 359 |
| MA | 3,766 | 3,352 | 3,479 | 3,639 | 666 | 743 | 777 | 632 | 3,100 | 2,609 | 2,702 | 3,007 |
| NH | 602 | 668 | 717 | 553 | 78 | 149 | 145 | 82 | 524 | 519 | 572 | 471 |
| RI | 704 | 624 | 680 | 648 | 122 | 125 | 130 | 117 | 582 | 499 | 550 | 531 |
| PR | 2,529 | 1,515 | 1,607 | 2,437 | 566 | 532 | 571 | 527 | 1,963 | 983 | 1,036 | 1,910 |
| **2ND** | 29,619 | 29,443 | 25,257 | 33,805 | 4,930 | 6,413 | 5,947 | 5,396 | 24,689 | 23,030 | 19,310 | 28,409 |
| CT | 3,908 | 2,729 | 2,966 | 3,671 | 453 | 434 | 486 | 401 | 3,455 | 2,295 | 2,480 | 3,270 |
| NY,N | 3,028 | 2,118 | 2,158 | 2,988 | 441 | 394 | 448 | 387 | 2,587 | 1,724 | 1,710 | 2,601 |
| NY,E | 8,911 | 8,701 | 7,949 | 9,663 | 2,266 | 3,595 | 3,138 | 2,723 | 6,645 | 5,106 | 4,811 | 6,940 |
| NY,S | 11,387 | 13,773 | 10,199 | 14,961 | 1,300 | 1,392 | 1,317 | 1,375 | 10,087 | 12,381 | 8,882 | 13,586 |
| NY,W | 2,012 | 1,711 | 1,524 | 2,199 | 381 | 455 | 424 | 412 | 1,631 | 1,256 | 1,100 | 1,787 |
| VT | 373 | 411 | 461 | 323 | 89 | 143 | 134 | 98 | 284 | 268 | 327 | 225 |
| **3RD** | 18,254 | 20,925 | 20,824 | 18,355 | 2,833 | 3,629 | 3,599 | 2,863 | 15,421 | 17,296 | 17,225 | 15,492 |
| DE | 892 | 961 | 778 | 1,075 | 98 | 139 | 122 | 115 | 794 | 822 | 656 | 960 |
| NJ | 5,409 | 6,387 | 6,285 | 5,511 | 920 | 1,127 | 1,136 | 911 | 4,489 | 5,260 | 5,149 | 4,600 |
| PA,E | 6,762 | 7,795 | 8,185 | 6,372 | 801 | 902 | 900 | 803 | 5,961 | 6,893 | 7,285 | 5,569 |
| PA,M | 1,663 | 2,368 | 2,263 | 1,768 | 400 | 639 | 618 | 421 | 1,263 | 1,729 | 1,645 | 1,347 |
| PA,W | 2,959 | 2,970 | 2,959 | 2,970 | 530 | 766 | 772 | 524 | 2,429 | 2,204 | 2,187 | 2,446 |
| VI | 569 | 444 | 354 | 659 | 84 | 56 | 51 | 89 | 485 | 388 | 303 | 570 |
| **4TH** | 13,998 | 20,719 | 20,518 | 14,199 | 4,103 | 5,448 | 5,422 | 4,129 | 9,895 | 15,271 | 15,096 | 10,070 |
| MD | 3,102 | 4,044 | 4,373 | 2,773 | 755 | 970 | 1,074 | 651 | 2,347 | 3,074 | 3,299 | 2,122 |
| NC,E | 998 | 1,451 | 1,322 | 1,127 | 327 | 514 | 459 | 382 | 671 | 937 | 863 | 745 |
| NC,M | 858 | 1,123 | 1,080 | 901 | 314 | 432 | 387 | 359 | 544 | 691 | 693 | 542 |
| NC,W | 1,041 | 1,043 | 1,076 | 1,008 | 315 | 286 | 322 | 279 | 726 | 757 | 754 | 729 |
| SC | 3,078 | 4,354 | 4,063 | 3,369 | 889 | 1,288 | 1,140 | 1,037 | 2,189 | 3,066 | 2,923 | 2,332 |
| VA,E | 2,038 | 5,051 | 4,812 | 2,277 | 335 | 704 | 668 | 371 | 1,703 | 4,347 | 4,144 | 1,906 |
| VA,N | 1,272 | 1,797 | 1,839 | 1,230 | 493 | 575 | 570 | 498 | 779 | 1,222 | 1,269 | 732 |
| WV,N | 533 | 653 | 632 | 554 | 177 | 225 | 231 | 171 | 356 | 428 | 401 | 383 |
| WV,S | 1,078 | 1,203 | 1,321 | 960 | 498 | 454 | 571 | 381 | 580 | 749 | 750 | 579 |

# Table C-1. (September 30, 1999—Continued)

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 |
| 5TH | 34,649 | 32,959 | 32,723 | 34,885 | 3,985 | 6,372 | 5,798 | 4,559 | 30,664 | 26,587 | 26,925 | 30,326 |
| LA,E | 2,968 | 3,915 | 4,094 | 2,789 | 273 | 545 | 516 | 302 | 2,695 | 3,370 | 3,578 | 2,487 |
| LA,M | 8,763 | 1,166 | 1,076 | 8,853 | 103 | 90 | 108 | 85 | 8,660 | 1,076 | 968 | 8,768 |
| LA,W | 2,232 | 2,521 | 2,482 | 2,271 | 448 | 612 | 615 | 445 | 1,784 | 1,909 | 1,867 | 1,826 |
| MS,N | 1,058 | 1,174 | 1,196 | 1,036 | 177 | 149 | 199 | 127 | 881 | 1,025 | 997 | 909 |
| MS,S | 1,987 | 2,429 | 2,188 | 2,228 | 279 | 436 | 379 | 336 | 1,708 | 1,993 | 1,809 | 1,892 |
| TX,N | 3,925 | 5,676 | 5,704 | 3,897 | 725 | 1,200 | 1,113 | 812 | 3,200 | 4,476 | 4,591 | 3,085 |
| TX,E | 5,899 | 5,334 | 5,543 | 5,690 | 435 | 380 | 429 | 386 | 5,464 | 4,954 | 5,114 | 5,304 |
| TX,S | 5,501 | 7,485 | 7,228 | 5,758 | 861 | 1,837 | 1,429 | 1,269 | 4,640 | 5,648 | 5,799 | 4,489 |
| TX,W | 2,316 | 3,259 | 3,212 | 2,363 | 684 | 1,123 | 1,010 | 797 | 1,632 | 2,136 | 2,202 | 1,566 |
| 6TH | 34,522 | 26,845 | 26,148 | 35,219 | 4,901 | 8,696 | 8,273 | 5,324 | 29,621 | 18,149 | 17,875 | 29,895 |
| KY,E | 1,903 | 2,258 | 2,311 | 1,850 | 996 | 1,234 | 1,325 | 905 | 907 | 1,024 | 986 | 945 |
| KY,W | 1,362 | 1,611 | 1,598 | 1,375 | 313 | 381 | 396 | 298 | 1,049 | 1,230 | 1,202 | 1,077 |
| MI,E | 18,781 | 6,569 | 6,228 | 19,122 | 1,062 | 3,160 | 3,024 | 1,198 | 17,719 | 3,409 | 3,204 | 17,924 |
| MI,W | 1,153 | 1,591 | 1,677 | 1,067 | 218 | 425 | 378 | 265 | 935 | 1,166 | 1,299 | 802 |
| OH,N | 3,346 | 6,833 | 5,909 | 4,270 | 748 | 1,418 | 1,272 | 894 | 2,598 | 5,415 | 4,637 | 3,376 |
| OH,S | 3,581 | 3,137 | 3,389 | 3,329 | 674 | 923 | 723 | 874 | 2,907 | 2,214 | 2,666 | 2,455 |
| TN,E | 1,922 | 1,758 | 1,941 | 1,739 | 459 | 486 | 511 | 434 | 1,463 | 1,272 | 1,430 | 1,305 |
| TN,M | 1,395 | 1,576 | 1,482 | 1,469 | 254 | 292 | 260 | 286 | 1,141 | 1,284 | 1,222 | 1,203 |
| TN,W | 1,079 | 1,512 | 1,613 | 978 | 177 | 377 | 384 | 170 | 902 | 1,135 | 1,229 | 808 |
| 7TH | 15,184 | 19,066 | 19,077 | 15,173 | 2,050 | 3,310 | 3,150 | 2,210 | 13,134 | 15,756 | 15,927 | 12,963 |
| IL,N | 7,556 | 9,491 | 9,446 | 7,601 | 790 | 1,062 | 1,000 | 852 | 6,766 | 8,429 | 8,446 | 6,749 |
| IL,C | 1,170 | 1,192 | 1,203 | 1,159 | 197 | 291 | 306 | 182 | 973 | 901 | 897 | 977 |
| IL,S | 1,119 | 1,335 | 1,305 | 1,149 | 253 | 394 | 358 | 289 | 866 | 941 | 947 | 860 |
| IN,N | 1,770 | 1,926 | 2,166 | 1,530 | 160 | 368 | 340 | 188 | 1,610 | 1,558 | 1,826 | 1,342 |
| IN,S | 2,119 | 2,808 | 2,657 | 2,270 | 371 | 614 | 553 | 432 | 1,748 | 2,194 | 2,104 | 1,838 |
| WI,E | 1,127 | 1,494 | 1,456 | 1,165 | 203 | 356 | 355 | 204 | 924 | 1,138 | 1,101 | 961 |
| WI,W | 323 | 820 | 844 | 299 | 76 | 225 | 238 | 63 | 247 | 595 | 606 | 236 |
| 8TH | 13,191 | 13,783 | 14,598 | 12,376 | 3,042 | 4,016 | 4,271 | 2,787 | 10,149 | 9,767 | 10,327 | 9,589 |
| AR,E | 2,125 | 2,382 | 2,389 | 2,118 | 666 | 825 | 868 | 623 | 1,459 | 1,557 | 1,521 | 1,495 |
| AR,W | 693 | 1,018 | 1,093 | 618 | 232 | 409 | 427 | 214 | 461 | 609 | 666 | 404 |
| IA,N | 598 | 637 | 640 | 595 | 144 | 226 | 230 | 140 | 454 | 411 | 410 | 455 |
| IA,S | 995 | 1,075 | 1,044 | 1,026 | 218 | 355 | 316 | 257 | 777 | 720 | 728 | 769 |
| MN | 2,476 | 2,138 | 2,454 | 2,160 | 376 | 425 | 531 | 270 | 2,100 | 1,713 | 1,923 | 1,890 |
| MO,E | 2,570 | 2,382 | 2,655 | 2,297 | 439 | 536 | 604 | 371 | 2,131 | 1,846 | 2,051 | 1,926 |
| MO,W | 2,162 | 2,398 | 2,578 | 1,982 | 618 | 690 | 787 | 521 | 1,544 | 1,708 | 1,791 | 1,461 |
| NE | 942 | 964 | 1,003 | 903 | 155 | 236 | 236 | 155 | 787 | 728 | 767 | 748 |
| ND | 234 | 331 | 312 | 253 | 84 | 159 | 135 | 108 | 150 | 172 | 177 | 145 |
| SD | 396 | 458 | 430 | 424 | 110 | 155 | 137 | 128 | 286 | 303 | 293 | 296 |

## Table C-1. (September 30, 1999—Continued)

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 | Pending Sept. 30, 1998 | Commenced | Terminated | Pending Sept. 30, 1999 |
| **9TH** | 34,298 | 43,777 | 39,615 | 38,460 | 7,120 | 12,766 | 9,842 | 10,044 | 27,178 | 31,011 | 29,773 | 28,416 |
| AK | 495 | 757 | 544 | 708 | 120 | 171 | 154 | 137 | 375 | 586 | 390 | 571 |
| AZ | 3,503 | 3,073 | 3,146 | 3,430 | 579 | 524 | 576 | 527 | 2,924 | 2,549 | 2,570 | 2,903 |
| CA,N | 5,060 | 6,800 | 6,569 | 5,291 | 911 | 2,094 | 1,972 | 1,033 | 4,149 | 4,706 | 4,597 | 4,258 |
| CA,E | 4,378 | 4,196 | 3,885 | 4,689 | 716 | 809 | 704 | 821 | 3,662 | 3,387 | 3,181 | 3,868 |
| CA,C | 9,139 | 15,061 | 11,710 | 12,490 | 2,640 | 5,593 | 3,209 | 5,024 | 6,499 | 9,468 | 8,501 | 7,466 |
| CA,S | 1,835 | 3,018 | 2,852 | 2,001 | 447 | 920 | 862 | 505 | 1,388 | 2,098 | 1,990 | 1,496 |
| HI | 1,472 | 918 | 1,147 | 1,243 | 135 | 164 | 162 | 137 | 1,337 | 754 | 985 | 1,106 |
| ID | 610 | 597 | 581 | 626 | 135 | 175 | 171 | 139 | 475 | 422 | 410 | 487 |
| MT | 763 | 661 | 696 | 728 | 191 | 179 | 202 | 168 | 572 | 482 | 494 | 560 |
| NV | 2,504 | 2,670 | 2,737 | 2,437 | 311 | 511 | 443 | 379 | 2,193 | 2,159 | 2,294 | 2,058 |
| OR | 1,890 | 2,366 | 2,255 | 2,001 | 411 | 651 | 606 | 456 | 1,479 | 1,715 | 1,649 | 1,545 |
| WA,E | 482 | 625 | 588 | 519 | 134 | 198 | 189 | 143 | 348 | 427 | 399 | 376 |
| WA,W | 2,043 | 2,853 | 2,742 | 2,154 | 363 | 661 | 513 | 511 | 1,680 | 2,192 | 2,229 | 1,643 |
| GUAM | 61 | 116 | 83 | 94 | 14 | 84 | 47 | 51 | 47 | 32 | 36 | 43 |
| NMI | 63 | 66 | 80 | 49 | 13 | 32 | 32 | 13 | 50 | 34 | 48 | 36 |
| **10TH** | 10,895 | 11,580 | 12,015 | 10,460 | 2,809 | 3,220 | 3,365 | 2,664 | 8,086 | 8,360 | 8,650 | 7,796 |
| CO | 2,824 | 2,713 | 2,873 | 2,664 | 667 | 562 | 662 | 567 | 2,157 | 2,151 | 2,211 | 2,097 |
| KS | 1,636 | 1,891 | 1,884 | 1,643 | 432 | 586 | 594 | 424 | 1,204 | 1,305 | 1,290 | 1,219 |
| NM | 1,648 | 1,578 | 1,713 | 1,513 | 459 | 485 | 510 | 434 | 1,189 | 1,093 | 1,203 | 1,079 |
| OK,N | 1,011 | 1,118 | 1,162 | 967 | 302 | 381 | 371 | 312 | 709 | 737 | 791 | 655 |
| OK,E | 502 | 703 | 773 | 432 | 191 | 244 | 299 | 136 | 311 | 459 | 474 | 296 |
| OK,W | 1,366 | 2,051 | 2,047 | 1,370 | 365 | 640 | 612 | 393 | 1,001 | 1,411 | 1,435 | 977 |
| UT | 1,451 | 1,170 | 1,176 | 1,445 | 303 | 235 | 238 | 300 | 1,148 | 935 | 938 | 1,145 |
| WY | 457 | 356 | 387 | 426 | 90 | 87 | 79 | 98 | 367 | 269 | 308 | 328 |
| **11TH** | 47,104 | 30,670 | 51,373 | 26,401 | 6,166 | 7,780 | 7,983 | 5,963 | 40,938 | 22,890 | 43,390 | 20,438 |
| AL,N | 24,080 | 3,795 | 23,811 | 4,064 | 594 | 741 | 813 | 522 | 23,486 | 3,054 | 22,998 | 3,542 |
| AL,M | 1,436 | 1,533 | 1,496 | 1,473 | 320 | 287 | 277 | 330 | 1,116 | 1,246 | 1,219 | 1,143 |
| AL,S | 1,273 | 1,261 | 1,467 | 1,047 | 381 | 337 | 430 | 288 | 892 | 924 | 1,057 | 759 |
| FL,N | 1,478 | 1,627 | 1,684 | 1,421 | 457 | 504 | 509 | 452 | 1,021 | 1,123 | 1,175 | 969 |
| FL,M | 6,078 | 7,005 | 7,263 | 5,820 | 1,627 | 2,276 | 2,188 | 1,715 | 4,451 | 4,729 | 5,075 | 4,105 |
| FL,S | 5,894 | 6,936 | 7,166 | 5,664 | 1,382 | 2,049 | 2,071 | 1,360 | 4,512 | 4,887 | 5,095 | 4,304 |
| GA,N | 4,204 | 4,412 | 4,822 | 3,794 | 841 | 943 | 1,024 | 760 | 3,363 | 3,469 | 3,798 | 3,034 |
| GA,M | 1,590 | 1,406 | 1,417 | 1,579 | 376 | 350 | 344 | 382 | 1,214 | 1,056 | 1,073 | 1,197 |
| GA,S | 1,071 | 2,695 | 2,227 | 1,539 | 188 | 293 | 327 | 154 | 883 | 2,402 | 1,900 | 1,385 |

NOTE: PENDING CASES EXCLUDE ASBESTOS CASES TRANSFERRED TO PA,E UNDER ORDER 875 OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION