**C. Certification Of A Mandatory Class Is Appropriate Under Rule 23(b)(2).**

Having satisfied the threshold requirements of Rule 23(a), class certification is first sought as to all claims for injunctive and other equitable relief, as well as for punitive damage relief, pursuant to Rule 23(b)(2). A class action may be maintained if:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed. R. Civ. P. 23(b)(2).

In considering whether to certify an injunctive class under Rule 23(b)(2), "'the conduct complained of is the benchmark.'" *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 326 (D. Mass. 1997) (quoting *Yaffe*, 454 F.2d at 1366. "As the First Circuit has explained, if injunctive or declaratory relief is appropriate with respect to the whole class, certification is proper." *Boulet v. Cellucci*, 107 F. Supp. 2d 61 (D. Mass. 2000) (*citing Dionne v. Bouley*, 757 F.2d 1344, 1356 (1st Cir. 1985); *Fraser v. Major League Soccer, L.L.C.*, 180 F.R.D. 178, 181 (D. Mass. 1998) (liability issues and remedy sought by plaintiffs were common to all plaintiffs, justifying certification of a class under Rule 23(b)(2)). Here, as in *Fraser*, both the conduct complained of the and relief sought are common to all plaintiffs.

**1. Rule 23(b)(2) Certification of Equitable Claims Is Necessary to Protect Against a Substantial Threat to Public Health.**

Among the high callings of a court is the exercise of equitable power to preserve public health and safety. Judicial experience with asbestos litigation teaches that avoidance of human exposure to asbestos, coupled with prompt remediation of property contamination, are far more affective remedies than after-the-fact compensatory schemes. The concerns driving a court's consideration of equitable remedies to prevent fatal illnesses and contamination are quite distinct from the private pecuniary interests typically at issue in damages-only actions. As recognized by the California Supreme Court in its leading medical monitoring decision, *Potter v. Firestone*, 6 Cal. 4th 965, 863 P.2d 795, 825 (Cal. 1993):

> Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism

> that encourages regular medical monitoring for victims of toxic exposure.

Quoting *Ayers v. Jackson Tp.*, 106 N.J. 557, 525 A. 2d 287, 314 (N.J. 1987). The Supreme Courts of California and New Jersey found that those public interests warrant such equitable remedies as funds to pay for diagnostic tests that encourage plaintiffs to safeguard their health, and that do not allow them the option of spending a money judgment for purposes that do not serve public health aims. *Id.*

Both the equities and the law strongly favor imposition upon Grace for the costs of a court-supervised equitable asbestos notification, education and remediation programs. As Chief Judge Emeritus Louis C. Bechtle observed in his decision approving the nationwide diet drug class action settlement, which included a Rule 23(b)(2) medical monitoring program analogous to the notification, education, and remediation program sought here:

> [T]he tort system often fails to accurately identify injured individuals. The economics of tort litigation means that intervention can only occur after a litigant has already sustained an injury. There are no incentives for the tort system to screen asymptomatic individuals, since such persons generally have limited compensation rights. Medical monitoring, on the other hand, suits public health goals of prevention and early treatment, because it seeks to preserve health and prevent injury rather than maximize damages, thereby ameliorating the harsh dynamics of an injury-compensation based tort system.

*In re Diet Drugs*, MDL 1203, 2000 WL 1222042 at * 41, 2000 U.S. Dist. LEXIS 12275 at *167-168. *See also Vadino v. American Home Products Corp.*, No. MID-L-425-98, at 5 (N.J. Superior Court 1999).

Establishment, under Fed. R. Civ. P. 23(b)(2), of a Court-supervised asbestos notification, education and remediation regimen will not only ensure that the proceeds of any monitoring trust fund be used to abate the public health hazard created by Grace, but will also substantially reduce the costs of asbestos notification, education and remediation efforts. The fact that courts today routinely administer complex forms of equitable and injunctive relief with the help of court-appointed outside experts belies any assertion that the equitable relief would be difficult to manage effectively.

**2. <u>Rule 23(b)(2) Certification of Equitable Claims Is Common Under No More Compelling Circumstances.</u>**

Injunctions compelling defendants to provide class members with health and safety protections are appropriate uses of a court's equitable powers under Fed. R. Civ. P. 23(b)(2).[14] *See*, *e.g.*, *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 828-31 (D.C. Cir. 1984) (upholding district court's mandatory preliminary injunction compelling defendants to create a medical monitoring fund for children at risk of neurological damage sustained during an airplane accident); *Day v. NLO*, 851 F. Supp. 869, 886 (S.D. Ohio 1994) (endorsing and applying courts' injunctive powers under 23(b)(2) to "oversee and direct medical surveillance" for radiation victims); *Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193, 203-205 (N.D. Cal. 1987) (affirming plaintiffs' right to seek a medical monitoring injunction because the exposure creating the need for surveillance was "the very essence of irreparable harm"); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 982 (Utah 1993) (use of a court-supervised fund to administer medical-monitoring "is an appropriate use of the Court's equitable powers").

Courts reject the argument that equitable health and safety claims are actually claims for money damages, rather than injunctive relief, and thus outside the authority of Fed. R. Civ. P. 23(b)(2). In *Redland Soccer Club v. Department of the Army*, 548 Pa. 178, 696 A.2d 137, 142-43, n.6 (1997), the Pennsylvania Supreme Court recognized, for example, that the right to medical monitoring is an equitable cause of action to obtain the necessary monitoring services through a court-supervised trust fund for all affected persons, rather than a legal claim for compensatory damages. Similarly, in *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993), for example, the court found the groundwater contamination monitoring claim suitable for Fed. R. Civ. P. 23(b)(2) certification, explaining: "[H]ere, plaintiffs do not merely seek money from [defendant]. Plaintiffs seek to implement a court-supervised program requiring ongoing, elaborate medical monitoring. Accordingly, plaintiffs' relief qualifies as injunctive relief and the Court may properly

---

[14] Similarly, under Fed. R. Civ. P. 23(b)(1)(A), a class action may be maintained when the "prosecution of separate actions by or against individual members of the class would create a risk of . . .inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct . . . " Claims for injunctive relief are often certified under Fed. R. Civ. P. 23(b)(1)(A); *see McDonnell Douglas Corp. v. U.S. District Court*, 523 F.2d 1083, 1086 (9th Cir. 1975); *Fraser v. Major League Soccer*, 180 F.R.D. 178 (D. Mass. 1998); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1772 (2d ed. 1986). Accordingly, this Court may also rest certification on the alternative basis of Rule 23(b)(1)(A).

certify the class under 23(b)(2)." In *German*, 885 F. Supp. at 558-60, the court, in certifying a Fed. R. Civ. P. 23(b)(2) medical monitoring class consisting of apartment tenants exposed to lead paint, properly rejected defendants' argument that the request for medical diagnostic testing is simply a legal damages request trying to disguise itself as injunctive relief.

In the federal diet drug litigation, too, the MDL Transferee Court certified 23(b)(2) injunctive claims on behalf of medical monitoring classes, first for litigation purposes, and later for settlement purposes. *In re Diet Drugs Prod. Liab. Litig.; Jeffers,* MDL 1203, 1999 U.S. Dist. LEXIS 13228 (E.D. Pa. 1999) (23(b)(2) litigation class certified); *In re Diet Drugs Prod. Liab. Litig.; Brown*, MDL 1203, No. 99-20593, 2000 U.S. Dist. LEXIS 12275, 2000 WL 1222042 (E.D. Pa. 2000) (settlement class certified under 23(b)(2) and (b)(3)). Chief Judge Emeritus Louis C. Bechtle's recent decision certifying this nationwide medical monitoring litigation class, under the laws of all states, of dexfenfluramine- and fenfluramine-exposed persons, well-illustrates the appropriateness of nationwide class certification of claims for equitable relief. *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*; *Jeffers v. American Home Products*, MDL 1203, 1999 U.S. Dist. LEXIS 13228 at *37-46 (E.D. Pa. 1999).[15]

### 3. **Rule 23(b)(2) Certification of Equitable Claims Is Warranted in this Case.**

Plaintiffs seek three forms of equitable relief: asbestos notification, education, and remediation. The notification component serves to effectively advise class members of dangers

---

[15] While funds to ensure medical diagnostic testing provide one important illustration of the use of equitable funds, equitable relief is not, of course, limited to medical monitoring. For example, in *In re GMC Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir. 1995), the court rejected a proposed class action settlement of claims stemming from a dangerous design that placed gas tanks outside the frames of certain GM trucks, because the settlement only provided coupons worth $1,000 toward the purchase of a new GM truck, and failed to provide equitable relief in the form of remediation of the defect. Leaving open the question of whether the court could order a recall of GM trucks by injunction, and whether a retrofit process was in fact preferable, the Third Circuit stated: "At all events, the district court could clearly have awarded relief that would require GM to set up a fund to finance retrofits initiated by owners individually." *Id.* at 811. Similarly, in *Garza v. Sporting Goods Properties, Inc.*, No. SA-93-CA-1082, 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. 1996), the court approved a class settlement including equitable relief in the form of warnings and facilitation of replacement of defective rifle barrels. Warnings were also a component of the injunctive relief approved in the diet drugs class action multi-district litigation. *In re Diet Drugs*; *Jeffers* 1999 U.S. Dist. LEXIS 13228; *In re Diet Drugs*; *Brown* 2000 U.S. Dist. LEXIS 12275, 2000 WL 1222042.

associated with Zonolite Attic Insulation, thus averting future injury. The education component serves to educate consumers as to actions they must take as homeowners to avoid asbestos exposure and contamination of property. The remediation component seeks to ensure that appropriate operation, maintenance, and abatement activities actually occur through creation of an equitable fund that facilitates and funds such activities exclusively.

If a claim is appropriately certified under Rule 23(b)(2), the predominance and superiority requirements of Rule 23(b)(3) need not be considered. Plaintiffs meet the requirements for class certification under Rule 23(b)(2) with respect to their claims for injunctive and equitable relief. The facts of this case cry for immediate equitable relief, as opposed to after-the-fact efforts to obtain a money judgment to compensate for the loss of a loved one or the considerable financial damages that typically follow in the wake of unknowing contamination of property with asbestos.

Plaintiffs' claims are typical of the claims of the class they seek to represent and they have demonstrated the adequacy of their representation. The relief they seek is equitable in character. Plaintiffs, therefore, have fully satisfied each of the elements of Fed. R. Civ. Proc. 23(a) and one of the elements of Fed. R. Civ. Proc. 23(b), making class certification appropriate.

### 4. **Rule 23(b)(2) Certification Is Not Defeated Where Claims for Damages Are Incidental to Claims for Equitable Relief.**

Courts adjudicating cases which involve predominantly equitable relief, but which also include incidental claims for damages, regularly certify both the injunctive claims for relief and the monetary damages claims under 23(b)(2). Classes certified under Rule 23(b)(2) may include individual monetary damage claims if the resolution of those claims does not destroy the cohesive nature of the class. *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 250-251 (3d Cir. 1975).

For example, in *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998), the Ninth Circuit upheld the district court's 23(b)(2) certification of a class settlement which provided cellular telephone minority interest holders with equitable relief including management-related changes, along with $10 million in damages. The court held that "'class actions certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory

relief, but may include cases that also seek monetary damages.'" *Id.* at 1240 n.3 (*quoting Probe v. State Teacher's Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (upholding class certification of Title VII claims and enjoining use of sex-segregated actuarial tables in action also seeking money damages)).

"The hallmark of a 23(b)(2) class action is homogeneity." *Von Colln v. County of Ventura*, 189 F.R.D. 583, 592-593 (C.D. Cal. 1999). The analysis of class certification under 23(b)(2) turns not on the predominance of the injunctive relief relative to the monetary relief requested, but on "identifying the cohesiveness of the class and the homogeneity of the members' interest as the salient factors on which the availability of the (b)(2) class action form hinges . . . ." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 451-52 (N.D. Cal. 1994); *see also Barefield v. Chevron*, 1998 WL 188433, at *3-*4, 12 Fed. R. Serv. 3d (Callaghan) 1232; 48 Fair Empl. Prac. Case (BNA) 907 (N.D. Cal. 1988).

Pursuant to this authority, this Court may include within the certified class costs incurred by class members who have already removed their asbestos-contaminated Zonolite Attic Insulation and thereby incurred monetary damages.

**5. Punitive Damages Claims May Properly be Certified on a Mandatory Basis Under 23(b)(2) and/or 23(b)(1)(B).**

Plaintiffs' punitive damages claims may be properly certified on a mandatory basis under 23(b)(2), and/or 23(b)(1)(B), since only a mandatory class can possibly ensure an equitable distribution of any punitive damage award among the affected community. In *Barefield v. Chevron*, 1998 U.S. Dist. LEXIS 15816 *11, 12 Fed. R. Serv. 3d (Callaghan) 1232 (N.D. Cal. 1988), for example, the district court held that punitive damages awards are appropriately certified under Rule 23(b)(2):

> A class claim for punitive damages does not detract from the homogeneity or cohesiveness of the class. Rather it is consistent with the notion that the focus of a (b)(2) action is the defendant's conduct toward persons sharing a common characteristic. Because the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole. The cohesive core of the (b)(2) action is thus maintained.

(Citations omitted.)

In *Barefield,* plaintiffs pursuing injunctive relief under Title VII and other race discrimination laws against Chevron also pursued punitive damages claims. The punitive damages claims were determined to be appropriately certified under Rule 23(b)(2) because "such relief may be treated as ancillary to the claims for injunctive and declaratory relief which remain at the heart of this action." *Id.* This is also true here. The same misconduct driving plaintiffs' principal claims for equitable relief against Grace also justify their ancillary claims for punitive damages. "[W]here the plaintiffs allege that the defendant acted in a manner applicable to the class as a whole, the issue whether that conduct is sufficiently culpable to support punitive damages is identical for each class member," *Id* at *15.

Similarly, many courts have found the issue of punitive damages to be susceptible to classwide treatment, even in cases in which the determinations of classwide entitlement to punitive damages precede determinations of classwide or individual compensatory damages. *See, e.g.*, *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 910 F. Supp. 1460, 1464 (D. Haw. 1995); *Jenkins v. Raymark Industries, Inc.*, 109 F.R.D. 269 (E.D. Tex. 1985), *aff'd*, 782 F.2d 468, *reh'g denied*, 785 F.2d 1034 (5th Cir. 1986). In both of these decisions, the respective courts of appeal affirmed class trial structures which provided for the entitlement and quantification of punitive damages (by either a fixed aggregate sum, as in the $1.2 billion affirmed in *Marcos*, or determination of a punitive-to-compensatory damages ratio, as in *Jenkins*).

In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991), the Supreme Court held that due process imposes both procedural and substantive limits on punitive damages (punitive damages should not be "greater than reasonably necessary to punish and deter"). In *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), the Court expressly reaffirmed that principle, stating that "Due Process . . . imposes substantive limits beyond which penalties may not go." 509 U.S. at 57. *BMW of No. Am. v. Gore*, 517 U.S. 559, 581 (1996) held that due process and the avoidance of unreasonable or excessive punitive damages requires that punitive damages bear a "reasonable relationship" or ratio to compensatory damages.

Rule 23(b)(1)(B) certification is ideally suited to punitive damages claims for both practical reasons, and under principles of equity. In many cases (including this one) a defendant may face financial ruin from multiple or disproportionate punitive damages awards. In other cases, even a financially robust defendant may be entitled to the constitutional protection of punitive damages limits. In all cases, the interests of plaintiffs and society may be ill-served without the application of a class mechanism that protects them against under-deterrence from insufficient punitive damages awards, while in turn protecting defendants from punitive damages overkill. Judge Weinstein applied these principles, which have come to be known as the limited punishment theory, in *In re "Agent Orange" Prods. Liab. Litig.*, 100 F.R.D. 718 (E.D.N.Y. 1983), *aff'd*, 818 F.2d 145 (2d Cir. 1987), certifying a mandatory nationwide class of Vietnam war veterans seeking punitive damages for injuries from exposure to the Agent Orange defoliant. The court determined that the chemical manufacturer defendants had sufficient assets to respond to any probable judgments, such that the traditional "limited fund" theory for Rule 23(b)(1)(B) certification would not apply. Nevertheless, the court concluded that a mandatory punitive damages class under Rule 23(b)(1)(B) was most appropriate, because the pool of potential punitive damages dollars was inherently limited as a matter of law:

> When a plaintiff recovers punitive damages against defendant, that represents a finding by the jury that the defendant was sufficiently punished for the wrongful conduct. There must . . . be some limit, either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction. At the very least, a trial court in passing on future claims may admit evidence as to the payment of prior awards which may be used by a jury to reduce an award to a party seeking additional punishment for the same misconduct. There is, therefore, a substantial probability that "adjudication with respect to individual members of the class . . . would as a practical matter be dispositive of the interests of the other members not parties to the adjudication." Accordingly, a class of all [claimants] is certified under (b)(1)(B) . . . for the award of punitive damages.

*Id.* at 728.

In 1994 it was the defendant, Exxon Corporation, that successfully invoked the "limited punishment" theory to obtain Rule 23(b)(1)(B) certification for trial purposes in *In re The Exxon Valdez*, No. A89-0095-CV (HRH) (D. Alaska). Exxon desired to face a single classwide trial and punitive damages award, and hence persuaded the trial court that mandatory class certification,

including the stay of any other proceedings by class members, was appropriate. In Fall 1994, the jury returned a classwide punitive damages verdict of $5 billion against Exxon, which remains on appeal to the Ninth Circuit. In approving mandatory classwide treatment of the punitive damages claim (over the objection of some plaintiffs), the *Exxon Valdez* court noted that federal punitive damages jurisprudence had, "in substance, created a limited fund for punitive damages in multi-claim cases," and that these were "substantive limits," "beyond which penalties may not go" without violating due process. *Exxon Valdez*, Order No. 180 Supplement at 8, citing, *TXO*, 509 U.S. at 454 and *Haslip*, 499 U.S. at 22.

The circuit courts have also acknowledged these principles. In *Morgan v. Woessner*, 997 F.2d 1244, 1258 (9th Cir. 1993), the Ninth Circuit held punitive damages should not "exceed[] the amount necessary to accomplish the goals of punishment and deterrence . . . ." And while courts have thus far declined to construe the Due Process Clause as a per se prohibition against multiple punitive awards for the same conduct, (*see Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir. 1993)), they have uniformly acknowledged that earlier punitive awards must be considered in mitigation of later ones.[16] This is best achieved by comparing aggregate compensatory damages to aggregate punitive damages. Class certification of compensatory damages and punitive damages makes it possible to achieve the fairest and most equitable assessment of these damages in a single proceeding.

Thus the courts accord judicial sympathy even to well-funded defendants who nonetheless wish to avoid seriatim and potentially limitless exposure to punitive damages. But what of defendants who do not affirmatively seek such relief, preferring, like the Grace defendants, to deploy a tactic of delay and attrition? In such an instance, the courts have determined that defendants may not elect to spend themselves into insolvency, gambling that the claimants' assets and energies will first be exhausted. As one federal court has put it, certifying punitive damages for classwide treatment is called for to prevent "an unseemly race to the courtroom door with monetary

---

[16] One court has alternatively referred to this theory as the "limited generosity" theory- apparently in reference to the fact that the law limits a jury's "generosity" to plaintiffs in awarding punitive damages. *In re School Asbestos*, 789 F.2d at 1005-06. Others have referred to it as the "punitive damages overkill" theory. *Id.*; *see also Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 839-41 (2d Cir. 1967).

prizes for a few winners and worthless judgments for the rest." *Coburn v. 4-R Corporation*, 77 F.R.D. 43, 45 (E.D. Ky. 1977).

**D. Certification Is Also Appropriate Under Rule 23(b)(3).**

Alternatively, this Court may certify all plaintiffs' claims for relief pursuant to Fed. R. Civ. P. 23(b)(3).[17] To certify a class under Rule 23(b)(3), this Court must find that:

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). Both criteria are met in this case: common issues predominate, and a class action is the superior method to adjudicate the claims of the class.

**1. Common Questions Predominate.**

Predominance of common issues ensures only that common proof at trial will not be overwhelmed with individual issues. *Hanlon*, 150 F.3d at 1022. The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The existence of individual issues such as statute of limitations does not compel a finding that individual issues predominate "[a]s long as a sufficient constellation of common issues binds class members together." *Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). "When common issues present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (citations and quotations omitted); *see also In re Prudential Ins. Co.*, 148 F.3d at 314-15

---

[17] Where a choice exists between certification under Rule 23(b)(3) and either Rule 23(b)(1) or (b)(2), courts generally prefer to certify the class action pursuant to (b)(1) or (b)(2). A mandatory class action is seen as preferable because there is no risk that individual members will opt out of the class and pursue separate litigation that might prejudice other class members or the defendant. *See In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989), *cert. denied sub nom, Anderson v. Aetna Casualty & Sur. Co.*, 493 U.S. 959 (1989) (certification should be made under Rule 23(b)(1) if action may also qualify under (b)(3)); *see also In re Real Estate Title and Settlement Servs. Antitrust Litig.*, 1986 U.S. Dist. LEXIS 24435 at *34 (E.D. Pa. 1986); *Newberg on Class Actions*, § 4.20 at 4-71 through 4-75. Additionally, certification under Rule 23(b)(1) or (b)(2) avoids the greater burdens on the parties and the court in meeting heightened notice and other requirements that may be applied to Rule 23(b)(3) class actions. *Eubanks*, 110 F.3d at 92 (certification under Rule (b)(1) or (b)(2) avoids "the often burdensome and costly notice requirements applicable to a [Rule23] (b)(3) class").

(certifying nationwide consumer fraud class); *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 545 (D.N.J. 1999) (individual issues do not defeat a finding of predominance of common issues ); *Rodriguez*, 166 F.R.D. at 479 ("any individual issues regarding damages were overshadowed by the "predominant common questions of liability.").

In previous asbestos remediation cases brought on behalf of schools, courts certified Rule 23(b)(3) classes for asbestos property damage claims of school districts nationwide, *In re Asbestos School Litigation*, 104 F.R.D. 422, 431-434, (E.D. Pa. 1984) *aff'd in relevant part*, *In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986), and of colleges and universities nationwide, *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 643 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993). In concluding that the class should be certified, the district court in *Asbestos School* held:

> These claims, as noted, arise out of the same common nucleus of operative facts relating to defendants' conduct and the nature of asbestos products. Common questions relating to the hazards of asbestos, the knowledge of the defendants of the hazards, industry policies and practices and defendants' failure to warn and to test are at the core of all the damage claims for relief, and will dominate other issues at trial, regardless of how defendants' conduct is characterized in terms of a specific tort.

*Id.*, 104 F.R.D. at 432; accord *In re School Asbestos*, 789 F.2d at 1008 ("Experience shows that in the asbestos litigation arena redundant evidence is the rule rather than the exception.");[18] *see also Jenkins*, 782 F.2d 468 (upholding Rule 23(b)(3) class certification of asbestos personal injury claims of almost one thousand individuals).

---

[18] In *In re School Asbestos*, the Third Circuit affirmed 23(b)(3) certification but reversed the district court's certification of a mandatory 23(b)(1)(B) punitive damage class on the grounds that the class was underinclusive and that there had been no financial showing of any limitation in the availability of punitive damages. *In re School Asbestos*, 789 F.2d 996, 1004-1008 (3rd Cir. 1986). Here, however, the class in fully inclusive since it includes all persons nationwide with Zonolite Attic insulation, except Washington residents for whom a class has already been certified and with respect to whom this court may readily coordinate claims. Similarly, the recent Third Circuit decision in *In re Mary Collins*, 2000 U.S. App. LEXIS 30176 (3d Cir. 2000), denying a petition for mandamus seeking the remand of punitive damage claims from MDL 875, held that it is appropriate to postpone adjudication of asbestos punitive damages claims in asbestos actions because of the existence of asbestos defendants' limited assets. This decision foreshadows the classwide determination of such claims.

In the *School Asbestos* cases, unlike in this action, every school had already been notified and ordered by Congress to remediate their asbestos contamination. *School Asbestos*, 789 F.2d at 1008. Therefore, damages rather than injunctive relief were the appropriate remedy and, for that reason, the district court declined certification under 23(b)(2) and certified the class under 23(b)(3). Here, on the other hand, class members are homeowners and tenants who remain ignorant of the contamination, and are not under any mandate to remediate. For these reasons, injunctive relief under Rule 23(b)(2) is required to ensure notification and education, and to further ensure that the funds provided are expended to remediate the hazard. Should the principle character of the action change as a result of any necessary shift in emphasis from equitable/injunctive relief to the adjudication of claims for money damages, then this Court would be free to modify its order and certify the entire case under Fed. R. Civ. P. 23(b)(3), a change which would only require consideration of an additional notice to inform class members of their right to opt out of any Fed. R. Civ. P. 23(b)(3) class.

The fact that claims against Grace include allegations of widespread consumer fraud bolsters, rather than undermines, the grounds for class certification. As the United States Supreme Court recently affirmed, "[p]redominance is a test readily met in . . . cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625. For example, in *Duhaime v. John Hancock*, 177 F.R.D. 54, 64 (D. Mass. 1997) (*citing Amchem*), where plaintiffs alleged fraud in the sales of life insurance, the court held that because the fraud was allegedly committed through a common scheme or deception, common factual issues predominated, and a damages class would be certified. Similarly, in *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 471 (D. Mass. 1984), the court certified a class notwithstanding issues of reliance and execution of releases by some class members. *See also Waste Mgt.*, 208 F.3d 288 (rejecting defendants' contention that issues of reliance precluded class certification); *Hurley v. Federal Deposit Ins. Corp.*, 719 F. Supp. 27, 34 (D. Mass. 1989) (same); *In re Badger Mtn. Irrigation Dist. Secs. Litig.*, 143 F.R.D. 693, 697 (W.D. Wash. 1992) ("Where plaintiffs allege a common course of wrongdoing based on the same misrepresentations, individual issues of reliance do not preclude certification of the class."); *Cope v. Metropolitan Life Ins.*, 82 Ohio St. 3d. 426, 696 N.E.2d 1001 (Ohio 1998) (reversing trial court's

refusal to certify a nationwide class of life insurance policy owners who were allegedly defrauded into paying excessive premiums and renewal fees, stated: "If a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis.").

These arguments are all the more applicable here because plaintiffs allege consumer fraud by concealment or omission. In such cases, the notion of subjective reliance has been recognized as illogical, or at least speculative. One cannot "rely" on that which is undisclosed, concealed, or omitted. That a person has taken action in ignorance of a material fact is a more objective and direct proof that defendants' fraud caused that person's damages than his speculative testimony, after the fact, could ever be. Failure to disclose a material fact creates a presumption of relevance that, as a well-established precept of common law proof, suffices in such cases to establish causation; this substantive rule applies both to individual actions or class actions. *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) (class action); *Cope*, 696 N.E.2d 1001 (class action); *Hunter v. McKenzie*, 197 Cal. 176, 239 P. 1090 (Cal. 1925) (individual action); *Amato v. General Motors Corp.*, 463 N.E.2d 625 (Ohio Ct. App. 1982) (class action). *In re Prudential Ins.*, 148 F.3d at 314("'because plaintiffs' fraud-based claims stem largely from misleading omissions,' reliance can be presumed"); *Zacharjasz v. Lomas and Nettleton Co.*, 1988 U.S. Dist. LEXIS 4957 (E.D. Pa. 1988) (certifying class arising from mortgages that were sold via a "standardized pattern of oral [misre]presentations."); *State, ex rel, Guste v. General Motors Corp.*, 370 So.2d 477 (La. 1978) (certifying class under Louisiana UTPCPL arising from nondisclosures regarding source of automobile engines); *Heastie v. Community Bank*, 125 F.R.D. 669 (N.D. Ill. 1989) (class of satellite dish purchasers under Illinois Consumer Protection Law injured by "bait and switch" scheme). *See also FTC v. Intl'l Diamond Corp.*, 1983-2 Trade Cas. (CCH) ¶ 65,725, 1983 U.S. Dist. LEXIS 11862 (N.D. Cal. 1983), *(citing Affiliated Ute*, 406 U.S. 128). *See generally* Fed. R. Civ. P. 23, 1966 Advisory Committee Notes ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action").

This case involves a single group of defendants and a request for a unitary determination of defendants' liability to fund an equitable a remedy to be uniformly offered to all

class members. Central to the claim of every class member is common proof that a single product, Zonolite Attic Insulation, contains asbestos which poses great danger when disturbed by activities such as remodeling or children playing in the attic. The case-in-chief for the plaintiff class presents proof common to all class members, will not vary from plaintiff to plaintiff, and does not depend on the knowledge or conduct of any plaintiff. Similarly, Grace's affirmative defenses or denials -- that the product is not defective and presents no danger -- present issues common to all class members.

The Rule 23(b)(3) predominance requirement is satisfied.

**2. <u>A Class Action is the Superior Method for the Fair and Efficient Adjudication of this Controversy.</u>**

This case also meets the second requirement of Rule 23(b)(3): that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

Superiority is demonstrated where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). To determine whether the class action mechanism is superior, courts should consider the following factors: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Here, equitable asbestos notification, education and remediation relief can only be obtained on a class basis. Moreover, the only theoretical alternative, piecemeal individual litigation, is not economically viable due to the relatively small value of injunctive relief in any particular building when compared to the litigation costs necessary to pursue any separate claim. *See e.g.*, *Hanlon,* 150 F.3d 1011; *M. Berenson Co.*, 100 F.R.D. at 471. Even if feasible, individual adjudication would unnecessarily burden the courts and would eliminate the possibility of class-wide equitable relief. *Hanlon*, 150 F.3d 1011. It would also impose a substantial risk of inconsistent or contradictory adjudications of the claims.

**3. <u>The Case Is Manageable Under Montana or Massachusetts Law Or Under The Laws Of All Jurisdictions.</u>**

There is no evidence before this Court that a class action will prove unmanageable because of the need to apply different laws to different class members. This case is manageable whether the law of a single state (*e.g.*, Montana or Massachusetts) applies, or whether the laws of the 50 states and the District of Columbia are applied.

**a. <u>The Law of Montana Applies Because There is No Conflict.</u>**

This Court may properly apply either the law of Montana or the law of Massachusetts to the tort claims of all class members because the relevant laws of Montana, Massachusetts and other interested states do not materially or directly conflict with respect to plaintiffs' claims for negligence, fraud and failure to warn. *Phillips Petroleum v. Shutts*, 472 U.S. 797, 817-822 (1985); *see also Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992) ("Before entangling itself in messy conflict of laws analysis a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states."); *In re Complaint of Bankers Trust Co.*, 752 F.2d 874 (3d Cir. 1984) (unless a material conflict exists creating a significant possible effect on the outcome of the trial, choice of law rules are inapplicable.). With respect to plaintiffs' punitive damages claims, 46 jurisdictions recognize the claim and, as a result, a choice of law analysis is appropriate. A choice of law analysis indicates that the law of Montana or Massachusetts would apply because those states have the most significant relationships with the parties, the states involved and the interstate system as a whole.

Montana and Massachusetts law provide for a cause of action against a manufacturer whose product causes harm either as a result of defective design or manufacture or as a result of inadequate warnings or instructions. *See* Montana Code Annotated ("MCA") T.27, Ch.1, Pt.7 (1999); *Vassallo v. Baxter HealthCare Corp.*, 696 N.E.2d 909, 923 (Mass. 1998). Montana and Massachusetts also provide for claims against a manufacturer who fraudulently deceives the public, conceals information, or fails to disclose information. *See* MCA T.30, Ch.14, Pt.1 (1999); *Vassallo*, 696 N.E.2d 909.

b. **There Are Few Material Significant Differences Among The Laws Of All States Which The Court Could Also Apply To The Controversy.**

Plaintiffs' class claims can be tried under the laws of all jurisdictions since all states recognize analogous claims. Any asserted differences in the laws of all states with respect to these claims may readily be managed with jury instructions and special verdict forms. Furthermore, should the need arise, subclasses can be created to account for variances pursuant to Rule 23(c)(4). See, e.g., *In re Asbestos School Litigation*, 104 F.R.D. at 434; *In re Diet Drugs*, *Jeffers*, 1999 U.S. Dist. LEXIS 13228, at *37-46.

(1) **Negligence.**

In every American jurisdiction, the legal standards with respect to negligence are essentially the same. *See* Appendix A1-2. As MDL Transferee Judge Spiegel concluded in *Telectronics*: "[A]ll states use the same elements to define a cause of action in negligence." *In re Telectronics Pacing Systems Inc.*, MDL 1057, 172 F.R.D. 271, 291 (S.D. Ohio 1997). After considering the same question in *Copley*, MDL Transferee Judge Brimmer concluded: "the standard for ordinary negligence does not significantly differ throughout the country, and the differences that do exist can be remedied through careful instructions to the jury." *In Re Copley Pharm., Inc.*, MDL 1013, 158 F.R.D. 485, 491 (D. Wyo. 1994) ("*Copley I*"). All American jurisdictions require a plaintiff to demonstrate the same four elements to establish a cause of action for negligence: duty, breach, causation and damages. *See* Appendices A-1 and A-2. Plaintiffs will establish Grace's negligence in the sale and marketing of its asbestos contaminated insulation and its ongoing efforts to conceal asbestos hazards from the class. Given the similarities in the law of negligence among the fifty-one jurisdictions, all jurisdictions can be squarely placed within the parameters of a single negligence subclass.

(2) **Strict Liability for Failure to Warn.**

Plaintiffs' strict liability claims arise from Grace's knowing failure to warn of dangers of asbestos contamination of its Zonolite product, claims which are treated uniformly across the nation. *See* Appendix B. While Massachusetts does not recognize strict liability, it recognizes

analogous failure to warn claims brought in negligence. *Id.* The law in the area of "failure to warn" is essentially the same in all American jurisdictions:

> Warning claims . . . tend to be treated the same way by the courts, regardless of the underlying cause of action. Thus with regard to different theories of recovery, and particularly strict liability and negligence, judges have opined that there is 'no practical difference,' no doctrinal distinction;' no 'rigid distinctions,' a 'strong resemblance' between the different products liability theories, or that any distinction is 'illusory.' Other courts have held that regardless of the underlying theory, warning claims are 'equivalent' 'indistinguishable,' virtually inextricable,' 'identical,' 'essentially the same,' and are generally measured by the same standards.'

2 Frumer & Friedman, *Products Liability* § 2.02[1], pp. 12-22 - 12-24 (1998) (citations omitted).

Plaintiffs' failure to warn claims are readily addressed on a classwide basis since all strict liability jurisdictions effectively apply the same knowledge test, also applicable in negligence, to measure whether a manufacturer or supplier may be found strictly liable for failing to warn of product risks:

> [T]he courts for the most part, in jurisdictions generally espousing the doctrine of strict products liability (when a negligence theory is applied, there is no question that actual or constructive knowledge is an essential element), hold that liability based upon a failure to warn users of a product's inherently dangerous quality or characteristic may be imposed only where the manufacturer, distributor, or seller as the case may be, had actual or constructive knowledge of the dangerous quality or characteristic.

Charles C. Marvel, *Strict Products Liability: Liability for Failure to Warn as Dependent on Defendant's Knowledge of Danger*, § 2, 33 A.L.R.4th 368 (1981-1988); Appendix B.

**(3) <u>Fraud.</u>**

All 51 jurisdictions recognize the tort of nondisclosure and/or fraudulent concealment. *See* Appendices C 1-4 (surveying all jurisdictions, which recognize *Restatement (Second) of Torts*, §§ 551 and 550 (1977) (Fraud by Nondisclosure and Fraudulent Concealment, respectively, or standards similar thereto). The attached charts visually demonstrate the substantial similarity and essential uniformity of the laws of the 51 jurisdictions on the fraud claims. Indeed, the only noteworthy nuances among these laws are the three alternative predicates creating a duty to disclose: superior knowledge, partial disclosure, and/or fraudulent concealment. All jurisdictions

recognize at least one of these predicates. Most jurisdictions recognize two or all of these as alternative bases for establishing duty. *See id.*

This nuance is immaterial as a matter of fact here, because all three duty predicates are alleged by the plaintiffs in this action. Here, plaintiffs allege that the Grace defendants knew, but concealed from the public, that asbestos contamination of Zonolite Attic Insulation posed significant hazards to class members. Plaintiffs allege further that Grace knowingly concealed the presence of asbestos from all class members by affirmatively concealing and suppressing the fact of contamination, allegations which suffice to create a duty to disclose under the laws of all jurisdictions, regardless of which predicate triggers the duty to disclose. *See* Appendices C 1-4.

**(4) <u>Punitive Damages.</u>**

The laws of forty-six jurisdictions recognize the availability of punitive damages, and those laws demonstrate a high degree of uniformity with respect to the description of the conduct that triggers punitive damages, the factors to be considered by the jury in deciding entitlement to punitive damages, and, if so, the quantum of the award that may be made. *See* Appendix D.

The United States Supreme Court has established common factors that must be considered by a fact finder in determining punitive damages. *Pacific Mutual Life Ins.*, 499 U.S. 1; *TXO Prod.*, 509 U.S. 443; *BMW of No. Am.*, 517 U.S. 559. These factors are:

a. that the purpose of punitive damages is to punish or deter the defendant or others in its position;[19]

b. that punitive damages cannot be awarded unless compensatory damages are awarded;

c. that punitive damages must bear some reasonable relation to the compensatory damages; and

d. that the jury must consider the reprehensibility of the defendant's conduct.

---

[19] There is one exception, Michigan, which has held that "exemplary damages are recoverable as compensation to the plaintiff and not as punishment of the defendant." *Green v. Evans*, 156 Mich. App. 145, 401 N.W. 2d 250 (Mich. App. 1985). A few other states disallow any punitive or exemplary damages in this case. To simplify the proceedings in the event the Court elects to proceed under an "all states" regime rather than selecting a single state's law, Plaintiffs would not seek exemplary damages for residents in these states (New Hampshire, Massachusetts, Louisiana, Nebraska and Washington).

Appendix D1.

For choice of law considerations addressed further below, it is noteworthy that Montana's well-crafted punitive damage statute expressly addresses the Due Process concerns described in these Supreme Court cases. MCA section 27-1-221 MCA provides: 1) an objective standard of liability; 2) a "clear and convincing evidence" standard of proof; 3) trial judge review of jury award; 4) enumerated factors for consideration, including previous punitive assessments for the same wrongful act, and proportionality to actual damages. For this reason, the Montana punitive statute well represents the federal constitutional law and is a procedural and substantive "common denominator" of the punitive damage laws of nearly all of the states.

**c. <u>Assuming There is a Conflict, This Court Should Apply the Choice of Law Rules of Montana.</u>**

As shown, with the exception of punitive damages, the relevant laws of all interested states do not materially conflict. This Court must apply the choice of law rules of Montana to resolve any conflict. Generally, a federal court with diversity jurisdiction must apply the choice of law principles of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941). However, a federal court hearing diversity cases transferred to it by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 is bound to apply the choice of law rules of the relevant transferor court. *In re Sunrise Sec. Litig.*, 698 F. Supp. 1256, 1261 (E.D. Pa. 1988) (*citing In re "Agent Orange" Prod. Liab. Litig.*, 580 F. Supp. 690, 695 (E.D.N.Y. 1984)). Because *Price* was transferred from the District of Montana, this Court should apply the choice of law rules of Montana.[20]

Montana choice of law rules determine that Montana or Massachusetts has the most significant interest in the dispute and therefore Montana or Massachusetts law should apply.

---

[20] This Court need not apply the choice of law rules of the forum of each of the consolidated cases because only the *Price* plaintiffs move for class certification. However, because the choice of law rules of the other two states — Massachusetts (Lindholm and Goldstein), and Illinois (Hunter) — apply compatible choice of law criteria, the analysis and conclusion are equally applicable and there is no potential conflict regarding the conflict analysis itself. *See, e.g.*, *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985) (Massachusetts Supreme Judicial Court adopting a fluid "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole."); *Ingersoll v. Klein*, 46 Ill. 2d 42, 262 N.E.2d 593 (1970) (Illinois Supreme Court uses "most significant relationship" test in tort cases.).

Montana follows the *Restatement (Second) of Conflict of Laws*, which holds that the law of the place of injury presumptively applies unless, with respect to the particular legal issue, a different state has a more significant relationship. *Phillips v. GMC*, 298 Mont. 438, 995 P.2d 1002 (Sup. Ct. Mont. 2000). The *Restatement's* "significant relationship" test, § 6, provides that:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Judge Weinstein's recent decision in a nationwide tobacco class action proceeding, *Simon v Philip Morris Inc.*, No. 99 CV 1988, 2000 U.S. Dist. LEXIS 16713 (D.N.Y. Nov. 17, 2000) exhaustively analyzes the judicial history and applicable public policy concerns relating to application of choice of law rules in the mass tort context, analyzing principles recognized under the *Restatement (Second) of Conflicts* as well as other choice of law standards and decisions. Judge Weinstein's decision observes and approves a historical move away from a focus upon the location of injury in the diffuse mass tort context, to determine applicable law by focusing upon the location of the defendants' fraudulent conduct. *Id.* Following this analysis, Judge Weinstein elected to apply New York law to the majority of the claims of the proposed nationwide class, due to New York's interest in ensuring that it is "not a base or a haven for law breakers to wreak injury nationwide" and based upon allegations that a substantial portion of the alleged conspiracy was orchestrated in New York. *Id.* at *82. Notably, the court simultaneously recognized and adopted the rule of depecage, a rule previously applied by MDL transferee courts, that permits different laws to apply to different claims, depending upon the different degrees of state interest with respect to the operative facts. *Id.* at *85. In applying depecage to the tobacco class action proceeding, the court determined that "while New York has a paramount interest in punishing and deterring misconduct, other states have a concurrent interest in ensuring that their own citizens receive individual relief in line with their own compensatory scheme." *Id.* at 91.

Since the *Price* plaintiffs seek a uniform, equitable nationwide asbestos notification, education and remediation program, they urge application of the law of Montana or, in the alternative, Massachusetts to the tort claims of all class members and the adoption of the depecage principle to permit application of the punitive damage laws of all jurisdictions, in appropriate recognition of the differing state interests on punitive damages.

(1) **Montana Has The Most Significant Relationship.**

In this case, the actionable activity was the fraudulent conduct in Libby, Montana involving the asbestos-contaminated vermiculite mined in Libby and distributed nationwide. All of the insulation materials were mined in Libby, Montana and the defendants' fraud was centered there. For years, Grace has deliberately made false claims in Montana to health officials denying any connection between the ore that it mined and processed and dangerous health conditions affecting Libby Workers, including high incidences of disease. Montana's relationship to the dispute is probably more significant than that of any other state. A state's interest in ensuring that its resident manufacturers and distributors made products safe for public consumption is "not only a cognizable interest but also the paramount interest in its law being enforced." *Butkera v. Hudson River Sloop "Clearwater,"* 300 N.J. Super. 550, 554, 693 A.2d 520 (N.J. Super. Ct. App. 1997); *Gantes v. Kason Corp.*, 145 N.J. 478, 679 A.2d 106 (N.J. Sup. Ct., 1996) (applying New Jersey law where malfunctioning machine made in New Jersey killed a Georgia resident in Georgia). Although each state has an interest in compensating its citizens and preventing unlawful business conduct within its jurisdiction, none has a significantly greater interest than Montana. Because Montana's interest exceeds that of all other interested states, Montana law should apply to all class members' claims.

This Court need not resolve with finality which law applies. For current class certification purposes, it is sufficient to conclude that each rational choice of law ruling will not create difficulties in manageability such that the class vehicle becomes undesirable. As addressed in greater detail, below, class members residing in states which do not recognize punitive damages, New Hampshire, Massachusetts, Louisiana, Nebraska and Washington: may potentially recover punitive damages should the Court apply Montana law; may simply be excepted from any potential punitive damage recovery, should the Court apply the laws of each state for the resident of that state;

or may be denied damages, along with class members in all states, should the Court apply Massachusetts law.

(2) **Massachusetts Also Has A Significant Relationship.**

A second rational result is that, Massachusetts law applies to the claims of all class members since a great part of the fraud also occurred in Massachusetts. *See Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 171-72 (D. Mass. 1989) (applying Massachusetts law to nationwide claims). Specifically, the following conduct is believed to have occurred in Massachusetts.

> Grace's Construction Products Division ("CPD") had overall responsibility for the manufacture and marketing of Zonolite and was headquartered in Cambridge, Massachusetts.
>
> Although Grace had expanding plants and other facilities in various states, the manufacturing activity was coordinated and supervised through the Cambridge headquarters.
>
> The managers at the various plants reported to personnel in the Cambridge headquarters.
>
> The marketing, advertising and promotional materials for Zonolite were developed and prepared at the Cambridge headquarters.
>
> The marketing, advertising and promotional materials for Zonolite were distributed to dealers (and other members of the distribution network) from the Cambridge headquarters.
>
> CPD personnel in Cambridge were partially, if not wholly, responsible for decisions with respect to the labeling of Zonolite.
>
> CPD personnel in Cambridge were partially, if not wholly, responsible for decisions with respect to whether or not to warn Zonolite purchasers or members of the public about the asbestos content of Zonolite and the hazards posed thereby.

Defendants may argue that *all* states have a significant interest because the Defendants' conduct resulted in the distribution and installation of their product nationwide, thereby creating a conflict of laws' thicket that prevents the fair and efficient adjudication of the claims arising from this conduct by a single court under a single state's law. Yet this is the precise reason that courts and commentators have recognized the special need for the application of choice of law principles to select one law to adjudicate all claims. There will always be one state with the *most* significant interest in the conduct giving rise to the controversy. *Simon, supra*. The federal courts

have long recognized that other states do indeed have an interest: the interest in seeing the claims adjudicated, rather than having their own laws applied. Thus, it has been frequently determined that these states would prefer to see the claims proceed on a class basis rather than to see them go unprosecuted. This is particularly true where, as here, the claims are not susceptible to economically feasible individualized litigation. *In re Pizza Time Theatre Securities Litigation*, 112 F.R.D. 15 (N.D. Cal. 1986). In *Pizza Time*, defendants had contended that class treatment of dependent tort claims "would be unmanageable because the court would have to apply dozens of separate legal standards." *Id.* at 17. The *Pizza Time* court rejected this contention under the controlling *Shutts* analysis, concluding that, whether or not a particular state's law would ultimately be determined to apply, no state had articulated an interest in protecting defendants from liability for wrongdoing, or would insist on having its own law apply at the expense of utilizing the class action mechanism, since no state had a legitimate interest in barring plaintiffs from court:

> The Court first notes that each of the interested jurisdictions shares the goals of deterring fraudulent conduct, protecting those wronged when accused of fraud, and providing a remedy for its residents who have been defrauded . . . . Each jurisdiction has laws prohibiting fraud that accommodate these sometimes competing concerns. It is evident that the similarities in these laws vastly outweigh any differences. It is also apparent that each jurisdiction would rather have the injuries of its citizens litigated and compensated under another state's law than not litigated or compensated at all.

112 F.R.D. at 20.

### E. **Notice To the Class Will Protect Their Procedural Rights and Interests and Assure the Fair Conduct of the Action.**

In addition to seeking certification of all equitable and punitive damages claims, plaintiffs have also moved this Court to order that notice to be sent to the class. If this matter is certified pursuant to Rule 23(b)(2), the provision of notice is within the broad discretion of the Court; if the matter is certified pursuant to Rule 23(b)(3), notice is required pursuant to Rule 23(c)(2). *See 2 Newberg on Class Actions* §§ 8-15, at 8-48 through 8-55. Rule 23(d)(2) gives the Court discretion to require that notice be given:

> ***[F]or the protection of the members of the class*** . . . of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action.

Rule 23(d)(2) (emphasis added).

Rule 23 notice and particularly Rule 23(d)(2) notice enables this Court to exercise its "broad and flexible powers under Fed.R.Civ.P. 23" in order to protect the due process rights of the class by fulfilling its unique fiduciary role in controlling the fair conduct of the action. *Avery v. HHS*, 762 F.2d 158, 164-165 (1st Cir. 1985); *see also Manual for Complex Litigation* § 30.213 (3rd ed. 2000), *Quern v. Jordan*, 440 U.S. 332, 335 n.3 (1979); *Fraser*, 180 F.R.D. at 182. Moreover, because class members will, in most instances, not have actual knowledge of changes in the status of their rights as the litigation develops, courts may need to advise class members of their need to protect their rights, by enabling them to make meaningful and informed choices in relation to on-going proceedings. *See id.* (court exercises discretion to order class notice informing members of binding effect of litigation); *see also Barkman v. Wabash, Inc.*, No. 85 C 611, 1988 WL 5039, at *2-3 (N.D. Ill. Jan. 20, 1988*) (notice provides class members with sufficient information to permit intelligent decisions and clearly disclaims any opinion by the court on the merits of the action.); *Manual for Complex Litigation* § 30.211 (3rd ed. 2000) ("In addition, sufficient information about the case should be provided to enable class members to make an informed decision about their participation. Thus, the notice should: . . . explain any special risks of class members, such as being bound by the judgment, while emphasizing that the court has not ruled on the merits of any claims or defenses . . . ."); *Harriss*, 74 F.R.D. 24 (issuing 23(d)(2) notice to promote "the fair conduct of the action" by providing information to, and obtaining information from, the class to guide the court and the parties in making future procedural and case management decisions.).[21]

Thus, Rule 23(d)(2) protects the interest of the class by ensuring that their legal rights are not prejudiced by the litigation itself or some conduct that occurs within the litigation. For example, in *In re Alert Income Partners Sec. Litig.*, MDL 915, No. 92-2-9150 (D. Colo. 1992), Rule 23(d)(2) informational notice was employed by the court in order to protect a class of investors by supplying factual information to prevent further losses of money and impairment of rights as a result of defendants' misconduct. In *Barbanti*, the Court found a "neutral" informational notice to be

---

[21] *See also*, Marjorie A. Silver, *Giving Notice: An Argument For Notification Of Putative Plaintiffs In Complex Litigation*, 66 Wash. L. Rev. 775, 789 (1991) ("the purpose of such notice is principally to protect the due process interests of class members"); Debra J. Gross, *Mandatory Notice and Defendant Class Actions: Resolving the Paradox of Identity Between Plaintiffs and Defendants*, 40 Emory L.J. 611, n. 167 (1991) (same).

appropriate for the class certified under C.R. 23(b)(2) and required that governmental public health agency information on the vermiculite attic insulation hazard be made available to the class.[22]

Like the class members in the cases described above (including *Barbanti*), class members here face a potential prejudice for which informational notice is appropriate, both to protect legal rights and to provide important information. Here, the plaintiffs can be prejudiced by an affirmative defense alleged by defendants, namely, failure to mitigate damages. Defendants may argue that if class members in fact disturb the Zonolite Attic Insulation in their homes or fail to hire a professional certified asbestos abatement contractor **after** the date that such precautionary recommendations were provided by the EPA (i.e., September 2000), then class members would have failed to mitigate. (See Grace Answer, Affirmative Defenses 13, 18 and 19.) Although plaintiffs contest this defense, even the possibility of assertion of such affirmative defenses warrants that notice of rights issue. Without such notice the class action could become a "trap" in which rights are waived without knowledge or consent. Of course, such notice in this case would also provide important public health information to the class.

The Court's inherent authority under Rule 23, and the Rule 23(d)(2) notice provision, enable the Court to preserve order and integrity in the proceedings by providing material information to class members. Rule 23(d)(2) notice should issue.

### F. Certification of the Class and Issuance of Injunctive Relief Does Not Give Rise to Any Conflict with a Regulatory Action.

Grace can be expected to argue that the doctrine of primary jurisdiction bars this Court from hearing the case. In *Barbanti*, Judge O'Connor considered this defense argument and

---

[22] The Court specified that the contents of the neutral notice are as follows:

- Identify the subject-matter of the litigation
- Identify the court, participants in the litigation and lead counsel
- Identify the criteria for members of the class
- Identify the implications to the class of certification under CR23(b)(2)
- Identify how potential class members should contact plaintiffs' counsel
- Identify how potential class members can find out information about the litigation, i.e., website, newsletter, correspondence etc.
- Identify how potential class members can access other information about the issues in this case, i.e. EPA website, State of Washington Department of Health websites, etc.

(Exhibit 3.)

held that, even if Zonolite Attic Insulation is under some consideration by a federal agency such as the EPA, this class litigation should go forward without delay. Exhibit 1 at 6; Exhibit 2 at 4.

**1. The Doctrine of Primary Jurisdiction Is Inapplicable To Plaintiffs' Request For Class Certification and Notice.**

Class certification and notice are necessary to protect the legal rights of the potential class members. The doctrine of primary jurisdiction only comes into play where **both a court and an agency** have jurisdiction over the issue presented, and in that case the doctrine guides the court in determining whether and when it should refrain from proceeding with the matter and allow the agency to resolve the issue. *See PHC, Inc. v. Pioneer Healthcare Inc.*, 75 F.3d 75, 80 (1st Cir. 1996); *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir. 2000). Under Rule 23, the class certification and notice issue presented here is a matter of legal rights and fair procedure, and this subject matter is vested exclusively in the Court. Therefore, the doctrine of primary jurisdiction has no applicability to the class certification and notice issue before the Court.

**2. The Doctrine of Primary Jurisdiction Should Not Be Invoked Because The Relief Requested Does Not Conflict With Any Government Regulation.**

Defendants' primary jurisdiction argument ignores the existence of countless federal and state cases involving highly regulated products and activities in which courts exercised their authority to determine common law and statutory rights. Examples span a wide range of litigation, from the nationwide litigation of asbestos in schools, where the EPA regulated abatement activity; to the recent example of a court-ordered recall of faulty TFI ignition switches in Ford automobiles, even though the U.S. Department of Transportation regulates cars and orders recalls. *See In re Asbestos School Products Liability Litigation*, 606 F. Supp. 713 (J.P.M.L., Apr. 10, 1985) (No. 624); *Howard v. Ford Motor Co.*, No. 763785-2, at 21 (Ca. Super. Ct. Alameda County).[23]

Here, like *Asbestos School Products*, *Howard*, *Diet Drugs* and *Naef*, this Court is fully authorized to order a common law remedy if it finds sufficient merit in the evidence supporting the request. *See also In re General Motors Corp.*, 55 F.3d at 811.

---

[23] *See also In re Diet Drugs; Brown*, 2000 U.S. Dist. LEXIS 12275 (certification and notice to class of users of prescription diet pills regulated by FDA); *Naef v. Masonite Corp.*, No. CV-94-4033 (Ala. Cir. Ct. Mobile County March 7, 1996) (class certification and notice to homeowners regarding faulty Masonite hardboard siding).

Certification of a homeowner class and provision of the injunctive relief requested here would not conflict with nor in any way interfere with an ongoing agency action or any existing statutory or regulatory scheme. *See Avery v. HHS*, 762 F.2d at 164-165 ("[A]bsent a clear statement to the contrary, legislation should not ordinarily be interpreted to oust a federal court's equitable power, or its jurisdiction over a pending case."); *In re General Motors*, 55 F.3d at 811 (Court expressed view that the court could order remediation in an auto defect case, even though NHTSA had considered the defect and already ordered a limited remedy.).

The doctrine of primary jurisdiction guides courts in deciding when to await agency determinations in the context of ongoing litigation. *PHC Inc.*, 75 F.3d at 80. Factors to consider in determining the application of the doctrine include "expertise of the agency, avoidance of conflicts, indications of legislative intent . . . ." *Id.*; *see also Pejepscot Indus. Park Inc. v. Maine Central R.R. Co.*, 215 F.3d 195, 205 (1st Cir. 2000); *Cal-Almond Inc. v. Dept. of Agriculture*, 67 F.3d 874, 882 (9th Cir. 1995) *vacated on other grounds*, 521 U.S. 1113 (1997); *Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1169 (D. Wyo. 1998).

Government regulation does not cover **residential** uses of asbestos-containing materials and few consumer products that contain asbestos are regulated. Vermiculite attic insulation, which Grace withdrew from the market in 1984, has never been regulated.[24] No rulemakings that might impact this action are open, thus there is no regulatory action to wait for or to protect from alleged interference. All that has happened is that CPSC and EPA have made limited

---

[24] The EPA and CPSC have regulated asbestos in some consumer products. Their actions in this capacity have been limited to the following:

- In 1977 the CPSC banned two products containing asbestos, consumer patching compounds and artificial emberizing materials (ash and embers). 16 C.F.R. §§1304, 1305.

- In 1986 the CPSC announced a policy to pursue enforcement against asbestos-containing consumer products not bearing labels warning of the hazards associated with asbestos. Notice of Enforcement Policy, 51 Fed. Reg. 33910 (Sept. 24, 1986). (According to Grace, even if Zonolite had been on the market in 1986, it would not have been covered by this policy. (Affidavit of Bertram Price at 15, Exhibit 1 to Defendants' Opposition to Notice in *Price*.)

- In 1989 EPA issued a ban on the manufacture, import and distribution of flooring felt, commercial paper, corrugated paper, rollboard and specialty paper containing asbestos. 40 C.F.R. §763, Subpart I.

consumer information on asbestos products and asbestos in the home publicly available. Together the agencies produced a booklet, Asbestos in Your Home. Other publications include Asbestos in Attic Insulation (Exhibit 30), and Q&A Regarding Vermiculite Insulation (Exhibit 29). These agency publications, while serving an information function, hardly constitute a comprehensive statutory or regulatory scheme governing vermiculite attic insulation.

None of the various regulatory programs that pertain to asbestos, nor the "Superfund" action in Libby, Montana, where the Grace mine and plant are located, amount to a comprehensive regulatory scheme addressing vermiculite attic insulation. The Superfund statute (CERCLA) does not provide for remedial actions in residential buildings. *See* Unilateral Administrative Order for Removal Response Activities, Libby Asbestos Site, Attachment 1 at 2-6; 42 U.S.C. § 9604(a)(3); *see also First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 868 (4th Cir. 1989) (holding that CERCLA does not encompass asbestos-removal actions); *Prudential Ins. Co. of America v. U.S. Gypsum Co.*, 711 F. Supp. 1244, 1254-55 (D.N.J. 1989) (finding that the sale of asbestos products does not constitute disposal, and therefore is not covered by CERCLA). Thus, vermiculite attic insulation is not encompassed by a comprehensive statutory or regulatory scheme.

Federal courts have found that where court action is consistent with on-going regulatory efforts, and will actually advance those efforts, abstention is not necessary under the doctrine of primary jurisdiction. *L.E.A.D. v. Exide Corp.*, 199 WL 124473*22 (E.D. Pa. 1999); *see also PHC*, 75 F.3d at 80; *Wilson*, 989 F. Supp. at 1169. Here, such is the case.

In sum, the vermiculite attic insulation at issue is not governed by a comprehensive regulatory scheme and the injunctive relief requested here would not conflict with any agency matter. Therefore the doctrine of primary jurisdiction does not apply.

## V. CONCLUSION

This is an appropriate case for class treatment. The proposed class is large, the class representatives and counsel are adequate and their claims are typical, common legal and factual issues predominate, and injunctive relief and punitive damages applicable to the whole class is sought. This motion presents the Court with a unique opportunity to certify class claims to promote the prevention of injuries and harm before they occur, a prospect which is far better than simply

adjudicating injury claims which could have been prevented in the first instance. Accordingly, the Court should certify the class of all owners and occupiers of real property located in United States in which Zonolite attic insulation has been installed; designate plaintiffs as class representatives; and appoint the *Price* counsel and Plaintiffs' Executive Committee as class counsel.

DATED: January 23, 2001

Respectfully submitted,

By: Elizabeth J. Cabraser
Elizabeth J. Cabraser,
Plaintiffs' Executive Committee and as
Proposed Class Counsel

Elizabeth J. Cabraser
Fabrice N. Vincent
John Low-Beer
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

and

By:
Thomas M. Sobol (BBO No. 471770)
Proposed Class Counsel

Thomas M. Sobol (BBO No. 471770)
Jan R. Schlichtmann
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
214 Union Wharf
Boston, MA 02109-1216
Telephone: (617) 720-5000
Facsimile: (617) 720-5015

By: [signature]
John G. Stoia, Jr.,
Plaintiffs' Executive Committee and as Proposed Class Counsel

John J. Stoia, Jr.
Timothy G. Blood
Jobeth Halper
MILBERG WEISS BERSHAD HYNES & LERACH LLP
600 West Broadway
1800 One America Plaza
San Diego, CA 92101-5050
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

By: [signature]
David Pastor,
Plaintiffs' Executive Committee and as Proposed Class Counsel

David Pastor
Edward L. Manchur
John C. Martland
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

By: [signature]
Edward J. Westbrook,
Plaintiffs' Executive Committee and as Proposed Class Counsel

Edward J. Westbrook
Robert M. Turkewitz
NESS MOTLEY LOADHOLT RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

By: [signature]
Darrell Scott, As Proposed Class Counsel

Darrell Scott
Michael Black
LUKINS & ANNIS, P.S.
1600 Washington Trust Financial Cntr
717 W Sprague Ave.
Spokane, WA 99201-0466
Telephone: (509) 455-9555
Facsimile: (509) 747-2323

Attorneys for Plaintiffs Paul Price, John Prebil, and Margery Prebil

By: [signature]
Richard Lewis, As Proposed Class Counsel

Richard Lewis
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

and

Steve Toll
Tamara Driscoll
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
999 Third Avenue, Suite 3600
Seattle, WA 98104
Telephone: (206) 521-0080
Facsimile: (206) 521-0166

Attorneys for Plaintiffs Paul Price, John Prebil, and Margery Prebil

By: [signature]
Allan McGarvey, As Proposed Class Counsel

Allan McGarvey
McGARVEY, HEBERLING, SULLIVAN & McGARVEY, P.C.
745 South Main
Kalispell, MT 59901
Telephone: (406) 752-5566
Facsimile: (406) 752-7124

Attorneys for Plaintiffs Paul Price, John Prebil, and Margery Prebil

On the Brief:

Christopher A. Seeger
SEEGER WEISS LLP
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

Attorneys for Jan Hunter

Mark S. Williams
BORRELLI, HUTTON & WILLIAM, P.A.
376 Trapelo Road
Belmont, MA 02478

Attorneys for Edward Lindholm and John J. Szufnarowski

William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107-3389
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Attorneys for Edward Lindholm and John J. Szufnarowski

Mark C. Goldenberg
HOPKINS & GOLDENBERG, P.C.
2132 Pontoon Road
Granite City, IL 62040
Telephone: (618) 877-0088
Facsimile: (618) 877-6230

Attorneys for Jan Hunter