**18**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | ) |
| | ) MDL Docket No. 1376 |
| ZONOLITE ATTIC INSULATION | ) |
| | ) The Honorable Patti B. Saris, |
| PRODUCTS LIABILITY LITIGATION | ) Presiding |
| ——————————————— | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| PAUL PRICE, JOHN PREBIL and | ) Case No. 1:00cv12510-PBS |
| MARGERY PREBIL, on behalf of themselves | ) |
| and all others similarly situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| W.R. GRACE & COMPANY (a Delaware | ) |
| Corporation); W.R. GRACE & COMPANY | ) |
| CONN (a Connecticut corporation); W.R. GRACE | ) |
| & CO., a/k/a GRACE, an association | ) |
| of business entities; SEALED AIR | ) |
| CORPORATION (a Delaware corporation), | ) |
| | ) |
| Defendants. | ) |
| ——————————————— | ) |

**GRACE DEFENDANTS' BRIEF IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
AND NOTICE**

## TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ................................................................................. 3

I.    The Product At Issue. ................................................................................... 3

  A.    ZAI Is Safe From A Scientific Perspective .............................................. 4

  B.    ZAI Is Safe From A Medical Perspective. ............................................... 6

  C.    ZAI Is Safe From An Industrial Hygiene Perspective........................... 8

  D.    ZAI Is Safe From A Regulatory Perspective........................................... 9

II.    This Lawsuit. ................................................................................................. 10

ARGUMENT ........................................................................................................... 11

I.    CLASS CERTIFICATION IS INAPPROPRIATE UNDER RULE 23(b)(2)
      BECAUSE THIS ACTION, WHICH PRIMARILY SEEKS MONEY
      DAMAGES, IS NOT COHESIVE AND MANDATORY CERTIFICATION
      WOULD BE UNCONSTITUTIONAL. ...................................................... 13

  A.    The Allegedly "Equitable" Relief Sought By Plaintiffs Does Not Make
        Rule 23(b)(2) Certification Available. .................................................. 14

    1.    The Predominant Relief Sought by Plaintiffs – Whether
          Directly in the Form of Compensatory Damages or in The
          Guise of A Claims-Based Remediation Trust – Is Money
          Damages And Not The Injunctive Relief Which Justifies Rule
          23(b)(2) Certification. ................................................................ 15

    2.    The Requested "Equitable" Relief In The Form Of An
          Education Trust And A Notification Program Are Within The
          Purview And Ambit Of Regulatory Agencies .......................... 20

  B.    A Mandatory Nationwide Class Action Which Seeks Money Damages
        Would Violate Due Process. .................................................................. 22

  C.    A Bifurcated Trial of Plaintiffs' Equitable and Damages Claims
        Would Implicate the Parties' Seventh Amendment Right to a Jury
        Trial. ....................................................................................................... 24

  D.    The Overwhelming Individual Issues of Fact And Law Destroy Class
        Cohesiveness. ......................................................................................... 25

    1.    The Class Lacks Cohesiveness Because Of Overwhelming
          Individual Issues of Fact............................................................. 25

    2.    The Class Lacks Cohesiveness Because The Differences In The
          Applicable Laws Create Overwhelming Individual Issues of
          Law. .............................................................................................. 27

II.    CLASS CERTIFICATION IS INAPPROPRIATE UNDER 23(b)(3)
       BECAUSE INDIVIDUAL RATHER THAN COMMON ISSUES OF FACT
       AND LAW PREDOMINATE AND BECAUSE CLASS CERTIFICATION
       IS NOT THE SUPERIOR METHOD OF ADJUDICATING PLAINTIFFS'
       CLAIMS.................................................................................................... 33

       A.    Common Factual And Legal Issues Do Not Predominate................... 34

       B.    A Class Action Is Not The Superior Method For the Fair and Efficient
             Adjudication of The Claims Of The Putative Class............................. 35

III.   CLASS CERTIFICATION OF PLAINTIFFS' PUNITIVE DAMAGES
       CLAIM VIOLATES DUE PROCESS AND IS UNSUPPORTED BY RULE
       23(b)(1)(B)'S LIMITED FUND THEORY....................................................... 40

IV.    PLAINTIFFS FAIL TO SATISFY THE ADEQUACY REQUIREMENT OF
       RULE 23(a)...................................................................................................... 41

       A.    Plaintiff Price Is An Inadequate Class Representative Because His
             Claims Are Barred By The Statutes Of Limitations............................. 42

       B.    The Prebils' Lack of Familiarity With the Claims Asserted in This
             Litigation Make Them Inadequate Class Representatives. ................. 42

       C.    Because Plaintiffs Have Strategically Limited The Relief Sought, They
             Are Not Adequate Class Representatives. ............................................ 44

V.     PLAINTIFFS' CLASS DEFINITION IS OVERBROAD AND THE
       PROPOSED CLASS IS INCAPABLE OF ASCERTAINMENT. ................. 45

VI.    PLAINTIFFS' REQUESTED NOTICE IS NOT AUTHORIZED BY RULE
       23(d)(2)............................................................................................................ 47

CONCLUSION ............................................................................................................. 50

# TABLE OF AUTHORITIES

## CASES

*In re Alert Income Partners Security Litig., MDL 915*, No. 92-Z-9150
(D. Colo. Sept. 3, 1992) ............................................................49

*In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718 (E.D.N.Y. 1983),
*aff'd*, 818 F.2d 145 (2d Cir. 1987) ............................................41

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987),
*cert. denied*, 484 U.S. 1004 (1988) ...........................................13

*Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168 (5th Cir. 1996)................31

*Allison v. Citgo Petroleum Corp.,* 151 F.3d 402
(5th Cir. 1998) .......................................................11, 12, 13, 16, 19, 25, 40

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591
(1997). .................................................... 11, 12, 13, 28, 33, 34, 35, 37-38

*In re American Med. Sys., Inc.,* 75 F.3d 1069 (6th Cir. 1996) ..............13, 22, 36

*Anderson v. Lyng,* 652 F. Supp. 1237 (M.D. Ala. 1987) .................................49

*Arch v. American Tobacco Co.,* 175 F.R.D. 469 (E.D. Pa. 1997) .................15, 17, 38, 39

*In re Asbestos Sch. Litig.,* 104 F.R.D. 422 (E.D. Pa. 1984), *modified sub nom.,*
*In re School Asbestos Litig.,* 789 F.2d 996, 1108 (3d Cir.), *cert. denied,*
479 U.S. 852 (1986) ...............................................................17, 18

*Avery v. Secretary of Health & Human Servs.,* 762 F.2d 158 (1st Cir. 1985) .................48

*Ayers v. Township of Jackson,* 525 A.2d 287 (N.J. 1987)................................18

*Balyeat Law, P.C. v. Hatch,* 942 P.2d 716 (Mont. 1997)................................44

*Barefield v. Chevron, U.S.A.,* 12 F.R.D. 1232 (N.D.Cal. 1988) ......................40

*Barkman v. Wabash, Inc.,* No. 85 C 611, 1998 WL 5039
(N.D. Ill. Jan. 20, 1998) .......................................................50

*Barnes v. American Tobacco Co.,* 176 F.R.D. 479 (E.D. Pa. 1997),
*aff'd,* 161 F.3d 127 (3d Cir. 1998), *cert. denied,* 526 U.S. 1114 (1999) .................26

*Barnes v. American Tobacco Co.,* 161 F.3d 127 (3d Cir. 1998),
*cert. denied,* 526 U.S. 1114 (1999) ...............................................18, 26, 27

*Bartlett v. Allstate,* 929 P.2d 227 (Mont. 1996) ......................................27

*Barth v. Firestone Tire & Rubber*, 661 F. Supp. 193 (N.D. Cal. 1987). ..........................18

*Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977) ....................................48

*BMW v. Gore*, 517 U.S. 559 (1996) ..................................................................40

*Broughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir. 1995) ....................................18

*Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992); ..............................23

*Burroughs v. Jackson Nat'l Life Ins. Co.*,, 618 So. 2d 1329 (Ala. 1993) ..................31

*Butler v. Colwell*, 967 P.2d 779 (Mont. 1998) ..................................................44

*Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319 (M.D. Fla. 1997) ....................43

*Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421 (E.D. La. 1997) ................43

*Castano v. American Tobacco Co.*, 160 F.R.D. 544 (E.D. La. 1995),
   *modified on other grounds*, 84 F.3d 734 (5th Cir. 1996) ..................15, 17, 19, 25

*Castano v. American Tobacco Co.*, 84 F.3d 734
   (5th Cir. 1996) ..................................................3, 13, 27, 31, 35, 36, 38, 39

*Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628
   (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993) ..........................................35

*Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993) ..................37

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) ....................................20, 29, 36

*Cline v. Prowler Indus.*, 418 A.2d 968 (Del. 1980) ..........................................30

*Davenport v. Gerber Prods. Co.*, 125 F.R.D. 116 (E.D. Pa. 1989) ........................18, 26

*Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980), *reh'g denied*,
   446 U.S. 947 (1980) ..............................................................................48

*Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D. Ill. 1998) ..................18

*In re Diet Drugs*, No. 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)................26

*Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So. 2d 1288 (Ala. 1993) ................31

*Doe v. General Hosp. of D.C.*, 434 F.2d 427 (D.C. Cir. 1970) ............................49

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ......................................3, 38

*Emigrant Savings Bank v. Chicago*, No. 72 C 1644, 1987 U.S. Dist.
  LEXIS 16749 (N.D. Ill. Feb. 2, 1987) ......................................................................48

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) .........44, 45

*Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365 (N.D. Ill. 1998) ..............................30

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360
  (E.D. La. 1997) ........................................................................28, 37, 44, 45

*In re  Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214 (E.D. La. 1998) ............31, 32

*Forman v. Data Transfer*, 164 F.R.D. 400 (E.D. Pa. 1995) ...........................................46

*Friends For All Children Inc. v. Lockheed Aircraft Corp.*,
  746 F.2d 816 (D.C. Cir. 1984) .................................................................................18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*,
  120 S. Ct. 693 (2000) ...............................................................................................42

*Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) ............................39

*General Telegraph Co. v. Falcon*, 457 U.S. 147 (1982) ...........................................13, 41

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1995),
  *aff'd sub nom.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .....1, 13, 36, 38

*German v. Federal Home Loan Mortgage Corp.*, 168 F.R.D. 145
  (S.D.N.Y. 1996) .......................................................................................................49

*Grace v. Detroit*, 145 F.R.D. 413 (E.D. Mich. 1992) ....................................................48

*Great Rivers Co-op. v. Farmland Indus., Inc.*, 120 F.3d 893 (8th Cir. 1997) ..................42

*Green v. Mansour*, 474 U.S. 64 (1986), *reh'g denied*, 474 U.S. 1111 (1986)..................49

*In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977) .........................................48

*Haley v. Medtronic, Inc.*, 169 F.R.D. 643 (C.D. Cal. 1996)..................................18, 32, 33

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)............................................42

*Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993) ........................ ....... ..18

*Harashe v. Flintkote Co.*, 848 S.W.2d 506 (Mo. Ct. App. 1993)........................ ...........38

*Harding v. Tambrands, Inc.*, 165 F.R.D. 623 (D. Kan. 1996)....................... ... ......18, 33

*Jaffee v. United States*, 592 F.2d 712 (3d Cir. 1979), *cert. denied*,
441 U.S. 961 (1979)................................................................................18

*Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999) ..........................................23

*Kent v. Sunamerica Life Ins. Co.*, 190 F.R.D. 271 (D. Mass. 2000) .................................45

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987),
*cert. denied*, 485 U.S. 959 (1988) ........................................................43, 44

*Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985) ..........................................49

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir. 1981) ........................................48, 49

*Leist v. Tamco Enterprises*, No. 80 Civ. 4439, 1984 WL 2425
(S.D.N.Y. Apr. 3, 1984)................................................................................48

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*,
216 F.3d 577 (7th Cir. 2000) ...............................................................14, 40

*Lewis v. Casey*, 518 U.S. 343 (1996) ......................................................................42

*Marcera v. Chinlund*, 595 F.2d 1231 (2d Cir. 1979), *vacated on other
grounds sub nom., Lombard v. Marcera*, 442 U.S. 915 (1979) ........................50

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D.
417 (E.D. La. 1997) ...........................................................................31, 32

*Mattingly v. First Bank*, 947 P.2d 66 (Mont. 1997) ........................................................27

*Messier v. Southbury Training Sch.*, 183 F.R.D. 350 (D. Conn. 1998) ..........................49

*Miller v. Central Chincilla Group*, 66 F.R.D. 411 (S.D. Iowa 1975) ..............................48

*Miller v. Hygrade Food Prods. Corp.*, No. 99-1087, 2001 U.S. Dist.
LEXIS 733 (E.D. Pa. Jan. 29, 2001) ......................................................25

*Millett v. Atlantic Richfield Co.*, No. Civ. A. CV-98-555,
2000 WL 359979 (Me. Super. Ct. March 2, 2000),
*appeal dismissed*, 760 A.2d 250 (2000) ...............................16, 17, 38, 39

*Nagy v. Jostens, Inc.*, 91 F.R.D. 431 (D. Minn. 1981) ....................................................49

*Nelsen v. King County*, 895 F.2d 1248 (9th Cir. 1990) ....................................................15

*Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625 (S.D. Ga. 1995),
*aff'd*, 95 F.3d 59 (11th Cir. 1996) ........................................................46

*In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.,*
    693 F.2d 847 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983)......................13, 27

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................................................23

*O. S. Stapley Co. v. Miller*, 447 P.2d 248 (Ariz. 1968) ........................................................30

*Pagan v. Dubois*, 884 F. Supp. 25 (D. Mass. 1995) ...........................................................45

*Parks v. Morris Homes Corp.,* 141 S.E.2d 129 (S.C. 1965)................................................31

*Penson v. Terminal Trans. Co.*, 634 F.2d 989 (5th Cir. 1981) ...........................................48

*Phillips v. General Motors Corp.*, 995 P.2d 1002 (Mont. 2000) ..................................28, 29

*Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985) ...............................................23, 28, 40

*Poe v. Sears Roebuck & Co.*, No. 1:96-CV-358, 1998 WL 113561 (N.D. Ga.
    Feb. 13, 1998) ...............................................................................................31, 33

*Punnett v. United States*, 602 F. Supp. 530 (E.D. Pa. 1984) .............................................21

*Quern v. Jordan*, 440 U.S. 332 (1979) ..............................................................................49

*In re Real Estate Title and Settlement Servs. Antitrust Litig.*, 869 F.2d 760
    (3d Cir.), *cert. denied*, 493 U.S. 821 (1989) ...............................................................23

*In re Rhône-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir.), *cert. denied*,
    516 U.S. 867 (1995)...........................................................13, 32, 37, 38, 39, 40

*In re School Asbestos Litig.*, 789 F.2d 996, 1108 (3d Cir. 1986), *cert. denied*,
    *Celotex Corp. v. Sch. Dist. of Lancaster*, 479 U.S. 852 (1986).................35, 37, 40, 41

*Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976).........................42

*Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795 (Cal. 1993) ....................................18

*Redland Soccer Club v. Department of the Army*, 696 A.2d 137 (Pa. 1997) ..................18

*Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593 (N.Y. App. Div.
    1998), *aff'd*, 720 N.E.2d 892 (N.Y. 1999) ...................................................................45

*Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D. Mo. 1997).............18

*Smith v. Nat'l Steel & Shipbuilding Co.*, 125 F.3d 751 (9th Cir. 1997),
    *cert. denied*, 523 U.S. 1094 (1998)............................................................................21

*Spence v. Glock*, 227 F.3d 308 (5th Cir. 2000) .................................................................29

*Strout v. Paisley*, No. CIV 00-107-B, 2000 WL 1900313
    (D. Me. Dec. 4, 2000) ............................................................................50

*Sugarhouse Finance Co. v. Anderson*, 610 P.2d 1369 (Utah 1980) ..................31

*In re Sunrise Sec. Litig.*, 698 F. Supp. 1256 (E.D. Pa. 1988) ...........................28

*In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997) ....................32, 33

*Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400 (W.D. Mo. 1994) ...........................18

*Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999) ..........................26

*Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493 (N.D. Ill. 1998) ...........................36

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ...............................21

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ..............................35, 36

*Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), *appeal dismissed*,
    945 F.2d 1188 (D.C. Cir. 1991) ...............................................................13, 15, 20, 21

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986), *cert. denied*,
    482 U.S. 915 (1987) ..................................................................................30, 36

*Werlein v. United States*, 746 F. Supp. 887 (D. Minn. 1990), *vacated in
    part on other grounds*, 793 F. Supp. 898 (D. Minn. 1992) ...........................18

*Young v. Ray Brandt Dodge*, 176 F.R.D. 230 (E.D. La. 1997) ...........................38

*Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) ....................19

## CONSTITUTIONAL PROVISIONS

U. S. Const. Amend. VII ...........................................................................2, 14, 25, 26, 40

## FEDERAL STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 2054 (b)(1) (West 2000) .......................................................21

15 U.S.C. § 2064(c)(1) (West 2000) ........................................................21

18 U.S.C. § 1962 (West 2000).................................................................30

42 U.S.C. § 4321 (West 2000) ................................................................21

40 C.F.R. § 61.141 ...................................................................................3

40 C.F.R. § 763.83...................................................................................3

Fed. R. Civ. P. 23 ................................................................................... *passim*

## STATE STATUTES

MCA 27-2-203 ............................................................................................42

MCA 27-2-204 ............................................................................................42


## MISCELLANEOUS

Charles Allen Wright, Arthur R. Miller, *et al.,*
   *Federal Prac. and Proc. Civ. 2d* (2000 Supp.) .......................................20, 49

Francis E. McGovern, *Resolving Mature Mass Tort Litig.,*
   69 B.U. L. Rev. 659, 659 (1989) .................................................................38

*Manual For Complex Litig.* (3d ed. 1995) .................................................38, 45

Restatement (Second) of Torts § 402A ........................................................30

Asbestos litigation has been described as "'a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s.'" *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618-19 (3d Cir. 1995) (quoting Report of The Judicial Conference Ad Hoc Committee on Asbestos, 1-3 (1991)), *aff'd sub nom., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). While the Zonolite Attic Insulation cases may be the latest chapter in that tale, they tell a very different story: not a story of building owners with real problems caused by a truly hazardous product, but rather a story of lawyers using class actions to create and capitalize on the illusion that what has been a completely innocuous product for years is now a serious threat.

This action complains about the alleged hazards of Zonolite Attic Insulation ("ZAI"), a vermiculite product that *may* contain a trace amount – well below 1% – of asbestos. Contrary to the alarmist allegations contained both in plaintiffs' complaint and their memorandum in support of class certification, ZAI is safe. The presence and sporadic disturbance of ZAI in homes is not hazardous to human health. ZAI has effectively insulated houses across America for decades without harming the people living in those homes.

Nonetheless, in the last year, ten lawsuits – all but one of them putative class actions – have been filed in state and federal courts complaining about the alleged risks to homeowners and building occupants from the presence of ZAI in attics. The lawyer-driven nature of this litigation is illustrated by the proposed class representatives: Paul Price, who has known about the presence of asbestos in ZAI for at least ten years, and John and Margery Prebil, who maintain that they did not know about asbestos in the product even after the complaint was filed.

The nature of the relief sought is also lawyer-driven. Instead of simply seeking compensatory damages for remediating plaintiffs' homes of ZAI and for any diminution in the homes' value, which is the relief the named plaintiffs truly desire, the complaint is artfully crafted as one for "equitable relief" seeking the establishment of several defendant-financed funds for testing, notification, research and remediation (plus compensatory and punitive damages). Through this sleight of hand, plaintiffs attempt to obtain class certification under the

facially less stringent Fed. R. Civ. P. 23(b)(2), while relying on Rule 23(b)(3), which contains more prerequisites to certification, as the less desirable alternative.

Defendants W.R. Grace & Company-Conn. ("Grace") and its parent W.R. Grace & Company, a Delaware corporation, (collectively the "Grace defendants") oppose class certification and will show that certification of the nationwide class that plaintiffs purport to represent is inappropriate under any provision of Rule 23:

- Certification under Rule 23(b)(2) is inappropriate because (i) notwithstanding plaintiffs' characterization of their requested relief as equitable, property owners with ZAI primarily seek monetary compensation for identifying, managing, and removing the product and (ii) any program for notification and education of homeowners is appropriately within the jurisdiction of administrative agencies charged with the obligation to advise citizens about hazardous substances.

- Certification is inappropriate under Rule 23(b)(2) because the putative class lacks cohesiveness and under Rule 23 (b)(3) because individual questions of fact and law predominate: (i) a trial of individual issues related to each property owner would be required before liability could be found, including whether a hazard relating to ZAI exists in a class member's building(s) and whether the insulation is, indeed, tremolite-containing ZAI; and (ii) 50 jurisdictions' different laws would govern the resolution of the class members' claims, making class-wide adjudication unmanageable.

- Certification of a mandatory class action under Rules 23(b)(2) or (b)(1)(B) violates class members' due process rights because it would bind them to a monetary judgment entered in a state with which they have no contacts.

- Certification of a class action that would rely upon bifurcated trials of either plaintiffs' equitable and legal claims or "common" and "individual" issues implicates the parties' Seventh Amendment right to a jury trial.

- Certification of a Rule 23(b)(1)(B) punitive damages class under a limited fund theory is inappropriate because a class seeking to punish Grace for its conduct with respect to asbestos hazards but limited to owners and occupants of buildings with ZAI would be under-inclusive.

- Certification of the proposed class is inappropriate in that the class as defined is both overbroad and incapable of ascertainment because, *inter alia*, the class includes owners of buildings with ZAI that is not comprised of Libby vermiculite.

- Certification of any class is inappropriate because the absent class members' interests will not be adequately represented by the named plaintiffs.

For all these reasons, class certification should be denied. And in the absence of a ruling on class certification, it is premature to determine whether a notice to owners and occupants of buildings containing ZAI is necessary or appropriate.

# FACTUAL BACKGROUND

## I.    The Product At Issue.

ZAI is a vermiculite product used primarily in homes for insulation. Vermiculite is *not* a form of asbestos. It is a mica-like mineral that has been used for more than 75 years in many products. Vermiculite, when milled and thermally expanded, serves as an effective insulation.

From 1963 until 1984, Grace mined vermiculite in Libby, Montana; milled the raw ore to remove unwanted materials; heated the resulting concentrate to expand the vermiculite into very light "kernels" which could be poured into attics or walls for insulation; and packaged vermiculite of the appropriate size for sale to lumber yards and other retailers as ZAI. When Libby vermiculite of the appropriate size was not available, Grace may have used vermiculite from other mines to manufacture ZAI. Property owners purchased ZAI primarily for do-it-yourself installation in existing properties. They would pour the product between the joists of the attic and level it. Given the nature of the product (including that an attic containing ZAI cannot be used for storage or other purposes unless some flooring is installed over it), ZAI is rarely disturbed by the typical property owner.

When vermiculite was mined in Libby, contaminants, including tremolite asbestos, were excavated with the ore. Asbestos was never an ingredient affirmatively added to ZAI. Grace acted to remove all the contaminants during milling and expansion of the vermiculite. Grace's efforts were so successful that ZAI does not meet the definition of an asbestos-containing product in various government regulations. *See, e.g.*, 40 C.F.R. §§ 61.141 and 763.83.[1]

The presence and occasional disturbance of ZAI in homes is not hazardous to human health. This was true from the time ZAI began being sold to insulate unfinished attics through today, more than sixteen years after Grace stopped selling the product. While now is not the time to decide the merits, it is proper for this Court to consider what the parties intend to prove and how such issues make class certification improper.[2] While Grace disputes that ZAI is

---

[1]  "Materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials." Plaintiffs' own expert, Donald Hurst, acknowledged that the vermiculite attic insulation which he tested contained less than 1/10 of 1% by weight of asbestos. (Affidavit of Donald Hurst ¶ 10)
[2]  As the Fifth Circuit explained in *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996), notwithstanding the Supreme Court's instruction in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156

hazardous in general, Grace is entitled to show that in no event is ZAI harmful under the site-specific conditions as it is installed and used in each plaintiff's particular building – an individualized showing that destroys cohesiveness and predominates over any alleged common issue. Accordingly, both to explain the individualized evidence that makes class certification inappropriate in this case and to respond to plaintiffs' one-sided characterization of the facts to be considered in resolving plaintiffs' motion, the Grace defendants briefly summarize the scientific, medical, industrial hygiene and regulatory evidence that they would present at any trial.

A.    ZAI Is Safe From A Scientific Perspective.

When viewed from a scientific perspective, ZAI is safe. Scientific analysis has shown that ZAI contains at most miniscule amounts of asbestos. In *Barbanti v. W.R. Grace & Co.*, No. 00201756-6 (Wash. Super. Ct. Spokane County),[3] analysis of samples taken in homes in Washington, by both plaintiffs' and defendants' experts, revealed that the asbestos content by weight of ZAI has been measured at between one one-hundredth (1/100th) and one one-thousandth (1/1000th) of one percent. (Deposition of plaintiffs' expert Ernest R. Crutcher, Ex. 1, p. 146:23-25; Testimony of Richard J. Lee ("Lee Test."), Nov. 30, 2000, Ex. 2, p. 54:1-14)[4]

Moreover, the mere presence of asbestos in a building product does not create a hazard. To assess any health risk, one must assess the theoretical possibility of inhalation of asbestos fibers in large quantities over lengthy periods of time. (Declaration of Dr. Morton Corn ("Corn Decl."), Ex. 3, ¶ 14) To measure *actual* exposure to asbestos in any individual home, it is necessary to measure levels of respirable fibers in the air in that home. (*Id.* ¶ 15)

Scientific testing of the air in homes with ZAI has found almost non-detectable or zero

---

(1974), that a court should not make a preliminary determination of the merits of plaintiffs' claims in the context of a Rule 23 determination, a "district court certainly may look past the pleadings to determine whether the requirements of Rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."

[3] *Barbanti* is a statewide class action brought by some of the same plaintiffs' lawyers involved in these actions on behalf of owners of buildings containing ZAI in the state of Washington. For the reasons set forth in footnote 21 *infra*, the Grace defendants believe that the class certification order in *Barbanti* was made in error and are seeking appellate review. In *Barbanti*, plaintiff also sought a preliminary injunction requiring Grace to issue an emergency warning notifying class members of the alleged hazards of Zonolite. Following a three-day hearing, Judge Kathleen O'Connor denied plaintiff's motion for a preliminary injunction, rejecting plaintiff's assertions that an emergency exists.

[4] All referenced exhibits are attached to the Declaration of Robert Murphy and will be cited as "Ex." followed by the exhibit number.

asbestos levels. The Grace defendants' analysis of air samples taken in the homes of certain of the named plaintiffs in these coordinated cases – specifically, in the Price, Prebil, Lindholm and Szufnarowski homes – found either non-detectable or only extraordinarily minute levels of asbestos. (Declaration of Richard J. Lee ("Lee Decl."), Ex. 4, ¶¶ 19, 21) In *Barbanti*, the results of defendants' analysis of air samples taken in homes in Washington were similar. (Lee Test., Ex. 2, p. 62:5-20) In tests by the Environmental Protection Agency ("EPA") at homes containing vermiculite insulation in Libby, the highest asbestos air concentration was 0.0003 fibers per cubic centimeter ("cc"). (*Id.* pp. 62:21-63:12) This is 300 times lower than the permissible occupational exposure level of 0.1 fibers per cc set by the Occupational Safety and Health Administration ("OSHA"). In fact, most of the EPA's air samples from the Libby homes did not find any asbestos fibers at all.

Plaintiffs have attempted artificially to skew the circumstances under which testing is done in the hope of raising the asbestos air concentration levels to show a hazard. Plaintiffs suggest that their methods are necessary to demonstrate a potential hazard from renovations or disturbance of the vermiculite insulation. Plaintiffs' self-created hazard is flawed in two ways. First, the plaintiffs artificially created an environment that was unrealistic based upon the practical utilization of ZAI. Under normal living conditions, homeowners rarely, if ever, come into contact with or disturb ZAI in their unfinished attics.[5] More significantly, based upon the level and duration of exposure that is required to cause an increased health risk, and the miniscule amount of asbestos in ZAI, it would be rare for a homeowner to disturb the insulation

---

[5] This is demonstrated by plaintiffs' testimony. Two of the three sections of the Prebils' attic are inaccessible. The third section is entered "seldom" by Mr. Prebil and never by Mrs. Prebil. (J. Prebil Dep., Ex. 5, pp. 75:19-76:10; 79:3-13; M. Prebil Dep., Ex. 6, p. 27:9-11) The Price attic has never been used and is entered solely for purposes of inspection. Mr. Price identified a single disturbance of the vermiculite during a six-hour attic repair project in the 22 years he has owned the home. (Price Dep., Ex. 7, pp. 66:12-24; 11:2-3) In the home owned by Edward Lindholm, plaintiff in *Lindholm v. W.R. Grace & Co.*, No. 00-CV-10323 (D. Mass.), the spaces where there is vermiculite are not accessed. He identified a single renovation – the installation of a bathroom exhaust fan – in approximately 40 years since installation of the ZAI that impacted or disturbed the ZAI in any way. (Lindholm Dep., Ex. 8, pp. 82:1-83:22; 6:14-17) The other *Lindholm* plaintiff, John Szufnarowski, testified that he has entered the ZAI-insulated attic in the original portion of his home approximately three times since he bought the home in 1965. He and his wife would enter a portion of the addition's attic approximately five times a year to remove and replace items stored there. Mr. Szufnarowski identified a single renovation in over 25 years since the ZAI was installed that may have disturbed the ZAI – the repair of a ceiling crack performed by contractors outside of his presence. (Szufnarowski Dep., Ex. 9, pp. 52:10-16; 56:15-58:17; 62:10-66:1; 20:10-14)

enough even to create a hazardous exposure level, much less sustain that level for the minimum duration necessary to create a hazard.  (*See* Corn Decl., Ex. 3, ¶ 26; Testimony of Dr. Morton Corn ("Corn Test."), Nov. 30, 2000, Ex. 10, pp. 115:6-117:20)

Second, the testing protocol and counting methods utilized by the plaintiffs were scientifically flawed for at least the following reasons:  (i) they did not collect the requisite amount of air for a valid testing volume; (ii) they used an inappropriate sample preparation procedure; (iii) they used the wrong analysis method and fiber counting protocol; (iv) they failed to adjust for time-weighted averages, and (v) they incorrectly applied regulations to reported concentrations.  (Lee Test., Ex. 2, pp. 64:12-24; 67:2-68:22; p. 69:4-22; pp. 71:17-72:3; Lee Decl., Ex. 4, ¶¶ 29-31)  As a result, the plaintiffs' air sampling data greatly overestimate an individual's exposure to asbestos fibers. *Id.*

Even if the plaintiffs' data were scientifically valid despite the unrealistic testing environment and the numerous errors in its computation, the time-weighted average exposure in an attic would be .05 to 0.1 fibers per cc.  (*Id.* p. 76:24-77:10)  At these levels, a homeowner would have to be exposed at least eight hours a day for 12,000 days in order to be at a risk of an asbestos related disease.  (Testimony of Dr. William Hughson ("Hughson Test."), Ex. 11, pp. 7:15-8:22)[6]  Simply stated, the minute amount of asbestos in ZAI, even if disturbed, cannot create any legitimate health risk to homeowners.

As part of the plaintiffs' case at trial, each homeowner would have to show both the amount of tremolite asbestos in the ZAI in that home[7] and, more importantly, the actual exposures to airborne asbestos fibers to the occupants of that home.

### B.    ZAI Is Safe From A Medical Perspective.

When viewed from a medical perspective, ZAI is safe.  Medical and epidemiological data demonstrate that there is no health hazard from sporadic exposure to the trace amounts of asbestos that may be present in ZAI.  Whether a person is at an increased health risk from

---

[6] Dr. Hughson's testimony for both days – November 29 and 30, 2000 – is collectively appended as Ex. 11. The first day is pages 171-196; and the second day, 1-45.
[7] As discussed more fully in Section V *infra*, the ZAI in plaintiff Lindholm's home is not comprised of Libby vermiculite and does not contain any tremolite asbestos. (*See* Lee Decl., Ex. 4, ¶¶ 21, 25)

exposure to asbestos depends on the level of exposure (dose), and the duration of the exposure (time). (Hughson Test., Ex. 11, pp. 185:19-190:10)  To be at risk of an asbestos disease, an individual must have a significant cumulative lifetime asbestos exposure that as a practical matter is not possible from ZAI, given the extremely low and often non-existent levels of asbestos in the breathable air of homes insulated with it. (Corn Test., Ex. 10, pp. 115:6-117:20)

The claim that every exposure to asbestos can cause harm to human health is not supported by medical evidence or common sense.  Asbestos is ubiquitous.  It is a naturally occurring mineral present in every urban environment.  All adults living in urban areas are exposed to low levels of asbestos in the ambient air and have millions of asbestos fibers in their lungs without any adverse effect on their health.  There is no evidence that exposure to the levels of asbestos in the ambient air over a lifetime causes any increased incidence of asbestos-related disease. (Hughson Test., Ex. 11, pp. 183:17-185:18)  The asbestos levels of homes with ZAI are no higher than the ambient air levels everyone breathes. (Corn Decl., Ex. 3, ¶ 19)

The levels of potential exposure to respirable asbestos fibers from ZAI are simply too low to harm human health.  In *Barbanti*, Dr. William Hughson, a board certified physician in pulmonary diseases and occupational medicine and a clinical professor at the University of California at San Diego, testified that the level of asbestos exposure necessary to create a risk of asbestosis or lung cancer is at least 25 fibers per cc years.[8]  The exposure threshold is lower for mesothelioma, but it is still about 5 fibers per cc years. (Hughson Test., Ex. 11, pp. 194:1-196:19)  With respect to exposure from ZAI, under normal living conditions there is essentially no exposure. (*Id.* pp. 6:1-7:6)  Even if the homeowners disturbed the attic insulation for a full eight-hour time period and caused an exposure at the level of 0.1 fibers per cc as a time-weighted average, a resident would have to be in his or her attic and exposed at that level for fifty years or twelve thousand days in order to reach the 5 fibers per cc year threshold level for mesothelioma risk. (*Id.* pp. 7:15-8:22)  Such a continuous and prolonged exposure is apocryphal. (Corn Test.,

---

[8] A fiber per cc year is the number of asbestos fibers to which a person is exposed during a working year (240 days).  For example, a person exposed to 1 fiber per cc for eight hours a day for a working year has accumulated a 1 fiber per cc year exposure; a person working for forty years would have to have an average exposure of .625 fibers per cc to accumulate a 25 fibers per cc year exposure. (*See* Hughson Test., Ex. 11, p. 187:2-22)

Ex. 10, p. 117:2-19)

In any trial of a building owner's claims, the Grace defendants must have the ability to demonstrate that the particular homeowner does not use his or her attic in a way that creates a hazardous exposure to the individuals in that building.

###### C.    ZAI Is Safe From An Industrial Hygiene Perspective.

When viewed from an industrial hygiene perspective, ZAI is safe.  Decades of air monitoring in buildings that contain materials with asbestos content far greater than found in ZAI have shown that there are no more asbestos fibers in the air inside buildings than outside.  (Corn Decl, Ex. 3, ¶ 19)  No meaningful data suggest that the situation is at all different for ZAI.

The occasional disturbance of ZAI by homeowners through renovations or other activities also would not pose any significant health risk even if the activity were undertaken without protection because the cumulative exposure would be minimal.  The OSHA permissible exposure level is 0.1 fibers per cc, 8 hours a day, 50 weeks per year for 45 years.  Given the low, and in some instances undetectable, asbestos levels in homes with ZAI, even after it is disturbed, homeowners would never approach the OSHA threshold level.  (Corn Test., Ex. 10, pp. 116:19-117:20)  Thus, even "intermittent exposure during the attic remodeling or renovations would not have any health significance."  (Corn Decl., Ex. 3, ¶ 26)

Each attic, of course, is different. To assess the *potential* for exposure in any individual home, the following factors must be considered, together with the results of air testing: (1) the quantity of asbestos-containing materials present; (2) their type and composition; (3) their condition; (4) their location; and (5) the potential for fiber release.  (*Id.* ¶ 14)

Dr. Morton Corn, the former head of OSHA, inspected the Price, Prebil, and Holbrook homes, as well as the homes of the plaintiff and affiants in *Barbanti*.  (*Id.* ¶ 22; Corn Test., Ex. 10, p. 112:3-5)  He observed many variations in attic conditions that would affect any ability of asbestos fibers to enter the ambient air: attics with highly limited access; completely unused attics; attics used only for storage; attics with floorboards covering the vermiculite and attics without floor boards; attics with ventilation providing an opportunity for recirculation of air; the presence of a variety of insulation types and varying amounts of vermiculite; evidence of

renovation; and various types of heating systems. (*Id.* ¶ 22)[9]

Based upon the location of ZAI in unfinished attics, and the minimal opportunity for and duration of disturbance of the material once in place, Dr. Corn has opined that there is an insignificant probability that exposure to airborne fibers would occur. (Corn Decl., Ex. 3, ¶ 26) In light of the varying individual factual circumstances, no class member can prove that ZAI presents a hazard absent an examination of the situation in each building and no finding of hazard in a particular plaintiff's building could be applied class-wide. This is consistent with the EPA's guidance that it is necessary to make site-specific decisions about asbestos management. (Affidavit of Bertram Price ("B. Price Aff."), Ex. 12, pp.14, 21)

In any trial of a homeowner's claims, Grace must have the ability to demonstrate that, in light of the individual factual circumstances in that attic, there is no hazard in the home.

### D.    ZAI Is Safe From A Regulatory Perspective.

Plaintiffs' claims must be considered in the context of the extensive regulation of asbestos-containing materials over the last thirty years. As set forth in the affidavit of Dr. Bertram Price, a consultant to the EPA, asbestos and asbestos-containing products have been the subject of federal and state regulatory action since at least the early 1970s. Collectively, the EPA, the Consumer Product Safety Commission ("CPSC"), OSHA, the Food and Drug Administration, and the Departments of Labor, Education, and Transportation have adopted an extensive regulatory scheme and have issued widely publicized notices and guidelines regarding products containing asbestos, including vermiculite attic insulation with trace amounts of asbestos. (*See Id.* §§ 2, 4)    Among the regulated subjects are occupational exposures, environmental emissions, and asbestos in buildings and in consumer products. (*Id.* § 2) The involved agencies have employed the expertise of independent scientists and research groups to determine the relationship between health risk and exposure to asbestos. (*Id.* p. 2)

The CPSC, which has the authority to ban any asbestos-containing products it deems

---

[9] Site specific differences are also evident from the named plaintiffs' and affiant Mr. Holbrook's descriptions of their attics. Two of the three sections of the Prebils' attic are completely inaccessible; the third section has no floor. (J. Prebil Dep., Ex. 5, pp. 75:19-76:10; 79:3-13; M. Prebil Dep., Ex. 6, p. 27:9-11) The Holbrook attic is 60 percent covered by flooring, and all of the vermiculite is covered by fiberglass insulation. (Holbrook Dep., Ex. 13, pp. 58:19-59:21) *See also* note 5 *supra*.

unsafe, began investigating vermiculite insulation with trace amounts of asbestos in the early 1980s. This study has not yielded grounds to ban or even regulate such products. (*Id.* pp. 2-3) EPA has been aware of the issue of asbestos contamination of vermiculite since 1979 and repeatedly looked at the need for regulation. (*Id.* pp. 8-9) Having "conducted a series of tests to evaluate the extent and nature of the risk," EPA recently issued a Fact Sheet stating that "the potential exposure to asbestos from some vermiculite products poses only a minimal health risk to consumers, although workers may face more serious risks." (*See* EPA Fact Sheet, "Asbestos-Contaminated Vermiculite," Ex. 14) As a result, although it "is continuing its effort to develop risk analysis methods for assessing environmental exposure to vermiculite" (B. Price Aff., Ex. 12, § 2.2), EPA's current guidance with respect to vermiculite attic insulation is "leave it alone." (*See* "Q & A Regarding Vermiculite Insulation," Ex. 15)[10]

In the trial of any homeowner's claim, Grace must have the ability to apply the EPA's hazard assessment criteria to the situation in that property. More importantly in the context of this motion, the activities of the EPA and CPSC demonstrate that the notification and education sought by plaintiffs is more appropriately within the ambit of these agencies than this Court.

## II.    This Lawsuit.

The alleged hazards of tremolite in vermiculite have been the subject not only of regulatory activities but also extensive examination in the press and in the asbestos bodily injury litigation unrelated to ZAI brought against Grace by many of these same plaintiffs' lawyers for decades. More recent media attention, including ongoing publicity about the filing of lawsuits concerning ZAI by plaintiffs' attorneys involved here, led plaintiffs Price and Prebil, who were concerned about the costs of responding to ZAI in their homes and its potential impact on their property values, to contact counsel. (Price Dep., Ex. 7, pp. 21:12-22:11; 16:23-17:4; 13:19-23; J. Prebil Dep., Ex. 5, pp. 21:12-22:11; 16:23-17:13; 96:2-97:25) Shortly after those contacts, this action was filed, without the knowledge or consent of Mr. and Mrs. Prebil. (M. Prebil Dep., Ex.

---

[10] Numerous agencies with authority over this issue also exist at the state and local levels. For example, the Montana Department of Environmental Quality disseminates guidance to property owners about asbestos-containing products. With respect to vermiculite insulation, the Department's Web page provides up-to-date guidance, including a link to the EPA's Home Page. (B. Price Aff., Ex. 12, § 4.1)

6, pp. 14:9-23; 16:17-20; J. Prebil Dep., Ex. 5, pp. 18:5-11; 24:13-20; 25:5-10; 21:4-8)

Unlike medical monitoring cases, where monitoring is sought to prevent future injury, plaintiffs here allege that they "have been injured as a result of the installation of Zonolite Attic Insulation." (Plaintiffs' Memo p. 20)  Asserting claims sounding in negligence, strict liability, and fraud, plaintiffs seek damages for that injury both explicitly and in the guise of trusts that would compensate homeowners for any remediation that they undertake.  Simultaneously, on behalf of absent class members who allegedly are not yet aware of the alleged hazards that prompted plaintiffs to file suit, this suit seeks a notification and education program.  And, of course, they seek punitive damages, as well as attorneys' fees and costs.

## ARGUMENT

Class certification does not become appropriate merely because the device is alleged to be a convenient vehicle for providing requested relief to a group of claimants.  As the Supreme Court stated in rejecting a class action settlement that would have implemented a program for compensating personal injury victims of asbestos exposure:

> The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure.  Congress, however, has not adopted such a solution.  And Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load . . . .

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628-29 (1997) (footnote omitted).  Here, Congress has adopted a solution for notifying and educating citizens about the dangers of hazardous substances in the home and appropriate response actions; that program is regulatory action by the EPA and the CPSC.  Moreover, when the demands of this litigation are closely scrutinized, it is clear that Rule 23 does not provide an alternative mechanism.

Rule 23 categorizes the different types of class actions according to the nature or effect of the relief sought.  As the Fifth Circuit explained in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998), "the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and *the interests of class members to pursue their claims separately or not at all. . . .*" (citations omitted) (emphasis supplied).

11

"The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all of the claims." *Id.* Examples of (b)(1)(A)'s application include a utility acting toward customers, a government imposing a tax, or a riparian owner using water as against all downstream owners. *Amchem*, 521 U.S. at 614.[11] Rule 23(b)(1)(B) encompasses the limited fund cases, *id.*, including cases seeking "legally limited" awards of punitive damages.

"The (b)(2) class action, on the other hand, was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary." *Allison*, 151 F.3d at 412. The Rule permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." The Supreme Court lists civil rights cases complaining of class-based discrimination as prime examples of (b)(2) classes. *Amchem*, 521 U.S. at 614.

"Finally, the (b)(3) class action was intended to dispose of all other cases in which a class action would be 'convenient and desirable,' including those involving large-scale, complex litigation for money damages." *Allison*, 151 F.3d at 412 (citing *Advisory Committee Notes*). Rule 23(b)(3) imposes two additional requirements beyond Rule 23(a)'s prerequisites:

> Common questions must "predominate over any questions affecting only individual members;" and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." In adding "predominance" and "superiority" to the qualifications-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."[12]

*Amchem*, 521 U.S. at 615 (quoting Rule 23 and *Advisory Committee Notes*).

To assure that "the rulemakers' prescriptions for class actions" are not "endangered by those who embrace [Rule 23] too enthusiastically," *id.* at 629, the court must conduct a "rigorous

---

[11] While plaintiffs state in conclusory fashion that certification under Rule 23(b)(1)(A) is appropriate in this case (*see* Plaintiffs' Memo p. 25 n. 14), they do not argue that position in their brief and do not explain how it is applicable. Therefore, defendants do not address that provision of the Rule, but reserve the right to respond more fully should plaintiffs seek such certification.

[12] The factors to be considered when evaluating predominance and superiority include: "(A) the interest of members of the class in individually controlling . . . separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

analysis" to assure that all of the requirements of Rule 23 are satisfied. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *see Castano*, 84 F.3d at 740. This includes not only the requirements of one provision of Rule 23(b), but also the prerequisites set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. The burden of proof is on the plaintiffs. *Castano*, 84 F.3d at 740. For the reasons set forth below, plaintiffs have not met and cannot meet that burden and class certification must be denied.

## I.    CLASS CERTIFICATION IS INAPPROPRIATE UNDER RULE 23(b)(2) BECAUSE THIS ACTION, WHICH PRIMARILY SEEKS MONEY DAMAGES, IS NOT COHESIVE AND MANDATORY CERTIFICATION WOULD BE UNCONSTITUTIONAL.

Aware of the courts' oft-stated reluctance to certify Rule 23(b)(3) class actions in products liability cases,[13] plaintiffs seek to characterize their requested relief as "equitable in nature" and therefore within the scope of (b)(2) certification. Indeed, although plaintiffs argue that either (b)(2) or (b)(3) certification would be appropriate, they contend that (b)(2) certification is "preferable." (Plaintiffs' Memo p. 32 n.17)

In so arguing, they fail to mention that Grace has not sold ZAI for more than 15 years and, therefore, is not currently engaged in any conduct vis-à-vis the putative class appropriately the subject of equitable or declaratory relief. They also disregard the "basic tenet of equity jurisdiction" that "if an adequate remedy at law exists, equitable relief will not be granted." *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 266 (D.D.C. 1990) (quoting *Goadby v. Philadelphia Elec. Co.*, 639 F.2d 117 (3d Cir. 1981), *appeal dismissed*, 945 F.2d 1188 (D.C. Cir. 1991).

More importantly, because plaintiffs' claims for individually based money damages predominate and because the overwhelming individual factual issues destroy class cohesiveness, a (b)(2) class should not be certified. As the Fifth Circuit explained in *Allison*:

> as claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases while the need for enhanced procedural safeguards to protect

---

[13] Because of the number of individual issues typically present in products liability litigation, the Supreme Court and the Second, Third, Fifth, Sixth, Seventh, and Ninth Circuits have repeatedly observed that such litigation is unsuitable for class-wide adjudication. *Amchem*, 521 U.S. at 624; *Georgine*, 83 F.3d at 628; *In re Rhône-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1304 (7th Cir.), *cert. denied*, 516 U.S. 867 (1995); *Castano*, 84 F.3d at 746; *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1089 (6th Cir. 1996); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 164 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); *In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983).

the individual rights of class members increases, thereby making class certification under (b)(2) less appropriate.

151 F.3d at 413 (citations omitted).[14]  Moreover, given the compensatory and punitive damages claims,  mandatory class certification would violate due process and implicate the parties' Seventh Amendment right to jury trial.

> A.    The Allegedly "Equitable" Relief Sought By Plaintiffs Does Not Make Rule 23(b)(2) Certification Available.

Plaintiffs' argument in favor of Rule 23(b)(2) certification necessarily disregards that plaintiffs and other class members primarily seek monetary compensation from defendants both explicitly and in the guise of a remediation program.  Ignoring the fact that their complaint seeks compensatory and punitive damages that are indisputably not the injunctive or declaratory relief that is a requirement for (b)(2) certification, plaintiffs recently described their requested relief as threefold:

> 1) classwide notification warning homeowners of the asbestos in defendants' attic insulation product and the potential for it to release asbestos and contaminate homes when disturbed; 2) implementation of an education program for homeowners addressing the appropriate safety precautions necessary to avoid disturbance and to minimize asbestos exposure and contamination of the home; and 3) creation of a claims-based asbestos remediation trust fund to reimburse homeowners for asbestos testing and asbestos containment and/or remediation.

(Plaintiffs' Initial Disclosures Pursuant to Rule 26(a)(1) and Local Rule 26.2(A), Ex. 16, ¶ D)[15] The "claims-based remediation trust," like the complaint's demand for compensatory and punitive damages, is plainly monetary relief that does not support (b)(2) certification.  Such compensatory, non-injunctive relief is the predominant relief sought by the class representatives and the other class members who have testified to date.  Accordingly, notwithstanding class counsel's contrived pleading, Rule 23(b)(2) class certification is not appropriate.  Moreover, the first two forms of relief, asbestos notification and education programs, seek judicial intervention

---

[14] *See also Lemon v. International Union of Operating Eng'rs, Local No. 139, AFL-CIO,* 216 F.3d 577, 580 (7th Cir. 2000)("A suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiff's claim.")

[15] Plaintiffs contend that they seek "relief in the form of notification, education and remediation" – that is, they seek "to create a procedural mediation by which to preserve class members' health and to prevent serious avoidable injuries and death caused by asbestos exposure."  (Plaintiffs' Memo p. 2) Presumably, a "procedural mediation" contemplates an extra-judicial claims-handling mechanism.

in an area within the purview of regulatory agencies that are charged and uniquely qualified to study and advise citizens about hazardous substances; therefore, they are not appropriate for (b)(2) certification. Thus, Rule 23(b)(2) certification is not available.

    1.    **The Predominant Relief Sought by Plaintiffs – Whether Directly in the Form of Compensatory Damages or in The Guise of A Claims-Based Remediation Trust – Is Money Damages And Not The Injunctive Relief Required For Rule 23(b)(2) Certification.**

Recognizing the distinctions in Rule 23, courts deny (b)(2) certification when plaintiffs primarily seek money damages rather than injunctive relief, when money damages effectively would redress the alleged harm, and when money damages are more appropriate than equitable remedies. *See Nelsen v. King County*, 895 F.2d 1248, 1255 (9th Cir. 1990) (Rule 23(b)(2) certification "not appropriate where the relief requested relates 'exclusively or predominantly to money damages'"); *Walsh*, 130 F.R.D. at 266 (rule that Rule 23(b)(2) classes should not be certified where money damages are the appropriate final relief "ought to be respected"). A class should be certified under Rule 23(b)(2) *only* "where equitable and injunctive relief is the sole or primary relief sought and . . . [not where] the appropriate final relief relates exclusively or predominantly to money damages." *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 481-82 (E.D. Pa. 1997) (quoting *Rules Advisory Comm. Notes to 1966 Amendments to Rule 23*).

Here, plaintiffs' complaint demonstrates that money damages is the primary relief sought. In addition to the request for a claims-based asbestos remediation trust fund, which is plainly a request for money damages, paragraph 2 of the complaint seeks "*compensatory relief* . . . to compensate property owners for harm suffered." (emphasis supplied). Plaintiffs' alleged injuries include "*costs* of testing, *costs* of property remediation, *costs* of asbestos containment, *costs* of asbestos abatement, and *costs* and hardship resulting from reasonable effort to avert harm." (Complaint, Ex. 17, ¶¶ 69, 73 and 84) (emphasis supplied) In short, plaintiffs seek money to determine whether ZAI is present in the class members' buildings, more money to abate any alleged hazard if ZAI is present, more money to compensate the proposed class members for any damages suffered, and yet more money in punitive damages.[16]

---

[16] Plaintiffs' request for punitive damages is further evidence that they seek predominantly monetary, rather than injunctive, relief. As in *Castano v. American Tobacco Co.*, 160 F.R.D. 544, 552 (E.D. La.

The class representatives' testimony confirms the primacy of monetary relief. Both Price and Prebil testified that their claims were motivated primarily by monetary concerns: the effect on the value of their homes and their ability to sell them with ZAI installed. (Price Dep., Ex. 7, p. 13:19-23; J. Prebil Dep., Ex. 5, pp. 96:2-97:25)  When asked to describe the relief that he understands the lawsuit is seeking, Mr. Price described "something to help alleviate some of the extra burden or cost of" renovation or loss of value on sale. (Price Dep., Ex. 7, pp. 29:25-30:12)  The affiants who support plaintiffs' claims echoed plaintiffs' desire to recover money. (King Dep., Ex. 18, pp. 43:4-13; 64:16-65:12; Hatch Dep., Ex. 19, pp. 91:14-19)

So too, plaintiff Edward Lindholm testified that he is seeking recovery for the diminution in the value of his property, the cost of cleaning his home, and the cost of testing and inspecting his home for asbestos. (Lindholm Dep., Ex. 8, pp. 39:18-42:14)  Likewise, John Szufnarowski, a plaintiff in *Lindholm*, testified that he is "seeking costs for the removal of the asbestos, the disposal of the asbestos, complete testing to be sure there's no residue involved as a result of the removal of it. I'm seeking replacement of the insulation and any costs that might diminish the value of the property." (Szufnarowski Dep., Ex. 9, p. 37:1-9)

Where the plaintiffs seek primarily monetary damages, Rule 23(b)(2) certification is not appropriate notwithstanding the presence of other claims for equitable relief. For example, in *Castano*, 160 F.R.D. at 551-52, the court concluded that a request for a medical monitoring program did not render (b)(2) certification appropriate because medical monitoring was only one type of relief sought by plaintiffs and it was not the primary relief.  Plaintiffs also sought compensatory, statutory, and punitive damages, which the court concluded were primary. Likewise in *Millett v. Atlantic Richfield Co.*, No. Civ. A. CV-98-555, 2000 WL 359979 at *20-21 (Me. Super. Ct. March 2, 2000), *appeal dismissed*, 760 A.2d 250 (2000), the court rejected plaintiffs' characterization as equitable relief a request that defendants be ordered to pay for court-approved sampling and analysis of groundwater for MTBE contamination and an order requiring defendants to fund corrective public education.  The court concluded that both the

---

1995), *modified on other grounds*, 84 F.3d 734 (5th Cir. 1996), the requested equitable relief is incidental to the requests for money to compensate for ZAI's presence and for additional money to punish Grace.

well-testing claims and corrective public education claims were claims for monetary relief and that (b)(2) certification was inappropriate.

Here, too, plaintiffs attempt to circumvent Rule 23(b)(2)'s injunctive relief requirement by characterizing their claim for money damages as a claim for "equitable relief" in the form of a "remediation and containment program and fund." (Complaint, Ex. 17, Prayer for Relief ¶ 5) However, plaintiffs seeking Rule 23(b)(2) class certification cannot simply disguise a request for money damages as a request for equitable relief. *See, e.g., In re Asbestos Sch. Litig.*, 104 F.R.D. 422, 438 (E.D. Pa. 1984), *modified sub nom., In re School Asbestos Litig.*, 789 F.2d 996, 1108 (3d Cir.), *cert. denied*, 479 U.S. 852 (1986) (denying (b)(2) certification for asbestos abatement remediation program, including inspection, testing, removal or containment, and restitution of abatement expenditures); *Arch*, 175 F.R.D. at 481-82 (denying (b)(2) certification for medical monitoring program, nicotine addiction treatment, research on addiction causes and treatment, educational campaigns and smoking cessation programs); *Castano*, 160 F.R.D. at 552 (denying (b)(2) certification for notice of nicotine's addictive nature, disgorgement of defendants' profits, restitution of plaintiffs' costs of cigarettes, a medical monitoring fund, and compensatory and punitive damages); *Millett*, 2000 WL 359979 at *21 (denying (b)(2) certification for warning about MTBE in groundwater, sampling and analysis of groundwater, and an educational fund).

Plaintiffs' argument that the creation of a Court-supervised fund to collect the proceeds may have the superficial, albeit paternalistic, appeal that the monies are spent on remediation, but it still does not transform the requested monetary payments into equitable relief. A claim for money damages cannot be converted into a claim for injunctive relief within the meaning of Rule 23(b)(2) simply by asking for a court order directing the defendants to pay money to the plaintiffs or by asking that money damages be pooled into a fund before they are disbursed to individual plaintiffs. "Plaintiffs cannot transform a legal claim into an equitable one merely by using a fund as a repository for money damages." *Arch*, 175 F.R.D. at 484. Plaintiffs' claims-based remediation trust is no different from similar attempts rejected in *Asbestos Schools* and *Arch*, where respective claims for restitution and a remediation program and for addiction treatment and smoking cessation programs were held to be claims for money damages. As the

court said in *Asbestos Sch.*, 104 F.R.D. at 438, "[d]espite the ingenuity of plaintiffs' claims for equitable remedies, this case remains at bottom, one for legal damages."[17]

Plaintiffs' reliance on medical monitoring cases[18] to support their argument that the requested trusts are in fact equitable in nature is misplaced because this case is vastly different from those cases.[19] In a medical monitoring case, plaintiffs seek a court-supervised fund from which they can draw in the future on an ongoing basis to monitor their health, which has not yet been adversely affected. The medical tests that are to be performed are universally recognized as the appropriate tests for determining whether an individual is developing the illness attributable to the hazardous substance or drug (*e.g.*, chest x-ray and pulmonary function test for asbestos exposure and echocardiogram for diet drug users). Here, plaintiffs complain of alleged property damage that they contend occurred in the past (the complaint repeatedly alleges "contamination" of real property with asbestos), and they seek monetary compensation to remedy that alleged property damage.[20] The appropriate response to the presence of the ZAI will vary depending on its installation and plaintiffs' use of the attic. However, even if the Court were persuaded that some of the relief plaintiffs seek (*e.g.*, notification or identification) is analogous to the medical monitoring claims which some courts have held to be equitable in nature, plaintiffs' request for compensatory and punitive damages, together with the "remediation and containment program and fund" out of which property owners would receive the costs of removal and containment, far

---

[17] *See also Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979), *cert. denied*, 441 U.S. 961 (1979); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99-100 (W.D. Mo. 1997); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1404 (W.D. Mo. 1994); *Werlein v. United States*, 746 F. Supp. 887, 895 (D. Minn. 1990), *vacated in part on other grounds*, 793 F. Supp. 898 (D. Minn. 1992); *Davenport v. Gerber Prods. Co.*, 125 F.R.D. 116, 120 (E.D. Pa. 1989).

[18] Plaintiffs' argument also ignores numerous cases in which courts have refused to certify (b)(2) medical monitoring classes. *See, e.g.*, *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142-149 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999); *Broughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995); *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 528-34 (N.D. Ill. 1998); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 657 (C.D. Cal. 1996); *Harding v. Tambrands, Inc.*, 165 F.R.D. 623, 632 (D. Kan. 1996).

[19] Many of the medical monitoring cases plaintiffs cite do not even address the issue of the propriety of class certification for such claims, but rather merely address the issue of whether medical monitoring claims are cognizable. *See Friends For All Children Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 824, 829-30 (D.C. Cir. 1984) (recognizing medical monitoring action under District of Columbia law); *Redland Soccer Club v. Dep't of the Army*, 696 A.2d 137, 142-43 n.6 (Pa. 1997) (same under Pennsylvania law); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 980 (Utah 1993) (same under Utah law); *see also Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 800 (Cal. 1993) (holding that medical monitoring is compensable item of damages); *Ayers v. Township of Jackson*, 525 A.2d 287, 314-15 (N.J. 1987) (same under New Jersey law); *Barth v. Firestone Tire & Rubber*, 661 F. Supp. 193, 203-05 (N.D. Cal. 1987) (recognizing medical monitoring claim as one for injunctive relief).

[20] That plaintiffs have not yet incurred the costs of asbestos remediation does not render the damages "future" nor the relief equitable. The alleged damage is the contamination, not the costs of remediation.

exceeds a request for medical monitoring alone.   *See Castano*, 160 F.R.D. at 551-52 (distinguishing *Day v. NLO*, 851 F. Supp. 869, 885 (S.D. Ohio 1994), cited by plaintiff, on the grounds that in *Day* plaintiffs sought only a medical monitoring program, whereas the *Castano* plaintiffs sought far more); *cf. Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) (sole remedy sought was medical monitoring).

Where both equitable relief and damages are sought, certification under Rule 23(b)(2) is improper unless the monetary relief is merely "incidental" to the injunctive or declaratory remedies. *See Allison*, 151 F.3d at 413. Damages are "incidental" only if they "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Id.* at 415. Three factors further define "incidental" damages: (1) class members must be automatically entitled to them by virtue of the injunctive or declaratory relief; (2) damages must be computable by "objective standards," and not dependent upon "the intangible, subjective differences of each class member's circumstances"; and (3) no additional hearings must be necessary to ascertain damages. *Id.*

Here, the claimed compensatory damages and monetary recoveries from the requested "funds" are far from "incidental." Each individual homeowner's recovery would depend upon specific findings of fact in individual cases, requiring individual examination of a wide variety of building-by-building issues that, at a minimum, include: (a) whether ZAI (rather than another brand) has been installed; (b) whether the areas containing ZAI are accessible, and if so, how they are utilized, if at all; (c) whether there is outside ventilation of those areas; (d) whether the areas containing ZAI may be sealed off; and (e) how much the remediation or removal of ZAI from the home will cost. (*See* B. Price Aff., Ex. 12, pp. 14, 21) (discussing EPA's conclusion that asbestos management must be determined on a site-specific basis) and Corn Decl. ¶¶ 14, 22 (listing factors required to determine whether a hazard exists, and widely varying presence of such factors noted during inspection of homes with ZAI). Such prerequisites inherently "depend on ... subjective differences of each class member's circumstances" and "require additional hearings to resolve the disparate merits of each individual's case." *Allison*, 151 F.3d at 415. Far from being "incidental" under *Allison*, money damages sought in this case overwhelm any

nominal equitable remedies. Thus, even if some of plaintiffs' requested relief is equitable, the suit is nonetheless one predominantly for money damages.[21]

> 2. **The Requested "Equitable" Relief In The Form Of An Education Trust And A Notification Program Are Within The Purview And Ambit Of Regulatory Agencies.**

In addition to monetary compensation for any claims of class members attributable to ZAI in their attics, which is the predominant relief sought in this action, plaintiffs demand relief in the form of a "Court-supervised notification program" and a "Court-supervised health and safety research and education trust." (Complaint, Ex. 17, Prayer for Relief ¶¶ 3, 4) The inclusion of this arguably equitable relief in the complaint does not support Rule 23(b)(2) class certification because it would require the Court to engage in the equivalent of administrative rule-making and to become entangled with a regulatory scheme. *See Walsh*, 130 F.R.D. at 266-67; Charles Alan Wright, Arthur R. Miller, *et al.*, *Federal Prac. and Proc. Civ. 2d*, § 1775 n.23 (2000 Supp.) (citing *Walsh*); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 n.6 (D.N.J. 1998) ("the administrative remedy provided by the NHTSA, including recall of vehicles for inspection and/or repair is more appropriate than civil litigation seeking equitable relief and money damages in federal court") (citing *Walsh* for proposition that "monetary damages [are] more suitable than equitable relief in view of the existence of an administrative remedial scheme and the difficulties in implementing the equitable relief requested").

---

[21] While the plaintiffs rely heavily on the Superior Court of Washington's decision in *Barbanti* to certify, pursuant to the Washington-equivalent of Rule 23(b)(2), a Washington statewide class of owners and occupiers of buildings with ZAI installed, the *Barbanti* court's certification decision is neither controlling nor persuasive. More importantly, defendants maintain that the certification was plainly wrong. The court certified the class under 23(b)(2) without citation to either state or federal authority. In the face of testimony from the plaintiff and absent class members that the lawsuit was motivated by the desire to recover the costs of abating the ZAI and that they were looking to the lawsuit to pay for the costs of removal, the court stated that it "accepts plaintiffs' assertion that equitable relief is the primary purpose although monetary damage claims would not be unexpected if plaintiffs prevail." (Memorandum Decision, Nov. 28, 2000, p. 5) The court engaged in no analysis of whether the alleged equitable relief was, as here, merely a disguised claim for money damages; it did not address the cases that hold that the use of a "fund" to funnel the damages to the class members does not transform a damages claim into an equitable one. The court likewise failed to analyze whether the equitable relief, as opposed to monetary damages, is the predominant relief sought, a prerequisite to (b)(2) certification. Inexplicably, the court cited to the Washington equivalent of Rule 23(b)(1)(A), which the court says "recognizes that in cases affecting substantial numbers of persons, defendants should not be subjected to inconsistent standards of conduct imposed by multiple court decisions." (Memorandum Decision p. 6) Plaintiff never asserted nor argued for certification pursuant to (b)(1)(A). Defendants have filed a Notice of Discretionary Review, seeking interlocutory appeal of the Washington court's certification decision. For these reasons, in addition to the fact that a statewide class lacks many of the infirmities unique to a nationwide class action like the one proposed here, plaintiffs' heavy reliance on the *Barbanti* certification decision is misplaced.

In *Walsh*, 130 F.R.D. at 266-67, the court refused to certify a "class of all owners [of a particular model of Ford vehicle] seeking recall and retrofit" on the grounds that denial of Rule 23(b)(2) certification "would avoid entanglement with a regulatory scheme designed and intended to empower principally the Department of Transportation, rather than the courts, to order and oversee motor vehicle recalls." The court also noted that a Rule 23(b)(2) class should not be certified "when the equitable relief sought demands more resources and supervision than the Court can muster reasonably." *Id.* at 266.[22]

Here, as in *Walsh*, plaintiffs seek judicial intervention in an area pervasively regulated by agencies uniquely qualified by virtue of their mandate, resources, expertise, and experience to determine the necessity and appropriateness of the requested relief. *See* B. Price Supp. Aff., Ex. 12. For example, the CPSC is empowered to "conduct research, studies, and investigations on the safety of consumer products," 15 U.S.C.S. § 2054 (b)(1) (West 2000), and if it determines that a product "presents a substantial product hazard and that notification is required in order to adequately protect the public from such substantial product hazard," it may order the manufacturer to "give public notice of the defect . . . ," 15 U.S.C.S. § 2064(c)(1) (West 2000). Similarly, the EPA is charged with, *inter alia*, the "conduct[ing] of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use of this information in strengthening environmental protection programs and recommending policy changes." 42 U.S.C.S. § 4321 (West 2000).

Pursuant to their charge, during the past 30 years, these agencies have implemented an extensive regulatory scheme for asbestos and asbestos-containing products. (B. Price Aff., Ex. 12, § 2) Although these activities have focused on products containing more than 1% asbestos,

---

[22] The *Walsh* court's reluctance to certify a class that would entangle the court in a regulatory scheme is consistent with the doctrine of primary jurisdiction pursuant to which courts defer to the experience and expertise of administrative agencies. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 353 (1963) ("judicial abstention [required] in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme"); *Smith v. Nat'l Steel & Shipbuilding Co.*, 125 F.3d 751, 756 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998) ("in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over"); *Punnett v. United States*, 602 F. Supp. 530 (E.D. Pa. 1984) (deferring to ongoing administrative process engaged in determining scope of alleged hazard and need for a public information process based upon its determinations).

the agencies have been aware since at least the 1970's of the presence of trace amounts of tremolite asbestos in vermiculite products, including vermiculite insulation, and have conducted and are conducting evaluations of the need for regulation of such products (*id.* pp. 8-9):

- Since 1977, the CPSC has investigated the safety of asbestos-containing products and has the authority to ban any that it deems unsafe. The CPSC began investigating vermiculite insulation with trace amounts of asbestos in the early 1980s. This study has not yielded grounds to ban, or even to regulate, such products. (*Id.* pp. 2-3)

- The EPA has studied potential vermiculite exposure since the early 1980s. It has made a comprehensive effort to obtain data, including contracting with several private scientific consultants. The EPA has been actively involved in exposure and risk assessment studies and has specifically evaluated the potential health hazard from ZAI. In an exposure assessment published in 1985, the EPA concluded that "once in place, vermiculite attic insulation would probably not lead to subsequent consumer exposure. The type of attic in which vermiculite is used is ordinarily isolated from the rest of the home and is not regularly entered." (*Id.* p. 9)

- The EPA's web page concludes: "[D]ue to the physical characteristics of vermiculite, there is a low potential the material is getting into the air. If the insulation is not exposed to the home environment – for example, it's sealed behind wallboards and floorboards or is isolated in the attic which is vented outside – the best advice would be to leave it alone." ("Q&A Regarding Vermiculite Attic Insulation," Ex. 15)

- In the EPA's guidance document on asbestos-in-buildings, with respect to products containing more than ten times as much asbestos as ZAI, the EPA has stated: "[T]he average airborne asbestos levels in buildings seems to be very low . . . the health risks to most occupants appears to be very low." (B. Price Aff., Ex. 12, p. 13) (quoting *Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*, EPA 20T-2003, July 1990)

These regulatory activities, which are ongoing, obviate the need for, and render inappropriate, the judicial intervention sought by plaintiffs in their request for Rule 23(b)(2) class certification. The Court should reject plaintiffs' request that this matter be certified under Rule 23(b)(2) because such certification would risk creating a judicial regulatory scheme apart from that enacted into law by Congress and the agencies charged with implementing those laws.

### B.    A Mandatory Nationwide Class Action Which Seeks Money Damages Would Violate Due Process.

Plaintiffs' request for certification of a mandatory class should be denied because certification of a nationwide class seeking money damages from which absent class members have no right to opt out would violate absent class members' constitutional right to due process, while unfairly subjecting defendants to future lawsuits brought by absent class members for

whom any settlement or other disposition of class claims would have no preclusive effect.

In *Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-812 (1985), the Supreme Court held that, in a class action seeking wholly or predominantly money judgments,[23] due process requires that absent class members who lack minimum contacts with the forum state be given notice, an opportunity to be heard, and the right to opt out. Class members who fail to opt out are deemed to have waived personal jurisdiction. Because Rule 23(b)(2) provides no right of exclusion, a class action so certified that purports to adjudicate the money damage claims of absent class members who do not have minimum contacts with the forum state is unconstitutional. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846-47 (1999) (vacating a mandatory settlement class in asbestos bodily injury litigation in part because 23(b)(1) certification deprived absent class members of the right to opt out); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999) (vacating (b)(2) class certification in part because *Ortiz* requires notice and opt-out to comply with due process "in actions for money damages").

When such a class is certified, a defendant is put in the precarious position of facing subsequent duplicative cases brought by absent class members. *See, e.g., Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992) (where absent class member "had no opportunity to opt out of . . . litigation . . . there would be a violation of minimal due process if Brown's damage claims were held barred by res judicata"); *In re Real Estate Title and Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 762 (3d Cir.), *cert. denied*, 493 U.S. 821 (1989) (a district court's enjoining of a state court damages action brought by an absent class member of a settled mandatory class action against defendants who were named in the class action violates due process where the absent class members "have not had minimum contacts with the forum nor consented to jurisdiction"). In *Brown*, plaintiffs sought to bring claims for injunctive relief and damages, notwithstanding the settlement of a prior Rule 23(b)(2) class action brought against the same defendants. The court held, 982 F.2d at 392, that while plaintiffs' injunctive claims could be barred by res judicata, their damages claims could *not* be precluded because they had been

---

[23] The Court explicitly left open the issue whether due process required the same procedures in other types of class actions, such as those seeking equitable relief. 472 U.S. at 812 n.3.

denied the right to opt out of the prior class action:

> According to [*Phillips Petroleum*], minimal due process requires that "an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." Because Brown had no opportunity to opt out of the [prior] litigation, we hold there would be a violation of due process if Brown's damage claims were held barred by res judicata.

Here, plaintiffs purport to assert predominantly money damage claims on behalf of a nationwide class of property owners, most of whom are highly unlikely to have minimum contacts with the forum state. Accordingly, the Court lacks personal jurisdiction over virtually all absent class members. Given the mandatory nature of Rule 23(b)(2) class certification, absent class members would not be permitted to opt out and thus would be denied the basic due process protections that *Phillips Petroleum* requires to bind out-of-state class members with money damages claims. Moreover, this denial of due process would undermine the preclusive effect of any final disposition of the class claims, and thus subject the defendants and the courts to uncertainty and the threat of endless litigation. Even if the Grace defendants successfully defended this action, and were found not liable for the costs of remediation the class is seeking, they would face the prospect of individual class members coming forward to relitigate their damage claims individually. It is doubtful that the Grace defendants could bar such actions by individuals who were denied the opportunity to opt out of the plaintiff class because it was improperly certified under Rule 23(b)(2).

## C.    A Bifurcated Trial of Plaintiffs' Equitable and Damages Claims Would Implicate the Parties' Seventh Amendment Right to a Jury Trial.

At the status conference before the Court, Ms. Cabraser stated that the crafting of the so-called injunctive remedies of notice, education and remediation was "a bench trial issue" but that a jury would need to assess damages for class members. (Initial Status Conference, Jan. 4, 2001, Ex. 21, pp. 16: 17-17:22) To sever the so-called equitable claims from the damages claims, trying the equitable issues to the Court and the entitlement to money damages to a jury, implicates the parties' Seventh Amendment right to a jury trial.

Once a right to a jury trial attaches to a claim, it extends to all factual issues necessary to resolve that claim. *Allison*, 151 F.3d at 423 (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S.

500, 510-11 (1959)).  When claims involving both legal and equitable rights are joined in one action, "the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims."  *Id.*  In *Allison*, the court held that, because of the numerous factual issues common to the plaintiffs' pattern or practice claim for legal damages and plaintiffs' disparate impact claim for equitable relief, the jury trial right meant that a jury had to decide all the common factual issues before the court could consider the merits of the plaintiffs' equitable claim; and, therefore, the equitable claim could not be severed for (b)(2) class treatment.  For the same reason, in the District Court's opinion in *Castano*, the court held that the Seventh Amendment precluded (b)(2) certification of the medical monitoring claim separate from the legal claims for damages, without regard to whether the equitable cause of action outweighed the legal cause.  160 F.R.D. at 552.

Here, (b)(2) certification of plaintiffs' so-called equitable claims for notice, education, and remediation funds for a bench trial separate from a jury determination of plaintiffs' claims for compensatory damages would violate the defendants' Seventh Amendment right to a jury trial.  The claims share common factual questions, including the fundamental question of whether ZAI is hazardous, which may not be tried in a class action bench trial without running afoul of the Seventh Amendment.  *Allison*, 151 F.3d at 425.

### D. The Overwhelming Individual Issues of Fact And Law Destroy Class Cohesiveness.

#### 1. The Class Lacks Cohesiveness Because Of Overwhelming Individual Issues of Fact.

"Rule 23(b)(2) classes must be cohesive, particularly because unnamed members are bound by the decision with no opportunity to opt-out. . . . In other words, 'disparate factual differences' can bar class certification."  *Miller v. Hygrade Food Prods. Corp.*, No. 99-1087, 2001 U.S. Dist. LEXIS 733 at *9 (E.D. Pa. Jan. 29, 2001) (quoting *Barnes*, 161 F.3d at 142-143).  While Rule 23(b)(2) does not require that common factual issues predominate, the Rule assumes that the nature of the injunctive relief sought will provide the requisite cohesiveness so that a

class action can be maintained without offending due process.[24]   Because of the due process

implications, the Third Circuit in *Barnes* held that "a (b)(2) class may require more cohesiveness

than a (b)(3) class." 161 F.3d at 142.  In *Barnes*, the District Court decertified the Rule 23(b)(2)

class of smokers seeking solely medical monitoring because the record revealed that the action

implicated "far too many individual issues to proceed on a class-wide basis." 176 F.R.D. 479,

498 (E.D. Pa. 1997), *aff'd*, 161 F.3d 127 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999).  The

court found that the individual factual issues of addiction, causation, defect, and the various

affirmative defenses and statute of limitations presented individual issues destroying

cohesiveness and rendering the case unmanageable for trial. 176 F.R.D. at 498-502.  The Third

Circuit agreed. 161 F.3d at 149.  *See also Thompson v. American Tobacco Co.*, 189 F.R.D. 544,

557 (D. Minn. 1999) (denying (b)(2) certification because individual issues "abound"); *Dhamer*,

183 F.R.D. at 529 (certification under (b)(2) inappropriate because individual issues

predominate).

    Here, individual issues of fact overwhelm plaintiffs' claims, thereby destroying

cohesiveness.  To obtain the requested relief of "remediation," plaintiffs must prove that ZAI is

hazardous and that Grace violated a duty owed to each plaintiff.  With respect to the allegedly

common issue of the hazard presented by ZAI, each class member must prove the existence of a

hazard given his or her personal and unique circumstances.  At the very least, each class member

would have to demonstrate the existence of a hazard in the class member's building by evidence

of the level and duration of exposure to airborne asbestos fibers and, assuming *arguendo* that

plaintiffs are correct, by evidence of a significant disturbance.  As explained more fully in the

Factual Background, it is not possible for plaintiffs to prove hazard on a class-wide basis.  The

individual facts necessary to prove ZAI is hazardous in any class member's building destroy

class cohesiveness, thereby rendering certification under Rule 23(b)(2) inappropriate.

---

[24] Plaintiffs cite Judge Bechtle's diet drugs decision repeatedly as support for the propriety of class certification.  However, Judge Bechtle expressly limited his holding to the settlement class before him: "when taking the settlement into consideration for purposes of determining class certification, individual issues which are normally present in personal injury litigation become irrelevant, allowing the common issues to predominate.  For example, differences in state law . . . do not destroy class cohesion because the settlement agreement provides for distribution of the benefits based on the objective criteria described therein." *In re Diet Drugs*, No. 99-20593, 2000 WL 1222042 at *43 (E.D. Pa. Aug. 28, 2000).

Other individual issues of fact presented by plaintiffs' claims are product identification,[25] product composition,[26] statute of limitations,[27] and the reliance element of the fraud claim.[28] These issues must be addressed individually for each class member.

Accordingly, because individual questions of fact are necessary to prove plaintiffs' claims of fraud, strict liability, and negligence, the class lacks the cohesiveness necessary for Rule 23(b)(2) certification. *See, e.g., Dalkon Shield*, 693 F.2d at 856 ("although . . . common factual questions [exist], the court should have balanced these concerns with the greater number of questions affecting individual class members").

### 2. The Class Lacks Cohesiveness Because The Differences In The Applicable Laws Create Overwhelming Individual Issues of Law.

Because the putative class members potentially hail from 50 different jurisdictions (every state, excluding Washington, plus the District of Columbia), plaintiffs' proposed nationwide certification violates the cohesiveness requirement of Rule 23(b)(2). Because each jurisdiction has an interest in seeing its residents' claims adjudicated according to its law, a correct choice of law analysis and the requirements of due process dictate that the laws of all 50 jurisdictions, which diverge significantly, be applied.

As a threshold matter, because a federal court sitting in diversity must decide state common law claims on the basis of state law, the Court must address the issue of choice of law.

---

[25] Grace was not the only source of vermiculite. (*See* "Sampling and Analysis of Garden Products that Contain Vermiculite" EPA 744-R-00-010, August 2000, Ex. 21, p. 10) Although some class members can establish the identity of the product by the presence of branded bags of ZAI in their attics (Hatch Dep., Ex. 19, p. 13:11-19) or because they installed the product (J. Prebil Dep., Ex. 5, p. 7:1-14), many others will have to rely on expert testing to establish whether their insulation was a Grace product. (Busch Dep., Ex. 22, pp. 61:25-62:14; Price Dep., Ex. 7, p.10:10-15; Holbrook Dep., Ex. 13, p. 20:11-22) In either case, individual hearings must be held for each class member to establish product identification.

[26] As discussed more fully in Section V *infra*, not all ZAI is comprised of vermiculite from Libby and, therefore, not all homeowners with ZAI in their homes have a claim for tremolite contamination.

[27] "[D]etermining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification." *Barnes*, 161 F.3d at 149. As discussed more fully in Section IV.A *infra*, Mr. Price's claim is barred by the Montana statute of limitations.

[28] Plaintiffs' fraud claim requires a showing by each individual class member of reliance upon the alleged representations concerning ZAI. *See Bartlett v. Allstate*, 929 P.2d 227, 231 (Mont. 1996) (reliance is an essential element of a claim for fraud); *Mattingly v. First Bank*, 947 P.2d 66, 70 (Mont. 1997) (reliance is an element of constructive fraud and negligent misrepresentation claims). The representations received and any reliance thereon are individual issues that must be established on a class member-by-class member basis. *See Castano*, 84 F.3d at 745 ("a fraud class action cannot be certified when individual reliance will be an issue") (citing *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973)). Mr. Prebil, the only proposed class representative who actually purchased ZAI for installation in his property, identified no representations by Grace upon which he relied in purchasing the product. (J. Prebil Dep., Ex. 5, pp. 8:17-9:8; 59:17-20; 115:24-116:2)

A court deciding class certification "may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirements that there be a common question of law." *Phillips Petroleum*, 472 U.S. at 821-23 ("constitutional limitations . . . must be respected even in a nationwide class action"); *see In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 371 (E.D. La. 1997) (in a nationwide products liability action, applying the laws of the state where the product was designed would offend notions of due process and the Full Faith and Credit Clause of the Constitution) (citing *Phillips Petroleum*, 472 U.S. at 822)); *see also Amchem*, 521 U.S. at 599 (federal courts lack "authority to replace state tort systems with a national toxic tort compensation regime").

In litigation transferred by the Judicial Panel on Multidistrict Litigation for coordinated pretrial proceedings, the transferee court must apply the choice of law principles of the state of the transferor court, which in this case is Montana. *See In re Sunrise Sec. Litig.*, 698 F. Supp. 1256, 1261 (E.D. Pa. 1988). Urging a strained and convoluted application of Montana's "significant relationship" test, *see Phillips v. General Motors Corp.*, 995 P.2d 1002, 1013 (Mont. 2000), plaintiffs propose that the law of either Montana or Massachusetts should be applied to the claims of all putative class members without regard to their state of residence or the location where the product at issue was purchased. However, plaintiffs' contention that Montana's choice of laws rules would apply Montana law because it is no different from any other states' laws on the asserted claims is wrong on many levels and belied by the recent decision of the Montana Supreme Court in *Phillips*. There the court analyzed, albeit not in a class action context, the products liability laws of *just three states* – Montana, North Carolina, and Kansas – and found significant differences. It concluded: "This is not a case in which the policies of interested states are basically the same except for minor differences in their local rules. . . . Instead, it appears that the various interested states have reached different conclusions concerning the right level of compensation and deterrence for injuries caused by defective products." 995 P.2d at 1014. Because the plaintiffs were *residents of Montana*, giving Montana "a significant relationship to the issues," and because "the purpose of a state's product liability law is to regulate *purchases made within its border* and to protect and compensate its residents, the court concluded that

Montana law would apply." *Id.* at 1013 (emphasis supplied). That conclusion indicates that under Montana choice of law, the law of each of the 50 jurisdictions would be applied in this case.

Indeed, plaintiffs' suggestion that the law of a single state be applied in this nationwide class action does not withstand scrutiny. The Fifth Circuit recently reversed class certification in a products liability case where – as plaintiffs urge here – the district court was going to apply the law of a single state to a nationwide class action. *Spence v. Glock*, 227 F.3d 308 (5th Cir. 2000). In *Spence*, the court recognized the plaintiffs' failure to engage in a sufficient choice of law analysis, that all 51 jurisdictions had an interest in the claims of their respective consumers, and that their laws differed, thus suggesting "'insuperable obstacles' to certification." *Id.* at 313 n.8 (citations omitted).

> [T]he most significant relationship test requires that the policies of each state with contacts be examined, yet the plaintiffs have not undertaken this analysis.
>
> The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate.
> * * *
> If the district court had performed a proper choice of law analysis, it likely would not have found Georgia law controlling on the tort issues in this nationwide class action. . . . [T]he class members are domiciled and likely bought their [products] in all 50 states and the District of Columbia. All these 51 relevant jurisdictions are likely to be interested in ensuring that their consumers are adequately compensated in cases of economic loss, but many have different concepts of what adequate compensation is. . . . For such reasons, several courts that have confronted similar situations in other multistate class actions have refused to find a single state's law controlling.

*Id.* at 313-14; *see also Chin*, 182 F.R.D. at 457 ("governmental interest" choice of law analysis applied to conclude laws of 50 states should be applied to nationwide product defect class action). Here, as in *Spence* and *Chin*, each of the 50 jurisdictions has an interest in seeing its residents' claims adjudicated according to its law, and each has the most significant relationship to those claims. Thus, the laws of all 50 jurisdictions – and not the law of only Montana or Massachusetts – should apply.

As then Judge (now Justice) Ginsberg carefully explained, given the applicability of the different states' laws to the claims of a national class of homeowners, plaintiffs bear the burden

in their motion for class certification of "credibly demonstrat[ing], through an extensive analysis of state law variances, that class certification does not present insuperable obstacles." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986), *cert. denied*, 482 U.S. 915 (1987). Even though the plaintiffs limit their claims to only three legal theories,[29] they cannot meet their burden even with respect to those theories. The Grace defendants have prepared an Appendix to this brief that summarizes the divergences of the 50 jurisdictions' laws applicable to each of plaintiffs' three causes of action and claim for punitive damages, illustrating for the Court the absence of cohesiveness of the proposed class on questions of law.

Plaintiffs erroneously assert that the law in the area of strict liability failure to warn "is essentially the same in all American jurisdictions." (Plaintiffs' Memo p. 39) As demonstrated in the Appendix to this brief at pp. A-28-A-43, among the states that recognize strict products liability, the tests for determining when or whether a duty to warn arises, the degree of defendants' knowledge as a prerequisite to the duty to warn, the availability of certain affirmative defenses, and the applicable statutes of limitations and repose vary considerably. Indeed, it has been observed that "[s]omeone seeking an example of the diversity of our nation and the continuing supremacy of the system of federalism as embodied in the Tenth Amendment to the United States Constitution need look no farther than products liability." *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 369 (N.D. Ill. 1998) (decertifying a national class because of variances in tort law) (citing Louis R. Frumer & Melvin I. Friedman, *Products Liab.* at 2.01 (1997)). These dramatic differences range from states that do not recognize a claim for strict liability, *see, e.g.*, *Cline v. Prowler Indus.*, 418 A.2d 968, 979-80 (Del. 1980), to other states that have adopted the Restatement (Second) of Torts § 402A, *see, e.g.*, *O. S. Stapley Co. v. Miller*, 447 P.2d 248, 251-52 (Ariz. 1968).

---

[29] By contrast to the Price plaintiffs who have asserted only three theories of recovery, other ZAI putative class actions, including those with plaintiffs who have joined in the *Price* motion for class certification, have asserted additional claims, including RICO violations (18 U.S.C. § 1962), reformation of warranty, and nuisance, asserted in *Lindholm*, breach of express or implied warranties, asserted in *Lindholm, Walsh v. W. R. Grace & Co.*, No. 00-CV-2486-DWF/SRN (D. Minn.), and *Harris v. W.R. Grace & Co.*, C 004738 MMC (N.D. Cal.), and violation of state consumer protection laws or deceptive trade practices laws, asserted in *Lindholm, Walsh, Harris, Barbanti v. W.R. Grace & Co.*, No. 00-01756-6 (Wash. Super.), and *Hunter v. W.R. Grace & Co.*, No. 00-569-GPM (S.D. Ill.) (collectively, Ex. 24). It appears that in an effort to mold the litigation for class certification purposes, plaintiffs are abandoning these theories of recovery on behalf of the class.

Even among those states that have adopted the Restatement, there are substantial variations in the courts' subsequent interpretation of Section 402A. *Castano*, 84 F.3d at 743 n.15 (citing 5 Stuart M. Speiser, *et al.*, *The American Law of Torts* §§ 18.31, 18.34-.35 (Law Co-op 1996)); (*see* Appendix pp. A-28-A-31). Plaintiffs completely disregard these differences and do not satisfy their burden of showing that there is a manageable way to deal with these differences in the law of strict liability. *See In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 423, 423 n.16 (E.D. La. 1997) (refusing to certify a national strict liability class based on differences in state law, concluding that "[t]he Court and the jury could be put in the impossible situation of employing, and then not employing, presumptions, and then accepting, and then not accepting, the same facts as affirmative defenses").

Similarly, there are numerous variations in the law of fraud, contrary to Plaintiffs' Memo and charts acknowledging a difference only in the predicate to the duty to disclose. Fraud laws differ with respect to the definition of materiality, the evidentiary standards, the standards used to determine reliance and the elements of damages. (*See* Appendix pp. A-5-A-27) In refusing to certify a nationwide fraud class, the court in *Castano*, 84 F.3d at 742 n.15, noted that "some states require justifiable reliance on a misrepresentation, *see Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 171 (5th Cir. 1996); *Burroughs v. Jackson Nat'l Life Ins. Co.*, 618 So.2d 1329, 1332 (Ala. 1993), while others require reasonable reliance, *see Parks v. Morris Homes Corp.*, 141 S.E.2d 129, 132 (S.C. 1965)." Another distinction is the application of different standards to determine when there is a duty to disclose facts. *See Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980) (finding no duty when transaction was made at arms length); *Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So.2d 1288, 1293 (Ala. 1993) (using a flexible standard based on the transaction and relationship of the parties); *Castano*, 84 F.3d at 743 n.15; *Poe v. Sears Roebuck & Co.*, No. 1:96-CV-358, 1998 WL 113561 (N.D. Ga. Feb. 13, 1998) (state law differences precluded certification of fraud claims, among other claims).

Plaintiffs acknowledge that there are differences in fraud; however, they do not suggest how to address these differences. They fail to formulate subclasses, craft proposed jury instructions, or propose any other method for adjudicating these diverse claims. *See also In re*

*Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 222 (E.D. La. 1998) ("Plaintiffs' contention that there are only a handful of state law variations in a fraudulent concealment claim is an oversimplification [and] their proposed jury charges and interrogatories fall far short of addressing the nuances in state law"). As such, plaintiffs fall woefully short of the mandate that they demonstrate how, if at all, this class can be managed.

With respect to the negligence claim, plaintiffs' simplistic assertion that, because every jurisdiction has adopted the same four elements for a claim of negligence, a single negligence subclass will be sufficient (Plaintiffs' Memo p. 38) ignores the numerous variations in the negligence laws of the 50 jurisdictions.[30] The states' laws define the duty of care, breach and causation elements sufficiently differently so as to render a single jury instruction unmanageable and incomprehensible. (*See* Appendix pp. A-44-A-54)

As Chief Judge Posner pointedly recognized in *Rhône-Poulenc*, "The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch." 51 F.3d at 1301. In denying certification of a nationwide negligence class, that court explained, "The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause may . . . differ among the states only in nuance, though we think not. . . . But nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts." *Id.* at 1300. *See also American Med. Sys.*, 75 F.3d at 1085 (denying certification of a nationwide class asserting various state law claims including negligence); *Hardboard Siding*, 170 F.R.D. at 423 (denying certification of a nationwide negligence class

---

[30] Plaintiffs rely on *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997), to support their claim that certification is proper with respect to the negligence claim. However, plaintiffs fail to point out that the *Telectronics* plaintiffs presented the court with an elaborate, detailed subclassing system to deal with the differences in state laws. Plaintiffs in the case at bar have merely suggested that subclassing will alleviate any variances in state law without satisfying their burden of explaining how this subclassing would work and without establishing that the subclasses individually meet the requirements of Rule 23. Moreover, plaintiffs maintain that all negligence claims can be addressed within a single negligence subclass. Additionally, in *Telectronics*, none of the claims were certified under 23(b)(2) and the class was certified only with respect to certain underlying liability issues, but not causation and damages. The court did not address the Seventh Amendment implications of its decision to divide the issues. Finally, *Telectronics* rejected certification of plaintiffs' punitive damages claim due to differences in state law. *Id.* at 294. The *Telectronics* court's approach has subsequently been criticized and rejected as "inherently complicated and incredibly inefficient." *Haley*, 169 F.R.D. at 656.

because plaintiffs failed to establish a manageable jury instruction accounting for the nuances in negligence law); *Harding*, 165 F.R.D. at 629 (denying certification; "the law of negligence is not uniform and cannot be abstracted into a single instruction").

As with the differing standards for liability, differences in the standards of the 50 jurisdictions governing punitive damages also preclude class certification. Variations in punitive damages include differing burdens of proof, limitations on recovery, and the type of conduct that justifies this award. (*See* Appendix pp. A-55-A-64) Courts repeatedly deny class certification of punitive damages claims based on these differences. *See Poe*, 1998 WL 113561 at *3-4 (state differences in laws governing punitive damages prevents class certification); *Telectronics*, 172 F.R.D. at 294 (denying certification of punitive damages class based on differences in state laws, including local procedures for imposing punitive damages and variances in standards of conduct and proof); *Haley*, 169 F.R.D. at 654 (denying certification because "the laws of the fifty states regarding compensatory and punitive damages contain numerous differences").

These differences in state law not only make unmanageable the resolution of plaintiffs' allegedly equitable claims but deprive those claims of the cohesiveness that is necessary for Rule 23(b)(2) certification.

II.    **CLASS CERTIFICATION IS INAPPROPRIATE UNDER RULE 23(b)(3) BECAUSE INDIVIDUAL RATHER THAN COMMON ISSUES OF FACT AND LAW PREDOMINATE AND BECAUSE CLASS CERTIFICATION IS NOT THE SUPERIOR METHOD OF ADJUDICATING PLAINTIFFS' CLAIMS.**

As an alternative, plaintiffs seek certification under Rule 23(b)(3), which requires proof that common issues of law or fact predominate and that class treatment is superior to other available methods for the fair and efficient adjudication of the case. As the Supreme Court stated in *Amchem*, 521 U.S. at 623, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." As explained above in Section I, the putative class lacks the necessary cohesiveness to be certified under 23(b)(2), and for the same reasons plaintiffs cannot meet their burden of showing that either common factual or legal issues predominate and that the class action device would be the superior method of adjudicating plaintiffs' claims.

33

A.    **Common Factual And Legal Issues Do Not Predominate.**

As described in extensive detail above at Section I.D.1, the individual issues of fact in this case overwhelm plaintiffs' claims. Even the small group of putative class members who provided discovery illustrates some of the array of individual issues:

- **Product Identification and Composition:** Mr. Lindholm's ZAI is not comprised of the Libby vermiculite that is the subject of this litigation (*See* Lee Decl., Ex. 4, ¶ 25);

- **Statute of Limitations:** Mr. Price's more than ten year knowledge of the presence of asbestos in ZAI, his 22 year knowledge of the presence of ZAI in his home, together with his 50 year awareness of the potential hazards of asbestos, renders each of his claims time-barred (*See* nn. 39-43, *infra*, and accompanying text);

- **Causation:** In view of the variations in attic use, access, and potential for significant disturbance, the alleged hazard of ZAI must be determined on a building-by-building basis (*See* Corn Decl., Ex. 3, ¶ 22; nn. 5, 9 (noting variations in attic access and accessibility)).

Grace's experience in property damage cases involving construction products containing approximately 10% deliberately added asbestos also demonstrates that these issues must be addressed individually for each class member. During the course of that litigation, Grace has tried 20 cases to verdict. Of that number, Grace has won a defense verdict in 12, including one case in which the jury's verdict for the plaintiff was reversed on appeal because the plaintiff's claim was barred by the statute of repose. In those cases, Grace was successful when it could show, using building specific evidence, that the product was not hazardous in light of the conditions in that particular building, or, indeed, was not a Grace product. This win-loss history demonstrates that, even in cases when a significant amount of asbestos was deliberately added to a construction product as an ingredient, unlike the extremely miniscule presence of naturally occurring asbestos in ZAI here, Grace's liability had to be determined on a case-by-case, building-specific basis.

Plaintiffs contend incorrectly that predominance is satisfied because "[c]entral to the claim of every class member in this action is common proof that a single product, Zonolite attic insulation contains asbestos which poses great danger when disturbed by activities such as remodeling or children playing in the attic." (*See* Plaintiffs' Memo p. 36) However, the *Amchem* Court made clear that "any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard." 521 U.S. at 624. Although

both *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628 (D.S.C. 1992), *aff'd*, 6 F.3d

177 (4th Cir. 1993), and *In re School Asbestos Litig.*, 789 F.2d 996, 1108 (3d Cir. 1986), *cert.*

*denied, Celotex Corp. v. Sch. Dist. of Lancaster*, 479 U.S. 852 (1986), on which plaintiffs rely,

found the health hazards of asbestos to be a predominant common issue, in light of *Amchem's*

ruling, their holding on the predominance issue is of doubtful authority.[31]  Furthermore, the fact

that plaintiffs' proposed class requires the application of the laws of 50 different jurisdictions in

turn exponentially expands the individual issues of fact and law.

**B.    A Class Action Is Not The Superior Method For the Fair and Efficient Adjudication of The Claims Of The Putative Class.**

Independent of the requirement that common issues predominate, Rule 23(b)(3) provides

that a class action may not be certified unless the court finds that "a class action is superior to

other available methods for a fair and efficient adjudication of the controversy." A class action is

superior only if no reasonable alternative exists. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d

1227, 1234-35 (9th Cir. 1996).  As discussed below, case-by-case adjudication is the preferred –

and given the immaturity of the claims, the only legally available – alternative here.  In addition,

the drafters instructed the court to consider "the difficulties likely to be encountered in the

management of a class action."  Fed. R. Civ. P. 23(b)(3)(D).  Applying the manageability test,

the court should consider whether a class action trial can be conducted efficiently, without undue

jury confusion, and consistent with due process. *See Castano*, 84 F.3d at 740 (holding that

district court committed reversible error by certifying a class without a "consideration of how

trial on the merits would be conducted").  As discussed below, the differences in applicable

states' laws and the mass nature of this litigation render trial of this case unmanageable.

"The greater the number of individual issues, the less likely superiority can be

established." *Castano*, 84 F.3d at 745 (citing *American Med. Sys.*, 75 F.3d at 1084-85).  Where

class adjudication will not reduce overall litigation costs and promote judicial efficiency, it

---

[31] Curiously, plaintiffs also rely on several cases certifying classes under various state consumer fraud and deceptive trade practices laws as supporting certification here; however, the *Price* complaint contains no consumer fraud or deceptive trade practices allegations and the plaintiffs in other transferred actions that do contain such claims have not moved for class certification of those claims. (*See* Plaintiffs' Memo pp. 34-35)

cannot be considered a superior method of resolving claims. *See Valentino*, 97 F.3d at 1234. The application of the laws of each of the 50 interested jurisdictions in a nationwide class action undermines a finding of superiority because the differences in state law increase rather than reduce overall litigation costs, and undermine rather than promote judicial efficiency. *See Georgine*, 83 F.3d at 627 ("because we must apply an individualized choice of law analysis to each plaintiff's claims, . . . the proliferation of disparate factual and legal issues is compounded exponentially"). These differences in state laws make management of any proposed class so difficult that plaintiffs cannot meet their burden of proving the superiority element of 23(b)(3).

As if wishing made it so, plaintiffs state that "[a]ny asserted difference in the laws of all states with respect to these claims may readily be managed with jury instructions and special verdict forms. . . . [and] . . . should the need arise, subclasses can be created to account for variances." (Plaintiffs' Memo at 38) Contrary to plaintiffs' oversimplification, this Court cannot simply rely on counsel's assurances of manageability when considering certification. *Castano*, 84 F.3d at 741 ("Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome."); *Chin*, 182 F.R.D. at 459 (denying certification of a nationwide class where plaintiffs made no concrete proposals regarding the utilization of subclasses, special jury instructions or special verdict forms). Plaintiffs must establish, through more than mere assertions, that the variations in state laws are insignificant. *Castano*, 84 F.3d at 741-42; *Walsh*, 807 F.2d at 1016. They cannot. So, too, they must do more than refer the court to "densely worded articles, graphs, and charts . . . . Plaintiffs should not expect the court to ferret through, disseminate, and craft manageable schemes from these exhibits when that burden clearly rests with Plaintiffs." *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 498 n.3 (N.D. Ill. 1998). However, this is precisely what plaintiffs want.

Moreover, plaintiffs cannot meet this burden because, as discussed above and as more fully demonstrated in the Appendix to this brief, there are too many differences in state law, making class adjudication of their claims unmanageable. *See American Med. Sys.*, 75 F.3d at 1085 (decertifying national class alleging the precise causes of action asserted here: strict products liability, negligence and fraud); *Rhône-Poulenc*, 51 F.3d at 1300 (decertifying national

class because of too many variations of negligence); *Bronco II*, 177 F.R.D. 360 (denying certification of national class alleging fraud where plaintiffs attempted to avoid variations in state law by arguing that contacts of one state would allow the applicability of that state's law).

Plaintiffs also rely heavily on the class certification in two asbestos property damage cases, *School Asbestos* and *Central Wesleyan,* to argue that the superiority element is satisfied. However, the expressions of grave reluctance about class treatment in the appellate courts' opinions, the actual experience in those cases post-certification, and the Supreme Court's subsequent rejection of class certification in *Amchem* undercut their authority and utility here. In those cases, the Third and Fourth Circuits affirmed class certification primarily because the district courts were willing to undertake a grand experiment that might help solve a small part of the asbestos litigation crisis. It was critical that both classes were conditionally certified and, in *Central Wesleyan,* for limited issues. Thus, if the grand experiments were unsuccessful, the classes could be decertified. *School Asbestos,* 789 F.2d at 1011; *Central Wesleyan v. W.R. Grace & Co.,* 6 F.3d 177, 186 (4th Cir. 1993). As the Third Circuit explained in *School Asbestos,* 789 F.2d at 1011:

> We acknowledge that our reluctance to vacate the (b)(3) certification is influenced by the highly unusual nature of asbestos litigation. The district court has demonstrated a willingness to attempt to cope with an unprecedented situation in a somewhat novel fashion, and we do not wish to foreclose an approach that might offer some possibility of improvement over the methods employed to date.

*Central Wesleyan,* 6 F.3d at 182, seven years later, questioned the wisdom of that certification:

> [T]he Third Circuit's ongoing experiment in class certification has not been an unqualified success. Over ten years have passed since the filing of the lawsuit, and no trial has been held. The original district judge has been disqualified from hearing the case . . . and the current judge has scheduled a hearing to assess the case's manageability.

The Fourth Circuit expressed its own manageability concerns, *id.* at 188, with good reason – although a number of settlements have been achieved, the case is still pending. The Fourth Circuit affirmed certification, in part, because some settlements had been achieved since the class was certified, weighing settlement as "an important factor [] to be considered when determining certification." *Id.* at 185. The weight given settlement undercuts the authority of *Central Wesleyan;* as the Supreme Court held in *Amchem,* while settlement is relevant to class

certification, it is not a substitute for meeting the requirements of Rule 23. 521 U.S. at 621.

When determining superiority the court also must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine*, 83 F.3d at 632. In balancing these interests, the court should consider the practical problems that may make class adjudication inappropriate. *Eisen*, 417 U.S. at 164.

As courts have recognized, traditional case by case litigation has a number of advantages that should not be lightly sacrificed at the altar of efficiency. One of its principal benefits is that it allows for the development of a "consensus, or at least a pooling of judgment, of many different tribunals." *Rhône-Poulenc*, 51 F.3d at 1300. By allowing such a consensus to develop, multiple verdicts can establish precedents that demonstrate the presence or lack of "persistent vitality in the plaintiffs' contentions." *See* Francis E. McGovern, *Resolving Mature Mass Tort Litig.*, 69 B.U. L. Rev. 659, 659 (1989). Multiple verdicts also provide a historical basis to value cases for purpose of settlement. *See id.* at 692-93.

In contrast, class certification requires a defendant and class members to trust their fate to a single jury and to accept the risk that they will be bound by what might be an aberrant decision. *See Castano*, 84 F.3d at 746, 748; *Rhône-Poulenc*, 51 F.3d at 1300; *see also Manual For Complex Litig.* § 33.26 (3d ed. 1995). The need to allow a consensus to develop is acute in this case where one individual case has been filed and none have been tried.[32]

There is a substantial question as to the appropriateness of handling such immature cases on a class-wide basis. *See Castano*, 84 F.3d at 747; *Young v. Ray Brandt Dodge*, 176 F.R.D. 230, 234 (E.D. La. 1997) ("when a plaintiff's theory is novel and untested, class certification is not a superior method of adjudication"); *Arch*, 175 F.R.D. at 494; *Millett*, 2000 WL 359979 at *19; *Manual for Complex Litig.* § 33.26 (3d ed. 1995) ("Fairness may demand that mass torts with few prior verdicts or judgments be litigated first in smaller units – even single-plaintiff, single-defendant trials, until general causation, typical injuries and levels of damages become

---

[32] The only asbestos in attic insulation case ever tried involved claims for personal injury, not property damage, and the plaintiff in that case was a plumber who was exposed to numerous asbestos-containing products, mostly in occupational settings, beginning at age 12. *See Harashe v. Flintkote Co.*, 848 S.W.2d 506 (Mo. Ct. App. 1993).

established."). Moreover, the lack of a track record in these cases precludes the necessary findings of predominance and superiority. *Castano*, 84 F.3d at 747 ("a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by Rule 23"); *Arch*, 175 F.R.D. at 494 (absence of prior cases makes superiority analysis impossible); *Millett*, 2000 WL 359979 at *18 (finding of superiority without a track record is "mere speculation"). As outlined above in Section II.A, Grace's experience in property damage cases involving construction products containing approximately 10% deliberately added asbestos demonstrates the superiority of individual litigation. Here, any class action trial would leave for resolution the individual issues discussed in the prior section of this brief – issues which have been proven determinative in cases involving products with far greater amounts of deliberately added asbestos. Any class action that defers resolution of those issues until late in the case is not superior to individual litigation.

Moreover, the Seventh Amendment is also implicated where bifurcation of so-called common issues of liability and individual damages is contemplated. Here, for example, bifurcation could result in one jury trying the allegedly common issue of product hazard separate from the individual determination of hazard in a particular home. The Seventh Amendment provides plaintiffs and defendants the right to have *one* jury decide all of the jury issues in a case. *Rhône-Poulenc*, 51 F.3d at 1301 (Seventh Amendment prohibits separate juries from examining the same issues); *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931). Adjudicating the general issue of hazard on a class-wide basis would not establish Grace's liability with respect to whether a hazard actually exists in each home with ZAI. Additionally, individual jury trials would be required to prove the presence of ZAI in individual class members' properties and the extent, if any, of the damages caused by it. *See Rhône-Poulenc*, 51 F.3d at 1303. This bifurcation, which appears to be inevitable in a class action of this type, would violate defendants' Constitutional right to a unified jury trial.

Finally, class adjudication would be unfair. "[T]he undue and unnecessary risk of a monumental industry-busting error in entrusting the determination of potential multi-billion

dollar liabilities to a single jury [should be avoided] when the results of the previous cases indicate that the defendants' liability is doubtful at best." *Id.* at 1304. No jury has ever determined whether in-place attic insulation creates a hazard. Class adjudication would unfairly place Grace in the precarious position of being forced either to settle a class action in which there are liability issues[33] or to litigate all ZAI claims in a single law suit, before a single jury.

## III.    CLASS CERTIFICATION OF PLAINTIFFS' PUNITIVE DAMAGES CLAIM VIOLATES DUE PROCESS AND IS UNSUPPORTED BY RULE 23(b)(1)(B)'S LIMITED FUND THEORY.

Plaintiffs offer an alternative to (b)(2) certification of their punitive damages claim:[34] certification under Rule 23(b)(1)(B) applying a "limited fund" or a "limited generosity" rationale.[35] Rule 23(b)(1)(b) certification is unavailable because plaintiffs have not, and cannot, make the requisite showing under the Rule.

Plaintiffs posit the "limited generosity" theory, which provides that some court may, at some time, determine that Grace has been penalized repeatedly for the same misconduct alleged here, and preclude any further awards of punitive damages against them.[36] Thus, subsequent plaintiffs will be barred from seeking punitive damages for the same acts or series of acts. *School Asbestos*, 789 F.2d at 1004-5. Relying on that possibility, plaintiffs contend that a Rule 23(b)(1)(B) class should be certified on the basis that some future award of punitive damages will be a "legally limited" fund.

---

[33] Even if there is considerable doubt as to liability, class certification places tremendous pressure on defendants to agree to "blackmail settlements." *Rhône-Poulenc*, 51 F.3d at 1298.

[34] Plaintiffs' principal authority for (b)(2) certification of their punitive damages claim, *Barefield v. Chevron, U.S.A.*, 12 F.R.D. 1232 (N.D.Cal. 1988), is of questionable authority in light of the more recent Circuit court decisions in *Allison* and *Lemon*. In *Allison*, the court held that "because punitive damages must be reasonably related to the reprehensibility of the defendant's conduct and to the compensatory damages awarded plaintiffs, . . . recovery of punitive damages must necessarily turn on the recovery of compensatory damages. . . . Moreover, being dependent on non-incidental compensatory damages, punitive damages are also non-incidental" and thus not appropriate for (b)(2) certification. *Allison*, 151 F.3d at 417-418; *see also Lemon*, 216 F.3d at 581. Plaintiffs' second point, that punitive damages can be determined on a class-wide basis prior to any award of compensatory damages, would violate *BMW v. Gore*, 517 U.S. 559, 580 (1996), which required that punitive damages must be reasonably related to the compensatory damages awarded and the similar laws of many interested states. (*See* Appendix at A-62).

[35] Plaintiffs' proposed certification of a mandatory class for punitive damages, by definition a claim for money damages, would violate the due process rights of the absent class members. *Phillips Petroleum*, 472 U.S. at 811-812.

[36] Punitive damages are governed by state law and thus the laws of the 50 jurisdictions must be examined to determine whether the "limited generosity" theory has been adopted. *School Asbestos*, 789 F.2d at 1007. Since plaintiffs have failed to establish that this principle is accepted in each jurisdiction, a nationwide class cannot be certified on this theory.