The limited fund theory was soundly rejected by the Third Circuit in *School Asbestos*, where the court addressed the propriety of certifying a mandatory class for punitive damages under 23(b)(1)(B) in asbestos property damages cases brought by school authorities. 789 F.2d at 1002-1008. In its opinion reversing the certification of a mandatory class based on the limited generosity theory, the court reasoned that the proposed class was under-inclusive because it did not include all property damage claims (for example, those brought by owners of buildings other than schools), nor did it include personal injury suits. *Id.* at 1005. As in *School Asbestos*, the proposed mandatory class in this case is under-inclusive because it does not encompass all persons with claims upon the "limited fund." *Id.* at 1006.

Punitive damages claims are made against Grace for its alleged failure to disclose the hazards of asbestos not only in these ZAI cases but also in the context of asbestos personal injury cases, asbestos property damage cases concerning building products other than ZAI, and environmental contamination and remediation cases, by way of example. Plaintiffs' proposed "limited generosity" class, however, includes none of those other claimants to the same "fund." The rationale behind certification of a (b)(1)(B) class under the limited generosity theory is abrogated; such a class seeks to dispose of *all* potential punitive damages claims in the same suit, and in this case, additional existing and potential lawsuits seek the same relief from the same "fund," arising from the same alleged conduct. Consequently, this one action does not resolve all punitive damages claims against Grace. *See School Asbestos*, 789 F.2d at 1005.[37]

## IV.    PLAINTIFFS FAIL TO SATISFY THE ADEQUACY REQUIREMENT OF RULE 23(a).

Because class litigation is representative litigation, Rule 23(a) requires that certain enumerated prerequisites – numerosity, commonality, typicality, and adequacy of representation – be demonstrated before a class action is certified. In *Falcon*, 457 U.S. at 157 n.13, the Supreme Court explained that these requirements "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the

---

[37] Plaintiffs rely on *In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718 (E.D.N.Y. 1983), *aff'd*, 818 F.2d 145 (2d Cir. 1987), to support their 23(b)(1)(B) certification argument. However, this case is easily distinguishable from *Agent Orange* because, as the *School Asbestos* court noted, "all of the claims against defendants were concentrated in one case." *School Asbestos*, 789 F.2d at 1005.

class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Here, for different reasons, neither Mr. Price nor the Prebils are adequate representatives of the class.

### A.    Plaintiff Price Is An Inadequate Class Representative Because His Claims Are Barred By The Statutes Of Limitations.

The thrust of plaintiffs' complaint is that the presence of trace amounts of asbestos in ZAI makes the product defective and that Grace's failure to disclose that information constituted negligent or fraudulent conduct. (Complaint §§ VII-IX) However, Mr. Price has known about the presence of asbestos in ZAI for at least ten years,[38] of the presence of ZAI in his home for 22 years,[39] and of the potential hazards of asbestos for nearly 50 years.[40] Accordingly, he is time barred from asserting a cause of action in strict products liability, negligence, or fraud.[41] Thus, Mr. Price is an inadequate representative of the class.[42] *Great Rivers Co-op. v. Farmland Indus., Inc.*, 120 F.3d 893, 899 (8th Cir. 1997) (Plaintiff "is not and cannot be a class member because his claim is time barred; consequently, he cannot represent the class."); *see also Hanon*, 976 F.2d at 508 ("Class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").[43]

### B.    The Prebils' Lack of Familiarity With the Claims Asserted in This Litigation Make Them Inadequate Class Representatives.

Mr. and Mrs. Prebil have demonstrated a stunning lack of familiarity with the claims made here, and an utter lack of involvement in the litigation. Neither Mr. nor Mrs. Prebil knows

---

[38] Mr. Price works for the Burlington Northern Santa Fe railroad, whose trains picked up loaded cars at the Zonolite loading facility at the Libby mine and at the expansion plant. Mr. Price recalled that, beginning in the late 1980's, the railroad cars were posted with signs that said "this contains .1 percent asbestos." (Price Dep., Ex. 7, pp. 7:14-8:7; 14:14-15:4; 75:21-76:5)

[39] Mr. Price, within several months of his home purchase in 1978, recognized his attic insulation as Zonolite, based on what he had seen at Libby and the expansion plant. (*Id.* pp. 10:10-11:12)

[40] Mr. Price has known since the 1950's that asbestos can be a hazard. (*Id.* p. 107:8-10)

[41] The Montana statute of limitations for Mr. Price's fraud claim is two years from discovery; for the tort claims of negligence and strict liability, three years. MCA 27-2-203; 27-2-204.

[42] Although the court may not evaluate the merits of the claims when determining class certification, the court may consider evidence that relates both to the requirements of Rule 23 and to the merits. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).

[43] Mr. Price's knowledge about asbestos in ZAI also renders him an inadequate class representative because he lacks standing to seek a notification program. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (prisoner with limited literacy challenging adequacy of prison library had standing to seek injunction designed to remedy inadequate library support for prisoners with limited literacy, but lacked standing to remedy lack of support for non-English speaking prisoners); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 120 S. Ct. 693, 706 (2000) ("plaintiff must demonstrate standing separately for each form of relief sought"); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (named plaintiff cannot predicate standing on the injury of class members).

how they became the representatives of this nationwide class. Neither even knew that they were named as class representatives in this suit, which was filed in April, 2000, until they received notices of their depositions in October, 2000. (M. Prebil Dep., Ex. 6, p.14:9-23; J. Prebil Dep., Ex. 5, pp. 18:5-11) Neither reviewed the class action complaint prior to its filing, nor did they meet with class counsel. Indeed, as of the time of their depositions in mid-October, 2000, six months post-filing, neither of the Prebils had *ever* reviewed the complaint. (M. Prebil Dep., Ex. 6, pp. 14:24-15:5; 16:17-20; J. Prebil Dep., Ex. 5, pp. 21:19-21; 22:3-5; 24:13-20; 25:5-10)

Not surprisingly, therefore, the Prebils were unaware of the most basic allegations in the complaint, including the essential claim that ZAI contains trace amounts of asbestos, which Mrs. Prebil first learned from defendants' request for production of documents and Mr. Prebil recently learned from class counsel. (M. Prebil Dep., Ex. 6, pp. 38:16-39:19; J. Prebil Dep., Ex. 5, pp. 58:9-59:13) Similarly, the Prebils exhibited a total unfamiliarity with the relief sought by the complaint, testifying that they expected both bodily injury and medical monitoring to be compensated. (M. Prebil Dep., Ex. 6, pp. 16:21-18:16; J. Prebil Dep., Ex. 5, pp. 26:6-28:3; 29:25-30:23; 31:3-12) Mr. Prebil does not understand the constitution of the class he seeks to represent, nor does he have any knowledge of any potential obligation to finance the notice that must be given to a Rule 23(b)(3) class. (J. Prebil Dep., Ex. 5, pp. 22:15-19; 38:2-8)

Accordingly, Mr. and Mrs. Prebil do not meet the minimal standards for willingness and ability to participate actively in and control class litigation. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988) (recognizing Rule 23(a)(4) not satisfied where "named plaintiffs demonstrated insufficient participation in and awareness of the litigation"); *Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319, 323 (M.D. Fla. 1997) ("Unfamiliarity with the facts and essential elements of the case" precludes satisfaction of the adequacy requirement). The concern is that the named plaintiffs will abdicate control of the case to class counsel – precisely what has occurred in this case. *See Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421, 427 (E.D. La. 1997) ("That [plaintiff] is not aware that she has any duties as class representative or what those duties might entail" tends to show "abdication of her responsibilities to counsel."). Accordingly, Mr. and Mrs. Prebil are

inadequate representatives of the class. *See Kirkpatrick*, 827 F.2d at 728 (If "the named plaintiff's participation . . . is so minimal that they virtually have abdicated to their attorneys the conduct of the case," then the class must not be certified.).

> **C.    Because Plaintiffs Have Strategically Limited The Relief Sought, They Are Not Adequate Class Representatives.**

A class representative cannot artificially concoct a coherent class by abandoning absent class members' claims in order to simplify the suit. *See Bronco II*, 177 F.R.D. at 368 (limiting the relief sought in a class action in order to establish commonality creates an adequacy problem). Here, notwithstanding Montana's prohibition on claim-splitting,[44] plaintiffs have chosen to limit strategically the claims asserted to property damage claims arising from the presence of ZAI. While Grace denies that any such claims would have merit, some class members might wish to assert claims for medical monitoring, personal injuries, property value diminution, emotional distress, or other claims. For example, affiant Ralph Busch has seen a doctor because of his concern about his ZAI exposure. (Busch Dep., Ex. 23, pp. 19:15-23:18) Indeed, Mr. Prebil testified that he assumes that this lawsuit will provide medical monitoring for those exposed to ZAI and that he would seek to recover for any physical injuries he and his wife have as a result of the ZAI. (J. Prebil Dep., Ex. 5, p. 31:3-12) However, this lawsuit does not assert claims for personal injury or medical monitoring.

The class representatives' (or their attorneys') willingness to abandon the claims of absent class members warrants denial of class certification. *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982). In *Feinstein*, the named plaintiff sued only for economic losses from allegedly defective tires and argued that class members could pursue their personal injury claims individually in other courts. The court disagreed, finding that representatives who "tailored the class claims in an effort to improve the possibility of demonstrating commonality" obtained this "essentially cosmetic" benefit only by "presenting

---

[44] *Butler v. Colwell*, 967 P.2d 779, 781-82 (Mont. 1998) (a claimant may not split a single cause of action because such a practice would result in no end to litigation); *see also Balyeat Law, P.C. v. Hatch*, 942 P.2d 716 (Mont. 1997) ("The doctrine of res judicata bars not only subsequent litigation of previously litigated subject matter and issues, but also litigation of subject matters and issues which could have been litigated in the prior proceeding.").

putative class members with significant risks of being told later that they had impermissibly split a single cause of action." *Id.* at 606. For this reason, the court ruled that the named plaintiffs were inadequate class representatives. [45] As in *Feinstein*, plaintiffs have abandoned claims of absent class members and are therefore not adequate class representatives.

Further, the representative parties are all Montana residents. Accordingly, they can seek relief only under Montana law. In *Bronco II*, 177 F.R.D. at 367, a nationwide class action that potentially implicated the laws of 51 jurisdictions, the court held that the fact that the 120 named plaintiffs represented only 9 different states weighed against a finding that the representative plaintiffs were typical of the absent class members.

## V.    PLAINTIFFS' CLASS DEFINITION IS OVERBROAD AND THE PROPOSED CLASS IS INCAPABLE OF ASCERTAINMENT.

Class definition is "of critical importance because it identifies the persons (1) entitled to relief, (2) bound by the judgment, and (3) entitled to notice in a Rule 23(b)(3) action." *Manual for Complex Litig. 3d*, § 30.14 (1995). In this case, the putative class should not be certified because the class definition is overbroad and the class membership is not ascertainable.

Where the class definition is too broad, the putative class should not be certified. *See Pagan v. Dubois*, 884 F. Supp. 25, 28 (D. Mass. 1995) (proposed class defined as "all Latino prisoners" was overbroad in case alleging lack of Spanish speaking staff because the class, as defined, included unaggrieved English speaking Latino prisoners). Additionally, class membership must be ascertainable. As Judge Robert Keeton of this Court recently observed:

> without a cognizable class defined by stable and objective factors – without a demonstrable correspondence between the class definition and the requirements of proffered evidence to enable me to determine whether a particular individual belongs in the class – *class certification is inappropriate because class membership is not ascertainable.* This threshold inquiry is essential *because a class must be unambiguously defined* in order for a court to decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment.

*Kent v. Sunamerica Life Ins. Co.*, 190 F.R.D. 271, 278 (D. Mass. 2000) (citing *Crosby v. Social*

---

[45] *See also Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 601-02 (N.Y. App. Div. 1998), *aff'd*, 720 N.E.2d 892 (N.Y. 1999) (holding that "[t]he ability to opt out of the class is insufficient to protect the rights of putative class members who would want to seek remedies other than those chosen by the [class] representatives," and that defendants are placed "at risk of uncertainty" as to whether a class action has finally disposed of all class members' claims since a later court might find that some or all of the class members were not adequately represented).

*Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986)) (emphasis supplied). "[A]t a minimum, plaintiff must define the class in a way that enables the court to determine whether a particular individual is a class member." *Forman v. Data Transfer*, 164 F.R.D. 400, 403 (E.D. Pa. 1995).

In *Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625, 632 (S.D. Ga. 1995), *aff'd*, 95 F.3d 59 (11th Cir. 1996), the court refused to certify a class defined as those exposed to defendant's plant emissions who have evidenced a particular physical ailment where individualized medical determinations incapable of common proof would be required to ascertain class membership.

In this case, plaintiffs seek compensation for alleged property damage caused by the presence of ZAI made with tremolite-containing vermiculite from Grace's mine in Libby. Apparently relying on the assumption that all ZAI was manufactured with vermiculite from Libby, plaintiffs have proposed a class defined as "all owners or occupiers of real property located in the United States in which Zonolite Attic Insulation has been installed." (Complaint, Ex. 17, ¶ 56) This definition is overbroad because it assumes that all ZAI was made with tremolite-containing Libby vermiculite. However, testing of class member Lindholm's property demonstrates otherwise. Mr. Lindholm is certain that the vermiculite insulation installed in his property is ZAI because he specifically recalls purchasing and installing it in the 1960s. (Lindholm Dep., Ex. 8, p. 6:10-20) Nonetheless, when Dr. Richard J. Lee, a materials characterization expert and renowned microscopist, tested samples of the ZAI taken from Mr. Lindholm's property, he concluded that it is not composed of Libby vermiculite and, indeed, contains no tremolite asbestos. (Lee Decl., Ex. 4, ¶¶ 21, 25) Thus, plaintiffs' proposed class is overbroad because it includes members whose properties contain ZAI not made with Libby vermiculite.

Additionally, here, as in *Newton*, the class membership is not ascertainable because the determination of whether tremolite-containing ZAI is installed in a property is incapable of common proof, *i.e.*, determining whether a particular class member's insulation is ZAI made from Libby vermiculite would require individualized testing of each class member's property and

mini-trials on product composition.[46]

Accordingly, it is not possible to identify the class members absent individual testing of the product in each building. Thus, because the class definition is overbroad and membership in the proposed class is incapable of ascertainment, class certification should be denied.

## VI.    PLAINTIFFS' REQUESTED NOTICE IS NOT AUTHORIZED BY RULE 23(d)(2).

Plaintiffs have moved for an order that notice be sent to the class pursuant to Fed. R. Civ. P. 23(d)(2) if this Court were to grant class certification. Without knowing if certification is granted under 23(b)(1), (2) or (3), without knowing the nature of the class or the grounds for certification, and without knowing more precisely what plaintiffs want in their notice,[47] it is premature to address whether notice should be granted or what it should provide.[48] If the Court considers the question at this time, as framed by plaintiffs, the request that the Court order a Rule 23(d)(2) notice should be denied. Insofar as plaintiffs seek here a form of notice like the one previously sought in *Barbanti* and attached to their moving papers, their request is improper.

Although Rule 23(d)(2) is limited to the "conduct of actions" and has been used only to provide neutral, objective notice to class members of procedural matters, plaintiffs apparently do not seek or justify such notice. Rather, they suggest that this Court order a notice that provides public health information and substantive advice to class members about how to avoid Grace's mitigation of damages defense. Plaintiffs' request for notice on these subjects is unprecedented and inconsistent with the type of notices that have been issued under Rule 23(d)(2). The discretionary notices authorized by Rule 23(d)(2) are limited to notices concerning the conduct

---

[46] Furthermore, the vague, amorphous "occupiers" portion of the class definition is even more difficult to ascertain because plaintiffs do not define what it means to "occupy" a property. It is unclear whether "occupy" encompasses anyone (e.g., visitors, transients, vacationers, workers, and contractors) who has ever been in a building in which ZAI is installed or only tenants in such properties. It is also unclear what relief is sought for these occupier members of the putative class inasmuch as, in their recently filed initial disclosures (quoted at page 14 *supra*), plaintiffs' description of the relief they seek focuses exclusively on relief for "homeowners."

[47] Although plaintiffs have attached to their moving papers a form of notice that plaintiff had at one time proposed in *Barbanti*, the plaintiff in *Barbanti* has since revised that notice and is now negotiating with the Grace defendants regarding a possible form of notice in that case. To date, plaintiffs have not set forth the specific notice that they seek here. For this reason too, plaintiffs' request for notice is premature.

[48] Plaintiffs' brief incorrectly suggests that the notice they seek might be mandatory if this Court were to grant certification under Rule 23(b)(3). The information contained in the notice required after a 23(b)(3) certification is specified quite clearly in Rule 23(c)(2), and that information concerns only procedural matters. If certification is granted under Rule 23(b)(2), no notice is required.

of the litigation, and the notices approved by courts have concerned only such matters. The notice plaintiffs request is not authorized by Rule 23(d)(2) and should be denied.

The discretionary power granted to the Court in Rule 23 (d) is limited to orders providing for the "conduct of actions." It permits a court, for the "protection" of class members or "otherwise for the fair conduct of the action," to order that notice be given "of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action . . . ." F.R.C.P. 23(d)(2). As the types of notices listed in the rule itself makes clear, this power is limited to orders that protect the class members' *procedural* rights, not their substantive rights. That is consistent with the well-established function of Rule 23 as providing "a procedural right only, ancillary to the litigation of substantive claims." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980), *reh'g denied*, 446 U.S. 947 (1980); *see also Eisen*, 417 U.S. at 177-78 (court may not make a preliminary merits inquiry in making decisions under Rule 23).

The notices issued or approved under Rule 23(d)(2) confirm that such notices are limited to procedural matters. They have issued in the following circumstances:

- To permit class members to object to the representation. *See Bauman v. U.S. District Court*, 557 F.2d 650, 660 (9th Cir. 1977).

- To advise class members about the removal or substitution of the class representative. *See Emigrant Sav. Bank v. Chicago*, No. 72 C 1644, 1987 U.S. Dist. LEXIS 16749, at *3 (N.D. Ill. Feb. 2, 1987); *Leist v. Tamco Enterprises*, No. 80 Civ. 4439, 1984 WL 2425, at *4 (S.D.N.Y. Apr. 3, 1984).

- To advise class members that class certification has been denied and that they have a right to intervene. *Miller v. Central Chincilla Group*, 66 F.R.D. 411, 416-17 (S.D. Iowa 1975).

- To notify class members when they have a right to opt out in a Rule 23(b)(2) action. *Penson v. Terminal Trans. Co.*, 634 F.2d 989, 994 (5th Cir. 1981).

- To require class members to file claims or be barred from asserting them. *Grace v. Detroit*, 145 F.R.D. 413, 415 (E.D. Mich. 1992); *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 395-96 (3d Cir. 1981) (after a finding of liability); *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1126 (9th Cir. 1977).

- To aid the court in determining class membership. *Avery v. Secretary of Health & Human Servs.*, 762 F.2d 158, 164-65 (1st Cir. 1985).

- To notify class members of a favorable decision on the merits and of the rights created by it. *See Anderson v. Lyng*, 652 F. Supp. 1237, 1239-40 (M.D. Ala. 1987); *Doe v. General Hosp. of D.C.*, 434 F.2d 427, 433 & n.21 (D.C. Cir. 1970).

- To remedy improper contact with class members. *See Nagy v. Jostens, Inc.*, 91 F.R.D. 431, 432 (D. Minn. 1981); *Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985).

*See generally* 7B Wright & Miller § 1793, at 306-13 (listing additional examples). Courts have authorized substantive notices only after the court has ruled on the merits after following usual procedures for addressing merits, such as after a trial or an injunction hearing. *See, e.g., Anderson*, 652 F. Supp. at 1239-40; *Kyriazi*, 647 F.2d at 390-91; *Doe*, 434 F.2d at 433-34 (after defendants failed to comply with preliminary injunction, court found appropriate a notice informing class members of their right to a therapeutic abortion without charge).[49]

Presumably because not a single federal case supports their expansive view of the functions of a Rule 23(d)(2) notice, plaintiffs are quite vague about what their proposed notice would say. A Rule 23(d)(2) notice is not appropriate to provide class members with "public health information," especially given that the Grace defendants vigorously disagree that ZAI poses any public health problem. Including a warning about ZAI would clearly be inappropriate because it would require a premature decision by this Court that ZAI poses a health problem and merits a warning. *See German v. Federal Home Loan Mortgage Corp.*, 168 F.R.D. 145, 161 (S.D.N.Y. 1996) (rejecting a notice warning class members of the dangers of lead paint: "Through their proposed notice, the Plaintiffs improperly seek to claim an early victory before a trial on the merits. . . . Any notice ordered will be limited to informing class members of the nature of the pending litigation and the binding nature of the judgment."); *see also Messier v. Southbury Training School*, 183 F.R.D. 350, 359 (D. Conn. 1998) ("one-sided statements [by

---

[49] None of the cases cited by plaintiffs are to the contrary. *Avery*, 762 F.2d at 164-65, involved both Rule 23 and a statute providing for notice, and the notice at issue was procedural. In *Quern v. Jordan*, 440 U.S. 332, 347-49 (1979), the notice was ancillary to relief awarded to the victorious plaintiffs and simply informed class members of state administrative procedures. *See Green v. Mansour*, 474 U.S. 64, 71 (1986), *reh'g denied*, 474 U.S. 1111 (1986), ("The notice in *Quern v. Jordan* did nothing other than inform a diverse and partially victorious class concerning the extent of the judgment in its favor, cf. Fed. Rule Civ. Proc. 23(d)(2)"). *In re Alert Income Partners Sec. Litig.*, MDL 915, No. 92-Z-9150 (D. Colo. Sept. 3, 1992), ordered a corrective notice to class members, apparently to correct improper communications from a defendant during the litigation. Contrary to plaintiffs' description of the order on page 46 of their brief, attached as Exhibit 51, the order does not state that the court issued it "to protect a class of investors by supplying factual information to prevent further losses of money and impairment of rights as a result of defendants' misconduct."

requirements for certification cannot be satisfied. Accordingly, defendants respectfully request
that the Court deny plaintiffs' motion for class certification.

Respectfully submitted,

Arlene Fickler
Lisa M. Salazar
Hoyle, Morris & Kerr LLP
One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA 19103
(215) 981-5850

Robert A. Murphy
Casner & Edwards, LLP
One Federal Street
Boston, MA 02110
(617) 426-5900

James J. Restivo
Lawrence Flatley
Douglas Cameron
Reed Smith LLP
435 6th Avenue
Pittsburgh, PA 15219
(412) 288-3122

Attorneys for Defendants
W.R. Grace & Company, a Delaware Corporation,
and W.R. Grace & Company-Conn.

## CERTIFICATE OF SERVICE

I, Robert A. Murphy, hereby certify that on February 22, 2001, I caused to be served copies of the following documents:

1.  Grace Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification and Notice;

2.  Declaration of Robert A. Murphy, Esquire, with exhibits;

3.  State Law Variations Appendix to Grace Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification and Notice;

4.  Certificate of Service; and

5.  Courtesy Letter to Judge Saris

upon the following counsel by hand delivery:

> Elizabeth J. Cabraser, Esq.
> c/o Thomas M. Sobol, Esq.
> Leiff, Cabraser, Heimann & Bernstein, LLP
> 214 Union Wharf
> Boston, MA 02109-1216

> James R. Carroll, Esq.
> Skadden, Arps, Slate, Meagher & Flom, LLP
> One Beacon Street
> Boston, MA 02108

and upon the following counsel by Federal Express overnight delivery:

> David Pastor, Esq.
> Gilman and Pastor, LLP
> 999 Broadway
> Saugus, MA 01906

> Edward J. Westbrook, Esq.
> Ness Motley Loadholt Richardson & Poole
> 28 Bridgeside Blvd.
> P.O. Box 1792
> Mt. Pleasant, SC 29465

John J. Stoia, Jr., Esq.
Milberg Weiss Bershad Hynes & Lerach, LLP
600 West Broadway
1800 One America Plaza
San Diego, CA  92101-5050

Sheila Birnbaum, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY  10036


Robert A. Murphy

52000.43/176111

19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:                  )

                   )

ZONOLITE ATTIC INSULATION    )
PRODUCTS LIABILITY LITIGATION   )

                   )

_____)

THIS DOCUMENT RELATES TO: ALL  )
ACTIONS                 )

_____)

MDL Docket No. 1376

The Honorable Patti B. Saris, Presiding

**DEFENDANT SEALED AIR CORPORATION'S
JOINDER IN THE GRACE DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND NOTICE**

Defendant Sealed Air Corporation concurs with the reasons set forth in the Grace

Defendants' Brief In Opposition To Plaintiffs' Motion For Class Certification And Notice.

Dated: February 22, 2001
      Boston, Massachusetts

Respectfully submitted,

_James R. Carroll_
James R. Carroll (BBO #554426)
Michael D. Blanchard (BBO #636860)
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM  LLP
One Beacon Street
Boston, MA  02108
(617) 573-4800

Of Counsel:
Sheila L. Birnbaum
Bert L. Wolff
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000

Counsel for Defendant
Sealed Air Corporation

Certificate of Service

    I, James R. Carroll,  hereby certify that on February 22, 2001, I caused a true copy of the
foregoing Defendant Sealed Air Corporation's Joinder In The Grace Defendants' Brief In
Opposition To Plaintiffs' Motion For Class Certification And Notice to be served by facsimile
and first-class mail, postage prepaid, upon counsel of record for each other party as indicated on
the service list attached hereto.

Dated:  February 22, 2001

_James R. Carroll_
James R. Carroll

## SERVICE LIST

Robert A. Murphy
CASNER & EDWARDS
One Federal Street
Boston, MA  02110
Telephone: (617) 426-5900
Facsimile: (617) 426-8810

Elizabeth J. Cabraser c/oThomas M. Sobol
LIEFF, CABRASER, HEIMANN &
 BERNSTEIN, LLP
214 Union Wharf
Boston, MA 02109-1216
Telephone: (617) 720-5000
Facsimile: (617) 720-5015

Arlene Fickler
HOYLE, MORRIS & KERR LLP
One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 981-5850
Facsimilie: (215) 981-5959

David Pastor
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

James Restivo
REED SMITH LLP
435 6th Avenue
Pittsburgh, PA  15219
Telephone: (412) 288-3122
Facsimile: (412) 288-3063

John J. Stoia, Jr.
MILBERG, WEISS, BERSHAD,
 HYNES, & LERACH, LLP
600 West Broadway
1800 One American Plaza
San Diego, CA  92101-5050
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Edward J. Westbrook
NESS MOTLEY LOADHOLT
 RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

**20**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

UNITED STATES OF AMERICA,          )
                                   )   Civ. No. 00-167-M-DWM
            Plaintiff,             )
                                   )
      vs.                          )
                                   )
W.R. GRACE & COMPANY and           )   CONSENT DECREE
KOOTENAI DEVELOPMENT               )
CORPORATION,                       )
                                   )
            Defendants.            )

## I. BACKGROUND

WHEREAS, on September 14, 2000, the United States of America, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint (the "Complaint") against Defendants W.R. Grace & Company and Kootenai Development Corporation ("Defendants") pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601 et seq., seeking immediate, unimpeded entry and access to portions of the Libby Asbestos Site owned and/or controlled by Defendants in and near Libby, Montana, and civil penalties for failure to provide requested access;

WHEREAS, on March 9, 2001, this Court issued an Order granting the United States the requested access, thereby resolving the injunctive allegations set forth in the Complaint;

WHEREAS, Defendants and other related entities filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on April 2, 2001 and have been operating as debtors-in-possession since that time;

WHEREAS, by their respective undersigned representatives, the Parties, having agreed that settlement of this matter has been negotiated by the parties in good faith and that this Consent Decree is fair, reasonable, consistent with applicable law and in the public interest, and

1 | that entry of this Consent Decree without further litigation is the most appropriate means of

2 | resolving this matter.

3 |      THEREFORE, with the consent of the Parties to this Consent Decree, it is ORDERED,

4 | ADJUDGED, AND DECREED:

5 | ## II. JURISDICTION AND VENUE

6 |     1.    This Court has jurisdiction over the subject matter of this action pursuant to 28

7 | U.S.C. §§ 1331, 1345 and 1355; Sections 104(e) and 113(b) of CERCLA, 42 U.S.C. §§ 9604(e)

8 | and 9613(b); and over the parties to this action. Venue is proper in this judicial district pursuant

9 | to 28 U.S.C. §§ 1391(b), 1391(c), and 1395, and Section 113(b) of CERCLA, 42 U.S.C.

10 | § 9613(b).

11 |     2.    Solely for the purposes of this Consent Decree and the underlying Complaint,

12 | Defendants waive all objections and defenses that they may have to the jurisdiction of the Court

13 | or to venue in this District. Defendants and Grace shall not challenge this Court's jurisdiction to

14 | enter and enforce this Consent Decree.

15 | ## III. PARTIES BOUND

16 |     3.    Upon approval of this Consent Decree by this Court and approval of Debtors'

17 | entry into this Consent Decree by the Delaware Court, this Consent Decree shall apply to and be

18 | binding upon the Parties and their successors and assigns. In any action to enforce the terms of

19 | this Consent Decree, Defendants or Grace shall not raise as a defense the failure of their officers,

20 | directors, agents, servants, contractors, or employees to take any actions necessary to comply

21 | with the provisions hereof. Subject to the Delaware Court's approval of Debtors' entry into this

22 | Consent Decree, this Consent Decree shall also be binding on any subsequently appointed

23 | trustee, custodian or receiver and shall survive any conversion or dismissal of the Bankruptcy

24 | Case.

25 |     4.    No change in ownership of the Site or any portion thereof shall in any way alter

26 | Defendants' or Grace's obligations or rights under this Consent Decree; nor shall any change in

27 | corporate status or ownership affect Defendants or Grace's obligations or rights under this

28 | Consent Decree.

# IV. DEFINITIONS

5.      Unless otherwise expressly stated, the terms used in this Consent Decree that are defined in CERCLA, or in regulations promulgated under CERCLA, shall have the meanings set forth in such definitions.

6.      Whenever the terms listed below are used in this Consent Decree or in any appendix attached hereto, the following definitions shall apply:

"Alternative Care" shall mean that care provided in an extended care facility or a skilled nursing facility as described in W.R. Grace's Libby Medical Plan.

"ATSDR" shall mean the Agency for Toxic Substances and Disease Registry.

"Attorneys' Fees" shall mean, as to the United States, the costs incurred by the Department of Justice in reviewing, investigating, and litigating this case, and as to Defendants, the cost incurred by Defendants' outside counsel in reviewing, investigating, and litigating this case.

"Bankruptcy Case" shall mean those bankruptcy cases presently pending in the Delaware Court captioned In re W.R. Grace & Co., et al., Case No. 01-01139 (JJF)(D. Del.).

"CERCLA" means the Comprehensive Environmental Response, Conservation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto.  In the event of conflict between this Consent Decree and any appendix, the Consent Decree controls.

"Coverage" shall mean the provision of the following medical benefits: 1) For those individuals meeting the terms of eligibility for screening under ATSDR's 2000-2001 health screening program in Libby, Montana, the payment of the costs associated with an annual screening for asbestos-related disease which results in Negative Findings; 2) For those individuals meeting the terms of eligibility for screening under ATSDR's 2000-2001 health screening program in Libby, Montana, payment of the costs associated with an annual screening for asbestos-related disease which results in Equivocal Findings and the costs of any further medical testing prescribed by a qualified doctor which results in Negative Findings; 3) For those

-3-

1    people who are Eligible Individuals with Qualifying Medical Conditions under W.R. Grace's

2    Libby Medical Program. the payment of a subsidy, based on income, for costs associated with

3    Alternative Care beyond that provided under W.R. Grace's Libby Medical Program; and 4) the

4    provision of any other medical service. as approved by the board of trustees. to Eligible

5    Individuals with Qualifying Medical Conditions that does not overlap those services provided for

6    by W.R. Grace's Libby Medical Program.

7        "Day" shall mean a calendar day unless expressly stated to be a Working Day. "Working

8    Day" shall mean a day other than a Saturday, Sunday or federal or state holiday.  In computing

9    any period of time under this Consent Decree, where the last day would fall on a Saturday,

10    Sunday or federal or state holiday, the period will run until the close of business of the next

11    Working Day.

12        "Debtors" shall mean the debtors in the Bankruptcy Case.

13        "Delaware Court" shall mean the United States District Court for the District of Delaware

14    where the Bankruptcy Case is currently pending.

15        "Defendants" shall mean W.R. Grace & Company (W.R. Grace & Co., a Delaware

16    corporation) and Kootenai Development Corporation.

17        "Eligible Individual" shall mean an individual who worked in the Libby Mine or Mill, or

18    was the spouse or legal dependent of someone at the time he or she worked in the Libby Mine or

19    Mill, or lived or worked within a 20-mile radius of the Libby Mine or Mill for at least six (6)

20    months at any time before January 1, 2000. and who meets the other criteria described in W.R.

21    Grace's Libby Medical Program.

22        "EPA" shall mean the United States Environmental Protection Agency and any successor

23    departments or agencies of the United States.

24        "Equivocal Findings" shall mean results of medical testing which do not conclusively

25    show a Qualifying Medical Condition. but which lead a qualified physician to determine that

26    further medical testing is necessary.

27        "Establishment Costs" shall mean those costs incurred in preparation of corporate and

28    contractual documents as required by Paragraph 14 and those costs associated with solicitation

1  for board members pursuant to Paragraph 17.

2  "Grace" shall mean W.R. Grace & Co.-Conn.

3  "Health Care Project" or "HCP" shall mean the non-profit Montana corporation formed

4  to undertake the SEP set forth in Section VI of this Consent Decree.

5  "KDC" shall mean Defendant Kootenai Development Corporation.

6  "Negative Findings" shall mean results of medical testing which conclusively show that

7  an Eligible Individual does not have a Qualifying Medical Condition.

8  "Oversight Costs" shall mean those costs incurred by Grace in ensuring that the SEP

9  Funds are spent on medical services falling within the definition of "Coverage," as required by

10  Paragraph 10.

11  "Paragraph" shall mean a portion of this Consent Decree identified by an arabic number.

12  "Parties" shall mean the parties to this Consent Decree: the United States, W.R. Grace &

13  Company, Grace, and Kootenai Development Corporation.

14  "Plaintiff" shall mean the United States.

15  "Qualifying Medical Conditions" shall mean those medical conditions defined as

16  Qualifying Medical Conditions within W.R. Grace's Libby Medical Program.

17  "Section" shall mean a portion of this Consent Decree identified by a roman numeral.

18  "SEP Funds" shall mean the $2,750,000 placed into an escrow account by Grace pursuant

19  to Section VI of this Consent Decree.

20  "Site" shall mean the Libby Asbestos Site, located near the town of Libby, Montana. The

21  Site is identified with EPA identification number BC.

22  "Supplemental Environmental Project" or "SEP" shall mean an environmentally

23  beneficial project not otherwise required by law, as described in the Final EPA Supplemental

24  Environmental Projects Policy, 63 Fed. Reg. 24,796 (1998).

25  "United States" shall mean the United States of America and its departments and

26  agencies, including the EPA.

27  "W.R. Grace's Libby Medical Program" shall mean the plan entitled "GRACE, Libby

28  Medical Program as of April 3, 2000. revision 004."

-5-

## V. CIVIL PENALTY/ALLOWED CLAIM

7.      Upon this Court's approval of this Consent Decree and the Delaware Court's approval of Debtors' entry into this Consent Decree. Plaintiff shall be deemed to have an allowed general unsecured claim against Grace and KDC in the amount of $71.000 in the Bankruptcy Case as a civil penalty.  Plaintiff's Proof of Claim in the Delaware Court shall include a general unsecured claim in this amount.  Subject to the Delaware Court's approval of Debtors' entry into this Consent Decree, EPA's allowed general unsecured claim in the amount of $71.000 described herein shall receive the same treatment. without discrimination. as other holders of allowed general unsecured claims and shall not be subordinated.  Any payments to the United States on this allowed claim shall be made in the same manner and at the same time as payments being made on any other allowed unsecured claims in the Bankruptcy Case.

8.      Civil penalties paid pursuant to this Consent Decree shall not be deductible for purposes of Federal or State taxes.

## VI. SUPPLEMENTAL ENVIRONMENTAL PROJECT

### A.  Supplemental Environmental Project Description

9.      Grace will implement a SEP, as described in this Section VI, in which it will form a Montana non-profit corporation (referred to herein as the "Health Care Project" or "HCP") and provide $2,750.000 in funding to the HCP to establish and administer a program to pay for medical care for asbestos-related illnesses not covered by W.R. Grace's Libby Medical Program, and related administrative expenses.  Specifically, the HCP will use the SEP Funds to pay for Coverage, as defined in this Consent Decree, and related administrative expenses.

10.      Grace's responsibilities related to the SEP shall be limited to (a) providing the SEP Funds and any other establishment or oversight support specifically required in this Consent Decree, (b) forming the HCP (including soliciting trustee nominations), consistent with this Consent Decree and applicable state or federal law, (c) enforcing the terms of the contract between Grace and HCP, and (d) auditing the HCP's cash disbursements for the SEP on a quarterly basis to ensure that the HCP's expenditures are for Coverage or other expenditures allowed under this Consent Decree. provided that Grace shall not be responsible for auditing any

-6-

1   other aspect of the operation of the HCP, including, but not limited to, issues involving the actual

2   amounts paid or reimbursed by the HCP for Coverage.  This SEP is not intended to create any

3   responsibilities or liabilities for Grace beyond the responsibilities specifically enumerated herein.

4

5          11.    The HCP shall assume and retain the responsibilities and liabilities regarding the

6   implementation of the SEP and the expenditure of SEP Funds including, but not limited to, (a)

7   investing the SEP Funds, (b) establishing and implementing standards and procedures for the

8   distribution of the SEP Funds. (c) establishing and implementing standards and procedures for

9   the appointment or election of additional or replacement members of the board of trustees, (d)

10  satisfying all applicable legal and tax filing requirements. (e) paying any applicable taxes, and (f)

11  purchasing and retaining appropriate directors' and officers' liability insurance (and a crime

12  bond) from a third-party insurer, which shall provide at least $2 million of coverage for any event

13  that may be a crime or a breach of any fiduciary duty involving the SEP and the proper and

14  lawful management of the SEP Funds.  The HCP will, at its sole discretion, set priorities for

15  expenditures among the four categories of Coverage specified in Section IV, determine the

16  eligibility of specific individuals for such Coverage, and establish the appropriate amount to be

17  paid or reimbursed for such Coverage.

18         12.    If, at any time, the HCP materially breaches its obligations to Grace set forth in

19  the contract executed pursuant to Paragraph 15, Grace will, in consultation with EPA. enforce the

20  contract. If Grace believes the HCP is unable to perform its obligations under the contract and,

21  after consultation EPA agrees. the HCP shall (pursuant to the terms of the contract) place the

22  remaining SEP Funds in an escrow account and EPA and Grace shall develop and implement an

23  alternate SEP.  In no event shall Grace be liable for any acts or omissions of the HCP during a

24  period in which required insurance policies have been allowed to lapse.

25  B.     **HCP Formation and Funding Requirements**

26         13.    Not later than thirty (30) days after entry of this Consent Decree. Grace shall place

27  $2.750.000 in an interest bearing escrow account at a Bank (to be mutually agreed upon by the

28  Parties not later than fifteen (15) days after entry of this Consent Decree) to be used to fund the

1    SEP described in this Section. The escrow agreement shall provide that the SEP Funds,

2    including any accrued interest, will be transferred to the HCP after the HCP selects a program

3    manager for the project.

4         14.     Not later than thirty (30) days after entry of this Consent Decree. Grace shall

5    submit to EPA for review and approval drafts of necessary corporate documents to create the

6    HCP to administer expenditures of the Funds for Coverage as defined in this Consent Decree.

7    Not later than thirty (30) days after such approval. Grace shall file all necessary papers to create

8    the HCP.

9         15.     Not later than sixty (60) days after entry of this Consent Decree, Grace shall

10    submit to EPA for review and approval a draft contract between Grace and the HCP that shall

11    detail corporate responsibilities, duties of the HCP's board of trustees, and Grace's oversight

12    responsibilities. That contract shall be consistent with the responsibilities of Grace and the HCP

13    set forth in Paragraphs 10 and 11, and shall require the HCP to meet the program administration

14    deadlines set forth in Paragraph 16. Not later than ninety (90) days after EPA approval of the

15    draft contract, Grace shall submit to EPA an executed contract with HCP in substantially the

16    same form as the EPA-approved draft contract, except as modified by the agreement of EPA,

17    Grace, and HCP.

18         16.     The contract between Grace and the HCP shall contain the following program

19    administration deadlines: (a) the HCP's board of trustees to select a program administrator within

20    sixty (60) days after execution of the contract; (b) the board of trustees to approve a medical plan

21    to implement the Coverage within one hundred twenty (120) days after execution of the contract;

22    and (c) implementation of the medical plan within one hundred and fifty (150) days after

23    execution of the contract.

24         17.     Not later than ninety (90) days after entry of this Consent Decree, Grace shall

25    submit to EPA the names of nominees for board of trustees positions, such nominations having

26    been solicited by advertisements in local newspapers. The United States will notify Grace of

27    board of trustee selections within thirty (30) days of receipt of the nominations.

18. If Grace terminates W.R. Grace's Libby Medical Program, the board of trustees, at its sole discretion, can expand the coverage of the medical plan beyond the categories set forth in Section IV's definition of "Coverage."

19. Grace's total expenditure for the SEP shall be limited to the sum of: (a) the $2.75 million payment referenced in Paragraph 9; (b) Establishment Costs over $25,000; and (c) any Oversight Costs up to $10,000 per year. Establishment Costs up to $25,000 and Oversight Costs over $10,000 per year shall be paid by, or reimbursed by, the HCP out of the SEP Funds.

## C.  Use of Existing Non-Profit Corporation to Implement the SEP

20. Not later than ten (10) days after entry of this Consent Decree, the Parties may agree, in writing, that an existing non-profit corporation shall implement the SEP instead of the new non-profit corporation that would otherwise be created for this purpose. In this event, Grace would be under no obligation (a) to form a Montana corporation as otherwise required in Paragraphs 9 and 14 or (b) to submit names of nominees for board of trustees positions as otherwise required in Paragraph 14. If an existing non-profit corporation is selected under the authority of this Paragraph, that organization shall have the role ascribed to the HCP in this Section, including the responsibilities and liabilities set forth in Paragraph 11. Moreover, Grace shall have the same funding, contractual and auditing responsibilities towards the existing non-profit corporation that they would otherwise have had toward the HCP in Paragraph 10. The draft and final contracts between Grace and the existing non-profit corporation must be submitted to EPA on the same dates that Grace's contract with the HCP would have been submitted under Paragraph 15, and must contain program administration deadlines that would have been required under Paragraph 16.

## D.  General Supplemental Environmental Project Provisions

21. By signing this Consent Decree, Defendants and Grace certify that they are not required, and have no liability, under any federal, state or local law or regulation or pursuant to any agreements or orders of any court, to perform or develop the SEP identified in Section VI of this Consent Decree. Defendants and Grace further certify that they have not received, and will

1   not in the future seek or receive, credit as a SEP or other penalty offset in any other enforcement

2   action for the SEP identified in Section VI of this Consent Decree.

3       22.    Grace shall submit a Quarterly Report to EPA on or before the 30th of January,

4   April, July, and October for the previous calendar quarter while this Consent Decree is in effect.

5   The Quarterly Report shall include an overview of the HCP's expenditures in the previous

6   quarter (including the types of coverage provided in the quarter and the amount spent for that

7   coverage), a certification that the HCP's expenditures were for Coverage or other expenditures

8   allowed under the Consent Decree, and a statement indicating the remaining balance available to

9   be spent.

10       23.    Grace shall submit a SEP Completion Report to EPA within thirty (30) days of the

11   date the SEP Funds are exhausted. The SEP Completion Report shall contain a certification that

12   the project has been fully implemented pursuant to the provisions of this Consent Decree.

13       24.    The deadlines established in this Section may be modified with the mutual written

14   consent of the Parties.

15       25.    Any written public statement made by Defendants or Grace or their

16   representatives regarding or otherwise referencing the SEP undertaken pursuant to this Section of

17   the Consent Decree shall include the following language: "This project was undertaken in

18   connection with the settlement of an enforcement action brought by the United States." In any

19   oral public statement publicizing the SEP or the results of the SEP within one year from the date

20   of entry of this Consent Decree, Defendants or Grace shall state in a prominent manner that the

21   SEP is being undertaken, or was undertaken, as part of the settlement of an enforcement action.

                                **VII. FORCE MAJEURE**

22

23       26.    Defendants or Grace shall notify EPA in writing of the occurrence, or expected

24   occurrence, of an event Defendants or Grace claim to be a force majeure event as soon as

25   practicable, but in any event within ten (10) days of when Defendants or Grace first knew of the

26   event, or should have known of the event by the exercise of due diligence. In this notice,

27   Defendants or Grace shall specifically reference this provision of the Consent Decree and

28   describe the anticipated length of the delay, the cause or causes of the delay, the measures taken

1     or to be taken by Defendants or Grace to prevent or minimize the delay, and the schedule by

2     which those measures will be implemented. Defendants and Grace shall adopt all reasonable

3     measures to avoid and minimize such delays

4          27.    Failure by Defendants or Grace to comply with the above notice requirements

5     shall constitute a waiver of their right to assert force majeure. Notification of any delay, in and

6     of itself. shall not extend the time allowed for meeting any requirement.

7          28.    If EPA agrees that the violation has been or will be caused solely by

8     circumstances beyond the control of. or any entity controlled by, Defendants or Grace. including

9     their contractors, and that they could not have foreseen and prevented such delay by the exercise

10     of due diligence, EPA shall extend in writing the time for compliance with the particular

11     requirement(s) affected by the force majeure event by a period not exceeding the length of the

12     delay actually caused by such circumstances. Such an extension does not alter the schedule for

13     any other part of this Consent Decree. except that EPA shall extend the time for performance of

14     other tasks under this Consent Decree that EPA determines will necessarily be delayed as a result

15     of the force majeure.

16          29.    If EPA does not agree with a claim of force majeure. the Defendants or Grace may

17     invoke the Dispute Resolution procedures of this Consent Decree. If the Court determines that

18     the violation has been or will be caused solely by circumstances beyond the control of

19     Defendants or Grace or any entity controlled by Defendants or Grace, including their contractors,

20     and that Defendants or Grace could not have foreseen and prevented such delay by the exercise

21     of due diligence, Defendants and Grace shall be excused as to that violation and delay, but only

22     for the delay actually caused by such circumstances.

23          30.    Defendants and Grace shall have the burden of demonstrating that the violation

24     has been or will be caused solely by circumstances beyond the control of Defendants or Grace or

25     any entity controlled by them. including their contractors. that the duration of the delay caused by

26     such circumstances is or was warranted solely by reason of such circumstances. and that they

27     could not have foreseen and prevented such delay by the exercise of due diligence. Defendants

28     and Grace also shall bear the burden of proving the duration and extent of any delay attributable

1    to such circumstances. Absent written approval by the United States. an extension of one

2    compliance date based on a particular event shall not of itself result in an extension of a

3    subsequent compliance date or dates.

4         31.    Unanticipated or increased costs or expenses associated with the performance of

5    Defendants' or Grace's obligations under this Consent Decree shall not constitute circumstances

6    beyond their control. or serve as a basis for an extension of time under this Section.

7                              **VIII. DISPUTE RESOLUTION**

8         32.    Unless otherwise expressly provided for in this Consent Decree. Defendants and

9    Grace shall have the right to dispute any decision of EPA under this Consent Decree, and the

10   provisions of this Section shall be the exclusive mechanism to resolve disputes arising under or

11   with respect to this Consent Decree. However, the provisions in this Section shall not apply to

12   actions by the United States to enforce obligations of Defendants or Grace that have not been

13   disputed in accordance with this Section.

14        33.    Any dispute which arises under or with respect to this Consent Decree shall in the

15   first instance be the subject of informal negotiations between the parties to the dispute. The

16   period for informal negotiations shall not exceed thirty (30) days from the time the dispute arises,

17   unless it is modified by written agreement of the parties to the dispute. The dispute shall be

18   considered to have arisen when Defendants or Grace send a written Notice of Dispute to the

19   United States. Defendants or Grace must send the Notice of Dispute to the United States within

20   fifteen (15) days of the decision of EPA that it seeks to dispute.

21        34.    In the event that the parties cannot resolve a dispute by informal negotiations

22   under the preceding Paragraph. then the position advanced by EPA shall be considered binding

23   unless. within ten (10) days after the conclusion of the informal negotiation period. Defendants

24   or Grace invoke the formal dispute resolution procedures of this Section by serving on the United

25   States a written Statement of Position on the matter in dispute. including, but not limited to, any

26   factual data. analysis or opinion supporting that position. any supporting documentation relied

27   upon by Defendants or Grace. and any actions which Defendants or Grace consider necessary to

28   resolve the dispute.

1     35. An administrative record of the dispute shall be maintained by EPA. The

2   administrative record shall include the Statement of Position and all of the information provided

3   by Defendants or Grace pursuant to the preceding Paragraph. as well as any other documents

4   relied upon by EPA in making its final decision pursuant to the next Paragraph. Where

5   appropriate. EPA shall allow submission of supplemental statements of position. data. reports, or

6   affidavits, by the parties to the dispute.

7     36. If EPA concurs with the position of Defendants or Grace, EPA shall provide them

8   with written notice of such concurrence. If EPA does not concur with their position, EPA shall

9   notify them in writing, setting forth the basis of its decision. The decision of EPA shall control

10  unless, within fifteen (15) days of receipt of EPA's written determination, Defendants or Grace

11  files a notice of judicial appeal with this Court which shall set forth a description of the matter in

12  dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any,

13  within which the dispute must be resolved to ensure orderly implementation of this Consent

14  Decree. The United States may file a response to the notice of judicial appeal.

15    37. In any such judicial appeal. Defendants or Grace shall have the burden of

16  demonstrating that the United States' position is an incorrect interpretation of the Consent

17  Decree. The Court shall base its determination pursuant to this Paragraph on the administrative

18  record. The Court may grant relief. or may, upon motion of either party or on its own motion,

19  remand the dispute for further consideration by EPA, including supplementation of the

20  administrative record as appropriate.

21    **IX. PUBLIC ACCESS TO INFORMATION**

22    38. All information and documents Defendants or Grace submit to EPA pursuant to

23  this Consent Decree shall be subject to public inspection. unless Defendants or Grace identify

24  and support a claim for confidential business information in accordance with 40 C.F.R. Part 2,

25  and rules adopted thereto.

26    39. If no claim of confidentiality accompanies documents or information when they

27  are submitted to EPA. the public may be given access to such documents or information without

28  further notice in accordance with 40 C.F.R. Part 2. Subpart B.

-13-

# X. NOTICE

40. Unless otherwise provided herein, notifications to or communications with EPA, or the Department of Justice, shall be deemed submitted on the date they are postmarked and sent either by overnight receipt mail service or by certified or registered mail, return receipt requested.

41. Unless this Consent Decree states otherwise, all notices, submissions, or communications in connection with this Consent Decree shall be addressed as follows:

As to the EPA:

    Matthew Cohn
    Enforcement Attorney
    U.S. Environmental Protection Agency
    Region VII
    999 18th Street
    Denver, Colorado 80202-2405

As to the Department of Justice:

    Chief, Environmental Enforcement Section
    Environment and Natural Resources Division
    U.S. Department of Justice
    P.O. Box 7611
    Ben Franklin Station
    Washington, D.C. 20044-7611
    (Reference: DOJ Case No. 90-11-2-07106/1)

As to Defendants and Grace:

    William M. Corcoran
    Vice President Regulatory Affairs
    W.R. Grace & Co.
    7500 Grace Drive
    Columbia, Maryland 21044

    Robert A. Emmett
    Senior Environmental Counsel
    W.R. Grace & Co.
    7500 Grace Drive
    Columbia, Maryland 21044

42. The Quarterly Reports required by Paragraph 22, the Completion Report required by Paragraph 23, and the certification required by Paragraph 52 shall be certified by a responsible corporate official, and accompanied by the following certification:

    I certify that the information contained in or accompanying this submission is true, accurate and complete. This certification is based on my personal preparation, review, or analysis of the submission, and/or supervision of persons who, acting on my direct

-14-

instructions. made the verification that the submitted information is true. accurate and complete.

## XI. GENERAL PROVISIONS

43.    Complete performance by Defendants and Grace of all of their obligations under this Consent Decree shall fully satisfy. release and discharge all civil liability of the Defendants and Grace for the violations alleged in the Complaint in this action through the date of lodging of the Consent Decree.  However. nothing in the Consent Decree is intended, nor shall be construed, to operate in any way to resolve any other liability of Defendants or Grace, including but not limited to:

a.  Liability for costs incurred in responding to releases or threats of releases of hazardous substances at the Libby Asbestos Site, including enforcement costs EPA has incurred in obtaining access at the Libby Asbestos Site other than Attorneys' Fees;

b.  Liability for damages to natural resources; and

c.  Any criminal liability.

44.    Each Party shall bear its own Attorneys' Fees incurred in this action.  Defendants and Grace waive the right to assert that any enforcement costs EPA has incurred for which reimbursement is sought in United States v. W.R. Grace & Company, et al., Civil Action No. 01-72-M-DWM (D. Mont.) are in fact costs that could or should have been sought or recovered as part of the instant case.  Defendants and Grace reserve any other arguments they may have regarding the recoverability of EPA enforcement costs.

45.    This Consent Decree does not limit or affect the rights of Defendants or Grace or the United States as against any third parties.

46.    Nothing in this Consent Decree shall be construed to create any rights in. or grant any cause of action to, any person not a party to this Consent Decree.

47.    Defendants and Grace agree to waive any claim that the access sought and awarded to the United States in this action constitutes a taking of property for which compensation is due, including any claims alleging such a taking under the Tucker Act. 28 U.S.C. § 1491, or the United States Constitution.

-15-

1    48.    Any modification of this Consent Decree must be in writing and approved by the

2    Court. Any such written modification must be agreed to and signed by all Parties to this Consent

3    Decree.

4    49.    The provisions of this Consent Decree are not severable. The Parties' consent

5    hereto is conditioned upon the entry of the Consent Decree in its entirety without modification,

6    addition, or deletion except as agreed to by all Parties in writing.

7    50.    The Parties stipulate that this Consent Decree is entered into for purposes of

8    settlement only and neither the fact that a party has entered into this Consent Decree, nor any of

9    the facts stipulated herein, may be used in this or any other proceeding except to enforce the

10    terms hereof by the parties to this agreement.

11    **XII. DOCUMENT RETENTION**

12    51.    Defendants and Grace agree that they shall preserve, during the pendency of this

13    Consent Decree and for a minimum of three (3) years after its termination, at least one legible

14    copy of all records and documents, including computer tapes, in the possession, custody, or

15    control of its divisions, employees, agents, accountants, contractors, and attorneys, that relate to

16    the performance of their obligations under this Consent Decree, including, but not limited to,

17    documents embodying or relating to the results of any sampling, tests, or other data or

18    information generated or acquired by them, or on their behalf.

19    **XIII. RETENTION OF JURISDICTION**

20    52.    This Court shall retain jurisdiction to modify or enforce the terms of this Consent

21    Decree or to take any action necessary or appropriate for its construction or execution.

22    **XIV. TERMINATION**

23    53.    This Consent Decree shall terminate after Defendants and Grace have completed

24    all actions required of them in the Consent Decree. At such time, Defendants and Grace shall

25    certify to EPA that they have completed their obligations under the Consent Decree, including

26    the performance of the SEP required in Section VI. If EPA agrees, the United States,

27    Defendants, and Grace shall jointly petition the Court to terminate the Consent Decree. If EPA

28    does not agree, the United States shall provide Defendants and Grace with written notification

-16-

stating the reasons why this Consent Decree should not be terminated. Upon receipt of such

notification, any party may submit the issue for Dispute Resolution pursuant to Section VII of

this Consent Decree. This Consent Decree shall survive confirmation of Debtors' plan of

reorganization in the Bankruptcy Court, unless it has been terminated pursuant to this Paragraph

prior to such confirmation.

## XV. JUDICIAL APPROVAL AND OPPORTUNITY FOR PUBLIC COMMENT

54.    Debtors' entry into the settlement reflected in this Consent Decree shall be subject

to the Delaware Court's approval pursuant to 11 U.S.C. §§ 105, 363 and 502 and Bankruptcy

Rules 2002, 6004 and 9019. Debtors shall seek the Delaware Court's approval for Debtors' entry

into this Consent Decree as soon as practicable and shall present such evidence and legal

argument as is reasonably necessary to obtain such approval.

55.    This Consent Decree shall be lodged with the Court for a period of not less than

thirty (30) days to enable the United States to seek public notice and comment in accordance with

Department of Justice policy and the provisions of 28 C.F.R. § 50.7 and to enable the Parties to

seek the Delaware Court's approval of Debtors' entry into this Consent Decree. The United

States reserves the right to withdraw or withhold its consent if the comments received disclose

facts or considerations which indicate that the Consent Decree is inappropriate, improper or

inadequate. As early as practicable after the United States reviews the public comments and the

Delaware Court has issued its decision on Debtors' request for approval of their entry into the

Consent Decree, the United States will inform this Court (a) whether any public comments

indicate to the United States that the Consent Decree is inappropriate, improper or inadequate

and (b) whether the Delaware Court has approved Debtors' entry into this Consent Decree. If the

United States does not exercise its right under this Paragraph to withdraw or withhold its consent

to the Consent Decree and the Delaware Court approves Debtors' entry into this Consent Decree

this Court may in its discretion enter the Consent Decree. This Consent Decree shall become

effective upon entry by this Court.

56.    If for any reason the Delaware Court should decline to approve Debtors' entry into

this Consent Decree in the form presented or this Court should decline to approve this Consent

-17-

1 │ Decree in the form presented. this agreement is void and the terms of the agreement may not be

2 │ used as evidence in any litigation between or among any of the Parties in this action.

3 │      57.    Upon the Delaware Court's approval of Debtors' entry into this Consent Decree,

4 │ Defendants and Grace consent to the entry of this Consent Decree by this Court without further

5 │ notice.  Defendants and Grace further agree not to oppose entry of this Decree by this Court or to

6 │ challenge any provision of this Decree. unless the United States has notified them in writing that

7 │ the United States can no longer support entry of the Consent Decree based on facts or

8 │ considerations which indicate that this Consent Decree is inappropriate, improper or inadequate.

9 │ **XVI. SIGNATORIES**

10 │      58.    The signatories for the Parties each certify that he or she is fully authorized to

11 │ enter into the terms and conditions of this Consent Decree and to execute and legally bind such

12 │ party to this Decree.

13 │

14 │      SO ORDERED THIS ___ DAY OF _____, 2001.

15 │

16 │

17 │                             _____

18 │                             United States District Judge

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

-18-

1   Through their undersigned representatives, the Parties agree and consent to entry of the foregoing
2   Consent Decree in <u>United States of America v. W.R. Grace & Company and Kootenai Development</u>
    <u>Corporation</u>:

3
    FOR PLAINTIFF UNITED STATES OF AMERICA:
4
5
6                                                    Date: 10/24/01
    ROBERT D. BROOK
7   Assistant Section Chief
    Environmental Enforcement Section
8   United States Department of Justice

9
10                                                   Date: 10/22/01
    JAMES D. FREEMAN
11  Trial Attorney
    United States Department of Justice
12  Environmental Enforcement Section
    999 18th Street, Suite 945NT
13  Denver, Colorado 80202
    (303) 312-7376
14
    WILLIAM W. MERCER
15  United States Attorney
    District of Montana
16
17                                                   Date: 10-22-01
    By:
18  VICTORIA FRANCIS
    Assistant United States Attorney
19  District of Montana
    2929 Third Avenue North, Suite 400
20  Billings, Montana 59101
    (406) 657-6101
21
22
23
24
25
26
27
28

                              -19-

1    Through their undersigned representatives, the Parties agree and consent to entry of the foregoing
     Consent Decree in <u>United States of America v. W.R. Grace & Company and Kootenai</u>
2    <u>Development Corporation</u>:

3

4    _Carol Rushin_ (signature)                              Date: _10/12/01_

     CAROL RUSHIN
5    Assistant Regional Administrator, ECEJ
     U.S. Environmental Protection Agency
6    Region VIII
     999 18th Street
7    Denver, Colorado 80202-2405

8

9

10   _Matt Cohn_ (signature)                                 Date: _10/11/01_

     MATTHEW COHN
11   ANDREA MADIGAN
     Enforcement Attorneys
12   U.S. Environmental Protection Agency
     Region VIII
13   999 18th Street
     Denver, Colorado 80202-2405

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-20-

1   Through their undersigned representatives, and entry into the foregoing by the Defendants and
Grace subject to the approval of the Delaware Court, the Parties agree and consent to entry of the

2   foregoing Consent Decree in United States of America v. W.R. Grace & Company and Kootenai
Development Corporation:

3

4

5   _William M. Corcoran_                            Date: _10/18/02_

6   WILLIAM M. CORCORAN
    Vice President

7   W.R. Grace & Co.
    7500 Grace Drive

8   Columbia, Maryland 21044

9   _William M. Corcoran_                            Date: _10/18/02_

10  WILLIAM M. CORCORAN
    Vice President

11  W.R. Grace & Co.-Conn.
    7500 Grace Drive

12  Columbia, Maryland 21044

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Through their undersigned representatives, and entry into the foregoing by the Defendants
2   subject to the approval of the Delaware Court, the Parties agree and consent to entry of the
    foregoing Consent Decree in United States of America v. W.R. Grace & Company and Kootenai
3   Development Corporation:

4

5                                                           Date: OCT 19, 2001
                _____
6   ALAN R. STRINGER
    President
7   Kootenai Development Corporation
    P.O. Box 695
8   Libby, Montana 59923

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                -22-