**21**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-Q

(Mark One)

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2000**

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

*Commission File Number 1-13953*

# W. R. GRACE & CO.

Delaware
------------------------------------
(State of Incorporation)

65-0773649
---------------------------
(I.R.S. Employer
Identification No.)

7500 Grace Drive
Columbia, Maryland 21044
(410) 531-4000

(Address and phone number of principal
executive offices)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes [X] No [ ]

67,494,869 shares of Common Stock, $.01 par value, were outstanding at April 28, 2000.

## W. R. GRACE & CO. AND SUBSIDIARIES

## PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing, or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all existing property damage cases for which sufficient information is available to form a reasonable estimate of such exposure.

Through March 31, 2000, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million; and 203 property damage cases were settled for a total of $604.2 million.

### PROPERTY DAMAGE CASE ACTIVITY

```
Cases outstanding, December 31, 1999 .... .....      11
New cases filed ......................... .....       2
Settlements ............................. .....      --
Dismissals .............................. .....      --
                                                 -----------
       Cases outstanding, March 31, 2000            13
================================================ =====================
```

## BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other producers of asbestos-containing products, cross-claims by and financial condition of co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace, given demographic assumptions of possible exposure to asbestos products manufactured by Grace.

Through March 31, 2000, approximately 14,840 asbestos bodily injury lawsuits involving 33,073 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 49,434 lawsuits involving 129,166 claims were disposed of (through settlement and judgments) for a total of $428.8 million.

## BODILY INJURY CLAIM ACTIVITY

```
Claims outstanding, December 31, 1999 ... .....      105,670
New claims filed ........................ .....        7,667
Settlements ............................. .....       (4,302)
Dismissals .............................. .....         (194)
Judgments ............................... .....          --
                                                  -----------
     Claims outstanding, March 31, 2000              108,841
================================================ ====================
```

I-7

## ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its experience with, and recent trends in, asbestos litigation. These estimates include property damage and bodily injury indemnity as well as defense costs. Grace regularly evaluates its financial exposure to asbestos-related lawsuits and the adequacy of related recorded liabilities. The amounts recorded at each balance sheet date reflect Grace's best estimate of probable and estimable liabilities in all material respects. However, changes to estimates of probable liabilities may occur as new information becomes available and as actual experience is gained over time.

## ESTIMATED LIABILITY FOR

| ASBESTOS-RELATED LITIGATION (Dollars in millions) | MARCH 31, 2000 | December 31, 1999 |
|---|---|---|
| Asbestos-related liability expected to be satisfied within one year............. | $   200. 1 | $   199.3 |
| Asbestos-related liability expected to be satisfied after one year.............. | 845. 7 | 884.7 |
| Total asbestos-related liability ................... | $1,045.8 | $  1,084. 0 |

The current portion of Grace's asbestos-related liability is based on management's estimate of indemnity payments and defense costs expected to be paid within one year.

## ASBESTOS-RELATED INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during the three months ended March 31, 2000 was as follows:

## ESTIMATED INSURANCE RECOVERY ON
## ASBESTOS-RELATED LIABILITIES
(Dollars in millions)

**NOTES RECEIVABLE**

```
Notes receivable from insurance carriers,
  beginning of year, net of discount of $ 0.8...  $    5.3
Proceeds received under asbestos-related
  insurance settlements ..................  ......       (2.2)
Current year amortization of discount ... ......        0.2
------------------------------------------  --------------------
  Notes receivable from insurance carrie rs,
    end of quarter, net of discount of $ 0.6 ..        3.3
------------------------------------------  --------------------


INSURANCE RECEIVABLE
Asbestos-related insurance receivable,
  beginning of  year ...................... ......      366.1
Proceeds received under asbestos-related
  insurance settlements ..................  ......       (22.0)
------------------------------------------  --------------------
  Asbestos-related insurance receivable, end        344.1
    of quarter ...........................  ......
------------------------------------------  --------------------
  Total amounts due from insurance carr iers..      347.4
  Expected to be realized within one ye ar ...       (62.5)
------------------------------------------  --------------------
  Expected to be realized after one yea r ....  $  284.9
==========================================  ====================
```

Grace has settled with and has been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for bodily injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related bodily injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

I-8

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate directly to Grace's estimated liabilities for property damage and bodily injury cases and claims pending at March 31, 2000 and bodily injury claims expected to be filed in the future.

Grace's ultimate exposure with respect to its asbestos-related cases and claims partly depends on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, it is probable that recoveries from its insurance carriers (including amounts reflected in the receivable discussed above), along with other funds, will be available to satisfy the property damage and bodily injury cases and claims pending at March 31, 2000, as well as bodily injury claims expected to be filed in the future.

3. DISCONTINUED OPERATIONS

## OTHER COMPREHENSIVE INCOME

| (LOSS)<br>(Dollars in millions) | MARCH 3 1,<br>2000 | December 31,<br>1999 |
|---|---|---|
| Foreign currency translation adjustments ................. | $(118. 7) | $(106.1) |
| Net unrealized gains on investments ................. | 12. 4 | 18.0 |
| Minimum pension liability adjustments ................. | (7. 8) | (7.8) |
| Total accumulated other comprehensive loss........... | $(114. 1) | $ (95.9) |

## 12. COMMITMENTS AND CONTINGENT LIABILITIES

## ASBESTOS

In the first quarter of 2000, class action lawsuits were filed against the Company on behalf of all owners of homes containing Zonolite(R) attic fill insulation, a product previously sold by Grace that is alleged to contain trace amounts of asbestos. These actions seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. While Grace has not completed its investigation of the claims described in these lawsuits, and therefore is not able to assess the extent of any possible liability related to these matters, it believes that this product is safe for its intended purpose and poses little or no threat to human health.

I-13

## ENVIRONMENTAL

In February 2000, a class action lawsuit was filed in U.S. District Court in Missoula, Montana against Grace on behalf of all owners of real property situated within 12 miles from Libby, Montana that are improved private properties. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. While Grace has not completed its investigation of the claims, and therefore is not able to assess the extent of any possible liability related to this lawsuit, it has no reason to believe that its former activities caused damage to the environment or property.

## INCOME TAXES

Grace has received notification from the Internal Revenue Service (IRS) on two matters. As a result of recent tax legislation, beginning in 1998, interest costs on policy loans for corporate-owned life insurance are not deductible for tax purposes. Furthermore, the IRS has asserted that Grace's past interest deductions are not allowable. The Company is contesting the IRS's position on the grounds that these insurance policies and related loans had, and continue to have, an important and valid business purpose to fund current and future obligations of Grace.

In the other matter, the IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 related to CCHP, Inc., a subsidiary of Grace that formerly held Grace's interest in Cross County Staffing. The assessments were made in connection with a meal and incidental expense per diem plan for travelling nurses. In July of 1999, Grace sold the business and assets of CCHP but retained the potential tax liability. The matter is currently in the U.S. Court of Claims, where both CCHP and the Department of Justice are conducting discovery.

Grace has received notification from a foreign taxing authority assessing tax deficiencies plus interest relating to the purchase and sale of foreign bonds in 1989 and 1990. This assessment is related to the Bekaert Group which Grace sold in 1991 but retained liability for tax deficiencies attributable to tax periods prior to the sale. The matter is currently before the foreign tax authorities where protests have been filed but no decision has been rendered.

## 13. BUSINESS SEGMENT INFORMATION

The table below presents information related to Grace's business segments for the three months ended March 31, 2000 and 1999.

| BUSINESS SEGMENT DATA (Dollars in millions) | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|
| | 2000 | 1999 |
| NET SALES | | |
| Davison Chemicals................... | $ 185.7 | $ 171.9 |
| Performance Chemicals.............. | 179.2 | 173.5 |
| TOTAL............................. | $ 364.9 | $ 345.4 |
| PRE-TAX OPERATING INCOME | | |
| Davison Chemicals................... | $ 32.9 | $ 21.7 |
| Performance Chemicals.............. | 19.1 | 16.8 |
| TOTAL............................. | $ 52.0 | $ 38.5 |

I-14

The table below presents information related to the geographic areas in which Grace operated for the three months ended March 31, 2000 and 1999.

| GEOGRAPHIC AREA DATA (Dollars in millions) | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|

```
          invested capital (trailing        13 .1%     12.5%
          four quarters)...............
                                           =======  ==================
```

| NET CASH FLOW FROM CORE OPERATIONS | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|
| | 200 0 | 1999 |
| CASH FLOWS: | | |
| Pre-tax operating income ......... | $ 39.8 | $25.5 |
| Depreciation and amortization .... | 2 2.2 | 22.6 |
| | | |
| PRE-TAX EARNINGS BEFORE DEPRECIATION AND AMORTIZATION .... | 6 2.0 | 48.1 |
| Capital expenditures ............. | (1 2.5) | (17.0) |
| Businesses acquired .............. | (2 5.0) | (0.5) |
| Working capital and other changes | (5 7.9) | (11.0) |
| | | |
| NET CASH FLOW FROM CORE OPERATIONS ...................... | $ (3 3.4) | $19.6 |

The Company has a net asset position supporting its core operations of $981.8 million at March 31, 2000 compared to $909.1 million at December 31, 1999 including the cumulative translation account reflected in Shareholders' Equity of $118.7 million at March 31, 2000 and $106.1 million at December 31, 1999. Weighted average capital over the past four quarters was $939.4 million. The change in the net asset position is primarily due to increased foreign currency translation adjustments, an increase in net assets due to business acquisitions and a reduction in core liabilities due to payments made in the first quarter of 2000 including the payment of accruals that had built up over the course of the prior fiscal year for items such as bonuses, customer rebates and taxes. After-tax return on capital invested in core operations (calculated based on a trailing four quarters) increased 0.6 percentage points.

The Company has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. Grace's current core operations, together with other available assets, are being managed to generate sufficient cash flow to fund these obligations over time.

## NONCORE ACTIVITIES

| (Dollars in millions) | MARCH 31, | December 31, |
|---|---|---|
| NET NONCORE LIABILITY | | |
| | | |
| BOOK VALUE OF ASSETS AVAILABLE TO FUND NONCORE OBLIGATIONS: | | |
| Cash and other financial assets .. | $ 37 5.7 | $ 345.8 |

```
Properties and investments .......      8.6        8.8
Asbestos-related insurance
  receivable ....................      34 7.4      371.4
Tax assets, net..................      35 6.0      363.8


----------------------------------  -------------  -------------------
ASSETS AVAILABLE TO FUND NONCORE
   OBLIGATIONS(1) ................    1,08 7.7    1,089.8
----------------------------------  -------------  -------------------
Noncore liabilities:
Asbestos-related litigation.......   (1,045.8)   (1, 084.0)
Environmental remediation........    (20 5.8)    (215.5)
Postretirement benefits..........    (19 8.9)    (201.4)
Retained obligations and other....    (9 0.5)     (99.1)
----------------------------------  -------------  -------------------
TOTAL NONCORE LIABILITIES.........   (1,54 1.0)  (1,600.0)
----------------------------------  -------------  -------------------
NET NONCORE LIABILITY............. $  (45 3.3) $  (510.2)
==================================  =============  ===================


NET CASH FLOW FROM NONCORE              THR EE MONTHS ENDED
      ACTIVITIES                            MARCH 31,
                                    -------------------------------------
                                      20 00         1999
==================================  =============  ===================


Pre-tax income from noncore
      activities.................. $   1.0    $    6.6
Proceeds from noncore asset sales     --          20.4
Other changes....................     6.4         (1.4)
Cash spending for:
  Asbestos-related litigation,
      net of insurance recovery....  (1 4.1)     (12.5)
  Environmental remediation.......   (1 3.9)      (9.7)
  Postretirement benefits.........    ( 5.1)      (4.6)
  Retained obligations and other..    ( 5.5)     (25.8)
----------------------------------  -------------  -------------------
NET CASH FLOW FOR NONCORE
      ACTIVITIES ................. $   (3 1.2)  $(27.0)
==================================  =============  ===================
```

1 The Company also had committed, unused credit facilities of $252 million at March 31, 2000 and $410 million at December 31, 1999.

The table above displays the book value of Grace's noncore liabilities and the assets available to fund those liabilities at March 31, 2000 and December 31, 1999. Each liability has different characteristics, risks and expected liquidation profile. Taken together, these liabilities represent $1,541.0 million of Grace's total liabilities as reflected on its balance sheet at March 31, 2000. Assets available to fund noncore liabilities consist of cash and cash equivalents, net cash value of life insurance where Grace is the beneficiary, property and investments not used in core operations, insurance coverage for asbestos-related litigation and net tax assets related to noncore liabilities. These assets, which in the aggregate total $1,087.7 million at March 31, 2000, are not required to support base core operating activities and, thus, are available to fund noncore liabilities.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In the first quarter of 2000, Grace paid $14.1 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers. The amount of spending in the first quarter of 2000 is consistent with Grace's expectation that spending throughout 2000 will be higher than 1999 due to the timing and adjudication of certain cases.

I-21

At March 31, 2000 Grace's balance sheet reflects a net liability after insurance and after recorded tax benefits of $446.5 million, which represents management's best estimate (in conformity with generally accepted accounting principles) of the undiscounted net cash outflows in satisfaction of Grace's current and expected asbestos-related litigation. The net present value of such net liability (based on cash flow projections that are inherently imprecise but represent management's best current estimate) is approximately $340 million (discounted at 5.2% - estimated after-tax investment rate) at March 31, 2000.

The Consolidated Balance Sheet at March 31, 2000 includes total amounts due from insurance carriers of $347.4 million pursuant to settlement agreements with insurance carriers and net tax assets of $252.0 million related to future net tax deductions for asbestos-related matters.

See Note 2 to the Consolidated Financial Statements for further information concerning asbestos related lawsuits and claims.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace made cash payments to remediate environmentally impaired sites during the first quarter of 2000 and 1999 of $13.9 million and $9.7 million, respectively. These amounts have been charged against previously established reserves. At March 31, 2000, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $205.8 million, as compared to $215.5 million at December 31, 1999. In the first quarter of 2000 cash payments were higher than the first quarter 1999 due to a settlement for a particular site. Grace continues to expect pre-tax cash outlays for remediation costs to average between $38 and $43 million for 2000.

Grace is in litigation with two excess insurance carriers regarding the applicability of the carriers' policies to environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

See Note 12 to the Consolidated Financial Statements for further information concerning environmental matters.

## POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertains to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred.

In June 1999, the Financial Accounting Standards Board (FASB) issued SFAS No. 137, "Accounting for Derivative Instruments and Hedging Activities - Deferral of the Effective Date of SFAS No. 133." This statement defers the effective date of SFAS 133 for one year. SFAS No. 133 requires an entity to recognize all derivatives as either assets or liabilities and measure those instruments at fair value. Based on analysis to date, it is not expected that adoption of this statement will have a material effect on the Company's financial statements.

## FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion of Results of Operations and Financial Condition, other uncertainties include the impact of worldwide economic conditions; pricing of both the Company's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; success of Grace's process improvement initiatives; and the impact of tax and legislation and other regulations in the jurisdictions in which the Company operates. Also, see "Introduction and Overview - Projections and Other Forward-Looking Information" in Item 1 of Grace's 1999 Annual Report on Form 10-K.

I-24

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Grace had no outstanding interest rate swap agreements on March 31, 2000. For further information concerning Grace's quantitative and qualitative disclosures about market risk, refer to Note 11 in the Consolidated Financial Statements in the 1999 Form 10-K.

I-25

## PART II. OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

(a) Note 2 to the interim consolidated financial statements in Part I of this Report is incorporated herein by reference.

(b) Reference is made to the section entitled "Asbestos Litigation" in Item 3 of the Company's 1999 10-K for information concerning the lawsuit Lindholm v. W. R. Grace & Co. Since this action was filed, additional lawsuits have been filed as class actions against the Company asserting similar claims and seeking similar damages to those described in the Lindholm case.

## ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

(a) Exhibits. The following is a list of Exhibits filed as part of this Quarterly Report on Form 10-Q.

**22**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-Q

(Mark One)

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2000**

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

*Commission File Number 1-13953*

# W. R. GRACE & CO.

Delaware                                                         65-0773649

--------------------------------          --------------------------
(State of Incorporation)                                    (I.R.S. Employer
                                                            Identification No.)

7500 Grace Drive
Columbia, Maryland 21044
<u>(410) 531-4000</u>

(Address and phone number of
principal executive offices)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes X No

67,057,644 shares of Common Stock, $.01 par value, were outstanding at July 28, 2000.

# W. R. GRACE & CO. AND SUBSIDIARIES

## Table of Contents

PART I.    FINANCIAL INFORMATION

Item 1.        Financial Statements

               Report of Independent Accountants

               Consolidated Statement of Operations

               Consolidated Statement of Cash Flows

               Consolidated Balance Sheet

               Consolidated Statement of Shareholders' Equity

               Consolidated Statement of Comprehensive Income (Loss)

               Notes to Consolidated Financial Statements

Item 2.        Management's Discussion and  Analysis of Results of Operations and
               Financial Condition

Item 3.        Quantitative and Qualitative Disclosures About Market Risk

PART II.   OTHER INFORMATION

Item 1.        Legal Proceedings

Item 4.        Submission of Matters To a Vote of Security Holders

Item 6.        Exhibits and Reports on For m 8-K

As used in this Report, the term "Company" refers to W. R. Grace & Co. (a Delaware corporation formerly named "Grace Specialty Chemicals, Inc."), and the term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

## PART I. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

## REPORT OF INDEPENDENT ACCOUNTANTS

## USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities (including contingent assets and liabilities) reported at the date of the consolidated financial statements and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates.

## 2. ASBESTOS-RELATED LITIGATION

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in 53,049 asbestos-related lawsuits on June 30, 2000 (10 involving claims for property damage, four claims involving attic insulation, and the remainder involving 115,414 claims for bodily injury), as compared to 50,342 lawsuits on December 31, 1999 (11 involving claims for property damage and the remainder involving 105,670 claims for bodily injury).

I-6

## PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing, or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all existing property damage cases for which sufficient information is available to form a reasonable estimate of such exposure.

Through June 30, 2000 Grace had been served with 370 property damage cases - 140 cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million; and 204 of these property damage cases were settled for a total of $629.2 million. Of the ten pending cases at June 30, 2000, two cases were settled and paid in July, 2000 bringing the total cases pending as of July 31, 2000 to eight.

## PROPERTY DAMAGE CASE ACTIVITY

```
Cases pending, December 31, 1999 ........ .....      11
New cases filed ......................... .....      --
Settlements ............................. .....     (1)
Dismissals .............................. .....      --
```

```
        Cases pending, June 30, 2000                       -----------
                                                               10*
     ==========================================  ======================
```

\* Two cases were settled and paid in July 2000, bringing the total cases pending to eight.

## ATTIC INSULATION LITIGATION

From January 2000 through June 2000 Grace was served four class action lawsuits on behalf of owners of homes containing Zonolite attic fill insulation. These actions seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. While Grace has not completed its investigation of the claims described in these lawsuits, and therefore is not able to assess the extent of any possible liability related to these matters, it believes that this product is safe for its intended purpose and poses little or no threat to human health. In the second quarter 2000 Grace established a liability to cover its estimated defense costs for these cases.

## BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other producers of asbestos-containing products, cross-claims by and financial condition of co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims.

I-7

Grace's bodily injury liability reflects management's estimate of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace, given demographic assumptions of possible exposure to asbestos products manufactured by Grace.

Through June 30, 2000, approximately 15,000 asbestos bodily injury lawsuits involving approximately 33,300 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 50,900 lawsuits involving approximately 135,900 claims were disposed of (through settlement and judgments) for a total of $461.5 million.

## BODILY INJURY CLAIM ACTIVITY

```
    Claims pending, December 31, 1999 .......  .....     105,670
    New claims filed ........................  .....      21,251
    Settlements .............................  .....     (11,057)
    Dismissals ..............................  .....        (449)
    Judgments ...............................  .....          (1)
                                                       -----------
        Claims pending, June 30, 2000                   115,414
    ==========================================  ======================
```

## ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its experience with, and recent trends in, asbestos litigation. These estimates include property damage and bodily injury indemnity as well as defense costs. Grace regularly evaluates its financial exposure to asbestos-related lawsuits and the adequacy of related recorded liabilities. The amounts recorded at each balance sheet date reflect Grace's best estimate of probable and estimable liabilities in all material respects. However, changes to estimates of probable liabilities may occur as new information becomes available and as actual experience is gained over time.

## ESTIMATED LIABILITY FOR

| ASBESTOS-RELATED LITIGATION (Dollars in millions) | JUNE 30, 2000 | Decem ber 31, 1999 |
|---|---|---|
| Asbestos-related liability expected to be satisfied within one year............. | $    213. 3 | $      199.3 |
| Asbestos-related liability expected to be satisfied after one year.............. | 791. 9 | 884.7 |
| Total asbestos-related liability .................. | $ 1,005. 2 | $    1,084.0 |

I-8

The current portion of Grace's asbestos-related liability is based on management's estimate of indemnity payments and defense costs expected to be paid within one year.

## ASBESTOS-RELATED INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during the six months ended June 30, 2000 was as follows:

## ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES
(Dollars in millions)

## NOTES RECEIVABLE

| | |
|---|---|
| Notes receivable from insurance carriers, beginning of year, net of discount of $ 0.8 ... | $    5.3 |
| Proceeds received under asbestos-related insurance settlements ................ ....... | (3.2) |
| Current year amortization of discount ... ....... | 0.3 |

```
     Notes receivable from insurance carriers,
     end of quarter, net of discount of $0.5   .....      2.4
----------------------------------------------   ----------------

INSURANCE RECEIVABLE
Asbestos-related insurance receivable,
  beginning of  year ....................  .......     366.1
Proceeds received under asbestos-related
  insurance settlements .................  .......     (34.9)
----------------------------------------------   ----------------
   Asbestos-related insurance receivable, end       331.2
   of quarter ...........................  .......
----------------------------------------------   ----------------
   Total amounts due from insurance carriers        333.6
   Expected to be realized within one year ....      (68.5)
----------------------------------------------   ----------------
   Expected to be realized after one year  .....    $ 265.1
==============================================   ================
```

Grace has settled with and has been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for bodily injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related bodily injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate directly to Grace's estimated liabilities for property damage and bodily injury cases and claims pending at June 30, 2000 and bodily injury claims expected to be filed in the future.

Grace's ultimate exposure with respect to its asbestos-related cases and claims partly depends on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, it is probable that recoveries from its insurance carriers (including amounts reflected in the receivable discussed above), along with other funds, will be available to satisfy the property damage and bodily injury cases and claims pending at June 30, 2000, as well as bodily injury claims expected to be filed in the future.

---

## 3. DISCONTINUED OPERATIONS

### CROSS COUNTRY STAFFING

In July 1999, the Company completed the sale of substantially all of its interest in Cross Country Staffing (CCS), a provider of temporary nursing and other healthcare services. The Company's investment in CCS had been accounted for under the equity method. The operations of CCS prior to the sale are included in "Income from discontinued operations, net of tax" in the accompanying Consolidated Statement of Operations. Certain contingent liabilities, primarily related to tax liabilities of

The following table identifies the percentage improvement in the cost per dollar of sales for each business segment and Grace's core operations in total for the six-month period ended June 30, 2000. The index is calculated using 1998 as the base year and carving out selling price changes, currency movements and cost inflation in every year since the base year. The resulting change in cost per dollar of sales is Grace's productivity measure. Changes in product volume and mix remain in the productivity equation.

| PRODUCTIVITY INDEX | SIX MONTHS ENDED JUNE 30, | |
| --- | --- | --- |
| | 2000 | 1999 |

**COST PER $ OF SALES ON A CONSTANT $ BASIS WITH 1998 AS BASE YEAR:**

| | 2000 | 1999 |
| --- | --- | --- |
| Davison Chemicals ............ | $ 0.795 | $ 0.832 |
| Performance Chemicals......... | 0.850 | 0.872 |
| Corporate operating costs..... | 0.028 | 0.034 |
| Total core operations......... | $ 0.850 | $ 0.885 |
| PRODUCTIVITY INDEX............ | 1.082 | 1.044 |
| PERCENTAGE IMPROVEMENT FROM PRIOR YEAR | 3.8 % | 4.4% |

As reflected in the table above, on a constant dollar basis with 1998, Grace produced a 3.8% reduction during the six months ended June 30, 2000. Most of the improvement was attributable to improvements in corporate costs, manufacturing processes and infrastructure integration.

Corporate operating costs include expenses incurred by corporate headquarters functions in support of core operations. During 1999, many of these functions were relocated from Boca Raton, Florida to the Davison Chemicals Headquarters in Columbia, Maryland. As such, the annual 1999 cost structure included incremental relocation costs, employee separation costs and duplicative salaries that occurred during the transition. These expenses should not reoccur in 2000. Corporate operating costs in the second quarter of 2000 were $10.0 million, compared to $11.0 million in second quarter 1999, a 9.1% reduction. For the six-month period ended June 30, corporate costs were $22.2 million in 2000 compared to $24.0 million in 1999, a 7.5% reduction.

**PRE-TAX INCOME (EXPENSE) FROM NONCORE ACTIVITIES**

The second quarter 2000 net expense from noncore activities of $0.6 million is comprised of approximately $20 million in income offset by various expenses. The income items include the income generated on the Company's pension assets, gains on the sale of noncore assets and income generated from the Company's investment in life insurance. The second quarter 2000 expenses include accruals for legal and environmental matters primarily related to the Company's former operations in Libby, Montana, the tax matters discussed in Note 12 of the Notes to Consolidated Financial Statements and

expenses related to retirees of divested businesses. The second quarter 1999 net expense from noncore activities of $1.4 million included a charge related to the settlement of a lawsuit with the Securities and Exchange Commission which required the Company to establish a $1.0 million educational fund for public sector programs to increase awareness and education relating to financial statements and generally accepted accounting principles. For the six months ended June 30, 2000 income from noncore activities was $0.4 million, compared to $5.2 million for the same period in 1999. The income from noncore activities for the six months ended June 30, 1999 includes $4.4 million gain from the sale of a corporate aircraft.

## INTEREST AND INCOME TAXES

Net interest expense for the second quarter of 2000 was $4.1 million, an increase of $0.6 million, or 17.1%, over the second quarter of 1999. Net interest expense for the six months ended June 30, 2000 was $7.1 million, a 14.5% increase over the same period in 1999. The increase for both periods is attributable to an increased average debt level on Grace's revolving credit facilities. This increased average debt level was used to fund the share repurchase program, business acquisitions and working capital requirements.

The Company's effective tax rate was 36.0% for the three-month and six-month periods ended June 30, 2000 and 1999.

I-14

---

## DAVISON CHEMICALS

### Recent Acquisitions

On January 31, 2000 Grace acquired Crosfield Group's hydroprocessing catalyst business from Imperial Chemical Industries PLC ("ICI"). This business had $3.5 million of sales in the second quarter of 2000 and $8.1 million of sales in the six-month period ended June 30, 2000. In June 2000, Grace acquired the Ludox(R) colloidal silicas business of the DuPont Company. These acquisitions have been accounted for as a purchase business combination, and accordingly, the results of operations of the acquired businesses have been included in the consolidated statement of operations from the date of their respective acquisitions.

### Sales

Davison Chemicals is a leading global supplier of catalysts and silica products. Refining catalysts, which represents approximately 28.0% of the second quarter 2000 and six-month year-to-date 2000 total Grace sales, include fluid cracking catalysts (FCCs) used by petroleum refiners to convert distilled crude oil into transportation fuels and other petroleum-based products, hydroprocessing catalysts which upgrade heavy oils and remove certain impurities, and chemical additives for treatment of feedstock impurities. In 1999, refining catalysts represented approximately 27.0% of the second quarter and six-month year-to-date sales. Chemical catalysts, which represent approximately 8.0% for both the second quarter 2000 and six-month year-to-date 2000 total Grace sales, include polyolefin catalysts which are essential components in the manufacturing of polyethylene resins used in products such as plastic film, high performance plastic pipe and plastic household containers. In 1999, chemical catalysts represented approximately 8.0% of the second quarter and six-month year-to-date sales. Silica products, which represents approximately 13.0% of the second quarter 2000 and six-month year-to-date 2000 total Grace

|                                         | 2000      | 1999     |
|-----------------------------------------|-----------|----------|
| **CASH FLOWS:**                         |           |          |
| Pre-tax operating income .........      | $ 98.5    | $ 77.9   |
| Depreciation and amortization ....      | 44.3      | 44.8     |
| PRE-TAX EARNINGS BEFORE DEPRECIATION AND AMORTIZATION .... | 142.8 | 122.7 |
| Working capital changes ..........      | ( 38.5)   | (20.8)   |
| Capital expenditures .............      | ( 27.3)   | (36.1)   |
| Businesses acquired ..............      | ( 44.9)   | (0.5)    |
| Sale of receivables ..............      | (1.0)     | 41.6     |
| Changes in other assets and liabilities...................... | ( 48.4) | (40.4) |
| NET CASH FLOW FROM CORE OPERATIONS ...................... | $ ( 17.3) | $ 66.5 |

The Company has a net asset position supporting its core operations of $991.1 million at June 30, 2000 compared to $909.1 million at December 31, 1999 including the cumulative translation account reflected in Shareholders' Equity of $129.0 million at June 30, 2000 and $106.1 million at December 31, 1999. Weighted average capital on a trailing twelve month basis was $952.3 million. The change in the net asset position is primarily due to the net assets resulting from business acquisitions, including goodwill, an increase in deferred pension costs and a reduction in core liabilities due to payments made in the first quarter of 2000, including the payment of accruals that had built up over the course of the prior fiscal year for items such as bonuses, customer rebates and taxes. After-tax return on capital invested in core operations (calculated based on a trailing four quarters) increased 0.8 percentage points. The Company has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. Grace's current core operations, together with other available assets, are being managed to generate sufficient cash flow to fund these obligations over time.

I-17

## NONCORE ACTIVITIES
(Dollars in millions)

|                                                   | JUNE 30, 2000 | December 31, 1999 |
|---------------------------------------------------|---------------|-------------------|
| NET NONCORE LIABILITY                             |               |                   |
| **BOOK VALUE OF ASSETS AVAILABLE TO FUND NONCORE OBLIGATIONS:** |               |                   |
| Cash and other financial assets .. $                | 313.2         | $ 345.8           |
| Properties and investments .......                | 8.5           | 8.8               |
| Asbestos-related insurance receivable ................... | 333.6         | 371.4             |

| | | | |
|---|---|---|---|
| Tax assets, net.................. | 35 | 0.3 | 363.8 |

| | | | |
|---|---|---|---|
| ASSETS AVAILABLE TO FUND NONCORE OBLIGATIONS.................... | 1,00 | 5.6 | 1,089.8 |

Noncore liabilities:

| | | | |
|---|---|---|---|
| Asbestos-related litigation....... | (1,005.2) | | (1,084.0) |
| Environmental remediation......... | (20 | 3.0) | (215.5) |
| Postretirement benefits.......... | (19 | 6.4) | (201.4) |
| Retained obligations and other.... | (8 | 6.5) | (99.1) |

| | | | |
|---|---|---|---|
| TOTAL NONCORE LIABILITIES........ | (1,49 | 1.1) | (1,600.0) |

| | | | | |
|---|---|---|---|---|
| NET NONCORE LIABILITY............ | $ | (48 | 5.5) | $ (510.2) |

| | | | | |
|---|---|---|---|---|
| UNUSED CREDIT FACILITIES | $ | 29 | 8.2 | $ 410.0 |

| | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|
| NET CASH FLOW FROM NONCORE ACTIVITIES | 200 0 | 1999 |

| | | | | |
|---|---|---|---|---|
| Pre-tax income from noncore activities................... | $ | 0.4 | $ | 5.2 |
| | | 0.4 | | |
| Proceeds from noncore asset sales | | 6.3 | | 20.4 |
| Other changes.................... | | 9.7 | | (2.1) |
| Cash spending for: | | | | |
| Asbestos-related litigation, net of insurance recovery.... | (5 | 0.7) | | (29.7) |
| Environmental remediation....... | (1 | 8.8) | | (15.0) |
| Postretirement benefits......... | (1 | 0.2) | | (9.7) |
| Retained obligations and other.. | 1 | 5.5 | | (70.9) |

| | | | |
|---|---|---|---|
| TOTAL SPENDING FOR NONCORE LIABILITIES ................. | (6 | 4.2) | (125.3) |

| | | | | |
|---|---|---|---|---|
| NET CASH FLOW OF NONCORE ACTIVITIES ................. | $ | (4 | 7.8) | $ (101.8) |

The table above displays the book value of Grace's noncore liabilities and the assets available to fund those liabilities at June 30, 2000 and December 31, 1999. Each liability has different characteristics, risks and expected liquidation profile. Taken together, these liabilities represent $1,491.1 million of Grace's total liabilities as reflected on its consolidated balance sheet at June 30, 2000. Assets available to fund noncore liabilities consist of cash and cash equivalents, net cash value of life insurance where Grace is the beneficiary, property and investments not used in core operations, insurance coverage for asbestos-related litigation and net tax assets related to noncore liabilities. These assets, which in the aggregate total $1,005.6 million at June 30, 2000, are not required to support base core operating activities and, thus, are available to fund noncore liabilities.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. Grace paid $36.6 million and $50.7 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers, during the second quarter 2000 and six months ended June 30, 2000, respectively. The amount of spending in 2000 is consistent with Grace's expectation that spending throughout 2000 will be higher than 1999 due to the timing and adjudication of certain cases. In 1999, Grace paid $17.2 million and $29.7 million during the second quarter and six months ended June 30, respectively.

The Consolidated Balance Sheet at June 30, 2000 reflects a net liability after insurance and after tax benefits of $432.8 million. Total amounts due from insurance carriers of $333.6 million are pursuant to settlement agreements with insurance carriers and net tax assets of $238.8 million relate to future net tax deductions for asbestos-related matters. The net present value of such net liability (based on cash flow projections that span nearly 40 years - inherently imprecise but represent management's best current estimate) is approximately $330 million (discounted at 5.2% - estimated after-tax investment rate) at June 30, 2000.

I-18

The Consolidated Balance Sheet at June 30, 2000 includes total amounts due from insurance carriers of $333.6 million pursuant to settlement agreements with insurance carriers and net tax assets of $238.8 million related to future net tax deductions for asbestos-related matters.

See Note 2 to the Consolidated Financial Statements for further information concerning asbestos related lawsuits and claims.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace made cash payments to remediate environmentally impaired sites during the second quarter 2000 and 1999 of $4.9 million and $5.3 million, respectively, and during the six-month period 2000 and 1999 of $18.8 million and $15.0 million, respectively. During 2000, a $6.3 million ($4.1 million after-tax) charge was taken to fund the estimated cost to remediate one site identified to be environmentally impaired. At June 30, 2000, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $203.0 million, as compared to $215.5 million at December 31, 1999. In the six-month period 2000, cash payments were higher than the same period of 1999 due to a settlement for a particular site which was made in the first quarter 2000. Grace continues to expect pre-tax cash outlays for remediation costs to be between $38 and $43 million for 2000.

Grace is in litigation with two excess insurance carriers regarding the applicability of the carriers' policies to environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

See Note 12 to the Consolidated Financial Statements for further information concerning environmental matters.

## POSTRETIREMENT BENEFITS

Company's financial statements.

## FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion and Analysis of Results of Operations and Financial Condition, other uncertainties include the impact of worldwide economic conditions; pricing of both the Company's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; success of Grace's process improvement initiatives; and the impact of tax and legislation and other regulations in the jurisdictions in which the Company operates. Also, see "Introduction and Overview - Projections and Other Forward-Looking Information" in Item 1 of Grace's 1999 Annual Report on Form 10-K.

I-21

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Grace had no outstanding interest rate swap agreements on June 30, 2000. For further information concerning Grace's quantitative and qualitative disclosures about market risk, refer to Note 11 in the Consolidated Financial Statements in the 1999 Form 10-K.

I-22

## PART II. OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

(a) Note 2 to the interim consolidated financial statements in Part I of this Report is incorporated herein by reference.

(b) Reference is made to the section entitled "Asbestos Litigation" in Item 3 of the Company's 1999 10-K for information concerning the lawsuit Central Wesleyan College, et al. v. W. R. Grace, et al. In March 2000, the South Carolina District Court issued its final approval for the pending settlement and in June 2000 Grace made its final payment under the terms thereof.

(c) In 1988 and 1990, Grace acquired whole life insurance policies ("COLI") on the lives of certain of its employees as part of a strategy to fund the cost of post retirement employee health care benefits and other long term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The Internal Revenue Service is challenging the interest deductions claimed by Grace on its 1990 through 1992 tax returns relating to interest payments made on the COLI related loans. In July 2000 Grace paid $21.3 million of tax and interest related to this issue.

Grace is currently under audit for the 1993-96 tax years. During those years Grace deducted approximately $122.1 million in interest attributable to the COLI policies. In 1996 legislation was enacted that phased out the tax benefits for COLI related interest deductions over a three-year period ending in 1998.) Grace believes it acquired the policies for a valid business purpose and that the interest deductions are in compliance with the tax regulations. The matter is currently under review in the Internal Revenue Service Appeals Office, where protest papers have been filed.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The Company's 2000 Annual Meeting of Stockholders was held on May 10, 2000. At the Annual Meeting, the Company's stockholders (a) elected two Class II Directors for a term expiring in 2003; (b) ratified the selection of PricewaterhouseCoopers LLP as independent accountants of the Company and its consolidated subsidiaries for 2000; and (c) approved the Company's 2000 Stock Incentive Plan.

II-1

The results of voting at the Annual Meeting are as follows:

|  | VOTES | | |
|---|---|---|---|
| MATTER | FOR | AGAINST* | ABSTENTIONS |
| Election of Directors |  |  |  |
| John F. Akers | 60,862,40 0 | 958,379 | 0 |
| John J. Murphy | 60,938,32 0 | 882,459 | 0 |
| Selection of Independent Accountants | 61,276,55 7 | 272,402 | 271,820 |
| Approval of Stock Incentive Plan | 28,276,19 0 | 26,098,549 | 833,255 |

* With respect to the Election of Directors, the Form of Proxy permitted Stockholders to check boxes indicating votes either "FOR" or "WITHHELD;" votes relating to Directors designated above as "AGAINST" are votes cast as "WITHHELD."

## ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

(a) Exhibits. The following is a list of Exhibits filed as part of this Quarterly Report on Form 10-Q.

```
4        First Amendment to 364-Day Credit Agreement dated as
         of May 5, 1999 among W. R. Grace  & Co.-Conn.; W. R.
         Grace & Co.; the several banks p arties thereto; Bank
         of America National Trust and Sa vings Association, as
         documentation agent; The Chase M anhattan Bank, as
```

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-Q

(Mark One)

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2000**

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

*Commission File Number 1-13953*

# W. R. GRACE & CO.

Delaware

--------------------------------------

(State of Incorporation)

65-0773649

---------------------------

(I.R.S. Employer
Identification No.)

7500 Grace Drive
Columbia, Maryland 21044
<u>(410) 531-4000</u>

(Address and phone number of principal
executive offices)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

<u>Yes X No</u>

65,418,232 shares of Common Stock, $.01 par value, were outstanding at October 31, 2000.

## W. R. GRACE & CO. AND SUBSIDIARIES

### Table of Contents

PART I.    FINANCIAL INFORMATION

Item 1.              Financial Statements

                     Report of Independent Accountants

                     Consolidated Statement of Operations

                     Consolidated Statement of Cash Flows

                     Consolidated Balance Sheet

                     Consolidated Statement of Shareholders' Equity

                     Consolidated Statement of Comprehensive Income

                     Notes to Consolidated Financial Statements

Item 2.              Management's Discussion and Analysis of Results of Operations ar
                     Financial Condition

Item 3.              Quantitative and Qualitative Disclosures About Market Risk

PART II.   OTHER INFORMATION

Item 1.              Legal Proceedings

Item 6.              Exhibits and Reports  on Form 8-K

As used in this Report, the term "Company" refers to W. R. Grace & Co. (a Delaware corporation formerly named "Grace Specialty Chemicals, Inc."), and the term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

## PART I. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### REPORT OF INDEPENDENT ACCOUNTANTS

To the Shareholders and Board of
Directors of W. R. Grace & Co.:

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in 58,225 asbestos-related lawsuits on September 30, 2000 (seven involving claims for property damage, six claims involving attic insulation, and the remainder involving 121,263 claims for bodily injury), as compared to 50,342 lawsuits on December 31, 1999 (11 involving claims for property damage and the remainder involving 105,670 claims for bodily injury).

## PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing, or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Thus, the amounts involved in prior dispositions of property damage cases are not necessarily indicative of the amounts that may be required to dispose of cases in the future. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending provide meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all existing property damage cases for which sufficient information is available to form a reasonable estimate of such exposure.

Through September 30, 2000 Grace had been served with 370 property damage cases - 140 cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million; and 207 of these property damage cases were settled for a total of $696.8 million.

## PROPERTY DAMAGE CASE ACTIVITY

| | |
|---|---|
| Cases pending, December 31, 1999 ........ ..... | 11 |
| New cases filed ......................... ..... | -- |
| Settlements ............................. ..... | (4) |
| Dismissals .............................. ..... | -- |
| Cases pending, September 30, 2000 | 7 |

## ATTIC INSULATION LITIGATION

From January 2000 through September 2000 Grace was served with six class action lawsuits on behalf of owners of homes containing Zonolite attic fill insulation. These actions seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. While Grace has not completed its investigation of the claims described in these lawsuits, and therefore is not able to assess the extent of any possible liability related to these matters, it believes that this product is safe for its intended purpose and poses little or no threat to human health. In the second quarter 2000 Grace established a liability to cover its estimated defense costs for these cases.

## BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims is influenced by numerous variables, including the solvency of other producers of asbestos-containing products, cross-claims by and the financial condition of co-defendants, the rate at which new claims are filed, the jurisdiction in which the filings are made, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace, given demographic assumptions of possible exposure to asbestos products manufactured by Grace.

Through September 30, 2000, approximately 15,400 asbestos bodily injury lawsuits involving approximately 33,800 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 52,000 lawsuits involving approximately 142,000 claims were disposed of (through settlement and judgments) for a total of $496.2 million.

## BODILY INJURY CLAIM ACTIVITY

| | |
|---|---:|
| Claims pending, December 31, 1999 | 105,670 |
| New claims filed | 33,670 |
| Settlements | (17,094) |
| Dismissals | (982) |
| Judgments | (1) |
| Claims pending, September 30, 2000 | 121,263 |

I-7

In recent months, certain codefendant companies in bodily injury litigation have petitioned for reorganization under Chapter 11 of the Federal Bankruptcy Code. As a consequence, litigation against them (with some exceptions) has been stayed or restricted. The impact of these actions on Grace will depend on numerous factors, including how plaintiffs respond, how the bankruptcy court adjudicates the petitions, and the response of other co-defendants in asbestos-related litigation. Due to the uncertainties involved, the financial effect of these proceedings on Grace's bodily injury litigation cannot be estimated at this time.

In addition, new bodily injury claims for the first nine months of 2000 are significantly higher than the 1999 comparable period. This increase in claims may represent an acceleration of future claims already expected by Grace to be filed, or could represent an increase in total claims to be filed in the future. More time, experience and analysis is required to determine whether the number of future claims may be materially higher than Grace's current estimates and the impact this would have on Grace's future cash flow and recorded liability for future claims.

## ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its experience with, and recent trends in, asbestos litigation. These estimates include property damage and bodily injury indemnity as well as defense costs. Grace regularly evaluates its financial exposure to asbestos-related lawsuits and the adequacy of related recorded liabilities. The amounts recorded at each balance sheet date reflect Grace's best estimate of probable and estimable liabilities in all material respects. However, changes to

estimates of probable liabilities may occur as new information becomes available and as actual experience is gained over time.

## ESTIMATED LIABILITY FOR

| ASBESTOS-RELATED LITIGATION (Dollars in millions) | SEPTEMBER 30, 2000 | Dec ember 31, 1999 |
|---|---|---|
| Asbestos-related liability expected to be satisfied within one year............. | $    168 .6 | $     199.3 |
| Asbestos-related liability expected to be satisfied after one year.............. | 729 .3 | 884.7 |
| Total asbestos-related liability................... | $    897 .9 | $   1,084.0 |

The current portion of Grace's asbestos-related liability is based on management's estimate of indemnity payments and defense costs expected to be paid within one year.

## ASBESTOS-RELATED INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during the nine months ended September 30, 2000 was as follows:

## ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES
(Dollars in millions)

## NOTES RECEIVABLE

| | |
|---|---|
| Notes receivable from insurance carriers, beginning of year, net of discount of $ 0.8... | $    5.3 |
| Proceeds received under asbestos-related insurance settlements ................ ...... | (3.2) |
| Current period amortization of discount . ...... | 0.4 |
| Notes receivable from insurance carrie rs, end of quarter, net of discount of $0. 4 .... | 2.5 |
| | |
| INSURANCE RECEIVABLE | |
| Asbestos-related insurance receivable, beginning of  year .................... ...... | 366.1 |
| Proceeds received under asbestos-related insurance settlements ................ ...... | (52.7) |
| Asbestos-related insurance receivable, end of quarter ........................... ...... | 313.4 |
| Total amounts due from insurance carr iers | 315.9 |

```
        Expected to be realized within one ye ar ...      (62.2)
        ---------------------------------------- --------------------
        Expected to be realized after one yea r ....     $ 253.7
        ======================================== ====================
```

Grace has settled with and has been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with certain excess insurance carriers that wrote policies available for property damage and bodily injury cases and claims; those settlements involve amounts paid and to be paid to Grace. In addition, Grace is involved in litigation with one of its primary insurance carriers with respect to coverage for liabilities related to Grace's former operations in Libby, Montana. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate directly to Grace's estimated liabilities for property damage and bodily injury cases and claims pending at September 30, 2000 and bodily injury claims expected to be filed in the future. Of the amount expected to be realized within one year of September 30, 2000, $25 million is for reimbursement of litigation and settlement costs paid.

I-8

Grace's ultimate exposure with respect to its asbestos-related cases and claims partly depends on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. In Grace's opinion, as long as the cost of asbestos related litigation follows historical experience, it is probable that recoveries from its insurance carriers (including amounts reflected in the receivable discussed above), along with other funds, will be available to satisfy the property damage, attic insulation and bodily injury cases and claims pending at September 30, 2000, as well as bodily injury claims expected to be filed in the future.

## 4. DISCONTINUED OPERATIONS

### CROSS COUNTRY STAFFING

In July 1999, the Company completed the sale of substantially all of its interest in Cross Country Staffing (CCS), a provider of temporary nursing and other healthcare services. The Company's investment in CCS had been accounted for under the equity method. The net pre-tax gain of $74.8 million ($32.1 million after-tax) and the operations of CCS prior to the sale are included in "Income from discontinued operations, net of tax" in the Consolidated Statement of Operations. For the third quarter of 1999, the results of CCS's operations were a loss of $13.3 million ($6.2 million after-tax). For the nine months ended September 30, 1999, the results of CCS's operations were a loss of $8.6 million ($4.0 million after-tax). Certain contingent liabilities, primarily related to tax liabilities of CCS, are being retained by the Company and are included in other current liabilities in the accompanying Consolidated Balance Sheet.

### PACKAGING BUSINESS

```
Postretirement benefits.............   (1 94.3)      (201.4)
Retained obligations and other......   ( 78.0)       (99.1)
                                     ------------- -------------
TOTAL NONCORE LIABILITIES...........   (1,3 62.2)    (1,600.0)
                                     ------------- -------------
NET NONCORE LIABILITY............... $ (4 34.8)    $ (555.7)
                                     ============= =============
```

| NET CASH FLOW  FROM NONCORE ACTIVITIES | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 200 0 | 1999 |
| Pre-tax income from noncore activities.................... | $    6.3 | $    9.8 |
| Proceeds from noncore asset sales .. | 6.3 | 20.4 |
| Other changes...................... | (1.1) | (0.5) |
| Cash spending for: | | |
| Asbestos-related litigation, net of insurance recovery...... | (1 40.3) | (40.3) |
| Environmental remediation......... | ( 27.9) | (18.6) |
| Postretirement benefits........... | ( 15.1) | (14.8) |
| Retained obligations and other.... | ( 15.0) | (71.4) |
| TOTAL SPENDING FOR NONCORE LIABILITIES .................. | (1 98.3) | (145.1) |
| NET CASH FLOW OF NONCORE ACTIVITIES .................... | $ (1 86.8) | $ (115.4) |

The table above displays the book value of Grace's noncore liabilities and the assets available to fund those liabilities at September 30, 2000 and December 31, 1999. Each liability has different characteristics, risks and expected liquidation profile. Taken together, these liabilities represent $1,362.2 million of Grace's total liabilities as reflected on its consolidated balance sheet at September 30, 2000. Assets available to fund noncore liabilities consist of cash and cash equivalents, net cash value of life insurance where Grace is the beneficiary, property and investments not used in core operations, insurance coverage for asbestos-related litigation and net tax assets related to noncore liabilities. These assets, which in the aggregate total $927.4 million at September 30, 2000, are not required to support base core operating activities and, thus, are available to fund noncore liabilities.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. Grace paid $89.5 million and $140.3 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers, during the third quarter 2000 and nine months ended September 30, 2000, respectively. In 1999, Grace paid a net of $10.6 million and $40.3 million during the third quarter and nine months ended September 30, respectively. The amount of spending in 2000 is consistent with Grace's expectation that spending throughout 2000 will be higher than 1999 due to the timing and adjudication of certain cases. At September 30, 2000 Grace's net current liability (that which is expected to be paid within twelve-months) for asbestos related litigation is $106.4 million compared to $124.1 million at December 31, 1999.

The Consolidated Balance Sheet at September 30, 2000 reflects a net liability after insurance and after tax benefits of $371.1 million. Total amounts due from insurance carriers of $315.9 million are pursuant to settlement agreements with insurance carriers and net tax assets of $210.9 million relate to future net tax deductions for asbestos-related matters. The net present value of such net liability (based on cash flow projections that span nearly 40 years - inherently imprecise but representing management's best current estimate) is approximately $270 million (discounted at 5.2% - estimated after-tax investment rate) at September 30, 2000.

See Note 3 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims, including factors that could cause management to change liability estimates.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace made cash payments to remediate environmentally impaired sites during the third quarter 2000 and 1999 of $9.1 million and $3.7 million, respectively, and during the nine-month period 2000 and 1999 of $27.9 million and $18.7 million, respectively. During 2000, a $10.8 million ($7.0 million after-tax) charge for discontinued operations was taken to fund the estimated cost to remediate one site identified to be environmentally impaired. During the third quarter 2000, Grace identified savings related to four specific sites. As a result, Grace reversed $6.4 million of environmental reserve and recognized $4.1 million after-tax earnings from discontinued operations. At September 30, 2000 Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations

I - 21

totaled $192.0 million, as compared to $215.5 million at December 31, 1999. In the nine-month period 2000, cash payments were higher than the same period of 1999 due to a settlement for a particular site which was made in the first quarter 2000. Grace's estimate of pre-tax cash outlays for remediation costs over the next twelve-months is $49.4 million.

Grace is in litigation with two insurance carriers regarding the applicability of the carriers' policies to environmental related costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

See Note 13 to the Consolidated Financial Statements for further information concerning environmental matters.

## POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertains to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred.

Spending under this program during the third quarter 2000 was $5.0 million and during the nine-month period 2000 was $15.1 million. This amount is consistent with expected spending of approximately $21 million for the year ended December 31, 2000. Grace's recorded liability of $194.2 million at September

23

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-Q**

**Quarterly Report Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**For the Quarterly Period Ended September 30, 1996**

**Commission File Number 1-12139**

**W. R. GRACE & CO.**

| Delaware | 65-0654331 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**One Town Center Road**
**Boca Raton, Florida 33486-1010**
**(561) 362-2000**

**Indicate by check mark whether the registrant (including its predecessor) (1)**

1

*Copyright 2001*

has filed all reports required to be filed by Section 13 or 15(d) of the
Securities Exchange Act of 1934 during the preceding 12 months and (2) has
been subject to such filing requirements for the past 90 days.

Yes [X]    No [ ]

83,007,373 shares of Common Stock, $.01 par value, were outstanding at
November 1, 1996.

*Copyright 2001*

W. R. GRACE & CO. AND SUBSIDIARIES

Table of Contents
-----------------

|  |  | Page No. |
|--|--|----------|
| Part I. | Financial Information |  |
| Item 1. | Financial Statements |  |
|  | Consolidated Statement of Operations | I-1 |
|  | Consolidated Statement of Cash Flows | I-2 |
|  | Consolidated Balance Sheet | I-3 |
|  | Notes to Consolidated Financial Statements | I-4 to I-12 |
| Item 2. | Management's Discussion and Analysis of Results of Operations and Financial Condition | I-13 to I-20 |
| Part II. | Other Information |  |
| Item 1. | Legal Proceedings | II-1 |
| Item 4. | Submission of Matters to a Vote of Security Holders | II-1 |
| Item 5. | Other Information | II-2 |
| Item 6. | Exhibits and Reports on Form 8-K | II-3 |

As used in this Report, the term "Company" refers to W. R. Grace & Co. (a Delaware corporation), and the term "Grace" refers to the Company and/or one or more of its subsidiaries.

PART I. FINANCIAL INFORMATION

Item 1.   FINANCIAL STATEMENTS

| W. R. Grace & Co. and Subsidiaries Consolidated Statement of Operations (Unaudited) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| $ millions (except per share) | 1996 | 1995 | 1996 | 1995 |
| Sales and revenues | $ 821.3 | $ 946.4 | $2,656.2 | $2,732.1 |
| Other income | 8.2 | 4.5 | 26.1 | 13.3 |
| Total | 829.5 | 950.9 | 2,682.3 | 2,745.4 |
| Cost of goods sold and operating expenses | 503.9 | 565.4 | 1,607.7 | 1,617.6 |
| Selling, general and administrative expenses | 150.5 | 225.3 | 556.2 | 693.5 |
| Depreciation and amortization | 43.4 | 45.8 | 135.3 | 124.2 |
| Interest expense and related financing costs | 18.2 | 17.8 | 54.9 | 52.3 |
| Research and development expenses | 22.5 | 27.2 | 80.3 | 92.2 |
| Restructuring costs | - | 44.3 | 53.7 | 44.3 |
| Gain on sales of businesses | - | - | (326.4) | - |
| Total | 738.5 | 925.8 | 2,161.7 | 2,624.1 |
| Income from continuing operations before income taxes | 91.0 | 25.1 | 520.6 | 121.3 |
| Provision for income taxes | 35.5 | 5.3 | 190.4 | 33.6 |
| Income from continuing operations | 55.5 | 19.8 | 330.2 | 87.7 |
| Income from discontinued operations | 2,464.4 | 1.9 | 2,587.2 | 60.2 |
| Net income | $2,519.9 | $ 21.7 | $2,917.4 | $ 147.9 |
| Earnings per share: | | | | |
| Continuing operations | $ .61 | $ .20 | $ 3.46 | $ .92 |
| Net income | $ 27.66 | $ .22 | $ 30.64 | $ 1.55 |
| Fully diluted earnings per share: | | | | |
| Continuing operations | $ .59 | $ .20 | $ 3.37 | $ .89 |
| Net income | $ 26.83 | $ .22 | $ 29.76 | $ 1.51 |
| Dividends declared per common share | $ .125 | $ .35 | $ .375 | $ 1.05 |

The Notes to Consolidated Financial Statements are
an integral part of these statements.

I-1

Copyright 2001

W. R. Grace & Co. and Subsidiaries
Consolidated Statement of Cash Flows (Unaudited)

Nine Months Ended
September 30,

| $ millions | 1996 | 1995 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Income from continuing operations before income taxes | $ 520.6 | $ 121.3 |
| Reconciliation to cash provided by/(used for) operating activities: | | |
| Depreciation and amortization | 135.3 | 124.2 |
| Noncash charge relating to restructuring costs | 53.7 | 44.3 |
| Gain on sales of businesses | (326.4) | - |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign exchange: | | |
| Increase in notes and accounts receivable, net | (158.6) | (55.4) |
| Decrease/(increase) in inventories | 26.1 | (81.5) |
| Proceeds from asbestos-related insurance settlements | 139.1 | 174.4 |
| Payments made for asbestos-related litigation settlements, judgments and defense costs | (86.6) | (96.7) |
| Decrease in accounts payable | (36.4) | (65.7) |
| Other | (116.3) | (14.2) |
| Net pretax cash provided by operating activities of continuing operations | 150.5 | 150.7 |
| Net pretax cash provided by operating activities of discontinued operations | 72.8 | 43.1 |
| Net pretax cash provided by operating activities | 223.3 | 193.8 |
| Income taxes paid | (113.8) | (207.2) |
| Net cash provided by/(used for) operating activities | 109.5 | (13.4) |
| **INVESTING ACTIVITIES (1)** | | |
| Capital expenditures | (335.3) | (366.5) |
| Businesses acquired in purchase transactions, net of cash acquired and debt assumed | (33.8) | (31.4) |
| Increase in net investing activities of discontinued operations | (181.2) | (149.1) |
| Net proceeds from divestments | 2,802.9 | 49.4 |
| Other | 25.3 | 9.3 |
| Net cash provided by/(used for) investing activities | 2,277.9 | (488.3) |
| **FINANCING ACTIVITIES (1)** | | |
| Dividends paid | (36.0) | (100.3) |
| Repayments of borrowings having original maturities in excess of three months | (513.6) | (41.6) |
| Increase in borrowings having original maturities in excess of three months | .1 | 52.1 |
| Net (decrease)/increase in borrowings having original maturities of less than three months | (512.7) | 475.3 |
| Stock options exercised | 52.0 | 123.1 |
| Purchase of treasury stock | (727.1) | (12.0) |
| (Decrease)/increase in net financing activities of discontinued operations | (198.8) | 4.2 |
| Other | .2 | - |
| Net cash (used for)/provided by financing activities | (1,935.9) | 500.8 |
| Effect of exchange rate changes on cash and cash equivalents | (0.5) | 3.5 |
| Increase in cash and cash equivalents | $ 451.0 | $ 2.6 |

(1) See Notes 1 and 5 in this Report for supplemental information relating to
noncash investing and financing activities.

The Notes to Consolidated Financial Statements
are integral parts of these statements.

I-2

*Copyright 2001*

W. R. Grace & Co  and Subsidiaries
Consolidated Balance Sheet (Unaudited)

| $ millions (except par value) | September 30, 1996 | December 31, 1995 |
|---|---|---|

### ASSETS

| | | |
|---|---|---|
| CURRENT ASSETS | | |
| Cash and cash equivalents............................... | $    491.6 | $    40.6 |
| Notes and accounts receivable, net...................... | 765.9 | 596.8 |
| Inventories............................................ | 415.3 | 491.9 |
| Net assets of discontinued operations.................. | 369.8 | 323.7 |
| Deferred income taxes.................................. | 220.7 | 206.1 |
| Other current assets................................... | 24.3 | 22.2 |
| Total Current Assets............................... | 2,287.6 | 1,681.3 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,428.4 and $1,418.8, respectively...................... | 1,833.6 | 1,736.1 |
| Goodwill, less accumulated amortization of $10.5 and $20.6, respectively.............................. | 49.3 | 111.8 |
| Net assets of discontinued operations - health care......... | | 1,435.3 |
| Asbestos-related insurance receivable...................... | 228.2 | 321.2 |
| Deferred income taxes.................................... | 361.8 | 386.6 |
| Other assets............................................ | 586.3 | 625.3 |
| TOTAL................................................ | $  5,346.8 | $  6,297.6 |

### LIABILITIES AND SHAREHOLDERS' EQUITY

| | | |
|---|---|---|
| CURRENT LIABILITIES | | |
| Short-term debt........................................ | $    155.3 | $    638.3 |
| Accounts payable....................................... | 253.2 | 339.2 |
| Income taxes........................................... | 280.3 | 103.3 |
| Other current liabilities.............................. | 842.2 | 836.4 |
| Minority interest...................................... | 297.0 | 297.0 |
| Total Current Liabilities........................... | 1,828.0 | 2,214.2 |
| Long-term debt......................................... | 741.6 | 1,295.5 |
| Other liabilities...................................... | 798.9 | 789.0 |
| Deferred income taxes.................................. | 62.3 | 44.8 |
| Noncurrent liability for asbestos-related litigation....... | 645.6 | 722.3 |
| Total Liabilities.................................. | 4,076.4 | 5,065.8 |

COMMITMENTS AND CONTINGENCIES

| | | |
|---|---|---|
| SHAREHOLDERS' EQUITY | | |
| Preferred stocks, $100 par value....................... | - | 7.4 |
| Common stock, par value of $.01 and $1, respectively.... | .9 | 97.4 |
| Paid in capital....................................... | 549.0 | 459.8 |
| Retained earnings...................................... | 762.7 | 709.0 |
| Cumulative translation adjustments..................... | (42.2) | (39.4) |
| Treasury stock - 53,000 common shares, at cost.......... | - | (2.4) |
| Total Shareholders' Equity........................... | 1,270.4 | 1,231.8 |
| TOTAL................................................ | $  5,346.8 | $  6,297.6 |

The Notes to Consolidated Financial Statements
are integral parts of these statements.

I-3

*Copyright 2001*

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

1. **CHANGE IN ORGANIZATION AND BASIS OF PRESENTATION**

Change in Organization

On September 28, 1996, W. R. Grace & Co., a New York corporation
subsequently renamed Fresenius National Medical Care Holdings, Inc. (Grace
New York), distributed all of the shares of the Company's outstanding
common stock to the holders of common stock of Grace New York on a
one-for-one basis. As a result of the distribution, Grace New York's
principal remaining asset was 100% of the outstanding capital stock of
National Medical Care, Inc. (NMC). On September 29, 1996, a wholly owned
subsidiary of Fresenius Medical Care AG (FMC), a German corporation,
merged with and into Grace New York, resulting in the combination of NMC
with the worldwide dialysis business of Fresenius AG (Fresenius), a German
health care corporation and the principal shareholder of FMC.

Neither the shares of Grace New York preferred stock issued and
outstanding at the time of the distribution nor the treasury shares held
by Grace New York at the time of the distribution were transferred to the
Company. Accordingly, the distribution was accounted for as a retirement
within the shareholders' equity section of the consolidated balance sheet
at September 30, 1996. See Note 9 below for a reconciliation of the
changes in shareholders' equity for the nine-month period ended September
30, 1996.

For further information, see the Grace New York Joint Proxy
Statement-Prospectus dated August 2, 1996 (Joint Proxy
Statement-Prospectus), the Company's Prospectus dated August 2, 1996
(Prospectus) and Note 5 below.

Basis of Presentation

The interim consolidated financial statements in this Report are unaudited
and should be read in conjunction with the consolidated financial statements
for the year ended December 31, 1995 contained in the Prospectus. Such
interim consolidated financial statements reflect all adjustments that, in
the opinion of management, are necessary for a fair presentation of the
results of the interim periods presented; all such adjustments are of a
normal recurring nature. Certain amounts in the prior periods' consolidated
financial statements have been reclassified to conform to the current
periods' basis of presentation.

The results of operations for the three- and nine-month interim periods
ended September 30, 1996 are not necessarily indicative of the results of
operations for the fiscal year ending December 31, 1996.

2. **ASBESTOS AND RELATED INSURANCE LITIGATION**

As previously reported, Grace is a defendant in property damage and
personal injury lawsuits relating to previously sold asbestos-containing
products, and anticipates that it will be named as a defendant in
additional asbestos-related lawsuits in the future. Due to the unique
nature of each property damage claim, Grace cannot predict whether and to
what

I-4

*Copyright 2001*

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

extent asbestos-related property damage lawsuits and claims will be
brought against it in the future or the expenses involved in defending
against and disposing of any such future lawsuits and claims. By contrast,
Grace believes that there are common features with respect to personal
injury claims; therefore, in 1995, Grace determined that it had adequate
experience to reasonably estimate the number of personal injury claims to
be filed against it through 1998 and established an accrual for such
claims.

Grace was a defendant in approximately 44,400 asbestos-related lawsuits at
September 30, 1996 (35 involving claims for property damage and the
remainder involving approximately 115,100 claims for personal injury), as
compared to approximately 40,800 lawsuits at December 31, 1995 (47
involving claims for property damage and the remainder involving
approximately 92,400 claims for personal injury). During the first nine
months of 1996, one new property damage lawsuit was filed; six property
damage lawsuits were settled for a total of $11.9 (including one case that
was on appeal); six property damage lawsuits were dismissed without the
payment of any damages or settlement amounts; and, in a case that had been
on appeal and is now final, Grace was held liable for $4.1.

During the first nine months of 1996, approximately 2,200 personal injury
claims against Grace were dismissed without payment and approximately
4,500 personal injury claims were settled for $18.6.

Based upon and subject to the factors discussed in Note 2 in the
Prospectus, Grace estimates that its probable liability with respect to
the defense and disposition of asbestos property damage and personal
injury lawsuits and claims pending at September 30, 1996 and December 31,
1995, as well as personal injury lawsuits and claims expected to be filed
through 1998, is as follows:

| | September 30, 1996 | December 31, 1995 |
|---|---|---|
| Current liability for asbestos-related litigation (1).................... | $ 100.0 | $ 100.0 |
| Noncurrent liability for asbestos-related litigation................. | 645.6(3) | 722.3 |
| Total asbestos-related liability (2).................................... | $ 745.6 | $ 822.3 |

(1) Included in "Other current liabilities" in the consolidated balance
    sheet.
(2) Excludes two property damage lawsuits as to which the liabilities are
    not yet estimable because Grace has not yet been able to obtain
    sufficient information through discovery proceedings.
(3) The decrease from December 31, 1995 reflects payments made by Grace
    for settlements and defense costs in connection with asbestos-related
    lawsuits and claims during the nine months ended September 30, 1996.

Grace previously purchased insurance policies with respect to its
asbestos-related lawsuits and claims. Grace has settled with and been paid
by its primary insurance carriers with respect to both property damage and
personal injury lawsuits and claims. With minor exceptions, Grace has also
settled with its excess insurance carriers that wrote policies available
for property damage claims; those settlements involve amounts paid and to
be paid to Grace. In addition, Grace has settled with many excess
insurance carriers that wrote policies available for personal injury
lawsuits and claims. Grace is currently in litigation with

I-5

Copyright 2001

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

its remaining excess insurance carriers whose policies are believed by
Grace to be available for asbestos-related personal injury lawsuits and
claims. Recovery under these policies is subject to lengthy litigation and
legal uncertainties. Insurance coverage for asbestos-related liabilities
has not been commercially available since 1985.

The following table shows Grace's total estimated insurance recoveries
related to the reimbursement for past and estimated future payments to
defend against and dispose of asbestos-related lawsuits and claims:

| | September 30, 1996 | December 31, 1995 |
|---|---|---|
| Notes receivable from insurance carriers - current, net of discounts of $4.0 (1995 - $4.3) (1)..... | $ 42.8 | $ 62.0 |
| Notes receivable from insurance carriers - noncurrent, net of discounts of $5.1 (1995 - $7.3) (2).. | 33.4 | 56.4 |
| Asbestos-related insurance receivable................................................ | 228.2 (3) | 321.2 |
| Total amounts due from insurance carriers............................................ | $ 304.4 | $ 439.6 |

(1) Included in "Notes and accounts receivable, net" in the consolidated
    balance sheet.

(2) Included in "Other assets" in the consolidated balance sheet.

(3) The decrease from December 31, 1995 reflects the receipt of net
    insurance proceeds of $46.3 and the reclassification of $46.7 from
    "Asbestos-related insurance receivable" to "Notes receivable from
    insurance carriers - current" and "- noncurrent" as the result of a
    1996 settlement with an insurance carrier.

At September 30, 1996, settlements with certain insurance carriers
provided for the future receipt by Grace of $85.3, which Grace has
recorded as notes receivable (both current and noncurrent) of $76.2, net
of discounts. In the first nine months of 1996, Grace received net
proceeds of $139.1 pursuant to settlements with insurance carriers in
reimbursement for monies previously expended by Grace in connection with
asbestos-related lawsuits and claims; of this amount, $91.4 was received
pursuant to settlements entered into in 1993 through 1996, which had
previously been classified as notes receivable. Pursuant to settlements
with two groups of carriers in 1995, Grace will continue to receive
payments based on future cash outflows for asbestos-related lawsuits and
claims; such payments are estimated to represent approximately $202.8 of
the asbestos-related receivable of $228.2 at September 30, 1996.

Grace's ultimate exposure with respect to its asbestos-related lawsuits
and claims will depend on the extent to which its insurance will cover
damages for which it may be held liable, amounts paid in settlement and
litigation costs. However, in Grace's opinion (which is not based on a
formal opinion of counsel), it is probable that recoveries from its
insurance carriers (including amounts reflected in the receivable
discussed above), along with other funds, will be available to satisfy the
personal injury and property damage lawsuits and claims pending at
September 30, 1996, as well as personal injury lawsuits and claims
expected to be filed in the future. Consequently, Grace believes that the
resolution of its asbestos-related litigation will not have a material
adverse effect on its consolidated results of operations or financial
position.

For additional information, see Note 2 in the Prospectus.

I-6

Copyright 2001

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

3. ACQUISITIONS AND DIVESTMENTS - CONTINUING OPERATIONS

Acquisitions

In July 1996, Grace completed the acquisition of Cypress Packaging, Inc.
(Cypress), a manufacturer of flexible packaging. Cypress, with 1995 sales
of more than $20, is a leading supplier of plastic packaging materials for
the retail pre-cut produce market segment.

In August 1996, Grace acquired Bayem S.A. de C.V., a wholly owned
subsidiary of Grupo Zapata in Mexico that produces can coatings and
closure sealants for the rigid container industry, with 1995 sales in
excess of $10.

Divestments

In June 1996, Grace sold its water treatment and process chemicals
business to Betz Laboratories, Inc. The purchase price in the transaction
was $632.0, subject to certain adjustments, plus the assumption of certain
liabilities. As initially adjusted, the purchase price of $636.4 (which is
subject to further adjustment) was paid at closing as follows: $534.8 in
cash, a $100.0 promissory note (secured by a letter of credit) due in
January 1997, and a $1.6 promissory note paid in July 1996. The sales and
revenues of Grace's water treatment and process chemicals business for the
six months ended June 30, 1996 (through the date of sale) and nine months
ended September 30, 1995 were $201.2 and $300.0, respectively; its
financial position and results of operations were not significant to
Grace.

The divestments of this business and Grace's biopesticides business
resulted in a pretax gain of $326.4, and an after-tax gain of $210.1
($2.20 per common share of the Company), in continuing operations.

4. RESTRUCTURING COSTS

As discussed in Note 5 in the Prospectus, during the third quarter of 1995
Grace began implementing a worldwide program focused on streamlining
processes and reducing general and administrative expenses, factory
administration costs and noncore corporate research and development
expenses. In the third and fourth quarters of 1995, Grace recorded pretax
charges totaling $44.3 and $91.7 ($27.1 and $61.9 after-tax),
respectively, associated with the implementation of the restructuring
program.

As previously reported, Grace has implemented, and expects to continue to
implement, additional cost reduction and efficiency improvements beyond
those initiated in 1995, as it further evaluates and reengineers its
operations. In furtherance of those actions, in the second quarter of 1996
Grace recorded a pretax charge of $53.7 ($32.4 after-tax), principally
related to employee termination benefits and lease termination costs in
connection with the restructuring of Grace's European packaging operations.

I-7

Copyright 2001

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

## 5. DISCONTINUED OPERATIONS

### Health Care

As discussed in Note 1 above, on September 28, 1996 Grace New York
completed the spin-off of the Company and the combination of NMC with the
worldwide dialysis business of Fresenius. Prior to the completion of these
transactions, Grace received a tax-free distribution of approximately $2,300
(including assumed debt) from NMC. As part of the transactions, for each
Grace New York common share outstanding at the close of trading on
September 27, 1996, Grace New York shareholders received one share of a new
class of Grace New York preferred stock and 1.04909 American Depositary
Shares (ADS), each representing one-third of an ordinary share of FMC (which
collectively represent approximately 44.8% of FMC's common equity).

The distribution of approximately $2,300, along with the 44.8% common
equity interest in FMC valued at approximately $2,200 (based upon the number
of ADSs and their initial price per share on September 30, 1996), resulted
in a transaction valued at approximately $4,500. The total proceeds of
approximately $4,500, less Grace New York's investment in NMC and related
transaction costs, resulted in a pre- and after-tax gain of approximately
$2,500 ($26.09 per common share of the Company) in discontinued operations.
The 44.8% common equity interest in FMC is also reflected as a dividend of
approximately $2,200 within the shareholders' equity section of the
consolidated balance sheet at September 30, 1996. See Note 9 below for a
reconciliation of the changes in shareholders' equity for the nine-month
period ended September 30, 1996.

In connection with the transaction, NMC borrowed $2,500 under a
credit agreement. Grace has guaranteed $950 of those borrowings and
expects its guarantee to be released (1) as to $800, upon the occurrence
of certain events and subject to certain conditions, not later than
November 26, 1996 and (2) as to the remaining $150, upon the achievement
of certain financial ratios by NMC and certain affiliates. However, Grace
can give no assurance whether or to what extent the guarantees will be
released or when such release will occur. See "Financing" in the Joint
Proxy Statement-Prospectus for additional information.

Under the terms of the transaction, NMC will remain responsible for all
liabilities, if any, resulting from the previously reported investigation
by the Office of the Inspector General (OIG) of the U.S. Department of
Health and Human Services. In July 1996, an agreement was entered into
with the U.S. government under which, subject to certain conditions and
limitations, (i) FMC and Grace New York guaranteed the payment of the
obligations, if any, of NMC to the U.S. government in respect of the OIG
investigation and another proceeding; (ii) Grace guaranteed the
obligations of FMC under the foregoing guarantee with respect to acts and
transactions that took place prior to the consummation of the transaction
(but only if such obligations become due and payable and remain
uncollected for 120 days); and (iii) NMC delivered a standby letter of
credit in the principal amount of $150 in favor of the U.S. government to
support its payment of such obligations.

I-8

*Copyright 2001*

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

See Note 7 in the Prospectus, and "Business of Fresenius Medical Care --
Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG
Investigation" and "-- OIG Agreements" in the Joint Proxy
Statement-Prospectus, for additional information.

Discontinued Operations - Consolidated Statement of Operations

The sales and revenues and results of the discontinued health care
operations and the gains on the separation of NMC and the sale of the
transgenic plant business of Grace's Agracetus subsidiary (discussed
below) were as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 1996 | 1995 | 1996 | 1995 |
| Sales and revenues - health care | $ 545.5 | $ 520.9 | $1,650.7 | $1,536.2 |
| Income/(loss) from health care operations before income taxes | $ (17.3) | $ 23.6 | $ 59.8 | $ 127.7 |
| Provision for income taxes | 2.0 | 21.7 | 35.7 | 67.5 |
| Income/(loss) from health care operations | $ (19.3) | $ 1.9 | $ 24.1 | $ 60.2 |
| Gain on separation/sale of businesses | $2,473.7 | $ - | $2,602.7 | $ - |
| Provision for/(benefit from) income taxes on separation/sale of businesses | (10.0) | - | 39.6 | - |
| Net gain on separation/sale of businesses | $2,483.7 | $ - | $2,563.1 | $ - |
| Income from discontinued operations | $2,464.4 | $ 1.9 | $2,587.2 | $ 60.2 |

The operating results of Grace's cocoa business and other discontinued
operations have been charged against previously established reserves and
are, therefore, not reflected in the above results.

The net operating income of the health care business reflects an
allocation of Grace's interest expense ($25.1 and $23.0 for the third
quarters of 1996 and 1995, respectively, and $76.3 and $64.7 for the nine
months ended September 30, 1996 and 1995, respectively) based on a ratio
of the net assets of the health care business as compared to Grace's total
capital. Taxes have been allocated to the health care business as if it
were a stand-alone taxpayer; however, these allocations are not
necessarily indicative of the taxes attributable to the health care
business in the future. For the three and nine months ended September 30,
1995, net operating income of the health care business also reflects an
allocation of Grace's health care-related research expenses (Grace
management initiated the phase-out of certain of its health care research
programs in the third quarter of 1995).

In May 1996, Grace completed the sale of the transgenic plant business of
its Agracetus subsidiary to the Monsanto Company for $150.0 in cash,
resulting in a pretax gain of $129.0 and an after-tax gain of $79.4 ($0.83
per common share of the Company) in discontinued operations.

I-9

Copyright 2001

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

Discontinued Operations - Consolidated Balance Sheet

The net assets, excluding intercompany assets, of Grace's discontinued
operations included in the consolidated balance sheet at September 30,
1996, were as follows:

|  | Cocoa | Other | Total |
|---|---|---|---|
| Current assets | $296.2 | $ 32.3 | $328.5 |
| Properties and equipment, net | 178.8 | 24.7 | 203.5 |
| Investments in and advances to affiliated companies | - | 40.6 | 40.6 |
| Other assets | 61.2 | 24.6 | 85.8 |
| Total assets | $536.2 | $ 122.2 | $658.4 |
| Current liabilities | $179.1 | $ 23.5 | $202.6 |
| Other liabilities | 79.1 | 6.9 | 86.0 |
| Total liabilities | $258.2 | $ 30.4 | $288.6 |
| Net assets | $278.0 | $ 91.8 | $369.8 |

Minority interest consists of a limited partnership interest in Grace
Cocoa Associates, L.P. (LP). LP's assets consist of Grace Cocoa's
worldwide cocoa and chocolate business, long-term notes and demand loans
due from various Grace entities and guaranteed by the Company and its
principal operating subsidiary, and cash. LP is a separate and distinct
legal entity from each of the Grace entities and has separate assets,
liabilities, business functions and operations. For financial reporting
purposes, the assets, liabilities, results of operations and cash flows of
LP are included in Grace's consolidated financial statements as components
of discontinued operations and the outside investors' interest in LP is
reflected as a minority interest. The intercompany notes held by LP are
eliminated in preparing the consolidated financial statements and,
therefore, have not been classified as pertaining to discontinued
operations.

6.  **PENSION PLANS AND OTHER POSTRETIREMENT BENEFIT PLANS**

As described in Notes 16 and 17 in the Prospectus, Grace maintains defined
benefit pension plans covering employees of certain units who meet age and
service requirements, and provides certain postretirement health care and
life insurance benefits for retired employees of specified U.S. units.
Effective in the third quarter of 1996, Grace, in conjunction with a plan
curtailment, reassessed the discount rate used to value future pension
obligations for its principal U.S. plan and changed the rate from 7.25% to
8.00%. This change is not expected to have a material impact on results of
operations.

I-10

*Copyright 2001*

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

## 7. STOCK INCENTIVE PLANS

As described in Note 15 in the Prospectus, stock options are granted under the Company's stock incentive plans. In connection with the transactions described in Notes 1 and 5 above, the number of shares covered by outstanding options and the exercise prices of such options were adjusted to preserve their economic value. The following table sets forth information relative to such options, as adjusted:

|  | Number of Shares | Average Exercise Price |
|---|---|---|
| Balance at December 31, 1995, as adjusted................ | 8,833,450 | $26.06 |
| Options granted......................................... | 984,818 | 51.43 |
|  | 9,818,268 |  |
| Options exercised....................................... | (2,710,055) | 24.90 |
| Options terminated or canceled.......................... | (367,763) | 28.08 |
| Balance at September 30, 1996........................... | 6,740,450 | 30.12 |

At September 30, 1996, options covering 4,726,562 shares were exercisable and 7,000,000 shares were available for additional grants. Currently outstanding options expire on various dates between October 1996 and May 2006.

## 8. INVENTORIES

Components of Grace's inventories were as follows:

|  | September 30, 1996 | December 31, 1995 |
|---|---|---|
| Raw and packaging materials | $111.6 | $137.1 |
| In process | 75.0 | 78.0 |
| Finished products | 277.1 | 325.2 |
|  | $463.7 | $540.3 |
| Less: Adjustment of certain inventories to a last-in/first-out (LIFO) basis | (48.4) | (48.4) |
| Total Inventories | $415.3 | $491.9 |

## 9. SHAREHOLDERS' EQUITY

Earnings per share are calculated on the basis of the following weighted average number of common shares outstanding:

|  | 1996 | 1995 |
|---|---|---|
| Three Months Ended September 30: ............. | 91,092,000 | 96,708,000 |
| Nine Months Ended September 30: .............. | 95,188,000 | 95,330,000 |

I-11

Copyright 2001

W. R. Grace & Co. and Subsidiaries
Notes to Consolidated Financial Statements
(Dollars in millions, except per share amounts)

The Company is authorized to issue 300,000,000 shares of common stock. Of
the common stock unissued at September 30, 1996, approximately 13,815,000
shares were reserved for issuance pursuant to stock options and other
stock incentives.

The Certificate of Incorporation also authorizes 53,000,000 shares of
preferred stock, $.01 par value, none of which has been issued. 3,000,000
of such shares have been designated Junior Participating Preferred Stock
and are reserved for issuance in connection with the Company's Preferred
Stock Purchase Rights (Rights). A Right trades together with each
outstanding share of common stock and entitles the holder to purchase
one-hundredth of a share of Junior Participating Preferred Stock under
certain circumstances and subject to certain conditions. The Rights are
not and will not become exercisable unless and until certain events occur,
and at no time will the Rights have any voting power.

The changes in shareholders' equity for the nine-month period ended
September 30, 1996 are as follows:

| | Preferred Stocks | Common Stock | Paid in Capital | Retained Earnings | Cumulative Translation Adjustments | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|
| Balance at January 1, 1996.................. | $ 7.4 | $ 97.4 | $ 459.8 | $ 709.0 | $ (39.4) | $ (2.4) | $ 1,231.8 |
| Net income................................... | -- | -- | -- | 2,917.4 | -- | -- | 2,917.4 |
| Cash dividends paid.......................... | -- | -- | -- | (36.0) | -- | -- | (36.0) |
| Dividend of common equity interest in FMC.. | -- | -- | -- | (2,172.3) | -- | -- | (2,172.3) |
| Stock options and awards.................... | -- | 1.4 | 50 6 | -- | -- | -- | 52.0 |
| Purchase of common stock.................... | -- | -- | -- | -- | -- | (727.1) | (727.1) |
| Shares issued under stock option plans..... | -- | -- | 1.6 | -- | -- | 5.8 | 7.4 |
| Retirement of treasury stock....... ........ | -- | (9.8) | (51.1) | (662.8) | -- | 723.7 | -- |
| Change in par value of common stock........ | -- | (88.1) | 88.1 | -- | -- | -- | -- |
| Retirement of preferred stocks............. | (7.4) | -- | -- | 7.4 | -- | -- | -- |
| Translation adjustments.................... | -- | -- | -- | -- | (2.8) | -- | (2.8) |
| Balance at September 30, 1996.............. | $ -- | $ .9 | $ 549.0 | $ 762.7 | $ (42.2) | $ -- | $ 1,270.4 |

I-12

Copyright 2001

Item 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF
        OPERATIONS AND FINANCIAL CONDITION

REVIEW OF OPERATIONS

   Overview - Income from Continuing Operations

The first nine months of 1996 included an after-tax gain totaling $210.1
million ($326.4 million pretax) on the sale of businesses, primarily
Grace's water treatment and process chemicals business and its
biopesticides business, partially offset by an after-tax charge of $32.4
million ($53.7 million pretax) for restructuring costs. The third quarter
and first nine months of 1995 included an after-tax charge of $6.1 million
and $18.6 million ($10.0 million and $30.0 million pretax), respectively,
relating to corporate governance matters, as well as an after-tax charge
of $27.1 million ($44.3 million pretax) for restructuring costs. Excluding
the above items, income from continuing operations for the third quarter
of 1996 would have increased 5% as compared to the third quarter of 1995,
and income from continuing operations for the 1996 first nine months would
have increased by 14% over the first nine months of 1995.

   Operating Results - Continuing Operations

Grace's continuing operations consist principally of the development,
manufacture and sale of packaging and specialty chemical products and
systems. The following table compares the operating results for Grace's
continuing operations for the 1996 third quarter and first nine months to
those for the comparable periods of 1995 (dollars in millions):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 1996 | 1995 | 1996 | 1995 |
| Sales and revenues, before divested businesses/other | $ 821.3 | $ 810.0 | $2,401.3 | $2,344.4 |
| Sales and revenues of divested businesses/other (i) | - | 136.4 | 254.9 | 387.7 |
| Sales and revenues | $ 821.3 | $ 946.4 | $2,656.2 | $2,732.1 |
| Operating income before taxes (ii) | $ 108.2 | $ 96.7 | $ 294.2 | $ 250.4 |
| Gain on sales of businesses | - | - | 326.4 | - |
| Restructuring costs | - | (44.3) | (53.7) | (44.3) |
| Provision for corporate governance | - | (10.0) | - | (30.0) |
| Interest expense/financing costs (iii) | (18.2) | (17.8) | (54.9) | (52.3) |
| Other income/(expenses), net (iii) | 1.0 | .5 | 8.6 | (2.5) |
| Income from continuing operations before income taxes | $ 91.0 | $ 25.1 | $ 520.6 | $ 121.3 |

- --------------------------------------------------------------------------

   (i)   Primarily comprised of the water treatment business, divested in the
         second quarter of 1996.
   (ii)  Reflects the allocation of general corporate overhead, general
         corporate research expenses and certain other income and expense
         items that can be identified with continuing operations.
   (iii) Corporate interest and financing costs and nonallocable expenses are
         not reflected in the results of continuing operations. Corporate
         interest and financing costs are not allocated to continuing
         operations because significant financing decisions are centralized
         at the corporate level.

                                I-13

Copyright 2001

Management's Discussion and Analysis of Results of Operations and
Financial Condition (Continued)

The 2% increase in sales and revenues before divested businesses/other for
the third quarter of 1996 reflected a favorable volume variance estimated
at 4% (with increased volumes in all product lines), offset by unfavorable
price/product mix and currency translation variances estimated at 2%. The
2% increase in sales and revenues before divested businesses/other for the
first nine months of 1996 reflected a favorable volume variance estimated
at 4%, offset by unfavorable price/product mix and currency translation
variances estimated at 1% each. The following is a discussion of the sales
and revenues of Grace's product lines for the 1996 and 1995 third
quarters.

o  PACKAGING - Volume increases were offset by unfavorable price/product
   mix variances, resulting in essentially flat sales for the 1996 quarter
   versus 1995. Sales of bags declined, particularly (1) in North America,
   due to lower sales in the processed (smoked and cured) meat segment as
   a result of continued higher pork prices, and (2) in Asia Pacific,
   caused by the lower consumption of beef due to consumer fears
   associated with the outbreak of E. coli bacteria and bovine spongiform
   encephalopathy - commonly referred to as "mad cow disease", partially
   offset by (3) sales increases in Latin America due to an improving
   economy in Argentina and increased cattle slaughter rates in Uruguay.
   Sales of bags in Europe for the 1996 third quarter were comparable to
   the 1995 quarter despite the impact of mad cow disease.

   Sales of films were down, primarily in North America and Asia Pacific,
   due to continued pricing pressures. European sales increased due to
   improved demand from the bakery segment due to stronger sales in the
   organized retail level in the U.K., along with growth in Italy and
   Holland due to market share gains. European display sales increased as
   a result of sales of new products. Laminate sales were flat, as improved
   sales in the processed and prepared foods segment from new product
   applications in Asia Pacific were offset by a decline in the rollstock
   segment in North America as a result of higher pork prices.

o  CONTAINER - Volume increases from improved market penetration of can
   coating products in Latin America were offset by sales declines of
   closure compounds. Lower consumer demand for beverage products in Europe
   and market share loss in Asia Pacific led to decreased sales of closure
   compounds for the 1996 quarter versus the 1995 quarter. European can
   sealing sales were up slightly due to market share gains.

o  CATALYSTS AND OTHER SILICA-BASED PRODUCTS - Sales declined slightly, as
   higher sales of polyolefin catalysts and silica/adsorbents were offset
   by a sales decline in refinery catalysts. The decline in refinery
   catalysts in North America and Europe, caused by pricing pressures,
   were partially offset by continued growth in Asia Pacific. Polyolefin
   catalyst sales continue to be positively impacted by the strong resin
   market, while silica/adsorbent sales benefited from new product
   applications in Europe and Asia Pacific.

o  CONSTRUCTION PRODUCTS - Sales increased in all regions and within all
   products, especially in North America, as volumes in concrete and
   waterproofing products improved from growth in housing starts and
   projects. Also significantly contributing to the increase was the
   positive impact from market share gains in Asia Pacific concrete
   products.

                                   I-14

Copyright 2001

Management's Discussion and Analysis of Results of Operations and
Financial Condition (Continued)

Operating income before taxes increased by 12% in the third quarter of
1996 as compared to the 1995 third quarter, as cost management programs
continued to favorably impact results across all regions and product
lines. In addition, regional results included the following operational
highlights:

o  NORTH AMERICA - Sales volume increases in construction products
   were partially offset by lower gross profit in packaging due to the
   volume declines in bags and films, discussed above.

o  EUROPE - Results were favorably impacted by the volume increases in
   construction products and silica/adsorbents, discussed above.

o  ASIA PACIFIC - Volume increases from catalysts and other silica-based
   products were partially offset by declines in gross profit in packaging
   due to the volume declines in bags and films, discussed above.

o  LATIN AMERICA - Results versus the 1995 third quarter were favorably
   impacted by the volume increases in bags, discussed above.

For the first nine months of 1996, operating income increased 17% over
1995, primarily due to growth in construction products and catalysts and
other silica-based products, as discussed above. This growth was partially
offset by the flat sales and unfavorable product mix from packaging due to
a volume decline in the European and Asia Pacific bag market as a result
of lower beef consumption levels, as previously discussed.

     Statement of Operations

Other Income

Other income includes interest income, dividends, royalties from licensing
agreements and equity in earnings of affiliated companies. Included in
other income in the first nine months of 1996 was interest income of $7.5
million relating to the settlement of prior years' Federal income tax
returns.

Interest Expense and Related Financing Costs

Interest expense and related financing costs of $18.2 million and $54.9
million (excluding amounts allocated to discontinued operations) in the
third quarter and first nine months of 1996, respectively, increased 2%
and 5%, respectively, versus the comparable 1995 periods. Including
amounts allocated to discontinued operations, interest expense and related
financing costs increased 6% and 12% in the third quarter and first nine
months of 1996, respectively, over the comparable 1995 periods, to $43.3
million and $131.2 million, respectively. The overall increase in interest
expense and related financing costs is primarily due to higher average
debt levels, partially offset by lower average effective interest rates.

See "Financial Condition: Liquidity and Capital Resources" below for
information on borrowings.

I-15

*Copyright 2001*

Management's Discussion and Analysis of Results of Operations and
Financial Condition (Continued)

Research and Development Expenses

Research and development spending decreased 17% and 13% in the third
quarter and first nine months of 1996, respectively, versus the 1995
periods, reflecting cost management programs. Research and development
spending for 1996 has been directed to Grace's continuing packaging and
specialty chemicals businesses.

Research and development spending is expensed as incurred. Research is
carried out by product line laboratories in North America, Europe, Latin
America and Asia Pacific and at a corporate research facility in the U.S.
Corporate research spending is generally charged to the product lines,
based upon the costs incurred on projects directly sponsored by the
product lines.

Restructuring Costs

See Note 4 in this Report for information relating to restructuring costs.

Income Taxes

The effective tax rates were 39.0% and 36.6%, respectively, for the third
quarter and first nine months of 1996, compared with 21.1% and 27.7%,
respectively, for the comparable periods in 1995. Excluding the items
discussed in "Overview - Income from Continuing Operations" above, Grace's
effective tax rates would have been 33.2% for the third quarter of 1995
and 38.5% and 31.8% for the first nine months of 1996 and 1995,
respectively.

The effective tax rates in the third quarter and first nine months of 1995
reflected a lower overall foreign tax rate than is currently experienced,
as the result of a reassessment of the valuation allowance for certain
deferred tax assets.

Income from Discontinued Operations

As discussed in Notes 1 and 5 in this Report, on September 28, 1996, Grace
New York completed the spin-off of the Company and the combination of
NMC with the worldwide dialysis business of Fresenius. The following table
compares the results for health care operations for the 1996 third quarter
and first nine months to results for the comparable periods of 1995
(dollars in millions):

|                                    | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|------------------------------------|----------|----------|-----------|-----------|
|                                    | 1996     | 1995     | 1996      | 1995      |
| Sales and revenues                 | $  545.5 | $  520.9 | $1,650.7  | $1,536.2  |
| Operating income before taxes (i)  | $    7.8 | $   46.6 | $  136.1  | $  192.4  |

-----------------------------------------------------------------------------------------

(i)  The above operating results do not include interest expense allocated
     to the discontinued health care business of $25.1 and $23.0 for the
     third quarters of 1996 and 1995, respectively, and $76.3 and $64.7
     for the first nine months of 1996 and 1995, respectively.

I-16

Copyright 2001

Management's Discussion and Analysis of Results of Operations and
Financial Condition (Continued)

Health care sales and revenues for the third quarter and first nine months
of 1996 increased by 5% and 7%, respectively, over the comparable periods
of 1995. These improvements were due to increases in revenues from kidney
dialysis services and medical products operations in both periods, largely
due to the effect of acquisitions subsequent to the first nine months of
1995. Partially offsetting the first nine months of 1996 increase was the
decision, effective July 1, 1995, to discontinue recognizing incremental
revenue relating to certain dual eligible end stage renal disease patients
due to the previously reported impact of the Omnibus Budget Reconciliation
Act of 1993 (OBRA 93) on the payment of benefits under Medicare and
employer health plans for certain dual eligible end stage renal disease
patients. The number of centers providing dialysis and related services
increased 11%, from 657 at September 30, 1995 to 732 at September 28, 1996
(607 in North America, 65 in Europe, 41 in Latin America and 19 in Asia
Pacific). The improvements in dialysis services and medical products
operations were partially offset by decreases in both the third quarter
and first nine months of 1996 in home health care revenues resulting from
a decrease in infusion therapy revenues, principally intradialytic
parenteral nutrition (IDPN) therapy, due to continued managed care pricing
pressure.

Operating income before taxes in the third quarter and first nine months
of 1996 decreased by 83% and 29%, respectively, over the 1995 periods. In
the third quarters of 1996 and 1995, operating income was affected by
various nonrecurring charges, primarily relating to asset impairments. As
previously discussed, operations were negatively affected by the effects
of OBRA 93 (which reduced revenues without a commensurate decrease in
costs) on kidney dialysis services results and a reduction in home health
care operating income due to the decreased revenues associated with IDPN
therapy, discussed above. Offsetting these items was the increase in
earnings from medical products operations due to the increased revenues
discussed above, as well as increased treatment volume in kidney dialysis
services which was positively impacted by the effects of acquisitions and
the increased number of centers providing dialysis and related services.

As previously reported, certain matters could materially adversely affect
NMC's business, financial position and results of operations. For a
discussion of these items, see Note 7 in the Prospectus and "Business of
Fresenius Medical Care -- Regulatory and Legal Matters" in the Joint Proxy
Statement-Prospectus.


FINANCIAL CONDITION; LIQUIDITY AND CAPITAL RESOURCES

During the first nine months of 1996, the net pretax cash provided by
Grace's continuing operating activities was essentially flat at $150.5
million, versus $150.7 million in the first nine months of 1995. A
reduction in cash inflows from settlements with certain insurance carriers
(in connection with asbestos-related litigation) net of amounts paid for
the defense and disposition of asbestos-related litigation of $52.5
million in the first nine months of 1996 as compared to $77.7 million in
the first nine months of 1995 was largely offset by improved operating
results. After giving effect to the net pretax cash provided by operating
activities of discontinued operations and payments of income taxes, the
net cash provided by operating activities increased by $122.9 million in
the first nine months of 1996 versus the first nine months of 1995.

I-17

Copyright 2001

Management's Discussion and Analysis of Results of Operations and
Financial Condition (Continued)

Investing activities provided $2,277.9 million of cash in the first nine
months of 1996, largely reflecting the net cash proceeds of $2,802.9
million from the divestments of businesses (excluding a $100.0 million
promissory note received on the sale of the water treatment and process
chemicals business and the 44.8% common equity interest in FMC valued at
approximately $2.2 billion). Capital expenditures of $335.3 million have
been made for the first nine months of 1996, primarily related to the
packaging and catalyst and other silica-based businesses. Also, investing
activities of discontinued operations for the first nine months of 1996
used $181.2 million (compared to $149.1 million used in the first nine
months of 1995), primarily reflecting the classification of the health
care business as a discontinued operation in the 1995 second quarter.
Management anticipates that total capital expenditures for 1996 will not
exceed the 1995 expenditure level.

Net cash used for financing activities in the first nine months of 1996
was $1,935.9 million, primarily reflecting reductions in debt, the
repurchase of stock (discussed below), and the payment of dividends,
partially offset by proceeds from the exercise of employee stock options.
Total debt was $896.9 million at September 30, 1996, reflecting a decrease
of $1,036.9 million from December 31, 1995. Grace's total debt as a
percentage of total capital (debt ratio) decreased from 61.1% at December
31, 1995 to 41.4% at September 30, 1996. As of September 30, 1996, Grace
canceled agreements to sell up to $300 million of interests in designated
pools of trade receivables, $180 million of which pertained to NMC. At
December 31, 1995, $295.8 million had been received pursuant to such
sales, $179.8 million of which pertained to NMC.

Grace is targeting a ratio of net debt to earnings before interest, taxes,
deprecation and amortization of between 1.6 and 2.0 following the
completion of pending divestments. Accordingly, the cash received from
divestments is being used to reduce debt and repurchase shares.

Grace New York initiated its previously announced share repurchase program
in April 1996. As of September 27, 1996, Grace New York had acquired
9,864,800 shares under this program at a cost of approximately $727.1
million or an average price of approximately $73.70 per share. This
average price per share does not reflect the NMC transactions described
in Notes 1 and 5 in this Report. Under the Company's program to repurchase
up to 20% of the shares outstanding following the NMC transaction, as of
November 14, 1996 the Company had repurchased 8,020,800 shares at a cost of
approximately $423.0 million (or an average price of approximately $52.74
per share).

At September 30, 1996, the Company held cash and cash equivalents of
$491.6 million in anticipation of continuing share repurchase activity.
This balance has been substantially eliminated as a result of the share
repurchases described above.

In May 1996, Grace entered into a new credit agreement providing for total
borrowings of $1.85 billion and terminated three previous agreements
providing for total borrowings of $850 million. On November 27, 1996, the
total borrowings available under the new credit

I-18

*Copyright 2001*

Management's Discussion and Analysis of Results of Operations and
Financial Condition (Continued)

agreement will be reduced to $650 million. In addition, Grace continues to
have $350 million available under a separate long-term facility expiring
on September 1, 1999.

See Note 5 in this Report for information concerning an agreement reached
with the U.S. government regarding the OIG investigation.

In July 1996, Grace completed the acquisition of Cypress Packaging, Inc.
(Cypress), a manufacturer of flexible packaging. Cypress, with 1995 sales
of more than $20 million, is a leading supplier of plastic packaging
materials for the retail pre-cut produce market segment. The acquisition
of Cypress is in lieu of the previously announced plan to construct a $50
million plant in Seneca, South Carolina to serve the fresh-cut produce
market.

In October 1996, Grace announced that it expects to divest four noncore
businesses within the next three to six months. The businesses to be sold
are Grace TEC Systems and Grace Specialty Polymers, as well as Grace Cocoa
and Amicon (a bioseparation sciences business), previously classified as
discontinued operations. Grace expects to receive approximately $300
million in pre-tax proceeds from the divestitures, net of satisfaction of
minority interest and other obligations associated with Grace Cocoa.

Asbestos-Related Matters

As reported in Note 2 in this Report, Grace is a defendant in property
damage and personal injury lawsuits relating to previously sold
asbestos-containing products and is involved in related litigation with
certain of its insurance carriers. As also indicated therein, the amounts
reflected in the consolidated financial statements with respect to the
probable cost of defending against and disposing of asbestos-related
lawsuits and claims and probable recoveries from insurance carriers
represent estimates; neither the outcomes of such lawsuits and claims nor
the outcomes of Grace's continuing litigations with certain of its
insurance carriers can be predicted with certainty. In the first nine
months of 1996, Grace received $52.5 million under settlements with
certain insurance carriers, net of amounts paid for the defense and
disposition of asbestos-related property damage and personal injury
litigation. The balance sheet at September 30, 1996 includes a $228.2
million receivable due from insurance carriers, a portion of which is
subject to litigation. Grace has also recorded notes receivable of $85.3
million ($76.2 million, net of discounts) for amounts to be received in
1996 to 2001 pursuant to settlement agreements with certain insurance
carriers.

Environmental Matters

During the third quarter of 1996, Grace settled a lawsuit with Hatco
Corporation (see Item 1 of Part I in this Report); this settlement is not
expected to significantly affect Grace's liquidity. There were no other
significant developments relating to environmental liabilities in the
first nine months of 1996.

For additional information relating to environmental liabilities, see Note
12 in the Prospectus.

I-19

*Copyright 2001*

**PART II - OTHER INFORMATION**

Item 1.   Legal Proceedings.

(a) Note (b) to the Consolidated Financial Statements in Part I of this Report is incorporated herein by reference.

(b) In September 1996, Grace settled the lawsuit instituted by Hatco Corporation ("Hatco"), which is described in the Prospectus under the heading "Business of Grace Chemicals -- Legal Proceedings and Regulatory Matters -- Environmental Proceedings." In addition, subject to the execution of definitive agreements, Grace and its insurance carriers have agreed on the terms of a settlement of the related lawsuit in which Grace sought indemnity from such carriers against any damages and defense costs incurred by Grace as a result of the Hatco lawsuit. Under the settlements, Grace will be required to pay a percentage of future remediation costs (which percentage will vary based upon the total amount of such costs), and the insurance carriers will pay Grace a specified amount. Grace believes that the amounts it will be required to pay in connection with the settlement of the Hatco lawsuit (net of recoveries expected from insurance carriers) will not exceed Grace's established reserves.

Item 4.   Submission of Matters to a Vote of Security Holders.

On September 16, 1996, the Company's predecessor, W. R. Grace & Co., a New York corporation subsequently renamed Fresenius National Medical Care Holdings, Inc. ("Grace New York"), held a special meeting of shareholders ("Special Meeting"). At the Special Meeting, Grace New York's shareholders (a) adopted and

II-1

*Copyright 2001*

approved the Agreement and Plan of Reorganization, dated as of February 4, 1996, between Grace New York and Fresenius AG, related agreements, and the transactions contemplated thereby and (b) adopted and approved an amendment to Grace New York's Certificate of Incorporation.

The following sets forth the results of voting at the Special Meeting:

|  | VOTES | | | |
|---|---|---|---|---|
| MATTER | FOR | AGAINST | ABSTENTIONS | BROKER NON-VOTES |
| - ------ | --- | ------- | ----------- | ---------------- |
| Agreement and Plan of Reorganization | 76,330,692 | 681,952 | 443,917 | 283,510 |
| Amendment to Certificate of Incorporation | 72,900,256 | 4,356,893 | 477,817 | 5,104 |

Item 5.  Other Information.

On October 22, 1996, Grace announced that it expects to divest four noncore businesses within the next three to six months. The businesses to be sold are Grace TEC Systems and Grace Specialty Polymers, as well as Grace Cocoa and Amicon, previously classified as discontinued operations.

In August 1996, Grace acquired Bayem S.A. de C.V., a wholly owned subsidiary of Grupo Zapata in Mexico that produces can coatings and closure sealants for the rigid container industry, with 1995 sales in excess of $10 million.

II-2

*Copyright 2001*

Item 6.   Exhibits and Reports on Form 8-K.

     (a) Exhibits. The following are being filed as exhibits to this Report:

        -- weighted average number of shares and earnings used in per share computations

        -- computation of ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends

        -- financial data schedule

     (b) Reports on Form 8-K. On July 11, 1996, Grace New York filed a Report on Form 8-K relating to the sale of the business and assets of Grace's Dearborn water treatment and process chemicals business to Betz Laboratories, Inc. Grace New York filed a Report on Form 8-K on August 9, 1996, relating to the announcement of 1996 second quarter results. The Company filed a Report on Form 8-K on October 10, 1996, relating to Grace New York's distribution of all of the shares of the Company's outstanding common stock to the holders of Grace New York's common stock on a one-for-one basis. The Company also filed a Report on Form 8-K on November 8, 1996, relating to the announcement of 1996 third quarter results.

II-3

*Copyright 2001*

**SIGNATURE**
---------

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

                              W. R. GRACE & CO.
                              -------------------------
                                    (Registrant)


Date: November 14, 1996          By /s/ Kathleen A. Browne
                                 -------------------------
                                    Kathleen A. Browne
                                 Vice President and Controller
                                 (Principal Accounting Officer)


                              II-4

*Copyright 2001*

W. R. GRACE & CO.

QUARTERLY REPORT ON FORM 10-Q
FOR THE QUARTER ENDED SEPTEMBER 30, 1996

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 11 | Weighted average number of shares and earnings used in per share computations |
| 12 | Computation of ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends |
| 27 | Financial Data Schedule |

EXHIBIT 11

W. R. GRACE & CO. AND SUBSIDIARIES
WEIGHTED AVERAGE NUMBER OF SHARES AND EARNINGS USED IN PER SHARE COMPUTATIONS
(Unaudited)

The weighted average number of shares of Common Stock outstanding were as follows (in thousands):

|  | 3 Mos. Ended | | 9 Mos. Ended | |
|---|---|---|---|---|
|  | 9/30/96 | 9/30/95 | 9/30/96 | 9/30/95 |
| Weighted average number of shares of Common Stock outstanding | 91,092 | 96,708 | 95,188 | 95,330 |
| Additional dilutive effect of outstanding options (as determined by the application of the treasury stock method) | 2,826 | 2,392 | 2,826 | 2,392 |
| Weighted average number of shares of Common Stock outstanding assuming full dilution | 93,918 | 99,100 | 98,014 | 97,722 |

Income used in the computation of earnings per share were as follows (in millions except per share):

|  | 3 Mos. Ended | | 9 Mos. Ended | |
|---|---|---|---|---|
|  | 9/30/96 | 9/30/95 | 9/30/96 | 9/30/95 |
| Net income | $2,519.9 | $ 21.7 | $2,917.4 | $ 147.9 |
| Dividends paid on preferred stocks | (.1) | (.1) | (.4) | (.4) |
| Income used in per share computation of earnings and in per share computation of | | | | |

Copyright 2001

```
earnings assuming full dilution...........     $2,519.8   $   21.6   $2,917.0   $
147.5

                                               ========   ========   ========
========

Earnings per share............................  $  27.66   $    .22   $  30.64   $
1.55

Earnings per share assuming full dilution....  $  26.83   $    .22   $  29.76   $
1.51
```

EXHIBIT 12

**W. R. GRACE & CO. AND SUBSIDIARIES**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND**
**COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS**
(in millions except ratios)
(Unaudited)

| | Nine Months Ended September 30, | | | Years Ended December 31, | | | |
|---|---|---|---|---|---|---|---|
| | 1996 (f) | 1995 (g) | 1991 | 1995 (b) | 1994 (c) | 1993 (d) | 1992 (e) |
| Net (loss)/income from continuing operations | $ 330.2 | $  87.7 | $157.4 | $ (196.6) | $ (41.4) | $  19.1 | $   1.4 |
| Add/(deduct): | | | | | | | |
| (Benefit from)/provision for income taxes | 190.4 | 33.6 | 99.1 | (115.8) | (46.6) | 10.1 | 79.9 |
| Income taxes of 50%-owned companies.... | - | - | 1.5 | - | - | .1 | 2.1 |
| Equity in unremitted losses/(earnings) of less than 50%-owned companies..... | .1 | (.7) | (.9) | .8 | (.6) | (.5) | (2.0) |
| Interest expense and related financing costs, including amortization of capitalized interest | 139.1 | 127.8 | 209.6 | 179.8 | 138.5 | 122.7 | 162.7 |
| Estimated amount of rental expense deemed to represent the interest factor | 8.5 | 7.7 | 12.7 | 8.5 | 10.1 | 11.3 | 14.0 |
| (Loss)/Income as adjusted................. | $ 668.3 | $ 256.1 | $479.4 | $ (123.3) | $  60.0 | $ 162.8 | $ 258.1 |
| Combined fixed charges and preferred stock dividends: | | | | | | | |
| Interest expense and related financing costs, including capitalized interest....... | $ 154.2 | $ 138.9 | $224.5 | $ 195.5 | $ 143.2 | $ 122.8 | $ 176.3 |
| Estimated amount of rental expense deemed to represent the interest factor | 8.5 | 7.7 | 12.7 | 8.5 | 10.1 | 11.3 | 14.0 |

Copyright 2001

```
Fixed charges............................        204.0     153.3     134.1     190.3
237.2     162.7     146.6

Preferred stock dividend requirements (a).          .5        .5        .8        .8
.9        .6        .6
                                                 ---------  ---------  ---------  ---------
------  ---------  ---------

Combined fixed charges and preferred
  stock dividends.......................      $ 204.5   $ 153.8   $ 134.9   $ 191.1
$238.1  $ 163.3  $ 147.2
                                                 =========  =========  =========  =========
======  =========  =========

Ratio of earnings to fixed charges...            (h)       (h)       1.21      1.36
2.02      4.11      1.75
                                                 =========  =========  =========  =========
======  =========  =========

Ratio of earnings to combined fixed charges
  and preferred stock dividends..........        (h)       (h)       1.21      1.35
2.01      4.09      1.74
                                                 =========  =========  =========  =========
======  =========  =========
```

(a) For each period with an income tax provision, the preferred stock
    dividend requirements are increased to include the pretax earnings
    required to cover such requirements based on Grace's effective tax
    rate for that period.
(b) Includes pretax provisions of $275.0 for asbestos-related liabilities
    and insurance coverage; $220.0 relating to restructuring costs, asset
    impairments and other activities; $77.0 for environmental liabilities
    at former manufacturing sites; and $30.0 for corporate governance
    activities.
(c) Includes a pretax provision of $316.0 relating to asbestos-related
    liabilities and insurance coverage.
(d) Includes a pretax provision of $159.0 relating to asbestos-related
    liabilities and insurance coverage.
(e) Includes a pretax provision of $140.0 relating to a fumed silica plant
    in Belgium.
(f) Includes a pretax gain of $326.4 on the sales of businesses,
    principally the water treatment and process chemicals business, offset
    by a pretax provision of $53.7 relating to restructuring costs.
(g) Includes pretax provisions of $44.3 relating to restructuring costs
    and $30.0 for corporate governance activities.
(h) As a result of the losses incurred for the years ended December 31,
    1995 and 1994, Grace was unable to fully cover the indicated fixed
    charges.

```
                         5
                             1,000


                     9-MOS
                             DEC-31-1996
                             JAN-01-1996
                             SEP-30-1996
                                491,600
                                      0
                                765,900
                                      0
                                415,300
                              2,287,600
                              3,262,000
                              1,428,400
```

Copyright 2001

```
                    5,346,800
                    1,828,000
                      741,600
                            0
                            0
                          900
                    1,269,500
                    5,346,800
                    2,656,200
                    2,682,300
                    1,607,700
                    1,607,700
                            0
                            0
                       54,900
                      520,600
                      190,400
                      330,200
                    2,587,200
                            0
                            0
                    2,917,400
                        30.64
                        29.76
```

Amount shown is net of allowances.

Included within current assets are net assets of
discontinued operations of $369,800.

Excludes sales reported by the discontinued health
care segment of $1,650,700 for the first nine months
of 1996.

Includes (i) a gain of $326,400 ($210,100 after-tax)
on the sales of businesses, principally the water
treatment and process chemicals business, and (ii) a
charge of $53,700 ($32,400 after-tax) relating to
restructuring costs.

Includes (i) after-tax income of $24,100 from health care
operations, (ii) an after-tax gain of $2,483,700 on the
separation of National Medical Care, Inc. and (iii) an
after-tax gain of $79,400 on the sale of the transgenic
plant business of Grace's Agracetus subsidiary.

---

**Created by 10KWizard Technology.**

*Copyright 2001*