UNITED STATES BANKRUPTCY COURT **FILED**
DISTRICT OF DELAWARE

2002 JAN 18  AM 10: 07

IN RE:                              . Case No. 01-1139 (JKK)
                                    .          US BANKRUPTCY COURT
                                    .          DISTRICT OF DELAWARE
                                    .
  W.R. GRACE & CO., et al.,         .
                                    . 5414 USX Tower Building
                                    . Pittsburgh, PA 15222
                Debtor.             .
                                    . January 3, 2002
. . . . . . . . . . . . . . . . . . 10:01 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Kirkland & Ellis
                             By:   DAVID M. BERNICK, ESQ.
                                   JAMES KAPP, ESQ.
                             200 East Randolph Dr.
                             Chicago, IL  60601

                             WILLIAM J.A. SPARKS, ESQ.
                             Senior Litigation Counsel
                             W.R. Grace & Co.
                             5400 Broken Sound Blvd., NW
                             Boca Raton, FL  33487-3511

                             Pachulski Stang Ziehl Young &
                              Jones
                             By: DAVID W. CARICKHOFF, JR.,ESQ.
                                 LAURA DAVIS JONES, ESQ.
                             919 North Market Street, 16th Fl.
                             P.O. Box 8705
                             Wilmington, DE  19899-8705

Audio Operator:              Cathy Younker

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For Exxon Mobil Corp.
Greenberg Traurig LLP
By:   ADAM D. COLE, ESQ.
885 Third Avenue
New York, NY   10022

SCOTT D. COUSINS, ESQ.
WILLIAM CHIPMAN, JR., ESQ.
The Brandywine Bldg.
1000 West Street, Suite 1540
Wilmington, DE   19801

Local Counsel to Asbestos
Claimants:
Campell & Levine LLC
By: MATTHEW G. ZALESKI, III, ESQ.
1201 N. Market St.
Chase Manhattan Centre, 15th Flr.
Wilmington, DE   19801

U.S. Trustee's Office:
Office of the U.S. Trustee
By:   FRANK PERCH, ESQ.
844 King Street
Wilmington, DE   19801

For Etergy Services, Inc.:
Klett Rooney Lieber & Schorling
By:   JEFFREY DELLER, ESQ.

For the Official Committee
of Unsecured Creditors:
Duane Morris & Hackscher LLP
By:   MICHAEL R. LASTOWSKI, ESQ.
1100 North Market St., Suite 1200
Wilmington, DE   19801-1246

Stroock & Stroock & Lavan LLP
By:   KENNETH PASQUALE, ESQ.
180 Maiden Lane
New York, NY   10038-4982

For Wachovia Bank NA:
Klett Rooney Lieber & Schorling
By:   ADAM G. LANDIS, ESQ.
1000 West Street, Suite 1410
Wilmington, DE   19801

For Official Committee of
Asbestos Property Damage
Claimants:
Bilzin Sumberg Dunn Baena Price
 & Axelrod LLP
By:   SCOTT L. BAENA, ESQ.
     JAY M. SAKALO, ESQ.
2500 First Union Financial Ctr.
200 South Biscayne Blvd.
Miami, FL   33131-2336

APPEARANCES (Cont'd.):

|  | Ferry & Joseph, P.A.<br>By:  THEODORE J. TACCONELLI, ESQ.<br>824 Market St., Suite 904<br>Wilmington, DE  19899 |
|---|---|
| For Ace Insurance: | White and Williams LLP<br>By: ROSS A. GIORGIANNI, ESQ.<br>437 Grant Street, Suite 1001<br>Pittsburgh, PA  15219 |
| For Sealed Air Corp.: | Skadden, Arps, Slate, Meagher<br>    & Flom LLP<br>By:  HENRY P. WASSERSTEIN, ESQ.<br>    BERT L. WOLFF, ESQ.<br>Four Times Square<br>New York, NY  10036-6522 |
|  | H. KATHERINE WHITE, ESQ.<br>General Counsel & Secretary<br>Park 80 East<br>Saddle Brook, NJ  07663-5291 |
| For American Real Estate Holdings: | Kirkpatrick & Lockhart LLP<br>By:  DAVID A. MURDOCH, ESQ.<br>    ERIC T. MOSER, ESQ.<br>535 Smithfield Street<br>Pittsburgh, PA  15222-2312 |
| For Burlington Northern: | Burns, White & Hickton<br>By:  DUSTIN C. EATON, ESQ.<br>120 Fifth Avenue, Ste. 2400<br>Pittsburgh, PA  15222-3001 |
| For the Equity Committee: | Kramer Levin<br>Kramer Levin Naftalis & Frankel<br>By:  GARY M. BECKER, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the Official Committee of Asbestos Personal Injury Claimants: | Caplin & Drysdale<br>By:  PETER VAN N. LOCKWOOD, ESQ.<br>One Thomas Circle, NW<br>Suite 1100<br>Washington, DC  20005 |

APPEARANCES (Cont'd.):

For National Medical Care      McDermott, Will & Emery
  & Fresenius:                 By:  DAVID S. ROSENBLOOM, ESQ.
                               227 West Monroe Street
                               Chicago, IL  60606-5096

For Burlington & Sante Fe      Burns, White & Hickton
R.R.:                          By:  MATTHEW J. CARL, ESQ.
                               120 Fifth Avenue, Suite 2400
                               Pittsburgh, PA  15222-3001

For Liberty Mutual:            Leech Tishman Fuscaldo & Lampl
                               By:  KEITHLEY D. MULVIHILL, ESQ.
                               1800 Frick Building
                               Pittsburgh, PA  15219

For Home Insurance Co.:        Steptoe & Johnson LLP
                               By:  MARCH DOLAN COLEMAN, ESQ.
                               1330 Connecticut Avenue, NW
                               Washington, DC  20036-1795

For Zonolite Claimants:        Lukins & Annis, P.S.
                               By:  DARRELL W. SCOTT, ESQ.
                               717 West Sprague Ave., Suite 1600
                               Spokane, WA  99201-0466

For Abs. PD - Princeton:       Ness Motley
                               By:  EDWARD COTTINGHAM, ESQ.

For Creditor:                  LEW LeCLAIR, ESQ.

For McNick Pipeline:           SUSAN KAUFMAN, ESQ.

For Timothy Kane:              STUART COHEN, ESQ.
                               NEIL LEVINSKY, ESQ.

For C.M.G.I.:                  GEORGE SHUSTER, ESQ.

For Perry Plaintiffs:          MICHAEL ZELZMER, ESQ.

For Creditors Committee:       ARLENE KRIEGER, ESQ.

Pro Se:                        ALICE SMOLKER, ESQ.

For Ellison's:                 STUART BROWN, ESQ.

For Home Savings Termite       HOLLY JENKINS, ESQ.
Control:

For Caterpillar Financial:     CHRISTINA MASON, ESQ.

ADDITIONAL APPEARANCES:

LOUIS KRUGER, ESQ.

WILLIAM HARSTAD, ESQ.

1        CLERK:  All rise.

2        THE COURT:  Good morning.  I was just trying to find

3   out if you're ready to proceed yet or if you're still waiting

4   for any of the people to come.  You're ready?

5        UNIDENTIFIED SPEAKER:  I believe we're all here, Your

6   Honor.

7        THE COURT:  Okay.  Please be seated.  Cathy, did you

8   get the sign-in sheets?

9        MS. YOUNKER:  Yes.

10       THE COURT:  Could you give them to Mona, so she can

11  Xerox them for me, please --

12       MS. YOUNKER:  Okay.

13       THE COURT:  -- so you have a copy and --

14       MS. YOUNKER:  They're still out there though, Judge.

15       THE COURT:  Oh, would one of you -- Mr. Merrill,

16  would you kindly get the sign in sheets for me, please?  This

17  is the matter of W.R. Grace and Company and the related cases,

18  bankruptcy number 01-01139 pending in the District of Delaware.

19  There has been an agenda item filed -- binder filed, and I

20  really don't have a preference with respect to the order in

21  which we proceed through the motions.

22       I do have some housekeeping issues that I would like

23  to address at some point with counsel.  Why don't I get entries

24  of appearances from counsel for the major parties, please, but

25  go slowly, because when I get names, I'm not the most speedy

1  typist.  Good morning.

2       MR. BERNICK:  Good morning.  David Bernick for the

3  debtor and with me are Jay Kapp, David Carickhoff, and Laura

4  Jones.

5       THE COURT:  Okay.  Good morning.

6       ALL:  Good morning, Your Honor.

7       MR. LOCKWOOD:  Peter Lockwood for the Asbestos

8  Personal Injury Committee, Your Honor, and with me is Matthew

9  Zaleski of Campbell and Levine.

10       MR. ZALESKI:  Good morning.

11       THE COURT:  Good morning.

12       MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo

13  for the Asbestos Property Damage --

14       THE COURT:  Sir, I can't hear you.  I'm sorry.

15       MR. SAKALO:  Jay Sakalo for the Asbestos Property

16  Damage claimants.  With me is Ted Tacconelli of Ferry and

17  Joseph.

18       MR. TACCONELLI:  Good morning, Your Honor.

19       THE COURT:  Good morning.

20       MR. SCOTT:  Good morning, Your Honor.  My name is

21  Darrell Scott.  I'm counsel in behalf of Zonolite claimants and

22  co-chair of the Property Damage Committee.

23       THE COURT:  I'm sorry.  What was your last name,

24  please?

25       MR. SCOTT:  Scott.

1          THE COURT:  Scott.  Thank you.

2          MR. PERCH:  Good morning, Your Honor.  Frank Perch,

3  U.S. Trustee.

4          MR. BECKER:  Good morning, Your Honor.  Gary Becker

5  for the Equity Security --

6          MS. YOUNKER:  You'll need to use the mike.

7          THE COURT:  You have to use the microphone.  We can't

8  pick your names up or anything that you're saying actually

9  without using the microphones.

10          MR. PASQUALE:  Kenneth Pasquale from Stroock and

11  Stroock and Lavan, Your Honor, for the Official Committee of

12  Unsecured Creditors.

13          MR. BECKER:  Good morning, Your Honor.  Gary Becker

14  from Kramer, Levin, Natalis, and Frankel for the Official

15  Committee of Equity Security Holders.

16          MR. DELLER:  Jeff Deller, Your Honor, from Klett

17  Rooney on behalf of the Committee of Equity Holders.

18          MR. MURDOCK:  David Murdock and Eric Moser from

19  Kirkpatrick and Lockhart on behalf of American Real Estate

20  Holdings, Inc., the 11th item on the list.

21          MR. WASSERSTEIN:  Good morning, Your Honor.  Henry

22  Wasserstein, Skadden, Arps, Slate, Meagher, and Flom on behalf

23  of Sealed Air Corporation.

24          MR. ROSENBLOOM:  Good morning, Your Honor, David

25  Rosenbloom of McDermott, Will, and Emery on behalf of National

1 Medical Care and Fresenius Medical Care Holdings.

2       THE COURT:  All right.  Thank you.  Anyone else who

3 speaks, please, when you do so, just enter your appearance on

4 the record.  Counsel for the debtor, who's going to direct this

5 proceeding today.

6       MR. BERNICK:  I'm going to try, Your Honor.

7       THE COURT:  All right.

8       MR. BERNICK:  David Bernick.  Would it be fine to

9 stand here or --

10       THE COURT:  Wherever you're comfortable --

11       MR. BERNICK:  Okay.

12       THE COURT:  -- and if you'd like to sit, you may be

13 -- you're free to sit, too.

14       MR. BERNICK:  Yes, okay.  I'll stand here if that's

15 all right, and I'm mindful of the fact that I -- I guess you

16 have to speak very directly into the microphones, and I'll

17 attempt to do that.  I thought it might be appropriate just to

18 go through the agenda in the order in which it's listed, and

19 there are a number of items, and I understand that the Court

20 would like to at least touch on all the items there, and we're

21 happy to do that.  So maybe if we could begin with item number

22 one, which is our motion for entry of the case management

23 order.

24       As Your Honor probably knows, this is something that

25 we've been trying very hard to get heard for quite some time,

1 and at the same time we're mindful of the fact that Judge Wolin

2 basically has indicated that with respect to matters pertaining

3 to case management generally, and asbestos liability in

4 particular, that those matters are going to be taken up by

5 Judge Wolin himself.  This particular item is really the

6 mainstream of that area, and, therefore, we would believe that

7 this is most appropriately handled by Judge Wolin.  We'll be

8 communicating with him about that.  If Your Honor has -- any

9 and all questions about it, anything that you'd like to discuss

10 relating to it, we're more than happy to do that.

11          THE COURT:  Don't you have a hearing or -- I'm not

12 sure if it's a hearing or some motions practice, but some

13 meeting with Judge Wolin scheduled next week?

14          MR. BERNICK:  Yes, on the 11th in the afternoon.

15          THE COURT:  All right.  I would assume that this is

16 one of the issues he wants to address.  He is trying to arrange

17 a meeting with Judge Newsome and me in Delaware when I'm next

18 there, which is at the end of January.  I don't recall the date

19 offhand -- the 28th I believe -- and one of the things that we

20 intend to do is to try to coordinate case management orders in

21 all of these cases at that time.  So whether he will be

22 entering some order on January 11th or whether it will be

23 deferred until we have a chance to coordinate items, I don't

24 know.

25          I would assume that it may be deferred, because I

1 think we are going to need to set up some practice, so that
2 whatever he decides he wants to do with respect to the personal
3 injury matters does not impede or interfere with what's
4 happening on the bankruptcy side and vice versa.  So I think
5 we're going to need some coordination of effort, and one case
6 management order may be a one fits all -- one shoe fits all and
7 may not.  I don't know.

8         Overall, I agree that you need a case management
9 order.  I have already told him I disagree with some of the
10 specifics that you proposed in this process, but not with the
11 concept overall and not with all of the specifics you're
12 proposing, but I think all of you probably need to sit down and
13 talk with him first about how the asbestos personal injury
14 issues are going to be handled, because I think that may drive
15 what happens with the rest of your case management order.

16         With respect to the bankruptcy issues that are going
17 to stay, I think you may need omnibus hearing dates.  If you're
18 going to have -- I realize you haven't had a hearing for a very
19 long time, and as a result, it's -- that's why this one is so
20 cumbersome.  Nonetheless, I would assume that you're going to
21 need omnibus hearing dates in a case of this size.  Am I
22 correct or not correct?

23         MR. BERNICK:  You are absolutely correct.

24         THE COURT:  Then I would propose that we work out a
25 schedule for omnibus hearing dates, and I gave you yesterday

**J&J COURT TRANSCRIBERS, INC.**

12

1  some proposals.  I have some corrections and modifications to

2  them today, but they're pretty much consistent with what I'd

3  said yesterday, so I don't know if you've had a chance yet to

4  share those.

5       MR. BERNICK:  I did.  I did.  We had a call yesterday

6  afternoon, and I passed all the dates on to all the counsel for

7  the committees as well as to a couple other attorneys who have

8  made appearances here this morning, so everybody knows what the

9  dates are.  I haven't really inquired any conflicts or issues.

10 They're -- all the dates are satisfactorily obviously with the

11 debtor.

12      THE COURT:  All right.  Well, let's do two things

13 before we progress then.  Number one is fix those dates, so

14 that everybody will know when they are, and number two, I'd

15 like to provide some instructions for how I want to proceed for

16 motions, so that we're all on the same page, and there are no

17 confusions going forward.  So let's pick the dates first.  I

18 brought a list with me but -- here we go.  Do you need another

19 date in January?  Because I can do it the 29th if you'd need

20 another date this month.

21      MR. BERNICK:  I'm thinking that we probably do not.

22 At the same time it might be that the best idea is to pick a

23 date in January.  If it turns out that there really isn't

24 enough to warrant taking that time, we could certainly inform

25 the Court.  I understand that there was some uncertainty about

1  what the particular date would be, but I don't think we're

2  going to need it, but we may as well give ourselves that

3  opportunity, particularly at this stage when things are kind of

4  in flux.

5  THE COURT:  Well, what may be helpful is if you have

6  been able to work something out with Judge Wolin with respect

7  to the case management order, if nothing else, maybe at the end

8  of January we can get that detail firmed up, because I think

9  you need a case management order in order to get this case back

10 on track and moving.  So if nothing else, perhaps it would be

11 advisable to try to use that time.  It may be too soon with

12 respect to your meeting with Judge Wolin.  I don't know, but

13 maybe we should at least have the time, and if it turns out to

14 be too soon, then we'll do something else.

15 Gentlemen on any of the creditor's sides, will you --

16 do you anticipate needing any hearings at the end of this

17 month?  The date I'm proposing is January 29th at 1:00 p.m.

18 MR. LOCKWOOD:  No, Your Honor.  I don't think we do.

19 I have I guess one question about this.  Judge Wolin issued an

20 order recently appointing consultants and special masters, and

21 in general, it was just generic, but with respect to this case,

22 Grace identified a gentleman, Dr. Dryer, as going to be the

23 special master, and it sounded like it was some sort of case

24 management purposes, and I was wondering if you and Judge Wolin

25 had discussed that and had any idea what his role, if anything,

14

1  was going to be in this, or is that something we'll learn on

2  the 11th or what?

3          THE COURT:  Well, you'll probably learn more on the

4  11th.  I'm hoping you also -- that you can sort of inform me,

5  too, but I'll tell you what I know.  When I got that order -- I

6  spoke with Judge Wolin yesterday.  His current expectation is

7  that, that order will drive the cases as to which the reference

8  is withdrawn but nothing more.

9          Unless you need some hearing that might be

10 appropriate for mediation or some sort of a settlement process,

11 then I can request use of that person for that purpose, but his

12 expectation at the moment seems to be that, that whole

13 consulting panel is really for looking at the case management

14 issues on the asbestos personal injury side of things and

15 probably not anything that will impact on the main bankruptcy

16 case itself.

17         MR. BERNICK:  That is very consistent with -- he --

18 at the omnibus hearing that he held he stood up and he had a

19 chart, and the chart indicated that the non-asbestos side of

20 the case would remain with the bankruptcy courts, but the

21 asbestos side of the case would be withdrawn at some point in

22 time, and that on that side of the case he would make use of

23 the masters, and my understanding was very much the same.  The

24 awkwardness, of course, is what falls on what side of that

25 line, and right now, as I understand it -- and this is

1  something we'd probably get to touch on at some point today --
2  if the effect of one of his early orders was effectively to
3  send the entire case back to all the different bankruptcy
4  judges and then his intent is to selectively have withdrawal on
5  discreet issues as they come up, there's only been one
6  withdrawal of reference that has so far I think in all the
7  cases with respect to the Federal Mogul (phonetic) case, a case
8  that's pending there.

9        So technically everything is here, but what he's
10 asked for are letters, and the purposes of the letters is he
11 has indicated is to describe the parties' views of what issues
12 he should be taking up, and then presumably, after he's read
13 the letters and had some of these conferences, he will
14 basically then decide, based upon what the parties want and
15 what he wants to do, what should then be withdrawn, and at that
16 point I think we'll have a clearer view about what's going to
17 be here and what's going to be before Judge Wolin.

18       THE COURT:  Well, I suspect -- and this is just a
19 suspicion, but nonetheless, I suspect the one thing that he
20 will take is anything that deals with liability on the personal
21 injury asbestos side.  I don't think at the moment he's
22 contemplating, for example, property damage issues, because,
23 traditionally, those would not necessarily be something that
24 the Bankruptcy Court would not deal with, but in any given case
25 it may be appropriate to have them there.  I really don't know,

16

1 but right now I think he expects -- and he will be withdrawing
2 asbestos personal injury matters of any type for any purpose,
3 and what more he'll choose to do, I don't know.

4         He's made it very clear that he will expect both the
5 parties and the bankruptcy judges to let him know if there is
6 an issue that any of us think should be withdrawn.  You, I
7 suppose by way of formal motion.  Us, probably a little more
8 informally than that, but nonetheless, I think for just simply
9 case management purposes it may be appropriate if, as you
10 identify issues that you think may be appropriately withdrawn,
11 you raise them here, because you'll be here every month, if
12 that's the case, and maybe we can work out some smooth
13 transition, and it's possible that there won't even be
14 objections to may of those withdrawals, and if that's the case,
15 we might be able to expedite that process, too.

16         MR. BERNICK:  And going back to the 29th, I don't
17 know where we're going to be at in this transition period, but
18 it does seem sensible, particularly if things move quickly, we
19 may as well have some time set aside in which to take matters
20 up with the Court.  If it turns out things are still too much
21 in flux, I'm sure we'll have a telephone call maybe proposing
22 to the judge -- to Your Honor that it be deferred until next
23 month, but I think we should have some --

24         THE COURT:  All right.  Well, let's use January 29th
25 at 1:00, and if there are matters, that's the time they'll be

17

1  heard.

2           February 25th.  I hate to have you folks start at

3  8:00, but I have to do it that day in order to get a date in

4  Delaware in February, so we'll have to start at eight.  I've

5  asked them to get a court reporter that day.

6           The next date is March the 18th.  I had told you, Mr.

7  Mr. Bernick, would do from ten til one, but I can only do ten

8  to noon that day.  I've got a trial scheduled that afternoon.

9  Anyone here involved in Fulcrum?  It's the trial in Fulcrum.

10 As far as I know right now, it's still scheduled to go forward.

11 Okay.  No one knows.  So February 18th from ten to noon.

12           MR. BERNICK:  March 18th.

13           THE COURT:  I'm sorry.  Thank you.  Yes, March 18th

14 from ten to noon.  The next date is April 22nd.  That is the

15 date that I need to do here in Pittsburgh.  These other dates

16 are in Delaware, but I need to do the April one here in

17 Pittsburgh.

18           MR. LOCKWOOD:  What time, Your Honor?

19           THE COURT:  I think these are all from ten to one,

20 Mr. Lockwood.  I -- let me double check my notes here.

21                          (Pause)

22           THE COURT:  Yes, sir, ten to one.  Is there any

23 expectation -- I've been assuming three hours is going to be

24 enough if we're doing general motions days once a month.  Is

25 there any reason why I need more time?  Less time?

                    **J&J COURT TRANSCRIBERS, INC.**

1    MR. BERNICK:  I wouldn't think it would generally

2 take three hours.  One thing that I think Your Honor mentioned

3 yesterday and I passed on to everybody is that these are

4 omnibus hearings not simply for scheduling and for uncontested

5 matters but for contested matters alone accepting only that you

6 don't -- you would not take testimony.

7    THE COURT:  That's right.

8    MR. BERNICK:  But that these are basically everything

9 that's up gets handled at the hearing --

10    THE COURT:  That's exactly right.  I expect that if

11 you're putting an agenda item together, we're going to go

12 through the list, and we would cover everything on that list

13 and whatever else has to be covered that day.  Thank you.

14 Okay, so April 22nd from ten to one.

15    May the 20th we're back in Delaware now in --

16 starting in May from ten to one.

17    Mr. Bernick, I wasn't sure about the June date.  I

18 now am.  It would be June the 18th, and this one would be at

19 1:00.  Then July 29th from ten to one, August 26th from ten to

20 one, February 23rd -- I'm sorry -- September 23rd from ten to

21 one.  I'm looking at these '02 years and thinking February is

22 month instead of 2002.  I'm not adjusted to 2002 yet.

23    October 28th from ten to one, November 25th ten to

24 one, and December 16th from ten to one.  That's as far as I can

25 go.

1        Now, with respect to these dates, I do not take

2   testimony on omnibus dates.  I don't have time.  If you need

3   testimony, what I expect is that you will let me know at that

4   hearing or the hearing before, and we will specially schedule

5   evidentiary matters, so please do not bring witnesses.  I will

6   not compensate you for bringing witnesses for motions days.

7   Please make that very -- please make a note.  Tell your

8   clients.  If they want to come, it's on their dime for these

9   proceedings with respect to testimony.  I do not take testimony

10  on motions days.  Anybody have any questions about the fact

11  that I don't take testimony on motions days?

12              (No verbal response)

13        THE COURT:  Okay.  I would like the calendar

14  organized as follows for omnibus dates.  First of all, I would

15  like all the uncontested matters listed.  In the hearing

16  binders I want the certificates of no objection, and I want the

17  proposed order that you want me to enter attached.  The reason

18  for that is in all probability I will be signing those orders

19  in advance of the hearing, and simply, if you haven't already

20  received copies announcing that those items have had orders

21  entered and there will not be anything that will take place in

22  Court except that.

23        If I have a question about something, then I will not

24  sign that order, and I will raise it at the hearing date on the

25  omnibus motion date, but in most cases, as you will see today,

1 I will have signed the orders in advance of the hearing. Today
2 I do have a question as to one, so you'll see how that process
3 will work as well.

4       Okay. The next thing I would like is any matters
5 that you have agreed to continue. I do not want to have
6 anything in the hearing binders with respect to continued
7 matters, because if you're continuing it, I don't want to spend
8 the time getting ready for that hearing. I want it in the
9 hearing binder when it's a matter that I need to adjudicate and
10 not before. I would like them on the agenda list, however, so
11 that I simply know that there's something out there, and that
12 if I choose to get it off the CMECF System, I can look at it in
13 advance, but I do not want that information in hearing binders.

14       This is my general policy, and the reason I'm going
15 into this now is because of voluntary continues. You may, by
16 agreement of counsel, continue any matter that you want
17 continued, including response dates -- I don't care --
18 provided that you may not grant a continuance that will mean
19 that I do not have in my hand one calendar week before the
20 hearing the complete set of pleadings. So if the last pleading
21 due is a reply brief, it must be filed one calendar week before
22 the hearing. If it's not filed then, and if you've agreed to a
23 continuance, you automatically continue that matter to the next
24 calendar. I will not hear something if there is a pleading
25 that comes in one day beyond this one week deadline. I will

1 not do it.

2          MR. BERNICK:  As to all matters.

3          THE COURT:  All matters forever, regardless of what

4 it is.  I want everything finished one calendar week before the

5 motions calendar that's set.  All right.  I guess we have phone

6 people calling in.

7          Mr. Bernick, I guess I'm going to have you repeat all

8 of this for anybody who's on the phone.  I apologize.  I

9 started before they were ready, but I'll hold up and wait.

10          Good morning.

11          ALL:  Good morning.

12          OPERATOR:  This is the conference operator.  May I

13 speak with Mr. David Carickhoff?

14          THE COURT:  Yes, he's present in the courtroom.

15          OPERATOR:  Oh, he can hear me?

16          THE COURT:  Yes, he can.

17          OPERATOR:  Okay.  I have about 15 individuals that

18 are trying to get into conference.  May I go ahead and join all

19 the parties?

20          THE COURT:  Yes, please.

21          OPERATOR:  Mr. Carickhoff, continue the roll call?

22          THE COURT:  Yes, please.

23          OPERATOR:  Okay.  One moment, please.

24                    (Pause)

25          OPERATOR:  Excuse me, everyone.  Thank you for

1 | patience.  I'd like to begin the meeting with a brief roll

2 | call.  Ms. Susan Kaufmann, can you hear me?

3 |        MS. KAUFMANN:  Excuse me?  Susan Kaufman here

4 | representing McNick (phonetic) Pipeline.

5 |        OPERATOR:  And Stuart Cohen, can you hear me?

6 |        MR. COHEN:  I can.

7 |        OPERATOR:  Jackie --

8 |        MR. COHEN:  Stuart Cohen on the Kane matter.

9 |        JACKIE:  Yes.

10 |        OPERATOR:  William Harstad (phonetic).

11 |        MR. HARSTAD:  Yes, I can hear you.

12 |        OPERATOR:  George Shuster?

13 |        MR. SHUSTER:  Yes.

14 |        OPERATOR:  Michael Zelzmer (phonetic).

15 |        MR. ZELZMER:  Yes.

16 |        OPERATOR:  Arlene Krieger.

17 |        MS. KRIEGER:  Yes.

18 |        OPERATOR:  William Chipman.

19 |        MR. CHIPMAN:  Yes.

20 |        OPERATOR:  Alice Smolker.

21 |        MS. SMOLKER:  Yes.

22 |        OPERATOR:  Stuart Brown.

23 |        MR. BROWN:  Here.

24 |        OPERATOR:  Louis Kruger.

25 |        MR. KRUGER:  Yes.

1          OPERATOR:  Adam Cole.

2          MR. COLE:  Yes.

3          OPERATOR:  And Mr. Carickhoff.

4          MR. CARICKHOFF:  Yes.

5          OPERATOR:  All right.  Thank you for your patience,

6   everyone.

7          UNIDENTIFIED SPEAKER:  Actually, you didn't call me.

8          UNIDENTIFIED SPEAKER:  And you didn't call my --

9          MR. LEVINSKY:  You didn't call Neil Levinsky either.

10          OPERATOR:  Okay.  Does anyone have phone numbers for

11   these three individuals, and we'll go ahead and call them?

12          ALL:  No, we're already on.

13          OPERATOR:  Oh, I'm sorry.  I'm very sorry.  I

14   apologize.

15          MR. LEVINSKY:  Why don't you plug us in?

16          THE COURT:  This is why we do not do phone

17   conferences.

18          OPERATOR:  Okay.  Well, if anyone needs anything,

19   please dial the operator at star zero, and please go ahead and

20   begin your conference.

21          THE COURT:  Thank you.  This is Judge Fitzgerald.

22   Would anyone else who was not identified on the call please

23   identify yourself now.

24          MR. LEVINSKY:  Your Honor, Neil Levinsky for movant

25   Timothy Kane.

1          THE COURT:  Thank you.  Anyone else?

2          MS. JENKINS:  Your Honor, Holly Jenkins from -- and

3   Moro (phonetic) on behalf of Home Savings Termite Control.

4          THE COURT:  Thank you.  Anyone else?

5          MS. MASON:  Your Honor, Christina Mason on behalf of

6   Caterpillar Financial Corporation.

7          THE COURT:  Anyone else?

8          RACHEL:  Your Honor, this is Rachel.

9          THE COURT:  Hi, Rachel.  Hello.  Welcome on your

10  vacation.  I'm sure you're thrilled to be participating by

11  phone.  Actually, Rachel, the only thing I needed you for was

12  these dates, so if you want to terminate that's fine, unless

13  there's any other procedural matter that you need me to go over

14  with counsel.

15         RACHEL:  No.

16         MR. BERNICK:  Would you like me to give a little bit

17  of a summary of --

18         THE COURT:  No.  Just one minute, Mr. Bernick.

19  Rachel, if -- what I was going to do is provide the information

20  about the web site and the box, so I will cover that.  Are

21  there any other matters?  Do you need extra copies or any other

22  procedural thing that we need to address with counsel?

23         RACHEL:  No, as long as they follow the procedures on

24  the web site, I think that, that should be fine.

25         THE COURT:  All right.  I will fill you in then if

**J&J COURT TRANSCRIBERS, INC.**

1  you want to terminate.  You're welcome to stay obviously, but
2  there's no need for you to.  If there's some issue that comes
3  up, I'll have you called back.

4          RACHEL:  Okay.

5          THE COURT:  Thank you.

6          RACHEL:  Thank you.

7          THE COURT:  Yes, Mr. Bernick, would you like to
8  summarize?

9          MR. BERNICK:  Yes.  Well, we spent a few minutes
10 covering some background matters pertaining to the proceedings
11 that are ongoing before Judge Wolin as well as the Court's
12 requirements for scheduling matters and briefing matters that
13 take place in this Court.

14         As concerns Judge Wolin's proceedings, Judge Wolin
15 held a omnibus hearing a couple weeks ago or a few days ago
16 basically giving broad guidance as to how matters before him
17 will be conducted, and I think that what we touched on today
18 was the expectation that matters pertaining to asbestos
19 personal injury litigation and liability would in all
20 likelihood be withdrawn to Judge Wolin and considered by Judge
21 Wolin, but the process of determining what Judge Wolin is going
22 to withdraw and handle versus what's going to stay before this
23 Court is one that's unfolding in the next few weeks, so we'll
24 just have to wait and see how that actually turns out.  It may
25 be that the line is -- that line may be a different line.  We

1  just have to wait and see.

2  Judge Wolin has asked that letters be sent by major

3  interested parties and specifically the Committees identifying

4  issues that should be considered by Judge Wolin.  That process

5  has -- is just now underway, and presumably through that

6  vehicle as well as through meetings and with greater definition

7  from Judge Wolin about what stays here and what he takes on.

8  With respect to the proceedings in this Court, the

9  Court indicated the desire to have -- and I think all the

10  parties did as well -- omnibus hearing dates on a regularly

11  scheduled basis.  Dates have now been proposed for every month

12  of this year including an additional hearing during the month

13  of January.  The first date would be January 29 at 1:00 p.m.,

14  and that would be in Delaware.

15  The next hearing date would be February 25th at 8:00

16  a.m. in Delaware.  The next hearing date would be March 18th at

17  10:00 in the morning in Delaware, and at this point pretty much

18  from March through the end of the year, although there's one

19  more exception, the time periods for these hearings would be

20  basically from ten to one.

21  So March 18 is ten to one in Delaware.  April 22 is

22  from ten to one as well, but it is in Pittsburgh.  So April 22

23  is Pittsburgh, ten to one.  May the 20th, ten to one in

24  Delaware.  June 18th at 1:00 in Delaware.  July 29, ten to one,

25  Delaware.  August 26, ten to one.  September 23, ten to one.

1  October 25, ten to one or 28.  November 25, ten to one.

2  December 16, ten to one.

3        The purpose of all the omnibus hearings is to take up

4  any and all matters be they contested or uncontested.  All

5  those matters will be considered, except evidence will not be

6  taken in the context of the omnibus hearings, and will not be

7  reimbursement for the costs of witnesses appearing on those

8  days, because their testimony will not, in fact, be taken.  The

9  expectation is that on those days all matters will be concluded

10 within the three hours set aside by the Court.

11       The Court I believe was then describing the -- in a

12 sense the paperwork side of the process.  We're to have an

13 agenda prepared in advance.  It's to cover uncontested matters

14 including a stipulation or a certification that the matter is

15 uncontested.

16       With regard to continued matters, they should not be

17 in the notebooks, but very importantly, with respect to

18 continuance, the Court announced a blanket rule that says that

19 no matter will be heard unless the last submission -- the last

20 pleading or brief is received by the Court one week in advance

21 of the hearing date.  If it hasn't been received, the matter

22 will not be heard and will continued.

23       And I'm assuming, Your Honor, you were about to then

24 say that the next portion of the agenda would then go to the

25 contested matters.

1     THE COURT:  Yes.  As I would like to just back up
2  with respect to continued matters, too, as I started to say, I
3  don't care generally speaking if you agree to continue
4  something, that's fine, but I will expect that it will be
5  continued if you cannot live with the pleading deadline,
6  because I simply can't get ready for Court if I don't have the
7  information in advance.

8     Mr. Bernick, I know that typically these agenda
9  binders are not submitted as far in advance as I'd like them,
10 and I just want to know whether this would cause an
11 administrative problem for you.  Is it possible to get the
12 hearing binders sent to me here in Pittsburgh two weeks in
13 advance of the hearing and then to file a supplement whenever -
14 - like the week before or whenever it would be due so that I
15 could actually start looking at things in advance?  I don't
16 know, because I don't know the time frames in which you deal in
17 the --

18    MR. BERNICK:  Well, we can certainly do that.  I
19 think what that will probably mean though is that Your Honor's
20 going to have to have somebody be slotting in new pieces of
21 paper as they come in.

22    THE COURT:  But that's fine, because I think -- I'm
23 just not sure what quantity of information we're talking about,
24 and if it's as much as, for example, as I get in <u>Owens</u>, and I'm
25 having two and actually I'm going to end up with three big

1  omnibus dates on one day in Delaware, I can't possibly absorb

2  all of this information in a week, so I need to start getting

3  it sooner, and I'm going to ask the parties in Owens to do the

4  same thing for me, if it's not too much an administrative

5  burden.  I don't know what that burden would be, so that's what

6  I'm asking.

7          MR. BERNICK:  No, it -- I'm sorry.

8          MS. JONES:  Your Honor, the only thing I would add to

9  that is that it would really be a preliminary -- in a draft-

10 type notebook.  I mean it would have probably the motions --

11 the time frame will have run for the motions.

12         MS. YOUNKER:  Can you speak more directly into the

13 mike?

14         MS. JONES:  What we'll be missing most of the

15 responses I'm sure in the two-week -- in the two weeks, then we

16 would just have to supplement the notebook as Mr. Bernick has

17 suggested, but I don't want to leave Your Honor with the

18 misimpression that the notebook in any way would be close to

19 being complete.

20         THE COURT:  Okay.  Well, why don't we talk about time

21 frames for a minute then and see.  If your last pleading is due

22 a calendar week before the hearings, then is that usually going

23 to be a reply or just a response?  Because if it's a reply,

24 then responses are going to be due probably two weeks in

25 advance.

1    MR. BERNICK:  Well, it depends.  I mean I don't know

2  if replies are always filed in the ordinary course, but

3  obviously, if there's going to be a reply and it has to be in

4  by that time, it'll have to be in by that time.  I -- see, I --

5  if -- I think what it actually is going to amount to is that

6  for anyone here -- and you're probably going to be picking up

7  pleadings that were filed, some of them even before the last --

8  this hearing had taken place, so you wouldn't --

9    (Malfunction with microphone sound occurs at this time.)

10    THE COURT:  Pardon me.

11    MR. BERNICK:  I don't -- it seems to me that I

12  understand Your Honor to have a desire to start to get into the

13  meat of these things as the materials become available, and it

14  seems to me that if you -- if we get -- it may take maybe some

15  squeaky wheels at the beginning, but if we take the time, we

16  can start to create these notebooks and then literally fill

17  them up.  It would just mean that somebody here is going to

18  have the task of making sure the right stuff goes in the right

19  place.

20    THE COURT:  Somebody has that anyway.

21    MR. BERNICK:  It won't be a de minimis task with

22  respect to some of these things, because there are a number of

23  submissions.

24    THE COURT:  If I make it ten days before -- what I'm

25  trying to do is get an extra weekend in.  That's what my object

1  is.  If I make it so that they're due two Friday's before the

2  hearing as opposed to that, would that hit -- be able to get

3  most of the response dates in?  Can we key the response dates,

4  so that they would be due say ten --

5          MR. BERNICK:  Oh, I see, so that --

6          THE COURT:  -- ten days in advance, so that then I

7  can get a relatively complete set of documents sent here that

8  Friday before --

9          MR. BERNICK:  The responses would be in.

10         THE COURT:  Right.

11         MR. BERNICK:  The other --

12         THE COURT:  It's more helpful.

13         MR. BERNICK:  I suppose the alternative really is

14  that if you set -- if you created a window between the

15  responses and the final completion date, we can always give you

16  in a sense the notebook as of that window period of time, and

17  then simply supplement it as they come in.  That's something

18  that could be -- it's a question of how Your Honor wants to set

19  it up.

20         THE COURT:  Okay.  Well, I'd like to do is get a

21  complete a set as possible, but I'd like two weekends -- to

22  have the opportunity to have two weekends to look at this,

23  because I just don't have the time on the normal of business to

24  go through this kind of material.

25         MR. BERNICK:  Let me make a suggestion.  How about if

1  we spent a little bit of time just among the Committees trying

2  to figure out maybe an agreed upon procedure that we can follow

3  in terms of timing for submission of materials, and then once

4  we get that together, we can let the Court know.

5       THE COURT:  Okay.  That would be fine.  All right.

6  Thank you.  All right, then yes, continuing with what I'd like

7  in the binders, yes.  Then I would like the contested matters,

8  and frankly, if there's something that you think is going to be

9  settled, and you can put them in the binders next, so that as

10 we get through, we can release people who have a more limited

11 interest in the particular proceeding, I would like those next.

12 I realize you don't always know that, but if you do, that's how

13 I would like it set up.

14      With respect to any settlements that you expect to be

15 presenting in Court, for example, you've had an issue, it's

16 resolved, but you're not going to be presenting an order until

17 the courtroom, please bring the order with you, but make a note

18 on the agenda that says you're going to be handing me an order,

19 so that I don't enter one that's attached in the notebook when,

20 in fact, you've got some modification that you want me to

21 address in Court.  Okay.

22      I don't -- have I missed anything that any of you

23 would expect to need in the agendas?  Scheduling matters you

24 can put in wherever they're appropriate.  You know, if you've

25 got an adversary or something that needs a scheduling issue and

1  it's a contested matter, wherever it pops up on the agenda

2  that's appropriate, that's fine.  What I'm trying to do is have

3  the weighty stuff fall to the bottom of the list, so that the

4  people who are less interested rather than more interested can

5  leave as they choose to leaved the courtroom.

6           MR. BERNICK:  And I take it then that with respect to

7  taking evidence, that will happen on separately scheduled

8  dates --

9           THE COURT:  Yes.

10          MR. BERNICK:  -- that we'll arrange during the course

11 of the omnibus --

12          THE COURT:  That's correct.  Now, if you know in

13 advance that you're going to need an evidentiary hearing, if

14 the pleadings are actually closed and you're convinced it's not

15 going to settle, if you can give me a proposal, then what I

16 would try to do is come back to Court with an evidentiary

17 hearing date and time that I can propose to you, and then we

18 can back the other dates up from there.  So if you could tell

19 me, for example, that you expect you're going to need six

20 months for discovery, and then you're going to want a trial in

21 nine months, I would try to get you some date.

22          Now, having said that, I generally don't like to

23 schedule trials that far out, because my experience is that

24 things tend to fall off the calendar, so my preference is that

25 before anything goes to an evidentiary hearing, we have a final

1  pretrial conference at which a specific trial date would be

2  set.  Occasionally, that doesn't work.  Generally, it does.

3  Most things that you tell me you're going to try, you really

4  don't try, and I really don't want to waste time scheduling

5  things, reserving time for this case that I can use for

6  something else, because like all of you, I'm very busy, and I

7  have precious few hours to spend, so I do not give out trial

8  times willingly in that I don't like to do them too far in

9  advance, but, you know, if you can tell me in advance what your

10  schedule is, then I'll try to work within that schedule.

11       Okay.  Anything else about the agenda that anyone

12  wants to address?

13       MR. BERNICK:  I had one more -- well, I think it

14  probably fell in the context of the list that we have today, so

15  I don't have anything further.

16       THE COURT:  Okay.  There are some other housekeeping

17  matters that I'm going to want to get to, and I don't know

18  where you would like to address them.

19       Number one is with respect to your administrative

20  order governing fees, I am going to want some modifications to

21  that order, but at the same time I recognize that in this case,

22  since many of the matters are going to be going before Judge

23  Wolin and not me, and as a result I'm not sure how we're going

24  to maneuver the fee applications, at the moment I think the

25  initial burden's going to be mine to look at all fee

1 applications for everyone, and to that end 1 am going to
2 require debtor's counsel to put together for me a summary sheet
3 in detail every quarter when the fee applications will come up.
4 This process is in use in <u>Owens Corning</u>.  It's in use in
5 <u>Pittsburgh Corning</u> and this case.  I know it's a pain for
6 debtor's counsel.  It's wonderful for me, and I'm going to
7 impose it in this case.

8          It is going to require all of you in your billing
9 submissions to the Court to use the same categories of cases.
10 Now I recognize all of you have different billing software and
11 your codes internally in your office are not the same.  I don't
12 care.  You can use whatever codes you like just so when you
13 categorize it for me for hearings, it's put together in the
14 same fashion.  I want everyone's fee app's filed for the same
15 period of time on the same dates and set for the same hearing.
16 So I don't want counsel for the debtor's to go from January
17 through March and counsel for the Committee's to go February
18 through April.  I want them all for the same periods of time,
19 so that I can compare what's going on across the board and have
20 a uniform set of what's happening in this case.

21          Having said that, I think it may be appropriate in
22 this case to get a fee examiner, and the reason I'm saying that
23 is, because I obviously am not going to have total knowledge of
24 what's happening before Judge Wolin nor will he know what's
25 happening before me, and it may be appropriate to use a fee

1  examiner for that reason.  I want you to consider it, and on

2  January 29th let me know what your view about that is and who

3  you would propose.  I think the U.S. Trustee's Office has a

4  position that it may wish to be heard on in that matter.  Mr.

5  Perch can discuss all that with you, if he hasn't already, but

6  on January 29th I would like to address this issue.

7          There are a couple of other housekeeping matters.

8  Number one.  On the Delaware web site, the www.deb.uscourts.gov

9  site, I have a home -- or I have page.  Please read it, because

10 the process that I have set up on that page will govern in this

11 case.  Unless any of you have reason after you've read it to

12 tell me that something isn't going to work in this case, I'm

13 willing to modify it when needed in a specific case, so I'm

14 willing to hear what you have to say.  Please read it between

15 now and January 29th, because if you have modifications, then I

16 want to do an order that will be appropriate for handling the

17 proceedings that will be in front of me, and I'll hear your

18 comments about that on January 29th.

19         I have a separate mailbox set up which is, Mona,

20 jkf@pawb --

21         MONA:   .uscourt --

22         THE COURT:   .uscourts.gov.  That mailbox is for one

23 purpose only, and that is to get emergency pleadings that you

24 are filing that you do not wish to have wait til a normal

25 motions day.  So if there -- from time to time some emergency

J&J COURT TRANSCRIBERS, INC.

1  does come up.  I realize that.  Send me copies of whatever it

2  is that you filed.  You can do it either in Word, Word Perfect,

3  or PDF format.  I don't care, as long as it's in one of those

4  three formats.  Send me a copy to that box, so that I know that

5  you need an emergency hearing, and I -- someone picks up that

6  box everyday, but do not send me anything else.  I do not want

7  your letters.  I do not want you vituperative comments back and

8  forth.  I don't want your happy comments back and forth.  I

9  want emergency pleadings and that's all in that box.

10          I have a fax machine.  It handles no more than ten

11  pages at a time.  It breaks regularly if anybody puts as much

12  as an 11th page.  So, please, I will give you that number, but

13  do not under any circumstances ever fax me something that's

14  longer than ten pages.  The number is 4-1-2-6-4-4-5-4-4-8.  If

15  it's something that you need to get to me that's longer than

16  ten pages, call my office and tell them that you're going to

17  send it to me in that PAWB box, and we'll look for it.  That's

18  the only exception to what I will accept in the PAWB box, if

19  there is something that you really need to get to my attention

20  and it's longer than ten pages.

21          I'm sure there are others, but at the moment I can't

22  think of what they are, so as they occur to me, I'll interrupt

23  the flow, and we'll discuss them then.  Are there any matters

24  that any of you, since we're talking housekeeping in these

25  kinds of global constructs, want to address?

1                        (No verbal response)

2           THE COURT:  Okay, Mr. Bernick, the floor is yours

3    again.

4           MR. BERNICK:  Okay.  Going through the agenda, we

5    started out with number one, which was the case management

6    order.  Number two is a motion for protective order filed by

7    the Official Committee of Asbestos Property Damage Claimants.

8    This is motion that pertained to taking depositions of two

9    witnesses who were going to be proffered by the Property Damage

10   Committee to testify in connection with item one, case

11   management order, and this particular motion for protective

12   order is now moot, because both the Committee and the debtor

13   are agreeable to proceed with those depositions on a basis that

14   would be timely by reference to whenever the hearing takes

15   place on the case management order.  So there is no need for

16   the Court to decide the protective order.  The depositions are

17   going to go forward, and the Property Damage people are here I

18   believe to confirm what I'm saying in that regard.

19          MR. LOCKWOOD:  That is correct, Your Honor.

20          THE COURT:  All right.  Item two is withdrawn.

21          MR. BERNICK:  Item three is the motion to modify the

22   preliminary injunction, and I'll note that there are three

23   other items on the agenda that are probably within the broad

24   ambit of this subject.  Those items are number four, which is

25   the motion for relief, are the Smolker's.  Item 16, which is

1  motion to lift the stay by a Timothy Kane, and then Item 22,

2  which is a motion for summary judgment by Exxon Mobil.  All

3  three of those matters also pertain to the basic question of

4  what kinds of litigation should proceed while Grace is in

5  Chapter 11.

6          The -- on the motion for preliminary injunction

7  itself or to modify it, I thought it might be best to go

8  through that first, and then as we get to the portions of it

9  that relate to these other items, we can take them up, unless

10  the Court would like us to handle them separately.

11          THE COURT:  That's fine.

12          MR. BERNICK:  Let me go through a little bit of the

13  history of where we're at, and I apologize in advance.  This is

14  an area that, well, putting it delicately, is choppy.  There

15  are a lot of things that are flying around, a lot of pieces of

16  paper, a lot of new developments.  It's hard often, frankly,

17  for me to keep track of it, Your Honor.  I'll do my best to

18  kind of walk through where I think we are, which is fairly well

19  progressed, and I think we're down to a very small number of

20  issues is the good news.

21          The history is roughly this.  That on the very first

22  day of this case, on April the 2nd, a temporary restraining

23  order was entered at our request by Judge Newsome.  The purpose

24  of the restraining order was basically to shut down not only

25  litigation against Grace but against other entities, other

1  affiliates, other people who -- the claims against whom fell

2  within the ambit of basically the McCartney decision, Robbins

3  decision.   They are cases that were related to the liabilities

4  that are issue in the Grace Chapter 11 or would have an

5  economic impact on Grace through an indemnity or other type of

6  obligation.

7          So the TRO was entered.   It was extended on April the

8  25th, and then a preliminary injunction hearing was held in an

9  order entered on May the 3rd.   On June the 21st we moved to

10 modify that preliminary injunction, and following the hearing

11 we submitted a supplemental brief.   This was filed on June the

12 27th, and unfortunately, as I indicated I believe to your law

13 clerk yesterday, mention was not made in these related

14 documents of the supplemental informational brief, and it's

15 very important, because Exhibit A to that supplemental brief is

16 a further refinement of the proposed preliminary injunction or

17 modifications that I'm going to want to work off today.   I have

18 an extra copy of it for the Court, so that we can walk through

19 that.

20         THE COURT:   I got it yesterday.   Wait til I see where

21 I put it though, since it's not in order.   Just a minute.   I

22 think this is the exhibit.

23         MR. BERNICK:   If I could hand up -- actually --

24 (Mr. Bernick walks away from microphone and cannot be heard.)

25         THE COURT:   All right.   Yes.   Thank you.

1      MR. BERNICK:  And there also have been even since
2   June the 21st further developments in these matters, and I'll
3   try to go through further developments as we go through each
4   one of the items.

5      Basically, by way of background -- and I'm going to
6   end up zeroing in on four changes to the order.  By way of
7   background, as Your Honor is aware from the briefs, the law
8   basically focuses on two tests in this area.  First was the
9   case that's sought to be enjoined is effectively a case versus
10  the debtor, or that essentially the real party in interest is
11  the debtor or property of the debtor, and then secondly whether
12  a continued prosecution of the case would have a significant
13  impact on the prosecution of the Chapter 11.

14     In looking at these two basic considerations the
15  courts often look to is there an indemnity -- an indemnity
16  obligation such that ultimately it's the debtor that's going to
17  have to pay.  What's the source of the liability?  Is it really
18  the liability of the debtor that's at issue albeit the
19  liability's now being asserted against a third party?  Is there
20  a risk of collateral estoppel?  What's the insurance situation?

21     The prior orders -- that is all the orders up to this
22  order for modification or request for modification -- covered
23  two major areas.  Area one are cases asserting asbestos-related
24  liabilities.  Area two are cases involving a threat to the
25  property of the debtor, particularly where there's an insurance

42

1  policy at issue.

2        The request to modify the existing preliminary
3  injunction really had two purposes.  First to plug holes in the
4  coverage in those two areas that had emerged.  Second was to
5  take an additional step and pick up the indemnity situation.
6  In other words, indemnity really wasn't part of the prior
7  orders.  The prior orders really focused on asbestos-related
8  claims and on claims against insurance.  The modification
9  sought to extend it to cover the indemnity situation.
10  Indemnity was the clear basis for the relief in A.H. Robbins.
11  Indemnity's been recognized by the Third Circuit repeatedly as
12  a basis for related to jurisdiction.  That's basically what the
13  modification sought to do.

14        And there were four specific changes, and what I've
15  tried to do, Your Honor, is to mark up this last order to
16  indicate where the four specific changes would be made, so that
17  if you turn the page to page two, and you take a look at
18  paragraph five and paragraph six and paragraph seven -- excuse
19  me -- eight and nine, these all relate to the first area of
20  change.

21        The first area of change pertained to expanding the
22  preliminary injunction to include asbestos-related claims
23  against affiliates who had not filed for protection under
24  Chapter 11.  So it's non-filing affiliates sued for asbestos
25  liability.

1      THE COURT:  Why are they not defendants?  Why are

2  they not debtors?  You've got 62 debtors in this case as it is.

3  Why are the rest of them, who may have some asbestos liability,

4  not part of the estate?

5      MR. BERNICK:  Well, see that's the problem is may

6  have some asbestos liability.  The liability that's being

7  asserted against these affiliates is really the liability of

8  the folks who did file.  Not all of these entities have

9  asbestos liability, so we filed for the people that have

10  asbestos liabilities, but because of the nature of outside

11  litigation, sometimes people get sued who aren't actually the

12  source of the liability.  They get sued anyhow, so the idea is

13  to give protection to those people and to avoid a situation

14  where asbestos liability is being determined as a central issue

15  here and also still being litigated outside the Chapter 11.

16      The whole purpose of this Chapter 11 was to bring all

17  the asbestos liability together in one place and to deal with

18  it at once, and the fact that there are some people who still

19  decide to sue other entities on the theory that somehow they're

20  responsible for that same liability, that's the problem that

21  we're trying to address with the preliminary injunction.

22      Yet in the prior orders, the TRO and the preliminary

23  injunction didn't have any problem with that.  In fact, in the

24  TRO we included all these entities, and then it was pointed out

25  to us and said, "Well, you know some of those entities haven't

1  actually been sued yet.  Why don't you wait until they're

2  sued?" and said, "Okay."  So the preliminary injunction took it

3  out.  Now we're putting it back in, because it turns out that

4  they're having such suits.  For example, suits against the

5  individual whose now a former employee, not a debtor, who is

6  responsible for running the Libby mine.  There's a lot of

7  litigation concerning a mine in Libby, Montana which is a

8  vermiculite mine, and there was asbestos contamination in the

9  vermiculite, so there's a lot of claims that relate to that.

10         Well, the former manager of the Libby mine has been

11  sued as an individual.  He's not a debtor.  The source of the

12  liability is W.R. Grace, so the purpose of this is to pick up

13  as a non-filing affiliate, an individual who has now been sued

14  for our asbestos liability.

15         Now, in this area I don't believe that there is any

16  objection to the language modifications that's highlighted,

17  excepting only that we've soft picked up the insurance

18  carriers.  Insurance carriers -- the insurance policies are

19  properties of the estate.  We want to protect those policies,

20  so we seek to have litigation that's being brought against the

21  insurance carriers asserting asbestos liability.  We have a

22  lawsuit down in Louisiana.  It's a direct action lawsuit

23  against the insurance carriers which seek to shut that down.

24         Now, insurance carriers are picked up in the original

25  TRO.  They are picked up in the preliminary injunction, but we

**J&J COURT TRANSCRIBERS, INC.**

1  now have an objection from the Personal Injury Committee -- the

2  Bodily Injury Committee saying, "You ought to identify the

3  individual policies.  The language is okay, but you ought to

4  identify the individual policies, so we know what it is that

5  we're talking about," and they point out that in the Babcock

6  and Wilcox case where we also represent the debtor in Babcock

7  and Wilcox -- we also represent the personal injury folks in

8  Babcock and Wilcox -- there's a similar list provided.  We'd be

9  willing to furnish that list to the Court.  That is the list of

10 the policies that we are aware of.

11         We deliberately included broad language here, so that

12 we wouldn't have to be back for further modifications, and we

13 have no quarrel with the idea of having a list of the policies

14 that we believe are at issue, and we could undertake to do that

15 within the next seven days and furnish that to the Court.  I

16 don't know if that meets the concern that the personal injury

17 people have, but to my knowledge, that is the only pending

18 objection against the non-debtor affiliates slash insurance

19 language in the current order.  I don't know if it would be

20 appropriate to find out if there's any objection to --

21         THE COURT:  Mr. Lockwood.

22         MR. LOCKWOOD:  Provided that it's both the insurance

23 carriers and the insurance policies.  I assume that Mr. Bernick

24 didn't intend to give us policies without carriers, and

25 secondly, with -- that the submission that he's going to

1  furnish as was done in <u>Babcock and Wilcox</u> is appended to the
2  Court's order, so that the parties that have received notice of
3  the order will know what the identified protected entities and
4  policies are.  That would be acceptable to us, Your Honor.  No
5  problem from my point of view.

6          THE COURT:  Okay.

7          MR. BERNICK:  The second item is marked as a little
8  two on page three, and you'll see that refers -- that appears
9  next to paragraph ten where it defines the actions as other
10 counsel.  I've highlighted the language.  It says, "and actions
11 that have not been filed or are not pending as of the date of
12 entry of this order."

13         If you also flip the page to page four, you will see
14 that there's another little two which appears opposite the
15 first operative paragraph.  That paragraph now contains a
16 second sentence that says, "Any additional actions that are
17 filed and served upon affiliated entities are upon completion
18 of service stayed and enjoined pending a final judgment in this
19 adversary proceeding or further order of this Court."  Those
20 two are marked two, because they refer to the second issue.
21 That issue being the effect of this order on newly filed
22 claims.  In other words, the same number of claims that were
23 pending at the time that these orders first were entered.

24         At the time of the TRO the TRO picked up current
25 claims and future claims.  Again, the preliminary injunction

47

1  moved back a little bit saying, "Well, why don't we wait and
2  see if they're filed," but then it turns out that they did get
3  filed.  There are a whole series of lawsuits that still
4  continue to get filed, so in our modification request we said
5  we want to bring back in the language that would preclude the
6  prosecution of new cases, and we put that back in the order.

7       Now, when we did that, we drew an objection by the
8  Property Damage Committee that says, "Well, if you're telling
9  people not to file future claims, what happens to the statue of
10 limitations?"

11      THE COURT:  Well, I read that, and I agree that there
12 maybe such an issue.  I guess my concern is why are people
13 filing new asbestos claims rather than filing claims?  There is
14 no reason at this point with a bankruptcy pending for people to
15 be filing a lawsuit at least against debtor entities.

16      Now against officers, directors, and affiliates, I'm
17 not sure.  I suppose the automatic stay isn't going to reach.
18 Wouldn't it make more sense simply to say that if you're going
19 to have claims filed, there is a body -- a repository
20 somewhere?  Surely, the debtor has to have a repository of
21 claims that are filed against it somewhere and its affiliated
22 entities.  Wouldn't it make more sense to have some notice
23 provision?

24      MR. BERNICK:  Well, the problem I think was the one
25 that Your Honor indicated, which is this goes beyond claims

48

1  against the debtor and picks up third parties, so the concern

2  is that if a person got a lawsuit against a third party, it

3  wouldn't necessarily be filed as a claim against the debtor in

4  the bankruptcy.

5          THE COURT:  Even if it -- no, I agree, but how is the

6  debtor treating claims that are filed against its affiliates?

7  Don't you have a program set up somewhere that indicates that

8  so and so filed an asbestos claim?

9          MR. BERNICK:  Oh, we keep track of them.  Absolutely.

10         THE COURT:  Yes.

11         MR. BERNICK:  And indeed that's really the force of

12 where we're going here, and that's why we modified the

13 language.

14         THE COURT:  Okay.

15         MR. BERNICK:  In light of the concern that the

16 Property Damage Committee raised, we, first of all, said,

17 "Well, the statute of limitations would be tolled."  That

18 created more controversy because --

19         THE COURT:  Well, this works.  If they're agreeable

20 with it, this allows --

21         MR. BERNICK:  What they do now is they basically file

22 their claims.  Everybody knows that the claim has been filed.

23 It's just stayed immediately upon completion of service.

24         THE COURT:  Does this work for you?

25         MR. LOCKWOOD:  It works for us, Your Honor.

1          THE COURT:  All right.  That's fine.  It works.
2  That's fine.

3          MR. BERNICK:  The third item -- now we're going to
4  move out of asbestos liability into claims that brought against
5  third parties which affect the property of the estate or
6  essentially against the estate by virtue of indemnity or other
7  relationships, and that's why I now come down to item three
8  under 10(e).  It now is defined to include as actions, "Actions
9  against current or former officers, directors, or employees of
10  debtors that arise out of such officer's, employee's, or
11  director's employment or relationship with debtor," so we want
12  to pick up the lawsuits against the employees.

13          THE COURT:  Mr. Bernick, let me interrupt you.  Would
14  you folks on the phone kindly hit your mute buttons until
15  you're prepared to speak?  You are writing or breathing or
16  something, and I'm not criticizing you for breathing, but
17  you're breathing into the microphones, and as a result, we're
18  getting a lot of static here.  Please hit your mute buttons
19  until you're prepared to speak.  Thank you.  I'm sorry, Mr.
20  Bernick.

21          UNIDENTIFIED SPEAKER:  Your Honor, I don't think I
22  have a mute button.  I'll try not to breath.

23          THE COURT:  Well, not that's all right.  Please don't
24  stop breathing.  Just do it a little further away from the
25  microphone, please.

**J&J COURT TRANSCRIBERS, INC.**

1    MR. BERNICK:  It's also rustling of paper.

2    THE COURT:  It's paper rustling and pen motion more

3 so than anything else.  Thank you.  Mr. Bernick, go ahead.

4    MR. BERNICK:  Okay.  So we're talking about lawsuits

5 against current or former officers or employees.  This is very

6 much within the mainstream of the cases.  They have often been

7 -- you have that in Robbins.  You have that in Manville.  You

8 have that in other cases, but you have to -- we wanted to

9 proceed cautiously in this area, because we know that this is

10 no longer asbestos liability.  It's other kinds of liabilities,

11 and we've looked to determine whether, in fact, the kind of

12 litigation that's being brought is, in fact, litigation where

13 there would be an indemnity obligation and whether the

14 litigation pertains to people.  That is the defendants are

15 employees who are people who would make a difference to the

16 case.

17    And there are two such suits that we have identified.

18 One is called Munoz, and in Munoz there was an agreement that

19 the case would be stayed on condition that the results of a

20 certain psychological examination were turned over, and that

21 was done with agreement along those lines, is Supplement B to

22 the supplement -- Exhibit B to the supplemental submission.

23 It's a letter confirming with counsel for the -- in the Munoz

24 case that their objection would be resolved if the

25 psychological exam were furnished.

**J&J COURT TRANSCRIBERS, INC.**

51

1        The second case is the <u>Lock</u> case.  The <u>Lock</u> case is
2   an employment discrimination case.  It's brought against a
3   Robert Bitocchi (phonetic), and Robert Bitocchi is a very
4   senior officer of Grace.  He's head of Grace's major business
5   which is performance tentacles.  He's a board member of Grace
6   Connecticut, which is one of the enemies, and he is further a
7   key witness in connection with the Zonolite Attic Insulation
8   claims that are a prominent feature of this case.

9        We pointed all of this out.  An issue had been raised
10  about whether there really was an indemnity, and we in our
11  supplement attached Exhibit C, which is a copy of the bylaws
12  that includes the relevant indemnity provision.  So this is
13  classically a case where there's a lawsuit brought against a
14  third party subject to an indemnity, and because of that
15  indemnity, it's <u>Robbins</u>, it's <u>McCartney</u>, it's covered by
16  preliminary injunction, and it's particularly important here
17  where you have prominent people who are important to the
18  Chapter 11.

19       My understanding at this time is that nothing has
20  happened in the <u>Lock</u> case pending a determination by this Court
21  of what to do in connection with the preliminary injunction.  I
22  don't know if Mr. Lock's counsel is on the phone, Your Honor.

23       MS. MILLER:  I am.  This is Kathy Miller on behalf of
24  Robert Lock.  As far as the proceeding in Massachusetts, this
25  case was -- the bankruptcy case was filed.  Obviously, it was

1  stayed against Grace.  The discovery in the case is complete

2  other than some discovery deficiencies.  The Massachusetts

3  Court ordered Mr. Bitocchi to provide the discovery which, as

4  we understand is done, but they haven't turned it over, so that

5  ruling came post-filing of the bankruptcy, and that still

6  hasn't happened.  I understand from my co-counsel that in

7  August they filed a motion to compel compliance with the

8  Court's order with respect to Mr. Bitocchi, and I understand

9  that, that has not been heard, so that motion is pending, just

10  to bring Your Honor up to date on where that is.

11      We disagree with -- that this preliminary injunction

12  should extend to him.  I'm not sure if Your Honor wants me to

13  address that now or not.

14      THE COURT:  You might as well, Ms. Miller, because I

15  think I'd like to get through as many of these issues today as

16  we can, so if you're prepared to do it, please go ahead.

17      MS. MILLER:  Well, I just have a comment on the

18  indemnification.  Initially, we argued this in front of Judge

19  Farnan.  At that time the debtor had other procedural problems

20  such as not even filing an adversary proceeding, not even

21  serving our client, but has subsequently done that.  We filed

22  an answer.  That issue is aside, but there are still a couple

23  other problems.

24      One is that, you know, there are statements made

25  about what is Mr. Bitocchi's role.  It's still unsupported, and

1  that was something we raised back in June, and we don't --
2  unless I've missed it, I don't see any affidavit.  The
3  complaint's not verified.  There's nothing for us to really
4  test that to see what kind of involvement he has or how this
5  really would affect a reorganization.

6          As I said, the discovery in the case is complete
7  other than Mr. Bitocchi's obligation to finish the discovery
8  that was deficient.  The defendants in Massachusetts filed a
9  motion for summary judgment, and our answer to that is due
10 after he files the response.  So the case is, as far as
11 discovery wise, is almost over, and I don't know whether the
12 summary judgment would resolve it or not.  From there it needs
13 to be tried, so it's not something that would take a lot of his
14 time we don't think, and without any kind of support for their
15 statement, we don't think it's a valid statement or sufficient
16 evidence that it would hamper the reorganization.

17          With respect to the indemnification, they did provide
18 the bylaws which state, "It shall -- the officers and directors
19 shall be indemnified to the fullest extent authorized by GCL as
20 exists."  That's -- it's a Delaware Corporation.  It's Delaware
21 corporate law.  The case cited by the debtor is Robbins, and in
22 their -- I think it's in their memorandum in support of motion
23 for summary judgment.  It says that, "An illustration is where
24 the third party is entitled to an absolute indemnification by
25 the debtor on account of any judgment."

1      Delaware corporation law does not provide absolute

2  indemnification where a condition is precedent.  We do not know

3  whether or not there is even entitlement to indemnification

4  until you have a trial on the case, and the matter is resolved

5  and determined, and then there needs to be determination, and

6  there are a few things that are under Delaware corporation law

7  that have to be satisfied before the officer and director would

8  be indemnification.  So it is not a situation where it is

9  absolute indemnification, and I think just, "Oh, there's

10  indemnification language out there," is sufficient to stay this

11  litigation.

12      THE COURT:  Who is representing Mr. Bitocchi in the

13  litigation?  Is it -- has Grace assumed the defense?

14      MR. BERNICK:  I believe -- I don't know the answer to

15  that question.  I know that we're paying for the defense.  I

16  don't know if we are -- if it's Grace's counsel.  I would

17  suspect he had his own counsel.

18      MS. MILLER:  They make a statement in the paper that

19  they're incurring tremendous legal expenses.  We don't know

20  that either.

21      THE COURT:  All right.  I guess the problem is I

22  don't have an affidavit that lays out the facts.  Would you

23  like to submit one?

24      MR. BERNICK:  Yes, the -- on the indemnity, the

25  indemnity is clear we believe from Exhibit C to the

1  supplemental, which I believe we have furnished to the Court,
2  and if there's any question about the indemnity, I'd be happy
3  to address it.  I don't hear counsel arguing that the indemnity
4  in some fashion isn't good.

5          With respect to Mr. Bitocchi's position and basically
6  verifying the facts, I represent to the Court we'd be happy to
7  do that, and we'd do that promptly.

8          THE COURT:  All right.  Well, I think counsel's
9  position about the indemnity is that all it says is that it's
10 an indemnity to the extent provided by Delaware law, but
11 Delaware law doesn't authorize an indemnity until there is a
12 determination of liability and you satisfy some of the other
13 conditions of Delaware law, and Robbins does say that it has to
14 be an absolute indemnity.  I'm not totally sure that an
15 indemnity is anything other than absolute if it applies, but
16 nonetheless, that's -- Robbins does use that --

17          MR. BERNICK:  That strikes me that -- it's a force
18 forest for trees issue.  If you're sitting here at the outset
19 of a case, and, obviously, if you were litigating the case to
20 its conclusion, you would find out what the final liability is
21 and whether the indemnity is, in fact, what it purports to be.
22 Now the decision has to be made and is made in all of these
23 cases based upon the outset of the case and what's alleged in
24 the nature of the indemnity.  If there were something about the
25 indemnity itself that was qualified and that was limited, you

1  could see on the face of it, it might not apply.  That would be
2  one thing.

3      But all these decisions have to be taken precisely
4  when there hasn't been a final determination of what the
5  liability is and what the indemnity is.  If you wait til the
6  end of the day, it's a little bit late.

7      THE COURT:  Well --

8      MS. MILLER:  Yes, 1 --

9      THE COURT:  -- the debtor has to liquidate the
10 claims.

11     MS. MILLER:  This is Kathy Miller.  I disagree with
12 that analysis.  There can be an indemnification that the -- in
13 a tort claim that, you know, a landlord indemnifies fully, you
14 know, a tenant or the other way around, you know.  It is a
15 problem with the language.  Their way would be language out of
16 the bylaws, but you have to read it in conjunction with the
17 Delaware statute, and the bylaw says it explicitly, "subject to
18 the terms of the Delaware statute," and when we read them
19 together, it is not an absolute right, and there may not be
20 even an obligation to indemnify at all.  It's not a question of
21 how much and what the indemnities going to be.  It's is there
22 even a right or an obligation to indemnify, and you won't know
23 that until the end, and that's the way that the Delaware
24 statute works.

25     MR. BERNICK:  In A.H. Robbins, Your Honor -- I mean

57

1  this has been done in every single case -- in every single case
2  at the outset including in particular <u>A.H. Robbins</u>.  There were
3  claims against the officers and directors.

4       THE COURT:  Was it based on Delaware law?  If the
5  indemnity was not the same and it was not written the same way
6  based on Delaware law, then it's irrelevant.  I mean it may
7  have some argument value, but it's not precedential.

8       MR. BERNICK:  But then <u>McCartney</u> adopted <u>Robbins</u>.

9       THE COURT:  <u>McCartney</u> I think does adopt <u>Robbins</u>.  I
10 think I need an affidavit from you that lays this out.

11      MR. BERNICK:  I'd be happy to do that.

12      THE COURT:  -- so we will look at it with respect to
13 an affidavit.  Ms. Miller, I'm going to require debtor's
14 counsel to provide an appropriate affidavit both with respect
15 to Mr. Bitocchi's position and why the suit should be stayed as
16 to him given his role in Grace's reorganization and with
17 respect to his position of the application of the indemnity.
18 How much time do you need for that?

19      MR. BERNICK:  Oh, ten days.  Probably less than that,
20 but let's just do ten days and be safe with it.

21      THE COURT:  All right.  In ten days that's to be
22 filed and served on Ms. Miller.  Ms. Miller, would you want an
23 opportunity to respond?

24      MS. MILLER:  Yes, Your Honor, I would, please.

25      THE COURT:  How much time?

1          MS. MILLER:  Ten days.  I'm sorry.  Another ten days

2  would be fine.

3          THE COURT:  This will be a counter-affidavit?

4          MS. MILLER:  I don't know that, Your Honor.  It may

5  deal more with the indemnity issue.

6          THE COURT:  All right, or a brief.  So it would be 20

7  days from today.  Okay.  This matter is continued until --

8  would you like the January 29th date?

9          MR. BERNICK:  Sure.  There are couple other items,

10  Your Honor, on this preliminary injunction, but you want to do

11  a --

12          THE COURT:  No, I'd rather do them all at one time.

13          MR. BERNICK:  So let's hold off here.

14          THE COURT:  Hold off.  All right.  Ms. --

15          MR. BERNICK:  It may so work out, but let's push

16  ahead.

17          MS. MILLER:  Your Honor, if I may?

18          THE COURT:  Yes.

19          MS. MILLER:  I believe we're done with our argument

20  part.  May I ask permission that someone sit in and listen to

21  the rest of this to get the date?  I have an 11:30 hearing.

22          THE COURT:  Yes, ma'am.

23          MS. MILLER:  Thank you.

24          MR. BERNICK:  Your Honor, if you flip to page five,

25  page five has got three cases, and I'm going to come back to

1 the two remaining cases on page four in a minute, but page five
2 might be a little bit faster.  Page five deals with three
3 cases.  These all relate to a business called Samson, and
4 Samson purchased Grace's petroleum business subject again to
5 certain indemnities, so people are now suing Samson.  Samson
6 says these are really matters that are handled or covered by
7 the Grace indemnity, so they fall into the same indemnity
8 category.

9           There are three of them.  There's Exxon Corp. vs.
10 Samson.  There's U.P. vs. Samson, and there's Ellison vs.
11 F.P.C. Disposal.

12           Taking them in reverse order, with respect to Ellison
13 vs. F.P.C. Disposal, agreement was reached as to this
14 injunction provided that the only matter that would be enjoined
15 or the other only part of the litigation that would be enjoined
16 are actions as to Samson Investment Company, Samson
17 Hydrocarbons Company, and their subsidiaries and affiliates.
18 You'll see that's the lead-in language at the bottom of page
19 four.  That was adopted in order to resolve the matter as to
20 the Ellison suit, so the Ellison's don't have an objection, as
21 we understand it.

22           With regard to U.P., which is number two, that matter
23 has been settled, so really, we come back to the Exxon Corp.
24 vs. Samson Hydrocarbons, which is number one.  Now there, there
25 is a -- the situation is as follows.  There was no timely

1 objection to this motion by Exxon.  Their date passed.
2 However, they have now submitted a motion for summary judgment
3 dismissing the adversary that was commenced against them, and
4 that is item 22 on the agenda, and I think there are really two
5 alternatives.

6         One is if counsel for Exxon is present today, we can
7 take up the motion for summary judgment on the merits now.  In
8 the alternative, I think that procedurally the correct
9 disposition of this is that the preliminary injunction ought to
10 be entered as there was no timely objection to it, and then if
11 they want to set on their motion for a hearing on summary
12 judgment, if they prevailed in the preliminary injunction, it
13 would be resolved as to that.  I think that's probably the best
14 way in which to do it.  Effectively, that's where we're at
15 because of the timing of the submissions, and we're prepared to
16 do it either way.

17         The claim is again based on the indemnities.  It
18 focuses on the indemnities.  We've now submitted the indemnity
19 language.  It's part of our supplemental brief, and we feel
20 that the record, therefore, is -- the defense of these cases
21 has been assumed, and the money that's now at issue is Grace
22 money.

23         MR. BROWN:  Your Honor, this is Stuart Brown
24 representing the Ellison's.  My mute button actually prohibited
25 me from more timely responding.  In addition to the agreement

1 that we have, we were a bit concerned by the broad

2 interpretation that the inclusion of the term, and it's

3 affiliates, quote/unquote, may have on the scope of our

4 settlement, and we have a -- I don't know about side agreement,

5 but we've got the record to reflect that the debtor will not

6 seek to enforce the order to the extent that any non-indemnity

7 is later determined to be an indemnity.

8        THE COURT:  But I'm not clear.  If it's a related

9 affiliate, then this order would apply to the extent that it's

10 related if the debtor has an indemnity.

11        MR. BROWN:  To the extent that the -- it's a non-

12 indemnity and if a Court determines that an affiliate is

13 protected by the order because of the broad language of the

14 inclusion of that language, then the debtors have agreed not to

15 seek to enforce the order with respect to such non-indemnity.

16        THE COURT:  I see.  So the debtor is only seeking to

17 enforce the order with respect to the parties who are currently

18 involved in the litigation and identified as affiliates?

19        MR. BROWN:  And identified as indemnities.

20        THE COURT:  Mr. Bernick.

21        MR. BERNICK:  Yes, I'm tempted to say I agree,

22 because I don't if it's a distinction that makes a difference.

23 I've got a letter from Stuart Brown, counsel, that doesn't

24 raise any of these issues, and so it's a little bit late in the

25 day.

1          MR. BROWN:  Well, this is a letter that I sent you on

2  July 20th, and I don't know if you have that with you or not.

3          MR. BERNICK:  On July the 20th?

4          MR. BROWN:  Yes.

5          MR. BERNICK:  Well, I do not have that.  1 have one

6  that was sent on the day that we -- on the date that we

7  appeared before Judge Farnan and represented that, in fact,

8  this was agreed to.  This has been represented as agreed to

9  dating back to that hearing on June 21.

10          THE COURT:  Frankly, gentlemen, I don't think you

11  have an issue.  I think perhaps what you need is simply to get

12  a paragraph in an order that will satisfy what both of you are

13  attempting to accomplish.  I think you're both saying that

14  you're agreeing that the injunctive relief will apply not to

15  any motions to transfer venue, but that's in _Abner_.  I don't

16  think that applies to _Ellison_ anyway.  So it's saying

17  essentially that this is stayed as to Samson Investment

18  Company.  I guess the concern is whether any of the other

19  defendants are somehow affiliates of the debtor.

20          MR. BROWN:  They are, and that's the concern we have.

21          MR. BERNICK:  Well, but is there some particular

22  subsidiary that does not have the benefit of the indemnity that

23  you can identify to the Court?

24          MR. BROWN:  I can't do that right now, no.

25          MR. BERNICK:  Well then I don't know why we're

1  arguing about this.  That's the point.

2       MR. BROWN:  Well, I'm not saying that doesn't exist.
3  I just can't identify it right now.

4       MR. BERNICK:  Well, we would propose that this --
5  this was an agreed matter that we had on before.  If there had
6  been something more particular that he wants to -- if he can --
7  and maybe, Your Honor, we're going to have a little bit of
8  time.  If he wants to submit something in seven days that
9  identifies some affiliate or subsidiary that would not get the
10  benefit of the indemnity, we can be -- we can see what that is.

11       THE COURT:  I think, Mr. Bernick, it may be easier if
12  we simply say that these actions are stayed as to Samson and
13  their subsidiaries and affiliates, and if it turns out later
14  that one of these affiliates is not the beneficiary of an
15  indemnity, then in that instance Mr. Ellison can seek relief
16  from this Court.

17       MR. BERNICK:  That's fine.

18       THE COURT:  And I think that would simply preserve
19  the situation, because you're trying to protect indemnities not
20  defendants who are not subject to an indemnity.

21       MR. BERNICK:  Correct.

22       THE COURT:  So I think that would work.  Mr. Brown,
23  is -- would something to that effect be agreeable to you?

24       MR. BROWN:  Your Honor, I don't disagree with Mr.
25  Bernick's representation that we had agreement, and in my July

1  20th letter to him, and to his co-counsel Janet Bayer.  I set
2  forth what his representation to me was with respect to the
3  debtor's intentions concerning the enforcement of the order
4  against parties who were non-indemnities and are affiliates,
5  and at that time on July 20th, which I believe is the date that
6  Mr. Bernick last sought to hand up an order on this motion, in
7  that letter I set forth this representation, and I have not
8  heard anything back from them saying that Mr. Bernick is not
9  intending to live up to that representation.

10        THE COURT:  No, I think he's saying he is intending
11  to.   The question is whether or not at this point there are any
12  such subsidiaries or affiliates that are not the beneficiary of
13  the indemnity agreement.  Mr. Bernick's position is that as far
14  as he knows, they are all subject to the indemnity.  If it
15  turns out later that one is not subject to the indemnity, then
16  all you need to do I think is come back to this Court and say,
17  "Look.  Here's the proof that one isn't subject to the
18  indemnity," and the debtor won't seek to enforce the order as
19  to that subsidiary, but what -- if I understand him correctly
20  on this record, what he's saying is he doesn't think there are
21  any such entities.  Mr. Bernick, am I misrepresenting what
22  you're saying?

23        MR. BERNICK:  No, that's fine, and maybe -- is there
24  an objection, counsel, to the language that we now have in the
25  order?

1          THE COURT:   The order right now, Mr. Brown, says,

2     "It's further ordered that the following actions are stayed.

3     As to Samson Investment Company, Samson Hydrocarbons Company,

4     and their subsidiaries and affiliates," and one of the three

5     enumerated actions is the <u>Ellison</u> action that's pending in

6     Oklahoma.

7          MR. BROWN:   Right, and with -- there's no objection

8     with Mr. Bernick's representation that the debtors will not

9     seek to enforce the order as to such non-indemnities that are

10    affiliates.

11         THE COURT:   If there are any, yes.   The problem is --

12    the question is -- here's the issue.   The order that I am being

13    asked to enter will stay all actions against all subsidiaries

14    and all affiliates.   If it -- because the debtor's position is

15    that as of now, all those subsidiaries and affiliates are the

16    beneficiary of the indemnity.   If you develop information that

17    indicates that, that is not the case, you would have to get

18    something before me that would get relief from this order.   If

19    you can show Mr. Bernick that, in fact, there is a subsidiary

20    or an affiliate that does not share in the indemnity agreement,

21    then the debtor agrees that it won't move to enforce this order

22    as to that entity, but you're going to have to do something

23    that will lift the stay as to that entity, because right now

24    I'm staying the action as to everything, because the

25    representation is that everything is subject to the indemnity.

1          MR. BROWN:  Well then, Your Honor, I would much

2   rather prefer to take the next two or three days and have an

3   opportunity to present that to Mr. Bernick as opposed to having

4   to -- I'm trying to live up to my representation to the debtor

5   that my objection on behalf of the Ellison's is resolved

6   subject to Mr. Bernick's representation with respect to the

7   scope and enforcement of the order, and that was -- that would

8   not require me to file a motion for relief from stay.

9          THE COURT:  No, I'm not saying you need to -- not a

10  362 motion.  You'd need to do something that would clarify that

11  this order would not apply to that.  This is an injunction.

12  It's a stay --

13         MR. BROWN:  Right.

14         THE COURT:  -- of litigation.  You'd have to do

15  something that would clarify that this order would not apply to

16  that particular affiliate.

17         MR. BERNICK:  He could --

18         MR. BROWN:  And my  -- Your Honor, my point is that I

19  think that I've done that with Mr. Bernick by virtue of my July

20  20th letter to him and not having received any response to

21  that.

22         THE COURT:  Now we're talking apples and oranges, Mr.

23  Brown.  This is really getting very complicated for no reason

24  that I can see.  The issue is are there any such affiliates.

25  Mr. Bernick's position is, as far as he knows, there are not.

1    You're saying on this record that you can't identify

2  any as right now, as we're sitting here in Court.  My view is

3  at the moment if I sign this order, it's going to stay the

4  <u>Ellison</u> action as to both Samson companies and all of its --

5  all of their subsidiaries and affiliates, because it's being

6  represented to me that any such affiliates and subsidiaries are

7  the beneficiaries of an indemnity.

8    If you can show Mr. Bernick that, that is not the

9  case, then he agrees.  He will not seek enforcement of this

10  order as to that entity, but I want a clarification of the

11  order that says this order doesn't apply to this action going

12  forward as to XYZ subsidiary.

13    MR. BERNICK:  Right.

14    THE COURT:  And he's -- Mr. Bernick is saying right.

15  I don't know if you can hear him.  He agrees.  So, Mr. Bernick,

16  I think you can add a half of a sentence or a sentence to this

17  order that would clarify that, and that will address this

18  issue.

19    MR. BERNICK:  Okay.  With regard to <u>Exxon</u>, as I

20  indicated to the Court, we didn't have a timely objection, but

21  there is the motion for summary judgment.  I don't know if

22  anyone from Exxon is on.

23    MR. COLE:  Your Honor, this is Adam Cole.  I

24  represent Exxon Mobil.  I guess I'm at a disadvantage in going

25  last.  We're prepared, if Your Honor wants, to deal with the

1  issue right or to schedule a hearing at a later date.

2  THE COURT:  Well, with respect to the scope of the
3  injunction, I think I'm prepared to address it now, but Mr.
4  Bernick's suggestion is that perhaps we should deal with it in
5  the context of your motion for summary judgment.  Would you
6  prefer to do that?

7  MR. COLE:  Yes, because if -- there was some
8  confusion -- and I'm not blaming the debtor in any way.  There
9  was some confusion as to the service of this action against
10  Exxon Mobil that resulted in our not complying or responding to
11  a motion for preliminary injunction.  If it means that there's
12  going to be a preliminary injunction entered, we might as well
13  deal with the summary judgment now, so that we can resolve that
14  issue.

15  THE COURT:  All right.  We'll -- I will deal with the
16  summary judgment, but I'm going to deal with that, since it's
17  argument, at the end of this calendar, so that everyone else
18  who's interested in other scheduling and other matters can
19  terminate, so if you'll just stay on, Mr. Cole, we'll deal with
20  it today, but at -- later in these proceedings.

21  MR. COLE:  Okay.  That's fine.

22  MR. BERNICK:  I think with that, Your Honor, the only
23  two other matters that are mentioned in the order are the
24  Smolker case, which is also the subject of a request to lift
25  stay, and that is item number four on your agenda, and then the

1  Kane matter which is number 16 on the agenda.  That's a motion

2  to lift stay, but does not fall within the scope of the

3  proposed modifications for the preliminary injunction.  So I

4  think that we have Smolker, Perry, and Kane, and then I think

5  we're pretty much done.

6         With regard to Smolker, Smolker -- they've made a

7  request to lift stay.  We want it included.  I guess I'll

8  address that briefly, albeit they're on the phone, and they can

9  pursue their motion to lift stay and then Perry as well.

10         Smolker is a lawsuit brought by a residential --

11  owners of a residential condominium.  They're appearing pro se

12  in their litigation, albeit apparently Mr. Smolker is a lawyer,

13  so it's not a typical pro se case.  As we understand it, there

14  were actually a series of prior lawsuits where the same

15  physical conditions -- this is a lawsuit alleging exposure to

16  pesticide that was manufactured by Grace and applied by other

17  defendants.

18         There have been prior cases where the same basic

19  physical ailments have been alleged due to other things, but

20  this was I think number four in order.  This lawsuit's now

21  being pursued and again involves a Grace product as well as

22  somebody applying a Grace product.  That's the -- those are the

23  home people.

24         We originally moved to include this Smolker case

25  within the scope of the preliminary injunction on three bases.

1  Number one.  It's taking place in California where there is --
2  where there are claims for equitable indemnity, and, therefore,
3  you have an indemnity situation.  It's not a contractual
4  indemnity.  It's an equitable indemnity.

5       Number two.  Our product is -- the Grace product is
6  centrally at issue in the case, and we're concerned that if you
7  start to have toxic tort cases emerge with respect to one of
8  your products, that it can have a ripple effect, and we've seen
9  that obviously.  Any company in America has that very much on
10 their minds.

11      And then finally some of the people who are involved
12 in the Smolker case on the Grace side are also people that are
13 important to the organization, and we pointed that out.

14      Since this matter was originally heard, the case
15 proceeded.  Effectively, we moved -- we removed the case and
16 sought to transfer it from California as the preliminary
17 injunction in this case gave us the latitude to do.  That was
18 unsuccessful.  The case was remanded back down to State Court.
19 It was not transferred, and apparently, it's now gone through
20 trial.  In the first phase of the case was a trial dealing with
21 the product claims.  They went to trial against the applicator.
22 It did not go to trial against Grace.  Information was
23 furnished by Grace in connection with that case.

24      As I understand it, the case was to take a week for
25 the plaintiffs to put their case on, and then there would be a

1 defense.  As it turns out, the Smolker's took three weeks to
2 try their case.  The judge had to declare a mistrial, because
3 it running into his vacation time.  In the meantime, he took a
4 verdict from the jury based solely on the Smolker's own
5 evidence, and at  least as I understand it, they came back 12
6 zero against the Smolker's.  So the Smolker's it seems had
7 their day in Court and access to information from Grace, and
8 the case has not turned out well for them at all.

9          You'd think at this point in time that enough is
10 enough.  The case ought to come to a stop.  It's a case that
11 effectively attacks our product.  It ought to be subject of the
12 scope of the preliminary injunction.

13          THE COURT:  Ms. Smolker, do you want to --

14          MS. SMOLKER:  Yes, this is Mrs. Smolker.  May I be
15 heard?

16          THE COURT:  Yes.

17          MS. SMOLKER:  Also, just to clarify for the Court,
18 I'm also an attorney in California not licensed to practice in
19 Delaware or in Pennsylvania and appearing in pro per in this
20 matter.

21          To go back to the beginning, when the Bankruptcy
22 Court in Los Angeles remanded the case back to the State Trial
23 Court, it was on the basis that the Bankruptcy Court has no
24 jurisdiction over the Smolker case as it involves the other --
25 the non-Grace parties.  In other words, all the other parties

72

1  that are presently in the case except for Grace.  The Court
2  found it was not even related to the bankruptcy, and I had sent
3  a copy of that opinion to Judge Farnan, who at the time I
4  thought was deciding this, in my letter dated July 27th of
5  2001.  I don't know if you have that or a copy of Judge
6  Blubon's (phonetic) memorandum decision, but I had sent that to
7  the Court back in July.  That was a case that was decided in
8  July of last year.

9        The Smolker action involves no subsidiaries or
10 affiliates of the Grace Company.  It does not involve any
11 contractual indemnity.  It's true that the trial did start in
12 December, and we had told the Judge all along that this was
13 going to be a long case to try, and nevertheless, the Judge
14 ordered it to begin at the beginning of December, and about
15 half way through the case declared a mistrial, because the
16 Judge wasn't going to be available the entire case.

17       So there was no decision by a jury.  There was no
18 complete case presented.  There was no complete closing.  We
19 didn't even put on our whole case, so counsel's comments
20 regarding what a jury decided are just pretty much meaningless,
21 because a mistrial is as if there's been no trial at all.

22       We don't have a new trial date set yet.  We have a
23 trial setting conference coming up in a couple weeks in this
24 case in California, but we do have a situation where the
25 parties are set to go to trial, and, Your Honor, I don't know

**J&J COURT TRANSCRIBERS, INC.**

1 if it's -- it's a little bit difficult to separate out, but at

2 this point I'm just talking about extending the injunction as

3 opposed to the relief from stay.  Is that all right?

4          THE COURT:  Yes.

5          MS. SMOLKER:  All right.  In terms of their motion to

6 extend the injunction, the Smolker case does not involve any

7 parties related to Grace, does not involve any contractual

8 indemnity.  There's no relationship to the bankruptcy at all,

9 and accordingly, we believe that the motion to extend the

10 injunction as to the Smolker case should be denied.

11          THE COURT:  Well doesn't it involve the debtor's

12 product?

13          MS. SMOLKER:  Yes, it does but against another party

14 -- against an applicator who misapplied it.

15          THE COURT:  And so you're not contending that it's a

16 defective product in this suit.  Only that it was applied

17 improperly?

18          MS. SMOLKER:  Well, we are contending it's a

19 defective product.  There is our action against Grace which

20 right now is stayed automatically.  That part is not going to

21 be tried unless Your Honor lifts the stay as to Grace, and I

22 can get to that later.

23          THE COURT:  I -- with respect to your request for

24 relief from stay as to Grace, quite frankly, I'm not sure

25 that's appropriate.  If you have a claim against this estate,

74

1  you should file it against this estate, and then if it's
2  necessary to be litigated, it will be litigated in an objection
3  to claim process as opposed to a State Court litigation.  So I
4  don't see the need for that, but my concern is I don't know the
5  state law requirements in California.  In order to meet your
6  burden of proof that this product was misapplied, do you have
7  to prove that it was a defective product, or do you have to
8  prove that it was a safe product but misapplied?

9          MS. SMOLKER:  No, in order to prove the case against
10  the applicator, we do not need to prove that it's a defective
11  product.

12          THE COURT:  All right.  Are you intending to prove
13  that it's a defective product because --

14          MS. SMOLKER:  Yes.

15          THE COURT:  All right.  Well, then I don't see any
16  reason not to --

17          MS. SMOLKER:  Actually, you know what, Your Honor?
18  Yes, it -- yes, part of our case is proving that it's a
19  defective product.

20          THE COURT:  Okay.  Well, if that's the case, then it
21  seems to me that it's appropriate to extend the injunction to
22  cover that, because what you should be doing is filing a proof
23  of claim when a bar date's set in this case for that issue, and
24  then to the extent that it's necessary to litigate the issue,
25  it will forward in the appropriate bankruptcy context.

**J&J COURT TRANSCRIBERS, INC.**

1       MS. SMOLKER:  Well, here's the problem with that,
2  Your Honor.  First of all, at the time Grace filed its
3  bankruptcy our case in California was ready for trial.  It was
4  -- in fact, it was originally set for trial in June of 2000.
5       THE COURT:  Yes, I understand, Ms. Smolker, but
6  unfortunately, when you're dealing with a case that has in
7  excess of 400,000 plaintiffs, you find them in all stages of
8  litigation, and this is not the only case.  In fact, in -- I'm
9  not sure if it was this one or in -- I think it was in the
10 Pittsburgh Corning case there were actually cases that were
11 going to trial, and, in fact, in Court that were stayed, and
12 I'm -- I can tell you that it didn't make anybody very happy,
13 particularly the judges who had prepared for those cases.
14       Nonetheless, that's the effect of the automatic stay.
15 It stays cases.  It stayed this case as to Grace, and it
16 appropriately should stay this case with respect to Grace's
17 product, because your claim against Grace's product is a claim
18 against a property interest that the debtor has, so it should
19 be stayed and this injunction should be extended to cover any
20 allegation that includes Grace or Grace's product as a
21 defective product.
22       MS. SMOLKER:  Well, another thing that Your Honor
23 might want to take into consideration is if our action against
24 the remaining parties is not related to the bankruptcy as the
25 Bankruptcy Court in Los Angeles decided, so that the remainder

1    of our case gets tried in California State Court, then you have
2    a situation where we have a voluminous file and a lengthy trial
3    and several expert witnesses, and to have to go through that
4    once in California and another time on the east coast, whether
5    it be in Delaware or Pittsburgh or whatever, and for us to have
6    to put on a second case against Grace with all these experts
7    and witnesses and so on and so forth, would be burdensome and
8    oppressive for us as well for the Bankruptcy Court.

9            In other words, if the case against the remaining
10   parties is going to be tried in California, then it seems most
11   the most expeditious thing, not only for the Smolker's but also
12   for the courts, would be to have one trial against the
13   defendants rather than two trials.

14           THE COURT:  Well, I appreciate the interest of
15   judicial economy.  I think, however, that there is a bankruptcy
16   policy which at the moment, given the current status of this
17   case, overrides that interest.  I think the question really is
18   whether your case can go forward without allegations that
19   Grace's product is defective.  If it can, and Grace is not
20   involved in those -- that application, and no question is
21   submitted to the jury with respect to the defective product as
22   opposed to a misuse of the product, then I don't see any reason
23   why the misuse issues can't go forward provided that no
24   allegation is made that the product is defective, and you're
25   simply looking at the misapplication.  So I think in that sense

1 I'm willing to limit this injunction to the issues and to the

2 product -- defective product issue and to Grace and its

3 affiliates.   I don't know if that solves your -- the concern

4 you're raising.

5        MS. SMOLKER:  Well, maybe I'm a little bit confused

6 about what you're saying, Your Honor.  Are you saying that you

7 were inclined to stay our case against other defendants,

8 because it involves Grace's product?

9        THE COURT:  Yes, to the extent that you are going to

10 raise an allegation that Grace in essence has to defend or

11 provide information for other entities to defend against the

12 defectiveness of its product.  Yes, to the extent and that

13 extent only I am willing to extend the injunction.  I think the

14 appropriate way to raise that issue is by having you and anyone

15 else who contends that there's a defective product raise that

16 by way of a proof of claim filed in this bankruptcy.

17        So as to the defendants, I'm not -- other than Grace,

18 I'm not concerned about whether the action goes forward or not.

19 I am concerned about the issue, which is whether or not Grace's

20 product is defective.  Would you like an opportunity after this

21 hearing to speak with Mr. Bernick and see if you can work out

22 the terms of an order that will achieve this purpose?  Would

23 you like an opportunity to try to talk to a mediator about this

24 issue to see whether or not you can eliminate the need to

25 pursue this issue of the defective product or Grace in the

**J&J COURT TRANSCRIBERS, INC.**

1  State Court?

2          MS. SMOLKER:  Well, the issue of defective product is

3  central to our case.  Without the defective product, basically,

4  there's no case.

5          THE COURT:  Well, I'm --

6          MS. SMOLKER:  This is essentially -- this is the

7  essential -- this is the essence of the case.

8          THE COURT:  Well --

9          MS. SMOLKER:  It's that this product that was put in

10  our home is defective.  So essentially there's no stay action

11  to try if we're not going to try that issue.

12          THE COURT:  Okay, then that issue is stayed, and I --

13  there will be a bar date for this type of claim at some point

14  set in this case sooner rather than later, because I expect to

15  address that issue at my next hearing in this case.  That is

16  bar dates for something other than asbestos-related personal

17  injury matters.  So you will be getting a notice, Ms. Smolker,

18  of a bar date in the case, and I would suspect that it would be

19  appropriate for you to file that proof of claim and raise that

20  issue here.

21          So I will stay the litigation in California, but I'm

22  not terminating it, because at some point that may be the

23  appropriate place to have this case litigated.  Obviously,

24  there's going to have to be a determination of liability at

25  some point, but for now I think the appropriate way to go about

1  it is to have a proof of claim filed here.

2      MS. SMOLKER:  All right, Your Honor.  Is there

3  anything further that you want to hear about relief from the

4  stay or --

5      THE COURT:  I think because of this ruling that the

6  relief from stay is denied in conjunction with the extension of

7  this injunction, but again, at this point I'm denying that

8  motion without prejudice to your raising it again at a later

9  time, but I think at least until the bar dates are over and the

10  debtor has an opportunity to look at proof of claim issues and

11  file appropriate objections, this action against this debtor's

12  product should be stayed.  So I --

13      MS. SMOLKER:  All right.  My only comment about that

14  at this point, and perhaps Your Honor's not prepared to rule on

15  that stay, is eventually when this case does get tried, that it

16  would just make sense to have it tried in one location, in

17  California State Court, rather than having two trials against

18  two defendants on two sides of the country that involve exactly

19  the same case and the same witnesses.

20      THE COURT:  That may be, Ms. Smolker.  I'm hoping

21  that rather than sending you to trial, I'm going to send you to

22  some settlement process that will not be -- not require a

23  trial, but you know, that may be, and certainly, your ability

24  to preserve that issue and raise it at the appropriate time is

25  stated on this record.

1      MS. SMOLKER:  Thank you, Your Honor.

2      THE COURT:  All right.

3      MS. JENKINS:  Your Honor, if I may, this is Holly

4  Jenkins appearing telephonically as well on that same item

5  number.  I represent Home Savings Termite Control.

6      THE COURT:  No, wait.  I'm not -- no, I'm not

7  prepared to move off the Smolker case yet, please.  Just give

8  me a minute.

9      MS. JENKINS:  It's the same case, Your Honor.

10     THE COURT:  No, please just give me a minute.  Mr.

11 Bernick, I would like you to prepare an order for me, please,

12 that will memorialize what I've just stated on the record with

13 respect to Smolker.  Please contact Ms. Smolker and see if you

14 can agree on the terms of the language of the order.  My ruling

15 is my ruling.  I'm not changing my ruling, but if the language

16 can accommodate both of your needs, I'd prefer to do it that

17 way.  When can I expect to get an order from you?

18     MR. BERNICK:  Well, we'll get it to you within seven

19 days.

20     THE COURT:  All right.  Now, I'm sorry.  Who was

21 speaking next, please?

22     MS. JENKINS:  This is Holly Jenkins, Your Honor, from

23 -- and Moro on the same agenda item you were just discussing.

24     THE COURT:  Yes.

25     MS. JENKINS:  I just wanted a clarification.  I

1 represent Home Savings Termite Control, which is the pesticide

2 applicator.

3           THE COURT:  Yes.

4           MS. JENKINS:  And I just wanted a clarification.  So

5 the Court has extended the injunction to stay the entire action

6 in California.

7           THE COURT:  I am staying the action with respect to

8 any defective product issues.  If there are other issues that

9 do not involve Grace, I am not staying those issues.  If you

10 want the stay of the general action -- if you and Ms. Smolker

11 agree that the entire action should be stayed, I'm happy to

12 stay the whole thing, but for purposes of this bankruptcy

13 estate I see two things that need to be stayed.  One is any

14 action against the debtor, and the second is any action against

15 the debtor's product, so I don't know what all the terms -- I

16 don't know what all your lawsuit involves.  I do not intend to

17 stay anything else unless you're asking me to.  If you want me

18 to, because it makes sense to stay the whole thing, I think I

19 can do that, but my intent is simply to limit it to the issues

20 that are relevant in this bankruptcy.

21           MS. JENKINS:  Your Honor, I think it does make sense

22 if you're going to do this to stay the entire action, because

23 everything is interrelated.  It doesn't make sense to go

24 forward with one little aspect and not -- you know, one little

25 tail of the dog and not the dog, so if Your Honor is going to

1 extend the injunction, then it should extend to the entire
2 Smolker action.

3          THE COURT:  All right.  Ms. Jenkins, do you agree?

4          MS. JENKINS:  I agree to the extent that the Smolker
5 -- Mrs. Smolker in Court just stated that the essential part of
6 their case is their argument that the product is defective, and
7 to that end, then I would agree, because that is their
8 argument.  That we applied a defective product.

9          THE COURT:  All right, then yes, I will simply extend
10 the injunction to that entire litigation for the reasons that
11 you've just expressed on the record, but that stay again is --
12 it's a temporary -- it's a preliminary injunction.  You folks
13 at some point after the bar date, if you want to ask that the
14 action continue in California in order to liquidate the claim,
15 then that -- your ability to do that is preserved on this
16 record --

17          MS. JENKINS:  Thank you, Your Honor.

18          THE COURT:  -- but the action is stayed.  Okay.  If
19 you're not interested in anything else in the agenda, you're
20 free to terminate the call.  Mr. Bernick will be in touch with
21 both of you with respect to the order that he will be
22 submitting within the next week that will stay that action.

23          MS. JENKINS:  Thank you, Your Honor.

24          MS. SMOLKER:  Thank you, Your Honor.

25          THE COURT:  Thank you.

                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Two more, Your Honor.  One is the Perry

2 case.  The Perry case is a personal injury case based upon the

3 -- an outbreak of Legionnaire's disease stemming from the

4 prison cooling tower.  The lawsuit was brought against the

5 State of Michigan, and the State of Michigan in turn brought a

6 third party case against Grace Dearborn and Betz (phonetic)

7 Dearborn.  Grace Dearborn was a contractor responsible for

8 different aspects of the cooling system.

9        That business in turn was sold by Grace and subject

10 to the indemnities -- sold by Grace to Betz Dearborn, and the

11 indemnities flowed from Grace to Betz Dearborn, so we can have

12 a situation where you have a business owned by Grace, engages

13 in conduct that allegedly gives rise to a tort, the business

14 gets sold to a third party subject to an indemnity, and as a

15 result, lawsuits are then lawsuits are then brought against

16 both Grace and against the third party that brought the

17 business.

18        We in connection with the motion to modify submitted

19 as Exhibits H and I, the contractual documents setting forth

20 the indemnity.  The defense of this case has been tendered to

21 Grace and tendered to Grace's insurers and is being defended by

22 Grace and its insurers.  There's a five million dollar,

23 however, deductible for that policy, so that this case

24 represents a significant financial exposure notwithstanding the

25 insurance coverage.

**J&J COURT TRANSCRIBERS, INC.**

1    There were also people that are involved in dealing

2  with this case that are involved in dealing with the Chapter 11

3  case as well.  We've listed them.  They include pretty

4  prominently Richard Fink, who's in charge of the property

5  damage litigation that concerns Grace -- asbestos property

6  damage litigation that concerns in this Chapter 11.

7    There were two objections that were made in

8  connection with the motion to modify by the State of Michigan.

9  One was that -- actually, two objections.  One by Perry, the

10 plaintiff.  One by the State of Michigan.

11    The objection by Perry was that the insurance was

12 separate from the insurance that might be answerable for other

13 kinds of claims that Grace sees.  The insurance is a general

14 liability policy, and it's true that most of the insurance

15 that's been implicated by asbestos claims has been products

16 liability not general liability, and I think we'll probably

17 learn from the committees there is a lot of thought that has

18 been devoted to and now effort that's been undertaken in other

19 cases to access general liability policies as well.

20    THE COURT:  I'm aware of that.

21    MR. BERNICK:  Okay, so the fact that it's general

22 liability policy doesn't really answer the issue or answer the

23 claim in argument that this -- these cases do -- this case does

24 implicate the property of the debtor.  You also have the

25 indemnity that again implicates the property of the debtor.

1          The interesting, I will say, legal issue that was
2  posed by the State deals with sovereign immunity, and they
3  submitted a brief that -- the brief kind of reads like a brief
4  that they submitted in many, many cases over many, many years,
5  and their essential argument is they have got sovereign
6  immunity, and it would be a violation of their sovereign
7  immunity to allow the prosecution of an adversary against them
8  in connection with this Chapter 11, and because we filed an
9  adversary in order to perfect the request for a preliminary
10 injunction, they say that, that's a violation of their
11 sovereign immunity.

12         I think that there are two answers to that -- one
13 technical and one much more common sense.  The technical answer
14 is that the -- your imposition of the stay itself, which is an
15 alternative ground for our request, would not do any such
16 thing.  It's not the commencement of any kind of proceeding
17 whatsoever.  It simply says the case is stayed.  The case can't
18 be pursued.  We're not initiating any proceeding.  We're not
19 initiating any action against the State of Michigan when it
20 comes to the stay.

21         Second and more prominently, our request is that the
22 entire case be stayed.  If the entire case is stayed, the
23 action brought by the plaintiffs against the State of Michigan
24 is stayed, then the third party action may not proceed in any
25 event, because the first party action no longer is going

1  forward.  So in the sense the narrow relief that we're

2  requesting, which is to stay the prosecution of the entire

3  case, doesn't require the initiation of any kind of proceeding

4  against Michigan and indeed doesn't even require the issuance

5  of an order that pertains to the State of Michigan.

6         THE COURT:  I'm confused, Mr. Bernick.  I'm sorry.

7  When I read these pleadings, I -- maybe I misunderstood.  The

8  initial action was brought by prisoners --

9         MR. BERNICK:  Prisoners.

10         THE COURT:  -- against the State.

11         MR. BERNICK:  Correct.

12         THE COURT:  The third party action was brought by the

13  State against the debtor.

14         MR. BERNICK:  Correct.

15         THE COURT:  Well, if the State's commenced the

16  action, how does the sovereign immunity principle apply at all?

17  Is the State allowed to sue you, and you can't interpose a

18  defense?

19         MR. BERNICK:  Well, that's -- maybe I just ought to

20  sit down, but I think what their argument is, is that because

21  in seeking to shut down the entire litigation, we initiated an

22  adversary proceeding that included the State.  That's the

23  initiation of action against the State and violates their

24  sovereign immunity.

25         THE COURT:  Traditionally, the sovereign immunity

**J&J COURT TRANSCRIBERS, INC.**

87

1  principles have looked to allegations of money judgments
2  against the State and the FISC that's involved not to questions
3  of whether or not the adversary, which seeks only to impose a
4  stay to stop litigation in process, is an action against the
5  State.  I don't see how the 11th Amendment is implicated in
6  this process.

7          MR. BERNICK:  I understand that, and that is our own
8  -- that's our own sense as well.

9          THE COURT:  However, if the State wants to proceed
10 with its defense, since its papers in this case seem to say
11 that they don't think Grace is going to be found to be liable
12 anyway, and even if Grace is liable somehow, it's going to be a
13 de minimis award in the State's view, if they want to proceed
14 to the defense and simply stay the third party action, I'm
15 happy to do that, because that may terminate any allegation
16 that there's liability on behalf of this estate.

17         MR. BERNICK:  Yes, well, I don't know if there's
18 anybody from the State who's on the phone.

19         THE COURT:  Anyone representing Michigan?

20                  (No verbal response)

21         THE COURT:  No.  If will present me with an order, it
22 seems to me that the best thing for me to do is let the State
23 interpose its defenses, if that's the case.  Is there some
24 reason Grace would be implicated in a first party suit?

25         MR. BERNICK:  No, the first party suit's not against

J&J COURT TRANSCRIBERS, INC.

1  us.

2         THE COURT:  So if the State wants to proceed with

3  that, which I think is what their papers are suggesting, let

4  them go ahead, and then if there is, in fact, an indemnity --

5  not an indemnity -- a third party claim that can be brought,

6  they can file a proof of claim here if they choose to.

7         MR. BERNICK:  Let me ask you -- ask the Court a

8  question.  We've tried to keep all of this together in one

9  document.  Would it be better, now that we're getting into some

10  of these individual issues, to have separate pieces of paper,

11  or would you still like to see just the one document?

12         THE COURT:  Well, the only reason that separate

13  pieces of paper may be helpful for you and the other parties

14  is, because I -- somebody's going to have to lodge them with

15  the appropriate Court somewhere for the actions that are being

16  stayed, so I don't have a preference, Mr. Bernick.

17         MR. BERNICK:  Okay.

18         THE COURT:  Whatever works for you is fine.

19         MR. BERNICK:  Okay.  The last item is actually item

20  16, but if we could take it up now, because it relates to the

21  same --

22         THE COURT:  Wait.  Can I ask first again are you

23  going to do this order in the next seven days?

24         MR. BERNICK:  Yes, the same period of time.

25         MR. ZELZMER:  Pardon me, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MR. ZELZMER:  This is Michael Zelzmer.  I represent

3  the Perry plaintiffs.  I did file a responsive pleading, and I

4  did appear at the June 21st hearing.

5          THE COURT:  All right.

6          MR. ZELZMER:  I sort of am behind the eightball, if

7  you will, on this matter for a number of reasons.  The first

8  and most important to me is that I have never received, despite

9  the fact that I've participated in this matter from the outset,

10  debtor's supplemental brief and its proposed revised order.  If

11  I may, I would like to suggest to the Court that Mr. Bernick

12  and I may be able to resolve these issues based upon some

13  representations made by Mr. Bernick on the record today.

14          First and foremost, at the June 21st, 2001 hearing

15  and prior to that I requested from debtor and, in fact, in the

16  State Court action there was a request for production of

17  documents requesting the indemnity agreement.  That has never

18  been tendered to me, and based upon Mr. Bernick's

19  representations today it's attached to that supplemental brief.

20  So if, in fact, the indemnity agreement by and between Grace --

21  excuse me -- W.R. Grace and Betz Dearborn is as represented by

22  Mr. Bernick, I may not have an issue with this matter.  Again,

23  I'm just requesting that maybe we can sort of adjourn this

24  matter, give myself and Mr. Bernick an opportunity to review

25  the papers filed that I haven't been served with.

1      THE COURT:  I'm not sure how you have an issue anyway

2  since you haven't sued the debtor.  It's the State who sued the

3  debtor.  You've sued the State.  I say the debtor.  The --

4      MR. ZELZMER:  Your Honor, if the matter is stayed,

5  obviously, I have an interest in that.

6      THE COURT:  No, all I'm talking about staying is the

7  third party action, the State against Grace.

8      MR. ZELZMER:  Okay, and if the order is going to be

9  limited like you're stating, Your Honor, I do not have an

10  objection.  That was never -- at least in the papers, that is

11  not what I deemed the debtor's request was.

12      THE COURT:  I don't think that's what the debtor

13  requested, but that's what I'm ruling.

14      MR. ZELZMER:  And as Mr. Bernick so eloquently

15  stated, maybe I should just sit down.

16      THE COURT:  Okay.  Mr. Bernick will be in touch with

17  you with respect to the language of the order that will be

18  proposed within this next week, but what it will do is stay the

19  third party action.

20      MR. ZELZMER:  Okay, and, Mr. Bernick, I am counsel of

21  record.  I have filed pleadings.  I will probably send you a

22  fax today just so you have my information.

23      MR. BERNICK:  Terrific.

24      MR. ZELZMER:  Thank you.

25      THE COURT:  All right.  If you're not interested in

1 anything further, you also may disconnect, sir.  You're welcome

2 to stay on the line if you choose.  Okay.

3         MR. ZELZMER:  Thank you again.

4         THE COURT:  Mr. Bernick.

5         MR. BERNICK:  Last item in the sequence is the Kane

6 motion for relief from automatic stay.  It's number 16, and

7 rather than responding to it we'll probably just hear from

8 counsel for Kane.  I believe that they're on the phone.

9         MR. COHEN:  They are, Your Honor.

10        THE COURT:  All right, and who's speaking, please?

11        MR. COHEN:  This is Stuart Cohen.  I am counsel for

12 Mr. Kane here in Florida.  I'm a member of the Florida bar and

13 represent him in the State Court action.  I am neither a member

14 of the Delaware bar nor the Pennsylvania bar.  I'm appearing

15 under a pro hac vice appearance along with Mr. Levinsky.

16        MR. LEVINSKY:  Your Honor, I moved his admission

17 yesterday.  Neil Levinsky for Timothy Kane.

18        THE COURT:  All right.  I don't think I've seen that

19 yet, but you're admitted pro hac for today's proceeding, Mr.

20 Cohen.

21        MR. LEVINSKY:  Thank you.

22        MR. COHEN:  Thank you, Your Honor.  May I proceed?

23        THE COURT:  Yes, please.

24        MR. COHEN:  Your Honor, I've been listening in on Mr.

25 Bernick's position regarding the other debtors, and I do

1  believe -- I'm sorry -- the other creditors who sought relief

2  from the stay, and I do believe that this case is different

3  mainly based upon the fact that there is ten million dollars

4  available in liability insurance to cover any of the State

5  Court judgments Mr. Kane seeks for product liability against

6  Grace.  There is no self-insured retention or deductible under

7  this policy.  At least that's what discovery has revealed so

8  far.

9       We filed a motion for relief from stay in this Court

10 in order to take five different depositions of Grace employees.

11 All of those employees are lower level employees, at best lower

12 level management.  The allegations of the personal injury

13 lawsuit against Grace do involve allegations of defectiveness

14 about a roofing underlayment.  They are not asbestos claims.

15 They're not toxic tort claims.  They simply deal with a roofing

16 underlayment that was manufactured by Grace.

17      The depositions that are sought are going to take

18 place or would take place if the Court lifted the stay in two

19 different locations, one Bedford Park, Illinois, and one in

20 Cambridge, Massachusetts, and those depositions can probably be

21 done over the course of two days in total.

22      THE COURT:  Mr. Bernick, why does the debtor not wish

23 to have the depositions taken?

24      MR. BERNICK:  Well, because the real purpose of the

25 deposition, given what counsel has said, is obviously to

1  prepare and prosecute the claim against Grace.  They're

2  basically attacking the -- this is -- the plaintiff was walking

3  across a roof that had a membrane that was manufactured by

4  Grace -- that membrane is used very widely -- and he slipped

5  and fell, and now he claims that it was too slippery -- it was

6  an unreasonably slippery roof, and you heard him just say that,

7  you know, this is a product -- that it's not a toxic tort case.

8  It's a defective product case.  It's very much like the Smolker

9  situation.  This is a person, he had a claim against Grace,

10 ought to be prosecuting that claim pursuant to a bar date, and

11 proceeding in this Court, and there's only one purpose to take

12 the discovery, which is to prove up the claim against Grace.

13       There are a variety of other defendants, as we

14 understand it, in this case.  This is not just a case against

15 Grace.  Let him go pursue the other defendants.  I don't see

16 how this is different from the Smolker case.

17       MR. COHEN:  Your Honor, if I may respond?

18       THE COURT:  Yes.

19       MR. COHEN:  To begin with, there are allegations in

20 this case against other defendants.  The incident took place at

21 the Grand Floridian Resort at Walt Disney World, and Mr. Kane

22 slipped on the Bicore (phonetic) ice and water shield, which

23 admittedly by Grace's own admission, is a product that becomes

24 extremely dangerous when wet.  The allegations involve

25 defective design of the product and also a strict liability and

J&J COURT TRANSCRIBERS, INC.

94

1  negligent failure to warn not only against Grace, but under
2  Section 2A of the Restatement of Torts, which has been adopted
3  here in Florida, against various other defendants who were in
4  the chain of distribution from Grace's product to the eventual
5  consumer of the product, which is Disney.

6        The discovery was stayed very early on in these
7  proceedings, Your Honor.  At the point they were stayed, Grace
8  had already produced the names of those persons who
9  participated in the design of the product as well as some slip
10 resistance testing that had been done on the product several
11 years after its original manufacture.

12        The minimal relief being sought in our petition for
13 relief from stay today is simply allowing these defendants --
14 I'm sorry -- these employees or lower level management
15 employees of the defendant to be deposed, so that we may
16 continue with discovery not only against Grace in our State
17 Court action but against these other defendants on the various
18 theories of liability.

19        THE COURT:  Well, to the extent that these employees
20 are not intimately involved in the Chapter 11, frankly, to the
21 extent that their information may be relevant to some other
22 issue in the case, I see no reason not to permit those five
23 depositions to go forward.  I do, however, see reason to stay
24 the case as to Grace and Grace's product.  Whether or not that
25 is any basis to go forward with the remainder of the case, I

1 don't know.  Mr. Cohen, I'll let the depositions go forward,

2 but that's all.  I will not permit the case to go forward.  I

3 don't know whether you'll decide you do or don't have a case at

4 the end of that time, so I'll grant relief to take the five

5 depositions, but that's all.  I will stay the remainder of the

6 action without prejudice to your right to come back in and ask

7 that I lift that stay for cause.  Mr. Bernick, an order in a

8 week?

9           MR. BERNICK:  Order in a week.

10           THE COURT:  All right.  Please get in touch with

11 either Mr. Levinsky or Mr. Cohen with respect to that as well.

12           MR. LEVINSKY:  Thank you, Your Honor.

13           THE COURT:  Gentlemen, if that's all you're

14 interested in, you also may terminate unless you prefer to stay

15 on the line.

16           MR. LEVINSKY:  Thank you.

17           THE COURT:  Okay, Mr. Bernick.

18           MR. BERNICK:  I don't know what Your Honor's pleasure

19 is.  I understand that items eight and nine will be taken up in

20 a telephone conference that Mr. Lockwood would be participate

21 in.

22           MR. LOCKWOOD:  Your Honor, before leave item three, I

23 have one comment I would like to make --

24           THE COURT:  Yes.

25           MR. LOCKWOOD:  -- on that topic.

**J&J COURT TRANSCRIBERS, INC.**

96

1          THE COURT:  Mr. Lockwood.

2          MR. LOCKWOOD:  Our objections are stated back in June

3  and July have, as Mr. Bernick said, have been resolved.  I

4  would, however, like to make one observation, because it

5  relates to both this matter and another matter.  One of the

6  things that this injunction does is under the guise of

7  referring to unrelated companies as affiliated entities, it

8  protects the companies that have no corporate relationship

9  whatsoever to Grace against fraudulent conveyance claims, and

10  specifically, it includes Fresenius and Sealed Air, who are the

11  subject, among other things, of agenda items eight and nine.

12          At the time we agreed -- decided, if you will, not to

13  object to the protection of these unrelated entities against

14  fraudulent conveyance claims, it was in significant part due to

15  the belief that it would be to the benefit of the debtor's

16  estate and the debtor's creditors that those fraudulent

17  conveyance claims should be pursued in the Grace bankruptcy.

18          As we will see in a few minutes, the debtors now wish

19  -- and in fairness have wished all along -- to protect these

20  entities -- unrelated entities who are being sued in the Grace

21  bankruptcy as well.  The fact is there are at least two, maybe

22  three, class actions that were filed pre-petition against these

23  entities.  They are not debtors.  Under Section 524(e) of the

24  Bankruptcy Code this Court's discharge of Grace under any plan

25  is not going to discharge those claims against those entities,

1  and the only way they will be discharged is under a channeling
2  injunction under 524(g) which is a plan that requires a 75
3  percent super majority vote in favor of it by the asbestos
4  claimants, and I just wanted, so nobody accuses me of
5  sandbagging, make the point that if we are not given permission
6  to pursue these fraudulent conveyance claims in this
7  bankruptcy, we will be back here moving to lift this injunction
8  against those claims being pursued outside the bankruptcy.

9          THE COURT:  Well --

10         MR. LOCKWOOD:  And I'm not asking anybody to do
11 anything --

12         THE COURT:  You can preserve the record, Mr.
13 Lockwood.  I want to get to the issue that is implicated in
14 eight and nine for a number of reasons, and I think -- and so
15 to the extent that your motion is granted, then I would modify
16 the injunction to permit that action to go forward anyway in
17 the bankruptcy case but not outside the bankruptcy for now.

18         Injunctions are, especially preliminary injunctions,
19 I think are always modifiable for cause.  That's why they're
20 preliminary.  So your record is preserved, and you can move to
21 modify it.  That's not to say it will be granted or denied.  I
22 don't know, but you can move to modify it.

23         MR. LOCKWOOD:  Thank you, Your Honor.  I just didn't
24 want anybody to feel like they've been sandbagged by our
25 silence with respect to agenda item three if we had a change of

1  position based on subsequent events.

2          THE COURT:  Okay.

3          MR. BERNICK:  Your Honor, I think that, that takes us

4  up to number five, and I know that the call is scheduled for

5  12:15.  I don't know if Your Honor wanted -- thought it would

6  be appropriate to take a ten-minute break before the call or --

7          THE COURT:  If I give you ten minutes and the call

8  comes in, you won't be back.  Frankly, I think we should

9  probably keep going until we get this call in, because I

10  recognize that Mr. Baena is on a short time frame.

11          MR. BERNICK:  Okay.  Items five, six, and seven are

12  kind of a piece, but they probably merit some discussion at

13  this time.  In fact, as Mr. Lockwood indicated, there were

14  class actions that were pending against W.R. Grace before the

15  Chapter 11 was filed.  There have been initial efforts to

16  continue to prosecute those class actions outside the context

17  of bankruptcy, and those were rejected.  The orders were

18  issued, and they covered those class actions as well.

19          For a long period of time the so-called Zonolite

20  Attic Insulation claimants, they are a distinct group of

21  claimants.  They're actually a distinct group of law firms.

22  Some of them are on the committees or represent people on the

23  committees.  I don't know that all of them represent people on

24  the committees, but these law firms decided really pretty much

25  on the eve of the case management order hearing to initiate a

1  series of adversary proceedings.  The briefing had already been

2  completed in the case management order.  When the hearing was

3  going to take place, we started to get adversary proceedings

4  coming in the door, and then shortly after the adversary

5  proceedings we started to get class certification motions

6  coming in the door, and the way that we look at all of this,

7  there are basically three major issues and problems.

8       Issue number one is are these properly commenced as

9  adversaries at all, or should they be prosecuted as claims and

10 then permission be sought to proceed by way of a class claim?

11 Are they proper adversaries at all?

12      Issue number two is does it make sense to proceed by

13 way of class certification, et al?  Is that necessary or

14 productive to the case?

15      And then issue number three pertains to where.  Well,

16 should it be here?  Is it a case management order for this

17 Court?  It's obviously a substantive claim.  It's not -- at

18 least in some cases the medical monitoring isn't -- personal

19 injury is a property damage -- you know, there's going to be a

20 line drawing question on where it belongs.

21      THE COURT:  Well, I'm a little confused about these

22 claims.  Has anybody actually manifested an injury that serves

23 as the basis for any of the claims that are asserted anywhere?

24      MR. BERNICK:  It's this, and you have to parse them

25 through.  There are, first of all, people that own homes --

1    THE COURT:  Yes.

2    MR. BERNICK:  -- and have got the attic insulation in

3 them.  Those are property damage claims, or the way that they

4 put it is do we want to notice, educate, and remediate?  Tell

5 people what they've got in their homes and then remediate the

6 homes.  There may be as many as a million homes.  That's

7 category number one, class number one.

8    THE COURT:  But those are limited to property damage

9 claims.

10    MR. BERNICK:  Correct.

11    THE COURT:  Well, all right.  My question remains the

12 same.  Has anybody actually asserted a damage claim to property

13 as the result of the attic insulation?

14    MR. BERNICK:  The only claims that I am aware of --

15 and I can be corrected on this -- in this area are class action

16 claims, so the main representatives will be making that

17 assertion, but I am not aware of any individual who has come

18 forward and said, "Fix my home," in the lawsuit.  These are

19 class action cases that have been brought.

20    THE COURT:  Okay.  What have the named plaintiffs

21 asserted by way of damages?

22    MR. BERNICK:  Well, what they assert by way of

23 damages again is the need for educational programs to inform

24 people and then potentially a need to remediate and abate the

25 asbestos that's in their homes -- what they say is the asbestos

1  in their homes -- the attic fill in their homes, and you know

2  that this -- I think you probably saw it from the papers.  This

3  is very hotly contested.  There was a class action that was

4  brought in the State of Washington, and there was actually a

5  preliminary injunction proceeding in the State of Washington,

6  the Barbanti (phonetic) case, and essentially, they asked that

7  a warning be made to all these homeowners in Washington telling

8  them they had asbestos in their homes, and after evidentiary

9  hearings and, you know, witnesses and all the rest, the Judge

10  denied that request.

11          They then went on to say, well, there should be a

12  class notice, and at the time the debate was taking place over

13  when the class notice should be.  Grace filed for Chapter 11,

14  so that never came to fruition.

15          There is another class action brought in -- a new

16  proceeding -- a federal proceeding.  That was a state case.

17  There's a federal proceeding pending in Boston.  All of the

18  other class actions I believe were went -- and there was a

19  class certification motion that had been briefed in Boston as

20  of the time of the case going in Chapter 11.  These are all

21  class litigations focused on people who own homes, but they're

22  not the only one.

23          You then have the medical monitoring class action.

24  The medical monitoring class action is brought by three groups

25  of people or brought on behalf of three groups of people.  It

1 was people who live in and around Libby, Montana where the mine

2 was located -- people who work at the expansion plants after

3 the 12:09:06 mine.   They then sent out to factories, and it

4 kind of popped like popcorn.   It's expanded.   Vermiculite's

5 expanded.   People worked at those plants.

6      And then people who fell into a description of folks

7 that had done a lot of attic fill installations.   That is

8 they're trades people who did a lot of these things or do it

9 yourself, but maybe some of these people did it in a business

10 sense.   Those were three classes of people that were picked up

11 in the medical monitoring case.

12      I don't believe that there's any allegation that any

13 of the class members themselves have sustained personal injury.

14 It is clearly the case there are people who worked in the Libby

15 mines who have gotten sick over the years, so we know that's

16 true at Libby.   Libby again is mining operation, and you have

17 different exposures for people who worked with the mine product

18 versus the refined product.

19      So you have a medical monitoring class action, and

20 medical monitoring says we want to watch over people, screen

21 people, watch over people in these different categories, see if

22 they get sick.   If they get sick, we intervene, with the

23 disease.   So it is personal injury in the sense that the

24 underlying insult is a personal insult.   It is not personal

25 injury in the sense that anybody says that they've actually

1 sustained injury.  It's a form of immediate preventive relief
2 that's being sought.

3         So you still stack out those three issues.  Is it
4 properly brought as an adversary at all, or should they be
5 filing claims, should it be class certified, or does that make
6 any sense, and where should -- what should be the proceeding?
7 Should it be here?  Should it be before Judge Wolin?  The
8 reason I say all that is that I could see, for example, Your
9 Honor deciding whether the adversary is the right way to go.
10 We think that clearly it's not the right way to go.  It's a
11 fairly discreet issue.  I can see Your Honor dealing with that,
12 but inevitably all of these things are already tied to --

13         OPERATOR:  Excuse me.  We have Mr. Scott Baena
14 waiting.

15         MR. BERNICK:  They're all part -- they're all --
16         THE COURT:  All right.  Just one minute, please.
17         MR. BERNICK:  They're all part of the question of how
18 is the Court going to handle medical monitoring.  How is the
19 Court going to handle attic insulation in peoples' homes?  And
20 I believe that those matters, probably in the first instance,
21 should be dealt with by Judge Wolin and for one very
22 significant reason.

23         Number one is that they are very, very instrumental
24 in the case as a whole, and number two is that the substantive
25 issues on which those cases will turn are very similar to the

1  substantive issues that are involved in the personal injury

2  cases.  For example, what's the issue with regard to the attic

3  insulation?  The issue with regard to the attic insulation is

4  how much asbestos really gets into the air under any set of

5  circumstances, and is it enough to create an unreasonable

6  danger?  We're going to have very much the same issues when it

7  comes to people who have personal injury claims but who never

8  got within 100 yards of a Grace product.  Where do you cut off

9  the exposure and say the plaintiff hasn't sustained its burden

10  of proof of showing that they had a substantial exposure to the

11  product?

12          THE COURT:  Well, I guess I don't have any problem if

13  Judge Wolin wants to take the issue on, and my question,

14  however, is why are these not simply futures claims that --

15  which should be handled by a futures rep, which we don't yet

16  have, but which is one thing that we are going to have shortly?

17  The debtor is going to file a motion and get a futures rep in

18  this case, and we're going to deal with it hopefully at the

19  next hearing.  So --

20          MR. BERNICK:  Here's how I'd answer it, and I'll put

21  their hat on for purposes of the answer.  With regard to the

22  property damage people, what they'll say is, "Gee, I don't like

23  having this risky thing in my home.  Take it out.  That's

24  property damage.  Even though I can't necessarily demonstrate

25  the risk is very substantial, I don't like having it there."

1      THE COURT:  A futures rep can deal with that issue.

2   I don't know that the -- I don't know what obligation, if any,

3   the debtor has at the moment, because that hasn't been

4   adjudicated by an appropriate Court as far as I know to do the

5   education and remediation function, but a futures rep could

6   certainly take a look at that issue and file whatever is

7   appropriate rather than trying to deal with a number of class

8   actions for people who probably don't know whether they've got

9   Zonolite or some other kind of insulation in their attic.  All

10  they know is that underneath the floorboards someplace they've

11  got some insulation.

12      MR. BERNICK:  Right.

13      THE COURT:  So a futures rep is a -- I think a more

14  realistic way to handle this whole line of litigation -- the

15  entire Zonolite issue.

16      Now, medical monitoring may be a somewhat different

17  issue.  It may not.  It may be the same, because you've got at

18  least people who know that they have had some exposure and are

19  concerned about whether some injury may develop I take it.

20      MR. BERNICK:  You don't even really know that.  For

21  example, if you say, "Who occupies the third category?  The

22  installer?  Is it one installation?  Is it two installations?

23  Is it five installations?  Am I that person --"

24      THE COURT:  Well then a futures rep could certainly

25  handle that, too.  That's the reason you have futures reps, to

1 deal with these unknown quantities, so I'm not sure why it

2 simply shouldn't be a futures rep who's appointed to look at

3 these issues and then can decide either to file claims, file an

4 adversary, or seek some other appropriate relief.  Mr.

5 Lockwood.

6           MR. LOCKWOOD:  Your Honor, could I put on the

7 claimant's hat and borrow it from Mr. Bernick for a moment?  A

8 futures, rep under 524(g) of the Code, is -- has the function

9 of representing people who do not have claims during the

10 pendency of the bankruptcy case.  The property damage claimants

11 is unlike class action.  It's for people who do have claims

12 during the bankruptcy.  Mr. Bernick and his client say they're

13 bad claims.  They should be dismissed.  He may be right.  I'm

14 not here to defend the Zonolite class claims, but I don't think

15 anybody in this courtroom, that I've heard so far anyway, or

16 read a pleading has ever suggested that the Zonolite claims are

17 future claims.

18           THE COURT:  Well, I --

19           MR. LOCKWOOD:  Secondly --

20           THE COURT:  So far I don't know that there are any

21 claims, so as a result, if there are not any, they may be

22 future, but they're not now, and it would seem that a

23 representative -- if you want to call that person something

24 else, call him an examiner, to take a look at the question of

25 whether there are or are not such claims.  It seems that a

1  funnel for looking at this issue makes the most sense.

2      MR. LOCKWOOD:  Your Honor, first it seems to be this

3  is a case management issue as Mr. Bernick has suggested.

4  Secondly, again, people, if they don't have claims now, it's

5  not because they'll have claims later.  The product is in their

6  homes, and they -- their representatives or purported

7  representative class actions have said we want relief now --

8      THE COURT:  Well, look.  It's either --

9      MR. LOCKWOOD:  -- and because of the presence of

10  this --

11      THE COURT:  If they already have claims, Mr.

12  Lockwood, to the extent that they're personal injury claims,

13  they have you, and to the extent that they're property damage

14  claims, they have your colleague, and so to the extent that

15  they already have claims, there are committees that can look at

16  the issue and figure out whether a class-type of claim process

17  is appropriate or whether they need special representation.

18      To the extent that there are futures claims, a

19  futures rep can deal with it.  I don't see why we need class

20  litigation.  I don't see why we need numbers of entities who

21  will independently take a look at the same question.

22      MR. LOCKWOOD:  I believe that the issue before the

23  Court today is whether or not further proceedings -- remember

24  these issues have not been beat up.  There haven't been

25  responses filed.  They're not on for hearing today.  I believe

1  the only issue before the Court is whether Your Honor is going

2  to listen to what the various committees have to say, what the

3  proponents of the class action have to say, what the debtor has

4  to say about this in terms of case management, or whether Judge

5  Wolin is going to hear this.

6      Your Honor suggested earlier that you thought that

7  you and Judge Wolin might split the baby by having property

8  damage decided -- dealt with by you and personal injury dealt

9  with -- by Judge Wolin.  I don't know whether that's a good

10  idea or not.  I have some qualms about it, but in any event,

11  that's a work in process between you and Judge Wolin I guess.

12      But all I'm trying to say, just so that you all

13  understand this, that the futures rep which we agree needs to

14  be appointed is in my and my committee's view a futures

15  representative for personal injury claimants.  It has nothing

16  to do with property damage claimants, whether they be class

17  members of Zonolite class or anything else unless there's some

18  sort of personal injury class out there floating around that I

19  don't know about.

20      MR. BERNICK:  But that's really I think the -- I mean

21  it's an interesting issue that Your Honor posed, because

22  technically speaking, the argument that will be made that say

23  had present claims is that the state law gives them a present

24  claim, and yet at the same time under state law you don't have

25  to look down the road to determine what might happen when there

1 actually is a future claim, and if these people are at risk and

2 their claim assumes they are at risk, these are the same people

3 who at the end of the day may ultimately have a futures claim,

4 and I don't know why there's any distinction between people who

5 now are seeking medical monitoring, later get sick, and people

6 who don't seek medical monitoring, later get sick.  The futures

7 representative should be out there looking for the interest of

8 people in the future.

9        I take what Your Honor is saying maybe in a going

10 forward sense in the following way.  Right now we have a class

11 of claimants -- a group of people who are represented by the

12 same group of law firms.  They're also the same people who

13 filed the motion to dismiss the entire case.  They're very

14 active and very litigious, very suddenly just before the case

15 management hearing.  It does seem to me that we have to

16 respond, and we will respond to whatever it is that they do or

17 whatever it is the Court directs that we do, but it does seem

18 to me that it's difficult for me to see why the committees

19 should not have a property damage committee, a personal injury

20 committee, and a futures rep if we have a position with regard

21 to these issues, so that we can be looking at these things as

22 interrelated and with the benefit of the committees thought.  I

23 think that's -- at least that's how I took what Your Honor's

24 statement to be, is to get some other folks involved looking at

25 this issue.

1    THE COURT:  That's all I'm trying to do.  It seems to
2  me that you're talking case management.  You need a funnel, and
3  in this instance it appears that the funnel may mean -- may
4  need someone who isn't currently before the Court to take a
5  look at the future aspects.  If you folks who are here can
6  adequately address this, I'm not trying to add more people to
7  the complex, but I think you need a futures rep no matter what
8  for the 524 issues.

9    MR. LOCKWOOD:  We certainly don't disagree with the
10  need for a futures rep, and I also didn't mean to suggest that
11  the medical monitoring class might not be a component
12  potentially.  I mean that's a different -- that is at least
13  personal injury --

14    THE COURT:  Yes.

15    MR. LOCKWOOD:  -- related even though it's not
16  personal injury -- even though they have not asserted personal
17  injury claims.  I was just speaking to the property damage
18  claims asserted in the Zonolite class action only.  I think
19  Mr. Scott has some comments about that.

20    MR. SCOTT:  I'll be very brief, Your Honor.  My name
21  is Darrell Scott.  I have the privilege of being appointed
22  class counsel by Catherine O'Connor of the Superior Court of
23  Spokane representing about 150,000 families in Washington who
24  have the misfortunate of having Zonolite in their attics and
25  have present claims.  I'm also co-counsel in the NBL

1  counterpart, which is the nationwide class action, and I am co-

2  counsel on two adversaries that have been recently filed, which

3  we believe are a counterpoint or an important dimension to case

4  management.

5          In that regard I agree with Mr. Bernick that the --

6  this issue of whether an adversary proceeding is a helpful

7  procedural device for determining -- raises true light of -- is

8  a matter probably best determined by Judge Wolin.

9          With regard to the Court's question as to existing

10 claims, medical monitoring, the present need for medical

11 diagnostic testing is a present claim in most states, and

12 that's why that action was brought by my firm and others in

13 Harlem, Montana.  In Washington, as well as many other -- most

14 other states, there is a post-marketing duty to warn, and so

15 the Zonolite case which we filed in Spokane County was --

16 brought the homeowners' present right to be advised of dangers

17 associated with a product that was in their home and presently

18 contaminating their home.

19         Those cases -- an important point needs to be made,

20 because the Zonolite attic insulation case, the medical

21 monitoring case are not cases which seek monetary damages.

22 They were -- they are not at law claims for monetary damages.

23 They are equitable claims seeking decrees of the Court which

24 help them reduce future claims by reducing exposure and by

25 getting medical -- appropriate medical diagnostic testing.

J&J COURT TRANSCRIBERS, INC.

1     MR. BERNICK:  I'll only add I mean that obviously now
2   gets us into the merits.  There are a whole series of courts
3   that entrust the question of whether medical monitoring is
4   equitable in anything other than Maine that ultimately requires
5   the disposition of funds.  This has been gone over in numerous
6   class actions that have been mounted on the basis of medical
7   monitoring.  Be that as it may, you still come out the same way
8   as a case management issue, and I think, you know, we're again
9   in a fluid situation.  Maybe it belongs here.  Maybe it belongs
10  before Judge Wolin.  I think we'll just have to sort that out.

11     THE COURT:  Ask Judge Wolin, because if he wants it,
12  it's his.  Anything Judge Wolin wants is his.  So you're going
13  to see him next week.  Ask him.  If he wants to address these
14  issues, he should, and he should give you the scheduling order.
15  If he doesn't, then at our next hearing you will get a
16  scheduling order, so that we can put these in context, but, Mr.
17  Bernick, in the meantime, I want a motion to appoint a futures
18  rep, because whether or not the futures rep deals with this
19  issue, the futures rep will be dealing with future at least
20  personal injury asbestos liability, so that in the even that
21  you are going to go forward with addressing your liability and
22  exposure and damage issues, there is an entity to look to, to
23  people who don't yet know that they have claims.

24     MR. BERNICK:  We've covered five, and I think seven.
25     THE COURT:  I think we have Mr. Baena.

**J&J COURT TRANSCRIBERS, INC.**

113

1          MR. BAENA:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Baena, I'm going to interrupt

3    Mr. Bernick, so that we can move to your issues which I believe

4    are agenda items eight and nine on this list.

5          MR. BAENA:  Thank you, Judge.  Scott Baena of Bilzen

6    Sumberg.  I am counsel to the Official Asbestos Property Damage

7    Claimants Committee, and first, of course, let me thank the

8    Court for allowing me to participate this way and apologize to

9    the Court that this is the way I have to participate.

10         Because of the awkwardness of making a presentation

11   over the phone, Your Honor, Mr. Lockwood and I have conferred

12   at length last night, and he is going to make an oral argument

13   to you in the courtroom, if that's okay with you.

14         THE COURT:  Yes, that's fine.

15         MR. LOCKWOOD:  Should I approach the lectern, Your

16   Honor?

17         THE COURT:  Wherever you're comfortable, Mr.

18   Lockwood.

19         MR. LOCKWOOD:  As Mr. Baena just observed, Your

20   Honor, we had originally anticipated that Mr. Baena would be

21   presenting this argument, so I'm pleased that he's here.  If I

22   miss anything, he'll be able to either add it or correct it, as

23   they case may be.

24         One of the things I wish to observe initially today

25   about this hearing is that we --

J&J COURT TRANSCRIBERS, INC.

1      THE COURT:  You can go ahead, Mr. Lockwood.  I'm

2  listening.

3      MR. LOCKWOOD:  We had been unclear prior to the

4  hearing today as to the scope of this proceeding and

5  specifically whether it would be a status conference or not,

6  and as a result, there was no discussion among any of the

7  parties including the representative of the debtor or us as to

8  whether or not there would be a need for any witnesses with

9  respect to these matters.  Obviously, we're having an omnibus

10  hearing under your -- under our prior understanding of that as

11  well as what Your Honor told us earlier today.  We don't have

12  any witnesses here, so that if the Court were to determine that

13  the decision on this matter required some sort of a record

14  beyond the papers that have been filed by the parties, one of

15  the things we would need to do today is to set a hearing for

16  such evidence to be taken.

17      From the prospective of the two committees, however,

18  that have made the motion for authority to prosecute fraudulent

19  conveyance claims on behalf of the debtor estate, we believe

20  that -- or least we hope that an evidentiary hearing will not

21  be necessary.  We believe that on the basis of the papers that

22  have been filed so far the Court is capable of evaluating the

23  propriety of this and making a decision on it.

24      As I mentioned a few minutes ago, these cases in part

25  -- excuse me -- our motion for authority to prosecute the

1 fraudulent conveyance claims is in part a second stage of

2 matters, because prior to the petition there had been several

3 class actions filed charging two separate sets of entities as

4 having received assets from the debtor in 1996 and 1998

5 respectively in the transactions which were asserted to be

6 fraudulent conveyances.

7        The first set of transactions evolved out of an

8 entity called Fresenius which arose out of a subsidiary of the

9 debtor called National Medical Corporation.   The second set

10 involved -- in '98 involved an entity called Sealed Air

11 Corporation.

12        With respect in particular to the Fresenius

13 transaction it should be noted that the only reason in all

14 likelihood that we are here today to even discuss that was, in

15 fact, that the so-called _Abner_ class action was filed within

16 mere days prior to the application of a four-year statute of

17 limitations that is arguably applicable to those claims, and

18 had those claims not been filed at that time and prior to the

19 petition, there is a distinct possibility that those claims

20 would've been barred by the statute of limitations already,

21 although that's not obviously a sure thing.

22        In any event, as we noted earlier, those class

23 actions were immediately stayed and enjoined under a temporary

24 restraining order obtained by the debtor and remain so as of

25 today.   The -- while certain members, or really to be more

1 precise about it, certain law firms representing members of
2 some of the committees -- one member of the PI committee and
3 one member -- a couple members of the PD committee -- were
4 involved in those actions.  A majority of the members in both
5 committees and their counsel were not.

6       After the petition was filed one of the things that
7 both committees commenced doing as part of familiarizing
8 themselves with the facts of the cases and the issues presented
9 by those facts was to look into these fraudulent conveyance
10 claims which were already in existence at that time, and on the
11 basis of that review which included, among other things,
12 talking to the law firms that were involved in the prosecution
13 of those pre-petition cases, both committees concluded that it
14 would be to the benefit of the debtor estate and all of the
15 creditors of the debtor estate, including not only the personal
16 injury and property damage claimants, but also all of the other
17 unsecured creditors of the estate, were those actions to be
18 prosecuted to conclusion.

19       And accordingly, given where matters stood and given
20 the availability of Section 544 of the Bankruptcy Code and
21 issues that suggested Bankruptcy Court decisions, including the
22 Cybergenics case in this circuit, that suggested that the
23 appropriate forum for fraudulent conveyance claims brought on
24 behalf of the estate of the debtor and its creditors was the
25 bankruptcy venue and not other courts.   The committees filed a

1 motion last spring for leave to prosecute these cases, and

2 those motions were briefed a good while ago.  Oral argument was

3 not, in fact, had.

4      In the interim, since the original responses to those

5 briefs had, among other things, raised the cost benefit issues,

6 the committees decided to see what sort of financial

7 arrangements might be available for the handling of those cases

8 that would be beneficial to the estates and cost effective, and

9 as part of that and as the subject of a separate agenda item at

10 the time, the committee's interviewed a number of law firms and

11 eventually concluded it owes to the Goldsmith law firm of

12 Dallas and Cozen and O'Connor of Philadelphia, as co-counsel to

13 prosecute those actions, under contingent fee arrangements

14 which would result in the debtor estate not itself having to

15 pay any legal fees unless the actions were successful and only

16 would result in the payment of out-of-pocket expenses.

17      And the thought there was if the contingent fee was

18 reasonable, it had two advantages, (a) it would reduce the cost

19 in the event the case was unsuccessful, and (b) it also would

20 be a demonstration on behalf of the counsel at least that they

21 had satisfied themselves through their own investigation of the

22 lawsuit that it had sufficient merit that they were willing to

23 spend what the committees considered to be likely to be

24 millions of dollars worth of their own time in pursuit of those

25 assets under circumstances in which if they did not succeed in

1  that endeavor for the benefit of the estates, they would be

2  paid nothing.

3          Now, what happened in response to the motion was two

4  sets of objections, one from the debtors and one from the

5  Unsecured Committee.  The objections are largely the same.

6  They boil down, as I read them, to three.

7          First, they claim that the property damage in

8  personal committees are biased and not disinterested, because

9  they have already concluded prior to making their motion that

10 the claims had merit and should be pursued, and as a sub-

11 category of that argument on behalf of the debtor at least,

12 they are also biased and not disinterested, because since a

13 premise or predicate for some but not all of the fraudulent

14 conveyance claims that would be brought would be a showing of

15 insolvency by the debtor -- on the part of the debtor at

16 earlier dates, 1996 and 1998, respectively, and since a showing

17 of insolvency now is also a -- something that those committees

18 believe exists and are prepared to demonstrate, that somehow or

19 another the, quote, bias in favor of the debtor's insolvency

20 should -- has infected, if you will, the judgment as to the

21 benefits to be achieved to the debtor estates in bringing the

22 fraudulent conveyance actions as of earlier dates.

23          The second argument that they make is that the

24 unsecured -- well, let me back up a second.  The debtors are

25 perforce given their bias argument required to and do accept

**J&J COURT TRANSCRIBERS, INC.**

1 the proposition that they are equally, quote, bias, close

2 quote, because they are of the view, as they have stated pre-

3 petition in response to the class actions and post-petition in

4 various informational briefs and otherwise, that they don't

5 believe they're insolvent at all.

6       They believe that all of the various categories of

7 personal injury claims, property damage claims of the

8 traditional sort, Zonolite class action claims, medical

9 monitoring claims, and I don't know whether there are other

10 categories.  It seems that there are not, but all of those are

11 sufficiently non-meritorious in the aggregate that when coupled

12 with their admitted liabilities to the creditor groupings

13 represented by the Unsecured Committee, namely, the bank, bond,

14 trade creditors, and I guess miscellaneous tort and contract

15 claimants not involving asbestos, that they are insolvent.

16 That there is room there for the equity, and that, therefore,

17 of course, they could not agree that there's legitimate

18 fraudulent conveyance claims here, because the factual

19 predicate or the legal predicate of insolvency for that is

20 absent.

21       So they propose who can we find that's a neutral that

22 will help us all decide whether this is a good idea?  They

23 decide the Unsecured Creditors Committee is the ideal neutral

24 party that can do that and do essentially, as they put it, a

25 cost benefit analysis, which I take it to mean a prediction of

1  how much it would cost to do the litigation offset by some sort

2  of risk-weighted probability of success.  We know that the ad

3  damnum, if you will, in the case is in the range of one, two,

4  or more billion dollars which will clearly exceed any costs,

5  particularly on a contingent fee basis, of pursuing the claim,

6  so obviously for there to be a cost benefit analysis that would

7  show costs exceeding the benefit, you would have to discount

8  the potential recovery by some risk component having to do with

9  lack of merit of the case or other reasons for unlikelihood of

10 succeeding on it.

11         And, finally, what they would propose the result of

12 identification of the Unsecured Committee as unbiased in this

13 regard is that the Unsecured Committee should be in some manner

14 or another delegated by the Court -- appointed by the Court to

15 review and, quote, evaluate, close quote, the claims, and they

16 don't exactly say having done the evaluation what the Committee

17 would do, although they suggest that in their papers dealing

18 with the retention that maybe the Unsecured Committee should

19 itself prosecute those claims on behalf of the estate.

20         We have a number of responses to those points.

21 First, with respect to this -- they use both the term

22 disinterested or not disinterested and the term biased to

23 describe the committees and the judgment process that they've

24 gone through here.  We don't think either of those terms are

25 accurate or appropriately used in the context of a bankruptcy

1  case such as this.

2      First, with respect to the disinterestedness, the
3  committees and our constituents are not going -- seeking to
4  achieve nor will they achieve any special benefits for
5  themselves out of this estate as a result of the prosecution of
6  these actions.  The actions are being overtly prosecuted or
7  sought to be prosecuted on behalf of the entire debtor estate.
8  Everybody, if they are successful, will benefit equally or pro
9  rata from that recovery.  I'm not aware of any definition of
10 dis -- of having an interest or not being disinterested that
11 would suggest that merely being interested in the debtor estate
12 being increased, so that the payout for all creditors would be
13 commensurately increased in some form of a disqualifying or
14 other challengeable interest in the case.

15     With respect to the bias issue, as far as I could
16 tell, they're using bias in almost the judicial sense.  In
17 other words, they're not saying that the committees have a
18 personal animus here against the non-debtor defendants who
19 these claims would be brought against, or that there's some
20 sort of improper motivation or something like that.  What
21 they're saying is that the committees have in effect prejudged
22 the outcome of the lawsuit.  They've decided it has merit, and
23 the argument is apparently that you should propose to have a
24 fraudulent conveyance case brought or examined without first
25 formulating an opinion about whether there might be some merit

1  to such fraudulent conveyance case.  I -- to me that's just
2  silly, frankly.  I mean -- but what the issue here is whether
3  the debtor's estate -- not the debtor under these -- under
4  Cybergenics these claims are clearly claims that the debtor
5  itself would not be entitled to benefit from were they
6  successful.  It's the estate as the representative of the
7  creditor body as a whole that is the potential beneficiary.

8          And the idea that it is somehow or another
9  disqualifying or improper or some or other to have people --
10 creditor constituencies that are interested in seeing if there
11 are ways to augment the debtor estate look into that, and on
12 the basis of preliminary investigation, which obviously is all
13 that can be done until you've filed a lawsuit and entitled to
14 obtain formal discovery, reach a conclusion that there's enough
15 there to warrant proceeding further is simply the same type of
16 investigation and decisionmaking process that any plaintiff,
17 including a debtor, would go through prior to filing a lawsuit,
18 and the notion having done that in a responsible fashion and
19 having arrived at an opinion on the subject that somehow that
20 then disqualifies you from urging that the lawsuit, in fact, be
21 filed strikes me frankly as silly.

22         The other part of the bias thing or argument, as I
23 see it, is a little different, and that is that, because the
24 two committees have each a separate and I might add potentially
25 conflicting interest in making sure that the aggregate amount

1  of asbestos liabilities to which the debtor is subject is
2  determined generously enough so that all of the claims of the
3  parties that make up that aggregate amount are capable of being
4  fully measured and hopefully fully paid.  That claim -- that
5  interest in some manner or another is aimed at pumping up, for
6  want of a better word, asbestos numbers here -- making them
7  seem larger than they really are.

8          In the bankruptcy case, generally, in order to get
9  the debtor's equity away from it, reduce the pro rata payout to
10 the Unsecured Committee, reduce each of PI and PD shares of the
11 pot or increase them vis-a-vis one another commensurately, and
12 that, that interest they say pollutes or contaminates their
13 judgment with respect to pursuing the fraudulent conveyance
14 claims, because having interested -- pumping up the claims in
15 the year 2001 would produce an interest in pumping them up in
16 the year 1996 and 1998 as well.

17         First, I would say that from the perspective of the
18 committees, they have an interest in presenting evidence
19 through estimation or otherwise to this Court that will
20 establish what justice the debtor claims its interest in that
21 will establish the true real right answer to this question.
22 They do not have an interest in fraudulently or otherwise
23 unjustifiably inflating the debtor's asbestos liability for
24 purposes of somehow or another unfairly or immoderately
25 reducing the share of other people in this case, but putting

**J&J COURT TRANSCRIBERS, INC.**

1  that aside, even if you don't want to take these protestations
2  of good will at face value, the fact of the matter remains that
3  the -- if you use that approach, not only is the debtor biased
4  in the same way, because it wishes to reduce those lia -- and
5  so is the Unsecured Creditors Committee, because it's quite
6  clear that the percentage recovery of the trade, bank, and bond
7  creditors will be materially affected by the relative magnitude
8  of the asbestos liability, so they will have the interest in
9  reducing the asbestos liabilities, and indeed that interest
10 showed up when this issue was first presented to Judge Farnan,
11 because the initial position taken by the Unsecured Creditors
12 Committee with respect to these proposals was, "Gee, we ought
13 to wait and see in the regular bankruptcy case whether or not
14 the asbestos liabilities are proven to be so low that we -- our
15 committee and constituency and everybody else is going to get
16 paid 100 cents on the dollar, because if we're going to get
17 paid 100 cents on the dollar, then we don't need to pursue
18 fraudulent conveyance claims."

19         THE COURT:  Well, is there a statute of limitations
20 issue now with respect to these suits?

21         MR. LOCKWOOD:  Under Section 108 of the Code we
22 believe that we have -- that the debtor, in fact, has two years
23 from the filing of the petition.  Eight months of that period
24 has already elapsed while we've been farfelling (sic) around
25 with the preliminaries that brought us here today.  So as we

J&J COURT TRANSCRIBERS, INC.

1 figure it, we probably got another 16 more months, and I might

2 add it is unclear to me -- and I'll get to it in a minute --

3 how much of that the debtors have in mind taking up with

4 further evaluation and argumentation and applications for

5 permission, etcetera, to pursue these lawsuits.  But in any

6 event --

7       THE COURT:  Well, is the question of solvency at the

8 time of the transfer going to be or whether the debtor's left

9 with unreasonably small capital?  I'm not sure exactly what

10 theory the committees would expect to go off on.  What would be

11 the major issue?

12       MR. LOCKWOOD:  I think it's fair to say, Your Honor,

13 that under the Uniform Fraudulent Transfer Act there are

14 generally three or four different and alternative theories that

15 you can proceed, and I would anticipate that the case will be

16 brought on all of them which will include not merely transfer

17 when insolvency, not merely left with unreasonably small

18 capital, but also intent to injure, delay, and defraud

19 creditors, which is, as Your Honor is well aware, a branch of

20 fraudulent conveyance and doesn't even require the proof that

21 the debtor was insolvent at the time the transfers were made.

22       I'm not here today, however, to argue the merits of

23 the fraudulent conveyance claims.  It's -- among other things,

24 there's been no real discovery on any of these things, and we

25 won't get to that until we actually have a lawsuit.

1    THE COURT:  Well, that's why I'm wondering whether in

2  this instance I shouldn't appoint an examiner to look at this

3  with some very short-defined time frames, because it appears to

4  me that at the moment everybody is arguing blind.  The debtor

5  has presented some statements in it.  I'm not sure in what.

6  It's informational briefs or in response to various motions

7  that indicate that the debtor, and apparently, the transferees

8  as well, feel that there isn't going to be any proof of a

9  fraudulent transfer.

10    The creditors obviously feel somewhat differently,

11  particularly based on the cash that came back into the estates

12  and the assets that were transferred out of the estates.  Why

13  shouldn't I simply have a true neutral look at this issue, take

14  a look at the solvency?  We can get a forensic accountant, if

15  that's appropriate, look at the financial pictures of all the

16  estates.  We can trace the history from the date before the

17  transfer up to the present time.  It shouldn't take that long

18  to do, and then we'll know from a neutral whether there is a

19  challenge that should be mounted.

20    Then the question is who should mount it.  Obviously,

21  the debtor is not likely to want to sue one of its

22  subsidiaries, and I haven't heard from the debtor that they're

23  not going to do it.  That's the first thing.  I don't know that

24  the debtor isn't going to do it.  If the debtor is, fine.  It's

25  up to the debtor.  Under any construction of the law the debtor

1 gets the first bite at the apple, so I don't know at this point

2 whether the debtor won't.  I think it's reasonable to assume

3 they won't, but nonetheless, I haven't heard that they won't.

4          Then I think we take a look at who prosecutes the

5 action if, in fact, an examiner takes a look and decides that

6 there is something of merit that should be investigated

7 further.

8          MR. LOCKWOOD:  Well, the debtor would be hard pressed

9 to do it, since they've filed their -- they're probably subject

10 to judicial estoppel based on prior pleadings that they filed -

11 -

12          THE COURT:  Well, they may.

13          MR. LOCKWOOD:  -- in a variety of things, plus I

14 think a fair reading of what they filed here today -- not today

15 but leading up to today, they forthrightly stated on numerous

16 occasions they do not believe that these claims have merit.

17          THE COURT:  But they may think differently if an

18 examiner tells them otherwise.

19          MR. LOCKWOOD:  Well --

20          THE COURT:  They may not, but they may.

21          MR. LOCKWOOD:  Your Honor, the problem with the

22 examiner, it seems to me, is that -- the exam -- if you look at

23 what would have to be done here, first you would have to -- the

24 examiner would have to determine what the asbestos liabilities

25 were in the 1996 and 1998, because if you ignore the asbestos

1  liabilities, Your Honor, these companies were clearly solvent.

2  THE COURT: No, the debtor -- they can do the same

3  thing that most debtors do with plans.  They can say if the

4  liabilities are this, then that, and if they're higher, then

5  this, and they'll give me a range just like everybody else does

6  in any other plan that's not a 524 issue, so they'll take the

7  claims which will be filed as filed with respect to whether or

8  not there is liability.

9  Now, if those claims come in as, you know, 25 billion

10 dollars, then the debtor undoubtedly will be challenging some

11 of those claims and may have some legitimate issues in terms of

12 challenging some of those claims.

13 MR. LOCKWOOD:  Well, Your Honor --

14 THE COURT:  There are lots of studies, Mr. Lockwood.

15 Lots of them that deal with the number of asbestos cases that

16 have already come through this system.  You've quoted them to

17 me in other cases from time to time with respect to how you can

18 go about estimating claims --

19 MR. LOCKWOOD:  I understand that, Your Honor, but --

20 THE COURT:  -- and for purposes of looking at this

21 issue and whether or not it has merit, an examiner can

22 certainly read those.

23 MR. LOCKWOOD:  Well, this is one of the reasons,

24 actually, when you mentioned that, as to why the committees

25 position on this matter is that in all probability ultimately

1  this is something that Judge Wolin should consider handling,

2  because to determine what the asbestos liabilities are you need

3  to decide what the --

4         THE COURT:  Why don't you propose to Judge Wolin that

5  he takes all the cases, Mr. Lockwood, and just keeps it,

6  because at the moment that's -- every time I raise something

7  that you disagree with, that's what happens.  Suddenly, it's

8  something Judge Wolin ought to hear, and frankly, I don't care

9  where it gets done.  I just want to get it moving.  I agree

10  with you.  This is an issue that should be looked at.  The

11  question is how best to go about it.

12         My idea at the moment is that we look at somebody

13  who's neutral.  I'm -- I don't think that the asbestos or any

14  other committee or any other claimant in this estate is biased

15  because they want to maximize the assets that are available for

16  distribution.  If that's a bias, it's the right kind of bias to

17  have.  That's what bias you should have as a creditor in the

18  case, and that's what bias you should have as a committee in

19  the case.

20         Whether or not the asbestos plaintiffs want to

21  somehow or other inflate their claims, I don't know.  I don't

22  think it's unusual that most people want to inflate claims,

23  because their claim is always worth more to them.  It's like

24  owning your house.  Your house is always worth more to you than

25  it is to a third party who's willing to come to buy it.  So

1  it's not necessarily even an intentional inflation of the
2  claim.   It's just that it may not be realistic.

3          If we get an examiner in to take a look at -- for
4  purposes of whether or not the debtor was solvent, whether or
5  not the debtor had a known body of creditors that it may have
6  defrauded, to take a look at those issues and put it in a
7  context, I think then we have a better understanding of whether
8  an action should be brought.   Where it's brought, I don't care.
9  You want to take it to Judge Wolin, fine, take it to Judge
10 Wolin.   You want to take it to a State Court, that's fine.   I
11 just want to get the case off dead center and moving.   It's
12 been here for a long time without any action.   It should be
13 moving for the benefits of your clients as well as everybody
14 else's.

15         MR. LOCKWOOD:   Your Honor, let me make -- respond to
16 that in two different ways.   First, Mr. Bernick and I and the
17 other -- and the property damage claimants and Zonolite
18 claimants, etcetera, have a very profound difference which is
19 exemplified in the competing case management orders --

20         THE COURT:   Yes, you do.

21         MR. LOCKWOOD:   -- as to how to quantify the asbestos
22 claims in this case and --

23         THE COURT:   But that's for a different purpose.   For
24 purposes of determining whether or not the debtor is likely to
25 be subject to a fraudulent transfer action, that will succeed

1  on the merits.  We don't need the same type of estimation.  I'm

2  not asking for proof.  I'm asking whether or not there is a

3  reasonable likelihood that if the appropriate committee or

4  committees actually pursue this action, that there will be that

5  cost benefit.  That there is a likely recovery out there, and

6  to do that you can estimate both the worth of the assets and

7  the liabilities.  That's what forensic accountants do all the

8  time.

9          MR. LOCKWOOD:  Forensic accountants, Your Honor,

10  could do a fine job on the asset side.  I strongly urge you

11  that they're not trained nor are they capable of estimating

12  asbestos liabilities where -- where there are disputes between

13  the debtor and the creditors as to fundamental legal concepts

14  between whether they are liabilities including a dispute over

15  whether, for example, you take future claims into account in an

16  insolvency.  Mr. Bernick and I --

17          THE COURT:  That's fine.  Then we'll --

18          MR. LOCKWOOD:  -- have been litigating that

19  particular question in Louisiana for some substantial period of

20  time.

21          THE COURT:  I appreciate that.

22          MR. LOCKWOOD:  How is an examiner --

23          THE COURT:  Keep -- you can keep your Louisiana

24  problems in Louisiana.  We have enough of them to deal with

25  here.  An examiner can retain the appropriate people to do

1   whatever is necessary to estimate both the assets and the

2   liabilities just like the committee would have to do that.

3          MR. LOCKWOOD:  Your Honor --

4          THE COURT:  What I want to know, Mr. Lockwood, and

5   what I don't know from the submissions that are here, is

6   whether or not the very heavy expense that it will cost this

7   estate to litigate this issue or to even tee it up for

8   litigation will provide a benefit to the creditors.  I don't

9   know that, and I can't see it.  I want somebody who can take a

10  look at it.  It's going to be expensive.

11         MR. LOCKWOOD:  Your Honor, we -- I would suggest to

12  you that the cost of the examiner process is likely to equal or

13  exceed the cost of prosecuting the claims on a contingent fee

14  basis.  You just said heavy costs to this estate.  We've got

15  reputable law firms that we have proposed that the -- should be

16  retained for this purpose who are prepared to do it at no cost

17  to the estate on the fee side, and the out-of-pocket costs

18  you're talking about deposition transcripts, travel expenses,

19  Xeroxing, copying, expert witness fees.  I mean how --

20         THE COURT:  An examiner doesn't need that formal

21  process.

22         MR. LOCKWOOD:  Excuse me?

23         THE COURT:  An examiner does not need that formal a

24  process.  That's why you put an examiner in place, so that you

25  don't have to have this formal process.

                    J&J COURT TRANSCRIBERS, INC.

1          MR. LOCKWOOD:  Your Honor, the committees already
2    looked at this.  What you're suggesting is by the need for an
3    examiner, it seems to me, is that somehow or another an
4    examiner who is going to -- who knows nothing about the claims
5    that the committees have considerable knowledge about, who
6    knows nothing about the underlying merits of the fraudulent
7    conveyance claim with respect to the -- which the committees
8    and the proposed counsel have already done and in the case of
9    the proposed counsel at no expense to the debtor, a substantial
10   amount of investigation, and we're going to turn it over to an
11   examiner simply, because the debtor says, "I don't agree that
12   these claims have merit."

13         The Unsecured Creditors Committee hasn't said they
14   don't have merit.  The Unsecured Creditors Committee is an
15   agnostic and --

16         THE COURT:  Well, at the moment so am I based on the
17   information that's been presented to me, and that's my concern.

18         MR. LOCKWOOD:  Well, if -- as I said earlier, if Your
19   Honor wants to have an evidentiary hearing in which we would
20   try and put on some evidence as to the magnitude of the
21   asbestos liabilities and as to the legitimacy of these claims,
22   we're prepared to do that.

23         THE COURT:  I -- an examiner would certainly be in
24   touch with whoever has looked into these issues, Mr. Lockwood.
25   That's why you get somebody who's a neutral.  An examiner would

1  be charged not just with contacting the committees for whatever

2  information they choose to share, and it would obviously be to

3  their best interest to share it if they choose to, because if

4  an examiner reports that there is no potential liability in his

5  view, that's going to weigh heavily on whether or not I decide

6  that this action should go forward and how the cost benefit

7  works out.

8       The debtor, on the other hand, has just as much of an

9  interest, as I would suspect do the transferees, in talking to

10  an examiner, because if, in fact, I decide that there is some

11  merit to it, they're going to be subject to a lawsuit by

12  somebody, but I don't see why at this stage, with the evidence

13  that is -- I say evidence -- with the submissions of the

14  parties that have been submitted, where the companies that did

15  get the debtor's assets did transfer significant sums back to

16  these estates -- well, to the pre-petition transferors.  There

17  -- it's not as though there was nothing transferred in exchange

18  for assets.

19       MR. LOCKWOOD:  Your Honor, these transfers could at

20  best be described as leverage buyouts.  All the money that went

21  back to the debtor estate came from the companies that were

22  being transferred.  It was a pre-transfer distribution to the

23  transferor, and then the diminished assets were then

24  transferred to the stockholders of the debtor and to the

25  companies with whom -- the stockholders with whom those assets

1 were combined.

2        The shareholders of Sealed Air Corporation and the
3 shareholders of Fresenius did not at the time of the transfers
4 pay a dime to the debtors for those assets.  All the payments
5 came out of the assets that were already owned by the debtors
6 prior to the time they were transferred.

7        But I come back to the -- let's assume the examiner
8 comes in here and says, "Well, you know, I've done the best I
9 can, and I think these aren't very good claims, either because
10 I don't think the asbestos liabilities are going to be enough
11 to prove insolvency or because I think there was no fraudulent
12 intent," or actually, he'd probably have to say both, because
13 there's two different branches.

14        The examiner isn't God.  It's not -- he's not even a
15 federal judge.  He doesn't decide that issue.  Your Honor
16 doesn't really decide that issue.  All Your Honor is supposed
17 to be deciding is if the debtor has refused to bring this, does
18 that give a party in interest, such as the committees, the
19 legal right to bring these claims, and Your Honor would have to
20 be virtually certain based on an evidentiary showing that the
21 cost of pursuing those claims would exceed the likely recovery
22 before you could do that, and even if Your Honor decided that,
23 you -- in the meantime the statute of limitations -- while the
24 examiner's going on, and they're disputing this with Your
25 Honor, etcetera, the statute of limitations is still running.

1    THE COURT:  You're not disputing anything with me,

2  Mr. Lockwood.

3    MR. LOCKWOOD:  I'm sorry.

4    THE COURT:  I'm not a party in interest here.  I'm

5  just trying to get something going, period, in a way that makes

6  sense --

7    MR. LOCKWOOD:  I'm --

8    THE COURT:  -- and I'm not sure at this stage that

9  this proposal makes sense.

10    MR. LOCKWOOD:  I'm suggesting to you, Your Honor,

11  that an appointment of an examiner is a recipe for delay and a

12  recipe for dispute, because I don't -- I cannot imagine, based

13  on what the investigation that the committees have done

14  already, that we would accept the conclusions of an examiner

15  that these claims lack sufficient merit, that the cost of

16  having a contingent fee lawyer pursue them with only the out-

17  of-pocket expenses born by the estate is greater than the risk-

18  weighted likelihood of a substantial recovery to the debtor

19  estate, and if we don't accept the examiner's conclusion on

20  that basis, where do we go from there?  Do we then have a

21  hearing in front of Your Honor similar to the one we're having

22  today in which Your Honor is now informed by some third party's

23  opinion as to the merits of the claims, but the third party is

24  simply a third party that's done whatever they've done and made

25  whatever judgments they've made and expressed whatever opinions

1 they have?

2      THE COURT: Well, what concerns me somewhat is that

3 the Unsecured Creditors Committee does not seem to be fully on

4 board with the concept that there is a fraudulent conveyance

5 action yet. That may happen, but it doesn't seem to have

6 happened yet, and my concern is this. I think the case law is

7 relatively clear that if the debtor refuses to bring what

8 appears to at least colorable be a legitimate action, the Court

9 can appoint somebody else to do it, but that somebody is the

10 Unsecured Creditors Committee not a specialized committee, but

11 the Unsecured Creditors Committee.

12      MR. LOCKWOOD: Your Honor, the Unsecured Creditors

13 Committee in this case is the name that the U.S. Trustee

14 appointed to a group that represents, in our view, a minority

15 fraction of the unsecured creditors in this case. The asbestos

16 claimants -- the PI Committee and the Property Damage Committee

17 represent, in our view, billions of dollars more than the

18 trade, bank, and bond, and miscellaneous creditors in the

19 abstract.

20      There is nothing -- none of the cases cited by the

21 debtors where courts have appointed the, quote, unsecured

22 creditors committee as the representative of the estate has

23 competing other official committees of unsecured creditors.

24 The unsecured -- they might have had an equity committee or

25 something like that, but there were no multiple unsecured

creditors committees, and it is simply not fair and certainly not supported by any record that anybody's made in this case that what I will call the trade creditor committee, for want of -- or the commercial -- I think commercial creditor committee would be the best way of describing the unsecured committee accurately here. The commercial committee in some way or another represents more unsecured creditors either in number or amount than either the PD Committee or the PI Committee, and the fact --

And as I said earlier, they've got their own internal conflict problems. Yes, certainly, if the debtor is insolvent, it would be to their constituencies interest to recover assets, because that would improve their dividend. On the other hand, it would be very nice if the debtor wasn't insolvent, because then they would get 100 cents on the dollar, and so if you think that they're being pulled in both directions here, what is there -- what has happened? They're agnostic. They haven't taken a position. They haven't agreed with the debtor. They haven't agreed with us. That doesn't mean that somehow or another they're neutral. All it means is that they're conflicted, and they haven't yet figured out which side their bread is buttered on.

Having made that decision, however, we don't know which is going to come out, and we don't know what's going to motivate them. We don't know what information they're going to

1  have to base whatever decision that they make on it.  I do not

2  believe that that Committee regards itself as having a

3  fiduciary duty to my constituency.  I do not believe that they

4  regard themselves as having a fiduciary duty to the property

5  damage constituency.  That's why the U.S. Trustee appointed

6  separate committees, and I would invite Mr. Perch to tell us if

7  he thinks I'm getting this wrong.

8          But at the end of the day, Your Honor, the issue here

9  is simply if you've got two out of three official committees to

10 think this is a good idea, one official committee that's

11 agnostic, and the debtor, who is the fraudulent -- the alleged

12 fraudulent transferor who is of the opposite view, and a

13 contingent fee proposal to handle the litigation with the

14 resulting expense to the debtor estate -- I mean there's no

15 question that there's a billion or two billion dollars at stake

16 here.  You don't need a forensic accountant to figure out that

17 number, but the only question is what multiple of billion -- of

18 a billion dollars might be applicable here.

19         There's no way that a forensic accountant is going to

20 come in here and say I'm going to add up the out-of-pocket

21 costs that some law firm might encounter in prosecuting some

22 fraudulent conveyance and have it equal ten million dollars

23 even.  I mean a million would be a lot, and as compared with a

24 billion, that's a thousand times less.

25         So the only way that you're going to conclude that

1 there's no -- that you fail a cost benefit analysis is if you

2 say these fraudulent conveyance claims are frivolous, because

3 even at a ten percent chance of recovery, that's a hundred

4 million dollars minimum, and why is an examiner going to be

5 better at figuring out that a -- what is really a trial lawyer

6 judgment here -- this isn't forensic accounting.  This is

7 what's the likelihood of success in winning the lawsuit.

8 That's what this is all about.  Examiners aren't -- I mean

9 that's not what people use examiners for and --

10         THE COURT:  It wouldn't certainly be what I use a

11 forensic accountant for either.

12         MR. LOCKWOOD:  Well, exactly, and so I don't see that

13 a forensic accountant -- I mean basically what -- if you wanted

14 to get an examiner that would -- that was qualified to do this,

15 what you'd have to do is get a really good trial lawyer to come

16 in and say, "Okay.  I see -- here's the claims.  Here's the

17 various allegations that people are making about the

18 liabilities and the transfer and --"

19         THE COURT:  That begs the point, Mr. Lockwood, and

20 I've heard all this.  I'm really -- I'm not interested in this.

21 I've read the materials, and I'm not going in that direction.

22 That's not the purpose to evaluate the likelihood of success on

23 the merits.  The purpose is to determine whether, whoever the

24 trial lawyer is, can show either that there was a transfer for

25 inadequate consideration, a transfer that left the debtor with

1 unreasonably small capital, a transfer that left the debtor

2 insolvent, or some evidence that, in fact -- or some reason to

3 suspect that, in fact, the debtor was attempting to mislead its

4 creditors at the time of the transfer.  That's the purpose, and

5 you don't need a trial lawyer for that judgment.  You need a

6 numbers person.

7       MR. LOCKWOOD:  Your Honor, I don't -- if all we

8 needed was an accountant to tell us what the asbestos

9 liabilities were in this case, then why do we have Mr.

10 Bernick's law firm and Mr. Baena's law firm and my law firm and

11 all kinds of other lawyers running around here talking about

12 case management orders and --

13       THE COURT:  I have an answer to that.  It's probably

14 not one you'd want to hear, so I'll keep it to myself.

15       MR. LOCKWOOD:  I'm happy to hear it, Your Honor.  If

16 you've got a better way, we should all be informed of it.  I

17 believe there are genuine legal disputes here.

18       THE COURT:  There probably are genuine legal

19 disputes.  At least I certainly hope there are since all of you

20 are fighting so hard about them instead of using my conference

21 room and attempting to resolve them without this expense,

22 because every dime that you guys get doesn't go to your

23 clients, and unfortunately, they are the ones with the injury

24 in the case.

25       This effort take a look at fraudulent transfers is

142

1   designed to see whether or not there is -- there are funds that
2   should come into this estate for the benefit of creditors.   The
3   problem I have -- well, I have several problems, but one is I
4   don't have a clue whether the debtor was or wasn't insolvent at
5   the time of the transfers.   I simply don't know, and there
6   isn't any way from the documents that have been submitted at
7   the moment that I can even hazard a guess.   The parties
8   certainly dispute significantly whether the debtor is even
9   insolvent now.

10           MR. LOCKWOOD:   That's right.

11           THE COURT:   Based on the multitude of asbestos claims
12   that could potentially be filed, it would be I think unlikely
13   that if you took those claims at face value -- just taking them
14   at face value without any defenses to them, that the debtor
15   would be able to sustain some judgment that says it isn't
16   insolvent on that kind of a basis, but I'm not sure that's the
17   means all and end all.   The debtor has raised significant
18   liability issues with respect to these claims not by way of
19   litigation, by way of informational briefs that it has
20   submitted.

21           So yes, at some point you're either going to have to
22   determine liability, or you're going to have to estimate the
23   claims in a way that's satisfactory to all of you, because
24   you're all in this bankruptcy together, and a plan isn't going
25   to get confirmed unless you all at some point decide to stop

1  fighting and start talking, because that's what it's going to
2  take to get this done.

3        With respect to this issue, I think it should be
4  looked into.  The question is how.

5        MR. BERNICK:  Your Honor, may I make some suggestions
6  on the how?

7        THE COURT:  Mr. Bernick, let me hear from Mr. Baena.
8  He may have to get back to court.  Yes, Mr. Baena.

9        MR. BAENA:  I appreciate that, Judge.  I won't repeat
10  any of -- hopefully any of Mr. Lockwood's argument.  I do want,
11  however, to spend a second or two on the issue that you pose
12  about the prospects of appointing an examiner, and the first
13  observation I would make and remind the Court of, respectfully,
14  is that the entire Third Circuit from the Court of Appeals down
15  to the Bankruptcy Courts have identified these asbestos cases
16  as something unique and different and imposing upon the courts
17  some real challenges that have to be dealt with differently,
18  and as we approach this matter as well as other matters, we
19  would be well advised to remember that we've already identified
20  that things are different in these cases.

21        And in the context of the fraudulent transfer motions
22  that you have before you, the first observation I would make is
23  because of the difference in these asbestos cases, it is a
24  slippery slope to start looking only at the case law that the
25  debtor puts forward and the Committee puts forward -- the

1  Unsecured Creditor Committee puts forward with regard to who

2  has handled this kind of litigation in other cases, because the

3  cases that they point to -- the decisional law they point to

4  didn't include the vast array and types of claims that are

5  inherent in these asbestos cases, and I would respectfully

6  submit that in other asbestos cases it was indeed asbestos

7  claimants committees that were deputized or empowered to pursue

8  these kinds of claims notwithstanding the fact that there

9  existed in those cases as well the more traditional unsecured

10 creditors committees.

11        Mr. Lockwood has already alluded to the fact that

12 they're prosecuting these sorts of claims against Mr. Bernick's

13 debtor client in Babcock and Wilcox.  These sorts of claims

14 were prosecuted by asbestos claimants in the Cellotex case, and

15 it is a feature of many of these asbestos cases that bankruptcy

16 was preceded by these sorts of transactions because of the

17 proliferation of the asbestos claims, and in many of those

18 cases where the asbestos claimants identified the causes of

19 action and the desirability of pursuing them, that it was the

20 asbestos committees that were granted the authority to do it,

21 and Mr. Lockwood has explained to you why it is that way, and

22 it is particularly evident in this case that it should be that

23 way, because it's irrefutable that the debtor has already

24 disabled itself.  It has made no bones about the fact that it's

25 disabled from pursuing these clients, and it doesn't even wish

1   to pursue these clients.

2          In the case of the Unsecured Creditors Committee it
3   has already articulated its own agenda, and it is at cost
4   purposes because of just the nature of the dynamics of an
5   asbestos bankruptcy with the prosecution of this kind of claim,
6   and so it naturally seems to fall upon asbestos claimants to
7   pursue this kind of litigation, and it ought not be any
8   different in this particular case.

9          I think as well that Mr. Lockwood makes a very
10  important point when he rhetorically inquires what do we do
11  when the examiner comes back.  If we, first of all, empower the
12  examiner principally to look at the insolvency issue, we are
13  begging the question about those claims that don't depend upon
14  insolvency as an element of proof, and so we are going to have
15  to deal with those claims in any event, and secondly, the
16  remarks of the Court respectfully suggest that what the
17  examiner will do in respect of the insolvency claims is not
18  quite the same thing that we're going to be doing as we wind
19  our way through this case on various issues including
20  confirmation of a plan which engenders, you know, a host of
21  insolvency-type determinations.  He's more or less going to be
22  taking the pulse of a variety of constituencies in this case
23  and discern from that whether or not there's some argument to
24  be made about some range of solvency or insolvency at the
25  applicable dates.

146

1        Respectfully, Your Honor, since the debtor is
2   disabled and because the debtor has already articulated its
3   inability to prosecute these claims, both because they don't
4   think it fits within a statute of Elizabeth type of an action
5   and also because they don't believe we'll ever meet all of the
6   elements of the constructive fraudulent transfer claim asking
7   the debtor for their methodology how they get there enables
8   them to do what they are disabled from doing in the first
9   instance.  It empowers them when all that we should find in
10  what they tell us about this motion should be interesting but
11  not dispositive.

12       We are allowing the disabled party to wag the dog,
13  and when the examiner comes back and says, "I took a poll.
14  There's a range.  There's a range of possibilities and
15  prospects for success," we will continue to maintain, because
16  of the significant amount of work and examination that we've
17  already done, that these claims need to be prosecuted.

18       The hedge that we provided is as Mr. Lockwood argued,
19  finding counsel that would assume the economic risk, and it is
20  inconceivable that the examiner routine will not engender more
21  fees and costs than the prosecution of these claims would
22  entail if we just went at it, and it seems to me that the
23  process of prosecuting the claims already engenders a process
24  for cutting the prosecution of those actions short, and that's
25  the whole motion of summary judgments, and the Court will be in

**J&J COURT TRANSCRIBERS, INC.**

1  a far better position to make a determination about allowing

2  these claims to go any further in the context of something that

3  we're judicially more comfortable with, and that's the notion

4  of a summary judgment hearing.

5       Then in the context of a provisional exercise of an

6  examiner coming in and reporting what he or she discerned by

7  talking to a group of constituencies that are affected by the

8  outcome and talking to a group of accountants who really did

9  part of the job but in an effort to spare the estate of expense

10 didn't do the full job or take the job to the full extent that

11 we would have to in the context of the prosecution of the

12 lawsuit.

13      I submit that the insolvency issue is going to be on

14 the forefront of any litigation that we bring.  It will be the

15 basis for motions at very early stages of the bankruptcy period

16 -- of the prosecution of the claims.  We're not going to let

17 that issue dawdle while we waste estate money.  It will be

18 heard promptly, because I suspect the defendants will raise it,

19 and they'll do so promptly, if for no other reason, to spare

20 themselves of the time and expense and simply -- the simple

21 aggravation of being involved in this sort of litigation that

22 affects them so significantly.

23      THE COURT:  Well, Mr. Baena, I'm not sure how this

24 insolvency issue, if I accept Mr. Lockwood's analysis and your

25 argument, is going to come out any better or any quicker until

1 | the asbestos liability is known, so no matter how you look it,
2 | if there's not a way to -- I'll use the word estimate.  I don't
3 | mean for future purposes.  I simply mean for taking a look at
4 | whether or not there's a likelihood that the debtor, in fact,
5 | made a fraudulent transfer.  Somehow or other you've got to do
6 | an estimation in order to get that far.  If you've got to prove
7 | the liability on each of these context, then you're going to be
8 | doing this fraudulent transfer case for a long time.

9 | MR. BAENA:  Well, Your Honor, respectfully, that may
10 | be the case, but then the notion of an examiner doesn't help us
11 | either, because the examiner will never be able to come to a
12 | conclusion.

13 | THE COURT:  Well, I think the examiner has some
14 | flexibility that the parties to litigation probability don't
15 | except perhaps in a settlement context but certainly not in
16 | terms of its evidentiary submissions to the Court in that there
17 | is some estimation process that can likely apply before the
18 | action is brought, number one.

19 | Number two.  To the extent that the examiners
20 | conclusion is that there is something that's worth pursuing in
21 | more detail, that may very well set up the basis for a
22 | settlement.  This case is very litigious.  It has to stop.  If
23 | you're going to get a plan done, it has to stop, and you've got
24 | to figure out mechanisms to stop it.  It seems to me that this
25 | may be one way.

1        Mr. Bernick, before I get back to you, this gentleman
2   has been trying to get my attention for a half an hour, so I'll
3   see him next.

4        MR. PASQUALE:  Okay.  Excuse me.  Thank you, Your
5   Honor.  Ken Pasquale for the Official Creditors Committee, the
6   agnostic group as we've been called, and I think that's true,
7   and it's I think for the same reason that the Court has alluded
8   to.  On the face of these papers we can't tell what
9   investigation has been done, and we can't make a decision.  We
10  can look at the public information as anyone else can do, and I
11  think something Mr. Lockwood said and I think may have been
12  passed over a little bit quickly bears emphasis.  He said that
13  looking -- but for the asbestos liabilities the debtors would
14  be solvent, and so the issue here certainly is, at least on the
15  solvency issue of the fraudulent transfers, solvency -- excuse
16  me -- the asbestos liabilities.

17       Mr. Lockwood also mentioned a comment that my
18  colleague made early on in this case that -- and I think the
19  arguments here today crystallize it.  That we wait until we
20  litigate in this case whether through estimation or through a
21  process similar to what the debtors have raised, the asbestos
22  liabilities.  That's going to happen in this bankruptcy case.
23  It doesn't appear that there is a legitimate basis to do it
24  separately for the fraudulent transfer case.

25       Granted, there are different years involved.  We have

1  to look at 1996.  We have to look at 1998, and we have to look
2  at 2000 -- 2001, but the issues will be the same.  The defenses
3  that the debtor wants to raise will be the same.  So whether --
4  I understand Mr. Lockwood's position that perhaps an examiner
5  can't look at those issues the same way as the parties would
6  with their respective experts, but that's going to happen in
7  the bankruptcy case, and why not wait and have those issues
8  litigated and then apply those rulings to the fraudulent
9  transfer issues if, in fact, there are fraudulent transfer
10 claims to be brought, and again, this Committee is not certain
11 that they're relevant.

12          THE COURT:  Well, the problem with that and the one
13 thing I do agree wholeheartedly with Mr. Lockwood about is that
14 to do an investigation and commence the litigation within a
15 very short window may push anyone reasonably to get it done, so
16 to the extent that there's 16 months left, that's not a long
17 time to bring a legitimate lawsuit and to do the investigation
18 that's necessary to make sure that, in fact, you do have a
19 legitimate lawsuit.  Now --

20          MR. PASQUALE:  Well, I -- I'm sorry, Your Honor.  I
21 didn't mean to interrupt.  There are, of course, stayed cases
22 that --

23          THE COURT:  Yes.

24          MR. PASQUALE:  -- have been brought that have tolled
25 the statute of limitations, so I'm not sure that, that's a

1  significant risk that the claims would be lost, because there
2  are claims pending.  It's a matter of how you litigate it, and
3  do you do it in the context of those cases or --

4          THE COURT:  Well, I -- the other thing I agree with
5  is that regardless of what judge handles these cases, I think
6  544 probably provides a more sound mechanism for a number of
7  reasons primarily -- well not only for the fraudulent
8  conveyance issue but for plan confirmation purposes we need to
9  know whether the debtor is insolvent.  We need to know what --
10 the debtor has to commit to a plan whether it's a 524 plan or
11 not as the debtor seems to suggest that there may be some
12 alternative to 524, so regardless of how you look at it in this
13 case, the determination of solvency is going to be significant.
14 It has to be made, so if this is the vehicle to make it, it
15 seems like it's a fine choice.  Somewhere or other that
16 determination has to be made.  The question is how and when
17 so --

18         MR. PASQUALE:  And not to reiterate what's already in
19 our submissions and what's been obviously the emphasis of the
20 discussion thus far, we do think an investigation of some sort
21 is needed first, because we're just not convinced looking at
22 the public information and the submissions in this record that
23 there's enough here to warrant the expense, contingent fee or
24 otherwise.  I mean there's the defense side of this thing, too,
25 that we're ignoring.  If it's going to be contingent fee

1 arrangement, sure, it's the disbursements on that side, but the
2 debtor's going to be a party.  There are indemnification
3 agreements involved that are going to affect the debtor's
4 assets, so it's not as simple to say it's only disbursements.

5      And just to take it one step further, Your Honor, if,
6 in fact, the possible recovery here is a billion or two, then I
7 would question whether a contingency arrangement is the right
8 arrangement to begin with, because as Mr. Lockwood alluded to
9 for a different point, it may be much more cost effective to
10 simply pursue this through counsel retained on an hourly basis.

11      THE COURT:  Well, I think that's one issue.  The
12 other structure of this contingency -- I confess I have limited
13 experience in a case where billions of dollars are expected to
14 be recovered, but the traditional case where I have at least
15 six zeros fewer than that tend to show you that the
16 contingencies go down as the recovery goes up not up as the
17 recovery goes up, so there are some unusual structures to this,
18 and frankly, I'm not sure I'm prepared to address that on the
19 merits today.  I think I want to get some more thought.  I
20 understand that the need for counsel in the event that the
21 Committee is successful in convincing me that it should be give
22 this opportunity now about whether I want to -- I'm not
23 prepared today necessarily to get into those specifics.  Okay,
24 Mr. Bernick, now you.

25      MR. BERNICK:  I'm sorry.  I know that we've been at

1  this for a while, and I thought I'd at least try to provide

2  some practical thoughts about how to move forward.

3          First, I had a long thing prepared to talk about the

4  fundamental point that I think Your Honor has underscored

5  throughout this morning, which is that what we're really here

6  to talk about is the need for an investigation before any kind

7  of lawsuit is decided to be brought, and I don't think it's

8  possible to gain say that that's exactly what the law requires.

9  Even in the Cybergenics case the debtor stepped aside to allow

10 one of the committees or allow another organization to conduct

11 an investigation.  The investigation was then conducted.  It

12 was then presented to the Bankruptcy Court.  The Bankruptcy

13 Court said, yes, there should be a lawsuit, and the lawsuit

14 then proceeded.  Everybody agreed in the context of that case

15 that an investigation was necessary.

16         We could've done the investigation as was done in the

17 McConnell case and submitted a report to Your Honor saying this

18 lawsuit should never be brought, and then the question is

19 whether our investigation was adequate, whether our judgment

20 was adequate.  We could've done that on our own I mean if our

21 position really is that we do get the first bite at the apple.

22         But what's absolutely clear, that because this is not

23 a private claim, because this is not a claim where you go out

24 and file a lawsuit and then find out whether it's worthwhile,

25 it's a public claim.  It's a claim brought on behalf of an

1 organization on behalf of a proceeding, and there are fiduciary
2 obligations that are involved.  There must be an investigation,
3 so the idea of retaining counsel any kind of basis to leap frog
4 to the prosecution of the claim is very premature.

5 Now what is actually involved is that early on in the
6 case a question was put to me, "Well, do you believe that Grace
7 can prosecute this claim?"  And I said in open Court -- I said,
8 "No, I think that we would always be accused of being biased.
9 We have that opportunity to ask them and make that decision,
10 but we think we would always be accused of being biased."

11 And what's our bias?  Our bias is driven by the
12 organization and the relationships with the defendants.  It's
13 also driven by the fact that we have looked into this, and I
14 will tell you and you will see as the evidence comes in from
15 whatever form these were some of the most gone over
16 transactions you can possibly imagine by the highest level of
17 lawyers, by the highest level of consultants, not one
18 consultant but multiple consultants using methodologies that
19 their own experts used in estimation.  These are absolutely
20 locked up solid cases, and we think that it's going to be very,
21 very evident, and we're only anxious to get it all out so
22 people can see it and we can get on to other things that are
23 more important.  We announced our own disability, and what we
24 then suggested is that somebody else do an investigation, and
25 before we had the opportunity to announce what our choice was

1  these motions were all filed saying let us go ahead and

2  prosecute the case.

3          To get to the question of the investigation and who

4  does it, there are a limited number of choices about who can do

5  it.  The Tort Committee says they want to do it, and the

6  fundamental problem -- and I only want to touch on this briefly

7  if I could approach, Your Honor, and give you a document here.

8  This is the status report that we filed before Judge Wolin.  I

9  believe we've also furnished --

10          THE COURT:  I've read this, yes.

11          MR. BERNICK:  Okay.  If take a look at that claim

12  flow chart, you see how it declines.  The claims culminated or

13  peaked in the mid 1990's, and they were on the decline, and the

14  Sealed Air transaction was executed -- entered into in 1998

15  against the backdrop of this steady decline in claims.  It's

16  very, very powerful, and as I say, if you take even the

17  estimation methodologies that are often used by the claimants

18  and you apply it to that curve, you are talking about a

19  downward slopping curve, and there is no insolvency, and the

20  asbestos liabilities are very manageable.

21          The only way that this claim could have any kind of

22  viability to say that the solvency wasn't there, the liability

23  was higher, is for somebody to come up with the theory that

24  says, gee, that curve shouldn't be drawn down as it is.  You

25  all of the sudden have to predict -- it ought to have been

1 predictable and ascertainable in 1998 using accept methodology,
2 then it was going to pop up all over again.  They've got to get
3 the curve back up.  Well, it is that area where I don't believe
4 that they got any credible case that they don't have a bias.
5 Every single thing about their place in this case from their
6 position that we are insolvent today to their position claiming
7 fraudulent conveyance against other companies under the same
8 circumstances will all force them to draw that line up to say
9 that those liabilities are going up.  That's the bias.  They
10 have a philosophical bias that's of critical important to them
11 economically in this case and a whole series of other cases.
12 They cannot be the ones to draw that line.

13        So now the alternative.  We said, well, go to the
14 unsecured creditors, and the unsecured creditors, they will
15 have an interest -- an interest in the outcome of this matter,
16 but they don't have a substantive bias on the analysis.  That's
17 the key different between them, and I haven't heard anything
18 here today that says -- that accuse the unsecured creditors of
19 having a substantive bias on how that line gets drawn.  They're
20 alternative.

21        Then you have the examiner, and there was actually
22 discussion about the possibility of an examiner back at the
23 very first day when I mentioned in Court that we might be
24 disabled, not really legally disabled but as a practical matter
25 disabled.  Some people thought that I was proposing the

1  appointment of an examiner, and I said, no, that's not
2  something that we specifically had in mind, and, ultimately, we
3  came out another way, but the examiner is an idea.

4         I think the difficulty with the examiner is something
5  that Mr. Lockwood touched on, and I don't think this is
6  insuperable by any stretch of the imagination, but an examiner
7  is getting into an area that is a fairly technical area.  The
8  estimation of mass tort claims flow and the valuation of an
9  asbestos liability as of a certain point in time is hugely
10 controversial.  It's been going on for 20 years.  It's a big
11 deal, and the accountants have their own set of contentions on
12 what they like to do, and they're not necessarily the same as
13 other people.  They'll have conventions that they adopt for
14 purposes of a compliance with GAP.  That may not be the same
15 thing as conventions that are adopted by other people.

16        We took a position in New Orleans -- and we believe
17 the only position to take in New Orleans is that if you are
18 going to frame a reserve as of a certain point in time, the
19 only thing you can do is follow GAP, and maybe that's correct.
20 That was disputed.  We believe we're correct.  That was
21 disputed, but an examiner that comes in under these set of
22 circumstances has got to be a fairly sophisticated examiner to
23 do justice by the nature of the different kinds of
24 methodologies that are out there.

25        We believe that at the end of the day it will come

1 down to be very simple, and the reason it would come down to be
2 very simple is the history of how these transactions got put in
3 place and how the analysis was done, and that downward sloping
4 curve as of 1998 wasn't turning up, and that slope that you see
5 right there is the be all simple answer to all estimates of
6 future liability, but the person who takes on this task is
7 going to have to wrestle with things that, as you can hear, are
8 going to be controversial.  Can you find the right person?

9          And then finally if Mr. Lockwood is not satisfied and
10 Mr. Baena is not satisfied with the unsecured creditors, and
11 they're not satisfied with an examiner, well, maybe we'll do it
12 after all.  We'll just present the facts to Your Honor, present
13 the facts to all of the other side.  You'll have the benefit of
14 a huge amount of information, and the Court can reach its own
15 assessment, but you have a limited number of alternatives, and
16 for them to say, no, the only alternative that's satisfactory
17 is our alternative, because we're the only ones who are
18 committed to this litigation gets it backwards.  The question
19 is who's going to do the best investigation, and I haven't
20 heard them say that they would be disinterested in that
21 process.

22          Who is one issue.  Time is another.  Output or work
23 product is a third.

24          With regard to time, we disagree with the position
25 that's taken by the unsecured creditors.  We believe that this

1 | issue should be resolved up front, because if you don't resolve
2 | it up front, it ends up cluttering up the machinery of any kind
3 | of dialogue about consensual resolution.  It's this huge
4 | imponderable that's out there that everybody will disagree
5 | about what the value of it is.  Let's get it fixed now.  Let's
6 | liquidate it now.  Find out if it's there or not.  We believe
7 | that, that's very important even separate apart from the
8 | statute of limitations.

9 | Can it be done on a timely basis?  It can be, and
10 | that's the other good news.  We have been working hard to
11 | muster all the materials that we have available to use in a
12 | sensible form, so that whoever does the investigation, we're
13 | going to give them the package.  It's going to be a lot of
14 | material in outline form back up whatever to streamline the
15 | process in getting to the things that count, and one of the
16 | reasons it's been possible is that transaction were so highly
17 | structured and well gone through to begin with.

18 | But we think it would be achievable not just to get
19 | this thing done in 16 months.  We think that this can be done
20 | in a matter of a few months.  That is to get on top of the
21 | basic facts of these transactions.  You know, the Fresenius
22 | transaction's 1994.  Even after Fresenius this company is worth
23 | billions and billions of dollars.  I don't even know why you
24 | won't even talk about Fresenius.  Sealed Air is a 1998.  Even
25 | after that transaction you've got billions of dollars of value,

1 but at least that's the one that had the major amount of the

2 assets that are at issue.

3        Focus on 1998, and you get the consultant's reports,

4 and you get the different proceedings that took place there.

5 We will have the ability to do this on a very prompt basis.  I

6 would suggest not in months.  I would suggest that you

7 establish a limited time frame of something like 90 or 120

8 days.  We'll give them the material.  They can start an

9 investigation.  They can talk with people, do whatever, and get

10 the thing in gear in a very short time frame.

11        In terms of report to the Court, it may be that what

12 Mr. Lockwood ultimately is concerned about is the -- a value to

13 the side of that equation.  That is the examiner says, "I don't

14 believe these claims have any merit whatsoever," and that's an

15 end on it.  It'll be overly influential on proceedings before

16 the Court.  I don't know.  I don't have my client's view on

17 what they would like the verbiage of it to be, but there's also

18 a range of possibilities.  You could have an examiner that

19 makes a report, just basically a factual report, and then it's

20 up to counsel to characterize or argue about what the

21 significance of that report is.

22        I think what Your Honor's saying is that you don't

23 have anything.  You have the wherewithal.  At a minimum we can

24 get the wherewithal in front of Your Honor in a very short

25 period of time, and I believe in a fashion that will be very

161

1  transparent.

2           THE COURT:  Well, nobody likes the concept of an

3  examiner since you don't think I can find someone.  What does

4  that leave me with?

5           MR. BERNICK:  We're not saying -- we just think that

6  it ought to be something where -- it's got be a careful choice,

7  and I didn't get -- I thought we had a little bit of a sense

8  that forensic accountants are out there, and they can kind of

9  do this stuff --

10          THE COURT:  Oh, no.  No.  No.  No.  No, please, I

11  wasn't being that naive about the process.  It's just that it

12  seems to me that if we pick someone with that kind of a

13  background, certainly, that person's going to know enough about

14  investigating books and records and whatever the types of

15  assets and liabilities are to find the right people to assist.

16  That's all.

17          MR. BERNICK:  Okay, that's --

18          THE COURT:  We're left with Mr. Perch I guess.  Are

19  you going to do it, Mr. Perch?

20          MR. PERCH:  Yes, Your Honor, I think that -- I think

21  this is as good a time as any for me to say a few words

22  briefly, because under Section 1104 it would fall to the U.S.

23  Trustee to select an examiner if the Court were to order an

24  examiner to be appointed.  Certainly, the U.S. Trustee stands

25  ready to consult with all of the constituencies and to evaluate

1  as expeditiously as we possibly can whatever recommendations

2  any of the constituencies want to make about somebody who I'm

3  hearing would in essence function as the Court's expert and --

4

5      THE COURT:  No, I don't expert an expert.  I truly do

6  not.  I expect someone who can make a report, and if I wasn't

7  clear -- based on Mr. Bernick's comments, I guess I wasn't -- I

8  would expect a factual report not an argumentative report.

9  That is the purpose, to try to ascertain whether there was some

10  basis from which to go forward with what could turn out to be a

11  costly lawsuit and to evaluate whether the contingency fee

12  arrangement or some hourly rate is more appropriate.  I'm sorry

13  to interrupt.

14      MR. PERCH:  That's all right, and I'm not -- I won't

15  dispute the Court's characterization of it.  I'm using a term

16  of art that may have a different meaning, but the only other

17  thing that I'll bring up is that Judge Wolin did enter an order

18  appointing certain individuals as Court-appointed consultants

19  in all of these cases and specifically designating one of those

20  individuals to be a special master for this case.  I don't know

21  anything about that individual.  I don't know a lot about that

22  individual.  I --

23      THE COURT:  He is an expert in let's say complex

24  litigation I think is a fair characterization.

25      MR. PERCH:  I take it from the lack of any

1  enthusiastic proposal of this nature by any of the parties that

2  have spoken that no one wants to consider the idea of referring

3  to the special master the question of making a recommendation

4  on this subject, but perhaps I don't -- I'm inferring too much

5  from that silence.  I don't know.

6           MR. LOCKWOOD:  Just to be clear, I believe that again

7  consistent with the chart that Judge Wolin put up, that the

8  special masters that he is talking about and the special master

9  that he specifically designated were to deal with the matters

10  as to which reference was withdrawn to him.

11          THE COURT:  Yes, that's what he's told me.  Yes.  I

12  as I indicated earlier, I believe I have the ability at any

13  point to ask for use of that person, and as much as I respect

14  that person, I do not think that issue -- this is an issue

15  that's within his particular field of expertise.  He's not an

16  accountant.  He's not an investigator.  I think that would not

17  probably be the appropriate person to look to.  I think all of

18  you have a better sense of what would be necessary for this

19  investigation.  Mr. Lockwood.

20          MR. LOCKWOOD:  A couple of things, Your Honor.

21  First, this need for investigation business.  If the debtor

22  wanted to go out and sue somebody for stealing it's money, the

23  debtor wouldn't have to go and have an examiner and have a big

24  investigation.  The debtor would just do its own investigation,

25  go out, and sue the person, and it would be --

1          THE COURT:  And could do it here but --

2          MR. LOCKWOOD:  And could do --

3          THE COURT:  -- you can't.

4          MR. LOCKWOOD:  And could do it here.

5          THE COURT:  But you can't.  That's right.

6          MR. LOCKWOOD:  Right, but so now that the debtor is -

7  - to put it gently -- biased -- I mean with all due respect to

8  Mr. Bernick and his charts that asbestos liability going down,

9  and everybody could see it, there's a lot more to that story

10 that you don't have time to listen to today, but suffice it to

11 say there were things going on, class action settlements in the

12 court system, the reduced filing rates.  Anybody with any

13 degree of sophistication, which doesn't include the accountants

14 that Mr. Bernick has been relying on in New Orleans, could've

15 been able to figure that out without much difficulty.

16         Mr. Bernick's idea of bias -- Mr. Bernick's running

17 around like a traveling road show preacher to everybody that

18 will listen pointing to these charts and saying asbestos

19 liabilities were supposed to go down and now they've gone up,

20 and that shows they're all bogus, and that's what he wants to

21 prove.  He filed a case management proposal in this case which

22 precipitated among when people objected to it -- an 84-page

23 reply brief in which he did a road map about how he's going to

24 litigate the personal injury and property damage asbestos

25 liabilities forever.

1          Now he wants to -- he admits that it's going to be a
2   little hard for an examiner to know whether he's right or we're
3   right about whether the asbestos liabilities are, as he would
4   view them, low, or as we would view them, very high.  That's
5   not an accounting decision.  So he says I've got an easier way.
6   Let me show you all the people who looked into transfers back
7   in 1996.  Fresenius, not 1994, and 1998, and all the high-
8   priced consultants and lawyers that the debtors and the
9   transferees to say Grace over these transactions and having
10  said Grace, you'll look at them, and you'll conclude, boy these
11  are terrific.

12          Putting aside the fact that every fraudulent
13  conveyance that I've seen in an asbestos case has had some
14  high-priced New York law firm, usually more than one, say Grace
15  over it ahead of time, at best that would get you away from the
16  intent to hinder, delay, or defraud prong of fraudulent
17  transfer.  He wouldn't say anything at all about whether the
18  debtor was insolvent or not at the time of the transfer, which
19  is a purely mechanical fraudulent transfer test.

20          And as I said earlier, there's not going to be a big
21  fight here about the value of the assets.  Maybe we'll differ
22  about them for a couple hundred million.  Maybe we won't even
23  bother in the New Orleans case.  His witness on value came in
24  $150 million higher than ours.  We said we'll take your
25  witness.  We're not going to fight with you about it, because

1 the dispute here is whether your asbestos liabilities are 500
2 million or five billion, and that dwarfs everything else.  So
3 the whole notion here that what we're talking about, looking
4 into the merits of this case, this case is a stone dead winner
5 under the Fraudulent Transfer Act if this company's asbestos
6 liabilities both present and future are taken into account
7 there back then on the methodology that we believe should be
8 used to do it.  It is a stone dead loser if you use Mr.
9 Bernick's methodology for doing that.

10        Now, who's going to referee that dispute.  Mr.
11 Bernick's client was the client that perpetrated these
12 transactions.  The notion is ridiculous that they should be
13 able to be the ones that should decide whether it should be
14 attacked now.  Indeed in New Orleans Mr. Bernick originally
15 attempted to bring a declaratory judgment action on behalf of
16 the debtor against the debtor's affiliates to get at a judgment
17 that the transaction was not a fraudulent transfer.  The
18 Committee intervened.  Mr. Bernick said, "OH, the Committee
19 shouldn't be able to intervene, because we need to be
20 controlled.  We're the debtor."

21        The Judge -- Judge Brown characterized his lawsuit as
22 an anti-avoidance action and summarily permitted the Committee
23 to intervene recognizing quickly, as did Judge Vance, that
24 having the debtor purportedly suing its present and/or former
25 affiliates in something like this would be a farce, because the

J&J COURT TRANSCRIBERS, INC.

1  debtor's view is the transactions are good.  So we've got
2  volunteers that -- we've done our investigation.  We have as
3  much interest as the Unsecured Committee in not wasting the
4  debtor's assets, because if we waste the debtor's assets, it's
5  our clients that are going to pay for that not Mr. Bernick's
6  equity.

7      And I -- with all due respect, Your Honor, I don't
8  think there's anybody you could find that any better equipped
9  to evaluate the merits of these cases than people who worked on
10 those cases for a long time being paid by nobody prior to the
11 bankruptcy, which is one of the law firms that we want to hire
12 here to do it and the asbestos committees that have consulted
13 with their clients, have consulted with their experts, and have
14 a reasonable idea of what they think the asbestos liabilities
15 are.  I'm not guaranteeing you this case is a winner.  If I
16 could guarantee you this case is a winner, I'd agree.  I'd hire
17 some guy on an hourly rate basis to do it.

18     We thought -- and we can always talk about the
19 contingent fees and the other -- we actually thought that the
20 increasing was better, because we thought it would be a lot
21 harder to get four billion dollars than it would be to get one
22 billion dollars, but that's all negotiable at the end of the
23 day.  But I cannot say to you more strongly that there has been
24 an investigation done.  It's just that the debtor doesn't like
25 the outcome of it.  He doesn't think -- and because the debtor

1  doesn't like the outcome of it, they've got to try and use
2  labels like bias, and self-interest, etcetera.   We understand
3  we have fiduciary obligations.   We think our fiduciary
4  obligations -- we're living up to our constituency more than
5  Mr. Bernick as representative of the so-called Trustee or
6  debtor in possession is living up to their obligations to our
7  creditor constituencies.

8         And, therefore, since at the end of the day it's all
9  going to come down to what is the magnitude of the asbestos
10 liability, at least for a major prong of this -- the other
11 stuff, intend to hinder, delay, or defraud, is -- you know,
12 it's an alternative claim, but we don't need it if we can prove
13 insolvency, and I just -- well, it would be nice if we could
14 say to Your Honor that there is a person out there that knows
15 enough about how -- and is accepted by the warring
16 constituencies, because Mr. Bernick isn't going to hire my
17 expert to estimate his asbestos liabilities, and I doubt very
18 much that Mr. Pasquale's committee is going to hire an expert
19 that's habitually used by asbestos committees in these cases.
20 These people -- it's kind of the typical battle of the experts.
21 You have some experts that everybody knows how they go about
22 the job, and so you kind of select which expert you have reason
23 to believe ahead of time based on methodology and prior
24 performance is likely to produce the kind of answer that favors
25 your side of the case.   That's the way it's done in our system.

1    And so I -- again, I come back to what's the examiner

2  going to do here, Your Honor?  I think you're giving an

3  examiner an impossible task, and I would suggest to you that

4  the two committees have done enough of the investigation side

5  to warrant either being permitted to go forward with or

6  alternatively, if you really want to hear more about the record

7  -- the basis -- how we derived this and why we derived it and

8  what we can present here, we're willing to come back here and

9  have a hearing on that.

10          THE COURT:  Okay.  Mr. Bernick.

11          MR. BAENA:  Your Honor.

12          MR. BERNICK:  As a practical selection -- practical

13  suggestion, we are prepared.  We think it would be a good idea

14  if Mr. Perch's office did start to look into who possible

15  examiners might be in order to give Your Honor some other

16  options.  We would stand by our willingness to have the

17  unsecured creditors do it, but the suggestion is fair one.

18  Even to get the ball rolling, because I believe at the end of

19  the day this is going to be a very straightforward exercise,

20  and it's already taken some time to get it going.  This will

21  give you another option of people to consider.

22          THE COURT:  Okay.  Mr. Baena, I'll give you the final

23  two minutes on this point, and we're taking a recess and moving

24  on to the rest of the agenda.  I'm going to think about this

25  for a while.

**J&J COURT TRANSCRIBERS, INC.**

1    MR. BAENA:  Well, I appreciate that, Judge, and

2  Bankruptcy Judge Rhea told me that I have to call my next

3  witness at 2:00, so I will only take one minute.

4    THE COURT:  All right.

5    MR. BAENA:  Your Honor, I do want to follow up by

6  saying that if anybody thought there was any intellectual

7  dishonesty in our desire to pursue these claims, we certainly

8  tried to ameliorate any distrust by also adding to the array of

9  motions before you a motion to appoint two law firms that we

10  thought should at this -- should disabuse everybody.  We went

11  through a very, very significant -- and I know you're not going

12  to decide law firms, but it does go to the point about how this

13  ought to be prosecuted I think.

14    We went through a fairly arduous process of

15  identifying law firms and interviewing them and then finally

16  selecting them, and when we did that whole process, we were

17  trying to achieve a couple of things.  The first thing was

18  efficiency with minimal duplication of the efforts that have

19  already been expended in the pending fraudulent transfer cases

20  that everybody has alluded to that existed prior to the

21  bankruptcy proceeding.  That goes to the concerns that have

22  been articulated particularly by myself and Mr. Lockwood about

23  the steep learning curve in the short period of time that we

24  have ahead of us for somebody to come in and make an evaluation

25  of these cases.

**J&J COURT TRANSCRIBERS, INC.**

1      We looked for somebody with objectivity in the sense
2  that we didn't want any law firm that had a strong
3  identification or association with any constituency in this
4  case, and we looked for them to take it on an alternative fee
5  basis because of the reasons we already stated.  That most
6  importantly that it represented their underwriting of the
7  likelihood of recovery based upon their thorough analysis of
8  the case.

9      And, incidentally, Judge, we did have our financial
10 advisors review numerous documents and asserted material to
11 come to preliminary conclusions about the viability of the
12 cause of action, and we shared that with the people who we
13 finally chose to present to the Court as our nominees.  We also
14 wanted firms that had resources, because we can't underestimate
15 the fact that Sealed Air and Fresenius are represented by some
16 of the largest and most prestigious law firms in the country
17 who I believe may have even participated in the engineering of
18 these transactions.

19     Of course, we wanted law firms that had presence in
20 this legal community, so that Your Honor would take some
21 umbrage on the fact that they were actually putting their
22 economic necks on the line and accept that as some form of a
23 seal of approval of a prima facia lawsuit existing, and then,
24 of course, we wanted somebody with experience, and we looked to
25 law firms that had the ability to handle a case of this

1   magnitude based upon their prior experience with this kind of
2   litigation.  We didn't ask lawyers to participate in this
3   process if this was the first fraudulent transfer case that
4   they had ever been asked to look at, and so we took great
5   comfort to the extent that we may have had any misgivings about
6   the viability of these lawsuits.  We took comfort from the two
7   nominees that we put forward by way of separate application for
8   their employment.

9        I think, Judge, that everything you seek to
10  accomplish by way of this mutual third party has been
11  accomplished in the process so far, and ultimately, you will
12  have the opportunity to decide whether or not we have a case.
13  I'm suggesting that you ought not put yourself in the awkward
14  position of having to decide that twice.  I think in the first
15  instance, even if you concluded -- if you concluded anything
16  based upon an examiner report, it would be there's a prospect
17  of winning or losing, but you couldn't really come to any final
18  conclusions about probability.  I think ultimately this case is
19  going to get litigated in any event whether we have an examiner
20  or not, and if we went through the examiner routine, came to
21  you, left you with any misgivings, you need to be respectfully
22  concerned about how those misgivings affect the claims as we
23  prosecute them in the future.

24       And I think we're just creating a very slippery slope
25  that we have attempted to avoid in this thoughtful process of

1 bringing these two applications before you, and, respectfully,

2 Judge, I urge you to allow us to go forward and prosecute these

3 claims, and finally, I want to thank you once again for

4 allowing me the professional courtesy of appearing by phone.

5          THE COURT:  Yes, Mr. Baena, I'm sorry that I couldn't

6 continue these, but having participated from an hour and a half

7 of what's probably going to be about six hours worth of

8 hearings, you probably now understand why.  Give Judge Rhea my

9 regards, please.

10          MR. BAENA:  I will do that.

11          THE COURT:  All right.  Thank you.  You're --

12          MR. BAENA:  May I be excused, ma'am?

13          THE COURT:  Yes, sir.  Thank you.

14          MR. BAENA:  Thank you.

15          THE COURT:  Okay.  Anybody else on these points

16 before we take a recess?

17          MR. COLE:  Oh, Your Honor, this is Adam Cole.  I

18 represent Exxon Mobile.

19          THE COURT:  Yes, sir?

20          MR. COLE:  We were supposed to be put at the end of

21 the calendar to argue our summary judgment motion.

22          THE COURT:  Yes, sir, that's where you still are.

23          MR. COLE:  And I've been on the phone for three and a

24 a half hours listening to the finest bankruptcy lawyers on the

25 planet, but I need to go to another court conference.

1          THE COURT:  All right.  What time?

2          MR. COLE:  I need to leave my office right now and go

3   down to -- go down to the Southern District of New York.

4          THE COURT:  All right.  When will you be back?

5          MR. COLE:  I could probably do it later in the

6   afternoon.

7          THE COURT:  What time?

8          MR. COLE:  Five o'clock.

9          THE COURT:  No.

10         MR. COLE:  Four o'clock.

11         THE COURT:  Even my patience isn't going to hold out

12  that long I don't think today.

13         MR. COLE:  Unless you want -- look.  Initially, we

14  talked about -- I'd rather not do it this way, but initially we

15  discussed scheduling it for another day, so that we can do this

16  in person.

17         THE COURT:  All right.  That -- Mr. Bernick.

18         MR. BERNICK:  The idea is because there was not a

19  timely objection to the preliminary injunction.  The

20  preliminary injunction would enter, and their motion would

21  essentially be by way of dismissing the adversary and then

22  dissolving the injunction as to them, and on that kind of

23  basis, we would have no objection.  They can schedule it

24  whenever they want.

25         MR. COLE:  Yes, see the thing is I don't think that

**J&J COURT TRANSCRIBERS, INC.**

1 the case is going to -- the trial is going to go forward any
2 time within the next week or two.

3          MR. BERNICK:  And you --

4          MR. COLE:  If we could schedule a date -- I'm sorry?

5          MR. BERNICK:  There shouldn't be any problem with
6 them having an injunction that says that it shouldn't go to
7 trial.

8          THE COURT:  Is there any problem with a -- at least
9 an injunction at this point that prohibits any further action
10 in the case until I hear the argument on the summary judgment?

11          MR. COLE:  Yes, as long as we're all in agreement
12 that the injunction is not going to -- is not admission of any
13 type of -- of our position on whether or the injunction was
14 proper in the first place.

15          THE COURT:  No, it would simply be a stay pending my
16 ability to hear the argument on the summary judgment and decide
17 whether or not to enter the injunction on some other basis, but
18 it would simply be a stay of the litigation, so I can see --
19 have a chance to evaluate your position in another context.

20          MR. COLE:  That's fine.  When is the next time you're
21 going to be in Delaware?

22          THE COURT:  January 29th, Mr. Bernick.  I don't want
23 you to be traveling is this is the only thing you think you're
24 going to be traveling for but --

25          MR. BERNICK:  I suspect that we're going to have

1 | other things on the 29th.  That's the reason I --

2 | THE COURT:  Okay.  How about January the 29th?  I'm

3 | currently to start Grace matters at 1:00.  If you could be

4 | there at one, I will guarantee I will ask Mr. Bernick to put

5 | this first on the agenda, so I'll put you on first.  You've

6 | waited long enough.

7 | MR. COLE:  That would be fine.

8 | THE COURT:  All right.  That's fine.

9 | MR. COLE:  Thank you, Your Honor.

10 | THE COURT:  You're going to be in Delaware for that

11 | purpose?

12 | MR. COLE:  I will.

13 | THE COURT:  Okay.  Thank you.

14 | MR. COLE:  Bye bye.

15 | THE COURT:  Is anyone else on the phone?

16 | MR. CHIPMAN:  Your Honor, this is William Chipman

17 | with Adam Cole for Exxon Mobile.  May I be excused?

18 | THE COURT:  Yes.

19 | MR. CHIPMAN:  Thank you.

20 | THE COURT:  Anyone else?

21 | MS. KAUFMANN:  Your Honor, this is Susan Kaufmann.  I

22 | am related to docket 12 I believe, a scheduling order in an

23 | adversary.

24 | MS. KRIEGER:  And Arlene Krieger from the Creditors

25 | Committee.  That's Stroock and Stroock and Lavan that's still

1 on the phone and would like to pick up when you reconvene, Your
2 Honor.

3          MR. SHUSTER:  And George Shuster who represents
4 C.M.G.I., a sub-tenant related to agenda matter number 11 is
5 still on the phone.

6          THE COURT:  All right.  We're -- then I will simply
7 leave the phone the way it is right now, so that you folks can
8 stay on, and we will simply take a ten-minute recess.  We'll be
9 back on the record in ten minutes.  Okay.  Thank you.

10                         (Recess)

11          THE COURT:  Mr. Bernick, first of all, I apologize.
12 I gave you an incorrect date.  I gave you the date that was
13 typed on my list, but it's not the correct date, so I have to
14 either back off the date or ask you whether you want to keep
15 the date but come to Pittsburgh for the hearing.  The dates
16 that I'm going to be in Delaware in July are actually the 22nd
17 of July not the 29th, so I don't have anything scheduled here,
18 but I can't go to Delaware because of my weekend agenda, so the
19 question is do you want to keep that date but do it here?

20          MR. BERNICK:  I'm completely neutral about that.  The
21 transportation from Chicago to Philadelphia is not
22 substantially different from the transportation from Chicago to
23 --

24          THE COURT:  How can you compare our wonderful airport
25 with the airport in Philadelphia.  Mr. Bernick.

1          MR. BERNICK:  I will note, Your Honor, I am very

2    familiar with the Pittsburgh Airport.  My in-law's family is in

3    Erie, Pennsylvania, and there's only one way to get to Erie.

4          THE COURT:  Yes, there is, but okay.  Does anybody

5    have a preference, because it may actually -- my experience

6    with July dates is that they tend to sort of fall apart anyway

7    and not much happens that month.  Now whether this case will be

8    atypical, I don't know, but that's generally the case, so July

9    tends to be a pretty slow month.

10          MR. LOCKWOOD:  The choice is July 22nd in Pittsburgh

11   or July 29th in Delaware or vice versa?

12          THE COURT:  No, the other way.  July 22nd in

13   Delaware.

14          MR. LOCKWOOD:  July 22nd in Delaware versus July 29

15   in Pittsburgh?

16          THE COURT:  Right.

17          MR. LOCKWOOD:  Is the 22nd the date we have the <u>Owens</u>

18   <u>Corning</u> hearing, Your Honor?

19          THE COURT:  Yes, I'm sure it is.

20          MR. LOCKWOOD:  Oh --

21          THE COURT:  You'd prefer to do it there.

22          MR. LOCKWOOD:  -- as far as I'm concerned, I'd prefer

23   the 22nd.

24          THE COURT:  Okay, then Mr. Bernick, I'm sorry, but

25   all of those dates -- I guess you're going to have to put in an

J&J COURT TRANSCRIBERS, INC.

1 order somewhere so that people will know the fact that I gave

2 you an incorrect date.  I'm very sorry, but we'll have to

3 change that date.

4          MR. BERNICK:  So we'll move it to the 22nd in

5 Delaware.

6          THE COURT:  Yes.

7          MR. BERNICK:  And at what time though, Your Honor?

8          THE COURT:  Ten o'clock.

9          MS. JONES:  Your Honor, we could send out a notice of

10 the omnibus hearings if you'd like and serve it on the 2002, if

11 that would be easiest?

12          THE COURT:  Actually, that may be a good idea anyway,

13 because what -- if you and the committees are going to get

14 together with respect to some process by which, you know,

15 motions will be filed by a certain date and responses will be

16 due by a certain date, it might not be a bad idea to send that

17 whole notice out, and then you could include the dates.

18          MS. JONES:  We could do that, yes.

19          THE COURT:  Okay.  All right, then we'll do it that

20 day.  Okay.  With respect to the Committee's motion, I guess I

21 have something of a compromise position to offer.  Mr. Bernick,

22 what about the debtor turning over the information that you

23 would've turned over to an examiner on a voluntary basis to all

24 three of the committees who can have the opportunity to look at

25 it for you tell me what's a reasonable period of time?  Let's

1  say 90 days, and at the end of that time we'll do simply a

2  status conference at which I will find out from the Unsecured

3  Creditors Committee whether it wants to go forward with the

4  litigation and from the other two committees whether they want

5  to go forward with the litigation, and at that point make some

6  decision about who and how ought to prosecute this.

7          In the meantime, I will obviously not be appointing

8  counsel for any of the committees for this purpose, but it

9  would provide the information that everyone seems to want.  It

10  would give me some comfort in knowing that, in fact, the debtor

11  has produced the information and that having looked at it the

12  committees' professionals are still convinced, if that's what

13  the resolution turns out to be, that an action should be

14  brought or not, either way.

15          MR. BERNICK:  Well, that's fine.  We'd be happy to do

16  that.  You know, in our view that would then create a

17  foundation for the status conference to be a meaningful

18  discussion about whether this action ought to proceed.  I mean

19  we still get to the prudential issue at the end of the day

20  about whether it's worth proceeding with this kind of pace.

21          THE COURT:  Yes, I -- that's still -- and that's

22  still what I cannot tell --

23          MR. BERNICK:  Right.

24          THE COURT:  -- from the papers that are here.  I just

25  don't have a method of assessing it, so but it does require a

1 voluntary disclosure by the debtor of that information.

2        MR. BERNICK:  We were prepared to do that before.
3 We're more than happy to do that on the timely basis that Your
4 Honor indicated.

5        THE COURT:  All right.

6        MR. PASQUALE:  Your Honor, that's fine with the
7 Committee, at least for the debtor.  I don't know -- I mean we
8 could always do -- I guess what I would also ask is that
9 Fresenius and Sealed Air make the same disclosures, so we have
10 the universe of information.

11        THE COURT:  Well, are they parties before me that I
12 can require any such information to be disclosed?

13        MR. PASQUALE:  Well, I was going to say we may have
14 to do that.  There would be other processes to do that.  That's
15 why I hesitated before I said it.

16        THE COURT:  Well, I would think that it -- the debtor
17 at least would have on its end the essential information that
18 you'd need with respect to the question of solvency.  The
19 debtor's view about the asbestos liability is going to be
20 different from everybody else's.  Everyone's made that clear,
21 but I --

22        MR. BERNICK:  Actually, that's item -- for purposes
23 -- that's why I did that little chart there.  For purposes of
24 determining an asbestos liability value as of a date of the
25 transaction --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Right.

2          MR. BERNICK:  We believe that even if you took at

3   face value the current marketplace for those claims, that is

4   you didn't even apply any of the defenses that we're now

5   talking about, the company would still be solvent.  The

6   asbestos liabilities would be there.  It's purely and simply a

7   question of whether in some fashion somebody says, "Oh, no,

8   that trend was wrong.  The real trend was going to sky rocket."

9          So for purposes of this assessment, I think we're

10  pretty much -- what we're pretty much going to be saying is

11  that we played the game their way, and it's still -- it's an

12  asbestos liability that does not produce insolvency.

13         THE COURT:  Okay.  Well, I think if the information

14  is disclosed and everyone has a brief period to look at it,

15  that this may be a method by which I can avoid the need for an

16  examiner and whatever factual information the examiner would be

17  bringing forward, but at the same time protect what I see as an

18  issue that needs to be looked at, and I think maybe all three

19  committees should have some interest in looking at that.

20         MR. LOCKWOOD:  Your Honor, do I understand correctly

21  that the information is going to be not only the information

22  related to the transaction itself and that Mr. Bernick had

23  described earlier about all the professionals looking over it,

24  etcetera, but also information about the asbestos claim history

25  of G.A.F. as of 1996 and 1998?  Is that what we're talking

**J&J COURT TRANSCRIBERS, INC.**

1 about?

2      MR. BERNICK:  You miss spoke, but I think I
3 understood.  We're not G.A.F.

4      MR. LOCKWOOD:  I'm sorry.  Grace.

5      MR. BERNICK:  I think that what he's asking for is a
6 fairly significant body of information.  It's all the claims
7 files historically, and I think that the experience in the
8 other cases would indicate that at some point in time claim
9 file information is made available to the tort committees.  I
10 don't know whether that's achievable though in the kind of
11 period that we're talking about here.

12      To the extent that the claims had been analyzed and
13 there's some kind data set that's been generated in connection
14 with the report that we are turning over, maybe the data set
15 could be turned over.  I just can't make a representation,
16 Peter, that we can muster all of our claim files to be turned
17 over in 90 days.

18      MR. LOCKWOOD:  Do you -- does Grace have a database
19 of the sort that Dunbar and Peterson usually manipulate?

20      MR. BERNICK:  I do know that they have a database of
21 some sort, but I don't know exactly what kind of database it
22 really is.

23      MR. LOCKWOOD:  Nor do you know whether it has the
24 historic information as of particular dates.

25      MR. BERNICK:  It has historic information.  I don't

1  know it fits in that prospect.  I'll tell you what we'll do,

2  because there's no philosophical issue there.  We'll take a

3  look and see what we have that's readily producible and that

4  would inform this process within 90 days, and if it's there and

5  it looks like we can turn it over to you and it would be

6  relevant to these materials, I don't think we're going to have

7  a problem.

8        MR. LOCKWOOD:  I mean that's, you know, fine with us,

9  Your Honor.  I -- it -- as I said earlier, it seems to us that

10  the asbestos liabilities is the driver, to use Mr. Bernick's

11  favorite phrase, of a lot of this, and so if there is a -- if

12  the information is there and producible so that the folks can

13  look at it, that would obviously inform everybody I think.

14        THE COURT:  Judge Wolin entered an order some time in

15  December that required all of the debtors in these asbestos

16  cases to maintain records anyway, and I assume that to the

17  extent that you have an asbestos claimant database, that's one

18  of the records that has to be maintained.

19        MR. BERNICK:  Yes, that's correct.  If --

20        THE COURT:  So -- I'm sorry.

21        MR. BERNICK:  Yes, that's right.

22        THE COURT:  So is there any possibility that, that

23  information can be -- I'm not even sure what the correct term

24  is, but just to make it evident what I'm trying to get to let's

25  say downloaded into some other computer that could be made

1 available.

2       MR. BERNICK:  That's what I have to take a look at.
3 I don't know to what extent (a) it's computerized and (b) it's
4 not computerized to what extent the files are -- exist in a
5 sensible collection and can be turned over, and I don't know if
6 there are attorney notes that have to be searched out from the
7 individual claim files -- things like that.  I've just been
8 through this process enough in connection with a lot of cases
9 to know that nothing is quite as simple as what you think it
10 ought to be, but that's not to say that we can't do it.  So
11 it's not a question of whether the documents still exist.  It's
12 really a question of form in which they exist and whether it's
13 readily transportable within this period of time.

14       THE COURT:  All right.  Well, let's start with what's
15 easy, and that is the information that the debtor has already
16 collected with respect to the Fresenius and Sealed Air
17 transfers.

18       MR. BERNICK:  Right.

19       THE COURT:  And then let's get that out first,
20 because that should be the easiest, and then while the debtor
21 is doing that, perhaps it can also take a look at the claims
22 databases and make whatever is available, available.

23       Now, having said that, if I schedule a status
24 conference for April 22 at 10, that's four months, but it will
25 eliminate, in the event that you decide you do have a suit, a

**J&J COURT TRANSCRIBERS, INC.**

1  lot of the discovery you would've needed anyway, because you're

2  going to have the information up front.  What about that?

3              MR. LOCKWOOD:  A status conference in four months?

4              THE COURT:  April 22nd.

5              MR. LOCKWOOD:  Given the alternatives, Your Honor,

6  that's acceptable.

7              MR. ZALESKI:  Your Honor, I'd just like to clarify

8  that claims files also relate to property damage claims as well

9  to the extent that they have any of those will be turned over?

10             MR. BERNICK:  Well, I know less about -- property

11 damage claims are a very different kettle of fish.  They're

12 very large cases.  They're not just thousands of small cases.

13 They're hundreds now even -- seven cases that are left.

14             THE COURT:  Well, that's what I was going to say.

15 You have a history of those based on either what you've settled

16 or what resolutions you've come to if the property damage

17 issues are settled.  I'm not sure --

18             MR. BERNICK:  But I mean it's a -- whatever

19 liabilities will be extant as of '96 or '98 will be easy to

20 ascertain.  We could probably provide a schedule of cases.  The

21 amounts that have been paid as of those times will also be

22 disclosed in the annual reports.  The whole idea that anyone's

23 going to an estimate of future property damage liability as of

24 1998 is almost unthinkable.  By that time your trend line is

25 down almost at zero.  It looks like this, so I don't know what

1 future estimated liabilities are going to be for future

2 property damage claims.  I don't understand what that means,

3 but to the --

4          THE COURT:  Well, there are --

5          MR. BERNICK:  -- to the extent that it was analyzed

6 in connection with the Fresenius or Sealed Air transactions,

7 it'll be part of the same collection of material.  If you're

8 talking about mustering now a whole bunch of historical claim

9 files that relate to the property damage cases, I don't have

10 any confidence that they exist in the same kind of form.  Those

11 were all one off cases that are then litigated, and it's a

12 different kettle of fish.

13          THE COURT:  Well, I would assume that the debtor has

14 at least some historical record about the settlements or the

15 paths on the cases that are over.

16          MR. BERNICK:  That's correct.  That's what I said.

17          THE COURT:  And there are at least damage claims

18 pending with respect to the ones that are still ongoing?

19          MR. BERNICK:  That's much more -- sure, but the --

20 you don't have -- you know, in the case of the personal injury

21 claim, there's a marketplace of prices for different kinds of

22 medical conditions.  When you get into the buildings, you're

23 talking about large buildings that have got fireproofing in

24 them.  What's the claim of the building worth?  It's much more

25 like a -- you know, kind of a complex I want to say

188

1    construction case, but a complex building case for a much more
2    unique -- I don't know that there's any particular formula that
3    you can use to translate one from the other.  They've got
4    unique defenses.  They're in different states.  It's much more
5    difficult to ascertain dollar values on that kind of basis.
6             THE COURT:  All right.
7             MR. BERNICK:  Whatever was done in connection with
8    these transactions -- again, I suspect there are going to be
9    lists of cases, and there's going to be some kind of amount,
10   and whatever was done in that regard I know we'll be able to
11   turn over, but I'm less comfortable though is that in contrast
12   to personal injury claim files are more -- much more
13   routinized, you may have basically litigation files for
14   individual buildings that would be much less routinized, much
15   more likely to have a lot of work product in them.
16            THE COURT:  Okay.  I think that -- I really think the
17   driver in this is going to be the personal injury claims,
18   because the property damage claims should have at least at this
19   point in time some finite component to them, and since you
20   represent those entities, I would think they could tell you
21   what their claims are and at what date they believe they arose,
22   and from there you're going to have to probably extrapolate
23   what the debtor's likelihood of knowledge was back in '96 and
24   '98 about the accruals of those claims.
25            So to the extent the debtor has something available,

1  I guess it should be produced, but I don't think that it's as
2  crucial as it is to get the personal injury claim information.
3         MR. BERNICK:  I'll take a look at it.  I'm not sure
4  -- I mean the key thing will be the snapshot of '96 -- whatever
5  the facts were in '96, whatever the facts were in '98.
6         THE COURT:  Right.
7         MR. BERNICK:  We are not producing materials --
8         THE COURT:  Right.
9         MR. BERNICK:  -- just so we're clear, that post-date
10 the '98 transaction, because they're not relevant under the
11 conveyance law.  Just so I'm clear on that, it is not our
12 intent to produce post-Sealed Air documentation of claims.
13        THE COURT:  Well, let's start -- oh, documentation of
14 claims.
15        MR. BERNICK:  Right.  In other words, if there are
16 post-1998 developments with regard to personal injury
17 liability, they weren't there at the time of the transaction.
18 Under the law they're not relevant.  They're not being
19 produced.  We didn't produce them in the Babcock case either in
20 the cutoff.
21        THE COURT:  Well, let's start with what you're
22 willing to produce, and then in -- on April 22nd we'll see
23 whether anybody's challenging --
24        MR. BERNICK:  Fair enough.
25        THE COURT:  -- whether that's enough.

1          MR. BERNICK:  Fair enough.

2          THE COURT:  Okay.  Your motion, which is agenda item
3 number eight, and also agenda item number nine, are continued
4 til April 22nd at ten.  Okay.  Next, Mr. Bernick.

5          MR. BERNICK:  Yes, I had my little list here, and
6 then I put it over to one side.  If memory serves, we should go
7 back to item number six.  Item number six was a motion to
8 dismiss.  It's not been fully briefed, and I kind of lumped
9 that together with five and seven as being matters that we
10 expected would be at least considered to be undertaken by Judge
11 Wolin.  In all cases the briefing has not been completed in any
12 event, but I would suggest with respect to all three of those
13 matters, that on the 29th we come back to see, well, in a sense
14 where they are coming to rest, and then if they come to rest
15 here, we can establish a briefing schedule.

16          THE COURT:  Yes, I agree with that.  I -- you need a
17 briefing schedule and a response date in all of these one way
18 or another.  It's just that if Judge Wolin's going to keep
19 them, he ought to do whatever is convenient to him and you, so,
20 yes, we'll adjourn those to the 29th.

21          MR. BERNICK:  Eight and nine we've taken care of.
22 Item ten --

23          THE COURT:  Mr. Bernick, are you going to submit an
24 order with respect to all of these that continue the items that
25 are continued and that memorialize what I've ruled with respect

1  to eight and nine?

2        MR. BERNICK:  We will attempt to do all of them.

3        THE COURT:  All right.  Then I'll quit bugging you

4  about when I'm going to get it, if that's the case.

5        MR. BERNICK:  That's fine, because then I won't have

6  to worry about whether I promised different things for

7  different orders.

8        THE COURT:  All right.

9        MR. BERNICK:  On item ten, this was originally a

10  request to compel us to retain, identify, collect, organize

11  documents.  As I think it was mentioned to your chambers, a

12  case management order issue from Judge Wolin -- I'm going to

13  hand this up.

14        THE COURT:  I have it.  The December 21st order?

15        MR. BERNICK:  It's called first case management --

16        THE COURT:  Yes, I have it.

17        MR. BERNICK:  And as Your Honor will see from that,

18  the order directs all the different debtors to preserve

19  relevant documents, and, in fact, to establish a written

20  document retention policy with regard to that, and that

21  retention policy has to be filed with the Court.

22        On the basis of this order and this initiative, I

23  believe the property damage people believe, and I believe

24  certainly, that their motion is moot.  That Judge Wolin has

25  taken control over this issue, and, therefore, there's nothing

1 that remains to be decided.

2       MR. ZALESKI:  That is correct, Your Honor, although
3 we do wish to see their policy when it's filed with the Court.

4       THE COURT:  Okay, yes, in fact, I probably won't mind
5 seeing it, too, so I'll -- I think everything is being filed
6 through the Bankruptcy Court at this stage.  Now if Judge Wolin
7 withdraws the reference, I assume that may change, but as of
8 now, everything is to be filed here anyway, so would you please
9 just make sure I get a copy of that as well?

10      MR. BERNICK:  Will do.  We then have items 11, 12,
11 13, and 14, and I think with respect to them, the -- our letter
12 to the Court indicated that they were in the process of being
13 resolved through negotiation.  I believe that's still true
14 today, and I think that probably the best thing to do is to
15 simply continue them also to the meeting on the 29th, the
16 expectation being that they'll be resolved by that time.

17      THE COURT:  Mr. Murdoch.

18      MR. MURDOCH:  Yes, good afternoon, Your Honor.  With
19 respect to number 11, that's correct that American Real Estate
20 Holdings is in negotiations and discussions with the debtor,
21 and I think it's more likely than not that we'll reach some
22 accommodation with the debtor.  I think Mr. Shuster's on the
23 phone with respect to the sub-lessee.  At the moment I think
24 it's more likely than not that we will not resolve matters with
25 the sub-lessee by the end of this month, and we may need to

1   report through my partner Mr. Michaelson, who's the -- for whom

2   I'm pinch hitting this afternoon.  Next time I'll let him sit

3   through four hours of hearings, but essentially, if we can't

4   resolve it, then on the 29th Mr. Michaelson or I in Wilmington

5   will have to ask the Court for some discovery time in February,

6   a status conference the end of February, and a trial time,

7   because they're trying to get out from under their tenement

8   rights, obligations, and we don't want to let them do that.

9          THE COURT:  Okay.  For now it's continued til January

10  29th, and I'll find out if it hasn't been resolved and what you

11  want to do on that date.

12         MR. MURDOCH:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         MR. SHUSTER:  Your Honor, this is George Shuster for

15  C.M.G.  To be clear, item number 11 on the agenda is a motion

16  to assume and assign the prime lease under which my client

17  C.M.G.I. is a sub-tenant.  It is true that this motion has a

18  great effect upon the sub-tenant in that.  If the motion to

19  assume and assign is granted, then our sub-lease sort of

20  travels along with the prime lease.  If it is rejected, then it

21  probably vitiates our rights under the sublease, and no longer

22  allows us to have those rights.

23         In addition, due to an order from Judge Farnan back

24  in I believe it was June 22nd of 2001 the rejection -- the

25  denial of the motion to assume and assign would have the effect

**J&J COURT TRANSCRIBERS, INC.**

1  of automatically rejecting the sublease with C.M.G.I.  Because

2  all of these things are sort of intertwined and because the

3  real party who's suffering here is C.M.G.I. who continues to

4  have the obligation to pay $25,000 a month under the sub-lease

5  without having any surety as to what the status of the sub-

6  lease will be moving forward, I would just ask that if the

7  matter is continued to the January 29th hearing that we do at

8  that point have some certainty as to the resolution of the

9  motion to assume and assign.  That it's either granted or

10  denied at that time.

11         MR. MURDOCH:  Your Honor, also listed under number 11

12  is the adversary complaint that our client filed.  Indeed there

13  was an objection filed by C.M.G.I.  The gravamen of that is

14  that C.M.G.I. got an order entered, didn't provide notice, has

15  denied us adequate notice and constitutional rights or property

16  rights involved, contract rights.  That has to be resolved as

17  well, and if that can't be resolved between now and the 29th,

18  those matters have to be heard.

19         THE COURT:  Okay.  I understood from the docket in

20  that case that there was an order that stayed that adversary

21  proceeding.

22         MR. MURDOCH:  That's correct.  There is an order

23  signed by Judge Farnan, and it would probably the case.  If we

24  can't resolve this with C.M.G.I. between now and the end of the

25  month, we'll need some relief from that order.

1    THE COURT:  All right, so all we'll do if it isn't
2  resolved between now and January, is take a look at what should
3  happen next, and either whether the stay should be lifted and a
4  scheduling order be entered or whether the stay shouldn't be
5  lifted.

6    MR. MURDOCH:  Fine.  Thank you, Your Honor.

7    THE COURT:  Okay.  Mr. Shuster, I don't think I'm
8  going to be prepared to address the adversary except as I've
9  just stated on record on January 29th.

10    MR. SHUSTER:  That's fine.  Thank you, Your Honor.

11    THE COURT:  All right.

12    MR. BERNICK:  The item 15 is the supplemental
13  application to employ Professor Elizabeth Warren as special
14  bankruptcy consultant, and I will say, Your Honor, that with
15  regard to this --

16    THE COURT:  What happened to 14?

17    MR. BERNICK:  Oh, it's the -- it falls into the same
18  category.  I didn't intend to skip over it.  I thought that was
19  something that was still --

20    THE COURT:  It's still being resolved?

21    MR. BERNICK:  Yes.

22    THE COURT:  So that's also continued to January 29?

23    MR. BERNICK:  Yes.

24    THE COURT:  Has there been -- on number 12, has there
25  been a summons issued?  This is a complaint for declaratory

1 judgment and turnover.  Was a summons issued?

2        MR. KAPP:  Yes, Your Honor.  James Kapp on behalf of

3 the debtors.  We believe a summons was served.  We have not yet

4 had our -- our objection deadline I believe is some point in

5 January, so that has not run yet, and we also are currently

6 negotiating with McNick, and we do believe a resolution is

7 possible.

8        THE COURT:  Okay.  All right, and 13, which we were

9 just talking about a minute ago, I -- is the debtor not taking

10 a position?  I have -- I don't know what the response is other

11 than I'm continuing it, because I don't have a response to this

12 motion.

13        MR. KAPP:  Your Honor, 13 is the same situation.  Our

14 objection deadline has been continued until January 11th.  We

15 also believe an amicable resolution will be resolved here, and

16 so we're currently negotiating with the parties.

17        THE COURT:  All right.

18        MR. KAPP:  And that also goes, Your Honor, for 14 as

19 well.  It's that same situation.  Objection deadline has been

20 extended until January 11th, and we're currently negotiating

21 with Toyota.

22        THE COURT:  Okay.  Thank you.

23        MR. BERNICK:  With regard to 15, Your Honor, our

24 position in -- up until today has been -- we've got fundamental

25 concerns about why this is really necessary.  There's no

1  provision in the rules for counsel for one of the committees to
2  in turn retain other counsel, and given the -- what I note to
3  be the considerable talents of the law firms that are already
4  involved for the committees, it did not appear to be clear what
5  it was that Professor Elizabeth Warren brought to the table.

6        At the same time I'm cognizant of the fact that Your
7  Honor is faced with this issue in connection with other cases
8  and approved those applications, and I'm not here to re-plow
9  old ground needlessly.  If it has been the Court's
10  determination that there has been a need and this is an
11  appropriate use of counsel, I'm not here to continue an
12  objection on a matter that's already been ruled on by the
13  Court.

14        THE COURT:  What I've stated, Mr. Bernick, is I'll
15  take a look at the question of the need when I see what
16  services are provided, because Mr. Lockwood's representation
17  has been that the firm from time to time could use sort of a
18  down and dirty approach to things, and someone with the
19  expertise to provide that on a quick turnaround time as opposed
20  to sending many perhaps less experienced associates into a law
21  library to look up information, and that in the long run it
22  would be cost effective to this estate.  Mr. Lockwood's here.
23  He can certainly speak for himself, but that's my inartful
24  summary essentially of what he has stated to me, and on that
25  ground I don't see a reason to deny the request that the

1  Committee be able to use Professor Warren's services in this

2  respect, but I have requested that she -- that the Committee

3  itemize her time records separately, so that we can take a look

4  -- everybody can take a look at what issues are being

5  adjudicated.  If it's something that's going to be a

6  confidential matter, then at least I'm going to see it under

7  seal, so I will look at that issue in the appropriate context.

8  It's very difficult to do that now.

9          MR. BERNICK:  That's fine.

10         THE COURT:  So you're withdrawing any objection?

11         MR. BERNICK:  I'll withdraw the objection.  The form

12  of order that I saw -- seem to -- I guess it had the language

13  in it at the end with regard to objections being made to the

14  fee applications as they come up that I understand to be

15  language that Your Honor yourself suggested and that appeared

16  to be consistent with what we had understood was the nature of

17  the approval, and we do not have an objection to an order in

18  that form.

19         THE COURT:  All right.

20         MR. PERCH:  And, Your Honor, just for the record,

21  Frank Perch for the U.S. Trustee.  Since I did also file an

22  objection, the objection was related to the form of order, and

23  Mr. Lockwood and Mr. Zaleski has made the changes similar to

24  the changes that were made in the Owens Corning case, and with

25  those changes the U.S. Trustee withdraws his objection.

1              THE COURT:  All right.

2              MR. LOCKWOOD:  Your Honor, the Unsecured Committee

3   also filed an objection, and we had submitted to them the order

4   that Your Honor had entered in both Pittsburgh Corning and

5   Owens Corning, and they -- it's my understanding that they're

6   prepared to withdraw their objection based on the supplemental

7   affidavit that we filed and revised form of order.  They have

8   proffered, and I would like to approach the bench if I might, a

9   mark up of Your Honor's previous order that we had submitted,

10  and we're prepared to accept either Your Honor's prior order or

11  the mark up.  I've shown the mark up to both counsel for the

12  debtor and to the U.S. Trustee.  I believe they are also

13  willing to accept either version of this, so I'll hand this

14  up --

15             THE COURT:  All right.

16             MR. LOCKWOOD:  -- and if the U.S. -- if the Unsecured

17  Creditors Committee wants to say anything about it, they can.

18             MR. ZALESKI:  That's accurate, Your Honor.  That's

19  fine.

20             THE COURT:  Thank you.

21             MR. BERNICK:  Then getting on to -- I'm sorry did you

22  want to --

23                        (Pause)

24             THE COURT:  All right.  This doesn't materially

25  change what I put on the record anyway, so if you're happy with

 1 this form of order, that's fine.

 2                       (Pause)

 3            THE COURT:  Okay, Mr. Bernick.

 4            MR. BERNICK:  Item 16 is the motion of Timothy Kane

 5 for relief from stay, and I think that's probably the last

 6 matter.  We then have uncontested matters 17 through 20.  There

 7 are two additional matters, 21 and 22.  Twenty-two has been put

 8 over.  That's the motion by Exxon.  Twenty-one I believe is in

 9 the process of being resolved and can probably be continued

10 until the next date.  That's 21.  So the last matter would be

11 16, and I don't know if counsel are still on the phone.

12            THE COURT:  I'm confused about -- well, let's deal

13 with 16, and then I'll go through them in order, because I have

14 a couple of questions anyway --

15            MR. BERNICK:  Okay.

16            THE COURT:  -- from the rest of the calendar.  Is

17 someone present representing the Kane's -- Mr. Kane?

18                    (No verbal response)

19            MR. BERNICK:  Oh, that was picked up.  Five

20 depositions rang the bell.

21            THE COURT:  That's right.  That order I'm waiting

22 for.

23            MR. BERNICK:  Okay, then the net has been addressed,

24 and then I guess we're on to the uncontested matters, and Mr.

25 Kapp here has the orders for the uncontested matters.

1          THE COURT:  Are they different from the ones that are

2     attached?

3          MR. KAPP:  No, Your Honor.

4          THE COURT:  Okay.  I've already signed those in,

5     number 17, 18, and 20.  I have a question about 19.  I cannot

6     tell from this application whether the firm had a pre-petition

7     claim, whether it was paid either pre-petition in the

8     preference period or post-petition, whether it was paid

9     pursuant to some order that may have authorized payments in the

10    ordinary course or to trade professionals, or whether there is

11    a waiver of any pre-petition claim.  Without that information I

12    am not prepared to state whether Steptoe and Johnson is, in

13    fact, disinterested within the meaning of the Price Waterhouse

14    opinion in this Circuit.

15         MR. KAPP:  Your Honor, if we can just submit a

16    continuance to the next hearing, and we'll submit an affidavit,

17    but I think that would resolve your issues.

18         THE COURT:  Okay.  It's continued til January 29th

19    then.

20                           (Pause)

21         THE COURT:  When will you be submitting the

22    affidavit?

23         MR. KAPP:  Given Mr. Bernick's example, I'd love to

24    see seven days, but could we make it ten?

25         THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1         MR. KAPP:  All right.

2         THE COURT:  Okay.  With respect to number 21, I'm

3    confused, because there was a certificate of no objection, and

4    there was an order attached to it.  Is there something -- some

5    reason why that's not the appropriate order to enter?

6         MR. KRIEGER:  Your Honor, Arlene Krieger from

7    Stroock.  I think that the order that was attached to the

8    certificate of no objection is the proper one.  There is a typo

9    in it, but that came form the U.S.A., but otherwise, 1 think

10   that's the proper form.

11        THE COURT:  Okay.  Is there some reason why this

12   order should not be entered, number 21?

13        MR. KAPP:  Your Honor, it's the motion of the United

14   States.  We don't have a problem with it.  We believe that the

15   commercial committee was the only ones with remaining issues,

16   so if they believe it's all right, I can't speak for the United

17   States, but we don't know of any reason why that order wouldn't

18   be entered.

19        THE COURT:  Okay, then I am entering the order if

20   it's attached to the certificate of no objection.  If there's

21   some need for modification, you can submit a new order, and

22   I'll be happy to sign it, but it appears to me that there is no

23   issue.

24                         (Pause)

25        THE COURT:  All right.  On number 22 --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I think we covered that one, Your
2 Honor.

3          THE COURT:  Well, yes, we did, but I'm missing some
4 documents.  I just wanted to -- I was.  I got some yesterday in
5 the -- from the CMECF system.  I wanted to make sure that I had
6 everything that I thought I needed.  Okay.  I believe that I'm
7 now caught up to date, so item 22 is to be put first on the
8 list for the January 29th argument.

9          Okay.  What else do we need to discuss?

10         MR. CARICKHOFF:  Your Honor, must with respect to the
11 amended administrative order in these cases, in response to
12 Your Honor's order asking the debtors to prepare a proposed
13 order, we've done that.  We've circulated it amongst the
14 various committee counsel, asked them to solicit comments from
15 their respective professionals as well.  I believe that we're
16 very close to having an agreed upon form of order, and we just
17 ask the Court's indulgence for another week so I can get
18 everybody -- the various committees to confirm that, that is
19 acceptable among the various professionals.

20         THE COURT:  Okay.  That's fine.  As I said earlier, I
21 was prepared to address this at the end of the month anyway,
22 but I guess -- here's my first question with respect to it.
23 When are the first round of fee petitions that I'm going to
24 have to rule on going to be filed, and what period of time will
25 they encompass?

**J&J COURT TRANSCRIBERS, INC.**

1       MR. CARICKHOFF:  We haven't had any interim fee

2  hearings in this case, Your Honor, so I -- but the first fee

3  applications that would fall under this order would cover the

4  quarter from January 1st, 2002 to the end of March, 2002.

5       THE COURT:  Okay, but you need a fee hearing on the

6  rest.

7       MR. CARICKHOFF:  That's correct.

8       THE COURT:  So we should do them all.

9       MR. CARICKHOFF:  Yes.

10      THE COURT:  And get you caught up to date.  One thing

11 that is in the <u>Owens Corning</u> order that I do not want in this

12 order, fi that's the one you're -- I'm not sure which order

13 you're basing this from.  <u>Owens</u>?

14      MR. CARICKHOFF:  Yes, Your Honor.

15      THE COURT:  My view is that anybody who gets notice

16 of an interim fee hearing and fails to object does not get a

17 second bite at the apple at the final fee hearing, so if you

18 get notice and you don't object to the interim, that's it.

19 That's your shot.  So to the extent that <u>Owens</u> has language to

20 the contrary, I want this one to say that if you do not -- that

21 if you get notice of the fee hearing and do not object, that's

22 basically the end of the ball game.

23      MR. CARICKHOFF:  We'll make sure that this order has

24 that.

25      THE COURT:  All right, so you're going to present

1 that order hopefully before January 29th, but otherwise, at

2 that hearing?

3          MR. CARICKHOFF:  Yes, Your Honor.

4          THE COURT:  Okay.  I would suggest that we ought to

5 probably set aside some time for the first round of fee

6 hearings.  What I tend to do with fee hearing is ask as many

7 questions as I can at the very first round, so that we can get

8 matters straightened out, and then hopefully thereafter if

9 there are no objections -- I don't have fee hearings unless I

10 see a problem which I always reserve the right to raise.  If I

11 get certificates of no objection in the future, after that firs

12 time, unless I see a problem, in all probability I'm going to

13 grant the fees the way they've been requested.

14          I do review them, and I do want the debtor's

15 summaries for that reason.  Weill you be able to present a

16 summary of the monthly's to date?

17          MR. CARICKHOFF:  I know that we can get a summary

18 with respect to the first quarter from January 1st, 2002

19 through March, which would be the interim application that

20 falls under the amended order.  With respect to having a

21 cumulative summary going back to the beginning of the case,

22 that depends on the various professionals' ability to go back

23 and put their time entries into the various billing matter

24 categories.

25          THE COURT:  I am willing to take them in a summary

1 form for that initial period form each applicant, so that what

2 they could do is -- let's say your billing code somehow fits

3 into category one, which would be an administrative matter,

4 they can go through their applications and simply tell me what

5 would fit into category one.  I want that kind of summary, so

6 that I can analyze this for every fee application including the

7 first one.

8          MR. CARICKHOFF:  But they do not have to go back and

9 re-codify their --

10          THE COURT:  No, they do not have need to codify the

11 applications, but for the summary purpose I'd like to see where

12 the expenses and fees are being generated by category.

13          MR. CARICKHOFF:  We'll communicate that, Your Honor.

14          THE COURT:  Okay.

15          MR. CARICKHOFF:  The way we've drafted this order, so

16 Your Honor is aware, we've asked that the various professionals

17 who are filing their own fee applications go through the

18 initial task of doing that initial summary, and then what the

19 debtors are going to do is make a compilation of the various

20 professionals' summaries and present that to the Court.

21          THE COURT:  That's fine.  Just so I get it on one

22 nice spread sheet that I can read, that's okay with me.  I

23 don't care how the information gets on there.  What I do care

24 about though is that everybody's applications cover the same

25 period of time.  I said this earlier.  I know I'm repeating

1 myself, but I am very adamant about this. I want them to cover

2 the same period of time, so that when I see these categories in

3 the summary, I know that I'm not comparing apples to oranges.

4 Okay. Mr. Perch.

5 　　　　　MR. PERCH: Your Honor, just a point of clarification

6 regarding the provision that Your Honor wants put in the order

7 that objections will be waive dif they're not raised at the

8 interim stage which is a departure from existing practice.

9 　　　　　THE COURT: Not in front of me, Mr. Perch.

10 　　　　　MR. PERCH: Understood, but departure from existing

11 practice in Delaware and in this case and departure from the

12 existing form of the order. Would it be correct that, that

13 will apply only to interims filed after this amended order is

14 entered? That it --

15 　　　　　THE COURT: Oh, yes.

16 　　　　　MR. PERCH: That a nunc pro tunc waive objections

17 that we didn't raise.

18 　　　　　THE COURT: Yes, that's fine.

19 　　　　　MR. PERCH: Okay.

20 　　　　　THE COURT: I will be happy to do that.

21 　　　　　MR. PERCH: Thank you.

22 　　　　　THE COURT: Except that there haven't been fee app's

23 yet, so it will apply to those, because you're going to have to

24 go through them for the fee app process.

25 　　　　　MR. PERCH: Well, that would be correct.

1          THE COURT:  So far there have only been monthly's.

2          MR. PERCH:  But there have been some interim -- I

3  think there have been some interim app's submitted by various

4  parties.

5          MR. JONES:  Your Honor, I think it's a matter of

6  semantics.  I think Mr. Perch is referring to the monthly

7  applications that are on negative notice versus the quarterly

8  which you're talking about which are --

9          THE COURT:  Yes.  No, I'm talking about the ones that

10  are filed for hearing purposes.

11          MR. PERCH:  All right, then let's -- I appreciate Ms.

12  Jones qualification, because perhaps I misunderstood what Your

13  Honor was suggesting.  What I heard -- and maybe I misheard it,

14  but let's do this -- is that if an objection was not raised to

15  a monthly interim application, it was waived.

16          THE COURT:  No.

17          MR. PERCH: You're referring Your Honor to the

18  quarterly's.

19          THE COURT:  Yes.

20          MR. PERCH:  Okay.

21          THE COURT:  I want the issues to come up --

22          MR. PERCH:  I appreciate that.

23          THE COURT:  -- in the Court --

24          MR. PERCH:  I -- thank you.

25          THE COURT:  -- when they're timely so that I can put

1 them in the context of what happened during that quarter.  I

2 don't want to wait five years when I have no recollection of

3 what took place in the case in that time frame.

4          MR. PERCH:  I understand that, Your Honor.  I think

5 Ms. Jones very -- it was a very good catch to pick the -- the

6 word interim has a couple of different meanings here.

7          THE COURT:  Okay.

8          MR. PERCH:  Thank you.

9          MR. ZALESKI:  Your Honor, while we're doing

10 clarifications, Matthew Zaleski, and perhaps it was my shear

11 fear at the size of the task.  Are you looking at to us to go

12 back to the beginning of this case --

13          THE COURT:  Yes.

14          MR. ZALESKI:  -- and reformat the traditional 15

15 codes I used -- 52?

16          THE COURT:  No.

17          MR. ZALESKI:  So I can just categorize from the 15

18 and 52 go forward.  I was just thinking about the time and the

19 sort of staff level work --

20          THE COURT:  I'm not asking you to re-categorize your

21 application at all.  For summary purposes, I would like to know

22 how much time you've spent within whatever the categories are

23 going to be.

24          MR. ZALESKI:  Well, for example, to date in this case

25 my firm uses the 15 matter categories that are in the Delaware

1  bankruptcy rules.  It would be easy to prepare for you a

2  summary according to each of those 15 categories.  It would be

3  tremendously time consuming to reformat that into the 52

4  proposed categories that we're looking at now.

5       THE COURT:  Why do we need 52 categories?

6       MR. ZALESKI:  That seems to be a them.  We have it in

7  Owens Corning.  In the order that I've seen circulated here

8  today has 52 as well, although they're different categories in

9  terms of numbering, but there's the same quantity.

10      THE COURT:  All right.  Can everyone live with

11 categorizing in the Delaware local rule 15 categories for the

12 first -- let's say for fees incurred through the end of 2001?

13 Start the new process beginning January 1st, 2002?

14                 (No verbal response)

15      THE COURT:  Fine, then I'll accept it that way.  Any

16 other housekeeping matters?  Any other housekeeping matters?

17 Any other items that you know are going to be coming that will

18 require particularly long periods?  Mr. Bernick.

19      MR. BERNICK:  It really depends on what shakes out

20 from -- what Court they end up in.  There clearly are -- if any

21 of these class matters come up for hearing soon, those are

22 significant matters.  Motion to dismiss the case would be a

23 significant matter, although I don't they're going to take very

24 long to dispose of.  A class certification is one that stands

25 out, and then obviously the case management matters are -- will

1  take significant time, but if those are in front of Judge

2  Wolin, then we don't have to schedule that hearing.

3          THE COURT:  Okay.  Well, those matters I'll inquire

4  into, as I said, in January then, and we'll find out where you

5  stand on those.

6          MR. BERNICK:  But beyond that, I -- the time -- the

7  hearing on the 22nd when we're going to talk about the --

8          THE COURT:  April.

9          MR. BERNICK:  April 22nd when we talk about the

10 fraudulent conveyance information, we ought to watch to see

11 what else gets scheduled for that day, because maybe the people

12 want to spend a significant amount of time on that.

13         THE COURT:  Okay.

14         MR. BERNICK:  I think if things are labor intensive,

15 those are the ones that stand out in my mind.

16         THE COURT:  All right.  I would like one minute to

17 review my notes to make sure I've covered everything that I

18 wanted to raise with you.

19                        (Pause)

20         THE COURT:  No, I did neglect one thing.  I would

21 like any request for relief to have an order proposed attached,

22 because I recognize that you may change the terms of the order

23 if you particularly file a certificate of no objection or you

24 may negotiate something else.  Nonetheless, I think it requires

25 you to spend some time crystallizing what it is that you're

212

1 actually asking for by putting it into a proposed order.  So
2 any requests for relief, whether it's an objection to claim, a
3 motion, an adversary complaint, I want a proposed order
4 attached to it.

5        I covered the futures rep and the fee examiner.
6 We'll address those again in -- at the January conference.
7 Gentlemen, from your side, other than what Mr. Bernick's
8 already identified, any significant issues that are going to
9 require blocks of time where I need more time reserved on the
10 calendar?

11        MR. LOCKWOOD:  Your Honor, if you and Judge Wolin
12 conclude that you are going to keep what we will generically
13 refer to as the property damage claims, then I would anticipate
14 that the case management order with respect to property damage
15 -- that's part of what keeping property damage entails -- might
16 well entail a significant amount of time.  I mean it really
17 depends on how that topic is sliced and diced between you and
18 Judge Wolin.

19        THE COURT:  Okay.  Well, as an initial matter, it
20 seems to me that what you need to do is figure out these bar
21 date issues, and let's just put aside the asbestos personal
22 injury at the moment.  It seems that you need some bar dates in
23 this case.  You've got to get them out there for the general
24 creditors.  It's probably a good idea to get them out there for
25 the property damage issues at least with respect to something

J&J COURT TRANSCRIBERS, INC.

1  other than the Zonolite claimants.  I'm not sure about that one

2  right now, but for the known property damage claims, the cases

3  that have already been filed I would think it would make some

4  sense to get those in.

5       I had a question, Mr. Bernick.  This may be something

6  that you want to raise with Judge Wolin, but maybe I'll alert

7  you to it anyway.  The debtor is requesting in the proof of

8  claim form for the asbestos personal injury cases that the

9  people who have settled claims nonetheless still submit a proof

10 of claim.  Is the debtor contesting what the settlements were

11 that the debtor entered into?

12      MR. BERNICK:  Yes.  Well, not always.  Well, I'm

13 disconcerted by your disconcerting look.  I think it's very

14 easy to explain.  A company goes into Chapter 11 you're

15 basically taking a process that involves thousands upon

16 thousands of claims, and you're stopping it on a day.  There

17 are huge numbers of claims that get settled on a day-by-day,

18 week-by-week basis, and they are in different stages of the

19 settlement process at any given point in time.  So if you do a

20 freeze frame on a given day, there will be some claims that

21 have gone through that settlement process in our settled

22 settled.  There will be a lot of other claims that are not all

23 the way through that process, and they're not settled.

24      So the question is, as of what point in time does a

25 settlement become consummated.  Now this ends up being a not

1  insignificant issue, and I know that this is -- New Orleans is
2  not the district where we are here, but what happened in New
3  Orleans is that we said, well, we want to determine which of
4  the claims really have been through the settlement process,
5  and, therefore, are contractually entitled to money, and the
6  first representations were made that there wouldn't be that
7  many.  Maybe a thousand, 12 hundred.

8       Well, it turns out that after we set the bar date
9  there were more claims that came in as so-called settled claims
10 than there had even been pending claims at the time the company
11 went into Chapter 11.  Everybody took their whole existing
12 inventory and said they're all settled, and it wasn't true.
13 They were just not even close to being settled, and what Judge
14 Brown then did was at our instigation but -- and he tailored
15 it, is he established a procedure -- kind of a protocol for
16 taking up the driving issues that would determine whether
17 categories of claims are settled.

18      For example, if you don't have a release, is the
19 claim settled?  If you have an agreement, not price, but the
20 price is not specific to a main claimant, is that individual
21 claimant settled?  So there were a series of key issues that
22 were teed up sequentially for determination driving the
23 validity of very large categories.  Sometimes some of them were
24 eight or nine thousand claims out of a total of 45 or 50,000
25 claims.  That process began last spring.

**J&J COURT TRANSCRIBERS, INC.**

1     It's now -- last spring slash summer.  It's now
2  pretty much over, and most of the issues have now been
3  resolved, and we now know based upon Judge Brown's
4  determination how many claims really are settled claims, but
5  the reason that this is not as simple as it would seem is that
6  the settlement process is this continuous process, and you may
7  not actually have a claim that's gone all the way through it.
8  Somebody who doesn't have a completely settled claim should not
9  enjoy greater status when it comes to claiming dollars when
10 somebody who, you know, is a few weeks earlier in that process
11 or a couple months earlier in that process.

12     THE COURT:  Okay.  Somehow I thought from looking at
13 the claim for that you were talking about claims that had, in
14 fact, been settled with a payment stream that either did or
15 should have commenced, because all of the documentation was in
16 place.

17     MR. BERNICK:  There are some of those, and there are
18 certainly -- there are certainly some of those, and those are
19 not the ones that are going to be controversial.  Those are
20 contracts that we have.  They're executory contracts.

21     THE COURT:  Okay.  Thank you.

22     MR. BERNICK:  But I think you were talking about the
23 bar dates processes.  The bar process is something that we
24 would have to take up, and, you know, there is a significant
25 amount of work that's been done on the bar dates for the

1  property claims as well.

2  THE COURT:  Well, there are -- there has been.  What
3  I think is complicating this -- it didn't obviously when this
4  case was going to be in front of one judge.  If it's in front
5  of two, I think what complicated it is the fact that our case
6  management proposal is perhaps too comprehensive in that it
7  attempts to address a variety of bar dates, some of which you
8  could probably get simply by a separate motion and start
9  getting those claims in, and it may make sense for you to
10 bifurcate out some of those requests and get a bar date set for
11 the general unsecured claims and the rejection damage claims,
12 and, you know, the traditional bankruptcy things that you've
13 got to do.

14 MR. BERNICK:  Right.

15 THE COURT:  And at least get that process started,
16 because I don't know the lay of the land with respect to who
17 represents how much, but at least the debtor will have some
18 indication of what its known universe is other than for the
19 asbestos claims if you can get that fixed, and clearly, you
20 have to have one for that, so --

21 MR. BERNICK:  It's a function of the fact that it was
22 all before one court, but Judge Farnan asked really on one
23 occasion early in the case for a plan that we wanted to be
24 comprehensive, and once it finally put together it -- maybe it
25 was a lot of paper that got exchanged, but we were going to

1  have one hearing with witnesses to talk about notice, people to

2  talk about claim forms.  It was all going to happen at once,

3  and there was a certain efficiency to that.  We don't have to

4  stay with that.

5        THE COURT:  Well, I mean it may still make more sense

6  to do it that way.  If Judge Wolin wants to hear it, that's

7  fine.  I'm not -- I just -- it just needs to be done.  That's

8  all, so I think it should get done.  However you choose to do

9  it.  If Judge Wolin isn't going to do it, then I'd like to get

10 that done, we can get that process started.

11        MR. BERNICK:  We'd be very anxious to do it as well.

12        MR. ZALESKI:  Your Honor, just one thing.  With

13 respect to whether the property damage claims should be

14 adjudicated in this Court or in front of Judge Wolin, I

15 respectfully request that my colleague Mr. Baena have the

16 opportunity to argue to this Court the PD Committee's position.

17 He's the person in our office who's been handling these maters

18 and unfortunately was unable to be here today.

19        THE COURT:  Oh, I think he'll have that opportunity

20 in front of Judge Wolin.  I believe Judge Wolin will decide

21 that.  When I'm talking about maintaining those issues, I --

22 what I'm talking about for now is getting the initial

23 submissions into the Court and through a process.  If they're

24 actually going to be litigated somewhere it depends on what the

25 claim is.  I don't have any way of knowing at the moment where

**J&J COURT TRANSCRIBERS, INC.**

1  that case will adjudicated.  It may make sense to send them to

2  Judge Wolin just for efficiency purposes.  I don't know, but in

3  terms of setting bar dates and getting those claims filed and

4  taking a look at the first round of objections to them that are

5  not based on asbestos injuries, I think that's likely to stay

6  here.  It doesn't make much sense that it wouldn't, but Judge

7  Wolin will listen to whatever you say.  I'm sure he'll come up

8  with some, you know, reasonable proposal for you.  He wants the

9  case to move, too.

10           MR. LOCKWOOD:  Your Honor, I would not like my

11  silence about the efficacy of the _Babcock and Wilcox_ settled

12  claim procedure to be indicative that I agree with Mr.

13  Bernick's characterization of it, but I would not that

14  interestingly enough in that case the District Court has taken

15  charge of the unliquidated claim process and the Bankruptcy

16  Court has retained jurisdiction over the settled claim process,

17  so not at the moment knowing what if anything the debtor

18  proposes to do about that here vis-a-vis you and Judge Wolin,

19  it's hard to know whether -- and also having no idea whether

20  the magnitude of the settled claim issue is anywhere as large

21  as it was in _BMW_, it's hard to know what to say about it at

22  this point.  I mean obviously it's something that has to be

23  addressed., and we'll have to I guess or at least the debtor

24  will have to, you know, tee something up.

25           THE COURT:  Yes, that's my only concern, Mr.

1  Lockwood.  This case has sat dormant from the Court's point of
2  view.  I'm sure not from a business point of view for a very
3  long time, and it's time to get it moving again, so whether you
4  want to do it here or in front of Judge Wolin, or somewhere
5  else, I don't really care.  I just want to get it moving, so
6  let's get the pieces in order.

7          MR. BERNICK:  Oh, we're very anxious to do the same.

8          THE COURT:  Okay.  Well, thank you all for coming to
9  Pittsburgh.  I appreciate your accommodating me, and we're
10  adjourned, and you're free to leave.  I'm going to take my --
11  finish my notes.  Thank you.

12          ALL:  Thank you, Your Honor.

13                    * * * * *

14                 **CERTIFICATION**

15          I, PATRICIA C. REPKO, certify that the foregoing is a
16  correct transcript to the best of my ability, from the
17  electronic sound recording of the proceedings in the above-
18  entitled matter.

19
20                                          Date:  January 11, 2002
21  PATRICIA C. REPKO
22  J&J COURT TRANSCRIBERS, INC.