Based upon Grace's litigation history and sample claims it already has analyzed, many claimants will be unable to meet the basic requirements of a cause of action for personal injury.

Claimants bear the burden of proving personal injury and causation by a preponderance of the evidence. *See, e.g., Vigiolto v. Johns-Manville Corp.*, 643 F. Supp. 1454 (W.D. Penn. 1986), *aff'd,* 826 F.2d 1058 (3d Cir. 1987); *See also Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581 (5th Cir. 1983); *Marshall v. Celotex Corp.*, 651 F. Supp. 389, 394-95 (E.D. Mich. 1987); *Gaulding v. Celotex Corp.*, 772 S.W.2d 66 (Tex. 1989). Grace submits that summary judgment proceedings on the common issues of (a) product identification and exposure, (b) dose sufficient to cause disease, (c) compensable injury and (d) lack of reliable diagnostic evidence will demonstrate that many claimants are unable to establish these basic elements of a personal injury claim.

### 1.    Product Identification And Product Exposure

As set forth in Part I of this brief, product identification is a massive problem with regard to the personal injury claims against Grace. The recent sampling of 1997 and 2000 claims shows that few claimants worked in industries and occupations in which they even could have been exposed to Grace asbestos products. Under the law, the inability to demonstrate actionable exposure to Grace product dooms any such claim.

There can be no personal injury claim unless the plaintiff establishes exposure to defendant's product or material. *See generally* PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) (an essential element of a plaintiff's case is "the identification of the named defendant as the manufacturer or supplier of the defective product"). In asbestos cases, the claimant must establish first that he or she worked at a job site where the defendant's asbestos was present. "It is axiomatic that, if the defendant never sold asbestos to any of the locations where [the claimant] was allegedly

employed, no cause of action lies against defendant." *Outlaw v. Keene Corp.*, No. 88-9490 1990, U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990).

Product identification has been highly controversial in asbestos cases in the tort system, as reflected by widely reported incidents of witness coaching[13] and of testimony "abruptly shift[ing]" in response to bankruptcy filings.[14] Grace intends to move for summary judgment against any claimant who cannot produce any identification of a Grace product as his or her work site.

### 2. Exposure Sufficient To Cause Disease

A second significant problem, arising both in prior litigation and in the sample claims noted above, is the lack of evidence of dose and exposure sufficient to cause harm. In toxic tort cases, merely working at a site where an asbestos product was present does not give rise to a cause that is sustainable under the Federal Rules of Evidence. The plaintiff must show that he or she was exposed to defendant's allegedly hazardous product or material and that such exposure proximately caused injury.

---

[13] *See, e.g.,* L. Brickman & R. Rotunda, *When Witnesses Are Told What to Say*, WASH. POST, Jan. 13, 1998, at A15; Rogers, *Witness Preparation Memos Raise Questions About Ethical Limits*, 14 ABA/BNA LAWYERS MANUAL ON PROF. CONDUCT 48, 48-50 (1998) (20-page document drawn from one asbestos plaintiffs' law firm "provides detailed information about asbestos products and packaging; instructs witnesses how to deal with questions and issues at the deposition; gives a list of health symptoms that could enhance damages; and provides general information and advice about being deposed. The document does not mention a witness's obligation to tell the truth."); *Accidental Exposure*, HARPER'S, 296 (1772) (1/1/98) (containing text of the memo); 30 TEX. TECH. L. REV. 1471, 1476 (1999) (former Texas Supreme Court justice terming the memorandum a "cancer on the legal system").

[14] Notably, when major asbestos producers such as Johns-Manville sought Chapter 11 protection years ago, claims — and testimony — shifted away from the primary manufacturers to more peripheral defendants who remained outside Chapter 11. Whereas "prebankruptcy testimony in Philadelphia Naval Yard Cases put Manville's share of product use as high as 80 percent, postbankruptcy testimony had Manville exposure accounting for a quarter or less of the volume of asbestos-containing materials encountered by plaintiffs." L. Brickman, *The Asbestos Claim Management Act of 1991*, 13 CARDOZO L. REV. 1891, 1917 n.13 (1992); *see also id.* at 1894 n.13 (noting that after the Johns-Manville filing, "plaintiffs' testimony (and that of their witnesses) abruptly shifted from a predominantly Manville exposure frame to a predominantly 'other defendants' exposure").

It is a fundamental tenet of science that "the dose makes the poison."[15] Any substance can be harmful in a large enough dose. Conversely, many substances that are known to be harmful at high doses – such as aspirin – are harmless at lower doses. This is true with asbestos as with all other chemicals. Virtually every person in North America has been exposed to asbestos. Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[16] According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

Hence, not every person who worked near a Grace asbestos product can demonstrate causation of injury. Here again, threshold determinations must be made under *Daubert*. The whole concept that "the dose makes the poison" is incorporated into the court's gatekeeping function under *Daubert*. A claimant thus has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (*i.e.,* general causation) and (2) the claimant himself was in fact exposed to the requisite dose (*i.e.,* specific

---

[15] This principle, first articulated by Paracelsus in the 16th century, is one of the foundations of modern toxicology. In the words of Paracelsus: "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison." *See* Casarett and Doull's *Principles of Toxicology:* THE BASIC SCIENCE OF POISONS at 14 (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

[16] "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs." A. Churg, *Nonneoplastic Disease Caused by Asbestos,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 293.

causation).[17]  "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous

to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic

substance before he or she may recover." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th

Cir. 1996).  Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's

causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chemical

Co.*, 151 F.3d 269, 278 (5th Cir. 1998) *(en banc)*, *cert. denied*, 526 U.S. 1064 (1999).  Unless and

until the claimant establishes the existence of a harmful dose – and further establishes actual

exposure to an amount in excess of that dose – the trier of fact is left to *guess* whether that particular

claimant's exposure was sufficient to cause disease.  Guesswork is insufficient under *Daubert* or any

other rule of evidence.  In *Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit

affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific

information of "levels of exposure that are hazardous to human beings generally as well as the

plaintiff's actual level of exposure to the defendant's toxic substance."  As the court explained:

"Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork.

Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.*

at 781.

It will be the claimants' burden to demonstrate through reliable scientific evidence

the levels of exposure sufficient to cause both malignant and non-malignant asbestos-related disease.

It will be their burden also to prove the occupational activities where the claimants' exposures to a

Grace product reached such levels.

---

[17] *See Reference Guide on Epidemiology*, in Federal Judicial Center REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.")

Following *Daubert* proceedings, Grace expects to move for summary judgment on all claims where the occupational activity that involved exposure to Grace products has not been proven (through evidence meeting *Daubert* standards) sufficient to cause the claimed disease.

### 3.    Lack Of Compensable Injury

Grace also intends to move for summary judgment against those claims which do not provide evidence of a legally cognizable injury.    Courts universally require the plaintiff to demonstrate "that the defendant had a duty of care which [was] breached, and that the breach proximately caused *legally cognizable injury*." *See, e.g.*, *Faya v. Almaraz*, 329 Md. 435, 448, 620 A.2d 327 (1993) (emph. added)."    The mere prospect of future harm, without any actual current harm, is not a legally cognizable personal injury. "Actual loss or damage resulting to the interests of another" is a necessary element of a negligence cause of action. "The threat of future harm, not yet realized, is not enough." PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[18] A "mere change or alteration in some physical person, object or thing" does *not* constitute a legally compensable harm. "Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person." A person suffers harm only "[i]n so far as physical changes have a detrimental effect" on that person. *Id.* § 7 cmt. b.

As is clear from the claims submitted to Grace historically, many claimants complain of "injury" from mere exposure to Grace products, but without any health problems or symptoms. Others complain of harmless pleural plaques or asymptomatic pleural thickening. Such conditions, however, are not compensable.

---

[18] This law also bars claims for medical monitoring costs. Medical monitoring claims present no present injury, only the risk of future injury. By definition, a risk of future injury is not compensable.

### *Pleural Plaques*

Pleural plaques are opaque, rounded lesions of the pleura, which is a filmy, plastic wrap-like tissue membrane that surrounds certain inner surfaces as well as the exterior of the lungs.[19] Pleural plaques are clinically harmless and do not cause injury or impair lung function. They have been described in the medical literature as nothing more than "spots" that can be observed on a lung x-ray, since "by themselves, plaques do not cause loss of function or symptoms."[20] Specifically, pleural plaques do *not* cause shortness of breath, impair lung function, cause chest pain, cause any abnormal physical symptoms, decrease life expectancy, or cause any known complications.[21] In short, there is a medical consensus that pleural plaques are "an isolated radiographic finding" that "do not by themselves produce clinically significant reductions in pulmonary function."[22]

---

[19] *See generally* American Thoracic Society (ATS), *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. 134: 363-68, 364 (1996). Pleural plaques typically are seen in the *parietal* pleura, which lines the inner chest wall, inner surface of the rib cage and diaphragm, as opposed to the *visceral* pleura, which surrounds the entire lung. Pleural plaques should generally be bilateral, that is, observed in both lungs.

[20] According to Dr. Murphy, who headed the ATS committee that established criteria for diagnosing asbestosis, pleural plaques have been referred to as "beauty spots on the roentgenogram" or "markers of exposure" because "by themselves, plaques do not cause loss of function or symptoms." AM. REV. RESP. DIS. 136: 1516-17 (1987) (citations omitted). *See also* L. Brickman, *The Asbestos Litigation Crisis*, 13 CARDOZO L. REV. 1819, 1848 (1992), *citing* Gaensler, *Asbestos-Related Pleural Plaques: Much Ado About Very Little*, DRI Seminar 10/16-18/91 ("The investigators who initially described the connection between exposure to asbestos and pleural plaques called such lesions 'harmless scurrilous beauty marks on the chest film' because they found them neither associated with loss of function or symptoms nor precancerous. An extensive review of the literature 35 years later has revealed nothing to contradict these original impressions.")

[21] *See* K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 458 ("Plaques themselves have no effect on life expectancy and are not known to give rise to any complications.")

[22] *See* Jones, et al., *The radiographic pleural abnormalities in asbestos exposure: Relationship to physiologic abnormalities*, J. THORACIC IMG. 3: 57-65 (1988). *See also* A. Churg, *Neoplastic Asbestos-Induced Disease,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 339 (pleural disease "is still seen with considerable frequency, but it generally has little or no functional import"); Matters of Health and Safety Arising from the Use of Asbestos in Ontario, Toronto, Ontario Ministry of the Attorney General 1984 (hereinafter "*Ontario Royal Commission*") at 103. (Plaques are "not associated with (continued...)

Although some pleural plaques can become calcified and enlarged, "[e]ven strikingly large and bulky plaques do not cause measurable functional impairment, and when these patients complain of dyspnea the usual cause is asbestosis or chronic obstructive lung disease."[23]  As Dr. Browne has written in a leading text, "[w]hether calcified or not, pleural plaques alone are symptomless; dyspnea [shortness of breath], chest pain, abnormal physical signs and impairment of lung function are absent."[24]  Nor do pleural plaques increase the risk that the patient may contract an actual disease associated with asbestos.  Pleural plaques are not precursors of lung cancer, mesothelioma or asbestosis.[25]

### *Pleural Thickening*

Pleural thickening is less common than pleural plaques.  It typically affects the visceral pleura, the membrane surrounding the lungs.  It can range from a thin, milky discoloration to a thicker fibrosis easily seen on x-ray.  Pleural thickening is usually asymptomatic, although extensive diffuse thickening may have an adverse effect on lung function.

### *Courts Have Found That Pleural Plaques, Pleural Thickening And Asymptomatic Asbestosis Are Not Legal Injuries*

---

[22]  (...continued)
clinical and functional abnormalities").

[23]  Gaensler et al., *Thoracic Surgical Problems in Asbestos-Related Disorders*, ANN. THORACIC SURG. 40:82-96, 93 (1985).

[24]  K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 455.

[25]  *Id.* at 451, 458-59.  *See also* A. Churg, *Nonneoplastic Disease Caused by Asbestos*, in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE, at 310 (Churg & Green, ed. 2d 1998) ("There is no evidence that plaques or diffuse pleural fibrosis are in any way precursors of mesothelioma"); W. Weiss, *Asbestos-related Pleural Plaques and Lung Cancer*, CHEST 103: 185-59 (1993) ("[T]he weight of the evidence favors the conclusion that persons with asbestosis-related pleural plaques do not have an increased risk of lung cancer in the absence of parenchymal asbestosis").

The majority of courts that have considered the issue have found that pleural plaques and asymptomatic pleural thickening do not cause injury, harm, loss or detriment. They merely reflect a subclinical change in lung tissue, which is not actionable. "A mere change in the lining of the lung does not constitute an impairment or worsening of a bodily function, nor does it prevent the exercise of a bodily function." *In re Asbestos Litigation*, No. 87-09-24, 1994 WL 721763, at *3 (Del. Super. June 14, 1994), *rev'd on other grounds*, 670 A.2d 1339 (Del. Super. Ct. 1995). *See also*, *Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) ("[m]ere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone *is not a functional impairment or harm,* and therefore, *do not constitute a legally compensable injury.*"); *Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) (cause of action for asbestos-related personal injury "does not arise until the asbestos fibers inhaled into the lungs cause functional impairment"), *citing ACandS, Inc. v. Abate*, 710 A.2d 944, 981-982 (Md. Ct. Spec. 1998), *cert. denied*, 713 A.2d 979 (1998) ("the condition known as pleural plaques, or even generalized pleural thickening, *unaccompanied by disabling consequences or physical impairment*, is not a compensable injury as a matter of law"); *Simmons v. Pacor, Inc.*, 674 A.2d 232, 236-37 (Pa. 1996) (Because scarring of lung tissue is a "mere physical change that was unaccompanied by any detrimental effect," plaintiffs suffered no harm and could not recover for asymptomatic pleural thickening.); *In re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563, 1567 (D. Haw. 1990) ("A claimant's subjective testimony as to shortness of breath and fatigue without more is not sufficient ....Plaintiff must show a compensable harm by adducing objective testimony of a *functional impairment* due to asbestos exposure."); *Wright v. Eagle-Picher Indus., Inc.*, 565 A.2d 377 (Md. 1989) (pleural plaques are non-compensable injury when unaccompanied by any symptoms or functional impairment) (all emph. added)

Likewise, in *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), the Maine Supreme Court concluded that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" *Id.* at 543. The *Bernier* court was quoting from a FELA case, *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985), *cert. denied,* 474 U.S. 864, 106 St. 183 (1985). As the U.S. Supreme Court has recognized in FELA cases, "the words 'physical impact' do not encompass every form of 'physical contact'. And, in particular, they do not include a contact that amounts to no more than an exposure." *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424, 432 (1997); *see also Amendola v. Kansas City Southern Railway Co.*, 699 F.Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers alone did not represent physical injury sufficient to support a claim).

Courts also have found that asymptomatic asbestosis is not a legally cognizable injury. For example, in *Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz. App. 1987), the court granted summary judgment to an asbestos mill owner with regard to subclinical asbestosis claims because subclinical injuries do not amount to physical harm. "[U]ntil the asbestosis manifests itself one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one hundred percent debilitating." Consequently, the court stated, "[w]e see no reason to depart from traditional tort concepts and allow recovery for injuries before any disease becomes manifest." *Id.* at 31. The court reasoned that a contrary rule would give rise to a cause of action for countless plaintiffs who are healthy and might never manifest injury. Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for

those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purposes of tort law: the compensation of victims who have suffered.

*Id.* at 30, (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985)).

Similarly, in *Taylor v. Owens-Corning Fiberglas Corp.,* 666 A.2d 681, 687 (Pa. Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer discernible physical symptoms to have a compensable injury." Several of the plaintiffs whose cases had been consolidated in *Taylor* had been diagnosed with asbestosis but had no symptoms attributable to asbestos exposure. The court found that none of the plaintiffs had an injury sufficient to sustain a legal cause of action. "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering, no loss of an organ function . . . ,' he does not have a compensable injury." *Id*. (quoting *Giffear v. Johns Manville Corp.,* 632 A.2d 880, 887 (Pa. Super. 1993)).

Given this precedent, Grace will ask the Court to decide that claims of "injury" predicated on pleural plaques, asymptomatic asbestosis or any other subclinical condition are not compensable.

### 4.    Claims Supported By Unreliable Diagnostic Data Cannot Survive *Daubert* Scrutiny

A further problem with asbestosis claims is that they turn on diagnostic assessments that are neither reproducible nor reliable unless they meet specific standards and are appropriately verified. A claimant must demonstrate that the test method performed in his or her case is reliable and admissible. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742, 745 (3d Cir.1994), *cert. denied sub nom General Elec. Co. v. Ingram*, 513 U.S. 1190 (1995) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible). The scientific method relied upon may not be based on

subjective speculation. *Daubert*, 509 U.S. at 590. The methodology must be real and it must produce consistent results, meaning, it must be reproducible. *See id.* at 590, n. 9. Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. *See, e.g., Metropolitan St. Louis Equal Housing Opp'y Council v. Gordon Gundaker Real Estate Co.*, 130 F.Supp.2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

In the asbestos context, data from two types of test results, while widely used to support mass claim filings, can be unreliable, manipulable and not reproducible: (1) ILO scores — which are based on subjective interpretations of lung x-rays — have been shown to be highly unreliable unless independent doctors make multiple corroborative readings, and (2) lung function testing, known as a pulmonary function test ("PFT"), is highly manipulable and must be reproduced in accordance with defined procedures before a claimant can be deemed to have a real impairment. While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not followed. In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under *Daubert*.

This is not merely an academic concern for Grace. As discussed in Part I above, the recent surge in claims against Grace has come after mass screenings were performed by a small number of plaintiff firms. ILO and PFT tests have yielded massive numbers of claims for nonmalignant conditions. The task of determining whether these claims are supported will be difficult (but necessary) to ensure that only claims that are based upon reliable science are permitted to proceed. Again, appointment of a Rule 706 panel may be appropriate to assist the Court in performing its role as a "gatekeeper" under *Daubert*. Independent experts also could be enlisted to

advise the Court in screening procedures necessary to assure that only claims supported by reliable

diagnostic data *per se* are allowed to go forward.

### *ILO Tests*

There are two major and interconnected problems with ILO scores – variability and

subjectivity.    Numerous studies have shown that lung x-rays are interpreted with tremendous

variability by different readers (inter-observer variability) and even by the same reader at different

times (intra-observer variability).    The ILO itself acknowledges that "there is significant variation

in repeated readings of the same radiograph, not only from reader to reader, but also between

readings by the same reader."[26]

The variability problem is particularly pronounced when an ILO reading is at the

lower end of the classification scale.    As Dr. Hans Weill, a leading pulmonologist and asbestos

researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of

interobserver variability (disagreement) occurs."[27]

In the face of these problems, two things must be shown for ILO readings to be

admissible under *Daubert*: (1) a minimum reading of 1/1; and (2) multiple readings of each

radiograph to ensure consistency and reproducibility.

While the requirements on reliability and reproducibility under *Daubert* can only be

satisfied in this way, these threshold showings also are fully consistent with the diagnostic criteria

for asbestosis.    The fact that a 1/0 reading represents only "suspect" disease, combined with the

---

[26]  *ILO 1980 International Classification of Radiographs of the Pneumoconioses* International Labour
Organization, Geneva 1980 at 20. NIOSH has further acknowledged that "[r]ecently, the [B-reader] program
has been criticized, the main concern being that variability among readers is excessive despite the training
and certification.  ("1980 ILO Report") There is also the perception some B-readers systematically bias
readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute
for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992)

[27]  H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting. The "authoritative consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[28] Thus, to make a scientifically reliable showing that a claimant has asbestosis, a chest radiograph must demonstrate that the claimant has a score of 1/1 or higher.

ILO classifications below 1/1 further fail to meet *Daubert* requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter. *Daubert* forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error. *Daubert*, 509 U.S. at 590, 594.[29] Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. *See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 236 n. 14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); *Raymark Indus., Inc. v. Stempel*, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

As for readings of 1/1 or higher, the variability problem may be reduced but still remains. Each B-reader brings an individual level of experience and bias to what indisputably is a subjective process of interpretation. Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified B-reader. The ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are

---

[28] *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS., 134:363-68 (1986).

[29] Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard. The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher. *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136: 1516-17 (1987).

made for each radiograph."[30]   Other experts agree.   As Dr. Ducatman has stated, "[a]t present, individual diagnoses, *legal decisions* and population assessments ought to rely on multiple readings."[31]

Accordingly, Grace proposes the use of independent, court-appointed scientific experts under Rule 706 to assist in ensuring the accuracy of ILO readings of asbestos personal injury claimants.   An outside panel could be recommended by the National Academy of Sciences (or a similar impartial authoritative organization) and approved by the Court for this purpose.

### *Pulmonary Function Tests*

PFTs are the best tool to determine whether an asbestos claimant has a physical impairment.   Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction.   But such tests are reliable only if performed accurately, and they are particularly subject to manipulation.   For this reason, the ATS has issued comprehensive standards governing PFTs.[32] Inaccurate or poorly performed tests can result in improper diagnoses.   Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[33]

Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests requires full patient cooperation and effort. "Variability is greater in pulmonary function tests than in most other laboratory tests because of the

---

[30]   1980 ILO Report at 20.

[31]   Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emph. added).

[32]   ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies,* AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[33]   *Id.*

need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly.[34] Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[35]

In order to survive a *Daubert* challenge, claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the ATS standards and experience in performing and interpreting PFT tests, can review existing tests to determine whether they were conducted properly. For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether a Forced Vital Capacity (FVC) test was properly conducted. A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other. If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

Another important check is whether the spirometer was set to record for the full length of time recommended by the ATS. Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present. Appropriate predictive values must also be used to identify what constitutes abnormality and normality.

---

[34] Fitzgerald *et al.*, *Office Evaluation of Pulmonary Function:  Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[35] ATS *Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136: 1285-98 (1987).

With respect to FVC curves and other spirometric tracings, an independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

**B.    Grace Has Proposed A Straightforward Litigation Protocol For Personal Injury Claims.**

Grace's litigation protocol for personal injury claims streamlines the process of adjudicating claims while preserving legitimate personal injury claimants' right to a jury trial. Grace intends to file exemplar objections and summary judgment motions to each category of disputed claims — e.g., claims alleging exposure at a site not served by Grace, claims alleging mere site exposure, instead of direct work with a Grace product, and so forth. These objections and summary judgment motions will present Grace's factual and legal arguments as to product identification, dose, and compensable injury. Each exemplar objection will be served by first-class mail to the holders of the disputed claims, who will have 30 days to file a response. Because the Proof of Claim form requires provision of most of the information needed, wide-scale discovery should not be necessary. Any Rule 706 expert work then can proceed. Incorporated in the resolution of these summary judgment issues may be the submission of expert reports on disease diagnosis, extent of injury, and causation, allowing the parties to engage in *Daubert* proceedings regarding the reliability of scientific evidence to support personal injury claims.

Once the Court rules on the exemplar objections/motions in a particular category, Grace will file omnibus objections and summary judgment motions for all similarly situated claims, which will be served by first-class mail on the holders of the disputed claims at the address provided on the Proof of Claim form. To the extent that claimants elect to contest the Debtors' objection, such claimants will have 30 days to file a response showing cause why the Court's exemplar rulings do not govern their situation. In *Babcock & Wilcox*, the court approved the use of similar omnibus

-41-

objection procedures to resolve over 49,000 claims based on alleged pre-petition settlements with B&W. Pursuant to the court's order, B&W periodically objects to "exemplar" claims within particular pre-defined categories. If the court sustains the exemplar objections, B&W files omnibus objections to other claimants who fit within the same category. Each of the claimants subject to the omnibus objection then has the opportunity to show cause why his or her claim should not be subject to the particular objection category. Although the B&W omnibus objection procedure is not yet complete, thus far, the categorical objection process has resulted in the resolution of over 10,000 claims without further court involvement.

IV.    **THE OBJECTIONS TO THE LITIGATION PROTOCOL MISCHARACTERIZE PRIOR ASBESTOS BANKRUPTCY CASES AND MISSTATE GRACE'S POSITIONS.**

Labeling Grace's proposals as "novel" and "unprecedented," the PI Committee and the Property Damage ("PD") Committee have lodged four objections against Grace's proposed litigation protocol:

(1)    The issues surrounding asbestos claims against Grace are too individual for common resolution.

(2)    The proposed protocol is novel and departs from the "prototypical asbestos bankruptcy."

(3)    The proposed protocol does not allow for each claimant to be represented by the counsel of his or her own choice.

(4)    Grace opposes appointment of a futures representative.

While the first two objections were advanced primarily by the PD Committee, the Debtors will respond to each of these four objections as it is possible the PI Committee may now adopt some or all of the PD Committee's arguments.

A.    **The Issues Here Are Not Too Individual For Common Resolution, And Grace Has Never Argued To The Contrary.**

The PD Committee's primary argument against Grace's proposed litigation protocol was that Grace opposed class certification in a number of cases long ago, on the basis that individual issues precluded class certification. The PD Committee quoted extensively from Grace briefs filed in class action proceedings in *Dayton Independent School District v. W.R. Grace & Co.* and in *Kirbyville Independent School District v. Asbestospray Corp.* in service of the argument that Grace opposed elsewhere what it proposes here. This contention lacks merit for three reasons.

***First***, the PD Committee's objection confuses litigating a class action — which is what was proposed in the *Dayton* and *Kirbyville* cases — with resolving common issues. A class

action is a far different procedure than a mass-tort bankruptcy. Because this is not a class action, no finding of predominance is required. Further, because this is a bankruptcy proceeding, all current claimants will be present before the Court. Thus, instead of allowing a few named plaintiffs to litigate on behalf of all, each claimant can be required, through the claim form, to support his or her own claim. Resolution of issues common to groups of claimants will adjudicate the claims directly, not through a representative.

*Second*, there were and remain good reasons why class certification in the prior cases was inappropriate. In *Dayton*, for example, Grace opposed a plan to try certain claims commonly for five out of 82 public school districts in the proposed class. The *Dayton* case involved not just a single product but many; not just Grace, but many other asbestos defendants as well; and varying claims not just for replacement but also for contamination.

*Third*, the cases cited by the PD Committee objectors are outdated. *Daubert* had not been decided at the time of those earlier cases, and the constructive notice and statute of limitations arguments that are key to MK-3 cases had not yet ripened. Furthermore, the state of technological advancement and diagnostic procedures has improved markedly in the intervening years, making possible threshold determinations of risk that were not feasible before.

The PD Committee's reliance on *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) for the proposition that no issues in an asbestos case may be litigated on a common basis also is misplaced. In *Cimino*, a multi-product class action brought against several asbestos manufacturers and suppliers, the district court adopted a three-phase litigation procedure which resulted in significant liability for one of the defendants.

In Phase I, a jury determined (i) which if any of each defendant's products was defective, (ii) what each defendant knew or should have known of the risk; (iii) whether each

-44-

defendant was guilty of gross negligence in marketing the offending products, and (iv) punitive

damages multipliers for each defendant guilty of gross negligence. *Cimino*, 151 F.3d at 301. In

Phase II, the parties entered into a stipulation approving a special verdict form and agreeing that

some plaintiffs had been exposed to defendants' products. *See id.* at 306-07. In Phase III, two juries

determined, for 160 "sample" cases only, two damages issues: (i) whether the plaintiffs suffered

from an asbestos-related injury or disease and, (ii) if so, the amount of damages. *See id.* at 303. In

the Phase III trial,

> "[T]he juries were told to assume that the claimants had sufficient exposure."
> Indeed, for the most part evidence of exposure and its likely or possible
> results was not allowed. Simply stated, whether there was exposure to
> Pittsburgh Corning's — or any other defendant's — asbestos, and, if so,
> whether that exposure was a cause of any of the 160 sample plaintiffs' illness,
> disease, or damages, was neither litigated nor determined in any of the Phase
> III trials.

*Id.* at 305.

Despite the fact that causation had not been shown for any individual or group of

individuals, the trial court "extrapolated" from the "sample" cases and allowed all claimants to

recover based upon the injuries they claimed. The Fifth Circuit found that this procedure was

unacceptable, violated Pittsburgh Corning's Seventh Amendment rights, and did not comport with

Texas substantive law or the Fifth Circuit's prior decision in *In re Fibreboard*, 893 F.2d 706 (5th

Cir. 1990). *See Cimino*, 151 F.3d at 303.

*Cimino* plainly does *not* stand for the proposition that *no* common issues can be

adjudicated in asbestos cases, but only for the proposition that (beyond general causation) *individual*

causation is an essential element of liability and cannot be proven *by the plaintiff* through

*extrapolation*. Indeed, in Phase I of *Cimino*, most of the defendants were eliminated based on

rulings regarding common issues concerning the alleged defectiveness of their products. This phase

was not deemed problematic by the appellate court. Thus, the court implicitly approved the sort of common-issue adjudication proposed by Grace here. With respect to Phase III, the court merely ruled it was impermissible to adjudicate remaining issues of "individual causation" for only a sample of the plaintiffs and then extrapolate those results to the remainder. *Id.* at 311.[36]

Here, Grace has proposed no such sampling and "extrapolation." Rather, Grace proposes the use of Rule 42 to resolve issues that are common to specific categories of claims. The issues Grace has identified for consolidated resolution here are exactly the sort of threshold, common issues that have been deemed the proper subject of consolidated resolution in asbestos cases such as *Cimino*[37] and in other mass-tort contexts as well. For example, in *Dow Corning*, the court indicated that consolidation of breast implant disease claims for purposes of a "single, generic causation trial" was appropriate. 211 B.R. at 580. Consolidation under such circumstances was warranted to adjudicate "a threshold issue which, depending on its resolution, could obviate the need for further proceedings." *Id.* at 583. In *Dow Corning*, the common issues that warranted consolidated resolution related to whether silicone in breast implants caused disease. *See id.* at 598.

---

[36] In its decision, the court distinguished between common issues of "generic causation" such as whether a "combination of chemical contaminants and the plaintiffs' exposure to them had the capacity to cause the alleged harm" and issues relating to "individual proximate cause." *Cimino*, 151 F.3d at 317 (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988)). The concurrence in *Cimino* specifically stated that under the court's ruling, a plan that involved consolidation of the litigation for purposes of adjudicating common causation and exposure issues "on a craft and work site basis during the relevant time periods" would be permissible. *Id.* at 337 (Garza, J., concurring). The court could then "simply plug[] each plaintiff into a craft, work site, and time period" to resolve the causation issue. *Id.*

[37] Contrary to the Committees' implication, asbestos cases have been consolidated in the past. *See, e.g., Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir. 1990) (upholding consolidation), *cert. denied*, 498 U.S. 920 (1990); *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1497 (11th Cir. 1985) ("The cases here [involving asbestos litigation] present precisely the kind of tort claims a court should consider consolidating for trial."); *Owens-Corning Fiberglass Corp. v. James*, 646 So.2d 669, 674 (Ala. 1994) (observing that "common questions of law and fact existed in these cases, both with respect to initial legal liability and with respect to medical causation"); *In re Minnesota Personal Injury Asbestos Cases*, 481 N.W.2d 24, 26 (Minn. 1992) (observing that consolidation of asbestos cases was appropriate because "[i]t is likely that there will also be common issues of law, including those relating to the connection between exposure to asbestos and disease").

-46-

Here, Grace proposes consolidated litigation of similar common issues relating to asbestos in various products it manufactured.

The fact that the asbestos claims may implicate other, individualized issues is no objection to consolidation. Rule 42 merely requires the existence of a common issue of fact or law — not that all issues relating to the consolidated claims be generic or common issues. *See* 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2384 (1995) ("Consolidation is not barred simply because the plaintiffs may be relying on different legal theories or because there are some questions not common to all actions; the critical consideration, as in other contexts under the federal rules, is whether there is at least one common question . . . ."). Thus, as the *Dow Corning* court recognized, consolidation under Rule 42 in the mass-tort context is particularly appropriate to resolve threshold issues relating to the validity of claims, given that resolution of such common issues at the outset may "obviate the need for further proceedings" involving "factors that are more individual in nature." 211 B.R. at 583, 594.[38]

### B.    The Proposed Protocol Is Neither Unprecedented Nor Impermissibly Novel.

The PD Committee also argues against Grace's protocol on the grounds that it does not look like the "prototypical asbestos bankruptcy." This argument misses the mark. Grace's protocol is comprised of litigation procedures taken right out of the rules. There is no question but that there is ample precedent outside of Chapter 11 for the use of *Daubert*, Rule 56, and Rule 42 to resolve common issues of science. (*See* § 3 above).

And there is additional precedent in the context of Chapter 11. As also noted above in Section 3, precedent is readily found in the *Dow Corning* and *Babcock* cases. Debtors in even

---

[38]    *See Dow Corning*, 211 B.R. at 581 (given "potential obstacles to class certification, it is perhaps fortunate that the Federal Rules of Civil Procedure provide for an alternative form of collective litigation" under "Rule 42").

more recent asbestos reorganizations also have indicated that they will follow this type of litigation

path for defining the scope of liability. *See, e.g.*, Debtors' Info. Br. 28-29, *In re Federal-Mogul*

*Global Inc.*, Case No. 01-10578 (Bankr. D. Del. Oct. 1, 2001) (proposing resolution of common

issues that bear upon the validity of asbestos-related claims); Debtors' Info. Br.18-24, *In re USG*

*Corp.*, Case No. 01-2094 (Bankr. D. Del. June 25, 2001) (same).

      That the Chapter 11 precedent is recent is no accident. Mass-tort bankruptcies have

evolved in light of the failures — and successes — that emerged from their predecessors. Earlier

cases that have been resolved without defining liability have involved consensual reorganizations.

Many of these reorganizations, however, have run into problems.    In the Johns-Manville

reorganization, for example, the Trust allowed all claimants to go back into the tort system, who

proceeded to litigate in every corner of the county, forcing the Trust to spend in litigation costs what

it should have been using to compensate claimants. *See* Frank Macchiarola, *The Manville Personal*

*Injury Settlement Trust: Lessons for the Future*, 17 Cardozo L. Rev. 583, 602–03 (1996). The Trust

quickly became insolvent, and in return for an agreement from plaintiffs to pay only 10 cents on the

dollar,  the Trust agreed to a new grid system for paying claims with loose criteria for disease proof

that ducked the issue of claim validity. Almost immediately after the grid system was activated, the

Trust was inundated with unexpected numbers of new nonmalignancy claims that it had reason to

believe were questionable if not downright fraudulent.

      Recently, as a result of this surge of claims against which the Trust had no defense

(having negotiated away the right to deny such claims), the Trust has been forced to lower the

percentage it pays out on claims. Similar reductions have occurred in payouts by the UNR and Eagle

Picher trusts.

C.    **The PI Committee's Argument That Each Claimant Is Entitled To His Own Counsel Misses The Mark.**

    1.    **Grace's Proposal Does Not Preclude Participation By Counsel For Claimants Who Are Not On The Committee.**

The PI Committee calls Grace's proposal to establish a Personal Injury Litigation Committee ("PIL Committee") an attempt to strip tort claimants of a fundamental right to hire counsel of their choice. *See* PI Cmte. Brf. at 34-35.[39] The accusation that Grace will force counsel upon unsuspecting claimants is incorrect and ignores the fact that the Bankruptcy Code specifically allows for and recognizes the importance of establishing claimant committees.

The need to create multiple creditor committees in complex cases has been recognized since the Bankruptcy Code's inception. *See In re Dow Corning Corp.*, 194 B.R. 121, 142 (Bankr.E.D.Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (Bankr.E.D.Mich. 1997). A court is authorized to appoint committees in addition to those required under § 1102(a)(1) as long as each committee adequately represents its constituents. *See id.* at 141-42. To determine whether a committee provides adequate representation, a court should consider "(a) the nature of the case; (b) identification of the various groups of creditors and their interests; (c) the composition of the committee; and (d) the ability of the committee to properly function." *See id.*

This case warrants creation of a PIL Committee. First, the complexity of this bankruptcy case and the sheer magnitude of the asserted claims counsels the appointment of litigation committees.

---

[39] It is important to note that in each case that the PI Committee cites in support of its contention that an individual's right to choose his or her counsel is fundamental, the facts are significantly different than those here, and the court explicitly state that the right to choose one's counsel is a qualified one. *See Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) ("To be sure, that right is qualified"); *PGH Int'l v. Gabor Shoes AG (In re PGH Int'l.)*, 222 B.R. 401, 408 (Bankr. D. Conn. 1998) (Yet, at a minimum, that right 'must be balanced against the need to maintain the highest standards of the profession.").

Second, the personal injury claimants make up a clearly-identifiable group, most of whom claim the same or similar injuries, making committee representation ideal.

Third, the PIL Committee would be comprised of attorneys representing the full spectrum of claimants in order fairly to represent each type of claimant. In the unlikely event that a particular claimant was not fairly represented, his or her counsel would not be precluded from appearing and objecting upon a showing of unique circumstances such that representation by the committee was inadequate.

Finally, the ability of the PIL Committee to function properly could be evaluated as the process continues to ensure that each claimant is adequately represented.

### 2. Proceedings In Babcock & Wilcox Confirm That The Committee Approach Works.

Once again, the experience of the *Babcock* bankruptcy is instructive. There, over 50,000 claimants filed proofs of claim alleging that they had settled individual cases against Babcock & Wilcox and thus had contractual claims to enforce, as opposed to pure personal injury claims. When litigation was initiated over these "settled claims," the B&W court faced the same challenge presented here — how efficiently to handle such massive numbers of claims. The B&W Asbestos Claimant's Committee — much like the PIL that Grace proposes here — took on the task of representing the interests of the "settled claims" group of claimants in determining the validity of their claims. Nonetheless, consistent with Grace's observations above, many claimants have had their own counsel appear for them where individual issues have arisen.

### D. Debtors Do Not Oppose Appointment Of A Futures Representative.

A final issue raised by the PD and PI Committees easily is resolved. Contrary to the PD and PI Committees' assertion, Debtors *do* support and indeed will seek (at the proper time) appointment of a futures representative.

-50-

## V.    THE PROPOSED NOTICE PLAN COMPLIES WITH DUE PROCESS AND IS REASONABLE.

Grace has proposed a multi-million-dollar Notice Plan designed to reach 96.5% of the target demographic group of PI claimants (men 65+) and 95.4% of the target demographic group of PD and ZAI claimants (adult 35+). The Plan is structured to provide potential claimants a reasonable opportunity to file their claims by the bar date. The Plan affords claimants due process and should be approved.

As noted at the outset of this Reply, Grace proposes that the district court and the bankruptcy court jointly approve a single bar date and a combined notice program for all asbestos and non-asbestos claims (other than the claims defined in the bar date notices that are not subject to any bar date, such as future claims and workers' compensation claims). Such a combined notice program would save approximately $4 million over the costs of separate notice programs. Moreover, a combined notice program would avoid any confusion among potential claimants that might arise from separate programs.

In analyzing the demographics of all the asbestos claimant groups, Grace's notice expert, Kathy Kinsella, determined that there are two primary demographic targets that include the vast majority of all claimants. Kinsella developed a plan that effectively reaches these groups without the necessity of separate media campaigns to reach the claimant groups individually. (Kinsella Aff. ¶ 9, Ex. A). Providing separate notices for each claimant group would be unnecessary and wasteful.

In analyzing the reasonableness of bar date notices, the court must balance the needs of notification of potential claimants with the interests of existing creditors and claimants. *See, Vancouver Women's Health Collective Society, v. Robbins Company, Inc.*, 820 F 2d 1359, 1364 (4th Cir. 1987) ("A bankrupt estate's resources are always limited and the bankruptcy court must use

discretion in balancing these interests" in deciding the adequacy of a notice plan.) Courts recognize that combining notices reduces "the costs of the litigation and thereby prevents an unnecessary depletion of" estate assets. *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d at 1106. The balance of competing interests here strongly favors a combined notice plan to take advantage of the similar demographics of the potential claimants.

Instead of publishing separate notices for each type of claimant, Grace has redesigned its notices to more fully describe the different types of Grace products which may be the subject of claims and the different type of claims that a claimant may hold. Since the bar date for all claimants is the same, the combined notice will cause no confusion. Grace's use of a combined notice is similar to that in *Babcock & Wilcox*, where both property damage as well as personal injury claimants were notified of a common bar date through a single notice.

The PI Committee has not raised any objections to Grace's Notice Plan. The objections raised by the PD Committee are addressed in Debtors' November 9, 2001 Reply Memorandum. The Debtors understand that the PD Committee's objections will be heard by Judge Fitzgerald. The portions of Debtors' Reply Memorandum addressing those PD Committee objections have therefore been omitted from this filing.

In the event that medical monitoring claims are heard by the district court, the objection that the Notice Plan fails to address such claims is simply wrong. First, the Plan expressly provides that the Bar Date Notice Package will be mailed to all residents of the Libby, Montana area. (at 15). In addition, the Notice will be published in the Libby, Montana newspaper, *The Missoulia Independent*, in Parade and USA Weekend, carried in seven different local newspapers in Montana, as well as relevant trade and consumer publications. The notices specifically disclose that the bar date applies to holders of claims "caused by asbestos in products manufactured by Grace or from

vermiculite mined, milled or processed by Grace." The notices also clearly provide that the bar date applies to *any* claims against Grace. Thus, the Medical Monitoring Claimants have been fully addressed in the Notice Plan. (Kinsella Aff. ¶ 26.)

In sum, the Notice Plan, as amended, provides potential claimants with adequate information with respect to the bar date and the claims being barred. It informs potential claimants of the effect of not filing a claim by the bar date and will be sent to all known claimants[40] and published in appropriate media so as to reach unknown claimants. Multi-faceted notice programs like that proposed in this case have been approved by many courts and utilized successfully for similar purposes in large consumer or product class actions where most class members are not individually identified. *See Cox v. Shell Oil Company*, case no. 18,844, Final Order Approving Class Action Settlement at 13 (Chancery Ct. Obion Cty., Tenn., Feb. 9, 1996) (citing *In re Domestic Air Transportation Antitrust Litigation*, 141 F.R.D. 534 (E.D. Pa. 1992)). The Notice Plan, as revised, is consistent with the many notice plans that have been approved in previous Chapter 11 bankruptcy cases, complies with due process and should be sustained.

---

[40] In preparation for sending actual notice to claimants, Grace has discovered that it does not have the addresses for known asbestos personal injury claimants and ZAI claimants in its database. Grace only has the addresses of claimants' counsel. As a result, Grace is requesting that counsel for claimants assist in sending out such actual notices as outlined on Exhibits E and F.

## VI.   THE PROPOSED ASBESTOS PERSONAL INJURY PROOF OF CLAIM FORM IS NECESSARY AND IS NOT UNREASONABLY BURDENSOME.

The Asbestos Personal Injury Claim form is key to the central task of this case. It supplies the necessary factual predicate for defining the Debtors' liability. To that end, the proposed asbestos personal injury claim form has been carefully tailored to achieve this goal — without being unreasonably burdensome. In objecting to the forms, the PI Committee is essentially demanding that its predicted 200,000 claims be accepted at face value, with no scrutiny of Grace's actual liability and no requirement that the claimant show actual asbestos-related injury until *after* a reorganization plan is confirmed and a trust is established to pay claims. The Committee's proposal would thus require this Court to ignore the assertion of illegitimate claims, and indeed would ratify and reward the filing of claims lacking a good-faith basis.

Grace's proposed Personal Injury Claim form is needed in order to decide whether the claimant actually was exposed to Grace's asbestos products, whether that exposure was sufficient to cause injury, and whether the claimant in fact suffered injury. The PI Committee's estimate that it would take a paralegal three hours to complete the form is an exaggeration. But even if this estimate is accurate, three hours is not an unreasonable burden.

### A.   Prior Cases Provide Ample Support For Grace's Tailored Requests.

There is ample authority for this approach. First, as noted above, detailed claims forms have been approved by numerous asbestos trusts for the payment of claims. The 21-page Manville claim form is more extensive than Grace's proposed form. The individualized review forms for the Celotex, Eagle-Picher and UNR Trusts are similar to Grace's form.

Second, detailed claim forms or questionnaires repeatedly have been approved outside of Chapter 11 in order to streamline the litigation of mass tort cases. For example, the MDL court which administered the Dow Corning breast implant multi-district litigation approved a much more

extensive and burdensome 42-page "Plaintiff Questionnaire" that required disclosure of information about plaintiffs' current and former addresses, family members, prior marriages, educational and employment history (including all absences for medical reasons), medical history (including all surgeries and hospitalizations and all visits to treating doctors), prescription drug history, claimed damages, prior lawsuits, prior communications with defendants, a listing of all witnesses who could support the claim, and a request for an extensive list of documents (including medical records, diaries, journals, logs, product identification records, medical bills, and documentation of lost wages or income), and releases authorizing the disclosure of medical and employment records.

As noted in Grace's opening brief, detailed questionnaires also were approved in the orthopedic bone screw product liability litigation, the "Phen-fen" product liability case, the latex allergy product liability case, an asbestos product liability case and the "Agent Orange" litigation, among others.[41]

Further precedent for this approach is provided by the widespread adoption of "*Lone Pine*" orders by both state and federal courts managing multi-plaintiff toxic tort claims. The term "Lone Pine order" originated in a New Jersey case, *Lore v. Lone Pine Corp.*, No. L-33606-85

---

[41] *See, e.g., In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1995 WL 925678, at *1 (E.D. Pa. Feb. 1, 1995) (attaching questionnaire); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 704702, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*, 1999 WL 387322 (E.D. Pa. 1999); *Ludwig Enters CMOs on Product ID Questionnaire, More In re Latex Allergy*, 12/2/97 Andrews Med. Devices Litig. Rep. 10 (discussing use of 42-page questionnaire seeking identification of manufacture, individuals who could corroborate use, documents supporting claims, medical information, and education and employment information in *In re Latex Gloves Prods. Liab. Litig.*, MDL Docket No. 1148 (E.D. Pa.)); *In re Food Lion, Inc.*, 1998 WL 322682, at *11 (4th Cir. 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim"); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1416 (E.D.N.Y. 1985), (Weinstein, J.) *aff'd in part, rev'd in part on other grounds,* 818 F.2d 179 (1987) (ordering questionnaires "sent to all claimants" seeking dates and location of service to determine extent of exposure); *In re New York City Asbestos Litig.*, 142 F.R.D. 60, 63, 65 (E.D.N.Y. 1992) (mentioning use of a "questionnaire process designed to elicit all information necessary for settlement" of asbestos claims).

(N.J. Super. Ct. 1986) in which the trial court directed plaintiffs to provide expert opinions supporting their personal injury and property damage claims against a neighboring landfill, including specific causation evidence. Last year, the Fifth Circuit rejected the argument that such "pre-discovery" orders imposed too high a burden on plaintiffs at the threshold stage of litigation. The court held that such orders mitigate the burdens of mass tort litigation on the courts and defendants, and merely require plaintiffs to disclose the causation and damages evidence they should have assembled *before* filing their claims:

> *Lone Pine* orders are designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation. In federal courts, such orders are issued under the wide discretion afforded district judges over the management of discovery under Fed.R.Civ.P. 16.

> \*               \*               \*

> The scheduling orders issued below essentially required that information which plaintiffs should have had before filing their claims pursuant to Fed. R. Civ. P. 11(b)(3). Each plaintiff should have had at least some information regarding the nature of his injuries, the circumstances under which he could have been exposed to harmful substances, and the basis for believing that the named defendants were responsible for his injuries.

*Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000) (affirming dismissal of radiation exposure personal injury cases for failure to comply with *Lone Pine* order). *See also Martinez v. City of San Antonio*, 40 S.W.3d 587, 591-92 (Tex. Ct. App. 2001) (rejecting challenge to *Lone Pine* order and to "no evidence" summary judgment dismissal of toxic tort claims alleging personal injuries from lead exposure based on failure to present causation evidence); *In re Love Canal Actions*, 547 N.Y.S.2d 174, 177 (N.Y. Super. 1989) (entering *Lone Pine* order requiring toxic tort plaintiffs to document their chemical exposure and medical injury claims prior to any further prosecution of the claims).

Third, and most importantly, this approach was approved by the court in the *Babcock*

case, the first major asbestos bankruptcy case to confront the recent surge in claims. In that case, the

debtors initially proposed a more extensive proof of claim form than ultimately was adopted by the

court. As in Grace, the personal injury committee opposed the inclusion of any substantive

information in the claim form, arguing the time and expense of compiling that information was

"prohibitive." (8/25/00 Order and Reasons at 21) The court agreed with the debtors that the claim

form "must establish, at a minimum, the ground on which they [the claimants] base debtors' liability

to them. In this case, that entails establishing a claimant's exposure to asbestos from debtors'

products and the injuries that resulted from that exposure." (*Id.* at 22) The court thus authorized the

debtors in the form "to ask questions that go to this prima facie evidence of liability" and approved

debtors' requests for:

- Diagnostic reports supporting the claimed asbestos injuries;

- PFT and ILO results;

- The total number of years of asbestos exposure and the year of first and last exposure;

- The specific locations where the claimant was exposed to debtors' boilers, and the industry and occupation codes associated with each such location.

While the court in *Babcock* declined to approve additional questions,[42] subsequent

events in the *Babcock* case underscore the need for the information sought by the debtors there, and

which Grace seeks in its proposed form here. Specifically, based on the pre-petition filing rate, about

50,000 current claims should have arisen in the 18 months between the B&W petition date and the

---

[42]  The court expressed concerns that requiring further information could deter the filing of claims by placing an "undue burden on parties who wish to assert claims" and eliminated several questions from the debtors' proposed form. (*Id. at* 21-25). As discussed below, subsequent events have underscored the need for sufficiently detailed forms.

July 30, 2001 claim bar date. Even allowing for some acceleration in the filing of claims due to the bar date, the more than 222,000 claims that were filed far surpassed any reasonable projection. The vast majority of those claims appear to be invalid, for many of the same reasons that apply to the 1997 and 2000 Grace sample claims. As with Grace, over 90% of the B&W claims are for non-malignant "asbestosis," yet more than half of those claims submitted either no x-ray results or an ILO reading below the American Thoracic Society standard for that disease. More than half of the claimants also failed to submit any PFTs, or submitted PFTs within the normal range established by the American Medical Association.

The majority of the B&W claims also presented no evidence of any actual exposure to B&W's product (boilers with asbestos insulation). Based on a sample of the B&W claims, the Debtors found that 68% of the claims failed to allege the claimant had even worked at a location where B&W's boilers were present. Where such allegations were made, 44% named locations where B&W's boilers had never been installed.

Finally, tens of thousands of the B&W claims already had been paid in full, or were duplicative, or were unsigned, or submitted none of the required medical records, or left entire sections of the form blank.

The major plaintiff law firms responsible for the mass filings of these invalid claims in the *Babcock* case will play the same role in the *Grace* cases. These recent developments thus underscore the critical need for the submission of the requested medical and exposure information in the Grace proof of claim form.

**B.      The Requests For Medical Information Are Reasonable.**

The proposed claim form asks for the following medical information:

- The claimant's diagnosis, including the name of the diagnosing physician, the date of the diagnosis, and any non-asbestos causes identified in the diagnosis.

- The results of any x-rays and Pulmonary Function Tests.

- Basic information on the claimant's smoking history, if any.

- Copies of the medical records relating to the diagnosis, along with any other x-ray or CT scan test results taken in the prior two years.

Each of these requests is essential to determining the validity of the claim. The diagnosis identifies the nature of the claim. X-ray tests (and the physician's ILO rating of those results) are needed to link the diagnosis to asbestos exposure. For non-malignant claims, PFT results are essential to establish actual impairment. Requiring disclosure of all x-rays and CT scans taken in the past two years assures full rather than selective disclosure of the relevant tests. As detailed in Part I, above, submission of this medical information is particularly important given the high proportion of pre-petition claims with little or no supporting medical tests.

The PI Committee does not dispute the ultimate need for disclosure of this information before any claim payment is made. Other asbestos proof of claim forms, including those issued by the Manville Trust, as well as the "individualized review" forms issued by the Celotex, Eagle-Picher, and UNR trusts, require similar information. Since more than half of those who assert claims against Grace are also asserting claims against the Manville Trust and other asbestos trusts, the additional burden of completing the Grace form will be minimal. (The paralegals in the "pretest" described in Peterson's affidavit apparently did not utilize the information already compiled for other

-59-

asbestos trusts. This alone would substantially reduce Peterson's three-hour estimate for completing the Grace form.)

C.    **The Requests For Exposure Information Here Are Necessary And Are Not Unreasonably Burdensome.**

The requested exposure information is essential to determining the validity of any submitted claims, as well as for estimating the ultimate magnitude of valid claims. Claimants who were occupationally exposed are asked to disclose:

- The time periods in which they were exposed to Grace's products as well as those of other defendants.

- Their industry, occupation and employer(s);

- The site locations where they were exposed to Grace's products;

- The name(s) of the Grace products and how close they were to those products while they were being installed.

This information is needed to ascertain the basis for Grace's alleged liability. Information on the claimant's exposure to other asbestos products also is essential to determining whether it was exposure to Grace's products that caused the claimant's injury.

Ironically, the PI Committee's arguments that it would be too "burdensome" to collect the requested information proves that the vast majority of the pre-petition claims have been filed against Grace with no good-faith factual basis, and that the asbestos plaintiffs' law firms intend to continue these tactics in asserting claims in these Chapter 11 cases. Peterson's affidavit admits that "few plaintiffs" recall being exposed to "specific asbestos products," and that the "assembly" of evidence from "documents, co-workers and only some time by the plaintiff himself" to support a claim of exposure to Grace's products is a "labor-intensive" and "burdensome" process that plaintiff lawyers defer until "the time of trial or discovery. . . ." (Peterson Aff. ¶ 34)

-60-

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program be granted.

Dated: February 12, 2002

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

and

PACHULSKI, STANG, ZIEHL, YOUNG &
JONES P.C.

Laura Davis Jones (2436)
David W. Carickhoff, Jr. (3715)
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in
Possession