IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' OPPOSITION TO THE MOTION BY ZONOLITE ATTIC INSULATION CLAIMANTS TO DISMISS DEBTORS' CHAPTER 11 BANKRUPTCY CASES PURSUANT TO 11 U.S.C. § 1112(b)**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or "Grace"), hereby oppose the Motion by Zonolite Attic Insulation Claimants To Dismiss Debtors' Chapter 11 Bankruptcy Case Pursuant to 11 U.S.C. §1112(b) (the "ZAI Claimants' Motion to Dismiss") as purportedly not having been filed in "good faith," and respectfully state as follows[2]:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] The Debtors also oppose the Limited Joinder of Official Committee of Asbestos Property Damage Claimants To Motion By Zonolite Attic Insulation Claimants To Dismiss Debtors' Chapter 11 Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b) ("Property Damage Claimants' Joinder"), which raises no additional arguments to the ZAI Claimants' Motion to Dismiss, other than the contention that the Debtors refuse to consider resolution of these cases through § 524(g) of the Bankruptcy Code. Property Damage Claimants' Joinder at 3. This assertion simply is wrong. The Debtors have never refused to pursue resolution of the cases by implementing a § 524(g) trust, but instead, simply have stated that other alternatives in addition to § 524(g) exist which may resolve these cases and that the Property Damage Committee and the Personal Injury Committee have misinterpreted § 524(g) in any event. See Debtors' Case Management Order Reply Brief ("CMO Reply Brief") at 22-23 (submitted herewith as Ex. B). The Property Damage Committee has argued that the trust mechanisms found in § 524(g) supercede the Debtors' rights to

(continued...)

## Introduction

Filed months after this case was initiated, only days before a long awaited hearing on the Debtors' proposed Case Management Order scheduled for November 21, 2001, and supported by no new information, the ZAI Claimants' Motion to Dismiss is driven by the same "strategical motivations" identified by Judge Lifland twenty years ago in rejecting a similar motion to dismiss the *Johns Manville* bankruptcy for alleged lack of good faith:

> *If there was merit in the motion [by the Asbestos Committee] to dismiss on grounds of lack of good faith, it could have been fervently pressed a year ago* instead of tolerating this alleged misuse of the courts. This same assertion of untimeliness can be made regarding the other co-defendant proponents of dismissal of the petition because they too may be pressing these motions as a last resort as a result of frustrations at the bargaining table. *This Court must therefore bear in mind the strategical motivations underlying the pursuit of these motions at this time* as well as recognize the progress toward a successful, perhaps consensual, reorganization that has already taken place. It is against this backdrop of progress and achievement accomplished by the key constituencies toward a resolution on perhaps a sweeping basis of the asbestos problem that the instant motions are now placed before me for determination.

*In re Johns-Manville Corp.*, 36 B.R. 727, 731 (Bankr. S.D.N.Y. 1984) (emphasis added), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985).

Indeed the motives are even more transparent today. Those twenty years have established again and again the debilitating impact of asbestos litigation on former asbestos manufacturers. The last two years have dramatically demonstrated the same catastrophic effect on companies

---

[2] (...continued)
contest their liability for putative asbestos claims. PD Committee Brief in Opposition to Debtors' CMO Motion at 43 (submitted herewith as Exhibit C); however, as the Debtors have pointed out, nothing in the language of § 524(g) addresses (much less forecloses) the claims allowance and disallowance process that the Debtors proposed in their CMO Motion. CMO Reply Brief at 22. Thus, the Debtors merely oppose the Property Damage Committee's misinterpretation of § 524(g), and absolutely do not foreclose the possibility of an ultimate resolution through § 524(g). In addition, as discussed extensively herein, Grace is entitled to be a Chapter 11 debtor for reasons unrelated to the possible application of § 524(g) in these cases. Indeed, there are other possible resolutions to Grace's putative asbestos liability which might be implemented in these cases as alternatives to § 524(g) and the Debtors, at this preliminary stage, will not foreclose any of those alternatives.

like Grace, which consumed rather than produced asbestos. No less than 10 companies facing asbestos-related liability have filed for protection under Chapter 11 in the last twenty four months.[3] Incredibly, the ZAI Claimants' motion blinks all of this away. As shown below:

- Grace has demonstrated its good faith filing and no new evidence suggests otherwise: it was carried into bankruptcy by a dramatic surge of personal injury claims and financial hardship resulting from other asbestos-related Chapter 11 filings that threatened its core businesses.

- The Third Circuit's decision in *SGL Carbon* forecloses rather than supports dismissal: The Third Circuit fully appreciated the impact of mass tort litigation, which was not involved in the case before it.

- The circumstances surrounding the filing of the instant motion clearly reflect an ulterior motive: To resume prosecution of pre-petition class action litigation, which Judge Farnan had shut down.

## Argument

I. **GRACE HAS DEMONSTRATED ITS GOOD FAITH FILING AND NO NEW EVIDENCE HAS BEEN PRESENTED TO SUGGEST OTHERWISE: UNCONTROLLED ASBESTOS CLAIMS AND OTHER ASBESTOS-RELATED CHAPTER 11 FILINGS DROVE GRACE INTO BANKRUPTCY**

From the outset of the case, Grace has painstakingly described the circumstances leading up to its need to file Chapter 11 and its plans for the Chapter 11 case. In fact, unlike most Chapter 11 debtors, Grace explained on the very first day in a detailed "Informational Brief" submitted to the Court exactly why the asbestos litigation/settlement process had eroded generally and how this impacted upon Grace in particular. *See* W.R. Grace & Company's

---

[3] In addition to Grace, these Chapter 11 cases are: *In re The Babcock & Wilcox Co., et al.*, No. 00-10992 (Bankr. E.D. La. 2000) (filed 2/22/00); *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. 2000) (filed 4/16/00); *In re Owens Corning, et al.*, No. 00-03837 (Bankr. D. Del. 2000) (filed 10/05/00); *In re Burns & Roe Enterprises, Inc.*, No.00-41610 (Bankr. D. N.J. 2000) (filed 12/04/00); *In re Armstrong World Industries, Inc., et al.*, No. 00-04471 (Bankr. D. Del. 2000) (filed 12/06/00); *In re GI Holdings, Inc.*, No. 01-30135 (Bankr. D. N.J. 2001) (filed 1/05/01); *In re USG Corp., et al.*, No. 01-02094 (Bankr. D. Del. 2001) (filed 6/25/01); *In re United States Mineral Products Company d/b/a Isolatek International*, No. 01-02471 (Bankr. D. Del. 2001) (filed 7/01/01); *In re Federal Mogul Global Inc., T&N Ltd., et al.*, No. 01-10578 (Bankr. D. Del. 2001) (filed 10/01/01).

3

Informational Brief (the "Informational Brief") filed on April 2, 2001 (the "Petition Date") (submitted herewith as Ex. A).

### A.  Grace Has Explained That Despite A Tort System That Was Unequipped To Resolve Asbestos Claims, Grace Historically Managed Its Claims

In its Informational Brief, Grace explained how the tort system had long been in a state of "crisis" in terms of fairly and effectively resolving asbestos litigation. Informational Brief at 12 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996), *aff'd,* 521 U.S. 591 (1997)). The Informational Brief also provided a detailed history explaining how asbestos litigation arose, how it was growing out of control by the 1980s, and how the number of claims had continued to grow. Informational Brief at 13-16. Further, Grace explained how attempts to litigate claims on a case-by-case basis no longer offered any viable resolution to the problem. Informational Brief at 21-26 (explaining, among other things, the backlog of cases within the tort system, exorbitant and inequitable costs, and arbitrary and inconsistent rulings respecting asbestos bodily injury claims which resulted in the tort system's failure in resolving these claims).

Moreover, while Grace could not effectively adjudicate its liability for these claims, it was able to contain and manage its asbestos litigation without impairing its core business. Informational Brief at 28-32. It did this by developing a policy of settling claims, bearing no relation to actual legal liability, but which for many years prior to the Petition Date appeared financially feasible to Grace, particularly because its claims experience and actuarial projections indicated that new claims were on a downward slope. Informational Brief at 30. In fact, for

example, Grace's asbestos bodily injury claims in 1997 fell by 21.3%, followed by an additional reduction in 1998 of 30.8% from the 1997 claims volume. Informational Brief at 30.

### B. The Spike In Asbestos Related Claims Offered Grace No Alternative To Bankruptcy

Despite its historical ability to manage the asbestos claims, in late 1999 to early 2000, as a result of an increasing number of bankruptcy filings by other asbestos-related defendants and for reasons that bore no apparent relation to changes in its liability or trends in asbestos-related disease, claims against Grace asserting asbestos-related disease sky-rocketed. Informational Brief at 33-37. Grace explained that while such disease claims against it peaked in 1996 and for a period of several years thereafter showed a steady downward trend, that trend ended in 1999, with an increase of 28% in that year, followed by an increase of 81% in the year 2000. Informational Brief at 38. Grace also explained how that spike in claims continued in the year 2001 preceding the Chapter 11 filing, with asbestos-related disease claims in January 2001 being asserted at a rate 374% higher than in January of 2000, and such claims in February 2001 being asserted at a rate of 207% higher than in February of 2000. Informational Brief at 39.

Grace was not alone. The rate at which new claims had been filed against the Manville Trust nearly doubled in the year 2000 and again in the year 2001. CMO Reply Brief at 10. Further, asbestos claims against other defendants similarly have increased. CMO Reply Brief at 11; Informational Brief at 35-37.[4] In light of this fully documented surge in claims against it and

---

[4] Further, stock prices for companies facing asbestos-related claims exposure decreased significantly during the period of 2000-2001 when the spike in asbestos-related disease claims occurred. *See* Dow Jones Interactive Quotes & Market Data for various asbestos-related companies in Chapter 11 showing the yearly highs and lows from 1996 through 2001 (submitted herewith as Ex. D).

other asbestos-related defendants, Grace had no reasonable expectation that the spikes would be "short-term" as alleged by the ZAI Claimants.

C.   **Grace's Only Option was to Commence this Chapter 11 Case**

As Grace has publicly stated, the twin developments of the spike in asbestos-related disease claims against it and the asbestos-related Chapter 11 filings of numerous other companies left Grace with no option but to commence this Chapter 11 case. Specifically, as Grace stated in its Form 10-K filed immediately after the Petition Date:

> These developments and events have caused an environment that increases the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. **These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system...**

W.R. Grace Form 10-K (FY 2000) at 12-13 (emphasis added) (submitted herewith as Ex. E).

Indeed, as far back as November 2000, Grace noted in its Third Quarter 10-Q for that year that "[d]ue to the uncertainties involved, the financial effect of [other recent asbestos Chapter 11] proceedings on Grace's bodily injury litigation cannot be estimated at this time" and "[m]ore time, experience and analysis is required to determine whether the number of future [asbestos] claims may be materially higher than Grace's current estimates and the impact this would have on Grace's future cash flow and recorded liability for future claims." *See* W.R. Grace Third Quarter Form 10-Q (Nov. 2000) at I-7 (submitted herewith as Ex. F).

In addition, Grace also noted in its Third Quarter 10-Q for the year 2000 that the adverse trend in claims and other significant asbestos Chapter 11 cases directly threatened its financial condition:

> The **recent petitions under Chapter 11 of the Federal Bankruptcy Code by certain companies involved in asbestos bodily injury litigation . . . may**

6

> **negatively impact the credit ratings and available credit sources** of other defendants in asbestos-related litigation, including Grace.

Ex. F at I-24 (emphasis added).

Grace's concerns over the adverse financial implications of its asbestos exposure were also noted in a press release by the company on January 29, 2001:

> The Company's 364-day bank credit facility matures in May 2001. This facility totals $250 million with $150 million drawn at December 31, 2000. **The current bank credit environment, which has tightened over the past several months, coupled with the uncertainties in the asbestos litigation environment, has increased the risk that this facility may not be renewed.**

W.R. Grace & Co. Investor News Release, Jan. 29, 2001 (emphasis added) (submitted herewith as Ex. G).

Ultimately, Grace was forced to conclude that its only option was to file Chapter 11. As Grace has explained at length, because the tort system offers no reasonable prospect for a just determination of Grace's actual asbestos-related liability, because other settlement mechanisms such as class action settlements have been ruled invalid, and because there is no prospect of legislative relief, Chapter 11 provides the only valid mechanism to Grace for managing in a fair and equitable manner its asbestos liability, while at the same time protecting its core business. As Grace explained in its Form 10-K filed immediately after the Petition Date:

> By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

Ex. E at 1.

### D.     Subsequent Developments Have Borne Out Grace's Decision to File

As stated above, the surge in asbestos-related disease claims have swept in nine other asbestos-related companies since early 2000. *See supra* note 3. In its CMO Reply Brief, Grace explained how there was no medical, legal or scientific explanation for the spike in claims, but nonetheless, the spike was real, widespread, and not likely to decrease in the near future. CMO Reply at 8-11. Such a spike also swamped existing asbestos-related trusts. For example, in a hearing held on December 13, 2001 before Judge Weinstein in the District Court for the Eastern District of New York regarding funding for the Manville Settlement Trust, the claims management facility for the Trust documented a similar experience in a surge in claims, specifically with nonmalignant claims. *See* Manville Personal Injury Settlement Trust – "Selected Operations Data for Presentation at Courts Hearing December 13, 2001" at 15 (submitted herewith in relevant part at Ex. H). Indeed, even the plaintiffs' bar has acknowledged the significance of the surge:

> Until the year 2000, in fact until somewhere into the year 2000, when we had a combination of things happen all at once, people began to say this is important, we should focus on it. What happened? Claims went up dramatically. Eight major asbestos defendants went into chapter 11. All of a sudden people realized we now have a large zero sum.

Elihu Inselbuch, Esq., selected counsel for Manville Trust beneficiaries, Manville Settlement Trust Hrg, December 13, 2001, Hrg Tr. 56:11-17 (submitted herewith in relevant part at Ex. I).

E. **The ZAI Claimants Offer No New Evidence To Suggest That Grace's Decision To File Chapter 11 Was Made In Bad Faith**

The ZAI Claimants simply have introduced no new evidence to contradict the facts presented above or to suggest Grace filed its Chapter 11 in bad faith.[5] *First*, the ZAI Claimants allege that the spike in asbestos-related disease claims is merely due to publicity "regarding speculation of an impending Grace bankruptcy [that] *likely contributed* to a short-term panic effect on the filing of bodily injury claims against Grace." Memorandum of Law In Support Of Zonolite Claimants' Motion To Dismiss The Bankruptcy Case ("ZAI Brief") at 23 (emphasis added). This assertion does not withstand scrutiny.[6] In particular, it is contradicted by the fact, discussed above, that other asbestos defendants have experienced similar or greater surges in claims which has lead to at least nine other asbestos-related Chapter 11 cases since January 1, 2000. Further, the ZAI Claimants assertion does not account for the effects on companies like Grace of these additional filings. As the Honorable Jack B. Weinstein, United States District Judge for the Eastern District of New York, observed: "a newer generation of peripheral

---

[5] In *SGL Carbon*, the Court noted "Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'" *Official Committee of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 162 n. 10 (3d Cir. 1999) (hereinafter *"SGL Carbon"*). In this case, the ZAI Claimants have essentially asserted Grace's lack of good faith based on a selective reading of the public record, but with absolutely no new information or evidence. Such a showing should not be held adequate to put Grace's good faith at issue. Moreover, as discussed above, the public record which the movants failed to quote, as well as Grace's numerous statements to the court, clearly meet Grace's burden of establishing that it commenced this case for the "valid reorganizational purpose" required by the Court in *SGL Carbon. Id.* at 165-66.

[6] Media has also allegedly been the root of the spike in claims according to the PI Committee's expert, Mark Peterson, who claimed that the spike in claims was related to unfavorable publicity last year about Grace's Libby, Montana mine, and that the spike in claims may be short-lived once the media disaster became more attenuated. *See* Peterson Affidavit, filed in Support of PI Committee's Opposition to Debtors' Case Management Motion, ¶ 23 (submitted herewith as Ex. J); CMO Reply Brief at 9-10. However, Grace has provided evidence that a small number of plaintiff's law firms were entirely responsible for the 1999-2000 surge in claims against Grace, with 17 law firms filing 22,550 of the 22,726 increase in total claims in that year. CMO Reply Brief at 8. The plaintiff law firms that are responsible for bringing these cases had already filed over 260,000 personal injury claims against Grace before 2000, and did not need to be inspired by publicity over the Libby, Montana mine (or a potential bankruptcy filing) before filing additional claims. CMO Reply Brief at 10. Further, this argument that Grace's own publicity resulted in some temporary, unique spike in claims ignores the reality that other asbestos defendants experienced similar or greater surges in claims in 2000. CMO Reply Brief at 10-11.

defendants are becoming ensnarled in the litigation" as plaintiffs' attorneys seek "to expand the number of those with assets available to pay for asbestos injuries." Informational Brief at 34 (*quoting* In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 747 (E.D.N.Y. 1991), *vacated*, 982 F.2d 721 (2d Cir. 1992), *modified*, 993 F.2d 7 (2d Cir. 1993)). Indeed, its is precisely out of concern over increased exposure caused by such filings that, as discussed above, Grace noted in its Third Quarter 2000 Form 10-Q a potential negative impact on its "credit ratings and available credit sources." W.R. Grace Third Quarter Form 10-Q (2000) at I-24.

*Second,* the ZAI Claimants selectively quote from Grace's financial documents throughout the ZAI Brief to establish Grace's historical ability to pay its claims (ZAI Brief at 5-7, 11, 14, 18-19) while ignoring the changed circumstances due to the sudden spike in claims and ill effects Grace sustained from other Chapter 11 asbestos-related filings. In fact, as pointed out above, Grace indicated in its public filings its increased risk of its inability to manage its asbestos claims if other asbestos defendants filed bankruptcy and how the spike in claims left it with no alternative but to file Chapter 11. *See supra* W.R. Grace Form 10-K (FY 2000); W.R. Grace Third Quarter Form 10-Q (2000).

*Finally*, the ZAI Claimants' reliance on the fact that Grace historically *managed* the claims against it, ignores the fact that Grace could not *resolve* the claims against it, particularly with a spike in claims as opposed to a decrease in claims, without filing for Chapter 11 protection. The tort system offered no viable solutions for Grace and class action settlements were foreclosed as a result of the Supreme Court's prohibition on class action settlements involving asbestos claims. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 843 (1999) (overturning an asbestos class action settlement certified under Fed. R. Civ. P. 23(b)(1)(B), recognizing that

Rule 23 "did not contemplate that the mandatory class action codified in subdivision (b)(1)(B) would be used to aggregate unliquidated tort claims on a limited fund rationale"); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (invalidating an asbestos class certification and settlement on the grounds that common issues of law or fact did not predominate as required under Fed. R. Civ. P. 23(b)(3)). The ZAI Claimants have offered no evidence to refute Grace's position that Grace was simply unable, by April 2001, to equitably and fairly address its putative asbestos liability and preserve its core business without recourse to Chapter 11. Moreover, the ZAI Claimants put forth no law to suggest that a company must run out of money before seeking the protection under the Bankruptcy Code. On the contrary, "there is no insolvency requirement for Chapter 11 debtor status. . ." *In re Johns-Manville*, 36 B.R. at 730.

## II. *SGL Carbon* Forecloses Rather Than Supports Dismissal In This Mass Tort Bankruptcy Where No Alternative Exists To Control The Pending And Future Claims Other Than Through Chapter 11

In support of the ZAI Claimants' assertion that Grace's Chapter 11 petition was filed in bad faith, ZAI Claimants rely on *Official Committee of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154 (3d Cir. 1999) (hereinafter *"SGL Carbon"*), claiming that Grace's case is "remarkably similar" to *SGL Carbon*. ZAI Brief at 2, 28. *SGL Carbon* is inapposite to this case on its facts and supports the proposition that a mass tort case such as Grace's case should not be dismissed when no viable alternative exists to Chapter 11 for resolving pending and future claims.

*SGL Carbon* involved a situation where, prior to the bankruptcy filing, the debtor and its parent had been found criminally liable for price-fixing resulting in criminal fines totaling $135

million. *SGL Carbon*, 200 F.3d at 156. Shortly thereafter, various parties filed class action antitrust lawsuits related to the same conduct with claims estimated at approximately $240 million. *Id.* at 157. In order to require this class of claimants and no others to accept less than full cash payment on its claims "to protect itself against excessive demands made by plaintiffs in civil antitrust litigation," SGL Carbon filed its Chapter 11 case. *Id.*

Two weeks later, the Official Committee of Unsecured Creditors (the "UCC") filed a motion to dismiss the Chapter 11 case on the basis that the bankruptcy petition was a "litigation tactic designed to frustrate the prosecution of the civil antitrust claims pending against [SGL Carbon] and preserve [SGL Carbon's] equity from these claims." *Id.* at 158 (quoting *In re SGL Carbon Corp.*, 233 B.R. 285, 287 (D. Del. 1999)). The District Court denied the UCC's motion to dismiss and the UCC appealed. *Id.* at 158-59.

The Third Circuit held that a Chapter 11 petition is subject to dismissal for cause under 11 U.S.C. § 1112(b) unless it is filed in good faith, and reversed the District Court. *Id.* at 162, 169-70. On the facts before it, the Third Circuit observed, among other things, that a reserve existed at the Debtor to pay the antitrust claimants in full should a judgment be rendered, no facts were presented to suggest that SGL Carbon was otherwise financially unhealthy or could be rendered insolvent, and that on the facts, SGL Carbon put forth no evidence that it had a valid reorganizational purpose where its proposed plan of reorganization proposed payment in full to all creditors – including parent corporations – except the antitrust creditors. *Id.* at 167.

Here, Grace faces a vastly different financial picture because of the overwhelming number of rising mass tort claims. In particular, Grace's putative asbestos liability and the spike in asbestos-related personal injury claims that necessitated this filing, constitute precisely the

12

kind of "pending litigation that [poses] a serious threat to the companies' long term viability" which the Third Circuit has approved as a basis for commencement of Chapter 11. *Id.* at 164. Indeed, the *SGL Carbon* Court distinguished several key mass tort cases from the case before it because of facts which precisely mirror Grace's situation:

- *In re Johns-Manville*, 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984): "Large judgments had already been entered against Johns-Manville and the prospect loomed of tens of thousands of asbestos health-related suits over the course of 20-30 years."

- *In re A.H. Robins*, 89 B.R. 555, 557 (Bankr. E.D. Va. 1988): "The 1985 bankruptcy petition of the A.H. Robins Company came only after 'the Company had settled 9,238 claims for approximately $530,000,000' and 'still faced over five thousand pending cases in state and federal court.'"

- *In re Dow Corning Corp.*, 211 B.R. 545, 553 (Bankr. E.D. Mich. 1997): "at the time it filed for bankruptcy Dow Corning Corporation faced 440,000 potential claimants which had resulted in the filing of more than '19,000 individual silicon-gel breast implant lawsuits and at least 45 putative silicone-gel breast implant class actions.'"

*Id.* at 164.

Grace is more obviously similarly situated to Dow Corning, A.H. Robins, and Johns-Manville with the thousands of pending and threatened claims against it than to SGL Carbon which very likely could have litigated or settled all claims against it without encountering financial devastation.

Finally, Grace's Chapter 11 filing allows for the creation of a trust created pursuant to 11 U.S.C. § 524(g) or otherwise, which would protect the interests of all asbestos claimants, including future claimants -- the kind of valid "reorganizational purpose" that SGL Carbon lacked. Through the bankruptcy filing, Grace intends to rationally adjudicate and resolve the thousands of asbestos claims against it, both present and future, so that valid claims can be paid, invalid claims can be disposed of, and Grace can reorganize into what would otherwise be a financially sound and productive business. It was Congress' intent that section 524(g) of the Bankruptcy Code be enacted specifically to enable a debtor such as Grace the ability to establish this kind of a trust to which it may channel present and future asbestos-related liabilities. Pub. L. No. 103-394, § 111(a), 108 Stat. 4106, 4113-17 (codified at 11 U.S.C. § 524(g)). Without question, Grace's desire to do that which Congress has intended constitutes a "valid reorganizational purpose." Indeed, in view of Congress' specific and clear purpose reflected in Section 524(g) that asbestos-related liabilities be addressed in Chapter 11, there can be no legitimate basis for finding that a company which has commenced a case under Chapter 11 to address such liability has acted in bad faith.

The ZAI Claimants also allege that Grace's filings were made to thwart their discovery and class certification process in order to gain "strategic advantage" in much the same way that SGL Carbon filed for bankruptcy in order to gain strategic advantage in connection with its pending civil antitrust litigation. ZAI Brief at 29. This argument again completely ignores the hundreds of thousands of asbestos personal injury claims against Grace and the recent spike in such claims shortly before Grace's filing and assumes that the ZAI Claims are the only claims that Grace considered before filing its Chapter 11 case. Further, if "strategic advantage" is being

sought, it is by the ZAI Claimants themselves who, as discussed in detail below, essentially turn *SGL Carbon* inside out by filing its Motion to Dismiss *seven months* after the case was filed while at the same time continuing to press for other relief in this case that has been repeatedly denied. *See SGL Carbon*, 200 F.3d at 169 (noting the importance in the fact that the UCC did not delay in filing SGL Carbon's motion to dismiss two weeks after the petition was filed unlike in *Johns-Manville* where factors in addition to the debtor's financial health such as "strategical motivations" in filing motions to dismiss the case long after it commenced played a part in Judge Lifland's decision to deny the relief sought).

### III. The Circumstances Surrounding The Filing of the Instant Motion Clearly Reflect an Ulterior Motive: to Resume Prosecution of Pre-Petition Class Action Litigation, Which Judge Farnan Had Shut Down.

The timing of this Motion to Dismiss says it all: seven months into this case and merely days before the CMO hearing was scheduled in November 2001, the ZAI Claimants alleged there was a bad faith filing. In fact, instead of seeking to dismiss this case when it was filed, these claimants sought to continue their litigation. The following facts demonstrate that this Motion to Dismiss is part of a strategy by the ZAI Claimants to revive certain litigation that has been shut down since the commencement of this case:

- Prior to the commencement of this case, certain law firms, including Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser") and Ness Motley Loadholt Richardson & Poole ("Ness Motley") had initiated several cases involving Zonolite attic insulation including: *Barbanti v. W.R. Grace & Company-Conn, et al.*, No. 00-2-01756-6 (Wash.) (*"Barbanti"*), and certain class actions including *Price et al. v. W.R. Grace & Co., et al.*, No. CV 00-71-M

("*Price*") and other suits consolidated in *In re Zonolite Attic Insulation Products Liability Litigation*, MDL Docket No. 1376 (D. Mass.)(*"MDL Litigation"*). In addition to asserting claims of strict liability, negligence, fraud and other similar torts, these prepetition actions also sought to (i) rescind as fraudulent transfers two unrelated 1996 and 1998 sales by the Debtors of different business lines and (ii) disgorge gains from those transactions. *See Barbanti Complaint; Price Complaint* (submitted herewith as Exs. K and L respectively). All the prepetition actions were subsequently stayed against Grace by the Debtors' Chapter 11 filing on April 2, 2001. Moreover, while the ZAI attorneys sought to continue the *MDL Litigation* by requesting relief from the stay, that relief was denied. *See* May 3, 2001 Hrg. Tr. 57:19-25; 58:6-8 (submitted herewith as Ex. M).

- Contemporaneous with the filing of its Chapter 11, on the Petition Date, Grace filed an adversary proceeding to stay asbestos-related litigation against various non-debtor affiliates of Grace whose purported liability was solely derivative of Grace's liability. *W.R. Grace v. Chakarian, et al.*, Adv. Pro. No. A-01-771 (submitted herewith as Ex. N).

- On that same day, Lieff Cabraser and Ness Motley filed *Woodward v. Sealed Air Corp.*, No. 01-10547 (D. Mass.) (the "*Woodward Action*"), which sought precisely the same asserted fraudulent transfer and disgorgement relief as the *Barbanti* and *MDL Litigation*. The *Woodward Action* thus treated Grace as a defendant in all but name and sought to subvert Grace's pending adversary

- proceeding seeking a stay of such claims against Grace's non-debtor affiliates. *See Woodward Action Complaint* (submitted herewith as Ex. O).

- Upon receipt of Grace's adversary proceeding, the Delaware court issued a temporary restraining order ("TRO") staying all asbestos-related personal actions against Grace and its "Affiliated Entities" – including, Sealed Air and Fresenius, the named defendants in the *Woodward Action*. The Court declined expressly to include fraudulent conveyance claims in its stay order, but rightly observed that under other applicable law only the debtor in possession – *i.e.* Grace – may raise those claims. *See* TRO (submitted herewith as Ex. P).

- While awaiting a decision on the preliminary injunction, Grace filed a motion to intervene in the *Woodward Action* and to transfer venue of that case to this Chapter 11 case pending in the District of Delaware. *See* Debtors' Memorandum in Support of Motion for Intervention and Transfer of Venue to the District of Delaware (submitted herewith as Ex. Q). On May 3, 2001, the Delaware Chapter 11 Court granted Grace's motion for a preliminary injunction, and issued a preliminary injunction barring the prosecution of currently pending asbestos-related actions and fraudulent transfer actions against certain affiliates of Debtors. This order expressly stayed the *Woodward Action*, except for the pending motion to intervene and transfer venue. Order Granting Preliminary Injunction (submitted herewith as Ex. R). Thereafter, on June 13, 2001, the Judge presiding over the *Woodward Action* granted Grace's motion to intervene and transfer, thus

ordering the *Woodward Action* transferred to Delaware. Notice of Ruling and Entry on Docket Granting Motion (submitted herewith as Ex. S).

- On November 16, 2001, the same day this Motion to Dismiss was filed, Lieff Cabraser and Ness Motley filed an adversary proceeding in this Chapter 11 case (the "ZAI Adversary Proceeding") seeking, under the guise of proposing a nationwide class action, to litigate the very same claims that were shut down by the Chapter 11 Court's preliminary injunction respecting the *Woodward Action*, including a fraudulent conveyance action to recover certain corporate transfers made by Grace prior to the bankruptcy filings. Moreover, the ZAI lawyers took this action without seeking court approval. Class Action Complaint Seeking Zonolite Attic Insulation Relief at 2-3, 17-22, 30-34 (submitted herewith as Ex. T). Grace has moved to dismiss the ZAI Adversary Proceeding. *See* Motion of the Debtors Dismissing the Class Action Adversary Complaint With Prejudice (submitted herewith as Ex. U).

It is against this backdrop that Lieff Cabraser and Ness Motley have also filed on behalf of the ZAI Claimants their Motion to Dismiss -- *over 7 months after the cases commenced,* having made no prior arguments that such filings were made in bad faith. The Motion to Dismiss was filed just days before the November 2001 hearing on the Debtors' Case Management Motion and after all previous attempts by the ZAI lawyers to litigate their alleged fraudulent conveyance and disgorgement claims outside of Chapter 11 had failed.

The timing of the ZAI Claimants' Motion to Dismiss constitutes exactly the bad faith and

strategic posturing disposed of by Judge Lifland in dismissing a similar motion to dismiss in the *Johns-Manville* case. *See supra* at 1-2. The ZAI Claimants' Motion to Dismiss is simply and obviously another attempt to remove this Chapter 11 case's restrictions on litigation of the claims contemplated by the *Woodward Action* and its predecessors. Such a transparent strategic move, particularly in view of Grace's good faith in commencement of this Chapter 11 case, should be dismissed out of hand.

### **Conclusion**

For the foregoing reasons, the Motion by Zonolite Attic Insulation Claimants to Dismiss Debtors' Chapter 11 Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b) should be denied.

Dated: February 15, 2002

Respectfully submitted,
KIRKLAND & ELLIS
David M. Bernick
Theodore L. Freedman
Andrew R. Running
James H.M. Sprayregen
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000
(312) 861-2200 (fax)

-and-

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

_____
Laura Davis Jones (#2436)
David W. Carickhoff, Jr. (3715)
919 North Market Street, 16th Floor
Wilmington, DE 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in Possession