# EXHIBIT A

## [Kinsella Affidavit]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | **Chapter 11** |
| ) | |
| **W. R. GRACE & CO. et al.,**[1] ) | Case No. 01-01139 (JFK) |
| ) | (Jointly Administered) |
| **Debtors.** ) | |

**AFFIDAVIT OF KATHERINE KINSELLA SUPPORTING THE DEBTORS'
APPLICATION FOR AN ORDER AMENDING THE ORDER UNDER SECTION 327(A)
OF THE BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT AND
RETENTION OF KINSELLA COMMUNICATIONS, LTD., AS NOTICE
CONSULTANT FOR THE DEBTORS AND DEBTORS-IN-POSSESSION TO
AUTHORIZE THE DEBTORS TO PAY INTERIM COMPENSATION TO
KINSELLA COMMUNICATIONS, LTD.**

DISTRICT OF COLUMBIA          )   ss.

I, Katherine Kinsella, being first duly sworn, on oath, state as follows:

1.   I am the president of Kinsella Communications, Ltd. ("KCL"),[2] 1920 L Street NW, Suite 700, Washington, DC 20036. This Affidavit is submitted pursuant to Fed. R.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. -Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (Ma Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G_ C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners 1, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Application.

Bankr. P. 2014(a) in support of the Debtors' application (the "Application") to amend the order dated July 19, 2001, (the "Retention Order") under section 327(a) of the Bankruptcy Code authorizing the employment and retention of as notice consultant for the Debtors pursuant to the terms of the advertising and services agreement, dated as of July 1, 2001, (the "Retention Agreement") to authorize the Debtors to pay interim compensation to KCL. I make this affidavit based on my own personal knowledge and belief.

2.    The Retention Order and the Retention Agreement provide that the Debtors will compensate KCL in an amount equal to 15% of the cost of the media buy, which amount was to be paid when the bar date notice program was implemented and reimburse out-of-pocket expenses. The Retention Order and Retention Agreement further provide that, if a bar date is not established in these Chapter 11 cases or work is cancelled before the bar date, the Debtors will be obligated to pay an amount equal to a reduced percentage of the media buy for the work performed, which reduced amount will be negotiated between KCL and the Debtors.

3.    Typically in cases involving developing and executing a complex media notice program, KCL will complete half of its work in developing a bar date notice plan and the notice materials. KCL generally completes the other half its work when the notice program is executed, at which time it is usually compensated. This arrangement is generally satisfactory for KCL because there is little delay between the time when the notice plan is developed and the notice program is executed.

4.    In these particular Chapter 11 cases, the Court has not yet set a bar date, even though seven months have passed since KCL was retained to develop and execute a media notice program. Furthermore, KCL performed the bulk of its services to date during the period

2

of May through November 2001, at which time other developments in these Chapter 11 cases further delayed the setting of a claims bar date.

    5.    During that period, KCL developed not just one, but two separate bar date notice plans and sets of notice materials, the first as part of the original case management order filed by the Debtors in June 2001, and the second in response to objections to the first plan by the Asbestos Property Damage Committee which was filed in November 2001. KCL expended significant resources during the May to November 2001, period without receiving any compensation. Further, without the prospect of a bar date being set to occur in the near future, KCL does not have any immediate prospect of receiving any compensation to offset its outlays to date.

    6.    Specifically, KCL performed the following tasks:

    (a)    For the initial plan, KCL:

    (i)    Extensively researched the Debtors' asbestos-related businesses and products as background for developing a bar date notice plan;

    (ii)    gathered and analyzed product information relating to the Debtors' asbestos-related products, including (A) information on Grace's vermiculite and asbestos-containing products, (B) distribution and sales information by state for MK-3 from sales records and (C) information regarding Zonolite Attic Insulation;

    (iii)    analyzed claims related information including (A) statistics regarding age of Personal Injury Claimants and (B) claims filings by jurisdiction for Grace;

    (iv)    developed demographic profiles of Personal Injury Claimants, Settled Claimants, Property Claimants, and Zonolite Attic Insulation Claimants using factors such as age, gender, occupation and the like;

    (v)    researched and identified the media vehicles through which different classes of potential claimants in the United States and Canada, including Personal Injury Claimants, Settled Claimants, Property Damage Claimants, and Zonolite Attic Insulation Claimants, normally receive information;

    (vi) developed a media program, including general consumer magazines, newspapers, television and public relations, through an extensive analysis of the most effective media vehicles to be used in combination to the reach claimants;

    (vii) calculated the estimated reach and frequency of the notice program;

    (viii) identified potential geographic concentrations of Personal Injury Claimants based upon identifiable areas where the Debtors may have mined, manufactured or distributed vermiculite and asbestos-containing products and operated expanding plants;

    (ix) identified (A) third-party organizations that may have contact with Personal Injury Claimants, including occupationally related trade or professional associations and organizations whose membership may include individuals with asbestos-related personal injuries, (B) trade publications that serve industries in which occupational asbestos exposure was likely, (C) consumer publications targeted to "do-it-yourself" homeowners and (D) trade publications likely to be read by owners, administrators, and managers of commercial, residential or public buildings; and

    (x) created the required notice materials with multiple drafts and layouts, including the bar date notices for use in trade and general publications, a script for a 30-second television spot and materials to be sent to trade unions and other third parties.

  (b) For the second notice plan, KCL:

    (i) developed a new notice program to address concerns of the Asbestos Property Damage Committee, including revisions to the planned consumer magazine, television and Canadian media buys;

    (ii) reconsidered all plan elements in light of the Asbestos Property Damage Committee's concerns;

    (iii) developed several alternative media plans in full using various combinations of television dayparts and print media vehicles;

    (iv) compared the alternative plans for their relative efficacies in achieving adequate reach among the intended notice parties;

    (v) rewrote and redesigned all notice materials, with multiple drafts and layouts, to address various constituent concerns;

  7. In addition, during the September to November 2001, time period, the KCL staff and I spent considerable time addressing the Asbestos Property Damage Committee

4

objections to the initial bar date notice plan. I also submitted to the Court a detailed affidavit in support thereof. KCL also provided the Asbestos Property Damage Committee with all requested information prior to their deposing me on November 16, 2001. I also spent substantial time preparing for that deposition, as well as preparing for expected testimony at a hearing scheduled for November 23, 2001, which was cancelled on the day of the hearing because of other case developments. KCL also developed extensive exhibits to support my planned testimony at the cancelled hearing.

8. KCL had anticipated that it would have substantially completed its work related to the notice program and concluded the media buy by the end of 2001, and therefore would have been entitled to compensation at that time under the terms of the Retention Order and the Retention Agreement. The delays in these Chapter 11 cases and the fact that a case management order allowing the notice program to go forward have not yet been approved in these Chapter 11 cases, have created a hardship for KCL in light of the back-loaded nature of the compensation arrangement and the much greater amount of work demanded by these Chapter 11 Cases in comparison with other notice programs that KCL has developed and executed in the past.

9. For these reasons, I am asking that the Debtors pay at this time half of the estimated fees that KCL ultimately will earn pursuant to the Retention Order and the Retention Agreement, an amount that I estimate will be approximately $398,000.

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/15___, 2002.

*Katherine Kinsella*
Katherine Kinsella

Subscribed and Sworn to before me
this __15__ day of __February__, 2002

*[signature]*
Notary Public
My Commission expires: __7/2004__

My Commission Expires
July 14, 2004