# EXHIBIT A

Bench Filed
on  4/3/01

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                              )   Chapter 11
                                                    )
W. R. GRACE & CO., et al.,[1]                       )   Case No. 01-0 นน  (___)
                                                    )   (Jointly Administered)
                                                    )
                            Debtors.                )

## W.R. GRACE & COMPANY'S
## INFORMATIONAL BRIEF

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL,
   YOUNG & JONES P.C.
Laura Davis Jones
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

– Co-Counsel for the Debtors and Debtors in Possession –

Dated: April 2, 2001

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

TABLE OF CONTENTS

I.   THROUGH A CORPORATE ACQUISITION IN 1963, GRACE BEGAN
     MANUFACTURING CERTAIN PRODUCTS CONTAINING VARYING
     AMOUNTS OF ASBESTOS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   The state of the asbestos industry prior to Grace's purchase of Zonolite . . . . . . . 4

     B.   In 1963, Grace entered the business of manufacturing certain
          asbestos-containing products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          1.   The operation of the vermiculite mine in Libby, Montana . . . . . . . . . . . 6
          2.   Grace's attic insulation product: Refined vermiculite, not asbestos . . . . . 8
          3.   The Monokote-3 fireproofing product: This contained added
               asbestos, but was applied wet in commercial large steel buildings . . . . . . 9
          4.   Other vermiculite and asbestos-containing products . . . . . . . . . . . . . . . . 11
          5.   The phase-out of asbestos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.  THE TORT SYSTEM LONG AGO CEASED TO PROVIDE A FAIR OR
     PRACTICAL MEANS FOR RESOLVING THE HUGE INVENTORY OF
     ASBESTOS CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     A.   How the problem came about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          1.   The number of claims is simply overwhelming . . . . . . . . . . . . . . . . . . . . 15
          2.   Aggregation has exacerbated the problem, not alleviated it . . . . . . . . . . 16
          3.   Claims are brought on behalf of claimants who suffer no
               asbestos-related impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     B.   Litigating asbestos cases today: Litigation of claims no longer is a real
          alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          1.   The backlog within the tort system precludes litigation
               on a case-by-case basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          2.   Litigation entails exorbitant and inequitable costs . . . . . . . . . . . . . . . . . 22
          3.   Even when claims are adjudicated, the results are arbitrary,
               inconsistent, and tainted by forum shopping . . . . . . . . . . . . . . . . . . . . . . 24

     C.   Settling cases today: The privatized claims resolution business
          also has failed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.  RECENT DEVELOPMENTS HAVE DEPRIVED GRACE OF THE ABILITY TO
      MANAGE ITS LITIGATION AND THREATEN ITS CORE BUSINESS . . . . . . . . . . 28

      A.   Historically, Grace was able to contain and manage its asbestos
           litigation without impairing its core business . . . . . . . . . . . . . . . . . . . . . . . . . . 28

           1.   Claims for bodily injury from asbestos products . . . . . . . . . . . . . . . . . . . 28
           2.   Lawsuits arising from the Libby Mine . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
           3.   Property damage claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      B.   Even as Grace was attempting to resolve its liability, it is apparent now
           that fundamental flaws in the claims resolution process were destined to
           undermine the orderly resolution of claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

           1.   An increasing number of bankruptcies created pressure to
                shift the litigation target to secondary players . . . . . . . . . . . . . . . . . . . . . 33
           2.   There was no practical check on the accelerated claims filings
                and increased demands against non-bankrupt companies . . . . . . . . . . . 37

      C.   In recent months, claims against Grace suddenly skyrocketed and
           now have forced Grace into Chapter 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.   THE BANKRUPTCY SYSTEM IS NOW THE ONLY AVAILABLE MEANS
      FOR THE ADJUDICATION AND RESOLUTION OF ASBESTOS CLAIMS . . . . . . 40

      A.   The Supreme Court has foreclosed use of Rule 23 class settlements
           to resolve asbestos claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      B.   Proposed legislative resolutions also have failed . . . . . . . . . . . . . . . . . . . . . . . . 43

      C.   Chapter 11 affords established procedures which can be used
           to define and resolve mass-tort liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

           1.   Johns-Manville . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
           2.   A.H. Robins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
           3.   Dow Corning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
           4.   Babcock & Wilcox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

V.    WHAT SHOULD BE ACCOMPLISHED IN THESE CHAPTER 11
      PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      A.   The central task is to return claims resolution to a controlled
           and rationalized process that pays only valid claims . . . . . . . . . . . . . . . . . . . . . 52

ii

B.  The only available vehicle for accomplishing this task is to enforce the proof and liability requirements whose absence has brought Grace here . . . . . . 53

C.  The District Court should maintain jurisdiction over all matters regarding Grace's tort liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    1.  Protection against collateral litigation . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    2.  Maintaining jurisdiction in the District Court . . . . . . . . . . . . . . . . . . . . 55

D.  The claims against Grace then can be addressed on a category-by-category basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    1.  Litigation regarding Grace's attic insulation product . . . . . . . . . . . . . . 56
    2.  Other property damage claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    3.  Litigation regarding bodily injury claims . . . . . . . . . . . . . . . . . . . . . . . 62

E.  Estimation of liability and liquidation through a post-confirmation claims resolution facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    1.  Any estimation should be completed before confirmation . . . . . . . . . . . 66
    2.  Estimation sets a fixed outer limit on compensation . . . . . . . . . . . . . . . 66
    3.  Estimation should proceed according to the best available scientific evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

This brief sets out the background for Grace's decision to file for Chapter 11 protection and defines the central task that must be addressed if a successful resolution of this case is to be achieved.    That task is to determine the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations.  Contemporaneous with the filing of this brief, Grace is filing a motion to withdraw the bankruptcy reference and maintain the District Court's control over this central task.  The motion is the first step in moving this case forward.

Grace's decision to file was compelled by two fundamental developments outside of its control.

First, the tort system long ago ceased to provide any realistic opportunity to define the actual responsibility of any manufacturer of asbestos products, including Grace, for asbestos-related claims.  As the Supreme Court recently observed, the tort system is besieged by an "elephantine mass of asbestos cases" that "defies customary judicial administration."[2]  The situation is "a disaster of major proportions to both the victims and the producers of asbestos products" alike.[3]

Lacking a properly functioning tort system, litigants developed what is essentially a privatized claims resolution business.  That business lacks the integrity assured by the rules of evidence and the rule of law.  But it has provided until recently a workable (albeit patently

---

[2] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

[3] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991). *See also Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 265 (E.D. Pa. 1994) (observing that the Judicial Conference Report "was a ringing condemnation of the asbestos litigation process in the tort system"), *vacated*, 83 F.3d 610 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997).

coercive and exorbitantly costly) means for companies who are not major players in the asbestos world to attempt to manage their asbestos litigation.

Second, and much more recently, the privatized claims process itself was turned against surviving asbestos defendants, dramatically increasing their exposure to asbestos claims and thereby destroying their already attenuated programs for managing claims. As other companies involved in asbestos litigation have gone bankrupt, the claims against Grace in particular have skyrocketed – without apparent connection to any new principle of liability or accepted principle of science. In 2000 alone, asbestos claims against Grace increased 81% over the prior year, reaching a total of nearly 49,000 claims for 2000. Year to date trends for 2001 are even worse. The asbestos litigation no longer merely siphons off Grace's profits – it threatens Grace's financial health and its core businesses.

Chapter 11 now affords the only solution for Grace. Other paths to resolution have been foreclosed. The Supreme Court has restricted class action settlements under Rule 23. Congress has failed to enact legislation to address the problem.

And Chapter 11 procedures can be tailored in this case to produce a fair and efficient resolution of legitimate claims while screening out meritless ones. Chapter 11 should not merely be a process for distributing available funds to claimants regardless of claim merit. Rather, the threshold task in Chapter 11 is to determine the validity of asserted claims. While that task is daunting in mass-tort bankruptcies, the courts have developed procedures that can be used to define and resolve mass-tort liability within the bankruptcy system. These include:

2

- Procedures for the consolidation of all claims before one court which can apply one set of procedural and evidentiary rules.

- Procedures to stay and enjoin any collateral litigation which may affect the issues in controversy.

- Procedures to define the population of all current claimants and to obtain information regarding their claims on a reliable and consistent basis.

- Procedures to decide threshold liability issues, including compliance with the precepts first set forth by the Supreme Court in *Daubert* and recently adopted in the Federal Rules.

- Procedures for developing the criteria for the settlement of valid claims through a post-confirmation trust.

Application of these procedures is the first and critical step to regaining control over the central question that is simply unanswerable outside of Chapter 11: Which claims should be paid by the debtor and which claims are invalid and should not be paid? And in Chapter 11, this question can be answered, not under the threat of being taken to trial in massive numbers of cases prosecuted in the forum most attractive to a particular plaintiffs' lawyer, but through a systematic proceeding that is designed to determine actual liability under the law.

This Informational Brief is designed to make what is admittedly a complex case more transparent by setting forth at the outset Grace's overall proposal for how the case should proceed. More specifically, Section I describes the Grace products that are at issue in the asbestos litigation. Section II identifies the historical problems that now preclude use of the tort system to efficiently and fairly resolve asbestos claims. Section III traces recent developments in asbestos litigation and the consequent dramatic increase in claims against Grace. Section IV explains why and how Chapter 11 provides the only means to define Grace's asbestos liability. Finally, Section V sets out Grace's general blueprint for the Chapter 11 process in this case.

3

I.    THROUGH A CORPORATE ACQUISITION IN 1963, GRACE BEGAN
      MANUFACTURING CERTAIN PRODUCTS CONTAINING VARYING
      AMOUNTS OF ASBESTOS.

         Grace was a late entrant into the asbestos business; its participation in the industry

in any meaningful way began with the purchase of the Zonolite Company ("Zonolite") in 1963.

A.    The state of the asbestos industry prior to Grace's purchase of Zonolite.

         Use of asbestos in the United States, however, had begun almost 100 years earlier,

in the 1860s, when asbestos was first employed commercially as an insulator.[4] In the following

decades, asbestos was incorporated in tens of thousands of products commonly found at work

and in the home.  Indeed, the "wide-ranging applications" for asbestos and its "ample and

accessible supplies" led to "its pervasiveness in many sectors of the American economy during

the twentieth century."[5] As a consequence of "man's utilization of asbestos, coupled with the

natural occurrence of the mineral, asbestos fibers are found in the air we breathe, the food we eat,

and the water we drink."[6]

---

[4] *In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. 710, 735 (E.D.N.Y. 1991), *vacated*, 982 F.2d 721
(2d Cir. 1992), *modified*, 993 F.2d 7 (2d Cir. 1993).

[5] *Id.* at 736. *See also* JAMES S. KAKALIK ET AL., COSTS OF ASBESTOS LITIGATION 3 (Rand Inst. 1983)
(observing that asbestos "is an excellent insulator and is also commonly used in asbestos-cement
products (e.g., pipe), brake linings, a number of roofing products, and flooring products.  It has been used
in millions of buildings in the U.S. and in hundreds of millions of automobiles.").

[6] ASBESTOS: AN INFORMATION RESOURCE, DHEW (NIH) Pub. No. 78-1681, at 1 (Richard J. Levine
ed. 1978). *See also id.* at 55 (noting that "[a]sbestos is . . . found as a contaminant in the ambient air");
*id.* at 62 ("Drinking water is one of the possible routes by which humans are exposed to asbestos."); *id.* at
64 (foods that may become contaminated with asbestos because of asbestos filters used in their
processing include:  beer, wine, liquors, fruit juices, sugar, lard, vegetable oil, cider, condiments,
mouthwashes, syrups, tonics, and vinegar."); Andrew Churg, *Nonneoplastic Diseases Caused by
Asbestos*, *in* PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 213, 219, 224-29 (Andrew Churg & Francis
H.Y. Green eds. 1988) (observing that most urban dwellers' lungs contain hundreds of thousands or
millions of asbestos fibers per gram of dry lung tissue).

4

Both government and industry bodies issued guidelines governing and permitting the use of asbestos beginning in the 1930s. Those guidelines indicated that the potential health hazards associated with asbestos could be controlled by "maintaining a modest level of exposure."[7] After considering such evidence, government health authorities such as the United States Public Health Service issued guidelines governing permissible exposure to asbestos in the workplace.[8]

Beginning in the mid-1960s, however, the work of Dr. Irving Selikoff and others raised serious concern within the scientific community regarding the safety of asbestos exposure levels permitted by existing exposure guidelines. The federal government responded by issuing additional requirements. In 1970, Congress established the Occupational Safety and Health Administration ("OSHA") to regulate health hazards in the workplace. Almost immediately after its creation, OSHA promulgated an initial regulation limiting asbestos exposure. 36 Fed. Reg. 10466, 10506 (table G-3) (May 29, 1971). Soon thereafter, prompted by union petitions expressing a concern that permissible exposure levels were still too high, OSHA revised its regulations to limit asbestos exposure even further and to require special handling of asbestos products. *See* 36 Fed. Reg. 23207 (Dec. 7, 1971) (emergency temporary standard); 37 Fed. Reg.

---

[7] *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1093 (5th Cir. 1973) ("[I]t was known in the 1930's that inhaling asbestos dust caused asbestosis and that the danger could be controlled by maintaining a modest level of exposure."), *cert. denied*, 419 U.S. 869 (1974).

[8] W.C. DREESSEN ET AL., A STUDY OF ASBESTOSIS IN THE ASBESTOS TEXTILE INDUSTRY, PUBLIC HEALTH BULLETIN NO. 241, at ix (U.S. Public Health Service 1938). *See also Borel*, 493 F.2d at 1084 ("The U.S. Public Health Service fully documented the significant risk involved in asbestos textile factories in a report by Dreessen et al., in 1938. The authors urged precautionary measures and urged elimination of hazardous exposures." (footnote omitted)).

11318 (June 7, 1972) (final standard). OSHA's asbestos regulations became progressively more restrictive, effectively precluding the use of asbestos in most commercial applications.[9]

**B.     In 1963, Grace entered the business of manufacturing certain asbestos-containing products.**

Grace purchased the assets of Zonolite in 1963 and merged them with what is now Grace's Construction Products division. Zonolite mined, milled and processed vermiculite from a mine ten miles north of Libby, Montana (the "Libby Mine"). It also added commercial asbestos in manufacturing building products such as acoustical plaster and fireproofing insulation.

**1.     The operation of the vermiculite mine in Libby, Montana.**

Vermiculite is a mineral that expands into popcorn-like, low-density pieces when heated. This expanded – or exfoliated – vermiculite is light-weight, fire-resistant and serves as a good insulator. Vermiculite is itself an inert mineral that is non-asbestos and has no known toxic properties.

When mined, vermiculite ore in the Libby Mine deposit contained a secondary mineral – fibrous asbestiform tremolite.[10] The ore was mined from relatively deep open-pits. The asbestos content of ore from the pits was as high as 30%. Grace mined the ore and then

---

[9] *In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. at 737 ("Because of the increased awareness of dangers and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's.").

[10] Fibrous asbestiform tremolite impurities in vermiculite are atypical and not characteristic of most vermiculite deposits. It is believed that the depth of the ore deposit in Libby is correlated to the amount of impurities, whereas most vermiculite deposits – such as those at Grace's Enoree, South Carolina mine – are relatively shallow.

6

milled it into a concentrate through a crushing, screening, washing, and flotation separation process.

After milling, the vermiculite concentrate contained 1-3% asbestos, typically less than 1%. At Grace's "expansion plants," the concentrate was passed through vertical furnaces at temperatures approaching 2,000 degrees, which resulted in the further reduction of asbestos content. The heating process transformed embedded moisture into steam, causing vermiculite to "pop" or expand into the light-weight material used commercially. When finished, expanded vermiculite – which typically contained a fraction of 1% asbestos – was bagged and sold for various uses under the Zonolite trade name.

Grace operated the Libby Mine from 1963 until 1990. Prior to Grace's purchase of Zonolite (and before the hazards of asbestos were fully known), asbestiform tremolite dust levels in the air at the Libby Mine were high. After acquiring the mine and learning of the working conditions there, Grace implemented a series of major steps over time that reduced asbestiform tremolite exposures to the lowest feasible levels. Grace also started a medical program to educate employees about the hazards of asbestiform tremolite and to monitor their exposure levels and health. Grace's improvements included, among other things:

- Construction of a new mill to convert processing of vermiculite from a dry to a wet process, thereby reducing dust levels.

- Construction of a new screening plant that minimized dust levels when sizing ore concentrate.

- Installation of an air scrubbing system at points where dry ore was handled.

- Enclosing the cabs of all mining equipment with air filtering systems.

7

- Installation of water injection and dust collection systems to convert to an all wet drilling process.

- Establishing an air sampling and employee medical monitoring program with annual chest x-rays for all of its employees.

- The application of dust suppressants on all roads in the area.

With these improvements, Grace lowered asbestiform tremolite dust levels from approximately 50 fibers per cubic centimeter of air ("f/cc") in 1963, to less than 1 f/cc in 1975 and down to .066 f/cc in 1985 – many times lower than required by government standards.

### 2.    Grace's attic insulation product: Refined vermiculite, not asbestos.

One of the principal commercial products made from Grace's vermiculite was Zonolite Attic Insulation ("ZAI"). ZAI was simply expanded loose-fill vermiculite which was poured into attics and rafters. ZAI contained, at most, *trace* quantities of asbestos – minute fractions of 1%.

Specifically, as noted above, vermiculite is *not* a form of asbestos and has no known toxic properties; it is an inert mineral that when milled and thermally expanded serves as an effective insulator. Asbestos was never added to ZAI. Instead, Grace acted to remove asbestos contaminants from the ore during the milling and expansion process. Grace's efforts were so successful in limiting asbestos impurities to trace levels that ZAI does not meet the regulatory definition of an asbestos-containing product. *See, e.g.*, 40 C.F.R. §§ 61.141 and 763.83.[11]

---

[11] Under federal regulations, "materials" containing less than 1% asbestos by weight are not defined as asbestos-containing "materials."

8

Today, Grace believes ZAI is safe and effectively asbestos-free. The asbestos levels of homes with ZAI are no higher than levels found in normal breathing air. Typically, ZAI remains isolated and undisturbed for years in attics, in many cases under a layer of plywood or a top layer of fiberglass insulation. Under these normal living conditions there is essentially no asbestos exposure from ZAI.[12] But even if a homeowner were to disturb the attic insulation for a continuous eight-hour time period (and were thereby to create an exposure level as high as 0.1 f/cc), exposure would have to continue for fifty years in order to reach the 5 fiber years per cc threshold level for mesothelioma risk.[13]

### 3. The Monokote-3 fireproofing product: This contained added asbestos, but was applied wet in commercial large steel buildings.

Asbestos was added to certain fireproofing products made by Grace. Monokote-3 ("MK-3") was the brand name for the spray fireproofing product being sold by Zonolite when Grace acquired the company in 1963. Sixty percent of MK-3 was gypsum – a naturally occurring mineral mined and sold by the Gypsum companies – which acted as the binding, cementitious component of the product. MK-3 contained roughly 30% vermiculite and 10% added chrysotile asbestos purchased from asbestos producers.

MK-3 was marketed to provide fire protection for the enclosed steel beams of large commercial structures, predominantly high-rise buildings. MK-3 provided such protection in two ways. First, MK-3 insulation prevented steel from heat-softening, thereby protecting high-rise structures from collapse during fires. Second, MK-3 prevented the spread of fire,

---

[12] Testimony of Dr. William Hughson in *Barbanti v. W.R. Grace & Co.*, No. 00201756-6 (Wash. Super. Ct. Spokane County), November 30, 2000 Transcript at 6:1-7:6.

[13] *Id.* at 7:15-8:22.

9

affording occupants the chance to escape to safety and firefighters the opportunity to control the fire.

There were two types of spray fireproofing product used in the construction industry generally: (1) dry-sprayed mineral fiber marketed by competitors of Grace and (2) the wet-sprayed plaster – or cementitious – product marketed by Grace.[14]  In the case of the dry-sprayed mineral fiber product, bags of dry fiber material were put through a blowing machine at the point of application.  The blowing machine fluffed and separated the material and it was blown dry through a mist of water that was controlled by the worker applying the material.

By contrast, Grace's MK-3 was a wet-sprayed, cementitious type.  MK-3 was mixed in a conventional automatic mixer with a prescribed amount of water on the ground.   The mixing of water with gypsum created a thick, adhesive cementitious mix. The mix was placed in the hopper of a plaster pump and pumped through a chamber to the high-rise floor on which it was being applied.  At the point of application, compressed air was injected into the mix at the nozzle and a ½ to ¾ inch thick coating of material was sprayed wet onto steel beams, where it began to harden immediately.

Due to the nature of the product, the dry-sprayed type of fireproofing material could produce dust during application.  By contrast, after initial mixing, because  MK-3 was applied wet and its cementitious nature bound and encapsulated the asbestos, MK-3 produced no such dust during application.

_____

[14]  To be marketed, all fireproofing products must meet standards established by Underwriter's Laboratories.  Underwriter's Laboratories designated MK-3 as "cementitious".

10

### 4.    Other vermiculite and asbestos-containing products.

In addition to the products described above, for certain periods of time, Grace manufactured other products containing asbestos or vermiculite. Some were similar to MK-3. Others were expanded vermiculite-based products. The products included:

- Acoustical plaster, sold under such trade names as "Zonocoustic", "Spray-White", "Zonolite Acoustical Plastic", "Econo-White" and Zonolite texture finish products. These products were clay and vermiculite based plaster, similar to MK-3, for wall and ceiling applications;

- Zonolite High-Temperature Cement, in essence, an insulating concrete style of MK-3;

- Zonolite Masonry-Fill, expanded vermiculite manufactured as insulation fill for the holes in cinder blocks;

- Roof deck cementitious products, similar to MK-3; and

- A variety of other expanded vermiculite products.

These products were manufactured for limited periods of time and, due to lack of demand, were not widely sold.

### 5.    The phase-out of asbestos.

After the Zonolite business was acquired, Grace began to develop a suitable replacement for asbestos in its products. This process took several years, as it proved difficult to find a material that possessed the characteristic strengths of asbestos. In 1970, Grace began selling Monokote-4 ("MK-4"), a spray fireproofing product free of commercially added asbestos. In 1972, Grace developed Monokote-5 ("MK-5"), which was also free of commercial asbestos and had better bonding strength.

11

Effective July 4, 1973, the EPA banned the spraying of surfacing products containing asbestos in amounts greater than 1%. The ban did not cover MK-3 as a product, just the *spray* application. Nonetheless, with the 1973 ban, Grace ceased selling MK-3 and replaced it with MK-5.

Grace stopped manufacturing ZAI in 1984. Grace concluded that it could no longer compete with fiberglass insulation products that were cheaper to produce and were more effective insulators. In 1990, as Grace's need for expanded vermiculite fell, Grace closed the Libby Mine but continued to sell vermiculite from its mine in Enoree, South Carolina.

## II.    THE TORT SYSTEM LONG AGO CEASED TO PROVIDE A FAIR OR PRACTICAL MEANS FOR RESOLVING THE HUGE INVENTORY OF ASBESTOS CLAIMS.

Even though its products generated little or no asbestos dust, or in the case of vermiculite, contained only trace levels of naturally occurring asbestos impurities, Grace has not been able to avoid the morass of litigation spawned by asbestos. And it is beyond any debate that the tort system has failed to effectively and fairly resolve that litigation. Put bluntly, the system has long been in a state of "crisis."[15] The "avalanche of litigation"[16] has been

---

[15] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (observing that there is "an asbestos-litigation crisis"); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996) ("This case arises against the background of an asbestos litigation crisis."), *aff'd*, 521 U.S. 591 (1997); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 554 (1992) ("It has become increasingly apparent in the last few years that the asbestos crisis facing the judicial system in the United States has reached epidemic proportions.").

[16] *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

characterized again and again as a "serious problem,"[17] a "dilemma,"[18] and a "disaster."[19]  Indeed,

"[n]o mass tort litigation . . . has received more intense criticism than the litigation concerning

exposure to asbestos."[20]

These problems have not just corroded the basic ground rules of in-court

litigation.  As discussed below, they have also given rise to an equally flawed process for claims

resolution outside of court.

A.    **How the problem came about.**

The relevant history is easily recited, albeit the solution to the problem still has

not been found.  In the mid-1970s, federal and state courts experienced the first substantial influx

of tort cases seeking recovery for asbestos-related occupational disease.[21]  After the Fifth Circuit

---

[17]  *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[18]  *Jenkins*, 782 F.2d at 470.

[19]  REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 14 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[20]  Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 GEO. L. J. 1983, 2017 (1999).  *See also* Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 541 (1992) ("Most commentators agree that tort litigation today is a highly unsatisfactory system for resolving claims arising out of workers' exposure to asbestos."); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged – A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 590 (1992) ("The traditional tort system, in connection with asbestos litigation, has been marked by high transaction costs, excessive delays in providing compensation to injured plaintiffs, unequal recoveries among identically injured victims, litigious parties and a judicial system clogged by an avalanche of cases.  All of these problems clearly indicate that something must be done and that the traditional approach to tort cases has failed in the asbestos context." (footnotes omitted)); *In re Asbestos Litig.*, 829 F.2d at 1235, 1261 ("Asbestos litigation poses a serious problem for American tort law, . . . with its inefficiencies, high costs, and inconsistent judgments.").

[21]  *See* DEBORAH R. HENSLER ET AL., ASBESTOS IN THE COURTS: THE CHALLENGE OF MASS TOXIC

(continued...)

13

in *Borel v. Fibreboard Paper Products Corp.*[22] affirmed a $68,000 jury verdict based on a theory of strict liability for failure to warn of a dangerous product, asbestos claims grew into the largest area of product liability litigation in history.  Plaintiffs sought recovery from asbestos miners, manufacturers, and suppliers of asbestos products.[23]

By the 1980s the asbestos litigation was growing out of control.[24]  By 1982, as many as 20,000 claimants had filed lawsuits, and $1 billion had been spent in litigation expenses and compensation.[25]  Inordinate delays and excessive transaction costs became common. Similarly-situated plaintiffs experienced widely disparate outcomes in the courts.  Aggregation of claims within the tort system led to even more irrational outcomes.  By the time Johns-Manville Corporation, the nation's leading asbestos manufacturer and the leading target of asbestos lawsuits,[26] filed for bankruptcy protection in 1982, it had become clear that the judicial system could not effectively cope with the wave of new claims.

---

[21] (...continued)
TORTS vii (Rand Inst. 1985).

[22] 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974).

[23] *See* JAMES S. KAKALIK ET AL., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES 5 (Rand Inst. 1984).

[24] *See Jenkins*, 782 F.2d at 470 ("Courts, including those in our own circuit, have been ill-equipped to handle this 'avalanche of litigation'"); *Georgine*, 157 F.R.D. at 263 ("By the early to mid-1980's, . . . major problems began to appear on the horizon in the asbestos litigation.").

[25] JAMES S. KAKALIK ET AL., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES v (Rand Inst. 1984).

[26] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988); Lester Brickman, *The Asbestos Claims Management Act of 1991: A Proposal to the United States Congress*, 13 CARDOZO L. REV. 1891, 1917 n.13 (1992) ("Before bankruptcy, Manville bore the brunt of asbestos litigation; it had the largest market share of asbestos-product sales and was assessed the highest percentage of liability by the tort system.").

In 1990, Chief Justice Rehnquist appointed a distinguished panel of judges to serve on a Judicial Conference Committee charged with examining the growing asbestos litigation problem. After extensive study, the Committee reported in 1991 that the "situation has reached critical dimensions and is getting worse." Characterizing the state of asbestos litigation as "a disaster of major proportions to both the victims and the producers of asbestos products," the Committee concluded that the courts were "ill-equipped" to address the mass of claims in an effective manner.[27]

Since then, the asbestos litigation problem has degenerated even further.[28] Indeed, the Supreme Court recently observed that both the federal and state judicial systems labor under the weight of an "elephantine mass of asbestos cases" that "defies customary judicial administration." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

As the Court indicated in *Ortiz*, the problems plaguing the asbestos litigation landscape are myriad. The underlying causes likewise are numerous, but include the following:

## 1.    The number of claims is simply overwhelming.

As the Judicial Conference Committee observed, one of the "most objectionable aspects of asbestos litigation" is that "dockets in both federal and state courts continue to

---

[27] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991).

[28] *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 15 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School) ("The judiciary has been handling the asbestos litigation for a generation, and its management of the litigation has contributed to what is now called a crisis but may better deserve to be termed a disaster.").

grow."[29]  Prior to 1980, plaintiffs had filed approximately 950 asbestos cases in the federal

District Courts.[30]  By 1985, 37,000 cases had been filed, a four-fold increase in the filing rate

over the preceding five-year period.[31]  Since then, the filings have continued to grow.  In the last

five years, new claims against major asbestos producers have averaged approximately 40,000 *per*

*year*.[32]  Today, the total number of pending claims is unreported but is in the hundreds of

thousands, the vast bulk of which Grace believes are without merit.

### 2.       Aggregation has exacerbated the problem, not alleviated it.

The "sheer number of asbestos cases" has led to a whole host of

"distort[ions of] the traditional process" for resolving tort claims.[33]  Unrelenting docket pressure,

for example, has resulted in attempts to aggregate and resolve claims on a collective basis.  But it

turns out that "mass consolidations only serve to magnify the irrationality of the litigation system

---

[29] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991); *id.* at 7 ("The tide of asbestos personal injury and wrongful death litigation in federal and state courts in the 1970s and 1980s continues to rise unabated and has not begun to crest.").  *See also Amchem*, 521 U.S. at 598 (quoting the Judicial Conference Report).

[30] TERENCE DUNGWORTH, PRODUCT LIABILITY AND THE BUSINESS SECTOR: LITIGATION TRENDS IN FEDERAL COURTS 36 (Rand Inst. 1988).

[31] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 3 (Rand Inst. 1991) (computations based on the federal statistical data base).  *See also Georgine*, 157 F.R.D. at 263 ("Although by this time state and federal courts were already burdened by many asbestos claims, amazingly 1986 saw the rate of filing of new asbestos suits quadruple.").

[32] *See The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Dean Paul Verkuil, Cardozo School of Law) ("[L]awsuits continue to arrive at a rate of over 40,000 per year, and over 200,000 cases are now pending."); *id.* ("The rate of new filings and the growing number of pending cases vividly demonstrate a basic fact – the asbestos litigation problem is not getting better, it is getting worse.").

[33] REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS TO THE JUDICIAL CONFERENCE OF THE UNITED STATES 23 (Feb. 25, 1999).

that awards massive amounts to the unimpaired while threatening the ability of seriously ill people to obtain compensation in the future." [34]  And the very process of aggregation can generate additional cases.[35]  As one commentator put it, "[j]udges who move large numbers of highly elastic mass torts through their litigation process at low transaction costs create the opportunity for new filings.  They increase the demand for new cases by their high resolution rates and low transaction costs.  If you build a superhighway, there will be a traffic jam."[36]

### 3.   Claims are brought on behalf of claimants who suffer no asbestos-related impairment.

Moreover, in many courts, the majority of pending asbestos claims are brought by individuals who merely have some marker of asbestos exposure, such as pleural plaques, but who suffer no asbestos-related impairment at all.  By the mid-1980s, 40-60% of the outstanding claims were filed by people with some form of pleural plaques (non-impairing fibrosis of the

---

[34] *Fairness in Asbestos Compensation Act of 1999*, H.R. 1283, 106th Cong., 1st Sess. § 2(11), at 5.

[35] REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS TO THE JUDICIAL CONFERENCE OF THE UNITED STATES 16 (Feb. 15, 1999).

[36] Francis E. McGovern, *The Defensive Use of Federal Class Actions in Mass Torts*, 39 ARIZ. L. REV. 595, 606 (1997).  As Professor McGovern further stated:  "Until 1980, Maryland devoted a small amount of judicial resources to asbestos litigation, resulting in a backlog of over 2000 cases. The trial court then decided to adopt an innovative, common-issue trial so that individual cases could be streamlined.  This decision encouraged plaintiffs' counsel to file an additional 6500 cases, most of which probably would not have been filed absent the common-issue trial . . . .  Thus, by attempting to accommodate the cases that had been filed, the trial court created an elastic procedure that invited massive additional filings." Francis E. McGovern, *An Analysis of Mass Torts for Judges*, 73 TEX. L. REV. 1821, 1839-40 (1995) (footnotes omitted).  *See also* Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1826-27 (1992) ("The more successful courts became in devising ways to more quickly and assuredly compensate the meritorious, the larger the number of unmeritorious claims that were able to enter the system.").

Saran Wrap-like pleural membrane lining the lungs).[37]  While plaintiffs often assert that pleural

plaques are indicators of future disease, the opinion within the medical community is that benign

pleural abnormalities do not result in impairment.[38]  Indeed, "[t]he benign conditions of the

pleura that are produced by asbestos are seldom of any lasting importance."[39]

---

[37] *See In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 931.  Data from 1992 indicate that such
claims have grown and presently "account for sixty to seventy percent of new asbestos claims filed."
Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13
CARDOZO L. REV. 1819, 1853 (1992).  Compounding the problem is the fact that pleural plaques are
often misdiagnosed.  *Id.* at 1852-53 ("Not infrequently the diagnosis of pleural plaque is erroneous."
(citing Howard Frumkin et al., *Radiologic Detection of Pleural Thickening*, 142 AM. REV. RESPIRATORY
DIS. 1325 (1990)).  *See also* Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L.
REV. 659, 674 (1989) ("Significant variances also existed in the parties' medical data.  For example, the
defendants' medical experts had generally found that many plaintiffs suffered only from pleural plaques
or thickening of pulmonary membranes through their analysis of radiographic evidence.  Plaintiffs'
doctors, however, often found interstitial fibrosis, a much more serious and advanced condition, from
similar evidence.").

[38] *See, e.g.,* W. RAYMOND PARKES, OCCUPATIONAL LUNG DISORDERS 455 (3d ed. 1994); ANDREW
CHURG & FRANCIS H.Y. GREEN, PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 234 (1988); Robert
Jones et al., *The Radiographic Pleural Abnormalities in Asbestos Exposure: Relationship to Physiologic
Abnormalities*, 3 J. THORACIC IMAGING 57-66 (1988); Theresa McCloud et al., *Diffuse Pleural
Thickening in an Asbestos-Exposed Population: Prevalence and Causes*, 144 AM. J. ROENTGENOLOGY 8-
18 (1985); *see also In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1567 (D. Haw. 1990) ("In
virtually all pleural plaque and pleural thickening cases, plaintiffs continue to lead active, normal lives,
with no pain or suffering, no loss of the use of an organ or disfigurement due to scarring."); AGENCY FOR
TOXIC SUBSTANCES AND DISEASE REGISTRY, DIVISION OF HEALTH STUDIES, *Preliminary Findings of
Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana,*
p. 4 ("Clinically, circumscribed pleural plaques found on chest radiographs, in the absence of other
abnormalities, are viewed as non-symptomatic 'markers of exposure' and the majority of cases will not
progress to significantly affect lung function.")

[39] RICHARD DOLL & JULIAN PETO, ASBESTOS: EFFECTS ON HEALTH OF EXPOSURE TO ASBESTOS 2
(1985).  *See also In re Asbestos Prods. Liab. Litig. (No. VI)*, Civ. A. No. MDL 875, 1996 WL 539589, at
*1 (E.D. Pa. Sept. 16, 1996) ("Only a very small percentage of the cases filed have serious asbestos-
related afflictions," and as a result they "are prone to be lost in the shuffle with pleural and other non-
malignancy cases.").

Consequently, many current claimants are not and will never be sick.[40]

Nonetheless, such unimpaired claimants often receive compensation, depleting resources that would otherwise be available to compensate legitimate claims. As Justice Breyer recently summed up, "up to one-half of asbestos claims are now being filed by people who have little or no physical impairment. Many of these claims produce substantial payments (and substantial costs) even though the individual litigants will never become impaired."[41]

Mass screening programs have facilitated the filing of huge numbers of claims by those who are unimpaired.[42] As Judge Weinstein observed when presiding over the Johns-Manville bankruptcy, some plaintiffs' attorneys "have filed all of their cases without regard to

---

[40] *See* Christopher F. Edley, Jr. & Paul C. Weiler, *Asbestos: A Multi-Billion-Dollar Crisis*, 30 HARV. J. LEGIS. 383, 384 (1993) ("Tens of thousands of [the asbestos] claims have been made, many successfully, by individuals who are understandably worried about their exposure to asbestos but who are not now and never will be afflicted with disease."). *See also Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. 77, 94 (Oct. 24, 1991) (testimony of Professor Lester Brickman) (observing that in the *Cimino* case, of 2300 claimants who were re-examined by doctors for the defense, 50% showed no signs of asbestos exposure).

[41] *Amchem*, 521 U.S. at 629 (Breyer, J., concurring in part and dissenting in part) (quoting Christopher F. Edley, Jr. & Paul C.Weiler, *Asbestos: A Multi-Billion Dollar Crisis*, 30 HARV. J. LEGIS. 383, 384, 393 (1993)).

[42] *Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. 77, 100 (Oct. 24, 1991) (testimony of Professor Lester Brickman) ("[P]leural plaque claims account for approximately 80% of new asbestos claim filings and represent a substantial percentage of previously filed claims. The existence of tens of thousands of such claims is accounted for by mass screenings of industrial workers financed by plaintiffs' lawyers and usually done with the active assistance of local union officials. Often, mobile x-ray vans brought to plant sites are used for the screenings."); Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 564 (1992) ("Another probable reason for the large number of unimpaired claims relates to the practice of some labor unions and plaintiffs' lawyers who engage in aggressive claim-solicitation campaigns on a mass basis designed to multiply the number of filed cases, thereby increasing the pressure on defendants to settle cases wholesale.").

the extent of injury."[43]  Working in conjunction with unions, they have "arranged through the use

of medical trailers and the like to have x-rays taken of thousands of workers without

manifestations of disease and then filed complaints for those that had any hint of pleural

plaque."[44]  Certain plaintiffs' counsel have candidly acknowledged that such practices have

burdened the courts with unmeritorious claims.  For example, Ron Motley observed in the early

1990s that: "[t]here are gross abuses of our system.  We have lawyers who have absolutely no

ethical concerns for their own clients that they represent – we have untrammeled screenings of

marginally exposed people and the dumping of tens of thousands of cases in our court system,

which is wrong [and] should be stopped."[45]  The scatter that can take place when asbestos-related

conditions are claimed was captured in a profile created several years ago by the late Judge Carl

Rubin.  Judge Rubin appointed his own medical experts to evaluate claimants in 65 pending

asbestos cases.  Although all the plaintiffs claimed some asbestos-related condition, the court-

appointed experts found that in fact only 15% had asbestosis, 20% had pleural plaques, and 65%

had no asbestos-related condition whatsoever.[46]

---

[43]  *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 748.  *See also Eagle-Picher Indus. v. American Employers' Ins. Co.*, 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed.  Moreover, many diagnoses are made by physicians not well schooled in the American Thoracic Society's criteria for the diagnosis of asbestosis, and the medical literature does not provide standards for judging the diagnosability of asbestos-related disease.").

[44]  *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 748.

[45]  AN ADMINISTRATIVE ALTERNATIVE TO TORT LITIGATION TO RESOLVE ASBESTOS CLAIMS, TRANSCRIPT OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES 15 (Oct. 31, 1991) (remarks of Ronald L. Motley).

[46]  Rubin & Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35 (1991).

In another example, a federal district judge in Kansas found that medical screeners departed from accepted medical standards by diagnosing asbestos-related "injuries" that failed to meet minimum American Thoracic Society diagnostic criteria.   As a result, the court concluded that "many, if not most" of the cases were "without merit."[47]  *See also In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1566 (D. Haw. 1990) (cases are often diagnosed based on "subjective declarations of shortness of breath, tiredness and general lassitude," rather than objectively observable clinical findings).

**B.      Litigating asbestos cases today: Litigation of claims no longer is a real alternative.**

The avalanche of claims precludes litigation on a case-by-case basis, and litigation of claims has imposed costs so high they make such litigation prohibitive.  Even when claims are litigated, the outcomes are arbitrary, inconsistent, and driven by systemic weaknesses such as rampant forum shopping.

**1.      The backlog within the tort system precludes litigation on a case-by-case basis.**

As the Judicial Conference Report observed, "[i]t is unrealistic to believe that individual trials can provide relief."[48]  This is because "[t]he local trial of an individual asbestos claim takes so long that trying each claim separately would require all the civil trial time for the

---

[47]  *See Raymark Indus. v. Stemple*, 1990 WL 72588, at *2, *8, *22 (D. Kan. 1990).  The court found that, despite the fact that the American Thoracic Society criteria for diagnosing asbestosis indicate "that a doctor should consider only fibrosis with a profusion of 1/1 or greater,"  the medical screeners reported that workers had asbestos-related "injuries" with only a 1/0 reading – a reading that has no clinical significance – on the International Labour Organization (ILO) scale.  Overall, the court concluded that the screening program produced a "steady flow of faulty claims" and a "fraud on the court."

[48]  REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 19 (Mar. 1991).

foreseeable future to the exclusion of all other cases in districts with heavy asbestos dockets."[49]

As the Fifth Circuit has observed,"[t]raditional methods of litigation are ill-designed to handle

such a volume of cases, for their sheer number is inundating the courts." Case-by-case

adjudication, the court stated, would "delay decision for years if not decades, burden both

claimants and manufacturers with massive litigation costs, leave claimants uncertain about the

possibilities of eventual recovery and manufacturers unable to determine their financial

exposure," as well as clog the court system generally.[50]  Any attempt to resolve the litigation on a

case-by-case basis would "bankrupt both the state and federal court systems."[51]

### 2.    Litigation entails exorbitant and inequitable costs.

Further, transaction costs are unconscionably high.  Approximately sixty cents of

every dollar paid by asbestos defendants is consumed to pay lawyers' and others' fees, resulting

in transaction costs exceeding claimants' recovery "by nearly two to one."[52]

---

[49]  *Id.  See also* Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective*, 80 CORNELL L. REV. 941, 958 (1995) ("The number of individual claims currently pending and reasonably anticipated in the future is in some mass tort litigations so large that it is simply not practicable to provide individual trials in the traditional fashion.").

[50]  *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1146 (5th Cir. 1985).  As one court remarked in calculating the time it would take to resolve all of the cases pending before it, "[i]f the Court could somehow close thirty cases a month, it would take six and one-half years to try these cases and there would be pending over 5,000 untouched cases at the present rate of filing."  *Cimino v. Raymark Indus.*, 751 F. Supp. 649, 652, 666 (E.D. Tex. 1990) (noting that "plaintiffs are facing a 100% confidence level of being denied access to the courts"), *aff'd in part, vacated in part*, 151 F.3d 297 (5th Cir. 1998).

[51]  JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 141 (1995) (quoting Spencer Williams, *Mass Tort Class Actions: Going, Going, Gone?*, 98 F.R.D. 323, 324 (1983)).

[52]  *Ortiz*, 527 U.S. at 821 n.1.  *See also id.* at 867 (Breyer, J., dissenting) ("'[O]f each dollar that asbestos defendants pay, those costs consume an estimated 61 cents, with only 39 cents going to victims.'"); *Amchem*, 521 U.S. at 632 (Breyer, J., dissenting) (same); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 749 (estimating that the percentage of all funds expended in asbestos litigation that
(continued...)

And the imposition of duplicative punitive damages awards during the course of asbestos litigation adds more inequitable costs. The award of punitive damages against asbestos producers such as Johns-Manville for their "outrageous misconduct"[53] was designed both to punish and deter companies from repeating such conduct. Punitive damages, however, have more than deterred, punishing companies "many times over" for conduct that long ago stopped.[54] In essence, recipients of punitive damages awards in the early litigation have received a windfall at the expense of future claimants who may suffer from asbestos-related disease but will no longer be able to seek full compensation from asbestos producers whose resources have been depleted. Indeed, this was the conclusion of the Judicial Conference Report which determined that "[m]eritorious claims may go uncompensated while earlier claimants enjoy a windfall unrelated to their actual damages."[55]

---

[52] (...continued)
were used to compensate claimants was only 30%, with 70% expended on transaction costs); REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991) (observing that "transaction costs exceed the victims' recovery by nearly two to one").

[53] See PAUL BRODEUR, OUTRAGEOUS MISCONDUCT: THE ASBESTOS INDUSTRY ON TRIAL 141-46 (1985) (claiming that executives at Johns-Manville suppressed evidence of harmful effects of asbestos exposure).

[54] See DEBORAH R. HENSLER ET AL., ASBESTOS IN THE COURTS: THE CHALLENGE OF MASS TOXIC TORTS 117 (Rand Inst. 1985) ("[T]here are controls over the level of punitive damages in some individual cases, but there are no controls over the cumulative effect of these cases. Therefore, there is no way to even roughly ensure that the social function of punitive damages has not been exceeded many times over, an undesirable result in itself, regardless of its effect on future claimants, owners, employees, and customers of the affected businesses.").

[55] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 32 (Mar. 1991); id. at 32 ("[M]ultiple judgments for punitive damages in the mass tort context against a finite number of defendants with limited assets threaten fair compensation to pending claimants and future claimants who awaited their recovery, and threaten the economic viability of the defendants."); In re Collins, 233 F.3d 809, 812 (3d Cir. 2000) (quoting Judicial Conference Report and observing that
(continued...)

23

### 3.    Even when claims are adjudicated, the results are arbitrary, inconsistent, and tainted by forum shopping.

When cases finally proceed to trial, the tort system often produces "lottery-like"

outcomes.[56] The "results of jury verdicts are capricious and uncertain."[57] Differences in the

application of statutes of limitation, rulings regarding apportionment of damages, admissibility

of evidence, the availability of punitive damages, and other substantive aspects of asbestos

litigation have led to similarly-situated plaintiffs receiving widely disparate compensation.[58]

Examples abound where claimants asserting speculative "future claims" for

"unconfirmed" disease have received millions, while others suffering from actual illness as a

---

[55] (...continued)
"[t]he continued hemorrhaging of available funds deprives current and future victims of rightful compensation"), *petition for cert. filed* (U.S. Mar. 1, 2001) (No. 00-1376).

[56] *See In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. at 749 ("The disparities [in asbestos litigation] are enormous. . . . Trials are much like a lottery with substantially higher verdicts in New York City, East Texas and parts of California than other parts of the country."); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Dean Paul R. Verkuil, Cardozo School of Law) ("[T]his system has come to resemble a lottery: Some plaintiffs–those with good lawyers who appear before favorable juries–hit the jackpot with punitive damages and generous compensatory recoveries, while others settle for meager awards or get nothing at all."); Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 560 (1992) ("Such a strong, persistent pattern of disparate outcomes in similar cases obviously offends our most fundamental notions of fairness.  For that reason, this pattern is profoundly demoralizing to many asbestos claimants and their families.").

[57] *In re School Asbestos Litig.*, 789 F.2d 996, 1001 (3d Cir. 1986), *cert. denied*, 479 U.S. 852 (1986) (noting that there are "uneven, inconsistent and unjust results" in asbestos cases); *Georgine*, 157 F.R.D. at 262 ("Results of jury verdicts are capricious and uncertain.  Sick people and people who died a terrible death from asbestos are being turned away from the courts, while people with minimal injuries who may never suffer severe asbestos disease are being awarded hundreds of thousands of dollars, and even in excess of a million dollars.  The asbestos litigation often resembles the casinos 60 miles east of Philadelphia, more than a courtroom procedure.").

[58] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 6 (Rand Inst. 1991).

result of asbestos exposure have received nothing or have had to wait years before they are

compensated.[59]  For example, in 1998 a Texas state court jury awarded $15.6 million in

compensatory damages and $100 million in punitive damages to a group of twenty-one plaintiffs

whose claimed illness ranged from "mild" to "asymptomatic" asbestosis.  Indeed, three of the

plaintiffs had no symptoms at all, but nonetheless received millions in "future damages" for their

"unconfirmed" disease.[60]  In a recent case in Mississippi state court, two plaintiffs who allegedly

suffered from asbestosis but whose "disease" could not be detected by x-ray examinations were

awarded between $2 and $3.5 million each.[61]  Similarly, a Texas jury recently awarded 22

plaintiffs $35 million for "future physical impairment" and "future medical costs."[62]  Finally,

---

[59] *See The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Dean Paul R. Verkuil, Cardozo School of Law) ("On the surface, of course, large judgments may be viewed as lottery-like winnings to those lucky enough to receive them. But these judgments are not benign.  Viewed systematically, disproportionate judgments overcompensate present plaintiffs at the cost of future ones who may be more deserving."); Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1834 (1992) (noting that "some claimants who roll the trial dice receive nothing while others, including substantial numbers of the unimpaired, hit the jackpot").

[60] *Aaron v. Abex Corp.*, No. 94-C-2110-2 (Dist. Ct., Brazoria Cty. Feb. 19, 1998); *Carborundum Co. Hit with $115.6 Million Verdict in 21 Texas Cases*, 13 MEALEY'S LITIG. REP.: ASBESTOS 5-6 (Mar. 6, 1998). *See also The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283* 106th Cong. (1999) (statement of Prof. Christopher Edley, Jr. Harvard Law School, discussing the case).

[61] *Cosey v. E.D. Bullard Co.*, No. 95-0069 (Miss. Dist. Ct., Jefferson Cty., June 12, 1998); *Mississippi Jury Awards $48.5 Million in 12 Cases*, ANDREWS ASB. LITIG. REP., at 1 (July 18, 1998). *See also The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School).

[62] *See Two Asbestos Defendants Hit With $35 Million Verdict*, 23 No. 4 ANDREWS ASB. LITIG. REP. 3 (Mar. 1, 2001).  In another Texas case a plaintiff with lung cancer who "never worked directly with asbestos products" but showed no sign of asbestosis was awarded $19.3 million. *Texas Jurors Award $19.3 Million to Widow in "No-Marker" Case*, 15 No. 3 MEALEY'S LITIG. REP.: ASBESTOS 4 (Mar. 3, 2000). *See also Seven Plaintiffs Awarded $19.25 Million by Texas Jury*, 22 No. 7 ANDREWS ASB. LITIG. REP. 3 (May 4, 2000) (award despite evidence that "none of the seven workers had asbestos-related diseases"); *2 Texas Juries Award Tyler Pipe Employees $26 Million for Occupational Exposure*, 15 No.
(continued...)

25

only a few weeks ago a single plaintiff diagnosed with asbestosis was awarded $18 million by

another Texas jury, despite evidence that no sales of defendant's product were ever made to the

plant where the plaintiff worked.[63]

      Forum shopping has contributed to the arbitrary outcomes produced within the

tort system.[64]  Cases have shifted from the federal courts toward the state courts since, as

Professor Edley recently testified, "[a]sbestos lawyers perceive the federal system as an

unfavorable forum for the majority of claimants – those who are not sick."[65]  Further, cases have

shifted toward particular state courts perceived as favorable to plaintiffs.  Recently for example,

asbestos cases reportedly have "migrat[ed] en masse" to certain counties in Mississippi because

of favorable long-arm jurisdictional rules and because "[j]uries in those counties rarely, if ever,

rule against plaintiffs in product liability cases, and defendants do not have the right to perform

medical exams on any claimants."[66]

---

[62] (...continued)
15 MEALEY'S LITIG. REP.: ASBESTOS 4 (September 1, 2000) (award despite evidence "company never had or used asbestos materials").

[63] *See Texas Jury Finds Insulation Maker Liable for $18 Million*, 23 No. 4 ANDREWS ASB. LITIG. REP. 3 (Mar. 1, 2001).

[64] Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1827 n.34 (1992) ("Forum shopping is widespread in asbestos litigation."); Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. REV. 659, 664 (1989) ("Part of the reason for the clogged East Texas trial docket was that jury verdicts in personal injury cases in East Texas are generally high, particularly in asbestos cases.").

[65] *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 4 (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School) (observing that "[t]he judge in charge of asbestos claims within the federal multidistrict litigation system, Judge Charles Weiner, of the Eastern District of Pennsylvania, gives priority to the sick.").

[66] S. Labaton, *Top Asbestos Makers Agree to Settle 2 Large Lawsuits*, N. Y. TIMES (Jan. 23, 2000).

C.      **Settling cases today: The privatized claims resolution business also has failed.**

Because traditional tort system litigation is not a practical option for resolving

claims, a de facto privatized claims resolution system has emerged.  Companies simply have no

choice but to settle claims on a mass basis.[67]  But the mass settlements are not governed by

traditional principles of liability, which require proof that the defendant's product actually caused

injury and a medically-valid disease diagnosis.  Facing the threat of widely dispersed litigation

in unfavorable courts, defendants inevitably agree to settlement programs not based upon actual

liability.

Of course, over the long term, this has only served to expand the litigation

problem.  Unimpaired claimants have been allowed to "free-ride" on the claims of the truly

impaired because the tort system has encouraged the "parasitic fusion of strong and weak

cases."[68]  Another result is that claim volumes grow because there is no real restriction on the

flow of claims into the system.  Yet another is that claims are asserted against a laundry list of

companies without any real demonstration that the claimant was hurt by any one of them.

---

[67] *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir.) (observing that aggregation
exposes the defendant to "intense pressure to settle"), *cert. denied*, 516 U.S. 867 (1995); *id.* at 1304
("The number of asbestos cases was so great as to exert a well-nigh irresistible pressure to bend the
normal rules."); *Recent Case*, 109 HARV. L. REV. 870 (1996) ("[C]ourts faced with the delay and docket-
crowding promised by [mass tort class actions] tend to encourage settlement."); Francis E. McGovern,
*Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 U.C.L.A. L. REV. 1851, 1858 (1997)
("plaintiffs' attorneys rush to their favorite judges and demand draconian procedures to pressure
defendants to make block settlements.); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88
NW. U. L. REV. 469, 521 (1994) ("Often the pressure for block settlements comes from plaintiffs'
attorneys who hope to get something for a large mass of questionable cases.  Some attorneys . . . will
take almost any case without regard to its merit, hoping for a global settlement.") (footnote omitted).

[68] John A. Siliciano, *Mass Torts and the Rhetoric of Crisis*, 80 CORNELL L. REV. 990, 1010 (1995).

III.    RECENT DEVELOPMENTS HAVE DEPRIVED GRACE OF THE ABILITY TO
        MANAGE ITS LITIGATION AND THREATEN ITS CORE BUSINESS.

Historically, Grace has faced a substantial but predictable volume of asbestos-related litigation.  In recent months, however, as companies have been forced into bankruptcy – a number of which were Grace's codefendants in asbestos litigation – the number of claims against Grace has risen dramatically.  This influx of new claims now threatens Grace's core business operations.

A.      Historically, Grace was able to contain and manage its asbestos litigation
        without impairing its core business.

Historically, Grace has faced three types of asbestos-related claims:  (1) bodily injury claims alleging health effects from exposure to Grace's asbestos containing products, such as MK-3; (2) claims alleging bodily injury from exposure to naturally occurring asbestos in connection with the mining and processing of vermiculite at Grace's mine in Libby, Montana; and (3) property damage claims ostensibly seeking payment for the cost of removing or containing asbestos-containing products in commercial buildings.  The history of each type of litigation is, briefly, as follows:

1.      Claims for bodily injury from asbestos products.

Bodily injury claims are the immediate cause of this Chapter 11.  The vast majority arise from alleged exposure to MK-3, which Grace stopped manufacturing in 1973 – nearly thirty years ago.  While Grace does not believe that the volume of claims filed against the company historically is indicative of its true liability, before the recent and dramatic increase in claim filings, Grace had been able to manage these claims principally through settlement and chose to follow that course.

28

In 1977, Grace received its first claim for bodily injury arising from an asbestos product. Thereafter, during the late 1970s, Grace was sporadically named in asbestos-related bodily injury lawsuits. These lawsuits were relatively insignificant in number and were efficiently managed and resolved. In fact, by 1982 the total volume of claims against Grace was less than 100.

The landscape changed when Johns-Manville filed for bankruptcy in 1982. Thereafter, not a single month passed without Grace receiving a claim, and the claim volume grew. By the end of 1984, Grace had been served with approximately 1,000 lawsuits. By the end of 1990, this number increased to approximately 28,000, and by the end of 1995, nearly 75,000 lawsuits had been filed against Grace. To defend just these bodily injury claims, Grace had incurred cumulative defense costs of over $101 million by the end of 1995.

While Grace considered many of these claims to be meritless, out of necessity Grace implemented a program in the mid-1990s to settle rather than litigate as many claims as possible. This policy was not prompted by trial losses (as of February 28, 2001, Grace had won 44 of the 63 bodily injury claims tried to verdict. It had also obtained additional orders of dismissal for 35,698 claims prior to trial). Instead, Grace adopted an inventory settlement policy because the costs of litigating the huge number of claims being filed was simply prohibitive.

Under this process, Grace negotiated inventory settlements with individual plaintiff law firms pursuant to which it agreed to pay a certain amount of money for each defined category of alleged asbestos-related injuries (for example mesothelioma, lung cancer, other cancers and pleural thickening). For the same disease, however, claim amounts varied significantly by jurisdiction and by plaintiff law firm. Moreover, for economic reasons, Grace

29

was forced to accept a claimant's simple attestation of exposure to a Grace product. Grace could not afford to investigate the validity or reliability of the attestation, the level of exposure or determine if the claimant actually was exposed to other manufacturers' products. Likewise, on the medical side, Grace could not determine other factors that might have contributed to the diagnosed disease. Nor could it seek to contest causation by looking into the claimant's smoking history or into whether a lung cancer had spread from another, non-respiratory organ.

As noted above, Grace pursued the policy of inventory settlements into the late 1990s because it had no alternative. Moreover, this policy appeared financially feasible to Grace. Both its own claims experience and the best actuarial projections showed that new claims were on a downward slope. The following chart shows the annual number of asbestos bodily injury claims served on Grace through 1998, recorded in the year they were actually received by the company:



As depicted above, Grace's 1997 bodily injury claims fell 21.3% from the 1996 peak; 1998 registered an additional 30.8% reduction from 1997 claims volume. Grace's outside actuarial

consultants advised the company that, based on recognized and accepted actuarial models, the

company could expect to see a continuation in this downward trend into the future.

## 2.    Lawsuits arising from the Libby Mine.

In 1967, Grace received the first workers' compensation claim from an employee

at the Libby Mine.  In around 1984, Grace received the first civil complaint.  Complaints came in

slowly and gradually until 1990, when Grace closed the mine and was no longer a local

employer.  Thereafter, complaints increased.

In the 1990's, the general nature of the complaints changed from former employee

suits to those brought by family members who had been exposed to asbestos dust brought home

on an employee's clothing.  After 1995, Grace began to receive complaints from non-employee

present and former residents near the mine, alleging health effects from asbestos exposure.  In

general, claims received prior to 1996 were for individuals with diagnosed asbestosis, whereas

beginning in 1996 individuals bringing claims generally did not have any form of diagnosed

impairment.

In total, 216 cases have been filed arising from the Libby Mine and, of these, 122

are pending.  Of the 94 closed cases, 83 were settled for nearly $22 million and 11 were

dismissed.  The vast majority of the cases have alleged bodily injury.

Recently, however, a medical monitoring class action on behalf of everyone living

in Libby and a property contamination class action covering all property within a twelve mile

radius of the Libby courthouse have been filed.  In addition, a medical screening program has

been implemented by the government for residents and former residents of Libby, Montana.

31

### 3.    Property damage claims.

Grace was served with its first property damage complaint in 1983.  Subsequent cases have almost universally related to Grace's MK-3 product.  There are a limited number of claims for Grace's acoustical plaster and masonry fill products.  Cumulatively, Grace has faced 379 property damage lawsuits covering thousands of buildings.  Of these, over 300 were filed before 1990.

Grace believes these cases were largely without merit and that it was improperly targeted, in some cases due to product misidentification.  For example, in a 1992 case, *In re State of West Virginia Public Building Asbestos Litigation,* a trial judge indicated he would direct a verdict against Grace after the close of plaintiff's case but before Grace had begun its defense on the grounds that asbestos surface products were "hazardous".  After Grace presented its evidence, the judge entered a directed verdict on liability against Grace.  The jury, however, concluded that the evidence failed to establish identification of a Grace product and awarded $0 in damages, whereupon the court set aside the jury's judgment.

Nonetheless, Grace has been able to manage its property damage litigation.  Of the 370 total cases, 207 were settled for approximately $700 million in total; 140 cases were either dismissed or a defense summary judgement order was entered; 9 were tried and won; and 7 were tried and lost with approximately $60 million in awarded damages.

As of February 1, 2001, there were only seven property damage lawsuits pending, all involving allegations concerning MK-3.  Two are on appeal and one on a suspense calendar.  Grace was awaiting a dismissal order in a fourth case due to product misidentification, and the remaining three cases were proceeding.

32

**B.      Even as Grace was attempting to resolve its asbestos liability, it is apparent
now that fundamental flaws in the claims resolution process were destined to
undermine the orderly resolution of claims.**

While Grace historically was able to manage its asbestos-related liability, the

private claims process had fundamental flaws that have now rendered it untenable for Grace.

**1.      An increasing number of bankruptcies created pressure to shift the
litigation target to secondary players.**

Numerous companies faced with asbestos bodily injury claims have been forced

to seek refuge under Chapter 11.[69] In 1993, asbestos plaintiffs' lawyers Ron Motley and Joseph

Rice observed that "seventeen (17) former asbestos defendants – representing one-half to three-

quarters of the original liability share – have gone into bankruptcy."[70] The depletion of resources

that would otherwise be available to compensate asbestos claimants has, in turn, prompted the

plaintiffs' bar to initiate a new wave of litigation to meet ever-increasing demands.[71] As a result,

"[t]he number of companies involved in asbestos litigation has . . . increased, as defendants seek

---

[69] *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong.
at 4 (1999) (statement of Professor Christopher Edley, Jr., Harvard Law School); *The Fairness in
Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 2 (1999)
(statement of Dean Paul R. Verkuil, Cardozo School of Law) ("Today, I understand that at least twenty-
five companies have been forced into Chapter 11 proceedings as a result of asbestos litigation.").

[70] *See* Ronald L. Motley & Joseph F. Rice, *The Carlough Settlement –Blueprint for a Sane Resolution of
the Asbestos Problem*, MEALEY'S LITIG. REP.: ASBESTOS at 24, 25 (July 2, 1993), quoted in Ann E.
Cohen, *Mass Tort Litigation After Amchem*, 2/25/98 ALI-ABA 269, at 277; *see also* REPORT OF THE
NATIONAL BANKRUPTCY REVIEW COMMISSION 315 (Oct. 20, 1997) ("The bankruptcy system offers a
structured system to manage multiple liabilities and has provided a forum for companies with massive
liabilities to attempt to do so.  At least 15 asbestos manufacturers, including UNR, Amatex, Johns-
Manville, National Gypsum, Eagle-Picher, Celotex, and Raytech, have reorganized or liquidated in
attempts to address massive numbers of known and unknown asbestos claimants using Chapter 11 of the
Bankruptcy Code.").

[71] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar.
1991) (observing that "future claimants may lose altogether"); *Amchem*, 521 U.S. at 637 (Breyer, J.,
concurring in part and dissenting in part) (quoting the Judicial Conference Report).

to spread their losses and plaintiffs search for new and previously untapped sources of compensation."[72] As Judge Weinstein observed, "a newer generation of peripheral defendants are becoming ensnarled in the litigation" as plaintiffs' attorneys seek "to expand the number of those with assets available to pay for asbestos injuries."[73] This, despite the fact that "[t]he extent of liability, possible defenses and value of the claims against these new defendants is unknown."[74] By 1986, close to 500 corporations had been named as lead defendants in federal asbestos cases.[75]

More recently, increased claims filings and demands have been made against secondary players who had modest roles and had survived the earlier waves of the litigation. In 1999, the sums demanded by plaintiffs for settlement of claims rose dramatically. Pressure was increased as plaintiffs' attorneys became more aggressive. "[C]ompanies in a vast number of industries . . . experienced a significant increase in the volume of asbestos lawsuits."[76]

---

[72] Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 561 (1992).

[73] *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 747.

[74] *Id. See also* Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., (Apr. 12, 2000), at B1 ("You have to look under every stone. . . . The deeper you dig into the industry, the more you find.") (quoting plaintiff attorney James Early). The Judicial Conference Report warned of such developments when it concluded that "exhaustion of assets threatens and distorts the process" of compensating asbestos claimants. REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3 (Mar. 1991).

[75] DEBORAH R. HENSLER, ASBESTOS LITIGATION IN THE UNITED STATES: A BRIEF OVERVIEW 5 (1991) (citing TERENCE DUNGWORTH, PRODUCT LIABILITY AND THE BUSINESS SECTOR: LITIGATION TRENDS IN FEDERAL COURTS 26 (Rand Inst. 1988)).

[76] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform (Nov. 28, 2000); Paul M. Sherer, *New Credit Aids Federal-Mogul in Asbestos Battle*, WALL ST. J., Jan. 4, 2001, at A10

(continued...)

The inevitable was not long in the making: a new wave of Chapter 11 filings soon followed in 1999 and 2000. Thus, faced with significant increases in settlement demands, Babcock & Wilcox, a boiler manufacturer, was forced to seek protection within the bankruptcy system.[77] Despite the fact that its connection to asbestos was circumscribed, hundreds of thousands of asbestos claims had been filed against it. As settlement demands increased in late 1999, the company was compelled to seek refuge under Chapter 11.[78]

Pittsburgh Corning followed Babcock in April 2000.[79] Soon thereafter in October, Owens Corning, one of the major producers of asbestos products, sought protection under Chapter 11. Although Owens Corning had undertaken a significant effort in the late 1990's to establish a national system for the resolution of its asbestos claims, the company was

---

[76] (...continued)
(observing that "[p]laintiffs' attorneys have become more aggressive, targeting companies with even passing links to asbestos"); Richard B. Shmitt, *How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial*, WALL ST. J., Mar. 5, 2001, at A1 ("The Internet has been a further engine for growth. . . . Several lawyers use the Web to refer big asbestos-injury cases to other lawyers, earning what are, in essence, brokerage fees."); Gregory Zuckerman, *Specter of Costly Asbestos Litigation Haunts Companies*, WALL ST. J., Dec. 27, 2000, at C1 ("Plaintiffs' attorneys have become more aggressive, by targeting all kinds of companies with a passing link to asbestos."); *Time to Bring Order to Asbestos Litigation*, ENG. NEWS-RECORD, Dec. 18, 2000, at 148 ("Like dominoes falling in a row, [companies] are filing for Chapter 11 protection to survive the crushing load of these lawsuits, which in turn pushes the lawsuits further down into the industry.").

[77] Melanie Trottman, *Babcock Files for Protection of Chapter 11*, WALL ST. J., Feb. 23, 2000, at A10; Alan Sayre, *Babcock & Wilcox Seeks Bankruptcy*, AP ONLINE (Feb. 22, 2000).

[78] *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy*, MEALEY'S LITIG. REP.: ASBESTOS, Mar. 3, 2000, at 18.

[79] Jim McKay, *140,000 Asbestos Lawsuits Force Filing*, PITTSBURGH POST-GAZETTE, Apr. 18, 2000, at F1 ("Pittsburgh Corning Corp. yesterday filed for Chapter 11 protection from creditors, saying bankruptcy is the only way it can reasonably deal with 140,000 lawsuits seeking damages over asbestos insulation.").

still overwhelmed by new claims.[80]  Despite its efforts to manage its liability, "[p]laintiffs

attorneys who didn't enter into the national settlement continued to bring suits and demand larger

payments."[81]

Armstrong World Industries filed for Chapter 11 protection in December of last

year,[82] as did engineering firm Burns & Roe.[83]  And in January G-I followed suit after paying

$1.5 billion to settle more than 500,000 asbestos claims.[84]

---

[80]  Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform, Nov. 28, 2000, at 2 (observing that Owens Corning "underestimated the size of its liability, the number and severity of claims that sought to participate in the program, and, most important, the number of likely opt-outs").

[81]  Queena Sook Kim, *Firms Hit By Asbestos Litigation Take Bankruptcy Route*, WALL ST. J., Dec. 21, 2000, at B4. *See also Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE (10/5/00) (citing "a flurry of recent new filings from plaintiff lawyers not participating in the NSP"); John Seewer, *Owens Corning Seeks Bankruptcy*, CHICAGO SUN-TIMES 4, Oct. 5, 2000, at 4 (citing the "cost of resolving claims, combined with new legal filings" as reason for bankruptcy).

[82]  *See* Jonathan D. Glater, *For Armstrong, Bankruptcy is Lesser of Two Evils*, N.Y. TIMES, Dec. 12, 2000, at C4; Queena Sook Kim, *Armstrong Holdings Unit Files Under Chapter 11*, WALL ST. J., Dec. 7, 2000, at A4; *Armstrong World Industries Seeks Bankruptcy Protection Reorganization: Firm Threatened by Mounting Asbestos Liability Claims Will Develop New Strategy*, L.A. TIMES, Dec. 7, 2000, at C3.

[83]  *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-RECORD, Dec. 18, 2000, at 22 (citing "spike" in plaintiff demands and new filings).

[84]  *See* Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases*, WALL ST. J., Jan. 8, 2001, at B12 ("Repeating a refrain common among companies with asbestos liability, G-I said that despite settling more than 500,000 claims to the tune of $1.5 billion, there was no ebb in the tide of personal-injury claims.  In fact, G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection*, 14 ASBESTOS & LEAD ABATEMENT REP., Feb. 1, 2001 ("Almost 70,000 claims were filed against the company last year, nearly double the number filed in 1996.").