The string of companies seeking resolution of their asbestos-related liability

through Chapter 11, coupled with the increasing pressures placed upon those companies

remaining outside the system, have led many observers to predict that there is "no end in sight."[85]

## 2.    There was no practical check on the accelerated claims filings and increased demands against non-bankrupt companies.

Many of the companies recently entering the bankruptcy system have cited

dramatic increases or "spikes" in the claims filed against them and in settlement demands.[86]

These increases bear no apparent relation to changes in liability or trends in disease.  Yet, there is

no mechanism in place to stem the new filings and escalating settlement demands against the

companies that remained outside of bankruptcy.

For all the reasons catalogued above, defendants have no effective recourse in the

courts.  Indeed, the threat of high volume litigation in unfavorable jurisdictions is precisely what

---

[85] *See* Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 8, Nov. 11, 2000 ("According to our industry sources, without legislative action many more companies will also be forced to file for bankruptcy within the next two years owing to rising costs per claim."); Jeff St. Onge, *Owens Corning Bankruptcy Shows Scope of Asbestos Issue*, DAILY BANKRUPTCY REV., Oct. 9, 2000 ("A flood of asbestos lawsuits since the mid-1960s have produced specialty law firms that are fleshing out new clients and cases at an awesome rate.  With an ever-increasing tide of lawsuits, growing by 50,000 a year by one estimate, the asbestos issue seems destined to throw several more companies into bankruptcy.").

[86] *See, e.g., Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability,* PR NEWSWIRE, Oct. 5, 2000 ("[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participated in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."); *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief,* ENG. NEWS-RECORD, Dec. 18, 2000, at 22 (noting that "'the number of cases brought against the company increased markedly'"); Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases,* WALL ST. J., Jan. 8, 2001, at B12 ("G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection,* ASBESTOS & LEAD ABATEMENT REP., Feb. 1, 2001 (citing "nearly double the number [of claims] filed in 1996" as reason for bankruptcy).

empowers claimants and their lawyers to shift and escalate their settlement demands essentially at will. The criteria used in resolving claims have also proven to be a problem rather than a cure. They have failed to screen out invalid claims, which continue to inundate the system.

Finally, the lack of a unified docket and lack of coordination among claimants' counsel, who often "have highly individualistic styles and different approaches toward discovery and trial," make resolution of the problem through negotiation impossible. *See* MANUAL FOR COMPLEX LITIGATION § 33.24, at 317 (Federal Judicial Center 3d ed. 1995). Indeed, the rate of new filings has been spurred by the "arrival of new plaintiff firms that apparently desire to move large numbers of cases to generate substantial fees."[87] This dynamic apparently was fatal to Owens Corning's National Settlement Program.

### C.    In recent months, claims against Grace suddenly skyrocketed and now have forced Grace into Chapter 11.

The filing of this case is merely the latest development in the same story: Grace too faced increased filings in 1999 and – as the new bankruptcies were filed – the unchecked, uncontrolled claims process shifted its sights to Grace, and the claims volume took off.

More specifically, as noted above, claims against Grace peaked in 1996 and showed an established, steady downward trend. The trend was not temporary. It lasted for years. As shown in the following figure, the trend ended in 1999, with a 28% increase in that year. And that increase was only a prelude to the 81% increase experienced in the year 2000:

---

[87] Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 3, Nov. 28, 2000.



These trends have continued into the beginning of this year.  Claims were served in January of this year at a rate 374% higher than January of 2000.  February 2001 claims were served at a rate 207% higher than February of 2000.

Even as bodily injury claims volume was shifted to Grace, numerous nation-wide and individual state class action lawsuits have been filed concerning Grace's attic insulation product, a product that was never before the subject of litigation.  In the last year or so, nine lawsuits have been filed seeking removal of ZAI from the attics of residential homes.[88]  This,

---

[88]  Of the nine pending lawsuits, four are state class actions: *Barbanti v. W.R. Grace & Co. – Conn.*, No. 00201756-6 (Spokane Cty., Wash.); *Daily v. W.R. Grace & Co. – Conn.*, No. 00-L-656 (Madison Cty., Ill.); *McMurchie v. W.R. Grace & Co. – Conn.*, No. PI 00-0015072 (Hennepin Cty., Minn.); and *Harris v. W.R. Grace & Co.*, No. 833392-2 (Alameda Cty., Ca.).  Four are federal class action lawsuits transferred and coordinated by the Judicial Panel on Multidistrict Litigation in *In re: Zonolite Attic Insulation Products Liability Litigation*, MDL No. 1376 (D. Mass.): *Lindholm v. W.R. Grace & Co.*, No. 00 CV 10323 (D. Mass.); *Price v. W.R. Grace & Co.*, No. CV 00-71-M (D. Mt.); *Hunter v. W.R. Grace & Co.*, No. 00-569 (S.D. Ill.); *Walsh v. W.R. Grace & Co.* (Hennepin Cty., Minn. Filed Oct. 6, 2000).  The ninth is an individual lawsuit that has been removed to federal court, *Nelson v. W.R. Grace & Co. – Conn.,* No. BDV 01-110 (Cascade Cty., Montana).

despite the fact that, as is detailed more fully below, the evidence shows that the asbestos levels in homes with ZAI are no higher than ambient levels in the normal air everyone breathes.

## IV.    THE BANKRUPTCY SYSTEM IS NOW THE ONLY AVAILABLE MEANS FOR THE ADJUDICATION AND RESOLUTION OF ASBESTOS CLAIMS.

Attempts to resolve the asbestos litigation problem globally outside the bankruptcy system have failed. Confronted with appellate disapproval of class certification for litigation purposes, judges and attorneys have proposed collective settlement of asbestos claims within the tort system, using class-action mechanisms. These approaches, however, have not survived appellate review. In two recent cases, *Ortiz v. Fibreboard Corp.* and *Amchem Products, Inc. v. Windsor*, the Supreme Court blocked class-action settlements. Similarly, while a number of proposals for legislative solutions have been advanced, Congress has failed to act.

As a result, the bankruptcy system is now the only available means to deal with the asbestos problem. Fortunately, bankruptcy affords unique procedures that can be applied to both define asbestos liability and resolve valid claims.

### A.    The Supreme Court has foreclosed use of Rule 23 class settlements to resolve asbestos claims.

The Supreme Court has rejected proposals for settlement of asbestos claims within the tort system not once, but twice. The Court has not turned a blind eye to the magnitude of the problem. Indeed, it has cited most of the widely-recognized flaws that have led courts and commentators alike to conclude that the system is in a state of "crisis." Nonetheless, the Court has ruled consistently that there are significant legal barriers to collective settlement of asbestos claims within the tort system.

In *Amchem Products, Inc. v. Windsor*, the Supreme Court invalidated an asbestos class certification and settlement on the grounds that common issues of law or fact did not predominate as required under Rule 23(b)(3) and the named parties would not "adequately protect the interests of the class" as required under Rule 23(a)(4). 521 U.S. 591, 625-26 (1997). Taking a cue from the Advisory Committee's Note to the 1966 revision of Rule 23(b)(3), which indicated that the class action device ordinarily was not appropriate for resolution of "mass accident" claims,[89] the Court recognized that consolidation within the tort system is inconsistent with the basic legal requirement of individualized determinations of individual issues.[90] *Id.* at 625. The Court observed that because the class members were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time, resulting in disabling disease for some plaintiffs and no physical injury for others, the commonality requirement of Rule 23(b)(3) was not satisfied. *See id.* at 609, 624.

Moreover, the Court expressed grave concern about the fairness of the settlement itself because of what it viewed as the serious conflicts of interest of the attorneys representing the class. *Id.* at 626. As the Court observed, "the interests of those within the . . . class are not aligned." *Id.* More specifically, the Court noted that "for the currently injured, the critical goal is

---

[89] Advisory Committee Note, FED. R. CIV. P. 23(b)(3) ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.").

[90] *See also* REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 19 (Mar. 1991) ("[C]ourts of appeals generally have not been amenable to class actions in mass tort cases. One reason for this reluctance has been the view that tort claims require individualized proof of claims.").

generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."  *Id.*

More recently, in *Ortiz v. Fibreboard Corp.*, the Court overturned an asbestos class action settlement certified under 23(b)(1)(B).[91]  Justice Souter's opinion for the Court recognized that asbestos litigation "defies customary judicial administration."  527 U.S. 815, 821 (1999).  Nonetheless, the Court concluded that the drafters of Rule 23 "did not contemplate that the mandatory class action codified in subdivision (b)(1)(B) would be used to aggregate unliquidated tort claims on a limited fund rationale."  *Id.* at 843.  In so ruling, the Court followed the analysis of a number of commentators who had observed that Rule 23(b)(1)(B) was not intended to be utilized in the mass-tort context to supplant bankruptcy proceedings.[92]  Indeed, as the Second Circuit had recognized, use of the class action device to resolve asbestos mass-tort liability "would surely lead to further evasion of the Bankruptcy Code as other debtors sought relief in mandatory class actions."[93]  The Court in *Ortiz* observed that there were "serious constitutional concerns" implicated by such efforts.  *Id.* at 845.

---

[91]  The class action settlement was negotiated with the aid of Judge Higginbotham of the Fifth Circuit who acted as a "settlement facilitator" and was certified by Judge Parker of the Eastern District of Texas. *In re Asbestos Litig.*, 90 F.3d 963, 970 (5th Cir. 1996), *vacated*, 521 U.S. 1114 (1997).  Certification of the settlement class action was affirmed by the Fifth Circuit over Judge Smith's dissent.  *In re Asbestos Litig.*, 134 F.3d 668 (5th Cir. 1998), *rev'd*, 527 U.S. 815 (1999).

[92]  *See, e.g.,* Henry Monaghan, *Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members*, 98 COLUM. L. REV. 1148, 1164 (1998) ("The 'framers' of Rule 23 did not envision the expansive interpretations of the rule that have emerged. . . .  No draftsmen contemplated that, in mass torts, (b)(1)(B) 'limited fund' classes would emerge as the functional equivalent to bankruptcy by embracing 'funds' created by the litigation itself.");  *see also In re Asbestos Litig.*, 134 F.3d at 670, 672 (Smith, J., dissenting) (concluding that District Court's decision to approve a limited fund class to settle asbestos mass-tort claims was "manifestly incorrect" because it "avoid[ed] the procedural protections of the bankruptcy code").

[93]  *In re Joint E. and S. Dist. Asbestos Litig.*, 14 F.3d 726, 732 (2d Cir. 1993).

Such concerns led the Court to find that the *Ortiz* class certification was defective. Much as it had in *Amchem*, the Court focused on the "divergent interests of the presently injured and future claimants." *Id.* at 853. It observed that plaintiffs' counsel had an "egregious" conflict because their interest was in "generous immediate payments," whereas future claimants' interest lay in "an ample, inflation-protected fund for the future." *Id.* at 853, 856. As a result, the Court determined that "the applicability of Rule 23(b)(1)(B) to a fund and plan purporting to liquidate actual and potential tort claims is subject to question and its purported application in this case was in any event improper." *Id.* at 815. Such rulings have effectively blocked resolution of asbestos claims within the confines of the tort system.

**B.      Proposed legislative resolutions also have failed.**

The Supreme Court urged Congress to act on the asbestos problem. In *Amchem*, the Court observed that "a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure." 521 U.S. at 628-29. In *Ortiz*, the Court concluded that the "elephantine mass of asbestos cases . . . defies customary judicial administration and calls for national legislation." 527 U.S. at 821; *see also id.* at 865 (Rehnquist, C.J., concurring) (observing that the asbestos crisis "cries out for a legislative solution").

These calls for action, however, were not new. A variety of other voices, including the asbestos manufacturers and their insurers as well as neutral commentators, had been urging Congress to act for many years. These calls led to congressional consideration of, but no action

43

on, the problem.[94]  In 1981 and 1982, Congress considered three different bills to address the

problem by setting up a fund to pay benefits to victims of asbestos-related disease.[95]  In 1983,

Congress considered the Occupational Disease Compensation Act, which would have made

compensation from a national insurance pool the exclusive remedy for asbestos-related claims

brought against employers.[96]  In 1984, Congress considered the Asbestos Workers' Recovery Act,

which would have established a compensation fund fed by government and industry to serve as

the exclusive remedy for injured workers against their employers and asbestos manufacturers.[97]

      Similar efforts continued throughout the 1990s.  In 1991, prodded by the Judicial

Conference Committee Report urging Congress to consider a legislative resolution to the asbestos

litigation crisis,[98] Congress again convened hearings on the matter,[99] yet took no action.  Indeed,

---

[94]  DEBORAH R. HENSLER ET AL., ASBESTOS IN THE COURTS: THE CHALLENGE OF MASS TOXIC TORTS 29 (Rand Inst. 1985); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 555 (1992) ("The sheer number of asbestos cases pending in the courts has led to calls for congressional action by commentators, district judges, circuit court judges and even by a judicial conference chaired by the Chief Justice of the United States Supreme Court. Yet despite the increasingly desperate situation faced by the courts, Congress has consistently failed to adopt a national response to the crisis." (footnotes omitted)).

[95]  Asbestos Health Hazards Compensation Act, H.R. 5224, 97th Cong., 1st Sess. (1981) (the "Fenwick bill"); Asbestos Health Hazards Compensation Act, S.1643, 97th Cong., 1st Sess. (1981) (the "Hart bill"); Occupational Health Hazards Compensation Act, H.R. 5735, 97th Cong., 2d Sess. (1982) (the "Miller bill").

[96]  H.R. 3175, 98th Cong., 1st Sess. (1983).

[97]  *Asbestos Workers' Recovery Act*, S. 2708, 98th Cong., 2d Sess. (1984).

[98]  *See* REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 3, 27 (Mar. 1991); *see also Amchem*, 521 U.S. at 598 ("As recommended by the Ad Hoc Committee, the Judicial Conference of the United States urged Congress to act. . . . To this date, no congressional response has emerged.").

[99]  *See Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on*
(continued...)

44

as recently as this past year, recognizing that "[a]sbestos personal injury litigation is unfair and inefficient, and imposes a crushing burden on litigants and taxpayers alike,"[100] Congress held hearings on the Fairness in Asbestos Compensation Act, which would have created a nationwide administrative claims-resolution process to compensate asbestos victims "rationally and efficiently."[101]  Unfortunately, the Act met the same fate as its predecessors and never made it out of Congress.[102]

## C.    Chapter 11 affords established procedures which can be used to define and resolve mass-tort liability.

Given the Supreme Court's recent rulings concerning the class action device and Congress's failure to act, the bankruptcy system remains the only available option for defining and resolving Grace's asbestos liability.  Fortunately, Chapter 11 "offers a structured system to manage multiple liabilities and has provided a forum for companies with massive liabilities to attempt to do so."[103]

---

[99] (...continued)
*Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. (Oct. 24, 1991 and Feb. 26-27, 1992).

[100] *Fairness in Asbestos Compensation Act of 1999*, H.R. 1283, 106th Cong., 1st Sess. § 2(1), at 1.

[101] 145 Cong. Rec. S3457-01, at *3509 (Sen. Ashcroft).  *See also* H.R. 1283, 106th Cong., 1st Sess.  at 1 (stating that purpose of Act was to "establish legal standards and procedures for the fair, prompt, inexpensive, and efficient resolution of personal injury claims arising out of asbestos exposure").

[102] *See Hyde Puts Off Asbestos Reform Measure Until Next Year*, CONGRESS DAILY (Nov. 2, 1999) (noting that Chairman Hyde "put the brakes on asbestos litigation reform litigation moving through his committee, announcing his intention to take the bill off the table until early 2000"); Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 4, Nov. 28, 2000 ("[T]he Clinton Administration and the Association of Trial Lawyers of American fought the bill as an infringement of individual rights" and as a result "[t]he bill was killed.").

[103] 1 REPORT OF THE NATIONAL BANKRUPTCY REVIEW COMMISSION 315, Oct. 20, 1997.

Over the years, courts in prior mass-tort bankruptcies have evolved (and improved upon) procedures designed to facilitate the resolution of mass-tort claims. Those procedures include:

- Consolidation of all claims in one court.

- Preclusion of collateral litigation in other courts.

- A procedure for identifying the universe of existing claims.

- Representation of future claimants.

- Consolidation (through a committee) of claimants' counsel.

- Procedures for disallowing invalid claims, by way of objections and litigation over claim validity.

- Procedures for establishing the criteria to be used in settling claims.

- Creation and funding of a trust, pursuant to the debtor's plan of reorganization, with criteria and procedures for evaluating, classifying and paying valid claims.

- A permanent injunction channeling all tort claims that might otherwise be brought against the debtor or its affiliates to a post-confirmation trust.

This section briefly reviews the evolution of these procedures, followed by a summary, in the next section, of how such procedures should be deployed in this case.

## 1.    Johns-Manville

Early mass-tort bankruptcies demonstrated the importance of controlled litigation within the bankruptcy system. While the original Johns-Manville plan of reorganization established an important precedent for channeling all claims to a post-confirmation trust, the Manville Trust nonetheless failed initially because it allowed the uncontrolled return of claims to the tort system. Specifically, the Manville Trust's design allowed all claimants to go back to the

tort system to litigate their claims 120 days after they filed a claim against the Trust. Claimants

proceeded to litigation en masse all over the country, forcing the Trust to litigate on several fronts

at once and thereby draining resources that could have been used to compensate claimants.[104]

        Judge Weinstein, who intervened during the Manville bankruptcy proceedings and

corrected some of the early problems with the Trust, observed that the problems stemmed in part

from the influence of certain plaintiffs' attorneys who "used their control [of the Trust] to amass

huge fees for themselves, stripping the trust of its assets, despite the efforts of the courts

supervising the trust to limit the fees to reasonable amounts."[105]  Indeed, Judge Weinstein

observed that there "was a frenzied offense by plaintiff's bar to dispose of claims by the hundreds

and thousands at a time and collect fees before the Trust went broke" and that "[t]he hundreds of

millions of dollars in fees received by plaintiffs' attorneys made assembling large stables of

claimants hugely profitable."[106]  Due to flaws in the plan and high administrative costs, the

---

[104] *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. at 753; Frank Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future*, 17 CARDOZO L. REV. 583, 602-03 (1996) ("The Trust mechanism was poorly designed and highly vulnerable to litigation. . . .  The Trust did little to effectively apportion its funding among all possible claimants because their settlements were docket driven.").

[105] JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 57, 106 (1995) ("Whether it consists of a trust, a foundation, or some other type of institution, a vehicle for fund distribution must be absolutely free of insider abuse. . . .  If plaintiffs control the appointment of attorneys, administrators, accountants, and trustees, the entity loses its independence.  Such control by those who brought the first major asbestos claims in the Manville bankruptcy is one of the factors that led to the rapid disintegration of the Manville Trust and the need for court intervention to replace management and restructure operations.").  *See also*  Frank Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future*, 17 CARDOZO L. REV. 583, 603 (1996)("The Trust, in essence, was captured and held hostage by the plaintiffs' bar.").

[106] *In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. at 758. *See also* Frank Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future*, 17 CARDOZO L. REV. 583, 604 (1996).

Manville claims-resolution process had to be drastically overhauled. *See In re Johns-Manville Corp.*, 982 F.2d 721, 727 (2d Cir. 1992), *modified*, 993 F.2d 7 (2d Cir. 1993).

### 2.    A.H. Robins

In contrast to the early Manville experience, the procedures established in the reorganization of A.H. Robins proved quite successful in resolving claims fairly and efficiently. A.H. Robins faced an "avalanche of actions filed in various state and federal courts throughout the United States . . . seeking damages for injuries allegedly sustained by the use of an intrauterine contraceptive device known as a Dalkon Shield." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 996 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986). Mindful of the Manville history, the *Robins* court approved a plan that offered flexible and easy-to-administer payment options that encouraged the orderly resolution of claims. The Dalkon Shield claimants were permitted to litigate their claims, but not at the expense of those who did not wish to do so.[107]

The Dalkon Shield Trust was able to resolve thousands of pending claims quickly by avoiding the costs associated with litigation.[108] Of the over 350,000 claims filed, only about 6,600 claimants initially elected arbitration or trial.[109] Thus, the vast majority of claimants found

---

[107] *See* Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)?*, 61 FORDHAM L. REV. 617, 637-51 (1992).

[108] *See, e.g.,* JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 280-81 n.88 (1995) ("Some trust mechanisms have functioned very well. The Dalkon Shield Claimants Trust has been, on the whole, a success."); Georgene M. Vairo, *Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution*, 31 LOY. L.A. L. REV. 79, 153 (1997) (observing that the Dalkon Shield Trust's approach to resolving claims "worked well").

[109] Georgene M. Vairo, *Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution*, 31 LOY. L.A. L. REV. 79, 145 (1997).

immediate compensation offered by the Trust to be "fair and just."[110] Of the remaining 6,600

claims, only a handful ultimately proceeded to an arbitration hearing or trial. As of 1997, fewer

than 300 of the claims were in arbitration or litigation, and about half of those claims had been

resolved. The Trust was able not only to reduce administrative costs, but also to resolve pending

tort claims "in about half the time contemplated."[111] All told, by 1997 virtually all of the claims

had been resolved for far less than the $2.4 billion fund (as augmented by accumulated interest

from investments) approved by the court to cover all tort claims through the post-confirmation

trust.[112] In comparison with the Manville Trust, the Dalkon Shield Trust, during the first four

years of its operation, processed five times as many claims, paid the full face amount of its

settlement offers, and incurred one-tenth the administrative cost per claim.[113]

The success of the Dalkon Shield Trust (and the failure of the Manville Trust)

demonstrated the importance of avoiding continued mass-tort litigation and employing flexible

payment options.

### 3.    Dow Corning

These lessons were taken to heart in the subsequent Dow Corning reorganization.

In 1992, the Food and Drug Administration ordered that silicone-gel breast implants be taken off

the market due to concern that they may cause connective tissue disease. *In re Dow Corning*

---

[110] *Id.* at 154.

[111] *Id.* at 155.

[112] *Id.* at 126-27.

[113] *See* Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)?*, 61 FORDHAM L. REV. 617, 655-56 (1992). In 1992, for example, the Dalkon Shield Trust spent $400 per claim on administrative costs whereas the Manville Trust spent $4,900. *See id.* at 656 n.140.

*Corp.*, 211 B.R. 545, 551 (Bankr. E.D. Mich. 1997).  On the heels of the FDA's action and the

attendant publicity, a wave of lawsuits against breast implant manufacturers soon followed.  In

1992, more than 3,000 such suits were commenced, including dozens of class actions.  Another

15,000 actions were filed in 1993 and 1994.  *Id.*  Dow Corning faced the prospect of defending

itself simultaneously in multiple trials and experienced "exorbitant settlement demands" from

plaintiffs' lawyers attempting to use the leverage from the looming trial dates to extract

concessions.  *Id.* at 553.  Unable to meaningfully litigate the mass of claims in the tort system,

Dow Corning sought resolution of the claims through procedures available within the bankruptcy

system.

        At the outset, Dow Corning objected to the asserted claims on the ground that there

was no scientific evidence or expert opinion testimony admissible, under the standards set forth in

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to support a finding that silicone

gel breast implants caused disease.  *See In re Dow Corning Corp.*, 211 B.R. at 554; *In re Dow*

*Corning Corp.*, 215 B.R. 346, 348 (Bankr. E.D. Mich. 1997).  Accordingly, Dow Corning asked

the bankruptcy court to (1) determine whether the claimants' scientific evidence was admissible

under *Daubert*, and (2) grant its motion for summary judgment and disallow thousands of pending

disease claims for lack of sufficient admissible evidence of causation.  The court agreed that it

could adjudicate such threshold issues in order to assess the validity of the asserted claims.  *See In*

*re Dow Corning Corp.*, 215 B.R. at 352.  Estimation of those claims that were not disallowed

would proceed following adjudication of the debtor's liability.  *See In re Dow Corning Corp.*, 211

B.R. at 555.

While the debtor's summary judgment motion on threshold issues of disease causation was pending – and against that backdrop – the parties negotiated a consensual plan of reorganization.[114] That plan set out criteria for allowable disease claims, provided for efficient and fair compensation mechanisms for those who opted to settle, and further provided that unsettled claims would be subjected to a controlled litigation process that would provide the opportunity for resolution of the same threshold, scientific issues.

The Dow Corning plan has been confirmed, *In re Dow Corning Corp.*, 244 B.R. 718 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445, 545 (E.D. Mich. 2000) , and the appeal of the confirmation order is pending.

### 4.    Babcock & Wilcox

Most recently, proposed procedures similar to those implemented in the Robins and Dow Corning bankruptcy proceedings were proposed in an asbestos Chapter 11 by Babcock & Wilcox. The initial procedures (withdrawal of reference, bar dates, special claim forms) have been approved by the court, and the case is underway.

As noted above, Babcock & Wilcox, much like Grace, faced increasing settlement demands and was forced to seek protection under Chapter 11. At the debtor's request, the District Court first partially withdrew the reference from the bankruptcy court to resolve threshold issues

---

[114] After ruling that it had the power to decide the summary judgment motions, the bankruptcy court declined to consider the motions and deferred their consideration to the District Court. While the summary judgment motions were pending, and after preliminary hearings regarding the motions had been held before the District Court, the parties negotiated a consensual plan of reorganization, which received the necessary approving votes and was approved by the bankruptcy court on November 30, 1999.

51

relating to the company's liability concerning various categories of claims. *See In re The Babcock & Wilcox Co.*, 2000 WL 422372 (E.D. La. 2000).

The court then set a bar date and crafted a special proof of claim form to be used in setting out the factual basis for claims. The bar date is due to expire soon, and the court anticipates "motions for summary judgment on threshold liability issues." *Id.* at *5. The threshold issues the court will consider include "the appropriate standard of liability, the availability of punitive damages, the validity of claims by unimpaired individuals, the validity of claims based on unreliable scientific evidence of disease and/or causation, the appropriate statute of limitations, and the applicability of the sophisticated purchaser and government contractor defense." *Id.* at *4.

Absent a negotiated plan of reorganization, the debtor will seek to (1) disallow claims based upon summary judgment rulings; (2) estimate the value of remaining claims; and (3) structure a trust to pay valid claims post-confirmation.

## V.   WHAT SHOULD BE ACCOMPLISHED IN THESE CHAPTER 11 PROCEEDINGS.

The tools developed in prior mass-tort bankruptcies can be adapted to this case. This section of the brief outlines the procedures that may be followed.

### A.   The central task is to return claims resolution to a controlled and rationalized process that pays only valid claims.

In the mass-tort context, the goal must be to obtain "a single, uniform, fair and efficient resolution of all claims growing out of a set of [related] events."[115] The procedures

---

[115] Edward H. Cooper, *The (Cloudy) Future of Class Actions*, 40 ARIZ. L. REV. 923, 947 (1998).

developed by bankruptcy courts in the past provide a means to achieving this end.  The current

spike in claims experienced by Grace not only is unwarranted, it is unmanageable.  While the

automatic stay will stop this uncontrolled flow of claims, the central goal of the case must be to

define a universe of valid claims and provide for the payment of such claims through a post-

confirmation trust.

**B.     The only available vehicle for accomplishing this task is to enforce the proof
         and liability requirements whose absence has brought Grace here.**

Critical in this process is to cure the problem that has led to Grace's filing:

Claimants have not had to meet well-established proof and liability requirements because mass

settlements eroded or abrogated such requirements.  Indeed, a number of commentators have

observed that such rational determinations of liability concerning asbestos claims have been

lacking in the tort system where the courts have failed to engage in stringent judicial "gate

keeping" in order to weed out "weak and frivolous claims."  *Castano v. American Tobacco Co.*,

84 F.3d 734, 747 n.24 (5th Cir. 1996) (observing that, if such scrutiny were applied, "even a mass

tort like asbestos could be managed . . . in a way that avoids judicial meltdown").  The

fundamental problem is that "[t]he ordinary tort-law requirement that a claim be supported by an

injury has been lost in asbestos. . . .  Today, given the volume of claims and the disappearance of

any effective injury requirement, defendants are paying those who are not really injured."[116]

---

[116] REPORT OF THE ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS
TORTS, REPORT ON MASS TORT LITIGATION 2, Feb. 15, 1999 (comments of John Aldock).

C.    **The District Court should maintain jurisdiction over all matters regarding Grace's tort liability.**

In order to move the case forward, Grace is asking the District Court to use its power to control all matters relating to Grace's tort liability.[117]  Only in this fashion can Grace's liability be defined once and for all and the procedures available to the District Court used effectively.

Two steps are required: first, staying any collateral litigation outside the bankruptcy proceedings, which may affect the debtor's estate; second, retaining jurisdiction over issues relating to Grace's tort liability.

1.    **Protection against collateral litigation.**

The centralization of the litigation is expressly provided for under existing bankruptcy rules through the automatic stay of pending litigation.  The automatic stay serves the dual purpose of (1) giving the debtor a breathing spell from the pressures that precipitated its bankruptcy filing and (2) protecting creditors by promoting the bankruptcy goal of equal treatment. *Constitution Bank v. Tubas*, 68 F.3d 685, 691 (3d Cir. 1995); *Taylor v. Slick*, 178 F.3d 698, 702 (3d Cir. 1999), *cert. denied*, 528 U.S. 1079 (2000);  *See also Matter of Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1182 (5th Cir. 1986) ("The purpose of the automatic stay is to give the debtor a 'breathing spell' from his creditors, and also, to protect creditors by preventing a race for the debtor's assets."), *cert. denied*, 483 U.S. 1005 (1987).

The automatic stay "is of broad scope," *Tubas*, 68 F.3d at 691, "affording the parties and the Court an opportunity to appropriately resolve competing economic interests in an

---

[117]  Edward H. Cooper, *The (Cloudy) Future of Class Actions,* 40 ARIZ. L. REV. 923, 947-49 (1998).

orderly and effective way," *Taylor*, 178 F.3d at 702.  It is designed "to protect debtors from

creditors and creditors from each other."  *Matter of Walker*, 51 F.3d 562, 566 (5th Cir. 1995)

(citing S. Rep. No. 989, 95th Cong., 2d Sess. 49-55 (1978)).  In furtherance of that purpose, the

automatic stay makes clear the bankruptcy court's centralized jurisdiction over the debtor's assets

and "forestall[s] the race to levy upon or make claims against the debtor's property with possibly

inconsistent results."  *Holland America Ins. v. Roy*, 777 F.2d 992, 995 (5th Cir. 1985).[118]

   In the present case, the automatic stay should be supplemented by issuance of an

injunction barring certain fraudulent conveyance and asbestos-related litigation against entities

formerly affiliated with Grace.  As set forth in Grace's "Plaintiffs' Motion for a Temporary

Restraining Order and Preliminary Injunction Staying All Asbestos-Related and Fraudulent

Transfer Claims Against Affiliated Entities," that litigation purports to raise issues concerning

assets of the estate in this case.  Those issues should be resolved in the sole proceeding designed

to muster and preserve those assets, i.e., the present case.  These matters are set forth in more

detail in the motion itself, which was filed contemporaneously with this Informational Brief.

  **2.  Maintaining jurisdiction in the District Court.**

   The second prong of Grace's proposal to centralize the litigation involves exercise

by the District Court of jurisdiction, at least initially, over the tort liability issues that are raised by

this case.  This proposal is set forth in Grace's Motion to Partially Withdraw the Reference and

---

[118]  The automatic stay is "designed 'to protect the debtor from an uncontrollable scramble for its assets
in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a
remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a
reasonable respite from protracted litigation, during which they may have an opportunity to formulate a
plan of reorganization for the debtor.'" *In re Continental Airlines*, 177 B.R. 475, 479 (D. Del. 1993)
(quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 998 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986)).

also is outlined briefly below.  In essence, by retaining jurisdiction over tort liability issues, the District Court can achieve three basic goals: (1) by-passing jurisdictional disputes concerning the power of the bankruptcy court to resolve bodily injury claims; (2) taking advantage of the Court's expertise as an Article III court to address the *Daubert* issues that are implicated by substantial segments of the litigation against Grace; and (3) maintaining overall control over the direction of this case – direct District Court involvement has been critical to the successful resolution of prior mass-tort bankruptcies.

**D.    The claims against Grace then can be addressed on a category-by-category basis.**

Once all tort liability matters have come to rest before the District Court, the definition of Grace's liability can take place systematically.  The process should be tailored to the different categories of claims:

**1.    Litigation regarding Grace's attic insulation product.**

Grace believes that all claims arising from this newest round of litigation are without merit and should be disallowed in their entirety.

To this end, Grace will seek to establish a bar date for attic insulation claims promptly after the filing of this case.  A bar date serves the important purpose of "enabl[ing] a debtor and his creditors to know, reasonably promptly, what parties are making claims against the estate and in what general amounts." *In re Kolstad*, 928 F.2d 171, 173 (5th Cir.), *cert. denied*, 502 U.S. 958 (1991).  A prompt bar date will provide "finality" concerning the universe of asserted property damage claims. *See Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 17 (1st Cir. 1997).

56

Once the bar date has passed, Grace will ask the District Court to determine the validity of the attic insulation claims on a consolidated basis under *Daubert* and will move for summary judgment under Rule 56. *See In re The Babcock & Wilcox Co.*, 2000 WL 422372, at *4 (E.D. La. 2000) (withdrawing the reference to determine "the validity of claims based on unreliable scientific evidence of disease and/or causation"); *In re Dow Corning Corp.*, 215 B.R. 526, 529 (Bankr. E.D. Mich. 1997) (application of *Daubert* in complex personal injury bankruptcy case).

The Supreme Court in *Daubert* directed the lower federal courts to act as "gatekeepers" to ensure that proffered scientific evidence is not only relevant, but also reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) ("gatekeeping" requirement "applies to all expert testimony"). The assessment of whether proffered expert testimony is admissible under Federal Rules of Evidence 702 and 703 is a preliminary question for the court. *See* FED R. EVID. 104(a); *Daubert*, 509 U.S. at 592-93. In making that preliminary assessment, the court must scrutinize whether plaintiffs' evidence survives the *Daubert* screen – that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

Expert opinion evidence must be rejected where "there is simply too great an analytical gap between the data and the opinion offered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 2238 (2000); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) ("[T]he district court did not abuse its discretion in finding that the 'analytical gap' between [the expert's]

57

causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide."), *cert. denied*, 526 U.S. 1064 (1999).

Under *Daubert*, claimants must first come forward and demonstrate to the Court that their evidence is admissible. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993) (affirming grant of summary judgment on *Daubert* grounds), *cert. denied*, 510 U.S. 1193 (1994). The "proponent of the expert testimony" must "prove by a preponderance of the evidence that the testimony is reliable." *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999).

In order to survive judicial scrutiny under *Daubert*, claimants must provide reliable scientific evidence demonstrating that exposure to Grace products is linked to disease. Evidence linking a specific chemical or toxin to disease is inadmissible unless there is "an established scientific connection between exposure and illness," including "information on the level of exposure necessary for a person to sustain injuries." *Moore*, 151 F.3d at 278. Indeed, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).[119]

---

[119] *See also Wright v. Willamette Indus.*, 91 F.3d 1105, 1106 (8th Cir. 1996) ("a plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." ); *In re TMI Litig. Consol. Proceedings*, 927 F. Supp. 834, 869 (M.D. Pa. 1996) (excluding cancer study where record did not "support the fundamental assumption . . . that doses were significantly higher than originally estimated"), *aff'd in part, rev'd in part*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000), *cert. denied*, 120 S. Ct. 2238 (2000); *In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200, 203 (M.D. Pa. 1996) (excluding expert testimony where expert's study, "standing alone, cannot speak to the issue of whether the observed tree damage resulted form radiation exposure" and thus, could not assist the jury in "determining whether or not persons (and trees) in the TMI area at the time of the accident were exposed
(continued...)

Grace maintains that attic insulation claimants will be unable to meet these criteria. Scientific testing of the air in homes with ZAI has found almost non-detectable or zero asbestos levels. In *Barbanti v. W.R. Grace & Co.*, No. 00201756-6 (Wash. Super. Ct. Spokane County),[120] analysis of ZAI samples taken in homes – by both plaintiffs' and defendants' experts – concluded that ZAI's asbestos content by weight was between .001 to .01 of one percent asbestos (i.e., .0001 to .00001).[121]

In tests by the EPA on homes in Libby, Montana containing ZAI, the highest asbestos air concentration was .0003 f/cc.[122] This is 300 times lower than the permissible occupational exposure level of 0.1 f/cc, 8 hours a day, 50 weeks per year for 45 years set by the Occupational Safety and Health Administration ("OSHA"). In fact, most of the EPA's air samples did not find any asbestos fibers at all.

According to tests run by plaintiffs' expert in the *Barbanti* case, the time-weighted average exposure in an attic would be .05 to 0.1 f/cc.[123] At these levels, a homeowner would have

---

[119]  (...continued)
to radiation").

[120]  *Barbanti* is a pending state-wide class action purportedly brought on behalf of owners of buildings containing ZAI.

[121]  *Barbanti* plaintiffs' expert, Ernest R. Crutcher, Deposition at 146:23-25; Testimony of Richard J. Lee ("Lee Test.") in *Barbanti*, Nov. 30, 2000 Transcript at 54:1-14.

[122]  Lee Test. at 62:21-63:12.

[123]  *Id.* at 76:24-77:10 (though Grace does not believe that plaintiffs' data was scientifically valid due to an unrealistic testing environment and numerous computational errors).

to be exposed at least eight hours a day for 12,000 days in order to experience any risk of an asbestos-related disease.[124]

If the claimants cannot meet their burden, or if the *Daubert*-tested evidence they produce is otherwise insufficient to allow a reasonable jury to find in their favor, Grace's summary judgment motion must be granted, and the claimants' disease claims must be disallowed as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (standard under Rule 56); *see also In re Barto Tech. Servs., Inc.*, 181 B.R. 255, 256 (Bankr. W.D. Pa. 1995) ("The summary judgment standard of Fed. R. Civ. P. Rule 56(c) applies in bankruptcy cases.").

While Grace maintains that such claims should be disallowed on the grounds that allegations that Grace's ZAI product can cause disease fail under *Daubert*, should the District Court conclude that summary judgment is inappropriate, Grace will seek adjudication of these claims on a consolidated basis through a bench trial.  Rule 42(a) "confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate cases for trial as may facilitate the administration of justice." *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964), *cert. denied*, 382 U.S. 812 (1965). *See also  In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977) (Rule 42(a) contains a "broad grant of authority," which "has been applied liberally.").

Indeed, the trial court's managerial power is "especially strong and flexible" in matters of consolidation. *In re Air Crash Disaster*, 549 F.2d at 1013. Judges have been "'urged to make good use of Rule 42(a) . . .  in order to expedite the trial and eliminate unnecessary

---

[124] Testimony of Dr. William Hughson in *Barbanti*, November 30, 2000 Transcript at 7:15-8:22.

repetition and confusion.'" *Id.* Rule 42(a) authorizes courts to "make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." FED. R. CIV. P. 42(a). Consolidation in this case is appropriate because it will "eliminate unnecessary repetition" in the resolution of common issues of law and fact and will help expedite resolution of the bankruptcy proceedings. *See Jenkins v. Raymark Indus, Inc.*, 782 F.2d 468, 471 (5th Cir. 1986) (recognizing that there may be "group-wide" determination of common issues in asbestos suits); *In re Fibreboard Corp.*, 893 F.2d 706, 708 (5th Cir. 1990) (considering "a single consolidated trial proceeding under Rule 42(a)" deciding state-of-the-art and punitive damages issues).

### 2.     Other property damage claims.

The second category of property claims relates to Grace's MK-3 product. These are relatively mature claims that are small in number. To confirm that the universe of such claims is thus circumscribed, Grace will ask the District Court to direct potential claimants to file their property damage claims by the same bar date established for Grace's attic insulation claims.

After the bar date has passed, definition and resolution of the property damage claims may proceed. Here too, there are significant threshold issues – for example, whether Grace products that have been installed in the structures at issue even need to be removed. In particular, Grace maintains that a wet-sprayed, cementitious product such as MK-3 incorporated into buildings does not pose an asbestos hazard. Throughout the years, tests have demonstrated that the potential for exposure to asbestos from MK-3 – either during application or after, in air systems of buildings – is minimal:

61

- In 1964, Boyle Engineering Laboratory conducted a test to see if air passing over MK-3 would erode its surface. The test exposed an MK-3 surface to a 104.8 m.p.h. air stream for 87 hours. The test result showed no erosion.[125]

- In 1965, the Robert M. Hunt engineering company tested the bond strength of MK-3 and found that MK-3 would crack internally before coming off an applied surface.

- In 1970, Bowser and Morner Testing Laboratories conducted a wind tunnel test to, again, determine if air passing over MK-3 would erode its surface and release particulates. The test detected no dusting that could be distinguished from ambient incoming air.

- In 1970, Tabershaw-Cooper conducted an industrial hygienics test to measure potential exposures during MK-3 application for pumping unit workers, those applying MK-3, workers in the general area of application, and the general public. The test showed that exposures were below the then-recommended threshold levels of 5 fibers/milliliter of air, based on time-weighted averages over 8-hour work days, 5 days a week. In the general area of application, workers were typically exposed to .01 to .0002 of the recommended threshold level.

Consequently, Grace believes that property damage claims arising from the use of such products should be disallowed. Should the District Court conclude that summary judgment is unwarranted, however, Grace will seek adjudication of these claims on a consolidated basis through a bench trial. The cases do not implicate the right to jury trial for bodily injury claims.

### 3.    Litigation regarding bodily injury claims.

The final category of claims involves alleged bodily injuries arising from exposure to Grace's asbestos and vermiculite products. Here again, Grace will seek to adjudicate threshold issues concerning the validity of certain claims. The disposition of other claims will turn on resolving the criteria for claim settlement.

---

[125] Boyle Engineering Laboratory, *"Report on Effect of High Velocity Air Upon the Surface of Mono-Kote Material"* (April, 30, 1964).

At the outset, Grace will ask the District Court to set a separate bar date for bodily

injury claims. *See In re The Babcock & Wilcox Co.*, 2000 WL 1511175, at *1 (E.D. La. Oct. 6,

2000) (bar date established for asbestos bodily injury claims); *In re Dow Corning Corp.*, 142 F.3d

433, 1998 WL 180594, at *1 (6th Cir. 1998) (bar date established in mass tort case involving

claimants seeking recovery for injuries allegedly caused by breast implants); *Maressa v. A.H.*

*Robbins Co.*, 839 F.2d 220, 221 (4th Cir.) (discussing bar date for personal injury tort claims),

*cert. denied*, 488 U.S. 826 (1988); *In re Eagle Picher Indus, Inc.*, 137 B.R. 679, 682 (Bankr. S.D.

Ohio 1992) (discussing bar date for asbestos bodily injury claims).

Whether through pre-confirmation litigation or post-confirmation settlement,

resolution of the bodily injury claims will require completion of a proof of claim form that

contains sufficient detail, including information relating to the nature of the injury asserted,

medical documentation to substantiate the claim, history of claimant exposure, and product

identification. Such information can provide the factual predicates for motion practice, estimation

and plan development. Consequently, Grace will ask the District Court to treat this category of

claims differently than the property damage claims. A special claim form should be used and a

separate bar date should be set.

After the bar date has passed, the District Court may proceed to decide common

threshold issues concerning the validity of the bodily injury claims. Among the threshold issues

Grace may seek to litigate are: (1) the validity of claims by those who remain unimpaired;[126] (2)

---

[126] In order to recover, a claimant "must properly plead" and prove "proximate cause, injury and
damage." *Abdullah v. ACandS, Inc.*, 30 F.3d 264, 269 n.6 (1st Cir. 1994). Further, "subclinical injury
resulting from exposure to asbestos is insufficient to constitute the actual loss or damage . . . required to
sustain a cause of action under generally applicable principles of tort law." *Schweitzer v. Consolidated*
(continued...)

the reliability of scientific evidence concerning whether Grace's vermiculite products can cause

disease at all;[127] (3) the absence of sufficient proof concerning exposure to Grace products; and (4)

whether exposure is sufficient to constitute a substantial contributing factor to a claimant's alleged

disease.[128] Finally, as with all other categories of claims, Grace will ask that claims for punitive

damages be disallowed. Disallowance of punitive damages is standard practice in mass-tort

---

[126] (...continued)

*Rail Corp.*, 758 F.2d 936, 942 (3d Cir.), *cert. denied*, 474 U.S. 864 (1985). *See also Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 273 (E.D. Pa. 1994) ("Based on the testimony of the [parties'] experts, the Court finds that pleural changes alone will in the vast majority of the cases cause no symptoms, no change in physiology, and will not have any effect on the individual's lifespan."), *vacated*, 83 F.3d 610 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997).

As the Supreme Court recently observed in ruling that unimpaired claims are not compensable under the Federal Employers' Liability Act, the substantive tort law of most states affords no cause of action for mere exposure to a toxin. *Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424, 425 (1997). *See also Amchem*, 521 U.S. at 612 n.15. Indeed, the Court observed that "with only a few exceptions, common-law courts have denied recovery to those [exposed to asbestos or other toxins] who . . . are disease and symptom free." *Metro-North*, 521 U.S. at 425. *See also Simmons v. Pacor, Inc.*, 674 A.2d 232, 238 (Pa. 1996) (denying recovery for pleural claims).

[127] In a toxic tort case, plaintiffs must establish that (1) the defendant released the substance into the environment, (2) that the plaintiffs were exposed, (3) that the plaintiffs have injuries, and (4) that the substance released by the defendant was the cause of those injuries. *See In re TMI*, 67 F.2d 1103, 1119 (3d Cir. 1995), *cert. denied*, 516 U.S. 1154 (1996); *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 275 (3d Cir. 1991); *Dombrowski v. Gould Electronics, Inc.*, 85 F. Supp. 2d 456, 459 (M.D. Pa. 2000) (observing that "[p]laintiffs' burden of proof in a toxic tort case is well documented in this Circuit"). The "exposure element requires that plaintiffs demonstrate that they have been exposed to a greater extent than anyone else, i.e. that their exposure levels exceeded the normal background level." *In re TMI Litig.*, 193 F.3d 613, 658 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 2238 (2000).

[128] Plaintiffs bear the burden of identifying a defendant's product as the source of their exposure. *See, e.g., Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581 (5th Cir. 1983) (affirming summary judgment in asbestos case as to defendants whose products plaintiff could not recall using), *cert. denied*, 465 U.S. 1102 (1984); *Aymond v. Texaco, Inc.*, 554 F.2d 206, 210-11 (5th Cir. 1977) (affirming directed verdict for manufacturer where plaintiff did not establish that manufacturer's product caused the injuries); *In re FELA Asbestos Cases*, 646 F. Supp. 610, 614 (W.D. Va. 1985) (granting summary judgment based on lack of product identification where "there is no evidence that [plaintiff] was exposed to any Nicolet [asbestos] products").

bankruptcies because allowing punitive damages "would prevent the fair and equitable treatment" of claims and "would frustrate the fair distribution of . . . assets." [129]

Nor is the District Court confined to the foregoing issues or, for that matter, to the traditional litigation procedures spelled out in Rule 56 of the Civil Rules and Rules 702 and 703 of the Federal Rules of Evidence. The Bankruptcy Rules also afford other means of defining what should and should not be paid. Thus, for example, criteria for the *settlement* of claims can be determined as part of litigation over a proposed plan of reorganization. That is to say, Grace could incorporate proposed criteria for the settlement of claims. If claimants object to that feature of the plan, the District Court could resolve that objection and either approve or disapprove such provisions.

### E.    Estimation of liability and liquidation through a post-confirmation claims resolution facility.

After the Court has resolved threshold issues concerning the validity of the asserted claims, procedures can be established for the estimation of any remaining claims, if such an estimation is necessary. Estimation of personal injury tort claims for the purpose of determining the feasibility of a plan of reorganization is a core proceeding within the jurisdiction of the bankruptcy court under 28 U.S.C. § 157(b)(2)(B). *See also* 11 U.S.C. §§ 1129, 502(c);

---

[129] *See In re Celotex Corp.*, 204 B.R. 586, 613 (Bankr. M.D. Fla. 1996); *see also Matter of Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986) ("To allow recovery of punitive damages . . . would be to risk the depletion of Trust assets to the benefit of known victims at the expense of future claimants."), *aff'd in part, rev'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988); *In re A.H. Robins Co.*, 89 B.R. 555, 562 (E.D. Va. 1988) ("The presence of a 'wild card' in the form of punitive damages would constitute the death knell of any feasible reorganization plan.").
    Further, as the Third Circuit has recognized in the asbestos context, "[i]t is responsible public policy to give priority to compensatory claims over exemplary punitive damages windfalls." *In re Collins*, 233 F.3d 809, 812 (3d Cir. 2000), *petition for cert. filed* (U.S. Mar. 1, 2001) (No. 00-1376).

*Matter of Poole Funeral Chapel, Inc.*, 63 B.R. 527, 533 (Bankr. N.D. Ala. 1986). Depending on a variety of factors that may be considered at the appropriate time, District Court involvement in the estimation process may also be appropriate.

### 1.    Any estimation should be completed before confirmation.

Estimation for purposes of determining the feasibility of a proposed plan of reorganization under Chapter 11 may be necessary where the adjudication of thousands of individual tort claims "would unduly delay the administration of" Grace's reorganization. *See* 11 U.S.C. § 502(c)(1); *see also In re Dow Corning Corp.*, No. 95-20512, 1995 WL 495978, at *3 (Bankr. E.D. Mich. Aug. 9, 1995). Any estimation should be completed before Grace's plan can be confirmed. *See In re MacDonald*, 128 B.R. 161, 164 (Bankr. W.D. Tex. 1991) (observing that estimation of unliquidated and contingent claims "is essential prior to the hearing on confirmation of a plan, in order for the court to evaluate the feasibility of the plan without delaying the confirmation process"). Only then can the District Court determine whether the plan is feasible as is required by the Code.

### 2.    Estimation sets a fixed outer limit on compensation.

Within the bankruptcy system, the debtor is ensured of a "complete discharge" of its debts so that it will not be subject to "lingering claims 'riding through' the bankruptcy." *Matter of Baldwin-United Corp.*, 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985). Consistent with these principles, estimation sets a fixed outer limit on the amount to be provided for contingent tort claims.[130]

---

[130]   *See Matter of Baldwin-United Corp.*, 55 B.R. at 898 (estimation "conclusively sets the outer limits" of a claimant's right to recover); Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter*
(continued...)

A fixed outer limit on liability may be necessary in order to comply with the requirements under the Code for determining the feasibility of a plan of reorganization. *See* 11 U.S.C. § 1129 (implicitly calling for a fixed estimation); *Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that feasibility finding was clearly erroneous where there was a failure to estimate contingent claim).

Accordingly, Grace's plan of reorganization will set an outer limit on the amount to be provided for contingent tort claims, which can be evaluated to determine if it complies with the requirements of Section 1129 of the Code. *See In re A.H. Robins Co.*, 880 F.2d 709, 720 n.13 (4th Cir.) (describing the necessity of setting an outer limit on the debtor's liability), *cert. denied*, 493 U.S. 959 (1989). At the time of plan confirmation, Grace will ask the District Court to enter a permanent injunction channeling both (1) the current tort claims deemed allowable during the Chapter 11 proceeding and (2) unasserted claims that may be brought in the future to a trust that will compensate both types of claims in substantially the same manner. *See, e.g., MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2nd Cir.), *cert. denied*, 488 U.S. 868 (1988); *UNARCO Bloomington Factory Workers v. UNR Indus.*, 124 B.R. 268 (N.D. Ill. 1990); *see also In re A.H. Robins*, 880 F.2d 694 (4th Cir. 1989), *cert. denied*, 493 U.S. 959 (1989).

### 3.    Estimation should proceed according to the best available scientific evidence.

In estimating claims, courts may use "whatever method is best suited to the particular contingencies at issue." *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982);

---

[130] (...continued)

*11 Proceedings*, 96 HARV. L. REV. 1121, 1129 n.45 (1983) (absence of a fixed limit on liability would render bankruptcy proceedings pointless).

*Matter of Baldwin-United Corp.*, 55 B.R. at 899; *Matter of Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989).  Because estimation sets a fixed outer limit on available compensation, however, estimation based on the best available scientific evidence is critical.  Accordingly, the court should determine an accurate value to assign to any remaining categories of claims and should base its valuation on accurate projections of future claims.  In this manner, the court will provide for an adequate fund to compensate legitimate claims.

## CONCLUSION

Resolution of the asbestos claims within the bankruptcy system is the only viable alternative.  As numerous judges and commentators have recognized, the tort system has failed to address the current asbestos litigation crisis in a rational manner.  Given that Congress has not provided a legislative solution, the bankruptcy system remains the only effective means available for rational adjudication of asbestos-related claims.  Using procedures developed in prior mass-tort bankruptcies, Grace's liability for the asserted claims may be adjudicated and resolved in a manner that is both rational and fair.

Wilmington, Delaware
Dated: April 2, 2001

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES PC

Laura Davis Jones (#2436)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession