# EXHIBIT B

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM

Dated: November 9, 2001

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG
    & JONES P.C.
Laura Davis Jones
David W. Carickhoff, Jr.
P.O. Box 8705
919 North Market Street, 16th Floor
Wilmington, Delaware 19899 (Courier 19801)
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and
Debtors in Possession

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................... v

SUMMARY ................................................................. 1

ARGUMENT ................................................................ 7

I.     THERE IS NO SERIOUS DISPUTE THAT THE ASBESTOS CLAIMS
       AGAINST GRACE SPUN OUT OF CONTROL BEFORE THIS CASE WAS
       FILED. ............................................................ 7

       A.    There Is No Explanation — Grounded Either In Medicine Or In
             Grace's Liability — For The Recent Spike In Claims Against
             Grace. ..................................................... 8

       B.    Grace's Analysis Of The 1997 And 2000 Claims Further Confirms
             The Need For Litigation To Define Grace's Liability. ...................... 11

             1.    The Vast Majority Of The Claims Provide No Evidence Of
                   Impairment. ......................................... 12

             2.    Most Claims Fail To Establish Exposure To Grace's
                   Products. ........................................... 13

II.    ESTIMATION CANNOT DEFINE GRACE'S LEGAL LIABILITY AND WILL
       IMPEDE RATHER THAN ADVANCE THIS CASE. ......................... 17

       A.    Estimation Based On Historical Settlements Can Never Address
             Legal Liability, And It Will Perpetuate The Problems This Case
             Must Resolve. ............................................. 17

       B.    Estimation Without Litigation Is Futile:  Estimation Cannot Be
             Used To Cramdown On Equity Where Liability Is Contested. .............. 20

       C.    The Committees Misinterpret § 524(g) Of The Bankruptcy Code............ 22

       D.    The PI Committee's Promise To Expedite This Case Is Less Than
             Forthright. ................................................ 23

**TABLE OF CONTENTS** (Continued)

Page

III.   THE LITIGATION PROTOCOL PROPOSED BY GRACE IS FOCUSED,
       LEGALLY SOUND AND MANAGEABLE. ................................... 26

       A.   ZAI: The PD Committee's Effort To Create A Whole New Area Of
            Liability Rests And Falls On Common Issues. ........................... 26

            1.   *Daubert* Proceedings Should Be Used To Determine
                 Whether There Is Reliable Scientific Evidence
                 Demonstrating that ZAI Poses An Unreasonable Risk. .............. 28

            2.   A Finding Under *Daubert* That Claimants Lack Reliable
                 Scientific Evidence Demonstrating ZAI Risk Would Be
                 Dispositive Of ZAI Property Claims. ............................. 29

                 a.   Product Defect ......................................... 29

                 b.   Causation .............................................. 31

                 c.   Economic Loss ......................................... 31

            3.   Grace Has Proposed A Straightforward Litigation Protocol
                 For ZAI Claims. ............................................... 32

       B.   MK-3 Property Damage Claims:  Again There Are Threshold
            Liability Issues. ..................................................... 34

            1.   The Statute Of Limitations ..................................... 35

            2.   Product Defect, Causation And Economic Loss .................... 37

            3.   Grace Has Proposed A Straightforward Litigation Protocol
                 For MK-3 Property Damage Claims. ............................. 38

       C.   Personal Injury Claims:  Many Claims Fail To Meet Basic Legal
            Requirements. ....................................................... 39

            1.   Certain Legal Requirements Are Suitable For Adjudication
                 On A Common Basis. ........................................... 39

                 a.   Product Identification And Product Exposure .............. 39

                 b.   Exposure Sufficient To Cause Disease .................... 41

**TABLE OF CONTENTS** (Continued)

Page

      c.    Lack Of Compensable Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      d.    Claims Supported By Unreliable Diagnostic Data Cannot
           Survive *Daubert* Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    2.    Grace Has Proposed A Straightforward Litigation Protocol
        For Personal Injury Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IV.    THE OBJECTIONS TO THE LITIGATION PROTOCOL MISCHARACTERIZE
      PRIOR ASBESTOS BANKRUPTCY CASES AND MISSTATE GRACE'S
      POSITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    A.    The Issues Here Are Not Too Individual For Common Resolution,
        And Grace Has Never Argued To The Contrary. . . . . . . . . . . . . . . . . . . . . . . . 56

    B.    The Proposed Protocol Is Neither Unprecedented Nor
        Impermissibly Novel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    C.    The PI Committee's Argument That Each Claimant Is Entitled To
        His Own Counsel Misses The Mark. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

      1.    Grace's Proposal Does Not Preclude Participation By
           Counsel For Claimants Who Are Not On The Committee. . . . . . . . . . . . 62

      2.    Proceedings In Babcock & Wilcox Confirm That The
           Committee Approach Works. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    D.    Debtors Do Not Oppose Appointment Of A Futures
        Representative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

V.    THE PROPOSED NOTICE PLAN COMPLIES WITH DUE PROCESS AND IS
      REASONABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    A.    The Objections To The Plan Wrongly Presume That The Notice
        Should Educate And Warn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    B.    Concerns With Respect To The Specific Content Of The Bar Date
        Notices Have Been Addressed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    C.    The Notice Plan Effectively Reaches Potential Claimants. . . . . . . . . . . . . . . . . 70

**TABLE OF CONTENTS** (Continued)

Page

VI.   THE PROPOSED PROOF OF CLAIM FORMS ARE NECESSARY AND
      APPROPRIATE. ....................................................... 74

      A.    The Personal Injury Claim Form Asks For Necessary Information
            And Is Not Unreasonably Burdensome. ............................... 74

            1.    Prior Cases Provide Ample Support For Grace's Tailored
                  Requests. .................................................... 74

            2.    The Requests For Medical Information Are Reasonable. ............. 79

            3.    The Requests For Exposure Information Here Are
                  Necessary And Are Not Unreasonably Burdensome. ................ 80

      B.    The Property Damage And ZAI Proof Of Claim Forms Are
            Appropriate. ......................................................... 81

      C.    The Non-Asbestos Proof Of Claim Form, Definitions And
            Instructions Have Been Modified Slightly. ............................. 82

CONCLUSION ................................................................. 83

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACandS, Inc. v. Abate*,
    710 A.2d 944 (Md. Ct. Spec. 1998), *cert. denied*, 713 A.2d 979 (1998) . . . . . . . . . . . . . 46

*Acuna v. Brown & Root, Inc.*, 200 F.3d 335 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Adams-Arapahoe Sch. Dist. v. GAF Corp.*,
    959 F.2d 868 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Allen v. Pennsylvania Eng'g Corp.*,
    102 F.3d 194 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Amendola v. Kansas City Southern Railway Co.*,
    699 F.Supp. 1401 (W.D. Mo. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Barbanti v. W.R. Grace & Co.-Conn.*,
    No. 00201756-6 (Spokane Cty., Wash. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 66-68

*Barrett v. Atlantic Richfield Co.*,
    95 F.3d 375 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Belton v. Fibreboard Corp.*,
    724 F.2d 500 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bernier v. Raymark Industries, Inc.*,
    516 A.2d 534 (Me. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Burns v. Jaquays Mining Corp.*,
    752 P.2d 28 (Ariz. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Carlough v. Amchem Products*,
    158 F.R.D. 314 (E.D. Pa. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 70

*Central Wesleyan College v. W. R. Grace*, 2:84-1860-8 (D.S.C.) . . . . . . . . . . . . . . . . . . . . . . . 68, 81

*Cimino v. Raymark Indus., Inc.*,
    151 F.3d 297 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 57-59

*Cinnaminson Township Bd. of Educ. v. National Gypsum Co.*,
    Civ. No. 80-1842 (AET), 1989 WL 5820 (D.N.J. Jan. 25, 1989) . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES (Continued)

Page(s)

*Cox v. Shell Oil Company,*
Case No. 18,844 (Chancery Ct. Obion Cty. Tenn, Feb. 9, 1996) . . . . . . . . . . . . . . . . . . . 73

*Cuevas v. E.I. DuPont de Nemours & Co.,*
956 F. Supp. 1306 (S.D. Miss. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 27, 28, 49, 51

*Eagle Picher Indus. v. Liberty Mutual Ins. Co.,*
829 F.2d 227 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Falk v. Keene Corp.,*
782 P.2d 974 (Wash. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Faya v. Almaraz,*
329 Md. 435, 620 A.2d 327 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Gaulding v. Celotex Corp.,*
772 S.W.2d 66 (Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

*General Electric Co. v. Joiner,*
522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*German v. Federal Home Loan Mortgage Corp.,*
168 F.R.D. 145 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Giffear v. Johns Manville Corp.,*
632 A.2d 880 (Pa. Super. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Grunin v. International House of Pancakes,*
513 F.2d 114 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Hendrix v. Raybestos-Manhattan, Inc.,*
776 F.2d 1492 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Hormel v. United States,*
17 F.R. D. 303 (S.D.N.Y. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*In re Agent Orange Prod. Liab. Litig.,*
611 F. Supp. 1396 (E.D.N.Y. 1985), (Weinstein, J.)
*aff'd in part, rev'd in part on other grounds,* 818 F.2d 179 (1987) . . . . . . . . . . . . . . . . . 75

## TABLE OF AUTHORITIES (Continued)

Page(s)

*In re Air Crash Disaster at Florida Everglades on December 29, 1972*,
  549 F.2d 1006 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Allegheny Int'l, Inc.*,
  954 F.2d 167 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Amdura Corp.*,
  170 B.R. 445 (D. Colo. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

*In re Asbestos Litigation*,
  No. 87-09-24, 1994 WL 721763 (Del. Super. June 14, 1994),
  *rev'd on other grounds*, 670 A.2d 1339 (Del. Super. Ct. 1995) . . . . . . . . . . . . . . . . . . . . 46

*In re Asbestos School Litigation*,
  No. 83-0268 (E.D. Pa) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*In re Bendectin Litig.*,
  857 F.2d 290 (6th Cir.1988), *cert. denied*, 488 U.S. 1006 (1989) . . . . . . . . . . . . . . . . . . 34

*In re Beverly Hills Supper Club Fire Litig.*,
  695 F.2d 207 (6th Cir. 1982), *cert. denied*, 461 U.S. 929 (1983) . . . . . . . . . . . . . . . . . . . 34

*In re Bonham*,
  251 B.R. 113 (Bankr. D. Alaska 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Canvas Specialty, Inc.*,
  No. LA 00-33180, 2001 WL 336463 (Bankr. C.D. Cal. Mar. 28, 2001) . . . . . . . . . . . . . 33

*In re Consumers Realty & Dev. Co.*,
  238 B.R. 418 (8th Cir. B.A.P. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Diet Drugs (Phentermine, Fenfluramine, Dexenfluramine) Prods. Liab. Litig.*,
  1999 WL 387322 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*In re Domestic Air Transportation Antitrust Litigation*,
  141 F.R.D. 534 (N.D. Ga. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 73

*In re Dow Corning Corp.*,
  194 B.R. 121 (Bankr.E.D.Mich. 1996),
  *rev'd on other grounds*, 212 B.R. 258 (Bankr.E.D.Mich. 1997) . . . . . . . . . . . . . . . . . . . 62

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

*In re Dow Corning Corp.*,
  215 B.R. 526 (Bankr. E.D.Mich.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Dow Corning Corp.*,
  237 B.R. 364 (Bankr. E.D. Mich. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Dow Corning Corp.*,
  250 B.R. 298 (Bankr. E.D. Mich 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Dow Corning*, 211 B.R. 545 (Bankr. E.D. Mich. 1997) . . . . . . . . . . . . . 18, 21, 24, 34, 59, 60

*In re Federal-Mogul Global Inc.*,
  Case No. 01-10578 (Bankr. D. Del. Oct. 1, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 61

*In re Fibreboard Corp.*,
  893 F.2d 706 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 58

*In re Food Lion, Inc.*,
  1998 WL 322682 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*In re Harrison*,
  987 F.2d 677 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Hawaii Federal Asbestos Cases*,
  734 F.Supp. 1563 (D. Haw. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*In re Husting Land & Dev., Inc.*,
  255 B.R. 772 (Bankr. D. Utah 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Japanese Elec. Prods. Antitrust Litig.*,
  723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds sub nom,*
  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  471 U.S. 1002 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Keene Corp.*,
  188 B.R. 903 (Bankr. S.D. N.Y. (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*In re Latex Gloves Prods. Liab. Litig.*,
  MDL Docket No. 1148 (E.D. Pa.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*In re Love Canal Actions*,
  547 N.Y.S.2d 174, 177 (N.Y. Super. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

*In re Minnesota Personal Injury Asbestos Cases,*
    481 N.W.2d 24 (Minn. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*In re New York City Asbestos Litig.,*
    142 F.R.D. 60 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*In re Nissan Motor Corp. Antitrust Litig.,*
    552 F.2d 1088 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 69

*In re Orthopedic Bone Screw Prod. Liab. Litig.,*
    1995 WL 925678 (E.D. Pa. Feb. 1, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
    1997 WL 704702 (E.D. Pa. Aug. 22, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*In re Paoli R.R. Yard PCB Litig.,*
    113 F.3d 444 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Paoli R.R. Yard PCB Litigation,*
    35 F.3d 717 (3d Cir.1994),
    *cert. denied sub nom General Elec. Co. v. Ingram,*
    513 U.S. 1190 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*In re Penn Central Transp. Co.,*
    771 F.2d 762 (3d Cir. 1985), *cert. denied*, 474 U.S. 1033 (1985) . . . . . . . . . . . . . . . . . . . 66

*In re The Babcock & Wilcox Co.,* Case No. 00-0558 (E.D. La.),
    Aug. 25, 2000 Order and Reasons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 77

*In re The Babcock & Wilcox Co.,* Case No. 00-0558 (E.D. La.),
    September 21, 2001 Order and Reasons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re The Babcock & Wilcox Co.,* No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000) . . . . . . . . . 18, 19

*In re The Babcock & Wilcox Co.,* No. CIV. A. 00-0558, 2000 WL 422372,
    at *4 (E.D. La. Apr. 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re USG Corp.,*
    Case No. 01-2094 (Bankr. D. Del. June 25, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Johnson v. Celotex Corp.,*
    899 F.2d 1281 (2d Cir. 1990), *cert. denied*, 498 U.S. 920 (1990) . . . . . . . . . . . . . . . . . . . 59

## TABLE OF AUTHORITIES (Continued)

*Lore v. Lone Pine Corp.,*
No. L-33606-85 (N.J. Super. Ct. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 76

*Magistrini v. One Hour Martinizing Dry Cleaning,*
109 F. Supp.2d 306 (D. N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Marshall v. Celotex Corp.,*
651 F. Supp. 389 (E.D. Mich. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Martinez v. City of San Antonio,* 40 S.W.3d 587 (Tex. Ct. App. 2001) . . . . . . . . . . . . . . . . . . . 76

*Metropolitan St. Louis Equal Housing Opp'y Council v. Gordon Gundaker Real Estate Co.,*
130 F.Supp.2d 1074, 1082-83 (E.D. Mo. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Metro-North Commuter Railroad Co. v. Buckley,*
521 U.S. 424 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Mitchell v. Gencorp.,*
165 F.3d 778 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Moore v. Ashland Chemical Co.,*
151 F.3d 269 (5th Cir. 1998) *(en banc), cert. denied*, 526 U.S. 1064 (1999) . . . . . . . . . . . 42

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 70

*New Jersey Turnpike Authority v. PPG Indus., Inc.,*
16 F.Supp.2d 460 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Outlaw v. Keene Corp.,*
No. 88-9490 1990 U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990) . . . . . . . . . . . 40

*Owens-Corning Fiberglass Corp. v. James,*
646 So.2d 669 (Ala. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Owens-Corning v. Bauman,*
726 A.2d 745 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) . . . . . . . . . . . . . . . . . . . . . . . 46

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,*
998 F.2d 1224 (3d Cir.), *cert. denied sub nom.,*
*Moyer Packing Co. v. Petruzzi's IGA Supermarket, Inc.,*
510 U.S. 994 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES (Continued)

Page(s)

*PGH Int'l v. Gabor Shoes AG (In re PGH Int'l.)*,
   222 B.R. 401 (Bankr. D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*,
   507 U.S. 380 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Privest Properties, et al. v. The Foundation Company of Canada et al., C884875* . . . . . . . . . 71

*Prudential Insurance Co. of America v. United States Gypsum Co.*,
   146 F. Supp. 2d 643 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Raymark Indus., Inc. v. Stempel*,
   No. 88-1014-K, 1990 WL 72588, * 7 (D. Kan. May 30, 1990) . . . . . . . . . . . . . . . . . . . . . 51

*Richardson-Merrell, Inc. v. Koller*,
   472 U.S. 424 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Richison et al. v. American Cemwood Corp. et al.*,
   No. 5532 (Sup. Ct. San Joaquin Cty, CA. May 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Schweitzer v. Consolidated Rail Corp.*,
   758 F.2d 936 (3d Cir. 1985), *cert. denied,* 474 U.S. 864, 106 St. 183 (1985) . . . . . . . 47, 48

*Simmons v. Pacor, Inc.*,
   674 A.2d 232 (Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Sterling v. Velsicol Chem. Corp.*,
   855 F.2d 1188 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Taylor v. Owens-Corning Fiberglas Corp.*,
   666 A.2d 681 (Pa. Super. Ct. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Thompson v. Johns-Manville Sales Corp.*,
   714 F.2d 581 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Vancouver Women's Health Collective Society v. Robbins Company, Inc.*,
   820 F 2d 1359 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Vigiolto v. Johns-Manville Corp.*,
   643 F. Supp. 1454 (W.D. Penn. 1986), *aff'd,* 826 F.2d 1058 (3d Cir. 1987) . . . . . . . . . . 39

## TABLE OF AUTHORITIES (Continued)

**Page(s)**

*Weinberger v. Kendrick*,
 698 F. 2d 61 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Wright v. Eagle-Picher Indus., Inc.*,
 565 A.2d 377 (Md. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Wright v. Willamette Indus., Inc.*,
 91 F.3d 1105 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

### Statutes and Rules

11 U.S.C. § 1102(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

11 U.S.C. § 1129(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11 U.S.C. § 524(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17, 22, 23

40 C.F.R. § 61.141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

40 C.F.R. § 763.83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Bankruptcy Reform Act of 1994,
 Pub. L. No. 103-394, § 111(b), 108 Stat. 4107 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cal. Code Civ. Pro. § 338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

D.C. Code Ann. § 12-301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

FED. R. CIV. P. 11(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Federal Rule of Evidence 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Federal Rule of Evidence 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 52, 54

N.Y. C.P.L.R. § 214-c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES (Continued)

**Page(s)**

**Other Authorities**

*4 Collier on Bankruptcy*, § 524.07[2], at 524-44, 524-45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*7 Collier on Bankruptcy* ¶ 1129.04[4][a] at 1129-89 to 1129-90
    (15th ed. Revised, 1999) (citing  H.R. Rep. 595, 95th Cong. 1st Sess. 414 (1977) . . . . . . 21

*9 Collier on Bankruptcy* ¶ 3001.09[2] at 3001–26 (15th ed. revised) . . . . . . . . . . . . . . . . . . . . . 32

9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2384 (1995) . . . . . . . . . . . . . . . . . . 60

Frank Macchiarola,
    *The Manville Personal Injury Settlement Trust:  Lessons for the Future*,
    17 Cardozo L. Rev. 583 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

James A. Henderson, Jr. & Aaron D. Twerski,
    *Closing the American Products Liability Frontier*,
    66 N.Y.U. L. Rev. 1263 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

RESTATEMENT (THIRD) OF TORTS, *Prod. Liab.* § 2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## **SUMMARY**

The only vision the tort committees offer for this case is an "estimation" that statistically extrapolates from the very mass claiming process that forced Grace into bankruptcy in the first place.[1] Their approach would replace the adjudication of Grace's legal liability with a presumption of liability based on prior settlements, thereby abandoning the rules of procedure and evidence that are at the heart of civil jurisprudence and that the Bankruptcy Code specifically adopted for resolving disputed liability in Chapter 11. The result the claimants seek is obvious: a Chapter 11 proceeding that protects the *status quo* and does nothing to define Grace's actual liability. By contrast, Grace's proposed Case Management Order calls for the application of bread-and-butter federal procedure to resolve core issues that lie at the heart of disputed claims – and are responsible for the mushrooming crisis in asbestos litigation. There is no credible alternative to the CMO.

The Debtors are mindful of the length of this reply brief, but we have tried to be comprehensive in responding to the Court's request for a proposal and want now to respond to all significant issues. Here is the roadmap for the brief:

---

[1] Committees that have filed briefs are: (1) Response and Memorandum of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtor's Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program; Exhibits A - E ("PD Cmte. Brf."); (2) Opposition of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of Notice Program; Exhibits A (1 -4) and B - F ("PI Cmte. Brf."); (3) Zonolite Plaintiffs' Objection to Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of Proof of Claim Forms and Approval of Notice Program (Docket No. 536); Motion to Extend the Time to Object or Respond to Such Motions; Joinder in Motion for Continuance by Official Committee of Asbestos Property Damage Claimants; Independent Motion to Continue the Hearing on Debtors' Motion; and Request for Consideration and Briefing Regarding Class Treatment; and (4) Medical Monitoring Claimants' Objection to Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of Proof of Claim Forms and Approval of Notice Program (Docket No. 536); Joinder in the Motions for Continuance and Motion for Continuance; and Request for Consideration and Briefing Regarding Class Treatment.

Part I brings the Court up to date on the historical predicate for this case – the absence of any legal or medical explanation for the surge of asbestos claims against Grace.  The tort committees utterly fail to provide such an explanation, and instead purport to account for the claims spike as a PR phenomenon brought about by media coverage of the controversy surrounding the Libby mine.  Even if true, this is no legal/medical justification for the claims.  But the Libby explanation is, in any event, belied both by the fact that the new wave of claims is not unique to Grace and by Grace's claims data.  A recent analysis of that data shows:

- More than 30% of the year 2000 claims present so little information that a medical condition cannot even be determined.

- Less than 6% of claims involved actual malignancy.

- Only 3.3% of non-malignant claims contain diagnostic data showing even mild impairment.

- Half of the claims reflect no exposure information at all.

- Only 12% of the claims were filed by workers in the construction industry, which Grace supplied.

Part II deals with the tort committees' Trojan horse: estimation.  Billed as a would be time-saver, the estimation advocated by the committees has been adopted by agreement in many cases as a tool for predicting the cost (and thereby determining the feasibility) of executing consensual plans.  But here it is proffered for a different, truly remarkable purpose – as a *substitute* for the determination of actual legal liability.  Specifically:

- **Rules of liability are discarded.**  The proposed estimation throws the rules of evidence out the door (in particular, the bedrock prohibition against inferring liability from settlement) and discards wholesale the core bankruptcy process of claim objection and disallowance.

- **Resolution of this case will be impeded not advanced.**  The lure of expediting the resolution of this case by leapfrogging liability and proceeding directly to a cramdown on equity is illusory because a dispute over liability cannot be swept

-2-

under the rug via cramdown – claimants cannot simply vote to pay themselves more than what their claims are worth.

- **Section 524(g) is not preclusive.** Section 524(g) is a new option for obtaining complete closure for asbestos bankruptcies, but it does not, as the Committees suggest, strip the Debtor of its liability defenses.

More generally, the tort committees never address the contentious nature of estimation or the fact that, until liability is resolved, estimation simply puts the cart before the horse.

Parts III and IV turn from estimation to the CMO proposal now before the Court. Part III describes in more detail the common issues that provide a path through the proliferation of claims against Grace in recent years. In each of the three major areas of litigation against Grace, the issues are amenable to a straightforward case management protocol. To the extent that scientific issues need to be scrutinized under *Daubert* or on the merits, a panel of experts can be appointed by the Court under Fed. R. Evid. 706, as was done in the breast implant litigation. In a nutshell, the issues to be addressed are as follows:

- **ZAI Litigation.** The Property Damage Committee's mission to find yet new liability for attic insulation containing trace amounts of asbestos turns on whether there is any reliable science establishing that the insulation poses an unreasonable risk. Absent supporting science that meets *Daubert* requirements, there is no claim. The outcome of preliminary injunction litigation in Washington State last year concerning this insulation is instructive here -- even setting aside *Daubert* (because the case was prosecuted in state court), the science presented by the *Barbanti* claimants was insufficient to show a likelihood of success on the merits, and the injunction was denied.

- **Property Claims for Spray-on Insulation.** Common issues also have emerged from the substantial record of traditional property damage litigation concerning commercial spray-on insulation (Monokote-3). While the issues of risk to commercial building occupants and notice to their owners have been litigated repetitively in these cases, mature science and well-established constructive notice should now enable the Court to decide the issues of product defect and the statute of limitations generically.

- **Bodily Injury.** The most pressing need for common issue litigation obviously arises from the onslaught of personal injury claims. The candidate issues are just as

-3-

obvious: 1) <u>Product identification</u>: Claim volume has grown against many companies because all claims are put improperly to every company regardless of whether there is any evidence of exposure to a particular company's product; 2) <u>Causation</u>: Exposure to one fiber is not enough to get a claim past *Daubert*. Rather, claimants must demonstrate the sufficiency of dose from Grace products to cause disease; and 3) <u>Diagnosis of injury</u>: Injury has been an essential element of tort liability since the beginning of common law, and *Daubert* can be used to assure that there is reliable medical support for a claim of injury.

Against the backdrop of these proposed common issues, Part IV addresses each of

the four specific objections made to the CMO. It demonstrates that:

- **Precedents Support the Proposed CMO.** Finally, the Committees' declaration that the procedures needed here to define Grace's liability are "unprecedented" is an effort to preserve a *status quo* that is strategically advantageous to claimants but fundamentally wrong. The effort fails because the CMO does no more than call for application of the Federal Rules of Civil Procedure and Evidence. While the parties in old-style bankruptcies agreed to forego litigation, leaving liability undefined (*Manville*, *UNR*, *Eagle Picher*), this is not "precedent" that precludes following the rules. Indeed, those same bankruptcies have now become precedent*supporting* the approach proposed here: the trusts formed without a meaningful definition of the debtor's liability have been swamped with claims and forced to cut payouts to deserving claimants. And there is more precedent. Beginning with *Dow Corning* (breast implants) and extending to *Babcock & Wilcox* (asbestos), more recent cases have focused on determining liability as a threshold matter. Very recent filings by *Federal Mogul* and *USG* in this Court reflect an intention to follow the same path.

- **Grace's Historical Objection to Class Litigation Is Irrelevant.** This section responds to and disposes of the "gotcha" contention that Grace's prior opposition to class certification somehow dooms its current proposal for common issue litigation. Rule 23 is not the only vehicle for common issue litigation. Class actions should not be pursued if common issues do not predominate over individual issues, and they do not predominate here. But common issues always can be decided under Rule 42 in order to streamline litigation.

- **No Extrapolation Is Necessary.** By the same token, turning to another objection, common issue litigation does not require the extrapolation found constitutionally deficient by the Fifth Circuit in *Cimino*. The problem in *Cimino* was the use of extrapolation to find liability to individual claimants, not the litigation of issues that were common to begin with.

- **The Right to Counsel Is Not Jeopardized.** The further complaint that the right to separate counsel means that each claim must be litigated separately also fails – the

Court easily can protect both the right to counsel and the need to avoid repetitive litigation of the same issues.

Parts V and VI turn to the tools of common issue litigation in Chapter 11, *i.e.*, the bar date, notice and claim forms. These procedures are unique to Chapter 11 and, when deployed in connection with Rules 56 and 42, create a simple and effective vehicle for litigating common issues once and decisively. The objections made to the adequacy of the proposed multi-million dollar notice program and the burden associated with the claim form raise implementation questions only, not problems that can or should cast any doubt upon the wisdom of the CMO's central purpose. And those implementation issues have been addressed as well:

- **The Notice Program.** The notice program has been carefully reviewed and revised to accommodate all specific concerns raised by the PD Committee. The Committee's broader contention that the notice should educate and warn the public regarding the claims against ZAI is wrong as a matter of law. Giving notice does not require addressing the merit of the claims being made.

- **The Claim Forms.** The claim form is the key to the common issue litigation because it provides the factual nexus between the common issues, on the one hand, and each particular claimant, on the other. Each element of the proposed forms relates directly to a common issue. Absent use of such forms, aggregated litigation could not proceed – which is precisely why the bodily injury claimants attack the forms so assiduously. Not only have similar forms been used both in and outside of Chapter 11, but the most that the PI Committee can say is that three hours is too much to ask of a claimant in the prosecution of his claim at this stage of the case (but not, interestingly, too much to ask when the claim is to be paid). Three hours would not be unduly burdensome even in an individual case, but the burden argument is simply frivolous when the only alternative is case-by-case litigation of thousands of claims. Moreover, the form seeks the kind of information that a responsible attorney should have in hand before filing a lawsuit asserting a company is liable.

In the end, the Debtors have carefully laid out the only path for this case if Chapter 11 is to provide any real solution to Grace's asbestos liability problem. It is a path that brings to bear the basic rules of evidence and procedure that are adopted in the Code. No extension of the law is necessary, and none is advocated. The only real response from the Committees is to argue for

-5-

abrogation of the entire concept of legal liability in service of their fervent desire to have this case governed, as the Debtor was governed before this case was filed, by the conventions of a one-sided settlement process that has devastated company after company, that deploys the threat of repetitive trials in the most permissive jurisdictions in the United States, and that now has come back to haunt even the bankruptcy trusts by sapping their ability to pay fair compensation to the small minority of claimants who actually have sustained an injury.

        In light of the passage of time and certain refinements to the litigation protocols, a revised proposed Case Management Order is being filed herewith.

## ARGUMENT

### I. THERE IS NO SERIOUS DISPUTE THAT THE ASBESTOS CLAIMS AGAINST GRACE SPUN OUT OF CONTROL BEFORE THIS CASE WAS FILED.

As we have previously advised the Court, Grace's bankruptcy[2] was necessitated by a dramatic reversal in the trend of asbestos claim filings against the company. Claims that had been declining for years suddenly skyrocketed in 2000, overwhelming Grace's ability to resolve them through the tort system:



**Asbestos Bodily Injury Claims**

This surge in claims starkly demonstrated the irrationality of the privatized claims process that evolved over the years, and it left Grace with no choice but to break the pattern of history and file bankruptcy. In their sole attempt to explain away the recent claims spike, the Property Damage (PD) and Personal Injury (PI) Committees offer no theory that has anything to do with Grace's actual liability. And the explanation that *is* proffered is contradicted by both the recent surge in claims against other companies and analysis of Grace's own unique claims history.

---

[2] "Grace" and "Debtors" are used interchangeably herein. "Debtors" is defined at footnote 1 of Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program.

**A.   There Is No Explanation — Grounded Either In Medicine Or In Grace's Liability — For The Recent Spike In Claims Against Grace.**

As detailed in Grace's initial memorandum, actual asbestos-related malignant disease rates are declining in response to the regulatory curtailment of significant asbestos exposures in the early 1970s.[3] The death rates for mesothelioma, the disease with the longest latency period, have been declining since 1992.[4] Leading medical researchers similarly have described asbestosis as a "disappearing disease."[5] A published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 yr."[6] Perhaps for these reasons, the PI Committee does not even attempt to justify the recent spike in claims against Grace based on an actual increase in disease caused by Grace's products.

Moreover, only a small number of plaintiffs' law firms were responsible for the surge in claims against Grace in 1999-2000, belying the notion that disease rates drive the increase. Seventeen law firms filed 22,550 more claims in 2000 than they had filed in 1999, and were therefore responsible for almost the entire 22,726 increase in total claims filed against Grace:

---

[3] *See generally* Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (A. Churg & F. Green, ed., 2nd, 1998) at 339 ("progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis"). *See also* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos* at 2 ("With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes.").

[4] SEER data from the National Cancer Institute available at www-seer.ims.nci.nih.gov.

[5] K. Browne, *Asbestos-Related Disorders*, Occupational Lung Disorders, 3rd, 411-504, 420 (1994).

[6] Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers,* American Review of Respiratory Disease 144(3):  689-696, 695 (1991) (emph. added).

| Law Firm | 1999 Claims | 2000 Claims | Increase |
|---|---|---|---|
| Peirce Raymond Osterhout | 143 | 3,579 | 3,436 |
| Kelley & Ferraro L.L.P. | 563 | 3,755 | 3,192 |
| David Lipman, P.A. | 511 | 2,908 | 2,397 |
| Larry Norris | 44 | 2,346 | 2,302 |
| Tayllor & Cire | 3 | 2,132 | 2,129 |
| Law Firm of Crymes Pittman | 0 | 1,169 | 1,169 |
| Barrett Law Offices | 0 | 1,054 | 1,054 |
| Hissey Kientz & Herron | 26 | 962 | 936 |
| Wallace & Graham P.A. | 317 | 1,150 | 833 |
| Law Offices of Peter Nicholl | 0 | 813 | 813 |
| Duke Law Firm | 42 | 820 | 778 |
| LeBlanc & Waddell | 0 | 707 | 707 |
| Odom & Elliott | 180 | 810 | 630 |
| Climaco Climaco Lefkowitz | 353 | 977 | 624 |
| Varas & Morgan | 435 | 1,018 | 583 |
| Cascino Vaughan Law Offices | 252 | 808 | 556 |
| Robins Cloud Greenwood & Lubel | 156 | 567 | 411 |
| **17 FIRM TOTALS:** | **3,025** | **25,575** | |
| **TOTALS FOR ALL FIRMS:** | **25,466** | **48,192** | **22,726** |

| | |
|---|---|
| **TOTAL 2000  INCREASE FOR 17 FIRMS:** | **22,550** |

Thus, while the rest of the plaintiffs' bar was filing claims against Grace in 2000 at about the same rate as in 1999, these 17 firms somehow generated 22,550 more claims than they had in 1999, raising their collective annual share of the claims against Grace from 11.8% to more than 53%. The committees offer no explanation for how such a small number of firms were able to generate such a significant surge of claims.

Instead, the PI Committee's expert Mark Peterson (a lawyer and psychologist) attributes Grace's claims spike to unfavorable publicity last year about Grace's Libby, Montana mine. (Peterson Aff. ¶ 23) Even if it were true that Libby publicity had a nationwide impact on the filing of claims against Grace, this would illustrate the problem Grace faces. The issues concerning asbestos exposure at Libby pertain to only a small group of claimants. Libby is a small town, with a population of 2,500. The cumulative total of Libby personal injury claims is 232, a small fraction (.07 %) of the 328,000 claims asserted nationally. If Libby publicity is causing a surge of claims nationally, those claims are being filed for the wrong reasons.

Further, the "Libby" theory for the broad upsurge in claims is unsupported by citation to any evidence and is contrary to the facts.

*First*, the plaintiff law firms that are responsible for bringing these cases already had filed over 260,000 personal injury claims against Grace before 2000. They did not need to be inspired by "adverse publicity" before filing additional claims.

*Second*, attributing the recent claims spike to adverse Libby publicity would blink away the glaring fact that other asbestos defendants experienced similar surges in claims in 2000. For example, the rate at which new claims have been filed against the Manville Trust has nearly doubled in each of the last two years. The following chart, included in the First Quarter 2001 Manville Trust Report, shows this dramatic surge in new claims filings through May of this year:[7]

---

[7] *See also* First Quarter 2001 Manville Trust Financial Report, available at www.mantrust.org. and *Mealey's Litigation Report: Asbestos*, August 3, 2001, at 13-14.



Asbestos claims against other defendants have increased as well. Equitas' March, 2001 Annual Report confirms that "[m]ost other defendants [in addition to the Manville Trust] also reported significant increases in the number of claims filed in 2001. The majority of these new claims have been filed on behalf of unimpaired persons." Likewise, a May 30, 2001 Tillinghast report estimates that average annual non-Center for Claims Resolution asbestos claims nearly doubled from 30,000 in 1998-99 to almost 60,000 in 2000.

### B.   Grace's Analysis Of The 1997 And 2000 Claims Further Confirms The Need For Litigation To Define Grace's Liability.

Grace recently has completed an analysis of 500 randomly-selected claim files from its 1997 and 2000 filings. Grace augmented the medical data and occupational exposure information in these claims files by obtaining information that the same claimants filed with the Manville Trust

and the Center for Claims Resolution. *See* attached Claims Report, Exhibit K. The combined data

from that survey confirms that the vast majority of the 1997 claims were invalid or of doubtful

validity, and that valid year 2000 claims are even more scarce.

      **1.**     **The Vast Majority Of The Claims Provide No Evidence Of Impairment.**

      The recent surge in claims against Grace is *not* due to an increase in the most serious

and best documented claims, *i.e.*, cancer claims, but overwhelmingly is due to non-malignant claims.

Based upon Grace's statistical survey, less than 7% of the 1997 claims were for mesothelioma, lung

cancer, or other cancers. Seventeen percent of the claims included so little information that the type

of disease could not even be determined. And the remaining 76% were for non-malignant

conditions.

      The percentage of malignant claims declined even further in 2000. Less than 6% of

the claims were for cancer. More than 30% of the year 2000 claims presented so little information

that no disease could be identified. The remaining 64% were for non-malignant conditions.

      Analysis of diagnostic data relating to the sampled claims shows the same picture:

no new wave of disease is responsible for the new wave of claims. Two diagnostic tests are widely

used in combination to diagnose non-malignant injury: "ILO" readings of chest x-rays and

Pulmonary Function Tests. X-rays are used to identify asbestosis within the lungs or pleural

thickening in the outer lining of the lungs. The physician grades the x-ray on a scale of 0/0 (no

abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour

Organization ("ILO"). The American Thoracic Society has set an ILO rating of 1/1 as the minimum

needed to support a diagnosis of asbestosis.[8] Since injury caused by the inhalation of asbestos fibers should affect both lungs equally, the x-ray findings should be bilateral.

Even an ILO rating of 1/1 does not establish any actual impairment in lung function. According to the American Medical Association, a second set of tests, Pulmonary Function Testing ("PFT"), is "the quantitative basis on which the evaluation of respiratory system impairment rests."[9] Two measurements of expiration function are taken: forced vital capacity (FVC) and forced expiratory volume in the first second ($FEV_1$). A third test, measuring the diffusing capacity of carbon monoxide in a single breath ($D_{co}$), is also performed. These results then are compared to normal predicted values calculated based on the gender, race, height and weight of the patient. For a diagnosis of "mild impairment," the AMA requires an FVC or $FEV_1$ result of 79% or less, or a $D_{co}$ result of 69% or less.[10]

When these diagnostic criteria are applied to Grace's 1997 and 2000 sample claims, the claims are found to be grossly wanting. Even if the 33 cancer claims in the 1997 sample are excluded, less than 2.8 % of the remaining claims presented ILO ratings of 1/1 or higher and PFT results meeting the AMA criteria for "mild impairment." Similarly, only 3.3% of the 2000 sample claims satisfied both standards.

In sum, the vast majority of the non-malignant claimants in both years failed to present the minimum medical evidence needed to substantiate *any* injury at all.

---

[8] American Thoracic Society ("ATS"), *The Diagnosis of Non-Malignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. (1986) 134: 363-367.

[9] *AMA Guides to the Evaluation of Permanent Impairment*, § 5.2, p. 159 (4th ed. 1998).

[10] *Id.*, at Table 8, p. 162.

-13-

## 2.    Most Claims Fail To Establish Exposure To Grace's Products.

The recent sampling of Grace's 1997 and 2000 claims also shows that very few claimants can establish any actionable exposure to Grace's asbestos products, either because they provide no exposure information or because the claimants worked in industries and occupations in which exposure to Grace's products would have been unlikely or impossible.

Half of the claims provide no exposure information whatsoever. Of the 1997 sample claims, 236 (47%) provide no information about the site or location where the alleged exposure occurred, the worker's employer or industry, or the Grace product to which he was exposed. Fifty-two percent of the 2000 sample claims fail to provide any of that critical information. Even when Grace attempted to fill in these gaps by cross-referencing the claimant's Social Security number to the Manville Trust and CCR databases, it was unable to identify the industry involved for 20% of the 1997 sample claims, and 29% of the 2000 claims. And, of course, the Manville Trust and CCR data provide no information about any exposures to Grace products.

For the other half of the claims, the meager exposure information that is provided rarely implicates Grace. For example, Grace's Monokote-3 fireproofing product was applied by plasterers primarily at high rise steel construction sites. Yet, only two of the 500 sample 1997 claims and only one of the year 2000 claims were filed by plasterers. Indeed, only 8% of the 1997 Grace sample claimants and 3% of the 2000 claimants identified themselves as construction workers. Even after the Manville and CCR data was used to identify as many of the "unknown" claimants as possible, only 16% of the 1997 sample claims, and 12% of the 2000 claims, were found to be filed by construction workers.

-14-

The majority of the sample claims in which the claimant's industry can be identified (using the combined information from the Grace claim file as well as the Manville and CCR databases) were filed by workers who should not have been exposed to any Grace products:

| Grace Sample Claim Distribution By Percentage Of Known Industries | | |
|---|:---:|:---:|
| **Industry** | **1997** | **2000** |
| Iron/Steel Aluminum Production | 25% | 18% |
| Non-asbestos products Mfg. | 9% | 20% |
| Petro/Chemical Mfg. | 14% | 7% |
| Utility/Power Plants | 9% | 5% |
| Shipbuilding | 4% | 8% |
| Railroad | 2% | 6% |
| Auto Maintenance | 2% | 6% |
| Tire/Rubber Mfg. | 0% | 5% |
| Marine | 1% | 1% |
| Non-Grace Asb. Mining or Mfg. | 1% | 1% |
| Other Inapplicable Indus. | 17% | 12% |
| Totals | 86% | 88% |

Not surprisingly, most of these claimants submit no information about exposure to any Grace product. When an attempt is made to implicate a Grace product, the product identification often makes no sense. For example, seven sample claimants from the Kaiser Steel plant in Chicago claimed to have been exposed at that plant to "Zonolite Spra-Tex," a *decorative* ceiling product that never would be used in a steel works. Others at the same plant listed "Zonolite Monokote," the fireproofing product used in *commercial* high-rise buildings.

Many of these new claims appear to be the result of recent mass "screenings" and claim recruiting efforts at large industrial plants. For example, during the Fall of 2000, a single

plaintiffs' law firm submitted 1,672 claims to Grace, nearly all of which were for steelworkers in Pennsylvania, West Virginia and Ohio. On January 31, 2001, that same law firm submitted 66 claims from a single plant, the U.S. Steel works in Gary, Indiana. Fifty of those 66 claims shared seven common "diagnosis" dates between May 17th and June 16th of 2000. The next month, this same firm submitted 353 additional steelworker claims from the Gary plant, raising the number of claims submitted in January-February, 2000 from that single plant to 419. Most of these claims again shared common "diagnosis" dates between April and June of 1999, indicating they were the product of mass screenings.

As detailed in Grace's Informational Brief, these trends are the result of the indiscriminate filing of asbestos claims against an ever-increasing number of defendants. As will be discussed in further detail below, even the PI Committee's expert Mark Peterson concedes in his affidavit that "few plaintiffs" recall the specific products to which they were exposed, and that no product identification information was available in 79% of the sample Grace claim files the Committee reviewed *at the claimants' own law firms*. (Peterson Aff. ¶ 34)

## II.    ESTIMATION CANNOT DEFINE GRACE'S LEGAL LIABILITY AND WILL IMPEDE RATHER THAN ADVANCE THIS CASE.

Both the PD Committee and the PI Committee have argued that estimation can supplant litigation and thus move the cases along to confirmation of a plan and creation of a settlement trust under 11 U.S.C. § 524(g). *See* PD Cmte. Brf. at 43; PI Cmte. Brf. at 9, 16, 18. Put bluntly, these arguments are an attempt to leap over the central issue here: whether the Debtors have actual legal liability under the federal rules and substantive law — a liability that is squarely contested in this case.

### A.    Estimation Based On Historical Settlements Can Never Address Legal Liability, And It Will Perpetuate The Problems This Case Must Resolve.

The contention that the Debtors' "liability" can be extrapolated statistically from their historical settlements is no more an extreme version of tabloid law — that settlements are an admission of liability. In fact, the Debtors' pre-petition claims settlements were not made because the claims were valid; rather, they were made because the tort system offered no means of limiting settlements to valid claims. Trying more cases would have been prohibitively expensive and beyond the capacity of the courts in any event.

But the Court need not parse this history because the Federal Rules are clear and dispositive: settlements cannot be used to establish liability. Liability must be proven the old-fashioned way: by evidence on each element of a substantive cause of action. Federal Rule of Evidence 408[11] expressly bars using evidence of a settlement to prove liability. *See* FED. R. EVID. 408 ("Evidence of . . . furnishing or offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim . . . *is not admissible to prove liability for*

---

[11]  Federal Rule of Bankruptcy Procedure 9017 states that "[t]he Federal Rules of Evidence . . . apply in cases under the Code."

. . . *the claim or its amount*.") (emph. added); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1247 (3d Cir.), *cert. denied sub nom., Moyer Packing Co. v. Petruzzi's IGA Supermarket, Inc.*, 510 U.S. 994 (1993) (evidence of settlement in two antitrust actions inadmissible under Fed.R.Evid. 408); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 275 (3d Cir. 1983), *rev'd on other grounds sub nom, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 471 U.S. 1002 (1985) (consent decision in electronics products "dumping" proceeding was not admissible in related civil judicial proceeding).[12]

Thus, as a matter of law, Grace's settlement history and estimation based on that history cannot be considered in adjudicating Grace's actual legal liability to any group of claimants. Instead, the proper time for estimation in a mass tort case, if estimation is to be employed, is *after* the Debtors' liability has been determined and the pool of valid claims against the Debtors has been defined. This sequence is mandated by the Debtors' basic right to seek disallowance of claims and the Code's adoption of ordinary litigation procedures for that process.

This sequence also has been acknowledged in two recent mass tort bankruptcies where liability was disputed and estimation was nonetheless proposed as an alternative to litigation. *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997); *In re The Babcock & Wilcox Co.*, No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000).

In *Dow Corning*, the bankruptcy court rejected competing motions for estimation where liability for breast implant claims was vigorously disputed. In a decision to which we return

---

[12] *See also New Jersey Turnpike Authority v. PPG Indus., Inc.*, 16 F.Supp.2d 460, 473 (D.N.J. 1998) (entering an administrative consent order for environmental cleanup claims cannot be used as evidence of liability in a CERCLA cost recovery action); *In re Dow Corning Corp.*, 250 B.R. 298, 342 (Bankr. E.D. Mich 2000) ("the Debtor's tentative offer to settle with breast implant claimants has no bearing on whether it will be found liable in tort . . ."); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (held improper in asbestos personal injury case for trier of fact to consider amounts of settlements with settling defendants as proof of the amount of claim against non-settling defendants).

later on, Judge Spector noted that liquidation (litigation) of personal injury claims is necessary and

estimation cannot eliminate that requirement:

> While estimation may be a somewhat abbreviated form of liquidation, they
> are still essentially duplicative processes.  With nonpersonal injury claims,
> estimation is often justified because it can entirely eliminate the need for
> liquidation.  However, the present motions deal with estimating the value of
> personal injury claims and, absent settlement, liquidation simply cannot be
> avoided.  As a result, proceeding directly to liquidation will have the salutary
> effect of saving time, money and eliminating potential negative side effects
> that could easily result from the estimation process.

*Id.* at 566.  The focus in the *Dow Corning* case then turned to *Daubert* and summary judgment

motions, which were pending at the time the case was resolved.

More recently in *Babcock*, the district court early on granted a motion for partial

withdrawal of the reference from the bankruptcy court, matters concerning the asbestos personal

injury claims because "it makes sense to withdraw the reference with respect to threshold liability

issues in order to have these issues addressed before a court with undisputed jurisdiction" and

because "[d]istrict courts are more familiar with these types of issues than bankruptcy courts."

*In re The Babcock & Wilcox Co.*, No. CIV. A. 00-0558, 2000 WL 422372, at *4 (E.D. La. Apr. 17,

2000) (citing *In re Dow Corning Corp.*, 215 B.R. 526, 529 (Bankr. E.D.Mich.1997).

Shortly thereafter, over the objections of the various tort committees, the district court

in *Babcock* ordered that a bar date be set for the asbestos personal injury claims and approved the

use of tailored proof of claim forms because "[a]scertaining the number and identity of present

claimants will assist in valuing the claims in this class [asbestos personal injury claims], by facilitating

the *claims allowance **and*** estimation processes . . . in turn assist[ing] the parties in the negotiation

and formulation of a viable reorganization plan." *In re The Babcock & Wilcox Co.*, Case No. 00-0558

(E.D. La.),  Aug. 25, 2000 Order and Reasons at 8 (emph. added).

-19-

In the meantime, after the bar date process was in place, the tort committees filed a motion to initiate estimation procedures in the bankruptcy court *before* any data from the bar date process could be used in the claims allowance and disallowance process before the district court. *See* 12/27/00 Motion by The Asbestos' Claimants' Committee; 2/15/01 Futures Representative's Response And Joinder. The bankruptcy court took the matter under advisement and recently denied the motion for estimation, observing that estimation of claims during the pendency of, *inter alia*, the asbestos claims analysis before the district court, was not prudent when such matters "indicate that progress is being made on the case . . ." *See* September 21, 2001 Order and Reasons at 2.

Likewise, if estimation is employed in this case, it should only be initiated *after* the Debtors' actual liability is established, *not before*. A rush to estimate claims at this point not only flies in the face of the Federal Rules of Evidence and the Code's provisions for disputing claims, it also would perpetuate the problems that forced these Debtors into Chapter 11 in the first place.

**B.      Estimation Without Litigation Is Futile:  Estimation Cannot Be Used To Cramdown On Equity Where Liability Is Contested.**

Nor will leapfrogging liability disputes facilitate confirmation of a plan. A consensual plan apparently cannot be achieved here without initiating litigation. And a cramdown on equity is barred as a matter of law where liability remains at issue.

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan over the objection of a debtor's shareholders only if the plan is "fair and equitable." As the leading commentator explains, a major component of the

> "fair and equitable" requirement is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim.  Once the participant receives or retains property equal to its claim, it may receive no more.

*  *  *

-20-

> With respect to this part of Section 1129(b), the House Report provided that "one requirement applies generally to all classes before the court may confirm under [Section 1129(b)]. No class may be paid more than in full."

*7 Collier on Bankruptcy* ¶ 1129.04[4][a] at 1129-89 to 1129-90 (15th ed. Revised, 1999) (citing H.R. Rep. 595, 95th Cong. 1st Sess. 414 (1977)).

In view of this requirement, the estimation requested by the PD and PI Committees has no value as a predicate for a cramdown plan. It is beyond dispute that Grace's shareholders would be entitled to a finding of the actual value of asserted asbestos claims, based on all available defenses, before any conclusion could be reached as to whether a proposed plan contemplated a distribution to asbestos claimants greater than their claims merited. The proposed estimation sought by the PD and PI Committees could not resolve that issue.

Again *Dow Corning* is instructive. *Dow Corning*, 211 B.R. at 562. In that case, Bankruptcy Judge Spector struggled with a similar situation involving a "mass tort bankruptcy where liability has been disputed by the debtor." *Id.* at 554. Judge Spector initially noted that the debtor's dispute of its liability made its situation different from other mass tort cases where liability was not disputed. *Id.* As a result of that fact,

> [c]ase law provides little guidance on how to . . . value the pending personal injury claims. In substantially all of the mass tort bankruptcy cases which preceded this one, the major questions were how much would be needed to satisfy the thousands of tort claims; how best to raise the money; and what would be the best methodology to fairly apportion those funds among the claimants.

*Id.* Ultimately, because liability was disputed in *Dow Corning*, Judge Spector denied estimation motions of both the debtor and the tort committee noting:

> [w]e . . . do not irrevocably foreclose the possibility of estimating unliquidated tort claims, say as part of a confirmed consensual plan of reorganization. But if this case deteriorates into litigation Armageddon, let this be a start to the design of the battlefield. *Id.* at 562.

-21-

**C.    The Committees Misinterpret § 524(g) Of The Bankruptcy Code.**

The PD and PI Committees also argue that the Debtors are not entitled to undertake the basic claims allowance and disallowance process because the trust mechanism found in § 524(g) supercedes the Debtors' right to contest liability for broad categories of putative asbestos claims. PI Cmte. Brf. at 16, 18; PD Cmte. Brf. at 43. This assertion is wrong.

*First,* § 524(g) is not the exclusive mechanism for a successful reorganization of companies with asbestos liabilities. Section 524(g) merely sets forth certain tests which, if satisfied, will guarantee the effectiveness of a channeling injunction to protect the debtor and other entities from present and future asbestos claims and demands. The legislation is explicit that § 524(g) does not limit or supercede a court's authority to issue injunctions or exercise other powers in connection with a plan of reorganization outside of the scope of § 524(g). Specifically, the general statute contains the following rule of construction:

> Rule of Construction. -- Nothing in subsection (a) [regarding supplemental injunctions under § 524(g)], or in the amendments made by subsection (a), shall be construed to modify, impair, or supercede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization.

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111(b), 108 Stat. 4107, 4117 (1994); *see also 4 Collier on Bankruptcy*, § 524.07[2], at 524-44, 524-45. Thus, it is incorrect for the Committees to urge that §524(g) preempts other procedures to determine a debtors' asbestos liability.

*Second,* there is nothing in the language of § 524(g) itself that even addresses (much less forecloses) a claims allowance and disallowance process *prior* to confirmation of a Chapter 11 plan. Section 524(g)(2)(B)(i) of the Bankruptcy Code contemplates the establishment of a trust and an injunction to be implemented in connection with the trust pursuant to a plan of reorganization, where such trust, among other things,

-22-

(1)     is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

11 U.S.C. 524(g)(2)(B)(i)(I). The language providing that the trust "assume the liabilities" of the debtor does not even speak to whether "liabilities" can be defined through a pre-confirmation claims allowance and disallowance process. Nor does it mean that the Debtors must abandon their defenses to contested liability or must cede to the trust the authority to litigate such defenses post-confirmation. To do so would mean that the Debtors would have no way of knowing how to properly fund or size such a trust in light of their actual liability. If, as the Debtors' contend, their ultimate asbestos liability is less than their net worth, then they are not insolvent, and any plan in these cases would need to protect the rights of the Debtors' equity holders as well as creditors.

Moreover, a § 524(g) trust cannot be created unless the plan is approved by at least 75% of those claimants voting. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). If the Committees' view were correct, and the Debtors could not engage in any pre-confirmation claims allowance and disallowance, then the success or failure of the § 524(g) trust would lie in the hands of claimants whose claims may be entirely meritless. This cannot be the intended result.

### D.     The PI Committee's Promise To Expedite This Case Is Less Than Forthright.

The PI Committee asserts that "[b]ecause Debtors' proposals for proceeding with liquidation of these [asbestos personal injury] claims would be enormously expensive and time-consuming, under section 502(c) such claims must be estimated — not individually liquidated." PI Cmte. Brf. at 19. However, the PI Committee fails to demonstrate how or why any resolution of these cases through an estimation proceeding will be any less burdensome or lengthy than the

procedures proposed in the Debtors' Motion. "Estimation" *sounds* faster, but, until liability issues have been resolved, there is no pool of claims to estimate and the promise of speed is unsupportable.

A full analysis of whether a contested estimation is likely to save any time is, again, found in *Dow Corning. See In re Dow Corning Corp.*, 211 B.R. at 555-68. Not only did the court find that estimation could not supplant litigation where liability for personal injury claims has disputed, but the bankruptcy court also exposed the inefficiency of contested estimation, finding that litigation was preferable because of all of the following problems:

(1)    "the very real concern that estimates may prove to be inaccurate would be eliminated";

(2)    "none of the time delay or expense associated with litigation over the question of how best to estimate the tort claims would be incurred";

(3)    "time delay and expense associated with the estimation process itself would be avoided";

(4)    perceived delays associated with claims liquidation are speculative — "there is no guarantee that estimation would in fact move matters along significantly faster";

(5)    engaging in a rationale allowance and liquidation process would not result in any greater disruption of the debtor's business or significant increase in costs, than an estimation proceeding; and

(6)    in the context of a mass tort case the effect of estimation can well be impermissibly to eliminate a claimant's rights without the due process associated with the liquidation process. *Id.* at 563-68.

The same considerations noted by Judge Spector in *Dow Corning* apply in this case. The Committees are asking this Court to use estimation based upon the Debtors' settlement history and the claims data for unrelated prior asbestos bankruptcies without regard to the threshold issue of whether the claims have legal validity. PI Cmte. Brf. at 19, 33; PD Cmte. Brf. at 36. Moreover, such estimates would most likely prove to be inaccurate, would vehemently be objected to by the

Debtors, and litigation regarding how best to estimate would ensue.  In addition, estimation based on settlement history is impossible for certain of the Debtors' potential claims such as Zonolite claims for which no such data exists.  There is no Zonolite claims settlement history and no prior liability determinations concerning the product — this is simply a new type of claim asserted against the Grace.  *See* Debtors' Case Management Motion at 1-2.

III.   **THE LITIGATION PROTOCOL PROPOSED BY GRACE IS FOCUSED,
       LEGALLY SOUND AND MANAGEABLE.**

As amplified below, Grace has identified very specific issues appropriate for common resolution and very specific procedures for addressing those issues.    Far from being "unprecedented," as the PD Committee claims, the approach taken by Grace was used in the *Dow Corning* case, and the procedures proposed in the pending motion currently are being used in the *Babcock* bankruptcy.   Moreover, these procedures come right out of the rules and are grounded in well-established, non-Chapter 11 precedent.   Although earlier asbestos bankruptcies did not employ these procedures, this was by agreement of the parties.   Recent events have demonstrated that the liability problems that were set aside by agreement in those cases did not disappear, and they now threaten the viability of the post-confirmation trusts.

Before responding to the tort committees' specific objections (*see* Section IV below), this Section first describes in more detail the issues to be litigated and the litigation plan for each issue.   This Section is organized according to the three main types of asbestos claims brought against Grace (ZAI property claims, MK-3 or traditional asbestos property claims, and personal injury claims) and explains the protocol proposed for each type of claim.   Section IV then addresses the objections.

A.     **ZAI: The PD Committee's Effort To Create A Whole New Area Of Liability
       Rests And Falls On Common Issues.**

As set forth in Grace's opening brief, the facts are these.   ZAI, an expanded loose-fill vermiculite (which has no known toxic properties), contains trace amounts of an asbestiform mineral that are far below even 1%, the level that the EPA and OSHA use to define "asbestos-containing"

-26-

material. *See, e.g.*, 40 C.F.R. § 61.141; 40 C.F.R. § 763.83.[13] From their inception, neither OSHA nor the EPA ever challenged the manufacture of ZAI or regulated ZAI due to its minuscule asbestos content. In addition, ZAI never has been the subject of a government warning. ZAI was not the subject of any property damage litigation until 2000, when the tide of asbestos claims against Grace grew. In fact, the only such litigation that reached the merits prior to the bankruptcy was the preliminary injunction and emergency class notice effort in the *Barbanti* case — which failed. *See Barbanti v. W.R. Grace & Co.-Conn.*, No. 00201756-6 (Spokane Cty., Wash. 2001).

These basic facts point to the threshold issue of whether ZAI poses any unreasonable risk at all. That is a classic *Daubert* summary judgment issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90 (1993) . As discussed below, *Daubert* requires that scientific evidence pass tests of reliability before it can even be considered by the trier of fact. Here, if *Daubert* proceedings lead the Court to conclude that ZAI claimants lack reliable scientific evidence demonstrating that ZAI poses an unreasonable risk to humans, that finding would be dispositive of ZAI property claims on several grounds, including absence of product defect, causation and the economic loss doctrine. The ZAI litigation therefore may be resolved through *Daubert* and summary judgment proceedings.

Notably, the PD Committee provides no alternative proposal for litigating ZAI claims, and simply ignores all questions of whether, and to what extent, Grace should be liable for any ZAI claims.

---

[13] The EPA and OSHA have most recently used these standards in reassuring those working or living near the World Trade Center site that they are safe from asbestos danger. *See, e.g.*, "EPA and OSHA Web Sites Provide Environmental Monitoring Data from World Trade Center and Surrounding Areas," http://www.epa.gov/epahome/wtc/data_summary.htm (visited Oct. 4, 2001); EPA-OSHA Fact Sheet: Environmental Information from Ground Zero at the World Trade Center Site, http://www.epa.gov/epahome/wtc/data/epa-osha02.htm (visited Oct. 4, 2001).

1.   ***Daubert* Proceedings Should Be Used To Determine Whether There Is Reliable Scientific Evidence Demonstrating that ZAI Poses An Unreasonable Risk.**

*Daubert* effected a major change in the law by assigning trial courts a "gatekeeping role" with regard to scientific evidence. *See Daubert*, 509 U.S. at 589-590, 597. *Daubert* bars "subjective belief" and "unsupported speculation" – that is, junk science – from entering the courtroom under the guise of expert testimony. *Id.* at 593-94. The Supreme Court set forth the following non-exclusive factors for trial courts to use in deciding whether science is admissible: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *See id.* at 593-94. In addition, the trial court must determine whether the proffered evidence is relevant, that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case" and is a good "fit." *Id.* at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

Importantly, where, as here, the *Daubert* inquiry involves complicated scientific issues, the courts can appoint scientific experts under Rule 706 to assist in the "gatekeeping" role. Indeed, the Supreme Court has encouraged the use of scientific experts in complex cases. In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) the Court upheld the trial court's grant of summary judgment based in part on the failure of plaintiffs' experts to provide sufficient evidence of disease causation. In a concurring opinion, Justice Breyer recognized the difficulties that complex cases impose on judges and cited with favor the New England Journal of Medicine's proposal for experts to assist courts in the gatekeeping process: "'a judge could better fill this gatekeeper function

if he or she had help from scientists. Judges should be strongly encouraged to make greater use of their inherent authority . . . to appoint experts.'" *Id.* at 149-50. Such independent experts can – by virtue of their scientific knowledge – play a critical role in advising the court and informing the decision-making process.[14]

In the multi-district litigation regarding breast implants, for example, a 706 panel was assembled and ultimately issued a report that was highly instrumental in the subsequent resolution of that litigation.

Here, under *Daubert*, ZAI claimants must provide scientifically reliable evidence demonstrating that ZAI poses an unreasonable risk. Grace expects *Daubert* proceedings to establish that there is no reliable scientific evidence demonstrating that ZAI poses a unreasonable risk.

> ### 2. A Finding Under *Daubert* That Claimants Lack Reliable Scientific Evidence Demonstrating ZAI Risk Would Be Dispositive Of ZAI Property Claims.

If the ZAI claimants do not produce reliable scientific evidence of unreasonable risk, summary judgment should be granted on several grounds: (a) absence of product defect; (b) lack of causation; and (c) application of the economic loss doctrine.

> #### a. Product Defect

By definition, a useful product free from unreasonable risk does not suffer from a product defect.[15] Although there are three different tests for finding a design defect—"risk-utility,"

---

[14] A panel of medical and scientific experts was used in the breast implant litigation and has been proposed in other pending Chapter 11 proceedings, including the *Babcock* bankruptcy and *In re Federal Mogul*, Case No. 01-10578 (Bankr. D. Del.).

[15] Under the generally accepted Restatement (Third) of Torts, a product may be defective under any of three theories: (1) a manufacturing defect, (2) a failure to warn or to instruct, or (3) a design defect. This section focuses on a design defect, because it is clear that ZAI does not suffer from a manufacturing defect (wherein a product fails to perform its intended purpose or does not match the design of others in its line)
(continued...)

"reasonable alternative design" and "consumer expectations" — a product that poses no unreasonable risk cannot be considered defective under any of those tests.

First, the risk-utility test balances the likelihood and seriousness of injury from the product against the usefulness of the product. *See Cinnaminson Township Bd. of Educ. v. National Gypsum Co.*, Civ. No. 80-1842 (AET), 1989 WL 5820, at *2 (D.N.J. Jan. 25, 1989); *see also* RESTATEMENT (THIRD) OF TORTS, *Prod. Liab.* § 2(b). If ZAI poses no unreasonable risk, the balance clearly weighs in favor of its usefulness, and the product is not defective.

Likewise, under a reasonable-alternative-design analysis, a manufacturer has a duty to use a safer alternative design only if one reasonably is available. *See* Restatement (Third) of Torts, *Prod. Liab.* § 2(b). If ZAI poses no unreasonable risk to building occupants, any alternative design is not "safer."

Finally, under a consumer-expectations analysis,[16] a product is defective if it is unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. *See, e.g., Falk v. Keene Corp.*, 782 P.2d 974, 977 (Wash. 1989). As a matter of law and logic, reasonable

---

[15] (...continued)
and is not defective under a failure-to-warn theory (which rests upon a predicate finding that there is something against which the consumer must be warned).

[16] The consumer-expectations analysis has been falling out of favor with courts, and it appears in the Restatement (Second) but not the Restatement (Third). The test likewise has been widely criticized in academic circles. *See, e.g.*, James A. Henderson, Jr. & Aaron D. Twerski, *Closing the American Products Liability Frontier*, 66 N.Y.U. L. Rev. 1263, 1294-95 (1991). The analysis also makes less sense for ZAI claims, as consumers did not usually select the ZAI product.