# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JJF) |
| | ) | (Jointly-Administered) |
| Debtors. | ) | |

## RESPONSE AND MEMORANDUM OF THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS IN OPPOSITION TO DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee") files this response and memorandum in opposition to the Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program (the "Debtors' Case Management Proposal"). In support hereof, the PD Committee would respectfully show as follows:

---

[1] The Debtors consist of the following 62 entities: W. R Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-I Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Ins., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Ins., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp, Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe. Inc., Grace H-G Inc., Grace H-G II Inc,, Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Ins., MICA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## I. INTRODUCTION

While the Debtors' Informational Brief filed at the outset of this case provided a glimpse of their "general blueprint of the Chapter 11 process in this case" (Informational Brief at 3), by the Debtors' Case Management Proposal, the Debtors fully reveal their unprecedented plan to impermissibly utilize the bankruptcy process.[2] The Debtors' Case Management Proposal is no more than a transparent attempt to deprive all asbestos claimants of fundamental Constitutional and bankruptcy rights and protections by the mere pretense that the Debtors (also collectively referred to as "Grace") seek to "reorganize" their businesses.

At best, the Debtors' Case Management Proposal is an ingenious concoction of devices and procedures to minimize, nay, to eliminate, the Debtors' asbestos liabilities that cannot be countenanced;[3] at worst, the Debtors' Case Management Proposal is manifest evidence that the Debtors lacked the requisite good faith when they invoked bankruptcy which would warrant the dismissal of these chapter 11 cases.[4] In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999).

---

[2] The Debtors' bankruptcy counsel recently commented, "We're the first to take this approach with these two cases [i.e., Grace and Babacock & Wilcox]," and that "[t]his is, in essence, a new approach in a very complex process that we're using and only time will tell how it will work out." Terry Brennan, *Willing to Run Through A Brick Wall*, THE DAILY DEAL, August 28, 2001.

[3] As more fully discussed hereinafter, the principal feature of the Debtors' Case Management Proposal to "litigate common threshold issues concerning the validity of whole categories of claims" through summary judgment proceedings followed by Rule 42 bench trials is glaringly suspect and represents a remarkable repudiation of the positions taken by Grace in the underlying litigations prior to the chapter 11 that property damage cases are "fact and building specific" in nature. *Dayton Independent School District, et al. v. W.R. Grace, et al.*, Civil Action No. B-81-277-CA (U.S.D.C. E.D. Texas, Beaumont Div.); and, *Kirbyville Independent School District, et al. v. Asbestospray Corp. et al.*, Civil Action No. 1:94CV412 (U.S.D.C. E.D. Texas, Beaumont Div.).

[4] The PD Committee reserves all claims and remedies not expressly sought herein.

## A. Summary of Argument

The PD Committee vehemently objects to the Debtors' Case Management Proposal for the following reasons:

- The proposal seeks to use this Court to accomplish what the Supreme Court and Congress have refused to authorize.

- The proposal does not comport with section 524(g) of the Bankruptcy Code and therefore, represents a substantial and ill-advised departure from the procedures authorized in other asbestos bankruptcy cases.

- The establishment of a bar date is unnecessary in this case.

- The proposed notification program is doomed to failure.

- The proposed proof of claim forms for property damage claimants are unduly burdensome and more likely to exclude such claimants from participating in this case and obtaining any recovery for their allowable claims.

- The proposed consolidated summary judgment procedures blatantly ignore differences between state laws governing property damage claims and are inconsistent with section 524(g) of the Bankruptcy Code.

- The proposed use of Rule 42 bench trials is ill-defined.

- The more sensible and expedient approach to this case (as employed in prior asbestos bankruptcy cases) is to estimate---as opposed to liquidate--- asbestos property damage claims.

3

## II. BACKGROUND

### A. Grace's Purported Reasons for Filing Under Chapter 11

On April 2, 2001, Grace filed for chapter 11 protection for the self-described purpose of determining "the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations." (Informational Brief at 1).

The Debtors claim they did not file these cases because financial distress threatened their continued viability. Grace has repeatedly acknowledged its fiscal strength in both its Informational Brief and in its other public statements and appearances before the Court. In fact, by all appearances, it seems to be "business as usual" for Grace. Executive Officer, Paul J. Norris, stated in his April 23, 2001 Press Release and May 8, 2001 announcement,

> Our decision on April 2, 2001 to seek Chapter 11 protection as a way to define and resolve asbestos-related claims was executed with no disruption to [our] customers. We continue to remain focused on growth and productivity and are anticipating a stronger second half of the year.
>
>                * * *
>
> Grace is a fundamentally sound company with strong cash flow. [Grace has] a clear leadership role in all of [our] major markets, many of them in industries vital to the economy.

Similarly, according to Grace, it did not file these cases because it gives credence to the asbestos claims that have been filed against the Debtors. Indeed, Grace maintains

4

that the vast majority of these asbestos claims are without merit and that potential exposure is readily covered by the $1 billion reserve established for asbestos claims liabilities.[5] Instead, Grace persistently maintains that the Debtors filed these cases because of the failings of the tort system that exposed and a dwindling universe of co-defendant asbestos companies with whom to share adverse results.

It is now apparent, however, that Grace's sole motive was not simply to "manage" its asbestos litigation but rather, to re-engineer the tort system at the expense of fundamental Constitutional and bankruptcy principles.

## B. Overview of the Debtors' Businesses

Grace was founded over 140 years ago as a trading and shipping company and over time developed into one of the largest manufacturing enterprises in the world. Grace acquired, and later divested or ceased operating, a multitude of different companies and product lines, including retail stores, restaurants, oil and gas exploration, coal interests, industrial chocolates, book distribution, water treatment chemicals, kidney dialysis clinics and consumer goods. (D. Siegel Affidavit, P. 4). With annual sales of approximately $1.6 billion, Grace now has over 6,000 employees and operations in nearly 40 countries. (Press Release, W.R. Grace & Co., Grace News (Apr. 23, 2001)).

The current business of Grace is described by Chief Executive Officer Paul Norris as "a premier specialty chemicals and materials company, applying innovative technologies to provide value-added products and services to global markets." (Chairman

---

[5] Importantly, the reserve does not include any provision for Zononlite claims or future demands by personal injury claimants.

Paul   J.   Norris,   Grace's   Website's   Welcoming   Statement,   <u>available   at</u>
<u>http://63.111.43.9/bigframes-welcome_stat.html</u>).


## C. Grace's Involvement With Asbestos-Containing Products and Asbestos Litigation

In 1954, Grace acquired Dewey & Almy Chemical Company and Davison Chemical Company. The former had been a manufacturer of friable asbestos products and, in the mid-1930's, it was branded a menace to health because a number of its employees had developed asbestos disease.[6] In fact, one of the leading medical researchers at the time, Dr. John Hawes, studied the employees and former employees of Dewey & Almy's Multibestos plant in Walpole, Massachusetts. His landmark findings, published in the 1937 New England Journal of Medicine, convincingly documented the danger of short term exposure to asbestos. Dr. Hawes concluded:

> Asbestos is a relatively new disease, of which we know remarkably little except that it does not seem to correspond to the laws governing silicosis in general. <u>There is not the slightest doubt, however, in my mind at least, that asbestos dust is the most dangerous of all dusts.</u> Asbestosis is able to produce total and permanent disability in a remarkably short length of time, even after only 2 or 3 years exposure and occasionally less, as compared with the much slower and more gradual action of pure silicon and the great majority of silicates. *** <u>The fact remains, however, that asbestos is extremely dangerous and fatal,</u> while talc, cement and other silicates are comparatively innocuous except under prolonged, intense exposure along with a very greatly lowered individual resistance.

John Hawes, Dangerous Dusts, Address Before the American Clinical and Climatological Association (Oct. 27, 1925), in NEW ENG. J. MED., JAN. 28, 1937 (emphasis supplied).

---

[6] Mr. Bradley Dewey served on Grace's board of directors from before the acquisition until the 1970's.

In 1963, Grace's Dewey & Almy Division purchased the Zonolite Company,[7] which has since been merged into Grace's Construction Products Division. (Informational Brief at 4). The acquisition of Zonolite established Grace's presence in manufacturing asbestos-containing products. (Id.). Zonolite mined, milled and processed vermiculite,[8] which was contaminated with asbestos. Zonolite also "added commercial asbestos in manufacturing building products." (Id. at 6). Among the vermiculite containing products sold were Zonolite Attic Insulation, Zonolite High Temperature Cement and Zonolite Masonry-Fill. (Id. at 8). Additionally, Zonolite, in its own plants and those of licensees worldwide, manufactured a host of construction products which included contaminated vermiculite as a primary material. These products were spray applied to steel frames and ceilings in buildings and commercial asbestos was added as an inexpensive filler to enable the products to be pressure ejected from the spray nozzle.

In addition, Grace manufactured and sold acoustical plaster, ceiling texture materials[9] and a product named Monokote-3 ("MK-3"), a spray fireproofing product used

---

[7] In all but one case, the acquisition has been characterized uniformly as a *de facto* merger. See, *In re State of West Virginia, 454 S.E.2d 413, 425* (W.Va. 1995) and cases cited therein at n. 7. As a legal consequence, Grace also acquired all of Zonolite's specific knowledge---dating back to at least the 1950's--- of the harmfulness of its asbestos laden products.

[8] Vermiculite is a light-weight fire-resistant mineral that serves as an effective insulator.

[9] None of Grace's papers in this chapter 11 refer to these ceiling products and related property damage claims. Yet, these products, in addition to Monokote fireproofing (MK-3), have also been the focus of underlying litigation of asbestos claims against Grace. Grace's ceiling acoustical and texture products included (a) Zonolite Acoutical Plastic ("ZAP"); (b) Zonocoustic; (c) Zonolite Finish Coat; (d) Hi-Sorb Acoustical Plaster; (e) Econo-White; (f) Ari-Zonolite; and (g) Versakote, among others. There is no basis for the Court to conclude that such claims have been resolved or that further claims of the sort are precluded by operation of law. In most jurisdictions, statutes of limitation do not even begin to run until the plaintiff knew or should have known that its property has been injured, which in an asbestos property damage action, is defined as the contamination of other property in the building with asbestos fibers. See, e.g., MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274 (8th Cir. 1994). Grace is hard pressed to argue that its products contaminated other property years ago when it contends even today that its products never contaminate. Moreover, statutes of limitation are tolled in most states by a defendant's fraud or fraudulent concealment, which brings into play Grace's campaign conducted through its alter-ego, the Safe Building Alliance, in which it assured consumers and government officials that its products were not defective. Furthermore, many states have *nullum tempus occurrit regi* protection and others have adopted special statutes of limitations for asbestos cases.

to provide fire protection for the enclosed steel beams of large commercial structures. (Id. at 9). MK-3 was later phased out with the introduction of Monokote 4 and then Monokote 5, which purportedly do not contain asbestos. (Id. at 10-11). Despite its knowledge of the harmfulness of asbestos, Grace did not market these asbestos-free products until 1970 because they were more costly; neither did Grace warn workers, architects or building owners about MK-3. Indeed, until it was forced to stop, Grace continued to promote MK-3 after the formulation of non-asbestos containing Monokote.[10]

While no stranger to litigation implicating its activities and products, Grace was served with its first bodily injury claim arising from an asbestos-containing product in 1977, and during the late 1970s, Grace was episodically named as a defendant in asbestos-related bodily injury lawsuits. These lawsuits were relatively infrequent; in 1982, the total number of claims filed against Grace was less than 100. (Id. at 29).

In 1982, Johns-Manville filed for bankruptcy and coincidentally, the volume of asbestos claims against Grace grew. By the end of 1984, Grace had been served with approximately 1,000 lawsuits. By the end of 1990, the number had increased to approximately 28,000, and by the end of 1995, it was nearly 75,000. (Id. at 29).

Grace claims to have considered these lawsuits to be devoid of merit but nonetheless implemented a program in the mid-1990s to settle as many asbestos claims as possible, characterizing this settlement process as one that "appeared financially feasible." (Id. at 30). While Grace maintains that this policy was not prompted by cases

---

[10] When the spray application of asbestos-containing fireproofing was banned, Grace substituted shredded newspaper , which served the same purpose albeit more expensive. See, *City of Greenville v. W. R. Grace & Co.*, 640 F.Supp. 559 (D.S.C. 1986), aff'd 827 F.2d 975 (4th Cir. 1987).

taken to trial, it had lost over 30% of the cases it selected as ideal to try to verdict. (Id. at 29).

In 1995 and 1996, the number of asbestos claims against Grace grew significantly; the number of bodily injury claims asserted against Grace in 1996 was almost double the number of claims filed in 1994. (Id. at 30). Yet, even then, Grace did not seek protection from its creditors.   (Id. at 30, 39).   Rather, it undertook a series of complicated transactions, which resulted in the excision from the Grace family of its medical business, and its packaging business which represented, in the aggregate, over 80% of the gross sales of the company.[11]

After four years of declining claims, the number of asbestos claims asserted against Grace again rose in 1999 and 2000.   It is this increase in claims that Grace contends prompted the filing of its bankruptcy petition. (Id. at 35). What Grace fails to point out is that asbestos diseases have a latency period of as much as 40 years. Thus, the lawsuits against Grace were entirely predictable since they were principally a result of Grace's asbestos manufacturing activities commencing in the 1960's. Moreover, publicity in the latter part of 2000 regarding speculation of an impending Grace bankruptcy likely contributed to a short-term stampede of personal injury lawsuit filings.

Significantly, however, the latest spike in the number of asbestos claims asserted against Grace represents an increase of only 27% over the previous spike in claims in 1995-96.   (Id. at 38).   Moreover, according to Grace, the vast majority of these new claims are wholly without merit, and do not present a realistic risk of liability exposure to Grace. (Id. at 32).   Finally, and most importantly, Grace now has established a reserve

---

[11] The Asbestos Claimants Committees appointed in these cases have jointly moved for leave to prosecute the related claims to set aside these transactions as fraudulent transfers.

against asbestos-related claims that it contends is more than sufficient to cover any liability it may have for these claims.   See, In re SGL Carbon Corp., 200 F.3d at 163.

Using generally accepted accounting principles, Grace accrued a reserve as of December 31, 2000, in the amount of $1,105,900,000, as its estimate of liability for all present asbestos-related property damage and bodily injury cases and claims then pending. Grace submits that the reserve now adequately covers the scope and breadth of the asbestos claims against Grace.[12] (2000 Form 10-K at 43).

### D. Grace Claims That it is Financially Healthy

Despite stating a net loss for the year 2000---caused principally by the increase of the asbestos liability reserve by $208,000,000---we accept for these purposes Grace's contention that it is a financially healthy conglomerate which continues to grow its core businesses and seeks to expand into emerging business opportunities.

For example, during the year 2000:

- Grace's aggregate net sales for its Davison Chemicals and Performance Chemicals divisions increased by 3.0% from 1999. (2000 Form 10-K at 85).

- Pre-tax income from core operations increased by 5.0% from 1999, with the expectation that year 2001 pre-tax income will increase by 5-10% over 2000. (Id. at 86).

---

[12] See, footnote 5.

- Grace paid retention bonuses in full (repayable under certain circumstances) in the approximate amount of $4.0 million. (Id. at 25-33).

- Grace granted retention bonuses payable over two years (repayable under certain circumstances) in the approximate amount of $5.1 million. (Id.).

- Grace entered into incentive laden employment agreements with certain executives of the company. (Id.).

- Grace completed six acquisitions for cash consideration of $49 million and the assumption of $19.6 million in liabilities. (Id. at 59).

In addition, during the first quarter of 2001:

- Grace reported net income of $14,600,000 for the first three months of 2001 and earned $.22/share. (2001 10-Q at 4).

- Grace completed two acquisitions. (Id. at 14).

- Grace's net sales increased 2.9% to $395.7 million in the first quarter of 2001 compared to the same period in 2000. (Id. at 4).

These recent developments are consistent with the optimism expressed in Grace's January 29, 2001 press release: "The strength of Grace's business and the consistency of their cash flows have historically been sufficient to obtain lender support for operating and investment needs, and to fund cash outflows for non-core obligations." (Press Release, W.R. Grace & Co., Grace News (Jan. 29, 2001)).

11

**E. Grace's Justification for its Commencement of These Chapter 11 Cases**

According to Grace, the "decision to file was compelled by two fundamental developments outside of its control."

> First, the tort system long ago ceased to provide any realistic opportunity to define the actual responsibility of any manufacturer of asbestos products, including Grace, for asbestos related claims. . . .
>
> Second, and more recently, the privatized claims process itself was turned against surviving asbestos defendants, dramatically increasing their exposure to asbestos claims and thereby destroying their already attenuated programs for managing claims.

(Informational Brief at 1, 2).

Grace asserts that as a result of this "failure" of the tort system, it has been unjustly caught in "the morass of litigation spawned by asbestos," "[e]ven though its products generated little or no asbestos dust, or in the case of vermiculite, contained only trace levels of naturally occurring asbestos impurities."[13] (Id. at 2).

The problem has been exacerbated, according to Grace, as "[c]laimants have not had to meet well-established proof and liability requirements because mass settlements eroded or abrogated such requirements;" and because "rational determinations of liability concerning asbestos claims have been lacking in the tort system where the courts have failed to engage in stringent 'gate keeping' in order to weed out 'weak and frivolous claims.'" (Id. at 53).

---

[13] In its limited objection to the Debtors' Case Management Proposal, the Department of Justice has taken great exception to Grace's characterization of the extent of damage and injury caused or posed by Grace's activities in Libby, Montana.

12

Grace maintains that the effect of these flaws is a "tort system [that] often produces 'lottery-like outcomes.'" (Id. at 24).

> The "results of jury verdicts are capricious and uncertain."
> Differences in the application of statutes of limitations,
> rulings regarding apportionment of damages, admissibility
> of evidence, the availability of punitive damages, and other
> substantive aspects of asbestos litigation have led to
> similarly-situated plaintiffs receiving widely disparate
> compensation.

Id.

Further adding to the "inequities" of the tort system which Grace would have this Court believe also entitles it to invoke the protections of the Bankruptcy Code and warrant the Debtors' Case Management Proposal, is the fact that asbestos claimants and their lawyers intentionally select forums which they feel will give them the best chance of prevailing.

> Forum shopping has contributed to the arbitrary outcomes
> produced within the tort system. Cases have been shifted
> from the federal courts toward the state courts since, as
> Professor Edley recently testified, "[a]sbestos lawyers
> perceive the federal systems as an unfavorable forum for
> the majority of claimants---those who are not sick."
> Further, cases have been shifted toward particular state
> courts perceived as favorable to plaintiffs.

(Id. at 26).

According to Grace, "Chapter 11 now affords the only solution for Grace. Other paths to resolution have been foreclosed. The Supreme Court has restricted class action settlements under Rule 23. Congress has failed to enact legislation to address the problem." (Id. at 2).

Per Grace, this bankruptcy was filed for the sole and express purpose of "managing" its asbestos litigation and avoiding the problems it would continue to face if

it were forced to defend and resolve claims in the same setting as ordinary litigants.
Grace, moreover, is unabashed about how i intends to accomplish this goal. As it states
in its Informational Brief and elaborates in its remarkable Case Management Proposal,
Grace seeks to impose on asbestos claimants---both known and unknown, and even
before the appointment of a future claimants representative---a series of procedures
designed to "centralize" and "simplify" the resolution of asbestos claims.

These procedures include:

- consolidation of all claims before one court of Grace's choosing which can
  fashion a unitary set of rules governing substantive and procedural rights, also of
  Grace's choosing;

- establishment of bar dates for the filing of all known and unknown claims;

- approval of  unprecedented proof of claim forms for asbestos claimants to elicit
  the information that Grace contends is "necessary in the resolution of threshold
  issues Grace plans to raise relating to each of the various categories of claims,"
  but which does not serve the traditional purpose of enabling the estimation, as
  opposed to liquidation, of asbestos claims;

- appointment of so-called "Litigation Committees" to represent the various
  categories of asbestos claimants in bulk, avoiding the needless duplication of
  individual representations and undermining pending class actions;

- the consolidated determination by summary judgment of threshold liability issues
  for the various groups of asbestos claimants to weed out scientifically
  unsupportable claims that Grace contends predominates over legitimate claims;
  and,

14

- for those claims that pass the gauntlet of Grace's threshold liability determinations, the use of Fed.R.Civ.P. 42 common issue trials to further ratchet down asbestos claims and the development of criteria for the settlement of "valid" claims.[14]

According to Grace, "[a]pplication of these procedures is the first and critical step to regaining control over the central question that is simply unanswerable outside of Chapter 11: which claims should be paid by the debtor and which claims should not be paid?" (Id. at 10). Grace contends,

> [I]n Chapter 11, this question can be answered, not under the threat of being taken to trial in massive numbers of cases prosecuted in the forum most attractive to a potential plaintiff's lawyer, but through a systematic proceeding that is designed to determine actual liability under law.

Id.

Unfortunately for Grace, while bankruptcy is a dynamic process, it empowers neither Grace nor this Court with the requisite authority to accomplish Grace's goals.

## F. Grace's Views on Asbestos Property Damage and Bodily Injury Claims

Grace would have the Court believe that it did not file this case because it was concerned that pending or future asbestos claims "posed a serious threat to [its] long term

---

[14] Grace's justification for the commencement of this bankruptcy is premised on a flawed assumption. Relying on a distorted extrapolation of questionable authority, Grace assumes that its stated reasons for filing this case are valid; that a corporation can invoke the protection of the Bankruptcy Code simply to facilitate the defense and resolution of litigation filed against it, even if the proposed "management" of the litigation denies claimants the right to select the forums and manner in which to prosecute their claims that they otherwise would have outside of bankruptcy.

Grace's assumption is wrong. Indeed, according to the Third Circuit's seminal decision in In re SGL Carbon Corporation, supra, the very reasons that Grace offers to support this case would require its dismissal as a bad faith filing.

viability." Although Grace has pointed to the recent spike in asbestos claims as the reason for its filing, it maintains that the overwhelming majority of these claims--- including all of the Zonolite claims and virtually all of the Monokote claims---are merit less.

Grace argues this point extensively both in its Informational Brief and its Case Management Proposal. With respect to the Zonolite claims, Grace contends that "claims arising from this newest round of litigation are without merit," (Informational Brief at 56) and that "ZAI claimants will be unable to meet their Daubert burden." (Debtors' Case Management Proposal Memorandum at 4).[15]

Similarly, with respect to the Monokote-3 property damage claims, Grace states that it does "not expect any additional claims to be filed," and that "those that are filed will be subject to a statute of limitations defense." (Id. at 6). Grace also argues that several of the "only seven claims" remaining as of the petition date will be barred by *res judicata* stemming from Grace's pre-petition class action settlements, and that the other claims also "will be unable to meet the Daubert criteria for establishing reliable, scientific evidence of product risk sufficient to warrant remediation."[16] (Id. at 10-12).

Finally, with respect to the bodily injury claims, Grace argues that the spike in the number of claims is "unsupported by any principle of science or law," and "bears no relation to the actual trend of disease." (Id. at 12-13). Grace maintains that "[s]tate law

---

[15] Grace's contentions about the harmfulness of its asbestos products and activities are in stark contrast to those of its critics. For example, a scientist with the Environmental Protection Agency reportedly characterized Grace's conduct in Libby, Montana as "deliberate murder." Mark Levine, *Killing Libby*, MEN'S JOURNAL, August, 2001, at 78.

[16] According to a recent article in The New York Times, "while Grace knew [MK-3 contained asbestos], for years it kept that knowledge largely hidden from workers who applied fireproofing and clients who wanted their buildings asbestos-free, according to confidential company documents obtained by The New York Times." Michael Moss and Adrianne Appel, *Company's Silence Countered Safety Fears About Asbestos*, N.Y. TIMES, July 9, 2001, at A1.

uniformly requires that no claim should proceed without credible evidence of exposure to Grace's asbestos products, and that "[t]o meet their burden of proof, claimants must present scientific evidence establishing that their exposure to Grace's asbestos products was a substantial causative factor in their developing an asbestos related disease." (Id. at 15-16).

Grace contends that:

> [T]he number of cases that will satisfy this causation standard will be modest. First, because Grace's products were installed using wet application methods, asbestos exposure levels for even those workers who directly applied the product were low. Second, most of those who are asserting claims against Grace had jobs that included insufficient exposure to cause disease.

Id. at p. 17.

## III. THE DEBTORS' CASE MANAGEMENT PROPOSAL

### A. The Debtors' Case Management Proposal Is An Improper Bankruptcy Exercise

It is against the foregoing backdrop that we must view the Debtors' Case Management Proposal. Remarkably, Grace proclaims the justness and necessity for the litigation program engendered by its Case Management Proposal with full appreciation of the impact which it would have on the ability of asbestos claimants to choose a forum, seek the protection of their own state's laws, present their cases to juries of their peers, and, of course, be represented by individual counsel of their choice. In the bankruptcy laboratory that Grace seeks to design, these rights that the Supreme Court, as well as the

state and federal courts of this country have recognized as substantial and fundamental, can be dispensed with in the interest of expediency. Grace is wrong.[17]

The purported "meritlessness" of the asbestos claims asserted against it is, according to Grace, a principal reason it has proposed its group summary judgment mechanism as part of its Case Management Proposal. Indeed, Grace contends that in ruling on its motions, "the Court will be in a position to resolve common threshold issues that affect the validity of whole categories of claims" (Debtors' Case Management Proposal Memorandum at 23), and thus "weed out" those claims that Grace intends to question "based on unreliable scientific evidence of product risk, disease and/or causations." (Id. at 22-23).

What Grace does not explain is why---if the asbestos claims are so merit less and the laws of the various states are so uniform---it was necessary for Grace to file this bankruptcy in the first place. Presumably, it could file the same dispositive summary judgment motions that it proposes to file in this case in the other forums where cases are pending. Moreover, since a number of the property damage claims---including the Anderson Memorial Hospital, County of Orange, Barbanti and Price cases---are embraced by pending class actions and because of the availability of defensive collateral estoppel in bodily injury cases, Grace presumably would have no problem eliminating the

---

[17] Piper Aircraft v. Reyno, 454 U.S. 235, 241 (1981) ("a plaintiff's choice of forum should rarely be disturbed"); Lony v. E.I. Du Pont Nemours & Co., 935 F.2d 604,609 (3d Cir. 1991) (reversing lower court's decision dismissing action due to court's failure to give deference to plaintiff's choice of forum). See, U.S. Const. Amend. VII; Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 578-81 (1990) (J. Brennan concurring and discussing the history of the Seventh Amendment's guarantee to the right to a jury trial); Jacaob v. City of New York, 315 U.S. 752, 752-753 (any attempt to curtail a civil party's right to a jury trial must be "scrutinized with the utmost care."). Texas Catastrophe Prop. Ins. Ass'n. v. Morales, 975 F.2d 1178, 1180-81 (5th Cir. 1992) (individual choice of counsel is a "fundamental right"); Erie RR Co. v. Tompkins, 58 S. Ct. 817, 822 (1938) (federal courts should apply substantive state law).

same vast bulk of "frivolous" claims through normal motion practice outside of bankruptcy.

Grace relies on the Supreme Court's unwillingness to relax the requirements of Fed.R.Civ.P. 23 and Congress' refusal to enact special asbestos legislation to support Grace's entitlement to the expanded reach of the Bankruptcy Code. Grace's argument is bewildering.

In <u>Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997)</u>, the Supreme Court invalidated an asbestos class certification and settlement on the grounds that common issues of law or fact did not predominate as required under Rule 23(b)(3) and the named parties would not "adequately protect the interests of the class" as required under Rule 23(a)(4). 521 U.S. at 623-26. As the Court held:

> The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution. And Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load CCR, class counsel, and the District Court heaped upon it. As this case exemplifies, the rulemakers' prescriptions for class actions may be endangered by "those who embrace [Rule 23] too enthusiastically just as [they are by] those who approach [the Rule] with distaste."

<u>Id.</u> at 628-29.

Grace's proposed case management system seeks to accomplish exactly what the Supreme Court in <u>Amchem</u> declared improper. Fundamentally, Grace's proposed mechanism for group determinations of the issues it believes are important is nothing other than an inverse Rule 23 defensive class action.

If the Supreme Court was unwilling to relax the standards for Rule 23 and, thereby ignore the rights of individuals in the name of expediency, what justification is there to expand the jurisdiction of this Court to allow Grace the same result? There is none.

Similarly, Grace complains of the twenty-year refusal of the Congress to enact curative legislation for the so-called "asbestos crisis". Indeed, despite the Ad Hoc Committee of Asbestos Litigation's 1991 call for legislative initiatives to deal with asbestos litigation, as well as the Supreme Court's urging for Congressional action, Congress has declined to do so despite prodding by companies like Grace.[18]

By its Case Management Proposal, Grace seeks to bend the Bankruptcy Code to do what the Supreme Court will not permit under existing law and rules of procedure and what Congress thus far has chosen not to allow.

There is simply no legitimate basis for the Debtors' Case Management Proposal and, perhaps, for this chapter 11. Grace's announced intentions are not recognized by the Constitution, the Bankruptcy Code, or applicable decisional law, as legitimate bankruptcy exercises and severely compromise the integrity of the bankruptcy process and the rights of asbestos claimants.

## B. The Debtors' Proposal Versus the Prototypical Asbestos Bankruptcy Case

The Debtors' Case Management Proposal represents a dramatic departure from the manner in which other bankruptcy courts have typically handled prior asbestos

---

[18] Congress acknowledged its awareness of the asbestos problem when it enacted the Bankruptcy Reform Act of 1994 to include the Manville Amendment (11 U.S.C. §524(g)) to allow a channeling injunction. *See* Pub. L. 103-394, 108 Stat. 4106 (1994).

bankruptcy cases, especially those cases in which debtors have availed themselves of asbestos trusts and channeling injunctions under 11 U.S.C §524.[19]

In the prototypical asbestos bankruptcy, a legal representative is appointed to represent the interests of future claimants; minimal proof of claim forms, if any, are required to be returned by a bar date; a notification program is employed which not only seeks substantial media penetration but also is designed to alert and educate asbestos claimants, rather than assuming that the general public is aware of their asbestos claims against the debtor; asbestos claims are estimated through empirical analysis, such valuation principally being a plan feasibility issue and often, the basis for negotiation of a consensual plan of reorganization; an asbestos trust is created and an injunction channeling all asbestos claims to the trust is issued in connection with the confirmation order; the asbestos trust establishes low-cost and efficient claims facilities to liquidate claims pursuant to claims resolution procedures approved in the course of confirmation of the plan; and, the trust pays all asbestos claims allowed by the claims facilities.

The Debtors' Case Management Proposal seeks to alter the process by imposing upon this Court the responsibility for liquidating asbestos claims prior to confirmation, stripping the trust and its claims facilities of the power to do so. Moreover, it intends to strip asbestos claimants of their right to have their claims adjudicated by the claims facilities in accordance with applicable state law,[20] represented by counsel of their choice, and in non-consolidated proceedings, even though such adjudications are highly factual.

---

[19] Grace's litigation tactics here are painfully reminiscent of the scorched earth defense strategies employed by the tobacco industry in recent times.
[20] One of the Debtors' proposals is to conduct *Daubert* hearings to challenge scientific evidence. Yet, not every jurisdiction recognizes that procedure.

The ham handedness of the Debtors' Case Management Proposal is exemplified by the precise dates that the Debtors would prescribe for the occurrence of every single event.

In addition, the Debtors' Case Management Proposal subjects the estate to enormous administrative expense and promises to ensure that liquidation litigation and the inevitable appeals therefrom will preclude reorganization in this chapter 11 for many years.[21] Notwithstanding the Debtors' persistent claims that it has sufficiently reserved for all asbestos liabilities and that the Debtors are solvent, the PD Committee thinks otherwise. Consequently, we contend that a significant problem with the Debtors' proposed agenda and "bet the farm" mentality is that it is asbestos claimants' "farm" which is on the line. Assuredly, this is not the first asbestos offender that has denied its products were harmful and that it was, therefore, not insolvent. Nonetheless, since the enactment of section 524(g), all confirmed asbestos reorganizations have left the liquidation of asbestos claims to low transaction cost claims facilities under the aegis of the section 524(g) asbestos trust, *inter alia*, in order to minimize the administrative expense of determining claims and to thereby maximize the recoveries of asbestos claimants.

The totality of the Debtors' Case Management Proposal and its readily apparent differences from prior asbestos cases reveals a process which from beginning to end is intended to be exclusionary. It sets traps for the unwary and the unsophisticated in an effort to keep as many claimants out of the claims process in the first instance; the Debtors' proposal then herds those who gain admission into expensive and protracted litigations.

---

[21] In *The State of Hawaii v. W. R. Grace & Co.-Conn., et al.*, Civil No. 93-4161-10 (1st Cir. Hawaii), Grace opposed a "20 building/complex, all issue trial," and argued that the threshold issue was product identification and that, in that case alone, the issue would entail three years of discovery.

## C. Setting of an April 1, 2002 Bar Date

The Debtors propose that an April 1, 2002 bar date be established for all asbestos claims other than future claims and claims of employees for personal injuries that may be subject of worker compensation. The bar date requirement is premised on the contention that "[a]ll parties whose claims are 'disputed, contingent, or unliquidated' must file a proof of claim by the Bar Date in order to 'be treated as a creditor with respect to such claim for the purposes of *voting and distribution*,' based on Fed. R. Bankr. P. 3003(c)(2)." (Debtors' Case Management Proposal at 2) (emphasis added).

The enactment of section 524(g) of the Bankruptcy Code in 1994 undermines the Debtors' proposal for the establishment of a bar date in respect of asbestos claims. First, section 524(g) is expressly made applicable to "present claims and future demands." 11 U.S.C. §§524(g)(1)(B) and (2)(B)(ii)(V). Second, section 524(g) expressly contemplates that any asbestos claim or demand will be *paid* by a trust established in accordance with that section. 11 U.S.C. §524(g)(1)(B). Thus, the statute intends that <u>all</u> asbestos claims will be subject to allowance or disallowance by the trust.

Thus, it is self evident that the Debtors' proposal for a bar date is unnecessary as to asbestos claims---whether present claims or future demands---in view of Grace's articulated goal of availing itself of section 524(g). Indeed, as we discuss below, but for section 524(g), Grace would have no arguable basis for being in bankruptcy. The principal significance of the determination of the amount of asbestos liability is whether any proposed plan of reorganization is feasible under section 1129 of the Bankruptcy Code; however, the long and expensive process of liquidating asbestos claims proposed

by the Debtors is unnecessary. Specifically, section 502(c) of the Bankruptcy Code requires that contingent and unliquidated claims "shall be estimated" if liquidation of such claims "would unduly delay the administration of the [chapter 11] case." 11 U.S.C. § 502(c).

By any standard, the Debtors' proposal to litigate asbestos property damage claims in this Court into, and probably beyond, the Second Quarter of 2003, not to mention the ill-defined process by which the Debtors propose to cull some claims and send them back to state courts next June, engenders undue delay. The notion of undue delay is particularly important in a mass-tort bankruptcy, lest we forget that there are people who are and will become sick, as well as property which has been contaminated or in which friable asbestos containing products have been installed.

The PD Committee is mindful that the district court rejected a similar argument in In re The Babcock & Wilcox Co.,et al., No. 00-10992, 2000 WL 1511175, *1 (E.D. La. Aug. 25, 2000); however, that decision is distinguishable for several reasons. First and foremost, the court concluded that "[a]scertaining the number and identity of present claimants will assist in valuing the claims in this class, by facilitating the claims allowance and estimation processes." Here, however, the PD Committee would show through the expert testimony of its asbestos claims estimator that a bar date is unnecessary to estimate the universe of property damage claims confronting Grace.

Further, as discussed in greater detail below, the PD Committee would submit that the proof of claim forms proposed by the Debtors provide little, if any, information concerning the value of such claims, as opposed to developing the Debtors' so-called "common threshold defenses." And furthermore, the fact that numerous of the Grace

property damage claims are embodied in class actions---we are unaware of any in Babcock & Wilcox---and therefore, subject of class proofs of claims,[22] can hardly be said to augment or facilitate the valuation of claims.

Other than the decision in Babcock & Wilcox, the PD Committee believes that in every other asbestos chapter 11, the bar date and the requirement for the filing of proofs of asbestos claims as a precondition of allowance was by agreement between the debtors and the asbestos claimants[23] or foregone altogether.[24]

In sum, a bar date and a proof of claim requirement serve no useful purpose in this case. In fact, it seems entirely incongruous to require present claimants to file proofs of claims to participate in distributions from a section 524(g) trust while future claimants have no such requirement. Rather, such impositions would represent no more than barriers to inclusion in the claims resolution process for asbestos property damage claimants.

---

[22] See: *In re Trebol Motors Distr. Corp.*, 211 B.R. 785, 787 (Bankr. D. Puerto Rico 1997), aff'd, *Trebol Motors Distr. Corp. v. Bonilla (In re Trebol Motors Distr. Corp.)*, 220 B.R. 500 (B.A.P. 1st Cir. 1998); *In re First International Equity Corp.*, 227 B.R. 358, 366 (Bankr. D. N.J. 1998); *Birting Fisheries v. Lane (In re Birting Fisheries, Inc.)*, 178 B.R. 849, 852 (Bankr. W.D. Wash. 1995); *Wilson v. Valley Elec. Membership Corp.*, 141 B.R. 309, 311 (E.D. La. 1992); *In re Bicoastal Corp.*, 133 B.R. 252, 255 (Bankr. M.D. Fla. 1991); *Zenith Labs., Inc. v.Sinay (In re Zenith Labs., Inc.)*, 104 B.R. 626 (Bankr. S.D.N.Y. 1989); *In re Retirement Builders, Inc.*, 96 B.R. 390 (Bankr. S.D. Fla. 1988); *In re American Reserve Corp.*, 840 F.2d 487, 493 ( 7th Cir. 1988); Contra: *Sheftelman v. Standard Metals Corp. (In re Standard Metals Corp.)*, 817 F.2d 625, 630-632 (10th Cir. 1987), vacated in part on other grounds, *Sheftelman v. Standard Metals Corp.*, 839 F.2d 1383 (1987), cert. denied 488 U.S. 881 (1988).

[23] *In re Eagle-Pitcher Indus., Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995); *In re The Celotex Corp.*, 204 B.R. 586 (Bankr. M.D. Fla. 1996).

[24] We believe that a bar date and proof of claim was not required in H.K. Porter, Raytech, and UNR, other than for voting purposes.

## D. Establishment of a Notice Program[25]

Axiomatically, the establishment of a bar date and the determination of whether it is applicable to all claimants---assuming *arguendo* that the Court does so---depends upon the ability of the Debtors to effectively notify property damage claimants. The Debtors and their expert, Katherine Kinsella, have seemingly devoted great energy and resources to developing a notification program ostensibly to ensure the broadest circulation of the fact of the proposed bar date. However, upon closer scrutiny, the proposed program fails of its intended purpose; worse yet, the program may be intentionally deficient to minimize the number of claimants actually heeding the call to file proofs of claim by the bar date. See, Mullane v. Central Hanover Trust Co., 339 U.S. 306, 315 (1950).

For purposes of this analysis, it is important to distinguish between the various types of property damage claims against the Debtors' estates.

### 1. Zonolite Claims

Zonolite Attic Insulation is an asbestos contaminated product that was marketed from approximately 1930 through 1984[26] and sold by Grace as a safe, harmless "do-it-yourself" product for installation in residences by homeowners. Unfortunately, however, Grace's Zonolite Attic Insulation was composed of asbestos contaminated vermiculite from Grace's Libby, Montana vermiculite mine. Despicably, that fact and the fact that

---

[25] By this response and memorandum, the PD Committee does not intend to analyze and comment upon proposed case management procedures that principally concern personal injury or future personal injury claimants. As to the former, we expect that the Official Committee of Asbestos Personal Injury Claimants will do so. As addressed elsewhere herein, unless and until a legal representative is appointed, future personal injury claimants will not have an effective spokesperson.

[26] Zonolite was sold by distributors and retailers long after that.

disturbance of the product could result in the release of asbestos fibers, was concealed by Grace.

The PD Committee estimates that Zonolite Attic Insulation continues to be in the attics and walls of hundreds of thousands or millions of homes nationwide. Importantly, homeowners remain unaware that Zonolite Attic Insulation is in their homes or that the product can contaminate their homes with asbestos fibers. Indeed, a scientifically conducted consumer survey conducted by GMA Research of just Washington state homeowners demonstrated that only four in every 100 homeowners has received any information, from any source, concerning potential health hazards from Zonolite Attic Insulation despite advisories issued by the Environmental Protection Agency and the Washington Department of Health. Moreover, detection by homeowners is particularly difficult since  most homeowners would not recognize Zonolite Attic Insulation  if they were to encounter it;[27] the product has often been covered by walls and floor boards; and, the product was oftentimes installed by prior owners.

Most importantly, Zonolite Attic Insulation poses grave risks of exposure and contamination when it is disturbed. Thus, the tragic possibilities are endless if notification requires a homeowner to tamper with walls or floors to discover whether Zonolite Attic Insulation is the insulation under such surfaces thereby disturbing the asbestos contaminated material.

---

[27] In an internal memo dated May 24, 1977, Grace recognized asbestos exposures "of upwards of 15f/ml" from Zonolite Attic Insulation and forecasted that the product would be banned. According to the memo, "[b]ased on the advice of corporate general counsel, [Grace] decided not to affix labels on...expanded products using Libby ore," because "[a] decision to label our consumer products would eliminate the risk of future liability, while exacerbating the risks of claims...from past use of the product."

The Debtors' proposed notification program for Zonolite Attic Insulation claimants[28] simply ignores the idiosyncrasies of the product and the claimants. <u>Small v. United States of America</u>, 136 F.3d 1334,1336 (C.A. D.C., 1998) ("in an increasingly populous and mobile nation, newspaper notices have virtually no chance of alerting an unwary person that he must act now or forever lose his rights…"). The Debtors place too much emphasis on "reaching" relevant groups and do not pay enough attention to the message being conveyed. In fact, there is no discussion whatsoever of the content of the Debtors' notice in the Debtors' Case Management Proposal or its Memorandum in support thereof.

As more particularly set forth in the affidavit of Todd Hilsee (attached as Exhibit A) of Hilsoft Notifications, the PD Committee's notification expert, the Debtors' notification plan suffers from numerous deficiencies in respect of Zonolite Attic Insulation claimants, including the following:

- The Debtors' notice targets too many audiences with a single communication and is therefore ineffective in reaching any particular audience;

- The Debtors' notice treats all claimants as though indistinguishable and ineffectively speaks to all of them;

- The Debtors' notice fails to describe or depict the appearance of the product;

- The Debtors' notice assumes that claimants are aware they have claims when, in fact, they have no such knowledge;

- The text of the Debtors' notice is not easily understood by the average homeowner;

---

[28] Notification of Zonolite Attic Insulation claimants presumes that such claimants ought be required to file proofs of claim. As discussed elsewhere, there is no necessity for filing more than class proofs of such claims.

- The Debtors' plan has too narrow a geographic focus; and,

- The Debtors' proposal fails to deal with the danger of disturbing the product.

## 2. Traditional Property Damage Claims

As for traditional property damage claims, which the Debtors mischaracterize as being solely related to Monokote-3,[29] the Debtors' misplace their reliance on this Court's approval of a notification program in In re Armstrong World Industries, et al., Case No. 00—4471 (JJF) (Bankr. D. Del. Order dated April 18, 2001). First, per the debtor in that case, unlike the Grace cases, "asbestos property damage claims simply are not material in the context of" the Armstrong chapter 11 cases. *Motion of Debtors For Order Vacating Appointment By United States Trustee of Official Committee of Asbestos–Related Property Damage Claimants,* August 21, 2001 at 10.

Second, even the Debtors apparently recognize that the Armstrong notice program (*i.e.,* publication of notice twice in a weekday edition of *The Wall Street Journal, The New York Times* and *USA Today* at least 30 days prior to the claims bar date) would fall woefully short of constitutionally required notice in this case where asbestos property damage claims against Grace entailed more than $696 million in settlement payments and judgments in excess of $60 million through December 31, 2000.

In this case, traditional property damage claimants are principally comprised of owners of commercial, institutional and governmental buildings and facilities throughout the world in which Grace asbestos containing products or materials have been installed. While the Debtors consistently point to the fact that there were only "seven unresolved" lawsuits pending at the date of the bankruptcy, only five of which were "active," they fail to point out that those lawsuits relate to potentially thousands of contaminated buildings

---

[29] See footnote 9.

and some are class actions. They also fail to address the as yet unasserted claims of the various states, governmental subdivisions and private property owners that are not barred by statutes of limitations.

Grace is the first chapter 11 implicating material asbestos property damage claims since the confirmation of a plan of reorganization establishing a qualified asbestos trust pursuant to 11 U.S.C. §524(g) in the chapter 11 of The Celotex Corporation and Carey Canada, Inc. in 1996. In re The Celotex Corporation et al., Case No. 90-10016-8B1 (Bankr. M.D. Fla.). There too, substantial disagreement existed as to the value of asbestos property damage claims ranging from several hundred million dollars to more than a billion dollars. It now appears that those claims will exceed $2 billion. In that case, claims which were not subject of pending lawsuits at the petition date were, in fact, subsequently asserted and allowed by the property damage claims administrator.

Thus, it is not a forgone conclusion that "what you see is what you get" and the notification program must be developed in such a way as to ensure that it effectively informs prospective asbestos property damage claimants. Moreover, even if we were to assume that every property owner had knowledge of this case, they are nonetheless entitled to reasonable notice before their claims are forever barred. New York v. N.H. & H.R. Co., 344 U.S. 293, 297 (1953). The Debtors' proposal falls short of the mark.

Again, referring to Mr. Hilsee's affidavit:

- The Debtors' notice proposal fails to inform of the wide-ranging types of property damage occasioned by Grace products;

- The Debtors' notice proposal fails to enumerate or describe Grace products giving rise to property damage claims;[30]

- The Debtors' proposal fails to give effective notice outside the United States; and,

- The Debtors' notice proposal does not focus on "reaching" administrators or owners of hospitals, airports, hotels, or other special use properties notoriously contaminated by asbestos.

Thus, if the Court were inclined to impose a bar date and the requirement for filing proofs of claims on any of the asbestos claimants, it must first determine whether the Debtors' proposed notification program can be meaningfully revamped[31] and, if so, cause that to be done. Mullane v. Central Hanover Bank & Trust, 339 U.S. at 314 (due process requires that notice be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their claims.").

### E. Approval of Proof of Claim Forms

As part of its Case Management Proposal, Grace has "crafted" proof of claim forms[32] that it contends "may be used to provide information critical in determining the validity of submitted claims." (Debtors' Case Management Proposal Memorandum at 25).    While the Debtors point to numerous cases that purportedly stand for the

[30] The PD Committee has reason to believe that the even Grace's "asbestos-free" Monokote 4 and 5 contained harmful levels of asbestos.
[31] Per Mr. Hilsee's affidavit, it is not at all clear, for the reasons set forth therein, that a notification program can be developed to overcome the procedural and substantive due process concerns engendered by the nature of Grace's asbestos property damage claims. Mr. Hilsee and the PD Committee will nonetheless continue to endeavor to evaluate and, if possible, formulate a truly effective notification program.
[32] We only concern ourselves here with asbestos property damage claims forms attached as Exhibits B and C to the Debtors' Case Management Proposal Memorandum.

31

proposition that other courts have authorized modified forms to elicit "extensive"
information, the PD Committee is unaware of any authority which warrants the forms
which the Debtors propose to require property damage claimants to complete in the
Grace cases; assuming, of course, the Court requires asbestos claimants to file proofs of
claim at all.

In fact, the PD Committee finds it deliciously ironic that the Debtors rely on the
decision in In re Babcock & Wilcox Co., 2000 WL 422372, at *4 (E.D. La. 2000), as the
"most recent" authority for a modified proof of claim form for asbestos personal injury
cases.[33] (Debtors' Case Management Proposal Memorandum at 26).   The decision in
Babcock & Wilcox  is remarkable for at least two reasons. First, the proof of claim form
proposed by the debtor in that case for asbestos property damage claims was no more
than Official Form 10 with "slight modifications." August 25, 2000 Order and Reason, In
re Babcock & Wilcox Co. at 15, attached as Exhibit B.

Second, the decision to which the Debtors refer was actually the third opinion of
that district court on the subject.[34]  In its first decision, however, the court observed:

> Rule 3001(a) requires that the proof of claim substantially conform
> to the relevant official form, which in this case is Official Form 10.
> Official Form 10 is a one-page document that merely requires the
> creditor's name, address and telephone number; the basis for the
> claim; the date the debt was incurred or a judgment obtained, if
> any; the total amount of the claim; a statement indicating whether
> the claim is secured or unsecured; and copies of supporting
> documents.

Id. at 16-17.

---

[33] Babcock & Wilcox is also represented by Kirkland & Ellis, Grace's bankruptcy counsel.
[34] We would have expected Grace's counsel—also counsel for Babcock & Wilcox—to have brought this to
our and the Court's attention. Fortunately, because property damage claims were not meaningfully
implicated in many of the asbestos cases since Celotex, the PD Committee and its counsel have been
carefully studying pleadings and interviewing parties in interest in those cases.

Accordingly, the court *rejected* the debtors' proposed proof of claim form[35] for asbestos personal injury claims which sought information concerning the debtors' threshold defenses to those claims. The court stated:

> The Court finds that the proposed claim form is unnecessarily detailed and would amount to an undue burden on parties who wish to assert claims. The 21 – page Manville Trust form relied on by debtors is not a proof of claim form required to meet a bar date but a claim form used by the trust to evaluate each claim individually for the purposes of liquidation and payment. The Court is therefore not persuaded that the extensive information requested in the Manville Trust form is an appropriate model for a proof of claim that will subject claimants to a bar date.
>
> The Court therefore finds that the claim form must be substantially modified. As indicated, disputed claims must establish, at a minimum, the ground on which they base debtors' liability. In this case, that entails establishing a claimant's exposure to asbestos from debtors' products and the injuries that resulted from that exposure. *The court will therefore allow debtors to ask questions that go to this prima facie evidence of liability.*

Id. at 21-22 (emphasis supplied).

The court thereupon directed the debtors to delete any requirements for the submission of death certificates or medical reports; the precise date of diagnoses; detailed information concerning exposure; and, identification of the precise debtor to whom exposure is attributed. Id. at 22-27. In short, the court insisted that the proof of claim contain minimal information concerning the claim.

In its second decision, the court once again rejected the debtors' proposed form since it was likewise impermissibly onerous. October 6, 2000 Order and Reasons, In re Babcock & Wilcox Co., at 3, attached as Exhibit C. The court observed that the offensive

---

[35] Babcock & Wilcox contended that its proposed form emanated from the forms used in *Johns-Manville* and in *Celotex*. As the court observed in the following excerpt, the Johns-Manville form was that of its claims facility, not the form required by the bankruptcy court. In Celotex, the proof of claim form proved to be valueless and a new form was promulgated after the effective date of the plan of reorganization by the Celotex Asbestos Trust property damage claims facility.

aspects of the form "may in effect, if not by design, discourage the filing of claims, which is not the function of a proof of claim form." Id.

The opinions in Babcock & Wilcox are instructive and make our point. First and foremost, in the case of asbestos property damage claims, Official Form 10 was deemed sufficient. Second, the court made it abundantly clear that minimal information establishing mere "prima facie evidence of liability" is sufficient. Finally, the court rebuked the debtors for the inclusion of any information or requirement that might discourage the filing of claims.

Here, the Debtors' proposed proof of claim forms for traditional property damage claims and Zonolite Attic Insulation claims are in stark contrast to those approved in Babcock & Wilcox, and therefore, should not be authorized. The forms do no more than attempt to facilitate the Debtors' analysis of defenses to filed claims. There is simply no authority for the proposition that sections 501 and 502 of the Bankruptcy Code permit the use of proof of claims for discovery purposes. In fact, however, the proposed forms would not even facilitate the Debtors' impermissible purposes since the proposed forms fail to take into account significant differences in the formulation of so-called threshold issues from jurisdiction to jurisdiction. Most importantly, the forms are the epitome of undue burdensomeness, both in terms of the detailed information sought and the lack of clarity.

In short, the proposed forms are well nigh impossible to complete--- whether by design or by effect---and would serve to discourage claimants from filing claims against the Debtors' estates.

34

Making matters worse is the fact that buried in the exceedingly confusing instructions for "Who Should Use This Form" is the unprecedented requirement that a claimant file a separate form for <u>each</u> <u>property</u> subject of its claim. In contrast, the Debtors' own Schedules of Liabilities list disputed and unliquidated known claims by the claimants' names and not separately by the buildings subject of their claims. Thus, under Bankruptcy Rule 3003(c)(3), holders of disputed and unliquidated claims are only required to file "a proof of claim."

Also, as a practical matter, such an imposition could be overwhelming. The Debtors apparently assume that every claimant is already aware that it has a claim which might also explain why the Debtors have devised a notification program that merely gives notice of the bar date rather than increasing the level of awareness that building owners may have claims against the Debtors that must be asserted by the bar date. There is no basis for such an assumption nor is one offered. Thus, under the Debtors' proposal, a building owner learning for the first time that if it has Grace products it may have a claim, would be compelled to inspect its buildings---all of them---and file separate claims by the bar date. In the case of a state or another owner of many buildings, that process could take months, or longer, when all that is really relevant to the process (without conceding the process is appropriate in the first place) is for the property owner which knows it bought Grace products to simply put the estate on notice of its claim.

Finally, the Debtors altogether fail to provide any proposed form for class proofs of claim. Surely, the Debtors do not propose, for example, that Marco Barbanti, the class representative for Washington Zonolite Attic Insulation claimants be required to file separate proofs of claim for each member of that certified mandatory non-opt out class

35

containing the information sought by the Debtors in their proposed Zonolite proof of claim, building by building. To so require would have the practical effect of disallowing the claims of all class members who as yet remain unidentified.

## F. A More Sensible Approach

The imposition of the ritualistic requirement that asbestos property damage claimants file proofs of claim simply serves no useful purpose. In every prior asbestos bankruptcy implicating section 524(g), the allowance or disallowance of such claims has been relegated to the asbestos trust's claims facilities for determination. And in each of those cases the claims facilities have made such determinations pursuant to claims procedures that entail the filing of thorough proofs of claims, promulgated in the course of the confirmation process, together with supporting documentation and evidence. It makes little sense and defies the notion of avoiding burdensome and exclusionary claims techniques to impose a redundant claims form requirement.

In this case, the critical exercise is estimating the universe of present and future asbestos claims. That is an empirical determination---especially in respect of Zonolite and future claims---that derives no benefit from the filing of proofs of claim. Rather, the analysis is virtually altogether derived from the Debtors' historical pay-out experience, and other anecdotal information, discounted, if appropriate, by some quantitative measure of anticipated applicable defenses. Should the estimation analysis result in the conclusion that the Debtors' assets are insufficient to cover its asbestos liabilities, the actual value of those claims makes little difference. In that instance, section 524(g) leaves it to the

36

ensuing trust to ensure that all asbestos claims---whether present or future---are paid "in substantially the same manner." 11 U.S.C. §524(g)(2)(B)(ii)(V).   In fact, section 524(g) imposes upon the trust an obligation to periodically *estimate* all such claims in order to provide such assurance. Id.

## G. The Disposition of Threshold Issues

The Debtors' Case Management Proposal attempts to add some sense of legitimacy and thoughtfulness by rolling out a seemingly comprehensive schedule of events by month, day and year that extends well into 2003. Nonetheless, the proposal leaves a great deal of uncertainty as to what we will actually be doing or, more importantly, why we are doing it in the first place, which brings us back to the inquiry whether this chapter 11 is a legitimate exercise in reorganization. In regard to the latter, Grace's proposal concerning so-called "common threshold issues" is especially revealing and calls into question its real motivations.

In SGL Carbon, the Third Circuit was presented with the issue of

> (w)hether on the facts of this case, a Chapter 11 bankruptcy petition filed by a financially healthy company in the face of potentially significant civil antitrust liability complies with the requirements of the Bankruptcy Code.

Id.

The debtor was the wholly owned North American subsidiary of the largest manufacturer of carbon and graphite products in the world.   Following an investigation by the United States Department of Justice into alleged price fixing by graphite manufacturers, various steel producers filed class action lawsuits against the debtor and

37

other manufacturers. These suits spawned additional actions so that at the time the debtor filed its petition in this Court, it was a defendant in one certified class action, six other federal district court actions and one Canadian court action.

The day after it commenced the proceedings, one debtor issued a press release in which it proclaimed its financial health and explained that it filed for bankruptcy "to protect itself against excessive demands by plaintiffs in civil antitrust litigation and in order to achieve an expeditious resolution of the claims against it." (Id. at 158). Contemporaneous with the press release, the debtor also conducted a conference call with securities analysts in which it stated that the debtor's "Chapter 11 petition was 'fairly innovative (and) creative' because 'usually Chapter 11 is used as a protection against serious insolvency or credit problems which is not the case [with SGL Carbon's petition].'" (Id. at 159).

The Official Committee of Unsecured Creditors[36] moved to dismiss the case on the grounds that it was a "litigation tactic designed to frustrate the prosecution of the civil antitrust claims proceeding against [SGL Carbon] and preserve [SGL Carbon's] equity from those claims." In re SGL Carbon Corp. 233 B.R. 285, 287 (D.Del.1999). After conducting a modified evidentiary hearing, this Court denied the Committee's motion to dismiss. This Court assumed that 11 U.S.C. §1112(b) imposes a duty of good faith upon bankruptcy petitioners and that this duty requires that the bankruptcy reorganization be designed to facilitate the restructuring of a debtor's finances. (Id. at 288). Nevertheless, this Court determined that the debtor's petition was valid because "plaintiffs' litigation was imperiling SGL Carbon's operation by distracting its management, was potentially ruinous and could eventually force the company out of business." Id. at 291.

---

[36] Eight of the nine Committee members were antitrust claimants against the debtor.

On appeal, the Third Circuit reversed.    Significantly, the Third Circuit agreed with this Court's assumption that good faith is an essential requirement for a valid chapter 11 petition, and held that "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. §1112(b) unless it is filed in good faith." In re SGL Carbon, 200 F.3d at 160.

The Third Circuit also agreed with this Court that the requirement of good faith mandates that the bankruptcy serve "a valid reorganizational purpose." Id. at 163.

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers---the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.---that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business the exercise of these powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

Id. at 165, 166.

The Court stated that "filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,'" and thus endorsed those decisions that dismissed chapter 11 petitions on this basis.    In re HBA East, Inc., 87 B.R. 248 (Bankr.E.D.N.Y.1988)("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith"); In re Marsch, 36 F.3d at 825, 828; (the debtor filed a chapter 11 petition merely to obtain a tactical litigation advantage and the court ruled "the purpose for which the petition was filed was not consonant with the purpose of the Bankruptcy Code" and the case was dismissed); Furness v. Lilienfield, 35