B.R. at 1006, 1013 ("The Bankruptcy Code's provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

After analyzing the debtor's public filings and press releases, the Third Circuit concluded that the petition "was not motivated by a desire to reorganize or rehabilitate SGL Carbon's business...but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms." In re SGL Carbon Corp., 200 F.3d at 167. It thus held that the petition lacked a valid reorganizational purpose and was subject to dismissal for lack of good faith under 11 U.S.C. §1112(b).

The Court relied on the statements of the debtor and its officials that the company did not need to reorganize under chapter 11, considering that it was "financially healthy, would continue its 'normal business operations' despite bankruptcy,' and was experiencing 'healthy and growing success.'" Id. at 166. The Court also determined that there was no evidence that the debtor "had difficulty meeting its debts as they came due, that it had any overdue debts, or that it had defaulted on any debts." Id.

With respect to the debtor's contention that adverse judgments in the antitrust actions could cause the debtor financial ruin, the Court found no evidence to support this claim. Id. at 163. To the contrary, the Court determined that at the time of filing, the debtor had an untouched reserve, and "no evidence was presented with respect to the amount sought by the antitrust plaintiffs beyond SGL Carbon's repeated characterization of their being 'unreasonable.'" Id.

The Court acknowledged that companies have been permitted to seek bankruptcy protection "when faced with pending litigation that poses a serious threat to the

companies' long term viability," but observed that "[i]n those cases, debtors experienced serious financial and/or managerial difficulties at the time of filing." Id. at 164.

The Court noted that in In re Johns-Manville Corp., 36 B.R. 727 (B.K.S.D.N.Y. 1984), which the debtor relied on to support its filing, an increase in asbestos claims "forced the debtor to either book a $1.9 billion reserve thereby triggering potential default on a $450 million debt which in turn could have forced partial liquidation, or file a Chapter 11 petition." Id. at 730. SGL Carbon by contrast---like Grace---faced no such financial consequences at the time of filing. "Although SGL Carbon may have to file for bankruptcy in the future, such an attenuated possibility standing alone is not sufficient to establish the good faith of its present petition." SGL Carbon, 200 F.3d at 164.

The Third Circuit also questioned the debtor's reliance on Johns-Manville because the court in that case expressed a very narrow view of the "good faith" requirement, and suggested that a petitioner lacks good faith "only if filed by a creditor-less company formed as a sham solely for the purpose for filing a bankruptcy petition, by a company that never operated legitimately, or by a company wishing to forestall tax liability or deed of trust papers." Id. (citing In re Johns-Manville, 36 B.R. at 737-738).

In reaching its decision that the debtor's motivation to improve its litigation position precluded it from meeting the good faith requirement under 11 U.S.C. § 1112(b), the Third Circuit acknowledged the impact of the Supreme Court's decision in Ortiz v. Fiberboard Corp., 527 U.S. 815 (1999), and Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997).

> [W]e are cognizant that it is growing increasingly difficult to settle large scale litigation...We recognize that companies that face massive potential liability and litigation costs continue to seek ways to rapidly conclude

> litigation to enable a continuation of their business and to maintain access to the capital markets.

SGL Carbon, 200 F.3d at 168.

The Court also appreciated the attraction that the Bankruptcy Code provided for such companies. Nevertheless, the Court recognized that necessary limits that had to be placed on the reach of the Code in order to ensure its integrity and to protect the rights of the parties involved.

> As evidenced by SGL Carbon's actions in this case, the Bankruptcy Code presents an inviting safe harbor for such companies. But this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings. Allowing SGL Carbon's bankruptcy under these circumstances seems to us a significant departure from the use of Chapter 11 to validly reorganize financially troubled businesses.

Id.

Thus, were we to accept all of Grace's self aggrandizement of its business, which we have no reason to doubt, as well as the correctness of its view that all asbestos claims are without merit for scientific or procedural reasons, then SGL Carbon would require this case to be dismissed if the purpose of this chapter 11 was shown to be Grace's effort to merely rearrange the landscape of asbestos litigation. When viewed against the backdrop that Grace depicts about itself and the validity of asbestos claims, the Debtors' Case Management Proposal presents a veritable Hobson's choice for Grace: Get out of the asbestos litigation business or get out of this Court.

The only justification we can conceive of for this chapter 11 is that Congress facilitated the bankruptcy remedy for asbestos companies---arguably, for solvent companies, as well as insolvent ones---upon its enactment of section 524(g). We note,

however, that Congress has persistently refused to extend the same relief to other industries confronted with mass tort liabilities. The inescapable conclusion, borne out by the results in every asbestos bankruptcy since the enactment of section 524(g), is that those asbestos companies which choose this course of action must exit chapter 11 via the establishment of qualified asbestos trusts and the trusts are charged with the determination and payment of asbestos claims, not the debtors. Thus, the only issue for the debtors is how they fund the trusts. At the risk of being repetitive, that issue does not and cannot entail litigation of the liquidated amounts of asbestos claims in the bankruptcy courts; it merely entails the estimation of those claims.

The Debtors' proposal that we now embark upon consolidated discovery and hearings on motions for summary judgment based on scientific evidence, statutes of limitations and principles of *res judicata*, are unnecessary, ill conceived, time consuming and expensive. They are unnecessary because section 524(g) provides a claims resolution mechanism and the process of estimation can statistically and empirically accommodate these theories. Indeed, the proposal is inconsistent with section 524(g) calling into question the propriety of Grace's invocation of bankruptcy in the first instance. They are ill conceived because each claim is subject to the laws of the state in which it arose, not some notion of federal common law. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law."); Grogan v. Garner, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law."). It is ludicrous to even suggest that asbestos claims

that are wholly factually unrelated can be heaped into "various categories" and then determined en mass under different state law theories of preclusion which are entirely dependent upon the nuances of each state's laws, as well as the facts of each claim, when the touchstone of summary judgment is that there are no material facts in dispute.

Moreover, Grace's proposal for the consolidation of the so-called "common threshold issues" is entirely inconsistent with the positions it has taken in actions brought against it prior to bankruptcy. For example, in <u>Dayton Independent School District</u>,[37] 82 Texas Public School Districts sought to recover the cost of abating asbestos containing material in approximately 600 public buildings. Grace vigorously opposed the schools' efforts to consolidate their claims for trial pursuant to Rule 42. In its pleadings opposing the court's trial format to initially try the claims of just 5 school districts on certain common issues pursuant to Rule 42, Grace represented to the court as follows:

> It may prove true that for some theories, like negligence, a school in Dallas purchased MonoKote MK-3 for its building at the same time that Dayton ISD allegedly purchased that product for its school. This coincidence is now difficult to predict. It is essential to understand, however, that any judgment of liability for those coincident schools will be based upon the determination of all of the elements of negligence (<u>e.g.</u>, duty to warn, failure to warn, demonstrated harm, proximate causation of harm, absence of intervening cause, comparative fault calculations, etc.). thus, what will be adjudicated for the claim of Dallas ISD with respect to its school that purchased MonoKote MK-3 in 1961 will differ as to liability from what will be adjudicated for the claim of Dayton ISD for its 1961 constructed school.
> Further, with respect to strict liability, the issue to be adjudicated for liability is equally fragmented over time and by specific facts developed as to each separate building....
> Thus, the issue of defectiveness will necessarily vary building by building even within each school district.

---

[37] See, footnote 3.

In each building, the issues will be whether the asbestos fibers, if any, found in the air came from a ceiling product (as opposed to ambient air, pipe and boiler insulation, floor tiles, etc.) and whether they pose a detectable and <u>unreasonable</u> danger. The condition of the material in each building is thus essential evidence for each claim of strict liability, just as the Dayton officials believed in 1984... . Further, the elements of strict liability include as well injury and comparative causation. Building conditions and maintenance are thus conspicuously relevant. Moreover, even in a design defect claim, state of the art evidence <u>is</u> admissible and relevant to the technological environment as of the time of sale. (citations omitted). The dimension of time therefore joins the splintering of claims by building conditions even under strict liability.

\*\*\*

<u>It is not practical, in this procedural, legal and factual environment, to carve out artificial, theoretical questions for common resolution as those general questions will not be the basis of any liability adjudication. The creation of such general questions would resolve nothing for the five plaintiffs in the initial trial.</u>

Moreover, Article III of the Constitution empowers federal courts to hear and determine "cases and controversies." "The case or controversy requirement of Article III of the Constitution is fundamental, and dictates that legal issues be presented in the context of actual cases and not in the abstract." (citation omitted).... .

\*\*\*

<u>The splintering out of abstract questions as to some aspect of a claim would also defeat the Seventh Amendment requirement that interrelated issues be tried to a single jury.</u>

\*\*\*

> It is also possible for parties to agree that a "test case" be litigated which will be treated by the parties as determinative of particular issues in other cases. This procedural device requires the agreement of the parties who thereby waive their rights to jury trial of other claims. For all of the reasons set out above, Grace and [United States Gypsum] expressly decline to treat the initial trial as a "test case." <u>The issues for each plaintiff and for each building are simply too fact-specific to admit of resolution in a fashion divorced from the particular facts that establish the adverse legal claims of the parties.</u>

Submission by W. R. Grace & Co. and United States Gypsum Company Regarding Common Issues at 7-14, <u>Dayton Independent School District, et al. v. W. R. Grace & Co.' et al.</u>, attached as Exhibit D (emphasis added).

Likewise, in its opposition to class certification in <u>Kirbyville Independent School District, et al. v. Asbestospray Corporation, et al.</u>,[38] in which the State of Texas, its agencies, public colleges and universities, as well as 352 other governmental entities sought to recover abatement costs for approximately 500 buildings, Grace argued:

> Once the individual members of the putative class have identified the products contained in their buildings, to recover damages, they will also have to show how much of that product is present, where it is located, the condition of the product and the potential hazards posed by that product as installed in that particular building, including the friability of the asbestos as installed, and the asbestos level in the air in each building. <u>Whether asbestos-containing materials installed in buildings are hazardous cannot be answered in the abstract or in a vacuum.</u> (citation omitted). <u>Rather determining whether defendants' products pose any hazard - which is obviously an essential element of plaintiff's case - requires a site specific, building by building analysis</u>....
>
> ***
>
> In some cases, the defenses to liability raised by the defendant have been held to raise a common issue of sufficient importance to provide a basis for class certification. (citation omitted). <u>However, in the present case, no defense raises an issue common to the class as a whole. A variety of defenses will</u>

---

[38] <u>Id.</u>

> be available to certain of the defendants in response to certain of the plaintiffs' claims, and in each case, the particular defense will depend on the particular individual facts applicable to the specific parties involved. For example, as to all plaintiffs, many claims may be reduced or eliminated by virtue of an analysis of comparative fault or intervening cause. Each individual member of the proposed class is likely to have had different levels of knowledge concerning asbestos that each acquired at different times. Further, in many cases, engineers and architects participated in the decisions to install asbestos-containing materials and decided what type of asbestos-containing product to use, and in what quantities, in the various buildings to members of the proposed class. Those sophisticated agents may well be partially responsible for the damages, if any, that plaintiffs allegedly suffered.
>     Issues of timing that are relevant to statutes of limitations and repose defenses are also individual in character and incapable of being decided on a class-wide basis. The date of the installation of the asbestos will differ from plaintiff to plaintiff and even from building to building. Thus, the availability of the statute of repose as a defense to plaintiffs' claims will have to be decided on an individual basis. With regard to the statute of limitations, some of the individual class members may be protected by Section 16.061 of the Texas Civil Practice and Remedies Code, which provides that the claims of certain public entities will not be barred by statutes of limitations, while others cannot rely on Section 16.061. Thus, the applicability of the statutes of limitations raises individual issues of both fact and law.
>     The "state of the art" defense is also not a predominant common question here. The precise outlines of the "state of the art" will differ from defendant to defendant depending on the state of knowledge of each defendant and the time period during which asbestos-containing materials were installed in particular buildings. It is clear that the "state of the art" defense will thus be highly dependent on individual facts.

Defendant W. R. Grace & Co.-Conn.'s Opposition to Plaintiffs' Motion For Class Certification at 33-35, *Kirbyville Independent School District, etc. v. Asbestospray Corporation, et al.*,[39] attached as Exhibit E.

Ever the alchemist in its bankruptcy laboratory, transforming their previous "good faith" representations to the courts presiding in the underlying cases, Grace now takes the

---

[39] Id.

47

opposite view that it can uniformly dispose of "common threshold issues" such as statutes of limitations and causation as to all categories of asbestos property damage claims.[40]

Adding insult to injury, is the Debtors' notion that the Court appoint a "Litigation Committee" to represent Zonolite Attic Insulation claimants in this folly. (Debtors' Case Management Proposal Memorandum at 46). Testimony to the Debtors' intellectual dishonesty in respect of this proposal is its promotion of the fiction that the bankruptcy courts in other asbestos and mass tort cases "have routinely appointed special committees to represent [the interests of asbestos and mass tort] claimants in common issue litigation." (Id. at footnote 26). None of the committees referred to by the Debtors to make their point were appointed for the purpose the Debtors contend; they were appointed for the same purposes served by the PD Committee, the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Unsecured Creditors in this case. See, 11 U.S.C. §1103(c).

Furthermore, the appointment of a "Litigation Committee" would merely serve to reverse the certification of class representatives in pending Zonolite Attic Insulation class actions that already have been certified, such as Barbanti and Anderson Memorial Hospital, as well as derail any legitimate effort to certify other pending Zonolite Attic Insulation class actions. The PD Committee is unaware of any authority conferred upon this Court to undo the appointment of a class representative. In fact, it occurs to us that this was the Debtors' hidden agenda by this unprecedented proposal, once again calling

---

[40] See, In re Chambers Development Company, 148 F.3d 214, 229 (3rd Cir. 1998) ("Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in (cont'd) the same or in a previous proceeding...designed to prevent litigants from playing fast and loose with the courts.").

48

into question whether the Debtors had a legitimate reorganization purpose when they filed these chapter 11 cases.

### H. Rule 42 Common Issue Trials

The Debtors' Case Management Proposal sheds little if any light on the purpose or the scope of the proposed Rule 42 trials it would have this Court convene upon the conclusion of the ill begotten summary judgment hearings. Then again, since these trials are not proposed to commence until the Second Quarter of 2003, and given all of the mischief and comic possibilities which would precede the trials under the other aspects of the Debtors' Case Management Proposal, the Debtors may be well advised to leave for another day greater definition of this ultimate event.

Without further illumination, the PD Committee is unable to fully assess this proposal. However, all of the concerns we have expressed concerning the propriety and wisdom of approaching this asbestos bankruptcy proceeding as though a consolidated litigation in defiance of section 524(g), ample precedent from prior asbestos bankruptcies, and the fundamental Constitutional and state law rights of asbestos claimants, are likewise applicable to this proposal.

The only common issue worthy of a Rule 42 trial is the estimation of the Debtors' asbestos property damage claims. In relatively short order, The PD Committee can be in a position to present the testimony and evidence of its estimation experts and witnesses to the Court. We are under the impression that the Debtors have likewise engaged such an expert of their own. If not, they certainly can do so. An estimation trial can be concluded

in less than one month whereupon the parties can begin in earnest to "reorganize" these Debtors availing themselves of section 524(g) of the Bankruptcy Code.[41] Such an elegantly simple solution---free of pretense or subterfuge---portends a far better and efficient result for all constituencies of the Debtors' estates, and promotes judicial economy. Most importantly, it will also legitimize the Debtors' invocation of chapter 11.

## IV. CONCLUSION

While Grace would have everyone believe that it was forced into chapter 11 by the onslaught of asbestos litigation, Grace's long and shameful journey to bankruptcy court actually began with its own decisions to mine asbestos and manufacture asbestos containing products and then, to continue to do so well after it learned that its activities and products caused injuries and damage. Grace apparently chooses to stay its course and to continue to erect roadblocks for those who have for far too long doggedly pursued it. Each and every element of the Debtors' Case Management Proposal represents another barrier. Respectfully, the Court should and must bring this breathtaking trip to a screeching halt.

WHEREFORE, the Official Committee of Asbestos Property Damage Claimants respectfully urges this Court to (1) deny the Debtors' Case Management Proposal; (2) enter a Case Management Order establishing deadlines and schedules for the estimation

---

[41] The PD Committee would also urge the Court to promptly appoint a Legal Representative for future claimants. Neither of the Official Asbestos Committees appointed in this case represent the interests of (cont'd) future claimants. See, Georgine v. Amchem Prods., 83 F.3d 610, 630-31 (3d Cir. 1996). Practically, as well as legally, no real progress towards confirmation of a plan of reorganization can occur until a Legal Representative has been appointed. 11 U.S.C. §524 (h). The appointment of a Legal Representative is the only constitutionally permissible means of ensuring the right of future claimants to due process, as well as to obtain a channeling injunction applicable to future claims. See generally, Ralph R. Mabey & Jamie Andre Gavrin, Symposium on Bankruptcy: Chapter 11 Issues: Constitutional Limitations on the Discharge of Future Claims In Bankruptcy, 44 S.C.L. Rev. 745, 784 (1993).

of asbestos property damage claims; (3) appoint a Legal Representative for future claimants; and (4) grant such further relief as it deems just and appropriate.

Dated: September 7, 2001

                        Respectfully submitted,

                        BILZIN SUMBERG DUNN BAENA
                        PRICE & AXELROD LLP
                        2500 First Union Financial Center
                        200 South Biscayne Boulevard
                        Miami, Florida 33131-2336
                        Telephone: (305) 374-7580

                        Scott L. Baena (Admitted Pro Hac Vice)

                                  and

                        FERRY & JOSEPH, P.A.
                        824 Market Street, Suite 904
                        P.O. Box 1351
                        Wilmington, Delaware 19899
                        Telephone: (302) 575-1555

                        By: s/ Theodore J. Tacconelli
                             Michael B. Joseph
                             (Del. Bar No. 392)
                             Theodore J. Tacconelli
                             (Del. Bar No. 2678)

                        CO-COUNSEL FOR THE OFFICIAL
                        COMMITTEE OF ASBESTOS
                        PROPERTY
                        DAMAGE CLAIMANTS

526835