# EXHIBIT E

Downloaded By: John S. Fitzgerald

Company: W R GRACE & CO
Form Type: 10-K405      SEC File #: 001-13953
Description: FORM 10-K WITH ITEM 405 CHECKED-OFF ON COVER
SEC File Date: 04/16/01

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC                   New York, NY                   Chicago, IL
Los Angeles, CA                    Miami, FL                     Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

===============================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

--------------------------------

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2000          Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                    65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
| --- | --- |
| Common Stock, $.01 par value<br>Preferred Stock Purchase Rights | New York Stock Exchange, Inc. |
| 7-3/4% Notes Due 2002<br>(issued by W. R. Grace & Co.-Conn.,<br>a wholly owned subsidiary) and<br>related Guarantees | New York Stock Exchange, Inc. |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [X]

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates was approximately $135,346,000 at March 12, 2001.

At March 12, 2001, 65,456,505 shares of W. R. Grace & Co. Common Stock, $.01 par
value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

None.

===============================================================================

TABLE OF CONTENTS

PART I.........................................................................1

    Item 1.    Business............................................................1
                 Chapter 11 Filing.............................................1
                 Business Overview.............................................1
                 Products And Markets..........................................4
                 Discontinued Operations.......................................9
                 Research Activities...........................................9
                 Patents And Other Intellectual Property Matters..............9
                 Environmental, Health And Safety Matters....................10
    Item 2.    Properties.........................................................11
    Item 3.    Legal Proceedings..................................................11
    Item 4.    Submission of Matters to a Vote of Security Holders..............15

PART II........................................................................16

    Item 5.    Market for Registrant's Common Equity and Related
                 Shareholder Matters...........................................16
    Item 6.    Selected Financial Data............................................17
    Item 7.    Management's Discussion and Analysis of Results of Operations
                 and Financial Condition.......................................18
    Item 7A.   Quantitative and Qualitative Disclosures About Market Risk.......18
    Item 8.    Financial Statements and Supplementary Data......................18
    Item 9.    Changes in and Disagreements with Accountants on Accounting
                 and Financial Disclosure......................................18

PART III.......................................................................18

    Item 10.   Directors and Executive Officers of the Registrant...............18
    Item 11.   Executive Compensation............................................20
    Item 12.   Security Ownership of Certain Beneficial Owners and Management...31
    Item 13.   Certain Relationships and Related Transactions...................33

PART IV........................................................................33

    Item 14.   Exhibits, Financial Statement Schedules, and Reports on
                 Form 8-K......................................................33

SIGNATURES.....................................................................39

FINANCIAL SUPPLEMENT........................................................F-1

PART I

ITEM 1.  BUSINESS

CHAPTER 11 FILING

On April 2, 2001, W. R. Grace & Co. ("Grace" or the "Company") and 61 of its United States subsidiaries and affiliates filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in United States Bankruptcy Court for the District of Delaware. The cases were consolidated for the purpose of joint administration and were assigned case numbers 01-1139 through 01-1200. None of the Company's foreign subsidiaries were included in the filing.

The filing was made in response to a sharply increasing number of asbestos-related bodily injury claims. Under Chapter 11, Grace expects to continue to operate its businesses as debtor-in-possession under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it.

Prior to 2000, Grace was able to settle asbestos-related claims through direct negotiations. The filings of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in bodily injury claims, which Grace believes is due to a surge in unmeritorious claims. Trends in case filings and settlement demands, which show no signs of returning to historic levels, and which have been exacerbated by the Chapter 11 filings of several co-defendants in asbestos bodily injury litigation, increased the risk that Grace would not be able to resolve its pending and future asbestos claims under the current state court system.

Grace has concluded that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims settlement process. By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

Grace's asbestos-related litigation and Chapter 11 filing is further discussed in Item 3 of this Report, and in Notes 1 and 3 to Grace's Consolidated Financial Statements for the three years in the period ended December 31, 2000 ("Consolidated Financial Statements") and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

BUSINESS OVERVIEW

W. R. Grace & Co., through its subsidiaries, is one of the world's leading specialty chemicals companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace primarily operates in the following two business segments:

o   Davison Chemicals manufactures catalysts and silica-based products.
    Davison Chemicals' catalysts include (1) fluid cracking catalysts and
    additives used by petroleum refineries to convert distilled crude oil
    into transportation fuels and other petroleum-based products; (2)
    hydroprocessing catalysts that upgrade heavy oils and remove certain
    impurities; and (3) polyolefin catalysts and catalyst supports that are
    essential components in the manufacture of high density and linear low
    density polyethylene resins used in products such as plastic film,
    high-performance plastic pipe and plastic household containers. Davison
    Chemicals' silica gel, colloidal silica, and zeolite adsorbents are
    used in a wide variety of industrial and consumer applications, such as
    ink jet paper, separations/chromatography, plastics, toothpastes,
    paints, precision investment casting, and insulated glass, as well as
    in the refining of edible oils and for purification in petrochemical
    processes. Davison Chemicals accounted for approximately 50% of Grace's
    2000 sales.

o   Performance Chemicals produces (1) specialty construction chemicals,
    including performance-enhancing concrete admixtures, cement additives
    and masonry products; (2) specialty building materials, including
    fireproofing and waterproofing materials and systems; and (3) container
    and closure sealants that protect food and beverages from bacteria and
    other contaminants, extend shelf life and preserve flavor, and coatings
    used in the manufacture of cans and closures. Performance Chemicals
    accounted for approximately 50% of Grace's 2000 sales.

Grace also has other business interests as described in "Other Businesses and
Investments" below. In 1997, Grace classified its former flexible packaging
business ("Packaging Business") as a discontinued operation. The Packaging
Business was separated from Grace on March 31, 1998 in a transaction described
in Notes 1 and 4 to the Consolidated Financial Statements.

        As used in this Report, the term "Grace" or the "Company" refers to W.
R. Grace & Co., a Delaware corporation and, in certain cases, one or more of its
subsidiaries and/or their respective predecessors. Grace's principal executive
offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone
410/531-4000. As of year-end 2000, Grace had approximately 6,300 full-time
employees worldwide in its continuing operations.

        Information concerning net sales, pretax operating income and total
assets of Grace's continuing operations by business segment and information by
geographic area for 2000, 1999 and 1998 is contained in Note 20 to the
Consolidated Financial Statements in the Financial Supplement to this Report.

        Strategic Objectives and Actions. Grace's strategy has been, and will
continue to be, to seek to enhance enterprise value by profitably growing its
specialty chemicals businesses on a global basis and achieving high levels of
financial performance. To achieve these objectives, Grace plans to (i) invest in
research and development activities, with the goals of introducing new
high-performance products and services and enhancing manufacturing processes;
(ii) implement process and productivity improvements and cost-management
initiatives (including the use of Six Sigma processes), including rigorous
controls on working capital and capital spending; and (iii) pursue selected
acquisitions and alliances. These plans are designed to make

2

Grace a high-performance company focused on the strengths of its global specialty chemicals businesses.

Projections and Other Forward-Looking Information. This Report contains, and other communications by Grace may contain, projections or other "forward-looking" information. Forward-looking information includes all statements regarding Grace's expected financial position, results of operations, cash flows, dividends, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology, plans and objectives of management, and markets for stock. Like any other business, Grace is subject to risks and other uncertainties that could cause its actual results to differ materially from any projections or that could cause other forward-looking information to prove incorrect.

Most significantly, Grace is a defendant in thousands of lawsuits related to previously sold asbestos-containing products. During 2000, several adverse developments occurred that resulted in a $294 million increase in Grace's estimated cost of disposing of its pending and expected future asbestos-related claims. As a result of these developments, Grace, following a thorough review of its strategic alternatives, filed for protection under Chapter 11 on April 2, 2001. See Item 3 of this Report, and Notes 1 and 3 to Grace's Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report, for a more detailed discussion of risks related to Grace's asbestos liabilities.

In addition to general economic, business and market conditions, Grace is also subject to other risks and uncertainties, including the following:

- o    developments in and the outcome of the Chapter 11 proceedings;

- o    the loss of flexibility in operating its businesses and the higher costs of doing business under Chapter 11;

- o    greater than expected liabilities with respect to environmental remediation;

- o    an inability to obtain committed credit facilities or alternative sources of liquidity in amounts sufficient to fund operations, growth initiatives and non-core obligations;

- o    a decline in worldwide oil consumption or the development of new methods of oil refining;

- o    increases in prices of raw materials and energy costs;

- o    an inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements (particularly in the construction industry);

- o    changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used, especially petroleum-based products;

- o    slower than anticipated economic advances in less developed countries;

- o    foreign currency devaluations in developing countries or other adverse changes in currency exchange rates;

- o    technological breakthroughs rendering a product, a class of products or a line of business obsolete;

- o    an inability to adapt to continuing technological improvements by competitors or customers; and

- o    the acquisition (through theft or other means) and use by others of Grace's proprietary formulas and other know-how (particularly in the container products business).

3

See Notes 1, 3, 4, 5, 10, 13 and 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional risks and uncertainties.

PRODUCTS AND MARKETS

　　　　Specialty Chemicals Industry Overview. Specialty chemicals, such as those produced by Grace, are high-value-added products used as intermediates, components or additives in a wide variety of products and processes. They are produced in relatively small volumes and must satisfy well-defined performance requirements and specifications. Specialty chemicals are often critical components of the end products and processes in which they are used; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer. Rapid response to changing customer needs and reliability of product and supply are important competitive factors in specialty chemicals businesses.

　　　　Grace's management believes that, in specialty chemicals businesses, technological leadership (resulting from continuous innovation through research and development), combined with product differentiation and superior customer service, lead to high operating margins. Grace believes that these factors reward the research and development and customer service costs associated with its strategy.

　　　　Davison Chemicals (Catalysts and Silica-Based Products). Davison, founded in 1832, is composed of two primary product groups: (i) catalysts and (ii) silica products and adsorbents. These product groups principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical/nutraceutical companies. Davison believes that its technological expertise provides a competitive edge, allowing it to quickly design products and materials that meet changing customer specifications and to develop new products and materials that expand its existing technology.

　　　　Davison produces refinery catalysts, including (i) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into more valuable transportation fuels (such as gasoline and jet and diesel fuels) and other petroleum-based products, and (ii) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison also develops and manufactures FCC additives used for octane enhancement and to reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide. Oil refining is a highly specialized discipline, demanding that products be tailored to meet local variations in crude oil and the refinery's products output mix. Davison works regularly with most of the approximately 360 refineries in the world, helping to find the most appropriate catalyst formulations for refiners' changing needs.

　　　　Davison's catalyst business has benefited from the increased use of FCC units to produce selected petrochemical feedstocks. It has also benefited from the passage of more stringent environmental regulations, which has increased demand for FCC additives that reduce emissions. Davison's business is affected by the capacity utilization of refiners' cracking units - as capacity utilization increases, the refiner uses a disproportionately greater amount of fluid cracking catalyst. Consolidation in the refining industry may affect Davison's sales and margins as the

4

purchasing power of its customers may increase, and the gain or loss of a customer may have a greater impact on Davison's sales.

Davison has recently introduced new catalyst technologies for certain high-technology market segments such as sulfur reduction in gasoline. Davison also has expanded its hydroprocessing catalyst offerings through two recent transactions. In 2000, Davison acquired the distillate catalyst business of the Crosfield Group. In March 2001, Grace and Chevron Corporation entered into a joint venture to combine Chevron's fixed bed residuum catalyst business with Davison's ebullating bed residuum and distillate catalyst business.

Davison believes it is one of the world leaders in refinery catalysts and the largest supplier of fluid cracking catalysts in the world. Competition in the refinery catalyst business is based on technology, product performance, customer service and price.

Davison is also a major producer of polyolefin catalysts and catalyst supports, essential components in the manufacture of high density and linear low density polyethylene resins used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison catalysts and catalyst supports are used in manufacturing nearly half of all such resins produced worldwide. The polyolefin catalyst business is technology-intensive and focused on providing products formulated to meet customer specifications. Manufacturers generally compete on a worldwide basis, and competition has recently intensified due to evolving technologies, particularly the use of metallocene catalysts. Davison believes that metallocene catalysts represent a revolutionary development in the making of plastics, allowing manufacturers to design polymers with exact performance characteristics. Davison is continuing to work with leading technology licensors on the development and commercialization of metallocene catalysts.

Silica products and zeolite adsorbents produced by Davison are used in a wide variety of industrial and consumer applications. For example, silica gels are used in coatings as matting agents (i.e., to reduce gloss), in plastics to improve handling, in toothpastes as whiteners, in foods to carry flavors and prevent caking, and in the purification of edible oils and beer stabilization. Colloidal silicas are used as binders in precision investment casting and refractory applications. Zeolite adsorbents are used between the two panes of insulating glass to adsorb moisture and are used in process applications to separate certain chemical components from mixtures. Competition is based on product performance, customer service and price.

Davison is using its expertise in silica gels technology to develop new products for existing markets, such as coatings. Davison also has recently introduced new products for the high-growth ink receptive paper segment, including improved gels for ink absorption for glossy media and new paper coating formulas. During 2000, Davison enhanced its silica products offerings by acquiring the colloidal silicas business of E.I. DuPont de Nemours. In addition to being used in some of the applications described above, colloidal silicas are used in precision investment casting and refractory applications. The silicas and adsorbents business has a large, fragmented customer base due to the diverse markets served by its products. To help cope with and better serve these customers, Davison recently introduced web-based initiatives, starting with online ordering of packaged desiccants and offering process design formulas online to assist customers in quickly and efficiently determining their needs. Europe accounts for almost half of silica and adsorbent sales, which have recently been subject to unfavorable currency exchange.

Davison's net sales were $784 million in 2000, $751 million in 1999 and $761 million in 1998; 49% of Davison's 2000 net sales were generated in North America, 33% in Europe, and 11% in Asia Pacific and 7% in Latin America. Sales of catalysts accounted for 35% of total net sales of Grace in 2000 and 1999 and 36% in 1998. Sales of silica products and zeolite adsorbents accounted for 14% of Grace's total net sales in 2000, 1999 and 1998. At year-end 2000, Davison employed approximately 2,800 people worldwide in 12 facilities (eight in the U.S. and one each in Canada, Germany, Brazil and Malaysia). Davison's principal U.S. manufacturing facilities are located in Baltimore, Maryland and Lake Charles, Louisiana. Davison has a direct selling force and distributes its products directly to approximately 12,300 customers (290 for catalysts and more than 12,000 for silicas/adsorbents), the largest of which accounted for approximately 6% of Davison's 2000 sales.

Most raw materials used in the manufacture of Davison products are available from multiple sources; in some instances, Davison produces its own raw materials. Recently, due to worldwide supply shortages, Davison has experienced significantly higher natural gas and petroleum-based raw material price increases that have had a negative impact on its operating margins. Seasonality does not have a significant overall effect on Davison's business. However, sales of refining catalysts tend to be lower in the first and fourth quarters due to a shift in production by refineries from gasoline to home heating oil for the winter season.

Performance Chemicals (Specialty Construction Chemicals, Specialty Building Materials and Container Products). Performance Chemicals was formed in July 1999 by integrating Grace's construction products businesses with its Darex(R) container products businesses. Grace integrated these businesses, which share many facilities around the world and are headquartered in the Cambridge, Massachusetts area, in order to realize efficiencies in supply chain management, process improvement, commercialization of new products and marketing.

Performance Chemicals is a leading supplier of specialty construction chemicals and building materials to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction industry. Specialty construction chemicals (principally concrete admixtures, cement additives and masonry products) add strength, control corrosion and enhance the handling and application of concrete, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall systems. Performance Chemicals has introduced a number of new construction chemicals products and product enhancements in recent years. These include an admixture that reduces concrete shrinkage and helps prevent cracking; a product that enables contractors to obtain acceptable concrete set times in colder temperatures; an admixture that inhibits corrosion and prolongs the life of concrete structures; and an additive that improves cement processing efficiency and product quality. In 1999, Performance Chemicals introduced a new masonry admixture for improving the freeze/thaw durability of segmental retaining wall units and pavers, and new structural fiber reinforcements for concrete that provide a corrosion-free alternative to steel fibers and welded wire mesh.

Performance Chemicals' specialty building materials prevent water damage to structures (such as water- and ice-barrier products for residential use and waterproofing systems for commercial structures) and protect structural steel against collapse due to fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include liquid-applied waterproofing products and new roof underlayments that provide

6

protection from ice and wind-driven rain; enhancements to fireproofing products that make Performance Chemicals' systems more competitive by improving applicator productivity; and fireproofing products for industrial, petrochemical and acoustical applications. In addition, through the acquisition of International Protective Coatings Corporation in 2000, Performance Chemicals added firestops to its product offerings. Firestops are caulk and sealant systems that retard the spread of heat, flame and smoke through walls and ceiling joints and openings in buildings for wiring and piping through which heat, flame or smoke can penetrate.

In addition to new product introductions and enhancements and acquisitions, Performance Chemicals looks for growth opportunities in developing economies, where increases in construction activity and sophistication of construction practices can increase demand for Performance Chemicals' construction chemicals and building materials products.

The construction chemicals and building materials produced by Performance Chemicals are marketed to an extremely broad range of customers, including cement manufacturers, ready-mix and precast concrete producers, local contractors, specialty subcontractors and applicators, masonry block manufacturers, building materials distributors and other industrial manufacturers, as well as construction specifiers, such as architects and structural engineers. For some of these customer groups (such as contractors), cost and ease of application are key factors in making purchasing decisions; for others (such as architects and structural engineers), product performance and design versatility are the critical factors. In view of this diversity, and because the construction chemicals and building materials businesses require intensive sales and customer service efforts, Performance Chemicals maintains a separate sales and technical support team for each of its product groups. These sales and support teams sell products under global contracts, under U.S. or regional contracts and on a job-by-job basis. Consequently, Performance Chemicals competes globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, particularly in markets outside the U.S. Competition is based largely on technical support and service, product performance, adaptability of the product and price.

The construction business is cyclical, in response to economic conditions and construction demand. The construction business is also seasonal due to weather conditions. Performance Chemicals seeks to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced higher-performance products, expanding geographically, and developing business opportunities in renovation construction markets. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on Performance Chemicals' construction business, there can be no assurance that this strategy will continue to succeed, and such cyclicality could adversely affect its business and results of operations in the future.

The raw materials used by the construction chemicals and building materials product lines can be obtained from multiple sources, including commodity chemical producers, petroleum companies and paper manufacturers. In most instances, there are at least two alternative suppliers for each of the principal raw materials used by these businesses. Recently, due to worldwide shortages in the supply of oil, petroleum-based raw materials costs have significantly increased, negatively affecting operating margins.

7

The container products business consists primarily of three product lines: can sealants and closure sealants for rigid containers, and coatings for metal packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, to protect the contents against the influences of metal, to ensure proper adhesion of sealing compounds to metal surfaces, and to provide base coats for inks and for decorative purposes. These products are principally sold to companies that manufacture containers.

Performance Chemicals is seeking to expand its container product offerings and improve sales growth through developing technologies, such as its oxygen-scavenging compounds (which absorb oxygen resulting in extended shelf life) and high barrier materials that limit gas transmission into plastic packaging. Performance Chemicals is also looking to improve container product sales through continued growth in developing regions. However, sales growth has been impacted and will likely be impacted in the future by the trend toward can systems requiring fewer seams, as well as the increasing use of plastic and glass containers.

Competition is based on providing high-quality customer service at customer sites, as well as on uniform product quality, reliability, the ability to offer environmentally-friendly products and price. In addition, because of the relative concentration of the canning and bottling market, maintaining relationships with leading container manufacturers, canners and bottlers, and assisting them as they install new production equipment and reengineer processes, are key elements for success. In 2000, approximately 35% of container product sales were derived from its top ten customers.

Although raw materials used in the container products business, including resins, rubber and latices, are generally available from multiple sources, certain raw materials are purchased from single source suppliers. Some raw materials are also subject to pricing pressures from time to time, particularly for certain specialty resins. Also, currency devaluations in developing countries may adversely affect raw material costs and the prices the business may charge for its products. Performance Chemicals has been successful in establishing a supply chain organization focused on managing raw material costs and flow to alleviate some of these pressures. However, due to recent worldwide shortages in the supply of oil, petroleum-based raw materials costs have significantly increased, negatively affecting operating margins. The impact of seasonality is not significant to the container products business.

Performance Chemicals' 2000 net sales totaled $813 million (58% in North America, 19% in Europe, 16% in Asia Pacific and 7% in Latin America), versus $800 million in 1999 and $785 million in 1998. Sales of specialty construction chemicals accounted for 22% of Grace's total net sales in 2000, 21% in 1999 and 20% in 1998; sales of specialty building materials accounted for 14% of Grace's total net sales in 2000, 1999 and 1998; and sales of container products accounted for 15% of Grace's total net sales in 2000, and 16% in 1999 and 1998. At year-end 2000, Performance Chemicals employed approximately 3,300 people at 65 production facilities (25 in North America, 19 in Asia Pacific, 14 in Europe and 7 in Latin America) and approximately 80 sales offices worldwide. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

8

Other Businesses and Investments. In January 1999, Grace sold its Circe biomedical subsidiary to an investment group. Circe was engaged in the development of bioartificial organs. Grace also owns miscellaneous businesses and investments that are not material.

DISCONTINUED OPERATIONS

Grace's former Packaging Business was a leading global supplier of high-performance materials and systems used in packaging food and industrial and consumer products. The Packaging Business operated in the U.S. and in 45 other countries throughout the world. Its principal products were various food packaging products and shrink and nonshrink films for industrial and consumer products. On March 31, 1998, the predecessor and former parent company of Grace ("Old Grace") combined its Packaging Business with Sealed Air Corporation ("Sealed Air"). Old Grace effected the transaction with Sealed Air by transferring its specialty chemicals and other non-packaging businesses to Grace, spinning off Grace to Old Grace shareholders and merging a subsidiary of Old Grace with Sealed Air. For further information, see Notes 1 and 4 to the Consolidated Financial Statements in the Financial Supplement.

In July 1999, Grace sold substantially all of its interest in Cross Country Staffing, a provider of temporary nurses and other health care related services, to an affiliate of Charterhouse Group International, Inc., a private equity firm, and the management of Cross Country Staffing. The transaction was preceded by Grace's purchase of a minority interest in Cross Country Staffing held by Nestor Healthcare Group plc. Grace received pretax net cash proceeds of approximately $103 million as a result of these two transactions.

RESEARCH ACTIVITIES

Grace's research and development programs are directed toward the development of new products and processes and the improvement of, and development of new uses for, existing products and processes. Research is conducted in all regions, with North America and Europe accounting for the most activity. Grace's research and development strategy is to develop technology platforms on which new products will be based, while focusing development efforts in each business unit on the improvement of existing products and/or the adaptation of existing products to customer needs.

Research and development expenses relating to continuing operations amounted to $46 million in 2000, $42 million in 1999 and $47 million in 1998 (including expenses incurred in funding external research projects). The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects sponsored by Grace) was not material.

PATENTS AND OTHER INTELLECTUAL PROPERTY MATTERS

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications, and include legally protectable know-how and other proprietary information. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance that Grace's patents, patent applications or

9

other intellectual property will provide sufficient proprietary protection. In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

        Manufacturers of specialty chemicals products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 2001 and 2002, for (i) the operation and maintenance of environmental facilities and the disposal of wastes with respect to continuing operations; (ii) capital expenditures for environmental control facilities relating to continuing operations; and (iii) site remediation:

| | (i)<br>Operation of<br>Facilities and<br>Waste Disposal | (ii)<br>Capital<br>Expenditures | (iii)<br>Site<br>Remediation |
|---|---|---|---|
| | | (in $ millions) | |
| 1998 | 38 | 6 | 37 |
| 1999 | 31 | 6 | 25 |
| 2000 | 26 | 4 | 47 |
| 2001 (est.) | 27 | 7 | 37 |
| 2002 (est.) | 29 | 6 | 23 |

        Additional material environmental costs may arise as a result of future legislation or other developments. Grace's earnings, competitive position and other capital expenditures have not been, and are not expected to be, materially adversely affected by compliance with environmental requirements. See Note 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

        With the goal of continuously improving Grace's environmental, health and safety ("EHS") performance, Grace established its Commitment to Care(R) initiative (based on the Responsible Care(R) program of the Chemical Manufacturers Association) in 1994 as the program under which all Grace EHS activities are to be implemented. To the extent applicable, Commitment to Care extends the basic elements of Responsible Care to all Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention.

10

        See Item 3 below for information concerning environmental proceedings
to which Grace is a party.

ITEM 2.   PROPERTIES

        Grace operates manufacturing and other types of plants and facilities
(including office and other service facilities) throughout the world. Some of
these plants and facilities are shared by more than one Grace business unit, and
since the disposition of the Packaging Business, some plants and facilities are
shared with Sealed Air Corporation. Grace considers its major operating
properties to be in good operating condition and suitable for their current use.
Although Grace believes that, after taking planned expansion into account, the
productive capacity of its plants and other facilities is generally adequate for
current operations and foreseeable growth, it conducts ongoing, long-range
forecasting of its capital requirements to assure that additional capacity will
be available when and as needed. Accordingly, Grace does not anticipate that its
operations or income will be materially affected by the absence of available
capacity. See Note 20 to the Consolidated Financial Statements and "Management's
Discussion and Analysis of Results of Operations and Financial Condition" in the
Financial Supplement for information regarding Grace's capital expenditures.

        Additional information regarding Grace's properties is set forth in
Item 1 above.

ITEM 3.   LEGAL PROCEEDINGS

        Asbestos Litigation. Grace is a defendant in property damage and bodily
injury lawsuits relating to previously sold asbestos-containing products and
expects that it will receive additional asbestos-related claims in the future.
Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000
(15 involving claims for property damage, including 8 relating to Grace's
former attic insulation product, and the remainder involving 124,907 claims for
bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving
claims for property damage, none of which relates to attic insulation, and the
remainder involving 105,670 claims for bodily injury). In most of these
lawsuits, Grace is one of many defendants.

        The plaintiffs in property damage lawsuits generally seek to have the
defendants absorb the cost of removing, containing or repairing the
asbestos-containing materials in the affected buildings. Cumulatively through
December 31, 2000, 140 asbestos property damage cases were dismissed without
payment of any damages or settlement amounts; judgments were entered in favor of
Grace in nine cases (excluding cases settled following appeals of judgments in
favor of Grace); judgments were entered in favor of the plaintiffs in seven
cases for a total of $60.3 million (none of which is on appeal); and 207
property damage cases were settled for a total of $696.8 million.

        In February 2000 a purported class action lawsuit was filed in the U.S.
District Court for the Eastern District of Massachusetts against the Company
(Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing
Zonolite(R) attic fill insulation, a product previously sold by Grace that may
contain trace amounts of asbestos. The action seeks damages and equitable
relief, including the removal, replacement and/or disposal of all such
insulation. Since Lindholm was filed, eight additional purported class action
lawsuits have been filed against Grace in various state and federal courts
asserting similar claims and seeking similar damages to those in Lindholm. One
of the purported federal class actions has been consolidated with

                                       11

Lindholm, and all the purported federal class actions have been transferred to the U.S. District Court for the Eastern District of Massachusetts. Purported class actions in California, Minnesota, Illinois and Washington were pending in state courts at the time of Grace's Chapter 11 filing. While Grace has not completed its investigation of the claims described in these lawsuits, Grace believes that this product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through December 31, 2000, approximately 16,200 bodily injury lawsuits involving approximately 35,500 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 53,400 lawsuits involving approximately 151,800 claims were disposed of for a total of $561.8 million.

Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31, 2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending (except for the cases and claims related to Grace's attic fill litigation as described above), as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.)

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $821.4 million prior to 1998, as well as payments totaling $74.0 million in 1998, $73.1 million in 1999, and $85.6 million in 2000. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded receivables to reflect the amounts expected to be recovered as asbestos-related claims are paid. At December 31, 2000, Grace had recorded a receivable of $369.3 million, as well as notes receivable of $2.7 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims.

During 2000, the number of bodily injury claims made against Grace increased significantly compared to 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation have petitioned for reorganization under Chapter 11 of the U.S. Bankruptcy Code. These developments and events

12

have caused an environment that increases the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11 of the U.S. Bankruptcy Code, Grace filed for protection under Chapter 11 on April 2, 2001. As a result of the Chapter 11 filing, all asbestos-related litigation against Grace has been stayed.

See Item 1 of this Report and Notes 1 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 2000, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities.

The EPA is conducting an investigation of the air, water and soil quality in and around Libby, Montana. This investigation was triggered by newspaper reports of excessive levels of asbestos-related disease related to Grace's former vermiculite mining activities in the area. The EPA, which commenced such investigation in 1999, has recently questioned the reliability of its analytical methods, and announced a program of additional testing in the yards and homes of Libby area residents. These investigations are not expected to result in material liability to Grace.

In February 2000, a purported class action lawsuit was filed in U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of real property situated within 12 miles of Libby, Montana that are improved private properties. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. Grace has no reason to believe that its former activities caused damage to the environment or property.

In October 2000, a purported class action lawsuit was filed in U.S. District Court for Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values of residents in the vicinity of a former vermiculite expanding plant in Minneapolis. Grace is presently cooperating with regulatory authorities and the present owners to investigate this former plant site. The EPA has commenced a program to remove suspected vermiculite

13

processing by-products from driveways at about 45 homes in the area. These activities are not expected to result in material liability to Grace.

The EPA is investigating approximately 50 vermiculite expanding plants operated by Grace and may be investigating approximately 285 other plants operated by third parties that handled vermiculite concentrate supplied by Grace. Active investigative or remediation activities are ongoing at five locations. Grace does not have sufficient information at this time to determine the extent of any possible liability related to this investigation.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge or disposition of hazardous wastes and other materials.

Grace is a party to three environmental insurance coverage actions pending in the U.S. District Court for the Southern District of New York. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed June 21, 1988). Litigation continues in this case as to a primary-level carrier that has not settled with respect to claims for environmental property damage. The second case, entitled Uniguard v. W. R. Grace, was filed on December 17, 1997. This declaratory judgment action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. In June 2000, a separate lawsuit was filed against Grace by one of its former primary insurance carriers seeking coverage determinations regarding 45 claims (Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co.-Conn.). Most of these claims involve alleged environmental property damage at sites once owned and operated by Grace or at waste sites that allegedly received waste materials from plants operated by Grace, including Grace's claims for coverage regarding certain claims involving its former vermiculite mining operation in Libby, Montana. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

Grace believes that the liabilities for environmental remediation costs, including costs relating to environmental proceedings, that have been recorded in Grace's historical financial statements are adequate and, irrespective of the outcome of the insurance litigations referred to above, Grace believes that the resolution of pending environmental proceedings will not have a material adverse effect on the consolidated financial position or liquidity of Grace. For further information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Abner Class Action. Grace has been named in a putative class action suit filed in September 2000 in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius A.G. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who presently have lawsuits on file that are pursuing personal injury or wrongful death claims against any of the defendants. The other defendants in the suit have all

14

asserted claims against Grace for indemnification. The amended complaint also names "Does 1-100" as defendants and alleges that those unidentified individuals are responsible "in some manner" for the wrongs alleged. While this lawsuit has been stayed as to Grace as a result of Grace's Chapter 11 filing, Grace believes that the suit is without merit.

Tax Claims. In 1988 and 1990, Grace acquired whole life insurance policies ("COLI") on the lives of certain of its employees as part of a strategy to fund the cost of post-retirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The Internal Revenue Service ("IRS") is challenging the deductions for interest on such loans claimed by Grace and similarly situated companies. In 2000 Grace paid approximately $21.2 million of tax and interest related to COLI deductions taken in 1990 through 1992. Grace is currently under audit for the 1993-96 tax years. During those years Grace deducted approximately $122.1 million in interest attributable to the COLI policies. In 1996 legislation was enacted that phased out the tax benefits for COLI-related interest deductions over a three-year period ending in 1998. During those years, Grace deducted approximately $41.1 million in COLI-related interest. Grace is contesting the IRS's position on the grounds that Grace had and continues to have a valid business purpose for acquiring the COLI policies, that the COLI policies have economic substance and that the interest deductions claimed were in compliance with tax laws in effect at the time.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 related to a subsidiary of Grace that formerly held a majority interest in Cross Country Staffing. The assessments were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel, which was in effect through 1999. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, for per diem and expense allowance plans. The matter is currently pending in the U.S. Court of Claims.

For further information, see Note 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations under Financial Condition" in the Financial Supplement to this Report.

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2000.

15

PART II

ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

        Except as provided below, the information called for by this Item
appears in the Financial Supplement under the heading "Financial Summary"
opposite the caption "Other Statistics - Common shareholders of record" (page
F-32); under the heading "Quarterly Summary and Statistical Information -
Unaudited" opposite the caption "Market price of common stock" (page F-31); and
in Note 16 to the Consolidated Financial Statements (page F-25).

        On March 31, 1998, the Company paid a dividend, in respect of each
share of the Company's Common Stock, par value $.01 per share ("Common Stock"),
of one Preferred Stock Purchase Right ("Right"). The Rights are not and will not
become exercisable unless and until certain events occur (as described below).
Until such events occur, the Rights will automatically trade with the Common
Stock, and separate certificates for the Rights will not be distributed. The
Rights will become exercisable on the earlier to occur of (a) 10 days after a
person or group ("Acquiring Person") has acquired beneficial ownership of 20% or
more of the then outstanding shares of Common Stock or (b) 10 business days (or
such later date as may be fixed by the Company's Board of Directors) after an
Acquiring Person commences (or announces the intention to commence) a tender
offer or exchange offer that would result in such Acquiring Person becoming the
beneficial owner or 20% or more of the then outstanding shares of Common Stock.
Holders of Rights, as such, have no rights as shareholders of the Company;
consequently, such holders have no rights to vote or receive dividends, among
other things.

        When the Rights become exercisable, each Right will initially entitle
the holder to buy from the Company one hundredth of a share of the Company's
Junior Participating Preferred Stock, par value $.01 per share ("Junior
Preferred Stock"), for $100, subject to adjustment ("exercise price"). If a
person or group becomes an Acquiring Person, each Right will entitle the holder
to receive upon exercise, in lieu of shares of Junior Preferred Stock, that
number of shares of Common Stock having a market value of two times the exercise
price of the Right. If, at any time after a person or group becomes an Acquiring
Person, the Company is acquired in a merger or other business combination of 50%
or more of the Company's consolidated assets or earning power is sold, each
Right not owned by an Acquiring Person will entitle the holder to buy a number
of shares of common stock of the acquiring company having a market value equal
to twice the exercise price.

        Shares of Junior Preferred Stock that may be purchased upon exercise of
the Rights will not be redeemable. Each share of Junior Preferred Stock will be
entitled to a minimum preferential quarterly dividend payment of $1.00 per share
but will be entitled to an aggregate dividend equal to 100 times the dividend
declared per share of Common Stock whenever such dividend is declared. In the
event of liquidation, holders of Junior Preferred Stock will be entitled to a
minimum preferential liquidation payment of $100 per share but will be entitled
to an aggregate payment equal to 100 times the payment made per share of Common
Stock. Each share of Junior Preferred Stock will have 100 votes, voting together
with the Common Stock. Finally, in the event of any merger, consolidation or
other transaction in which the Common Stock is exchanged, each share of Junior
Preferred Stock will be entitled to receive an amount equal to 100 times the
amount received per share of Common Stock. These rights are protected by
customary antidilution provisions.

16

Because of the nature of the dividend, liquidation and voting rights of the Junior Preferred Stock, the value of the one-hundredth interest in a share of Junior Preferred Stock that may be purchased upon exercise of each Right should approximate the value of one share of Common Stock.

At any time after any person or group becomes and Acquiring Person, and prior to the acquisition by such Acquiring Person of 50% or more of the outstanding shares of Common Stock, the Company's Board of Directors may exchange the Rights (other than Rights owned by such person or group, which will become void after such person becomes an Acquiring Person) for Common Stock or Junior Preferred Stock, in whole or in part, at an exchange ratio of one share of Common Stock, or one hundredth of a share of Junior Preferred Stock (or of a share of another series of the Company's Preferred Stock having equivalent rights, preferences and privileges), per Right (subject to adjustment).

At any time prior to the acquisition by a person or group of beneficial ownership of 20% or more of the outstanding shares of Common Stock, the Company's Board of Directors may redeem the Rights in whole, but not in part, at a price of $.01 per Right.

The terms of the Rights may be amended by the Company's Board of Directors without the consent of the holders of the Rights, including an amendment to lower (a) the threshold at which a person becomes an Acquiring Person and (b) the percentage of Common Stock proposed to be acquired in a tender or exchange offer that would cause the Rights to become exercisable, to not less than the greater of (a) the sum of .001% plus the largest percentage of the Company's outstanding Common Stock then known to the Company to be beneficially owned by any person or group and (b) 10%, except that, from and after such time as any person or group becomes an Acquiring Person, no such amendment may adversely affect the interests of the holders of the Rights.

The Rights are currently scheduled to expire on March 31, 2008 (subject to extension or the earlier redemption or exchange of the Rights).

The foregoing summary of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as an Exhibit 4.1 to the Company's Form 8-K filed on April 9, 1998.

ITEM 6.    SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-32 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 15 to the Consolidated Financial Statements (pages F-10, F-11, F-12, F-13, F-14, F-15, F-16, F-17, F-20, F-21, F-22, F-23 and F-24 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-47 of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 1996-2000.

ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND
         FINANCIAL CONDITION

         The information called for by this Item appears on pages F-33 to F-45
of the Financial Supplement, which is incorporated herein by reference.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

         The information called for by this Item appears in Notes 12 and 13 to
the Consolidated Financial Statements (pages F-21 and F-22 of the Financial
Supplement), which is incorporated herein by reference.

ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

         See the Index to Consolidated Financial Statements and Financial
Statement Schedule and Exhibit on page F-2 of the Financial Supplement, which is
incorporated herein by reference.

ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
         FINANCIAL DISCLOSURE

         This Item is inapplicable, as no such changes or disagreements have
occurred.

                                   PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

         The Company's current directors and executive officers are listed
below. The Company's Certificate of Incorporation provides for the division of
the Board of Directors into three classes, each to serve for a three-year term
or until their respective successors are elected. Executive officers are elected
to serve until the following annual meeting of the Company's Board of Directors
or until their respective successors are elected.

| Name and Age | Office | First Elected |
|---|---|---|
| John F. Akers (66) | Class II Director - Term expiring in 2003 | 05/09/97 |
| Ronald C. Cambre (62) | Class III Director - Term expiring in 2001 | 09/01/98 |
| Marye Anne Fox (53) | Class I Director - Term expiring in 2002 | 05/10/96 |
| John J. Murphy (69) | Class II Director - Term expiring in 2003 | 05/09/97 |
| Paul J. Norris (53) | Class III Director (Chairman) - Term expiring in 2001, President and Chief Executive Officer | 01/01/99 11/01/98 |
| Thomas A. Vanderslice (69) | Class I Director - Term expiring in 2002 | 05/10/96 |

18