| | | |
|---|---|---|
| Robert J. Bettacchi (58) | Senior Vice President | 04/01/97 |
| William M. Corcoran (51) | Vice President | 05/11/99 |
| W. Brian McGowan (51) | Senior Vice President | 12/06/90* |
| David B. Siegel (52) | Senior Vice President and General Counsel | 09/01/98* |
| Robert M. Tarola (50) | Senior Vice President and Chief Financial Officer | 05/11/99 |

* Designated an Executive Officer on July 9, 1998

In view of the Chapter 11 filing, the directors are expected to continue to serve beyond the expiration of their respective terms.

Mr. Akers served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is a director of Hallmark Cards, Inc., Lehman Brothers Holdings, Inc., The New York Times Company, PepsiCo, Inc. and Springs Industries, Inc.

Mr. Cambre is Chairman of the Board of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and has served as Chairman since 1995. He is also a director of Cleveland-Cliffs Inc. and McDermott International, Inc.

Dr. Fox is Chancellor of North Carolina State University and Professor of Chemistry at that institution. Previously she was Vice President for Research and the Waggoner Regents Chair in Chemistry of the University of Texas, positions she held from 1994 and 1992, respectively, until 1998.

Mr. Murphy served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is a director of CARBO Ceramics, Inc., Kerr-McGee Corporation, PepsiCo, Inc. and Shaw Industries Ltd.

Mr. Norris was Senior Vice President of AlliedSignal Incorporated and President of its specialty chemicals business from January 1997 until joining Grace. Mr. Norris joined AlliedSignal in 1989 as President of its fluorine products/chemicals and catalysts businesses.

Mr. Vanderslice served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until his retirement in 1995. He is a director of Texaco Inc.

Messrs. Bettacchi, McGowan and Siegel have been actively engaged in Grace's business for the past five years.

19

Mr. Corcoran previously served as Vice President of Business and Regulatory Affairs for AlliedSignal Incorporated's specialty chemicals business from 1997. For nine years prior to that, he served as Vice President of Public Affairs in AlliedSignal's engineered materials sector.

Mr. Tarola joined Grace from MedStar Health, Inc., where he had served as Senior Vice President and Chief Financial Officer from July 1998. He previously served in a similar capacity with Helix Health, Inc. for two years. From 1974 through 1996, Mr. Tarola was an employee of and partner of Price Waterhouse LLP.

ITEM 11. EXECUTIVE COMPENSATION

Summary Compensation Table. The following Summary Compensation Table contains information concerning the compensation of (a) Paul J. Norris, Chief Executive Officer; and (b) the other four most highly compensated executive officers of Grace who were serving as such at year-end 2000. Certain information has been omitted from the Summary Compensation Table because it is not applicable or because it is not required under the rules of the Securities and Exchange Commission ("SEC").

| | | Annual Compensation | | | Long-Term Compensation | | | |
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary | Bonus | Other Annual Compensation | Restricted Stock Award(a) | No. of Shares Underlying Options Granted(b) | LTIP Payouts(c) | All Other Compensation(d) |
| -------- | ---- | ------ | ----- | ------------ | --------- | ----------- | ---- | ----------------- |
| P. J. Norris | 2000 | $612,500 | $526,800 | --- | --- | 315,000 | N/A | $90,766 |
| Chairman, President and | 1999 | 737,500 | 942,500 | $272,486(e) | --- | 290,000 | N/A | 33,353 |
| Chief Executive Officer(f) | 1998 | 120,833 | 250,000 | | $2,966,486 | 439,026 | N/A | 3,819 |
| | | | | | | | | |
| R. J. Bettacchi | 2000 | 332,344 | 125,000 | | --- | 85,000 | $202,670 | 42,171 |
| Senior Vice President | 1999 | 297,500 | 300,000 | | --- | --- | 45,508 | 41,733 |
| | 1998 | 242,500 | 170,000 | | --- | 130,000 | 1,905,438 | 37,358 |
| | | | | | | | | |
| W. M. Corcoran | 2000 | 256,667 | 100,000 | | --- | 40,000 | N/A | 7,157 |
| Vice President (g) | 1999 | 145,833 | 125,000 | | 178,750 | 32,500 | N/A | 306 |
| | 1998 | | | | | | | |
| | | | | | | | | |
| D. B. Siegel | 2000 | 306,667 | 125,000 | | --- | 60,000 | 75,832 | 22,205 |
| Senior Vice President | 1999 | 275,000 | 225,000 | | --- | --- | 35,822 | 16,561 |
| and General Counsel | 1998 | 240,000 | 108,000 | | 202,000 | 130,000 | 1,491,352 | 16,737 |
| | | | | | | | | |
| R. M. Tarola | 2000 | 359,000 | 155,000 | | --- | 75,000 | N/A | 12,322 |
| Senior Vice President | 1999 | 224,130 | 155,000 | | --- | 100,000 | N/A | 621 |
| and Chief Financial | 1998 | | | | | | | |
| Officer (h) | | | | | | | | |

(Footnotes appear on following page)

20

(a)     At December 31, 2000, the dollar value of the 170,733 shares of
        restricted stock issued to Mr. Norris was $544,211. The restrictions
        expire in one-third increments on November 1, 1999, November 1, 2000
        and November 1, 2001. At December 31, 2000, the dollar value of the
        10,000 shares of restricted stock issued to Mr. Corcoran was $31,875.
        The restrictions on shares held by Mr. Corcoran expire on May 31, 2002.
        At December 31, 2000, the dollar value of the 10,100 shares of
        restricted stock issued to Mr. Siegel was $32,194. The restrictions on
        shares held by Mr. Siegel expired on April 2, 2001. Restrictions on all
        shares will expire earlier under certain circumstances, such as a
        change of control. See "Employment Agreements."

(b)     The share amounts in this column for Messrs. Bettacchi and Siegel
        reflect adjustments made to give effect to the March 1998 separation of
        Grace's packaging business and the merger of such business with Sealed
        Air Corporation (the "Packaging Transaction").

(c)     The amounts in this column represent payments under the Long-Term
        Incentive Plan ("LTIP") made in each year, as follows: 2000 - amounts
        paid for the 1997-1999 Performance Period; 1999 - amounts paid for the
        1996-1998 Performance Period (to the extent not previously paid in
        1998); and 1998 - amounts paid for the 1995-1997, 1996-1998 and
        1997-1999 Performance Periods following termination of the LTIP in
        connection with the Packaging Transaction. See "LTIP" below for
        additional information.

(d)     The amounts in this column for 2000 consist of the following:

        (i)     above-market interest earned on deferred compensation, as
                follows: Mr. Norris -- $864; Mr. Bettacchi -- $16,949; Mr.
                Corcoran -- $1,587; and Mr. Tarola -- $5,875;

        (ii)    the actuarially determined value of Company-paid premiums on
                "split-dollar" life insurance, as follows: Mr. Norris --
                $32,904; Mr. Bettacchi -- $4,415; and Mr. Siegel -- $4,516;

        (iii)   payments made to persons whose personal and/or Company
                contributions to Grace's Salaried Employees Savings and
                Investment Plan ("Savings Plan") would be subject to
                limitations under federal income tax law, as follows: Mr.
                Norris -- $50,736; Mr. Bettacchi -- $15,130; and Mr. Siegel
                -- $12,012.

        (iv)    Company contributions to the Savings Plan , as follows: Mr.
                Norris -- $5,100; Mr. Bettacchi -- $5,100; Mr. Corcoran --
                $5,142; Mr. Siegel -- $5,100; and Mr. Tarola -- $5,870; and

        (v)     the value of Company-provided personal liability insurance,
                as follows: Mr. Norris -- $1,162; Mr. Bettacchi -- $577; Mr.
                Corcoran -- $428; Mr. Siegel -- $577; and Mr. Tarola -- $577.

(e)     This amount includes $238,996 of payments made to Mr. Norris under
        Grace's relocation program.

(f)     Mr. Norris was elected President and Chief Executive Officer November
        1, 1998 and became Chairman on January 1, 1999.

(g)     Mr. Corcoran was elected Vice President on May 11, 1999.

(h)     Mr. Tarola was elected Senior Vice President and Chief Financial
        Officer on May 11, 1999.

21

Stock Options. The following table contains information concerning stock options granted in 2000, including the potential realizable value of each grant assuming that the market value of the Common Stock were to appreciate from the date of grant to the expiration of the option at annualized rates of (a) 5% and (b) 10%, in each case compounded annually over the term of the option. For example, the options granted to Mr. Norris in 2000 would produce a pretax gain of $6,745,848 shown in the table if the market price of the Common Stock rises at an annual rate of 10% to $34.88 per share by the time the options are exercised; based on the number and market price of the shares outstanding at year-end 2000, such an increase in the price of the Common Stock would produce a corresponding aggregate pretax gain of approximately $312 million for the Company's shareholders. The assumed rates of appreciation shown in the table have been specified by the SEC for illustrative purposes only and are not intended to predict future stock prices, which will depend upon various factors, including market conditions and future performance and prospects. In view of recent developments, Grace believes it is unlikely that its Common Stock will achieve the indicated levels of appreciation in the foreseeable future, if at all (see "Chapter 11 Filing" in Item 1).

Options become exercisable at the time or times determined by the Compensation Committee of the Board of Directors; the options shown below become exercisable in three approximately equal annual installments beginning one year after the date of grant or upon the earlier occurrence of a "change in control" (see "Employment Agreements" and "Severance Agreements"). All of the options shown below have purchase prices equal to the fair market value of the Common Stock at the date of grant.

| NAME | 2000 Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term | |
| | No. of Shares Underlying Options Granted | % of Total Options Granted to Employees in 2000 | Purchase Price ($/Share) | Expiration Date | 5% | 10% |
| --- | --- | --- | --- | --- | --- | --- |
| P. J. Norris. . . . . | 315,000 | 12% | $13.4688 | 5/9/10 | $2,672,883 | $6,745,848 |
| R. J. Bettacchi . . . | 85,000 | 3% | $13.4688 | 5/9/10 | 721,254 | 1,820,308 |
| W. M. Corcoran. . . . | 40,000 | 2% | $13.4688 | 5/9/10 | 339,414 | 856,616 |
| D. B. Siegel . . . . . | 60,000 | 2% | $13.4688 | 5/9/10 | 509,121 | 1,284,923 |
| R. M. Tarola . . . . . | 75,000 | 3% | $13.4688 | 5/9/10 | 636,401 | 1,606,154 |
| All Shareholders . . . . | - | - | - | - | $123,640,458 | $312,044,967 |
| Named Executive Officers' Percentage of Realizable Value Gained by All Shareholders. . . . | - | - | - | - | 4% | 4% |

The following table contains information concerning stock options exercised in 2000, including the "value realized" upon exercise (the difference between the total purchase price of the options exercised and the market value, at the date of exercise, of the shares acquired), and the value of unexercised "in-the-money" options held at December 31, 2000 (the difference

22

between the aggregate purchase price of all such options held and the market value of the shares covered by such options at December 31, 2000).

| Name | Option Exercises in 2000 and Option Values at 12/31/00 (1) | | | |
|---|---|---|---|---|
| | No. of Shares Acquired on Exercise | Value Realized | No. of Shares Underlying Unexercised Options at 12/31/00 Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at 12/31/00 Exercisable/Unexercisable |
| P. J. Norris . . . . | 0 | $ 0 | 389,350 / 654,676 | $0 / $0 |
| R. J. Bettacchi . . | 0 | 0 | 668,399 / 128,334 | 0 / 0 |
| W. M. Corcoran. . . | 0 | 0 | 10,833 / 61,667 | 0 / 0 |
| D. B. Siegel . . . . | 0 | 0 | 254,861 / 103,334 | 0 / 0 |
| R. M. Tarola . . . . | 0 | 0 | 33,333 / 141,667 | 0 / 0 |

(1)   The number of shares covered by each option and the purchase price of each option reflect, where applicable, adjustments made in connection with the Packaging Transaction in the cases of Messrs. Bettacchi and Siegel.

Long-Term Incentive Program (LTIP). In connection with the Packaging Transaction, the Compensation Committee determined to make the following changes in the LTIP: (a) Performance Units granted for the 1996-1998 and 1997-1999 Performance Periods vested on a prorata basis on March 31, 1998, the completion date of the Packaging Transaction; (b) the amounts earned under those Units were calculated based on results achieved through March 31, 1998; (c) 75% of the estimated value of such vested portions was paid in cash prior to completion of the Packaging Transaction; (d) the balance of such vested portions was paid in cash following completion of the Packaging Transaction; and (e) the value of the unvested portions, based on targeted Performance Units and on the final average price of the Common Stock immediately prior to completion of the Packaging Transaction, was paid in cash following the end of the respective Performance Periods (subject to continued service).

The Board has approved a new LTIP for key employees for 2001, and it is anticipated that awards will be made to key employees under the new LTIP for each subsequent calendar year as well. The new LTIP is generally designed to provide key employees with long-term incentives having a value at the 60th percentile of long-term incentives offered by specialty chemical companies of comparable size to Grace. For each key employee, the targeted value of the new LTIP award for each year will be split so that 50% of the value of the award will be provided in the form of a stock option grant, and 50% will be in the form of cash compensation, payable if the Company achieves certain pretax earnings targets over a three calendar year period. Depending on the pretax earnings performance of the Company during the applicable three-year period, the employee may be paid a total amount ranging from zero to two times the targeted cash compensation applicable to the employee.

If a key employee becomes entitled to any cash compensation for any award year under the new LTIP, then such compensation will generally be paid in two installments; one after the end of the second calendar year following the applicable award year (which will be a partial payment based on performance for the first two years of the applicable three-year period), and the other installment will be paid to the employee after the end of the third calendar year

23

following the applicable award year (which will consider performance for the complete three-year period and will be offset by the amount of the prior installment). Generally, under the new LTIP, a key employee will forfeit his or her rights to receive an installment of cash compensation if, prior to the payment of the installment, the employee either voluntarily resigns from the Company or is terminated by the Company for cause.

Pension Arrangements. Salaried employees of designated units who are 21 or older and who have one or more years of service are eligible to participate in the Retirement Plan for Salaried Employees. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation and (b) the number of years of the employee's credited service. For purposes of this basic retirement plan, compensation generally includes nondeferred base salary and nondeferred annual incentive compensation (bonus) awards; however, for 2000, federal income tax law limited to $170,000 the annual compensation on which benefits under this plan may be based.

Grace also has a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, Grace's deferred compensation plan no longer permits deferrals of base salary or incentive compensation.) An employee will generally be eligible to participate in the supplemental plan if he or she has an annual base salary of at least $75,000 and is earning credited service under the basic retirement plan.

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2000, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans.

24

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
| $100,000 | $15,000 | $22,500 | $30,000 | $37,500 | $45,000 | $52,500 |
| 200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |
| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,100,000 | 165,000 | 247,500 | 330,000 | 412,500 | 495,000 | 577,500 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,300,000 | 195,000 | 292,500 | 390,000 | 487,500 | 585,000 | 682,500 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,500,000 | 225,000 | 337,500 | 450,000 | 562,500 | 675,000 | 787,500 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,700,000 | 255,000 | 382,500 | 510,000 | 637,500 | 765,000 | 892,500 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 1,900,000 | 285,000 | 427,500 | 570,000 | 712,500 | 855,000 | 997,500 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,100,000 | 315,000 | 472,500 | 630,000 | 787,500 | 945,000 | 1,102,500 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |

At December 31, 2000, Messrs. Norris, Bettacchi, Corcoran, Siegel and Tarola had 8.83, 29, 1.56, 23.75 and 1.56 years of credited service, respectively, under the basic and supplemental retirement plans. (Mr. Norris' years of credited service include his eligible service with Grace from 1975 to 1981.) For purposes of those plans, the 2000 compensation of such executive officers was as follows: Mr. Norris -- $1,755,000; Mr. Bettacchi -- $632,344; Mr. Corcoran -- $381,667; Mr. Siegel -- $531,667; and Mr. Tarola -- $514,000. Messrs. Corcoran and Tarola are entitled to additional pension benefits under their employment agreements, and Mr. Norris is eligible for additional pension benefits under his employment agreement if his employment continues beyond October 31, 2001, or if he is terminated without cause (see "Employment Agreements").

Employment Agreements. Effective January 1, 2001, Mr. Norris and Grace entered into a new employment agreement, which supercedes the letter agreement between Mr. Norris and Grace dated October 26, 1998. This agreement expires December 31, 2002, subject to renewal provisions. Under the agreement, Mr. Norris' annual base salary will not be less than $875,000. He will continue to participate in Grace's annual incentive compensation program, under which his targeted award will be at least 75% of his annual base salary.

Under Mr. Norris' prior letter agreement, he received a restricted stock award on November 1, 1998 covering 170,733 shares of Grace Common Stock. The restrictions on the

25

final installment of Mr. Norris' restricted stock award (covering 56,911 shares of Grace Common Stock) will lapse on November 1, 2001. Under his employment agreement, Mr. Norris may choose to receive the award in the form of unrestricted shares or may convert the award to cash in the amount of $10.25 for each unrestricted share comprising such final installment.

Also under the prior agreement, Mr. Norris received upon his commencement of employment on November 1, 1998 a non-statutory stock option grant covering 439,026 shares of Common Stock pursuant to Grace's 1998 Stock Incentive Plan. His employment agreement provides that Grace will make a stock appreciation payment to Mr. Norris, at the time he elects to exercise any vested options under that stock option grant or at the time he elects to cancel such options, provided that the price of a share of Common Stock is above $10.25 at the time. The payment will be equal to the number of shares exercised (or cancelled), multiplied by the difference between (a) the purchase price per share ($16.75), or the price of a share of Common Stock on the date of such exercise if less than the purchase price per share, and (b) $10.25.

Under his employment agreement, Mr. Norris received (in January 2001) an $875,000 retention bonus for services through December 31, 2001, and if he remains employed with Grace (or is terminated without cause or on the basis of constructive discharge, death or disability), he will receive retention bonuses of $500,000 each on December 31, 2001 and 2002. The first two payments are subject to prorata repayment if Mr. Norris' terminates his employment other than on the basis of constructive discharge, death or disability.

Under the employment agreement, if Mr. Norris' employment is terminated by Grace without cause or by Mr. Norris on the basis of constructive discharge at any time, then he will be entitled to receive a severance payment equal to two times the dollar amount that equals 175% of his annual base salary at the time of such termination. Such payment will be made in a lump sum immediately after Mr. Norris' date of termination.

Mr. Norris' employment agreement also continues the same retirement benefits provisions as under his prior agreement, which are described in this paragraph: If Mr. Norris is not terminated for cause, and he does not terminate his employment (other than on the basis of constructive discharge, disability or death), prior to November 1, 2001, the agreement provides that, in determining the benefits payable to Mr. Norris under Grace's basic and supplemental retirement plans, his years of service with Grace and his prior employer will be recognized as if those years were continuous service with Grace, with an offset for any retirement benefits payable from his prior employers' retirement plans. In addition, the "final average compensation" used to determine his retirement benefits payable under Grace's basic and supplemental retirement plans will only consider compensation earned by Mr. Norris from and after the commencement of his current term of employment with Grace on November 1, 1998.

Also, the employment agreement provides that, if Mr. Norris does not receive supplemental retirement benefits under any Grace plan, then such supplemental benefit will become payable to Mr. Norris under his employment agreement. In addition, in the event of Mr. Norris' termination on or after November 1, 2001 (or if he terminates his employment with Grace at any time based on constructive discharge), Grace will immediately pay Mr. Norris a

26

lump sum cash payment equal in value to all supplemental retirement benefits payable to Mr. Norris under his employment agreement or any plan or program of Grace.

The agreement further provides that, upon Mr. Norris' termination of employment (unless Mr. Norris terminates his employment prior to October 31, 2001 other than on the basis of constructive discharge, disability or death), Grace will provide Mr. Norris with relocation assistance to any location within the continental United States selected by Mr. Norris, including certain cash payments and relocation assistance, including compensation for any loss incurred on the sale of his Maryland home.

The agreement also provides for Mr. Norris' participation in other benefits and compensation programs, including benefits and programs generally available to other senior executives of Grace. The foregoing description of Mr. Norris' employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which is filed as Exhibit 10.20 to this Report.

Mr. Corcoran has an employment agreement with Grace that terminates May 31, 2002, subject to extension. Under the agreement, Mr. Corcoran's initial base salary is $250,000, subject to annual review and approval of the Compensation Committee. In addition, Mr. Corcoran is eligible to participate in Grace's annual incentive compensation program, with a target award no less than to 37% of his annual base salary (except that his incentive award for 1999 was set at an amount between $92,000 and $182,000). Under the agreement, Mr. Corcoran also received a stock option grant covering 32,500 shares of Common Stock, and a grant of 10,000 shares of restricted Common Stock.

In the event that Mr. Corcoran is terminated by Grace without cause on or before May 31, 2002, he will generally be entitled to a severance payment equal to two times the amount that is 137% of his annual base salary at the time of his termination. If he is terminated by Grace without cause after that date, Mr. Corcoran will generally be entitled to a severance payment equal to one times such amount. (However, along with other executive officers and certain key employees of Grace, Mr. Corcoran has entered into a retention agreement with Grace, described below, under which, in certain circumstances, he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.)

If Mr. Corcoran's employment does not cease prior to May 22, 2002 (or he is terminated without cause prior to that date), the benefits payable to Mr. Corcoran under Grace's basic and supplemental retirement plans will be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for an additional one-half year of credited service under those plans (up to a maximum of 5 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which is filed as Exhibit 10.24 to this Report.

27

On January 30, 2001, Mr. Siegel entered into a new agreement with Grace that specifies certain terms and conditions of his employment (the "2001 Agreement"). Under the 2001 Agreement, which supercedes his prior agreement, Mr. Siegel received a retention payment and became covered by an enhanced severance arrangement, each of which is described below. In exchange, Mr. Siegel agreed that he would have no right to severance pay under the Grace 1999 Productivity and Effectiveness Program (the "PEP Program") and that he would give Grace at least 90 days' prior notice if he voluntarily resigned or retired on or prior to December 31, 2002.

Under the 2001 Agreement, Mr. Siegel received a retention payment in the amount of $600,000. Mr. Siegel is required to repay a prorata portion of one-half of the retention payment if he voluntarily terminates his employment with Grace (other than as a result of a constructive termination), or he is terminated for cause, prior to December 31, 2002. The 2001 Agreement also specifies that Mr. Siegel would be entitled to an enhanced severance payment equal to two times his annual base salary if he is involuntarily terminated without cause under circumstances which would qualify him for severance pay under Grace's severance plan that generally covers salaried employees.

The 2001 Agreement also provides that Mr. Siegel will relocate full time to Columbia, Maryland on or before January 1, 2003, unless he gives Grace 90 days' notice of his election to resign prior to September 30, 2002. If Mr. Siegel relocates to Maryland, he will be entitled to the relocation benefits generally available to other Grace employees who relocated to Maryland during 1999 in conjunction with the relocation of Grace's headquarters from Boca Raton, Florida. If Mr. Siegel elects to resign prior to September 30, 2002, then he will be eligible for all separation arrangements under the PEP Program (except severance pay under the PEP Program). Until Mr. Siegel relocates to Maryland or resigns, Grace has agreed to continue to provide him with a furnished apartment in Baltimore, a rental car while on business in Maryland and roundtrip coach airfare for travel between Boca Raton and Columbia. The foregoing description of the 2001 Agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which is filed as Exhibit 10.22 to this Report.

Mr. Tarola has an employment agreement providing for his service as Senior Vice President and Chief Financial Officer of Grace through November 10, 2002, subject to extension by agreement between Mr. Tarola and Grace. Under this agreement, Mr. Tarola is entitled to an annual base salary of $350,000, and an annual incentive award (bonus) for each calendar year during his term of employment. That bonus will be targeted to be no less than 45% of his annual base salary (with a maximum bonus equal to double the targeted bonus for any calendar year); except that his incentive award for 1999 was set at an amount no less than $129,000. The agreement also provides that Mr. Tarola's annual base salary and incentive award is generally subject to annual review and approval of the Compensation Committee. Under the agreement, Mr. Tarola received a stock option grant covering 100,000 shares of Common Stock.

In the event that Mr. Tarola is terminated by Grace without cause on or before November 10, 2002, he will generally be entitled to a severance payment equal to two times the amount that is 145% of his annual base salary at the time of his termination. If he is terminated by Grace without cause after that date, Mr. Tarola will generally be entitled to a severance payment equal to one times such amount. (However, along with other officers and certain key employees of

28

Grace, Mr. Tarola entered into a retention agreement with Grace, described below, under which, in certain circumstances, he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.)

    If Mr. Tarola's employment does not cease prior to November 10, 2002 (or if he is terminated without cause prior to that date), the benefits payable to Mr. Tarola under Grace's basic and supplemental retirement plans will be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for one additional year of credited service under those plans (up to a maximum of 10 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as an exhibit to Grace's Quarterly Report on Form 10-Q filed on August 13, 1999 for the quarter ended June 30, 1999.

    Change-in-Control Severance Agreements. In addition to the severance described in the retention agreements below, Grace has severance agreements with all of its executive officers. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control" of Grace, he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to prorata reduction in the case of an officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means the acquisition of 20% or more of the Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the shareholders of Grace immediately preceding such transaction do not own more than 50% of the combined voting power of the corporation resulting from such transaction, or the liquidation or dissolution of Grace. This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which was filed as an exhibit to the Registration Statement on Form 10 filed with the SEC by Grace (named Grace Specialty Chemicals, Inc. at the time of filing) on March 13, 1998.

    Retention Agreements. Effective January 1, 2001, Grace entered into retention agreements with each of the executive officers other than Messrs. Norris and Siegel, whose retention agreements are covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Common Stock has had and is expected to continue to have on Grace's ability to attract and retain key employees. Under the terms of these agreements, each such executive officer received a payment in January 2001 equal to his annual base salary, subject to remaining employed with Grace for a two-year period. In the event of the voluntary termination of such officer's employment (other than a constructive termination caused by a

29

reduction in salary, a permanent change in job location or a change in job duties inappropriate to such officer's position) or a termination of such officer's employment for cause, then such officer would be required to reimburse Grace for a prorata portion of such payment based on the number of days remaining in such two-year period. The retention payments are not considered compensation for purposes of any Grace benefit or compensation plan or program. In addition to the retention payment, the retention agreements provide that in the event of the involuntary termination of such officer's employment under circumstances that would qualify such officer for severance pay under Grace's severance plan that generally covers salaried employees, then the officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any such officer who has any other agreement with Grace regarding the payment of severance upon termination of employment, if such officer becomes entitled to severance under both the terms of the retention agreement and such other agreement, then the officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the officer would only receive severance pay under such other agreement).

Executive Salary Protection Plan. All executive officers participate in the Executive Salary Protection Plan ("ESPP"), which provides that, in the event of a participant's disability or death prior to age 70, Grace will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the ESPP may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). This description of the ESPP does not purport to be complete and is qualified in its entirety by reference to the text of the ESPP, as amended, which was filed as an exhibit to Grace's predecessor's Annual Report on Form 10-K for the year ended December 31, 1996.

Effect of Chapter 11 Filing. The continuation of certain executive compensation and benefit programs may be affected by the Chapter 11 proceedings.

Directors' Compensation and Consulting Arrangements. Under the compensation program for nonemployee directors in effect for 2000, each nonemployee director received an annual retainer of $50,000 payable, at the election of each director, in the form of Common Stock or options to purchase Common Stock. The number of option shares is calculated based on a ratio of three option shares for each share of Common Stock that would otherwise be payable had a director elected to receive the annual retainer in Common Stock. The purchase price of the option is the market value of a share of Common Stock on the date the option is granted. All such options are immediately exercisable. In addition, in lieu of individual meeting fees, each nonemployee director received an annual fee of $24,000, ($30,000 for directors holding a committee chair), prorated for scheduled meetings not attended. This fee was paid, at the election of each director, in cash, in Common Stock or in stock options as described above. A director may elect to defer all or part of each payment made in Common Stock. The deferred payment will be held in a deferred compensation trust established by Grace. Common Stock held in the trust will be delivered to the director following his or her termination from service (or a subsequent date specified by the director). All stock options are transferable to family members or trusts for their benefit.

Beginning in 2001, directors will receive $4,000 ($5,000 for directors
holding a committee chair) in cash for each meeting date in respect of the
Board meeting and all committee meetings held on such date. In addition, the
annual retainer of $50,000 will be paid one-half in cash, and one-half in
Common Stock or options to purchase Common Stock, at the election of each
director following the end of each year, as described above.

Grace reimburses nonemployee directors for expenses they incur in
attending Board and committee meetings. Grace also maintains business travel
accident insurance coverage for them. In addition, nonemployee directors may
receive $1,000 per day for work performed at the request of Grace.

Compensation Committee Interlocks and Insider Participation. During 2000,
the Compensation Committee of the Board was comprised of Messrs. Akers (Chair),
Cambre, Murphy and Vanderslice, and Dr. Fox. None of such persons is a current
or former officer or employee of Grace or any of its subsidiaries, nor did any
of such persons have any reportable transactions with Grace or any of its
subsidiaries.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the Common Stock beneficially owned,
directly or indirectly, as of January 31, 2001 by (1) each person known to
Grace to be the beneficial owner of more than 5% of the outstanding shares of
Common Stock, and (2) each current director and nominee, each of the executive
officers named in the Summary Compensation Table set forth under "Election of
Directors -- Compensation," and such directors and all executive officers as a
group.

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
| --- | --- | --- | --- |
| The Baupost Group, L.L.C (1) . . . . . . . . . . . . . . .<br>44 Brattle Street, 5th Floor<br>Cambridge, MA 02138 | 5,733,600 | | 8.8% |
| FMR Corp. (1) . . . . . . . . . . . . . . . . . . . . . . .<br>62 Devonshire Street<br>Boston, MA 02109 | 3,765,400 | | 5.6% |
| Peninsula Partners, L.P. (1) (2) . . . . . . . . . . . . .<br>Peninsula Capital Advisors, LLC<br>404B East Main Street, 2nd Floor<br>Charlottesville, VA 22902 | 3,330,000 | | 5.1% |
| J. F. Akers . . . . . . . . . . . . . . . . . . . . . . . . | 1,205<br>74,535<br>11,287 | <br>(O)<br>(T) | * |
| R. J. Bettacchi . . . . . . . . . . . . . . . . . . . . . . | 668,399<br>8,155 | (O)<br>(T) | 1.02% |

31

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| R. C. Cambre . . . . . . . . . . . . . . . . . . . . . . . | 3,362 | | * |
| W. M. Corcoran. . . . . . . . . . . . . . . . . . . . . . . | 10,000<br>10,833<br>2,496 | <br>(O)<br>(T) | |
| M. A. Fox . . . . . . . . . . . . . . . . . . . . . . . . . | 3,455<br>59,007<br>2,834 | <br>(O)<br>(T) | * |
| J. J. Murphy . . . . . . . . . . . . . . . . . . . . . . . | 1,139<br>15,528<br>5,509 | <br>(O)<br>(T) | * |
| P. J. Norris . . . . . . . . . . . . . . . . . . . . . . . | 195,733<br>778,701<br>2,089 | <br>(O)<br>(T) | 1.47% |
| D. B. Siegel . . . . . . . . . . . . . . . . . . . . . . . | 15,100<br>254,321<br>40,656 | <br>(O)<br>(T) | * |
| R. M. Tarola  . . . . . . . . . . . . . . . . . . . . . . | 15,000<br>33,000<br>124 | <br>(O)<br>(T) | * |
| T. A. Vanderslice . . . . . . . . . . . . . . . . . . . . | 1,731<br>69,876<br>9,060 | <br>(O)<br>(T) | * |
| Directors and executive officers as a group . . . . | 268,275<br>2,297,238<br>117,857 | <br>(O)<br>(T) | 3.96% |

\*    Indicates less than 1%

(O)  Shares covered by stock options exercisable on or within 60 days after
     January 31, 2001.

(T)  Shares owned by trusts and other entities as to which the person has the
     power to direct voting and/or investment.

(1)  The ownership information set forth is based in its entirety on material
     contained in a Schedule 13G, dated February 2001 with respect to The
     Baupost Group, L.L.C and FMR Corp.; and December 2000 with respect to
     Peninsula Partners, L.P., filed with the SEC, which stated that the
     securities were not acquired for the purpose of changing or influencing
     the control of Grace.

(2)  Shared voting power.

Ownership and Transactions Reports

Under Section 16 of the Securities Exchange Act of 1934, the Company's directors, certain of its officers, and beneficial owners of more than 10% of the outstanding Common Stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Common Stock; such persons are also required to furnish the Company with copies of such reports. Based solely upon the reports and related information furnished to the Company, the Company believes that all such filing requirements were complied with in a timely manner during and with respect to 2000.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Commercial Transactions. During 2000, no director, executive officer (or any member of any of their respective immediate families) or, to the Company's knowledge, any holder of more than 5% of the Common Stock, had a direct or indirect material interest in any transaction (or any proposed transaction) to which the Company was a party.

Legal Proceedings; Indemnification. During 2000 there were no legal proceedings pending in which any current officers or directors of the Company were parties or had a material interest adverse to the Company.

PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

Financial Statements and Schedules. See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement.

Reports on Form 8-K. The Company did not file any Reports on Form 8-K during the fourth quarter of 2000.

Exhibits. The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace. See Note 1 to the Consolidated Financial Statements in the Financial Supplement for a description of the reorganization involving Grace's former Packaging Business.

33

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/9/98) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.2 to Form 10-K (filed 3/29/99) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/9/98) |
| 4.2 | Indenture dated as of September 29, 1992 among W. R. Grace & Co.-Conn., Grace New York and Bankers Trust Company | Exhibit 4(a) to Registration Statement No. 33-43566 on Form S-3 (filed 10/29/91) |
| 4.3 | Supplemental Indenture dated as of September 24, 1996, among W. R. Grace & Co.-Conn., Grace New York, Old Grace and Bankers Trust Company, to Indenture dated as of September 29, 1992 | Exhibit 4.4 to Form 8-K of Old Grace (filed 10/10/96) |
| 4.4 | Indenture dated as of January 28, 1993 among W. R. Grace & Co.-Conn., Grace New York and The Bank of New York (successor to NationsBank of Georgia, N.A.) | Exhibit 4(a) to Registration Statement No 33-55392 on Form S-3 (filed 12/4/92) |
| 4.5 | Supplemental Indenture dated as of September 24, 1996, among W. R. Grace & Co.-Conn., Grace New York, Old Grace, and The Bank of New York, to Indenture dated as of January 28, 1993 | Exhibit 4.5 to Form 8-K of Old Grace (filed 10/10/96) |

34

| 4.6 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98) |
| 4.7 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.8 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10 (filed 3/13/98) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10 (filed 3/13/98) |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 for Form 10-Q (filed 8/15/00)* |

35

| | | |
|---|---|---|
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Annex C to the Information Statement of Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) dated February 13, 1998 including the Form 10 of Grace filed 3/13/98 ("Information Statement")* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Annex D to Information Statement* |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Exhibit 10.4 to Form 10-Q (filed 5/15/98)* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.03 to Form 10-K of Old Grace (filed 3/28/97)* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.04 to Form 10-K of Old Grace (filed 3/28/97)* |
| 10.9 | W. R. Grace & Co. 1981 Stock Incentive Plan, as amended | Exhibit 10.3 to Form 8-K of Old Grace (filed 10/10/96)* |
| 10.10 | W. R. Grace & Co. 1986 Stock Incentive Plan, as amended | Exhibit 10.4 to Form 8-K of Old Grace (filed 10/10/96)* |
| 10.11 | W. R. Grace & Co. 1989 Stock Incentive Plan, as amended | Exhibit 10.5 to Form 8-K of Old Grace (filed 10/10/96)* |
| 10.12 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.6 to Form 8-K of Old Grace (filed 10/10/96)* |
| 10.13 | Information concerning W. R. Grace & Co. Incentive Compensation Program, Deferred Compensation Program and Long-Term Incentive Program | Pages 7-12 and 26-36 of Proxy Statement of Old Grace (filed 4/7/97)* |
| 10.14 | Form of Long-Term Incentive Program Award | Exhibit 10.13 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.15 | Forms of Stock Option Agreements | Exhibit 10.15 to Form 10-K (filed 3/29/99)* |

36

| | | |
|---|---|---|
| 10.16 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.17 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98)* |
| 10.18 | Form of Executive Severance Agreement between W. R. Grace & Co. and officers | Exhibit 10.20 to Form 10 of Grace Specialty Chemicals, Inc. (now W. R. Grace & Co.) (filed 3/13/98)* |
| 10.19 | Form of Restricted Share Award Agreements dated April 7, 1998 | Exhibit 10.1 to Form 10-Q (filed 5/15/98)* |
| 10.20 | Employment Agreement, dated January 1, 2001, by and between W. R. Grace & Co. and Paul J. Norris | Filed herewith* |
| 10.21 | Employment Agreement dated May 11, 1999 between W. R. Grace & Co.-Conn. and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.22 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of W. R. Grace & Co., and David B. Siegel | Filed herewith* |
| 10.23 | Form of Long-Term Incentive Program Award | Filed herewith* |
| 10.24 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of W. R. Grace & Co., and William M. Corcoran | Filed herewith* |
| 10.25 | Distribution Agreement by and among Grace New York, W. R. Grace & Co.-Conn. and Fresenius AG dated February 4, 1996 | Exhibit 2 to Form 8-K of Grace New York (filed 2/6/96) |
| 10.26 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Directors | Exhibit 10.39 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.27 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Officers and Directors | Exhibit 10.37 to Form 10-K of Old Grace (filed 3/28/97)* |

| 10.28 | Form of Retention Agreement | Filed herewith* |
| 12 | Computation of Ratio of Earnings and Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2000 Form 10-K |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2000 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 99.1 | Audit Committee Charter | Filed herewith |
| 99.2 | Press Release | Filed herewith |

38

SIGNATURES

      Pursuant to the requirements of Section 13 or 15(d) of the Securities
Exchange Act of 1934, the registrant has duly caused this Report to be signed
on its behalf by the undersigned, thereto duly authorized.

                              W. R. GRACE & CO.


                         By:  /s/ Robert M. Tarola
                              ---------------------
                              Robert M. Tarola
                              (Senior Vice President and
                              Chief Financial Officer)

Dated: April 16, 2001

      Pursuant to the requirements of the Securities Exchange Act of 1934, this
Report has been signed below by the following persons on behalf of the
registrant and in the capacities indicated on April 16, 2001.

      Signature              Title
      ---------              -----
      P. J. Norris*          President and Director
                             (Principal Executive Officer)

      J. F. Akers*        )
      R. C. Cambre*       )
      M. A. Fox*          )   Directors
      J. J. Murphy*       )
      T. A. Vanderslice*  )

 /s/ Robert M. Tarola        Senior Vice President and Chief Financial Officer
---------------------------  (Principal Financial Officer and Principal
     (Robert M. Tarola)      Accounting Officer)


-------------------------------
*    By signing his name hereto, Mark A. Shelnitz is signing this document on
     behalf of each of the persons indicated above pursuant to powers of
     attorney duly executed by such persons and filed with the Securities and
     Exchange Commission.


                         By:  /s/  Mark A. Shelnitz
                              ---------------------------
                              Mark A. Shelnitz
                              (Attorney-in-Fact)



                                   39

FINANCIAL SUPPLEMENT

W. R. GRACE & CO.
ANNUAL REPORT ON FORM 10-K
FOR THE YEAR ENDED DECEMBER 31, 2000

FINANCIAL SUPPLEMENT
TO
ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2000

W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements
and Financial Statement Schedule and Exhibit

Management's Responsibility for Financial Reporting..................... F-3
Report of Independent Accountants...................................... F-4
Report of Independent Accountants on Financial Statement Schedule...... F-5
Consent of Independent Accountants.................................... F-5
Consolidated Statement of Operations for the three years in the
    period ended December 31, 2000.................................... F-6
Consolidated Statement of Cash Flows for the three years in the
    period ended December 31, 2000.................................... F-7
Consolidated Balance Sheet at December 31, 2000 and 1999.............. F-8
Consolidated Statement of Shareholders' Equity (Deficit) for the three
    years in the period ended December 31, 2000...................... F-9
Consolidated Statement of Comprehensive Income (Loss) for the three
    years in the period ended December 31, 2000...................... F-9
Notes to Consolidated Financial Statements............................ F-10 - F-30
Quarterly Summary and Statistical Information......................... F-31
Financial Summary..................................................... F-32
Management's Discussion and Analysis of Results of Operations
    and Financial Condition.......................................... F-33 - F-45

Financial Statement Schedule
    Schedule II  -  Valuation and Qualifying Accounts and Reserves.... F-46

Exhibit 12:  Computation of Ratio of Earnings to Fixed Charges and
    Combined Fixed Charges and Preferred Stock Dividends.............. F-47

The financial data listed above appearing in this Financial Supplement are
incorporated by reference herein. The Financial Statement Schedule should be
read in conjunction with the Consolidated Financial Statements and Notes
thereto. Financial statements of less than majority-owned persons and other
persons accounted for by the equity method have been omitted as provided in
Rule 3-09 of Securities and Exchange Commission Regulation S-X. Financial
Statement Schedules not included have been omitted because they are not
applicable or the required information is shown in the Consolidated Financial
Statements or Notes thereto.

MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING

Management is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such financial information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

Management maintains internal control systems to assist it in fulfilling its responsibility for financial reporting. These systems include business, accounting and reporting policies and procedures, selection of personnel, segregation of duties and an internal audit function. While no system can ensure elimination of all errors and irregularities, Grace's systems, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed and transactions are properly executed and reported. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

The Audit Committee of the Board of Directors, which is comprised of directors who are neither current nor former officers, employees or consultants to Grace, meets regularly with Grace's senior financial personnel, internal auditors and independent accountants to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal control systems. The Audit Committee reports its findings and recommends the selection of independent accountants to the Board of Directors. Grace's management, internal auditors and independent accountants have direct and confidential access to the Audit Committee at all times.

The independent accountants are engaged to conduct the audits of and report on the Consolidated Financial Statements in accordance with generally accepted auditing standards. These standards require a review of the systems of internal controls and tests of transactions to the extent considered necessary by the independent accountants for purposes of supporting their opinion as set forth in their report.


/s/ Paul J. Norris                          /s/ Robert M. Tarola
Paul J. Norris                              Robert M. Tarola
Chairman, President and                     Senior Vice President and
Chief Executive Officer                     Chief Financial Officer