# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et. al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**AFFIDAVIT OF MARK PETERSON**

1.      I have a Ph.D. from UCLA in psychology, a JD from Harvard and an

undergraduate degree from the University of Minnesota. I have been a visiting professor at UCLA

Law School, where I taught courses in Mass Torts and in Law and Social Sciences, and have also

taught courses on law and policy research at the RAND Graduate School and UCLA. My vita is

attached as Exhibit 1.

2.      I have worked at the RAND Corporation since 1976 as a member of the research

staff, a consultant and an independent contractor conducting empirical and policy research on

matters of civil and criminal justice.  I have been the directing, principal researcher on many

studies, including studies of asbestos litigation, mass tort litigation generally, and workplace

injuries and workers compensation.  I have many publications on these studies, including

monographs on mass tort litigation and on evaluation of trusts and other mass tort claims

facilities.

3.      Since 1983 I have been president of Legal Analysis Systems, Inc. (LAS), a

Consulting company that conducts empirical and statistical analyses of mass tort claims for

courts and litigants. LAS's work has involved various types of mass tort cases, including breast

implant litigation, Dalkon Shield inter-uterine devices and tobacco, but the substantial majority of its work has been in many cases involving asbestos litigation.

4.    I have participated in asbestos litigation since the early 1980s working as an expert and special master for courts, insurance companies, asbestos settlement trusts, defendants and asbestos claimants creditors committees in bankruptcy. I was the Special Advisor to U.S. District Court Judge Jack B. Weinstein and Bankruptcy Court Judge Burton Lifland in the *Findley v. Falise* class action litigation to restructure the Manville Trust. I have been an expert for the court on matters of asbestos litigation for U.S. District Courts in Texas and Ohio. I am an expert for ten asbestos trusts.

5.    I have been an expert for several asbestos defendants and a consultant to other businesses on matters of asbestos liabilities. I have been an expert or consultant to five insurance companies, and testified in the *Ahearn v. Fibreboard* class action as an expert for Continental and Chubb. I have been an expert for asbestos claimants committees in the following consummated bankruptcies: Eagle-Picher, National Gypsum, Keene, H.K. Porter, Celotex, Hillsborough Holding Company, Raymark, Raytech, Wallace & Gale and Fuller-Austin, and testified as an expert in all of these cases except H.K. Porter and Fuller-Austin where my testimony was entered by affidavit. I am presently an expert for asbestos claimants committees in six pending bankruptcy proceedings. I am a trustee of the Fuller-Austin Settlement Trust, created in the bankruptcy of Fuller-Austin Insulation Company, an asbestos insulation contractor and distributor.

6.    For the past twenty years I have devoted a substantial portion of my professional work to matters of the treatment and valuation of claims in mass torts and mass tort bankruptcies. I have participated in litigation about matters of bar dates, proofs of claims, claims' estimations

{D0000460:1 }

2

and the nature of claims allowance and claims procedures in trusts created in mass tort
bankruptcies.

      7.     On behalf of the Official Committee of Asbestos Bodily Injury Claimants (the
"Committee"), I have reviewed the Debtors' filings related to their proposed bar date and proof
of claim form, drawing upon my experience as an expert on asbestos and other mass tort
litigation, in bankruptcies involving mass torts and my scholarly research and experience with
asbestos litigation, and have reached the following conclusions discussed below:

          a.     No court in the bankruptcy of an asbestos defendant has ever approved a
proof of claim form as extensive and complicated as that proposed here by
the Debtors.

          b.     The proof of claim form is so massive and technically flawed as to prevent
claimants from complying and prevent any meaningful analyses of results.

          c.     The production of medical documents demanded by the proof of claim
form is more extensive and intrusive than full discovery in a law suit.

          d.     The Debtors would require that the proposed proof of claim form be
completed by more than 200,000 persons, placing enormous and
expensive burdens on the Debtors' estate, on claimants and their attorneys
and on the Court.

          e.     The results of the Committee's pretest of the Debtors' proof of claim
(described below) show that completion of the Debtors' program would
require over 600,000 person-hours (390 persons-years), cost claimants and
their attorneys over $24 million, and take well over a year of time. Costs
and delays to the Debtors' estate and the Court would likely be far more.

    f.  The Committee's pretest also shows that many claimants will not have information required by the Debtors' proposed form.

    g.  The Debtors' proposed bar date and the data collected through the proof of claim form will have no value in estimating or allowing asbestos personal injury claims.

    h.  The Debtors' proposed bar date and proof of claim form are unnecessary. Estimation, allowance and enforcement of any successful Debtors' summary judgment motions all can be achieved better and at lower cost through other means.

  8.  No court in the bankruptcy of an asbestos defendant has ever approved a proof of claim form as extensive and complicated as that proposed here by the Debtors.

  9.  I have personal knowledge of the proof of claim forms for the twenty bankruptcies involving mass tort claims in which I have participated. In their motion papers, the Debtors have repeatedly misinformed the Court about proofs of claim forms in those cases. Contrary to the Debtors' representations, both the Eagle-Picher and the Celotex Courts refused to approve the Debtors' motions for approval of special asbestos proof of claim forms like the one proposed here. Both Courts also noted that they did not have authority to order completion of any proof of claim form other than the standard Bankruptcy Form 10. The Celotex court approved a two-page form, but allowed claimants to submit the standard Form 10 as an alternative. The Eagle-Picher Court approved only the standard Form 10. In the Babcock and Wilcox case, the District Court denied the debtors' motion for a proof of claim form that was comparable to that submitted by the Debtors here, and subsequently approved a substantially shorter and less burdensome form.

{D0000460:1 }

4

10.    Contrary to the Debtors' statements, there was no bar date or proof of claim during the Manville bankruptcy other than for voting purposes. In other words, claimants stated that they had a claim at the time that they voted on the plan. Instead, the Manville reorganization plan established a deadline 18 months after the effective date for claimants to file claims with the Trust. Since the Manville plan established the Trust as the vehicle for reviewing and allowing claims, claimants would necessarily have to file information with the Trust. By establishing a bar date to be administered by the Trust after plan consummation, the Manville Court avoided the costs and burdens to the estate, Court and claimants of duplicate filings. Similarly, Courts in the UNARCO, Raytech, National Gypsum and Fuller-Austin bankruptcies did not establish bar dates or proofs of claim. As an alternative, the UNARCO, Raytech and Fuller-Austin plans, like Manville, required claimants to file claims with the trusts by an established date after the plans became effective.

11.    In the A. H. Robins bankruptcy, I was an expert for U. S. District Court Judge Robert R. Merhige, Jr. on matters of collecting and analyzing data about Dalkon Shield bodily injury claims. I am personally aware that, contrary to the Debtors' representation, the Court did not require that all claimants complete an "extensive proof of claim." In that case the Court first invited claimants to send letters indicating their interest in making claims. The Court then required claimants to complete a two-page questionnaire that was described in the report that my fellow experts and I prepared for the Court:

> [A] brief questionnaire sent to claimants by the court. The questionnaire provided limited information about the nature of each claim and the period of use of the Dalkon Shield. The Court's questionnaire did not provide proof of injuries nor did it provide sufficient information to evaluate the nature of injuries.

{D0000460:1 }

5

Excerpt, Report of the Dalkon Shield Claims Estimation Process, June 15, 1988, prepared by
Francis McGovern, Patricia Ebener, Mark Peterson, Dan Relles, at page 24 (attached as Exhibit
2). The Court required no further information from most of the over 200,000 claimants. Instead,
in order to estimate the characteristics and values of all Dalkon Shield claims, the Court required
that a randomly sampled 2,500 claimants complete an extensive questionnaire about their
injuries and use of the Dalkon Shield. *Id.* at 26-27. Again, this sampling process was
undertaken to avoid what would have been an overwhelming burden on the estate, Court and
claimants if all claimants had been required to complete the extensive questionnaire. *Id.* at 16.

      12.    I am personally familiar with bar dates and proofs of claim in the Dow Corning
bankruptcy through my participation as an expert for the Tort Claimants Committee. The Court
refused to approve an extensive questionnaire requested by the debtor, stating that it doubted
whether or not it could require completion of any proof of claim other than the standard form.
The Court subsequently approved a simple two-page proof of claim form that identified the
claimant and her attorney, the type and manufacturer of the claimed implant product, dates of
implantation and removal, and whether the claim was for a present or future injury to the
claimant or another person. A third page was required only for claims by spouses or others
making a claim for an implant placed in another person.

      13.    The proof of claim form Grace is proposing is so massive and technically flawed
as to prevent claimants from complying.

      14.    The Debtors here have proposed an unprecedented data collection effort in their
motion for bar date and proof of claim. They propose an eleven-page form that would require
answers to over 170 questions for claimants who worked at only one occupation at one site, had
only one asbestos-related disease that was diagnosed only once by one doctor and who never saw

{D0000460:1 }

6

a doctor for any other condition that might be related to the asbestos-related disease. The number of questions that a claimant must answer increases dramatically with any additional occupation, job site, disease, or diagnosis: e.g., claimants who worked at a combination of five occupations and sites would need to complete over 300 questions; workers at 20 occupations and sites (a modest number for construction workers) would need to complete 800 questions. The claimant must repeatedly answer the same 33 questions for every job site where the claimant was exposed to asbestos, whether or not the asbestos was from a Grace product, and separately again for each different job category at each site.

15.     The Debtors' proposed proof of claim and instructions are technically so flawed as a data-collection instrument that claimants will be unable to understand how they are to comply, they will be unable to complete the questions on the form, and the interpretation of the form's instructions will not be consistent across claimants and paralegals who attempt to answer those questions. Because of these flaws, no meaningful analyses or conclusions can be based on the proofs of claim. As examples of the form's flaws:

      a.     The proof of claim form contains branching questions (i.e., if answer to question 1 is "yes", then claimant must answer question 2), but does not indicate where the claimant is to branch, i.e., where to look for the second question. *Compare* questions 1 and 3 with questions 5 and 6 under Part III of the form; *see also* question 2 under Part V.

      b.     The form contains redundant questions.

      c.     The form's instructions are dense and uninformative.

      d.     The form's questions about medical tests only permit a claimant to fill in results or leave the items blank. The form does not allow claimants to

{D0000460:1 }

7

indicate either that the test has not been done or that a test has been done but results are unavailable.

e.    The form requires a claimant to submit only the latest test results even if the claimant is not relying on the latest test or the latest test was an independent medical examination performed by a defendant's doctor or the latest test was technically flawed.  The claimant cannot even select his own evidence.

f.    The form's medical questions are often confusing and indefinite, _e.g.,_ asking for "additional" data from International Labor Organization ("ILO") tests without indicating what information is sought, so that the claimant does not know how to answer and the Debtor has no ability to interpret "additional" data when it is provided.

g.    The form requires medical information about "alternative or non-asbestos cause" without indicating or giving examples of what such a cause might be.

h.    The form requires claimants or paralegals to make medical interpretations of ILO readings even though the form requires submission of the actual test forms.

i.    The form requires submission of all medical reports "relating to the diagnosis/-es" without defining "relating to."

j.    The form's questions about exposure to asbestos are confusing and indefinite.  For example, the form asks the confusing question:  "If exposure occurred because the injured party was exposed to an

occupationally exposed person" and then requires dates of exposure only for the other "occupationally exposed person" but not for the claimant.

k.      The form's next confusing question asks "If exposure occurred as a result of non-occupational exposure but not based on another person's exposure," and then requires the claimant to "describe below" without indicating what the claimant is to describe or providing space for a description and without indicating where such description should be made.

l.      The form requires that claimants complete an additional "Occupational Exposure History Supplemental Form" for each different "job category" at the same site, but does not define what it means by "job category."

m.      The form asks if the claimant was either "a worker who personally installed Grace asbestos/asbestos-containing products" or "a worker in a work space where Grace asbestos/asbestos-containing products were being installed by others" or "a worker at the site, but not in the immediate work space where Grace asbestos/asbestos-containing products were being installed by others" or "other."  Workers who check "other" are instructed to "specify" but there is no indication what they are to specify.  All of these statements are indefinite: what precisely is "personally installed" or "work space" or "immediate work space" or "site"?  Furthermore the vague instruction to "specify" will provide no information useful for systematic analysis.

n.      The form asks for a list of judgment defendants but allows inadequate space for a response.

o.  The form asks if the claimant has settled with "any bankruptcy trust or other claim facility or entity" without defining what an "entity" is. Is the Center for Claims Resolution or the Asbestos Claims Facility such an entity?

p.  The form then requires the aggregate amount of settlements by bankruptcy trust, facilities or entities, which raises two problems: First, which entities are to be aggregated? And, second, does the claimant add the full allowed liquidated value of the settled claim or the amount that he has received? All asbestos bankruptcy trusts pay less than 100 percent of the value of claims, but agree that they will pay additional money if they ever have sufficient funds to do so. Since claimants settle with a trust for x dollars, but only receive a fraction of x, what number do they include?

r.  In any event, such settlement information would not be discoverable in the tort system.

16.  The Debtors' proof of claim is so overwhelming and poorly designed that it will produce frequent errors and missing answers. The Debtors clearly plan to take advantage of this flawed proof instrument to prejudice claimants for their inability to complete the form. If a claimant cannot answer a question within the Debtors' obligatory format, the Debtors will presume and argue to the Court that the claimant cannot support his claim. For example, the Debtors' "INSTRUCTIONS FOR PART III -- Asbestos-Related Conditions" starts with the following:

> "Respond to all applicable questions. If a section is left blank it
> will be interpreted to mean that the injured party does not have the
> specified injuries, conditions, or test results addressed in that
> section."

{D0000460:1 }

10

While the Debtors include no such instructions for completing other portions of the form, the
DEBTORS' MEMORANDUM makes it clear that they will treat incomplete information on the
form about claimants' work sites, exposures and identification of asbestos-containing products as
evidence that claimants could never establish such matters.

17.     The production of medical documents demanded by the Debtors' proof of claim
form is more extensive and intrusive than full discovery in a law suit.

18.     For example, the proposed form would require claimants to attach medical
records that they would not have to submit to defendants in discovery for their asbestos bodily
injury law suits. *See* Affidavit of William Haras, dated July 9, 2001 (attached, along with
Affidavits from professionals at other law firms regarding pretest results, as Exhibit 3). The
form requires medical records of every doctor who diagnosed any asbestos-related disease as
well as "any doctor [who] identified an alternative or non-asbestos cause." Because of the scope
and ambiguity of this demand, claimants or their lawyers would have to review and submit all of
the claimants' medical records for any matter, not simply those which prove the presence of an
asbestos-related disease, since they cannot know what the Debtors' regard as an "alternative or
non-asbestos cause". Id.

19.     The proposed proof of claim form also demands production of seven types of
medical records for every diagnosis of every claimed asbestos disease, for every medical event in
which a "doctor identified an alternative or non-asbestos cause of a claimed asbestos disease and
any record involved any history of smoking." No claimant or law firm has such records.
Claimants and law firms have reports from doctors that document the claimed disease, but do not
have all of a doctor's records that backed up the report, and certainly do not have   complete
medical records of a claimant's entire medical history. To comply with the proposed

{D0000460:1 }

11

requirements, the claimant must locate, obtain, assemble, copy and send all this information with the proof of claim.

20.     The proposed proof of claim form requires claimants to submit all x-rays and x-ray reports taken within the last two years. The x-ray report is the medical interpretation of what is shown on the x-ray film. The actual x-ray will serve no purpose for the Debtors. Rather, the actual x-ray must be retained by claimants for litigation with other defendants and cannot be copied.

21.     The proposed form requires claimants to identify every doctor who made any diagnosis, including all doctors who "identified an alternative or non-asbestos cause," providing for each doctor the name, specialty, address and "diagnosis given." The form then requires the claimant to authorize and direct his medical professionals to release every piece of medical information to Grace, to waive the confidentiality of all conditions that might have contributed to the disease and regarding medical records and presumably incur the costs of sending whatever records the Debtors' request. The claimant must also identify the asbestos trusts and facility to whom he has submitted claims so that Grace can compare proof of claim answers with information submitted to other asbestos trusts -- even though information submitted to other trusts is confidential.

22.     The Debtors would require that the proposed proof of claims be completed by more than 200,000 persons placing enormous and expensive burdens on the Debtors' estate, on claimants and their attorneys and on the Court.

23.     The Debtors argue that they need this extraordinary proof of claim form because they have experienced a recent "spike" in claims, *i.e.,* 48,000 in 2000 compared to 27,000 in 1999. This increase resulted from unprecedented unfavorable publicity in 2000 regarding its

{D0000460:1 }

vermiculite business and mine in Libby, Montana. Even in year 2000, however, the number of cancer claims filed against Debtors almost certainly represented less than half the number of persons who fell ill to or died of an asbestos-related cancer that year, as most asbestos injuries do not result in claims. Moreover, virtually all asbestos defendants have experienced such one to two-year spikes as a result of particular events such as Grace's media disaster in 2000, which were often followed by comparably sharp declines in claims.

24.     The Debtors' financial statements report that 124,907 asbestos bodily injury claims were pending as of December 31, 2000. The Debtors received about 4,000 such claims per month during 2000, and about 2,245 per month during 1999. This implies that the Debtors' would have received between 40,400 and 72,000 additional claims between December 31, 2000, and a hypothetical June 30, 2002 bar date (2,245 x 18 months = 40,410; 4,000 x 18 months = 72,000). Added together, these amounts indicate that between 165,000 and 196,000 claims are expected to be pending or accrued by June 30, 2002, based on recent filing rates. However, bar dates in asbestos and mass tort bankruptcies have always produced a surge of new claims far in excess of the debtors' historic claiming rates, (e.g., 300,000 claims filed to date in Celotex compared to 120,000 pending as of the Celotex petition date). We must thus anticipate that the bar date proposed here would result in filings of well over 200,000 proofs of claim.

25.     The preparation, submission, filing, retrieval, coding and analyses of over 200,000 proposed proofs of claim with all required   medical documents would place an enormous and expensive burden on the Debtors' estate, on claimants and their attorneys and on the Court. The Debtors' collection of and apparent plan to review the enormous quantities of medical tests, reports and x-rays would bring the scale and cost of this proposal beyond any ever involved with any litigation and presents a project surpassed perhaps only by the census. In the

{D0000460:1 }

standard process of conducting large-scale data collection efforts, the party planning to undertake such an effort would first identify the purpose of the effort, then specify how the data will be analyzed, and then estimate the time, cost and likely success of that effort. Because the Debtors have provided none of this information, neither the Court nor the parties can evaluate the Debtors' proposal within the standards of ordinary data collection efforts.

26.    A "pretest" by the Committee of the Debtors' proposed proof of claim form, which is described below, indicates that completion would require over 600,000 person-hours (390 persons-years), a cost of over $24 million and well over a year of time. Costs and delays to the estate and the Court would be far more.

27.    The Committee conducted the pretest of the Debtors' proposed proof of claim to estimate the likely success and some of the costs and time demands of their proposal. Such pretests are standard procedures for evaluating and modifying large-scale data collection efforts like that proposed by the Debtors. The Committee asked four law firms represented on the Committee to complete the proposed data collection process for several claims from each firm, record the time necessary to complete the proposed form for each claim, identify the information requested by the proposed form that was unavailable, and estimate the time required to obtain additional information that might be obtained. The results of the pretest are attached as Exhibit 4. The pretest was not, and was not intended to be, a representative sample of claims that might be subject to the proof of claim. As is typical of a pretest method, the exercise was undertaken to provide a rough estimate about the burdens and efficacy of the proposed data collection effort.

28.    The pretest establishes that the Debtors' proposed proof of claim is unworkable. It will not obtain information sought by the Debtors, and it will place great financial and time burdens on the asbestos claimants, the Debtors' estate, and the Court. These results were what I

{D0000460:1 }

14

expected based on my experience with asbestos litigation during the past twenty years, my
pretest of other complex proof of claim forms proposed but not used in the Eagle-Picher,
Raytech, and Babcock & Wilcox bankruptcies, and my work as an expert for the Court in the
A.H. Robins bankruptcy.

29.     The Committee's pretest provides a means to estimate the costs of the Debtors'
proposed proof of claim process to claimants and their attorneys. As paralegals for the law firm
completed the proofs of claim forms, to the extent that they could, they calculated the amount of
time that they had spent on the form and estimated the additional time that would be required to
provide information that was not immediately available to them and the time needed to obtain
the claimant's signature. This total time, both elapsed and anticipated, was provided for sixteen
of the twenty-five claims in the pretest. The total time ranged from a low of 2.0 hours to 6.0.
The total for elapsed and anticipated time averaged 3.016 hours per claim. Taking a reasonable
assumption that each paralegal costs on average $40.00 per hour in salary, benefits and overhead,
the total cost of completing the Debtors' proposed proof of claim for the 124,907 claims pending
as of December 31, 2000, would be $15 million (127,407 x 3.016 x $40 = $15 million). If the
bar date and proof of claim were to also apply to claimants who had not filed prior to the
bankruptcy but whose cause of action arose prior to the bar date, the number of claims would
likely exceed 200,000 claims, which would entail costs of $24 million (200,000 x 3.016 x $40 =
$24 million).

30.     The costs of the Debtors' proposed proof of claim would be far greater to the
Debtors' estate. Because the Debtors have provided no plan for collecting, data-entering and
analyzing their proposed proof of claim, the costs to the estate cannot be estimated as easily as
costs to claimants. It is important to recognize, however, that there would be a multiplier effect

{D0000460:1 }

15

for the costs to the estate because every party – the Debtors, the Committee, the Legal

Representative, the Unsecured Creditors Committee, and the Property Damage Committee –

would have the opportunity and obligation to obtain and analyze this data at the expense of the

estate. As the Debtors are proposing to use these data in summary judgment motions dealing, in

part, with technical medical issues, and to obtain x-rays and other results of medical tests, and

presumably have plans for expert review of these, the parties would have to retain expensive

medical coders and doctors to help analyze the hundreds of thousands of pages of medical

records. The sample of Dalkon Shield claims in the A. H. Robins bankruptcy provides the only

comparable basis for estimate the costs of collecting detailed litigation, medical and exposure

information for all 200,000 W. R. Grace claimants. The district court judge who oversaw the

Dalkon Shield data collection, Hon. Robert R. Merhige, Jr., estimated that that process cost the

Robins estate $10 million (in mid-1980s dollars and costs), or $4,000 per sampled claim.

31.     The Debtors' proof of claim process would consume years and endlessly delay

resolution of the bankruptcy. Claimants' law firms simply cannot complete all proof of claims

and obtain all requested medical records within any reasonable period of time. Many law firms

represent thousands of claimants, some tens of thousands. A law firm with 5,000 claims would

have to devote over 10 paralegals for one year (5,000 claims x 3.016 hours divided by 7 hours

per day x 220 days per year) to complete the forms. Obviously, no law firm has an excess

capacity of 10 persons with the training needed to complete these forms. Some law firms have

even more claims and would face an even more onerous burden. Indeed, one law firm

submitting an affidavit for this pretest may have as many as 23,858 clients eligible to file W. R.

Grace proofs of claims. This firm would have to devote 47 paralegals for one year to complete

the proofs of claims. Indeed, there is no reasonable period of time in which to complete a task

{D0000460:1 }

16

that would require 602,200 person hours (200,000 claims times 3.016 hours) simply to complete the forms for the likely 200,000 claimants. Even a bar date period of a year would be insufficient.

32.    After the proofs of claim are received, then the data must be entered, cleaned, organized and analyzed. Because the Debtors apparently intend an analysis of all medical records, exposure and legal detail in their proposed proof of claim to support their planned summary judgment motions, this analysis process will consume years more. Much of this analysis will be based on the many medical reports required of each claimant, material that cannot be easily and quickly analyzed. Moreover, the vast and ambiguous data and medical reports will lead to endless disputes about the facts and legal significance for tens of thousands of individual claims, increasing litigiousness and delay.

33.    The Committee's pretest shows that claimants do not have information required by the Debtors' proposed proof of claim form.

34.    The Committee's pretest found that the information required by the Debtors' proposed proof of claim is not available to claimants. Paralegals could find required product identification for only 5 of 24 claims. Overall, no information was available for 79 percent of claims. This result is expected. In asbestos litigation, few plaintiffs know comprehensively the specific asbestos products to which they were exposed and few files contain such information. Rather, such products are identified through a number of sources: documents, co-workers and only some time by the plaintiff himself. At the time of trial or discovery, lawyers assemble this information comprehensively from all sources. This assembly is labor-intensive but can be managed, because cases get to discovery or trial at different times or do not get to discovery or

{D0000460:1 }

17

trial at all. Here, instead, the Debtors would impose this burdensome work for every case, and require that the work be done at the same time for every case.

35.    The Committee's pretest showed that other information required by the Debtors' proof of claim form could not be provided because the information dealt with matters that are never an issue in tort litigation and, therefore, not in the hands of claimants or their attorneys. Because the requested documents and data are not needed to establish liability by W. R. Grace or any other defendant, or to address any defense in trial of these claims, they are not maintained as part of litigation of asbestos claims. For example, 42 percent of claimants could not provide required information about work sites including who owned the sites.

36.    Medical information required by the Debtors' proof of claim is even less likely to be available to claimants. Only one third of claimants had all of the required information about the identity, description and location of doctors. Less than half had all of the medical reports they would be required to produce with the proof of claim. Only half of law firms had x-rays, and only half thought they could provide required information about doctors who identified alternative or non-asbestos causes.

37.    Many claimants who would be required to file proofs of claims under the Debtors' proposal would not manifest their asbestos-related disease until shortly before the bar date. Based on recent filing rates against Grace, at least 2,500 to 4,000 claims will arise within a month before the bar date and at least 15,000 to 24,000 within six months before. The Committee's pretest examined the special problems that these new claimants will face in complying with the Debtors' bar date by having paralegals attempt to complete the proposed proof of claim for some claims arising in the last month and some within the last six months. For none of the six claims tested that had originated within the last month was required information

{D0000460:1 }

18

about work histories or product identifications available. Two thirds of the claims arising within six months could not provide the required product identification, and twenty-two percent could not provide all of the information required about the claimants' work history.

38.    The Committee's pretest shows that the medical questions in the Debtors' proposed proof of claim are impossible for newly-filed claims because the medical cases have only begun to be developed. No claim that arose within the last month could provide required information about doctors and none had the required medical tests and reports. X-rays were unavailable for two thirds of claimants filed within one month, and two-thirds did not have required information about alternative causes. Forty-four percent of claimants filed within six months were missing each of these required sets of information.

39.    The Debtors have proposed requirements that cannot be satisfied by claimants. Substantial percentages of claimants cannot provide the required information about exposures. Less than half of claimants could provide required information and documents about their medical conditions. No recently filed claimants can satisfy the requirements for medical information and documents.

40.    The Debtors' proposed bar date and proof of claim are a trap that the Debtors acknowledge they will use to disallow claims. Over half of all claimants and all recently-arising claims will not have information about tests or other required medical matters because the claimant will not yet have had the tests or diagnoses demanded by the Debtors or will not have the results of those tests or diagnoses by the bar date. Although this missing information is simply a matter of timing, the Debtors' instructions state that they will presume that these claimants have no asbestos-related diseases. This is an artificial trap that has nothing to do with the merits of claims. The Debtors' proposed process would treat these asbestos claims as if they

{D0000460;1 }

19

will never have medical examinations or obtain test results in the future. In reality, information about asbestos claims develops over time as claimants get additional medical examinations or as the seriousness of their conditions progress.

41.    The Debtors are attempting to turn the bar date and proof of claim from a process that identifies claims into one that allows claims. In every completed asbestos case, the bankruptcy plan creates a trust, and channels claims to that trust for review and allowance. Claimants submit claims to the trust as their claims ripen and become fully documented, and the trust evaluates the claim based on all the information that a claimant develops supporting his claim. The Debtors, instead, would force all claims to be frozen and evaluated at an arbitrary point in time, when many are far from fully developed, based on answers and documents selected and formatted by the Debtors that cannot be answered or supplied by most claimants.

42.    The Debtors' proposed bar date and the data collected through the proof of claim will have no value in estimating or allowing asbestos personal injury claims.

43.    The data which the Debtors propose to collect through their proof of claim will have no value in estimating or allowing asbestos personal injury claims. So many data items sought in the proposed proof of claim form will be unavailable that neither the Debtors nor anyone else will be able to use these data. But even if all of the persons with claims against the Debtors could provide all requested data, this would not help promote reasonable and efficient claims estimation. The data could not be used in a statistical estimation process based on analyses of characteristics that significantly affected past settlement values of claims against this or similar asbestos defendants. The Debtors do not have information like that sought in the proof of claim for claims that they have already resolved. Similarly, no other asbestos defendant or trust has such information for claims that it has resolved. Therefore, neither the parties nor the

{D0000460:1 }

20

Court could use the requested to data to estimate the values of claims still pending against the Debtors on the basis of how characteristics inquired about in the proposed proof of claim form were associated with past settlement amounts. The Debtors could use the requested information to value claims only by asserting that the requested information affects values in ways that cannot be supported by any historic data, or else by litigating the purported effect of items on a case by case basis.

44.     Similarly, the Debtors' proof of claim form would not be useful for purposes of allowing individual claims. Asbestos personal injury claims against the Debtors will be allowed or disallowed by a trust using claims procedures established by a confirmed bankruptcy plan. In order to preserve its assets, the trust will have to evaluate claims through an efficient process that requires the review of limited information. Like all other asbestos trusts, a W. R. Grace trust will have to use a specialized administrative process rather than litigation. For example, the trust will not need or be able to use most information requested by the Debtors. The trust will not need or be able to review every medical record requested by the Debtors or every asbestos product to which a claimant was exposed or the precise period of a claimant's exposure to asbestos from a W. R. Grace product. Rather, as in all other mass tort bankruptcies, this administrative review will be based on limited claims information whose scope will be determined either by the trust or else as part of a confirmed plan of reorganization. The trust will do a better job without the excessive information sought by the Debtors' proposed proof of claim. The experience of other asbestos trusts shows that, by looking only to limited, critical information, those trusts do a more complete job of reviewing claims and deny more claims than do asbestos producers who are still in the litigation process.

45.    While information sought by the Debtor's proof of claim is not necessary or helpful for estimation and allowance of claims and cannot be obtained in any event, other alternative sources can provide information to aid in the estimation of claims.  Like other asbestos defendants, W. R. Grace likely maintains an electronic database of its asbestos claims. Such databases are invariably useful in an estimation process.  W. R. Grace has not provided its claims database to the Committee or to the Court.  It is important to understand this database, its utility and limitation in order to evaluate the necessity of undertaking an expensive and time-consuming proof of claim process.

46.    The W. R. Grace claims database can be supplemented by information from databases maintained by other asbestos trusts.  Three claims facilities maintain data about asbestos claims submitted to the Manville, UNR, Eagle-Picher and Celotex Trusts.  These databases have been made available in bankruptcies of other asbestos defendants and have been enormously useful in supplementing information critical for estimating claims.

{D0000460:1 }

I, Mark Peterson, hereby declare, under penalty of perjury, that the contents of this Affidavit are known to me and that the matters and things therein set forth are true.

September 9, 2001

Mark A. Peterson