Conn. (Grace Chemicals), which in turn was a wholly owned subsidiary of the parent company

Grace;

      b)     Grace-Conn. Transferred the stock of NMC to its parent Grace, thus

making Grace-Conn. and NMC equal sibling subsidiaries of Grace;

      c)     Grace then transferred that stock of Grace-Conn. to a newly formed

subsidiary of Grace, Grace Holding Company, Inc.;

      d     Grace then spun off to its shareholders this brand new subsidiary Grace

Holding Company, Inc. as a totally separate company. This left Grace with NMC as its sole

asset;

      e)     Grace (with its sole asset NMC) then merged with Fresenius Medical Care

A.G., a wholly owned subsidiary of Fresenius A.G. This new entity was called Fresenius

National Medical Care ("FNMC"). Grace's shareholders effectively received 44.8% of the stock

of this new entity FNMC , and Grace ceased to exist; and

      f)     Grace Holding Company Inc. was renamed W. R. Grace & Co., a

Delaware corporation.

      67.     The effect of this series of transactions is that Grace-Conn.- the entity with

the asbestos liability and now renamed W. R. Grace & Co. - is totally stripped of, and segregated

from, its profitable former subsidiary NMC. The new W. R. Grace & Co. was left with full

responsibility for satisfying Grace's asbestos liabilities, but was left undercapitalized and did not

receive fair value for its now lost assets.

      67.     In the Form S-4 regarding these 1996 transactions, Grace

expressly recognized that the transactions may constitute a fraudulent transfer. In a section titled

19

"Fraudulent Transfer and Related Considerations," Grace acknowledged its exposure when it

stated:

> "Under applicable law, the NMC Distribution would constitute a
> 'fraudulent transfer' if (a)New Grace or Grace Chemicals is insolvent, (b)
> the effect of the NMC Distribution would render New Grace or Grace
> Chemicals insolvent, (c) the NMC Distribution would leave New Grace or
> Grace Chemicals unreasonably small capital, or (d) New Grace or Grace
> Chemicals intended to incur, or believed it would incur, debts beyond its
> ability to pay as such debts mature...Grace believes that, based on the
> factors considered in connection with the NMC Distribution, the NMC
> Distribution will not be a fraudulent transfer and will be made out of
> surplus in accordance with applicable law. There is no certainty, however,
> that a court would reach the same conclusion in determining that New
> Grace and Grace Chemicals have satisfied the applicable standards. In this
> regard, it should be noted that Grace Chemicals has had, and is expected to
> continue to have, significant liabilities arising out of asbestos-related
> litigation and claims....If, in a lawsuit filed by an unpaid creditor or a
> representative of unpaid creditors or a trustee in bankruptcy, a court were
> to find that, at the time the NMC Distribution was consummated or after
> giving effect thereto, either New Grace or Grace Chemicals, as the case
> may be, (a) was insolvent, (b) was rendered insolvent by reason of the
> NMC Distribution, (c) was engaged in a business or transaction for which
> its remaining assets constituted unreasonably small capital, or (d) intended
> to incur, or believed it would incur, or believed it would incur, debts
> beyond its ability to pay as such debts matured, then such court might
> require FNMC or NMC to fund certain liabilities of New Grace or Grace
> Chemicals, as the case may be, for the benefit of New Grace's or Grace
> Chemicals' creditors. The same consequences would also apply were a
> court to find that the NMC Distribution was not made out of the surplus of
> Grace Chemicals."

69.    As Grace fully expected, the 1996 "NMC Distribution" rendered

Grace insolvent and with unreasonably small capital reserves. Grace intended and believed that

following, and as a result of, the NMC Distribution transactions, it would have debts beyond its

ability to pay such debts as they matured.

### The 1998 Fraudulent Transfer

70.    In August 1997, Grace - - now consisting of the pared down former W. R. Grace-Conn. - - entered into an agreement with Sealed Air to effect another fraudulent conveyance transaction structured almost identically to Grace's 1996 fraudulent conveyance transactions involving Fresenius. This time Grace stripped out and segregated its packaging business from its chemical subsidiary's asbestos liability, thus further leaving Grace without sufficient capital to pay its asbestos victims and creditors.

71.    Briefly stated, the March 1998 transaction unfolded as follows.

a)    Before the transactions, Grace consisted of a specialty chemicals business and a packaging business;

b)    Grace separated its specialty chemicals business and a packaging business into two separate subsidiaries;

c)    Grace then transferred the stock of Grace-Conn. (it specialty chemicals company) to a newly formed subsidiary of Grace, Grace Specialty Chemicals, Inc.;

d)    Grace then spun off to its shareholders this brand new subsidiary, Grace Specialty Chemicals, as a totally separate company. This left Grace with its packaging business as its sole asset;

e)    Grace (with its sole asset the packaging company) then merged with and into Sealed Air Corporation, a company outside the Grace family of companies; and

f)    Grace's shareholders effectively received 63% of the stock of Sealed Air Corporation.

72.    The result of these transactions is that Grace is totally stripped of, and segregated from, its profitable, formerly-affiliated packaging business. The new W. R. Grace &

21

Insulation, Defendants and/or their predecessor corporations continued to aggressively manufacture, promote, distribute, and sell Zonolite Attic Insulation, while concealing and/or failing to disclose the substantial risks of disease associated with asbestos exposure.

44.    Defendants and/or their predecessor corporations conducted secret animal tests that demonstrated an association between tremolite asbestos and mesothelioma, including Dr. W. Smith's biological testing (final report May 25, 1978). Despite those findings confirmed by its own tests, Grace publicly denied the existence of a relationship between tremolite asbestos exposure and mesothelioma, including in a letter dated May 8, 1979 to county health officer Dr. Richard Irons.

45.    Despite knowledge of the unreasonable risks to human health, Defendants or their predecessor corporations intentionally chose to not warn the public of health risks associated with Zonolite Attic Insulation, including the advised decision "not to affix labels" on attic insulation products (May 24, 1977). This decision to conceal from the public such health risks was predicated on a calculation of the financial reward to Defendants or their predecessors corporations should the public be kept uninformed. Written analysis of the financial consequences include a May 24, 1977 "Zonolite Profitability Impact" projecting a "10-50% reduction in sales volume that would result from a requirement to label our products as containing asbestos."

46.    Until Grace withdrew Zonolite Attic Insulation from the market in 1984, Defendants and/or their predecessor corporations affirmatively and actively engaged in steps to conceal the toxicity and dangers of Zonolite Attic Insulation from the public and from government agencies charged with police powers to protect public health and safety.

13

47.    In the 1970s, state and federal officials cited various plants belonging to

Grace for excessive asbestos exposures levels, including those summarized in the September 21,

1971 memo to R.M. Coquillette. Defendants and/or their predecessor corporations did not

normally consider controls to abate these levels "until a citation issued" and only then would

each plant be addressed "singly as they are forced to comply."

48.    Defendants and/or their predecessors corporations, falsely and/or

misleadingly represented to government officials that Zonolite Attic Insulation had been treated

with a binder (a substance that would prevent deadly tremolite fibers from being released into the

air) while, in fact, no such binder had been successfully developed or applied to Defendants'

Zonolite Attic Insulation product.

49.    Defendants and/or their predecessor corporations failed to test adequately

or properly the use of a binder in preventing hazardous exposure to asbestos.

50.    Although Defendants and/or their predecessor corporations publicly

represented that Zonolite Attic Insulation posed no health hazard, internal Grace memoranda,

including a May 24, 1977 memo from Wood to Brooks and Graf, demonstrate that Grace knew

that Zonolite Attic Insulation posed an unreasonable risk to human health with exposure

"concentrations upward of 15 f/ml." and that Grace anticipated that Zonolite Attic Insulation

would "eventually be banned" by government agencies.

51.    As early as 1977, Grace drafted a press release, stating that it was

"sufficiently concerned about the entire issue of asbestos and associated health hazards to

discontinue this product (Zonolite Attic Insulation)." Despite actual knowledge by Defendants

and/or their predecessor corporations that Zonolite Attic Insulation posed a substantial hazard to

14

the consuming public, they determined to withhold this important press release, to conceal the health hazards associated with Zonolite Attic Insulation, and to continue to aggressively sell Zonolite Attic Insulation for an additional seven years.

52.    Defendants and/or their predecessor corporations had superior knowledge, as compared with the consuming public and government enforcement agencies, with respect to the health dangers posed by Zonolite Attic Insulation, but concealed their knowledge of the health dangers associated with their product because they believed that asbestos contained in Zonolite Attic Insulation would remain undetected.

53.    As a proximate result of the conduct of the Defendants and/or their predecessor corporations, there is a present, compelling, and immediate need to provide appropriate warnings to the public of the health dangers associated with Zonolite Attic Insulation. Necessary warnings include:

a).    Warning that Zonolite Attic Insulation contains tremolite, an especially dangerous form of asbestos, and that persons should avoid exposure to Zonolite Attic Insulation;

b).    Warning that disturbing Zonolite Attic Insulation exposes individuals to hazardous levels of asbestos;

c).    Warning that persons should not enter or use attic spaces in properties believed to contain Zonolite Attic Insulation, together with advisories on how to identify Zonolite Attic Insulation;

d).    Warning that tests should be conducted on properties where Zonolite Attic Insulation has been disturbed and that disturbance poses a threat that asbestos may

15

have been transported to living spaces of the property;

     e).    Warning that property owners and occupants where Zonolite Attic Insulation has been installed should not engage in remodeling or other activities that involve the disturbance of Zonolite Attic Insulation until an asbestos containment plan has been established by qualified asbestos abatement personnel;

     54.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, real properties of Plaintiffs and Class members have been contaminated with asbestos, requiring the development and implementation of an appropriate operations and maintenance program to limit further exposure to dangerous levels of asbestos.

     55.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, Plaintiffs and Class members will incur substantial costs of property remediation, restoration, and asbestos abatement.

     56.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, owners of real property in which Zonolite Attic Insulation has been installed have been interfered with in their use and quiet enjoyment of their real property.

     57.    Plaintiffs and members of the Class possess property interests in claims against various Defendants and/or their predecessor corporations for harms arising out of conduct asserted in the Complaint. Defendants and their predecessor corporations knowingly caused injury to the property interests of Plaintiffs and Class members, including through actions to fraudulently shield assets of one another for purposes of evading asbestos liability.

     58.    Nationwide, experts estimate that at least 21 million American workers have been exposed to "significant" amounts of asbestos at the workplace since 1940. Millions

16

others have been exposed through environmental contact or contact with relatives who have worked with the products. Because of its injurious propensities, such exposure, in human terms, has meant that literally tens of thousands of people fall ill or die from asbestos-related diseases every year. In legal terms, it has translated into hundreds of thousands of lawsuits centered mainly in industrialized areas along the country's coasts, including Massachusetts.

59.    Asbestos litigation has been ongoing for four decades and as a result of this litigation, numerous corporations have been forced into bankruptcy. Raymark Industries, Forty-Eight Insulations, Unarco, Standard Asbestos, Johns-Manville Corporation, Eagle-Picher Industries, and Celotex Corporation, just to name a few, all have at one point declared bankruptcy due to asbestos liability.

60.    In light of mounting potential asbestos liability, Grace initiated corporate restructuring transactions during the last decade that were specifically designed to shield assets from actual or potential judgements.

61.    On September 30, 1996, Grace and Fresenius A.G. completed a series of transactions that resulted in the creation of two new business entities. First, Grace spun off to its common shareholders a "new" Grace comprised of Grace's packaging and specialty chemicals business. Second, Grace's former health care subsidiary, National Medical Care, Inc. ("NMC") was combined with the worldwide dialysis business of Fresenius A.G. to form a new company name Fresenius Medical Care A.G.

62.    As a result of these transactions, Grace's common shareholders received 100% of a "new" W. R. Grace & Co., focused on its packaging and specialty chemicals businesses. "Old" W. R. Grace & Co. common shareholders also received 44.8% of a newly-

17

created health care company, Fresenius Medical Care A.G., the world's largest fully-integrated renal care company.

63.     On March 31, 1998, the "new" Grace and Sealed Air corporation completed a series of transactions that resulted in the creation of two new companies. First, Grace spun off to its shareholders a second "new" W. R. Grace & Co., comprised of Grace's specialty chemicals businesses. Second, W. R. Grace & Co.'s Cryovac flexible packaging business was combined with Sealed Air, to form the world's leading protective and specialty packaging company.

64.     Valued by the market at more than $6 billion, these 1998 transactions provided substantial value to Grace's shareholders, who received 100% of the second "new" W. R. Grace & Co., a premier global specialty chemicals company, and also received common and preferred stock representing approximately 63% of the "new" Sealed Air, the company combining Grace's former Cryovac business with Sealed Air's protective packaging business.

### The 1996 Fraudulent Transfer

65.     On February 4, 1996, Grace and Fresenius A.G. signed an Agreement and Plan of Reorganization and other related agreements. This transaction was designed to strip out and segregate NMC and other good assets from Grace's specialty chemicals business and asbestos exposure, thus leaving Grace without sufficient capital to pay its asbestos victims and creditors.

66.     Briefly stated, the September 28 and 29, 1996 transactions unfolded as follows:

a)     Before the transactions, NMC was a wholly-owned subsidiary of Grace-

18

Conn. (Grace Chemicals), which in turn was a wholly owned subsidiary of the parent company

Grace;

     b)     Grace-Conn. Transferred the stock of NMC to its parent Grace, thus

making Grace-Conn. and NMC equal sibling subsidiaries of Grace;

     c)     Grace then transferred that stock of Grace-Conn. to a newly formed

subsidiary of Grace, Grace Holding Company, Inc.;

     d     Grace then spun off to its shareholders this brand new subsidiary Grace

Holding Company, Inc. as a totally separate company. This left Grace with NMC as its sole

asset;

     e)     Grace (with its sole asset NMC) then merged with Fresenius Medical Care

A.G., a wholly owned subsidiary of Fresenius A.G. This new entity was called Fresenius

National Medical Care ("FNMC"). Grace's shareholders effectively received 44.8% of the stock

of this new entity FNMC , and Grace ceased to exist; and

     f)     Grace Holding Company Inc. was renamed W. R. Grace & Co., a

Delaware corporation.

     67.     The effect of this series of transactions is that Grace-Conn.- the entity with

the asbestos liability and now renamed W. R. Grace & Co. - is totally stripped of, and segregated

from, its profitable former subsidiary NMC. The new W. R. Grace & Co. was left with full

responsibility for satisfying Grace's asbestos liabilities, but was left undercapitalized and did not

receive fair value for its now lost assets.

     67.     In the Form S-4 regarding these 1996 transactions, Grace

expressly recognized that the transactions may constitute a fraudulent transfer. In a section titled

19

"Fraudulent Transfer and Related Considerations," Grace acknowledged its exposure when it

stated:

> "Under applicable law, the NMC Distribution would constitute a
> 'fraudulent transfer' if (a)New Grace or Grace Chemicals is insolvent, (b)
> the effect of the NMC Distribution would render New Grace or Grace
> Chemicals insolvent, (c) the NMC Distribution would leave New Grace or
> Grace Chemicals unreasonably small capital, or (d) New Grace or Grace
> Chemicals intended to incur, or believed it would incur, debts beyond its
> ability to pay as such debts mature...Grace believes that, based on the
> factors considered in connection with the NMC Distribution, the NMC
> Distribution will not be a fraudulent transfer and will be made out of
> surplus in accordance with applicable law. There is no certainty, however,
> that a court would reach the same conclusion in determining that New
> Grace and Grace Chemicals have satisfied the applicable standards. In this
> regard, it should be noted that Grace Chemicals has had, and is expected to
> continue to have, significant liabilities arising out of asbestos-related
> litigation and claims....If, in a lawsuit filed by an unpaid creditor or a
> representative of unpaid creditors or a trustee in bankruptcy, a court were
> to find that, at the time the NMC Distribution was consummated or after
> giving effect thereto, either New Grace or Grace Chemicals, as the case
> may be, (a) was insolvent, (b) was rendered insolvent by reason of the
> NMC Distribution, (c) was engaged in a business or transaction for which
> its remaining assets constituted unreasonably small capital, or (d) intended
> to incur, or believed it would incur, or believed it would incur, debts
> beyond its ability to pay as such debts matured, then such court might
> require FNMC or NMC to fund certain liabilities of New Grace or Grace
> Chemicals, as the case may be, for the benefit of New Grace's or Grace
> Chemicals' creditors. The same consequences would also apply were a
> court to find that the NMC Distribution was not made out of the surplus of
> Grace Chemicals."

69.   As Grace fully expected, the 1996 "NMC Distribution" rendered

Grace insolvent and with unreasonably small capital reserves. Grace intended and believed that

following, and as a result of, the NMC Distribution transactions, it would have debts beyond its

ability to pay such debts as they matured.

### The 1998 Fraudulent Transfer

70.    In August 1997, Grace - - now consisting of the pared down former W. R. Grace-Conn. - - entered into an agreement with Sealed Air to effect another fraudulent conveyance transaction structured almost identically to Grace's 1996 fraudulent conveyance transactions involving Fresenius. This time Grace stripped out and segregated its packaging business from its chemical subsidiary's asbestos liability, thus further leaving Grace without sufficient capital to pay its asbestos victims and creditors.

71.    Briefly stated, the March 1998 transaction unfolded as follows.

a)    Before the transactions, Grace consisted of a specialty chemicals business and a packaging business;

b)    Grace separated its specialty chemicals business and a packaging business into two separate subsidiaries;

c)    Grace then transferred the stock of Grace-Conn. (it specialty chemicals company) to a newly formed subsidiary of Grace, Grace Specialty Chemicals, Inc.;

d)    Grace then spun off to its shareholders this brand new subsidiary, Grace Specialty Chemicals, as a totally separate company. This left Grace with its packaging business as its sole asset;

e)    Grace (with its sole asset the packaging company) then merged with and into Sealed Air Corporation, a company outside the Grace family of companies; and

f)    Grace's shareholders effectively received 63% of the stock of Sealed Air Corporation.

72.    The result of these transactions is that Grace is totally stripped of, and segregated from, its profitable, formerly-affiliated packaging business. The new W. R. Grace &

21

Co. is left with full responsibility for satisfying Grace's asbestos liabilities, but was

undercapitalized and did not receive fair value for its now lost assets.

73.    In another Form S-4 filing with the SEC, Grace acknowledged - as it had

with regard to its September 1996 series of transactions - that its March 1998 series of

transactions may constitute a fraudulent transfer:

> "Claimants may also bring suit seeking recovery from New Sealed
> Air or its subsidiaries by claiming that the transfers of assets and
> liabilities in connection with the reorganization of Grace, including
> the separation of Grace's packaging and specialty chemicals
> businesses and the cash transfer to and spin-off of New Grace,
> were 'fraudulent transfers.' A transfer would be a fraudulent
> transfer if the transferor received less than reasonably equivalent
> value transferor was insolvent at the time of the transfer, was
> rendered insolvent by the transfer or was left with unreasonably
> small capital to engage in its business. A transfer may also be a
> fraudulent transfer if it was made to hinder, delay or defraud
> creditors. If any transfers in connection with the reorganization of
> Grace are found to be fraudulent transfers, the recipient (including
> New Sealed Air and its subsidiaries) might be required to return
> the property in the transferor.

74.    Grace represented that the newly-formed W. R. Grace & Co. would be

adequately capitalized and purported to believe that the transfers effected in the 1998 transactions

were not fraudulent. Grace admitted, however, in its SEC filing that "a court applying the

relevant legal standards may not reach the same conclusion."

75.    As a result of the 1996 and 1998 fraudulent transfer transactions, the so-

called W. R. Grace, & Co. entity left with the asbestos liability is a mere shadow of its former

self. Virtually all of its valuable assets have been transferred away from the asbestos liabilities.

The asbestos liabilities facing Grace far exceed Grace's fraudulently diminished worth and far

22

exceed Grace's ability to pay its debts as they mature.

76.     As of 1996, Grace was aware that it faced tremendous exposure in the asbestos litigation against it. Its aggregate accrual for asbestos liabilities at December 31, 1996, was reported by the firm to be $994.1 million. This amount includes all pending personal injury and property damage claims as well as personal injury claims expected to be filed through 2001.

77.     This exposure has only increased over time. According to its Form-10K filed with the SEC on March 28, 2000, as of December 31, 1999, W. R. Grace & Company was a defendant in approximately 50,342 asbestos related lawsuits, involving 105,670 claims for personal injury. This number represented an increase over its exposure at the end of 1998, when 45,086 lawsuits involving 97,017 claims for personal injury were pending.

78.     In that same From 10-K, Grace noted that judgements had been entered against it in seven cases for a total of $60.3 million and that it had settled 203 cases for a total of $603.8 million. Grace estimated that its gross aggregate accrual for asbestos liabilities as of December 21, 1999 was $1.084 billion.

79.     At all times mentioned herein, Defendants knew of Grace's massive asbestos liability and the experiences of other asbestos manufacturers mentioned above. With intent to defraud contingent creditors such as Plaintiffs and the class, Defendants intentionally, willfully, maliciously and fraudulently took the actions herein alleged to defraud and oppress Plaintiffs and the Class.

## V. CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action as a class action for injunctive, equitable, and monetary relief pursuant to Rules 23(b)(1)(A), 23(b)(2) and/or 23(b)(3). F. R. Civ. P. on behalf

23

of themselves and a defined class of similarly situated individuals. The Class is defined as: All owners or occupiers of real property located in the United States in which Zonolite Attic Insulation has been installed.

81.    The members of the Class are so numerous that their joinder is impracticable.

82.    There are questions of law and fact common to the Class. Members of the Class share a well-defined community of interest in the questions of law and fact that affect members of the Class, which questions predominate over questions solely affecting individual members. Illustrative common issues of law and fact include, but are not limited to the following:

A.    With respect to the manufacture, distribution and sale of Zonolite Attic Insulation:

i.    Whether Zonolite Attic Insulation designed, manufactured, and sold by said Defendants and/or their predecessor corporations is not reasonably safe in its design and/or manufacture in that it contains dangerous levels of readily-airborne asbestos.

ii.    ˙ Whether said Defendants and/or their predecessors failed to provide adequate warnings in connection with Zonolite Attic Insulation.

iii.    Whether asbestos, contained in Zonolite Attic Insulation and installed in homes, constitutes a present threat to public health and safety.

iv.    Whether Zonolite Attic Insulation installed in homes constitutes a present threat to health and safety in that owners and occupants, engaged in their ordinary use and enjoyment of their properties, will be exposed to dangerous levels of asbestos.

24

v.      Whether owners and occupiers of properties in which Zonolite Attic Insulation are installed are unaware of, or unappreciative of, dangers posed by this product, unaware of safeguards that must be taken to avoid harmful exposure to asbestos, unaware of operations and maintenance practices appropriate to properties where Zonolite Attic Insulation is installed, and unaware of the necessity to, and prudent means by which to, engage in such activities as testing, remediation, removal, or abatement.

vi.     Whether said Defendants and/or their predecessor corporations concealed from consumers and government agencies responsible for public health, material information concerning the health hazards associated with Zonolite Attic Insulation.

vii.    Whether said Defendants and/or their predecessor corporatic :s made public announcements, statements, or representations concerning Zonolite Attic Insulation that were untrue, deceptive, or misleading.

viii.   Whether said Defendants and/or their predecessor corporations made public announcements, statements, or representations with respect to Zonolite Attic Insulation that had a capacity to deceive a substantial portion of the consuming public.

ix.     Whether the practices of said Defendants and/or their predecessor corporations representing Zonolite Attic Insulation as asbestos free and safe constitute unfair or deceptive business practices.

x.      Whether preliminary injunctive relief is warranted, including warnings to the public regarding Zonolite Attic Insulation.

xi.     Whether members of the Class have suffered harm to their property interests in that the presence of Zonolite Attic Insulation requires property owners and property

25

occupants to restrict their use and quiet enjoyment of their property.

        xii.    Whether Defendants' conduct with respect to Zonolite Attic

Insulation warrants punitive damages.

        B.    With respect to the corporate restructuring transactions of 1996 and 1998:

        i.    Whether Defendants and/or their predecessor corporations

fraudulently conveyed assets in violation of the Uniform Fraudulent Transfer Act;

        ii.    Whether Defendants and/or their predecessor corporations

fraudulently conveyed assets in violation of the common law of fraudulent conveyance;

        iii.    Whether Defendants and/or their predecessor corporations

conspired to fraudulently transfer assets in violation of Plaintiffs' and the Class members' rights;

        iv.    Whether Defendants and/or their predecessor corporations

denuded, depleted or dissipated Grace's assets;

        v.    Whether Defendants and/or their predecessor corporations

conspired to denude, deplete or dissipate Grace's assets;

        vi.    Whether Grace received a reasonably equivalent value in exchange

for the assets it transferred to Defendants;

        vii.    Whether Grace was engaged or was about to be engaged in

business in which its remaining assets after the transfer were unreasonably small;

        viii.    Whether Grace intended to incur or reasonably believed it would

incur debts beyond its ability to pay as they became due;

        ix.    Whether Defendants and/or their predecessor corporations made

the transfers as herein alleged with actual intent to hinder, delay or defraud the Plaintiffs and the

Class.

83. The claims of Plaintiffs arise from the same events and course of conduct by Defendants that give rise to the claims of the other Class members. Plaintiffs are members of the Class they seek to represent and possess the same interests and have suffered the same injuries as other Class members, making Plaintiffs' claims typical of the claims of the Class generally.

84. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions and products liability litigation.

85. Class certification is appropriate pursuant to Rule 23(b)(1)(A) because prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct of Grace.

86. Class certification is appropriate pursuant to Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Class, in that Defendants and their predecessor corporations have concealed and failed to disclose hazards associated with Zonolite Attic Insulation, rendering millions of homeowners unaware of present dangers in their homes and causing harms and hardship even to those who do learn of this present danger. Furthermore, Defendants and their predecessor corporations have engaged in fraudulent corporate restructuring transactions designed to illegally shield the assets of W.R. Grace & Co., Inc. from individuals, including Plaintiffs and the Class, harmed by tremolite asbestos contained in vermiculite and vermiculite-containing products including Zonolite Attic Insulation. Defendants' common course of conduct makes appropriate preliminary and final injunctive and

27

declarative relief.

87.     Class certification is appropriate pursuant to Rule 23(b)(3) because

questions of law and fact common to the Class predominate over any questions affecting only

individual members of the Class and class-wide adjudication of Class members' claims is

superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

88.     Plaintiffs hereby assert each and every cause of action and remedy at law

or in equity supported by facts alleged in this Complaint. The causes of action and remedies at l

law and in equity include, but are not limited to, each of the following:

## COUNT I.

## FRAUDULENT CONVEYANCE IN VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT, ADOPTED BY M.G.L. c. 109A § 2, AND THE COMMON LAW OF FRAUDULENT CONVEYANCE

89.     Plaintiffs refer to and incorporate by reference all preceding paragraphs as

if fully set forth herein.

90.     At all times as herein alleged, Plaintiffs and Class members were creditors

under the Uniform Fraudulent Transfer Act against a debtor, Grace, for their contingent claims

arising from their injuries suffered due to asbestos exposure. In relevant part, the Act provides as

follows. A creditor is any "person who has a claim." A claim under the Act is defined as " a

right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

91.     The distribution of assets from Grace to FNMC and Sealed Air,

respectively, were fraudulent transfers. The transfers were made with the intent to hinder

28

Plaintiffs' and the Class ability to recover. Grace did not receive reasonably equivalent value for the transferred assets. Indeed, Grace's remaining assets after the transfers were unreasonably small. As a result of the transfers, Grace was rendered insolvent and unable to pay its debts as they matured. Grace transferred its assets with the intent and belief that the transactions would deprive the Plaintiffs and Class members of recovery for their asbestos claims.

92.     Defendants acted intentionally, fraudulently, maliciously, and without regard for the legitimate rights of the Plaintiff Class and thus the Class is entitled to exemplary damages.

93.     Knowing of the contingent tort liability faced by Grace resulting from the numerous asbestos-related litigations already pending at the time of the corporate transactions at issue, transferees as herein described did not accept the transfer of assets in good faith.

94.     At the time it made these transfers of assets herein described, Grace and each of the Defendants had actual intent to hinder and defraud Plaintiffs' and the Class' collection of their contingent claims against Grace. Defendants possessed such knowledge by virtue of their long history of dealing with asbestos litigation and knowledge of Grace's massive future asbestos liability.

## COUNT II.

## DENUDING. DEPLETING. AND DISSIPATING THE ASSETS OF GRACE

95.     Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

96.     This Court should declare that FNMC and Sealed Air are liable for Grace's asbestos liabilities, to the extent of the assets of the former W.R. Grace & Co. that each

29

received as a result of the 1996 and 1998 transactions described above. FNMC and Sealed Air were aware of Plaintiffs' and the Class' claims and potential claims against Grace but still effectively stripped Grace of valuable assets that otherwise would have been available to pay the liabilities of Grace. These transactions were wrongful distributions of assets.

## COUNT III.

## CONSPIRACY TO DENUDE, DEPLETE, DISSIPATE THE ASSETS OF GRACE

97.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

98.    Defendants conspired with Grace to denude, deplete and dissipate Grace's assets. They thus are liable for Grace's asbestos liabilities to the extent of the value of the assets of the former W.R. Grace & Co., including subsidiaries, that each received as a result of the 1996 and 1998 transactions, respectively.

## COUNT IV.

## COMMON LAW CONSPIRACY

99.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

100.    Grace made the transfer of assets as herein described with the intent to defraud Plaintiffs and the class.

101.    Defendants and each of them knowingly participated in the unlawful plan herein described and agreed to aid Grace to carry out its fraudulent conveyances.

102.    Each of the Defendants had knowledge of the conspiracy and its unlawful

30