UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: W.R. Grace & Co., et al.,[1] <br><br> DEBTORS, | CHAPTER 11 <br><br> BANKRUPTCY NO. 01-01139 <br> (Jointly Administered) |

**ZONOLITE CLAIMANTS' REPLY MEMORANDUM
IN SUPPORT OF THE MOTION TO DISMISS THE BANKRUPTCY**

**I.    INTRODUCTION**

Grace's Opposition to the Motion by Zonolite Attic Insulation ("ZAI") Claimants to Dismiss the Chapter 11 Cases ("Grace's Opposition") offers many irrelevant accusations, but in substance it amounts to little more than a confession, i.e., that Grace seeks to use these Chapter 11 proceedings to reorganize the American tort system to its own ends. Grace does not seek to reorganize its business or financial structure in any way. Because the Third Circuit in In Re: SGL Carbon Corporation, 200 F.2d 154, 168 (3rd Cir., 1999), held that mere numerosity of civil claims pending against a financially healthy company does not constitute a "good faith" basis for filing a Chapter 11 proceeding, this case must be dismissed.

---

[1] The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecaig, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-g II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Crop., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## II. ARGUMENT

### A. Grace Bears The Burden To Prove Its Good Faith

Grace concedes that a chapter 11 petition for reorganization is subject to dismissal for "cause" under 11 U.S.C. § 1112(b) unless it is filed in good faith. See In re SGL Carbon, 200 F.3d 154, 162 (3d Cir. 1999); see also In re Start Engines, Inc., 219 B.R. 264, 272 (Bankr. C.D. Cal., 1998) (dismissing petition based on bad faith filing intended to delay state court action); In re St. Paul Self Storage Ltd. Partnership, 185 B.R. 580, 583 (9th Cir. BAP 1995) (dismissing bad faith petition filed one day prior to hearing in state court).

When the issue before the Court is whether the Chapter 11 proceeding was filed in good faith, the burden is on the debtor to produce *evidence* of good faith. See SGL Carbon, 200 F.3d at 156, n.10. Grace seeks to avoid this burden, but it cites no legal authority by which to shift this burden. (Grace's Opposition, 9 n.5). Grace's response stands in stark contrast to the debtor's attempted evidence of good faith in SGL Carbon (where the debtor sought to address the "requisite fact intensive inquiry" by submitting detailed deposition and documentary evidence) and In re Johns-Mansville, 36 B.R. 727 (Bankruptcy S.D.N.Y. 1984) (where the debtor submitted a 106 page rebuttal analysis and a 176 page "Compendium of Factual Record" together with over 500 pages of exhibits and transcripts of twenty-nine witnesses, see In Re Committee of Asbestos-Related Litigants, 749 F.2d 3 (2d. Cir. 1984)).

Here, Grace submits no testimony by deposition or affidavit, and it submits no rebuttal to the documentary record that establishes the financial health of Grace and the lack of any effect on its business or management abilities by reason of the numerosity of asbestos claims. The only evidence Grace submits (three short references to two SEC filings, each of which is misplaced, see page 3 to 5) fails utterly to meet its burden.

It is understandable that Grace wishes to run from its burden, but the holding of SGL Carbon is clear, and Grace must present evidence establishing its "good faith" within the meaning of that decision. It has not done so.

B.     **Grace's Arguments Fail to Support Good Faith**

Lacking evidence to show a valid reorganizational purpose for this chapter 11, Grace resorts to arguments. However, Grace's displeasure with the state tort system does not justify a Chapter 11 filing. (Grace's Opposition, 3-6, 8). Grace's tirade against the courts for the handling of asbestos-related claims is often repeated, both in Grace's Opposition, and in the previous filings in this case. What Grace fails to understand, however, is that its political and social judgments, and even its litigation frustrations, may be genuinely felt, but they do not satisfy the "good faith" requirement for Chapter 11 proceedings. See SGL Carbon, *et passim*. Indeed, Grace's rant against the American tort system and its public pronouncements regarding its motivation for filing this Chapter 11 proceeding amount to nothing more than a confession that its Chapter 11 proceeding is intended solely as strategic maneuver to change the forum and rules by which its asbestos-related liabilities will be adjudicated. Some examples:

> We believe that the state court system for dealing with asbestos claims is broken, and that Grace cannot effectively defend itself against unmeritorious claims. The best forum available to Grace to achieve predictability and fairness in the claims settlement process is through a federal court-supervised Chapter 11 filing.

Paul J. Norris, President and Chief Executive Officer, W.R. Grace & Co., Press Release dated April 2, 2001 (date of the Chapter 11 filing).

> Grace has concluded that a federal court-supervised Chapter 11 filing provided the best forum available to achieve predictability and fairness in the claims settlement process. By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

Form 10-K of W.R. Grace & Co. for year 2000 issued April 2, 2001 (date of the Chapter 11 filing).

> [F]ollowing a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11..., Grace filed for protection under Chapter 11 . . . .

Id.

Grace harbors the view that "the tort system long ago ceased to provide any realistic opportunity to define the actual responsibility of any manufacturer for asbestos products." (Grace's Opposition, 7). This may or may not be true, and it may or may not warrant the legislative solution Grace and other manufacturers have urged Congress in recent years. Id. It does not serve as the basis for a Chapter 11 filing.

### C.      Grace's Three Fact Citations Do Not Support A "Good Faith" Finding

Grace points to three sources in order to support a "good faith" finding. Not one of these sources supports such a finding.

#### 1.      Grace's December 31, 2000 10-K Form

Grace points to its Form 10-K (which it filed late, and only after the Chapter 11 filing) for the conclusion that Grace's "only option" was to file the bankruptcy. The *full quote* from the Form 10-K follows:

> These developments and events have caused an environment that increases the risk of more claims being filed against Grace than previously projected, with high settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state board system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11..., Grace filed for protection under Chapter 11 . . . .

W.R. Grace & Co. Form 10-K (fiscal year 2000) at 12-13.

Grace's statement is little other than an admission that, in response to Grace's frustration with, and attack on, the American tort system, it plans to change the rules and forum for litigation to the bankruptcy courts. Grace boldly states that the bankruptcy petition is a litigation tool used to liquidate the asbestos claims in what it believes to be a better forum. Such a strategic attempt to achieve reorganization of the tort system rather than reorganization of Grace is simply an abuse of the bankruptcy process. See In re HBA East, Inc., 87 B.R. 248 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."); In re Marsch, 36 F.3d 825, 828 (9th Cir. 1994) (ruling the debtor's attempt to obtain tactical litigation advantage by filing Chapter 11 was "not consonant with the purpose of the Bankruptcy Code.").

### 2. Grace's Third Quarter 10-Q Form

Grace argues that selected quotations clipped from its Third Quarter 10-Q support the claim that Grace's "only option" was to file Chapter 11. After describing the fact of other recent asbestos bankruptcies, the *full quote* from the Third Quarter 10-Q states:

> In addition, new bodily injury claims for the first nine months of 2000 are significantly higher than the 1999 comparable period. This increase in claims may represent an acceleration of future claims already expected by Grace to be filed, or could represent an increase in total claims to be filed in the future. More time, experience and analysis is required to determine whether the number of future claims may be materially higher than Grace's current estimates and the impact this would have on Grace's future cash flow and recorded liability for future claims.

WR Grace & Co. Form 10-Q (Third Quarter 2000, issued in November of 2000).

What Grace fails to disclose is that the difficulty Grace observed in November 2000 (in estimating liability reserves given recent filings) disappeared two months later. On

January 29, 2001, Grace adjusted its liability reserve for all asbestos-related liabilities, and took into account the phenomenon of the increased rate of claims during the year 2000. The revised asbestos-related liability totals $1,105.9 million dollars (without reductions for insurance and tax savings) as compared to $1,108.40 million dollars in 1999, for an increase of only $21.9 million in year end estimates, or an increase of less than two percent (2%) over the prior year estimate. To the extent that Grace's Third Quarter implied any difficulty in reserve estimation, it was resolved by the Fourth Quarter.

### 3. Grace's Investor News Release

Grace argues that in a January 29, 2001 press release it described a risk that a $250 million bank facility may not be renewed given the current bank environment and asbestos-related claims. See W.R. Grace & Co. Investor News Release at 7. Of course, Grace neglects to state that this same release also described how Grace was flush with $400 million in cash and cash equivalents, as well as another $150 million from which to draw on this $250 facility, if necessary. See id. In any event, any cause for this slight concern abated by the time Grace filed for Chapter 11 protection in April of 2001. By that time, Grace had negotiated for the replacement of that bank facility on favorable terms and conditions. See Debtor's Emergency Motion for Interim and Final Orders under 11 U.S.C. 105, 362, 363, and 364, Approving Post-Petition Financing and Related Relief and Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c). The renegotiation of this facility had already occurred at the time of the April 2, 2001 filing. Thus, any claimed risk of non-renewal for this facility no longer existed at the time of the Chapter 11 filing.

There has been no showing that Grace faced any imminent need to restructure its business, and no evidence that the numerosity of asbestos claims had had any effect whatsoever on the business, structure or management of Grace.

### D. Grace's Argument That the Third Circuit's Decision in SGL Carbon is Inapplicable Lacks Merit

Grace argues that the SGL Carbon case is inapposite to its situation because of its "vastly different financial picture." Grace Opposition at 12. This argument lacks merit. The SGL Carbon case explains in detail the very reasons why Grace's Chapter 11 petition should be dismissed.

In In re SGL Carbon, the Court held that when a petition is "not motivated by a desire to reorganize or rehabilitate" but rather intends to put pressure on the claimants, then it lacks a valid reorganizational purpose and is subject to dismissal for lack of good faith under 11 U.S.C. § 1112(b). Here, Grace's situation is very similar to SGL Carbons. Just as in SGL Carbon, Grace has provided no evidence in support of its claim that adverse judgments in the asbestos actions could cause it financial ruin. See id. at 163. Grace had an untouched reserve, and no evidence has been presented with establishing that the asbestos claims would deplete that reserve.

In In re Johns-Manville, an increase in asbestos claims "forced the debtor to either book a $1.9 billion reserve thereby triggering potential default on a $450 million debt which could have forced partial liquidation, or a Chapter 11 petition." See id. at 730. Grace faced no such financial consequences. Grace has already accrued a reserve that it states is adequate to cover any current or future asbestos claims, just as in SGL Carbon, and Grace does not contend that the possibility of future judgments against it has or will cause loan defaults or require new liability reserves. As the Third Circuit stated in SGL Carbon, mere threat of long term viability – without "present" financial stress – is insufficient to meet the good faith requirement under 11 U.S.C. § 1112(b). See SGL Carbon, 200 F.3d at 169.

In In re A.H. Robins, the debtor faced serious financial crises: The Company's liability arising out of these Dalkon Shield claims caused a critical depletion of the Company's

operating funds. By June of 1985, the Company's unrestricted funds were estimated to be $5 million. Robins' financial picture had become so bleak that financial institutions were unwilling to lend it money. With only $5 million in unrestricted funds and the inability to secure commercial financing, it appears that Robins had no choice but to file for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq., (the "Code").

The debtor in A.H. Robins is quite different from Grace. Robins was a solvent company until it was deluged by product liability awards. Moreover, the punitive damage awards were monumental, making its prospective liability staggering. See SGL Carbon, 200 F.3d at 164 (quoting In re A.H. Robins, 89 B.R. at 557). The debtor's financial situation was so dire, the Court was unable to determine if the debtor's reorganizational plan was at all operable. Grace's financial situation is quite different. Grace is a solvent company that on several occasions has stated its financial strength and viability, and which suffers no outstanding debilitating punitive awards. Thus, just as the Third Circuit held in SGL Carbon, the financial position of the debtor in A.H. Robins is wholly distinguishable from Grace.

Similarly, at the time the debtor in In re Dow Corning filed for bankruptcy, it faced 440,000 potential claimants which had resulted in the filing of more than "19,000 individual silicone-gel breast implant lawsuits and at least 45 putative silicone-gel breast implant class actions." See SGL Carbon, 200 F.3d at 164 (quoting In re Dow Corning, 211 B.R. at 553). The debtor, in 1994, had sales amounting to $2.2 billion, but nevertheless had reported a $6.8 million loss. Further, the insurers of the debtor had paid less than $100 million of the $1.5 billion owed. These are concrete financial difficulties suffered by Dow which Grace has not experienced.

Each of these debtors financial situations are distinguishable as they experienced extreme financial difficulty at the time of filing. Grace, "by its own account and by all objective

indicia" has experienced no financial difficulty at the time of filing nor any significant managerial distraction. See id. Although Grace may have to file for bankruptcy in the future, such an attenuated possibility standing alone is not sufficient to establish the good faith of its present petition. See id.; see also In re Cohoes Indus. Terminal Inc., 931 F.2d 222, 228 (2d Cir. 1991) ("Although a debtor need not be in extremis in order to file [a Chapter 11] petition, it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future.").

### E. Grace's Argument That The Motion Is Tardy Is Frivolous.

Grace's argument that the ZAI claimants' dismissal motion should be denied as belated is frivolous, and its citation to Johns-Manville is misplaced.

First, the eighteen year old decision of Bankruptcy Judge Lifland in In re Johns-Manville, 36 B.R. 727 (Bankruptcy S.D.N.Y. 1984), was called into question by the Third Circuit in the 1999 decision of In re SGL Carbon Corp., 200 F. 3d. 154 (3rd Circuit 1999). In SGL, the Third Circuit eschewed the apparent holding in Johns-Manville, i.e., that a company might seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the company's long term viability. Instead, the SGL Carbon Court observed that the authority of Johns-Manville was limited because the debtors had "experienced serious financial and/or managerial difficulties at the time of filing." SGL Carbon, 200 F. 3d. at 164. The Third Circuit also observed that the Johns-Manville court "had a narrow view of what constitutes 'good faith'," a view that the Third Circuit did not endorse. Id. at 168.

Second, even in Johns-Manville itself, the delay in bringing the dismissal motion played no role in the court's analysis as to whether Johns-Manville had satisfied its burden to show that its Chapter 11 filing was made in good faith. Although Judge Lifland articulated his dismay at the timing of the filing of the dismissal motion, Johns-Manville, 36 B.R. at 731, his

evaluation of the motion addressed the merits by conducting the required fact-intensive inquiry as to whether Johns-Manville had demonstrated a legitimate, financial reorganizational purpose in making its Chapter 11 filing, 36 B.R. 732-743.  If anything, then, Judge Lifland's analysis in <u>Johns-Manville</u> demonstrates that regardless of perceived delay in filing a dismissal motion, the motion should nevertheless be addressed on the merits, and the inquiry must focus on the debtor's conduct in filing the Chapter 11, not the movant's conduct in filing the dismissal motion.

Third, in <u>Johns-Manville</u> the delay was inordinate and the prejudice significant, neither of which is present here.  In <u>Johns-Manville</u>, the movants (who, ironically, included W.R. Grace) waited well over a year before pressing the motion to dismiss, and during this time substantial time and expense was incurred in estimating the value of asbestos-related claims and the parties had undertaken lengthy and involved settlement discussions; the dismissal motion itself was filed only after the movants became disenchanted with those settlement prospects.  Indeed, what dismayed Judge Lifland was the appearance that the motion was filed solely in response to the direction those settlement discussions had taken.

The facts here are completely different.  Here, the motion was filed soon after Grace disclosed in its motion papers for the initial case management order that its plan for this Chapter 11 involved no valid reorganizational purpose at all, only a litigation plan with changed rules and venue.  Indeed, the dismissal motion was filed *before* a hearing was even conducted on the initial case management order for asbestos-related claims; *before* any estimation process has even begun; and *before* even initiation of any settlement discussions.  Although Grace filed for Chapter 11 protection in April of 2001 and the dismissal was filed in November of that year, in the Fall the case remained at the very earliest of stages with only a few procedural steps having been taken in an effort to get a hearing for initial case management.  Indeed, it was not until well

after the dismissal motion was filed that the judicial assignments and general structure for these proceedings was sorted out.

The Third Circuit's observations in SGL apply with equal weight here:

> Johns-Manville is also factually distinguishable . . . . Unlike this case, the Johns-Manville creditors pursued their motion only after sixteen months of bargaining over an acceptable reorganization plan resulted in a deadlock. In denying the creditors' motion to dismiss, the court stated it would 'bear in mind the strategical motivations underlying [creditors'] pursuit of these motions at this time' and would recognize 'the progress toward a successful, perhaps consensual reorganization that has already taken place.

In re SGL Carbon Corporation, 200 F. 3d. 154, 168, quoting Johns-Mansville, 36 B.R. at 731.

In this case, the dismissal motion was filed even before the most preliminary steps were taken toward claim litigation or resolution. In summary, Grace's reliance on Johns-Manville is misplaced due to the authoritative SGL decision. Johns-Manville itself instructs a court to address dismissal motions on the merits. In any event, the procedural circumstances here show that the dismissal motion was filed at an early procedural stage.[2]

## III.   CONCLUSION

By this Chapter 11 filing, Grace seeks to achieve through the Bankruptcy Code the legislative relief Congress denied it. It is clear that there is no legitimate basis for Grace's petition, and its stated intentions are not valid reorganizational purposes. Such a compromise of the integrity of the bankruptcy process is improper and the ZAI Claimants motion to dismiss this Chapter 11 petition for cause should be granted.

---

[2] Grace repeatedly argues that the ZAI dismissal motion is simply an effort to resume litigation in In Re Zonolite Attic Insulation, MDL No. 1376, a prospect which Grace claims Judge Farnan "had shut down." (Grace Opposition, 15). In fact, Judge Farnan did no such thing. In June of 2001 Judge Farnan denied, but *without prejudice*, the ZAI motion to lift the automatic stay and in so doing left open the possibility that ZAI claims might be litigated in the MDL forum; Judge Farnan stated that he first wished to see an overall case management plan discussed by the parties and presented to him prior to making any final decisions as to how and where matters might be litigated. Grace's characterization that Judge Farnan "had shut down" this possibility is false and misleads this Court.