UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .        Chapter 11
                                .
W.R. Grace & Co., et al.,       .
                                .
        Debtor(s).              .        Bankruptcy #01-01139 (JKF)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
February 25, 2002
8:00 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:                     Laura Davis Jones, Esq.
                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

                                David W. Carickhoff, Jr., Esq.
                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

                                James W. Knapp, Esq.
                                Kirkland & Ellis
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                David Bernick, Esq.
                                Kirkland & Ellis
                                200 E. Randolph Drive
                                Chicago, IL 60601

| | |
|---|---|
| 1 | Janet S. Baer, Esq. |
| 2 | Kirkland & Ellis |
| | 200 E. Randolph Drive |
| | Chicago, IL 60601 |
| 3 | |
| 4 | For Unsecured Creditor's: Committee |
| 5 | |

For Unsecured Creditor's:   Kenneth Pasquale, Esq.
Committee   Stroock, Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038

For Zonolite Plaintiffs:   William Sullivan, Esq.
Elzufon, Austin, Reardon,
Tarlov & Mondell, PA
Ste. 1700
300 Delaware Ave.
Wilmington, DE 19801

For Barbonti/Zolonite:   Darrell Scott, Esq.
Claimants   Lukins & Annis, PS
Ste. 1600
717 W. Sprague Ave.
Spokane, WA 99201

For Travelers:   Jordan N. Malz, Esq.
Simpson, Thacher & Bartlett
425 Lexington Ave.
New York, NY 10017

For The Chase Manhattan:
Bank
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19899

For
Edwina R. Travers, Esq.
Murphy, Sparado & Landon
824 Market Street
Wilmington, DE 19899

For Equity Security Holders:   Philip Bentley, Esq.
Committee   Kramer, Levin, Naftalis
& Frankel, LLP
919 Third Ave.
New York, NY 10022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

```
 1                               Gary Becker, Esq.
                                 Kramer, Levin, Naftalis
 2                               & Frankel, LLP
                                 919 Third Ave.
 3                               New York, NY 10022

 4                               Jeffrey Waxman, Esq.
                                 Klett, Rooney, Lieber
 5                               & Schorling
                                 The Brandywine Bldg.
 6                               1000 West Street-Ste. 1410
                                 Wilmington, DE 19801
 7
     For PD Committee:          Scott Baena, Esq.
 8                               Bilzin, Sumberg, Dunn,
                                 Baena, Price & Axelrod, LLP
 9                               First Union Financial Center
                                 Ste. 2500
10                               200 South Biscayne Blvd.
                                 Miami, FL 33131
11
                                 Daniel A. Speights, Esq.
12                               Speights & Runyan
                                 200 Jackson Ave. E.
13                               Hampton, SC 29924

14   For Asbestos PD Committee:  Martin Dies, ESq.
                                 Dies & Hile, LLP
15                               1009 West Green Ave.
                                 Orange, TX 77360
16
                                 Theodore J. Tacconelli, Esq.
17                               Ferry, Joseph & Pearce, PA
                                 824 Market Street
18                               Wilmington, DE 19899

19   For Asbestos PI Committee:  Matthew Zaleski, III, Esq.
                                 Campbell & Levine, LLC
20                               1201 North Market St.-Ste. 1501
                                 Wilmington, DE 19801
21
                                 Peter Lockwood, Esq.
22                               Caplin & Drysdale
                                 One Thomas Circle, N.W.
23                               Washington, DC 20005

24

25
```

4

| | | |
|---|---|---|
| 1 | For NMC & FMCH: | Davis Rosenbloom, Esq. |
| 2 | | McDermott, Will & Emery<br>227 West Monroe |
| 3 | | Chicago, IL 60606 |
| 4 | For Unofficial Committee:<br>of Select Asbestos | Edmund George, Esq.<br>Obermeyer, Rebmann, Maxwell |
| 5 | Claimants | & Hippel, LLP<br>1617 JFK Blvd. |
| 6 | | Philadelphia, PA 19103 |
| 7 | For Trade Committee: | Michael Lastowski, Esq.<br>Duane Morris, LLP |
| 8 | | Ste. 1200<br>1100 North Market street |
| 9 | | Wilmington, DE 19801 |
| 10 | Audio Operator: | Laurie Capp |
| 11 | Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd. |
| 12 | | Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE COURT:  Please be seated.

2      (Pause in proceedings)

3          THE COURT:  This is the matter of W.R. Grace,

4  Bankruptcy #01-1139.  There is an entire series of agenda

5  binders this morning.  I don't have any preference as to the

6  order.  Mr. Bernick, if you would enter your appearance, and

7  then we'll get started.  I'd simply ask that any attorney who

8  is going to speak identify yourself on record when you speak,

9  please.

10          MR. BERNICK:  Yes, David Bernick for the Debtor

11  Grace.  Your Honor, with respect to the agenda, per the

12  typical format we've got the continued matters and the

13  uncontested matters.  And we don't have anything to take up in

14  connection with any of those.  I don't know that anybody else

15  does.  There are three contested matters that are on for this

16  morning.  Actually, a total of four.  But two of them are very

17  closely related.  The first is the Motion to Dismiss the case,

18  item 9.  The second is our revised Motion -- that's Debtor's

19  revised Motion for a Case Management Order with respect to the

20  non-personal injury claims.  And then third we have two

21  matters that are related, which are our objections to the

22  retention of Hilton and Rabinowitz, who are two experts that

23  the Official Committee for Property Damage had sought to

24  retain.  So those are the matters that are on for discussion

25  this morning.  There's another contested matter that was

6

1    listed, which is our revised Motion for a CMO as to the

2    personal injury claims.  Per Your Honor's instructions last

3    time, that was simply filed for transfer to Judge Wolin.  We

4    don't have to take that up.  And I think that the remaining

5    two matters that were listed on the agenda, that is actually

6    there are a total of three -- 14, 15, and 16 -- all three of

7    those have been continued.  So that leaves us with the three

8    matters this morning:  The Motion to Dismiss; the Case

9    Management for non-personal injury; and the objections to the

10   two experts.

11             THE COURT:  Okay.  Maybe the numbers are different on

12   the amended agenda than they are on the original agenda.

13   Because I'm looking at the original agenda, and the items are

14   different.  And I made notes on probably the original that I

15   have.  Let me see here.  Yes.  The Motion to Dismiss the case

16   is item 10 even on the amended agenda.

17             MR. BERNICK:  Okay.

18             THE COURT:  All right.  13 and 14 are the requests of

19   the Committee for their retention of the consultants.  11 is

20   the new Case Management Order.  15 and 16 both are related to

21   Ms. Gerard's Motion to Intervene.

22             MR. BERNICK:  Right.

23             THE COURT:  And those are the two that are continued.

24   Correct?

25             MR. BERNICK:  Well there was another one that was

1    continued, which was the -- those two are continued.  That's

2    correct, Your Honor.

3         THE COURT:  Okay.  Any others?

4         MR. BERNICK:  Yeah, there was the Motion for

5    Preliminary Injunction that related to the claim against

6    National Union Fire Insurance Company.  It was a Motion for a

7    Preliminary Injunction and TRO, adversary proceeding.  And

8    that also has been continued.

9         THE COURT:  What number is that on the agenda?

10        MR. BERNICK:  That was number five.  That's probably

11   what accounts for it then.

12        THE COURT:  All right.  Okay.  I had a question about

13   one item.  In item -- let me find it.  Pardon me.  Oh, no,

14   really it's only about item 12.  That's your revised motion

15   with respect to the asbestos personal injury claim.  I have

16   not yet done an Order that transfers that case to Judge Wolin.

17   But I will as soon as I get back --

18        MR. BERNICK:  Okay.

19        THE COURT:  -- to Pittsburgh.  So that motion will in

20   fact be heard by him.  Do you need to work out any process?  I

21   think it's working well enough that if you file items related

22   to that agenda with the Clerk, they'll simply be transferred

23   to Judge Wolin.  And I'll assure you that I'll also check, as

24   long as they're in an agenda somewhere that indicates that

25   they belong to Judge Wolin, to make sure that they're

1   appropriately transferred to him.  Has he worked out something

2   with you about e-filing or sending copies of documents to him

3   by e-mail or anything of that sort?

4          MR. BERNICK:  Yeah, I don't think that we've actually

5   had that specific discussion with him.  At the same time, I'm

6   not aware of any problem that we have faced that way either.

7          THE COURT:  Okay.

8          MR. BERNICK:  I'm not sure there's actually been an

9   occasion to file anything before Judge Wolin with the

10  exception of --

11         THE COURT:  This one.

12         MR. BERNICK:  -- this one.  Right.

13         THE COURT:  Okay.  Well, I will discuss with him if

14  there's some particular procedure he wants in place.  And if

15  so, I'll include it in the transfer Order.  All right.  What

16  would you like to start with now?

17         MR. BERNICK:  Well, I guess we should start with the

18  Motion to Dismiss.

19         THE COURT:  All right.  Item 10?

20         MR. BERNICK:  Yes.

21         THE COURT:  Okay.  And pardon me while I get the

22  right form then.

23      (Pause in proceedings)

24         THE COURT:  Good morning.

25         MR. SOBOL:  Good morning, Your Honor.  My name is Tom

1   Sobol, S-O-B-O-L, with the law firm of Leif, Frazar, Hyman &
2   Bernstein, here on behalf of the Zonolite Attic Insulation
3   Claimants in connection with the Motion to Dismiss.   In SGL
4   Carbon, Your Honor, the 3rd Circuit held that a Chapter 11
5   bankruptcy petition is subject to dismissal under Section
6   1112(b), unless filed in good faith.   Now, Your Honor, this
7   motion and the good faith requirement under the Bankruptcy
8   Code is not a pro forma requirement.   The SGL's Court, the 3rd
9   Circuit, could have rested its decision in SGL on the basis of
10   the statutory language cited, the legislative history that it
11   pointed out, and the observation that, as it said, {quote}
12   "The conclusion of every Court of Appeals to address the
13   issues is clear.   Chapter 11 petitions must be filed in good
14   faith, and are subject to dismissal."
15       The 3rd Circuit did not rest its decision though on what
16   would commonly be recognized, I think, as a more than
17   sufficient basis upon which to make this conclusion.   Instead
18   it looked at two other things.   First, to the equity
19   underpinnings of the Bankruptcy Code.   And second, to the
20   purposes of Chapter 11 proceedings themselves.   Now, when
21   they're looking at equity, what the Court said was this.   It
22   said that there are strong roots in equity of Chapter 11
23   proceedings.   And it looks to both the avoidance of economic
24   dismemberment, but in a manner which does equity and does
25   fairness to all the Parties-In-Interest.   The Court also

1  looked to the nature of Chapter 11 proceedings, and to the

2  purposes underlying Chapter 11 proceedings.  In doing that,

3  Your Honor, what the Court concluded essentially was this.

4  That it is an extraordinary event when an American corporation

5  files for a Chapter 11 petition.  And that when that

6  corporation does so, it must be doing so in good faith and

7  consonant with the purposes in mind behind the Chapter 11

8  proceeding.

9      The Court said this.  "It is easy to see why Courts have

10  required Chapter 11 petitions to act within the scope of the

11  Bankruptcy laws.  Chapter 11 vests petitioners with

12  considerable powers, whether it's the stay or it's discharges

13  or other things that are unique, obviously, to bankruptcy.

14  That -- and these can impose significant hardship on

15  particular Creditors."  Now this is most important, Your

16  Honor.  The 3rd Circuit said, "When financially troubled

17  petitioners seek a chance to remain in business, the exercise

18  of those powers is justified.  But this is not so when a

19  petitioner's aims lie outside the Bankruptcy Code."

20      I start with this review, Your Honor, which I know that

21  the Court is more than capable to be able to review the SGL

22  Carbon decision, but essentially to draw this point.  When

23  coming before this Court, W.R. Grace seeks to invoke the

24  extraordinary powers of the Chapter 11 proceeding.  When it

25  does so -- when it seeks to change the landscape so markedly

1   in terms of how it is that the claims of hundreds of thousands

2   of tort Claimants are affected, it must do so in good faith.

3   And it must take seriously the mandate of the 3rd Circuit to

4   come forward with evidence that it is a financially troubled

5   institution, or that it has such a sufficient overwhelming

6   number of claims that its managerial capacity has been

7   seriously undermined.

8          THE COURT:  Well, number one, I don't read SGL

9   Carbon, I don't read the Bankruptcy Code, I don't read any

10   other case that I can recall offhand to say that Chapter 11 is

11   only for insolvent corporations.

12          MR. SOBOL:  Absolutely, Your Honor.

13          THE COURT:  Fine, okay.  So then we're looking at

14   point two, which is the management of claims.  I'm faced with

15   a Debtor who has in excess of -- known, if I recall correctly,

16   200,000 plus claims.  Unknown, if I believe you, your client

17   that is with respect to the Zonolite Attic Insulation, with

18   potentially 15,000,000 homes across the country from the

19   1920's through the early 1980's with however many resales of

20   those homes may have occurred in the interim, with a universe

21   of Claimants that is broad beyond all human imagination, and

22   certainly unknown in scope.  Now, how can anybody deal with

23   that universe absent something like the structure of Chapter

24   11?  And what more do I need to know, other than that?

25          MR. SOBOL:  Okay.  First, Your Honor, you're

1   absolutely right.  The 3rd Circuit recognized that a company

2   need not be insolvent in order to file a bankruptcy petition.

3   And the 3rd Circuit made that clear.  The 3rd Circuit also

4   said, however, that in order for a company to come before it,

5   even if it has litigation issues, it must show that it's

6   either financially troubled or that there is a serious

7   inability to manage the claims.  Now, addressing your question

8   as to the manageability of the claims, it's very important to

9   recognize this.  First, as to Zonolite Attic Insulation

10  claims, pre-petition those claims were well under control.

11  Those claims were before the Multi-District Litigation Panel.

12  They were sent to a Federal District Court in Boston.

13          THE COURT:  Well, some of them.  If they had all been

14  sent there, I wouldn't have the various request that I have

15  for a certification of class action.  So certainly you can't

16  contend that they're all before a State Court or the MDL

17  Panel.  They're not, or I wouldn't have these motions to

18  certify the class.  They would have already been certified.

19          MR. SOBOL:  With all respect, Your Honor, they were.

20          THE COURT:  All the classes were certified?

21          MR. SOBOL:  No.  What was before the Court was this.

22  All the Federal claims, all the claims, all the Zonolite Attic

23  Insulation claims that were filed in the country were pending

24  either before the MDL Court, prepared and already having

25  briefed the issue of certification which Judge Saras was

1  planning to hear on April 25th.  Second, they were a certified

2  class in Barbonti, in Washington State.  And third, there was

3  a proposed class action, I believe, in South Carolina.  Those

4  three cases were well under control, and were being managed.

5           THE COURT:  And how many more are there?

6           MR. SOBOL:  None.

7           THE COURT:  There are no other classes out there?

8  I'm not gonna deal with any issues except for Massachusetts,

9  Washington, and South Carolina.  That's it.

10          MR. SOBOL:  Correct.

11          THE COURT:  That's the only place that I'm gonna have

12 any Zonolite issues at all in this case.

13          MR. SOBOL:  Those were where the claims were pending.

14          THE COURT:  Well --

15          MR. SOBOL:  The answer is yes.

16          THE COURT:  The answer is yes, that I'm only dealing

17 with Zonolite in three states.

18          MR. SOBOL:  You're dealing with --

19          THE COURT:  Not foreign countries and not any place

20 else.  Only three states.

21          MR. SOBOL:  That's correct, Your Honor.  In other

22 words, I want --

23          THE COURT:  Okay.

24          MR. SOBOL:  -- to make sure it's clear.  Okay?

25          THE COURT:  So do I.  Because I want this record very

1    clear --

2         MR. SOBOL:  Sure.

3         THE COURT:  -- that there will be no Zonolite claims

4    filed by anybody who doesn't have a home in one of those three

5    States.

6         MR. SOBOL:  No, that's not what I mean.  In the MDL

7    there was a proposed national class action on behalf of all

8    property owners resident in the United States and its

9    territories.  So that covered the landscape of the United

10   States and its territories in the MDL.  Carved out of that

11   proposed class action were the residents in the State of

12   Washington, and the residents in the state of South Carolina,

13   to the extent covered by the South Carolina case.

14   Accordingly, litigation with respect to Zonolite Attic

15   Insulation claims was pending in only three Courts.  Those

16   Courts were handling all of the Zonolite Attic Insulation

17   claims in the country, and were being well managed.

18        THE COURT:  What --

19        MR. SOBOL:  And W.R. Grace makes no question in

20   anything that it's filed to this Court for the past

21   approximately three-quarters of a year, that that is not the

22   case.

23        THE COURT:  Well, my understanding -- and, again,

24   please correct me if I'm wrong -- of those three litigations

25   is:  Number one, the South Carolina class has not been

1  certified; number two, in the Multi-District Litigation Judge

2  Saras had issued a Case Management Order, but I don't even

3  know if discovery has commenced in that case.

4      MR. SOBOL:  They have.

5      THE COURT:  In the Barbonti case, that case was a

6  little further along than the MDL action.  I don't recall

7  Judge Saras excluding anything to do with the South Carolina

8  case in the Orders.  It could be in there.  It might just be

9  my recollection that's incorrect.  But it did definitely --

10     MR. SOBOL:  Yes.

11     THE COURT:  -- her Orders did definitely exclude the

12 Washington State litigation.

13     MR. SOBOL:  Yes.

14     THE COURT:  All right.  So now I have the possibility

15 of three suits with inconsistent results, and major litigation

16 in three forum.  Why?

17     MR. SOBOL:  I don't think that there was any

18 possibility, Your Honor, with all due respect, of inconsistent

19 results.  Because the way that the class was proposed before

20 Judge Saras, it would have excluded any other Court that at

21 that time had certified a class.  And that's why there

22 wouldn't have been any inconsistent rulings.  Discovery was

23 well under way before Judge Saras.  She was scheduled to have

24 a trial -- or at least to have concluded discovery roughly by

25 the Spring of this year.  And, again, there hadn't been any

1  issue raised by Grace regarding its inability to manage the

2  Zonolite Attic Insulation claims.  In fact, its position

3  before the MDL Panel had been that the most efficient and

4  logical way to deal with Zonolite was to consolidate the cases

5  in the country, and have them all sent to Boston.  And that's

6  precisely what happened.

7       With respect to the numerosity of the claims on the

8  personal injury side, Your Honor, I would say the following.

9  First, W.R. Grace does not make any claim that it was not

10  capable of managing those cases.  In fact, it says it was.  In

11  its reply, or in its opposition, at page 10, in this dismissal

12  motion, it says that -- at the bottom it says that the

13  Zonolite Attic Insulation Claimants' reliance on the fact that

14  Grace historically managed -- they underline "manage" -- the

15  claims against it, ignores the fact that Grace could not

16  resolve the claims against it, particularly with the spiking

17  claims as it indicated recently.  In other words, they say by

18  way of argument, but without by way of factual support or

19  affidavit, that they were capable of managing those claims, as

20  they historically had done, but that they wanted to get a

21  different way to liquidate to try to resolve the personal

22  injury claims.

23       I'd also say this, Your Honor.  To be sure, and I make no

24  bones about it, there are many, many personal injury claims

25  that are out there that are pending against W.R. Grace.  The

1   problem here is that that only takes Grace so far.  The

2   question is, has Grace come forward with evidence, and that

3   evidence showing that management of Grace was seriously

4   affected in some way, certainly consonant with the notions of

5   what's set forth in SGL such that it couldn't go forward?

6        Now, I would anticipate, Your Honor, that you would have,

7   among the many concerns regarding this motion, the following

8   two concerns.  One would be, isn't that enough?  What I would

9   suggest, Your Honor, is that a review of the SGL decision

10  points out that Judge Farnan, when he issued findings of fact

11  regarding SGL's situation, he issued findings saying that it

12  appeared that litigation did cause many distractions.  And he

13  also indicated that it looked like the claims against SGL

14  harbored in the long term problems with respect to SGL's

15  future viability.  The 3rd Circuit, not only did it impose a

16  good faith requirements, but it found those findings clearly

17  erroneous, reversed Judge Farnan, and issued an Order

18  directing that the bankruptcy case be dismissed because of the

19  insufficiency of the subsidiary facts that had been put before

20  the SGL Court.  Here, I'd suggest that that applies with equal

21  weight.

22        Here, there's no question, to be sure, that W.R. Grace,

23  like SGL, is financially healthy, that its revenues are

24  growing, that its debt structure was fine, that it was not

25  experiencing difficulty of incurring debt and going out and

1  getting beneficial debt for the company.  Here, also it's

2  clear, and perhaps unlike many other major mass tort

3  bankruptcies, Grace does not say anything about its inability

4  to manage its claims or how it affects its business.  The

5  other concern Your Honor would have is, well, aren't there

6  other major mass tort bankruptcies out there that involve

7  asbestos claims where it appears that the Debtor has stayed in

8  a Chapter 11?  And the answer to that is yes.  But the SGL

9  Court drew distinctions between some of those other mass tort

10  bankruptcies.  And I'd suggest that we can do so here.  It's

11  in the briefs, but I wanted to be able to graphically show

12  you.  May I approach, Your Honor?

13          THE COURT:  Thank you.

14          MR. SOBOL:  What I've handed you are charts of

15  materials that are already in the record.  But if you could go

16  to the last page, Your Honor, which looks like this comparison

17  chart -- I'm not sure if you have it before you.

18          THE COURT:  Yes.

19          MR. SOBOL:  Does it look like this, Your Honor?

20          THE COURT:  Oh, no.

21          MR. SOBOL:  It was late last night.

22          THE COURT:  Okay.

23          MR. BERNICK:  Your Honor, can I ask that the chart be

24  provided to other parties?

25          (Pause in proceedings)

1          MR. SOBOL:   Do you have the comparison chart, Your

2    Honor?

3          THE COURT:   Yes.

4          MR. SOBOL:   In the SGL case, Your Honor, the Court

5    drew comparisons between Johns Mansville situation and a

6    couple of other cases, not necessarily A.H. Robins and Dow

7    Corning, though it did cite it.  If one goes to those cases --

8    I'll look at the first two columns, if you will.  In the A.H.

9    Robins bankruptcy, the Court had observed that there was a

10   critical depletion of company operating funds, and that A.H.

11   Robins' unrestricted funds were down to $5,000,000.  Similar

12   kinds of issues faced Dow Corning, though to be sure not as

13   severe.  But insurers had paid a tiny fraction of the funds

14   that were owing Dow Corning.  And it was stated in the

15   decision that -- and by Dow Corning -- that it could not

16   afford to fund a settlement and defend the existing and

17   escalating claims.  In Johns Mansville the company was shocked

18   from a first time $1.9 billion reserve that it needed to make.

19   And that was accelerating close to a half a billion dollars in

20   borrowance.

21         When one compares those financial circumstances to the

22   situations facing Grace, it's a remarkable and striking

23   difference.  With respect to W.R. Grace, it had roughly

24   $400,000,000 in cash on hand, and was sufficiently liquid to

25   carry on its affairs.  If one looks to a couple of other

1  points too, in the <u>A.H. Robins</u> situation the Court had

2  observed that for A.H. Robins things were so bleak that

3  financial institutions were unwilling to lend it money.  And

4  if you go to the <u>Johns Mansville</u> situation, the Court had

5  observed that it faced partial or perhaps total liquidation.

6  In this situation involving Grace though, Grace was able to

7  come up with a quarter of a billion dollars of financing in

8  recent months.

9      The long and the short of it, Your Honor, is that the 3rd

10 Circuit in the <u>SGL</u> case took pains to point out that -- I want

11 to make sure I get the right cite, because I think really the

12 crux of a part of their decision appears here.  I believe this

13 appears at page 163, Your Honor.  Is that the Court drew

14 distinctions between situations where a financially healthy

15 company might file for bankruptcy, or when there are supposed

16 mass tort bankruptcies, if you will.  The Court said this.

17 "In those cases, however, the Debtors experienced serious

18 financial and/or managerial difficulties at the time of

19 filing."  And then the Court pointed to other situations,

20 including <u>Johns Mansville</u>, and quoted at length from those

21 other decisions, pointing out that there is a need to show

22 either one of those two things.

23      I would also say this, Your Honor.  If one honestly takes

24 a step back and looks at Grace's position in this case, its

25 lament is essentially this.  That when trying to litigate

1   cases in the State Court system, or I guess sometimes they

2   just say Court system, so I assume that they mean the Federal

3   Court system as well -- they don't like it.  They don't think

4   that it's fair.  They don't think that they're able to get a

5   fair shake at the trial.  They don't like the kind of money

6   that they have to pay out to the personal injury Claimants.

7   And as a result -- and this is in the charts that are before

8   you, and in the record -- the president of Grace from the date

9   that they filed for bankruptcy basically says, "We think that

10  the tort system's broken.  We want to go somewhere else to try

11  to get our claims liquidated.  Not that we're having any

12  problem managing them.  Not that we're in any financial

13  trouble.  But we want to find a different forum to have our

14  cases heard."  And their lament continues that one of the

15  reasons the tort system's broken, is that you can't do things

16  like class actions, or you can't do things like aggregated

17  claims in the tort system.  And then it points to cases like

18  Ortiz or Am Chem, where the Supreme Court has made it more

19  difficult, or at least more exacting, the requirements of

20  class actions.

21      The problem with this argument, frankly, Your Honor, was

22  that it was totally rejected by the 3rd Circuit in the SGL

23  decision.  And at the end of that decision the SGL Court said,

24  "In reaching our conclusion, we are cognizant that it is

25  growing increasingly difficult to settle large scale

1  litigation.  We recognize" -- and then it cites <u>Ortiz</u> and <u>Am</u>
2  <u>Chem</u> for their recognition that it's difficult to resolve
3  large scale litigations.  "We recognize that companies that
4  face massive potential liability and litigation costs continue
5  to seek ways to rapidly conclude litigation to enable a
6  continuation of their business, and to maintain access to the
7  capital markets.  The Bankruptcy Code presents an inviting
8  safe harbor for such companies.  But this lure creates the
9  possibility of abuse, which must be guarded against to protect
10  the integrity of the bankruptcy system, and the rights of all
11  involved in such a proceeding."

12        So, Your Honor, what I'd ultimately urge this Court to be
13  mindful of is this.  What W.R. Grace has done in this case is
14  it's come before you and asked you to exercise extraordinary
15  powers under the Bankruptcy Code.  It also asks you to do so
16  despite the existence of the <u>SGL</u> decision.  Certainly at a
17  minimum, if it seriously wants to take advantage of your
18  powers in this case, ought it to have come forward with far
19  more evidence, by way of affidavit, declaration, true
20  documentary record that it's either suffering financial
21  hardship such that it could come into this Court, or that
22  somehow the personal injury cases for which it is -- the only
23  reason that it rests really it's the numerosity issue -- were
24  it difficult to manage, or so difficult to manage that it
25  ought to be able to invoke the Bankruptcy Code.  That last

1  issue as to whether or not the numerosity was such that it

2  would affect the managerial capacity, is not something that it

3  has ever claimed.  It certainly hasn't gotten beyond that

4  which was before Judge Farnan in the SGL decision.

5         THE COURT:  Well, you know, to a certain extent I

6  suppose, particularly as lawyers, we prize the rhetoric that

7  we use.  But to a large extent isn't it the same thing as

8  saying, "I disagree with the State tort system.  I think I'm

9  being treated unfairly.  It's difficult for me to get

10  consistent rulings.  I'm not able to handle class actions or

11  to aggregate claims."  Isn't that just another way of saying,

12  "I can't manage the responsibility that the State tort system

13  imposes on me," without using those same words?  I mean you've

14  got a company that to this day professes that it has sound

15  financial underpinnings.  I don't know whether the company's

16  insolvent from a book perspective, or not, based on the

17  universe of claims that haven't even been filed against it

18  yet.  So I'm not going there.  I'm not talking about

19  insolvency.  But I'm not sure that it's a correct analysis to

20  say that because the Debtor doesn't use the words that SGL

21  might use, assuming that SGL is even factually enough similar

22  to these cases that it applies in that respect, that the

23  Debtor isn't, nonetheless, unable to manage the litigation

24  that it's facing.

25         It seems to me that's exactly what the Debtor is saying.

24

1   "I can't manage the litigation in the State Courts.  And so I

2   want a different forum to do it.  I want to get out of 50

3   different State Court jurisdictions, not to mention the

4   several hundred different Courts in which actions in each of

5   those States could be filed, and get into one forum where I

6   can manage it all."  It seems to me that that's the very

7   position the Debtor is asserting.

8          MR. SOBOL:  I think that that's right, Your Honor.  I

9   think that's the position they're asserting.  But I also

10  think, Your Honor, that that is precisely the edge that the

11  SGL Court was trying to make.  In other words, the SGL Court

12  was saying, "If your claim is that you are unhappy with the

13  way that the tort system liquidates, adjudicates claims, and

14  that's your only reason for being in Bankruptcy Court, you're

15  not allowed to be here."

16         THE COURT:  Well, I don't know that I can go quite

17  that far with SGL.  There's -- on the facts, the SGL situation

18  is so egregiously different from a company that is looking at

19  hundreds of thousands of known Claimants with asbestos

20  personal injury, millions of potential Claimants with property

21  damage.  I just can't on the facts see how there is a

22  similarity between this case and SGL.

23         MR. SOBOL:  Where there is on the facts, Your Honor,

24  or not, certainly what the Court stated, particularly when the

25  Court on its own evoked Am Chem and Ortiz, and said that those

1  are not reasons why it is that one invokes the Bankruptcy

2  Code, I would suggest that there is a hurdle that Grace has

3  not taken seriously to show something more other than, "We

4  have lots of claims.  And we'd rather --

5          THE COURT:  Well --

6          MR. SOBOL:  -- be in Bankruptcy Court."

7          THE COURT:  -- I think SGL does stand for the

8  proposition that the bankruptcy isn't to be a simple device

9  for getting around a litigation issue.  If you've got what

10 could -- well, reduced to its essence is a two-party dispute,

11 the Debtor against some other entity or group of entities with

12 a similar interest, then the Bankruptcy Code is not supposed

13 to be used as a means of avoiding a different forum, and

14 dragging cases here for litigation, imposing the stay in a

15 fashion that may do some injustice to those other parties.  I

16 think SGL clearly stands for that, and cites Am Chem and Ortiz

17 for that proposition.  It's not a litigation get-around, I

18 guess is the right word.  But I don't think that SGL or any of

19 the other cases stand for the proposition that if there is a

20 real need to file to either manage claims or to resolve your

21 financial picture for a reason other than management of

22 claims, that you don't have access to the Bankruptcy Code.

23         I'm having some difficulty understanding what it is that

24 you allege is bad faith here.  Because in order for the Debtor

25 to have to come forward to show good faith, you've got to tell

1  me what's bad faith.  What did the Debtor do that was so

2  improper here, that the Debtor now has the burden of

3  affirmatively demonstrating some good faith?

4  　　　　MR. SOBOL:  Well, I would suggest that there's no

5  short list that exists there, Your Honor.  First, with respect

6  to the Zonolite Attic Insulation claims, what the Debtor has

7  essentially tried to do is -- and -- but has -- it has so far

8  accomplished doing, is that it stopped material information

9  going to the putative class representatives.  It stopped dead

10  in its tracks the activities of an Article 3 Judge, appointed

11  by the Multi-District Panel to adjudicate those claims.  And

12  has -- and now in bankruptcy has not said, "Well, all right.

13  We'll use the same procedures that were in effect for the MDL

14  now that we're in Chapter 11."  It's tried to markedly change

15  the way that those cases and those claims get adjudicated.  So

16  -- well, I --

17  　　　　THE COURT:  That's what bankruptcy does.  It gives

18  you a different procedural device for handling claims.  It may

19  or may not work in a particular case.  But it gives you an

20  option you don't have if you don't file bankruptcy.  What's

21  bad faith about taking advantage of what the statute provides

22  you?

23  　　　　MR. SOBOL:  Because if you don't have the basis upon

24  which to be in the Bankruptcy Court in the first place, if

25  you're not financially troubled, or if you're capable of

1   managing your claims, then you're not enabled to just be able

2   to change the rules and the substance by which the claims get

3   adjudicated.  I'd also say, Your Honor, that while on the

4   facts the SGL case involved a party to party dispute, if you

5   will, did not include numerosity in terms of an issue, the 3rd

6   Circuit went out of its way to bring in the notion that long

7   term viability of a company in mass tort situations may be

8   inviting, but isn't enough.  In other words, the Court went

9   out itself and looked at Johns Mansville.

10          THE COURT:  It wasn't a mass tort case.  SGL Carbon,

11  the reason that it went up was not because of mass tort

12  issues.  Was it?  So whatever the 3rd Circuit said is not part

13  of its holding in that case.  Is it?

14          MR. SOBOL:  That's correct.  Not its holding on the

15  facts.  The question is whether or not we look at what the 3rd

16  Circuit's telling us by way of adjudicating good faith claims

17  are not beside that point.  But certainly it's not within the

18  heart of the holding, to be sure.  But if one wants to take

19  seriously the language, then what the Court's telling us is

20  the Court went out of its way essentially to point to other

21  mass tort situations, and to show that in those circumstances

22  there were financial hardship.  And that in those kind of

23  situations, although Am Chem and Ortiz invite safe harbor to

24  the Bankruptcy Courts, that's not what the good faith

25  requirement permits.

1  So, you know, going back to the question regarding,

2  again, whether or not Grace's presentation here or it's, you

3  know, seeking resort is in good faith or bad faith here,

4  whether or not I have shown that they're in bad faith, not

5  only does the -- Grace bear the burden on that issue to show

6  its good faith -- not others to show its bad faith -- but I

7  would say --

8          THE COURT:  Well --

9          MR. SOBOL:  -- again --

10         THE COURT:  No, wait.  There is no explicit

11  requirement of good faith in Chapter 11.  <u>SGL</u> and several

12  other cases have imposed as a gloss, and I wholeheartedly

13  endorse the concept, that there is a good faith aspect to

14  invoking bankruptcy relief.  But the issue is, how does it

15  come up?  Unless somebody puts that good faith at issue by

16  showing that there is some reason why the Debtor has to

17  affirmatively demonstrate it, I don't understand any of the

18  Circuit opinions to say that the Debtor, in order to file, has

19  to affirmatively demonstrate good faith.  I think there's the

20  equivalent of a rebuttable presumption that the case is filed

21  in good faith, because you don't have to file affidavits that

22  say, "This is the reason we're filing."  The Codes lists what

23  you have to do.  You've got to file your schedules and your

24  petition.  You've got to list all your Creditors and all your

25  assets.  There is no allegation that Grace didn't do any of

1  that.  So what is it that Grace has to affirmatively

2  demonstrate?

3       You're saying that Grace has to affirmatively demonstrate

4  that it can't manage its claims.  I think there is sufficient

5  justification for that kind of a finding probably without

6  evidence in this record, because the facts are not in dispute.

7  Grace faces hundreds of thousands of known, let alone unknown,

8  personal injury claims, is subject, according to all of the

9  information on other briefs that have been submitted by all

10  the parties, massive numbers of suits that go to trial in the

11  hundreds weekly, all across the country, takes massive

12  resources both in terms of human time and energy and financial

13  resources to defend those actions, takes its time and its

14  resources with respect to its business operations, and diverts

15  them into the management of that litigation, and hasn't even

16  yet got a handle on what the universe of property damage

17  claims pursuant to the Zonolite Attic Insulation will be.  I'm

18  having some difficulty understanding how those facts which I

19  don't think are in dispute -- is any of that in dispute?

20       MR. SOBOL:  The one part that is in dispute, Your

21  Honor, is that recognizing all of what you've said, Grace had

22  no problem doing it.

23       THE COURT:  Okay.  The facts themselves are not in

24  dispute.  What you're telling me is that there is a different

25  conclusion that can be drawn from those facts.  But the facts

1    are not in dispute.

2           MR. SOBOL:   Correct.  But there's another fact that's

3    also not in dispute.  And the other fact that's not in dispute

4    is that although there were numerous claims pending in

5    multiple jurisdictions on the personal injury side, okay, it

6    had no problem managing those and paying those claims.  The

7    question ends up being that they just didn't like the results.

8    And that's really the issue.  And, again, if we take Grace at

9    its word, and we look to page 10 of its response, that's what

10   it says.

11          THE COURT:   It does say it didn't like the results.

12   I'm sure every --

13          MR. SOBOL:   Right.

14          THE COURT:   -- Debtor that's facing asbestos mass

15   tort litigation doesn't like the results.  So I don't think

16   that's bad faith that they don't like the results.

17          MR. SOBOL:   And what I would suggest is the

18   additional bad faith though here, Your Honor, is the

19   affirmative statements by Grace, some of which I've clipped in

20   the charts that I put before you, that the reason it's coming

21   into bankruptcy is to seek a different forum to liquidate.

22   Not to have its business reorganized, but to have the tort

23   system reorganized.

24          THE COURT:   Well --

25          MR. SOBOL:   That's what they're out to do.

1          THE COURT:  -- I don't think the Bankruptcy Courts

2   are about to reorganize State tort systems.  But Congress has

3   provided an alternative mechanism for Debtors to liquidate and

4   manage claims.  I am still having a great deal of difficulty

5   understanding why it's bad faith to take advantage of a

6   privilege that Congress has, in its wisdom, decided that

7   Debtors have.  That's where I have a disconnect.

8          MR. SOBOL:  Sure.

9          THE COURT:  Why is that bad faith?

10          MR. SOBOL:  Okay.  Because the Courts require that it

11   is a privilege.  It's not an entitlement.  And in order to

12   have this privilege, not an entitlement, the Courts have said

13   either you must be in financial extremes, or there must be

14   something so affecting the ongoing operations of your business

15   and your ability to operate your business, that you need to

16   seek sanctuary in the Bankruptcy Court.  Now, I can't do much

17   more than that, Your Honor, other --

18          THE COURT:  Okay.

19          MR. SOBOL:  -- than to say that my reading clearly

20   under SGL is that the Court reached out into these mass tort

21   situations and prescribed rules by which someone would need to

22   come forward with evidence, not argument, as to meeting that

23   burden.

24          THE COURT:  All right.  Well I certainly hope SGL

25   isn't going to stand for the proposition that Debtors have to

1  wait until they're in financial extremis before they file

2  bankruptcy, because we already have too many Chapter 11's that

3  wait too long to file, and as a result have no cash, and as a

4  result don't make it out.  So if this case was, in my view,

5  wise enough to be filed before that happened, I applaud that

6  decision.  I can't criticize it.

7          MR. SOBOL:  Well, again, Your Honor, I think that the

8  SGL Court, the 3rd Circuit, expressly raised that question as

9  to whether or not, you know, that the bankruptcy laws

10  encourage early filing.  However, the Court said that that

11  does not mean premature filing.  And indeed I think what the

12  SGL Court expressly held was that a Debtor must prove, and

13  cannot enter at a time that it is financially healthy and

14  isn't experiencing the kind of overwhelming managerial

15  difficulties that I've indicated.  The Court expressly was

16  aware of that concern, and essentially held, "No, you do have

17  to wait.  You do have to wait until things are critical before

18  you use these extraordinary protections."

19          THE COURT:  I'm not sure I can read SGL to say that.

20  Find that word for me in the opinion.  If it's in there, I've

21  --

22          MR. SOBOL:  Sure.

23          THE COURT:  -- missed it.  Okay.  Because if things

24  needs to be critical, we might as well write Chapter 11 out of

25  the Code.

1    MR. SOBOL:   The word "critical" is not there.   But
2  what the Court said is, at page 163, when talking about how
3  the Bankruptcy Code encourages early file, said this.   "Such
4  encouragement, however, does not open the door to premature
5  filing, nor does it allow the filing of a bankruptcy petition
6  that lacks a valid reorganizational purpose."   Then about a
7  paragraph or two later, the Court says, "We do not hold that a
8  company cannot file a valid Chapter 11 petition until after a
9  massive judgment has been entered against it."   Okay?   But
10 then it says, "In cases where that has been done, Debtors
11 experienced serious financial and/or managerial difficulties
12 at the time of the filing."
13     THE COURT:   Yes, after a mass judgment was entered
14 against it, yes.
15     MR. SOBOL:   And the Court is saying --
16     THE COURT:   Which is the situation --
17     MR. SOBOL:   -- that that's what entitles --
18     THE COURT:   -- in SGL.
19     MR. SOBOL:   Yes.   So what I'm suggesting, Your Honor,
20 here is just that obviously the 3rd Circuit was mindful of the
21 concern of early filing, but said that, you know, that does
22 not permit filing at any time.   And in my view drew the
23 distinction of where it is that I've indicated earlier.
24     THE COURT:   Okay.
25     MR. SOBOL:   Thank you.

1        THE COURT:  Mr. Bernick?

2        MR. BERNICK:  Yes, I'll be brief, Your Honor.  Three

3   points really.  The first begins with the fraudulent

4   conveyance litigation which provides a meaningful backdrop to

5   the motion that's before the Court.  Just last week we were in

6   a different room -- a jury meeting room -- with Judge Wolin.

7   And Mr. Lockwood and Mr. Baena were not looking merely as

8   relaxed as they do here today.  They were leaning forward,

9   because they were very, very focused on obtaining the

10  authority to pursue fraudulent conveyance litigation.  What

11  was the central contention in that litigation, and what is the

12  central claim?  It was and is that Grace was insolvent in

13  1998, insolvent in 1996.  Now, was that because there was

14  negative cash flow?  No.  Was it because there was negative

15  equity?  No.  It's because their central theory in this case

16  is that the estimated future liabilities swamp the company and

17  make it insolvent.  That's their position in this case.  Is

18  the world changed since 1998, which is what the fraudulent

19  conveyance claim focuses on?  No, it's not.  They'll still say

20  that we are swamped by the future estimated asbestos

21  liabilities.  It's true in every one of the cases that's now

22  on file.  They say the future swamps the current claims,

23  swamps the company, insolvent.  It will be the central theme

24  in this case.  You ask Mr. Lockwood today does he believe that

25  Grace is solvent?  He'll say, "No, Grace is not solvent."  His

1  partner Mr. Inselbrock told me that the first day we showed up

2  in the Babcock case where there was no negative cash flow, no

3  negative equity, but in their view estimated future

4  liabilities that were -- you know what he said?  "You are

5  insolvent.  You belong here."

6      It's no accident that the ACC or the property damage have

7  filed no Motion for Dismissal of this case.  Because it'd be

8  completely contrary to their entire theory of the case.

9  That's where the Committee's at.  What about the Zolonite

10  Attic Insulation Claimants?  Are they any different?  Well

11  interestingly, the day this case was filed they initiated

12  their own lawsuit, called the Woodward lawsuit.  And in that

13  lawsuit they asserted a fraudulent conveyance claim.  They

14  said that this company was insolvent, not today, but two or

15  three years ago.  It was only on the eve of the Case

16  Management Order hearing that was set on November 21 that they

17  decided to ride a different horse.  They decided to ride a

18  horse that says, "Well, let's get this company out of 11 so we

19  can then pursue the class action litigation involving homes

20  all over the country," millions of claims in their view, "so

21  we can then threaten them with an involuntary insolvency, and

22  maybe we'd get our own separate settlement."  That's what's

23  going on here.  That's their agenda.  That's point one.

24      Point two, what was our view of why we filed for 11?  And

25  is it true that there's no record, as counsel asserts, no

36

1    affidavit, as counsel asserts, showing that there was a

2    management problem?  Well, the reason that we filed for

3    Chapter 11 is I know already familiar to the Court.  But it

4    does tend to highlight where we're going with this motion.

5    This is a chart that was attached to our original information.

6    We've shown it many times before.  As of 1996 it shows two

7    complaint filings.  And then it -- as you get here to 1998, by

8    that time, which is when the fraudulent conveyance claims say

9    the company was insolvent, and the Committees will say that

10   the estimated future liability is -- shows that the company

11   was insolvent, we were at a downward trend.  And, in fact, we

12   did the estimates, we used the models, we used their own

13   models, and they showed that the future liability was under

14   control, and the company was in fact solvent, so those

15   transactions would go forward, and the company would still be

16   solvent.

17        What's happened since?  Well what's happened since is, as

18   you can see, that the claims skyrocketed.  There is this spike

19   that occurred in the year 2000.  Now, we don't believe that

20   that spike represents the real liability of W.R. Grace.  And

21   we've said so.  We believe that spike represents something

22   else.  As Judge Weinstein indicated in a recent Order that he

23   entered in the fall of last year, he says, "What's going on?"

24   Because there was a similar spike with respect to the

25   Mansville case.  It says the Courts take judicial notice of

1   the continuing media and other campaigns encouraging a flood

2   of new claims.  And we know what those campaigns were.  These

3   are campaigns that have headlines like, "Find out if you have

4   billion dollar lungs."  It's the screening campaign.  The

5   trend is show up with the x-rays, and all the claims get

6   filed.  This was one of the better characterizations that I've

7   seen of where the process is, and telling that presentation.

8   It's the energizer bunny of toxic torts.  It just keeps on

9   going, and going, and going.  That was the problem.  Not our

10  liability.  Not our actual liability.

11      The difficulty of course was that at that point in time,

12  that is by the year 2000, we believed that if you did an

13  estimate again using the same models, we were still solvent.

14  And we will be demonstrating that.  But the problem was that

15  the claim volume was going against us.  It was going the wrong

16  way.  And there's nothing that we could do to control it.  We

17  had absolutely no alternative in order to deal with that new

18  influx of claims but to seek a different venue and a different

19  procedure in order to resolve that problem.

20      Now, counsel says, "Gee, well if all this is true, why

21  don't you provide any evidence of it?"  The Court is already

22  familiar.  These facts are undisputed facts.  But he is also

23  wrong that there is no record of it.  In fact, there is a very

24  clear and specific record of it.  It's just that they have

25  chosen not to point it out to the Court.  Exhibit F to our

38

1  brief is a financial statement, 10-Q, issued in September of

2  the year 2000.  And by this time there's a trend process still

3  under way, and we're not quite sure where it's going to end

4  up.  Okay?  We disclose at that point that there are new

5  bodily injury claims in the first nine months of 2000 that are

6  significantly higher than any comparable period, that more

7  time experience analysis is required to determine what to do

8  about it.  After the turn of the year, this was the best and

9  newest release for January 29th.  I'll call it Exhibit G.  By

10  this time we now have most of the claims in for the year.

11  We're now focused on what our credit situation is.

12      This discloses the company's 364 day bank facility,

13  matures in May.  The current bank credit requirement which is

14  tight over the past several months, coupled with the

15  uncertainty from these asbestos litigations environment have

16  increased the risk that this facility may not be renewed.  And

17  if it's not, we're gonna have some other problems in our

18  financial future.  What does that mean?  Grace's advisors are

19  reviewing the strategic options, including Chapter 11.  Was

20  there no declaration?  Was there no declaration on the date of

21  filing that disclosed the management problems?  There

22  certainly was a declaration.  Mr. Siegel, general counsel of

23  the company, sent out this declaration on the 2nd of April

24  contemporaneously with the petition.  And this declaration

25  specifically talks about the management problems.  It says,

1  "The recent dramatic influx of new claims has severed whatever

2  tenuous connection to actual liability that may have existed

3  in earlier years, and in effective defense of such disbursed

4  and voluminous litigation is simply not feasible.  The

5  dramatic increase in asbestos claims and recent adversarial

6  litigation impair the Debtor's ability to obtain financing,

7  consumes management time and attention, threaten the health of

8  the Debtor's core businesses.  Under these circumstances,

9  Debtors have concluded that there is no other way to timely

10  resolve the asbestos liability while preserving core

11  businesses, other than file the Chapter 11."  A plain, clear,

12  evidentiary submission.  It was sufficient data in connection

13  with our request for preliminary injunction.  It was accepted

14  by the Court.  It was never contested by any of the parties.

15  It was never contested by Mr. Sobol or his firm or any of the

16  clients that they represent.  And in the face of this, they

17  never even sought to obtain the deposition to find out if

18  there were any contrary tasks or any contrary evidence.  The

19  record is palpably clear.  It's painfully clear.  It's the

20  pain that drove us to file this Chapter 11 case.

21      Was that a reasonable judgment?  Well, the standard is

22  not reasonableness.  We all know it's a reasonable judgment.

23  Look at all the other companies that have made exactly the

24  same judgment -- exactly the same judgment.  Do we blink away

25  the reality of what all these companies have done, and say,

1  "Oh, gee, none of them have to be in Chapter 11.  This Motion

2  to Dismiss is really a motion to dismiss all these different

3  cases.  All these companies have got to go back to the State

4  Court system."  That's not a credible argument.

5      What about SGL Carbon?  It would really be ironic if SGL

6  Carbon did what counsel says.  Remember that the Supreme

7  Court, on appeal of a decision coming out the 3rd Circuit in

8  Am Chem -- the Supreme Court specifically found that the

9  asbestos litigation system was an elephantine morass -- I

10 think the words were.  It was broken.  And it recognized that

11 it was broken.  The Supreme Court in Am Chem rejected Rule 23

12 settlement as a way out.  So we now have a problematic tort

13 litigation system in the State system, a Federal Rule, Rule

14 23, that is not available.  Bankruptcy look like the only

15 recourse.  Is what they're saying that the 3rd Circuit then

16 turned around and in asbestos, exactly the same context that

17 the Supreme Court was addressing, said, "Oh, bankruptcy's not

18 available either for asbestos mass torts"?  That would be

19 highly ironic.  It's not what they did.

20     Take a look in asbestos bankruptcy.  What are the major

21 features?  Thousands, or hundreds of thousands of claims.

22 Claim volume.  Payment of hundreds of millions of dollars.

23 We're still paying.  And all these things are true of Grace.

24 There's no issue about that.  You cannot manage the influx and

25 change in the flow of claims.  It threatens the company.  And

41

1    look what it's done with other companies.  Driven them under.

2    It's destroyed them.  For Grace, Chapter 11 was the only

3    alternative.  These are all of the record.  There are facts on

4    the record.  There is nothing that they have submitted that

5    says that they're wrong.

6         What does SGL say?  Well, SGL did not involve a mass

7    claim situation.  Indeed it contrasted, in one of the

8    footnotes that I can identify for the Court, a situation SGL

9    Carbon versus that in Dow Corning and H. Robins where there

10   were massive numbers of claims.  What about the payment of

11   dollars?  SGL Carbon hadn't paid a dime.  There'd been no

12   payment, no judgment.  The Court says it's premature.  It

13   ain't premature with us.  We're paying the money.  We paid the

14   money, and we're still paying the money.  SGL Carbon

15   litigation was under control.  Here it was not under control.

16   That spike is under control?  We can't control that spike.

17   With SGL Carbon the Court made the specific finding that there

18   was no threat to the enterprise.  Here, it's exactly the

19   opposite.  In contrast to our situation where Chapter 11, as

20   the Court has appreciated, is the only alternative.  There,

21   Chapter 11 was solely a tactical move.  These are completely

22   poles apart.  To say that we're under control and that we can

23   go and manage our situation, is -- wears blinders.  It's

24   unreal.

25        I want to point out one particular case in this process.

1   And I think that the Movant's here have focused on it because

2   they realize that it's a very similar situation.  And that's

3   the Dow Corning case.  They point out that in the case of Dow

4   Corning -- which is one of the cases that was identified here

5   -- see, even in Dow Corning, the company reported a loss in

6   1994, the year just before the Chapter 11 was filed.  Now, I

7   was lead counsel for the litigation involving Dow Corning

8   before the Chapter 11.  I represented the company in the

9   Chapter 11.  And it didn't strike me as strange because I went

10  back and got -- and checked.  It turns out, yes, there was a

11  loss of $6.8 million that year.  But the reason there was a

12  loss, as we'll see in a minute, is that they took an enormous

13  reserve that was designed to cover all their asbestos clients

14  for then and in the future.  What it didn't tell you was that

15  retained earnings that they had for the year were

16  $597,000,000.  This loss was no illustration of the company's

17  financial strength.

18      And, again, why was the reserve taken the year it was

19  taken?  Because they had a global settlement.  And that global

20  settlement had opt outs.  And what they did is they priced out

21  the global settlement and they priced out the opt outs and

22  they bumped the whole thing off at once.  And so you see the

23  implant reserve of 475,000,000 with a long term reserve at 1.9

24  billion.  And yet even with all of those reserves they took

25  that equity of $676,000,000.  How much cash did the company

1  have?  $201,000,000.  This was not a company that even when it

2  looked at its reserve was facing a big financial problem.

3  What they were facing was an enormous logistical management

4  problem.  We were successful in trying cases for Dow Corning.

5  And we realized that there was no way that we could keep

6  trying -- and I think the nearest counting in Texas alone, we

7  had 90 cases in separate file in a three month period in three

8  different Courts.  We just can't cut it.

9       If you take a look at Judge Specter's opinion on

10  estimation, 211 Bankruptcy 545, he specifically talks about

11  this.  He says, "Since many of the trial dates were

12  overlapping, the situation facing the Debtor was daunting.

13  According to the Debtor, the possibility of defending itself

14  on so many fronts simultaneously was financially and

15  logistically impossible.  Financially, the total cost to

16  litigate each of the pending trials would have been

17  staggering.  On the other hand, the Debtor was not willing to

18  succumb to what it thought were exorbitant settlement demands.

19  Logistically, the Debtor felt it simply could not muster the

20  manpower necessary effective to defend itself on so many

21  concurrent fronts, and therefore filed a Chapter 11."  That's

22  exactly what happened.  Exactly what happened here.

23          MR. SOBOL:  Briefly, Your Honor?

24          MR. BENTLEY:  Your Honor, the Equity Committee.  May

25  we be heard briefly?

1           THE COURT:  Yes, sir.  Would you enter your

2   appearance please?

3           MR. BENTLEY:  Yes, Your Honor.  Philip Bentley of the

4   Kramer, Levin firm on behalf of the Official Equity Committee.

5           THE CLERK:  Bentley?

6           MR. BENTLEY:  B-E-N-T-L-E-Y.  Your Honor, I'll be

7   very brief.  We -- the Equity Committee strongly supports the

8   Debtor's position here.  We filed a short pleading explaining

9   our views.  I won't repeat what Mr. Bernick has said, but I

10  think it may be helpful to add a brief comment on the SGL

11  case, where my firm was counsel for the Plaintiffs who

12  prevailed in the 3rd Circuit.  And I, in fact, argued the 3rd

13  Circuit appeal.  The SGL case, as has been pointed out, was

14  fundamentally different from this case.  And I would say it's

15  differences fall into three basic categories.  In the first

16  place, SGL had none of the unmanageability aspects that Your

17  Honor's very cognizant of here, and that Mr. Bernick has

18  spoken to.  SGL was essentially one suit.  It was a nationwide

19  class action in Philadelphia.  There were seven opt out suits.

20  But all but one of those were in the same Court as the MDL

21  class action.  So there was no argument ever advanced that it

22  could be handled more efficiently in bankruptcy, let alone

23  that the Debtor was completely beyond itself in trying to

24  handle the litigation.  There were no efficiency benefits of a

25  bankruptcy filing in SGL.

1    Second, in <u>SGL</u> there was no financial distress whatsoever
2    that the Debtor was facing before it filed bankruptcy.  The
3    Debtor wasn't losing customers or employees, and it wasn't as
4    Grace was here, facing any risk at all of a downgrade of its
5    credit or a possible loss of its credit facility.  Indeed, the
6    Debtor in <u>SGL</u>, the great bulk of its debt was either held by
7    its corporate parent -- this was a subsidiary of a very large,
8    very solvent German company -- or was guaranteed by the
9    corporate parent.  So, completely different situation.  They
10   didn't have a need in <u>SGL</u> to rely on the capital markets as
11   Grace does here.  And obviously that's a very big difference
12   because the capital markets can very easily get spooked, can
13   very easily get very concerned about massive mass tort
14   litigation.

15       One third and final fundamental difference between <u>SGL</u>
16   and this case.  In <u>SGL</u> there was no futures problem.  And as
17   the Court knows, as the judicial conference report spoke about
18   10 years ago, and as many others have commented, in mass tort
19   there's a fundamental issue of futures.  If the Debtor winds
20   up being rendered insolvent, futures can lose out altogether
21   outside of a bankruptcy.  And that's an issue that while we
22   don't think it will ever come to pass here, it's an issue that
23   was conceivable outside of bankruptcy in the W.R. Grace
24   situation.  The Plaintiffs, as we've heard, argue that Grace
25   is insolvent.  They argue that its assets aren't nearly enough

1  to satisfy all the claims against it.  And if there were not a
2  bankruptcy filing, then obviously the first Plaintiffs to the
3  pie, so to speak, the Plaintiffs who get settlements and who
4  recover judgments prior to the conceivable insolvency would be
5  paid in full, and later Claimants would be paid -- would have
6  much more trouble getting paid.  That is a problem that the
7  bankruptcy filing solves, and a very important point.
8       So to sum it up in a nutshell, and from the perspective
9  that I think was pivotal to the 3rd Circuit in SGL, the crux
10  of the 3rd Circuit's decision as I read it in SGL was that
11  there was no reason articulated by the Debtor there that it
12  couldn't have waited until the litigation had advanced
13  further.  Indeed, that it couldn't have waited until a
14  potentially huge judgment was entered against it in SGL, as
15  had happened in Texaco where there was a huge judgment and the
16  bankruptcy wasn't filed 'til a year after the judgment.
17  There, there was no reason put forward why the Debtor couldn't
18  have waited.  Here, of course, if the Debtor were to wait
19  there's the potential of the Debtor losing out, and of all the
20  Creditors losing out.  You have the unmanageability of the
21  litigation eating away at the Debtor's resources inexorably.
22  You have possibly dire effects on the Debtor's financial
23  situation, and its standing in the capital markets.  And you
24  have this enormously significant potential impact on future
25  Claimants.  All of those are present here.  Not one of them

47

1   was present in the <u>SGL</u> case.

2           THE COURT:  Thank you.

3           MR. BENTLEY:  Thank you, Your Honor.

4           MR. SOBOL:  Your Honor, Mr. Bernick points to, I

5   think, three sources of purported evidence for the financial

6   difficulties of W.R. Grace.  First, he points to a third

7   quarter 10-Q, 2000, of Grace for the notion that it

8   highlighted or anticipated difficulties down the road.  That's

9   terribly misleading.  What the 10-Q third quarter statement

10  said was that more time and experience and analysis is

11  required to determine whether the number of future claims may

12  be materially higher than current estimates.  And we need to -

13  - basically it says that we need to determine the impact this

14  would have on future cash flow and recorded liability for

15  future claims.  That's what it says in November of 2000.

16      What Mr. Bernick doesn't tell you is that in January --

17  excuse me -- yeah, in January, two months later, Grace did

18  just that.  It took a look at the new claims.  It made a new

19  reserve.  It anticipated the effect on cash flow and of its

20  overall reserve for asbestos-related liabilities.  And it

21  issued a report on January 29th giving a new estimate.  That

22  estimate, by the way, was less than two percent higher than

23  the prior year's overall reserve.  And in that estimate did

24  not indicate any significant future cash flow of Grace.

25      Second, Mr. Bernick points to the same January 29, 2001

1  press release for the notion that it in some way highlighted

2  the possibility of an inability to renew a $250,000,000 bank

3  facility.  What he doesn't tell you is that that bank facility

4  was renegotiated and renewed prior to the filing of the

5  Chapter 11.  And indeed it appears that it's the same D-I-P

6  financing that Grace got approved on day one of its bankruptcy

7  filing.  Therefore, although there might have been some

8  statement in late January of 2001 indicating that there might

9  be some theoretical difficulty to renew this bank facility in

10 the future, that never occurred.  And in fact, quite the

11 opposite occurred.

12    Third, Mr. Bernick points to statements in a declaration

13 filed contemporaneously with its Chapter 11 on April 2, 2001.

14 Now, Mr. Bernick and I both share this.  We both had forgotten

15 that that declaration had been filed, because Grace does not

16 mention it in its opposition to the Motion to Dismiss.  Had

17 they remembered it or thought it important, they would have

18 put it in their opposition.  But they didn't.  And had I

19 remembered it, I would have addressed it.  But I had not.

20 Nevertheless, the point is this.  The same exact kind of

21 conclusory allegations that are set forth in the declaration

22 that Mr. Bernick has now put before this Court, but which they

23 forgot in their opposition -- those same kind of conclusory

24 allegations were set forth in affidavits before the SGL Court.

25 And the SGL Court indicated that it is not sufficient to come

1    forward with such conclusory allegations, and reversed Judge

2    Farnan's findings of fact as clearly erroneous when based on

3    them.

4        Finally, I would remark that with respect to the

5    circumstances involving Dow Corning, I'm not aware of any

6    Motion to Dismiss in Dow Corning.  Therefore, I'm not aware of

7    this issue being aired as to whether or not it was appropriate

8    or not under the 3rd Circuit rule in Dow Corning to have that.

9    But, again, what Mr. Bernick points to are markedly different

10   circumstances that those that apply here.  He talks about how

11   defending itself was financially and logistically impossible.

12   Now, despite all of Grace's harangue about the tort system and

13   about the overwhelming nature of asbestos-related claims

14   against it, you can go to this chart, Your Honor, which is the

15   second to last document that I have in the materials I put

16   before you earlier.  This is a chart.  This is page nine from

17   the Debtor's consolidated reply that they filed a couple of

18   weeks ago.  The same chart had appeared in a document that was

19   submitted close to the time last November.

20       Grace's position is that the so-called overwhelming

21   spiking claims was a result of these 17 Plaintiffs' law firms.

22   Grace's position before this Court is that these 17 law firms

23   filed 22 frivolous asbestos-related claims -- excuse me --

24   22,000 frivolous asbestos-related claims.  They're able to

25   identify who the law firms are, how many claims they've filed,

1  how many claims have increased over the prior period of time.

2  It is hard to imagine if Grace can in the Court system

3  understand that these are the culprits who are filing the

4  frivolous cases, that the United States Courts, the States and

5  the Federal Courts can't adjudicated in some kind of

6  reasonable fashion the nature of those claims.

7      In other words, despite citations to _Am Chem_ and _Ortiz_ as

8  elephantine asbestos-related problems, or the quotes taken out

9  of context from numerous other jurisdictions, the Grace

10  situation ultimately is unique.  Not only is it a financially

11  healthy company, they admit they're managing their claims

12  well.  They can show the 17 law firms that they think are the

13  culprits.  And, nevertheless, they filed a Chapter 11

14  petition.  I would suggest, Your Honor, that if they can

15  identify who the increase in claims came from, that they're

16  probably well on their way to being able to manage them as

17  well.

18      THE COURT:  Well, I'm not sure how.  Just because you

19  can identify, to use your word, a culprit, doesn't mean that

20  you can stop that culprit from continuing to act in that kind

21  of a fashion.  Does it?

22      MR. SOBOL:  No, but then --

23      THE COURT:  What are they going to do?  Ask for an

24  injunction in every Court in the country against 17 firms from

25  filing what may be legitimate claims?

1           MR. SOBOL:   No, I don't think so, Your Honor.   But

2    what --

3           THE COURT:   I don't either.

4           MR. SOBOL:   No.   But what it does say is this.   That

5    Grace hasn't been able to come forward with evidence as to why

6    it is that the State and the Federal Courts where they've been

7    adjudicating these cases can't address issues of frivolous

8    claims or not.

9           THE COURT:   Oh, they very well may.   The problem is,

10   as I articulated earlier, you've got 50 states with

11   innumerable State Court actions.   And most of those states

12   having several Federal Court Districts in which those issues

13   have to take place.   There is no doubt in my mind -- and I

14   hope this record is sufficient to sustain it in the event that

15   there is an appeal -- that Grace has a management of claims

16   issue.   There's a management of claims issue on my own docket

17   in this case alone.   And I'm only the one Judge who's involved

18   in looking at the issues.   I can't for the life of me explain

19   or expect that Grace doesn't have a case management issue --

20   claims management issue with respect to the cases that it has

21   to defend against.   And I just can't understand where -- the

22   number of Plaintiffs' asbestos personal injury Claimants alone

23   against this Estate are so huge and being filed in every

24   jurisdiction and continuing to be filed, but for the stay in

25   this case -- how Grace could continue to manage its

52

1  operational business, let alone manage the claims against it.

2      The bankruptcy is the appropriate forum for bringing all

3  of those claims to a head, to protect the futures interests to

4  the extent that they're out there, and for looking at the

5  property damage -- the known property damage claims as well.

6  There is a funnel.  Congress decided that there was a funnel

7  for which Debtors, if they chose to elect it, could manage

8  claims litigation against them.  And this is it.  And I simply

9  do not see anything improper, abusive, or in bad faith about

10 the fact that a Debtor elects that forum.

11     I quite understand why the Circuit may have thought that

12 SGL was a bad faith filing.  Had I been faced with that case,

13 I probably would have found it to be a bad faith filing at the

14 outset.  There is no way that SGL is comparable to a situation

15 such as Grace where you're dealing with hundreds of thousands

16 of claims filed all across the country, and the kind of

17 management issues that is extant in this case.  It's just not

18 factually similar enough to have much weight in the context of

19 this case.  And that's not to say I disagree with the holding,

20 as I've already articulated.  I think SGL was correctly

21 decided by the Circuit, and would have found the same way if

22 I'd been asked to, which I wasn't.  But I don't think that it

23 applies in this case.  The facts are just simply totally

24 different.

25     With respect to the evidence, the affidavit -- or the

1  declaration of the general counsel is of record.  In addition,

2  I don't think there is a dispute of fact.  I've asked for it.

3  Nobody stood up to tell me that there are facts in dispute.

4  The facts that are undisputed alone indicates that there is

5  sufficient evidence of record before this Court to say that

6  this is a good faith bankruptcy filing.  And I am not going to

7  grant the Motion to Dismiss.  So for those reasons the motion

8  is denied.  Mr. Bernick, will you present me with an Order?

9  When can I expect -- or did we agree that it's gonna be within

10  a week after hearing?  Yes, we did.  Okay, thank you.  Pardon

11  me just one minute.

12          MR. BERNICK:  Sure.

13      (Pause in proceedings)

14          THE COURT:  Yes, sir.

15          MR. SPEIGHTS:  Your Honor, good morning.  My name is

16  Dan Speights.  And I co-chair the Asbestos Property Damage

17  Committee.  And I've been sitting in the corner not expecting

18  to address the Court today.  But I do want to correct one

19  innocent misstatement that was made during the argument, that

20  had nothing to do with your ruling, but has a lot to do with

21  something that will be before you apparently in April.

22          THE COURT:  All right.

23          MR. SPEIGHTS:  I represent the Anderson Memorial

24  Hospital, which is the South Carolina class action which

25  includes Zonolite claims.  And an innocent misstatement was

1  made.  Anderson was certified as a class action prior to the

2  bankruptcy.  And we will not be making a motion to certify

3  that class action before Your Honor.

4          THE COURT:  Okay.  As a property damage?

5          MR. SPEIGHTS:  As a property damage class action --

6          THE COURT:  All right.

7          MR. SPEIGHTS:  -- which includes both traditional

8  property damage claims and Zonolite Attic Insulation and

9  Masonry Field.

10         THE COURT:  All right.

11         MR. SPEIGHTS:  And I'm sure Mr. Sobol just didn't

12  know that.  I'm not trying to get in this dispute right now.

13  I just --

14         THE COURT:  Okay.

15         MR. SPEIGHTS:  I just wanted --

16         THE COURT:  He may have said that, and I may have

17  misunderstood.  But I appreciate the correction.  Thank you.

18         MR. SPEIGHTS:  Thank you, Your Honor.

19         MR. DIES:  Your Honor, likewise, my name is Martin

20  Dies.  I'm on the Property Damage Committee, and I'm class

21  counsel for a State Court class action pending in Texas called

22  Orange County vs. W.R. Grace.  I don't think this is a

23  conflict.  But since Your Honor requested clarification,

24  encompassed in the class definition in the Orange County case

25  are the Meculite Fill and claims dealing with public, private,

1  and commercial buildings, not private residences.  So I don't

2  think there's a conflict.

3          THE COURT:  Okay.

4          MR. DIES:  But just to clarify.

5          THE COURT:  Yes, thank you.

6          MR. DIES:  Thank you.

7          THE COURT:  Okay, Mr. Bernick.

8          MR. BERNICK:  Yes.  Turning to the Motion for the

9  Case Management Order, which I believe is the next matter up

10 for discussion.  I want to begin by making sure that the Court

11 has the same reading of the status of the paperwork as we do,

12 because I know it's not been probably the easiest thing to get

13 through.  At the Court's direction we separated the personal

14 injury case management motion from the case management motion

15 with respect to other claims.  And we now, therefore, have two

16 case management motions.  And we filed the personal injury

17 motion with the Court for transfer to Judge Wolin.  We also at

18 the same time filed a new case management order with respect

19 to the non-PI claims.  That is it's not only separate, but

20 it's a little bit different because some of the dates that we

21 had in our original motion were obviously not gonna be met.

22         THE COURT:  Yeah.

23         MR. BERNICK:  So I wanted to make sure that the Court

24 was alerted to that.  The underlying notice bar date and claim

25 form materials did not change in any significant degree.  Nor

1  did we, in those materials, separate out personal injury from

2  non-personal injury.  And the reason that we didn't is that

3  there's still some prospect, I suppose, that everything could

4  go all out at once.  We can easily do that.  But I want to

5  make sure that the Court is clear we haven't done it yet.  And

6  therefore --

7          THE COURT:  Yes, I understand that.  I saw in your

8  motion that will be transferred to Judge Wolin and the one

9  that I'm going to be hearing, that the Debtor is hoping that

10  we can get both of those notices out in whatever fashion at

11  the same time to eliminate some of the expense.  And I'm

12  certainly willing to discuss that with Judge Wolin.  If there

13  is a way we can do it, I'm sure we will.  I just don't know

14  what his view is going to be about sending out notice on the

15  personal injury side.

16          MR. BERNICK:  Right.

17          THE COURT:  I do know what my view is about sending

18  notice out on the rest of the sides.

19          MR. BERNICK:  Right.

20          THE COURT:  And I think we need to do that.  So --

21          MR. BERNICK:  Right.  And --

22          MR. BAENA:  Your Honor, if I may, on that?

23          THE COURT:  Yes, sir.

24          MR. BAENA:  Scott Baena on behalf of the Property

25  Damage Committee.  Your Honor, in regard to your last comment,

1    and in regard to an allusion that Mr. Bernick made earlier

2    about the fraudulent transfer hearing last week, I think it is

3    important at this point for us to focus on what is happening

4    in these various Courts in respect of these various matters,

5    and how it affects what we were supposed to be doing today.

6    Candidly, I'm not quite sure.  But I want to air it with the

7    Court.  We did indeed have a hearing in front of -- or a

8    meeting, I should say, in front of Judge Wolin on Wednesday of

9    last week to discuss the fraudulent transfer cases.  And the

10   Defendants, the putative Defendants in those lawsuits, counsel

11   for the Committees, as well as the Debtor were represented at

12   that meeting.

13       Two very important things, I think, occurred at that

14   hearing which may be implicated by what we're about to do

15   here.  The first is that Judge Wolin authorized the two

16   Asbestos Committees to prosecute those causes of action.  And

17   the second thing he did was to bifurcate two issues from the

18   entire case or claims engendering fraudulent transfer.  He

19   bifurcated the claim that the Debtors were insolvent at the

20   time of the transfers, which as Mr. Bernick alluded to was

21   1996 and 1998.  And in addition, he bifurcated the issue of

22   reasonably equivalent value.  And he said he will try those

23   matters on September 30th.  And indeed based upon the

24   structure that he set in place, the motions -- or the case

25   management orders that he anticipates us providing him, he

1  very much impressed upon me that he will be trying those

2  issues on September 30th.

3      The significance of all of that, I think, is that because

4  insolvency again as alluded to by Mr. Bernick very definitely

5  involves the quantification of asbestos liabilities at the

6  dates of the transfers which we intend to contest, it will

7  entail an estimation of those liabilities at those transfer

8  dates.  So while we've been laboring under the assumption from

9  time to time that PV is here, PI is in front of Judge Wolin,

10  his ruling very, very much makes it clear to me that at least

11  in respect to the fraudulent transfer cases the notion of the

12  value of property damage claims at the transfer dates is

13  before him.  Because he's going to determine that in the

14  context of the fraudulent transfer cases.

15      THE COURT:  Well, as of the dates of the transfers,

16  yes.  But the case was filed two years later.  So I mean

17  that --

18      MR. BAENA:  Understood.

19      THE COURT:  -- may have some relevance, but it's

20  certainly not going to be the means all and end all.

21      MR. BAENA:  It isn't a mean all and end all, for

22  sure.  And indeed we would object to any such significance

23  being attached to it.  But, I think it does conceivably

24  engender the starting place for the determination of asbestos

25  property damage claims.  And while it --

1    THE COURT:   I'm confused.  At the moment, I think

2   what is before me is trying to figure out what type of notice,

3   if any, ought to go out, and setting dates for bar dates for

4   people to file claims.   I'm not being asked at this point to

5   determine whether the Debtor was insolvent, how much money the

6   Debtor might have to put into a plan to meet the liquidation

7   alternative test, what Claimants are entitled to share in the

8   distribution scheme, and in what levels, or at this point in

9   time anything to do with proof of the claims.   I'm only at

10   this point trying to get the claims filed.

11    MR. BERNICK:   Your Honor, just to be clear, I'm sure

12   that Scott wanted a chance to stand up and respond and inform

13   the Court if he wants to.   But what happened with the

14   fraudulent conveyance has almost nothing to do with the

15   business that's here before the Court, except only from a

16   timing point of view, which is Judge Wolin's obviously anxious

17   to get the matter resolved.   He has explicitly said -- he has

18   said to us that he understands that the question of whether

19   there was an estimate, and whether the estimate was reasonable

20   as of 1998 and 1996 for fraudulent conveyance purposes is

21   different from the question of what now is the actual

22   liability of the Debtor for all these different claims.   I

23   mean he has said that -- he went through this same issue in

24   connection with the trial on the fraudulent conveyance claim

25   in Babcock.   There was an estimation that was narrowed down

1  too for the purpose of determining fraudulent conveyance.  So

2  if -- we can proceed on and talk a little bit about the

3  program that we're proposing, to see if there are issues on

4  that item.

5           THE COURT:  Okay.  Well let me hear Mr. Baena's

6  second point first.  But I'm only confused because I don't

7  think that that's gonna adversely impact the issue about

8  setting a bar date.  But pardon me one minute.

9       (Pause in proceedings)

10          THE COURT:  I'm sorry.

11          MR. BAENA:  Your Honor, as part of the case

12 management proposal that the Debtor has before you, there is

13 in addition to a bar date, a proof of claim form and a

14 notification program.

15          THE COURT:  Right.

16          MR. BAENA:  There is a proposal that we roll out for

17 a couple of years a litigation process to deal with the

18 valuation of property damage claims.  And while we strenuously

19 object to the entire notion of using this Bankruptcy Court to

20 litigate the property damage claims, especially given the

21 existence of 524(G), we would also observe that as a practical

22 matter getting into those kinds of issues today or before

23 September 30th would seem to me to be inappropriate.

24          THE COURT:  Well, the issue of where anything is

25 going to be litigated, if it ever has to get to litigation, I

1  don't think is something I need to determine today.  If it's

2  necessary to get into the Debtor's structure versus the Bank's

3  structure versus anybody else's proposed structure for how to

4  handle a schedule of litigation, I guess we can do that.  My

5  concern right now is I want to get the notices out to the

6  entities who are entitled to notice of the bankruptcy filing

7  and a bar date.  And I want to get the claims filed of record

8  so that we can start the pieces rolling that do need to be

9  litigated.  Whether they're litigated here or elsewhere, at

10 this point in time I think is meaningless.  I mean what we

11 need to do is get the basic information filed so the parties

12 can decide if they're gonna litigate.

13      Mr. Baena, I've tried to use, you know, the C word --

14 compromise, in this case very regularly.  I hope that this is

15 going to be a consensual plan.  I am going to do everything in

16 my very limited powers to drive you folks to getting a

17 consensual plan together.  The first piece that I need, and I

18 think you need, is to get the claims filed of record.  Let's

19 get the claims in, and then fight about what to do with them.

20      MR. BAENA:  We'll argue about the value of the

21 claims, depending upon what sort of things you require in a

22 moment.  All I raise, Judge, is there continues to be this

23 confusion between the various roles of the various Courts.

24      THE COURT:  Well I'm --

25      MR. BAENA:  I wanted to --

1              THE COURT:  -- not confused.  And I don't think Judge

2    Wolin's confused.

3              MR. BAENA:  Well I doubt that any of you are

4    confused.  I do want to point out, and I'm sure I demonstrate

5    it all the time, my continuous confusion about what we're all

6    doing in these various Courts.  And I --

7              THE COURT:  Well that's --

8              MR. BAENA:  -- apologize for that.

9              THE COURT:  -- a different issue.  What you're doing

10   -- I mean what all of you are doing I find very confusing.

11   But I don't find what Judge Wolin is doing to be confusing.

12   And I know what I'm doing.  And I don't --

13             MR. BAENA:  Okay.

14             THE COURT:  -- find it to be confusing either.  So --

15             MR. BAENA:  I appreciate that.  And I would also say

16   that for what it is worth -- and I am just conveying

17   information.  But like most messengers I'm getting shot.  What

18   I'm also --

19             THE COURT:  It's soft bullets, Mr. Baena.

20             MR. BAENA:  I -- excuse me?

21             THE COURT:  It's soft bullets.

22             MR. BAENA:  Oh, okay.

23             THE COURT:  Okay.

24             MR. BAENA:  They use those when there are riots,

25   Judge.  And I don't intend to riot in this room.

1        (Laughter)

2        MR. BAENA:  There's one other thing that I thought I

3   would apprise the Court of.  And that is that Judge Wolin has

4   not set a hearing on the personal injury side of this motion

5   which, as Mr. Bernick points out, is -- you know, contains the

6   same features as the property damage.

7        THE COURT:  Yes, I'm sure he hasn't done that because

8   I haven't transferred it to him yet.  I wanted to get through

9   today's hearing before I do, because it seems to me that if we

10  can work out dates that make sense with respect to these other

11  issues, he may like the benefit of that information.  So

12  that's -- I'm waiting until today's hearing is finished.  I

13  will transfer that piece to him when I get back to Pittsburgh.

14       MR. BAENA:  Okay.  Having survived the soft bullets,

15  Judge, I'm gonna sit down now.

16       THE COURT:  All right.

17       MR. BAENA:  Thank you.

18       THE COURT:  Mr. Bernick?

19       MR. BERNICK:  I think on the question of linkage, our

20  view is that if they can go out together without delaying

21  everything, that's probably more attractive from a cost point

22  of view.  At the same time, we don't know that it's worth it

23  if it means that both sides of the slip -- that is we're

24  anxious to proceed and to resolve some of these other issues.

25  And we want to get a bar date and notice process under way

1   with respect to the non-PI claims as soon as we possibly can.

2   And there may be some additional reasons why it doesn't make

3   sense to do the bar date for the PI claims.  Right now those

4   matters can be taken up before Judge Wolin.  I was trying to

5   get through the paperwork before I got to the argument here.

6   One of the pieces of paperwork is that we have filed a

7   proposed claim form for the medical monitoring claims as well.

8   We just did that last week.  That's not up for determination

9   this morning.  But I did want to alert the Court to that.  My

10  hope is that we can get some agreement on the content of the

11  form so that maybe it can be just wrapped into the program

12  without the necessity of raising it at the next hearing.

13  Maybe we'll get one of those issues where there is consent.

14  And we'll certainly work hard to get there.  If we can't get

15  there, then we'll raise it at the next hearing, which I don't

16  think is very far down the road anyhow.

17          THE COURT:  All right.  Well, it may make sense if we

18  try to identify what issues are uncontested and what issues

19  are --

20          MR. BERNICK:  Right.

21          THE COURT:  -- contested, and then get to the claim

22  forms themselves if that's appropriate.  Maybe someone has a

23  better structure in mind.

24          MR. BERNICK:  No, I think that that's fine.  I think

25  that when it comes to the issues, we're first of all talking

65

1   about property damage.  And then we've got the ZAI.  With
2   regard --
3           MR. BAENA:  If I can just interrupt.  I'm sorry.
4   When we were last here, it wasn't clear whether medical
5   monitoring was in this Court or --
6           THE COURT:  It's here.
7           MR. BAENA:  -- Judge Wolin's.
8           THE COURT:  It is here.
9           MR. BAENA:  Okay.  Thank you.  Sorry.
10          MR. BERNICK:  With respect to property damage, I
11  think that the way that the issue sorts out in terms of why
12  it's being done is very simple.  And the answer is -- at least
13  we can see it on paper.  This indicates this is not a
14  situation where it's new litigation.  It's very old
15  litigation.  And a key fact from our point of view is that we
16  believe it's been resolved, an awful lot of money has been
17  paid and a lot of cases that have settled, dismissed, and a
18  small number have been tried, or they can now hopefully be
19  tried.  So the bottom line is that if you take a look at the
20  number of pending cases, we're now down to only seven pending
21  cases.  And as to the number of new cases filed, there was a
22  whole period of time in the last few years when we didn't have
23  any cases filed at all.  There is one that was filed in 2001,
24  just before the Chandler case.  The basic fact is that we
25  believe that this litigation is over.  We've got seven cases

1   and we've reserved on the seven cases.  And if we're only here

2   to talk about the seven cases, we can probably resolve the

3   seven cases.  The question is, what else is out there?

4       We feel that the only way to get there is to have a bar

5   date and have a process set up whereby if there are additional

6   claims we get the information right up front with the special

7   claim forms.  And we will then be able to resolve what the

8   value is, if any, of those additional claims.  The only answer

9   that I have heard with respect to this proposal is essentially

10  the contention that, "Gee, why do we have to do this now?  Why

11  not simply liquidate the value of all the property claims into

12  trusts?"  And I think that that's one of the issues that's

13  raised by the briefs.  And they point to the <u>Celetex</u> case

14  where apparently all the issues concerning the validity of

15  property damage claims were resolved in the trusts.  The

16  problem, of course, is that this assumes that there's

17  agreement between the parties on what the value or scope of

18  the liability is, so you can then go forward and negotiate a

19  plan of reorganization and set aside enough money to pay all

20  those claims.  But we don't have it.  We believe that this

21  litigation is over.  Apparently they do not.

22      So they say, "Well, instead of doing -- instead of trying

23  to determine what that value is in this fashion, why don't we

24  have some kind of estimation?"  But, again, the problem is

25  going to be the same.  We're going to say that the estimated

1   value, based upon the trend that's here is we don't think

2   there are any more claims.  We believe the claims that are

3   there may be subject to very important special defenses.  So

4   estimation simply will be a disputed process were it to occur.

5   And the key issues that will drive that estimation are the

6   very matters that we seek to get control over to the bar date

7   process.  That is who are the Claimants, how many claims are

8   there, and are they subject to these special defenses?  So no

9   matter which way you get it, unless there were to be an

10  agreement on a total sum of money that would represent the

11  liability for those claims, we can't afford to sit there and

12  say, "Well, let's do it later."  And we can't afford to simply

13  go into estimation.  We need to find out who the Claimants

14  are, and the nature of the claims.

15      I'll point out to the Court that in <u>Celetex</u> where they

16  didn't do it, there was no agreement with respect to the value

17  of the property damage claims.  This is a page of a disclosure

18  statement from the <u>Celetex</u> case.  And it says that the

19  property damage was set at $1,000,000,000.  And then you look

20  at the footnote, though.  It turns out that the Committee

21  believes that this amount is higher.  There was no agreement

22  on what the estimation was.  What happened when they finally

23  consummated the plan and they started the trust up and they

24  started to present all these property damage claims?  Well, a

25  huge fight broke out about which claims were valid and which

1  claims were invalid.  Here's just an excerpt that gives you a

2  flavor of how striking this has become.  There's a Motion to

3  Compel in the <u>Celetex</u> case.  Property Damage Advisory

4  Committee files a Motion to Compel, seeking an Order directing

5  the trust to pay certain asbestos property claims.  These are

6  certain PD claims.

7       What does the Trust say by way of its comment?  "The

8  Trust unequivocally and categorically disputes and denies the

9  outrageous accusations and innuendo of bias in the Motion to

10 Compel.  The Trust has fairly and judiciously administered the

11 Trust.  The PD Advisory Committee continues to urge that the

12 Trust must blindly pay every claim submitted to the Trust for

13 payment.  Refuse to yield to persistent, self-serving" --

14 obviously people feel very strongly that there's a real issue

15 about what the valid claims are.  But the <u>Celetex</u>'s do

16 nothing, wait until later approach does not advance the cause.

17 And we would strongly urge that that approach not be adopted

18 here.

19            THE COURT:  Mr. Bernick --

20            MR. BERNICK:  We believe that we've got to --

21            THE COURT:  I'm sorry.

22            MR. BERNICK:  Sure.

23            THE COURT:  Go ahead.

24            MR. BERNICK:  We've got to get the number of claims

25 and find out some basic information about them.

1           THE COURT:  When you're talking property damage,

2   you're talking public buildings --

3           MR. BERNICK:  Yes.

4           THE COURT:  -- essentially -- non-residence.

5           MR. BERNICK:  I'm sorry, yes.

6           THE COURT:  Correct?

7           MR. BERNICK:  The traditional public building kinds

8   of cases.  That's correct.  Office building cases.

9           THE COURT:  All right.  And the Debtor at this point

10  thinks that except for the seven that are remaining, there are

11  no others out there.  But what you want to do is identify the

12  universe.

13          MR. BERNICK:  Yeah.  We want to constrain the

14  universe and then get basic information so that if there are

15  some more that come in, we know how amenable they're gonna be

16  to a statute of limitations defense or to a product risk

17  defense.

18          THE COURT:  All right.

19          MR. BERNICK:  And we'll litigate those issues.

20          THE COURT:  Well with respect to the first issue --

21          MR. BERNICK:  Yes.

22          THE COURT:  -- identifying the universe --

23          MR. BERNICK:  Yes.

24          THE COURT:  -- I agree the Debtor needs to identify

25  the universe.

1          MR. BERNICK:  Right.

2          THE COURT:  So to the extent that there is an

3 objection to the contrary, it's overruled.  I think the

4 Bankruptcy Code itself requires the Debtor to identify the

5 universe in order to deal appropriately with all Creditors who

6 will be entitled to a distribution from the same class.  And

7 to the extent that a Creditor chooses not to file a claim,

8 then, you know, if the Debtor has a discharge and nothing's

9 paid, that's the way it will be.

10          MR. BERNICK:  Right.

11          THE COURT:  So with respect to the identification,

12 yes.  A proof of claim bar date must be set.  The question now

13 is, do we look at the proof of claim form the Debtor proposes

14 and see whether or not there are objections to it?  Or --

15          MR. BERNICK:  Well, I --

16          THE COURT:  -- where do you want to go from there?

17          MR. BERNICK:  Yeah, I think we can go in that

18 direction, and then maybe take up the Zonolite, which is a

19 separate issue.  Because I believe that the Zonolite people

20 object to the notice program.  The traditional property people

21 I don't believe have interposed an objection from those

22 programs.

23          MR. BAENA:  Yes, we have.

24          MR. BERNICK:  Well I guess so.  They didn't have any

25 witnesses, so we made the assumption that they didn't.  But

1  the -- on the property claim forms I think that they have

2  objections that the questions are too burdensome.  So if they

3  want to go through those objections, we can respond.

4          THE COURT:  All right.  Where are they in the binders

5  now?

6          MR. BERNICK:  The property damage claims are Exhibit

7  G and H in the original consolidated reply brief.  Exhibit G

8  is the property damage claim, traditional property.  And

9  Exhibit H --

10         THE COURT:  Which number on the binders?

11         MR. BERNICK:  These are number -- it's the

12  consolidated reply.  I don't know which --

13         THE COURT:  Is this in 11?

14         MR. BERNICK:  Yes.

15     (Pause in proceedings)

16         MR. BERNICK:  If Your Honor would like one, I can

17  just hand it up to you.

18         THE COURT:  Oh, that would be much easier.

19         MR. BERNICK:  I brought one along.

20         THE COURT:  Oh, thank you very much.  Oh, perfect,

21  thank you.  All right, let's look first at the asbestos

22  property damage proof of claim form.  Do we all have the same

23  document for the traditional, not Zonolite claims, Mr. Baena?

24         MR. BAENA:  Yes, we have the document.

25         THE COURT:  All right.  Would you like to address it?

1        MR. BAENA:  Yes, I would.  May it please the Court,

2   first let me just make sure the Court is well aware of the

3   property damage constituency that we represent.  We actually

4   view it as having two components.  The first is Zonolite,

5   which you've heard so much about and we'll hear more about.

6   And the second is what we refer to as traditional property

7   damage.  Traditional property damage claims, I would define,

8   Judge, as everything other than Zonolite Attic Insulation

9   claims.  And, therefore, it may include residential claims,

10  but for products other than Zonolite Attic Insulation.

11        THE COURT:  Okay.

12        MR. BAENA:  The Anderson Memorial class action, as a

13  matter of fact, includes residences in South Carolina for

14  other product.  And in terms of the product, the principal

15  product that engendered most of the litigation, but not by any

16  means the only product that contained either manufactured or

17  naturally occurring asbestos was Monokote-3.  There were

18  numerous other products that Grace manufactured over the years

19  that included asbestos that was added -- manufactured asbestos

20  that was added, or which had naturally occurring asbestos in

21  that product, similar to the naturally occurring asbestos

22  problem with the Zonolite Attic Insulation.  So there's a vast

23  array of products out there.  And there are numerous types of

24  claims.  And we continue to believe that there is an enormous

25  amount of property damage liability that is confronting this

1  Debtor.   Indeed, I would only point out, Your Honor, that

2  while the Debtor continuously refers to only seven pending

3  lawsuits, some of those lawsuits cover every building in the

4  State in which the lawsuit was filed.

5          THE COURT:  Well, that's okay.  The point is we need

6  to identify the claims.

7          MR. BAENA:  Right.

8          THE COURT:  You've convinced me.

9          MR. BAENA:  Right.

10          THE COURT:  We need to identify the claims.

11          MR. BAENA:  Right.

12          THE COURT:  So let's get to how to do it.

13          MR. BAENA:  Okay.  I just don't want there to be a

14  misapprehension about the size of the claims.

15          THE COURT:  I'm not misapprehending --

16          MR. BAENA:  Okay.

17          THE COURT:  -- the size of this case.  I assure you.

18  To the extent that my rulings on the Motion to Dismiss were

19  not clear, I'm not misapprehending the size.

20          MR. BAENA:  Okay.  In terms of the proof of claim

21  form itself, Your Honor, I think the threshold issue is what

22  philosophy are we going to apply to the proof of claim form?

23  What importance are we going to attach to it?  If the proof of

24  claim form is merely to identify people who can participate in

25  this proceeding, the nature of the proof of claim form becomes

1   a very simple matter for us to deal with.  It merely only has

2   to identify the players.  On the other hand, if the proof of

3   claim form is somehow going to be used to value the amount of

4   the claims, the process becomes far more cumbersome.  And in

5   our humble judgment, it becomes impossible for Claimants to

6   clear all of the hurdles that would necessarily be entailed by

7   preparing and submitting a proof of claim that quantifies the

8   value of their claims against the Estate.

9       The Debtor actually takes a position somewhere in

10  between.  The proof of claim form that the Debtor has

11  propounded does not quantify or even enable somebody to

12  quantify the value of the claims that it's confronted by,

13  although Mr. Bernick says they're very interested in knowing

14  that information.  And it isn't on the other end of the

15  spectrum, a proof of claim form that merely identifies people

16  with claims.  Rather, it is a litigation device which is

17  designed with one function, and one function only in mind.

18  And that is to determine what defenses the Debtor could

19  utilize to defeat property damage claims generally, and those

20  claims specifically.  They really only seek information in

21  respect of two things from their proof of claim forms.  They

22  only seek to find out whether statute of limitations is

23  applicable, and whether the claim itself is barred by some

24  other notion of preclusive theory of law.

25      As the Court is well aware, a proof of claim form isn't

1  designed to do any more than identify the people involved in

2  the case.  And we're aware and cognizant of that requirement

3  in this case.

4          THE COURT:  Well, it's also designed to make the

5  person attach the documents that support the claim, and to

6  provide some evidence as to the value of the claim.  So if you

7  want to go back to the specific purposes --

8          MR. BAENA:  Well --

9          THE COURT:  -- we could get there.

10         MR. BAENA:  Well, let me suggest to you, Judge, while

11  you might view that to be a purpose of a proof of claim in

12  other cases -- and that's not always the case, there are

13  exceptions to that -- it certainly isn't the case in this kind

14  of case -- in an asbestos case.  Because indeed under Section

15  524(G) the determination and the payment of those claims is

16  deferred to a trust.

17         THE COURT:  Yes, but the estimation of whether the

18  Debtor has sufficient resources to fund it is left right here.

19  And without some evidence of what that estimation is going to

20  encompass, I have no means of determining whether the Debtor

21  has satisfied its burdens under 524 or any other provision of

22  the Code.  So we need some estimate of value.

23         MR. BAENA:  Judge, respectfully, in every other case

24  that information wasn't required.  And the estimation was

25  performed.  And despite what counsel says, those cases that

1 have had trouble, haven't had trouble because of their

2 inability to define the universe of those claims.  <u>Celetex</u> is

3 not a case that's in extremis because they didn't know the

4 value of the claims.  <u>Celetex</u> is a case in extremis because of

5 the funding mechanism not being there from the first day.

6 　　　　　THE COURT:  Well, I agree, Mr. Baena, you can get the

7 estimation in any number of ways.  But it seems to me that the

8 simplest and most efficient way, particularly where at least

9 in the Debtor's view it's not expecting a large universe of

10 claims to come in on the property damage side, is to have the

11 entity that files the claim list what it thinks the Debtor's

12 liability to it is, and for what product.

13 　　　　　MR. BAENA:  Judge, surely it could be for what

14 product.  In terms of what the amount of their claim is

15 depends upon what actions that have been taken or not yet

16 taken in respect of the claim.

17 　　　　　THE COURT:  Then it can state that.

18 　　　　　MR. BAENA:  But they're all unliquidated at this

19 point in time, Judge.

20 　　　　　THE COURT:  Yes, of course they are.

21 　　　　　MR. BAENA:  And there is not necessarily any present

22 ability to liquidate the value of those claims.

23 　　　　　THE COURT:  Well, I don't know about whether there is

24 a present ability or not, because I don't know what the claims

25 are.

1    MR. BAENA:  Well, Judge, just by way of example, in

2 Celetex, since that's the example that was used -- in Celetex

3 the claims process that enabled the allowance and disallowance

4 of claims took two years after confirmation of the bankruptcy

5 proceeding.

6    THE COURT:  Right.  That's part of the problem.

7    MR. BAENA:  That may be part of the problem, but --

8    THE COURT:  Which is one reason why it wasn't a good

9 idea to do it that way.  So maybe we should try something

10 different.

11    MR. BAENA:  Well, Judge, I'm up for innovation.  I

12 agree with you.  But I must say that if the innovation is to

13 require individual building owners to provide the sort of

14 information that you will need to actually determine the value

15 of their claims, there won't be enough time that we could

16 provide to them to do that.

17    THE COURT:  Well, why don't we go through the proof

18 of claim form itself and see what is objectionable and what

19 your suggestions are to make it unobjectionable?  Let's do it

20 that way.

21    MR. BAENA:  Well, Judge, I can make that real easy.

22 I think they need to do any more than identify who the

23 Claimant is, and the nature of their claim against the Estate,

24 for what products.  That's it.

25    THE COURT:  Well, the nature of the claim, the

1   location of the building -- or I suppose it's going to be a

2   building or other area that may have been adversely impacted,

3   I suppose --

4             MR. BAENA:   There is a --

5             THE COURT:   -- by asbestos.

6             MR. BAENA:   There is a digression though in respect

7   of that analysis.  Firstly, Judge, in other cases, although we

8   may not want to do what they did, a building by building

9   analysis at the proof of claim level was not required.

10            THE COURT:   Well, I'm not -- I don't know what you

11  mean by "analysis".  If you're saying that a Claimant has to

12  identify which building they contain --

13            MR. BAENA:   Yes.

14            THE COURT:   -- they allege contains damages --

15            MR. BAENA:   They --

16            THE COURT:   -- that's absolutely critical

17  information.  Because how else can the Debtor tell whether or

18  not the same Claimant is filing duplicate proofs of claims?

19  You've got to at least know that you have an asset that you

20  claim was damaged by conduct or property of the Debtor.

21            MR. BAENA:   The problem is, Judge, that so many

22  buildings are encompassed by class actions or group claims

23  that the amount of information is not available on an

24  individual basis.  I presume we're going to move eventually in

25  this hearing to the issue of proof of claims by --

1      THE COURT:  Yes.

2      MR. BAENA:  -- classes.  Certainly what the Debtor is

3  proposing is that even in respect to certified classes,

4  individual members of the class provide a proof of claim.

5  That undermines the whole notion of the class --

6      THE COURT:  Well, it does.

7      MR. BAENA:  -- in the first instance.

8      THE COURT:  I think it does.  So --

9      MR. BAENA:  So if we're not gonna require, as to the

10  vast majority of building owners, that information because

11  they're in a class, how is it fair to require that information

12  as to multi-building owners?

13      THE COURT:  Because if you own a building and you

14  contend that it was damaged, and as a result you are entitled

15  to a claim, you identify a building.  If you own two buildings

16  and you contend that one, but not both of them was identified,

17  you identify the building that was damaged.  If you own a

18  whole slew of buildings, the same analysis applies.  I don't

19  understand how you can present a claim against an Estate and

20  not know what property it is that you claim to have a property

21  damage claim for.

22      MR. BAENA:  It's because of the nature of the

23  Debtor's business, Judge.  And it's also relevant in this

24  context that the damage that you refer to doesn't occur in

25  most jurisdictions under applicable law until there's

1  contamination.  Now, people have installed Monokote-3 or some

2  other product in their building, and it has not yet released

3  fires.

4           THE COURT:  Okay.

5           MR. BAENA:  Well, how do you identify the value of

6  your claim in that context?

7           THE COURT:  That's their problem, isn't it?  That's

8  what they have to do as a Claimant against the Bankruptcy

9  Estate.  That problem isn't any different for people with

10  asbestos property damage claims as it is to anybody else.  I

11  mean an architect may be subject to liability because the

12  architect did something improper.  And everybody knows it's

13  improper, but the building hasn't fallen down yet so you don't

14  know what it's gonna cost to rebuild it.  You get an estimate.

15  You do what everybody else does in a similar circumstance.  It

16  may be difficult because of the universe of use of asbestos.

17  That may be the problem.  But the situation in terms of

18  proving a claim isn't any different in this case than it is in

19  any other situation.  It may be more difficult because of some

20  circumstances, but it's still the Claimant's burden.  You

21  don't get an allowed claim against an Estate unless you prove

22  it.

23           MR. BAENA:  Exactly, Judge.

24           THE COURT:  Okay.

25           MR. BAENA:  And my point is nor are you going to be

1  asked to allow those claims.  Those claims will be allowed or

2  disallowed in another part of the process.

3        THE COURT:  Maybe, maybe not.  I have to estimate

4  them.  In order to meet the confirmation standards, somebody

5  has to show me what the hopefully close to accurate estimation

6  of these claims will be so that I know whether the Debtor has

7  funded appropriately to pay those claims once they are

8  allowed.  So however you slice it, I need the same

9  information.  And so do you.

10        MR. BAENA:  I understand that it's part of the

11  feasibility issue in this case.  I understand that.  The

12  question is, how and when do you address it?

13        THE COURT:  Right.  That's what I said.  Let's go to

14  the proof of claim form.  We're running out of time.  We have

15  like 20 minutes to get through this issue.  And we're arguing

16  about nothing at the moment, because I've already said we're

17  gonna have a proof of claim form.  So let's go to the merits

18  of what the claim form is.

19        MR. BERNICK:  Your Honor, can I make a suggestion?

20  This claim form has been out there in pretty much its current

21  form.  It was slightly modified in November, but it was out

22  for the last year.  And I would have thought that by the time

23  the briefs got filed, and they were very particular on if

24  there's a particular question that's problematic, let's take

25  it out.  There's no such thing.  There's a generalized

1    statement about burden.  I can take Your Honor through this

2    form in about three minutes.  And you'll see the nature of the

3    questions that are being asked and whether there's some reason

4    why a particular Claimant wouldn't have that information.

5    Maybe that's something we can take up.  But I'm very mindful

6    of the passage of time, and the need to talk about the

7    Zonolite Attic issue as well.  And maybe to expedite things we

8    could go through the form right here and you can see what it

9    is.

10            THE COURT:  That's what I've been suggesting for 20

11    minutes.

12            MR. BERNICK:  Right.  The first obviously part --

13    very first part, part one, is the claiming party.  Part two is

14    information about claiming party's attorney.  Part three is --

15            MR. BAENA:  Let me stop you.  The information in

16    respect of a building owner ought not -- should not include

17    things such as a social security number.  In another case, I

18    believe Babcock and Wilcox, that information was found to be

19    invasive and unnecessary.

20            THE COURT:  Well, if somebody objects to setting out

21    a social security number, I suppose they can say, "I object,"

22    and not set it out.  The problem still is you have the same

23    issue with respect to identifying duplicate claims.  And that

24    is a good tool to use.  I'm not trying to invade somebody's

25    Constitutional rights.  And I don't want to set out a social

1  security number.  Okay.  Maybe we can agree that the last four

2  digits of the social security number should be stated.

3          MR. BERNICK:  The real property for which the claim

4  is being asserted is the address, when did you buy it, what's

5  the property used for, how many floors does it have, square

6  footage, when was it built, what's the structural support,

7  have there been any interior renovations.  And you have to

8  then describe them.  Then asked to make -- to specify the

9  different kinds of claims.  And the breakout there is Grace

10  product on the property, or one of the mining or millings or

11  processing operation claims.  Then they take them up.

12  Category one:  Allegation with respect to asbestos from a

13  Grace product on the property.

14          MR. BAENA:  Can we stay with A before you move on to

15  B?  Are you moving on to B?

16          MR. BERNICK:  A is descriptions of renovations.

17  Okay?  A is descriptions --

18          MR. BAENA:  No, no. I'm --

19          THE COURT:  A.  Yes, go ahead, Mr. Baena.  Real

20  property for which a claim is being asserted.

21          MR. BAENA:  Yes.

22          THE COURT:  Okay.

23          MR. BAENA:  Your Honor, I think other than

24  identifying the building, if Your Honor requires that -- and

25  of course we object to that -- that's all you need to know.

1   What is the relevance of this other information?

2           THE COURT:  I'm not sure.

3           MR. BERNICK:  Very, very simple.  If somebody did a

4   renovation of a number that would uncover the fact that there

5   being asbestos there on a certain date, that's going to be

6   highly relevant to the statute of limitations.

7           MR. BAENA:  But you see, Your Honor, that's not what

8   the proof of claim form is for.

9           MR. BERNICK:  Of course it is.  We're gonna sit there

10  and -- these claims are gonna come in.  There's gonna be a big

11  dispute then about whether they have any validity or not.

12  That's gonna be centrally relevant to the estimation.  The

13  property damages cases, the statute of limitations is going to

14  be one of the main defenses of the case.  There was a case

15  that was just dismissed by virtue of the statute of

16  limitations.

17          THE COURT:  The issue as to whether or not the person

18  filing the claim either owns the property or somehow

19  represents the owner of the property is certainly relevant

20  information, because since we're talking about asbestos

21  property damage claims, you have to be able to assert that in

22  fact you're entitled to raise that claim.  So that information

23  is relevant.  The date of the purchase of the property is

24  relevant for the same reason, because it may or may not be the

25  Debtor's product.  Because I can anticipate that at some point

1  people will say, "We know we have insulation.  We don't know

2  whose."  And that may or may not be sufficient to bar a claim.

3  It may take discovery to do it.  The date of the purchase is

4  relevant.

5      The date that any renovations were made to the property

6  that involved insulation in that building is relevant.  The

7  date of any other minor renovations probably are not.  I think

8  this question needs to be restated to make it of relevance to

9  the Debtor, because any interior renovations may be too broad.

10  But interior renovations that involve the crucial issue in the

11  case, which is whether or not A) the Debtor's asbestos

12  products were used; or B) whether they were disturbed, is

13  relevant information.  And I don't see that there's a

14  difficulty with a person producing that information --

15          MR. BAENA:  Well --

16          THE COURT:  -- in the proof of claim.

17          MR. BAENA:  -- Judge, I presume you own a home.  I

18  tell you I couldn't give an answer to that question with all

19  the renovations from time to time made to a home that we own

20  for 20 something years.

21          THE COURT:  But this is a commercial building.  And

22  if their renovations are -- it says -- I guess the question

23  should be renovations been completed in the property since

24  this owner had it.  Because if it's beforehand, they're

25  probably not relevant.

1          MR. BAENA:  Some of these buildings have been owned

2     by the same State, as an example, since they were built for 30

3     some odd years.

4          THE COURT:  If they can't state it, Mr. Baena,

5     they'll put that down.  It seems to me that having them go

6     through their records -- at some point you're gonna be doing

7     discovery on this.

8          MR. BAENA:  Well --

9          THE COURT:  To the extent that there is some easy

10    information -- and, frankly, whether or not they made the kind

11    of renovations that would involve a replacement or a

12    disturbance of asbestos products I would think would be

13    something that would be a major renovation, not putting up

14    walls -- down walls inside a building.

15         MR. BAENA:  That's wrong, Judge.

16         THE COURT:  Okay.

17         MR. BAENA:  Putting up a wall could disturb the

18    meculite fill in some of these buildings.  Judge --

19         MR. BERNICK:  But that's --

20         MR. BAENA:  -- if I may finish.  The most important

21    part is under the Debtor's theory, if anybody fails to fill

22    out any part of this, the claim is being denied.

23         THE COURT:  Well, that's not my theory.  And I will

24    be the person making that determination.  But it seems to me

25    that this information is relevant.  And a Claimant ought to

87

1  make a good faith effort to find it.  If they can't, they

2  ought to state why they can't.  It may be that they just

3  purchased the building and they don't have the records.  It

4  may be that their building burned down and they don't have

5  records.  There could be reasons why people can't fill this

6  out.  But it should be -- there should be an effort made to do

7  it.  That question should be restated to make it more narrow,

8  Mr. Bernick.

9        MR. BERNICK:  Yeah, we'll do that.  Okay.  We then

10  have the category with respect to the Grace product.  This is

11  the non-meculite mining, milling or processing.  And, again,

12  the questions are very basic.  What's the product as to which

13  you're making the claim?  When was the product installed?  The

14  name of the architect or architectural firm who designed the

15  property?  The name of the general contractor?

16        THE COURT:  Well, this one I agree with Mr. Baena is

17  going too far afield.  Because depending on how old these

18  buildings are, this information may be very difficult to get.

19        MR. BERNICK:  If they have it.  If they don't have it

20  -- I mean it would seem to me at that point, Your Honor, if

21  they don't fill in the blanks we could then take up the

22  question of what to do about it.  But with respect to some of

23  these buildings, as Mr. Baena indicated, they may not have

24  changed hands.  They may know exactly what the story is.

25        THE COURT:  Well --

1          MR. BAENA:  Judge, I agree with where you're going,

2   Judge.  And let's think about the practical consequence of

3   this.  Where is the clerk gonna store these proof of claim

4   forms?

5          THE COURT:  Well, Mr. Baena's agent's going to.

6          MR. BAENA:  Mine?

7          THE COURT:  No, I'm sorry.

8          MR. BAENA:  Mr. Bernick's?

9          THE COURT:  Mr. Bernick's agent.

10          MR. BERNICK:  Absolutely.  We've done this in other

11   cases.  You hire an agent.  It's all processed on computer.

12   We can deal with the volume.  And they're very happy to deal

13   with the volume.

14          MR. BAENA:  The date of installation if not performed

15   by the current owner or operator is not known.

16          THE COURT:  Well, it may be known.  It seems to me

17   that if they're alleging a specific product, then if the owner

18   had it installed, the owner should know and should be required

19   to provide that information.  If it was installed prior to the

20   owner, they ought to state what they know, if they know it.

21   The rest of this, however, I think is discovery material.

22   It's not relevant to the proof of claim.

23          MR. BERNICK:  Fifteen through 18 we'll take out.  Do

24   you have any documentation related to purchase or installation

25   of the product on the property?  If so, attach it.  When did

1  you first know of the --

2       MR. BAENA:  Excuse me.  Let's take that one.  Judge,

3  what relates to the purchase or installation of the product

4  might include architectural plans, specifications, work

5  orders.  It could include a room full of information.  This is

6  too big a hurdle.

7       THE COURT:  I think it is.  How about if you have

8  documentation, check off yes and describe in general terms

9  what it is?  And then if you want it later, Mr. Baena, you can

10  ask for it.  I'm sorry, Mr. Bernick.  I keep doing that.  I

11  apologize.  Mr. Bernick.

12       MR. BERNICK:  Meanwhile, Your Honor, all this does is

13  to -- and that's fine.  All it does is when the information

14  comes in, Your Honor wants to do the estimation or whatever

15  process, at some point we're gonna need --

16       THE COURT:  We may very well.  But at least this will

17  alert people.  In fact, it could even be something like if you

18  wish to attach it, attach it.  Because some people may want to

19  just get that off their books.  At some point they're gonna

20  have to prove whether it was Grace's product, when it was put

21  in the building.

22       MR. BERNICK:  When did you first know the presence in

23  the property of the Grace product for which you're making the

24  claim?  Directly relevant to the statute.

25       MR. BAENA:  No.  I'm not sure what statute it's

1   relevant to.  I'm not aware of a statute.  In most

2   jurisdictions that's not the rule.

3          THE COURT:  I think it's encompassed with respect to

4   the dates of installation.  I mean we're not looking at

5   personal injury claims.  We're looking at property damage

6   claims.  And I think the statute is not going to be driven by

7   when they know of the presence in the property.  It's when

8   they know that there may have been damage caused as a result

9   of the product in the property.

10         MR. BERNICK:  Well --

11         MR. BAENA:  Right.

12         MR. BERNICK:  -- this is now one of the issues of

13  this case.  That is first of all we may get people who say, "I

14  don't know the date of installation."  But they do know when

15  the product was installed.

16         THE COURT:  Fine.

17         MR. BERNICK:  So we've now learned something new.

18  Second, we have the issue about contamination.  That ends up

19  being basically addressed by expert testimony.  The issue is

20  not when they became aware of the contamination.  That's only

21  a term of art.  We find out when they were aware of the

22  product being there.  And then if there's some issue that

23  somehow contamination hasn't taken place, that's not resolved

24  through the particular Claimant.  That's resolved through

25  expert testimony.  We need to know when they became aware that

1  asbestos was there.

2      MR. BAENA:  Judge, they don't need to know that

3  information, because under every State that we think is

4  relevant to this particular controversy, it is exactly what

5  you said.

6      THE COURT:  All right, gentlemen.  This is how we're

7  going to resolve these issues.  Mr. Baena, you're gonna file a

8  line by line item objection.  All of you.  Anybody who objects

9  to any proof of claim form, you're gonna file a line by line

10 itemization of your objections.  Mr. Bernick, you're gonna

11 attempt to resolve those to the best of your ability.  If

12 you're unable, in the next hearing you will tell me which ones

13 you want me to decide.  And in March I will decide these

14 issues.  If you need an earlier hearing before March, let me

15 know.  And some time today I'll give you an earlier hearing

16 date.

17     MR. BERNICK:  I think that's -- I think --

18     MR. BAENA:  That's more efficient.

19     MR. BERNICK:  -- that's well said.  But in all

20 fairness, these forms have been out there, amenable to any

21 kind of objections literally for months.

22     THE COURT:  Yes.

23     MR. BERNICK:  And we've received nothing.

24     THE COURT:  Yes, they have.

25     MR. BAENA:  Well, they have, Judge.  We filed a

1  response.  And we did object to the proof of claim forms.  And

2  we said why.

3      THE COURT:  Well, fine.  If you want me to rule on

4  your objection to the global terms, in that sense I'm simply

5  going to overrule them because --

6      MR. BAENA:  We have specifics in there as well.

7      THE COURT:  -- we need proof of claim forms.  Well, I

8  want a line by line objection.

9      MR. BAENA:  I will do that.

10      THE COURT:  That's how we're gonna do it.  And maybe

11  we can get -- I don't know if we can get through this one so

12  you can redo the drafts, Mr. Bernick.

13      MR. BERNICK:  I just --

14      THE COURT:  We're not gonna get through the others.

15      MR. BERNICK:  Yeah, I guess I would prefer that Your

16  Honor have the benefit of getting everything in writing, and

17  at your leisure, rather than in the press of time here this

18  morning, going through it and doing it.  Obviously, our

19  general position is that we're gonna need the information

20  sooner or later anyhow.  We may as well get it sooner and on a

21  uniform basis, which is why it is that we've asked for it.

22  And particularly with respect to people who are in the

23  business of owning a building, there may be some burden.  But

24  it's not all that significant.

25      THE COURT:  Well, I -- and I agree with that.  To the

1  extent that records exist, I don't see any reason why they

2  can't be attached at this stage.  They're gonna have to be

3  attached at some stage anyway.  I do think, however, that some

4  of these questions could be a bit onerous.  And I don't think

5  the purpose is to have people not file proofs of claim because

6  they don't want to go through the burden of filing it either.

7       MR. BERNICK:  But let's just touch on that for a

8  minute.  That's obviously true.  When you're talking about

9  people making this kind of claim, basically there is a burden

10  associated with making the claim.  If you're not inclined to

11  shoulder that burden, you probably shouldn't be pursuing your

12  claim to begin with.

13       THE COURT:  Well, if you're correct that the vast

14  majority of claims are already filed, then it's not going to

15  be that much of a burden anyway, because you already know what

16  those claims are.  And are undoubtedly, since so many of them

17  have been settled in the process of discovery with respect to

18  them anyhow.  So I think we should probably start with a

19  simplified proof of claim form.  And if it turns out that

20  that's insufficient, then maybe there's some method of

21  compelling additional information.  I know you don't want to

22  go out with notices twice.  And I'm not trying to build that

23  into this process.  But I think that it can be stated in a

24  fashion that will not be quite so burdensome.  Maybe the

25  Debtor can do a check-off list.  You know, the Debtor may, for

1    example, know that you used Monokote-3 from 1979 to 1984, and
2    not any other time, just hypothetically.
3              MR. BERNICK:  They know that.
4              THE COURT:  Well --
5              MR. BERNICK:  You know, the -- well, we can certainly
6    do that.  That's a fact that's already known to the
7    Committees.  I really think that the best procedure is the one
8    that you proposed, which is that they ought to go through and
9    point out where they really have a very specific objection.
10             THE COURT:  I think so.
11             MR. BERNICK:  I'll respond to it.  Can we get a
12   deadline for them to do that?
13             THE COURT:  Yes.
14             MR. BERNICK:  Let's say a week?
15             MR. BAENA:  I'm in trial next week, Your Honor, in
16   Texas.  I'd like to the week after.
17             THE COURT:  Well, I'm here early next month.  Our
18   hearings are on March 18th.  So if I give you a week, and give
19   the Debtor a week to respond, we're back.
20             MR. BAENA:  On March 18th?  Come back on the 18th?
21             THE COURT:  Yes.
22             MR. BAENA:  That's fine.  If I could have until the
23   12th to provide them with our comments --
24             MR. BERNICK:  No.
25             THE COURT:  No, the hearing's on the 18th.  So I

1    need --

2          MR. BAENA:  I understand.

3          THE COURT:  -- I need the information so that they,

4    number one, can hopefully modify the proof of claim, and also

5    let me know what of these objections have not been resolved.

6    So I don't think that schedule works.  It's -- you need to do

7    it sooner.  I need their comments back essentially by the --

8    well, the 15th at the very latest, if you can get them to me

9    in Pittsburgh.  Because the hearing is the 18th.  That's

10   Monday.

11         MR. BAENA:  When do you want us to provide our

12   comments to them, Judge?

13         THE COURT:  Well --

14         MR. BAENA:  I am in trial the week of the 4th.

15   And --

16         THE COURT:  Well who else in your firm will be

17   working on this?

18         MR. BAENA:  Well, we have a number of people.  And I

19   could delegate it.

20         THE COURT:  Okay.  How --

21         MR. BAENA:  We are also dealing with the fraudulent

22   transfer issues --

23         THE COURT:  That's a --

24         MR. BAENA:  -- at the same time.

25         THE COURT:  -- different problem.  That's not on my

1  docket --

2          MR. BAENA:  Another Court.

3          THE COURT:  -- and I don't care about that.

4      (Laughter)

5          MR. BAENA:  That's another matter.  I have that other

6  matter on my plate.

7          THE COURT:  How about by March 8th?

8          MR. BAENA:  That's great.

9          THE COURT:  All right.  March 8th for the line item

10  objections.  Anybody who's filing them, I would suggest that

11  you try to get together a mini Committee so that we only have

12  to go through these once.  Everybody feed into these

13  objections.  And, Mr. Bernick, yes, file a consolidated

14  response.

15          MR. BAENA:  Now --

16          THE COURT:  All right.  Line item objections.  Pardon

17  me one second.  This is to all of the non-asbestos personal

18  injury proof of claim forms.

19          MR. BAENA:  Now, Judge, the proof of claim form that

20  we're working on now obviously anticipates an owner or

21  operator of a building to file it.  It is not designed to be

22  used for a class proof of claim.

23          THE COURT:  Absolutely.

24          MR. BAENA:  And so we need to deal with that issue.

25  And I don't know, you know, in what context you want to do

1    that.  We have class and group proof of claim forms that

2    haven't been provided to us.

3          MR. BERNICK:  Well I -- we're gonna take up class

4    here in a minute talking about the --

5          THE COURT:  Well, I had the chance over the last week

6    to read, I think, all of the cases -- at least all the cases

7    you've identified.  I haven't done any independent research

8    with respect to the concept of class proofs of claim.  And as

9    a result, I had the chance to take the Debtor's argument and

10    the Committee's argument, you know, under advisement.  And

11    subject to your convincing me otherwise at this argument, it

12    seems to me that the process that Judge Gambardella followed

13    in the First Inter-Relation case --

14          MR. BAENA:  Inter-Regional.

15          THE COURT:  -- Inter-Regional, thank you, case makes

16    good sense.  And as a result I think I have a procedural

17    problem, which is I don't have a motion by anybody to allow a

18    class proof of claim.  I think we need to start with a motion

19    to allow whatever the types of class proofs of claims are.  I

20    think that would obviate the need to look at the issue of

21    certifying class actions in State Courts or elsewhere -- any

22    other Court but here.  I think there is some benefit to using

23    that class process.  I'm not making rulings with respect, for

24    example, to the property damage claims that are already

25    satisfied.  I haven't examined it in that context.  I'm just

1  talking in general terms.  It seems to me that that use may be

2  appropriate in this case.  But I think I need an appropriate

3  motion.  I need an opportunity for people to respond.  And

4  then I need to consider it.  I think the process that Judge

5  Gambardella outlined is a very efficient process.  I have a

6  call in to her to ask her how it actually worked, because at

7  the moment I don't know that.  I'm only reading it from the

8  case.  Maybe those of you who were involved know.  I don't.

9  And to see whether she has some suggestions for how she might

10  make changes to it.  She also had a notice form of some form

11  that was used in that case.  But it's not attached, and wasn't

12  part of that opinion.  So I'd like to find out what she used

13  there as well.

14       The issue that she addressed, and in fact other Courts

15  have addressed, is whether you need to file an individual

16  proof of claim either in addition to or in lieu of the class

17  claim.  She, and most of the other Courts that looked at this

18  issue, decided you do not need the individual claims if you

19  permit the class proof of claim, because in some senses it's

20  duplicative.  In other senses it essentially wipes out the

21  class action aspects of the proof of claim form.  I'm inclined

22  to think that's probably right.  But I'm not sure in every

23  given case that you don't also need either an individual claim

24  form or an identification of the Claimant.  In her case she

25  did not need to get into the individual proof of claim form

1   because attached to the class group was a list of all the

2   putative claim holders.  And she found that that was

3   sufficient.

4       So that's what I think we need to do.  We need to figure

5   out how to get appropriate notices out.  Then we need to

6   figure out who the putative class members are.  And then we

7   need a list.  Somewhere or other the Debtor needs a list of

8   who the putative class members are.  And it's gonna be

9   important for both estimation and actual damage issues if we

10  get that far.

11      MR. BERNICK:  Your Honor, if I could address that for

12  just a moment, just so that I understand what it is that

13  you're contemplating, and what it is that we need to be

14  responding to, we have at the end of the day a need to

15  identify Claimants and claims, and to be able to put a dollar

16  figure on them.  And that's true with respect really to all

17  the claims, but obviously with respect to the claims that

18  we're talking about here.  You can already see that when it

19  comes to the traditional property damage claims that there's a

20  lot of information that's necessary to be able to get there,

21  and that you need the number -- you need who is a Claimant,

22  and you need information.  If we try to do an estimation, if

23  we try to do a litigation, which is what we propose, these are

24  the elements that drive that process.  And at the end of the

25  day, no matter if you have a class or not, ultimately it's not

1    the class that gets the release.

2            THE COURT:  That's right.

3            MR. BERNICK:  It's an individual.  So you have to

4    know who the individual is --

5            THE COURT:  Right.

6            MR. BERNICK:  -- at some point in time.  Otherwise

7    you're not dealing with the bottom line of, well, how much

8    money do we set aside.  Now, as we sit here in connection with

9    the property damage claims, we know that there are seven

10   claims.  That's all that we know about.  We can sit there, and

11   on the cases of those Claimants and the information that we

12   already have with regard to them we can determine the value of

13   those claims either through litigation or through estimation.

14   If we send out a class form in lieu of individual forms with

15   respect to these claims, then we'll never learn how many more

16   Claimants are actually out there.

17           THE COURT:  No, I --

18           MR. BERNICK:  And --

19           THE COURT:  I'm sorry.  I don't know why if you have

20   seven Claimants -- number one, you wouldn't meet the

21   numerosity requirements in any event.  So if there are only

22   seven Claimants --

23           MR. BAENA:  No, no, no, Judge.  There's seven pending

24   actions --

25           THE COURT:  Okay.

1    MR. BAENA:  -- is what he means.

2    MR. BERNICK:  I mean real actions.

3    MR. BAENA:  Even though one of them includes every

4  building in South Carolina.

5    THE COURT:  But who are the Claimants?  I don't care

6  about the number of buildings.  Who are the Claimants?  In

7  that case, for example, are they all public buildings owned by

8  the State of South Carolina?

9    MR. SPEIGHTS:  No.  They are all private buildings,

10  commercial buildings, houses, churches, schools who opted out

11  of the schools class, and colleges who opted out.  It's every

12  type of building except Government buildings.

13    MR. BERNICK:  There's an issue there about how many

14  of them were settled.  But Mr. Speights just made my case,

15  which is that even if you had a large group of claims, you'd

16  still have to know all about all those -- how many of those

17  people have what type of buildings, and are they really gonna

18  step forward at the end of the day and seek to have their

19  particular claims recovered out of the class.

20    THE COURT:  Well, you can do it --

21    MR. BERNICK:  But --

22    THE COURT:  I think you can do it in several ways.

23  But the way that Judge Gambardella looked at this issue was to

24  say that attach -- at some point, yes.  Somebody has the

25  burden of coming forward to identify the Claimants and, in

1   this instance I think, the building involved in the damages

2   asserted.  I agree with that.  The question is, do you do it

3   by individual proof of claim forms?  Do you permit a class

4   proof of claim form and have the representatives of the class

5   adopt the burden of identifying the class members?

6           MR. BERNICK:  No, that's what's very, very different.

7           THE COURT:  That's what she did.

8           MR. BERNICK:  But, no, what she did was a little bit

9   different.  What she did was to say, "I'm gonna let this case

10  proceed as a class."  And it actually had it defined under a

11  people.  And we're going to have them identify the Claimants.

12  We're gonna go through class discovery --

13          THE COURT:  Right.

14          MR. BERNICK:  -- and all the rest of that.  That

15  doesn't solve the problem.  The reason it doesn't solve the

16  problem is that at the end of the day -- and that I think was

17  a securities case.

18          THE COURT:  Yes, it was.

19          MR. BERNICK:  You're gonna do a calculation there

20  that's a question of multiplying a certain number of people by

21  a certain dollar recovery based upon a formula.  Here, when it

22  comes to individual buildings, you don't have any one formula

23  fits all, at all.  You need an awful lot more information in

24  order to resolve the question of how many buildings there are.

25  But even in the class, you still have a point in time at the

1   end of the day when people have to come forward and say, "Yes,

2   I want to participate in the class recovery."  In other words,

3   just because it's a class action doesn't mean that all these

4   players are in the process at the end of the day.  So you have

5   two basic problems.  Problem one is determining the

6   information that really is necessary to do an estimate.  And a

7   securities case is very, very different from asbestos property

8   damage.  And, number two is you have to know who's gonna

9   actually step forward and assert a claim.  And again, that's a

10  situation which no one, class representatives or anybody else,

11  no one can decide that.

12      The difficulty is that if you defer these items, you're

13  gonna need them at the end of the day.  But if you defer them,

14  you produce a whole different dynamic in this case -- a very

15  pronounced and difficult dynamic.  It's the same one that

16  Judge Posner identified in the Rhone Polenc class action

17  certification in the 7th Circuit where he said, "If we were to

18  certify" -- that was a case where there was a certain number

19  of individual claims that were being pursued.  But then -- and

20  I think it was even Mr. Sobol's firm that was one of the firms

21  that, "Let's turn it all into a class."  And Judge Posner

22  said, "You know what's gonna happen if you turn it into a

23  class?  It could go from here all the way up to here."  You

24  create a negotiation dynamic that is almost coercive, because

25  the sheer volume of the class, even though you don't know

104

1   who's actually gonna be a Claimant -- the sheer volume of a

2   class creates an economic threat that cannot do anything but

3   dramatically affect the case.  Even before you know how many

4   people are really gonna come out of the woodwork, and even

5   before you know any information about them, you've now

6   introduced what Mr. Lockwood called, "Class Fear."  The 800

7   pound gorilla in the case, and you don't even know who's a

8   Claimant or the necessary information.

9          THE COURT:  Mr. Bernick, that's why I want a motion

10   filed that you can respond to.  Because right now I don't have

11   one.  So I'm not in a position to even determine whether a

12   class proof of claim is appropriate for any or all of these

13   various constituents.  Because the first thing I need is a

14   motion to determine if one is appropriate.

15          MR. BERNICK:  We want to do that.  The question that

16   I'm really raising today is this.  Which is take up the class

17   proof of claim.  I think that actually the way that it was

18   done in her case is pretty much what I'm going to say.  She

19   set the bar date.  All of the claims came in.  All of the

20   claims -- individual claims as well as the class proof of

21   claims came in.  And she then took up the question -- and this

22   is what we propose, I believe, in our papers, and what I'll

23   reiterate here today -- we propose that after the bar date

24   passes and you have the individual claims as well as having

25   the proposed class proof of claim, you then take up the

1    question of whether to allow the individual -- allow the class

2    proof of claims be used as the claim form in the case.

3         And the advantage of that is that you will have a piece

4    of information that's very critical, which is how many

5    individuals have actually come out and said, "I want to be

6    there."  So you'll know what truly numerosity is.  And you

7    will have information with respect to those individuals that

8    will be very central to the question of whether you can even

9    certify the class under Rule 23.  Typically what happens in a

10   Rule 23 certification is you have individual representatives.

11   And you take discovery to elicit facts about, you know,

12   predominance and individuality claims.  Here, if you make --

13   you set the bar date and the individual Claimants come

14   forward, you will have that information.  You will know how

15   many real Claimants are out there.  And you can take up the

16   question that was specifically identified in the <u>American</u>

17   <u>Reserve</u> decision, the 7th Circuit decision.  Remember at the

18   very back end of the case the decision's remanded.  And it's

19   remanded so that the Bankruptcy Court can determine whether,

20   in fact, the whole class mechanism is even necessary or

21   whether the same thing could be achieved by having individuals

22   file their claim and then package them up as a class, or

23   package them up as a group.

24        All of those things should be before Your Honor.  What we

25   would strenuously object to is the idea that pending a

1    determination of class proof of claim, that the obligation of

2    individuals to step forward and file a claim by the bar date

3    somehow be lost.  If you do that, not only do you lose the

4    critical information, but you put us on a track that is gonna

5    go forever.  Why?  Because if you certify that class, it's

6    subject to interlocutory appeal.  We can't go forward with

7    dealing with the individual claims in the case.  And at the

8    end of the day we only learn who's the real Claimant when it's

9    all over and people have shown up.

10          THE COURT:  Well --

11          MR. BAENA:  Judge, the problem with Mr. Bernick's

12   argument is what he in essence is trying to do is defuse the

13   entire concept of class action practice in bankruptcy.  We

14   know it does have a place in bankruptcy.  He's trying to

15   require people to opt into a class by the process he's

16   creating.  But they have to affirmatively file a proof of

17   claim themselves, as if that proof of claim was somehow going

18   to demonstrate whether they're in the class or out of the

19   class.  It still doesn't answer his fundamental question.  In

20   every other case -- every other Circuit that's handled this

21   has said, "Class proof of claim is okay."  It has not required

22   in addition to that, that an individual file a proof of claim.

23          THE COURT:  Well --

24          MR. BAENA:  And this --

25          THE COURT:  -- I don't know that that's correct, Mr.

1    Baena.   Because in a number of cases, in fact, the individuals

2    had filed the proofs of claim in advance.   Not in all cases,

3    but in some.   And so the issue simply didn't come up in the

4    context you're raising it now.

5         MR. BAENA:   I agree.   But --

6         MR. BERNICK:   And --

7         MR. BAENA:   -- if I may finish, Mr. Bernick.   The

8    fundamental problem with Mr. Bernick's iteration of the

9    problem is that he says we have to have this information

10   before we can determine the dollars.   That's not a role you

11   need to play in this case.   He's looking for a precise

12   determination of the value of a claim.   If this process is

13   going to be estimation, we've got to decide are we estimating

14   property damage claims generally, or are we estimating the

15   claim of each individual Claimant.   He's taking you down the

16   road where you will be estimating each claim.

17        THE COURT:   Well, I'm not going to estimate each

18   claim.   If I have to try claims, I'll be making findings with

19   respect to each claim.   And it probably won't be done here.

20   So that's a whole different --

21        MR. BAENA:   Or in this lifetime.

22        THE COURT:   Well, it's a whole different issue.   I

23   need a motion.   If you're gonna request that a class proof of

24   claim be filed, I need an appropriate motion by a

25   representative of the putative class by a law firm that is

1   competent to handle it.  Until I get such a motion there will

2   be no class proofs of claim.  Because I think that's what I

3   need.

4          MR. BAENA:  We --

5          THE COURT:  So until I get it, all issues are

6   preserved.  There are no class proofs of claim until I get

7   through an appropriate motion process.

8          MR. BAENA:  We need to give notice of that --

9          THE COURT:  Yes.

10          MR. BAENA:  -- to each of those people who might have

11   the right to file a class --

12          THE COURT:  Well --

13          MR. BAENA:  -- proof of claim.

14          THE COURT:  -- that's the other problem.

15          MR. BAENA:  To the class reps.

16          THE COURT:  Oh, the class reps.

17          MR. BAENA:  Or the putative class reps.  We need to

18   give them notice of that.

19          MR. BERNICK:  I'm sorry.  I guess I'm sitting out

20   there a little bit.  What we would be proposing in order to

21   keep the ball rolling here, Your Honor, is to keep on going

22   forward with the bar date and the people --

23          THE COURT:  Oh, yes.

24          MR. BERNICK:  -- can file the proof of claims.  If

25   they want to file a class proof of claim, they can do exactly

1   what happened in the <u>First Equity</u> case, which is they can file

2   a class proof of claim.  There's nothing about the bar date

3   notice process that mutilate that.  In this case everybody had

4   to file.  And then later on, actually the motion for class

5   certification that was made was with respect to the 2,000

6   people that filed.  And it was at that point that the Court --

7   I'm a little concerned with this.  That if you take the motion

8   of the class claim now, you won't have the same information

9   that she had when she decided that case.

10          THE COURT:  Well, I think --

11          MR. BAENA:  This is an ambush, Judge.

12          THE COURT:  -- what she did was took the motion to

13   approve the class proof of claim when the class proof of claim

14   was filed.  I think that's how it happened in that case.

15          MR. BERNICK:  That -- no, I mean the class proof of

16   claim was filed, however, after the bar date.  She set the bar

17   date.  All the claims came in, including a proposed class

18   proof of claim.  And then she took up the question of whether

19   Rule 23 should apply.

20          THE COURT:  Okay.  Well, I think with respect to the

21   property damage claims, not the Zonolite issues, I'm not sure

22   it's going to make a difference.  Because we need a proof of

23   claim that's going to identify the basics that I've already

24   put on the record.  That's what I'm going to rule.  I hope you

25   folks will be able to find something that is acceptable to all

1   of you in terms of the format.  But that's what I think this

2   case needs.  I don't expect it to be a massive undertaking.  I

3   do expect it to provide essential information.  So let's get

4   that far.  Let's get a proof of claim together.  If you file a

5   motion to have a class proof of claim filed at some point,

6   it'll get scheduled and I'll hear it.  Unless and until I get

7   that motion there will be no class proofs of claim, because I

8   think that's the way I need to get it raised.

9           MR. BERNICK:  And with respect to ZAI, same approach?

10          THE COURT:  Well, yeah.  I mean with respect to the

11  need for an appropriate motion, I think I have to have an

12  appropriate motion.  Now, I do have motions pending in the ZAI

13  matters to certify classes, which I don't have with respect to

14  these property damages issues.  So maybe it's a slight --

15  there is a slight difference out there.  But I'm not sure it's

16  a material difference.  I think I need an appropriate motion

17  to file a class proof of claim.  You know, not on the property

18  damage side -- on the Zonolite issues, it appears that all

19  parties are in agreement that there are going to be some

20  issues that will be common, primarily on risk factors and

21  liability size.

22          MR. BERNICK:  That's absolutely correct.  The

23  significance of the proof of claim forms of ZAI are exactly

24  the same, but a little bit more dramatic.  With respect to

25  ZAI, again in order to determine even whether there are --

1  what the common issues are, you need to get the information as

2  to the proof of claim.  Because the proof of claim asks for,

3  where is the product located?  What's the use of the

4  residence?  How many times did you go up to the attic?  Have

5  there ever been renovations?  All that type of information

6  will bear centrally on the issue of what we can identify as

7  being common issues to begin with.  So when you send the proof

8  of claim forms out, you can get that information and then be

9  in a position to identify exactly how to frame the common

10  issues.  If you don't send the proofs of claim out, you can't.

11  That's number one.

12       Number two, a huge significance, make no mistake about

13  it, is that they'll sit there and argue that this is a

14  15,000,000 claim case.  By a stroke of a pen you turn your

15  claim into a 15,000,000 -- 10, 15, whatever it is.  And it's

16  worth billions upon billions upon billions.  And we don't even

17  know.  That's the problem.  You now have an imponderable that

18  drives the entire case.  Easy way to find out if it's true or

19  not.  Ask the individuals to show up and submit their claim

20  forms.  And then Your Honor can, with the benefit of that

21  information, decide do you want to create this dynamic in the

22  case or not.  But unless you get those individuals to file

23  proof of claims, you don't know what the real number is, and

24  you don't have the relevant information.  You can't make the

25  judgment about whether it's worthwhile to the case to have a

1   15,000,000 person class.

2           MR. SCOTT:  Your Honor, my name is Darrell Scott.  I

3   am the class counsel in the Washington class action.  I just

4   wanted to give the Court an idea of what we had intended with

5   regard to Zonolite Attic Insulation claim.  We had filed an

6   adversary proceeding which we actually think was the

7   appropriate procedural device.  The Court will decide whether

8   that's true or not.  Absent a proof of claim process, we

9   didn't see a procedural device for moving for certification.

10  And so our intention was that if the Court began a proof of

11  claim process we would file the appropriate class proofs of

12  claim immediately, and immediately seek certification for

13  those which have not been previously certified.  So that's an

14  issue the Court can tackle up front, early on in the process,

15  hopefully resolve it long before a bar date lapses, and also

16  cite whether those are claims that ought to be resolved

17  through a proof of claim.

18          And as to the process, we're an adversary proceeding.

19  That's our intention.  With regard to this power, it is

20  certainly very important to have their information to the

21  Court with regard to quantity of Zonolite Attic Insulation

22  that was sold by Grace, and its distribution of that product.

23  Which would certainly aid this Court in determining the

24  potential impact liability might have on Grace.  The

25  particular identity of homeowners is absolutely immaterial so

113

1   the --

2        THE COURT:  Is immaterial?

3        MR. SCOTT:  Immaterial.  Whether it's -- the Court

4   made reference to the fact earlier, for example, that homes

5   change.  Our own expert indicates that in the United States

6   20% of residents change residence every year.  That's a moving

7   target.  The house is not a moving target.  The quantity of

8   homes is not a moving target.  And Grace certainly has

9   substantial evidence that would aid this Court in

10  understanding the quantity of distribution, the locations of

11  distributions, which we tend to believe are northern States,

12  which would readily facilitate an estimation of the number of

13  homes that might be involved and what potential costs would

14  be, for example, of removing it, or merely warning.

15       THE COURT:  Well, you know, I think at some point

16  what we need to do is just spend maybe an entire day.  I think

17  maybe I'm going to have to specially set this.  If we need to

18  deal with the property damage claims on one hand, and the

19  Zonolite separately, maybe we just need time to hash through

20  some of these issues, which I don't think we're gonna get to

21  do on an omnibus hearing date.  My concern in the Zonolite

22  matter is the Debtor obviously will have some records -- I

23  don't know what sort at this point in time -- as to what it's

24  distribution mechanism was, and over what period of time.

25  That isn't, again, the means all and end all as to whether any

1  particular home had that product installed in it though.  So

2  knowing where the Debtor distributed and what it's

3  intermediary distributors were isn't necessarily going to get

4  where you need to go in terms of satisfying who may actually

5  have a claim for installation of that product in home.

6      There is, it appears to me from the submissions of the

7  parties so far, a vast difference of opinion as to whether or

8  not there is even going to be any liability or what the risk

9  level is.  I don't know that we even should be getting very

10 far with respect to this proof of claim concept until and

11 unless that scientific piece is adjudicated.  Because if it

12 turns out that there is no such risk, or the risk is so

13 minimal that it's not worth going forward, maybe we don't need

14 to deal with these.  And so what the beauty of having at least

15 one class proof of claim to me is, it gives you the vehicle to

16 do what the Debtor was calling a series of test cases.  But I

17 don't know about the binding aspect of rulings in test cases.

18 I am sure about the binding aspect of rulings in the class

19 action.

20      MR. BERNICK:  But it works in both ways.  Because as

21 soon as -- and this is exactly what Judge Posner talked about

22 in the Rhone Polenc case.  As soon as you get that class proof

23 of claim, for purposes of that threshold issue, I would urge

24 Your Honor that I don't think you can even define what that

25 issue is appropriately unless you have information that tells

1  you the mix of the uses that are out there.  But assuming that

2  you get that claim form views and you get the determination --

3  let's say the determination is unfavorable.  Immediately,

4  before we have any real idea of how many people are really out

5  there and how many of those people really want their house

6  come in and torn up and renovated -- see, we have people in

7  this case that will say, "We own the company."  And that'll

8  make the true heavies here, which I'm willing to concede are

9  Mr. Lockwood's clients.  It'll make them look like second rate

10  citizens.  You create the dynamic that is exactly what Judge

11  Posner says is the wrong use of class litigation, even outside

12  of Chapter 11.

13      So, if Your Honor is looking for a way to neatly and

14  quickly get to well what is it, what's the scientific issue,

15  the neatest and cleanest way to get to it is to get the

16  individuals to file their claims, and you tee up the issue as

17  a common issue.  If it turns out right -- or it's right from

18  our point of view -- the other people who haven't filed are

19  not bound.  On the other hand, they've also not filed their

20  proof of claim.  We'd be willing to take that risk.  If it

21  turns out that they do have a claim, you simultaneously know

22  two things.  You know that they have a claim.  And you know

23  how many of them there are.  So that their role in the case

24  has been defined.  If you use class, you will not get a

25  definition of who the real Claimants are --

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

1          THE COURT:  Well --

2          MR. BERNICK:  -- and you'll produce this dynamic.

3          THE COURT:  -- I don't know that it would even be

4     possible to certify a class of 15,000,000 homes.  You know,

5     it's just -- the numerosity itself seems to me to be wholly

6     impractical.  You wouldn't do any better certifying that kind

7     of class than you would not having any kind of class.  So I'm

8     not so sure that that makes sense.  But it may make sense to

9     look, for example, at the class that's already certified in

10    the State of Washington.  I don't know how many people are

11    involved in that.  Or perhaps just the Liddy group or some

12    small subsection in which you can identify these issues,

13    litigate those issues, and then figure out where to go from

14    there.

15         MR. BERNICK:  Or better yet -- and this is what we

16    suggested -- to take the people who actually file a proof of

17    claim, and you make them into a class.  That way you could

18    take care of all issues.

19         THE COURT:  Well, you may be dealing with 15,000,000.

20         MR. BERNICK:  I don't know.

21         MR. BAENA:  Or only 15.

22         MR. BERNICK:  If we -- but if only 15 people show up

23    to present their claims --

24         THE COURT:  There won't be a class.

25         MR. BERNICK:  -- that tells us something that's very

1  meaningful, and there won't be a class.  Whereas --

2          THE COURT:  All right.

3          MR. BERNICK:  -- in a class proof of claim you won't

4  find out.  We're back into the world of the towers.

5          THE COURT:  Okay, gentlemen, we're way past when I'm

6  supposed to be starting my other issues.  You will hear from

7  me with respect to a date at which we will address the

8  property damages issues and the Zonolite issues.  But for now

9  I'm sticking with the schedule that I previously set in about

10  the line item objections.  I think maybe a discussion at some

11  point about those issues will be productive.  I do not think

12  we're gonna do it on March 18th.  I think I'm going to give

13  you a special hearing date.

14          MR. BERNICK:  Can we have the line item responses for

15  the Zonolite claim form too?

16          THE COURT:  Yeah, they're for all four proofs of

17  claim form that I'm dealing with.  I want line item objections

18  to all of them.  If I don't get a line item objection, that

19  part of that proof of claim will probably be approved.  Yes,

20  sir.

21          MR. SPEIGHTS:  I know you need to stop, Your Honor.

22  Anderson is unique.  It's certified.  It's Zonolite

23  Insulation.  And it's traditional.  Mr. Bernick effectively is

24  trying to get you to decertify Anderson's claims.  What we

25  fought for, for eight years, I'm gonna say this in less than a

1   minute.  If there was no bankruptcy, all we would do is go to

2   trial on behalf of all the buildings in South Carolina,

3   hundreds and hundreds of buildings, and present adequate proof

4   as a class representative of how much damages we have.  And

5   all we need now, I believe, and I thank you for letting us

6   have a hearing in which we can participate, is to let the

7   class representative file the claim.  And we will have to give

8   you proof to estimate what Anderson's claim is.  Otherwise we

9   have a myriad of problems.  And Mr. Bernick is in effect

10  undermining the certification that's already by made by South

11  Carolina Courts.

12          THE COURT:  Well, I haven't -- I'm not aware of that

13  certification, as I expressed my ignorance on the record

14  earlier.  So let me just start this discussion with that.  I

15  have a conceptual difficulty with how you have representative

16  Plaintiffs that encompass schools and churches and public

17  buildings and private residences.  I have some difficulty with

18  that concept.

19          MR. SPEIGHTS:  But the South Carolina Judge in

20  various opposition has certified with that.

21          THE COURT:  Regardless, right now you're before me.

22          MR. SPEIGHTS:  I understand that.

23          THE COURT:  And I do not see --

24          MR. SPEIGHTS:  But that's why -- he is arguing

25  against what was done in South Carolina.

1        THE COURT:  And I agree.  It does not seem to me that

2   there can be appropriate class representatives unless you're

3   gonna bifurcate these classes into groups somehow for purposes

4   of this proof of claim.  I am certainly not -- not ever --

5   going to permit a class proof of claim to be filed that is

6   going to encompass possible damages for schools and churches

7   and public buildings and residences.  I will not do it.  I

8   cannot see in any way how the damages could be the same, how

9   the discovery will be the same, how the issues will be the

10  same.  I may permit some groups with respect to residences,

11  and separately schools, and separately churches or other types

12  of public buildings.  But there is no way that one class proof

13  of claim is going to be filed for every building in South

14  Carolina.  It will not happen in this Court.  So figure out

15  something that makes more sense than that.  Because that

16  doesn't make sense.

17        MR. SPEIGHTS:  Well, and I'm glad --

18        THE COURT:  It's not --

19        MR. SPEIGHTS:  -- we're gonna brief it.  And now just

20  the last comment.  It costs the same to remove a square foot

21  of Monokote from the ceiling of a beam in a church --

22        THE COURT:  It may.

23        MR. SPEIGHTS:  -- as it does on a commercial

24  building.

25        THE COURT:  It may.

1        MR. SPEIGHTS:  And that's what it comes down to.

2        THE COURT:  It may cost the same amount.  But whether

3   people want to do it may differ significantly.  And whether

4   people want to opt in or opt out or not opt at all into those

5   classes may be very different.  And the owners of public

6   buildings are not representative of owners of homes.  They are

7   not the same type of individuals who hold claims in a

8   bankruptcy context.  It may make sense from a State Court

9   point of view.  It doesn't from the context of this case.  So

10  figure out something a little less encompassing.

11       MR. SPEIGHTS:  I will.  And we're all private

12  buildings in my class.  And I think it can be done very

13  easily.

14       THE COURT:  All right.  Okay.  What else do we need

15  to get through quickly?

16       MR. BERNICK:  We have a very quick thing at the end,

17  which is that there are applications that were filed for

18  paying Dr. Francine Rabinowitz and a Mr. Hilton.  Francine

19  Rabinowitz is -- got expertise in the estimation of personal

20  injury claims.  And Mr. Hilton is -- got a position in

21  connection with the Celetex Trust and National Gypsum Trust.

22  We do not have any -- we realize that they have the ability to

23  retain these people.  But we have a very significant concern

24  with what it is that they're actually going to do.  Ms.

25  Rabinowitz is expert only in personal injury, I believe.

1   She's got no background in estimating property claims.  If
2   they intend to use her as a way of gainsaying or contradicting
3   what the personal injury people believe are the personal
4   injury claims, I guess we can't stop them from doing it.  But
5   if they intend to use her to estimate property claims, we have
6   a very strenuous objection.  She doesn't have the
7   qualifications for it.
8          With regard to Mr. Hilton, we're very concerned.  Mr.
9   Baena and Mr. Hilton have got a long history together.  He is
10  already working on the Celetex and National Gypsum Trusts.
11  There doesn't seem to be any reason why we should be helping
12  to pay for that exercise.  If there's something incremental
13  that he is going to do that is specific to our case, that's
14  fine.  But we don't think it's appropriate that we should have
15  to bear the burden of funding the work that he's doing in
16  other cases.  So those are two issues that I guess we'll put
17  in the category of being we do not agree to incurring these
18  costs.  We do not disagree with their ability to retain these
19  folks, but we have an objection to their performing these
20  kinds of activities pursuant to their retention.
21          THE COURT:  Okay.  Mr. Baena?
22          MR. BAENA:  Your Honor, you have entered Orders
23  approving these retentions already.  And you enumerated in
24  your Orders certain limitations that we are to abide by.  And
25  we will.  I think it's entirely inappropriate for counsel to

1    suggest that he believes there's a limitation of expertise on

2    the part of Dr. Rabinowitz that precludes her from being

3    engaged for the purposes that we wish to use her.  That's

4    something better left for cross examination when and if we put

5    her on the stand.

6              THE COURT:  Please don't use her for something beyond

7    the scope of her qualifications, Mr. Baena.

8              MR. BAENA:  Of course.

9              THE COURT:  We don't need to go there.

10             MR. BAENA:  Of course, Your Honor.

11             THE COURT:  Okay.

12             MR. BAENA:  I will not.  As far as Mr. Hilton is

13   concerned, Your Honor, these motions were filed -- these

14   applications were filed when perhaps we didn't even have to,

15   as a result of conversations with the U.S. Trustee.

16   Previously an Order was entered by Judge Farnan allowing us to

17   hire these people without disclosing them.  And all we had to

18   do was put the amount of their fees, without denominating who

19   they were being paid to, as a cost item on my bill.  And

20   that's what we were doing.  In conversation with Mr. Perch, we

21   didn't have any problem since we started to actually disclose

22   the fact that these people had been doing things for us when

23   we were coming before Judge Farnan on case management issues.

24   We had no problem at this point filing an application if that

25   set a good trend in these case.  So that's why we did it.

1    Arguably, we don't even have to do it.

2        So in the case of Mr. Hilton, Mr. Hilton has not recently

3    performed any services.  He assisted us in evaluating the

4    proof of claim forms, and assisted us with determining the

5    process that would be employed for allowance or disallowance

6    of property damage claims, which is entirely pertinent to the

7    case management issues.  He's been paid to date, I believe,

8    for all of those services.  We may wish to use him in the

9    future if it's helpful to the Court, or if it's helpful to the

10   Committee.  But right now this is merely to take an

11   undisclosed expert and disclose him.

12       THE COURT:  All right.  To the extent that what

13   you're gonna be doing with these folks is calling them as

14   expert witnesses, quite frankly I think Judge Farnan had it

15   right.  I'm not sure that anybody has to disclose that at this

16   stage.  You may very well in the course of litigation.  If

17   you're using them as consultants or something else, that's a

18   different issue.  But to the extent that what you're doing is

19   nominating them as experts, I'm not aware of any provision in

20   the Bankruptcy Code that says I have to approve experts.

21       MR. BAENA:  It's very difficult to separate the

22   function though, Judge.  If I talk to Dr. Rabinowitz about how

23   do we deal with an issue like this, as opposed to how would

24   you testify to it, one could arguably say she's consulting and

25   not providing expert testimony in that context, even though it

1  would be with a view towards using her.

2          THE COURT:  Right.  Well, to the extent that what you

3  need is a comfort Order, I guess you've got it.  So it's here.

4          MR. BAENA:  I've got it.  I've got it.  And I'm

5  perfectly content with the Orders that were entered by the

6  Court.

7          THE COURT:  Okay.  What happened?  Did I miss an

8  objection and entered an Order?

9          MR. BERNICK:  Well, it may be that that's what

10  happened.  It's not particularly material because, again, he

11  does have the right to retain these people.  But it just looks

12  like there's a huge problem with what they're going to be able

13  to do.  And it's not a question of taking it up on cross.

14  It's a question of who pays the fees in the process.

15          THE COURT:  Well you can always object to the payment

16  of the fee.

17          MR. BERNICK:  Yeah, I understand that.

18          THE COURT:  And it'll come up in that context.

19          MR. BERNICK:  I understand that.

20          THE COURT:  Okay.  Mr. Perch?

21          MR. PERCH:  Your Honor, I don't think I need to say

22  too much about this.  Mr. Baena is correct.  Frank Perch for

23  the U.S. Trustee.  Mr. Baena is correct that it was, at least

24  in part, a response to concerns I had raised about large,

25  unexplained line items on the fee application, and my belief

1   that the original Order of Judge Farnan was relating to

2   experts in collateral matters, not consultants for material

3   bankruptcy issues in the case like noticing and claim

4   estimation.  But I think that Mr. Bernick, in his

5   opportunistic desire to make an objection, is losing sight of

6   the fact that by bringing these people within the number of

7   retained professionals, instead of having the unexplained line

8   item on the fee application, we're going to have -- of Mr.

9   Baena -- we're going to have some understanding of who they

10   are and what they're doing.  So that if Mr. Bernick or I or

11   anybody else in the case has a concern about whether they are

12   doing -- they're billing this Estate for something that

13   relates to Celetex or they're doing something beyond the scope

14   of their retention, we can bring that before the Court.  And

15   that's exactly what I wanted to happen.

16          THE COURT:  Okay.  To extent that what they're doing

17   is using them as experts, I don't think I need to look at that

18   issue.  And, frankly, I don't want to look at that issue.  To

19   the extent that they're using them as consultants, I probably

20   do have to and I want to.  Okay.

21          MR. BAENA:  And that's the distinction we're gonna

22   make.

23          MR. PERCH:  Thank you, Your Honor.

24          THE COURT:  All right.  Okay.  I'm not sure what's

25   left today.  I've kind of lost track of this in the context of

1  what we need.

2        MR. BERNICK:  I'm sorry, Your Honor.  I don't believe

3  anything is left.  I think we're all -- I think we've gotten

4  through everything.

5        THE COURT:  All right.  So I do not need Orders on

6  agenda items whatever they were, 12 and 13, or 13 and 14.

7        MR. BAENA:  We never got to the notice program.  But

8  that is driven in large part by the rest of the things that

9  were still to be decided.

10       THE COURT:  Okay.  I think we need a separate date

11 for that.  And that's what I propose.  That's probably going

12 to be scheduled in Pittsburgh, folks.

13       MR. BAENA:  And we'd like to make that an evidentiary

14 hearing, Judge.

15       THE COURT:  Oh, no, not the first day, Mr. Baena.  I

16 just want to get through the issues.  I'm not even sure at

17 this point that I understand what the issues are.  So this

18 one's for my edification.

19       MR. BAENA:  Okay.

20       THE COURT:  If you need an evidentiary hearing after

21 I understand it, then that's fine.  But the first one, I just

22 want to hear what it is that this universe is all about.

23       MR. BAENA:  Okay.

24       THE COURT:  Okay.

25       MR. BERNICK:  These are some Orders.

1       THE COURT:  All right.  Okay.  I was to get Orders.

2   And let me make sure that this is what I have.

3       MR. BERNICK:  Your Honor, those should be 7, 8 and 9.

4       THE COURT:  Okay.  I believe I entered an Order on 6

5   earlier.  Did you get 6?  Sometime in January.  I thought I

6   entered that Order at the end of the last set of hearings, on

7   the motion to assume, sell and assign certain leases at docket

8   817.

9       MR. BERNICK:  Your Honor, I believe you entered it

10  with regards to extending the removal period.

11      THE COURT:  The removal period?

12      MR. BERNICK:  Yes.  That was entered last month.

13      THE COURT:  All right.  So this is -- the first is on

14  number 7, the Order extending the time to assume or reject.

15      MR. BERNICK:  Yes, Your Honor.

16      THE COURT:  Okay.  Did you get an Order on 6?

17  Because I thought I signed one.  And if you don't have it,

18  then I may be in error.  I thought I signed a --

19      MR. BERNICK:  Your Honor, we're not matching up on

20  the numbers.  When you say 6 --

21      THE COURT:  I'm looking at uncontested matters,

22  motion for entry of an Order pursuant to Section 365(A),

23  Item --

24      MR. BERNICK:  This says 7.  All right.

25      (Pause in proceedings)

1        THE COURT:  Could you please on the amended agendas

2   not change the numbers of things?  If you want to delete

3   something, delete it.  But don't change the numbers for me,

4   please.  It's too confusing.  All right.  Now what is it that

5   -- I thought on your new number 7 that I had entered an Order

6   last week on a stipulation.  Did you get it or not?  That's

7   what I'm still trying to find out.

8        MR. KNAPP:  We have not received it, Your Honor.

9        THE COURT:  Is that what this is?

10       MR. KNAPP:  Yes.

11       THE COURT:  I'm not matching up the numbers.  I'm

12  sorry.  This says it's Re: Docket #1532.  What I have as

13  number 7 is Re: Docket #817 and 1583.  I'm not matching them

14  up.

15       MR. KNAPP:  That's what's on my agenda, Your Honor.

16       THE COURT:  Then what's this?  Here it is.  This is

17  on number 9.  Okay, I see it.

18     (Pause in proceedings)

19       THE COURT:  All right.  This was original agenda item

20  number 8.  It's now number 9.  And this Order was to be

21  brought to the Court.  Obviously it has been.  I'm entering

22  it.  Okay.  The next one is Re: Docket #1531.  And that was

23  original agenda item 7, amended agenda item 8.  This extends

24  the Debtor's exclusive period as requested.  That Order is

25  signed.

1      MR. CARICKHOFF:  Your Honor, I think -- David

2  Carickhoff with the Debtors.  I think the confusion might be

3  in the fact that we provided to Your Honor a draft of the

4  agenda a couple weeks in advance.  And then before we actually

5  file it what we do is we at that time we have a better sense

6  of what will be continued and what won't be.  If it's easier

7  for Your Honor to review the matters, we'd be happy to not

8  change the numbers as per the draft that we give Your Honor.

9  We'll just simply change the status.

10      THE COURT:  That's fine.  Just if you keep the

11  numbers the same, if you just put in there, "deleted by

12  agreement" or something.  I don't care.  Just so I don't have

13  this problem following the numbers through.  It's very

14  confusing for me, and it's worse for my staff.

15      MR. CARICKHOFF:  I understand.  We'd be happy to keep

16  it consistent with the draft we provide to the Court.

17      THE COURT:  Okay.  All right, the next one is -- I

18  don't know what the next one is.  It doesn't have a reference.

19  Please also put the references in.

20      MR. BERNICK:  Is it --

21      THE COURT:  It's a Stipulation Order resolving

22  Debtor's motion for an entry of an Order under Section 363 and

23  365 authorizing assumption and sale of a prime lease.

24      MR. CARICKHOFF:  I believe that's the one Your Honor

25  referenced previously that dealt with the Docket #817.  And

1   the reason we didn't do it as referenced to a particular

2   docket number is because it refers to several docket items.

3   It not only resolves Docket #817, it resolves the complaints

4   of American Real Estate Holdings, as well as the objection to

5   American Real Estate Holdings.  So the stipulation actually

6   deals with three separate docket numbers.

7           THE COURT:  That's okay.  Put them all in.  Rather

8   than leaving them out, put them all in so that I have an idea

9   of where they go to.  Or if it's easier to refer to them by

10  agenda -- no, put the docket reference in.  That's how my

11  staff needs to know that they're appropriately docketing the

12  orders.

13          MR. CARICKHOFF:  Sure, we can do that.

14          THE COURT:  Okay.  What is the resolution with

15  respect to American Holdings, since I don't have time to look

16  at this now?

17          MR. KNAPP:  Your Honor, we're objecting to the lease.

18  And we are paying amounts -- administrative expenses through

19  December 15th, 2001.

20          THE COURT:  Okay.  All right, that Order is signed as

21  well.

22          MR. KNAPP:  And, Your Honor, one final question with

23  regard to item 11.  You set some dates.  Would you like a

24  Scheduling Order from us?

25          THE COURT:  Yes, please.  If you leave a date blank,

131

1    I don't think we're going to have time on your normal calendar

2    to deal with those issues next month in March.  So I'm going

3    to give you a separate date.  So if you would just leave the

4    hearing date blank.  I'll keep to the same line item issues,

5    but change the hearing date.  I will try to keep it as close

6    to March 18th as I can.

7            (Pause in proceedings)

8            THE COURT:  Okay.  Mr. Zaleski?

9            MR. ZALESKI:  Good morning, Your Honor.  Matthew

10   Zaleski, Campbell & Levine with a rather unusual housekeeping

11   item.  On Friday I was talking with Warren Smith on an

12   unrelated matter.  As you're aware, he's been nominated, if

13   not approved, as a fee examiner in this case.  Mr. Smith asked

14   me to relay to the Court that he has an interest in discussing

15   his engagement with Your Honor, but felt uncomfortable calling

16   the Court, and wanted to know if either Your Honor would call

17   him or grant some type of permission or a suggested time that

18   he call you.  I told you it was a rather unusual housekeeping

19   request.

20           THE COURT:  Could he just not come to Court and -- is

21   it something --

22           MR. ZALESKI:  Well he -- no, I think he has in the

23   past in USG had been given direction, I guess, from Judge

24   Newsome, or at least had a chance to discuss --

25           THE COURT:  Oh, as to what he needs --

1          MR. ZALESKI:  His job.

2          THE COURT:  -- to do.  I would prefer that he just

3     come to Court and we can work it out with everyone.  If he

4     wants to appear by phone, that would be fine.  I --

5          MR. ZALESKI:  I got the impression this was a not

6     having the parties involved, and merely having a chance to

7     discuss with you.  Judge Newsome has employed him as what is,

8     in all intents and purposes, a 706 expert.  And I think he has

9     taken that instruction or guidance from him.  And to the

10    extent Your Honor is interested in doing the same, he sort of

11    asked me to bring the subject up.

12         THE COURT:  My view about the fee examiner is I want

13    somebody who's gonna review the fee petitions, find out

14    whether or not there are duplicative services, who's charging

15    for what, and do an analysis of the fees.  That's what I'm

16    looking for.  There really isn't any magic to what I'm

17    expecting.  I'm hoping that he comes to the conclusion that

18    everything is just fine and appropriate, and doesn't have any

19    changes that need to be made.  But if he does, I want to know

20    what they are and why.

21         MR. ZALESKI:  Okay.

22         THE COURT:  I don't really have more specific

23    marching orders --

24         MR. ZALESKI:  That's fine.  I --

25         THE COURT:  -- than that.

133

1          MR. ZALESKI:   -- will relay that and tell him to

2   focus on the former of those two options, and I think we'll

3   all be set.

4          THE COURT:   What I do need to know from him though is

5   I still have this amended administrative order set which I was

6   asked to defer until he is appointed because of the category

7   issues.  And that I do want an opinion from him as to how he

8   would like that handled.

9          MR. CARICKHOFF:   Your Honor, if I may.  David

10  Carickhoff with the Debtors.  I had spoken with Mr. Smith

11  about the billing matter categories.  And his question to the

12  Court was he didn't know if those were for the fee examiner's

13  benefit or for Your Honor's benefit.  To the extent they were

14  for the fee examiner's benefit, he was content just for the

15  firms to continue to use their regular billing matter

16  categories.  He didn't need this special set of billing matter

17  categories, and in fact thought that might actually be more

18  confusing than following what existing structure they already

19  have.  So if Your Honor could I guess clarify that point of

20  whether it's for Your Honor's benefit to have that in place or

21  for the fee examiner's, I don't know that the fee examiner

22  feels that's necessary.

23         THE COURT:   Okay.  Well it was for my benefit when I

24  didn't have a fee examiner.  But now that I'm going to have a

25  fee examiner, I think we need to do things that are copacetic.

1   So if he doesn't need them, I'm willing to see what it is that

2   he proposes to do.   It actually might be helpful if we just

3   get him here and discuss these issues for a few minutes.   I do

4   not think it would take a long time.

5          MR. CARICKHOFF:   I believe he'll be up for the March

6   18th omnibus hearing.

7          THE COURT:   Okay.   Anybody have an objection to

8   trying to get Mr. Smith here and see if we can work something

9   out?   All right.   I'm going to hold this administrative order,

10  the amendment then until the March hearing again.   Okay, any

11  other matters that need to be addressed today?   Okay, thank

12  you.   I'll expect to get your Orders in a week.

13      (Court adjourned)

14

15                     CERTIFICATION
    I certify that the foregoing is a correct transcript from the
16  electronic sound recording of the proceedings in the above-
    entitled matter.

17

18  _____          3-5-02
    Signature of Transcriber          Date

19

20

21

22

23

24

25

Writer's Cramp, Inc.

Certified Court Transcribers

732-329-0191