IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No: 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## SUPPLEMENTAL AFFIDAVIT OF TODD B. HILSEE ON DEBTORS' BAR DATE

## NOTICE PROPOSAL AND ALTERNATIVE NOTICE PLAN

1.      I am the President of Hilsoft Notifications, a company that specializes in designing, developing, analyzing, and implementing legal notification plans.  I have served as a qualified notice expert in bankruptcy and class action notice programs.  I have designed, analyzed and/or implemented notice in over 100 notice programs involving all aspects of notice in many of the largest and most significant cases.

2.      On September 6, 2001, I submitted an affidavit critiquing the Debtors' first notice plan submission, that included a detailed description of my work in the notification field, including many judicial comments relating not only to the implementation of notice programs, but also on my studies as to the adequacy and sufficiency of notice programs,

including the Babcock & Wilcox asbestos bankruptcy notice, over the objection of Grace's

current notice expert[1]. I have included my earlier affidavit in this case as **Exhibit 1** for this

Court's convenience.

3.      Since the submission of my report, I have been asked to prepare an

alternative Bar Date notice plan. In my prior affidavit, I expressed concerns about whether

a notice and a notice program could effectively and reasonably notify potential W.R. Grace

claimants of a Bar Date. I have not concluded whether a notice program can effectively

overcome the notice issues surrounding a bar on claims, including communications issues

relating to the unwary nature of PD (Zonolite and traditional) claimants, specifically: if

potential claimants don't know they have the product, it would be difficult for any notice

to engender that knowledge if they are not supposed to disturb it, or if it is hidden in their

property. I have addressed that scenario with a critique of the Debtors' revised proposal,

and a better alternative. The method and forms of notice should represent the best way to

effectively reach the most claimants that are reasonably possible to reach.

4.      Under this scenario, I have designed the attached alternative notice plan,

that, relative to the Debtors' revised notice plan, costs $1.25 million less and provides –

---

[1] The Court in the Babcock & Wilcox bankruptcy, where I worked for the debtor, found, over the objection of Katherine Kinsella and the Asbestos Claimants Committee, that my notice plan, which followed the same strategic approach that I have employed here, was effective and appropriate and that my testimony was not rebutted.

just like many notice programs that I and the Debtors' expert have prepared – separate, attention-getting, compelling and simplified notices that are written and designed to focus on the distinctly different people with distinctly different key claim types affected by this case.  It also reaches as many or more claimants, provides several hundred million additional notice exposures to them, provides more notice placements, in more publications, with more TV spots and rating points, in better and more focused publications, and an overhauled selection of the most appropriate trade publications to reach traditional PD claimants.  In paragraph # 20 of this affidavit I detail a point-by-point comparison of the notice plans.  The Alternate Notice Plan, with the forms of notice called for therein, is attached to this affidavit as **Exhibit 2**.

5.      Before completing this alternate plan, I studied the revised notice plan that the Debtor has submitted and the comments that the Debtor through its notice expert, Katherine Kinsella, provided in her latest affidavit.

## THE DEBTORS' REVISION TO ITS ORIGINAL NOTICE PLAN

6.      Since my first report, the Debtors have revised their notice and notice plan, notably:

a.     The Debtors have completely redesigned and revised the short form and trade notices to include a headline that is directed more to claimants rather than claims, as was strongly recommended in my initial affidavit.  In addition, the short form notice and presumably the television spot[2] have been revised to include a visual of vermiculite, and a more detailed description of the Zonolite product.

b.     The Debtors have revised the notice plan in Canada.  The Debtors' revised plan includes five more Canadian magazines as well as activity on Canadian television.  Three regional newspapers and 26 local newspapers have been deleted in this revision.  Additionally, the Debtors' plan now includes delivery information for Canada, which was not originally addressed.

c.     The Debtors have acknowledged the error I noted in the sizing of notices in the tabloid newspapers in Puerto Rico, Guam and the Virgin Islands and have adjusted the revised plan to reflect an adequate notice size in each of the recommended newspapers in these U.S. territories/possessions.

## REMAINING PROBLEMS WITH DEBTORS' NOTICE PLAN

---

[2] The Debtors' plan describes that a 'visual treatment is to be determined', while the latest affidavit notes that unspecified visuals of Zonolite will be included.  The notice proposed in the alternate plan here shows precisely what visual treatment is recommended, so the Court knows exactly what it is approving.

7.      Although the notice plan was improved since my first report, I believe

significant problems still exist:


a.      The overwhelming bulk of the notice plan still employs one print notice attempting

to shoehorn many distinctly different claims held by distinctly different readers and

viewers into one print notice and one TV notice. Although revised, the Debtors'

notice is still too broad, is even more complicated, and still attempts to speak to all

of the claimant groups at once: **"If you have an asbestos-related personal injury,**

**have a home with Zonolite loose-fill attic insulation, own or operate**

**commercial, residential or public buildings, have any claim against W.R.**

**Grace..."** The revised notice most likely does not draw the attention of most of the

potential claimants in any one category.


b.      The TV spot is an unintelligible, complicated mixture of messages (and now some

type of visuals) that target widely divergent types of people.  It is not effective, and

certainly not in thirty seconds.  In my experience supervising creative and

production professionals that write and design TV commercials for large

advertising agencies, in addition to my experience designing and producing TV

commercials for litigation campaigns, I have not seen the complicated, dense copy

and visual approaches as proposed by the Debtors.  TV is designed to communicate a simple key message to viewers who are being interrupted from entertainment. Viewers are not waiting for detailed "print ads" to appear on the airwaves. Moreover, the Court is asked to approve a TV spot with visuals, with no idea of what these visuals will be.

c.     The use of consumer TV, with its broad audience of adults, for traditional property damage claims – involving a business audience that can be reached effectively and more effectively through business print media and trade publications – is not an effective use of TV.

d.     The headline of the single main print notice is a complicated mixture of four different types of claims.  Its length and complexity does not address the detailed evidence in my prior report about the communications industry standard for single-minded focus for good communications, and is inconsistent with the effective notices that Courts have approved not only in the asbestos area but in many other litigation matters.

e.   The topic at the top of the notice is "**asbestos-related personal injury**," and it is likely that many readers will think the entire notice relates only to those who have asbestos-related injury.  Other claimant groups may disregard the notice and turn the page.

f.   It is almost a foregone conclusion that most Zonolite claimants won't know they are affected.

g.   It is almost a foregone conclusion that most other Property Damage claimants won't know they are affected.

h.   The tiny photo of a Zonolite nugget in the print notice is grossly ineffective.  The overall attic appearance is critical for the person who will poke his/her head into the attic.  An exclusive shot of a single nugget is almost useless except for the person who grabs one to study it, and with the Court having not ruled whether it is dangerous, this is not what people should do.  No bag is included in the visual.  The bag itself is a very useful tool to help identify Zonolite, regardless of the varying types, because bags were often left in the attic during installation and are there to

this day.  This is another simple tool that could prevent disturbance during

identification.

i.      There is no explanation of "why" the Zonolite reader should even care to determine

whether he/she has Zonolite or should file a claim.  The notice does not mention

any key issues, even in a party neutral expression, such that the unwary Zonolite

claimant would know that he/she has the insulation and that has the right to file a

claim as a result.

j.      There is no structure tied into the notice addressing the unique "catch- 22" that

Zonolite homeowners are in:  They don't know if they have the product; they have

to identify it to even know whether to file a claim; the reason a claim has to be filed

is because it may contain asbestos; if it does contain asbestos, it may be dangerous

and shouldn't be disturbed.  Because of these unresolved problems with unwary

consumers, unlike any other previous bar date notification, the notification

procedure may need to include an inspection process that potential claimants can

avail themselves of so that they can know whether to file a claim without disturbing

the product.

k.    The Debtors' plan does not acknowledge that over ¼ of PI Claimants are Men 55-64. Instead, the Debtors' plan limits its primary target to Men 65+.

l.    Because we personally use and study A.C. Nielsen data, and have recently completed intensive post-buy analyses of the massive network TV campaign that we personally negotiated and placed in the B&W bankruptcy case, we determined that, contrary to the basis for the "estimated" unduplicated reach of Men 65+ in Kinsella's original plan, mathematical calculations revealed that Kinsella's rating point expectations are way out of line with marketplace realities. To generate the reach figures she cited (80.0% reach and 3.9 frequency), the average rating point required to deliver this reach during the time periods she selected were necessarily: Early Morning 4.2, Early News 16.6, Prime 11.5, and Sports 12.3. In actuality, based on 2001 Nielsen Television Index - Total Viewing Sources data, the average rating for spots in these dayparts against the Men 65+ demographic for the first calendar quarter (the highest ratings quarter) are: Early Morning 2.3 (54% percent of Kinsella's estimate), Early News 8.4 (50% of Kinsella's estimate), Prime 6.1 (53% of Kinsella's estimate), and Sports 3.5 (28% of Kinsella's estimate). The resulting shortfall when it comes to reach could be disastrous. When we determined that the 65+ target was too narrow, as noted above, comparison with

Kinsella's 65+ audience data became unimportant. We did not complete a

comparison with other targets. However, to the extent that Kinsella does not

commit to delivering reach based on actual A.C. Nielsen data for other key

demographics, this is concerning. In our plan, the Court is promised that target

audience reach data will be achieved based on actual A.C. Nielsen data.


m.    The Debtors' plan continues to disregard the possibility of additional foreign

activity to reach potential claimants outside of the U.S. and Canada. In her

affidavit, Ms. Kinsella states that she is "not aware of sales of asbestos containing

products outside of the United States and Canada." Kinsella Aff. at 24. She goes

on to state "the Debtors' records contain information suggesting that for a period of

time in the 1970s and early 1980s Grace sold some vermiculite products to various

parties in the Persian Gulf region and Asia." Kinsella Aff. at 24. Grace has

apparently told Ms. Kinsella that "these sales constituted no more than about 1% of

its sales of vermiculite products" Kinsella Aff. at 24. The Property Damage

Committee believes that these sales may constitute more than suggested by Grace.

According to the PD Committee, Grace had two licensees that sold in the Pacific,

Vermiculite of Hawaii Inc. and Vermiculite of Japan Inc. Additionally Vermiculite

Northwest in Seattle, and California Vermiculite shipped to Hawaii, Guam and

Micronesia. Until further sales information is provided, the Asia/Pacific Rim or other regions cannot be overlooked if a bar is sought on these claims. As a result, we suggest that an additional $200,000 to $250,000, or more, for foreign notification may be necessary, pending Court review of the detailed information necessary to determine where and how much notice is necessary, before barring rights in potentially key areas.

n.    I have traveled to Libby, Montana and studied the publications available to reach Libby residents. The Debtors proposed publishing notice in the *Missoula Independent*, a "free" weekly journal distributed in Western Montana. We spoke to the publication and were told regarding circulation that "there is nothing in Libby." Not placing notices in the leading publications within Libby, the widely read dailies *Missoula Missoulian* and the *Kalispell Interlake,* with paid and documented circulation, or in the *Montanian* and *Western News* from Libby itself, when the costs are so minimal, is simply not advisable.

## SEPARATE NOTICE 'PROGRAMS' ARE NOT NECESSARY;  SEPARATE NOTICES ARE;  THEY WON'T COST MORE AND ARE OFTEN UTILIZED.

8.      In the February 11, 2002 affidavit of the Debtors' notice expert Katherine

Kinsella, she stated that separate notices are not needed, seemingly ignoring the fact that

homeowners who have Zonolite attic insulation claims have nothing in common with

owners/managers of commercial entities who have traditional property damage claims, or

workers who have injuries from installing asbestos insulation products. In fact, there could

hardly be more divergent messages and groups. The simplistic supporting argument that

many people in these groups are (at least) the same age, has no bearing on whether the

messages necessary to communicate with them are at all alike.


9.      The Debtors' expert further opines that curing the problem would require a

separate notice program and would cost $4 million more than the $6.075 million plan she

has formulated. This is not correct, as shown by the alternate plan submitted here. In fact,

the Debtors' plan costs too much already, and delivers too little.


10.     As am I, the Debtors' notice expert is experienced in other asbestos cases,

although the Debtors' notice expert designed notices and plans in the attempted global

asbestos class action settlements, in which $10-20 million notice programs with "catch-all"

notices to both current and future claimants, resulted in Supreme Court questions about the

ability of any notice to adequately address the intended audiences of unaware putative

class members.

11.     My notice and plan does not address the issue of whether any notice issued

should "educate" or "warn" in the context of a Bar Date notice situation.  However, there is

a difference between warning and educating a person who knows that a message affects

him/her, and ensuring that a person understands that a message affects them at all.  In the

context of a Bar Date notice scenario, it is the latter (awareness and understanding) that

notice must ensure.  The Debtors' proposed revised notices still do not adequately ensure

awareness and understanding.[3]

12.     The extent to which the Debtors and their expert have focused on

dissemination methods does a service in that it follows the models that courts have

---

[3] In the November deposition of the Debtors' notice expert, Ms. Kinsella testified that a different notice
might be needed if it were found that Zonolite was inherently dangerous.  I agree, because a very public
notice campaign could drive people into their attics to see if they have Zonolite, creating the very undesirable
effect of placing people, unknowingly, in danger.  On the other hand, a Bar Date without the most attention
getting public call to action possible for this almost completely unaware group of potential claimants will
result in an entirely false sense of how many claims are out there, because hardly anyone with the product
will respond.  Unfortunately, according to the deposition of Ms. Kinsella, the Debtors' notice presumes
someone does not have to "inhale it, eat it, touch it, or anything" to identify Zonolite, and that it is not
dangerous, even before such a finding by the Court.  From a communications perspective, having seen films
of billowing clouds of dust from mere disturbance of Zonolite, I would not issue notices that may suggest or
encourage homeowners to be as bold as Ms. Kinsella.  Instead, an alternate form of notice here suggests an
inspection and identification process be considered for a Bar Date notice program.  While this may take more
time to lead up to a Bar Date, this situation is not at all like a situation where the respondent can simply look
up in the air and not have to touch anything to easily visually identify a product, for example the recent
ceiling mounted sprinkler recall notices undertaken by the Debtors' expert, or other more typical asbestos
bankruptcies where claimants have some awareness that notices affect them.

reviewed for a long time, since *In re Domestic Air,* which the Debtors cited. In the published notice decision in that case, 141 F.R.D 534, 548-55 (N.D. Ga., 1992), the court was reviewing my work, which initiated legal notification 'net reach' analyses. However, the Debtors' notice plan does a great disservice by ignoring the content and design of notices.

13. In fact, statements seemingly dismissing the importance of notice content in Kinsella's October 29, 2001 affidavit are not consistent with her other work. *"There is no standard for using headlines in legal notices... In fact - by far the great majority of the bar date and class action notices do not contain an attention getting headline at all."* Kinsella Aff. at 7. *"There is no rule or requirement that notices be directed at claimants rather than claims".* Kinsella Aff. at 8. I have not seen any notice prepared by Ms. Kinsella that did not carry some type of attention-getting headline. In fact, there is a standard for good and effective notices. The notion that ineffective notices with descriptions of divergent claims shoe-horned into them, without attention-getting designs and focused content, are somehow minimally acceptable, is reflective of the environment that has resulted in the recent judicial and legislative concerns about the content of notices, in proposed rule changes to Fed. R. Civ. P. 23, calling for class action notices that are 'clear, concise

notices in plain easily understood English', and a similar call for clarity in class action

notices H.R. 2341 proposed by Congress.


14.    In the *In Re Dow Corning Corporation* bankruptcy, my job was to design

the notices and the paid media plan. The parties stipulated to those notices. There were

two main notices, each distinctly different, focused on the two distinctly different groups

of claimants: Breast Implantees and Other Implantees. This did not blow the budget. The

disparity of those different claims demanded different notices and they were submitted

with the jointly proposed plan. The varying "executions" of notices were split and rotated

precisely like I propose in our plan here[4]. Suggestions that separate notices here would

require drastically greater notice exposures overall, and therefore a very expensive notice

plan, would not be consistent with the Court approved methodology for calculating the

reach in the *Dow Corning* case, which I prepared and which was supported by the Debtors'

notice expert, and which are similar to those in my alternate notice plan here.


15.    In the *In Re Holocaust Victims Assets Litigation*, No. CV-96-4849 in the

Eastern District of New York, (the 'Swiss Banks' litigation), the notices were designed

with attention-getting headlines written to individuals in such a way as to ensure that all

---

[4] Suggestions raised in my November deposition that some far less important 'umbrella' notices were meaningful to that case are misleading since the two main notices, including the separate notice for Breast Implantees (which is like a separate notice for Zonolite claimants here), accounted for 98% of the 'impressions' or notice exposures in that Bar Date notice program.

potential claimants knew that they might be affected.  Interestingly, Ms. Kinsella also

advocated and implemented separate notices to Romani people (Gypsies), even though

they might have been the same age and even in many of the same countries as many

Jewish Holocaust Survivors and heirs.[5]

16.    In another major claims program, this one not in a legal setting, Ms.

Kinsella asked me to oversee the content and design of notices that again provide a great

example of how notices must be sure to get the attention of the affected reader and inform

them of how they may be affected by a claims process.  In the International Commission

on Holocaust Era Insurance Claims program, the notice headline **"Suppose you had a

Holocaust Era Insurance Policy and you just didn't know about it?"** along with a

photo of a Holocaust era family, stir a memory that a reader may have a claim from long

ago.

---

[5] The Swiss Banks case involved various people who shared a similar, horrible fate, one that was unforgettable.  One that became the single, defining characteristic handed down through the families of all the people involved.  For the main notice program, one simple headline could, and did, alert anyone: PEOPLE VICTIMIZED BY NAZI PERSECUTION.  The notice could easily reach the different types of people who could identify themselves by such a headline.  Similarly, one notice headline to Zonolite Attic Insulation homeowners can alert people in older homes, people in newer homes, people in the North, people in the Midwest, tall people, short people, people of different ethnic groups and religious groups.  Notably, perhaps because of the difficulty of informing someone of the complex nature of the Swiss Banks settlement and recognition of the necessity of explaining the claim they may have, our notice team spread out around the globe and dug into the local communities of claimants.  Ms. Kinsella traveled to Eastern Europe and set up a network of local assistance organizations to reach Romani (Gypsies).  She worked to get to the Romani populations on the ground.  She met with Romani leaders.  She set up field workers to find Romani to give them notices.  She recommended simple separate notices to reach them.  Her work was outstanding.  Similar activities were undertaken to reach the Jewish groups.  Country supervisors and assistance groups were setup in dozens of countries whose job it was to explain the settlement, what types of claims they have, to go out and find claimants.  There were even local help centers in certain countries such as Israel, to allow one-on-one assistance in filing claims.

17.    In the Babcock & Wilcox notices that the Debtors describe, I was responsible for writing and designing the notices, as well as implementing the notice program. The notice in that program was <u>not</u> written for both the Personal Injury and Property Damage claimants, since there was no significant property damage component. The notices in Babcock were in fact written almost exclusively for Personal Injury claimants (with reference to other claims, as my proposed notices will do here) and the headline of that notice could not have more deliberately targeted those claimants. The headline clearly explained who should read the notice and why it is important, precisely in a manner that I am proposing here. It stated, "**If you currently suffer from asbestos-related injury and you worked at sites with commercial boilers, you must act now to preserve your rights.**"

18.    In fact, in a better comparison with our present situation, where there was a separate and distinct claim type in the Babcock & Wilcox case, an entirely different notice was designed and published. For claims relating to nuclear contamination involving the Apollo/Parks nuclear facility, entirely different notices were prepared and disseminated that bore no resemblance to the other personal injury notices: "**If you are or were a**

**resident of Apollo, PA or Parks Township, PA, you must act now to preserve your rights relating to nuclear contamination or radiation claims."**

19.     The fact that certain age demographic groups may contain people with distinctly different claims does not provide any benefit to lumping distinctly different messages into notices designed to reach different people within that demographic group. For example, just because people who own homes with Zonolite are more likely be 35 years and older and the men who worked around insulation products are also older than 35 years (they are mostly far older than that as recognized by the Debtor), does not mean that they are the same people or that one notice to both of them would be effective. This logic does not work.

### ALTERNATE NOTICE PLAN

20.     We have developed an alternate plan that compares as follows with the Debtors' revised proposed plan:

| Elements | Hilsoft Notification's Notice Plan | Debtors' Notice Plan |
|---|:---:|:---:|
| **Creative[6]:** | | |
| Focused ZAI Print Notice | Yes | No |

[6] Notice focuses on claimants with a key claim type, and addresses other claimants.

| | | |
|---|---|---|
| Focused PD Print Notice | Yes | Yes |
| Focused PI Print Notice | Yes | No |
| Focused Libby, MT Print Notice | Yes | No |
| Focused 3rd Party Print Notice | Yes | Yes |
| Focused ZAI Television Notice | Yes | No |
| Focused PI Television Notice | Yes | No |
| | | |
| **U.S. Media:** | | |
| Direct Mail Notice | Yes | Yes |
| | | |
| Television | Yes | Yes |
| • Adult 35+ GRPs[7] | 245 | 210 |
| • Men 55+ GRPs | 289 | Not addressed |
| • Adult 18+ GRPs | 203 | Not addressed |
| | | |
| Consumer Magazines | Yes | Yes |
| • # of publications | 10 | 6 |
| • # of insertions | 16 | 7 |
| | | |
| National Newspapers | Yes | Yes |
| • # of newspapers | 3 | 3 |
| • # of insertions | 6 | 6 |
| | | |
| Local Newspapers | No[8] | Yes |
| | | |
| U.S. Territories/Possessions | Yes | Yes |
| • # of Puerto Rico papers | 3 | 3 |
| • # of Guam papers | 1 | 1 |
| • # of Virgin Is. Papers | 3 | 2 |
| • # of insertions | 14 | 6 |
| | | |
| Trade Publications: | | |
| Commercial Property/ Buildings[9] | Yes | Yes |
| • # of publications | 9 | 9 |
| Hospitals/Healthcare[10] | Yes | Yes |

---

[7] A measure of audience coverage. One gross rating point equals 1% of a given population.

[8] Our analysis found the 43 local newspapers recommended in the Debtors' plan to be extremely inefficient and less effective when compared to other media. Details of our analysis are included in the summary of conclusions below.

[9] We recommend a national magazine, *Commercial Investment Real Estate,* in place of the Debtors' recommendation of *Commercial Realty News*, whose circulation is largely limited to Pennsylvania and New Jersey.

Supplemental Affidavit of Todd B. Hilsee on Debtors' Bar Date Notice Proposal and Alternative Plan

| | | |
|---|---|---|
| • # of publications | 3 | 3 |
| Schools/Colleges/Universities[11] | Yes | Yes |
| • # of publications | 7 | 7 |
| Local/State/Federal Government[12] | Yes | Yes |
| • # of publications | 4 | 5 |
| Airports | Yes | No |
| • # of publications | 1 | |
| Churches | Yes | No |
| • # of publications | 2 | |
| Hotels | Yes | Yes |
| • # of publications | 2 | 1 |
| Malls/Shopping Centers | Yes | No |
| • # of publications | 1 | |
| Movie Theaters | Yes | No |
| • # of publications | 1 | |

**U.S. Delivery:**

| | | |
|---|---|---|
| Adult 35+ Reach[13] | 95.5% | 95.4% |
| Adult 35+ Frequency | 5.9 | 4.3 |
| Adult 35+ Gross Impressions | 767,672,000 | 553,066,740 |
| Men 55+ Reach[14] | 95.7% | Not Addressed |
| Men 55+ Frequency | 6.2 | Not Addressed |
| Men 55+ Gross Impressions | 147,433,000 | Not Addressed |
| Adult 18+ Reach[15] | 93.9% | Not Addressed |
| Adult 18+ Frequency | 5.4 | Not Addressed |
| Adult 18+ Gross Impressions | 1,012,914,000 | Not Addressed |

---

[10] We recommend _Modern Healthcare_ in place of the Debtors' recommendation of _FacilityCare_ in order to effectively reach top-level healthcare executives.

[11] We recommend _American School and University Magazine_ in place of the Debtors' recommendation of _University Business_. In addition, we recommend the audited and 100% paid for _American School Board Journal_ in place of the Debtors' recommendation of _School Board News,_ which offers a smaller, non-audited circulation.

[12] The Debtors' plan includes _County News_ which has readership comprised of county and state officials in Texas only.

[13] The Debtors' plan does not acknowledge that Adults 35+ (including ZAI and PD Claimants) are a primary target; instead the Debtors' plan lists Adults 35+ (the core homeowner with Zonolite target) as a secondary target.

[14] The Debtors' plan does not acknowledge that over ¼ of PI Claimants are Men 55-64. Instead, the Debtors' plan limits its primary target to Men 65+. For comparison, our analysis of the Debtors' plan found its Men 55+ reach to be 94.9% with a 4.7 frequency and a total of 110,821,000 gross impressions.

[15] The Debtors' plan acknowledges the importance of reaching Adults 18+, however, does not include delivery information against Adults 18+. Our analysis of the Debtors' plan found the Adult 18+ reach to be 90.9% with a 3.7 frequency and a total of 675,944,000 gross impressions.

**Canadian Media:**

| | | |
|---|---|---|
| Consumer Magazines | Yes | Yes |
| • # of publications | 8 | 7 |
| • # of insertions | 12 | 7 |
| | | |
| Newspapers | Yes | Yes |
| • # of national papers | 2 | 2 |
| • # of regional papers | 18 | 36 |
| • # of insertions | 40 | 38 |
| | | |
| Television | Yes | Yes |
| • Adult 35+ GRPs | 185 | 180 |

**Canadian Delivery:**

| | | |
|---|---|---|
| Adult 35+ Reach | 91.8% | 91.2% |
| Men 55+ Reach | 90.5% | Not addressed |
| Adult 18+ Reach | 90.5% | Not addressed |

**Other Activities:**

| | | |
|---|---|---|
| Earned Media | Yes | Yes |
| On-Line Notice | Yes | Yes |
| Toll-Free Telephone Support | Yes | Yes |
| Third Party Notice | Yes | Yes |
| Libby, Montana Newspapers | Yes | No |
| • # of newspapers | 4 | 0 |
| • # of insertions | 4 | 0 |

**Estimated Expenses:**
(based on 2nd Quarter 2002)

| | | |
|---|---|---|
| Paid Media | $4,746,100 | $6,028,842 |
| Production/Distribution | $50,000 | $25,640 |
| Earned Media | $10,000 | $3,500 |
| Miscellaneous | $15,000 | $17,500 |
| Total Budget | $4,821,100 | $6,075,482 |

## MERITS OF ALTERNATE PLAN AND CONCLUSIONS

Supplemental Affidavit of Todd B. Hilsee on Debtors' Bar Date Notice Proposal and Alternative Plan

21.     There are distinct differences between the attached recommended notice plan and the Debtors' proposed plan:

a.     ***Focus and Clarity of Message***

i)     As mentioned previously, the attached notice plan addresses each of the distinctly different key claimant groups (ZAI Claims, traditional PD Claims, PI Claims, and Libby, Montana claims) with notices designed specifically for them, whereas the Debtors' notice attempts to speak to *all* of these claimants with one "catch-all" notice. The Debtors' notice proposal does not even include a notice written especially for Libby residents.

ii)     Our attached recommended notices use headlines that speak directly to each of the potential claimant groups separately, i.e. "**If your property contains loose-fill vermiculite attic insulation…**," "**If your commercial property has asbestos containing building products…**", capturing their interest and inviting them to read the text of the notices.

iii)     Unlike the Debtors' traditional PD notice which has no mention of asbestos

products in its headline, "**If you own or operate commercial, residential or**

**public buildings you may have a claim in the W.R. Grace bankruptcy**", our

notices clearly address the PD Claimants, "**If your commercial property has**

**asbestos containing building products…**" with the intent to inform and attract

these claimants to read more.

iv)     The Bar Date is prominent in a bold, large subhead.


v)      The Zonolite product is depicted in large, clear and helpful photographs to

enhance recognition and understanding. There is no reason not to employ them.


vi)     The photo of the bag is helpful to provide another opportunity for

homeowners to possibly avoid disturbing the product.


vii)    The headlines in all the notices are simple, focused and clear.


viii)   The notices provide a greater explanation of background, in a completely

neutral fashion, so readers know how they are affected and can exercise a more

informed decision as to their rights. These notices are drafts.  The wording will be

modified with input from the parties, and of course the final wording will come from, and be approved by, the Court.

ix)    The print notices have larger more prominent calls to action – phone number and website.

x)    The notice provides the phone number and website of the Environmental Protection Agency, providing claimants with a neutral and credible information source about the safe handling of asbestos and vermiculite at www.epa.gov/asbestos/insulation .

xi)    The Zonolite notice advises potential claimants who do not want to disturb the insulation to identify it (as recommended by the EPA), that they can have an inspector check it for them, albeit the necessity for this device provides a great deal of uncertainty as to whether any notice can be effective in a typical Bar Date notice time period.

xii)    The television spots are simple and clear and also focus on each of the consumer and individual claim types.

xiii)    The television spot for Zonolite carries a specific representation of the visuals that will be photographed, so that the Court and the parties can see and approve before production.

22.    **_Television Effectiveness and Efficiencies_**

a.    The Debtors' television activity is planned at a higher cost than our direct network TV buying experience can achieve. As planned, the Debtors' cost to deliver an Adults 35+ rating point (CPP) is 80% higher than our CPP.

b.    Additionally, the attached recommended program outperforms the Debtors' plan by almost 17% in terms of adult 35+ television GRPs achieved (245 GRPs v. 210 GRPs). Although not provided in the Debtors' plan, our analysis shows that our recommended plan also offers 25% more adult 18+ GRPs and 15% more men 55+ GRPS.

23.    **_Print Media Effectiveness and Efficiencies_**

a.  The attached recommended consumer print plan offers a greater reach and
    frequency than the Debtors' consumer print plan through the use of more consumer
    magazines (10 vs. 6) and the fact that the number of insertions is more than
    doubled (16 vs. 7).

b.  Both plans (ours and the Debtors') recommend the same activity in national
    newspapers (three papers, two insertions in each).  However, the Debtors' plan
    recommends additional activity in 43 local newspapers that our analysis found to
    be inefficient and less effective when compared to other media.  On the misguided
    presumption that workers, many of whom long ago retired, are still residing in
    force near the plants where they once worked[16], the Debtors' plan spends $403,700
    on certain local newspapers, which provide an adult reach of only 16.2%.  The
    majority of this local newspaper reach is already obtained through other print and
    broadcast media, in particular _Parade_ and _USA Weekend_, which provide a much
    greater reach among adults, 39.1% and 23.5% respectively, at a significantly lower
    out-of-pocket cost.  In general, the Debtors' cost to reach 1,000 U.S. adults (CPM)
    through local newspapers is $12.41, compared to our consumer magazine adult
    CPM of only $3.17.

---

[16] The movements of retirees notwithstanding, even U.S. Census data indicates that for many years an
average of 16% of our population moves every year.

c.     In Puerto Rico, Guam, and the Virgin Islands, our recommended plan outperforms

the Debtors' plan by providing an additional newspaper in the Virgin Islands (*St.*

*John Tradewind*) and more than double the newspaper insertions (14 vs. 6).


24.    ***Coverage of Traditional PD Claims - Research and Analysis of Trade***

***Magazines***


a.     Our staff offers years of professional experience as business-to-business (trade)

media planners.  As a result, an in-depth analysis of each market and the available

publications has been performed, and rationale supporting the publication selection

is provided.  The Debtors' trade plan includes a list of recommended publications

and is limited in its analysis.


b.     Our recommended trade plan offers a stronger effort against PD Claimants than the

Debtors' plan through the addition of five more recommended trade publications.

Similar to the Debtors' plan, our attached recommended plan utilizes leading

publications targeting decision-makers at hospitals, schools, colleges/universities,

hotels, government buildings and general commercial buildings.  However, the

attached plan additionally utilizes leading publications targeting PD Claimants

within other industry categories deemed important by the Property Damage

Committee such as airports, churches, malls/shopping centers, and movie theaters.

c.     In-depth research and analysis was performed so that the leading publication in

each of the targeted industries was included.  In our analysis we found that the

Debtors' trade recommendation did not include some of the leading publications

targeting key decision makers.  For instance, the Debtors' plan did not attempt to

reach top-level healthcare executives.  Instead, efforts were focused solely on

reaching health facility managers.  Therefore, we recommend utilizing *Modern*

*Healthcare* magazine in place of the Debtors' recommended *FacilityCare*

magazine to reach interested top-level executives in the healthcare industry.  Health

facility managers are already reached through placement in *Health Facilities*

*Manager*, the official publication of the two leading societies in the field, and

therefore additional placement in *FacilityCare* is not necessary.

d.     Another publication we do not recommend on the Debtors' plan is *Commercial*

*Real Estate Review*.  Unlike the other nationally recommended publications

targeting top-level commercial real estate executives and investors, *Commercial*

*Real Estate Review*'s distribution is limited to Pennsylvania and New Jersey.  Many

other statewide commercial real-estate publications are available and were not

recommended by the Debtors, probably because of the national scope of the notice

program.

e.      Additionally, we do not recommend the Debtors' use of _County News_ since its

circulation is limited to Texas only. Other county-focused government publications

are available on a statewide basis, however, we once again assume they were not

recommended by the Debtors because of the national scope of the notice program.

f.      In the schools/colleges/university market, we recommend _American School and_

_University Magazine_ in place of the Debtors' recommendation of _University_

_Business_. Our analysis found that 29% of _University Business_'s non-paid

circulation is derived from Dun and Bradstreet lists, suggesting that almost a third

of its recipients did not request to receive the publication and may not have any

interest in reading it. Instead, _AS&U_ offers a larger, audited circulation with _all_ of

its recipients directly requesting to receive it. In addition, _AS&U_ reaches key

decision makers in all of the targeted sectors of education, including public and

private K-12 schools as well as colleges/universities.

g.      We also recommend *American School Board Journal* in place of the Debtors'

recommendation of *School Board News*.  Although both publications are published

by the National School Boards Association and both target key decision makers in

the K-12 market, *American School Board Journal* offers a larger and audited

circulation.  In addition, unlike *School Board News*, *American School Board

Journal* is a paid for publication ($54/year subscription price), suggesting that its

readers are interested in receiving it.


25.      *Target Audience Analysis*


a.      Although both plans achieve effective delivery levels, the Debtors' plan does not

appropriately address and/or acknowledge all of the claimant groups.  The Debtors'

plan describes older men as the primary target, with Adults 35+ labeled secondary.

However, both targets are equally important claimant groups.  In fact, of the two,

Adults 35+ (ZAI and PD Claimants) are more difficult to reach through media

efforts and are less aware, if at all, of W.R. Grace and their status as a potential

claimant.  Therefore, to describe Adults 35+ as secondary target serves an injustice

to both ZAI and PD Claimants.

b.     Furthermore, the Debtors' plan does not acknowledge a large portion of PI

       Claimants.  According to W.R. Grace's data, over a quarter (25.46%) of recorded

       PI Claimants are within the age group of 55-64, yet the Debtors' more limited

       target of Men 65+ ignores these claimants.


c.     Likewise, the Debtors' proposal mentions the importance of reaching the general

       adult population (Adults 18+), yet no delivery against Adults 18+ is provided.


   26.    *Effective Canadian Reach*


a.     The revised Debtors' plan has addressed the issues of insufficient activity in

       Canada and the lack of audience delivery information.  Their revised plan is now

       comparable to our recommendation in that it too utilizes national magazines,

       national and local newspapers and television to achieve reach among Canadian

       claimants.  As a result, both plans achieve similar deliveries against Adults 35+.

       Overall, the Debtors' plan reaches 91.2% of Adults 35+and our plan achieves a

       slightly higher Adult 35+ reach of 91.8%.  Despite the fact that the Debtors' expert

       acknowledged the importance of reaching all adults in her plan, once again, a

Canadian adult 18+ reach is not addressed.  Our plan recommendation achieves a 90.5% reach of all Canadian adults and a 90.5% reach of Men 55+.

b.    In her affidavit, the Debtors' expert explains that her Canadian effort is not directed to PI Claimants since "the Canadian workers compensation system provides claimants the appropriate redress for their injuries." Kinsella Aff. at 23.  If such is the case and no Bar on Canadian Personal Injury Claims is sought, we have designed a notice plan option that focuses solely on PD (Zonolite and traditional). This plan option is included in the attached recommended notice plan.  The notice plan option (without PI Claimants) eliminates publications and activity that are targeted to the PI demographic.  However, unlike the Debtors' plan, we have included PI Claimants in our Canadian analysis and plan recommendation to demonstrate a complete package.

27.    *Effective Libby, MT Reach*

a.    The attached recommended notice plan also offers a stronger effort among the residents of Libby, Montana.  Like the Debtors' proposal, direct mail to every household in Libby is recommended, however, with the scope of the potential

claims in this small area, additional local newspaper activity is certainly reasonable to include.  We recommend a total of four insertions in the four leading local newspapers reaching the Libby region, including the <u>Missoula Missoulian</u>, and the <u>Kalispell Interlake</u>.

b.      Furthermore, a notice written and designed specifically for the Libby Claimants is recommended and provided.  I can think of no logical reason to disseminate notices in Libby and not focus the message on them.

28.      ***Overall Plan Effectiveness and Efficiency***

As detailed above, the attached recommended plan is more effective in its media and communication efforts than the Debtors' proposed plan.  It effectively and efficiently reaches all claimant groups with a message designed specifically for each of them. Additionally, at the same time delivering far more notice in a highly focused fashion, the attached recommended notice program costs $1,254,382 less than the Debtors' proposal.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

_Todd B. Hilsee_

SUBSCRIBED AND SWORN TO BEFORE ME this 13 day of march ,

2002.


NOTARY PUBLIC

MY COMMISSION EXPIRES: 04|15|2002

```
NOTARIAL SEAL
LORI A. DAVIES. NOTARY PUBLIC
Souderton Boro, Montgomery Co.
My Commission Expires April 15, 2002
```

© 2002 Hilsoft Notifications

Supplemental Affidavit of Todd B. Hilsee on Debtors' Bar Date Notice Proposal and Alternative Plan