# EXHIBIT A

ORIGINAL

1

```
 1
 2   IN RE:                        : Chapter 11
     W.R. GRACE CO., et al.,       : Case No.
 3       Debtors                   : 01-01139(27)
 4                        November 16, 2001
 5
 6         Oral deposition of TODD B. HILSEE,
 7   held at The Four Seasons, One Logan
 8   Square, Philadelphia, Pennsylvania 19103,
 9   commencing at 12:10 p.m., on the above
10   date, before Linda L. Golkow, a
11   Federally-Approved Registered
12   Professional Reporter and Certified
13   Shorthand Reporter.
14
15
16
17
18
19
20
               ESQUIRE DEPOSITION SERVICES
21           1880 John F. Kennedy Boulevard
                       15th Floor
22           Philadelphia, Pennsylvania 19103
                     (215) 988-9191
23
24
```

1   have yielded to produce those results.
2   So, we studied that and concluded that
3   that would have had a drastic result in
4   lowering the reach of that target.
5           Q.      Did you --
6           A.      Subsequently, I would say.
7   So, anyway, that was where that came
8   from.
9           Q.      Subsequently what?
10          A.      Well, subsequently, as I
11  said, we talked about, was there a need
12  to focus on men 65 plus. And we
13  determined, as I've described here, that
14  that's not an appropriate target, is too
15  narrow, and we have not -- I'm not
16  submitting an alternate plan, and I have
17  not gone and compared or testified to a
18  comparison of different reach analyses on
19  different targets. That's not something
20  that's within the scope of beyond what
21  I've testified that you just asked me
22  about. It's not within the scope of what
23  I'm going to be testifying to on
24  Wednesday, if I testify.

1  on, but for that men 65 plus target, is
2  intending to deliver 80 percent.
3        Q.    If you go back to Page 18,
4  you'll see the discussion of the TV.
5        A.    So, I'm registering -- what
6  I'm doing is registering concern against
7  that men 65 plus target, which I don't
8  believe is appropriate for the reasons I
9  mentioned, that that 80 percent that that
10 96 relies upon may be suspect in the way
11 that it is actually going to be
12 implemented at this budget level. And
13 beyond that, I will tell you that it's
14 not germane to the conclusions that I'm
15 going to be testifying to at this time.
16 I'm not going to be making conclusions at
17 this time that the reach of the overall
18 program is somehow inadequate for --
19 based on simply the quantified numbers
20 that are here. So, I don't know if that
21 short circuits or saves you some time,
22 but it will be in the context of
23 preparing alternate plans if we get to
24 that and if that's necessary, and -- but

1  we're not.  I'm more concerned with what
2  is it that 96 --
3          Q.    I understand that.
4          A.    -- that the estimated 96
5  percent of people are going to see.
6          Q.    In other words, you're
7  saying that even if this plan will, in
8  fact, get to 98.6 percent or 96.8
9  percent, that's not the main problem
10 here?
11         A.    Yes.
12         Q.    Let's go back to the main
13 problem for a minute.  You talked about
14 how you believe that the only way to
15 solve the problem here is to have
16 separate notice campaigns and separate
17 notices for at least four categories,
18 Libby, Zonolite, property damage and
19 personal injury; correct?
20         A.    I'm going to ask you to
21 restate it so I'm -- it sound like you
22 are asking something that was pretty firm
23 and absolute, and I want to make sure
24 that I understand.

1   represent some substantial percentage of
2   Zonolite homes.
3       Q.   Do you have any idea?
4       A.   Does the debt -- I haven't
5   seen that anywhere in this proposal
6   that -- any statistics that suggest. I'm
7   not presenting an alternate plan at this
8   time. I've registered why. But in this
9   plan that is being presented, I don't see
10  any evidence, other than in Kathy's
11  recent affidavit, a suggestion that
12  that's a justification for a combined
13  campaign. From the standpoint of a media
14  planning professional, it's not an
15  appropriate justification for lumping
16  these entirely different types of people
17  with entirely different messages.
18  Somehow it's acceptable to reach them
19  with one campaign on that basis.
20      Q.   Are you saying that people
21  are incapable of understanding more than
22  one message that's thrown at them at one
23  time?
24      A.   That's precisely what the

1   had none of those in B&W. Why is that?
2           A.      Why didn't we have it in the
3   B&W plan?
4           Q.      Yes.
5           A.      Because, again, property
6   damage claims were not a significant part
7   of the entirety of the B&W case.
8           Q.      So, again, in Grace, if you
9   are talking property damage claims, then
10  it may be more appropriate?
11          A.      May be. Whether they are
12  the right ones or not, whether they've
13  been analyzed correctly, I don't know.
14  We're working on that, but, again, I'm
15  not preparing an alternate plan. So, I'm
16  not submitting one, I should say, in
17  connection with my testimony. So, I
18  haven't completed an analysis of those.
19          Q.      Now, one of the things you
20  said in your affidavit in criticizing the
21  Kinsella plan was that it did not
22  adequately address Canada. The revised
23  notification plan solves that problem;
24  doesn't it?