FILED
'02 MAR 27 PM 12: 12

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .  Case No. 01-1139 (JHW)
                                    .  Chapter 11
W.R. GRACE, et al.,                 .
                                    .  Bankruptcy Courtroom No. 2
                                    .  824 Market Street
                Debtors.            .  Wilmington, Delaware 19801
                                    .
                                    .
                                    .  March 18, 2002
. . . . . . . . . . . . . . . ..    .  1:07 P.M.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:               Kirkland & Ellis
                           By:  DAVID M. BERNICK, ESQ.
                           200 East Randolph Drive
                           Chicago, Illinois 60601

                           Pachulski Stang Ziehl Young & Jones
                           By:  DAVID CARICKHOFF, JR., ESQ.
                           919 North Market Street, 16th Floor
                           Post Office Box 8705
                           Wilmington, Delaware 19899-8705

For Asbestos P.I.          Campbell & Levine
Claimants:                 By:  MATTHEW ZALESKI, ESQ.
                           1201 Market Street, 15th Floor
                           Wilmington, Delaware 19801

                           Caplin & Drysdale
                           By:  PETER LOCKWOOD, ESQ.

Audio Operator:            Rachel Bello

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

---

**TRANSCRIPTS PLUS**
**435 Riverview Circle, New Hope, Pennsylvania 18938**
e-mail courttranscripts@aol.com

**215-862-1115    (FAX) 215-862-6639**



2

Appearances:
(Continued)

| | |
|---|---|
| For Grace: | W.R. Grace<br>By:  BRIAN McGOWN, ESQ. |
| For the Equity<br>Committee: | Klett Rooney Lieber & Schorling<br>By:  JEFF WAXMAN, ESQ.<br>The Brandywine Building<br>1000 West Street, Suite 1410<br>Wilmington, Delaware 19801 |
| For Edythe Kellogg: | Barros, McNamara, Scanlon<br>Malkiewicz & Taylor, PA<br>By:  PATRICK SCANLON, ESQ.<br>2 West Lockerman Street<br>Post Office Box 1298<br>Dover, Delaware 19903 |
| (Handwriting<br>illegible on appearance<br>sheet) | Stepke & John<br>By:  MARK CELAN, ESQ. |
| For Equity Committee: | Kramer Levin Naftalis & Frankel<br>By:  GARY M. BECKER, ESQ.<br>     PHILLIP BENTLEY, ESQ. |
| For Travelers: | Simpson Thacher<br>By:  JORDAN MULZ, ESQ. |
| For Asbestos P.D.<br>Claimants: | Ferry & Joseph, PA<br>By:  THEODORE TACCONELLI, ESQ.<br>824 North Market Street, No. 904<br>Wilmington, Delaware 19899 |
| | Bilzin Sumberg<br>By:  SCOTT BAENA, ESQ.<br>     JAY SATALO, ESQ. |
| For Novak Landfill: | Montgomery McCracken Walker<br> & Rhoades, LLP<br>By:  NOEL C. BURNHAM, ESQ.<br>Christiana Executive Campus<br>131 Continental Drive, Suite 304<br>Newark, Delaware 19713 |
| The U.S. Trustee: | Office of the U.S. Trustee<br>By:  FRANK J. PERCH, III, ESQ.<br>844 King Street<br>Wilmington, Delaware 19899 |

Appearances:
(continued)

For R.J. Reynolds:          Blank Rome Comisky & McCauley, LLP
                            By:  BONNIE GLANTZ FATELL, ESQ.
                            1201 Market Street, Suite 800
                            Wilmington, Delaware 19801
                            (via telephone)

                            KURT WEAVER, ESQ.
                            (via telephone)

For Liggett:                Copeland Cook Taylor & Bush
                            By:  LEE HOWELL, ESQ.
                            1062 Highland Colony Parkway
                            200 Concourse, Suite 200
                            P.O. Box 6020
                            Ridgeland, Mississippi 39158
                            (via telephone)

For Grace:                  RICHARD BROWN, ESQ.
                            (via telephone)

For Ms. Gerard:             Klehr Harrison Harvey Branzburg
                             & Ellers, LLP
                            By:  JAMES E. HUGGETT, ESQ.
                            919 Market Street, Suite 1000
                            Wilmington, Delaware 19801

                            Parker Dumler and Kiely, LLP
                            By:  BRIAN PARKER, ESQ.
                            2200 Charles Center South
                            36 South Charles Street
                            Baltimore, Maryland 21201

For Washington Zonolite     Lukins & Annis, P.S.
Attic Insulation case:      By:  DARRELL SCOTT, ESQ.
                            1600 Washington Trust Financial Center
                            West 717 Sprague Avenue
                            Spokane, Washington 99201-0466

For the Price Case:         Lieff Cabraser Heimann & Bernstein
                            By:  THOMAS M. SOBOL, ESQ.
                            175 Federal Street, 7th Floor Boston
                            Massachusetts 02110-1216

4

## INDEX

                                                            Page

Status conference discussion                                  5
Item 5, Motion authorizing debtors to acquire Addiment       10
Item 7, Motion for an order authorizing debtors to close
        a manufacturing plant, consolidate operations        13
Item 9, Debtors' application for entry or an order
        appointing a fee auditor                             13
Item 10, Carol Gerard's motion to intervene                 24
Item 11, Carol Gerard's motion to clarify the scope
        of the preliminary injunction                       24
Item 12, Motion to annul the automatic stay                 44
Item 13, Debtors' revised motion to all non-asbestos
        claims, asbestos property damage and ZAI claims
        for entry of case management order                  53
Item 14, Motion to dismiss case filed by Zonolite
        Attic   Insulation Class Plaintiffs                188

1          THE COURT:    Good afternoon.    Please be seated.    This
2    is the matter of W.R. Grace, Bankruptcy Number 01-1139.    There
3    is a long agenda this afternoon.    Those of the parties are
4    aware with respect to the uncontested matters that were on the
5    agenda, Items 5 through 8, those orders have been entered as
6    reflected.

7          Mr. Bernick?

8          MR. BERNICK:    Yes, Your Honor?

9          THE COURT:    Go ahead.

10         MR. BERNICK:    I think actually the first matter is a
11   status conference on an issue that I cannot speak to, Mr.
12   Carickhoff will.

13         THE COURT:    All right.    Mr. Carickhoff.

14         MR. CARICKHOFF:    Good morning, Your Honor.    David
15   Carickhoff of Pachulski Stang Ziehl Young and Jones on behalf
16   of the debtors.

17         As Your Honor may recall, we had a telephonic TRO
18   hearing with respect to a request by the debtors to stay
19   certain tobacco litigation pending in the Mississippi State
20   Court.    Your Honor, we have prepared a draft of a motion to
21   stay that action in the Mississippi Court, have circulated a
22   draft of that motion to the counsel for the tobacco defendants
23   and are essentially waiting for their response to see whether
24   or not they will oppose such motion.

25         Once we have a response from them, hopefully it will

1  be an indication that they will not oppose it.  We'd like to

2  incorporate that in the pleading itself that is to be filed

3  with the Court.

4           THE COURT:  All right.

5           MR. CARICKHOFF:  The deposition that we were trying

6  to stay by our TRO motion is currently set forth to go forward

7  on March 22nd.  Obviously the debtors would like to have the

8  tobacco defendants agree to continue that out until such time

9  as a Mississippi State Court can rule on the motion that we

10 will be filing there.  And we have not heard back from tobacco

11 counsel in that regard.  And I believe that is Kurt Weaver is

12 on the phone on behalf of R.J. Reynolds.

13          THE COURT:  All right.  Mr. Weaver?

14          MR. WEAVER:  Yes, Your Honor.  Kurt Weaver, along

15 with Bonnie Fatell, who I believe is in the courtroom for R.J.

16 Reynolds.

17          MS. FATELL:  Actually I'm on the phone.

18          MR. WEAVER:  Okay.  Your Honor, we received a copy of

19 the draft pleading in the Mississippi Court Friday at about

20 4:30.  I have not personally had a chance to talk to my client

21 about it or confer with our industry on whether or not the

22 approach that Grace is suggesting now is acceptable.  I don't

23 believe that it should take very long for us to do that and we

24 would be more than willing to, again, extend the time for the

25 deposition in an effort to resolve this.

1          I would ask sort of a reciprocal promise from Grace,
2   however.  Our answer date or response date for the complaint
3   for injunctive relief, I believe, is either the 22nd or 25th.
4   If we could just simply move that to April 19th, that, I think,
5   would take the pressure off everyone.

6          THE COURT:  Mr. Carickhoff?

7          MR. CARICKHOFF:  We'd be willing to accommodate them
8   and extend the answer date, provided that they're willing to
9   extend the time after the deposition.

10         THE COURT:  Sounds like you have a deal, gentlemen.
11  I -- April 19th is the date for both the deposition and the
12  answer?

13         MR. WEAVER:  That's fine from our perspective, Your
14  Honor.

15         THE COURT:  Mr. Carickhoff?

16         MR. CARICKHOFF:  That's fine from the debtors'
17  perspective, Your Honor.

18         THE COURT:  All right.  Do you need an order to this
19  effect from me or --

20         MR. CARICKHOFF:  No, I believe it's a State Court
21  matter at this point, Your Honor.

22         THE COURT:  Okay.  So, what do you -- what about the
23  hearing -- I'm sorry.  The deposition -- no, that's the
24  deposition.  I don't know what you need -- more you need from
25  me.

1      MR. CARICKHOFF:  Well, to the extent that things
2  don't work out in State Court, Your Honor, we would look to
3  proceed with our preliminary injunction papers with this Court.

4      So, at this point, all we'd be doing is continuing
5  this to another hearing date until such time as we have a
6  better understanding of what is going to happen in the State
7  Court.

8      THE COURT:  Well, I don't think you want a hearing
9  much before my May calendar, do you?  If the answer's not due
10 until April 19th, and you're going to need to present a motion
11 to the State Court Judge.

12     MR. CARICKHOFF:  Sure.  The May hearing -- the May
13 omnibus should be --

14     THE COURT:  Mr. Weaver, is that all right with you?
15 To continue this status conference on the adversary until May
16 20th at ten A.M.

17     MR. WEAVER:  That's fine, Your Honor.  And I just
18 assume, for purposes of our response date, that the transcript
19 would be as ordered.  So, we won't need a separate order
20 extending our response date.

21     THE COURT:  I think -- Mr. Carickhoff has been
22 presenting me with orders that memorialize all the rulings I've
23 been making on the record anyway, so it can be either way.

24     MR. WEAVER:  Okay.

25     THE COURT:  Mr. Carickhoff?

1          MR. CARICKHOFF:  It's up to Your Honor.  If Your

2   Honor would prefer a scheduling order, I'd be happy to submit

3   one to the Court within --

4          THE COURT:  Well, I would.  Only because there are so

5   many of these cases and I sometimes tend to get jumbled with

6   the date.  So, I would actually rather have one just so I don't

7   forget what I'm waiting for or when.  But -- so, if you're

8   willing to present one, Mr. Carickhoff, I'd prefer that.

9          MR. CARICKHOFF:  Certainly.  And I'd circulate it to

10  Mr. Weaver and his colleagues, as well, and have them sign off

11  on it before submitting it to Your Honor.

12         THE COURT:  Okay.  So, I'll get that order in within

13  a week, Mr. Weaver, and essentially it will say that your time

14  to answer is extended until April 19 and the pretrial is

15  extended until May 20 at ten o'clock.

16         MR. WEAVER:  That's fine.  And just so -- well,

17  that's fine, Your Honor.

18         THE COURT:  Do you need something else?

19         MR. WEAVER:  No, Your Honor.

20         THE COURT:  Okay.  Anything more on the preliminary

21  injunction issue then?

22         MR. CARICKHOFF:  No, Your Honor.

23         THE COURT:  All right.  If you wish to stay on the

24  phone, those of you who are involved in the adversary, you may.

25  If you wish to hang-up, you may also do that.

1          MS. FATELL:   Your Honor, this is Bonnie Fatell.   I
2   will hang-up.   Thank you.
3          THE COURT:   All right.
4          MR. WEAVER:   Kurt Weaver will hang-up.
5          THE COURT:   All right.
6          MR. HOWELL:   And Lee Howell for Liggett (phonetic)
7   will hang-up also.
8          THE COURT:   All right.
9          MR. BROWN:   Richard Brown for Grace will hang-up.
10          THE COURT:   Anybody left?
11          MR. SMITH:   Yes, Your Honor, Warren Smith.
12          THE COURT:   Mr. Smith.
13          MR. SMITH:   But I wasn't involved with the tobacco
14   litigation, Your Honor.
15          THE COURT:   All right.   Anything else in that
16   litigation, the adversary, Mr. Carickhoff?
17          MR. CARICKHOFF:   No, Your Honor.
18          THE COURT:   Okay.
19          MR. CARICKHOFF:   I'd just like to address a couple of
20   points on the uncontested matters.   Your Honor had indicated
21   that you had entered those orders?
22          THE COURT:   Yes.
23          MR. CARICKHOFF:   With respect to Agenda Item 5, which
24   was the order authorizing the debtors to acquire the business
25   of Addiment.

1        THE COURT:  Yes.

2        MR. CARICKHOFF:  The debtors had since revised that

3 order after they filed their certification of counsel.  The

4 Creditors' Committee had raised some concerns with some

5 language in the order with respect to the purchase price.  And

6 to accommodate that, we have a revised form of order that we'd

7 like to present to the Court.

8        THE COURT:  How am I suppose to know these things in

9 advance so that I don't sign orders and then have to vacate

10 them?

11        MR. CARICKHOFF:  Certainly.  In the amended agenda,

12 which I apologize, Your Honor got on Friday or at some point

13 thereafter --

14        THE COURT:  I haven't gotten one yet.

15        MR. CARICKHOFF:  Okay.  Did Your Honor receive a

16 package at the Brandywine Suites?

17        THE COURT:  I did get -- is that the amended one?

18        MR. CARICKHOFF:  Yes, Your Honor.

19        THE COURT:  Okay.  I'm sorry, I did get that, I

20 apologize.

21        MR. CARICKHOFF:  That's fine.  In the status on that,

22 we tried to indicate that the debtors intend to present a

23 further revised order to the Court at the hearing.

24        THE COURT:  Okay.  Then what I did incorrectly was

25 looked at this agenda notice, which was in the binders that I

1   was looking at here today and signed it.  So -- okay.  I'll

2   take your revised order, but please you folks can do this a

3   little more promptly than the day before the hearing.  So, from

4   now on, I'm going to have you file a motion to vacate or amend

5   those orders unless you get them to me on time.  I'm not doing

6   this anymore.

7           MR. CARICKHOFF:  I --

8           THE COURT:  I'll take your -- I'll take your order

9   now.

10          MR. CARICKHOFF:  I understand.  I apologize for that,

11  Your Honor.

12          And then with respect to Item Number 9 --

13          THE COURT:  No, wait.  No, let me do one at a time,

14  please.

15          MR. CARICKHOFF:  Sure.

16          THE COURT:  Let me have Number 5.

17                      (Pause)

18          THE COURT:  I don't know -- I doubt that the order I

19  signed this morning has been docketed yet, MR. Carickhoff.  If

20  it hasn't, I'll simply use this one instead.  If it has, then a

21  separate order will be entered to vacate the earlier one and

22  docket this one.

23          MR. CARICKHOFF:  Thank you, Your Honor.  Again, I

24  apologize.

25          THE COURT:  All right.  Now, 9?

1          MR. CARICKHOFF:  Yes.  If I could just address Number
2  7.

3          THE COURT:  Okay.

4          MR. CARICKHOFF:  Your Honor indicated you entered
5  that order.  Did you -- there was an order that was attached to
6  the certification of counsel.

7          THE COURT:  That's the one I signed.

8          MR. CARICKHOFF:  Okay.  With respect to Item Number
9  9, which is the order appointing a fee auditor.  That order has
10  changed with respect to comments we received from Mr. Smith and
11  the Creditors' Committee.

12          THE COURT:  All right.

13          MR. CARICKHOFF:  And if I could present the Court
14  with the revised order on that.

15          THE COURT:  Okay.  Thank you.

16                         (Pause)

17          THE COURT:  Okay.  That order is entered, as well.

18          Now, I understand Mr. Smith had some issues he wanted
19  to raise.

20          MR. CARICKHOFF:  Yes, Your Honor.

21          THE COURT:  Is this the appropriate --

22          MR. CARICKHOFF:  Sure.  As Your Honor may recall, we
23  also had pending before the Courts an amended administrative
24  order that dealt with revised interim compensation procedures.
25  In conversations with Mr. Smith and the Creditors' Committee,

1  Mr. Smith has come up with certain procedures that would

2  effectively streamline the fee application process.

3  Essentially instead of the parties filing a monthly fee

4  application, they would submit essentially a summary which they

5  current do anyway under the current procedures and simply the

6  invoice itself as the -- as the monthly fee application.  And

7  that would be served electronically upon the various noticed

8  parties and it would be served upon -- hard copy upon the U.S.

9  Trustee and Mr. Smith himself.

10           MR. SMITH:  As well as the debtor, Your Honor.

11           MR. CARICKHOFF:  And the debtors.  And Mr. Smith is

12  on the phone and I guess he can speak to the procedures himself

13  and address any questions that Your Honor may have.

14           One of the things that has come up, too, is with

15  respect to the 2001 quarterly fee applications.  Because Your

16  Honor was not really appointed in these cases until late

17  December, it was our understanding that Mr. Smith would be

18  reviewing those fee applications, as well, for the Court.

19           THE COURT:  That's what I thought, too, yes.  I have

20  not entered any orders, I believe, on any of those fee

21  applications.  So, that's one reason I wanted to get Mr. Smith

22  up and moving so that, in fact, your fee orders can be

23  addressed.

24           MR. SMITH:  Okay, Your Honor.  I just want to say a

25  couple of things regarding the procedures that I'm proposing

1  here, and that is that they are only proposals.   That my job is

2  essentially to assist the Court.   So, I'm, of course, willing

3  to go along with any procedures that the Court desires.

4          THE COURT:   Mr. Smith, I'm happy to try anything you

5  want that you think is going to work that will expedite your

6  review.   If I find after I get your reports that I need

7  something, then I think that would be the appropriate time for

8  me to address any issues that I'm finding.   I expect that the

9  laboring work for this review is now on your shoulders.

10          And so whatever makes the project easier for you, I'm

11 willing to try.   And only if I see some problem with the

12 reports I'm getting back do I think I would have to undertake

13 some changes.   And at that point, I'd simply ask that you

14 either call in or come here to a hearing where we could address

15 this with all counsel.

16          MR. SMITH:   And that would be fine, Your Honor.   I'm

17 essentially anticipating that in the -- for the fee

18 applications themselves, which would be on a quarterly basis,

19 that I would be undergoing this process of doing an initial

20 report that goes solely to the applications, we would discuss

21 it.   And then I would be filing a final report with the Court.

22          The final report -- we try to aim the final report in

23 conjunction with the fee application, but not the fee detail in

24 the sense that we are assuming that the Court will be reading

25 the written narrative of the fee application, but not the fee

1  detail.  And so that's how we kind of aimed the final report.

2  THE COURT:  All right.  Well, I probably will review

3  it all, but I will probably take my lead from problems that you

4  point out to me, Mr. Smith.  You know, how much time I have to

5  spend actually looking at this is getting, I guess, less and

6  less as the cases get larger and larger.  And so that's one

7  reason I want a fee auditor in place.

8  MR. SMITH:  I understand.

9  THE COURT:  Has the U.S. Trustee agreed with this

10  process of not submitting the monthly fee applications, but

11  only the summary.

12  MR. SMITH:  Yes,  Your Honor.  We've talked to Frank

13  Perch, I don't know if he's in court now?

14  THE COURT:  Yes, he is.

15  MR. SMITH:  Okay.  And we've talked about it.  And,

16  as a matter of fact, the indications from him were that as far

17  as filing the monthly invoices and serving them electronically

18  on all parties, except for the fee auditor, the debtor and the

19  U.S. Trustee's Office, that was a procedure that was acceptable

20  to him, my recollection is anyway.

21  THE COURT:  All right.  Mr. Perch?

22  MR. PERCH:  Your Honor, good afternoon.  Frank Perch

23  for the U.S. Trustee.

24  I'm a little bit uncomfortable with the situation

25  that I'm placed in because there was really nothing on the

1 amended agenda that indicated that this aspect of the
2 discussion would be up for today.  And I don't want to
3 contradict Mr. Smith, but I did want to remind Mr. Smith that I
4 had a conversation with him which was part a conversation and
5 part an e-mail exchange in which I did indicate some concerns
6 about going to less notice rather than more regarding fee
7 applications.

8         One of the things I'm concerned about, Your Honor, is
9 that the administrative compensation order that we started out
10 with on this case that Your Honor made some small modifications
11 consistent with Your Honor's regular procedures is something
12 that was negotiated with a lot of members of the bar in order
13 to settle an appeal and in order to avoid a lot of repeat
14 litigation over the form of this order.  It's been a procedure
15 that has been somewhat routinized in this jurisdiction.  And
16 what I'm concerned about is that the relaxations of it that
17 might be implemented here might suddenly start appearing in
18 other cases.

19         THE COURT:  Well, I know two other cases that it will
20 appear in.

21         MR. PERCH:  Other than what occurs in these cases
22 where Mr. Smith is appointed as serving as kind of a -- and he
23 can serve as a backstop of it, I understand that.  But I'm
24 concerned about those finding their way into other cases.  And
25 so I really am reluctant to endorse something that waters down

what we have spent a lot of time working out and has been a
workable procedure and acceptable procedure for other cases.

THE COURT:   Well --

MR. PERCH:   I'm trying to be accommodating to Mr.
Smith's needs and the Court's needs at the same time.

THE COURT:   Well, I think as long as the quarterly
fee applications are actually filed with the detail so that
parties can see them in advance of a hearing with notice, then
that should provide all the parties with an opportunity to
raise any objections that they might have to the actual
allowance of the fee.

Producing the invoice and -- I take it that the order
that -- the part of the order that says that the lesser of the
approved 80 percent of the approved -- not by the Court but by
the parties fees -- or the uncontested, I guess that's what I
should say.  The uncontested portions of those fees, plus 100
percent of the expenses is what would govern on a monthly
basis.  So, that part of the order, I take it, will stay in
place.

MR. PERCH:   I believe that that's correct.  What I'm
a little bit unclear on -- what I remain a little bit unclear
on is when we're talking about, quote, "an invoice" on a
monthly basis.  Does that include billing detail or is that a
one-pager that says for services rendered?

MR. SMITH:   Oh, no, that includes the fee detail.

1          MR. PERCH:  That's $100,000 --

2          MR. SMITH:  Frank -- Your Honor, if I could address
3     that?

4          THE COURT:  Yes, sir.

5          MR. SMITH:  Essentially it has pretty much a one-page
6     cover sheet which indicates any prior monthly invoices and how
7     much has been paid.  But then the -- what I call the fee
8     detail, which is the day-by-day, line-by-line entry of the time
9     entries is all a part of the monthly invoice.  And, quite
10    frankly, Your Honor, we need that every month because we review
11    that as that comes in.  And that's the only way we can prepare
12    for the onslaught of getting of getting the fee applications
13    with all that detail -- monthly detail or fee detail.

14         THE COURT:  So, what is missing between the invoice
15    process and the billing is just a categorizations?

16         MR. SMITH:  Well, no.  It's essentially the narrative
17    with a fee application.  You have this, you know, 20-page
18    narrative.

19         THE COURT:  I don't see why we need the narrative on
20    a monthly basis.  We do need a quarterly, provided that the
21    details go with the invoice.

22         MR. SMITH:  Exactly, Your Honor.  And it's been our
23    experience in the U.S.G. case that when they were doing -- when
24    the monthly invoices were being photocopied, mailed around by
25    Fed Ex to everyone, that was an expense of about $6,000 a

1 month.   And I asked all the parties and no one was reading that
2 fee detail that I could find, except for Frank Perch's office
3 and myself.

4          And it seemed to me that Fed Ex'ing that around
5 seemed to be -- I have no objection to spending money when it's
6 useful, but it seemed to be a useless expense and that's why I
7 proposed the e-mailing of that in the PDF format, which is the
8 format that is filed with the Court.   It seems to me it saves
9 money and it's a lot more efficient.

10          THE COURT:   I can tell you, Mr. Smith, my process --
11 my practice since probably about six months ago has been I
12 don't review these until I get the quarterly and know that a
13 fee hearing is coming up anyway.   So, for my purposes, these
14 monthlies are being filed for some notice, but it doesn't help
15 me one way or the other.   I'd be perfectly comfortable as I was
16 before the problem arose to have them filed quarterly.   So, if
17 you need them monthly, that's fine.   I don't see that there is
18 anything wrong with that, it's good notice to parties.

19          But in terms of my own review, I'm going to review
20 them quarterly when the fee hearings are coming up and not
21 before.   So, if the narrative is essentially for my benefit,
22 having it quarterly is fine.

23          MR. SMITH:   I understand, Your Honor.   Thank you.
24          MR. PERCH:   This is Frank Perch speaking.   Just by
25 way of comment on that, to the extent that what's being

1  proposed is meant to be similar to what's being done in U.S.G.,
2  I probably don't have a problem with it.   It sounded to me, and
3  perhaps that's just my misunderstanding of it, that it was, in
4  a certain sense, a mirror image of what's being done in U.S.G.
5  Because in U.S.G., there is monthly billing detail, but we've
6  either curtailed or eliminated the monthly narrative.

7           I at first thought I heard sort of the opposite here,
8  which was that there would be a narrative monthly but less
9  detail.   So, I'm perhaps a little -- perhaps simply a little
10  confused.   I think what's been done in U.S.G. has been ordered
11  by Judge Newsome in that case and I wouldn't object to
12  something of that nature being done here.

13           THE COURT:  Well, as I understand it, you're
14  implementing essentially the same provision here that you're
15  using in U.S.G., correct, Mr. Smith?

16           MR. SMITH:  Yes, Your Honor.   But we are also
17  proposing in U.S.G., as we are proposing here, that the monthly
18  invoices, while they are filed and hard copies are sent to Mr.
19  Perch, myself and the debtor, the only other service is by e-
20  mail to the noticed parties.

21           THE COURT:  That's fine, as long as the parties have
22  agreed to that, and we're getting everything else by e-mail in
23  this case or by -- in PDF format one way or another anyway.
24  Does anybody have an objection to e-mail notification on the
25  monthly?   There's no one in court indicating that they have an

1    objection to that process, Mr. Smith.

2            MR. SMITH:   Thank you, Your Honor.

3            MR. PERCH:   Thank you, Your Honor.

4            THE COURT:   Okay.   All right.   So, if I simply sign

5    this order that I've been presented now with respect to Mr.

6    Smith, does that lay out the details that you need or do you

7    need a revised administrative order, as well?

8            MR. CARICKHOFF:   We need a revised administrative

9    order, as well, that we'll present to the Court within ten

10   days.   We'll circulate it amongst the various committee counsel

11   and Mr. Perch, as well, the U.S. Trustee and then upon

12   everybody consent and approval, we'll submit it to Your Honor.

13           THE COURT:   Okay, that's fine.   I have passed out to

14   most of you by my law clerk as you were coming in the order

15   that I just entered last week on Owens Corning.   It does not

16   deal with fee, it deals, however, with preparation of the

17   hearing binders and some other things that I had hoped to get

18   in on the record with you folks last month, and simply we ran

19   out of time so I didn't.

20           Please take a look at that.   I would like a similar

21   order entered in this case.   The one problem I have this month

22   with getting the inserts for the binders is they were not

23   labeled by agenda item.   And it took me forever to go through

24   looking for the docket number entries, which fortunately are on

25   the agenda, but that's how I knew where the inserts had to go.

1  Please, have somebody put in for me what agenda items they have

2  to go in.

3         Now, the stuff that came to the hotel had that, but

4  the stuff that came to Pittsburgh did not and that's where I

5  was reviewing this was at my home over the weekend before I got

6  here.  So, it took a long time.  Please have somebody indicate

7  where in those agenda binders the inserts are to go, it will

8  save me massive amounts of time.

9         MR. CARICKHOFF:  Certainly, Your Honor.

10         THE COURT:  Okay.  Mr. Smith, do you have anything

11  else you want to address on the record, sir?

12         MR. SMITH:  No, I have nothing further, Your Honor.

13         THE COURT:  Does anyone have any questions or

14  comments to Mr. Smith?

15         Okay.  You're also free to disconnect or to stay on,

16  as you prefer, Mr. Smith.

17         MR. SMITH:  I would prefer to save some time and

18  disconnect, Your Honor.

19         THE COURT:  All right.  Thank you.

20         MR. SMITH:  Thank you.

21         THE COURT:  Is anyone else on the line?  All right.

22  Mr. Carickhoff?

23         MR. CARICKHOFF:  Thank you, Your Honor.  Mr. Bernick

24  will address the remaining items.

25         THE COURT:  Okay.  Mr. Bernick?

1            MR. BERNICK:   Good afternoon, Your Honor.   There are
2    three items, 10, 11 and 12, that pertain to the preliminary
3    injunction and the stay.

4            The first are brought by a Carol Gerard, and Item 12
5    is from Edythe Kellogg, and then we get on to, I think,
6    probably the -- the matters that will take the bulk of the
7    afternoon, which is Item 13 relating to the bar dates and the
8    case management.   I don't know if counsel for Ms. Gerard is
9    here.

10           THE COURT:   Good afternoon.

11           MR. HUGGETT:   Good afternoon, Your Honor.   Jim
12   Huggett from the Klehr Harrison firm in Wilmington.   With me is
13   Brian Parker of Parker Dumler and Kiely in Baltimore.   A motion
14   for his admission has been submitted to the Court, I don't know
15   if an order has been entered yet.

16           THE COURT:   I believe I signed that order this
17   morning.   If you don't get it promptly, call my office and let
18   me know, but I believe I approved it this morning.

19           MR. HUGGETT:   If I might yield the podium to Mr.
20   Parker.

21           THE COURT:   Yes, thank you.

22           MR. PARKER:   Thank you very much, Your Honor.   Brian
23   Parker on behalf of Carol Gerard.   We appreciate your taking
24   time to consider this matter.

25           In order for me to help you understand the issues

1 before you with respect to this matter, I'd like to give you

2 some brief background regarding the development of and the

3 genesis of Ms. Gerard's case.

4 Ms. Gerard is represented by my firm, as well as by

5 the firm of McGarvey Heberling, which is a Montana law firm.

6 That firm has represented a number of plaintiffs in connection

7 with cases against W.R. Grace that arose out of its Libby

8 Mining Operation.  But the cases which the McGarvey Heberling

9 firm brought alleged, among other things, that W.R. Grace had

10 been negligent in its failure to develop a proper dust control

11 system and to address various other industrial hygiene concerns

12 at the Libby Mining Operation.

13 And when it brought those suits, it believed,

14 understandably, that W.R. Grace was the entity that was

15 responsible for developing the dust control system and for

16 addressing those industrial hygiene concerns.

17 What it learned in the course of discovery, however,

18 was that that assumption was incorrect.  In 1963, Maryland

19 Casualty Company became both the workman's compensation

20 insurance carrier for W.R. Grace, as well as a general

21 liability insurance carrier.  And it continued to provide those

22 types of insurance coverage from 1963 until 1973.

23 And what they learned in the course of discovery was

24 that Maryland Casualty had a medical department, it had an

25 engineering department, it had a loss control department and it

1 believed that because of its expertise that it could address
2 the issues of dust control and industrial hygiene better than
3 W.R. Grace.  And that it assumed the responsibility to develop
4 a plan to protect the workers at Libby and to protect the
5 community members.

6       There are letters that we have obtained in the course
7 of discovery that indicate, for example, that a letter from
8 W.R. Grace saying that they were applying to the letters of
9 September 8th and September 14th, this is a letter from Marcia
10 McClennan (phonetic), the agent, saying that the dust problem
11 has been referred to our engineering division and they, in
12 conjunction with our medical division, are presently
13 formulating a program for control and prevention.

14       Another letter they say -- this is in reference to
15 your letters relating to our dust problem at this location.
16 Our accident prevention department is well aware of this
17 condition, not only in Libby but in other locations.  We are
18 presenting engaging in drafting an overall program for the
19 entire Zonolite operation and all phases of prevention and
20 control of dust conditions.

21       And they go on to say that that's going to address --
22 it's going to be a comprehensive program covering all phrases
23 of accident prevention, as well as industrial hygiene.

24       And as a result of that information, when Mrs. Gerard
25 developed mesothelioma, we brought suit in Maryland against not

1  only W.R. Grace but against Maryland Casualty.  And we assumed

2  Maryland Casualty, not because it was an insurance provider,

3  but because it had decided to do more than provide insurance.

4  It had decided to assume this obligation to develop the dust

5  control and to address the industrial hygiene concerns at the

6  Libby operation.  And we sued them because they had assumed

7  that operation and then had failed to discharge it properly.

8          That suit was brought long before this bankruptcy was

9  initiated.  And when the bankruptcy was initiated, we

10  understood that the automatic stay barred the continuation of

11  that suit as it related to W.R. Grace.

12          But we did not believe, and still do not believe,

13  that the stay has any effect against the independent claims

14  that we brought against Maryland Casualty that arise out of its

15  failure to properly discharge the obligations that it assumed.

16          And curiously, Maryland Casualty doesn't believe that

17  this bankruptcy stays those allegations.  It understands that

18  it is not being sued as an insurer.  It is not being sued

19  because of any coverage obligations that it may have for

20  Grace's wrongdoing.  But that it is being sued for its own

21  independent wrongdoing and has never suggested either in this

22  Court or in the Maryland litigation that the claims against it

23  are stayed.  And, in fact, last week, both Maryland Casualty's

24  outside counsel and inside counsel were in my offices

25  participating in depositions related to this case.

1       And the issue of the stay as it relates to the
2   Maryland Casualty claims didn't arise until I issued a subpoena
3   to W.R. Grace requesting that it make available to me its
4   Boston document depository so that we could obtain documents
5   that Grace might have in its possession relating to our claims
6   against Maryland Casualty.  And then for the first time,
7   Maryland Casualty -- W.R. Grace suggested that the case was
8   stayed and/or subject to the preliminary injunction.  And I
9   want to briefly address why we think that that is not true.
10  And I would suggest to you that what has happened here is that
11  they are attempting to expand the scope of the language that is
12  in the preliminary injunction, and then they are attempting to
13  recast the claims that Mrs. Gerard has asserted and, frankly,
14  mischaracterize those claims in an effort to establish that
15  they are derivative claims of Grace's conduct when, in fact,
16  that that is not true.

17       With respect to the preliminary injunction, Your
18  Honor, their -- Grace's position on this has changed throughout
19  the briefing of this matter and they have asserted at various
20  different points in time that different provisions of the
21  preliminary injunction bar this claim.  But I'd like to address
22  the three that I think that they have asserted at some point
23  during their briefing.

24       Essentially what they argue is that this -- the
25  preliminary injunction stays all actions and that this somehow

1  is an action as defined in that order.  If you look at

2  Paragraph 10 of the preliminary injunction, it defines what an

3  action is.  And there are three categories or subcategories in

4  Paragraph 10 that they assert apply to Ms. Gerard's claim.  The

5  first is they say that this is an action against affiliated

6  entities that arises from exposure to asbestos directly or

7  indirectly alleged to be caused by the debtors.  And there's a

8  reason why that -- two reasons why that provision doesn't

9  apply:

10  The term affiliated entities is a defined term in the

11  order.  The term affiliated entities includes insurance

12  carriers, but insurance carriers, in turn, is a defined term.

13  An insurance carrier is defined as an insurer who has been sued

14  under an insurance policy in a direct action state, including

15  Maryland Casualty, among other insurance carriers.

16  But this is not a claim under an insurance policy

17  because the insurance -- term insurance policy, again a defined

18  term, is a policy that provides coverage for the debtor.  We're

19  not suing Maryland Casualty because it provided coverage for

20  the debtor.  Again, we're suing Maryland Casualty because of

21  what it did and what it failed to do, unrelated to any

22  insurance coverage it provided.

23  THE COURT:  So, you're saying you're not attempting

24  to access any of the debtor's insurance proceeds -- policy

25  proceeds as a result of this suit?

1          MR. BERNICK:  Absolutely not, Your Honor.

2          THE COURT:  And Maryland Casualty understands that it
3 is subject to -- that a judgment in your client's favor, that
4 any judgment would be -- have to be satisfied from some other
5 source, other than proceeds of this insurance policy.

6          MR. BERNICK:  Absolutely.  It will come from the --
7 it will come from the assets of Maryland Casualty Company.
8 Because, once again, they have committed the tort and they're
9 responsible for the tort.

10          So, there is absolutely no way that they will be able
11 to access the insurance policy -- any of the insurance policies
12 or coverage under those insurance policies.

13          The other reason why it doesn't fall under 10A is
14 that, once again, this is not a claim for asbestos exposure
15 caused by the debtor.  Once again, we're not suing Maryland
16 Casualty because of anything the debtor did.  We're suing them
17 because of what Maryland Casualty did.

18          10B and C are other definitions of the term action
19 but, once again, 10B relates to actions for which there may be
20 coverage under the insurance policies --

21          THE COURT:  Wait, I'm sorry.  My head's still on 10A.

22          MR. BERNICK:  Okay.

23          THE COURT:  Pardon me a moment.

24          MR. BERNICK:  Certainly.

25          THE COURT:  On 10A, I don't think they're asserting

1 that the Maryland Casualty ran the operation and, therefore,
2 discharged into the air the asbestos fibers. You're simply
3 saying that they undertook come duty -- I'll call it
4 remediation, on behalf of the debtor and negligently carried
5 out that duty.

6          MR. BERNICK:  That --

7          THE COURT:  The fiber exposure, you're certainly not
8 alleging came from the insurance company. There's not an
9 allegation, is there, that the insurance company --

10          MR. BERNICK:  No.  No.  We're not suggesting that.
11 But what we are suggesting is, once again, they said that we
12 will take responsibility for making sure the dust control is
13 adequate.  That it's not discharged into the air.  We'll
14 develop the dust control program.  We will address all of the
15 industrial hygiene issues.  And then failed to do that.  And
16 that they're responsible for that assumption of the duty and
17 the failure to discharge the duty.

18          And, once again, we're not -- that conduct, as I'll
19 discuss with you in a moment, is not derivative of anything
20 that Grace did or did not do.

21          The other two items under 10B and D, which are the
22 other bases for their contention that this is an action, are
23 clearly not applicable.  Because, once again, B relates to
24 actions for which there may be coverage under insurance
25 policies.  And, as I've already explained to you, this is not a

1 claim -- is certainly not a coverage claim and not a claim that
2 might be covered by an insurance policy.   And D is -- says an
3 action is any action against the insurance carriers alleging
4 coverage for asbestos related liabilities.   And, once again, we
5 are not asserting -- this is not a coverage action in which we
6 are asserting that there is coverage because of the issuance of
7 insurance policies.

8           The other argument that they have raised in this case
9 is that the -- this is a derivative action.   And if you look at
10 the surreply, which they have filed in connection with this
11 case, they have tried to explain their position, and let me
12 just read it to you.   It says, "In her reply, Mrs. Gerard
13 alleges that certain industrial hygiene actions taken by
14 Maryland were the proximate cause of her illness."

15           And they go on and say, "In fact, to the extent such
16 actions were taken, they would have been performed at Grace's
17 direction with Grace determining and controlling the scope of
18 Maryland Casualty's work."

19           That's their attempt to recast our case.   That is not
20 what we are alleging.   And, in fact, what we are alleging is
21 the precise opposite.   Not that Maryland Casualty acted at the
22 direction of Grace, but rather that they put Grace to the side
23 and said we can do this better than you and we will assume the
24 responsibility to develop the dust control system.   We will
25 assume the responsibility to develop the industrial -- to take

1  care of the industrial hygiene concerns and then didn't do it.

2      And the position taken by Grace in this case, I would

3  submit to you is somewhat curious.  Rather than opposing us,

4  you would think that Grace would be cheering us on.  That

5  they'd be giving us bullets to load our gun.  Because if, in

6  fact, we are correct in what we are alleging, the

7  responsibility for much of the disaster in Libby rests not on

8  the shoulders of Grace, but rests on the shoulders of Maryland

9  Casualty.  If we are successful in pursuing this case, and I

10  believe we will be if we're given access to the Grace

11  documents, we will not be filing a claim in this Bankruptcy

12  because we will be successful in laying that liability at the

13  footstep of Maryland Casualty and we will be fully compensated

14  in connection with the Maryland Casualty case.

15      So, this is not going to have a detrimental effect on

16  this bankruptcy, it will have a very positive one.  And that

17  goes to the final issue which they raise, which is that there

18  is somehow an indemnification obligation that will arise if we

19  are successful in pursuing Maryland Casualty.  And I would

20  assert that as a matter of common law that certainly is not the

21  case.

22      If Maryland Casualty assumed the obligation to

23  undertake dust control and industrial hygiene and didn't do it,

24  how can they then turn around when they are held liable for not

25  doing that and say, Grace is responsible for it?  If they

1  assumed the obligation and didn't do it, they can't blame Grace
2  for their own failure to act.

3        So, the only way that they could possibly be held
4  liable is if they have some contractual obligation to
5  indemnify, which Grace has also asserted.

6        And what they said initially in their papers is that
7  there are two written contracts under which we may have an
8  indemnification obligation.  In their surreply, they say, well,
9  maybe there's actually one.  And then they give us Pages 24
10 through 27 of that agreement.  They don't give us the entire
11 agreement, including the portion of it that defines terms.  So,
12 it's almost impossible to make sense of what they've given us
13 and what obligations it imposes or doesn't impose.

14        But if you look at the provisions, once again, it is
15 clear that the contractual identification obligation involves,
16 once again, claims that arise under the insurance policies.  It
17 includes claims that involve liability on the part of Grace
18 Connecticut subject to the aggregate products limits.  It talks
19 about asbestos related claims that are covered or may have been
20 covered by any of the primary policies.

21        Again, those are not the types of claims that are
22 being asserted here, so I think it is clear that there is no
23 indemnification obligation that arises contractually or by
24 common law.  And that brings us, I guess, full circle to what
25 brought us here, which was the subpoena that I issued to obtain

1  documents from W.R. Grace and whether or not that type of
2  discovery is somehow stayed by 363 because Grace is in
3  Bankruptcy.  And we have cited a number of cases for Your Honor
4  in the briefing and I will candidly acknowledge that there are
5  courts which -- either under 363 or 105 have stayed discovery
6  against entities that are in Bankruptcy.  The vast majority of
7  courts have not, however.  And the way that I think you can
8  easily harmonize the cases that have and the cases that have
9  not is that it focuses on the extent to which the discovery
10  will be disrupted.

11        For example, in the <u>Manville</u> bankruptcy, the
12  discovery was stayed where the discovery sought to depose top
13  officers of the corporation at a critical time in their
14  reorganization and sought to depose the about issues central to
15  the bankruptcy, such as what they knew or didn't know about the
16  dangers of asbestos at various times.

17        That's not what we're seeking here.  Grace has a
18  depository of documents in Boston.  They have made it available
19  to hundreds of people over a long period of time.  All we have
20  asked for is that we be given access to that depository.  They
21  have a firm that controls that depository.  We have told them
22  that they we will pay for reasonable paralegal time to make it
23  available to us.  That's all we need at this point in the
24  litigation.

25        I can't think of any discovery that will be less

1 disruptive to W.R. Grace.

2       Mrs. Gerard strongly believes that she has an
3 independent claim against an entity that is not in bankruptcy.
4 She believes that she can be fully compensated by that entity
5 for the injuries that she has unfortunately suffered.   And I
6 would request that this Court not stay that action.   That it
7 not expand the injunction that currently exists to cover the
8 action, that you permit it to go forward, permit us to get the
9 limited discovery so that, once again, Mrs. Gerard can be
10 compensated.

11       Thank you very much.

12       THE COURT:  All right.  Mr. Bernick?

13       MR. BERNICK:  Your Honor, Ms. Gerard originally sued
14 Grace.  And the reason that Ms. Gerard sued Grace is that Ms.
15 Gerard alleged an injury from asbestos from the Grace mine.
16 That injury has still been alleged, it's being pursued yet
17 today, along with many, many other claims of people similarly
18 situated.   There are lots of claims that arise from the
19 operation of Libby Mine.

20       The only difference between the theory or case that
21 we're talking about here and the theory or case that has been
22 brought by many, many other people is that they've chosen to
23 name what they believe is a joint tort feasor.   Otherwise, this
24 case is exactly like many, many other cases.   It arises from
25 the operation of Libby Mine.

1   This situation that is where a new theory or a new
2 claim is developed on the basis of the same underlying tort,
3 this situation was specifically contemplated by the preliminary
4 injunction, it was contemplated as far back as the TRO.  We
5 were very, very mindful of a variety of different claims being
6 brought against others who really were joint tort feasors,
7 allegedly joint tort feasors, along with Grace, and as to whom
8 Grace still had a continuing relationship and then the net
9 effect was that if they're not picked up by the stay or the
10 preliminary injunction, effectively is the continuation of
11 massive litigation against Grace.  This is something that was
12 very much on our minds.

13   And I believe ever since the very first orders that
14 were tendered up on the first day of the case there has been
15 language and there had been provisions that have been designed
16 to shut down these efforts to, in a sense, plead around what's
17 essentially a case against Grace or arises out of an exposure
18 that involves Grace's product.

19   As has been pointed out, the operative language is
20 from 10A.  10A deals with actions and defines actions to mean
21 pending actions and actions that have not been filed or are not
22 pending as of the date of the entry of the order as follows.
23 Sub A, against affiliated entities that arise from alleged
24 exposure to asbestos indirectly or directly allegedly caused by
25 the debtors.

1          So, the operative term is what is the exposure,
2   what's the source of the injury that's being claimed.   And
3   obviously as counsel has recognized, affiliated entities is
4   defined to include insurance carriers and this particular
5   insurance carrier.

6          The only gloss that's been offered up to the Court
7   about why 10A is not absolutely crystal clear is that he points
8   out that insurance carriers means -- and there's a list of
9   different carriers -- and any other carrier of the debtors
10  under the insurance policies as outlined in Exhibit B.   So, he
11  says, well, the idea was to pick-up the direct action
12  situation.   But that gloss is not picked up by 10A.   10A deals
13  not with whether the claim might be covered by the insurance
14  policy or whether the action is one that's brought predicated
15  upon a direct action statute, 10A picks up what is the
16  underlying source of the injury.   If the underlying source of
17  the injury is Grace asbestos, 10A is triggered.

18         And, again, the whole purpose of this exercise was we
19  didn't want people who had a claim arising from an alleged
20  exposure to Grace asbestos in turn going around and suing
21  certain other identified entities, one of them being Maryland
22  Casualty.

23         So, the language of 10A is very clear, there's no
24  other way to construe it.   Indeed, it was specifically designed
25  to handle exactly this kind of situation.

1      Now, is there a reason?  Was there a reason why Grace
2  had a continuing interest?  And the answer is obviously, yes.
3  First of all, any time you have any kind of case that's being
4  brought against an alleged joint tort feasor, you not only have
5  the prospect of discovery, but you have the development of a
6  record.  And you have the pursuit of new theories, new
7  evidence.  It is impossible to separate out the development of
8  a new theory against a Maryland Casualty from the development
9  effects that could ultimately also be used against Grace,
10  that's number one.

11      Number two, you obviously have insurance policies
12  that can be at issue.  But even beyond that, you have indemnity
13  relationships.  And there is an indemnity relationship that's
14  been -- that could be alleged here.  The indemnification
15  agreement, we've attached the relevant portion to the
16  agreement.  If counsel wants the rest of the agreement, we can
17  certainly furnish it.

18      But the whole idea was that Grace reached a
19  settlement agreement with Maryland Casualty.  And under that
20  settlement agreement, any claim that could have been -- could
21  have been, as well as had been, asserted under that policy was
22  then picked up.  Basically Maryland Casualty agreed to offer
23  the insurance, but in turn, it wanted an indemnity so if it
24  continued to be sued based upon those same underlying claims,
25  they would be indemnified.  And we don't have any assurance

1 that this indemnity would not, in fact, be picked up and
2 applied to us.

3       Third, obviously if you have a claim against a joint
4 tort feasor, there is the possibility of ultimately third party
5 claims and contribution claims. So, this is not an area where
6 the preliminary injunction is superfluous. It meets an actual
7 real problem that poses an actual real threat with regard to
8 Grace.

9       I guess the best and simplest way to put it is that
10 this is not an issue of what would constitute Grace's best
11 strategy. We do not look at this strategic matter. We look at
12 this as basic protection in Chapter 11 so that people can't use
13 imaginative pleading to go after entities with respect to which
14 Grace has got an ongoing relationship. It's not a strategic
15 issue for us, it's a matter of pure protection.

16       The key issue is what is going to be the strategy of
17 Maryland Casualty. Once Maryland Casualty gets sued and if
18 this lawsuit is successful, ultimately has to pay. What
19 assurance does Grace have that there will not be a claim made
20 in the bankruptcy, not by Ms. Gerard, but by Maryland Casualty.
21 It was precisely to avoid the prospect of being any such threat
22 or any such involvement that this preliminary injunction was
23 entered.

24       If this door is opened up, anybody who was exposed to
25 asbestos from the Grace Mine under even remotely similar

1  circumstances to that of Ms. Gerard could well plead the same

2  theory, will have a lot of discovery coming out of the

3  depository and the threat against Grace will grow.

4           MR. LOCKWOOD:  Your Honor, could I --

5           THE COURT:  Yes, sir?

6           MR. LOCKWOOD:  I had not planned on --

7           THE COURT:  Enter your appearance.

8           MR. LOCKWOOD:  Peter Lockwood for the Official

9  Committee of Asbestos, Personal Injury Claims.

10          I had not planned on speaking to this motion, but

11  after listening to Mr. Bernick characterize the circumstances

12  around which this injunction came into existence, which I was

13  personally involved in negotiating and discussing with him and

14  Judge Farnin the terms of this, I feel I'm obligated to say

15  that he is not accurately describing the understanding, at

16  least of my Committee, when we were negotiating this.

17          The purpose of this injunction, for one thing, had

18  nothing to do with codefendant joint tort feasors.  Nothing.

19  There's millions of codefnedants -- well, millions is an

20  exaggeration.  There's hundreds of potential codefendant joint

21  tort feasors out there to Grace in the world.  And this

22  injunction doesn't protect any of them.

23          Maryland Casualty was identified and we insisted, we,

24  my Committee, insisted that the policies be identified on this

25  injunction precisely because we did not want a situation in

1 which some unrelated insurance company was being protected

2 against lawsuits on the ground it's an affiliated of W.R. Grace

3 because it wrote some insurance.

4         If the plaintiff is correct, and it certainly sounds

5 to me like they are, that this suit against Maryland Casualty

6 is as a tort feasor and not as an insurer of Grace, then that

7 provision relating to affiliates in the injunction has nothing

8 whatsoever to do with staying that action.

9         And the further argument that, oh, well, they might

10 have a contribution claim or indemnity claim, every codefendant

11 in the world might have a contribution claim and an indemnity

12 claim and my Committee is adamant in this case, and every other

13 case that equivalent committees exist that we represent, that

14 there will be no injunctive protection of codefendants.

15 There's -- as Your Honor has been furnished with briefs in

16 other circumstances, the case law is quite clear that with the

17 exception of some idiosyncratic occurrence in the Dow Corning

18 case, which Mr. Bernick is fond of trotting early and often,

19 there has been no case by any court involving asbestos in this

20 country were codefendants have been protected against merely

21 because they might have contribution or indemnity claims.

22         So, if Mr. Bernick wants to persuade this Court that

23 because of the peculiarities of the Gerard case it should

24 somehow be enjoined, he's at liberty to attempt to do that.

25 But the notion that somehow or another the injunction that's

43

1  already been entered in this case was intended or should be

2  read to accomplish that is simply not right, Your Honor.

3       THE COURT:  Okay.  Anyone else?  Any closing comments

4  on behalf of Ms. Gerard?

5       MR. PARKER:  Your Honor, I think that counsel has

6  spoken more eloquently than I could have to those issues.  So,

7  I have no further comment.

8       THE COURT:  Okay.  I'm going to take this under

9  advisement, I'll take a look at it when I get back to the

10 office and have a chance to look at it specification in

11 conjunction to the three orders.  So, this is under advisement

12 and you'll be hearing from me promptly.

13      MR. PARKER:  Thank you very much, Your Honor.

14      THE COURT:  Excuse me, this takes care of both Number

15 10 on the motion to intervene and Number 11 on your request for

16 clarification, is that correct?

17      MR. PARKER:  That is correct.

18      THE COURT:  All right.  And the debtors' position is

19 that neither the intervention nor the merits of the motion are

20 appropriate?

21      MR. BERNICK:  That's correct.  Well, I suppose for

22 purposes of making the request, you could do it on either

23 ground.  But for purposes of making a request, I think that the

24 operative one that the request on the merit should be under --

25      THE COURT:  Eleven, okay.

1          MR. PARKER:  Thank you.

2          THE COURT:  All right, thank you.  Yes, it seems to

3  me with respect to the intervention, that to the extent that

4  the request is to clarify the order, I'm not sure why the

5  intervention on that purpose is inappropriate.  I guess that's

6  where I'm having some difficulty with what the debtor is

7  seeking or the debtor's position on intervention.

8          MR. BERNICK:  I don't think that we really debate

9  that somebody could come in, a potentially interested claimant

10  and raise the question about the scope of the preliminary

11  injunction or the scope of the stay.

12          THE COURT:  Okay.

13          MR. BERNICK:  Our position's been predicated upon the

14  substance of the request.

15          THE COURT:  All right, thank you.

16                    (Pause)

17          THE COURT:  Okay.  Mr. Scanlon, you're representing

18  Ms. Kellogg?

19          MR. SCANLON:  I am, Your Honor.  This is an

20  automobile negligence case.  Ms. Kellogg is an 82-year-old

21  widow who entered an intersection in California and was t-boned

22  by a pick-up truck driven by an employee of the Grace Company

23  in a Grace truck.

24          She was in a coma for 33 days and has spent all but

25  40 days is approximately 440 days since the accident in the

1    hospital or in a nursing home.  Her medical bills already
2    exceed $500,000.  And she's had to spend $40,000 out of pocket
3    already.

4         There is an insurance policy, we are led to believe,
5    though we don't have the policy because they haven't given it
6    to us, for $5 million which the -- I believe a $250,000
7    retention.  It's not clear how the $250,000 retention works,
8    again, because the debtor hasn't provided us with that
9    information.

10        But either it will result in a unsecured claim filed
11   by Ms. Kellogg at the end of the case or perhaps the insurance
12   company will have to pay the entire claim and then be entitled
13   to either a general claim or a secured claim, as suggested by
14   the answer.

15        In any event, this is the case in which the legal
16   maxim justice delayed is justice denied has particular
17   poignancy.  This woman has to proceed with her case while she's
18   still alive.

19        In California, because of her age, she has docketing
20   preference and can get to trial in rather short order.

21        The debtor in this case basically says that this will
22   be too much of a burden to be bothered with the trial.  What is
23   that burden, Your Honor?  We have the driver of a '98 GMC pick-
24   up truck who we don't even know whether he's still employed by
25   the debtor.  Certainly have no indication that he's a high

1 level employee.  What he knows about the case is what happened
2 -- that's relevant is what happened in the three seconds before
3 he drove the truck into the side of Ms. Kellogg's vehicle.
4 It's my understanding that he has admitted liability, but even
5 if he doesn't, the amount of testimony that is required by him
6 is negligible.  The -- there is the issue of whether he was in
7 the scope of his employment.  Only, again, the driver knows
8 what he was doing that day.

9        If his testimony is believed to be false, perhaps
10 there's the testimony of his immediate superior, again, not a
11 very burdensome thing.

12        And also, these questions were undoubtedly asked and
13 investigated by the insurance company at the time that this
14 accident happened about three months before the bankruptcy was
15 filed.  The Grace truck was substantially damaged or possibly
16 destroyed in this, there must have been an insurance
17 investigation at that time in which the driver was interviewed,
18 the employer was interviewed.

19        What's significant about this case and what makes it
20 a substantial trial is what happened to the defendant (sic),
21 what is her medical condition, what was her medical condition
22 before.  All of these things will be covered by the insurance
23 counsel.

24        W.R. Grace has virtually nothing to do with this case
25 but to call the insurance carrier and say defend this.

1          THE COURT:  Except possibly to pay $250,000.

2          MR. SCANLON:  Yes, Your Honor.  But that has to be

3 litigated anyway.  And the insurance company has a very strong

4 incentive to protect that interest as they would if they were

5 not bankruptcy.  It's my understanding there's a $5 million

6 policy.  We've filed a claim -- an unliquidated claim estimated

7 to be $2.5 million for Mrs. Kellogg.

8          So, the insurance company adequately will protect

9 that if it's the first $250,000 that's here, that's going to

10 wind up as a claim one way or the other.  And the sooner that

11 it's litigated, as soon as it's reduced to a hard number, to

12 better for all concerned.  And it can be done with virtually no

13 bother on the part of the debtor.  And the response, I submit,

14 is extremely hard-nosed in this situation.  The detriment to

15 the debtor is insignificant.   The detriment to Mrs. Kellogg is

16 life altering.

17          THE COURT:  Okay.  Mr. Bernick?

18          MR. BERNICK:  I'll be very brief, Your Honor.  We

19 don't, by any means, minimize Ms. Kellogg's injury and her

20 situation.  But at the same time, I would venture to say, at

21 the risk of provoking Mr. Lockwood's ire again, that so, too,

22 for many of his clients, they face very difficult situations

23 involving their own injuries.  And I don't believe that any

24 position has been stated that would make the situation of Ms.

25 Kellogg any more compelling than the situation of many, many

1 other claimants who are also making claims against Grace.

2 And as Your Honor points out, this is not a situation
3 where the assets of Grace are not exposed.  They are exposed.

4 THE COURT:  Well, are they?  Because Mr. Scanlon says
5 he doesn't have the insurance policy, and I don't know what the
6 exposure is.

7 MR. BERNICK:  I believe that there's a $250,000
8 deductible, but we could certainly supply that to the Court and
9 inform the Court about what the exposure is.

10 THE COURT:  Well, I guess the question is if there is
11 -- is the insurance policy that's in place the same insurance
12 policy as to which asbestos or other plaintiffs are going to be
13 looking for relief?  Because if they are, then I don't know
14 that it's appropriate to let this one go through any more than
15 letting anybody else liquidate their claim.  If it isn't, if
16 it's a different type of policy, then there may be reason to
17 let this go through.

18 MR. BERNICK:  I'm not sure about that, I believe that
19 it is a different policy.  I'd have to confirm that and tie it
20 down.

21 But I also believe by the same token that there is a
22 deductible that is not an insignificant amount of money.

23 THE COURT:  All right.  And what's the responsibility
24 of the insurance company to pay?  I mean does the debtor have
25 to satisfy the deductible first?

1          MR. BERNICK:   I don't -- I just don't know the answer

2   to that, Your Honor.

3          THE COURT:   I --

4          MR. BERNICK:   We can find that out.

5          THE COURT:   Yes, I think you need to give both Mr.

6   Scanlon and me some additional facts.   It would seem that if

7   there is a separate insurance policy that other tort claimants

8   are not going to be able to lay claim to, for purposes of this

9   proceeding, that possibly should go forward with Ms. Kellogg

10  limited to recoveries against the insurer and not to making

11  claims for the deductible.   As to that, either she or the

12  insurance company, whoever is appropriate, would have to,

13  again, file a claim here.

14         But to the extent that that's what happens, I'm not

15  sure there is reason to prohibit this one from going through.

16  If it is the same insurance policy that other tort feasors or,

17  I guess, other asbestos claimants specifically may be able to

18  look to or other property damage claimants may be able to look

19  to, then I don't think Ms. Kellogg should be in any different

20  position from the rest of the unsecured creditors in this case.

21         So, I think I need some additional information and I

22  think Mr. Scanlon does, as well.

23         MR. BERNICK:   We'll provide that information.

24         THE COURT:   Mr. Lockwood, has your ire been raised?

25  Do you want to comment on this?

1          MR. LOCKWOOD:  No, but I would love to hear from the
2  debtor that it has late 1990's insurance that provides coverage
3  for an asbestos PI/PD claimants as I'm sure my fellows at the
4  table --

5          THE COURT:  There, I just gave you the opportunity,
6  Mr. Bernick, to make it up to Mr. Lockwood.

7          MR. BERNICK:  Oh, I see.

8          THE COURT:  He won't be ired any longer.  All right.
9  How much time is it going to take to get the insurance policy
10 to Mr. Scanlon, and I guess file whatever supplemental
11 pleadings you want?

12         MR. BERNICK:  I think we can certainly get the policy
13 to Mr. Scanlon within a week.  And then if he wants to -- I
14 guess we'll probably -- maybe the best idea is for both sides
15 to provide a supplemental memo to the Court and we'll address
16 the question of whether the $250,000, if that's what it is, is
17 a deductible and is somehow we wouldn't have to be pay --

18         THE COURT:  Okay.  It seems to me that if it is the
19 type of deductible that will simply require Ms. Kellogg to file
20 a claim here to recover on that $250,000, that relief from stay
21 should be granted to pursue this action for the reasons I've
22 expressed.

23         Otherwise then, I think I need something
24 supplemental.  So, that would be, based on what I've heard and
25 what I've seen so far, my preliminary view.

1    MR. BERNICK: So, if we actually have to pay the
2 deductible out --

3    THE COURT: Before she can collect.

4    MR. BERNICK: -- before she gets -- before she gets
5 money, then you would want to have an additional submission to
6 the Court or --

7    THE COURT: Well, yes. I think if that's the case,
8 then I -- if it's that type of policy, and I have seen a couple
9 like that, then I'm not sure I can grant relief from the stay
10 because I think assets of this estate could well be adversely
11 impacted, unless she has to waive her claim to the first
12 250,000. If she wants to do that, then that's a different
13 issue.

14    So, I guess what I'm trying to do is raise the
15 parameters for all of you to sit down and talk. See if you can
16 work it out, and if you can't, then, yes, I need something
17 supplemental.

18    So, you'll get the insurance policy within a week and
19 you're going to file a copy of that here, too.

20    MR. BERNICK: Sure.

21    THE COURT: And then what would you like by way of a
22 supplemental submission other that the insurance policy?

23    MR. BERNICK: Well, it seems to me that we'll furnish
24 the policy, we'll then sit down and talk with counsel about
25 where this is going. And I suppose that if there are going to

1  be supplemental submissions, maybe ten days after that.

2          THE COURT:  All right.  Supplemental submissions or -

3  - I'll call it an agreed order.  I'm not expecting either of

4  you to consent to the order that I propose to enter.  But

5  agreed in the sense that there isn't anything further to be

6  done, other than what I've -- the rulings that I've articulated

7  on the record today.

8          So, let's say an agreed order or supplemental

9  submissions will be due by -- that the policy is due by March

10  25th.  How about by April 12th, that's two weeks after?

11          MR. SCANLON:  That would be fine, Your Honor.

12          MR. BERNICK:  That's fine.

13          THE COURT:  Okay.  Do you want this calendared again

14  for the April hearing for some reason?  Or shall I simply take

15  it -- I think I understand the issues, I just don't know the

16  facts.

17          MR. BERNICK:  Right.  We don't see, frankly, a

18  necessity for reraising it with Your Honor.  I don't know what

19  counsel's preference is, but we would simply prefer to have it

20  submitted, then Your Honor can make a determination.

21          MR. SCANLON:  I would agree to that, Your Honor.

22          THE COURT:  All right.  Then I'll take it under

23  advisement.

24          MR. SCANLON:  Thank you, Your Honor.

25          THE COURT:  Okay.  What's next, Mr. Bernick?

1              MR. BERNICK:  I think that what's next is the case
2   management order and the claim forms.  And I guess I'd like, if
3   I could, to ask the Court for a little bit of clarification on
4   how you would like to proceed this afternoon, mindful of the
5   fact that we started the last time and had to spill over.  And
6   as I read the order that you entered scheduling today's
7   hearing, you set out some directions for counsel.

8              There are a series of matters that have basically
9   arisen since that time, and are also the subject of further
10  correspondence with the Court.  There is an effort by an expert
11  for the Property Damage Committee to submit now a notice
12  program of their own through Mr. Hilsee.  We'd move to strike
13  that submission on the grounds that it's grossly untimely.

14             There's also a motion for permission to file a class
15  proof of claim.  And that was filed, I think, just at the end
16  of last week.  We obviously have not had a chance to respond to
17  that, but obviously feel very strongly that that motion should
18  not get in the way of the bar date motion and case management
19  order motion that we've made already and that we're now in the
20  second day of hearing on.  So, that's another matter.

21             We had an opportunity when we were last here to also
22  talk with the Court about the overall notice, the content of
23  the notice itself.  And I don't know if that's something as to
24  which the Court wants to have further argument today.

25             So, I guess the real question is as I took the

1  scheduling order that Your Honor entered, it seemed to focus
2  almost exclusively on the actual proof of claim forms.  And if
3  that's what we're to handle this afternoon, that's clear.  And
4  I think we can proceed seriatim, as Your Honor had indicated.
5  And I can certainly tell the Court what our preference would be
6  in the way of argument.

7         But if there are these other matters that Your Honor
8  is inclined to take up, I'd like to know that now so that we
9  can --

10        THE COURT:  Well, actually I have same question
11  myself to ask all of you, frankly.  Because I have received the
12  motion for permission to file the class proof of claim, but I
13  haven't really had the chance to really focus on it either.  It
14  was just filed, and I did get a letter from someone, and I
15  apologize, I don't even remember who, but someone indicating
16  that -- I think maybe you, Mr. Bernick, you had just received
17  it and had some opposition that you wanted to prepare or at
18  least some comments that you wanted to prepare and, of course,
19  haven't had the chance to do that.

20        I guess with respect to the Zonolite issues as a
21  whole, that both case management, proof of claim and class
22  action, it seems to me that we almost got to decide whether the
23  class of proof claim concept is viable before we get to the
24  issue about the content of the proof of claim form.  Because it
25  seems to me that if there is a class proof of claim that is

1 authorized, maybe the debtors' suggestion in a slightly
2 different context for how to proceed on the Zonolite issues
3 might work better.  And, again, this is kind of a gut instinct,
4 so I don't want -- I'm not sure I want to be bound by this by
5 way of making findings.  But I'd like to have some discussion
6 about it.

7 Let's assume for a moment that aside -- just putting
8 aside the debtors' objection to the fact that there can be a
9 class proof of claim, let's just assume for the moment that
10 there is authorized a class proof of claim and before the bar
11 date is set for any other Zonolite individual claims that come
12 in, that may have -- particularly if it can be one without a
13 opt out, that may be the best way to get to the debtors'
14 scientific issue on liability because then I think we may not
15 need the Rule 42 trial, as the debtor proposes.  Instead, we
16 could have the debtor or anybody, but in my hypothetical the
17 debtor, file an objection to that class proof of claim raising
18 the common issues, do the scientific evidence trial, find out
19 whether there is or is not liability.

20 If there is not liability, we never need to worry
21 about notice to the Zonolite plaintiffs or a proof of claim to
22 the Zonolite plaintiffs at all because there won't be any
23 liability, there's been a finding to that effect and they won't
24 be involved in a class because there's no liability.

25 On the other hand, if there is some scientific basis

1  for showing that Zonolite has caused property damage that

2  would, at some point, have to be remediated, then I think we do

3  need to worry about the content of approving a claim and what

4  type of notice would go out to potential class members.

5  Because then the debtor, particularly for estimating liability

6  under the plan, has to know the kinds of things that the

7  debtor, I think, is suggesting that it needs to know.

8          Now, that's without getting into all the detail on

9  the proof of claim, and I don't mean that.  But you do need to

10 know whether your product is involved, whether there is a

11 person who has had exposure in the home or school or whatever.

12 So, it may make more sense if you folks could, I guess, agree

13 to a process to have a class proof of claim filed on behalf of

14 all Zonolite plaintiffs, where they are, whoever they may be.

15 Litigate the common issues, the scientific, particularly

16 liability issues, and see how that comes out.

17         Then when you know how it comes out, if the debtor

18 wins on the liability, I think that's the end of the ball game.

19 If the debtor loses, then we're right back where we are now

20 with what we need on the proof of claim form and the type of

21 notice that needs to go out.

22         MR. BERNICK:  Your Honor, if I could address that,

23 and maybe -- we've been kind of nibbling around the edges of

24 this for a while.

25         THE COURT:  Yes.

1          MR. BERNICK:  Maybe I'll use some of my time this

2  afternoon to talk about this because what Your Honor is

3  describing would have huge ramifications for this case.

4          THE COURT:  Oh, sure.

5          MR. BERNICK:  It's not a question simply of, you

6  know, difference in framing the notice.  It is a whole dynamic

7  that comes into the case.

8          Let me get into a little bit of a time line.  Because

9  I think that there is another way to accommodate and, indeed,

10  achieve what Your Honor has described as a fast way to get to

11  the common issues without creating some of the ramifications

12  that I'm talking about.  What we're proposing is that

13  essentially we have the bar date and then people would file

14  their individual claims.

15          THE COURT:  I know, but we don't need to get that far

16  if there's no scientific liability.

17          MR. BERNICK:  I understand that.  But the difficulty

18  is -- the difficulty is either way it's going to go, we're

19  going to have to have the scientific liability determined.

20          THE COURT:  Right.  That's right.

21          MR. BERNICK:  Either way you go.  And this -- to have

22  the class proof of claim issue, you can't have a class proof of

23  claim issue that has the consequence that Your Honor has

24  described, which is that nobody can opt out and everybody is

25  there, you can't have it unless you certify the class.

1          THE COURT:  Oh, I agree.  I'm assuming for the moment
2    that we're passed those issues in discussing this.  As I said,
3    I'm not attempting to adjudicate all the issues, I'm just
4    trying to see whether there is a framework that essentially
5    accommodates what the creditors say they need and what the
6    debtor says it needs.  And I think it's in there, it's just a
7    matter of ferreting it out.

8          MR. BERNICK:  But the consequences of certifying that
9    class don't disappear.  They're there for ever.

10         THE COURT:  Sure.

11         MR. BERNICK:  They not only effect the notice
12   process, they create an enormous economic dynamic to the case.
13   You create the possibility -- no one really knows what the size
14   of the debt class is.  Maybe it's a million people, maybe it's
15   ten million people.  And the process of finding out may take a
16   very, very long time.

17         So, while this becomes one means of solving the
18   notice problem or addressing notice, it goes way beyond that.
19   And it's not necessary to get to where we have to go to.  The
20   fastest way to get to where we have to go to is to establish
21   that bar date, have the claims come in -- including what I'll
22   describe here as the class proof of claim.  We're not --

23         THE COURT:  I don't think that eliminates the
24   expense, Mr. Bernick, because in order to do it the way you
25   were suggesting and get the individual claim in first, I think

1 you have to have some sort of a notice program out there.

2          MR. BERNICK:  We're going to have to have a notice

3 program, I believe, Your Honor, no matter which way you -- you

4 can't take the rights of these people and say guess what,

5 because I'm certifying a non-opt out class, I'm not going to

6 provide notice to anybody and they'll just simply be bound by

7 the opt out.  You're talking about people who may have

8 individual claims.  It would be an extraordinary class for

9 people to have individual damage claims and be handled on a

10 mandatory non-opt out basis.

11          THE COURT:  But while it could be -- or it may or it

12 may not be, but the fact that is that in bankruptcy, you've

13 essentially got a non-opt out class because either they opt out

14 and file an individual claim or else their claim is discharged.

15          MR. BERNICK:  True enough.  There are still other

16 ramifications.  If you certify this class under B2, as opposed

17 to B3, A, I don't understand, Your Honor, how you would ever do

18 it.  This is a damage case, it's a B3 class.  Right there,

19 you've got a lot of complicated questions that come in that are

20 not simply a question of bringing people into court.

21          For example, if these people had a right to opt out

22 as they do under B3, even if it's in Bankruptcy, they have a

23 right to their own determination.

24          THE COURT:  Okay.

25          MR. BERNICK:  Okay.  You then get to the question of

1 because of the huge size of this class and the impact that it
2 has on the case, the debtor would have absolutely no choice but
3 to seek interlocutory review under 23(f) about whether that was
4 an appropriate certification or not.  Just the process of
5 seeking interlocutory review, first to Judge Wolin and then
6 potentially to the Third Circuit, which we would have the right
7 to do under 23(f), you're talking about a huge period of time
8 elapsing.

9        THE COURT:  You're going to have that period of time
10 no matter what.

11        MR. BERNICK:  Well, not really.  Because if we set a
12 bar date, and it's a relatively prompt bar date, and we go
13 forward and we get the individual claim forms in and the class
14 proof of claim form in, at that point, you can go forward and,
15 first of all, determine whether certification is really
16 necessary given the number of claims that you've got.  And
17 second of all, regardless of whether the certification takes
18 place, you can have that common issue trial right there.  You
19 don't have to wait for anything else.

20        The only bite, Your Honor, I think that you're trying
21 to identify is that somehow if you were to certify a mandatory
22 non-opt out class right here, you would save the expense of a
23 notice program before you got to the science trial.  And all
24 that I'm suggesting is that, number one, I think that that may
25 well be illusory because I think that there's going to have to

1  be notice to the claimants in any event because it is a B3

2  class.   Whatever the differences might be between being an opt

3  out and not being an opt out, people are going to have to get

4  notice of that.

5           THE COURT:  Well --

6           MR. BERNICK:  B3 means notice.

7           THE COURT:  All right.  Let me ask this, at least --

8  there have been at least two class actions served by -- so far,

9  correct?  The one in the Libby Mine on the Zonolite issues and

10 the one -- I'm sorry.  In the State of Washington, I apologize.

11          MR. BERNICK:  State of Washington.

12          THE COURT:  State of Washington, and the other in

13 South Carolina.

14          MR. BERNICK:  Yeah, the one in South Carolina was

15 actually certified -- it was certified on an ex parte basis.

16 It went through a long briefing process.  It was then certified

17 on an ex parte basis in the weeks just before we filed for

18 Chapter 11.

19          There was then a show cause order, and I believe the

20 show cause order was still pending at the time that the company

21 went into Chapter 11.

22          THE COURT:  Okay.  It deals with Zonolite issues.

23          MR. BERNICK:  Yes.  It deals actually with property

24 damage issues generally and may include Zonolite.   The Barbanti

25 (phonetic) class was a Zonolite class, State of Washington

1  only.

2          THE COURT:  All right.

3          MR. BERNICK:  Notice did not go out on that.  There

4  had not been any notice issued at the time the Chapter 11 was

5  filed.  We had a non-notice statewide certified class.  That's

6  all that you had.

7          THE COURT:  Okay.  Well, because what I was thinking

8  is that it's possible that at least as a preliminary matter to

9  try to get to these issues, because I truly think that the

10  issue that's going to drive this part of the plan is the

11  scientific side.  We need to get to the scientific side.

12          MR. BERNICK:  Absolutely.

13          THE COURT:  So, if there is a class or there are

14  classes that have already been certified in State Courts, which

15  could file, in quotes, a class proof of claim, they could, at

16  least, stand to, I guess, be the Rule 42 type trial you're

17  talking about on a scientific side.

18          MR. BERNICK:  You could certainly try to -- you could

19  certainly do that.  But, again, by the time that you get down

20  to that road, we're not talking about very long before we have

21  these claims here.  The question of time to get to trial is --

22          THE COURT:  But you may never need those claims.  Why

23  do you want to go out with a notice program to potentially --

24  well, somewhere in these materials I saw something that said

25  that these homes have perhaps turned over as many as three

1  times.   And if you say -- if you assume that at least three

2  people are living in a home that's turned over at least three

3  times and there are 15 million of them, we're looking

4  potentially at 45 million, roughly, potential claimants.   Now,

5  why do we want to send out a notice that's going to get

6  potentially 45 million plaintiffs when it may not be necessary

7  if the debtor is successful on the scientific side?

8          MR. BERNICK:   I would love to be able to tee-up the

9  issue of the science without any notice, you know.   Anybody

10  will provide a class --

11          THE COURT:   Well, you can't --

12                  (Laughter)

13          MR. BERNICK:   You can't do that.   The problem is that

14  if the sole purpose of the class really is to provide that

15  notice, it has a lot of other ramifications.   If these people

16  represent 45 million claimants and they say we now have the

17  judgment on the science in favor of 45 million claims, they

18  don't know how many of these people are actual.   But they will

19  certainly assert the full scope of that claim in connection

20  with this case.

21          Your Honor is continually telling us that we ought to

22  be focused on the ultimate resolution of the case.   How do you

23  negotiate a resolution with people who are sitting on top of

24  the class that's got 45 million people?   We'll have

25  disagreements.   We'll say, oh, well, gee, only three percent of

1  them or four percent of them or two percent or a half a percent

2  will actually be claimants.  They'll say, no, it would be far

3  more than that.

4          THE COURT:  Well, you'll know -- but the thing is,

5  you will know that because at some point in time, if a class is

6  certified, then you will have people who will have to do

7  something, either with the class or with the bar date one way

8  or another, to join the class.

9          MR. BERNICK:  That's my whole point is that if we're

10  going to have to do that, if we're going to have to find out

11  who is a claimant at some point in this process, let's find out

12  now.

13          THE COURT:  But the question is why do that when you

14  may never need to know?

15          MR. BERNICK:  Well, --

16          THE COURT:  If you're successful on the scientific

17  side --

18          MR. BERNICK:  Sure.

19          THE COURT:  -- it doesn't matter how many potential

20  people are out there, they're not going to be a class.  They're

21  not going to have claims.  And you don't need to worry about

22  them anymore.

23          MR. BERNICK:  That's absolutely correct.

24          THE COURT:  Okay.

25          MR. BERNICK:  But again, Your Honor assumes in that

1  process that, number one, we don't have to provide these people
2  with notice before we certify the class or after we certify the
3  class.   And I really grabble with whether that is so because
4  they still do have different rights if they have the right to
5  opt out.

6          And, second, we would like to believe and we believe
7  it is the case, if science favors our position, then we will be
8  successful.   But as long as there is any prospect that this
9  class is certified even if we were to win, you can be assured
10  that given the magnitude of this potential claim, this case is
11  going to become extraordinarily difficult to resolve.

12          Whereas if we go forward with the individual claims
13  and then we win on the science, what committee or what group of
14  lawyers is ultimately going to believe I still want to pursue
15  this and still want to pursue class certification because
16  ultimately I hope to get both.   I hope to get this turned
17  around, get the class certified and then use my economic
18  leverage against these people.   There's no need for it.

19          Much simpler if you keep tee-up the issue with
20  respect to these claims and, at the same time, find out what is
21  the size of the real claimants' class.

22          THE COURT:   I don't think on terms of the scientific
23  side that it makes much sense to have the individual claims go
24  to litigation.   I mean there has to be a class, I think,
25  certified, or should be.   I don't know that it has to be, but

1  it seems to me to make more sense, to certify some sort of
2  class to do the common issue trials, you can bind everyone that
3  way.

4         I don't know the outcome in a bankruptcy context of a
5  Rule 42 trial in terms of the rest of the people who aren't
6  involved in those common issue trials.  Now, you could
7  certainly say that the rulings, to the extent that the evidence
8  is going to be similar, might have some collateral estoppel
9  consequence, but it won't have a res judicata consequence if
10 all those claimants aren't there.  And I don't know about you,
11 Mr. Bernick, but even if we only have a class of 15 million
12 homes, and we look at the home as the claimant instead of the
13 people in the home, for purposes of winnowing this down some, I
14 don't really want to do 15 million trials.

15        MR. BERNICK:  That's exactly why we ought not to go
16 forward to certify a class for purposes of suiting what's
17 essentially a notice or a procedural problem.  We've got to
18 find out who the real claimants are, bring them in and Rule 42
19 is not a question of the res judicata or collateral estoppel
20 effect.  They are there.  These people come in, however many
21 are here, they are all physically and judicially present before
22 the Court.

23        All that Rule 42 does -- this is the problem with
24 getting your mind around the concept -- all that Rule 42 does
25 is says with respect to whatever that group is, they are

1  treated as the same for purposes of a common issue, which is is
2  Zonolite unreasonably dangerous.  It's not a question -- we
3  don't have to look for collateral estoppel or res judicata or
4  anything in order to get that judgment to be binding.

5              THE COURT:  Well --

6              MR. BERNICK:  It is binding because they are there.

7              THE COURT:  They're there, but they're there
8  represented by 15 million different lawyers potentially.  Not
9  by the same group.  It doesn't -- it makes no sense to do it
10 that way.

11             MR. BERNICK:  This is exactly what the -- Your Honor,
12 this is actually fairly well established.  It's exactly what
13 happened in Benbecton (phonetic).  Benbecton, there were 11
14 hundred plaintiffs, all consolidated under Rule 42 for a common
15 issues trial before Judge Rubin in Cincinnati.  And they didn't
16 have each and every one of them be represented by a separate
17 lawyer who stood up there and cross-examined the experts and
18 the like.  They had a trial team of lawyers that represented
19 them all.  And they were all there for purposes of one single
20 common issue, which is did Benbecton cause birth defects.  It
21 went up and was affirmed by the Sixth Circuit after a Rule 42
22 trial.

23             THE COURT:  But there isn't any reason to
24 disenfranchise a particular individual plaintiff from using his
25 or her own lawyer when you can certify a class and have the

1 lawyers appointed for that purpose.

2      MR. BERNICK:  Your Honor, with due respect, you just
3 accomplished exactly the same thing when you said certify the
4 class.  Unless you make that a mandatory class --

5      THE COURT:  Well, sure.

6      MR. BERNICK:  Well, that's a big problem to have a
7 case that involves damages be certified as a mandatory class.
8 You either have to have a limited fund certification in the
9 context of Chapter 11, which I don't believe has ever been done
10 before, maybe it has.  Or you have to characterize the nature
11 of the relief that's being offered as injunctive, which would
12 be very difficult to do because these people -- each and every
13 one of these individuals could say, gee, my home is worth less
14 then will cost me actual dollars to remediate it.

15      THE COURT:  Well, I'm not --

16      MR. BERNICK:  There is -- I'm sorry.

17      THE COURT:  Why --

18      MR. BERNICK:  If it's a B3 class, if I am right, it's
19 going to have to be a B3 class at the end of the day.  And the
20 problem that you identified with common counsel representation
21 is every bit as much fair, indeed, it's worse because you don't
22 have Rule 42.  These people are going to be entitled to bring
23 in their own lawyers for purposes of litigating this issue.
24 They have the right to opt out, even though you would all say
25 that their opt out is still in the context of a Chapter 11

1 proceeding.

2       THE COURT:  An opt out in that context makes very

3 little sense.  I mean there may be a few people who will want

4 to opt out, maybe.  But to what end?

5       MR. BERNICK:  Well, I would ask exactly the same

6 question.  They would say I want to opt out because I want to

7 have my own lawyer.  They could say that.  Well, same thing

8 over here, these people say why is it they want their own

9 lawyer?  They would be so ably represented by counsel here, why

10 should they want their own lawyer?  So, they may still want

11 their own lawyer.

12       THE COURT:  If the estimates for remediation are

13 correct, that it's going to cost between 1,000 and $7,000 per

14 home to remediate this, it's going to be very difficult to

15 understand how any individual is going to want to opt out and

16 have his or her own lawyer appear in a case in which the

17 maximum amount of damage that they could seek would be $7,000.

18       MR. BERNICK:  Well, you know why it will happen, and

19 this is the way the word in mass tort, it won't be just one --

20 it won't be driven by the individual claimants.  It will be

21 driven by the lawyers.  You will get lawyers who will come in

22 and say I will represent all kinds of people who are opting

23 out, the opt out lawyers.  One lawyer will represent, not ten,

24 20, 30, but could be a hundred or 200 people.  In which case,

25 they get a lawyer of their own choice, somebody who will

1  negotiate for them, maybe do better than the relief that's
2  offered with respect to the class.   None of this happens.   This
3  is the way the class actions work is that people come into
4  business on the strength of the opt out claims.

5        But however you look at that, A,  you've got to
6  provide them with notice.

7        THE COURT:  You have to give them notice.

8        MR. BERNICK:  You have to give them notice.

9        THE COURT:  I'm not challenging that.

10       MR. BERNICK:  We're going to have the notice program.
11  B, if I'm correct, because B3 rather than B2, you have to give
12  them the opportunity to opt out.   And what would be absolutely
13  for sure is that -- I have to talk to my client who is sitting
14  right there, but I don't think that the debtor could stand by
15  and watch this class get created, as strongly as we felt about
16  the science, this is the very dynamic that was describe in the
17  wrongful -- the case that we cited to the Court where there was
18  a nationwide hemophiliacs case that was certified, went up to
19  the Seventh Circuit and it was decertified.   And Judge Posner
20  (phonetic) described in graphic terms the economic leverage
21  that is exerted by virtue of a class.   Bear in mind that before
22  this case was filed -- this Chapter 11 case was filed, there
23  was not a single, not one property damage Zonolite case that
24  had ever even been pursued.   And now we're going to create 45
25  million claims?

1           I will have an obligation -- Grace will have an
2  obligation to take this matter up for as long as it goes
3  because we would have to unwind this class before we would ever
4  have the individual science trial.  So, the net effect would be
5  that rather than getting what I think the Court would like to
6  see and we would dearly like to see, which is the science trial
7  promptly, we now go down the rabbit whole in trying to get rid
8  of what will be then described aptly by Mr. Lockwood as he
9  described it before, the 800 pound gorilla in this case.

10          So, it is -- it's tempting to say, gee, why worry
11  about the notice that's associated with the bar date because if
12  it's class, isn't it much easier?  And I would like to do
13  anything we can possibly do to alleviate the burden of the
14  notice to do it promptly, to do it less expensively, we'd like
15  to do it.

16          But the fact of the matter is that if the price of
17  doing that is to create this dynamic, we have taken -- we've
18  taken a huge step backwards.  This would be a major, major
19  development in this case.  I don't see this size trial taking
20  place any time soon.  And that's just being candid with the
21  Court, this is an enormous dynamic --

22          THE COURT:  Well --

23          MR. BERNICK:  -- as well as everything else in the
24  case.

25          THE COURT:  It may be an enormous dynamic, I don't

1  know, I mean it's difficult as I sit here now to know.  I don't
2  know how many entities are going to end up in that class.  It
3  may turn out that perhaps nine-tenths of the homes that have
4  Zonolite in it at one point in time have already been destroyed
5  and there may be nobody in the class.  I mean at the moment, I
6  don't know.  I don't know what we're looking at.

7          MR. BERNICK:  But we -- and that's what the
8  difficulty is that that is, under class procedure, that's the
9  last thing that you find out.  You find out about that way down
10 the road, look what they want to do, they'll want to do a deal
11 that pays in a fund as part of a plan and then whoever claims,
12 claims.

13         What we want to do is we want to find out that answer
14 up front so that we can then say, okay, we now understand what
15 the dimensions of this claim -- this litigation really is.  We
16 can afford to litigate the settlements.  Whatever Your Honor
17 decides with respect to Rule 42 certainly could carry
18 tremendous weight.  And all that we've paid as a price for
19 getting there -- the price for getting this very important
20 information and getting it promptly, the only price that we've
21 paid is that we've spent the time necessary to prove a claim
22 form and we got a notice program that goes out to the other
23 with the property damage notice program, all at the same time
24 to get the whole thing done.  This is what I'm responding with
25 is why Your Honor believes that somehow this notice here is so

1 much more costly and onerous than what we're already going to
2 need with respect to --

3        THE COURT:  Because you may never need it in the
4 Zonolite issue.  The fact is you may never need it.  You might
5 actually win on the science side.  And if you do, you've done
6 all this work for nothing.

7        MR. BERNICK:  Again --

8        THE COURT:  And you've put these individuals through
9 a lot of work which, if they have a claim, they very well need
10 to do.  But if they don't have a claim, because the science
11 doesn't support it, then it's been very costly for them to go
12 through this for nothing.

13        MR. BERNICK:  But --

14        THE COURT:  Because they're not going to recover.

15        MR. BERNICK:  I would -- you could probably also --
16 another possibility, I'll put this out, it's something to think
17 about, another possibility is to get some group of individuals.

18        THE COURT:  Well, that's what I was just saying, that
19 it's --

20        MR. BERNICK:  Yeah, is that this -- we don't certify
21 a class, we get some group of individual claims.  Your Honor
22 then can deal with what the scientific evidence is.  And on the
23 basis of that, we go forward.  We could probably live with
24 something along those lines.

25        But the whole thrust of what we're saying is let's

1  get the individual claimants in.  If it's not necessary to go

2  to an elaborate notice process and the time and expense and

3  energy, you know, we'd certainly be flexible with that.

4       If you take the named representatives from the Park

5  Andy (phonetic) case, maybe some of the other people who are

6  named representatives in the other purported class action,

7  bring them in, we'll put on the science, we'll litigate the

8  issue.  You've given something up, a little bit, which is that

9  you've now decided the science on the basis where you can't say

10 that it's res judicata.  At the same time, I think most lawyers

11 looking in would probably be very much influenced by whatever

12 it is that Your Honor decided with respect to those claims.

13      But almost guaranteed for sure we go down this road,

14 we've got notice, we've got a huge problem that we are going to

15 spend a very, very long period of time unwinding it, and I

16 believe completely unnecessarily.

17      Why do they want to do it?  Because they want that

18 influence in the case.  They want that influence in the case.

19      THE COURT:  Well --

20      MR. BERNICK:  And they'll get it.

21      THE COURT:  Well, I'm not sure I agree that the --

22 that as long as the scientific evidence is not determined that

23 either side has influence in the case for that kind of

24 bargaining.  Once the scientific side is determined then I

25 think, yes, that that is the situation.  Then you do need to

1  know who the members of the class are.  And if the debtor loses

2  on the scientific side, and it turns out to be that big a

3  class, the debtor faces that whether it's in through individual

4  liability claims or whether it's in through a class.

5         MR. BERNICK:  Oh, we won't -- that's the problem with

6  this.  Ultimately -- let's assume that we went forward.  We

7  would never -- we would never go through the process of finding

8  out exhaustively how many of these people there are, it won't

9  happen.  We couldn't conclude the case.

10         Instead, what will happen is that Your Honor and

11  Judge Wolin and everybody else will want to figure out some way

12  to resolve this claim on the basis of the creation of the fund.

13  And at that point, it is purely a question of who's got the

14  leverage, and that's what -- that is what they want.  That is

15  why we are here, is that they would like to go forward, create

16  that class and have it -- that's exactly what the Seventh

17  Circuit decided, just sitting out there and say, come and do

18  business with me.

19         And what really sticks in our craw about that,

20  frankly, is that not only do we think the science is good, and

21  I think Your Honor appreciates that, but you're operating in

22  the context of a Chapter 11 that was filed where the history

23  was that there were zero of those claims.  And effectively in

24  one stroke, we've now taken a Chapter 11 where there was no

25  litigation history in this area, a tremendous amount of

1  litigation history courtesy of Mr. Lockwood, and you've now
2  created a totally different situation where he's no longer the
3  big guy in town because there's an even bigger guy in town.

4          THE COURT:  Ain't it grand what bankruptcy does for
5  you.

6                          (Laughter)

7          MR. BAENA:  Your Honor, if I can make a couple of --
8          MR. BERNICK:  I certainly --

9          MR. BAENA:  If I can make a couple of observations?
10         THE COURT:  Yes.

11         MR. BAENA:  May it please the Court, Scott Baena on
12 behalf of the Property Damage Committee.

13         Your Honor, since September 1, we filed our response
14 to the proposed case management schedule and activities.  We
15 have been saying exactly what Your Honor articulated today, we
16 think the process is upside down as described by the debtor.
17 And I think he's come very close to explaining why it's upside
18 down in their view of the bankruptcy scheme of things.  He
19 calls it leverage, but what I would prefer to characterize
20 their strategy to be is to create a process which is doomed
21 from the outset such that people fail to file proofs of claims
22 and so we minimize the effect of an adverse ruling on science,
23 which is what we fully expect will happen.

24         THE COURT:  Well, I think -- Mr. Baena, I mean I
25 guess I'm playing devil's advocate.  But, frankly, I think it's

1  an issue that's capable of resolution of any number of ways and
2  that's only one.

3          It seems to me that with respect to the debtors'
4  proposal, to do the notice, not necessarily of the proofs of
5  claim, but the notice of the fact that there is an issue as to
6  whether or not Zonolite does create some property damage and
7  puts people to the task of discovery, whether they do or don't
8  have Zonolite so that they can file a proof of claim has merit,
9  too because at some point, this estate needs to know whether,
10  A, there are such people.  And, B, how many of them there are.
11  And, C, what the class is going to be.

12          And despite everything, you and Mr. Lockwood continue
13  argue to me, and you continue to lose this argument, and you're
14  not going to fare any better today, there will be proofs of
15  claim filed in this case somewhere, somehow by somebody.  It's
16  not going to be an issue that's going to be left to a trust to
17  resolve.  We're going to know how many claims there are before
18  this case gets to plan confirmation.

19          MR. BAENA:  We've resigned ourselves to that fact,
20  Judge.  And we're working on that basis.

21          But if I may react, I think that, first of all, there
22  is an entirely different outcome when you have a notice program
23  in the context of a class action and when the notice is
24  directed at allowing claimants to opt out of a class as opposed
25  to a notice program that is intended to facilitate a proof of

1 claim regimen, the effect of which is if you fail to file the
2 proof of claim by the bar date, you're out of the program
3 altogether, as opposed to you just didn't opt out if you didn't
4 comply with whatever it is you're required to do in the context
5 of the class action.

6          So, they are absolutely diametrically opposed notice
7 programs.  What you seek to accomplish in the proof of claim
8 notice program is to eliminate claimants, and that's what
9 they're trying to do.  They're trying to eliminate claimants.

10         In the event that their science position is wrong,
11 which, again, we suspect is wrong, this is their second bite at
12 the apple.  This is their belt and suspenders.  This is how
13 they're going to minimize the effect of that 800-pound gorilla,
14 so to speak.

15         So, it's not simply because we have to get there
16 anyway, Judge.  It's not simply because we're going to spend
17 the money anyway, Judge.  It's a very different purpose which
18 they attempt to serve by getting you to push that notice
19 program on this side of the bar date line.

20         And I think it's also worth observing that the
21 problems we have with the existing notice program, in large
22 part, relate to the Zonolite issues.  The fact is there is the
23 threshold issue of whether you can ever devise a program for a
24 proof of claim purpose that will sufficiently satisfy minimal
25 motions of due process, get the notice to people who are unwary

1  of the situation that they're confronted by both in respect of
2  the product being in their property and, secondly, that because
3  it is, they have to file a proof of claim.

4  So, we have this initial concern that you're not
5  going to be able to develop a notice program that we're all
6  going to necessarily feel real good about when we're finished.
7  And if we move that notice program to the more conventional
8  point in time in the context of a class action, it's an
9  entirely different exercise and we can feel better about that
10  program.

11  In addition, the notification program forces -- in
12  the proof of claim context, forces claimants to do something
13  that some people say they shouldn't be forced to do, and that
14  is to determine whether or not they have this product.  And
15  that determination of itself can cause a dangerous situation to
16  occur.  You saw the objection that was filed by the EPA, I'm
17  sure, which focuses on that one issue.  We'd better tell people
18  that if you go looking to see if you ought to be included in
19  this bankruptcy, you might hurt yourself.  You might cause the
20  product become friable.

21  So, I think the approach that the Court is looking at
22  is a much more logical way to approach this.  It eliminates all
23  the problems we have about the notice program or the context of
24  the proof of claim.

25  THE COURT:  Well, what about the concept of doing it

1 on, I guess, a limited basis. Rather than setting the bar date

2 for all Zonolite plaintiffs now, to essentially set it for a

3 group of Zonolite claimants now, but not everybody, so that we

4 have -- I'll use the word test case. So, we have a couple of

5 test cases.

6       So, for example, we set it for the whole State of

7 Washington and, therefore, we already have a class that's been

8 certified, although no notice has gone out, and we use those

9 folks to file a proof of claim as the test case for the

10 scientific issues.

11      Now, I agree, that outcome would not be binding on

12 those entities who have not yet filed proof of claim. But the

13 fact is that unless the science changes significantly in those

14 couple of months between when some order is issued deciding

15 whether there is or isn't liability and when the next bar date

16 notice would go out for everybody else, the likelihood is that

17 the next outcome is going to be very similar, it's not likely

18 to be changed. And that probably would be pretty good evidence

19 for everybody else.

20      MR. BAENA: That might be a sensible approach. I

21 would suggest that whoever's had a certified class action --

22      THE COURT: Right.

23      MR. BAENA: -- in respect to Zonolite ought to be

24 involved in that process so that they can't complain later on.

25      THE COURT: Well, that makes sense. Maybe a -- I'll

1    use the word committee loosely, I don't mean an official
2    committee, but maybe a committee put together to decide who the
3    named representatives of -- again, I hate to use the word
4    class, but that entity, that class.

5           MR. BERNICK:  That's the problem is --

6           MR. BAENA:  The litigants.

7           MR. BERNICK:  -- as soon as you would recognize that
8    class in this bankruptcy, it really is no different from what's
9    up on the board.

10          My proposal is that we simply use whoever it is
11   that's filed the claim, i.e. the class representatives, to be
12   our group of individuals who would then fee-up the common
13   issue.  I just want to be clear to the Court that as soon as
14   you go make it a class litigation, you know, it may be only the
15   State of Washington or -- I don't know, I think the South
16   Carolina class actually is nationwide.  But whatever it is,
17   you're now talking about something, that 45 million.  We would
18   be required to preserve our rights, to seek to be certified in
19   that class right away.

20          THE COURT:  But you just made this proposal.

21          MR. BERNICK:  No, I made -- the proposal -- that's
22   what I was going to say.  The proposal that I made was that
23   rather than send out a notice and get all of the individuals to
24   file --

25          THE COURT:  Right.

1          MR. BERNICK:  -- that we would use the individuals
2  who already have filed claims, i.e. in the context of class
3  litigation.  They would be the individuals who would be in
4  court --

5          THE COURT:  You're using the word claim, and I'm
6  thinking of bankruptcy proofs of claim, and you're not talking
7  about bankruptcy claims.

8          MR. BERNICK:  I'm -- I understand.  So, we can take
9  what is their existing lawsuit and use those as the claim.  In
10  point of fact, we would actually have the power under Section
11  147 to actually remove and transfer those claims here.  So, the
12  individual claims, even without a notice, to be brought before
13  the Court as claims and, therefore, used for purposes of this
14  proceeding, the proposal is to use a pre-certified class and
15  bring it in to this case, then we're back into the same world.
16  We don't believe that Rule 23, A, belongs here.  And, B,
17  certainly doesn't belong in the same set of circumstances and
18  that's very clear under <u>American Reserve</u>.  So, we have to go
19  down the road and, again, litigate this -- so, my proposal is
20  avoiding this altogether, proceeding with individual claims,
21  but using the people who already had stepped forward as being
22  the test claimants.

23          THE COURT:  Well, if you use them as individual
24  claims or use them in the limited class, I don't think it's
25  going to make much difference in terms of -- the certification

1 issue is different.  But in terms of getting the scientific

2 trial, I don't think it's going to make much difference.

3          MR. BERNICK:  It makes a difference only if you say

4 that that limited class is not confined just to them, but it's

5 the State of Washington.  That's a pretty significant

6 difference.

7          MR. BAENA:  Judge, it doesn't make any sense for us

8 to find a date within the next week where during this period of

9 time we can confer, see if we can come up with an agreement

10 this way we can contact the class counsel that are out there.

11 And, you know, within the next week.  I'm not trying to

12 postpone this indefinitely.

13          And then come back to the Court with a proposal or

14 counter proposals.

15          MR. BERNICK:  I'm not sure -- I mean I would be happy

16 to take proposals from counsel.  But, frankly, this I think is

17 now the third argument that we've had.  And there is a very

18 bright line, the bright line is are you talking about a class

19 trial, a certified class or not?

20          Because it's not something that we've got any

21 discretion, it is just a huge difference --

22          THE COURT:  Well, I think what Mr. Baena is saying is

23 he needs some time perhaps to see whether they can agree to

24 looking at what you're now calling individual claims, i.e. the

25 people who are members -- who are class representatives in the

1 State of Washington, and use them as the test case for the
2 scientific side, correct?

3 MR. BAENA: Correct. I'm in no position to speak for
4 Anderson or those folks, and I'm not trying to delay anything,
5 Judge. I want to --

6 THE COURT: It seems to me that we ought to get to
7 the scientific side of this promptly. Because, number one, I'm
8 not sure it makes a lot of sense to notify people who may have
9 Zonolite in their homes that they may be exposed to significant
10 risk if, in fact, they're not. Because that could be creating
11 a panic of some sort that's not really justified if the
12 scientific evidence doesn't warrant it. So, I've got that to
13 decide.

14 By the same token, if the scientific evidence does
15 warrant it and they do need to be made aware of the problems
16 should they disturb the Zonolite in their attics, then we
17 probably ought to know that. And do that form of notice before
18 we require people to file proofs of claim.

19 So, no matter how you look at it, it makes more sense
20 to litigate the science of this first.

21 MR. BAENA: Are you going to treat that, Your Honor,
22 just to put a little definition on this, are you going to treat
23 that as a bifurcated issue in the estimation process as opposed
24 to the litigation of the respective claims? I mean there's all
25 sorts of jury trial issues, I'm sure, that are implicated.

1        MR. BERNICK:   Personal injury cases, there's no jury
2    trial.

3        THE COURT:   Well, the jury trial issue is for people
4    who will file claims here for property damage.

5        MR. BERNICK:   I think that that's a very important --

6        MR. BAENA:   They haven't filed a claim yet.

7        THE COURT:   Well --

8        MR. BAENA:   That -- we haven't gotten to that point
9    yet.

10        THE COURT:   Right.   They haven't filed a claim here,
11   but the debtor can file the claim for them.

12        MR. BAENA:   Okay.   I'm just --

13        THE COURT:   Because the meet's well passed --

14        MR. BAENA:   Is the notion, though, that this is part
15   of an estimation process or is this part of a class
16   certification process or --

17        THE COURT:   I think it would be used for both
18   purposes frankly because I think in order to get the class
19   certified, and we have to know that there is likely to be a
20   class that could sustain damage.   So, I think it would stand
21   for both of those --

22        MR. BAENA:   There is a hearing pending before Your
23   Honor on the 22nd of April, you know that, on the motion to
24   certify the class in Zonolite in the adversary proceeding.

25        MR. BERNICK:   No, it's just a motion to dismiss.

1          UNIDENTIFIED ATTORNEY:  Just a motion to dismiss.

2          MR. BAENA:  No -- well --

3          THE COURT:  I think it's the motion to dismiss, not

4 the motion to certify.

5          MR. BAENA:  I apologize.

6          MR. BERNICK:  Which I -- just on this business of

7 estimation, because it's a property claim, not a personal

8 injury claim, Your Honor is fully empowered to rule on the

9 merits of the claim.  So --

10          THE COURT:  Oh, sure.

11          MR. BERNICK:  So, I don't know what -- for purposes

12 if we have claims that are brought in here, we try those

13 claims.  And I don't know whether -- I suppose you can say

14 maybe, you know, it has some potential use, either on class

15 certification considerations down the line or on estimations.

16 But the process itself liquidates those claims.

17          THE COURT:  Well, the process liquidates the claims.

18 But at this point in time, I wasn't thinking of getting to the

19 damage issue.

20          MR. BAENA:  Right.

21          THE COURT:  Which is something that would both

22 liquidate the claim and go to the estimation.  I'm only looking

23 at the liability side to see whether the debtor is liable at

24 all.

25          I think you've raised, Mr. Bernick, and I think it's

quite correct, in this issue where there has been no test of the scientific side by way of an adjudication before this bankruptcy was filed, the debtor should know whether it is subject to liability on that score, and so should the creditor. And I think that piece ought to be determined before we alarm a lot of potential people who have Zonolite in their attics that there may or may not be some detriment as it turns out. I don't know what the answer will be, but either way, it doesn't make much sense to alarm them until we know that there is reason to do it. And right now, as I sit here, there seems to be a big challenge as to whether there is reason to alarm them. So, we ought to figure that piece out.

And then if there is, we ought to structure a notice program that makes sense to advise people about what the potential risks are and how they can minimize the risk and what they need to do in order to finish filing a claim here.

At that point, I think we can determine whether it's necessary to do a lot of individual claims or look at a class certification. But I think we need to get to that science first. I think to do everything else is putting sort of the cart before the horse and --

MR. BAENA: So, we are not determining individual versus class proof of claims --

THE COURT: Right.

MR. BAENA: -- at this point in time.

1          THE COURT:  No, I would think we would not need to do
2   that until the science is decided.  Once the science is
3   decided, then we're right back in the seat that we're in today.

4          MR. BAENA:  Do you think you need a class proof of
5   claim though to bring on the scientific issue?

6          THE COURT:  Well, that's what I was suggesting
7   earlier.  I'm not sure we do, though, to the extent that either
8   -- for example, the named plaintiffs in the Washington suit
9   that Barbanti plaintiffs, for example, if we would simply get
10  them to file the proofs of claim and litigate the issue in that
11  context, or have the debtor file the proof of claim for them
12  and then litigate the issue in that context, I think we could
13  get to it in sort of a mini trial.

14         MR. BAENA:  Again, as a class proof of claim?

15         MR. BERNICK:  No --

16         THE COURT:  Well, it's not really a class proof of
17  claim.  It's the consolidated trial as to any of those
18  plaintiffs who have filed proofs of claim.

19         MR. BERNICK:  It is --

20         MR. BAENA:  As to the class representatives then.

21         THE COURT:  Yes.

22         MR. BAENA:  Their proof of claims.

23         THE COURT:  Yes.

24         MR. BERNICK:  But in this practical matter, the only
25  thing that we would really have to do to bring those claims

1 before the Court, as Your Honor has indicated is that those
2 lawsuits have been pending against Grace. We can simply import
3 to this Court those underlying lawsuits. There doesn't even
4 have to be a proof of claim.

5 THE COURT: That's true, too. And that eliminates
6 somewhat with your issue and Mr. Lockwood's issue at the moment
7 about filing the proofs of claim.

8 MR. LOCKWOOD: Your Honor, could I interject
9 something here? I hate to sound like a technical nitpicker,
10 but I'm getting a little bit concerned about the interplay
11 between the bar dates to the class determinations. First,
12 you've got a motion to dismiss an adversary proceeding,
13 adversary proceedings technically are not the way to present
14 claims. I think that's probably right.

15 We also have something called a motion for permission
16 to file a class proof of claim. I don't think we need --

17 FEMALE SPEAKER: Mr. Lockwood, would you step up to
18 the microphone?

19 MR. LOCKWOOD: I don't think you need permission to
20 file a proof of claim. You can file -- anybody can file a
21 proof of claim. It may get objected to, and it may get thrown
22 out on any one of a number of grounds, but people come in, they
23 file proofs of claims.

24 And, indeed, that's what Judge Newsome determined in
25 connection with the class proof of claim issue in the Armstrong

1  case.

2       THE COURT:  Well, I don't know about in Armstrong, I

3  mean one of these cases, though, he had had a bar date that

4  already passed.

5       MR. LOCKWOOD:  I understand that.  But I think -- but

6  you can file a claim in advance of a bar date and that's one of

7  the things I want to focus on here.  People could file a proof

8  of -- a class proof of claim on a national class, on a state

9  class, whatever here.  The debtors could object to that proof

10 of claim.  The people could file individual proofs of claims.

11      The problem that we've got here is the interplay

12 between the bar date --

13      THE COURT:  Right.

14      MR. LOCKWOOD:  -- and the class proof of claim.

15 Frankly, it seems to me one of the things we might want to

16 consider is whether or not we should essentially suspend the

17 idea of having a bar date on the Zonolite proofs of claim for

18 the time being.  Let somebody file a class proof of claim.

19      The first thing you need to do, by way of an

20 objection, is determine whether or not a class proof of claim

21 is maintainable in a bankruptcy case, if so, what would the

22 class be, that's the certification, if you will, of the class

23 proof of claim.  There's a multiplicity of potential classes

24 that we're talking about here.

25      Mr. Bernick is right, I hate to agree with him about

1  anything, but he's right.  Once one determines that there's a

2  class here, you have to determine which subsection of 7023(b)

3  it's under.  And that determination will have consequences.

4          THE COURT:  Oh, sure.

5          MR. LOCKWOOD:  We can't just sort of say, well, gee,

6  we'll have a class for purposes of assignments trial.  But if

7  we don't like the outcome, we won't have a class anymore.

8          THE COURT:  That's right, which is why the concept of

9  taking a look at -- well, I guess a Rule 42 common issues at

10 trial with respect to a limited number of claimants probably

11 makes sense.  Because to the extent that the science doesn't

12 support it, there's no need to go through that.

13         MR. LOCKWOOD:  Well, I understand, Your Honor.  But

14 then that gets me back to my comment about technical.  Let's

15 assume somehow or another we get some -- we'll call them a test

16 case because that's really what we're talking about here,

17 somehow or another, we identify some group of plaintiffs

18 whether they be putative class representatives in Barbanti or

19 the Boston or South Carolina, whatever, and we have a

20 litigation involving the science and those lawyers.  Certainly

21 from a technical point of view, the results of that litigation

22 are not going to be binding on anybody but those plaintiffs,

23 and that's true of collateral estoppel as well because you

24 couldn't use non-mutual collateral estoppel for a defense win

25 against plaintiffs.

1      So, what we're really betting on if we go that route

2  is that the people who lost that case who presumably are going

3  to want to appeal the loss will be ultimately satisfied that

4  the loss will be definitive and they won't want to come in and

5  demand the opportunity to re-litigate the loss, having seen

6  what happened to them the first time and saying with a group of

7  plaintiffs and a different group of lawyers, well, you know,

8  Mr. Sobol had a bad expert or he didn't have enough experts or

9  --

10      THE COURT:  But that's irrelevant I think because if

11  there is some scientific evidence that shows that Zonolite

12  really is creating some sort of a problem, it's only the

13  liability that will lead to massive numbers of claims.  The

14  real purpose for looking at this is to see, A, what type of

15  notice we're going to bring and, B, what type of class.

16      So, if we get the science decided first, then we know

17  whether either or both of those makes sense and we have a whole

18  lot more information in which to determine the type of

19  certification.

20      MR. LOCKWOOD:  Your Honor, the science is going to be

21  a battle of experts.

22      THE COURT:  Sure.

23      MR. LOCKWOOD:  And the -- who wins and who loses in

24  that battle may depend on who the experts are and who selected

25  the experts and how well they prepared the experts and a

1  different group --

2          THE COURT:  That's always the case.

3          MR. LOCKWOOD:  Yeah, but a different group of
4  plaintiffs or defendants with -- well, not defendants, we
5  always got the same defendant.  But a different group of
6  plaintiffs as they lose the first go around might decide they
7  can come up with a better group of experts.

8          THE COURT:  They may very well do that.

9          MR. LOCKWOOD:  And how can this Court tell them that
10  they can't do that?

11         THE COURT:  Because in that context, what I may be
12  able to do is say, you might very well be right and we're going
13  to certify a class and we'll do it one more time, but this time
14  we're going to do it with a class-appointed expert, and then we
15  bind everybody.

16         But at least we have an idea as to whether or not
17  it's necessary to go that step.  Because if there is no
18  scientific basis for it, there's no need to, A, do the notices
19  or, B, certify a class.

20         If there is scientific support, then at that point, I
21  think you've got a whole lot more information to determine what
22  the potential scope of that liability is, what kind of
23  scientific damage -- scientific evidence will support what type
24  of damage and what type of class, if any, is appropriate.

25         MR. LOCKWOOD:  Well, remember, it's not just

1  scientific evidence, it's scientific evidence proving by a
2  preponderance that there's a cause of action for --
3         THE COURT:  Well, of course.
4         MR. LOCKWOOD:  -- for property damage which would
5  include whether it needs to be abated or whether it needs to be
6  remediated or whether it needs to be covered up.  That's not
7  just damage, that's part of the underlying determination of
8  whether there's a property damage claim at all, whether there's
9  an injury, if you will.
10        THE COURT:  Well, that may be.  And it may also be --
11 it may also lead to the conclusion -- a hypothetical.  Let's
12 assume we get 500 individual claims that are filed, no class,
13 just 500 individual proofs of claim.  And 250 of them say my
14 damages are $1,000 because I want to put some sort of seal in,
15 and that's what it's going to cost me to seal the Zonolite.
16 And the other 250 say I want $7,000 because I'm going to do
17 renovations to my house and I -- and since this stuff has to be
18 taken out, and that's what it's going to cost.  It may well be
19 that those two shouldn't be in the same either class, for
20 purposes of Rule 23 class, or class for purposes of plan
21 confirmation.
22        MR. BERNICK:  And it could -- just to pick-up on
23 that, and I think the general opinion remains that information
24 will come out of this process that certainly will better inform
25 the proper disposition and procedures surrounding these claims.

1 We may find out that the exposure conditions to begin with were
2 very, very different, depending upon the nature of the
3 application, that the risks are very different.  And that could
4 obviously effect any effort to certify the class.

5      There's also another word that I know will get Mr.
6 Lockwood's goat, at a certain point there's also a _Dalbert_
7 issue here.  And _Dalbert_ is not confined to any individual
8 claims.

9      MR. LOCKWOOD:  Well, Your Honor, I'm going to turn
10 things over to Mr. Scott, but I just -- the one thing I want to
11 say from my perspective is that before we have any
12 determination by this Court, either that a class proof of claim
13 should be allowed on a class basis and/or that a class should
14 be certified, I do think we need to have a full fledged
15 briefing of that issue, as well as discovery, et cetera.

16      THE COURT:  Oh, yes.

17      MR. LOCKWOOD:  Right now, I mean the way the papers
18 have been teed-up, we're sitting here talking about whether
19 there should be a class claim or not.  And, frankly, we're not
20 ready to have you decide that.

21      THE COURT:  And I'm not ready to decide it by a
22 longshot.  I tried to tell you that this afternoon that I just
23 wanted to have a discussion as to whether or not this actually
24 was a vehicle which got you all to where you need to be, at
25 least, and if it does, you ought to take advantage of that

1  opportunity.   That's how I thought I started this discussions.

2       MR. SCOTT:   That is how you started it, Your Honor.

3  My name is Darrell Scott, I am class counsel in the Washington

4  Zonolite Attic Insulation case, which is Barbanti.

5       I don't have any arguments, I actually just have some

6  information I think might be helpful to the Court, and then I

7  could answer any questions.

8       The Barbanti case, despite the comments made by Mr.

9  Bernick, is a 23(b)(2) class action.  So, not only is there

10 precedent with regard to this process, there is with regard to

11 the very points you're talking about Zonolite.  The comment was

12 made notice hasn't gone out.  23(b)(2) doesn't require notice.

13      The Court in Barbanti elected to have a voluntary

14 notice to alert class members that she had certified a non-opt

15 out class that put class members in the position of monitoring

16 the process and she thought that was helpful.

17      So, they are correct that about eight days before the

18 Court was to pen the final order that would have resulted in a

19 comprehensive notice to class members, including the EPA web

20 sites and the special 1-800 number, about a week or two weeks

21 before the Court penned that order, they filed bankruptcy.

22      I think the Court is correct that it is the certified

23 classes provide a vehicle for expediting resolution of the

24 issue of the science.  And that putting the court in a position

25 where it is making actual determinations of that sort is going

1  to assist the Court and then understanding whether there are
2  legitimate claims out there, what their character is, what the
3  notice needs to be to that community.  So, the question is how
4  did we get there.

5          I heard Mr. Bernick say three times in sort of subtle
6  way that this is fine as long as the only people who show-up
7  are the representatives.  So -- and I -- that simply cannot
8  work as a device.

9          Mr. Barbanti has a claim that's worth a few thousand
10 dollars.  The only way he can economically have me here even
11 for this hearing is because he has been empowered to represent
12 a class.  And I think it is important that that certified class
13 -- and what it means, which has been fully argued by Grace,
14 needs to be present at any determination of the science.  It
15 cannot be Mr. Barbanti on his own because that simply
16 eviscerates the ability of that person to even proceed.

17         I'd also say -- I only make this remark because it
18 might be helpful to the Court, Barbanti's a certified class
19 action.  The Court has entered orders that have -- continue the
20 time period for removal of actions.  A filed claim -- there is
21 an automatic right of removal to the Bankruptcy Court.  And
22 when that happens, it's an adversary proceeding which brings to
23 bear all of the 7000 rules, including certification, which is
24 already done in this case, and the plenary civil rules by which
25 cases are litigated.

1            So, among the devices to actually have meaningful

2    parties before this Court, one potential device is a removal of

3    the Barbanti case or lifting of the stay so that it could be

4    tried in Washington, which would have been done this spring had

5    there not been a bankruptcy, would get us there.  But I -- but

6    only to the extent that it is Mr. Barbanti as the designated

7    representative of homeowners in Washington designated by the

8    Court, empowered in a meaningful way to participate.  If it is

9    just --

10           THE COURT:  Well --

11           MR. SCOTT:  The comment about -- you know, if you go

12   this way we're going to appeal and it will go on forever and

13   you'll never get where you want to be, you know, it's not

14   helpful to make threats, but the reality is if the certified

15   class is not recognized, plaintiff really is in the same

16   position of having to challenge the lack of there being a

17   class.

18           THE COURT:  Well, that could be, but that won't be as

19   deadly as the prosecution of the case and assert as a challenge

20   to the class certification.  That really would stop the plan

21   process in its tracks, I think.  I don't think --

22           MR. SCOTT:  Well, that's --

23           THE COURT:  However, I'm not sure that at least if

24   this process works for the whole Barbanti concept that it's

25   inappropriate necessarily to do that piece of it on a class

1  basis just for that group of people or maybe for the South

2  Carolina, whoever --

3          MR. SCOTT:  Sure.

4          THE COURT:  Whoever the appropriate groups that are

5  already recognized as class groups may be.  I don't know, I

6  don't have a view about it one way or the other.  I'm not

7  trying to make decisions about certifying the class, truly I'm

8  not.  And I don't want this record to sound like I am because

9  I'm not.  I'm not there yet.

10         But it seems to me that if we need more than one

11 individual in order to make this trial feasible, then we ought

12 to have enough people here to make it feasible, and that takes

13 --

14         MR. SCOTT:  Class does that.

15         THE COURT:  -- a class, i.e. the people who are in

16 the Barbanti class to do it, then maybe that's the way that

17 I'll allow it.

18         MR. SCOTT:  And it's B(2), it's non-opt out, no

19 notice is required.  And it puts together a reasonable

20 community of individuals who were actually prepared to try this

21 issue before they filed bankruptcy.

22         MR. BERNICK:  Your Honor, it is not a threat, it's a

23 reality.  If that class proceeds here, that class is

24 incorporated here.  We would have to appeal that.

25         Your Honor could not bring that class in and simply

1 incorporate the certification, we have to approve that

2 certification.   Under Rule 9014, you then have to apply Rule

3 23, Seventh Circuit, <u>American Reserve</u> case specifically says if

4 there's a discretionary analysis that has to be done or Rule 23

5 can be used, you have to determine what the impact on the

6 bankruptcy is going to be.   The impact on that bankruptcy would

7 be unmistakable if we would have to take on that class, and we

8 believe we're perfectly entitled to and that we'd be correct in

9 doing so.

10        THE COURT:   Well, but if you remove the action here -

11 -

12        MR. BERNICK:   Let me address that because there are

13 three points to be made that I think are somewhat technical,

14 but let me respond to them.

15        First of all, he says it's a B2 class, I had thought

16 that they sought certification under both B2 and B3, I'll take

17 his representation it's B2.   It's a State Court B2 class.   And

18 I believe that in point of fact in Washington State, and I

19 think it goes back to a Boeing case that was prosecuted,

20 they're tended to be somewhat broader certifications under B2

21 on the theory that medical monitoring is injunctive relief and

22 things of that nature than I think what you'd find in the

23 federal jurisprudence.

24        The federal jurisprudence has consistently been very

25 clear, you do not get B2 unless you are talking about flat out

1 injunctive relief, that's number one.

2      Number two, removals do not have to be of cases or
3 whole proceedings.  They can be of claims.  And, in fact, we
4 went through this process at some length in connection with my
5 representation of the car companies and their motion to remove
6 and transfer just those claims predicated on friction products
7 before Judge Wolin.  So, we could certainly remove and transfer
8 the claims of the individuals.

9      Number three, with respect to getting a critical
10 mass, there are a series of purported class actions that have
11 been filed in different parts of the country.  And I'm fairly
12 confident that we can find among those class representatives a
13 sufficiently large number of people that, together with what I
14 believe will be the abiding interest of all the lawyers sitting
15 at this table who have an economic interest in winning that
16 trial because they'll then want to argue for you that there's a
17 class.  I don't think we'll have a problem finding counsel who
18 will adequately represent those people.

19      And, you know, the line in the sand really is class.
20 And I say that again, not by saying, oh, we're going to just
21 mess up the sandbox.  It's just -- it's the economic reality of
22 the ramifications of that class certification.

23      So, for all those reasons, I think that there's
24 probably -- no I will agree with Mr. Baena here, some merit in
25 perhaps devoting a little bit of time to thinking about it, but

1  I think that our thoughts would certainly be in the direction

2  of that group of people, and we can figure out some way to try

3  to pick them.  And maybe the appropriate thing to do is to

4  allot some time to that and then to make some proposals for

5  Your Honor.

6          THE COURT:  I think that's not a bad idea.  I think

7  meanwhile, however, the responses to the motion for approval to

8  file the class proof of claim and the arguments on the motion

9  to dismiss the adversary and so forth ought to go through.

10  Because if you're not able to come to some resolution, I have

11  to decide it and I don't want to delay it too long.

12          MR. BERNICK:  Sure.

13          THE COURT:  It seems to me that this is a pretty

14  crucial issue and you should just get to it.  So, I would like

15  a briefing schedule.  All right, that was along the way of --

16          MR. BERNICK:  One -- one docketing issue on that.  We

17  have dates for the motions to dismiss.  I don't believe that

18  there was any date for the class certification briefing and

19  argument.  And while I don't -- I'm not anxious that there be

20  one, I just heard Your Honor say that you want to keep this

21  process rolling.  Do you want to set dates for that or --

22          THE COURT:  I thought that under your local rules,

23  when you filed a motion there was automatically a response date

24  that kicked in.  But I saw on that announcement that it was a

25  to be determined, both for responses and a hearing date, I was

1  confused as to why that was --

2       MR. BERNICK:  Because it came up for original
3  discussion when we first were before you about what the
4  sequence should be.  And the sequence that Your Honor
5  determined we were going to follow was going to follow the --
6  you know, first the motions to dismiss before you got to the
7  class certification issues, they were deferred.  And I think
8  there's actually colloquy that I remember pursuing with Your
9  Honor bringing home that distinction.

10      And then somewhere along the line, because of all the
11 discussion that we had about a class proof of claim, Your Honor
12 then asked for some briefs to be filed that were kind of bench
13 memos, not really a response or further briefs in support of
14 class certification, but just discussions such as we've had
15 here today.

16      So, at this point in time, we do not actually have a
17 response date.  And as Mr. Lockwood maybe is now rising to his
18 feet to indicate, it may be that there will be -- if we have to
19 go down this road, there would have to be some discovery that
20 would be associated with it, as well.

21      THE COURT:  Well, there probably needs to be some
22 discovery.  But I think I need to get the pleadings closed
23 first.

24      MR. LOCKWOOD:  Well, Your Honor, the problem that I
25 was going to address is that right now, to the extent things

1 are teed up, it's teed up in the context of the adversary

2 action filed and the motion to dismiss.

3        My own personal view is that fighting about the

4 motion to dismiss the adversary proceeding is a waste of

5 everybody's time.   They're going to file a class proof of

6 claim, the debtor will object to it, they move for

7 certification and approval of litigating or processing or

8 allowing or disallowing the class proof of claim on a class

9 basis.   There's whatever discovery the Court decides is

10 necessary to determine whether that should go forward on a

11 class basis.  And then you have a hearing on what amounts to

12 certification of a class proof of claim.

13        Because otherwise, frankly, I think what's going to

14 happen is you're going to waste two months litigating over

15 whether an adversary proceeding is the right way to present

16 property damage claims in a bankruptcy, and it's something I

17 think they're going to lose.

18        MR. BERNICK:  The adversary proceedings were brought

19 to raise a question as to what the appropriate device was for a

20 resolving the claims, whether it was a proof of claim process

21 or an adversary proceeding.  And there is some truth to the

22 remark that that -- as long as we're getting to the merit of

23 the claim, it's not so important, I suspect -- I'm thinking out

24 loud, but I think it's not so important to resolve the

25 theoretical question about whether that device is a proof of

1 claim process or an adversary proceeding. Because, in fact,

2 we'll have an adversary proceeding, I think, we will have a

3 trial.

4     THE COURT:  Well, if you file a proof of claim and

5 they object and somebody has a counterclaim maybe, but I'm not

6 sure that it would necessarily end up in an adversary unless

7 they remove the proof of claims --

8     MR. BERNICK:  Correct.  We wouldn't --

9     MR. LOCKWOOD:  Your Honor, all of the Rule 7000 rules

10 that matter for adversary proceedings apply to contested

11 matters and it will certainly be a contested matter.

12     THE COURT:  Yes, it --

13     MR. BERNICK:  Yes.

14     THE COURT:  -- will that.

15     MR. LOCKWOOD:  And the only thing that doesn't apply

16 is Rule 7023 and Rule 9014 gives the Court discretion to apply

17 other rules if it wants to --

18     MR. BERNICK:  At any stage.  But, again, just so

19 we're clear --

20     THE COURT:  Thank you for the --

21     MR. BERNICK:  He left out just one little bit, which

22 is that that whole idea that is 7023 is available at a -- at

23 any stage on the language no matter what --

24     THE COURT:  Yes.

25     MR. BERNICK:  It has not yet been adopted by the

1 Third Circuit, which is all the more reason why ultimately --
2 well, and particularly in this kind of context, ultimately it
3 might have to go up. But I think that if they were to file a
4 proof of claim, they're always entitled to -- safe to file a
5 proof of claim, we can't stop them from doing it. I think that
6 Peter is, in fact, right about that.

7 By the same token, I would suppose that if we can't
8 reach agreement on our -- what is our alternative proposal, we
9 can simultaneously go down the road of dealing with that
10 request for class proof of claim and certification, but then
11 also it's then, I suppose, up to us to decide how to tee-up the
12 alternative that we've explored here today, which we'd be happy
13 to do. And maybe we just ought to put them on parallel tracks,
14 although my own feeling is that I take Your Honor being
15 anxious, desirous of moving forward to that science trial, so
16 would we. And from that point of view, if we -- if there's any
17 way we can reach agreement on something to tee-up promptly,
18 that ought to be the priority.

19 THE COURT: All right. Well, let me ask two
20 questions first then. I guess of you, Mr. Bernick, and Mr.
21 Scott, primarily. Number one, Mr. Scott, I think that the
22 appropriate way to pursue the claims in the case is going to be
23 through a proof of claim process. I think you're going to have
24 more difficulty in substantiating that it should be through the
25 adversary simply because the Bankruptcy Rules provide for a

1 proof of claim process that works.   Would you consider

2 withdrawing that adversary without prejudice so that we can get

3 passed it for purposes of trying to tee up something on the

4 property damage proof of claim side?   And it is without

5 prejudice, you could always refile that very adversary because

6 there's not Statute of Limitations issue in the event that this

7 process does not resolve itself in terms of protecting your

8 clients' right to your satisfaction.

9 　　　　　MR. SCOTT:   Certainly, Your Honor.   The adversary

10 proceeding is also broaching the issue of the appropriateness

11 of tackling the Zonolite claims on a class basis.   And the

12 recognition of certified Zonolite classes is a thing that can't

13 be --

14 　　　　　THE COURT:   Well, that, though, you've now got --

15 somebody filed a motion, I'm not even sure who did that, but

16 filed a class proof of claim, was that you?

17 　　　　　MR. SCOTT:   We filed that.

18 　　　　　THE COURT:   Okay.   So, you've got that teed up in

19 that context anyway.

20 　　　　　MR. SCOTT:   Sure.

21 　　　　　THE COURT:   It's now there.

22 　　　　　MR. SCOTT:   I understand.

23 　　　　　MR. BAENA:   Your Honor, we apprized the Court last

24 week that it has been withdrawn.   We sent a -- to the Court's

25 Clerk when there was some confusion about scheduling --

1           THE COURT:  Oh, I haven't -- I didn't -- the motion

2  to --

3           MR. SCOTT:  I got that same e-mail, but I never saw

4  anything go to the Court that withdrew it.

5           THE COURT:  I haven't seen anything that withdraws

6  that motion.

7           MR. BAENA:  We wrote to the Court's Clerk to apprize

8  the Court that it's being withdrawn last week.

9           THE COURT:  Okay.  Well, I haven't seen that letter

10  then.

11           MR. BAENA:  I mean it could be refiled and --

12           MR. SCOTT:  It was admittedly a procedural matter.

13  We were told that the Court wanted to address the class group

14  of claim question at ten o'clock today.  We filed a pro forma

15  motion so that the Court had something in front of it to rule

16  on.

17           And then when it turned out the Court wasn't going to

18  have a hearing starting at ten o'clock on that issue, it was

19  functionally withdrawn.  The issue I think is still before the

20  Court and the motion is, as well, it's just not being heard as

21  a result --

22           THE COURT:  For today.

23           MR. SCOTT:  That's correct.

24           THE COURT:  Okay.

25           MR. LOCKWOOD:  At the risk of sounding like a broken

1 record, why can't they just file a class proof of claim and
2 then move to have it certified?  That's the way that we
3 normally do things in the world.  You file a complaint and you
4 move to have it certified.  This idea that I need permission of
5 the Court to file a proof of claim that's called class --

6          THE COURT:  I think --

7          MR. LOCKWOOD:  -- it has not --

8          THE COURT:  That came up, Mr. Lockwood, I think
9 because that's my understanding of that Interregional Trucking
10 Company case that Judge Gambardella had.  That's how the issue
11 came up.  And I think I suggested on the record that that was
12 the appropriate way to go about this so that we teed the issue
13 up in a contested matter and had an opportunity for the parties
14 to respond to it, I think that's why it's --

15          MR. BAENA:  That's exactly how it came up, Judge.
16 You said repeatedly last time we had a -- I don't have a motion
17 in front of me --

18          THE COURT:  Right.

19          MR. BAENA:  -- I'm not going to hear this.  And so we
20 responded that way.

21          THE COURT:  And gave me a motion.

22          MR. BAENA:  Judge, just one more word on the motion
23 that was filed.  It's sort of generic, it was filed by the
24 Zonolite claimants, but it generically talks about filing class
25 proof of claims that anybody and that was what the committee

1 had --

2        MR. BERNICK:  Just to be clear, the Property Damage

3 Committee is seeking to file a class proof of claim with

4 respect to all property claims?

5        MR. BAENA:  No, no, no.  What I said was the

6 Zonolite claimants filed a motion for leave to file class

7 proofs of claim, and the relief they sought were as to all

8 classes, Zonolite or otherwise.

9        THE COURT:  And we're not talking all classes.

10        MR. BAENA:  No, we're just talking about Zonolite.

11        THE COURT:  Zonolite.

12        MR. BAENA:  Correct.

13        THE COURT:  I'm having enough trouble with Zonolite,

14 I won't be needing anything else.  Yes, sir?

15        MR. SOBOL:  Good afternoon, Your Honor.  Tom Sobol

16 for the Price case in Boston.  I just wanted to make two

17 comments.  And as Mr. Scott also indicated, they're

18 informational only.

19        First, I obviously agree wholeheartedly with the

20 notion of trying some kind of test process, whether it's on a

21 class base or some other basis, that makes an awful lot of

22 sense.

23        One of the main reasons for that, frankly, is I found

24 when reading the papers for today when we were doing the claim

25 form that this Court, frankly, is at a -- very much put in an

1 awkward position.   You have on the one hand the debtors saying
2 that there's absolutely no scientific basis whatsoever for
3 having anything to do with Zonolite.

4        And on the other hand, you have the United States
5 Department of Justice, the Environmental Protection Agency and
6 the United States Attorney for the District of Delaware saying
7 that you've got to notify people of the dangers of Zonolite.
8 And you've got no affidavit on either side of that fence.   And
9 so just recognizing that before this Court can make any kind of
10 an intelligent decision, you obviously have to have an awful
11 lot more behind you in connection with that.

12        If there is to be any type of a test basis, any kind
13 of a trial, that kind of thing, again, which I endorse, what I
14 would, again, suggest to the Court or at least be mindful of is
15 this, that nothing focuses the mind any better than a trial
16 date.   And that the dates upon which that the parties have to
17 do certain things when they have their mind focused for that
18 trial date, obviously bear attention of getting certain things
19 done, and those obviously include discovery.

20        Because one of the things that the Zonolite claimants
21 have as an issue is that there were massive amounts of
22 documents that were right about to be produced to us at the
23 time that the Chapter 11 was filed last April, and that we had
24 depositions that we were getting ready to take, as well.   And
25 that that whole trial had to stop.   So, I'm more than happy to

1  do anything on any kind of an expedited basis.

2          And I would simply suggest that one of the things the

3  Court might consider when sending the parties away to figure

4  out who the claimants might be is also what the trial date is

5  and what the events are that go before the trial date.

6          THE COURT:  Okay.  All right.  I'm not sure, Mr.

7  Bernick, whether -- what position -- because the debtor hasn't

8  had a chance to respond to the motion to -- or to file the

9  class proof of claim.  I thought that was an appropriate way to

10 tee the issue up because it put everybody on the notice of what

11 the effort was and I thought it got you to the point where it

12 could become a contested matter.

13          I'm not necessarily married to that process.  If you

14 simply would prefer that somebody file the class proof of claim

15 and then the issues come up, I think it's okay.  I think you're

16 going to get to those issues one way or another.

17          If the adversary action is going to be temporarily

18 withdrawn and there's a way to get to the issue of the test

19 cases and I think after that determine the propriety of what

20 kind of bankruptcy classes we're going to have, if any, then

21 that, I think, makes a lot more logical sense and I think gets

22 you to the end of the case quicker.

23          The problem may be trying to figure out who these --

24 I'm going to adopt that test plaintiff concept for now --

25 should be if there isn't going to be a class as a Rule 23 class

1 for purposes of that trial.

2        MR. BERNICK:  That's something that I think that we
3 may actually be in the position to solve because we've got the
4 cases.

5        THE COURT:  Okay.  Then it seems to me that perhaps
6 that's where the debtors' focus should go for now.  We ought to
7 figure out how to get those cases either here or -- that was my
8 second question, I'm sorry, I never asked it.  Do you prefer to
9 do this trial in State Court somewhere?  Do you want relief
10 from stay to go back to the State Court and try the case?

11        MR. BERNICK:  I --

12        THE COURT:  Because if you do, I want to get that
13 order to get you moving.

14        MR. SCOTT:  We prefer that, Your Honor.  And I know
15 Gaffney O'Connor (phonetic) is prepared to try the case.

16        THE COURT:  Okay.

17        MR. BERNICK:  That is not what we prefer.  In fact,
18 we are talking about getting a unified, single -- this is the
19 record, isn't it?  The unified, single determination under the
20 Federal Rules which I know now that Mr. Lockwood will agree
21 because it's another 9000 Rule --

22                       (Laughter)

23        MR. BERNICK:  -- 9017 says Federal Rules of Evidence
24 apply.

25        THE COURT:  All right.

1          MR. BERNICK:  So, that is something that we would be
2  seeking to litigate before Your Honor and we are prepared to
3  move forward and set up a schedule for that.  Although,
4  obviously we have to, first of all, figure out who the
5  plaintiffs are going to be.  But we will, commencing tomorrow,
6  move forward to try to identify with greater specificity
7  exactly what we can do to bring that process forward before
8  Your Honor.

9          THE COURT:  All right.  Do you want a short recess to
10  talk about this for a few minutes now so that you can give me a
11  date by which you're going to take the actions that you think
12  are appropriate?  For example, I'm just guessing, let's assume
13  the debtor is going to remove at least some of the claims
14  issues here, I know you won't know which ones today, but you're
15  going to want to talk to people to find out which ones are
16  coming in.  So, let's say you pick 50 claims that you're going
17  to remove here and you need time to get them in, then you need
18  time, I think, to get the pleadings closed.  Because as far as
19  I know, the pleadings are not closed as to any of those claims
20  in any of the State Courts, correct?

21          MR. BERNICK:  Yes, that's true.  But I don't know
22  that we have to get -- when you say the pleadings are closed?

23          THE COURT:  Well, if there is -- if a debtor is going
24  to file an objection to that claim, it needs to be filed and I
25  need to get a response to it filed and then I need to set a

 1 discovery schedule, right?

 2        MR. BERNICK:  Right.  I think that, number one, if we
 3 were to take a break now and actually have a concrete
 4 discussion about that, it would end up being too complicated to
 5 be able to report back to you in a simple fashion.

 6        What I would propose is that we initiate whatever
 7 contacts are going to take place and that really the burden, I
 8 suppose, is really on the debtor to communicate with the Court
 9 before the next omnibus hearing with a proposal for what the
10 schedule should be, and then you can take up that matter in
11 connection with the -- that is -- I take it what you're asking
12 about is really scheduling.

13        THE COURT:  Yes.

14        MR. BERNICK:  I think we can take up scheduling at
15 the next omnibus hearing.

16        THE COURT:  Okay.  I would prefer, if I can, to get
17 an order in advance of the next hearing so that at the next
18 hearing, we can discuss a trial date.  I'd like you to get an
19 order that will set the dates by which all of the preliminary
20 actions are to be put together and then we will talk trial.

21        MR. BERNICK:  That's what I'm suggesting is that
22 between now and then, we would be making a submission to the
23 Court and they obviously would have the opportunity to respond
24 that would be a proposed schedule.  So that at the time of the
25 next hearing, we can take up the question of that schedule

before Your Honor.

THE COURT:   Okay.   The other --

MR. BERNICK:   That's what I'm -- that's --

THE COURT:   All right, that's fine.

MR. BERNICK:   Yeah.

THE COURT:   The other -- the only issue, I think, that I don't know in terms of scheduling a trial right now is until I know how many of these claims you're going to be bringing in and how many witnesses you think you'll need, then I'm not sure I know how much time we're going to need to reserve.   And I don't know if you're going to be prepared to address that even at the next hearing.   You may need to get proofs on the discovery first.

MR. BERNICK:   Maybe.   But we'll certainly -- one thing is for sure, but by the time of the next hearing, we'll be in a better position to explore those matters with Your Honor.

THE COURT:   All right.   Is this process acceptable to everyone?   That Mr. Bernick's office will take the lead in getting all of you together to put together a proposed schedule for how the test cases are going to get before this Court.   I will try them here since we make use, I think, of the Federal Rules for that purpose.

Meanwhile, the adversary that was set for a motion to dismiss argument in April will be withdrawn without prejudice.

1  What do you want to do about the motion to file the class proof

2  of claim?  Let's just get the answers to it in and start the

3  briefing with respect to that?  I think we ought to do the test

4  cases first, or do you want to withdraw that without prejudice,

5  too, for now?

6          MR. SCOTT:  It's unclear to me how the test cases are

7  before the Court, whether that's through a proof of claim

8  process --

9          MR. BERNICK:  It's called removal and transfer.

10          MR. SCOTT:  Okay.  Removal and transfer.

11          MR. BERNICK:  You remove the case, transfer it

12  physically to be before this Court.

13          MR. SCOTT:  Sure.  Then the class proof of claim

14  wouldn't be a necessary --

15          THE COURT:  Not right now.

16          MR. BERNICK:  It would be withdrawn.

17          THE COURT:  Not right now.

18          MR. BERNICK:  It would be withdrawn at this time.

19          THE COURT:  Okay.  So, the motion to file a class

20  proof of claim and the adversary will be withdrawn without

21  prejudice to this test case process that we're going to

22  implement instead.

23          MR. SOBOL:  Correct.  And just so the record is clear

24  on all those motions, we're also not moving forward on the

25  class certification motion --

1        MR. BERNICK:  Right.

2        MR. SOBOL:  -- at this time, as well.  All those

3  issues make sense to defer until we've gone through this other

4  process, or at least until we decide otherwise.

5        THE COURT:  Well, the motion to certify the class is

6  part of the adversary, is it not?

7        MR. BERNICK:  Yes.

8        MR. SOBOL:  Yes.

9        THE COURT:  So, if the adversary is withdrawn --

10        MR. SOBOL:  Yes.

11        THE COURT:  -- that's being withdrawn for now, too.

12        MR. SOBOL:  Yes.

13        THE COURT:  Okay.

14        MR. BERNICK:  You know -- go ahead.  Well, Mr. Baena

15  raises the issue of medical monitoring.

16        MR. BAENA:  Right.

17        MR. BERNICK:  And we have a -- there is a medical

18  monitoring class, medical monitoring adversary and motions to

19  dismiss the medical monitoring adversary which I think would

20  probably also be recognized to be meritorious.

21        MR. BAENA:  That's correct.

22        MR. BERNICK:  And then the question, I suppose, is do

23  you -- do you -- well, I guess I'd want to think a little bit

24  about medical monitoring.  Medical monitoring will overlap, in

25  some degree, what you have with respect to the property claims.

1 In connection with the property claims, the claim will be that

2 the presence of material in the house creates an unreasonable

3 risk of harm.

4 Medical monitoring also is predicated upon a showing

5 of risk. So, there is some substantive overlap. And I guess

6 what I would suggest is that we get the same agreement to

7 withdraw that adversary and that motion, and that we take up

8 that issue, as well, after Your Honor has had the benefit of

9 hearing the science.

10 The same people -- there's -- there are two classes

11 of -- there are two classes of -- actually three groups of

12 medical monitoring claimants that were proposed:

13 One were people who lived in Libby.

14 Second is people who worked in connection with the

15 expansion class -- classes.

16 And then third, what I was just referring to, which

17 is people who were allegedly installers of the Zonolite. So,

18 there's some potential overlap on that last issue.

19 With respect to the first two categories, although

20 there's some differences, too. With respect to the first two

21 categories, the exposure situations are different. And,

22 therefore, in that respect, the trial would be somewhat

23 different.

24 I don't know what to say other than that I suppose

25 you could think about what we contemplated with respect to

1 medical monitoring, and that's why we submitted a form was

2 that, again, the medical monitoring people would make

3 individual claims and would come before the Court and we can

4 then, in connection with Rule 42, determine whether these three

5 groups of people really had a claim in all of them, rather than

6 doing the preclass certification.

7 I don't think that -- Your Honor was focused on a

8 question of whether what you tell people on the property side

9 about the lists of family, you don't have that with respect to

10 these other people.  These are all people who occupationally

11 were exposed, and not necessarily just to Zonolite, but to

12 other material.  So, I don't think that you have this problem

13 of trying to figure out how to instruct people to determine

14 whether their house falls within the scope of the class.

15 People will know whether they were commercial installers.

16 People will know whether they lived at Libby and believed that

17 they were subject to contamination from the asbestos.  And

18 people will know whether they worked at the expansion plants.

19 So, I would propose that we stay status quo with

20 respect to medical monitoring.  We would oppose -- we would

21 move to dismiss if they don't withdraw the medical monitoring

22 adversary.  We would propose the imposition of the bar date.

23 They submit the claim form that we used and that we then --

24 when we get to the science, which could be at a subsequent

25 trial, we would work with the individual claims.

1          I'll add also that in this context, I believe that
2    there are B3 problems here.  The B3 problems for people
3    alleging personal exposure are overwhelming.  This is the
4    classic kinds of factual variables that have led to all of the
5    de-certifications that took place in the '90's in the Supreme
6    Court decision --

7          THE COURT:  Well, is the debtor challenging the
8    medical monitoring request for the people who worked in either
9    the expansion plants or at the Libby Mine?

10         MR. BERNICK:  Well --

11         THE COURT:  Or only to people who have Zonolite
12   insulation in their homes and that's their only level --

13         MR. BERNICK:  Yeah, we would be challenging all of
14   those.  Obviously there are some people who worked at Libby and
15   were heavily exposed, and we understand that.  And there may be
16   some claims in connection with that process -- well, there are
17   claims where people actually had sustained personal injury.
18   So, the exposures were high enough.

19         But the group of people that's described is much
20   broader than that.  It's anybody, I think, whoever lived or
21   worked in Libby.  And we are not in agreement that that entire
22   group ought to have medical monitoring.  It's a very diverse
23   group and the exposures there, we believe, for the overwhelming
24   number of people who are there, are not anywhere close to the
25   kind of levels that would be requiring medical monitoring.

1 That's the problem with the class is that it's so variable, it
2 describes people who have had greater exposure and people who
3 have lesser exposures.

4        So, in direct answer to your question, we don't
5 believe the class certification would be appropriate.  We
6 believe with respect to many, if not most of the people who
7 would comprise the class, that they're not entitled to relief.

8        On the expansion plans, you're talking about a very
9 small number of people.  And, again, with very significant job
10 differences.  Both -- and differences in exposure.  People at
11 the expansion plants were working with a different kind of
12 material.  So, their exposures would have been different from
13 the people who are working in Libby.  And we do contest the
14 medical monitoring claims there.

15        With respect to the people who were working with
16 Zonolite for a period of six months, I'm not sure how many of
17 those people there actually were.  I guess we have a class
18 representative who says that he's one, but it's kind of hard to
19 deal with that because we have a difficulty understanding what
20 this occupation is.  For the most part, this was put in by
21 people on their own and I don't know that there are many people
22 that would actually fit the class description.

23        So, that's all the more reason why you send out the
24 individual claims and you get exactly that kind of information,
25 who are these people who are going to file claims, what are

1  their job exposures, et cetera, et cetera, et cetera. You'll

2  then have an awful -- and how many of them are there. You have

3  an awful lot more information on the basis of which we can

4  chart a course. And, indeed, in our first CMO, Your Honor.

5       THE COURT: How many people live in Libby or the

6  immediate area? Whatever it is.

7       MR. BERNICK: It's the low thousands of people, I

8  guess about 45 hundred people, 6,000 people.

9       MR. SCOTT: Something like that. And it's like, you

10  know, ten, 15,000 people who had lived in that County --

11       MR. BERNICK: Over the time.

12       MR. SCOTT: Yeah, since 1937. It's a -- you know,

13  migratory group of people.

14       MR. BERNICK: The expansion plant population, these

15  were operations that were very low personnel requirement

16  operations, very small numbers of people. But whatever it is,

17  when this issue was first raised -- medical monitoring was

18  first raised, in our very first CMO, what we said was, gee, the

19  EPA and others are gathering data from Libby that will show us

20  where some of the contamination was. It's impossible to even

21  figure out what to do with a claim like medical monitoring,

22  which will always be driven by exposure until we have more

23  data. There's so much variability.

24       They then filed their medical monitoring class action

25  in the sense -- in a sense, forced our hand. And our response

1  to that really is okay, well, let's find out who the people are
2  and what their conditions are and then we can make a more sound
3  proposal for how to deal with their claim.   Right now, all we
4  know is that there's a lot of variability.

5          So, we would stand by the request that people --
6  those are people who are more like the straight personal injury
7  claimants --

8          THE COURT:   Okay.

9          MR. BERNICK:   -- they should file a proof of claim.

10         THE COURT:   Well, in a case of this size with several
11 hundred thousand asbestos claimants, having 15,000 doesn't seem
12 out of line, I mean to require individual claims doesn't seem
13 to be so much of a problem.

14         So, I'm not so sure in this instance I have a problem
15 with doing whatever appropriate notice should be giving,
16 getting individual claims in and then if it's appropriate to
17 certify a class action, those claims come in, if we look at
18 that issue.   But it seems to me that getting individual claims
19 in should not be that much of a problem.   The Zonolite's a
20 whole horse of a different color because you don't even -- you
21 can't get your arms around what you're dealing with.   But you
22 can with this and 15,000 doesn't seem to be a large number.

23         MR. BERNICK:   Can we get agreement?   I mean would
24 counsel be willing to withdraw the adversary and the motion to
25 certify that class so that we can have that out of the way?

1    THE COURT:  What we could do, I think, is work on the
2 proof of claim form and the kind of notice that needs to go out
3 to the individuals who have those medical monitoring claims,
4 let's get them out, get the claims in, and then see whether a
5 class should be certified.

6    MR. SCOTT:  Well, we would -- we would -- if we were
7 not moving through an adversary process -- because medical
8 monitoring in many states is inherently an equitable claim, we
9 don't -- equitable.  It's not a, we think, claim under
10 bankruptcy nor can be transformed into a monetary claim.

11    THE COURT:  Why not?  I mean all that we're
12 monitoring is we're sending somebody to the doctor.  So, that
13 incurs a medical bill, that's a classic equitable claim that
14 can be turned into a money damage claim.

15    MR. BERNICK:  The Third Circuit decided this very
16 issue in the Barnes case.  Barnes was medical monitoring for
17 people who were smokers.  Actually an --

18    MR. SCOTT:  I'm familiar.  The -- if we go through a
19 proof of claim process, we'll be filing a class proof of claim.
20 And that can be disputed --

21    MR. BERNICK:  Well, I think what we're contemplated,
22 if all that this discussion meant was there was one claim for
23 the class, it wouldn't do anything.  What we're asking for is
24 for individuals to file proofs of claim.

25    MR. SCOTT:  Sure.

1          MR. BERNICK:   The same thing as Mr. Lockwood said, I

2  suppose if you want, you can file also a class proof of claim,

3  it would then be objected --

4          MR. SCOTT:   Of course.

5          MR. BERNICK:   -- to and at an appropriate time, the

6  Court can decide to take-up the question --

7          MR. SCOTT:   Correct.

8          MR. BERNICK:   -- whether there ought to be a

9  certification.

10          MR. SCOTT:   That's exactly right.

11          MR. SOBOL:   If we just stayed proceedings in that

12  adversary and took no action and Mr. Bernick wouldn't have to

13  file any responses at this time and -- I'm not sure whether

14  people are ready to agree right now or even, you know, have

15  resolved whether there's an equitable claim or a legal claim or

16  something like that.

17          THE COURT:   But does it really matter?   If the

18  concept is to get out the appropriate notice so that --

19          MR. SOBOL:   Right.

20          THE COURT:   -- the appropriate group of people know

21  they can make a claim for medical monitoring.

22          MR. SOBOL:   Right.

23          THE COURT:   And then to send the same group the

24  notices to get the proofs of claim filed so that we have them,

25  we know how many people there are, what kind of medical

1  monitoring, what kind of exposure they have.  The debtor may or
2  may not object to some of those proofs of claim.

3          At the same time, if a class proof of claim is filed,
4  we can withhold any certification until we get the individual
5  claims in and see if it's appropriate to have a class.  It may
6  be after those claims come in, but it doesn't seem so
7  improbable to get 15,000 or however many individual claims in
8  from people and then see.  Because it may be that maybe more
9  than one class would make sense in that kind of a context.
10 These people may want leave for relief or be entitled to
11 different relief.

12         MR. SOBOL:  I just thought that if one of the
13 objections to that class group of claim in that context was
14 that it wasn't a legal claim, it's the kind of claim that
15 should be brought in some other fashion, you would want to be
16 able to have that and that's one of the reasons we filed it.

17         And the other reason we filed it at the time, but it
18 sounds like this is also obviated by that process, is that
19 there might be some discovery that would be had on behalf of
20 the medical monitoring claimants, if you will, during the
21 process, as well, too.  And that's another reason for filing
22 our case.  But I think both of those are obviated by the
23 process that we're talking about.

24         THE COURT:  Yes, I think we can do the same thing in
25 the proof of claim context as opposed to the adversary context,

1   it's a little less formal perhaps than in the context of the
2   proof of claim and hopefully it will get you where you need to
3   be sooner rather than later.  So --

4           MR. BERNICK:  That also would have the virtue that we
5   could do the notice program at once together with the property
6   damage rather than separately and save ourselves some money.

7           THE COURT:  Okay.  So, at the moment, the debtor is
8   contemplating with respect to notice, doing the property damage
9   notice and doing the medical monitoring notice.

10          MR. BERNICK:  Correct.

11          THE COURT:  And doing the other bar date non-
12  administrative notice.

13          MR. BERNICK:  Yes, not on the non-asbestos.

14          THE COURT:  Right.

15          MR. BERNICK:  Yes.

16          THE COURT:  So, you'll deal with the asbestos
17  personal injury actions with Judge Wolin.  And if we can get
18  these orders in sync, you'll do it all once, but that's between
19  you and Judge Wolin.

20          MR. BERNICK:  Right.

21          THE COURT:  And with respect that Zonolite would
22  defer any issue at all about a proof of claim and the notice of
23  Zonolite until we get the scientific issues decided.

24          MR. BERNICK:  That's correct.  Which would then leave
25  us with the proof of claim form for the traditional property

1 claim. I know that Your Honor's received objections and our

2 responses in the -- I think our response tried to repeat, to

3 the extent that we could --

4        THE COURT: Yes.

5        MR. BERNICK: -- what their objections were. And

6 then this issue of the new Hilsee affidavit, which we would

7 like to take up with the Court so that we know what to do about

8 that. But in order to kind of tell you where I'm going, the

9 hour is drawing a little bit late, and --

10       THE COURT: Gentlemen, I told you to bring your

11 toothbrushes. We're here today until we're done.

12                  (Laughter)

13       MR. BERNICK: Okay. I was going to suggest that when

14 it came to the proof of claim, if Your Honor had reactions to

15 the arguments as they've already been made, then maybe you

16 could tell us where you're going, that might expedite that

17 process and maybe the other thing we ought to get out of the

18 way, though, is what to do with this -- the Hilsee affidavit

19 because that goes to the notice program.

20       THE COURT: Okay. Well, let's back-up for a moment

21 to the adversary on the medical monitoring. Is that going to

22 be withdrawn without prejudice to them?

23       MR. BERNICK: Yes.

24       THE COURT: Okay. All right. Mr. Scott, are you

25 going to file appropriate notices of withdrawals without

1 prejudice of those?

2        MR. SCOTT:  Yes.

3        THE COURT:  Okay.  Okay.  Before we move to the other

4 issues, would you folks like a brief recess?  Maybe take a 15-

5 minute recess, and then we'll come back and deal with this.

6 Okay.  Thank you.

7                        (Recess)

8        THE COURT:  Everybody back?  Please be seated.  Okay.

9 Mr. Bernick, what issue would you like to address next?

10        MR. BERNICK:  Well, there's -- I think that there

11 would be two matters that may overlap, and we've just been

12 having a discussion here to see if we can't expedite this.  We

13 obviously, I think, all recognize that there's going to be a

14 bar date of the traditional property damage claims.  And,

15 therefore, issue one is the proof of claim form.  Issue two is

16 the disputes that remain between the parties on the notice

17 program.

18        And we're prepared to address all those this

19 afternoon, go though it line-by-line if there's a need for

20 that.  The discussion we were having is whether there might be

21 an effort to sit down between the parties to see if we can't

22 reach agreement on those.

23        THE COURT:  Where's Mr. Lockwood?  He's not here,

24 huh?

25        MR. BAENA:  Can the record reflect my suggestion?

1  People who are mulling that over right now --

2         MR. BERNICK:  Well, yes, for the following reasons,
3  is that we have now -- this is kind of struggling through yet
4  another round before we get to be before Your Honor where
5  something is a final resolution.  We are really prepared to do
6  it today.

7         So, I have said that we would sit down and talk about
8  it, but I really wanted a deadline for further report to the
9  Court on where we were because we wanted to get the thing done.

10         MR. BAENA:  If I may.  Here's the issue on
11  notification, Judge.  With what just transpired in respect to
12  Zonolite, I think that eliminates a lot of the concerns we have
13  with the program.  We want more publications here and some more
14  frequency there.  And that's something that I think once the
15  experts put their own private authorship aside, we'll be able
16  to resolve.

17         Mr. Bernick's colleague who is heading up this matter
18  suggested that by the end of the week they can prepare and
19  present to us revised notices, excising that which is no longer
20  going out.  And that we could meet the following week, subject
21  to her availability because of other plans.  And we're prepared
22  to do that.  I don't know how we can be any more reasonable.

23         THE COURT:  I can do it either way, Mr. Bernick.  You
24  asked for some advice with respect to the accusation that was
25  filed by the Property Damage Committee.  I didn't even have a

1 chance to finish reading all of the documents of the notice
2 program that were included with that affidavit. I think that
3 the burden is the debtors' to figure out a notice program that
4 works.

5      So, to the extent that you're looking for guidance or
6 an order in terms of who's going to do it, the debtor is going
7 to do it, at this stage.

8      In terms of some of the suggestions that are here,
9 some of them, I think, make sense. For instance, looking at
10 television ads that attempt to essentially restate what's in
11 print, I think you probably want to breakdown by type of claim
12 that you're looking for as opposed to doing all of them
13 together. Something like that, just seems to me, to make
14 logical sense. Now, I don't watch much television, I confess,
15 but nonetheless, when I do and I look up, I'm much more
16 visually struck by a brief description of something than I am
17 if I actually read bankruptcy notice. I remember the appliance
18 store, for example, appliance store going out of business and
19 it was a yellow screen with red letters, that's what I remember
20 about it, and it went on and on and on and on, and at the end
21 of it all it was like what I got out of it was that the
22 appliance store was going out of business.

23      MR. BERNICK: Well, it's interesting because Mr. --
24 we retained Mr. Hilsee in connection with the Dow Corning
25 bankruptcy and also in connection with the Babcock and Wilcox

1 bankruptcy, those are exactly how the TV ads, in fact, ended up

2 reading.  But be that as it may, it may be that there's not

3 really the same need for TV when we come to the property damage

4 claims --

5          THE COURT:  Yes.

6          MR. BERNICK:  -- and the medical monitoring claims to

7 begin with.

8          THE COURT:  That's right.

9          MR. BERNICK:  That's what gives me some hope that

10 maybe we can reach resolution.  And all that I'm saying is that

11 I'd like to get -- you know, we're just very, very focused on

12 getting this thing done.  And I'd like to be able to create a

13 date certain for reporting back to the Court in the sense of

14 getting the Court to finally approve what it is that we've come

15 up with.

16          THE COURT:  Okay.

17          MR. BERNICK:  So --

18          THE COURT:  I'm prepared to do it today.  If you want

19 to stay and go through these line-by-line today, seriously, I'm

20 here until eight o'clock tomorrow morning when I start my next

21 proceeding and all of you can join me doing this today as long

22 as it takes.  You're here until you're ready to go home today.

23          MR. BERNICK:  There is one issue that I know -- I

24 don't know what the -- whether there's any movement on this,

25 but there's one issue on which we -- if we have to present to

1  Your Honor, we will, it's been our consistent position all

2  along, we do not believe the notice is the appropriate context

3  in which it recite contentions or positions.

4       THE COURT:  And I agree with that.  It should be a --

5  if a different type of notice needs to go out to alert people

6  to the fact that they have to file a proof of claim, it should

7  not be on a proof of claim form, I agree with that.

8       To the extent -- now, this is going back to the

9  Zonolite one that --

10      MR. BAENA:  That's correct.

11      THE COURT:  -- I know we're not address right now,

12 but for example, someone said that some description of what

13 Zonolite looked like should be on the proof of claim form.  I

14 disagree with that.  I don't think you need to do that on the

15 proof of claim form.  But what you could do is say if you don't

16 know what Zonolite is, look at this web site address where you

17 can see a picture or something, and that's a -- and it can be

18 solved.  I don't think we're that far apart on a major issue --

19      MR. BERNICK:  Okay.  And --

20      MR. BAENA:  That identification issue was strictly

21 limited to Zonolite.

22      THE COURT:  Yes.

23      MR. BAENA:  And I'm not concerned about that right

24 now because we have a process that we're going to employ.  If I

25 could just say briefly why did we give you the Hilsee revised

1 affidavit? We gave it, Judge, to be forward going. We gave it
2 because we expected you would do the same thing with notice
3 that you did with the proof of claim form:  Show me where you
4 disagree. And so we have Hilsee compare their program to what
5 we thought was a better program, it wasn't to ambush anybody.
6 It certainly wasn't to delay anything . It was just to
7 facilitate the conversation we wanted to have.

8        So, my apologies, that's -- if they're necessary.  We
9 were trying to be forward going.

10        MR. BERNICK:  We will turn --

11        THE COURT:  Okay.

12        MR. BERNICK:  We'll turn over to them our proposal
13 for how to create something that now reflects their last round
14 of input, we'll do that by Friday.

15        THE COURT:  All right.

16        MR. BERNICK:  If they would then, by the following
17 Friday, be in a position to sit down and talk about any
18 remaining differences with the view then to reporting to the
19 Court by the following Friday, that is two weeks from this
20 Friday, what we hope would be an agreement on what the notice
21 program and proof of claim forms would be.

22        MR. BAENA:  I will undertake this end.

23        THE COURT:  All right. So, you're going to hopefully
24 get me consensual notice programs and proof of claim forms for
25 which, the property damage?

1     MR. BERNICK:  And medical monitoring.

2     THE COURT:  And the traditional other --

3     MR. BERNICK:  Traditional --

4     MR. BAENA:  Traditional PD.

5     MR. BERNICK:  Traditional --

6     MR. BAENA:  I do not represent medical monitoring.

7     MR. BERNICK:  Well, we've got to get the medical
8 monitoring because we want it to be part of the same notice
9 program.  Otherwise we're wasting --

10     THE COURT:  Which I think makes sense.  I mean we
11 ought to try to do at least a couple of notices --

12     MR. BERNICK:  And we have not --

13     MR. BAENA:  I don't disagree.  I just don't represent
14 them.

15     THE COURT:  Yes.

16     MR. BERNICK:  Yeah.  We have not received any
17 comments on the proof of claim at all.

18     THE COURT:  No, that's -- I was going to ask that
19 because none have been filed that I'm aware of.  I had the
20 docket searched this morning and I'm not aware of any on the
21 medical monitoring.

22     MR. BERNICK:  Okay.  So, I guess what it is is that
23 we'll go forward with a program that includes both.  We will
24 circulate that program to counsel for the traditional property
25 damage claims, as well as counsel for the medical monitoring

1   claims.   Anybody who's got comments, got to get back by a week
2   from Friday.   And then we'll undertake to meet and see if we
3   can't report out a consensual resolution on all those matters
4   by two weeks from Friday.

5           THE COURT:   All right.   Now, you want this issue back
6   on the April 22nd agenda in the event that there are still any
7   disputes.

8           MR. BERNICK:   Yeah, although I --

9           THE COURT:   So --

10          MR. BERNICK:   I really -- I really hope we're going
11  through an exercise that's designed not to be on that omnibus
12  agenda.

13          THE COURT:   I honestly don't think you're that far
14  apart on these other issues.

15          MR. BAENA:   I don't either.

16          THE COURT:   There's only like -- the major one.

17          MR. BAENA:   I agree, Judge.   There is only one other
18  issue, I think, just to put it on the table.   Assuming we get
19  through, as I am very hopeful we will, the proof of claim form
20  and the notification program, the last issue becomes what is
21  the bar date.   And just to preview what we've already described
22  elsewhere, our biggest concern is -- and this became evident
23  when we took their expert's deposition, that there was no
24  accommodation made for the completion of the proof of claim
25  form at the end of the notification program.

1      There is a certain reach that they seek to obtain in
2  order to give -- the number is actually 135 million people,
3  five, six opportunities to see this, advising them of the fact
4  of the bar date.  And you have to run out the whole program
5  until the last person has had that opportunity.  And that
6  happens to be almost coterminous with the date the proof of
7  claim form is due under their bar date proposal.  That doesn't
8  work.

9      The problem we have is if you work from the end of
10  the program, which keeps getting contracted, by the way, as we
11  go forward, if you work from the end of the program, you have
12  to give a period of time for somebody to react to what they've
13  learned.

14      And as we have repeatedly said, Judge, this is an
15  arduous process, depending upon how much information is
16  required and, in addition, mandatory in terms of the proof of
17  claim.

18      So, we will have to address the bar date as a
19  separate issue.

20          THE COURT:  I think --

21          MR. BERNICK:  Well, --

22          THE COURT:  -- you can address it as part of the same
23  issue.  When is the notice program -- when are you
24  contemplating starting it, regardless of what it is?  When is
25  it going to start and when is it going to end?

1          MR. BAENA:   Second -- it contemplated a second

2  quarter run.

3          MR. BERNICK:   Well, whatever, we can go and pin that

4  down.   I hear what Mr. Baena's concern is.   We can make that an

5  item of discussion and we'll see if we can't reach agreement on

6  it.

7          THE COURT:   Right.

8          MR. BERNICK:   The point's the point.

9          THE COURT:   Yes, we do need to address it.   And, yes,

10 there should be some period of time after the last notice is

11 published to allow people to file the claim.   But it doesn't

12 have to be as much time as when the first notice was published

13 either, you know, 30 days or something.

14         MR. BAENA:   Now, Judge, when we met outside of your

15 presence, we were talking about sitting down and having this

16 conversation about the notice program.

17         In your remarks, you expanded it a bit to include

18 proof of claim, and I'm delighted to do that.   But I suspect

19 that there's going to be a series of questions that they have

20 asked that we're never going to agree.

21         THE COURT:   Then let's just go through them.

22         MR. BAENA:   We might as well go through those.

23         MR. BERNICK:   Okay.

24         THE COURT:   Which one do you want to focus on, the

25 non-asbestos proof of claim form?

1          MR. BAENA:  Well, you know, Judge, they did a very
2   useful thing by -- as Mr. Bernick described.  If we go to his
3   response, the debtors' reply to objections to property damage
4   proof of claim form and related matters -- I don't know that I
5   have the --

6          THE COURT:  I have it.

7          MR. BAENA:  I could probably describe where we depart
8   company, using that.  If you go to Page 2, Judge, of their
9   reply, Roman Numeral IIB, they're still insisting on the
10  provision of a social security number.  They refer to that
11  being the requirement in three other cases.  But that was a
12  requirement in respect to personal injury claims.  We thought
13  you --

14         THE COURT:  Well, let me ask --

15         MR. BAENA:  -- solved that.

16         THE COURT:  I thought I did, too.  But if four digits
17  isn't enough, what about six digits?  You certainly don't need
18  a full social security number.  You're going to have name,
19  address, age, other identifying information that shouldn't
20  require a whole social security number.  A lot of people are
21  very concerned about providing social security information.  In
22  fact, even the Bankruptcy Courts are moving to rules to delete
23  that except for the last four digits in published information.

24         MR. BERNICK:  Whatever it is that we need to be able
25  to cross reference some of the other trusts.

1        THE COURT:  Can't you do it with six digits?

2        MR. BERNICK:  I just don't know.

3        MR. BAENA:  That may be a false start anyway, Judge,

4   because I'm not sure that any of the other trusts -- I know

5   none of the other trusts that I'm involved in use social

6   security numbers or Federal ID numbers for purposes of

7   processing the claims.  They do not do it that way.

8        THE COURT:  You already have names and addresses and

9   birth dates from what you're asking here.  And I don't --

10  everybody knows their own birth date.

11       MR. BERNICK:  Birth date.  Do you agree to birth

12  date?

13       MR. BAENA:  Well, I guess I'll agree to birth date.

14  But, of course, if it's owned by a corporation, there is none.

15       THE COURT:  Well, we're talking individuals.

16       MR. BAENA:  Okay.

17       THE COURT:  And an F.E.I.N. for a corporation should

18  be fine, you're not objecting to the F.E.I.N. for --

19       MR. BAENA:  No.

20       THE COURT:  -- the corporation?

21       MR. BAENA:  No.

22       THE COURT:  So, how about last four digits of the

23  social security number plus birth date for individuals, and

24  F.E.I.N. for a corporation.

25       MR. BAENA:  That's fine.

1      THE COURT:  And if you still can't figure it out, you
2  can file an objection to the claim based on the fact that you
3  can't identify the claim.

4      MR. BAENA:  Or they could call the phone number on
5  the proof of claim form --

6      THE COURT:  That, too.

7      MR. BAENA:  -- and ask the claimant, who are you?

8      THE COURT:  All right.  What's next?

9      MR. BAENA:  The next one is on Page 3, 8.  In Number
10  8, Judge, they're asking when the property was built.  They say
11  that that's because after 1973, they didn't sell the product.
12  That's only half true, Judge.  That product -- their products
13  continued to be sold even after they stopped manufacturing them
14  because they were in the hands of contractors, distributors,
15  they were on shelves and they were used.

16      We believe that the real reason that they're seeking
17  this information is not so terribly difficult to discern, and
18  that is not for product identification purposes but for Statute
19  of Limitation purposes.  And this really is the beginning of a
20  series of objections we have, Judge, that crystalize a material
21  difference of opinion about what we're doing here.

22      As I understood it from the last hearing, and I
23  reread that transcript several times before today, you made a
24  profound impression upon us, Judge, that what you were seeking
25  to do is to formulate a proof of claim form that permits you to

1 estimate and facilitate confirmation of a plan, that's what you
2 asked. And our position is we're prepared to ensure that you
3 get that information, but we need to talk about what
4 information is it that that really engenders.

5 And our position is that the only information that is
6 required for you to make that determination is where's your
7 building, what was your building, and what product did you
8 install in the building and how big is that building.

9      THE COURT: And when did you install the product.

10     MR. BAENA: Judge, under the law, that's immaterial.

11     THE COURT: It may or may not be.

12     MR. BAENA: It's immaterial. And, again, I don't
13 have a problem with that requirement either if you don't
14 disallow a claim simply because a building owner is unable to
15 tell you that with iterations of owners, with numerous jobs
16 being done in seriatim in some buildings. Who knows sometimes?
17 And it's not a dispositive fact in any jurisdiction that I'm
18 aware of --

19     THE COURT: Well, the debtor has agree, though, to
20 add to most of these questions, I don't know about this one
21 specifically, something like to the best of your knowledge --

22     MR. BAENA: No, they haven't, Judge. They've
23 objected to wherever we have said to your best of your
24 knowledge. They've basically objected to all of that.

25     MR. BERNICK: Very simple, you're talking about, for

1 the most part, people who will be in the business of owning a
2 building for whatever purpose.  And they are not individuals,
3 they are not devoid of resources.  They ought to make a
4 reasonable inquiry to make a determination.  If at the end of
5 reasonable inquiry they can't answer the question, they can't
6 answer the question.  We'll deal with the consequences of that.

7        But they ought to be able to put down whatever it is
8 that they can reasonably make inquiry into --

9        MR. BAENA:  Judge --

10       THE COURT:  While I disagree with that, I'm not sure,
11 however, that particularly -- well, again, this is not
12 Zonolite, I was thinking for a moment with respect to Zonolite.
13 But, you know, people may not know if there is a fourth and
14 fifth owner of a home when it was built.

15       MR. BERNICK:  Sure.

16       MR. BAENA:  Or a building, Judge.  I mean we have
17 passive investors in buildings that have claims.  Not everybody
18 is a building operator in the sense that that's their only
19 business.

20       THE COURT:  Well, it seems to me that the more
21 relevant question is what -- which of the debtors' products are
22 you claiming caused your injury and when was it installed in
23 the building, when were renovations to the building done that
24 may have impacted or disturbed the product --

25       MR. BERNICK:  Well, that's --

1          THE COURT:  -- seems to me to be more relevant.

2          MR. BERNICK:  That -- it's also -- this helps us that
3  when the property was built, it does help in the question of
4  what product actually is there.  And it also helps us on the
5  question of notice for Statute of Limitation purposes.
6  Explicit about that, it's not some secret.

7          THE COURT:  Well, I don't see that the question of
8  when was the property built is that damaging.  People will
9  either know or they won't.  I mean they're only going to fill
10 out on this form what they know.

11         MR. BAENA:  Judge, if your position is and if you
12 don't know it and you don't put it down, the claim is still
13 allowable, that's fine.

14         MR. BERNICK:  Well, that --

15         THE COURT:  Well, it may be subject to an objection
16 because it's not filled in.  But whether that objection is
17 sustainable or not is --

18         MR. BAENA:  But the relevance of that question and
19 the basis for that being a reason for disallowing a claim --

20         THE COURT:  That's what I'm saying.  I can't prohibit
21 people from filing objections to it, but the relevance has to
22 be determined in the context of the objection.  Would I
23 disallow a claim simply because any specific question isn't
24 filled in?  Probably not.  Would I ask people to supplement it
25 if somebody shows me that there's relevance?  Yes, I would.

1          MR. BAENA:  Well, they've already made their prima

2    facie showing to you today, Judge, of what they deemed the

3    relevance to be.  They've said, that's relevant to us because

4    we didn't sell our products after 1973 and if they didn't tell

5    us the age of the building, we have no way of determining

6    whether it's our product.

7          Well, Judge, product ID is going to be another issue

8    in another context.  We're not talking about that in the

9    context of estimating claims.

10         THE COURT:  Well, I guess the question is -- and just

11   because the building is built, for example, in 1920 doesn't

12   mean it doesn't have Zonolite, for example, in it.

13         MR. BAENA:  Right.

14         THE COURT:  Or some other of the debtors' product.

15         MR. BERNICK:  No, it's --

16         MR. BAENA:  And --

17         MR. BERNICK:  I'm sorry, Scott.  It's the other way

18   -- clearly the other way around.  And let me say I disagree

19   that somehow their vision of what the information gets used for

20   governs the process that we're trying to --

21         THE COURT:  No, I'm not sure it does.

22         MR. BERNICK:  But with respect to this question, it's

23   very simple.  If the product -- if the building was built after

24   1973, we didn't make an asbestos containing product --

25         THE COURT:  Then ask that, was the building built

1 before 1973, check here.  After 1973, check here.  If that's
2 what we need to know, then make it that way.  That's a lot
3 easier than identifying when specifically a building was built.

4        MR. BERNICK:  But then the second prong really is
5 buildings -- the asbestos -- coverage of the asbestos
6 controversy just escalated from the 1960's and early 1970's.
7 Regulations were actually promulgated beginning in 1971 on
8 emergency basis by OSHA.

9        If the building was built during that period, that is
10 late '60's, early 1970's, there is clearly a stronger
11 constructive notice case to be made.

12        THE COURT:  Then do it within the ranges.  If that's
13 the case, do three ranges.  Was your built before 1969, between
14 1969 and 1973 and after 1973.  That still makes it easier for
15 them.

16        MR. BERNICK:  We'll do that.

17        MR. BAENA:  I agree that that's somewhat easier,
18 Judge.  I just want to say, again, though that all that does is
19 facilitate a defense to a particular claim.

20        THE COURT:  Well, it provides relevant information,
21 as well, in assessing whether or not to file an objection to a
22 claim at all.  And it's -- because it seems to me that if the
23 building is built at a time after which the debtor has nothing
24 to do with that insulation or production of the product, the
25 debtor may have grounds to file an objection to claim, and they

1  ought to know that.   I think it's relevant to that extent.

2  It's not harmful.   Most people are going to have a

3  decade within which their building was built.

4  All right.   Restructure question 8.

5  MR. BERNICK:   Yes.

6  MR. BAENA:   Number 10 on Page 4.   We asked that the

7  question regarding interior renovations be modified so that it

8  -- consistent with what you said earlier, relate specifically

9  to renovations that involve the removal or disturbance or

10  installation of asbestos.

11  Their question asks, has there been any interior

12  renovations for the property.   Well, that's not relevant.

13  THE COURT:   Well, I asked that question, I thought,

14  at the last hearing.   And I was told that, for example, even if

15  you move a wall, that would have no interior insulation and it

16  disturbs the ceiling above it, it could be a problem.   And,

17  therefore, they want to know about any renovations.

18  MR. BAENA:   Well, that renovation respectfully would

19  have affected their product.

20  THE COURT:   Yes.

21  MR. BAENA:   And that's what I'm saying.   We'll put

22  that down, but to say well, did you move the light switches

23  from that wall to that wall.   A renovation is not clearly

24  defined.   You and I might not agree on what a renovation is.   I

25  know that my wife and I never agreed on the budget for them.

1 It's just too broad and it's just too difficult.

2          THE COURT:   It is pretty broad.  What are you trying

3 to get to?

4          MR. BERNICK:  What I'm trying to get at is that it's

5 not just -- it's not just the Grace asbestos product.  It's not

6 just a question of ascertaining the -- in terms of Grace

7 asbestos.  You could have a building that has other asbestos

8 and gets renovated and there is the need to remove asbestos.

9 The owner's clearly on notice of the regulations and the

10 importance of doing that.  And the renovation did not cover

11 Grace asbestos.

12          THE COURT:   All right.  What about something --

13 renovations been completed in the property that affected any of

14 the insulation in the property.

15          MR. BERNICK:  Or any of the asbestos on the property.

16          THE COURT:   Fine, whichever you want to get to.

17          MR. BAENA:   To your knowledge.

18          THE COURT:   No, it can't be --

19          MR. BAENA:   During the period that you owned or

20 operated.

21          THE COURT:   During the period you owned or operated

22 the --

23          MR. BAENA:   That's fine.

24          MR. BERNICK:  Well, no, no, but then you have

25 somebody who --

1          THE COURT:  Break it into two questions because I
2   think you're entitled to know under penalty of perjury whether
3   the person filing the complaint made that renovation.  But
4   otherwise, it's going to be hearsay.  They may have some
5   knowledge and it's before they owned the renovation, but they
6   may not have been aware of it at the time.  So, break it into
7   the second question, and any other period of time to your
8   knowledge.

9          MR. BERNICK:  Okay.

10         MR. BAENA:  I move to Page 5, Judge, Number 14.  This
11  is a question where they asked when was the product installed
12  in the property.  I know you think that that's relevant.  We
13  accede to your view.  And we merely ask that it be conditioned
14  by the language to the extent you know.

15         THE COURT:  Well, I think we should do this the same
16  way I just did the last one.  When did you or somebody on your
17  behalf put this in, otherwise when was it installed to the best
18  of your knowledge.  It seems to me that you're entitled under
19  penalty of perjury if the current claimant did something to
20  that information.  Otherwise, I'm not sure it's fair to expect
21  that a person would specify a date that they may not know.  So,
22  I think if you ask all of these questions in two parts, you get
23  what you need and it solves the problem of making -- creating
24  an inadvertent perjury that somebody would really not want.

25         MR. BAENA:  Right.  And I think it's also fair to

1  say, Judge, that nobody makes an installation of that sort in

2  one day on a particular moment in time.  That you could say,

3  oh, on July 4th I did that.  It's a period of time during which

4  installation occurs with regard to many products.

5       THE COURT:  Well, that's probably true, too, Mr.

6  Bernick.  I'm not sure -- I mean to the extent that the owner

7  did it, probably they know the date or the dates, plural.  But

8  otherwise, they may have a time frame which might be something

9  like 1970.

10       MR. BAENA:  Right.

11       MR. BERNICK:  But then they can just specify that.

12       MR. BAENA:  Well, the way this is written, though,

13  Judge, it leads the reader to believe that they have to give a

14  month, day and year.

15       MR. BERNICK:  Well, if --

16       THE COURT:  Why don't you just put a blank space?

17       MR. BAENA:  That's fine.

18       THE COURT:  And let them figure in what information

19  they --

20       MR. BERNICK:  Or the blank space for the not --

21       THE COURT:  Actually for both.

22       MR. BAENA:  Both.

23       THE COURT:  Because if the installation started, for

24  example, on January 1st and ended February 25th, you've only

25  got one month, day and year.

1          MR. BERNICK:  How about we just say -- how about we

2  just specify year?

3          THE COURT:  Fine.

4          MR. BAENA:  Yes.  I'm on Number 19, Judge.

5          MR. BERNICK:  Yes, we agree to withdraw 15 through

6  18, based on the --

7          THE COURT:  All right.

8          MR. BAENA:  19, Judge, is illustrative of a recurring

9  problem.  They require, in numerous instances, that

10 documentation be attached.

11         THE COURT:  Well --

12         MR. BAENA:  We have asked that there be summaries of

13 the documentation allowed.

14         THE COURT:  It seems to me if they have the

15 documents, they should attach them.  If they're voluminous,

16 they can attach a summary and tell the debtor where they can

17 get the rest.  It seems to me either one of those is all right.

18 If they don't have them, then they ought to state that they

19 don't have them and why.

20         I don't think there's an issue about the

21 documentation.

22         MR. BAENA:  That's fine.  We really wanted to be in a

23 position to say, okay, here's a summary of what we have because

24 it is a room full of documentation.

25         THE COURT:  That's --

1         MR. BERNICK:  But then we would want to have the

2  access to the documents themselves.

3         MR. BAENA:  They always have that right.

4         THE COURT:  I think that's fine.

5         MR. BAENA:  They always have a right.

6         THE COURT:  Yes, I think that's fine.  I mean, you

7  know, a homeowner may have an invoice or something, it's a one-

8  page document.  A contractor who has done renovations for years

9  in buildings could have literally a room full.  So, I think

10 summaries are okay at the option of the claimants, but with the

11 debtors' right to get to access of the documents.

12        So, I think this should be modified to say yes,

13 attach all such documentation in your possession or summaries

14 with a consent to release the documents to the debtor upon

15 request and where they can be obtained.

16        MR. BAENA:  And if documents aren't available, why?

17        THE COURT:  Why?

18        MR. BERNICK:  Well, if the documents aren't

19 available, we're assuming this is now a third case where

20 there's no summary --

21        THE COURT:  Yes, it's possible that if you bought a

22 home in 1960 that somebody told you've got insulation in there,

23 but you don't know when it was installed and you don't have any

24 documents.  So, there should be an option if you don't have

25 documents and you can't get them, fill that in.

1      MR. BAENA:  Questions 21 to 23 on Page 7, Judge, all
2  go to when somebody learned of the presence of the Grace
3  product, how they learned it and, you know, related issues.
4  They're asking specifically dates that you learned that you had
5  the Grace product.

6      These are more tedious and, in some cases, impossible
7  questions for claimants to answer.  I've heard anecdotally
8  stories of Grace itself taking 80 depositions at a time in
9  order to find out that very same information in respect of
10  certain claimants in pre-petition litigation.

11      The most important point, though, is how they learned
12  of the presence of it, also doesn't advance even their Statute
13  of Limitations defense.

14      THE COURT:  No, but it may advance the nature of the
15  injury and level of exposure.  If somebody learned about it
16  because they went up in the attic and crawled around, that's a
17  whole different thing than somebody learning about it --

18      MR. BAENA:  These are not exposure claims, Judge.
19  These are property damage claims.

20      THE COURT:  That's true.  All right.  So, if somebody
21  learns about it because they're tearing out their retaining
22  wall and finds it in that process, that may be different from
23  somebody who goes up to the attic as a result of getting a
24  proof of claim form to find out if, in fact, there is some
25  insulation there.

1          MR. BAENA:  I don't know what the difference could be

2   as a matter of law.

3          THE COURT:  Oh, I think it just could be a

4   difference, but --

5          MR. BAENA:  I mean it's interesting, but --

6          THE COURT:  No, it could fix the damages.  In some

7   cases, the damages might actually be fixed and some, they might

8   be contingent and some they may not exist.  I think it's

9   calculated to relevant information --

10          MR. BAENA:  Just for what it is worth, and I know

11  we're innovating in this case, Judge, it has never been a

12  question that's even been asked in a facility --

13          THE COURT:  That doesn't make it wrong.

14          MR. BAENA:  No, it doesn't make it wrong, but you got

15  to sit back and say well, what case does it advance?  It

16  doesn't advance the damage claim, it doesn't advance the

17  Statute of Limitation claim.  And so it ends up becoming a

18  barrier to somebody participating in the claims process.

19          THE COURT:  I'm not sure why the fact that somebody

20  learns that they have insulation somewhere or other property

21  damage as a result of asbestos and stating how they learned of

22  it doesn't advance the claims process.  They have a basis for

23  the claim because they're filing a claim.  They must have some

24  reason how they learned that they have the basis for the claim.

25  I don't think that that should be --

1          MR. BAENA:  Well, because at the end of the day,
2 they're still going to have to make product identification.

3          THE COURT:  Yes, they are.

4          MR. BAENA:  So --

5          THE COURT:  In fact, they're going to have to do it
6 in this proof of claim form somewhere.

7          MR. BAENA:  Minimally.

8          THE COURT:  They're --

9          MR. BAENA:  Minimally.

10          THE COURT:  They're going to have to substantiate in
11 this proof of claim form that it's the debtors' product, yes.
12 And --

13          MR. BAENA:  They're going to have to say they have
14 the debtors' product.

15          THE COURT:  That's right.

16          MR. BAENA:  That's exactly right.

17          THE COURT:  Yes.

18          MR. BAENA:  We agree.  But how they learned it was
19 the debtors' product?  I mean who cares?  If it isn't the
20 debtors' product, they don't have a claim.  Who cares?  It's
21 just more information.  More tedious work.

22          MR. BERNICK:  You know, we're spending about 20 times
23 as long as it will take for each one of these people to answer
24 these three questions.

25          THE COURT:  That's probably true.

1    MR. BAENA:  I challenge Mr. Bernick to do this claims

2  form in respect of any particular building on the planet in

3  one-twentieth of the time that we've had this conversation,

4  which is about 30 minutes.

5    MR. BERNICK:  With respect to my home.  I've learned

6  in my home when I moved to 874 Bloss Street (phonetic) there

7  was asbestos on the piping, went down, looked at it, saw it

8  there, that's exactly what I have was June of 1986.

9    MR. BAENA:  Yeah, well, what about the State of

10  California that just filed -- the State of California that just

11  filed a $300 million proof of claim form in the Armstrong case

12  and they have thousands of buildings?  We've got to remember

13  that these are multi building owners and --

14    THE COURT:  That's what I think may be the issue,

15  whether or not the same claim form really should be used for

16  the commercial property as opposed to be --

17    MR. BERNICK:  Just because an individual claimant,

18  like a university has a number of buildings, doesn't mean that

19  the information is any less probative.

20    THE COURT:  No.

21    MR. BERNICK:  It just means that they should be

22  filling out -- what we've said is that they should fill out a

23  separate form for each --

24    MR. BAENA:  It took --

25    THE COURT:  And I agree with that.

1          MR. BAENA:  It took two years, Judge, it took two
2    years in other cases to get this information together.  I'm
3    just saying I think this is an inclusive process because you
4    want to know what the universe of the claims are.  You don't
5    want to know what a particular claim is.  You want to know what
6    a particular claimant says it is.  From the proof of claim
7    form, that's all you can tell is what they think their claim
8    is.

9          MR. BERNICK:  I don't know --

10          THE COURT:  Yes, their -- their proof of claim
11    entitles them to a prima facie determination that it is what
12    they say it is.  So, they should at least have to come forward
13    with sufficient evidence in the proof of claim form, including
14    their own testimony under the penalty of perjury, to what the
15    claim is.

16          MR. BAENA:  Let's not be naive, though, Judge.
17    They're going to object to every one of these proof of claims.
18    Whether these people put it in or not, they've given us a road
19    map, they're going to object to everything.  So, we're going to
20    -- excuse me.  We're going to provide this information which
21    doesn't advance the claim.  It doesn't advance a defense.  And
22    these people are going to have a claims objection anyway.  And
23    it's going to take them months to complete this.

24          MR. BERNICK:  I thought about 25 minutes ago there
25    was this gracious recognition that we are going to have a bar

1  date and we are going to have claim forms.

2          THE COURT:  Yes.

3          MR. BERNICK:  And if this is a claim form that was
4  designed so people could fill it out, supply the prima facie
5  evidence without too much trouble, that's now being debated is
6  well, gee, what they're going to do with this and it's so
7  burdensome and all the rest of that --

8          THE COURT:  I do not find this question asking how
9  they found out about the presence of asbestos to be too
10  burdensome.  I don't find the question about when they found
11  out about it within a year to be too burdensome.

12          MR. BAENA:  The month, the day and the year.

13          THE COURT:  No, it was just the year.  They've taken
14  out everything but the year.

15          MR. BERNICK:  We've taken out month and date.

16          MR. BAENA:  Judge, it's an evolutionary process.

17          THE COURT:  Well, then they'll say that.

18          MR. BAENA:  How do you find that out?

19          THE COURT:  Then they'll say that.  I first heard
20  about it in 1970, but I didn't go down to my basement and look
21  at the pipes until 1986, that's what they'll tell us.

22          MR. BAENA:  How did you first learn that the product
23  contained asbestos?  I mean how?

24          THE COURT:  They may --

25          MR. BAENA:  How?  How did you first learn that?  I

1 mean --

2          THE COURT:  Wait, I'm looking at --

3          MR. BAENA:  21, 22 and 23.

4          THE COURT:  Oh, I'm sorry.

5          MR. BAENA:  How did you first learn of the presence

6 in the property of the Grace product for which you are making

7 this claim.

8          THE COURT:  Okay.

9          MR. BAENA:  That could be for a commercial property

10 owner at the risk of filing the proof of claim under the pains

11 and penalties of perjury, a very difficult question to answer.

12 You know, I had -- they could have had 20 different property

13 managers over the last five years.

14          THE COURT:  It says how did you first learn.

15          MR. BAENA:  How did you first learn?

16          THE COURT:  Yes.

17          MR. BAENA:  How did you first learn?

18          THE COURT:  The person filling this out, how did you

19 first learn.

20          MR. BAENA:  Well, did the person -- is it just the

21 person filling it out?

22          THE COURT:  That's who's signing the document.

23          MR. BAENA:  is the person that fills it out if they

24 are a commercial company responsible for knowing whether a

25 janitor chipped the thing and said, you know, this looks like

1  Monocle 3?

2       THE COURT:  Well, Mr. Baena, I'm sorry, this question

3  does not admit of that wide range.  It's a very simple

4  question, how did you first learn.  If I'm the person filling

5  it out and I never learned about it, that's what I say.  If I'm

6  an agent for someone, I say my client says he first learned

7  because the janitor told him that it looked like asbestos on

8  the pipe in 1987.

9       MR. BAENA:  That's fine, Judge.  If that's the

10  limitation on the answers to these questions, that's perfectly

11  fine.

12       THE COURT:  That's the limitation on the answer to

13  the question.  They're going to state what they know.

14       MR. BAENA:  Can we make it clear that when the form

15  refers to you, it's referring to the person who's completing

16  this form?

17       MR. BERNICK:  Well, no, no, this is -- Mr. Baena --

18       THE COURT:  Do we need to define what yes means?

19       MR. BAENA:  No.

20       MR. BERNICK:  When any company has to answer

21  questions in the course of litigation, you've got to look at

22  the information to answer it appropriately, that's all that's

23  involved here.

24       THE COURT:  Number 21 is fine.  I'm overruling the

25  objection.  It's all right.

1          22 is changed to a year.

2          23 is how did you first learn that the Grace products

3    which you're making the claim contained asbestos, okay, that's

4    the same -- that's just a corollary to 21.   That's fine.

5          The objection to 21, two and three, except to the

6    extent month and day are eliminated, are overruled.

7          What's next?

8          MR. BAENA:   24 is another instance where there's a

9    requirement that all documents be attached.   We just want the

10   ability to do a summary, it's regarding abatement activities.

11         THE COURT:   That's fine.   I think the same thing --

12   all questions related to the documents be amended as I've

13   already stated.

14         MR. BERNICK:   Yes, the -- I think the procedure that

15   Your Honor indicated is appropriate.   I -- my only concern is

16   that we don't get into a situation where it's go see our

17   warehouse in Bethlehem, it's somewhere in a box.   I mean the

18   access has got to be a meaningful access to these particular

19   documents.

20         THE COURT:   I think you can even ask specifically

21   where are the documents located, how are they categorized.   If

22   that's what you need --

23         MR. BERNICK:   Yes.

24         THE COURT:   -- I think you can ask some limitation

25   like that if the documents are not attached.   You can ask

1 specifically who has possession of them, where they're located,
2 what they consist of.   It seems to me that the summary should
3 state what the documents are.

4 　　　　MR. BAENA:   We're all accustomed to the use of
5 summaries of proof of claim forms.   I mean I'm not asking for
6 any more.

7 　　　　THE COURT:   Okay.   What's next?

8 　　　　MR. BAENA:   On testing and sampling, as well as --
9 which is in Question 26 and 27 on Pages 9 and 10 of their
10 response.   We wanted, again, to your knowledge, to the extent
11 that any of that was done before they owned the building.   It's
12 the same sort of thing.

13 　　　　THE COURT:   26 could be broken into the same type,
14 have you ever or anybody on your behalf ever done any testing,
15 sampling, and when and otherwise a second question, has anybody
16 else ever done it.   I mean we're making the claim form longer
17 by doing this, but I think it's more accurate.

18 　　　　MR. BERNICK:   That's fine.   On this one, we would
19 like to have them an attached the test document, some
20 voluminous set of construction materials, this is very discrete
21 documentation --

22 　　　　MR. BAENA:   There's only one issue I would raise in
23 respect of that, and that is it may be work product if there
24 were pending litigation.

25 　　　　MR. BERNICK:   Well, but if it's work product and

1 there's pending litigation, it should be discoverable, you can
2 make the claim of work product if you talk about the document.
3 I guess I'm a little bit unclear how testing data with respect
4 to a building would be work product.

5 MR. BAENA:  Well, the problem with the test data in
6 27, the dates that are required, it's not related to the Grace
7 products.  This is any test sampling.

8 MR. BERNICK:  Then it doesn't make a difference.

9 MR. BAENA:  Well, it could be before your products
10 were even installed.  Why is that relevant?

11 THE COURT:  Well, I think the -- isn't the issue with
12 respect to Grace only testing during the years in which Grace
13 says that it either manufactured or distributed the product?

14 MR. BERNICK:  Well, first of all, the problem is that
15 it's more difficult to try to frame a set of questions when we
16 pick-up all the permutations just to ask for the testing data.
17 But we would want to have testing data that enabled us to
18 determine whether the presence of Grace product made any
19 difference to the ambient concentrations of fibers in the
20 building.  So, we want before and we want after the product was
21 actually --

22 THE COURT:  Well, I don't see a problem with these, I
23 think the issue about the summary -- I know -- I understand why
24 the debtor would the complete test or sample data, but it
25 depends, I think, on whether the existing owner has that

1 information.

2        So, to the extent that the existing owner performed
3 the test and the information is there, I think you're entitled
4 to the document.

5        To the extent, though, that the owner knew about it
6 and could say that it doesn't have the document, you're not
7 going to get the document.

8        MR. BERNICK:  That then asks for -- in 27 to have the
9 identification, and we can take, again, the month and the year
10 out because if they don't have the documents anymore, we might
11 be able to get them from a third party.

12        THE COURT:  Yes, I don't have a problem with 27 with
13 respect to who did the testing.  I think they're -- you know,
14 that information, if they know, they can put it in.  And if
15 they own the building, they should know.

16        And 26, with respect to the document, I think you're
17 entitled to that information from the claimant, but the
18 claimant may not have the information.  If they don't, I think
19 you're entitled to know where it is.  So, it seems to me that
20 if they have it, they should attach it.  If they don't, they
21 should tell you were you can get it.

22        Okay.  And this will just be the year in 27.

23        MR. BAENA:  Page 12, Number 31.

24        THE COURT:  All right.

25        MR. BAENA:  It asks does or did anyone living in the

1 household work for the Grace operation against which you are
2 making a claim.

3 THE COURT:  Yes, what does -- what does that -- what
4 relevance is that when it's a property damage claim?

5 MR. BAENA:  And what operation are they making a
6 claim against?  I mean what does that mean?

7 MR. BERNICK:  Well, because this is designed
8 specifically to deal with people who have asbestos in their
9 homes because they worked in the Libby Mine or perhaps in the
10 processing plant who brought material back to their homes.

11 MR. BAENA:  Well, you have a separate proof of claim
12 form for Libby, for Libby residents.

13 MR. BERNICK:  Yeah, we have a separate proof of claim
14 form for Libby residents, but that deals with the personal
15 injury.

16 MR. BAENA:  Well --

17 MR. BERNICK:  This picks up property.

18 MR. BAENA:  Well, how could the property damage be
19 caused by somebody having worked somewhere in Grace?  I mean
20 that's -- it's so remote as to be ridiculous, Judge, and I
21 don't know what operations of the debtor --

22 MR. BERNICK:  And people won't fill it out, but
23 that's exactly what it is that we're worried about, is that
24 people brought materials home to their homes, now -- and their
25 homes are contaminated and they're worth less money, they have

1    to be remediated. I don't know that you've got those claims or

2    not, but that's exactly what it is that we're trying to get at.

3            THE COURT: You're suggesting that somebody might

4    have gotten -- I'll call them free samples from the Libby plant

5    and taken them home and installed them without --

6            MR. BERNICK: No --

7            MR. BAENA: No, I think they're worried about

8    somebody carrying fibers on their clothing.

9            THE COURT: On their clothes?

10           MR. BERNICK: Yes, or any number of other ways.

11   Again, when you have a situation that's as emotionally charged

12   now as Libby is, you have the EPA going around to everybody's

13   home, taking samples and taking measurements, you may have

14   people say that, gee, I've got some fibers in my home, I

15   believe that diminishes the value of the home and ought to be

16   remediated, ought to be cleaned, and they make a claim.

17           MR. BAENA: There's a product ID requirement, Judge.

18           THE COURT: Well, there is one affidavit of record

19   that I've seen in this case by some woman who owns a couch and

20   is afraid to have people sit on it because it may be

21   contaminated, Mr. Baena, so it's not as far out as it sounds.

22           MR. BAENA: Because somebody in the house worked at

23   Grace and they were making a property damage claim?

24           THE COURT: All the affidavit says is that the person

25   is concerned and is part of a named class because there is need

1 for remediation because, among other things, their couch, and I

2 think carpets or something, may be contaminated.  It's not as

3 far out as it sounds.  There are affidavits of record in this

4 already --

5      MR. BAENA:  Well, there's an affidavit, Judge.  I

6 don't think that the prototypical property damage claimant is

7 complaining about a couch.

8      THE COURT:  Probably not, but you never know.  And to

9 the extent that the debtor is entitled to discharge all the

10 claims against it, this is probably relevant.

11      But I do agree about the question of Grace

12 operations.  I'm not sure --

13      MR. BERNICK:  Well, it enables us really to -- it's

14 pretty simple.  You've got somebody who's in Libby and they say

15 that they got contamination of Grace asbestos in their homes.

16 And this is a way of finding out is the real contention that

17 they're making there that they brought the material home with

18 them from the mine.

19      THE COURT:  Why don't you ask that question?

20      MR. BAENA:  Judge, now you're asking lay people to

21 decide whether they have property damage claims or personal

22 injury claims.

23      THE COURT:  Yes.

24      MR. BAENA:  But, Judge, at some point -- but at some

25 point in time, you're asking too much of some people.

1          THE COURT:  It seems to me that if they're going to
2   make the claim that their couch is contaminated, they ought to
3   be able to say why.  I mean apparently there are people out
4   there who may be making those claims.

5          MR. BAENA:  All right.  Now --

6          THE COURT:  So, perhaps what you want is some
7   allegation other than --

8          MR. BAENA:  Can't you put a period after Grace?

9          THE COURT:  Fine.

10          MR. BAENA:  Does anyone living in the household work
11   for Grace?  I mean, period.

12          THE COURT:  Well, I think it has to be the Grace
13   entities maybe because there's more than just Grace, correct?

14          MR. BAENA:  Well, they use Grace everywhere else, and
15   I don't know what Grace is anymore.

16          MR. BERNICK:  Say no more, we'll put a period after
17   Grace.

18          THE COURT:  Great, all right.  I have --

19          MR. BAENA:  And that's only for household members,
20   it's not for commercial building owners.

21          THE COURT:  And I think that probably should be -- if
22   that's what you're trying to get --

23          MR. BERNICK:  I guess that's true, except that the
24   simple answer -- Mr. Baena is flummoxed with the prospect that
25   these claims might be there, the worst that could happen is

1  that they don't fill out the claim form.  You've got somebody
2  who's commercial, you've got somebody who's individual, doesn't
3  make a difference.  If they don't have a claim, they don't fill
4  it out.

5       THE COURT:  Well, but Number 31 says specifically
6  anyone living in your household.  And the question is what
7  happens if this is a commercial enterprise that's filling out
8  the proof of claim?

9       MR. BERNICK:  Then the question --

10      MR. BAENA:  You know, I --

11      MR. BERNICK:  -- they'll have a hard time answering.

12      THE COURT:  Yes.

13      MR. BAENA:  Well, Judge, you know I think we're being
14 -- you know, we're about to spend about five or $6 million to
15 get these things out.  Why are we being so flip about this?  If
16 it's not an important task to undertake, let's save the money
17 and let's forget about the proof of claim forms.

18      THE COURT:  I don't think anybody is being flip.  The
19 question is does anyone living in the household work for Grace,
20 but this form is designed for others in addition to household
21 entities.

22      So, that's the question.  I think it has to be
23 limited to the property that's involve in the damage claim.
24 That's the issue.  I'm not sure of the question.

25      MR. BERNICK:  If the claim -- if the claim relates to

1  a residence, does or did anybody living in the household work

2  at Grace.

3          THE COURT:  That's fine.

4          MR. BAENA:  Okay.  And I would submit, Judge, that

5  Questions 33 and 34 are already answered elsewhere on the form,

6  when did you first learn of the presence, how did you first

7  learn of the presence --

8          THE COURT:  Yes.

9          MR. BAENA:  -- we've already covered that.

10          THE COURT:  I think there is --

11          MR. BERNICK:  Well, it's a separate category of

12  claims.

13          MR. BAENA:  Well --

14          THE COURT:  You're not expecting people to fill out

15  category one if they fill out category two?

16          MR. BAENA:  Is that clear from the form?  Because I

17  don't think it's clear from the form.

18          MR. BERNICK:  See it says category -- go back to 12.

19          MR. BAENA:  No, no, go back to A.

20          THE COURT:  Actually just go to D.

21          MR. BAENA:  Does everybody have to fill out Part A?

22          MR. BERNICK:  Yes.

23          MR. BAENA:  Does everybody have to fill out Part B?

24          MR. BERNICK:  For whatever category that -- category

25  one and category two.

1              MR. BAENA:  Okay.

2              MR. BERNICK:  Category one is picked up by C,

3      category two is picked up by D.

4              THE COURT:  Where is Question 19 -- where are

5      Questions 21 through 23, which category?

6              MR. BERNICK:  21 through 23 are part of category C.

7              THE COURT:  Okay.

8              MR. BERNICK:  Which is a category one claim.

9              THE COURT:  And 33 and 34?

10             MR. BERNICK:  Are part of category two, section two,

11     which is category two claims.

12             THE COURT:  All right.  That is fine.  Just amend

13     them to be the same as the ruling is already made with respect

14     to category one.

15             MR. BAENA:  Page 15, Questions 39 and 40, Judge, were

16     you aware of the presence of asbestos when you sold your

17     property?  It's hard to even understand what the application of

18     this is.

19             THE COURT:  Does Question -- do Questions 33 and 34,

20     are they in the same category as 39 and 40?

21             MR. BERNICK:  Yes.  It doesn't help.  I mean the

22     basic reason for asking 39 and 40 is to find out if the

23     presence of asbestos was material to the commercial

24     transaction, which would be their only source of real loss.

25     They sold the property, they don't have a loss to sustain any

1  more.   The question would be did they sell it for less money?

2  If they weren't aware of the asbestos, then presumably they

3  didn't sell it for less money.

4         Likewise if they bought knowing that there was

5  asbestos there, they paid whatever they thought the property

6  was worth.

7         THE COURT:   All right, they're allowed, they go to

8  damages.

9         MR. BAENA:   16, Part F, which I believe relates to

10  all claimants.

11         THE COURT:   Question what?

12         MR. BAENA:   Part F.

13         THE COURT:   Part F?

14         MR. BAENA:   On -- starts on Page 16.   F is asbestos

15  litigation claims, I believe that applies to all claims.

16         MR. BERNICK:   Part 4, you must have a typo.

17         MR. BAENA:   It's Subsection F, Part 4.   Right here.

18         MR. BERNICK:   Oh, that.

19         MR. BAENA:   Part 4.

20         MR. BERNICK:   Okay, yeah.

21         MR. BAENA:   That applies to everybody.

22         MR. BERNICK:   Right.

23         MR. BAENA:   Okay.   We've objected to Question 1,

24  Judge, as firstly being much too broad.   It inquires whether

25  they have ever contacted a lawyer about a possible asbestos

related property damage lawsuit or claim.  It has nothing to do
with this particular property.  It doesn't have anything
necessarily to do with their product.  And it doesn't have any
relationship in time to anything that we seem to be concerned
about here.

As such, it's purely invasive of the attorney/client
privilege.

THE COURT:  I honestly -- well, I don't know that it
invades the attorney/client privilege.  But I have some
difficulty understanding the relevance.  If they have a claim
they made, whether they contacted a lawyer or not is
irrelevant.

MR. BERNICK:  Well, let's say that they contacted the
attorney about suing Celotex in connection with the asbestos in
their buildings.  They knew all about asbestos, knew about
their ability to bring a claim and they didn't bring a claim
against Grace, even though they knew Grace product was in their
building.

MR. BAENA:  Well, suppose --

THE COURT:  I don't think it's relevant.  If they
have a claim, they have it.  And it seems to me that's just the
way it is.  If you need discovery because you discovered that a
particular claimant filed a claim against a different asbestos
producer at a certain point in time, then in that discovery, I
think you're entitled to it.  But I don't see the need for this

1 on a proof of claim.

2          MR. BERNICK:  Your Honor, on the point about the
3 Statute of Limitations is the fact that we believe it goes to
4 show that they had knowledge of their ability to prosecute
5 asbestos claims even though it was not a claim against Grace.

6          THE COURT:  I understand.  But I don't think that
7 that's -- I think that's going too far afield with the proof of
8 claim.

9          So, Question 1 under Part F is stricken.

10          MR. BAENA:  Question 2, again without relating it to
11 their product or the building that's subject to the claim, they
12 ask if the claimant has ever brought an asbestos related
13 property damage lawsuit.

14          THE COURT:  And what's the relevance?

15          MR. BERNICK:  It is the same -- it is the same basic
16 point, which is as they, in fact, brought a lawsuit, if they
17 had, it would indicate that they're knowledgeable about their
18 ability to claim against asbestos.

19          The other thing is that this now picks up also claims
20 that would include claims against Grace, as well as others.
21 So, this is really any kind of asbestos related property damage
22 suit.  And there is a theme that runs through these questions
23 here, what we want to know is if somebody has prosecuted
24 asbestos property damage claim in some other context, and
25 they're now prosecuting the claim with respect to the same

1  building here, we want to know if they've settled because it

2  relates to both the Statute of Limitations and to -- and the

3  consistency of what they're now saying in this case.  They go

4  sue Celotex and they say, Celotex is the source of all of our

5  problems, they win or lose, and they say now with respect to

6  the same building, we're doing the same thing to Grace, the

7  only problem is it's 15 years later.

8          MR. BAENA:  Here's the problem, Judge, it doesn't

9  relate to this building.  It doesn't relate to the same

10  product.

11          MR. BERNICK:  We don't know that.

12          MR. BAENA:  But the question doesn't.

13          THE COURT:  Well, the question probably should be

14  related to the specific property in question because that's the

15  basis of the property damage claim.  You're asking for the

16  damages as to a particular property, so I think that's --

17          MR. BERNICK:  That's correct.  We'll -- I think

18  that's fair.  Same structure, same building.

19          THE COURT:  Right.

20          MR. BAENA:  And same product.  Same installation.

21          THE COURT:  Well, it may not be the same

22  installation, I don't know because it's -- it may or may not be

23  the same installation.

24          MR. BAENA:  All right.

25          THE COURT:  It can still be the same product.  It

1 seems to me that it's a fair question provided that it's

2 restricted to the property that serves as the basis of the

3 claim.

4          MR. BERNICK:  Right.

5          MR. BAENA:  Okay.  And, of course, we have also

6 raised in the third check box below that question, Judge, it

7 says non-lawsuit claim.  I'm not sure that that's very

8 descriptive.

9          THE COURT:  I didn't -- actually I don't know what

10 that means.

11          MR. BAENA:  I mean if you call up your landlord and

12 say --

13          MR. BERNICK:  How about --

14          MR. BAENA:  -- what's the problem --

15          MR. BERNICK:  -- out of court claims?

16          MR. BAENA:  No, but, Judge, what does that mean?  I

17 mean you can raise a claim in so many different contexts by so

18 many different actions on your part, verbally and otherwise.

19          THE COURT:  How about doing it this way, make it no

20 or yes and if yes, was the lawsuit filed, and if so, state the

21 relevance, the caption and the location of the suit?  That's

22 really what you want to know.

23          MR. BERNICK:  I mean if the person a makes the claim,

24 for example, against Celotex, never filed a lawsuit, made the

25 claim against Celotex for the same building --

1        THE COURT:  Right.

2        MR. BERNICK:  -- basically complaining about the same

3   condition, we want to look at that claim.

4        THE COURT:  Right.  So, you want to say, either, no,

5   they've never done it or yes, they have.  And under yes, if

6   yes, and a lawsuit was filed, give the caption and the location

7   of the suit.

8        MR. BERNICK:  Um --

9        THE COURT:  I mean they could have filed an

10  arbitration action.  They could have filed -- there could be

11  other ways that an issue could be resolved, whether we're ever

12  going to get all that, I don't know.

13       But what you really need to know is whether a lawsuit

14  was filed in --

15       MR. BERNICK:  Well, the problem here is, you know,

16  again, if they pursued it out of court and exchanging

17  information, got compensation, blamed it all on somebody else,

18  we want to know about it.

19       THE COURT:  Well, you get that because it would say -

20  - you've got either no or yes.

21       MR. BERNICK:  Right.

22       THE COURT:  And if yes, and a lawsuit was filed, give

23  the particulars.

24       MR. BERNICK:  We would then get the -- if they never

25  filed a lawsuit because it was resolved --

1          MR. BAENA:  Judge, you know --

2          THE COURT:  Then the block yes will have been

3 checked.

4          MR. BERNICK:  Right.  But then we still need to

5 follow through on it, that it's -- I guess it picks up Tab C or

6 Section C.  This explains the claim -- parties admitted claim,

7 including --

8          THE COURT:  I don't have Section C right here, I'm

9 sorry.  What it says is --

10          MR. BERNICK:  There's an introduction, and then

11 there's the lawsuit, and then --

12          THE COURT:  The claim.

13          MR. BAENA:  Yeah, but this goes to Grace in C.  C1

14 talks about a claim against Grace.

15          Question 2 in A is talking about any claim against

16 anybody that ever --

17          MR. BERNICK:  No, that's not -- Scott, come on, it's

18 not confined to Grace.  That's one.  Then you turn to Page 2,

19 that's 2, all other claims.

20          MR. BAENA:  Judge, you know, we've heard from the

21 beginning of this case that there really aren't a lot of

22 property damage claims.  And, you know, we're creating a form

23 that they're, nonetheless, going to take discovery about.

24 Anything that anybody files, they're going to take discovery

25 about, and we're creating this massive proof of claim form that

1 already exceeds anything ever done in any other cases, even

2 those that Mr. Bernick was involved in.

3        MR. BERNICK:  I don't think it's very arduous for

4        people to specify that they made a claim -- a non-

5        lawsuit claim without a lawsuit.

6        THE COURT:  Actually I think all you're trying to do

7 is find out whether these folks sued Grace or sued someone else

8 or both, right?  Why don't you just ask that question directly?

9 Did you ever file a claim against a party other than Grace for

10 the same building?

11        MR. BERNICK:  Building, yes.

12        MR. BAENA:  That's where we started this.

13        THE COURT:  Which is where we started.  Just ask that

14 question, did you ever do it, against Grace and against

15 somebody other than Grace.  I think those are proper questions.

16        MR. BAENA:  Right.

17        MR. BERNICK:  Okay.

18        MR. BAENA:  Right, and --

19        THE COURT:  But I'm not sure you need all those

20 details.  Because if you get a yes, then you're entitled to

21 discovery.  If you --

22        MR. BERNICK:  Well, that's true.  But this way, we

23 get to know -- again, the whole idea is not to have to go take

24 all the discovery, just get some basic information about what

25 happened.

1           THE COURT:  But the -- but the proof of claim form is

2   supposed to be neutral.  It's not a discovery device in all it

3   particulars for the debtor or for other creditors who may not

4   contest it.

5           MR. BERNICK:  All that we will need -- all that we'll

6   need is that we will then get a piece of information that's of

7   more limited value.

8           THE COURT:  Yes, it will be of more limited value,

9   but it may also mean that more people will fill out the proof

10  of claim form because they will not have to take so much time

11  to go back and restructure the --

12          MR. BAENA:  Our point, Judge.

13          MR. BERNICK:  With due respect, Your Honor --

14          MR. BAENA:  That's our point.

15          MR. BERNICK:  With all due respect, Your Honor,

16  again, we're not talking about individuals here.  We're talking

17  about businesses.  They've got the ability to do this, they

18  believe their claims are --

19          THE COURT:  Well --

20          MR. BAENA:  Excuse me --

21          THE COURT:  -- except this applies to everyone.

22          MR. BAENA:  -- this applies to individuals, too, you

23  said that.  I asked you specifically.

24          MR. BERNICK:  And you asked me specifically, you did.

25  And it is true that there are some individuals who could be

1  picked up on this, maybe we can specify with respect to people

2  who are making claims for commercial property.

3         THE COURT:  Fine.  You want to do it with respect to

4  commercial property, that's fine.

5         MR. BERNICK:  Okay.

6         MR. BAENA:  Now, you'll see, Judge, in -- if you

7  follow down on Page 17, now if there's a lawsuit, the claimant

8  is supposed to make copies of this page and then start

9  answering all these questions in respect of each lawsuit.

10  They're supposed to make as many copies of this page as there

11  are lawsuits.  It's too much, Judge.  It's just too much

12  information.

13         And then they're going to say when we get to that bar

14  date issue, they're going to say, well, give them a couple

15  weeks.

16         THE COURT:  I think when we -- I think with respect

17  to the suit, just asking for the description of the caption and

18  where it was filed should be sufficient.  And I think that you

19  can just attach it like these people can fill it in, I don't

20  think they need to recopy this.  I'm not going to make them

21  attach copies of the complaint.  It seems to me if Grace wants

22  them, they can go get them.  But you are entitled to a

23  description to know where to go.

24         MR. BERNICK:  The description is here.

25         THE COURT:  The description that says, you know, the

1  name of the case and where it's filed.  X versus Y at --

2  MR. BAENA:  Style, court and case number.

3  THE COURT:  Right, case number.

4  MR. BAENA:  I believe that's all we had, Judge.

5  THE COURT:  All right.  And if it's a non-lawsuit,

6  you're entitled to the same information.

7  MR. BERNICK:  We will revise this and submit a form

8  on the same basis schedule so that we will get it done by the

9  end of the week.

10  THE COURT:  All right.

11  MR. BERNICK:  And then --

12  MR. BAENA:  We have one last item, I'm sorry, Judge,

13  on the signature page.  I think they've tried this before with

14  no success, Judge, but on the signature page, they have the

15  claimant agree that to consent to release of records and

16  information.  And it says, "I hereby authorize and request that

17  all of the parties with custody of any documents or information

18  concerning my property damage or the information contained in

19  this form to disclose any and all records to Grace or to

20  Grace's representative.  I hereby authorize the release of my

21  social security number for use in comparing information

22  provided separately to other asbestos trusts or asbestos claims

23  facilities to verify the completeness and accuracy of the

24  information contained in this form."

25  THE COURT:  Well, with respect to the release of the

1  social security numbers, we have stricken all but four digits,

2  that's somewhat irrelevant.  That can come out.

3          MR. BAENA:  So, that part can come out.

4          THE COURT:  With respect to the consent of the

5  release of records, I don't think it's proper as part of the

6  proof of claim form.  If you want to attach a separate release

7  document, a separate one, along with the proof of claim when

8  it's mailed out, I think you can ask people to submit that

9  information, but not as part of the proof of claim.

10         MR. BERNICK:  All right.

11         MR. BAENA:  And they've got to make it very clear,

12 Judge, that you're not required to give that release.

13         THE COURT:  Yes, I think you can --

14         MR. BERNICK:  Well, but -- first of all, with respect

15 to the -- with respect to the documents that we keep on

16 referring to, the documents are located X, Y or Z --

17         THE COURT:  Right.

18         MR. BERNICK:  -- we will certainly do one at least

19 with respect to those.

20         THE COURT:  And I think in those specific questions

21 -- well, I think you're entitled to that information --

22         MR. BERNICK:  Yes.

23         THE COURT:  -- with or without a release.  I mean if

24 they don't attach the documents that substantiate the proofs of

25 claim, you're entitled to discovery to get them.  So --

1           MR. BERNICK:  What we want to do is avoid having to

2   initiate that discovery.  So, how about if we get a release at

3   the end that applies specifically to those questions where they

4   have identified a specific damage claim.

5           MR. BAENA:  No --

6           THE COURT:  But have them attach it.

7           MR. BERNICK:  Have it attached.

8           MR. BAENA:  Why don't we just provide in the

9   instructions that if you refer to documents in the possession

10  of somebody else as opposed to providing the documents or a

11  summary of the documents, then the debtor may seek to obtain

12  those documents from the person that you --

13          THE COURT:  No, they need to provide a summary.  I'm

14  not waiving the requirement of the summary.  They've got to

15  substantiate the basis upon which the proof of claim and the

16  property damage by documents.  So, I'm not waiving the

17  requirement for at least the summary.

18          But a consent to release, I think, as to those

19  documents, if you choose to do it that way in the instructions,

20  that's fine.  I think that's fine.

21          MR. BERNICK:  But with respect to all documents that

22  exist that fall within the scope of those questions, again, we

23  need access to those documents.  And we need the consent for

24  that access.

25          THE COURT:  I think --

1        MR. BERNICK:   In other words, even if they supplied
2   the summary, there's still a question of getting access to the
3   document.

4        THE COURT:   I am not opposed in the instruction to
5   say that if you attach a summary of documents, that your
6   attachment of the summary constitutes a release to get the
7   documents you have summarized, and that -- you can put that
8   above it -- above the signature.   That seems to be fine.

9        But a blanket release of all information?   I do not
10  think is appropriate in the proof of claims form.

11       MR. BERNICK:   We'll tailor it to those claims.

12       MR. BAENA:   Judge, before this is submitted back to
13  the Court as a final agreed upon proof of claim form, we'd like
14  to see the revised form.

15       THE COURT:   Oh, sure.

16       MR. BERNICK:   That's what I just said, we will get it
17  to you this Friday, and if you've got comments, you can get
18  back to us by the following Friday, and we can submit it to the
19  Court the next week.

20       THE COURT:   That's fine.   Anyone else want to be
21  heard on the property damage?   Okay.   You want to go through --
22  I have not received any objections on the medical monitoring
23  proof of claim order, did anybody raise any that I didn't get?

24       MR. BERNICK:   I'm not aware of any.

25       MR. SOBOL:   Your Honor, we've been handling the

1  medical monitoring claim form.  I have to confess, I was not

2  aware that there was a separate claim form for medical

3  monitoring.  I'm not saying that I didn't get it, but I just

4  know that I personally was not aware that there was such a

5  claim form that was out there.  It may have been either a

6  miscommunication or something with respect to that.

7           MR. BERNICK:  Well --

8           MR. SOBOL:  I'm not saying there isn't one, I'm just

9  saying that, you know, one of the issues that there

10 occasionally has been is that the non-like claimants, the

11 medical monitoring claimants, aren't counsel to the committee

12 and sometimes we get something, sometimes we don't.

13          What I'd simply suggest is if I could get an

14 opportunity to review that.  I'm going to be speaking with Mr.

15 Bernick anyway about other medical monitoring things, I'm going

16 to be speaking with him about Zonolite matters, too.  I'd just

17 simply see it as a way of taking care of that.

18          THE COURT:  All right, that's fine.  The medical

19 monitoring, I think, you can address.  Zonolite, at this point

20 in time, I don't think you need to address --

21          MR. SOBOL:  Right.

22          THE COURT:  -- because there is no point until we

23 find out what requirements we need in the proofs of claim.

24          MR. SOBOL:  Right.

25          THE COURT:  Okay.  So, that takes care of the three

1   that I need to address.

2           MR. BERNICK:  I think that's it.  The non-asbestos is

3   agreed to.

4           THE COURT:  Yes, the proof of claim form, I have not

5   received any objections to that either.  Are there any?  All

6   right, so that one's okay.

7           All right.  What's next?

8           MR. BERNICK:  The last item is Item 14, Item 14

9   really is a carry over from the argument in connection with the

10  motion to dismiss.  We understand that Your Honor denied the

11  motion to dismiss, but there were a number of comments that

12  were made in court concerning various factual matters and

13  various people from my client were sitting back in the

14  courtroom saying, no, that's not what happened.  So, what we've

15  done is simply -- I simply had asked Mr. Segal, who is Vice

16  President, General Counsel, to respond to those different

17  matters and that is the last item, with a letter to  Your

18  Honor, to simply make --

19          THE COURT:  I have received it already.

20          MR. BERNICK:  Okay, that's fine.

21          THE COURT:  Yes, it wasn't a request for me to do

22  anything.

23          MR. BERNICK:  No.

24          THE COURT:  It was just a letter.  That's fine, it's

25  docketed.

1          MR. SOBOL: Your Honor, on behalf of the Zonolite
2    movants, obviously we object from a technical point of view. I
3    mean it's not a document that's been submitted to you either by
4    way of an affidavit or a declaration. It's statements of fact,
5    that kind of thing.

6          But if Your Honor wishes to docket it, then I'll
7    simply hand to you a responsive document which indicates that
8    we think that the statements we made were true and were
9    generally accurate.

10         THE COURT: I think it was docketed because it was
11   filed.

12         MR. SOBOL: Right.

13         THE COURT: I don't have anything to do with
14   docketing. Things get filed and they get docketed. So, I
15   believe it was docketed.

16         MR. SOBOL: Okay. Well, then just so that we can
17   make sure that the record is completely full in terms of what
18   the parties' positions are --

19         THE COURT: Fine. I'm not considering his letter and
20   I'm not considering your supplement. Go file it
21   electronically, I'm not take it now.

22         MR. SOBOL: Okay.

23         THE COURT: I should explain. I deal with evidence,
24   evidentiary matters, I do not address letters. I will
25   generally read them because I need to know whether they require

1 some action on my part.  That didn't.  I did read it.  I'm not
2 considering it for any purpose.  I will read yours when it's
3 docketed, and I won't consider it for any purpose.
4          I had a record.  I made my rulings.  That's the end.
5 They're appealable.  If you don't like them, go file an appeal.
6 That's all I can tell you.  Okay.
7          What else, Mr. Bernick?
8          MR. BERNICK:  Nothing, Your Honor.  I appreciate your
9 patience here this afternoon.
10         THE COURT:  Anything else from this side?  Mr. Baena,
11 no?
12         MR. BAENA:  No, ma'am.
13         THE COURT:  Okay.  I'll see you in April then.  Thank
14 you.
15                    (Conclusion)
16
17
18
19
20
21
22
23
24
25

1
2
3          C E R T I F I C A T I O N
4
5          I, Karen Hartmann, certify that the foregoing is a
6    correct transcript to the best of my ability, from the
7    electronic sound recording of the proceedings in the above-
8    entitled matter.
9
10    _____          Date: March 25, 2002
11    TRANSCRIPTS PLUS
12
13
14
15
16
17
18
19
20
21
22
23
24
25