IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

W.R. GRACE & CO., et al.,

Debtors.

_____ /

Chapter 11

Case No. 01-01139 (JKF)

(Jointly Administered)

## CLAIMANTS' MOTION TO STRIKE PROOFS OF CLAIM AND RESPONSE TO DEBTORS' PROPOSED ORDER SETTING INITIAL SCHEDULE FOR LITIGATION CONCERNING ZONOLITE ATTIC INSULATION PRODUCT RISK

In response to Debtors' Proposed Order Setting the Schedule for Zonolite Attic Insulation ("ZAI") liability, certain Counsel for the Claimants[1] for whom W.R. Grace filed individual proofs of claims ("Zonolite Counsel") file the following opposition:

### PRELIMINARY STATEMENT

Having previously acknowledged that lifting stay and removal of actual pending Zonolite case would facilitate its reorganization, Grace unexpectedly disclosed at this Court's April omnibus hearing, that several days earlier it had filed, without notice to creditors involved, proof of claim in the name of selected creditors. Grace indicated that it intended to initiate a contested claims process with respect to those claimants. The individual claimants would be saddled with the impossibly expensive burdens of litigating a single issue of Grace's choosing, disconnected from the actual state laws or issues governing those creditors' claims. Further, Grace proposed that the individuals selected by Grace would litigate the global Zonolite issue as defined by Grace, in their individual names only, creating for Grace a "heads I win, tails you loose" situation. An unfavorable outcome from Grace would establish liability for only a few claims, while a favorable outcome could functionally bar the claims millions of creditors.

Having previously announced to the Court that it was "drawing a line in the sand" as to any class treatment of Zonolite creditors, Grace has attempted to single handedly decertify a

---

[1] Counsel for Marco Barbanti, Ralph Busch, John and Margery Prebil, and Paul Price all join in this Response.

previously certified state class to whom two of the selected claimants owe fiduciary duties – Marco Barbanti and Ralph Busch. Grace has simply declared in its own filing that the claimants are only appearing individually. The course Grace has proposed is as perilous as it is unprecedented.

This Court has made clear that evaluating Grace's potential liability to Zonolite claimants is an important initial step in Grace's reorganization. The question now before the Court is selecting an appropriate and trustworthy procedural mechanism for bringing Grace's Zonolite liabilities into focus without trampling the Claimants' due process rights to notice and fair procedure. Grace's proposal does neither. Debtor, with no occasion to warrant the conduct, has perched this Court on the brink of a slippery slope falling straight into a morass of Constitutional and procedural concerns. Debtors' latest invention would permit Grace to chose its plaintiffs and chose the issue that plaintiffs would litigate, divorce those plaintiffs from the class of Zonolite creditors they have been appointed to represent, and impose on those individual creditors impossibly large financial burden intrinsic to litigating the issue Grace has defined. Any defendant would certainly enjoy such a system of "justice." However, that is simply not the system envisioned by either the Constitution or the Bankruptcy Code. Ratification of such a proposal would surely divert Grace's bankruptcy from the important task of timely compensating Grace's asbestos victims, and reroute it into appellate practice involving issues of due process.

As ZAI claimants have consistently maintained that the proper procedure to adjudicate actual Zonolite claims or limited issues presented by those claims is to lift the stay. This would allow the suits to go forward either in their present jurisdictions, or upon removal and consolidation before this Court. All of the procedural mechanisms for determining the liabilities of the debtor are available in the Courts, creating no need to bend and break the Bankruptcy Rules to fabricate an unprecedented procedure to hear these issues.

Claimants request that the Court strike Debtors' Proofs of Claims and deny the Debtors order for the reasons stated herein.

## STATEMENT OF FACTS

Aside from Grace's unprecedented and unworkable procedural device, its statement of the issues to be determined in this hearing as whether "ZAI presently poses an unreasonable risk of harm to the occupants of the home…" is neither factually nor legally correct. This is not a personal injury case. The factual issues, succinctly framed, are whether ZAI contains asbestos, a

known toxic substance, whether there are avenues of exposure to homeowners, and whether homeowners are reasonable in taking steps to avoid this exposure. Due to debtor's misstatement of these issues, Claimants have included the following statement of facts.

## A.  Grace's Manufacturing and Marketing of Zonolite Attic Insulation Occurred with its Full Knowledge That it Contained Asbestos and Was Hazardous.

For many decades, W.R. Grace & Company ("Grace") and its predecessor, Zonolite Company, mined, milled and processed vermiculite in Libby, Montana. Vermiculite, a form of mica, makes a satisfactory insulating material when exfoliated (heated and expanded) in a furnace. Prior to the mid-1980s, Grace was the leading producer of vermiculite-based insulation products in the United States. Grace manufactured and sold over three thousand tons of vermiculite each year including sales of over eighty-eight thousand bags of Zonolite attic insulation each month. See 1978 Performance Report of W.R. Grace's U.S. Zonolite operations (April 3, 1975) [sic] (Exh. A) and R.J. Bettacchi Monthly Report Memo (October 7, 1983) (Exh. B).

Zonolite Attic Insulation was one of Grace's vermiculite-based products sold nationwide. The vermiculite used in Grace's products, including Zonolite Attic Insulation, contained asbestos. The raw vermiculite used in Grace's product contained up to 21 percent asbestos. Letter from Wake to Byers (September 12, 1956) (Exh. C). Despite its recognition of the hazards of asbestos, Grace never completely removed the asbestos from its finished vermiculite-based products, including Zonolite Attic Insulation. Grace's testing showed that its finished vermiculite products contained asbestos in amounts up to and exceeding 5 percent by weight. Memo from Yang to Wood (April 19, 1977) (Exh. D).

Moreover, weight is not a reliable measure of risk presented by residential exposure to asbestos. The asbestos fibers in tremolite are so small that millions of them are present in a tiny portion of an asbestos product, yet they are barely detectable by weight. In Harashe v. Flintkote Co., 848 S.W.2d 506 (Mo. Ct. App. 1993), expert testimony established that 600 billion tremolite fibers would constitute approximately the volume of the cap of a fountain pen. Harashe, 848 S.W.2d at 508. In Harashe, the jury found that plaintiff's fatal mesothelioma disease was caused by Zonolite Attic Insulation. The appellate court upheld that verdict. Though potentially lethal to the lungs, asbestos fibers are invisible to the naked eye and can only be identified through the

use of microscopic equipment used by highly trained professionals. Memo from Wood on Tremolite in Vermiculite at 9 (May 24, 1977) (hereinafter "Wood Memo") (Exh. E).

As explained by Dr. Henry A. Anderson, M.D., a medical doctor, and public health official with extensive clinical and research experience with asbestos disease, exposure to asbestos can and does cause cancer and other lung disease. See Anderson Aff.,11:4-7 (Exh. F). Furthermore, medical research has established that asbestos is highly carcinogenic and there is no known safe level of exposure to asbestos. Id. NIOSH Pamphlet (April 1980) at p. 3 (Exh. G), EPA Study (February 1988) at p. 5 (Exh. H) and EPA Guidance Document ((March 1979) at Part 1, p. 1 (Exh. I).

Grace's Zonolite Attic Insulation was marketed and used as a "do-it-yourself" product to be installed by homeowners immediately following construction or during remodeling. Most of this material was installed in homes before 1985. It is common for older homes to be in need of maintenance, repair and remodeling involving rewiring, installation and replacement of fixtures and utilities in ceilings, attics, and walls, and similar dust-creating and dust-disturbing activities. See U.S. Census Bureau data compilations (Exhs. J, K, and L). The Zonolite Attic Insulation product itself is a granular substance that was poured out of large bags into spaces between the roof and the ceiling. The granules are small, about the size of a pencil eraser. After years in the attic, the product may darken and lose some structure and become more dust-like or sand-like.

The facts described herein show that homeowners, members of the class, are generally unaware of asbestos in Grace's Zonolite Attic Insulation and the dangers posed when this product is disturbed. As a result, homeowners nationwide are unwittingly disturbing Grace's Zonolite Attic Insulation during maintenance, repair, and remodeling and are at risk of causing dangerous asbestos exposures and contamination without any knowledge of the hazard and the need for precautions in order to minimize exposure and contamination.

As contrasted with Claimants' lack of knowledge of the Zonolite Attic Insulation hazards, Grace and Grace's predecessor, the Zonolite Company, have been aware of the serious health hazards associated with asbestos in their vermiculite since the 1950s. Montana State Board of Health Report on Industrial Hygiene Study of the Zonolite Company (August 8-9, 1956) (Exh. M) and Dr. Cairns letter to Bleich (July 20, 1959) (Exh. N).

In the 1960s, recognition of the asbestos hazard in Libby vermiculite was confirmed repeatedly, as demonstrated in documents from Grace's predecessor the Zonolite Company, the

Montana State Board of Health, and Grace itself. See Grace letter from Lovick (June 14, 1961)
(Exh. O); Chicago Daily News Article (October 6, 1964) (Exh. P); Montana Board of Health
letter to Bleich (May 11, 1964) (Exh. Q) and Lovick Memo (December 23, 1969) with Study and
Graph (Exh. R) (showing 90 percent of Zonolite/Libby employees suffered lung disease).
Grace's safety manager knew in the late 1960s that Grace's vermiculite-based products were
contaminated with asbestos, which occurred in the vermiculite ore. Accordingly, he advised:

> I think it well at this time, with the advice of counsel, to consider
> applying a warning or precautionary label or statement on all
> containers of products containing vermiculite. This may aid our
> defense in cases of product liability claims.

Memo to Kostic from Dugan (March 31, 1969) (Exh. S). This was not done.

In 1977, in an exhaustive report done by Grace with the benefit of extensive product
testing and consultation with its own legal counsel, including the corporate legal division, Grace
found that former Libby employees were suffering a "risk of lung cancer . . . five times the
national average." The report went on to state in a section entitled "Harm to Customers," that
"[t]he highest level of exposure is for Attic Insulation and Masonry Insulation. The high
concentrations of upwards of 15 fibers per milliliter ["f/ml"] (15 minute maximum) for attic
insulation . . . were observed . . . " In a telling conclusion to its exhaustive report, Grace stated
that "a decision to label our consumer products would eliminate the risk of future liability, while
exacerbating the risk of claims . . . from past use of the product." "Wood Memo" at 1909, 1919
and 1924 (Exh. E).

In April 1977, Grace revisited the issue of a vermiculite warning in connection with the
drafting of a material safety data sheet for Grace" vermiculite products. Grace officials met to
develop a "sales view point" on the MSDS in order to edit language "to take into account
potential adverse impact on the business." It was decided that the MSDS requirement could be
avoided for ZAI because it was a consumer product. **However, the Grace officials
acknowledged that normal handling given the vermiculite concentration could create an
airborne fiber level in excess of the OSHA standards.** (See Exh. T, attached C to April 7,
1977 proposal). The issue of whether to set forth the weight percent of asbestos in Grace's
vermiculite products was also addressed. In comments delivered at a April 8, 1977 meeting,

Grace's General Counsel, Mario Favorito recognized the misleading nature of a weight percent figure for asbestos in vermiculite:

> I understand that the reason for warning to indicate the percent by weight of Tremolite is to give the recipient the indication that he is not getting a product containing commercial asbestos…I think that this could be construed as an invitation for the recipient to believe that because of the percent from Tremolite asbestos content is low, that the amount of Tremolite asbestos fiber released in handling the product can be assumed to be less than that prescribed by the asbestos standard. **As you know, respirable Tremolite asbestos fibers are light and countless number may be present even though the percent by weight is low.** Accordingly, I must recommend that such a statement be deleted. OSHA standard 1910.101 regulates asbestos fiber concentrations and that should be the recipient's concerns.

(Exh. T, emphasis added.)

In the 1970s, Grace documented the dangerous level of airborne asbestos that resulted from pouring attic insulation and seriously considered discontinuing the production and sale of vermiculite products due to these hazards. "Wood Memo" at 1917 (Exh. E), Memo from Brown to Locke (March 11, 1976) (Exh. U). Nevertheless, Grace continued to sell Zonolite Attic Insulation until 1984, without warning consumers about the asbestos and the cancer hazard associated with this product. As clearly noted in its exhaustive 1977 analysis, Grace's decision not to provide such an asbestos warning was motivated by its concern that warnings would increase the risk of claims, and thus reduce the profitability of Zonolite Attic Insulation. "Wood Memo" at 1921 (Exh. E) and Junker Deposition at 84 (October 23, 1991) (Exh. V).

In 1985, one year after Grace discontinued the production and sale of Zonolite Attic Insulation, Grace performed a risk assessment of workers exposed to asbestos from vermiculite products nationwide and estimated that 30,000 lung cancers would result from such exposures. Walsh Memo (November 1, 1985) (Exh. W). The lethal effect of exposure to this asbestos compound was unequivocally known to Grace as a result of its own health data on its workers and its own product testing data. Although armed with sufficient knowledge of the asbestos hazard from Zonolite Attic Insulation as early as the 1960s, Grace did not issue an asbestos

warning to consumers then, or at any subsequent point from 1960 until today, as it acquired more and more compelling information identifying this hazard. Instead, the company decided to forego asbestos warnings and take their chances in defending themselves against lawsuits brought by persons injured by this product.

**B.      The Presence of Grace's Zonolite Attic Insulation Provides for Risk of Expose to Homeowners and Others to Asbestos.**

The disturbance of readily airborne asbestos as a result of home maintenance, repair, and remodeling carries with it the risk of exposure. This risk is amplified because of the widespread use of Zonolite Asbestos Insulation and because routine homeowner renovation is so prevalent. Nationwide thousands of homes with Zonolite Attic Insulation undergo renovation each year.

These facts recently compelled the U.S. Environmental Protection Agency ("EPA"), to issue an advisory describing the vermiculite attic insulation problem and the precautionary steps for a homeowner to take. The advisory first describes the problem as follows:

> If disturbed, asbestos fibers in vermiculite insulation may get into the air. These fibers can be inhaled and become trapped in the lungs where they may cause diseases such as asbestosis, lung cancer, and mesothelioma. These diseases can develop many years after exposure to asbestos.

Asbestos in Vermiculite Insulation, U.S. EPA Office of Pollution Prevention and Toxics at 1 (December 29, 2000) (Exh. X).[2]

The EPA advisory details the considerable precautionary procedures to be instituted if disturbance of the insulation does occur, including the use of accredited asbestos removal professionals to perform product identification, risk assessment, product removal and contamination "clearance" testing - skills and tasks well beyond the know-how of a layperson class member. For example, the advisory recommends:

> If you are planning to remodel or replace vermiculite insulation, have it tested first.
>
> •      EPA recommends using a trained and accredited professional to conduct the tests. If you decide to remove the vermiculite home insulation, use accredited, licensed asbestos

---

[2] This description of the health risk is confirmed by the expert opinion of Dr. Henry A. Anderson, a medical doctor/ epidemiologist with two decades of experience with asbestos research. *See* Affidavit of Henry A. Anderson, M.D. (July 20, 2000), ¶ 7 (Exhibit 25).

removal professionals.  Use of a "negative pressure enclosure" technique will prevent fibers  and dust from escaping from the attic into the rest of the home.  Do not attempt to do this yourself.  You could spread asbestos fibers throughout your home, putting you and your family at risk of inhaling asbestos fibers.

•  After the vermiculite insulation is removed, you may want to consider having air monitoring tests done in your attic and throughout the living areas of your home.  This is to ensure that the concentration of asbestos fibers in the home  is low or not present.

Id. at 2-3 (emphasis in original)[3]

Amplifying these risks further, is the fact that Grace concealed knowledge from the homeowners that ZAI contained a toxic substance – asbestos.  Even though Grace marketed Zonolite Attic Insulation as a "do-it-yourself" home improvement product without warnings, the assessment, remediation and control of the hazard is absolutely not a "do-it-yourself" endeavor, and can only be safely and effectively accomplished by adequately informed professional asbestos abatement personnel.[4]

Three central liability issues—the risks of Zonolite Attic Insulation, the necessity to avoid disturbance, and the need for professional assistance to address the problem—are confirmed by a review of Grace's own documents, the asbestos abatement literature and specific field testing performed by professional environmental consultants in this litigation.

Scientific testing simulating home maintenance, repair and remodeling recently performed by both Materials Analytical Services and Fulcrum Environmental Consulting,

---

[3] These procedures are consistent with recognized practices to prevent hazardous exposures to asbestos in schools and other buildings.  See "Guidance for Controlling Asbestos-Containing Materials in Buildings," U.S. EPA (1985) (known as the "Purple Book") ("However, when ACM [asbestos-containing material] is damaged or disturbed - for example, by maintenance or repairs conducted without proper controls - asbestos fibers are released.  These fibers can create a potential hazard for building occupants.") (Exhibit 26); "Managing Asbestos in Place," U.S. EPA (1990) (known as the "Green Book") (["A]sbestos materials can become hazardous when, due to damage, disturbance, or deterioration over time, they release fibers into building air.  Under these conditions, when ACM is damaged or disturbed - for example, by maintenance repairs conducted without proper controls - elevated airborne asbestos concentrations can create a potential hazard for workers and other building occupants.  As this guide will explain in some detail, in-place management does not mean "do nothing."  It means having a program to ensure that the day-to-day management of the building is carried out in a manner that minimizes release of asbestos fibers into the air . . . .") (Exhibit 27) Affidavit of Donald J. Hurst (May 25, 2000), President of Fulcrum Environmental Consulting at 1 21-24 (identifying the need for safety precautions to minimize exposure and stressing need for use of specifically trained professionals) (Exhibit 28).

[4] Asbestos in Vermiculite Insulation, US EPA Office of Pollution Prevention and Toxics at 3 (December 29, 2000) (Exhibit 24 at 3).  Other similar public health advisories were issued by EPA Region I, Region X, and the Centers for Disease Control ("CDC"), Agency for Toxic Substances Disease Registry (ASTDR").  See also Exhibits 29, 30, and 31.

environmental consultants in this litigation,[5] demonstrate dangerous levels of airborne asbestos during routine household remodeling. Testing in the Spokane, Washington home of Susan and Rand Hatch demonstrated that the demolition of walls, drilling of holes in a ceiling, shoveling and vacuuming of attic insulation, emptying the vacuumed material into bags, and the sweeping of the dust resulted in airborne asbestos levels ranging from .31 to 5.6 fibers per cubic centimeter ("f/cc") when analyzed by phase contrast microscopy. (Exh. Y). In addition, dust found on horizontal surfaces in the vicinity of the renovation was found to contain actinolite-tremolite asbestos. Id.

Similarly, in the Spokane, Washington home owned by Marco Barbanti, it was determined that simply scooping the vermiculite using a tin dust pan and pouring it into a bag resulted in airborne asbestos concentrations ranging from 6.96 to 12.48 structures per cubic centimeter ("str/cc"). See Affidavit of Richard Hatfield (July 18, 2000) at N 16 (Exh. Z). The dust below the vermiculite contained approximately 47 million structures per square foot of asbestos. Id.

These measurements exceed current Occupational Safety and Health Administration ("OSHA") and Environmental Protection Agency ("EPA") standards and are clearly unsafe for homeowners and their families. See Affs. of Anderson at ¶ 7 (Exh. F), Hatfield at ¶ 19-21 (Exh. Z). See also EPA Report to Congress of Asbestos-Containing Materials in Public Buildings (February 1988) at p. 5. (Exh. H) and OSHA Fed. Reg., Vol. 59, No. 153 (August 10 1994) at p. 40978 (Exh. AA). The OSHA permissible exposure limit has continued to be reduced over the years, and is currently 0.1 fibers per cubic centimeter ("f/cc"). OSHA has stated that it expects worker exposure at this level will result in significant risk (1994 OSHA Reg. 59 CFR at 40967). Further, the OSHA regulation prohibits workers from being exposed to airborne asbestos concentrations exceeding 1.0 f/cc for a period exceeding 30 minutes. (Exh. AA). The EPA clearance level of 0.01 f/cc represents the airborne asbestos concentration below which a public building can be reoccupied following removal of asbestos. This standard involves aggressive testing in which dust on all surfaces is made airborne using a leaf blower. EPA Final Rule and Notice on Asbestos-Containing Materials in Schools, 52 Fed. Reg. 41856 (Oct.30,1987) (Exh. BB). The design of EPA clearance testing recognizes settled dust can be

---

[5] Mr. Hurst is a certified environmental consultant and the President of Fulcrum Environmental Consulting, Inc.; Mr. Hatfield is a certified environmental consultant and the Senior Asbestos Consultant at Materials Analytical

resuspended and cause an exposure hazard and recognizes the hazards associated with asbestos dust on surfaces.

In addition, Grace's own historical testing also has shown that use or disturbance of its finished vermiculite-based products results in dangerously high airborne concentrations of asbestos. In 1976, Grace conducted testing of its vermiculite attic fill insulation and determined that "attic fill tested in excess of the 5 fibre level generally and in excess of the 10 fibre ceiling in some instances." Grace concluded that "this necessitates a binder development program or other remedy."[6] Also in 1976, Grace conducted simulated testing involving the pouring of Zonolite Attic Insulation and analyzed the air samples by a transmission electron microscope. All ten samples analyzed exceeded 4.5 f/cc. Memo to Hamilton (July 11, 1977) (Exh. CC). In March 1980, Grace conducted additional testing of its Zonolite Attic Insulation and found that use of this product resulted in fiber levels of 0.971-2.597 f/cc, Letter from Wood to Ray (April 1, 1980) (Exh. DD). Grace's Construction Products Division concluded internally that these results were of concern. Memo to McCord from Eaton (March 25, 1980) (Exh. EE).

All of the measurements of asbestos released from Zonolite Attic Insulation described above, both contemporary and historical, field testing and laboratory testing, show that disturbance of Zonolite Attic Insulation presents a significant risk of exposure and property damage.

## C.    Without Effective Notice, Homeowners Are Ignorant of the Risk of Exposure to a Toxic Substance from Disturbing the Zonolite Attic Insulation Product.

Grace's Zonolite Attic Insulation was sold to homeowners as a "do-it-yourself product. Remarkably, in product literature and on its Zonolite bags, Grace affirmatively represented to homeowners that Zonolite Attic Insulation "pours easily and cleanly," does not require "mask gloves or special equipment," and "[c]ontains no harmful chemicals." Zonolite brochure and bag (Exh. FF). Further, Grace depicted in its literature and on its bags a person pouring the material without any safety precautions whatsoever, including no mention of respiratory protection, noting the material was "non-irritating to the lungs," and an appropriate activity for "family fun."

---

Services.

[6] A "binder" program refers to the asbestos dust control concept of binding the asbestos fibers together to the product so the fibers cannot so easily be separated from the product and cause exposures.

(Exh. GG).[7]  See also, Zonolite advertisement (November 1960) and brochure (1950) and other undated advertisements (Exh. GG). Grace has never corrected this dangerously misleading information,[8] nor has Grace warned homeowners that Zonolite Attic Insulation contains asbestos. As a result of Grace's failure to warn and affirmative misstatements of fact, many thousands of homeowners remain ignorant of the dangers to which they and their families may be exposed.

John Holbrook's experience illustrates this point. John Holbrook and his family have over the years engaged in typical homeowner renovation activities, and use their attic area for storage. Because the Holbrooks were not advised or warned that Zonolite Attic Insulation contained asbestos, they conducted their work and accessed their attic storage area without taking important safety precautions. Aff. of John Holbrook (July 21, 2000) (Exh. HH). Now the Holbrooks face an uncertain future risk to their health, are uncertain what home repairs they can or cannot make, and are concerned that living spaces in the home are contaminated. The circumstances of the Holbrook family illustrates that routine homeowner renovation activities taking place in homes threaten public health and safety.

In addition to the demonstration of anecdotal information documenting lack of homeowner knowledge as to the Zonolite Attic Insulation problem and how to deal with it, plaintiffs' counsel commissioned a statistical marketing research survey in the state of Washington to assess the level of homeowner awareness or lack thereof of the problem. The survey, which was admitted into evidence in the Barbanti hearing, was conducted by a professional marketing consultant and determined that approximately 90 percent of homeowners

---

[7]  With Grace's Zonolite Attic Insulation, an examination of construction records, such as Grace's product literature, would not disclose the presence of asbestos, Further, a visual inspection of the insulation (without specific knowledge of the physical characteristics of Zonolite Attic Insulation) would not disclose the presence of asbestos since asbestos fibers are invisible to the naked eye.

[8]  This misinformation and deceit continues and is compounded by Grace's ongoing public statements. For example, Grace's web site encourages homeowners to feel safe when working with and around Zonolite attic insulation:

Grace took steps to remove fibrous tremolite from the vermiculite used in Zonolite© Attic Insulation . . .

•       Asbestos fibers in the attic space during installation were at a level well below what was then considered a permissible lifetime occupation exposure.

•       Air sampling indicated no asbestos fibers were detected in the attic within six hours after installation.

Based on these results, Grace concluded that no unreasonable risk of injury was posed to a homeowner installer. http://www.grace.com/html/llbby/libby.html.

surveyed were not aware of the problem or how to deal with it.[9] Needless to say, one cannot take appropriate safety precautions or hire properly trained safety personnel (as the EPA recommends) if one is unaware of the presence of Zonolite Attic Insulation in the home or its risks.

## LEGAL ANALYSIS

## I. ALLOWING GRACE TO FILE INDIVIDUAL PROOFS OF CLAIMS IS PROCEDURALLY AND CONSTITUTIONALLY IMPERMISSIBLE.

### A. Grace's Strategic Co-opting of Creditor's Rights to Define and File Their Claims is Not Permitted by the Bankruptcy Code.

Grace purports to file proofs of dischargable claims in the name of creditors of Grace's selection, despite those creditors have ample time within which to timely file claims on their own behalf, and indeed, the Court having rejected Grace's proposal to establish a bar date for such claims.

Having done so, Grace then demands that the creditor selected by Grace be charged with the responsibility and burdens of investigating and litigating in their own name, but functionally on behalf of millions of creditors nationwide, a single issue of Grace's creation, without regard for the actual state laws governing those creditors claims or the range of liability issues potentially determinative of those claims. Such a process is not authorized by the bankruptcy code and offends basic notions of due process.

11 U.S.C. 501(c) grants creditors the right to file a proof of claim. The exceptional power of a debtor to file a proof of claim on behalf of a creditor is narrowly proscribed in 11 U.S.C. sec 501(c): "If a creditor does not timely file a proof of such creditor's claim, the debtor or the trustee may file a proof of such claim."

The express language of subsection 501(c) of the Code manifests the legislatures intent to limit a debtor's right to file a proof of claim to situations where the creditor has failed to timely exercise his own substance right afforded under 11 U.S.C. § 501 and the debtor desires to protect himself from claims that are not themselves dischargable or arguably not dischargable in

---

[9] Washington State Survey Summary Report (October 2000) at 6 (Exhibit 49). It should be noted that Washington homeowners have been exposed to more media coverage of the problem than other markets due to the presence of Grace vermiculite expanding plants in the state and the occurrence of an extensive series of articles in the Seattle Post Intelligencer. The *Intelligencer* has played a lead role nationally in coverage of the Grace vermiculite issue. Thus, there is every reason to expect that homeowner awareness of the problem will be greater in Washington State than around the country.

bankruptcy. "The purpose of this subsection is mainly to protect the debtor if the creditor's claim is nondischargable. See Notes of the Committee on the Judiciary, Senate Report No. 95-989, see also, In re Ginger, 48 B.R. 1000 (D.C. 1985). Thus, where section 501 was employed to file a dischargable claim for strategic reasons, that claim was disallowed as inconsistent with the legislative objectives of sec 501(c).

In the present case, Grace seeks to abuse the bankruptcy process by strategically segregating out for litigation dischargable claims of its own choosing. Moreover, in the case of two creditors, by slight of comment contained in their filing, purport to isolate two Court appointed class representatives from the class of creditors to whom they owe duties to represent. This strategic effort is violative of 501(c) and the statute's intent. Not surprisingly, this is without precedent. This Court should decline Grace's invitation to assume the risks of rewriting the Code by striking Grace's proofs of claim[10].

## B.    Debtor's Suggested Procedure Raises Practical and Due Process Issues.

Aside from cutting against the statutory purpose the Bankruptcy Act, Debtor's proposal raises numerous practical and constitutional concerns that the Court would be forced to address. Plaintiffs' costs and attorneys fees for this proposed hearing will likely be extensive and will certainly far outstrip any recovery for the individual. At the same time, debtor has spent hundreds of thousands of dollars from the estate on attorneys' fees and experts to prepare for just such a hearing. There is simply no possible way that an individual Plaintiff can burden the cost of such a hearing and neither the Court nor the Debtor has proposed an equitable solution to this dilemma. Allowing the Debtor to force these individuals to bear such a burden, raises substantial Substantive and Procedural Due Process issues that would have to be addressed before any hearing could be commenced.

---

[10] The Code, itself, does not designate the time period for timely filing proofs of claim. Rather, "The Rules of Bankruptcy Procedure will set the time limits, the form, and the procedures for filing, which will determine whether claims are timely or tardily filed." H.R. Rep. No 595, 95th Cong., 1st Sess,. 351 (1977); S. Rep No. 989 95th Cong., 2d Session., 61 (1978), in In re Tucker, 174 B.R. 732 (N.D.Ill. 1994). Under the Rules Enabling Act, however, "Such rules shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. The Rules, therefore, and their interpretation, cannot enlarge the rights of the debtor or abridge the right of the creditor, as embodies in section 501 and as intended by Congress. Some bankruptcy courts have construed Rule 3004 as affording the debtor the power to file a proof of claim any time after the first meeting of creditors. This reading of Rule 3004 is not compatible with the legislative intend underlying Section 501, abridges the rights of creditors, and enlarges the rights of the debtor in violation of Rules Enabling Act. That this is the case is most obvious, as here, where the enlarged right is further abused to achieve private strategic aims outside the intent of Section 501(c).

Moreover, the Debtor's proposal will likely raise a host of other issues for the Court to address. For example, Debtor has filed a proof of claim for Marco Barbanti as an individual. However, Mr. Barbanti is the class representative for a duly certified class in Washington State. A previously certified class constitutes a single claimant. In re Trebol Motors Distribution Corp., 220 B.R. 500, 503 (1st Cir. 1998). Here Debtor seeks to break apart that class by naming the representative individually. This is clearly impermissible. As Claimants have maintained throughout this proceeding, they would be willing to file a class proof of claim for the Washington class and proceed on a class basis to try debtor's liabilities. However, Debtor simply cannot remove Mr. Barbanti from the class on its own accord.

It is clear that Grace's proposed order is premature under the Bankruptcy Act and raises a quagmire of procedural and constitutional issues the Court would have to address before even hearing evidence on Debtor's liabilities. Finally, Debtor's proposal is simply in equitable and unjust when it has spent hundreds of thousands of dollars to litigate this action and there is not a foreseeable recovery for Claimants. For these reasons, the Court should strike Debtor's Proofs of Claims and deny the Debtor's proposed order.

## II.    THE "ISSUE" CREATED BY GRACE FOR LITIGATION FAILS TO ADDRESS GRACE'S ACTUAL LIABILITIES TO ZONOLITE CLAIMANTS.

Grace seeks to summarily avoid responsibility and evade liability for its decades of concealment of asbestos contamination in its Zonolite attic insulation by seeking resolution of only a single issue, whether Zonolite "poses an unreasonable risk of harm to present occupants of homes" containing ZAI. This quasi-personal injury formulation simply misstates the issues and the state of the law. Not surprisingly, the debtor has chosen the most rigorous standard for liability concerning Zonolite Attic Insulation, i.e., whether it is "unreasonably dangerous." The debtor ignores the fact that there are numerous other grounds for liability that are more easily met and equally applicable to the situation. For example, the consumer expectation test followed by California and other states looks to a consumer's reasonable expectations. ZAI claims are not quasi-personal injury claims.

The ZAI claims in the bankruptcy court focus on Claimants' *property damages* caused by ZAI and Grace's years of cover-up. There is no question that ZAI is dangerous to individuals who are exposed to it. Individuals who have ZAI in their homes in order to avoid these risks

must, for example, refrain from use of their attics, refrain from remodeling their homes, keep extra care that their children do not disturb the material, and take extraordinary precaution if they must disturb the ZAI. All of this, of course assumes that the homeowner even knows that he has ZAI in his home and knows of its dangers. These are all damages to the Claimant's property interest and Grace is liable for each. In addition the mere presence of asbestos in attic dust sharply diminishes the market value of these homes, and causes homeowners to incur the added expense of compliance with industrial hygiene standards and procedures each time a contractor is hired. Finally, homes with ZAI contamination in unsealed attics increase the risk of asbestos contaminated dust leaking into other living areas.

Grace's potential liability is much broader than whether there is an unreasonable risk to the claimants. Adopting a narrow issue will do little to determine debtor's liability. For this hearing to be of use to the Court and the estate, the Court must address each applicable test to properly determine the general merit behind the claims and potential claims. Zonolite claims arise, in general, from the Grace's affirmative, continuing decision to conceal asbestos contamination in Zonolite from consumers and homeowners this misconduct raises multiple mainstream claims for liability and multiple possible remedies, including:

### Common Zonolite Claims

- Negligence for failure to warn about its asbestos content and the propensity of the product to release asbestos and cause property damage and exposure;
- Strict liability product defect claims under <u>five applicable</u> product defect tests used across the country (not only unreasonably dangerous);
- Strict liability for failure to warn;
- Breach of express and implied warranties;
- Violation of consumer protection acts; and
- Fraudulent concealment.

### Potential Zonolite Remedies

- Warnings to homeowners of the presence of asbestos-contaminated Zonolite in their homes so they can protect themselves and their children;
- Property damage awards to compensate for the costs of cleaning up asbestos contamination within the contaminated homes (often contaminated by innocent homeowners

following demolition and remodeling activities performed without knowledge of asbestos containment needs and protocols);

•       Property damage awards to compensate for diminution of value relating to disclosure of the presence of the easily disturbed loose asbestos in the attics and/or walls;

•       Equitable relief in the form of an asbestos notification, education and remediation program; and/or

•       Restitution.

        The Court could ultimately avoid trial of Zonolite claims under the laws of all states if it chooses to certify a class of Zonolite claimants and then apply the laws of a single jurisdiction under applicable choice of law rules. However, under Grace's current proposal to conduct initial bellwether issue trials, the proceeding can only be meaningful if it includes trial of threshold issues common to and representative of the typical claims brought regardless of jurisdiction. (Cf. Opening Memorandum of Points and Authorities In Support of Zonolite Plaintiffs' Motion for [Bankruptcy] Class Certification (filed on or about November 15, 2002) Section II(D)(1), p. 38 [urging application of a single state's laws – that of Montana, Delaware or Maryland—to the claims of all class members]).

        Attached as Exhibit II is the plaintiffs' list of nineteen proposed threshold/bellwether issues Zonolite that would have to be tried in order for any such hearing or trial to be helpful to a determination of Grace's potential liabilities.

## A.   Negligence

        In every American jurisdiction, the legal standards with respect to negligence are essentially the same. All American jurisdictions require a plaintiff to demonstrate the same four elements to establish a cause of action for negligence: duty, breach, causation and damages. As MDL Transferee Judge Spiegel concluded in Telectronics: "[A]ll states use the same elements to define a cause of action in negligence." In re Telectronics Pacing Systems Inc., MDL 1057, 172 F.R.D. 271, 291 (S.D. Ohio 1997). After considering the same question in Copley, MDL Transferee Judge Brimmer concluded: "the standard for ordinary negligence does not significantly differ throughout the country, and the differences that do exist can be remedied through careful instructions to the jury." In re Copley Pharm., Inc., MDL 1013, 158 F.R.D. 485, 491 (D. Wyo. 1994) ("Copley I"). Plaintiffs will establish Grace's negligence in the sale and marketing of its asbestos contaminated insulation and its ongoing efforts to conceal asbestos hazards from the class.

**B.    Breach of Express Warranty Law**

Virtually all states nationwide recognize liability for breach of express warranty for the sale or lease of the defective products, whether the breach occurred in the context of a Uniform Commercial Code ("U.C.C." or "the Code") sale of goods or not. Zonolite claims are particularly well-suited to breach of warranty claims since the debtor expressly warranted it to be safe and to require no precautions when handling it. See Exhs. FF and GG.

With respect to the express warranties created by Defendants' advertising, it has long been held as a matter of warranty law that promises or representations in manufacturers' advertisements and brochures may serve as the basis of express warranties. See Greenman v. Yuba Power Prods., 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (Cal. 1963). California and all of the other potentially concerned states explicitly acknowledge that representations made in such advertising rise to the level of express warranties. In short, "when a manufacturer engages in advertising in order to bring his goods and their quality to the attention of the public and thus to create a consumer demand, the representations made constitute an express warranty running directly to a buyer who purchases in reliance thereon." Gherna v. Ford Motor Co., 246 Cal. App.2d 639, 652, 55 Cal. Rptr. 94, 103 (Cal. Ct. App. 1st Dist. 1966). See also Fundin v. Chicago Pneumatic Tool Co., 152 Cal. App.3d 951, 957, 199 Cal. Rptr. 789, 753-54 (Cal. Ct. App. 4th Dist. 1984).

**C.    Uniformity of Implied Warranty Law**

Claims for breach of implied merchantability may be adjudicated under Section 2-314(a) of the U.C.C., uniformly enacted in virtually all American jurisdictions. It requires that goods sold by a merchant seller be "merchantable." According to section 2-314(2)(c), for goods to be "merchantable" they must be "fit for the ordinary purposes for which such goods are used." As noted above, fit for "ordinary purposes" is a common sense proposition. Plaintiffs assert that loose-fill asbestos contamination that contaminates a home with potentially hazardous asbestos is not fit for the "ordinary purposes" for which it is intended.

**D.    Violation of Consumer Protection Statutes**

All jurisdictions have adopted statutes prohibiting unfair and deceptive practices. These statutes have common sources (generally modeled after Section Five of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting

commerce, and unfair or deceptive acts or practices in or affecting commerce are hereby declared unlawful."), and/or related models developed by the FTC and the Commissioners on Uniform State Laws) and contain provisions commonly prohibiting the type of conduct specifically at issue in this action. All states' statutes have provisions that can be categorized into two main groups: (1) statutes that generally prohibit any unfair and deceptive practices, and not limiting claims to specific practices; and (2) statutes that enumerate a "laundry list" of specific prohibited practices. Several states incorporate both types of provisions. Whether as a general prohibition, or as a "laundry list" of specific violations, all states' statutes prohibit Defendant's conduct here, such as "representing that goods have characteristics, uses, benefits, or qualities that they do not have, or that goods are of a particular standard, quality, or grade if they are of another."

## E. Unreasonably Dangerous is Only One of Five Tests Across the Country for Product Defect.

There are five (not one) basic formulations under the laws of the fifty states and the District of Columbia for establishing strict liability for the sale of a defective product: (1) whether the product fails to meet the reasonable expectations of the ordinary consumer;[11] (2) whether the product is unreasonably dangerous;[12] (3) whether the product is unreasonably dangerous, taking into consideration the product's utility and its risk of failure;[13] (4) whether the product is not fit for the ordinary purposes or its intended use;[14] and (5) whether an ordinarily

---

[11] Many states look to a consumer's reasonable expectations in evaluating product defect and that test may be particularly damning in the case of Zonolite since the debtor's own documents acknowledge that asbestos warnings were expected to reduce sales and provide claims and, as a result, the debtor consciously elected to conceal the asbestos hazards from consumers. See e.g. Barker v. Lull Engineering Co., 20 Cal. 3d 413, 422-7, 143 Cal. Rptr. 225, 231-234 (1978); Fluor Corp. v. Jeppesen & Co., 170 Cal. App.3d 468, 476, 216 Cal. Rptr. 68 (Cal. Ct. App. 2d Dist. 1985); Bohnstedt v. Robscon Leasing L.L.C., 933 P.2d 135, 136 (Ct. Civ. App. Okla. 1999); Gann v. International Harvester Co. of Canada, Ltd., 712 S.W.2d 100, 103-05 (Tenn. 1986); Tweedy v. Wright Ford Sales, Inc., 357 N.E.2d 449, 451-52 (Ill. 1976). See Exhibit B for multistate chart on the five product defect tests.

[12] Only a small group of states which consider whether a product is unreasonably dangerous. See Mallard v. Hoffinger Indus., Inc., 2564 N.W.2d 74, 76 (Mich. App. 1997); LcMaster v. Glock, Inc., 610 So.2d 1336, 1337 (Fla. App. 1992); Gowler v. Ferrell-Ross Co., 563 N.E.3d 773, 777 (Ill. App. 1990); Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 377 (Mo. 1986).

[13] A few states apply the risk-utility test. See Barker v. Lull Engineering Co., 20 Cal. 3d 413, 422-7, 143 Cal. Rptr. 225, 231-234 (1978); Fluor Corp. v. Jeppesen & Co., 170 Cal. App.3d 468, 476, 216 Cal. Rptr. 68 (Cal. Ct. App. 2d Dist. 1985); Dean v. Toyota Industrial Equipment Mfg., Inc., 540 S.E.2d 233, 236-37 (Ga. 2000); Guillory v. International Harvester Co., Inc., 745 So.2d 733 (La. App. 1999); Sperry-New Holland, A Division of Sperry Corp. v. Prestage, 617 So.2d 248, 253 (Miss. 1993); Stanley v. Schiavi Mobile Homes, Inc., 462 A.2d 1144, 1148 (Me. 1983).

[14] A few states ask whether a product is not fit for the ordinary purpose or its intended use. See Flemister v. General Motors Corp., 723 So.2d 25, 27-28 (Ala. 1998) (vehicular crashworthiness). This is likewise the test for breach of implied warranty, in all states.

18

prudent company manufacturing the product, being fully aware of the product risk, would not have put the product on the market.[15] See Ronald W. Eades, Jury Instructions On Products Liability (3d ed.), Group 5: Design Defect Liability (1999).

Notably, the debtor also fails to articulate any context for its single-issue trial of whether Zonolite is unreasonably dangerous and this failure is significant. Plaintiffs contend that warnings are critically important to permit homeowners to lessen and manage the risks, especially homeowners planning to disturb the materials while remodeling as well as homeowners with children and guests who would otherwise play with and around the material.

Zonolite plaintiffs have previously alleged that persons nationwide need and deserve to be warned that the product contains asbestos so that persons could take appropriate precautions, which, if taken, would avoid needless exposures and prevent serious future illnesses and deaths and thereby likely make the product much less dangerous. These concerns are supported by the EPA. See Exh. X. Unfortunately, the debtor's proposal fails entirely to account for the thousands or hundreds of thousands or millions or people living with the asbestos contaminated Zonolite (the very people who most need to be warned in order to avoid unreasonably dangerous situations).

## F.    Most States Also Recognize Strict Liability for Failure to Warn

An alternate theory of product defect liability recognized in most jurisdictions is strict liability for failure to warn, a theory particularly suitable to the facts of this case where Grace consciously disregarded internal recommendations to warn of the product's asbestos content and failed to take such action in order to increase sales and profits. See Exhs. E, S, T, and U. Forty-four jurisdictions permit plaintiffs to show that the failure to warn of product risks renders a product defective and/or unreasonably dangerous for purposes of establishing liability:

> [I]t is apparently recognized in all the jurisdictions which have
> adopted the doctrine of strict liability in tort, that the doctrine
> applies even though the product is faultlessly manufactured and
> designed but is nevertheless dangerous or likely to cause harm
> unless properly used. In such cases the doctrine is invoked, under

---

[15] The ordinarily prudent company test for design defects operates in several states including Kentucky, Tennessee, West Virginia, Minnesota, and Oregon. See Nichols v. Union Underwear Co., 602 S.W.2d 429 (Ky. 1980); Rutherford v. Polar Tank Trailer, Inc., 978 S.W.2d 102 (Tenn. Ct. App.1998); Adkins v. K-Mart Corp., 51 S.E.2d 840 (W. Va. 1998); Trost v. Trek Bicycle Corp., 162 F.3d 1004 (8th Cir. 1998) (Applying Minnesota law.); McGathern v. Toyota Motor Corp., 985 P.2d 804 (Or. App. 1999).

> appropriate circumstances, if there is a failure to warn or instruct as
> to possible danger, with many of the courts which have adopted the
> Restatement language of the doctrine stating that the particular
> product is in a 'defective condition unreasonably dangerous,' by
> virtue of the absence of adequate warning or instruction.

53 A.L.R.3d 239, <u>Failure to Warn As Basis of Liability Under Doctrine of Strict Liability in</u>
<u>Tort</u>, § 2[a] (1999); <u>See also</u>, <u>Restatement (Second) of Torts</u>, § 402A, Comment J ("In order to
prevent the product from being unreasonably dangerous, the seller may be required to give
directions or warning.") This test is particularly suitable to Zonolite given the existence of
simple measures that would dramatically reduce risk. (E.g., A warning could say: WARNING
ZONOLITE CONTAINS ASBESTOS. Disturbance may release asbestos fibers into the air and
result in exposure to asbestos and contamination of your home. Exposure to asbestos may be
minimized by preventing disturbance of the insulation and the dust from the insulation. If
disturbance of the insulation or dust from the insulation cannot be avoided, persons in the
vicinity of any disturbance should take precautions to avoid breathing this dust, including the use
of proper respiratory protection.

   Virtually all strict liability jurisdictions apply a knowledge requirement to measure
whether a manufacturer or supplier may be found strictly liable for failing to warn of product
risks and, as a result, this raises the critical necessary trial issue of what did the debtor know and
when did it know it:

> [T]he courts for the most part, in jurisdictions generally espousing
> the doctrine of strict products liability (when a negligence theory is
> applied, there is no question that actual or constructive knowledge
> is an essential element), hold that liability based upon a failure to
> warn users of a product's inherently dangerous quality or
> characteristic may be imposed only where the manufacturer,
> distributor, or seller as the case may be, had actual or constructive
> knowledge of the dangerous quality or characteristic.

33 A.L.R.4th 368, Strict Products Liability: Liability for Failure to Warn as Dependant on
Defendant's Knowledge of Danger, § 2 (1981-1988); (Appendix 3). As a result, the strict
liability failure to warn doctrine highlights a powerful similarity among the predicate liability
requirements (common also to negligence and warranty claims) and endorses the need to address
the knowledge and warnings issue in any attempt to dispose early of threshold Zonolite claims.

Negligence, warranty and strict liability claims tend to merge in the failure to warn context due to a uniform focus on what the defendant knew or should have known about the product risks:

> Warning claims, however, from a practical standpoint, tend to be treated the same way by the courts, regardless of the underlying cause of action. Thus with regard to different theories of recovery, and particularly strict liability and negligence, judges have opined that there is 'no practical difference,' no doctrinal distinction;' no 'rigid distinctions,' a 'strong resemblance' between the different products liability theories, or that any distinction is 'illusory.' Other courts have held that regardless of the underlying theory, warning claims are 'equivalent' 'indistinguishable,' virtually inextricable,' 'identical,' 'essentially the same,' and are generally measured by the same standards.'

2 Louis R. Frumer & Melvin L. Freidman, Products Liability § 12.02[1], pp. 12-22 - 12-24 (1998) (citations omitted); accord, 53 A.L.R.3d 239, supra; see also, Smith v. E R Squibb & Sons, Inc., 273 N.W.2d 476, 479 (Mich. 1979) ("Determination of whether a product defect exists because of an inadequate warning requires the use of an identical standard. Consequently, when liability turns of the adequacy of a warning, the issue is one of reasonable care, regardless of whether the theory pled is negligence, implied warranty or strict liability in tort.").

## G.    Uniformity of Unjust Enrichment/Restitution Law

The unjust enrichment cause of action is uniformly recognized throughout the states. It is a universally accepted legal principle that "[a] person who is unjustly enriched at the expense of another is liable in restitution to the other." Restatement (Third) of Restitution & Unjust Enrichment § 1. As was observed decades ago in Pink v. Title Guarantee & Trust Co., 8 N.E.2d 321 (N.Y. 1937), "Independent of any statute, form of action, or legal nomenclature, the obligation to do justice rests upon all persons, natural or artificial, and the law will compel restitution from a person who obtains money or property from another fraudulently, unjustly, or without authority." Id. at 323.

> The law of unjust enrichment requires an individual to make restitution if he or she is unjustly enriched at the expense of another. . . . A person is enriched if the person receives a benefit at another's expense. . . . The person receiving the benefit is required to make restitution only if the circumstances are such that as between two individuals, it is unjust for the person to retain it. . . .

> A [defendant] with knowledge of the circumstances giving rise to
> an unjust enrichment may be obligated to make restitution.

First Nationwide Sav. v. Perry, 11 Cal. App.4th 1657, 1662-63, 15 Cal. Rptr.2d 173, 176 (Cal. App. 6 Dist. 1992). Stated simply, the elements for a claim of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." Lectrodryer v. Seoulbank, 77 Cal. App.4th 723, 726, 91 Cal. Rptr.2d 881, 883 (Cal. App. 2 Dist. 2000). See also Barber v. SMH (US), Inc., 509 N.W.2d 791, 796 (Mich. App. 1994). "The scope of the remedy for unjust enrichment is broad, centering attention… on the prevention of injustice." University of Colorado Foundation, Inc. v. American Cyanamid, 974 F. Supp. 1339, 1354 (D. Colo. 1998), rev'd in part on other grounds, 196 F.3d 1366 (Fed. Cir. 1999); see generally Restatement of the Law of Restitution §§ 1, 40, 41 (1937); Palmer, Law of Restitution § 1.1 (1978).

Under the restitution theory, the measure of recovery is the value of the benefit that it would be unjust for the defendant to retain. See generally Restatement of Restitution § 1 (1937). On this point of appropriate recovery, the Restatement elaborates:

> [T]he measure of restitution is determined with reference to the
> tortiousness of defendant's conduct or the negligence of other fault
> of one or both of the parties in creating the situation giving rise to
> the right of restitution. If the defendant was tortuous in his
> acquisition of the benefit he is required to pay for what the other
> has lost although that is more than the recipient benefited.

Restatement of Restitution, Introductory Note, Topic 2, §§ 150-59 (1937), accord, D. Dobbs, Handbook of the Law of Remedies: Damages-Equity-Restitution 623-24 (1973).

Here, the measure of unjust enrichment is common, and the appropriate recovery is restitution and recovery of the amount Plaintiffs overpaid for the product purchased. This amount is the difference in value between the product as purchased in its concealed defective condition and the value that the product would have had if the contamination had not been concealed prior to its sale. In re Cardizem CD Antitrust Litigation, 105 F. Supp.2d 618, 668-71 (E.D. Mich. 2000) (under law of California, Michigan and several other jurisdictions, amount which plaintiffs overpaid for product may be recovered in restitution action as representing the benefit that it would be unjust for defendants to retain).

## H.    Fraudulent Concealment

All 51 jurisdictions recognize the tort of nondisclosure and/or fraudulent concealment. See Restatement (Second) of Torts, §§ 551, 550 (1977) (Fraud by Nondisclosure and Fraudulent Concealment, respectively, or standards similar thereto). The attached charts visually demonstrate the substantial similarity and essential uniformity of the laws of the 51 jurisdictions on the fraud claims. Indeed, the only noteworthy nuances among these laws are the three alternative predicates creating a duty to disclose: superior knowledge, partial disclosure, and/or fraudulent concealment. All jurisdictions recognize at least one of these predicates. Most jurisdictions recognize two or all of these as alternative bases for establishing duty.

This nuance is immaterial as a matter of fact here, because all three duty predicates are alleged by the plaintiffs in this action. Here, plaintiffs allege that the Grade defendants knew, but concealed from the public, that asbestos contamination of Zonolite Attic Insulation posed significant hazards to class members. Plaintiffs allege further that Grace knowingly concealed the presence of asbestos from all class members by affirmatively concealing and suppressing the fact of contamination, allegations which suffice to create a duty to disclose under the laws of all jurisdictions, regardless of which predicate triggers the duty to disclose.

### CONCLUSION

Grace's Proofs of Claims are inconsistent with the Bankruptcy Act and the Bankruptcy Rules. Moreover they raise serious Constitutional issues by forcing individual litigants to bear the expense of litigating a "science trial" without the protection of a class to defer the expense. For these reasons the Court should strike the Proofs of Claims. Grace also misstates the issues that would have to be adjudicated in order for the "science trial" to be of any value to the Court. As Zonolite Claimants have consistently maintained the proper procedural device would be to lift stay and allow the trials to go forward in their present jurisdictions or to remove the cases and consolidate the actions in this Court. For these reasons Claimants' request that the Court deny Grace's Order Setting Initial Scheduling for Litigation Concerning Alleged Zonolite Attic Insulation Product Risk.

Dated: May 10th, 2002.

Respectfully submitted,

By: _____
Burke D. Jackowich

Burke D. Jackowich
LUKINS & ANNIS, P.S.
717 W. Sprague, Suite 1600
Spokane, WA 99201
Telephone: (509) 455-9555
Facsimile: (509) 747-2323


William D. Sullivan
ELZUFON, AUSTIN, REARDON,
TARLOV & MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899
Telephone: (302) 428-3181
Facsimile: (302) 428-3180



Elizabeth J. Cabraser
Fabrice N. Vincent
John Low-Beer
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Thomas M. Sobol
Matthew L. Tuccillo
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
214 Union Wharf
Boston, MA 02109-1216
Telephone: (617) 720-5000
Facsimile: (617) 720-5015

Edward J. Westbrook
Robert M. Turkewitz
NESS MOTLEY LOADHOLT
RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

Allan M. McGarvey
MCGARVEY, HEBERLING,
SULLIVAN & MCGARVEY, P.C.
745 South Main
Kalispell, MT 59904
Telephone: (406) 752-5566
Facsimile: (406) 752-7124

Attorneys for Zonolite Claimants