# EXHIBIT AA



federal register

Wednesday
August 10, 1994

Part II

Department of Labor

Occupational Safety and Health
Administration

29 CFR Parts 1910, et al.
Occupational Exposure to Asbestos; Final
Rule

PLAINTIFF'S
EXHIBIT
34
mDL 1396

EXHIBIT
27
Emergency Notice



8-10-94
Vol. 59    No. 153

# federal register

Wednesday
August 10, 1994

NOW AVAILABLE ONLINE!
Subscribe Now ... Only $375 Per Year
See Page II for Details.

United States
Government
Printing Office

SUPERINTENDENT
OF DOCUMENTS
Washington, DC 20402

OFFICIAL BUSINESS
Penalty for private use, $300

SECOND CLASS NEWSPAPER

Postage and Fees Paid
U.S. Government Printing Office
(ISSN 0097-6326)

PLAINTIFF'S
EXHIBIT
851

## Modification

Alternatives or modifications to listed control methods are allowed when the employer demonstrates that such a "modification" still provides equivalent worker protection. OSHA does not intend that changes in a control method which decrease the safety margin of a material or omitting a procedure be permitted by calling it a "modification." A "modification" means a changed or altered procedure, material which replaces a procedure, material or component of a procedure. For example, a new test proven successful in detecting leaks might be substituted for required "smoke tests." Omission of a procedure or component, or a reduction in the stringency or strength of a material or component is not considered a "modification" under this section.

## Presumed Asbestos-Containing Material (PACM)

In all three standards, "presumed asbestos containing material," "PACM" means thermal system insulation and sprayed on and/or troweled or otherwise applied surfacing material in buildings constructed no later than 1980. OSHA has found that these materials are "high risk" if asbestos-containing. OSHA bases this on the record, including the HEI Report which states that "thermal system insulation and surface treatments (fireproofing, acoustical and decorative finishes) stand out in importance for their potential for fiber release and subsequent exposure to [building] occupants" (Ex. 1–344, p. 4–5). Although these materials may have been installed in small quantities after 1980, OSHA finds that their installation is unlikely after that date.

## Project Designer

OSHA has adopted a definition like that of EPA for a "Project Designer"— a person who has successfully completed the training requirements for an abatement project designer established by 40 USC 763.90(g).

## Removal

"Removal" means all operations where ACM and/or PACM is removed from a building component, regardless of the reason for the removal. It includes those maintenance, repair, renovation and demolition activities where ACM and/or PACM removal is incidental to the primary reason for the project, as well as where removal of ACM and/or PACM is the primary reason for the project. Removal should be distinguished from "disturbance" which includes "cutting away" a small amount of ACM or PACM.

## Regulated Area

"Regulated area" is included in all three standards. All three, like the 1986 standards, require the establishment of such an area where the employer believes that the PEL will be exceeded. Now, the construction and shipyard employment standards add that such area must be established also where Class I, II and III activities will take place, regardless of exposure levels. Also, the specific actions required of the employer to demarcate a regulated area are deleted from the definition, and are placed in the appropriate prescriptive paragraph, in this case paragraph (e)(6).

## (3) Permissible Exposure Limits

Paragraph (c) General Industry, Construction and Shipyard Standards.

In all three standards, the eight hour time-weighted average permissible exposure limit is changed from an eight hour time weighted average (TWA) of 0.2 f/cc to a TWA of 0.1 f/cc in the revised final rules. As noted in the 1990 proposal and in the preamble discussion above, OSHA's decision to reduce the PEL across the board responds to the Court's directive to consider whether to establish operation-specific exposure limits, since the Court noted that on the record of the 1986 standards, it appeared feasible to reduce the PEL to 0.1 f/cc limit in many industry sectors. OSHA has rejected "operation-specific" PELs for the wide variety of operations that expose employees to asbestos. OSHA proposed and these final standards adopt required operation-specific work practices, in addition to an across-the-board PEL reduction to 0.1 f/cc. OSHA expects that the risk reduction accomplished by this two-pronged approach will be at least as great as would operation-specific PELs. First, the required controls are found to be capable of achieving maximum exposure reduction on an operation-by-operation basis. Second, since OSHA has found that specific work practices are feasible, the Agency expects a higher compliance rate and thus, greater risk reduction than if practices were not specified. Third, in operations where particular controls are specified, the PEL is a backstop; alerting employers where additional controls are needed or closer surveillance is required; in all operations the PEL is a measurable and comparable value, which cannot be exceeded without further action by the employer to reduce exposures.

At the time of the proposal in 1990, the question of whether the proposed PEL reduction would reduce a still significant risk had already been given a tentative answer by the Court. The

D.C. Circuit Court of Appeals, in remanding the issue of lowering the PEL to the Agency, noted that based on the 1984 risk assessment, the excess risk stemming from average exposures of 0.1 f/cc "could well be found significant." BCTD v. Brock, 838 F.2nd at 1265. (55 FR at 29714).

In the proposal, OSHA stated that it believes "that compliance with a proposed amendments to reduce the PEL to 0.1 f/cc as a time-weighted average measured over 8 hours would further reduce a significant health risk which exists after imposing a 0.2 f/cc PEL." (55 FR 29714, July 20, 1990). OSHA's 1984 risk assessment showed that lowering the TWA PEL from 2 f/cc to 0.2 f/cc reduced the asbestos cancer mortality risk from lifetime exposure from 64 to 6.7 deaths per 1,000 workers. OSHA estimated that the incidence of asbestosis would be 5 cases per 1,000 workers exposed for a working lifetime under the TWA PEL of 0.2 f/cc. Counterpart risk figures for 20 years of exposure are excess cancer risks of 4.5 per 1,000 workers and an estimated asbestosis incidence of 2 cases per 1,000 workers.

OSHA's risk assessment also showed that reducing exposure to 0.1 f/cc would further reduce, but not eliminate, significant risk. The excess cancer risk at that level would be reduced to a lifetime risk of 3.4 per 1,000 workers and a 20 year exposure risk of 2.3 per 1,000 workers. Consequently significant risk would be reduced substantially. However, OSHA concluded therefore that continued exposure to asbestos at the TWA permitted level and action level would still present residual risks to employees which are significant.

The Court did not ask and OSHA did not undertake to review its earlier risk assessment in the proposal. At the hearing in January, 1991, Mr. Martonik, spokesperson for OSHA was asked by Mr. Hardy, representing the Safe Building Alliance (SBA), if OSHA was planning to update the earlier risk assessment as part of this proceeding. Mr. Hardy stated that "a number of parties have suggested to OSHA that its risk assessment from 1984, as relied on in the 1986 final rule, is outdated" (Tr. 30). Mr. Martonik responded that "we have to consider all information we receive and determine relevance in this rulemaking after the record is closed." (Ibid).

Other parties questioned OSHA's continuing reliance on the 1984 risk assessment. The Asbestos Information Association (AIANA) testified that "OSHA's 1984 risk assessment fails to take into account the scientific community's consensus that chrysotile

# EXHIBIT  BB

NO. 9942 P. 2

Friday
October 30, 1987





## Part III

# Environmental Protection Agency

**40 CFR Part 763**
Asbestos-Containing Materials in Schools;
Final Rule and Notice





PLAINTIFF'S
EXHIBIT
BOB

527

**41826**   Federal Register / Vol. 52. No. 210 / Friday. October 30. 1987 / Rules and Regulations

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 763**

**[OPTS-42048E; FRL-3269-8]**

**Asbestos-Containing Materials in Schools**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is issuing a final rule under section 203 of Title II of the Toxic Substances Control Act (TSCA). 15 U.S.C. 2643. to require all local education agencies (LEAs) to identify asbestos-containing materials (ACM) in their school buildings and take appropriate actions to control release of asbestos fibers. The LEAs are required to describe their activities in management plans, which must be made available to all concerned persons and submitted to State Governors. This final rule requires LEAs to use specially-trained persons to conduct inspections for asbestos. develop the management plans. and design or conduct major actions to control asbestos. Exclusions are provided for LEAs which have previously conducted inspections and for LEAs subject to any state requirement at least as stringent as the comparable requirement in this final rule.

**DATES:** In accordance with 40 CFR 23.5. this rule shall be promulgated for purposes of judicial review at 1 p.m. Eastern Standard Time on November 13. 1987. This rule shall be effective on December 14. 1987. The incorporation by reference in the rule is approved by the Director of the Federal Register as of December 14. 1987.

**FOR FURTHER INFORMATION CONTACT:** Edward A. Klein. Director. TSCA Assistance Office (TS-799). Office of Toxic Substances. Environmental Protection Agency. Rm. E-543. 401 M St., SW. Washington. DC 20460. Telephone: (202) 554-1404).

**SUPPLEMENTARY INFORMATION:**

I. Background

*A Description of the Enabling Legislation*

On October 22. 1986. President Reagan signed into law the Asbestos Hazard Emergency Response Act (AHERA) which enacted, among other provisions. Title II of the Toxic Substances Control Act (TSCA) 15 U.S.C. sections 2641 through 2654. Section 203 of Title II, 15 U.S.C. 2643. requires EPA to propose rules by April 20 1987 (180 days after enactment). and

to promulgate final rules by October 17. 1987 (360 days after enactment). regarding: (1) The inspection of all public and private school buildings for ACM: (2) the identification of circumstances requiring response actions: (3) description of the appropriate response actions: (4) the implementation of response actions: (5) the establishment of a reinspection and periodic surveillance program for ACM: (6) the establishment of an operations and maintenance program for friable ACM: (7) the preparation and implementation of asbestos management plans by LEAs and the submission of the management plans to State Governors. who may review the plans and approve or disapprove them: and (8) the transportation and disposal of waste ACM from schools. This final rule implements the Title II requirements to issue the section 203 rules (except for transportation and disposal. as discussed further below).

Section 206 of TSCA Title II. 15 U.S.C. 2646. also requires EPA to issue by April 20. 1987. a final model accreditation plan for persons who inspect for asbestos. develop management plans. and design or conduct response actions. States are required to adopt an accreditation program at least as stringent as the EPA model within 180 days after the beginning of their next legislative session. Accreditation of laboratories which analyze asbestos bulk samples and asbestos air samples is also required by TSCA Title II. The National Bureau of Standards (NBS). U.S. Department of Commerce. is required to establish the bulk sampling accreditation program by October 17. 1987. and the air sampling accreditation program by October 12. 1988.

States were required to notify LEAs by October 17. 1987. regarding where to submit management plans. LEAs must submit those plans to their State no later than October 12. 1988. The plans must include the results of school building inspections and a description of all response actions planned. completed. or in progress. After receiving a management plan. States are allowed 90 days to disapprove the plan. If the plan is disapproved. the State must provide a written explanation of the disapproval and the LEA must revise the plan within 30 days to conform with the State's suggested changes. The 30-day period can be extended to 90 days by the State. LEAs are required to begin implementation of their management plans by July 9. 1989. and to complete implementation in a timely fashion.

Transport and disposal rules under TSCA section 203(h) have not yet been proposed. In accordance with TSCA

section 204(f). therefore. LEAs shall provide for transportation and disposal of asbestos in accordance with the most recent version of EPA's "Asbestos Waste Management Guidance." Applicable provisions of that document are included as Appendix D of this rule Regulations governing transport of asbestos-containing waste. including school waste already regulated by the National Emission Standard for Hazardous Air Pollutants (NESHAP) [40 CFR Part 61. Subpart M] under the Clean Air Act [42 U.S.C. section 7401. et seq.]. were promulgated by the Department of Transportation (DOT) [49 CFR Part. 173 Subpart J]. The NESHAP and DOT rules must be followed. according to the "Asbestos Waste Management Guidance." These rules will be sufficient to ensure the proper loading and unloading of vehicles and to ensure the physical integrity of containers.

Section 203(i) requires Department of Defense schools to carry out asbestos identification. inspection and management activities in a manner comparable to the manner in which an LEA is required to carry out such activities. EPA interprets the language of this section which states that such activities shall be carried out "to the extent feasible and consistent with the national security" as recognition that existing agreements with foreign governments may make it difficult to carry out certain provisions of this regulation.

Since this rule has been signed by the EPA Administrator by October 17. 1987. the rule has been promulgated within the statutory time frame required by section 203 of TSCA Title II. In accordance with 40 CFR 23.5. however. solely for purposes of judicial review deadlines under section 19 of TSCA Title I. the rule is considered to be promulgated at 1 p.m. eastern time. 14 days after publication in the Federal Register. Thus. the period in which petitions for review of this rule may be filed under section 19 commences 14 days after publication.

*B. Previous EPA Asbestos Activities*

EPA has undertaken a variety of technical assistance and regulatory activities designed to control ACMs in buildings and minimize inhalation of asbestos fibers.

1. *Technical Assistance Program.* Since 1979. EPA staff have assisted schools and other building owners in identifying and controlling ACM in their buildings. Through a cooperative agreement with the American Association of Retired Persons (AARP). EPA has hired architects. engineers. and

(b) The inspector shall classify and give reasons in the written assessment for classifying the ACBM and suspected ACBM assumed to be ACM in the school building into one of the following categories:

(1) Damaged or significantly damaged thermal system insulation ACM.

(2) Damaged friable surfacing ACM.

(3) Significantly damaged friable surfacing ACM.

(4) Damaged or significantly damaged friable miscellaneous ACM.

(5) ACBM with potential for damage.

(6) ACBM with potential for significant damage.

(7) Any remaining friable ACBM or friable suspected ACBM.

(c) Assessment may include the following considerations:

(1) Location and the amount of the material, both in total quantity and as a percentage of the functional space.

(2) Condition of the material, specifying:

(i) Type of damage or significant damage (e.g., flaking, blistering, water damage, or other signs of physical damage).

(ii) Severity of damage (e.g., major flaking, severely torn jackets, as opposed to occasional flaking, minor tears to jackets).

(iii) Extent or spread of damage over large areas or large percentages of the homogeneous area.

(3) Whether the material is accessible.

(4) The material's potential for disturbance.

(5) Known or suspected causes of damage or significant damage (e.g., air erosion, vandalism, vibration, water).

(6) Preventive measures which might eliminate the reasonable likelihood of undamaged ACM from becoming significantly damaged.

(d) The local education agency shall select a person accredited to develop management plans to review the results of each inspection, reinspection, and assessment for the school building and to conduct any other necessary activities in order to recommend in writing to the local education agency appropriate response actions. The accredited person shall sign and date the recommendation, provide his or her State of accreditation, and, if applicable, provide his or her accreditation number, and submit a copy of the recommendation to the person designated under § 763.84 for inclusion in the management plan.

§ 763.90 Response actions.

(a) The local education agency shall select and implement in a timely manner the appropriate response actions in this section consistent with the assessment conducted in § 763.88. The response actions selected shall be sufficient to protect human health and the environment. The local education agency may then select, from the response actions which protect human health and the environment, that action which is the least burdensome method. Nothing in this section shall be construed to prohibit removal of ACBM from a school building at any time, should removal be the preferred response action of the local education agency.

(b) If damaged or significantly damaged thermal system insulation ACM is present in a building, the local education agency shall:

(1) At least repair the damaged area.

(2) Remove the damaged material if it is not feasible, due to technological factors, to repair the damage.

(3) Maintain all thermal-system insulation ACM and its covering in an intact state and undamaged condition.

(c)(1) If damaged friable surfacing ACM or damaged friable miscellaneous ACM is present in a building, the local education agency shall select from among the following response actions: encapsulation, enclosure, removal, or repair of the damaged material.

(2) In selecting the response action from among those which meet the definitional standards in § 763.83, the local education agency shall determine which of these response actions protects human health and the environment. For purposes of determining which of these response actions are the least burdensome, the local education agency may then consider local circumstances, including occupancy and use patterns within the school building, and its economic concerns, including short- and long-term costs.

(d) If significantly damaged friable surfacing ACM or significantly damaged friable miscellaneous ACM is present in a building the local education agency shall:

(1) Immediately isolate the functional space and restrict access, unless isolation is not necessary to protect human health and the environment.

(2) Remove the material in the functional space or, depending upon whether enclosure or encapsulation would be sufficient to protect human health and the environment, enclose or encapsulate.

(e) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for damage is present in a building, the local education agency shall at least implement an operations and maintenance (O&M) program, as described under § 763.91.

(f) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for significant damage is present in a building, the local education agency shall:

(1) Implement an O&M program, as described under § 763.91.

(2) Institute preventive measures appropriate to eliminate the reasonable likelihood that the ACM or its covering will become significantly damaged, deteriorated, or delaminated.

(3) Remove the material as soon as possible if appropriate preventive measures cannot be effectively implemented, or unless other response actions are determined to protect human health and the environment. Immediately isolate the area and restrict access if necessary to avoid an imminent and substantial endangerment to human health or the environment.

(g) Response actions including removal, encapsulation, enclosure, or repair, other than small-scale, short-duration repairs, shall be designed and conducted by persons accredited to design and conduct response actions.

(h) The requirements of this Subpart E in no way supersede the worker protection and work practice requirements under 29 CFR 1926.58 (Occupational Safety and Health Administration (OSHA) asbestos worker protection standards for construction), 40 CFR Part 763, Subpart G (EPA asbestos worker protection standards for public employees), and 40 CFR Part 61, Subpart M (National Emission Standards for Hazardous Air Pollutants—Asbestos).

(i) Completion of response actions. (1) At the conclusion of any action to remove, encapsulate, or enclose ACBM or material assumed to be ACBM, a person designated by the local education agency shall visually inspect each functional space where such action was conducted to determine whether the action has been properly completed.

(2)(i) A person designated by the local education agency shall collect air samples using aggressive sampling as described in Appendix A to this Subpart E to monitor air for clearance after each removal, encapsulation, and enclosure project involving ACBM, except for projects that are of small-scale, short-duration.

(ii) Local education agencies shall have air samples collected under this section analyzed for asbestos using laboratories accredited by the National Bureau of Standards to conduct such analysis using transmission electron microscopy (TEM) or, under circumstances permitted in this section,

552

laboratories enrolled in the American Industrial Hygiene Association Proficiency Analytical Testing Program for phase contrast microscopy (PCM).

(iii) Until the National Bureau of Standards TEM laboratory accreditation program is operational, local educational agencies shall use laboratories that use the protocol described in Appendix A to Subpart E of this part.

(3) Except as provided in paragraphs (i) (4), (5), (6), or (7) of this section, an action to remove, encapsulate, or enclose ACBM shall be considered complete when the average concentration of asbestos of five air samples collected within the affected functional space and analyzed by the TEM method in Appendix A of this Subpart E, is not statistically significantly different, as determined by the Z-test calculation found in Appendix A of this Subpart E, from the average asbestos concentration of five air samples collected at the same time outside the affected functional space and analyzed in the same manner, and the average asbestos concentration of the three field blanks described in Appendix A of this Subpart E is below the filter background level, as defined in Appendix A of this Subpart E, of 70 structures per square millimeter (70 s/mm²).

(4) An action may also be considered complete if the volume of air drawn for each of the five samples collected within the affected functional space is equal to or greater than 1,199 L of air for a 25 mm filter or equal to or greater than 2,799 L of air for a 37 mm filter, and the average concentration of asbestos as analyzed by the TEM method in Appendix A of this Subpart E, for the five air samples does not exceed the filter background level, as defined in Appendix A, of 70 structures per square millimeter (70 s/mm²). If the average concentration of asbestos of the five air samples within the affected functional space exceeds 70 s/mm², or if the volume of air in each of the samples is less than 1,199 L of air for a 25 mm filter or less than 2,799 L of air for a 37 mm filter, the action shall be considered complete only when the requirements of paragraph (i) (3), (5), (6), or (7) of this section are met.

(5) At any time, a local education agency may analyze air monitoring samples collected for clearance purposes by phase contrast microscopy (PCM) to confirm completion of removal, encapsulation, or enclosure of ACBM that is greater than small-scale, short-duration and less than or equal to 160 square feet or 260 linear feet. The action shall be considered complete when the results of samples collected in the

affected functional space and analyzed by phase contrast microscopy using the National Institute for Occupational Safety and Health (NIOSH) Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 2rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit of quantitation for PCM (0.01 fibers per cubic centimeter (0.01 f/cm³) of air). The method is available at the Office of the Federal Register Information Center, 11th and L St., NW., Room 8401, Washington, DC. 20408, and the EPA OPTS Reading Room, Rm. C004 Northeast Mall, 401 M St., SW., Washington, DC. 20460. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. The method is incorporated as it exists on the effective date of this rule, and a notice of any change to the method will be published in the Federal Register.

(6) Until October 7, 1989, a local education agency may analyze air monitoring samples collected for clearance purposes to confirm completion of removal, encapsulation, or enclosure of ACBM that is less than or equal to 3,000 square feet or 1,000 linear feet. The action shall be considered complete when the results of samples collected in the affected functional space and analyzed by PCM using the NIOSH Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit quantitation for PCM (0.01 fibers per cubic centimeter, 0.01 f/cm³). The method is available at the Office of the Federal Register, 11th and L St., NW., Room 8301, Washington, DC. 20408, and in the EPA OPTS Reading Room, Rm. C004 Northeast Mall, 401 M St., SW., Washington, DC. 20460. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. The method is incorporated as it exists on the effective date of this rule and a notice of any change to the method will be published in the Federal Register.

(7) From October 8, 1989, to October 7, 1990, a local education agency may analyze air monitoring samples collected for clearance purposes by PCM to confirm completion of removal, encapsulation, or enclosure of ACBM that is less than or equal to 1,500 square feet or 500 linear feet. The action shall be considered complete when the results of samples collected in the affected

functional space and analyzed by PCM using the NIOSH Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit of quantitation for PCM (0.01 fibers per cubic centimeter, 0.01 f/cm³). The method is available at the Office of the Federal Register, 11th and L St., NW., Room 8301, Washington, DC. 20408, and in the EPA OPTS Reading Room, Rm. C004 Northeast Mall, 401 M St., SW., Washington, DC. 20460. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. The method is incorporated as it exists on the effective date of this rule and a notice of any change to the method will be published in the Federal Register.

(8) To determine the amount of ACBM affected under paragraphs (i) (5), (6), and (7) of this section, the local education agency shall add the total square or linear footage of ACBM within the containment barriers used to isolate the functional space for the action to remove, encapsulate, or enclose the ACBM. Contiguous portions of material subject to such action conducted concurrently or at approximately the same time within the same school building shall not be separated to qualify under paragraphs (i) (5), (6), or (7) of this section.

§ 763.91  Operations and maintenance.

(a) Applicability. The local education agency shall implement an operations, maintenance, and repair (O&M) program under this section whenever any friable ACBM is present or assumed to be present in a building that it leases, owns, or otherwise uses as a school building. Any material identified as nonfriable ACBM or nonfriable assumed ACBM must be treated as friable ACBM for purposes of this section when the material is about to become friable as a result of activities performed in the school building.

(b) Worker protection. The protection provided by EPA at 40 CFR 763.121 for worker protection during asbestos abatement projects is extended to employees of local education agencies who perform operations, maintenance, and repair (O&M) activities involving ACM and who are not covered by the OSHA asbestos construction standard at 29 CFR 1926.58 or an asbestos worker approved by OSHA under section 19 of the Occupational Safety and Health Act. Local education agencies may consult

553

# EXHIBIT CC

EX 183.183

REQUEST FOR TECHNICAL SERVICE

CONFIDENTIAL

NUMBER:          67562   762701
GROUP:           ZONOLITE
ACTUAL COST:     $220.00
REPORTING DATE:  July 11, 1976

SUMMARY:

Ten samples were received from Weedsport, New York, and evaluated by standard methods. All ten samples exceeded 4.5 fibers per cc of air.

> "All ten samples exceeded 4.5 fibers per cc of air."

> "SIMULATED ATTIC FILL TESTS"

---

CONSTRUCTION
PRODUCTS
DIVISION

PAGE 1

BRANCH:        67562
GROUP:         Zonolite 762700
RVEN:          7/11/77
OBJECT NO.:    71-046
REQUESTOR:     F.W. Eaton
MARKETING or REPORTING DEPT/DIV
PHASE: T.E. Hamilton
APPROVED: J.E. Hamilton (W)

PROBLEM TITLE:    Environmental Evaluation – Air – Fibrous Materials

SIGNIFICANCE:     The evaluation of workplace air on a periodic basis is
                  necessary to comply with the air sampling section of the
                  OSHA Asbestos Standard.

SPECIFIC OBJECTIVE:   Determine fiber counts for filter media.

SUGGESTED APPROACH:   Phase contrast microscopy.

DEADLINE (last day information will be of value): 2 weeks

DETAILS OF PROBLEM:   Evaluate 10 sim. attic test samples from
                      Weedsport

ACCEPTED BY RESEARCH DEPT.: M. Doyle          DATE:
ASSIGNED TO: M. Doyle
ADDITIONAL COPIES: Original; to Library: M.C. Duecker, H.A.Eschenbach,
                   E. Wood, J. Webber, B.M.T.
                   CPD-MA, File: 71-046

CONFIDENTIAL

---

GRACE

SIMULATED ATTIC FILL TESTS
Screened 25 ± 3P 43
AIR SAMPLING RECORD SHEET

PLANT LOCATION: Weedsport
CONTAINMENT: Attic
SAMPLING BY: F.W. Eaton
DATE: 1/6/77 - 2/15/77

SAMPLING CONDITIONS:
OUTSIDE: Exc. 70°f Shower's
INSIDE DRAFT:
VISIBLE DUST:

HOUSEKEEPING:

| Sample Number | Employee Name | Job Location and Description | Pump Number On/Off | Pump Time On/Off | Sampling Time | Flow Rate | Total Sampled Volume | Lab Evalue |
|---|---|---|---|---|---|---|---|---|
| 8M52-951 DUPE | | Pauma Attic | 166-4 | | 16 | 16 | | 5.09 |
| 8M52-952 | | | 166-7 | | 16 | 16 | | 4.81 |

SAMPLING CONDITIONS:
20-40f Above Base
Very Little Dust. Screened
to Screened DET.

PLAINTIFF'S EXHIBIT 33

EXHIBIT 28

CONSTRUCTION

PRODUCTS

DIVISION

<table>
<tr><td>ORDER:</td><td>01901</td></tr>
<tr><td>GROUP:</td><td>Zonolite 762700</td></tr>
<tr><td>DATE:</td><td>7/11/77</td></tr>
<tr><td>CHARGE NO.:</td><td>71-046</td></tr>
<tr><td>REQUESTOR:</td><td>F.W. Eaton</td></tr>
</table>

MARKETING or MANUFACTURING APPROVAL

NAME: T.E. Hamilton

APPROVED: *T. E. Hamilton*

PAGE 1

REQUEST FOR TECHNICAL SERVICE

PROBLEM TITLE: Environmental Evaluation - Air - Fibrous Materials

SIGNIFICANCE: The evaluation of workplace air on a periodic basis is necessary to comply with the air sampling section of the OSHA Asbestos Standard.

SPECIFIC OBJECTIVE: Determine fiber counts for filter media.

SUGGESTED APPROACH: Phase contrast microscopy.

DEADLINE (Last day information will be of value): 2 weeks

DETAILS OF PROBLEM: Evaluate 10 sim. attic test samples from Weedsport

EXHIBIT
183.183

ACCEPTED BY RESEARCH DEPT.: _____ DATE: 7/11/77

ASSIGNED TO: M. Doyle

ADDITIONAL COPIES: Original to Library, H.C.Duecker, H.A.Eschenbach, F.W.Eaton, R.M.Vini, E.S.Wood, J.W.Wolter, B.R.Williams, W.R.Hanlon, CPD-T&A, File: 71-046

CONFIDENTIAL

15083050  72-51

REQUEST FOR TECHNICAL SERVICE

CONFIDENTIAL

| NUMBER: | 67567  762701 |
| GROUP: | ZONOLITE |
| ACTUAL COST: | $220.00 |
| REPORTING DATE: | July 11, 1976 |

SUMMARY:

Ten samples were received from Weedsport, New York, and evaluated by standard methods.  All ten samples exceeded 4.5 fibers per cc of air.

RELEVENT PRIOR TECHNICAL SERVICE:

CONCLUSIONS:

DATA AND ANALYSIS:

See attachment.

*Maureen A. Doyle*

M. A. Doyle

MAD:mlr

attachment

72-
52

15083051

# GRACE

SCREENED 2 1 43

## AIR SAMPLING RECORD SHEET

PLANT LOCATION: WEEDSPORT
CONTAMINANT: FREE
SAMPLING BY: F.W. Farm
DATE: 7/7/72

SAMPLING CONDITIONS:
OUTSIDE _____
INSIDE DRAFT _____
VISIBLE DUST _____

HOUSEKEEPING: _____

| Sample Number | Employee Name | Job Location and Description | Remarks | Pump Number | Pump Off | Pump On | Sampling Time | Flow Rate | Total Sampled Volume | Lab Evaluation |
|---|---|---|---|---|---|---|---|---|---|---|
| MSC-1F3 Dune | | Blowing Attic | Remaining 10 Bags or | | | | 3 | 1.6 | | 11.22 |
| MSB-1F4 | | | TEST No. 10158 | | | | 8 | 1.0 | | 10.15 |
| | | | NOTE: MAN REHANG CAMP NEW | | | | | | | |
| | | | THIS TEST 10158-F6 MAT IN | | | | | | | |
| | | | CLEAN AS 10158 2hr CREW REMOVE | | | | | | | |
| | | | RAN INTO DIFFERENT GRR IS SHE | | | | | | | |
| | | | AS FURNACE OVERRUN (Man is up | | | | | | | |
| | | | HEAT ALONG TEST 10158 - | | | | | | | |
| | | | I.F. THIS IS A FACT IT seems | | | | | | | |
| | | | SIBLE NO IN REPORT thing MORE | | | | | | | |
| | | | TESTS 10158-F6 F6 feb-F3 3 f6 | | | | | | | |

Laboratory Evaluation By: _____
Date: _____

Additional Comments: _____

15083052

76270

GRACE

(1)

702703

## SIMULATED PH - MAG TESTS SCREENED 1 SY 43
## AIR SAMPLING RECORD SHEET

PLANT LOCATION __WEEDSPORT__
CONTAMINANT __FIBER__
SAMPLING BY __F. V. EATON__
DATE: __3/6/77 - 3/9/77__

SAMPLING CONDITIONS:
OUTSIDE __MID 70's SHOWERS__
INSIDE DRAFT
VISIBLE DUST

HOUSEKEEPING:

| Sample Number | Employee Name | Job Location and Description | Remarks | Pump Number | Pump Off | Pump On | Sampling Time | Flow Rate | Total Sampled Volume | Lab Evaluation |
|---|---|---|---|---|---|---|---|---|---|---|
| 1152-AF1 | DUME | POWERS AMC | 20-YCF PAPER BAGS | 1CG-4 | | | 16 | 1.6 | | 5.08 |
| 1152-AF2 | | | VERY LITTLE DUST SHOWERED TO SCREENED PCS | 1CG-7 | | | 16 | 1.6 | | 4.51 |
| 1154-AF1 | | | SAME AS 1BAG 2 | | | | 17 | 1.6 | | 4.18 |
| 1154-AF2 /IT | | | | | | | 17 | 1.6 | | 3.30 |
| 1156-AF1 | | | SAME AS 1BAG 2 EXCEPT | | | | 18 | 1.6 | | 9.50 |
| 1156-AF2 | | | NOT AS CLEAN | | | | 18 | 1.6 | | 6.17 |
| 1158-AF1 | | | 10-4CF PAPER BAGS | | | | 8 | 1.6 | | 11.22 |
| 1158-AF2 | | | REMAINING BAGS (W) SCREENED ON 1BAG2-HEAVY BASE 2 | | | | 8 | 1.6 | | 12.83 |

15083053

Additional Comments: (1) ALL CYCLONE FIRST SCREENED
(2) SCREENED OVER 14 MESH SCREEN
(3) CG-6 READ SHOWER 1CG-7 LEFT

Laboratory Evaluation By: _[signature]_   Date: 4/4/77

CONFIDENTIAL

# EXHIBIT DD

23931330

**GRACE**

Construction Products Division

Industrial Chemicals Group
W.R Grace & Co
62 Whittemore Avenue
Cambridge, Mass. 02140

(617) 876-1400

April 1, 1980

Mr. Dale Ray
Consumer Product Safety Commission
Economic Program Analysis Division
Room 656-B
Washington, D.C. 20207

Dear Mr. Ray:

This will confirm our conference call of March 12, 1980 in which we reviewed with you the results of testing performed by the Construction Products Division of W. R. Grace & Co to determine the extent of asbestiform tremolite fiber release associated with use of Grace vermiculite in consumer products. During our conversation, you requested that we set out the details of Grace's fiber exposure test methodology and test results and indicate the nature of Grace's fiber reduction efforts.

As you know, tremolite is a tramp mineral contaminant which is associated with vermiculite and which Grace has been attempting to reduce to the maximum extent feasible. Since 1970, Grace has invested over $15 million to extract worthless materials and contaminants and to reduce airborne fiber exposure in its vermiculite mining, milling and expanding operations. A substantial part of this investment was associated with the construction by Grace of a new vermiculite mill at its Libby, Montana mine which uses wet screening and other wet ore beneficiation processes designed to reduce the asbestiform tremolite contaminant associated with vermiculite.

Following startup of the new mill, in early 1975, Grace took further steps to reduce tremolite contamination by removing and disposing of selected fines which have a higher level of contamination, thereby reducing the level of contamination in its finished ore concentrate. Since that time, changes have been made in the exfoliation process equipment used at Grace's vermiculite expanding plants which

PLAINTIFF'S EXHIBIT 36 WRL 1371

PLAINTIFF'S EXHIBIT 9039.0

15103485

EXHIBIT 29 Emergency Notice

03631331

Mr. Dale Ray                    - 2 -                April 1, 1980

process Grace vermiculite ore for use in both consumer and industrial products. These changes provided for further screening, separation, and removal of both fines and the heavier unexpanded residual high density material following exfoliation both of which may contain a higher level of asbestiform tremolite contamination than the finished product. By use of bag houses and other dust filtration equipment, including an air elutriation step, additional reduction of the tremolite fiber contamination of expanded vermiculite end product is accomplished.

Grace has taken the further step of developing a binding agent for its Zonolite(R) Attic Insulation product and has recently started up equipment at all its expanding plants to apply this binder to Attic Insulation to further reduce dust and exposure to asbestiform fibers during the use of this product.

As a result of these reductions in asbestiform tremolite contamination, we believe that consumer products containing vermiculite and sold by Grace do not generate unreasonable risks for users. This has been verified by Grace's fiber exposure tests of consumer products containing expanded Grace vermiculite ore. All measurements were made by the NIOSH-approved technique as set forth in 40 CFR Section 1910.1001, paragraphs (e) and (f), utilizing the membrane filter method at 400-450 X (magnification) (4 millimeter objective) with phase contrast illumination. The results of these tests were as follows:

| Product | Fibers Detected |
|---|---|
| Terra-Lite(R) Vermiculite | None Detected |
| Redi-Earth(R) | None Detected |
| Lightweight Fertilizer (Scott's Turf Builder) | None Detected |
| Zonolite Attic Insulation | Some fibers detected during installation |

The actual test protocols and results of the tests are shown in Annex A to this letter. No tests were performed on Pool Cushion (R), a Grace product, which is used for protection of the base of vinyl-lined above-ground swimming pools since this use occurs out-of-doors and, typically, involves no more than 3 to 12 bags of vermiculite, depending on the size of the pool.

JKS31332

Mr. Dale Ray                    - 3 -                April 1, 1980

The only Grace product whose use resulted in a detectable fiber exposure was Attic Insulation and, then, at low levels only during installation. Tests indicate no residual fiber release following installation. Since this product is unlikely to be used more than two or three times during an entire lifetime and, then, only for exposure times which would not be expected to exceed two hours in any one case, the lifetime dosage is several orders of magnitude lower than any promulgated government standard applicable to tremolite fiber exposure.

Grace is continuing to exert its best efforts to further reduce the asbestiform tremolite contamination associated with its vermiculite products to the maximum extent feasible. For example, beginning in May of this year, a new rock and tremolite removal circuit should be operational at the Libby mill. This circuit is expected to reduce the level of tremolite contamination in fine size vermiculite ore by 50%. Additional research is underway to develop a similar circuit for reduction of tremolite contamination in the coarser sizes of vermiculite ore used for Zonolite Attic Insulation. One promising separation technique is slot screening which, if successful, could reduce tremolite contamination in the coarse ore concentrate by over 50%.

We are rapidly approaching a point of diminishing return since the amount of asbestiform tremolite contaminant in the vermiculite ore presently shipped to the exfoliating plants averages only 0.5% on a dry weight basis. For expanded vermiculite products, the level of contaminant is on average at or below the lowest level of reliable detectability, 0.2% on a dry weight basis. Accordingly, the 50% reduction Grace expects to achieve in the fine ores by May and, ultimately, the coarse ore sizes is a reduction from an already very low contaminant level. With this background, it is clear to us that the task of further reducing the remaining residual contamination in unexpanded ore and expanded vermiculite products will show a rapidly escalating cost in relation to the benefits derived.

J5103487

00631333

Mr. Dale Ray                    - 4 -                    April 1, 1980

        We trust that this information will be useful to you
in connection with the CPSC's evaluation of the asbestos
contamination issue.

                              Very truly yours,


                              E. S. Wood
                              Executive Vice President



Attachment

cc/ David C. Evans, Esq.


bcc/ B. A. Blessington
     F. W. Eaton
     R. M. Vining
     C. E. Brookes
     A. A. Eustis
     C. N. Graf
     O. M. Favorito

15103488

03C31334

USER EXPOSURE TO FIBROUS TREMOLITE
IN VERMICULITE CONSUMER PRODUCTS

TEST DATA

I.  TEST PROTOCOL

A.  Horticultural Products

    1.  Consumer Use of Terra-Lite(R) Vermiculite[a]

       (a) Mix and fill pots to simulate consumer preparation
of a mix of 50% peat moss and 50% Terra-Lite vermiculite by
scooping equal volumes of materials out of separate packages
and depositing on work surface. Hand mix to reasonable
uniformity and fill fifteen (15) 4" diameter flower pots in
15 minutes. Press down to firm up the soil to hold the plant.

    After 8 days the 15 pots were brought into the work
area where three separate procedures were performed. Fiber
counts were taken during each of these three procedures.
Five pots were used for each of the three procedures.

    (b) Knock Out and Disposal-- To simulate the consumer
who does not intend to reuse the soil. Invert the pot and
rap on the working surface so that the soil drops out.
Brush the mound of soil off the bench into a disposal
container. Take a paper towel and wipe inside of pot so
that is is clean for reuse and dispose of the paper towel.
In this procedure, contents of five pots will be disposed of
during the 15 minute test period.

    (c) Knock Out and Reuse for Potting Other Plants -
Simulate a consumer who will reuse the potting soil. Rap
pot on workbench by hand and break up the lump of soil to

15103489

make it similar to its original free-flowing condition.
Repeat this five times.  Combine all soil into one pile;
then proceed to refill pots by scooping the material back in
and tamping it down.  In this 15 minute test procedure, five
pots will be filled.

(d) Knock Out and Blend with New Potting Soil - Simulate
a consumer who will blend old with new potting soil.  Rap
pot on workbench by hand and break up the lump of soil to
make it similar to its original free-flowing condition.
Repeat procedure five times.  Obtain additional potting soil
to match the volume of the dried soil.  Place new soil on
top of the old soil and mix together by hand.  Use this mix
to fill pots.  During this 15 minute test procedure, 10 pots
are filled.

2.  Consumer Use of Redi-Earth(R) Potting Soil[b]

(a) Same procedure as 1 (a) except substitute premixed
Redi-earth for Terra-Lite Vermiculite as the soil medium.

(b) Same procedure as 1 (b).

(c) Same procedure as 1 (c).

(d) Same procedure as 1 (d).

B.  Consumer Use of Lightweight Fertilizer[c]

1.  General

A five building apartment complex was selected as the
test site.  With over 100,000 sq. ft. of grass area, the
site allowed air sampling while fertilizing over an extended
period of time.

- 2 -

JB031036

The tests were conducted with two people:  one filling the spreader hopper and fertilizing, and the other maintaining log sheets, time and pump calibrations.

2. Application of Lightweight Lawn Fertilizer

Two sampling pumps with filter cassettes located in the left and right breathing zones were worn by the applicator during the sampling/fertilizing period.  The applicator filled the spreader hopper to within 2" of the top and refilled when the hopper was approximately 3/4ths empty. Using a new Model 35 Scotts spreader with guide markers, the applicator spread thirteen (13) bags of lawn fertilizer at the normal coverage application rate (5000 ft$^2$/bag).

C. Consumer Installation of Vermiculite Attic Insulation[d]

1. General

Vermiculite Attic Insulation is generally purchased in quantities of 10 - 100 bags per home to "retrofit" or "add to" existing insulation in an existing home.  Seldom is vermiculite Attic Insulation installed in new construction. To determine consumer exposure to tremolite fibers, the following series of tests by home owners was intended to indicate actual exposures under a variety of conditions.

2. Area Engineering Samples

Engineering samples were taken as follows:

(a) Prior to installing vermiculite Attic Insulation, monitor attic space for 5 - 6 hours.

(b) Approximately two months after installing insulation, monitor attic space for 5 - 6 hours.

- 3 -

15103491

JEGG1337

3.  Pouring/Leveling Vermiculite Attic Insulation in a Home

   Each test home utilized 40 - 70 bags (3 cubic feet
each) of vermiculite Attic Insulation.  The installer was
monitored during the placement of insulation.

   Initially, place 15 - 20 bags in the attic.  The
installer poured all bags and leveled insulation with a
wooden hand screed or one with a handle to push insulation
back into roof eaves.  Additional bags were brought to the
attic in lots of 15 - 20 bags as required.


NOTES:

   (a) Terra-Lite vermiculite is composed of expanded #3
vermiculite ore from either Libby, Montana or Enoree, South
Carolina.

   (b) Redi-Earth is a potting soil consisting of a
mixture of 50% peat moss and 50% expanded #3 vermiculite ore
from either Libby, Montana or Enoree, South Carolina with
plant nutrients added.

   (c) Lightweight fertilizer utilizes expanded #4 vermicu-
lite ore from either Libby, Montana or Enoree, South Carolina.

   (d) Attic Insulation is composed of expanded #1 or #2
vermiculite ore available only from Libby, Montana.

   (e) Pool Cushion which was not tested utilizes expanded
#3 vermiculite ore from either Libby, Montana or Enoree,
South Carolina.

15103492

II. <u>RESULTS</u> (See note 1)

| | PERSONNEL AVE. EXPOSURE (f/cc) | | PERSONNEL TWA EXPOSURE (f/cc) | |
|---|---|---|---|---|
| | South Carolina | Montana | South Carolina | Montana |

A. <u>HORTICULTURAL PRODUCTS</u> (see Note 2)

| | | | | |
|---|---|---|---|---|
| 1. <u>Consumer Use of Terra-Lite Vermiculite</u> | | | | |
| (a) <u>Mix and Fill Pots</u> | <0.29 | <0.14 | <0.073 | <0.035 |
| (b) <u>Knock Out and Disposal</u> | <0.14 | <0.14 | <0.035 | <0.035 |
| (c) <u>Knock Out and Reuse</u> | <0.14 | <0.14 | <0.035 | <0.035 |
| (d) <u>Knock Out and Blend</u> | <0.14 | <0.14 | <0.035 | <0.035 |
| 2 <u>Consumer Use of Redi-Earth</u> | | | | |
| (a) <u>Mix and Fill Pots</u> | <0.29 | <0.14 | <0.073 | <0.035 |
| (b) <u>Knock Out and Disposal</u> | <0.14 | <0.14 | <0.035 | <0.035 |
| (c) <u>Knock Out and Reuse</u> | <0.14 | <0.14 | <0.035 | <0.035 |
| (d) <u>Knock Out and Blend</u> | <0.14 | <0.14 | <0.035 | <0.035 |

B. <u>LIGHTWEIGHT FERTILIZER</u>

| | | |
|---|---|---|
| 1. <u>Application of Lightweight Fertilizer With Montana derived vermiculite</u> | <0.03 | <0.008 |

C. <u>Home Installation of Vermiculite Attic Insulation</u>

1. <u>Engineering/Area Samples</u>

| Home | Type Home | No. Bags | Fiber Concentration (f/cc) Attic Before | After (see note 3) |
|---|---|---|---|---|
| F | Colonial | 55 | 0.03 (see note 4) | <0.01 |
| N | Cape | 30 | NO TEST | <0.01 |
| S | Ranch | 64 | <0.01 | <0.01 |
| W | Colonial | 70 | <0.01 | <0.01 |

- 5 -

03631039

2. Installer Personnel Samples

| Home | Type Home | Personnel Exposure (f/cc) | |
|------|-----------|---------|------------------|
| | | Ave | TWA (see note 5) |
| F | Colonial | 2.597 | 0.649 |
| N | Cape | 0.971 | 0.243 |
| S | Ranch | 2.115 | 0.529 |
| W | Colonial | 1.746 | 0.436 |

NOTES:

1. The symbol $<$ (less than) indicates no fibers were observed in the counted fields. As a measure of test precision, results are reported to be less than the value represented by one fiber if such had been detected in one of the observed fields.

According to NIOSH reports, the limit of reliable detectaility for this test procedure is 0.5 f/cc exposure and 0.1 f/cc TWA. Values below 0.5 f/cc exposure and 0.1 f/cc TWA are not judged as detectable.

2. Each test of horitcultural products was repeated using products made from both Libby, Montana ore and Enoree, South Carolina ore. The Grace vermiculite ore used in making Attic Insulation originates from the Libby, Montana mine as does the ore purchased by O. M. Scott & Sons for use in its lightweight lawn fertilizer.

3. In addition to results tabulated, two additional tests indicate no fibers detected in attics insulated with vermiculite loose fill in one case six hours and in another case approximately nine years after installation.

4. In all home attics tested, vermiculite Attic Insulation was added as a retrofit insulation over existing glass, mineral wool or cellulose insulation. In home "F", a fiber was observed in the counted fields prior to pouring vermiculite Attic Insulation. Although length and aspect ratio fell within the fiber definition, it is believed to be airborne glass fiber from existing insulation. There was no vermiculite Attic Insulation in the attic when this prejob sample was taken.

- 6 -

15103494

03931340

5.  In calculating the time-weighted average (TWA)
exposure for consumers using Attic Insulation, it is assumed
that the user would work in the attic pouring Attic Insulation
for two hours in one eight-hour work day.  Results in C. 1.,
indicate no further exposures after installation.  The
lifetime exposure and risk associated with the use of Attic
Insulation is infinitesimally small compared to industrial
exposures since the opportunity for exposure is rare (perhaps
twice in a lifetime) compared to a permitted industrial
exposure up to 2 f/cc during each eight-hour work day
throughout a working lifetime.  Therefore, comparison of
TWAs between a rare and nonroutine exposure in the case of
Attic Insulation and the OSHA industrial standard of 2 f/cc
vastly overstates the potential hazard involved in the use
of Attic Insulation.

- 7 -

15103495

# EXHIBIT EE





> CPD does have concern with [ ] as shown in the test results

INTERNAL CORRESPONDENCE

GRACE

Construction Products Division
06175381

To:      W. F. McCord/Ajax           Date:    March 25, 1980

From:    F. W. Eaton                 Subject: Consumer Products

cc:  D. M. Favorito
     R. M. Vining
     F. S. Wood

In my recent facility survey reports on St. Thomas and Ajax, comments
were made concerning end user exposure to Tremolite Fibers and CPD's response
to EPA and CPSC ANPR's. D. M. Favorito has discussed this issue with you and
has agreed the accompanying attachments should be forwarded to you as general
information. These attachments are:

1.  User Fiber Exposure   -   Actual attic installations
2.  User Fiber Exposure   -   Simulated attic, L-1 un-
                              screeded, unbound
3.  User Fiber Exposure   -   Simulated attic, L-1 screened
                              (14 mesh) unbound
4.  User Fiber Exposure   -   Simulated attic, L-1 screened
                              (14 mesh) bound w/0.5% CMC @
                              0.2% wts/cf
5.  CPD's response to EPA and CPSC ANPR's respecting asbestos
    in consumer products.
6.  Consumer products fiber exposure - test protocol and results.

Test data has documented that there is no user exposure to asbestos fiber
(tremolite) in mixed horticultural products or light weight fertilizer contain-
ing Libby Vermiculite (K. M. Scott Turf Builder). CPD does have concern with
attic insulation as shown in the test results. In CPD's response to EPA and
CPSC ANPR's we have stressed and will continue to stress to CPD's advantage,
two points on the final CPSC banning of consumer patching compounds and arti-
ficial embedding materials. These are:

1.  The ban applies only to intentionally - added respirable
    freeform asbestos and does not apply to products having
    unavoidable trace amounts (contaminates).

2.  In the case of contaminantes, manufacturers must take
    steps to reduce asbestos to the maximum extent feasible.

In point # 1, asbestos (tremolite) in vermiculite is a contaminant and
not intentionally added. In point # 2 CPD has and will continue to reduce to
the maximum extent feasible by:

1.  New Libby mill
2.  New Rock reduction circuit at Libby - in progress
3.  Slot screening at Libby - Research and Development stage.



PLAINTIFF'S
EXHIBIT
9520

GRACE & ASPERTAN

# GRACE

Construction Products Division
06175161

To:    W. F. McCord/Ajax

From:  F. W. Eaton

Date:    March 25, 1980

Subject:  Consumer Products

cc: O. M. Favorito
    R. M. Vining
    E. S. Wood

In my recent facility survey reports on St. Thomas and Ajax, comments were made concerning end user exposure to Tremolite Fibers and CPD's response to EPA and CPSC ANPR's.  O. M. Favorito has discussed this issue with you and has agreed the accompanying attachments should be forwarded to you as general information.  These attachments are:

1. User Fiber Exposure  -  Actual attic installations
2. User Fiber Exposure  -  Simulated attic, L-1 un-screeded, unbound
3. User Fiber Exposure  -  Simulated attic, L-1 screened (14 mesh) unbound
4. User Fiber Exposure  -  Simulated attic, L-1 screened (14 mesh) bound w/0.5% CMC @ 0.28 qts/cf
5. CPD's response to EPA and CPSC ANPR's respecting asbestos in consumer products.
6. Consumer products fiber exposure - test protocol and results.

Test data has documented that there is no user exposure to asbestos fiber (tremolite) in mixed horticultural products or light weight fertilizer containing Libby Vermiculite (O. M. Scott Turf Builder).  CPD does have concern with attic insulation as shown in the test results.  In CPD's response to EPA and CPSC ANPR's we have stressed and will continue to stress to CPD's advantage, two points on the final CPSC banning of consumer patching compounds and artificial emberizing materials.  These are:

1. The ban applies only to intentionally – added respirable freeform asbestos and does not apply to products having unavoidable trace amounts (contaminates).

2. In the case of contaminantes, manufacturers must take steps to reduce asbestos to the maximum extent feasible.

In point # 1, asbestos (tremolite) in vermiculite is a contaminant and not intentionally added.  In point # 2 CPD has and will continue to reduce to the maximum extent feasible by:

1. New Libby mill
2. New Rock rejection circuit at Libby - in process
3. Slot screening at Libby - Research and Development stage.

PLAINTIFF'S
EXHIBIT
91560

4. Screen all consumer, industrial and horticultural
   expanded products.
5. Bind all L-1 & 2 attic insulation.

CG175382

Reduced rock content in concentrate, proper stoner adjustment and product screening to reduce unexpandable/heavy particles are the major contributors to reduced user fiber exposure to tremolite fibers. Binding of attic insulation shows some further fiber reduction but its biggest asset is to act as a dust suppressant. Process Engineering and Research are continuing binder efforts but I see little light at the end of this tunnel during the next 12 months.

If I can provide you with any additional test data such as Monokote, masonry fill etc., please advise.

F. W. Eaton

FWE/gm
Enclosures

bcc: Bill Sinacore/W. Chicago

# EXHIBIT FF





"No need for mask ...It pours...cleanly."

". . . Contains no harmful chemicals."

pounded. When insulation decomposes, absorbs moisture, becomes infested with vermin, or loses its insulating efficiency after it is installed, it may have to be removed and replaced. That means digging out all the old insulation, putting in new insulation, and repairing the walls or ceiling. It means a lot of trouble and expense.

The only way to be sure that this will not happen to you is to select an insulation of proved permanence. Select Zonolite Insulation. Through rigorous testing and extensive usage over many years, Zonolite has proved that it fulfills completely all of the following requirements for good insulation. No other known material can answer such a record.

1. Dual Insulation Value
2. Uniform Tamper-Proof Density
3. Complete Fill
4. Light in Weight
5. Easy to Install
6. Chemically Inert
7. Fire-proof
8. Vermin-proof
9. Rot-proof
10. Naturally Permanent

EXHIBIT



# THE MODERN MIRACLE
# OF INSULATION



*Permanent as the Earth Itself*



EXHIBIT
10c

EXHIBIT
10c



**ZONOLITE**

REMEMBER THE STORY of how roast pork was discovered? Back in Ancient China, according to the legend, some fellow's pig pen burned to the ground, and all his pigs with it. After the fire he accidentally stuck his finger into one of the simmering animals. Jamming the smarting finger into his mouth, he was delighted with the taste he found there. That gave him an idea. He spread the word, and soon his neighbors for miles around were burning down their pig pens.

And so roast pork was discovered!



Just a few years ago a discovery equally important was made in much the same way. A group of engineers were seeking mineral deposits in the mountains near Libby, Montana. One day one of the men



*Permanent as*

## ZONOLITE

accidentally heated what looked like ordinary mica. To his amazement the ore expanded to several times its original size and changed its color as he watched.

Although these engineers didn't know it, on that day they discovered Zonolite—a material which now is used in a thousand ways the world over. Today Zonolite is known as "The Modern Miracle of Insulation."

For six hundred million years the mica-like ore from which Zonolite is made has lain on Mount Zonolite completely unprotected, perfect prey for the destructive forces of time and weather. Rain has drenched it; winter cold has chilled it; forest fires have raged around it; summer sun has blazed down upon it; yet it has stood all these tests without deterioration.



Who knows what prehistoric monsters wandered over Mount Zonolite, how many battles were fought or how many generations of trees grew and died in that spot before a curious engineer accidentally discovered the secret of Zonolite?

In the romantic story of Zonolite there is a clear cut, unimpeachable record of natural permanence that no other insulation has been able to equal.

*Earth Itself*



THE METHOD OF CONVERTING the micaceous ore that is dug from the earth at Mount Zonolite into the lightweight, air-filled granular substance that is Zonolite Insulation has changed very little from the first. It is a process of heating, nothing more. Each flake of ore consists of about one million laminations per inch. Trapped between each layer there is a minute



amount of water. When the ore is subjected to a temperature of about 2000° Fahrenheit, this water turns into a gas, explodes the ore and expands it twelve to fifteen times its original size, producing countless tiny dead air spaces in each granule. In the exploding process the color of the ore changes to a glittering golden brown giving the expanded granules of insulation bright, shiny surfaces which have high heat reflectivity. This reflective quality plus the dead air cell entrapment makes Zonolite the only material having a dual insulating value. It insulates efficiently from sub-zero to 2000° F.

*Permanent as*

LITE

If the engineers who discovered Zonolite could have looked just twenty years into the future they would have seen ore from Mount Zonolite travelling by land and water to Burma, India, Australia, Malaya, England, Canada and South America. They would have seen a vast network of more than fifty Zonolite manufacturing plants, thirteen of them in foreign countries. They would have seen thousands of homes, office buildings, and factories made comfortable—warmer in winter, cooler in summer—by Zonolite Granu-



ZONOLITE GRANULE
AFTER EXPLOSION
(Greatly Enlarged)

lar Fill Insulation. They would have seen Zonolite Insulating Bricks protecting the walls of gigantic furnaces, Zonolite in the walls of great cold storage plants, Zonolite All-Purpose Plaster providing better walls for countless buildings, Zonolite Lightweight Concrete on the roofs of some of the largest buildings in the world. They would have thrilled to see how rapidly new uses are being found for that simple ore that waited six hundred million years to reveal its great secret.

*Earth Itself*

## ZONOLITE



INSULATION IS NOW ACCEPTED as an essential part of every building. Home owners, as well as architects and builders, know that it is false economy to try to get along without it. In a recent nationwide survey the respondents were asked to rank in the order of importance to them the reasons why they might insulate their homes. More people gave "because insulation makes homes warmer in winter," than any other reason. Close behind were "because it lowers fuel bills," and "because it makes homes cooler in the summer." Insulation will do all these things. An efficient insulation will pay for itself in actual fuel savings within one to three years.

There are several materials on the market today which, if properly installed, will do an efficient job of insulating for a time. In choosing an insulation it is extremely important to investigate two things:

   *1. "Does this insulation automatically assume the correct insulating density when it is installed?"*

   *2. "Will it stay forever at maximum efficiency without settlement, rot or disintegration?"*

The efficiency of Zonolite is not dependent upon the chance that it may be installed at the correct density. It cannot be stretched too thin nor compressed too tight. You know what you are getting with Zonolite. The long life of Zonolite is not dependent upon fancy treatments. It is 100% mineral and naturally permanent. You get lasting, uniform insulation with Zonolite.

Don't make the mistake of buying just "insulation." Insulation is a sound investment in comfort, health, money; but poor insulation is a bad investment com-

*Permanent as*

# ZONOLITE

pounded. When insulation decomposes, absorbs moisture, becomes infested with vermin, or loses its insulating efficiency after it is installed, it may have to be removed and replaced. That means cleaning out all the old insulation, putting in new insulation, and repairing the walls or ceilings. It means a lot of trouble and expense.

The only way to be sure that this will not happen to you is to select an insulation of proved permanence. Select Zonolite Insulation. Through rigorous testing and extensive usage over many years, Zonolite has proved that it fulfills completely all of the following requirements for good insulation. No other known material can equal such a record.

1. **Dual Insulation Value** . . . Insulates both by its air cell construction and its glittering, reflective surfaces.
2. **Uniform Tamper-Proof Density** . . . Same density installed in the home as when it leaves the factory.
3. **Complete Fill** . . . Fills walls solidly leaving no voids. Does not "ball-up" on rough obstructions, nails, wires, or pipes. Cannot be "fluffed up."
4. **Light in Weight** . . . A bag can be handled easily. A 3-inch layer of Zonolite adds only 1½ pounds per square foot of ceiling.
5. **Easy to Install** . . . No need for mask, gloves, or special equipment. It pours easily and cleanly. The average home can be insulated in just a few hours.
6. **Chemically Inert** . . . Contains no harmful chemicals. Will not disintegrate nor deteriorate. Will not corrode any material. Will not stain wall or plaster. Is practically moisture-proof.
7. **Fire-proof** . . . Not merely fire "resistant." It melts at about 2400° Fahrenheit.
8. **Vermin-proof** . . . Mice, rats, insect larvae, or termites will not attack it.
9. **Rot-proof** . . . Will not decompose nor give off odors. It is a 100% mineral material.
10. **Naturally Permanent** . . . The permanence of Zonolite is not dependent upon synthetic treatments. Its inherent permanence means efficient insulation for your home forever.

ZONOLITE

IF YOU ARE BUILDING A HOME, don't take chances with just "insulation." Be sure of permanent, efficient performance. Select Zonolite, the material that fulfills all the requirements for good insulation.

If your present home is not insulated, don't shiver through another winter nor swelter through another summer. Let your present wasted fuel dollars pay for a complete Zonolite installation . . . now!

Why not talk to your lumber dealer today? He'll be glad to tell you all about it.



*Permanent as the Earth Itself*