IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline: July 5, 2002 at 4:00 p.m.**
**Hearing Date: July 22, 2002 at 10:00 a.m.**

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order authorizing, but not requiring, the implementation of certain revised compensation programs, including a general retention program, a long-term incentive plan for certain key employees and a revised severance pay program for U.S. salaried employees. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3.      On April 2, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"), which have been consolidated for administrative purposes only. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

4.      On April 2, 2001, upon a motion of the Debtors (the "Wages Motion"), the Court entered an order that, inter alia, (i) authorized and approved on an interim basis certain retention programs (the "Key Employee Retention Programs") for key employees (the "Key Employees"), including the General Retention Program (the "2001-2002 General Retention Program") and the 2001-2003 Long-Term Incentive Plan (the "2001-2003 LTIP"), and (ii) approved the W. R. Grace & Co. Severance Pay Plan for Salaried Employees (the "Wages Order").[2] On June 22, 2001, the Court entered a final order authorizing and approving the Key Employee Retention Programs.[3]

---

[2]   Terms not defined herein shall have the meaning ascribed to them in the Wages Motion.

[3]   In the Wages Motion, the Debtors reserved the right to determine whether a particular employee is a Key Employee pursuant to the Key Employee Retention Programs. For purposes of this Motion, the Debtors continue to reserve the right to determine whether a particular employee is a Key Employee.

5.      On June 22, 2001, the Court also entered an order modifying the authority of the Debtors to make payments under the Wages Order (the "Wages Modification Order").   The Wages Modification Order, in part, preserved the right of the Creditors' Committee or the Asbestos Personal Injury Committee to object to the extension of the W. R. Grace Change in Control Severance Program (the "Change-in-Control Severance Program") beyond its December 31, 2001, termination date.

## Relief Requested

6.      By their Motion, the Debtors request that the Court authorize, but not require, the implementation of certain revised compensation programs, consisting of a revised long-term incentive program for 2001-2003 (the "Revised 2001-2003 LTIP"), a new long-term incentive program for 2002-2004 (the "2002-2004 LTIP"), a new general retention program (the "2003-2004 General Retention Program") and a revised severance pay program (the "Revised Severance Pay Program," collectively with the 2003-2004 General Retention Program, the Revised 2001-2003 LTIP and the 2002-2004 LTIP, the "Revised Compensation Programs") pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.[4]

## The Revised Compensation Programs

7.      The Revised Compensation Programs are described as follows:

8.      *The 2003-2004 General Retention Program.*

(a)      The 2003-2004 General Retention Program implements a new general retention program for two years, through December 31, 2004, to replace the 2001-2002 General Retention Program (which provides retention bonus payments through December 31, 2002).  The Debtors have refined the revised program by targeting Key Employees who are at the most risk

---

[4]    The terms of past employee programs are described in more detail in the Wages Motion.  In particular, the 2001-2002 General Retention Program is described in ¶ 81, the 2001-2003 long-term incentive program (the "2001-2003 LTIP") is described in ¶ 85; the W.R. Grace & Co. Severance Pay Plan is described in ¶ 64 and the Change-in-Control Severance Program is described in ¶ 66.

of leaving the Debtors' employ with bonus packages tailored to the particular circumstances of each such Key Employee.

(b)     As compared to the 2001-2002 General Retention Program, the 2003-2004 General Retention Program increases the range of percentage-of-salary bonuses for Program Participants to 15-65% from 12.5-50%. Rather than using distinct tiers with fixed bonus percentages, the Debtors will determine each individual Program Participant's general retention bonus separately so as to better target at-risk Key Employees, subject to the limitations of the 65% maximum payout and the $6.7 million total plan cost.[5]

(c)     In another revision to the 2001-2002 General Retention Program, the Debtors will pay all bonuses in arrears in lump sums instead of upfront or in ongoing bi-monthly payments. These payments will be made either in two lump sums per year, one at the six-month mark and the other at the end of the calendar year ($^{1}/_{2}$ for each period) or a single lump sum payment at the end of each calendar year.[6]

(d)     The 2003-2004 General Retention Plan will terminate on the effective date of any confirmed plan of reorganization. Promptly after the effective date, the Debtors will make payment of earned bonuses, prorated as of the effective date.

(e)     Exhibit A compares the 2003-2004 General Retention Program to the 2001-2002 General Retention Program.

9.     *The Revised 2001-2003 Long-Term Incentive Plan.*

(a)     The Debtors will revise the 2001-2003 LTIP to better accommodate their employees' concerns during the Chapter 11 Cases. The original payment targets of the 2001-2003 LTIP were structured to deliver the value of awards 50% in cash and 50% in stock options. The Revised 2001-2003 LTIP will enhance the cash component so that, to the extent that the applicable targets are achieved, the value of an award will be delivered 100% in cash.[7] This revised structure recognizes the fact that, with the commencement of the Chapter 11 Cases, most of the Debtors' employees consider the stock option component of the 2001-2003 LTIP to have only speculative value.

---

[5]   The plan cost of $6.7 million is estimated by applying the revised payout percentages to the existing tiers, notwithstanding the authority to determine individual payments, within the plan limits.

[6]   The Debtors reserve the right to determine, in their sole discretion, who will receive which type of payment.

[7]   For practical reasons the Debtors will not actually cancel existing options granted under the 2001-2003 LTIP.

10. *The 2002-2004 Long-Term Incentive Plan.*

    (a)    The Debtors have designed the 2002-2004 LTIP in response to their employees' concerns as discussed above. To that end, the payments under the 2002-2004 LTIP will consist of 100% cash.

    (b)    The threshold 3-year compound annual growth rate in core earnings before interest and taxes ("EBIT") to achieve an award of 100% of the 2002-2004 LTIP target payment (the "Base Target Payment") will be 6% per annum as compared to 10% under the 2001-2003 LTIP, consistent with the growth rates of Grace's industry peers;[8]

    (c)    Partial payouts for EBIT growth rates between 0% and 6% will be implemented on a straight-line basis.

    (d)    The following features of the 2002-2004 LTIP will be consistent with the 2001-2003 LTIP:

        (i)    The amount of the 2002-2004 LTIP target payment will be increased at EBIT compound annual growth rates in excess of the target growth hurdle (6% and 10% respectively, for 2002-2004 LTIP and 2001-2003 LTIP) up to a maximum of 200% of the Base Target Payment at an annual compound growth EBIT growth rate of 25%;

        (ii)    Payout timing will be consistent (i.e., in 1/3 and 2/3 installments, respectively, in March following years 2 and 3 of the plan).

        (iii)    Total target payout will be approximately $11.8 million, excluding the CEO.

11. *The Revised Severance Pay Program.*

    (a)    The Revised Severance Pay Program will continue to include the W. R. Grace & Co. Severance Pay Plan for Salaried Employees (the "Salaried Severance Plan") which covers approximately 2,200 employees. Under the plan, any covered employee who is involuntarily terminated without cause by the Debtors (other than as described below) will receive a payout of 1.5 weeks of salary per year of service, consistent with the terms of the

---

[8]  For the 2002-2004 LTIP, EBIT from core operations is calculated to include the accrual for the Debtors' annual incentive compensation plan ("AICP"), which pays out annual incentive bonuses to employees, as well as the accrual for the retention plan.

Salaried Severance Plan, with a minimum payout of 4 weeks severance pay and a maximum payout of one year's pay.[9]

(b)    The Revised Severance Pay Program also incorporates the terms of the Change in Control Severance Program (on the terms described in ¶ 66 of the Wages Motion and as modified below) through a date 2 years after the effective date of any confirmed plan of reorganization.[10] The Change in Control Severance Program will no longer cover a change of control resulting from a confirmed plan of reorganization, although it will continue to provide severance pay and other benefits to employees who are involuntarily terminated due to any other change in control of the Debtors. Instead, under the Revised Severance Pay Program, the Salaried Severance Plan will be revised so that it will pay a minimum of 4 months salary to any employee who is involuntarily terminated at any time within the 1 year period following the effective date of any confirmed plan of reorganization, provided that the employee's termination results from the implementation of the plan of reorganization (i.e. employees involuntarily terminated as a result of matters unrelated to the implementation of the plan of reorganization will not be eligible for the 4 month minimum).

### Basis For Relief

12.    Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a) This Court has recognized that the broad reach of its equitable powers under section 105(a) of the Bankruptcy Code authorizes, among other things, implementation of key employee retention programs and postpetition severance pay programs.

13.    Section 363(b) provides in relevant part that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the

---

[9]    The Revised Severance Pay Program will not modify the severance benefits for 16 Key Employees. As described in ¶ 81 of the Wages Motion, any one of such 16 Key Employees who is terminated without cause will be entitled to receive two years of severance pay.

[10]    The Change in Control Severance Program is an unfunded welfare plan that provides severance pay and other benefits to employees whose employment with the Debtors is involuntarily terminated following a change in control of the
(Continued...)

debtor's sound business judgment and when the use of the property is proposed in good faith. Cinicola v. Scharffenberger, 248 F.3d 110, 112 (3d Cir. 2001); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr.D.Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

14.    Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business.  See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983).  Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest.  See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

15.    Generally, courts authorize debtors to implement key employee retention programs because key employees are essential to a debtor's continued operations.  See  In re America West Airlines, Inc., 171 BR. 674, 678 (Bankr. D. Ariz. 1994) (approving success bonuses to certain officers and employees as within Debtor's sound business judgment); In re Interco Inc., 128 BR. 229, 234 (Bankr. E.D. Mo. 1991) (authorizing the debtor to assume prepetition severance contracts and approving performance based retention program to ensure critical employees remained with the debtor).

---

Debtors.  As of the Petition Date, the plan covered approximately 2,500 U.S. non-union employees.  On December 31, 2001, it expired by its terms.

16.    To maintain cohesive and motivated management teams during the chapter 11 process-particularly in large chapter 11 cases-debtors frequently implement various combinations of incentive compensation, retention and/or severance programs.  Without such programs, essential key employees will often tend to leave a debtor's employ if other employment opportunities arise offering greater financial rewards without the uncertainties inherent in a debtor's reorganization process.  Recognizing these risks, similar employment and incentive plans have been authorized recently by this and other courts, including In re Homelife Corporation et al., Case No. 01-02412 (Bankr.D.Del. July 16, 2001); In re Acme Metals Incorporated, et al., Case No. 98-2179 (Bankr.D.Del. February 23, 1999 and March 1, 1999); In re FPA Medical Management, Inc., et al., Case Nos. 98-1596 through 98-1685 (Bankr.D.Del. September 23, 1998); In re APS Holding Corp., et al., Case No. 98-00197 (Bankr.D.Del. September 2, 1998); and In re PWS Holding Corporation, Brunos, Inc., et al., Case Nos. 98-212 through 98-223 (Bankr.D.Del. June 3, 1998).

17.    In developing the Revised Compensation Programs, the Debtors, in conjunction with Human Capital Advisor Services Group of Deloitte & Touche, analyzed the compensation programs and severance benefits authorized for other companies in chapter 11 bankruptcies because of mass tort liabilities to develop an up-to-date snapshot of prevailing compensation practices and pay-plan design alternatives utilized in bankruptcies similar to the Chapter 11 Cases.  Based upon this analysis, the Debtors believe that the Revised Compensation Programs are comparable to programs implemented by other, similarly situated debtors.

18.    Implementing the Revised Compensation Programs will accomplish the sound business purpose of aiding the maximization of the value of the Debtors' estates and furthering the Debtors' efforts to successfully reorganize.  The Key Employees are experienced and

talented individuals who are intimately familiar with the Debtors' businesses and can easily obtain employment elsewhere. Furthermore, the Debtors' management believes that, without the Revised Compensation Programs, it would be difficult and expensive to attract and hire qualified replacements for any Key Employees who do leave.

19.      Moreover, such a loss of Key Employees likely would adversely affect the Debtors' operations by lowering the morale of the remaining employees because of the appearance of disarray and disruption generated by such departures. It also would burden the Debtors' remaining employees with additional responsibilities. All of these factors would make it more likely that the remaining Key Employees, too, would explore other employment opportunities. The loss of even a few Key Employees could therefore potentially lead to more losses. Such a scenario would negatively impact the Debtors' operations. The Debtors therefore must protect a critical mass of their high-performing employees in sufficient numbers to profitably operate their businesses during the pendency of these Chapter 11 Cases, thus maximizing the likelihood of a successful restructuring.

20.      Additionally, given the current status of the Chapter 11 Cases, the Debtors' management believes that it will be unable to maintain employee morale and loyalty if it does not offer the Revised Compensation Programs. The employees' morale, continued loyalty to the Debtors and faith in the Debtors' management will be greatly enhanced by the Revised Compensation Programs because such programs clearly signal the Debtors' commitment to continuing to profitably grow their businesses for the benefit of the Debtors' stakeholders, including their employees. The Revised Compensation Programs are vital to maintaining a dedicated, motivated and loyal workforce in the Debtors' business judgment. And, the Debtors need such programs to maximize their chances of successfully reorganizing.

21.     In light of these circumstances, the Debtors' specific goals in implementing the

Revised Compensation Programs include:

     (a)    implementing retention, severance and cash-based long-term incentive opportunities to achieve pay levels that are not only competitive within the specialty chemical industry, but also are competitive with and comparable to similar programs instituted by other companies in chapter 11 because of mass tort liabilities;

     (b)    providing significant incentive compensation potential to Key Employees during the Chapter 11 Cases. The substitution of cash for stock provides a meaningful, measurable reward at a time in these Chapter 11 Cases when the value of equity is impossible to quantify. This will eliminate concerns that Key Employees might have about earning an equity stake in a company whose restructuring may markedly reduce or even eliminate that equity stake; and

     (c)    providing adequate levels of financial protection for U.S. salaried employees who are involuntarily terminated, which will stabilize the Debtors' workforce during a prolonged period of uncertainty. This program also helps the Debtors "keep the faith" with their U.S. salaried employees, which is critical to maintaining high employee morale.

22.     In light of the foregoing, the Debtors believe that the incentives provided by the

Revised Compensation Programs are reasonable and appropriate and will enhance the prospect

of retaining Key Employees and, ultimately, attaining a successful result in these Chapter 11

Cases. For all of the foregoing reasons, the Revised Compensation Programs should be

approved.

## Notice

23.     Notice of this Motion has been given to: (i) the United States Trustee,

(ii) counsel to the DIP Lender, (iii) counsel to The Chase Manhattan Bank as agent for the

Debtors' prepetition lenders, (iv) counsel to the Committees and (v) all those parties that

requested service and notice of papers in accordance with Fed.R.Bankr.P. 2002. In light of the

nature of the relief requested, the Debtors submit that no further notice is required.

**No Prior Request**

24.     No prior motion for the relief requested herein has been made to this or any other

Court.

WHEREFORE, the Debtors request entry of an order substantially in the form

attached hereto (a) authorizing, but not requiring, the Debtors to implement certain revised

compensation programs and (b) granting such other and further relief as is just.

Wilmington, Delaware
Dated:  June 17, 2002

Respectfully submitted,
KIRKLAND & ELLIS
James H.M. Sprayregen, P.C.
James W. Kapp III
Christian J. Lane
Roger J. Higgins
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession