# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*, | ) | **Case No. 01-01139  (JKF)** |
| | ) | (Jointly Administered) |
| **Debtors.** | ) | |

## W.R. GRACE'S SUPPLEMENTAL BRIEF REGARDING PROCEDURES FOR THE LITIGATION OF THE COMMON PERSONAL INJURY LIABILITY ISSUES

KIRKLAND & ELLIS
David M. Bernick, P.C.
James H.M. Sprayregen, P.C.
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG
    & JONES P.C.
Laura Davis Jones
David W. Carickhoff, Jr.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705
(302) 652-4100
(302) 652-4400 (fax)

*Co-Counsel for the Debtors and
Debtors in Possession*

Dated: June 21, 2002

## <u>TABLE OF CONTENTS</u>

I.    THERE IS NO SERIOUS DISPUTE THAT ASBESTOS PERSONAL INJURY
      CLAIMS AGAINST GRACE HAVE RECENTLY SPUN OUT OF CONTROL. ............4

      A.    There Is No Explanation -  Grounded Either In Medicine Or In Grace's
            Liability - For The Recent Spike In Claims Against Grace. ....................................4

      B.    Grace's Analysis Of The 1997 And 2000 Claims Further Confirms The
            Need For Litigation To Define Grace's Liability. ......................................................7

            1.    The Vast Majority Of The Claims Provide No Evidence Of
                  Impairment...............................................................................................7

            2.    Most Claims Fail To Establish Actual Occupational Exposure To
                  Grace's Products........................................................................................9

II.   THE BEST MECHANISM FOR RESOLVING THE ASBESTOS PERSONAL
      INJURY CLAIMS IS TO IMMEDIATELY SET A BAR DATE AND
      APPROVE GRACE'S PROPOSED CLAIM FORM AND NOTICE PROGRAM..........10

      A.    Proposed "extrapolations" based on Grace's pre-petition settlements are
            improper. ......................................................................................................11

      B.    Estimation is governed by certain bedrock principles..............................................12

            1.    A debtor cannot be required to pay more than its legal liability. ...............12

            2.    Estimation is governed by the Federal Rules of Evidence. ........................14

            3.    Estimation must be done in accordance with the Federal Rules of
                  Civil Procedure..........................................................................................14

            4.    The use of estimation is limited by the right to jury trial. ..........................15

      C.    The Personal Injury Committee's proposed "estimation" is not an
            estimation at all and is precluded by the rules. ........................................................16

III.  THE COURT MAY PROCEED IMMEDIATELY TO DETERMINE COMMON
      ISSUES RAISED BY THE PRE-PETITION CLAIMS, WHILE POSTPONING
      THE SETTING OF THE BAR DATE FOR OTHER POTENTIAL
      CLAIMANTS. ..........................................................................................................16

      A.    The pre-petition claims may be brought before this Court using either Fed.
            R. Bank. P. 3004 or the transfer provisions of 28 U.S.C. § 157(b)(5). .................17

            1.    Filing a proof of claim pursuant to Fed. R. Bank. P. 3004. ........................17

2.      Transfer of pending claims pursuant to 28 U.S.C. §  157(b)(5. .................18

B.      Submission of Court-Approved Claim Forms. ........................................................20

C.      Possible Appointment of a Rule 706 Expert Panel. .................................................23

D.      Summary Judgment Motions and *Daubert* Proceedings.........................................25

1.      Failure to Comply with the Requirements of the Claim Form ...................27

2.      Claims Based On Unreliable Diagnostic Evidence.....................................28

3.      Claims Lacking Reliable Evidence of Restrictive Impairment .................33

4.      A Lack of Any Occupational History Entailing Work with Grace's
        Products........................................................................................................36

5.      A Lack of Reliable Evidence that Grace's Products Were a
        Substantial Contributing Factor in Causing the Claimed Disease ............37

E.      Resolution of post-petition claims submitted pursuant to the bar date. .................39

F.      Estimation following procedures consistent with the established rules. ................40

## <u>TABLE OF AUTHORITIES</u>

### Cases

*A.H. Robins v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) ................ 19

*Amendola v. Kansas City Southern Ry. Co.*, 699 F. Supp. 1401 (W.D. Mo. 1988) ................... 34

*Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268 (S.D.N.Y. 1996) ........................................... 26

*Belton v. Fibreboard Corp.*, 724 F.2d 500 (5th Cir. 1984) ........................................................ 11

*Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986) ................................................ 33

*Bittner v. Borne Chemical Company, Inc.*, 691 F.2d 134 (3rd Circ. 1982) .............................. 13

*Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz. App. 1987) .............................................. 34

*Calumet Nat'l Bank v. Levine*, 179 B.R. 117 (N.D. Ind. 1995) ............................................... 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ..................................... 28

*Eagle Picher Indus. v. Liberty Mut. Ins. Co.*, 829 F.2d 227 (1st Cir. 1987). ..................... 29, 30

*Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673 (3d Cir. 1964), *cert. denied*, 382 U.S. 812 (1965) ...................................................................................................... 27

*Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993) .............................................................. 33

*Giffear v. Johns Manville Corp.*, 632 A.2d 880 (Pa. Super. 1993) ......................................... 35

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996) ....................................... 23

*Harris v. Owens Corning Fiberglas Corp.*, 102 F.3d 1429 (7th Cir. 1996). ........................... 36

*In re 50-Off Stores, Inc.*, 231 B.R. 592 (Bankr. W.D. Tex. 1999) .......................................... 26

*In re A.H. Robins Co.*, 118 B.R. 436 (Bankr. E.D. Va. 1990) ................................................ 17

*In re A.H. Robins Co.*, 862 F.2d 1092 (4th Cir. 1988) ...................................................... 20, 21

*In re Babcock & Wilcox Co.*, 2000 WL 422372 (E.D. La. Apr. 17, 2000) .............................. 27

*In re Babcock & Wilcox Corp.*, No. 00-00-0558, at 4 (Bankr. E.D. La. Oct. 30, 2000 ........... 20

*In re Box Bros. Holding Co.*, 194 B.R. 32 (D. Del. 1996) ...................................................... 26

*In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338 (5th Cir. 1984) ...................................... 14

*In re Columbia Gas Sys., Inc.*, 224 B.R. 540 (Bankr. D. Del. 1998) ........................................... 26

*In re Diet Drugs*, 1999 WL 387322 ...................................................................................... 21

*In re Dow Corning Corp*., 211 B.R. 545 (Bankr. E.D. Mich. 1997) ...................................... 15, 41

*In re Dow Corning Corp.*, 250 B.R. 298 (Bankr. E.D. Mich 2000) ............................................ 11

*In re Dow Corning Corp.*, 86 F.3d 482 (6ᵗʰ Cir. 1996) ........................................................... 19

*In re Eagle-Picher Indus., Inc.*, 137 B.R. 679 (Bankr. S.D. Ohio 1992) ................................... 39

*In re Farley, Inc.*, 146 B.R. 748 (Bankr. N.D. Ill. 1992) ......................................................... 13

*In re Federal Mogul Corp.*, No. 01-10578 (Dec. 10, 2001) ..................................................... 19

*In re Fidelity Holding Co.*, 837 F.2d 696 (5th Cir. 1988) ....................................................... 27

*In re FIRSTPLUS Fin., Inc.*, 248 B.R. 60 (Bankr. N.D. Tex. 2000) .......................................... 26

*In re Food Lion, Inc.*, 1998 WL 322682 (4th Cir. 1998) ........................................................ 21

*In re Frascatore*, 98 B.R. 710 (Bankr. E.D. Pa. 1989) ........................................................... 17

*In re Gingery*, 48 B.R. 1000 (D. Colo. 1985) ....................................................................... 17

*In re Int'l Wireless Communications Holdings, Inc.*, 257 B.R. 739 (Bankr. D. Del. 2001) .... 26

*In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983) ............................... 11

*In re Kelley*, 259 B.R. 580 (Bankr. E.D. Tex. 2001) ............................................................... 17

*In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991) ................................................................ 17

*In re Marvel Entertainment Group, Inc.*, 254 B.R. 817 (D. Del. 2000) ..................................... 26

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 70472 (E.D. Pa. Aug. 22, 1997). 21

*In re Pan Am Corp.*, 16 F. 3d 513 (2d Cir. 1994) ................................................................. 19

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190 (1990) .................................................................................................................... 28

*In re Pinnacle Brands, Inc.*, 259 B.R. 46 (Bankr. D. Del. 2001) ............................................... 27

*In re Schwartz*, 192 B.R. 90, 94 (Bankr. D.N.J. 1996) ........................................................... 17

*In re Silicone Gel Breast Implant Prods. Liab. Litig.* (N.D. Ala. 1996), *in* 4 MEALEY'S LITIG. REP.: BREAST IMPLANTS F-1 (June 23, 1996) ................................................................. 23

*In re Snyder*, 156 B.R. 759 (Bankr. W.D. Pa. 1993)...................................................... 17

*In re The Babcock & Wilcox Co.*, 2000 WL 422372 (E.D. La. 2000) ........................................ 21

*In re The Babcock & Wilcox Co.*, No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000).................. 12

*In re Tucker*, 174 B.R. 732 (Bankr. N.D. Ill. 1994)........................................................ 17

*In re United Companies Fin. Corp.*, 267 B.R. 524 (Bankr. D. Del. 2000)............................... 26

*In re United States Lines, Inc.*, 1990 WL 451981 (S.D.N.Y. Nov. 6, 1990).............................. 19

*In re Waterman SS Corp.*, 200 B.R. 770 (Bankr. S.D.N.Y. 1996) ...................................... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 471 U.S. 1002 (1985) .............................. 11

*Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9 (1st Cir. 1997). ...................................................................................................... 39

*Metro-North Commuter Railroad Co. v. Buckley,* 521 U.S. 424 (1997) ...................................... 34

*Metropolitan St. Louis Equal Housing Opp'y Council v. Gundaker Real Estate Co.*, 130 F. Supp. 2d 1074 (E.D. Mo. 2001)........................................................................... 28

*Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999)....................................................... 38

*Moore v. Ashland Chem. Co.*, 151 F.3d 269 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999)................................................................................................... 38

*Moyer Packing Co. v. Petruzzi's IGA Supermarket, Inc.*, 510 U.S. 994 (1993)......................... 11

*Outlaw v. Keene Corp.*, No. 88-9490, U.S. Dist. LEXIS 1245 (E.D. Pa. Feb. 5, 1990). ........... 36

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir.) .. 11

*Raymark Indus., Inc. v. Stempel*, No. 88-1014-K, 1990 WL 72588 (D. Kan. May 30, 1990). 31

*Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545 (D. Colo. 1990) ...................................... 23

*Renaud v. Martin Marietta Corp.*, 972 F.2d 304 (10th Cir. 1992)...................................... 23

*Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir. 1985), *cert. denied*, 474 U.S. 864 (1985)....................................................................................................... 34

*Taylor v. Owens-Corning Fiberglas Corp.*, 666 A.2d 681 (Pa. Super. Ct. 1995)...................... 34

*Williams v. National Surety Corp.*, 257 F.2d 771 (5th Cir. 1958)...................................... 26

*Wright v. Willamette Indus., Inc.*, 91 F.3d 1105 (8th Cir. 1996). ...................................... 38

## Statutes

11 U.S.C. §  501(c) ....................................................................................... 16, 17

11 U.S.C. § 1129(b)(1) .................................................................................... 13

11 U.S.C. § 502(b)(1) ...................................................................................... 13

28 U.S.C.  157(b)(5) ................................................................................... 17, 18

28 U.S.C. § 1411(a) ........................................................................................ 15

28 U.S.C. § 157(b) .......................................................................................... 18

28 U.S.C. § 157(b)(5) ................................................................................. 15, 18

Fed. R. Civ. P. 42(a) ...................................................................................... 26

## Other Authorities

10 COLLIER ON BANKRUPTCY ¶ 9014.05 at 9014-5 (15th ed. rev. 1999 ................... 14

4 COLLIER ON BANKRUPTCY ¶ 502.03[2][b][iii], at 502-25 .................................... 13

7 COLLIER ON BANKRUPTCY ¶1129.04[4][a], at 1129-89 ........................................ 13

A. CHURG, NONNEOPLASTIC DISEASE CAUSED BY ASBESTOS, IN PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 293 (Churg & Green, ed. 2nd 1998) ......................... 37

AMA Guides to the Evaluation of Permanent Impairment (4th ed. 1998) .................................... 8

American Thoracic Society ("ATS"), The Diagnosis of Non-Malignant Diseases Related to Asbestos, AM. REV. RESPIR. DIS. (1986) .......................................................................... 8

ATS Standardization of Spirometry–1987 Update, AM. REV. RESP. DIS. 136:1285-98 (1987) 32

ATS, Lung Function Testing: Selection of Reference Values and Interpretative Strategies, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991) .......................................................... 31

Attfield, M. & Wagner, D., A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program, JOM 34: 875-78 (1992) ........................................................................................................................... 29

Browne, K., Asbestos-Related Disorders, Occupational Lung Disorders, 3rd, 411-504, 420 (1994) ............................................................................................................................ 5

CASARETT AND DOULL'S PRINCIPLES OF TOXICOLOGY: THE BASIC SCIENCE OF POISONS at (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, IN FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000)......... 37

CHURG, A., NONNEOPLASTIC DISEASE CAUSED BY ASBESTOS, IN PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 293 (Churg & Green, ed. 2nd 1998) .......................... 37

Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) ...................................................................................................................... 30

Fitzgerald et al., *Office Evaluation of Pulmonary Function: Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996)........................................................ 32

Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, American Review of Respiratory Disease 144(3) (1991)...................................5

ILO 1980 INTERNATIONAL CLASSIFICATION OF RADIOGRAPHS OF THE PNEUMOCONIOSES INTERNATIONAL LABOUR ORGANIZATION, GENEVA 1980 ....................................... 29, 30

Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (A. Churg & F. Green, ed., 2nd, 1998)..........................................................................................5

PROSSER & KEETON ON TORTS § 103 (5th ed. 1984)........................................ 36

PROSSER & KEETON ON TORTS § 30 (5th ed. 1984)........................................ 33

*Reference Guide on Epidemiology, in* FEDERAL JUDICIAL CENTER REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ...................................................................... 38

Reisinger, Karen Butler, *Court-Appointed Expert Panels: A Comparison of Two Models*, 32 IND. L. REV. 225 (1998)............................................................................................ 25

*The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 134:363-68 (1986)............................................................................................................. 35

*The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136:1516-17 (1987)............................................................................................................. 30

Weill, H., *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987) ........................... 30

## Rules

Fed. R. Bank. P. 3004 ............................................................................................... 17

Fed. R. Bankr. P. 3004 ............................................................................................. 16

Fed. R. Bankr. P. 7042(a)......................................................................................... 26

**Fed. R. Bankr. P. 9017** ............................................................................................................ **14**

**Fed. R. Civ. P. 42** ..................................................................................................................... **27**

**Federal Rule of Evidence 408** ................................................................................................... **14**

**H.R. 8200, 95th CONG., 1st Sess. 203-04, § 1129(b) (July 1997)** ................................................ **13**

## INTRODUCTION

Following up on the discussions with the Court during the May 22, 2002 case management conference, Grace details in this memorandum its proposals to expedite the litigation of common liability issues raised by the asbestos personal injury claims against the Debtors.

Part I reviews for the Court the factual context of these case management decisions.  Specifically, we show there is no legal or medical explanation for the surge of asbestos personal injury claims against Grace.  The need for meaningful scrutiny of these claims is confirmed by a recent analysis of the claims filed against Grace in 2000, which shows:

- More than 30% of the claims present so little information that a medical condition cannot even be determined.

- Less than 6% of claims involved actual malignancy.

- Only 3.3% of non-malignant claims contain diagnostic data showing even mild impairment.

- Half of the claims reflect no exposure information at all.

- Only 12% of the claims were filed by workers in the construction industry, which Grace supplied.

Part II of this memorandum explains why Grace continues to believe that the best procedure for resolving its asbestos personal injury liability is for this Court to set a bar date, to approve a claims form and notice program, and to set a case management schedule for the litigation of the common liability issues.  As detailed in Grace's initial June 27, 2001 case management motions, as well as its February 11, 2002 reply to the objections of the Personal Injury Committee ("PI Committee"), this procedure assures that all claimants will be on notice of these Chapter 11 cases and will have an opportunity to participate in the litigation of these

common issues.  The information each claimant would disclose in Grace's proposed claim form would also be of critical importance in the prompt and efficient resolution of those issues.

The PI Committee has to date opposed the setting of any bar date and the approval of any claim form requiring the disclosure of substantive information.  The Committee would instead have this Court simply assume Grace's liability, and proceed directly to the "estimation" of the required funding for a claims trust based on "projections" from pre-petition settlements.  This approach would impermissibly treat Grace's settlements as admissions of liability, in essence perpetuating the breakdown of the tort system that forced Grace to resort to "inventory" settlements in the late 1990s and -- after that approach only encouraged the filing of more frivolous claims -- eventually required the filing of these Chapter 11 cases.

While the PI Committee's proposal to "expedite" this case is unacceptable, Grace shares the Court's concern that the common liability issues be addressed at the earliest possible opportunity.  Grace therefore details in Part III of this memorandum an alternative approach, under which Grace and those who filed pre-petition claims would litigate common liability issues prior to the execution of the notice program and claims bar date, as follows:

- Pursuant to Bankruptcy Rule 3004, Grace would promptly file claims in these Chapter 11 cases on behalf of all claimants who had lawsuits pending against Grace as of the April 2, 2001 petition date;

- Grace would also serve the Court-approved claim form on counsel for these claimants;

- The claimants would have 90 days to complete and return the form;  The information disclosed in those forms would be critical to the litigation that would follow;

- Grace would file omnibus claims objections, FRCP 42 consolidation and Bankruptcy Rule 7056 summary judgment motions raising common issues for litigation before this Court;

- The Court could decide at an early stage whether to appoint a FRE 706 Expert Panel to facilitate the resolution of disputes over scientific issues;  In any event, those disputes could be resolved through expert discovery and *Daubert* proceedings;

- After the Court rules on the motions, Grace would then execute a Court-approved notice program to advise all other claimants of the Court's bar date;  A claims form tailored to the Court's liability rulings would be used by these new claimants to file their claims, expediting the completion of this last phase of the litigation;

- A show cause hearing would be held after the bar date to provide these new claimants with the opportunity to challenge or  seek modifications to the Court's liability rulings.

Grace's timeline for these steps would reach claim rulings by October 1, 2003:



After this litigation is concluded, the Court will be in a position to estimate the size of the personal injury trust under the plan of reorganization.

I.    **THERE IS NO SERIOUS DISPUTE THAT ASBESTOS PERSONAL INJURY CLAIMS AGAINST GRACE HAVE RECENTLY SPUN OUT OF CONTROL.**

Grace's bankruptcy was necessitated by a dramatic reversal in the trend of asbestos claim filings against the company. Claims that had been declining for years suddenly skyrocketed in 2000, overwhelming Grace's ability to resolve them through the tort system:



This surge in claims starkly demonstrated the irrationality of the privatized claims process that evolved over the years, and left Grace with no choice but to break the pattern of history and file bankruptcy.

A.    **There Is No Explanation - Grounded Either In Medicine Or In Grace's Liability - For The Recent Spike In Claims Against Grace.**

The PI Committee does not even attempt to justify the recent spike in claims against Grace based on an actual increase in disease caused by Grace's products. Actual asbestos-related malignant disease rates are declining in response to the regulatory curtailment of

significant asbestos exposures in the early 1970s[1].  The death rates for mesothelioma, the disease with the longest latency period, have been declining since 1992.[2]  Leading medical researchers similarly have described asbestosis as a "disappearing disease."[3]  A published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 yr."[4]

Moreover, as detailed in Grace's February 11, 2002 Reply, only a small number of plaintiffs' law firms was responsible for the surge in claims against Grace in 1999-2000, belying the notion that disease rates drive the increase.  Seventeen law firms filed 22,550 more claims in 2000 than they had filed in 1999, and were therefore responsible for almost the entire 22,726 increase in total claims filed against Grace.  The PI Committee offers no explanation for how such a small number of firms was able to generate such a significant surge of claims.

Instead, the PI Committee's expert Mark Peterson  attributes Grace's claims spike to unfavorable publicity last year about Grace's Libby, Montana mine.  (Peterson Aff.  23)  Even if it were true that Libby publicity had a nationwide impact on the filing of claims against Grace,

---

[1] *See generally* Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (Churg, A. & F. Green, ed., 2nd, 1998) at 339 ("progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis").  *See also* R. Doll & J. Peto, *Asbestos:  Effects on Health of Exposure to Asbestos* at 2 ("With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes.").

[2] SEER data from the National Cancer Institute available at www.seer.ims.nci.nih.gov.

[3] K. Browne, *Asbestos-Related Disorders*, Occupational Lung Disorders, 3rd, 411-504, 420 (1994).

[4] Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, American Review of Respiratory Disease 144(3):  689-696, 695 (1991) (emph. added).

this would only illustrate the problem Grace faces.  The issues concerning asbestos exposure at Libby pertain to only a small group of claimants.  Libby is a small town, with a population of 2,500.  The cumulative total of Libby personal injury claims is 232, a small fraction (.07 %) of the 328,000 claims asserted nationally.  If Libby publicity is causing a surge of claims nationally, those claims are being filed for the wrong reasons.

Further, the "Libby" theory for the broad upsurge in claims is unsupported by citation to any evidence and is contrary to the facts.  *First*, the plaintiff law firms that are responsible for bringing these cases already had filed over 260,000 personal injury claims against Grace before 2000.  They did not need to be inspired by "adverse publicity" before filing additional claims.  *Second*, attributing the recent claims spike to adverse Libby publicity would blink away the glaring fact that other asbestos defendants experienced similar surges in claims in 2000.  For example, the rate at which new claims have been filed against the Manville Trust has nearly doubled in each of the last two years.  The following chart, included in the First Quarter 2001 Manville Trust Report, shows this dramatic surge in new claims filings through May 2001:



Asbestos claims against other defendants have increased as well. Equitas' March, 2001 Annual Report confirms that "[m]ost other defendants [in addition to the Manville Trust] also reported significant increases in the number of claims filed in 2001. The majority of these new claims have been filed on behalf of unimpaired persons." Likewise, a May 30, 2001 Tillinghast report estimates that average annual non-Center for Claims Resolution asbestos claims nearly doubled from 30,000 in 1998-99 to almost 60,000 in 2000.

**B.      Grace's Analysis Of The 1997 And 2000 Claims Further Confirms The Need For Litigation To Define Grace's Liability.**

Grace recently has completed an analysis of 500 randomly-selected claim files from its 1997 and 2000 filings. Grace augmented the medical data and occupational exposure information in these claims files by obtaining information that the same claimants filed with the Manville Trust and the Center for Claims Resolution. *See* Claims Report, Exhibit K to February 11, 2002 Reply. The combined data from that survey confirms that the vast majority of the 1997 claims were invalid or of doubtful validity, and that valid year 2000 claims are even more scarce.

**1.      The Vast Majority Of The Claims Provide No Evidence Of Impairment.**

The recent surge in claims against Grace is not due to an increase in the most serious and best documented claims, i.e., cancer claims, but overwhelmingly is due to non-malignant claims. Less than 7% of the 1997 claims were for mesothelioma, lung cancer, or other cancers. Seventeen percent of the claims included so little information that the type of disease could not even be determined. And the remaining 76% were for non-malignant conditions.

The percentage of malignant claims declined even further in 2000. Less than 6% of the claims were for cancer. More than 30% of the claims presented so little information that no disease could be identified. The remaining 64% were for non-malignant conditions.

Analysis of diagnostic data relating to the sampled claims shows the same picture: no new wave of disease is responsible for the new wave of claims. Two diagnostic tests are widely used in combination to diagnose non-malignant injury: "ILO" readings of chest x-rays and Pulmonary Function Tests. X-rays are used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs. The physician grades the x-ray on a scale of 0/0 (no abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour Organization ("ILO"). The American Thoracic Society has set an ILO rating of 1/1 as the minimum needed to support a diagnosis of asbestosis.[5]

Even an ILO rating of 1/1 does not establish any actual impairment in lung function. According to the American Medical Association, a second set of tests, Pulmonary Function Testing ("PFT"), is "the quantitative basis on which the evaluation of respiratory system impairment rests."[6] Two measurements of expiration function are taken: forced vital capacity (FVC) and forced expiratory volume in the first second ($FEV_1$). A third test, measuring the diffusing capacity of carbon monoxide in a single breath ($D_{co}$), is also performed. These results then are compared to normal predicted values calculated based on the gender, race, height and weight of the patient. For a diagnosis of "mild impairment," the AMA requires an FVC or $FEV_1$ result of 79% or less, or a $D_{co}$ result of 69% or less.[7]

---

[5] American Thoracic Society ("ATS"), *The Diagnosis of Non-Malignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. (1986) 134: 363-367.

[6] *AMA Guides to the Evaluation of Permanent Impairment*, § 5.2, p. 159 (4th ed. 1998).

[7] *Id*. At Table 8, p. 162.

Applying these diagnostic criteria to Grace's 1997 and 2000 claims, the claims are found to be grossly wanting. Excluding the 33 cancer claims in the 1997 sample, less than 2.8 % of the claims presented ILO ratings of 1/1 or higher and PFT results meeting the AMA criteria for "mild impairment." Only 3.3% of the 2000 sample claims satisfied both standards.

**2.      Most Claims Fail To Establish Actual Occupational Exposure To Grace's Products.**

The recent sampling of Grace's 1997 and 2000 claims also shows that very few claimants can establish any actual exposure to Grace's asbestos products, either because they provide no exposure information or because theys worked in industries and occupations in which exposure to Grace's products would have been unlikely or impossible.

Half of the claims provide no exposure information whatsoever. Of the 1997 sample claims, 236 (47%) provide no information about the location where the alleged exposure occurred, the worker's employer or industry, or the Grace product to which he was exposed. Fifty-two percent of the 2000 sample claims fail to provide any of that critical information. Even when Grace attempted to fill in these gaps by cross-referencing the claimant's Social Security number to the Manville Trust and CCR databases, it was unable to identify the industry involved for 20% of the 1997 sample claims, and 29% of the 2000 claims. And, of course, the Manville Trust and CCR data provide no information about any exposures to Grace products.

For the other half of the claims, the meager exposure information that is provided rarely implicates Grace. For example, Grace's Monokote-3 fireproofing product was applied by plasterers primarily at high-rise steel construction sites. Yet, only two of the 500 sample 1997 claims and only one of the year 2000 claims were filed by plasterers. Indeed, only 8% of the 1997 Grace sample claimants and 3% of the 2000 claimants identified themselves as construction workers. Even after the Manville and CCR data was used to identify as many of the

"unknown" claimants as possible, only 16% of the 1997 sample claims, and 12% of the 2000 claims, were found to be filed by construction workers.

All of the evidence points to one conclusion:  the recent surge in claims against Grace is due to the indiscriminate filing of asbestos claims against an ever-increasing number of defendants nationwide.  Even the PI Committee's expert Mark Peterson concedes in his affidavit that "few plaintiffs" recall the specific products to which they were exposed, and that no product identification information was available in 79% of the sample Grace claim files the Committee reviewed *at the claimants' own law firms*.  (Peterson Aff.  34)

## II.    THE BEST MECHANISM FOR RESOLVING THE ASBESTOS PERSONAL INJURY CLAIMS IS TO IMMEDIATELY SET A BAR DATE AND APPROVE GRACE'S PROPOSED CLAIM FORM AND NOTICE PROGRAM.

The litigation protocol proposed by Grace in its original June 27, 2001 CMO motions and further detailed in its February 12, 2002 reply memorandum is the ***only*** proposal that complies with clear rules of procedure and evidence and that:  (1) provides prompt and effective notice to known and potential claimants of these Chapter 11 cases; (2) requires claimants desiring to bring a claim against Grace to file those claims prior to the bar date and submit to this Court's jurisdiction; (3) requires disclosure in the claim form of the basic information needed to resolve threshold common issues relating to product identification, product exposure, and the existence of compensable injury (including compliance with for reliable diagnostic criteria); and  (4) complies with the federal rules of procedure and evidence. (*See* Grace's June 27, 2001 Memorandum at 19-42; February 12, 2002 Reply at 25-43.)

In contrast, the "estimation" procedure proposed by the PI Committee simply assumes that Grace's pre-petition settlements are a binding acknowledgment of the validity of the unresolved claims pending against Grace as of the petition date, as well as of future claims. The PI Committee would dispense with a bar date and with the filing of claims forms, and

proceed directly to the funding of a claims settlement trust based on "projections" derived from the pre-petition settlements.

A.     **Proposed "extrapolations" based on Grace's pre-petition settlements are improper.**

Contrary to the PI Committee's contentions, most of the Debtors' pre-petition claims settlements were ***not*** made because the claims were valid.  Rather, Grace was compelled to agree to so-called "inventory settlements" because the tort system offered no means of limiting settlements to valid claims.  But the Court need not parse this history because Federal Rule of Evidence 408 expressly bars using evidence of a settlement to prove liability: "Evidence of . . . furnishing or offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim . . . *is not admissible to prove liability for . . . the claim or its amount*."(emphasis added); *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1247 (3d Cir.), *cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarket, Inc.*, 510 U.S. 994 (1993) (evidence of settlement in two antitrust actions inadmissible under Fed.R.Evid. 408); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 275 (3d Cir. 1983), *rev'd on other grounds sub nom, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 471 U.S. 1002 (1985) (consent decision in "dumping" proceeding was not admissible in related civil judicial proceeding); *In re Dow Corning Corp.*, 250 B.R. 298 (Bankr. E.D. Mich 2000); *Belton v. Fibreboard Corp.*, 724 F.2d 500 (5th Cir. 1984).

Thus, as a matter of law, Grace's settlement history and estimation based on that history cannot be considered in adjudicating Grace's actual legal liability to any group of claimants.  Instead, the proper time for estimation in a mass tort case, if estimation is to be employed, is after the Debtors' liability has been determined and the pool of valid claims against the Debtors has been defined.  This sequence is mandated by the Debtors' basic right to seek

disallowance of claims and the Code's adoption of ordinary litigation procedures for that process.  *See* Part II.B., next section *infra*.

This basic sequence was clearly delineated in *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997), where competing estimation proposals were rejected in favor of litigation.   In *Dow Corning*, the bankruptcy court denied competing motions for estimation where liability for breast implant claims was vigorously disputed.   In a decision to which we return later on, Judge Spector noted that liquidation (litigation) of personal injury claims is necessary and estimation cannot eliminate that requirement:

> While estimation may be a somewhat abbreviated form of liquidation, they are still essentially duplicative processes.  With nonpersonal injury claims, estimation is often justified because it can entirely eliminate the need for liquidation.  However, the present motions deal with estimating the value of personal injury claims and, absent settlement, liquidation simply cannot be avoided.  As a result, proceeding directly to liquidation will have the salutary effect of saving time, money and eliminating potential negative side effects that could easily result from the estimation process.

*In re Dow Corning*, 211 B.R. at 566.  The focus in the *Dow Corning* case then turned to *Daubert* and summary judgment motions, which were pending at the time the case was resolved.

## B.    Estimation is governed by certain bedrock principles.

Any estimation must comport with certain bedrock principles that apply to all bankruptcy litigation, and which preclude the estimation of contested liability issues here:

### 1.    A debtor cannot be required to pay more than its legal liability.

A fundamental principle of bankruptcy law is that a Debtor cannot be required to pay more than its legal liability.  Most importantly, Section 502(b)(1) of the Bankruptcy Code provides that where a claim is subject to objection, the claim shall not be allowed if such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable

law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. §

502(b)(1).  As explained in Collier:

> Claims that are unenforceable against the debtor or against
> property of the debtor under any agreement or by applicable law
> for other reasons [than that they are contingent or unmatured] are
> simply not allowable for purposes of a right to share in a
> distribution of the debtor's assets.

4 COLLIER ON BANKRUPTCY ¶ 502.03[2][b][iii], at 502-25.

Similarly, in order for a Chapter 11 plan to be confirmed over the non-acceptance

of the equity class, the plan must be found to be "fair and equitable" as to equity.  11 U.S.C. §

1129(b)(1).  Furthermore,"[a] major component of the 'fair and equitable' requirement is that no

creditor or interest holder be paid a 'premium' over the allowed amount of its claim.  Once the

participant receives or retains property equal to its claim it may receive no more."  7 COLLIER ON

BANKRUPTCY ¶1129.04[4][a], at 1129-89.  This principle is intended to assure that before a court

may confirm a plan it must find that "'[n]o class may be paid more than in full.'"  *Id.* at 1129-90

(citing H.R. 8200, 95th CONG., 1st Sess. 203-04, § 1129(b) (July 1997)).

These core principles govern the allowance and treatment of claims in Chapter 11

cases and cannot be diluted by the concept of estimation.  In particular, in virtually every case

where estimation has been used to address a disputed liability for any purpose, courts have made

clear that in "doing" the estimation, the court is bound by the legal rules which may govern the

ultimate legal value of the claim.  For example, when the claim is based on an alleged breach of

contract, the court must estimate its worth in accordance with accepted contract law.  *Bittner v.*

*Borne Chemical Company, Inc.*, 691 F.2d 134 (3rd Circ. 1982) at 135-37 (bankruptcy court

affirmed where it "estimated the value of . . . stockholders' claims according to the ultimate

merits of their state court action"); s*ee also In re Farley, Inc.*, 146 B.R. 748, 753 (Bankr. N.D.

Ill. 1992) (estimation requires application of the "relevant laws" which govern the liability); *In re*

*Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) (affirming a bankruptcy court's estimation of the value of contingent "call contracts" for purposes of a liquidation based on applicable bankruptcy and state law principles).

### 2. Estimation is governed by the Federal Rules of Evidence.

Bankruptcy Rule 9017 mandates that the "Federal Rules of Evidence . . . apply in cases under the Code." Fed. R. Bankr. P. 9017. Most significantly, this means that estimation proceedings which are directed at the size of the Debtors' disputed, putative asbestos liability, are governed by Federal Rule of Evidence ("FRE") 408. That rule provides that "[e]vidence of ... furnishing valuable consideration in compromising or attempting to compromise a claim ... is not admissible to prove liability for . . . the claim or its amount." As detailed above, this forecloses the PI Committee's proposal to base an estimation on Grace's pre-petition settlements.

### 3. Estimation must be done in accordance with the Federal Rules of Civil Procedure.

Estimation is also governed by "those general principles which should inform all decisions made pursuant to the Code." *Bittner*, 691 F.2d at 136. In particular, estimation proceedings are conducted as "contested matters" under Bankruptcy Rule 9014. Underlying BR 9014 is the recognition that "the fundamental requisites of due process must be afforded to all parties in a dispute." *See* 10 COLLIER ON BANKRUPTCY ¶ 9014.05 at 9014-5 (15th ed. rev. 1999). Thus, BR 9014 makes certain of the procedural rules that are applicable to adversary proceedings under Part VII of the Bankruptcy Rules directly applicable in contested matters, and gives the Bankruptcy Court authority to apply such other rules under Part VII as it directs. The rules under Part VII, in turn, largely incorporate the Federal Rules of Civil Procedure.

**4.      The use of estimation is limited by the right to jury trial.**

Two additional rules affecting the rights of personal injury tort claimants limit the availability of estimation in Chapter 11 mass tort cases.  First, 28 U.S.C. § 1411(a) provides that except in certain matters involving involuntary cases, the provisions of bankruptcy law do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with respect to a personal injury or wrongful death tort claim.  Second, under 28 U.S.C. § 157(b)(5):

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the claim is pending, or in the district court in the district in which the claim arose, or determined by the district court in which the bankruptcy case is pending.

These rules have the practical effect of limiting the use to which estimation may be put in Chapter 11 cases, since, without the consent of an individual tort claimant, estimation for purposes of allowance of the claim in lieu of a jury trial is prohibited.

Furthermore, as explained by the Court in *In re Dow Corning*:

> if estimation for plan confirmation purposes results in de facto estimation for distribution purposes via the effects of the plan of reorganization and the discharge provisions of §1141(d), a claimant's right to a jury trial for purposes of liquidating [its] claim becomes hollow.  Therefore, a strong argument can be made that estimating the aggregate value of tort claims for plan purposes runs roughshod over personal injury claimants' rights.

211 B.R. 545, 568 (Bankr. E.D. Mich. 1977).  Finally, because the right to jury trial is clearly personal to the claimant, this limitation is just as binding on estimations proposed by a claimants committee, or future claimants representative, as it is on the debtor.

**C.**     **The Personal Injury Committee's proposed "estimation" is not an estimation at all and is precluded by the rules.**

In sum, the PI Committee's "estimation" proposal has no precedential support in bankruptcy case law, and is in fact contrary to the basic principles established by courts applying estimation procedures in Chapter 11 cases. It disregards the principle that estimation of the Debtors' asbestos personal injury liability must be based on the legal merits of those claims. Contrary to FRE 408, it treats Grace's pre-petition settlements as admissions of liability to other claimants. And, if this Court's ultimate estimation is not to the claimants' liking, it effectively preserves the option for those claimants to later object that their personal rights to notice, a jury trial and perhaps other procedural rights were not respected in the estimation process.

**III.**     **THE COURT MAY PROCEED IMMEDIATELY TO DETERMINE COMMON ISSUES RAISED BY THE PRE-PETITION CLAIMS, WHILE POSTPONING THE SETTING OF THE BAR DATE FOR OTHER POTENTIAL CLAIMANTS.**

Unlike claimants' proposals, the procedures laid out in Grace's CMO motions are in full compliance with due process, the Bankruptcy Code, the Federal Rules of Civil and Bankruptcy Procedure, and the Federal Rules of Evidence. Moreover, they would lead to binding rather than merely advisory rulings. And, they would do so promptly.

Should, however, the Court decide to address even more quickly the fundamental liability issues raised by the personal injury claims, pre-petition claims may immediately be brought before the Court pursuant to the procedures outlined in 11 U.S.C. § 501(c) and Fed. R. Bank. P. 3004 or, alternatively, through transfer under 28 U.S.C. § 157(b)(5). At the same time, based on information contained in Grace's claims database, each of the pre-petition claimants could be issued a claim form to be completed promptly pursuant to a deadline set by the Court.

In the interim, the Court could appoint a panel of experts to assist it in deciding the contested scientific issues, or it could defer addressing those issues until after expert discovery and a hearing on *Daubert* motions.  The parties could then litigate the threshold issues concerning the validity of these claims through summary judgment proceedings as laid out in Grace's CMO motions.  At the conclusion of this phase, the Court could establish a bar date for the filing of any additional post-petition claims, approve a claim form tailored to its liability rulings and approve a notice program.  The advantage of this approach is that the Court may immediately address threshold liability issues without waiting until the notice program has been completed and the bar date has passed.

A.     **The pre-petition claims may be brought before this Court using either Fed. R. Bank. P. 3004 or the transfer provisions of 28 U.S.C. § 157(b)(5).**

The first step in such an expedited process is to bring all of the pre-petition claims before this Court.  This can be done immediately using one of two alternative mechanisms:

1.     **Filing a proof of claim pursuant to Fed. R. Bank. P. 3004.**

First, the pre-petition personal injury claims may be brought before this Court pursuant to 11 U.S.C. § 501(c) and Fed. R. Bank. P. 3004, which permit the debtor to file a proof of claim on behalf of its creditors.  *See, e.g., In re Kelley*, 259 B.R. 580, 584 (Bankr. E.D. Tex. 2001); *In re Schwartz*, 192 B.R. 90, 94 (Bankr. D.N.J. 1996); *In re Tucker*, 174 B.R. 732, 736 (Bankr. N.D. Ill. 1994); *In re Snyder*, 156 B.R. 759, 760 (Bankr. W.D. Pa. 1993); *In re A.H. Robins Co.*, 118 B.R. 436, 439 (Bankr. E.D. Va. 1990); *In re Frascatore*, 98 B.R. 710 (Bankr. E.D. Pa. 1989); *In re Gingery*, 48 B.R. 1000, 1004-05 (D. Colo. 1985).  In enacting § 501(c), "Congress authorized a debtor or trustee to file a proof of claim for a creditor in order to broaden the scope of participation in the bankruptcy case and thus facilitate the debtor's march toward rehabilitation."  *In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991).  Rule 3004 provides guidance

concerning the requirements for filing such a claim:  "[i]f a creditor fails to file a proof of claim

on or before the first date set for the meeting of creditors called pursuant to § 341(a) of the Code,

the debtor or trustee may do so in the name of the creditor."  Fed. R. Bank. P. 3004.

Here, the first meeting of creditors has passed.  The approximately 800 claims

received to date include a small number of personal injury claims, but the vast majority of those

who filed pre-petition personal injury lawsuits against Grace have yet to file their claims in these

Chapter 11 cases.  Accordingly, Grace may now file such claims.  Upon filing, notice may be

given to claimants so that they may file their own proofs of claim that "would supersede the

proof filed by the debtor."  *Id.*  Adv. Cmt. Note.

Judge Fitzgerald recently ruled that Grace had the right to file Rule 3004 claims

on behalf of the pre-petition ZAI claimants, in order to bring those claimants before the Court to

litigate common liability issues raised by those claims.  Thereafter, the ZAI claimants filed

amended claims with the Court.  There is no reason this procedure would not work equally well

here.

**2.      Transfer of pending claims pursuant to 28 U.S.C. §  157(b)(5.**

Alternatively, the Court could transfer all pending claims against Grace using the

mechanism provided in 28 U.S.C. § 157(b).  Under Section 157, personal injury and wrongful

death claims may be transferred to the district court presiding over the bankruptcy proceedings:

> The district court shall order that personal injury tort and wrongful death claims
> shall be tried in the district court in which the bankruptcy case is pending or in the
> district court in the district in which the claim arose, as determined by the district
> court in which the bankruptcy case is pending.

28 U.S.C. § 157(b)(5).  In this manner, the court may exercise jurisdiction over all related claims

in order to centralize the litigation in a single forum.  *See, e.g. In re Dow Corning Corp.*, 86 F.3d

482, 496 (6th Cir. 1996); *A.H. Robins v. Piccinin*, 788 F.2d 994, 1011 (4th Cir.), *cert. denied*, 479

U.S. 876 (1986); *Calumet Nat'l Bank v. Levine*, 179 B.R. 117, 121 (N.D. Ind. 1995).

   In *Dow Corning*, for example, the court transferred thousands of breast implant

claims to preside over a "threshold jury trial on the issue of whether silicone gel breast implants

cause the diseases claimed." *Dow Corning*, 86 F.3d at 486. The court concluded that it was

essential that the litigation be centralized in a single forum, which would "increase[] the debtor's

odds of developing a reasonable plan of reorganization" and "'assure fair and non-preferential

resolution of . . . claims.'" *Id.* at 496 (quoting *A.H. Robins*, 788 F.2d at 1011).

   Similarly, in *Pan Am*, the court transferred several personal injury and wrongful

death actions against the debtor directly from the state court in which they were pending to the

U.S. District Court for the Southern District of New York, the location of the Pan Am

bankruptcy proceedings.[8] As the Second Circuit observed in upholding the transfer, "Congress

enacted section 157(b)(5) to expand the district court's venue-fixing powers with an eye to

centralizing the adjudication of a bankruptcy case." *In re Pan Am Corp.*, 16 F.3d 513, 516 (2d

Cir. 1994). Accordingly, the court agreed that transfer of the tort claims for resolution within the

bankruptcy proceedings was appropriate.

   Finally, this Court recently issued similar orders in the *Federal-Mogul* Chapter 11

to transfer thousands of friction product claims against various parties on a provisional basis.

*See, e.g.,* Order, *In re -Federal Mogul Corp.*, No. 01-10578 (Dec. 10, 2001). The same

---

[8] *See also Calumet Nat'l Bank v. Levine*, 179 B.R. 117, 122 n.7 (N.D. Ind. 1995) ("Section 157(b)(5) bestows upon the district court authority to transfer actions pending in state court."); *In re United States Lines, Inc.*, 1990 WL 451981, at *1-2 (S.D.N.Y. Nov. 6, 1990) (ordering transfer of actions pending in state court).

procedures may be employed here to immediately obtain jurisdiction over the pre-petition personal injury claims that are currently pending in various jurisdictions.

**B.      Submission of Court-Approved Claim Forms.**

After the claims are brought before this Court, specialized claim forms may be sent out immediately to counsel of record for all claimants based on the information in Grace's claims records.  Claimants could be required to complete the forms promptly, within 90 days. Because these claims have been pending for at least 14 months, have been filed by claimants represented by counsel, and because counsel have been on notice of Grace's proposed claim form for 10 months, such a deadline poses no unreasonable burden on claimants.

As detailed in the CMO motions, Grace's proposed claim form would provide an efficient means of obtaining information essential to determining the validity of claims.  On March 18, 2002, Judge Fitzgerald approved similarly detailed claims forms in these cases for property damage and medical monitoring claims.  The property damage form approved by Judge Fitzgerald is 10 pages in length (copy attached).  Detailed claim forms have been used in prior mass tort bankruptcies to the same end.  *See, e.g., In re A.H. Robins Co.*, 862 F.2d 1092 (4th Cir. 1988) (approving required questionnaire); Order, *In re Babcock & Wilcox Corp.*, No. 00-00-0558, at 4 (Bankr. E.D. La. Oct. 30, 2000 (approving asbestos personal injury claim form).

The requirements of the claim form vary depending on what issues are being contested in the case.  Thus, in *Babcock & Wilcox*, the court approved a claim form that requires asbestos claimants to provide information relevant to certain common issues such as "the appropriate standard of liability, the availability of punitive damages, the validity of claims by unimpaired individuals, the validity of claims based on unreliable scientific evidence of disease and/or causation, the appropriate statute of limitations, and the applicability of the sophisticated purchaser and government contractor defense."  *In re The Babcock & Wilcox Co.*, 2000 WL

422372, at \*4 (E.D. La. 2000).  Similarly, in *A.H. Robins*, the court required "information of the claimant's use of the Dalkon Shield, the type of injury alleged and the names of physicians or clinics visited by the claimant."  *In re A.H. Robins Co.*, 862 F.2d at 1095-96 & n.4.

The claim form proposed by Grace requests the information necessary to establish a claim in the face of the defenses it intends to assert.  First, the proposed form requires submission of information about the claimant's medical diagnosis, including the date of first diagnosis, and the medical records relating to the diagnosis, all of which are necessary to establish claims of disease causation.  Second, the form requests information needed to identify any alternative causes of a claimant's disease.  Third, the claim form requires information concerning the claimant's occupational exposure to asbestos, and to Grace's products in particular.  Finally, the claim form elicits information necessary to determine if claims are barred by the doctrine of *res judicata*, such as information concerning any prior asbestos-related lawsuits or workers' compensation claims filed by the claimant and any settlements or judgment.  These questions are all necessary to establish that a particular claim has merit.

Such claim forms are an efficient means of obtaining the information necessary to resolve the validity of asserted claims.  Thus, even outside of Chapter 11, in recent cases involving diet drug, orthopedic bone screw, and latex mass tort litigation, similar forms have been used to streamline mass tort litigation.[9]

---

[9] *See, e.g., In re Diet Drugs*, 1999 WL 387322, at \*1 (utilizing claim forms in order to "minimize time consuming and expensive exchanges of discovery" by numerous plaintiffs); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 70472, at \*4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Food Lion, Inc.*, 1998 WL 322682, at \*11 (4th Cir. 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim").

Moreover, the use of such forms can present no burden given that Grace's proposed claim form seeks information similar to that already required by the major asbestos personal injury settlement trusts. As is shown in the Table below, the Celotex, Eagle-Picher, UNR, and the Manville settlement trusts all require essentially the same basic information:

**Comparison of Proposed Grace PI Form To Individualized Review Forms Used By Major Settlement Trusts**

| PROPOSED GRACE PI FORM | CELOTEX (IR Form) | EAGLE-PICHER (IR Form) | MANVILLE | UNR (Option 2 Form) |
|---|---|---|---|---|
| Length: 10 pages | 11 pages | 13 pages | 21 pages | 3 pages +4 pages re required med. docs. |
| Identification of Claimant and Counsel | Yes | Yes | Yes | Yes |
| Cause of Death | Yes | Yes | Yes | No |
| Diagnosed Asbestos-Related Injuries, including Date of First Diagnosis & Diagnosing Doctors | Yes | Yes | Yes | Yes |
| PFT Test Reesults | Yes, for disabling disease | Yes, if relied upon in diagnosis | Yes, for disabling disease | Yes, to realize full value |
| ILO Ratings | No | Yes, if relied upon in diagnosis | Yes, for disabling disease | Yes, usually required |
| Smoking History | Yes | Yes | Yes | Yes |
| Recent Diagnostic Reports and Test Records | Yes | Yes | Yes | Yes |
| Period of Asbestos Exposure | Yes | Yes | Yes | Yes |
| Occupational Exposure To Grace Products: | | | | |
| - Sites | Yes | Yes | Yes | Yes |
| - Occupation Description. or Code | Yes | Yes | Yes | Yes |
| - Industry Description or Code | Yes | Yes | Yes | Yes |
| - Proximity to Asbestos Product | Yes | Yes | Yes | Nature of Exposure |
| - Product Identification | Yes | Yes | Yes | Yes |
| Prior Lawsuits or Settlements | Yes | Yes | Yes | Yes |
| Dependant or Related Party Claims | Yes | Yes | Yes | Yes |
| Signature by Claimant or Agent | Yes | Yes | Yes | Yes |

In fact, the information required in the claim form used by the largest and best known claims resolution facility, the Manville Personal Injury Trust, is far more extensive than that required in the proposed Grace personal injury form. *See, e.g.,* Manville Personal Injury Trust Claim Form (attached). Thus, claimants must submit such information in order to receive

compensation.  Doing so now, rather than later, avoids needless duplication of effort and allows the information to be put to good use in order to ensure that only valid claims receive compensation.  Moreover, requiring the submission of such information before the criteria for payment are established is an important means of preventing the submission of fraudulent information that is crafted to ensure that claims are paid.  While the Personal Injury claimants assert that such claim forms are "impossible" to fill out, they are exactly the sort of forms plaintiffs' counsel have submitted by the thousands in the past.

### C.    Possible Appointment of a Rule 706 Expert Panel.

While the claim forms are being filled out and analyzed, the Court has the option of appointing a Rule 706 Panel.[10]  Appointment of such a panel has precedent in the breast implant litigation and may facilitate the resolution of  the important scientific issues.  If, however, the Court decides not to appoint a Rule 706 Panel, those same issues can be litigated and resolved through expert discovery followed by *Daubert* motions.

In finding qualified, neutral experts, the Court may  seek assistance from recognized medical organizations such as the American Thoracic Society or the American College of Chest Physicians.  Among the questions that might be considered by the Panel are:

---

[10] *See, e.g.,* Order 31, *In re Silicone Gel Breast Implant Prods. Liab. Litig.* (N.D. Ala. 1996), *in* 4 MEALEY'S LITIG. REP.: BREAST IMPLANTS F-1 (June 23, 1996) (appointing panel of medical experts to provide independent opinion medical evidence supporting general causation); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1552-53 (D. Colo. 1990) (appointing independent expert to assess testing methods used by plaintiffs' expert to support opinion on PCB contamination), *aff'd*, 972 F.2d 304 (10th Cir. 1992); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1404-05 (D. Or. 1996) (appointing and looking to panel of independent experts to provide opinion on medical evidence supporting causation).

**Questions relating to diagnostic data**

- **Pulmonary function tests**:  What result from PFT testing provides reliable, reproducible proof of impaired lung function or of impairment due to asbestos-related restriction?

- **Radiographic results**:  What ILO category provides reliable, reproducible evidence of diffuse fibrosis?  What procedures/standards should be followed in verifying that any particular X-ray reading is reliable and reproducible or that a particular reading of 1/0 or less is reliable and reproducible?

**Questions relating to the diagnosis of asbestosis**

- **Pathologic diagnosis**: If pathologic evidence is available, what pathologic evidence is required to reliably and consistently diagnosis asbestosis?

- **Diagnosis based upon ILO readings of 1/0 or less**:  Absent pathologic evidence sufficient to diagnose asbestosis or impaired lung function as shown through validated PFT test results, can a reliable diagnosis of asbestosis be made on the basis of unverified ILO readings of 1/0 or less?

**Pleural findings and impairment**

- **Pleural findings**:  Do pleural plaques constitute impairment or clinical disease?

- **Impairment**:  Absent impaired lung function as shown through validated PFT test results, does diffuse pleural thickening constitute impairment or clinical disease?

**Dose and causation**

- **Mesothelioma**:  Is the causation of mesothelioma by asbestos exposure dose-dependent? At what lifetime dose of asbestos has reliable, reproducible scientific evidence demonstrated causation of mesothelioma from asbestos exposure -- a two-fold excess of risk above the background risk of mesothelioma in the general population?

- **Asbestosis**:  Is the causation of asbestosis by asbestos exposure dose-dependent?  At what lifetime dose of asbestos has reliable, reproducible scientific evidence demonstrated causation of asbestosis from asbestos exposure -- a two-fold excessive risk above the background?

- **Lung cancer**:  Is the causation of lung cancer by asbestos exposure dose dependent?  At what lifetime dose of asbestos has reliable, reproducible scientific evidence demonstrated causation of lung cancer from asbestos exposure -- a two-fold excess of risk due to asbestos exposure?

All of these issues are central to the determination of the validity of claims, and may be resolved based on information provided in the proof of claim forms.

Once the Panel is formed, the Court can set procedures for its work. This could include the submission of literature by the parties for the Panel's consideration. The role of the Panel in the litigation can also be tailored to this Court's objectives. The breast implant panel proceedings before Judge Pointer, for example, represent a litigation-oriented approach -- indeed, the panel members were even deposed. Judge Pointer adopted that approach to create a record for use in widely-dispersed litigation, rather than to decide *Daubert* issues himself based upon the panel's work. In other breast implant litigation, Judge Jones adopted a more streamlined approach, appointing the panel to serve as technical advisors pursuant to Fed. R. Evid. 104 and to prepare reports, which were used by the court in resolving motions *in limine*. *See generally* Karen Butler Reisinger, *Court-Appointed Expert Panels: A Comparison of Two Models*, 32 IND. L. REV. 225 (1998). The approach most appropriate in this case can be decided in due course.

**D.    Summary Judgment Motions and *Daubert* Proceedings.**

Following completion of the claim forms, Grace will file omnibus objections and move for summary judgment on issues where claimant-specific information can be determined from the face of the claim form. For most claims, Debtors' objection will be paired with a summary judgment motion pursuant to Bankruptcy Rule 7056. Grace will provide notice and serve the omnibus objection/motion upon each affected claimant. Holders of the disputed claim would then have 30 days to file a written response that complies with the applicable rules. In the Case Management Order, the Court can determine briefing schedules, motions, an appropriate structure and schedule for discovery (if any), an appropriate structure and schedule for evidentiary hearings, and the sequence of timing of the various categories of claim objections.

Grace may file omnibus objections to large numbers of similarly situated claims, as is commonly done in large bankruptcy cases.[11]  A number of courts have recognized that the resolution of common issues through omnibus objections is essential in effectively resolving complex bankruptcy proceedings.  *See In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 544 (Bankr. D. Del. 1998) (since "it would have been extremely time-consuming for the court to consider the merits in the first instance of even a portion of these claims," the court established "a procedure for initial resolution of issues generic to all or to large categories" of claims).  *See also* Fed. R. Civ. P. 42(a) and Fed. R. Bankr. P. 7042(a) ("When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions . . . and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."); *Williams v. National Surety Corp.*, 257 F.2d 771, 776 (5th Cir. 1958) (consolidating single underlying legal issue into one trial).

As described in Grace's CMO motions, once the omnibus objections have been filed, the Court may rule on the summary judgment motions "to weed out those claims which do not present a genuine issue of material fact, and for which the debtor is entitled to judgment as a matter of law."  *In re Dow Corning Corp.*, 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997).  *See*

---

[11] *See, e.g., In re Marvel Entertainment Group, Inc.*, 254 B.R. 817, 820 (D. Del. 2000) (expunging claim after claimant did not respond to omnibus objection); *Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 270 (S.D.N.Y. 1996) (granting debtors' omnibus objection by disallowing creditor's claim); *In re Box Bros. Holding Co.*, 194 B.R. 32, 36 (D. Del. 1996) ("[Debtor] filed an Omnibus Objection to Certain Proofs of Claim . . . [and] the Bankruptcy Court granted the Omnibus Objection . . ."); *In re Int'l Wireless Communications Holdings, Inc.*, 257 B.R. 739, 742 (Bankr. D. Del. 2001) (sustaining omnibus objection and equitably subordinating creditor's claim); *In re United Companies Fin. Corp.*, 267 B.R. 524,-27 (Bankr. D. Del. 2000) (allowing in part claim after objection filed in omnibus objection); *In re FIRSTPLUS Fin., Inc.*, 248 B.R. 60, 65 (Bankr. N.D. Tex. 2000); *In re 50-Off Stores, Inc.*, 231 B.R. 592, 593 (Bankr. W.D. Tex. 1999) (granting debtor's omnibus objection and disallowing creditor's claim).

*also In re Babcock & Wilcox Co.*, 2000 WL 422372, at \*4 (E.D. La. Apr. 17, 2000).  If

necessary, any remaining issues can be resolved using common issue trials pursuant to Fed. R.

Civ. P. 42.  *See, e.g., Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675

(3d Cir. 1964), *cert. denied*, 382 U.S. 812 (1965); *In re Dow Corning*, 211 B.R. at 580, 583.

      Among the issues that are critical in determining the validity of submitted claims

and may be raised in summary judgment proceedings are the following:

### 1.      Failure to Comply with the Requirements of the Claim Form

      Under the Bankruptcy Rules, the ultimate burden of proof to establish a valid

claim "always rests upon the claimant."  *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir.

1988).  "Initially, a claimant must alleged facts sufficient to support a legal basis for the claim."

*In re Pinnacle Brands, Inc.*, 259 B.R. 46, 49-50 (Bankr. D. Del. 2001).  *See also In re Waterman*

*SS Corp.*, 200 B.R. 770, 774 (Bankr. S.D.N.Y. 1996) (same).

      Claim forms that do not provide the minimum requisites for establishing a claim

should be invalidated.  To weed out those claims that do not even meet the requirements of

qualifying as a "claim" under the bankruptcy rules and the procedures established by the Court,

Debtors would file omnibus objections and seek to disallow for all purposes duplicate claims,

paid claims, employee claims and claims failing to set forth on the Proof of Claim the most

rudimentary facts necessary to support a cause of action (*e.g.*, claims failing to provide *any*

medical information, failing to attach *any* medical records, failing to provide *any* exposure or

work site data).  Unless a claimant can produce such basic information necessary to establish a

valid claim, the claim should be barred.

      These objections can be resolved promptly in a relatively ministerial fashion

based on information that is apparent from the face of the claim form itself.  Indeed, once

objections are filed, many claims that are defective on their face may be withdrawn.  This has

been the experience in the *Babcock & Wilcox* bankruptcy, where thousands of purportedly "settled" proofs of claim were withdrawn after objections were lodged by the debtor.

### 2.    Claims Based On Unreliable Diagnostic Evidence

In order to maintain a claim, a plaintiff must demonstrate that tests were obtained using reliable and admissible methods. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742, 745 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190 (1990) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible). The scientific method relied upon may not be based on subjective speculation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) at 590. The methodology must be real, and it must produce consistent, reproducible results. *See id.* at 590 n. 9. Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. *See, e.g., Metropolitan St. Louis Equal Housing Opp'y Council v. Gundaker Real Estate Co.*, 130 F. Supp. 2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

Unfortunately, each of the two tests needed to establish asbestosis -- the ILO rating and PFT results--are subject to manipulation and can produce unreliable and non-reproducible results. While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not followed. In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under *Daubert*.

Accordingly, Grace intends to file a summary judgment motion seeking dismissal of claims based upon ILO and PFT readings that have not been obtained in compliance with accepted standards. Once again, the information on the claim form will be essential to determining the reliability of the submitted diagnostic evidence. For example, the claim form

requires (for non-malignant claims) submission of the results of any medical tests in which a medical doctor measured the claimant's lung function or capacity, and copies of those reports and tests.  Claimants must also submit copies of any X-rays or CT scans performed in the last two years and reports of their interpretation, including the claimant's ILO form along with information concerning the medical professionals that performed such tests.  As detailed below, if such tests were not performed or evaluated in conformance with recognized standards, then the claim should be invalidated.  *See, e.g., Eagle Picher Indus. v. Liberty Mut. Ins. Co.*, 829 F.2d 227, 236 n.14 (1st Cir. 1987).

### *ILO Tests*

There are two major and interconnected problems with ILO scores – variability and subjectivity.  Numerous studies have shown that lung x-rays are interpreted with tremendous variability by different readers (inter-observer variability) and even by the same reader at different times (intra-observer variability).  The ILO itself acknowledges that "there is significant variation in repeated readings of the same radiograph, not only from reader to reader, but also between readings by the same reader."[12]  The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale.  As Dr. Hans Weill, a leading

---

[12]ILO 1980 INTERNATIONAL CLASSIFICATION OF RADIOGRAPHS OF THE PNEUMOCONIOSES INTERNATIONAL LABOUR ORGANIZATION, GENEVA 1980, at 20.  NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification.  ("1980 ILO Report") There is also the perception some B-readers systematically bias readings  in legal proceedings."  M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992).

pulmonologist and asbestos researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[13]

In the face of these problems, ILO readings must be confirmed by two independent and qualified readers to be admissible under *Daubert*. All ILO readings must satisfy this requirement. The ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are made for each radiograph."[14] Other experts agree. As Dr. Ducatman has stated, "[a]t present, individual diagnoses, legal decisions and population assessments ought to rely on multiple readings."[15] The ILO classification of 1/0 suffers from an additional defect, because by definition it recognizes that a second reader could find no evidence of fibrosis. ILO classifications below 1/1 further fail to meet *Daubert* requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter. *Daubert* forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error. *Daubert*, 509 U.S. at 590, 594.[16] Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. *See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 236 n.14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case.");

---

[13]H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

[14] 1980 ILO REPORT at 20.

[15] Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emphasis added).

[16]Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard. The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher. *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136:1516-17 (1987).

*Raymark Indus., Inc. v. Stempel*, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

As for ILO readings of 1/1 or higher, the variability problem may be reduced but still remains. Each B-reader brings an individual level of experience and bias to what indisputably is a subjective process of interpretation. Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified B-reader.

### *Pulmonary Function Tests*

PFTs are the best tool to determine whether an asbestos claimant has a physical impairment due to asbestos. Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction. But such tests are reliable only if performed accurately, and they are particularly subject to manipulation. For this reason, the ATS has issued comprehensive standards governing PFTs.[17] Inaccurate or poorly performed tests can result in improper diagnoses. Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[18]

Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests requires full patient cooperation and effort.

---

[17] ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies*, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[18] *Id.*

"Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort.  Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly.[19]  Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[20]

In order to survive a Daubert challenge, claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and accurate fashion, in conformance with the well-accepted standards established by the ATS.  Qualified experts, with knowledge of the ATS standards and experience in performing and interpreting PFT tests, can review existing tests to determine whether they were conducted properly.  For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether a Forced Vital Capacity (FVC) test was properly conducted.  A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other.  If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

Another important check is whether the spirometer was set to record for the full length of time recommended by the ATS.  Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present.  Appropriate predictive values must also be used to identify what constitutes abnormality and normality.  (An independent

---

[19]  Fitzgerald et al., *Office Evaluation of Pulmonary Function:  Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[20] *ATS Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136:1285-98 (1987).

facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.)

          3.      **Claims Lacking Reliable Evidence of Restrictive Impairment**

Courts universally require the plaintiff to demonstrate "that the defendant had a duty of care which [was] breached, and that the breach proximately caused legally cognizable injury." *See, e.g., Faya v. Almaraz*, 329 Md. 435, 448, 620 A.2d 327 (1993) (emphasis added). The mere prospect of future harm, without any actual current harm, is not a legally cognizable personal injury. "Actual loss or damage resulting to the interests of another" is a necessary element of a negligence cause of action. "The threat of future harm, not yet realized, is not enough." PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[21] A "mere change or alteration in some physical person, object or thing" does not constitute a legally compensable harm. "Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person." A person suffers harm only "[i]n so far as physical changes have a detrimental effect" on that person. *Id*. § 7 cmt. b.

For example, the Maine Supreme Court concluded in *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" *Id*. at 543. The Bernier court was quoting

---

[21] This law also bars claims for medical monitoring costs. Medical monitoring claims present no present injury, only the risk of future injury. By definition, a risk of future injury is not compensable.

from a FELA case, *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985),

*cert. denied*, 474 U.S. 864 (1985).  As the U.S. Supreme Court has recognized in FELA cases,

"the words 'physical impact' do not encompass every form of 'physical contact'.  And, in

particular, they do not include a contact that amounts to no more than an exposure." *Metro-*

*North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 432 (1997); *see also Amendola v.*

*Kansas City Southern Ry. Co.*, 699 F. Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers

alone did not represent physical injury sufficient to support a claim).

Courts have therefore repeatedly found that asymptomatic asbestosis is not a

legally cognizable injury.  For example, in *Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz.

App. 1987), the court granted summary judgment to an asbestos mill owner with regard to

subclinical asbestosis claims because subclinical injuries do not amount to physical harm.

"[U]ntil the asbestosis manifests itself one can only speculate as to the debilitating effects the

plaintiff will suffer.  Not all asbestosis is one hundred percent debilitating."  Consequently, the

court stated, "[w]e see no reason to depart from traditional tort concepts and allow recovery for

injuries before any disease becomes manifest."  *Id.* at 31.  The court reasoned that a contrary rule

would give rise to a cause of action for countless plaintiffs who are healthy and might never

manifest injury.  Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting in
> windfalls for those who never take ill and insufficient compensation for those who
> do.  Requiring manifest injury as a necessary element of an asbestos-related tort
> action avoids these problems and best serves the underlying purposes of tort law:
> the compensation of victims who have suffered.

*Id.* at 30 (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985)).

Similarly, in *Taylor v. Owens-Corning Fiberglas Corp.*, 666 A.2d 681, 687 (Pa.

Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer

discernible physical symptoms to have a compensable injury."  Several of the plaintiffs whose

cases had been consolidated in Taylor had been diagnosed with asbestosis but had no symptoms attributable to asbestos exposure.  The court found that none of the plaintiffs had an injury sufficient to sustain a legal cause of action.  "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering, no loss of an organ function ...,' he does not have a compensable injury."  *Id.* (quoting *Giffear v. Johns Manville Corp.*, 632 A.2d 880, 887 (Pa. Super. 1993)).

The fact that an ILO reading of 1/0 represents only "suspect" disease, combined with the variable nature of a 1/0 reading (*see* prior section), has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting.  The "authoritative consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[22] Similarly, any "asbestosis" that does not result in at least "mild impairment" under the AMA's standards for evaluating PFT results cannot support a claim of medical impairment.

---

[22]*The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 134:363-68 (1986).

4.    **A Lack of Any Occupational History Entailing Work with Grace's Products**

Grace also intends to file omnibus objections and summary judgment motions based on the claimant's failure to identify any occupational history involving actual work with Grace's products.  In order to bring a valid claim, "a plaintiff must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product." *Harris v. Owens Corning Fiberglas Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996).  There can be no personal injury claim unless the plaintiff establishes exposure to defendant's product.  *See generally* PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) (an essential element of a plaintiff's case is "the identification of the named defendant as the manufacturer of the defective product").  Thus, "[i]t is axiomatic that, if the defendant never sold asbestos to any of the locations where [the claimant] was allegedly employed, no cause of action lies against defendant." *Outlaw v. Keene Corp.*, No. 88-9490, U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990).

Here, again, the information on the face of the claim form will determine the validity of the asserted claims.  The proposed claim form requires a description of each occupational position and job location in which exposure to Grace's products occurred, the specific Grace products that the claimant was exposed to, the specific job performed by the worker while he was exposed to Grace's product, and the proximity and duration of exposure to Grace's product at each location.

5.      **A Lack of Reliable Evidence that Grace's Products Were a Substantial Contributing Factor in Causing the Claimed Disease**

Even for those with some occupational exposure to Grace's products, the claimant must additionally show that such exposure substantially contributed to the causation of the claimed asbestos related disease.  It is a fundamental tenet of science that "the dose makes the poison."[23]  This is true with asbestos as with all other chemicals.  Virtually every person in North America has been exposed to asbestos.  Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[24]   According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies."  Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

Hence, not every person who worked near a Grace asbestos product can demonstrate that product substantially contributed to his claimed injury.  Here again, threshold determinations must be made under *Daubert*.  The whole concept that "the dose makes the poison" is incorporated into the court's gatekeeping function under *Daubert*.  A claimant thus

---

[23] This principle, first articulated by Paracelsus in the 16th century, is one of the foundations of modern toxicology.  In the words of Paracelsus: "What is there that is not poison?  All things are poison and nothing [is] without poison.  Solely the dose determines that a thing is not a poison."  *See* CASARETT AND DOULL'S PRINCIPLES OF TOXICOLOGY: THE BASIC SCIENCE OF POISONS at (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, IN FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

[24] "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs."  CHURG, A., NONNEOPLASTIC DISEASE CAUSED BY ASBESTOS, IN PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 293 (Churg & Green, ed. 2nd 1998).

has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (i.e., general causation) and (2) the claimant himself was in fact exposed to the requisite dose (i.e., specific causation).[25] "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996). Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 278 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999). Unless and until the claimant establishes the existence of a harmful dose – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to guess whether that particular claimant's exposure was sufficient to cause disease. Guesswork is insufficient under *Daubert* or any other rule of evidence. In *Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." As the court explained: "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork. Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.* at 781.

---

[25] *See Reference Guide on Epidemiology*, in FEDERAL JUDICIAL CENTER REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.").

It will be the claimants' burden to demonstrate through reliable scientific evidence the levels of exposure sufficient to substantially contribute to both malignant and non-malignant asbestos-related disease.  It will be their burden also to prove the occupational activities where the claimants' exposures to a Grace product reached such levels. Accordingly, following *Daubert* proceedings, Grace expects to move for summary judgment on all claims where the occupational activity that involved exposure to Grace products has not been proven (through evidence meeting *Daubert* standards) sufficient to substantially contribute to the causation of the claimed disease.

**E.    Resolution of post-petition claims submitted pursuant to the bar date.**

At the same time this Court moves forward to determine the validity of the pre-petition claims, the Court may establish a bar date for personal injury claims arising during the pendency of these proceedings and approve a notice program to alert potential claimants of the bar date set by the Court.  The setting of the bar date can be timed so that prospective claimants can be informed of the Court's liability rulings, and can take those rulings into account in deciding whether to file claims.  As set forth in Grace's CMO motions, the prompt establishment of a bar date is a critical element of the successful resolution of these Chapter 11 proceedings. The bar date is designed to "provide the debtor and its creditors with finality and to insure the swift distribution of the liquidated estate." *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 17 (1st Cir. 1997).  In particular, in mass tort bankruptcies such as this, the bar date is essential to "the process of arriving at a value of the claims of [the tort claimant] class." *In re Eagle-Picher Indus., Inc.*, 137 B.R. 679, 681 (Bankr. S.D. Ohio 1992).

Once the bar date has passed, the Court may determine the appropriate disposition of the post-petition claims that have been received.  In resolving these claims, the Court's rulings

with respect to the pre-petition claims would obviously stand as strong precedent.  Thus, it is highly likely that these claims can be resolved promptly after a show cause hearing that affords the new claimants an opportunity to persuade the Court to modify its prior liability rulings..

>    **F.    Estimation following procedures consistent with the established rules.**

Following the Court's rulings on summary judgment, to the extent necessary, the Court may estimate any remaining claims.  The goal of the estimation will not be to allow or disallow claims for distribution purposes.  Rather, any claims that survive summary judgment will be made against a post-confirmation trust, which will have the power to settle or litigate the claims that are submitted.  Thus, the purpose of the estimation will be to determine the appropriate size of the claims resolution facility.

Nonetheless, the prior summary judgment proceedings will be essential to the success of any subsequent estimation.  Obviously, claims that are invalid should not be included in any estimation of Grace's asbestos liability.  Failure to exclude such claims will only ensure that any subsequent estimation is grossly inaccurate.  *See, e.g., In re Dow Corning Corp.*, 211 B.R. at 563-68 (where liability issues are resolved at the outset "the very real concern that estimates may prove to be inaccurate would be eliminated").  Not only are such liability determinations required under the rules, it would be a waste of time to "estimate" the value of categories of claims that have no merit.  *See id.* (resolving threshold liability issues means that "time delay and expense associated with the estimation process itself would be avoided").  As the court observed in *Babcock*, "[a]scertaining the number and identity of present claimants will assist in valuing the claims in this class [asbestos personal injury claims], by facilitating the claims allowance and estimation processes . . . in turn assist[ing] the parties in the negotiation and formulation of a viable reorganization plan."  *In re The Babcock & Wilcox Co.*, No. 00-0558 (E.D. La. Aug. 25, 2000).

## <u>CONCLUSION</u>

The procedures outlined in this memorandum would allow the Court to immediately proceed to the resolution of the threshold liability issues described in Grace's CMO motions in a manner that is consistent with the applicable rules.  Whether the Court decides to set a prompt bar date followed by litigation of common liability issues or proceed immediately to the litigation phase using the pre-petition claims as described in this memorandum, it is clear that under the applicable rules the Court may not dispense with liability determinations as the PI Committee suggests.  Rather, such procedures are barred in a "mass tort bankruptcy [such as this] where liability ha[s] been disputed by a debtor."  *In re Dow Corning Corp.*, 211 B.R. at 554.

In sum, while the Personal Injury Committee may want to receive payment for submitted claims whether they are valid or not, Debtors have a right to contest the validity of such claims.  The procedures outlined in this memorandum demonstrate that, contrary to the Committee's suggestions, the Court may resolve such threshold liability issues promptly.

Dated:  June 21, 2002

Respectfully submitted,


KIRKLAND & ELLIS
David M. Bernick, P.C.
James H.M. Sprayregen, P.C.
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000
(312) 861-2200 (fax)

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

/s/ David W. Carickhoff, Jr.
Laura Davis Jones
David W. Carickhoff, Jr.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in Possession