UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Case No. 01-01139 (JKF)
                                    .
W. R. GRACE & CO., et al.,          .    Chapter 11
                                    .    Jointly Administered
        Debtors.                    .
                                    .    June 18, 2002
                                    .    2:40 p.m.
                                    .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



1    THE COURT:   Okay.   This is the matter of W.R.

2  Grace, 01-1139.

3    MR. KAPP:   Good afternoon, Your Honor.   James Kapp

4  on behalf of the debtors.   Your Honor, items (1) and (2) on

5  our agenda are continued.   Item (3) was uncontested.

6    THE COURT:   Whoa - whoa.

7    MR. KAPP:   I'm ready to rule, Your Honor.

8    THE COURT:   I'm not even on --

9    MR. KAPP:   I'm excited.   I'm ready to go.   Having

10  fun.

11    THE COURT:   All right.   Items (1) and (2) are

12  continued till July 22nd.

13    MR. KAPP:   Item No. (3), Your Honor, is --

14    THE COURT:   I have signed that order.

15    MR. KAPP:   Excellent.   If you would allow us, Your

16  Honor, I would like to go out of order to Item No. (5) as we

17  have reached a resolution with regards to the United States

18  Trustee's objection to the debtors' motion to retain PWC.

19    THE COURT:   All right.

20    MR. KAPP:   In particular, the order has now been

21  modified with two regards.   PWC will be retained as of April

22  15th, the date of the admitted application, and particularly

23  the order now also specifies, and I'd like to read on the

24  record, Your Honor, that this order shall not constitute

25  approval of any finding or evidence regarding: (1) any

1   request for approval on any theory of the employment of PWC

2   by any of the debtors prior to April 15th, 2002; and (2) the

3   disinterestedness of PWC at any time prior to April 15th,

4   2002; and (3) PWC's entitlement to any compensation for

5   services prior to April 15th; and finally, any other fact

6   that may be subsequently offered by the debtors or PWC in

7   support of any request to retain or compensate PWC for any

8   services rendered prior to April 15th, 2002.  And all parties

9   reserve all their rights to object with regards to all such

10  matters.  And with that said, Your Honor, if there's no

11  objection, I would offer a revised order.

12          THE COURT:  Just a minute, please.

13          MR. KAPP:  Your Honor, if it would help, I have a

14  redline of the changes, if that would help.

15          THE COURT:  PWC's affidavit indicates that it's

16  waiving its right to claim an indemnity as to its

17  Casson/Bruce (phonetical) litigation, but I'm not clear

18  whether -- what it's saying is that they're waiving the right

19  as of April 15th or whether they just filed the affidavit on

20  April 15th, and they're waiving any claims to that indemnity.

21  The brief seems to indicate it's the latter.  The affidavit,

22  I think, isn't clear.  Which is it?

23          MR. KAPP:  Your Honor, PWC is here, but I believe

24  you are correct it is the latter.  They are waiving the

25  conflict altogether.

1    THE COURT:  Waiving the indemnity claim.

2    MR. KAPP:  Yes.

3    THE COURT:  Well, if they're waiving the indemnity

4    claim altogether, is there some other pre-petition claim that

5    it has?

6    MR. KAPP:  Your Honor, PWC performed -- We are

7    retaining -- The debtors are retaining PWC now as auditors

8    and tax consultants.  PWC did do other work for the debtors

9    prior to that period.  That amount is still out there, and in

10    the past -- in the original application, they sought to be

11    retained as of the petition date, but the now this agreement

12    will reserve their right to come back if they so choose to

13    try to argue for that amount.  I would ask PWC's counsel to

14    speak up as to the actual dollar amount outstanding.

15    THE COURT:  But they still have a claim for pre-

16    petition services?

17    MR. KAPP:  I believe --  Actually, no, it's with

18    regards to post-petition services.  They don't have any pre-

19    petition claim, but PWC has been doing work for the debtors

20    since the petition date, April 2nd of 2001, and pertains to

21    fees incurred by PWC after April 15th, 2002, but we have the

22    period from the petition date to April 15th, 2002, this order

23    would just be a standstill and preserve the rights of all

24    parties with regard to that, that post-petition period.

25    THE COURT:  All right.  Can I just get a time line

1    answer to my question so I make sure I'm on the same page.

2    The only claims PWC had pre-petition was this indemnity claim

3    for the Casson-Bruce litigation.   There was no unpaid pre-

4    petition amount owed to PWC.

5              MR. KAPP:  Yes, Your Honor.

6              THE COURT:   Post-petition they performed work

7    before the order was entered authorizing their appointment,

8    and they haven't been paid for those post-petition services.

9              MR. KAPP:  Yes, Your Honor.

10             THE COURT:  And now everybody's agreeing that as of

11   April 15th, 2002, they can be retained and they can be paid

12   for services from that date forward.

13             MR. KAPP:  Yes.

14             THE COURT:  But it's the only petition -- The only

15   potential conflict they had for services before April 15th,

16   2002, was the fact that this indemnity was out there, and

17   they've now waived that claim.   Why aren't they entitled to

18   be paid for the rest of the post-petition services and be

19   appointed nunc pro tunc?

20             MR. KAPP:  Well, Your Honor, we would agree with

21   you, but I have a feeling the U.S. Trustee has a few

22   comments.

23             THE COURT:  Well, I'd like to hear them because I'm

24   not sure I understand since the case law seems to say that if

25   there is no conflict then you're entitled to be retained, why

I have to address this issue later rather than now?  Mr.
Perch?

MR. PERCH:  Good afternoon, Your Honor, Frank Perch
for the United States Trustee.  Your Honor, the United States
Trustee's continuing objection to the approval of PWC's
retention for a time period prior to April 15th of 2002 is
based upon the standard set forth in the Third Circuit case
law on nunc pro tunc retention such as the F.S. Air Lease
case which sets forth a two-part test for approving nunc pro
tunc retention, and the two prongs are first, that the
applicant must have been disinterested and thus capable of
being retained as of the proposed earlier nunc pro tunc date,
and secondly, the applicant must show extraordinary
circumstances justifying the delay.  We believe, Your Honor,
that there are problems on both prongs of this test but most
germane to Your Honor's concerns being expressed right now is
that the affidavit of Mr. Farmer attached to the amended
retention application recites that, quote, "As of the date
hereof," close quote, the indemnity claim has been waived.
And the date of Mr. Farmer's affidavit is April 15, 2002.
The "as of the date hereof" language indicates that there was
no waiver of the indemnity claim prior --

THE COURT:  But that's been verified on the record
now.

MR. PERCH:  -- to April 15th, 2002.

1    THE COURT:  That's been clarified simply to say

2  that the affidavit is dated that date, but they're waiving

3  the claim entirely.  That's what I just asked on this record,

4  because that's what their brief says.

5    MR. PERCH:  But they're waving it as of April 15th.

6  They're not waiving it as --

7    THE COURT:  No.  No, they're waiving it backwards.

8  They filed the affidavit on April 15th.

9    MR. PERCH:  Well, I didn't understand that to be

10  the nature of the clarification, Your Honor.

11    THE COURT:  Well, let me ask counsel for PWC so we

12  get it on the record because that's what I understood the

13  application to say.  So, let me clarify, Mr. Perch.  Good

14  afternoon.

15    MR. GOODCHILD:  Good afternoon, Your Honor, John

16  Goodchild with the law firm of Morgan, Lewis, and Bacchus

17  (phonetical) on behalf of PricewaterhouseCoopers.  Your

18  Honor, counsel for the debtors is correct.  Although the date

19  on which the waiver was made was April 15th, the waiver is of

20  any claim at any time arising under that indemnity.

21    THE COURT:  Can I get that specified in writing in

22  a supplemental affidavit so that I can put this issue to bed?

23    MR. GOODCHILD:  Yes, Your Honor.

24    THE COURT:  Thank you.  How much time will that

25  take?

1    MR. GOODCHILD:  We could have it within a day or

2  two, Your Honor.

3    THE COURT:  Fine.  Thank you.  Within a week.  I'd

4  like that supplemental affidavit to simply explain that the

5  waiver is for all claims under it, but the affidavit was

6  dated as of that date.

7    MR. GOODCHILD:  Is there any other issue you'd like

8  me to address, Your Honor?

9    THE COURT:  Well, I want to hear from Mr. Perch.  I

10  don't know.  If you give me a minute, I'll let you know.  Mr.

11  Perch?

12    MR. PERCH:  I'm having a little bit of difficulty

13  understanding how it is that the indemnity agreement can be

14  waived retroactively.

15    THE COURT:  Because there hasn't been a claim made.

16  So if there hasn't been a claim made, and they waive any

17  rights to be paid under that indemnity it can be waived

18  retroactively because they'll never be able to file a claim.

19  Am I correct?  There's been no claim made?

20    MR. GOODCHILD:  Your Honor, there was never any

21  claim made.

22    THE COURT:  So they're waiving it retroactively.

23    MR. PERCH:  I think, Your Honor, we still need to

24  address the second prong of the nunc pro tunc retention

25  standard which is:  What are the extraordinary circumstances

supporting the delay in making PWC disinterested?  It is my

understanding that this issue was in -- that this indemnity

agreement was in existence prior to the filing of W. R.

Grace's petition on April 2 of last year, 2001, and that the

issue, therefore, was obvious from the date the petition was

filed.  PWC has been rendering services since the date the

petition was filed.  Initially, in fact, I think it's fair to

say that no efforts were made or at least no efforts were

successfully made, I should say, to deal with the problem

until April 15th.  Instead what happened was PWC filed a --

really, I'm sorry I have to say frivolous application to get

paid notwithstanding the conflict, and I strongly suspect

although it was ultimately continued a few times and

withdrawn consuming a lot of attorney time and, therefore,

the estate's money in dealing with this situation over these

-- period of really basically a year, a year and two weeks,

to put themselves into a position where they could be

retained.  And I don't think there's been any showing of a

set of factual circumstances meeting the requirements of

Third Circuit law explaining the delay of a year and two

weeks.

THE COURT:  Well, I think the application was filed

perhaps in a different format but asking to retain

Pricewaterhouse shortly after the case was filed.  And then,

as I recall, it was withdrawn because the U.S. Trustee and

1    frankly the Court had some concerns about the nature of --

2    not the nature of the retention but the method of the

3    retention, and this application was substituted for it, if I

4    recall correctly.  Now, if that's the case, we're talking, I

5    think, about a two-month delay.  I don't think at the outset

6    of the case that that's extraordinary.

7         MR. PERCH:  Your Honor, the time frame was that the

8    original application was filed, the non-professional

9    application or whatever it is one might want to call it, was

10   filed on January 10th of 2002 --

11        THE COURT:  Right.

12        MR. PERCH:  -- not when the case was filed.

13        THE COURT:  Oh, in 2002.

14        MR. PERCH:  The case was filed, Your Honor, April 1

15   of -- April 2, pardon me, of 2001.  First application of any

16   kind to approve compensation or retention of PWC was on

17   January 10 of 2002.

18        THE COURT:  The case was filed when?

19        MR. PERCH:  April 2 of 2001, Your Honor.

20        THE COURT:  Okay.

21        MR. PERCH:  So that even if you want to go back to

22   that first date, we've still got to explain getting from

23   April of 2001 to January of 2002.

24        THE COURT:  Yeah, now, that I agree with.  But I

25   think that the retention can go back to January when the

initial application was filed because I think this waiver,
that clarifies it is a waiver of any claim under that
indemnity, satisfies the fact that Pricewaterhouse now was
eligible at that time to be retained because the waiver is in
place.

MR. PERCH: Your Honor, with all respect, I
disagree with that because allowing the April 15th
application to relate back to January 10 really authorizes
and endorses an effort for the movant to manipulate the
process and have it both ways because the application filed
on January 10 took the position that PWC -- well, took a
number of somewhat inconsistent positions, but it basically
took the position that PWC was not a professional and,
therefore, could be compensated notwithstanding the fact that
it had a conflict, alternatively took the position that PWC
was an ordinary course professional.  Then when objections
were filed to that, they dropped back and filed an
application, really a garden variety application, under
327(a) and 328 seeking to be retained as professionals when
an objection was filed to the nunc pro tunc aspect of that
going back to a time prior to the date that they said they
made themselves disinterested, then a reply brief was filed
reviving the argument that they were nonprofessionals --

THE COURT: Well, let me put that argument --

MR. PERCH: -- and all goes back and forth.

1        THE COURT:  Let me put that argument to bed.  There

2   is no way under the circumstance of this case that this Court

3   is going to say that they were anything other than

4   professionals.  No way.  And one reason I want to go back to

5   the January date is because I want to make a ruling that says

6   that application attempting to say that Pricewaterhouse was

7   retained as something other than a professional subject to

8   327 through 330 of this code is absolutely not supported by

9   anything of record.  I'm not even sure how it could ever be

10  supported of anything of record, and I want to put that issue

11  to bed.  That's one reason I would like to go back to that

12  date.  I want it clear that they were asking in a

13  professional capacity on this record, and that there is no

14  claim for services under any other theory except 327 through

15  330.  That's what I intend to do in this order.

16       MR. PERCH:  Thank you, Your Honor.  Your Honor, I

17  won't disagree on that score at all.

18       THE COURT:  I don't think I need anything from you

19  except a supplemental affidavit unless you want to tell me

20  how your law firm that's been a professional in virtually

21  ever case I've been associated with that has your firm in it

22  is a professional, and why you would want a ruling that's

23  going to be published in the Wall Street Journal or whatever

24  that says the Court determines Pricewaterhouse provides non-

25  professional services.

1    MR. GOODCHILD:  Your Honor, I think it's fair to

2    say that supplemental affidavit exists.

3    THE COURT:  Okay.  I'm going to make this order

4    retroactive to January 10th when it was filed.  If there's

5    some basis for going back beyond that, that issue can be

6    preserved.  What was the date of filing?  January what?

7    MR. KAPP:  January 10th, Your Honor.

8    THE COURT:  January 10?

9    MR. KAPP:  Ten, 2002.

10   THE COURT:  All right.  I have modified this

11   proposed order to state that for the reasons I've expressed

12   on the record, that I am authorizing Pricewaterhouse's

13   retention nunc pro tunc to January 10, 2002, that it has

14   waived any claims to an indemnity re the Casson/Bruce

15   litigation and all other pre-petition claims.  I understand

16   there aren't any but I want to make it clear.  That the

17   requirements to employ Pricewaterhouse as the disinterested

18   professional is met, and Pricewaterhouse is retained as a

19   professional under 327 through 330 and not under Section 363

20   as an ordinary course employee.  That the issue of the nunc

21   pro tunc beyond January 10, '02 and fees for services in that

22   time as a professional, those issues are preserved.  And that

23   the debtor has set forth sufficient reasons why nunc pro tunc

24   authorization as of January 10 is appropriate.  I think I

25   corrected all of the November '01 dates to say January 10,

1    '02.  If I didn't, when you get this order please let me know

2    and I'll revise it, but I want it clear that they're being

3    retained nunc pro tunc to January 10 for now.

4             MR. KAPP:  Thank you, Your Honor.

5             THE COURT:  All right.  That order's entered.

6             MR. KAPP:  And, Your Honor, before we go back down

7    to (4), if this Court would be so kind to excuse Mr.

8    Goodchild.

9             THE COURT:  Yes, sir, thank you.

10            MR. GOODCHILD:  Thank you, Your Honor.

11            MR. KAPP:  Your Honor, Item No. (4), final item on

12   today's agenda, is Kellogg's motion to reconsider this

13   Court's denial of their motion for relief from the automatic

14   stay.

15            THE COURT:  All right.

16            MR. KAPP:  Mr. Scanlon.

17            MR. SCANLON:  Good afternoon, Your Honor, Patrick

18   Scanlon --

19            THE COURT:  Good afternoon.

20            MR. SCANLON:  -- for Edythe Kellogg.  Your Honor,

21   Ms. Kellogg asks the Court to reconsider the prior denial of

22   the motion for relief from stay based on her agreement to

23   waive the first $250,000 of any award under this.  This was

24   an automobile accident.  The retention agreement with W. R.

25   Grace provides that they will reimburse the insurance carrier

for the first $250,000.  Grace should not object to this

waiver because of their benefitting by $250,000 that has to

be paid either as a secured or unsecured claim.  The

insurance company will be providing a defense for this

action.  Because this is an automobile negligence

intersection accident which a truck driven by -- a truck

belonging to W. R. Grace was involved in the accident.  There

are no complicated issues that would require the attention of

senior management in W. R. Grace.  At most, there's an issue

of what the driver of the truck was doing at the time for

scope of employment issue.  The insurance company has no

reason to complain.  They don't have to pay the two hundred

and fifty thousand and then take the risk that they can

collect from the two lines of credits totalling just under $3

million.

THE COURT:  Well debtor tells me that their policy

of insurance provides that they have to pay that claim

regardless of whether your client waives it or not.  That

before the insurance company has to pay a dime, the debtor

has to pay $250,000.

MR. SCANLON:  Your Honor, there's nothing that I've

seen in the insurance policy that addresses that.  The

insurance policy doesn't contemplate the filing of

bankruptcy.  It merely states, as I understand it, that the

obligation of W. R. Grace is to repay the insurance company,

1   reimburse the insurance company for the first $250,000

2   awarded in it.   If the defendant is waiving that, the

3   insurance company can hardly collect on something that they

4   haven't paid.

5           THE COURT:   They will have paid it though.   It's

6   just that -- You know, let's say your client gets an award of

7   a million dollars, and she agrees not to take the

8   distribution of $250,000, then I'm involved in litigation

9   between the debtor and the insurance company as to whether

10  it's the first two fifty or the last two fifty out of that

11  million that's being waived.   So debtor can say that it's

12  first, but that doesn't change the insurance policy between

13  the debtor and the insurer.   So, all I've done --

14          MR. SCANLON:   Your Honor --

15          THE COURT:   -- is essentially convert your client's

16  unsecured claim over to the insurance company's unsecured

17  claims.   Only they may actually be secured because they've

18  got letters of credit it.   So, I've created a double problem

19  for the debtor.

20          MR. SCANLON:   You haven't, Your Honor.   Money is

21  completely fungible.   There's no first two hundred and fifty

22  thousand or last two hundred and fifty thousand out of a

23  million dollar award.   The award is a million dollars in your

24  example.   The insurance company doesn't pay the million

25  dollars but only seven hundred and fifty because of this

1   order requiring that Edythe Kellogg waive the first two

2   hundred and fifty thousand. They can hardly come back to

3   collect the two hundred and fifty thousand when they haven't

4   paid that money. This is a false issue. Besides, the

5   insurance company is not going to come back at all. If

6   they're going to go to anyone, they're going to go to the

7   bank, the line of credit. It will be the bank that's

8   defending that issue. The larger of these two lines of

9   credits for Bank of America for $2.19 million is not secured

10   by anything. The other one if it happens to be that the

11   insurance company proceeds against the line of credit that is

12   secured by assets of the estate, they're going to certainly

13   have a hard time coming against W. R. Grace to collect

14   something that they haven't paid. It's just totally

15   unjustified. The insurance company is getting a free ride on

16   this because they don't have to take the risk that they can't

17   collect on the lines of credit. The full line of credit will

18   be there undiminished by this two hundred and fifty thousand

19   to secure them for the payment of other claims that they

20   might have to pay. And the bank who has the line of credit

21   will also benefit and be in no position to complain in this

22   because if it's the Bank of America, they won't have to repay

23   the insurance company. They won't wind up with an unsecured

24   claim for two hundred and fifty thousand. If it's the claim

25   that's secured by the assets of the debtor, then that

FORM FED-25   PENGAD · 1-800-631-6989

$730,000 line of credit will remain available for other claims that are against it. So, the insurance company is not hurt. The bank is not hurt. The debtor is not hurt. The debtor is not inconvenienced except in the most negligible of sense by allowing this claim to be presented. And the advantages to the debtor, all of the other parties involved, far outdistance any minor inconvenience that they might have to answer a few interrogatories about scope of employment.

THE COURT: Well, I still think your client's remedy is to file a claim here. I mean, she filed this claim in the state court in violation of the automatic stay in the first place, and if I were to approve this order, that would potentially alert creditors to the fact that it's okay to file things in violation of the stay and not face the consequences which are that that action's void, and I don't think that's a good policy to set, Mr. Scanlon. I think the policy is you shouldn't be filing actions in violation of the stay particularly when there is a proof of claim process available or you should get relief from stay to be able to file that action. This was filed, if I recall, about a year after the accident. Correct? So it was a statute of limitation's issue that would excuse not getting a relief from stay at the outset.

MR. SCANLON: Your Honor, these are personal injury attorneys.

1    THE COURT:  Yes.

2    MR. SCANLON:  They didn't receive a notice of the

3    filing of bankruptcy.

4    THE COURT:  It's difficult with a company the size

5    of Grace and the announcement in virtually every paper in the

6    country that this case has filed bankruptcy along with its

7    ga-zillion related companies, I don't even know the number of

8    them, Mr. Scanlon, to think that somebody wasn't aware of it.

9    And even if they were, I'm not saying that it's subject to

10   some sanctions for having filed it, but it seems to me that

11   it sets the wrong policy for permitting an action to go

12   forward that's filed in violation of the statute.

13   MR. SCANLON:  Your Honor, we have no problem with

14   dismissing the action and filing it again if we get the

15   relief.  The point is that this eighty-two --

16   THE COURT:  Well, the . . . is to validate the

17   action.

18   MR. SCANLON:  No, Your Honor.  The relief is not to

19   say that you can ignore the stay, and as soon as they found

20   out that this bankruptcy existed, they hired me to come in

21   and file this application for relief to proceed.

22   THE COURT:  Right.

23   MR. SCANLON:  And we have not disobeyed the Court

24   once we knew the Court was involved in the proceeding nor

25   would we do so in the future.  But we have a situation here

1  where it seems that for a gnat's breath of inconvenience to

2  the debtor, the sixty-year-old -- eighty-two year old woman

3  is going to be denied any relief at all, her accident, during

4  her probable lifetime.

5         THE COURT:  Why?  If she simply files a -- If she

6  files a proof of claim, then if somebody has an objection to

7  it, they'll raise it.  If they don't have an objection to it,

8  she'll get paid.  So, I'm not sure.  I mean, at some point

9  the claim has to be liquidated, but I'm not sure why it has

10 to be liquidated now.  The asbestos victims and other court

11 victims that the debtor has to deal with are in the same

12 positions as your client.  I don't see what separates her

13 out, and I'm not trying to minimize the fact that she's

14 elderly and would like to see this done, Mr. Scanlon, but the

15 reality is that the debtor has filed bankruptcy in part to

16 eliminate all the litigation going against it so that it can

17 get all of its creditors dealt with an appropriate forum and

18 I don't know that piecemealing litigation back to the state

19 courts is a good idea.

20        MR. SCANLON:  Your Honor, the plaintiff filed a

   proof of claim on January 30th, '02.

21

22        THE COURT:  All right.

23        MR. SCANLON:  For $250,000.

24        THE COURT:  All right.

25        MR. SCANLON:  Nothing has been paid, nothing is

1   proposed, and nothing is anywhere close to being paid on

2   that.

3            THE COURT:  Well --

4            MR. SCANLON:  And no objection has been filed.

5            THE COURT:  Okay.  Then I guess the question for

6   the debtor is when are you going to do something about this

7   proof of claim.  You don't want to go back to state court.

8   It's got to be liquidated.  When are you going to do

9   something about it.

10           MR. KAPP:  Well, Your Honor, I guess I would look

11  -- We don't have a bar date yet set.

12           THE COURT:  That doesn't matter.  This one's filed.

13           MR. KAPP:  Well, we can file an objection, Your

14  Honor.

15           THE COURT:  And there is a bar date set, I think,

16  for unsecured creditors any way.  It just hasn't passed yet.

17           MR. KAPP:  I'm sorry, Your Honor -- We can get an

18  objection on file, Your Honor, address it, otherwise in the

19  next ten days.

20           THE COURT:  Okay.  If you're going to.  I mean I

21  don't know whether the debtor is going to object to it or

22  not, but it seems to me that at this point some discussions

23  should get started.  Mr. Scanlon, I don't think it's a good

24  idea to permit this to go forward.  However, I'm a little

25  intrigued by your concept that the estate isn't going to be

1    out $250,000 because you're actually not waiving the claim

2    against the estate, you're waiving the first recovery of

3    proceeds.   So, I need to know from the debtor whether that

4    changes this analogy.

5         MR. KAPP:   Your Honor, James Kapp, just briefly.

6    Your Honor got it right at the April omnibus hearing.   No

7    matter which way we go here, there will be assets of the

8    estate expended if the Kellogg litigation is allowed to

9    continue.   We do sympathize with Ms. Kellogg's plight, but

10   the terms of the agreement are the terms of the agreement,

11   and the terms provide that the insurer has a right for the

12   debtors to indemnify them as to the first $250,000 expended,

13   and we believe, therefore, that Ms. Kellogg's proposal would

14   not work as it sets the bar with the first two -- It's really

15   not the obligation of Ms. Kellogg to waive.   It's the

16   obligation of the insurance.   They're not here.   So we do not

17   believe that that addresses this, and also, Your Honor,

18   either we convert an unsecured claim into a secured claim or

19   in the alternative we're faced with collateral litigation

20   down the road as to what this insurance policy provides and

21   either way we're out assets of the estate.   So we would

22   recommend and request that this Court deny the motion for

23   reconsideration.

24        THE COURT:   All right.   Mr. Scanlon said that in

25   his reading of the insurance policy it doesn't say anything

about the debtor having to pay the first two hundred and

fifty thousand.  That if he waives the first two hundred and

fifty thousand, then the insurance company never has to pay

it.  So you don't have to reimburse it.

MR. KAPP:  Your Honor, actually we went through

this before, actually both the March hearing and the April

hearing on this issue.  We do believe, as we argued in April,

that the provision is not the most clear admittedly but our

reading is that we are obligated to pay the first $250,000.

We would note that the insurers have not been here at any of

these hearings, and I'm sure they have their own opinion, and

as Your Honor noted at the April hearing, and I will quote

from the transcript:  "In all probability the insurance

company will deny coverage until the debtor does not make

whatever reimbursement is -- does make whatever reimbursement

is necessary and we're right back into collateral litigation

any way, which is what I'm trying to avoid."  We believe

that's what will end up, Your Honor.

THE COURT:  All right.  Anyone else wish to be

heard?  Okay.  I don't think reconsideration is appropriate,

Mr. Scanlon.  I should say I don't think your -- I should not

grant your motion for reconsideration.  I have reconsidered

the prior order but it seems to me that the litigation that

was instituted in violation of the stay really should not be

permitted to stand.  Movant's remedy is to file a proof of

1  claim here and at this point, based on the debtor's

2  construction of this insurance policy, I think I have to

3  adopt the debtor's view that it -- at best this is going to

4  provide some collateral litigation.  Which doesn't make any

5  sense because it's just converting one form of litigation

6  into another.  So, that doesn't inure to the benefit of the

7  estate.  I will, however require the debtor to examine this

8  proof of claim, and if there is going to be some objection to

9  it, to commence that objection within the next thirty days.

10           MR. SCANLON:  Thank you, Your Honor.

11           MR. KAPP:  Your Honor, we do have an order here.

12           THE COURT:  All right.  Thank you.  Are you going

13  to need to amend your proof of claim before I require this to

14  go forward, Mr. Scanlon?  Or are you only looking to this two

15  fifty at this point?

16           MR. SCANLON:  We're looking for two fifty.

17           THE COURT:  Two fifty, okay.

18           MR. SCANLON:  Two million five hundred thousand.

19           THE COURT:  Oh, I'm sorry.  I thought it was two

20  hundred and fifty thousand.

21           MR. SCANLON:  No, I'm sorry.  We have filed a proof

22  of claim for $2,500,000.

23           THE COURT:  I'm going to use the form of order I'm

24  drafting rather than the one that the debtors did.  Okay.

25  For the reasons expressed on the record, the motion for

1   reconsideration is denied.  Movant has filed a proof of

2   claim.  The litigation initiated by movant in state court was

3   commenced in violation of the automatic stay and will not be

4   permitted to proceed at this time.  Movant's waiver of the

5   $250,000 deductible is not sufficient in the circumstances of

6   this case to permit the action to go forward without

7   prejudice to other unsecured creditors in this estate for the

8   reasons stated in debtors' pleadings and briefs and as

9   further expressed on this record, which record is

10  incorporated as part of the Court's findings and conclusions.

11  The debtor shall commence any objection to the proof of claim

12  within thirty days.

13          MR. KAPP:  That's fine, Your Honor.

14          THE COURT:  Okay.

15          MR. SCANLON:  Thank you.

16          THE COURT:  Thank you.

17          MR. KAPP:  Your Honor, unless there's any

18  housekeeping items, this is the end of the agenda.

19          THE COURT:  The only housekeeping matter I think I

20  have is the question of what's happening or what happened

21  with respect to the science trial issue.  I think I'm

22  missing some information and maybe it's just that I've been

23  out of town and I haven't had an opportunity to do a docket

24  search.  But, I'm not sure whether there was an objection to

25  a claim submitted.  I just don't know what the status of that

1   litigation is.

2   MS. BAER:  Your Honor, Janet Baer on behalf of the

3   debtors.  I can report on the status.  Your Honor, on May

4   20th you actually set up a schedule and we submitted a draft

5   order to the Court along with the certification of counsel.

6   That draft order was never signed, and that does set forth

7   the schedule, and we do have copies here if Your Honor would

8   like to take a look at it.

9   THE COURT:  I didn't sign it because it got to me

10  after I had left the country, I believe, and then I got stuck

11  out of the country longer than I expected because of the Aer

12  Lingus strike and I got back and went to another conference

13  immediately so that's the problem with it.

14  MS. BAER:  Well, Your Honor, the good news is we're

15  complying with your directions in court on May 20th even

16  though the order was not signed.  The budgets were filed.

17  Objections to the proofs of claim were filed.  The

18  application to employ special counsel has been filed.

19  Pursuant to your ruling on May 20th, the response to the

20  budgets -- each side's responses are due on July 1st.  The

21  responses to the objections to the claims -- the objections

22  filed to the claims, the responses are due on July 10th, and

23  the whole matter is set for status hearing before you on July

24  22nd.  And again, Your Honor, that is what you had said

25  orally in court on May 20th.  It's what we put in the draft

1    order, and it's what we've been doing.

2            THE COURT:  Okay.  Was there a competing order

3    submitted to me?  This is where I think I'm losing --

4            MS. BAER:  No, Your Honor.

5            THE COURT:  No competing order?

6            MS. BAER:  There's a competing order on the Girard

7    matter.  On this one there was an order submitted, there was

8    a certification of counsel that indicated that we had not

9    received comments on the order but for Mr. Baena's comments

10   that he wasn't sure we were supposed to be doing this.  And

11   Mr. Baena can state in more specific what he had said, but we

12   filed it with the certification indicating that he had

13   reservations about whether this was what we were supposed to

14   be doing, but we were complying with it.

15           THE COURT:  Okay.  May I have your form of order

16   and also hear from Mr. Baena again.  If we can work out this

17   order, I'd like to get one entered.  Mr. Baena?

18           MR. BAENA:  That's not exactly --

19           THE COURT:  Yes, thank you.

20           MR. BAENA:  May it please the Court, Scott Baena on

21   behalf of the Property Damage Committee.  That's not exactly

22   what we raised with the debtor in regard to the order.  The

23   first event that that order required the parties to comply

24   with seemed to us to have been out of sequence.  And so --

25   which was the amendment of proofs of claims.  The second

1   event being the committee had to come back to the Court and

2   say we'll handle this or we suggest special counsel.  So I

3   went to Mr. Bernick, and I suggested that that sequence

4   didn't make sense because if we're going to go with special

5   counsel, they ought to be involved with the amendment to the

6   claims.  Debtors' counsel prevailed upon us to believe that

7   they were submitting the order in any event, and so,

8   Zonalight (phonetical) counsel, people who have represented

9   class claimants went ahead and filed certain amended proofs

10  of claims by the deadline that was originally established by

11  the Court.  So, we've complied.  There is one aspect of what

12  Your Honor discussed in the last hearing, and I apologize, I

13  had to go to Newark that day to meet with Judge Woolin

14  (phonetical), so I only could get a sense of it from the

15  transcript, but you had indicated that you wanted the

16  committee, the Property Damage Committee, and the debtor to

17  meet in person before the debtor filed its response to the

18  papers that were filed by the committee, including the budget

19  and the motion to appoint special counsel.  We've endeavored

20  to have such a meeting.  We had suggested that we hold that

21  meeting here today before this hearing, but Mr. Bernick was

22  unavailable.  I have written to him since to find out

23  alternative dates.  I'm not so sure that we're going to be

24  able to manage to have that meeting before July 1.  I don't

25  believe that that meeting requirement is part of the order.

1  It was something that you indicated you wanted to see happen

2  at court.

3       THE COURT:  I wanted to see it happen because I

4  wanted to make sure that -- I wanted to try to assure that

5  both sides were on the same wavelengths of what the costs of

6  this litigation was going to be and see whether or not there

7  could be some consensus with respect to the budget.  That's

8  primarily what I had in mind.  Also to see whether the

9  process that's been put in place at that stage seemed to be

10  working or whether you needed some modification.  That was

11  what I had in mind.

12       MR. BAENA:  Understood.  And that's what we would

13  have envisioned using that meeting for.  I will say that

14  although I don't think it was required by anything that the

15  Court imposed upon the parties, the debtor did file its own

16  budget for special counsel, what it suggests special counsel

17  for the Zonalight claimants ought to be spending in this

18  case.

19       THE COURT:  Oh.

20       MR. BAENA:  Not their budget, but our budget.

21       THE COURT:  Well, I want their budget.

22       MR. BAENA:  I thought you did.

23       THE COURT:  Yes.  I --

24       MR. BAENA:  We have not gotten their budget, we've

25  gotten gratuitously, if you will, their suggestion of what

1   our budget should be.

2           THE COURT:  Well --

3           MR. BAENA:  And it's very difficult frankly, Judge,

4   to discern from it what they really think the budget ought to

5   be.  So, it would be very helpful to that conversation you

6   wish us to have for us to see their budget.

7           THE COURT:  I want both budgets filed.  That's the

8   whole purpose of --

9           MR. BAENA:  We have filed our budget.

10          THE COURT:  Yes.  I want the debtors' budget.  My

11  view of this litigation is, folks, frankly that we're going

12  to set a budget.  It's not going to be subject to additional

13  amounts coming in, not for either side, unless there is some

14  catastrophic, astronomical event that is wholly unanticipated

15  right now.  That's my view.  Once this budget's set, both

16  sides are going to live with it, and I don't expect that it's

17  going to be a significant difference in the amounts of the

18  budget for either side.  That's my perception.

19          MS. BAER:  Your Honor, with respect to the budget,

20  if I can clarify, we've looked back at the transcript and it

21  was not clear on the transcript what the Court wanted the

22  debtor to provide.  A couple days after the hearing there was

23  actually a telephone call to the Pachulski firm and Mr.

24  Carickoff spoke with your clerk.

25          THE COURT:  Yes.

1       MS. BAER:  Based on that conversation, we

2   understood that the Court had wanted us to provide a budget

3   for special counsel.

4       THE COURT:  No, no, no, no.  I want your budget.  I

5   want a litigation budget.  Let me put it this way:  I want a

6   litigation budget.  I want to know what the costs to this

7   estate of doing this litigation is going to be.  So, if, for

8   example, the Trade Committee expects to have a piece of this

9   litigation or to be participating or the Asbestos Plaintiffs

10  Committee does.  I want their budget because I am going to

11  set a budget and all people are going to live within it, and

12  it will not be not modified in all probability.  So, I want a

13  complete litigation budget.

14      MR. BAENA:  Judge, that would be useful information

15  for us to have before we sat down and met with them

16  obviously.  I believe that the deadline for meeting with them

17  is --

18      MS. BAER:  It's June 30th in the order.

19      MR. BAENA:  Right.

20      MS. BAER:  Yes.

21      MR. BAENA:  It's co-terminus with their reply to

22  our motion.

23      MS. BAER:  Right.

24      MR. BAENA:  So, counsel has been excellent to deal

25  with, but I don't think an order is necessary but if we could

1    get some indication that we'll have that sufficiently in

2    advance of a meeting.

3            MS. BAER:  Your Honor, we had anticipated filing a

4    response to their request to employ special counsel and a

5    response to their budget at the same time on July 1.

6    Obviously now we won't be filing a response to their budge,

7    if I understand it -- oh, no, you want that too.

8            THE COURT:  Yea.

9            MS. BAER:  All right.  So we need to do both, Your

10   Honor.

11           THE COURT:  That's why I wanted you to meet because

12   I want -- And I don't think it was clear on the record the

13   last time, that's why I asked my clerk to call and have it

14   built into the order.  That's what I thought was going to

15   happen.  It would be built into the order that was being

16   submitted that everybody was to submit their own budget.  I'm

17   sorry for the miscommunication.

18           MR. BAENA:  It was actually -- I understand how

19   somebody might have interpreted it otherwise.  I understood

20   from the transcript not having been burdened with being here,

21   that you wanted --

22           THE COURT:  Are you going on vacation any time

23   soon.

24           MR. BAENA:  I'm not going to Destin, Judge, I'll

25   tell you, and don't take their offer to go to Destin because

1    that's referred to as the red-neck Riviera in Florida.

2        THE COURT:  If you'd seen the town I grew up in,

3    Mr. Baena, you might think I'd be right at home.

4        MR. BAENA:  You wouldn't like that place.

5        MS. BAER:  If I might suggest, Your Honor, if you

6    could give the debtors until next Monday, which is the 24th

7    to file our budget, I think we could still stay on the

8    schedule of filing our response to their budget and their

9    special counsel retention and perhaps they could file their

10   response to our budget by the July 1st deadline, or if need

11   be, we can push that a little bit.

12       THE COURT:  Yeah, the dates from my point of view

13   aren't hard and fast as long as you folks agree to a

14   difference.  My concern -- I like to set dates because then

15   if you disagree, it's easy for me.  I have an order that says

16   do it by that date, so do it.  If you can agree to a change,

17   just so you have all the pieces before me by the time I need

18   to consider them, it's all right with me.

19       MS. BAER:  Your Honor, I know that Mr. Baena wants

20   to meet and confer.  I don't know Mr. Bernick's schedule.  We

21   haven't seen him for several weeks.  It's been very, very

22   difficult.  So in that respect I think -- I don't think it's

23   likely that we will get all this done and meet by June 30th.

24       MR. BAENA:  Judge, I'm trying to comply with your

25   wishes.

1    THE COURT:  Okay.

2    MR. BAENA:  I don't hold great hopes coming to a

3  conclusion at a meeting with Mr. Bernick over budgets, but I

4  think it's worth the exercise to hear before they file papers

5  with the Court, if we can come to some agreement somewhere,

6  it's worth it.  We're willing to do it.

7    THE COURT:  Okay.  So --

8    MR. BAENA:  Maybe, Judge, if you can alleviate the

9  requirement that we do it in person, that might be helpful to

10  Mr. Bernick.  If we could do it telephonically.

11    THE COURT:  Well, if I let you do it telephonically

12  are you going to accomplish anything?

13    MR. BAENA:  I don't think it will be any worse than

14  if we meet in person, having been to a couple of these

15  meetings already.

16    MS. BAER:  But they're very civil.

17    MR. BAENA:  They're wonderful.  They're wonderful

18  but they're very expensive to go to, Judge.

19    THE COURT:  It doesn't have to be in person.  I

20  just want you to meet and confer.  What I thought -- That's

21  another thing, Mr. Baena, I did use those words "in person",

22  but my view of in person was I wanted the principal people to

23  be speaking.  I didn't want this filtered down to a fourth

24  level junior associate who wasn't going to be able to make a

25  decision and then never get a decision.  So, I want you to

1  talk to Mr. Bernick and corporate counsel if that's

2  appropriate.  Anybody else who has a budget, who is

3  submitting a budget, I want those people to be involved in

4  the discussion.

5       MR. BAENA:  That will be fine, and we can probably

6  arrange something.

7       MS. BAER:  I'm sure we can.

8       THE COURT:  All right.  With all of that, should I

9  sign this order that --

10       MS. BAER:  This order isn't quite right any more.

11  It does not -- We need to provide some time, obviously, for

12  us to file our budget now that we understand what Your Honor

13  wants, and then they need time to respond to that.

14       THE COURT:  Well, can I just build those in here?

15       MS. BAER:  Absolutely.

16       THE COURT:  Mr. Zaleski?

17       MR. ZALESKI:  Matt Zaleski, Kimble & Veen

18  (phonetical) on behalf of the Asbestos Committee.  Your

19  Honor, just so it's clear to the extent that we would be

20  monitoring or participating in a limited capacity in this,

21  you'd like a budget submitted by the professionals for our

22  committee, same time line as the debtors?  I think it might

23  be easier if we saw theirs first.  It's really going to be

24  reactive fees.

25       THE COURT:  If you're sending one person to monitor

FORM FED-25  PENGAD  1-800-631-6989

1  a trial, I'm not sure I care.  If you're going to participate

2  in depositions and discovery so that there is going to be a

3  significant cost to the estate, then I do -- I want budgets.

4  So, yes, I put you on the same time frame as the debtor.

5  MR. ZALESKI:  Okay.  At this point, the committee

6  has not really authorized or instructed us in any way as to

7  that so we will do that and then submit an appropriate budget

8  accordingly.

9  THE COURT:  All right.

10  MR. ZALESKI:  Thank you.

11  MR. BAENA:  Well, Judge, that raises an issue.  I

12  mean, are they or are they not a party to this trial?  I

13  mean, are they going to offer evidence?  Should discovery or

14  new discovery be taken of their experts?  I think we need to

15  know what PI's role in this is.

16  THE COURT:  Well, that -- I agree.  I think you do.

17  So far I haven't understood that they were taking an active

18  role, but if they are, I think this budget ought to clarify

19  that role.

20  MR. ZALESKI:  I think in classic bankruptcy it is

21  sort of disserving, but I think we can get to a point where

22  we'll be more clear shortly.

23  MR. BAENA:  Well, if that's the classic thing to do

24  in bankruptcy, I'll reserve too, Judge.  I'm forced to object

25  to their participation.

THE COURT:   I think you already did object to my assigning this task to your committee, Mr. Baena, but nonetheless this has to be done.   I don't see that the other two committees have a particularly active role that has to be played in this issue.   And it's really a question of liability on a property damage side.   That's why there's a Property Damage Committee set up.

MR. BAENA:   Right.   We're not sizing that liability.

THE COURT:   No.   No, no.   We're just determining whether there's liability.

MR. BAENA:   Right.

THE COURT:   Okay.   So where in here shall I put the modifications you've been talking about?

MS. BAER:   Your Honor, if you look at the order, paragraphs (1) through (5) are all things that have in fact occurred.

THE COURT:   All right.

MS. BAER:   We don't need to look at those at all. Paragraph (6) talks about the debtors and the PD submitting the budgets, but as you can see it's for the counsel representing claimants.   So I think we need to add in there a time frame for the debtor to submit a budget for its own fees.

THE COURT:   All right.   Debtor and any committee

1    that anticipates active participation, i.e., anything more

2    than monitoring this litigation shall submit a litigation

3    budget by Monday?

4            MS. BAER:  That's fine, Your Honor.

5            THE COURT:  June 24.  All right.  The budgets are

6    to breakdown the anticipated fees and costs.  Okay, what

7    else?

8            MS. BAER:  Your Honor, paragraph (7) provides that

9    the parties shall have through and including July 1 to file

10   and serve responses to the other's proposed budget.  I guess

11   the question is is that enough time.

12           THE COURT:  Probably not if you have to meet.

13           MS. BAER:  Right.  We still have to make that July

14   22nd hearing date, so --

15           THE COURT:  Can I just push that back to July 8th?

16   That gives you an extra week.

17           MR. BAENA:  Sure.

18           THE COURT:  And with respect to the retention

19   application then I think should that also be pushed back to

20   July 8th?  Is that going to be driven by the budget or by

21   different factors?

22           MS. BAER:  With respect to the retention

23   application, we do have the budget for the Property Damage

24   Committee's special counsel.  They actually propose to retain

25   five different law firms to participate, and I understand

1   that the budget is for all the law firms.

2           MR. BAENA:  That is correct.

3           MS. BAER:  We do have the information we need, I

4   guess to respond.

5           THE COURT:  Okay.  So that can be filed by July 1?

6           MS. BAER:  Yes.

7           THE COURT:  What I don't think I have in here is

8   when responses to your objections are due.

9           MS. BAER:  Yes, you do, Your Honor, that --

10          THE COURT:  I do.

11          MS. BAER:  -- if you back up is taken up in the

12  first part.

13          THE COURT:  Okay.

14          MS. BAER:  The responses are due on July 10th,

15  that's paragraph (4).

16          THE COURT:  Oh, all right.  That's fine.

17          MS. BAER:  And then paragraph (9) the meet and

18  confer that needs to be revised.

19          THE COURT:  Okay.  By when?

20          MS. BAER:  Well, if we get the -- If our responses

21  on the budgets are due on July 8th, it would make sense to

22  confer before that.  With the holiday, it's going to be a

23  little tough.

24          THE COURT:  Well, let me see.  The reason I wanted

25  something about responses to the budget by July 8th is I'm

1   hoping that you'll use that time to come to some agreement

2   after July 8th when you respond to each other's --

3           MS. BAER:   Right.

4           THE COURT:   -- budgets, and in order to get them

5   filed with me by the 15th, which I really need, I think, in

6   order to be able to have time to consider them, I think you

7   need a little bit of time in there.

8           MS. BAER:   I think we need time between July 8th

9   and the hearing to confer.   So, perhaps put in something like

10  --

11          THE COURT:   If I give you till July 5th, can you

12  still get them filed, responses filed by -- I can say as late

13  as July 10 but that only gives you three days to revise your

14  budget.

15          MR. BAENA:   I'm going on vacation from the 4th to

16  the 10th, I think it is.

17          THE COURT:   Okay.

18          MR. BAENA:   So, I'll get it done by the 5th.

19          THE COURT:   All right.   Then why don't I just say

20  to meet and confer -- meet or confer by July 5th.

21          MS. BAER:   That's fine, Your Honor.

22          THE COURT:   But keep the budget dates by --

23          MS. BAER:   July 8th.

24          THE COURT:   Okay.  All right.  Anything else?

25  All right.   What I don't have from the debtor yet are:   the

objections to claims.  I don't have the committee's request

for counsel.  I suppose that's because it will come up in my

July hearing binder, but I think I'd like to see them sooner.

Any possibility that I can get you to send them?

MS. BAER:  Your Honor, I have the objections to

claims with me now and can present that to you.  I do not

have an unmarked copy of their retention application.

UNIDENTIFIED SPEAKER:    I have a copy of it.

THE COURT:  Okay.  What about the amended proofs of

claim.  I haven't seen those either.

MS. BAER:  I don't have them with me.

MR. BAENA:  I don't have them, Judge, either with

me.  We didn't file them.  They were filed by --

MR. TACCONELLI:  Your Honor, Theodore Tacconelli,

local for the PD Committee.  Your Honor, they were docketed.

They can be pulled off of the docket, the amended proofs of

claims.

THE COURT:  They were docketed at the main case

instead of with the proof of claim docket?

MR. TACCONELLI:  Yes.

THE COURT:  Okay.  Mona, can you get the amended

proofs of claims.  If you have any problems, call Mr. Baena

or counsel to the debtor, one or the other, so that we can

get the amended proofs of claims.

MR. BAENA:  And if I can approach the bench, I'll

1  give you a copy.

2      THE COURT:  All right.  Thank you.  All right.  I

3  just want these for my ability to read them in advance.  I'll

4  expect to get them in the hearing binders any way.

5      MS. BAER:  And, Your Honor, I have the debtors'

6  objections.

7      THE COURT:  Okay.  These to the amended claims now?

8      MS. BAER:  Yes.

9      THE COURT:  All right.

10     MS. BAER:  Your Honor, if you might recall, I think

11  we filed ten claims.  There were four amended claims, this

12  response to the four amended claims as well as the other

13  claims.

14     THE COURT:  All right.  Okay.  Any other changes to

15  this order then?  All right.  I am signing it now.

16     MS. BAER:  Thank you, Your Honor.

17     THE COURT:  So hopefully it will get docketed.

18  Okay.  Anything else that we need to discuss.

19     MR. TACCONELLI:  Your Honor, I'm sorry.  Is there

20  any way you can just review the dates.

21     THE COURT:  Sure.

22     MR. TACCONELLI:  So we're all straight on that.

23     THE COURT:  All right.  Just one second.  Okay.

24  These are the dates that have expired already:  By May 30,

25  amended claims were to be filed; by June 10, objections to

the claims were to be filed; by July 10, any response to

those objections to claims is due.  This one's also past:  By

June 7, the Property Damage Committee was to file its

application to retain special counsel.  Also by June 7, the

debtors and the Property Damage Committee were to serve their

budgets.  The Property Damage Committee I understand is

docketed -- Mona, would you get that too.  We haven't seen

that budget yet either.

MR. BAENA:  It's in the paper I gave you.

THE COURT:  It's in the paper?  Okay.  Thank you.

And now I've modified that paragraph to say that by June

24th, the debtor and any committee that anticipates active

participation is to submit a litigation budget.  The parties

have through and including July the 8th to file responses to

the other budget.  The debtor had till June the 7th -- No,

I'm sorry.  The debtor had until July the 1st to object to

the retention application for special counsel for the

Property Damage Committee.  The parties are to meet or confer

by July the 5th to discuss their budgets.  And the pretrial

conference is going to be held on July 22nd at ten.  Okay?

MR. TACCONELLI:  Thank you, Your Honor

MR. BAENA:  Judge, I believe, if I may, I believe

that the scope of the meeting was not to just discuss the

budget but to discuss the scope of the trial.

THE COURT:  Yes, it was for both.  Do you want me

1 to add that to this order?

2 MS. BAER:  It's in there, Your Honor.  Actually if
3 you read the last part if it, it indicates to discuss
4 proposed budgets and other litigation issues in connection
5 with the anticipated science trial.

6 THE COURT:  It does say that.  I just skipped that
7 part.

8 MR. BAENA:  As long we understand it's the scope of
9 the trial.

10 THE COURT:  Yes.  It's the budgets and the scope of
11 the trial.  Okay.  Now, was the discovery order -- I'm sorry,
12 but I've lost track of this totally.  Was the discover order
13 on the trial itself actually set, the pretrial process for
14 the science trial, or were we waiting till July 22 to do
15 that?

16 MS. BAER:  Your Honor, you determined to wait till
17 July 22.

18 THE COURT:  Okay.  Fine.  Then, hopefully, you'll
19 give me a proposal that you might agree on.

20 MS. BAER:  We'll certainly give you a proposal.
21 We'll try.

22 THE COURT:  All right.  You folks, I mean, you get
23 along fine in court.  What do I have to do with you out of
24 court to get you to start talking to each other and --

25 MS. BAER:  We get along fine.  We just have a

difference of opinion.

THE COURT:  Okay.  Anything else on this issue, Mr. Zaleski?

MR. ZALESKI:  Again, Matt Zaleski, on behalf of the PI Committee.  Briefly, Your Honor, the objection that I had originally in the PD special counsel application was July 8th.  You're now modifying that for all parties; correct?  To July 1, which is what you just read but you said the debtors, and I'd like to be clear.

THE COURT:  For which?  I'm sorry.

MR. ZALESKI:  To the special counsel application of the PD Committee.

THE COURT:  Well, it only says the debtor in here.

MR. ZALESKI:  Okay.  Well, they served it on parties and --

THE COURT:  It should be debtors and any other party, yes.

MR. ZALESKI:  And we would be now July 1 for that deadline.

THE COURT:  That's correct.  Is that long enough?

MR. ZALESKI:  It will be if that's what it is.

THE COURT:  Okay.

MR. ZALESKI:  Thanks.

THE COURT:  All right.  I've modified it to say debtor any other party in interest.  Okay?  Anything else on

1    this order?  Okay.  It's entered.  Anything else in the case?

2    All right.  We're adjourned.  Thank you.

3            ALL:  Thank you, Your Honor.

4            (Hearing concluded for this date.)

13            I, Elaine M. Ryan, approved transcriber for the

14    United States Courts, certify that the foregoing is a correct

15    transcript from the electronic sound recording of the

16    proceedings in the above-entitled matter.

*Elaine M. Ryan*                                    7-1-02

Elaine M. Ryan
2801 Faulkland Road
Wilmington, DE 19808
(302) 683-0221