IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| | ) | |
| In re: | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| W. R. GRACE & CO., et al.,[1] | ) | |
| | ) | **Re: Docket No. 2230** |
| Debtors. | ) | |
| | ) | **Hearing Date: July 22, 2002 @ 10:00 a.m.** |
| | ) | **Objection Deadline: July 5, 2002** |
| _____ | ) | |

**RESPONSE AND OBJECTION OF THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE CLAIMANTS TO MOTION OF THE
DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE
IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS**

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee"),
through its undersigned counsel, hereby files this Response and Objection (the "Objection") to
the Motion of the Debtors for an Order Authorizing, but not Requiring, the Implementation of
Revised Compensation Programs (the "Motion") [Docket No. 2230], and respectfully submits as
follows:

**Introduction**

1.      On April 2, 2001 (the "Petition Date"), the Debtors commenced these chapter 11
cases by filing their voluntary petitions for relief under chapter 11 of title 11 of the United States
Code (the "Bankruptcy Code").  Since that time, the above-captioned debtors (the "Debtors")
have continued to operate and manage their businesses as debtors in possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1]   In order to save space, the list of all 62 Debtors has been omitted. For a list of the Debtors, please review the
Motion (as defined below) at page 1.

2.    On the Petition Date, the Court entered an interim order (the "Interim Wages Order") granting the Wages Motion[2] that, among other things, (i) authorized and approved on an interim basis, the Key Employee Retention Programs, including, the 2001-2002 General Retention Program and the 2001-2003 Long-Term Incentive Plan, and (ii) approved the W.R. Grace & Co. Severance Pay Plan for Salaried Employees.  On June 22, 2001, the Court entered a final order authorizing and approving the Key Employee Retention Programs (the "Final Wages Order"; collectively, with the Interim Wages Order, the "Wages Order").

3.    On April 12, 2001, the Office of the United States Trustee (the "UST") appointed the PD Committee, the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Claimants.

4.    On June 17, 2002, the Debtors filed the Motion, seeking this Court's authorization to implement certain revised compensation procedures, consisting of: (i) a revised long-term incentive program for 2001-2003 (the "Revised 2001-2003 LTIP"); (ii) a new long-term incentive program for 2002-2004 (the "2002-2004 LTIP"); (iii) a new general retention program (the "2003-2004 General Retention Program"); and (iv) a revised severance pay program (the "Revised Severance Pay Program"; collectively, with the 2003-2004 General Retention Program, the Revised 2001-2003 LTIP and the 2002-2004 LTIP, the "Revised Compensation Procedures").

## General Objections

5.    The wisdom of maintaining key employees and sustaining employee morale and well-being during the pendency of a bankruptcy proceeding is self-evident.    However, the

---

[2]   Capitalized terms used, but not defined herein, shall have the meanings ascribed thereto in the Motion.
575735v1

methods used to accomplish such goals must be balanced against the consequences of such methods.  At a basic level, the PD Committee does not object to the Debtors implementing a set of compensation programs designed to accomplish the dual, and often overlapping, goals of maintaining key employees and sustaining overall employee morale.  In fact, after the formation of the PD Committee, counsel to the PD Committee convened a meeting with representatives of the Debtors and their counsel to discuss the merits and particulars of the Key Employee Retention Programs.  Despite originally having serious reservations about the propriety of certain components of the Key Employee Retention Programs, the PD Committee concluded that  in the overall scheme of the bankruptcy, although at the far end of being palatable, no objection to the programs was warranted.

6.    However, now being presented with Revised Compensation Procedures, the PD Committee respectfully submits that the Debtors have not met their burden of proving the necessity for authorization to implement the procedures.  As set forth in detail below, without any justification, the Debtors now seek to sweeten the pot even more for the employees covered by the Revised Compensation Procedures. The Debtors offer no support -- via affidavit or by representation of counsel -- to sustain their burden of proof that the Revised Compensation Procedures are within the Debtors' sound business judgment.  See Cinicola v. Scharffenberger, 248 F.3d 110, 112 (3d. Cir. 2001).

7.    Moreover, in light of the Debtors' positions throughout these proceedings, their arguments in favor of most of the Revised Compensation Procedures fail.  Time and again throughout these proceedings, the Debtors have tried to minimize the ability of its creditors to participate in their reorganization.  For example, the management personnel that the Debtors'

575735v1

seek to continue to motivate for "the sound business purpose of aiding the maximization of the value of the Debtors' estates and furthering the Debtors' efforts to successfully reorganize," (Motion at ¶ 18), is the very same management personnel that has instructed the Debtors' counsel to file a motion to intervene in the pending fraudulent transfer action against Sealed Air Corporation as a <u>defendant</u>, which if the defendants prevail, will have the effect of keeping <u>billions</u> of dollars out of the Debtors' estates.  It is senseless to think that the Debtors have the interests of creditors in mind.  It is all too clear that the Debtors' management is principally concerned about their interests.

8.       Thus, against that backdrop, the Debtors now seek this Court's authorization to implement excessively rich Revised Compensation Procedures that, among other things, <u>lower</u> the target levels necessary to reach the achievable bonuses, and, astonishingly, <u>increase</u> the payout for reaching these <u>lower levels</u> of performance.

## 2003-2004 General Retention Program

9.       The 2003-2004 General Retention Program is a prime example of the largess that the Debtors seek to bestow upon their conflicted Key Employees.[3]   The proposed program increases the range of percentage-of-salary bonuses for Program Participants to 15-65% from 12.5-50%.  This increased payout will result in an estimated total cost of the program of $6.7 million -- an increase of almost <u>50%</u> over the existing program.  The Debtors, without any supporting evidence or documentation, assert that the program targets "Key Employees who are at the most risk of leaving the Debtors' employ . . ."  However, the Debtors provide no support for this baseless assertion.  Further, the Debtors provide no explanation or examples of where for

---

[3]   Under the General Retention Program, the Debtors reserve the right, <u>in their sole discretion</u>, to determine which employees are "Key Employees."

575735v1

heaven's sake these "at risk" employees will obtain employment if they leave the Debtors' employ.

## Revised 2001-2003 Long-Term Incentive Plan

10.      "The Debtors will revise the 2001-2003 LTIP to better accommodate their employees' concerns during the Chapter 11 Cases."  Whereas the original payments under the 2001-2003 LTIP were to be delivered 50% in stock and 50% in cash, the Debtors seek to revise the program to make all payments in cash.  Remarkably, the Debtors argue that the change is necessary since, as a result of the Debtors' commencement of these proceedings, the stock option component of the program only has speculative value and thus, their Key Employees should be compensated in cash because of a depressed stock price.

11.      While it is unfortunate for all constituencies of the Debtors' estates that their stock price has not risen over the past twelve months, that fact is absolutely no justification to allow the Debtors to favor their employees with cash payments over their creditors.  It is helpful to think of a company outside of bankruptcy.  Would a non-debtor with an underperforming stock price be permitted to liquidate the "underwater" stock options in cash without a cry of outrage from its shareholders?  Not likely.  Why then should the Debtors, who elected to file a voluntary chapter 11 proceeding, be permitted to favor its employees over its creditors solely because of a low stock price?

## 2002-2004 Long-Term Incentive Plan

12.      The 2002-2004 LTIP truly demonstrates the Debtors' avarice.  Similar to the 2001-2003 LTIP, the Debtors seek to have all payments made in cash.  However, presumably because the Debtors deemed the targeted earnings before interest and taxes ("EBIT") for the

575735v1

5

2001-2003 LTIP too difficult to achieve, the 2002-2004 LTIP reduces the targeted EBIT by 40%. Further accentuating the corporate greed, whereas under the existing program, participants do not receive any payouts for EBIT below 5%, under the new program, participants would be entitled to receive a ratable portion of the payout between 0% and 6% growth in EBIT. Thus, the Debtors are providing these employees with a trifecta windfall: (i) increased cash; (ii) lowered targets for 100% payout; and (iii) ratable payouts for <u>any</u> growth in EBIT.

13.     The Debtors should not be permitted to continue performance-based incentive plans if the plans are structured to pay out even in the absence of any meaningful performance achievements. By reducing the target levels, the Debtors' performance-based incentive programs seemingly have been converted into quasi-deferred salary plans. One must wonder if the Debtors are permitted to implement the Revised Compensation Procedures, but again fail to achieve their "targeted" numbers, will they seek to lower them once more in the future.

## Revised Severance Pay Program

14.     There are two components to the Revised Severance Pay Program -- the Salaried Severance Plan and the Change of Control Severance Program -- each of which increases the lucre already in place for employees who may be severed involuntarily.

15.     Under the existing Salaried Severance Plan, covered employees are entitled to 1.5 weeks of pay after termination for each year of service with the Debtors. There is no minimum payout to any covered employees. However, under the proposed Revised Salaried Severance Plan, covered employees would be entitled to a minimum of 4 weeks of pay. Unfortunately, the Debtors do not provide a breakdown of the potential increased cost of providing a minimum of 4 weeks of severance pay, thus making it difficult for the PD Committee to analyze the true

575735v1

financial impact of this change.    Should the Debtors provide the PD Committee with the increased cost associated with this change to the Salaried Severance Plan, the PD Committee will be in a much better position to analyze the appropriateness of the objection to this specific part of the Revised Compensation Procedures.

16.    It is also worth noting that 16 Key Employees who may be participants in the Salaried Severance Program are also entitled to  2 years  of severance pay in the event they are terminated by the Debtors without cause.

17.    Likewise, the Debtors seek to modify the Change in Control Severance Program by increasing the severance payout to covered employees to a minimum of 4 months salary to any employee who is involuntarily terminated within one year of the effective date of a plan of reorganization if the termination results from the implementation of the plan.    In comparison, the existing program provides covered employees with 4 weeks severance pay for each year of service with the Debtors.    Thus, at bottom, under the proposed revised plan, every covered employee with between one and three years of services would receive at least 1 month of additional severance pay, and could receive up to 3 months of additional pay.    The Debtors do not provide an estimate of the increased cost of the proposed revised program.    Should the Debtors provide the PD Committee with the increased cost associated with this change to the Change of Control Severance Plan, the PD Committee will be in a much better position to analyze the appropriateness of the objection to this specific part of the Revised Compensation Procedures.

575735v1

## Argument

18.    The Debtors baldly assert that "[i]mplementing the Revised Compensation Procedures will accomplish the sound business purpose of aiding the maximization of the value of the Debtors' estates and furthering the Debtors' efforts to successfully reorganize."  Motion at ¶ 18.  However, in actuality, the Revised Compensation Procedures are nothing more than a wolf dressed up in sheep's clothing.

19.    The Key Employee Retention Programs approved by the Wages Order were also purportedly designed to minimize turnover, retain talent in a tight labor market and motivate employees throughout the bankruptcy process.  See Wages Motion at ¶ 80.  Over one year has passed since the Court entered the Wages Order.  Based upon discussions between the Debtors' financial advisors, the Blackstone Group, and the PD Committee's financial advisors, Conway, Del Genio & Gries, the PD Committee has learned that only 5 of the 116 employees covered by the General Retention Program left the Debtors' employ within the past year.  According to the Debtors, this rate of turnover is entirely consistent with their historical rates.  Thus, while the Debtors stress the necessity of implementing the revised programs in order to curb employee turnover, by their own admissions, it is abundantly clear that the existing program is more than sufficient to support and maintain the Debtors' original objectives and the gross inflation of the new programs is completely unwarranted.

20.    Moreover, the Debtors' attempt to justify the inflated Revised Compensation Procedures by alleging that key personnel would obtain employment elsewhere is dubious and does not withstand scrutiny.  First, the country is still mired in an economic recession and most companies are slashing, not expanding, payrolls.  Second, implicit in this justification is that the

575735v1

Debtors would be underpaying their Key Employees were they not eligible for these compensation plans. This notion is hard to believe when the 2001 compensation of the Debtors' most highly-compensated executives is compared with these individuals' prior compensation and with the compensation of their counterparts within the industry.

21.     Further, the Debtors' attempt to justify the richness of the Revised Compensation Procedures by comparing them to the "other, similarly situated [i.e., mass-tort] debtors" is unavailing. This hapless "me-too" justification only accentuates the impropriety of the Revised Compensation Procedures. In one paragraph the Debtors attempt to justify the programs as necessary to "maintain cohesive and motivated management teams" and then, ignoring their own arguments, in the succeeding paragraph, attempt to justify the programs by arguing they are only seeking to implement programs comparable to other debtors. Which one is it?

22.     Lastly, curiously missing from any of the details of the Revised Compensation Procedures is their effect on the Chief Executive Officer of W.R. Grace & Co., Paul Norris. Unquestionably, including the amounts owed to Mr. Norris would indeed impact the total cost of the program. The absence of any discussion of such impact is suspicious.

575735v1

## Conclusion

WHEREFORE, for the foregoing reasons, the PD Committee respectfully requests that this Court: (a) sustain this Objection to the Motion and deny the relief sought therein and (b) grant such other and further relief as the Court may deem appropriate.

Wilmington, Delaware
Dated:  July 5, 2002

Respectfully submitted,
BILZIN SUMBERG DUNN BAENA
   PRICE & AXELROD
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131-2336
Telephone:  (305) 374-7580

Scott L. Baena (Admitted Pro Hac Vice)
Jay M. Sakalo (Admitted Pro Hac Vice)


        and

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
Telephone:  (302) 575-1555


By: /s./ Theodore J. Tacconelli
     Michael B. Joseph
     (Del. Bar No. 392)
     Theodore J. Tacconelli
     (Del. Bar No. 2678)


CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS

575735v1