IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | Re: Docket No. 2230 |

**DEBTORS' RESPONSE TO THE OBJECTION OF THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS TO MOTION OF
THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING,
THE IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby submit this response (the "Response") to the

objection (the "Objection") of the Official Committee of Asbestos Property Damage Claimants

(the "PD Committee") to the motion of the Debtors for an order authorizing, but not requiring,

the implementation of revised compensation programs (the "Motion"). The Debtors respectfully

represent as follows:

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

### Introduction

1.    On April 2, 2001, upon a motion of the Debtors (the "Wages Motion"), the Court entered an order that, inter alia, (i) authorized and approved on an interim basis certain retention programs (the "Key Employee Retention Programs") for key employees (the "Key Employees"), including the General Retention Program (the "2001-2002 General Retention Program") and the 2001-2003 Long-Term Incentive Plan (the "2001-2003 LTIP"), and (ii) approved the W. R. Grace & Co. Severance Pay Plan for Salaried Employees (the "Wages Order").[2]  On June 22, 2001, the Court entered a final order authorizing and approving the Key Employee Retention Programs.

2.    With the 2001-2002 General Retention Program set to expire at the end of the year and the 2001-2003 LTIP no longer providing employees the benefit it was intended to provide, in late 2001 the Debtors, together with Nick Bubnovich, currently of the Human Capital Advisor Services Group of Deloitte & Touche ("Deloitte"), began to develop new and modified compensation programs to retain their employees, consisting of a revised long-term incentive program for 2001-2003 (the "Revised 2001-2003 LTIP"), a new long-term incentive program for 2002-2004 (the "2002-2004 LTIP"), a new general retention program (the "2003-2004 General Retention Program") and a revised severance pay program (the "Revised Severance Pay Program," collectively with the 2003-2004 General Retention Program, the Revised 2001-2003 LTIP and the 2002-2004 LTIP, the "Revised Compensation Programs").  These Revised Compensation Programs were presented to and approved by Grace's board of directors on November 7, 2001.

---

[2]    Terms not defined herein shall have the meaning ascribed to them in the Wages Motion.

3.      In an effort to gain the support of (i) the PD Committee; (ii) the committee of asbestos personal injury claimants (the "PI Committee") and (iii) Official Committee of Unsecured Creditors (the "Creditors' Committee" and together with the PD Committee and the PI Committee, the "Committees"), the Debtors, Deloitte and The Blackstone Group, the Debtors' financial advisors ("Blackstone"), presented the proposed Revised Compensation Programs to the Committees' financial advisors on March 12, 2002 (the "March 12 Presentation"). A copy of the presentation materials is attached hereto as Exhibit A.[3] At the March 12 Presentation, and in the period following the March 12 Presentation until the date of the filing of the Motion, the Debtors solicited comments from the Committees and made modifications to the proposed Revised Compensation Programs in an effort to satisfy concerns expressed by the Committees.

4.      Subsequent to the March 12 Presentation, Conway, Del Genio & Gries, the PD Committee's financial advisor ("Conway") requested certain clarification and follow-up information, to which the Debtors promptly responded in full. On April 29, Conway informed Blackstone of the following comments to the Revised Compensation Programs: (i) the Revised 2001-2003 LTIP and the 2002-2004 LTIP, as modified, were satisfactory and (ii) the 2003-2004 General Retention Program should retain the same terms as the 2001-2002 General Retention Program. Conway provided no comments on the severance plan. On June 13, Blackstone again contacted Conway to inform them of the planned filing of the Motion and received no response.

5.      The Debtors amended the terms of the programs based on comments received from the Committees after the March 12 Presentation. On or about June 17, 2002, the Debtors

---

[3] The presentation materials reflect the original proposal for the Revised Compensation Programs. The Debtors amended the terms of the programs based on comments received from the Committees at and after the March 12 Presentation. The revised final numbers are reflected in Motion.

filed the Motion seeking approval of the Revised Compensation Programs.  On July 5, 2002, the

PD Committee filed the Objection.

## Summary

6.      The Objection asserts that the Revised Compensation Programs are (i) not

supported by sound business judgment and (ii) too rich given the Debtors' circumstances.

Paragraph 7 of the Objection makes clear, however, the PD Committee's real issue with the

Revised Compensation Programs: the PD Committee is upset that the Debtors are intervening in

the PD Committee's fraudulent conveyance actions against Sealed Air Corporation and Fresinius

Medical Care Holdings, Inc.  The Revised Compensation Procedures set forth in the Motion

reflect substantial changes made by the Debtors to satisfy the PD Committee's objections to the

March 12 Presentation.  The Objection asserts issues with every part of the Revised

Compensation Programs even though the Revised Compensation Programs were modified to

satisfy the PD Committee's previous objections.  The Debtors should not be unjustifiably

punished for merely fulfilling their obligation to represent all of the constituencies of its estate–

equity holders, non-tort claimants, the ongoing businesses, etc.  Grace has an obligation as

debtor-in-possession to represent all of the estates' constituencies, many of whom do not share

the PD Committee's interest in enhancing the value of the tort claims, and who actually have an

interest in minimizing the value of those claims.

7.      For the reasons set forth herein and in the Motion, and as described in the

Affidavit of Paul J. Norris, attached hereto as Exhibit B and the Affidavit of Nick Bubnovich,

attached hereto as Exhibit C, the Debtors, in their reasonable business judgment, believe that the

Revised Compensation Programs are necessary to retain Key Employees.  A loss of any of the

Key Employees could directly and adversely affect the ability of the Debtors to effectively and

profitably operate their businesses during the pendency of these Chapter 11 Cases, which would diminish the value of the Debtors' estates.

8.     Further, as set forth herein and in the Motion, the Debtors, in conjunction with Deloitte, developed the Revised Compensation Programs after extensive analysis of the compensation programs and severance benefits authorized for other companies in chapter 11 bankruptcies because of mass tort liabilities.  The Debtors and Deloitte developed an up-to-date snapshot of prevailing compensation practices and pay-plan design alternatives utilized in similar bankruptcies.  Based upon this analysis, the Debtors believe that the Revised Compensation Programs are comparable to programs implemented by other, similarly situated debtors and are reasonable under the circumstances.

**The Revised Compensation Programs are Supported by Reasonable Business Judgment**

9.     As set forth in the Motion, and as implicitly recognized in paragraph 6 of the Objection, a court may authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith.  Cinicola v. Scharffenberger, 248 F.3d 110, 112 (3d Cir. 2001).  In seeking such authority, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business.  See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983).  Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest.  See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  As set forth below and in the Motion, the Debtors have met their burden and the PD Committee has not offered and cannot offer evidence that overcomes the

91100-001\DOCS_DE:50733.1                                       5

presumption that the Debtors propose the Revised Compensation Programs on an informed basis, in good faith and in the honest belief that the action is in the Debtors' best interest.

10.    The Debtors believe that the Revised Compensation Programs are necessary to the continued successful operation of the Debtors' business and thus the preservation of the value of the Debtors' estates.  For the reasons set forth herein, the Debtors believe in their reasonable business judgment that the failure to implement the Revised Compensation Programs would adversely affect the ability of the Debtors to attract, motivate and retain Key Employees and ultimately adversely affect the Debtors' ability to operate and manage their businesses during the pendency of the Chapter 11 Cases.

11.    The PD Committee contends that the Debtors' Key Employees would be unlikely to depart because no companies are hiring.  (Objection at ¶¶ 9 and 20).  This is simply untrue and unsupported.  Contrary to the assertion in the objection, it is precisely the Key Employees who can find other employment even when the "country is mired in an economic recession" because of their experience and proven skills which would be beneficial to less successful companies looking to upgrade their employee base.  (Objection at ¶ 20).  Additionally, the Debtors are aware that many of their key senior and mid-level management employees have been approached by competitors and other companies looking to hire the Key Employees.

12.    Moreover, such a loss of Key Employees likely would adversely affect the Debtors' operations by lowering the morale of the remaining employees because of the appearance of disarray and disruption generated by such departures.  It also would burden the Debtors' remaining employees with additional responsibilities.  All of these factors would make it more likely that the remaining Key Employees, too, might explore other employment

opportunities. Surveys of the Debtors' employees conducted in 2000 revealed very high levels

of satisfaction with the quality of the supervisory and leadership groups. This result was

confirmed during employee focus group sessions held in 2001. A change in leadership was cited

by employees as a potential reason why they would leave the Debtors. The Debtors must protect

a critical mass of their high-performing employees in sufficient numbers to profitably operate

their businesses during the pendency of these Chapter 11 Cases, thus maximizing the likelihood

of a successful restructuring.

13.     In the context of these Chapter 11 Cases, with all of the attendant uncertainty that

inevitably arises during any chapter 11 process, the compensation programs must have targets

which are competitive with other companies in the marketplace for the same talented employees

and are meaningful to the employees, otherwise the entire purpose of such programs is

subverted. Based upon the Debtors' evaluation of their circumstances, their competitors, and

their industry, the Debtors believe that these programs are appropriately structured to accomplish

their purpose and, contrary to wasting the Debtors' assets, are instrumental in preserving them.

14.     In particular, the Revised Compensation Programs are necessary to retain Key

Employees as set forth below:

(a)     2003-2004 General Retention Program.  At this time, it is impossible to predict
        when the Debtors could conclude these Chapter 11 Cases. In face of a declining
        stock price resulting from the onslaught of asbestos claims, the retention of Key
        Employees was recognized as an issue in late 2000. (Norris Aff. at ¶ 5). In
        January 2001, three months prior to the Debtors' chapter 11 filing, the 2001-2002
        General Retention Program was introduced. (Norris Aff. at ¶ 5). As the 2001-
        2002 General Retention Program expires at the end of 2002, a new retention plan
        is needed for the same reason the Debtors needed the original program. (Norris

Aff. at ¶ 5).  There are two changes in the 2003-2004 General Retention Program from the 2001-2002 General Retention Program.  One is an increase in the percentage payouts to the employees.  The resulting target amount for total payouts under the 2003-2004 General Retention Program increases from $4.6 million to $6.7 million.  (Bubnovich Aff. at ¶ 14).  This increase is needed to compensate for the uncertainty as to the end date of the bankruptcy and the increasingly difficult operational environment the longer the Company must operate in the chapter 11 proceeding.  (Norris Aff. at ¶ 5).  The second change involves the timing of payments.  The 2003-2004 General Retention Program will make payouts to employees in arrears, either semi-annually or annually, while the 2001-2002 General Retention Program makes payments upfront or at intervals conforming to normal pay cycles.  The percentages and average total payouts are consistent with programs for companies of comparable size and circumstances.  (See Exhibit A, page 6; Bubnovich Aff. at ¶ 14).

(b)    Revised 2001-2003 LTIP.  The 2001-2003 LTIP was part of the employee compensation programs at Grace prior to the bankruptcy filing.  (Norris Aff. at ¶ 6).  The 2001-2003 LTIP provided for a combination of cash and stock options to reward employees if certain performance benchmarks were met or exceeded.  (Norris Aff. at ¶ 6).  Prior to the bankruptcy filing, stock options were a meaningful part of that program to the employees because of the potentially greater inherent value afforded to the employees by options rather than by cash.  (Norris Aff. at ¶ 6).  With the bankruptcy filing, the benefits of stock options to the employees have severely diminished and the 2001-2003 LTIP as currently structured does not offer the employees the benefits it was intended to provide without replacing the options with cash.  (Norris Aff. at ¶ 6).  The Revised 2001-2003 LTIP will deliver an award 100% in cash thus reinstating the benefits the Key Employees expected to receive from the 2001-2003 LTIP.  (Norris Aff. at ¶ 6).

(c)    2002-2004 LTIP.  The 2002-2004 LTIP keeps the total dollars available for payout to employees the same as under the 2001-2003 LTIP, but reduces the

EBIT growth rate at which that amount is available from 10% to 6% per annum. (Norris Aff. at ¶ 7). The reason behind the reduction is simple and straightforward: 10% is not the appropriate number when looking at the historic growth rates of Grace's competitors and holds Grace's employees to an artificially high standard given changes in the industry and economic environment. (See Bubnovich Aff. at ¶ 18; Exhibit A, page 8). It is commonplace for companies to adjust incentive targets periodically based upon economic conditions, as well as a particular company's business prospects. (Bubnovich Aff. at ¶ 18). The Debtors also believe that achieving a 6% EBIT growth rate year over year for three consecutive years would be excellent performance in the current economic environment. (Norris Aff. at ¶ 7).

(d)     Revised Severance Pay Program. The PD Committee misunderstands the proposed modifications to the Severance Pay Program. The Revised Severance Pay Program will not effect a change to the minimum severance payable to (i) covered employees, who will continue to be entitled to a 4 week minimum or (ii) the 16 Key Employees, who will continue to be entitled to a 2 year minimum. The proposed modifications contained in the Revised Severance Pay Program apply only to those employees who are terminates in connection with a court-approved plan of reorganization. With respect to the Revised Severance Pay Program, the Debtors did not analyze the cost for all 2300 employees covered by the program because it is nonsensical to assume that all employees would be terminated in connection with a court-approved plan of reorganization. (Norris Aff. at ¶ 8) The Debtors and Blackstone analyzed the cost of the change with respect to the 276 members of the corporate staff (105 of whom were hired since 1998, as a result of the relocation of the corporate headquarters to Columbia, Maryland, which relocation allowed a net reduction of the corporate staff by 75 employees) who may be more likely to be terminated in connection with a court-approved plan of reorganization. (Norris Aff. at ¶ 8) In the event that all 276 employees were terminated, the cost under the proposed new plan would be $2,040,000 more than under the old plan. (Norris Aff. at ¶ 8) Given the risk of being terminated in connection with a court-approved plan of reorganization faced

by these employees, the Debtors deem this change to be necessary to motivate and retain these employee through the pendency of the Chapter 11 Cases. (Norris Aff. at ¶ 8)

In short, each of the individual pieces of the Revised Compensation Programs is an integral part of the overall plan to retain and motivate the Debtors employees and thus supported by sound business judgment.

15.     The Key Employees also occupy the "command and control" positions within the Debtors' businesses. An exodus of these key senior and mid-level management employees would adversely affect the Debtors' ability to operate their businesses, which, historically, have been quite profitable. In fiscal year 2001, on a consolidated basis, Grace's pre-tax income from core operations was $187.5 million on net sales of $1.72 billion. In fiscal year 2000, pre-tax income from core operations was $187.1 million on net sales of $1.59 billion. Compared to a peer group of eleven specialty chemicals companies, Grace ranked first in sales growth and second in profit growth comparing 2001 results over 2000. In 1999, net sales and pre-tax income was $1.55 billion and $178.1 million, respectively. The going-concern value of the Debtors is therefore much larger than in the typical chapter 11 setting involving debtors of similar size.

16.     The Revised Compensation Programs do not in any way impact the compensation structure of the Chief Executive Officer (the "CEO"). The CEO is employed under a separate contract which is set to expire on December 31, 2002. Any modifications to the CEO's compensation structure will be handled through separate motion, with the Committees given an opportunity to review and comment.

17.     In conclusion, the Debtors, in their reasonable business judgment, believe that, for all the reasons discussed herein, the risk to the health of the Debtors' businesses posed by the

failure to approve the Revised Compensation Programs far outweighs the incremental cost of the new and revised programs.

### Conclusion

For the foregoing reasons and the reasons set forth in the Motion, the Debtors respectfully request entry of an order (i) authorizing, but not requiring, the Debtors to implement the Revised Compensation Programs and (ii) denying the Objection.

Dated: July 12, 2002

KIRKLAND & ELLIS
David M. Bernick, P.C.
James W. Kapp III
Christian J. Lane
Roger J. Higgins
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession