# EXHIBIT B

## Affidavit of Paul Norris

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

### AFFIDAVIT OF PAUL J. NORRIS IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS

Paul J. Norris, being duly sworn, deposes and says:

1. I am chairman, president and chief executive officer of W. R. Grace & Co., a corporation organized under the laws of the State of Delaware, one of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in this proceeding. I offer this affidavit in support of the Debtors' Response to the Objection of the Official Committee of Asbestos Property Damage Claimants to the Motion of the Debtors for an Order Authorizing, but not Requiring, the Implementation of Revised Compensation Programs.

2. The Debtors' Key Employees at this time are 118 employees and include the CFO, general counsel and CRO, business unit heads, senior administration, sales and marketing personnel, plant managers and operations personnel, directors of research and strategic planning, senior analysts and engineers; in summary, the leaders who are responsible for the excellent operating results Grace has achieved during the bankruptcy. It is precisely these people who can find other employment even when the "country is mired in an economic recession" because of their experience and proven skills which would be beneficial to other companies looking to upgrade their employee base.

3. Five Key Employees have left the Debtors from April 2, 2001 to date even with the existing compensation programs in place. Key Employees know that such compensation programs are in place to provide economic incentives and sustain employee morale. Through my leadership team, I have been made aware of at least 22 Key Employees who have been approached by executive search firms with serious opportunities with other companies. I am certain that if these and other Key Employees left, their loss would have a significant negative impact on Grace's businesses.

4. Although the actual number of Key Employees who would leave if the proposed programs were not put in place is not readily predictable, as the CEO of Grace with over 30 years experience in the chemicals industry and 15 years in senior leadership positions with major corporations, I have personal knowledge of what motivates people and what sustains their belief that Grace is a company where they can excel professionally and be appropriately compensated for their efforts. I believe that the Revised Compensation Programs are necessary to meet the needs of Grace employees, show sound business judgment and are appropriate to achieve the objective of keeping personnel at a reasonable cost to the estate. The importance of employees' trust in their leadership's ability to maintain and grow the long term value of the company cannot be overstated. I believe that continuing to provide compensation programs that are valued by employees is one way to demonstrate management's resolve to keep their trust.

5. At this time, it is impossible to predict when the Debtors could conclude these Chapter 11 Cases. In face of a declining stock price resulting from the onslaught of asbestos claims, the retention of Key Employees was recognized as an issue in late 2000. In January 2001, three months prior to the Debtors' chapter 11 filing, the 2001-2002 General Retention Program was introduced. As the 2001-2002 General Retention Program expires at the end of

2002, a new retention plan is needed for the same reason the Debtors needed the original program. The increased payout under the 2003-2004 General Retention Program is needed to compensate for the uncertainty as to the end date of the bankruptcy and the increasingly difficult operational environment the longer the Company must operate in the chapter 11 proceeding.

6. The 2001-2003 LTIP was part of the employee compensation programs at Grace prior to the bankruptcy filing. Prior to 2001, 100% of the LTIP award was in the form of stock options. The 2001-2003 LTIP provided for a combination of cash and stock options to reward employees if certain performance benchmarks were met or exceeded. Prior to the bankruptcy filing, stock options were a meaningful part of that program to the employees because of the potentially greater inherent value afforded to the employees by options rather than by cash. With the bankruptcy filing, the benefits of stock options to the employees have severely diminished and the 2001-2003 LTIP as currently structured does not offer the employees the benefits it was intended to provide without replacing the options with cash. The Revised 2001-2003 LTIP will deliver an award 100% in cash thus reinstating the benefits the Key Employees expected to receive from the 2001-2003 LTIP.

7. The 2002-2004 LTIP keeps the total dollars available for payout to employees the same as under the 2001-2003 LTIP, but reduces the EBIT growth rate at which that amount is available from 10% to 6% per annum. This change came at the recommendation of our compensation consultant after an analysis of peer company performance during the past decade. I believe that achieving a 6% EBIT growth rate year over year for three consecutive years would be excellent performance in the current economic environment.

3

8. The Revised Severance Pay Program will not effect a change to the minimum severance payable to (i) covered employees, who will continue to be entitled to a 4 week minimum or (ii) the 16 Key Employees, who will continue to be entitled to a 2 year minimum. With respect to this plan, the Debtors did not analyze the cost for all 2300 employees covered by the program because it is nonsensical to assume that all employees would be terminated in connection with a court-approved plan of reorganization. The Debtors did analyze the cost of the change with respect to the 276 members of the corporate staff (105 of whom were hired since 1998, as a result of the relocation of the corporate headquarters to Columbia, Maryland, which relocation allowed a net reduction of the corporate staff by 75 employees) who may be more likely to be terminated in connection with a court-approved plan of reorganization. In the event that all 276 employees were terminated in connection with a court-approved plan of reorganization, the incremental cost of the proposed new plan would be $2,040,000 greater than under the existing plan. Given the risk of being terminated in connection with a court-approved plan of reorganization faced by these employees, I deem the incremental cost of this change to be necessary to motivate and retain these employee through the pendency of the Chapter 11 Cases.

9. The purpose of all these proposed compensation programs is to retain Key Employees to continue Grace's successful operating performance that inures to the benefit of all constituencies. For that objective to be met the programs must have targets which are meaningful to the employees, otherwise the entire purpose is subverted. Based on my professional experience and knowledge of Grace, its competitors, and the industry in which Grace operates, I believe that these programs are appropriately structured to accomplish their purpose and contrary to wasting the Debtors' assets, are instrumental in preserving them.

AFFIANT FURTHER SAYETH NOT

Dated this 12th day of July, 2002.

_____
Paul J. Norris

SUBSCRIBED AND SWORN TO BEFORE ME

this 12th day of July, 2002.

_____
Notary Public
My Commission Expires: 9-16-02

[Notary Seal: JANET L. DAVIS, NOTARY PUBLIC, CARROLL COUNTY, MD]

5