# EXHIBIT C

## Affidavit of Nick Bubnovich

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**AFFIDAVIT OF NICK BUBNOVICH IN SUPPORT OF THE DEBTORS'
MOTION FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING,
THE IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS**

Nick Bubnovich, being duly sworn, deposes and says:

1. I am a partner in Deloitte & Touche's ("Deloitte") Human Capital Advisory Services ("Human Capital") consulting practice. I have worked at Deloitte since May 8th, 2002. Prior to my employment with Deloitte, I was a partner in Arthur Andersen's Human Capital consulting practice. I offer this affidavit in support of the Debtors' Response to the Objection of the Official Committee of Asbestos Property Damage Claimants to the Motion of the Debtors for an Order Authorizing, but not Requiring, the Implementation of Revised Compensation Programs.

2. I have over 20 years of experience in the field of compensation and benefits consulting, but I primarily focus on executive compensation. I have special expertise with compensation programs for companies that have commenced Chapter 11 cases or are otherwise financially distressed. My work consists of both designing and evaluating employee retention programs, long-term incentive programs, severance programs, emergence bonus programs, etc.

3. I would estimate that I have reviewed and consulted on the compensation programs of approximately 50 troubled companies. My Chapter 11 clients have included Dow-

Corning, FPA Medical Management, Favorite Brands, Singer International, Sun Healthcare, ENBC, USG, Armstrong Industries, USOP, Imperial Sugar, Comdisco, Global Crossing, Trans World Airlines, Federal Mogul, Polaroid, Bethlehem Steel, and Hayes Lemmerz.

4. On numerous occasions, the bankruptcy courts have had the opportunity to consider and accept expert reports prepared by me. On at least six occasions, (FPA Medical Management, Favorite Brands, Sun Healthcare, USG, Polaroid, and Hayes Lemmerz) the United States Bankruptcy Court for the District of Delaware has accepted my reports.

5. In addition, I have given expert testimony with respect to Chapter 11 compensation programs for the following cases: Comdisco in the United States Bankruptcy Court for the Northern District of Illinois; Einstein Noah Bagel Corporation in the United States Bankruptcy Court for the District of Arizona; and Imperial Sugar, Trans World Airlines, Federal Mogul, and Polaroid, all of which were before the United States Bankruptcy Court for the District of Delaware.

6. W. R. Grace & Co. ("Grace") engaged my services while I was with Arthur Andersen and has continued to use my services at Deloitte. I was retained to assist Grace in the evaluation, design and implementation of the company's revised compensation program including the employee retention, long-term incentive, and severance programs.

7. To familiarize myself with Grace's compensation programs and philosophy, I have talked to Grace's outside counsel and financial advisers, met with senior management and the company's Compensation Committee, as well as reviewed publicly available financial information and Grace's confidential compensation data.

2

8. To determine the overall appropriateness of Grace's proposed retention, long-term incentive and severance programs, we undertook different analyses, which were deemed appropriate for each circumstance. Each analysis is described in greater detail below.

9. To determine if the proposed retention program was appropriate and competitive, we reviewed the retention programs implemented at companies in Chapter 11 because of mass tort liabilities. This analysis compared the annual cost of each program to that of Grace's. The proposed retention program was designed to support the Compensation Committee's principles of providing competitive pay opportunities, promoting retention of key executives, and maintaining an appropriate cost/benefit relationship.

10. To determine if the revised long-term incentive program was appropriate and competitive, we analyzed the degree of difficulty of the EBIT growth goal for a three-year period by calculating the compounded annual growth rate ("CAGR") for a group of peer companies. The peer group consisted of fourteen companies, four of which comprise the S&P Specialty Chemicals Group and the remaining ten are specialty chemicals companies that are appropriate for this comparison. The CAGR was calculated for each three-year period from 1992 through 2000 (i.e., 1992-1994,1993-1995, etc.) and then averaged.

11. To determine the overall competitiveness of Grace's severance program, we reviewed and analyzed the severance programs at approximately 60 companies to determine competitive participation levels and amounts.

12. Finally, a competitive compensation analysis of Grace's total direct compensation ("TDC") was performed for the top 16 executive positions. An assessment of the reasonableness of such compensation was performed by comparing each position's TDC (i.e., the sum of the

3

base salary, target annual incentive, target long-term incentive opportunity, and proposed retention bonus) to the total direct compensation opportunity (i.e., base salary, target bonus opportunity and long-term incentive opportunity) provided to individuals holding similar positions in the chemical and manufacturing industry.

13. To address employee concerns regarding employment security, a more stressful work environment, perceived loss of internal opportunity, potential reduction in pay opportunity, etc. and to persuade the management team as well as key employees that it is worth the investment of their time, effort, and reputation to see Grace through the current challenging period, I consider it crucial that competitive pay levels are maintained. Based on my experience, the boards of directors of companies in mass tort liability cases typically do not object to paying competitive TDC and in fact sometimes pay a premium. Typically, companies (including Grace) in Chapter 11 because of mass tort liabilities continue the salary and annual incentive programs with little or no modifications. Thus, the focus of providing the necessary pay levels is on a retention bonus program and long-term incentive ("LTI") opportunity.

14. The potential payouts under the proposed 2003-2004 General Retention Program represent a relatively modest increase from the 2001-2002 General Retention Program. The target amount for total payouts under the proposed 2003-2004 General Retention Program increases from $4.6 million to $6.7 million. Based on the analyses performed, I believe the proposed 2003-2004 General Retention Program is within the range of competitive practice and the cost of the plan is reasonable compared to the programs of other mass tort liability companies.

4

15. It has been proposed that the 2001-2003 LTIP be changed so that the value of all options awarded thereunder be converted to a cash-based opportunity. Based on my experience, such a conversion from stock options is common among companies in circumstances similar to Grace's. Providing all of the long-term incentive opportunity through a cash-based performance plan is the most effective method of delivering competitive compensation and retaining executives and key employees during this critical period.

16. The proposed 2002-2004 LTIP has the following change from the 2001-2003 LTIP. The total payout to employees remains the same as the 2001-2003 LTIP, but it reduces the target EBIT growth rate from 10% to 6%. Thus, target LTI payouts to employees will be made at 6% EBIT growth instead of 10%.

17. Our analyses of Grace's competitor's EBIT CAGR indicated that a 10% growth rate is not appropriate as the target performance for earning LTI. Based on the analysis, the average and median three-year EBIT CAGR equal 5.8% and 5.9%, respectively. Adjustments to LTI targets (downward in Grace's case) are commonplace among companies in all circumstances. Virtually all companies adjust incentive targets periodically based upon economic conditions, as well as the company's business prospects.

18. The U.S. Salaried Employee Severance Plan currently provides a severance benefit of 1.5 weeks of salary for each year of service, with a minimum of 4 weeks' salary. The proposed plan provides that a minimum severance benefit equal to 4 months salary be provided to employees whose employment is terminated, if such termination is:

   (a)   The direct result of a transaction whereby one or more of the Company's business units are sold or otherwise separated from the other business units as part of the implementation of a plan of reorganization, or

(b) The direct result of a "Reduction in Force" necessary to implement the plan of reorganization; as determined by the Company's management.

19. The proposed severance program is generally consistent with competitive practice. The minimum severance benefit of 4 months salary is slightly higher than competitive practice, but 4 months salary compares favorably to the typical range of severance payments of 3 to 9 months salary. In addition, the 4 month severance benefit is only provided as an enhancement if termination of employment is related to a plan of reorganization. An employee terminated for cause or poor performance will not be eligible to receive the enhanced severance benefits. Accordingly, I conclude that the proposed program is within the range of competitive practice.

20. It is important for compensation purposes to focus on the total compensation opportunity rather than simply one or two components of compensation. Accordingly, we analyzed the top 16 executive positions' TDC and compared it to competitive practice. Based on the analysis, the top 16 executive positions are between the 50th and 75th percentile of competitive practice, and thus I conclude that TDC for such positions is well within the range of competitive practice.

AFFIANT FURTHER SAYETH NOT

Dated this 12th day of July, 2002.

_____
Nick Bubnovich

SUBSCRIBED AND SWORN TO BEFORE ME

this 12th day of July, 2002.

_____
Notary Public
My Commission Expires:

"OFFICIAL SEAL"
Nancy Freeman Shobeiri
Notary Public, State of Illinois
My Commission Expires March 14, 2006