IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et.al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## CASE MANAGEMENT PROPOSAL OF
## THE OFFICIAL COMMITTEE
## OF ASBESTOS PERSONAL INJURY CLAIMANTS

CAMPBELL & LEVINE, LLC
Matthew G. Zaleski, III (I.D. No. 3557)
Chase Manhattan Centre
1201 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone:    (302) 426-1900
Telefax:        (302) 426-9947

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax:        (212) 644-6755

Peter Van N. Lockwood
Albert G. Lauber
Nathan D. Finch
Max C. Heerman
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5088
Telefax:        (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

Dated:   July 22, 2002

{D0003687:1 }

## TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................4

DISCUSSION...................................................................................................................5

I.    Estimation Of The Debtors' Pending And Future Asbestos Personal Injury Claims *Has* To Be Done, And There Is An Established Method For Doing It...............................................5

    A.    Under Bankruptcy Code § 502 And Applicable Case Law, Estimation Is Mandatory In This Case ........................................................................................................5

    B.    This Court Must Estimate From A Known Data Set, Whereas The Debtors Propose That The Court Estimate, If At All, From The Unknown ........................................7

        1.    This Court Should Estimate Based On A Known Data Set Comprised Of Grace's Claims Resolution History ............................................................8

        2.    Grace's Claims Resolution History Reflects Its Real Liability In The Tort System, Taking Grace's Defenses Into Account ......................................11

        3.    The Only Other Known Data Set For Estimation—Grace's Judgment History—Would Unquestionably Result In A Higher Overall Liability..................................................................................................13

        4.    Estimating From Data Derived From Proofs Of Claim Forms Would Elevate The Unknown Over The Known...............................................15

II.    The Debtors' Opposition To The Committee's Estimation Proposal Is Unfounded.........17

    A.    There Is No Basis For The Debtors' Assertion That They Were Forced To Settle Claims In A Broken Tort System...............................................................................18

    B.    Debtors Badly Misapply Fed. R. Evid. 408 ........................................................20

    C.    The Debtors' Heavy Reliance On *Dow Corning* Is Misplaced..........................22

    D.    Debtors' "Cramdown" Argument Would Render § 502(c)(1) Superfluous ..........23

    E.    The Debtors' Assertion That Estimation Must Encompass Full-Blown Litigation Rights Is Incorrect As A Matter Of Law.................................................................24

III.    Grace's Proposed Procedures For Litigating "Common Personal Injury Liability Issues" Are Unworkable And Legally Indefensible...................................................................26

{D0003687:1}

A.  Proofs of Claim Are *Prima Facie* Evidence of Valid Claims, And They Must Be Allowed Unless Debtors Object With Specific Rebuttal Evidence.......................27

B.  Omnibus Lists of "Similarly Situated" Claims Are Not Sufficient To Initiate Contested Proceedings.............................................................................................28

C.  The Debtors' Objection Procedures Would Violate Collateral Estoppel Principles and Claimants' Due Process Rights.......................................................................30

C.  The Bankruptcy Rules Allow Claimants Full Discovery In Contested Proceedings........................................................................................................31

E.  Product Identification Requires Claim-by-Claim Discovery And, Where Facts Are Disputed, Trial ...................................................................................................32

F.  The Debtors Err In Asserting That Whole Categories of Claims, Meeting Their Self-Serving Definition of "Unimpaired Claims," Are Universally Non-Compensable.........................................................................................................35

G.  The Debtors' Proposed Use of *Daubert* Is Erroneous As A Matter Of Law.........38

H.  Grace's Proposed Procedures For Bringing Claims Before This Court Are Unworkable Or Improper.....................................................................................41

CONCLUSION.................................................................................................................44

ii

## INTRODUCTION

To arrive at a confirmable plan of reorganization and proceed with the establishment of a § 524(g) trust, this Court must value approximately 130,000 pending asbestos personal injury claims, as well as all future claims, against the Debtors, W.R. Grace & Co. ("Grace" or "Debtors"). The Official Committee of Asbestos Personal Injury Claimants ("the Committee") submits that the only way to manage this project without resorting to interminable litigation that would undermine the very purposes of the bankruptcy process is to value this enormous volume of current and future demands through a § 502 estimation.

Grace is in this bankruptcy because it could no longer sustain the price of resolving tort claims against it. The procedure the Committee proposes would estimate the value of pending and future claims against Grace by the very standards Grace itself used in the 20 years before it filed for bankruptcy, thereby producing a reasonable estimate of what is at issue — the total value of the tort claims that Grace would have faced in state court had it not filed in Chapter 11. Grace proposes a wholly different approach: "once-for-all" proof of claim forms, mass "omnibus" proceedings, and judicial promulgation of substantive medical protocols and standards on disputed technical issues.

Grace's proposal is unsustainable *substantively*. It is inconsistent with the task of estimating Grace's potential liability in the real-world tort system, because it depends on this Court's promulgating pro-defendant standards of proof and pleading that have no basis in the actual tort law of any State. Grace's proposal is improper *procedurally*. It requires freezing claimants' evidence to what they state on a proof of claim form, and it ignores the basic rule that disputed claims are considered contested matters in which most procedures under the Federal Rules — notably discovery — apply. And Grace's proposal is unworkable *practically*. If well-established

{D0003687:1 }

procedural and substantive rules are applied, as the Bankruptcy Code and Rules require, the wholesale "omnibus" proceedings Grace proposes would be impossible. This Court would have to give individual consideration to summary judgment motions against thousands of claims, most of which would involve disputed issues of fact and thus require jury trials. This process would take many years and, in the end, result in most claims' being allowed.

Grace seems to imagine that the issue is not what its actual tort liability would have been, but for the bankruptcy, in the legal system that actually exists, but what its liability ought to be in a hypothetical, vastly more pro-defendant, system of its own devising. In essence, Grace seeks to use this Court to legislate its idiosyncratic vision of tort "reform" in both procedure and substance. But it is not this Court's task to legislate tort reform or to invent a federal common law of torts in which Grace would fare better than it has fared in the state courts. The task is not to decide whether the tort system is "fair" but to estimate how claims would be valued in it.

Estimation is an approximation. It necessarily involves comparing known data to the unknown set being estimated. The question to be answered is what is the present value of all current unliquidated claims — and all similar future claims — as if they had been or would be liquidated through settlement or judgment in the tort system throughout the United States and abroad. Case law, statistical principles, and common sense demonstrate that the soundest method for estimating Grace's present and future liabilities is by reference to Grace's long history of resolving these same asbestos claims in the tort system. Estimation by reference to a debtor's claims resolution history is an established and statistically sound methodology that conforms to the Bankruptcy Code and case law. It is efficient, permitting Grace to emerge from bankruptcy with relative dispatch, and injured claimants to recover from the § 524(g) trust without indefinite delay. The claims resolution history is real, known, and comprehensive, making it the most

{D0003687;1 }

- 2 -

dependable data set available for predicting the future. And estimation based on Grace's claims resolution history will reflect the value that the pending and future claims against Grace would have in the tort system — that is, under the body of substantive state law (and foreign law) that would apply if these 130,000 claims were tried in the Bankruptcy Court. After all, Grace's claims resolution history is an aggregate that takes into account the particular facts of all claims against it — both the strong claims and the weak ones.

The Debtors oppose the estimation process mandated by § 502, asking instead that this Court pursue one of two methods of valuing claims. First, Grace "continues to believe" that the Court should pursue the interminable path proposed in its initial filing — forgoing estimation based on its own claims resolution history in favor of a bar date, lengthy and burdensome proof of claims forms, a complex notice program, and a fact-specific (yet somehow "omnibus") litigation process aimed at excluding thousands of claims. Supp. Br. 1, 16.

Grace's more recent proposal, purportedly arising from its "concern that the common liability issues be addressed at the earliest possible opportunity" (Supp. Br. 2), is even more complex and fraught with legal obstacles than the first. Grace would have this Court bifurcate its procedures for addressing "common liability issues" by initially accepting proofs of claim filed by Grace on behalf of pre-petition litigants, and then resolving these tens of thousands of claims using the same shotgun "omnibus" motions it proposed earlier. Then, Grace asks the Court to establish a bar date and notification program, followed by abbreviated — and procedurally inadequate — "show cause" hearings intended to wipe out thousands of additional claims. Finally, Grace grudgingly proposes what it calls an estimation for the "surviving claims," but fails to suggest how the Court should go about placing monetary values on these surviving claims. The only logical way to estimate such claims — by reference to Grace's history of trial judgments —

{D0003687:1 }

- 3 -

would assuredly result in a higher overall liability than the estimation procedure used in prior bankruptcies, which the Committee proposes here.

Grace's proposals are completely unworkable. There is no case law or statutory support for any claims valuation method remotely resembling what the Debtors have proposed. The Debtors' two-phase litigation process would drag on for years, burdening this Court and the parties while conflicting with the Bankruptcy Code's policy of speedy resolution. In fact, Grace's more recent proposal would be more taxing than its prior proposal. In effect, Grace now suggests going through the entire process it originally proposed twice, once for the claims of pre-petition litigants, then doing it all over again for all other claims. Both of Grace's schemes would merely postpone a true claims estimation until thousands of costly motions and hearings, and several years, have passed. The Committee asks that estimation start at once.

## BACKGROUND

Shortly after filing for Chapter 11 protection in April 2001, Grace filed an Informational Brief ("Info. Br.") and memoranda in support of a Motion for Entry of a Case Management Order. *See* Briefs filed by Grace on June 27, 2001 ("Bar Date Motion"), November 9, 2001 ("Preferred Reply"), and February 12, 2002 ("Feb. 11 Reply"). With those filings, Grace touted the fundamental soundness of its core business, complained that a the "broken" tort system had precipitated its bankruptcy, and announced its intention to re-engineer that system to determine its "true" asbestos liability. The Committee opposed Grace's unprecedented proposals, urging instead that this Court follow the path dictated by Bankruptcy Code § 502 and estimate both present and future claims as a first step toward establishing a confirmable plan of reorganization. *See* Briefs filed by the Committee on September 10, 2001 and December 19, 2001. This Court did not grant Grace's motions but instead, on May 22, 2002, instructed Grace and the Committee to

{D0003687.1 }

- 4 -

submit new briefs setting forth their proposals.  On June 21, Grace filed its Supplemental Brief ("Supp. Br.").

With this filing, the Committee offers its counter-proposal.  This brief will demonstrate that the only way to manage the pending and future asbestos personal injury claims against Grace is by a § 502 estimation.  The brief will first explain the estimation process and demonstrate that estimation is essential here.  Next, it will discuss the soundest method for estimating Grace's asbestos liabilities.  In particular, this brief identifies the two known data sets that could be used to perform the estimation: (1) Grace's overall claims resolution history; and (2) Grace's history of judgments in the tort system.  The first set is the most relevant and comprehensive known data set for estimation.  The second set, if used instead, would assuredly result in *higher* total liability for the Debtors.  Finally, this brief addresses the Debtors' proposed "procedures for the litigation of the common personal injury liability issues," and shows that they are both unworkable and legally indefensible.

DISCUSSION

IV.    **Estimation Of The Debtors' Pending And Future Asbestos Personal Injury Claims *Has* To Be Done, And There Is An Established Method For Doing It**

    A.    **Under Bankruptcy Code § 502 And Applicable Case Law, Estimation Is Mandatory In This Case**

Bankruptcy Code § 502(c) provides in pertinent part that "there *shall be* estimated for purpose of allowance under this section -- (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would *unduly delay the administration* of the case.  11 U.S.C. § 502(c) (emphasis added).  Congress added § 502(c) to the Bankruptcy Code in 1978.  Having broadened the definition of the term "claim," thereby bringing more disputes into bank-

ruptcy proceedings, Congress mandated estimation where contingent claims cannot be liquidated without undue delay.

Section 502(c)'s estimation provisions permit the preparation and evaluation of a plan of reorganization without awaiting the litigation of every contingent or unliquidated claim to judgment. *See In re Johns-Manville Corp.,* 843 F.2d 636, 646-48 (2d Cir. 1988); *A.H. Robins* v *Piccinin,* 788 F.2d 994, 1013 (4th Cir. 1986); *In re UNR Indus., Inc.,* 45 B.R. 322, 326 (N.D. Ill. 1984). The central purpose of § 502(c) is to avoid delay. *See In re Lane,* 68 B.R. 609, 611 (Bankr. D. Haw. 1986) ("The bankruptcy court is empowered to estimate claims if the liquidation would unduly delay the administration of the case."); *see also* 9A Am. Jur. 2d *Bankruptcy § 2246* (2000); *7 Collier on Bankruptcy* ¶ 502.LH[6] (15th rev. ed. 2001) (*"Collier"*).

Courts may perform an estimation using "whatever method is best suited to the circumstances" and recognizing that absolute certainty is impossible. *In re Brints Cotton Marketing Inc.,* 737 F.2d 1338, 1341 (5th Cir. 1984). While bound by the legal rules that may govern the ultimate resolution of a claim, a court has discretion in selecting the method to estimate its value. *Bittner v. Borne Chem. Co., Inc.,* 691 F.2d 134, 135 (3d Cir. 1982) (estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim"). The objective is to assess the "probable value" of claims in the tort system. In this effort, courts take into account practical factors: the hazards of litigation, past settlement practices, the results in analogous cases, and other real-world considerations. Some courts have simply valued a personal injury claim as equal to the nationwide average of unreduced jury verdicts for similar injuries. *See In re Federal Press Co.,* 116 B.R. 650, 654 (Bankr. N.D. Ill. 1992). In *In re Farley, Inc.,* 146 B.R. 748, 752, 756 (Bankr. N.D. Ill. 1992), the court estimated the value of personal injury claims by multiplying the claimed damages ($5 million) by the court's evaluation of the plaintiffs' chances of success at trial (25%),

{D0003687:1 }

- 6 -

and using the resulting product ($1.25 million) as the allowed value of the claims. Because the claims had survived summary judgment, the court held that they "cannot and do not have a zero value in any legal or practice sense," even though they were not likely to prevail at trial. *Id.* at 753.

In asbestos and other mass tort cases involving many thousands of pending claims and even more anticipated future claims, courts have recognized that estimating each claim individually would require an inordinate amount of time (although less time than litigating each claim) and defeat § 502(c)'s goal of avoiding delay. In such cases courts have estimated the "liability with respect to present and future asbestos-related personal injury claims in the aggregate." *In re Eagle-Picher Industrial, Inc.,* 189 B.R. 681, 682-83, 692 (Bankr. S.D. Ohio 1995); *see also A.H. Robins,* 788 F.2d at 1013, *UNR Indus., 45* B.R. at 326. Here, the fixing and liquidation of 130,000 individual asbestos claims would take years. Estimation of Grace's aggregate asbestos personal injury liability is thus the appropriate — indeed, the mandated — course.

## B. This Court Must Estimate From A Known Data Set, Whereas The Debtors Propose That The Court Estimate, If At All, From The Unknown

Reason dictates that estimation — valuing the unknown can only be done by reference to what is known. *See Eagle-Picher,* 189 B.R. at 686 ("In valuation, the only sound approach is, if possible, to begin with what is known.") In this case, the Court's task is to estimate the value of pending and future claims against Grace (the unknown) by reference to some known data set. The competing proposals before this Court could not be more distinct. The Committee proposes that this Court value the claims by reference to a known data set, namely, Grace's claims resolution history, which includes tens of thousands of resolved claims. Grace, by contrast, refuses to accept *any* known data set on which to base estimation, proposing that this Court "estimate" by reference to proofs of claim, which have no known value. Grace rejects its own claims resolution history,

{D0003687:1 }

- 7 -

comprised overwhelmingly of voluntary settlements, arguing that such settlements do not indicate its "actual" liability because Grace was forced to settle unmeritorious claims.  Supp. Br. 11; Info. Br. 28.  At the same time, Grace implicitly rejects the only other known data set — its judgment history in the tort system — because, according to Grace, its trial losses include unreasonable "lottery" jackpots.  Info. Br. 24.

Grace's reasons for discarding these known data sets are self-serving and unsupportable. Moreover, if these known data sets are simply discarded, estimation will be baseless.  Rather than value the unknown by comparison to the known, Grace proposes to value the unknown by comparison to nothing.

## 1.    This Court Should Estimate Based On A Known Data Set Comprised Of Grace's Claims Resolution History

An expert in claims valuation starts by examining the debtor's pending claims database and grouping the claims into categories of alleged disease.  The disease categories typically used are cancers (subdivided among mesothelioma, lung cancer, and other cancers), asbestosis, and pleural disease.  Other relevant subsets can be added as needed.

Next, the expert compares this universe of pending claims to "closed claims" that the defendant has resolved by settlement, judgment, or rejection.  *See Eagle-Picher,* 189 B.R at 686. Asbestos defendants, including Grace, keep databases of their closed claims, which include characteristics like the age of the claimant, nature of the disease, place of exposure, amount of any settlement or judgment, and other factors.  Using these data, the expert ascertains the average value for each category of claim, takes the number of pending claims for each category, discounts by the debtor's historical rate of claims rejection, and multiplies the resulting numbers by the average resolution amount for each category.  The product is the total estimated liability for pending claims.

{D0003687:1 }

- 8 -

Estimating future claims is only slightly more complicated. The expert starts by computing the number of likely future cancer claims, based on prior epidemiological studies, and values them by looking to a known data set, namely, the debtor's past resolution of cancer claims. The sum of these estimated future liabilities is then determined by discounting at the risk-free rate of return. *See, e.g., Eagle-Picher*, 189 B.R. at 692. Finally, the expert values future asbestosis and pleural disease claims based on the prior statistical relationship between cancer claims and non-cancer claims. Once the number of such claims has been established, the methodology for determining their dollar value is exactly the same as for the cancer claims.[1]

This common-sense method for valuing pending and future claims — tailored to the particular facts of each case — has been used in every asbestos-related bankruptcy since 1990. These include the Eagle-Picher, UNR, National Gypsum, Celotex, Fibreboard, Fuller-Austin, and Raytech proceedings. *See Eagle-Picher*, 189 B.R. at 683-92; *UNR Indus.*, 45 B.R. at 326; *see also A.H. Robins*, 788 F.2d at 1013 (Dalkon Shield).

The leading case on estimation of asbestos claims, *Eagle-Picher*, squarely supports this methodology. Like the instant case, *Eagle-Picher* involved an estimate of the Debtor's liability for purposes of formulating a plan, and the *Eagle-Picher* estimation was based in part on Eagle Picher's prior payment history. 189 B.R. at 684-86. And like this case, *Eagle-Picher* was an asbestos bankruptcy where a § 524(g) trust was contemplated at the time of estimation. The precise argument Grace advances here — that its claims resolution history cannot serve as a basis for estimating its "actual" asbestos liability — was squarely rejected in *Eagle-Picher*, where the

---

[1]    In practice, estimates often also allow for administrative costs of claims handling, and adjust such parameters as settlement values, claiming rates, or the cancer/non-cancer ratio to take account of established trends in those parameters.

Estimating future claims is only slightly more complicated. The expert starts by computing the number of likely future cancer claims, based on prior epidemiological studies, and values them by looking to a known data set, namely, the debtor's past resolution of cancer claims. The sum of these estimated future liabilities is then determined by discounting at the risk-free rate of return. *See, e.g., Eagle-Picher,* 189 B.R. at 692. Finally, the expert values future asbestosis and pleural disease claims based on the prior statistical relationship between cancer claims and non-cancer claims. Once the number of such claims has been established, the methodology for determining their dollar value is exactly the same as for the cancer claims.[1]

This common-sense method for valuing pending and future claims — tailored to the particular facts of each case — has been used in every asbestos-related bankruptcy since 1990. These include the Eagle-Picher, UNR, National Gypsum, Celotex, Fibreboard, Fuller-Austin, and Raytech proceedings. *See Eagle-Picher,* 189 B.R. at 683-92; *UNR Indus.,* 45 B.R. at 326; *see also A.H. Robins,* 788 F.2d at 1013 (Dalkon Shield).

The leading case on estimation of asbestos claims, *Eagle-Picher,* squarely supports this methodology. Like the instant case, *Eagle-Picher* involved an estimate of the Debtor's liability for purposes of formulating a plan, and the *Eagle-Picher* estimation was based in part on Eagle Picher's prior payment history. 189 B.R. at 684-86. And like this case, *Eagle-Picher* was an asbestos bankruptcy where a § 524(g) trust was contemplated at the time of estimation. The precise argument Grace advances here — that its claims resolution history cannot serve as a basis for estimating its "actual" asbestos liability — was squarely rejected in *Eagle-Picher,* where the

---

[1]     In practice, estimates often also allow for administrative costs of claims handling, and adjust such parameters as settlement values, claiming rates, or the cancer/non-cancer ratio to take account of established trends in those parameters.

court described the debtor's pre-petition record on disposal of asbestos claims as "a valuable experiential resource" for estimating the value of pending and future claims. *Id.* at 686. Indeed, *Eagle-Picher* established the key considerations that should enter into a court's estimation of present and future asbestos liabilities: (1) the history of the Debtor company; (2) the total number of claims expected; (3) the category of disease and occupation; and (4) *settlement values* for claims close to the bankruptcy filing date. *See id.* at 690-91.[2]

Further, Dr. Frederick Dunbar, a *debtors'* expert on estimating asbestos claims, has advocated the use of historical settlement information to estimate such liabilities. In his 1996 treatise on estimating mass tort claims, Dr. Dunbar states that "[w]here data is available on the indemnity payments that historically have been made on similar claims, an average of these may serve to estimate the payment on pending or future claims." Frederick C. Dunbar et al., *Estimating Future Claims: Case Studies from Mass Tort and Product Liability* 81 (Andrews Publications 1996) ("Dunbar"). Later in the book, Dr. Dunbar describes how his firm and other experts each used historical averages of settlement values to predict and value pending and future asbestos

---

[2]     Grace has sought to distinguish *Eagle-Picher* and other prior estimations on the theory that the debtors in those cases did not dispute liability. *See* Feb. 11 Reply 21. If Grace means to argue that § 502(c) does not permit the estimation of "disputed" claims, that argument is nonsensical. Generally, there would be no need for estimation of undisputed claims, and they would be allowed under § 502(a) at face value. Moreover, if only undisputed claims may be estimated under § 502(c), and all claims subject to objection must be determined individually before a plan is approved, a bankruptcy *would never end*. If a debtor chose to lodge a "dispute" as to future claims, the court could *never* confirm a plan, because it would have to wait for each "future" claim to become a "present" claim, then liquidate it. This approach would nullify § 502(c), and it is thus unsurprising that estimation is routinely used where claims are disputed. *See Federal Press*, 116 B.R. 650 (estimating value of disputed $2.1 million personal injury claim at $950,000 based on average jury verdicts); *In re Farley*, 146 B.R. 748 (estimating disputed claims at 25% of face value based on hazards of litigation). Contrary to Grace's assertion, moreover, the debtor in *Eagle-Picher did* dispute liability when it thought it had a basis to do so: in confirming the plan, the court included in its estimation a percentage of claims that would receive no payment by the § 524(g) trust. Nowehere in its opinion does the court state that the debtor conceded liability.

{D0003687:1}

- 10 -

claims in the *National Gypsum* case. *Id.* at 158-60. This estimation method has also been used by corporations, settlement trusts, risk managers, and insurance companies, as well as by courts in contexts outside § 502(c). *See* Dunbar at 1-5, 119-136.

Unavoidably, projections as to future events are uncertain. But estimation is nonetheless valid, and it provides here the only practical method for determining the aggregate value of Grace's asbestos liability. The fact that estimation cannot generate a result that will turn out to be perfectly accurate is no reason not to do it, particularly when there is no other choice.

### 2.    Grace's Claims Resolution History Reflects Its Real Liability In The Tort System, Taking Grace's Defenses Into Account

The purpose of estimation is neither to determine what is owed particular claimants (that will be the function of the § 524(g) trust) nor to determine what, in a defendant's perfect world, is the "right" amount claimants should be paid. Rather, estimation should approximate what Grace's pending and future asbestos liability would be if these claims were litigated or settled under the substantive tort laws of the various States. In other words, estimation should determine what Grace's liability would have been but for its bankruptcy filing.

Grace's claims resolution history reflects its real-world liability. It represents negotiated and litigated resolutions that take into account *all* of its defenses to *all* types of claims — from the strongest individual facts and legal positions to the weakest. For those cases that were settled, it reflects the value that claimants placed on their injuries and the costs (including large jury awards) that Grace anticipated and sought to avoid. And all settlements necessarily reflect both parties' assessments of any defenses Grace may have had. For those relatively few cases that were litigated, it reflects the determinations of judges and juries. In fact, Grace itself used its claims resolution history as the basis for estimating the asbestos liabilities shown in its prebankruptcy financial statements.

{D0003687:1 }

- 11 -

Yet Grace refuses to accept the reality of its tort-system liabilities (Supp. Br. 10):

> [M]ost of the Debtors' pre-petition claims settlements were not made because the claims were valid. Rather, Grace was compelled to agree to so-called 'inventory settlements' because the tort system offered no means of limiting settlements to valid claims.

Glaringly absent from the papers filed by Grace's new lawyers is a shred of evidence to support this assertion. If it were true that Grace regularly paid money to settle worthless claims, one would expect to see at least an affidavit from one of the many attorneys who, on Grace's behalf and on behalf of its insurers, opposed, tried, settled, and paid tens of thousands of the very types of claims Grace now says are worthless.

Not surprisingly, Grace's assertion that it has been forced to pay meritless claims since "the mid-1990s" (Info. Br. 29) is controverted by its own documented claims settlement policy. Grace followed a policy of settling only claims that were extremely likely to survive a motion for dismissal; it defended against the rest.

Grace followed this strategy because it was the *cheapest method* of resolving its asbestos liability. As we show below, it would have been much more expensive if, instead of settling vir-

{D0003687;1 }

- 12 -

tually all cases likely to survive dismissal, Grace had litigated them to judgment. In short, by using Grace's claims resolution history as the data set for estimation, this Court will not be unfair to the Debtors, but will favor them with the presumption that they could have continued to dispose of cases with equivalent efficiency.

3.   **The Only Other Known Data Set For Estimation—Grace's Judgment History—Would Unquestionably Result In A Higher Overall Liability**

Because Grace realizes that any estimation of its present and future asbestos liability based on its claims resolution history would result in a finding that it is hopelessly insolvent, it has proposed an elaborate liquidation procedure to winnow out "weaker" cases first. But Grace fails to explain how it would attach monetary values to the stronger cases that survive its threshold defenses. Unless these claims are tried to juries one by one, the only logical way to value them would be by reference to Grace's trial judgment history. The claims that survive Grace's winnowing process would be most similar to the claims that survived comparable winnowing processes in the tort system — motions to dismiss, discovery, evidentiary hearings, and motions for summary judgment — and proceeded to judgment. *See* Peterson Affidavit ("Aff.") ¶ 29 (attached as Exhibit C).

Grace does not propose estimation based on its judgment history for an obvious reason: it would produce a much *higher* aggregate liability. Grace's settlement history reveals that, while it has paid something to the majority of claimants, the average payment has been relatively modest. The story is quite different where Grace has litigated claims to judgment. Although its verdict history naturally reflects a higher percentage of "no-pay" claims, the claims it did pay have often been enormous. Grace has practically admitted this fact, writing that "[w]hen cases finally proceed to trial, the tort system often produces 'lottery like' outcomes." Info. Br. 24. Indeed, Grace, in its attempted indictment of the tort system, asserts that "capricious" awards "abound"

[D0003687.1]

- 13 -

when cases go to trial and result in verdicts for "millions" to "claimants asserting speculative 'future claims' for 'unconfirmed' disease." *Id.*

At the time of its Chapter 11 filing, Grace stated that it had lost 19 of the 63 cases it had tried to verdict. Info. Br. 29.

And even if Grace were able to eliminate thousands of claims based on its "threshold liability filters," it is obvious that any estimation projected from its tort-system verdict history would produce a gargantuan liability.

4.    **Estimating From Data Derived From Proofs Of Claim Forms Would Elevate The Unknown Over The Known**

Disregarding both its overall claims resolution history and its judgment history, Grace would have this Court "estimate" by looking to data from yet-to-be-filed proofs of claim. To extrapolate Grace's current and future liability from proofs of claim, this Court would have to fashion some proxy for the tort system to determine claim validity while preserving claimants' rights to due process, including rights to jury trials. This simply cannot be done in any reasonable time frame. Equally important, Grace has proposed no mechanism for attaching *monetary values* to the claims that survive the "liability filters" it proposes to erect.

The whole purpose behind estimation is *quickly* to evaluate an unknown quantity by comparison to similar claims with known characteristics and values. Using proofs of claim would be a painstakingly long process. First, the Court would have to establish "known values" for some subset of claims that would be statistically meaningful and have equivalent extrapolative force to Grace's 20-year history of resolving claims in the tort system. To do so, the Court would be required to analyze and evaluate, at the very least, a statistically valid sample of the claims; apply the Debtors' multiple liability filters (after giving thousands of claimants discovery on each alleged defense); and, as discussed above, either value the claims that pass through the filters by comparison to *jury verdicts* in similar cases, or try the surviving claims to juries in this Court. This would not be estimation, but the protracted litigation that estimation is intended to replace.

For a sample of claims to be statistically valid for estimation purposes, it would have to be large enough to be fairly representative of the factual and legal variations of all claims that have been or will be filed against the Debtors, taking into account all defenses they propose to assert. One need only look at the many defenses the Debtors have advanced, and the factual variables affecting each defense, to realize that the sample size required for statistical validity would be very

{D0003687:1}

- 15 -

large. And not mentioned by Grace is that most, if not all, of these defenses would involve significant variations in governing state tort law, as well as an overarching choice-of-law element.[4] The very process of identifying a valid sample would be laborious and sharply litigated. Even if a tiny sample (such as the 1% sample suggested by USG in its current proposal to this Court) were somehow deemed sufficient in this case, this Court would add approximately 1,300 tort cases to its civil docket. If this Court's civil docket now consists of 120 cases, its docket would increase *ten-fold.* If the necessary sample size were 10%, the docket would increase *one-hundred-fold.* Bringing each claim through discovery and to trial would take years. In short, contrary to the goal of § 502(c), using proofs of claim to generate a data set for estimation would be overwhelmingly burdensome to the parties and the Court, and it would impermissibly cause undue delay in the administration of this case.

Fortunately, there is no reason to incur the exorbitant time and expense required to reduce several hundred thousand proofs of claim to "known values." The Bankruptcy Code provides for estimation. Settled authority establishes a method for estimating a debtor's pending and future asbestos personal injury liability by reference to "known values" that already exist — namely, its

---

[4]    Each defense, moreover, presents its own multiplicity. For defenses based on medical conditions, it would take some time even to arrive at a list of potential scenarios from which a group of test cases would be chosen. Each disease category, including all cancers, pleural plaques, pleural thickening, and asbestosis — each with varying stage of manifestation or impairment — must be included in a sample. The vast array of State laws allowing for recovery for such claims must be appropriately factored into the equation. Other factors would have to include the variants on subjective testimony as to symptoms and damages; medical histories, including susceptibility to disease; nature of exposure (a subject which clearly cannot be bottled up by occupation); and any other variable related to Debtors' medical defenses, including differences in ILO and PFT readings, and the legal significance (if any) of so-called "dose risk" or "minimum cumulative dose." In the end, as the Fifth Circuit has already held in no uncertain terms, causation simply cannot be lawfully determined on a group basis across thousands of plaintiffs and 50 States' substantive laws. *See Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 313, 317 (5th Cir. 1998).

{D0003687:1}

- 16 -

claims resolution history. And Grace's claims resolution history is extensive, well-documented, and available to experts and this Court.

## II.    The Debtors' Opposition To The Committee's Estimation Proposal Is Unfounded

When filing their Chapter 11 petition, the Debtors conceded that "estimation for purposes of determining the feasibility of a proposed plan * * * may be necessary"; cited case law indicating that estimation "'is essential prior to the hearing on confirmation of a plan, in order for the court to evaluate the feasibility of the plan without delaying the confirmation process'"; and touted an estimation's ability to "set a fixed outer limit on the amount to be provided for contingent tort claims." Info. Br. 66, *quoting In re MacDonald*, 128 B.R. 161, 164 (Bankr. W.D. Tex. 1991). Yet what the Debtors now propose is not an "estimation," but an unending claim-by-claim liquidation process. The Committee, by comparison, has proposed a *bona fide* estimation, and the Debtors' unprecedented arguments against it should be rejected.

{D0003687:1 }

- 17 -

A.    **There Is No Basis For The Debtors' Assertion That They Were Forced To Settle Claims In A Broken Tort System**

Grace argues that this Court should not estimate based on its claims resolution history because (1) Grace was the victim of a spike in claims due to "indiscriminate filings," and (2) "the tort system offered no means of limiting settlements to valid claims." Supp. Br. 11. Both arguments are false.

Citing "regulatory curtailment of significant asbestos exposures in the early 1970s," Grace asserts that there is "no explanation — grounded in either medicine or in Grace's liability — for the recent spike in claims against [it]," and it accordingly infers that those claims must be "indiscriminate." Supp. Br. 4, 5, 10. These assertions are pure histrionics. Asbestos defendants, including Grace, have known for years that the rates of asbestos-related disease would increase steadily until the turn of the twenty-first century; and they have. In 1982, the well-known Nicholson Study predicted the future asbestos-caused cancer deaths that would occur through 2030. *See Nicholson, Perkel & Selikoff,* "Occupational Exposure to Asbestos," 3 AM. J. INDUST. MED. 259 (1982). This Study considered the levels of exposure to asbestos prior to its "regulatory curtailment" in the 1970s, the size of the exposed population, and the long latency period of asbestos-related cancers. It projected that mesothelioma and lung cancer deaths would rise throughout the 1980s and 1990s, plateauing at the turn of the century. Real-world mesothelioma deaths as measured by the National Cancer Institute have confirmed the Study's forecast. *See* Peterson Aff. ¶ 47; *Eagle-Picher*, 189 B.R. at 687 (discussing the Study). The "spike" in claims prior to Grace's 2001 bankruptcy is thus easily explained — more and more people were suffering from asbestos-related disease.

And there are other explanations. As Grace notes (Supp. Br. 5), there has been an increase in the claiming rate of injured plaintiffs. But whereas Grace asserts that this increase has been

{D0003687:1 }

- 18 -

confined to non-malignant claims, the fact is that the propensity to sue has increased *more* with respect to individuals suffering from asbestos-related cancers than for those suffering from other asbestos-related disease. *See* Peterson Aff. ¶ 48 & Table 5. The bankruptcies of other asbestos defendants also increased the number of claims against those defendants who were not in bankruptcy; until April 2001, this category included Grace. *See* Info. Br. 28, 33. During the pendency of the *Georgine* and and *Fibreboard* litigation, claims against numerous defendants were stayed or deferred; when the Supreme Court found these settlements unconstitutional, claims against all asbestos defendants naturally rose. Finally, the Committee would agree that unfavorable publicity surrounding Grace's Libby, Montana asbestos mine was another factor in the increase in claims against Grace (although this by no means suggests that these claims were invalid). *See* Supp. Br. 5.

Similarly, there is no merit to Grace's assertion that it was forced to settle worthless claims because it could not get a fair trial in the tort system. This assertion is completely unsupported, and it is belied by Grace's own stated policy of defending against weak claims and settling only those claims that were likely to survive motions to dismiss. The notion that Grace could not get a fair trial across the entire American tort system is offensive and absurd. This Court is well aware of the capabilities of the American tort system to provide all parties with a fair opportunity to present their cases. Asbestos litigation is not confined to what Debtors call "high verdict" jurisdictions; for example, thousands of claims have been filed against asbestos defendants in the state and federal courts of Pennsylvania, Delaware, and New Jersey, venues familiar to this Court.

In short, the