Courts competently manage the vast majority of asbestos personal injury cases throughout the country.

Finally, resolution in the bankruptcy court of asbestos claims against Grace is governed by substantive state tort law as it currently exists, not some kind of "federal common law" that they would like to see erected. If the Debtors believe their settlement policy was too generous, and that most claims against Grace are deficient on their face, they are free to withdraw their petition and bring these cases before judges and juries. What they cannot do is create a new federalized tort system where the deck is stacked in their favor. "Filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws." *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (internal quotes omitted).

## B.   Debtors Badly Misapply Fed. R. Evid. 408

Grace errs in contending (Supp. Br. 11) that Federal Rule of Evidence 408 precludes estimation based on past settlement values. Rule 408 renders inadmissible at trial evidence of offers to settle disputed claims where such evidence is proffered "to prove liability for or invalidity of *the claim or its amount.*" Fed. R. Evid. 408 (emphasis added). In other words, Rule 408 only bars the use of evidence of compromise "to prove the validity or invalidity of the claim that was the subject of the compromise." 23 WRIGHT AND GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5306 (1980).

By contrast, if "the settlement negotiations and terms explain and are part of another dispute, they must often be admitted if the trier of fact is to understand the case." 2 WEINSTEIN, FEDERAL EVIDENCE § 408.08[5] (2d ed. 1997). In this bankruptcy proceeding, information about the number of Grace's past tort claims and the cost of its past tort settlements is essential to estimation, and that evidence is unquestionably admissible under Rule 408. *See Broadmount*

{D0003687:1}

- 20 -

*Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10ᵗʰ Cir. 1992) (evidence from prior settlement discussions admissible because "related to an entirely different claim" from the claim that was the subject of the negotiations); *In re Babcock & Wilcox Co.*, 274 B.R. 230, 256-57 (Bankr. E.D. La. 2002) (evidence of settlement history is admissible under Rule 408).

Presumably, Grace would not dispute that estimation — whether for present or future claims — must be extrapolated from some number. Indeed, Grace previously suggested that the Court assign values to categories of claims and project future claims from those values. *See* Info. Br. 68. But a plaintiff in a tort case against a particular defendant can no more establish liability by proffering evidence of earlier *verdicts* won by other plaintiffs than by proffering evidence of attempts to settle the case at hand. *See* Fed. R. Evid. 404(b). Thus, acceptance of Grace's position would preclude any form of extrapolation and render estimation impossible.

This Court, charged with the task of estimating Grace's future tort liabilities, may properly consider Grace's prior settlements, as well as verdicts against Grace (or others) in the tort system. These data would not be used to "prove the validity or invalidity" of any particular claim, but to estimate Grace's *aggregate liability* for all present and future claims. 23 WRIGHT & GRAHAM § 5306. Consideration of prior settlements is an accepted component of estimation in bankruptcy cases. *See Eagle-Picher*, 189 B.R. at 691.[5]

C.    **The Debtors' Heavy Reliance On *Dow Corning* Is Misplaced**

---

[5]    Similarly, Grace errs in contending (Supp. Br. 12, 13) that estimation based on its pre-filing experience would violate the principle that only legally valid claims be allowed. Since Grace's settlement history reflects its assertion of defenses and takes full account of rejected claims, the estimated iability will encompass only "valid claims."

Grace contends that "if estimation is to be employed," it should take place after litigation of a whole range of loosely-defined "common issues." Supp. Br. 40. Yet courts have rejected the idea of protracted litigation prior to estimation. *See A.H. Robins,* 788 F.2d at 1012 (estimation of the potential and pending claims by the bankruptcy court should precede any trials of the claims); *UNR Industries*, 45 B.R. at 326 (rejecting contention that trial on liability issues must precede estimation and holding that it is "not necessary to order trials now so that these claims can be valued.")

In insisting that litigation must precede estimation, the Debtors rely chiefly on *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997). *See* Supp. Br. 12, 15, 41. To the Committee's knowledge, *Dow Corning* is the only mass-tort bankruptcy case in which the court decided to conduct consolidated litigation rather than an estimation of unliquidated unsecured claims (although it never in fact did so). But the facts in *Dow Corning* differed critically from those in *Eagle-Picher,* the other mass-tort bankruptcies involving estimation, and this case. The holding of *Dow Corning* is thus completely inapposite.

In *Dow Corning,* the Debtor's key defenses revolved around a single issue of general causation — whether the leaking of breast implants could cause disease. In the claims against Grace, there is no general causation issue, because no one disputes that asbestos causes disease. Because *Dow Corning* involved a single, controlling issue common to virtually every claim, threshold litigation of that issue made some sense. Here, there is no dispute about general causation, only legal and factual questions unique to each claimant, such as facts relevant to exposure, severity of injury, and governing state law. In fact, the Michigan bankruptcy court expressly noted that *Dow Corning* differed from "substantially all of the mass tort bankruptcy cases which preceded [it]" — a group that consisted, almost entirely, of asbestos mass tort

{D0002687:1}

bankruptcies. *See* 211 B.R. at 554. Grace here attempts to apply a decision that expressly *distingushed* asbestos bankruptcies to — of all things — an asbestos bankruptcy.[6]

## D.     Debtors' "Cramdown" Argument Would Render § 502(c)(1) Superfluous

Grace's suggestion (Supp. Br. 13) that estimation conflicts with 11 U.S.C. § 1129(b) widely misses the mark. Grace essentially argues that the Committee's estimation proposal would inevitably require a "cramdown" on equity, and that the statutory requirement that a cramdown be "fair and equitable" would be violated if the Court estimates claims before it has ascertained Grace's actual liability on each claim.

Under Grace's logic, estimation would *always* run afoul of § 1129. Yet Grace does not cite a single case in which this argument was even raised. This is unsurprising. Because it is a prediction of future value, an estimation, by its nature, runs the risk of overestimating (or underestimating) the value of unliquidated claims. No reasonable interpretation of the Bankruptcy Act would hold that, because of this risk, an estimation *per se* "discriminate[s] unfairly" and can never be "fair and equitable" to the debtor. Such an interpretation would effectively render the Code's estimation provisions for unliquidated claims superfluous, whereas well-settled principles of statutory construction require that statutes be interpreted to give effect to every clause. *See Heckler v. Chaney*, 470 U.S. 821, 829 (1985).

Any plan of reorganization involves uncertainties, not only on the liability side, but also on the asset side. For example, in determining whether a plan is feasible, the bankruptcy court,

---

[6]     The *Dow Corning* debtors (represented by the same law firm representing Grace here) did not oppose an estimation. They sought one. *See* 211 B.R. at 554. The court denied their request in part because it anticipated estimation could be a lengthy process, as compared with an outcome-determinative resolution of the threshold issue of general causation. *See id.* at 563. The opposite is true here.

creditors, and shareholders make their best judgements about the actual value of the business and its future cash flows. So long as the plan is "fair and equitable" to each class, the court can do a "cramdown" on equity despite these uncertainties. Thus, if a statistically valid estimation shows that the Debtors are insolvent, the resulting plan of reorganization would not entail a "premium" for any class of creditors, and this Court could confirm the plan as "fair and equitable" to Grace's shareholders.

## E.     The Debtors' Assertion That Estimation Must Encompass Full-Blown Litigation Rights Is Incorrect As A Matter Of Law

Grace asserts that "bedrock principles" of estimation, including full-blown litigation rights, prevent estimation based on its claims resolution history. Supp. Br. 12, 14-15. This is nonsense. The express purpose of estimation is to promote a speedy bankruptcy resolution where claims cannot be expeditiously liquidated. If estimations involved full-blown litigation rights, they would not be estimations at all, they would be trials, defeating the important statutory purpose behind § 502(c).

Courts have expressly recognized that Congress' use of the term "estimate" recognizes that the result will not necessarily be precise. *See In re Baldwin-United Corp.*, 55 B.R. 885, 898-99 (Bankr. S.D. Ohio 1985); *In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 66 (E.D. Va. 1982). Thus, as the Third Circuit explained in *Bittner*, even streamlined arbitration of individual claims is likely to conflict with the efficiency goal underlying estimation:

> Congress intended the procedure to be undertaken initially by the
> bankruptcy court judges, using whatever method is best suited to the
> particular contingencies at issue. The principal consideration must be an
> accommodation to the underlying purposes of the Code. It is conceivable
> that *in rare and unusual cases* arbitration or even a jury trial on all or
> some of the issues may be necessary to obtain a reasonably accurate
> evaluation of the claims. Such methods, however, usually will run counter
> to the efficient administration of the bankrupt's estate and *where there is
> sufficient evidence on which to base a reasonable estimate of the claim,*

{D0003687:1 }

- 24 -

the bankruptcy judge should determine the value.

691 F.2d at 135-56 (emphasis added); *see also In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) (quoting *Bittner*). In keeping with the mandate of § 502(c), therefore, courts have repeatedly rejected litigation of individual claims in favor of an estimation "in the interests of administering th[e] case efficiently." *See Federal Press,* 116 B.R. at 654.

Grace errs in asserting that "the use of estimation is limited by the right to jury trial." Supp. Br. 15. A properly-conducted estimation — that is, an estimation based on Grace's history of claims resolution — will not implicate the right to a jury trial, because it will not determine Grace's liability to any particular claimant or affect any particular claimant's rights. Thus, there is no right to jury trial in estimation, even for claimants. *See Grzybowski v. Aquaslide 'N' Dive Corp.*, 85 B.R. 545, 549 (9th Cir. 1987); *In re Poole Funeral Chapel, Inc.*, 63 B.R. 527, 533-34 (Bankr. N.D. Ala. 1986); *In re Lane*, 68 B.R. 609, 612 (D. Hawaii 1986). If Grace means to assert its *own* jury trial rights, its assertion is completely misplaced. By its terms, 28 U.S.C. § 1411(a) applies only to *individuals,* and courts have held that *debtors*, by voluntarily petitioning for bankruptcy, waive jury trial rights. *See N.I.S. Corp. v. Hallahan*, 936 F.2d 1496, 1505 (7th Cir. 1991); *Longo v. McLaren*, 3 F.3d 958, 960-61 (6th Cir. 1993).[7]

## III.   Grace's Proposed Procedures For Litigating "Common Personal Injury Liability Issues" Are Unworkable And Legally Indefensible

---

[7]   The fact that claimants and Debtors alike have no right to jury trial in *estimation* does not contradict the fact that claimants would have a right to jury trial if their claims were individually litigated in bankruptcy. *See* 28 U.S.C. § 1411. The Bankruptcy Code preserves for personal injury and wrongful death claimants the trials by jury to which they are entitled under the Seventh Amendment. *See* 28 U.S.C. § 1411(a); *Granfinanciera v. Nordberg*, 492 U.S. 33, 42 n.3 (1989); *A.H. Robins,* 788 F.2d at 1012; *see also* 28 U.S.C. § 157(b)(5). Thus, claimants' jury trial rights would unquestionably be implicated by the type of "pseduo-estimation" that Grace proposes.

The case management proposal in Grace's Supplemental Memorandum is essentially the same as the case management proposal it offered last year. Both proposals rely on identical, and highly detailed, proof of claim forms; both would virtually eliminate all fact (as opposed to expert) discovery; and both presuppose the winnowing of claims via "omnibus" objections, consolidation motions, motions for summary judgment, "*Daubert*" proceedings," and common-issue trials on matters that remain in dispute.

The only real difference between Grace's two proposals is that the more recent one would apply, at first, only to claims of *pre-petition* litigants. Grace suggests that this new proposal would start the claims resolution process sooner, believing (incorrectly) that these claims could quickly be transferred to this Court from the state courts. Even if this were true, far from abbreviating its prior proposal, Grace would lengthen it by taking the Court through the entire process *twice*. For after resolving all pre-petition litigation claims through its multi-step process, Grace would ask the Court to establish a bar date and implement a notification program for *all other* claims. Supp. Br. 39-40. Grace asserts that pre-bar date claims would be resolved consistently with pre-petition litigation claims, but it does not explain how the Court would do this. Inevitably, the Court would have to go through the entire process all over again, doubling the time and expense incident to Grace's original proposal, which was itself unworkable.

Grace's current proposal is a wolf in sheep's clothing: although it sometimes uses the rhe-toric of "estimation," what Grace is really proposing is liquidation, via litigation, of all present claims, followed by an estimation of future claims, which of course cannot be liquidated. (Notably, Grace's actual "estimation" proposal does not appear until the last page of its brief, and the discussion occupies less than a page. *See* Supp. Br. 40.) This is not what Congress intended

{D0003687:1}

- 26 -

when it enacted § 502(c), and it is not what prior bankruptcy courts or expert statisticians have
understood by "estimation." Grace's proposal is flawed from start to finish.

## A.   Proofs of Claim Are *Prima Facie* Evidence of Valid Claims, And They Must Be Allowed Unless Debtors Object With Specific Rebuttal Evidence

Both of Grace's proposals would have this Court adopt lengthy and detailed "specialized"
claims forms and require claimants to complete the forms under an extremely tight deadline. *See*
Supp. Br. 20 (90 days); Bar Date Motion 45 (180 days after notice program). Grace would have
the information in these forms serve as the only evidence that claimants would be permitted to
adduce by way of response to Grace's subsequent dismissal motions. *See* Supp. Br. 21. Under
Grace's proposal, virtually no factual discovery would be allowed.[8]

Grace's proposal improperly attempts to shift the burden of going forward. The Bank-
ruptcy Rules simply require that a proof of claim be "a written statement setting forth a creditor's
claim" that "conform[s] substantially to the appropriate Official Form." Fed. Bankr. R. 3001(a).
Proofs of claim filed in accordance with these Rules are *prima facie* evidence of the validity and
amount of the claims, and must be allowed unless the debtor files an objection under Fed. Bankr.
R. 3007 that meets its burden of producing enough contrary evidence to overcome the *prima facie*

---

[8]     Grace argues (Supp. Br. 20-23) that its multi-page proof of claim forms (POCs) would not impose an
"unreasonable burden on claimants" and that "detailed" POCs have been used in other bankruptcies, such as the
Babcock & Wilcox (B&W) case. But the "detailed" POCs have not proven useful in B&W; to date; they have been
put to no use whatsoever by the court. Moreover, whereas Grace's whole scheme depends on this Court's *disallowing*
POCs solely on the basis of the claim as initially filed (Supp. Br. 27), the court in B&W determined that *amendments*
to POC's would be permitted. *See* Transcript of Jan. 25, 2002 Hearing Before Judge Vance at 18-20. Nor does Judge
Fitzgerald's decision to send out court-approved property-damage POCs (Supp. Mem. 20) support Grace's current
proposal. Grace has fewer than 1,000 property damage claimants, whereas it has more than 130,000 personal injury
claimants. The property-damage POCs request no medical information, and the limited data they do seek — *e.g.*,
square footage, product identification, and whether the insulation had been disturbed — will usually be readily
available to the property owner. Grace's proposed personal injury POCs, by contrast, are much more burdensome,
demanding extensive medical information often in the possession of doctors rather than claimants, and requiring
precise information about products used decades ago. Finally, Judge Fitzgerald set the bar date *a full year* from the
issuance of her order, whereas Grace would insist that 130,000 claimants complete much more complicated forms in
just 90 days.

effect of the claim. *See* 11 U.S.C. § 502(a); Fed. Bankr. R. 3001(f); *Gardner v. State of New Jersey*, 329 U.S. 565, 573 (1947); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50 (Bankr. D. Del. 2001). The debtor must produce "substantial evidence" in order to negate the *prima facie* validity of the filed claim. *See Allegheny*, 954 F. 2d at 173. If a debtor fails to meet this burden, "the debt is considered allowed." *IRS v. Taylor*, 132 F.3d 256, 261 (5th Cir. 1998); *see also Pinnacle Brands*, 259 B.R. at 50. And even if "substantial evidence" is introduced in opposition, "[t]he sworn proof of claim does not disappear from the case; like a deposition of the claimant, it is still entitled to some weight as a sworn statement with respect to the matters asserted therein." *In re Sabre Shipping Corp.*, 299 F. Supp. 97, 99 (S.D.N.Y. 1969).

**B.    Omnibus Lists of "Similarly Situated" Claims Are Not Sufficient To Initiate Contested Proceedings**

Under both of its protocols, Grace envisions that this Court would hear summary judgment motions on "omnibus objections" to tens of thousands of claims. Supp. Br. 26; Feb. 11 Reply 41. Grace completely ignores the threshold question of whether it can rebut the *prima facie* validity of these claims by "omnibus objections" which merely assert that the claims are "similarly situated" to others. The answer is quite obviously "no." The Supreme Court made clear nearly a century ago that parties cannot defeat proofs of claim — or even require claimants to produce further evidence — by unvarnished objection. *Whitney v. Dresser*, 200 U.S. 532, 535 (1906). Following *Whitney*, courts have repeatedly overruled objections and allowed claims based on proofs of claim alone where debtors produced no specific evidence in rebuttal. *See, e.g.*, *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1040-41 (9th Cir. 2000); *In re Dresser*, 135 F. 495, 498-99 (2d Cir. 1905); *Matter of Walker*, 216 B.R. 275, 277 (D. Neb. 1997); *In re Myrland*, 209 B.R.

{D0003687:1 }

- 28 -

524, 526 (W.D. Wash. 1997); *Vomhof v. United States*, 207 B.R. 191, 192 (D. Minn. 1997); *In re Equipment Servs., Ltd.*, 36 B.R. 241, 244-45 (Bankr. D. Alaska 1983).

In its original proposal, Grace said that it would submit "factual and legal arguments" with respect to "exemplar" objections only. Feb. 11 Reply 41. After 30 days for "exemplar" claimants to respond — a period that would afford *no* discovery because the proofs of claim form assertedly provided "most of the information needed" — Grace proposed that the Court rule on the *merits* of these exemplar claims. Grace's current proposal similarly envisions that pre-petition litigation claimants, after being served with Grace's "omnibus objection/motion" forms, would have just 30 days to respond. Supp. Br. 25. Assuming that the Court decided Grace's motions against the pre-petition claimants, all other present claimants would have the burden of persuading the Court, in "show cause" hearings, not to apply its earlier liability rulings to them. Supp. Br. 39-40. In other words, Grace's current proposal simply treats pre-petition claimants as "exemplars" to post-petition claimants; the proposed procedure is otherwise exactly the same.

Both proposals are wrong. At the objection stage, the Court would have to decide whether *Grace's* evidence meets *its* burden of rebutting the *prima facie* validity of the exemplar claims, thereby triggering contested proceedings on those particular claims. If Grace carried its initial evidentiary burden, the claimants would then be entitled to full discovery and, where facts were contested, jury trials on the validity of their claims.

Grace likewise errs in suggesting that thousands of "non-exemplar" claimants could be required to "show cause" why their claims should not be disallowed the same way as "similarly situated" claims. Supp. Br. 39-40; Feb. 11 Reply 41. An "omnibus" objection consisting of nothing but an assertion that the claim is similar to a disallowed claim cannot rebut the *prima facie* effect of the proofs of claim, let alone shift to claimants the burden of showing why their claims

{D0003687:1}

- 29 -

should not be disallowed. Claims intended for back-of-the-hand disposal by "omnibus objection" under Grace's protocol would instead have to be *allowed* as a matter of law, given Grace's failure to come forward with substantial countervailing evidence.

## C. The Debtors' Objection Procedures Would Violate Collateral Estoppel Principles and Claimants' Due Process Rights

Grace's proposal to apply pre-petition objection rulings to post-petition claims, like its original "exemplar" procedure, violates the principles of collateral estoppel, which "apply in bankruptcy proceedings under the current Bankruptcy Code." *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). Collateral estoppel ensures that, before an individual can be bound by the results of a court's prior ruling or precluded from litigating an issue resolved in a prior proceeding, he must have been a party or in privity with a party to the earlier proceeding. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.7 (1979). "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Id.*

Nor can Grace evade collateral estoppel principles by purporting to shift onto claimants the burden to "show cause" why they should not be bound by a prior ruling in Grace's favor. In order to obtain summary judgment on the validity of a given claim, the initial burden always remains on the moving party — *i.e.*, on Grace — to show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986); *Jones v. United Parcel Service*, 214 F.3d 402, 405 (3d Cir. 2000). Thus, even if the requisite discovery were properly afforded claimants, and assuming *arguendo* that omnibus summary judgment across thousands of claims were feasible, Grace cannot as a matter of law shift

{D0003687:1}

its initial burden onto claimants by requiring them to "show cause" why a summary judgment ruling affecting other people's claims is not binding on them too.

## D. The Bankruptcy Rules Allow Claimants Full Discovery In Contested Proceedings

In its opening papers, Grace at least acknowledged that claimants are entitled to *some* discovery. *See* Bar Date Motion 49 (proposing "six-month period during which any discovery related to [Grace's] submitted summary judgment motions could take place.") Now Grace cavalierly suggests that it can get summary judgment based on the proof of claim forms alone, affording no factual discovery whatever to claimants. Supp. Br. 25; Feb. 11 Reply 41-42.

Under settled law, if a debtor's objection meets its burden of controverting the proof of claim, a "contested matter" governed by Bankruptcy Rule 9014 begins. *Toma Steel Supply, Inc. v. GHR Energy Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992); 9 *Collier* ¶ 3007.01[1] (15th ed. 2000). Although the burden of proof then shifts to the claimant to prove claim validity by a preponderance of the evidence, *Allegheny,* 954 F.2d at 174, "a claim objection under Rule 3007 assumes a contest and the concomitant requirements of due process." 9 *Collier* ¶ 3007.01[1]. Rule 9014 mandates that "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought," and that specified provisions of the Bankruptcy Rules "shall apply," including *full discovery* under Rule 7026 (the equivalent of Fed. R. Civ. P. 26), and Rules 7028-7037. As *Collier* explains (¶ 9014.05):

> [T]he fundamental requisites of due process must be afforded to all parties in a dispute whether that dispute is classified as an adversary proceeding or a contested matter. That is why Rule 9014 * * * incorporates the Part VII procedures on * * * discovery, depositions, interrogatories, perpetuation of testimony [and other pre-trial procedures] on behalf of non-parties for application in those contested matters governed by the Rule.

Accordingly, courts facing multiple tort claims in Chapter 11 bankruptcies have routinely

allowed discovery before disallowing claims in contested proceedings. *See, e.g.*, *Ackles v. A.H.*

*Robins Co., Inc.*, 59 B.R. 99, 106 (Bankr. E.D. Va. 1986). The governing law is thus a far cry

from Grace's proposal. How any claimant would have a fair chance of meeting Grace's undefined

"show cause" standard without any opportunity for discovery is unfathomable. Grace cannot

simply wish away Rule 9014 and the panoply of fact-finding tools it mandates.

## E.   Product Identification Requires Claim-by-Claim Discovery And, Where Facts Are Disputed, Trial

The Debtors argue that their unilateral "sampling of Grace's 1997 and 2000 claims" shows

that "very few claimants can establish any actual exposure to Grace's asbestos products," and that

omnibus summary judgment disposition of such claims is therefore warranted. Supp. Br. 9, 36-39.

The very idea, however, that Grace could obtain summary judgment on the theory that claimants

who worked in particular occupations could not, as a matter of law, have been exposed to a

sufficient quantity of asbestos is simply absurd. Grace's proposal ignores the liberal standards

afforded by the substantive tort law of numerous States for getting to a jury on this issue. At a

minimum, significant claimant-by-claimant discovery must inform this issue before it is ripe for

summary judgment and, inevitably, decided by juries.

Product identification is largely a question of fact. *Weitzman v. Eagle-Picher Indus.*, 542

N.Y.S.2d 118, 122 (N.Y. Sup. Ct. 1989); *see also Spaur v. Owens-Corning Fiberglas Corp.*, 510

N.W.2d 854, 859 (Iowa 1994) ("Whether evidence of exposure to a particular defendant's product

will be legally sufficient to permit a finding of substantial factor causation is fact-specific to each

case."). Therefore, a claimant seeking recovery from an asbestos manufacturer need not present

direct evidence of product identification; circumstantial evidence from which a reasonable jury

{D0003687:1}

- 32 -

could infer causation is sufficient to survive summary judgment. *Richoux v. Armstrong Cork Corp.*, 777 F.2d 296, 297 (5th Cir. 1985).

More specifically, to identify material to which they were exposed, plaintiffs need only present evidence that a defendant's products were present at the worksite. *See Kaiu v. Raymark Indus., Inc.*, 960 F.2d 806, 817 (9th Cir. 1992). In this regard, testimony of co-workers is sufficient. *See Lockwood v. AC&S, Inc.*, 744 P.2d 605, 612 (Wash. 1987); s*ee also Roehling v. National Gypsum Co.,* 786 F.2d 1225, 1229 (4th Cir. 1986) (circumstantial evidence that plaintiff "was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area * * * inhaled" was enough to allow a jury to infer liability). Indeed, in a seminal decision, the Fifth Circuit imposed liability even when it was "*impossible,* as a practical matter, to determine with absolute certainty which particular exposure to asbestos resulted in injury." *Borel v. Fiberboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973) (emphasis added). Other Circuits have similarly held that exposure to unknown quantities of asbestos dust is sufficient to raise a supportable inference of causation. *See Miller v. American President Lines, Ltd.,* 989 F.2d 1450, 1464-65 (6th Cir. 1993); *Roehling,* 786 F.2d at 1228. *Cf. AC&S, Inc. v. Aetna Casualty and Surety Co.,* 764 F.2d 968, 974 (3d Cir. 1985).

Accordingly, it is clear that, at least in some states, product identification can be proven by circumstantial evidence, even if that evidence does not definitively link asbestos-related injury to a Grace product. For that reason, Grace cannot possibly establish a "product identification" defense by "omnibus objection" covering thousands of claims. Individualized discovery on this claim-specific issue is plainly necessary.

The Fifth Circuit's opinion in *Cimino,* 151 F.3d 297, ignored in Grace's most recent brief, shows the error of its proposal. In that case, the Fifth Circuit held that "under [State] substantive

{D0003687:1 }

- 33 -

law causation of plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined as to 'individuals, not groups.'" The Court stated: "We are aware of no appellate decision approving such a group, rather than individual, determination of cause in a damage suit for personal injuries to individuals at widely different times and places." *Id.* at 313, 316 (quoting *In re Fibreboard,* 893 F.2d 706, 712 (5th Cir. 1990)). Debtors previously suggested that *Cimino* stands "only for the proposition that * * * individual causation is an essential element of liability and cannot be proven *by the plaintiff* through extrapolation." Feb. 11 Reply 45 (emphasis added). This is a distinction without a difference: if causation cannot be proven by a plaintiff through extrapolation, it cannot be disproven as a matter of law by a defendant through extrapolation either. And to assert (*id.* at 46) that "Grace has proposed no such sampling and 'extrapolation'" is to word-smith in the worst way. Debtors' proposal of forcing post-petition claimants to "show cause" why previous "omnibus" rulings do not govern their situation is precisely the kind of "extrapolation" that *Cimino* forbids. Indeed, Grace's proposal is worse, as it does not afford claimants routine discovery or respect their "absolute right to have their claims liquidated by a jury trial." *Dow Corning,* 211 B.R. at 556 (citing 28 U.S.C. § 1411).[9]

F.    **The Debtors Err In Asserting That Whole Categories of Claims, Meeting Their Self-Serving Definition of "Unimpaired Claims," Are Universally Non-Compensable**

Grace contends that certain claims "lacking reliable evidence of restrictive impairment" are ripe for elimination via summary judgment prior to estimation. Supp. Br. 33. Grace refers to

---

[9]    Grace's attempted reliance on *Dow Corning* to overcome the holding in *Cimino* is misplaced. As noted above (page 21, *supra*) the court in *Dow Corning* ordered a *general* causation *trial* on the question of whether the debtor's silicone gel caused disease. *See* 211 B.R. at 589-91. There is no similar general causation question looming here: even Grace cannot dispute that asbestos causes disease. As for the specific causation question of whether "the claimant himself was in fact exposed," that determination cannot be made across thousands of claims, as *Cimino* held.

{D0003687:1 }

- 34 -

these as "unimpaired" claims (Info. Br. 19-20), then manufactures a set of mechanical criteria it thinks claims should have to meet to survive. *See* Supp. Br. 33-35. Grace then lumps all claims not meeting its criteria into the category of "unimpaired." But Grace's criteria are made up of whole cloth, and the claims it labels "unimpaired" are cognizable in the tort system.

The American Thoracic Society ("ATS") long-ago published standards recognized by the medical profession for the diagnosis of non-malignant asbestos-related disease. *See* American Thoracic Society, *The Diagnosis of Nonmalignant Diseases Related to Asbestos* 363 (1986) (attached as Exh. E). The ATS standards make clear that there are only two elements necessary for diagnosis of such disease: (1) a reliable history of exposure and (2) a time interval between exposure and detection, *i.e.*, a latency period. *Id.* at 367. The ATS standards recognize certain "clinical criteria to be of recognized value," including an ILO reading of 1/1 or higher. *Id.* at 367. But contrary to Grace's repeated assertions (Supp. Br. 28-31), an ILO reading of 1/0 does not *disprove* asbestos disease; it only means that the diagnosis is less certain. In that event, the ATS standards provide that the diagnosis of disease may be supplemented and confirmed by other observations of the examining physician. *See id.* at 366. Thus, any credible expert opining on Grace's proposed "defenses" would merely point out that a proper diagnosis of asbestos-related disease must comply with ATS standards. There is no additional "threshold standard" for pleural claims or so-called asymptomatic asbestosis claims, or any of the other categories of claims Grace seeks to extinguish as a matter of law.

Consistently with the ATS standards, most jurisdictions do not limit the type of asbestos-related claims on which plaintiffs can recover. *See, e.g., Verbryke v. Owens-Corning Fiberglas Corp.*, 616 N.E.2d 1162, 1167 (Ohio Ct. App. 1992) (physical changes or alterations such as pleural plaques may be sufficient to constitute a legally compensable claim); *Mauro v. Owens-*

{D0003687:1}

*Corning Fiberglass Corp.*, 542 A.2d 16, 23 (N.J. Super. Ct. App. Div. 1988) (plaintiff suffering

from pleural thickening as result of long-term exposure to defendants' asbestos was entitled to

present emotional distress claim to jury); *Bowerman v. United Illuminating*, No. X04CV

940115436S, 1998 WL 910271, at *5 (Conn. Super. Ct. Dec. 15, 1998) (jury must decide whether

lung scarring and implantation of asbestos fibers in lungs is compensable); *see also Bryson v.

Pillsbury Co.*, 573 N.W.2d 718 (Minn. Ct. App. 1998) (stating that trier of fact in pesticide

exposure case should determine whether asymptomatic chromosome damage is compensable).[10]

Finally, the "exposure only" cases Grace cites — most notably *Metro-North Commuter

R.R. Co. v. Buckley*, 521 U.S. 424, 432 (1997) (construing Federal Employers' Liability Act) —

have absolutely no application here. Apart from the fact that the Supreme Court in *Metro-North*

was interpreting federal, not state, law, the plaintiffs there did not allege that they had contracted

an asbestos-related illness, only that they had been *exposed* to asbestos. *See id.* at 427. Here, by

contrast, the claimants Grace calls "unimpaired" have incurred pleural plaques or thickening, or

have been diagnosed with asbestosis after x-ray examination. Plaintiffs alleging pleural disease

and asymptomatic asbestosis *do* allege a legally-cognizable impairment, and they routinely

recover judgments in the tort system.

In short, substantive state law applies to the claims Grace seeks to dismiss, and most States

---

[10]     Indeed, certain states allow recovery by plaintiffs who allege mere exposure to harmful substances, with no
physical evidence of bodily change. A Louisiana appellate court recently held that "even though the possibility of
acquiring [an-asbestos-related] disease is remote, the plaintiff's *fear* of acquiring the disease is compensable." *Bon-
nette v. Conoco, Inc.*, No. 01-0297, 2001 WL 1047546, at *7 (La. App. Sept. 12, 2001) (emphasis added). Debtors
also err in asserting (Mem. 28 n.49) that "a cause of action for individual medical monitoring is not generally
recognized." Courts have held otherwise. *See, e.g., Barnes v. The American Tobacco Co.*, 161 F.3d 127, 139-40 (3d
Cir. 1998) (recognizing cause of action for medical monitoring); *Fried v. Sungard Recovery Svcs., Inc.*, 936 F. Supp.
310, 311 (E.D. Pa. 1996) ("a party may recover damages for expenses incurred in the medical surveillance of
asymptomatic pleural thickening caused by * * * exposure to asbestos").

{D0003687:1 }

do not foreclose, as a matter of law, causes of action alleging asymptomatic asbestosis, pleural plaques, or pleural thickening.[11] Excluding all such claims, or valuing them at zero, would thus fly in the face of governing state law. *See In re Nat'l Gypsum Co.*, 257 B.R. 184, 201 (Bankr. N.D. Tx. 2000) ("claimants in these [pleural and asbestosis] categories have received recoveries in the tort system.") Grace is plainly cognizant of this fact. Otherwise, its rhetorical indictment of the tort system — that huge awards "abound" when cases go to trial "asserting speculative 'future claims' for 'unconfirmed' disease" (Info. Br. 24) — would have no factual predicate.

## G.     The Debtors' Proposed Use of *Daubert* Is Erroneous As A Matter Of Law

On the issues of proximate cause and legally cognizable injury, Grace proposes that the Court engage in *Daubert* proceedings to tee up summary judgment motions on (1) "all claims where the occupational activity that involved exposure to Grace products has not been proven * * * sufficient to cause the claimed disease"; (2) all claims for which repeated chest radiographs fail to demonstrate an ILO score of 1/1 or higher; and (3) all claims for which pulmonary function tests (PFTs) were not "properly conducted." Supp. Br. 25-28, 30-32; Feb. 11 Reply 27, 37-41. Debtors' proposed use of *Daubert* is both legally erroneous and totally impractical.

To begin with, the mechanical standards that Grace asks this Court to apply in "*Daubert* proceedings" have no basis in law. "Low" ILO scores, for example, do not by themselves indicate an absence of disease. According to ATS standards, an ILO score of 1/0 means only that the diagnosis of disease is less certain; the diagnosis may nevertheless be confirmed by other

---

[11]     Moreover, for a high percentage of plaintiffs, venue does not lie in one jurisdiction alone. Depending on state venue provisions and choice of law rules, even plaintiffs who reside in the minority of jurisdictions that bar pleural and asymptomatic asbestos claims may file suit in other states where Grace does business. Given the variation

observations of the examining physician. *See* pages 34-35, *supra*. Grace would have this Court discard all such claims as a matter of law, even in the face of medical diagnosis by a claimant's doctor and testimony by other witnesses that the claimant cannot climb a flight of stairs.

Even if Grace's "liability filters" had some legal basis, its invocation of *Daubert* as a tool for imposing substantive legal standards across thousand of cases is wholly improper. In *Daubert*, the Supreme Court considered the standards for admitting *a particular expert's testimony* in a *particular trial.* The Court held that an expert's testimony is admissible so long as the methodology used in formulating his opinion is *relevant* and *reliable.* 509 U.S. at 589; *see U.S. v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) ("*Paoli II*"). Under *Daubert*'s reliability prong, expert opinion need only be based on "good grounds." *Daubert*, 509 U.S. at 590; *see also Paoli II*, 35 F.3d at 744 ("The grounds for an expert's opinion merely have to be good, they do not have to be perfect.") This means that the expert's opinion must be based on the methods and procedures of science. *See Daubert*, 509 U.S. at 590; *Paoli II*, 35 F.3d at 744. The reliability inquiry is a flexible one, designed merely to serve as a threshold query for admissible evidence. *See Daubert*, 509 U.S. at 594; *see also Paoli II*, 35 F.3d at 744 ("The reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence.") And the court "must err on the side of admission rather than exclusion." *Paoli R.R. Yard PCB Litigation v. Monsanto Co. ("Paoli I")*, 916 F.2d 829, 857 (3d Cir. 1990).

Grace proposes to morph *Daubert*, from a threshold test governing admissibility of a particular expert's testimony in a particular case, into a means of establishing dispositive legal

---

in state tort laws and complex choice of law rules, each claim against Grace would have to be separately considered

{D0003687:1 }

*Distinction*, 15 CARDOZO L. REV. 1747, 1748 (1994) ("[I]t is completely inappropriate for either the proponent of scientific testimony or her opponent to advance Rule 702 admissibility arguments that depend on the ultimate conclusion reached by an expert."). Here, Grace seeks to exclude testimony on the basis of the expert's conclusion — *e.g.,* his conclusion that a claimant with an ILO score of 1/0 has asbestos disease — rather than on the basis of the methodology the expert employed to reach his conclusion. This is an egregious misapplication of *Daubert*.

Even if *Daubert* could be applied on a global basis as Grace seeks to do, the issues Grace seeks to resolve via "*Daubert* proceedings" are wholly inappropriate for summary judgment. For example, there is no legal requirement, in state or federal law, than an expert's methodology must be "reproducible" (Supp. Br. 30, 31) in order for his testimony to be admitted. *Daubert* requires that the methodology be "relevant" and "reliable." There is no third prong.

Equally implausible is Grace's notion that *Daubert* could be applied to determine, in a single "omnibus" summary judgment proceeding, whether PFT tests were conducted properly in tens of thousands of individual cases. *See* Supp. Br. 28. Whether a test was conducted properly, obviously, depends on the conduct of the particular test-taker and the particular person being tested. It is absurd to suggest that such fact-intensive issues could be globally resolved in summary proceedings. And if the test results originally submitted by a particular plaintiff were found wanting, he could obviously submit new test results to avoid summary judgment. Finally, Grace's suggestion that these factual determinations could be fobbed off on "a Rule 706 expert panel" (Supp. Br. 23) blinks reality. Tremendous judicial resources (time and money) would be necessary for selecting experts and overseeing the taking of testimony. *See* Natasha I. Campbell and Anthony Vale, *Encouraging More Effective Use of Court-Appointed Experts and Technical Advisors*, 67 DEFENSE COUNSEL JOURNAL 196, 199 (April 2000). Once the experts were impan-

{D0003687:1}

- 40 -

eled, it would be ridiculous to ask them to review tens of thousands of ILO and PFT readings in

the name of "simplifying" these proceedings and applying *Daubert.*

## H.    Grace's Proposed Procedures For Bringing Claims Before This Court Are Unworkable Or Improper

In its current proposal, Grace suggests bringing claims before this Court by filing proofs of

claim on behalf of all pre-petition litigants under 11 U.S.C. § 501(c) and Fed.R.Bank.P. 3004. *See*

Supp. Br. 17-20.  Section 501(c) permits a debtor to file a proof of claim on behalf of a creditor

"when the creditor does not timely file its proof of claim."  4 *Collier* ¶ 501.04 at 501-17 (15th ed.

2002).

"[T]he primary purpose of permitting the debtor or the trustee to file [a proof of claim] is

to protect the debtor in those situations in which the creditor's claim is nondischargeable." *Ibid.*

This concern is irrelevant here: all present and future asbestos claims against Grace will be dis-

charged and paid by the § 524(g) trust.  Moreover, recognizing the potential for abusing § 501(c),

courts have expressly held that it cannot be used the way Grace wants to use it here — as a means

for forcing a plaintiff into an alternative forum for the resolution of disputed claims. *See In re*

*Diaz,* 45 B.R. 137 (Bankr. S.D. Fla. 1984).

Alternatively, Grace suggests that this Court transfer to itself all pre-petition asbestos

personal injury claims under 28 U.S.C. § 157(b).  But the process of transferring the cases to this

Court would be very burdensome.  Most personal injury claims against Grace are pending in state

courts.  Under U.S.C. § 1452, removal to the local district court is the normal route for state-court

cases into the federal system.  The process of removing tens of thousands of claims from state to

federal court would take months, if not years.  Asbestos claimants would be permitted to respond

to removal notices filed in state courts, and district judges would necessarily receive and entertain

{D0003687:1}

- 41 -

remand motions. Thus the idea that § 157(b) would enable this Court to commence common-issue litigation immediately is meritless.

Grace notes that this Court last year issued provisional transfer orders in the *Federal-Mogul* bankruptcy, provisionally transferring thousands of friction products claims to itself for purposes of determining the existence of federal subject matter jurisdiction. Supp. Br. 19, *citing* Order dated Dec. 10, 2001 ("Order"). Contrary to Grace's assertion (Supp. Br. 20), this order provides no support for the idea that § 157(b)(5) can be "employed here to immediately obtain jurisdiction over the pre-petition personal injury claims." This Court's provisional transfer in *Federal-Mogul* was premised on the fact that "movants have removed these cases from the several state courts to the United States District Courts for the Districts in which these cases were pending." Order 1. In a subsequent letter opinion amending the Order, this Court noted that "the only claims transferred to this Court are those that had already been removed to federal court on the date the relevant Provisional Transfer Order was entered." Letter dated Jan. 3, 2002, at 2. Concerned about the status of subsequently-removed cases, the Court then ordered that any claim "now removed to federal court * * * will also be provisionally transferred to this Court." *Id.* at 3.

Grace does not represent that it has removed to federal court *any* pre-petition personal injury claims pending in the state courts. Quite the contrary: Grace strongly implies that it wishes this Court to transfer such claims directly from the state courts to itself. *See* Supp. Br. 19 & n.8. This Court's order in *Federal-Mogul* furnishes absolutely no support for such an application of § 157(b)(5).

It seems obvious that Grace's purpose in offering these two alternatives for bringing pending claims into this Court is to create a *de facto* bar date. If Grace were allowed to file proofs of claim on behalf of creditors, or if this Court were to transfer to itself the pending state-court

{D0003687:1}

- 42 -

claims, Grace proposes that claimants be allowed just 90 days to file amended proofs of claim.

Supp. Br. 20. In effect, this 90-day deadline would serve as a bar date. This Court should not

permit Grace to establish a *de facto* bar date using this underhanded means, certainly not one im-

posing an unconscionably short, 90-day period to file amended proofs of claim. Indeed, when

Judge Fitzgerald set a bar date for filing proofs of claim for property damage — proofs that would

number fewer than 1,000 and would not require the assembly and submission of any medical

evidence — she set the bar date a *full year* from the date of her order.

{D0003687:1 }

## CONCLUSION

Debtors' Motion for Entry of a Case Management Order should be denied. Instead,

estimation should begin immediately using Grace's historical claims resolution data.

Respectfully submitted.

CAMPBELL & LEVINE, LLC

Matthew G. Zaleski, III (I.D. No. 3557)
Chase Manhattan Centre
1201 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone:    (302) 426-1900
Telefax:        (302) 426-9947

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:    (212) 319-7125
Telefax:        (212) 644-6755

Peter Van N. Lockwood
Albert G. Lauber
Nathan D. Finch
Max C. Heerman
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:    (202) 862-5088
Telefax:        (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

Dated: July 22, 2002

{D0003687:1}

- 44 -