IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

USG CORPORATION, a Delaware
Corporation, et al.,

Debtors.

)
)
)
)
)
)
)
)

Chapter 11
Case No. 01-2094 (RJN)
Jointly Administered
Hearing Date: Not Yet Set

## AFFIDAVIT OF MARK A. PETERSON, Ph.D.

### A.    Professional Background and Experience

1.    I have a Ph.D. from UCLA in psychology, a JD from Harvard and an
undergraduate degree from the University of Minnesota. I have been a visiting professor at UCLA
Law School, where I taught courses in Mass Torts and in Law and Social Sciences, and have also
taught courses on law and policy research at the RAND Graduate School and UCLA. My vita is
attached as Exhibit 1.

2.    I have worked at the RAND Corporation since 1976 as a member of the research
staff, a consultant and an independent contractor conducting empirical and policy research on
matters of civil and criminal justice. I have been the directing, principal researcher on many
studies including studies of mass tort litigation and of workplace injuries and workers
compensation. I have many publications on these studies, including monographs on mass tort
litigation.

3.    Since 1983 I have been president of Legal Analysis Systems, Inc. (LAS), a
consulting company that conducts empirical and statistical analyses of mass tort claims for courts
and litigants. LAS's work has involved various types of mass tort cases, including breast implant

litigation, Dalkon Shield inter-uterine devices and tobacco, but the substantial majority of its work has been in many cases involving asbestos litigation.

4.    I have participated in asbestos litigation since the early 1980s working as an expert and special master for courts, insurance companies, asbestos settlement trusts, defendants and asbestos claimants creditors committees in bankruptcy. I was the Special Advisor to U.S. District Court Judge Jack B. Weinstein and Bankruptcy Court Judge Burton Lifland in the *Findley v. Falise* class action litigation to restructure the Manville Trust. I have been an expert for the court on matters of asbestos litigation for U.S. District Courts in Texas and Ohio. I am an expert for the following asbestos trusts: Manville, UNR, Eagle-Picher, National Gypsum, Keene, H.K. Porter, Fibreboard, Fuller-Austin and for the Futures Representative for the Celotex Trust. I currently serve as an expert for asbestos claimants committees in 12 pending bankruptcies, and I previously have served as an expert for asbestos claimants committees in the following completed bankruptcies: Eagle-Picher, National Gypsum, Keene, H.K. Porter, Celotex, Hillsborough Holding Company, Raymark, Raytech, Wallace & Gale and Fuller-Austin. I have testified as an expert in all of these cases except H.K. Porter and Fuller-Austin where my testimony was entered by affidavit. I have been an expert for E.J. Bartells and other asbestos defendants, as well as a consultant to various businesses on matters of asbestos liabilities. I have been an expert or consultant to the following insurance companies on matters of estimation of asbestos claims and liabilities: Continental (CNA), Chubb, Zurich International (Bermuda), and Price Waterhouse/Coopers involving matters of insolvent London insurers. I testified in the *Ahearn v. Fibreboard* class action as an expert for Continental and Chubb.

5.    I am a trustee of the Fuller-Austin Settlement Trust, created in the bankruptcy of Fuller-Austin Insulation Company, an asbestos insulation contractor and distributor.

6.     I was an expert on matters of estimation and collection of data about Dalkon Shield claims for U.S. District Court Judge Robert R. Merhige, Jr. in the bankruptcy of A.H. Robins Company.

**B.     USG's Membership in CCR and Zero Pays**

7.     I have conducted empirical and policy research on the operation of the U. S. civil justice system for over twenty years, primarily through the Institute for Civil Justice located at RAND. I have studied generally the negotiation and settlement strategies and tactics of plaintiffs and defendants and have studied those issues in tort litigation, primarily asbestos litigation. I have also observed how asbestos lawsuits are managed, negotiated and settled through my work as an expert in asbestos litigation for courts, trusts, plaintiffs' committees, defendants and insurance companies.

8.     The strategic interests of asbestos litigants differ in no material way from those of litigants in classic one-on-one litigation. Defendants seek to minimize the sum of indemnity and defense costs that they must spend and to defer into the future their obligation to make such payments.

9.     USG's membership in CCR promoted its strategic interests. USG joined the Center for Claims Resolutions (CCR) in 1988 to minimize its indemnity and defense costs for asbestos litigation. Members' joint defense of asbestos claims through the CCR reduced defense costs for each member. Membership in CCR provided CCR members with continuation of the concessions that many insurers had provided in the "Wellington Agreement," lessening insurance litigation expenses and providing money to pay indemnity and defense costs.

10.     The greatest benefit of CCR membership is that it gave USG and other members enhanced negotiating leverage with plaintiffs. The combined indemnity paid by CCR members represented the largest potential source of indemnity payments for most asbestos claimants. Given

the Manville Trust's financial problems and the contemporaneous bankruptcy filings by major non-CCR defendants — Eagle-Picher, Celotex, Carey Canada, Keene, Raytech, H.K. Porter — plaintiffs and their lawyers were hungry for the money that settlement with CCR could bring. If plaintiffs' lawyers did not reach agreement with the CCR, they and their clients would get compensation only in dribs and drabs. CCR was cognizant of plaintiff lawyers' financial position, and it exploited this negotiating leverage to its members' advantage.

11. The recent settlement history of USG evidences the negotiating advantage that CCR membership brought. Between leaving CCR and entering bankruptcy on June 25, 2001, USG resolved 3,872 claims either through dismissals or what USG called its "unbundled" settlements. After leaving CCR, USG's indemnity costs paid to resolve asbestos claims increased by 77%. This figure represents the percent by which USG's average cost to resolve a claim outside of CCR (the average payment across all claims that were resolved with or without payment) exceeded its most recent resolution average while still a member of CCR.

12. At all times — before, during, and after its membership in CCR — USG could and did review claims and reject claims where it believed it had no liability. In fact USG rejected 45,641 asbestos claims during 1977-2002. See Table 1. These rejections represented 15% of the total number of claims that USG resolved during this period. In recent years, USG has rejected a relatively high percentage of claims: 24% in 1995, 54% in 1996, 44% in 1997, and 33% in 2000. See Table 2.

13. As in every estimation in an asbestos bankruptcy, estimation of USG's asbestos liabilities in this bankruptcy will reflect the percent of claims that USG historically closed without payment along with other statistics on USG's past settlement history and (where applicable) its verdict history. Any credible estimation of USG's liability must assume that USG would continue to reject a substantial percent of its pending and forecasted future claims.

Table 1
Number of USG Claims Closed Without Payment

| Year Resolved | Lung | Meso | Nonmal | Other Cancer | Unknown | Total |
|---|---|---|---|---|---|---|
| | | | Disease | | | |
| Unknown | 89 | 146 | 986 | 28 | 1,204 | 2,453 |
| 1977 | 0 | 0 | 0 | 0 | 1 | 1 |
| 1979 | 0 | 0 | 1 | 0 | 2 | 3 |
| 1980 | 1 | 1 | 2 | 0 | 1 | 5 |
| 1981 | 1 | 2 | 22 | 0 | 9 | 34 |
| 1982 | 6 | 3 | 88 | 3 | 66 | 166 |
| 1983 | 7 | 5 | 108 | 0 | 27 | 147 |
| 1984 | 7 | 4 | 106 | 2 | 12 | 131 |
| 1985 | 15 | 7 | 169 | 3 | 63 | 257 |
| 1986 | 31 | 9 | 488 | 14 | 41 | 583 |
| 1987 | 5 | 3 | 150 | 4 | 110 | 272 |
| 1988 | 8 | 14 | 292 | 6 | 650 | 970 |
| 1989 | 21 | 13 | 255 | 5 | 78 | 372 |
| 1990 | 24 | 12 | 266 | 6 | 152 | 460 |
| 1991 | 15 | 6 | 184 | 5 | 549 | 759 |
| 1992 | 7 | 8 | 294 | 0 | 452 | 761 |
| 1993 | 8 | 7 | 111 | 2 | 224 | 352 |
| 1994 | 16 | 25 | 48 | 7 | 1,872 | 1,968 |
| 1995 | 44 | 47 | 223 | 6 | 1,711 | 2,031 |
| 1996 | 19 | 20 | 66 | 6 | 9,495 | 9,606 |
| 1997 | 18 | 28 | 140 | 7 | 3,921 | 4,114 |
| 1998 | 113 | 92 | 2,261 | 54 | 3,221 | 5,741 |
| 1999 | 48 | 27 | 1,349 | 31 | 254 | 1,709 |
| 2000 | 41 | 54 | 1,609 | 11 | 10,993 | 12,708 |
| 2001 | 0 | 0 | 10 | 1 | 3 | 14 |
| 2002 | 1 | 3 | 17 | 2 | 1 | 24 |
| Total | 545 | 536 | 9,245 | 203 | 35,112 | 45,641 |

| Resolution Year | Number Resolved | Number Paid | Number Rejected | % Rejected |
|---|---|---|---|---|
| Unknown | 4,510 | 2,057 | 2,453 | 54% |
| Through 1981 | 43 | 0 | 43 | 100% |
| 1982 | 166 | 0 | 166 | 100% |
| 1983 | 147 | 0 | 147 | 100% |
| 1984 | 132 | 1 | 131 | 99% |
| 1985 | 1,304 | 1,047 | 257 | 20% |
| 1986 | 5,122 | 4,539 | 583 | 11% |
| 1987 | 6,199 | 5,927 | 272 | 4% |
| 1988 | 9,907 | 8,937 | 970 | 10% |
| 1989 | 20,550 | 20,178 | 372 | 2% |
| 1990 | 14,858 | 14,398 | 460 | 3% |
| 1991 | 13,750 | 12,991 | 759 | 6% |
| 1992 | 13,897 | 13,136 | 761 | 5% |
| 1993 | 39,137 | 38,785 | 352 | 1% |
| 1994 | 13,530 | 11,562 | 1,968 | 15% |
| 1995 | 8,354 | 6,323 | 2,031 | 24% |
| 1996 | 17,779 | 8,173 | 9,606 | 54% |
| 1997 | 9,336 | 5,222 | 4,114 | 44% |
| 1998 | 46,878 | 41,137 | 5,741 | 12% |
| 1999 | 40,024 | 38,315 | 1,709 | 4% |
| 2000 | 37,947 | 25,239 | 12,708 | 33% |
| 2001 | 3,611 | 3,597 | 14 | 0% |
| 2002 | 26 | 2 | 24 | 92% |
| Total | 307,207 | 261,566 | 45,641 | 15% |

14.    As Tables 1 and 2 show, the number and percentage of asbestos claims that USG rejected varied by type of disease and year. The process that USG chose to manage and resolve its asbestos claims — including during the period of its CCR membership — affected this process.

15.    When it joined CCR, USG and other members voluntarily agreed to a process in which every CCR member contributed to every CCR settlement, whether or not the particular member had been named in the settled lawsuit. This was an arrangement of cross-subsidization that lasted for the first five years of CCR. Because of this cross-subsidization, USG, like every other CCR member, contributed to settlements for more claims than it would have paid if it had

- 6 -

not been a member. In effect USG subsidized other defendant members of CCR by contributing to the settlements made by those other defendants even when USG had not been named in a lawsuit and had no tort liability for the settlement. In turn, all other members of CCR similarly subsidized USG's settlements of lawsuits in which USG had been sued but the other member had not been sued. USG had to pay less to settle each lawsuit against it, because CCR members who were not sued in those cases nonetheless contributed to the settlement.

16.     This cross-subsidization simplified CCR's processing of claims and at least roughly balanced out for each CCR member. It meant that USG occasionally paid plaintiffs when USG had no legal obligation to the plaintiff. This was not because USG was unable to determine meritorious claims nor was it because of exploitation by plaintiffs or their lawyers. Rather USG paid settlements to plaintiffs to whom it owed no legal obligation because of its obligations to other CCR members, who like USG had agreed to cross-subsidization as a matter of efficiency, convenience and adequate justice. Even in this period from 1988 to the early 1990s, USG rejected and paid nothing to thousands of plaintiffs.

17.     CCR abandoned its cross-subsidization in the early 1990s when some insurers objected, adopting instead a policy that CCR members would contribute to settlements only in cases where they had been named in the complaint. This reduced the number of settlements to which USG contributed and raised the amount it paid when it did contribute. In evaluating claims, CCR would settle a claim with asbestos disease if exposure could be established for any named CCR member. It did not determine if a plaintiff had viable claims against more than one named member or against all named members. Of course this CCR policy meant that USG, like every CCR member, contributed to settlements of some claims simply because it was named in complaints and not because its liability had been confirmed. Conversely, USG was subsidized

by other CCR members who paid a portion of USG's liabilities even though their own liability had not been confirmed. Here again, USG paid these extra claims not because of USG's inability to determine meritorious claims nor because of exploitation by plaintiffs or their lawyers, but rather because all CCR members had agreed to this policy of "pay when named" as a matter of efficiency, convenience and adequate justice.

18.    At the formation of CCR, the members negotiated and agreed upon each member's share of their combined liability, with each member's share determined in part by how frequently each member had been sued in the past, *i.e.*, in what percentage of past law suits it had been named.

19.    USG negotiated aggressively and at arm's-length with other CCR members in an effort to set USG's share of settlements at the lowest possible level, thus minimizing USG's subsidy to other members and maximizing other members' subsidy to it. Assuming that other CCR members behaved in the same way, the result should be expected to be roughly a wash. That is, the total dollar amount of each member's aggregate asbestos liability would be roughly the same under the CCR cross-subsidization approach as it would have been if that member had paid only when it determined that it likely had liability. This aggregate liability under cross-subsidization would simply be the product of a higher number of settlement payments, multiplied by a lower dollar amount per settlement. In any case, when the CCR-derived benefits of lower transaction costs and leverage to negotiate reduced settlements with plaintiffs are factored in, it is likely that each member's aggregate asbestos obligation within the CCR was in fact substantially lower than it would otherwise have been. Unless CCR members perceived the outcome under CCR to be an improvement over solo negotiation they would have bargained for a lower percentage contribution to CCR settlements, or they would have left CCR altogether. In sum, because any

subsidy that USG paid to other CCR members would be roughly offset by the subsidies other CCR members paid to it, USG's settlement history during its period of CCR membership provides valid and statistically reliable data for purposes of estimating USG's present and future asbestos liability.

## C.   USG's Proposed 1% Sample Process

20.   The Debtors' proposal to estimate USG's aggregate asbestos liability based on discovery of a 1% sample of claims is naive. It would be a breathtakingly slow and expensive process that would prevent confirmation of a plan for many years. Worse yet, this process in the end would not yield any means to estimate USG's liability.

21.   First, this proposal would require an extensive and detailed discovery process for more than 1,900 claims, if based only on the 190,000+ asbestos claims pending against USG at its petition date. (As shown by USG's asbestos claims database, there were 139,146 "open," plus 51,681 "settled but not documented," cases at that time.). If the Court were to order that asbestos claimants file proofs of claim before a bar date, the 1% sample would likely require processing of more than 3,000 claims. Any bar date would likely be at least two years after the June 2001 petition date in this case, during which perhaps 60,000 to 80,000 additional claims will have accrued during the bankruptcy stay. Bankruptcy bar dates always produce additional filings to protect against the foreclosure of the bar date, so USG would likely receive 300,000 to 350,000 claims filed in response to a bar date.

22.   Under the Debtors' proposed 1% sample, only about 40 to 60 sample claims would be for mesothelioma. Mesothelioma cases have the highest, but also highly variable, values, and they represent a very large proportion of the Debtors' overall asbestos liabilities. In

- 9 -

my opinion, 40 to 60 mesothelioma claims would be too few to provide reliable estimates from the sample.

23.    Because the evaluation of each claim would affect hundreds of thousands of other claims, the stakes of each case would be so great that both the Debtors and the plaintiff's lawyer would have to fully prepare each case, conducting at least as much preparation and discovery as in a case tried in tort litigation. Effectively the Court would be supervising at least 1,900 distinct lawsuits that are simultaneously going through full discovery in preparation for trial.

24.    The Debtors' proposed process would be extremely burdensome both in time and money. The only large data-collection process in a mass tort bankruptcy, in the A.H. Robins case, took two years, cost $10 million when done 15 years ago and was far simpler in its objectives and approach than what the Debtors propose. The court in A. H. Robins undertook a process to sample fewer than 2,000 pending Dalkon Shield claims and a sample of resolved claims, requiring sampled claimants to complete questionnaires and submit relevant medical records. The court undertook this process to determine an aggregate value of Dalkon Shield claims. It did not allow additional discovery of sampled claimants and did not undertake the process to disqualify any of those claimants.

25.    Experts for each party in the A. H. Robins bankruptcy met and developed this data collection process. I was one of the Court's experts, working with Professor Francis McGovern to supervise the negotiations of the data collection and then administer the process. It took about a year for the experts to agree to and develop the process and about another year to collect and review the obtained data. The process cost about $10,000,000 when carried out in the mid-1980s. Costs for a similar project today would likely be several times greater.

26.     The process proposed by the Debtors here would not be similar to that in
A. H. Robins, but would be both more difficult and more expensive than the Robins process.
Moreover, unlike the Robins process, the Debtors' proposal would not be useful in determining
the aggregate value of claims. Parties in the Robins case, including the debtor, accepted the his-
toric bases by which Robins had paid Dalkon Shield claims and used Robins' historic resolution
to value the sampled claims. The sampling process was carried out simply because the company
did not have sufficient information about settled or pending claims. Here, by contrast, the Debt-
ors challenge the historic bases by which USG actually resolved past cases. Much more infor-
mation would be required here than in Robins, because the Debtors here propose to collect in-
formation so that it can initiate disputes for potentially every claim, which would require the
collection of large masses of factual data potentially relevant to five or more separate defenses
that the Debtors propose to assert.     This would, of course, require a much more thorough in-
formation collection process than in Robins, effectively a full discovery process rather than a fo-
cused and targeted data collection. Then, rather than resolving disputes through data analysis,
as was done in Robins, the Debtors' proposal here would require litigation of hundreds or thou-
sands of claims.

27.     The burdens of the Debtors' proposal could not be borne by the court, by plain-
tiffs' law firms or even the Debtors. For example, if 1,900 claims were selected randomly,
they would be concentrated among the 10 or 20 law firms that represent a majority of asbestos
plaintiffs. On average, each firm would have to 60 to 120 cases, and each firm would have to
prepare simultaneously scores, perhaps hundreds, of cases for trial; the Debtors concurrently
would have to prepare thousands of such cases for trial. The court would have to supervise a
divisive and high-stakes process of discovery that inevitably affects hundreds of thousands of

- 11 -

other claims. The Debtors have thus proposed something that never happens in asbestos litigation, and which could not happen because of its extraordinary burdensomeness.

28.    To estimate USG's liability based on its historic resolution of claims prior to the bankruptcy, there is no need to collect additional data as the Debtors propose. USG's database of hundreds of thousands of settled claims, plus any judgment outcomes, provides more than an ample universe of data for estimation purposes.

29.    Another major defect in the Debtors' proposal is that it offers no mechanism for attaching monetary values to the sample claims that survive their threshold defenses— all of which would be very "good" claims that would command large verdicts in the tort system. First, since the Debtors dispute USG's historic resolution of claims, the 1,900 sample claims could not be valued based on USG's hundreds of thousands of pre-bankruptcy resolutions. Second, each of the sampled claims would in effect be trial ready and would have been prepared and documented far more thoroughly than claims historically settled by USG, so historic settlements would not be applicable to the sample claims. Third, and most important, claims that survived the Debtors' proposed new defenses could not be valued by historic USG settlements, because these surviving claims would have proven value in ways that were never demanded by USG in its pre-bankruptcy settlements. Needless to say, plaintiffs receive far more in settlements after they have passed through multiple legal and factual defenses than they receive when they settle without going through such challenges.

30.    In short, there would be no historical basis on which to attach monetary values to the Debtors' proposed sample of 1,900 claims. Since there would be no basis in USG's history to value these claims, they could be valued only through full trial of each claim. The resulting trials would not be simple, but would be more demanding than typical trials of asbestos personal

injury cases. The stakes would be far higher, affecting not only the claim being valued, but hundreds of thousands of others whose values depend upon the trial outcomes.

31.     The Debtors expect that the outcome of their proposed process would be to value almost all asbestos bodily injury claims at zero. Such a result would be counterfactual, and it would not represent the true economic value of the claims in question. The overwhelming majority of asbestos claims historically filed against and resolved by USG had value because the overwhelming majority were paid. The Debtors desired outcome would not represent the actual values of asbestos claims resolved by USG or by any asbestos defendant in any jurisdiction at any time.

## D.    USG's Claim Rejection Rate By State

34.    USG's claims arise in all States, with heavy concentrations in the Northeast. As
Table 3 shows, USG rejected between 2% and 17% of claims in the Northeast States. The
overall average in the Northeast is typical of USG's review and rejection of claims for the coun-
try as a whole.

| Table 3 USG Asbestos Claims Arising in Northeastern States | | | | |
|---|---|---|---|---|
| State | Paid | Zero $ | Total Resolved | % Paid |
| PA | 19,644 | 715 | 20,359 | 96% |
| NY | 14,632 | 2,212 | 16,844 | 87% |
| MA | 7,518 | 1,591 | 9,109 | 83% |
| MD | 8,853 | 217 | 9,070 | 98% |
| NJ | 6,544 | 605 | 7,149 | 92% |
| DE | 1,085 | 50 | 1,135 | 96% |

## E.    Geographic Dispersal of Favorable and Adverse Judgments

35.    To examine the contention that trial courts do not apply tort law even-handedly as
between asbestos claimants and defendants, I examined the outcomes of trials against W.R.
Grace & Co. (I currently have no data available on trials involving USG.)

- 14 -

F.    USG's Proposed Defenses

38.    Several defenses that the Debtors have proposed as bases for excluding asbestos claims have no precedent as effective bars to payment of claims. USG's own history shows that

in the past it paid most claims that would be subject to the novel defenses it now proposes to as-
sert.

(i)    **Nonmalignant claims:**

39.    The "impairment" criteria that the Debtors propose are not recognized defenses
that universally prevent payment of claims. Most states allow causes of action for nonmalignant
claims whether they pass or fail the Debtors' proposed criteria. Historically, USG itself did not
assert this defense.

40.    We were able to identify 114,030 claims that were resolved by USG and that
likely would have been subject to the Debtors' proposed new "no impairment" defense. We
matched data from USG's database for claims that were resolved by USG with data from the
Manville Trust's database showing the Trust's evaluation and classification of claims within its
payment categories. Manville's evaluations found that 41,296 of the matched claims were in its
pleural category, Level 1; and 72,634 were in Manville's non-disabling asbestosis category,
Level 2. (Another 60,157 claims resolved by USG were in Manville's disabling asbestosis cat-
egory, Level 3.) The criteria and the Manville Trust's application of the criteria indicate that
virtually all of these 114,030 pleural and non-disabling asbestosis claims resolved by USG
would be subject to the Debtors' proposed "no impairment" defense. Of these 114,030
claims, USG in fact paid all but 6,920 claims. In other words, USG historically has paid all but
6% of the 114,030 claims that it now asserts are subject to its "no impairment" defense —
claims that the Debtors believe have no value and entitle claimants to no right to vote on a bank-
ruptcy plan.

(ii)   **Lung Cancer:**

41.   USG historically did not reject claims for plaintiffs with lung cancer claims who could not prove that they also had asbestosis or pleural disease. We again matched data from USG's database on claims that it had resolved with data from the Manville Trust database. We identified 1,793 claims that were settled and paid by USG where Manville categorized the plaintiff in Level 5, lung cancer. These claimants almost certainly did not have evidence of asbestosis or pleural disease, for if they did have such evidence, Manville would have placed the claimants in Level 6, a higher paying lung cancer category for claimants who did not smoke or else who had asbestosis or pleural disease. The 1,793 Manville lung cancer claimants would be in its Level 5 category only if they smoked and had no evidence of asbestosis or pleural disease. USG received and rejected claims for 100 claimants who were in Manville's Level 5, showing that USG paid 95% of claimants who had lung cancer but could not show asbestosis or pleural disease (1,793 / (1,793 + 100) = 95%).

(iii)   **Other Cancer:**

42.   USG historically paid 96% of plaintiffs who sued USG for a cancer other than mesothelioma or lung cancer. Again, our match with Manville data showed that USG paid 2,852 plaintiffs whose disease was categorized as an "other cancer" by the Manville Trust and who had either colo-rectal, pharyngeal, laryngeal or esophageal cancer. USG rejected claims for another 131 plaintiffs whose disease was classified as "other cancer" by Manville.

43.   The conclusion that asbestos exposure causes the cancers included in the Manville category of compensable other cancers has been accepted by prominent medical researchers and epidemiologists, including Dr. Irving Selikoff, Dr. William Nicholson and others at Mt. Sinai Hospital, New York, the leading medical research institution on asbestos-related disease.

(iv)  **Fiber counts:**

44.    I see no basis on which Debtors could obtain summary judgment on the issue whether claimants were, or were not, exposed to "sufficient quantities" of asbestos dust. I am aware of no data that show fiber counts at the thousands of work sites where USG claimants allege exposure to USG asbestos. Claimants would have no access to such data. The data do not exist. Precise measures of asbestos fiber concentrations were made at few work sites during the years that most victims of asbestos disease worked with asbestos. The failure to make such measures reflects the same failure to protect workers that resulted in their exposure to asbestos. Workers who were not warned that asbestos was dangerous to their health were also not warned that they needed to take measurements of ambient asbestos fibers to protect their health. The exposed workers themselves could not have taken such measures. If workers had feared asbestos enough to measure it, they would then have been informed of its risks.

(v)  **Chrysotile:**

45.    The Debtors' proposed "chrysotile defense" has been asserted by other defendants with only intermittent success during the past decade of asbestos litigation. The two primary reporters of asbestos litigation, Mealey's and the Asbestos Litigation Reporter, list many trials in which defendants have raised the chrysotile defense but which nevertheless resulted in verdicts for plaintiffs. For example, Mealey's reported a February 8, 2002 verdict in New York of $53 million to a mesothelioma victim against Honeywell, which raised the chryostile defense (Patricia Brown v. AC&S et. al. No 12658-00, N. Y. Sup., N.Y. Co., Mealey's Product Liability and Risk, Volume 1, Issue #12). Mealey's reported an August 29, 2001 verdict in Texas of $55.5 million to a mesothelioma victim against Kelley-Moore Paint Co, who also asserted the chrysotile defense (Alfredo Hernandez, Sr. et. al. v. Kelly-Moore Paint Co.,

No. CA-2000-3559, Texas Dist., El Paso Co. Mealey's Product Liability and Risk, Volume 1, Issue #1). Meeley's has many more references to trials and appellate decisions supporting plaintiffs' verdicts in cases where defendants unsuccessfully raised the chrysotile defense.

46.     The chryostile defense is based on the opinions of some medical researchers that mesothelioma cannot arise from exposure to chrysotile asbestos. This opinion is not generally accepted in the medical community; it is rejected, for example by medical researchers at the Mt. Sinai program on environmental health that has been the primary center of research on asbestos related disease. At trial, both plaintiffs and defendants typically present conflicting opinions from qualified medical experts about the relevant medical evidence.

## G.     Historical Pattern of Asbestos Claims

47.     I disagree with the Debtors' presentation concerning the growth pattern in filings of asbestos bodily injury claims. Throughout the 1990s into this decade, for every defendant, claims filings have increased greatly for both cancer and nonmalignant claims. Cancer claims have been increasing for two reasons. First, the primary epidemiological study of the incidence of asbestos-related cancers by Dr. William Nicholson (with Drs. Selikoff and Parkel of Mt. Sinai Hospital) forecast that the incidence of such cancers would increase during the 1990s, particularly for construction workers who dominate claim filings against USG and Grace. Nicholson's forecasts have been confirmed by the SEER cancer registry maintained by the National Cancer Institute. Second, the propensities to sue for cancer increased during the 1990s.

48.     Table 5 below shows the rate of increases separately for cancer claims and nonmalignant claims for four defendants including USG. The table shows the number of filings for cancers and separately for nonmalignants in each year as a percent of filings for that type of disease in 1993. For example, the number of cancer claims filed in 2000 against Babcock &

Wilcox was 373% of the number of cancer claims it received in 1993. The number of malig-

nant claims filed against Babcock & Wilcox in 2000 was 353% of nonmalignant filings in 1993.

Year after year, for all defendants, growth in cancer filings is at the same or greater rate than

the growth in nonmalignant filings.

| Table 5 Asbestos Cancer Claim Filings Have Increased As Rapidly As Asbestos Nonmalignant Filings (number of claims filed each year as a percent of 1993 claims for all defendants) | | | | |
|---|---|---|---|---|
| | Babcock & Wilcox | | GAF | |
| | Cancers | Nonmal | Cancers | Nonmal |
| 1993 | 100% | 100% | 100% | 100% |
| 1994 | 120% | 128% | 117% | 85% |
| 1995 | 152% | 172% | 109% | 84% |
| 1996 | 108% | 135% | 138% | 166% |
| 1997 | 126% | 138% | 204% | 170% |
| 1998 | 152% | 122% | 233% | 233% |
| 1999 | 151% | 151% | 172% | 162% |
| 2000 | 373% | 353% | 218% | 209% |

| | Owens Corning | | USG | |
|---|---|---|---|---|
| | Cancer | Nonmal | Cancers | Normal |
| 1993 | 100% | 100% | 100% | 100% |
| 1994 | 125% | 106% | 136% | 97% |
| 1995 | 180% | 181% | 100% | 81% |
| 1996 | 132% | 116% | 132% | 152% |
| 1997 | 129% | 134% | 199% | 193% |
| 1998 | 123% | 126% | 281% | 326% |
| 1999 | 147% | 163% | 232% | 235% |
| 2000 | 149% | 161% | 270% | 274% |
| 2001 | —— | —— | | |

I, Mark Peterson, do solemnly swear, under penalty of perjury, that the contents of this Affidavit are known to me and that the matters and things therein set forth are true.

Mark A. Peterson

Date: July 19, 2002

EXHIBIT A

MARK A. PETERSON

1700 Main Street
Santa Monica,
California 90406
(310) 393-0411

970 Calle Arroyo
Thousand Oaks,
California 91360
(805) 499-3572

**EDUCATION**

Ph.D. Social Psychology, 1976, UCLA
M.A.  Social Psychology, 1973, UCLA
J.D.  (cum laude), 1969, Harvard University
B.A.  (summa cum laude), Phi Beta Kappa), 1966, University of Minnesota

**PROFESSIONAL EXPERIENCE**

1976-Present--Policy analysis and research, Senior Research
    Scientist, RAND, Santa Monica, California.

Principal Investigator for following studies:

Workers Compensation.  Evaluation of California worker
compensation system and suggestions for change for Cali-
fornia Commission on Health and Safety and Workers Compen-
sation.

Mass Tort Litigation.  Examines uses of alternative legal
procedures and methods of alternative dispute resolution
in toxic and other mass torts.

Economic Effects of Product Liability Law.  Case Studies
and Statistical Analyses of Selected Industries.

Punitive Damages Study.  Described frequency, size, and
types of cases in which punitive damages are awarded;
trends over time; effects of post-trial actions; possible
effects of legal changes.  In collaboration with Special
Committee on Punitive Damages of the Litigation Section of
the American BarAssociation.

Trends and Patterns in Jury Trials and Verdicts.  Data
collection and analysis of civil jury trials in California
and Cook County, Illinois, between 1959-1985.

Expert System for Evaluating Asbestos Cases.  Examined how
lawyers and adjusters evaluate claims; developed artifi-
cial intelligence computer model to describe evaluation
process.

Modeling of Trial Lawyers' Decisionmaking.  Development of
a prototype expert system of settlement practices for
product liability claims.

RAND Criminal Offender Survey.  Survey of inmates in five
California prisons.  Estimated crime parameters; examined
incapacitation effects; examined relationships between
crime and inmate characteristics.

RAND Criminal Offender Survey II.  Examined preincarcera-
tion crimes for sample of 2500 jail and prison inmates in
three states.

Effects of California Determinate Sentencing.

Peterson

**1984-Present**--Legal Analysis Systems, Inc.  Special master/expert/
consultant in complex litigation.

Findley v. Falise, Findley v. Blinken (mandatory, limited
fund class actions to reorganize Manville Personal Injury
Settlement Trust): Special Advisor to U.S. District Courts
for Eastern and Southern Districts of New York, U.S. Bank-
ruptcy Court for Southern District of New York.  Special
master and technical consultant to the courts and parties.

Fuller-Austin Settlement Trust: Trustee, Chairman of the
Trust and expert on estimation of claims for trust created
to allow and pay asbestos personal injury claims.

NGC Asbestos Disease and Property Damage Settlement Trust:
Consultant for estimating present and future asbestos per-
sonal injury claims and cash flow analyses of Trust's
ability to pay projected claims.

UNR Asbestos Disease Claimants Trust: Consultant on esti-
mation of present and future asbestos claims and claims
distribution procedures.

Eagle-Picher Asbestos Trust:  Consultant on estimation of
present and future asbestos claims and claims distribution
procedures.

Celotex Trust: Consultant to Representative of Future
Claimants regarding estimation of asbestos liabilities.

Keene Asbestos Claimants Trust:  Expert of estimation of
liabilities for asbestos personal injury claimants.

CNA: Expert for CNA Insurance on liabilities of an asbes-
tos defendant insured by CNA.

H. K. Porter Inc. Asbestos Claimants Trust:  Consultant on
estimation of present and future asbestos claims and
claims distribution procedures.

In re: Celotex and Carey Canada:  Expert for Asbestos
Claimants' Committee on estimation and treatment of asbes-
tos personal injury claims.

Ahearn v. Fibreboard (mandatory class action):  Expert for
CNA and Continental Insurance Companies regarding estima-
tion of values of future asbestos personal injury claims
and likely performan of the proosed Fibreboard Trust.

In re Bankruptcy of Dow Corning Corporation: Expert for
Tort Claimants' Committee regarding estimation and treat-
ment of breast implant and other medical implant claim-
ants.

In re: Bankruptcy of Wallace and Gale Corporation:  Expert
for Asbestos Claimants' Committee regarding estimation and
treatment of asbestos personal injury claims.

In re: Bankruptcy of Fuller-Austin Insurance Company:  Ex-
pert for Asbestos Claimants' Committee regarding estima-
tion and treatment of asbestos personal injury claims, ne-
gotitation of prepackaged bankrutyc plan and cash-flow
analyses for proposed claimants' trust.

In re: Bankruptcy of Raytech Corporation: Expert for As-
bestos Claimants' Committee regarding estimation and

treatment of asbestos personal injury claims and for design of procedures to pay such claims.

In re: Bankruptcy of Raymark Corporation: Expert for Unsecured Claimants' Committee regarding estimation of liabilities for asbestos personal injury claims.

In re: The Babcock and Wilcox Company et. al.: Expert for Asbestos Claimants' Committee in bankruptcy proceedings regarding estimation and treatment of asbestos personal injury claims.

In re: Pittsburgh Corning Corporation: Expert for Official Committee of Unsecured Asbestos Creditors in bankruptcy proceedings regarding estimation and treatment of asbestos personal injury claims.

In re: Owens Corning, et. al.: Expert for Official Committee of Asbestos Claimants in bankruptcy proceedings regarding estimation and treatment of asbestos personal injury claims.

In re: Bankruptcy of Eagle-Picher Industries, Inc.: Expert for Injury Claimants Committee regarding estimation and treatment of present and future asbestos injury claims and design of Trust distribution procedures to pay asbestos and potential lead claims.

In re: Bankruptcy of National Gypsum Corporation: Expert for Asbestos Claimants Committee regarding estimation and treatment of present and future asbestos injury claims and design of Trust distribution procedures to pay asbestos personal injury claims.

In re: Bankruptcy of H. K. Porter Company, Inc.: Expert for Unsecured Creditors Committee regarding estimation and treatment of present and future asbestos injury claims.

In re: Bankruptcy of Hillsborough Holdings Corporation: Expert for Asbestos Claimants regarding estimation of values of present and projected future claims against Celotex Corporation at various points in time.

In re: Bankruptcy of Keene Corporation: Expert for Asbestos Claimants Committee regarding estimation of present a and future asbestos claims.

Manville Personal Injury Settlement Trust: Developed "expert system"--rules for evaluating asbestos personal injury claims derived from plaintiffs and defense lawyers.

In re: Bankruptcy of A. H. Robins Company, Inc.: Neutral expert for the U.S. Bankruptcy Court for Eastern District of Virginia. Developed "expert system," data bases and statistical analyses to evaluate claims for personal injuries from Dalkon Shield.

Jenkins v Raymark (Voluntary class action): Neutral expert for the U.S. District Court, Eastern District of Texas to evaluate asbestos personal injury claims.

Ohio Asbestos Litigation Plan: Neutral expert for the U.S. District Court, Northern District of Ohio to evaluate asbestos personal injury claims.

Peterson

> MGM Grand Hotel Fire Insurance Litigation:  Expert for
> Frank B. Hall, Inc. to evaluate wrongful death and per-
> sonal injury claims arising from MGM Grand Hotel Fire.

1969-1974--Private Law practice in Los Angeles, California.

> Selective service practice, with some litigation and com-
> mercial practice
> (1970-1974).

> Tax, selective service, and trial practice, Margolis, Mc-
> Ternan, Smith, Scope and Herring (1970).

> Corporate and Tax practice, Kindel and Anderson (1969--
> 1970).

1965-1969--Computer programming and systems analyst.

> Law firm case accounting and monitoring system, Hale and
> Dorr, Boston
> (1967-1969).

> American Oil Company, Minneapolis, Minnesota (1965-1966).

> International Business Machines, St. Paul, Minnesota
> (1965).

**OTHER PROFESSIONAL ACTIVITIES**
California Legislature, Joint Rules Committee, Sacramento--Consultant. Su-
pervised three research projects on prisons, sentencing, and prison alter-
natives.

California Board of Prison Terms, Sacramento--Consultant. Developed com-
puter system for reviewing disparity in felony sentencing.

National Jury Project--Attorney and researcher for jury selection in cases
involving racial issues.  Designed and analyzed public opinion surveys.
Los Angeles County District Attorney--Lecturer on methods for jury selec-
tion.

Los Angeles County Superior Court--Consultant.  Examined effects of massive
pretrial publicity on jurors' opinions and decisions.

Los Angeles County Superior Court; U.S. District Court--Appointed expert on
eye witness identification.

**TEACHING**
Law School, University of California, Los Angeles--Visiting Professor. Ad-
vanced Torts:  Mass Torts; Law and Social Sciences Seminar, Fall 1989.
RAND Graduate School--Policy Analysis of Legal Issues, Fall 1984.

Department of Psychology, University of California, Los Angeles---
Psychological Analyses of Legal Issues, Spring 1973, Spring 1975.

Law School, University of California, Los Angeles--Trial Tactics (with
W.L.F. Felstiner), Spring 1974, Fall 1974, Spring 1975.

**PROFESSIONAL ORGANIZATIONS**
California Bar Association

American Bar Association

Peterson

**PUBLICATIONS**

"Compensating Permanent Workplace Injuries: A Study of the California System, RAND. 1998. Coathured.

"Findings and Recommendations of California's Permanent Partial Disability System, RAND, 1998.  Coauthored.

"Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis," *Brooklyn Law Review*, Vol. 59, Fall 1993 (coauthored).

"Mass Justice:  The Limited and Unlimited Power of Courts," *Law and Contemporary Problems*, Vol. 54, Summer 1991 (coauthored).

"Giving Away Money:  Comparative Comments on Claims Facilities," *Law and Contemporary Problems*, Vol. 53, Autumn 1990.

*Resolution of Mass Torts:  Toward a Framework for Evaluation of Aggregative Procedures*, RAND, N-2805-ICJ, 1988 (coauthored).

"Expert Systems for Legal Decisionmaking," in *Knowledge-Based Systems for Management Decisions*, Robert J. Mockler, Englewood Cliffs, NJ: Prentice Hall, 1988 (coauthored).

*Trends in Tort Litigation:  The Story Behind the Statistics*, RAND, R-3583--ICJ, 1987 (coauthored).

*Punitive Damages:  Empirical Findings*, RAND, R-3311-ICJ, 1987 (coauthored).

*Civil Juries in the 1980s:  Trends in Jury Trials and Verdicts in California and Cook County Illinois*, RAND, R-3466-ICJ, 1987.

*Summary of Research Results:  Trends and Patterns in Civil Jury Verdicts*, RAND, P-7222-ICJ, 1986.

"SAL:  An Expert System for Evaluating Asbestos Claims," in *Proceedings of the Australian Artificial Intelligence Congress*, November 1986 (coauthored).

"Remarks on the Role of Juries in Cases Involving Medical Causation," in *Causation and Financial Compensation for Claims of Personal Injury from Toxic Chemical Exposure*, The Institute for Health Policy Analysis of the Georgetown University Medical Center and the Georgetown University Law Center, 1986.

*Deep Pockets, Empty Pockets:  Who Wins in Cook County Courts*, RAND, R-3249-ICJ, 1985 (coauthored).

"An Expert System Approach to Evaluating Product Liability Cases," in *Computing Power and Legal Reasoning*, Charles Walter (ed.), St. Paul: West Publishing Co., 1985 (coauthored).

Peterson

*Evaluating Civil Claims: An Expert Systems Approach*, RAND, P-7073-ICJ, 1985; also in *Expert Systems: The International Journal of Knowledge Engineering*, Vol. 1, No. 1, 1984 (coauthored).

*Compensation of Injuries:  Civil Jury Verdicts in Cook County*, RAND, R-3011-ICJ, 1984.

*New Tools for Reducing Civil Litigation Expenses*, RAND, R-3013-ICJ, 1983.

*Comparative Justice:  Civil Jury Verdicts in San Francisco and Cook Counties, 1959-1980*, RAND, R-3006-ICJ, 1983 (coauthored).

*The Civil Jury:  Trends in Trials and Verdicts, Cook County, Ill., 1960-1979*, RAND, R-2881-ICJ, 1982 (coauthored).  Also in *Federation of Insurance Council Quarterly*, Summer 1982.

*The Pace of Litigation*, RAND, R-2922-ICJ, 1981 (coauthored).

*Models of Legal Decisionmaking*, RAND, R-2717-ICJ, 1981 (coauthored).

*Punitive Damages:  Preliminary Empirical Findings*, RAND, N-2342-ICJ, 1985.

*Who Commits Crime:  A Survey of Prison Inmates*, Oelgeschlager, Gunn and Hain, Cambridge, 1981 (coauthored).

*Survey of Prison and Jail Inmates:  Background and Method*, RAND, N-1635-NIJ, 1982 (coauthored).

*California Justice Under Determinate Sentencing:  A Review and Agenda for Research*, RAND, R-2497-CRB, 1980 (coauthored).

*Doing Crime:  A Survey of California Prison Inmates*, RAND, R-2200-DOJ, 1980 (coauthored).

*Recommendations and Report of the Citizens' Advisory Committee on Alternatives to Incarceration*, California Legislature, Joint Rules Committee, 1980.

*Witnesses' Perception of Meaning*, RAND, P5975, 1977.

*Results of YLS Survey on Specialization/Relicensing*, RAND, P-5752, 1976.

"Specialization and Relicensing," *Barrister Magazine*, 1976.

"Right to Jury Trial in Public Employee Strikes," *Harvard Civil Rights-Civil Liberties Law Review*, 1969.

March 2001