## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FOURTH INTERIM QUARTERLY FEE APPLICATION OF
## STROOCK & STROOCK & LAVAN, LLP

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Fourth Interim Quarterly Fee Application of Stroock & Stroock & Lavan, LLP (the "Application").

## BACKGROUND

1.      Stroock & Stroock & Lavan, LLP ("Stroock") was retained as counsel to the official committee of unsecured creditors.  In the Application, Stroock seeks approval of fees totaling $267,170.20 and costs totaling $6,149.76 for its services from January 1, 2002, through March 31, 2002, as well as $36,352.60 for the fees and expenses of an asbestos issues expert.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application.   We reviewed the Application for compliance with 11 U.S.C. 330, the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11

U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent

established in the United States Bankruptcy Court for the District of Delaware, the United States

District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served on

Stroock an initial report based on our review, and received a response and e-mails from Stroock,

portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.      In our initial report we noted that not all of the monthly applications that made up the

Application had a separate project for Stroock's own fee application preparation.  Guidelines Rule,

II.D.1. states "[a] separate project category should be used for ... fee application preparation."  Thus

we asked Stroock to in the future always use a separate project category for time devoted to seeking

its own compensation, and Stroock stated that it would do so.

4.      In our initial report we noted that the time entries of Krieger, Defreitas, Cotto,

Greenberg, and Brandes frequently lacked adequate detail.  Rule 2016-2(d) provides that an

application for compensation: "shall include activity descriptions which shall be sufficiently detailed

to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and

necessary . . . . All motions shall include complete and detailed activity descriptions . . . .  Each

activity description shall include the type of activity (e.g., phone call, research) . . . .Activity

descriptions shall include the subject matter (e.g., exclusivity motion, 341 meeting)."  The

Guidelines, Rule, II.D.5., provide that: "[s]ervices should be noted in detail . . . , with each service

showing a separate time entry . . . ."  While we do not at this time suggest any reduction for this

inadequate detail, in our initial report we asked Stroock to please advise all timekeepers to provide

adequate detail in their time entries in the future, and Stroock responded that it would do so.

5.      In our initial report we noted that Krieger, Kruger, Defreitas, Sasson, and Cotto frequently lumped their time entries. Rule 2016-2(d)(vii) provides that: "[a]ctivity descriptions shall not be lumped – each activity shall have a separate description and a time allotment." The Guidelines, Rule, II.D.5. provide that: "[s]ervices should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; ...." While we do not at this time suggest any reduction for this lumping, in our initial report we asked Stroock to please advise all timekeepers to avoid such lumped time entries in the future, and Stroock responded that it would do so.

6.      In our initial report we noted that there is a "pass through" expense of $36,352.60, attributable, on page 8 of the Application, to the "fees and expenses of the asbestos issues expert employed by the Committee pursuant to the Court's June 22, 2001 Order Authorizing the Retention of Experts . . . .", and referenced again on pages 27 and 28 of the Application. However, the Application never states the name of the asbestos issues expert, nor describes in any way the services rendered by the asbestos issues expert.

7.      We have reviewed the Order Authorizing the Retention of Experts, entered June 22, 2001, (the "Expert Retention Order") and under our interpretation of this order and the Order Appointing Fee Auditor in Accordance with the Court's Direction (the "Fee Auditor Order"), we have no authority to review the reasonableness of the fees of an expert retained under the Expert Retention Order, since such fees were generated by "professionals providing services pursuant to an order that does not require submission of fee applications". Fee Auditor Order, p. 2. Thus, we believe that while we should verify the amount billed by the asbestos issues expert, we should offer

no opinion regarding the reasonableness of the $36,352.60 billed for the asbestos issues expert, and

we asked Stroock to please send us copies of the invoices sent to Stroock by the asbestos issues

expert.  Stroock responded:

> The asbestos issues expert employed by the Creditors' Committee is Chambers Associates
> Incorporated.  A copy of the four invoices are annexed to this response.  The Fee Auditor will observe
> that each of the invoices includes detail for the following three separate categories:  (i) Professional
> Fees, (ii) Support Services, and (iii) Expenses, and time detail identifying the timekeeper, the date the
> services were rendered, the time spent and a description of the services rendered, encompassed within
> the Application.  Given the Fee Auditor's request with respect to providing the invoices included
> within the Application, Stroock will make it a practice going forward to provide copies of Chambers'
> invoices, which are included in the Quarterly Fee Applications beginning with the Fifth Quarterly Fee
> Application, at such time as Stroock forwards such Quarterly Application to the Fee Auditor.

We reviewed the four invoices for Chambers Associates Incorporated that were attached to the

response, copies of which are attached hereto as Attachment A through Attachment D, and observed

that they totaled $22,002.76.   Thus we e-mailed Stroock regarding the discrepancy.   Stroock

responded:

> You are correct that the four invoices forwarded to you total $22,002.76.  Those four Chambers'
> invoices for amounts owing in respect of the months of October 2001, November 2001, December
> 2001 and January 2002, correspond to the amounts included in the three monthly compensation
> applications Stroock filed for January, February and March 2002.  Stroock sought reimbursement of
> the Chambers' February 2002 invoice in the amount of $14,349.84 in Stroock's April 2002 monthly
> fee statement.  It appears that the amount of the February 2002 invoice was also inadvertently added
> into Stroock's Fourth Quarterly Interim Application.  Please know that Stroock received payment in
> respect of Chambers' February 2002 invoice only once; in response to Stroock's April 2002 monthly
> fee statement.

Thus, it appears that Stroock is actually seeking approval of four invoices totaling $22,002.76 during

this interim period rather than $36,352.60, and we have no objection to the reimbursement of

$22,002.76 for the fees and expenses of an asbestos issues expert

8.       In our initial report we noted that on January 18, 2002, Kruger and Pasquale attended

a meeting with Judge Wolin.  The total time spent including non work travel was 7.10[1] hours for a

---

[1] The time for item was located in two categories - Asbestos Claim Litigation and Non-working Travel Time.

total of $3,744.50.  These time entries are set forth below:

| 01/18/2002 | Conference with K. Pasquale, B. Katchen and Judge Wolin with respect to status, committee's view of litigation prospects and issues. | Kruger, L. | 3.4 |
| 01/18/2002 | Travel to meeting with Judge Wolin (1.2) | Pasquale, K. | 1.2 |
| 01/18/2002 | Meeting with Judge Wolin re asbestos issues (2.5) | Pasquale, K. | 2.5 |

Pursuant to the Guidelines Rule, II.D.5. ... "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees."  Thus in our initial report we asked Stroock why it was necessary for more than one to attend this meeting. Stroock's response is set forth in Exhibit A.  We accept this explanation and do not suggest any reduction for this matter.

9.      In our initial report we noted that Stroock also represents the Unsecured Creditor's Committee in the USG bankruptcy matter, and that in the USG case, K. Pasquale billed the following time entries to the proposed meeting with Judge Wolin, for a total of $346.50 in fees:

| 01/14/2002 | . . . .attention to proposed meeting with Judge Wolin (.3) | Pasquale, K. |
| 01/16/2002 | Preparation for meeting with Judge Wolin (.4) | Pasquale, K. |

However, it does not appear that any portion of the meeting itself, on 1/18/2002, was charged to the USG case.  Thus in the initial report we asked that Stroock please explain how it allocates such charges among the cases it is handling.  Stroock responded:

> As you are aware, towards the end of 2002, five chapter 11 cases pending in the Third Circuit with asbestos claim-related issues were reassigned to Judge Wolin.  In December 2001 Judge Wolin held a conference attended by representatives for the debtors, and official committees, for each of the five chapter 11 cases.  Stroock, which also represents the Official Unsecured Creditors' Committee in the USG chapter 11 cases, anticipated that Judge Wolin would spend some time at the January 18 conference on issues in respect of each of the Grace cases and the USG cases pending before him. Accordingly, Stroock expended time preparing for the January 18 conference on behalf of the creditors' committee in each of USG and Grace.  As the conference itself focused entirely upon the issues in the Grace chapter 11 cases, Mr. Pasquale billed his time for attending the January 18 conference solely to Grace.

We appreciate this explanation, and have no objection to these fees.

10.     In our initial report, we noted that for January 15, 2002, Krieger, A. has the following

time entry of 0.90 hours for a total of $382.50:

| 01/15/2002 | Office conference LK, KP re proceedings before Judge Wolin, fee examiner appointment, valuation analyses (.5). | Krieger, A. | 0.9 |

The parenthetical totals 0.50 hours, for a value of $212.50.  The difference is $170.00, and thus we

in our initial report we informed Stroock that we would recommend a reduction of fees in this

amount in the absence of an explanation.  Stroock agreed to this reduction in its response that is

attached as Exhibit B, and thus we recommend a reduction of $170.00 in fees for this matter.

11.     In our initial report, we noted that for January 30, 2002, Krieger, A. has the following

a time entry of 1.80 hours for a total of $765.00:

| 01/30/2002 | Memo to R. Douglas re revised form of confidentiality agreement (.1); review revised form of agreement and telephone call R. Douglas re same (.6); prepare form of Committee member acknowledgment (.8); memo to R. Douglas re: acknowledgment (.1) | Krieger, A. | 1.8 |

The parentheticals total 1.60 hours, for a value of $680.00.  The difference is $85.00, and thus we

in our initial report we informed Stroock that we would recommend a reduction of fees in this

amount in the absence of an explanation.  Stroock agreed to this reduction in its response that is

attached as Exhibit B, and thus we recommend a reduction of $85.00 in fees for this matter.

12.     In our initial report we noted that for February 25, 2002, K. Pasquale has a time entry

of 4.8 hours for a total of $2,376.00.

| 02/25/2002 | Preparation for (2.2) and attendance at court hearing (2.5). | Pasquale, K. | 4.8 |

The parentheticals total 4.7 hours for a value of $2,326.50. The difference is $49.50, and thus we in our initial report we informed Stroock that we would recommend a reduction of fees in this amount in the absence of an explanation. Stroock agreed to this reduction in its response that is attached as Exhibit B, and thus we recommend a reduction of $49.50 in fees for this matter.

13.    In our initial report we noted that the Application charges $19,558.50 in the project category of "Compensation of Professionals (Fee Applications of Self)", and that this constitutes 7.21% of the fees charged in the Application. Thus we asked that Stroock please explain why it was necessary to spend so much time on this matter. Stroock's response is set forth in Exhibit C, and in light of this response we do not recommend any reduction for this issue.

14.    In our initial report we noted that on January 3, 2002, Krieger and Pasquale attended a hearing with Judge Fitzgerald. The total time spent including non work travel was 16.00[2] hours for a total of $7,535.00. Set forth below are the time entries related to this issue:

| | | | |
|---|---|---|---|
| 01/03/2002 | Travel to court hearing in Pittsburgh, PA (6.0) | Pasquale, K. | 6.0 |
| 01/03/2002 | ....; extended hearing before Judge Fitzgerald (5.5) | Krieger, A. | 5.7 |
| 01/03/2002 | Preparation for and court hearing before Judge Fitzgerald (7.5) | Pasquale, K. | 7.5 |

Pursuant to the Guidelines Rule, II.D.5. ... "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." Thus we asked Stroock to please explain why it was necessary for more than one to attend this meeting. Stroock's response is set forth in Exhibit A, and in light of this response we have no objection to these fees.

15.    In our initial report we noted that between January 18, 2002, and January 31, 2002,

---

[2] The time for item was located in two categories - Preparation for and Attendance at Hearings and Non-working Travel Time.

Levy, Brandes and Greenberg spent a total of 21.30 hours for a total of $7,227.00 on NOL issues.

Set forth below are the time entries related to this issue:

| Date | Description | Timekeeper | Hours |
|---|---|---|---|
| 01/18/2002 | Work on various tax issues including availability of NOL carrybacks, etc. (.9); t/c A. Krieger (.1) | Levy, M. | 1.0 |
| 01/25/2002 | Meeting with Mark Levy and Mayer Greenberg re: current status and concerns of client; discussions about net operating loss carrybacks and carryforwards; received new assignment (1.8) | Brandes, R. | 1.8 |
| 01/25/2002 | Conversation w/RB and MAL re status of tax issues including nol calculations and reparartiation issues (1.8); | Greenberg, M. | 2.4 |
| 01/25/2002 | Meeting with M. Greenberg and R. Brandes to discuss issues relating to NOLs and foreign sub distributions, etc. (1.8); analysis (.4). | Levy, M. | 2.2 |
| 01/28/2002 | Constructed chart for net operating loss carrybacks and carryforwards since 1990 and created list of outstanding issues (1.6); research under IRC Section 172 re: election to carryback net operating losses and impact when NOLs are carried back or forward (1.1); review 1999 tax returns re: taxable income taxes and Net operating losses (.5). | Brandes, R. | 3.2 |
| 01/28/2002 | Review materials re nol calculation | Greenberg, M. | 1.1 |
| 01/29/2002 | Research on net operating losses, the carry back or carry forward losses; calculation of specified liability losses (2.4); completed "issues List: about client's concerns (1.1) | Brandes, R. | 3.5 |
| 01/29/2002 | Review materials re nol calculation | Greenberg, M. | 1.4 |
| 01/29/2002 | NOL usage, etc. - review Sealed Air transaction re SRLY losses (.7). | Levy, M. | 0.7 |
| 01/30/2002 | Review R. Brandes issues list re NOLs (.3) | Levy, M. | 0.3 |
| 01/31/2002 | Research re: net operating loss elections (1.5); research re: calculating net operating losses and special rules for specified liability losses (2.1); meeting with Mayer Greenberg about IRS procedures regarding carrybacks and carryforwards of NOLs (.3) | Brandes, R. | 3.9 |
| 01/31/2002 | Discussion w/R. Brandes re 172 issues (.3); analysis re 172 (.1) | Greenberg, M. | 0.4 |

As the narrative portion of the Application contained only a brief mention of the NOL issue, we

asked Stroock to please explain why it was necessary to spend so much time on this issue. Stroock

responded:

> The value of Grace's net operating losses and other tax attributes which are available upon the Debtors' emergence from chapter 11 may have a significant impact upon the cash available for distribution to creditors. As that value is based on tax-related decisions Grace has made over the last 10 years, as well as tax-related decisions Grace makes going forward while in chapter 11, attorneys in Stroock's tax department performed a comprehensive review of the tax returns for Grace and its affiliates, in order to obtain an understanding of the current value of Grace's net operating losses and other tax attributes and determine whether and how such value can be maximized. Specifically, in connection with this evaluation, Stroock had to determine the amount and treatment of Grace's NOLs in past years, determine what NOL carry-back or carry-forward elections were made or could have been made by Grace for each of the past ten years and determine the current amount and nature of the tax attributes still available. Stroock's review and analyses were complicated by the voluminous materials included in the tax returns and various changes in the tax code regarding the operative rules governing NOL carry-backs and carry-forwards. Stroock also had to take into consideration the foreign tax credits used by Grace and its affiliates and the impact of highly technical consolidated returns in Stroock's analyses.

We accept this explanation and thus recommend no reduction for this issue.

16.    In our initial report we noted that on March 18, 2002, Krieger and Sasson attended a hearing. The total time spent including non work travel was 13.00[3] hours for a total of $5,655.00, as set forth below:

| 03/18/2002 | ......; representation of Committee at hearing before the court (4.2). | Krieger, A. | 6.4 |
| 03/18/2002 | ......; attend omnibus hearing (4.5). | Sasson, M. | 6.0 |
| 03/18/2002 | Travel back to New York from court hearing. | Krieger, A. | 2.3 |
| 03/18/2002 | Travel back to NYC (2.0) | Sasson, M. | 2.0 |

Paragraph II.D.5. of the Guidelines states: "....If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." Thus in our initial report we asked Stroock to please explain the decision to deploy two attorneys for this hearing. Stroock's response is set forth in Exhibit A, and in light of this response we have no objection to these fees.

---

[3] The time for item was located in two categories - Non-working Travel Time and Preparation for and Attendance at Hearings.

<u>Expenses</u>

17.    The Application contains a charge of $4.91 for "Overtime."  The February invoice,

under the category of "Overtime", contains the following time entry:

02/26/2002      Cr card calls 12/01      4.91

Thus in our initial report we asked Stroock to please provide a brief explanation of this charge.

Stroock responded:

> The charge questioned is duplicative of another charge which is properly categorized as a long
> distance telephone expense.  The aggregate amount of expenses for which Stroock seeks
> reimbursement in the Application should be reduced by $4.91.

Thus we recommend a reduction of $4.91 in expenses.

18.    In the initial report we noted that the Application charges $1,263.04 for "Westlaw",

but it is not apparent from the fee detail that there was a corresponding amount of research during

the period covered by the Application.  Thus we asked Stroock to please provide the backup for this

charge.  Stroock responded:

> As the Fee Auditor requested, we are forwarding with this response backup detail generated directly
> from Westlaw reflecting the charges for the period covered by the Application.  This additional
> backup detail reflects for each search the client matter number (699842 up through January 31, 2002
> and thereafter 699843), the corresponding project (matter) category, and the timekeepers
> identification number.  With respect to the charges, the Fee Auditor will observe that approximately
> 75% of the total Westlaw charge corresponds to two searches performed on January 4 and 7, 2002
> by Ms. Judy N. Dhanraj.  Ms. Dhanraj, who is a member of Stroock's library staff, was asked to
> conduct searches with respect to the four judges appointed as Special Masters/Consultants by Judge
> Wolin at the end of December 2001, particularly William Dreier appointed as Special Master in the
> W. R. Grace chapter 11 cases.  Ms. Dhanraj  did not bill the time she spent conducting the searches
> for the Grace case.

We reviewed this backup, a copy of which is attached hereto as Attachment E, and have no objection

to these charges.

**CONCLUSION**

19.    Thus, we recommend approval of fees totaling $266,865.70 ($267,170.20 minus

$304.50) and costs totaling $6,144.85 ($6,149.76 minus $4.91) for Stroock's services from January 1, 2002, through March 31, 2002, as well as $22,002.76,  rather than $36,352.60, for the fees and expenses of an asbestos issues expert.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____

Warren H. Smith
Texas State Bar No. 18757050

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 29th day of July, 2002.

_____

Warren H. Smith

## SERVICE LIST

Notice Parties

**The Applicant**

Lewis Kruger
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022


Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

Exhibit A

The Report comments that on January 18, 2002, two attorneys, Lewis Kruger and Kenneth Pasquale billed an aggregate of $3744.50 for 7.1 hours of time, including non-working travel time of 1.2 hours in connection with attending a meeting on that date with Judge Wolin in Newark, New Jersey. . . . The Report further states that pursuant to the Guidelines, if more than one professional from a firm attends a hearing or a conference, the applicant must explain the need for multiple attendees.

It is Stroock's position that both Mr. Kruger and Mr. Pasquale play necessary but distinct roles in these proceedings which are not duplicative. As reflected by the time records generally, Mr. Kruger, a partner in the bankruptcy department, focuses on the every day chapter 11 issues, and all long-term plan and chapter 11 emergence-related issues. Mr. Pasquale, a partner in the litigation department, focuses upon the asbestos claim issues, in respect of both personal injury and property damage claims, the fraudulent transfer claim issues and all related litigation. As you are aware, District Court Judge Alfred Wolin has withdrawn the reference from the Bankruptcy Court with respect to all matters relating to the asbestos personal injury claims in these cases, and with respect to the fraudulent transfer litigation the asbestos claim committees have been authorized to prosecute on behalf of the Debtors' estates. Judge Wolin is trying to come up with a methodology for resolving, either through litigation or estimation proceedings or settlement the magnitude of the asbestos personal injury claims to be ultimately dealt with in a reorganization plan by these chapter 11 estates and is trying to have the fraudulent transfer litigation promptly prosecuted. Accordingly, proper representation of the Creditors' Committee's interests at conferences with Judge Wolin often requires counsel with expertise from both the chapter 11 insolvency area and from the litigation area. At the January 18 conference with Judge Wolin, and other conferences and hearings too, in addition to discussing the asbestos claims generally and estimation/litigation related issues, Judge Wolin often inquirers as to chapter 11 processes, including general plan issues and Section 524(g) trust issues, which are inherently bankruptcy issues.

Furthermore, given the multitude of asbestos personal injury and property damage claims and related issues, along with the panoply of chapter 11 and reorganization issues, it is inconceivable that one attorney with expertise in only one legal discipline can be expected to have the experience in these chapter 11 cases to properly meet the needs of the Creditors' Committee and the creditor body it represents. The January 18, 2002 conference the Report inquired about is but one instance where Stroock attorneys with expertise from multiple disciplines were required to attend.

The Report has made the same inquiry with respect to two hearings before Judge Fitzgerald . . . . The first, an extended 5 ½ hour hearing before Bankruptcy Court Judge Fitzgerald on January 3, 2002 in Pittsburgh was attended by both Mr. Pasquale (in person) and Arlene Krieger (telephonically from Stroock's New York office), for which counsel billed an aggregate of $7,535.00 for 16.0 hours of time, including non-working travel time. Like Mr. Kruger, Ms. Krieger is an attorney from Stroock's insolvency law group. The second hearing on March 18, 2002, which occurred in Delaware, for which counsel billed an aggregate of $5,655.00 for 13.0 hours of time, including nonworking travel time, was attended by Ms. Krieger and Moshe Sasson, an attorney in Stroock's

litigation practice group.  In each of these instances, the Court was scheduled to address both more typical chapter 11 motions and issues, as well as litigation-related issues.  As you are aware, the W. R. Grace chapter 11 cases were reassigned to Judge Wolin and to Judge Fitzgerald towards the end of 2001.   The January 3 hearing was the first hearing held before Judge Fitzgerald and the Court intended to hear and consider every pending matter in the Grace cases, which involved both inherent chapter 11 issues, the asbestos committee's joint motion to prosecute the fraudulent transfer claims, which the Creditors' Committee and other parties opposed, the class action/class certification issues raised by the zonolite attic insulation claimants, and other related litigation issues.  Similarly, the agenda for the March 18 hearing not only included the more usual chapter 11 motions and stipulations, including matters relating to a bar date for non-asbestos general unsecured creditors, but also extensive argument on whether the Court should certify one or more of the ZAI classes or otherwise allow class proofs of claim for such claimants.  These are issues requiring expertise from both the insolvency and litigation areas.

Stroock has made every effort to send only one attorney to those conferences and hearings before Judges Wolin and Fitzgerald that have not required counsel from both the litigation and insolvency areas.  Stroock expects, however, that it is likely that there will be more conferences and hearings before Judge Wolin and Judge Fitzgerald where the topics of discussion will be such that the expertise of both an experienced bankruptcy lawyer and an experienced litigator, or possibly an experienced tax lawyer or lawyer from another discipline will be necessary.

In sum, while the Creditors' Committee is very cognizant of concerns regarding the professional fees being incurred in these cases, and makes every effort to avoid duplication of services, it is Stroock's position that there are times when multiple attendance by lawyers from Stroock are required and justified by the circumstances and that any bright line rule which provides that only one attorney can attend and be compensated is unfair and not justified by the case law on this subject.  See In re Wire Cloth Products, Inc., 130 B.R. 798 (Bankr. N.D. Ill. 1991) (no reduction in fees for court hearings at which two attorneys were present because each played a necessary role and they divided the responsibilities); In re Bennett Funding Group, Inc., 213 B.R. 234 (Bankr. N.D.N.Y. 1997) (counsel could recover compensation for multiple attendance at events since magnitude and diversity of work involved in sorting through the issues encountered in cases would be difficult if not impossible for just one or two attorneys to address properly).   The Grace cases are without a doubt large and complex cases involving substantial litigation-related as well as inherent chapter 11 issues.  Accordingly, Stroock believes that attendance of two attorneys with different expertise at the January 18 conference with Judge Wolin and at the January 3 and March 18 hearings before Judge Fitzgerald were appropriate, and that allowance of the compensation sought with respect to such services should be granted in their entirety.

Exhibit B

The Report identifies three instances where the time reflected in the narrative is less than the corresponding aggregate amount of time stated for a particular timekeeper for the date in question. . . . . In the aggregate, the differences for the three entries questioned is $304.50.  As already stated, the Quarterly Fee Application contains approximately 75 pages of time entries.   While Stroock endeavors to double-check each and every narrative and corresponding aggregate amount entry to ensure that the amounts are correct throughout, errors occur from time to time.  Stroock's review of the time entries reveals that they are correct, but that the stated aggregate amount is incorrect. Stroock therefore submits that the aggregate amount of the compensation it is seeking under the Fourth Quarterly Fee Application should be reduced by $304.50.

Exhibit C

The amount of time Stroock spent for services detailed in this matter category resulted from an unusual confluence of events occurring during the Application period, some of which are one-time events that should never have to be repeated in these cases.  More specifically, during this period, Stroock prepared three monthly fee applications and the Application, and implemented new project categories and summary compensation schedules.  As you are aware, at the very beginning of the Application period, the Bankruptcy Court contemplated that it would be reviewing all of the fee applications filed in these cases, not a fee auditor.  In connection therewith, the Court requested that the professionals adopt for use going forward a uniform schedule of project (matter) categories based on the over fifty matter categories being used in the Owens Corning cases, and that the Administrative Order under §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members dated May 3, 2001 (the "Administrative Fee Order"), would be amended to require use of those matter categories by all professionals.  The Administrative Fee Order entered by Judge Farnan did not require each of the professionals to utilize the same or even similar matter categories to separately identify the services rendered.  Accordingly, Stroock utilized the 25 or so categories it routinely uses in chapter 11 cases.  Similarly, in contemplation of putting in place processes to assist the Court in reviewing the fee applications previously filed with the Court, the Court instructed counsel to prepare an amended Administrative Fee Order to provide for all professionals to utilize certain uniform cover sheets and spreadsheets.  In order to be able to compare the services rendered by professionals in these cases during the period prior to Judge Fitzgerald's assignment to these cases, the Court directed the professionals to transfer the information from the 2001 application periods within each professionals' existing project categories and convert it so that such information would fit into the fourteen (14) or so suggested project categories identified in Local Form 102 of the Local Delaware Rules.  The resulting aggregate amount of compensation, and time spent reflected in each such new category, was to be provided to the Court in the form of a new spreadsheet.  A number of Stroock's existing matter categories did not easily fit into one of the Delaware categories.  As a result, and in order to property "fit" all of the entries within Stroock's then existing matter categories into the Delaware categories, Stroock needed to review the entries in each of its prior nine monthly fee applications corresponding to certain categories.  In order to be able to prepare these spreadsheets in the time frame that was then being contemplated by the Court, as well as be able to promptly change to the "to be adopted" fifty or so uniform project categories, Stroock, in advance of the Court actually issuing the amended Administrative Fee Order, rendered services in connection with the implementation of the new project categories, the preparation of the new forms of coversheets and spreadsheet and began to review and refit its old time entries into the Delaware categories.  At the time the Court ultimately determined to appoint a fee auditor to review, in the first instance, all of the fee applications previously filed, as well as those to be filed, in these cases, and the Fee Auditor determined not to have the professionals implement a number of the changes the Court had contemplated for itself, Stroock ceased to render such services that were no longer necessary.  Stroock, therefore, submits that the aggregate amount billed in this project category should be allowed as requested.