## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

### FEE AUDITOR'S FINAL REPORT REGARDING
### FEE APPLICATION OF CASNER & EDWARDS, LLP
### FOR THE FOURTH INTERIM QUARTER

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Fee Application of Casner & Edwards, LLP for the Fourth Interim Quarter[1] (the "Application").

### BACKGROUND

1.    Casner & Edwards, LLP ("Casner"), was retained as special environmental counsel to the Debtors. In the Application, Casner seeks approval of fees totaling $581,696.50 and costs totaling $96,031.15 for its services from January 1, 2002, through March 31, 2002 (the "Application Period").

2.    In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application. We reviewed the Application for compliance with 11 U.S.C. § 330, the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for

---

[1] While Casner describes the Application as the second quarterly, we note that the Application is for the fourth interim fee application period in this bankruptcy proceeding.

the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served an initial report on Casner based on our review, and received a response from Casner, portions of which are quoted herein.  We also talked to Robert Murphy of Casner about the Application.

## DISCUSSION

### General Issues

3.     In our initial report we noted that the Application does not have a separate category for Casner's own fee application preparation.  The Guidelines, Rule II.D.1. states "[a] separate project category should be used for ... fee application preparation."  Thus in our initial report we asked Casner to use a separate project category in the future for time devoted to seeking its own compensation, and Casner responded that it would do so.

4.     We noted in the initial report that while the time entries in the Application generally contained adequate detail and avoided lumping, there were several instances of lumping timekeepers ARA, RAM, and MTM.  Paragraph II.D.5. of the Guidelines provides that "[s]ervices should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry; however, tasks performed in a project which total a de minimis amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate."  While we do not recommend any reduction at this time for these time entries, in the initial report we asked Casner to advise these timekeepers to be more consistent in avoiding this problem, and Casner responded that

it would do so.

5.        In our initial report we noted that almost all of Casner's fees relate to the review of documents in connection with a document production.  An identical description accompanies most of the time entries in the Application: "Review documents for production in Chapter 11 cases and to the EPA".  In the initial report we acknowledged that large-scale document productions can be expensive, but we stated that the detail of the time entries is insufficient to indicate the extent of the task at hand, and noted that the Application does not provide a sufficient narrative describing Casner's activities.

6.        Paragraph I.E. of the Guidelines instructs the court to consider "whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered" and "whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed."   Thus in the initial report, in order to facilitate our evaluation of the reasonableness of Casner's document production efforts, we asked Casner to provide further relevant information such as the nature of the documents produced (*e.g.*, "financial records" or "waste disposal records"), the Debtors or facilities to which the documents relate, the sheer quantity of the documents to be reviewed, and the focus of the document production request(s) to which the Debtors are responding (*e.g.*, "production of documents relevant to an evaluation of solvency" or "production of documents relevant to the identification of transferees of recoverable property").  Casner supplied this information to us in its written response, and the portion of the response that explains the document production is set forth in Exhibit A.  We believe this explanation adequately addresses our concerns.

7.        We note that the vast majority of time billed in the Application was paralegal time

rather than attorney time. Of the $581,696.50 in fees, only $38,206.50 was billed by attorneys, the remainder was billed by paralegals.

8.      In our initial report we noted that between 1/9/02 and 1/14/02, RAM spent a total of 5.00 hours on the following task: "Review and quality control documents re: vermiculite". These time entries are set forth below:

| Date | Atty | Description | Time | Value |
|------|------|-------------|------|-------|
| 01/09/02 | RAM | Review and quality control documents re: vermiculite. | 1.10 | $214.50 |
| 01/11/02 | RAM | Review and quality control documents re: vermiculite. | 2.40 | $468.00 |
| 01/14/02 | RAM | Review and quality control documents re: vermiculite. | 1.50 | $292.50 |

The Application indicates that RAM is a partner billing at $195 per hour, and thus in our initial report we asked Casner whether it would have been possible to assign a less-expensive professional to this task of quality control relating to such documents. Casner responded as follows:

> This firm was asked by Jay Hughes, an in-house counsel at Grace, to review all documents in the Grace document repository that related or referred to a particular company that purchased vermiculite from Grace and then used the vermiculite in manufacturing products it sold to the public. Using work product means, paralegals produced a list of approximately 2500 potentially responsive documents. I (RAM) reviewed the list and indicated which documents should be obtained from the repository. Paralegals did that. I then reviewed those documents to determine if they were responsive to the client's request. I described the work as "Review and quality control.."

We believe this explanation adequately addresses our concerns.

9.      In our initial report we noted that between 1/23/02 and 1/29/02, ARA spent a total of 9.60 hours, for $720.00 in fees, on the following task: "Organize files at Winthrop Square". These time entries are set forth below:

| Date | Atty | Description | Time | Value |
|------|------|-------------|------|-------|
| 01/23/02 | ARA | Organize files at Winthrop Square. | 2.80 | $210.00 |
| 01/24/02 | ARA | Organize files at Winthrop Square. | 2.20 | $165.00 |
| 01/25/02 | ARA | Organize files at Winthrop Square. | 0.60 | $45.00 |
| 01/28/02 | ARA | Organize files at Winthrop Square. | 2.10 | $157.50 |
| 01/29/02 | ARA | Organize files at Winthrop Square. | 1.90 | $142.50 |

Paragraph II.E.7. of the Guidelines provides that certain overhead items are nonreimburable and

provides that "[o]verhead includes word processing, proofreading, secretarial and other clerical services."   In the initial report we noted that under some circumstances the organizing of files may qualify as a clerical service, and we asked Casner to explain why this task should not be considered nonreimbursable overhead.  Casner responded as follows:

> ARA is the paralegal who was not terminated when Grace filed for bankruptcy protection and who is the "resident custodian" at Winthrop Square whom I referred to in the introductory Document Review section above. This firm moved its offices from One Federal St. to 303 Congress St. during the Martin Luther King weekend of January 18-21 of this year. We had lots of materials at One Federal St. that were used exclusively in defending Grace in asbestos bodily injury cases, such as a deposition library containing over 700 loose leaf binders of transcripts, as well as rows of loose leaf binders containing information on products, competitors, medical issues, discovery issues, motions and so on. Our new space at 303 Congress is much smaller and we do not have room for that material. Therefore, we sent the materials to the repository at Winthrop Square. The questioned time of ARA was spent organizing these materials when they arrived at Winthrop Square.

While we believe we understand this explanation, we do not believe that organizing files as a result of a firm moving its offices should be considered overhead, and thus recommend a reduction of $720.00 in fees for this task.

10.    In our initial report we noted that on 2/1/02, a time entry bills for 6.70 hours of ARA's time; the time parenthetically ascribed to the subparts of the activity description, however, add up to just 6.50 hours.  The difference in between 6.70 hours and 6.50 hours is $16.00. This time entry is set forth below:

02/01/02    ARA    receipt of originals and copies from Merrill Corp.    6.70Hrs    $536.00
re:post sweep documents that were tagged for copying.
Oversee review of documents (4.4).  Per MTM's request,
prepare weekly box count report (1.5); provide inventory/list
of boxes picked up by onsite (.2).  Meeting re: unscannable
box procedure (.2).  Receive instructions from MTM re: Dead
Storage cards and box locations (.2).

Thus we asked Casner to explain this discrepancy.  Casner responded: ".2 hours should have been indicated after the first sentence. I will fax you a copy of an earlier draft of the fee application which

indicates that time.  You will also note that I reduced ARA's total time by 1.5 hours that day because I did not believe all her time was billable."  We received the fax referenced in this response, verified the facts set forth in this response, and are satisfied by this explanation and do not recommend any reduction for these time entries.

11.    In our initial report we noted that from 3/18/02 to 3/29/02, DBM spent 33.70 hours at $190 per hour ($6,403 in fees) doing research for a "comprehensive memo on MK and other products", but apparently no final document was completed during the Application Period .  See Exhibit B.  Local Rule 2016-2(d) provides that each fee application "shall include activity descriptions which shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary".  Paragraph I.E.of the Guidelines instructs the court to consider "whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed".  Thus in our initial report we asked Casner to provide us with further information explaining the nature of this activity and why so much time was spent on it.  Casner's response is set forth in Exhibit C.  We have reviewed this response, are satisfied by this explanation and do not recommend any reduction for these time entries.

<u>Expenses</u>

12.    Local Rule 2016-2(e) provides that fee applications "shall state the requested rate for copying charges (which shall not exceed $.15 per page)".  Local Rule 2016-2(e)(iii) provides that fee applications "shall state the requested rate for ... out-going facsimile transmission charges (which shall not exceed $1 per page, with no charge for incoming facsimile charges)".  In our initial report we noted that the Application does not state these rates, and thus we asked Casner to provide this

information, and in its response Casner stated that: "[w]e charge $0.12 per page for copying. We do

not charge for facsimile transmissions, other than related telephone toll charges, or for incoming

facsimiles." We are satisfied by this explanation

13.    In our initial report we noted that Casner seeks reimbursement of $88,287.97

expended to rent a document repository for seven months.

| | | |
|---|---|---|
| 03/31/02 | $11,775.12 | Rent and utilities for document repository at One Winthrop Square – November 2001. |
| 03/31/02 | $12,663.19 | Rent and utilities for document repository at One Winthrop Square – October 2001. |
| 03/31/02 | $12,571.58 | Rent and utilities for document repository at One Winthrop Square – September 2001. |
| 03/31/02 | $12,527.80 | Rent and utilities for document repository at One Winthrop Square – January 2002. |
| 03/31/02 | $12,593.66 | Rent and utilities for document repository at One Winthrop Square – December 2001. |
| 03/31/02 | $13,497.06 | Rent and utilities for document repository at One Winthrop Square – March 2002. |
| 03/31/02 | $12,659.56 | Rent and utilities for document repository at One Winthrop Square – February 2002. |

In our initial report we noted that Casner's time entries indicate that the document review is a pre-

production review of documents to be produced by the Debtors rather than documents received by

the Debtors in response to requests for production propounded by the Debtors.  We wondered why

these documents were not reviewed at their original locations (presumably the Debtors' offices and

other facilities), and we asked Casner to indicate why it was necessary to rent additional space,

whether this space was used solely for this case, why these costs should not be considered overhead,

and whether these expenses were approved by the Debtors in advance.  Casner responded:

> The document repository was created at Grace's direction in the late 1980's. Grace was directly
> charged and paid for rent and utilities until it filed for bankruptcy protection. Subsequent to the filing,
> these charges were not paid for several months. Eventually, Grace asked this firm to pay the back
> charges and  charges going forward and then include all such charges as expenses in our fee
> applications. Also, please refer to the description of the document review, above, as to the necessity,

creation and use of the repository.

We are satisfied by this explanation.

14.    In our initial report we noted that the expense detail indicates four charges for payments relating to a "recordkeeper archive".  These charges are as follows:

| | | |
|---|---|---|
| 01/14/02 | $382.35 | RECORDKEEPER ARCHIVE – monthly storage fee (1/02) |
| 02/11/02 | $392.10 | RECORDKEEPER ARCHIVE – monthly storage fee (2/02) |
| 03/04/02 | $387.30 | RECORDKEEPER ARCHIVE – monthly storage fee (3/02/02) |
| 03/18/02 | $ 45.00 | RECORDKEEPER ARCHIVE – pickup boxes for storage prior to |

move to 303 Congress Street. (1/25/02)

Office rent is non-reimbursable overhead, and ordinarily office space will include some storage space.  Paragraph II.E.7. of the Guidelines explains that "[o]verhead consists of all continuous administrative or general costs incident to the operation of the applicant's office and not particularly attributable to an individual client or case."  Thus in our initial report we asked Casner to explain why the indicated charges do not qualify as non-reimbursable overhead.  Casner responded as follows:

> All of the material included in the Recordkeeper Archive charges is related to Grace. Examples of what is at Recordkeeper are thousands of closed case files (recall that we were national counsel for Grace for over 15 years), work product related to this firm's responsibility to respond to discovery requests in asbestos related bodily injury cases throughout the U.S., and this firm's copies of document productions made to hundreds of plaintiffs.

We are satisfied by this explanation.

## CONCLUSION

15.    Thus, we recommend approval of fees totaling $580,976.50 ($581,696.50 minus $720.00) and costs totaling $96,031.15  for Casner's services from January 1, 2002, through March 31, 2002

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____

       Warren H. Smith
       Texas State Bar No. 18757050
       Mark W. Steirer
       Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

       **FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 29th day of July, 2002.

_____
       Warren H. Smith

Exhibit A

Beginning in approximately December, 1999, Grace was served with a series of 104(e) requests for information from the Environmental Protection Agency in connection with the EPA's investigation of Grace's closed vermiculite mine and mill in Libby, Montana. To respond to the EPA's requests, this firm along with the Colorado firm of Holme Roberts & Owen, began a review of documents previously gathered by this firm in the early to mid 1980s in connection with preparing the defense of asbestos related actions.  (Beginning in 1984, this firm served as national counsel in defending asbestos related bodily injury cases filed against Grace and as part of our duties, we commenced a review of millions of potentially relevant Grace documents). While the focus of the earlier document reviews in the 1980s was on products to which asbestos was added, the EPA investigations and subsequent attic insulation class actions involve products containing vermiculite to which no commercial asbestos had been added. 800-1,000 boxes of documents regarding such vermiculite products had been gathered during the reviews in the 1980s, but such documents were not made a part of Grace's asbestos litigation document repository which has been maintained in Boston since the late 1980's.  Rather, they were retained at the headquarters of Grace's Construction Products Division in Cambridge, Massachusetts in the event that they might be deemed responsive to future asbestos litigation involving vermiculite products.

It became apparent that the scope of the document requests in the EPA investigations and the various class actions included documents regarding all aspects of the manufacture and sale of vermiculite products at least through the early 1990s.  As the last comprehensive review of Grace documents had been conducted in the mid-1980s and the vermiculite containing products which were the subject of the 1999 and 2000 document requests continued to be produced well into the 1990s, this firm identified an additional 5,000 and 6,000 boxes of potentially responsive documents stored in several "dead storage" areas at the Construction Products Division in Cambridge, the entity which manufactured and sold the vermiculite products.  These documents included manufacturing and sales records, health and safety records, advertising for the relevant vermiculite products, as well as personnel records for employees at the various plants which manufactured the vermiculite products.  Each of the 5,000 to 6,000 boxes in the "dead storage" areas in Cambridge were initially reviewed to determine whether they were likely to contain relevant documents and boxes so identified were subsequently reviewed page by page.  Given the huge volume of potentially responsive documents, Grace decided to capture such documents electronically (as opposed to paper copies) and the page by page review process included identifying responsive documents by means of a target sheet as well as capturing certain limited information about each document to be put into a database for use in the defense of the EPA investigations and class actions.

The  review of the 5,000 to 6,000 boxes began in late July, 2000 and was conducted by attorneys and paralegals from this firm, Holme Roberts & Owen and Reed Smith Shaw & McClay in Pennsylvania. Given this firm's prior experience as lead counsel in the document reviews in the 1980s, Casner & Edwards was designated by Grace as lead counsel for the "current" document review.  In order to meet existing and anticipated deadlines for production of responsive documents and given the large number of boxes needing review, Casner & Edwards hired approximately 15 paralegals to complement its then existing staff of four or five paralegals to assist in the review which continued from late July, 2000 until Grace's bankruptcy filing on April 1, 2001.  Following the filing of the bankruptcy petition, all but one of the paralegals were terminated.  The one who was retained served essentially as resident custodian at Grace's document repository at Winthrop Square, Boston.  During the late summer of 2001, Grace decided to resume the document review which had been half completed at the time of its bankruptcy filing.  In addition, asbestos creditors' committees had filed Motions in the bankruptcy court to require Grace to create a repository.  These motions were mooted by the reality of the existing repository and Grace's actions in restarting the review of documents.  In November 2001, the review was restarted, many paralegals were hired and rehired, and the final boxes of responsive documents were sent to the scanning vendor last week.

Exhibit B

| Date | Atty | Description | Time | Value |
|------|------|-------------|------|-------|
| 03/14/02 | DBM | Read background materials; research documents on MK and other products. | 4.10 | $779.00 |
| 03/18/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 1.60 | $304.00 |
| 03/19/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 5.20 | $988.00 |
| 03/20/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 1.70 | $323.00 |
| 03/21/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 5.30 | $1,007.00 |
| 03/22/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 5.40 | $1,026.00 |
| 03/25/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 3.90 | $741.00 |
| 03/28/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 2.30 | $437.00 |
| 03/29/02 | DMB | Continue research for comprehensive memorandum on MK and other products. | 4.20 | $798.00 |

Exhibit C

Kirkland Ellis, Grace's primary bankruptcy counsel, has assigned to this firm the task of preparing some comprehensive memoranda that will be used in presenting Grace's positions to the Court. We consider the memoranda to be attorney work product. DBM is preparing a memorandum as to each of the Zonolite Company's and W.R. Grace & Co.'s commercial asbestos-containing products, used in the commercial construction industry. As to Mono-Kote, for example, the memorandum will cover information regarding the fireproofing market, the development, testing, marketing and sales of Mono-Kote, the "state of the art" of knowledge regarding hazards posed by the spray application of fireproofing in general and its effect on the marketing, sales, research and replacement of Mono-Kote MK-3. The memorandum will cover application, in-place and removal issues as to the commercial asbestos-containing products. By far the majority of such information is pertinent to Mono-Kote MK-3. To the extent such information is available for other commercial asbestos-containing products, it will be included.

Comprehensive memoranda on these products have never before been compiled. They are necessary to present fairly to the court the history and background of Grace's involvement with asbestos-containing products. They will assist the court, the creditors and the Grace's counsel with assessing the value of the bodily injury and property damage claims asserted against Grace for these products. The memorandum is not intended to be a document weighted toward the views of Grace; rather, it attempts to present objectively the information available to claimants and the debtor regarding these products.

Since no attempt has been made to create such comprehensive memoranda previously, information is being derived from numerous primary and secondary source materials, including Grace's documents and witnesses, plaintiffs' documents, governmental documents and independent testing laboratory sources, among others. The memoranda will be footnoted to identify each of these sources. The scope of the project necessitates a substantial amount of time and could not reasonably be completed during the application period.

## SERVICE LIST

Notice Parties

**The Applicant**

Robert A. Murphy, Esq.
Casner & Edwards, L.L.P.
303 Congress St., 2nd Floor
Boston, MA 02210

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

## Official Committee of Equity Holders

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

## United States Trustee

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801