**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| W.R. GRACE & CO., et al., | § | Jointly Administered |
| | § | Case No. 01-01139 (JKF) |
| Debtors. | § | |
| | § | |

**FEE AUDITOR'S FINAL REPORT REGARDING**
**FOURTH INTERIM QUARTERLY FEE APPLICATION OF**
**CAPLIN & DRYSDALE, CHARTERED**

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its

capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Fourth Interim

Quarterly Fee Application of Caplin & Drysdale, Chartered (the "Application").

**BACKGROUND**

1.      Caplin & Drysdale, Chartered ("Caplin & Drysdale"), was retained as counsel to the

official committee of asbestos property damage claimants.  In the Application, Caplin & Drysdale

seeks approval of fees totaling $281,179.50 and costs totaling $79,962.62 for its services from

January 1, 2002, through March 31, 2002 (the "Application Period").

2.      In conducting this audit and reaching the conclusions and recommendations contained

herein, we reviewed in detail the Application in its entirety, including each of the time entries

included in the exhibits to the Application.   We reviewed the Application for compliance with 11

U.S.C. 330, the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the

District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11

U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent

established in the United States Bankruptcy Court for the District of Delaware, the United States

District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served on

Caplin & Drysdale an initial report based on our review, and received a response from Caplin &

Drysdale containing an Exhibit A and an Exhibit B, portions of which response are quoted herein,

and Exhibit A and Exhibit B to which response are attached hereto.

### DISCUSSION

#### General Issues

3.      In our initial report we noted that the Application did not have a separate category

solely for Caplin & Drysdale's own fee application preparation, as the category it currently uses,

"Compensation of Professsionals", also contains time for the review of fee applications of others.

The Guidelines, Rule II.D.1. states "[a] separate project category should be used for ... fee

application preparation." Thus in our initial report we asked Caplin & Drysdale to use a separate

project category for time devoted to seeking its own compensation.

4.       The time entries were generally adequately detailed and devoid of lumping, although

there were some instances of lumping by NDF and DRH, and there was a consistent lack of detail

from DRH.  Thus in our initial report we asked Caplin & Drysdale to please advise these timekeepers

to be more consistent in avoiding lumping and providing detailed descriptions of their activities.

5.      In our initial report we noted that Caplin & Drysdale instituted new hourly rates in

January of 2002 and that the rate increases were not uniform.  For example there was a 12% increase

in PVL's hourly rate (from $500 to $560) and a 16% increase in JWD's hourly rate (from $365 to

$425).  Paragraph II.A.3. of the Guidelines instructs applicants to provide an "explanation of any

changes in hourly rates from those previously charged".  Thus in our initial report we asked Caplin

& Drysdale to explain the basis for these increases.  Caplin & Drysdale responded:

> As stated in our retention application, which was approved by the Court on June 13, 2001, Caplin &
> Drysdale reviews its hourly billing rates on an annual basis, usually as of October 1 of each year.
> This year, after an exhaustive examination of the hourly rates charged by comparably-situated firms,
> the firm determined that Caplin & Drysdale's billing rates were generally lower than those of
> comparable law firms doing equivalent work and, at certain levels, substantially lower.  The increases
> that you note are firm-wide, went into effect on January 1, and apply to all clients and cases, rather
> than merely the Delaware or other bankruptcy matters.  We believe that these rate increases are
> reasonable and that Caplin & Drysdale attorneys and, in particular, Mr. Lockwood and Ms. Davis,
> whose billing rates were very low when compared with attorneys with similar experience at
> comparable firms, are now billing at rates that are commensurate with their experience, background
> and skills.

We believe that this response adequately addresses our concern.

### Specific Time and Expense Entries

6.       We noted that between January 7, and February 28, 2002, JWD billed a total of 18.1

hours at her new rate of $425  per hour for a total of $7,692.50 for reviewing pleadings and drafting

status reports regarding those pleadings.  We also noted that thereafter she billed no further time.

| Date | Atty | Rate | Hours | Description |
| --- | --- | --- | --- | --- |
| 01/07/02 | JWD | 425.00 | 1.80 | Review pleadings for week |
| 01/11/02 | JWD | 425.00 | 2.10 | Review pleadings |
| 01/17/02 | JWD | 425.00 | 1.50 | Review pleadings, conference with PVNL re status of case for status report |
| 01/18/02 | JWD | 425.00 | 2.30 | Draft status report |
| 01/25/02 | JWD | 425.00 | 2.30 | Review pleadings for status report |
| 01/29/02 | JWD | 425.00 | 2.20 | Draft status report |
| 02/01/02 | JWD | 425.00 | 2.20 | Review filings for status report |
| 02/21/02 | JWD | 425.00 | 1.40 | Review filings from 2/14 to 2/19 for status report |
| 03/01/02 | JWD | 425.00 | 2.30 | (Late entry for 2/28) Review pleadings for week of 2/25 |

We had a number of questions regarding these entries.  We questioned whether it was appropriate

to assign this task to an attorney with Ms. Davis's experience and billing rate.  We also questioned

the efficiency of assigning the task to an attorney who billed no other time to the case, and we

questioned the value of time spent reviewing pleadings on occasions when the review was not

followed by the drafting of a status report.  Thus, in our initial report we asked Caplin & Drysdale

to provide further information to address our concerns regarding these time entries.  Caplin &

Drysdale responded:

> Ms. Davis' duties in these matters went far beyond simple docket review.  It included an in-depth analysis of any substantive pleadings and the drafting of a status report that included both recommendations to the Committee regarding positions to be taken on particular issues, and updates on the status of and actions taken or to be taken in pending and future matters.  Where the review of pleadings was not immediately followed by a status report, Ms. Davis either delivered her recommendations orally or included those comments in a subsequent report.  These reports were employed by all C&D attorneys, as well as our local counsel, to keep current with both developments in the case and the positions taken on behalf of our clients regarding the many complicated issues and court filings that the case involves.  We believe that the task of preparing the status reports was appropriately assigned to a senior attorney, and that these reports allowed for an efficient distribution of information among all of the members of our legal team.

We believe that this response adequately addresses our concern.

7.       In our initial report we noted that, on three occasions, two professionals participated

in the same meeting or teleconference, on January 11, 2002, January 22, 2002, and February 12,

2002, as follows:

| Date | Attorney | Rate | Hours | Description |
|------|----------|------|-------|-------------|
| 01/11/02 | PVL | 560.00 | 3.60 | Prep with EI for meeting w/J. Wolin (.3); attend meeting w/J. Wolin, Bernick, McGovern, EI et al.(2.6); confer Speights and EI (.3); confer Speights (.3); review miscellaneous filings (.1) |
| 01/11/02 | EI | 675.00 | 5.00 | Trip to Newark while reviewing file (1.0); conference PVNL (1.0); conference Judge Wolin (3.0) |
| 01/11/02 | PVL | 280.00 | 5.00 | Travel to Newark and return to DC |
| 01/11/02 | EI | 337.50 | 1.00 | Return to NY |
| 01/22/02 | PVL | 560.00 | 0.60 | Teleconference EI re status (.1); prep for meeting with J. Wolin (.4); review draft order |

| | | | | and email ES (.1). |
|---|---|---|---|---|
| 01/22/02 | PVL | 560.00 | 3.00 | Confer EI re meeting w/J. Wolin (1.0); attend meeting with Wolin and EI.(2.0). |
| 01/22/02 | EI | 675.00 | 5.00 | Travel to court with PVNL preparing for conference (2.0); conference Judge Wolin (2.0); return to office (1.0) |
| 01/22/02 | PVL | 280.00 | 8.50 | Travel to and from Newark for meeting with J. Wolin |
| 02/12/02 | PVL | 560.00 | .70 | Teleconference committee, EI et al. |
| 02/12/02 | EI | 675.00 | 1.00 | Committee conference call re: fraudulent transfer case. |

Paragraph II.D.5. of the Guidelines provides that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees."

Thus we asked Caplin & Drysdale to please explain the necessity of both attorneys on these occasions.  Caplin & Drysdale responded:

> The first two meetings in question were called by Judge Wolin to discuss the status of W.R. Grace in relation to other pending asbestos bankruptcy matters.  The third meeting was in fact a conference call meeting of the W.R. Grace Committee.  In general, Mr. Inselbuch and Mr. Lockwood share responsibility for all bankruptcy matters, with Mr. Inselbuch, who is in overall charge of each bankruptcy, addressing broad policy matters, negotiations, and reorganization plan issues, and Mr. Lockwood supervising all day-to-day activities.  Having two senior attorneys share these responsibilities is not duplicative, but rather permits for an efficient division of labor between the development of advice to and policy for the clients and its implementation.  While Mr. Inselbuch and Mr. Lockwood rarely attend the same meetings, they do so when such meetings, including those with Judge Wolin referenced above, involve major policy issues or negotiations, with or without the clients in attendance, as well as negotiations with other constituencies.  Where matters of a global nature are involved, we believe that it would be inappropriate to leave our client, the Asbestos Personal Injury Claimants Committee (the "Committee") with only one pair of "eyes and ears."  Further, although we will, of course, provide you with non-privileged information regarding the meetings attended by both Mr. Inselbuch and Mr. Lockwood, we believe that, in order to serve our clients' interests, we must reserve the right to make such staffing choices on their behalf.

While we do not dispute that Caplin & Drysdale has the right to make its own staffing choices, it is still our duty to make recommendations regarding whether the fees caused by such staffing choices are reasonable and necessary.  We believe that this response adequately addresses our concerns regarding the meetings with Judge Wolin, but it is not clear that it was reasonable or necessary to

have two professionals participate in the conference call on February 12, 2002, and thus we

recommend a reduction of ½ of the fees incurred, for a recommended reduction of $533.50.

8.       On January 31, 2002, RCT spent 3.0 hours, and $1,080, researching bankruptcy rule

9013.

| Date | Attorney | Rate | Hours | Description |
|------|----------|------|-------|-------------|
| 01/31/02 | RCT | 300.00 | 3.60 | Research re: Rule 9013 (3.0); e-mail memos to E. Warren re: 9013 (.3); conferences with EI re: 9013 (.3). |

Local Rule 2016-2(d) requires that time entries "shall be sufficiently detailed to allow the Court to

determine whether all the time, or any portion thereof, is actual, reasonable, and necessary."  We

noted in our initial report that the time entry did not explain what, beyond the actual text of the rule,

was being researched and we requested an explanation.  Caplin & Drysdale responded:

> The time entries at issue contain a clerical error, so that the research indicated concerned Rule 9031, not Rule 9013.  This research was conducted in response to Judge Wolin's request that the Committee state a position regarding the issue of whether a special master could be appointed in a bankruptcy matter.

We accept this explanation and have no objection to these fees.

9.       In our initial report we noted that in February and March 2002, as the fraudulent

transfer litigation heated up, Caplin & Drysdale pressed into service a number of attorneys who had

previously had little, if any, role in the case. Two of these attorneys, BSH and DRH, recorded very

vague time entries, such as "Reading bankruptcy cases", which suggested that they may have spent

considerable time getting up to speed on basic bankruptcy issues.  We also noted that BSH billed

27.6 hours and DRH billed 22.7 hours on this issue for a total of $12,397 in fees and that nine

electronic database charges, totaling $1,033.34, were related to this research, as follows:

| Date | Attorney | Rate | Hours | Description |
|------|----------|------|-------|-------------|
| 02/20/02 | BSH | 260.00 | 1.60 | Research and analyze protection of creditors under fraudulent conveyance law |
| 02/21/02 | BSH | 260.00 | 3.00 | Research and analyze protection of creditors under fraudulent conveyance law |
| 02/22/02 | BSH | 260.00 | 2.00 | Research and analyze protection of creditors under fraudulent conveyance law |
| 02/23/02 | BSH | 260.00 | 3.30 | Research and analyze protection of creditors under fraudulent conveyance law |
| 02/24/02 | BSH | 260.00 | 1.30 | Research and analyze protection of creditors under fraudulent conveyance |
| 02/25/02 | BSH | 260.00 | 2.50 | Research and analyze protection of creditors in fraudulent conveyance law |
| 02/26/02 | BSH | 260.00 | 3.10 | Research and analyze protection of creditors in fraudulent conveyance law |
| 02/27/02 | BSH | 260.00 | 3.10 | Research and analyze protection of creditors under fraudulent conveyance law |
| 02/28/02 | BSH | 260.00 | 2.50 | Research and analyze protection of creditors under fraudulent conveyance law |
| 03/01/02 | BSH | 260.00 | 1.70 | Draft outline re: protection of creditors in fraudulent conveyance law (1.5); review Hillsborough case history in eleventh circuit (.2) |
| 03/03/02 | BSH | 260.00 | 1.10 | Draft outline re: protection of creditors in fraudulent conveyance law |
| 03/04/02 | BSH | 260.00 | 2.60 | Draft outline re: protection of creditors in fraudulent conveyance law |
| 03/12/02 | DH | 230.00 | .60 | Reviewing file |
| 03/13/02 | DH | 230.00 | 1.90 | Research and reading bankruptcy cases |
| 03/14/02 | DH | 230.00 | 3.70 | Researching bankruptcy law issues on insolvency and valuation; reading cases |
| 03/15/02 | DH | 230.00 | 2.20 | Research on SEC case and reading cases |
| 03/19/02 | DRH | 230.00 | 2.50 | Reading cases on valuation; AICPA research, calling AICPA, speaking to technical support library, etc. |
| 03/20/02 | DRH | 230.00 | 1.80 | Researching subsequent insolvency issue |
| 03/25/02 | DRH | 230.00 | 2.00 | Research on bankruptcy issues; meeting with NDF |
| 03/26/02 | DRH | 230.00 | 4.10 | Researching existing liability cases; reviewing case law and treaties |
| 03/27/02 | DRH | 230.00 | 2.20 | Reading cases on insolvency |
| 03/30/02 | DRH | 230.00 | 1.70 | Reading bankruptcy cases |

10.   We noted in our initial report that the time entries referred to above were too vague

to convey the substance of the research or whether the amount of time spent on it was reasonable or necessary to the administration of the case.  Local Rule 2016-2(d) requires that time entries "shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary."  Paragraph I.E. of the Guidelines, moreover, instructs the court to consider "whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered" and "whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed".  Thus in our initial report we requested that Caplin & Drysdale explain the nature of the research performed by BSH and DRH and the value of that research within the context of the case.  Caplin & Drysdale responded:

> These attorneys billed a total of 37 hours researching several complex issues of fraudulent transfer law.  While the work-product doctrine protects against disclosure of the precise topics researched, we can tell you that the law in the areas of fraudulent transfer in question was not well-defined, thus necessitating the examination of literally hundreds of UFTA cases that touched on those areas of law.  Given the magnitude of the fraudulent transfer claims in this case -- $2.6 billion – and the outcome determinative nature of the issues researched, we believe that the time billed was justified.  Moreover, as reflected in her April time reports, Ms. Hartstein completed a memo on her research in April.  Further, despite the fact that she wrote no formal memo, Ms. Heleman produced an extensive outline, detailing the results of her research, that has been relied on by other C&D lawyers in numerous memoranda, briefs and other work.

We believe this explanation adequately addresses our concerns, and have no objection to these fees.

11.    In our initial report we noted that on January 23 and 25,2002, and February 28, 2002, AGL recorded brief time entries reflecting meetings with attorneys whose time entries reflect no such meetings.  These time entries are set forth below.

| Date | Atty | Rate | Hours | Description |
|---|---|---|---|---|
| 01/23/02 | AGL | 445.00 | .20 | Conference w/TWS re Daubert research project. |
| 01/25/02 | AGL | 445.00 | .20 | Meet w/BAS re Daubert research project. |
| 02/28/02 | AGL | 445.00 | .20 | Conference with PVNL re case management |

Thus we asked for an explanation regarding this discrepancy.  Caplin & Drysdale responded:

> The meetings referenced were part of longer conferences that involved discussions of issues in several of the bankruptcy cases, including W.R. Grace, and Peter Lockwood (PNVL), Brian Skretny (BAS) and Ted Swett (TWS) evidently failed to record the .2 hours of their respective time at those meetings that was spent discussing W.R. Grace-related issues.   We continue to take the position that inconsistency among attorneys' time records does not constitute prima facie evidence that meetings did not take place or did not take place for the amounts of time indicated, particularly when the discrepancies in question are small.  We believe that Mr. Lauber's time records are an accurate reflection of his work time and that, although the Debtor was not billed for their time, equal amounts of time were spent by Mr. Lockwood, Mr. Skretny and Mr. Swett, respectively, on the issues in question on the indicated days.

We accept this explanation and have no objection to these fees.

12.    In our initial report we noted that, both NDF and TWS participated in lengthy meetings with L. LeClair and the PD Committee on two separate occasions.  We also noted on a different occasion NDF and JPC participated in a separate meeting with counsel for the PD committee.  These time entries are set forth below.

| Date | Attorney | Rate | Hours | Description |
|---|---|---|---|---|
| 03/05/02 | TWS | 425.00 | 5.30 | Meet with L.LeClair and PD Comm. Lawyers to discuss legal issues, strategies, and division of responsibilities |
| 03/05/02 | NDF | 350.00 | 9.00 | Reviewing Grace Solvency Opinion; KPMG study (2.5); reviewing corr. Wachtel and KPMG/florence produced by defendants (.9); meeting and strategy session w/TWS, LeClair, Turken, Sakalo and others (5.1); t/c w/ Clerk and defendants counsel and TWS, LeClair, Turken and others re: CMO (.5). |
| 03/06/02 | TWS | 425.00 | 5.50 | Meet with L.LeClair and PD Comm. Lawyers to discuss legal issues and strategies and to make assignments for next steps |
| 03/06/02 | NDF | 350.00 | 8.60 | …meeting and strategy session w/TWS, LeClair, Turken, Sakalo and others (5.5);…. |
| 03/12/02 | JPC | 215.00 | 3.00 | Conference with NDF and attorneys from Bilzin firm incl. Preparation of document review protocol, analysis of fraudulent transfers, and discussion of division of labor for trial preparation |

| 03/12/02 | NDF | 350.00 | 5.00 | Strategy and document review training meeting with Turken, Sakalo, JPC and others (3.0);.... |
|----------|-----|--------|------|------|

Paragraph II.D.5. of the Guidelines provides that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." Thus we asked Caplin & Drysdale to explain the reason for the participation of two attorneys on these occasions. Caplin & Drysdale responded:

> The March 5-6 meeting was an initial strategy meeting with the Property Damage Committee and Mr. LeClair that included a discussion of the division of responsibilities in the fraudulent transfer case, among other matters. While the work product doctrine protects against disclosure of precisely what topics were discussed at the March 5-6 meeting, Mr. Swett and Mr. Finch are the Caplin & Drysdale lawyers with primary responsibility for litigating the fraudulent transfer case, and each takes responsibility for different questions, motions and procedural aspects of that action. Given these lawyers' division of responsibility and overall roles in administering the case, Caplin & Drysdale decided that, in order to best serve the Committee's interests, both of them needed to be present at this major meeting and strategy discussion.

> Similarly the March 12 meeting was a briefing session for the document review team in which Mr. Finch provided information to that team, which included Mr. Cunningham and Bilzin attorneys, regarding certain key documents to be identified and the manner in which those documents should be analyzed for later review. As indicated in the description of the document review, below, the task was complicated by the fact that the materials to be reviewed were numerous and, in many cases, highly technical. Thus, this preliminary informational meeting was necessary, both in order to ensure accuracy and so as to save time.

We accept this explanation and thus have no objection to these fees.

13.     In our initial report we noted that Caplin & Drysdale attorneys recorded a total of 94.0 hours and $22,457 in fees for review of documents produced by the Debtors. See Exhibit 1 at the end of this document. Given the magnitude of this expenditure and the fact that the Application does not contain a narrative description of its activities, we requested further detail regarding the nature of the documents produced, the Debtors or facilities the documents relate to, the sheer quantity of the documents to be reviewed, and the general purposes of the review. We also noted that Bilzin

Sumberg Dunn Baena Price & Axelrod LLP, ("Bilzin"), as counsel for the personal injury claimants committee spent 167.9 hours reviewing the same documents and we were concerned that there may have been a duplication of effort in this matter.  Thus in our initial report we asked Caplin & Drysdale to please provide us with more detail regarding this project. We also requested information on any efforts made to coordinate and avoid duplication of efforts, and explain why Bilzin had, as of March 31, 2002, expended considerably more time in this endeavor.  Caplin & Drysdale responded:

> W.R. Grace and Sealed Air produced over 200 boxes of document to the document repository in response to document requests in the fraudulent transfer case.  The nature of the documents reviewed falls within the categories of "financial records," but more specifically includes securities filing, financial records, legal memoranda, personal injury estimation documents, property damage estimation documents, documents bearing on reasons for transfers, fairness opinions and solvency opinions.  A team of 6-8 lawyers or paralegals from Caplin & Drysdale and Bilzin reviewed the documents, and no box of documents was reviewed more than once.  Bilzin had more professionals in the room than did Caplin & Drysdale, however, and hence billed a higher total of hours than did Caplin & Drysdale.

We accept this explanation and have no objection to these fees.

14.	We noted in our initial report on March14, 2002 and March 15, 2002, BSH spent 8.60 hours researching the scope of 544(b).

| Date | Attorney | Rate | Hours | Description |
|------|----------|------|-------|-------------|
| 03/14/02 | BSH | 260.00 | 7.00 | Research scope of section 544(b) |
| 03/15/02 | BSH | 260.00 | 1.60 | Research scope of section 544(b) |

Local Rule 2016-2(d) requires that time entries "shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary."  Thus in our initial report we asked for a more complete description of this research.  Caplin & Drysdale responded:

While the work product doctrine protects against disclosure of the precise nature of this research, Ms. Heleman was looking at a choice of law issue under section 544(b) under the direction of Mr. Finch.

We accept this explanation and have no objection to these fees.

15. In our initial report we noted that on March 5, 2002, TWS charged the estate $300.35 for dinner for himself, NDF and L. LeClair. Paragraph II.E.1. of the Guidelines instructs us to consider "[w]hether the expense is reasonable and economical. For example, first class and other luxurious travel mode or accommodations will normally be objectionable." Thus we asked Caplin & Drysdale to explain the cost of this dinner. Caplin & Drysdale responded:

The dinner in question cost $100.12 per participant. We believe that this amount is consistent with the rates usually charged by restaurants in Florida in the winter season, but are willing to accept a one-time, 50% reduction in the amount sought to be reimbursed, for a total reduction of $150.18.

We reject this explanation, as we believe that perfectly adequate meals can be found in Florida, in the winter season, for less than $25.00 per person. Thus we recommend a reduction of $225.35 in expenses.

16. In our initial report we noted that from March 5, to March 8, 2002, associate attorney JPC spent a total of 21.6 hours and $4,644 in fees drafting discovery requests. These time entries are set forth below.

| Date | Attorney | Rate | Hours | Description |
| --- | --- | --- | --- | --- |
| 03/05/02 | JPC | 215.00 | 1.70 | Begin drafting Grace interrogatories and requests for production of documents per instructions of NDF |
| 03/05/02 | JPC | 215.00 | 1.20 | Research discovery relating to fraudulent conveyances and download and review same |
| 03/05/02 | JPC | 215.00 | 2.60 | Review legal background materials for use in fraudulent conversion analysis, incl. trial briefs and fact outlines |
| 03/05/02 | JPC | 215.00 | 2.40 | Review and analyze discovery materials, specifically interrogatories and requests for |

| | | | | |
|---|---|---|---|---|
| | | | | production of documents, for use in Grace discovery |
| 03/06/02 | JPC | 215.00 | 4.20 | Continue review and analysis of materials relating to discovery and continue drafting first set of interrogatories and requests for production of documents |
| 03/07/02 | JPC | 215.00 | 5.40 | Continue review and analysis of materials relating to Grace discovery and continue drafting first set of interrogatories and requests for production of documents |
| 03/08/02 | JPC | 215.00 | 4.10 | Finish drafting first set of interrogatories and requests for production of documents relating to fraudulent transfers, then edit and revise same and consult w/ NDF on same |

Thus we asked for an explanation as to the amount of time involved. Caplin & Drysdale responded with the paragraph referenced below as well as copies of the discovery requests.

> The requests required review of numerous background materials and documents and sought numerous categories of documents, including many with highly technical definitions. Copies of the discovery requests are attached hereto as Exhibits A and B.

While we note that other firms also worked on these discovery requests, we accept this explanation and have no objection to these fees.

## CONCLUSION

18.     Thus we recommend approval of fees totaling $280,646.00 ($281,179.50 minus $533.50) and costs totaling $79,737.27 ($79,962.62 minus $225.35) for Caplin & Drysdale's services from January 1, 2002, through March 31, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____

      Warren H. Smith
      Texas State Bar No. 18757050
      Mark W. Steirer
      Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 29th day of July, 2002.

_____
           Warren H. Smith

## SERVICE LIST

Notice Parties

**The Applicant**

Elihu Inselbuch, Esq.
Rita C. Tobin, Esq.
Caplin & Drysdale, Chartered
399 Park Avenue, 27th Floor
New York, NY 10022-4614

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

EXHIBIT 1

| Date | Attorney | Rate | Hours | Description |
|------|----------|------|-------|-------------|
| 03/11/02 | JPC | 215.00 | 6.10 | Prepare for Boca Raton document review incl. contact phone calls and e-mails to host firm, finalizing discovery draft, conf. w/NDF on document review details, and study of Grace background documents |
| 03/12/02 | JPC | 215.00 | 3.00 | Conference w/NDF and attorneys from Bilzin firm incl. preparation of document review protocol, analysis of fraudulent transfers, and discussion of division of labor for trial preparation |
| 03/12/02 | NDF | 350.00 | 5.00 | Strategy and document review training meeting with Turken, Sakalo, JPC and others (3.0);.... |
| 03/13/02 | JPC | 215.00 | 8.50 | Conduct document review of all Grace documents relating to alleged fraudulent transfers, analyze relevant documents, and take categorized notes on same |
| 03/13/02 | NDF | 350.00 | 9.30 | Review Grace docs in document repository (6.0);.... |
| 03/14/02 | JPC | 215.00 | 8.50 | Conduct document review of all Grace docs relating to alleged fraudulent transfers, analyze relevant documents, and take categorized notes on same |
| 03/14/02 | NDF | 350.00 | 8.80 | Review Grace docs in document repository (5.0);.... |
| 03/15/02 | JPC | 215.00 | 6.30 | Conduct document review of all Grace docs relating to alleged fraudulent transfers, analyze relevant documents, and take categorized notes on same |
| 03/19/02 | MCH | 230.00 | 8.50 | Document review |
| 03/19/02 | JPC | 215.00 | 8.50 | Conduct document review of all Grace docs relating to alleged fraudulent transfers, analyze relevant documents, and take categorized notes on same |
| 03/20/02 | MCH | 230.00 | 8.80 | Document review |
| 03/20/02 | JPC | 215.00 | 8.80 | Conduct document review of all Grace docs relating to alleged fraudulent transfers, analyze relevant documents, and take categorized notes on same |

| 03/21/02 | MCH | 230.00 | 6.50 | Document review |
| 03/21/02 | JPC | 215.00 | 6.50 | Conduct document review of all Grace docs relating to alleged fraudulent transfers, analyze relevant documents, and take categorized notes on same |