## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FOURTH INTERIM QUARTERLY FEE APPLICATION OF
## PITNEY, HARDIN, KIPP & SZUCH, LLP

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Fourth Interim Quarterly Fee Application of Pitney, Hardin, Kipp & Szuch, LLP (the "Application").

## BACKGROUND

1.      Pitney, Hardin, Kipp & Szuch, LLP ("Pitney Hardin"), was retained as special counsel for the Debtors[1].  In the Application, Pitney Hardin seeks approval of fees totaling $136,517.10 and costs totaling $26,231.48 for its services from January 1, 2002, through March 31, 2002 (the "Application Period").

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware,

---

[1]The Application states that Pitney Hardin was also retained as an ordinary-course professional for certain matters. The retention order attached as an exhibit to the Application, however, does not indicate that Pitney Hardin was retained as an ordinary course professional; accordingly, we have reviewed all time and expense entries included in the Application.

Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing

Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued

January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the

United States Bankruptcy Court for the District of Delaware, the United States District Court for the

District of Delaware, and the Third Circuit Court of Appeals.  We served on Pitney Hardin an initial

report based on our review, and received a response from Pitney Hardin, portions of which response

are quoted herein.

## DISCUSSION

### General Issues

3.       In the initial report we noted that the Application does not have a separate category

for Pitney Hardin's own fee application preparation.  Guidelines Rule, II.D.1. states "[a] separate

project category should be used for ... fee application preparation."  Thus we asked Pitney Hardin

to please use a separate project category for time devoted to seeking its own compensation in the

future, and Pitney Hardin responded that it would do so.

4.        In the initial report we noted that during the Application Period there were major

problems with timekeepers Rose, Hatfield, Marchetta, and Purrington lumping their time entries.

Rule 2016-2(d)(vii) provides that "[a]ctivity descriptions shall not be lumped – each activity shall

have a separate description and a time allotment."  Likewise, Paragraph II.D.5. of the Guidelines

states that ". . . [s]ervices should be noted in detail and not combined or "lumped" together, with

each service showing a separate time entry; . . ."  To illustrate, in the initial report we included, in

a list attached hereto as Exhibit A, several of the numerous examples of lumping in the Application.

5.       In the initial report we stated that the time entries set forth in Exhibit A are not the

only instances of lumping by these timekeepers, nor are these timekeepers the only ones at Pitney Hardin who lumped their time entries during the Application Period.  We noted that the lumping of time entries in the Application is unusually severe and needs to be corrected.  We warned Pitney Harding that its professionals must avoid such lumped entries, or we in the future we would recommend reduction in fees for such lumping.  Pitney Harding responded that it would "attempt to avoid lumping of time entries to the greatest extent possible."  While we do not recommend any reduction solely for lumped entries in the Application, this lumping was a factor in a reduction recommended below.

6.       In our initial report we noted instances of inadequate detail from timekeepers Florence, Marchetta, Scordo, Wasserman, and Jasket.  Local Rule 2016-2(d) directs fee applicants to "include activity descriptions which shall be sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable, and necessary".  We noted that while inadequate detail was not as pervasive a problem as the lumping cited above, we requested that Pitney Hardin advise these timekeepers to be more consistent in providing the required level of detail.  Pitney Hardin responded that: "As requested, we have advised all timekeepers to be as detailed as possible in all time entries." While we do not recommend any reduction in fees solely for this inadequate detail, this inadequate detail was a factor in a reduction recommended below.

7.       We note that Pitney Hardin billed 111.2 hours for $30,635.50 in fees in the project category of "Internal Office Meetings", which constituted 22% of the total fees billed in this interim period.  In our initial report we noted that in January Pitney Hardin billed 38.9 hours for $11,813.50 in fees for "Internal Office Meetings" in the January invoice. This constituted more than 30% of the $38,823.00 in fees requested for the month, a considerably higher percentage than in subsequent

months.  Paragraph I.E. of the Guidelines instructs the court to consider "whether the services were

necessary to the administration of, or beneficial towards the completion of, the case at the time they

were rendered" and "whether services were performed within a reasonable time commensurate with

the complexity, importance, and nature of the problem, issue, or task addressed."  Thus in our initial

report we asked Pitney Hardin to explain why "Internal Office Meetings" took up such a substantial

proportion of the firm's activities and how these meetings were necessary or beneficial within the

context of the case.  Pitney Hardin responded that:

> The matters billed in the Fourth Interim Fee Application required more attorney conferences as a
> result of various developments in the matters being handled for the debtor including, for example,
> (a) problems with the Herman's warehouse facility which caused the real estate attorneys and
> litigators to have to constantly review the developing situation to determine how best to proceed
> with the facility's tenants. As noted in your item 11, time was spent preparing a complaint as against
> one tenant, Gemini.  That complaint ultimately was not filed because of a last minute settlement
> with the tenant; (b) in Lampetr there were constant discussions between Mr. Scordo and myself
> because of problems in trying to finalize a settlement with the landlord of the property; (c) in the Weja
> matter, there has been continuing follow up and conferences because of our inability to get an
> opinion issued by the Court, despite the fact that the trial ended more than two years ago; (d) In
> Superfund, conferences were necessary because of the need for considerable strategy sessions
> involved with federal appellate briefing issues; (e) finally, I have been the partner in charge of and
> have represented the debtor for more than 12 years, and I oversee the various matters and report and
> advise the Company on all issues involving such cases as necessary.  This causes me to confer with
> attorneys working on all matters.

We have reviewed this response, but are still concerned about the time involved in these meetings,

particularly since the pervasive inadequate detail and lumping of the time entries often makes it

difficult to discern what was involved in these conferences.  Because of the combination of these

factors, we recommend a reduction of 20% of this time for these meetings, for a reduction of

$6,127.10 in fees.

### Specific Time and Expense Entries

8.    In our initial report we noted that the Application does not indicate the amount

charged for photocopying, and the Application's summary of expenses does not include a specific

line item for facsimile transmissions (nor are line items for faxes found in the monthly invoices).

Local Rule 2016-2(e) limits per-page photocopying charges to $0.15 and per-page charges for

outgoing faxes to $1.00. Thus we asked Pitney Hardin to please indicate the rate it used to calculate

copying charges, as well as the per-page rate, if any, that it charges for outgoing faxes. Furthermore,

the Application does not explain what constitutes a miscellaneous expense. In addition, we asked

Pitney Hardin to please itemize the $4,245.78 of charges denominated "Travel and Miscellaneous

Expense".  Pitney Hardin responded:

> We charge the debtor 14 cents per page for photocopying and do not charge for outgoing faxes. On
> occasion, we charge 20 cents per page for incoming faxes.
> Regarding Travel, in the matter of Intercat bankruptcy, in which Grace was the largest unsecured
> creditor (approximately $23 million), in January $1,774.26 was charged for travel to Savannah,
> Georgia, air fare, one night in a hotel, business meals, cab fare, etc. in connection with a hearing at
> the bankruptcy court of Intercat, Inc.'s Disclosure Statement. $2,273.12 was also for travel to
> Savannah, Georgia, air fare, one night in a hotel, business meals, cabs, etc. for a hearing at the
> bankruptcy court on Intercat, Inc.'s Plan of Reorganization and settlement of threatened litigation
> against Grace.

We noted that this explanation only explains $4,047.38 of the $4,245.78 of charges denominated

"Travel and Miscellaneous Expense", and thus we asked Pitney Hardin to please provide the detail

for all of these charges.  We received and reviewed this detail, which is attached to the end of this

report as Response Exhibit 1, and we believe that this satisfies our concern.  We also asked Pitney

Hardin to tell us the total amount charged for faxes.  Pitney Hardin responded that its total charge

for faxes during the period covered by the Application was $16.20, and we have no objection to this

charge.

9.      In our initial report we noted that the expense detail for the Application indicates

"Document-Access Facility" charges totaling $5,856.88, $5,728.00, and $5,728.00 for January,

February, and March 2002, respectively. According to Paragraph II.E.3. of the Guidelines, "[u]nusual

items require more detailed explanations." Thus we asked Pitney Hardin to please explain the nature

of these charges, and, if they are charges for renting storage space, please indicate why it was necessary to rent additional space, whether the space was used solely for this case, and why these costs should not be considered overhead.   We also asked Pitney Hardin to please advise us whether these charges were approved by the Debtors in advance.  Pitney Hardin responded:

> The "Document Access Facility" charges were specifically approved by  the  debtor  and  have been extant for some time.  Pitney Hardin Kipp & Szuch  warehouses  for  the debtor all documents and discovery in all their matters  with  our office, including several large litigations, real estate files, involving  post  Chapter  11  proceedings for Herman's and Channel. This is not office space, but is a building given over to document storage, hence the term "Document Access Facility."

We then asked whether this "Document Access Facility" charge was a third party charge that was passed through at Pitney Hardin's cost.  Pitney Hardin responded:

> This is a building originally rented by the law firm in 1996 to house very large cases, primarily litigations, being handled by the firm for W.R. Grace.  Originally, only Grace matters were stored in the facility.  Some time later, additional litigation files were stored as well.  W.R. Grace is charged a percentage of the expenses based on the amount of space used by the particular matters.  This arrangement was approved by the debtor in 1996 because of the voluminous space needs for W.R. Grace litigations, and the high cost of using an outside document facility with attendant document retrieval costs.  This is a direct expense pass-through and there are no administrative or other charges attached to it.

This response satisfies our concern.

10.     In our initial report we noted that the January expense detail indicates the following charge:

Vendor: Paid Gann Law Books for service $305.42.

Paragraph II.E.7. of the Guidelines provides that "[o]verhead includes word processing, proofreading, secretarial and other clerical services, rent, utilities, office equipment and furnishings, insurance, taxes, local telephone and monthly car phone charges, lighting, heating and cooling, and library and publications charges.  Thus we asked Pitney Hardin to please explain the nature of this charge and why it should not be considered overhead.  Pitney Hardin responded:

> The $305.42 was a charge in connection with the asbestos proceedings transferred to Judge Wolin of Federal District Court in New Jersey. Judge Wolin appointed a Special Master, Judge William Dreier, concerning certain product liability issues. We supplied copies of Judge Dreier's book concerning product liability law to debtor's in-house counsel and outside counsel.

Thus we have no objection to this charge.

11.    In the initial report we noted that between 02/20/02 and 03/08/02, A. Marchetta ($410 per hour) and J. Scordo ($270 per hour) billed 10.4 hours at a cost to the bankruptcy estate of $3,172.00 for preparing for and drafting a complaint (see Exhibit B), yet the Application does not indicate that the complaint was ever filed. Thus we asked Pitney Hardin to please explain whether the complaint was filed and, if not, why it was necessary to spend time drafting it. We also asked Pitney Hardin to please explain why A. Marchetta's time entries indicate four conferences or work sessions with J. Scordo that are not reciprocally indicated in J. Scordo's time entries within the Gemini Sound Products Corp. category. A. Marchetta of Pitney Hardin responded that:

> [t]his was a litigation that was to be filed against the tenant of the debtor at the Herman's facility, Carteret, New Jersey, and after considerable work and negotiations with the client, the matter was settled and the complaint was never filed. As to time entries for A. Marchetta in which J. Scordo did not have a reciprocal time entry, Mr. Marchetta generally meets with Mr. Scordo in his office and makes his time entries contemporaneously. Mr. Scordo sometimes forgets to enter his time, and we do not correct such omissions by adding time. Also, in my discretion as the partner in charge, I sometimes do not bill other attorneys' time on conferences.

In light of this explanation, and have no objection to these charges.

12.    In our initial report we noted that on 03/13/02, J. Scordo ($270 per hour) billed .5 hour at a cost to the bankruptcy estate of $135.00 for organizing a file, as follows:

03/13/02        J. Scordo        0.5        $135.00        . . .; organize file and return to L. Reilly.

We asked Pitney Hardin why an attorney was billing for this type of ministerial task, and Pitney Hardin responded:

> The entry by Mr. Scordo on 3/13/02 for organizing the file was because Mr. Scordo is a litigation attorney and used the files of a real estate attorney for purposes of preparing a draft complaint

> concerning the Herman's tenant (Gemini).  Certain materials were removed from the file for the purposes of drafting the complaint by Mr. Scordo, and because the file needed to be maintained as part of the real estate department's files, and, given Mr. Scordo's familiarity with the contents of the file, we believe it was more appropriate for Mr. Scordo, rather than a secretary, to reorganize the file.

We believe that this explanation only establishes that it was convenient for Mr. Scordo to organize this file, not that it was necessary.  We still believe that this is a ministerial task for which Pitney Hardin cannot charge, and recommend a reduction of $135.00 in fees for this charge.

13.    In our initial report we noted that between 1/31/02 and 2/28/02, Pitney Hardin billed the estate $27,299 for 130.2 of time spent on the "Weja, Inc." matter.  We note that all but eight of the entries refer to closing arguments, and the eight that do not refer explicitly to closing arguments nonetheless appear to relate to the preparation thereof.  Subsequently, from 3/06/02 to 3/29/02, W. Hatfield ($240 per hour), A. Marchetta ($410 per hour), R. Rose ($350 per hour), and S. Purrington ($90 per hour) billed another 52.4 hours at a cost to the bankruptcy estate of $13,529 for further work on closing argument issues.  See Exhibit C.  All told, from 1/31/02 to 3/29/02, Pitney Hardin spent 182.6 hours and $40,828 on the preparation of closing arguments, and as of the end of the Application Period, Pitney Hardin had not billed for actually conducting closing arguments, suggesting that there may be additional time in subsequent months.  Thus we asked Pitney Hardin to please explain the relevant issues, why it was necessary to spend so much time on these closing arguments, and whether there would be additional charges in subsequent invoices for this matter. Pitney Hardin responded:

> The matter of W.R. Grace v. Weja is an environmental cost remediation recovery action which was tried in the Hudson County Superior Court from February 7, 2000 to March 14, 2000 which initially involved six parties.  At issue was over $2.5 million of past and estimated future clean-up costs on a Grace site in Jersey City, New Jersey, which had been contaminated with gasoline by tenants who owned or operated a gas station on the site over a period of fifteen years.  Following final submission of the case to the judge for decision, the matter sat for a period of almost two years.  As a result of continued prodding of the court, the judge decided he would like to conduct closing arguments despite the fact that written findings of fact and conclusions of law had been

> submitted to the court following the trial.  As a result, the attorneys had to refamiliarize themselves
> with the entire record of the case, which had taken six weeks to try  for  purposes  of  the  closing
> arguments.   There  will  be  time  in subsequent invoices for the actual final briefing and closing
> arguments.

We believe this response satisfies our concern.

14.    In our initial report we noted that between 2/26/02 and 3/22/02, A. Marchetta ($410 per hour), S. Zuber ($295 per hour), M. Zelenty ($350 per hour), P. Forgosh ($365 per hour) and R. Rutherford ($245 per hour) billed 14.9 hours at a cost to the bankruptcy estate of $4,195.50 for work on a warrant/escrow agreement.  It does not appear that work on this agreement was finalized during this billing period.  Thus we asked Pitney Hardin to please explain the relevant issues and why it was necessary to spend so much time and involve so many attorneys on this warrant/escrow agreement and whether there are additional charges in subsequent invoices.  Pitney Hardin responded:

> Work on the proposed agreement was an integral part of the negotiated  consensual  plan  in Intercat,
> Inc.  Under Intercat's plan, Grace, as  the largest unsecured creditor (approximately $23 million) is
> scheduled  to  receive  100%  of  its claim plus interest. As security for Intercat's obligations, we were
> able to negotiate confessions of judgment and stock warrants  to be held in escrow.  Given the size
> of the indebtedness,  and the number of parties involved, we believe that the time spent  working on
> and drafting the appropriate warrant/escrow agreement was appropriate.

We understand this explanation, and have no objection to these charges.

## CONCLUSION

15.    Thus, we recommend approval of fees totaling $130,255.00 ($136,517.10  minus $6,262.10) and costs totaling $26,231.48 for Pitney Hardin's services from January 1, 2002, through March 31, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____

Warren H. Smith
Texas State Bar No. 18757050
Mark W. Steirer
Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 31st day of July, 2002.

_____
Warren H. Smith

# SERVICE LIST

Notice Parties

**The Applicant**

Anthony J. Marchetta, Esq.
Pitney, Hardin, Kipp & Szuch, LLP
P.O. Box 1945
Morristown, NJ 07962-1945

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**
Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**
Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

Exhibit A

| Date | Timekeeper | Hours | Fees | Description |
|------|-----------|-------|------|-------------|
| 01/18/02 | A. Marchetta | 1.8 | $ 738.00 | Review information regarding Drier appointment; forward information to client regarding same; work on same; telephone call with W. Corcoram and R. Beber regarding Drier appointment and strategy regarding same; telephone call to Dr. Bernick; forward decisions of Drier to client. |
| 02/07/02 | R. Rose | 2.0 | $ 700.00 | Telephone from Court concerning proposed dates for closing arguments; telephone conference with F. Biehl concerning same; telephone Court and forward letter confirming date; discuss preparation for same with B. Hatfield; begin review of trial materials. |
| 02/18/02 | W. Hatfield | 7.5 | $1,800.00 | Strategy session meeting with R. Rose on closing; revise outline; address pre-judgment interest issues; address time line and draft case damages chart; direct S. Purrington on issues for same; draft of closing points regarding Weja defenses; review trial testimony on UST ownership and registration issues. |
| 02/18/02 | S. Purrington | 7.9 | $ 711.00 | Review trial transcripts for all sustained objections during testimony. Prepare powerpoint slide with new version of time line. Prepare charts for Plaintiffs' damages. Confer with W. Hatfield regarding same. |

Exhibit B

| Date | Timekeeper | Hours | Fees | Description |
|---|---|---|---|---|
| 02/20/02 | A. Marchetta | 0.5 | $ 205.00 | Conference with client, J. Scordo and L. Reilly regarding suit. |
| 02/21/02 | A. Marchetta | 0.4 | $ 164.00 | Work with J. Scordo regarding complaint and follow up with client. |
| 02/25/02 | A. Marchetta | 0.2 | $ 82.00 | Conference with J. Scordo and client regarding complaint. |
| 02/25/02 | J. Scordo | 0.6 | $ 162.00 | Leave voice mail for H. Pearson; phone calls with A. Nagy and A. Marchetta regarding same. |
| 02/26/02 | A. Marchetta | 0.2 | $ 82.00 | Follow up regarding complaint. |
| 02/27/02 | A. Marchetta | 0.5 | $ 205.00 | Follow up with L. Reilly and J. Scordo regarding complaint. |
| 03/04/02 | J. Scordo | 4.4 | $1,188.00 | Review and analyze correspondence; draft and revise complaint. |
| 03/05/02 | A. Marchetta | 0.2 | $ 82.00 | Follow up with J. Scordo regarding complaint. |
| 03/06/02 | J. Scordo | 2.8 | $ 756.00 | Draft, revise and finalize first draft of complaint. |
| 03/08/02 | A. Marchetta | 0.6 | $ 246.00 | Review draft complaint; . . . |

Exhibit C

| Date | Timekeeper | Hours | Fees | Description |
|------|-----------|-------|------|-------------|
| 03/06/02 | W. Hatfield | 0.7 | $ 168.00 | Address outline for closing argument. |
| 03/11/02 | A. Marchetta | 0.4 | $ 164.00 | E-mails regarding damages claim and court closings regarding same. |
| 03/12/02 | A. Marchetta | 0.2 | $ 82.00 | Conference with R. Rose regarding damages at closing. |
| 03/12/02 | W. Hatfield | 0.2 | $ 48.00 | Address costs and fees issues and closing argument issues. |
| 03/15/02 | W. Hatfield | 0.3 | $ 72.00 | Attend to closing argument issues. |
| 03/18/02 | A. Marchetta | 0.4 | $ 164.00 | Follow up on closing regarding information for client. |
| 03/19/02 | W. Hatfield | 0.2 | $ 48.00 | Attend to closing argument matters; memo to S. Purrington on same. |
| 03/20/02 | W. Hatfield | 2.0 | $ 480.00 | Attend to closing argument outline; . . .; review and revise initial arguments on closing. |
| 03/21/02 | W. Hatfield | 4.3 | $1,032.00 | Attend to preparations for closing argument; . . .; discuss closing arguments - open legal issues in case; . . .; attend to demonstrative exhibit issues. |
| 03/22/02 | R. Rose | 1.1 | $ 385.00 | Review draft of exhibits to be enlarged for closing arguments with B. Hatfield; . . .; discuss preparations for closing arguments with B. Hatfield. |
| 03/22/02 | W. Hatfield | 7.0 | $1,680.00 | Attend to preparations on closing arguments; . . .; attend to demonstrative exhibits; direct S. Purrington on work for closing. |
| 03/22/02 | S. Purrington | 1.6 | $ 144.00 | Meet with B. Hatfield regarding closing arguments; . . . |
| 03/23/02 | W. Hatfield | 5.0 | $1,200.00 | Prepare outline and address exhibit references; . . . |
| 03/25/02 | R. Rose | 2.0 | $ 700.00 | Review draft of closing argument. |
| 03/25/02 | W. Hatfield | 1.4 | $ 336.00 | . . .; review memo from S. Evans on Weja exhibit issues; review new demonstrative exhibits for closing. |
| 03/26/02 | R. Rose | 3.0 | $1,050.00 | Continue review of initial draft of summation; discuss revisions with B. Hatfield; review exhibits to be used in summation; . . . |
| 03/26/02 | W. Hatfield | 1.5 | $ 360.00 | Prepare for closing arguments; confer with R. Rose on strategy and draft outline of argument; . . . |

| 03/27/02 | W. Hatfield | 2.6 | $  624.00 | Attend to revisions of closing argument outline. |
| 03/28/02 | W. Hatfield | 8.3 | $1,992.00 | Attend to closing argument issues; . . . continue revisions to closing outline. |
| 03/29/02 | R. Rose | 3.2 | $1,120.00 | Discuss revised summation outline with B. Hatfield and begin review of same; . . . |
| 03/29/02 | W. Hatfield | 7.0 | $1,680.00 | Revise and edit closing argument outline; . . . |

Exhibit D

| Date | Timekeeper | Hours | Fees | Description |
|------|-----------|-------|------|-------------|
| 02/26/02 | S. Zuber | 0.3 | $ 88.50 | Telephone conversation with D. Posner post-confirmation issues, including payment schedule and warrant agreement. |
| 02/26/02 | S. Zuber | 0.3 | $ 88.50 | Telephone conversation with I. Greene regarding warrant agreement and clarification of certain post-confirmation obligations of the Debtor. |
| 03/05/02 | A. Marchetta | 0.3 | $ 82.00 | Conference with S. Zuber regarding comments on warrant agreement; follow up with A. Chan regarding same. |
| 03/08/02 | S. Zuber | 0.2 | $ 59.00 | Telephone conversation with I. Greene regarding warrant agreement. |
| 03/13/02 | S. Zuber | 1.3 | $ 383.50 | Receipt, review, analyze and revise draft Escrow Agreement, including discussions with M. Zelenty and R. Rutherford, and meeting with R. Rutherford. |
| 03/13/02 | M. Zelentry | 0.4 | $ 140.00 | Review draft escrow agreement. |
| 03/13/02 | R. Rutherford | 3.2 | $ 784.00 | Review and revisions to Escrow Agreement. |
| 03/14/02 | S. Zuber | 2.2 | $ 649.00 | Continued revision of warrant (escrow) agreement. |
| 03/14/02 | R. Rutherford | 1.7 | $ 416.50 | Review and revisions to Escrow Agreement. |
| 03/16/02 | S. Zuber | 1.4 | $ 343.00 | Revisions to Escrow Agreement. |
| 03/18/02 | S. Zuber | 0.3 | $ 88.50 | Discuss warrant agreement with A. Marchetta. |
| 03/18/02 | S. Zuber | 1.2 | $ 354.00 | Continued review and revision of warrant agreement, including discussion with R. Rutherford regarding same. |
| 03/18/02 | A. Marchetta | 0.5 | $ 205.00 | Conference with S. Zuber regarding escrow agreement and filings. |
| 03/18/02 | R. Rutherford | 0.9 | $ 220.50 | Review and revisions to Escrow Agreement. |
| 03/22/02 | S. Zuber | 0.3 | $ 88.50 | Discuss Escrow Agreement and Board issues with A. Marchetta. |
| 03/22/02 | A. Marchetta | 0.4 | $ 164.00 | Conference with S. Zuber regarding escrow agreement; follow up regarding same. |

<u>Response Exhibit 1</u>

11/21/01  Scott Zuber Amtrak for meeting with client in Columbia, MD re
Intercat matter              $ 445.00
10/01        Scott Zuber Car service re hearing in Savannah on Intercat
                $ 124.00
1/7/02        Scott Zuber airline ticket for travel to Savannah on
1/10-11, 2002 for Intercat court hearing          $ 1122.50
1/11/02        Scott Zuber change of flight cost
                $ 98.50
1/11/02        Scott Zuber Hyatt Savannah
        $ 23.12
1/11/02        Scott Zuber Hyatt Regency in Savannah
                $ 194.40
1/10/02        Scott Zuber food at NewarkAirport
        $ 17.06
1/11/02        Scott Zuber car service for trip to Savannah
                $ 124.00
12/16-17,01    Scott Zuber Intercat Savannah meals and misc. expenses
                $ 71.10
1/10-11, 02    Scott Zuber Intercat Savannah meals and misc. expenses
                $ 53.44


12/4/02        AJM Car service to Penn Station for Columbia, MD meeting
with client on Intercat issues.          $ 98.90
12/4/02        AJM Car service from Penn Station home after meeting with
client in Columbia, MD          $ 98.90
12/11/02  Scott Zuber travel on Continental Airlines to Savannah, GA for
hearing on Intercat          $ 1122.00
12/16-17/02    Scott Zuber Hotel in Savannah
        $ 142.00
12/16-17/02    Scott Zuber meals in Savannah
        $ 174.46
12/4/02        Scott Zuber parking in Newark for trip to Columbia, MD
                $ 14.00
12/16-17/02    Scott Zuber car service for trip to Savannah
                $ 124.00


2/1/02        AJM Meeting in Cinammonson with R. Weinroth and Shinn
dinner                $ 136.95


2/20-21, 02    Scott Zuber hearing in Savannah Meals and other misc.
expenses          $ 61.45