1

2                       UNITED STATES BANKRUPTCY COURT
3                          DISTRICT OF DELAWARE

4                                    .
      IN RE:                         .       Chapter 11
5                                    .
      W.R. Grace & Co., et al.,      .
6                                    .
              Debtor(s).             .       Bankruptcy #01-01139 (JKF)
7     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8                              Wilmington, DE
                               July 22, 2002
9                               9:56 a.m.

10                      TRANSCRIPT OF MOTIONS HEARING
                BEFORE THE HONORABLE JUDITH K. FITZGERALD
11                    UNITED STATES BANKRUPTCY JUDGE

12    APPEARANCES:

13    For Debtor:                    David W. Carickhoff, Jr., Esq.
14                                   Pachulski, Stang, Ziehl,
                                     Young & Jones
15                                   919 North Market Street
                                     Wilmington, DE 19801
16
                                     James W. Knapp, Esq.
17                                   Kirkland & Ellis
                                     200 E. Randolph Drive
18                                   Chicago, IL 60601

19                                   David Bernick, Esq.
                                     Kirkland & Ellis
20                                   200 E. Randolph Drive
                                     Chicago, IL 60601

21                                   Janet S. Baer, Esq.
22                                   Kirkland & Ellis
                                     200 E. Randolph Drive
23                                   Chicago, IL 60601

24

25

2

```
 1                              James J. Restivo, Jr., Esq.
                                Reed Smith
 2                              435 Sixth Ave.
                                Pittsburgh, PA 15219
 3
                                Paul J. Norris, Esq.
 4                              W.R. Grace
                                In-House Counsel
 5
                                David B. Siegel, Esq.
 6                              W.R. Grace
                                In-House Counsel
 7
                                Brian McGowan, Esq.
 8                              W.R. Grace
                                In-House Counsel
 9
      For Unsecured Creditor's:  Kenneth Pasquale, Esq.
10    Committee                 Stroock, Stroock & Lavan, LLP
                                180 Maiden Lane
11                              New York, NY 10038

12    For Zonolite Plaintiffs:  William Sullivan, Esq.
                                Elzufon, Austin, Reardon,
13                              Tarlov & Mondell, PA
                                Ste. 1700
14                              300 Delaware Ave.
                                Wilmington, DE 19801
15
      For Equity Security Holders: James C. McCarroll, Esq.
16    Committee                 Kramer, Levin, Naftalis
                                & Frankel, LLP
17                              919 Third Ave.
                                New York, NY 10022
18
      For PD Committee:         Rick Miller, Esq.
19                              Ferry, Joseph & Pearce, PA
                                824 Market Street
20                              Wilmington, DE 19899

21    For Asbestos PI Committee: Matthew Zaleski, III, Esq.
                                Campbell & Levine, LLC
22                              1201 North Market St.-Ste. 1501
                                Wilmington, DE 19801
23
      For                       Joseph Grey, ESq.
24                              Stevens & Lee
                                300 Delaware Ave.-Ste. 800
25                              Wilmington, DE 19801
```

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191 

3

```
 1   For Wesconn:                    William W. Erhart, Esq.
                                     William W. Erhart, PA
 2                                   300 Delaware Ave.-Ste. 1130
                                     Wilmington, DE 19899
 3
     For ZAI Claimants:             Elizabeth J. Cabraser, Esq.
 4                                   Lieff, Cabraser, Heimann
                                     & Bernstein, LLP
 5                                   Embarcadero Center West
                                     275 Battery St.-Ste. 3000
 6                                   San Francisco, CA 94111

 7                                   Thomas M. Sobol, Esq.
                                     Hagens, Berman, LLP
 8                                   225 Franklin Street-26th Fl.
                                     Boston, MA 02110
 9
                                     Edward J. Westbrook, Esq.
10                                   Richardson, Patrick, Westbrook
                                     & Brickman, LLC
11                                   174 E. Bay Street
                                     Charleston, SC 29401
12
                                     Allan McGarvey, Esq.
13                                   McGarvey, Heberly
                                     Kalispell, Montana
14
     For EAIC:                      Scott Talmadge, Esq.
15                                   Clifford, Chance, Rogers
                                     & Wells
16                                   200 Park Ave.
                                     New York, NY 10166
17
     Audio Operator:                Virginia L. Akin
18
     Transcribing Firm:            Writer's Cramp, Inc.
19                                   6 Norton Rd.
                                     Monmouth Jct., NJ 08852
20                                   732-329-0191

21   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
22

23

24

25
```

4

1    THE COURT:  There is an agenda this morning.  I
2    understand that Items 1,2 and 3 have been continued until next
3    month's calendar and earlier this morning I signed the Order
4    that's attached to the Certificate of Counsel on Agenda Item
5    #5, which is the Debtor's Motion to Assume and Assign a Prime
6    Lease.  And I believe that's all.  Everything else, I think,
7    is still on the calendar.
8         MR. BERNICK:  That's right.  David Bernick for Grace.
9    With respect to uncontested matters, what is reflected as #4
10   uncontested, is now contested, so maybe we can pick that up
11   when we begin with the contested matters.  Item #6, which was
12   our Estimated Litigation Budget for the ZAI Science Trial,
13   there has been no objection and I have an Order.  I circulated
14   copies to counsel here, and here's an Order for the Court to
15   approve that budget for Item 6.
16        THE COURT:  All right.  This is just the Debtors'
17   budget, or --
18        MR. BERNICK:  Just the --
19        THE COURT:  -- or everybody's?
20        MR. BERNICK:  -- Debtors'.
21        THE COURT:  Okay.  I have -- I think I want to talk
22   about that before I --
23        MR. BERNICK:  Okay.
24        THE COURT:  -- approve that budget.  Okay.
25        MR. BERNICK:  I guess that would bring us back, then,

1 to Item 4 as being the first contested matter.  This relates

2 to the Revised Compensation Program, and as Your Honor can see

3 from the papers, only one constituency has objected to this

4 package, that's the PD Committee, and it's our position that

5 the objection that's been made is facially defective and for

6 the following reasons.

7      The Debtor in this case followed a textbook business

8 judgment process in the course of coming up with this Revised

9 Compensation Package.  Grace retained an outside consultant

10 from Deloitte, Touche who's got specific expertise with regard

11 to dealing with mass tort Chapter 11 debtors.  That

12 individual, Mr. Bubnovich, developed a series of

13 recommendations about what the Revised Compensation Package

14 should be.  It came on for them -- the development by the

15 Compensation Committee of Grace's Board of Directors, and that

16 Committee is comprised wholly of outside directors.  There's

17 no inside director and there's no individual who would be

18 affected by this compensation package.  So it's a totally

19 disinterested group of people.  The Compensation Committee put

20 together the revisions based upon the recommendations of Mr.

21 Bubnovich, and I believe that the -- ultimately it was

22 approved by the full board, but in any event, the Compensation

23 Committee's say so with regard to such matters is dispositive

24 in this area.  This process was completely informed, outside

25 consultants were involved, a completely disinterested decision

1  was made.

2        The Company, of course, went even further and sought

3  to obtain the concurrence of the Committees in this case.   A

4  presentation of this package was made to the Committees,

5  including their financial advisors, on the 12th of March.   The

6  PD Committee was represented in connection with that

7  presentation.   They had a financial advisor who was present.

8  The Company responded to questions that were posed and revised

9  this package based upon the input of the Committees, in order

10 to come out with the final package that's now before the

11 Court.

12        Our Motion was filed, and of course the PD Committee

13 alone has objected, and they criticize, really, all aspects of

14 this Revised Compensation Package.   What's notable, however,

15 is the absence of support for this objection and absence of

16 anything that would implicate the application of the Business

17 Judgment Rule.   There is no affidavit even from the PD

18 Committee's own financial advisor taking issue with this.

19 There's no affidavit of any expert in the field of

20 compensation that says that these decisions were improper.

21 And there's no fact that's been produced to this Court that

22 would say that this process was poorly informed or -- would

23 say that this process was affected by self-dealing.   This is a

24 classic case of the Business Judgment Rule.

25        The real beef, as we can see from the papers that

1    have been filed by the PD Committee, is that they're unhappy

2    with the fact that Grace has now intervened in connection with

3    the fraudulent conveyance litigation.   That intervention was

4    predicated upon an absolute right to intervene, but is in any

5    event entirely irrelevant for matters that are now before the

6    Court.   Essentially, they are unhappy and they now seek to

7    second-guess these decisions that were made.   They essentially

8    ask the Company to dare its own employees to leave.   It says,

9    "they haven't left yet, well let's see if they do" before the

10   Company is able to take action to preserve a business that all

11   constituencies have an interest in preserving.

12          This effort to second-guess without some

13   demonstration that the Business Judgment Rule cannot be

14   applied is foreclosed by the Rule.   Strategic objections are

15   not permissible under the Business Judgment Rule, and we don't

16   believe that the Court should even reach the issues that they

17   pose on the merits because they have not been able to

18   demonstrate that the Business Judgment Rule should not apply.

19   I am prepared to take up any and all questions that the Court

20   has with regard to particular features of the package, but we

21   don't believe this objection rises to that level.

22          THE COURT:   All right.   Who wants -- for the Property

23   Committee, who wants to speak?

24          MR. SACKOLOW:   Good morning, Your Honor.   Jay

25   Sackolow on behalf of the Asbestos Property Damage Committee.

1   Your Honor, the first point I want to make is that the Debtors

2   did meet with our financial advisors.  The financial advisors

3   did point out issues that the Property Damage Committee had

4   with the package.  The Debtors did try to address certain of

5   those issues, they did not address all of them, and the plan

6   that was put forth does not address all of our issues.

7         I'd like to begin with just a few illuminating

8   comments about certain parts of the program that I think you

9   should be aware of and why the Debtors have not met the burden

10  of sustaining why they need to implement revised compensation

11  procedures.  There's essentially four --

12        THE COURT:  Well, how am I going to challenge the

13  Debtors' business judgment from a Response that's not

14  supported by any evidentiary material?  I mean, that -- Mr.

15  Bernick is quite correct.  There is nothing that supports

16  anything other than an argument that this appears to be too

17  rich.  That's what the Response says.  This looks like it's

18  too rich.

19        MR. SACKOLOW:  Understood, Your Honor.  We did not

20  have the chance to depose their experts.

21        THE COURT:  Well, why not?  How long has it been

22  since this process has gone on?

23        MR. SACKOLOW:  The objection was filed on July 5th.

24        THE COURT:  The objection was filed on July 5th.

25  When was the Motion file?

1          MR. SACKOLOW:  I believe at the end of June.  I don't
2   remember the exact date, Your Honor.
3          THE COURT:  And how long was the process in place?
4          MR. SACKOLOW:  The -- the meeting was held in March
5   of 2002.  We did not see a motion until June of 2002.  Based
6   upon the Debtors' stated confidentiality reasons, they were
7   not -- they did not present us the presentation that they gave
8   to our financial advisors.  Our financial advisors were not
9   able to share that with us.  The Debtors did attach to their
10  Reply that they filed to our Response, but we were not
11  entitled to that information prior to them filing that Reply.
12  We didn't have the opportunity to take depositions of their
13  experts prior to the -- us filing our objection.
14         THE COURT:  Okay.  Go ahead.
15         MR. SACKOLOW:  A couple of the interesting aspects,
16  Your Honor.  The General Retention Program.  The Debtors are
17  seeking to increase it by 50%, almost 50%, over the existing
18  number from 4.6 million up to $6.7 million.  Over the past
19  year, only 5 of 116 employees, according to the Debtors, have
20  left their employ.  This is entirely consistent with their
21  general attrition rates prior to the bankruptcy.  It appears,
22  without a doubt, that their current program is paying their
23  employees a sufficient amount to make them desire to stay with
24  the Debtors.
25         Also interesting with respect to the increase, it

1   appears from their attachment to the -- Exhibit-A to their

2   Reply, that the lion's share of the increase of this Retention

3   Program is going to tier 1 employees.  It's a group that

4   appears to consist of 18 employees which we believe are the

5   top management of the Debtors.

6         Another component of the revised compensation

7   procedures are the long-term incentive program that's existing

8   that was passed on the petition date by Judge Farnin and

9   approved in June as -- June of 2001 as a Final Order.  They're

10  seeking to revise that and they're seeking to implement a new

11  long-term incentive program.  This is a program that rewards

12  people for reaching certain goals of earnings before interest

13  and taxes.  Under the existing program it's currently being

14  paid 50% in cash, 50% in stock.  The Debtors are seeking to

15  retroactively go back and change the existing program to be

16  100% in cash and eliminate the stock component.  The Debtors

17  argue that it's a decreased stock price as a result of the

18  bankruptcy that is causing them to have to go back and pay

19  everybody in cash now as opposed to stock.  I would wonder

20  what their stock would be doing outside of bankruptcy, given

21  the market that we're all in.

22        THE COURT:  Well, I am somewhat in agreement that

23  this program should not be retroactively changed.  It was

24  approved by Final Order before, it's not appealable, and I

25  don't see a retroactive change, and Mr. Bernick, I think the

1    Debtor has to live with what the Debtor did.  Now, going

2    forward, that's a different issue.  But I don't see a

3    retroactive change.

4         MR. SACKOLOW:  Now, on the new -- on the 2002-2004

5    Long-Term Incentive Plan, as the Debtors call it, the Debtors

6    are seeking also to pay this all out in cash as opposed to

7    stock.  Importantly, what the Debtors are seeking to do is

8    they're seeking to reduce the target earnings growth rate from

9    10% to 6%, a reduction of 40%.  The Debtors argue that this is

10   the proper way of doing it, because 6% is the average

11   historical growth rate of their peers in the industry.  It

12   strikes me as odd, and strikes our Committee as odd, that the

13   historical growth rate of its peers is what they would base it

14   upon, as opposed to their own historical growth rate.  They're

15   now targeting their bonuses to their peers' growth rate, as

16   opposed to their own growth rate.

17        The effect of this, of changing it from a stock

18   component to a cash component, has a potential effect of

19   upwards of 6 to $9 million per year for the current year, and

20   according to the Debtors' own numbers, could be a difference

21   of 12 to $20 million per year additional cashout of the

22   Estate.

23        It's important to understand that because of where we

24   are right now in the bankruptcy.  We're at a point the Debtors

25   haven't begun talking to the Asbestos Committees about a plan

1    of reorganization.  We have all the Zonolite issues on the

2    table.  We have the fraudulent transfer issues on the table.

3    Debtors have not done anything to move this bankruptcy beyond

4    their litigation protocols that they keep trying to institute,

5    but now at the same time, what they're trying ensure is that

6    additional cash will come out of the Estate to pay to their

7    employees, to pay their top management.  Your Honor, the PD

8    Committee submits that this cannot be permissible.

9        THE COURT:  All right.  Does anyone else wish to

10   speak in objection first?

11       ALL:  (No verbal response)

12       THE COURT:  Okay.  Mr. Bernick?

13       MR. BERNICK:  I think that the materials that have

14   been submitted to the Court respond to the issues that were

15   raised in connection with the General Retention Program.  I

16   would note that Mr. Sackolow talks about the fact that the

17   recipients of a lot of this benefit would be the top

18   executives of the company and, of course, as we've indicated

19   to the Court, the top executives of this company, even with

20   this package, are only in the 50 to 75th percentile of

21   compensation in reference to their peers.  This is not a

22   company that's passing out money above and beyond what the

23   marketplace would indicate to its top people.

24       With regard to the reduction in the target growth

25   rate from 10 to 6%, it's easy for counsel to raise issues with

1  that, but the fact of the matter is that our expert indicated,

2  and the data supports him, that the 10% is simply unrealistic

3  in this environment.  You don't set an incentive performance

4  level that people have no realistic ability to meet.  And

5  that's exactly why you take a look at your competition to see

6  what performance goals are being set within the industry,

7  because it's in the industry that people have alternatives to

8  go out and get other jobs.  And that review showed an average

9  of 5.8 to 5.9, which makes the 6% target totally reasonable.

10         At the end of the day, Mr. Sackolow comes back to

11  what really is the essence of the -- their objection.  The

12  essence of their objection is that we oughta use this

13  compensation, and employee compensation generally, to act as a

14  hostage for where they believe this case should go, and that

15  is not the purpose.  The purpose is to maintain the value of

16  the business.  You don't sit there and gamble with the value

17  of the business because you don't like the direction that the

18  case is pursuing.  And very meaningfully, it is the PD

19  Committee and the PD Committee alone which has objected.  The

20  Bodily Injury Committee has exactly the same concerns, they

21  have the -- they have different, but also contrary strategic

22  objectives in this case.  They are not here making any kind of

23  objection.

24         MR. BAENA:  Judge, may I add something?  Judge, you

25  know, using a peer group for purposes of deciding what the

1  appropriate level of compensation in bankruptcy is is a

2  particularly slippery slope if you don't analyze what the peer

3  group is and where that peer group is in its own

4  reorganization exercises.  That's why it's particularly

5  appropriate to consider the fact that we have not moved this

6  case any further along to reorganization on a consensual

7  basis.  And I think it's entirely appropriate for the Court to

8  consider the fact that in this case --

9       THE CLERK:  Judge, excuse me.  We're not sure he's

10  recording.  Can we take a break?  Sorry, Mr. Baena.

11       MR. BAENA:  Only when I speak.

12    (Laughter)

13    (Pause in proceedings)

14       THE COURT:  Are you ready?

15       THE CLERK:  Yes, Judge.

16       THE COURT:  Okay.  We're currently back in business.

17  Mr. Baena, you were saying that --

18       MR. BAENA:  Yes.

19       THE COURT:  -- this case is not moving along on a

20  consensual basis.

21       MR. BAENA:  It's not moving along on a consensual

22  basis, Your Honor, and as a consequence, one absolutely

23  fundamental showing that this Debtor needs to make to support

24  this application can't be made.  And they haven't made it.

25  And that is what they expect their Unsecured Creditors will

1   receive in this case.  Absent that showing, I think it would

2   be improvident to approve the application.  And Judge, let's

3   keep in mind that they already have a plan in place.  This

4   isn't an instance where we're saying no Key Employee Retention

5   Program at all.  They have a program.

6          Finally, Your Honor, in defining their --

7          THE COURT:  Doesn't the existing plan expire?  I

8   think it expires at the end of the year or something like

9   that.  So, yes, there is a plan in place until the end of the

10  year, but not thereafter.  Isn't that correct?

11         MR. SACKOLOW:  I believe the Long-Term Incentive

12  Program is through 2003.  The existing program.  It's a 2-year

13  plan, I believe.

14         MR. BAENA:  I don't believe anything that we're

15  talking about expires this year, Judge.

16         THE COURT:  Okay.  Can we verify that?

17         MR. BERNICK:  The Retention Plan expires at the end

18  of this year, and the Long-Term Plans, as I understand them,

19  cover a more extended period of time, but there are features

20  that kick in each year, so that you're really kind of going

21  with rolling 3-year periods of time.

22         MR. BAENA:  Judge --

23         THE COURT:  And when is the existing plan --

24         MR. BERNICK:  Well --

25         THE COURT:  -- over?

1    MR. BERNICK:  -- the existing plan covers a period of

2  time up through -- the Long-Term -- the LTIP goes from 2001 to

3  2003 and the proposed LTIP goes from 2002 to 2004.  So we're

4  picking up a portion of the old and going on to the new.

5    THE COURT:  Okay.

6    MR. BAENA:  There's no urgency, Judge.  And this

7  isn't a matter that couldn't come up later in the year anyway,

8  when hopefully there'll be more progress and they'll be able

9  to report to the Court what they anticipate their Unsecured

10 Creditors are gonna receive before we increase the largesse

11 for management.

12    THE COURT:  Well, number one, I don't know that what

13 the Unsecured Creditors will receive in this type of a plan is

14 the test, Mr. Baena, because what the Unsecured Creditors are

15 entitled to receive is whatever the worth of the Debtor is and

16 what they'd get if the case were liquidated.  So if we need an

17 evaluation hearing on that score, okay, but I think that's

18 part of what your fraudulent conveyance action is going to get

19 to anyway.  So that process is in place.

20    But I have never seen a case that ties retention

21 programs to distributions to Unsecured Creditors in a Chapter

22 11.

23    MR. BAENA:  The Court very clearly said that in the

24 Interco case.  The Court refused to, in fact, in Interco, even

25 entertain the issue of a KER program until a plan had been

1    confirmed, so that the Court could know when, in fact -- what,

2    in fact, Unsecured Creditors would be receiving.

3            THE COURT:  Well --

4            MR. BAENA:  And also, Judge, I ask you to take into

5    account what they're considering to be their peer group.  I

6    don't know what numbers Mr. Bernick just told you about, but

7    in the moving papers, they characterized their peer group as

8    other debtors in mass tort bankruptcy cases.  Well, we're not

9    involved in all those cases, but I can tell you that in U.S.

10   Gypsum, where there is substantial presence of traditional

11   property damage claims and we'll -- those claims are

12   represented by Committee, the program there is on a per-

13   employee basis almost half of what they're proposing here on a

14   per-employee basis.  So I don't know that there's a well-

15   defined peer group.  I'm not sure where these numbers are

16   coming from.  I don't see any basis at all, given that there

17   hasn't been attrition and given that the Debtor hasn't even

18   here today said they can't meet their former targets for

19   profitability, that there's any concern about management not

20   being able to attain those targets.

21            And then finally, and most importantly, I reiterate,

22   it seems to me highly inappropriate to continue to reward

23   management while there is no expectation yet on the table for

24   Unsecured Creditors in this case.

25            THE COURT:  Well, again, I'm just not sure that the

1   issue with respect to the Unsecured Creditors gets very far

2   because if this were a going company not in bankruptcy and

3   liquidated, there may or may not be a distribution to

4   Unsecured Creditors.   I don't know that that's the means all

5   and end all to whether key management should stay in place.   I

6   am sure that should something drastic happen and all of the

7   key management leave, for whatever reason, that the likelihood

8   that Unsecured Creditors would get anything is significantly

9   diminished.

10           So I don't think anybody's challenging the fact that

11   the business ought to be ongoing.

12           MR. BAENA:   We are not challenging that.   We are not

13   challenging the fact that compensation ought to be consistent

14   with what's paid in the community, but Judge, this

15   compensation uses as its target profitability results.   And

16   so, what they're asking us to do in one fell swoop is to

17   reduce the expectations they formerly rolled out in front of

18   the Court about where we're going in this case, and they

19   haven't said that it's because they're not going to achieve

20   that level of profitability and why, but rather because others

21   in their industry don't expect to receive -- reach that level

22   of profitability.   And I'm not even sure I'm characterizing it

23   correctly when I say others in their industry, because they're

24   just talking about mass tort debtors.   And I don't even know

25   how that's -- comparable to what we're talking about here.

1    If you look at the asbestos bankruptcies, again, U.S.

2   Gypsum, regardless of what the target -- is in that case, the

3   cost of keeping management is not nearly as great as it is

4   being proposed here.

5        THE COURT:  Well, I don't know anything about Gypsum.

6   I don't know how big a company it is.  I don't know how many

7   key employees it has.  I don't know the nature of the

8   business.

9        MR. BAENA:  That's my -- that's my point, Judge.  And

10  yet, you're -- you know, you're being asked to rule to approve

11  this as if you did.  There's no testimony about any of that.

12  Where are they in their bankruptcies, these other mass tort

13  companies?  You do know about some of those cases, and you

14  know that they're maturer in terms of approaching

15  reorganization than this case is.

16       THE COURT:  Well, I know this case doesn't seem to be

17  off dead center, that's for sure.

18       MR. BAENA:  All right.  I'm not --

19       THE COURT:  And I am --

20       MR. BAENA:  -- sure that we've reached --

21       THE COURT:  -- a little concerned --

22       MR. BAENA:  -- dead center yet, Judge.

23       THE COURT:  -- and I know that in the not too near

24  future, the Debtor's going to be looking at another extension

25  of exclusivity and I know if this case doesn't get moving, I'm

1  going to have some problems with it.  But with respect to key

2  management, I think it's a different issue.

3          MR. BAENA:  Well, if the Court already anticipates

4  that it's gonna have some reservations about exclusivity --

5          THE COURT:  I always do.

6          MR. BAENA:  -- being extended, as you ought,

7  particularly in a case like this, why not roll this forward to

8  that next hearing on exclusivity?

9          THE COURT:  Well, let -- why don't we break this into

10  components, because I'm not totally sure I understand the

11  Property Committee's objections.  Are you only objecting to

12  the long-term aspects?  Or are you also objecting to the Key

13  Retention Program that expires in December?  Because this is

14  July.  There isn't a whole lot of time left to assure existing

15  management that with respect to their retention, not the long-

16  term but the other aspect of this, that there will be a plan

17  in place.  So I may defer it for a month.  I don't expect to

18  defer it until exclusivity's over or until this period of time

19  expires.  I don't think that's appropriate.  If I was on a

20  board, I would certainly object to a board not taking that

21  issue on earlier, and I'm not going to defer it that long.

22          MR. BAENA:  Well, Judge --

23          MR. SACKOLOW:  Your Honor --

24          MR. BAENA:  -- why don't we then defer it for a month

25  and we'll take the depositions that somebody suggested we

1   should have taken by now, and we'll be able to either come to

2   an agreement or come back to the Court and tell you why

3   they're using strongmen to set this motion up with.

4          THE COURT:  I wasn't suggesting that you needed any

5   depositions.  I was only asking why if you needed them, they

6   hadn't been done yet.  I want to make that clear.

7          MR. BAENA:  Well --

8          MR. BERNICK:  Your Honor, this is a perfect

9   illustration of the reason why the Business Judgment Rule

10  exists, and particularly in the context of Chapter 11.  The PD

11  Committee here is being just plainly irresponsible.  The

12  remarks that are being made here are simply counsel's effort

13  to develop a piece of leverage in this case.  That's all it

14  is.  They could have at any point gone off and gotten an

15  expert, they could have conducted the discovery, they could

16  have read the case law --

17         THE COURT:  Well, they didn't get the information

18  until July 5th.  This is only July 22nd.  That's not a whole

19  long time, Mr. Bernick.

20         MR. BERNICK:  Their advisor had this information in

21  March.  There was a whole --

22         THE COURT:  Well, I'm being told that they weren't

23  permitted to share it with the Committee.

24         MR. BERNICK:  Well -- but, their advisor knew what

25  the basic dimensions of this situation --

1    THE COURT:  Well that's advice, but if they're

2 looking for legal counsel, whether -- regardless of what the

3 advisor knows, if they can't talk to their counsel about it,

4 the counsel can't do the discovery that's necessary.

5    MR. BERNICK:  Well, I --

6    THE COURT:  Because you can't -- you can't hamstring

7 somebody in that fashion, if that's the case, if it's the

8 case.

9    MR. BERNICK:  Your Honor, I'm now told that they

10 could talk to counsel, that is, the financial advisor could

11 talk to the counsel, they just couldn't talk to the Committee

12 itself.  So this is not news to counsel, either.  And this is

13 -- this is --

14    MR. BAENA:  Your --

15    MR. BERNICK:  -- a situation where, again, Mr. Baena

16 has been totally and completely transparent on this.  He wants

17 to use this as leverage in the case.  He's now saying, "let's

18 hold off making these kinds of compensation decisions so we

19 can see what we're gonna get out of the case," and the case

20 law plainly says that that's not so.  This is --

21    THE COURT:  Well, I don't know that that's totally

22 the -- that that's a totally appropriate focus.  I've already

23 said that on this record, Mr. Bernick.  But I don't think it

24 hurts to wait a month and let them take some discovery if

25 that's what's necessary to see how the Debtor is exercising

23

1  business judgment. I've already said, I'm not approving

2  retroactive changes to the existing program that was already

3  approved by Final Order anyway. So some change needs to be

4  done in the package that's presented to the Court. I will not

5  undo a Final Order of Court that previously approved that

6  package. If the directors took stock and were comfortable in

7  it, that's what they get. Everybody who's in the stock market

8  suffers the increase and decreases of the vagaries of the

9  market, and they are no different, and this is their company.

10  If anybody ought to be comfortable having the stock option and

11  relying on it, it ought to be the directors and key employees

12  of the company who are largely responsible for insuring the

13  value of that stock.

14          Now, I recognize this is a dire economic time and a

15  lot of stock that has intrinsic value isn't recognized for a

16  lot of other reasons. Nonetheless, I am not changing that

17  program retroactively and that portion is not approved.

18  Regardless of the Debtor's business judgment, it was subject

19  to a Final Order, it's not appealable and I'm not approving

20  it. So it needs to be redone anyway, and it's going to take a

21  little bit of time, I think, to segregate out the portions of

22  the program that were previously approved by way of Final

23  Order from those going forward. Going forward, if it's the

24  Debtor's business judgment that all cash is necessary, then I

25  guess that's the Debtor's business judgment, but I do want to

1   know why.   I want to know why these employees are no longer

2   willing to rely on the fact that the stock that they're

3   responsible for managing isn't going to be a part of their

4   compensation.

5   MR. BERNICK:   Your Honor, we -- with respect to the

6   Court, that's what we thought we did.   We submitted the

7   affidavit of our expert from Deloitte, Touche.   We cited the

8   review that he did of other companies and the review that he

9   did of Grace and his determination that in Chapter 11 it

10   doesn't make much sense to promise people that they're gonna

11   get stock as value, because of the uncertainty of the Chapter

12   11.   These very Committees are going to take the position that

13   the stock is completely worthless.   So an employee sitting

14   here making a decision about whether to continue to work at

15   the Company is then promised, "well, if you reach a certain

16   level of performance, you're gonna earn out, but half your

17   earn-out is gonna be in stock and we don't know whether the

18   stock is gonna continue to have value or not."   What we're

19   dealing with is the reality of what people keep -- what will

20   keep people working for this Company, and that is precisely

21   the area that's encompassed by the Business Judgment Rule.

22   THE COURT:   Well, that's true.   But we do have the

23   fact that the Debtor has not seen massive turnovers.   Now,

24   they -- obviously, key employees were comfortable with the

25   plan that was in place for the period of time for which it's

1  in place, because they haven't been leaving in droves and

2  there are lots of mass tort cases.  I'm sure it's a

3  competitive market.  I'm sure if folks chose to leave, there

4  is a likely place for them to go.  They haven't been leaving

5  in droves.  I don't want to see them leave in droves. I don't

6  think the Committee wants to see them leave in droves.  But

7  the question is to balance what's an appropriate incentive to

8  keep them, and I'm not retroactively approving -- disapproving

9  something that's already been approved by way of Final Order.

10 So it needs to be redone.

11      MR. BERNICK:  Your Honor, I'd ask if we could have

12 this expedited.  I mean, this is all set out, the --

13      THE COURT:  I'll continue it till August, yes.  That

14 way if the Committee wants some additional information,

15 they've got that time to take it.  I will hear it on a final

16 basis in August.  I will not continue it again.

17      MR. BERNICK:  Okay.  Then for the Court's

18 information, the peers with respect to which these

19 determinations were made were not simply Chapter 11 peers.

20 They're companies like Dow Chemical, DuPont, Eastman Chemical.

21 This is a very professional review job that was done and there

22 was no effort here to pass out money undeservedly.  These are

23 -- this is an effort to maintain a business that's been

24 performing extremely well, and that everybody in this room

25 should have an interest, a very active interest, in

1  maintaining.  And the idea that we're gonna sit here and have

2  self-serving statements made about where this case is going,

3  there is no one who wants this case to be resolved on a

4  consensual basis more than the Company.  The Company has been

5  actively pursuing discussions where they can take place with

6  different constituencies, including constituencies that have

7  spoken to this issue this morning, and will continue to do

8  that.  The fact of the matter is that there are a number of

9  issues in this case, there always have been a number of issues

10  in this case, and we're trying to move those, too, through the

11  resolution process.  So this is a two-way street.  We'd like

12  to reach closure, too.

13       THE COURT:  Okay, that's fine.  This -- agenda Item

14  #4 is continued to August -- the August omnibus date.  If the

15  Committee needs any type of discovery, make sure you get it,

16  because whatever the filing dates are with respect to the

17  motions that are put on that agenda for August will apply.  So

18  if you have any supplemental materials, make sure they're

19  filed on time and I get them in advance, that 2 weeks in

20  advance timeframe.  Do you need some specific Order?

21       MR. BERNICK:  I don't think so.

22       MR. BAENA:  Could -- respectfully, Judge, could we --

23  you know, we've had scheduling difficulties before and -- we

24  always have scheduling difficulties with discovery -- can we

25  compress that 2-week period a little bit, just to give us a

1  little bit more time?

2        THE COURT:  The problem, Mr. Baena, is I don't get

3  the documents.  And it is very difficult to get these things

4  piecemeal and try to fit them in, and I really need those

5  documents in advance, especially if you're going to have some

6  objection that's going to require some analysis and legal

7  research and thought.  I will compress it by a couple of days,

8  so that the Debtor has an opportunity to respond to it, but I

9  can't do much more than that.

10       MR. BAENA:  I understand, but even if it were 10

11 days, it would be better than 14.

12       THE COURT:  All right.  The Property Damage Committee

13 may submit, I guess its supplement to its objection by -- if I

14 give them until August the 15th, Mr. Bernick, the hearing's

15 August 26th.  Does that give the Debtor sufficient time to get

16 something to me by at least the 22nd?

17       MR. BERNICK:  Well --

18       THE COURT:  If you choose to submit anything more?

19       MR. BERNICK:  Yeah.  I'm sure that if they're gonna

20 make a submission, we're gonna want to respond to it.  I guess

21 I would ask that if we have a period of time during which to

22 get this whole thing done, that we just divide it 50/50, that

23 if the submission's gotta be made by the twenty --

24       THE COURT:  Theirs would be by the 16th of August,

25 yours by the 22nd.

1    MR. BERNICK:  Why don't we take the distance between

2  now and the 22nd and divide it evenly?  I think that that

3  would be more appropriate.

4    THE COURT:  Well, the problem is that they need to

5  take some discovery.  They're going to need a little bit of

6  time to do that and that pretty much gives them 2 weeks to do

7  discovery and a week to get their documents together.  Mr.

8  Baena, I'll cut your date back till the 15th of August.  That

9  pretty much splits the difference after the -- a couple of

10  weeks for discovery, and keep the Debtors at August 22nd.

11    MR. BAENA:  Thank you, Judge.

12    THE COURT:  Mr. Bernick, I know I generally do not

13  want copies of things sent to Pittsburgh, because then I end

14  up with --

15    MR. BERNICK:  Right.

16    THE COURT:  -- triplicates and I get confused.  In

17  this case, though, for your response, I would like a copy

18  sent --

19    MR. BERNICK:  Sure.

20    THE COURT:  -- to me in Pittsburgh.  I don't need

21  yours that way, Mr. Baena.  There's plenty of time for me to

22  get it.  But I will need Mr. Bernick's.

23    MR. BAENA:  Thank you, Judge.

24    MR. BERNICK:  The next item is Item 7, which is the

25  Motion of Wesconn for Relief from Stay.

1        MR. ERHART:  May it please the Court, William Erhart

2  for movant Wesconn.  Your Honor, set forth in my Motion,

3  Wesconn's a small Connecticut company with grosses of about $2

4  million per year, who had been a long-term customer of W.R.

5  Grace.  Wesconn sprays fireproofing material on structural

6  steel in new constructions and renovations.

7        During the, basically, the summer/fall of 2000,

8  inferior product had been sold to my client that then cost

9  them a great deal of time and work.  Consultations with W.R.

10  Grace revealed that at the Grace manufacturing facility, they

11  had changed the manufacturing process.  Originally, the mixing

12  device, a hopper, operated on a base isolated and spilt

13  retardant and other chemicals into the mixture.  They changed

14  their assembly line so that multiple hoppers were operating on

15  the same base, vibrating, and they affected one another.  As a

16  result, the chemical mixture sometimes had too much retardant,

17  sometimes too little retardant, and clogged up the spraying

18  devices of my client numerous times and cost them about

19  $400,000 in various damages.

20        My client is currently struggling to survive.  It

21  employs approximately 20 people.  It's had to max-out on its

22  credit line, which is $150,000 for them.  Invoices and bills

23  are coming due that were related to the overtime my client had

24  to spend correcting the problems.  As a result, as the Court

25  well knows, there's a linkage between the amount of time men

1    work and earn, and unemployment insurance -- Workers'

2    Compensation, insurance liability coverage, and retirement

3    contributions to the union, which -- to which most of

4    Wesconn's men belong, so they're in a desperate situation,

5    Your Honor.

6        This matter went into bankruptcy April 2001, and as

7    the Court noted earlier, it's not off dead center yet.  My

8    client's waited quite a bit and now is at a point where it

9    needs to move.

10        Your Honor, we're requesting relief from stay and

11   asking the Court essentially to balance the hardship between

12   Wesconn and W.R. Grace, and there's no doubt that there's some

13   hardship to the Debtor in permitting this litigation to

14   proceed.  It is gonna cost them some money to defend.  On the

15   other hand, Your Honor, once litigation's been initiated, my

16   client will at least have the opportunity to identify other

17   responsible parties.  More likely than not that there's a

18   consultant, design engineer, a contractor, and even sub-

19   contractors, who may have been responsible for the change in

20   the assembly line that resulted in the inferior product.

21        Therefore, Your Honor, we believe, in weighing the

22   equities, that my client should be entitled to some relief

23   from stay to be able to go forward with the litigation and at

24   least identify other potential defendants who may well have

25   additional insurance to be able to resolve the matter.

31

1        Two issues that the Debtor raised in its Response,
2   one, that my client failed to show substantial likelihood of
3   success on the merits.  We believe we have, Your Honor.  I
4   named in my Motion three Grace employees who gave my client
5   the information that there had been a defect in the
6   manufacturing process at the Grace facility.  For purposes of
7   the lift stay Motion at this stage, that's a sufficient
8   showing of likelihood of success on the merits.  When we filed
9   our Motion, based on information and belief, we believed there
10  had been insurance coverage.  Some representatives at Grace
11  had told my client that there was insurance coverage from
12  dollar one.  Since I filed my Motion, Grace has provided some
13  insurance documents to him that are a little confusing.  There
14  are two deductible sections.  One indicates that there's no
15  deductible for this type of claim; the other one indicates
16  that there is a 250,000 deductible, or probably more properly,
17  a self-retention.  They've also asserted in their Response
18  that the self-retention, or the deductible, is guaranteed by a
19  letter of credit.  In other words, the insurance company upon
20  notice is responsible for the defense of the litigation
21  without calling upon Grace to actually pay the 250,000
22  deductible, but at some part in the process may call upon
23  Grace to make good that self-retention or else it can call
24  upon the letter of credit.
25       This is a relatively small construction claim, as I

1   mentioned, with a value of about $400,000.   In a light that's

2   most favorable to my client, the cost of litigating it, at

3   least initially, anyway, is de minimis, a small part of that.

4   Probably this case could be litigated from beginning to end

5   for less than $100,000.   And while it is some burden on the

6   Debtor, that needs to be balanced against the hardship to my

7   client as well.

8           THE COURT:  Mr. Bernick?

9           MR. BERNICK:  Your Honor, we've been through this

10  one, I think, before, very recently in connection with the

11  Kellogg case.   We have a claim that's covered by insurance but

12  with a substantial deductible of $250,000 secured by a letter

13  of credit, which in turn is collateralized with cash.   So in

14  order to get access to that policy, we could be called upon to

15  pay that $250,000 in cash, so there really is a cost to the

16  Estate.   Beyond that, the -- Your Honor has consistently

17  determined that the stay should apply to these kinds of cases,

18  really under circumstances that are much more compelling than

19  this one.

20          This is a business claim.   Your Honor has stood by

21  the stay, even in connection with significant personal injury

22  claims, but the fact that we keep on seeing a steady stream of

23  these petitions being made in a sense demonstrates the wisdom

24  of what the Court already has done, because we're convinced

25  that if the Court were to lift stay for these purposes, we'd

1  actually see not only these, but a significantly larger number

2  of other claims come before the Court for exactly the same

3  kind of treatment.  That's the whole purpose for the stay is

4  to avoid that situation.  So we would ask that the Court stand

5  by the approach that was articulated and applied in connection

6  with the <u>Kellogg</u> case and let the stay hold.

7          THE COURT:  When is the bar date for unsecured

8  general claims?

9          UNIDENTIFIED SPEAKER:  March 31st --

10          THE COURT:  I'm sorry?

11          MR. BERNICK:  March 31st.

12          THE COURT:  Has your client filed a proof of claim

13  yet?

14          MR. ERHART:  No, Your Honor.  We have -- well, we

15  have one prepared, but we haven't filed it yet.  We were

16  reluctant to actually file a proof of claim until where we

17  knew where the underlying litigation might proceed, not to

18  prejudice ourself.

19          THE COURT:  Well, it seems to me that the underlying

20  litigation ought to pursue by way of some objection to claim

21  if there is one, and that what I should do is tell the Debtor

22  simply -- well, tell you to file your proof of claim and give

23  the Debtor a bar date by which to file an objection to it if

24  that's appropriate.

25          I know that the Debtor will be doing omnibus

1  objections at some point, but maybe under these circumstances

2  it would be a good idea for the Debtor to take a look at this

3  one separately.  It doesn't appear that this particular claim

4  is going to be different from others.  The only thing is, even

5  then, what you're going to do is probably reduce the claim

6  from a judgment somewhere, somehow, and in terms of

7  collection, you're still looking at a plan.

8        So, I don't -- I think you need to file a proof of

9  claim.  I think if the Debtor has an objection to it, it needs

10  to be objected to.  I don't know that the Debtor does have an

11  objection, but if there is one -- but I don't think it's

12  appropriate to lift the stay.  I think the automatic stay is

13  there for a good reason, and if I were to lift it in this

14  case, every business claimant would come in, would have some

15  -- I guess, meritorious reason why it should be lifted in

16  terms of the economic differences among the parties.  But on

17  balance, I think the Debtor's interest in keeping the

18  automatic stay in place outweighs those claims.

19        I don't see anything in this one that is any

20  different from what the typical creditor faces by way of an

21  economic loss as the result of a business transaction, so I

22  don't see anything that distinguishes this from other claims

23  of a similar nature.  So, I'm not prepared to lift the

24  automatic stay for those reasons.  But I do think you have a

25  remedy in filing a proof of claim.  And tell me when, and I'll

1  then expect to do it, then I'll require the Debtor to examine

2  it and file an objection to it, if the Debtor has an objection

3  to it, within a certain period of time thereafter.

4          MR. ERHART:  Okay.  Your Honor, then, I would suggest

5  I could file a proof of claim by July 30th.

6          THE COURT:  All right.  Then, Mr. Bernick, I'll wait

7  to get an Order from the Debtor, again, to enter this, but the

8  Debtor is to submit an Order that will deny the request for

9  relief from stay, but state that if the Creditor files a proof

10  of claim by July 30, then the Debtor must examine that claim

11  and if an objection to it is going to be filed, file and serve

12  the same by -- is 2 months enough time for this?  September

13  30?

14          MR. BERNICK:  Be fine.

15          THE COURT:  By September 30.  And I think that will

16  get you maybe not quite at the same place, but within the

17  construct of the bankruptcy, a little further along.

18          MR. ERHART:  Okay.

19          THE COURT:  That Order will be entered.  The Debtor

20  will run it by you and then submit to me within a week.

21          MR. ERHART:  Thank you, Your Honor.

22          THE COURT:  Okay.  Mr. Bernick?

23          MR. BERNICK:  The next item, Item 8, is, I guess,

24  gonna be the first of three different items dealing with the

25  retention of counsel and budget associated with the science

1  trial.  This one deals with the Application of the Property

2  Damage Committee to Retain Special Counsel.  So, I expect to

3  hear from them.

4          THE COURT:  Okay.  Mr. Baena?

5          MR. BAENA:  May it please the Court.  Judge, I'm sure

6  you've read our paper and in a nutshell, you gave us two

7  choices as a Committee on the Zonolite issue.  Choice #1 was

8  to represent these particular claimants in these -- in this

9  context, or door #2 was appoint -- you know -- find counsel to

10  do it.

11          We took door #2.  We don't believe that as a matter

12  of law we can represent the individual interests of claimants.

13  And we went to the people we thought we ought go to for

14  purposes of determining who should handle this, and that was

15  the lawfirms that represented these and similar situated

16  claimants before the bankruptcy commenced.  They gave us a

17  list of five lawfirms.  We apprised them of their obligation

18  to come up with a budget.  They've done that.  And we apprised

19  them that it was necessary for them to pick a lead counsel

20  among them, and they have chosen Mr. Westbrook, who will be

21  addressing the remainder of the Motions today.

22          I really feel that from this point -- we're just

23  handing off at this point, Judge.  In accordance with the

24  Court's instructions, we're happy to be the gatekeeper, but I

25  don't think we can go much further than that.

1      THE COURT:  Okay.  Well, I don't know whether you

2  want to address this, Mr. Baena, or whether I should address

3  this to Mr. Westbrook.  My concern is I don't see a need for

4  five lawfirms to participate in this trial.  One lawfirm, yes.

5  Two, maybe.  Five, no.  So, it seems to me that it's over-

6  budgeted just on that basis alone.

7      I deferred the issue of the Debtor's budget and so

8  perhaps I should bring up this issue, too, because I kind of

9  see these two things as hand-in-hand.

10     I think both of the budgets are way too rich, and I

11  do mean both.  It seems to me that to get to a legitimate

12  trial that raises these issues, we shouldn't be looking at

13  collectively more than 10 experts.  At a certain point in time

14  they're going to be falling all over themselves with

15  repetitious evidence.  I don't intend to hear a lot of

16  repetitious evidence.  There may be some cumulative evidence

17  necessary, but certainly, not coming from 14 to 20 experts.

18  10 ought to do it.  So, #1, I think in terms of litigation

19  plan, we need to limit this to 10 experts.  That in and of

20  itself reduces the cost for experts, somewhat, from the

21  Property Damage Committee.  It may raise it a little in the

22  Debtors' budget.

23     The Property Damage Committee's estimate and the

24  Debtors' are not particularly at variance with respect to

25  expert and other out-of-pocket costs, it's the fees that seem

1  to be getting very far afield.  But I think part of it is

2  because the Property Damage Committee is looking at five

3  firms.  I simply am not going to approve five firms.  I do not

4  see the need for it.  These are special counsel to litigate a

5  limited issue, and that's the purpose.  At least not at the

6  expense of the Estate.  If five firms want to participate,

7  that's up to them.  But this Estate isn't going to be bear the

8  cost for five firms.  I want to make that clear.  Anybody who

9  wants to participate can, but not at the cost of this Estate.

10       It seems to me that a reasonable litigation budget

11  collectively, for both the Property Damage and the Debtor, is

12  $4 million, and I think 3 million of that would be your --

13  allocated to fees, and a million would be allocated to expert

14  witnesses for whatever, and costs, and that ought to be quite

15  sufficient for the 6 months that this is -- information is

16  going to be generated by the parties outside this Court.

17       So, that's what I'm looking at in terms of a budget.

18  In fact, I think maybe that's rich, but given the fact that

19  the Property Damage Committee's looking at 4.2-plus million,

20  and the Debtor at 2.8-plus million, I think cutting it to 4

21  million overall probably makes sense.  If it's absolutely

22  necessary to go beyond that, then I'm sure both sides will be

23  in here -- be arguing about it, because I expect that this

24  budget is going to be divided equally.  50-50.  And once your

25  $2 million is over, then that's it.  You're in as counsel and

1  you're done.  You get no more fees unless I approve them, and
2  I want to see some specific reasons as to why.
3       Now, having said that, that's what I think looks
4  reasonable given the information that I have on hand.  I'll
5  hear everybody and give you a chance to talk me out of it.
6  Sometimes you're successful, sometimes you're not, but you
7  want to take a stab, Mr. Baena, I'll listen to you, if you
8  want to push this off to Mr. Westbrook, I'll from him.
9       MR. BAENA:  I aspire to be like Ed McMahon in this
10  matter.
11       (Laughter)
12       MR. BAENA:  And introduce Johnny.
13       MR. WESTBROOK:  Good morning, Your Honor.
14       THE COURT:  Good morning.
15       MR. WESTBROOK:  That's called a punch, Your Honor.
16       THE COURT:  I think it was.  Yes.
17       MR. WESTBROOK:  Your Honor, I have read your
18  transcripts, and I certainly understand where the Court is
19  coming from, and if I can make a few preliminary observations,
20  perhaps, on the issue of a least the division, I understand
21  why the Court has set its original benchmark.
22       As I reviewed these matters, and this is my first
23  time being here before Your Honor, it appears to me that Grace
24  has had three advantages in this matter.  Since April 2001, it
25  has been working to prepare the Zonolite issue.  Grace

1    selected Reed, Smith, fine lawyers who I've known for over a

2    decade, and I've reviewed their time submissions, and I see

3    that they have spent over a million dollars already, sort of

4    in the can, which is not in Mr. Bernick's proposed budget.

5    His budget is going forward, we understand that.

6         THE COURT:  But Mr. Westbrook, these issues arose

7    because of class action suits that were filed in various

8    Courts before the bankruptcy and requests to file some since

9    the bankruptcy.  One plaintiff already has a judgment based on

10   this in the outside world, outside of bankruptcy.  It is very

11   hard-pressed, I think, to say that the plaintiffs in the

12   outside world are not also prepared to address this and

13   haven't already incurred some cost and looked at the issues

14   from an expert witness point of view.  Because if they

15   haven't, then I think Rule 9011 is going to require some

16   additional sanctions.

17        MR. WESTBROOK:  Your Honor, I think that correctly

18   so, up to the time of bankruptcy, the Zonolite claimants were

19   getting up to speed on this issue.  But as the Court has

20   noted, this is what I think DeSeisa referred to as an immature

21   tort.  That's why the Court wants to have the science trial,

22   to find out a little more about it and certainly reasonably

23   so.

24        But the history of immature torts, Your Honor, is

25   that the plaintiffs are always at a disadvantage, because the

1  defendants have been working on it, they have created the

2  facts, they know the facts.  Just let me give you an example.

3  Mr. Bernick's budget assumes, and rightly so, that he'd be

4  able to pick up the phone and call Grace people and ask them,

5  "Well, what happened at Libby?"  "What happened here?"  "What

6  happened there?"  He can pick their brains with a phone call.

7  We'll have to take depositions and we'll have to pull teeth.

8  The difference in cost and effort is enormous, Your Honor.

9  Their budget has sort of "off-the-clock" work for all the

10  Grace people who will support them, and that's their client,

11  they certainly can do that.  We have that disadvantage.

12  They've also --

13          THE COURT:  But you have the plaintiffs who allege

14  the injuries, who know where their -- where the Zonolite was

15  put in and what happened to it.  And you can pick up the phone

16  and call them.  You've got exactly the same litigation

17  advantages on the other side.  That's why we have a two-party

18  litigation system.

19          MR. WESTBROOK:  Your Honor's absolutely correct.  We

20  certainly can confer with our clients.  But with this issue

21  directed more to the science than to the lay issues, Your

22  Honor, we feel that Grace, which has been doing its testing,

23  doing testing when it made the product, et cetera, has the

24  advantage in what they can pick up the phone.  But Your Honor

25  is certainly correct that both sides can call their client.

1   　　　Grace has also had the advantage of people.  The

2   Grace submissions indicate that Reed, Smith has had up to 14

3   lawyers working on this matter in various months since April.

4   And Your Honor, although there've been people discussing these

5   issues on our side, I don't think that anyone could fairly say

6   that we have had the opportunity or have had 14 lawyers from

7   one firm -- any firm -- working on this.

8   　　　THE COURT:  Then you should be grateful, because that

9   will mean that their discovery documents will be in better

10  shape to be able to produce to you expeditiously and they

11  won't incur any portion of their budget by putting them

12  together, because they're already together.

13  　　　MR. WESTBROOK:  Yes.

14  　　　THE COURT:  So you get the advantages just as they

15  did.

16  　　　MR. WESTBROOK:  Well, we're certainly happy to have

17  whatever advantage we can get from Grace, Your Honor.  For

18  instance, perhaps they have computerized their documents and

19  they have them on a computerized index.  I assume that would

20  be available to us and they wouldn't invoke a work product

21  privilege, then.  And we'd be able to get that.

22  　　　THE COURT:  If they're computerized and you can make

23  use of the computers as long as they're restricted to this

24  particular trial on the science issues, I don't see why they

25  can't produce -- be produced in that format.

1     MR. WESTBROOK:  Yes, Your Honor, I think that would
2 certainly help on these --
3     THE COURT:  But I don't know whether they are in that
4 format.
5     MR. WESTBROOK:  I'm just -- from past experience in
6 non-Zonolite cases, Grace has done internal work to
7 computerize its documents --
8     THE COURT:  Fine, if --
9     MR. WESTBROOK:  -- and get them on.
10     THE COURT:  -- that's the case, everybody will
11 benefit from that.
12     MR. WESTBROOK:  There are additional documents, Your
13 Honor, that were produced in connection with this in some EPA
14 proceedings and I -- last I lost track of them they were out
15 in Denver, and I assume those documents have been reviewed by
16 -- by Grace and those documents have been organized and we'll
17 have some access to that to make it more efficient.
18     THE COURT:  I don't know.  This isn't a discovery
19 colloquy.  As far as I know, you haven't even propounded any
20 yet, because you're not retained as counsel.  So --
21     MR. WESTBROOK:  Correct, Your Honor.
22     THE COURT:  -- why don't we wait and see if there are
23 disputes, because if there are, I'm sure that Judge Dreier
24 will be happy to hear from you about the discovery disputes,
25 because gentlemen, that's where you're going to be taking

1   them.  So, what's next?

2       MR. WESTBROOK:  Yes, Your Honor.  My point is that

3   that work is in the can from Grace, and I think fairly said,

4   the people on Grace's side certainly know more about their

5   documents, what they've done, the science.  I believe Grace

6   has also already retained experts and those experts have

7   already done or may have already done experimental work and

8   done work that's not in their budget, work that we've got to

9   start behind.  We're -- basically, Your Honor, we're 14 months

10  behind.  They're 14 months out ahead.

11      THE COURT:  You shouldn't be.  The suits were filed

12  in the State Court already.  You shouldn't be 14 months

13  behind.  I can't help that fact.  What I can do is order that

14  the Debtor produce whatever it is that the Debtor has that's

15  going to be relevant after you file a reasonable request for

16  same.  And to that extent, you'll benefit from that

17  preliminary work.

18      MR. WESTBROOK:  Your Honor, we certainly were running

19  with them up until April 2001, but after that, they could

20  continue to work on their documents in their repository.  Our

21  discovery stopped, our work stopped, they got permission from

22  the Court to hire experts, and logically, we were not hiring

23  experts to do work on claims that we didn't know where they

24  were going yet.  As the Court said, we're sort of at square

25  one right one.  So my point, Your Honor --

45

1    THE COURT:  But they produce the product.  If they

2  don't know more about this product than the plaintiffs do,

3  there's something wrong in the world.  I mean, that's the way

4  it always is.

5    MR. WESTBROOK:  I think -- that's certainly correct.

6  They do know more about it, and that's what we need to try

7  to --

8    THE COURT:  Fine.

9    MR. WESTBROOK:  -- find out.

10    THE COURT:  So go take your discovery and find out.

11    MR. WESTBROOK:  Right.  What I suggest, Your Honor,

12  is that to divide the budget equally, whatever the budget is,

13  to divide it equally gives Grace an unfair advantage because

14  they've had the time --

15    THE COURT:  The Debtors' paying for this, which in no

16  other context would the Debtor ever be required to do that I

17  know of.  As a result, I think that this is a quite reasonable

18  prospectus that the Court is imposing and I -- whatever the

19  budget is, it's going to be divided equally.  If I -- if it

20  turns out that that's an incorrect view, from the information

21  I have available, I'm sure I'll be hearing from you.  But as

22  of this minute, it's a division equally.

23    MR. WESTBROOK:  Yes, Your Honor.  I understand your

24  Court's view.  Now with respect, Your Honor, to the lawyers

25  who are gonna prosecute the case, the Zonolite effort has been

1   a collaborative effort of a number of firms, and the Court is

2   rightly concerned about the budget and I've seen in prior

3   transcripts the Court said "whatever the budget is, that's

4   gonna be it," and the Court wasn't particularly concerned

5   whether you spent it on experts or whether you spent it on

6   lawyers, et cetera.

7           I would suggest that just as the Court has given the

8   Grace side discretion to hire -- they have Kirkland & Ellis,

9   fine lawyers, and to bring on Reed, Smith, and to let them

10  have 14 lawyers work a month, et cetera, that the Court should

11  not be particularly concerned if, for instance, if I'm lead

12  counsel and we've got a document production in Boston, rather

13  than fly people up from South Carolina, I could call on Mr.

14  Sobel, who's in Boston to go over there and do that.  Or if I

15  have documents out in Denver, I could call on Mr. Scottus in

16  Spokane to be able to go out and do that.  Or we have an

17  expert witness in San Diego that Mr. Brazier's firm could go

18  out there from California.  I think, Your Honor, it could

19  bring significant efficiency to the process for the Court to

20  be concerned, as it rightly is, about the budget, but to leave

21  some discretion in lead counsel to call on lawyers from other

22  firms, as opposed to getting 10 lawyers from my firm to work

23  on it.  That should not necessarily be the be-all and end-all.

24  It's the best lawyers, the most experienced lawyers, the most

25  efficient lawyers, now, with the budget that the Court

1  suggested.

2      THE COURT:  That's fine, with one caveat.  I am not

3  going to approve any interconference telephone calls between

4  lawfirms.  Because as soon as you start that, that takes the

5  efficiency out of it.  So my view is, if you want five firms

6  involved, that's fine.  But, the interconference calls at

7  which you get up to speed is on your dime, not the Estate's.

8  Otherwise, I'll approve two and your interconference calls

9  between the two firms, as they will for the Debtor, they'll be

10  approved, up to the maximum budget that I'm submitting.

11      MR. WESTBROOK:  Okay.  I understand that, Your Honor.

12  I understand that.

13      THE COURT:  But I want to know who's being retained

14  and for what purposes.  I do want to know that piece, but I'll

15  let you work that out.

16      MR. WESTBROOK:  Okay.  Your Honor, with that, unless

17  the Court has some questions, I think I understand the Court's

18  views on the overall budget.  We respectfully believe it is a

19  bit slim, I think.  For one -- one time Grace and we -- agree

20  on something, so maybe that means we're both wrong, but I

21  think it is a bit slim, because I know the Court knows this is

22  an important issue, and wants to have a full and fair

23  presentation and something that somebody won't come back later

24  and say, well, this was done on a less than full -- both sides

25  said it should cost more, the Court said less, so it couldn't

1  have been due process.  We try to avoid that.

2          THE COURT:  Now, wait a minute.  I have never heard

3  that a budget is a due process issue.  And I've already said

4  that if you think I've way underestimated this, I'll be

5  hearing from you.  It seems to me that $4 million for 4 firms

6  and some expert witnesses and document productions over a 6-

7  week period is gonna be hard-pressed by anybody to say that

8  that's not a reasonable budget.  That's a lot of money.  By

9  anybody's stretch.  A lot of money to get one trial under way,

10  especially with 10 experts.  However, if I'm incorrect, I will

11  be hearing from you and I expect to.  I'm not trying to

12  hamstring either side to the point where you can't produce

13  your witnesses or get your evidence in.  But I want a

14  reasonable budget.  I think this is erring on the side of

15  being too generous, not less generous.  But because of your

16  estimates, I will go up to $4 million, 3 for fees, 1 for a

17  combination of costs and experts.

18          MR. WESTBROOK:  We understand, Your Honor, and if the

19  costs and experts don't come up to the million dollars, do the

20  sides have discretion on the fee side, or would we need to

21  come back to the Court on that?

22          THE COURT:  You'll have to come back.  I'm going to

23  look at your fee petitions anyway.  But I'm putting you on a

24  budget.  I want to see how this is going.  The problem is the

25  maximum amount I intend to approve right now is $4 million.

1    And quite frankly, if your fees and your expert -- witness

2    fees and costs don't go up to a million dollars and you need

3    additional legal time, probably both sides will be in that

4    position.  So, I'm happy the Debtor knows that it's going to

5    commit $4 million to this project right now.  If you all can

6    collectively, both sides, can agree that this distribution is

7    not appropriate, you can let me know.  I'm usually not in

8    position of taking on issues that the parties agree otherwise

9    about.  Occasionally, but not often.  And so if you can agree

10    that there should be a different distribution, fine.  I'm sure

11    I'll be reasonable about it.  But for now, since the sides

12    don't seem to agree on much, this is the Order that I'm

13    entering.

14             MR. WESTBROOK:  Thank you, Your Honor.  We'll confer

15    with Grace on that issue.

16             THE COURT:  All right.  Mr. Bernick?

17             MR. BERNICK:  Your Honor obviously correctly recited

18    the backdrop for this whole discussion, which is that it is

19    highly unusual that a Debtor would have to pay for the cost of

20    prosecuting claims against it.  And I think that that was very

21    much behind Your Honor's pretty clear statement last time,

22    that we should only have to pay for one lead lawfirm.  I

23    remember that discussion quite well.  Against my dire

24    prediction that the claimants would not be able to agree among

25    themselves and we would have five --  actually, what I said

1  was there are three lead lawfirms in the fraudulent conveyance

2  litigation, now it's gotten worse, there are five lead

3  lawfirms.

4         And I think it's very important that -- you know --

5  who the folks are.  I don't think anyone takes issue, I know

6  that no one takes issue, with the qualifications of Mr.

7  Westbrook and Mr. Terkowitz.  I've litigated against Mr.

8  Westbrook in completely unrelated matters; he's a very, very

9  capable lawyer.  Likes, I think, generally to be the lone wolf

10  in any event.  He obviously has background experience here and

11  there's no question but that he should be lead counsel.

12         When you go down the rest of the list, you really

13  cannot find any compelling reason to have them be part of it,

14  other than the argument that's been made here this morning,

15  which is, well, we need more help.  Well, "we need more help"

16  shouldn't take you to saying, "well, we're gonna have, for

17  example" -- and I don't mean to pick on Elizabeth, in fact

18  I'll pick on her in a way that is laudatory.  She is a very,

19  very experienced and highly regarded class action attorney.

20  But what does class actions have to do with the issue that

21  we're gonna be trying, which is the science issue?

22         THE COURT:  At the moment, nothing.  But, Mr.

23  Bernick, I'm putting them on a budget of $1½ million, totally,

24  for fees.  As I am with the Debtor.  If they want to spend it

25  all doing something that isn't going to be fruitful for

1   producing witnesses at trial, then they're going to lose,

2   because they won't have the evidence at trial.  I doubt very

3   much that that's the way that they will choose to allocate

4   their million and a half dollars.

5         MR. BERNICK:  Here's the problem that I see.  You

6   know, obviously if we have a hard and fast budget, you know,

7   we gotta live with that.  But as I heard Your Honor, there is

8   a process that could unfold where people are saying, gee, it

9   has not proven to be enough, and then the budget is broken,

10  and then it's kind of a little too late to say, well, the

11  wrong lawyers are involved.

12        THE COURT:  Oh.  My view is, Mr. Bernick, I'm

13  approving, in advance, a budget of $4 million.  It may not get

14  to that level, because the fees and costs that I approve

15  within that budget may not get to $4 million.  But I want the

16  Debtor to know that it has to have, somewhere, $4 million in

17  cash to pay for this science trial.  That's what I -- that's

18  the point that I'm trying to make.  If that budget turns out

19  to be wholly inadequate, I'm going to hear it from the Debtor

20  too, because the Debtor has half of it and the Committee has

21  half of it.  So if it's wholly inadequate from one side, it's

22  going to be wholly inadequate from the other, and I don't

23  think it should be an issue that anybody's going to be

24  objecting to.  Well, you may object to how it's inadequate,

25  but you won't object to the fact that it's inadequate, because

1   I'll be hearing from both of you.  And it's going to take a

2   lot of information to convince me that this budget isn't rich

3   enough to support this trial.  I've looked at everything the

4   parties have submitted.  I think it's -- I think your

5   estimates are, as all estimates probably ought to be, high,

6   because you don't want to be trapped into something low, but I

7   think they're very high.  I think the Debtors' is less high

8   than the Committee's, but the Debtor isn't expecting to use

9   five firms.  I don't think that the Committee needs five

10  firms.  If they'll -- if it will help them to minimize costs

11  to send somebody from Boston to do a deposition in Boston,

12  fine.  I don't think the Debtor has any issue with attempting

13  to save costs.  That's the point.

14          So, I've already told Mr. Westbrook I want to know

15  from him, I'm going to get an outline from him, about who is

16  going to be doing what within this litigation structure and it

17  could come in the fee application process, because I want to

18  make sure that it is in fact an economy to this Estate, not

19  costing the Estate money.  I'm willing to approve two firms

20  for both sides, one as lead counsel, and one to make sure that

21  everything else that has to get done in a litigation of this

22  scope gets done.  That's it.  They want to hire somebody else,

23  at essentially their expense, because it's within this budget,

24  then so be it.  They'll need my approval, because they're part

25  of a Committee.

1      MR. BERNICK:  So just to be concrete, we're gonna go

2  back and aim at the $2 million assigned in the way that Your

3  Honor has indicated.  They will pick two lead firms --

4      THE COURT:  One lead firm.

5      MR. BERNICK:  One lead firm.

6      THE COURT:  And another firm to assist with whatever

7  they want.  I want -- Mr. Westbrook has been designated as

8  lead counsel, that's fine.  He's the lead firm.

9      MR. BERNICK:  Okay.  And they'll also be one other

10  firm and then they will submit a new budget to the Court --

11      THE COURT:  As will the Debtor.

12      MR. BERNICK:  As will the Debtor.  That --

13      THE COURT:  For the Debtor's side.

14      MR. BERNICK:  Right.  That identifies the two firms

15  and who is going to be doing what, and then states what their

16  requests for the budget is.

17      THE COURT:  Yes.  That's essentially it.  And within

18  that, if they say that, for example, if the depositions are

19  going to be in the New England area, that they're going to use

20  one of the other folks on this list to do that deposition,

21  fine.  And we know in advance that that's who it's going to

22  be.

23      MR. BERNICK:  We'd like to get this -- it seems to be

24  appropriate to get this resolved soon.

25      THE COURT:  Yes.

1    MR. BERNICK:  Can we get this done on the basis so

2  that Your Honor can take it up next time?

3    THE COURT:  I'd like to have it done by way of an

4  Order without another hearing on it.

5    MR. BERNICK:  That's fine with us.

6    THE COURT:  I'm not sure I need another hearing.  Is

7  the Committee going to be looking at another hearing?  Mr.

8  Westbrook?

9    MR. ERHART:  Here's Johnny.

10    MR. WESTBROOK:  Your Honor, I'm not sure another

11  hearing is necessary, but I did want to be clear that Mr.

12  Bernick said, well, we'd say, "who's gonna do the Boston

13  work?"  It may not be -- always geographically divided.  It

14  may not be quite as clean and neat as that.  There may be an

15  expert in Boston who, for instance, I have to take for some

16  reason, and I think we could certainly give the Court some

17  guidance, but I would hate to have a --

18    THE COURT:  I'm not approving five firms in advance,

19  Mr. Westbrook.  I've tried to make that clear.  I'm --

20    MR. WESTBROOK:  I understand.

21    THE COURT:  -- approving two firms.  You pick -- you

22  collectively -- you pick the two.  If you find it necessary

23  for economy of scale on a piecework basis to bring somebody

24  else in, I assume it'll be one of these other three firms,

25  they're the only ones that have been designated on this

1   record, I'm saying in advance, if you tell me for what

2   purpose, I will approve that, with the exception that I'm not

3   approving the work that it's going to take to get another firm

4   up to speed in this case.  I'm approving the work to get up to

5   speed for two firms, not for five.  Because I think two's

6   adequate.

7         MR. WESTBROOK:  I understand, Your Honor, but with

8   that, Your Honor, then we might want to have some time to

9   confer on that and maybe the next hearing would be

10   appropriate, then --

11         THE COURT:  All right.

12         MR. WESTBROOK:  -- to have that approved.

13         THE COURT:  Sure.  That's fine.  In the meantime,

14   however, I want to get this project started.

15         MR. BERNICK:  Yeah.  We've got another agenda item

16   that deals with the schedule.

17         THE COURT:  Yes.  So, is there any reason, Mr.

18   Westbrook, if you're being designated as lead counsel and

19   you've now got this parameter, you know I will sign an Order

20   that will appoint you as lead counsel, only I can't sign it

21   until I get, so as of today, you're designated as lead

22   counsel.  The Order can be retroactive in that respect.  Is

23   there any reason now we can't get to the discovery issues and

24   the -- the scheduling Order, I guess I should say?  Mr.

25   Zaleski?

1    MR. ZALESKI:  Matthew Zaleski.  Campbell, Levine on

2  behalf of the Asbestos Personal Injury Committee.  Your

3  Honor's last comments suggests that now might be the time to

4  hear our objection, which the Committee reiterated its

5  decision to press today.  And it's unlike the others.  Our

6  focus really isn't the how much, but it's who.

7    While the PD Committee's actual application is

8  careful not to cite to Section 1103, I find it difficult to

9  understand what other statutory predicate might be available

10  for such an application.  327 certainly doesn't apply; 1103

11  seems, if not to apply in letter, it certainly should be

12  applied in spirit.  I think our Committee has difficulty, and

13  if you permit me to step back, at the time we filed our

14  objection and subsequently --

15    THE COURT:  Which firm are you objecting to?

16    MR. ZALESKI:  Actually, that's precisely what I was

17  clearing up.  We had understood that the Ness, Motley firm was

18  not going to be going forward with this.  I have not received

19  subsequent confirmation.  The papers are written directed at

20  the McGarvey, Heberling firm.  The facts and circumstances,

21  however, are the same, and anything that we would have said in

22  the paper regarding McGarvey, Heberling, if it turns out our

23  information at that time was wrong, equally would be

24  applicable to the Ness, Motley firm.  So it would be both of

25  those unless someone can tell me otherwise.

1          THE COURT:  All right.  And both of those attorneys

2     sit as attorneys in fact for members of the Asbestos Creditors

3     Committee?

4          MR. ZALESKI:  In the case of McGarvey, Heberling, the

5     same lawyers.  In the case of Ness, Motley, there's -- the

6     lawyer who sits as attorney in fact on the Committee is not in

7     fact the one's who's proposed or was originally proposed here.

8     But the objection still would be the same.

9          THE COURT:  Well, with respect to the Ness, Motley,

10     hasn't Judge Wolin in a similar context with respect, I think

11     it was to Mr. Dreier, required a china wall.  That should work

12     for purposes of representation so that the information can't

13     be shared.  I am concerned about a conflict.  It seems to me

14     that there may be an actual conflict with an attorney who sits

15     as an attorney in fact for somebody on one Committee to now

16     try to represent the interests of another.  I am concerned

17     about that.  And I think the Committee's objection is well-

18     founded.  But can it be cured by a china wall?

19          MR. ZALESKI:  I do not believe the Committee in its

20     last discussion of the subject thought so, but we'd be willing

21     to try to work, I presume, at something like that, if that was

22     this Court's direction.  But beyond just that issue, and this

23     just sort of comes up when you look at the lack of a statutory

24     predicate, I mean, when you start talking about

25     disinterestedness and the applicability of paying someone

1  under 328(c), where maybe we don't necessarily have to get to

2  actual conflict or not, but simply that this compensation

3  would be done and you do have -- you're being compensated as

4  special counsel to the PD Committee or whatever euphemism gets

5  applied to it, that would be drawing against the Estate to

6  pursue dollars on behalf of one claimant, contrary to

7  performing a function and a fiduciary function to another

8  Committee on behalf of a totality of claimants who have

9  competing claims to those same dollars.

10          THE COURT:  I think the particular attorney who is

11  the attorney in fact has a conflict and cannot work.  The

12  question is, can a firm work if there is a china wall?

13          MR. ZALESKI:  I guess my question is are you

14  instructing us to attempt to work with that or to see if the

15  Committee is willing to.  As of end of last week, that was not

16  something that they were willing to, but if instructed by this

17  Court to try and implement programs, we suppose we could.  Our

18  Committee is still monitoring the Zonolite litigation,

19  believes that there are issues related to the Zonolite

20  litigation that we may like to be heard on at some point or

21  another either in this Court or should there be a subsequent

22  appeal.  We do believe it possible that we would be taking

23  positions adverse to the Zonolite claimants.

24          THE COURT:  Let me first inquire whether Ness, Motley

25  intends to somehow or other be involved in this process, and

1   then I'll ask the same thing with respect to McGarvey.  Mr.

2   Westbrook, do you know the answer?

3          MR. WESTBROOK:  Your Honor, I'm not here for Ness,

4   Motley, but it was my understanding, I had received no notice

5   that Ness, Motley was withdrawing its application to be

6   involved in this in any way.

7          THE COURT:  And what about McGarvey?

8          MR. WESTBROOK:  Mr. McGarvey was here.

9          MR. MCGARVEY:  I'm here, Your Honor, and if I may

10  have an opportunity to respond to the matter.

11         THE COURT:  Identify yourself, please, on the record.

12         MR. MCGARVEY:  Allan McGarvey, McGarvey, Heberling,

13  Sullivan & McGarvey.  Your Honor, our firm represents Montana

14  claimants Price and John and Marjorie Prebell.  They're three

15  of the 10 ZAI claimants that are in this science trial.  Mr.

16  Price and the Prebells have been lead Plaintiffs in the ZAI

17  litigation from the start, through the multidistrict

18  litigation certification and into the present, and our firm

19  has been an active participant in the litigation throughout

20  that time.

21         Our lawfirm also represents Mr. Royce Ryan, who

22  serves on the Personal Injury Committee.  He is a personal

23  injury claimant from Libby.  I believe Mr. Ryan was appointed

24  to the Committee because the Trustee recognized that the Libby

25  claimants are a substantial constituency of very seriously