## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | | Hearing Date: Not Yet Set |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MEMORANDUM IN SUPPORT OF DEBTORS' CASE MANAGEMENT PROPOSAL

**STROOCK & STROOCK & LAVAN LLP**
Lewis Kruger
Kenneth Pasquale
(Members of the Firm)
180 Maiden Lane
New York, New York 10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

and

**DUANE MORRIS LLP**
Michael R. Lastowski (DE I.D. No. 3892)
William S. Katchen
1100 North Market Street
Suite 1200
Wilmington, Delaware 19801
Tel: (302) 657-4900
Fax: (302) 657-4901

Counsel for the Official Committee
of Unsecured Creditors

The Official Committee of Unsecured Creditors of W. R. Grace & Co., et al. (the "Creditors' Committee"), by its undersigned counsel, submits this Memorandum in support of the Debtors' proposal for case management of the asbestos personal injury claims in these bankruptcy cases[1], pursuant to the schedule set forth in this Court's order dated June 19, 2002.

## INTRODUCTION

The Creditors' Committee continues to support the Debtors' proposal for litigation of common issues in order to determine "the true scope of Grace's liability to asbestos claimants and then provide for the payment of valid claims on a basis that preserves Grace's still strong core business operations." Status Report of W. R. Grace and Proposal of Priorities for Litigation in this Court, dated December 14, 2001, at 1. Such a determination is of particular concern to the Creditors' Committee because it represents all non-asbestos unsecured creditor interests, with claims well in excess of $500 million. As a result, these creditors are the real party in interest to the disputes with the asbestos claimants before the Court, in that these creditors will share their recoveries pro rata with the asbestos claimants.

Thus, the Creditors' Committee believes that litigation of the threshold issues identified by the Debtors and discussed below -- including product identification, causation and impairment -- is necessary and appropriate. That being said, the Creditors' Committee recognizes that the Debtors' litigation plan will take a great deal of time to complete. Although the prospect of waiting years for the resolution of these asbestos issues is not one that the Creditors' Committee accepts easily, the prospect of having unquestionably valid non-asbestos claims dwarfed by asbestos claims that might not satisfy legal standards for validity is unacceptable.

---

[1]    W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues, dated June 21, 2002, is referred to herein as the "Debtors' Mem."

1

Indeed, the alternative suggested by the Official Committee of Asbestos Personal Injury Claimants (the "ACC") raises more significant problems. The estimation process that the ACC advocates assumes that the Debtors will be bound by their past actions in settling asbestos claims. Under the ACC's plan, the initial base (prior to any deductions) upon which the asbestos claims would be valued would be huge because it will not have considered any of the Debtors' defenses. Nor does the ACC's estimation plan recognize the simple fact that claims were settled by the Debtors pre-petition not because the Debtors conceded that the claims had merit, but simply because the Debtors considered the costs and risks of litigation and concluded that settling even non-meritorious claims made better economic sense. The ACC seeks to avoid resolution of the threshold issues and Grace's defenses by arguing that "the task is not to decide whether the tort system is fair, but to estimate how claims would be valued in it." (ACC Brief 2). However, a bankruptcy court's central task is to ensure that the reorganization is equitable – that is a basic goal of Chapter 11. A reorganization in which those with valid personal injury asbestos claims, as well as other legitimate creditors of these estates, are stinted so that those who have suffered no harm can claim compensation does not meet the test.

## ARGUMENT

### THE DEBTORS' CASE MANAGEMENT PROPOSAL SHOULD BE ADOPTED BY THIS COURT BECAUSE IT WOULD PERMIT THE PARTIES TO LITIGATE CONTESTED LIABILITY ISSUES CONSISTENT WITH BANKRUPTCY LAW

The Debtors' case management proposal is predicated upon a bar date and the completion by asbestos claimants of a "specialized claim form" to obtain certain information essential to determining the validity of claims against these Debtors' estates. Following submission of the proofs of claim, the Debtors would file omnibus objections to claims in order to litigate certain threshold liability issues, including: (1) whether an alleged injury is based on

2

WLM\164109.1

scientifically reliable and admissible evidence, including reliable diagnostic methods; (2) whether claimants can demonstrate an occupational history involving actual exposure to the Debtors' products; and (3) whether claimants can demonstrate that exposure to the Debtors' product substantially contributed to the claimed asbestos- related injury.  Among the scientific issues to be addressed, perhaps by an expert panel pursuant to Fed. R. Evid. 706, are what are appropriate diagnostic data for the diagnosis of asbestosis, whether pleural findings constitute impairment and what doses are recognized to cause mesothelioma, asbestosis and lung cancer.

        The respective memoranda filed by the Debtors and the ACC clearly reflect the fact that the science behind these asbestos liability issues is in dispute and requires review by this Court prior to estimation.  For example, there is a broad consensus, supported by the medical literature, that exposure to asbestos of sufficient intensity and duration can cause lung cancer. However, the development of lung cancer in an individual who has been exposed to asbestos does not necessarily mean that asbestos is the proximate cause of the cancer or even a substantial contributor.  Lung cancer has other causes, of which by far the most important is smoking, which is implicated in more than 90% of all lung cancer deaths.[2]  Moreover, lung cancer is a dose-response disease:  it takes a certain level and duration of exposure to asbestos, as it does to tobacco smoke, to create a substantial risk that the disease will develop.  Thus, the fact that an individual has been exposed to asbestos will not be sufficient to show causation unless that exposure threshold has been met.   For these reasons, particularly in cases where the claimant is or has been a cigarette smoker, the problem is to find valid criteria for distinguishing lung cancers caused by asbestos exposure from those caused entirely or mostly by smoking.

---

[2]   See American Lung Association, Trends in Lung Cancer Morbidity and Mortality, (February 2000), found online at http://www.lungusa.org/data/lc/lc_1.pdf.

3

Numerous researchers have concluded that asbestosis is a necessary prerequisite for deeming

lung cancer to be asbestos-related, and even, in some studies, that the asbestosis itself is a cause.

cause.[3]  The fact that the ACC can cite opposing studies is precisely why this Court must resolve

the contested issue based upon valid scientific evidence sufficiently reliable to satisfy Daubert.

Another example is the standard for diagnosing asbestosis, and whether non-

impaired claimants deserve compensation.  The ACC acknowledges that the American Thoracic

Society's published standards (The Diagnosis of Nonmalignant Diseases Related to Abestos,

official statement of the American Thoracic Society, March 1986, hereinafter "ATS") -- well

accepted in the medical profession -- requires a 1/1 ILS reading for a diagnosis of asbestosis.[4]

This is consistent with what the Debtors propose here and inconsistent with the plaintiffs'

assertions that an ILO reading of 1/0 "does not disprove asbestos disease." (ACC Brief at 35,

emphasis in original).  Although the ACC states that a 1/0 ILS reading is sufficient for a

diagnosis of asbestosis, the ATS Statement states that in order to make a diagnosis of asbestosis,

it is necessary that there be a "reliable history of exposure."  (ATS at 367).  "The major problem

facing the clinician is whether an exposure has been sufficient to cause the disease...A careful

sequential history of all exposures to all potentially harmful substances is obviously important."

(ATS at 365).  That is precisely the type of information that the Debtors insist is necessary from

claimants as part of their disclosures in the proof of claim.  The ATS finds that the value of an

---

[3]   See, e.g., Hughes, J.M. and Weill, H., "Asbestosis as a Precursor of Asbestos-Related Lung Cancer: Results of
a Prospective Mortality Study," British Journal of Industrial Medicine, 48:229-233 (1991); Churg et al.,
"Asbestos, Asbestosis and Lung Cancer," Modern Pathology, Vol. 6, pp. 509-510 (1993); Jones, Hughes, &
Weill, "Asbestos Exposure, Asbestosis, and Asbestos-Attributable Lung Cancer," Thorazx, S1 (Supplement 2),
S9-15 (1996); Browne, K., "Is Asbestos or Asbestosis the Cause of the Increased Risk of Lung Cancer, 43 Brit.
J. Indus. Med. 145-49 (1986); Hubbard et al,, "Lung Cancer and Cryptogenic Fibrosing Alevolitis--A
Population-Based Cohort Study," American Journal of Respiratory and Critical Care Medicine, 161:5-8 (2000).

[4]   According to the ATS, this criterion is the most important of the clinical criteria found to be "of recognized
value"—"When this criteria [sic] is not met, considerable caution is warranted." (ATS at 357).

WLM\164109.1

asbestosis diagnosis is increased by the presence of restrictive impairment (ATS at 367); in fact,

"The characteristics of pulmonary asbestosis are those of a restrictive lung disease." (ATS at

366). It is no coincidence that the ATS discusses pleural plaques and pleural thickening under

the heading "Benign Pleural Abnormalities Associated With Asbestos" (ATS at 363, emphasis

added).[5]  If they are benign, there is no injury, and no compensation is warranted.[6] [7]

The ACC predictably seeks to avoid litigation of these types of threshold issues,

preferring instead that the Court estimate the asbestos personal injury claims against the Debtors

based upon the pre-petition judgment and settlement history of the Debtors, without reaching the

underlying merits of any claims. The ACC's view ignores the fact that a defendant cannot obtain

a fair trial on an asbestos claim in many state courts.[8]  And even were this Court to find that it

---

[5]   Although "benign" can mean "nonmalignant" as well as "harmless," the fact that all the diseases discussed in
the article are already understood via its title to be nonmalignant indicates that "benign" is used in the latter
sense here.

[6]   Also, in the same section, the ATS describes plaques as "frequently diagnosed roentgenologically in
asymptomatic persons…." (ATS at 364). Thus, such claimants clearly have no symptoms and would not even
know there are plaques without an x-ray. Without any injury or impairment, there is nothing to compensate one
for.

[7]   The majority of the states that have ruled on the validity of unimpaired asbestos claims have found that pleural
plaques and asymptomatic pleural thickening do not constitute legal harm. See Debtors' Mem. at 33-35.
Moreover, because other states have not ruled on the issue, this Court may apply traditional notions of tort law,
consistent with all state's laws, and require that a claimant prove manifested harm in order to assert a valid
claim against the Debtors here. See In re M. Frenville Co., 744 F.2d 332, 337 n.8 (3d Cir.), cert. denied 469
U.S. 1160 (1985) (suggesting that federal common law might appropriately be applied in a "bankruptcy
proceeding stemming from a mass-tort – such as exposure to asbestos").

[8]   See, e.g., Bendily v. Exxon Corp, (La. 23rd Jud. Dist., Ascension Parish 1998), reported 13 Mealey's Litigation
Report: Asbestos, Sep. 21, 1998 (plaintiff claiming asbestosis without impairment was awarded $855,000 in
compensatory damages in Ascension Parish, Louisiana); Curry v. AC&S Inc., No. CV 00-181 (Miss. Cir.,
Holmes Co. 2001), reported 16 Mealey's Litigation Report: Asbestos, Nov. 9 2001 ($25 million verdict is the
highest verdict reported for asbestosis, in a case where none of the six plaintiffs suffered any impairment — in
fact, the named plaintiff testified at trial that he walked three to four miles a day); Parrino v. Owens Corning
Fiberglas, No. 94-04152-C-42 (11th Jud. Cir., Dade Co. Fla. 1998), reported 12 Mealey's Litigation Report:
Asbestos, January 23, 1998 (plaintiff claiming only pleural plaques was awarded $500,000 in Miami, Florida);
Lehmann v. Able Supply Co., No. 26-342B (Texas Dist. Mylam Co. 2001), reported 16 Mealey's Litigation
Report: Asbestos, Dec. 7, 2001. (A Texas court awarded a former Alcoa employee claiming pleural plaques
$370,000 plus $250,000 in punitive damages, for a total of $620,000;  another plaintiff in the case claiming
asbestosis actually received a lower compensatory award, $237,500, but a punitive damages award of
$500,000).

5

should apply state law in estimating claims, it is not bound to follow in lockstep the manner in which asbestos cases are mismanaged in the "tort system" -- a term that the ACC uses repeatedly in its brief, but that is not synonymous with "state law." By importing the past settlements of dubious claims for estimation purposes, the ACC seeks to capitalize on the very abuses and inefficiencies which have created the asbestos litigation crisis in the first place, and which led the Debtors to seek bankruptcy protection.

Moreover, the ACC's insistence on estimation based upon strict adherence to Grace's prior settlement history ignores the very purpose of estimation. Estimation is not being done for its own sake, but, in the case of an asbestos bankruptcy like this one, to assess the level of claims liability that a Bankruptcy Code § 524(g) trust will face so that it can be adequately funded to pay such claims. Contrary to the assertions of the ACC, the Debtors are not trying to impose "the litigation of every contingent or unliquidated claim to judgment," (ACC Brief at 6), or even the litigation of some of the claims to judgment, or to "estimate each claim individually." (Id. at 7). Rather, the Debtors propose to establish the ground rules under which claims against the 524(g) trust will ultimately be made and, based upon how many claims will be valid under those rules, accurately estimate the Debtors' asbestos personal injury liability. Estimation will be done in the aggregate -- once the criteria for estimation have been determined.

The need to prove the validity of their claims against the Debtors' estates is fundamental to the claims allowance and resolution process in bankruptcy cases. The ACC's insistence on using prior claims history as a means of estimating asbestos personal injury liability thus confuses the familiar with the necessary. The ACC argues that "Grace's claims resolution history reflects its real-world liability." However, it cannot be denied that in choosing to settle cases Grace had to consider not only its potential liability but its costs (legal and other) of

6

defending lawsuits spread across nearly every jurisdiction and court in the country. Thus, for example, if Grace had 100,000 absolutely non-meritorious claims outstanding, and each would cost approximately $3,000 to defend (a low-ball figure by any account), prudent exercise of business judgment would justify settling all such claims for any amount less than $3 billion. However, that doesn't mean that any amounts paid reflect Grace's liability to such claimants, which under the hypothetical would still be zero. Yet, using Grace's past settlement payments as a basis for estimating liability does just that. Estimation of Grace's "real-world liability" is not best done by extrapolation from past settlements payments, but rather by centralized litigation of those common threshold liability issues which Grace and other asbestos defendants were unable to advance in the "tort system."

        Not even the ACC can deny that the courts have been unable to handle the excess of asbestos litigation pending before them. Over ten years ago, a distinguished panel of judges appointed by Chief Justice Rehnquist characterized the state of asbestos litigation as "a disaster of major proportions to both the victims and the producers of asbestos products, which the courts are ill-equipped to meet effectively":

> [D]ockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recoveries by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.

Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation, at 2-3 (Mar. 1991) ("Judicial Conference Report"). This very Court recognized the problem even earlier, noting:

> Undeniably asbestos exposure litigation has created a court logjam of unprecedented dimension. It is estimated that 'more than 30,000 asbestos personal injury claims were filed nationwide by 1986, and an additional 180,000 claims are projected to be on court dockets by the year 2010.' The portent of this staggering and almost incomprehensible number of claims compels the legal and the judicial communities to mutually rethink the organic structure of a product liability trial, especially when it is premised on an asbestos-related injury. The

7

> magnitude of the problem invites the employment of extraordinary case
> management techniques provided they equally serve the litigants, the court and
> the ends of justice.

Campolongo v. Celotex, 681 F.Supp. 261, 262 (D.N.J. 1988) (Wolin, J.) (citing In re School

Asbestos Litigation, 789 F.2d 996, 1000 (3d Cir.1986)) (emphasis added).  The sheer volume of

asbestos litigation and the exorbitant transaction costs attendant thereto resulted in many

defendants adopting inventory-style settlements of unmeritorious claims in an effort to minimize

legal fees required to mount a vigorous defense of such claims.  See Debtors Mem. at 14, 18-20.

 A basic tenet of tort law is that one must have sustained a harm to have a claim.[9]

Yet, in asbestos litigation, that tenet has been largely ignored.  The rise of claims alleging

"injury" without physical impairment has been cogently described as a "substantial factor in the

perverse incentive structure that permeates asbestos litigation and plays a very substantial role in

the asbestos-litigation crisis, both in terms of sheer volume and the various costs imposed on

defendants." Brickman, "The Asbestos Litigation Crisis, Is There a Need for an Administrative

Alternative?", 13 Cardozo L. Rev. 1819, 1859 (1992) (finding that "pleural plaque claims

account for sixty to seventy percent of new asbestos claims filings and represent a substantial

percentage of previously filed claims;" id. at 1852-54).  The result of this perverse incentive

structure is that:

> In recent years, caseloads have burgeoned — not because of an increase in the
> numbers of the seriously ill — but rather because of the enormous incentives for
> the plaintiffs to weather the lottery and the far more enormous incentives for
> plaintiffs' lawyers to obtain ever increasing numbers of claimants.

---

[9]  Harm means "the existence of loss or detriment in fact of any kind to a person resulting from any cause."
RESTATEMENT (2ND) OF TORTS §7 (1965).  The harm must be current, actual harm, not prospective harm:
"The threat of future harm, not yet realized, is not enough."  PROSSER & KEETON ON TORTS §30, at 165 (5th ed.
1984).  Moreover, a "mere change or alteration in some physical person, object, or thing" is not a legally
compensable harm.  The restatement notes that "Physical changes or alterations may be either beneficial,
detrimental or of no consequence to a person," and there is legal harm only "[i]nsofar as physical changes have
a detrimental effect on that person." RESTATEMENT §7 cmt. b.

8

Id. at 1834. Since 1992, all that has changed is that the proportion of unimpaired plaintiffs in new asbestos claims filings has grown even larger, to over 90% in some jurisdictions[10], while the rising number of claims has driven some two dozen additional companies into bankruptcy.

Professor Brickman recently opined that an amorphous "special asbestos law" is routinely applied to resolve asbestos claims:

> Instead of having to directly prove both exposure to specific products and causation, all that was required was testimony from somebody that Company A's products were used at the work site, plus medical testimony that exposure could cause injury, plus a claim of significant injury, and the case could go to the jury, and the jury could do what juries do. But in adjusting the rules of evidence to meet the exigencies of asbestos cases, that is, in creating a result-driven evidentiary regime for cases where the fullest compensation for serious injury seemed merited, the appellate courts failed to confine the circumstantial hearsay evidence rule that they had created to cases of serious injury. Almost immediately, special asbestos law was applied to cases of dubious injury and ultimately to cases ... with no injury.[11]

Unlike any other state or federal court, a Bankruptcy Court (or a District Court sitting in bankruptcy) has the power to centralize the resolution of all claims against a debtor-defendant in a single court under claims resolution procedures. See 11 U.S.C. §502. Perhaps most significant is the Court's ability to determine through this process issues common to large numbers of claimants, so that these common issues are litigated only once, rather than being litigated repeatedly in different courts, with inconsistent results, lengthy delays, and enormous transaction costs. This is exactly what Debtors propose here. Indeed, global disposition of threshold common issues is precisely the sort of stringent judicial "gate-keeping" that, as the Fifth Circuit Court of Appeals has urged, is necessary to weed out "weak and frivolous claims"

---

[10]  See, e.g., Roger Parloff, The $200 Billion Miscarriage of Justice, Fortune, March 4, 2002: "Though the ratios vary widely by jurisdiction, in some states non-malignant cases now outnumber cancer cases by margins as wide as 47 to 1." While "non-malignant" can include impairing asbestosis, the incidence of such has been diminishing for a number of years as more time passes since the years of heavy exposure.

[11]  Mealey's Asbestos Bankruptcy Report, Volume 1, Issue #12, July 2002 at 30 (emphasis added).

9

and thereby manage mass tort litigation "in a way that avoids judicial meltdown." Castano v. American Tobacco Co., 84 F.3d 734, 747 n. 24 (5th Cir. 1996).

      The ACC rightly notes that it is an established principle of bankruptcy law that a bankruptcy court must look to state law to determine the validity of pre-petition claims against the debtor.[12] However, the ACC is mistaken in its assertion that the applicable law requires the Court to accept such a claim as valid even if brought by persons who have suffered no harm, where the harm suffered by the plaintiff cannot be shown by scientifically valid evidence to be caused by asbestos, or where the plaintiff cannot show exposure to Debtors' asbestos products. This assertion ignores the fundamentals of tort law, followed by every state, which require a plaintiff to show: (1) that he has suffered an actionable legal harm; and (2) that the defendant's breach of a duty of care was a substantial cause of that harm to the plaintiff. See Restatement of Torts §431(a) and footnote 9 supra. There is no requirement in bankruptcy or any other law that the Debtors provide compensation to claimants who cannot meet those essential elements of a cause of action in tort.

      The Debtors are thus entitled to a determination, based on evidence that conforms with the Daubert requirements, on questions such as those listed in Debtors' brief at 24, regarding the medical criteria to be applied to claims in order to ensure that the threshold requirements of harm and causation are met. These criteria should require a showing based on reliable diagnostic procedures that the claimant either has a malignant illness or has a non-malignant illness that has caused impairment -- i.e., actual harm -- and that that illness is caused by exposure to asbestos. Claimants should also be able to show that they worked in an

---

[12] In re Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 91 L. Ed. 162, 67 S. Ct. 237 (1946). See also, West Texas Marketing v. U.S., 54 F.3d 1194 (5th Cir. 1995), cert. denied 516 U.S. 991, 116 S.Ct. 523, 133 L.Ed.2d 430 (1995).

occupation or workplace where they would have been exposed to the Debtors' asbestos products -- otherwise, it should go without saying, the Debtors have no liability whatsoever to the claimant.

Only after those criteria have been established by the Court can an estimation possibly be made as to how many claimants will have a valid claim for which the 524(g) trust will be liable, i.e., will meet the basic elements of harm and causation, and the value of their claims determined. Under the essential principles of both tort and bankruptcy law, those claimants who do not meet those criteria must be excluded from compensation and hence from any estimates of the trust's ultimate liability. The Debtors' limited assets must not be squandered on payments to putative claimants whose claims do not meet the most minimal requirements of the law, and no estimation should assume that they would do so.

11

## CONCLUSION

For the reasons set forth above and those set forth in the Debtors' motion and accompanying submissions, it is respectfully submitted that this Court adopt the Debtors' case management proposals.

Dated: Wilmington, Delaware
      August 6, 2002

Respectfully submitted:

**STROOCK & STROOCK & LAVAN LLP**
Lewis Kruger
Kenneth Pasquale
(Members of the Firm)
180 Maiden Lane
New York, New York 10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

and

**DUANE MORRIS LLP**

/s/ Michael R. Lastowski
Michael R. Lastowski (DE I.D. No. 3892)
William S. Katchen
1100 North Market Street
Suite 1200
Wilmington, Delaware 19801
Tel: (302) 657-4900
Fax: (302) 657-4901

Co-Counsel for the Official Committee
of Unsecured Creditors

12