# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W. R. Grace & Co., *et. al*. | ) | |
| | ) | **Case No. 01-01139(JKF)** |
| Debtors. | ) | **Jointly Administered** |

## THE UNOFFICIAL COMMITTEE OF SELECT ASBESTOS CLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEBTORS' MOTION FOR CASE MANAGEMENT ORDER

Steven T. Davis, Esquire (SD2731)
Obermayer Rebmann Maxwell & Hippel LLP
716 Tatnall Street
Wilmington, DE 19801

- and -

Edmond M. George, Esquire (pro hac vice)
Obermayer Rebmann Maxwell & Hippel LLP
One Penn Center – 19th Floor
1617 John F. Kennedy
Philadelphia, PA 19103-1895
215-665-3100

Local Counsel to the Unofficial Committee
of Select Asbestos Claimants

- and -

Elizabeth W. Magner, Esquire (pro hac vice)
1100 Poydras Street
Suite 1806, Energy Centre
New Orleans, Louisiana  70163
(504) 599-8650

Counsel to the Unofficial Committee
of Select Asbestos Claimants

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................................................……iii

I.      INTRODUCTION..........................................................................................1

II.     OBJECTION TO CLAIMS.............................................................................6

        A.      Claims Objections Are Necessary.............................................................6

        B.      Claims Identification and Filing..........................................................13

                1.      Failure to State a Claim..........................................................14

                2.      Failure to Establish Harm......................................................17

III.    CONCLUSION................................…......................................................20

# TABLE OF AUTHORITIES

## <u>CASES</u>

**CASE**                                                                                          **PAGE**

*Ammons v Franklin Ins.*, 348 F2d 414 (5th Cir. 1965)....................................................13

*Anderson v WR Grace & Co.*, 628 F. Supp. 1219 (D. Mass. 1986)...............................16

*Bailey v Capital Holding Corporation*, 873 S.W.2d 187 (Ky. 1994)...........................16

*Bernier v Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986)....................................16

*Bocook v Ashland Oil, Inc.* 819 F. Supp. 530 (1993)....................................................16

*Bonz v Sudweeks*, 119 Idaho 539, 808 P.2d 876 (Idaho 1991)......................................16

*Caterinicchio v Pittsburgh Corning Corp*, 127 N.J. 428, 605 A.2d 1092 (NJ 1992)....................17

*Chereton v. United States*, 286 F.2d 409, 413 (6th Cir. 1961), *cert. denied*, 366 U.S. 924, 81 S. Ct. 1351, 6 L. Ed. 2d 384 (1961)…………………………………………………………...11

*Cochrane v AC&S, Inc*, 1998 U.S.Dist. LEXIS 14633 (1998)......................................16

*DeStories v City of Phoenix*, 154 Ariz 604, 744 P.2d 705 (1987)................................16

*Eagle-Picher Industries, Inc v Cox*, 481 So.2d 517 (Fla D. Ct. App. 1985)................16

*Eagle-Picher Industries, Inc., et al.,* (U.S.D.C. S.D.O., WD) 1996 U.S. Dist. LEXIS 17160 (November 18, 1996)…………………………………………………………………..2

*Evans v S.S. Kresage Co.*, 394 F.Supp. 817 (D.C. Pa. 1975), *affm'd* 544 F.2d 1184, cert den'd 97 S.Ct. 2973, 433 U.S. 908, 53 L.Ed2d 1092.............................13

*Goodall v United Illuminating*, 1998 Conn. Super. LEXIS 3584 (1998)…………………………..16

*In re A.H. Robins Company*, 89 B.R. 555 (E.D. Va. 1988) .....................................5,14

*In re Acequia*, 787 f. 2d 1352 (9th Cir. 1986).................................................................3

*In re: Asbestos Litigation; Leary Trial Group, Limited to: Alfred Mancari:* 1994 Del. Super.

LEXIS 685 (1994)………………………………………………………………..16

*In re Asbestos II*, 142 F.R.D. 152 (1991)...................................................................16

*In re Chateaugay Corporation, Reomar, Inc. v. LTV Steel Company, Inc., et al.*, (1991 U.S. Dist. LEXIS 4739) (S.D. N.Y.  April 8, 1991)……………………………………………..12

*In re Coltex Loop Central Three Partners, L.P.*, 38 F. 3d 39 (2nd Cir. 1998)................................4

*In re Corey*, 892 F. 2d 829, (9th Cir. 1989) *cert. den'd*, 498 U.S. 815, 112 L.Ed 2d 31…………..5

*In re Cuyahoga County Asbestos Cases*, 127 Ohio App.3d 358 (1998)........................................17

*In re Frigitemp Corp.*, 15 B.R. 263  (Bankr.S.D.N.Y. 1981)………………………………………11

*In re GHR Energy Corp.*, 33 B.R. 451 (Bankr.D.Mass 1983)………………………………………11

*In re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563, (D. Hawaii 1990)..............................16

*In re Johns-Manville Corp.* 36 B.R. 743 (Bkrtcy. 1984).................................................................14

*In re Johns-Manville Corp*, 42 B.R. 362 (Bkrtcy. S.D. N.Y. 1984)   ..........................................11

*In re Kar Development Associates, L.P.*, 180 B.R. 597 (Bkrtcy. D. Kan. 1994)...........................14

*In re Mantolesky*, 14 B.R. 973, 976 (Bankr.D.Mass. 1981). .....................................……………11

*In re Perez*, 30 F. 3d 1209 (9th Cir. 1994)...................................................................................3

*In re Potter Material Service, Inc.*, 781 F. 2d 99 (7th Cir. 1986).....................................................3

*In re Southern Pacific Transport Co. v. Voluntary Purchasing Group, Inc.*  252 B.R.  373 (E.D. Tex 2000)..............................................................................................4

*In re UNR Industries, Inc.*, 45 B.R. 322, 326-27 (N.D.Ill. 1984)…………………………………5

*In re Westpointe*, L. P., 241 F. 3d 1005, (8th 2001)........................................................................4

*Joyce v AC&S, Inc.*, 785 F.2d 1200 (4th Cir. Va. 1985)...............................................................17

*Kaeding v WR Grace & Co*, 1998 MT 160 (1998).......................................................................16

*Kraciun v Owens-Corning Fiberglas Corp.*, 895 F.2d 444 (8th Cir. 1990)..................................16

*Matter of 203 N. LaSalle Street Partnership*, 126 f. 3d 955(7th Cir.1997)....................................3

*McCleary v Armstrong World Industries, Inc.*, 913 F.2d 257 (5th Cir. Tex. 1990).......................17

*Miller v Armstrong World Industries, Inc.*, 949 F.2d 1088 (1991)..............................................16

*Owens-Illinois, Inc. v Armstrong World Industries, Inc.*,
     87 Md. App. 699, 591 A.2d 544 (1991)....................................................................16

*Potts v Celotex Corp*, 703 F. Supp. 672 (1988).......................................................................16

*Richmond v A.P. Green Industries, Inc.*, 66 Cal. App 4th 878 (1998)..........................................16

*Roberts v. Johns-Manville Corp.*, 45 B.R. 823, 825-26 (S.D.N.Y. 1984) ....................................5

*Schweitzer v Consolidated Rail Corp*, 758 F.2d 536 942 (3d Cir. 1985)....................................16

*Sopha v Owens Corning Fiberglas Corp*, 230 Wis 2d 212 (1999)..............................................16

*Werlin v United States*, 746 F.Supp. 887 (D. Minn. 1990)........................................................17

*Zweig v Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975)................................................................13

## STATUTES

11 U.S.C. §524(g)..........................................................................................................3,4

11 U.S.C. §1129(c)............................................................................................................3

11 U.S.C. §1129(b) ...........................................................................................................3

11 U.S.C. §1126(c)............................................................................................................4

11 U.S.C. §101(5)............................................................................................................14

28 U.S.C. §157(b)(5)...........................................................................................................4

Fed. R. Bankr. P. 2004.................................................................................................11,12

Fed. R. Bankr. P. 3004......................................................................................................1

Fed. R. Bankr. P. 3018(a)...................................................................................................3

Fed. R. Civ. P. 11.................................................................................………..20

Fed. R. Civ. P. 12.......….........................................................................…….14

Fed. R. Civ. P. 42………........................................................................…….14

Fed. R. Civ. P. 56. . ...............................................................................…….14

## OTHER AUTHORITIES

Collier on Bankruptcy, P 502.04 [3](Lawrence P. King ed. 15th rev. ed.2001)............................. 3

*Principles of Assessment*, Guides to the Evaluation of Permanent Impairment, American
       Medical Association…………………………………………………………..…18

Prosser & Keeton on Torts §30, at 165 (5th Ed. 1984)....................................................17

Restatement (2nd) of Torts §7 (1965)..........................................................................17

**THE UNOFFICIAL COMMITTEE OF SELECT ASBESTOS CLAIMANTS'
MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE
TO W.R. GRACE'S SUPPLEMENTAL BRIEF REGARDING PROCEDURES FOR THE
LITIGATION OF THE COMMON PERSONAL INJURY LIABILITY ISSUES**

This memorandum is submitted by the Unofficial Committee of Select Asbestos Claimants ("SAC") in response to the request by W.R. Grace & Co., *et.al*. ("Debtors") for approval of Procedures for the Litigation of the Common Personal Injury Liability Issues.  As directed by the Court, the SAC will address only those objections not otherwise raised by the Official Committee   of Asbestos Claimants ("ACC") or Debtors, or positions that differ from these parties in interest.

## I.    INTRODUCTION

The Debtors propose an estimation process whereby claims will be identified either through the fixing of a bar date and the use of the claims allowance process or through transfer of pending claims from other forums, or through Debtors' filing of claims on behalf of certain asbestos claimants who have not filed proofs of claim under and pursuant to the authority granted in Fed.Bank.R.P. 3004[1]. Thereafter, claims would be subject to challenge based on defenses enumerated by Debtors.  Without commenting on the merits of any defenses raised or challenges proposed by the Debtors, the SAC supports Debtors' request for a claims process and a procedure whereby claims failing to present evidence of disease or impairment may be substantively challenged and eliminated for purposes of estimating Debtors' liability, as well as for voting, and distribution purposes.

The ACC objects to the Debtors' proposed vehicle for challenging claims, arguing that it is impossible to deal with these claims through the allowance process, condemning the claims filing process, while arguing that providing notice to claimants of objections and engaging in trials on the merits as implausible. The ACC thus demands that all claims, no matter how flimsy or specious to be accepted for estimation and voting purposes, regardless of their validity, simply because demand has been made. The Bankruptcy Code does not authorize those without legitimate claims to participate in the distribution of the debtor's assets.

The importance of the estimation and allowance process selected by this Court cannot be understated. Generally, estimation determines the allowed amount of an unliquidated or contingent claim. The claim as allowed is then utilized by the court, debtor and claimants alike to determine feasibility of the plan, voting rights and for purposes of plan confirmation, the allocation of distributions to classes of claimants. For example, in the case of a single, disputed claim, the estimation process determines the dollar amount included in the class for the claimant. Because a claimant votes based on the amount of its claim, estimation also determines the weight to be attributed to a claimant's vote. Finally, if the plan is confirmed, the amount estimated or allowed defines the pool used to calculate distributions under the plan. *See Eagle Picher Industries, Inc., et al.,* (U.S.D.C. S.D.O, WD) 1996

---

[1] F.BankR.P. 3004 provides in pertinent part: " If a creditor fails to file a proof of claim on or before the first date set for the meeting of creditors . . . the debtor may do so in the name of the creditor within 30 days after the expiration of the time for filing claims.

398162

2

U.S. Dist. LEXIS 17160 (November 18, 1996).   In short, the estimation and allowance process

substantively determines the claimant's rights against the debtor.[2]

If a case contains a large class of unliquidated claims, estimation may be used to determine the

extent of the debtor's total liability to the class.  The amount determined may be used to test the plan's

feasibility. Pursuant to 11 U.S.C. §1129(c), a plan may be confirmed if the court finds that all impaired

classes consent and the plan is feasible.[3]   A plan is feasible if under its terms, a debtor is unlikely to

need further reorganization or the plan has a reasonable likelihood of success.[4]  Thus the first inquiry

into confirmation of a proposed plan is the debtor's ability to satisfy its terms without the necessity of

further bankruptcy relief.  The size and repayment terms of the debtor's obligations obviously are

critical to any such finding.  To the extent the debtor's liabilities are contingent, unliquidated, or may

arise in the future, the court may estimate their size in order to determine if the debtor can reasonably

expect to meet its proposed obligations as set forth in the plan.

The size of the class may also determine if equity interests may retain their rights to the debtor

under a plan.  Under either 11 U.S.C. §1129(b) or 524(g), the shareholders of the debtor may not

retain any rights of ownership unless all creditor claimants have received distributions under the plan

---

[2]  A claim allowed through estimation is allowed for all purposes in a bankruptcy case.   4
*Collier on Bankruptcy*, P 502.04 [3](Lawrence P. King ed. 15th rev. ed.2001); Fed. R. Bankr. P.
3018(a).

[3]  Confirmation may also be allowed despite rejection by an impaired class, if at least one
impaired class votes to accept the plan and the court finds the plan to be fair and equitable.  *In re
Perez*, 30 F. 3d 1209 (9th Cir. 1994); *In re Potter Material Service, Inc.*, 781 F. 2d 99 (7th Cir.
1986).

[4]  *In re Acequia*, 787 F. 2d 1352 (9th Cir. 1986); *Matter of 203 N. LaSalle Street
Partnership*, 126 F. 3d 955 (7th Cir 1997).

equal to 100% of their claims.[5]

Estimation may also be necessary to determine if consent to the plan has been obtained from the class.[6]  Under 11 U.S.C. §1126(c), classes of claimants vote by both amount and number. The debtor is required to obtain the consent of 66 2/3% of the total amount owed as well as 50% of the total number of claimants voting in the class.  Under 11 U.S.C. §524(g), the debtor must obtain 75% approval of the amount and number of claims in the asbestos personal injury claimants class in order to obtain §524(g) relief.  Since most, if not all, of these claims are unliquidated, the court must estimate individual values of the class in order to establish individual voting rights and ultimately determine whether there has been acceptance by the class of the plan.

While estimation of wrongful death and personal injury tort claims can determine the amount of the claim for voting purposes as well as determine the amount included in a class, it does not control the claimant's distributions under a confirmed plan.  This important exception to the estimation power of the courts is codified in 28 U.S.C. §157(b)(5).  The exception ensures that personal injury tort and wrongful death claims *shall* be liquidated by a district court after utilizing the protections afforded the litigants under the Federal Rules of Civil Procedure.   This exception does not prevent the bankruptcy court from determining by estimation and allowance a claimants' entitlement to participate in distributions under the plan.   Indeed, many courts have observed that though §§157 (b) denies authority to the bankruptcy court to "estimate" contingent claims only if the purpose is to make a

---

[5]  The absolute priority rule ensures that subordinate classes of claims do not receive anything of value under the plan until all superior classes have been satisfied. *In re Westpointe, L. P.,* 241 F. 3d 1005, (8th Cir. 2001); *In re Coltex Loop Central Three Partners, L.P.*, 138 F. 3d 39 (2d Cir. 1998);  and  *In re Southern Pacific Transport Co. v. Voluntary Purchasing Group, Inc.* 252 B. R. 373 (E.D.Tex. 2000).

"distribution" of the assets of the debtor; the statute does not in express terms deny to the bankruptcy court the authority, or relieve it of the duty, to "estimate" the contingent "personal injury" claims for purposes of determining the feasibility of a reorganization.  *See Roberts v. Johns-Manville Corp.*, 45 B.R. 823, 825-26 (S.D.N.Y. 1984); *see also In re UNR Industries, Inc.*, 45 B.R. 322, 326-27 (N.D.Ill. 1984).  Both of these cases, addressing asbestos related personal injury claims specifically, clearly hold that estimations of the debtors' potential personal injury tort liabilities as an incident of the development of a plan of reorganization are core proceedings within the bankruptcy court's jurisdiction and that such estimations are not foreclosed by Section 157(b)(5) of the Act.  Indeed estimation is critical in ensuring the Debtor is not subjected to litigation in numerous forums when its efforts could be better spent in formulation of its plan.  *See In re A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir 1996).

Unlike the proposal of *US Gypsum, et. al*., also pending before this Court,   Debtors' litigation protocol will substantively challenge certain claims based on the claimant's failure to present evidence sufficient to support his or her claim.  Debtors contemplate bringing these challenges through summary judgment hearings on common issues of law, avoiding individual consideration of the underlying facts surrounding the claims.   If Debtors are successful in their challenge, the claims will then be eliminated from the pool used to estimate Debtors' liability.  They will also be barred from participating in any distribution from the personal injury trust formed under a confirmed plan.[7]  The substantive elimination of claims from both the pool from which future liability is estimated, and the ultimate distributions under the

---

[6]  *In re Corey*, 892 F.2d 829 (9th Cir. 1989) *cert. den'd*, 498 U.S. 815, 112 L.Ed 2d 31.

plan avoids the substantial risk of an under-funded trust.  Though the ACC makes much of the Court's inability to hear substantive challenge to claims, the SAC does not believe the task is as daunting as the ACC would have all assume.  The SAC respectfully submits that a protocol for estimation and allowance is appropriate and necessary given the facts of this case.

## II.    OBJECTION TO CLAIMS

### A. Claims Objections Are Necessary

If we take the ACC at their word, in order to estimate future claims by asbestos claimants, experts will have to first determine the incidence of asbestos related disease in the population for a given time period.  According to the ACC, this is derived from well-known epidemiological models.  The ACC next states that the expert will estimate the percentage of people filing claims against Debtors, noting any increased filing trends and taking full account of the Debtors' rejection history.  The ACC's estimation process must scrutinize claims in order to determine if (1) "trends in filing rates" are likely to continue, increase or decrease; and (2) historical rejection rates will increase, decrease or remain constant.  The SAC argues that either or both of these factors may change substantially based on the number and quality (in terms of proof of disease, damage and exposure) of the claims filed.

While the SAC agrees that past settlements are an indication of future liability, there are substantial limitations to the usefulness of this information.  The ACC's insistence that past settlement histories are the best evidence of future liabilities conveniently ignores the unprecedented and inexplicable changes in the number, quality, and as evidenced by increase in unimpaired claims, validity

---

[7]  The SAC supports the elimination of claims, which fail to establish a compensable disease or injury as well as those with no impairment.  However the SAC believes that said claims should be dismissed without prejudice to refiling if a disabling condition should develop in the future.

398162                                                6

of claims being filed in the last two to three years.

What the ACC fails to explain is the sudden increase in claims filings within the Debtors' recent history.   In its Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues ("WRG Mem."), WR Grace outlines the inexplicable ***73% increase*** in claims filed against it in the year 2000 alone.  (WRG Mem. p. 4-7).  This increase is almost wholly the result of an increase in unimpaired claims.  As WR Grace asserts: "Actual asbestos-related malignant disease rates are declining in response to the regulatory curtailment of significant asbestos exposures in the early 1970's." (WRG Mem. p. 6-5).  WR Grace's filing history for malignancy claims reflects this reality, with only 7% of the claims asserting a claim for mesothelioma in 1997 and 6% in 2000.

Over the most recent past, tens of thousands of claims alleging injury due to asbestos exposure have been filed against defendants with insurance and assets to pay.  The claimants typically do not suffer from any disabling condition.  They have no compensable damage in the form of medical costs, loss of earning capacity or diminution of quality of life.  Most claimants have not been diagnosed by a physician, nor have they undergone sufficient medical testing to establish the disease of which they complain.  Dr. Peterson, expert for the ACC in the Babcock & Wilcox bankruptcy proceedings taking place in Louisiana, testified that the incidence of claims made by this class of creditors follows *no known epidemiological model.*

> You can't apply the epidemiological work--and, indeed, there is no similar epidemiological work like we've just seen for cancers.  There's nothing really like that for non-malignant diseases.
>
> So, as a result, I and everyone else who forecast this-- and I'm not alone-- virtually-- not everyone--most everyone else who forecasts asbestos claims projects and forecasts the number of future non-malignant claims as some mathematical function, some

mathematical relationship to the number of cancer claims occurring in future years.[8]

Dr. Peterson also testified:

> Q: Would it be fair to say that there is no epidemiological forecast or model for non-malignant claims that you're able to use in this case?

> A: I think that's--well, there are epidemiological models that I use and understand that contribute to what I do, but there is no epidemiological model that says that number of people that get non-malignancies, year-by-year, nor is there an epidemiological projection that says what's the total number of people who, out there today, have a non-malignancy.

Dr. Peterson bases the future estimation of claims in this category, not on medical science, but upon his own mathematical formula.  Thus the ACC's bold assertion that its expert, Dr. Peterson, would estimate future claims "based on sound epidemiological science" is without support.  As explained by Dr. Peterson in the Babcock & Wilcox case, only the occurrence of malignancies may be projected based on medical science and epidemiological studies proven to be accurate over the last 30 years.  The incidence of nonmalignant claims has defied any method of projection and in his opinion is based on the "propensity to sue."[9]

Far from being ascertainable under any accepted scientific model, Dr. Peterson's projections are  merely guesses.  In the Babcock & Wilcox case, the debtor had received approximately 46,000 claims in the year preceding its filing.  After a bar date was set sixteen months subsequent to its

---

[8]   Testimony of Dr. Mark Peterson at the hearing on insolvency conducted by the United States Bankruptcy Court for the Eastern District of Louisiana, in the case of  In re Babcock & Wilcox Co. et. al., case no. 00-10992, October 23, 2001, page 20, lines 13-23, page 95, lines 2-10, attached hereto as Exhibit "A".

bankruptcy filing, Babcock & Wilcox had over 225,000 claims on file. Nothing in its historical experience could explain the 350% increase in claims. Interestingly, the total claims representing malignancies was historically and statistically constant. It was the sharp increase in unimpaired, nonmalignant claims that accounted for the rise. An analysis by Babcock & Wilcox revealed that 160,000 claims failed to identify any site containing a Babcock & Wilcox boiler. Of the total claims filed, over 148,000 were for pleural conditions or asbestosis with no lung impairment. Another 12,000 claims had no evidence of medical disease or condition. Despite an extensive proof of claim form requiring the claimant's work history and medical documentation of disease, over 75% of the claims filed lacked any evidence of one or both.[10]

The experience of Babcock & Wilcox is reflected in the rate of filings against Johns-Manville and other defendants. In the year 2001 alone, the Johns-Manville Trust received over 90,000 new claims. This shocking increase in the assertion of these unimpaired claims is highly improbable from a statistical and logical standpoint, given that in 1986 Manville had only 17,000 claims in total from all claimants. At present, *over 76% of every dollar* distributed by the Johns-Manville Trust is paid to a claimant who suffers no impairment whatsoever. Interestingly, while the amounts paid to those dying from mesothelioma and lung cancer dwindle to embarrassingly inadequate amounts, the total number of

---

[9]  Taken from testimony of Dr. Mark Peterson offered at the trial on Debtor's Petition for Declaratory Relief, specifically on the calculation of existing and future liability due to asbestos exposure claims, October 22-23, 2001. The testimony was rejected by the Court as insufficient to establish liability. See Opinion of the Honorable Jerry A. Brown, United States Bankruptcy Judge, Eastern District of Louisiana.

[10]  Babcock & Wilcox Report to The Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here, filed October 18, 2001, pgs. 3-4, attached hereto as Exhibit "B".

malignancy claims presented for payment in any given year has remained relatively stable.[11]

Indeed, Judge Weinstein and Judge Lifland, overseeing the Johns-Manville bankruptcy proceedings just last week issued an order reflecting the court's disappointment of the existing parties in interest to deal with the misallocation of the trust assets, and the obvious and inequitable disfavoring of those with the most serious injuries.  The judges set a status conference for September 3, 2002 so that interested parties could "show cause" why an order should not be entered by the court exercising its chancery powers to modify prior judgments and relevant trust documents as warranted by "the present and prospective equities."   See July 29, 2002 Order of Judge Weinstein and Judge Lifland attached hereto as Exhibit "D".

Finally, in *US Gypsum*, the Debtors are also complaining of an unnatural increase in the rate of unimpaired, non-malignancy claims.  Though Debtors in that case paid approximately 307,000 over their 22-year history, claims filed in the 3 years immediately prior to bankruptcy may reach 190,000 or 60% of the total claims paid.

With rates for the assertion of new claims climbing at alarmingly suspicious rates, any reasonable person should conclude that something in the process is amiss.  Unfortunately for the SAC's clients who suffer from real, life-threatening diseases, the majority of the plaintiff's bar is in large part responsible for these increases.  These facts squarely support the SAC position that scrutiny of the claims is mandatory to ensure that claimants without supportable claims do not receive a windfall at the expense of the seriously ill.  With statistically improbable numbers of claimants making demand, without any proof of medical diagnosis or even at the most basic of levels of exposure, no one, least of all this Court, can be

---

[11]   See Report of Johns-Manville Personal Injury Claimants Trust for the year ended December

assured that the claims really do represent valid liabilities of the Debtors.  So significant is the question of the Debtor's underlying liability for a majority of claims asserted, that preliminary challenges to test the sufficiency of the claims against Debtors must be brought.

The ACC's statement that discovery cannot be propounded upon the claimants is equally without merit.  With or without pending objection to a claim, Debtors may propound discovery against any interested party including personal injury claimants.  Under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 2004, any party may demand discovery of  "any entity" in order to determine "the liabilities and financial condition of the debtor or to any matter which may effect the administration of the debtor's estate . . . ."  Fed.R.Bkr.P. 2004.  The range of discoverable subject matter in a Rule 2004 examination is "unfettered and broad."  *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr.D.Mass 1983).  Courts have routinely likened the examination under Bankruptcy Rule 2004 to a "fishing expedition," [12] granting parties in interest wide latitude in the scope of the examination.  *See In re Johns-Manville Corporation*, et al., 42 B.R. 362; (S.D.N.Y. 1984).

Debtors' right to discover facts surrounding claims pending against them, whether asserted by

---

31, 2001, attached hereto as Exhibit "C".

[12]  Indeed, Rule 2004 contemplates a broad and far-reaching inquiry, even a "fishing-expedition".  *See In re Frigitemp Corp.*, 15 B.R. 263, 264 n.3 (Bankr. S.D.N.Y. 1981).  Creditors and third parties, as well as the debtor, may be examined.  *See also Chereton v. United States*, 286 F.2d 409, 413 (6th Cir. 1961), *cert. denied*, 366 U.S. 924, 81 S. Ct. 1351, 6 L. Ed. 2d 384 (1961).  Moreover, the inquiry may "cut a broad swath through the debtor's affairs, those associated with him, and those who might have had business dealings with him."  *In re Mantolesky*, 14 B.R. 973, 976 (Bankr.D.Mass. 1981).

398162                                                    11

proof of claim, as scheduled debt, or through suit or demand, is axiomatic.[13]  *See In re Chateaugay Corporation, Reomar, Inc. v. LTV Steel Company, Inc*., *et al*., (1991 U.S. Dist. LEXIS 4739) (S.D. N.Y.  April 8, 1991).  In the *Chateaugay* case, Chief Judge Lifland issued a 2004 order authorizing the debtors to conduct oral examinations of holders of unliquidated claims; compel the production of documentary evidence; and obtain judicial subpoenas to aid the debtors in securing compliance with their demands for oral examinations and document production.  The Bankruptcy Rule 2004 Order entered by Judge Lifland provided in part:  "Any holder of an Uncertain Claim  [defined as "unliquidated and/or unsubstantiated claims filed herein"] who fails to comply with a reasonable discovery request pursuant to the provisions [of the order] may be subject to having such claim disallowed by the Court after an appropriate application with respect thereto upon notice to the holder of such claim."  *Id*.

While the SAC admits the burdens accompanying this process, it is not unreasonable for this Court to require claimants supply information necessary to substantiate their claims.  Such a requirement is completely appropriate in light of the current circumstances facing the Debtors.

Having established that this Court holds jurisdiction over both, and the procedural means to challenge asbestos related claims, the SAC now turns to the process under which limited challenges can be brought.

---

[13]  Discovery under Rule 2004 extends beyond the debtor to any person who may have had dealings with the debtor.  *See In re Johns-Manville*, 42 B.R. 362, 364 (Bankr. S.D.N.Y. 1984).  Clearly, determining the extent of contingent unliquidated claims falls squarely within the stated purposes of Rule 2004 of determining the nature and extent of the debtor's finances and matters relating to the administration.

The SAC agrees that to individually litigate these claims to judgment would be impossible. The sheer volume of these claims and complexity of the legal issues should not obscure the existence of common issues.[14] Some of these issues if addressed by motions for summary judgment might substantively dispose of tens of thousands of claims by the allowance process, thereby obviating the need for a jury trial. While personal injury claims are subject to certain procedural protections not otherwise accorded other claimants, they are not immune from challenges properly brought under the Federal Rules of Bankruptcy Procedure.

### B.    Claims Identification and Filing

In order to begin the process of substantive challenge, the claimants must be identified and served with notice of an objection to their claim. The ACC has opposed the institution of a bar date, or any similar claims filing process, on the basis that it is unduly burdensome to the claimants. It argues that the estimation process allows the Court to bypass any individual filings or scrutiny of claims. As previously explained, close inspection of the ACC's proposal does not support this contention.

The SAC requests that this Court adopt a procedure whereby Debtors file claims on behalf of all known plaintiffs. The plaintiffs and their counsel would then be served with limited discovery requesting substantiation of the claim, including diagnosis of disease by a licensed physician, proof of exposure, and proof of impairment or damage including submission to pulmonary lung function testing in accordance with the American Thoracic Society standards. Once these are returned, the Debtors will

---

[14] The mere fact that issues may be complex is not valid reason to deny summary judgment, *Zweig v Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975); *Ammons v Franklin Life Ins.*, 348 F2d 414 (5th Cir. 1965). The existence of important, difficult or complex questions of law where there is no genuine issue of material fact is not a bar to summary judgment. *Evans v S.S. Kresge Co.*, 394 F.Supp. 817 (D.C. Pa. 1975), *aff'd* 544 F.2d 1184, *cert denied* 433 U.S. 908 (1977).

be in a position to determine how many, and specifically, which claims may be subject to substantive challenge through summary proceedings.

### 1.    Failure to State A Claim

Federal Rule of Civil Procedure 12 states that a defense, in law or fact, to a claim for relief may be heard by motion before a trial.  Specifically, a defense based on failure to state a claim upon which relief may be granted shall be treated as one for summary judgment and disposed of as provided under Federal Rule of Civil Procedure 56.  Actions involving common questions of fact or law may be consolidated under Federal Rule of Civil Procedure 42.  Actions in which there is no genuine issue of material fact may also be disposed of by summary judgment.

The SAC believes that challenges to thousands of unimpaired claimants may be joined based on their failure to state a claim upon which relief can be granted.  It is clear that the definition of  a claim is a matter of bankruptcy law.  11 U.S.C. §101(5) defines claim as a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ….  While a "right to payment" may be defined by state law, bankruptcy courts are not bound to slavishly follow state law if to do so conflicts with the principles and goals of the bankruptcy process or if to do so jeopardizes the reorganizational effort.  *See In re A.H. Robins, Company, Incorporated*, 89 B.R. 555 (E.D.Va. 1988); *In re Johns-Manville Corp*., 36 B.R. 743 (Bkrtcy. 1984); *In re KAR Development Associates, L.P.*, 180 B.R. 597 (Bkrtcy. D. Kan. 1994).

Generally a tort plaintiff must prove injury caused by the debtor *to state a claim*.  Under the Restatement of Torts, injury means "the invasion of any legally protected interest of another."  The SAC

proposes an initial motion for summary judgment based on the asbestos claimants' failure to state a claim for injury.  The SAC has reviewed the substantive law of the 50 jurisdictions and found that in the context of asbestos personal injury litigation, in all but a few jurisdictions, proof of injury is defined as *evidence of an asbestos related disease*.  Though the ACC will no doubt argue that the definition of injury is susceptible to diverse fact patterns unique to the claimant, the SAC believes that many claimants will not be able to substantiate that they suffer from *any* recognized asbestos disease, if only because they have never been examined, much less diagnosed, by a physician. If the claimants fail to present, either through the discovery process or on motion for summary judgment, proof of diagnosis of disease by a physician, the claim should properly be eliminated from both estimation and distribution.

As to claims, which state a condition of pleural thickening or plaques, these claims may also be ripe for summary disposition based on the existing status of tort law.  Far from the ACC's characterization that existing state law supports claims for pleural condition as a compensable disease,

45 state jurisdictions either have no law on the subject or bar recovery.[15]   In the handful of jurisdictions

that do allow suit based on alleged pleural plaques or pleural thickening, two of the five states do not

hold that said conditions constitute injury, but merely that it is a question for the jury.[16]  Even the Third

Circuit Court of Appeals has ruled that in the absence of some verifiable impairment, asbestos-related

subcellular changes do not give rise to valid claims for physical injury.  *Schweitzer v Consolidated Rail*

*Corp*, 758 F.2d 936, 942 (3d Cir. 1985).

   Thus as an initial threshold question, this Court should consider not only if the claimant has been

---

[15]   The SAC's review of state jurisprudence revealed that twenty-three (23) states have no reported decisions on the subject while an additional twenty-two (22) refuse to recognize a claim.  The states barring pleural conditions as compensable are: Arizona, *DeStories v City of Phoenix*, 154 Ariz 604, 744 P.2d 705 (1987); California, *Richmond v A.P. Green Industries, Inc.*, 66 Cal. App. 4th 878 (1998); *Miller v Armstrong World Industries, Inc.,* 949 F.2d 1088 (10th Cir. 1991); Connecticut, *Goodall v United Illuminating*, 1998 Conn. Super. LEXIS 3584 (1998); Delaware, I*n re: Asbestos Litigation; Leary Trial Group, Limited to: Alfred Mancari*: 1994 Del. Super. LEXIS 685 (1994); Florida, *Eagle-Picher Industries, Inc v Cox*, 481 So.2d 517 (Fla D. Ct. App. 1985); Hawaii, *In re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563 (D.Hawaii 1990); Idaho, *Bonz v Sudweeks*, 119 Idaho 539, 808 P.2d 876 (Idaho 1991); Illinois, *In re Asbestos II*, 142 F.R.D. 152 (1991); Iowa, *Kraciun v Owens-Corning Fiberglas Corp.*, 895 F.2d 444 (8th Cir. 1990); Kentucky, *Bailey v Capital Holding Corporation*, 873 S.W.2d 187 (Ky. 1994); Maine, *Bernier v Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986); Maryland, *Owens-Illinois, Inc. v Armstrong World Industries, Inc.*, 87 Md. App. 699, 591 A.2d 544 (1991); Massachusetts, *Anderson v WR Grace & Co.*, 628 F.Supp. 1219 (D. Mass. 1986); Montana, *Kaeding v WR Grace & Co*, 1998 MT 160 (1998); New York, *Cochrane v AC&S, Inc*, 1998 U.S.Dist. LEXIS 14633 (1998); Tennessee, *Potts v Celotex Corp*, 703 F.Supp. 672 (1988); West Virginia, *Bocook v Ashland Oil, Inc.* 819 F.Supp. 530 (1993); Wisconsin, *Sopha v Owens Corning Fiberglas Corp*, 230 Wis.2d 212 (1999).

[16]   The SAC could find only five states that recognize the condition of pleural thickening or the presence of pleural plaques as an "injury" for purposes of sustaining a cause of action.  It is important to note, however, that in two of the five states, the courts did not sustain the cause of action but merely held that the condition raised a factual question for the jury.  The states are: Ohio, Texas, Minnesota, Virginia and New Jersey.  Leading decisions on the subject are: *Werlin v United States*, 746 F.Supp. 887 (D. Minn. 1990); *Caterinicchio v Pittsburgh Corning Corp*, 127 N.J. 428, 605 A.2d 1092 (NJ 1992); *In re Cuyahoga County Asbestos Cases*, 127 Ohio App.3d 358 (1998); *McCleary v Armstrong World Industries, Inc.*, 913 F.2d 257 (5th Cir. Tex. 1990); *Joyce v AC&S, Inc.*, 785 F.2d 1200 (4th Cir. Va. 1985).

properly diagnosed with an asbestos condition, but also what diseases constitute an "injury" sufficient to support a cause of action.  The SAC believes this question to be one ripe for summary judgment, as the vast weight of case law denies claimants "suffering" from pleural disease any cause of action.

2.       **Failure to Establish Harm**

For those claimants who suffer from a recognized disease related to asbestos exposure, the next threshold question is the amount of the damage, or harm, suffered as a result of that disease or condition.  Harm means "the existence of loss or detriment in fact of any kind to a person resulting from any cause."  *See Restatement (2nd) of Torts* §7 (1965).  Actual loss or damage resulting to the interest of another is a necessary element of tort.  The threat of future, unrealized, harm is not sufficient. *See Prosser & Keeton on Torts* §30, at 165 (5th Ed. 1984).

The SAC submits that the vast majority of claims filed against Debtors are for unimpaired asbestosis or pleural plaques, neither of which causes any disability or loss by the claimant.  Though the degree or extent of damage is specific to the individual claimant, any claimant who fails to establish loss of lung function based on the application of medical testing, cannot be damaged.  In short, the SAC believes that until objective proof of impairment is established through medical testing, the claimant suffers no physical harm *as a matter of law*.[17]

Based on the guidelines set by the American Medical Association, a series of pulmonary function tests can provide the basis, or lack thereof, for a claimant's alleged physical loss.  If these tests are required as part of the information requested in the claims review process, and later as proof

---

[17] If and when an unimpaired claimant manifests both proof of injury and impairment, he would have the right to file a claim with the trust.  Such a process would achieve the goal of providing fair compensation to those suffering damages as a result of asbestos related injuries.

necessary to withstand a motion for summary judgment, the wheat may be easily separated from the chaff.[18]  This Court could then hold summary judgment hearings on any claim failing to supply sufficient medical information to establish impairment or damage.  This will enable the Court to consider the sufficiency of the claims without the necessity of individual review.[19]

The ACC objects to scrutiny of any claims.[20]  Given the inexplicable levels of claim filings and the lack of data (medical or otherwise) filed to support claims, this position is telling, but unreasonable. Though summary proceedings will not be appropriate for all claims, for those that fail to identify exposure in any form, fail to supply proof of medical diagnosis by a physician or fail to demonstrate physical damage through loss of pulmonary lung function, summary judgment is warranted.  Though the ACC objects to any process which requests this information from claimants, the SAC believes it is reasonable to require some bare level of proof establishing exposure, disease (injury), and damage. Though this may be inconvenient for the claimants, they have little ground to complain if they cannot make a case against Debtors sufficient to withstand summary judgment. Since none of these elements of

---

[18]  The American Medical Association has long published Guides to the Evaluation of Permanent Impairment specifically designed as standards for the medical community in evaluating respiratory impairment.  As the report warns, "an impairment as stated in Chapter 1, is a loss, loss of use, or derangement of any body part, organ system, or organ function.  Not all impairments result in a functional loss or affect the ability to perform activities of daily living."  *See Principles of Assessment*, Chapter 5.1, American Medical Association.

[19]  Claimants failing to establish impairment could be eliminated without prejudice to refile claims if an impairment develops.

proof are within the possession of Debtors, it is not anticipated that any discovery from Debtors will be

necessary. [21] Based on the multitude of claims Debtors must review,  it is presumed that only the most

egregious circumstances will be challenged substantively.  Still, based on the reviews conducted by

Johns Manville and Babcock & Wilcox, this may amount to over 70% of the claims filed.

    With the very real possibility that over 70% of the claims against Debtors may be improperly

asserted, the SAC has no choice but to request substantive scrutiny of the type outlined above.  To turn

a blind eye to this problem is to place control of the reorganizational efforts in the hands of parties who

may well have no enforceable claim against the Debtors.  Nothing in the Bankruptcy Code mandates

such a result.  While the SAC and their clients do not

relish the delays that will be caused by this process, they do not see any viable alternative.

## IV.    CONCLUSION

    In conclusion, the SAC believes that this Court may accomplish both a timely resolution of the

confirmation process and afford the debtor the right to object to claims.  The balance of these goals may

be accomplished through well-defined summary judgment hearings combined with substantive estimation

---

[20]  "Furthermore, the information Debtors propose to obtain from these unsuspecting claimants is astonishingly invasive....  But the fact that the claimant may not have these data does not mean that he could not get them--something his counsel would normally do in preparation for trial."  (ACC Mem. p. 22).  The SAC questions the 'unsuspecting' characterization of the claimants for if they have made demand against Debtors, presumably they are both aware of the pending bankruptcy case and had information, at the time of demand, to support a complaint or demand. Certainly given the institution of legal proceedings, they can hardly claim surprise when they are called upon to substantiate their claim.

[21]  The SAC agrees that proof of exposure to Debtors' products may require discovery from Debtors before elimination of a claim may be ordered in all but the most egregious cases.  However, Federal Rule of Civil Procedure 11 requires the claimant to have some evidence of exposure to Debtors' products in order to file a claim in the first instance.  Thus Debtors could presumably inquire as to the initial basis of exposure supporting the claims.  Those failing to supply even a modicum of proof of exposure might then be subject to challenge.

398162                                                19

on the corollary issues.  Through this process claimants potentially affected by the court's rulings can be noticed and bound by its determinations.  Standards for the definition of injury, harm and allowance of a claim can be maintained, benefiting the eventual trust and more importantly, resulting in a more accurate estimation of the liability owed.  For these reasons the SAC supports the Debtors' request for "substantive estimation" provided that any ruling on issues tried in this process be applied to substantively eliminate pending claims and future demands.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Respectfully submitted,

Dated: August 6, 2002                              /s/ Steven T. Davis
                                                   Steven T. Davis, Esquire (SD2731)
                                                   Obermayer Rebmann Maxwell & Hippel LLP
                                                   716 Tatnall Street
                                                   Wilmington, DE 19801

                                                   - and -

                                                   Edmond M. George, Esquire (pro hac vice)
                                                   Obermayer Rebmann Maxwell & Hippel LLP
                                                   One Penn Center – 19th Floor
                                                   1617 John F. Kennedy
                                                   Philadelphia, PA 19103-1895
                                                   215-665-3100

                                                   Local Counsel to the Unofficial Committee
                                                   of Select Asbestos Claimants

                                                   - and -

                                                   Elizabeth W. Magner, Esquire (pro hac vice)
                                                   1100 Poydras Street
                                                   Suite 1806, Energy Centre
                                                   New Orleans, Louisiana  70163
                                                   (504) 599-8650

                                                   Counsel to the Unofficial Committee
                                                   of Select Asbestos Claimants