IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|                              |   |                          |
|------------------------------|---|--------------------------|
|                              | ) | Chapter 11               |
|                              | ) |                          |
| In re:                       | ) | Case No. 01-01139 (JKF)  |
|                              | ) | (Jointly Administered)   |
| W. R. GRACE & CO., et al.,   | ) |                          |
|                              | ) |                          |
| Debtors.                     | ) |                          |
|                              | ) |                          |
|                              | ) |                          |
|                              | ) |                          |

**RESPONSE TO FEE AUDITOR'S FINAL REPORT REGARDING
FOURTH INTERIM QUARTERLY FEE APPLICATION OF
BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP**

The law firm of Bilzin Sumberg Dunn Baena Price & Axelrod LLP ("Bilzin Sumberg")
hereby responds to the Fee Auditor's Final Report Regarding Fourth Interim Quarterly Fee
Application (the "Final Report") of Bilzin Sumberg, as follows:

### PRELIMINARY STATEMENT

*Then 'tis like the breath of an unfee'd
lawyer; you gave me nothing for 't.*[1]

1.      By the Final Report, the Fee Auditor seeks a reduction of the fees sought by
Bilzin Sumberg for the attendance of four attorneys, at different times, at planning and strategy
conferences held in South Florida on March 5, 6 and 12, 2002, in connection with the fraudulent
transfer actions.  The Fee Auditor concluded that "these meetings were overstaffed" without any
further explanation.  Moreover, the Fee Auditor recommends a "reduction of 1/2 the fees charged
for these meetings, for a reduction of $8,211.75 in fees," without any qualitative justification for
his recommendation.

---

[1] WILLIAM SHAKESPEARE, THE TRAGEDY OF KING LEAR act I, sc. IV

\74817\15537\ # 582384 v 1

1

2.      The Fee Auditor's conclusions are wrong for at least <u>four</u> reasons:

•   First, the attendance of the lawyers deployed by Bilzin Sumberg was essential;

•   Second, Bilzin Sumberg not only had the lawyers to deploy, but was closer in proximity to the production site than any of the other law firms representing the plaintiffs in the fraudulent transfer actions making it a sensible decision for Bilzin Sumberg to have more lawyers in attendance;

•   Third, as a result of the active participation of the Bilzin Sumberg lawyers, the meetings resulted in the development of case strategies that are and have already proved to be critical to the prosecution of the fraudulent transfer actions; and

•   Fourth, the arbitrariness of the Fee Auditor's conclusions are best demonstrated by the fact that the total fees charged by Bilzin Sumberg in this instance were $16,423.50, which the Fee Auditor blithely proposes be discounted by one-half, whereas the Fee Auditor recommended the approval of Caplin & Drysdale's fees for the attendance of three lawyers at the same meetings in the amount of $22,457, not to mention the additional expenses incurred by Caplin & Drysdale for travel, lodging and meals while in South Florida (none of which we find objectionable in the circumstances).

## DISCUSSION
### The March Meetings

3.      To put the disputed fees in historical context, while this case was pending before District Judge Farnan, the Official Committee of Asbestos Property Damage Claimants (the "PD

Committee") and the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"; the PD Committee and the PI Committee are collectively referred to as the "Asbestos Committees") jointly moved for leave to prosecute certain fraudulent transfer actions (the "Fraudulent Transfer Motion").  After the reassignment of these Chapter 11 cases to District Judge Wolin and the reference of certain aspects of these cases to this Court, including the Fraudulent Transfer Motion, this Court directed the Debtors to produce certain documents to the Asbestos Committees and that the Asbestos Committees advise the Court of the merits of the fraudulent transfer claims before ruling on the Fraudulent Transfer Motion.  Just subsequent to that, Judge Wolin announced his intention to be the trial judge in the fraudulent transfer actions and to allow the Asbestos Committees to prosecute those actions.  Moreover, Judge Wolin directed that the production of documents ordered by this Court should proceed.  Subsequently, Judge Wolin issued his written order withdrawing the reference of the fraudulent transfer actions and a case management order governing the conduct of such actions.  By the case management order, Judge Wolin directed the Asbestos Committees to file the complaint(s) in the fraudulent transfer actions by March 18, 2002.

4.    The Asbestos Committees had determined that special litigation counsel should be engaged to prosecute the fraudulent transfer actions, subject to Court approval.  To that end, the Asbestos Committees filed their application to retain McKool Smith and Cozen & O'Connor as co-special litigation counsel.  Subsequently, it was determined that Cozen & O'Connor had a

conflict of interest that precluded their engagement.   Thus, by March 5, 2002, only McKool

Smith (through its partner, Lewis LeClair) remained involved.[2]

5.      The review of the first wave of documents produced by the Debtors, directed first

by this Court and then by Judge Wolin, commenced on March 5, 2002.  The documents were

produced at Grace's office in Boca Raton, Florida and consisted of some 500,000 pages of

materials.

6.      Counsel to the Asbestos Committees and McKool Smith concluded it made

eminent sense to use the occasion of document production to meet in South Florida, commencing

on March 5, 2002, to establish document review and retention procedures; agree upon the

division of responsibilities among the three law firms; discuss the contours of the complaints to

be filed; and, consider case strategies, as well as to review the hundreds of thousands of pages of

documents produced.

7.      On behalf of Bilzin Sumberg, the meetings were attended by Robert W. Turken, a

senior bankruptcy litigation partner who continues to have principal day-to-day responsibility for

the fraudulent transfer actions; Mitchell E. Widom, another senior litigation partner who likewise

continues to be fully engaged in the prosecution of the fraudulent transfer actions; Jay Sakalo, a

mid-level bankruptcy associate who by now has become well-known to the Court for his active

involvement in these cases; and, Daniel R. Green, a junior litigation associate who was charged

with responsibility for the handling and review of the produced documents.   Mr. Green

participated in the course of the first two days of meetings when, among other things, document

---

[2] Later, however, Judge Wolin disapproved of the retention of McKool Smith but authorized the retention of
Milberg Weiss Bershad Hynes & Lerach LLP as lead special litigation counsel, as well as the involvement of Bilzin
Sumberg on property damage issues and Caplin & Drysdale on personal injury issues.

review procedures were developed and an overview of the litigation was discussed to give him a better sense of what to look for in the course of his review of the documents then made available by the Debtors.

8.       On behalf of Caplin & Drysdale, partners Nathan Finch and Theodore Swett attended all three days of meetings.  On March 12, they were joined by their colleague, John Cunningham, who reviewed the produced documents with Mr. Sakalo, Mr. Green and another Bilzin Sumberg associate, Jenette Mathai, who did not attend the meetings which engendered the Fee Auditor's recommendations.

9.       On behalf of McKool Smith, senior partner Lewis LeClair attended all three days of the meetings.  As McKool Smith's retention had not yet been considered by the Court, Mr. LeClair chose not to bring any one else from his firm.

10.      The meetings were extremely productive and far-reaching decisions were made. The documents produced were reviewed.  The fraudulent transfer complaints were filed timely.

**The Fee Auditor's Objection**

11.      Virtually unaware of the substance or complexity of the fraudulent transfer actions; indifferent to Court-imposed deadlines; unpersuaded, for unstated reasons, by Bilzin Sumberg's thorough explanations on more than one occasion; unmoved by the sheer volume of the initial wave of production; unmindful of the difficulty of coordinating the roles of the three law firms then involved in the prosecution of the fraudulent transfer actions; and, in utter disregard for the fact that the recommended fees for Caplin & Drysdale's participation in the very same meetings exceeded Bilzin Sumberg's even before the Fee Auditor's recommended arbitrary

fifty percent discount of the latter, the Fee Auditor concluded – without any elaboration – that Bilzin Sumberg had "overstaffed" attendance at the meetings.  While to some the amount in controversy may seem small, it is nonetheless too great a price to pay for such indifference to the necessity, quality and reasonableness of the services performed.

12.    The Florida meetings presented the first opportunity for plaintiffs' counsel to meet and confer in person with the objective of framing pleadings and issues, to ensure that before a single document was examined, all involved would be aware of what they were looking for, and to coordinate efforts to achieve maximum efficiency and economies.  It is simply inconceivable that the Fee Auditor – who necessarily practices in an information void – could reasonably conclude that, as far as Bilzin Sumberg is concerned, two attendees, rather than four, would have been sufficient or that Bilzin Sumberg's fees ought to be roughly one-third of those of counsel for the PI Committee.  Indeed, it is unlikely that the Fee Auditor even appreciated that the fraudulent transfer litigation – a $4 billion dispute – is a centerpiece of these Chapter 11 proceedings, let alone the importance of what was accomplished at the meetings.

13.    Clearly, the Fee Auditor has reflexively applied fee guidelines governing the use of multiple attorneys on a quantitative basis without any regard for the qualitative value of the services performed and results achieved by the attendees.  Moreover, at the risk of redundancy, the fact that the Fee Auditor concluded that Caplin & Drysdale's fees of approximately $22,000 were appropriate (with which we wholeheartedly concur) but that Bilzin Sumberg ought only be paid approximately $8,000 for the very same services, may well demonstrate that the Fee Auditor's quantitative analysis defies explanation.

14.     Substantively and practically speaking, the fraudulent transfer litigation presents numerous challenges for the plaintiffs and great opportunities for these estates.  The transferees are represented by two of the largest law firms in the United States, neither of which is constrained by fee guidelines as they staff the defense of these cases. They are augmented by the awesome resources of the Debtors' own counsel, Kirkland & Ellis, by virtue of the Debtors' intervention.  Moreover, the cases involve a series of complicated corporate transactions and a multitude of highly contentious issues.  Just last week, Judge Wolin issued a 38 page opinion of first impression (in the plaintiffs' favor no less) which sent shock waves through Wall Street. Yet, left to his penchant to rigidly apply a virtual prohibition against more than one attorney attending meetings of any sort, subject apparently to exceptions which cannot be articulated, the Fee Auditor, _ipse dixit_, would rearrange the playing field ensuring that this monolithic litigation is under-lawyered on the plaintiffs' side or that plaintiffs' counsel not be paid in full for services performed.

WHEREFORE, the law firm of Bilzin Sumberg respectfully urges that the Court not follow the recommendation of the Fee Auditor as to the law firm's fees for the attendance of attorneys at case management meetings on March 5, 6 and 12, 2002, in connection with the fraudulent transfer litigation.

Wilmington, Delaware
Dated: August 13, 2002.

Respectfully submitted,

BILZIN SUMBERG DUNN BAENA
  PRICE & AXELROD
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131-2336
Telephone:  (305) 374-7580


By:/s/ Scott L. Baena
    Scott L. Baena (Admitted Pro Hac Vice)