IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Docket No. 2230** |
| | ) | |
| | ) | **Hearing Date: August 26, 2002** |
| | ) | **Objection Deadline: August 22, 2002** |

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS TO MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE IMPLEMENTATION OF REVISED COMPENSATION PROCEDURES**

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee"), through its undersigned counsel, hereby files this Supplemental Objection (the "Objection") to the Motion of the Debtors for an Order Authorizing, but not Requiring, the Implementation of Revised Compensation Procedures (the "Motion") [Docket No. 2230], and respectfully submits as follows:

### I. Introduction

1. On April 2, 2001 (the "Petition Date"), the Debtors commenced these chapter 11 cases by filing their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since that time, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] In order to save space, the list of all 62 Debtors has been omitted. For a list of the Debtors, please review the Motion (as defined below) at page 1.

74817\15537\ # 583273 v 1

2. On the Petition Date, the Court entered an interim order (the "Interim Wages Order") granting the Wages Motion[2] that, among other things, (i) authorized, and approved on an interim basis, the Key Employee Retention Programs, including, the 2001-2002 General Retention Program and the 2001-2003 Long-Term Incentive Plan, and (ii) approved the W.R. Grace & Co. Severance Pay Plan for Salaried Employees. On June 22, 2001, the Court entered a final order authorizing and approving the Key Employee Retention Programs (the "Final Wages Order"; collectively, with the Interim Wages Order, the "Wages Orders").

3. On April 12, 2001, the Office of the United States Trustee (the "UST") appointed the PD Committee, the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Personal Injury Claimants.

4. On June 17, 2002, the Debtors filed the Motion, seeking this Court's authorization to implement certain revised compensation procedures, consisting of: (i) a revised long-term incentive program for 2001-2003 (the "Revised 2001-2003 LTIP"); (ii) a new long-term incentive program for 2002-2004 (the "2002-2004 LTIP"); (iii) a new general retention program (the "2003-2004 General Retention Program"); and (iv) a revised severance pay program (the "Revised Severance Pay Program"; collectively, with the 2003-2004 General Retention Program, the Revised 2001-2003 LTIP and the 2002-2004 LTIP, the "Revised Compensation Procedures").

5. On July 5, 2002, the PD Committee filed its Response and Objection to the Motion [Docket No. 2333] (the "Original Objection"). On July 12, 2002, the Debtors filed their Response to the Original Objection [Docket No. 2370] (the "Debtors' Response"). At the July 22, 2002 omnibus hearing, this Court deferred ruling on all aspects of the Revised Compensation

---

[2] Capitalized terms used, but not defined herein, shall have the meanings ascribed thereto in the Motion.

\74817\15537\ # 583273 v 1

Procedures, except for the Debtors' proposed Revised 2001-2003 LTIP. With respect to the Revised 2001-2003 LTIP, the Court ruled that the Debtors' attempt to modify the existing long-term incentive program by retroactively liquidating underwater stock options in favor of a cash payout would not be permitted. See July 22, 2002 Hearing Transcript at 25 (the relevant pages of the July 22, 2002 Hearing Transcript are attached as Exhibit "A").

6. Additionally, at the hearing, the Court granted the PD Committee the right to take discovery of the Debtors. The PD Committee subsequently took the depositions of Messrs. Nick Bubnovich, an employee of Deloitte & Touche, Paul Norris, the Chief Executive Officer, President and Chairman of the Board of W.R. Grace & Co., and W. Brian McGowan, the Senior Vice President, Administration, of W.R. Grace & Co.

## II. General Objections

7. In discussing the need to implement the Revised Compensation Procedures, the Court correctly observed at the July 22, 2002 hearing, "the question is to balance what's an appropriate incentive to keep them [the employees] . . ." See July 22, 2002 Tran. at 25. The PD Committee submits the balance that must be achieved is between incentivizing employees to remain dedicated to the Debtors and to perform at their highest levels, while at the same time, examining the consequences -- both financial and otherwise -- of providing such incentives.

8. In advocating the implementation of the Revised Compensation Procedures, the Debtors hide behind the rubric of the "sound business judgment" rule. However, a careful review of the Debtors' arguments in favor of the Revised Compensation Procedures reveals that the Debtors' purported exercise of "sound business judgment" is dubious at best. In support of the Revised Compensation Procedures, the Debtors build their case on premises that they have vehemently denied in all other aspects of these chapter 11 cases. Moreover, the Debtors

selectively cultivate comparable salary and compensation data to justify the excesses they seek to bestow upon their management and certain employees.

### III. The Revised Compensation Procedures[3]

9. For the Court's convenience, below is a short summary of the remaining Revised Compensation Procedures that the Debtors are seeking to have approved:

**A. 2003-2004 General Retention** Program: The 2003-2004 General Retention Program seeks to increase the range of percentage-of-salary bonuses for Program Participants to 15-65% from 12.5-50%. This increased payout will result in an estimated total program cost of $6.7 million -- an increase of almost <u>50%</u> over the existing program;

**B. 2002-2004 Long-Term Incentive Plan:** The Debtors seek to modify the 2001-2003 LTIP, which provides for payments to be made 50% in stock and 50% in cash, by making all payments <u>in cash</u> under the 2002-2004 LTIP. The Debtors also seek to lower the targeted earnings before interest and taxes ("EBIT") for the 2002-2004 LTIP by 40% -- a reduction from 10% to 6% EBIT per annum. In addition, whereas under the existing program, participants do not receive any payout for EBIT below 5%, under the proposed program, participants would be entitled to receive a ratable portion of the payout between 0% and 6% growth in EBIT; and

**C. Revised Severance Pay Program**: There are two components to the Revised Severance Pay Program -- the Salaried Severance Plan and the Change of Control Severance Program -- each of which increases the potential payout for employees

---

[3] As indicated above, the Court ruled that the 2001-2003 LTIP cannot be modified, thus, the description of the Revised Compensation Procedures omits a summary of such Plan.

\74817\15537\ # 583273 v 1

4

who may be severed involuntarily. Under the existing Salaried Severance Plan, covered employees are entitled to 1.5 weeks of pay after termination for each year of service with the Debtors. There is no minimum payout to any covered employees. However, under the proposed Revised Salaried Severance Plan, covered employees would be entitled to a minimum of <u>4 weeks</u> of pay. Likewise, the Debtors seek to modify the Change in Control Severance Program by increasing the severance payout to covered employees to a minimum of <u>4 months</u> salary to any employee who is involuntarily terminated within one year of the effective date of a plan of reorganization if the termination results from the implementation of the plan. In comparison, the existing program provides covered employees with <u>4 weeks</u> severance pay for each year of service with the Debtors. It is also worth noting that 16 Key Employees who may be participants in the Salaried Severance Program are also entitled to <u>2 years</u> of severance pay in the event they are terminated by the Debtors without cause.

### IV. <u>Argument</u>

10. The PD Committee recognizes that the Court's analysis should focus on whether the Debtors exercised "sound business judgment" in approving the Revised Compensation Procedures. <u>See</u> <u>In re Montgomery Ward Holding Corp.</u>, 242 B.R. 147, 153 (Bankr. D. Del. 1999); <u>see</u> also <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991). In doing so, the Court has considerable discretion in approving or disapproving the use of estate property outside of the ordinary course of business. <u>See</u> <u>Montgomery Ward</u>, 242 B.R. at 152-153.

11. In response to the Original Objection, the Debtors relied upon the affidavits of Messrs. Bubnovich and Norris in support of the Debtors' contention that they exercised "sound

business judgment." The affidavits did not provide sufficient detail to allay the PD Committee's concerns, so the PD Committee deposed the two affiants and Mr. McGowan. Importantly, but not surprisingly, the deponents' testimony demonstrates that the Debtors in fact failed to exercise "sound business judgment" in approving the Revised Compensation Procedures. Rather, as the depositions plainly reveal, the Debtors' premise for the Revised Compensation Procedures is that the W.R. Grace & Co. publicly traded stock is worthless. As the Court well knows, however, from the beginning of these cases, the Debtors have denied their insolvency in every other context. In addition, the Debtors' witnesses could not point to any concrete business justification for the proposed increases save that the existing program is less generous than programs of other chapter 11 mass-tort debtors in this District. See Motion at ¶17. As demonstrated below, the Debtors unscientific approach[4] results in increased payments under each component although there is a veritable void of evidence that the existing program needs to be modified.

12.    Time and again throughout these chapter 11 cases, the Debtors have maintained that they are not insolvent and that it will not be necessary for their shareholders to cede their equity interests under a plan of reorganization. See e.g., February 22, 2002 Hearing Transcript at 37; W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues at 13. However, in support of their Revised Compensation Procedures -- specifically in support of the proposed 2002-2004 LTIP and 2003-2004 General Retention Plan -- the Debtors now take the position that the equity interests of W.R. Grace are worthless and, accordingly, the loss of that source of compensation for key employees must be rectified. See Deposition of Paul J. Norris, August 1, 2002, at 13:1-13:19, 47:9-47:12 (the

---

[4]  See Deposition Transcript of Mr. Nick Bubnovich, July 30, 2002 at 31 (the transcript of Mr. Bubnovich's deposition is attached hereto as Exhibit "B" and is referred to hereafter as the "Bubnovich Deposition").

\74817\15537\ # 583273 v 1

transcript of Mr. Norris's deposition is attached hereto as Exhibit "C" and is referred to hereafter as the "Norris Deposition").

13. Moreover, it is abundantly clear that the Debtors (and their expert) have sought to engineer the Revised Compensation Procedures by selectively choosing alternate "comparable" peer groups that smacks of a shell game. For example, when analyzing the 2003-2004 General Retention Program, the Debtors analyzed the retention programs in other chapter 11 cases of mass-tort debtors currently pending in this District. See Norris Deposition at 69; Deposition of Bubnovich Description at 49. When analyzing the 2002-2004 LTIP, however, the Debtors looked at their "peer group" of fourteen companies. See Bubnovich Deposition at 58. Lastly, when analyzing the Revised Severance Pay Program, the Debtors viewed the severance benefits of 60 other chapter 11 debtors. Id. at 67. The Debtors' schizophrenic approach is revealing of the shortcomings of their proposals.

14. Despite the Debtors' inability to provide any anecdotal or empirical proof that the Key Employee Retention Programs approved by the Wages Orders need fixing, the Debtors' expert, Mr. Bubnovich,[5] conceived the notion that other mass-tort debtors in possession serve the Debtors' objective of increasing employee benefits.[6] Without exception, Mr. Bubnovich's review

---

[5] Mr. Bubnovich was asked to review each of the Revised Compensation Procedures. However, with respect to the elimination of the stock option aspect of the 2002-2004 LTIP in favor of an all-cash payout, the Debtors had already decided to make this change prior to Mr. Bubnovich being engaged. See Bubnovich Transcript at 15.

[6] To wit, the following passage from the Bubnovich Deposition is illuminating:

"Q: So the retention and compensation issues of key employees in the mass tort cases that you have dealt with are not as contentious in the, as you would say, run-of-the-mill bankruptcy cases?

A: I don't know about contentious. I think the point I was trying to make was the committees [in mass-tort cases] are more willing to pay up, and the pay is better and higher in the mass tort liability cases than it is in your run-of-the-mill Chapter 11 cases."

Q: Did that affect your analysis for W.R. Grace in terms of what the retention and compensation programs should be?

\74817\15537\ # 583273 v 1

7

of the Debtors' existing Key Employee Retention Programs concluded that they should be revised to put more cash in the hands of the employees. Yet, Mr. Bubnovich acknowledges that the existing programs are within a range he considered to be competitive, albeit at the lower end of such range.[7]  See e.g. Bubnovich Deposition at 10, 76-77.

15.    Further, in the Original Objection, the PD Committee questioned the Debtors' unsupported speculation that key personnel would obtain employment elsewhere unless the Revised Compensation Procedures are approved.  Discovery has proven the Debtors wrong. Other than Mr. Norris' testimony that he has heard from management level people below him that Key Employees are contemplating leaving the Debtors' employ, there is no support for the contention that employees will leave without these additional benefits.  See Deposition of W. Brian McGowan, July 30, 2002 at 55 (the transcript of Mr. McGowan's deposition is attached hereto as Exhibit "D" and is referred to hereafter as the "McGowan Deposition"); see also Bubnovich Deposition at 18-19 (**Q:** Did you have discussions with any other key employees [Mr. Bubnovich met with Mr. McGowan, Mr. David Siegel and Mr. Mike Piergrossi] whether they were considering leaving W.R. Grace?  **A:** No, I never had any discussions with any particular employee as to whether he or she would leave.)  In fact, the most recent focus group conducted by the Debtors for which results were made available indicated that employees are very satisfied with the quality of leadership of W.R. Grace.  See Norris Deposition at 36-37.

---

(cont. …)

A:    Yes, I so advised Grace's Management Compensation Committee and board.

Q:    And what did your advise then in that regard?  That they should be entitled to more because it's a mass tort situation or what?
A:    I advised them along the lines of what I just said, that based on my experience, the pay was generally higher for the management of mass tort liability companies . . . "
See Bubnovich Deposition at 24-25.

[7] However, Mr. Bubnovich testified that the existing severance program may be below the competitive range, which according to Mr. Bubnovich, begins at two-months' pay. See Bubnovich Deposition at 68.

\74817\15537\ # 583273 v 1

Thus, while the Debtors stress the necessity of implementing the revised programs to preempt employee departures, it seems abundantly clear that the existing program is more than adequate.

### **Conclusion**

Based upon the foregoing, as well as for the reasons raised in the Original Objection, and the arguments made at the July 22, 2002 hearing, the PD Committee respectfully submits that authorization of the Revised Compensation Procedures should be denied.

The PD Committee, however, does not object to the extension of Debtors' existing programs "as-is," beyond their current expiration at the end of the year, subject to adjustment for inflation.

WHEREFORE, the PD Committee respectfully requests that this Court: (a) sustain this Objection and the Original Objection to the Motion and deny the relief sought by the Motion and (b) grant such other and further relief as the Court may deem appropriate.

Wilmington, Delaware
Dated:  August 15, 2002

Respectfully submitted,

BILZIN SUMBERG DUNN BAENA
   PRICE & AXELROD
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131-2336
Telephone:  (305) 374-7580

Scott L. Baena (Admitted Pro Hac Vice)
Jay M. Sakalo (Admitted Pro Hac Vice)

and

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
Telephone:  (302) 575-1555

By: /s/ Theodore J. Tacconelli
    Michael B. Joseph
    (Del. Bar No. 392)
    Theodore J. Tacconelli
    (Del. Bar No. 2678)

CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS