1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                            .
IN RE:                      .        Chapter 11
                            .
W.R. Grace & Co., et al.,   .
                            .

        Debtor(s).          .        Bankruptcy #01-01139
(JKF)
```

.........................................................
..

Wilmington, DE
July 22, 2002
9:56 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:                    David W. Carickhoff, Jr.,
Esq.

                               Pachulski, Stang, Ziehl,
                               Young & Jones
                               919 North Market Street
                               Wilmington, DE 19801

                               James W. Knapp, Esq.
                               Kirkland & Ellis
                               200 E. Randolph Drive
                               Chicago, IL 60601

                               David Bernick, Esq.
                               Kirkland & Ellis
                               200 E. Randolph Drive
                               Chicago, IL 60601

                               Janet S. Baer, Esq.

2

```
                                  Kirkland & Ellis
                                  200 E. Randolph Drive
                                  Chicago, IL 60601


                                  James J. Restivo, Jr., Esq.
                                  Reed Smith
                                  435 Sixth Ave.
                                  Pittsburgh, PA 15219

                                  Paul J. Norris, Esq.
                                  W.R. Grace
                                  In-House Counsel

                                  David B. Siegel, Esq.
                                  W.R. Grace
                                  In-House Counsel

                                  Brian McGowan, Esq.
                                  W.R. Grace
                                  In-House Counsel

 For Unsecured Creditor's:        Kenneth Pasquale, Esq.
 Committee                        Stroock, Stroock & Lavan,
LLP
                                  180 Maiden Lane
                                  New York, NY 10038

 For Zonolite Plaintiffs:         William Sullivan, Esq.
                                  Elzufon, Austin, Reardon,
                                       Tarlov & Mondell, PA
                                  Ste. 1700
                                  300 Delaware Ave.
                                  Wilmington, DE 19801

 For Equity Security Holders:     James C. McCarroll, Esq.
 Committee                        Kramer, Levin, Naftalis
                                  & Frankel, LLP
                                  919 Third Ave.
                                  New York, NY 10022

 For PD Committee:                Rick Miller, Esq.
                                  Ferry, Joseph & Pearce, PA
                                  824 Market Street
                                  Wilmington, DE 19899

 For Asbestos PI Committee:       Matthew Zaleski, III, Esq.
                                  Campbell & Levine, LLC
                                  1201 North Market St.-Ste.
```

```
 3
1501
```
                                        Wilmington, DE 19801

 For                                    Joseph Grey, ESq.
                                        Stevens & Lee
                                        300 Delaware Ave.-Ste. 800
                                        Wilmington, DE 19801


 For Wesconn:                           William W. Erhart, Esq.
                                        William W. Erhart, PA
                                        300 Delaware Ave.-Ste. 1130
                                        Wilmington, DE 19899

 For ZAI Claimants:                     Elizabeth J. Cabraser, Esq.
                                        Lieff, Cabraser, Heimann
                                        & Bernstein, LLP
                                        Embarcadero Center West
                                        275 Battery St.-Ste. 3000
                                        San Francisco, CA 94111

                                        Thomas M. Sobol, Esq.
                                        Hagens, Berman, LLP
                                        225 Franklin Street-26th Fl.
                                        Boston, MA 02110

                                        Edward J. Westbrook, Esq.
                                        Richardson, Patrick,
 Westbrook
                                        & Brickman, LLC
                                        174 E. Bay Street
                                        Charleston, SC 29401

                                        Allan McGarvey, Esq.
                                        McGarvey, Heberly
                                        Kalispell, Montana

 For EAIC:                              Scott Talmadge, Esq.
                                        Clifford, Chance, Rogers
                                        & Wells
                                        200 Park Ave.
                                        New York, NY 10166

 Audio Operator:                        Virginia L. Akin

 Transcribing Firm:                     Writer's Cramp, Inc.
                                        6 Norton Rd.
                                        Monmouth Jct., NJ 08852
                                        732-329-0191

4
Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

THE COURT:  There is an agenda this morning.  I
understand that Items 1,2 and 3 have been continued until
next month's calendar and earlier this morning I signed the
Order that's attached to the Certificate of Counsel on
Agenda Item #5, which is the Debtor's Motion to Assume and
Assign a Prime Lease.  And I believe that's all.
Everything else, I think, is still on the calendar.

MR. BERNICK:  That's right.  David Bernick for
Grace.  With respect to uncontested matters, what is
reflected as #4 uncontested, is now contested, so maybe we
can pick that up when we begin with the contested matters.

Item #6, which was our Estimated Litigation Budget for the
ZAI Science Trial, there has been no objection and I have
an Order.  I circulated copies to counsel here, and here's
an Order for the Court to approve that budget for Item 6.

THE COURT:  All right.  This is just the Debtors'
budget, or --

MR. BERNICK:  Just the --

THE COURT:  -- or everybody's?

5

MR. BERNICK:  -- Debtors'.

THE COURT:  Okay.  I have -- I think I want to talk about that before I --

MR. BERNICK:  Okay.

THE COURT:  -- approve that budget.  Okay.

MR. BERNICK:  I guess that would bring us back, then, to Item 4 as being the first contested matter.  This relates to the Revised Compensation Program, and as Your Honor can see from the papers, only one constituency has objected to this package, that's the PD Committee, and it's our position that the objection that's been made is facially defective and for the following reasons.

The Debtor in this case followed a textbook business judgment process in the course of coming up with this Revised Compensation Package.  Grace retained an outside consultant from Deloitte, Touche who's got specific expertise with regard to dealing with mass tort Chapter 11 debtors.  That individual, Mr. Bubnovich, developed a series of recommendations about what the Revised Compensation Package should be.  It came on for them -- the development by the Compensation Committee of Grace's Board of Directors, and that Committee is comprised wholly of outside directors.  There's no inside director and there's no individual who would be affected by this compensation package.  So it's a totally disinterested group of people.

6

The Compensation Committee put together the revisions
based upon the recommendations of Mr. Bubnovich, and I
believe that the -- ultimately it was approved by the full
board, but in any event, the Compensation Committee's say
so with regard to such matters is dispositive in this area.

This process was completely informed, outside consultants
were involved, a completely disinterested decision was
made.

The Company, of course, went even further and
sought to obtain the concurrence of the Committees in this
case.  A presentation of this package was made to the
Committees, including their financial advisors, on the 12th
of March.  The PD Committee was represented in connection
with that presentation.  They had a financial advisor who
was present.  The Company responded to questions that were
posed and revised this package based upon the input of the
Committees, in order to come out with the final package
that's now before the Court.

Our Motion was filed, and of course the PD
Committee alone has objected, and they criticize, really,
all aspects of this Revised Compensation Package.  What's
notable, however, is the absence of support for this
objection and absence of anything that would implicate the
application of the Business Judgment Rule.  There is no
affidavit even from the PD Committee's own financial

7

advisor taking issue with this.  There's no affidavit of
any expert in the field of compensation that says that
these decisions were improper.  And there's no fact that's
been produced to this Court that would say that this
process was poorly informed or -- would say that this
process was affected by self-dealing.  This is a classic
case of the Business Judgment Rule.

        The real beef, as we can see from the papers that
have been filed by the PD Committee, is that they're
unhappy with the fact that Grace has now intervened in
connection with the fraudulent conveyance litigation.  That
intervention was predicated upon an absolute right to
intervene, but is in any event entirely irrelevant for
matters that are now before the Court.  Essentially, they
are unhappy and they now seek to second-guess these
decisions that were made.  They essentially ask the Company
to dare its own employees to leave.  It says, "they haven't
left yet, well let's see if they do" before the Company is
able to take action to preserve a business that all
constituencies have an interest in preserving.

        This effort to second-guess without some
demonstration that the Business Judgment Rule cannot be
applied is foreclosed by the Rule.  Strategic objections
are not permissible under the Business Judgment Rule, and
we don't believe that the Court should even reach the

8

issues that they pose on the merits because they have not been able to demonstrate that the Business Judgment Rule should not apply.  I am prepared to take up any and all questions that the Court has with regard to particular features of the package, but we don't believe this objection rises to that level.

THE COURT:  All right.  Who wants -- for the Property Committee, who wants to speak?

MR. SACKOLOW:  Good morning, Your Honor.  Jay Sackolow on behalf of the Asbestos Property Damage Committee.  Your Honor, the first point I want to make is that the Debtors did meet with our financial advisors.  The financial advisors did point out issues that the Property Damage Committee had with the package.  The Debtors did try to address certain of those issues, they did not address all of them, and the plan that was put forth does not address all of our issues.

I'd like to begin with just a few illuminating comments about certain parts of the program that I think you should be aware of and why the Debtors have not met the burden of sustaining why they need to implement revised compensation procedures.  There's essentially four --

THE COURT:  Well, how am I going to challenge the Debtors' business judgment from a Response that's not supported by any evidentiary material?  I mean, that -- Mr.

9

Bernick is quite correct.  There is nothing that supports
anything other than an argument that this appears to be too
rich.  That's what the Response says.  This looks like it's
too rich.

        MR. SACKOLOW:  Understood, Your Honor.  We did not
have the chance to depose their experts.

        THE COURT:  Well, why not?  How long has it been
since this process has gone on?

        MR. SACKOLOW:  The objection was filed on July 5th.

        THE COURT:  The objection was filed on July 5th.
When was the Motion file?

        MR. SACKOLOW:  I believe at the end of June.  I
don't remember the exact date, Your Honor.

        THE COURT:  And how long was the process in place?

        MR. SACKOLOW:  The -- the meeting was held in March
of 2002.  We did not see a motion until June of 2002.
Based upon the Debtors' stated confidentiality reasons,
they were not -- they did not present us the presentation
that they gave to our financial advisors.  Our financial
advisors were not able to share that with us.  The Debtors
did attach to their Reply that they filed to our Response,
but we were not entitled to that information prior to them
filing that Reply.  We didn't have the opportunity to take
depositions of their experts prior to the -- us filing our
objection.

10

THE COURT:  Okay.  Go ahead.

MR. SACKOLOW:  A couple of the interesting aspects, Your Honor.  The General Retention Program.  The Debtors are seeking to increase it by 50%, almost 50%, over the existing number from 4.6 million up to $6.7 million.  Over the past year, only 5 of 116 employees, according to the Debtors, have left their employ.  This is entirely consistent with their general attrition rates prior to the bankruptcy.  It appears, without a doubt, that their current program is paying their employees a sufficient amount to make them desire to stay with the Debtors.

Also interesting with respect to the increase, it appears from their attachment to the -- Exhibit-A to their Reply, that the lion's share of the increase of this Retention Program is going to tier 1 employees.  It's a group that appears to consist of 18 employees which we believe are the top management of the Debtors.

Another component of the revised compensation procedures are the long-term incentive program that's existing that was passed on the petition date by Judge Farnin and approved in June as -- June of 2001 as a Final Order.  They're seeking to revise that and they're seeking to implement a new long-term incentive program.  This is a program that rewards people for reaching certain goals of earnings before interest and taxes.  Under the existing

11

program it's currently being paid 50% in cash, 50% in stock.  The Debtors are seeking to retroactively go back and change the existing program to be 100% in cash and eliminate the stock component.  The Debtors argue that it's a decreased stock price as a result of the bankruptcy that is causing them to have to go back and pay everybody in cash now as opposed to stock.  I would wonder what their stock would be doing outside of bankruptcy, given the market that we're all in.

          THE COURT:  Well, I am somewhat in agreement that this program should not be retroactively changed.  It was approved by Final Order before, it's not appealable, and I don't see a retroactive change, and Mr. Bernick, I think the Debtor has to live with what the Debtor did.  Now, going forward, that's a different issue.  But I don't see a retroactive change.

          MR. SACKOLOW:  Now, on the new -- on the 2002-2004 Long-Term Incentive Plan, as the Debtors call it, the Debtors are seeking also to pay this all out in cash as opposed to stock.  Importantly, what the Debtors are seeking to do is they're seeking to reduce the target earnings growth rate from 10% to 6%, a reduction of 40%. The Debtors argue that this is the proper way of doing it, because 6% is the average historical growth rate of their peers in the industry.  It strikes me as odd, and strikes

12

our Committee as odd, that the historical growth rate of its peers is what they would base it upon, as opposed to their own historical growth rate.  They're now targeting their bonuses to their peers' growth rate, as opposed to their own growth rate.

The effect of this, of changing it from a stock component to a cash component, has a potential effect of upwards of 6 to $9 million per year for the current year, and according to the Debtors' own numbers, could be a difference of 12 to $20 million per year additional cashout of the Estate.

It's important to understand that because of where we are right now in the bankruptcy.  We're at a point the Debtors haven't begun talking to the Asbestos Committees about a plan of reorganization.  We have all the Zonolite issues on the table.  We have the fraudulent transfer issues on the table.  Debtors have not done anything to move this bankruptcy beyond their litigation protocols that they keep trying to institute, but now at the same time, what they're trying ensure is that additional cash will come out of the Estate to pay to their employees, to pay their top management.  Your Honor, the PD Committee submits that this cannot be permissible.

THE COURT:  All right.  Does anyone else wish to speak in objection first?

13

ALL:  (No verbal response)

THE COURT:  Okay.  Mr. Bernick?

MR. BERNICK:  I think that the materials that have been submitted to the Court respond to the issues that were raised in connection with the General Retention Program.  I would note that Mr. Sackolow talks about the fact that the recipients of a lot of this benefit would be the top executives of the company and, of course, as we've indicated to the Court, the top executives of this company, even with this package, are only in the 50 to 75th percentile of compensation in reference to their peers. This is not a company that's passing out money above and beyond what the marketplace would indicate to its top people.

With regard to the reduction in the target growth rate from 10 to 6%, it's easy for counsel to raise issues with that, but the fact of the matter is that our expert indicated, and the data supports him, that the 10% is simply unrealistic in this environment.  You don't set an incentive performance level that people have no realistic ability to meet.  And that's exactly why you take a look at your competition to see what performance goals are being set within the industry, because it's in the industry that people have alternatives to go out and get other jobs.  And that review showed an average of 5.8 to 5.9, which makes

14

the 6% target totally reasonable.

At the end of the day, Mr. Sackolow comes back to what really is the essence of the -- their objection. The essence of their objection is that we oughta use this compensation, and employee compensation generally, to act as a hostage for where they believe this case should go, and that is not the purpose. The purpose is to maintain the value of the business. You don't sit there and gamble with the value of the business because you don't like the direction that the case is pursuing. And very meaningfully, it is the PD Committee and the PD Committee alone which has objected. The Bodily Injury Committee has exactly the same concerns, they have the -- they have different, but also contrary strategic objectives in this case. They are not here making any kind of objection.

MR. BAENA: Judge, may I add something? Judge, you know, using a peer group for purposes of deciding what the appropriate level of compensation in bankruptcy is is a particularly slippery slope if you don't analyze what the peer group is and where that peer group is in its own reorganization exercises. That's why it's particularly appropriate to consider the fact that we have not moved this case any further along to reorganization on a consensual basis. And I think it's entirely appropriate for the Court to consider the fact that in this case --

15

THE CLERK:  Judge, excuse me.  We're not sure he's recording.  Can we take a break?  Sorry, Mr. Baena.

MR. BAENA:  Only when I speak.

(Laughter)

(Pause in proceedings)

THE COURT:  Are you ready?

THE CLERK:  Yes, Judge.

THE COURT:  Okay.  We're currently back in business.  Mr. Baena, you were saying that --

MR. BAENA:  Yes.

THE COURT:  -- this case is not moving along on a consensual basis.

MR. BAENA:  It's not moving along on a consensual basis, Your Honor, and as a consequence, one absolutely fundamental showing that this Debtor needs to make to support this application can't be made.  And they haven't made it.  And that is what they expect their Unsecured Creditors will receive in this case.  Absent that showing, I think it would be improvident to approve the application.  And Judge, let's keep in mind that they already have a plan in place.  This isn't an instance where we're saying no Key Employee Retention Program at all.  They have a program.

Finally, Your Honor, in defining their --

THE COURT:  Doesn't the existing plan expire?  I

16

think it expires at the end of the year or something like that.  So, yes, there is a plan in place until the end of the year, but not thereafter.  Isn't that correct?

MR. SACKOLOW:  I believe the Long-Term Incentive Program is through 2003.  The existing program.  It's a 2-year plan, I believe.

MR. BAENA:  I don't believe anything that we're talking about expires this year, Judge.

THE COURT:  Okay.  Can we verify that?

MR. BERNICK:  The Retention Plan expires at the end of this year, and the Long-Term Plans, as I understand them, cover a more extended period of time, but there are features that kick in each year, so that you're really kind of going with rolling 3-year periods of time.

MR. BAENA:  Judge --

THE COURT:  And when is the existing plan --

MR. BERNICK:  Well --

THE COURT:  -- over?

MR. BERNICK:  -- the existing plan covers a period of time up through -- the Long-Term -- the LTIP goes from 2001 to 2003 and the proposed LTIP goes from 2002 to 2004. So we're picking up a portion of the old and going on to the new.

THE COURT:  Okay.

MR. BAENA:  There's no urgency, Judge.  And this

17

isn't a matter that couldn't come up later in the year

anyway, when hopefully there'll be more progress and

they'll be able to report to the Court what they anticipate

their Unsecured Creditors are gonna receive before we

increase the largesse for management.

THE COURT:  Well, number one, I don't know that

what the Unsecured Creditors will receive in this type of a

plan is the test, Mr. Baena, because what the Unsecured

Creditors are entitled to receive is whatever the worth of

the Debtor is and what they'd get if the case were

liquidated.  So if we need an evaluation hearing on that

score, okay, but I think that's part of what your

fraudulent conveyance action is going to get to anyway.  So

that process is in place.

But I have never seen a case that ties retention

programs to distributions to Unsecured Creditors in a

Chapter 11.

MR. BAENA:  The Court very clearly said that in the

Interco case.  The Court refused to, in fact, in Interco,

even entertain the issue of a KER program until a plan had

been confirmed, so that the Court could know when, in fact

-- what, in fact, Unsecured Creditors would be receiving.

THE COURT:  Well --

MR. BAENA:  And also, Judge, I ask you to take into

account what they're considering to be their peer group.  I

18

don't know what numbers Mr. Bernick just told you about,
but in the moving papers, they characterized their peer
group as other debtors in mass tort bankruptcy cases.
Well, we're not involved in all those cases, but I can tell
you that in U.S. Gypsum, where there is substantial
presence of traditional property damage claims and we'll --
those claims are represented by Committee, the program
there is on a per-employee basis almost half of what
they're proposing here on a per-employee basis.  So I don't
know that there's a well-defined peer group.  I'm not sure
where these numbers are coming from.  I don't see any basis
at all, given that there hasn't been attrition and given
that the Debtor hasn't even here today said they can't meet
their former targets for profitability, that there's any
concern about management not being able to attain those
targets.

     And then finally, and most importantly, I
reiterate, it seems to me highly inappropriate to continue
to reward management while there is no expectation yet on
the table for Unsecured Creditors in this case.

     THE COURT:  Well, again, I'm just not sure that the
issue with respect to the Unsecured Creditors gets very far
because if this were a going company not in bankruptcy and
liquidated, there may or may not be a distribution to
Unsecured Creditors.  I don't know that that's the means

19

all and end all to whether key management should stay in

place.  I am sure that should something drastic happen and

all of the key management leave, for whatever reason, that

the likelihood that Unsecured Creditors would get anything

is significantly diminished.

So I don't think anybody's challenging the fact

that the business ought to be ongoing.

MR. BAENA:  We are not challenging that.  We are

not challenging the fact that compensation ought to be

consistent with what's paid in the community, but Judge,

this compensation uses as its target profitability results.

And so, what they're asking us to do in one fell swoop is

to reduce the expectations they formerly rolled out in

front of the Court about where we're going in this case,

and they haven't said that it's because they're not going

to achieve that level of profitability and why, but rather

because others in their industry don't expect to receive --

reach that level of profitability.  And I'm not even sure

I'm characterizing it correctly when I say others in their

industry, because they're just talking about mass tort

debtors.  And I don't even know how that's -- comparable to

what we're talking about here.

If you look at the asbestos bankruptcies, again,

U.S. Gypsum, regardless of what the target -- is in that

case, the cost of keeping management is not nearly as great

20

as it is being proposed here.

       THE COURT:  Well, I don't know anything about

Gypsum.  I don't know how big a company it is.  I don't

know how many key employees it has.  I don't know the

nature of the business.

       MR. BAENA:  That's my -- that's my point, Judge.

And yet, you're -- you know, you're being asked to rule to

approve this as if you did.  There's no testimony about any

of that.  Where are they in their bankruptcies, these other

mass tort companies?  You do know about some of those

cases, and you know that they're maturer in terms of

approaching reorganization than this case is.

       THE COURT:  Well, I know this case doesn't seem to

be off dead center, that's for sure.

       MR. BAENA:  All right.  I'm not --

       THE COURT:  And I am --

       MR. BAENA:  -- sure that we've reached --

       THE COURT:  -- a little concerned --

       MR. BAENA:  -- dead center yet, Judge.

       THE COURT:  -- and I know that in the not too near

future, the Debtor's going to be looking at another

extension of exclusivity and I know if this case doesn't

get moving, I'm going to have some problems with it.  But

with respect to key management, I think it's a different

issue.

21

          MR. BAENA:  Well, if the Court already anticipates

that it's gonna have some reservations about exclusivity --

          THE COURT:  I always do.

          MR. BAENA:  -- being extended, as you ought,

particularly in a case like this, why not roll this forward

to that next hearing on exclusivity?

          THE COURT:  Well, let -- why don't we break this

into components, because I'm not totally sure I understand

the Property Committee's objections.  Are you only

objecting to the long-term aspects?  Or are you also

objecting to the Key Retention Program that expires in

December?  Because this is July.  There isn't a whole lot

of time left to assure existing management that with

respect to their retention, not the long-term but the other

aspect of this, that there will be a plan in place.  So I

may defer it for a month.  I don't expect to defer it until

exclusivity's over or until this period of time expires.  I

don't think that's appropriate.  If I was on a board, I

would certainly object to a board not taking that issue on

earlier, and I'm not going to defer it that long.

          MR. BAENA:  Well, Judge --

          MR. SACKOLOW:  Your Honor --

          MR. BAENA:  -- why don't we then defer it for a

month and we'll take the depositions that somebody

suggested we should have taken by now, and we'll be able to

22

either come to an agreement or come back to the Court and
tell you why they're using strongmen to set this motion up
with.

THE COURT:  I wasn't suggesting that you needed any
depositions.  I was only asking why if you needed them,
they hadn't been done yet.  I want to make that clear.

MR. BAENA:  Well --

MR. BERNICK:  Your Honor, this is a perfect
illustration of the reason why the Business Judgment Rule
exists, and particularly in the context of Chapter 11.  The
PD Committee here is being just plainly irresponsible.  The
remarks that are being made here are simply counsel's
effort to develop a piece of leverage in this case.  That's
all it is.  They could have at any point gone off and
gotten an expert, they could have conducted the discovery,
they could have read the case law --

THE COURT:  Well, they didn't get the information
until July 5th.  This is only July 22nd.  That's not a
whole long time, Mr. Bernick.

MR. BERNICK:  Their advisor had this information in
March.  There was a whole --

THE COURT:  Well, I'm being told that they weren't
permitted to share it with the Committee.

MR. BERNICK:  Well -- but, their advisor knew what
the basic dimensions of this situation --

23

THE COURT:  Well that's advice, but if they're looking for legal counsel, whether -- regardless of what the advisor knows, if they can't talk to their counsel about it, the counsel can't do the discovery that's necessary.

MR. BERNICK:  Well, I --

THE COURT:  Because you can't -- you can't hamstring somebody in that fashion, if that's the case, if it's the case.

MR. BERNICK:  Your Honor, I'm now told that they could talk to counsel, that is, the financial advisor could talk to the counsel, they just couldn't talk to the Committee itself.  So this is not news to counsel, either. And this is -- this is --

MR. BAENA:  Your --

MR. BERNICK:  -- a situation where, again, Mr. Baena has been totally and completely transparent on this. He wants to use this as leverage in the case.  He's now saying, "let's hold off making these kinds of compensation decisions so we can see what we're gonna get out of the case," and the case law plainly says that that's not so. This is --

THE COURT:  Well, I don't know that that's totally the -- that that's a totally appropriate focus.  I've already said that on this record, Mr. Bernick.  But I don't

24

think it hurts to wait a month and let them take some
discovery if that's what's necessary to see how the Debtor
is exercising business judgment.  I've already said, I'm
not approving retroactive changes to the existing program
that was already approved by Final Order anyway.  So some
change needs to be done in the package that's presented to
the Court.  I will not undo a Final Order of Court that
previously approved that package.  If the directors took
stock and were comfortable in it, that's what they get.
Everybody who's in the stock market suffers the increase
and decreases of the vagaries of the market, and they are
no different, and this is their company.  If anybody ought
to be comfortable having the stock option and relying on
it, it ought to be the directors and key employees of the
company who are largely responsible for insuring the value
of that stock.

Now, I recognize this is a dire economic time and a
lot of stock that has intrinsic value isn't recognized for
a lot of other reasons.  Nonetheless, I am not changing
that program retroactively and that portion is not
approved.  Regardless of the Debtor's business judgment, it
was subject to a Final Order, it's not appealable and I'm
not approving it.  So it needs to be redone anyway, and
it's going to take a little bit of time, I think, to
segregate out the portions of the program that were

25

previously approved by way of Final Order from those going

forward.  Going forward, if it's the Debtor's business

judgment that all cash is necessary, then I guess that's

the Debtor's business judgment, but I do want to know why.

 I want to know why these employees are no longer willing

to rely on the fact that the stock that they're responsible

for managing isn't going to be a part of their

compensation.

        MR. BERNICK:  Your Honor, we -- with respect to the

Court, that's what we thought we did.  We submitted the

affidavit of our expert from Deloitte, Touche.  We cited

the review that he did of other companies and the review

that he did of Grace and his determination that in Chapter

11 it doesn't make much sense to promise people that

they're gonna get stock as value, because of the

uncertainty of the Chapter 11.  These very Committees are

going to take the position that the stock is completely

worthless.  So an employee sitting here making a decision

about whether to continue to work at the Company is then

promised, "well, if you reach a certain level of

performance, you're gonna earn out, but half your earn-out

is gonna be in stock and we don't know whether the stock is

gonna continue to have value or not."  What we're dealing

with is the reality of what people keep -- what will keep

people working for this Company, and that is precisely the

26

area that's encompassed by the Business Judgment Rule.

THE COURT:  Well, that's true.  But we do have the
fact that the Debtor has not seen massive turnovers.  Now,
they -- obviously, key employees were comfortable with the
plan that was in place for the period of time for which
it's in place, because they haven't been leaving in droves
and there are lots of mass tort cases.  I'm sure it's a
competitive market.  I'm sure if folks chose to leave,
there is a likely place for them to go.  They haven't been
leaving in droves.  I don't want to see them leave in
droves. I don't think the Committee wants to see them leave
in droves.  But the question is to balance what's an
appropriate incentive to keep them, and I'm not
retroactively approving -- disapproving something that's
already been approved by way of Final Order.  So it needs
to be redone.

MR. BERNICK:  Your Honor, I'd ask if we could have
this expedited.  I mean, this is all set out, the --

THE COURT:  I'll continue it till August, yes.
That way if the Committee wants some additional
information, they've got that time to take it.  I will hear
it on a final basis in August.  I will not continue it
again.

MR. BERNICK:  Okay.  Then for the Court's
information, the peers with respect to which these

27

determinations were made were not simply Chapter 11 peers.
 They're companies like Dow Chemical, DuPont, Eastman
Chemical.  This is a very professional review job that was
done and there was no effort here to pass out money
undeservedly.  These are -- this is an effort to maintain a
business that's been performing extremely well, and that
everybody in this room should have an interest, a very
active interest, in maintaining.  And the idea that we're
gonna sit here and have self-serving statements made about
where this case is going, there is no one who wants this
case to be resolved on a consensual basis more than the
Company.  The Company has been actively pursuing
discussions where they can take place with different
constituencies, including constituencies that have spoken
to this issue this morning, and will continue to do that.
The fact of the matter is that there are a number of issues
in this case, there always have been a number of issues in
this case, and we're trying to move those, too, through the
resolution process.  So this is a two-way street.  We'd
like to reach closure, too.

        THE COURT:  Okay, that's fine.  This -- agenda Item
#4 is continued to August -- the August omnibus date.  If
the Committee needs any type of discovery, make sure you
get it, because whatever the filing dates are with respect
to the motions that are put on that agenda for August will

28

apply.  So if you have any supplemental materials, make
sure they're filed on time and I get them in advance, that
2 weeks in advance timeframe.  Do you need some specific
Order?

        MR. BERNICK:  I don't think so.

        MR. BAENA:  Could -- respectfully, Judge, could we
-- you know, we've had scheduling difficulties before and -
- we always have scheduling difficulties with discovery --
can we compress that 2-week period a little bit, just to
give us a little bit more time?

        THE COURT:  The problem, Mr. Baena, is I don't get
the documents.  And it is very difficult to get these
things piecemeal and try to fit them in, and I really need
those documents in advance, especially if you're going to
have some objection that's going to require some analysis
and legal research and thought.  I will compress it by a
couple of days, so that the Debtor has an opportunity to
respond to it, but I can't do much more than that.

        MR. BAENA:  I understand, but even if it were 10
days, it would be better than 14.

        THE COURT:  All right.  The Property Damage
Committee may submit, I guess its supplement to its
objection by -- if I give them until August the 15th, Mr.
Bernick, the hearing's August 26th.  Does that give the
Debtor sufficient time to get something to me by at least

29

the 22nd?

   MR. BERNICK:  Well --

   THE COURT:  If you choose to submit anything more?

   MR. BERNICK:  Yeah.  I'm sure that if they're gonna
make a submission, we're gonna want to respond to it.  I
guess I would ask that if we have a period of time during
which to get this whole thing done, that we just divide it
50/50, that if the submission's gotta be made by the twenty
--

   THE COURT:  Theirs would be by the 16th of August,
yours by the 22nd.

   MR. BERNICK:  Why don't we take the distance
between now and the 22nd and divide it evenly?  I think
that that would be more appropriate.

   THE COURT:  Well, the problem is that they need to
take some discovery.  They're going to need a little bit of
time to do that and that pretty much gives them 2 weeks to
do discovery and a week to get their documents together.
Mr. Baena, I'll cut your date back till the 15th of August.
 That pretty much splits the difference after the -- a
couple of weeks for discovery, and keep the Debtors at
August 22nd.

   MR. BAENA:  Thank you, Judge.

   THE COURT:  Mr. Bernick, I know I generally do not
want copies of things sent to Pittsburgh, because then I