IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| W. R. GRACE & CO., | ) |
| et al., | ) Case No.: 01-01139(JFK) |
| Debtors | ) Jointly Administered |
| | ) Re: Docket No. 2230 |

The deposition of NICK BUBNOVICH called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before EILEEN M. HERATY, a notary public within and for the County of Cook and State of Illinois, at 200 East Randolph, Chicago, Illinois, on the 30th day of July, 2002, at the hour of 12:40 p.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376

FILE NO.: 9C05836

Reported By: Eileen M. Heraty, CSR

License No.: 084-003212

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

APPEARANCES:

BILZIN, SUMBERG, DUNN, BAENA, PRICE & AXELROD, LLP., by
MR. ALVIN D. LODISH
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131-2336
(305) 375-6129
Representing the Claimant;

KIRKLAND & ELLIS, by
MR. ANDREW R. RUNNING,
200 East Randolph
Chicago, Illinois 60601
(312) 861-2200
Representing the Debtors.

INDEX

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| NICK BUBNOVICH | | | | |
| By Mr. Lodish | 4 | | | |

EXHIBITS

| NUMBER | MARKED FOR ID | RECEIVED |
|---|---|---|
| Defendant's Exhibit | | |
| No. 1 | 8 | |
| No. 2 | 21 | |

(Exhibits 1 and 2 are not attached)

(Witness sworn.)

NICK BUBNOVICH,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LODISH:

**Q. Mr. Bubnovich, can you please give us your full name for the court reporter, please.**

A. My name is Nick Bubnovich spelled B-u-b-n-o-v-i-c-h.

**Q. Where do you live, Mr. Bubnovich?**

A. I will in Glenview, Illinois.

**Q. And you're currently employed with Deloitte & Touche Accounting Firm?**

A. Yes.

**Q. And how long have you been employed there?**

A. Approximately two months and three weeks.

**Q. And prior to that, I understand from your affidavit, that you were with Arthur Anderson; is that right?**

A. Correct.

**Q. And how long were you with Arthur**

**Anderson?**

A. Approximately 15 years. It will be 15 years on Friday.

**Q. In your affidavit it indicates you were in Arthur Anderson's Human Capital Consulting Practice.**

**Can you briefly tell me what that consulting practice involved?**

A. Yes. Human capital at Anderson had four principal service lines. One was compensation, which was the group that I was in.

Another one was international executive services, which provided compliance and consulting services to companies concerning expatriates.

The third group was employee benefits. That group provided compliance and consulting services regarding retirement benefits.

The fourth group was what at Anderson we call people strategy. People strategy is what I would call a softer HR consulting non-tax, non-compensation. Typical people strategy projects would entail succession planning, organization development, and similar sort of HR functions.

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

**Q. Your affidavit indicates in the second paragraph that you have 20 years experience in the compensation and benefits consulting area.**

**I assume then that you were working those areas prior to working for Arthur Anderson; is that accurate?**

A. Yes.

**Q. Who did you work for prior to Arthur Anderson?**

A. Before I joined Anderson, I was an attorney in the legal department at the Northern Trust Company.

My responsibilities there were to provide support services to the trust department and its relationship with its employee benefit customers.

My job description also included supporting the Northern's human resource department on compensation benefits matters.

**Q. I take it then, Mr. Bubnovich, that you have a law degree?**

A. Yes.

**Q. Do you have any other degrees other than a law degree, postgraduate degrees?**

A: No.

Page 6

**Q. When you came in here today, I believe you brought with you a summary of TDC or total direct compensation for executives at W. R. Grace; is that accurate?**

A. Yes.

**Q. And what was the reason that you did this particular analysis or summary?**

A. The purpose of the analysis is to demonstrate that notwithstanding the fact that the executive team, as well as a number of key employees at Grace, have what I'll call four components to their basic compensation package. The aggregate of those components is within the range of competitive practice.

**Q. When were you asked to do this summary?**

A. We began working on it the week after the 4th of July. So that would be the week of July 8th.

**Q. Okay. At the time that you signed your affidavit on July 12, 2002, do I understand that this summary was not done at that time?**

A. Well, it's referred to in the affidavit, isn't it?

**Q. It's referred to, but I take it it was not printed up? It was not presented with your affidavit; is that your understanding?**

A. That's correct. I mean, it was done.

MR. LODISH: Andy, is this --

MR. RUNNING: I have another copy you can mark.

MR. LODISH: We will mark this as the -- I guess in these proceedings we are a claimant, so I guess we would mark these as Defendant's 1 for the purpose of this deposition.

(Whereupon, Defendant's Deposition Exhibit No. 1 was marked for identification.)

MR. RUNNING: Let me explain on the record I explained to Counsel when I handed him this document that this contains confidential compensation information that's not publicly available and consisting with the undertakings of the PD Committee.

With respect of the handling of confidential information, we expect this information will be treated as such.

MR. LODISH: I indicated, Mr. Running, I have no problem to agreeing to that for the purpose of the deposition, and I have no idea whether that would be an issue later on, but

Page 8

there's no problem agreeing to that at this point.

BY MR. LODISH:

**Q. Mr. Bubnovich, when did you first begin consulting for W. R. Grace?**

A. September 2001.

**Q. And at that time you were with Arthur Anderson, correct?**

A. Yes.

**Q. And what was your consulting assignment that W. R. Grace asked you to do for them?**

A. W. R. Grace asked me to help them review their compensation programs to assure that while they were in bankruptcy the compensation programs were competitive and otherwise consistent with the company's business strategy.

**Q. And was beginning September 2001 the first time you had done any work for W. R. Grace?**

A. Yes.

**Q. And did you render advice to W. R. Grace in terms of the competitiveness of their compensation program?**

A. Yes.

**Q. And what did -- What was your -- What was your response to them after you undertook the**

Page 9

9C05836
NICK BUBNOVICH JULY 30, 2002

**task of looking at their benefits and program?**
A. One of the things that I was asked specifically to do as part of the overall review was to look at the company's existing retention program, and I did so, and I told the company that I thought that the program was on skinny side, that it was at the low end of competitive practice.
As we delved into some of their other compensation programs, I had some reservations about the structure of the long-term incentive program also.
**Q. So you were -- As far as you're aware, were you the first person that told W. R. Grace that the retention program was on the skinny side?**
A. No. I think they had come to that conclusion themselves.
**Q. When you were first retained, did they tell you that they thought their retention program was not as lucrative as it should be?**
MR. RUNNING: Objection, lack of foundation, lack of specifics as to who, what, where, when.
BY MR. LODISH:
**Q. If you can answer it, go ahead.**

Page 10

A. Could you repeat the question, please.
**Q. Let me back up.**
**Who contacted you from W. R. Grace in terms of retaining you to look at their benefits and compensation program?**
A. Mike Piergrossi, who was the vice president of human resources, and Brian McGowan who is the senior vice president of administration at Grace.
**Q. Do you know how to spell the first person's name?**
A. Sure. P-i-e-r-g-r-o-s-s-i.
**Q. Did they meet with you together or separately?**
A. They called me, I believe, at the end of August.
For some reason, I'm pretty sure it was in August, and we were scheduled to meet. I was going to go to the company on September 12th. That was a trip I obviously did not make because of the suspension in air travel.
**Q. And did you eventually meet with them?**
A. Yes.
**Q. When was that?**
A. The first meeting I had with them was

Page 11

October 4th.
**Q. Of 2001?**
A. Yes.
**Q. And what did they tell you about their retention program at that time?**
A. Oh, they explained their retention program to me, the terms and conditions of it.
They also explained to me that Mike was the member of a human resource committee of companies that were experiencing asbestos-related litigation problems and HR people periodically. So Mike was aware of the retention and other compensation programs at other companies. That's where he got my name from Brian Cook at U.S. Gypsum.
**Q. Okay. And did they express any concerns about their retention program at that meeting?**
A. Well, what they said was they wanted to -- The program, as I presume you're aware, is in place for 2001 and 2002.
They told me that they wanted to change it, and actually they had expressed -- They had asked me whether I thought we could get the current program changed, and I told them no, and

Page 12

I advised them against that.
**Q. Okay.**
A. Instead I suggested that we develop a new program effective January 1, 2003.
**Q. Are you aware that they had asked to change the current program?**
A. Yes.
**Q. And I take it that when they asked you about that, you told them that that was not something you thought they ought to do; is that right?**
A. Well, I told them they should not change the terms and conditions of the program that were in effect for 2001 and 2002.
**Q. Why did you tell them that?**
A. The done deal, as far as I was concerned, plus I felt that it would be difficult to get the committees to approve any changes once they had already been agreed to.
**Q. At the time of that first meeting had you reviewed the compensation program they had?**
A. Yes.
**Q. At that first meeting did you have an opinion whether the 2001, 2002 retention program was competitive?**

Page 13

**9C05836**
**NICK BUBNOVICH JULY 30, 2002**

A. Well, I think I have already answered that, and I came to the conclusion that it was -- Clearly it's less than what their peer Chapter 11 companies have in place, but the overall test of these things is not a particular program. You have to look at it in the aggregate, and that's why I did this particular analysis that we have marked as Exhibit 1.

**Q. What did they ask you to do in terms of the programs going forward, the programs that were not already in place?**

A. Well, following September 12th, beginning on September 12th we had a conference call that day instead of a face-to-face meeting.

Until the first face-to-face meeting on October 4th, I reviewed their existing compensation programs and prepared a document that summarized five possible alternatives for them for a new retention program beginning 1-1 2003.

**Q. Okay.**

A. Also at that meeting, I discussed with them my views on their long-term incentive program.

**Q. The long-term incentive program that**

**was already in place or --**

A. Yes.

**Q. And what were your views on the long-term incentive program at that time?**

A. Well, they had already come to the conclusion that the program -- That the option feature of that program should be converted to cash, and I told them I agreed completely with that.

I told them that I thought that the 10 percent EBIT target was inappropriate, EBIT, which stands for earnings before income taxes, was inappropriate.

**Q. Inappropriate? Why did you think it was inappropriate?**

A. I thought it was inappropriate because it was too high given their industry and the performance of their peers.

At that meeting, I showed them a chart I had prepared where we had analyzed the three-year EBIT growth at their peer companies.

**Q. Did you think it was inappropriate based upon the company's past performance?**

A. That was a factor, yes.

**Q. Do you recall what the company's past**

**performance had been in say the prior five years to 2001?**

A. I don't know about the prior five years. I do know that the EBIT for the past two years, 2001 and 2002, was approximately four and five percent respectively.

I'm also aware that the last time they did 10 percent was 1998.

**Q. After you met with them face to face on October 4, 2001, did you meet with them any further, or what was your assignment after that date?**

A. There was an additional meeting later in October. I don't remember the date.

Again, I met with management as well as the chairman of the Compensation Committee, John Akers, A-k-e-r-s.

**Q. And at that meeting in late March, were you given any other instructions in terms of your analysis?**

A. Well, at the October --

MR. RUNNING: He said March.

BY MR. LODISH:

**Q. I meant late October, sorry.**

A. At the October meeting, one of the

things we did was discuss the five retention alternatives I presented to the company, and we decided upon one of those particular approaches.

At the later meeting -- At the meeting later that month in October, we discussed in more detail, the new or proposed retention program to be effective January 1, 2003, as well as the materials that I prepared with a little more detail concerning the long-term incentive program.

And then we also reviewed Dave Siegal's S-i-e-g-a-l compensation.

**Q. What was the purpose of reviewing his compensation?**

A. I was asked to benchmark his compensation given his expanded responsibilities as chief restructuring officer.

**Q. And when you say, "benchmark his compensation," what do you mean by that?**

A. By benchmarking, I mean to compare it to competitive practice.

**Q. Other than Mr. Siegal's, were you asked to do that with anyone else's compensation?**

A. I was also had ask to do it for Mr. Norris, the CEO.

**Q. Anyone else?**
A. I don't believe so.
**Q. You have now testified you met with three different people from Grace.**
**Did you meet with any other people with Grace prior to completing your analysis of the compensation and retention program?**
A. Well, I met with Dave Siegal also, but we did not discuss the retention program or any compensation matters.
**Q. And did you meet with anyone else from Grace concerning the compensation or retention program?**
A. No. The only three people I met were Mike Piergrossi, Brian McGowan, and Paul Norris from the company.
**Q. Did any of those three individuals, as well as Mr. Siegal indicate to you that if these programs weren't changed they were considering leaving W. R. Grace?**
A. No, we never discussed that.
**Q. Did you have discussions with any other key employees whether they were considering leaving W. R. Grace?**
A. No. I never had any discussions with

any particular employee as to whether he or she would leave.
**Q. Sitting here today, Mr. Bubnovich, do you know of any W. R. Grace key employees who are contemplating leaving the company if the revised compensation and benefits plan is not put in place?**
A. Well, having only talked to four of the key employees, the answer is no.
**Q. Do you know how many key employees W. R. Grace has identified that would be beneficiaries of the program?**
A. There is approximately 118, if I remember correctly, that have been so identified.
**Q. And other than the four that you just testified to, you have not spoken to any of the other 118; is that correct?**
A. That's correct.
**Q. Did any of the four individuals from W. R. Grace you spoke with, did they indicate to you about any specific employee that they knew of that was contemplating leaving W. R. Grace if the new benefits and compensation package did not come into effect?**
A. Concern was expressed to me,

particularly by Mr. Norris, regarding the possibility of key people leaving if their compensation programs were not competitive.
**Q. In your experience --**
A. He even mentioned some names on one occasion, but I don't remember them, and I did not write them down.
**Q. In your experience whether a company is in Chapter 11 or not, isn't the compensation package for key employees important with respect to their remaining at the company?**
A. Compensation is certainly an important element of what I would refer to as the employment proposition, but there are a lot of things that tend to weigh in on, you know, again the employment proposition.
**Q. Let me show you what we will mark as Exhibit No. 2, which is the response that was filed by W. R. Grace to the objection by the Committee of Asbestos Property Claimants, who I represent, which includes your affidavit, and I'm primarily concerned with you looking at your affidavit, but I wanted to mark the whole pleading Exhibit No. 2.**

(Whereupon, Defendant's Deposition Exhibit No. 2 was marked for identification.)
BY MR. LODISH:
**Q. Did you have occasion to see the motion with all of the exhibits?**
A. Yes.
**Q. Did you have occasion to see it before it was filed?**
A. Yes.
**Q. Now referring specifically to your affidavit, and I will try to go in the order of the affidavit to make this simpler.**
**You indicate that you have a special expertise with the compensation programs for companies that have commenced Chapter 11 cases.**
**When did you begin to develop that expertise?**
A. The first major bankruptcy that I worked on was Dow Corning. I guess that was 1996. I can't say I recall exactly when, but that's something we could easily figure out.
**Q. And since -- Was 1996, was that the first time you began working on compensation programs for a Chapter 11 company?**

A. I believe so.

**Q. Since 1996 up until your retention with W. R. Grace, do you know how many Chapter 11 companies you have worked for?**

A. It depends perhaps on what you say by "worked for." I believe in my affidavit I mentioned a hundred-plus companies.

When I was at Anderson, I might get a call from our restructuring group asking me to look at one particular compensation or benefits aspect of a particular bankruptcy. And there were many such calls, if we want to count those. Certainly the number is well over 100, perhaps 200.

In my affidavit I list the -- some of the major companies that I have done work for over the past several years.

**Q. And in paragraph three you refer to compensation programs, approximately 50 troubled companies.**

**Do you see that in paragraph three?**

A. Yes.

**Q. Were those the types of calls you were referring to or was your involvement with those 50 more substantial than perhaps getting a call**

**from someone and restructuring?**

A. No. The 50 would include minor little projects as opposed to a major project.

The companies I have done major compensation projects would include a number of those that are listed in paragraph three and in some of the subsequent paragraphs.

**Q. Do you know how many Chapter 11 cases you have worked in where the companies were involve in mass tort which led to the bankruptcy?**

A. I think I could figure that out. That would be Dow Corning, Federal Mogul, United States Gypsum, Armstrong, and Grace.

**Q. Were the retention issues that you dealt with for the companies in Chapter 11 that were not mass tort related Chapter 11 cases, were those issues different than those that were in Chapter 11 due to mass tort issues?**

A. I think there is a general distinction that needs to be drawn between companies that are in Chapter 11 because of mass tort liabilities versus what I will call your run-of-the-mill Chapter 11 case in the latter; that is, with the run-of-the-mill Chapter 11 cases you have a lot of situations where existing management is blamed

for the bankruptcy, and that's not the case when you have a mass tort liability situation, particularly the asbestos liability cases where the liability stems from business activity that happened 20, 30, or 40 years ago.

As a consequence, most creditors' committees are generally interested in keeping management.

They certainly don't have any particular grudge against management based on management's financial performance.

**Q. So the retention issue --**

A. So the retention issue is generally one where the committees will strive perhaps a little bit harder than they might otherwise to ensure the retention of management.

**Q. Okay. So the retention and compensation issues of key employees in the mass tort cases that you have dealt with are not as contentious in the, as you would say, run-of-the-mill bankruptcy cases?**

A. I don't know about contentious. I think the point I was trying to make was the committees are more willing to pay up, and the pay is better and higher in the mass tort

liability cases than it is in your run-of-the-mill Chapter 11 cases.

**Q. Did that affect your analysis for W. R. Grace in terms of what the retention and compensation programs should be?**

A. Yes, I so advised Grace's Management Compensation Committee and board.

**Q. And what did you advise them in that regard? That they should be entitled to more because it's a mass tort situation or what?**

A. I advised them along the lines of what I just said, that based on my experience, the pay was generally higher for the management of mass tort liability companies.

I also advised them that I thought it was important in these situations to maintain pay at competitive levels, notwithstanding the fact that equity-based compensation, as a practical matter, wasn't available.

**Q. Mr. Bubnovich, in the mass tort cases that you consulted on, have you always consulted on the side of the debtor of the corporation?**

A. Yes.

**Q. In all of your other Chapter 11 cases, have you always consulted on the side of a debtor**

**as opposed to a creditor?**
A. Almost exclusively.
**Q. And I take it then, the cases that you have identified in paragraphs three, four, and five of your affidavit were all either reports or testimony that you gave on behalf of debtors; is that correct?**
A. Yes.
**Q. In the mass tort cases you have worked on, did you keep statistics as to what the actual retention rate was of employees in those companies after they were in Chapter 11 for a period of time?**
A. Did I keep statistics?
**Q. Yes.**
A. No, but I have asked follow-up questions about retention.
**Q. When you say "follow-up questions," what do you mean by that? After they came out of bankruptcy?**
A. No. For example, I have asked Brian Cook who is the senior vice president of human resources at U.S.G. whether he thought the retention program there was working and to serve its purpose, and he told me yes. Dick Randazzo

at Federal Mogul told me the same thing.
**Q. And for both the companies you just identified, did you make recommendations as to the compensation retention policies for those companies?**
A. Yes.
**Q. Did you make them along the same lines as you had recommended for W. R. Grace?**
A. No.
**Q. Did you recommend that for either of those companies that they increase the retention benefits or compensation for the key employees during bankruptcy as opposed to keep them where they were prior to bankruptcy?**
A. Yes.
**Q. And were those recommendations accepted by the companies and ultimately by the Court?**
A. In U.S.G.'s case, yes. Federal Mogul is a more complicated situation, but I would say in Federal Mogul, the opportunity is at least the same. There is more variation at Federal Mogul than U.S.G.
**Q. Are you saying that in some aspects of Federal Mogul's compensation and benefits it was not increased during the time of the bankruptcy?**

A. Federal Mogul has an offset program as part of its retention program for top executives. So it's difficult to sometimes estimate where the pay may shake out.
**Q. And, again, I take it you made certain recommendations for Federal Mogul, correct?**
A. Correct.
**Q. Were all of them accepted?**
A. No.
**Q. Were all of them accepted by the company prior to submission to the Court?**
A. Oh, yes.
**Q. Not all of them were accepted by the Court; is that correct?**
A. That's correct. There were compromises along the way with the committees.
**Q. And despite the fact that not all of your recommendations were accepted, Federal Mogul has told you that their retention policy has been working fine; is that correct?**
A. Yes.
**Q. Do you recall the recommendations you made in Federal Mogul that were not accepted?**
A. Yes. The original recommendation I made to Federal Mogul regarding the level of the

retention bonuses was actually not accepted by the company.

The company on its own cut it back.
**Q. Any other specific recommendations you made that were not accepted?**
A. That was the principal recommendation.
**Q. Why did they cut it back?**
A. The company cut it back largely because they thought it was going to be too expensive, that it would have a possible negative effect on their P & L.
**Q. Are there any recommendations that you have made to W. R. Grace with respect to their compensation retention benefits that they have not accepted?**
A. Yes.
**Q. What did you recommend that they have not accepted?**
A. Well, I recommended with respect to the retention bonus program that they set the levels for the three tiers at 25, 50, and I think it was 85 percent of the salary, and the company has cut those back.
**Q. Do you recall sitting here now what they cut them back to?**

9C05836
NICK BUBNOVICH JULY 30, 2002

A. Well, the top level has been cut back to 65 percent.
**Q. Were the other levels cut back or kept the same?**
A. I believe they were cut back a little bit. I want to say maybe 40 and 20, but I don't remember for sure because --
**Q. Would one of the attachments to the response that was filed show you what --**
A. Yes, it might be in the motion itself -- I don't mean the motion. I mean the response, the debtor's response.
**Q. If you look at Exhibit A, which is the Revised Compensation Program that was by the Blackstone Group attached to the response there in Exhibit No. 2, do you know if it's in the analysis there?**
A. Yes. There is the original recommendation on Page 4, 85, 50 and 30. I believe I said 85, 50 and 25, but --
**Q. Well, isn't that the new plan recommendation?**
A. That was what I had recommended, and it was part of the proposal for a long time, but the company has voluntarily cut it back.

I'm trying to find that somewhere.
**Q. Were you informed why they decided to cut it back?**
A. I was told that the company was trying to cut it back to accommodate the various creditor constituencies and to ensure that the program would be approved.
**Q. Mr. Bubnovich, you indicated that you didn't keep statistics with respect to retention rate of employees for the Chapter 11 companies that you worked on, but you had gotten some feedback such as what U.S.G. and Federal Mongul had told you.**
**In any of the other Chapter 11 cases that you worked on, did you get any other feedback about the retention programs?**
A. Sure.
**Q. And did you receive any, if not statistics, numbers which would reflect whether any of those companies lost employees because of the retention programs?**
A. Well, you have to keep in mind we are talking about an inexact science here, because, you know, if the company had not been in bankruptcy, they possibly would have lost some

people anyway.
**Q. Let me just follow up on that for a minute, and I will let you finish your thought.**
**Isn't it true with respect to the W. R. Grace bankruptcy, the numbers of employees they lost when you reviewed this, was historically the same that they had lost previously, before bankruptcy?**
A. I will assume that's the case, but I'm not quite sure what that necessarily proves. So that's why I said what we are talking about is an inexact science here.
**Q. Well, do you consider it important if you look at Mr. Norris' affidavit that you have there in front of you as part of Exhibit No. 2, Mr. Norris indicates that they have lost five out of 18 key employees.**
**I'm looking to find exactly where that is.**
MR. RUNNING: I think it's five out of 118.
MR. LODISH: I'm sorry, five out of 118.
Do you have the page?
MR. RUNNING: Page 2 of his affidavit.
MR. LODISH: Thank you.

BY MR. LODISH:
**Q. Do you see that, Mr. Bubnovich?**
A. Paragraph 2 or Page 2?
MR. RUNNING: Paragraph 3, Page 2.
THE WITNESS: Oh, I see. Okay. "Five key employees have left the debtors since the beginning of the bankruptcy."
BY MR. LODISH:
**Q. Right. And were aware that that five out of 118 figure was historically the same, that attrition rate that Grace had had prior to the bankruptcy?**
MR. RUNNING: Objection, assumes a fact not in evidence.
THE WITNESS: No, but if that's the case, doesn't that help or doesn't that suggest that the retention program has worked well?
BY MR. LODISH:
**Q. The original retention plan, correct? Isn't that correct? That was under the original retention plan?**
A. Well, you mean -- Again, you can't look at just one element of the program.
Keeping people is not just a retention program. It's their other compensation --

**Q. Well, Mr. Bubnovich, do you have any information sitting here today as to any employee that would leave W. R. Grace if the retention program is not kept the same, but is increased along the lines that you have recommended and W. R. Grace has asked for?**
MR. RUNNING: I think this has already been asked and answered. He hasn't interviewed employees about their plans to leave the company.
THE WITNESS: Yes. Again, I only talked to four employees.
BY MR. LODISH:
**Q. So you have no information about anybody that would leave if the retention plan and the compensation package was kept as it was, correct?**
A. Again, I did not interview.
**Q. So then you don't have any information, correct?**
A. I do not have any information, correct.
**Q. And you did not undertake to get any empirical evidence, did you, as to who may leave if the benefits plan is not increased; is that correct?**

Page 34

MR. RUNNING: It's asked and answered. It's the same question. You just substituted empirical evidence for information.
It's the same question.
BY MR. LODISH:
**Q. Can you answer that?**
A. The answer is no.
**Q. As you indicated, assuming the attrition rate since bankruptcy is the same as pre-bankruptcy, that would show that the retention program is working effectively; is that correct?**
A. I don't know if the people are staying solely because of the retention program, because as you said, I have not interviewed them.
**Q. Do you recall in the U.S.G. case when you consulted with them and the revised retention plans for U.S.G. and bankruptcy went into effect?**
A. It was retro -- once the Court approved it, it was retroactive to the date of bankruptcy.
**Q. Do you know when that was?**
A. I don't remember the exact date. I believe U.S.G. filed at the end of June in 2001.
**Q. Was the economy in a better state in June of 2001 than it is today?**

Page 35

MR. RUNNING: Objection, the question is vague and ambiguous.
THE WITNESS: Well, based on what Alan Greenspan says, the economy was perhaps worse then than it is now.
BY MR. LODISH:
**Q. How about -- Have you looked at employment opportunities in June 2001 versus employment opportunities today in July 2002?**
A. No.
**Q. Do you have any information as to how many people in the chemical-related industries are being laid off today?**
A. No.
**Q. Do you have any idea how many were being laid off in 2001?**
A. No.
**Q. Did you look at that information at all before recommending on your retention and benefits analysis for W. R. Grace?**
A. No.
**Q. Do you know that the state of the economy, and in particular, the state of employment prospects has any bearing on the benefits and compensation in a corporation such**

Page 36

**as W. R. Grace should consider while in bankruptcy?**
A. Let me answer that this way? Talented people, regardless of the state of economy are always in demand. If you have good people, your competitors and other companies are going to be after them.
Based on what I have been told, W. R. Grace has a pretty good management team. So I would assume that competitors are seeking out some of those individuals, particularly in light of the fact that Grace is in Chapter 11.
**Q. You're assuming that; you don't know based on any facts; is that correct?**
A. I have been told that some of Grace's people have been recruited. I think it just stands to reason that when a company gets in Chapter 11, headhunters start calling.
**Q. Do you know whether the W. R. Grace people are being recruited because of bankruptcy or whether they are being recruited for other reasons?**
A. I think it's a combination of things.
Presumably they are being recruited because they are talented individuals and have

Page 37

industry skills, and because Grace is in bankruptcy, Grace is unable to offer them equity-based compensation, whereas some of their competitors -- All of their competitors can.

**Q. And when you say "equity-based compensation," do you mean primarily interest in stock and stock options?**

A. Yes. I mean stock awards and stock options.

**Q. Have any of the Chapter 11 mass tort companies that you have consulted with come out of bankruptcy?**

A. No.

**Q. Excluding the mass tort area, have any of the companies that you consulted for come out of Chapter 11?**

A. Sure.

**Q. Okay. Have the stock price of those companies after they came out of Chapter 11 gone up or down or do you not know?**

A. I do not know, other than maybe one or two specific instances.

**Q. Is it your understanding that the stock price of W. R. Grace now is pretty low?**

A. That is my understanding.

**Q. If W. R. Grace, if and when W. R. Grace comes out of bankruptcy, would you consider the stock price of W. R. Grace to be a real bargain today?**

MR. RUNNING: Objection, calls for speculation.

THE WITNESS: I'm not sure I understand the question.

Could you repeat it.

BY MR. LODISH:

**Q. If W. R. Grace comes out of bankruptcy, would you expect its stock price to go up?**

A. Well, when W. R. Grace comes out of bankruptcy, I will presume that the existing stock will be cancelled.

So we are really talking about different stock unless some piece of it is preserved as part of the bankruptcy, but that's highly speculative.

**Q. Is W. R. Grace able to offer stock to its employees even if the stock would be of a different nature when it came out of bankruptcy; in other words, if there was going to be a new issue of stock after bankruptcy, would W. R. Grace be able to offer that to its employees?**

MR. RUNNING: Objection, the question is ambiguous and confusing.

THE WITNESS: Well, once that stock is issued, and the plan of reorganization has been confirmed, and the new owners agree to set aside some portion of the stock for management, yes.

BY MR. LODISH:

**Q. In your discussions with W. R. Grace, was that discussed? Do we know?**

MR. RUNNING: Objection, you're saying was the possibility discussed and erroneous in a future entity that doesn't exist now?

THE WITNESS: There were some general discussions about Grace having the opportunity to issue stock options once it had emerged from bankruptcy.

BY MR. LODISH:

**Q. And do I take it that was not an accepted option in your discussions?**

A. It was given only cursory discussion, and the context of the discussion, as I remember it was, we need to do something for our people in the interim, and that something is Grace's existing long-term incentive program as well as a retention program to make up for the lost

opportunity in equity.

**Q. Now, I'm going back to your affidavit again.**

**I'm now referring to paragraph number seven on Page 2.**

A. Yes.

**Q. You indicate in the first sentence: "To familiarize yourself with Grace's compensation program and philosophy, you talked to certain persons, et cetera."**

**What is Grace's philosophy that you're referencing there?**

A. Grace wanted to maintain aggregate compensation at certain levels. They wanted to make sure that their people had an opportunity to be paid well if they performed well.

**Q. You indicate that you spoke with outside counsel.**

**Who are you referring to there?**

A. Kirkland & Ellis.

**Q. And you refer to financial advisors.**

**Who were you referring to there?**

A. Blackstone.

**Q. And I take it that the persons that you had testified about earlier are the persons from**

**senior management and the Compensation Committee that you were -- Strike that.**
**The reference you make to senior management and the company's Compensation Committee are the individuals you spoke about earlier?**
A. Yes.
**Q. Now the Compensation Committee, who is your understanding was a member of that?**
A. John Akers is the chairman of the Compensation Committee of Grace's board. I can't remember the names of the other committee members.
**Q. But did you meet with all of them or just Mr. Akers?**
A. I met with all of them when I met with the board.
**Q. Oh, you met with the full board of W. R. Grace?**
A. Yes.
**Q. So does that encompass more than the individuals that you testified about earlier?**
A. Yes.
**Q. And so let's back up a second.**
**So you did meet with the Compensation**

**Committee, correct, or no?**
A. I guess the answer is no. I did not attend a separate meeting of the Compensation Committee.
**Q. It was primarily Mr. Akers?**
A. Yes, I met with Mr. Akers, and then I made a presentation to the board.
**Q. Okay. And do you know how many members of the board attended your presentation?**
A. Well, it was a regularly scheduled board meeting, so certainly there was a quorum.
I don't remember if anybody in particular was absent.
**Q. Was Mr. Norris there?**
A. Yes.
**Q. Was Mr. McGowan there?**
A. Yes.
**Q. And do you do you recall the names of any other individuals that were there other than the two that you mentioned?**
A. Mike Piergrossi was there also.
**Q. Was Mr. Akers there? Is he a member of the board?**
**Do you know if he is a member of the board?**

A. He is a member of the board. All members of the Compensation Committee are members of the board.
**Q. Do you recall the names of anybody else that was attending the board meeting?**
A. Other than board members, no. Although somebody from Kirkland & Ellis was on the phone.
**Q. And I take it based on your previous testimony that at that board meeting nobody raised specific names to you of anybody that was contemplating leaving the company if the compensation and retention plan wasn't revised?**
A. To the best of my knowledge there was no discussion about that.
**Q. At the time that you were retained in September of 2001, were you aware that W. R. Grace had already requested of the Court and been approved to keep the current retention benefits compensation program in place?**
A. Yes. I think I testified to that earlier.
**Q. I just wanted to be sure that you're aware that the mechanics were done with the bankruptcy court, that's all.**
A. Right.

**Q. Did you do any analysis as to the results of having those in place in terms of the key employees and retaining them?**
A. I'm not sure I understand the question.
**Q. That was not a very good question.**
**Did you do any analysis as to how the retaining the current benefit program had affected key employees?**
A. Well, my analysis involved talking to management about the program, asking them if employees had expressed any concerns about the program, as well as finding out from management what their concerns were about retention issues in the future.
**Q. Did you look at the specifics of the retention and compensation benefits plan that was in place as to either which employees left, what benefits were paid, those types of things under the current plan?**
A. I'm not sure I understand what you mean when you say "what benefits were paid." I was aware of the terms and conditions of the existing retention program.
**Q. For example, do you know whether any W. R. Grace employees received benefits under the**

**severance program that was in place at the time you came on that was approved by the bankruptcy court?**
A. No, I don't know, but I presume that to the extent that anybody had an entitlement to severance they were paid that, but no, I did not took and tie severance payments.
**Q. Do you know whether there had been any payments made under either the current retention or compensation plan made to key employees after the Court approved in April of 2001 and when you came on and were doing your consulting work?**
A. There were -- Under the design of the program, payments were being made.
**Q. Did you look statistically at the amount of money paid to which employees?**
A. No.
**Q. Did anyone from W. R. Grace define for you what they consider to be a key employee?**
A. No.
**Q. What definition were you working off of or what assumptions were you making when you were doing your analysis for them as to who a key employee is?**
A. Well, I was relying on the company's

judgment as to who was a key employee.
All senior management knows who their key employees are, and that's part of the performance management process.
**Q. Are you --**
A. I'm not going to second guess their judgment as to who is a key employee and who is not.
**Q. Are all senior management key employees?**
A. I would say yes.
**Q. Are all senior management key employees you would necessarily want to retain?**
A. Are you talking about Grace or in general?
**Q. In general. We are talking in general.**
A. No, clearly from time to time for a variety of reasons, you know, including performance and including chemistry, I'll make a point here, people are asked to leave the ranks of senior management.
**Q. And now specifically with regard to W. R. Grace, do you have any information as to any of the senior management of W. R. Grace**

**frankly would mind if they left as opposed to staying?**
A. I have no information in that regard.
**Q. Since you were not given a definition of key employee, for you is loyalty one of the aspects of being a key employee?**
A. Yes, it's a factor.
**Q. And with respect to loyal important employees, is one of the reasonable expectations that they will hang with the company during rough times with the expectation of being perhaps rewarded down the road?**
A. Possibly.
**Q. Now referring to Paragraph 9 of your affidavit --**
A. Before we start on Paragraph 9, can we take a break?
MR. LODISH: Sure.
(A short break was taken.)
BY MR. LODISH:
**Q. Before we took a brief break, I made reference to Paragraph 9, but let me back up a little bit and make reference to Paragraph 8.**
**You indicate, Mr. Bubnovich, that you undertook different analyses for the different**

**programs: One for retention, one for long-term incentive, and one for the severance programs.**
**Is there a reason why you took a different approach to each one of the programs in terms of your analysis?**
MR. RUNNING: Objection --
BY MR. LODISH:
**Q. In other words, let me put it this way: You used different test groups for each one of the benefits programs.**
**For example, the first one in Paragraph 9, with respect to the retention program, you look at other Chapter 11 mass tort liability companies, correct?**
A. Correct.
**Q. You didn't look at all peer companies?**
A. Correct.
**Q. Why did you do that that way with respect to the retention program?**
A. Because Grace is in Chapter 11, it has some of the same retention issues that other Chapter 11 companies face, and I'm talking here broadly about all Chapter 11 companies, not just the mass tort liability companies.
When a company finds itself in Chapter

11, the employment proposition, which I referred to earlier, becomes squed. Now let me expand on that.

The employment proposition refers to both the tangible and the intangible things that cause each of us to decide where we want to work.

The tangibles clearly are compensation and benefits.

The intangible things are our assessment of our company's prospects, our career at a particular company, our relationship with our peers and supervisors.

When a company finds itself in Chapter 11, employees tend to say or employees tend to recognize that the employment proposition becomes squed, clearly doubts are raised about the company's ability to be an ongoing concern, about the company's ability to meet career promises.

Now one way the companies can write, perhaps only temporarily, the employment proposition is to make guarantees about pay. That's why most, if not all Chapter 11 companies, tend to implement some type of retention program.

So for the retention program, I looked at Chapter 11 companies. Now, for --

**Q. Well, let's -- Were you going to move to a different program?**

A. Yes.

**Q. Let's take one at a time.**

**What is the purpose of a retention program? Isn't it to keep the employee with the company?**

A. Yes, that would be a purpose of the program. It preserves, in my mind, the debtor's estate by keeping employees focused on the task at hand; that is, their particular job rather than various aspects of their compensation.

**Q. And if an employee was thinking about leaving, wouldn't a review of the likely companies he would go, such as the peer group companies, be a reasonable analysis with respect to compensation?**

A. Yes.

**Q. In other words, if the peer group companies didn't have a retention policy, and the compensation was the same or less as W. R. Grace, would that affect your analysis as to the importance of W. R. Grace's retention policy or**

**certainly increasing the benefits under the retention policy?**

A. Retention programs have a number of different purposes. I have already discussed one, which is to keep people in place, but, you know, another one is a form of guaranteed compensation.

In some cases, the retention bonus serves to make up for the lost opportunity under the annual incentive plan.

In some cases, and this is true in Grace, I think it makes up for lost opportunity under equity-based compensation programs.

So the question is: Where does it fit into the general scheme of the company's compensation programs.

Now I'm not sure where you're going with the comparison to Grace's peer companies, but in relation to whether somebody stays or not, whether somebody stays or not is a combination of a lot of different things, and it varies from person to person.

**Q. Okay. And all that we really can address is the issue of compensation, because in terms of somebody's happiness in their job or**

**what they want to do in their career, those are obviously issues we cannot deal with, and all we can really deal with is retention.**

**You don't think what their compensation would be at a similar company based on the knowledge or expertise they develop at W. R. Grace is a factor in terms of what should be done with the retention policy?**

A. Well, I think pay at peer companies is a factor that people will take into account if they decide to stay or leave Grace.

**Q. Why wouldn't you take that into account though when you're doing your analysis of Grace's retention program as to what key management, if they left, would or could be paid out there in the market?**

A. Well, none of Grace's competitors, to the best of my knowledge, have a retention program.

So, you know, we could say, well, you really have this wonderful benefit at Grace, a retention program, and you can't get it anywhere else, and therefore you ought to stay here.

Well, that's a very simplistic analysis. That's why I did the analysis that I

handed you at the beginning of the deposition, which is to look at the aggregate pay.

**Q. Yes, and in Exhibit -- what we marked as Exhibit 1 shows the aggregate pay.**

**Does it compare with their peers in the industry though?**

A. To the extent we were able to find industry data. But what we used were broad surveys, and to the extent we could, the chemical industry cuts -- It's very difficult to find public information regarding 16 executives at -- in the chemical industry. It just doesn't exist as public information.

**Q. So for analysis retention, you reviewed the mass tort companies that were in Chapter 11, correct?**

A. Yes.

**Q. And even though none of Grace's direct competitors have retention programs, that was not a factor in your analysis; is that correct?**

A. That's correct.

**Q. Now the mass tort companies that you considered, is that all of the companies that have been in Chapter 11 because of mass tort liability?**

A. No.

**Q. So was it just a select group?**

A. It was a select group for which I had information.

**Q. Okay. Because I couldn't tell from your affidavit whether it was all of them or a select -- Well, is the select group those you have consulted for in the past?**

A. No. It also includes information from Owens-Corning.

**Q. Is Owens-Corning the only mass tort Chapter 11 company that you considered that you were not a consultant on?**

A. Yes.

**Q. Why didn't you look at all companies that were in Chapter 11 based on mass tort liability?**

A. Because I didn't have data on all of them.

**Q. Was it unavailable or did you not seek it?**

A. It was largely unavailable to me.

**Q. Did you try to get the information?**

A. I tried in one or two cases, yes.

**Q. What were those cases that you tried?**

A. I tried for Babcock and Wilcox and couldn't get it.

**Q. So do you know the total number of companies that have been in Chapter 11 because of mass tort liabilities?**

A. No.

**Q. So you have no idea whether the number of companies that you used is a fair sampling or not; is that right?**

A. I believe it's representative of compensation programs at large companies that are in bankruptcy because of mass tort liabilities.

**Q. What were the number of companies that you looked at with respect to the retention program?**

A. Well, I actually looked at it two ways. I looked at the mass tort liability companies. I looked at Owens-Corning, Armstrong, U.S.G., and Federal Mogul.

I also maintain a data base on retention programs for Chapter 11 companies that I referred to earlier as the run-of-the-mill Chapter 11 companies.

Then there is 50, 60 companies that are in that particular data base.

**Q. Did you look and consider that data base when you were reviewing the retention program for W. R. Grace?**

A. I guess the answer to that is yes. The reason I say "I guess" is that information is always in my mind. I didn't think it was the best comparison here, given that Grace was in 11 because of mass tort liabilities, but -- I'm sorry, mass tort liabilities, but I never used that data in any report that I prepared.

**Q. I believe that you indicated that you looked at Owens-Corning, U.S.G., Federal Mogul, Armstrong.**

**Is there any other companies you looked at? Am I missing any? And, again, we are talking about the retention program.**

A. Right. No, I don't think so.

**Q. Do you know the number of other companies that have been in Chapter 11 due to mass tort liabilities?**

A. Didn't you ask just ask me that?

**Q. I'm asking you for a number. Do you know how many, a number, five, 10, 15, 20?**

A. I would guess 10, maybe as many as 15. I don't know.

9C05836
NICK BUBNOVICH JULY 30, 2002

**Q. Including the five that you specifically looked at?**

A. Yes.

**Q. And you consider those five out of perhaps 10 or 15 to be a fair sampling of what the retention programs are for all of those companies?**

A. I think it's a fair sampling given their size and Grace's size.

**Q. You indicate in your analysis now of the long-term incentive program, that your analysis was to look at the EBIT, E-B-I-T, growth rate goals for Grace's peer group, which was 14 companies, correct?**

A. Yes.

**Q. And why did you think that that analysis was the best in order to determine the long-term incentive program?**

A. It seemed to me that the best measure for assessing Grace's potential performance would be to look at the performance of its peer companies in its industry.

So we took the five companies from S & P's Specialty Chemical Group and then other chemical companies, and we analyzed their EBIT

growth performance over three-year periods.

**Q. But those companies were not in bankruptcy; is that correct?**

A. That's correct.

**Q. So for the retention program for you, you felt it was reasonable just to look at mass tort companies, the five you indicated.**

**With respect to the long-term incentive program, you felt it was reasonable to simply look at a peer group of 14 companies, correct, and in terms of their growth rate?**

A. Yes.

**Q. And if you look at what was part of Exhibit A, which is the Blackstone Group analysis on Page 8, are these the companies that you're referring to?**

A. Yes, but it's not the Blackstone analysis, it's the Blackstone report. It's our analysis.

**Q. Yes. I'm sorry. Those are the companies, correct?**

A. Yes.

**Q. And what you have done is take these 14 companies over the time period, the three-year time periods beginning with 1992 through the year**

**2000 and came up with an average and median growth rates; is that correct?**

A. That's correct.

**Q. Now isn't it true, Mr. Bubnovich, that in any given three-year period, the swing between the various companies with respect to growth rate is very -- is significant, isn't it?**

**For example, if you look at the '92 to '94 time period, isn't it true that Union Carbide had the greatest growth increase of 24.49 percent, and then you look at Dow Chemical, which is 2.68 percent; is that correct?**

A. Yes.

**Q. That's a pretty large swing, isn't it?**

A. Absolutely.

**Q. Again, let's pick out the '93, '95 time frame.**

**You have H. B. Fuller at a negative .77 percent growth rate, and you look down again to Union Carbide that has a 48.40 percent growth rate.**

**That's a significant difference, isn't it?**

A. Yes, it is.

**Q. And without going through each one, you**

**could go through each three-year time period and pick out the highs and the lows; could you not?**

A. Certainly.

**Q. And you think it's reasonable to simply take the average of all of these companies and compare it to W. R. Grace to come up with an average growth rate when the differences between the companies and the reasons for the various growth rates could be numerous factors which have nothing to do with W. R. Grace?**

MR. RUNNING: Objection, the question is compound.

BY MR. LODISH:

**Q. Let me ask it this way: Do you think that W. R. Grace is comparable to Ecolab as a company?**

A. These are companies who are in the same general industry that Grace is in.

**Q. Okay.**

A. I think that this analysis provides an excellent starting point for assessing the target performance under Grace's long-term incentive program.

**Q. And what was the reason that Grace was not put in here as a -- at least for comparison**

**purposes with the peer group?**
A. Because we are looking to see how Grace's peers performed, not they -- not how Grace performed.
**Q. But isn't it true when a company devises its own long-term incentive program, it's basing it on its own growth rate and its own performance objectives?**
A. Sure.
**Q. So why should W. R. Grace be basing its growth rate on what other companies are doing in the market as opposed to its own expectations?**
A. Well, as I said a few minutes ago, I think this analysis is a good starting point for establishing what Grace's growth rate ought to be.
Obviously, it has to be tempered by the items you just suggested.
Now as I said earlier, in 2000, Grace's growth rate was I believe five percent. In 2001, it was four percent.
**Q. And do you think the factors as to why Grace's growth rate was five and four percent respectively are the same factors that affected these other 14 companies?**

A. Some of them, certainly. The chemical industry is somewhat cyclical. What affects the industry as a whole would affect Grace.
If Grace were not in bankruptcy, analysts would certainly compare Grace's performance using different measures, EBIT may be one, EBIT another to their peers, and certainly it's an inexact science, but the marketplace generally rewards companies that outperform their peers.
**Q. When you met with the Grace people to come up with your analysis and make your recommendation, did you ask them what their expectation was in terms of the growth rate?**
A. Well, I knew that the growth rate was 10 percent.
**Q. And was it your understanding that that was their expectation as to what they felt was a reasonable growth rate in order to pay incentive bonuses?**
A. Well, I knew that the 10 percent was baked into the plan, and as I discussed it with management, it became clear to me that it was what I would term an aggressive goal.
It's the case of the CEO, in

particular, setting the bar high.
**Q. Is there anything wrong with that?**
A. Absolutely not.
**Q. Isn't that what incentive programs are all about, to set the bar higher so that people will try to meet that performance?**
A. Partially, yes.
**Q. And under the plan that you recommended, isn't it true that under the incentive program that the growth rate for W. R. Grace could be less than one percent and the employees would receive an incentive bonus?**
A. Yes, that's true.
**Q. And you believe that meets the goals of a long-term incentive program?**
A. Performance is relative. I mean, if I shoot 80 on Sunday, I'm pretty happy. If Tiger Woods shoots 80, he's not happy.
**Q. Again, referring to your analysis of the long-term incentive program, why didn't you consider chemical and manufacturing companies which is what you considered when you looked at the top 16 executives in the TDC?**
**Why did you make that distinction?**
MR. RUNNING: So you're asking why didn't he

consider the manufacturing companies?
MR. LODISH: Yes. In each one of the analyses, he used a different control group, and I'm trying to determine why.
THE WITNESS: Well, we didn't use chemical manufacturing companies in the analysis. We used manufacturing companies, and the reason for that was those particular surveys did not have a separate chemical cut.
BY MR. LODISH:
**Q. You mean for the TDC analysis?**
A. Yes.
**Q. You're referring to -- that you reference in Paragraph 12 of your affidavit?**
A. Yes. Isn't that what you just asked me about?
**Q. Yes.**
A. Yes.
**Q. So that's why you used that -- the information you're referring to combined the chemical and manufacturing industry and didn't separate out the chemical industry?**
**Am I understanding that correctly?**
A. Well, the survey parameters as we describe it on the attachments for these two

William M. Mercer surveys are manufacturing industry nondurables.

So it would include chemical companies, and it would include nonchemical companies.

**Q. Well, when you were considering the TDC for the top 16 executives, why didn't you just consider the peer group?**

A. Because I could not get the pay information for 16 executives for the peer group companies.

**Q. If you could have gotten that, would you have done that analysis?**

A. Yes.

**Q. Would you have preferred to have done that analysis than the one based on chemical and manufacturing industry?**

A. Well, again, we didn't do -- Well, yes. I think that would be a more appropriate benchmark.

**Q. Now if you look at Paragraph 11 with respect to the severance program, concerning severance you reviewed 60 companies?**

A. Yes.

**Q. You don't delineate in what industries or anything else about those 60 companies.**

A. That's are Chapter 11 companies.

**Q. All 60 are Chapter 11 companies?**

A. Yes.

**Q. And what was your reasoning for picking 60 Chapter 11 companies?**

A. Grace is in Chapter 11.

**Q. So you were looking at the severance program simply based on whether those companies were in Chapter 11; and therefore, that would be the reasonable analysis for Grace to look at?**

A. I believe so, yes. Again, when a company is in Chapter 11, the possibility of job loss is heightened, and companies more often than not, when they are in Chapter 11 will enhance or at least formalize their severance programs.

**Q. Did you look at the severance programs of the peer group?**

A. No, not publicly available information.

**Q. Again, do you think if you had reviewed the severance program of their peer groups that that would have been a more reasonable analysis to compare with W. R. Grace?**

MR. RUNNING: If publicly available.

MR. LODISH: If he had it. I'm just asking.

THE WITNESS: No.

BY MR. LODISH:

**Q. Why not?**

A. Because they are not in Chapter 11.

**Q. What is your understanding as to the reason that W. R. Grace wants to increase the severance benefit?**

A. When Grace moved from Boca Raton to Columbia, it, as a practical matter, hired a number of new people.

Under Grace's existing severance program, those new people would have a minimum benefit of only four weeks pay, and some of them are middle-level managers and even higher where, you know, severance benefit of four weeks is below the range of competitive practice.

So Grace is changing the severance program for them in the limited circumstance if they were to lose their job in connection with the reduction in force under a plan of reorganization.

So it's a very limited scope enhancement of the severance package.

**Q. Again, I want to go back for a moment to the long-term incentive program that you**

**reference in Paragraph 10.**

**Were you aware at the time that you did this analysis with respect to the growth rate as to what Grace's sales growth and profit growth was for 2000, 2001 as compared to other companies in its peer group?**

MR. RUNNING: Well, he has already testified as to EBIT.

MR. LODISH: Right.

THE WITNESS: I don't recall looking at the sales growth or earnings growth.

BY MR. LODISH:

**Q. Well --**

A. The earnings have to be abysmal given the asbestos liability, but I don't know. I did not look at it.

**Q. Well, if you look at Page 10 of the response.**

A. The debtor's response?

**Q. Yes.**

A. Paragraph 10?

**Q. Yes.**

A. Okay.

**Q. And if you look -- it says in the middle of the paragraph: "Compared to peer group**

**of 11 specialty chemical companies --**
A. I'm lost. Paragraph 10 or Page 10?
**Q. Paragraph 10, Paragraph 15. I'm sorry. My fault.**
A. Okay.
**Q. Do you see in the middle of the paragraph where it says: "Compared to peer group of 11 specialty chemical companies, Grace ranked first in sales growth and second in profit growth comparing 2001 results over 2000;" do you see that?**
A. Yes.
**Q. Did you consider the sales growth and profit growth as part of your analysis to determine what would be reasonable for the long-term incentive program?**
A. No. The long-term incentive program is based on EBIT growth.
**Q. Well, do you consider sales growth or profit growth for purposes of long-term incentive programs?**
A. Some companies may use such measures, yes.
**Q. Isn't it true that the sales growth and profit growth of Grace for 2001 sets it above and**

**apart from its peers?**
A. Yes.
**Q. And you still believe based upon knowing what the sales growth rate was and the profit growth rate -- not rate, but the profit growth and sales growth, that using the peer analysis to come up with the EBIT growth rate is reasonable for a long-term incentive program?**
A. Again, I think it's a reasonable starting point. Again, it's a three-year program. We are looking at one particular year, and we are looking at two measures that are not used under the plan.
**Q. Do you see the last sentence in Paragraph 15 where it states: "The going concern value of the debtors is therefore much larger than the typical Chapter 11 setting involving debtors of similar size;" do you see that?**
A. Yes.
**Q. Did you consider that when you were doing your analysis for all of these benefit programs for W. R. Grace?**
A. Well, I believe I testified to this issue earlier.
As I remarked, I think a distinction

has to be drawn between companies that are in bankruptcy because of mass tort liabilities and other Chapter 11 -- Companies in Chapter 11 because of mass tort liabilities are generally going to have very strong operating income, and because of that, there is in truth more dollars available for compensation programs.
In addition, as I also testified earlier, it's been my experience that creditor committees are interested in keeping management intact to maintain the operating performance.
**Q. When you were doing your analysis for the long-term incentive program, did you look at the year 2001 at all for the peer group for W. R. Grace?**
A. No, because we did the analysis in the fall of 2001, so 2001 results were not in yet.
**Q. Would 2001 results be in now?**
A. Yes.
**Q. Have you been asked to do any revisions or look at the plan again based on the 2001 results?**
A. No.
**Q. Referring to Paragraph 13 of your affidavit in the first line where you say: "To**

**address employees' concerns regarding employment security."**
**Again, I take it you're talking generally speaking, not because of any employee expressing concerns, correct?**
A. That's correct.
**Q. And then you say: "A more stressful work environment."**
**Is that, again, your assessment based on simply the circumstances as opposed to talking with any employees about whether they feel they are in a stressful working environment?**
A. To a large extent it's based on my assessment. To use your word, as well as my experience, of work environments in Chapter 11 companies, but, you know, certainly Mike Piergrossi and Brian McGowan both told me that their particular work environments were more stressful.
**Q. Did they indicate to you whether they were thinking of leaving Grace?**
A. As I testified, no. Neither one told me that.
**Q. However, you have also indicated several times that in mass tort situations, it's**

**a little different because it's not management issues that are the problem, it's the nature of the business, correct?**

**So it's not the same pressure on management as if they had done something wrong as it might be in other Chapter 11 cases, correct, where the issues may be mismanagement?**

A. I would concede that that particular item of stress may not be present.

**Q. And based on the growth rate and sales rate as I just showed you based on Grace's own pleading for 2001, there is every reason for the executives to be upbeat, isn't there, based upon how they are doing since they have been in bankruptcy?**

A. The particular sentence that you refer to indicates that Grace had a good year based on those two measures.

**Q. You then -- Again, in the beginning of 13, concerning the employees' perceived loss of internal opportunity; what do you mean by that?**

A. Loss of opportunity for internal advancement, promotion.

**Q. And why is that no longer available?**

A. The company may have put -- The company

may not be expanding or growing as they were in the past, and without that growth, there may not be as many promotion opportunities as there are at other companies.

Again, it's the strictures of Chapter 11.

**Q. Are you aware of any prohibitions on W. R. Grace's management from promoting anyone that they see fit within the confines of the Chapter 11 plan that they are currently working under?**

A. No.

**Q. So, again, you were just talking generally of companies, not necessarily that this is what's going on with W. R. Grace?**

A. This is a general -- These are general statements, but it is my expectation that certainly many employees would be concerned about one or more of these items.

**Q. And then, again, your last statement is, again, in terms of the employee concerns concerning the potential reduction in pay opportunity.**

**What are you referring to there?**

A. Loss of equity-based compensation.

**Q. Which you believe is present in W. R. Grace?**

A. Absolutely.

**Q. If you go further down in Paragraph 13, you indicate that, quote, "I consider it crucial that the competitive pay levels are maintained."**

**Do you see where you have that?**

A. Yes.

**Q. Again, you understand that the issues are not maintaining what has already been approved, but the matter before the Court is increasing benefits and incentives; you understand that, do you not?**

A. Yes.

**Q. Is it your understanding that the competitive pay levels are not going to be maintained by W. R. Grace under its current plan?**

A. If the increases are adopted, Grace's pay would be more competitive.

**Q. But that was not my question.**

**Do you think if the plan as in place now just remains the same and the increases are not put in place, isn't it true that those pay levels will be competitive in the industry?**

A. I didn't do that analysis. I believe

that the pay levels would still be within the range of competitive practice.

**Q. Again, in Paragraph 13, you go on to say that: Companies in Chapter 11, because of mass tort liabilities, continue the salary and annual incentive programs with little or no modifications. I presume that that's based on your experience; is that correct?**

A. Yes.

**Q. Or that's where you got your testimony from?**

A. Yes.

**Q. And, again, you understand that there is nothing before the Court not to continue the salary and the current annual incentive program, so that if this program is kept in place and continued, wouldn't that be typical, in your experience, of what happens with the Chapter 11 mass tort liability company?**

MR. RUNNING: Well, objection. You're purposefully disregarding the next sentence. You're just focusing now on salary and not --

MR. LODISH: I'm just going through his affidavit.

MR. RUNNING: I object. We are not

proposing a change in salary.
MR. LODISH: Well, annual incentive programs.
THE WITNESS: Are you equating the retention program with one of these two programs?
BY MR. LODISH:
**Q. Well, the long-term incentive program, isn't that an annual incentive program?**
A. No.
**Q. It's not?**
MR. RUNNING: That's under the next sentence.
BY MR. LODISH:
**Q. So what you were referring to here is not any of the benefits that you were addressing, and that being either the severance program, the long-term incentive, retention, or the TDC for the top 16 executives; is that correct?**
A. That's correct.
**Q. Now I'm referring to Paragraph 14.**
**You indicate in the first sentence that you consider the proposed 2003 2004 general retention program to represent a relatively modest increase from the 2001 2002 general retention program.**

A. Correct.
**Q. Isn't it true, based on the numbers you have there below, the increase is going from 4.6 million to $6.7 million that that's a 50 percent increase, correct?**
A. It is a 50 percent increase.
**Q. Do you consider that modest?**
A. What I considered modest were the dollars involved.
**Q. So let's talk about the percentage of increase.**
**Isn't that a substantial increase in the percentage?**
A. I don't want to be like Bill Clinton and ask what's the meaning of is, but I will concede to the point. It's a substantial percentage increase.
**Q. But you believe the dollar amounts involved are not that significant?**
A. Given the size of Grace's overall payroll, it did not strike me -- $2 million did not strike me as a significant amount of money given the potential benefits.
**Q. Again, the potential benefits, though, isn't it true you don't really know what those**

**potential benefits are because you don't know what employees would actually factor in this increase as to whether they would stay at Grace or not, correct?**
A. That's correct.
**Q. And, again, your comparison to the other mass tort liability companies is the basis of your testimony at the end of 14 when you say: "It's reasonable compared to their programs," correct?**
A. Yes.
**Q. Even though with respect to the peer group, they don't even have a retention program, do they?**
A. Correct.
**Q. So it's considerably more than reasonable than the peer group, correct?**
A. I don't believe you could compare it to the peer group.
**Q. Now the payout that we referred to in the general retention program, there is a difference, is there not, that in the proposed retention program -- Strike that question.**
**Now let's focus on the long-term incentive program that I believe you begin to**

**testify more specifically to in Paragraph 15.**
**One of the significant components of the proposal is to change the 50/50 stock to cash to all cash, correct?**
A. Yes.
**Q. We had already gone through that you had recommended against doing it for the plan already in place.**
**This only, I presume --**
A. No, that's not true.
**Q. It's not?**
A. No. I believe I testified earlier that I told Grace management that I supported the change from stock options to cash under the 2001 to 2003 plan.
**Q. But you didn't recommend it because you thought it would draw criticism or controversy; isn't that --**
A. No, I recommended it.
**Q. So even though it was in the current plan, I thought your testimony was that it was already a done deal that you did not recommend going from 50/50 to all cash because it was a done deal; am I incorrect about that?**
A. I believe you're incorrect. Although,

maybe we need to look at the testimony.
When I made the statement, I had in mind only the retention program.
**Q. Okay. You did not mean to say the long-term incentive program?**
A. That's correct.
**Q. You believe it was reasonable for that to be retroactive essentially?**
A. Yes.
**Q. Are you a shareholder in W. R. Grace?**
A. No.
**Q. Are you aware of any other companies that have retroactively changed these programs from stock options that are part stock, part cash, and paid 100 percent cash?**
A. Federal Mogul essentially moved to an all-cash program to a cash-incentive program.
**Q. Did they do it retroactively?**
A. That, I don't remember.
**Q. Are you aware of any other circumstances or cases that you were involved in where there was retroactive application of all cash for stock options?**
A. No, although I think the reason for that is that some of the other situations I'm

thinking of, the plan was only a one-year plan, and the company was granting stock options every year, unless, for example, in Armstrong's case, they could easily convert the program -- not convert the program, but move to an all-cash program, and none of them had a three-year program like Grace did.
**Q. So this is the first circumstance like this you're aware of, correct?**
A. As I sit here, yes.
**Q. In your discussions with Grace at either your presentation at the board meeting or with the four individuals you indicated, did you discuss with them the retroactivity of this and whether that would be fair to the current W. R. Grace shareholders?**
A. That issue was not discussed, to the best of my recollection.
**Q. And putting aside the plan going forward, the retroactive nature of the long-term incentive plan, what is the reason that you believe that current key employees who are at Grace today will stay in the future if this plan is changed retroactively?**
**Again, I'm not talking about things in**

**the future, retroactively.**
A. I'm not quite sure I understand the question.
**Q. What is the basis for your belief that they would need to change the long-term incentive plan to retroactively pay all cash for stock as a reason to retain key employees?**
A. The stock option award that was made as part of the plan is illusory. It has no value.
MR. LODISH: Could you read the question and answer back, please.
(Whereupon, the record was read.)
THE WITNESS: To state it another way, the employees were made a compensation promise by the company, and to the extent that promise involved stock options, the promise was made on what are essentially worthless pieces of paper; that is, the stock option award.
BY MR. LODISH:
**Q. But that wasn't the case when the promises were made though, right?**
A. I was not involved in the stock option awards, and I'm not entirely sure what went into the thinking at the time.
**Q. But isn't that true in all stock option**

**awards, you have no idea what the value of the stock is going to be and what's going to happen in the future, right?**
A. That's true, but the company's circumstances at the time in 2001 should have strongly suggested those awards would never make it any more.
**Q. Did you do an analysis of the long-term incentive plans of the peer group?**
A. No, other than -- No.
**Q. And isn't the peer group the most likely group of companies or employers that key employees may go to?**
A. I would guess yes.
**Q. So again -- So you don't know whether they have long-term incentive plans, correct, as opposed to retention which you knew they didn't, you don't know in terms of long-term incentive plans?**
A. I'm positive that all of them have long-term incentive plans.
**Q. How they compare with Grace's, you don't know, correct?**
A. That's correct.
**Q. Was that information that you would be**

**able to get and look at?**

A. I would be able to find out what types of incentive -- I'm sorry, what types of long-term incentive programs they have, as well as the level of awards made to the CEO and the next four highest paid executives.

**Q. And why didn't you do that when you were considering Grace's program?**

A. You know, that's a good question.

**Q. Well, wouldn't that be a reasonable part of the analysis to look at the peer group and see what they offer?**

A. Certainly, and the reason I probably didn't do it was it was going to produce a number that was going to be very difficult for Grace to achieve because Grace would be forced to use cash, and these other companies are able to use equity.

**Q. Well, how do you know that if you don't even know what their programs are?**

A. Because I have been doing this for a long time.

**Q. In the long-term incentive program there are two significant changes that would enhance the benefit; is there not? One is**

**reducing the EBIT growth rate from 10 percent to six percent?**

**(Telephone interruption.)**

**BY MR. LODISH:**

**Q. Let me start over with the question.**

**There are two significant changes in the benefits under the long-term incentive program.**

**One is the EBIT growth rate going from 10 percent to 6 percent, and the other is the recommendation that all cash be paid as opposed to 50/50 cash to stock, correct?**

A. Yes.

**Q. Was there any consideration of doing only one of those two items?**

A. Yes.

**Q. And what was the consideration of that?**

A. Internally Grace had decided on its own, as I think I testified earlier, that it believed it was appropriate to convert the plan from 50 percent options and 50 percent cash to 100 percent cash.

At that time, and I believe this is the summer of 2001 when Grace management decided that this was a reasonable approach, they had not

considered changing the EBIT growth rate.

It was after I had been retained and did my analysis that they considered that issue.

**Q. So are you saying it was your input -- Do you believe that it was your input that led them to change the EBIT growth rate down from 10 percent to 6 percent?**

A. I raised the issue with them. I showed them my analysis, discussed it with management. It was then presented to the board, and it was their judgment that it ought to be changed.

Now companies are always changing the targets, whether it's under annual incentive plan or long-term incentive plan.

Had Grace not been in bankruptcy and decided to use a cash plan instead of options, then at the time when they instituted the new plan, they would have said, hey, should we keep 10 percent, do we need to raise it to 10 or 15 or does circumstance dictate that we lower it.

All I think I did was accelerate the issue for them.

**Q. Well, the way you're describing the discussion and course of events, it doesn't sound like the Grace management was concerned they**

**needed to change the EBIT rate down from 10 percent to 6 percent in order to keep key employees, but came as a suggestion later on it would be another way to increase the benefit; is that accurate?**

A. I don't think that's accurate. Again, the chronology of events were that, we, that Anderson, began working on this starting September 12th.

At that time, there were substantial concerns about the economy, and when I undertook the analysis, the point I was trying to make for the company was you ought to take a look at this number.

If 10 percent was right at the beginning of 2001 for the 2001 through 2003 plan, that doesn't mean it's right in January of 2002 for the 2002 through 2004 plan.

Now I can assure you that the company would have taken a look at that, maybe they wouldn't have done the same sort of analysis I would have done, had they not hired me, because again, all companies review the performance measures each time them implement a plan.

Now sometime in November or December

somebody would have said, hey, if we put in the 2002 through 2004 plan, should we use 10 percent again, and they would have said, yes, no, let's make it 8, let's make it 12, let's make it 2.

**Q. Mr. Bubnovich, doesn't a corporation normally look at its own growth rate and its own view of what they believe the rate should be for incentive?**

**They don't look at their peer group to come up with an average, do they, under a normal circumstance?**

A. Again, peer group is a benchmark or a reference point.

**Q. But it's a reference point for the industry, correct? It's not a reference point for an individual company that's setting its own goals, is it?**

MR. RUNNING: This has been asked and answered. We have gone over this.

BY MR. LODISH:

**Q. Well, I'm just trying to determine why W. R. Grace has decided to adopt --**

A. Can I give you an analogy?

**Q. Sure.**

A. Do you play golf?

**Q. Some. I'm not very good.**

A. Okay. I set a goal for myself every time I go out to shoot par. At my club, that's 70. And indeed -- I think I was flying out to Grace last year when I ran into Chip Beck. He's one of the three professional golfers to ever shoot 59. I told him, you know, my goal is to shoot one round in the 60's in my life.

**Q. I have been playing nine holes.**

A. Now as I have already testified, if I shoot 80, I tend to be happy. Now I think that's what you have at Grace. I think we have a very very high bar. The bar is par 72 for Nick. If Nick shoots 78 or 80, we are very happy. So even though we are telling the employees you guys all have to go out there and shoot par, we are going to reward you if you shoot 78 or 80 because all told, that's a good round.

So I don't think -- I think it's a little bit misleading to look at the 10 percent bar that Grace often communicates to employees.

You know, another -- Strike the word another.

**Q. Do you know based upon the sales growth rate you saw for 2001 and the growth in revenues**

**that the 10 percent bar is unreasonable for a company like W. R. Grace or for its incentive program?**

A. Grace's long-term incentive program covers three years. So one year's worth of performance doesn't necessarily mean that they expect to maintain that performance over a three-year period, particularly in light of what happened in the economy on September 11th.

**Q. Was there any consideration other than all cash, doing some stock and some stock, maybe not 50/50, but maybe 80/20, 70/30?**

A. No, I don't remember any such discussion.

**Q. And was there a specific reason why all cash was picked as opposed to just changing the percentage of cash to stock?**

A. Yes, because the general consensus was employees believed current equity in Grace had no value.

**Q. Now I'm referring to Paragraph 17 of your affidavit.**

**When you say in the first line: "There are analysis of Grace's competitors, EBIT, CAGR," are you referring to the peer group analysis or**

**is there one in particular you are talking about?**

A. No, that's the peer group.

**Q. You indicate in Paragraph 17 that: Adjustments to LTI, which is long-term incentives, targets are commonplace among companies in all circumstances.**

**Is it commonplace to have a 40 percent adjustment down in one year? Is that commonplace?**

A. I don't know.

**Q. That is a significant adjustment downward, isn't it?**

A. It's a significant percentage, yes. Commonplace in that sentence refers to adjustments, not the percentage in Grace's case.

**Q. You indicate in the last line of Paragraph 17 that: "Virtually all companies adjust incentive targets periodically based upon economic conditions as well as the company's business prospects."**

**Again, looking at the revenue and sales rate, aren't W. R. Grace's business prospects good?**

A. I'm not knowledgeable about the extent of Grace's business prospects.

9C05836
NICK BUBNOVICH JULY 30, 2002

**Q. The four months indicated in Paragraph 18 to be provided as a severance benefit, was that your recommendation or was that a recommendation on the table at the time you got involved?**
A. It was six months originally, and it was something that the company had already determined that it ought to do.
**Q. Okay. And how did the four month number come about? Do you know?**
A. I believe the four months came again as part of negotiations among the company and the committees to reach a consensual agreement as to the changes Grace wishes to make regarding its compensation programs.
**Q. So originally you believe Grace wanted six months, and then after discussions, they came down to four months; is that accurate?**
A. Yes.
**Q. You indicate in Paragraph 19 that: "The four months is slightly higher than competitive practice, but the four months salary compares favorably to the typical range of severance benefits of three to nine months salary."**

**When you say it's "slightly higher than competitive practice," what do you mean by that?**
**I'm on Page 6 of your affidavit, Paragraph 19.**
A. Well, minimum severance benefit is probably more often two to three months salary, so when we establish a minimum here of four months, that's in my view higher than competitive practice, but when you look at the four months within the range of typical severance benefits to this middle-level group of employees, you would expect them to be receiving three to nine. So there it falls within the range. It's just the fact that the minimum is at four is a little bit high.
**Q. Because you mean normally there is a range as opposed to in this circumstance where there would be one set amount of not less than four months; is that correct?**
A. Yes, normally the low end is lower than four months.
**Q. So if the low end was two or three months, that would be what you would consider competitive?**
A. Yes.

**Q. Now looking at Paragraph 20, again, this is looking at the top 16 executive positions, the TDC and compare with competitive practice.**
**You testified that the top 16 executive positions were between the 50th and 70th percentile of competitive practice.**
**Now as we were discussing earlier, that is based on your control group, which was the chemical and the manufacturing industry, correct?**
A. It is based on the survey data from the five different or six -- six or seven different surveys we use for different positions.
**Q. But the surveys were all companies of the chemical and manufacturing industry?**
A. No.
**Q. So what you indicate, at least initially in Paragraph 12 of your affidavit, is not -- for lack of a better word, it's not complete.**
**Did you consider other companies in other industries?**
MR. RUNNING: I will object to the characterization.
MR. LODISH: Well, I could have made it much

worse.
BY MR. LODISH:
**Q. You indicate there that with provided individuals holding similar positions in the chemical and manufacturing industry, that's what you indicated as how you assess the top 16 executive positions and the total direct compensation?**
A. Right.
**Q. Is that accurate?**
A. Yes. I think what you said was the chemical manufacturing industry.
**Q. Well, I meant chemical and manufacturing industry. That's the industry you used to come up with the percentiles that you have here in Paragraph 20, correct?**
A. Well, we used data from the manufacturing industry. We used data from surveys that identified specifically the chemical industry.
**Q. Did you -- Could you tell me what the percentiles are of the top 16 executives as compared to its peer group?**
A. No. No. That data is not available.
**Q. Can you tell me what the top 16**

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

**executive positions with W. R. Grace would be in terms of percentile compared to other mass tort Chapter 11 companies?**

A. I could do it for two others.

**Q. And for two others you know of that you're thinking of --**

A. Right. Or have the data for the top 16 people.

**Q. Well --**

A. Although, the problem -- Yes, I could do it for the top 16, recognizing that the positions would be different.

**Q. Okay. Well, sitting here now, and I'm not asking you to do the analysis, do you know as you're thinking about those two analysis, is Grace higher or lower than those two companies?**

A. I would say Grace is lower.

**Q. And what are the other companies you are thinking of?**

A. U.S.G. and Federal Mogul.

MR. LODISH: Let me take a quick look here.

BY MR. LODISH:

**Q. One other question with respect to the long-term incentive program and the change of the EBIT from 10 percent to 6 percent and the cash**

**payment.**

**Was one of the considerations in lowering the EBIT percentage from 10 percent to 6 percent was due to the fact if all cash is paid in lieu of stock that you can't expense out the cash payments?**

**Was that one of the reasons to lower the percentage of the EBIT?**

A. I don't understand your premise about can't --

**Q. Well, stock options, as we are all hearing about today are expensed out, correct, for accounting purposes?**

A. No. You have it backwards.

**Q. You're right. Cash payments are -- no, no, no. Back up a second.**

**As it stands today accountingwise, stock options are not expensed out, correct?**

A. That's correct.

**Q. The cash payments are expensed out?**

A. Yes.

**Q. Okay. Therefore, if the new changes are made, isn't that going to affect the bottom line of the company?**

A. I think your question is since we are

going to increase the amount of the cash payout under the 2001 to -- the potential cash payout. They still have to earn it because it's performance based.

But if we convert from options to cash and we pay out that cash, it will be a compensation expense, whether it hurts the bottom line or not kind of depends on other things, but yes, it will be that cash piece will be a penal expense.

**Q. Was that a factor in reducing the EBIT from 10 percent to 6 percent?**

A. Well, they are two different issues, aren't they?

**Q. I'm asking if this was an issue in that or not.**

A. I don't know because they are two separate issues in my mind.

**Q. So if the bottom line is affected and it's affected adversely because of the cash expense, it would not affect the EBIT percentages for the company at the end of the year; is that what you're saying?**

A. You're asking about the interrelationship between the two, okay.

**Q. Yes.**

A. I'm sorry. I didn't catch that. Let me think about that for a minute.

I believe the company accounts for a long-term incentive program on a self-funding basis up to -- I think it's the first 6 percent under the plan.

Now I guess what I don't remember is whether the accounting is based on the target measure, and thus it's 10 percent under the 2001 plan; and therefore, it would change to 6 percent under the 2002 plan, but the answer to your question essentially is that up to target, if I remember correctly, the long-term plan is self-funding. In other words, they have to earn it.

**Q. Okay. So do I take it then that it was not a factor or consideration in the discussions to reduce the EBIT from 10 to 6, the fact that all cash would be paid for the --**

A. No, I don't remember it being a factor.

**Q. And the 6 percent was squarely derived from the analysis that was done; is that accurate? It was not based on what Grace's own internal assessment was or what its prior growth**

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

**rate had been since 1992, correct?**

A. No, that's not entirely true. As I mentioned earlier, Grace's EBIT growth rate in 2000 was five percent.

The last time Grace did 10 percent EBIT in any one year was 1998. So I think management and the board when they looked at my analysis and it suggested 6 percent, that that was not inconsistent with Grace's recent performance.

**Q. Do you know what Grace's EBIT was from '92 through '97?**

A. No, I don't.

**Q. How is it that you remember what 1998 was or how did you gain that knowledge?**

A. Because I asked the question of Mike Piergrossi when was the last time Grace had 10 percent EBIT growth.

**Q. And it wouldn't have been a factor that you felt you needed to consider as to whether the EBIT growth rate for W. R. Grace had been 10 percent or higher the majority of the years, 1992 through 1997?**

A. No, because Grace was a very different company then. They spun off a lot of businesses, and they were starting to move apples to oranges

Page 102

from 1992 to 2002.

**Q. That answers another question, but the peer companies you have, do you have any idea whether they went through those kind of changes Grace did in the years 1992 through 2000?**

A. No, I don't.

**Q. Isn't that why it's somewhat dangerous to compare companies like that, because of the inherent differences that the companies may be going through in their individual businesses?**

A. Well, it's dangerous to compare one or two companies to another. When you have got a larger set of companies and you're looking at data over many time frames, it tends to smooth out, and there is less risk of the problem that you pose.

MR. LODISH: Okay. Let me take a very quick check. I think we are done. I have nothing further.

MR. RUNNING: We will reserve the right to review the transcript.

(FURTHER DEPONENT SAITH NOT.)

(Ending time 3:40 p.m.)

Page 103

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ) Chapter 11
W. R. GRACE & CO., )
et al., ) Case No.: 01-01139(JFK)
Debtors ) Jointly Administered

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Eileen M. Heraty, Certified Shorthand Reporter, on July 30, 2002, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

________________________
NICK BUBNOVICH

SUBSCRIBED AND SWORN TO before me this _____ day of ___________ 2002.

________________________
Notary Public

Page 104

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Eileen M. Heraty, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on the 30th day of July, 2002, personally appeared before me, at 200 East Randolph Drive, Chicago, Illinois, NICK BUBNOVICH, in a cause now pending and undetermined in the United States Bankruptcy Court for the District of Delaware, In Re: W. R. Grace & Co., et al., Debtors.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

Page 105

**9C05836**
**NICK BUBNOVICH JULY 30, 2002**

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this ______ day of ______________, 2002.

______________________________
NOTARY PUBLIC, COOK COUNTY, ILLINOIS

Page 106

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

**A**

**ability** 50:18,19
**able** 39:20,25 54:7 86:1,2,17
**about** 10:11 12:4,17 13:9 16:3 19:21 24:22 26:17 31:16,23 32:11 34:9,14 36:7 39:16 40:14 41:25 42:5,22 44:14 45:10 45:11,13 47:14 49:23 50:17,18,22 51:15 57:16 64:5 65:16 66:25 73:11 75:18 79:10 81:24 83:25 89:11 93:1,24 94:10 98:15 99:9,12 100:24 101:3
**above** 70:25
**above-entitled** 104:11
**absent** 43:13
**Absolutely** 60:15 64:3 76:3
**abysmal** 69:14
**accelerate** 88:21
**accepted** 27:16 28:8 28:10,13,18,23 29:1 29:5,15,18 40:19
**accommodate** 31:5
**account** 53:10,12
**accounting** 4:15 99:13 101:9
**accountingwise** 99:17
**accounts** 101:4
**accurate** 6:6 7:4 89:5,6 94:18 97:10 101:24
**accurately** 104:13
**achieve** 86:16
**activity** 24:4
**actual** 26:10
**actually** 12:23 29:1 56:16 80:2
**addition** 72:8
**additional** 16:13
**address** 52:24 73:1
**addressing** 78:15
**adjust** 93:18
**adjustment** 93:8,11
**adjustments** 93:4,15
**Administered** 1:7 104:6
**administration** 11:9
**adopt** 90:22
**adopted** 76:18
**advancement** 74:23
**adversely** 100:20
**advice** 9:20
**advise** 25:8
**advised** 13:1 25:6,11 25:15
**advisors** 41:21
**affect** 25:3 51:24 63:3 99:23 100:21
**affected** 45:8 62:24 100:19,20
**affects** 63:2
**affidavit** 4:22 5:4 6:1 7:20,23 8:1,20 [illegible] 21:12,13 22:6 [illegible] 26:5 32:14,23 41:2
48:15 55:6 65:14 72:25 77:24 92:22 95:3 96:18
**affixed** 106:10
**aforesaid** 105:16,22
**after** 7:16 9:25 16:9,11 26:12,19 37:7 38:19 39:24 46:10 88:2 94:17
**afterwards** 105:18
**again** 16:15 20:15 28:5 33:22 34:11,18 41:3 57:15 60:16,19 64:19 66:17 67:11,19 68:24 71:9,10 72:21 73:3,9 74:19 75:5,13,20,21 76:9 77:3,13 79:24 80:6 83:25 85:15 89:6,23 90:3,12 93:21 94:11 96:1
**against** 13:1 24:10 81:7
**aggregate** 7:13 14:6 41:13 54:2,4
**aggressive** 63:24
**ago** 24:5 62:13
**agree** 40:5
**agreed** 13:19 15:8
**agreeing** 8:23 9:1
**agreement** 94:13
**ahead** 10:25
**air** 11:21
**Akers** 16:17 42:10,15 43:5,6,22
**al** 1:6 104:5 105:12
**Alan** 36:3
**all-cash** 82:17 83:5
**Almost** 26:2
**along** 25:11 27:7 28:16 34:5
**already** 13:19 14:1,11 15:1,5 34:7 44:17 52:4 69:7 76:10 81:6 81:8,22 91:10 94:7
**alternatives** 14:18 17:2
**although** 44:6 81:25 82:24 98:10
**ALVIN** 2:4
**always** 25:21,25 37:5 57:6 88:12
**ambiguous** 36:2 40:2
**among** 93:5 94:12
**amount** 46:16 79:22 95:18 100:1
**amounts** 79:18
**analogy** 90:23
**analyses** 48:25 65:3
**analysis** 7:7,8 14:7 16:20 18:6 25:3 30:17 36:20 45:1,6,9 46:23 49:5 51:18,24 53:13,25,25 54:14,20 58:10,12,17 59:14,18 59:19 61:20 62:14 63:12 64:19 65:6,11 66:12,15 67:10,21 69:3 70:14 71:7,21 72:12,16 76:25 85:8 86:11 88:3,9 89:[illegible] 89:21 92:24,25 98:14
98:15 101:23 102:7
**analysts** 63:5
**analyzed** 15:20 58:25
**Anderson** 4:23 5:1,9 5:19 6:5,9,10 9:8 22:8 89:8
**Anderson's** 5:5
**ANDREW** 2:12
**Andy** 8:3
**annual** 52:10 77:6,15 78:2,8 88:13
**another** 5:12 8:4 52:6 63:7 84:13 89:4 91:22,23 103:2,12
**answer** 10:25 19:9 35:6,7 37:3 43:2 57:4 84:11 101:12
**answered** 14:1 34:8 35:1 90:19
**answers** 103:2 104:14
**anybody** 34:15 43:12 44:4,10 46:5
**anyone** 17:23 18:1,11 46:18 75:8
**anything** 64:2 66:25
**anyway** 32:1
**anywhere** 53:22
**apart** 71:1
**appear** 104:15
**APPEARANCES** 2:1
**appeared** 105:8
**apples** 102:25
**application** 82:22
**approach** 49:4 87:25
**approaches** 17:3
**appropriate** 66:18 87:20
**approve** 13:18
**approved** 31:7 35:19 44:18 46:2,11 76:11
**approximately** 4:19 5:2 16:5 19:13 22:19
**April** 46:11
**area** 6:3 38:14
**areas** 6:5
**Armstrong** 23:13 56:18 57:13
**Armstrong's** 83:3
**Arthur** 4:22,25 5:5 6:5 6:8 9:7
**asbestos** 20:20 24:3 69:15
**asbestos-related** 12:10
**aside** 40:5 83:19
**asked** 7:15 9:11,12 10:2 12:24 13:5,8 17:15,22 26:16,21 34:6,8 35:1 47:21 65:15 72:20 90:18 102:15 104:14
**asking** 22:9 45:10 57:22 64:25 67:25 98:14 100:15,24
**aspect** 22:11
**aspects** 27:23 48:6 51:14
**assess** 97:6
**assessing** 58:20 61:2[illegible]
**assessment** 50:11
73:9,14 101:25
**assignment** 9:10 16:11
**assume** 6:4 32:9 37:10
**assumes** 33:13
**assuming** 35:8 37:13
**assumptions** 46:22
**assure** 9:13 89:19
**ATKINSON-BAKER** 1:21
**attached** 3:15 30:15
**attachments** 30:8 65:25
**attend** 43:3
**attended** 43:9
**attending** 44:5
**attorney** 6:11
**attorneys** 106:3
**attrition** 33:11 35:9
**August** 11:16,18
**available** 8:17 25:19 67:18,23 72:7 74:24 97:24
**average** 60:1 61:5,7 90:10
**award** 84:8,18
**awards** 38:8 84:23 85:1,6 86:5
**aware** 10:13 12:12,20 13:5 16:7 33:9 44:16 44:23 45:22 69:2 75:7 82:12,20 83:9
**AXELROD** 2:3
**A-k-e-r-s** 16:17

**B**

**B** 3:10 60:18
**Babcock** 56:1
**back** 11:2 29:3,7,8,23 29:25 30:1,3,5,25 31:3,5 41:2 42:24 48:22 68:24 84:11 99:16
**backwards** 99:14
**BAENA** 2:2
**baked** 63:22
**bankruptcy** 1:1 9:14 21:19 22:11 23:10 24:1,21 26:20 27:13 27:14,25 31:25 32:5 32:8 33:7,12 35:9,18 35:20 37:2,20 38:2 38:12 39:2,11,14,18 39:22,24 40:16 44:24 46:2 56:12 59:3 63:4 72:2 74:15 88:15 104:1 105:11
**bar** 64:1,5 91:13,13,21 92:1
**bargain** 39:3
**base** 56:20,25 57:2
**based** 15:23 24:10 25:12 36:3 37:8,14 44:8 53:5 55:16 66:15 67:8 70:18 71:3 72:21 73:9,13 74:10,11,13,17 77:7 79:2 91:24 93:18 96:9,11 100:4 101:5 10[illegible]
**basic** [illegible]
**basing** 62:7,10
**basis** 80:7 84:4 101:6
**bearing** 36:24
**became** 63:23
**Beck** 91:5
**becomes** 50:2,16
**before** 1:14 6:10 15:12 21:8 32:8 36:19 48:16,21 76:11 77:14 104:22 105:8
**began** 7:16 21:24 89:8
**begin** 9:4 21:17 80:25
**beginning** 9:17 14:13 14:19 33:7 54:1 59:25 74:19 89:16
**behalf** 26:6
**being** 36:13,16 37:20 37:21,24 46:14 48:6 48:11 78:16 101:21
**belief** 84:4
**believe** 7:1 11:15 18:2 22:1,6 30:5,20 35:23 56:10 57:11 62:20 64:14 67:11 71:3,23 76:1,25 79:18 80:18 80:25 81:12,25 82:7 83:22 87:23 88:5 90:7 94:11,16 101:4
**believed** 87:20 92:19
**below** 68:16 79:3
**benchmark** 17:15,18 66:19 90:12
**benchmarking** 17:20
**beneficiaries** 19:12
**benefit** 6:15 45:7 53:21 68:7,13,15 71:21 86:25 89:4 94:2 95:5
**benefits** 5:16,18 6:3,19 10:1 11:4 19:6,23 22:10 27:12,24 29:14 34:24 36:20,25 44:18 45:16,18,21,25 49:10 50:9 52:1 76:12 78:15 79:23,24 80:1 87:7 94:24 95:10
**best** 44:13 53:18 57:7 58:17,19 83:18
**better** 24:25 35:24 96:19
**between** 23:20 60:5 61:7 72:1 96:6 100:25
**Bill** 79:14
**BILZIN** 2:2
**Biscayne** 2:5
**bit** 24:15 30:6 48:23 91:20 95:14
**Blackstone** 30:15 41:23 59:14,17,18
**blamed** 23:25
**board** 25:7 42:11,17,18 43:7,9,11,23,25 44:1 44:3,5,6,9 83:12 88:10 102:7
**Boca** 68:8
**bonus** 29:20 52:8 64:12
**bonuses** 29:1 63:20
**both** 27:2 50:[illegible]
**bottom** 95:23 10[illegible]

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

Boulevard 2:5
break 48:17,19,21
Brian 11:7 12:14 18:15 26:21 73:17
brief 48:21
briefly 5:7
broad 54:8
broadly 49:23
brought 7:2
bubnovich 1:10 3:3 4:2 4:8,10,12 6:20 9:4 19:3 25:20 31:8 33:2 34:1 48:24 60:4 90:5 104:19 105:9
business 9:16 24:4 74:3 93:20,22,25
businesses 102:24 103:10
B-u-b-n-o-v-i-c-h 4:11

C

C 105:3
CAGR 92:24
call 5:20,21 7:11 14:14 22:9,25 23:22
called 1:10 4:3 11:15
calling 37:18
calls 22:12,23 39:5
came 7:1 14:2 26:19 38:19 39:22 46:2,12 60:1 89:3 94:11,17
cancelled 39:15
capital 5:5,9
Carbide 60:10,20
career 50:11,19 53:1
case 1:6 23:23 24:1 27:18 32:9 33:15 35:16 63:25 83:3 84:20 93:15 104:5
cases 21:16 23:8,16,24 24:3,19,21 25:1,2,20 25:24 26:3,9 31:14 52:8,11 55:24,25 74:6 82:21
cash 15:8 81:3,4,14,23 82:15,15,23 84:6 86:17 87:11,12,21,22 88:16 92:11,16,17 98:25 99:4,6,15,20 100:1,2,5,6,9,20 101:20
cash-incentive 82:17
catch 101:2
cause 50:6 104:11 105:9,15
CEO 17:25 63:25 86:5
certain 28:5 41:10,14
certainly 20:12 22:13 24:9 43:11 52:1 61:3 63:1,5,7 73:16 75:18 86:13
Certified 104:12
certify 104:9 105:6,13 105:23 106:1,5
cetera 41:10
chairman 16:16 42:10
change 12:22 13:6,13 78:1 81:3,14 84:5 88:6 89:1 98:24 101:11
changed 12:25 18:19 82:13 83:24 88:11
changes 13:18 86:24 87:6 94:14 99:22 103:4
changing 68:17 88:1 88:12 92:16
Chapter 1:4 14:3 20:9 21:16,25 22:3 23:8 23:15,16,18,21,23,24 25:2,24 26:12 31:10 31:14 37:12,18 38:10 38:16,19 49:13,20,22 49:23,25 50:14,23 51:2 54:15,24 55:12 55:16 56:4,21,23 57:19 67:1,2,5,6,9,12 67:14 68:4 71:17 72:3,3 73:15 74:6 75:5,10 77:4,18 98:3 104:3
characterization 96:24
chart 15:19
check 103:18
chemical 54:9,12 58:24,25 60:11 63:1 64:21 65:5,9,21,22 66:3,15 70:1,8 96:10 96:15 97:5,12,13,19
chemical-related 36:12
chemistry 47:20
Chicago 1:16 2:14 105:9
chief 17:17
Chip 91:5
chronology 89:7
circumstance 68:18 83:8 88:20 90:11 95:17
circumstances 73:10 82:21 85:5 93:6
Civil 1:12
claimant 2:9 8:7
Claimants 20:20
clear 63:23
clearly 14:3 47:18 50:8 50:17
Clinton 79:14
club 91:3
co 1:5 104:4 105:12
Columbia 68:9
combination 37:23 52:20
combined 65:20
come 10:17 15:5 19:24 38:11,15 61:6 63:12 71:7 90:10 94:10 97:15
comes 39:2,11,13
commenced 21:16
committee 8:18 12:9 16:16 20:20 25:7 42:1,5,8,11,12 43:1,4 44:2
committees 13:18 24:7 24:14,24 28:16 72:10 94:13
commonplace 93:5,7,9 93:14
communicates 91:21
companies 5:14 12:10 12:13 14:4 15:21 21:16 22:4,7,16,20 23:4,9,15,20 25:14 26:12 27:2,5,11,17 31:10,20 37:6 38:11 38:15,19 49:14,16,22 49:23,24 50:20,23 51:2,17,18,22 52:18 53:9 54:15,22,23 55:15 56:4,8,11,13 56:18,21,23,24 57:14 57:19 58:7,14,22,23 58:25 59:2,7,10,15 59:21,24 60:6 61:5,8 61:17 62:11,25 63:9 64:21 65:1,6,7 66:3,4 66:10,22,25 67:1,2,5 67:8,13 69:5 70:1,8 70:22 72:1,3 73:16 75:4,14 77:4 80:7 82:12 85:12 86:17 88:12 89:23 93:6,17 96:14,21 98:3,16,18 103:3,8,9,12,13
company 6:12 10:5 11:19 17:2 18:16 19:5 20:8,11 21:25 28:11 29:2,3,8,22 30:25 31:4,24 34:10 37:17 44:11 48:10 49:25 50:12,14 51:9 53:5 55:12 61:16 62:5 67:12 74:25,25 77:19 83:2 84:15 89:13,19 90:16 92:2 94:7,12 99:24 100:22 101:4 102:24
company's 9:16 10:4 15:23,25 42:4 46:25 50:11,18,19 52:15 85:4 93:19
comparable 61:15
compare 17:20 54:5 61:6 63:5 67:22 80:18 85:22 96:3 103:8,11
compared 69:5,25 70:7 80:9 97:23 98:2
compares 94:23
comparing 70:10
comparison 52:18 57:7 61:25 80:6
compensation 5:11 6:3,19 7:3,12 8:16 9:13,14,22 10:10 11:5 12:13 13:21 14:17 16:16 17:12,14 17:18,19,23 18:7,10 18:12 19:6,23 20:3,9 20:12 21:15,24 22:10 22:19 23:5 24:18 25:5,7,18 27:4,12,24 29:14 30:14 33:25 34:16 36:25 38:3,6 41:9,14 42:1,4,8,11 42:25 43:3 44:2,12 44:19 45:16 46:10 50:8 51:14,19,23
52:7,13,16,24 53:4 56:11 72:7 75:25 84:14 94:15 97:8 100:7
competitive 7:14 9:15 10:7 13:25 17:21 20:3 25:17 68:16 76:6,16,19,24 77:2 94:22 95:2,8,24 96:3 96:7
competitiveness 9:21
competitors 37:6,10 38:4,4 53:17 54:19 92:24
complete 96:20
completely 16:8
completing 18:6
compliance 5:13,17
complicated 27:19
components 7:12,13 81:2
compound 61:12
compromises 28:15
Computer-Aided 105:19
concede 74:8 79:16
concern 19:25 50:18 71:15
concerned 13:17 20:22 75:18 88:25
concerning 5:14 17:9 18:12 66:21 74:20 75:22
concerns 12:17 45:11 45:13 73:1,5 75:21 89:11
conclusion 10:18 14:2 15:6
conditions 12:7 13:13 45:22 93:19
conference 14:13
confidential 8:15,20
confines 75:9
confirmed 40:5
confusing 40:2
connection 68:19
consensual 94:13
consensus 92:18
consequence 24:6
consider 32:13 37:1 39:2 46:19 57:1 58:4 64:21 65:1 66:7 70:13,19 71:20 76:5 78:22 79:7 95:23 96:21 102:19
considerably 80:16
consideration 87:14 87:17 92:10 101:18
considerations 99:2
considered 54:23 55:12 64:22 79:8 88:1,3
considering 18:19,23 66:5 86:8
consistent 9:16
consisting 8:17
constituencies 31:6
consultant 55:13
consulted 25:21,21,25 35:17 38:11,15 55:8
consulting 5:5,8,14,17 5:21 6:3 9:5,10 46:12
contacted 11:3
contains 8:15
contemplating 19:5,22 44:11
contentious 24:20,22
context 40:21
continue 77:5,14
continued 77:17
control 65:3 96:9
controversy 81:17
convert 83:4,5 87:20 100:5
converted 15:7
cook 1:15 12:14 26:22 105:5 106:17
copy 8:4
Corning 21:20 23:12
corporation 25:22 36:25 90:5
correct 4:24 8:2 9:8 19:17,18 26:7 28:6,7 28:14,15,20 33:19,20 34:17,20,21,25 35:12 37:14 43:1 49:14,15 49:17 54:16,20,21 58:14 59:3,4,10,21 60:2,3,12 73:5,6 74:3 74:6 77:8 78:18,19 79:1,5 80:4,5,10,15 80:17 81:4 82:6 83:9 85:16,23,24 87:12 90:15 95:19 96:10 97:16 99:12,18,19 102:1 105:21
correctly 19:14 65:23 101:14
counsel 8:14 41:18 105:24 106:5
count 22:12
county 1:15 105:3,5,5 106:17
course 88:24
court 1:1,21 4:9 27:17 28:11,14 35:19 44:17 44:24 46:3,11 76:11 77:14 104:1 105:11
Courts 1:13
covers 92:5
creditor 26:1 31:6 72:9
creditors 24:6
criticism 81:17
crucial 76:5
CSR 1:24
current 12:25 13:6 44:18 45:7,19 46:9 76:17 77:15 81:20 83:15,22 92:19
currently 4:14 75:10
cursory 40:20
customers 6:16
cut 29:3,7,8,22,25 30:1 30:3,5,25 31:3,5 65:9
cuts 54:10
CX 3:2
cyclical 63:2

D

D 2:4 3:1

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

dangerous 103:7,11
data 54:8 55:18 56:20 56:25 57:1,10 96:11 97:17,18,24 98:7 103:14
date 16:12,14 35:20,22
Dave 17:11 18:8
day 1:17 14:14 104:22 105:7 106:11
deal 13:16 53:2,3 81:22,24
dealt 23:15 24:19
debtor 25:22,25
debtors 1:7 2:16 26:6 33:6 71:16,18 104:6 105:12
debtor's 30:12 51:11 69:19
December 89:25
decide 50:6 53:11
decided 17:3 31:2 87:18,24 88:16 90:22
Defendant's 3:12 8:8 8:10 21:1
define 46:18
definition 46:21 48:4
degree 6:21,24
degrees 6:23,24
delaware 1:2 104:2 105:11
delineate 66:24
Deloitte 4:15
delved 10:9
demand 37:5
demonstrate 7:9
department 6:11,14,19
depends 22:5 100:8
DEPONENT 103:22
deposition 1:10 8:9,11 8:24 21:2 54:1 104:10 105:24 106:2 106:3
depositions 1:13
derived 101:22
describe 65:25
describing 88:23
description 6:17
design 46:13
despite 28:17
detail 17:6,9
determine 58:17 65:4 70:15 90:21
determined 94:8
develop 13:3 21:17 53:6
development 5:24
devises 62:6
Dick 26:25
dictate 88:20
difference 60:22 80:22
differences 61:7 103:9
different 18:4 23:17 39:17,22 48:25,25 49:4,9 61:4 62:4,21 63:6 65:3 74:1 96:12 96:12,13 98:12 100:13 102:23
difficult 13:17 28:3 54:10 86:19
direct 4:6 7:3 54:18
97:7
discuss 17:1 18:9 83:14
discussed 14:22 17:5 18:21 40:9,11 52:4 63:22 83:17 88:9
discussing 96:8
discussion 40:20,21 44:14 88:24 92:14
discussions 18:22,25 40:8,14,19 83:11 94:17 101:18
disregarding 77:21
distinction 23:19 64:24 71:25
district 1:2,12 104:2 105:11
Docket 1:8
document 8:15 14:17
doing 46:12,23 53:13 62:11 71:21 72:12 74:14 81:7 86:21 87:14 92:11
dollar 79:18
dollars 72:6 79:9
done 7:21 8:2 9:18 13:16 22:16 23:4 44:23 53:8 59:23 66:12,14 74:5 81:22 81:24 89:21,22 101:23 103:18
doubts 50:17
Dow 21:20 23:12 60:11
down 20:7 38:20 48:12 60:19 76:4 88:6 89:1 93:8 94:18
downward 93:12
draw 81:17
drawn 23:20 72:1
Drive 105:8
due 23:18 57:19 99:4
duly 4:4 105:14
DUNN 2:2
during 27:13,25 48:10
DX 3:2

E

E 3:1,10
each 49:4,9 50:6 60:25 61:1 65:2 89:24
earlier 41:25 42:6,22 44:21 50:2 56:22 62:19 71:24 72:9 81:12 87:19 96:8 102:3
earn 100:3 101:15
earnings 15:12 69:11 69:14
easily 21:22 83:4
East 1:16 2:13 105:8
EBIT 15:11,11,21 16:4 58:12,25 63:6,7 69:8 70:18 71:7 87:1,9 88:1,6 89:1 92:24 98:25 99:3,8 100:11 100:21 101:19 102:3 102:5,10,17,20
Ecolab 61:15
economic 92:19
economy 35:24 36:4
36:23 37:4 89:11 92:9
effect 13:14 19:24 29:10 35:18
effective 13:4 17:7
effectively 35:11
eileen 1:14,24 104:11 105:4
either 26:5 27:10 45:17 46:9 78:16 83:12
element 20:13 33:23
ellis 2:11 41:20 44:7
else's 17:23
emerged 40:15
empirical 34:23 35:3
employed 4:14,17
employee 5:16 6:15 19:1,21 34:2 46:19 46:24 47:1,7 48:5,6 51:8,15 73:4 75:21
employees 7:11 18:23 19:4,9,10 20:10 24:18 26:11 27:12 31:10,20 32:5,17 33:6 34:9,12 39:21 39:25 45:3,8,11,17 45:25 46:10,16 47:3 47:10,12 48:9 50:15 50:15 51:12 64:12 73:1,11 74:20 75:18 80:2 83:22 84:7,14 85:13 89:3 91:15,21 92:19 95:11
employers 85:12
employment 20:14,16 36:8,9,24 50:1,4,16 50:21 73:1
encompass 42:21
end 10:7 11:15 35:23 80:8 95:20,22 100:22
Ending 103:23
enhance 67:14 86:25
enhancement 68:23
ensure 24:15 31:6
entail 5:23
entirely 84:23 102:2
entitled 25:9
entitlement 46:5
entity 40:12
environment 73:8,12
environments 73:15 73:18
equating 78:4
equity 41:1 86:18 92:19
equity-based 25:18 38:3,5 52:13 75:25
erroneous 40:11
essentially 82:8,16 84:17 101:13
establish 95:7
establishing 62:15
estate 51:12
estimate 28:4
et 1:6 41:10 104:5 105:12
even 20:5 39:21 54:18 68:14 80:12,13 81:20 86:20 91:14
events 88:24 89:7
eventually 11:22
ever 91:6
every 74:12 83:2 91:2
evidence 33:14 34:23 35:3
exact 35:22
exactly 21:21 32:18
examination 1:11 4:6
examined 4:4
example 26:21 45:24 49:11 60:8 83:3
excellent 61:21
Excluding 38:14
exclusively 26:2
executive 5:12 7:10 96:2,5 97:7 98:1
executives 7:3 28:3 54:11 64:23 66:6,9 74:13 78:18 86:6 97:22
Exhibit 3:12 8:11 14:8 20:18,24 21:2 30:13 30:16 32:15 54:3,4 59:14
exhibits 3:15 21:6
exist 40:12 54:12
existing 10:4 14:16 23:25 39:14 40:24 45:22 68:11
expand 50:2
expanded 17:16
expanding 75:1
expatriates 5:15
expect 8:20 39:12 92:7 95:12
expectation 48:11 63:14,18 75:17
expectations 48:9 62:12
expense 99:5 100:7,10 100:21
expensed 99:12,18,20
expensive 29:9
experience 6:2 20:4,8 25:12 72:9 73:15 77:8,18
experiencing 12:10
expertise 21:15,18 53:5
explain 8:13
explained 8:14 12:6,8
express 12:16
expressed 12:23 19:25 45:11
expressing 73:5
extent 46:5 54:7,9 73:13 84:15 93:24
E-B-I-T 58:12

F

face 16:9,9 49:22
face-to-face 14:14,15
fact 7:9 25:17 28:17 33:13 37:12 95:14 99:4 101:19
factor 15:24 48:7 53:7 53:10 54:20 80:2 100:11 101:18,21 102:18
factors 61:9 62 22:24
facts 37:14
fair 56:8 58:5,8 83:15
fall 72:17
falls 95:13
familiarize 41:8
far 10:13 13:16
fault 70:4
favorably 94:23
feature 15:7
Federal 23:12 27:1,18 27:20,21,24 28:1,6 28:18,23,25 31:12 56:19 57:12 82:16 98:20
feedback 31:12,16
feel 73:11
felt 13:17 59:6,9 63:18 102:19
few 62:13
figure 21:22 23:11 33:10
FILE 1:23
filed 20:19 21:9 30:9 35:23
financial 24:11 41:21
find 31:1 32:18 54:7,10 86:2
finding 45:12
finds 49:25 50:14
fine 28:20
finish 32:3
Firm 4:15
first 4:3 9:4,18 10:14 10:19 11:10,25 13:20 13:23 14:15 21:19,24 41:7 49:11 70:9 72:25 78:21 83:8 92:23 101:6 105:14
fit 52:14 75:9
five 14:18 16:1,3,6 17:1 26:5 32:16,20,21 33:5,9 57:23 58:1,4 58:23 59:7 62:20,23 96:12 102:4
Florida 2:7
flying 91:4
focus 80:24
focused 51:12
focusing 77:22
follow 32:2
following 14:12
follows 4:5
follow-up 26:16,18
force 68:20
forced 86:16
foregoing 104:13 105:20,24
form 52:6
formalize 67:15
forward 14:10 83:20
foundation 10:22
four 5:10 7:11 16:5 19:8,15,19 26:4 34:12 62:21,23 68:13 68:15 83:13 86:6 94:1,9,11,18,21,22 95:7,9,14,19,21
fourth 5:19
frame 60:17
frames 103:14

**9C05836**
**NICK BUBNOVICH JULY 30, 2002**

frankly 48:1
Friday 5:3
from 4:21 11:3 12:14 18:4,11,16 19:19 22:9 23:1 24:4 40:15 41:25 44:7 45:12 46:18 47:18 52:21 55:5,9 58:23 68:8 71:1 75:8 77:11 78:24 79:3 81:14,23 82:14 87:1,9,21 88:6 89:1 96:11 97:17,18 98:25 99:3 100:5,12 101:19,23 102:10 103:1
front 32:15
full 4:9 42:18
Fuller 60:18
functions 5:25
further 16:11 76:4 103:19,22 105:13,23 106:1,5
future 40:12 45:14 83:23 84:1 85:3

G

gain 102:14
gave 26:6
general 23:19 40:13 47:15,16,17 52:15 61:18 75:16,16 78:22 78:24 80:21 92:18
generally 24:7,13 25:13 63:9 72:4 73:4 75:14
gets 37:17
getting 22:25
give 4:8 90:23
given 15:17 16:19 17:16 40:20 48:4 57:7 58:8 60:5 69:14 79:20,23 104:14 105:16,21
Glenview 4:13
go 10:25 11:19 21:12 39:12 51:17 61:1 68:24 76:4 77:3 85:13 91:3,16
goal 63:24 91:2,7
goals 58:13 64:14 90:17
going 11:19 14:10 29:9 37:6 39:23 41:2 47:6 51:3 52:17 60:25 71:16 72:5 75:15 76:16 77:23 79:3 81:23 83:19 85:2,2 86:14,15 87:9 91:16 99:23 100:1 103:10
golf 90:25
golfers 91:6
gone 38:19 81:6 90:19
good 37:5,9 45:5 62:14 74:17 86:9 91:1,18 93:23
gotten 31:11 66:11
grace 1:5 7:4,11 9:5,11 9:12,18,21 10:14 11:3,9 18:4,6,12,20 18:24 19:4 11,20,22 20:19 22:3 23:13 25:4 27:8 29:13 32:5 33:11 34:3,6 36:20 37:1,9,12,19 38:1,2 38:24 39:1,1,3,11,13 39:20,25 40:8,14 41:13 42:19 44:17 45:25 46:18 47:14,24 47:25 49:20 51:23 52:12 53:7,11,21 57:3,7 61:6,10,15,18 61:24 62:4,10 63:3,4 63:11 64:11 67:6,10 67:22 68:6,8,17 70:8 70:25 71:22 72:15 73:21 74:17 75:15 76:2,17 80:3 81:13 82:10 83:7,11,16,23 86:15,16 87:18,24 88:15,25 90:22 91:5 91:12,21 92:2,19 94:14,16 98:1,16,17 102:5,16,20,23 103:5 104:4 106:12
Grace's 25:6 37:15 40:23 41:8,11 42:11 51:25 52:18 53:13,17 54:18 58:9,13,20 61:22 62:3,15,19,23 63:5 68:11 69:4 74:11 75:8 76:18 79:20 85:22 86:8 92:4,24 93:15,22,25 101:24 102:3,9,10
granting 83:2
greatest 60:10
Greenspan 36:4
group 5:11,16,17,19 22:9 30:15 51:17,21 55:2,3,7 58:13,24 59:10,14 62:1 65:3 66:7,9 67:17 69:6,25 70:7 72:14 80:13,17 80:19 85:9,11,12 86:11 90:9,12 92:25 93:2 95:11 96:9 97:23
groups 49:9 67:20
growing 75:1
growth 15:21 58:12 59:1,11 60:2,6,10,19 60:20 61:7,9 62:7,11 62:15,20,23 63:14,15 63:19 64:10 69:3,4,4 69:11,11 70:9,9,13 70:14,18,19,20,24,25 71:4,5,6,6,7 74:10 75:2 87:1,9 88:1,6 90:6 91:24,25 101:25 102:3,17,20
grudge 24:10
guaranteed 52:6
guarantees 50:22
guess 8:7,8 21:20 43:2 47:6 57:4,5,24 85:14 101:8
guys 91:15
Gypsum 12:15 23:13

H

H 3:10 60:18
hand 51:13 106:10
handed 8:14 54:1
handling 8:19
hang 48:10
happen 85:2
happened 24:5 92:9
happens 77:18
happiness 52:25
happy 64:17,18 91:11 91:14
harder 24:15
having 4:3 19:8 40:14 45:2
headhunters 37:18
hearing 99:12
heightened 67:13
help 9:12 33:16
heraty 1:14,24 104:11 105:4
hereinbefore 106:4
heretofore 105:6
hereunto 106:9
hey 88:18 90:1
high 15:17 64:1 91:13 95:15
higher 24:25 25:13 64:5 68:14 94:21 95:1,8 98:16 102:21
highest 86:6
highly 39:19
highs 61:2
him 8:14 91:7
hired 68:9 89:22
historically 32:7 33:10
holding 97:4
holes 91:9
hour 1:18
HR 5:21,24 12:11
human 5:5,9 6:18 11:7 12:9 26:22
hundred-plus 22:7
hurts 100:7

I

ID 3:11
idea 8:24 36:15 56:7 85:1 103:3
identification 8:12 21:3
identified 19:11,14 26:4 27:3 97:19
Illinois 1:16,17 2:14 4:13 105:1,6,9 106:17
illusory 84:9
implement 50:24 89:24
importance 51:25
important 20:10,12 25:16 32:13 48:8
inappropriate 15:11,13 15:14,15,16,22
INC 1:21
incentive 10:11 14:23 14:25 15:4 17:9 40:24 49:2 52:10 58:11,18 59:8 61:22 62:6 63:19 64:4,10 64:12,15,20 68:25 70:16,17,20 71:8 72:13 77:6,15 78:2,7 78:8,17 80:25 82:5 83:21 84:5 85:9,16 85:18,21 86:3,4,23 87:7 88:13,14 90:8 92:2,4 93:18 98:24 101:5
incentives 76:12 93:5
include 23:2,5 66:3,4
included 6:17
includes 20:21 55:9
including 47:19,20 58:1
income 15:12 72:5
inconsistent 102:9
incorrect 81:24,25
increase 27:11 60:10 68:6 78:24 79:3,5,6 79:11,12,17 80:3 89:4 100:1
increased 27:25 34:4 34:24
increases 76:18,22
increasing 52:1 76:12
indeed 91:4
indicate 18:18 19:20 21:14 41:7,17 48:24 58:10 73:20 76:5 78:21 93:3,16 94:20 96:17 97:3
indicated 8:22 31:8 35:8 57:11 59:7 73:24 83:13 94:1 97:6
indicates 5:4 6:1 32:16 74:17
individual 90:16 103:10
individuals 18:17 19:19 37:11,25 42:5 42:22 43:19 83:13 97:4
industries 36:12 66:24 96:22
industry 15:17 38:1 54:6,8,10,12 58:22 61:18 63:2,3 65:21 65:22 66:2,16 76:24 90:15 96:10,15 97:5 97:12,14,14,18,20
inexact 31:23 32:12 63:8
information 8:16,20,21 34:2,14,19,21 35:3 36:11,18 47:24 48:3 54:11,13 55:4,9,23 57:5 65:20 66:9 67:18 85:25
informed 31:2
inherent 103:9
initially 96:18
input 88:4,5
instances 38:22
instead 13:3 14:14 88:16
instituted 88:17
instructions 16:19
intact 72:11
intangible 50:5,10
interest 38:6
interested 24:7 72:10 106:7
interim 40:23
internal 74:21,22 101:25
internally 87:18
international 5:12
interrelationship 100:25
interruption 87:3
interview 34:18
interviewed 34:8 35:15
involve 23:10
involved 5:8 45:9 79:9 79:19 82:21 84:15,22 94:5
involvement 22:24
involving 71:17
issue 8:25 24:12,13 39:24 40:15 52:24 71:24 83:17 88:3,8 88:22 100:15
issued 40:4
issues 23:14,17,18 24:18 45:13 49:21 53:2 74:2,7 76:9 100:13,18
item 74:9
items 62:18 75:19 87:15

J

January 13:4 17:7 89:17
job 6:17 51:13 52:25 67:12 68:19
John 16:16 42:10
joined 6:10
jointly 1:7 104:6
judgment 47:1,7 88:11
July 1:17 7:17,18,20 36:9 104:12 105:7
June 35:23,25 36:8
just 19:15 25:12 27:2 32:2 33:23,24 35:2 37:16 42:15 44:22 49:23 54:12 55:2 57:21 59:6 62:18 65:15 66:6 67:24 74:11 75:13 76:22 77:22,23 90:21 92:16 95:13

K

K 105:3
keep 26:10,14 27:13 31:9,22 44:18 51:8 52:5 88:18 89:2
keeping 24:7 33:24 51:12 72:10
kept 30:3 34:4,16 77:16
key 7:10 18:23 19:4,9 19:10 20:2,10 24:18 27:12 32:17 33:5 45:3,8 46:10,19,23 47:1,3,7,9,12 48:5,6 53:14 83:22 84:7 85:12 89:2

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

**kind** 100:8 103:4
**kirkland** 2:11 41:20 44:7
**knew** 19:21 63:15,21 85:17
**know** 11:10 16:3,4 19:4,10 20:15 22:3 23:8 24:22 30:16 31:24 35:13,21 36:22 37:13,19 38:20,21 40:9 43:8,24 45:24 46:4,8 47:19 52:6 53:20 56:3 57:18,23 57:25 68:15 69:15 73:16 79:25 80:1 85:15,16,23 86:9,19 86:20 91:7,22,24 93:10 94:10 98:5,14 100:17 102:10
**knowing** 71:4
**knowledge** 44:13 53:6 53:18 102:14
**knowledgeable** 93:24
**knows** 47:2

L

**L** 29:11
**lack** 10:22,23 96:19
**laid** 36:13,16
**large** 56:11 60:14 73:13
**largely** 29:8 55:22
**larger** 71:16 103:13
**last** 16:7 71:14 75:20 91:5 93:16 102:5,16
**late** 16:18,24
**later** 8:25 16:13 17:4,5 89:3
**latter** 23:23
**law** 6:21,24
**least** 27:20 61:25 67:15 96:17
**leave** 19:2 34:3,9,15,23 47:21 53:11
**leaving** 18:20,24 19:5 19:22 20:2 44:11 51:16 73:21
**led** 23:10 88:5
**left** 33:6 45:17 48:1 53:15
**legal** 6:11
**less** 14:3 51:23 64:11 95:18 103:15
**let** 8:13 11:2 20:17 32:2,3 37:3 48:22 49:8 50:2 61:14 87:5 98:21 101:2 103:17
**let's** 42:24 51:3,6 60:16 79:10 80:24 90:3,4,4
**level** 28:25 30:1 86:5
**levels** 25:17 29:20 30:3 41:14 76:6,16,24 77:1
**liabilities** 23:21 56:5 56:12 57:8,9,20 72:2 72:4 77:5
**liability** 24:2,3,4 25:1 25:14 49:14,24 54:25 55:17 56:17 65:15 77:19 80:7
**License** 1:25
**lieu** 99:5
**life** 91:8
**light** 37:11 92:8
**like** 79:14 83:7,8 88:25 92:2 103:8
**likely** 51:16 85:12
**limited** 68:18,22
**line** 72:25 92:23 93:16 99:24 100:8,19
**lines** 5:10 25:11 27:7 34:5
**list** 22:15
**listed** 23:6
**litigation** 12:11
**little** 17:8 23:2 24:14 30:5 48:23 74:1 77:6 91:20 95:14
**live** 4:12
**LLP** 2:3
**lodish** 2:4 3:4 4:7 8:3,6 8:22 9:3 10:24 16:23 21:4 32:21,24 33:1,8 33:18 34:13 35:5 36:6 39:10 40:7,17 48:18,20 49:7 61:13 65:2,10 67:24 68:2 69:9,12 77:23 78:2,6 78:13 84:10,19 87:4 90:20 96:25 97:2 98:21,22 103:17
**long** 4:17,25 30:24 86:22
**longer** 74:24
**long-term** 10:11 14:23 14:25 15:4 17:9 40:24 49:1 58:11,18 59:8 61:22 62:6 64:15,20 68:25 70:16 70:17,20 71:8 72:13 78:7,17 80:24 82:5 83:20 84:5 85:8,16 85:18,21 86:4,23 87:7 88:14 92:4 93:4 98:24 101:5,14
**look** 10:4 11:4 14:6 22:10 30:13 32:14 33:22 36:18 45:15 46:15 49:13,16 54:2 55:15 57:1 58:12,21 59:6,10,13 60:8,11 60:19 66:20 67:10,16 69:16,17,24 72:13,21 82:1 86:1,11 89:13 89:20 90:6,9 91:20 95:9 98:21
**looked** 36:7 51:1 56:14 56:16,17,18 57:12,14 58:2 64:22 102:7
**looking** 10:1 20:22 32:18 62:2 67:7 69:10 71:11,12 93:21 96:1,2 103:13
**lose** 68:19
**loss** 67:13 74:20,22 75:25
**lost** 31:20,25 32:6,7,16 40:25 52:9,12 70:2
**lot** 20:14 23:24 62:21 102:24
**low** 10:7 38:24 95:20 95:22
**lower** 88:20 95:20 98:16,17 99:7
**lowering** 99:3
**lows** 61:2
**loyal** 48:8
**loyalty** 48:5
**LTI** 93:4
**lucrative** 10:21

M

**M** 1:14,24 66:1 104:11 105:4
**made** 28:5,23,25 29:5 29:13 43:7 46:9,10 46:14 48:21 82:2 84:8,14,16,21 86:5 96:25 99:23
**maintain** 25:16 41:13 56:20 72:11 92:7
**maintained** 76:6,17
**maintaining** 76:10
**major** 21:19 22:16 23:3 23:4
**majority** 102:21
**make** 11:20 21:13 24:23 27:3,7 40:25 41:15 42:3 47:20 48:23 50:22 52:9 63:12 64:24 85:6 89:12 90:4,4,4 94:14
**makes** 52:12
**making** 46:22
**management** 16:15 23:25 24:8,10,16 25:6,13 37:9 40:6 42:1,4 45:10,12 47:2 47:4,9,12,22,25 53:14 63:23 72:10 74:1,5 75:8 81:13 87:24 88:9,25 102:6
**management's** 24:11
**managers** 68:14
**manufacturing** 64:21 65:1,6,7,21 66:1,16 96:10,15 97:5,12,14 97:18
**many** 19:10 22:3,12 23:8 36:12,15 43:8 57:23,24 75:3,18 103:14
**March** 16:18,22
**mark** 8:5,6,8 20:17,23
**marked** 3:11 8:12 14:8 21:3 54:3
**market** 53:16 62:12
**marketplace** 63:8
**mass** 23:10,16,18,21 24:2,18,25 25:10,13 25:20 26:9 38:10,14 49:13,24 54:15,22,24 55:11,16 56:5,12,17 57:8,9,20 59:6 72:2,4 73:25 77:5,19 80:7 98:2
**materials** 17:8
**matter** 25:19 68:9 76:11
**matters** 6:19 18:10
**may** 28:4 34:23 63:6 70:22 74:7,9,25 75:1 75:2 85:13 103:9
**maybe** 30:6 38:21 57:24 82:1 89:20 92:11,12
**McGowan** 11:7 18:15 43:16 73:17
**mean** 8:2 17:19,20 26:19 30:11,11 33:22 38:6,8 45:20 64:16 65:11 74:21 82:4 89:17 92:6 95:2,16
**meaning** 79:15
**meant** 16:24 97:13
**measure** 58:19 101:10
**measures** 63:6 70:22 71:12 74:18 89:24
**mechanics** 44:23
**median** 60:1
**meet** 11:13,18,22 16:10 18:5,11 42:14 42:25 50:19 64:6
**meeting** 11:25 12:18 13:20,23 14:14,15,22 15:19 16:13,18,25 17:4,4 43:3,11 44:5,9 83:12
**meets** 64:14
**member** 12:9 42:9 43:22,24 44:1
**members** 42:13 43:8 44:2,2,6
**mentioned** 20:5 22:7 43:20 102:3 106:4
**Mercer** 66:1
**met** 16:9,15 18:3,8,14 42:16,16,18 43:6 63:11
**Miami** 2:7
**middle** 69:25 70:6
**middle-level** 68:14 95:11
**might** 22:8 24:15 30:10 74:6
**Mike** 11:6 12:8,12 18:15 43:21 73:16 102:15
**million** 79:4,4,21
**mind** 31:22 48:1 51:11 57:6 82:3 100:18
**minimum** 68:12 95:5,7 95:14
**minor** 23:2
**minute** 32:3 101:3
**minutes** 62:13
**misleading** 91:20
**mismanagement** 74:7
**missing** 57:15
**modest** 78:24 79:7,8
**modifications** 77:7
**Mogul** 23:12 27:1,18 27:20,21 28:1,6,18 28:23,25 56:19 57:12 82:16 98:20
**Mogul's** 27:24
**moment** 68:24
**money** 46:16 79:22
**Mongul** 31:12
**month** 17:5 94:9
**months** 4:19 94:1,6,11 94:17,18,21,22,24 95:6,8,9,19,21,23
**more** 17:5,8 22:25 24:24 25:9 27:19,21 42:21 66:18 67:13,21 72:6 73:7,18 75:19 76:19 80:16 81:1 85:7 95:6
**most** 24:6 50:23 85:11
**motion** 21:5 30:10,11
**move** 51:3 83:5 102:25
**moved** 68:8 82:16
**much** 71:16 96:25
**myself** 91:2

N

**N** 3:1
**name** 4:9,10 11:11 12:14
**names** 20:5 42:12 43:18 44:4,10
**nature** 39:22 74:2 83:20
**necessarily** 32:10 47:13 75:14 92:6
**need** 40:22 82:1 84:5 88:19
**needed** 89:1 102:19
**needs** 23:20
**negative** 29:10 60:18
**negotiations** 94:12
**Neither** 73:22
**never** 18:21,25 57:9 85:6
**new** 13:4 14:19 17:6 19:23 30:21 39:23 40:5 68:10,12 88:17 99:22
**next** 77:21 78:11 86:6
**nick** 1:10 3:3 4:2,10 91:13,14 104:19 105:9
**nine** 91:9 94:24 95:12
**nobody** 44:9
**nonchemical** 66:4
**nondurables** 66:2
**none** 53:17 54:18 83:6
**non-compensation** 5:22
**non-tax** 5:21
**normal** 90:10
**normally** 90:6 95:16,20
**Norris** 17:25 18:15 20:1 32:14,16 43:14
**Northern** 6:11
**Northern's** 6:18
**notarial** 106:10
**notary** 1:14 104:25 105:4 106:17
**nothing** 61:10 77:14 103:18 105:15
**Notice** 1:11 106:2
**notwithstanding** 7:9 25:17
**November** 89:25
**number** 3:11 7:10 22:13 23:5 41:4 52:3 56:3 7:13 57:16,22 57:23 66:10 86:14

9C05836
NICK BUBNOVICH JULY 30, 2002

89:14 94:10
numbers 31:19 32:5 79:2
numerous 61:9

O

O 105:3,3
object 77:25 96:23
objection 10:22 20:19 33:13 36:1 39:5 40:1 40:10 49:6 61:11 77:20
objectives 62:8
obviously 11:20 53:2 62:17
occasion 20:6 21:5,8
October 12:1 14:16 16:10,14,21,24,25 17:5
off 36:13,16 46:21 102:24
offer 38:2 39:20,25 86:12
officer 17:17
offset 28:1
often 67:13 91:21 95:6
Oh 12:6 28:12 33:5 42:18
okay 7:19 12:16 13:2 14:21 24:17 33:5 38:18 43:8 52:23 55:5 61:19 69:23 70:5 82:4 91:2 94:9 98:13 99:22 100:25 101:17 103:17
once 13:18 35:19 40:3 40:15
one 5:10,12 10:2 16:25 17:3 20:5 22:10 24:13 30:8 33:23 38:21 48:5,9 49:1,1,2 49:4,9,11 50:20 51:6 52:5,6 55:24 60:25 63:7 64:11 65:2 66:15 71:11 73:22 75:19 78:5 81:2 86:25 87:9,16 91:6,8 92:5 93:1,8 95:18 98:23 99:2,7 102:6 103:11
one-year 83:1
ongoing 50:18
only 18:14 19:8 34:11 40:20 50:21 55:11 68:13 81:9 82:3 83:1 87:15
operating 72:5,11
opinion 13:24
opportunities 36:8,9 75:3
opportunity 27:20 40:14 41:1,15 52:9 52:12 74:21,22 75:23
opposed 23:3 26:1 27:13 48:1 62:12 73:10 85:17 87:11 92:16 95:17
option 15:6 40:19 84:8 84:18,22,25
options 38:7,9 40:15
81:14 82:14,23 83:2 84:16 87:21 88:16 99:11,18 100:5
oranges 102:25
order 21:12 58:17 63:19 89:2
organization 5:24
original 28:24 30:18 33:19,20
originally 94:6,16
other 6:23,23 10:9 12:12,13 16:19 17:22 18:5,22 19:15,17 25:24 29:4 30:3 31:14,15 33:25 37:6 37:21 38:21 39:23 42:12 43:19,19 44:6 49:8,13,21 51:21 57:14,18 58:24 62:11 62:25 69:5 72:3 74:6 75:4 80:7 82:12,20 82:25 85:10 86:17 87:10 92:10 96:21,22 98:2,18,23 100:8 101:15
others 98:4,5
otherwise 9:15 24:15
ought 13:10 53:23 62:15 88:11 89:13 94:8
out 21:22 23:11 26:19 28:4 32:16,20,21 33:10 37:10 38:11,15 38:19 39:2,11,13,22 45:12 53:15 58:4 60:16 61:2 65:22 86:2 91:3,4,16 99:5 99:12,18,20 100:6 103:15
outcome 106:8
outperform 63:9
outside 41:18
over 22:13,17 59:1,24 70:10 87:5 90:19 92:7 103:14
overall 10:3 14:4 79:20
Owens-Corning 55:10 55:11 56:18 57:12
own 29:3 62:6,7,7,12 74:11 87:19 90:6,6 90:16 101:24
owners 40:5

P

P 29:11
package 7:12 19:23 20:10 34:16 68:23
page 30:19 32:22,23 33:3,4 41:5 59:15 69:17 70:2 95:3
paid 41:16 45:18,21 46:6,16 53:15 82:15 86:6 87:11 99:4 101:20
paper 84:17
par 91:3,13,16
paragraph 6:2 22:18 22:21 23:6 33:3,4 41:4 48:14,16,22,23 49:12 65:14 66:20
69:1,21,25 70:2,3,3,7 71:15 72:24 76:4 77:3 78:20 81:1 92:21 93:3,17 94:1 94:20 95:4 96:1,18 97:16
paragraphs 23:7 26:4
parameters 65:24
part 10:3 28:2 30:24 32:15 39:18 47:3 59:13 70:14 82:14,14 84:9 86:11 94:12
Partially 64:7
particular 7:7 14:5,7 17:3 19:1 22:10,11 24:10 36:23 43:13 50:12 51:13 56:25 64:1 65:8 71:11 73:18 74:8,16 93:1
particularly 20:1 24:3 37:11 92:8
parties 105:25 106:6
past 15:23,25 16:4 22:17 55:8 75:2
Paul 18:15
pay 24:24,25 25:12,16 28:4 50:22 53:9 54:2 54:4 63:19 66:8 68:13 75:22 76:6,16 76:19,23 77:1 84:6 100:6
payment 99:1
payments 46:7,9,14 99:6,15,20
payout 80:20 100:1,2
payroll 79:21
PD 8:18
peer 14:3 15:21 49:16 51:17,21 52:18 53:9 58:13,21 59:10 62:1 66:7,9 67:17,20 69:6 69:25 70:7 71:6 72:14 80:12,17,19 85:9,11 86:11 90:9 90:12 92:25 93:2 97:23 103:3
peers 15:18 50:13 54:5 62:3 63:7,10 71:1
penal 100:9
pending 105:10
people 5:20,20,22 12:11 18:4,5,14 20:2 32:1 33:24 35:13 36:12 37:4,5,16,20 40:22 41:15 47:21 52:5 53:10 63:11 64:5 68:10,12 98:8
perceived 74:20
percent 15:11 16:6,8 29:22 30:2 60:11,12 60:19,20 62:20,21,23 63:16,21 64:11 79:4 79:6 82:15 87:1,2,10 87:10,21,21,22 88:7 88:7,19 89:2,2,15 90:2 91:20 92:1 93:7 98:25,25 99:3,4 100:12,12 101:6,10 101:11,22 102:4,5,8 102:17,21
percentage 79:10,13 79:17 92:17 93:13,15 99:3,8
percentages 100:21
percentile 96:7 98:2
percentiles 97:15,22
performance 15:18,23 16:1 24:11 47:4,20 58:20,21 59:1 61:22 62:8 63:6 64:6,16 72:11 89:23 92:6,7 100:4 102:9
performed 41:16 62:3 62:4
perhaps 22:5,13,25 24:14 36:4 48:11 50:21 58:5
period 26:13 59:24 60:5,9 61:1 92:8
periodically 12:11 93:18
periods 59:1,25
person 10:14 52:22,22
personally 105:7
persons 41:10,24,25
person's 11:11
pertaining 1:13
philosophy 41:9,11
phone 44:7
pick 60:16 61:2
picked 92:16
picking 67:4
piece 39:17 100:9
pieces 84:17
Piergrossi 11:6 18:15 43:21 73:17 102:16
place 12:21 14:4,11 15:1 19:7 44:19 45:2 45:17 46:1 52:5 76:21,23 77:16 81:8
plan 19:6 30:21 33:19 33:21 34:15,24 40:4 44:12 45:16,19 46:10 52:10 63:22 64:8 68:20 71:13 72:21 75:10 76:17,21 81:7 81:15,21 83:1,1,19 83:21,23 84:6,9 87:20 88:13,14,16,18 89:16,18,24 90:2 101:7,11,12,14
planning 5:23
plans 34:9 35:18 85:9 85:16,19,21
play 90:25
playing 91:9
pleading 20:24 74:12
please 4:8,9 11:1 84:11
plus 13:17
point 9:2 24:23 47:21 61:21 62:14 71:10 79:16 89:12 90:13,14 90:15
policies 27:4
policy 28:19 51:22,25 52:2 53:8
portion 40:6
pose 103:16
positions 96:3,6,13
97:4,7 98:1,12
positive 85:20
possibility 20:2 40:11 67:12
possible 14:18 29:10
possibly 31:25 48:13
postgraduate 6:24
potential 58:20 75:22 79:23,24 80:1 100:2
practical 25:18 68:9
practice 5:6,8 7:14 10:8 17:21 68:16 77:2 94:22 95:2,9 96:4,7
preferred 66:14
premise 99:9
prepared 14:17 15:20 17:8 57:10
presence 105:18
present 74:9 76:1 106:3
presentation 43:7,9 83:12
presented 7:25 17:2 88:10
preserved 39:18
preserves 51:11
president 11:7,8 26:22
pressure 74:4
Presumably 37:24
presume 12:20 39:14 46:4 77:7 81:9
pretty 11:17 37:9 38:24 60:14 64:17
previous 44:8
previously 32:8
pre-bankruptcy 35:10
price 2:3 38:18,24 39:3 39:12
primarily 20:22 38:6 43:5
principal 5:10 29:6
printed 7:25
prior 4:21 6:5,8 16:1,3 18:6 27:14 28:11 33:11 101:25
probably 86:13 95:6
problem 8:23 9:1 74:2 98:10 103:15
problems 12:11
Procedure 1:12
proceedings 8:7
process 47:4
produce 86:14
professional 91:6
profit 69:4 70:9,14,20 70:25 71:5,5
program 9:22 10:1,5,6 10:12,15,21 11:5 12:5,7,17,20,25 13:4 13:6,13,21,24 14:5 14:19,24,25 15:4,6,7 17:6,10 18:7,9,13 19:12 26:24 28:1,2 29:20 30:14 31:7 33:17,23,25 34:4 35:11,14 40:24,25 41:9 44:19 45:7,10 45:12,23 46:1,14 49:13,19 50:25 51:1

# 9C05836
# NICK BUBNOVICH JULY 30, 2002

51:4,8,11 53:14,19 53:22 56:15 57:3,16 58:11,18 59:5,9 61:23 62:6 64:10,15 64:20 66:21 67:8,20 68:12,18,25 70:16,17 71:8,11 72:13 77:15 77:16 78:5,7,8,16,23 78:25 80:13,21,23,25 82:3,5,17,17 83:4,5,6 83:7 86:8,23 87:8 92:3,4 98:24 101:5
**programs** 9:13,15 10:10 12:13 14:10,10 14:17 18:19 20:3 21:15,25 22:19 25:5 31:16,21 49:1,2,4,10 52:3,13,16 54:19 56:11,21 58:6 64:4 67:15,16 70:21 71:22 72:7 77:6 78:3,5 80:9 82:13 86:4,20 94:15
**prohibitions** 75:7
**project** 23:3
**projects** 5:23 23:3,5
**promise** 84:14,15,16
**promises** 50:19 84:21
**promoting** 75:8
**promotion** 74:23 75:3
**Property** 20:20
**proposal** 30:24 81:3
**proposed** 17:6 78:22 80:22
**proposing** 78:1
**proposition** 20:14,16 50:1,4,16,22
**prospects** 36:24 50:11 93:20,22,25
**proves** 32:10
**provide** 6:14
**provided** 5:13,17 94:2 97:3
**provides** 61:20
**public** 1:14 54:11,13 104:25 105:4 106:17
**publicly** 8:16 67:18,23
**purpose** 7:8 8:9,24 17:13 26:25 51:7,10
**purposefully** 77:21
**purposes** 52:4 62:1 70:20 99:13
**pursuant** 1:11 106:2
**put** 19:6 49:8 61:25 74:25 76:23 90:1
**putting** 83:19
**P's** 58:24
**P-i-e-r-g-r-o-s-s-i** 11:12
**p.m** 1:18 103:23

**Q**

**question** 11:1 35:2,4 36:1 39:8 40:1 45:4,5 52:14 61:11 76:20 80:23 84:3,10 86:9 87:5 98:23 99:25 101:13 102:15 103:2
**questions** 26:17,18 104:14
quick 98:2[illegible] 10[illegible]

**quite** 32:10 84:2
**quorum** 43:11
**quote** 76:5

**R**

**R** 1:5 2:12 7:3 9:5,11 9:12,18,20 10:14 11:3 18:20,24 19:4 19:11,20,22 20:19 22:3 25:4 27:8 29:13 32:5 34:3,6 36:20 37:1,8,19 38:24 39:1 39:1,3,11,13,20,24 40:8 42:19 44:16 45:25 46:18 47:24,25 51:23,25 53:7 57:3 61:6,10,15 62:10 64:11 67:22 68:6 71:22 72:14 75:8,15 76:1,17 82:10 83:15 90:22 92:2 93:22 98:1 102:20 104:4 105:12
**raise** 88:19
**raised** 44:10 50:17 88:8
**ran** 91:5
**Randazzo** 26:25
**Randolph** 1:16 2:13 105:8
**range** 7:14 68:16 77:2 94:23 95:10,13,17
**ranked** 70:8
**ranks** 47:21
**rate** 26:11 31:10 33:11 35:9 58:13 59:11 60:6,19,21 61:7 62:7 62:11,15,20,23 63:14 63:15,19 64:10 69:3 71:4,5,5,7 74:10,11 87:1,9 88:1,6 89:1 90:6,7 91:25 93:22 102:1,3,20
**rates** 60:2 61:9
**rather** 51:13
**Raton** 68:8
**RCX** 3:2
**RDX** 3:2
**re** 1:4,8 104:3 105:12
**reach** 94:13
**read** 84:10,12 104:9
**real** 39:3
**really** 39:16 52:23 53:3 53:21 79:25
**reason** 7:6 11:17 37:17 49:3 57:5 61:24 65:7 68:6 74:12 82:24 83:21 84:7 86:13 92:15
**reasonable** 48:9 51:18 59:6,9 61:4 63:19 67:10,21 70:15 71:8 71:9 80:9,17 82:7 86:10 87:25
**reasoning** 67:4
**reasons** 37:22 47:19 61:8 99:7
**recall** 15:25 21:21 [illegible] 43:18 44:4 69:10

**receive** 31:18 64:12
**received** 3:11 45:25
**receiving** 95:12
**recent** 102:9
**recognize** 50:16
**recognizing** 98:11
**recollection** 83:18
**recommend** 27:10 29:17 81:16,22
**recommendation** 28:24 29:6 30:19,22 63:13 87:11 94:3,4
**recommendations** 27:3,16 28:6,18,22 29:4,12
**recommended** 27:8 29:19 30:23 34:5 64:9 81:7,19
**recommending** 36:19
**record** 8:13 84:12
**recruited** 37:16,20,21 37:24
**reduce** 101:19
**reduced** 105:19
**reducing** 87:1 100:11
**reduction** 68:20 75:22
**refer** 20:13 22:18 41:21 74:16
**reference** 42:3 48:22 48:23 65:14 69:1 90:13,14,15
**referencing** 41:12
**referred** 7:22,24 50:1 56:22 80:20
**referring** 21:11 22:24 41:4,19,22 48:14 59:16 64:19 65:13,20 72:24 75:24 78:14,20 92:21,25
**refers** 50:4 93:14
**reflect** 31:19
**regard** 25:9 47:23 48:3
**regarding** 5:18 20:1 28:25 54:11 73:1 94:14
**regardless** 37:4
**regularly** 43:10
**related** 23:16 106:6
**relation** 52:19
**relationship** 6:15 50:12
**relative** 64:16
**relatively** 78:23
**relying** 46:25
**remaining** 20:11
**remains** 76:22
**remarked** 71:25
**remember** 16:14 19:14 20:6 30:7 35:22 40:21 42:12 43:12 82:19 92:13 101:8,14 101:21 102:13
**render** 9:20
**reorganization** 40:4 68:21
**repeat** 11:1 39:9
**report** 57:10 59:18
**reported** 1:24 105:17
reporter 4:9 104:17
REPORTERS [illegible]

**reports** 26:5
**represent** 20:21 78:23
**representative** 56:10
**Representing** 2:9,16
**requested** 44:17
**reservations** 10:10
**reserve** 103:20
**reserved** 105:24
**resource** 6:18 12:9
**resources** 11:7 26:23
**respect** 8:19 20:10 29:13,19 31:9 32:4 48:8 49:12,19 51:18 56:14 59:8 60:6 66:21 69:3 80:12 98:23
**respective** 105:25
**respectively** 16:6 62:24
**response** 9:25 20:18 30:9,12,12,15 69:18 69:19
**responsibilities** 6:13 17:16
**restructuring** 17:17 22:9 23:1
**results** 45:2 70:10 72:17,18,22
**retain** 47:13 84:7
**retained** 10:19 44:15 88:2
**retaining** 11:4 45:3,7
**retention** 10:4,15,20 12:5,6,12,17 13:24 14:19 17:1,6 18:7,9 18:12 22:2 23:14 24:12,13,16,17 25:4 26:11,17,24 27:4,11 28:2,19 29:1,14,20 31:9,16,21 33:17,19 33:21,24 34:3,15 35:11,14,17 36:19 40:25 44:12,18 45:13 45:16,23 46:9 49:1 49:12,19,21 50:24 51:1,7,22,25 52:2,3,8 53:3,8,14,18,22 54:14,19 56:14,21 57:2,16 58:6 59:5 78:4,17,23,25 80:13 80:21,23 82:3 85:17
**retirement** 5:18
**retro** 35:19
**retroactive** 35:20 82:8 82:22 83:20
**retroactively** 82:13,18 83:24 84:1,6
**retroactivity** 83:14
**revenue** 93:21
**revenues** 91:25
**review** 9:13 10:3 51:16 89:23 103:21
**reviewed** 13:21 14:16 17:11 32:6 54:14 66:22 67:19
**reviewing** 17:13 57:2
**revised** 19:5 30:14 35:17 44:12
revisions 72:20
reward [illegible]

**rewarded** 48:12
**rewards** 63:9
**right** 4:23 13:11 33:9 44:25 56:9 57:17 69:9 84:21 85:3 89:15,17 97:9 98:7 99:15 103:20
**risk** 103:15
**road** 48:12
**rough** 48:10
**round** 91:8,18
**Rules** 1:11
**running** 2:12 8:4,13,22 10:22 16:22 32:20,23 33:4,13 34:7 35:1 36:1 39:5 40:1,10 49:6 61:11 64:25 67:23 69:7 77:20,25 78:11 90:18 96:23 103:20
**run-of-the-mill** 23:22 23:24 24:21 25:2 56:22

**S**

**s** 3:10 27:18 58:24
**SAITH** 103:22
**salary** 29:22 77:5,15 77:22 78:1 94:22,25 95:6
**sales** 69:4,11 70:9,13 70:19,24 71:4,6 74:10 91:24 93:21
**same** 27:1,7,21 30:4 32:7 33:10 34:4 35:2 35:4,9 49:21 51:23 61:17 62:24 74:4 76:22 89:21
**sampling** 56:8 58:5,8
**saw** 91:25
**saying** 27:23 40:10 88:4 100:23
**says** 36:4 69:24 70:7
**scheduled** 11:18 43:10
**scheme** 52:15
**science** 31:23 32:12 63:8
**scope** 68:22
**seal** 106:10
**second** 6:1 42:24 47:6 70:9 99:16
**security** 73:2
**see** 21:5,8 22:21 33:2,5 62:2 70:6,10 71:14 71:18 75:9 76:7 86:12
**seek** 55:20
**seeking** 37:10
**seemed** 58:19
**select** 55:2,3,7,7
**self-funding** 101:5,15
**senior** 11:8 26:22 42:1 42:3 47:2,9,12,22,25
**sentence** 41:7 71:14 74:16 77:21 78:12,21 93:14
**separate** 43:3 65:9,22 100:18
separately 11:14
September 9:6 [illegible]

9C05836
NICK BUBNOVICH JULY 30, 2002

11:19 14:12,13 44:16 89:9 92:9
serve 26:24
serves 52:9
service 5:10
services 5:13,14,18 6:14
set 29:20 40:5 64:5 91:2 95:18 103:13 106:9
sets 70:25
setting 64:1 71:17 90:16
seven 41:5 96:12
several 22:17 73:25
severance 46:1,6,7 49:2 66:21,22 67:7 67:15,16,20 68:7,11 68:15,17,23 78:16 94:2,24 95:5,10
shake 28:4
shareholder 82:10
shareholders 83:16
shoot 64:17 91:3,7,8 91:11,16,17
shoots 64:18 91:14
short 48:19
Shorthand 104:12
show 20:17 30:9 35:10
showed 15:19 74:11 88:8
shows 54:4
side 10:7,16 25:22,25
Siegal 18:8,18
Siegal's 17:11,22
signature 105:23
signed 7:19
significant 60:7,22 79:19,22 81:2 86:24 87:6 93:11,13
similar 5:24 53:5 71:18 97:4
simpler 21:13
simplistic 53:24
simply 59:9 61:4 67:8 73:10
since 21:23 22:2 33:6 35:9 48:4 74:14 99:25 102:1
sit 83:10
sitting 19:3 29:24 34:2 98:13
situation 24:2 25:10 27:19
situations 23:25 25:16 73:25 82:25
six 87:2 94:6,17 96:12 96:12
size 58:9,9 71:18 79:20
skills 38:1
skinny 10:6,15
slightly 94:21 95:1
smooth 103:14
softer 5:21
solely 35:14
some 10:9,10 11:17 20:5 22:15 23:7 27:23 31:11,25 37:11 37:15 38:3 39:17 40:6 13 49:21 50:24
52:8,11 63:1 68:13 70:22 82:25 91:1 92:11,11
somebody 44:7 52:19 52:20 90:1
somebody's 52:25
someone 23:1
something 13:10 21:22 40:22,23 74:5 94:7
sometime 89:25
sometimes 28:3
somewhat 63:2 103:7
somewhere 31:1
sorry 16:24 32:21 57:9 59:20 70:4 86:3 101:2
sort 5:24 89:21
sound 88:24
South 2:5
speaking 73:4
special 21:14
specialty 58:24 70:1,8
specific 19:21 29:4 38:22 44:10 92:15
specifically 10:3 21:11 47:23 58:2 81:1 97:19
specifics 10:23 45:15
speculation 39:6
speculative 39:19
spell 11:10
spelled 4:10
spoke 19:20 41:17 42:5
spoken 19:16
spun 102:24
squarely 101:22
squed 50:2,17
SS 105:2
stands 15:12 37:17 99:17
start 37:18 48:16 87:5
starting 61:21 62:14 71:10 89:8 102:25
state 1:15 35:24 36:22 36:23 37:4 84:13 105:1,5
statement 75:20 82:2
statements 75:17
states 1:1,12 23:13 71:15 104:1,14 105:10
statistically 46:15
statistics 26:10,14 31:9,19
stay 53:11,23 80:3 83:23
staying 35:13 48:2
stays 52:19,20
stems 24:4
stenographically 105:17
still 71:3 77:1 100:3
stock 38:7,7,8,8,18,23 39:3,12,15,17,20,21 39:24 40:3,6,15 81:3 81:14 82:14,14,23 83:2 84:6,8,16,18,22 84:25 85:2 87:12 92:11,11,17 99:6 11
99:18
strategy 5:20,20,22 9:16
stress 74:9
stressful 73:7,12,19
strictures 75:5
strike 42:2 79:21,22 80:23 91:22
strive 24:14
strong 72:5
strongly 85:6
structure 10:11
submission 28:11
SUBSCRIBED 104:21
subsequent 23:7
substantial 22:25 79:12,16 89:10
substituted 35:2
succession 5:23
suggest 33:16
suggested 13:3 62:18 85:6 102:8
suggestion 89:3
suit 106:7
Suite 2:6
SUMBERG 2:2
summarized 14:18
summary 7:2,7,15,21
summer 87:24
Sunday 64:17
supervisors 50:13
support 6:14
supported 81:13
supporting 6:18
sure 11:12,17 30:7 31:17 32:10 38:17 39:7 41:15 44:22 45:4,20 48:18 52:17 62:9 84:2,23 90:24
survey 65:24 96:11
surveys 54:9 65:8 66:1 96:13,14 97:19
suspension 11:21
swing 60:5,14
sworn 4:1,4 104:21 105:14
S-i-e-g-a-l 17:12

T

T 3:10
table 94:4
take 6:20 7:24 13:8 26:3 28:5 40:18 41:24 44:8 48:17 51:6 53:10,12 59:23 61:5 73:3 89:13 98:21 101:17 103:17
taken 1:14 48:19 89:20 104:10
taking 1:13 106:1
talented 37:3,25
talk 79:10
talked 19:8 34:11 41:9
talking 31:23 32:11 39:16 45:9 47:14,16 49:22 57:16 73:3,10 75:13 83:25 93:1
tangible 50:5
tangibles 50:8
target 15:11 61:2
101:9,13
targets 88:13 93:5,18
task 10:1 51:12
taxes 15:12
TDC 7:2 64:23 65:11 66:5 78:17 96:3
team 7:10 37:9
Telephone 87:3
tell 5:7 10:20 12:4 13:15 55:5 97:21,25
telling 91:15
tempered 62:17
temporarily 50:21
tend 20:15 50:15,15,24 91:11
tends 103:14
term 63:24
terms 9:21 11:4 12:7 13:13 14:9 16:19 25:4 45:2,22 49:5 52:25 53:7 59:11 63:14 75:21 85:18 98:2
test 14:4 49:9
testified 4:4 18:3 19:16 41:25 42:22 44:20 69:7 71:23 72:8 73:22 81:12 87:19 91:10 96:5
testify 81:1 105:14
testimony 26:6 44:9 77:10 80:8 81:21 82:1 105:16,21 106:9
Thank 32:24
their 7:12 9:13,21 10:1 10:9,20 11:4 12:4,6 12:17 14:3,16,23 15:17,18,21 20:2,11 28:19 29:11,13 33:25 34:9 38:3,4 41:15 45:13 47:2,6 51:13 51:14 52:25 53:1,4 54:5 58:9,25 59:11 63:7,9,13,18 67:15 67:20 68:19 73:18 80:9 86:20 88:11 90:9 103:10
themselves 10:18
thereof 106:8
thing 27:1
things 10:2 14:5 17:1 20:15 37:23 45:18 50:5,10 52:21 83:25 100:8
think 10:17 14:1 15:14 15:22 23:11,19 24:23 29:21 32:20 34:7 37:16,23 44:20 52:12 53:4,9 57:6,17 58:8 58:16 61:4,14,20 62:14,22 66:18 67:19 71:9,25 76:21 82:24 87:19 88:21 89:6 91:4,11,12,19,19 97:11 99:25 101:3,6 102:6 103:18
thinking 51:15 73:21 83:1 84:24 98:6,15 98:19
third 5:16
though 53:13 54:6,18 79:24 80:12 81:20 84:21 91:15
thought 10:6,20 12:24 13:10 15:10,16 25:15 26:23 29:9 32:3 81:17,21
three 4:19 18:4,14,17 22:18,21 23:6 26:4 29:21 91:6 92:5 94:24 95:6,12,22
three-year 15:21 59:1 59:24 60:5 61:1 71:10 83:6 92:8
through 59:25 60:25 61:1 77:23 81:6 89:16,18 90:2 102:11 102:22 103:4,5,10
tie 46:7
tiers 29:21
Tiger 64:17
time 7:19,21 9:7,18 12:5 13:20 15:4 16:7 21:24 26:13 27:25 30:24 44:15 46:1 47:18,18 51:6 59:24 59:25 60:9,16 61:1 69:2 84:24 85:5 86:22 87:23 88:17 89:10,24 91:3 94:4 102:5,16 103:14,23
times 48:11 73:25
today 7:1 19:3 34:2 35:25 36:9,13 39:4 83:23 99:12,17
together 11:13
told 10:5,14 12:22,25 13:9,12 15:8,10 26:25 27:1 28:19 31:4,13 37:8,15 73:17,22 81:13 91:7 91:18
top 28:2 30:1 64:23 66:6 78:18 96:2,5 97:6,22,25 98:7,11
tort 23:10,16,18,21 24:2,19,25 25:10,14 25:20 26:9 38:10,14 49:13,24 54:15,22,24 55:11,16 56:5,12,17 57:8,9,20 59:7 72:2,4 73:25 77:5,19 80:7 98:2
total 7:2 56:3 97:7
Touche 4:15
to-wit 105:7
transcript 103:21 104:10,13 105:21
Transcription 105:20
travel 11:21
treated 8:21
tried 55:24,25 56:1
trip 11:20
troubled 22:19
true 32:4 52:11 60:4,9 62:5 64:9,13 70:24 76:23 79:2,25 81:10 84:25 85:4 102:2 105:20
trust 6:12,14

9C05836

NICK BUBNOVICH JULY 30, 2002

truth 72:6 105:14,15 105:15
try 21:12 55:23 64:6
trying 24:23 31:1,4 65:4 89:12 90:21
two 4:19 16:4 38:22 43:20 55:24 56:15 65:25 71:12 74:18 78:5 86:24 87:6,15 95:6,22 98:4,5,15,16 100:13,17,25 103:12
type 50:24
types 22:23 45:18 86:2 86:3
typewriting 105:19
typical 5:22 71:17 77:17 94:23 95:10

U

ultimately 27:17
unable 38:2
unavailable 55:20,22
under 33:20 45:18,25 46:9,13 52:1,9,13 61:22 64:8,9 66:11 68:20 71:13 75:11 76:17 78:11 81:14 87:7 88:13 90:10 100:2 101:7,10,12
understand 4:21 7:20 39:7 45:4,20 76:9,13 77:13 84:2 99:9
understanding 8:1 38:23,25 42:9 63:17 65:23 68:5 76:15
undertake 34:22
undertakings 8:17
undertook 9:25 48:25 89:11
undetermined 105:10
Union 60:9,20
united 1:1,12 23:12 104:1 105:10
unless 39:17 83:3
unreasonable 92:1
until 14:15 22:2
upbeat 74:13
use 65:5 70:22 73:14 86:16,17 88:16 90:2 96:13
used 49:9 54:8 56:8 57:9 65:3,6,19 71:13 97:15,17,18
using 63:6 71:6
U.S 12:14
U.S.G 26:23 27:18,22 31:12 35:16,18,23 56:19 57:12 98:20

V

vague 36:2
value 71:16 84:9 85:1 92:20
variation 27:21
varies 52:21
variety 47:19
various 31:5 51:14 60:6 [illegible]
versus 2[illegible]:22 36:8
very 45:5 53:24 54:10 60:7 68:22 72:5 86:15 91:1,12,13,14 102:23 103:17
vice 11:6,8 26:22
view 90:7 95:8
views 14:23 15:3
Virtually 93:17
voluntarily 30:25

W

W 1:5 7:3 9:5,11,12,18 9:20 10:14 11:3 18:20,24 19:4,11,20 19:22 20:19 22:3 25:4 27:8 29:13 32:5 34:3,6 36:20 37:1,8 37:19 38:24 39:1,1,3 39:11,13,20,24 40:8 42:19 44:16 45:25 46:18 47:24,25 51:23 51:25 53:7 57:3 61:6 61:10,15 62:10 64:11 67:22 68:6 71:22 72:14 75:8,15 76:1 76:17 82:10 83:15 90:22 92:2 93:22 98:1 102:20 104:4 105:12
want 22:12 30:8 47:13 50:6 53:1 68:24 79:14
wanted 12:19,22 20:23 41:13,14 44:22 94:16
wants 68:6
wasn't 25:19 44:12 84:20
way 28:16 37:3 49:9,18 50:20 61:14 84:13 88:23 89:4 106:6,7
ways 56:17
week 7:16,17
weeks 4:20 68:13,15
weigh 20:15
well 7:10,22 12:19 13:12 14:1,12 15:5 16:15,21 17:7 18:8 18:18 19:8 22:13 29:19 30:1,21 31:22 32:13 33:17,22 34:1 36:3 39:13 40:3,24 41:16,16 43:10 45:9 45:12 46:25 51:3 53:9,17,20,24 55:7 56:16 62:13 63:15,21 65:5,24 66:5,17,17 69:7,13,17 70:19 71:23 73:14 77:20 78:2,7 86:4,10,19 88:23 90:21 93:19 95:5 96:25 97:13,17 98:9,13 99:11 100:13 103:11
went 35:18 84:23 103:4
were 4:22,25 5:4 6:4 6:13 7:15 9:7,14,15 10:1[illegible] 14 19 11:18 12 [illegible] 14 14 [illegible] 15:3 16:18 17:22 18:14,19,23 20:3 22:12,23,23 23:9,14 23:16,16,17 26:5,12 27:14,16 28:8,10,13 28:15,18,23 29:5 30:3,5 31:2 33:9 36:15 40:13 41:22 42:2 43:19 44:15,16 44:23 45:13,18,21 46:6,12,13,14,21,22 46:22 48:4 51:3 54:7 54:8,15 55:13,16,25 56:13 57:2 59:2 63:4 66:5 67:7,9 68:19 69:2 71:20 72:12,17 73:18,21 75:1,13 78:14,15 79:8 82:21 84:14,21 86:8 89:7 89:10 96:6,8,14 102:25 106:3
weren't 18:19
WHEREOF 106:9
while 9:14 37:1
whole 20:23 63:3 105:14
Wilcox 56:1
William 66:1
willing 24:24
wishes 94:14
witness 3:2 4:1,3 33:5 33:15 34:11 36:3 39:7 40:3,13 65:5 68:1 69:10 78:4 84:13 105:13,17,18 105:22
wonderful 53:21
Woods 64:18
word 73:14 91:22 96:19
words 39:23 49:8 51:21 101:15
work 6:8 9:18 22:16 46:12 50:7 73:8,15 73:18
worked 21:20 22:4,6 23:9 26:9 31:11,15 33:17
working 6:4,5 7:16 21:24 26:24 28:20 35:11 46:21 73:12 75:10 89:8
worse 36:4 97:1
worth 92:5
worthless 84:17
wouldn't 51:16 53:12 77:17 86:10 89:21 102:18
write 20:7 50:20
wrong 64:2 74:5

X

X 3:1,10

Y

year 59:25 71:11 72:14 74:17 83:3 91:5 93:8 100:22 102:6
years [illegible]
102:21 103:5
year's 92:5

$

$2 79:21
$6.7 79:4

0

01-01139(JFK) 1:6 104:5
084-003212 1:25

1

1 3:13,15 8:8,11 13:4 14:8 17:7 54:4
1-1 14:19
10 15:10 16:8 57:23,24 58:5 63:16,21 69:1 69:17,21 70:2,2,3 87:1,10 88:6,19,19 89:1,15 90:2 91:20 92:1 98:25 99:3 100:12 101:10,19 102:5,16,20
100 22:13 82:15 87:22
11 1:4 14:3 20:9 21:16 21:25 22:3 23:8,15 23:16,18,21,23,24 25:2,24 26:12 31:10 31:14 37:12,18 38:10 38:16,19 49:13,20,22 49:23 50:1,15,23 51:2 54:15,24 55:12 55:16 56:4,21,23 57:7,19 66:20 67:1,2 67:5,6,9,12,14 68:4 70:1,8 71:17 72:3,3 73:15 74:6 75:6,10 77:4,18 98:3 104:3
11th 92:9
118 19:13,17 32:20,21 33:10
12 7:20 65:14 90:4 96:18
12th 11:19 14:12,13 89:9
12:40 1:18
13 72:24 74:20 76:4 77:3
14 58:13 59:10,23 62:25 78:20 80:8
15 5:2,2 57:23,24 58:5 70:3 71:15 81:1 88:19
16 54:11 64:23 66:6,9 78:18 96:2,5 97:6,22 97:25 98:7,11
17 92:21 93:3,17
18 32:17 94:2
19 94:20 95:4
1992 59:25 102:1,21 103:1,5
1996 21:21,23 22:2
1997 102:22
1998 16:8 102:6,13

2

2 [illegible]
33:3,4 41:5 90:4
2.68 60:12
20 6:2 24:5 30:6 57:23 96:1 97:16
200 1:16 2:5,13 22:14 105:8
2000 60:1 62:19 69:5 70:10 102:4 103:5
2001 9:6,17 12:2,21 13:14,24 16:2,5,10 35:23,25 36:8,16 44:16 46:11 62:20 69:5 70:10,25 72:14 72:17,17,18,21 74:12 78:24 81:14 85:5 87:24 89:16,16 91:25 100:2 101:10
2002 1:17 7:20 12:21 13:14,24 16:5 36:9 78:24 89:17,18 90:2 101:12 103:1 104:12 104:23 105:7 106:11
2003 13:4 14:20 17:7 78:22 81:15 89:16
2004 78:22 89:18 90:2
21 3:14
2230 1:8
24.49 60:10
25 29:21 30:20
2500 2:6
288-3376 1:22

3

3 33:4
3:40 103:23
30 24:5 30:19 104:12
30th 1:17 105:7
305 2:8
312 2:15
33131-2336 2:7
375-6129 2:8

4

4 3:4 16:10 30:19
4th 7:17 12:1 14:16
4.6 79:3
40 24:5 30:6 93:7
48.40 60:20

5

50 22:19,25 23:2 29:21 30:19,20 56:24 79:4 79:6 87:21,21
50th 96:6
50/50 81:3,23 87:12 92:12
59 91:7

6

6 87:10 88:7 89:2 95:3 98:25 99:3 100:12 101:6,11,19,22 102:8
60 56:24 66:22,25 67:2 67:5
60's 91:8
60601 2:14
65 30:2

**9C05836**
**NICK BUBNOVICH JULY 30, 2002**

**7**

70 91:4
70th 96:6
70/30 92:12
72 91:13
77 60:18
78 91:14,17

**8**

8 3:13 48:23 59:15 90:4
8th 7:18
80 64:17,18 91:11,14 91:17
80/20 92:12
800 1:22
85 29:22 30:19,20
861-2200 2:15

**9**

9 48:14,16,22 49:12
9C05836 1:23
92 60:8 102:11
93 60:16
94 60:9
95 60:16
97 102:11