Page 3

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2    -----------------------------------------------
 3    In Re:
 4    W.R. GRACE & CO., et al.,
 5              Debtors.
 6              CHAPTER 11
              Case No. 01-1139 (JKF)
 7            (Jointly Adminised)
 8    -----------------------------------------------
 9
10
11
12
13
14
15    DEPOSITION OF:    PAUL J. NORRIS
16    DATE:             AUGUST 1, 2002
17    TAKEN BY:         ALVIN LODISH, ESQ.
18    REPORTED BY:      MARIANNE HEWITT, CSR
19
20
21
22
23
24    FINAL COPY, SIGNED  08/02/02
25    JANE ROSE REPORTING    1-866-ROSE-NYC
```

**Page 3**

```
 1              STIPULATION
 2          It is stipulated and agreed by and between
 3    counsel for the respective parties that the filing of
 4    this deposition with the Clerk of Court be and the
 5    same is hereby waived.
 6              - - - - - - -
 7    Whereupon,
 8              PAUL J. NORRIS,
 9    called as a witness, having been first duly affirmed
10    to tell the truth, the whole truth, and nothing but
11    the truth, was examined and testified as follows:
12          EXAMINATION BY MR. LODISH:
13      Q    Mr. Norris, could you please give us
14    your full name.
15      A    Paul Julius Norris.
16      Q    Okay.  And what is your current
17    address?
18      A    You want my personal address?
19      Q    Yes.
20      A    12649 Golden Oak Drive, Ellicott
21    City, Maryland 21042.
22      Q    Thank you.  Mr. Norris, you're the
23    chief executive officer of W.R. Grace; is that
24    correct?
25      A    That's correct.
```

**Page 2**

```
 1          The deposition of PAUL J. NORRIS was held
 2    on Thursday, August 1, 2002, commencing at 3:00 p.m.,
 3    at the offices of W.R. Grace & Company, 7500 Grace
 4    Drive, Building 25, 2nd Floor, Executive Board Room
 5    235, Columbia, Maryland 21044, before Marianne R.
 6    Hewitt, Notary Public.
 7
 8    APPEARANCES:
 9          ANDREW R. RUNNING, ESQUIRE
              On behalf of Debtors, W.R. Grace &
10            Company
11          ALVIN LODISH, ESQUIRE
              On behalf of Official Committee of
12            Asbestos Property Damage Claimants
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1      Q    Okay.  Do you hold any other titles
 2    with W.R. Grace?
 3      A    Chairman and president.
 4      Q    Chairman of the board.
 5      A    Yes.
 6      Q    Okay.  How long have you been with
 7    Grace?
 8      A    Since November of 1998, in this
 9    position.  My -- I was with Grace from 1971
10    through 1981.
11      Q    Okay.  All right.  And if you could
12    briefly just tell me where you were between when
13    you left Grace and came back.
14      A    I went to work for Engelhard
15    Corporation in 1981 in their petroleum refining
16    group.  Ultimately became the president of their
17    catalysts and chemicals business.
18          And in 1989 I joined AlliedSignal as
19    the president of their fluorine products business
20    and held that position until the middle of 1990
21    -- let's see, middle of 1994 when I became the
22    president of the Polymers business.
23          And in 1997, January of 1997 the
24    president of their specialty chemicals business.
25      Q    Okay.  And then you left there and
```

Page 5

1  joined Grace in November of 1998.
2      A    That's correct.
3      Q    Okay.  And, again, just to make sure
4  I'm clear, the titles that you hold today are
5  those the titles that you received when you were
6  hired by Grace in November of '98?
7      A    I was president and chief executive
8  officer when I was hired, I became chairman the
9  follow -- that January, so.
10     Q    January of 1999.
11     A    January of 1999.
12     Q    Okay.  When you were hired by Grace
13  the second time around, November 1998, was
14  bankruptcy at all contemplated at that point in
15  time?
16     A    No.
17     Q    Okay.  Mr. Norris, did you attend the
18  hearing on July 22nd before the bankruptcy court
19  when the motion was originally discussed to
20  revise the compensation plan?
21     A    Yes.
22     Q    Okay.  So you were able to hear the
23  court's comments and the issues that were raised.
24     A    Yes.
25     Q    Okay.  Who was it at Grace that

Page 6

1  decided that the original retention and
2  compensation plan that had been approved by the
3  court in April of 2001 should be revised to give
4  increased benefit to the key employees?
5      A    Well, the that decision was made by
6  the Grace compensation committee upon my
7  recommendation following discussions by Brian
8  McGowan and a number of internal, you know, human
9  resource personnel and our outside consultants.
10     Q    What were the issues or concerns that
11  triggered the revision process?
12     A    Well, the first is that the current
13  plan was put in place in January of 2001 for a
14  two-year period and so the current plan expires
15  at the end of this year.
16     Q    Okay.  Well, setting aside any issue
17  about continuing the current plan, the revisions
18  which would increase the benefits, what
19  precipitated those issues or concerns?
20         MR. RUNNING:  Are you focusing on the
21  retention plan?
22         MR. LODISH:  Well, on actually all of
23  the -- I'm focusing on the plan in general.
24  BY MR. LODISH:
25     Q    One is the retention, the long-term

Page 7

1  incentive, as well as the severance package
2  because all of them have revisions that would
3  offer more benefits.
4         So if they were addressed at
5  different times then, you know, you can tell me
6  that.  I was trying to get a feel of when it came
7  up that the current plan should be revised to
8  provide greater benefits, when did that come up?
9      A    Well, that discussion began actually
10  with the original plan when we reviewed the
11  retention benefits offered to companies in
12  Chapter 11, even though we were not in Chapter 11
13  at the time and really weren't sure if we were
14  going to have to file for Chapter 11, we felt and
15  our board agreed that the uncertainty would be an
16  environment where it was very important for us to
17  keep or key employees, our key leaders.
18         So we agreed, I believe at a late
19  November meeting in 2000, to put the original
20  retention plan in place at that time.
21         We had advice from Price Waterhouse
22  Coopers as to the appropriateness of that plan
23  for companies who were in Chapter 11, so that our
24  board is always very concerned about our
25  compensation practices being appropriate and

Page 8

1  consistent with industry and other peer
2  evaluations.
3         So we had a lot of conversations
4  about the risk and uncertainty of employees
5  during that period.
6         The PWC analysis was that the
7  original plan except for the up front cash
8  payment to the senior leaders was sort of the
9  middle of the road to the lower appropriate level
10  for companies in Chapter 11.
11         So at that time we thought it was the
12  right level, given the fact that we weren't sure
13  if we were going to file, and given the fact that
14  by making the up front payments we significantly
15  reduced the risk or fear more than risk, the
16  anxiety that people had if we put in a plan it
17  may not ultimately be approved by the court, and
18  so they may not ultimately get the benefits.
19         So even at that time we were
20  discussing whether the size of the payments was
21  the right number, I mean given the circumstances.
22     Q    Okay.
23     A    So when we revisited it we obviously
24  also had concerns about whether the amounts were
25  the right amounts.

Page 9

1      Q    Okay.  And I assume that what you
2  were just referring to was the original plan that
3  Price Waterhouse had reviewed it, consulted with
4  you and the original plan was what you came up
5  with when you were contemplating that bankruptcy
6  may be coming in order to make your employees
7  feel, you know, more secure, better about what
8  was happening with the company; is that accurate?
9      A    No, that's correct.  I think there's
10  a high level of anxiety throughout the company.
11  And I made, you know, many visits to individual
12  sites, both inside and outside the U.S.
13          It was a significant issue at our
14  town meetings, which we hold regularly, and a
15  serious concern of the key leaders.
16          You know, many who were trying to
17  make decisions about whether they wanted to stay,
18  how much risk did this have for their, you know,
19  personal careers?
20          And so it seemed like the best way to
21  maintain the continuity of the leadership.  And I
22  think it worked because I think we were able to
23  achieve our goal.
24      Q    Okay.  So I take it a good bit of
25  thought was put into the original plan that was

Page 10

1  submitted prior to it being submitted to the
2  bankruptcy court.
3      A    That's correct.
4      Q    Okay.  And your assessment today is
5  that that worked effectively and helped quell
6  some of the concerns.
7      A    Certainly to this point.
8      Q    Okay.  Has anything specifically
9  happened since the plan was approved and now that
10  you've been living under bankruptcy for a little
11  over a year that caused you to want to increase
12  the benefits?
13      A    I think that specifically people are
14  -- now have comfort that the company can operate
15  under the normal course, but the key leaders are
16  expressing more concern about the long-term
17  career opportunities at the company due to a
18  limited growth prospects because of our
19  constraints.
20      Q    And how do the revisions in the plan
21  as proposed quell those fears?  Doesn't that
22  really go to more as what's going to happen with
23  Grace after bankruptcy?
24      A    Well, there is two things.  One, in
25  designing all of our plans, we want our employees

Page 11

1  to recognize the fairness and they test the
2  fairness by viewing things outside.
3      Q    We bring in outside advisors to
4  ensure that the information that we have
5  represents a view from across the industries or
6  multiple industries where our employees might
7  find opportunities.
8          So in looking at that information we
9  then devise a plan for what's the right level of
10  compensation for an individual at base salary in
11  a particular position, what's the appropriate
12  annual incentive, what is the targeted cash
13  incentive?
14          And then in the case of Chapter 11
15  and looking at other companies in our situation
16  what's the appropriate retention?
17          We package that together to look at
18  their overall compensation and say given our
19  circumstances and performance is that the level
20  at which we feel is most appropriate?
21      Q    Okay.
22      A    And in doing that we come up with a
23  judgment by category and by individual.
24      Q    When you put together the original
25  plan which was approved by the court without

Page 12

1  objection, at the time that you were doing that
2  you were already aware that the stock price of
3  W.R. Grace was going down, and I believe based on
4  your affidavit due to the large number of
5  asbestos claims; is that accurate?
6      A    Certainly that was a factor, if not
7  the main factor.
8      Q    Okay.  Well, do you believe it was
9  the main factor for this?
10      A    I certainly believe that people's
11  concern over our liabilities, primarily personal
12  injury asbestos was the main factor.
13      Q    Okay.  So at that time you were aware
14  that any stock option plan was going to be very
15  speculative at best, right?
16      A    No, I think at that time -- in fact,
17  we felt that because we were unsure and perhaps
18  may even roll over and secure our banks and
19  decide to pursue activities outside Chapter 11
20  for a period of time, that the stock options
21  might have some value.
22          And not to issue stock options at
23  that time would have -- might have sent an
24  incorrect message to our employees and to the
25  outside world that, in fact, we made a decision

Page 13

1  that we really hadn't made yet.
2      Q    Well, did you have an understanding
3  as to what the value would be of those stock
4  options if you did, in fact, file for bankruptcy
5  which was certainly being contemplated at that
6  time?
7      A    Yes, we understood that in all
8  likelihood the stock options would have no value.
9      Q    Okay.  And even though you understood
10 that then you didn't take that into account in
11 the original plan that was submitted to the
12 bankruptcy court.
13     A    No.  I would say that in all of these
14 issues that the board took into account sort of
15 the total compensation in all of the activities
16 which we were doing for our employees.
17          And the fact that we put in the
18 retention plan we felt mitigated some of the risk
19 of the long-term compensation plan at that time.
20          And I have to say that the
21 inexperience, if you will, of the management team
22 with Chapter 11 probably was the cause of not
23 correcting this at the time we filed.
24          And frankly our attention was focused
25 on much bigger issues for the company.  And so,

Page 14

1  you know, when we looked at the files of first
2  day papers we put these in directly as had been
3  approved rather than trying to make changes that
4  might be -- make the plans better in light of the
5  fact that we actually filed for bankruptcy.
6          And you have to recognize that there
7  was a tremendous amount of activity at that time
8  and although this is certainly one of our most
9  important issues in terms of compensating our
10 employees, we picked up a lot of plans and filed
11 them as they existed at that time rather than
12 looking at each one of them to see how much we
13 should change it relative to filing for Chapter
14 11.
15     Q    Okay.  Do I understand you correctly,
16 Mr. Norris, in that after you filed for Chapter
17 11 and sought and got approval of the original
18 plan you learned more about what the
19 possibilities may be of a company in Chapter 11
20 in terms of what you could do with a retention
21 and compensation package?
22     A    No, more the other way.  I realized
23 that the limitations of the previous retention
24 plan and of the original long-term incentive
25 plan, LTIP.

Page 15

1      Q    Okay.  Well, it sounds like, Mr.
2  Norris, that it's not that there was anything
3  wrong with the original plan because as you've
4  already indicated that it seemed to have quelled
5  the fears and been successful, that you then
6  realized that there was more that you could do
7  and that you want to do more for the employees if
8  you can.
9      A    Well, it's more that we should do
10 rather than there's more that we could do.
11          We felt, again, given the risks and
12 the opportunities for the company that it was
13 appropriate to do more.
14          Every time we decide on a
15 compensation level particularly for an existing
16 employee, we take into account the environment,
17 the opportunities that are available, and the
18 risk and the cost of the company if that employee
19 were to leave.
20          So in this case, we believe that the
21 value creation for our stakeholders is to create
22 as much EBITDA with as good as growth rate to
23 create the highest enterprise value multiple.
24          And so to do that we believe that
25 this key employee population is critical, and

Page 16

1  that the leverage exists on the absolute earnings
2  level and the growth rate because particularly
3  the retention payments will be eliminated from
4  people's consideration at the time that we
5  reorganize because they'll not be an ongoing
6  cost.
7          So the opportunity to achieve greater
8  leverage on the enterprise multiple made it
9  appropriate for us to ensure the continuity
10 because these jobs many of them have extremely
11 high leverage, and we don't have built in
12 replacements for most of these key positions.
13          So in selecting the people that went
14 into the retention program, one of the key issues
15 was how do we provide a backup, if you will, in
16 the event that one person left so that we could
17 minimize the disruption?
18     Q    Well, was it your intention under the
19 new plan to give the key employees a better
20 benefit than they would have had if the company
21 hadn't gone into bankruptcy?
22     A    No.
23     Q    Okay.  Looking at the long-term
24 incentive plan, for example, the significant
25 changes in the long-term incentive plan appear to

US District Court - Delaware          **FINAL**          Paul J. Norris
Chapter 11 - W.R. Grace                                  August 1, 2002

Page 17

1   be threefold.
2           One is to reduce the EBIT and it's
3   actually not EBITDA for that purpose, but the
4   EBIT --
5       A   That's correct.
6       Q   -- from 10 percent to 6 percent.  To
7   make the payments all cash with no stock
8   component, and also to award incentives for
9   anything over zero percent growth.
10          Are you aware of that?
11      A   Yes.
12      Q   Okay.  Prior to bankruptcy do you
13  believe that you would have awarded your
14  employees in long-term incentives for some growth
15  but less than one percent growth?
16      A   The reason that people choose equity
17  plans rather than cash long-term incentive plans
18  because the horizon is quite long.
19          And so the awards are made every year
20  based on a targeted cash basis converted by some
21  multiple into equity.
22          And people have the expectation that
23  over the 10-year period they'll be able to
24  achieve the value, and the company is not making
25  the award based on the actual performance in that

Page 18

1   year or even in the last three years.
2           The company is basing the award on
3   targeted compensation with the expected value to
4   occur in the future.
5           And then typically that value gets
6   vested, the options can't be exercised for a
7   period of, you know, three years.  They vest
8   usually one-third each year for three years.
9           So the company is actually awarding
10  the expected value even in a year in which the
11  income declined.
12      Q   And is that something that you would
13  have done before bankruptcy?
14      A   Yes.
15      Q   Now, another significant component is
16  the fact that you're going to pay 100 percent
17  cash as opposed to a stock option.
18          Now, all stock options are
19  speculative, correct?
20      A   Yes.
21      Q   Because you have no idea what the
22  value of the stock is going to be.
23      A   Correct.
24      Q   Or what's going to happen.  So aren't
25  you guaranteeing the employees.

Page 19

1       A   No.  Again, I think the shortness of
2   the horizon, the fact that it's not relative to
3   what's going on in the rest of the marketplace
4   means that me personally and I think most of our
5   employees would choose to have had their awards
6   in the form of options as originally proposed,
7   but the company's performance relative to its
8   peers and its long-term opportunity be the basis
9   of their award rather than a specific
10  mathematical formula over a three-year period.
11          For example, if you have one bad year
12  or two bad years in a plan of this nature you
13  have zero payout.
14          In the third year you could have a
15  very good performance, not enough to offset the
16  other two, but in the stock market in the third
17  year you can have a good stock market, you can
18  have good performance better than your peers, the
19  stock will appreciate substantially and you are
20  the beneficiary of receiving options at low
21  prices during periods when performance of the
22  company and its industry was low.
23      Q   So are you saying that other than
24  during a situation like bankruptcy you wouldn't
25  be looking at how peer companies performed, you

Page 20

1   would just be looking at your own performance in
2   determining what incentives should be --
3       A   No.  As I said, The long-term
4   incentive -- you have to understand that if I
5   took your salary and I said I'm going to give it
6   to you in three pieces.
7           I'm going to give you a fixed monthly
8   salary that if you stay here and you show up and
9   you just do your good job, I'm going to make sure
10  you get it.
11      Q   If you're breathing.
12      A   If you're breathing.  Well, hopefully
13  we expect more than that.
14          And there's a piece that if the
15  firm does well this year you have an opportunity
16  to get an increase depending on how well the firm
17  does and how well your department does.
18          And I'm going to give you some
19  partnership shares every year, but the
20  partnership shares only create value if the
21  firm's value goes up overall.  And it's only
22  worth what people will pay for it at the moment
23  in time in which you want to sell it.
24          So the partnership shares that I'm
25  giving you are based on a cash number that was

Page 21

1  the collection of those three pieces.
2          And so when I give it to you you
3  didn't earn it really that year except that I've
4  agreed that that's the number of shares that I'm
5  going to give you because it represents the
6  long-term piece of your total compensation.
7          I don't know if that's --
8      Q    Okay.
9      A    -- clear but so it isn't, in an
10  equity plan, it isn't the performance of the
11  company over the last three years or even any
12  formula over the next three years, it's a fixed
13  amount based on your position and your agreement
14  when you took that position that you would be
15  willing to accept that much of your compensation
16  tied to the equity of the company.
17     Q    Did you contemplate as opposed to the
18  100 percent cash payment alternative to giving
19  equity once Grace comes out of bankruptcy?
20     A    Well, I'm assuming that when Grace
21  emerges it's likely that this cash plan will be
22  converted over time back to equity.
23          Again, that's speculative since
24  reorganization plans, as I understand it, are
25  widely different.  And it's almost impossible to

Page 22

1  predict at this stage exactly the form of our
2  reorganization plan.
3      Q    But did you consider for those people
4  who would stay and hang in there with you during
5  this time of giving them an additional equity
6  interest after bankruptcy as opposed to
7  essentially guaranteeing these payments now?
8          MR. RUNNING:  You're saying in lieu
9  of the proposal of the changes.
10          MR. LODISH:  Yeah, in lieu of the
11  proposal of the changes that were submitted.
12          THE WITNESS:  We discussed with our
13  advisors, particularly our financial advisors,
14  the possibility of using some form of equity and
15  their response was that it was extremely unusual
16  and it would be impossible to get the creditors
17  to agree in advance to equity and to be able to
18  in any way value how much equity there would be
19  relative to paying off all of the creditor's
20  obligations.
21          Plus as you know, these bankruptcies
22  have -- there's a very difficult process to
23  estimate timing.
24          And so we felt that it was more
25  important to try and motivate people to generate

Page 23

1  performance while we were in bankruptcy than to
2  focus them, you know, really specifically and
3  totally on our emergence.
4  BY MR. LORDISH:
5      Q    Okay.  Mr. Norris, who do you
6  consider to be the key employees as defined under
7  the plan?
8          MR. RUNNING:  Which plan now?
9  BY MR. LODISH:
10     Q    Under the long-term incentive plan.
11     A    We have about 300 employees, they are
12  the same group of employees who would have
13  previously been in our stock option plan.
14     Q    Okay.  And what is your understanding
15  as to what makes somebody eligible to be in that
16  group of 300?
17     A    Well, it's usually two things.  One
18  is your grade is usually necessary but not
19  sufficient condition.
20          At some level, I guess if there is a
21  level at which if you have a certain grade you
22  were hired with an expectation of having a
23  package of compensation that would include long
24  term and so you would be in that plan normally.
25          There are another group of people who

Page 24

1  have key positions and anywhere from 20 to 25
2  percent of the next lower grades, if you will,
3  would be then included in the option plan on the
4  basis that their jobs are such that we want them
5  to have additional incentive.
6      Q    Okay.  Well, you said you have a copy
7  of your affidavit in front of you; is that
8  correct?
9          It's also part of Exhibit Number 2,
10  but it might be easier just to look at your own
11  copy.
12          In paragraph 2 you indicate the
13  debtors' key employees at this time are 118
14  employees.
15     A    Well, these are people that are in
16  the retention plan.
17     Q    Okay.  So in this paragraph you're
18  talking about the retention plan.
19     A    The retention plan.
20     Q    Okay.
21     A    And I think the only place we -- I
22  thought we defined key employees as being in the
23  retention plan versus participants of the
24  long-term incentive plan, but I may not be
25  precise.

Page 25

1    But when I was referring to key
2  employees a moment ago I was referring to the
3  population in the long-term incentive plan.
4    Q.    Okay.
5    A    And this group is in the retention
6  plan.
7    Q.    Okay.  Do you know the difference --
8    MR. RUNNING:  Just for the record, it
9  is defined on page 2 of the initial memo.
10    MR. LODISH:  Right.
11    MR. RUNNING:  It's relating to the
12  retention plan.
13    THE WITNESS:  The people that are in
14  the -- the key employees in the retention plan,
15  number one, we started with the leadership team,
16  which is about, you know, 12 to 14, depending on
17  individuals.  Mostly my direct reports and some
18  other key positions.
19    The general managers of the larger
20  businesses, and then selected key sales,
21  marketing and operations personnel, and then key
22  administrative personnel, either finance, legal,
23  environment, health and safety, those functional
24  areas.
25  BY MR. LODISH:

Page 26

1    Q    To come up with those 118 did you
2  look at particular individuals to determine
3  whether they should be eligible or did you look
4  at their position?
5    A    We solicited from the leadership team
6  the people that they felt would be critical
7  either because of the specific position or their
8  ability to fill a position in the event that
9  another individual left.
10    Q    Now, I understand, again, based on
11  your affidavit looking at paragraph 3 that five
12  of the key employees for purposes of the general
13  retention plan had left since the plan was
14  approved by the court in April of 2001.
15    Isn't it true that that number
16  leaving is within the Grace's historical
17  attrition rate?
18    A    I believe that's correct.
19    Q    Okay.  Sitting here today, do you
20  know of any other of the key employees who are
21  going to leave, who said that they're going to
22  leave?
23    A    None have resigned.
24    Q    Okay.  Is it your understanding that
25  those five key employees have been replaced?

Page 27

1    A    Not entirely.  I know that as we do
2  in many times, two I believe we have reorganized
3  the work because we decided that we could do the
4  work with the existing key employees.
5    And the other three were replaced
6  from outside hires.
7    Q    And to the best of your knowledge,
8  Mr. Norris, are you satisfied with the work of
9  the three people that you secured from the
10  outside?
11    A    Yes.
12    Q    So your experience to date under the
13  original plan that you put together and was
14  approved by the court is that the attrition rate
15  has not been any different and replacements
16  you've been able to get have worked out
17  sufficiently, correct?
18    A    Except for the time and cost and
19  potential loss during the period when the
20  positions were vacant and during the period when
21  the new individuals were learning their jobs.
22    Q    Well, that would be true at anytime
23  whether it's bankruptcy or other times, wouldn't
24  it, if you lost five people?
25    A    Anytime we would lose an employee in

Page 28

1  this category, that's correct.
2    Q    Okay.  Is there anything
3  extraordinary about any of these positions that
4  cost the company more time or energy than other
5  employees that you've lost in the past that would
6  be different?
7    A    I think the only thing that's
8  different that we know that one from personal
9  knowledge left because of the bankruptcy, he was
10  the plant manager of our largest plan in the U.S.
11    And it did cause difficulty and,
12  obviously, I think we lost productivity.  And
13  it's almost impossible to determine losses and
14  sort of gains, if you will, momentum during that
15  period.
16    Q    And how do you know that the plant
17  manager left because of the bankruptcy?
18    A    Because he told me.
19    Q    Okay.  And that was the plant manager
20  where?
21    A    Curtis Bay.
22    Q    And do you know where he went?
23    A    Yeah, he went to work for Saint
24  Goabain, S-A-I-N-T, G-O-A-B-A-I-N.  I believe
25  it's the CertainTeed division, as the head of

Page 29

1  manufacturing.
2      Q    Okay.  Are they a competitor of
3  Grace's?
4      A    Not directly.
5      Q    And what did he tell you was the
6  reason he left other than just bankruptcy, what
7  were his issues, if any, to you?
8      A    The growth opportunities he felt
9  would be better at Saint Goabain.  He said
10  clearly I have the opportunity to do that now.
11  I'd rather not wait and see how the bankruptcy
12  turns out.
13      Q    Did you discuss with him coming back
14  after Grace came out of bankruptcy?
15      A    No.
16      Q    You indicate in your affidavit that
17  you've been made aware that 22 key employees have
18  been approached by executive search firms with
19  serious opportunities with other companies.
20          I take it based on your previous
21  testimony that none of those 22 have indicated
22  they are leaving.
23      A    Not to my knowledge, but as you know
24  you only find out that they're leaving when they
25  tell you that they're going to be gone.

Page 30

1      Q    Is that a recent phenomenon that
2  executive search firms would contact your key
3  people, or is that something that would happen
4  over time even before Grace was in bankruptcy?
5      A    I'm sure that it happened before, I
6  believe that it's happening with greater
7  frequency.
8          At least some executive search firms
9  have told us that we clearly would be a target
10  based on our circumstances.
11      Q    Well, that would be national if
12  you're in bankruptcy, right?
13      A    Yes.
14      Q    Okay.  Have any of the key employees
15  told you that if the revised general retention
16  and long-term incentive plan and severance
17  package are not approved that they'll leave?
18      A    No.
19      Q    You indicate in paragraph 4 of your
20  affidavit towards the bottom, you state the
21  importance of employee's trust in their
22  leadership's ability to maintain and grow the
23  long-term value of the company cannot be
24  overstated.
25          How would the revisions of the

Page 31

1  retention and incentive plans affect an
2  employee's view of the leadership in that way?
3      A    Well, I think the critical issue is
4  leaders don't usually leave in ones.  It's not
5  unusual for leaders who have developed strong
6  relationships and knowledge about other employees
7  in the company to invite those -- to invite other
8  employees to join.  So I think that's one issue.
9          We always have a high degree of
10  concern that people see one of the leaders that
11  they respect leave, and even if it's not the
12  case, they believe that that's that leader's
13  judgment about the capability of the organization
14  and the opportunity in the organization going
15  forward.
16          So I think it's very important for
17  the overall confidence in the organization to see
18  the people that they respect and trust to remain
19  with the organization and to continue to
20  communicate positive things about the
21  organization.
22          And I think that their compensation
23  and how they're being treated, how they view
24  their treatment inside the bankruptcy and inside
25  -- well, any company -- is important to the way

Page 32

1  they communicate with others.
2      Q    Okay.
3      A    So as I said I think this is about
4  their view of what's fair compensation, you know,
5  given the industry and given the circumstances.
6          This is a very transparent process.
7  They have access to all the information that we
8  have access to.
9          And they review it to determine
10  whether they're being treated in a, quote, fair
11  way compared to other people who are either in
12  our industry or who may be in bankruptcy due to
13  mass tort.
14      Q    So if I understand what you're saying
15  in part is that they know what other individuals
16  or key employees are getting as compensation or
17  incentive packages for other companies that are
18  in Chapter 11 due to mass tort claims.
19      A    Well, they certainly know what the
20  retention plans and long-term incentive plans are
21  for employees in other companies that are in
22  Chapter 11 for mass tort liabilities.
23      Q    But you're aware that none of your
24  competitors or your peer group have a retention
25  plan.

Page 33

1          Are you aware of that?
2     A    I don't believe any of our
3 competitors or peer group are in Chapter 11.
4     Q    Okay.
5     A    I will say that my experience at
6 AlliedSignal was that in a period when they felt
7 that their employees were being targeted by other
8 firms because of the desirability of their
9 background and experience, in addition to an
10 equity plan they also put in a long-term
11 incentive plan that had some of the
12 characteristics of the plan that we put in.
13         So it was a retention aid that was in
14 addition to the salary, annual incentive, and
15 equity incentive plan.
16     Q    And in the long-term incentive plan
17 at AlliedSignal that you're referring to, was
18 there a stock option component to that, an equity
19 component?
20     A    The equity component was the
21 traditional piece.  They added the cash component
22 as an additional incentive for people to stay.  I
23 believe there's was a three-year cliffiest, but I
24 don't remember the details.
25     Q    Can you spell cliffest for the Court

Page 34

1 Reporter?
2     A    I think it's C-L-I-F-F, cliff.
3     Q    Okay.  Mr. Norris, if you could look
4 at if you have your own copy of the response that
5 was filed, this is in the body of the pleading,
6 if you look on page 7 of the pleading.
7          First let me ask you, did you have a
8 chance to review this pleading that's attached to
9 your affidavit before it was filed?
10     A    I did review it, I can't tell you
11 that I reviewed the precise one that was filed.
12     Q    Okay.
13     A    I did review some earlier drafts.
14         MR. RUNNING:  Are you referring to
15 the motion?
16         MR. LODISH:  Yeah, to the response.
17 To the response.  No, the response that he has in
18 front of him.
19         MR. RUNNING:  Okay.
20 BY MR. LODISH:
21     Q    On the top of page 7 do you see where
22 it indicates the surveys that W.R. Grace had
23 conducted in the year 2000?
24         Do you see that?
25     A    Yes.

Page 35

1     Q    And, again, looking at a copy of
2 what's Exhibit Number 2.
3     A    Yes.
4     Q    It indicates that you had done
5 surveys in 2000 which showed very high levels of
6 satisfaction with the quality of the supervisory
7 and leadership groups.
8          Do you recall those surveys being
9 done and the results?
10     A    Yes, I do recall them.
11     Q    Okay.  It then indicates that this
12 result was confirmed during employee focus group
13 sessions held in 2001, change of leadership was
14 cited by employees as potential reasons why they
15 would leave the debtors.
16         Do you recall when the focus group
17 sessions were done in 2001, in particular was it
18 before or after April of 2001?
19     A    Well, it was after April of 2001.
20     Q    Okay.
21     A    It was done, I would say, in late
22 summer.
23     Q    Okay.
24     A    It was done in preparation for our
25 leadership team meeting, which had as a topic

Page 36

1 retention, motivation, employee satisfaction.
2     Q    Okay.
3     A    And concerns that we needed to
4 address as a leadership team.
5     Q    Did you attend the focus group
6 sessions?
7     A    No, I did not.
8     Q    Okay.  Was one of the purpose of the
9 focus group session in 2001 to address the issues
10 concerning the bankruptcy that had been filed, it
11 sounds like, a number of months prior to the
12 focus group?
13     A    The purpose was really to try to get
14 an understanding of how our employees were
15 dealing with the bankruptcy, the way that we had
16 managed the communication process, the way that
17 we were managing the company and conducting
18 ourselves as leaders.
19     Q    Okay.
20     A    But in a very general -- in a very
21 general way.
22     Q    Okay.  And that the results of that
23 focus group confirmed that the employees thought
24 in 2000, which was they had very high levels of
25 satisfaction as to the quality of the leadership,

Page 37

1   correct?
2        A     That's correct.
3        Q     Okay.  Have there been any other
4   focus groups or surveys done since there, Mr.
5   Norris?
6        A     Not to my knowledge.
7        Q     Okay.
8        A     I correct that.  We do have a survey
9   that was just completed with our catalysts group
10  using the new gallop ten questions, the critical
11  ten questions for employees.
12       Q     Yes.
13       A     But I have not seen the results.
14       Q     Okay.
15       A     But it isn't uncommon, we may have
16  another group in the company using a methodology
17  to survey employee's attitudes and understand
18  issues and things that we should address as
19  leaders.  I mean so I wouldn't necessarily know
20  of all the surveys that are being conducted.
21       Q     Okay.  No, I understand that.  But at
22  least to the ones that have done addressing, you
23  know, these issues, the latest one which is even
24  after bankruptcy was that the satisfaction levels
25  were very high.

Page 38

1        A     Well, that I haven't seen the results
2   on the latest one, so I --
3        Q     You mean the catalyst group one.
4        A     Yeah.  I haven't seen those results,
5   so I don't know specifically.  I think they just
6   began their internal review about a week or so
7   ago.
8        Q     Okay, all right.  Well, you're not
9   aware of any other focus groups or surveys of the
10  employees done that are any different than what's
11  reported here, correct?
12       A     That's correct.
13       Q     Okay, all right.  At the time -- we
14  had discussed this a little bit earlier, but I
15  want to make sure that we're clear on this.
16             At the time you were contemplating
17  and putting together the General Retention
18  Program weren't you aware at that time that if
19  the company did go into bankruptcy it would have
20  a very negative affect on the stock, the value of
21  the stock?
22       A     Yes.
23       Q     Okay.  As part of the plan that you
24  sought approval and, again, you were at the
25  hearing so you heard the comments of the court,

Page 39

1   you were seeking a retroactive affect of the --
2   that the stock option payments to convert them to
3   cash now even for the plan that had already been
4   put in place, correct?
5        A     We were asking to convert the plan to
6   cash but recognizing that when we made this
7   proposal to our board and got our board's
8   concurrence that was before I think even a full
9   year of that plan had been in place.
10            So since we haven't earned that plan
11  to date I wouldn't use the word retroactive, I
12  would use the word that we would change to
13  payout.
14       Q     Okay.  Well, it had already been a
15  plan that had been set and approved, correct?
16       A     That's correct.
17       Q     Okay.  And in your experience with
18  any of the other companies that you had been
19  involved with, Mr. Norris, had there ever been a
20  -- well, I'll call it a retroactive decision to
21  pay cash for stock and stock options, have you
22  ever seen that done in your experience?
23       A     I haven't been associated with a plan
24  like this, this was a very unique circumstance.
25       Q     Okay.

Page 40

1        A     And so not what would be
2   traditionally done.  Traditionally companies
3   might choose to make this change or award
4   additional incentives based on extraordinary
5   performance without tying it to any specific
6   formula.  Our board might do that at any time.
7        Q     Well, but in your experience you had
8   never seen a plan like this done, correct, where
9   there was retroactively decided to turn a stock
10  option into a cash payment?
11       A     No.
12       Q     Okay.  When you were deciding this
13  and discussing it did you discuss whether that
14  would be fair to the shareholders of the company,
15  in general?
16       A     Yes.
17       Q     And what was the result of that
18  discussion?
19       A     I believe everyone felt that it would
20  be fair, both to the shareholders, all the
21  stakeholders and to the employees involved.
22            Again, recognizing that the plan
23  hadn't been earned fully as yet to motivate the
24  employees and to provide them access to the
25  targeted compensation that they would normally be

Page 41

1  able to achieve since the options, a value was
2  speculative at best.  And our advisor said likely
3  not to be of any value.
4      Q    Now, referring to paragraph 7 of your
5  affidavit you indicate that the initial
6  recommendation to change the EBIT growth rate
7  from 10 percent to 6 percent came from your
8  compensation consultant, do you see that?
9      A    Yes.
10     Q    Okay.  Are you referring to Mr.
11 Bubnovich?
12     A    That's correct.
13     Q    Okay.  And how did that come about,
14 if you know, that he recommended it as opposed to
15 it coming from Grace?
16     A    We asked Mr. Bubnovich to review
17 long-term incentive plans and retention plans and
18 to make a recommendation to the company.
19         We had discussed general plans with
20 our board, and he took that information and then
21 went back and reviewed it relative to other
22 companies, peer companies in our industry and
23 other companies in our situation in Chapter 11
24 and came back with the recommendations.
25         And based on his analysis it seemed

Page 42

1  appropriate that we should be giving targeted
2  awards based on performance that was consistent
3  with our industry, not an arbitrary standard.
4      Q    Okay.  But isn't that different than
5  what you would base your incentives on in the
6  past?
7      A    It is different than our annual
8  incentive target.
9      Q    Okay.  And what did you base your
10 annual incentive target on prior to talking to
11 Mr. Bubnovich?
12     A    We had been looking at what I would
13 call premier performance of companies in many
14 industries, double digit earnings growth was
15 clearly a premier performance and a performance
16 level that we thought was the right aggressive
17 target for the company on an annual basis.
18     Q    And that had been 10 percent.
19     A    That had been 10 percent.
20     Q    Was that for a couple of years?
21     A    Since 1999, the target for the year
22 1999.
23     Q    Okay.
24     A    I will say that the strategy of that
25 approach was to always make the target 10 percent

Page 43

1  over the prior year.
2          So if the prior year dropped 25
3  percent, the target was 10, the prior year it was
4  up 20 percent, the target was 10 to avoid
5  negotiations of an annual budget with the
6  individual businesses because in a negotiating
7  process businesses tend to set lower targets and
8  they tend to exceed lower targets.
9          So I felt that this was a way of
10 having aggressive and stretched targets, and we
11 managed our payment schedule to give fair
12 compensation to individuals for what I thought
13 would be performance that might be more average.
14 We thought they still had a chance to get some
15 reasonable incentive compensation.
16     Q    Well, is it fair to say that, you
17 know, but for bankruptcy and your retaining Mr.
18 Bubnovich your target would have remained the
19 same?
20     A    No.  I think we would have, again,
21 looked at how could we fairly deliver this
22 long-term incentive compensation portion of
23 people's total compensation package.
24         The bankruptcy process made us look
25 to a different approach but our overall

Page 44

1  compensation theory was that for good performance
2  we should be delivering the target and for
3  superior performance we should deliver above the
4  target.
5      Q    The target that you presented to the
6  bankruptcy court in April of 2001, which was also
7  after you had discussed with Price Waterhouse
8  Coopers and had done your retention plan, was
9  still at 10 percent, correct?
10     A    That's correct.
11     Q    Why didn't you change it then?
12     A    Because I wasn't given the same
13 information about peer companies to be able to
14 evaluate what was fair inside the industry in
15 which our leaders will look for comparison.
16     Q    Well, are you saying that in the
17 prior years even before bankruptcy you should
18 have been looking at what peers were doing to
19 determine your growth rate?
20     A    No.  In the prior years because we
21 used an equity component, which has an automatic
22 ability to compensate relative to our performance
23 and our peers and the rest of the equity markets
24 we didn't need to -- we didn't need to have that
25 discussion.

Page 45

1     The market would evaluate our
2  performance, set the value of the equities and
3  our employees would be rewarded proportionately.
4  That's the major benefit of equity over any
5  arbitrary target.
6     Q    Okay.  The issue of when payments
7  would kick in, in your previous plan there was a
8  floor of 5 percent, under the revised plan the
9  floor is any growth.
10     Was that a recommendation from Mr.
11  Bubnovich, or was that a recommendation that came
12  from Grace?
13     A    I can't be sure whether that came
14  from Mr. Bubnovich or from Brian McGowan and
15  their analysis.
16     Q    And, again, speaking about I guess a
17  premier incentive plan, do you now believe that
18  rewarding any growth no matter how minute is a
19  good idea for a long-term incentive plan?
20     A    Yes.
21     Q    So is that something that you would
22  say that once Grace comes out of bankruptcy that
23  you would maintain that component?
24     A    I think we have designed a plan so
25  that people always want to deliver the maximum

Page 46

1  because there is a level at which they'll be
2  compensated.
3     If you have a cliff of any arbitrary
4  amount, if it's clear I won't make that amount,
5  then my incentive to do as well as I can, even
6  something below that amount is significantly
7  reduced.
8     In other words, if I could get 3
9  percent growth, but I only get paid for 6 percent
10  growth, my incentive to get to 3 versus doing
11  none or letting the business even go negative
12  growth is not there.
13     So you want to have incentive for
14  people always to deliver the maximum that they
15  can in any given period of time.
16     So when you create these arbitrary
17  limits you make cause behavior that was
18  unintended.  In other words, they just say I
19  can't get any extra incentive for this, why
20  should I work that little extra bit?
21     And, again, this is the motivational
22  issue of how do you motivate 6,000 people or in
23  this case 300 people who you can't talk to every
24  day?  They're each one making their own decisions
25  about how they're going to put their energies.

Page 47

1     Q    Is that a problem that you think
2  existed at Grace, you know, prior to the
3  bankruptcy that because the incentive plans had a
4  5 percent floor that people were not producing if
5  they didn't think the floor was going to be
6  reached?
7     A    In looking backward --
8     Q    Yes.
9     A    -- if I had the opportunity to
10  redesign that plan, recognizing that that plan
11  was designed in a rather hurried fashion to
12  replace an existing equity plan which was
13  obviously not going to provide incentive, I would
14  not have established the mechanism in quite the
15  same fashion nor would I have established the
16  target in quite the same fashion.
17     So I also recognize that the problem
18  with long-term incentive plans, the reason why I
19  think it's important to have a retention
20  component is because people don't believe in
21  long-term plans until they get close to the first
22  period of payout because there are so many
23  uncertainties, so many things that can happen
24  that are beyond their control.
25     Just the economic environment, for

Page 48

1  example, the price of natural gas, the price of
2  raw materials that can offset much of the good
3  work that they may do as individuals or teams.
4     So it's only when they start to get
5  relatively close or that they have a vested
6  benefit, in other words, they've already achieved
7  a certain amount, do they put the high competence
8  in the payout which makes the retention benefit
9  of those plans extremely valuable?
10     In the case of our plans here they
11  will be staggered in over a period of time before
12  they begin to have a significant retention
13  benefit.
14     Q    Now, you understand that the analysis
15  that your consultant did was based on a peer
16  group of companies and that's how he came up with
17  the approximately 6 percent, correct?
18     A    That's correct.
19     Q    Okay.  I don't know if you have the
20  chart in front of you, I can give the exhibit.
21     A    I think I have that.  He has it, the
22  famous peer company chart.
23     Q    Now, do you believe, Mr. Norris, that
24  taking these 14, what they're called peer group
25  companies, looking at their individual growth

Page 49

1 rate over these years, coming up with an average,
2 keeping in mind the differences between not only
3 these companies but these companies and W.R.
4 Grace is a reasonable way to determine a growth
5 rate for W.R. Grace?
6     A    I think that's a reasonable way to
7 determine a target for W.R. Grace employees that
8 is related to other companies in our industry
9 which would be a consistent way of comparing them
10 if their long-term plan was an equity-based plan
11 in which case investors would be choosing to
12 invest in this group of companies versus W.R.
13 Grace in the chemical industry.
14     Q    But I'm sure you know better than I
15 if you looked at these individual companies and
16 you looked over the number of years and the time
17 span and the different growth rates and how
18 varied they are for the different companies, I
19 assume you would know looking at some of these
20 years and some of these companies, for example,
21 why Union Carbide in '93 to '95 had a 48 percent
22 plus growth rate and in '98 to 2000 had a
23 negative 41.74 growth rate.
24         I'm taking that as a different you
25 would know that better than I.

Page 50

1     A    No.  I think that the companies on
2 this list represent a diverse group.
3         In the case of Union Carbide I'm sure
4 that much of that has to do with the price of
5 feed stocks and the price of final products.
6         So in looking at any one company I
7 wouldn't necessarily use that as the benchmark
8 against our company.
9         It seemed like a reasonable cross
10 section to compare a group of companies that
11 might represent, if you will, quote, our peer
12 group.
13         I mean they are by definition in a
14 specialty chemical industry.  There is no group
15 of companies that sort of mirror the products and
16 portfolio of other groups of companies, so.
17     Q    Right.  And well, isn't that a reason
18 why a company when it's deciding a growth rate to
19 use particularly for incentives for its own
20 employees uses its only company's standards and
21 growth rate as a basis for deciding on the
22 incentive?
23     A    Well, that's a possible method.  I
24 think if you took -- and I haven't done this
25 analysis.  I can only say that in our case, for

Page 51

1 example, in the years '99 and 2000 our own growth
2 rate was in the two and a half to three percent
3 range.
4         In 1999 it was probably 15 or 20
5 percent so it was very high but that's the year I
6 came and I hope I can take some credit for that.
7         But '98 to '99 I don't think that the
8 company's businesses have exhibited, for example,
9 10 percent income growth on their own overall
10 during this same period of time, but I don't have
11 that data.
12         I think if you had a company with a
13 long history and stable businesses you might be
14 able to use your own growth rate as a standard
15 and look historically at your performance.
16         I don't think you would set an
17 arbitrary target without some way of giving your
18 employees an expectation that they could meet the
19 target because it becomes a disadvantage rather
20 than an incentive.
21     Q    Well, candidly the problem I have
22 with Mr. Bubnovich's method for doing this using
23 these 14 companies is that if you look at any
24 given years there are a couple of companies here
25 that really skew the percentages, you know, Union

Page 52

1 Carbide was one.  Dow Chemical in a couple of
2 years, Greak Lakes Chemical, I mean either
3 negative or positive, and they are probably very
4 good individual reasons for those results,
5 wouldn't you agree in a particular year?
6         MR. RUNNING:  Objection to the form
7 of the question.
8         It's vague and ambiguous, please
9 rephrase it.
10 BY MR. LODISH:
11     Q    Well, for example, in the '94 to '96
12 time period the average growth rate was a
13 positive 14.69 percent but Great Lakes Chemical
14 had a minus 24.36 percent growth rate, which
15 obviously is the only company there that had a
16 negative growth rate which obviously brought this
17 percentage down, you know, who knows by how much
18 but if you took them out who knows, it might have
19 been an 18 or 19 percent.
20     A    Right, but as you argued Union
21 Carbide had a 21 percent growth rate in that same
22 period.
23     Q    Exactly.
24     A    And I don't think if you -- you know,
25 you can take the entire universe of chemical

Page 53

1  companies, you can pick as Mr. Bubnovich did what
2  he thinks is a representative sample.
3          You know, my view was that there was
4  no perfect sample. The reason we ask people who
5  are independent to do this is because it takes
6  away our biases as a management team from one
7  direction or another.
8          Clearly, again, we are replacing
9  something which was naturally self-policing, if
10 you will, in the form of equity. It didn't
11 matter if we picked a standard because the market
12 would price our stock at what it thought our
13 expectations were in the future and they would
14 base that based on our past performance, so --
15     Q     Since you're going to a cash base you
16 had to find some other type --
17     A     We had to find a mechanism and to be
18 honest, again, if we recognize the leverage here
19 is to create more EBITDA at a higher growth rate,
20 the multiple -- the earnings that we would
21 distribute in this plan are overshadowed by the
22 10 to 1 leverage that we would get on the value
23 of the company.
24          In other words, if we could move our
25 EBITDA from 300 million, let's say, to 350

Page 54

1  million and move our multiple from 7 to 10, I'll
2  make it up, we could take the value of the
3  company from 2.1 billion to 3.5 billion.
4          Even if we paid the maximum payout on
5  our long-term incentive plan our ability to
6  borrow or our ability to provide value to our
7  stakeholders through equity was hugely leveraged.
8          So anything that we could do that
9  would motivate our employees to the highest
10 possible growth rate was in the direct
11 beneficiaries of all of our stakeholders.
12         I mean so in my mind the most
13 important thing was to drive that number as
14 rapidly as we could, but also to have a plan that
15 our employees felt had an opportunity for them to
16 be fairly compensated so that they didn't just
17 accept that we're in bankruptcy we should just
18 hang on and wait to see what happens in a
19 reorganization plan.
20     Q     Okay. Can you, for the record, tell
21 us what EBITDA means?
22     A     Earnings before interest, taxes,
23 depreciation and amortization. And I use it
24 because it's a common nomenclature and the
25 multiples are sort of easily obtained.

Page 55

1      Q     Okay. Which raised --
2      A     I get excited.
3      Q     Which raised a question I had is that
4  for purposes of the growth rate only EBIT is used
5  as opposed to EBITDA.
6      A     Well, the reason the multiple, the
7  percentages are roughly the same, the reason we
8  use EBIT, as is explained to our employees, we
9  don't get into the depreciation and amortization
10 which are the result of our investment.
11         In other words, depreciation if we
12 make an investment, depreciation occurs over
13 about a decade, our depreciation and amortization
14 stay relatively constant which, you know, so
15 today are about a $90 million level. So if we
16 made $187 million of EBIT, in almost all of these
17 cases we would just add $90 million to the EBIT
18 number to create the EBITDA.
19         When you go to the industry to
20 calculate enterprise value, typically investment
21 analysts use EBITDA which represents cash flow
22 and they apply a multiple to EBITDA.
23         But for purposes or EBITDA and EBIT
24 should grow at exactly the same ratio unless
25 there was some dramatic change in capital

Page 56

1  investment, and in which case depreciation is a
2  reduction of income and EBIT would result --
3  would have the lower earnings because of the
4  higher depreciation rate.
5      Q     So you believe that EBIT was a better
6  way of calculating --
7      A     It's much simpler in communicating to
8  employees if they -- when we communicate every
9  quarter in terms of our earnings to our employees
10 we communicate around EBIT because there are no
11 other -- even that's hard enough for, you know,
12 some of our employees. But to add EBITDA makes
13 it even, you know, more complicated. But the two
14 ought to track from a percentage perspective
15 identically.
16     Q     Okay.
17     A     So it shouldn't be any change.
18     Q     Now, just to clarify --
19     A     Are there companies, I mean many
20 companies that you're aware of that have grown
21 their own of 6 percent while they're in
22 bankruptcy?
23     Q     Well, one of the luxuries is I don't
24 have to answer questions, whether I know the
25 answer or not, so.

Page 57

1        But as you've indicated in your
2  response isn't Grace number one in sales in its
3  peer group or it was this past year?
4        A    We had the highest growth rate in
5  sales of a group of companies that we follow from
6  an investment perspective, many of which are on
7  this sheet as well.
8        And we had, although a very small
9  increase in earnings, it was also the best of
10 that group of companies.
11       Q    And how many companies do you think
12 that happens to while they're in bankruptcy?
13 It's a rhetorical question but --
14       A    Hopefully we are able to achieve
15 performance that everyone is satisfied with.  I
16 hope our stakeholders are thrilled to pay us.
17       Q    If you look on page 10, again, this
18 is a response that it's part of that document.
19 This is what we were just talking about,
20 paragraph 15 of page 10.
21       A    Um-hum.
22       Q    Where it indicates in fiscal year
23 2001 Grace's pre-tax income was 187.5 million on
24 net sales of $1.72 billion.
25       Then in fiscal year 2000 the pre-tax

Page 58

1  income was 187.1 million on net sales of $1.5
2  billion.
3        A    Right.
4        Q    If my calculations are correct, the
5  difference in sales between 2001 and 2000 is
6  about $130 million, but the pre-tax income
7  difference was only $400,000.
8        Do you know why there is that
9  difference between those two years that income
10 isn't reflected higher on the sales in 2001 than
11 in 2000?
12       A    Well, I'd have to -- I can get you a
13 financial bridge --
14       Q    No, that's okay.  I just wondered if
15 you --
16       A    -- but I believe that, for example,
17 natural gas prices in that period were different.
18 Raw materials, the revenue --
19       Q    So it would be expenses and cost.
20       A    Yes.  And the revenue during that
21 period we had some acquisitions which added to
22 revenue during that period so that revenue growth
23 was probably not all organic.
24       So we had a combination of higher
25 costs.  We weren't, even though I think we did a

Page 59

1  pretty good job with productivity, we didn't
2  offset all the inflation.
3        Q    Now, if you look at the next sentence
4  where it indicates that Grace ranked first in
5  sales growth and second in profit growth
6  comparing 2001 to 2000 among the 11 specialty
7  chemical companies in your peer group.
8        Are all of those 11 companies on the
9  chart?
10       A    No, I don't have -- I can tell you
11 that some I know, for example, Albermarle and
12 Great Lakes would be in that group.  Dow, I'm
13 quite sure would be in that group.  I think IFF
14 is in that group.  I have to get the chart back.
15       But I can't confirm without going and
16 getting the other group of companies the exact
17 comparison to them.
18       Q    Do you know sitting here today,
19 though, which companies are not on the peer group
20 list that would be included in the 11 referred to
21 in paragraph 15?
22       A    Well, I'm quite sure Union Carbide is
23 not since it's now part of Dow.
24       Q    Right.
25       A    Other than that one I would have to

Page 60

1  -- I know Cabot is on the list.
2        Q    Okay.  Are there any companies that
3  aren't on the list?
4        A    No, I understand.  I'm just kind of
5  -- I'd have to get that list.
6        Q    Okay.
7        A    I can get it very quickly, if you
8  want it.
9        Q    Well, I'm really trying to determine
10 whether Mr. Bubnovich covered the universe of
11 your peer group companies in this list.
12       A    Yeah.  No, there was not any
13 intention or there was no attempt by us to
14 perfectly match the two groups.
15       Q    But I would assume if there was one
16 or two or three companies that were intended in
17 paragraph 15 under the 11 specialty chemical
18 companies, that they should have been part of the
19 peer group companies that were done in the
20 survey.
21       A    No, I understand the question.  I
22 just can't confirm with total accuracy that the
23 two are identical.
24       Q    Okay, I understand.  Do you agree
25 with me, though, that they should have been

Page 61

1 included in there if they're not?
2     A    The only thing I can say is that they
3 were done for two different purposes by two
4 different people, and we didn't intentionally put
5 them together.
6         So I just can't assure you that
7 someone looked at both lists and said let's make
8 sure that both lists are identical.
9         When I look down at the names, the
10 names here do appear to be familiar to me based
11 on the other list but --
12    Q    Okay.  Well, that's something you say
13 you can provide that information to us right now.
14    A    Yes.  We have provided it to the
15 creditors' committees already in a financial
16 presentation.
17    Q    Okay.
18    A    So they have the information, I just
19 don't have it in my hand.
20    Q    Okay.  And do you know how Mr.
21 Bubnovich got his peer group list?
22    A    No.
23    Q    Okay.  You don't know whether he got
24 it from Grace or he did his own analysis.
25    A    I'm quite sure he didn't get it from

Page 62

1 Grace.
2    Q    Okay.
3    A    But Brian McGowan would have been the
4 only other likely source.
5    Q    Okay.  I think --
6    A    If you want to take a five-minute
7 break I'll get you that list and I'll go to the
8 rest room.
9         MR. LODISH:  Yeah.  Particularly if
10 you want to, I mean that's fine.  That's fine.
11         We're getting close to the end here,
12 so that's fine.
13         THE WITNESS:  All right.
14         (A recess was taken from 4:23 p.m.
15 until 4:30 p.m.)
16 BY MR. LODISH:
17    Q    Mr. Norris, did you have a chance to
18 get a copy of that list you were referring to in
19 terms of the sales and gross profit?
20    A    Yes, I did and I'll give you a copy
21 of the list.  And I see that there are two spots
22 for the same company, so I need to get you the
23 exact list that we gave to the financial
24 advisors.
25    Q    Okay.

Page 63

1     A    I will do that, but as you can see
2 they are substantially the same.
3     Q    Okay.  Is there at least one company
4 on your list of the peer comparison list that you
5 have there that's not on the peer group company
6 list?
7     A    There is one at least, it looks like
8 Rohm & Haas.
9     Q    Okay, all right.  And they are listed
10 there twice, correct?
11    A    That's correct.
12    Q    And so you're going to check to just
13 see whether that was inadvertent or whether there
14 should have been another name in there.
15    A    That's correct.
16    Q    Okay, all right.
17         MR. LODISH:  And if we can, I'd like
18 to make a copy of that and then we'll make that
19 Defendants' Exhibit 3, at least the copy of it.
20 Okay.
21         MR. RUNNING:  Do you need that copy?
22         THE WITNESS:  No.
23         MR. RUNNING:  Why don't we just use
24 that one.
25         THE WITNESS:  You may have that one.

Page 64

1         MR. LODISH:  Oh, okay.  Great.  Then
2 we'll mark that one.
3         THE WITNESS:  Since I used that in a
4 town meeting and, you know, a thousand people saw
5 it it should be around here somewhere.
6         MR. LODISH:  Well, if not I'll be
7 happy to give you a copy.
8         THE WITNESS:  Yeah.  No, I'm sure we
9 have a copy.
10         (Defendants' Deposition Exhibit Number 3
11 was marked for purposes of identification.)
12 BY MR. LODISH:
13    Q    Mr. Norris, beginning with paragraph
14 8 of your affidavit you discuss the revised
15 severance paid program, I have a few questions
16 about that.
17         And that is the four months severance
18 timetable that would be provided under the
19 revised plan, was that a time period that Grace
20 came up with or was that a recommendation from
21 Mr. Bubnovich?
22    A    That was a Grace recommendation.
23    Q    Okay.  And how did you come up with
24 four months?
25    A    Grace had a relocation of its

Page 65

1 corporate headquarters in 1999, and we looked at
2 what was necessary at that time to -- as a way of
3 deciding what people were comfortable with as a
4 time to make a transition, and we developed the
5 four months.
6         Recognizing this plan is primarily
7 oriented toward corporate employees who because
8 of a reorganization plan might no longer have
9 positions.
10        Most of our operating people are less
11 sensitive to a potential reorganization plan
12 since they are not likely to lose their positions
13 as a result.
14    Q    So there was actually some type of a
15 study or something done to come up with the four
16 months or --
17    A    Brian McGowan reviewed a number of
18 internal documents and came to the
19 recommendation.
20    Q    Okay. So you don't know why two or
21 three months wasn't the accepted timetable, for
22 example, as opposed to four months?
23    A    Again, I think that we tried to pick
24 a period that was reasonable but would allow
25 people enough time in these mid level positions

Page 66

1 to find other employment because they had some of
2 the most fungible skills.
3         And so given the uncertainty of the
4 bankruptcy and the fact that we wouldn't be able
5 to offer any reasonable period of severance pay,
6 they might choose to leave earlier rather than
7 wait. So this was a judgment on our part.
8    Q    So you believe by increasing the
9 severance time frame, particularly the four
10 months, that that may have an impact on whether
11 an employee would decide to leave Grace now than
12 let's say in a year from now.
13    A    Now or a year from now or any time
14 when they felt that the uncertainty level
15 increased and they didn't have appropriate
16 severance in order to find other employment, they
17 would either search for other employment actively
18 or be subject to, you know, recruiters.
19    Q    Okay. Do you know whether there was
20 any specific concern expressed by any of the
21 employees that would potentially fall into this
22 category?
23    A    In general conversations with
24 employees in the corporate accounting group, for
25 example, this has been consistently a concern

Page 67

1 that the reorganization might involve a shutdown
2 of the corporate activity.
3         And they are relatively short tenure
4 employees and therefore would not have real
5 severance benefits under our existing plan.
6         And, obviously, if we were going to
7 change that plan we would need to seek court
8 approval. That's a process that obviously takes
9 some time and is subject to review by quite a few
10 parties.
11    Q    Okay. If you could take a look at
12 Mr. Bubnovich's affidavit that's attached to
13 Exhibit Number 2, I believe you have your own
14 copy in front of I, I wanted to ask you about his
15 analysis of the TDC for the top 16 employees.
16    A    TDC is what?
17         MR. RUNNING: Total direct
18 compensation.
19         EXAMINATION BY MR. LODISH:
20    Q    Yeah, total direct compensation.
21    A    You've been hanging around with the
22 HR people.
23    Q    Yeah. Okay. As you can see at the
24 bottom of page 3, paragraph 12, Mr. Bubnovich
25 indicates he did a competitive analysis of

Page 68

1 Grace's total direct compensation for the top 16
2 executive positions.
3         He did an assessment of
4 reasonableness of such compensation by comparing
5 each of the TDCs, and he defines what makes up
6 TDC provided to individuals holding similar
7 positions in the chemical and manufacturing
8 industry.
9         And Mr. Bubnovich then as part of his
10 analysis came up with the recommendations he did,
11 which included the top 16 executives.
12         And I wanted to ask you, Mr. Norris,
13 were you aware at all -- and if I asked you this,
14 I apologize -- as to the different corporate
15 groups that Mr. Bubnovich was using to determine
16 compensation for the various key employee
17 categories for W.R. Grace?
18         MR. RUNNING: Objection to the form
19 of the question.
20         Lack of foundation.
21 BY MR. LODISH:
22    Q    Well, I don't want to -- if you look
23 at paragraphs 10, 11, 12, you will see that Mr.
24 Bubnovich outlines the different corporate
25 entities that he reviewed to come up with his

Page 69

1  recommendations.
2       For example, in paragraph 9 for the
3  retention program he only looked at mass tort
4  Chapter 11 companies.
5       If you look at paragraph 10 for EBIT
6  growth he looked at the peer group that we
7  discussed earlier that was 14 companies, which
8  deals with the long-term incentive program.
9       In paragraph 11 which addresses
10 severance, he reviewed 60 companies and
11 presumably their severance packages.
12      And then in paragraph 12, which we
13 were referring to, he compared similar positions
14 in the chemical and manufacturing industry.
15      So my question is after reviewing
16 those paragraphs were you aware that he was going
17 to be doing those comparisons with the different
18 --
19   A    I was aware of the methodology that
20 he would use, I wasn't aware of the specific
21 companies or industry consultant groups that he
22 was going to use as the basis of the comparison.
23   Q    Okay.
24   A    If that answers the question.
25   Q    Okay.  My question is in terms of the

Page 70

1  total direct compensation for the top 16
2  executive positions, don't you think that a
3  better comparison is a comparison to the top 16
4  executives in your peer group?
5    A    No, because it's too limited a
6  population and the opportunities for those
7  individuals is clearly not limited to the peer
8  group.
9        For example, AlliedSignal wouldn't be
10 in the peer group.  I clearly -- AlliedSignal has
11 a lot of people in the chemical industry,
12 chemical engineers, managers, marketing leaders,
13 so I think it's a much broader population that's
14 appropriate.
15   Q    Well, then in that regard do you
16 think it should have been limited to the chemical
17 and manufacturing industry?
18   A    Manufacturing being a very broad
19 category I believe is appropriate.  Although we
20 have had individuals who have gone to dot coms
21 and other, you know, less direct and less obvious
22 positions, consulting, but I think an appropriate
23 thing which we would do in our compensation
24 system is to use chemical and manufacturing.
25      That would be something that our

Page 71

1  board would use as its basis for making these
2  same kinds of comparisons.
3       Typically with one industry expert as
4  our benchmarking, you know, we use Hewitt, for
5  example, as a historical standard.  We wouldn't
6  use more than one, generally.
7    Q    Okay.  Well, why wouldn't that hold
8  true for the EBIT growth analysis?  Why wouldn't
9  using chemical and manufacturing industry be a
10 better and a more accurate way of rating your
11 growth as opposed to your peer group for the same
12 reasons?
13   A    Then I would suggest you just use GDP
14 since --
15   Q    I'm sorry.
16   A    Gross domestic product would be a
17 surrogate for that and that's two and a half
18 percent.  I didn't think that that would be an
19 appropriate basis.
20      So I think when you're looking at a
21 peer group for earnings you would like to get a
22 group which has more characteristics of products
23 of the company and the industry in which the
24 company operates.
25      But when looking at the population of

Page 72

1  employees that could be in key leadership
2  positions, particularly, I think you need to look
3  at the population from which you really compete,
4  which is I believe a much broader population.
5    Q    Now, he doesn't indicate here, Mr.
6  Bubnovich doesn't, how many different companies
7  he looked at in the chemical and manufacturing
8  industry.
9        Do you happen to know sitting here
10 today?
11   A    I believe he used multiple ones, I
12 don't know by personal knowledge which ones he
13 used.
14   Q    Okay.  Because if you look at
15 paragraph 20 of his affidavit, he states that
16 accordingly we analyzed the top 16 executive
17 positions, TDC, and compared it to competitive
18 practice.
19      Based on the analysis the top 16
20 executive positions are between the 50th and 75th
21 percentile of the competitive practicing, and
22 thus I conclude that TDC for such positions is
23 well within the range of competitive practice.
24      So you believe for the top 16
25 positions, Mr. Norris, that using the chemical

Page 73

1  and manufacturing industry is a better basis of
2  judging whether the total direct compensation for
3  W.R. Grace's top 16 employees is appropriate, is
4  better than just looking at your peer group.
5      A    Yes. We use a similar methodology
6  for all of the key salaried positions in the
7  company.
8      Q    Okay.
9      A    In other words, we have a basis that
10 is broad rather than narrow. For example, we
11 don't use a regional basis for scientists or
12 chemical engineers, we use a national basis.
13         We don't use a narrow basis of just a
14 narrow segment of the chemical industry or just
15 the chemical industry, we use sort of a general
16 manufacturing industry because that represents
17 their true opportunities.
18         Our chemists can go to work for
19 Alcoa, clearly not in our peer competitive group,
20 but I would say it's a good employment
21 opportunity for individuals.
22         GE, I wouldn't put them in our peer
23 group, but I certainly wouldn't -- I would
24 consider them a good employer.
25     Q    Okay. Well, GE wouldn't be included

Page 74

1  in -- wouldn't qualify for chemical or
2  manufacturing.
3      A    I think in general manufacturing --
4  in fact, we certainly try to attract people from
5  GE to come here.
6         And I do know that, for example, our
7  former head environmental manager has gone to GE
8  in a position of that kind. So clearly, you
9  know, we do compete with each other for people.
10     Q    Okay.
11         MR. RUNNING: He said chemical and
12 manufacturing not chemical manufacturing.
13         MR. LODISH: Right.
14 BY MR. LODISH:
15     Q    No. What I meant was I appreciate
16 what you're saying is that GE would be one of
17 those companies in the mix that could go after
18 your employees or you could go off theirs.
19     A    Oh, I'm sorry.
20     Q    But my question was there at GE
21 wouldn't be in, as you understand it, in the
22 chemical and/or manufacturing industry, would
23 they?
24     A    I believe that GE would be in the
25 survey.

Page 75

1      Q    Okay.
2      A    I can't tell you precisely the
3  companies that are in this survey. I would hope
4  that in the broad survey that GE and companies
5  like 3M, I mean other, you know, broad companies
6  that I would consider companies that have good
7  performance and are recognized as leaders would
8  be included in the surveys.
9      Q    Okay. So if you were doing a study
10 and looking at your top 16 executives you would
11 certainly include like GE and 3M to see how it
12 stacks up.
13     A    I would certainly include a broad
14 cross session since every company doesn't
15 participate in every survey I couldn't be -- I
16 mean I couldn't tell you precisely whether they
17 were in or not in any of the surveys that we
18 used.
19     Q    Okay. Well, let me show you --
20     A    Without getting Mr. Bubnovich in
21 trouble, I hope that he's included a broad enough
22 sample.
23     Q    Well, you may be able to answer that
24 for me. If you look at Exhibit Number 1, which
25 Mr. Running is giving you a copy of, which we

Page 76

1  marked as Defendants' Exhibit Number 1.
2         This was a summary of the total
3  direct compensation done by Mr. Bubnovich that he
4  gave me right before his deposition on Tuesday.
5         And if you look at the individuals
6  attached to the summary in the front, you will
7  see who conducted the surveys that he took, but
8  then you will see the survey parameters which
9  indicates the industries that were used.
10        And, for example, the very first one
11 is Mr. Bettacchi.
12     A    Yes.
13     Q    Would you agree with me or not that
14 the only place where GE or perhaps 3M would fall
15 in as a basis for a parameter for his position
16 would be under all industries down at the second
17 from the bottom?
18     A    Well, in this survey because the
19 companies are also chosen by size --
20     Q    Right.
21     A    -- I assume that GE would not be.
22 But I also assume that Mr. Bettacchi couldn't go
23 to a position that he was qualified for his
24 that would provide significantly greater
25 compensation than is in this survey, or I'm

Case 01-01139-AMC   Doc 2545-3   Filed 08/15/02   Page 20 of 31

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 77

1  assuming that Mr. Bettacchi would have already
2  done so.
3       So I'm assuming that in a broader
4  sense these are also competitive across that
5  range as well.  But this survey is obviously more
6  appropriate for companies of our size.
7       Q    Okay.  And you're referring to the
8  sales where they show the amount of sales.
9       A    That's correct.
10      Q    Okay.  If you could just turn to Mr.
11 McGowan, he's maybe the seventh or eighth one.
12      A    Okay.
13      Q    You see under the survey parameters
14 when looking at Mr. McGowan's position as senior
15 vice president, corporate administration, there
16 are no corporate chemical companies or chemical
17 and pharmaceutical companies listed there.
18      Do you think that your peer group has
19 positions such as the one held by Mr. McGowan?
20      A    I don't know if they do or they
21 don't.  I mean they could.  I think you -- one of
22 the difference of in some of our positions is the
23 scope of the positions is significantly greater
24 than many of the companies of our size because of
25 the legacy obligations of the company and the

Page 78

1  history of the company in going from a company of
2  a much larger size to its current size.
3       So there are several positions, Mr.
4  McGowan's is one of them, environmental, health
5  and safety, public affairs positions would be
6  another, obviously chief restructuring officer is
7  not a position that would be classic.
8       So their positions may not be
9  parallel in a company of our size in either the
10 chemical or manufacturing industry.
11      Q    Now, I understand that you, you being
12 Grace, in the past has retained Hewitt to do --
13      A    Yes.
14      Q    -- to help you with compensation to
15 do studies and the like.
16      Did you ask Hewitt to assist in
17 determining the reasonableness of the
18 compensation packages that you were presenting to
19 the bankruptcy court?
20      A    I believe that we asked Hewitt to
21 confirm that the compensation programs that we've
22 had in the past are still appropriate in the
23 current circumstances.
24      In other words, we've always had
25 base-targeted incentive and long-term incentive

Page 79

1  as a total cash component.  And I believe that we
2  asked Hewitt if there was any reason to believe
3  that that environment had changed substantially
4  from the last time they had done a review.
5       Q    And what was their answer?
6       A    I believe they said that it was still
7  valid subject to inflation of, you know, the 3 or
8  4 percent since I believe the last review was in
9  2000, but I'm not 100 percent sure of that date.
10      Q    Okay.
11      A    This is the same methodology that
12 I've used in other companies, and I still believe
13 is very common in industry.
14      Q    To do, just so I understand --
15      A    Just to make sure that people
16 understand what is the total compensation that
17 should be available in different positions and
18 does it take the form of base incentive and
19 long-term incentive.  I mean what are the general
20 splits.
21      Q    Which raised another question, due to
22 the, you know, complexities of bankruptcy did you
23 consider instead of revising the incentive plans
24 of contemplating increasing direct compensation
25 or salaries for the employees?

Page 80

1       A    We did.  We felt that the package
2  that we had proposed was fair in its direct
3  compensation and that was something that we did
4  not want to get distorted for the long term for
5  employees after we exited from bankruptcy.
6       Our annual incentive plan we thought
7  was appropriately weighted to give more weight,
8  if you will, to our short term results which were
9  I think our strong desire to continue to perform
10 in the short term because of the issues around
11 our bankruptcy in making sure we had good short
12 term performance.
13      And then a long term component so
14 that we continued to motivate people not to do
15 things that would just generate income today but
16 many of our businesses are three or four-year
17 horizons for some of the activities.
18      We didn't want -- we wanted to be
19 able to continue to reinforce to people to do the
20 right things for the long term health and growth
21 of the businesses, and we thought a long-term
22 incentive plan was consistent with that message.
23      And we tried to balance all of that
24 to make it a compensation system which we thought
25 was fair but appropriate.

Page 81

1     Q     And I understand when the board of
2  directors of the company considered the revisions
3  to the compensation and benefits plan you didn't
4  participate in that vote; is that right?
5     A     No, I don't.  I'm not a member of the
6  compensation committee.
7     Q     Okay.  But you're a member of the
8  board.
9     A     I am a member of the board.
10    Q     Did you participate in the board's
11 formal decision to accept the revisions to be
12 presented?
13    A     No.
14    Q     Okay.
15    MR. LODISH:  All right.  Let's go off
16 the record.  Just give me a second, I may be
17 done.
18    (A recess was taken from 4:59 p.m.
19 until 5:00 p.m.)
20 BY MR. LODISH:
21    Q     Mr. Norris, if you can look at again
22 the revised compensation program that's attached
23 to the response there, yes.  If you will --
24    (Telephone interruption.)
25 BY MR. LODISH:

Page 82

1     Q     Mr. Norris, referring to the
2  retention plan as part of the report, let's see,
3  it's page 4.
4        Do you have that page?
5     A     Yes, I do.
6     Q     Okay.  And it gives an analysis of
7  the current and new retention plans.
8        Do you see under the target payout
9  there is three tiers of employees or who can
10 participate?
11    A     Yes.
12    Q     Now, the tier one, which is 18
13 participants, do you know whether that group
14 includes yourself?
15    A     I believe it does not include me.
16    Q     Okay.  Do you know whether it
17 includes Mr. McGowan?
18    A     I believe it does.
19    Q     Okay.  Would it include Mr. Siegel as
20 well?
21    A     Yes.
22    Q     So would it be all top management
23 other than yourself?
24    A     Yes.  It would be the people that
25 report to me, plus I believe it includes the

Page 83

1  general managers of the large businesses.
2     Q     Okay.
3     A     There are several large businesses
4  that have general managers that are also included
5  in that top tier.
6     Q     Okay.  Are you particularly concerned
7  about those 18 people leaving Grace?
8     A     Yes.
9     Q     Is that the reason why they, under
10 the new plan, would receive more of the funds to
11 be distributed to the group than either of the
12 other two tiers?
13    A     Yes.  This would also be consistent
14 with their compensation relative to the others.
15 And when we looked at this we looked specifically
16 at long-term compensation.
17    Q     Okay.  Have any of those 18
18 participants in the, what I'll refer to as upper
19 management, indicated to you that if the new plan
20 is not accepted with respect to the new retention
21 plan that they will not remain at Grace?
22    A     They have not specifically said that.
23 They have all indicated a high level of interest
24 in the outcome of this process.
25    Q     Okay.

Page 84

1     A     I have to say that people generally
2  come in and make their announcements, they don't
3  usually come in and make overt or covert threats
4  since particularly in areas where I have limited
5  if no control.
6     Q     Okay.  Meaning that you don't have
7  control over whether this ultimately gets
8  approved.
9     A     Right.
10    Q     Okay.  All right.
11    A     I would like to put on the record
12 that I think, again, the process and people's
13 general trust in the outcome and the way that
14 they will be able to influence their own destiny
15 is an important aspect.
16        So we try to make this as positive
17 internally as we can because it's the general
18 anxiety which will cause people to either pursue
19 a phone call from a recruiter or to look
20 seriously, and then ultimately you look seriously
21 you find that there are some opportunities that
22 are attractive.  So we like to make this as
23 positive as we can.
24    Q     Are you saying that your ability to
25 get a plan like this approved is important in



Page 85

1 terms of their view of how the company is going
2 to be able to function, essentially?
3     A    Yes.
4     Q    Okay.
5         MR. LODISH:  I don't have anything
6 further.  Thank you very much for your time.
7         THE WITNESS:  Well, thank you.
8         MR. LODISH:  And I don't know how you
9 handle reading or waiving.  I don't know what you
10 want to do.
11         MR. RUNNING:  Yeah.  We'll reserve
12 the right to read and sign the transcript.
13         THE WITNESS:  Okay.
14         (Deposition concluded at 5:07 p.m.)
15
16
17 %
18
19
20
21
22
23
24
25

Page 86

1         CERTIFICATE OF DEPONENT
2
3
4
5         I hereby certify that I have read and
6 examined the foregoing transcript, and the same is a
7 true and accurate record of the testimony given by me.
8         Any additions or corrections that I
9 feel are necessary, I will attach on a separate
10 sheet of paper to the original transcript.
11
12
13         _____
14             Paul J. Norris
15
16
17
18
19
20
21
22
23
24
25

Page 87

1 State of Maryland
2 County of Baltimore,
3         I, MARIANNE R. HEWITT, a Notary Public of
4 the State of Maryland, County of Baltimore, do hereby
5 certify that the within-named witness personally
6 appeared before me at the time and place herein set
7 out, and after having been duly affirmed by me,
8 according to law, was examined by counsel.
9         I further certify that the examination was
10 recorded stenographically by me and this transcript is
11 a true record of the proceedings.
12         I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in
14 the outcome of the action.
15         As witness my hand and notarial seal this
16 2nd day of August, 2002.
17
18         _____
            MARIANNE R. HEWITT
19             Notary Public
20
21
22
23
24 My Commission Expires:
25 June 21, 2003

Page 88

1             INDEX
2     Deposition of Paul J. Norris
3         August 1, 2002
4
5 Examination by:                    Page
6     Mr. Lodish                       3
7
8 Defendants' Exhibit Number         Marked
9 3   One-page Peer Comparison First Quarter   64
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 89

## A

**ability** 26:8 30:22 44:22 54:5,6 84:24
**able** 5:22 9:22 17:23 22:17 27:16 41:1 44:13 51:14 57:14 66:4 75:23 80:19 84:14 85:2
**absolute** 16:1
**accept** 21:15 54:17 81:11
**accepted** 65:21 83:20
**access** 32:7,8 40:24
**account** 13:10,14 15:16
**accounting** 66:24
**accuracy** 60:22
**accurate** 9:8 12:5 71:10 86:7
**achieve** 9:23 16:7 17:24 41:1 57:14
**achieved** 48:6
**acquisitions** 58:21
**action** 87:14
**actively** 66:17
**activities** 12:19 13:15 80:17
**activity** 14:7 67:2
**actual** 17:25
**add** 55:17 56:12
**added** 33:21 58:21
**addition** 33:9,14
**additional** 22:5 24:5 33:22 40:4
**additions** 86:8
**address** 3:17,18 36:4,9 37:18
**addressed** 7:4
**addresses** 69:9
**addressing** 37:22
**Adminisered** 1:7
**administration** 77:15
**administrative** 25:22
**advance** 22:17
**advice** 7:21
**advisor** 41:2
**advisors** 11:3 22:13,13 62:24
**affairs** 78:5
**affect** 31:1 38:20 39:1
**affidavit** 12:4 24:7 26:11 29:16 30:20 34:9 41:5 64:14 67:12 72:15
**affirmed** 3:9 87:7
**aggressive** 42:16 43:10

**ago** 25:2 38:7
**agree** 22:17 52:5 60:24 76:13
**agreed** 3:2 7:15,18 21:4
**agreement** 21:13
**aid** 33:13
**al** 1:4
**Albermarle** 59:11
**Alcoa** 73:19
**AlliedSignal** 4:18 33:6 33:17 70:9,10
**allow** 65:24
**alternative** 21:18
**ALVIN** 1:17 2:11
**ambiguous** 52:8
**amortization** 54:23 55:9,13
**amount** 14:7 21:13 46:4,4,6 48:7 77:8
**amounts** 8:24,25
**analysis** 8:6 41:25 45:15 48:14 50:25 61:24 67:15,25 68:10 71:8 72:19 82:6
**analysts** 55:21
**analyzed** 72:16
**ANDREW** 2:9
**and/or** 74:22
**announcements** 84:2
**annual** 11:12 33:14 42:7,10,17 43:5 80:6
**answer** 56:24,25 75:23 79:5
**answers** 69:24
**anxiety** 8:16 9:10 84:18
**anytime** 27:22,25
**apologize** 68:14
**appear** 16:25 61:10
**APPEARANCES** 2:8
**appeared** 87:6
**apply** 55:22
**appreciate** 19:19 74:15
**approach** 42:25 43:25
**approached** 29:18
**appropriate** 7:25 8:9 11:11,16,20 15:13 16:9 42:1 66:15 70:14,19,22 71:19 73:7 77:6 78:22 80:25
**appropriately** 80:7
**appropriateness** 7:22
**approval** 14:17 38:24 67:8
**approved** 6:2 8:17 10:9 11:25 14:3 26:14

**27:14 30:17 39:15 84:8,25
**approximately** 48:17
**April** 6:3 26:14 35:18 35:19 44:6
**arbitrary** 42:3 45:5 46:3,16 51:17
**areas** 25:24 84:4
**argued** 52:20
**asbestos** 2:12 12:5,12
**aside** 6:16
**asked** 41:16 68:13 78:20 79:2
**asking** 39:5
**aspect** 84:15
**assessment** 10:4 68:3
**assist** 78:16
**associated** 39:23
**assume** 9:1 49:19 60:15 76:21,22
**assuming** 21:20 77:1,3
**assure** 61:6
**attach** 86:9
**attached** 34:8 67:12 76:6 81:22
**attempt** 60:13
**attend** 5:17 36:5
**attention** 13:24
**attitudes** 37:17
**attract** 74:4
**attractive** 84:22
**attrition** 26:17 27:14
**August** 1:16 2:2 87:16 88:3
**automatic** 44:21
**available** 15:17 79:17
**average** 43:13 49:1 52:12
**avoid** 43:4
**award** 17:8,25 18:2 19:9 40:3
**awarded** 17:13
**awarding** 18:9
**awards** 17:19 19:5 42:2
**aware** 12:2,13 17:10 29:17 32:23 33:1 38:9,18 56:20 68:13 69:16,19,20

## B

**back** 4:13 21:22 29:13 41:21,24 59:14
**background** 33:9
**backup** 16:15
**backward** 47:7
**bad** 19:11,12

**balance** 80:23
**Baltimore** 87:2,4
**bankruptcies** 22:21
**bankruptcy** 5:14,18 9:5 10:2,10,23 13:4 13:12 14:5 16:21 17:12 18:13 19:24 21:19 22:6 23:1 27:23 28:9,17 29:6,11 29:14 30:4,12 31:24 32:12 36:10,15 37:24 38:19 43:17,24 44:6 44:17 45:22 47:3 54:17 56:22 57:12 66:4 78:19 79:22 80:5,11
**banks** 12:18
**base** 11:10 42:5,9 53:14 53:15 79:18
**based** 12:3 17:20,25 20:25 21:13 26:10 29:20 30:10 40:4 41:25 42:2 48:15 53:14 61:10 72:19
**base-targeted** 78:25
**basing** 18:2
**basis** 17:20 19:8 24:4 42:17 50:21 69:22 71:1,19 73:1,9,11,12 73:13 76:15
**Bay** 28:21
**began** 7:9 38:6
**beginning** 64:13
**behalf** 2:9,11
**behavior** 46:17
**believe** 7:18 12:3,8,10 15:20,24 17:13 26:18 27:2 28:24 30:6 31:12 33:2,23 40:19 45:17 47:20 48:23 56:5 58:16 66:8 67:13 70:19 72:4,11 72:24 74:24 78:20 79:1,2,6,8,12 82:15 82:18,25
**benchmark** 50:7
**benchmarking** 71:4
**beneficiaries** 54:11
**beneficiary** 19:20
**benefit** 6:4 16:20 45:4 48:6,8,13
**benefits** 6:18 7:3,8,11 8:18 10:12 67:5 81:3
**best** 9:20 12:15 27:7 41:2 57:9
**Bettacchi** 76:11,22

**77:1
**better** 9:7 14:4 16:19 19:18 29:9 49:14,25 56:5 70:3 71:10 73:1 73:4
**beyond** 47:24
**biases** 53:6
**bigger** 13:25
**billion** 54:3,3 57:24 58:2
**bit** 9:24 38:14 46:20
**board** 2:4 4:4 7:15,24 13:14 39:7 40:6 41:20 71:1 81:1,8,9
**board's** 39:7 81:10
**body** 34:5
**borrow** 54:6
**bottom** 30:20 67:24 76:17
**break** 62:7
**breathing** 20:11,12
**Brian** 6:7 45:14 62:3 65:17
**bridge** 58:13
**briefly** 4:12
**bring** 11:3
**broad** 70:18 73:10 75:4 75:5,13,21
**broader** 70:13 72:4 77:3
**brought** 52:16
**Bubnovich** 41:11,16 42:11 43:18 45:11,14 53:1 60:10 61:21 64:21 67:24 68:9,15 68:24 72:6 75:20 76:3
**Bubnovich's** 51:22 67:12
**budget** 43:5
**Building** 2:4
**built** 16:11
**business** 4:17,19,22,24 46:11
**businesses** 25:20 43:6,7 51:8,13 80:16,21 83:1 83:3

## C

**Cabot** 60:1
**calculate** 55:20
**calculating** 56:6
**calculations** 58:4
**call** 39:20 42:13 84:19
**called** 3:9 48:24
**candidly** 51:21

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

**capability** 31:13
**capital** 55:25
**Carbide** 49:21 50:3
52:1,21 59:22
**career** 10:17
**careers** 9:19
**case** 1:6 11:14 15:20
31:12 46:23 48:10
49:11 50:3,25 56:1
**cases** 55:17
**cash** 8:7 11:12 17:7,17
17:20 18:17 20:25
21:18,21 33:21 39:3,6
39:21 40:10 53:15
55:21 79:1
**catalyst** 38:3
**catalysts** 4:17 37:9
**categories** 68:17
**category** 11:23 28:1
66:22 70:19
**cause** 13:22 28:11
46:17 84:18
**caused** 10:11
**certain** 23:21 48:7
**certainly** 10:7 12:6,10
13:5 14:8 32:19
73:23 74:4 75:11,13
**CertainTeed** 28:25
**CERTIFICATE** 86:1
**certify** 86:5 87:5,9,12
**chairman** 4:3,4 5:8
**chance** 34:8 43:14
62:17
**change** 14:13 35:13
39:12 40:3 41:6
44:11 55:25 56:17
67:7
**changed** 79:3
**changes** 14:3 16:25
22:9,11
**Chapter** 1:6 7:12,12,14
7:23 8:10 11:14
12:19 13:22 14:13,16
14:19 32:18,22 33:3
41:23 69:4
**characteristics** 33:12
71:22
**chart** 48:20,22 59:9,14
**check** 63:12
**chemical** 49:13 50:14
52:1,2,13,25 59:7
60:17 68:7 69:14
70:11,12,16,24 71:9
72:7,25 73:12,14,15
74:1,11,12,22 77:16
77:16 78:10

**chemicals** 4:17,24
**chemists** 73:18
**chief** 3:23 5:7 78:6
**choose** 17:16 19:5 40:3
66:6
**choosing** 49:11
**chosen** 76:19
**circumstance** 39:24
**circumstances** 8:21
11:19 30:10 32:5
78:23
**cited** 35:14
**City** 3:21
**Claimants** 2:12
**claims** 12:5 32:18
**clarify** 56:18
**classic** 78:7
**clear** 5:4 21:9 38:15
46:4
**clearly** 29:10 30:9
42:15 53:8 70:7,10
73:19 74:8
**Clerk** 3:4
**cliff** 34:2 46:3
**clifffest** 33:25
**cliffiest** 33:23
**close** 47:21 48:5 62:11
**collection** 21:1
**Columbia** 2:5
**combination** 58:24
**come** 7:8 11:22 26:1
41:13 64:23 65:15
68:25 74:5 84:2,3
**comes** 21:19 45:22
**comfort** 10:14
**comfortable** 65:3
**coming** 9:6 29:13 41:15
49:1
**commencing** 2:2
**comments** 5:23 38:25
**Commission** 87:24
**committee** 2:11 6:6
81:6
**committees** 61:15
**common** 54:24 79:13
**communicate** 31:20
32:1 56:8,10
**communicating** 56:7
**communication** 31:16
**companies** 7:11,23
8:10 11:15 19:25
29:19 32:17,21 39:18
40:2 41:22,22,23
42:13 44:13 48:16,25
49:3,3,8,12,15,18,20
50:1,10,15,16 51:23

51:24 53:1 56:19,20
57:5,10,11 59:7,8,16
59:19 60:2,11,16,18
60:19 69:4,7,10,21
72:6 74:17 75:3,4,5,6
76:19 77:6,16,17,24
79:12
**company** 2:3,10 9:8,10
10:14,17 13:25 14:19
15:12,18 16:20 17:24
18:2,9 19:22 21:11,16
28:4 30:23 31:7,25
36:17 37:16 38:19
40:14 41:18 42:17
48:22 50:6,8,18 51:12
52:15 53:23 54:3
62:22 63:3,5 71:23,24
73:7 75:14 77:25
78:1,1,9 81:2 85:1
**company's** 19:7 50:20
51:8
**compare** 50:10
**compared** 32:11 69:13
72:17
**comparing** 49:9 59:6
68:4
**comparison** 44:15
59:17 63:4 69:22
70:3,3 88:9
**comparisons** 69:17
71:2
**compensate** 44:22
**compensated** 46:2
54:16
**compensating** 14:9
**compensation** 5:20 6:2
6:6 7:25 11:10,18
13:15,19 14:21 15:15
18:3 21:6,15 23:23
31:22 32:4,16 40:25
41:8 43:12,15,22,23
44:1 67:18,20 68:1,4
68:16 70:1,23 73:2
76:3,25 78:14,18,21
79:16,24 80:3,24 81:3
81:6,22 83:14,16
**compete** 72:3 74:9
**competence** 48:7
**competitive** 67:25
72:17,21,23 73:19
77:4
**competitor** 29:2
**competitors** 32:24 33:3
**completed** 37:9
**complexities** 79:22
**complicated** 56:13

**component** 17:8 18:15
33:18,19,20,21 44:21
45:23 47:20 79:1
80:13
**coms** 70:20
**concern** 9:15 10:16
12:11 31:10 66:20,25
**concerned** 7:24 83:6
**concerning** 36:10
**concerns** 6:10,19 8:24
10:6 36:3
**conclude** 72:22
**concluded** 85:14
**concurrence** 39:8
**condition** 23:19
**conducted** 34:23 37:20
76:7
**conducting** 36:17
**confidence** 31:17
**confirm** 59:15 60:22
78:21
**confirmed** 35:12 36:23
**consider** 22:3 23:6
73:24 75:6 79:23
**consideration** 16:4
**considered** 81:2
**consistent** 8:1 42:2
49:9 80:22 83:13
**consistently** 66:25
**constant** 55:14
**constraints** 10:19
**consultant** 41:8 48:15
69:21
**consultants** 6:9
**consulted** 9:3
**consulting** 70:22
**contact** 30:2
**contemplate** 21:17
**contemplated** 5:14
13:5
**contemplating** 9:5
38:16 79:24
**continue** 31:19 80:9,19
**continued** 80:14
**continuing** 6:17
**continuity** 9:21 16:9
**control** 47:24 84:5,7
**conversations** 8:3
66:23
**convert** 39:2,5
**converted** 17:20 21:22
**Coopers** 7:22 44:8
**copy** 1:24 24:6,11 34:4
35:1 62:18,20 63:18
63:19,21 64:7,9 67:14
75:25

**corporate** 65:1,7 66:24
67:2 68:14,24 77:15
77:16
**Corporation** 4:15
**correct** 3:24,25 5:2 9:9
10:3 17:5 18:19,23
24:8 26:18 27:17
28:1 37:1,2,8 38:11
38:12 39:4,15,16 40:8
41:12 44:9,10 48:17
48:18 58:4 63:10,11
63:15 77:9
**correcting** 13:23
**corrections** 86:8
**correctly** 14:15
**cost** 15:18 16:6 27:18
28:4 58:19
**costs** 58:25
**counsel** 3:3 87:8,12
**County** 87:2,4
**couple** 42:20 51:24
52:1
**course** 10:15
**court** 1:1 3:4 5:18 6:3
8:17 10:12 11:25
13:12 26:14 27:14
33:25 38:25 44:6
67:7 78:19
**court's** 5:23
**covered** 60:10
**covert** 84:3
**create** 15:21,23 20:20
46:16 53:19 55:18
**creation** 15:21
**credit** 51:6
**creditors** 22:16 61:15
**creditor's** 22:19
**critical** 15:25 26:6 31:3
37:10
**cross** 50:9 75:14
**CSR** 1:18
**current** 3:16 6:12,14,17
7:7 78:2,23 82:7
**Curtis** 28:21
**C-L-I-F-F** 34:2

**D**

**Damage** 2:12
**data** 51:11
**date** 1:16 27:12 39:11
79:9
**day** 14:2 46:24 87:16
**dealing** 36:15
**deals** 69:8
**debtors** 1:5 2:9 24:13
35:15

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

decade 55:13
decide 12:19 15:14
  66:11
decided 6:1 27:3 40:9
deciding 40:12 50:18
  50:21 65:3
decision 6:5 12:25
  39:20 81:11
decisions 9:17 46:24
declined 18:11
Defendants 63:19
  64:10 76:1 88:8
defined 23:6 24:22 25:9
defines 68:5
definition 50:13
degree 31:9
DELAWARE 1:1
deliver 43:21 44:3
  45:25 46:14
delivering 44:2
department 20:17
depending 20:16 25:16
DEPONENT 86:1
deposition 1:15 2:1 3:4
  64:10 76:4 85:14
  88:2
depreciation 54:23
  55:9,11,12,13 56:1,4
designed 45:24 47:11
designing 10:25
desirability 33:8
desire 80:9
destiny 84:14
details 33:24
determine 26:2 28:13
  32:9 44:19 49:4,7
  60:9 68:15
determining 20:2 78:17
developed 31:5 65:4
devise 11:9
difference 25:7 58:5,7
  58:9 77:22
differences 49:2
different 7:5 21:25
  27:15 28:6,8 38:10
  42:4,7 43:25 49:17,18
  49:24 58:17 61:3,4
  68:14,24 69:17 72:6
  79:17
difficult 22:22
difficulty 28:11
digit 42:14
direct 25:17 54:10
  67:17,20 68:1 70:1,21
  73:2 76:3 79:24 80:2
direction 53:7

directly 14:2 29:4
directors 81:2
disadvantage 51:19
discuss 29:13 40:13
  64:14
discussed 5:19 22:12
  38:14 41:19 44:7
  69:7
discussing 8:20 40:13
discussion 7:9 40:18
  44:25
discussions 6:7
disruption 16:17
distorted 80:4
distribute 53:21
distributed 83:11
DISTRICT 1:1,1
diverse 50:2
division 28:25
document 57:18
documents 65:18
doing 11:22 12:1 13:16
  44:18 46:10 51:22
  69:17 75:9
domestic 71:16
dot 70:20
double 42:14
Dow 52:1 59:12,23
drafts 34:13
dramatic 55:25
drive 2:4 3:20 54:13
dropped 43:2
due 10:17 12:4 32:12
  32:18 79:21
duly 3:9 87:7

_____

E

earlier 34:13 38:14
  66:6 69:7
earn 21:3
earned 39:10 40:23
earnings 16:1 42:14
  53:20 54:22 56:3,9
  57:9 71:21
easier 24:10
easily 54:25
EBIT 17:2,4 41:6 55:4
  55:8,16,17,23 56:2,5
  56:10 69:5 71:8
EBITDA 15:22 17:3
  53:19,25 54:21 55:5
  55:18,21,22,23 56:12
economic 47:25
effectively 10:5
eighth 77:11
either 25:22 26:7 32:11

52:2 66:17 78:9
  83:11 84:18
eligible 23:15 26:3
eliminated 16:3
Ellicott 3:20
emergence 23:3
emerges 21:21
employee 15:16,18,25
  27:25 35:12 36:1
  66:11 68:16
employees 6:4 7:17 8:4
  9:6 10:25 11:6 12:24
  13:16 14:10 15:7
  16:19 17:14 18:25
  19:5 23:6,11,12 24:13
  24:14,22 25:2,14
  26:12,20,25 27:4 28:5
  29:17 30:14 31:6,8
  32:16,21 33:7 35:14
  36:14,23 37:11 38:10
  40:21,24 45:3 49:7
  50:20 51:18 54:9,15
  55:8 56:8,9,12 65:7
  66:21,24 67:4,15 72:1
  73:3 74:18 79:25
  80:5 82:9
employee's 30:21 31:2
  37:17
employer 73:24
employment 66:1,16
  66:17 73:20
energies 46:25
energy 28:4
Engelhard 4:14
engineers 70:12 73:12
ensure 11:4 16:9
enterprise 15:23 16:8
  55:20
entire 52:25
entirely 27:1
entities 68:25
environment 7:16
  15:16 25:23 47:25
  79:3
environmental 74:7
  78:4
equities 45:2
equity 17:16,21 21:10
  21:16,19,22 22:5,14
  22:17,18 33:10,15,18
  33:20 44:21,23 45:4
  47:12 53:10 54:7
equity-based 49:10
ESQ 11:7
ESQUIRE 2:9,11
essentially 22:7 85:2

established 47:14,15
estimate 22:23
et 1:4
evaluate 44:14 45:1
evaluations 8:2
event 16:16 26:8
exact 59:16 62:23
exactly 22:1 52:23
  55:24
examination 3:12
  67:19 87:9 88:5
examined 3:11 86:6
  87:8
example 16:24 19:11
  48:1 49:20 51:1,8
  52:11 58:16 59:11
  65:22 66:25 69:2
  70:9 71:5 73:10 74:6
  76:10
exceed 43:8
excited 55:2
executive 2:4 3:23 5:7
  29:18 30:2,8 68:2
  70:2 72:16,20
executives 68:11 70:4
  75:10
exercised 18:6
exhibit 24:9 35:2 48:20
  63:19 64:10 67:13
  75:24 76:1 88:8
exhibited 51:8
existed 14:11 47:2
existing 15:15 27:4
  47:12 67:5
exists 16:1
exited 80:5
expect 20:13
expectation 17:22
  23:22 51:18
expectations 53:13
expected 18:3,10
expenses 58:19
experience 27:12 33:5
  33:9 39:17,22 40:7
expert 71:3
expires 6:14 87:24
explained 55:8
expressed 66:20
expressing 10:16
extra 46:19,20
extraordinary 28:3
  40:4
extremely 16:10 22:15
  48:9

_____

F

fact 8:12,13 12:16,25
  13:4,17 14:5 18:16
  19:2 66:4 74:4
factor 12:6,7,9,12
fair 32:4,10 40:14,20
  43:11,16 44:14 80:2
  80:25
fairly 43:21 54:16
fairness 11:1,2
fall 66:21 76:14
familiar 61:10
famous 48:22
fashion 47:11,15,16
fear 8:15
fears 10:21 15:5
feed 50:5
feel 7:6 9:7 11:20 86:9
felt 7:14 12:17 13:18
  15:11 22:24 26:6
  29:8 33:6 40:19 43:9
  54:15 66:14 80:1
file 7:14 8:13 13:4
filed 13:23 14:5,10,16
  34:5,9,11 36:10
files 14:1
filing 3:3 14:13
fill 26:8
final 1:24 50:5
finance 25:22
financial 22:13 58:13
  61:15 62:23
find 11:7 29:24 53:16
  53:17 66:11,16 84:21
fine 62:10,10,12
firm 20:15,16
firms 29:18 30:2,8 33:8
firm's 20:21
first 3:9 6:12 14:1 34:7
  47:21 59:4 76:10
  88:9
fiscal 57:22,25
five 26:11,25 27:24
five-minute 62:6
fixed 20:7 21:12
floor 2:4 45:8,9 47:4,5
flow 55:21
fluorine 4:19
focus 23:2 35:12,16
  36:5,9,12,23 37:4
  38:9
focused 13:24
focusing 6:20,23
follow 5:9 57:5
following 6:7
follows 3:11
foregoing 86:6

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 92

**form** 19:6 22:1,14 52:6 53:10 68:18 79:18
**formal** 81:11
**former** 74:7
**formula** 19:10 21:12 40:6
**forward** 31:15
**foundation** 68:20
**four** 64:17,24 65:5,15 65:22 66:9
**four-year** 80:16
**frame** 66:9
**frankly** 13:24
**frequency** 30:7
**front** 8:7,14 24:7 34:18 48:20 67:14 76:6
**full** 3:14 39:8
**fully** 40:23
**function** 85:2
**functional** 25:23
**funds** 83:10
**fungible** 66:2
**further** 85:6 87:9,12
**future** 18:4 53:13

**G**

**gains** 28:14
**gallop** 37:10
**gas** 48:1 58:17
**GDP** 71:13
**GE** 73:22,25 74:5,7,16 74:20,24 75:4,11 76:14,21,23
**general** 6:23 25:19 26:12 30:15 36:20,21 38:17 40:15 41:19 66:23 73:15 74:3 79:19 83:1,4 84:13,17
**generally** 71:6 84:1
**generate** 22:25 80:15
**getting** 32:16 59:16 62:11 75:20
**give** 3:13 6:3 16:19 20:5,7,18 21:2,5 43:11 48:20 62:20 64:7 80:7 81:16
**given** 8:12,13,21 11:18 15:11 32:5,5 44:12 46:15 51:24 66:3 86:7
**gives** 82:6
**giving** 20:25 21:18 22:5 42:1 51:17 75:25
**go** 10:22 38:19 46:11 55:19 62:7 73:18 74:17,18 76:22 81:15

**Goabain** 28:24 29:9
**goal** 9:23
**goes** 20:21
**going** 7:14 8:13 10:22 12:3,14 18:16,22,24 19:3 20:5,7,9,18 21:5 26:21,21 29:25 31:14 46:25 47:5,13 53:15 59:15 63:12 67:6 69:16,22 78:1 85:1
**Golden** 3:20
**good** 9:24 15:22 19:15 19:17,18 20:9 44:1 45:19 48:2 52:4 59:1 73:20,24 75:6 80:11
**Grace** 1:4 2:3,3,9 3:23 4:2,7,9,13 5:1,6,12,25 6:6 10:23 12:3 21:19 21:20 29:14 30:4 34:22 41:15 45:12,22 47:2 49:4,5,7,13 57:2 59:4 61:24 62:1 64:19,22,25 66:11 68:17 78:12 83:7,21
**Grace's** 26:16 29:3 57:23 68:1 73:3
**grade** 23:18,21
**grades** 24:2
**Greak** 52:2
**Great** 52:13 59:12 64:1
**greater** 7:8 16:7 30:6 76:24 77:23
**gross** 62:19 71:16
**group** 4:16 23:12,16,25 25:5 32:24 33:3 35:12,16 36:5,9,12,23 37:9,16 38:3 48:16,24 49:12 50:2,10,12,14 57:3,5,10 59:7,12,13 59:14,16,19 60:11,19 61:21 63:5 66:24 69:6 70:4,8,10 71:11 71:21,22 73:4,19,23 77:18 82:13 83:11
**groups** 35:7 37:4 38:9 50:16 60:14 68:15 69:21
**grow** 30:22 55:24
**grown** 56:20
**growth** 10:18 15:22 16:2 17:9,14,15 29:8 41:6 42:14 44:19 45:9,18 46:10,12 48:25 49:4,17,22,23 50:18,21 51:1,9,14 52:12,14,16,21 53:19

**54**:10 55:4 57:4 58:22 59:5,5 69:6 71:8,11 80:20
**growth,but** 46:9
**guaranteeing** 18:25 22:7
**guess** 23:20 45:16
**G-O-A-B-A-I-N** 28:24

**H**

**Haas** 63:8
**half** 51:2 71:17
**hand** 61:19 87:15
**handle** 85:9
**hang** 22:4 54:18
**hanging** 67:21
**happen** 10:22 18:24 30:3 47:23 72:9
**happened** 10:9 30:5
**happening** 9:8 30:6
**happens** 54:18 57:12
**happy** 64:7
**hard** 56:11
**head** 28:25 74:7
**headquarters** 65:1
**health** 25:23 78:4 80:20
**hear** 5:22
**heard** 38:25
**hearing** 5:18 38:25
**held** 2:1 4:20 35:13 77:19
**help** 78:14
**helped** 10:5
**Hewitt** 1:18 2:6 71:4 78:12,16,20 79:2 87:3 87:18
**high** 9:10 16:11 31:9 35:5 36:24 37:25 48:7 51:5 83:23
**higher** 53:19 56:4 58:10,24
**highest** 15:23 54:9 57:4
**hired** 5:6,8,12 23:22
**hires** 27:6
**historical** 26:16 71:5
**historically** 51:15
**history** 51:13 78:1
**hold** 4:1 5:4 9:14 71:7
**holding** 68:6
**honest** 53:18
**hope** 51:6 57:16 75:3 75:21
**hopefully** 20:12 57:14
**horizon** 17:18 19:2
**horizons** 80:17
**HR** 67:22

**hugely** 54:7
**human** 6:8
**hurried** 47:11

**I**

**idea** 18:21 45:19
**identical** 60:23 61:8
**identically** 56:15
**identification** 64:11
**IFF** 59:13
**impact** 66:10
**importance** 30:21
**important** 7:16 14:9 22:25 31:16,25 47:19 54:13 84:15,25
**impossible** 21:25 22:16 28:13
**inadvertent** 63:13
**incentive** 7:1 11:12,13 14:24 16:24,25 17:17 20:4 23:10 24:5,24 25:3 30:16 31:1 32:17,20 33:11,14,15 33:16,22 41:17 42:8 42:10 43:15,22 45:17 45:19 46:5,10,13,19 47:3,13,18 50:22 51:20 54:5 69:8 78:25,25 79:18,19,23 80:6,22
**incentives** 17:8,14 20:2 40:4 42:5 50:19
**include** 23:23 75:11,13 82:15,19
**included** 24:3 59:20 61:1 68:11 73:25 75:8,21 83:4
**includes** 82:14,17,25
**income** 18:11 51:9 56:2 57:23 58:1,6,9 80:15
**incorrect** 12:24
**increase** 6:18 10:11 20:16 57:9
**increased** 6:4 66:15
**increasing** 66:8 79:24
**independent** 53:5
**INDEX** 88:1
**indicate** 24:12 29:16 30:19 41:5 72:5
**indicated** 15:4 29:21 57:1 83:19,23
**indicates** 34:22 35:4,11 57:22 59:4 67:25 76:9
**individual** 9:11 11:10 11:23 26:9 43:6

**48**:25 49:15 52:4
**individuals** 25:17 26:2 27:21 32:15 43:12 48:3 68:6 70:7,20 73:21 76:5
**industries** 11:5,6 42:14 76:9,16
**industry** 8:1 19:22 32:5 32:12 41:22 42:3 44:14 49:8,13 50:14 55:19 68:8 69:14,21 70:11,17 71:3,9,23 72:8 73:1,14,15,16 74:22 78:10 79:13
**inexperience** 13:21
**inflation** 59:2 79:7
**influence** 84:14
**information** 11:4,8 32:7 41:20 44:13 61:13,18
**initial** 25:9 41:5
**injury** 12:12
**inside** 9:12 31:24,24 44:14
**intended** 60:16
**intention** 16:18 60:13
**intentionally** 61:4
**interest** 22:6 54:22 83:23
**interested** 87:13
**internal** 6:8 38:6 65:18
**internally** 84:17
**interruption** 81:24
**invest** 49:12
**investment** 55:10,12,20 56:1 57:6
**investors** 49:11
**invite** 31:7,7
**involve** 67:1
**involved** 39:19 40:21
**issue** 6:16 9:13 12:22 31:3,8 45:6 46:22
**issues** 5:23 6:10,19 13:14,25 14:9 16:14 29:7 36:9 37:18,23 80:10

**J**

**J** 1:15 2:1 3:8 86:14 88:2
**JANE** 1:25
**January** 4:23 5:9,10,11 6:13
**JKF** 1:6
**job** 20:9 59:1
**jobs** 16:10 24:4 27:21

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 93

**join** 31:8
**joined** 4:18 5:1
**Jointly** 1:7
**judging** 73:2
**judgment** 11:23 31:13
  66:7
**Julius** 3:15
**July** 5:18
**June** 87:25

**K**

**keep** 7:17
**keeping** 49:2
**key** 6:4 7:17,17 9:15
  10:15 15:25 16:12,14
  16:19 23:6 24:1,13,22
  25:1,14,18,20,21
  26:12,20,25 27:4
  29:17 30:2,14 32:16
  68:16 72:1 73:6
**kick** 45:7
**kind** 60:4 74:8
**kinds** 71:2
**know** 6:8 7:5 9:7,11,16
  9:18 14:1 18:7 21:7
  22:21 23:2 25:7,16
  26:20 27:1 28:8,16,22
  29:23 32:4,15,19
  37:19,23 38:5 41:14
  43:17 47:2 48:19
  49:14,19,25 51:25
  52:17,24 53:3 55:14
  56:11,13,24 58:8
  59:11,18 60:1 61:20
  61:23 64:4 65:20
  66:18,19 70:21 71:4
  72:9,12 74:6,9 75:5
  77:20 79:7,22 82:13
  82:16 85:8,9
**knowledge** 27:7 28:9
  29:23 31:6 37:6
  72:12
**knows** 52:17,18

**L**

**Lack** 68:20
**Lakes** 52:2,13 59:12
**large** 12:4 83:1,3
**larger** 25:19 78:2
**largest** 28:10
**late** 7:18 35:21
**latest** 37:23 38:2
**law** 87:8
**leaders** 7:17 8:8 9:15
  10:15 31:4,5,10 36:18
  37:19 44:15 70:12

75:7
**leadership** 9:21 25:15
  26:5 31:2 35:7,13,25
  36:4,25 72:1
**leadership's** 30:22
**leader's** 31:12
**learned** 14:18
**learning** 27:21
**leave** 15:19 26:21,22
  30:17 31:4,11 35:15
  66:6,11
**leaving** 26:16 29:22,24
  83:7
**left** 4:13,25 16:16 26:9
  26:13 28:9,17 29:6
**legacy** 77:25
**legal** 25:22
**letting** 46:11
**let's** 4:21 53:25 61:7
  66:12 81:15 82:2
**level** 8:9,12 9:10 11:9
  11:19 15:15 16:2
  23:20,21 42:16 46:1
  55:15 65:25 66:14
  83:23
**levels** 35:5 36:24 37:24
**leverage** 16:1,8,11
  53:18,22
**leveraged** 54:7
**liabilities** 12:11 32:22
**lieu** 22:8,10
**light** 14:4
**likelihood** 13:8
**limitations** 14:23
**limited** 10:18 70:5,7,16
  84:4
**limits** 46:17
**list** 50:2 59:20 60:1,3,5
  60:11 61:11,21 62:7
  62:18,21,23 63:4,4,6
**listed** 63:9 77:17
**lists** 61:7,8
**little** 10:10 38:14 46:20
**living** 10:10
**Lodish** 1:17 2:11 3:12
  6:22,24 22:10 23:9
  25:10,25 34:16,20
  52:10 62:9,16 63:17
  64:1,6,12 67:19 68:21
  74:13,14 81:15,20,25
  85:5,8 88:6
**long** 4:6 17:18 23:23
  51:13 80:4,13,20
**longer** 65:8
**long-term** 6:25 10:16
  13:19 14:24 16:23,25

17:14,17 19:8 20:3
  21:6 23:10 24:24
  25:3 30:16,23 32:20
  33:10,16 41:17 43:22
  45:19 47:18,21 49:10
  54:5 69:8 78:25
  79:19 80:21 83:16
**look** 11:17 24:10 26:2,3
  34:3,6 43:24 44:15
  51:15,23 57:17 59:3
  61:9 67:11 68:22
  69:5 72:2,14 75:24
  76:5 81:21 84:19,20
**looked** 14:1 43:21
  49:15,16 61:7 65:1
  69:3,6 72:7 83:15,15
**looking** 11:8,15 14:12
  16:23 19:25 20:1
  26:11 35:1 42:12
  44:18 47:7 48:25
  49:19 50:6 71:20,25
  73:4 75:10 77:14
**looks** 63:7
**LORDISH** 23:4
**lose** 27:25 65:12
**loss** 27:19
**losses** 28:13
**lost** 27:24 28:5,12
**lot** 8:3 14:10 70:11
**low** 19:20,22
**lower** 8:9 24:2 43:7,8
  56:3
**LTIP** 14:25
**luxuries** 56:23

**M**

**main** 12:7,9,12
**maintain** 9:21 30:22
  45:23
**major** 45:4
**making** 8:14 17:24
  46:24 71:1 80:11
**managed** 36:16 43:11
**management** 13:21
  53:6 82:22 83:19
**manager** 28:10,17,19
  74:7
**managers** 25:19 70:12
  83:1,4
**managing** 36:17
**manufacturing** 29:1
  68:7 69:14 70:17,18
  70:24 71:9 72:7 73:1
  73:16 74:2,3,12,12,22
  78:10
**Marianne** 1:18 2:5

87:3,18
**mark** 64:2
**marked** 64:11 76:1
  88:8
**market** 19:16,17 45:1
  53:11
**marketing** 25:21 70:12
**marketplace** 19:3
**markets** 44:23
**Maryland** 2:5 3:21
  87:1,4
**mass** 32:13,18,22 69:3
**match** 60:14
**materials** 48:2 58:18
**mathematical** 19:10
**matter** 45:18 53:11
**maximum** 45:25 46:14
  54:4
**McGowan** 6:8 45:14
  62:3 65:17 77:11,19
  82:17
**McGowan's** 77:14 78:4
**mean** 8:21 37:19 38:3
  50:13 52:2 54:12
  56:19 62:10 75:5,16
  77:21 79:19
**Meaning** 84:6
**means** 19:4 54:21
**meant** 74:15
**mechanism** 47:14
  53:17
**meet** 51:18
**meeting** 7:19 35:25
  64:4
**meetings** 9:14
**member** 81:5,7,9
**memo** 25:9
**message** 12:24 80:22
**method** 50:23 51:22
**methodology** 37:16
  69:19 73:5 79:11
**mid** 65:25
**middle** 4:20,21 8:9
**million** 53:25 54:1
  55:15,16,17 57:23
  58:1,6
**mind** 49:2 54:12
**minimize** 16:17
**minus** 52:14
**minute** 45:18
**mirror** 50:15
**mitigated** 13:18
**mix** 74:17
**moment** 20:22 25:2
**momentum** 28:14
**monthly** 20:7

**months** 36:11 64:17,24
  65:5,16,21,22 66:10
**motion** 5:19 34:15
**motivate** 22:25 40:23
  46:22 54:9 80:14
**motivation** 36:1
**motivational** 46:21
**move** 53:24 54:1
**multiple** 11:6 15:23
  16:8 17:21 53:20
  54:1 55:6,22 72:11
**multiples** 54:25

**N**

**name** 3:14 63:14
**names** 61:9,10
**narrow** 73:10,13,14
**national** 30:11 73:12
**natural** 48:1 58:17
**naturally** 53:9
**nature** 19:12
**necessarily** 37:19 50:7
**necessary** 23:18 65:2
  86:9
**need** 44:24,24 62:22
  63:21 67:7 72:2
**needed** 36:3
**negative** 38:20 46:11
  49:23 52:3,16
**negotiating** 43:6
**negotiations** 43:5
**net** 57:24 58:1
**never** 40:8
**new** 16:19 27:21 37:10
  82:7 83:10,19,20
**nomenclature** 54:24
**normal** 10:15
**normally** 23:24 40:25
**Norris** 1:15 2:1 3:8,13
  3:15,22 5:17 14:16
  15:2 23:5 27:8 34:3
  37:5 39:19 48:23
  62:17 64:13 68:12
  72:25 81:21 82:1
  86:14 88:2
**notarial** 87:15
**Notary** 2:6 87:3,19
**November** 4:8 5:1,6,13
  7:19
**number** 6:8 8:21 12:4
  20:25 21:4 24:9
  25:15 26:15 35:2
  36:11 49:16 54:13
  55:18 57:2 64:10
  65:17 67:13 75:24
  76:1 88:8

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 94

**O**

**Oak** 3:20
**objection** 12:1 52:6
   68:18
**obligations** 22:20 77:25
**obtained** 54:25
**obvious** 70:21
**obviously** 8:23 28:12
   47:13 52:15,16 67:6,8
   77:5 78:6
**occur** 18:4
**occurs** 55:12
**offer** 7:3 66:5
**offered** 7:11
**officer** 3:23 5:8 78:6
**offices** 2:3
**Official** 2:11
**offset** 19:15 48:2 59:2
**Oh** 64:1 74:19
**okay** 3:16 4:1,6,11,25
   5:3,12,17,22,25 6:16
   8:22 9:1,24 10:4,8
   11:21 12:8,13 13:9
   14:15 15:1 16:23
   17:12 21:8 23:5,14
   24:6,17,20 25:4,7
   26:19,24 28:2,19 29:2
   30:14 32:2 33:4 34:3
   34:12,19 35:11,20,23
   36:2,8,19,22 37:3,7
   37:14,21 38:8,13,23
   39:14,17,25 40:12
   41:10,13 42:4,9,23
   45:6 48:19 54:20
   55:1 56:16 58:14
   60:2,6,24 61:12,17,20
   61:23 62:2,5,25 63:3
   63:9,16,20 64:1,23
   65:20 66:19 67:11,23
   69:23,25 71:7 72:14
   73:8,25 74:10 75:1,9
   75:19 77:7,10,12
   79:10 81:7,14 82:6,16
   82:19 83:2,6,17,25
   84:6,10 85:4,13
**once** 21:19 45:22
**ones** 31:4 37:22 72:11
   72:12
**One-page** 88:9
**one-third** 18:8
**ongoing** 16:5
**operate** 10:14
**operates** 71:24
**operating** 65:10
**operations** 25:21

**opportunities** 10:17
   11:7 15:12,17 29:8,19
   70:6 73:17 84:21
**opportunity** 16:7 19:8
   20:15 29:10 31:14
   47:9 54:15 73:21
**opposed** 18:17 21:17
   22:6 41:14 55:5
   65:22 71:11
**option** 12:14 18:17
   23:13 24:3 33:18
   39:2 40:10
**options** 12:20,22 13:4,8
   18:6,18 19:6,20 39:21
   41:1
**order** 9:6 66:16
**organic** 58:23
**organization** 31:13,14
   31:17,19,21
**oriented** 65:7
**original** 6:1 7:10,19 8:7
   9:2,4,25 11:24 13:11
   14:17,24 15:3 27:13
   86:10
**originally** 5:19 19:6
**ought** 56:14
**outcome** 83:24 84:13
   87:14
**outlines** 68:24
**outside** 6:9 9:12 11:2,3
   12:19,25 27:6,10
**overall** 11:18 20:21
   31:17 43:25 51:9
**overshadowed** 53:21
**overstated** 30:24
**overt** 84:3

**P**

**package** 7:1 11:17
   14:21 23:23 30:17
   43:23 80:1
**packages** 32:17 69:11
   78:18
**page** 25:9 34:6,21
   57:17,20 67:24 82:3,4
   88:5
**paid** 46:9 54:4 64:15
**paper** 86:10
**papers** 14:2
**paragraph** 24:12,17
   26:11 30:19 41:4
   57:20 59:21 60:17
   64:13 67:24 69:2,5,9
   69:12 72:15
**paragraphs** 68:23
   69:16

**parallel** 78:9
**parameter** 76:15
**parameters** 76:8 77:13
**part** 24:9 32:15 38:23
   57:18 59:23 60:18
   66:7 68:9 82:2
**participants** 24:23
   82:13 83:18
**participate** 75:15 81:4
   81:10 82:10
**particular** 11:11 26:2
   35:17 52:5
**particularly** 15:15 16:2
   22:13 50:19 62:9
   66:9 72:2 83:6 84:4
**parties** 3:3 67:10 87:13
**partnership** 20:19,20
   20:24
**Paul** 1:15 2:1 3:8,15
   86:14 88:2
**pay** 18:16 20:22 39:21
   57:16 66:5
**paying** 22:19
**payment** 8:8 21:18
   40:10 43:11
**payments** 8:14,20 16:3
   17:7 22:7 39:2 45:6
**payout** 19:13 39:13
   47:22 48:8 54:4 82:8
**peer** 8:1 19:25 32:24
   33:3 41:22 44:13
   48:15,22,24 50:11
   57:3 59:7,19 60:11,19
   61:21 63:4,5 69:6
   70:4,7,10 71:11,21
   73:4,19,22 77:18 88:9
**peers** 19:8,18 44:18,23
**people** 8:16 10:13
   16:13 17:16,22 20:22
   22:3,25 23:25 24:15
   25:13 26:6 27:9,24
   30:3 31:10,18 32:11
   33:22 45:25 46:14,22
   46:23 47:4,20 53:4
   61:4 64:4 65:3,10,25
   67:22 70:11 74:4,9
   79:15 80:14,19 82:24
   83:7 84:1,18
**people's** 12:10 16:4
   43:23 84:12
**percent** 17:6,6,9,15
   18:16 21:18 24:2
   41:7,7 42:18,19,25
   43:3,4 44:9 45:8 46:9
   46:9 47:4 48:17
   49:21 51:2,5,9 52:13

52:14,19,21 56:21
   71:18 79:8,9
**percentage** 52:17 56:14
**percentages** 51:25 55:7
**percentile** 72:21
**perfect** 53:4
**perfectly** 60:14
**perform** 80:9
**performance** 11:19
   17:25 19:7,15,18,21
   20:1 21:10 23:1 40:5
   42:2,13,15,15 43:13
   44:1,3,22 45:2 51:15
   53:14 57:15 75:7
   80:12
**performed** 19:25
**period** 6:14 8:5 12:20
   17:23 18:7 19:10
   27:19,20 28:15 33:6
   46:15 47:22 48:11
   51:10 52:12,22 58:17
   58:21,22 64:19 65:24
   66:5
**periods** 19:21
**person** 16:16
**personal** 3:18 9:19
   12:11 28:8 72:12
**personally** 19:4 87:5
**personnel** 6:9 25:21,22
**perspective** 56:14 57:6
**petroleum** 4:15
**pharmaceutical** 77:17
**phenomenon** 30:1
**phone** 84:19
**pick** 53:1 65:23
**picked** 14:10 53:11
**piece** 20:14 21:6 33:21
**pieces** 20:6 21:1
**place** 6:13 7:20 24:21
   39:4,9 76:14 87:6
**plan** 5:20 6:2,13,14,17
   6:21,23 7:7,10,20,22
   8:7,16 9:2,4,25 10:9
   10:20 11:9,25 12:14
   13:11,18,19 14:18,24
   14:25 15:3 16:19,24
   16:25 19:12 21:10,21
   22:2 23:7,8,10,13,24
   24:3,16,18,19,23,24
   25:3,6,12,14 26:13,13
   27:13 28:10 30:16
   32:25 33:10,11,12,15
   33:16 38:23 39:3,5,9
   39:10,15,23 40:8,22
   44:8 45:7,8,17,19,24
   47:10,10,12 49:10,10

53:21 54:5,14,19
   64:19 65:6,8,11 67:5
   67:7 80:6,22 81:3
   82:2 83:10,19,21
   84:25
**plans** 10:25 14:4,10
   17:17,17 21:24 31:1
   32:20,20 41:17,17,19
   47:3,18,21 48:9,10
   79:23 82:7
**plant** 28:10,16,19
**pleading** 34:5,6,8
**please** 3:13 52:8
**plus** 22:21 49:22 82:25
**point** 5:14 10:7
**Polymers** 4:22
**population** 15:25 25:3
   70:6,13 71:25 72:3,4
**portfolio** 50:16
**portion** 43:22
**position** 4:9,20 11:11
   21:13,14 26:4,7,8
   74:8 76:15,23 77:14
   78:7
**positions** 16:12 24:1
   25:18 27:20 28:3
   65:9,12,25 68:2,7
   69:13 70:2,22 72:2,17
   72:20,22,25 73:6
   77:19,22,23 78:3,5,8
   79:17
**positive** 31:20 52:3,13
   84:16,23
**possibilities** 14:19
**possibility** 22:14
**possible** 50:23 54:10
**potential** 27:19 35:14
   65:11
**potentially** 66:21
**practice** 72:18,23
**practices** 7:25
**practicing** 72:21
**precipitated** 6:19
**precise** 24:25 34:11
**precisely** 75:2,16
**predict** 22:1
**premier** 42:13,15 45:17
**preparation** 35:24
**presentation** 61:16
**presented** 44:5 81:12
**presenting** 78:18
**president** 4:3,16,19,22
   4:24 5:7 77:15
**presumably** 69:11
**pretty** 59:1
**previous** 14:23 29:20

Case 01-01139-AMC    Doc 2545-3    Filed 08/15/02    Page 29 of 31

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 95

45:7
**previously** 23:13
**pre-tax** 57:23,25 58:6
**price** 7:21 9:3 12:2 44:7
48:1,1 50:4,5 53:12
**prices** 19:21 58:17
**primarily** 12:11 65:6
**prior** 10:1 17:12 36:11
42:10 43:1,2,3 44:17
44:20 47:2
**probably** 13:22 51:4
52:3 58:23
**problem** 47:1,17 51:21
**proceedings** 87:11
**process** 6:11 22:22 32:6
36:16 43:7,24 67:8
83:24 84:12
**producing** 47:4
**product** 71:16
**productivity** 28:12
59:1
**products** 4:19 50:5,15
71:22
**profit** 59:5 62:19
**program** 16:14 38:18
64:15 69:3,8 81:22
**programs** 78:21
**Property** 2:12
**proportionately** 45:3
**proposal** 22:9,11 39:7
**proposed** 10:21 19:6
80:2
**prospects** 10:18
**provide** 7:8 16:15
40:24 47:13 54:6
61:13 76:24
**provided** 61:14 64:18
68:6
**public** 2:6 78:5 87:3,19
**purpose** 17:3 36:8,13
**purposes** 12:19 55:4,23
61:3 64:11
**pursue** 12:19 84:18
**put** 6:13 7:19 8:16 9:25
11:24 13:17 14:2
27:13 33:10,12 39:4
46:25 48:7 61:4
73:22 84:11
**putting** 38:17
**PWC** 8:6
**p.m** 2:2 62:14,15 81:18
81:19 85:14

**Q**

**qualified** 76:23
**qualify** 74:1

**quality** 35:6 36:25
**quarter** 56:9 88:9
**quell** 10:5,21
**quelled** 15:4
**question** 52:7 55:3
57:13 60:21 68:19
69:15,24,25 74:20
79:21
**questions** 37:10,11
56:24 64:15
**quickly** 60:7
**quite** 17:18 47:14,16
59:13,22 61:25 67:9
**quote** 32:10 50:11

**R**

**R** 2:5,9 87:3,18
**raised** 5:23 55:1,3
79:21
**range** 51:3 72:23 77:5
**ranked** 59:4
**rapidly** 54:14
**rate** 15:22 16:2 26:17
27:14 41:6 44:19
49:1,5,22,23 50:18,21
51:2,14 52:12,14,16
52:21 53:19 54:10
55:4 56:4 57:4
**rates** 49:17
**rating** 71:10
**ratio** 55:24
**raw** 48:2 58:18
**reached** 47:6
**read** 85:12 86:5
**reading** 85:9
**real** 67:4
**realized** 14:22 15:6
**really** 7:13 10:22 13:1
21:3 23:2 36:13
51:25 60:9 72:3
**reason** 17:16 29:6
47:18 50:17 53:4
55:6,7 79:2 83:9
**reasonable** 43:15 49:4
49:6 50:9 65:24 66:5
**reasonableness** 68:4
78:17
**reasons** 35:14 52:4
71:12
**recall** 35:8,10,16
**receive** 83:10
**received** 5:5
**receiving** 19:20
**recess** 62:14 81:18
**recognize** 11:1 14:6
47:17 53:18

**recognized** 75:7
**recognizing** 39:6 40:22
47:10 65:6
**recommendation** 6:7
41:6,18 45:10,11
64:20,22 65:19
**recommendations**
41:24 68:10 69:1
**recommended** 41:14
**record** 25:8 54:20
81:16 84:11 86:7
87:11
**recorded** 87:10
**recruiter** 84:19
**recruiters** 66:18
**redesign** 47:10
**reduce** 17:2
**reduced** 8:15 46:7
**reduction** 56:2
**refer** 83:18
**referred** 59:20
**referring** 9:2 25:1,2
33:17 34:14 41:4,10
62:18 69:13 77:7
82:1
**refining** 4:15
**reflected** 58:10
**regard** 70:15
**regional** 73:11
**regularly** 9:14
**reinforce** 80:19
**related** 49:8
**relating** 25:11
**relationships** 31:6
**relative** 14:13 19:2,7
22:19 41:21 44:22
83:14
**relatively** 48:5 55:14
67:3
**relocation** 64:25
**remain** 31:18 83:21
**remained** 43:18
**remember** 33:24
**reorganization** 21:24
22:2 54:19 65:8,11
67:1
**reorganize** 16:5
**reorganized** 27:2
**rephrase** 52:9
**replace** 47:12
**replaced** 26:25 27:5
**replacements** 16:12
27:15
**replacing** 53:8
**report** 82:2,25
**reported** 1:18 38:11

**Reporter** 34:1
**REPORTING** 1:25
**reports** 25:17
**represent** 50:2,11
**representative** 53:2
**represents** 11:5 21:5
55:21 73:16
**reserve** 85:11
**resigned** 26:23
**resource** 6:9
**respect** 31:11,18 83:20
**respective** 3:3
**response** 22:15 34:4,16
34:17,17 57:2,18
81:23
**rest** 19:3 44:23 62:8
**restructuring** 78:6
**result** 35:12 40:17
55:10 56:2 65:13
**results** 35:9 36:22
37:13 38:1,4 52:4
80:8
**retained** 78:12
**retaining** 43:17
**retention** 6:1,21,25
7:11,20 11:16 13:18
14:20,23 16:3,14
24:16,18,19,23 25:5
25:12,14 26:13 30:15
31:1 32:20,24 33:13
36:1 38:17 41:17
44:8 47:19 48:8,12
69:3 82:2,7 83:20
**retroactive** 39:1,11,20
**retroactively** 40:9
**revenue** 58:18,20,22,22
**review** 32:9 34:8,10,13
38:6 41:16 67:9 79:4
79:8
**reviewed** 7:10 9:3
34:11 41:21 65:17
68:25 69:10
**reviewing** 69:15
**revise** 5:20
**revised** 6:3 7:7 30:15
45:8 64:14,19 81:22
**revising** 79:23
**revision** 6:11
**revisions** 6:17 7:2
10:20 30:25 81:2,11
**revisited** 8:23
**rewarded** 45:3
**rewarding** 45:18
**rhetorical** 57:13
**right** 4:11 8:12,21,25
11:9 12:15 25:10

30:12 38:8,13 42:16
50:17 52:20 58:3
59:24 61:13 62:13
63:9,16 74:13 76:4,20
80:20 81:4,15 84:9,10
85:12
**risk** 8:4,15,19 9:18
13:18 15:18
**risks** 15:11
**road** 8:9
**Rohm** 63:8
**roll** 12:18
**room** 2:4 62:8
**ROSE** 1:25
**roughly** 55:7
**Running** 2:9 6:20 22:8
23:8 25:8,11 34:14,19
52:6 63:21,23 67:17
68:18 74:11 75:25
85:11

**S**

**safety** 25:23 78:5
**Saint** 28:23 29:9
**salaried** 73:6
**salaries** 79:25
**salary** 11:10 20:5,8
33:14
**sales** 25:20 57:2,5,24
58:1,5,10 59:5 62:19
77:8,8
**sample** 53:2,4 75:22
**satisfaction** 35:6 36:1
36:25 37:24
**satisfied** 27:8 57:15
**saw** 64:4
**saying** 19:23 22:8
32:14 44:16 74:16
84:24
**schedule** 43:11
**scientists** 73:11
**scope** 77:23
**seal** 87:15
**search** 29:18 30:2,8
66:17
**second** 5:13 59:5 76:16
81:16
**section** 50:10
**secure** 9:7 12:18
**secured** 27:9
**see** 4:21 14:12 29:11
31:10,17 34:21,24
41:8 54:18 62:21
63:1,13 67:23 68:23
75:11 76:7,8 77:13
82:2,8

US District Court - Delaware
Chapter 11 - W.R. Grace
FINAL
Paul J. Norris
August 1, 2002

Page 96

seek 67:7
seeking 39:1
seen 37:13 38:1,4 39:22 40:8
segment 73:14
selected 25:20
selecting 16:13
self-policing 53:9
sell 20:23
senior 8:8 77:14
sense 77:4
sensitive 65:11
sent 12:23
sentence 59:3
separate 86:9
serious 9:15 29:19
seriously 84:20,20
session 36:9 75:14
sessions 35:13,17 36:6
set 39:15 43:7 45:2 51:16 87:6
setting 6:16
seventh 77:11
severance 7:1 30:16 64:15,17 66:5,9,16 67:5 69:10,11
shareholders 40:14,20
shares 20:19,20,24 21:4
sheet 57:7 86:10
short 67:3 80:8,10,11
shortness 19:1
show 20:8 75:19 77:8
showed 35:5
shutdown 67:1
Siegel 82:19
sign 85:12
SIGNED 1:24
significant 9:13 16:24 18:15 48:12
significantly 8:14 46:6 76:24 77:23
similar 68:6 69:13 73:5
simpler 56:7
sites 9:12
sitting 26:19 59:18 72:9
situation 11:15 19:24 41:23
size 8:20 76:19 77:6,24 78:2,2,9
skew 51:25
skills 66:2
small 57:8
solicited 26:5
somebody 23:15
sorry 71:15 74:19

sort 8:8 13:14 28:14 50:15 54:25 73:15
sought 14:17 38:24
sounds 15:1 36:11
source 62:4
span 49:17
speaking 45:16
specialty 4:24 50:14 59:6 60:17
specific 19:9 26:7 40:5 66:20 69:20
specifically 10:8,13 23:2 38:5 83:15,22
speculative 12:15 18:19 21:23 41:2
spell 33:25
splits 79:20
spots 62:21
stable 51:13
stacks 75:12
stage 22:1
staggered 48:11
stakeholders 15:21 40:21 54:7,11 57:16
standard 42:3 51:14 53:11 71:5
standards 50:20
start 48:4
started 25:15
state 30:20 87:1,4
states 1:1 72:15
stay 9:17 20:8 22:4 33:22 55:14
stenographically 87:10
stipulated 3:2
STIPULATION 3:1
stock 12:2,14,20,22 13:3,8 17:7 18:17,18 18:22 19:16,17,19 23:13 33:18 38:20,21 39:2,21,21 40:9 53:12
stocks 50:5
strategy 42:24
stretched 43:10
strong 31:5 80:9
studies 78:15
study 65:15 75:9
subject 66:18 67:9 79:7
submitted 10:1,1 13:11 22:11
substantially 19:19 63:2 79:3
successful 15:5
sufficient 23:19
sufficiently 27:17
suggest 71:13

summary 76:2,6
summer 35:22
superior 44:3
supervisory 35:6
sure 5:3 7:13 8:12 20:9 30:5 38:15 45:13 49:14 50:3 59:13,22 61:8,25 64:8 79:9,15 80:11
surrogate 71:17
survey 37:8,17 60:20 74:25 75:3,4,15 76:8 76:18,25 77:5,13
surveys 34:22 35:5,8 37:4,20 38:9 75:8,17 76:7
system 70:24 80:24
S-A-I-N-T 28:24

───────────
T
───────────

take 9:24 13:10 15:16 29:20 51:6 52:25 54:2 62:6 67:11 79:18
taken 1:17 62:14 81:18
takes 53:5 67:8
talk 46:23
talking 24:18 42:10 57:19
target 30:9 42:8,10,17 42:21,25 43:3,4,18 44:2,4,5 45:5 47:16 49:7 51:17,19 82:8
targeted 11:12 17:20 18:3 33:7 40:25 42:1
targets 43:7,8,10
taxes 54:22
TDC 67:15,16 68:6 72:17,22
TDCs 68:5
team 13:21 25:15 26:5 35:25 36:4 53:6
teams 48:3
Telephone 81:24
tell 3:10 4:12 7:5 29:5 29:25 34:10 54:20 59:10 75:2,16
ten 37:10,11
tend 43:7,8
tenure 67:3
term 23:24 80:4,8,10 80:12,13,20
terms 14:9,20 56:9 62:19 69:25 85:1
test 11:1
testified 3:11

testimony 29:21 86:7
thank 3:22 85:6,7
theirs 74:18
theory 44:1
thing 28:7 54:13 61:2 70:23
things 10:24 11:2 23:17 31:20 37:18 47:23 80:15,20
think 9:9,22,22 10:13 12:16 19:1,4 24:21 28:7,12 31:3,8,16,22 32:3 34:2 38:5 39:8 43:20 45:24 47:1,5,19 48:21 49:6 50:1,24 51:7,12,16 52:24 57:11 58:25 59:13 62:5 65:23 70:2,13,16 70:22 71:18,20 72:2 74:3 77:18,21 80:9 84:12
thinks 53:2
third 19:14,16
thought 8:11 9:25 24:22 36:23 42:16 43:12,14 53:12 80:6 80:21,24
thousand 64:4
threats 84:3
three 18:1,7,8 20:6 21:1,11,12 27:5,9 51:2 60:16 65:21 80:16 82:9
threefold 17:1
three-year 19:10 33:23
thrilled 57:16
Thursday 2:2
tied 21:16
tier 82:12 83:5
tiers 82:9 83:12
time 5:13,15 7:13,20 8:11,19 12:1,13,16,20 12:23 13:6,19,23 14:7 14:11 15:14 16:4 20:23 21:22 22:5 24:13 27:18 28:4 30:4 38:13,16,18 40:6 46:15 48:11 49:16 51:10 52:12 64:19 65:2,4,25 66:9,13 67:9 79:4 85:6 87:6
times 7:5 27:2,23
timetable 64:18 65:21
timing 22:23
titles 4:1 5:4,5
today 5:4 10:4 26:19

55:15 59:18 72:10 80:15
told 28:18 30:9,15
top 34:21 67:15 68:1,11 70:1,3 72:16,19,24 73:3 75:10 82:22 83:5
topic 35:25
tort 32:13,18,22 69:3
total 13:15 21:6 43:23 60:22 67:17,20 68:1 70:1 73:2 76:2 79:1 79:16
totally 23:3
town 9:14 64:4
track 56:14
traditional 33:21
traditionally 40:2,2
transcript 85:12 86:6 86:10 87:10
transition 65:4
transparent 32:6
treated 31:23 32:10
treatment 31:24
tremendous 14:7
tried 65:23 80:23
triggered 6:11
trouble 75:21
true 26:15 27:22 71:8 73:17 86:7 87:11
trust 30:21 31:18 84:13
truth 3:10,10,11
try 22:25 36:13 74:4 84:16
trying 7:6 9:16 14:3 60:9
Tuesday 76:4
turn 40:9 77:10
turns 29:12
twice 63:10
two 10:24 19:12,16 23:17 27:2 51:2 56:13 58:9 60:14,16 60:23 61:3,3 62:21 65:20 71:17 83:12
two-year 6:14
tying 40:5
type 53:16 65:14
typically 18:5 55:20 71:3

───────────
U
───────────

ultimately 4:16 8:17,18 84:7,20
Um-hum 57:21
uncertainties 47:23

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

Paul J. Norris
August 1, 2002

Page 97

**uncertainty** 7:15 8:4
66:3,14
**uncommon** 37:15
**understand** 14:15 20:4
21:24 26:10 32:14
37:17,21 48:14 60:4
60:21,24 74:21 78:11
79:14,16 81:1
**understanding** 12:3
23:14 26:24 36:14
**understood** 13:7,9
**unintended** 46:18
**Union** 49:21 50:3 51:25
52:20 59:22
**unique** 39:24
**UNITED** 1:1
**universe** 52:25 60:10
**unsure** 12:17
**unusual** 22:15 31:5
**upper** 83:18
**use** 39:11,12 50:7,19
51:14 54:23 55:8,21
63:23 69:20,22 70:24
71:1,4,6,13 73:5,11
73:12,13,15
**uses** 50:20
**usually** 18:8 23:17,18
31:4 84:3
**U.S** 9:12 28:10

**V**

**vacant** 27:20
**vague** 52:8
**valid** 79:7
**valuable** 48:9
**value** 12:21 13:3,8
15:21,23 17:24 18:3,5
18:10,22 20:20,21
22:18 30:23 38:20
41:1,3 45:2 53:22
54:2,6 55:20
**varied** 49:18
**various** 68:16
**versus** 24:23 46:10
49:12
**vest** 18:7
**vested** 18:6 48:5
**vice** 77:15
**view** 11:5 31:2,23 32:4
53:3 85:1
**viewing** 11:2
**visits** 9:11
**vote** 81:4

**W**

**wait** 29:11 54:18 66:7

**waived** 3:5
**waiving** 85:9
**want** 3:18 10:11,25
15:7 20:23 24:4
38:15 45:25 46:13
60:8 62:6,10 68:22
80:4,18 85:10
**wanted** 9:17 67:14
68:12 80:18
**wasn't** 44:12 65:21
69:20
**Waterhouse** 7:21 9:3
44:7
**way** 9:20 14:22 22:18
31:2,25 32:11 36:15
36:16,21 43:9 49:4,6
49:9 51:17 56:6 65:2
71:10 84:13 87:13
**week** 38:6
**weight** 80:7
**weighted** 80:7
**went** 4:14 16:13 28:22
28:23 41:21
**weren't** 7:13 8:12
38:18 58:25
**we'll** 63:18 64:2 85:11
**we're** 38:15 54:17
62:11
**we've** 78:21,24
**widely** 21:25
**willing** 21:15
**within-named** 87:5
**witness** 3:9 22:12 25:13
62:13 63:22,25 64:3,8
85:7,13 87:5,15
**wondered** 58:14
**word** 39:11,12
**words** 46:8,18 48:6
53:24 55:11 73:9
78:24
**work** 4:14 27:3,4,8
28:23 46:20 48:3
73:18
**worked** 9:22 10:5
27:16
**world** 12:25
**worth** 20:22
**wouldn't** 19:24 27:23
37:19 39:11 50:7
52:5 66:4 70:9 71:5,7
71:8 73:22,23,25 74:1
74:21
**wrong** 15:3
**W.R** 1:4 2:3,9 3:23 4:2
12:3 34:22 49:3,5,7
49:12 68:17 73:3

**Y**

**Yeah** 22:10 28:23
34:16 38:4 60:12
62:9 64:8 67:20,23
85:11
**year** 6:15 10:11 17:19
18:1,8,10 19:11,14,17
20:15,19 21:3 34:23
39:9 42:21 43:1,2,3
51:5 52:5 57:3,22,25
66:12,13
**years** 18:1,7,8 19:12
21:11,12 42:20 44:17
44:20 49:1,16,20 51:1
51:24 52:2 58:9

**Z**

**zero** 17:9 19:13

**$**

**$1.5** 58:1
**$1.72** 57:24
**$130** 58:6
**$187** 55:16
**$400,000** 58:7
**$90** 55:15,17

**0**

**01-1139** 1:6
**08/02/02** 1:24

**1**

**1** 1:16 2:2 53:22 75:24
76:1 88:3
**1-866-ROSE-NYC**
1:25
**10** 17:6 41:7 42:18,19
42:25 43:3,4 44:9
51:9 53:22 54:1
57:17,20 68:23 69:5
**10-year** 17:23
**100** 18:16 21:18 79:9
**11** 1:6 7:12,12,14,23
8:10 11:14 12:19
13:22 14:14,17,19
32:18,22 33:3 41:23
59:6,8,20 60:17 68:23
69:4,9
**118** 24:13 26:1
**12** 25:16 67:24 68:23
69:12
**12649** 3:20
**14** 25:16 48:24 51:23
69:7
**14.69** 52:13

**15** 51:4 57:20 59:21
60:17
**16** 67:15 68:1,11 70:1,3
72:16,19,24 73:3
75:10
**18** 52:19 82:12 83:7,17
**187.1** 58:1
**187.5** 57:23
**19** 52:19
**1971** 4:9
**1981** 4:10,15
**1989** 4:18
**1990** 4:20
**1994** 4:21
**1997** 4:23,23
**1998** 4:8 5:1,13
**1999** 5:10,11 42:21,22
51:4 65:1

**2**

**2** 24:9,12 25:9 35:2
67:13
**2nd** 2:4 87:16
**2.1** 54:3
**20** 24:1 43:4 51:4 72:15
**2000** 7:19 34:23 35:5
36:24 49:22 51:1
57:25 58:5,11 59:6
79:9
**2001** 6:3,13 26:14
35:13,17,18,19 36:9
44:6 57:23 58:5,10
59:6
**2002** 1:16 2:2 87:16
88:3
**2003** 87:25
**21** 52:21 87:25
**21042** 3:21
**21044** 2:5
**22** 29:17,21
**22nd** 5:18
**235** 2:5
**24.36** 52:14
**25** 2:4 24:1 43:2

**3**

**3** 26:11 46:8,10 63:19
64:10 67:24 79:7
88:6,9
**3M** 75:5,11 76:14
**3.5** 54:3
**3:00** 2:2
**300** 23:11,16 46:23
53:25
**350** 53:25

**4**

**4** 30:19 79:8 82:3
**4:23** 62:14
**4:30** 62:15
**4:59** 81:18
**41.74** 49:23
**48** 49:21

**5**

**5** 45:8 47:4
**5:00** 81:19
**5:07** 85:14
**50th** 72:20

**6**

**6** 17:6 41:7 46:9 48:17
56:21
**6,000** 46:22
**60** 69:10
**64** 88:9

**7**

**7** 34:6,21 41:4 54:1
**75th** 72:20
**7500** 2:3

**8**

**8** 64:14

**9**

**9** 69:2
**93** 49:21
**94** 52:11
**95** 49:21
**96** 52:11
**98** 5:6 49:22 51:7
**99** 51:1,7