Page 3

| | |
|---|---|
| 1      IN THE UNITED STATES DISTRICT COURT<br>          FOR THE DISTRICT OF DELAWARE<br>2  -----------------------------------------------<br>3  In Re:<br>4  W.R. GRACE & CO., et al.,<br>5          Debtors.<br>6          CHAPTER 11<br>          Case No. 01-1139 (JKF)<br>7          (Jointly Adminisered)<br>8  -----------------------------------------------<br>9<br>10<br>11<br>12<br>13<br>14<br>15  DEPOSITION OF:    W. BRIAN McGOWAN<br>16  DATE:             AUGUST 1, 2002<br>17  TAKEN BY:         ALVIN LODISH, ESQ.<br>18  REPORTED BY:      MARIANNE HEWITT, CSR<br>19<br>20<br>21<br>22<br>23<br>24  FINAL COPY, SIGNED  08/02/02<br>25  JANE ROSE REPORTING     1-866-ROSE-NYC | 1        STIPULATION<br>2        It is stipulated and agreed by and between<br>3  counsel for the respective parties that the filing of<br>4  this deposition with the Clerk of Court be and the<br>5  same is hereby waived.<br>6          - - - - - - -<br>7  Whereupon,<br>8          W. BRIAN MCGOWAN,<br>9  called as a witness, having been first duly affirmed<br>10  to tell the truth, the whole truth, and nothing but<br>11  the truth, was examined and testified as follows:<br>12        MR. RUNNING:  I want to talk to Brian for<br>13  just one second.<br>14      (A discussion was held off the record.)<br>15        EXAMINATION BY MR. LODISH:<br>16      Q    Mr. McGowan, can you give us your<br>17  full name, for the record, please.<br>18      A    William Brian McGowan.<br>19      Q    And what is your address?<br>20      A    7808 Grovemont, G-R-O-V-E-M-O-N-T,<br>21  Drive, McLean, Virginia 22102.<br>22      Q    You have a little bit of a drive to<br>23  get here.<br>24        Mr. McGowan, what is your current<br>25  title with W.R. Grace? |

Page 2

| | |
|---|---|
| 1        The continued deposition of W. BRIAN MCGOWAN<br>2  was resumed on Thursday, August 1, 2002, commencing at<br>3  1:21 p.m., at the offices of W.R. Grace & Company,<br>4  7500 Grace Drive, Building 25, 2nd Floor, Executive<br>5  Board Room 235, Columbia, Maryland 21044, before<br>6  Marianne R. Hewitt, Notary Public.<br>7<br>8  APPEARANCES:<br>9        ANDREW R. RUNNING, ESQUIRE<br>          On behalf of Debtors, W.R. Grace &<br>10        Company<br>11        ALVIN LODISH, ESQUIRE<br>          On behalf of Official Committee of<br>12        Asbestos Property Damage Claimants<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1      A    Senior vice president,<br>2  administration.<br>3      Q    Okay.  I believe you've been deposed<br>4  previously in this bankruptcy matter; is that<br>5  correct?<br>6      A    That is correct.<br>7      Q    Okay.  Could you describe for me your<br>8  responsibilities as senior vice president,<br>9  administration?<br>10      A    My primary responsibilities, I'm in<br>11  charge of human resources, information<br>12  technology, real estate, procurement, certain<br>13  areas of procurement, not all of it; and site<br>14  services for this site, this corporate site; and<br>15  some other miscellaneous activities but those are<br>16  the main ones.<br>17      Q    Okay.  In the particular matter that<br>18  I'm deposing you today, we had requested that<br>19  somebody be presented who was familiar with the<br>20  hiring and retention of key employees at W.R.<br>21  Grace.<br>22        Are you the person who is in the best<br>23  position to speak about those issues?<br>24      A    Yes.<br>25      Q    Okay.  And how long have you been |

Page 5

1   with W.R. Grace?
2      A    Since 1979.
3      Q    Okay.  Now, Mr. McGowan, when you
4   refer to key employees, who are you talking
5   about?
6      A    Well, I guess I'd have to ask you to
7   clarify that for me.  I mean we --
8      Q    Okay.  Fair enough.  Are you familiar
9   with the requests that have been made in the
10  bankruptcy court to revise the compensation for
11  key employees?
12     A    Absolutely, yes.
13     Q    Okay.  So I'm asking you who key
14  employees are in the context of your application.
15     A    In the long-term plan, the long-term
16  incentive plan we have eligible key employees
17  around the company, throughout the company,
18  domestic and internationally of about 600 people
19  that based on their positions would be eligible
20  to participate in the plan.
21     Q    Okay.
22     A    And that is the same group of people
23  that we looked at when we were going to input the
24  retention plan.  It was kind of the same group.
25          Obviously we were very selective in

Page 6

1   picking the number of people, and we're selective
2   in picking the number of people that participated
3   in the long-term plan.  So eligibility is not an
4   automatic entry.
5           Actually, based on our last thing,
6   it's about 50 percent of the eligible people
7   partake in our long-term incentive plan.
8      Q    Okay.  So as we're sitting here today
9   those who have been picked who are eligible out
10  of the 600 is approximately 300.
11     A    About 300, yes.
12     Q    Okay.
13     A    And then the further clarification of
14  the people we felt it was needed to give
15  additional protection to in the retention plan
16  was about 120 people, a little less than 120.
17     Q    Okay.  Now, does that group of 120
18  overlap with the 600, or is that a different
19  group?
20     A    No, it's the same group of people.
21     Q    Okay.  But in terms of the 300 that
22  have been picked, does the 120 overlap with that
23  group or is it in addition to that, to the 300
24  group?
25     A    It overlaps.

Page 7

1      Q    Okay, all right.
2      A    All the people that are participating
3   in our long-term plan or put it another way, all
4   the people in the retention plan are also
5   participants in our long-term plan.
6      Q    Okay.  So you'd have to be eligible
7   for the long-term plan to also be eligible for
8   the general retention plan.
9      A    We didn't have that as a criteria,
10  but those are the key people that you would look
11  at.  Those are the people that are -- that it
12  would be critical if we lost them to the company.
13          So it wasn't a criteria, but it
14  happens to be that way because they're the key
15  people we looked at.
16     Q    Okay.  So again going back to the
17  original question is how you define key employees
18  for purposes of the application.
19          What categories are the 600 eligible
20  in at the company?
21     A    Well, they're certainly in managerial
22  positions, okay.  Higher level managerial
23  positions or they might be scientists that don't
24  necessarily have managerial decisions but are
25  critical to the success of the business and to

Page 8

1   new products.
2           And they cross -- they go across all
3   disciplines.  General managers that run the
4   businesses, sales and marketing people, our
5   research and technical people, and then our
6   general administrative people and our corporate
7   staff.
8           So it covers all the disciplines and
9   basically who are in the retention plan, you
10  know, the critical people in each one of those
11  things on a business-by-business basis.
12     Q    Okay.  So are there set levels that
13  you have to be or achieve at the company in order
14  to be part of the 600, or is it discretionary
15  that you pick regardless of what the title or
16  position of the person is?
17     A    No.  We determine eligibility by
18  using our outside consultant.  And in this case
19  it was Hewitt Associates who was our compensation
20  consultant for all of our -- for our long-term
21  plan and our annual plan.
22          And what takes place is that position
23  by position you say that looking at other
24  comparable data of other companies does this
25  position normally entitle you at other companies

Page 9

1   to be eligible for a long-term plan?
2          So it's done based on external
3   factors, so we need to be competitive and to make
4   that opportunity available to people that they
5   could get on the outside from other companies.
6       Q    Okay.  So I take it that you retained
7   outside consultants and then discussed with them
8   in terms of the industry or the business as a
9   whole what types or category of persons would
10  normally be eligible in the business community so
11  that they could also be eligible at Grace.
12      A    That is correct, yes.
13      Q    Okay.
14      A    What positions would we need to be to
15  be competitive so if we want to attract people or
16  keep people, you know, we want to make sure that
17  they're compensated and have the opportunities at
18  the appropriate levels.
19      Q    Okay.  How long have you had these
20  outside consultants?
21      A    We've -- as far back as I known we've
22  always used outside consultants in developing our
23  compensation plans.
24      Q    Okay.
25      A    And I've been involved with it

Page 10

1   directly since 1990 when I moved into this
2   position, and prior to that I was the corporate
3   controller of the company so I was aware of what
4   took place and we've always had outside
5   consultants advising us on, you know, what type
6   of programs would be appropriate, competitive to
7   make.
8          And, you know, it was something that
9   our board, our compensation committee, which I
10  meet with the compensation committee, make the
11  recommendations and they also want to make sure
12  that we're using outside experts in developing
13  all our compensation plans.
14         So, again, we're, you know, being
15  competitive, we're being fair, they're not too
16  rich, they're where they should be for the
17  benefit of the company.
18      Q    Okay.  Is longevity with W.R. Grace a
19  factor in whether you're eligible for, for
20  example, the long-term incentive plan?
21      A    No, it's position.  It's based on
22  position in the company.
23      Q    Okay.  And is that also true for the
24  retention plan?
25      A    That is correct.

Page 11

1       Q    Okay.  What about loyalty, Mr.
2   McGowan, is that a criteria for being eligible?
3       A    No.  I mean the factors that go into
4   eligibility are positions, performance levels,
5   what you're contributing to the company.
6          And in the case of -- specifically in
7   the case of the retention plan, as you know, how
8   vital, how vital are you to the success of the
9   company?  And then if you were to leave, you
10  know, the consequences that would come as a
11  result of that.
12      Q    Okay.  So if I understand you
13  correctly, the position that you hold is a
14  factor, for example, a managerial position,
15  senior management might be one of the factors.
16      A    I'd say that would be the starting
17  point.
18      Q    Okay.
19      A    The starting point of eligibility for
20  any plans, compensation plans are what position
21  do you hold in the company?
22      Q    Okay.  And then you also mentioned
23  performance.
24      A    Yes.
25      Q    Now, do I understand that when

Page 12

1   somebody is hired for one of the positions that
2   would be eligible, are there performance goals,
3   et cetera, set out from the beginning of their
4   employment, or is that something developed over
5   time?
6       A    It's developed over time.
7       Q    Okay.  But when you're hired by W.R.
8   Grace in one of those positions don't you become
9   eligible to be in either the long-term incentive
10  plan or retention from the start of your
11  employment?
12      A    Well, you become eligible, and I
13  would say depending on what position you come in
14  at -- let's talk about the long-term plan.
15         Depending on what position you come
16  in at, because we have bands and grades, and I'll
17  talk about grades because eligibility for the
18  long-term incentive plan starts at our internal
19  grade 15, okay.
20         Which, again, why did we pick that as
21  the starting point?  Because based on competitive
22  outside data that's where people are in the
23  positions that grade represents are
24  eligible, not entitled, eligible to be considered
25  for the plan.

Page 13

1          And -- but at those levels we only --
2   between grades 15 and 18, I believe it is, we
3   only really have about 20 percent of the
4   population in those grades actually participate
5   in the long-term plan.
6          So we're really picking out the high
7   potential individuals in those. It's not an
8   entitlement, it's basically done based on your
9   performance, what are you delivering to the
10  company?
11         You know, and you can go into all the
12  other factors, you know, your loyalty, you know,
13  your work habits but, you know, it's kind of like
14  what you deliver, how valuable are you to the
15  company?
16         So it's not an automatic, you know,
17  you're in this position, you're part of the team.
18     Q    Okay.
19     A    Above that level the eligibility
20  because we tend to think that when we hire people
21  above that level when you start to move up into
22  the upper management ranks, you know, the initial
23  reaction is if you hired them from the outside,
24  you know, you've done a lot of research and you
25  think that person is valuable to the company, so

Page 14

1   initially the person would be put in the plan for
2   the most part.
3          On the other hand if you had a person
4   in that higher level internally that you weren't
5   going to sponsor in the long-term plan, well,
6   that sends a signal that maybe that person is not
7   going to really, you know -- is not really right
8   for the company and then you need to take some
9   action because if you have someone in senior
10  management that's, you know, you don't want to
11  put into a long-term plan you have some other
12  issues that you have to deal with.
13     Q    Okay. Now, Mr. McGowan, are you
14  familiar with the long-term incentive plan and
15  the general retention plan that was approved by
16  the bankruptcy court in April of 2001?
17     A    Yes, sir.
18     Q    Okay. Are you familiar with how that
19  plan has operated at Grace since the court
20  approved it?
21     A    Yes.
22     Q    Okay. For example, do you have
23  information concerning, you know, payments that
24  were either made or the number of persons that
25  receive payments under the retention plan, for

Page 15

1   example?
2      A    Yes.
3      Q    Okay. Let me ask you as a general
4   matter, how has that plan been working since
5   April of 2001, the plan that was approved?
6          MR. RUNNING: Objection to the form
7   of the question.
8          It's vague and ambiguous.
9   BY MR. LODISH:
10     Q    Well, if you can characterize it. If
11  you can't, you can't.
12         But has it been working well, has it
13  not been working well, has it been working as it
14  did in prior years, you know, before you had to
15  ask a bankruptcy court to approve a plan like
16  that?
17     A    Well, we've never had prior to 2001,
18  for the most part, a retention plan such as this.
19         I mean this plan was specifically put
20  in place because of the company's desire to make
21  sure we retained the key people that are going to
22  help grow this company in the face of, you know,
23  mounting litigation that, you know, people were
24  getting very nervous about what was going to
25  happen in the future, what opportunities that

Page 16

1   we're going to have, was the company going to be
2   able to continue to grow, their own future and,
3   you know, is this the place they wanted to
4   continue to invest their time.
5      Q    And when you say litigation, does
6   that mean the asbestos litigation primarily?
7      A    Yes. Yes.
8      Q    Okay. So 2001 is the first year that
9   W.R. Grace had a retention plan.
10     A    A retention plan such as this. I
11  mean in past years you might have some very
12  select type of plans, we were implementing SAP,
13  okay. Our information and technology system,
14  which people back four years ago, five years ago
15  when we started implementing SAP, these people
16  were in hot demand, they were hot. I mean they
17  were in demand.
18         So we had to give them, you know, a
19  special program, kind of a hot skills bonus we
20  called it, you know, which you could call that a
21  retention plan but they got a premium, you know,
22  while that skill -- while they were implementing
23  and while we considered that skill still a hot
24  skill that, you know, everyone wanted them.
25         So, you know, we put -- selectively

Page 17

1  you put programs in.  We had to do that when we
2  were at the Y2K when everyone was facing the same
3  thing with Y2K.
4          And there was a lot of demand on
5  those critical resources and there was a lot of
6  fear that, you know, once Y2K was done, you know,
7  a lot of companies would be finished with the
8  people that helped to solve the issues there.
9          So, you know, we did a certain type
10 of programs that in general you could categorize
11 them as retention programs to hold on to those
12 needed skills.
13     Q     But it wasn't a general retention
14 plan that would cross all disciplines --
15     A     No.
16     Q     -- and be available to all --
17     A     For the most part, no, sir.
18     Q     Okay, all right.  So you have had
19 about a year history with the general retention
20 plan; is that right?
21     A     It's 18 months now.
22     Q     Eighteen months now.
23     A     Yeah.  We're winding down, that's why
24 we're getting a little nervous.  We're winding
25 down because the plan that's in place expires at

Page 18

1  the end of 2002.
2      Q     Okay.  How has this plan been working
3  or how have the employees reacted to the plan
4  that was put in place in 2001?
5          MR. RUNNING:  Objection to the form
6  of the question.
7          It's compound.
8          THE WITNESS:  Can you just give me
9  some more specific -- what are you looking for?
10 BY MR. LODISH:
11     Q     Okay.  From the administration's
12 point of view, how has the general retention plan
13 that was first adopted in 2001 been received over
14 the last 18 months?
15     A     Well, I would say that, you know, it
16 was, for the most part, it was received
17 favorably.
18          People were concerned and nervous
19 about their own personal growth opportunities,
20 their own opportunities that they were missing at
21 other companies that were not operating under
22 Chapter 11 that, you know, there's considerable
23 and risk reward and considerable opportunities
24 with equity-based compensation, which once we
25 entered Chapter 11 we no longer had that, plus

Page 19

1  any options that were not exercised there was no
2  more retention value of those options that were
3  outstanding.
4          So I mean they felt it was a step in
5  the right direction, they felt good about it but,
6  you know -- because it did help them with the
7  fact that they were losing a lot of other -- both
8  financial opportunities and potentially some
9  business opportunities because of the inability
10 of companies, for the most part, to grow and
11 acquire companies in bankruptcy.  You know, as
12 the organization grows the opportunities grow for
13 these people.
14     Q     Have payments been made in the last
15 18 months under the general retention plan?
16     A     Yes.
17     Q     Okay.  And this would be the first
18 time that those who were participants in the
19 general retention plan received such payments; is
20 that accurate?
21          In other words, you identified some
22 specialized areas where you had done some bonuses
23 that had been considered retention.
24     A     Right.
25     Q     But for those who were participants

Page 20

1  in the general retention plan, this was the first
2  time they were receiving such payments over the
3  last 18 months; is that correct?
4      A     At Grace, yeah.  This was the first
5  time, to my knowledge, we've ever had a plan like
6  this.
7      Q     Okay.  Now, when I asked you earlier
8  the number of people that are participants,
9  eligible participants in the general retention
10 plan I think you told me approximately 120
11 people.
12          I think in Mr. Norris' affidavit he
13 mentions the number of 118 people.  I think in
14 the papers that were filed with the court, 116
15 people.
16     A     Yeah.  I said approximately, I think
17 I said approximately 120.
18     Q     No, no.  I understand.  I understand.
19 So I think we're talking about the same group of
20 people.
21     A     Oh, it's the same group of people,
22 yes.
23     Q     So in the papers that were filed or I
24 believe Mr. Norris' deposition indicated that
25 five of those people had left W.R. Grace that

Page 21

1  were in that category.
2      A     That is correct. The people that --
3  the five individuals that were given retention
4  were put into the retention program starting in
5  the beginning of '01, five people left the
6  company even though they were in that plan.
7      Q     Okay. Now, am I correct that
8  historically that number of people leaving is
9  approximately the attrition rate that W.R. Grace
10 had in that group of employees?
11     A     It's approximately in line with our,
12 you know, prior historical attrition, yes.
13     Q     Okay. Now, those five individuals,
14 do you know where they went when they left Grace?
15     A     I couldn't -- I don't know the names
16 of the companies, no.
17     Q     Okay. Do you know whether they're
18 direct competitors or other different businesses
19 in the industry, do you have any idea?
20     A     It's a mix of where they went. Some
21 are in the specialty chemicals, I do not believe
22 any are direct competitors, some are in the
23 specialty chemicals, some are in other fields.
24           You know, our people, the people that
25 are in this pool are not, you know, tied to

Page 22

1  either Grace's businesses, you know, the Davison
2  catalyst business or the construction business
3  but, you know, a lot of them fitted within one
4  within the specialty chemical business or two
5  anyplace, you know. Our administrative people,
6  our finance people, our research people. I mean,
7  you know, they're --
8      Q     Well, yeah. That was my next
9  question.
10     A     -- the cream of the crop we have.
11     Q     I was going to ask you, the five
12 individuals that left what categories or
13 disciplines did they work in, do you know?
14     A     Two were in human resources, our top
15 two human resources people in the business.
16           One in the catalyst business, which
17 is the Premium business that's located here in
18 Columbia.
19           One woman was the top HR person for
20 Grace Performance Chemicals out of Boston. $700
21 million business, she ran the human resources on
22 a worldwide basis for them.
23           Another individual was our director
24 of finance here in Columbia.
25           The fourth one was a plant manager at

Page 23

1  our Curtis Bay facility here in Baltimore.
2  That's one of our -- that is our largest facility
3  in the world. Gross sales of close to 400, $300
4  million. 3 to $400 million.
5           And the last one I can't recall who
6  the person is right now.
7      Q     Okay. All right. Were any of these
8  people asked to leave?
9      A     No.
10     Q     Okay. They all left on their own.
11     A     On their own.
12     Q     Okay.
13     A     All were recruited from other people.
14 They all had jobs when they walked out the door,
15 they were all recruited.
16     Q     Okay. Did all of these people get
17 excellent reviews of their performances while at
18 Grace?
19     A     Yes.
20     Q     Okay. Do you know how long each of
21 these individuals had been with Grace?
22     A     These will be my best guesstimate,
23 okay, of my knowledge with them.
24     Q     That's all I can ask for.
25     A     The one human resource person in

Page 24

1  Cambridge I would probably say about three years.
2           The HR person here in Columbia, 15
3  years, 15 plus years.
4           The same with the director of finance
5  would be about 10 years.
6           And the plant manager at Curtis Bay,
7  he was probably the shortest one. Maybe a couple
8  of years, one or maybe two years.
9      Q     And the one up in Boston.
10     A     That was the first one I mentioned.
11     Q     Oh, okay.
12     A     Oh, I'm sorry. She was about three
13 years, I would say.
14     Q     Okay. Did you know all these
15 individuals?
16     A     Yes.
17     Q     Okay. Did you have conversations
18 with them before they left?
19     A     Yes. I spoke to, I'd say, three of
20 the four, you know, quite a bit.
21           I mean I spoke to all of them more or
22 less from, you know, good luck to you and this
23 and that.
24           But I did have conversations with
25 three of them in particular, you know, long

Page 25

1  conversations with them.
2      Q    Okay.  Did any of the three that you
3  spoke with tell you why they were leaving, did
4  that come up?
5      A    That's always the question that I'm
6  supposed to ask because we want to see what we
7  can do so that we don't lose, you know, these
8  type of individuals because recruiting people
9  like this in any environment is very difficult,
10  if you want to get the best.
11          And so that's part of our program is
12  to say, you know, could we have done something
13  differently to retain these people?
14      Q    You do the exit interviews of the
15  senior management.
16      A    No, I wouldn't say the exit
17  interviews.  I'm just kind of the -- I do it in a
18  fashion so that I can get the person to maybe
19  open up more with me than, you know, could I have
20  your credit card back and all this type of stuff.
21  You know, did you sign up for your COBRA
22  insurance and that.
23          But, you know, it's more from a --
24  you know, and I know these people.  Certain
25  people I don't know I might not have as much with

Page 26

1  these people I really knew, so I'd have more of a
2  conversation with them.
3      Q    Okay.  So of the three people you
4  spoke with did they indicate why they were
5  leaving?
6      A    Opportunity.
7      Q    Okay.
8      A    A better opportunity, better growth,
9  you know, concerns about, you know, Grace, about
10  where the future was going to be and just a
11  general I got a terrific offer that I couldn't
12  refuse.
13          And when I compare that to -- even
14  though a lot of them were long-term people, when
15  I compare it to where I think -- you know, even
16  though I like it here and, you know, they just
17  couldn't refuse the opportunity based on the, you
18  know, the risks, potential risks at Grace and the
19  uncertainty.  Maybe uncertainty is a better word
20  -- at Grace.
21      Q    Well, did any of them leave for
22  personal reasons, outside of the business context
23  for personal reasons?
24      A    Not that I'm aware of.
25      Q    Okay.  Now, you mentioned that nobody

Page 27

1  went to a direct competitor.
2      A    Not that I'm aware of, I do not
3  believe so.
4      Q    Okay.  Who do you consider your
5  direct competitors?
6      A    I would say that our direct
7  competitors are Engelhard in the catalyst
8  business, that would probably be the closest
9  direct competitor that I would come up with.
10      Q    Okay.  When, you know, I said direct
11  competitor.  If I said competitor of yours, would
12  that broaden the field for you?
13      A    Yeah.  I think that the -- you know,
14  our -- the specialty chemical peer companies
15  which, you know, which I know you have that
16  information, we presented it to the committees
17  on, and that's from when we we're looking at
18  long-term plans.
19      Q    Right.
20      A    Cabot, duPont, Dow, I mean, you know,
21  we're -- they have pieces of their business that
22  relate very closely to Grace.
23          So you could say -- you could look at
24  it and say any specialty chemical company some
25  way is a competitor.  There's ones that are more

Page 28

1  competitors than others.
2          Like Engelhard is on that list and
3  that's a huge catalyst business that is a direct
4  competitor, but they all have segments that they
5  compete with us.
6      Q    Okay.  Let me show you, which is
7  Exhibit A to the pleading filed by Grace, which
8  was the response to the objection of the Official
9  Committee of Asbestos Property Damage Claimants
10  concerning the request to the bankruptcy court to
11  revise the retention incentive programs.
12          And I'm showing you what is part of
13  Exhibit A that was submitted, which is the list
14  of peer group companies.
15      A    Yes, that's correct.  This is the
16  specialty chemical group companies that our
17  consultant used because they're all in the S & P
18  they're classified as specialty chemicals as
19  Grace is.  So this would be the best peer
20  companies to compare ourselves to.
21      Q    Okay.
22      A    So you could look at these and say
23  our people, you know, these would be competitors
24  of ours.
25      Q    Okay.  So you would consider all the

Page 29

1   companies listed there as competitors.
2       A    To some degree, yes.  To some degree.
3       Q    Well, on the list of the 14 peer
4   companies are some that are in the specialty
5   chemical business but not to the same extent as
6   W.R. Grace.
7       A    I don't know that answer.  I think
8   you would -- the best person to approach with
9   that answer would be Mr. Norris --
10      Q    Okay.
11      A    -- who has worked in the business,
12  and he would be able to give you that answer.
13      Q    Okay, all right.  I'll save it for
14  Mr. Norris.
15           But did any of the five people who
16  left go to any of the companies on the peer group
17  company list?
18      A    Not that I'm aware of.
19      Q    Okay.  So I take it, Mr. McGowan,
20  that since bankruptcy has been filed by W.R.
21  Grace the attrition rate of key employees has not
22  been any different than it was before bankruptcy;
23  is that accurate?
24      A    That is an accurate statement, sir.
25      Q    Okay.  Have you had general

Page 30

1   discussions with the key employees about the
2   status of Grace financially and their
3   compensation?
4           MR. RUNNING:  Objection.  It's a
5   compound question.
6   BY MR. LODISH:
7       Q    What I'm getting at is have any of
8   the approximately 120 employees gone to you and
9   expressed concerns that they have about their
10  compensation here at W.R. Grace?
11      A    Yes.
12      Q    Okay.  And can you tell me out of the
13  approximately 120 how many have come to you?
14      A    I'd probably say in the range of at
15  least a dozen of the people.
16      Q    Okay.  And what types of concerns do
17  they raise with you?
18      A    What they raise is the long-term
19  opportunities that no longer exist at Grace and
20  at other companies being the equity-based
21  opportunities that, you know, I think we've seen,
22  they've all seen, you know, examples outside is
23  that, you know, that's the wealth creation part
24  of it.
25           That's how you build for your

Page 31

1   retirement, that's how you build to have a better
2   life for your family.
3           And since filing for bankruptcy, you
4   know, that is, you know, in the near term or the
5   long term no one sees that it's gone.
6           And also that they've lost.  And a
7   lot of them had stock options that were not
8   exercised prior to us filing, prior to the stock
9   going down that, you know, the opportunities
10  there are never going to materialize.
11          And the question is, you know,
12  because these people are the top people, they see
13  what their peers are doing at other companies and
14  they're saying, you know, what's in it for me?
15  What's going to happen in the future?  You know,
16  is this going to become -- you know, are we going
17  to be able to get back on track?
18      Q    And how have you been responding to
19  those concerns?
20      A    Well, I think, you know, we've -- you
21  know, that we've attempted to -- attempted to try
22  to make up some of the lost opportunities by, you
23  know, putting in a retention plan to get us over
24  this period of uncertainty and -- but, you know,
25  they're bright enough people to know that, you

Page 32

1   know, incentive is a fixed number and there is no
2   up side that was available to them prior to
3   filing for it and available to other people at
4   other companies.
5       Q    Well, do you discuss the plans of
6   W.R. Grace when the bankruptcy process is
7   concluded?  Do you discuss with them what the
8   prospects, what the plans are after bankruptcy?
9       A    Well, I mean we can -- it's, you
10  know, you can speculate, okay, that, you know,
11  once we get out of this we will get back to a
12  more normal, you know, compensation arrangements
13  where, you know, we believe but, you know, you'd
14  never know what the ultimate outcome is going to
15  be of the reorganization plan but we'd expect
16  that, you know, there would be equity
17  opportunities again would come back.
18          But then the question posed is, well,
19  when is that going to be?  How long is it going
20  to take to get there?  Am I going to be missing
21  a, you know, a five, seven-year piece of my life
22  in terms of trying those opportunities?
23          And, you know, I'm marketable now.
24  You know, when -- you know, should I be waiting
25  for whenever to come out and, you know, but if I

Page 33

1    have the opportunity now, you know.
2            A lot of people are saying, you know,
3    I like the place, I want to stay here but you
4    also have to look out for yourself and your
5    family and the opportunities on the outside.
6        Q    Have there been discussions with the
7    senior management or with the compensation
8    committee at W.R. Grace that when the bankruptcy
9    process is over making up, so to speak, the
10   equity issues with the key employees at that
11   time?
12           In other words, making up for what
13   might have been lost during the time period of
14   bankruptcy?
15       A    No. I think we'd be speculating at
16   this time, and we certainly wouldn't want people
17   to hold out hopes.
18           But I will tell you that the meetings
19   that we have on the compensation committee, our
20   compensation committee is very concerned.
21   Concerned that we -- they know that we are a thin
22   management group. That we don't have a
23   tremendous amount of depth because we've had a
24   lot of reductions in staff over the year, and
25   we've kind of cut back.

Page 34

1            A lot of productivity and relocations
2    where we cut the staffs. And the board of
3    directors is concerned and want to make sure that
4    we keep the key people to the business.
5            And our compensation committee and
6    our chairman of the compensation committee, John
7    Akers, who approved this plan that we put forward
8    last November has said to me on several occasions
9    and also to Paul Norris is that tell me what I
10   can do to help you through this process? And if
11   you want me to come in and testify, give an
12   affidavit, he'd be -- he wants to do it because
13   he feels and the board feels is that we are at
14   risk of losing people if we do not put in the
15   right plans.
16           And I tell you, they reviewed this
17   plan in detail and made changes to it and had our
18   experts from the outside come in and review the
19   plans with them.
20           And, again, they required changes,
21   changes were made and they feel that this is
22   certainly an appropriate plan that there's no
23   guarantees, but they think it would be -- it
24   would certainly help in trying to retain these
25   people.

Page 35

1        Q    Mr. Akers, what is his position with
2    the company?
3        A    He's chairman of the compensation --
4    he's a director, chairman of the compensation
5    committee.
6            All our directors are outside
7    directors, have no other association with the
8    company at all, never were employed by the
9    company nor any consulting arrangements with the
10   company.
11       Q    And the compensation committee, who's
12   on that?
13       A    The entire board, excluding Mr.
14   Norris. So our board is relatively small, okay.
15   If you want, I'll give you the names.
16       Q    Okay.
17       A    John Akers, Ron Cambre, Marye Anne
18   Fox, Jack Murphy, Furlong Baldwin and Tom
19   Vanderslice.
20           Those are all the members of the
21   board except for Mr. Norris, and that is the
22   entire compensation committee, too. And Mr.
23   Norris is not on the compensation committee.
24       Q    Okay. You're not on the compensation
25   committee.

Page 36

1        A    No.
2        Q    Okay.
3        A    No one from the inside. Outside
4    directors only.
5        Q    Did the revised benefits and
6    compensation plan that was presented to the board
7    and approved by the board, were you part of that
8    presentation?
9        A    I gave the presentation along with
10   Nick Bubnovich, yes.
11       Q    Okay. Other than yourself and Mr.
12   Bubnovich who else was involved in putting the
13   plan together for W.R. Grace?
14       A    Paul Norris, of course, we was
15   involved in the -- you know, when we formulated
16   the plan and looked at it.
17           I worked mostly with Nick Bubnovich
18   and as we developed the programs then we sat down
19   with Paul to explain them to him and, you know,
20   to make sure he understood them, agreed with them
21   and, you know, felt that it was the right course
22   to go before we submitted them to the board.
23           An individual that works with me,
24   too, Mike Piergrossi who is in human resources,
25   he assisted me in the preparation of these

Page 37

1  things.
2      Q    Okay.  Why did W.R. Grace retain Mr.
3  Bubnovich as a consultant?
4      A    In mid 2001 we started to look at our
5  retention plan, our long-term plan as we were
6  operating into Chapter 11 to see -- you know, you
7  can't wait the last minute we know when
8  especially when you're dealing with these
9  committees.
10     So we started to look at these plans,
11 and we went to our board of directors with kind
12 of a, you know, here's a preliminary draft of a
13 plan that, you know, we think would work for the
14 future.  And that was done in September of 2001.
15     The board's comments to us was, you
16 know, we would -- they would like us to go out
17 and retain an outside expert in this area.  And
18 someone that is working with companies in our
19 specific situation, mass tort asbestos, to make
20 sure that, one, we're competitive, we're not
21 overpaying, we're not asking for too much but
22 we're putting in the right incentives with other
23 companies that are in our particular situation.
24     And following that I dealt with the
25 chairman of the committee, John Akers, and Nick

Page 38

1  Bubnovich's name came to the top of the list
2  because he has worked on these programs with --
3  I'll probably forget one of them but Armstrong,
4  Federal Mogul, USG -- I know there's another one
5  that's in -- there's another one but, you know, I
6  mean I think that shows you it's a -- it's
7  certainly a lot of the key ones in asbestos, the
8  more recent ones that are in asbestos.
9      So we went out and discussed this
10 with Nick and we retained him to do this.  And he
11 looked at the plans of all, again, these other
12 companies, compared it and really said this is
13 what I think is appropriate for Grace.
14     He came back to the -- he came back
15 to our board meeting in November, presented it to
16 our board of directors and the board at that time
17 authorized me to go forward with that, you know,
18 subject to my final approval once we -- after
19 we got through the process of the individual
20 awards that would be made and to go forward and
21 present that to the creditors' committees.
22     Q    Okay.  Did you review either the
23 report that Mr. Bubnovich did and the methodology
24 that he used to come up with the various
25 proposals that he made to the committee?

Page 39

1      A    Yes.
2      Q    Okay.  Was there any discussion with
3  Mr. Bubnovich about what companies that he
4  should look at in terms of deciding upon
5  recommendations and the various programs, general
6  retention, long-term incentive and severance or
7  did you leave that up to him?
8      A    We left that up to him.
9      Q    Okay.  When it came to the total
10 compensation for the top 16 executives at W.R.
11 Grace --
12     A    Yes.
13     Q    -- was that also left up to him as to
14 what companies he would look at to try to
15 determine what was reasonable compensation for
16 the top 16?
17     A    To the best of my knowledge, yes.
18 And we really, you know, really didn't look at
19 specific companies in that in terms of it was
20 basically survey data that was prepared by -- and
21 it was a weighing of the survey data that was
22 prepared by the four largest compensation
23 consulting companies in the world, Mercer,
24 Hewitt, Wyatt and Towers Perrin.
25     And who basically those are the key

Page 40

1  names in the compensation business, and they
2  maintain the databases.
3      And basically he took that surveyed
4  data and there could be, you know, by position.
5  It all depends on by position how many, you know,
6  how many data points they have in there.
7      You know, for the CEO it might be
8  less than what they have for the general counsel
9  or something like that, but they looked at all
10 those databases, which are the broadest you can
11 get, and then compared that to say that versus
12 the 16 top people that we have.
13     Q    Okay.  But prior to Grace entering
14 bankruptcy and retaining Mr. Bubnovich had you
15 reviewed that survey information in deciding the
16 compensation for the top 16 executives at Grace?
17     A    Yes.  We have always used and prior
18 to bankruptcy we used Hewitt Associates.  Hewitt
19 Associates we've been involved with for at least
20 six years I would say, okay.
21     And as I said we've always used
22 outside consultants and Hewitt, who has their own
23 practice, has their own database, they basically
24 -- they've looked at all our jobs, you know, for
25 the most part.

Page 41

1        And they're the ones that tell us,
2  you know, the annual -- they're the ones that say
3  for an annual bonus this is what the target
4  should be of base salary for this position.
5        So if you're at this position, if
6  you're at a grade 20, I'll call it, you know,
7  your annual target should be 35 percent of your
8  base salary.  And you should have a long-term
9  opportunity for that position of $75,000.
10       So we've always used outside experts
11 in coming up to what are appropriate salaries,
12 base salaries, annual bonuses, long-term targets
13 for each position in the company.
14       Q    Okay.  When Hewitt had been
15 consulting with you, do you know what companies
16 they used in their survey parameters?
17       Did they use companies like Grace in
18 the chemical business?
19       A    Yeah.  It was a mix, yeah.  And again
20 ours was focused, it was focused at the size of
21 the company you have, too, so, you know, you --
22 ours would have been tailored to a $2 billion
23 company because that's what we were.
24       So you wouldn't want to tailor it to
25 $10 billion company because, you know, the data

Page 42

1  should be skewed at a higher rate.
2        So ours we looked at at 1 and a half
3  to $2 billion companies.  And that's what Hewitt,
4  you know, many years ago when we had other
5  businesses, they were looking at a 5 to $10
6  billion.
7        So over time the companies they
8  looked at have been adjusted based on the size of
9  Grace, the facts and circumstances.
10       Q    But when Hewitt was doing it for you
11 were they looking not only at the size but also
12 in the same industry that you were in?
13       A    Yes.  I mean they look at -- it's
14 both.  I mean it's done a lot of ways.  They look
15 at the industry you're in and peripheral
16 industries, too, because, you know, the people we
17 have are not just able to go to our industry.
18       So it's a -- it's -- it can be -- and
19 I can't give you the specifics of what companies
20 they used because they wouldn't -- they will not
21 give to us what companies are in their database.
22 They were not give us individual data.
23       So they'll do the analysis for you
24 and basically give it back to you, but they look
25 at specialty chemicals, but then they look at all

Page 43

1  companies, too.  So they try to get the best
2  available data.
3        Q    Okay.  Did you ask Hewitt to do an
4  analysis for you as they did in the past for this
5  year or the information that you were going to
6  use leading up to the request to revise the plan
7  to the bankruptcy court?
8        A    Hewitt, Hewitt -- when we started to
9  look at the retention aspect of the plan, we went
10 to Hewitt.  Hewitt does not participate in this
11 arena.
12       So Hewitt does not have that data.
13 We had the individual that headed up our job in
14 to see the board and basically he says, I don't
15 have that database.
16       And that's why, you know, we probably
17 would -- we would have stuck with Hewitt because
18 that was the history but now we had to move on to
19 someone that had knowledge and worked in that
20 arena.  And Hewitt does not have a practice in
21 that area.
22       Q    Okay.  But with respect to the total
23 direct compensation for the top 16 executives,
24 did you ask Hewitt to do a survey for you as they
25 had done in the past for --

Page 44

1        A    Not since we entered bankruptcy, no.
2        Q    Is there a particular reason why you
3  haven't?
4        A    Well, actually we haven't changed
5  anything in terms of the top 16 people, okay,
6  that you see on those charts there.
7        The targeted annual bonus, which is a
8  percent of salary, it's converted there into a
9  dollar amount but it really starts off as a
10 percent of base salary and the long-term
11 opportunity which is a dollar amount, those were
12 originally produced to us by Hewitt going back
13 about two to three years ago.  So all the data
14 was done by Hewitt.
15       Q    And I had asked you, you had reviewed
16 the reports that Mr. Bubnovich did; is that
17 correct?  Did you look at his survey that was --
18 it was produced to me on Tuesday?
19       A    Yes, I've seen the top sheet that you
20 --
21       Q    Okay.
22       A    I've seen those two sheets where he
23 has base salary, annual bonus, long term, right.
24 Those are the backup data sheets about the survey
25 data.

Page 45

1      Q    Okay.  And did you look at your
2  individual information for you, Mr. McGowan?
3      A    Yes.
4      Q    Okay.  Let me just show you what has
5  been previously marked as Exhibit Number 1 at the
6  last deposition, and just ask you to look at your
7  information.
8           And while I'm getting that for you,
9  did you discuss with Mr. Bubnovich your
10 individual information?
11     A    No, I didn't think that was
12 appropriate.
13          MR. RUNNING:  I guess my suggestion
14 would be that we not refer to specific salary
15 information on the record, otherwise we'll have
16 to mark the deposition as confidential.
17          MR. LODISH:  No, I wasn't going to
18 discuss any numbers anyway.
19          MR. RUNNING:  Okay.
20          MR. LODISH:  I mean this information
21 is confidential.
22          I've got it here.  I've got it on
23 mine.  Okay.  I see that your lawyer has put in
24 front of you the copy of the survey.  Yeah, I
25 found it here.

Page 46

1          THE WITNESS:  Yup.
2  BY MR. LODISH:
3      Q    Okay.  You see that.  And have you
4  seen that before today, your particular analysis?
5      A    Yeah, I got it this week.
6      Q    Okay.
7      A    I didn't do a lot of hard studying to
8  it, but I got it this week.
9      Q    That's okay.  Okay.  Well, I wanted
10 to ask you whether you realized that, for
11 example, for you, Mr. McGowan, that the survey
12 parameters you see there that what's there under
13 survey parameter.
14     A    Yes.
15     Q    The seventh column.  There aren't any
16 chemical corporations that he used in the survey
17 for you, is there?  It's all --
18     A    Well, I'm not sure, all industries
19 and corporate manufacturing industries, you know,
20 I don't know what the companies in there would
21 be, sir, so.
22     Q    Well, look at just, you know, for
23 illustrative purposes, at the very first
24 person, Mr. Bettacchi on the very first page.
25          Do you see him, do you see under

Page 47

1  survey parameters?
2      A    Yes.
3      Q    Do you see there what was used was
4  one, two, three chemicals, plastic,
5  pharmaceuticals and cosmetics.
6      A    Right.
7      Q    And then at the end group chemicals
8  companies, do you see that?
9      A    Yes.
10     Q    Okay.  So do you know why for your
11 particular survey none of those companies were
12 used to help determine where your TDC fell?
13     A    Well, what I could say from based on
14 my experience, and I think you're going to see
15 this potentially with some other jobs here, I'm a
16 staff person.
17          I think if you go to Mark Shelnitz,
18 who is our associate general counsel you'll find
19 the same type of thing so that, you know, it's --
20 we're not -- they're looking at appropriate data
21 for us and we, you know, our jobs might
22 necessarily be in the specialty chemical
23 business, they're trying to get more of a general
24 type of industry because our jobs fit anyplace.
25          So I can't -- that's my view of what

Page 48

1  I see here is that, you know, they are using
2  broad bases for administrative people, finance
3  people, legal staff because that's more
4  appropriate because our skills are not, you know,
5  aligned with the chemical industry.
6          Whereas our business people, Mr.
7  Bettacchi, runs our business and some of the
8  other people I would say --
9      Q    Well, you mentioned --
10     A    -- you know, a Greg Poling, you got
11 the chemical, plastics, you know.
12     Q    Well, you mentioned Mark Shelnitz.
13     A    Right.
14     Q    If you look at his survey there --
15     A    Right.
16     Q    -- you're correct in that the survey
17 parameters there are all either manufacturing or
18 all industries, correct?
19     A    Right, um-hum.
20     Q    But are you saying that in the
21 chemical industry they don't have associate
22 general counsels?
23     A    No, I wouldn't say that.  It just --
24 again, we relied on an outside expert to say
25 where is the most appropriate place to benchmark

Page 49

1    these jobs and what segments of the database do
2    they fall into?
3            Because I think what you'll see here
4    is that if we go back to -- if we go back to Mr.
5    Bettacchi, it's the same type of databases that
6    you have. It's from Mercer.
7            There's one from Shelnitz and myself
8    from Mercer. So Mercer has the data segregated,
9    you know, and I think it's where the jobs fall in
10   for it.
11           I mean we're using Mercer data in all
12   cases.
13   Q     Well, for example, let's look at --
14   A     There's a survey data from Mercer,
15   it's the same exact survey data it just happens
16   to be the parameters they looked at manufactured
17   and nondurables for me but it's the same company
18   that provided, you know, the data for Mercer.
19   Q     No, I understand it's the same
20   company that provided the survey.
21           But, for example, if you look at
22   David Siegel, the senior vice president, general
23   counsel, do you know why he for David Siegel, the
24   general counsel, would use four chemical-based
25   corporations in that chemicals, plastics,

Page 50

1    pharmaceuticals and cosmetics and he used two in
2    the survey parameter and also used corporate
3    chemicals and the company that did the survey for
4    Mr. Siegel's chart was Watson Wyatt and Watson
5    Wyatt was also used for Mark Shelnitz but used in
6    the survey parameter a whole different industry.
7            Unfortunately, I got this right
8    before Mr. Bubnovich's deposition and I was
9    wondering whether you knew why he mixed and
10   matched the different industries and companies
11   even if it was done by the same survey producer?
12   A     No.
13           MR. RUNNING: Objection to the
14   characterization mixed and matched,
15   argumentative.
16   BY MR. LODISH:
17   Q     Do you know whether Mr. Bubnovich did
18   these surveys for the individual positions to try
19   to get the compensation up as high as was
20   possible?
21   A     Could you repeat that question?
22   Q     Do you know whether Mr. Bubnovich
23   used the surveys for the individual positions
24   here for the purposes of getting the compensation
25   up as high as he could?

Page 51

1    A     Absolutely not.
2    Q     And how do you know that?
3    A     I don't believe he would have done
4    that. I'm the chief ethics officer in the
5    company besides being the chief HR person, and I
6    would not allow that to happen.
7    Q     Well, I appreciate that, Mr. McGowan,
8    but if you hadn't had the opportunity or able to
9    review the industries that were used as the
10   parameters for these surveys, then you haven't
11   had an opportunity to review whether, for
12   example, for a position like yours whether it
13   exists in the chemical industry and if it does
14   what the various compensation would be, right?
15   A     I don't know the answer why certain
16   ones are used and certain not, they are the same
17   companies that are being used so it's from the
18   same company, we're not selecting particular
19   companies on this thing. It's the same companies
20   that are being used on all of them.
21           Why certain of them say under survey
22   parameters I'm not sure at this time, but I will
23   research that information and respond back to
24   you.
25   Q     Okay. No, I appreciate that. Now,

Page 52

1    we had talked about the people who had left. Are
2    you familiar with persons who have applied for
3    senior management or key personnel eligible
4    positions at W.R. Grace in the last year?
5    A     I am familiar with the people who
6    replaced the people that left, yes.
7    Q     Okay. So you have replaced all five;
8    is that correct?
9    A     I know of three that we replaced. We
10   made some internal moves to replace -- internal
11   promotions to replace the director of finance.
12           We replaced from externally the two
13   HR people and the one plant manager at Curtis
14   Bay.
15           And the last individual that I
16   cannot, you know, remember who it was, I
17   certainly don't know if we replaced that person
18   or not.
19   Q     Okay. The finance person who you
20   replaced by bringing somebody up internally.
21   A     Right. We made some internal moves,
22   yes.
23   Q     Okay. Was that done because you
24   couldn't find somebody outside or because the
25   person who you moved up was deserving of that

Page 53

1   position?
2       A    The person we moved up was deserving
3   of the position, and we felt that we could take
4   some opportunities to share some jobs around the
5   company, and we are constantly looking for
6   productivity.
7       And this was an opportunity for us
8   that we thought we could spread some of the work
9   out amongst a variety of people and reduce our
10  level by one person.
11      Q    Okay.  So of the five, three were
12  replaced by outside people; is that correct?
13      A    Yes, three of the four I know were
14  replaced by outside.  The fifth one I don't -- I
15  can't recall that at this time.
16      Q    Okay.  Are you pleased or satisfied
17  with the replacements that you got from the
18  outside?
19      A    I think we've -- you know, it was a
20  long process in some of the cases, but I think at
21  this point in time we're pleased with the people
22  that we got.
23      Q    Okay.  Do you get resumes in now and
24  then unsolicited for positions at W.R. Grace?
25      A    Yes.

Page 54

1       Q    Okay.  Does that include even for key
2   employee positions?
3       A    We get a variety of levels of people
4   writing in, yes.
5       Q    Okay.  Are there any executive search
6   firms that you work with in particular?
7       A    None in particular.  None in
8   particular.
9       Q    The three positions that were
10  replaced, did you use an executive search firm or
11  any entity like that to find someone?
12      A    Yes, we use executive search firms.
13  I cannot tell you who they were, I don't know
14  that.
15      Q    Okay.  Okay.  Did the three people
16  from the outside come from any of the peer group
17  companies?
18      A    I'm not sure.  Two I know didn't, the
19  other one I'm not sure.
20      The manager at the Curtis Bay, again,
21  Paul would be able to tell you that on the
22  replacement at Curtis Bay.
23      Q    Okay.  Mr. McGowan, do you have a
24  sense at all at how much hiring is going on at
25  let's say the peer group companies?

Page 55

1       A    No, I do not.
2       Q    Okay.  Mr. McGowan, if the revised
3   compensation plan which is pending before the
4   bankruptcy court, if that is not accepted and the
5   plan that was accepted in April of 2001 remains
6   and continues on in that way, would you consider
7   leaving W.R. Grace?
8       A    I have opportunities and I'd have to
9   make a decision at that time.
10      Q    Are you waiting to see how this is
11  going to go in terms of deciding whether you'd
12  consider leaving W.R. Grace?
13      A    It's a factor in a -- you know, it's
14  a factor as one factor in determining my future.
15      Q    Are you aware of any specific key
16  employees that are going to leave if the revised
17  plan is not accepted and the current plan
18  continues?
19      A    No, I could not say that I'm
20  personally aware of anyone.
21      I think Mr. Norris in his deposition,
22  you know, indicated, you know, from information
23  we received from the leadership team that, you
24  know, there was -- there's a lot of serious
25  contacts being made today in the company.

Page 56

1       And I believe that the people on the
2   retention plan leadership team think that, you
3   know, we'll do the right thing for them.
4       And I think that if the current
5   retention long-term plan is the one that is just
6   put in place for the future, it is going to be a
7   disappointment for people because that when you
8   look at the pieces of the plan, that their
9   opportunities aren't there and targets that are
10  being set in the long-term plan are unrealistic
11  at ten percent compounded average growth over the
12  next three years to meet just target awards is
13  unrealistic in today's environment.
14      And you look at -- when you look at
15  the retention plan, you know, you look at what's
16  being done at other companies.
17      And based on the information that
18  we've been provided by our consultants and we --
19  you know, the results of those is that, you know,
20  our retention plan is less generous than people
21  in our situations.
22      Q    Were you aware, Mr. McGowan, that
23  none of your competitors have a retention
24  program?
25      A    That list of competitors there.

Page 57

1      Q    Well, whomever Mr. Bubnovich
2  considers your competitors.
3      A    Right, that's the -- I think we need
4  to clarify things.
5           MR. RUNNING:  That is the list he was
6  referring to.
7  BY MR. LODISH:
8      Q    All right.  Are you aware that none
9  of your competitors on that list has a general
10 retention plan like Grace does?
11          MR. RUNNING:  Just so we're clear,
12 this is the list that's attached to March 12th.
13          MR. LODISH:  Okay.
14          THE WITNESS:  Are you aware that none
15 of those companies are operating under Chapter
16 11?  In answer to your question --
17 BY MR. LODISH:
18     Q    Fortunately I get to ask the
19 questions.
20     A    Okay, I'm sorry.  All right.  In
21 response to your question I am not aware of any
22 of those companies having a retention plan,
23 however, I must state for the record that none of
24 those companies are operating under Chapter 11.
25          When Grace was not under Chapter 11

Page 58

1  or just prior to ours we did not have a retention
2  plan.  We were still able to give equity a based
3  compensation that provided significant upside to
4  people if we performed.  We no longer have that.
5      Q    Okay.  And I take it then the purpose
6  for the general retention plan was to make up for
7  what was contemplated to be lost in the equity to
8  the key employees through the general retention
9  plan, right?
10     A    I think there's a number of factors
11 why you put in a general retention plan is to
12 retain those people, okay.
13          It's to -- there's a lost opportunity
14 for these people in terms of personal
15 development, not just money but personal
16 development because as we operated into Chapter
17 11 our ability to grow the company through
18 acquisitions, which means there's more
19 opportunity for your key people to move on,
20 that's been limited.
21          So people's opportunities in the
22 company has been decreased, as well as
23 opportunities for financial reward for achieving
24 what we believe are above average results against
25 our peer companies.

Page 59

1           We can't be rewarded in the equity
2  market so that's why the retention plan is needed
3  to offset those, I'll call them negatives, that
4  we're operating underneath.
5      Q    Mr. McGowan, but isn't it true that
6  you are proposing to reward your people not just
7  for above average results but for any results?
8           In your new proposal you are seeking
9  not only to lower the bar from 10 percent EBIT,
10 that's E-B-I-T, to five percent, you are now
11 proposing to award people for any growth over
12 zero percent, correct?
13          MR. RUNNING:  I think you misspoke,
14 it's 6 percent.
15          THE WITNESS:  Let me correct you, let
16 me correct it.  It's 6 percent, first of all.
17 BY MR. LODISH:
18     Q    6 percent, I'm sorry.  You're right,
19 it's 10 percent to 6 percent.
20     A    Right.
21     Q    But also the change you're seeking is
22 to award people for any type of growth.
23     A    Anything above --
24     Q    Zero.
25     A    -- zero would start to trigger such a

Page 60

1  payment, that is correct.
2           I think if you look at the chart
3  that's been presented there, the 6 percent that
4  is being used is a long-term growth of those 16
5  companies, 15, 16, companies.
6           And I think if you look at where is
7  that 6 percent generated, a lot of that 6 percent
8  was generated in the early years, in the early
9  '90s to mid '90s.
10          If you look at the growth of those
11 companies over the last four years it's negative,
12 it's cumulatively about 5 percent negative growth
13 over the last four years.
14          So I believe that our plan at 6
15 percent, if you want to slice the data which we
16 did not do, we did it over a long-term period, 6
17 percent is certainly appropriate especially when
18 you look at what's transpired in our peer
19 companies over the last five years.  It's been
20 negative growth not positive growth.
21     Q    Mr. McGowan, that's interesting.  You
22 raise an interesting point I'd like to follow up.
23          If you look at the chart, which is
24 part of Exhibit A attached to Exhibit Number 1 in
25 front of you, the pleading.

Page 61

1        Do you see that chart?
2    A    Yes.
3    Q    The last years that you were
4 referring to on the chart, '98 through 2000.
5 Yes, it's true that the average down below that
6 was calculated is minus 2.35 percent but isn't it
7 true that of the list of the 14 companies that
8 eight of them had positive growth and that Union
9 Carbide that had a minus 41.74 percent decline
10 really skewed those results?
11       I mean, isn't it due to Union
12 Carbide's poor performance, '98 to 2000 is the
13 reason it's in the negative?
14   A    '98 through 2000.
15   Q    Yeah.  Those are the last, you said
16 the last, you know, couple of years in referring
17 to the chart.
18   A    Yes, that is a factor.
19   Q    Okay.
20   A    That's a factor there but there are
21 several ones and there's a lot of them at 1
22 percent growth rate,  2 percent growth rate, flat
23 growth rate.  So yeah, it's a mix.
24   Q    But isn't it true in 1998 W.R.
25 Grace's growth rate was 10 percent?

Page 62

1    A    Yes.
2    Q    Okay.  So W.R. Grace, fortunately for
3 W.R. Grace stacks up very favorably against
4 these companies, doesn't it, during the time
5 period that this chart was done?
6    A    We --
7    Q    Do you know what -- excuse me, Mr.
8 McGowan, do you know what W.R. Grace's average
9 growth rate was for this same time period, '92
10 through the year 2000?
11   A    No, I do not.
12   Q    Okay.
13   A    We've been in and out of so many
14 businesses we could never restate.
15   Q    Okay, all right.  I can appreciate
16 that.  But isn't that the problem when you use
17 analyses like these to decide on your own
18 incentive program to use these averages of other
19 companies in the industry that it can be skewed
20 by one company by using an average such as Union
21 Carbide?
22       Union Carbide it looks like skewed
23 the results in the early years.  In '93 to '95
24 they were up 48.40 percent.
25   A    Okay.  But if you look at the average

Page 63

1 for all the period of times Union Carbide didn't
2 skew it.  Union Carbide was at 8 percent so
3 that's why, you know, it's --
4    Q    I understand that.  But when you were
5 doing your incentive program before bankruptcy
6 were you looking and worrying about what other
7 companies were doing or were you basing it on
8 your own expectations and the growth of W.R.
9 Grace?
10       MR. RUNNING:  Well, I'll object to
11 the characterization of worrying about what other
12 companies were doing.
13       MR. LODISH:  Well --
14       THE WITNESS:  All right.  Let me go
15 back to say long-term plans, we're talking about
16 the long-term plans.
17       Prior to bankruptcy it was a stock
18 place plan, we didn't have to worry about it.  It
19 was 100 percent equity.  We didn't have to worry
20 about growth.  So that's why it never came into
21 play.
22       And what I'll tell you is that when
23 we put the '01/'03 plan in place, you know, which
24 was -- you know, that was put into place in '01
25 right before we went into bankruptcy because we

Page 64

1 knew we were facing an issue, a potential issue
2 that could put us into bankruptcy we decided to
3 split the plan between half cash and half stock.
4       And I tell you right now and from a
5 -- because we were very business doing a lot of
6 things during that period of time, that we took
7 the easy way out and we said we're using 10
8 percent for our short-term plan, just use 10
9 percent for the long-term plan.
10       So we never went out when we put the
11 '01/'03 plan in place and looked at any data.  We
12 just said we're 10 for short term, use 10 for
13 long term.
14 BY MR. LODISH:
15   Q    Well, but '92 through 2000 --
16   A    Right.
17   Q    -- did you look at what the peers in
18 the industry was doing to come up with the 10
19 percent?
20   A    No, we did not.
21   Q    Okay, all right.  So when bankruptcy
22 was being contemplated they were at least two
23 things you did to try to improve the lot of the
24 key employees that were here and give them some
25 level of comfort, as I understand it.

Page 65

1      One was the general retention
2  program, correct?
3      A    Yes.
4      Q    And the other was giving them 50
5  percent cash, 50 percent stock, correct?
6      A    Yes, we -- yes, we thought that was
7  appropriate based on what was happening to our
8  stock because even before we went into bankruptcy
9  our stock was sliding downwards and people did
10 not view our stock options as they did in past
11 years.
12     Q    Okay.  So what has changed that you
13 believe then, which was not that long ago, that a
14 50/50 split was a reasonable thing to do since it
15 had always been 100 percent stock before and now
16 you believe you have to give 100 percent cash?
17     A    I don't know of any companies
18 operating under Chapter 11, you know,
19 historically have ever issued stock options
20 because until you know what a reorganization plan
21 -- how would you motivate people by giving them a
22 stock option that you don't know what those stock
23 options -- what's going to happen to those stock
24 options in a reorganization plan.
25          They could just get wiped out.

Page 66

1  Depending on what happened -- even if the equity
2  gets a substantial amount, stock option holders
3  might get nothing.  So it's a big uncertainty.
4      Q    Okay.  Isn't there inherent risks in
5  stock options to begin with based on what the
6  stock will be doing in the future?
7      A    You have a ten-year window that --
8  yes.  But it lasts for ten years, right.
9      Q    Okay.  And isn't it true that you've
10 taken out any of risk by giving 100 percent cash?
11     A    We still have to perform, we have to
12 deliver, we have to grow the business to get our
13 targeted awards.
14     Q    But not only are you giving 100
15 percent cash, you are now starting to pay even if
16 there is minuscule growth, correct?
17     A    That is a correct statement, that's
18 the way the plan is designed.
19     Q    I mean don't you believe the plan as
20 designed now is a market change from the previous
21 plan in terms of the benefits that the employees,
22 the key employees are going to get?
23     A    I think it's a change.  I'm not sure
24 I characterize it as you did but it's a change
25 that's been necessitated because of the fact that

Page 67

1  we are in bankruptcy today, and we need to
2  motivate and retain these people.
3      Q    Okay.  And you believe that it is
4  good business judgment to reward them with 100
5  percent cash in terms of their benefit even if
6  the growth rate for W.R. Grace declines to say
7  one or two percent over the next two years.
8      A    If the growth rate is one or two
9  percent they will still get a payout.
10     Q    That's right.
11     A    It will not be close to the target,
12 but they will still get a payout.
13     Q    And you believe that's appropriate
14 for an incentive program going forward.
15     A    If we want to retain those key people
16 while we're in bankruptcy, okay, to make sure
17 that we continue to grow the enterprise, I think
18 it's appropriate, our consultants think it's
19 appropriate, and our board of directors thinks
20 it's critical to make sure that we have those
21 incentives out to the people and at a lower bar
22 that you might not have if you weren't in
23 bankruptcy.
24     Q    Okay.  Let me see if there is
25 anything else that I have.

Page 68

1      (Pause.)
2      MR. LODISH:  Okay.  I don't think I
3  have anything further, Mr. McGowan.
4      I appreciate your time.
5      THE WITNESS:  Very good.
6      MR. RUNNING:  He'll read and sign.
7      (Deposition concluded at 2:40 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 69

1  State of Maryland
2  City of Baltimore, to wit:
3          I, MARIANNE R. HEWITT, a Notary Public of
4  the State of Maryland, County of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly affirmed by me,
8  according to law, was examined by counsel.
9          I further certify that the examination was
10 recorded stenographically by me and this transcript is
11 a true record of the proceedings.
12         I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in
14 the outcome of the action.
15         As witness my hand and notarial seal this
16 2nd day of August, 2002.
17
                    _____
                         MARIANNE R. HEWITT
18                          Notary Public
19
20
21
22
23
24 My Commission Expires:
25 June 21, 2003

Page 70

1          CERTIFICATE OF DEPONENT
2
3
4
5          I hereby certify that I have read and
6  examined the foregoing transcript, and the same
7  is a true and accurate record of the testimony
8  given by me.
9          Any additions or corrections that I
10 feel are necessary, I will attach on a separate
11 sheet of paper to the original transcript.
12
13         _____
14                W. Brian McGowan
15
16
17
18
19
20
21
22
23
24
25

Page 71

1                    INDEX
2       Deposition of W. Brian McGowan
3              August 1, 2002
4
5  Examination by:                    Page
6    Mr. Lodish                        92
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 01-01139-AMC    Doc 2545-4    Filed 08/15/02    Page 19 of 26

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

W. Brian McGowan
August 1, 2002

Page 72

## A

**ability** 58:17
**able** 16:2 29:12 31:17
  42:17 51:8 54:21
  58:2
**Absolutely** 5:12 51:1
**accepted** 55:4,5,17
**accurate** 19:20 29:23
  29:24 70:7
**achieve** 8:13
**achieving** 58:23
**acquire** 19:11
**acquisitions** 58:18
**action** 14:9 69:14
**activities** 4:15
**addition** 6:23
**additional** 6:15
**additions** 70:9
**address** 3:19
**adjusted** 42:8
**Administered** 1:7
**administration** 4:2,9
**administration's** 18:11
**administrative** 8:6 22:5
  48:2
**adopted** 18:13
**advising** 10:5
**affidavit** 20:12 34:12
**affirmed** 3:9 69:7
**ago** 16:14,14 42:4
  44:13 65:13
**agreed** 3:2 36:20
**Akers** 34:7 35:1,17
  37:25
**al** 1:4
**aligned** 48:5
**allow** 51:6
**ALVIN** 1:17 2:11
**ambiguous** 15:8
**amount** 33:23 44:9,11
  66:2
**analyses** 62:17
**analysis** 42:23 43:4
  46:4
**ANDREW** 2:9
**Anne** 35:17
**annual** 8:21 41:2,3,7,12
  44:7,23
**answer** 29:7,9,12 51:15
  57:16
**anyplace** 22:5 47:24
**anyway** 45:18
**APPEARANCES** 2:8
**appeared** 69:6
**application** 5:14 7:18

**applied** 52:2
**appreciate** 51:7,25
  62:15 68:4
**approach** 29:8
**appropriate** 9:18 10:6
  34:22 38:13 41:11
  45:12 47:20 48:4,25
  60:17 65:7 67:13,18
  67:19
**approval** 38:18
**approve** 15:15
**approved** 14:15,20
  15:5 34:7 36:7
**approximately** 6:10
  20:10,16,17 21:9,11
  30:8,13
**April** 14:16 15:5 55:5
**area** 37:17 43:21
**areas** 4:13 19:22
**arena** 43:11,20
**argumentative** 50:15
**Armstrong** 38:3
**arrangements** 32:12
  35:9
**asbestos** 2:12 16:6 28:9
  37:19 38:7,8
**asked** 20:7 23:8 44:15
**asking** 5:13 37:21
**aspect** 43:9
**assisted** 36:25
**associate** 47:18 48:21
**Associates** 8:19 40:18
  40:19
**association** 35:7
**attach** 70:10
**attached** 57:12 60:24
**attempted** 31:21,21
**attract** 9:15
**attrition** 21:9,12 29:21
**August** 1:16 2:2 69:16
  71:3
**authorized** 38:17
**automatic** 6:4 13:16
**available** 9:4 17:16
  32:2,3 43:2
**average** 56:11 58:24
  59:7 61:5 62:8,20,25
**averages** 62:18
**award** 59:11,22
**awards** 38:20 56:12
  66:13
**aware** 10:3 26:24 27:2
  29:18 55:15,20 56:22
  57:8,14,21

## B

**back** 7:16 9:21 16:14
  25:20 31:17 32:11,17
  33:25 38:14,14 42:24
  44:12 49:4,4 51:23
  63:15
**backup** 44:24
**Baldwin** 35:18
**Baltimore** 23:1 69:2,4
**bands** 12:16
**bankruptcy** 4:4 5:10
  14:16 15:15 19:11
  28:10 29:20,22 31:3
  32:6,8 33:8,14 40:14
  40:18 43:7 44:1 55:4
  63:5,17,25 64:2,21
  65:8 67:1,16,23
**bar** 59:9 67:21
**base** 41:4,8,12 44:10,23
**based** 5:19 6:5 9:2
  10:21 12:21 13:8
  26:17 42:8 47:13
  56:17 58:2 65:7 66:5
**bases** 48:2
**basically** 8:9 13:8
  39:20,25 40:3,23
  42:24 43:14
**basing** 63:7
**basis** 8:11 22:22
**Bay** 23:1 24:6 52:14
  54:20,22
**beginning** 12:3 21:5
**behalf** 2:9,11
**believe** 4:3 13:2 20:24
  21:21 27:3 32:13
  51:3 56:1 58:24
  60:14 65:13,16 66:19
  67:3,13
**benchmark** 48:25
**benefit** 10:17 67:5
**benefits** 36:5 66:21
**best** 4:22 23:22 25:10
  28:19 29:8 39:17
  43:1
**Bettacchi** 46:24 48:7
  49:5
**better** 26:8,8,19 31:1
**big** 66:3
**billion** 41:22,25 42:3,6
**bit** 3:22 24:20
**board** 2:5 10:9 34:2,13
  35:13,14,21 36:6,7,22
  37:11 38:15,16,16
  43:14 67:19
**board's** 37:15
**bonus** 16:19 41:3 44:7
  44:23

**bonuses** 19:22 41:12
**Boston** 22:20 24:9
**Brian** 1:15 2:1 3:8,12
  3:18 70:14 71:2
**bright** 31:25
**bringing** 52:20
**broad** 48:2
**broaden** 27:12
**broadest** 40:10
**Bubnovich** 36:10,12,17
  37:3 38:23 39:3
  40:14 44:16 45:9
  50:17,22 57:1
**Bubnovich's** 38:1 50:8
**build** 30:25 31:1
**Building** 2:4
**business** 7:25 9:8,10
  19:9 22:2,2,4,15,16
  22:17,21 26:22 27:8
  27:21 28:3 29:5,11
  34:4 40:1 41:18
  47:23 48:6,7 64:5
  66:12 67:4
**businesses** 8:4 21:18
  22:1 42:5 62:14
**business-by-business**
  8:11

## C

**Cabot** 27:20
**calculated** 61:6
**call** 16:20 41:6 59:3
**called** 3:9 16:20
**Cambre** 35:17
**Cambridge** 24:1
**Carbide** 61:9 62:21,22
  63:1,2
**Carbide's** 61:12
**card** 25:20
**case** 1:6 8:18 11:6,7
**cases** 49:12 53:20
**cash** 64:3 65:5,16 66:10
  66:15 67:5
**catalyst** 22:2,16 27:7
  28:3
**categories** 7:19 22:12
**categorize** 17:10
**category** 9:9 21:1
**CEO** 40:7
**certain** 4:12 17:9 25:24
  51:15,16,21
**certainly** 7:21 34:22,24
  38:7 52:17 60:17
**certainty** 33:16
**CERTIFICATE** 70:1
**certify** 69:5,9,12 70:5

**cetera** 12:3
**chairman** 34:6 35:3,4
  37:25
**change** 59:21 66:20,23
  66:24
**changed** 44:4 65:12
**changes** 34:17,20,21
**Chapter** 1:6 18:22,25
  37:6 57:15,24,25
  58:16 65:18
**characterization** 50:14
  63:11
**characterize** 15:10
  66:24
**charge** 4:11
**chart** 50:4 60:2,23 61:1
  61:4,17 62:5
**charts** 44:6
**chemical** 22:4 27:14,24
  28:16 29:5 41:18
  46:16 47:22 48:5,11
  48:21 51:13
**chemicals** 21:21,23
  22:20 28:18 42:25
  47:4,7 49:25 50:3
**chemical-based** 49:24
**chief** 51:4,5
**circumstances** 42:9
**City** 69:2
**Claimants** 2:12 28:9
**clarification** 6:13
**clarify** 5:7 57:4
**classified** 28:18
**clear** 57:11
**Clerk** 3:4
**close** 23:3 67:11
**closely** 27:22
**closest** 27:8
**COBRA** 25:21
**Columbia** 2:5 22:18,24
  24:2
**column** 46:15
**come** 11:10 12:13,15
  25:4 27:9 30:13
  32:17,25 34:11,18
  38:24 54:16 64:18
**comfort** 64:25
**coming** 41:11
**commencing** 2:2
**comments** 37:15
**Commission** 69:24
**committee** 2:11 10:9,10
  28:9 33:8,19,20 34:5
  34:6 35:5,11,22,23,25
  37:25 38:25
**committees** 27:16 37:9

38:21
**community** 9:10
**companies** 8:24,25 9:5
17:7 18:21 19:10,11
21:16 27:14 28:14,16
28:20 29:1,4,16 30:20
31:13 32:4 37:18,23
38:12 39:3,14,19,23
41:15,17 42:3,7,19,21
43:1 46:20 47:8,11
50:10 51:17,19,19
54:17,25 56:16 57:15
57:22,24 58:25 60:5,5
60:11,19 61:7 62:4,19
63:7,12 65:17
**company** 2:3,10 5:17
5:17 7:12,20 8:13
10:3,17,22 11:5,9,21
13:10,15,25 14:8
15:22 16:1 21:6
27:24 29:17 35:2,8,9
35:10 41:13,21,23,25
49:17,20 50:3 51:5,18
53:5 55:25 58:17,22
62:20
**company's** 15:20
**comparable** 8:24
**compare** 26:13,15
28:20
**compared** 38:12 40:11
**compensated** 9:17
**compensation** 5:10
8:19 9:23 10:9,10,13
11:20 18:24 30:3,10
32:12 33:7,19,20 34:5
34:6 35:3,4,11,22,23
35:24 36:6 39:10,15
39:22 40:1,16 43:23
50:19,24 51:14 55:3
58:3
**compete** 28:5
**competitive** 9:3,15 10:6
10:15 12:21 37:20
**competitor** 27:1,9,11
27:11,25 28:4
**competitors** 21:18,22
27:5,7 28:1,23 29:1
56:23,25 57:2,9
**compound** 18:7 30:5
**compounded** 56:11
**concerned** 18:18 33:20
33:21 34:3
**concerning** 14:23 28:10
**concerns** 26:9 30:9,16
31:19
**concluded** 32:7 68:7

**confidential** 45:16,21
**consequences** 11:10
**consider** 27:4 28:25
55:6,12
**considerable** 18:22,23
**considered** 12:24 16:23
19:23
**considers** 57:2
**constantly** 53:5
**construction** 22:2
**consultant** 8:18,20
28:17 37:3
**consultants** 9:7,20,22
10:5 40:22 56:18
67:18
**consulting** 35:9 39:23
41:15
**contacts** 55:25
**contemplated** 58:7
64:22
**context** 5:14 26:22
**continue** 16:2,4 67:17
**continued** 2:1
**continues** 55:6,18
**contributing** 11:5
**controller** 10:3
**conversation** 26:2
**conversations** 24:17,24
25:1
**converted** 44:8
**copy** 1:24 45:24
**corporate** 4:14 8:6 10:2
46:19 50:2
**corporations** 46:16
49:25
**correct** 4:5,6 9:12
10:25 20:3 21:2,7
28:15 44:17 48:16,18
52:8 53:12 59:12,15
59:16 60:1 65:2,5
66:16,17
**corrections** 70:9
**correctly** 11:13
**cosmetics** 47:5 50:1
**counsel** 3:3 40:8 47:18
49:23,24 69:8,12
**counsels** 48:22
**County** 69:4
**couple** 24:7 61:16
**course** 36:14,21
**court** 1:1 3:4 5:10
14:16,19 15:15 20:14
28:10 43:7 55:4
**covers** 8:8
**cream** 22:10
**creation** 30:23

**credit** 25:20
**creditors** 38:21
**criteria** 7:9,13 11:2
**critical** 7:12,25 8:10
17:5 67:20
**crop** 22:10
**cross** 8:2 17:14
**CSR** 1:18
**cumulatively** 60:12
**current** 3:24 55:17
56:4
**Curtis** 23:1 24:6 52:13
54:20,22
**cut** 33:25 34:2

**D**

**Damage** 2:12 28:9
**data** 8:24 12:22 39:20
39:21 40:4,6 41:25
42:22 43:2,12 44:13
44:24,25 47:20 49:8
49:11,14,15,18 60:15
64:11
**database** 40:23 42:21
43:15 49:1
**databases** 40:2,10 49:5
**DATE** 1:16
**David** 49:22,23
**Davison** 22:1
**day** 69:16
**deal** 14:12
**dealing** 37:8
**dealt** 37:24
**Debtors** 1:5 2:9
**decide** 62:17
**decided** 64:2
**deciding** 39:4 40:15
55:11
**decision** 55:9
**decisions** 7:24
**decline** 61:9
**declines** 67:6
**decreased** 58:22
**define** 7:17
**degree** 29:2,2
**DELAWARE** 1:1
**deliver** 13:14 66:12
**delivering** 13:9
**demand** 16:16,17 17:4
**depending** 12:13,15
66:1
**depends** 40:5
**DEPONENT** 70:1
**deposed** 4:3
**deposing** 4:18
**deposition** 1:15 2:1 3:4

20:24 45:6,16 50:8
55:21 68:7 71:2
**depth** 33:23
**describe** 4:7
**deserving** 52:25 53:2
**designed** 66:18,20
**desire** 15:20
**detail** 34:17
**determine** 8:17 39:15
47:12
**determining** 55:14
**developed** 12:4,6 36:18
**developing** 9:22 10:12
**development** 58:15,16
**different** 6:18 21:18
29:22 50:6,10
**differently** 25:13
**difficult** 25:9
**direct** 21:18,22 27:1,5
27:6,9,10 28:3 43:23
**direction** 19:5
**directly** 10:1
**director** 22:23 24:4
35:4 52:11
**directors** 34:3 35:6,7
36:4 37:11 38:16
67:19
**disappointment** 56:7
**disciplines** 8:3,8 17:14
22:13
**discretionary** 8:14
**discuss** 32:5,7 45:9,18
**discussed** 9:7 38:9
**discussion** 3:14 39:2
**discussions** 30:1 33:6
**DISTRICT** 1:1,1
**doing** 31:13 42:10 63:5
63:7,12 64:5,18 66:6
**dollar** 44:9,11
**domestic** 5:18
**door** 23:14
**Dow** 27:20
**downwards** 65:9
**dozen** 30:15
**draft** 37:12
**drive** 2:4 3:21,22
**due** 61:11
**duly** 3:9 69:7
**duPont** 27:20

**E**

**earlier** 20:7
**early** 60:8,8 62:23
**easy** 64:7
**EBIT** 59:9
**eight** 61:8

**Eighteen** 17:22
**either** 12:9 14:24 22:1
38:22 48:17
**eligibility** 6:3 8:17 11:4
11:19 12:17 13:19
**eligible** 5:16,19 6:6,9
7:6,7,19 9:1,10,11
10:19 11:2 12:2,9,12
12:24,24 20:9 52:3
**employed** 35:8
**employee** 54:2
**employees** 4:20 5:4,11
5:14,16 7:17 18:3
21:10 29:21 30:1,8
33:10 55:16 58:8
64:24 66:21,22
**employment** 12:4,11
**Engelhard** 27:7 28:2
**entered** 18:25 44:1
**entering** 40:13
**enterprise** 67:17
**entire** 35:13,22
**entitle** 8:25
**entitled** 12:24
**entitlement** 13:8
**entity** 54:11
**entry** 6:4
**environment** 25:9
56:13
**equity** 32:16 33:10 58:2
58:7 59:1 63:19 66:1
**equity-based** 18:24
30:20
**especially** 37:8 60:17
**ESQ** 1:17
**ESQUIRE** 2:9,11
**estate** 4:12
**et** 1:4 12:3
**ethics** 51:4
**exact** 49:15
**examination** 3:15 69:9
71:5
**examined** 3:11 69:8
70:6
**example** 10:20 11:14
14:22 15:1 46:11
49:13,21 51:12
**examples** 30:22
**excellent** 23:17
**excluding** 35:13
**excuse** 62:7
**executive** 2:4 54:5,10
54:12
**executives** 39:10 40:16
43:23
**exercised** 19:1 31:8

US District Court - Delaware    FINAL    W. Brian McGowan
Chapter 11 - W.R. Grace    August 1, 2002

**Exhibit** 28:7,13 45:5
  60:24,24
**exist** 30:19
**exists** 51:13
**exit** 25:14,16
**expect** 32:15
**expectations** 63:8
**experience** 47:14
**expert** 37:17 48:24
**experts** 10:12 34:18
  41:10
**expires** 17:25 69:24
**explain** 36:19
**expressed** 30:9
**extent** 29:5
**external** 9:2
**externally** 52:12
**E-B-I-T** 59:10

**F**

**face** 15:22
**facility** 23:1,2
**facing** 17:2 64:1
**fact** 19:7 66:25
**factor** 10:19 11:14
  55:13,14,14 61:18,20
**factors** 9:3 11:3,15
  13:12 58:10
**facts** 42:9
**fair** 5:8 10:15
**fall** 49:2,9
**familiar** 4:19 5:8 14:14
  14:18 52:2,5
**family** 31:2 33:5
**far** 9:21
**fashion** 25:18
**favorably** 18:17 62:3
**fear** 17:6
**Federal** 38:4
**feel** 34:21 70:10
**feels** 34:13,13
**fell** 47:12
**felt** 6:14 19:4,5 36:21
  53:3
**field** 27:12
**fields** 21:23
**fifth** 53:14
**filed** 20:14,23 28:7
  29:20
**filing** 3:3 31:3,8 32:3
**final** 1:24 38:18
**finance** 22:6,24 24:4
  48:2 52:11,19
**financial** 19:8 58:23
**financially** 30:2
**find** 47:18 52:24 54:11

**finished** 17:7
**firm** 54:10
**firms** 54:6,12
**first** 3:9 16:8 18:13
  19:17 20:1,4 24:10
  46:23,24 59:16
**fit** 47:24
**fitted** 22:3
**five** 16:14 20:25 21:3,5
  21:13 22:11 29:15
  32:21 52:7 53:11
  59:10 60:19
**fixed** 32:1
**flat** 61:22
**Floor** 2:4
**focused** 41:20,20
**follow** 60:22
**following** 37:24
**follows** 3:11
**foregoing** 70:6
**forget** 38:3
**form** 15:6 18:5
**formulated** 36:15
**fortunately** 57:18 62:2
**forward** 34:7 38:17,20
  67:14
**found** 45:25
**four** 16:14 24:20 39:22
  49:24 53:13 60:11,13
**fourth** 22:25
**Fox** 35:18
**front** 45:24 60:25
**full** 3:17
**Furlong** 35:18
**further** 6:13 68:3 69:9
  69:12
**future** 15:25 16:2 26:10
  31:15 37:14 55:14
  56:6 66:6

**G**

**general** 7:8 8:3,6 14:15
  15:3 17:10,13,19
  18:12 19:15,19 20:1,9
  26:11 29:25 39:5
  40:8 47:18,23 48:22
  49:22,24 57:9 58:6,8
  58:11 65:1
**generated** 60:7,8
**generous** 56:20
**getting** 15:24 17:24
  30:7 45:8 50:24
**give** 3:16 6:14 16:18
  18:8 29:12 34:11
  35:15 42:19,21,22,24
  58:2 64:24 65:16

**given** 21:3 70:8
**giving** 65:4,21 66:10,14
**go** 8:2 11:3 13:11 29:16
  36:22 37:16 38:17,20
  42:17 47:17 49:4,4
  55:11 63:14
**goals** 12:2
**going** 5:23 7:16 14:5,7
  15:21,24 16:1,1 22:11
  26:10 31:9,10,15,16
  31:16 32:14,19,19,20
  43:5 44:12 45:17
  47:14 54:24 55:11,16
  56:6 65:23 66:22
  67:14
**good** 19:5 24:22 67:4
  68:5
**Grace** 1:4 2:3,4,9 3:25
  4:21 5:1 9:11 10:18
  12:8 14:19 16:9 20:4
  20:25 21:9,14 22:20
  23:18,21 26:9,18,20
  27:22 28:7,19 29:6,21
  30:2,10,19 32:6 33:8
  36:13 37:2 38:13
  39:11 40:13,16 41:17
  42:9 52:4 53:24 55:7
  55:12 57:10,25 62:2,3
  63:9 67:6
**Grace's** 22:1 61:25
  62:8
**grade** 12:19,23 41:6
**grades** 12:16,17 13:2,4
**Greg** 48:10
**Gross** 23:3
**group** 5:22,24 6:17,19
  6:20,23,24 20:19,21
  21:10 28:14,16 29:16
  33:22 47:7 54:16,25
**Grovemont** 3:20
**grow** 15:22 16:2 19:10
  19:12 58:17 66:12
  67:17
**grows** 19:12
**growth** 18:19 26:8
  56:11 59:11,22 60:4
  60:10,12,20,20 61:8
  61:22,22,23,25 62:9
  63:8,20 66:16 67:6,8
**guarantees** 34:23
**guess** 5:6 45:13
**guesstimate** 23:22
**G-R-O-V-E-M-O-N-T**
  3:20

**H**

**habits** 13:13
**half** 42:2 64:3,3
**hand** 14:3 69:15
**happen** 15:25 31:15
  51:6 65:23
**happened** 66:1
**happening** 65:7
**happens** 7:14 49:15
**hard** 46:7
**headed** 43:13
**held** 3:14
**help** 15:22 19:6 34:10
  34:24 47:12
**helped** 17:8
**Hewitt** 1:18 2:6 8:19
  39:24 40:18,18,22
  41:14 42:3,10 43:3,8
  43:8,10,10,12,17,20
  43:24 44:12,14 69:3
  69:17
**He'll** 68:6
**high** 13:6 50:19,25
**higher** 7:22 14:4 42:1
**hire** 13:20
**hired** 12:1,7 13:23
**hiring** 4:20 54:24
**historical** 21:12
**historically** 21:8 65:19
**history** 17:19 43:18
**hold** 11:13,21 17:11
  33:17
**holders** 66:2
**hopes** 33:17
**hot** 16:16,19,23
**HR** 22:19 24:2 51:5
  52:13
**huge** 28:3
**human** 4:11 22:14,15
  22:21 23:25 36:24

**I**

**idea** 21:19
**identified** 19:21
**illustrative** 46:23
**implementing** 16:12,15
  16:22
**improve** 64:23
**inability** 19:9
**incentive** 5:16 6:7
  10:20 12:9,18 14:14
  28:11 32:1 39:6
  62:18 63:5 67:14
**incentives** 37:22 67:21
**include** 54:1
**INDEX** 71:1
**indicate** 26:4

**indicated** 20:24 55:22
**individual** 22:23 36:23
  38:19 42:22 43:13
  45:2,10 50:18,23
  52:15
**individuals** 13:7 21:3
  21:13 22:12 23:21
  24:15 25:8
**industries** 42:16 46:18
  46:19 48:18 50:10
  51:9
**industry** 9:8 21:19
  42:12,15,17 47:24
  48:5,21 50:6 51:13
  62:19 64:18
**information** 4:11 14:23
  16:13 27:16 40:15
  43:5 45:2,7,10,15,20
  51:23 55:22 56:17
**inherent** 66:4
**initial** 13:22
**initially** 14:1
**input** 5:23
**inside** 36:3
**insurance** 25:22
**interested** 69:13
**interesting** 60:21,22
**internal** 12:18 52:10,10
  52:21
**internally** 14:4 52:20
**internationally** 5:18
**interviews** 25:14,17
**invest** 16:4
**involved** 9:25 36:12,15
  40:19
**issue** 64:1,1
**issued** 65:19
**issues** 4:23 14:12 17:8
  33:10

**J**

**Jack** 35:18
**JANE** 1:25
**JKF** 1:6
**job** 43:13
**jobs** 23:14 40:24 47:15
  47:21,24 49:1,9 53:4
**John** 34:6 35:17 37:25
**Jointly** 1:7
**judgment** 67:4
**June** 69:25

**K**

**keep** 9:16 34:4
**key** 4:20 5:4,11,13,16
  7:10,14,17 15:21

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

W. Brian McGowan
August 1, 2002

Page 75

29:21 30:1 33:10
34:4 38:7 39:25 52:3
54:1 55:15 58:8,19
64:24 66:22 67:15
**kind** 5:24 13:13 16:19
25:17 33:25 37:11
**knew** 26:1 50:9 64:1
**know** 8:10 9:16 10:5,8
10:14 11:7,10 13:11
13:12,12,13,16,22,24
14:7,10,23 15:14,22
15:23 16:3,18,20,21
16:24,25 17:6,6,9
18:15,22 19:6,11
21:12,14,15,17,24,25
22:1,3,5,7,13 23:20
24:14,20,22,25 25:7
25:12,19,21,23,24,24
25:25 26:9,9,15,16,18
27:10,13,15,15,20
28:23 29:7 30:21,22
30:23 31:4,4,9,11,14
31:15,16,20,21,23,24
31:25 32:1,10,10,12
32:13,13,14,16,21,23
32:24,24,25 33:1,2,21
36:15,19,21 37:6,7,12
37:13,16 38:4,5,17
39:18 40:4,5,7,24
41:2,6,15,21,25 42:4
42:16 43:16 46:19,20
46:22 47:10,19,21
48:1,4,10,11 49:9,18
49:23 50:17,22 51:2
51:15 52:9,16,17
53:13,19 54:13,18
55:13,22,22,24 56:3
56:15,19,19 61:16
62:7,8 63:3,23,24
65:17,18,20,22
**knowledge** 20:5 23:23
39:17 43:19
**known** 9:21

**L**

**largest** 23:2 39:22
**lasts** 66:8
**law** 69:8
**lawyer** 45:23
**leadership** 55:23 56:2
**leading** 43:6
**leave** 11:9 23:8 26:21
39:7 55:16
**leaving** 21:8 25:3 26:5
55:7,12
**left** 20:25 21:5,14 22:12

23:10 24:18 29:16
39:8,13 52:1,6
**legal** 48:3
**let's** 12:14 49:13 54:25
**level** 7:22 13:19,21 14:4
53:10 64:25
**levels** 8:12 9:18 11:4
13:1 54:3
**life** 31:2 32:21
**limited** 58:20
**line** 21:11
**list** 28:2,13 29:3,17
38:1 56:25 57:5,9,12
61:7
**listed** 29:1
**litigation** 15:23 16:5,6
**little** 3:22 6:16 17:24
**located** 22:17
**Lodish** 1:17 2:11 3:15
15:9 18:10 30:6
45:17,20 46:2 50:16
57:7,13,17 59:17
63:13 64:14 68:2
71:6
**long** 4:25 9:19 23:20
24:25 31:5 32:19
44:23 53:20 64:13
65:13
**longer** 18:25 30:19
58:4
**longevity** 10:18
**long-term** 5:15,15 6:3,7
7:3,5,7 8:20 9:1
10:20 12:9,14,18 13:5
14:5,11,14 26:14
27:18 30:18 37:5
39:6 41:8,12 44:10
56:5,10 60:4,16 63:15
63:16 64:9
**look** 7:10 27:23 28:22
33:4 37:4,10 39:14
39:18 42:13,14,24,25
43:9 44:17 45:1,6
46:22,23 48:14 49:13
49:21 56:8,14,14,15
60:2,6,10,18,23 62:25
64:17
**looked** 5:23 7:15 36:16
38:11 40:9,24 42:2,8
49:16 64:11
**looking** 8:23 18:9 27:17
42:5,11 47:20 53:5
63:6
**looks** 62:22
**lose** 25:7
**losing** 19:7 34:14

**lost** 7:12 31:6,22 33:13
58:7,13
**lot** 13:24 17:4,5,7 19:7
22:3 26:14 31:7 33:2
33:24 34:1 38:7
42:14 46:7 55:24
60:7 61:21 64:5,23
**lower** 59:9 67:21
**loyalty** 11:1 13:12
**luck** 24:22

**M**

**main** 4:16
**maintain** 40:2
**making** 33:9,12
**management** 11:15
13:22 14:10 25:15
33:7,22 52:3
**manager** 22:25 24:6
52:13 54:20
**managerial** 7:21,22,24
11:14
**managers** 8:3
**manufactured** 49:16
**manufacturing** 46:19
48:17
**March** 57:12
**Marianne** 1:18 2:6
69:3,17
**mark** 45:16 47:17
48:12 50:5
**marked** 45:5
**market** 59:2 66:20
**marketable** 32:23
**marketing** 8:4
**Marye** 35:17
**Maryland** 2:5 69:1,4
**mass** 37:19
**matched** 50:10,14
**materialize** 31:10
**matter** 4:4,17 15:4
**McGOWAN** 1:15 2:1
3:8,16,18,24 5:3 11:2
14:13 29:19 45:2
46:11 51:7 54:23
55:2 56:22 59:5
60:21 62:8 68:3
70:14 71:2
**McLean** 3:21
**mean** 5:7 11:3 15:19
16:6,11,16 19:4 22:6
24:21 27:20 32:9
38:6 42:13,14 45:20
49:11 61:11 66:19
**means** 58:18
**meet** 10:10 56:12

**meeting** 38:15
**meetings** 33:18
**members** 35:20
**mentioned** 11:22 24:10
26:25 48:9,12
**mentions** 20:13
**Mercer** 39:23 49:6,8,8
49:11,14,18
**methodology** 38:23
**mid** 37:4 60:9
**Mike** 36:24
**million** 22:21 23:4,4
**mine** 45:23
**minus** 61:6,9
**minuscule** 66:16
**minute** 37:7
**miscellaneous** 4:15
**missing** 18:20 32:20
**misspoke** 59:13
**mix** 21:20 41:19 61:23
**mixed** 50:9,14
**Mogul** 38:4
**money** 58:15
**months** 17:21,22 18:14
19:15 20:3
**motivate** 65:21 67:2
**mounting** 15:23
**move** 13:21 43:18
58:19
**moved** 10:1 52:25 53:2
**moves** 52:10,21
**Murphy** 35:18

**N**

**name** 3:17 38:1
**names** 21:15 35:15
40:1
**near** 31:4
**necessarily** 7:24 47:22
**necessary** 70:10
**necessitated** 66:25
**need** 9:3,14 14:8 57:3
67:1
**needed** 6:14 17:12 59:2
**negative** 60:11,12,20
61:13
**negatives** 59:3
**nervous** 15:24 17:24
18:18
**never** 15:17 31:10
32:14 35:8 62:14
63:20 64:10
**new** 8:1 59:8
**Nick** 36:10,17 37:25
38:10
**nondurables** 49:17

**normal** 32:12
**normally** 8:25 9:10
**Norris** 20:12,24 29:9
29:14 34:9 35:14,21
35:23 36:14 55:21
**notarial** 69:15
**Notary** 2:6 69:3,18
**November** 34:9 38:15
**number** 6:1,2 14:24
20:8,13 21:8 32:1
45:5 58:10 60:24
**numbers** 45:18

**O**

**object** 63:10
**objection** 15:6 18:5
28:8 30:4 50:13
**Obviously** 5:25
**occasions** 34:8
**offer** 26:11
**officer** 51:4
**offices** 2:3
**Official** 2:11 28:8
**offset** 59:3
**Oh** 20:21 24:11,12
**okay** 4:3,7,17,25 5:3,8
5:13,21 6:8,12,17,21
7:1,6,16,22 8:12 9:6
9:13,19,24 10:18,23
11:1,12,18,22 12:7,19
13:18 14:13,18,22
15:3 16:8,13 17:18
18:2,11 19:17 20:7
21:7,13,17 23:7,10,12
23:16,20,23 24:11,14
24:17 25:2 26:3,7,25
27:4,10 28:6,21,25
29:10,13,19,25 30:12
30:16 32:10 35:14,16
35:24 36:2,11 37:2
38:22 39:2,9 40:13,20
41:14 43:3,22 44:5,21
45:1,4,19,23 46:3,6,9
46:9 47:10 51:25
52:7,19,23 53:11,16
53:23 54:1,5,15,15,23
55:2 57:13,20 58:5,12
61:19 62:2,12,15,25
64:21 65:12 66:4,9
67:3,16,24 68:2
**once** 17:6 18:24 32:11
38:18
**ones** 4:16 27:25 38:7,8
41:1,2 51:16 61:21
**open** 25:19
**operated** 14:19 58:16

Case 01-01139-AMC   Doc 2545-4   Filed 08/15/02   Page 23 of 26

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

W. Brian McGowan
August 1, 2002

Page 76

operating 18:21 37:6
  57:15,24 59:4 65:18
opportunities 9:17
  15:25 18:19,20,23
  19:8,9,12 30:19,21
  31:9,22 32:17,22 33:5
  53:4 55:8 56:9 58:21
  58:23
opportunity 9:4 26:6,8
  26:17 33:1 41:9
  44:11 51:8,11 53:7
  58:13,19
option 65:22 66:2
options 19:1,2 31:7
  65:10,19,23,24 66:5
order 8:13
organization 19:12
original 7:17 70:11
originally 44:12
outcome 32:14 69:14
outside 8:18 9:5,7,20
  9:22 10:4,12 12:22
  13:23 26:22 30:22
  33:5 34:18 35:6 36:3
  37:17 40:22 41:10
  48:24 52:24 53:12,14
  53:18 54:16
outstanding 19:3
overlap 6:18,22
overlaps 6:25
overpaying 37:21
O1 63:23
O3 63:23

P

P 28:17
page 46:24 71:5
paper 70:11
papers 20:14,23
parameter 46:13 50:2
  50:6
parameters 41:16
  46:12 47:1 48:17
  49:16 51:10,22
part 8:14 13:17 14:2
  15:18 17:17 18:16
  19:10 25:11 28:12
  30:23 36:7 40:25
  60:24
partake 6:7
participants 7:5 19:18
  19:25 20:8,9
participate 5:20 13:4
  43:10
participated 6:2
participating 7:2

particular 4:17 24:25
  37:23 44:2 46:4
  47:11 51:18 54:6,7,8
parties 3:3 69:13
Paul 34:9 36:14,19
  54:21
Pause 68:1
pay 66:15
payment 60:1
payments 14:23,25
  19:14,19 20:2
payout 67:9,12
peer 27:14 28:14,19
  29:3,16 54:16,25
  58:25 60:18
peers 31:13 64:17
pending 55:3
people 5:18,22 6:1,2,6
  6:14,16,20 7:2,4,10
  7:11,15 8:4,5,6,10 9:4
  9:15,16 12:22 13:20
  15:21,23 16:14,15
  17:8 18:18 19:13
  20:8,11,13,15,20,21
  20:25 21:2,5,8,24,24
  22:5,6,6,15 23:8,13
  23:16 25:8,13,24,25
  26:1,3,14 28:23 29:15
  30:15 31:12,12,25
  32:3 33:2,16 34:4,14
  34:25 40:12 42:16
  44:5 48:2,3,6,8 52:1,5
  52:6,13 53:9,12,21
  54:3,15 56:1,7,20
  58:4,12,14,19 59:6,11
  59:22 65:9,21 67:2,15
  67:21
people's 58:21
percent 6:6 13:3 41:7
  44:8,10 56:11 59:9,10
  59:12,14,16,18,19,19
  60:3,7,7,12,15,17
  61:6,9,22,22,25 62:24
  63:2,19 64:8,9,19
  65:5,5,15,16 66:10,15
  67:5,7,9
perform 66:11
performance 11:4,23
  12:2 13:9 22:20
  61:12
performances 23:17
performed 58:4
period 31:24 33:13
  60:16 62:5,9 63:1
  64:6
peripheral 42:15

Perrin 39:24
person 4:22 8:16 13:25
  14:1,3,6 22:19 23:6
  23:25 24:2 25:18
  29:8 46:24 47:16
  51:5 52:17,19,25 53:2
  53:10
personal 18:19 26:22
  26:23 58:14,15
personally 55:20 69:5
personnel 52:3
persons 9:9 14:24 52:2
pharmaceuticals 47:5
  50:1
pick 8:15 12:20
picked 6:9,22
picking 6:1,2 13:6
piece 32:21
pieces 27:21 56:8
Piergrossi 36:24
place 8:22 10:4 15:20
  16:3 17:25 18:4 33:3
  48:25 56:6 63:18,23
  63:24 64:11 69:6
plan 5:15,16,20,24 6:3
  6:7,15 7:3,4,5,7,8 8:9
  8:21,21 9:1 10:20,24
  11:7 12:10,14,18,25
  13:5 14:1,5,11,14,15
  14:19,25 15:4,5,18,18
  15:19 16:9,10,21
  17:14,20,25 18:2,3,12
  19:15,19 20:1,5,10
  21:6 31:23 32:15
  34:7,17,22 36:6,13,16
  37:5,5,13 43:6,9 55:3
  55:5,17,17 56:2,5,8
  56:10,15,20 57:10,22
  58:2,6,9,11 59:2
  60:14 63:18,23 64:3,8
  64:9,11 65:20,24
  66:18,19,21
plans 9:23 10:13 11:20
  11:20 16:12 27:18
  32:5,8 34:15,19 37:10
  38:11 63:15,16
plant 22:25 24:6 52:13
plastic 47:4
plastics 48:11 49:25
play 63:21
pleading 28:7 60:25
please 3:17
pleased 53:16,21
plus 18:25 24:3
point 11:17,19 12:21
  18:12 53:21 60:22

points 40:6
Poling 48:10
pool 21:25
poor 61:12
population 13:4
posed 32:18
position 4:23 8:16,22
  8:23,25 10:2,21,22
  11:13,14,20 12:13,15
  13:17 35:1 40:4,5
  41:4,5,9,13 51:12
  53:1,3
positions 5:19 7:22,23
  9:14 11:4 12:1,8,23
  50:18,23 52:4 53:24
  54:2,9
positive 60:20 61:8
possible 50:20
potential 13:7 26:18
  64:1
potentially 19:8 47:15
practice 40:23 43:20
preliminary 37:12
premium 16:21 22:17
preparation 36:25
prepared 39:20,22
present 38:21
presentation 36:8,9
presented 4:19 27:16
  36:6 38:15 60:3
president 4:1,8 49:22
previous 66:20
previously 4:4 45:5
primarily 16:6
primary 4:10
prior 10:2 15:14,17
  21:12 31:8,8 32:2
  40:13,17 58:1 63:17
probably 24:1,7 27:8
  30:14 38:3 43:16
problem 62:16
proceedings 69:11
process 32:6 33:9 34:10
  38:19 53:20
procurement 4:12,13
produced 44:12,18
producer 50:11
productivity 34:1 53:6
products 8:1
program 16:19 21:4
  25:11 56:24 62:18
  63:5 65:2 67:14
programs 10:6 17:1,10
  17:11 28:11 36:18
  38:2 39:5
promotions 52:11

Property 2:12 28:9
proposal 59:8
proposals 38:25
proposing 59:6,11
prospects 32:8
protection 6:15
provided 49:18,20
  56:18 58:3
Public 2:6 69:3,18
purpose 58:5
purposes 7:18 46:23
  50:24
put 7:3 14:1,11 15:19
  16:25 17:1 18:4 21:4
  34:7,14 45:23 56:6
  58:11 63:23,24 64:2
  64:10
putting 31:23 36:12
  37:22
p.m 2:3 68:7

Q

question 7:17 15:7 18:6
  22:9 25:5 30:5 31:11
  32:18 50:21 57:16,21
questions 57:19
quite 24:20

R

R 2:6,9 69:3,17
raise 30:17,18 60:22
ran 22:21
range 30:14
ranks 13:22
rate 21:9 29:21 42:1
  61:22,22,23,25 62:9
  67:6,8
reacted 18:3
reaction 13:23
read 68:6 70:5
real 4:12
realized 46:10
really 13:3,6 14:7,7
  26:1 38:12 39:18,18
  44:9 61:10
reason 44:2 61:13
reasonable 39:15 65:14
reasons 26:22,23
recall 23:5 53:15
receive 14:25
received 18:13,16
  19:19 55:23
receiving 20:2
recommendations
  10:11 39:5
record 3:14,17 45:15

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

W. Brian McGowan
August 1, 2002

Page 77

57:23 69:11 70:7
**recorded** 69:10
**recruited** 23:13,15
**recruiting** 25:8
**reduce** 53:9
**reductions** 33:24
**refer** 5:4 45:14
**referring** 57:6 61:4,16
**refuse** 26:12,17
**regardless** 8:15
**relate** 27:22
**relatively** 35:14
**relied** 48:24
**relocations** 34:1
**remains** 55:5
**remember** 52:16
**reorganization** 32:15
65:20,24
**repeat** 50:21
**replace** 52:10,11
**replaced** 52:6,7,9,12,17
52:20 53:12,14 54:10
**replacement** 54:22
**replacements** 53:17
**report** 38:23
**REPORTED** 1:18
**REPORTING** 1:25
**reports** 44:16
**represents** 12:23
**request** 28:10 43:6
**requested** 4:18
**requests** 5:9
**required** 34:20
**research** 8:5 13:24 22:6
51:23
**resource** 23:25
**resources** 4:11 17:5
22:14,15,21 36:24
**respect** 43:22
**respective** 3:3
**respond** 51:23
**responding** 31:18
**response** 28:8 57:21
**responsibilities** 4:8,10
**restate** 62:14
**result** 11:11
**results** 56:19 58:24
59:7,7 61:10 62:23
**resumed** 2:2
**resumes** 53:23
**retain** 25:13 34:24 37:2
37:17 58:12 67:2,15
**retained** 9:6 15:21
38:10
**retaining** 40:14
**retention** 4:20 5:24

6:15 7:4,8 8:9 10:24
11:7 12:10 14:15,25
15:18 16:9,10,21
17:11,13,19 18:12
19:2,15,19,23 20:1,9
21:3,4 28:11 31:23
37:5 39:6 43:9 56:2,5
56:15,20,23 57:10,22
58:1,6,8,11 59:2 65:1
**retirement** 31:1
**review** 34:18 38:22
51:9,11
**reviewed** 34:16 40:15
44:15
**reviews** 23:17
**revise** 5:10 28:11 43:6
**revised** 36:5 55:2,16
**reward** 18:23 58:23
59:6 67:4
**rewarded** 59:1
**rich** 10:16
**right** 7:1 14:7 17:18,20
19:5,24 23:6,7 27:19
29:13 34:15 36:21
37:22 44:23 47:6
48:13,15,19 50:7
51:14 52:21 56:3
57:3,8,20 58:9 59:18
59:20 62:15 63:14,25
64:4,16,21 66:8 67:10
**risk** 18:23 34:14 66:10
**risks** 26:18,18 66:4
**Ron** 35:17
**Room** 2:5
**ROSE** 1:25
**run** 8:3
**RUNNING** 2:9 3:12
15:6 18:5 30:4 45:13
45:19 50:13 57:5,11
59:13 63:10 68:6
**runs** 48:7

────────────
**S**
────────────

**S** 28:17
**salaries** 41:11,12
**salary** 41:4,8 44:8,10
44:23 45:14
**sales** 8:4 23:3
**SAP** 16:12,15
**sat** 36:18
**satisfied** 53:16
**save** 29:13
**saying** 31:14 33:2
48:20
**says** 43:14
**scientists** 7:23

**seal** 69:15
**search** 54:5,10,12
**second** 3:13
**see** 25:6 31:12 37:6
43:14 44:6 45:23
46:3,12,25,25 47:3,8
47:14 48:1 49:3
55:10 61:1 67:24
**seeking** 59:8,21
**seen** 30:21,22 44:19,22
46:4
**sees** 31:5
**segments** 28:4 49:1
**segregated** 49:8
**select** 16:12
**selecting** 51:18
**selective** 5:25 6:1
**selectively** 16:25
**sends** 14:6
**senior** 4:1,8 11:15 14:9
25:15 33:7 49:22
52:3
**sense** 54:24
**separate** 70:10
**September** 37:14
**serious** 55:24
**services** 4:14
**set** 8:12 12:3 56:10 69:6
**seventh** 46:15
**seven-year** 32:21
**severance** 39:6
**share** 53:4
**sheet** 44:19 70:11
**sheets** 44:22,24
**Shelnitz** 47:17 48:12
49:7 50:5
**short** 64:12
**shortest** 24:7
**short-term** 64:8
**show** 28:6 45:4
**showing** 28:12
**shows** 38:6
**side** 32:2
**Siegel** 49:22,23
**Siegel's** 50:4
**sign** 25:21 68:6
**signal** 14:6
**SIGNED** 1:24
**significant** 58:3
**sir** 14:17 17:17 29:24
46:21
**site** 4:13,14,14
**sitting** 6:8
**situation** 37:19,23
**situations** 56:21
**six** 40:20

**size** 41:20 42:8,11
**skew** 63:2
**skewed** 42:1 61:10
62:19,22
**skill** 16:22,23,24
**skills** 16:19 17:12 48:4
**slice** 60:15
**sliding** 65:9
**small** 35:14
**solve** 17:8
**somebody** 4:19 12:1
52:20,24
**sorry** 24:12 57:20
59:18
**speak** 4:23 33:9
**special** 16:19
**specialized** 19:22
**specialty** 21:21,23 22:4
27:14,24 28:16,18
29:4 42:25 47:22
**specific** 18:9 37:19
39:19 45:14 55:15
**specifically** 11:6 15:19
**specifics** 42:19
**speculate** 32:10
**speculating** 33:15
**split** 64:3 65:14
**spoke** 24:19,21 25:3
26:4
**sponsor** 14:5
**spread** 53:8
**stacks** 62:3
**staff** 8:7 33:24 47:16
48:3
**staffs** 34:2
**start** 12:10 13:21 59:25
**started** 16:15 37:4,10
43:8
**starting** 11:16,19 12:21
21:4 66:15
**starts** 12:18 44:9
**state** 57:23 69:1,4
**statement** 29:24 66:17
**STATES** 1:1
**status** 30:2
**stay** 33:3
**stenographically** 69:10
**step** 19:4
**stipulated** 3:2
**STIPULATION** 3:1
**stock** 31:7,8 63:17 64:23
65:5,8,9,10,15,19,22
65:22,23 66:2,5,6
**stuck** 43:17
**studying** 46:7
**stuff** 25:20

**subject** 38:18
**submitted** 28:13 36:22
**substantial** 66:2
**success** 7:25 11:8
**suggestion** 45:13
**supposed** 25:6
**sure** 9:16 10:11 15:21
34:3 36:20 37:20
46:18 51:22 54:18,19
66:23 67:16,20
**survey** 39:20,21 40:15
41:16 43:24 44:17,24
45:24 46:11,13,16
47:1,11 48:14,16
49:14,15,20 50:2,3,6
50:11 51:21
**surveyed** 40:3
**surveys** 50:18,23 51:10
**system** 16:13

────────────
**T**
────────────

**tailor** 41:24
**tailored** 41:22
**take** 9:6 14:8 29:19
32:20 53:3 58:5
**taken** 1:17 66:10
**takes** 8:22
**talk** 3:12 12:14,17
**talked** 52:1
**talking** 5:4 20:19 63:15
**target** 41:3,7 56:12
67:11
**targeted** 44:7 66:13
**targets** 41:12 56:9
**TDC** 47:12
**team** 13:17 55:23 56:2
**technical** 8:5
**technology** 4:12 16:13
**tell** 3:10 25:3 30:12
33:18 34:9,16 41:1
54:13,21 63:22 64:4
**ten** 56:11 66:8
**tend** 13:20
**ten-year** 66:7
**term** 31:4,5 44:23
64:12,13
**terms** 6:21 9:8 32:22
39:4,19 44:5 55:11
58:14 66:21 67:5
**terrific** 26:11
**testified** 3:11
**testify** 34:11
**testimony** 70:7
**thin** 33:21
**thing** 6:5 17:3 47:19
51:19 56:3 65:14

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

W. Brian McGowan
August 1, 2002

Page 78

**things** 8:11 37:1 57:4 64:6,23
**think** 13:20,25 20:10 20:12,13,16,19 26:15 27:13 29:7 30:21 31:20 33:15 34:23 37:13 38:6,13 45:11 47:14,17 49:3,9 53:19 53:20 55:21 56:2,4 57:3 58:10 59:13 60:2,6 66:23 67:17,18 68:2
**thinks** 67:19
**thought** 53:8 65:6
**three** 24:1,12,19,25 25:2 26:3 44:13 47:4 52:9 53:11,13 54:9,15 56:12
**Thursday** 2:2
**tied** 21:25
**time** 12:5,6 16:4 19:18 20:2,5 33:11,13,16 38:16 42:7 51:22 53:15,21 55:9 62:4,9 64:6 68:4 69:6
**times** 63:1
**title** 3:25 8:15
**today** 4:18 6:8 46:4 55:25 67:1
**today's** 56:13
**told** 20:10
**Tom** 35:18
**top** 22:14,19 31:12 38:1 39:10,16 40:12,16 43:23 44:5,19
**tort** 37:19
**total** 39:9 43:22
**Towers** 39:24
**track** 31:17
**transcript** 69:10 70:6 70:11
**transpired** 60:18
**tremendous** 33:23
**trigger** 59:25
**true** 10:23 59:5 61:5,7 61:24 66:9 69:11 70:7
**truth** 3:10,10,11
**try** 31:21 39:14 43:1 50:18 64:23
**trying** 32:22 34:24 47:23
**Tuesday** 44:18
**two** 22:4,14,15 24:8 44:13,22 47:4 50:1 52:12 54:18 64:22

67:7,7,8
**type** 10:5 16:12 17:9 25:8,20 47:19,24 49:5 59:22
**types** 9:9 30:16

___

**U**

**ultimate** 32:14
**um-hum** 48:19
**uncertainty** 26:19,19 31:24 66:3
**underneath** 59:4
**understand** 11:12,25 20:18,18 49:19 63:4 64:25
**understood** 36:20
**Unfortunately** 50:7
**Union** 61:8,11 62:20,22 63:1,2
**UNITED** 1:1
**unrealistic** 56:10,13
**unsolicited** 53:24
**upper** 13:22
**upside** 58:3
**use** 41:17 43:6 49:24 54:10,12 62:16,18 64:8,12
**USG** 38:4

___

**V**

**vague** 15:8
**valuable** 13:14,25
**value** 19:2
**Vanderslice** 35:19
**variety** 53:9 54:3
**various** 38:24 39:5 51:14
**versus** 40:11
**vice** 4:1,8 49:22
**view** 18:12 47:25 65:10
**Virginia** 3:21
**vital** 11:8,8

___

**W**

**W** 1:15 2:1 3:8 70:14 71:2
**wait** 37:7
**waiting** 32:24 55:10
**waived** 3:5
**walked** 23:14
**want** 3:12 9:15,16 10:11 14:10 25:6,10 33:3,16 34:3,11 35:15 41:24 60:15 67:15
**wanted** 16:3,24 46:9
**wants** 34:12

**wasn't** 7:13 17:13 45:17
**Watson** 50:4,4
**way** 7:3,14 27:25 55:6 64:7 66:18 69:13
**ways** 42:14
**wealth** 30:23
**week** 46:5,8
**weighing** 39:21
**went** 21:14,20 27:1 37:11 38:9 43:9 63:25 64:10 65:8
**weren't** 14:4 67:22
**we'll** 45:15 56:3
**we're** 6:1,8 10:12,14,15 13:6 16:1 17:23,24,24 20:19 27:17,21 37:20 37:20,21,22 47:20 49:11 51:18 53:21 57:11 59:4 63:15 64:7,12 67:16
**we've** 9:21,21 10:4 15:17 20:5 30:21 31:20,21 33:23,25 40:19,21 41:10 53:19 56:18 62:13
**William** 3:18
**winding** 17:23,24
**window** 66:7
**wiped** 65:25
**wit** 69:2
**within-named** 69:5
**witness** 3:9 18:8 46:1 57:14 59:15 63:14 68:5 69:5,15
**woman** 22:19
**wondering** 50:9
**word** 26:19
**words** 19:21 33:12
**work** 13:13 22:13 37:13 53:8 54:6
**worked** 29:11 36:17 38:2 43:19
**working** 15:4,12,13,13 18:2 37:18
**works** 36:23
**world** 23:3 39:23
**worldwide** 22:22
**worry** 63:18,19
**worrying** 63:6,11
**wouldn't** 25:16 33:16 41:24 42:20 48:23
**writing** 54:4
**Wyatt** 39:24 50:4,5
**W.R** 1:4 2:3,9 3:25 4:20 5:1 10:18 12:7

16:9 20:25 21:9 29:6 29:20 30:10 32:6 33:8 36:13 37:2 39:10 52:4 53:24 55:7,12 61:24 62:2,3 62:8 63:8 67:6

___

**Y**

**yeah** 17:23 20:4,16 22:8 27:13 41:19,19 45:24 46:5 61:15,23
**year** 16:8 17:19 33:24 43:5 52:4 62:10
**years** 15:14 16:11,14 16:14 24:1,3,3,5,8,8 24:13 40:20 42:4 44:13 56:12 60:8,11 60:13,19 61:3,16 62:23 65:11 66:8 67:7
**Yup** 46:1
**Y2K** 17:2,3,6

___

**Z**

**zero** 59:12,24,25

___

**$**

**$10** 41:25 42:5
**$2** 41:22 42:3
**$300** 23:3
**$400** 23:4
**$700** 22:20
**$75,000** 41:9

___

**0**

**01** 21:5 63:24 64:11
**01-1139** 1:6
**03** 64:11
**08/02/02** 1:24

___

**1**

**1** 1:16 2:2 42:2 45:5 60:24 61:21 71:3
**1-866-ROSE-NYC** 1:25
**1:21** 2:3
**10** 24:5 59:9,19 61:25 64:7,8,12,12,18
**100** 63:19 65:15,16 66:10,14 67:4
**11** 1:6 18:22,25 37:6 57:16,24,25 58:17 65:18
**116** 20:14
**118** 20:13
**12th** 57:12

**120** 6:16,16,17,22 20:10,17 30:8,13
**14** 29:3 61:7
**15** 12:19 13:2 24:2,3 60:5
**16** 39:10,16 40:12,16 43:23 44:5 60:4,5
**18** 13:2 17:21 18:14 19:15 20:3
**1979** 5:2
**1990** 10:1
**1998** 61:24

___

**2**

**2** 61:22
**2nd** 2:4 69:16
**2.35** 61:6
**2:40** 68:7
**20** 13:3 41:6
**2000** 61:4,12,14 62:10 64:15
**2001** 14:16 15:5,17 16:8 18:4,13 37:4,14 55:5
**2002** 1:16 2:2 18:1 69:16 71:3
**2003** 69:25
**21** 69:25
**21044** 2:5
**22102** 3:21
**235** 2:5
**25** 2:4

___

**3**

**3** 23:4
**300** 6:10,11,21,23
**35** 41:7

___

**4**

**400** 23:3
**41.74** 61:9
**48.40** 62:24

___

**5**

**5** 42:5 60:12
**50** 6:6 65:4,5
**50/50** 65:14

___

**6**

**6** 59:14,16,18,19 60:3,7 60:7,14,16
**600** 5:18 6:10,18 7:19 8:14

___

**7**

**7500** 2:4

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL

W. Brian McGowan
August 1, 2002

Page 79

**7808** 3:20

**8**

**8** 63:2

**9**

**90s** 60:9,9
**92** 62:9 64:15 71:6
**93** 62:23
**95** 62:23
**98** 61:4,12,14