IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et.al.*, | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

REPLY MEMORANDUM FOR
THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS

**CAMPBELL & LEVINE, LLC**
Matthew G. Zaleski, III (I.D. No. 3557)
Aileen F. Maguire (I.D. No. 3756)
Chase Manhattan Centre
1201 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone:   (302) 426-1900
Telefax:   (302) 426-9947

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax:   (212) 644-6755

Peter Van N. Lockwood
Albert G. Lauber
Nathan D. Finch
Max C. Heerman
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax:   (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

Date: August 21, 2002

The Official Committee of Asbestos Personal Injury Claimants (the "Committee") files this reply to the briefs submitted on August 6, 2002, by the Official Committee of Equity Security Holders ("Equity Br."), the Official Committee of Unsecured Creditors ("Unsecured Cr. Br."), and the Unofficial Committee of Select Asbestos Claimants ("SAC Br.").[1]  The Equity Holders and the Unsecured Creditors unqualifiedly support the proposal for resolution of asbestos personal injury claims submitted by W.R. Grace & Co. ("Grace" or the "Debtor") and oppose the counter-proposal outlined in the Committee's opening brief ("Comm. Br.").  The SAC, while criticizing some elements of Grace's proposal, nevertheless supports its central, and flawed, premise that claims can be disallowed by omnibus motions without offending the rights of asbestos claimants and without unduly delaying administration of the case.  It is telling that supporters of Grace's scheme admit that it "will take a great deal of time to complete" and force creditors to "wait[] years" for resolution.  Unsecured Cr. Br. 1.  Unlike Grace's flawed plan, the Committee proposes a *bona fide* § 502(c) estimation that averts the interminable delay that would be caused by liquidating 130,000 asbestos personal injury claims, while fully protecting all claimants' rights.

### A.    The Attacks On The Committee's Proposal Are Misguided

The central theme of our opponents' briefs is that the Committee's proposal ignores Grace's defenses and will result in paying claims that are "unenforceable under state law." Unsecured Cr. Br. 2; Equity Br. 3, 4.  There is no merit to this submission.  To begin with, the Committee's estimation proposal will not result in "paying" any claims.  Rather, it will determine the estimated amount needed to fund the § 524(g) Trust, which will in turn pay claims

---

[1]    As this Court is aware, the SAC is an not an official committee with statutory standing to represent a class of creditors, and its purported constituents are officially represented by the

upon presentation of satisfactory evidence of disease.  Contrary to the SAC's assertion (SAC Br. 12), the Committee is not contending that asbestos claimants should be absolved of the duty to substantiate their claims.  To the contrary: once the Trust is funded, claimants will have to meet whatever substantiation standards the Trust puts in place.  Our submission is simply that such elaborate and time-consuming fact-gathering, concerning 130,000 distinct claims, is not needed for estimation and should not be done now.

Nor does the Committee's proposal "ignore Grace's defenses."  The estimation methodology recommended by the Committee — which uses Grace's overall claims-resolution history as the data set for projecting liability — includes all claims that Grace, or a court, has rejected.  Of necessity, therefore, the Committee's proposal takes into account the defenses that led to rejection of claims.  See Comm. Br. 11-12.  Grace's prior settlements also reflect the parties' evaluations of whatever defenses Grace had available.  Indeed, an important reason for using Grace's *overall* claims resolution history as the basis for estimation is the very breadth of this data set, which includes all conceivable variables that affect claim valuation.

Equally misguided is the assertion that Grace was "unable to advance" its defenses in the tort system because "a defendant cannot obtain a fair trial on an asbestos claim in many state courts."  Unsecured Cr. Br. 5, 7.  This is a restatement of Grace's tired argument about the "broken tort system."  Needless to say, Grace has always been perfectly free to advance its defenses in the state courts, and it has done so – often successfully.  The fact that its defenses were frequently rejected does not show that the tort system is "broken."  Similarly unavailing is the effort to set aside Grace's claims-resolution history on the theory that it was forced to settle meritless claims rather than incur litigation costs.  See Unsecured Cr. Br. 6-7.  As the Committee

---

Committee.

has shown (Comm. Br. 12-13), Grace's documented policy was to settle claims that were likely to survive motions to dismiss, and to defend against the rest.[2]

Finally, even if the tort system were "broken," bankruptcy courts were not established to rewrite the rules of litigation to the liking of debtors and their allies. "[I]n its role as a collective debt-collection device, bankruptcy law should not create rights. Instead, it should act to ensure that the rights that exist are vindicated to the extent possible." Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 22 (Harvard 1986). If the Nation's tort system needs fixing, it is for Congress to fix; the role of the bankruptcy court is not to decide whether the tort system is "fair," but to determine how claims would be valued in it. As we have noted (Comm. Br. 9), and as our opponents do not dispute, asbestos claims have been valued by looking to the debtor's overall claims-resolution history in every asbestos bankruptcy estimation since 1990. This Court should follow those precedents here.

Besides challenging the fundamental premise of basing estimation on the historical record, our opponents attack procedural and technical aspects of the Committee's estimation proposal. These attacks merit a brief reply:

1.      The Unsecured Creditors admit that there exist *bona fide* disputes on medical and science evidence regarding the "asbestos liability issues" that Grace desires to resolve by omnibus motions. See Unsecured Cr. Br. 3-4. From this premise, our opponents draw the

---

[2]     The argument that high litigation costs forced Grace to settle invalid claims is really an attack on the "American Rule," which requires each party to a litigated dispute to bear its own costs. Whether the American Rule is fair is not an issue to be decided when estimating claims in bankruptcy; a proper estimation values claims by looking to the legal framework that exists. The American Rule is in effect in all state and federal courts, as it has been in many jurisdictions since colonial times. See John F. Vargo, The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice, 42 Am.U.L.Rev. 1567, 1575-78 (1993).

illogical conclusion that "review [of these issues] by this Court prior to estimation" is required. Id. at 3. The opposite is true: the existence of such disputes shows the impossibility of determining claim validity as a matter of law via omnibus objections. The existence of such disputes also shows the error of the Equity Holders' assertion that claims could be liquidated without "undue delay" under § 502(c) because they could be quickly dismissed with "no evidentiary hearing." See Equity Br. 3. Rather, the existence of disputed issues of law and fact is precisely why estimation is necessary: under these circumstances, liquidation would take forever.

2. In opposing the Committee's proposal that Grace's asbestos liability be estimated on an *aggregate* basis, the SAC argues that "the court must estimate individual values" for claims where a § 524(g) trust is envisioned as part of the reorganization plan. SAC Br. 4. The premise of this argument is that "the debtor must obtain 75% approval *of the amount* and number of claims in the asbestos personal injury class in order to obtain § 524(g) relief." SAC Br. 4 (emphasis added). The SAC's premise is incorrect. Under the statute, satisfaction of the 75% approval requirement is determined solely by reference to the *number* of claimants voting, without regard to the amounts of their respective claims. See 11 U.S.C. § 524(g)(2)-(B)(ii)(IV)(bb); see also Collier ¶ 524.07[2] at 524-43. In short, § 524(g) does not require that claims be estimated individually, and estimation can be done (and has always been done in asbestos mass tort cases) on an aggregate basis.

3. The SAC challenges the Committee's proposal for estimating future claims, contending that no epidemiological studies exist from which to predict future rates of non-malignant disease, and charging that the methodology employed by Dr. Mark Peterson, the Committee's expert, involves "mere guesses." SAC Br. 7-8. To the extent the SAC is contending that future claims cannot be estimated, it is simply wrong. Future claims have been

estimated in all prior mass-tort bankruptcies, and § 524(g) reflects an explicit Congressional judgment that future asbestos claims can be valued and a trust appropriately funded. Since future asbestos claims typically dwarf present claims, it would be impossible to have a feasible reorganization plan without consideration of future claims.

Moreover, the soundness of Dr. Peterson's methodology for estimating future claims cannot seriously be disputed. See In re National Gypsum Co., 257 B.R. 184, 199 (Bankr. N.D.Tex. 2000) (accepting "the Peterson projections of future claims through 2039 * * * for purposes of projecting the number of claims, the value of claims and the allowed liquidated value for payment of claims by the facility."); In re Eagle-Picher Indus., Inc., 189 B.R. 681, 687-90 (Bankr. S.D. Ohio 1995) (estimating future claims using the same method put forward by Dr. Peterson and the Committee here). If the SAC or Grace desires to submit, in an estimation proceeding, competing expert testimony concerning the proper manner of estimating future claims, they are of course free to do so. Assuming that their experts' testimony satisfies Daubert's relevancy and reliability requirements, the Court will weigh their testimony at the same time it considers Dr. Peterson's.

4.    Contrary to the SAC's assertion, the Committee does not contend "that discovery cannot be propounded upon the claimants." SAC Br. 11. The Bankruptcy Code clearly provides for mutual discovery once the debtor has objected to a claim and thus initiated a contested proceeding. What the Committee disagrees with is the Debtor's effort to circumvent the procedural rules governing contested proceedings by demanding discovery of claimants while, at the same time, denying claimants the right to take discovery of Grace. Even the SAC seems to agree that Grace's one-sided discovery proposal is inequitable. See SAC Br. 20 n.21 ("proof of exposure to Debtors' products may require discovery from Debtors").

Contrary to the SAC's assertion (Br. 11-12), Bankruptcy Rule 2004 does not support the one-way discovery that Grace desires. Rule 2004 governs discovery only where there is no contested matter or adversary proceeding. In the case of adversary proceedings and contested matters, discovery is governed by Bankruptcy Rules 7026 through 7037. See In re 2435 Plainfield Avenue, Inc., 223 B.R. 440, 445-46 (Bankr. D.N.J. 1998). As we showed in our opening brief, those Rules plainly provide for *mutual* discovery where claims are contested by the debtor, as Grace has announced its intention to do here.

### B.    There Is No Merit To The SAC's Assertions About An Unexplained "Spike" In Asbestos Claims

Restating arguments made in Grace's opening brief, and ignoring the Committee's response thereto (Comm. Br. 18-19), the SAC asserts that the recent "spike" in asbestos claims against Grace lacks any reasonable explanation. See SAC Br. 7-10. In support of its assertion that something must be "amiss," the SAC notes the increase in the number of claims filed against Babcock & Wilcox ("B&W") after a bar date was set in that bankruptcy. See SAC Br. 9-10. But B&W's experience has no relevance here. It stands to reason that a bar date will trigger the filing of numerous claims: faced with the preclusive effect of a bar date, claimants and their attorneys will naturally accelerate the filing of their claims, even if the facts are underdeveloped and the indicia of disease are less obvious. The SAC's assertions about the nature of the claims filed against B&W are suspect, based as they are on self-serving hearsay statements in a B&W filing. See SAC Br. 9 & n.10. However, assuming *arguendo* that most claims filed in response to the B&W bar date involved nonmalignancies, as SAC asserts, that fact would not be unexpected, and it would show nothing about the merit of claims filed against Grace during 1998-2000.

{D0064261}  7

Equally unfounded is the SAC's related assertion that a "sharp increase in unimpaired, nonmalignant claims" accounts for the rise in asbestos claims, whereas claims representing malignancies have remained "constant." SAC Br. 9. As we showed in our opening brief, the propensity to sue has increased *more* with respect to individuals suffering from asbestos-related cancers than for those suffering from other asbestos-related diseases. See Comm. Br. 19; Peterson Aff. ¶ 48 & Table 5.

### C. SAC's Proposal Is Unsupportable

As an alternative to the Committee's estimation proposal, the SAC proposes a variant on the Debtor's liquidation procedure. Under this variant: (1) Grace would file a simplified proof of claim on behalf of all "known" claimants;[3] (2) Grace would pursue one-sided discovery from claimants, purportedly as a means of substantiating medical diagnoses of disease, proof of exposure, and proof of impairment; and (3) Grace would then file summary judgment motions aimed at weeding out claims that fail to establish injury. See SAC Br. 13-14, 17. The SAC's proposal would not impose a *de facto* bar date by forcing claimants to file amended proofs of claim, and it does not envision summary judgment motions on the issue of product identification. However, the SAC's proposal resembles Grace's in all other respects, and it is both legally insupportable and unworkable.

#### 1. Substantive Non-Bankruptcy Law Applies In Valuing Claims

The SAC correctly notes that the "definition of 'claim' is a matter of federal law," whereas the existence of a "right to payment" is defined by substantive state tort law. SAC Br. 14. But our opponents go on to suggest that bankruptcy courts should apply general tort

---

[3] It is unclear what constitutes a "known" claimant, or what the SAC proposes should happen to claimants that are not presently "known" to Grace.

{D0006426 F.1 } 8

principles or some version of federal common law in deciding whether a right to payment exists. See SAC Br. 14-15 (suggesting that Restatement of Torts determine whether claimants "state a claim"); see Unsecured Cr. Br. 5-6 & n.7 (suggesting that bankruptcy court apply "federal common law" rather than "follow in lockstep" with state tort law). Well-settled authority forecloses this argument.

It is hornbook law that the validity of claims in bankruptcy is governed by applicable non-bankruptcy law. See Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20 (2000); Butner v. United States, 440 U.S. 48, 55 (1979); see also Collier ¶ 502.03[1][a]. Our opponents, in their candid moments, acknowledge this rule. See Equity Br. 3 (when determining whether a claim is allowable in bankruptcy, the court must look to "applicable [non-bankruptcy] law"); Unsecured Cr. Br. 10 ("it is an established principle of bankruptcy law that a bankruptcy court must look to state law to determine the validity of pre-petition claims against the debtor."). This well-settled rule follows from the fact that the Bankruptcy Code establishes a forum and procedure for dispute resolution, but "does not endeavor to supplant the substantive law under which the claim against the estate (or for that matter any defenses, counterclaims, or other rights claimed by either party to the dispute) arose." In re Landbank Equity Corp., 973 F.2d 265, 270 (4th Cir. 1992). Because application of state tort law would make it impossible to discard claims wholesale via summary judgment, as the SAC desires to do, it proposes to jettison state law from the process. This proposal simply ignores the mandatory application of non-bankruptcy law in valuing claims.

Moreover, in asking this Court to fashion federal common law for determining claim values, the SAC violates the clear mandate of the Supreme Court, which, since Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), has consistently held that "where a federal rule is not essential, or

where state law already operates within a particular field," federal courts should apply "state law rather than opting to create federal common law."  Camps Newfound/Owatanna, Inc. v. Town of Harrison, Maine, 520 U.S. 564, 615 (1997) (Thomas, J., dissenting) (citing United States v. Kimbell Foods, Inc., 440 U.S. 715, 730 (1979), and Atherton v. FDIC, 519 U.S. 213, 225-26 (1997)).  See Tiernan v. Devoe, 923 F.2d 1024 (3d Cir. 1991) (cautioning against creation of federal common law where state substantive law would normally apply); General Engineering Corp. v. Martin Marietta Alumina, Inc., 783 F.2d 352, 356 (3d Cir. 1986) (same).

### 2. The SAC's Characterization Of State Law Regarding Pleural And Other Nonmalignant Asbestos Claims Is Inaccurate

Grudgingly recognizing that state tort law ultimately governs claim validity, the SAC advances several arguments intended to show that the omnibus summary judgment proceedings it desires would nevertheless be feasible.  First, the SAC points out that the tort laws of most States require "evidence of an asbestos-related disease" as a pre-condition to recovery.  SAC Br. 15.  But while it is true that recovery presupposes evidence of harm, it is also true, as the SAC admits, that in asbestos cases evidence of harm can consist of a "diagnosis of disease by a physician."  Ibid.  Virtually all individuals with claims against Grace, if asked to respond to a summary judgment motion, could produce a diagnosis of disease by a physician.  Thus, summary judgment proceedings aimed toward eliminating claims unsupported by any medical diagnosis would dispose of very few claims while consuming large judicial resources.

The SAC next contends that thousands of claims could be effortlessly eliminated on summary judgment because only a handful of States allow recovery for pleural plaques or pleural thickening.  SAC Br. 15-17 & nn.15 & 16.  This argument operates from the false premise that there is a simple, bright-line answer to the question whether a cause of action alleging pleural disease can survive a motion for summary judgment.  In virtually every State, the answer

depends on the particular facts of the case. Because very few States actually "bar" recovery for pleural disease or categorically disallow the types of claims the SAC deems "unimpaired," summary judgment motions directed against pleural claims would entail a claim-by-claim, State-by-State, analysis. As the Committee has consistently maintained, this process would take years, capsizing the efficient administration of the estate.

There are gaping holes in the SAC's misguided effort to manufacture a numerical breakdown of States that do, and do not, allow recovery for pleural disease. The SAC asserts that only five States - Ohio, Texas, Minnesota, Virginia, and New Jersey - "allow suits based on alleged pleural plaques or pleural thickening." SAC Mem. 16 & 17 n.16. While these States do recognize pleural claims, it is simply untrue that others do not. Indeed, many jurisdictions that recognize pleural claims appear on the SAC's list of States that allegedly "bar[] pleural conditions."[4] Many States, such as California, accept subjective evidence of symptoms - such as

---

[4] See, e.g., Bowerman v. United Illuminating, No. X04CV 940115436S, 1998 WL 910271, at *5 (Conn. Super. Ct. Dec. 15, 1998) (jury must decide whether lung scarring and implantation of asbestos fibers in lungs is compensable); Bonnette v. Conoco, Inc., No. 01-0297, 2001 WL 1047546, at *7 (La. Ct. App. Sept. 12, 2001) ("[E]ven though the possibility of acquiring [an-asbestos-related] disease is remote, the plaintiff's *fear* of acquiring that disease is compensable."); Burns v. Jaquays Mining Corp., 156 Ariz. 375, 380 (1988) (plaintiffs suffering from "subclinical" asbestos-related injuries are "entitled to such regular medical testing and evaluation as is reasonably necessary and consistent with contemporary scientific principles applied by physicians experienced in the diagnosis and treatment of these types of injuries"); Capital Holding Co. v. Bailey, 873 S.W.2d 187, 192-93 (Ky. 1994) (denying summary judgment to defendant where plaintiffs sue for future consequences of asbestos exposure and demonstrate a present injury such as "x-ray evidence [of] pleural thickening or pleural plaque"). See also Barnes v. The American Tobacco Co., 161 F.3d 127, 139-40 (3d Cir. 1998) (recognizing cause of action for medical monitoring and outlining policy reasons for its existence) (applying Pennsylvania law); Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 977 (Utah 1993) ("Although the physical manifestations of an injury may not appear for years, the reality is that many of those exposed have suffered some legal detriment; the exposure itself and the concomitant need for medical testing constitute the injury."); Fried v. Sungard Recovery Svcs. Inc., 936 F. Supp. 310, 311 (E.D. Pa. 1996) ("[A] party may recover damages for expenses incurred in the medical surveillance of asymptomatic pleural thickening caused by * * *

shortness of breath - as sufficient to state a claim.[5] As other bankruptcy courts have recognized, claimants alleging asbestosis and pleural disease "have received recoveries in the tort system" and many of them "will incur actual damages for medical tests and diagnostic treatment." In re Nat'l Gypsum Co., 257 B.R. 184, 201 (Bankr. N.D. Tx. 2000). The string citation that the SAC offers in an effort to prove the contrary (Br. 16 n.15) is simply riddled with inaccuracies. Many of the cases the SAC cites do not address the question whether allegations of pleural disease state a cause of action, or actually rule for the plaintiff on this point.[6]

Finally, the "exposure only" cases included in the SAC's string citation are easily distinguished from those controversies in which plaintiffs have actually *incurred* pleural plaques or thickening, or have been diagnosed with asbestosis after x-ray examination. In "exposure only" actions, plaintiffs do not allege that they have contracted an asbestos-related illness, but merely that they have been *exposed* to a defendant's asbestos. See, e.g., DeStories v. City of Phoenix, 154 Ariz. 604, 607 (1987); Bernier v. Raymark Indus., Inc., 516 A.2d 534, 543 (Me.

---

exposure to asbestos."); Simmons v. Pacor, Inc. 674 A.2d 232, 240 (Pa. 1996) (holding that recovery for medical monitoring is "appropriate and just" where claimants are diagnosed with asymptomatic pleural thickening caused by exposure to asbestos).

[5]    See, e.g., Duarte v. Zachariah, 22 Cal. App. 4th 1652, 1655 (1994) (a minor or collateral detriment makes exposure to a toxic substance sufficient to state a claim for relief).

[6]    See Kraciun v. Owens-Corning Fiberglas Corp., 895 F.2d 444, 445, 456 (8th Cir. 1990) (involving adjudication of statute of limitations issues with no substantive discussion of viability of pleural disease claims); Capital Holding Co. v. Bailey, 873 S.W.2d 187 (Ky. 1994) (denying summary judgment to defendant where plaintiffs sue for future consequences of asbestos exposure and demonstrate a present injury by "x-ray evidence [of] pleural thickening or pleural plaque"); Bonz v. Sudweeks, 808 P.2d 876, 879 (Idaho 1991) (professional malpractice suit involving cloud on title to real property with no discussion of asbestos-related disease); Sopha v. Owens-Corning Fiberglass Corp., 601 N.W.2d 627, 636 (Wis. 1999) (merely holding that diagnosis of pleural thickening did not start statute of limitations for mesothelioma or other subsequent malignancy claim); Eagle-Picher Indus., Inc. v. Cox, 481 So.2d 517 (Dist. Ct. App. Fla. 1986) (no mention whatsoever of pleural disease).

1986) (both cited in SAC Br. 16 n.15). Plaintiffs alleging pleural disease fall well outside the net that the SAC casts over "unimpaired" claims.

In sum, the SAC's argument on pleural disease is premised on a disingenuous marshaling of judicial precedent. Numerous States have allowed pleural claims to proceed under their tort laws, and the SAC's assertion that 22 States categorically bar such claims is demonstrably wrong. Some States that have not addressed pleural claims in the asbestos context have addressed analogous issues in other contexts. Other States may have no relevant law on the subject, and it is impossible to predict how their courts would rule. For present purposes, there is little to be gained by attempting to divide the States into competing camps. The bottom line is that, given the diversity of state tort law and the fact-intensive nature of the relevant judicial analysis, the SAC's notion that 130,000 asbestos claims could be effortlessly resolved through summary judgment proceedings is utterly unrealistic.

### 3. It Is Impossible To Demonstrate Lack Of Harm As A Matter Of Law By Sole Reference To AMA And ATS Standards

As one prong of its proposed liquidation procedure, the SAC contends that claimants should be required to submit results of pulmonary function tests showing physical impairment, and that standards adopted by the American Medical Association (AMA) could be used to prove "lack of harm" as a matter of law. See SAC Br. 17-18. The Unsecured Creditors similarly assert that ATS standards could be used to eliminate claims. See Unsecured Cr. Br. 4-5. These arguments are baseless.

Neither the SAC nor the Unsecured Creditors cite any authority - and there is none - for the proposition that that AMA or ATS diagnostic standards have the force of law, or can be used to invalidate claims as a matter of law. Moreover, contrary to their assertions, ATS standards do

not "require" a 1/1 ILO reading for a diagnosis of asbestosis.  <u>See</u> Unsecured Cr. Br. 4.  Rather, ATS standards permit a diagnosis of asbestosis based upon credible observations by an examining physician - including shortness of breath, clubbing of the fingers, lung crackles, and reduction in lung volume.  <u>See</u> ATS Standards 366.  Furthermore, the Unsecured Creditors' inference (Br. at 5) that the ATS considers pleural disease "harmless" because it is discussed under the caption, "*Benign* Pleural Abnormalities," is wholly unwarranted in light of the fact that the ATS Standards state that pleural thickening "may cause symptoms and impair pulmonary function." ATS Standards 364.

      The SAC suggests that the court could hold summary judgment hearings "on any claim failing to supply sufficient medical information" and that this "will enable the court to consider the sufficiency of the claims without the necessity of individual review." SAC Br. 18.  How any court could determine individual impairment without reviewing individual claims is a mystery.  In fact, this process would be tantamount to claims liquidation, and it would be enormously time-consuming.

## CONCLUSION

For these reasons and those stated in our opening brief, this Court should conduct an estimation proceeding as recommended by the Committee.

> Respectfully submitted.
>
> **CAMPBELL & LEVINE, LLC**
>
> /s/Aileen F. Maguire
> Matthew G. Zaleski, III (I.D. No. 3557)
> Aileen F. Maguire (I.D. No 3756)
> Chase Manhattan Centre
> 1201 N. Market Street, 15th Floor
> Wilmington, DE 19801
> Telephone:     (302) 426-1900
> Telefax:         (302) 426-9947
>
> **CAPLIN & DRYSDALE, CHARTERED**
> Elihu Inselbuch
> 399 Park Avenue, 36th Floor
> New York, NY 10022
> Telephone:     (212) 319-7125
> Telefax:         (212) 644-6755
>
> Peter Van N. Lockwood
> Albert G. Lauber
> Nathan D. Finch
> Max C. Heerman
> One Thomas Circle, N.W.
> Washington, D.C. 20005
> Telephone:     (202) 862-5000

Date: August 21, 2002          Telefax:         (202) 429-3301

> Counsel for the Official Committee of Asbestos Personal Injury Claimants