IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | Hearing Date: August 26, 2002 at 10:00 a.m. |
| | ) | |
| Debtors | ) | Regarding Docket No. 2458 |

### RESPONSE TO FEE AUDITOR'S FINAL REPORT REGARDING FOURTH INTERIM QUARTERLY FEE APPLICATION OF FTI POLICANO & MANZO

This is the response of FTI Policano & Manzo (FTI P&M) to the Final Report (the "Fee Audit Report") of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor (the "Fee Auditor") in the above-captioned bankruptcy proceedings, regarding the Fourth Interim Quarterly Fee Application of FTI Policano & Manzo (the "Application"). The Fee Audit Report is attached as Attachment A.

### Background

FTI P&M was retained as financial advisors to the Official Committee of Unsecured Creditors (the "Committee"). In the Application, FTI P&M sought approval for fees totaling $197,137.00 and expenses totaling $6,343.22 for services rendered from January 1, 2002 through March 31, 2002. An audit of the Application was performed by the Fee Auditor and a Final Report was filed with the Court on July 29, 2002.

WLM\164744.1

## Introduction

We obtained a copy of the Fee Auditor's Final Report, as filed with the Court, on July 30, 2002. Brief explanations of the adjustments made by the Fee Auditor in the Final Report are as follows:

Fee Application Charges:

> The Fee Auditor has taken exception to the charges for 35 hours related to the "analysis and review of the succession of proposed revisions to the case administrative procedures" and to the "conversion of professional hourly and fee data."
>
> The total hours charged were 90.3. The Fee Auditor is disallowing ½ of the fees charged.

Meeting Attendance:

> The Fee Auditor has disallowed ½ of the fees and expenses resulting from the attendance by two timekeepers at a meeting conducted by the Debtors at their headquarters. The Fee Auditor believes that attendance by one representative would have sufficed.

Ministerial Tasks:

> The Fee Auditor objects to the use of highly paid professionals to perform "ministerial tasks." The tasks in question relate to the review of court docket listings and selected items.

Seminar Costs:

> The Fee Auditor is disallowing the entire amount of fees and expenses related to the attendance of two professionals at an asbestos liability seminar.

Copies and Fax Charges:

> The Fee Auditor is disallowing, and we agree, that the incorrect per page rate was used to calculate our original expenses for these items.

Word Processing Charges:

> The Fee Auditor challenged our expenses for word processing, and we acquiesced in our response to the Fee Auditor's Initial Report.

Document Preparation:

> The Fee Auditor is disallowing all of our direct document preparation charges.

WLM\164744.1

2

In this document, we address the Fee Auditor's remarks on these remaining issues and seek to re-instate the fees and expenses disallowed with respect to these various issues, with the exception of the disallowance of fees and expenses for Copies and Fax Charges and Word Processing Charges to which we have previously agreed.

### Issue: Fee Application Charges

**Fee Auditor's Initial Report**

As the compensation for preparing a particular fee application is generally sought in the following fee application (we have heard this referred to as a "trailing expense"), the fee application of a firm whose activities are decreasing as the case progresses will often reflect disproportionate charges for fee application preparation. Thus, we generally look at the fee application charges cumulatively.

For the application period, FTI P&M's fee application charges totaled $28,865.50, or almost 15% of the fees requested in the Application. The Application, moreover, indicates that FTI P&M's fees for December 2001 – the month immediately preceding the quarter covered by the Application – were less than FTI P&M's monthly average for January through March 2002. Accordingly, it would not appear that the unusually high fee application charges are due to their status as a "trailing expense." We would request that FTI P&M explain why its fee application charges constitute such a large percentage of the firm's total fees.

**FTI P&M Response to Initial Report**

i.  The Compensation of Professionals' category totaled 78.7 hours and $27,585.00, not $28,865.50 as noted above, in fees during the Fourth Interim Period. In addition, there was an error in summarizing the detail of professional time that resulted in 11.6 hours and $3,422.00 in fees being charged to "Asset Acquisitions/Business Combinations" by Craig MacCallum in the Tenth Interim period. The 11.6 hours and $3,422.00 in fees should have been categorized as Compensation of Professionals. The professional fees, as corrected, incurred in the Compensation of Professionals' category totaled $31,007.00 or approximately 16% of the total fees incurred in the Fourth Interim Quarterly period. The professional hours, as corrected, incurred in the Compensation of Professionals' category were 90.3 hours or approximately 17% of the 540.6 total hours incurred during the Fourth Interim Quarterly period.

ii.  Approximately 35 hours or 39% of the hours incurred in the Compensation of Professionals' category were incurred performing tasks related to the analysis and review of the succession of proposed revisions to the case administrative procedures related to

compensation of professionals and to the conversion of professional hourly and fee data in compliance with the new administrative requirements. The remaining 55.3 hours were incurred for the preparation of five court filings including the Eighth Interim Fee Application, the Ninth Interim Fee Application, the Tenth Interim Fee Application, the Eleventh Interim Fee Application and the Third Interim Quarterly Fee Application.

iii.     The activities of professionals during the Fourth Interim Period for this category were described in summary form on page 2, Exhibit B of the attached Tenth Interim Application (for the period January 1, 2002 through January 31, 2002) and in detail by professional in Exhibit D of the attached Tenth Interim Application; in summary form on page 1 of Exhibit B of the attached Eleventh Interim Application (for the period February 1, 2002 through February 28, 2002) and in detail by professional in Exhibit D of the attached Eleventh Interim Application; and in detail by professional in Exhibit D of the attached Twelfth Interim Application (for the period March 1, 2002 through March 31, 2002):

  a) During the Tenth Interim Period the activities of professional staff totaled 43.7 hours and fees totaled $14,910.00 for the Compensation of Professionals' category, as filed. The corrected amounts would be 55.3 hours and fees of $18,332. We prepared and filed the Eighth Interim Fee Application and the Ninth Interim Fee Application, including new formats for the reporting of cumulative time and expenses by category. We prepared and filed the Third Quarterly Fee Application. We reviewed the proposed revised administrative order with respect to interim fee applications. We converted our time and expense records for the interim periods in 2001 to conform to proposed revised administrative reporting requirements.

  b) During the Eleventh Interim Period the activities of professional staff totaled 20.1 hours and fees totaled $7,240.00 for the Compensation of Professionals' category. We prepared and filed the Tenth Interim Fee Application, including new formats for the reporting of cumulative time and expenses by category. We continued to review the proposed revised administrative order with respect to interim fee applications. We continued to convert our time and expense records for the interim periods in 2001 to conform to revised administrative reporting requirements.

  c) During the Twelfth Interim Period the activities of professional staff totaled 14.9 hours and fees totaled $5,435.00 for the Compensation of Professionals' category. We prepared and filed the Eleventh Interim Fee Application. We continued our efforts to obtain and understand the on-going proposed changes to the case administrative order with respect to interim fee applications.

**Fee Auditor's Final Report**

In our initial report we noted that FTIPM's fee application charges totaled almost 15% of the fees requested in the Application. While we calculated these fee application charges as $28,865.50, FTIPM calculated them as $31,007.00, for 16% of the total fees it incurred in the period. Thus in our initial report we requested that FTIPM explain why its fee application charges constitute such a large percentage of the firm's total fees. FTIPM responded, in part, as follows:

> Approximately 35 hours or 39% of the hours incurred in the Compensation of Professionals' category were incurred performing tasks related to the analysis and review of the succession of proposed revisions to the case administrative procedures related to compensation of professionals an to the conversion of professional hourly and fee data in compliance with the new administrative requirements. The remaining 55.3 hours were incurred for the preparation of five court filings including the Eighth Interim Fee Application, the Ninth Interim Fee Application, the Tenth Interim Fee Application, the Eleventh Interim Fee Application and the Third Interim Quarterly Fee Application.

While we understand that compliance with the administrative procedures related to compensation may seem burdensome, we do not believe that this is a valid excuse for an applicant charging so much time to seeking its own compensation, and we believe that the amount charged by FTIPM for seeking its own compensation is excessive. Thus, we recommend a reduction in fees of ½ the amount sought by FTIPM in seeking its own compensation, for a reduction of $15,503.50 in fees.

**FTI P&M Response to Final Report**

i.   The original Administrative Order in the case was signed by Judge Farnan on May 3, 2001. FTI P&M fee applications were prepared on the basis of that administrative order for the periods beginning April 20, 2001, when FTI P&M was first retained in the case, through December 31, 2001.

ii.  On January 10, 2002, we received notice of a proposed Amended Administrative Order from David W. Carickhoff, at Pachulski Stang Ziehl Young & Jones, that would establish revised procedures for the interim compensation of professionals. The proposed revised procedures would require significant changes to our fee application procedures, as follows: a) billing matter categories previously internally defined and used in our fee applications to-date would change to specified categories as defined in an Exhibit to the proposed order, b) expenses would be required to be identified with billing matter categories, c) a spreadsheet of quarterly and cumulative fees and expenses, in the format of an Exhibit to the proposed order, would be required to be submitted to the Debtors' counsel prior to each quarterly fee application hearing, and d) various changes in filing dates and submission procedures.

iii. At the time we received notice of the proposed changes, we reviewed the requirements and made initial plans to meet them. The plans included organization of

fee and expense data collection on a prospective basis and conversion of past fee application data to meet the new requirements. In February and March we began to convert our April 2001 through December 2001 data to the proposed required formats and to prepare reporting formats for our January 2002 data. The majority of the time charged to the Compensation of Professionals category is the result of this activity.

iv. On March 22, 2002, FTI P&M received a copy of the version of the proposed Amended Administrative Order that was filed with the Court from Stroock & Stroock & Lavan. We again reviewed the requirements and compared them to our understanding of the preliminary proposed order. We updated our schedules, especially in order to meet the cumulative reporting requirements.

v. The remaining hours were incurred for the preparation of five court filings including the Eighth Interim Fee Application, the Ninth Interim Fee Application, the Tenth Interim Fee Application, the Eleventh Interim Fee Application and the Third Interim Quarterly Fee Application. Preparation, on average, totaled 11 hours. The period included preparation of the Fee Application for November 2001 (the Eighth Interim). Normally, the quarterly period would include preparation time for only four court filings. The amount of hours spent in preparation, review and distribution of these filings, given the level of care required for detail and accuracy, would seem to be reasonable to us.

## Issue: Attendance by More than One Individual at Meetings

### Fee Auditor's Initial Report

On March 12, 2002, timekeepers Whitney and Hamilton spent 10.0 hours each attending a meeting at the Debtors' corporate offices, billing $3,750 and $3,500 respectively. Paragraph II.D.5. of the guidelines provides that "[I]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." The time entries indicate that Ms. Whitney had done the bulk of the work relating to the 2002 operating plan that appears to have been the primary subject of the meeting. Please explain the necessity for both professionals' attendance.

The expense detail reflects the costs associated with both professionals' attendance at the 3/12/02 meeting. Please explain the necessity for the attendance of both professionals.

### FTI P&M Response to Initial Report

i.             The Debtors' have held few meetings where top executives have been available to the Committee and its representative, FTI P&M. Attendance at the meeting on March 12, 2002, was therefore an opportunity to directly question Debtor's management and their advisors on a variety of major issues including, the 2002 Operating Plan scope and details, outlook for 2002 from Divisional executives' point of view, the proposed changes to the employee compensation program, status of current acquisitions, acquisition pipeline for 2002, and closure of certain plant locations. The number of issues and the complexity of each issue dictated that two members of the case team attend

the meeting. Timekeeper Whitney was involved in the preliminary analysis of the 2002 Operating Plan and in a portion of the executive compensation analysis work performed to-date. Timekeeper Hamilton was also involved in analysis of the 2002 Operating Plan as well as the acquisition and divestiture analyses performed to-date.

ii.          The meeting was attended by the at least seven of the top executives from the Company, including the CEO, the CFO and three business unit heads. It was attended by at least three members of the Debtors' advisory firm, Blackstone. It was also attended by representatives of at least two other statutory committees to the bankruptcy proceedings, each of which sent two or three representatives. FTI P&M feels that its representation at the meeting was in keeping with the due diligence requirements of its retention as financial advisors to the Committee and in-line with representation of other committees in attendance at the meeting.

iii.         Given the complexity, scope and size of the business and the number of significant issues to be covered at the meeting, FTI P&M assigned two case team staff members to attend the meeting, each of whom has an understanding of the overall consolidated operations, of the divisional operations of the Company and of specific issues such as Company acquisitions, divestments and compensation and incentive plans.

iv.         Timekeepers Whitney and Hamilton both attended the Debtors' meeting held at their corporate offices and incurred time and expenses attending the meeting. Efforts were taken to ensure that time and expenses were kept to a minimum. Both timekeepers traveled to and from the meeting on the same day to avoid the expense of an overnight stay. As, explained above, the issues were numerous and complex, and in our judgment, required the attendance of both timekeepers.

**Fee Auditor's Final Report**

In our initial report we noted that on March 12, 2002, timekeepers Whitney and Hamilton spent 10.0 hours each attending a meeting at the Debtors' corporate offices, billing $3,750 and $3,500, respectively.
Paragraph II.D.5. of the guidelines provides that "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." The time entries indicate that Ms. Whitney had done the bulk of the work relating to the 2002 operating plan that appears to have been the primary subject of the meeting. Thus we asked FTIPM to explain the necessity for both professionals' attendance.
While we believe we understand the explanation offered by FTIPM, we still believe that this meeting was overstaffed, and thus we recommend a reduction of ½ the fees and expenses charged fort is meeting, for a reduction of $3,625.00 in fees and a reduction of $491.50 in expenses.

**FTI P&M Response to Final Report**

i.  We would like to reiterate that "Given the complexity, scope and size of the business and the number of significant issues to be covered at the meeting, FTI P&M assigned two case team staff members to attend the meeting, each of whom has an understanding of the overall consolidated operations, of the divisional operations of the Company and of specific issues such as Company acquisitions, divestments and compensation and incentive plans."

ii. The primary topics covered at the March 12th meeting included an overview of the 2002 Operating Plan, an in-depth discussion of the 2001 Operating Results, a discussion of the comparison of the 2002 Operating Plan to the 2001 Operating Results, a review of the business strategy for each major division, a discussion of the effect of acquisitions during FY 2001, and a presentation by Blackstone of the Revised Compensation Program including LTIP, Retention and Severance programs. During the Fourth Quarterly Interim Period, Timekeeper Hamilton recorded time spent on analysis and reporting of the Company's 4th quarter 2001 and year-end results of operations as well as the analysis and reporting of major acquisition and asset divestiture transactions. During the Fourth Quarterly Interim Period, Timekeeper Whitney recorded time spent on the analysis and reporting of the Company's 2002 Operating Plan, including comparisons to prior year results. We strongly believe that both their individual and collective knowledge of the complex workings and specific transactions of the Company were important to bring to the meeting in order to best serve the information requirements of the Committee.

iii. Also, and in general, the attendance of more than one individual at a meeting such as the one held on March 12th is important in retaining an awareness and up-to-date knowledge of case issues among management and staff members assigned to the case. It has been the historical practice of FTI P&M to assign more than one staff member to attend meetings in cases of great complexity. The practice is consistent and the number of attendants in this instance and others is in the low end of competitive practices.

iv. It should be noted that at the March 12th meeting, FTI P&M's representation of the Committee by two staff members was the smallest representation of any group present at the meeting, including the Company's own financial advisors, Blackstone.

### Issue: Ministerial Tasks Performed by a Professional

**Fee Auditor's Initial Report**

<u>In several instances we noted time entries suggesting timekeeper Hamilton performed ministerial tasks or other activities not befitting a $350-an-hour professional:</u>

9-Jan     12     Set-up formats for analyzing monthly financial statements.     2.0

| | | | |
|---|---|---|---|
| 10-Jan | 12 | Continued to set-up formats for analyzing monthly financial statements. | 1.7 |
| 11-Mar | 12 | Updated court docket listing. | 1.5 |
| 13-Mar | 12 | Updated court docket listings. | 1.1 |

Please explain why it was appropriate to have Ms. Hamilton performing these tasks.

### FTI P&M Response to Initial Report

i.  The Fee Auditor noted that certain time entries by timekeeper Hamilton appear to relate to ministerial tasks, specifically, work that was described as "set-up formats for analyzing monthly financial statements" on January 9th and January 10th, and "updated court docket listing" on March 11th and March 13th.

ii. The work described as "set-up formats for analyzing monthly financial statements" included reading the detailed monthly operating reports for October, November and December 2001 and preparing a by-month analysis format which would summarize results on a monthly basis and compare it to prior year results and which could be used in conjunction with our first quarter 2002 review. The Debtors' business is large and complex, and therefore, often requires this type of analysis by an experience professional to obtain a clear understanding of its operations and results of operations.

iii. The work described as "updated court docket listing" is an on-going activity which involves acquiring web-access to the court docket system, reading entries and retrieving selected docket items. The selected docket items are read and analyzed and the information disseminated to case team members to ensure their current and timely knowledge of case issues. It is our belief that this task was and is appropriately assigned to professional staff.

### Fee Auditor's Final Report
In our initial report we noted several instances of time entries suggesting timekeeper Hamilton performed ministerial tasks or other activities not befitting a $350-an-hour professional.
Thus we asked FTIPM to explain why it was appropriate to have Ms. Hamilton performing these tasks.

While we believe we understand the explanation offered by FTIPM, and we accept this explanation regarding "set-up formats", we still believe that the task of "update court docket listing" is a task not appropriate for a $350 an hour professional, and thus we recommend a reduction of $910.00 in fees for these charges.

WLM\164744.1                                    9

**FTI P&M Response to Final Report**

The work that the Fee Auditor is questioning and describing as "ministerial" FTI P&M has described in its fee applications as "updated court docket listing." We would like to take this opportunity to expand upon our explanation of that task.

i.  The timekeeper is expected to regularly access the Court's internet-based docket listing. The docket listing is read and items related to important issues and that may affect the Committee's interests are identified. In our opinion, it is necessary for a professional to perform this portion of the task. Only a professional, and one involved in the case, would be able to "sift through" and decipher the abbreviated docket entries to determine which items may be of relevance for further analysis.

ii. The professional who performs this task will then obtain a copy of the motion, order or other docket item and read it in order to determine what further action may be necessary. The professional also prints a copy of the docket listing and gives it to a support staff member for entry into our internal database.

iii. At times, based on the reading by the professional, an internal memo or e-mail distribution is prepared summarizing the key elements of the document and no further action is taken. At other times, the document may be of greater significance and it is identified to the case manager as requiring analysis and possibly reporting to Committee counsel and/or the Committee. Time recorded for this type of further analysis is identified separately in the time records of this or any other professional subsequently assigned to perform such analysis. Thus the timekeeper records only the initial actions under this task code.

iv. Upon review of the Fee Auditor's comments, FTI P&M believes that this activity has been inadequately described in our time records. Should the Fee Auditor agree to re-instate the fee charges for this activity, we will seek to be more descriptive of the task in the future.


### Issue: Attendance at Seminars

**Fee Auditor's Initial Report**

On two occasions, FTI P&M billed the estate for their attendance at seminars. For the first seminar, on February 15, 2002, we see the following expense entries:

Seminar Costs:
| | | |
|---|---|---|
| L. Hamilton | 15-Feb | 595.00 |
| C. Whitney | 15-Feb | 595.00 |

The Application reflects no time entries or travel costs associated with this seminar. And on March 26, 2002, timekeepers Hamilton and Gilligan attended another seminar. On this occasion, there was no line item for the cost of the seminar registration, but both

Hamilton and Gilligan billed 8.0 hours for attending and Hamilton incurred $31.45 in travel expenses.

The Application provides no information regarding the February 15 seminar and, vis-à-vis, the March 26 seminar, does not explain why the estate should bear the cost of FTI P&M professionals' education regarding asbestos issues. Please explain why such education is not non-reimbursable overhead.

### FTI P&M Response to Initial Report

i.  FTI P&M paid seminar fee costs in advance of the actual date of the seminar. This fee cost was charged to the case in the month it was paid. It was originally planned that timekeeper Whitney and timekeeper Hamilton would attend the seminar. On the date of the seminar, March 26th, timekeeper Whitney was not available and timekeeper Gilligan was sent as a replacement. Timekeeper Gilligan is a case team member. Travel expenses related to attendance at the seminar were also charged to the case.

ii. One of the major issues, in fact a primary reason that the Debtors' filed for bankruptcy, is its potential asbestos claims liability. The importance of the status of asbestos litigation and asbestos liability for the Debtors and for certain other major companies is critical to understanding the case. The seminar was organized to present the latest litigation efforts from the plaintiff and defendant points-of-view as well as the most current estimates of asbestos liabilities for the industry. The Debtors are prominent defendants and many of the experts cited the Debtors' experiences and addressed the expected litigation and claims trends for the near-term. Accordingly, FTI P&M sent two of its case team members to gain the most current understanding of these asbestos issues. The timekeepers attended the seminar, wrote a report summarizing the material presented and distributed the report to the case team. The information was used in updating the Committee on asbestos issues. The information obtained as a result of the seminar is considered by FTI P&M to relate specifically to the Debtors case and, accordingly, has billed these costs to the Debtors' estate.

### Fee Auditor's Final Report

We noted in the initial report that on two occasions, FTIPM billed the estate for their attendance at seminars. For the first seminar, on February 15, 2002, we see the following expense entries:
Seminar Costs
| L. Hamilton | 15-Feb | 595.00 |
| C. Whitney | 15-Feb | 595.00 |

The Application reflects no time entries or travel costs associated with this seminar. And on March 26, 2002, timekeepers Hamilton and Gilligan attended another seminar. On this occasion, there was no line item for the cost of seminar registration, but both

WLM\164744.1                    11

Hamilton and Gilligan billed 8.0 hours for $5,800.00 in fees for attending, and Hamilton incurred $31.45 in travel expenses.
The Application provides no information regarding the February 15 seminar and, vis-à-vis the March 26 seminar, does not explain why the estate should bear the cost of FTIPM professionals' education regarding asbestos issues. Thus, in our initial report we asked FTIPM to explain why such education is not non-reimbursable overhead.
While we believe we understand the explanation offered by FTIPM, we still believe that knowledge of asbestos liability issues is built into the hourly rates charged by FTIPM, and thus recommend a reduction of $5,800.00 in fees and $1,221.45 in expenses for these charges.

### FTI P&M Response to Final Report

i. We would like to explain, as our initial response was in part, not sufficiently clear and thus misunderstood, that the charges of $595 for Hamilton and $595 for Whitney on February 15 were actually advance payments of seminar fees associated with the seminar held on March 26. In the course of events, when the date of the seminar arrived, timekeeper Hamilton attended and since timekeeper Whitney was unavailable, timekeeper Gilligan attended the seminar in her place.

ii. The seminar was organized by Tillinghast – Towers Perrin and Claims Resolution Management around the concept of "Understanding the Financial Aspects of Asbestos Litigation." The speakers and media attendance list is as follows:

| Name | Affiliation |
|---|---|
| Altonji, Gerard | A.M.Best |
| Angelina, Mike | Tillinghast – Towers Perrin, Philadelphia |
| Austern, Esq., David | Claims Resolution Management Corporation |
| Berenson, Alex | New York Times |
| Bernick, David | Kirkland & Ellis |
| Biggs, Jenni | Tillinghast – Towers Perrin, St. Louis |
| Bond, Patti – Writer | Atlanta Journal & Constitution |
| Carroll, Steve | The Rand Institute |
| Davis, Donna | Claims Resolution Management Corporation |
| Do, Phuong | Claims Resolution Management Corporation |
| Hanlon, Patrick | Shea & Gardner |
| Havens, David | UBS Warburg |
| Knoerzer, Michel | LeBoeuf, Lamb, Greene & MacRae, LLP |
| Lockwood, Peter | Caplin & Drysdale |
| MacIntosh, Julie – Reporter | Reuters |
| O'Reilly, Tim | Garrison Litigation Management |
| Powell, David | Tillinghast – Towers Perrin, New York |
| Rigby, Bill – Reporter | Reuters |
| Siemer, Fred – Editor | Chemical Research for Wall Street |
| Sottile IV, Esq., James F. | Baach, Robinson & Lewis |
| Tomlinson, William L. | Claims Resolution Management Corporation |

The topics presented are as follows:

> History and Current Status of Asbestos Litigation
> Trends in Asbestos Personal Injury Claims
> Forecasting Claims
> Status of Existing Bankruptcies
> Insurance and Reinsurance: The Effects of Asbestos Liabilities on Insurance Companies
> Legislative Front/Solutions
> Implications – The Effects of Asbestos Claims on a Company and Its Bottom Line

This seminar is best described as a high-level presentation by individuals who are leading the public discussion of this complex and, in many aspects, groundbreaking area. Most, if not all, of the presentation speakers cited W.R. Grace and used the Company's experiences to illustrate the topic at hand.

iii.   While we can agree that a basic knowledge of asbestos liability issues should be assumed held by staff and management assigned to this case, the degree to which asbestos liability is an issue and a central causal factor in the bankruptcy filing of this Company is unusual. There is a plethora of complex, simultaneous and interconnected litigation cases, primarily concerning asbestos claims, fraudulent conveyance and solvency issues that are associated with this bankruptcy filing. Even the most astute professional involved in the case has sought information from peers and experts in various fields to assist in their understanding of this case.

iv.   Accordingly, FTI P&M considered that it would be prudent and diligent on its part to participate in this seminar (and for that matter, in subsequent and similar seminars) and to convey the information received to members of its staff not in attendance. The information obtained was used in a report to the Committee and in on-going discussions with the Company and with the Committee.

v.   Also, and in general as noted in our response to the issue of Attendance by More Than One Individual at Meetings, the attendance of more than one individual at a this seminar was considered important in retaining an awareness and up-to-date knowledge of case issues among management and staff members assigned to the case.

### Issue:  Document Preparation and Handling Services

**Fee Auditor's Initial Report**

The Application includes a total of $1,050 in entries denominated "Document Preparation and Handling Services." The text of the Application leads us to believe that these charges relate to "preparation, collation and binding" of documents. Although FTI P&M explains that these charges are limited to time attributable to a particular client, in the absence of further explanation it appears that these activities are clerical in nature and accordingly constitute non-reimbursable overhead.

**FTI P&M Response to Initial Report**

i.  The charges described as "Documentation Preparation and Handling Services" include preparation of documents for distribution by our internal support staff. The time involved and the level of care required in preparing distributions of case reports and other related information is not insignificant. It is our belief that these activities are best handled by carefully trained, internal staff. We believe that costs are minimized by using internal staff rather than using a chargeable, outside service. In using internal staff, we are also fulfilling the requirements of our confidentiality agreements in the case. Therefore, we respectfully request that the Fee Auditor let stand these charges.

**Fee Auditor's Final Report**

In our initial report we noted that the Application includes a total of $1,050 in entries denominated "Document Preparation and Handling Services." The text of the Application leads us to believe that these charges related to "preparation, collation and binding" of documents, and indicates that these charges are limited to time attributable to a particular client.

It appears to us that these activities are clerical in nature an accordingly constitute non-reimbursable overhead, and thus we recommend a reduction of $1,050.00 in fees for these charges.

**FTI P&M Response to Final Report**

i.  It is the usual practice of FTI P&M to charge document preparation and handling services directly to a case for the costs associated with major and distinct projects. Daily and general document handling and preparation costs are not allocated to cases and are considered to be overhead. As noted in our response to the Fee Auditor's Initial Report, "we believe that costs are minimized by using internal staff rather than using a chargeable, outside service. In using internal staff, we are also fulfilling the requirements of our confidentiality agreements in the case."

**Summary**

Below is a table that summarizes the Fee Auditor's adjustments to FTI P&M fees and expenses for the Fourth Quarterly Interim Period:

| Description | Fee Amount | Expense Amount | Total |
|---|---|---|---|
| Total per original filings | $197,137.00 | $ 6,334.22 | $203,471.22 |
|  |  |  |  |
| Adjustments: |  |  |  |

| Fee Application Charges | (15,503.50) |  | (15,503.50) |
|---|---|---|---|
| Meeting Attendance | (3,625.00) | (491.50) | (4,116.50) |
| Ministerial Tasks | ( 910.00) |  | ( 910.00) |
| Seminar Costs | (5,800.00) | (1,221.45) | (7,021.45) |
| Copies and Fax Charges |  | (406.85) | (406.85) |
| Word Processing Charges |  | (120.00) | (120.00) |
| Document Preparation | (1,050.00) |  | (1,050.00) |
|  |  |  |  |
| Total Adjustments | $(26,888.50) | $(2,239.80) | $(29,128.30) |
|  |  |  |  |
| Agreed Adjustments: |  |  |  |
|    Copies and Fax Charges |  | 406.85 | 406.85 |
|    Word Processing Charges |  | 120.00 | 120.00 |
| Subtotal: Agreed Adjustments |  | 526.85 | 526.85 |
|  |  |  |  |
| Balance of Adjustments | $(26,888.50) | $(1,712.95) | $(28,601.45) |

      We respectfully request that the Fee Auditor review our responses to both the Initial Report and to the Final Report and that he re-instate the Balance of Adjustments for a total of $28,601.45 for fees and expenses related to the Fourth Quarterly Interim Period.

Dated: August 21, 2002                    Respectfully submitted,

*[signature]*

Michael R. Lastowski (DE I.D. No. 3892)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail:    mlastowski@duanemorris.com

Co-Counsel to the Official Committee of
Unsecured Creditors