# Attachment A

**Fee Auditor's Final Report Regarding
Fourth Interim Quarterly Fee Application of
FTI Policano & Manzo**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In Re:** | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| **Debtors.** | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FOURTH INTERIM QUARTERLY FEE APPLICATION OF
## FTI POLICANO & MANZO

This is the final report of Warren H. Smith & Associates, P.C. ("Smith"), acting in its

capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Fourth Interim

Quarterly Fee Application of FTI Policano & Manzo (the "Application").

## BACKGROUND

1.      FTI Policano & Manzo ("FTIPM") was retained as financial advisers to the official

committee of unsecured creditors.  In the Application, FTIPM seeks approval of fees totaling

$197,137.00 and costs totaling $6,334.22 for its services from January 1, 2002, through March 31,

2002.

2.      In conducting this audit and reaching the conclusions and recommendations contained

herein, we reviewed in detail the Application in its entirety, including each of the time entries

included in the exhibits to the Application.  We reviewed the Application for compliance with 11

U.S.C. 330, the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the

District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11

U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent

established in the United States Bankruptcy Court for the District of Delaware, the United States

District Court for the District of Delaware, and the Third Circuit Court of Appeals. We sent FTIPM

an initial report based on this review, and FTIPM sent us a response to this initial report, portions

of which response are quoted herein.

## DISCUSSION

### General Issues

3.      We note that the Application's narrative does not describe the services rendered, and

thus in our initial report we had to ask more questions than if the Application were more complete.

4.      In our initial report we noted that in some instances there is inadequate detail

regarding the services performed by timekeepers Hamilton, Whitney, and Hakoun. Paragraph

II.D.5. of the Guidelines provides that "[s]ervices should be noted in detail and not combined or

"lumped" together, with each service showing a separate time entry." While we do not recommend

any reduction at this time for these time entries, in our initial report we asked FTIPM to advise these

timekeepers to provide more detail in the future, and FTIPM stated that it would do so.

5.      In our initial report we noted that FTIPM's fee application charges totaled almost

15% of the fees requested in the Application. While we calculated these fee application charges as

$28,865.50, FTIPM calculated them as $31,007.00, for 16% of the total fees it incurred in the period.

Thus in our initial report we requested that FTIPM explain why its fee application charges constitute

such a large percentage of the firm's total fees. FTIPM responded, in part, as follows:

> Approximately 35 hours or 39% of the hours incurred in the Compensation of Professionals' category
> were incurred performing tasks related to the analysis and review of the succession of proposed
> revisions to the case administrative procedures related to compensation of professionals and to the
> conversion of professional hourly and fee data in compliance with the new administrative

requirements. The remaining 55.3 hours were incurred for the preparation of five court filings including the Eighth Interim Fee Application, the Ninth Interim Fee Application, the Tenth Interim Fee Application, the Eleventh Interim Fee Application and the Third Interim Quarterly Fee Application.

While we understand that compliance with the administrative procedures related to compensation may seem burdensome, we do not believe that this is a valid excuse for an applicant charging so much time to seeking its own compensation, and we believe that the amount charged by FTIPM for seeking its own compensation is excessive. Thus, we recommend a reduction in fees of ½ the amount sought by FTIPM in seeking its own compensation, for a reduction of $15,503.50 in fees.

6.    In our initial report we noted that between January 22, 2002, and February 1, 2002, five professionals spent a total of 70.00 hours for a total of $26,056.50 analyzing, discussing, and writing about the Blueberry acquisition, plus an additional 5.50 hours for a total of $1,925 on February 26-27, 2002. (See Exhibit A.) While we recognize that the Debtors' "Project Blueberry" proposal was a significant transaction that warranted a careful analysis, we did not believe that the Application -- particularly in the absence of a detailed narrative -- demonstrated why it was necessary for FTIPM to spend this much time on the issue or why it was necessary for Libby Hamilton to spend 5.50 hours revising a Blueberry acquisition memo three-and-a-half weeks after FTIPM's professionals had stopped working on the Blueberry acquisition. Thus, in our initial report we asked FTIPM to provide further, explanatory information on these points. FTIPM responded that:

> Professional fees and hours incurred analyzing the Debtors' "Project Blueberry" were categorized as "Asset Acquisitions/Business Combinations" (also identified as task code 8). . . .
> The issues concerning the Blueberry Acquisition included the legitimacy of an asset acquisition by a Debtor company in bankruptcy, questions of source of financing as well as the usual return on investment issues of any business acquisition.
> Our activities included analysis of the Debtor's financial model, analysis of industry data, discussion with Debtors' management, review with Counsel and Committee Chair, and reporting to the Committee.
> Our analyses included analyses of market share calculations and financial projections, with a focus on obtaining an understanding of the synergistic effects on EBITDA as a result of the

acquisition. We also performed analyses for purpose of determining valuation based on EBITDA multiples.

The additional 5.50 hours incurred by timekeeper Hamilton were required as the Debtors provided FTI P&M with a revised financial model and proposal reflecting updated terms for the acquisition during the last week of February and after the original work had been completed. Significantly, for example, the purchase price decreased from $6.5 million to $4.0 million. We then read and analyzed the new financial model and, accordingly, revised our previous report. The updated report was reviewed with members of the Committee and then distributed to the Committee.

We believe that this information satisfies our concern, and thus we have no objection to these fees.

7.      In our initial report we noted that between March 15, 2002, and March 29, 2002, timekeepers Cunningham and Gilligan spent a total of 22.80 hours for a total of $8,972.50 on employee retention plan issues. (See Exhibit B.) We recognize that employee retention can be an important reorganization issue, but the Application does not indicate why this expenditure of time was necessary. Thus, in the initial report we asked for further information explaining why so much time was devoted to this issue. FTIPM responded that:

i.       The Debtors' employee retention plan proposal was evaluated in comparison to the proposals of other companies in bankruptcy and also in comparison to other companies with asbestos litigation issues. Our activities included attending a presentation by the Debtors' management and advisors and review of the presentation materials, discussions with the Debtor's advisors, Blackstone, concerning the plan assumptions, reading and analyzing information on plans of similar companies, discussion with Counsel and Committee members, and the issuance of a report to the Committee. The review also included analysis of other executive compensation programs to gain an understanding of the reasonableness of the total compensation of top executives.      And specifically;
ii.      At the meeting held at the offices of W.R. Grace on March 12, 2002, senior management and the Company's advisors presented an outline of changes to the previously approved "Key Employee Retention Program." The outline was presented as a preview to a formal request to the Committee to be made on April 11, 2002. Debtors' management indicated the need and importance of such plan changes in response to concerns of employee morale and potential loss of key employees critical to the continued financial and operational success of the estate.
iii.     The retention plan is complex in nature and the Company proposal requested modifications to three components to the previously approved plan
a)      Modifications to structure, year-over-year EBIT growth targets and potential dollar bonus awards to the Company's Long Term Incentive Plan (the "LTIP"). Please note that the LTIP proposed for key management is in lieu of traditional common stock options plans that were negated due to the bankruptcy filing.
b)      Enhancement to certain change of control severance provisions for 2,181 full time employees.
c)      Enhancements and extension of the retention component of the plan for a period covering years 2003 and 2004.
iv.      Based on the modifications proposed by the Debtor and their financial advisor, Blackstone, FTI P&M began to analyze similar compensation plans and arrangements at other bankrupt estates

through previously filed "KERP" motions and plans implemented at other asbestos "Chapter 11" filings.

FTI P&M's preliminary analysis was designed to understand management's rationale for the changes, analyze the economic impact of the proposed changes and prepare a comparative analysis against other similarly situated "Chapter 11" cases. Analysis and discussions with the Debtor and their advisors have continued.

We believe that this information satisfies our concern, and thus we have no objection to these fees.

8.    In our initial report we noted that between March 1, 2002, and March 28, 2002, four professionals spent a total of 87.70 hours for a total of $32,533.00 on 2001 fourth-quarter and full-year performance analysis, and we asked FTIPM to explain why it was necessary to devote so much time to this endeavor. FTIPM responded that:

i.    FTI P&M, at the direction of the Committee, normally prepares a report of operating results on a periodic basis so that the Committee can monitor the Debtors' operating performance. In an attempt to be both time and cost efficient, FTI P&M, the Debtors and the Debtors' financial advisors have agreed to a process of quarterly reviews as opposed to monthly reviews. Quarterly telephonic conference calls and, or meetings are coordinated whereby divisional operating management as well as senior management provide an overview of operating performance to-date as well as current business trends and outlooks. FTI P&M, accordingly, reports the results of those meetings to the Committee.

ii.    The report for the fourth quarter 2001 also included analyses on a full-year basis, and therefore required more time spent by professional staff in reading, analyzing, summarizing and presenting conclusions to the Committee. These full-year results were compared to the Debtors' forecast for 2001. The understanding gained from full-year analyses enables the Committee in evaluating the ability of the Debtors to meet expectations of the creditors with respect to eventual reorganization. The information garnered from these analyses was also used as a basis for understanding the Debtors' ability to execute their new business plan for 2002.

iii.    The Debtors' operations are both large, with 2001 sales of $1.7 billion, and complex with operational detail reported on both a divisional and a global company basis. Also, FTI P&M reports to the Committee on the results of operations for two groups of entities, W.R. Grace & Co. (the "Company") taken as a whole, and also separately on the sixty-one debtor entities within the Company.

iv.    For any reporting period, a substantial amount of professional time is required to analyze and assimilate the information provided in the Debtors' reporting package. For the fourth quarter 2001, we analyzed consolidated quarter and year-to-date performance. We also analyzed performance by division and prepared divisional variance analyses for the Davison Division and for the Performance Chemicals Division. We examined Corporate and Other income and expense items. We analyzed the Company's cash flow for the quarter and cumulative since the date of bankruptcy filing for both filing and non-filing entities within the Company. We performed comparative analyses, comparing sales and EBITDA results on a quarter and a year-to-date basis to prior year and to the operating plan.

v.    We participated in conference calls with the Company to discuss the results of operations and followed-up with the Company's management on various issues including EBIT reconciliation items, geographic sales results (U.S. versus foreign operations), foreign exchange gains and losses effects, cash flow effects of various asbestos and environmental clean-up expenses, and many other items.

vi.      The information analyses were included in a detailed report that was distributed to
Committee members. The results of our analyses were discussed with members of the Committee and
with Counsel.

We believe that this information satisfies our concern, and thus we have no objection to these fees.

9.      In our initial report we noted that on March 12, 2002, timekeepers Whitney and

Hamilton spent 10.0 hours each attending a meeting at the Debtors' corporate offices, billing $3,750

and $3,500 respectively.

Libby Hamilton:
| 12-Mar | 17 | Attended a meeting at the Debtors' corporate offices to discuss the 2002 Operating Plan and proposed changes to the employee compensation program. | 10.0 |

Christina Whitney:
| 12-Mar | 17 | Attended a meeting at the Debtors' corporate offices to discuss the 2002 Operating Plan and proposed changes to the employee compensation program. | 10.0 |

The expense detail reflects the following costs associated with both professionals' attendance at the

3/12/02 meeting:

Transportation, lodging, tolls and parking:
| L. Hamilton | Milage | 12-Mar | 30.00 |
| L. Hamilton | Train | 12-Mar | 424.00 |
| L. Hamilton | Parking | 12-Mar | 21.40 |
| C. Whitney | Train | 12-Mar | 424.00 |
| C. Whitney | Taxis | 12-Mar | 84.00 |

Paragraph II.D.5. of the guidelines provides that "[i]f more than one professional from the applicant

firm attends a hearing or conference, the applicant should explain the need for multiple attendees."

The time entries indicate that Ms. Whitney had done the bulk of the work relating to the 2002

operating plan that appears to have been the primary subject of the meeting.  Thus we asked FTIPM

to explain the necessity for both professionals' attendance.  FTIPM responded that:

i.      The Debtors' have held few meetings where top executives have been available to the
Committee and its representative, FTI P&M.  Attendance at the meeting on March 12, 2002, was
therefore an opportunity to directly question Debtor's management and their advisors on a variety of

major issues including, the 2002 Operating Plan scope and details, outlook for 2002 from Divisional executives' point of view, the proposed changes to the employee compensation program, status of current acquisitions, acquisition pipeline for 2002, and closure of certain plant locations.    The number of issues and the complexity of each issue dictated that two members of the case team attend the meeting. Timekeeper Whitney was involved in the preliminary analysis of the 2002 Operating Plan and in a portion of the executive compensation analysis work performed to-date.  Timekeeper Hamilton was also involved in analysis of the 2002 Operating Plan as well as the acquisition and divestiture analyses performed to-date.

ii.    The meeting was attended by the at least seven of the top executives from the Company, including the CEO, the CFO and three business unit heads. It was attended by at least three members of the Debtors' advisory firm, Blackstone.  It was also attended by representatives of at least two other statutory committees to the bankruptcy proceedings, each of which sent two or three representatives. FTI P&M feels that its representation at the meeting was in keeping with the due diligence requirements of its retention as financial advisors to the Committee and in-line with representation of other committees in attendance at the meeting.

iii.    Given the complexity, scope and size of the business and the number of significant issues to be covered at the meeting, FTI P&M assigned two case team staff members to attend the meeting, each of whom has an understanding of the overall consolidated operations, of the divisional operations of the Company and of specific issues such as Company acquisitions, divestments and compensation and incentive plans.

iv.    Timekeepers Whitney and Hamilton both attended the Debtors' meeting held at their corporate offices and incurred time and expenses attending the meeting. Efforts were taken to ensure that time and expenses were kept to a minimum.  Both timekeepers traveled to and from the meeting on the same day to avoid the expense of an overnight stay.  As, explained above, the issues were numerous and complex, and in our judgment, required the attendance of both timekeepers.

While we believe we understand the explanation offered by FTIPM, we still believe that this meeting

was overstaffed, and thus we recommend a reduction of ½ the fees and expenses charged for this

meeting, for a reduction of $3,625.00 in fees and a reduction of $491.50 in expenses.

10.    In our initial report we noted several instances of time entries suggesting timekeeper

Hamilton performed ministerial tasks or other activities not befitting a $350-an-hour professional:

| 9-Jan | 12 | Set-up formats for analyzing monthly financial statements. | 2.0 |
|-------|----|-----------------------------------------------------------|-----|
| 10-Jan | 12 | Continued to set-up formats for analyzing monthly financial statements. | 1.7 |
| 11-Mar | 12 | Updated court docket listing information. | 1.5 |
| 13-Mar | 12 | Updated court docket listing. | 1.1 |

Thus we asked FTIPM to explain why it was appropriate to have Ms. Hamilton performing these

tasks. FTIPM responded that:

> i.      The Fee Auditor noted that certain time entries by timekeeper Hamilton appear to relate to ministerial tasks, specifically, work that was described as "set-up formats for analyzing monthly financial statements" on January 9[th] and January 10[th], and "updated court docket listing" on March 11[th] and March 13[th].
> ii.     The work described as "set-up formats for analyzing monthly financial statements" included reading the detailed monthly operating reports for October, November and December 2001 and preparing a by-month analysis format which would summarize results on a monthly basis and compare it to prior year results and which could be used in conjunction with our first quarter 2002 review. The Debtors' business is large and complex, and therefore, often requires this type of analysis by an experience professional to obtain a clear understanding of its operations and results of operations.
> iii.    The work described as "updated court docket listing" is an on-going activity which involves acquiring web-access to the court docket system, reading entries and retrieving selected docket items. The selected docket items are read and analyzed and the information disseminated to case team members to ensure their current and timely knowledge of case issues. It is our belief that this task was and is appropriately assigned to professional staff.

While we believe we understand the explanation offered by FTIPM, and we accept this explanation regarding "set-up formats", we still believe that the task of "update court docket listing" is a task not appropriate for a $350 an hour professional, and thus recommend a reduction of $910.00 in fees for these charges.

11.     We noted in the initial report that on two occasions, FTIPM billed the estate for their attendance at seminars. For the first seminar, on February 15, 2002, we see the following expense entries:

Seminar Costs

| | | |
|---|---|---|
| L. Hamilton | 15-Feb | 595.00 |
| C. Whitney | 15-Feb | 595.00 |

The Application reflects no time entries or travel costs associated with this seminar. And on March 26, 2002, timekeepers Hamilton and Gilligan attended another seminar. On this occasion, there was no line item for the cost of seminar registration, but both Hamilton and Gilligan billed 8.0 hours for $5,800.00 in fees for attending, and Hamilton incurred $31.45 in travel expenses, as set forth below:

<u>Libby Hamilton</u>:
26-Mar2     Participated in Asbestos Seminar.                                    8.0

<u>Walter Gilligan</u>:
26-Mar2     Attended Asbestos Seminar.                                          8.0

<u>Transportation, lodging, tolls and parking</u>:

|              |       |        |       |
|--------------|-------|--------|-------|
| L. Hamilton  | Train | 26-Mar | 26.45 |
| L. Hamilton  | Taxis | 26-Mar | 5.00  |

The Application provides no information regarding the February 15 seminar and, vis-a-vis the March

26 seminar, does not explain why the estate should bear the cost of FTIPM professionals' education

regarding asbestos issues. Thus, in our initial report we asked FTIPM to explain why such education

is not non-reimbursable overhead.   FTIPM responded that:

> i.      FTI P&M paid seminar fee costs in advance of the actual date of the seminar. This fee cost
> was charged to the case in the month it was paid. It was originally planned that timekeeper Whitney
> and timekeeper Hamilton would attend the seminar.  On the date of the seminar, March 26[th],
> timekeeper Whitney was not available and timekeeper Gilligan was sent as a replacement.
> Timekeeper Gilligan is a case team member.  Travel expenses related to attendance at the seminar
> were also charged to the case.
> ii.      One of the major issues, in fact a primary reason that the Debtors' filed for bankruptcy, is
> its potential asbestos claims liability. The importance of the status of asbestos litigation and asbestos
> liability for the Debtors and for certain other major companies is critical to understanding the case.
> The seminar was organized to present the latest litigation efforts from the plaintiff and defendant
> points-of-view as well as the most current estimates of asbestos liabilities for the industry.  The
> Debtors are prominent defendants and many of the experts cited the Debtors' experiences and
> addressed the expected litigation and claims trends for the near-term.  Accordingly, FTI P&M sent
> two of its case team members to gain the most current understanding of these asbestos issues. The
> timekeepers attended the seminar, wrote a report summarizing the material presented and distributed
> the report to the case team.  The information was used in updating the Committee on asbestos issues.
> The information obtained as a result of the seminar is considered by FTI P&M to relate specifically
> to the Debtors case and, accordingly, has billed these costs to the Debtors' estate.

While we believe we understand the explanation offered by FTIPM, we still believe that knowledge

of asbestos liability issues is built into the hourly rates charged by FTIPM, and thus recommend a

reduction of $5,800.00 in fees and $1,221.45 in expenses for these charges.

        12.     Local Rule 2016-2(e)(iii) provides that the charge for out-going facsimile

transmissions shall not exceed $1 per page.  In our initial report we noted that the Application states

that FTIPM charges $1.25 per page for such transmissions and that this charge was applied to a total

of 65 pages. FTIPM responded that:

> The Fee Auditor noted that Local Rule 2016-2(e)(iii) provides that the charge for out-going facsimile
> transmissions shall not exceed $1 per page. In error, FTI P&M charged $1.25 per page for facsimile
> transmissions during the period reviewed. We respectfully suggest that this cumulative overcharge
> of $16.25 should be credited to the Debtors on a subsequent fee application.

Thus, we recommend a reduction of $16.25 in expenses.

13.     Local Rule 2016-2(e) provides that photocopying charges shall not exceed $.15 per

page. In our initial report we noted that the Application states that FTIPM charges $0.20 per page

for photocopies and that this charge was applied to 7,812 copies. FTIPM responded that:

> The Fee Auditor noted that Local Rule 2016-2(e)(iii) provides that the charge for photocopying shall
> not exceed $0.15 per page. In error, FTI P&M charged $0.20 per page for photocopies during the
> period reviewed. We respectfully suggest that this cumulative overcharge of $390.60 should be
> credited to the Debtors on a subsequent fee application.

Thus, we recommend a reduction of $390.60 in expenses.

14.     In our initial report we noted that the Application indicates $120 in charges for word

processing. Paragraph II.E.7. of the Guidelines provides that nonreimbursable overhead includes

word processing. FTIPM responded that:

> The Fee Auditor noted that Paragraph II.E.7 of the Guidelines provides that non-reimbursable
> overhead includes word processing. FTI P&M has charged to the Debtors minimal amounts of word
> processing directly related to the case for a total charge in the period of $120.00. We respectfully
> submit that the charges were accurate, necessary and directly related to the preparation of case
> documents, however, FTI P&M shall eliminate this charge through a credit on a subsequent fee
> application.

Thus, we recommend a reduction of $120 in expenses.

15.     In our initial report we noted that the Application includes a total of $1,050 in entries

denominated "Document Preparation and Handling Services":

Document Preparation and Handling Services:
20-Jan          0.5 hours @ $75/hour          37.50

| 31-Jan | 2.5 hours @ $75/hour | 187.50 |
| 31-Jan | 6.0 hours @$75/hour | 450.00 |
| 10-Feb | 2.0 hours @ $75/hour | 150.00 |
| 28-Feb | 2.0 hours @$75/hour | 150.00 |
| 31-Mar | 1.0 hours @ $75/hour | 75.00 |

The text of the Application leads us to believe that these charges relate to "preparation, collation and binding" of documents, and indicates that these charges are limited to time attributable to a particular client. In its response FTIPM stated that:

> The charges described as "Documentation Preparation and Handling Services" include preparation of documents for distribution by our internal support staff. The time involved and the level of care required in preparing distributions of case reports and other related information is not insignificant. It is our belief that these activities are best handled by carefully trained, internal staff. We believe that costs are minimized by using internal staff rather than using a chargeable, outside service. In using internal staff, we are also fulfilling the requirements of our confidentiality agreements in the case. Therefore, we respectfully request that the Fee Auditor let stand these charges.

However, it appears to us that these activities are clerical in nature and accordingly constitute non-reimbursable overhead, and thus we recommend a reduction of $1,050.00 in fees for these charges.

## CONCLUSION

16.    Thus, we recommend approval of fees totaling $170,248.50 ($197,137.00 minus $26,888.50) and costs totaling $4,094.42 ($6,334.22 minus $2,239.80) for FTIPM's services from January 1, 2002, through March 31, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____

Warren H. Smith
Texas State Bar No. 18757050
Mark W. Steirer
Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas 75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 29th day of July, 2002.

_____
Warren H. Smith

## SERVICE LIST

Notice Parties

### The Applicant

Edwin N. Ordway, Jr.
FTI Policano & Manzo
Park 80 West, Plaza I
Saddle Brook, NJ 07663

### The Debtors

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

### Counsel for the Debtors

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

### Counsel for the Official Committee of Unsecured Creditors

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

### Counsel to the Official Committee of Property Damage Claimants

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

### Counsel to the Official Committee of Personal Injury Claimants

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

EXHIBIT A

Edwin N. Ordway, Jr.:

| | | | |
|---|---|---|---|
| 22-Jan | 8 | Read and analyzed Blueberry acquisition data. | 0.6 |
| 23-Jan | 8 | Read and analyzed Blueberry acquisition data. | 1.3 |
| 29-Jan | 8 | Reviewed draft of report for Committee regarding Blueberry acquisition | 1.1 |
| 31-Jan | 8 | Reviewed findings regarding Blueberry with counsel and Committee chairman | 0.8 |
| 1-Feb | 12 | Called Chair and counsel to discuss proposed acquisition And FTI P&M's evaluation thereof. | 0.4 |

Sean Cunningham:

| | | | |
|---|---|---|---|
| 21-Jan | 8 | Discussed Project Blueberry acquisition and proposed timing with Company financial advisor, Blackstone. | 0.3 |
| | 8 | Reviewed preliminary financial overview of Project Blueberry | 0.7 |
| 28-Jan | 8 | Reviewed financial model presented by Company pertaining to Blueberry acquisition | 2.0 |
| | 8 | Prepared preliminary analysis of Blueberry acquisition financial information | 1.0 |
| 29-Jan | 8 | Prepared comparative financial data pertaining to the Blueberry acquisition | 1.0 |
| | 8 | Prepared financial analysis for incorporation into report to unsecured committee pertaining to the Blueberry acquisition | 2.0 |
| 30-Jan | 8 | Reviewed Motion to acquire Blueberry | 0.3 |
| | 8 | Prepared and finalized report to the Committee for the Blueberry acquisition | 3.0 |
| 31-Jan | 8 | Reviewed findings pertaining to Blueberry with the counsel and Committee chair. | 0.9 |

| | 8 | Participated in conference call with Committee and counsel to review the Blueberry acquisition | 1.4 |

Christina Whitney:

| 23-Jan | 8 | Reviewed Blueberry acquisition report and acquisition model, prepared questions and participated in conference call with Company | 4.5 |
| 30-Jan | 8 | Reviewed P&M report on Blueberry acquisition and updated report for edits | 1.6 |
| | 8 | Researched industry data on projected growth of masonry/paver market related to Blueberry acquisition | 1.2 |

Libby Hamilton:

| 23-Jan | 8 | Prepared for and participated in conference call with company related to Blueberry acquisition | 1.1 |
| | 8 | Analyzed company model related to Blueberry acquisition. | 1.2 |
| | 8 | Prepared draft of report related to Blueberry acquisition. | 0.8 |
| 24-Jan | 8 | Analyzed industry research data related to the Blueberry acquisition | 1.6 |
| | 8 | Continued to prepare draft of report related to Blueberry acquisition. | 3.8 |
| 25-Jan | 8 | Prepared for and participated in conference call regarding the Blueberry acquisition | 2.7 |
| 28-Jan | 8 | Continued to prepare draft of report related to Blueberry acquisition. | 7.1 |
| 29-Jan | 8 | Continued to prepare draft of report related to Blueberry acquisition. | 10.2 |
| 30-Jan | 8 | Continued to prepare draft of report related to Blueberry acquisition. | 5.6 |

| 31-Jan | 8 | Finalized draft of report related to Blueberry acquisition. | 0.8 |
| 1-Feb | 8 | Analyzed data provided by the Debtors and prepared talking Points in preparation for conference call related to Blueberry acquisition. | 6.9 |
| | 8 | Participated in conference call with company related to Blueberry acquisition. | 1.1 |
| 26-Feb | 8 | Updated Blueberry acquisition memo. | 2.5 |
| 27-Feb | 8 | Incorporated review comments in updated Blueberry acquisition memo. | 3.0 |

Matt Hakoun:

| 24-Jan | 8 | Gathered information on annual consumption of concrete, concrete products and forecasted growth within the industry for use in Blueberry acquisition analysis | 2.0 |
| 25-Jan | 8 | Received and reviewed U.S. forecast on cement products used in highways, residential and commercial construction for use in Blueberry acquisition analysis | 1.0 |

EXHIBIT B

Cunningham:

| | | | |
|---|---|---|---|
| 15-Mar | 12 | Analyzed managements' proposed changes to the employee retention plan. | 0.8 |
| 25-Mar | 12 | Prepared analysis of initial employee retention plan approved in 2001 compared to latest proposal. | 1.3 |
| | 17 | Participated in conference call with Blackstone regarding revised employee retention plan. | 0.8 |
| 26-Mar | 12 | Gathered information and analyzed employee retention plans at similar companies with asbestos liabilities. | 2.5 |
| 29-Mar | 17 | Discussed preliminary issues and findings regarding employee retention plan proposal with counsel. | 1.1 |

Walter Gilligan:

| | | | |
|---|---|---|---|
| 25-Mar | 12 | Analyzed Debtors' current employee retention plan and compared terms to proposed revisions. | 5.4 |
| 27-Mar | 12 | Continued analysis of Debtors' current employee retention plan and compared terms to proposed revisions. | 6.5 |
| 28-Mar | 12 | Read and analyzed employee retention plans cited in Blackstone presentation. | 3.5 |
| | 17 | Participated in conference call with Blackstone regarding the employee retention plan. | 0.9 |

EXHIBIT C

Sean Cunningham:

| 19-Mar | 12 | Prepared analysis of 2001 4th quarter and year-to-date results | 2.0 |
|---|---|---|---|
| 21-Mar | 12 | Continued to Prepare analysis of 2001 4th quarter and year-to-date results | 4.3 |
| 22-Mar | 12 | Continued to Prepare analysis of 2001 4th quarter and year-to-date results | 4.4 |

Libby Hamilton:

| 1-Mar | 12 | Prepared draft of report of 2001 4th quarter operating results | 5.6 |
|---|---|---|---|
| 4-Mar | 12 | Prepared 2001 4th quarter analytics. | 5.2 |
| 5-Mar | 12 | Prepared 2001 4th quarter analytics. | 9.0 |
| 6-Mar | 12 | Continued to prepare 2001 4th quarter analytics. | 8.9 |
| 7-Mar | 12 | Continued to prepare 2001 4th quarter analytics. | 3.3 |
| 8-Mar | 12 | Continued to prepare 2001 4th quarter analytics. | 1.4 |
| 14-Mar | 12 | Updated 4th quarter report. | 1.2 |
| 18-Mar | 12 | Updated 4th quarter report. | 3.1 |
| 19-Mar | 12 | Updated 4th quarter report. | 1.9 |
| 22-Mar | 12 | Reviewed revisions to 4th quarter report. | 1.1 |
| | 12 | Updated 4th quarter report. | 1.3 |

Christina Whitney:

| 19-Mar | 12 | Prepared draft of report on 4th quarter and full-year 2001 performance. | 7.8 |
|---|---|---|---|
| 20-Mar | 12 | Continued to prepare draft of report on 4th quarter and full-year 2001 performance. | 6.5 |

**FEE AUDITOR'S FINAL REPORT** - Page 19
Final report re FTIPM - Fourth Quarterly covering Jan - Mar 2002.wpd

| 21-Mar | 12 | Continued to prepare draft of report on 4th quarter and full-year 2001 performance. | 6.1 |
| 22-Mar | 12 | Updated the report on 4th quarter and full-year 2001 to reflect reviewer's comments. | 1.9 |
| 25-Mar | 12 | Updated the report on 4th quarter and full-year 2001 to reflect reviewer's comments. | 2.0 |
| 26-Mar | 12 | Updated the report on 4th quarter and full-year 2001 to reflect reviewer's comments. | 3.4 |
| 28-Mar | 12 | Updated the report on 4th quarter and full-year 2001 to reflect reviewer's comments. | 1.6 |

<u>Walter Gilligan</u>:

| 19-Mar | 12 | Prepared 2001 4th quarter operating plan analysis. | 2.0 |
| | 12 | Reviewed 4th quarter analysis with case manager. | 0.5 |
| 22-Mar | 12 | Reviewed and edited 4th quarter report. | 2.1 |
| 22-Mar | 12 | Reviewed and edited 4th quarter report. | 1.1 |