## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                         )          Chapter 11
                                               )
W. R. GRACE & CO., *et al.*,                   )          Case No. 01-01139  (27)
                                               )          (Jointly Administered)
                              Debtors.         )

## W.R. GRACE'S REPLY BRIEF ON PROCEDURES FOR LITIGATION OF THE COMMON PERSONAL INJURY LIABILITY ISSUES

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG
& JONES P.C.
Laura Davis Jones
Scotta E. McFarland
919 North Market Street
16th Floor
Wilmington, Delaware  19801
(302) 652-4100
(302) 652-4400 (fax)

*Co-Counsel for the Debtors and*
*Debtors in Possession*

Dated: August 21, 2002

## TABLE OF CONTENTS

I.     THE LEGAL ARCHITECTURE OF THE PI COMMITTEE'S PROPOSAL REDUCES TO THREE FUNDAMENTAL PROPOSITIONS THAT ARE CONTRARY TO THE PLAIN LANGUAGE OF THE CODE. ...................................2

     A.     The PI Committee's Proposition #1: "Estimation Is Mandatory," Presumes Liability From Earlier Settlements, and Strips Away Legal Defenses...................................................................................................3

     B.     The PI Committee's Proposition #2:  The Rules Of Evidence And Procedure Do Not Apply To Mass Tort Estimation. ...........................5

     C.     The PI Committee's Proposition #3:  Mass Tort Estimation Is A "Discretionary" Procedure With No Articulated Legal Rules. .........................6

II.    NOT CONTENT WITH A PROCEEDING UNCONSTRAINED BY THE CODE, THE PI COMMITTEE GOES FURTHER AND IMPROPERLY SEEKS TO RIG THE ESTIMATION BY ALLOWING ONLY ITS DATA AND ONLY ITS METHODOLOGY TO BE USED.....................................................7

     A.     The PI Committee Insists That Only Its Data Be Considered And Only Its Methodology Be Used. ...........................................................7

     B.     The PI Committee's Proposed One-Way Street Further Eviscerates The Law. ..................................................................................8

     C.     The Committee's Approach Also Blinks Away The Reality Of Asbestos Litigation Today................................................................10

           1.     The First Myth:  That Grace's Pre-Petition Settlements Are Admissions Of Actual Liability. .............................................10

           2.     The Second Myth:  Using Only Dr. Peterson's Method, An Expert Can Scientifically Ascertain Grace's Actual Liability In The Future. .......................................................................15

           3.     The Third Myth:  That Extrapolation Is The Only Legally Permissible Method For Estimation.......................................19

III.   GRACE'S PROPOSAL FOR MOVING THESE PROCEEDINGS FORWARD. ..................................................................................21

## Introduction

In parallel adversary proceedings now pending before this Court, the PI Committee strongly advocated and the Court adopted *in limine* an "actual liability standard" for determining Grace's solvency as of 1998. Yet, at the same time, in the bankruptcy case itself where the central issue **is** the definition of Grace's actual liability **today**, the PI Committee has advocated an approach which systematically avoids a determination of that liability, and would in fact preclude Grace from contesting liability altogether.

Let us begin, however, with the areas of agreement, because there are some. Specifically, there is no dispute but that:

- Grace's liability has to be defined in these cases;

- Grace's liability has to be defined through aggregative proceedings. Nobody is advocating trying the claims individually.

- Any aggregative proceedings will rely upon data concerning the pending, unresolved claims.

- Any aggregative proceeding will deploy some method for dealing with thousands of claims at once.

Beyond this common ground, the disagreements clearly are profound. Part I of this memorandum distills from the extensive briefing that has taken place over the past year the fundamental legal propositions that underlie the PI Committee's position. They are:

- Estimation is mandatory, assumes that prior settlements establish liability, and strips away Grace's legal defenses.

- The rules of evidence and procedure do not apply to the estimation;

- In fact, no legal rules constrain the estimation process, which is "discretionary."

These propositions are bold, without cited precedent, and so flawed that the short and dispositive refutations can be found in the plain language of the Bankruptcy Code.

In Part II, we show that the PI Committee does not stop with charting an off-the-road path for these cases, unconstrained by the Code. The Committee further advocates that a series of conventions be adopted that permits only its approach and forecloses all alternatives. In essence, the Committee's proposal is "our way is the only way" and the Court should exercise its discretion solely in favor of the Committee's outcome determinative estimation methods. Not only would adoption of this approach produce further Code violations and abrogate constitutional rights, but it would give credence to basic fictions about the asbestos litigation process that even the Committee's own expert does not support. To wit:

- First myth: That Grace's settlements are admissions of actual liability. The reality is that Grace was compelled to settle the claims because of their sheer volume, and that every objective assessment has found pervasive defects.

- Second myth: That the PI Committee's chosen method of extrapolation can scientifically ascertain Grace's actual liability in the future. The reality is that its method is not the product of science, but simply deploys statistics to express their judgments about future claims filing behavior, which is inherently a "behavioral" rather than a "hard" science.

- Third myth: That statistical extrapolation is "mandatory" here. The reality is that the Committee's "leading" authority, *Eagle-Picher*, did not even address the issue whether statistics can be imposed as a substitute for the adjudication of disputed liability issues. And the Code mandates that it cannot.

Finally, Part III proposes a different path for progressing these cases, one that allows both sides to pursue their preferred approaches, and defers a decision by this Court on which approach should ultimately be adopted until a fuller factual record is developed.

## I.   THE LEGAL ARCHITECTURE OF THE PI COMMITTEE'S PROPOSAL REDUCES TO THREE FUNDAMENTAL PROPOSITIONS THAT ARE CONTRARY TO THE PLAIN LANGUAGE OF THE CODE.

The purported legal foundation for the PI Committee's proposal may be distilled into three basic propositions: (1) estimation is "mandatory" and assumes away the PI Committee's duty to demonstrate Grace's liability, while at the same time stripping Grace of its legal defenses; (2) estimation is unconstrained by the federal rules of procedure and evidence; and (3)

in fact, mass tort estimation is a "discretionary" procedure with no articulated rules whatsoever. Each of these three legal predicates is fatally flawed.

A.    **The PI Committee's Proposition #1: "Estimation Is Mandatory," Presumes Liability From Earlier Settlements, and Strips Away Legal Defenses.**

First, the PI Committee contends that estimation is "mandatory" and contemplates no actual litigation of liability. (PI Comm. Br. at 5-6.) In fact, Grace's liability is presumed from earlier settlements. This presumption then is made irrebuttable by precluding Grace from asserting any legal defenses.

That the PI Committee can cite no Code provision or precedent to support this extreme proposition (*see id.* at 1) is unsurprising because the entire purpose of Chapter 11 is to decide and resolve the debtor's liabilities for disputed claims. The Bankruptcy Code specifically bars recovery for claims that are not enforceable. 11 U.S.C. § 502(b)(1). Moreover, the Code mandates that any plan of reorganization must be "fair and equitable" and that, consequently, no class of claimants "may be paid more than in full," 7 COLLIER ON BANKRUPTCY ¶ 1129.04[4][a], at 1129-90 (15th ed. 1999).

In implementing these principles, the Code requires a detailed claims objection process to ensure that only valid claims receive compensation. First, individuals asserting a claim are required to submit a proof of claim. 11 U.S.C. § 501(a). The debtor is then afforded the opportunity to make objections to any asserted claims. *Id.* § 502(a). Where there is any dispute concerning the validity of a claim, that dispute must be resolved. Pursuant to Section 502, "the court, after notice and a hearing, shall determine the amount of such claim." *Id.* § 502(b). However, the court must not allow any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." *Id.* § 502(b)(1).

Under the plain language of the Bankruptcy Code, these procedures must be employed to eliminate claims for which the debtor is not liable. *See, e.g., In re G.I. Indus. Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000) ("[a] claim cannot be allowed [under section 502(b)(1)] if it is unenforceable under nonbankruptcy law."); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) ("a claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy."); *In re Buchholz*, 224 B.R. 13, 19 (Bankr. D.N.J. 1998) (disallowing claim that was "defective under both Federal and New Jersey State law"); *Matter of Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981) ("If . . . the claim falls within one of the paragraphs of § 502(b), it is simply not allowable. . . . To the extent that applicable law, including state law, provides the debtor a defense to the claim of a creditor, absent bankruptcy, such defense is available . . . in objecting to the claim."). Yet, under the PI Committee's' proposal the entire claims objection process would be read out of the Code.

Moreover, not only does the Code contemplate objections to the validity of claims, it expressly reserves the debtor's right to assert any and all defenses: "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses." 11 U.S.C. § 558. Thus, the PI Committee's attempt to strip away Grace's legal defenses directly contradicts the Code.

The abrogation of the debtor's right to assert any defenses would violate not only the Code, but also the Constitution. As the Third Circuit has recognized, "[i]f parties were barred from presenting defenses and affirmative defenses to claims which have been filed against them, they would not only be unconstitutionally deprived of their opportunity to be heard, but they would invariably lose on the merits of the claims brought against them. Such a serious

deprivation of property without due process of law *cannot be countenanced in our constitutional system.*" *National Union Fire Ins. Co. of Pittsburgh, Pa. v. City Savings, F.S.B.*, 28 F.3d 376, 394 (3d Cir. 1994) (emphasis added).

Any right to estimation cannot be interpreted to wipe away these basic rights and procedures guaranteed by the Code and the Constitution. Actual estimations conducted under the Code reflect that while estimation does streamline the adjudicatory process, that process does remain an adjudication. In fact, the PI Committee acknowledges the debtor's right to "obtain summary judgment on the validity of a given claim" (PI Comm. Br. at 30), making clear that their assertions to the contrary are without merit.[1]

### B.    The PI Committee's Proposition #2:  The Rules Of Evidence And Procedure Do Not Apply To Mass Tort Estimation.

The PI Committee further presupposes that the Federal Rules of Evidence and Procedure do not apply. Specifically, the Committee assumes that Rule 702's requirement that proffered scientific evidence be reliable and Rule 408's prohibition against the use of settlement data can be discarded. For example, it derides application of Federal Rule 702 and the Supreme Court's ruling in *Daubert* to exclude unreliable scientific evidence as creating "federal common law." (PI Comm. Br. at 20, 38-39.)  Similarly, the PI Committee asserts that somehow "prior

---

[1] Moreover, while the PI Committee maintains that Grace has no right to defend itself, at the same time it asserts that it has a right to full adjudication of its claims including "full discovery" (*id.* at 31) followed by "trials by jury to which they are entitled under the Seventh Amendment." (PI Comm. Br. at 2, 25 n.7.)  In sum, the PI Committee cites no authority saying that a debtor over its objection may be barred from challenging claims as invalid or asserting any defenses to liability. Indeed, as noted above, such contentions are flatly inconsistent with the express provisions of the Code.

settlements" may be used "as a component of estimation in bankruptcy cases," despite the flat prohibition against the admission of such evidence under Rule 408.[2]  (*Id.* at 20-21.)

The PI Committee's position, however, is flatly contrary to the language of the Bankruptcy Code. Bankruptcy Rule 9017 plainly states that the "Federal Rules of Evidence . . . apply in cases under the Code." Fed. R. Bankr. P. 9017. Similarly, Bankruptcy Rule 9014 makes plain that the rules governing adversary proceedings in Part VII of the Code apply in "contested matters" such as estimation. And Part VII of the Code largely incorporates the Federal Rules of Civil Procedure. *See* Fed. R. Bankr. P. 7001-87. Accordingly, the PI Committee's suggestion that the federal rules do not apply in these proceedings blinks away the Code itself.

## C.   The PI Committee's Proposition #3:   Mass Tort Estimation Is A "Discretionary" Procedure With No Articulated Legal Rules.

---

[2] The PI Committee mischaracterizes the law governing the admissibility of settlement information under Rule 408. The plain language of the Rule states that evidence regarding settlement "is *not admissible* to *prove liability* for or invalidity of the claim *or its amount.*" Fed. R. Evid. 408 (emphasis added). *See also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1247 (3d Cir.) (same), *cert. denied*, 510 U.S. 994 (1993). Yet, the PI Committee asserts just the opposite: that "information about the number of Grace's past tort claims and the cost of it's past tort settlements . . is unquestionably admissible under Rule 408." (PI Comm. Br. at 20.) This, despite its acknowledgment that settlement information cannot be admitted "'to prove the validity or invalidity of the claim.'" (PI Comm Br. at 20.) Indeed, even *Weinstein's Evidence*, which the Committee mischaracterizes, states that "Rule 408 codifies the long-standing axiom in federal courts that compromises proposed or accepted are not evidence of an admission of the validity or invalidity of the claim *or the amount of damage.*" 2 WEINSTEIN'S EVIDENCE § 408.03[1] (2d ed. 2002) (emphasis added). As Judge Weinstein explains: "Rule 408 codifies the general practice of the federal courts in making compromise agreements inadmissible in such circumstances as proof of liability for, or invalidity of, the claim or its amount. Settlements have always been looked on with favor, and courts have deemed it against public policy to subject a person who has compromised a claim to the hazard of having a settlement proved in a subsequent lawsuit by another person asserting a cause of action arising out of the same transaction. Even if the *fact of settlement* is admissible for a purpose other than proof of liability, *disclosure of the settlement amount may constitute reversible error.*" *Id.* 408.04 (emphasis added). As the rule makes plain, settlement data cannot be used to (1) prove *liability* for or (2) the *amount* of any claim--two essential elements that the PI Committee must demonstrate here.

Finally, not content to point out that "absolute certainty is impossible" (PI Comm. Br. At 6) and accordingly, estimation need "not necessarily be precise" (*id.* at 24), the PI Committee suggests that estimation is an entirely "discretion[ary]" procedure with no articulated legal rules. (PI Comm. Br. at 6.)

The PI Committee cites no precedent for this assertion. Not only does the Code provide otherwise, but the case law shows that estimation is a streamlined adjudication to determine the merits of asserted claims. In conducting an estimation, "[t]he court is of course bound by 'the legal rules which may govern the ultimate value of the claim;'" *In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995). *See also In re O.P.M. Leasing Serv., Inc.*, 79 B.R. 161, 166 (S.D.N.Y. 1987) (same); *In re Aspen Limousine Service, Inc.*, 193 B.R. 325, 337 (D. Color. 1996) (in conducting estimation, "the court is bound by the legal rules governing the ultimate value of the claim"). Yet, the Committee seeks to use procedures that wholly disregard the merits of the underlying claims.

## II. NOT CONTENT WITH A PROCEEDING UNCONSTRAINED BY THE CODE, THE PI COMMITTEE GOES FURTHER AND IMPROPERLY SEEKS TO RIG THE ESTIMATION BY ALLOWING ONLY ITS DATA AND ONLY ITS METHODOLOGY TO BE USED.

Ironically, while the PI Committee maintains that there are no restrictions governing estimation, it at the same time advocates a position that would, in essence, have this Court exercise its discretionary flexibility in only one direction—one that cuts off Grace's fundamental right to present any competing method for defining liability.

### A. The PI Committee Insists That Only Its Data Be Considered And Only Its Methodology Be Used.

The one-way street that the PI Committee proposes could not be more plain. Whether it is data or methodology, there is only one way and it's the Committee's way. For example, it asserts that claims must be estimated based on a "known data set, namely, Grace's claims

resolution history"—which just happens to be the data set that the PI Committee plans to use. (PI Comm. Br. 7.)  Similarly, it asserts that estimation can only be done through a statistical extrapolation 40 years into the future based on past claims settlement data—again, the very methodology that the Committee proposes.  (*Id.* at 8.)

Discovery by Grace relating to *current* claimants, seeking information relating to *Grace's* legal **defenses**?  Not allowed.

Aggregative litigation using any methodology different from the PI Committee's?  Not allowed.

A true trial of liability, with **two** sides to the issue?  Far from it, the PI Committee urges upon the Court that such a trial cannot be.

According to the PI Committee, its one-way proposal "will not be unfair."  (*Id.* at 13.) Yet, plaintiffs cite no authority, no case law, and no provision in the Bankruptcy Code that says that only the PI Committee's data and only the PI Committee's methodology can be used.

### B.    The PI Committee's Proposed One-Way Street Further Eviscerates The Law.

Indeed, to do so nullifies Grace's fundamental rights under both the Code and the Constitution.  As the PI Committee acknowledges, estimation proceedings are conducted as "contested matters" under Bankruptcy Rule 9014, under which "the fundamental requisites of due process must be afforded to all parties in a dispute."  (PI Comm. Br. at 31 (quoting 10 COLLIER ON BANKRUPTCY ¶ 9014.05, at 9014-5 (15th ed. 1999)).  Yet, the Committee's proposal is designed for only one purpose:  to deprive Grace of these fundamental rights.

First, as the PI Committee insists for **itself**, the parties have a right to "full discovery" under the Code.  (PI Comm. Br. at 31.)  Indeed, it is a "fundamental maxim of discovery that '[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper

litigation.'" *Societe Nationale Industrielle Aerospatiale v. United States District Court*, 482 U.S. 522, 540 n.25 (1987). "Discovery, in other words, is not a one-way proposition." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Yet, despite these established principles, that is exactly what the Committee proposes. At the same time it seeks to use claims settlement data obtained from Grace, it asks the Court to bar Grace from obtaining any reciprocal discovery at all.

Second, parties have a right to fully participate in contested proceedings under the Code. Indeed, the PI Committee admits that "Rule 9014 mandates that 'reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.'" (PI. Comm. Br. at 31.) Yet, the Committee seeks to block Grace from fully participating in these proceedings by precluding Grace from using any methodology that is different from the one that the PI Committee proposes or obtaining any data different from that which it wants to use.

Third, the parties have a right to provide contrary expert testimony and to cross-examine other parties' experts on the basis of facts obtained in discovery. Yet, the PI Committee seeks to block Grace from obtaining information necessary for cross-examination of its experts and for Grace's affirmative expert testimony.

Finally, as noted above, pursuant to Bankruptcy Rule 9017, the Federal Rules of Evidence control in proceedings under the Bankruptcy Code. Fed. R. Bankr. P. 9017. Yet, the PI Committee seeks to discard these evidentiary rules in their entirety by basing its analysis on inadmissible settlement data, while at the same time barring Grace from invoking Rule 702 to exclude scientific evidence that is demonstrably unreliable.

C.   **The Committee's Approach Also Blinks Away The Reality Of Asbestos Litigation Today.**

The PI Committee's argument that this Court must estimate Grace's liability based upon pre-petition settlements and must use the Committee's preferred estimation method in doing so, rests on fundamental misapprehensions of the nature of asbestos litigation today.

1.   **The First Myth:  That Grace's Pre-Petition Settlements Are Admissions Of Actual Liability.**

The Committee argues that "glaringly absent from the papers filed by Grace" is an affidavit from one of Grace's attorneys verifying that Grace was "compelled to agree to so-called inventory settlements because the tort system offered no means of limiting settlements to valid claims." (PI Comm. Br. at 12.)  As a result, the Committee asserts, the Court need not tarry on a determination of actual liability, because the settlements are a binding admission and no further evidence is necessary.  This contention was stridently advanced in the *Babcock* case, only to be refuted by the Committee's own evidence.  It has met the same fate here.  And it must:  The central problem of asbestos litigation today is that bogus claims are being presented *en masse* and are being paid because there is no choice.  Even plaintiff experts are now acknowledging that the problem must be solved.  Yet ironically, it is plaintiff's counsel who are the last to defend a broken system, and alone argue that even the proceeding of last resort -- Chapter 11 -- can only be used to perpetuate the problems that have been decried by the nation's highest court.

We have litigated this all before.  Mr. Inselbuch argued in his opening statement in the *Babcock* solvency trial that B&W's claims processor, David McKnight, settled cases only after determining they "satisfied Babcock & Wilcox's criteria of demonstrating an asbestos-related injury, diagnosed by a doctor, and exposure to asbestos at a site with Babcock & Wilcox product there, making the nexus between the two.  And, if those two things were shown in broad outline,

then the case would be settled and paid." (Ex. A, 10/22/01 Tr. at 11-12.) But as soon as the

Committee called Mr. McKnight as its first witness, reality intruded. Mr. McKnight testified:

- B&W settled cases not because it was legally liable, but because it had no choice. As a result, B&W was "not really interested in all kinds of technical questions about. . . legal liability. . . ." (Ex. B, 10/22 Tr. 71-72, 147-48)

- Settlement was the only option in a tort system that had degenerated into "social engineering" not "real litigation," where the plaintiffs' firms "held the cards." (*Id.* at 67-69; 147-48)

- Throughout the settlement process, B&W's actual liability for asbestos personal injury claims "was doubtful and in dispute." (*Id.* at 146)

History repeats itself. In this case, just a week before it filed its July 22nd brief, the

Committee's counsel took the deposition of Grace's senior counsel responsible for asbestos

personal injury claims, Jay Hughes. In that deposition, Mr. Hughes testified that the sheer

volume of the claims against Grace in the mid- to later-1990s forced the company to settle the

claims on a mass scale even though it knew most were of doubtful validity.

> Leaving, aside the quality, **the sheer volume of the cases and the resources available in the courts and the resources available to the company to defend the cases made an individual trial of the cases impossible**. . . . In a situation where there's hundreds of thousands of cases being filed . . . . even though we knew and were well aware that there were significant problems with the credibility of most of this evidence and, but for the problems associated with the volumes of the cases, the money associated with the cases, that **these cases probably were not legitimate claims against Grace,** we were **forced to pay them**.

(Ex. C, 7/19/02 Hughes Dep. at 48-49 (emphasis added)).

The experts cannot alter these basic facts. Indeed, the September 9, 2001 affidavit

submitted by PI Committee's expert Dr. Mark Peterson specifically confirms that plaintiff

lawyers routinely have sued first, and ask questions about the merits of their claim later, if at all.

Peterson testified that he arranged for a sample survey to be conducted of the information *in the*

*plaintiff attorneys' own files* relating to the pre-petition claims against Grace. Peterson found:

- Information indicating the claimant had actually been exposed to Grace's products was found in only 5 of the 24 sample claims. *"Overall, no [product identification] information was available for 79 percent of claims."* (9/9/01 Peterson Aff. ¶ 34 (emphasis added))

- Peterson was not surprised by the absence of evidence implicating Grace's products: "This result is expected. In asbestos litigation, *few plaintiffs know comprehensively the specific asbestos products to which they were exposed* and few files contain such information." (*Id.*)

- Peterson confirmed that *information showing an actual asbestos-related injury* (much less an injury attributable to Grace's products) *was even more lacking*: "Medical information required by the Debtors' proof of claim is even less likely to be available to claimants." Peterson's survey of the plaintiff attorneys' own claim files showed that only one-third of the files contained the requested information about diagnosing physicians, less than half had all of the requested medical reports, only half had x-rays, and "only half [of the plaintiff attorneys] thought they could provide required information about doctors who identified alternative or non-asbestos causes." (*Id.* ¶ 36)

In light of Peterson's own survey of the claimant attorneys' own files, there can be no dispute that these claims were brought against Grace without any investigation of Grace's actual liability. Since inventory settlements by their nature never force plaintiffs to submit real evidence to prove their claims, the PI Committee can offer no evidence to support Peterson's assumption that "this missing information is simply a matter of timing . . ." (*Id.* at 19.)

Grace's own expert analysis has confirmed the depths of the problem. As detailed in Grace's February 12, 2002 CMO reply brief to this Court, Grace retained Dr. Daniel Rourke to perform a statistical study of 1,000 randomly selected pre-petition claims (500 each filed in 1997 and 2000). (*See* 11/12/01 Rourke Decl. (attached as Ex. D)). For each of the sample claims, Dr. Rourke used the Grace claims files as well as the CCR and *Johns Manville* claims databases to compile as much information as possible about the occupational and medical histories of each claimant. His findings show the vast majority of the pre-petition claims are highly suspect:

- More than 30% of the year 2000 claims present so little information that a medical condition cannot even be determined.

- Less than 6% of the year 2000 claims and 7% of the year 1997 claims involved actual malignancy. (*See* Ex. E.)

- Only 3.3% of the year 2000 non-malignant claims and 2.8% of the year 1997 non-malignant claims contain diagnostic data showing even mild impairment. (*See* Ex. F.)

- Half of the claims (47% of the year 1997 claims and 52% of the year 2000 claims) reflect no exposure information at all.

- Only 12% of the year 2000 claims were filed by workers in the construction industry, which Grace supplied. (*See* Ex. G.)

These findings are consistent with other reports and testimony by **plaintiffs'** lawyers and

**plaintiffs'** experts concerning the indiscriminate solicitation and filing of claims on behalf of

unimpaired persons:

- Dr. David Egilman of Brown University, an expert witness frequently retained by asbestos plaintiff lawyers, wrote in the August 2002 issue of the *American Journal of Industrial Medicine* that many of the claims referred to him by plaintiffs in the past two years were for "individuals [that] could not (due to inadequate latency or exposure) and did not manifest any evidence of asbestos-related disease. Most of the cases are generated by 'screenings' which plaintiff lawyers have sponsored the past several years to attract new asbestos clients for lawsuits. These 'screenings' raise medical and larger political and social issues." (*See* Ex. H, attached hereto.)

- According to a July 23, 2002 letter from Steven Kazan to Judge Jack Weinstein, who presided over the *Johns Manville* bankruptcy, 90% of the Manville Trust's last 200,000 claims originated from attorney-sponsored x-ray screening programs; 91% of all claims against that Trust allege only non-malignant asbestos "disease," and those cases currently receive 76% of all Manville Trust payouts. (*See* Ex. I, attached hereto.)

- Judge Weinstein and Bankruptcy Judge Lifland found in a November 7, 2001 Order in the *Findley v. Trustees of the Manville Settlement Trust* case that "[t]he courts take judicial notice of the continuing media and other campaigns encouraging a flood of new claims. This combination of events, together with the increasing number of bankruptcy filings by asbestos related entities, suggests that there may be a misallocation of available funds, inequitably favoring those who are less needy over those with more pressing asbestos related injuries." (*See* Ex. J, attached hereto.)

Can the PI Committee use settlement data to at least identify a sub-population of the pre-

petition claims that do meet the basic requirements for proving liability? The answer is no. The

PI Committee's counsel used Dr. Peterson as its valuation expert in the *Babcock & Wilcox* case.

In his testimony, Dr. Peterson admitted that his methodology does not and cannot determine the most basic elements of liability: (1) the population actually exposed to a specific defendant's products; (2) the dose received by this population from the defendant's products; and (3) whether this dose caused disease. (10/23/01 Hearing Tr. at 115-18 (attached as Ex. K)). In a naked effort to change the rules, the Committee disregards these basic elements of liability as unimportant. Settlements made in a flawed system are deemed sufficient to establish liability.

Finally, the Committee seeks to justify its reliance on pre-petition settlements by arguing that a projection based on what it calls Grace's "judgment history" would "produce a much **higher** aggregate liability." (PI Comm. Br. at 13) First, the Committee does not assert that the 80 cases Grace tried to judgment were in any way representative. As Jay Hughes testified in his recent deposition, "the cases that we tried are in no way, in any way, shape or form representative of the vast majority of the asbestos cases that were pending in America at the time of these trials." (*See* Ex. C at 50)). Second, despite the fact that most of the 80 cases tried to verdict were hand-picked by the plaintiffs, Grace was found to have no liability in 54 of the cases, or 67% of the total. Third, in projecting liability from the adverse trial verdicts, Peterson ignores the approximately **1,590 pretrial judgments** that Grace won. (*See* Ex. L.) Those dismissals and summary judgments should count equally in Grace's "judgment history." Including them with the 80 trial verdicts raises Grace's winning percentage in cases litigated to judgment to 98.4%. (This figure may understates Grace's success rate, because Grace's claims database probably does not capture all pre-trial dismissals.) This litigation success rate thus confirms Jay Hughes' testimony that Grace settled almost all of its cases not because of their merit, but rather because of their sheer volume. As Mr. Hughes testified, Grace was forced to settle these cases **despite** the fact that "at least 80 to 90 percent of the cases that were pending at

the time would have been difficult [for the plaintiffs] to present any kind of testimony even to meet a bare-bones standard if they were allowed to proceed to trial." (Ex. C at 50-51.)

    **2.**    **The Second Myth:  Using Only Dr. Peterson's Method, An Expert Can Scientifically Ascertain Grace's Actual Liability In The Future.**

Not only does the Committee's estimation proposal require exclusive reliance upon flawed settlement data, it compounds the problem by statistically extrapolating decades of future flawed settlements and calling it legal liability.   Other methods of determining aggregate liability, such as those provided by the rules of procedure, are discarded as unrealistic.   As an attempt to sugar-coat this bitter pill, the Committee presents its methodology as being driven solely by science and epidemiology.   It is not.

First, there is no dispute that most of Grace's estimated future liability is for claims that do not even exist today, and therefore do not constitute any actual liability today.   This is clearest in the case of malignancy claims, which are prosecuted shortly after diagnosis, and for which most diagnoses are not projected to be made for **many** years.   Therefore, what is being projected is not an actual claim, but a future claim.

Second, and most importantly, because there is no defined population of people who are known to have been significantly exposed to Grace's asbestos products, there is no scientific method for predicting how many **will get sick as a result of Grace's products**.   As Peterson admitted, for example, "you cannot actually estimate the total number of incidences of cancer **from B&W's asbestos, no.**"   (Ex. M, 10/23/01 Tr. at 118 (emphasis added); *see also* Ex. K at 80-84).

Third, as a result, what is being predicted by the Committee's method is not the incidence of disease actually caused by exposure to Grace's asbestos, but rather the number of people who will assert claims against Grace.   For that reason, Peterson admits that his method for estimating

future claims "is not an epidemiological study.  It's not the kind of subject matter that epidemiology investigates.  It [epidemiology] does not deal with legal claims."  (*Id.* at 134.)  Instead, Peterson admitted in *Babcock* that "I'm essentially projecting future claims based upon the past experience of B&W in this period of time in the 1990s, and I'm valuing them based upon how B&W valued them in the past." (*Id.* at 126.)  In essence, the Committee's method for estimating future claims leverages off a defendant's settlement history every bit as much as its method for estimating the current liability.  Peterson referred to this as "the behavioral science of claiming," and admitted it was not a "hard science." (*Id.* at 59-60)

Contrary to the Committee's representations, the two key drivers in its methodology are not the product of "statistics" either, but are rather nothing more than after-the-fact judgments.  The first of these drivers, the "propensity to sue," is simply the arithmetic ratio of the number of people who make a claim against Grace for a certain asbestos-related disease and the total number of people in the United States who have that asbestos-related disease.  For example, for malignant claims it would be the ratio of the number of people who filed cancer claims against a defendant divided by the total amount of asbestos-related cancer in the United States. (*See* Ex. K at 66-67; *see also*, 10/24/01 *Babcock & Wilcox* Hearing Transcript (Ex. N) at 15.)  Dr. Peterson conceded during his *B&W* hearing not only that he does not know whether claimants actually have the disease (much less that it was caused by Grace), but also that non-epidemiological factors such as the legal environment, the potential claimant's knowledge of claiming options, and changing payment levels, all play a big role in determining the propensity to sue.  Moreover, Peterson admitted that he has never conducted a statistical study of the non-epidemiological factors that determine the propensity-to-sue ratio. (*See* Ex. K at 70, 73-74; *see also* Ex. N. at 19-20.)  Lacking any objective method for projecting, for example, how many people who contract

lung cancer in the future will file claims against Grace, Dr. Peterson and others fall back on their "expectations." (*Id.*)

For non-malignant claims, plaintiffs' experts rely even more upon judgment, because there are no epidemiological or scientific studies of the incidence of non-malignant asbestos-related diseases. (*See* Ex. K. at 93-95.) Because of this, plaintiffs cannot determine a "propensity-to-sue" ratio for those claims. (Ex. K at 94-95, 105.) Instead, their experts simply assume that future non-malignant claims will maintain a fixed relationship to their estimate of the malignant claims that will be filed against the company in the future. (*See* PI Comm. Br. at 9; Ex. K at 86-97.) This method of predicting future non-malignant claims is judgment to the second power:  it relies upon a judgment (the non-malignant claim to malignant claim ratio) based on another judgment (the "propensity-to-sue" estimate used to predict the future malignant claims). For example, in the *Babcock &Wilcox* case, Dr. Peterson simply assumed that the ratio of non-malignant to malignant claims would remain constant for decades into the future, despite the fact that this ratio has fluctuated greatly in the past and has varied widely from state to state. (Ex. K at 74, 98-101, 107; *B&W* Ex. 5131 (Exs. 6094a-c, 6095a), attached hereto as Ex. O.) When asked whether this double estimate had ever been the subject of a scientific study, Dr. Peterson testified:  "There has been no scholarly studies [sic] of the non-malignant ratio.  Of course not." (Ex. K at 105.) As Peterson admitted, the compounding effect of these multiple non-epidemiological judgments precludes "meaningful studies":  "[Y]ou cannot do meaningful studies, because these [non-epidemiological factors] are compounded in the real world and their effects cannot be disaggregated." (*Id.* at 85-86)

In sum, because the Committee's methodology for predicting future claims against Grace is not the **product** of science or statistics, but is simply the **deployment** of statistics in service of

**judgments**, there is no basis for imposing that methodology as dispositive of any aspect of Grace's legal liability.

How "scientific" estimation is as a predictor of claims behavior can be further shown by reference to the 2000-2001 claims spike. As detailed in Grace's February 12, 2002 CMO reply brief, Grace's claims database allows for the identification of the specific plaintiff law firms that were responsible for the year 2000 claims spike that drove Grace into bankruptcy. While the rest of the plaintiffs' bar was filing claims against Grace in 2000 at about the same rate as in 1999, a mere 17 law firms somehow generated 22,550 more claims in 2000 than they had in 1999, raising their collective annual share of the claims from 11.8% to more than 53%. (*See* 2/12/02 Grace CMO Reply Brf. Table at 9.)

The PI Committee has yet to offer any explanation for how science or medicine accounts for a spike that 17 law firms created all on their own.

And neither Dr. Peterson nor any other asbestos claims "expert" predicted the spike before the fact. As Dr. Fred Dunbar noted in his *Babcock & Wilcox* testimony, "the share prices of the companies that were reporting asbestos liabilities diverged from the share prices of other companies, non-asbestos companies, *after* 1998. What this means is that prior to that divergence, very well informed people in the market place were not expecting the decline in the fortunes of the asbestos firms that actually occurred." (Ex. P, 10/29/01 Tr. at 75-76).

Dr. Peterson's September 9, 2001 affidavit in this case attributed the 2000 claims spike entirely to bad "publicity" about Grace's Libby mine:   "This increase resulted from unprecedented unfavorable publicity in 2000 regarding its vermiculite business and mine in Libby, Montana." (9/9/01 Peterson Aff. ¶ 23.) Noting that such "spikes . . . [are] often followed by comparably sharp declines in claims," Peterson's affidavit does not attribute any long-term

significance to the spike.  (*Id.*)  If the PI Committee's "estimation" proposal were really based on an assumption that the 2000 claims level was a "one to two year spike[]" (*id.*) and that Grace's claims would revert back to their pre-1999 downward trend, a negotiated resolution of these cases would be at hand.  But that is obviously not the PI Committee's position.  Which again raises the question, how can it seek to "estimate" Grace's liability based on claiming behavior it can neither explain nor justify?

Nor was the spike limited to Grace (*see* Exs. Q and R) for the similar Manville Trust and other non-CCR defendant spikes).  Indeed, it was the spike that accounts for the rash of asbestosis bankruptcies in the past two years.  This Court's docket may in fact be the best evidence that the spike was not limited to Grace.

3.    **The Third Myth:    That Extrapolation Is The Only Legally Permissible Method For Estimation.**

Statistical extrapolation cannot be used to avoid the bedrock requirement of the Code that only valid claims can be paid, and therefore only valid claims need be provided for in a post-confirmation trust.  Where, as here, liability is disputed, there must be a liability determination before statistics can take over.

While it is true that extrapolations of the type advocated by the PI Committee have been used to estimate the size of settlement trusts in other asbestos bankruptcies, it had always been with the consent of the debtors.  Such precedents do not support the mandatory imposition of such methods over the objection of the debtors.

The Committee mislabels *Eagle-Picher* as the "leading case" supporting the mandatory imposition of its approach in this case, when in fact there are no other cases that "follow" it. *In re Eagle-Picher Indus., Inc.,* 189 B.R. 681 (Bankr. S.D. Ohio 1995) (PI Comm. Br. at 9-10)  In fact, *Eagle-Picher* does not even support their position.  In that case, the debtors had already

negotiated an agreement on the plan of reorganization with the current asbestos claimants committee and the future claimants representative. 189 B.R. at 682. These proponents of the reorganization plan had also negotiated the size of the settlement trust, but agreed that the court should have full discretion to modify that figure after conducting an estimation hearing in which experts from the unsecured creditors and the equity committee could also submit their expert testimony on the estimation. *Id.* In short, the estimation was consensual, not mandatory.

Equally important, the debtors' agreement in *Eagle-Picher* to determine the trust size based on a final estimation hearing was made after the court had set a claims bar date, the bar date had passed, and the parties and their experts had been given an opportunity to evaluate the submitted claims. *Id. Eagle-Picher* thus in no way supports the Committee's argument that this Court must proceed directly to estimation without setting a bar date and allowing Grace to assert defenses to the filed claims.

And to reiterate, *Eagle-Picher* never addressed the central contention made here, that statistics can substitute for the adjudication of disputed liability issues. By contrast, the court's careful analysis in *In re Dow Corning Corp,* directly addressed that issue. 211 B.R. 545 (Bankr. E.D. Mich. 1997).

First, the court ruled that estimation is mandatory **only** in exceptional cases where "undue" delay would otherwise result:

> From the plain language of § 502(c), it is clear that estimation **does not become mandatory merely because liquidation may take longer** and thereby delay administration of the case. Liquidation of a claim, in fact, will almost always be more time consuming than estimation. **Nonetheless, bankruptcy law's general rule is to liquidate, not to estimate**.

211 B.R. at 562 (emphasis added).

Second, the court concluded that litigation of the tort claims would ultimately be required, whether before or after plan confirmation:

> Nonetheless, post-confirmation liquidation of tort claims cannot be avoided. Whether liquidation occurs through a common-issue trial, through individual trials, through a series of representative trials with the results being extrapolated to the tort claim as a whole or through some other acceptable means, **liquidation must occur. And regardless of the form that it takes, the liquidation process would be time-consuming**.

*Id.* at 566 (emphasis added)

Third, the court ruled that "a strong argument can be made that estimating the aggregate value of tort claims for plan purposes runs roughshod over personal injury claimants' rights." *Id.* at 569.

Finally, the court emphasized that the serious differences between the parties' competing estimation proposals, and the substantial delays and potential appeals that would be required to complete any estimation, further undercut any argument that "undue delay" would result from litigating liability issues through the claims process. *Id.* at 562-564.

All of these considerations apply with equal force here. The Committee's contention that *Dow Corning* is inapplicable because it did not involve asbestos is unpersuasive. The right to litigate liability defenses is no less fundamental in asbestos bankruptcies.

## III.   GRACE'S PROPOSAL FOR MOVING THESE PROCEEDINGS FORWARD.

Notwithstanding the profound differences between the parties in these proceedings, Grace believes that there is a way to move forward and at the same time give the Court the benefit of a fuller record before it commits to one path for determining Grace's liability. Grace proposes that the parties proceed on parallel paths and present evidence in regard to the current claims. Specifically, the following steps could be taken to develop the record upon which the Court may base its decision:

- **Step 1**: Both sides will gather the relevant facts. The PI Committee can collect and analyze past claims settlement data while Grace will collect data from the current claimants using its proof of claim form.

- **Step 2**: Following their respective methodologies, the parties will frame for the Court the proper determination of liability.

- **Step 3**: The Court can hold a hearing and resolve issues regarding estimation, adjudication, certification of issues on appeal, or a combination of the foregoing.

By proceeding with discovery before making any final determinations, the Court will ensure that its decisions are fully informed. Moreover, this is the standard practice both inside and outside of Chapter 11—a process that the PI Committee seeks to short-circuit with its demand that only its data and only its methodology may receive any hearing.

Dated: August 21, 2002

Respectfully submitted,

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones
Scotta E. McFarland (Bar No. 4184)
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in Possession