# EXHIBIT B

```
                    UNITED STATES BANKRUPTCY COURT

                     EASTERN DISTRICT OF LOUISIANA

                              NEW ORLEANS


    * * * * * * * * * * * * * * * *
                                   *    CASE NO. 00-10992
    IN THE MATTER OF:              *    through  00-10995
                                   *    (Jointly Administered)
    THE BABCOCK & WILCOX CO., ET AL,*
                                   *    SECTION "B"
         DEBTORS.                  *
                                   *    CHAPTER 11
    * * * * * * * * * * * * * * * *
                                   *    ADVERSARY NO. 01-1155
    THE ASBESTOS CLAIMANTS'        *
    COMMITTEE, ET AL,              *
                                   *
         PLAINTIFF-INTERVENORS,    *
                                   *
    VERSUS                         *
                                   *
    BABCOCK & WILCOX INVESTMENT    *
    COMPANY, ET AL,                *
                                   *
         DEFENDANTS.               *
                                   *
    * * * * * * * * * * * * * * * *
```

MORNING SESSION

Transcript of the proceedings taken in the above-captioned matter on **Monday, October 22, 2001**, the Honorable Jerry A. Brown, United States Bankruptcy Judge, presiding.

AUDIO OPERATOR:    Demond Smith

TRANSCRIPTIONIST:  Dorothy Bourgeois

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

FILED 2001 OCT 23 P 1:07 CLERK UNITED STATES BANKRUPTCY COURT

```
 1   APPEARANCES:

 2
          Baldwin & Haspel, L.L.C.
 3        By:  Dennis M. LaBorde, Esquire
          By:  Monica T. Surprenant, Esquire
 4        1100 Poydras Street, Suite 2200
          New Orleans, Louisiana 70163-2200
 5
          and
 6
          Caplin & Drysdale
 7        By:  Nathan D. Finch, Esquire
          By:  Walter B. Sloccombe, Esquire
 8        One Thomas Circle, NW
          Suite 1100
 9        Washington, D.C. 20005

10        and

11        Caplin & Drysdale
          By:  Elihu Inselbuch, Esquire
12        399 Park Avenue
          New York, New York 10022
13
              Representing the Asbestos Claimants' Committee
14

15        Steffes & MacMurdo, LLP
          By:  William E. Steffes, Esquire
16        201 St. Charles Street
          Baton Rouge, Louisiana 70802
17
          and
18
          Blakeley & Blakeley
19        By:  Bradley D. Blakeley, Esquire
          230 Main Street, Suite 540
20        Irvine, California 92614

21            Representing the Unsecured Creditors Committee

22
          Law Office of Elizabeth Wall Magner
23        By:  Elizabeth Wall Magner, Esquire
          228 St. Charles Avenue, Suite 1110
24        New Orleans, Louisiana 70130

25            Representing the Unofficial Asbestos Committee
```

3

```
 1   APPEARANCES (Cont'd.):

 2        Young, Conaway, Stargett & Taylor, LLP
          By:  James L. Patton, Jr., Esquire
 3        By:  Richard Morse, Esquire
          By:  Edwin J. Harron, Esquire
 4        11th Floor, Rodney Square North
          Wilmington, Delaware 19899-0391
 5
          and
 6
          Sessions, Fishman & Nathan
 7        By:  J. David Forsyth, Esquire
          By:  Melissa M. Savoie, Esquire
 8        201 St. Charles Avenue, 35th Floor
          New Orleans, Louisiana 70170-3500
 9
               Representing Future Asbestos Claimants
10
          Kirkland & Ellis
11        By:  David M. Bernick, Esquire
          By:  John Donley, Esquire
12        By:  David Zott, Esquire
          By:  Paul Brown, Esquire
13        By:  Jason Zakia, Esquire
          By:  Ellis Leibenstein, Esquire
14        By:  Wayne Murphy, Esquire
          200 East Randolph Drive
15        Chicago, Illinois 60601

16        and

17        Heller, Draper, Hayden, Patrick & Horn, L.L.C.
          By:  William H. Patrick, III, Esquire
18        By:  Jan M. Hayden, Esquire
          By:  Warren Horn, Esquire
19        650 Poydras Street, Suite 2500
          New Orleans, Louisiana 70130-6103
20
               Representing The Babcock & Wilcox Company
21

22

23

24

25
```

4

1  APPEARANCES (Cont'd.):
2
3       Adams & Reese
        By:  John M. Duck, Esquire
4       One Shell Square, Suite 4500
        New Orleans, Louisiana 70139
5
        and
6
        Jenner & Block
7       By:  Daniel R. Murray, Esquire
        By:  Joel Africk, Esquire
8       One IBM Plaza
        Chicago, Illinois 60611
9
            Representing McDermott, Inc.,
10          Babcock & Wilcox Investments, et al
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

# I N D E X

PAUL DAVID McKNIGHT

DIRECT EXAMINATION BY MR. FINCH . . . . . . . . . . . . . 58


| EXHIBITS: | | OFFERED | RECEIVED |
|---|---|---|---|
| (ACC) | | | |
| Nos. 500 thru 532B | Quarterly Reports | 93 | -- |
| Nos. 777 and 787 | Databases | 98 | 99 |

McKnight - Direct

1   A. Yes, it was August of '82.

2   Q. Did you notice any effect of that event on other asbestos

3   clients that Travelers may have had?

4   A. Yes.

5   Q. Can you tell us what that was, please?

6   A. After a slight lull, there was a dramatic increase in the

7   number of lawsuits being filed against other defendants that

8   Travelers had.

9   Q. And, did that include Babcock & Wilcox?

10  A. Yes.

11  Q. Can you tell us what you did, in terms of when you first

12  got assigned to deal with the Babcock & Wilcox cases?

13  A. Well, some time early on, we met with the Risk Management

14  Department and a lot of the internal law departments of

15  Babcock & Wilcox, and discussed where the litigation was going

16  and the fact that the Manville bankruptcy had precipitated

17  this growing number of lawsuits against other defendants,

18  including B&W, and discussed approaches that should be taken

19  to -- in essence, a cost benefit analysis of how to proceed.

20  Q. And, what were the various approaches that could be taken

21  to deal with this litigation that you discussed with Babcock &

22  Wilcox management at the time?

23  A. Well, approximately three. One would be to simply

24  litigate every single case all the way to the verdict and

25  appeal.

Case 01-01139-AMC    Doc 2581-3    Filed 08/21/02    Page 8 of 18

67

McKnight - Direct

1    The second approach would be to pick and choose; litig.
2    some and try to resolve others via settlement or whatever.
3        And, the third option was a straightforward settlement
4    strategy of not going to trial unless absolutely forced to.
5    Q.  As part of your job within The Travelers, did you keep
6    abreast of what strategies other defendants at the time were
7    trying?
8    A.  Yes, sir.
9    Q.  And, is the three strategies you just describe the basic
10   philosophies that different companies would have at the time?
11   A.  That's my understanding, yes.
12   Q.  Did you have any particular view as to which of the three
13   strategies Babcock & Wilcox should adopt?
14   A.  I did.
15   Q.  And, what was that?
16   A.  My view was that they should adopt the settlement
17   strategy.
18   Q.  Why did you have that view, sir?
19   A.  At that time -- again, which was early '83, in essence --
20   looking at what other defendants, albeit not -- other
21   defendants, such as Manville and Pittsburgh Corning after they
22   left The Travelers, who were manufacturers of product, not
23   necessarily the same as B&W, but their experience seemed to be
24   that even that early stage you could tell that, at least in my
25   layman's opinion, that this was not real litigation.

1  It was more a social engineering approach, if you will,
2  where it seemed to be that there was something about an
3  asbestos case -- against the right defendants, anyway -- would
4  inflame a jury and that, over the long-term, it seemed that
5  taking this out of the court system and trying to do some sort
6  of informal settlement approach would be the way to -- at the
7  time, again -- based on the time frame, to minimize the impact
8  on B&W.
9  Q.  Other than the fact that something about asbestos seemed
10 to inflame juries, were there other reasons why you
11 recommended a settlement strategy?
12 A.  Well, it was to keep transaction costs to a minimum.
13 You've got X amount of money, and the feeling was it was
14 better to move as many cases as possible rather than spend the
15 money paying lawyers and court costs, et cetera, and that we
16 had seen in some other defendants that, if they went through
17 extensive discovery, that things sometimes seemed to pop up
18 that nobody knew about until they got out in the open.
19     So, that was -- even though we had no idea of any -- had
20 done no discovery of B&W, it was just a general observation
21 from historic events that plaintiff attorneys are very good at
22 finding things in documents and blowing them up -- you know,
23 taking one sentence out of a letter and putting it up in front
24 of a jury and so on.
25     So, that it was to avoid that kind of expense and

1   potential for something being in documents that nobody eve.
2   knew about.
3   Q.   Potential for discovery that could be harmful to B&W?
4   A.   Right; yes.
5   Q.   That a plaintiff's lawyer could use to inflame the jury,
6   perhaps?
7   A.   Perhaps.
8   Q.   Was there a consensus arrived at between The Travelers and
9   B&W and McDermott management as to which of the three
10  strategies you discussed earlier B&W should adopt for dealing
11  with its asbestos liabilities?
12  A.   Yes.  The consensus was that they should adopt the
13  settlement strategy.
14  Q.   And, how did you go about implementing that strategy?
15       MR. BERNICK:  Your Honor, at this point, I'd like to
16  interpose an objection on 408 grounds, relevancy grounds, for
17  all the reasons that we indicated in our briefs and the
18  opening argument.  We're now getting into the substance of the
19  settlement programs, as opposed to these preliminaries.  We
20  believe it violates Rule 408.
21       However Your Honor rules on that, I'd like to not
22  keep on popping up and down again.
23       I'd also note that Mr. Donley is going to be handling
24  the examination of this Witness and I know that Your Honor is
25  probably sensitive about having multiple lawyers, but this is

1   a fundamental issue in the case and --

2   THE COURT: All right. I'll overrule the objection

3   and I'll let your objection be made continuing to any

4   questions that you feel violate Rule 408.

5   MR. BERNICK: Okay.

6   THE COURT: So, you don't have to pop up. It'll be

7   continued on the record.

8   All right, continue.

9   MR. FINCH: Thank you, Your Honor.

10  BY MR. FINCH:

11  Q. Mr. McKnight, can you tell us how Travelers and B&W went

12  about implementing this settlement strategy that you

13  recommended to the company?

14  A. Well, I don't know if I recommended it or it was -- a

15  consensus was reached that we should do this.

16  Q. Okay. You were part of the group that reached that

17  consensus?

18  A. Right.

19  Q. And, it was consistent with your views, is that right?

20  A. Yes, sir.

21  Q. Okay. Can you tell us how B&W and Travelers went about

22  implementing the settlement strategy, which you described as

23  one of the three options the company could take?

24  A. At the time, again, which is early '83, B&W had been named

25  in a large number of lawsuits -- at least it seemed so at the

Case 01-01139-AMC    Doc 2581-3    Filed 08/21/02    Page 12 of 18

71

McKnight - Direct

1 time -- a large number of lawsuits in California and
2 elsewhere.
3    So, the idea was to contact the plaintiff attorneys and go
4 meet with them and negotiate face-to-face, an informal
5 arrangement, protocol -- whatever you want to call it -- to
6 resolve the cases short of litigation, short of discovery, and
7 eventually move to a non-suit agreement where the plaintiff
8 attorney would not even name B&W in their lawsuit, but we
9 would agree to toll the statute as of the day that they filed
10 the lawsuit against everybody else.
11    And, continuing with that, once we had worked out some
12 negotiated protocol with the plaintiff attorney, that would
13 involve, then, processing their claims through The Traveler
14 and receipt and release, and closing the file.
15 Q. Can you describe for us the characteristics of the
16 settlement protocol that you would negotiate with these
17 plaintiffs' firms?
18 A. Yeah. It was a very simple approach. We weren't -- we
19 did not -- again, at the time, we're talking a few thousand
20 cases, originally. The idea was: We're not really interested
21 in all kinds of technical questions about various legal
22 liability issues. What we were talking about was: Let's get
23 some basic criteria down.
24    And, those were two-fold, and one was: Can the plaintiff
25 demonstrate that he worked around the asbestos allegedly

McKnight - Direct

1  claimed in a Babcock & Wilcox boiler?

2  And, secondly, can he present a medical diagnosis of an
3  asbestos-related disease?

4  Q. And, were those two -- why were those two the criteria in
5  the solvency protocol?

6  A. Well, we wanted to -- those were -- the key elements in
7  getting a settlement was -- aside from making sure that the
8  case was legitimate, the statute had run or something; other
9  than that, it was simply does he have exposure and does he
10 have a disease, and is there enough of those two items that a
11 question of fact is raised, so that a judge would allow that
12 case to proceed to trial?

13 Based on those two criteria, those are the cases we wanted
14 to settle to avoid transaction costs, discovery, a run-away
15 inflamed jury, et cetera.

16 Q. So, those --

17     MR. FINCH: Strike that.

18 BY MR. FINCH:

19 Q. Those were the criteria that you believe were the minimum
20 necessary to get to a jury, is that correct?

21 A. No, sir. I believe those were the two criteria that we
22 said -- you had to give us enough evidence on those two
23 criteria that a judge would allow it to go to a jury on those
24 two issues.

25 Q. Did B&W extend the settlement protocol to other -- to try

McKnight - Direct

1  to cover other plaintiff law firms?
2  A. Yes, sir.
3  Q. And, can you describe for us how, if at all, the
4  settlement protocol differed, in any material respects, from
5  the initial ones you set up with the firms in California?
6  A. Well, as time went on, the word, of course, got out that
7  B&W was following a settlement strategy, and instances we
8  would be contacted by a plaintiff's firm saying, "We're
9  getting ready --" for example -- "We're getting ready to file
10 2500 lawsuits in such-and-such jurisdiction. Would you like
11 to talk before we file it against everybody? And, so if we
12 can resolve something, we will not name you in these
13 lawsuits."
14     So, that was one change in -- it was kind of we would --
15 in a lot of instances, we were still being -- they were still
16 being named and we'd contact plaintiff attorneys, and in
17 others they were contacting us.
18     And, of course, there's always variations in the types of
19 proofs, if you will, that would be required in each protocol,
20 but they followed the basic two tenets that I mentioned.
21 Q. The basic two being some evidence of exposure and a
22 medical diagnosis of an asbestos-related disease?
23 A. Right.
24 Q. Did those two basic tenets continue all the way through,
25 up to the time B&W filed for bankruptcy?

Case 01-01139-AMC    Doc 2581-3    Filed 08/21/02    Page 15 of 18

145

McKnight - Cross

1  BY MR. DONLEY:

2  Q. Now, Mr. McKnight, just to identify Exhibit 5048, is this

3  the letterhead of Mr. Jock's Maritime Admiralty Law Firm?

4  A. Yes.

5  Q. And you recognize his signature?

6  A. Yes.

7  Q. And this appears to be a letter to a client. It reads,

8  "Dear Client," on November 8th, 1996, regarding a $2,250

9  settlement with Babcock & Wilcox; is that fair?

10 A. Yes, sir.

11 Q. Can you read the first paragraph for us of what Mr. Jock

12 is writing to his client in 1996?

13 A. "To provide clear understanding about your asbestos

14 related case and in sharing with you good news of good

15 tidings, we furnish this update report."

16 Q. And in the second paragraph, could you read that for us,

17 please?

18 A. "You will receive from Babcock & Wilcox Company, who made

19 boilers for some ships you sailed, because B&W's liability is

20 doubtful and at best minimal, we have negotiated" --

21 Q. Let me just stop you there, because I want to get the --

22 it's blown up on the highlight. Can you start with, "because

23 of B&W's liability," again, please?

24 A. "Because B&W's liability is doubtful and at best minimal,

25 we have negotiated an early settlement of $2,250 to cut their

1  defense costs and at the same time put some early money in
2  your pocket."
3  Q.  And the first line of the next paragraph, could you read
4  what plaintiff's lawyer Jock wrote to his client in 1996?
5  A.  "Other `bit players' will settle down the line."
6  Q.  And your understanding of bit -- one of the bit players
7  referred to here is Babcock & Wilcox?
8  A.  That's my understanding, yeah.
9  Q.  And is that letter consistent with in all of your dealings
10 with Babcock & Wilcox with regard to their asbestos liability,
11 if any, that it was doubtful and in dispute?
12 A.  Yes.
13 Q.  Now, you were asked earlier, Mr. McKnight, how B&W
14 determined what to pay and you told us that every figure wa`
15 the result of negotiations.  Do you recall that?
16 A.  Yes.
17 Q.  And I want to follow up on an answer you gave about the
18 sequence of negotiations.  You said that we negotiated the
19 cases and then backed into, "backed into" was your word, what
20 the showing for asbestosis would be.  Can you explain what you
21 meant by that answer, please?
22 A.  Well, we -- we would meet with the plaintiff attorney and
23 what at that time we called just the B&W story, you know, who
24 they are, why they are in our view a bit player, a small,
25 really probably should, you know, very limited exposure, et

1  cetera, but to save costs and so on, we want to negotiate a
2  settlement agreement protocol with you that -- and then we
3  talk about the exposure and medical requirements.  And when we
4  got into values and negotiating them and the person would say,
5  I want -- I need $2,000 for my asbestosis.  And then we said,
6  "All right, what is the definition of asbestosis," would be
7  the logical -- so we would then determine what for that law
8  firm would constitute a diagnosis of asbestosis that met the
9  criteria in order to generate that payment.
10 Q.  And did the plaintiffs' lawyers tell you what definition
11 of asbestosis would satisfy them to settle a claim?
12 A.  Yes.
13 Q.  I think you told us earlier that you got your layman's
14 definition of what an ILO score of 1/0 or 1/1 means from --
15 where did you get it from?
16 A.  A lot of plaintiffs' firms.
17 Q.  Plaintiff firms.  And who told you how many claims were
18 coming in?
19 A.  Plaintiff firms.
20 Q.  Who told you what type of claims were coming in?
21 A.  Plaintiff firms.
22 Q.  Who told you what amount was demanded?
23 A.  Plaintiff firms.
24 Q.  Who told you what criteria for what would measure disease
25 would be acceptable to settle a claim?

1   A.   Plaintiff firms.

2   Q.   And in the negotiations, Mr. McKnight, with no disresp

3   to your -- what I'm sure are your very considerable

4   negotiating skills, who held the cards in the negotiations?

5   A.   Plaintiff firms.

6   Q.   Now, with regard to the two basic criteria you mentioned,

7   exposure, some showing of exposure and some showing of medical

8   criteria, those were the two main ones, right?

9   A.   Yes, sir.

10  Q.   Let me focus on and follow up on exposure specifically.

11  On Exhibit 582 that Counsel just examined you on, do you still

12  have that memo from Mr. Burkart regarding a September 4th,

13  1996 asbestos meeting where you considered various things that

14  you might do?

15  A.   Yes.

16  Q.   And just to set the stage, this was a memo listing some

17  items under discussion at a September 1996 meeting --

18  A.   Right.

19  Q.   -- that you and Mr. Burkart and other people participated

20  in?

21  A.   Right.  It was suggested -- items were suggested that we

22  talk about.

23  Q.   And in Item Number 4, did you talk about beginning --

24  beginning to require greater proof on work -- excuse me, to

25  begin requiring greater proof on work proximity to our