# EXHIBIT H

# AMERICAN JOURNAL OF INDUSTRIAL MEDICINE

INCORPORATING ENVIRONMENTAL AND OCCUPATIONAL HEALTH

Volume 42/ Number 2/ August 2002

## Editor-in-Chief
Philip J. Landrigan

## Deputy Editor
Steven B. Markowitz

## Advisory Editors
Eula Bingham  J. Donald Millar
Lynn R. Goldman  Kenneth Olden
Richard J. Jackson  Linda Rosenstock

## Associate Editors
Henry A. Anderson  Richard E. Letz
Shunichi Araki  Stephen M. Levin
Dean Baker  James M. Melius
Arthur L. Frank  James A. Merchant
John R. Froines  Albert Miller
James H. Godbold  John M. Peters
William E. Halperin  William N. Rom
J. Malcolm Harrington  E. Neil Schachter
Robin Herbert  Ellen K. Silbergeld
David G. Hoel  Yasunosuke Suzuki
Howard M. Kipen  David H. Wegman
Richard A. Lemen  Ainsley Weston
Mary S. Wolff

## Assistant Editor
Valerie M. Josephson

WILEY-LISS

ISSN 0271-3586





Letter to the Editor

# Asbestos Screenings

To the Editor:

For the past several years, I have served as an expert witness in areas related to state-of-the-art and liability primarily at the request of plaintiff lawyers. However, I have usually reviewed the medical records and X-rays of workers in the cases in which I have testified. Over the past 2 years, I have noted that many of these individuals could not (due to inadequate latency or exposure) and did not manifest any evidence of asbestos-related disease.

Most of these cases are generated by "screenings" which plaintiff lawyers have sponsored the past several years to attract new asbestos clients for lawsuits. These "screenings" raise medical and larger political and social issues. Many "screenings" consist of chest X-ray with a B-reading alone. No history, PFTs, smoking or continuing exposure-related counseling occurs. The B-reading manual specifically precludes the use of B-readings for individual diagnosis, yet this is often the only test performed prior to case settlement. Although the B-reader should be blinded as to exposure this is often not the case. In one series of ongoing screenings, the reader knows he is reading for an "asbestos screening" for litigation, knows the cut off (1/0) that would qualify for compensation and receives differing payments based on the nature of the reading. This payment plan based on the reading result is incorporated into his reporting style; he does not fill out a B-reading report if the "reading" is less than 1/0. Therefore, he is paid $70 for 1/0 and $35 for 0/1 or lower.

I was amazed to discover, that in some of the screenings, the worker's X-ray had been "shopped around" to as many as six radiologists until a slightly positive reading was reported by the last one of them.

The "shopping around" of X-rays is not sound or proper medical practice and may, in fact, result in harm to some of the screened individuals. Some workers end up being unnecessarily and incorrectly advised that they have a potentially or invariably fatal disease. A number, no doubt, suffer anxiety and stress as a result. Others may change their life plans for no valid reason.

The cost of treatment for patients with mesothelioma, lung cancer, and asbestosis far exceeds the cost of "treating" someone with questionable minimal asbestos related chest X-ray changes. Often cancer victims have medical bills in the $150,000–$250,000 range, while patients with only questionable minimal asbestos related chest X-ray changes have few expected medical costs. However, current litigation related compensation pattern settlements do not reflect these expense-disease disparities. For example, there is no medical cost justification for the current Johns-Manville bankruptcy disparity in payments where the mesothelioma victim receives $10,000 and the non-impaired pleural case can receive as much as $2000. This disparity in monetary compensation has created an incentive for lawyers to file as many cases as possible and, thus has created a market for "screened unimpaired" cases.

Finally, with respect to public policy, compensation dollars are now unnecessarily diverted from real victims of asbestos exposure and their families, to transaction costs and compensation of the uninjured and unimpaired. In an ideal world, the unimpaired would receive compensation. However, many of the culpable companies have diverted resources, filed bankruptcy or otherwise escaped from their obligation to compensate individuals they have injured. As a result the money for present and future death cases is drying up. To the extent that "litigation screenings" which require the participation of physicians are contributing to the problem, physicians and their organizations have a responsibility to speak out and intervene.

David Egilman, MD, MPH*
Clinical Associate Prof.
Department of Community Health
Brown University
Never Again Consulting, Inc.
8 North Main Street, Suite 404
Attleboro, MA 02703

*Correspondence to: David Egilman, Never Again Consulting, Inc., 8 North Main Street, Suite 404, Attleboro, MA 02703. E-mail: degilman2@yahoo.com

Accepted 2 May 2002
DOI 10.1002/ajim.10109. Published online in Wiley InterScience (www.interscience.wiley.com).

© 2002 Wiley-Liss, Inc.