# EXHIBIT K

1

1                    UNITED STATES BANKRUPTCY COURT

2                   EASTERN DISTRICT OF LOUISIANA

3                            NEW ORLEANS

4

5    * * * * * * * * * * * * * * * *
                                    *
6    IN THE MATTER OF:              *    CASE NO. 00-10992
                                    *    through   00-10995
7    THE BABCOCK & WILCOX CO., ET AL,  *    (Jointly Administered)
                                    *
8            DEBTORS.               *    SECTION "B"
                                    *
9    * * * * * * * * * * * * * * * *  *    CHAPTER 11
                                    *
10   THE ASBESTOS CLAIMANTS'        *    ADVERSARY NO. 01-1155
     COMMITTEE, ET AL,             *
11                                  *
12           PLAINTIFF-INTERVENORS, *
                                    *
     VERSUS                         *
13                                  *
     BABCOCK & WILCOX INVESTMENT    *
14   COMPANY, ET AL,               *
                                    *
15           DEFENDANTS.            *
                                    *
16   * * * * * * * * * * * * * * * *

17                        **MORNING SESSION**

18

19        Transcript of the proceedings taken in the above-

     captioned matter on **Tuesday, October 23, 2001,** the Honorable
20
     Jerry A. Brown, United States Bankruptcy Judge, presiding.
21

22   AUDIO OPERATOR:    Demond Smith

23   TRANSCRIPTIONIST:  Dorothy Bourgeois

24   Proceedings recorded by electronic sound recording,

25   transcript produced by transcription service.

2

APPEARANCES:

Baldwin & Haspel, L.L.C.
By:  Dennis M. LaBorde, Esquire
By:  Monica T. Surprenant, Esquire
1100 Poydras Street, Suite 2200
New Orleans, Louisiana 70163-2200

and

Caplin & Drysdale
By:  Nathan D. Finch, Esquire
By:  Walter B. Sloccombe, Esquire
One Thomas Circle, NW
Suite 1100
Washington, D.C. 20005

and

Caplin & Drysdale
By:  Elihu Inselbuch, Esquire
399 Park Avenue
New York, New York 10022

     Representing the Asbestos Claimants' Committee


Steffes & MacMurdo, LLP
By:  William E. Steffes, Esquire
201 St. Charles Street
Baton Rouge, Louisiana 70802

and

Blakeley & Blakeley
By:  Bradley D. Blakeley, Esquire
230 Main Street, Suite 540
Irvine, California 92614

     Representing the Unsecured Creditors Committee


Law Office of Elizabeth Wall Magner
By:  Elizabeth Wall Magner, Esquire
228 St. Charles Avenue, Suite 1110
New Orleans, Louisiana 70130

     Representing the Unofficial Asbestos Committee

3

1    <u>APPEARANCES</u> <u>(Cont'd.)</u>:

2        Young, Conaway, Stargett & Taylor, LLP
         By:  James L. Patton, Jr., Esquire
3        By:  Richard Morse, Esquire
         By:  Edwin J. Harron, Esquire
4        11th Floor, Rodney Square North
         Wilmington, Delaware 19899-0391

5

6        and

7        Sessions, Fishman & Nathan
         By:  J. David Forsyth, Esquire
         By:  Melissa M. Savoie, Esquire
8        201 St. Charles Avenue, 35th Floor
         New Orleans, Louisiana 70170-3500

9

10           Representing Future Asbestos Claimants

11       Kirkland & Ellis
         By:  David M. Bernick, Esquire
         By:  John Donley, Esquire
12       By:  David Zott, Esquire
         By:  Paul Brown, Esquire
13       By:  Jason Zakia, Esquire
         By:  Ellis Leibenstein, Esquire
14       By:  Wayne Murphy, Esquire
         200 East Randolph Drive
15       Chicago, Illinois 60601

16       and

17       Heller, Draper, Hayden, Patrick & Horn, L.L.C.
         By:  William H. Patrick, III, Esquire
18       By:  Jan M. Hayden, Esquire
         By:  Warren Horn, Esquire
19       650 Poydras Street, Suite 2500
         New Orleans, Louisiana 70130-6103

20

21           Representing The Babcock & Wilcox Company

22

23

24

25

4

1    APPEARANCES (Cont'd.):

2

3        Adams & Reese
         By:  John M. Duck, Esquire
4        One Shell Square, Suite 4500
         New Orleans, Louisiana 70139
5
         and
6
         Jenner & Block
7        By:  Daniel R. Murray, Esquire
         By:  Joel Africk, Esquire
8        One IBM Plaza
         Chicago, Illinois 60611
9
             Representing McDermott, Inc.,
10           Babcock & Wilcox Investments, et al

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1               I N D E X

2

3    DR. MARK PETERSON

4    DIRECT EXAMINATION BY MR. INSELBUCH. . . . . . . . . . 7
     (Continued from 10/22/01)
5
     CROSS-EXAMINATION BY MR. BERNICK . . . . . . . . . . 45
6

7

8
     EXHIBITS:                              OFFERED    RECEIVED
9
     (ACC)
10
     No. 676        Database Processing Materials  6         6
11
12   No. 2000       Peterson Charts              43        43

13

14

15

16

17

18

19

20

21

22

23

24

25

Peterson - Cross

1   minds whether they're inclined to sue.  That is: Of all the

2   people in the United States, how many of them, through their

3   lawyers or through their doctors or through some other means,

4   decided that they're going to make a claim against Babcock.

5   Correct?

6   A.  It is the number of -- among those persons who have

7   mesothelioma, what portion of them are going to make a claim

8   against B&W.

9      Now, the issue of whether B&W has responsibility for it is

10  addressed in a separate calculation, and that has to do with

11  the calculation of value, the percentage of claims that are

12  decided.  That's the whole process of evaluating and paying a

13  claim or litigating it, if you want.

14     But, this -- right, the step you're talking about now

15  doesn't yet incorporate that.  That's taken care of, but right

16  now this is the number of people who file claims.

17     Some of those claims will be non-meritorious, no question

18  about it.  I'd agree with you entirely.

19        MR. BERNICK:  Well, Dr. Peterson, respectfully.

20        I'd move to strike.

21        I asked you a very simple question.

22  BY MR. BERNICK:

23  Q.  My simple question is that:  All that you've done is to

24  take the total number of deaths and relate it to those people

25  who were steered to or decided to sue Babcock & Wilcox -- or

Peterson - Cross

1   make a claim, correct?

2   A.   Well, with regard to the "steer to," -- I agreed with you

3   that's -- the calculation is the number of claims filed

4   against B&W, and the denominator is the total number of

5   mesothelioma claims.  Of course.  I agree with that.

6   Q.   Now, --

7   A.   That's -- you've characterized it precisely, except for

8   the "steer."

9   Q.   Well, except for the "steer."

10      Well, let me ask you this:  Let's talk about some of the

11   factors that drive who it is that decides to make a claim.

12      Isn't it true that there are a whole variety of factors

13   that affect who makes a claim that have nothing to do with

14   disease?

15   A.   There are -- I would agree that there are a whole number

16   of factors that are conditioned upon having a disease.  If you

17   have the disease, there are things that determine whether or

18   not you're going to file a claim.

19   Q.   Isn't it true:  Of all the people -- all the people who

20   have the disease, that's the total number of deaths?  And, I'm

21   talking about the people who are then making claims against

22   Babcock & Wilcox, that determination depends upon a whole

23   bunch of factors that have got nothing to do with science or

24   medicine, and everything to do with non-epidemiological

25   factors?  Correct?

Peterson - Cross

1    A.  I just said it, yes.

2    Q.  And, the kinds of processes that one would have to go

3    through if you filed a lawsuit or made a claim is how easy or

4    difficult it would be to recovery, correct?

5    A.  Well, it's more than that.  It's how burdensome and

6    personally unpleasant it is.

7    Q.  Okay.  It's also a question of how easy it is to get

8    money; true?

9    A.  Yes, there's enough of an economist in me to believe that,

10   yes.

11   Q.  Okay.  And, in fact, these kinds of factors -- I want to

12   show you an excerpt from one briefs that's been filed in this

13   case.  These kinds of factors, non-epidemiological factors,

14   play a big role in determining what kinds of payments are

15   going to be made, correct?

16   A.  Can I look at what you put up?

17   Q.  It's a brief that was filed, a consolidated reply brief

18   that was filed, totally acknowledging that non-epidemiological

19   factors, like the legal, victim's knowledge of claiming

20   options and changing payment levels play a big role in the

21   claiming process.

22    ·  Would you agree with that or not?

23   A.  I agree with that wholeheartedly.

24   Q.  Okay.  So, when it comes to figuring out, of all the

25   people who are sick in the United States, who decides to zero

Peterson - Cross

1   in on Babcock & Wilcox, that's a decision that depends upon

2   the lawyers, it depends upon the amount of money that's

3   available, it depends upon about whether it's going to be easy

4   to make a claim -- all those factors are germane, correct?

5   A.   It ultimately depends upon the claimant, yes.   And, all of

6   those things have an impact.

7   Q.   Okay.   Now, isn't it true that, when it comes to all of

8   these other factors, your propensity ratio is not derived from

9   any quantitative or statistical analysis of any of those

10  factors; true or not?

11  A.   I don't think that's entirely true.

12  Q.   I asked this question of you in your deposition and did

13  you give this answer:   "Isn't it true that the fraction or

14  that ratio that you use in your model for the propensity to

15  sue for malignant disease, that is not derived from any of the

16  15 or 20 propensity factors that you listed a little while

17  ago, correct?"

18      Answer:   "The actual calculation is based on -- on fact --

19  the number of claims against B&W and the science and

20  epidemiology.  ·It does not necessarily involve any of those

21  sets of assumptions, no."

22    ·  Was that your testimony under oath in the deposition,

23  Dr. Peterson?

24  A.   I believe that that question and answer is taken out of

25  context.   I had been discussing that there are a number of

72

Peterson - Cross

1  matters -- that I take these things into account in selecting

2  the period for propensity to sue.  I take them into account in

3  determining whether or not the propensity to sue is going to

4  increase in the future or not.

5      But, when you finally pinned me down, I agreed with you

6  that the actual calculation is a calculation.  And, while

7  those matters affect my decision about what period of time to

8  use to make that calculation, and knowledge about these other

9  factors determine how I assess the applicability of that

10 calculation into the future, that actual calculation is simply

11 a calculation.

12 Q.  "Is simply a calculation."  This ratio is not derived from

13 any quantitative analysis of any of the factors that we're

14 talking about; true or not?

15 A.  I wouldn't entirely agree with that.

16 Q.  Where is the quantitative analysis, Dr. Peterson, that

17 ties the ratio, for example to the amount of money that was

18 being made available by Babcock & Wilcox?

19 A.  I don't know that in this particular case the amount of

20 money offered by Babcock & Wilcox is a particularly important

21 element.  I was asked is that an important element to

22 propensity to sue.  Yes, it is.  It can be.  It isn't

23 necessarily a particularly important matter here.

24 Q.  Where is the quantitative statistical analysis,

25 Dr. Peterson, that ties your ratio for Babcock & Wilcox to the

Peterson - Cross

1    activity of the plaintiffs' bar?  Where is it?

2    A.  It is quantitative in the effect that it is one a number

3    of factors that I consider in picking the period of time,

4    which is a quantitative calculation.  It is a matter that I

5    take into account in assessing whether it is reasonable to

6    expect that the propensity to sue will continue into the

7    future.  That was a quantitative calculation.

8        The reasonableness and the application of that to the

9    future is a quantitative determination that's driven, in part,

10   by these sets of considerations.

11   Q.  What you're telling me is that, when you came up with your

12   decision to use the ratio, you considered these factors.

13   That's not my question.

14       My question is whether you have done a statistical study

15   that actually ties and quantifies the impact of money, the

16   impact of the unions, and the impact of the plaintiffs bar on

17   claims against Babcock & Wilcox.  Have you done that

18   statistical study?

19   A.  No, I've done no study like that.

20   Q.  I'm sorry?

21   A.  No, I've done no study like that.

22   Q.  Let's talk about, now, how you move to the future.  In the

23   future, you use an epidemiological forecast for total

24   mesothelioma deaths, correct?

25   A.  Yes, I continue to use the same forecast.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q.  That, now, extends out to the future, correct?

2   A.  Yes.

3   Q.  Okay.

4   A.  I was watching what you were writing.

5   Q.  Okay.  And, you then determine -- you then decide what to

6   do with that propensity ratio; true?

7   A.  Yes.

8   Q.  And, isn't it a fact that in this case you have decided,

9   essentially, to continue, at the least continue that

10  propensity ratio going forward?

11  A.  The minimum expectation is that that ratio will continue

12  into the future, yes.

13  Q.  Okay.  Isn't it true that, when you decide to continue

14  that ratio going forward into the future, again there is no

15  quantitative analysis of how those non-epidemiological factors

16  will, in fact, affect the propensity ratio in the future, is

17  there?

18  A.  As I said before, I've taken those factors to understand

19  why the particular ratio obtained here, and those are the

20  kinds of things I consider, in addition to simply the numbers

21  from B&W, to make the projection.  The most reasonable

22  projection is that they will continue into the future.  And,

23  that's the quantitative projection.

24      But, I didn't do any specific study of these issues within

25  the context of B&W claims, no.

Peterson - Cross

1    Q.   Okay.   And, by the same token, let's just be straight

2    about it.   You don't know what the factors are that, in fact,

3    will affect propensity in the future, do you?

4    A.   Oh, I don't agree --

5    Q.   You just don't know what they are.

6    A.   I don't agree with that at all.

7    Q.   What, you're able to look into a crystal ball and tell us

8    what the unions are going to do, Dr. Peterson?

9    A.   I have an expectation as to what the unions are will do

10   in the future, and I have an expectation -- I have an

11   understanding of matters that affect the propensity to sue,

12   based not only on my work and the examination and

13   understanding of the asbestos litigation, but there are

14   scholarly studies by my colleagues at Rand, primarily, -- and

15   others -- that look at how various elements affect the

16   claiming behavior of persons.

17        And, so those are predictable matters, to some degree,

18   but you can't know precisely.   I would agree with you that you

19   can't know the precise determinates and the precise propensity

20   to sue.   There's no question that that's one level of

21   uncertainty.

22   Q.   Well, let me be more specific.   You're taking a propensity

23   ration that based upon four years prior to 1998; true?

24   A.   Yes, that's the basis for both projections, actually.

25   Q.   Four years prior to 1998, and you're extending that

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

Peterson - Cross

1    Q.   And, he was there, you were not.

2    A.   On cross-examination, yes, he said that.

3    Q.   He said that and he was there and you were not,

4    Dr. Peterson, correct?

5    A.   He was negotiating the claims and I was not, no question.

6    Q.   And, he also talked about the problems in even getting

7    people to state that they actually had an exposure to a

8    Babcock boiler.  Do you recall that?

9    A.   I don't recall that, no.

10   Q.   Do you recall the problems that we had in getting specific

11   medical information out of the claimants, the audit reports

12   that said that the claims that are being filed do not even

13   state a specific medical condition, do you recall that?

14   A.   Your characterization I don't agree with.  I don't think

15   that there was difficulty getting medical records out of the

16   claimants, no, I don't agree with that.

17   Q.   Well, whatever it is that --

18   A.   I don't think that characterizes what happened.

19   Q.   Whatever it is that Mr. McKnight testified about the Court

20   has heard.  But, the full scope of what he said were the

21   issues and problems that he was facing, you've taken them and

22   frozen them and perpetuated them for 40 years of additional

23   claims, correct?

24   A.   Absolutely not.  One of the reasons that they did not have

25   the medical information, nor complete medical information is

Peterson - Cross

1    that they were not -- they are -- in a number of

2    jurisdictions, there are defense committees that the

3    defendants get together, they have independent medical

4    records.  They collect the information.  They disburse that

5    among the various defendants.

6       There's a letter from Mr. McKnight to one of the people in

7    McDermott, where he says that "we could obtain that

8    information in California, --" which he stated was one of

9    their worse jurisdictions "-- and New Jersey, --" and perhaps

10   other places "-- but we chose not to get that information from

11   the defense committees.  We didn't want to be a member of it,

12   because we didn't want to pay the money and we didn't want to

13   raise our profile."

14      They could have changed what they were doing and they

15   could have done it in a very simple manner, in that example,

16   by going and getting this defense medical information, and

17   they wouldn't have been in the same situation.

18      So, they could have done that, they didn't, but they could

19   have and they would have been in a different situation.

20   Q.   And, I guess Mr. McKnight could have done his job better

21   is what you're saying.

22   A.   Oh, in some respects.  Can't we all?

23   Q.   Right.  And, your model assumes that whatever job he was

24   doing, whatever problems he had, and whatever leverage was

25   there, your model assumes that it basically continued for 40

1    years?  That's my question, Dr. Peterson.

2    A.  I think the fundamental problem that he was faced with, an

3    overwhelming number of claims, because of -- his company had

4    engaged in production and sale of an asbestos-containing

5    product.  It was a problem he would never get out from under.

6    That was a terrible problem and I'm sympathetic to having that

7    problem.

8         How he managed that problem, how he dealt with it, he

9    could have changed, of course.

10   Q.  Dr. Peterson, as we go forward into the future, now, isn't

11   it a fact that you have no where determined that exposure to

12   Babcock & Wilcox asbestos, in particular, was a cause of any

13   of the future claims from malignancy?  Nowhere determined

14   that.

15   A.  Well, I'm not looking at -- first of all, I'm not looking

16   at a case-by-case basis in the future.  And, as we discussed

17   for many minutes in my deposition, the matter of causation,

18   particularly medical causation, is a very difficult matter.

19        And, on an individual case, you can never say what caused

20   this disease.  You, perhaps, can't even say it in

21   mesothelioma.  You certainly can't say it in lung cancer.

22        That's what we have juries for.  That's what we have

23   judges for.  They make the determination about causation.  I

24   certainly can't.

25   Q.  Could you please answer my question, Dr. Peterson?  You

Peterson - Cross

1  have nowhere determined in any of your work that exposure t

2  Babcock & Wilcox's asbestos was a cause of any of the future

3  malignancy that you included in your model; true or not?

4  A.   I don't agree with that.   They certainly were a cause of

5  future malignancy claims that will be filed.

6  Q.   You have nowhere determined that in any of your reports or

7  work in this case.   I can't even find the word spoken in your

8  report; true?

9  A.   Well, you asked me a different matter.   They distributed

10  and sold asbestos-containing products.   Aasbestos causes

11  cancer.   Some of the cancers that have arisen and will arise

12  were caused, in part, not only by their asbestos, but by

13  exposure to of the asbestos of many different companies.

14       So, they were one of a number of companies whose actions

15  caused these cancers, and there's no question about that.   I

16  don't even thing that B&W questions that.

17            MR. BERNICK:   Move to strike as not responsive,

18  Your Honor.   I asked him specifically whether his analysis in

19  this case, his report in this case anywhere determine whether

20  and to what extent exposure to Babcock & Wilcox asbestos was a

21  cause, either of the pending claims or the old claims or the

22  new claims.

23            I'd like an answer to that question --

24            MR. INSELBUCH:   Your Honor, --

25            MR. BERNICK:   -- please.

Peterson - Cross

1      MR. INSELBUCH:  -- he answered that question.  It's

2  part of his analysis.

3      THE COURT:  All right.  Go forward.  You're not going

4  to get the exact answer you want out of him.  I think he said

5  yes, he assumed that, or -- he didn't say that, but the

6  assumption -- underlying his answer is the assumption that

7  some cancer was caused by Babcock & Wilcox's product, along

8  with other companies.  So, --

9      THE WITNESS:  I would agree with that answer, and

10  that capsulizes what I tried to say.

11      THE COURT:  But, in the future, Dr. Peterson, it will

12  go a little faster -- when he asks you a direct question that

13  calls for a yes or no answer, if you can answer it "No,

14  but --" answer it that way.

15      THE WITNESS:  I will, sir.

16      THE COURT:  Then we'll remove the objection.

17      For example, his question just there:  Did you make a

18  separate study of causation?

19      Your answer, I guess, would be:  No, but you don't

20  have to make a study, because the courts and everybody else

21  has taken recognition that asbestosis does cause cancer.

22      THE WITNESS:  All right, Your Honor.  I'm sorry.  I

23  will try and do that.

24      MR. BERNICK:  Well, now that Your Honor has said

25  that, I really do have to follow-up because this is an

Peterson - Cross

1    important --

2           THE COURT: _Well, you can disagree with me.   I do

3    believe that some court somewhere has decided that.

4    BY MR. BERNICK:

5    Q.  If you take all of the mesothelioma claims that have be

6    made or will be made, isn't it a fact that your report no

7    where quantifies what portion of those claims, if any, was

8    caused by actual exposure to Babcock & Wilcox asbestos?

9    A.  No, I don't have -- I have not made that calculation, b

10   I believe that B&W has made such a calculation by its

11   settlement practices.

12   Q.  Okay.  Let's talk about non-malignant disease.  Here, t

13   with non-malignant disease, you have a certain number of

14   claims -- correct?  A certain number of claims against Babc

15   & Wilcox, correct?

16   A.  Yes.

17   Q.  And, with respect to those claims, isn't it true that i

18   the case of non-malignant diseases, you've nowhere determin

19   how much non-malignant disease has been caused by exposure

20   Babcock & Wilcox products; true or not?

21   A.  Yes, I have not made that determination, but I believe

22   that B&W has made a determination of the number of claims t

23   might have been caused, in part, by exposure to their

24   products.

25   Q.  All right.  Did I get that down right here (indicating)

Peterson - Cross

1    Dr. Peterson?  "B&W has made a determination of the number of

2    claims that might have been caused by exposure to their

3    products."

4    A.   I think that's either what I said or close to it, yes.

5    Q.   And, that's what you've relied up, correct?

6    A.   For what?

7    Q.   Does it make a difference to your model?

8    A.   Well, I don't understand the context of your question.

9    I'm sorry.

10   Q.   Well, I'll just ask it again.  Does the fact that B&W made

11   a determination of the number of claims that might have been

12   caused by exposure to their products, does that make a

13   difference to any of your projections?

14   A.   It makes no difference with regard to my projections of

15   numbers of claims.  It's irrelevant to it, because I'm

16   projecting claims.

17   Q.   Okay.  What about dose?  Have you made any determination

18   -- well, let me ask you:  Would the same thing be true with

19   respect to your projections of malignant disease?  Does it

20   make a difference to that, either?

21   A.   The determinations of B&W to settle a claim because there

22   was a possibility of showing a causation affects neither the

23   filings for either, but it affects the resolutions of those

24   claims; the second step.

25   Q.   Okay.  Now, what about dose?  Have you ever made any

1   determination about the dose of Babcock & Wilcox asbestos t

2   was seen by any of the claimants for non-malignant disease?

3   A.   No.

4   Q.   That doesn't affect any of your calculations, does it?

5   A.   Well, I don't think I'd go that far.

6   Q.   Well, do you have dose?  Is dose a quantitative part of

7   any of your calculations for non-malignant disease?

8   A.   It isn't a quantitative part, but of course it affects

9   the projections, because it affects the fact that people are

10  filing claims.

11  Q.   But, it doesn't affect the numbers that you come up with

12  in your model, does it?

13  A.   There is no element of any mathematical calculation tha'

14  do that has anything to do with the relative dose or amount

15  dose.  That's correct.

16  Q.   If I wanted to know what percentage, what market share of

17  the total number of malignant disease --- non-malignant disease

18  cases there were that were filed against Babcock & Wilcox, do

19  you know what that market share is?

20  A.   You'll have to define "market share" for me.

21  Q.   Tell me what the total number is of non-malignant disease.

22  Just like we had for mesothelioma, can you tell me the total

23  amount of non-malignant disease that's arisen with respect to

24  asbestos?

25  A.   Well, no one knows that number, precisely.  That's why the

Peterson - Cross

1   calculation isn't done the same as cancer.  There are -- I

2   think there's no question that the number is in the millions,

3   but the precise number is -- and that's the opinion of

4   Dr. Nicholson.

5       But, I can't give you a precise number like I could with

6   cancer.  That's why I do the method I do.

7   Q.  Well, I want to get to why you do the method you do, but

8   please answer the question.

9       You don't know the number of non-malignant cases around

10  the United States, correct?

11  A.  I know a range, but I don't know with any precision, yes,

12  that's correct.

13  Q.  And, therefore, you don't even know the percentage of the

14  total number of non-malignant claims that have been made

15  against Babcock & Wilcox, do you?

16  A.  Of all the people that have non-malignancies, what

17  percentage of them --

18  Q.  Right.

19  A.  I have no idea.

20      Well, that's not fair.  I have a sense of it, but I don't

21  have any precise calculation.

22  Q.  You have a sense?

23  A.  (Witness nods affirmatively)

24  Q.  What about propensity?  Can you tell us what the

25  propensity is with respect to non-malignant claims?

Peterson - Cross

1   A.   It's a meaningless term in this context.

2   Q.   Would it be fair to say that there is no epidemiological

3   forecast or model for non-malignant claims that you're able to

4   use in this case?

5   A.   I think that's -- well, there are epidemiological models

6   that I use and understand that contribute to what I do, but

7   there is no epidemiological model that says that number of

8   people that get non-malignancies, year-by-year, nor is there

9   an epidemiological projection that says what's the total

10  number of people who, out there today, have non-malignancy.

11  Q.   But, my question, really, is, Dr. Peterson:   There's no

12  epidemiological model that is used in making the forecast that

13  you're offering in this case for non-malignant disease,

14  correct?

15  A.   There are models that contribute to it that are in then

16  background, but they're not used for the precise calculation.

17  Q.   Now, what you've done is you've gone ahead, then, and

18  compared the non-malignant claims against Babcock & Wilcox to

19  the malignant claims against Babcock & Wilcox, correct?

20  A.   Yes.

21  Q.   I'll draw that just with a blue line, and you draw a ratio

22  between the two of these (indicating), correct?

23  A.   Correct.

24  Q.   And, those are the same claims that we were talking about

25  before, correct?

96

Peterson - Cross

1   A.   I don't understand your question.

2   Q.   Well, it's the same malignant claims -- this line here

3   (indicating) representing the number of malignant claims

4   brought against Babcock & Wilcox during the four years prior

5   to 1998, that's the same line that you used for purposes of

6   calculating your ratio of non-malignant-to-malignant claims,

7   correct?

8   A.   Now, you've lost me.

9   Q.   In calculating the ratio of non-malignant-to-malignant

10  claims, you're using the same -- as your denominator, you're

11  using the same malignant claims that we've been talking about

12  here a while ago.

13  A.   Okay, yeah.  Yes, it's summed across the three cancers,

14  yes.

15  Q.   Okay.  Now, this ratio, that is, the ratio between non-

16  malignant and malignant claims, this takes the place of

17  propensity, which you say is meaningless in this model,

18  correct?

19  A.   It doesn't take the place of it.  It's a different kind of

20  calculation.

21  Q.   Different kind of calculation.

22      It's what you use in order to project out into the future

23  what's going to happen to claims against Babcock & Wilcox,

24  correct?

25  A.   Yes, but it's based upon the ratio to the cancer filings,

Peterson - Cross

1    whereas the propensity to sue is based upon an epidemiologic

2    model, which, as you point out, I don't have available.

3       So, it's a different calculation and it doesn't replace

4    it.  It doesn't replace the propensity to sue.  It's a

5    different thing.

6    Q.  It's different -- but, you basically use that as your

7    means of calculating how many claims there are going to be?

8    A.  Well, yes.  That's what I said.  Of course.

9    Q.  Okay.  Taking a look at 24 of 2000, -- it's one of your

10   charts -- this is a chart that talks about what's happened to

11   the non-malignant multiplier, this ratio, over the last

12   several years, correct?

13   A.  Yes, that's right.

14   Q.  Okay.  And, we can see, as I think you pointed out, that

15   there's been some change in the ratio of non-malignant-to-

16   malignant disease; true?

17   A.  That's correct.

18   Q.  In fact, if we went back a little bit further to 1985, we

19   would find that this multiplier, back in 1985, was in the

20   range of about 4.5 of 5.0, would we not?

21   A.  For whom?

22   Q.  For Babcock & Wilcox.

23   A.  I have no reliable data prior to 1990 for Babcock &

24   Wilcox.  The database they gave me was the Babcock & Wilcox

25   claims.  The data prior to 1990 were handled by Travelers.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313