Peterson - Cross

1    And, apparently, this is the second database, which I

2    understand we've just gotten in the last day or two from The

3    Travelers database.

4        So, I have no knowledge about the ratio and, if you try

5    and calculate a ratio -- there were some claims in the

6    database I had, but it's only partial information.  So, if

7    you're try and to that calculation based upon the database I

8    have, it would be meaningless, because it's an

9    unrepresentative subsample of the claims.

10   Q.  Well, let me just be clear.  You have not done the

11   calculation of non-malignant-to-malignant disease for the

12   1980s period of time, for the reasons you've indicated?

13   A.  For B&W, I've had no ability to do it; therefore, I have

14   not done it.

15   Q.  Okay.  Is it true that, in the case of other companies, we

16   have seen fluctuation in the ratio of non-malignant-to-

17   malignant claims, over time; significant fluctuation?

18   A.  Sure.  It changes from -- it changes among defendants.

19   It's different among defendants and it's changed some over

20   time.  The trend is generally up.

21   Q.  Well, I just asked you whether there had been

22   fluctuations.  True or not?

23   A.  I'd have to see what you're going to put up.

24   Q.  Are you familiar with the Rand study that just came out?

25   A.  I'm familiar with the Rand study, yes.

1   Q.  And, the Rand study has been a study -- Rand -- from tim

2   to time, that's your -- you're part of Rand, are you not?

3   A.  I'm a consultant at Rand.

4   Q.  Okay.  And, they just came out with a report on asbestos

5   claims and asbestos litigation; true?

6   A.  They did.

7   Q.  Okay.  And, this is one of the charts from the Rand study.

8   It talks about what had been the trends for mesothelia and

9   other malignant claims versus non-malignant claims, and it

10   gives this as an example, one of the defendants; single

11   defendant, 1991 to 2000.  Are you familiar with that?

12   A.  I think I've seen this table, but I'm not really familiar

13   with it.

14   Q.  Well, that's <u>Johns-Manville</u>, is it not?

15   A.  I don't know.

16   Q.  What this reflects is that there's been a significant

17   fluctuation in what's happened to non-malignant claims in

18   relation to malignant claims against this defendant, right?

19           MR. INSELBUCH:  Your Honor, I would ask that the same

20   rule apply here, that if we're going to look at material, that

21   it should be cut off here in 1998 --

22           MR. BERNICK:  That's what --

23           MR. INSELBUCH:  -- and not include information for

24   any period thereafter.

25           MR. BERNICK:  That's fine.  That's fine.

Peterson - Cross

1    Well, you can --

2    MR. INSELBUCH: I think we can trust the Court to

3    just do that, but I'd just like the record to reflect --

4    THE COURT: All right. Unless you want to hold the

5    screen up there over it, --

6    THE WITNESS: I'm sorry, Mr. Bernick. I've lost the

7    question.

8    BY MR. BERNICK:

9    Q. The question is whether this reflects a significant

10   fluctuation in non-malignant claims to malignant claims during

11   the period of time of the 1990s?

12   A. Well, I don't know what defendant this is, although it

13   looks like it could be Johns-Manville, and because of the

14   litigation events for Johns-Manville, -- during the period

15   1990 through 1995, there was essentially a stay on payments by

16   Manville, and so most of the claims that were getting filed

17   were cancer claims. People weren't really putting in their

18   non-malignant claims. So, they were accruing to get filed

19   later.

20   So, yes, there are fluctuations. Generally, there are

21   litigation explanations for the fluctuations. So, I'd agree

22   they are and usually I either understand them or can figure

23   out why they occurred.

24   Q. Okay. And, if we assume that this is Johns-Manville,

25   there are a lot things that were happening in the Manville

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Peterson - Cross

1    trust during the back-end of the 1990s that affected the

2    filing rate for non-malignant claims, correct?  There were

3    audit programs, there were -- in 1995, the trust opened its

4    doors for the first time; true?

5    A.   I think the litigation events involving Manville that were

6    important in affecting the relative number of cancers-to-non-

7    cancers are what I've already described.  The early '90s, you

8    couldn't get paid.

9         I think later on in the decade the litigation events that

10   affected things were, perhaps, external to Manville.

11   Q.   Isn't it a fact, thought, that, when it comes to the

12   filing rate for non-malignant claims, that filing rate is

13   subject to what's happening on the litigation scene?  There

14   are other factors just as we had for propensity?

15   A.   To some degree, there are, yes.

16   Q.   Isn't it a fact that, even within even on company, such as

17   Babcock & Wilcox, there are significant fluctuations in your

18   ratio, non-malignant-to-malignant claims from state-to-state?

19   A.   Well, I acknowledged that on my direct.  Of course.

20   Q.   In fact, the ratio of non-malignant-to-malignant claims in

21   Mississippi for Babcock has been as high as 48-to-1, whereas

22   the ratio in California has been as low as 2.5-to-1.  Did you

23   study that?

24   A.   I've seen a document that was in Mr. Dunbar's report.  I

25   haven't personally looked at that issue, and I don't know if

1   against Babcock & Wilcox divided by malignant claims against

2   Babcock & Wilcox.

3   A.   It's long division.

4   Q.   Long division, okay.   It's a ratio?   It's a number?   You

5   can do it if you had third grade arithmetic, you could

6   calculate that number, could you not?

7   A.   Hopefully.

8   Q.   Okay.   And, all I'm saying is that:   Is there any

9   scientific study that you're aware of that says, "Here's what

10   causes that ratio to exist," that says, "Here are the factors

11   that are responsible for the ratio --"

12   A.   Sure.

13   Q.   "-- a scientific study"?

14   A.   Sure.   There are scientific studies.   There's a whole

15   series of scientific studies dealing with why people file

16   lawsuits.

17      The Rand Corporation did a study where they surveyed

18   25,000 people and asked them if they'd ever had an event that

19   might lead to a -- cause an injury, and they followed up to

20   see did they file a lawsuit.

21      One of the factors that affects whether you file a lawsuit

22   is the seriousness of your injury.   That's why, even though

23   there are relatively more persons with non-malignant disease

24   than cancers, you see a relatively larger number of the cancer

25   claimants filing claims.

Peterson - Cross

1    There are a number of factors of science that have been

2    incorporated into that understanding of why I make those

3    projections.

4    Q.  All right.  That's not really an answer to the question,

5    but maybe I wasn't clear.  I'll try to make it more specific.

6    You've got a ratio of non-malignant disease-to-malignant

7    disease, right?

8    A.  Yes.

9    Q.  And, there's a particular numerical relationship that you

10   use, right?

11   A.  Yes.

12   Q.  You tell me the peer review publication that said -- that

13   takes that ratio of non-malignant-to-malignant disease, a peer

14   review publication that says, "It is caused or it is

15   statistically associated with the following factors --" tell

16   me the publication.

17   A.   There have been no scholarly studies of the non-malignant

18   ratio.  Of course not.

19            THE COURT:  Are we at a convenient breaking point?

20            MR. BERNICK:  Yes, Your Honor.  This would be just

21   fine.

22            THE COURT:  All right.  Then the Court will adjourn

23   until 2:00.

24                    *    *    *    *    *

25                    (Luncheon Recess)

Peterson - Cross

1      A F T E R N O O N   S E S S I O N

2          THE COURT:  Good afternoon, ladies and gentlemen.

3          MR. BERNICK:  Good afternoon, Your Honor.

4          MR. INSELBUCH:  Good afternoon, Judge.

5          THE COURT:  Be seated.

6          THE WITNESS:  Your Honor, I made a mistake in a

7      calculation that I was asked to do on the fly, both by

8      Mr. Inselbuch and Mr. Bernick, and if I might correct the

9      record with regard to that mistake.  It has to with the

10     calculation of the percent of liabilities due to cancer on

11     this chart.

12         THE COURT:  All right.

13         THE WITNESS:  I had taken -- I said incorrectly that

14     the number is about a third of this last column.  That's in

15     correct calculation.  What you have to do is take the -- well,

16     the number that's the total expenses, liabilities pending and

17     futures for the present value of that number, and take the

18     percent that's cancer, which is roughly a third; when you do

19     that, the number is $1,768,000,000.

20         But, because this number is lower, the insurance goes

21     out for a longer period of time.  So, the present value of the

22     insurance goes down to a little over a billion dollars.  And,

23     the payment obligation, just for cancers under this

24     calculation, is $744 million.

25         I didn't correctly -- I said it was around

Peterson - Cross

1    $1.4 billion.   It's $744 million.

2            THE COURT:   Okay.  And, would the bottom figure

3    change in like manner?  Because I think you testified as to

4    the bottom figure, too.

5            THE WITNESS:   Yes, I testified as to this, as well.

6            THE COURT:   You testified 600 --

7            THE WITNESS:   No.  I testified it was around

8    $700 million.  That's $225 million.

9            THE COURT:   Yeah, yeah.  That's right.  You first

10   testified it was $600 million and then you corrected it and

11   said it was closer to $700 million.

12           THE WITNESS:   They were both wrong.

13                     *    *    *    *    *

14                CONTINUED CROSS-EXAMINATION

15   BY MR. BERNICK:

16   Q.   So, what is the correct --

17   A.   It's $225 million.

18   Q.   Okay, $225 million.

19   A.   Seven forty-four, $225 million.  And, this (indicating), I

20   think, is 869.  That's one billion sixty-eight, I believe.

21   Q.   Well, let me just -- I'm sorry, Dr. Peterson.

22   A.   Sure.

23   Q.   If we just went through and did the calculation for what

24   would take the place of the two billion, zero, zero seven in

25   the last column of red Number 17, of Exhibit 2000, what would

Peterson - Cross                                    114

1   you should be validating that forecast by taking a look at how

2   disease actually has arisen in that group, historically?

3   A.   Yes, although -- I mean, that's the validation step you're

4   talking about.   That's what you're going to use.   The study,

5   itself, that's not included in the study.   You have the

6   population estimate, the dosage, as well as the probability

7   of getting asbestosis, which is the medical model, plus other

8   features like the time of exposure and so on.

9   Q.   So, again, to make that epidemiological forecast, you need

10  a defined exposure group, you need to know what their dose was

11  of asbestos, as well as their expected response, and then you

12  can make a prediction of how many people are going to get sick

13  over what period of time; fair?

14  A.   I don't want to nitpick, but I've dealt with you.   That --

15  Q.   This is our first time, Dr. Peterson.

16  A.   No, but I've known you for -- I've enjoyed your friendship

17  for many years.   The bottom part of that is not a response,

18  it's the probability of getting cancer.

19      So, yeah, you just mischaracterized that a bit.

20  Q.   I'll write "probability."

21  A.   It's probability model, perhaps, if you want --

22  Q.   "Probability model."

23  A.   Now, I'm happy.

24  Q.   I'll write down anything you want me to.

25  A.   I don't think that's true.

1    Q.   I'll write down what you say, now.

2         So, we now know that, to make an epidemiological forecast,

3    we need the exposure group, the people who were exposed to

4    asbestos, we need their dose, and we need a probability model

5    that applied to that group; --

6    A.   Yes.

7    Q.   -- fair?

8    A.   Yes.

9    Q.   Now, on the basis of that, epidemiologists can forecast

10   how much disease is expected to arise in the future; fair?

11   A.   That's the basic model here, yes.

12   Q.   And, if they're really good, they'll come back later on

13   and they will try to validate their model by actually taking a

14   look at disease that's diagnosed within that group as being

15   caused by that exposure -- not by some other exposure, but by

16   that exposure, correct?

17   A.   Yes.   Presumably, that's the case, yes.

18   Q.   Okay.   Now, when it comes to Babcock & Wilcox, isn't it

19   true that nobody has determined -- we can't find out in your

20   report, in any event -- we can't find in our report a defined

21   group of people who are the people actually exposed to Babcock

22   & Wilcox asbestos, can we?

23   A.   I have not provided such an estimate, no.

24   Q.   If we go to your report, we can't find the dose that

25   actually was experienced by anybody who was exposed to Babcock

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

116

Peterson - Cross

1   & Wilcox asbestos, can we?

2   A.   I think that's not true.

3   Q.   Well, you tell me the dose estimate for -- I guess where

4   I'm falling a little bit -- if you don't have a group

5   defined, how can you know what their dose was?

6   A.   The dose -- the people who were exposed to Babcock &

7   Wilcox asbestos were also exposed, almost universally, to the

8   asbestos products of other defendants, other manufacturers,

9   because including -- in addition to the boilers, there are

10   pipes.   I mean, a boiler is an instrument for heating.   There

11   are hot pipes that are around it.   Those pipes are insulated.

12   So, people are exposed to asbestos from a number of sources.

13       The Nicholson and KPMG estimates provide estimates of the

14   dose that people were exposed to, and the population of

15   persons exposed to products -- to asbestos by B&W were also

16   exposed to the products of these other people.

17       So, those estimates, that are Nicholson, are what you

18   would use to estimate the dose for the persons exposed to B&W,

19   as well.

20   Q.   No.   Then I'll be more precise in my question.

21       Is there anywhere in your report where we can find the

22   dose of people exposed to Babcock & Wilcox asbestos, the dose

23   that resulted from that asbestos exposure, as opposed to other

24   kinds of asbestos exposure?

25   A.   You can't -- then if you do that, you can't apply the

1    medical model, because the medical model is based upon all

2    the exposure, all of the asbestos people were exposed to.

3    Q.   Okay.   So, if we don't know how much the exposure was to

4    Babcock & Wilcox asbestos, in particular, we can't do

5    epidemiological forecasts for the resulting disease; is that

6    fair?

7    A.   It's a meaningless exercise.   You can't do it, because --

8    you cannot conduct a meaningful epidemiological study of the

9    impact of asbestos exposure of an individual defendant when

10   they've been exposed to asbestos from a variety of defendants,

11   because it's the effect of the exposures across all of the

12   defendants that, together, cause the probability of getting

13   the disease.

14   Q.   So, if we want to know the extent of disease actually

15   caused by exposure to Babcock & Wilcox asbestos, science does

16   not give us a way of quantifying that disease; fair?

17   A.   You're talking in an aggregate, the total number of

18   persons?

19   Q.   Yes.

20   A.   I don't believe they can do that, no.

21   Q.   Okay.   Now, in point of fact, we come back to your

22   testimony that I think has already been shown to the Court.

23   Does that testimony remain true today, which, as I asked you,

24   "Is it true that you have nowhere determined whether and how

25   much malignant disease was actually caused by exposure to

118

Peterson - Cross

1   Babcock & Wilcox products?"

2        Your answer was:  "No, I've not determined that."

3        Does that testimony remain true today?

4   A.   Well, actually, I think I probably answered only part of

5   your questions.  It was a compound question.  The "whether,"

6   yes, I have determined that there are people who have cancer.

7   The "how much malignant disease," I can't and still have not

8   determined, no.

9   Q.   Nor does your model tell us how much malignant disease

10  will result from Babcock & Wilcox asbestos in the future;

11  fair?

12  A.   The model is all based upon the total incidence of these

13  diseases caused by asbestos, in the total population, as I've

14  said before.  That's the total estimate.  We've gone over

15  that.  That's compared with the number of claims.

16       The estimate of the total -- you can hypothetically

17  estimate what that is, but you cannot actually estimate the

18  total number of incidences of cancer from B&W's asbestos, no.

19  Q.   Maybe you've answered it:  You can't and you've nowhere

20  determined how much disease either has or will result from

21  Babcock & Wilcox asbestos, specifically; fair?

22  A.   Solely from asbestos.  It's a meaningless concept.

23  Q.   Okay.  Now, I want to focus back on your statement today

24  about claims; that is that you are dealing with claims, right?

25  A.   That's what I'm projecting.

Peterson - Cross

1    Q.   That's what you're projecting, and the epi-studies and

2    medical studies, they deal with disease, right?

3    A.   Yes.

4    Q.   And, the two are not necessarily the same; fair?

5    A.   They're related, but they're not the same.

6    Q.   I want to deal, now, -- and I'm going to -- try to keep

7    track of this and tell me if I go wrong.  You have an estimate

8    for future non-malignant claims, right?  That's what we just

9    got done talking about.

10   A.   Yes.

11   Q.   In order to make that estimate work, you first of all need

12   a future non-malignant ratio, right?

13   A.   That's what I use, yes.  That's how I derive it, in part.

14   Q.   And, you also need future malignant claims.

15        So, you take the future malignant claims and you use the

16   ratio and you figure out the future non-malignant claims.

17   A.   That's it.

18   Q.   In order to get the future malignant claims, that, in

19   turn, depends on having your analysis of future propensity,

20   correct?

21   A.   Yes.

22   Q.   And, future propensity depends upon past propensity,

23   correct?

24   A.   Both the absolute level prior to the projection point, and

25   the trends, yes.  Two elements of it.

_ 126

Peterson - Cross

1    doesn't necessarily imply it's going to be the same.  In this

2    case, it probably is.

3    Q.  It probably is.  You're basically assuming, in your model,

4    that Babcock has got a history of settling a certain volume

5    of claims of a certain quality on a certain basis, and the

6    essence of what your model does is to predict the number of

7    claims that will result if that settlement program proceeded

8    and continued, correct?

9    A.  I don't think that it's very contingent, the number of

10    claims, on the particular process by which B&W settled it,

11    settled their claims.  The amount that got paid, the number of

12    claims that got paid, the percent there I have essentially --

13    the value is predicated upon a continuation of the past

14    settlement practices.  I think that isn't quite as important

15    an assumption with regard to the numbers of claims.

16        But, I'm essentially projecting future claims based upon

17    the past experience of B&W in this period of time in the

18    1990s, and I'm valuing them based upon how B&W valued them in

19    the past.

20        So, I'm projecting a future that is essentially based on

21    the past experience of B&W, both with regard to the claims it

22    received and with regard to how they valued those claims.

23    And, if B&W continued to value claims in the same way, the

24    liability they would have is what I'm projecting.

25    Q.  Going back to non-malignant claims, you've told us that

Peterson - Cross

1   there's no epidemiology that tells us the total volume of

2   those claims, right?

3   A.    There are observations by estimates by epidemiologists,

4   but they're quite general.

5   Q.    Okay.  You told us, incidentally, this morning that 33

6   percent of all mesothelioma cases in the entire country were

7   claimed against Babcock & Wilcox.  Do you recall that?

8   A.    During the four years prior to June 1998, that's correct.

9   Q.    And, 25 percent of all the lung cancer claims were claimed

10  against Babcock & Wilcox --

11          MR. BERNICK:    Strike that.

12  BY MR. BERNICK:

13  Q.    Twenty-five percent of all the asbestos-related lung

14  cancer disease --

15  A.    Deaths.

16  Q.    -- deaths were claimed against Babcock & Wilcox; true?

17  A.    Again, during the same period, yes.

18  Q.    Okay.  And, when it comes to the total percentage of all

19  of the non-malignant disease claims in the United States that

20  were actually lodged against Babcock & Wilcox, you said you

21  had a sense of what that percentage is?

22  A.    I don't think I have a sense of the percent.  I have kind

23  of a sense of the volume.

24  Q.    A sense of the volume.

25          Isn't it --

FORM CSR-I-LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

- 134

Peterson - Cross

1  defines or leads to the ratio that you have used to generate

2  the forecast, correct?

3  A.  My ratio is not an epidemiological study.  It's not the

4  kind of subject matter that epidemiology investigates.  It

5  doesn't deal with legal claims.

6  Q.  And it's --

7  A.  It's not its area of expertise.

8       MR. BERNICK:  Your Honor, I have no further questions

9  at this time, except that I'd like to offer into evidence,

10  Exhibits 5121 and 5122.  These are two documents that I quoted

11  from earlier today.  They are both authored by Dr. Peterson,

12  one in 1992 and one in 1994, and they both speak to the issue

13  of the ability to forecast propensity.

14       Exhibit 5121 is an August 27, 1992 memo from Mark

15  Peterson to Tom Henderson.

16       Exhibit 5122 is a report of findings regarding H.K.

17  Porter, done by Mark Peterson on January 6th of 1994.  And

18  the witness has acknowledged, albeit it qualified, the

19  statements that were made in those documents.

20       MR. INSELBUCH:  No objection.

21       THE COURT:  They're admitted.

22       MR. BERNICK:  I have nothing further.

23       MR. AFRICK:  Good afternoon, Your Honor.  Joel Africk

24  for the non-Debtor Defendants.  I promise to be mercifully

25  brief.

Peterson - Cross

1          *    *    *    *    *

2                CROSS-EXAMINATION

3    BY MR. AFRICK:

4    Q.   Dr. Peterson, I just want to leave the area of your

5    estimate of future claims for a minute, to follow up on a

6    point concerning your estimate of B&W's pending claims.  So,

7    if you'd just kind of redirect your mindset from the future,

8    back to the pending claims.

9    A.   Very well.

10   Q.   Am I correct, sir, that you have estimated B&W's liability

11   for pending asbestos claims at somewhere from $377 million to

12   $424 million, as of June 30, 1998?

13   A.   Yes.

14   Q.   And on that date, according to your analysis, there were

15   some 57,800 claims pending, is that correct?

16   A.   Those were claims that, in the database, were identified

17   as pending claims, yes.

18   Q.   And what you have done is you have estimated for the

19   Court, the cost of settling those 57,850 claims, correct?

20   A.   Correct.

21   Q.   And you came up with a range from $377 million to $424

22   million, based on the assumed continuation of the

23   settlement process that Mr. McKnight talked about yesterday,

24   correct?

25   A.   Yes.

1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS

* * * * * * * * * * * * * * * *

IN THE MATTER OF:

THE BABCOCK & WILCOX CO., ET AL,

DEBTORS.

* * * * * * * * * * * * * * * *

THE ASBESTOS CLAIMANTS'
COMMITTEE, ET AL,

        PLAINTIFF-INTERVENORS,

VERSUS

BABCOCK & WILCOX INVESTMENT
COMPANY, ET AL,

        DEFENDANTS.

* * * * * * * * * * * * * * * *

CASE NO. 00-10992
through  00-10995
(Jointly Administered)

SECTION "B"

CHAPTER 11

ADVERSARY NO. 01-1155

        Transcript of the proceedings taken in the above-caption matter on Friday, November 2, 2001, the Honorable Jerry A. Brown, United States Bankruptcy Judge, presiding.

AUDIO OPERATOR:    Gene Ann Avenel

TRANSCRIPTIONIST: Dorothy Bourgeois

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Peterson - Cross

79

1  he's using to check and to run this, this confidence interval

2  analysis isn't the same -- it doesn't have the same numbers of

3  mesothelioma diagnoses in 1996 and '97 as Dr. Florence did.

4  It's a different model, it's a different analysis.

5      And it's the difference between what Dr. Dunbar says

6  Florence says, about the meso and lung cancer diagnoses that

7  is the basis for all of the analyses that Dr. Dunbar does.

8  Dr. Dunbar finds a disparity between what the database says

9  about the actual diagnoses in the year, with what he says the

10  Florence model was. And it's that difference, that disparity,

11  that drives all of the analysis subsequent to it. But, in

12  fact, there was no difference because, in fact, the model was

13  calibrated so it would be precisely that.

14      So, whatever Dr. Dunbar was doing, he was using some

15  kind of analysis that was different than Dr. Florence, but we

16  don't have the derivation of what his model was, so we don't

17  know how he got it. All we know is it's different, it's not

18  what Dr. Florence testified about, it's not his analysis.

19          THE COURT: All right.

20          MR. PATTON: No further questions, Your Honor.

21          THE COURT: All right. Cross-examination.

22                  *   *   *   *   *

23                  CROSS-EXAMINATION

24  BY MR. BERNICK:

25  Q.  Good afternoon, Dr. Peterson.

80

Peterson - Cross

1   A.  Good afternoon, Mr. Bernick.

2   Q.  I want to begin by asking you some questions about --

3   well, it's going to be a short examination, we're running out

4   of paper.

5   A.  Mr. Inselbuch stole it.

6   Q.  All right.  You have some testimony about multiple

7   exposures.  You said that the people who worked at facilities

8   that had Babcock & Wilcox boilers had exposure to Babcock &

9   Wilcox asbestos, and then also to asbestos from other sources,

10   or something to that effect, is that right?

11   A.  That's true, yes.

12   Q.  Okay.  Now, in point of fact, you don't know the size of

13   the group of people who were actually exposed to Babcock &

14   Wilcox asbestos, do you?

15   A.  No.

16     Well, I know in order of magnitude but I certainly don't

17   know a precise number.

18   Q.  Did you testify in this trial at Page 115, as follows, Dr.

19   Peterson:  "Now, when it comes to Babcock & Wilcox, isn't it

20   true that nobody has determined -- we can't find out in your

21   report, in any event -- we can't find in your report a defined

22   group of people who are the people actually exposed to Babcock

23   & Wilcox asbestos, can we?"

24     "I have not provided such an estimate, no."

25     You do not have an estimate of that exposure proof, do

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6

Peterson - Cross

81

1    you?

2    A.  No, I do not have an estimate of the number of persons who

3    were exposed to Babcock & Wilcox, which is another reason why

4    it's difficult to do an epidemiological model specific to

5    Babcock & Wilcox.

6    Q.  Let's talk about causation of disease.  Isn't it true that

7    with respect to causation of disease, you don't know the

8    number of people who have gotten sick from Babcock & Wilcox

9    asbestos, correct?

10   A.  That's precisely the point.

11   Q.  Let's talk about a different group of people.  Let's talk

12   about people who have got claims.  As of 6/98, as of June

13   1998, the total number of people who had pursued claims

14   against Babcock & Wilcox.  You don't know how many of the

15   people exposed to Babcock & Wilcox actually made claims, do

16   you?  You don't know the percentage or degree to which people

17   who had been exposed actually made claims, do you?

18   A.  That's correct.

19   Q.  You don't know the percentage of the people who got sick

20   from Babcock & Wilcox asbestos, who actually made claims, do

21   you?

22   A.  That's correct.

23   Q.  In fact, the figure that you provided when you said,

24   "Well, the number of claims that had actually been paid by

25   Babcock & Wilcox were a very small percent," they were a very

Peterson - Cross

1    small percent of the total number of people who had been

2    exposed to asbestos from any source. That's the percentage

3    you gave us, correct?

4    A. Yes, it's the number of persons that Dr. Nicholson

5    estimated were exposed to asbestos and were alive in 1980.

6    They were -- they had an occupational exposure to asbestos in

7    one of the identified industries which were specified in

8    Nicholson and which correspond to the industries from which

9    claims arise for B&W.

10   Q. And you don't know -- you don't know the number of people

11   that actually got exposed to Babcock asbestos and the

12   relationship that that bears to the total of number of people

13   who got exposed to asbestos from any source, correct?

14   A. We don't -- because we're unable to do an epidemiological

15   study for B&W, we cannot know -- well, first of all, you can't

16   do a count of that, but what I also said on my -- on the

17   rebuttal, is that be it --

18   Q. Would you just answer the question first, please. You

19   don't know the percentage or the relationship between the

20   total number of people actually exposed to Babcock & Wilcox

21   asbestos and the total number of people exposed to asbestos

22   from all sources, do you?

23          MR. INSELBUCH: Your Honor, I object to the Counsel

24   interrupting the Witness' answers. If he doesn't like the

25   answers, if he thinks they're not responsive, he can move to

Peterson - Cross

1    the Court.

2            THE COURT: Well, I'm going to overrule your

3    objection and tell the Witness: Answer yes or no, if you can,

4    then you can explain. And I'll make sure you get a chance to

5    explain.

6            THE WITNESS: Thank you.

7            I'm sorry. Could you repeat the question?

8    BY MR. BERNICK:

9    Q.  You don't know the number -- you don't know the

10   relationship, the percentage that the number of people exposed

11   to Babcock & Wilcox asbestos bears to the total number of

12   people who have been exposed to asbestos from any source, do

13   you?

14   A.  No, I don't know that. And the reason I can't know that

15   is because Babcock, the asbestos that came from Babcock &

16   Wilcox boilers was only a subset, a part, as you've drawn the

17   diagram here of all of the asbestos to which these people were

18   exposed, both at this place and other places. And because

19   asbestos disease is a dose response disease, all of that

20   asbestos together and jointly caused the probability of

21   disease that people got and caused their diseases. They all

22   are implicated and they all contribute to the cause because of

23   the dose response relationship.

24          So, that's -- but since I cannot do that calculation of

25   the total asbestos to which these people were exposed, I

Peterson - Cross

1  cannot do that calculation, no.

2  Q.  Well, let me just ask you this:  Can you identify a single

3  Babcock & Wilcox claimant who wouldn't have gotten sick but

4  for the fact that he was exposed to Babcock & Wilcox asbestos?

5      Wouldn't have gotten sick but for the fact that he was

6  exposed to our asbestos?

7  A.  I can't identify an individual.  There certainly are such

8  persons because of the dose response nature of the

9  relationship between asbestos fibers and asbestos diseases, so

10  there are some but that number has not been estimated either.

11  Q.  Okay.  I want to ask you something else.  Let's take the

12  claims and put them on another page.  The same claims, as of

13  6/98.  And instead of talking about exposure and disease, I

14  want to talk about non-epidemiological factors and their

15  impact on claims.

16      Now, you showed us on direct examination, this chart,

17  "Factors affecting propensity to sue."  And would it be fair

18  to say, Dr. Peterson, that all of these factors are non-

19  epidemiological factors?

20  A.  Yes.

21  Q.  Okay.  And it's true, is it not, that non-epidemiological

22  factors, I think you told us the first time you were here,

23  play a big role when it comes to propensity to sue, correct?

24  A.  Well, essentially, it's the step between the epidemiology

25  and the number of claims.  It's what causes the persons who

Peterson - Cross                    85

1   are injured, that population of persons, --

2   Q.   Well, let's --

3   A.   -- to make claims.

4   Q.   Well, let's be responsive though, Dr. Peterson.   You

5   agreed wholeheartedly, I think, with the idea that these

6   factors play a big role in the claiming process, true or not?

7   A.   Of course.

8   Q.   Okay.   And today, as I took down your testimony, you said

9   -- you were kind of quantifying them; do you recall that?

10  A.   (No response)

11  Q.   That chart was your effort to quantify these non-

12  epidemiological factors, unchanged increase, unchanged

13  deceleration, unchanged.

14       Those were your words on direct examination, correct?

15  A.   No, I think that's not entirely correct.   I said that if

16  there isn't a change, I can certainly quantify that.   That's a

17  zero change, so that's quantifiable.   I said that I could

18  state the direction of increase or decrease, but I couldn't

19  give you a precise percentage of it.

20  Q.   Okay.   Well, in point of fact, you have done no

21  statistical study quantifying the impact of non-

22  epidemiological factors on Babcock & Wilcox claims, have you?

23  A.   That's correct.   I haven't.   And as again, as I said in my

24  direct, you cannot do meaningful studies because these are

25  compounded in the real world and their effects cannot be

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Peterson - Cross                    86

1   disaggregated.

2   Q.  Indeed, isn't it true that you have done no specific

3   study of any kind regarding these factors and Babcock &

4   Wilcox; true or not?

5   A.  I think that's not true.

6   Q.  Let me show you Page 74 of your cross-examination in this

7   trial:  "Isn't it true that when you decide to continue that

8   ratio going forward into the future again, there's no

9   quantitative analysis of how those non-epidemiological factors

10  will, in fact, affect the propensity ratio in the future, is

11  there?"

12      Answer:  "As I've said before, I've taken those factors to

13  understand why the particular ratio obtained here, and those

14  are the kinds of things I consider in addition to simply the

15  numbers from B&W, to make the projection.  The most reasonable

16  projection is that they will continue into the future and ask

17  a quantitative projection."

18      And then you finally got around to my question:  "But I

19  didn't do any specific study of these issues within the

20  context of B&W claims."

21      Wasn't that your testimony on cross-examination earlier in

22  this trial?

23  A.  Yes, it was.  But that was a different question that you

24  just asked me.  You asked me if I'd studied it, and yes, I've

25  studied it.  I've looked at how these impact the claims.  I've