IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**DEBTORS' RESPONSE TO THE SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS TO MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this response (the "Supplemental Response") to the supplemental objection (the "Supplemental Objection") of the Official Committee of Asbestos Property Damage Claimants (the "PD Committee") to the motion of the Debtors for an order authorizing, but not requiring, the implementation of revised compensation programs (the "Motion"). The Debtors respectfully represent as follows:

### Introduction

1.      The PD Committee continues to misunderstand and misrepresent the Revised Compensation Programs[1] requested by the Debtors. Indeed, the PD Committee's objections to the Revised Compensation Procedures are simply one more incidence of the PD Committee's consistent practice of delay in these chapter 11 cases.

2.      As set forth in more detail in the Response, the Debtors first presented the proposed Revised Compensation Programs to the PD Committee's financial advisor, Conway,

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion and the Debtors' response to the objection of the PD Committee to the Motion (the "Response") .

Del Genio Gries & Co. ("Conway"), at the March 12 Presentation. At no time did the Debtors or Blackstone inform Conway that the material was not to be distributed to or discussed with the PD Committee legal advisors or Committee members. In fact, nothing (including the confidentiality agreement executed by Conway with the Debtors) prohibited Conway from communicating with the PD Committee's counsel or Committee members and Conway explicitly told Blackstone that its comments reflected the Committee's concerns. Instead of expressing fundamental misgivings concerning the Revised Compensation Programs, the PD Committee, through Conway, suggested modifications to the Revised Compensation Programs (of which all but one modification were made) and ultimately expressed no serious reservations pertaining to the Revised Compensation Programs. Nonetheless, at the eleventh hour, the PD Committee filed its Objection contending that the Revised Compensation Programs should not be implemented at all.

3.    Moreover, the PD Committee fails to offer any valid substantive reason in support of its Objection. In fact, the PD Committee, contrary to prevailing case law, fails to present any evidence whatsoever that the Revised Compensation Programs, as approved by the Debtors' totally independent compensation committee of their board of directors, are not a valid exercise of the Debtors' sound business judgment. The PD Committee merely relies on unsupported allegations and conclusory statements to contend that the Revised Compensation Programs are not acceptable because: (a) the Debtors take inconsistent positions as to their solvency; (b) the Debtors selected inappropriate comparison groups to develop the Revised Compensation Programs; and (c) the Debtors bear no risk of Key Employees leaving in the future.

4.    The PD Committee could not produce any concrete evidence in support of these allegations even if they tried to do so. First, although the Debtors have consistently maintained

that they are solvent and their stock has value, the value which stock options possess with regard to employee retention and motivation has been reduced essentially to zero. Second, the Revised Compensation Programs were developed through a rational, well-reasoned process, using comparison groups which are appropriate for benchmarking each of the component programs. Third, the Debtors have a reasonable concern about employee departures in the future. The Debtors believe that the loss of any Key Employees will cause a far greater loss to the estates than the incremental cost of the Revised Compensation Programs. The PD Committee provides no evidence to dispute any of the Debtors' reasoned conclusions.

**Revised Compensation Programs**

5.      The revisions requested by the Debtors to their employees' compensation package consists of changes to three program components: (a) retention bonus, (b) long-term incentives and (c) severance. Given the PD Committee's continued misunderstanding of the basic terms of the Revised Compensation Programs, the following tables provide a further summary of the key terms of the Revised Compensation Programs, highlighting the changes from the existing programs and the changes the Debtors made (at the request of the Committees) from the proposal presented to the Committees at the March 12 Presentation:

### Revised General Retention Program

| Current and Revised General Retention Programs (Excludes CEO) | | | | | | |
|---|---|---|---|---|---|---|
| | Current Plan (2001–2002) | | Revised Plan (2003–2004) (as presented to the Committees on March 12, 2002) | | Revised Plan (2003–2004) (as submitted for court approval) | |
| Target payout: | Annual Amount | % of salary | Annual Amount | % of salary | Annual Amount | % of salary |
| Tier 1 | $2.1 million | 50 | – | Individually tailored awards ranging from 30% to 85% per annum | – | Individually tailored awards ranging from 15% to 65% per annum |
| Tier 2 | $1.7 million | 25 | – | | – | |
| Tier 3 | $0.8 million | 12.5 | – | | – | |
| Total Participants | $4.6 million | | $9.3 million | | $6.7 million | |
| Average Award | $40,000 | | $80,635 | | $56,000 | |
| Payout Timing | Tier 1 receives a lump sum for 2 years at the start of the plan period; Tiers 2 and 3 receive payout in regular payroll intervals. | | Tier 1 receives lump sum at the end of each calendar year; Tiers 2 and 3 receive payout every six months. | | Tier 1 receives lump sum at the end of each calendar year; Tiers 2 and 3 receive payout every six months. | |

### 2002-2004 LTIP

The 2002-2004 LTIP is a new program, of the same type as, but entirely separate from, the 2001-2003 LTIP. Each LTIP is designed to cover a three year period in which the compound annual target EBIT growth rate must be met in order for an eligible employee to receive the targeted payout. Each LTIP provides a single incentive payout, broken into an estimated payment (if earned) at the end of the second plan year and a final payment (if earned) at the end of the third plan year. The plan is designed with rolling three year award cycles to provide an annual long-term incentive opportunity equivalent to the opportunity under an annual stock option reward. Although the time periods for determining the amount of payout earned partially overlap, the two LTIP plans are entirely separate. Thus, an eligible employee could be a participant in three separate LTIP plans during any calendar year--one plan in the first year of its three year cycle, one plan in the second year of its three year cycle, and one plan in the final year of its three year cycle.

| Comparison of Key Terms of 2001-2003 and 2002-2004 Long-Term Incentive Plans | | | |
|---|---|---|---|
| | 2001-2003 LTIP | 2002-2004 LTIP (as presented to the Committees on March 12, 2002) | 2002-2004 LTIP (as submitted for court approval) |
| Target Payout Total | $11.8 million | $14.0 million | $11.8 million |
| Target Payout per Employee | 9-120% of salary | 14-144% of salary | 14-126% of salary |
| Form of Payout | 50% Stock Options/50% Cash | 100% Cash | 100% Cash |
| Growth threshold for target payout | 10% compound annual 3-year growth in EBIT | 6% compound annual 3-year growth in EBIT | 6% compound annual 3-year growth in EBIT |
| Maximum payout | 200% of target at 25% growth | 400% of target at 25% growth | 200% of target at 25% growth |
| Minimum payout | 0% at less than 5% | 0% if no growth; prorated between 0% and 6% | 0% if no growth; prorated between 0% and 6% |
| Payout timing | Pays 33% on 3/31/03; 66% on 3/31/04 | Pays 33% on 3/31/04, 66% on 3/31/05 | Pays 33% on 3/31/04, 66% on 3/31/05 |

**Revised 2001-2003 LTIP**

Based on the Court's comments at the July 22 Hearing, the Debtors withdraw their request to modify the 2001-2003 LTIP previously approved in the Wage Order. Awards under the 2001-2003 LTIP will remain in the form of 50% cash and 50% stock options.

**Revised Severance Pay Programs**

The change in control severance program is designed to give the Debtors' employees protection in the event that the company is sold or merged and there are job losses in connection with the transaction.

| Change in Control Severance Program | | |
|---|---|---|
| | Expired Program | Program as Originally Proposed on March 12, 2002 and Program Submitted to the Court |
| Payout per Year of Service | 4 weeks | No change |
| Minimum Payout | 16 weeks | No change |
| Maximum Payout | 52 weeks | No change |
| Period of coverage | 24 months after change in control | No change |
| Effect of Plan of Reorganization | Termination related to Plan of Reorganization is covered if implementation of Plan of Reorganization results in a change in control | Termination related to Plan of Reorganization is not covered |

The Change in Control Severance Program expired December 31, 2001. The program submitted to the Court merely reinstates the expired program and modifies the definition of change in control to be consistent with the definition used in the Key Employee Retention Programs, as set forth in the order of this Court dated June 22, 2001.

| Salaried Severance Program | | | |
|---|---|---|---|
| | Existing Program | Program as Originally Proposed on March 12, 2002 | Program Submitted to the Court |
| Payout per Year of Service | 1.5 weeks | No change | No change |
| Minimum Payout | 4 weeks | No change | No change |
| Maximum Payout | 52 weeks | No change | No change |
| Effect of Plan of Reorganization | Covered under change in control program | Involuntary termination related to Plan of Reorganization, within one year before or after the effective date of a Plan only, entitled to 6 month minimum | Involuntary termination related to Plan of Reorganization, within one year after the effective date of a Plan only, entitled to 4 month minimum |

**The Revised Compensation Programs are Supported by Sound Business Judgment**

6.    As set forth in the Motion, the Response and the affidavits attached thereto, the

Debtors exercised sound business judgment in determining that the Revised Compensation

Programs are necessary to the success of their business.   Indeed, the Revised Compensation

Programs have been approved by the Debtors' totally independent compensation committee of

their board of directors, chaired by John F. Akers, retired chairman and chief executive officer of

IBM.[2]   The PD Committee, however, challenges the Debtors business judgment based on no

concrete evidence, and relies solely on unsupported allegations.   This is entirely inappropriate.

Indeed, as the Court in In re Montgomery Ward Holding Corp. made clear, "an objectant is

required to produce some evidence supporting its objections." 242 B.R. 147, 155 (D. Del. 1999).

In particular, the PD Committee bases its Objection upon three unsupported allegations.   As

discussed below, the PD Committee, even if it attempted to do so, can not support such

erroneous contentions, and as a result thereof, the PD Committee has failed to demonstrate that

the Debtors have not satisfied the business judgment standard.

*The Debtors' Stock has Value, but Stock Options*
*have Lost their Value as an Incentive*

7.    The Debtors have consistently maintained that they are solvent and that their

stock retains positive worth.   Even though the stock retains value, however, the motivational

value of stock options to an employee is, at this point, reduced to a speculative level. (Norris

Aff. at ¶ 6; Norris Dep. at 40:22-41:3; Bubnovich Dep. at 84:4-85:7).   Indeed, the uncertain

---

[2]   In addition to Mr. Akers, the Debtors' compensation committee is comprised of five independent, outside directors: H. Furlong Baldwin, Chairman of the Board and former President and CEO of the Mercantile Bankshares Corporation; Ronald C. Cambre, retired Chairman of Newmont Mining Corporation; Marye Anne Fox, Chancellor of North Carolina State University; John J. Murphy, retired Chairman of the Board of Dresser Industries, Inc.; and Thomas A. Vanderslice, former Chairman and Chief Executive Officer of M/A-COM.

nature of these chapter 11 cases in which asbestos liabilities have not yet been resolved, combined with the fact that the ultimate treatment and value of such stock options in a plan of reorganization may have little, if any, correlation to the Debtors' financial performance relative to the marketplace (as would be the case outside of bankruptcy), minimizes the value of stock options as a retention tool. (Norris Dep. 19:1-21:16). The purpose of the Revised Compensation Programs is to motivate the Debtors' employees to work to improve the Debtors' financial performance and to remain with the Debtors during their chapter 11 cases and beyond. Retaining a stock option component under the present circumstances does not provide any perceived value to employees, thus defeating its intended purpose. (McGowan Deposition at 65:6-66:3).

8.      The PD Committee provides no evidence whatsoever (in the form of affidavits or otherwise) to contest the Debtors' reasoned business judgment that stock options have lost their value to employees as a motivational and retention tool. Instead, the PD Committee attempts to cloud the issue by arguing that the Debtors' determination that the 2002-2004 LTIP will only pay cash (and not a combination of cash and stock options as provided by the 2001-2003 LTIP) somehow undermines the Debtors' position in these chapter 11 cases that they are not insolvent. First of all, the Debtors have not, and do not, take the position that the Debtors are insolvent.[3]

---

[3] The PD Committee cites to the following excerpts from Mr. Norris' deposition:

"Q    Well, did you have an understanding as to what the value would be of those stock options if you did, in fact, file for bankruptcy which was certainly being contemplated at that time?

A      Yes, we understood that in all likelihood the stock options would have no value." (Norris Dep. at 13:2-13:8).

and

"A    ...if I had the opportunity to redesign that plan, recognizing that that plan was designed in a rather hurried fashion to replace an existing equity plan which was obviously not going to provide incentive, I would not have established the mechanism in quite the same fashion nor would I have established the target in quite the same fashion." (Norris Dep. at 47:9-47:16).

(Continued...)

More importantly, however, the PD Committee ignores the fact that whether or not the stock or the options have value is unimportant in the context of the Revised Compensation Programs--the only relevant consideration is whether the employees believe that they are receiving value through the stock options.    It is the Debtors' reasoned business judgment that employees perceive stock options in the context of these chapter 11 cases as having only speculative value at best and therefore does not have value for motivation or retention.    (Norris Dep. at 18:18-18:20 & 40:22-41:3; McGowan Dep. at 18:18-19:3).    Once again, the PD Committee cites to absolutely no evidence to contest this reasoned business judgment.[4]

### The Methodology used in Developing the Revised Compensation Programs is Reasonable

9.    The particular comparable companies used in developing the Revised Compensation Programs provided appropriate comparisons given the Debtors status as chapter 11 debtors and the nature of the programs being developed.    As set forth below and in the Supplemental Affidavit of Nick Bubnovich, attached hereto as Exhibit A, the comparison groups selected were appropriate for each particular program:

---

While Mr. Norris suggests that the existing stock options may have no value, it is inappropriate for the PD Committee to make the inference that, as a result, the Debtors are insolvent.  While the concepts of the Debtors' solvency and the value of the stock options may be related, such concepts are distinct and are not interdependent.  Indeed, given the requirements of the Bankruptcy Code and the context of negotiations to develop a plan of reorganization, there are certainly circumstances where, although the Debtors are determined to be solvent, holders of stock options may receive no distribution on account of such options under a proposed plan.

[4] Compare the PD Committee's lack of evidence with the following testimony from Mr. McGowan: "A    I don't know of any companies operating under Chapter 11, you know, historically have ever issued stock options because until you know what a reorganization plan -- how would you motivate people by giving them a stock option that you don't know what those stock options -- what's going to happen to those stock options in a reorganization plan.  They could just get wiped out.  Depending on what happened -- even if the equity gets a substantial amount, stock option holders might get nothing.  So it's a big uncertainty." (McGowan Dep. at 65:17-66:3).

- Long-Term Incentive Plan

    In analyzing the LTIP, Mr. Bubnovich reviewed the EBIT growth rate over each
    three year period from 1992 through 2000[5] for fourteen specialty chemical
    companies (the "Industry Peer Group"), including Dow Chemical and DuPont.
    (Bubnovich Supp. Aff. at ¶ 2). The use of an industry peer group is common
    practice to benchmark possible target performance levels for long-term incentive
    plans. (Bubnovich Supp. Aff. at ¶ 3). A critical decision in the long-term
    incentive design process is to select a performance measure (e.g., sales, operating
    income, EBIT, cash flow) and a target level of performance (e.g., $x million in
    sales, operating income, etc. or x% growth in sales, operating income, etc.).
    (Bubnovich Supp. Aff. at ¶ 3).

    The performance of industry peers is an invaluable guide to determining an
    appropriate and relative performance level under a long-term incentive plan,
    because each company within an industry group likely will be impacted by the
    same economic and market conditions. (Bubnovich Supp. Aff. at ¶ 4). Thus,
    companies in the same industry are likely to have their earning influenced by the
    same external factors. (Bubnovich Supp. Aff. at ¶ 4). The Industry Peer Group is
    appropriate because these companies are in the same industry as the Debtors and
    in some cases, direct competitors of the Debtors. (Bubnovich Supp. Aff. at ¶ 5).
    Performance in the specialty chemical industry is sensitive to general economic
    conditions and, therefore, economic factors which may affect the Industry Peer
    Group will also affect the Debtors. (Bubnovich Dep. at 63:1-63:3; Bubnovich
    Supp. Aff. at ¶ 5).

- General Retention Program

    In general, companies which are chapter 11 debtors have unique retention issues.
    (Bubnovich Supp. Aff. at ¶ 6). Employees at chapter 11 debtors have concerns
    about pay opportunities, their careers, and their employer's prospects.
    (Bubnovich Supp. Aff. at ¶ 6). Employees at companies not in chapter 11
    generally do not have such heightened concerns. (Bubnovich Supp. Aff. at ¶ 6).
    Thus, the Industry Peer Group would not provide an appropriate benchmark with
    regard to such concerns. (Bubnovich Dep. at 67:19-68:4; Bubnovich Supp. Aff.
    at ¶ 6). Most, if not all, chapter 11 debtors address these concerns through a
    retention bonus program. (Bubnovich Dep. at 67:11-67:15; Bubnovich Supp. Aff.
    at ¶ 6). Such programs help to preserve the debtor's enterprise value by focusing

---

[5] The 2001 figures were not available for all the companies in the Industry Peer Group when the analysis was originally
conducted. When the 2001 figures for the Industry Peer Group are included in the analysis, the average median growth rate for
each three year period during 1992-2000 for the Industry Peer Group goes down from 5.89% to 4.45% for each three year period
during 1992-2001 (a decrease of 32%) and the average of the average growth rate goes from 5.84% to 3.49% (a decrease of
67%). The revised analysis, even more so than the original analysis, strongly supports the use of 6% EBIT growth as an
appropriate target performance measure. (See Bubnovich Supp. Aff. at ¶ 2). A complete summary of the updated analysis is
attached hereto as Exhibit 1 to the Bubnovich Supplemental Affidavit.

employees on their day-to-day responsibilities and by minimizing the risk of employees seeking other employment. (Bubnovich Supp. Aff. at ¶ 6).

The Debtors' retention program is benchmarked against those of other recent, large mass tort liability chapter 11 debtors ("Mass Tort Debtors"), namely Federal Mogul, USG, Armstrong and Owens-Corning. (Bubnovich Supp. Aff. at ¶ 7). The rationale is that a retention program similar to those of other mass tort liability chapter 11 debtors' programs would best serve the Debtors' retention needs. (Bubnovich Supp. Aff. at ¶ 7). Unlike most other chapter 11 companies, Mass Tort Debtors typically have strong operating performance and want to keep management intact to maintain such performance. (Bubnovich Supp. Aff. at ¶ 7). Therefore, Mass Tort Debtors typically continue to provide competitive aggregate compensation and in some cases even a premium to retain the current executive team and key employees. (Bubnovich Supp. Aff. at ¶ 7). As a result of these unique considerations, the comparison of the Debtors retention plan to those of other Mass Tort Debtors is appropriate. (Bubnovich Supp. Aff. at ¶ 7).

- Severance Pay Programs

  To assess the enhancement to the Debtors' severance program, the severance programs of approximately 60 chapter 11 debtors were reviewed and analyzed to determine competitive participation levels and amounts. (Bubnovich Supp. Aff. at ¶ 8). This broader group of debtors (as opposed to the Mass Tort Debtors) was used because severance issues are typically a major concern to all employees of most chapter 11 debtors, given the likelihood of a potential sale, cost cutting measures or similar actions which might result in the loss of jobs. (Bubnovich Supp. Aff. at ¶ 8). Severance programs at chapter 11 debtors are often distinct and different from companies who are not facing significant financial challenges and therefore chapter 11 debtors (and not the Industry Peer Group, which consists entirely of non-debtors) are an appropriate measure of the competitiveness of the Debtors' severance program. (Bubnovich Supp. Aff. at ¶ 8).

- Total Direct Compensation Analysis

  In assessing the total compensation of the Debtors' top sixteen employees, Mr. Bubnovich analyzed the total compensation of similar positions using broad industry surveys and, to the extent possible, chemical industry-specific data. (Bubnovich Supp. Aff. at ¶ 9). Broad industry data was used where there was inadequate chemical industry survey data to perform a proper comparison. (Bubnovich Supp. Aff. at ¶ 9). Mr. Bubnovich needed to use a different comparison group rather than the Industry Peer Group because adequate information regarding the total direct compensation of the top sixteen employees was not available for the companies in the Industry Peer Group. (Bubnovich Supp. Aff. at ¶ 9). To produce a reliable analysis, Mr. Bubnovich looked to a wide range of companies (i.e. those participating in the surveys) to find a sufficient amount of information for the number of positions. (Bubnovich Supp. Aff. at ¶ 9).

10.    The PD Committee implies that the Debtors should have selected one group of comparable companies and used that one group for determining the appropriate levels for each of the programs.  However, the PD Committee fails to point to any evidence or testimony which supports its view in any way or demonstrates that the method selected by the Debtors and its professionals was unreasonable.  In fact, it would be incorrect and illogical to use one set of companies to benchmark retention bonus practices, EBIT growth, total direct compensation and severance and doing so is inconsistent with best practices.  (Bubnovich Supp. Aff. at ¶ 10). Rather than articulating an alternative approach or presenting a rational objection, the PD Committee resorts to name calling--the Debtors' method is a "shell game" and "schizophrenic" (Supp. Obj. at ¶ 13).  These unsupported accusations can not overcome the Debtors' substantial evidence that they exercised sound business judgment in developing and approving the Revised Compensation Programs.

11.    The PD Committee also objects on the ground that the Debtors have been unable "to provide any anecdotal or empirical proof" that the plans as approved in the Wage Order need to be modified.  That the Debtors have exercised sound business judgment in determining the need for the Revised Compensation Programs is supported by the affidavit of Mr. Norris[6] (attached to the Response) and the depositions of Mr. Norris[7] and Mr. McGowan.[8]  The evidence

---

[6] "I believe that the Revised Compensation Programs are necessary to meet the needs of Grace employees, show sound business judgment and are appropriate to achieve the objective of keeping personnel at a reasonable cost to the estate.  The importance of employees' trust in their leadership's ability to maintain and grow the long term value of the company cannot be overstated.  I believe that continuing to provide compensation programs that are valued by employees is one way to demonstrate management's resolve to keep their trust." Norris Aff. at ¶ 4.

[7] "So I think it's very important for the overall confidence of the organization to see the people that they respect and trust to remain with the organization and to continue to communicate positive things about the organization.  And I think that their compensation and how they're being treated, how they view their treatment inside the bankruptcy ...is important to the way they communicate with others. ... So as I said I think this is about their view of what's fair compensation ...given the industry and given the circumstances." Norris Dep. at 31:16-31:5.

11

presented indicates the Debtors need to implement the Revised Compensation Programs to maintain their low turnover rate, maintain employee morale and retain key employees who are essential to the Debtors' business operations and reorganization. (Norris Aff. at ¶¶ 4 & 9). The Debtors (together with their non-debtor affiliates) have achieved significant operating and financial success, with 2001 revenues of $1,723.2 million and operating profit of $187 million. The Debtors believe that the loss of any Key Employees would jeopardize this success and the value of their estates. Further, the Debtors in their business judgment believed the Revised Compensation Programs are reasonable in light of the circumstances surrounding the Debtors' chapter 11 cases including the degree of uncertainty related to the timing and effect on the capital structure of a plan of reorganization. (Norris Aff. at ¶¶ 4 & 9). Once again, the PD Committee has provided no evidence, whatsoever, to contest the Debtors' business judgment.

*The Debtors Reasonably Believe there is a Risk of*
*Key Employee Departures*

12.    The Debtors are aware that at least 22 of their current key senior and mid-level management employees have been approached by executive search firms, competitors and other companies looking to hire the Key Employees. (Norris Aff. at ¶ 3). Indeed, the Debtors have lost 5 key employees since the Petition Date.[9] Moreover, the Debtors believe that it is precisely the Key Employees who can find other employment because of their experience and proven skills. (Norris Aff. at ¶ 2; Response at ¶ 11). At least a dozen of the 118 key employees have approached Mr. McGowan to express concern about the level of compensation and opportunity

---

[8] "…it's a change necessitated because of the fact that we are in bankruptcy today, and we need to motivate and retain these people." McGowan Dep. at 66:24-67:2.

[9] At least one of the five left the Debtors specifically because of the uncertainty surrounding the bankruptcy. See Norris Dep. at 28:2-29:12.

with the Debtors. (McGowan Dep. at 30:7-30:24). The need to minimize the risk of losing even one of the Key Employees is essential to avoid (i) the time, expense and lost revenue related to finding a replacement, (ii) the loss of experience and knowledge of such Key Employees and (iii) the potential that those departing will influence others to leave the Debtors employ. (Norris Dep. 27:18-27:21 & 31:2-31:21). Further, the current satisfaction of the employees with the leadership of the Debtors (as noted by the PD Committee) is likely based in part on the belief that the Debtors will "do the right thing for them" with respect to the compensation programs (McGowan Dep. at 56:1-56:21).

13.     In the face of such evidence, the PD Committee still contends that the Debtors' Key Employees would be unlikely to depart if the Revised Compensation Procedures are not approved. (Supp. Obj. at ¶ 15). Indeed, the PD Committee expressly acknowledges that Mr. Norris has been alerted to potential departures and does not provide any evidence contradicting or disputing this testimony. (Supp. Obj. at ¶ 15; Norris Aff. at ¶ 4; Norris Dep. at 29). Instead, the PD Committee attempts to minimize the risk of the Key Employee departures by pointing to Mr. McGowan's testimony that, while he has been approached by at least a dozen Key Employees expressing concerns related to the Debtors' current compensation plans, Mr. McGowan can not state with certainty that any such Key Employees will actually leave the Debtors if the Revised Compensation Programs are not approved. (McGowan Dep. at 30:13-30:15 & 55:15-55:20). The PD Committee once again misses the point. The issue is that a viable risk exists and that the Debtors, in their reasonable judgment, believe that proactive measures are necessary to avoid the risk of actual departures. The PD Committee presents no evidence that (a) the Debtors approach is unreasonable or (b) supports their contention that the

Debtors should wait until after such departures occur before the Debtors take measures to address the concerns of Key Employees already expressed to the Debtors' management.[10]

14.    In conclusion, the Debtors, in their reasonable business judgment, believe that, for all the reasons discussed in the Motion, the Response, and herein, the risk to the health of the Debtors' businesses posed by the failure to approve the Revised Compensation Programs far outweighs the incremental cost of the new and revised programs. Further, the PD Committee simply has not produced any evidence whatsoever to demonstrate otherwise and thus cannot meet their burden. Montgomery Ward, 242 B.R. at 155.

---

[10] Moreover, the PD Committee also attempts to contest the Debtors' reasonable concerns about the serious risk of Key Employee departures by noting that the Debtors' advisor, Mr. Bubnovich, has had no "discussions with any particular employees as to whether he or she would leave." (Supp. Obj. at ¶ 15; Bubnovich Dep. at 18-19). The Debtors respectfully submit that this is not the responsibility of Mr. Bubnovich. The risk of employee departures was already identified by the Debtors management. Indeed, both Mr. Norris and Mr. McGowan were approached regarding Key Employees' concerns with the existing compensation programs. (McGowan Dep. at 30:7-30:24; Norris Dep. at 9:9-9:23 & 10:13-10:19). Alerted to such concerns, the Debtors appropriately consulted Mr. Bubnovich to determine whether such concerns were legitimate and whether the Debtors' current programs were competitive within the market. The PD Committee provides no evidence to support that (i) the Debtors' approach was unreasonable, (ii) a compensation and benefits consultant, such as Mr. Bubnovich, is expected to independently validate the concerns of the Debtors or (iii) it is unreasonable for a compensation and benefits consultant to rely on the information and concerns provided to him by the Debtors.

**Conclusion**

15.    For the foregoing reasons and the reasons set forth in the Motion, the Debtors

respectfully request entry of an order (i) authorizing, but not requiring, the Debtors to implement

the Revised Compensation Programs and (ii) denying the Objection.

Wilmington, Delaware                      Respectfully submitted,
Dated: August 22, 2002

                                          KIRKLAND & ELLIS
                                          David M. Bernick, P.C.
                                          James W. Kapp III
                                          Janet Baer
                                          Christian J. Lane
                                          200 East Randolph Drive
                                          Chicago, Illinois 60601
                                          (312) 861-2000

                                          and

                                          PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

                                          Laura Davis Jones (Bar No. 2436)
                                          Scotta E. McFarland (Bar No. 4184)
                                          919 North Market Street, 16th Floor
                                          P.O. Box 8705
                                          Wilmington, DE 19899-8705 (Courier 19801)
                                          Telephone: (302) 652-4100
                                          Facsimile:  (302) 652-4400

                                          Co-Counsel for the Debtors and Debtors in Possession