## EXHIBIT A

### Affidavit of Nick Bubnovich

(See Attached)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**SUPPLEMENTAL AFFIDAVIT OF NICK BUBNOVICH IN SUPPORT OF THE
DEBTORS' MOTION FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING,
THE IMPLEMENTATION OF REVISED COMPENSATION PROGRAMS**

Nick Bubnovich, being duly sworn, deposes and says:

1.    I offer this affidavit in support of the Debtors' Supplemental Response to the Objection of the Official Committee of Asbestos Property Damage Claimants to the Motion of the Debtors for an Order Authorizing, but not Requiring, the Implementation of Revised Compensation Programs. Reference is made to my previous affidavit, attached as Exhibit C to the Debtors' Response to the Objection of the Official Committee of Asbestos Property Damage Claimants to the Motion of the Debtors for an Order Authorizing, but not Requiring, the Implementation of Revised Compensation Programs, filed with this Court on July 12, 2002, as Docket No. 2370.

2.    In analyzing Grace's long term incentive plan ("LTIP"), I reviewed the EBIT growth rate over each three year period from 1992 through 2000 for fourteen specialty chemical companies (the "Industry Peer Group"). The 2001 figures were not available for all the companies in the Industry Peer Group when the analysis was conducted. When the 2001 figures for the Industry Peer Group are included in the analysis, the average median growth rate for each three year period during 1992-2000 for the Industry Peer Group goes down from 5.89% to 4.45% for each three year period during 1992-2001 (a decrease of 32%) and the average of the average

growth rate goes from 5.84% to 3.49% (a decrease of 67%). The revised analysis, even more so than the original analysis, strongly supports the use of 6% EBIT growth as an appropriate target performance measure. A summary of the analysis of the EBIT growth rates for the Industry Peer Group, including the 2001 figures, is attached hereto as Exhibit 1.

3.      The use of an industry peer group is common practice to benchmark possible target performance levels for long-term incentive plans. A critical decision in the long-term incentive design process is to select a performance measure (e.g., sales, operating income, EBIT, cash flow) and a target level of performance (e.g., $x million in sales, operating income, etc. or x% growth in sales, operating income, etc.).

4.      The performance of industry peers is an invaluable guide to determining an appropriate and relative performance level under a long-term incentive plan, because each company within an industry group likely will be impacted by the same economic and market conditions. Thus, companies in the same industry are likely to have their earnings influenced by the same external factors.

5.      The Industry Peer Group is appropriate because these companies are in the same industry as Grace and in some cases, direct competitors of Grace. Performance in the specialty chemical industry is sensitive to general economic conditions and, therefore, economic factors which may affect the Industry Peer Group will also affect Grace.

6.      In general, companies which are chapter 11 debtors have unique retention issues. Employees at chapter 11 debtors have heightened concerns about pay opportunities, their careers, and their employer's prospects. Employees at companies not in chapter 11 generally do not have such heightened concerns. Thus, the Industry Peer Group would not provide an appropriate

2

benchmark with regard to such concerns. Most, if not all, chapter 11 debtors address these concerns through a retention bonus program. Such programs help to preserve the debtor's enterprise value by focusing employees on their day-to-day responsibilities and by minimizing the risk of employees seeking other employment.

7.      Grace's General Retention Program is benchmarked against those of other recent, large mass tort liability chapter 11 debtors ("Mass Tort Debtors"). The rationale for using the Mass Tort Debtors is that a retention program similar to those of other mass tort liability chapter 11 debtors' programs would best serve Grace's retention needs. Unlike most other chapter 11 companies, Mass Tort Debtors typically have strong operating performance and want to keep management intact to maintain such performance. Therefore, Mass Tort Debtors typically continue to provide competitive aggregate compensation and in some cases even a premium to retain the current executive team and key employees. As a result of these unique considerations, the comparison of Grace's General Retention Plan to those of other Mass Tort Debtors is appropriate.

8.      To assess the potential enhancement to Grace's Severance Pay Programs and to determine competitive participation levels and amounts I reviewed the severance programs of approximately 60 chapter 11 debtors. This broader group of debtors, as opposed to the Mass Tort Debtors, was used because severance issues are typically a major concern to all employees of most chapter 11 debtors, given the likelihood of a potential sale, cost cutting measures or similar actions which might result in the loss of jobs. Severance programs at chapter 11 debtors are often distinct and different from companies who are not facing significant financial challenges and therefore chapter 11 debtors, and not the Industry Peer Group (which consists

3

entirely of non-debtors), are an appropriate measure of the competitiveness of Grace's Severance Pay Program.

9.    In assessing the total compensation of the Debtors' top sixteen employees, I analyzed the total compensation of similar positions using broad industry surveys and, to the extent possible, chemical industry-specific data.  Broad industry data was used where there was inadequate chemical industry survey data to perform a proper comparison.  I needed to use a different comparison group rather than the Industry Peer Group because adequate information regarding the total direct compensation of the top sixteen employees was not available for the companies in the Industry Peer Group.  To produce a reliable analysis, I looked to a wide range of companies (i.e. those participating in the surveys) to find a sufficient amount of information for the number of positions.

10.    It would be incorrect and illogical to use one set of companies to benchmark retention bonus practices, EBIT growth, total direct compensation and severance.  Using one set of companies for benchmarking such disparate programs is inconsistent with best practices.

AFFIANT FURTHER SAYETH NOT

Dated this 22ⁿᵈ day of August, 2002.

_Nick Bubnovich_

Nick Bubnovich

SUBSCRIBED AND SWORN TO BEFORE ME

this 22ⁿᵈ day of August, 2002.

_Nancy Freeman Shobeiri_

Notary Public
My Commission Expires:

"OFFICIAL SEAL"
Nancy Freeman Shobeiri
Notary Public, State of Illinois
My Commission Expires March 14, 2006

4

## EXHIBIT 1

## INDUSTRY PEER GROUP COMPARISON

(See Attached)

**W.R. Grace**
Performance Analysis Comparison
*Specialty Chemical Peer Group*

| Peer Group List | EBIT — Compounded Annual Growth Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | '91-'94 | '92-'95 | '93-'96 | '94-'97 | '95-'98 | '96-'99 | '97-'00 | '98-'01 | Average |
| Albemarle | 8.52% | 23.94% | 18.62% | 8.68% | 2.43% | 8.33% | 5.57% | -7.04% | 8.63% |
| Cabot | 17.69% | 20.60% | 19.51% | 2.16% | -8.16% | -13.18% | 1.35% | -6.28% | 4.21% |
| Dow Chemical | 2.68% | 31.20% | 23.98% | 14.42% | -17.40% | -10.23% | -6.69% | -18.94% | 2.38% |
| Du Pont | 6.80% | 27.74% | 26.51% | 1.34% | -5.14% | -9.07% | -5.67% | -25.73% | 2.10% |
| Eastman Chemical | 6.00% | 24.05% | 13.70% | -3.70% | -23.36% | -20.59% | 0.18% | -9.66% | -1.67% |
| Ecolab | 9.53% | 11.46% | 12.70% | 14.66% | 17.21% | 16.09% | 13.85% | 6.78% | 12.79% |
| Englehard Corp. | 8.33% | 14.82% | 21.55% | 16.83% | 12.73% | 7.03% | 8.53% | 1.89% | 11.47% |
| Great Lakes Chemical | 12.29% | 11.07% | -24.36% | -24.13% | -27.39% | -0.65% | 2.04% | -137.70% | -23.60% |
| H. B. Fuller | 3.29% | -0.77% | 10.73% | 9.78% | 8.03% | 14.42% | 5.41% | 0.06% | 6.37% |
| Hercules | 15.06% | 7.40% | 11.11% | -2.10% | -0.98% | 4.39% | 0.42% | -12.13% | 2.90% |
| International Flavors & Fragrances | 11.10% | 10.62% | 3.59% | -1.60% | -7.21% | -6.14% | -8.70% | -2.35% | -0.09% |
| PPG Industries | 21.31% | 23.84% | 21.78% | 9.18% | -0.63% | -5.02% | -2.98% | -10.20% | 7.16% |
| Rohm and Haas Co. | 24.02% | 20.22% | 24.36% | 9.11% | 5.95% | 10.05% | 11.27% | -12.90% | 11.51% |
| Sigma-Aldrich | 9.63% | 10.46% | 10.13% | 12.71% | -0.03% | -3.15% | -4.47% | 2.18% | 4.88% |
| | | | | | | | | | |
| Average | 11.16% | 16.90% | 13.85% | 4.81% | -3.14% | -0.55% | 1.44% | -16.57% | 3.49% |
| 25th Percentile | 7.19% | 10.73% | 10.83% | -0.86% | -7.92% | -8.34% | -4.10% | -12.71% | 2.17% |
| Median | 9.58% | 17.52% | 16.16% | 8.90% | -0.81% | -1.90% | 0.88% | -8.35% | 4.45% |
| 75th Percentile | 14.37% | 23.91% | 21.72% | 11.97% | 5.07% | 8.01% | 5.53% | -0.54% | 8.26% |