FILED

2002 SEP -9 AM 11:20

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .        Chapter 11
                                .
W.R. Grace & Co., et al.,       .
                                .
        Debtor(s).              .        Bankruptcy #01-01139 (JKF)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
August 26, 2002
10:00 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:                     David Bernick, Esq.
                                Kirkland & Ellis
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                Janet S. Baer, Esq.
                                Kirkland & Ellis
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                David W. Carickhoff, Jr., Esq.
                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

                                Paula A. Galbraith, Esq.
                                Pachulski, Stang, Ziehl,
                                Young & Jones
                                919 North Market Street
                                Wilmington, DE 19801

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191



2

Scotta McFarland, Esq.
Pachulski, Stang, Ziehl,
Young & Jones
Ste. 1100
10100 Santa Monica Blvd.
Los Angeles, CA 90067

Anthony J. Marchetta, Esq.
Pitney, Hardin, Kipp
& Szuch, LLP
P.O. Box 1945
Morristown, NJ 07962

Paul J. Norris, Esq.
W.R. Grace
In-House Counsel

David B. Siegel, Esq.
W.R. Grace
In-House Counsel

Brian McGowan, Esq.
W.R. Grace
In-House Counsel

For Special Asbestos Counsel: Richard Keuler, Esq.
Reed Smith
Ste. 1500
1201 Market Street
Wilmington, DE 19801

Douglas Cameron, Esq.
Reed Smith
435 Sixth Ave.
Pittsburgh, PA 15219

For Unsecured Creditor's:    Lewis Kroger, Esq.
Committee                    Stroock, Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038

Richard Riley, Esq.
Duane Morris, LLP
1100 N. Market St.-Ste. 1200
Wilmington, DE 19801

| | |
|---|---|
| For Zonolite Plaintiffs: | William Sullivan, Esq.<br>Elzufon, Austin, Reardon,<br>Tarlov & Mondell, PA<br>Ste. 1700<br>300 Delaware Ave.<br>Wilmington, DE 19801 |
| For Equity Security Holders:<br>Committee | Gary M. Becker, Esq.<br>Kramer, Levin, Naftalis<br>& Frankel, LLP<br>919 Third Ave.<br>New York, NY 10022 |
| | Jeffrey Waxman, Esq.<br>Klett, Rooney, Lieber<br>& Schorling<br>The Brandywine Bldg.<br>1000 West Street-Ste. 1410<br>Wilmington, DE 19801 |
| For Asbestos PD Committee: | Jay Sakalo, Esq.<br>Bilzin, Sumberg, Dunn,<br>Baena, Price & Axelrod, LLP<br>First Union Financial Center<br>Ste. 2500<br>200 South Biscayne Blvd.<br>Miami, FL 33131 |
| | Scott Baena, Esq.<br>Bilzin, Sumberg, Dunn,<br>Baena, Price & Axelrod, LLP<br>First Union Financial Center<br>Ste. 2500<br>200 South Biscayne Blvd.<br>Miami, FL 33131 |
| | Theodore J. Tacconelli, Esq.<br>Ferry, Joseph & Pearce, PA<br>824 Market Street<br>Wilmington, DE 19899 |
| | Rick Miller, Esq.<br>Ferry, Joseph & Pearce, PA<br>824 Market Street<br>Wilmington, DE 19899 |

4

| | |
|---|---|
| For Asbestos PI Committee: | Matthew Zaleski, III, Esq.<br>Campbell & Levine, LLC<br>1201 North Market St.-Ste. 1501<br>Wilmington, DE 19801 |
| For Maryland Casualty:<br>Company | Jeffrey C. Wisler, Esq.<br>Connolly, Bove, Lodge<br>& Hutz, LLP<br>1220 Market Street-10th Fl.<br>Wilmington, DE 19899 |
| For ZAI Claimants: | Edward J. Westbrook, Esq.<br>Richardson, Patrick, Westbrook<br>& Brickman, LLC<br>174 E. Bay Street<br>Charleston, SC 29401 |
| | Rob Turkewitz, Esq.<br>Richardson, Patrick, Westbrook<br>& Brickman, LLC<br>174 E. Bay Street<br>Charleston, SC 29401 |
| | Darrell Scott, Esq.<br>Lukins & Annis, PS<br>Ste. 1600<br>717 W. Sprague Ave.<br>Spokane, WA 99201 |
| For ACE: | Linda M. Carmichael, Esq.<br>White & Williams<br>824 N. Market Street-Ste. 902<br>Wilmington, DE 19801 |
| For Carol Gerard, et al.: | Jon Heberling, Esq.<br>McGarvey, Heberling<br>Kalispell, Montana |
| | Steven K. Kortanek, Esq.<br>Klehr, Harrison, Harvey,<br>Branzburg & Ellers, LLP<br>Ste. 1000<br>919 Market Streeet<br>Wilmington, DE 19809 |

1    For U.S. Trustee:                Frank J. Perch, III, Esq.
                                      Office of U.S. Trustee
2                                     844 King Street-Ste. 2313
                                      Lock Box 35
3                                     Wilmington, DE 19801

4    Audio Operator:                  Sherry A. Johnson

5    Transcribing Firm:               Writer's Cramp, Inc.
                                      6 Norton Rd.
6                                     Monmouth Jct., NJ 08852
                                      732-329-0191
7
     Proceedings recorded by electronic sound recording, transcript
8    produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  All right.  I've signed the Order on Item

2  #2.

3      MR. BERNICK:  Item #3 is an amended motion of General

4  Electric.  And I'll put the Trustee's title here.

5      THE COURT:  All right.  I'll sign that.

6      MR. BERNICK:  With respect to the contested matters,

7  as the agenda or the amended agenda indicates, Item #4 which

8  was a Motion to Lift Automatic Stay for Cause filed by Timothy

9  Kane has been continued until September 23.  And so the first

10  contested matter that I think we should be taking up this

11  morning is Item #5, which is a motion of Carol Gerard.  And

12  both Grace and other counsel that have approached me have --

13  or would propose to the Court that the Court take up as a

14  preliminary matter what the procedural posture is of this

15  motion, because we don't believe that it's a properly taken

16  motion at this time.  The Court not need reach the merits.

17  I'm prepared to address that procedural issue up front if that

18  would be appropriate for the Court.  Or the Court can just

19  take --

20      THE COURT:  That's fine.

21      MR. BERNICK:  Okay.  The motion is styled as being a

22  motion under the rules which govern judgments.  Rule 60 is

23  cited, Rule 59, Rule 52.  And yet this is not properly styled

24  as a motion to amend any judgment, because there isn't any

25  judgment to be amended.  This matter arises really as a motion

1    to reconsider the result of a motion to clarify an Order that

2    was entered in January that actually incorporated language

3    that dates back to last May, and from which May Order there

4    was never an appeal.  And that distinction makes a difference.

5    That is that this is not really a motion to amend or change a

6    judgment, but is instead a motion for reconsideration of an

7    interlocutory matter.  The case law is clear that this makes

8    it a purely discretionary matter, and that these matters ought

9    to be taken up sparingly, so as not to produce repetitive

10   litigation at the Trial Court level.  And I think that the

11   facts of this case are fairly unique, that is the background

12   facts, in that they put the Movants here in a uniquely poor

13   posture to ask to have this matter taken up yet again.  I'd

14   just like to review a few of those facts briefly.

15            THE COURT:  Mr. Bernick, I really don't need the

16   facts reviewed.  This is at least the fourth time I've had

17   this hearing up.  I'm really -- based on the fact that I have

18   already prepared to hear this argument which -- I agree that

19   there may be a procedural question about how this motion was

20   filed.  But I'd really rather just get to the merits, and get

21   one Order done.  So that if someone wants to appeal, if

22   there's grounds for appeal -- and, frankly, I'm not sure there

23   is either.  But if there is, it can be done, and we can just

24   move on.

25            MR. BERNICK:  That's fine.  I'd only add in terms of

1   the posture of it that this whole thing is very curious in

2   terms of exactly how this motion was filed and how it was

3   styled.  And it may be that what the Movants are really

4   looking for is to have Your Honor's determination today styled

5   as a motion to decline to modify a judgment, thereby

6   bolstering the position that somehow this is not

7   interlocutory, it does relate to a judgment, and that improves

8   their appellant jurisdictional posture.  We don't think that

9   it relates to a judgment.  We think that it's an interlocutory

10  matter.  And however Your Honor rules today, that ruling

11  should be styled as an interlocutory matter, so that they

12  don't acquire appellant rights that they don't have.

13         With respect to the substance of the motion, obviously

14  you've received numerous briefs, and there's a quarrel about

15  what got said last time, and whether it really makes a

16  difference.  And all that I can really comment on --

17         MR. HEBERLING:  I believe (indiscern.).

18         THE COURT:  Yeah.  I'll --

19         MR. BERNICK:  That's fine.

20         THE COURT:  -- give you five minutes, literally.

21  That's it.  Both sides, all sides get five minutes.  I have

22  heard this motion to the point where I really question why it

23  is that it keeps repetitiously coming back on my calendar.

24  So, yes, please, take whatever opportunity you need to explain

25  what your position is, and why I should look at what I did at

1    the last hearing again.

2        MR. BERNICK:  It's fine if he wants to go first.

3        THE COURT:  Yeah.  Good morning.

4        MR. HEBERLING:  May it please the Court, I'm John

5    Heberling from Montana.  And I realize I may have come all

6    this way to no avail.  But that's our risk.  Moving quickly,

7    I'd like to hand up --

8        THE COURT:  All right, thank you.

9        MR. HEBERLING:  -- and move to Tab 2.  I represent

10    people of Libby, Montana with asbestos disease.  It's Trim

11    Light Asbestos Disease, which may be the worst of all asbestos

12    disease.  It's highly progressive, and we have over 100 dead.

13    We -- the base show that -- and Mr. Bernick mentioned that the

14    Court has discretion to consider this matter.  And we believe

15    the Court has discretion to amend the record to include the

16    Gerard and Schull complaints which were discussed extensively

17    in the record, for a full and fair consideration of the

18    issues.  We also believe that the Court has discretion to

19    correct what we believe is a manifest error of law on

20    collateral estoppel.  That'll be my major point.  And I hope I

21    can cover this in five minutes.

22       Maryland Casualty provided industrial hygiene services

23    from 1962 to 1973 in Libby, Montana.  They designed a dust

24    control system.  And Maryland Casualty has sued for it own

25    torts in professional negligence and inspector negligence.  We

1   analogize this to architect's negligence where the architect

2   does not build the building, but if it collapses, the

3   architect may be liable to third parties.  So briefly I have

4   three points.  There are no indemnity rights here.  There's no

5   collateral estoppel here.  And there's no significant burden

6   on Grace in seeing these cases against Maryland Casualty go

7   forward.  So turning to Tab 2 which is a chart for the

8   argument, the second row, "Is this a suit that could have been

9   commenced against the Debtor?"  No, this is a suit against

10  Maryland Casualty for its own professional negligence.  These

11  are independent obligations as the Court has heard last time.

12  There is no identity of interests, as is the case where

13  directors and officers are sued for claims identical to those

14  against the company.  Maryland Casualty is an independent

15  entity.

16      So the third row of this Tab 2 handout asks, "Is this a

17  suit to obtain possession or exercise control of a property of

18  the Debtor?"  No, the suit against Maryland Casualty cannot

19  trigger insurance coverage.  It's for Maryland Casualty's

20  torts, not Grace's torts.  And there's no indemnity right here

21  in Maryland Casualty back against Grace for Maryland

22  Casualty's own torts.  And Grace and Maryland Casualty have

23  claimed indemnity.  But I've attached as Tab 4 to the handout,

24  paragraph 7 from their Indemnity Agreement of 1991.  And it

25  says in the pink subparagraph, "Claims.  Indemnity is for

1    claims which involve liability or alleged liability on the

2    part of Grace." And each time Grace appears, that's in

3    orange. Each time coverage or liability appears, that's in

4    pink. It's clear that Maryland Casualty has no indemnity

5    rights as to our suits or separate suits against Maryland

6    Casualty. Then getting back to Tab 2 -- so as in the Robbins

7    Two case which has been cited by both sides, the Court said in

8    Robbins, "A suit against Aetna based solely on its own

9    negligence would implicate no property of the Debtor." So

10   here, our suits against Maryland Casualty similarly implicate

11   no property of the Debtor.

12        So then we get to the last possible basis for the

13   injunction, which is Section 105. And there is a potential

14   basis there. And this gets to the fee issue, which is

15   collateral estoppel. The Robbins Two decision says that

16   {quote} "Robbins will be inexorably drawn into this

17   litigation," {closed quote} between the Plaintiffs and Aetna.

18   And this is where the key difference is. And I think this is

19   where the Court had questions last time. The Robbins opinion

20   says there must be a determination of Aetna's relative fault.

21   And under New Hampshire and Kansas law that was so. But

22   that's not so under Montana law. And I've attached as Tab 3,

23   Montana's comparative fault statute. And at page 2 of Tab 3,

24   highlighted in yellow, we have under number 6, "Comparison and

25   fault with any of the following persons is prohibited." And

1   then little ii, "A person who is not subject to the

2   jurisdiction of the Court."  That's Grace.  Grace's fault

3   can't be compared with that of any other Defendant in the

4   Maryland Casualty case.  There is no collateral estoppel.

5   There is nothing that can harm the Bankruptcy Court, or

6   Bankruptcy Estate in these proceedings outside the bankruptcy.

7   And in Montana we try cases all the time with absent parties.

8   And no findings can be entered against the absent parties.  So

9   Grace is not a party to the case against Maryland Casualty.

10  Grace won't be on the special verdict form.  No findings can

11  be entered.  And in fact if any finding was entered against

12  Grace, it would be a denial of substantive due process under

13  Section 72 of the Montana Constitution.  So there's no

14  collateral estoppel.  And I think that's the main point I want

15  to make today.

16       The last issue is burden on Grace.  I'll quickly go

17  through that.  A 105 injunction is not a part of the automatic

18  stay under 362.  It requires balancing.  And this is the other

19  prong of the Robbins Two case, holding a finding that Robbins

20  -- with the finding that Robbins' managers {quote} "would

21  exhaust their energies," {closed quote} in the litigation of

22  the Plaintiffs.  Well, no such finding can be made here.

23  We're talking about events from 1962 to 1973.  No current

24  managers of Grace were involved in any of those.  No current

25  managers of Grace would be distracted from the reorganization.

1   And so that's a major difference between our case and <u>Robbins</u>.

2          THE COURT:  Who within the Debtor other than some

3   current manager is going to be able to do the search for

4   documents and witnesses that are going to be required when

5   Maryland Casualty contacts the Debtor and says, "We did this

6   work because you were our client," among other things,

7   hypothetically speaking, of course, "and, therefore, we want

8   access to your personnel, your files, and your documents."

9          MR. HEBERLING:  Grace has a repository in Boston.

10  Everything's pre-packaged.  They have a database on the

11  documents.  And as to other third party cases we have brought

12  for the people of Libby, we attached a letter from the

13  custodian of the repository which shows that they had I think

14  210 documents, and that they would show us the files.  They

15  don't guarantee that that's all the documents.  But the

16  repository searches are regularized.  They don't involve

17  anyone in Grace's current management.  Also, Maryland Casualty

18  -- and I should mention also that the case against Grace has

19  been tried five times in Libby -- three times to verdict.  The

20  case against Grace is an open book.  We've had discovery.

21  Maryland Casualty has had discovery upon Grace in its

22  extensive litigation with Grace in the late '80s, which

23  resulted in the Indemnity Agreement, a portion of which is

24  attached here, and which is attached to another brief.  So

25  Maryland Casualty has largely had discovery.  And there are no

1  witnesses to depose except two retired managers who have

2  already been deposed.  So the burden on Grace is very light.

3  And the burden on our Plaintiffs who must wait in pain and who

4  have difficulty in breathing, and the preliminary injunction

5  in Continental Airlines was in place for nine years.  It could

6  be five years or more here.  Some of these people don't have

7  their medical expenses covered, particularly as to nursing

8  home and 24 hour care costs.  And we believe that our case is

9  different from Robbins Two in that Grace and Maryland Casualty

10  have made this effort to take the 105 injunction out beyond

11  where it's gone before.  And we believe that should fail, and

12  our cases should proceed.

13          THE COURT:  But the documents that were submitted

14  under seal, which were sent from Maryland Casualty and the

15  Plaintiff's claims against Maryland Casualty, is that the

16  universe of documents that purport to establish some

17  independent obligation on behalf of Maryland Casualty?

18          MR. HEBERLING:  That's everything we have.  That's

19  discovery--

20          THE COURT:  There is nothing in those documents that

21  indicate that Maryland Casualty undertook a separate

22  obligation to design a dust control system.  Nothing.  I read

23  every page of those documents.

24          MR. HEBERLING:  The dust control system document is

25  in there.  And was attached and referenced in Dr. Spears'

1   deposition.   There are seven or eight documents which talk

2   about the formulation of the plan.

3         THE COURT:   There are no --

4         MR. HEBERLING:   The plan is there.   It is defective

5   in number of ways, inconsistent with industrial hygiene

6   standards.   Doesn't provide for any warning of the workers,

7   and so forth.

8         THE COURT:   It seems --

9         MR. HEBERLING:   So that's our case.

10        THE COURT:   Regardless of what the documentation says

11  or doesn't say, the question is whether or not Maryland was a

12  volunteer, or somehow or other a principal, as opposed to an

13  agent, in undertaking some obligation.   Now, maybe I'm missing

14  documents.   But I got I think two binders full that were

15  submitted to me in Pittsburgh.   I read every word of those

16  documents.   There is nothing in the documents that were sent

17  to me that establishes that Maryland was acting as anything

18  other at any time than as an agent for the Debtor.   Nothing.

19  Now, one of the things that I have to do in looking at whether

20  to lift this injunction or lift relief from the stay, is to

21  determine the probability of success on the hearing.   And

22  that's the reason I'm getting to this.   I'm not saying it's an

23  evidentiary matter.   Maybe you can't prove the case at some

24  point.   Maybe you can.   But from those documents that were

25  submitted in support of the motion, I can't see how if that

1    serves as the basis you have much chance of winning this suit.

2    And --

3         MR. HEBERLING:  Okay.

4         THE COURT:  -- for that reason -- and that's all, I'm

5    not making findings with respect to the content, only about

6    the probability of success.  And based on the review of those

7    documents, I don't see much probability of success.

8         MR. HEBERLING:  Okay.  Thank you, Your Honor.

9         THE COURT:  Mr. Bernick?

10        MR. BERNICK:  I'll only add one thing, because I'm

11   only concerned that our record be complete here, in the event

12   that there's an attempt to prosecute an appeal.  Obviously all

13   these matters were raised, and raised repeatedly, and nothing

14   new has been proffered to the Court today.  The only thing I'd

15   like to add as a matter of record is just the practical

16   reality of what actually will happen if this litigation is

17   allowed to proceed.  Separate and apart from whether there is

18   actual collateral estoppel, it is inevitable that the

19   Defendants in that case would point out by way of defending

20   themselves and saying that they didn't cause the exposures at

21   issue, will inevitably point the finger at Grace.  It's

22   inevitably going to happen.  And we're going to have to

23   protect that record, because that record is forever.  People

24   stand up, take oaths, they're cross examined.  It becomes the

25   record that then is germane to those claims which ultimately

1  will be prosecuted against us as well.  We will be drawn into

2  the litigation not only from a witness point of view, but also

3  from a lawyer point of view.  And at this time, Your Honor,

4  there are no less than two major cases that are now focused on

5  Libby in the context of this litigation.  There's the

6  fraudulent conveyance litigation which focuses in part on

7  environmental liabilities, including Libby.  In connection

8  with that case I'm going out to a deposition in Denver two

9  days from now that relates to Libby.  There's also a cost

10 recovery case that's pending now where the Government's trying

11 to recover costs against Grace, again relating to Libby.  And

12 there are discovery requests that have now been propounded in

13 the ZAI litigation that also make reference to and seek to get

14 evidence that relates to Libby.  So the Debtor is

15 extraordinarily busy right now as it is.  It has its hand full

16 dealing with the Libby situation, and dealing with the

17 litigation.  The last thing that we need is to worry about 132

18 claims pending in two different State Courts which are

19 purportedly not against us, but ultimately are against us.

20          THE COURT:  Anyone else wish to address these issues?

21          ALL:  (No verbal response).

22          THE COURT:  Mr. Bernick, are there any other

23 documents with respect to Maryland Casualty's obligations in

24 this regard, other than those two binders that were submitted

25 under seal?

1          MR. BERNICK:  I can't -- I personally am not aware of

2     anything.  At the same time, I don't know how they pulled that

3     set together.  There are lots and lots of documents that

4     relate to Libby.  And I don't know that we have done a

5     separate search to determine if there are other documents that

6     might relate to that issue, other than the ones that they

7     tendered to the Court.

8          THE COURT:  All right.  I'm concerned that I have not

9     seen all of the documents.  As I said, I did look at the

10    documents that were sent to me.  I want to make sure that I've

11    seen everything that the moving party is relying on, because

12    of the issue simply about looking at the probability of

13    success on the merits of whoever brings it.  So if there's

14    something that I'm missing, I want an opportunity to look at

15    it.  But what I've seen so far -- and I don't get into much

16    detail since they have been filed under seal -- I've already

17    articulated my impression.

18         MR. BERNICK:  That's fine.

19         THE COURT:  Okay.  Anyone else wish to be heard?

20         MR. WISLER:  Your Honor, Jeff Wisler on behalf of

21    Maryland Casualty Company.  Only if Your Honor has questions.

22         THE COURT:  Well, I want to know whether I've seen

23    all the documents, Mr. Wisler.  Did you see the documents that

24    were submitted under seal?

25         MR. WISLER:  I did not.  But I'm certain that Mr.

1 Bernick and his co-counsel provided the Court with everything

2 that they determined was necessary.

3          THE COURT:  No, it wasn't the Debtor who submitted

4 them, I believe.  Aren't I correct?

5          MR. HEBERLING:  You are, Your Honor.  We made a

6 request to Grace for the Maryland Casualty documents.  And

7 that was the initial subject (indiscern.).  And so there are

8 probably documents at the repository that are not included.

9 But we're willing to go forward based on the documents we have

10 received.

11          THE COURT:  All right.  Well, as I said, at this

12 point it's somewhat irrelevant anyway, because my examination

13 was for a very limited purpose.  And as I said, I want to make

14 sure that the record is clear that I'm not foreclosing at some

15 point your opportunity to prove the case, because it may very

16 well be there.  But with the limited set of documents that

17 I've seen, looking solely at that one issue, the probability

18 of success, at the moment I have some difficulty seeing it,

19 because there are no documents in that set that I saw that

20 establish an independent obligation.  Okay.  I'm going to deny

21 this motion, which I'm treating as a motion to reconsider the

22 Order that I entered last month after the last set of

23 hearings.  I think that's what you're asking for.  Correct?

24 You're asking me really to reconsider what I did at the last

25 hearing.

1        MR. HEBERLING:  Yes, Your Honor.  And we agree you've

2   done that.  And we accept the result.

3        THE COURT:  Okay.  So I will deny the motion for

4   reconsideration of the Order that I entered at the last

5   hearing.  And the reasons are, number one, I have since then,

6   which I had not before, reviewed the documents that were

7   submitted under seal.  Number two, I believe that this issue

8   has been intently and thoroughly litigated by all parties up

9   to now.  I do appreciate the opportunity to take a look at the

10  Order that I entered.  It actually makes the assertion in here

11  there's an error of law or that I mis-stated the collateral

12  estoppel fact.  Having taken a look though at the additional

13  pleadings, I don't think that that was an error.  I believe

14  that the collateral estoppel consequence to the Debtor might

15  still be there.  But where they are or are not there, I am

16  convinced that the Debtor will have to spend significant

17  resources -- Debtor in terms of its managerial staff and its

18  professional staff, as this thing with the insurance company,

19  if one is suing the Plaintiffs in the action -- to go forward

20  with this litigation.  And I went through this the last -- on

21  the record at the last hearing.  I don't see any reason to

22  restate that now.  But I don't see anything in the new

23  pleadings that convince me otherwise.  And for all of the

24  reasons that I've stated at the last hearing, I believe that

25  the Order denying the motion is proper.  And I am going to

1    continue that denial of modifying the injunction in any way,

2    or I guess clarifying to delete these insurance companies from

3    that injunction.

4            MR. BERNICK:  Thank you, Your Honor.

5            THE COURT:  Do I have an Order that I can sign?  Or

6    do I need to get one?

7            MR. BERNICK:  We can tender it.

8            THE COURT:  All right.  Please run it by opposing

9    counsel first to make sure there is no dispute as to the

10   language of the Order.  I'm not asking for consent to it,

11   obviously.  But I do want to make sure that you've worded the

12   Order as fairly representative as to what I've said on the

13   record today.  All right.  So with respect to Agenda #5 I'll

14   wait for an Order to be submitted by the Debtor denying the

15   motion as stated on the record.  Okay.  Yes?

16           MR. BERNICK:  Item #6 is our motion for an Order

17   authorizing but not requiring the implementation of a revised

18   compensation program, which is docket 2230.  Your Honor will

19   undoubtedly recall that this matter was up for argument last

20   time, and it was continued in order to allow the discovery to

21   take place.  That discovery has now been completed.  And the

22   basic facts that we think drive the motion haven't changed.

23   Number one is that the proposed package that is now before the

24   Court was very systematically and deliberately developed.

25   Number two, it was guided by expert advice properly obtained

1   from Dallied & Tush.   Number three, it was approved by a
2   disinterested committee of the Board of Directors.   Number
3   four, it was presented to the financial advisors for the
4   Committees in March of this year.   Number five, there was no
5   restriction.   There had been some reference last time that
6   somehow that information could not be shared with counsel.
7   That was not so.   There was no restriction on communications
8   with counsel.   All that information was available to the
9   Committees and their counsel.   Number six, Grace and the
10  Committee's financial advisors negotiated changes to the
11  proposal that had been made.
12      Number seven, the package with those negotiated changes
13  was then presented to the Court.   Only then did Committee's
14  counsel lodge objections.   There had been no objections that
15  had been heard from the Committees, except through their
16  financial advisors, previously.   And those had been
17  negotiated.   And when the counsel for the Committees objected
18  last time, there was no expert affidavit that was submitted.
19  There wasn't even support from their own financial advisors
20  endorsing their position.   Even today the Committee's
21  financial advisor, the PD Committee's financial advisor, has
22  not come forward to voice any support for the objection to
23  continue to be lodged before the Court.   In fact, the PD
24  Committee in their objections enjoys the support of absolutely
25  no expert.   There is no expert who is prepared to come in and

1    sign on.  This is purely a lawyers quarrel.  And the law

2    hasn't changed in this area from the time the briefs were

3    submitted before.  And that law does not sanction such

4    quarrels.  The business judgment rule applies.  We've clearly

5    and properly invoked that rule.  And there's been no showing

6    by the PD Committee that somehow there was the kind of self

7    dealing or conflict or interest in behavior that would suspend

8    operation of and the effect of the business judgment rule.  So

9    as a matter of law under the business judgment rule, their

10   objection should be overruled, and I should sit down.  But I

11   want to spend a little bit of time on this, this morning.

12        (Laughter)

13        MR. BERNICK:  I know.  At the end of all this I'll

14   regret the fact that I kept on standing.  But the reason I'm

15   doing that is that after all this attention, understandably

16   so, the Debtor is anxious that the Court appreciate that not

17   only was this a business judgment, but it was a good business

18   judgment.  And we want to spend a few minutes this morning

19   going through how that judgment was put together.  And in

20   order to expedite it, I've drawn a few little charts here, if

21   I can show them to the Court.

22        The first and most important part of this process is to

23   recognize the forest for the trees.  What we're talking about

24   is putting together a full compensation package.  All pieces

25   of what ultimately ends up as a package that gets presented to

24

1  employees.  And what are the elements?  Obviously everybody

2  knows that employees get a salary.  They get an annual bonus.

3  And they get incentive compensation.  Those are basic elements

4  of any compensation package for executives in a major company

5  in the United States today.  There is also a special feature

6  here, because these employees are employees of a company that

7  faces special risks.  And they're taking a special chance.

8  They don't know what's going to happen to their jobs.  There's

9  an increased uncertainty because of the company's Chapter 11.

10  And the traditional feature of compensation that is designed

11  to address this issue, is the retention program.  These are

12  the basic elements of the package.

13       Second question to address in this regard is annual --

14  the annual nature of the review.  The employees look at their

15  compensation every year.  They way, "What are you doing for me

16  this year?"  And they look for their opportunities in the

17  market place each and every year.  So each and every year the

18  company has to take a look at this total package and say, "Are

19  we competitive with respect to all of these elements now this

20  year, given how things have changed with the company?"  And

21  the third, of course, is then to give them a measure of,

22  "Well, what are we being compared with?  What's competitive?

23  What's happening out there that provides other opportunities

24  to employees?"

25       Taking a look at the total package, it's very important

1    to emphasize that when you include all of the different

2    elements that are part of this Grace package, compare what the

3    value of that package is at Grace versus its major

4    competitors, 16 other -- or other companies with respect to

5    their top key executives, which you find out that the total

6    value of the package puts Grace in the 50 to 75th percentile.

7    This is not some rich deal.  It's a deal that leans toward the

8    middle, and maybe a little bit towards the higher side.  Why?

9    Because the retention features of the package are designed to

10   compensate employees for increased risk and uncertainty.  So

11   if you end at the middle in everything else, the retention

12   should put you a little bit close, behind and in the middle.

13   And that's exactly where the company ended out.  And its

14   outside expert from Dallied & Tush has put together an

15   affidavit and so testified that this is exactly the comparison

16   that he did to assure that basically the company was on the

17   right track.  It is a sound business judgment with respect to

18   the forest before we get to the trees, saying, "Yes, the

19   company with all of these different things considered ended up

20   in the right place."

21        Now, there are three trees that have been raised and then

22   subsequently attacked.  The first is the retention program.

23   And the story here, this is basically a bonus that's a

24   percentage of salary that's designed to get people to stay.

25   The story here is relatively simple.  Basically a retention

1  program was put in place last year.  And the retention program

2  was a range of potential bonuses going up to about 50% of

3  salary.  This is kind of the seedling of the arrangement.  And

4  then it turned out that when people from the company went

5  around and talked to their compatriots at other companies that

6  are before this Court, other large companies that are in mass

7  torts and in Chapter 11, they found out, "Gee, we're not --

8  our retention is just not as good."  So Grace responded to

9  this, because they now had learned something new.  And it

10  turns out that taking a look at USD, Armstrong World

11  Industries, and Federal Mobile, they were under-marketing.

12  And these were the right people to look at, because they are

13  other companies that are in Chapter 11.  They are strong

14  companies with Chapter 11, mass tort.  Very, very parallel

15  circumstances.  And they're all in this Court.  And their

16  compensation has been approved.  And based upon a review of

17  the packages that were available for these companies, Deloyt

18  and Tush recommended that Grace increase the top end of their

19  retention range to 85% of salary.  And that was the proposal

20  that was made to the Committees.  But that wasn't the end of

21  it.  The Committees' financial advisors came back and said,

22  "We think that that's too rich."  And ultimately the

23  negotiated package was at 65% -- top end was at 65%.  Again,

24  not only a business judgment, but a very sound, orthodox,

25  mainstream business judgment.

1    The second tree that's been placed at issue is the

2  incentive program.  And here too there's a relatively simple

3  story.  There was an incentive program put in place last year

4  that covers the years 2001, 2002, 2003.  It's a three-year

5  workout.  And with the benefit of hindsight, there were two

6  features of that program that were problematic.  One is that

7  the target earn out said that employees should be pushing to

8  have the company grow at a rate of 10% over a three-year

9  period.  Well it turns out the industry's in a less robust

10 position, and we expect it to be for some time.  This ended up

11 to be too high.

12    The second problem was that the long-term incentive

13 benefit was in the form of both options and cash.  Now, that

14 might have worked for a company outside of Chapter 11.  But

15 inside Chapter 11 people take a look at the equity option and

16 say, "Why should that be valuable to me?"  Now, we believe

17 that the equity of W.R. Grace does have positive value and

18 should emerge as having positive value in this case.  And yet

19 you can't tell the employees that they should count on the

20 outcome of this case when it comes to their own compensation.

21 Why?  Because they can't control the outcome of this case.

22 The whole purpose of a long-term incentive program is to

23 incent people to take their own actions so that they can

24 improve performance of the company.  These people can't

25 improve the performance of the company in this Courtroom.

1  Only the people sitting here in this Courtroom right now can

2  attempt to do that.  And it's not up to them.  It's up to the

3  Court and all the other constituencies in the case.  So

4  options really drop out of the picture as being something that

5  actually has either real or perceived value to the employee.

6  And that effect of having a program that is both options and

7  cash is that essentially the employee looks through the

8  options and sees the cash, and the cash is only half as good

9  as it should be.  Now, these are both problems with respect to

10  the 2001 to 2003 plan.  And they are both things that the

11  company said with a little bit of hindsight they would have

12  done differently.  We, however, had withdrawn our request to

13  modify that plan.  We're not asking to do that.

14      But we're now on the -- we're now required in the

15  marketplace to develop a new looking forward plan that takes

16  us out another three years.  So the employees are saying,

17  "Okay, now we're at the end of the year.  What does the world

18  look like for me now with respect to this new program?"  So we

19  have an opportunity to deal with both of these issues.  We

20  deal with this issue here, that's options and cash, by going

21  to 100% cash where the employee knows that it's something that

22  he can affect.  We're taking this growth rate down to 6% which

23  was supplied to us by Deloyt and Tush.  It's a lower growth

24  rate, but it's also predicated upon a systematic examination

25  of the growth rate of other companies in the same industry.

1    There's one other feature of this that flows from this.

2   And that is under the old plan basically you got a continuous

3   improvement of benefits under the LTIP all the way down to 5%.

4   If the company's growth dropped below 5%, which is kind of a

5   clip, they pay back nothing.  But when you're lowering your

6   target growth to 6%, you can't have the clip at 5, because

7   that means that unless the company performs within 1% of

8   target, all of a sudden you get nothing.  It doesn't make any

9   sense at all.  So together with moving towards the 6% number,

10  we also changed the plan so that there are prorated benefits

11  down to zero.  So that if there's performance up to 6%, the

12  benefit that's achieved is commensurate with the level of

13  performance on a prorated basis.  Again --

14       THE COURT:  I understand the concept of the prorated

15  benefit.  But I did have some question about why there's a

16  benefit for zero percent target performance rate.

17       MR. BERNICK:  Well, if it's zero, you get zero.

18       THE COURT:  Okay.  And at one you get --

19       MR. BERNICK:  You get -- it's prorated all the way

20  up.  So as good as you do, you get that much more.

21       THE COURT:  But what is the proration?

22       MR. BERNICK:  Oh, I think it's straight line.

23       THE COURT:  Straight line, okay.

24       MR. BERNICK:  So in both of these areas we tried to

25  craft a program that again meets the objectives that are

1  necessary for critics.  What's the benefit?  What's the
2  standard?  The standard is to meet the market.  The market is
3  the benchmark for what's fair.  The market is the benchmark
4  for also what's necessary.  Employee looks to the market for
5  fairness, looks to the market for opportunities.  So this is
6  all driven by are we at market.  And we believe based upon the
7  advice that we're receiving, the judgment that we've made,
8  that this would put us at market, even though we haven't been
9  at market before.

10  Last feature is severance.  Here I'm not quite sure what
11  the issue is, other than perhaps a misunderstanding of labels.
12  Admittedly we could have done a better job.  Whatever.  Under
13  the old program, the existing program, the benefits that would
14  accrue to an employee if the plan of reorganization went into
15  place, and they were terminated because of that plan, would
16  have been spelled out in the change and control severance
17  plan.  That's the one that would have been applicable.  The
18  change and control language would be triggered by that event,
19  and the benefits would then apply.  Once the change and
20  control applies, it trumps the other available severance
21  programs in this area.  What was available under the change
22  and control program?  You get four weeks of benefits, salary,
23  per year of service, a minimum of 16 weeks worth of benefits,
24  and a maximum of 53 weeks.  All that we're doing this time is
25  that we're switching the plan pursuant to which the severance

1    benefits are offered.  We've not changed the change and

2    control language so that it's not triggered by the development

3    of the plan of reorganization if the termination is a result

4    of that.  We're putting it into the salary severance plan

5    itself.  So this is out.  And we've now replaced it.

6        Now, what are we replacing it with?  The benefit of 1.5

7    weeks of salary per year of service, minimum four months and

8    maximum of 53 weeks.  So if anything, the proposed payments

9    are actually a little bit less rich, but a little bit less

10   attractive because it reduces for certain people who do not --

11   who exceed in their service the minimum and don't reach the

12   maximum, it's a slightly smaller benefit on the basis of the

13   time that they spent at the company.  So these are the major

14   areas.  And I know that there may be some detailed questions

15   that the Court may have, or that counsel may raise.  But

16   basically going back to the benchmark of this whole thing, is

17   this a business judgment?  It absolutely obviously is.

18   There's no issue about the fact that it's a business judgment.

19   And that really ought to be an end to it.  But it's more than

20   that.  We believe it's a good business judgment.  And we want

21   to make sure that that's appreciated by the Court.

22        THE COURT:  Okay, thank you.  Who wants to argue?

23   Good morning.

24        MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo

25   on behalf of the Asbestos Property Damage Committee.  Your

1    Honor, after we took the depositions of Mr. Bobnovich, Mr.

2    Norris, and Mr. McGowan, it became apparent to us there was a

3    rather simple analysis that needed to be conducted.   The

4    Debtor has engaged an expert, Mr. Bobnovich, who clearly has a

5    lot of experience in mass tort, Chapter 11 bankruptcies, and

6    the area of employee retention and compensation.   And one of

7    his quotes -- or one of his statements during his deposition

8    was very illuminating.   He made a statement that in mass tort

9    Chapter 11 bankruptcies, Committees are more willing to pay up

10   to Debtors in that circumstance.   And, therefore, those

11   Debtors receive more than, I think he called it, a run of the

12   mill Chapter 11 bankruptcy.   And when asked whether or not he

13   took this into consideration when advising Grace's board, he

14   said he did.   He advised them that Chapter 11 mass tort

15   Debtors receive more than a run of the mill bankruptcy,

16   Chapter 11 bankruptcy.

17          THE COURT:   He also explained why, however, which is

18   that generally the operations of the business were not the

19   reason that the company was put into bankruptcy, and it's

20   generally not the current management that's responsible for

21   the asbestos claims.   But they are simply picking up the

22   operations of the business for someone else who was

23   responsible for the asbestos claims.   And that the Committees

24   as a traditional role want to see management in place, because

25   they want to see a Plan confirmed, and then also that business

1   operations can go forward.

2        MR. SAKALO:  That's correct.  And we agree with that,

3   Your Honor.  We do not want to see management displaced.

4   However, what he said, and what was important, I believe, was

5   they're not responsible for the asbestos claims that exist.

6   That's correct.  But they are responsible for electing to put

7   the company into Chapter 11 bankruptcy.  So the fact --

8        THE COURT:  Would you prefer it not be in Chapter 11?

9   And then it'll be a race to the Courthouse so that whoever

10  litigates first gets whatever there is, and no one else gets

11  anything.

12       MR. SAKALO:  I can't speak for the individual

13  Claimants that are out there, Your Honor.  So --

14       THE COURT:  I think it was a wise decision on

15  management's part to put the company into bankruptcy.  Maybe

16  the only problem is they didn't do it soon enough.

17       MR. SAKALO:  Mr. Bobnovich then went on, Your Honor,

18  and asked if the changes of the existing plan were not made,

19  whether or not they would still be in the range of the

20  competitive environment.  And he said they were.  He said they

21  would still be competitive.  They might be at the lower end of

22  the range of competitiveness, but they would be competitive.

23  Under the new retention plan Mr. Bobnovich said it's a

24  substantial increase in the reduction of the earning before

25  interest and taxes target under the new long-term incentive

1   program.  It's a significant decrease.  He's now allowing --

2   the Debtors are now seeking to allow payouts from anything

3   above zero up to 6%, as Mr. Bernick just explained.

4            THE COURT:  I'm sorry.  I didn't follow what you just

5   said.

6            MR. SAKALO:  Sure.

7            THE COURT:  You said that there would be a

8   significant increase in benefits and payouts?

9            MR. SAKALO:  No.  What he had said was there'd be a

10  significant cost increase.

11           THE COURT:  Cost increase.

12           MR. SAKALO:  Under the --

13           THE COURT:  Did you say something about taxes?

14           MR. SAKALO:  The earnings before interest and taxes.

15  It's the --

16           THE COURT:  Okay.

17           MR. SAKALO:  That's the target number that they look

18  at.

19           THE COURT:  Okay.

20           MR. SAKALO:  It's the growth rate.

21           THE COURT:  Decrease in the percentage of growth?

22           MR. SAKALO:  Correct, from 10% down to 6%.

23           THE COURT:  All right.

24           MR. SAKALO:  What's important about that is the

25  Debtors historically -- they had an incentive program before

1   they were in bankruptcy.  And that incentive program looked at
2   their own historical growth rate.  Now that they're in
3   bankruptcy, they say that it's justifiable to look only at
4   their industry peer group for historical growth rate, despite
5   the fact that before bankruptcy nothing changes about this
6   program other than that they're in bankruptcy.  But now that
7   they're in bankruptcy, this expert's testimony is that you're
8   looking at different industry peer group, as opposed to
9   looking at your own internal numbers, where historically they
10  had a benchmark of 10%.

11          THE COURT:  But he did look at their historical
12  numbers.  And he indicated that -- I don't remember the
13  specific period, I think 1998 or -- 1998 to 2000, I think,
14  but, I'm sorry, I don't recall that specifically -- the Debtor
15  had not met the 10% performance expectations in any of the
16  years in which he took a look at the situation.  His testimony
17  was that he was reducing that expectation to make it in
18  conformity with the Debtor's historical rate as well as the
19  industry rate.

20          MR. SAKALO:  That's correct, Your Honor.  But it's
21  important to know, as Mr. Bernick pointed out, that that 10%
22  was the target to reach the top target payout.

23          THE COURT:  Right.

24          MR. SAKALO:  They were paid if they reached less than
25  10%.  They were paid from 5% through 10%.  So they were not

1  getting zero if they didn't reach 10%.  They were still

2  receiving a certain amount of compensation when they were

3  between 5 and 10%.

4          THE COURT:  Right.

5          MR. SAKALO:  And now they're reducing it to 6% based

6  on industry peers, as opposed to based on the company's

7  historical growth.  What does this all add up to, Your Honor?

8  Both Mr. McGowan and Mr. Norris testified that the company had

9  historical attrition rates during the first 14, 15 months of

10  the plan, five employees out of 118 employees that were

11  denominated as key employees had left the Debtor's employ.

12  It's consistent with the amount of turnover they've had in the

13  past.  They were able to replace those employees they needed

14  to replace.  They were able to consolidate certain positions

15  that those employees held when they left, with presumably no

16  additional cost to the Debtor for doing that at the

17  elimination of a position or two.  There may have been an

18  increase in pay to those employees, but we don't know that.

19  It didn't come out during the testimony.  Their own expert

20  stated that the current plan is within the range of

21  reasonableness.  It's competitive within the industry.  Again,

22  whether or not they're looking at their industry peers, their

23  mass tort peers, for the purpose of retention, which I think

24  is important to note, that none of their peers have a

25  retention program.  They'll point out that that's because none

1   of their peers are in Chapter 11.  But when they looked to

2   implement a Chapter 11 retention program, they said, "Well,

3   let's look at the other Chapter 11 mass tort Debtors."  They

4   go back and forth on that, Your Honor.

5       There is a substantial increase to the retention program.

6   There's a substantial decrease to the long-term incentive

7   program.  As to the severance program, it might be a matter of

8   semantics.  That's something we can talk to the Debtors about.

9   I'm still -- I'm not entirely sure that I follow what Mr.

10  Bernick drew up there on the easel, but we can talk to him

11  about that.

12          THE COURT:  Well, I think it's not quite a matter of

13  semantics.  I mean the trigger factors are definitely

14  different when they move it from the change and control to the

15  salary severance side.  So it's unlikely just a matter of

16  semantics.  And, of course, there are some changes in the

17  benefit level.  The changes in the benefit level so -- not

18  from mass tort bankruptcy, but from other cases in which I've

19  dealt with severance issues, I don't see that they're

20  particularly far out of line with other Chapter 11 cases that

21  I've seen in which severance issues have been raised.  Now,

22  that's just anecdotal.  I certainly haven't done any study of

23  it.  But they don't seem to be too far out on that score.  But

24  there is a change in the trigger factor that is a much

25  different provision given that program.

1        MR. SAKALO:  That's correct.  I --

2        THE COURT:  I think the issue though really, despite

3   all of this, is I'm not sure if it's your view or my view or

4   the Committee's view about what matters.  The issue is whether

5   this is an appropriate exercise of the Debtor's business

6   judgment.  And although I think you can argue some of the nuts

7   and bolts, both you and the Debtor seem to agree that the

8   issue ought to be looking at the overall compensation picture,

9   and whether within the Debtor's business judgment that's

10  reasonable.  What I haven't heard is why that's unreasonable.

11  Why would this be -- if the word we used was discretion, or if

12  you appreciate legal analogy, why would this be an abuse of

13  the Debtor's business judgment?

14        MR. SAKALO:  Well, Your Honor, I think the Debtors

15  make an argument that they're now within the 50th to 75th

16  percentile under their industry peers that they argue fit

17  within this group.  However, their expert says that their

18  current plan is within a range of reasonableness.  It seems to

19  me that we're at kind of a creeping analysis.  Next year --

20  now they might be moving to the 70th percentile.  Mr. Bernick

21  said if you're looking at it, you should be shooting slightly

22  for above the 50th percentile.  If next year the plan comes

23  back, and now they're at the -- they've moved back down to the

24  60th percentile because the other mass tort Debtors have moved

25  their programs, or the economy has changed the amount of money

1  being paid to their industry peer, employees change, are they

2  gonna come back and then keep moving up?  They're currently

3  within a range of reasonableness.  Their own expert said that.

4  The plan's -- we don't see the need to have a change in the

5  plans to move them to a higher level than a range of

6  reasonableness when the existing plans have shown that they

7  have worked.  I mean five of 118 employees.  I don't want to

8  have to keep coming back to that point, but if the major focus

9  of this plan is to keep the employees, it's worked.  They have

10  not lost employees at a greater rate than they've lost

11  historically.

12          THE COURT:  Okay.

13          MR. SAKALO:  And --

14          THE COURT:  That's probably -- I don't know that the

15  Debtor disputes that.  From the information of record I think

16  their expert indicated that he really had not done a study to

17  see whether five out of 118 was consistent with the historical

18  perspective.  In fact, I don't know anything about it.  So for

19  purposes of this discussion why don't we just agree that that

20  is the historic range?  But even if that's the case, what that

21  shows is that given current management, and possibly the

22  expectation that something new is on the horizon, people

23  aren't leaving.  But how do you factor in that crystal ball

24  now of, "Yes, I have this bird in the hand today, but for

25  example stock options are simply not worth to me what they

1  were now -- they're not worth to me now what they were worth

2  two years ago or three years ago"?

3         MR. SAKALO:  I understand that, Your Honor.  The

4  stock is still trading.  I'm not sure what it's trading out

5  now.  It was over $2 a share last time I checked.  It's

6  decreased historically the last few years based on a variety

7  of factors, none of which -- I don't have a crystal ball that

8  looks into the stock market to be able to tell you exactly why

9  it's decreased.  It has decreased, Your Honor.  But the

10  existing plans are within the range of reasonableness.

11         THE COURT:  But so is the new plan.  That's what

12  their expert says.

13         MR. SAKALO:  That's correct.  But the Debtors have

14  not shown that there's a reason that they have to be at the

15  top range of the reasonableness.

16         THE COURT:  But they're not at the top.  50 to 75th

17  percentile is not the top.  75 is certainly getting closer to

18  the top, but it's not the top.  They're not at the top.

19         MR. SAKALO:  It's correct.  But it's important to

20  know how they get to that 50th to 75th percentile.  That's a

21  combination of all these different programs --

22         THE COURT:  Yes.

23         MR. SAKALO:  -- put together.  Some of these programs

24  their competitors don't have.  They readily admit that.  So

25  they have the retention program that their competitors don't

1    have.  That's in there because other Chapter 11 mass tort

2    Debtors have them.  Now, I believe the way the value of the

3    stock options is -- of the outside competitor is valued,

4    that's a moving target.  As the stock prices of these

5    competitors move, so does the 50th and 75th percentile.  So we

6    have a constantly moving target.  It appears that we can't

7    give the Debtors carte blanche to keep coming in and saying,

8    "Well, now the percentiles have moved; we need to move the

9    program up," when their experts have said they're currently

10   competitive, they haven't lost additional people.

11           THE COURT:  All right.  Well, with respect to the

12   Debtor's original request to make some changes retroactive, I

13   indicated at the last hearing I wasn't going to approve, the

14   Debtor has withdrawn that request.  So we're not looking at

15   what happened in the past.  We're starting with 2003 and going

16   forward.  I'm sorry, three years?

17           MR. BERNICK:  2002 going three years.  So it's 2002,

18   '3, and '4.

19           THE COURT:  On which part?

20           MR. BERNICK:  On the LTIP, Long-Term Incentive

21   Program.

22           THE COURT:  And what years for the other parts?

23           MR. BERNICK:  Well, the severance provision would

24   remain -- the one we just talked about would be a steady stay,

25   would remain in place.  With regard to the retention program,

1  that again would be for this year, because you're talking

2  about salaries that are paid this year.  Again, every year we

3  take a look at the snapshot.  And there are some elements of

4  the snapshot that require that we look down the road.  It's a

5  long-term incentive program.  Other elements don't look down

6  the road.  They're just what you're getting here and now.

7          THE COURT:  Okay.  The program that's previously been

8  approved --

9          MR. BERNICK:  Right.

10          THE COURT:  -- I want to make sure that I'm not

11  creating some overlap.

12          MR. BERNICK:  There's no overlap in the programs that

13  were previously approved.

14          THE COURT:  Okay.  All right.  So, anyway, it's

15  essentially a forward looking, not a backward looking issue.

16  So the programs are not on all fours with each other.  They've

17  made some changes within those programs.  And in the expert's

18  opinion those changes have kept this program within the range

19  of reasonableness.  I think he was pretty clear in his

20  affidavit he thought that there were some things that the

21  Debtor should be recommending higher amounts, and some that he

22  thought the Debtor should be recommending lower amounts.  But

23  overall he felt the program was reasonable.  And that

24  apparently was the Debtor's view.  I'm not sure what should

25  convince me that the Debtor's exercise of its business

1    judgment is improper in that regard.

2    MR. SAKALO:  I understand what you're saying, Your

3    Honor.  Just one important distinction I believe is what he

4    testified to, Mr. Bobnovich testified to, was that the

5    existing plans were rolled forward.  So if the 2001 through

6    2003 long-term incentive program became the 2002 through 2004

7    long-term incentive program, if the existing retention program

8    was carried over at the same dollar amounts, and if the

9    severance package was carried over at the same dollar amounts,

10   those numbers as they exist today would all be within a

11   competitive range --

12   THE COURT:  Right.

13   MR. SAKALO:  -- going forward.  So I understand what

14   you're saying.  But I just wanted to make it clear to you that

15   he believed going forward those plans would be within a

16   reasonable range --

17   THE COURT:  But --

18   MR. SAKALO:  -- without making any of the proposed

19   changes.

20   THE COURT:  Yeah, but whether he believed that that's

21   reasonable or not, he's also saying that Debtor's new proposal

22   is also reasonable.  So I'm not exactly comparing apples to

23   apples.  It's really more of a mixed fruit bowl, yes.  But

24   despite that fact, having put everything into that one basket

25   his view is that that program is overall reasonable.  And

1  isn't that what the Debtor is supposed to be doing in

2  exercising its business judgment?  Figuring out a compensation

3  package that meets the goals that the Debtor, and I would

4  think the Committees frankly have, which is to keep a good

5  management team in place at a reasonable cost.

6        MR. SAKALO:  That is -- I believe that's a mutual

7  goal that both sides have, Your Honor.  I'd just like to point

8  out once again that what Mr. Bobnovich stated was we have an

9  existing program.  Yet we're looking to go to a new program.

10  Our concern is that because there is more money in the pot for

11  other Debtors, the Debtors believe it's reasonable to give

12  more to their employees.  And we're not disputing that we want

13  their management to stay in and continue to perform.  And

14  they're performing very well based on their last 10-Q.  But

15  what we're saying, Your Honor, is that it's a continuing

16  moving target.  And it's, you know, they're getting this, so

17  we should be getting this.  And now they're gonna get more, we

18  should get more.  Which is important.  And you have to stay

19  competitive.  But what you have to look at is, well that's

20  what they got last year.  The USD programs, the Armstrong

21  programs, Federal Mobile, and Owens Corning programs were all

22  in place last year.  And Grace's program performed consistent

23  with their historical performance.  So if they were under

24  market last year, it didn't affect their ability to continue

25  to perform at historical rates.  So now they're looking to

1    move it up, move it forward, when in the past they've

2    performed at that same level.

3            THE COURT:  They performed at whatever level they

4    performed at.  I mean the historical record is the historical

5    record.  But as I understand the Debtor, the Debtor is

6    concerned, and I think their expert was clear that he had no

7    evidence to back it up.  He had not talked to employees who

8    said they were going to leave.  Nonetheless, the Debtor is

9    concerned.  There are competitors out there.  There are lots

10   of cases with mass tort concepts hitting bankruptcy.  Some or

11   all of them may have changes in managerial roles.  People with

12   experience are marketable.  And their concern is keeping

13   together a team that works, that have kept the company in good

14   performance level, which seems to be the case despite the

15   Chapter 11 filing, and to do it at a cost that is reasonable

16   for all constituents within the Estate, but not to cause

17   people to want to leave.  Now, if you're suggesting that the

18   problem really is that this program's on the rich side and so

19   the next year they come in maybe it will be even richer, I

20   think the issue is maybe you need a longer term for the

21   program that they're talking about.  Because I recognize that

22   the Debtor says you have to do this annually.  Maybe from the

23   Committee's point of view it's something that should be looked

24   at on a longer term basis as opposed to a shorter term.  But,

25   okay, let's --

1    MR. SAKALO:  I'm sorry.  I agree with everything you

2  said, Your Honor.  Just the one thing I would point out in

3  what you said is there are a lot of other mass tort Debtors

4  that are filing bankruptcy.  But the Debtors were clear in

5  their statement and their papers, in and in their deposition

6  testimony that they don't consider them their competitors for

7  their top management.  They consider it a much broader

8  industry scope as to who their top management may go to, the

9  CEO-type, CFO --

10    THE COURT:  Oh, yes.

11    MR. SAKALO:  -- top level people.  So I think the

12  concern that other mass tort Debtors are maybe filing

13  bankruptcy or ones that are filed recently, and that they'd be

14  losing these employees to those people for -- because they may

15  have excelled in management in the Chapter 11 process.  I

16  don't think that that's accurate.

17    THE COURT:  Okay.

18    MR. SAKALO:  Thank you.

19    THE COURT:  Anyone else?  Mr. Bernick?

20    MR. BERNICK:  Yeah, I just had a couple of things

21  just to really add for the record.  One, Your Honor asked with

22  respect to that severance, the new severance package, how did

23  it compare with others?  And I think you recited some of your

24  own experience.  This also is an area where Mr. Bobnovich

25  specifically compared the severance terms with those of I

1  think 60 other Chapter 11 Debtors.  So that feature of the

2  package as well has been the subject of expert input.  Second,

3  with regard to this fundamental question of business judgment,

4  obviously the judgment in this case is kind of a two-prong

5  judgment.  One is what does it take to be competitive.  And

6  then secondly, well, what is it worth to the company?  How

7  much does it cost, and is it really worth it?  And I would

8  just direct the Court's attention in that regard to page 54 of

9  Mr. Norris' testimony.  I know that he would very much like to

10  come up and give that testimony himself, but he'll restrain

11  himself.

12      He said, "Even if we paid the maximum payout on their

13  long-term incentive plan, our ability to borrow or our ability

14  to provide value to our stakeholders through equity was hugely

15  leveraged.  So anything that we could do that would motivate

16  our employees to the highest possible growth rate was in the

17  direct beneficiaries of all of our stakeholders.  I mean so in

18  my mind the most important thing to do was to drive that

19  number as rapidly as we could, but also to have a plan that

20  our employees felt had an opportunity for them to be fairly

21  compensated, so they didn't just accept that we're in

22  bankruptcy, that we should just hang on and wait to see what

23  happens in the reorganization plan."  He also said what's

24  going on here is that, yes, there's a cost.  But if these

25  objectives are achieved, there's enormous leverage.  You drive

1  the value of the company up, and then everybody gets the

2  benefit of that.   That's Mr. Norris' judgment about what's

3  competitive and what's cost effective.   The implicit judgment

4  of the PD Committee apparently is that it's better to be

5  cheaper, to be on the lower end of middle rather than the

6  higher end of middle.   Well, God bless, but right now the

7  current management of Grace is doing a great job.   And they're

8  making the business judgment.   This is classically a business

9  judgment.   There's nothing that says business judgments have

10  to be made on a lowest bid basis, or on a let's see how cheap

11  we can get it kind of basis.   And that's really kind of borne

12  out here in particular respect.   Mr. Sakalo points out that,

13  "Well, gee, the benefits were lower this last year, but the

14  Grace people still did well."   Kind of like well we still got

15  it out of them even though we didn't have to pay as much.   You

16  can't count on that.   And right now in fact what happened was

17  those same Grace employees learned that some of the other

18  Chapter 11 Debtors were paying out better retention benefits.

19  Are you really going to be able to count on the Grace people

20  going forward when they start this look around and see what's

21  happening elsewhere?   I don't know what's gonna happen.   But

22  it's the kind of thing that again is squarely a matter of

23  business judgment.

24       With respect to the moving target, I think that again

25  this is all prospective.   We're all going forward.   There are

1    certain parts of this program that we will not have to change,

2    including the retention part of the program we will not have

3    to change.  Others, like long-term incentive program, it's in

4    their nature that they change every year.  And it is a certain

5    amount of a moving target because the market conditions

6    change.  And if you want to retain your people and do right by

7    them, you've got to adapt accordingly.

8           THE COURT:  Anyone else?

9           ALL:  (No verbal response).

10          MR. BERNICK:  We actually have an Order to present to

11    the Court.

12          THE COURT:  Okay.  I don't see anything improper in

13    the Debtor's exercise of its business judgment in this regard.

14    In my view, this is a rich program.  And I hope not to see a

15    request in the near future for anything that's more rich than

16    this one.  So to the extent that that is going to be a problem

17    from your employees' standpoint, this is about as rich as it's

18    going to get in this Chapter 11 case, folks.  So deal with it.

19    But for this one, I think this is appropriate.  And as a

20    result I will approve the Debtor views.  But if you're coming

21    back in, you'd better give me some very hard evidence, and

22    don't just give me comparisons with Chapter 11 mass tort

23    Claimants.  I want to know what your industry is doing, what

24    comparable mass tort Debtors, if you're coming back in for a

25    modification of these programs.  Because I want some real

1 evidence about why something more rich than this needs to be

2 done as an overall package.  But I'll take your Order.  Could

3 you show this to --

4        (Pause in proceedings)

5        THE COURT:  When do you expect, Mr. Bernick, that the

6 LTIP package issues will be the subject of another motion,

7 since they're going to go through 2003?

8        MR. BERNICK:  It's a rolling deal.  That is that you

9 basically have what kind of looks like this.  One, two, three

10 years on the plan.  You do have the first year.  When the next

11 year comes along, one, two, three year plan.  So every year

12 you come up and do a new program.  And the benefits are not

13 paid all at once.  They're paid out spaced over time so they

14 kind of end up lining up here.  And it affects the payout of

15 the old plan and a new plan.

16        THE COURT:  I was really just thinking in terms of

17 scheduling something for when the LTIP portion of this is

18 going to be coming up.  Since it was through 2003, I would

19 suspect that not too long from now you're going to be asking

20 for some -- either a change or some --

21        MR. BERNICK:  Yes.

22        THE COURT:  -- approval.

23        MR. BERNICK:  Next year -- well, next year, just like

24 this year, we'll come in.  This was '01 to '03, '02 to '04.

25 Next year '03 will come in to the mix.  So it's the same thing

1  every year.  You're just adding another year and saying,

2  "Okay, here's where the market's going.  What should be an

3  appropriate program to keep people for a longer term?"

4          THE COURT:  Okay.  I was just concerned about trying

5  to schedule something.  But I just think maybe --

6          MR. BERNICK:  I think it'll come up in the ordinary

7  course.

8          THE COURT:  Okay.

9          MR. BERNICK:  Item 7, I don't know, is the -- that's

10  our revised estimation litigation budget for the ZAI Science

11  Trial.  Remember the Court asked parties to come up -- both

12  sides to come up with a budget.  We submitted a revised budget

13  based upon the guidance of the Court last time.  There haven't

14  been any responses to our budget.

15          THE COURT:  Well, you submitted one, and ZAI --

16          MR. BERNICK:  Yes.

17          THE COURT:  -- Science submitted one.  And they're

18  not too dissimilar.  I mean they both come down to the same

19  bottom line number.

20          MR. BERNICK:  Right.

21          THE COURT:  Is there some reason why both of them

22  can't be approved?  If the ZAI plan is going to spend theirs a

23  little differently than you do, does it matter?

24          MR. BERNICK:  No, we don't have any problem with

25  either side of this.

1    THE COURT:  Okay.  So on 7 and 8 with respect to the

2  budgets, I think I'm prepared to sign Orders if somebody can

3  give them to me.  I'm a little confused about all the Orders.

4  But I've been given one from ZAI Science.  So I haven't signed

5  anything because I'm not sure what's new and what's been

6  agreed on in the past.

7    MR. BERNICK:  This is an Order for us.

8    THE COURT:  All right.

9    (Pause in proceedings)

10    THE COURT:  Okay.  Good morning.

11    MR. WESTBROOK:  Good morning, Your Honor.  Ed

12  Westbrook for the ZAI Claimants.  We also have a proposed

13  Order.

14    THE COURT:  All right.  Thank you.  Now, Mr.

15  Westbrook, I meant to check this morning, and I forgot frankly

16  to do it.  Have I signed an Order that appointed the

17  appropriate people?  I don't recall having received an Order

18  that actually dealt with the appointment.

19    MR. WESTBROOK:  Your Honor, our proposed Order on the

20  budget reiterated our appointment as lead counsel and

21  assistant lead counsel.  And that Order does that, that you

22  just have in front of you.

23    THE COURT:  Okay.  I remember getting --

24    MR. WESTBROOK:  Yeah.

25    THE COURT:  -- something from you that indicated, I

1 thought in an Order form that as maybe attached to a motion or

2 something that said how you were going to contact either

3 Boston or California counsel.  But I don't think I ever signed

4 an Order related to that.

5        MR. WESTBROOK:  That's correct, Your Honor.  That was

6 our -- and I can show it to the Court -- that is the

7 designation.  And then attached to that was the Order that you

8 just signed.  I'm going to give Mr. Bernick the other copy.

9        THE COURT:  Okay.  Does this deal with the law firm

10 that withdrew at the last hearing, however?

11        MR. WESTBROOK:  Yes, Your Honor.  This only addresses

12 the possibility that we may call on other firms that have not

13 withdrawn.

14        THE COURT:  Okay.  So this Order that I signed -- I

15 think I need a specific Order so when fee applications come in

16 I know what I'm looking for to designate the firms that are

17 involved.  And this Order that I've just signed simply says

18 that revised special counsel designation's approved.  But it

19 doesn't say for whom and what.  And they're not mentioned in

20 here.  I think I need a specific Order --

21        MR. WESTBROOK:  That's fine.

22        THE COURT:  -- that --

23        MR. WESTBROOK:  Sure.

24        THE COURT:  -- says that.

25        MR. WESTBROOK:  Okay.

1          THE COURT:  And there is none attached to this

2   motion.  Correct?

3          MR. WESTBROOK:  The Order that I handed up was the

4   Order, Your Honor.

5          THE COURT:  Okay.  Well, I can give you this back.

6          MR. WESTBROOK:  Okay.

7          THE COURT:  I've seen this.  But I'd like to get --

8   when can I expect to get that from you, Mr. Westbrook?

9          MR. WESTBROOK:  We can get it to you this afternoon,

10  Your Honor.

11         THE COURT:  All right, that'd be fine.  Okay.

12         MR. BERNICK:  Item 9, I'm not quite sure what there

13  really is to do with respect to this.  We filed an Omnibus

14  objection.  But I think that basically we're involved now in

15  the pre-trial process on the Science trial.  Mr. Cameron's on

16  the phone in case there are any questions the Court has.  I

17  know that some discovery's been served, and the process is

18  beginning to unfold.  But I'm not sure if there's any matter

19  that has to be raised with the Court today, unless there is

20  something that Your Honor would like to take up.

21         THE COURT:  Well, I was waiting for an Order that

22  memorialized what -- well, actually I think this is what

23  happened.  I signed a modified Order in Court that set the

24  discovery schedule.

25         MR. BERNICK:  Right.

1    THE COURT:  And apparently it's among the missing.  I

2  think what happened, but I'm not really sure, is that I signed

3  the Order and made the modifications on the one that was in

4  the bench book.  And then the bench book must have been given

5  back to counsel for the Debtor.  And I don't know if he

6  destroyed it or kept it or what.  If you have it, that Order

7  may be in there.

8    MR. BERNICK:  Okay.

9    THE COURT:  That's the only other place I know to

10  look, because the --

11    MR. BERNICK:  The Order --

12    THE COURT:  -- Court doesn't seem to have it.  Do you

13  have it?

14    MS. BAER:  Your Honor, we don't have your signed

15  Order, but we prepared a new one and submitted to you with

16  Certification of Counsel on Thursday.

17    THE COURT:  Yeah, I brought that.  But then I also

18  brought something, I think, from the Property Damage Committee

19  or you, Mr. Westbrook.  I'm not really sure at this point who

20  submitted it.  But the two Orders weren't identical.  And I

21  don't know at what point they were submitted.  So I don't know

22  whether the property damage was submitted before the last

23  hearing.  It seemed to be something that came in after that.

24    MR. WESTBROOK:  Your correct, Your Honor.  We

25  submitted ours on August 6th, which I thought was the date for

1  those to come in.  I haven't seen Grace's Order.  But our

2  Order attempted to track what happened at the last hearing.

3  And the Order I have from Grace, which I now understand is to

4  be superseded by another Order, was -- had been superseded by

5  events at the hearing with respect to dates and two or three

6  other issues.  And perhaps we can discuss what may be points

7  of difference in that proposed Order.  Although I haven't seen

8  it, they may still have the same differences tracked in there.

9          THE COURT:  Well, I think the dates were the same.

10  Both of you picked out the dates that we put on the record.

11  But the issue was, I think, whether or not the 10 Plaintiffs

12  were only the Plaintiffs who could participate in the case.

13  And there was a bit of a difference -- I'm not sure it's

14  really significant -- in defining if those were for trial.

15          MR. BERNICK:  That's correct.

16      (Pause in proceedings)

17          MR. BERNICK:  I believe Your Honor entered an Order.

18  This is --

19          THE COURT:  I did.

20          MR. BERNICK:  -- the same thing.  Yeah.  So the only

21  question should then be retrieving --

22          THE COURT:  That Order.

23          MR. BERNICK:  -- a copy of what Your Honor entered.

24  And I believe that this is it.  But in order to make

25  absolutely sure, we will endeavor to find where that Order is.

1  I'm very loathe to go back over it now to compare the language

2  of something that's -- there should not be any difference at

3  this point.  We've gone over this ad nauseam.

4       MR. WESTBROOK:  I don't know that that's correct,

5  Your Honor.  When I left the hearing I wasn't under the

6  impression that the Court had signed that Order, because we

7  had changed the dates, we had discussions about the language,

8  and then also just for instance the Order that I had on

9  record, which apparently is not the Order that he has now to

10  give me, said in the scheduling that only Grace could file

11  Dalbert motions.  And we thought it should be mutual, that we

12  may have some problems with their science, that there should

13  be a mutual opportunity to file Dalbert motions.

14       THE COURT:  Well, let me check my notes.  Let's see.

15  My notes clearly say that I entered an Order that day.  It

16  says, "Modified Order entered on Item 13."  That was the

17  agenda item for this.  And -- the record is I quote particular

18  dates because to the extent that there was going to be an

19  argument on the Dalbert motions that were going to be in

20  Pittsburgh June 30 and July 1.  So I definitely signed an

21  Order.

22       MR. BERNICK:  I think.

23       THE COURT:  I don't have it.

24       MR. BERNICK:  I have a copy of it in the office with

25  your handwritten interlineations --

1      MR. WESTBROOK:  Right.

2      MR. BERNICK:  -- if that's the one we're talking

3  about.

4      THE COURT:  That's the one, yes.

5      MR. BERNICK:  I have a copy.

6      THE COURT:  Will you fax a copy to me?

7      MR. BERNICK:  Absolutely.

8      MR. WESTBROOK:  And that's the one I don't have

9  either, Your Honor.  So we're both in the same --

10      MS. BAER:  I must have a copy of Your Honor's --

11      MR. BERNICK:  That's where it went, Your Honor.

12   (Laughter)

13      MR. BERNICK:  Now we found out where it went.

14   (Pause in proceedings)

15      THE COURT:  All right.  Now, I do agree, Mr.

16  Westbrook, however -- the one point I really do agree with is

17  that if your Plaintiffs want to file a Dalbert motion, then

18  they ought to have the ability to do that.  I don't see why it

19  should be restricted to the Debtor.  And I am happy to modify

20  the Order on that point, because I think it should be either

21  side.  The rest of it though I think I'd like to see the Order

22  that I entered first.

23      MR. WESTBROOK:  Okay.  And I'd like just to alert the

24  Court one other point is that the original Order that I saw,

25  what I'll call the old Order, said the evidence would be

1  limited to the 10 Claimants.  And we think the Court is

2  looking for the best evidence on the ZAI Science.  And if

3  there are other buildings in which testing on ZAI is relevant,

4  the Court would like to see that.  So our Order -- and that

5  may be a distinction from Grace's Order -- said that evidence

6  is not necessarily limited to those 10 Claimants, that the

7  Court can -- that we can bring forth whatever evidence we

8  believe is relevant, and the Court will rule.

9        THE COURT:  Well, here's the problem.  If this were

10  in the nature of a class action, or if I had other claims of

11  record for which the Debtor filed objections, I'd be happy to

12  do that.  The problem is at the moment the way this proceeding

13  is coming before me, there are objections to -- or there are

14  proofs of claim, and then there are objections stated.  So if

15  you're going to do that, I set a date by which anybody who

16  wanted to join the proceeding could, so that I didn't have to

17  address this issue at the last minute.  If you need a very

18  brief extension to get some claims on record so that the

19  Debtor can object to them, so that we can expand the scope,

20  I'll do it now before discovery starts.  But I'm not going to

21  do it at the last moment, because I don't know how to prepare

22  for a trial on that claim.

23        MR. WESTBROOK:  We may be talking about a little

24  different thing, Your Honor.  For instance, when -- years ago

25  before there was ever any thought of bankruptcy, there was

1   some testing done on ZAI in homes.  And that's historical

2   testing.  It's from Grace records.  Our view would be that

3   that evidence if it's otherwise relevant should be able to

4   come before the Court.

5            THE COURT:  Well, I'll rule on the relevancy of

6   various issues when I see the context in which it's offered at

7   trial.  But in terms of looking at what Claimants are actually

8   involved in the case as main Defendants to the Debtor's

9   actions to object to claims, the only ones I know that I have

10  are those 10.  Because I'd be happy to expand the universe.

11  I'd like to get everybody in here so we only have to do this

12  once clearly, and combine everybody for sure, without any

13  appellant issues on those points.  But I don't think that's

14  the way I can rule given the context of this trial.

15           MR. WESTBROOK:  Your Honor, Mr. Bernick points out

16  that his language specifically is that claims litigation is

17  limited.  But that is not necessarily a limitation on the

18  evidence.  So we may not have a problem.

19           MR. BERNICK:  I think --

20           THE COURT:  Okay.

21           MR. BERNICK:  -- that's a very good point.  The Order

22  so reads.  What the scope of the evidence is that my company

23  Grace has filed is certainly something that we can take up.

24  But I had the same recollection as Your Honor, which is that

25  we have an open invitation for anybody to come and file a

1  claim that would want to.  They really ought to be here if

2  their buildings gonna get litigated.

3          THE COURT:  Yeah, that's what I think.  If they want

4  in, then I'm happy to put them in.  But it has to be done in a

5  fashion that permits everybody to get involved in the

6  discovery on those same buildings.

7          MR. WESTBROOK:  And just for instance, Your Honor,

8  there may be buildings that Grace has done some testing in

9  which are not buildings of these 10 Claimants.  But we may

10 discover something in discovery about that testing that we'd

11 like to bring before the Court.

12         THE COURT:  You may.

13         MR. WESTBROOK:  Okay.

14         THE COURT:  And as I said, with respect to relevancy

15 I can't issue rulings on relevancy until I hear the context in

16 which the evidence is brought.  So I simply can't address that

17 now.

18         MR. WESTBROOK:  Thank you, Your Honor.  May I confer

19 with Mr. Bernick for a minute?

20         THE COURT:  Yes.

21     (Pause in proceedings)

22         MR. BERNICK:  Your Honor, all the other entries on

23 the agenda pertain to quarterly fee applications.  And I don't

24 know what the Court's pleasure is with respect to them.

25         THE COURT:  Why don't we take a minute and get caught

1  up --

2      MR. BERNICK:  Sure.

3      THE COURT:  -- with this issue first, Mr. Bernick?

4  All right.  I'm going to get from Mr. Baena a copy of the

5  Order that I entered.  And then compare it to the other two

6  Orders, I guess, that have been presented.  And I will modify

7  it to add the ability of the Property Damage to file their

8  motions if they choose.  I don't think I need to do anything

9  with respect to the Claimants if it's an evidentiary

10  principle.  Is that everything, Mr. Westbrook?

11     MR. WESTBROOK:  From memory, Your Honor, the only

12 other differences following the hearing when we submitted our

13 Order, we've framed the issue as it says in the context of a

14 property damage case, whether ZAI presents an unreasonable

15 risk, we tried to track the language from the transcript.  And

16 the Court will see that when it compares our Order with

17 Grace's Order.

18     MR. BERNICK:  That is a sore subject, because we've

19 been over that like nine times, and argued that very issue

20 very specifically, and then negotiated it out.

21     THE COURT:  Well, hopefully I did it myself within

22 the context of the hearing.  If I didn't, then I'll take a

23 look at that.  I was trying very hard not to set the parameter

24 for what the issues would be until the discovery is done.  I

25 think the appropriate place to look at that is at the pre-

1  trial conference.

2          MR. BERNICK:  We can live with that.

3          THE COURT:  Okay.  Because I think after discovery we

4  may be able to frame the issue a little bit better than we can

5  now anyway.  Okay.  All right, fee applications.

6          MR. BERNICK:  Fee applications.  I've not done this

7  with the Court before, and I don't know what your preferred

8  procedure is.  There are quite a number of them.  And --

9          THE COURT:  Well, with respect to -- first of all, my

10  preferred procedure is to get from somebody -- I don't know if

11  this is gonna be Mr. Smith or you, Mr. Bernick, but one Order

12  that will address all the fees in an Omnibus Order so that I

13  can get them addressed by period.  So you or Mr. Smith can

14  work out how that will be proffered.  But I would like to get

15  one Order after I get through the allowance process.  For

16  today's purposes I have not had any objections to Mr. Smith's

17  report with respect to #10 -- these are agenda items -- #10,

18  #12 through 18, #20 through 31, I believe.  I think I need

19  hearings on 11 -- I'm sorry, I thought -- 16 I believe I did

20  get a response in.  I'm sorry.  I have a different issue with

21  16.  I literally cannot read it.  The print is too small.  And

22  I literally cannot read Mr. Smith's final report because he

23  incorporates some responses that he got from whomever's

24  application that is.  And the way they're put into the report,

25  the print is too small.  I can't read it.  As a result, I have

1  not read it, and I'm not going to read it until it's in a font

2  that I can see.  So you're gonna have to deal with that,

3  folks.  You've got to make it bigger.  I have bad eyesight.

4  That's just the way it is.  So make it big enough that I can

5  see it.  And I'll tell you a story.  I had an attorney in

6  Pittsburgh who took this to heart and did a disclosure

7  statement with one letter per page at one time as a joke,

8  because I was able to see the one letter per page.  I don't

9  need it that big, but --

10      (Laughter)

11          THE COURT:  Okay.  So I think I need a hearing on 11,

12  16, and 19, unless something has been filed other than what

13  I'm aware of.

14          MS. BAER:  Your Honor, I have 28, Kirkland & Ellis.

15  We did file a response.

16          THE COURT:  Yes, you're correct.  I got that after I

17  made these notes.  And I did see that one as well.  Thank you.

18  28.  So unless there is something more to be said with respect

19  to item 10, 12 through 15, 17 through 18, 20 through 27, and

20  29 through 31, I am prepared to enter the Orders as Mr. Smith

21  has composed those Orders.  And I need hearings on the rest.

22          MR. WAXMAN:  Excuse me, Your Honor.

23          THE COURT:  Good afternoon.

24          MR. WAXMAN:  Good afternoon.  Jeff Waxman, Klett,

25  Rooney, Lieber & Schorling.  Your Honor, we did not file an

1  objection to the final report.  But we did file a

2  Certification of Counsel which refers to the final report.

3  And by agreement with the fee auditor, there were some

4  modifications to the final report.

5       THE COURT:  I saw the Certification of Counsel.  And

6  I took that to be no objection.  So whatever the numbers are

7  you've agreed on, I'm happy to enter.  That Certification

8  though didn't have numbers in it.  Okay.  I think it said that

9  there was no objection to Mr. Smith's report.  Or maybe I've

10  got yours and someone else's confused.

11       MR. WAXMAN:  Your Honor, I have a copy here if I

12  could hand it up.

13       THE COURT:  Yeah, please.  Thank you.

14       MR. WAXMAN:  There are final numbers in there.

15       THE COURT:  There are indeed, thank you.  And I --

16  no, this is not the one I was thinking of.  I must have gotten

17  a consent by someone else.  All right.  In any event, what

18  number is yours?

19       MR. WAXMAN:  I believe it's 13.  Yes, Ma'am.

20       THE COURT:  Okay.  Does Mr. Smith have these numbers

21  correct on --

22       MR. WAXMAN:  He does.

23       THE COURT:  -- number 13?

24       MR. SMITH:  Yes, Your Honor.

25       THE COURT:  And do you agree with him, Mr. Smith?

1        MR. SMITH:  Yes, Your Honor.

2        THE COURT:  Fine.  Then I will enter the Order as the

3 Certification of Counsel proposes on #13.

4        MR. WAXMAN:  Thank you, Your Honor.

5     (Pause in proceedings)

6        THE COURT:  Good afternoon.

7        MR. RILEY:  Good afternoon.  Richard Riley from Duane

8 Morris on #16.  We facilitated the filing of Policano &

9 Manzo's fee application.  And I have a Certification by Mr.

10 Smith that resolves -- I know you said you wanted to see the

11 final fee auditor's report.  I think it's all been resolved.

12 If Mr. Smith wants to speak up --

13       MR. SMITH:  Yes, Your Honor, I can speak up as loudly

14 as people would like.

15    (Laughter)

16       THE COURT:  Go ahead.

17       MR. SMITH:  Yes, Your Honor.  In this -- and I

18 apologize for the small type, Your Honor, and I'll do better

19 in the future.

20       THE COURT:  Okay, thanks.

21       MR. SMITH:  But this is one in which FTI Policano --

22 is that how it's pronounced -- contacted me on Thursday in an

23 attempt to resolve some outstanding issues.  They supplied me

24 with a lot more information, and we've now come to an

25 agreement.  On Friday I filed a Certification of Counsel.  And

1    I apologize for not getting it to the Court's attention prior

2    to this time.

3              THE COURT:  All right.  Then I do want to see --

4              MR. BERNICK:  Your Honor, I have a copy of the

5    Certification if you'd like it.

6              THE COURT:  All right.  Mr. Smith, did you say it's

7    been filed?

8              MR. SMITH:  Yes, we filed it on Friday, Your Honor.

9              THE COURT:  Okay.  I don't need another copy then.  I

10   will have it pulled through the docket.  And in all

11   probability if you've agreed to a fee I'll probably approve

12   it.  But I do want to see the report in a format that I can

13   read first.

14             MR. SMITH:  Yes, Your Honor.

15             THE COURT:  Okay.  Good afternoon.

16             MR. CARICKHOFF:  Good afternoon, Your Honor.  David

17   Carickhoff of Pachulski, Stang, Ziehl, Young & Jones.  Your

18   Honor, I have an Order for Item #25 on the agenda, which was

19   Holme Roberts & Owen.  And they did agree with the fee

20   auditor's report, as did my firm which is Item #27 on the

21   agenda.  And if I could present this Order to the --

22             THE COURT:  I'm not taking those Orders.  I am going

23   to do one Omnibus Order.  Someone is going to prepare it.  And

24   by the way, I'm not entering any Orders in this case until I

25   get the following.  And I'm also withdrawing from the Debtor

1   the ability to make any further payments starting September

2   1st -- any payments until further Order of the Court and until

3   I get literal compliance with my Orders.  So this is a very

4   serious issue with me, gentlemen.  I expect clients to comply

5   with Orders of the Court.  I expect counsel and other

6   professionals to comply with Orders of the Court.  This is

7   what I want.  The fee auditor provides you with spreadsheets

8   for me because: A) not everyone categorized their fee

9   applications; and B) not everyone gave him the information to

10  enable him to do a spreadsheet.  The information that he did

11  file was not in spreadsheet format, number one.  And number

12  two, it didn't have the information in it that I want in.  And

13  I'm not approving any fees until I get that spreadsheet in a

14  format that I want, that has all the information in it.  So

15  let's, number one, figure out how you're going to get him this

16  information promptly, because it's in your best interest to do

17  it.  And I'm not signing it until he certifies to me that he

18  has it from everybody.  So this is also your obligation.

19      In the event that there is some recalcitrant firm that

20  does not submit this information, I want to know it from the

21  fee auditors.  And that firm will be nunc pro tunc removed

22  from representing any client in this case, and all fees and

23  expenses paid to date will be reimbursed.  I am very serious

24  about this.  Does anybody have any questions?  Because I want

25  it very clear what I expect.  I backed off the category system

1  the way I wanted it, which I think is easier, for the

2  convenience of everyone.  And then you didn't even use it.

3  That's not gonna work.  Any questions?

4          MR. CARICKHOFF:  No, Your Honor.  We'll meet with the

5  fee auditor after the hearing, and find out what information

6  he still needs to complete the spreadsheet, and try --

7          THE COURT:  All right.

8          MR. CARICKHOFF:  -- and get those as quickly as

9  possible.

10          THE COURT:  The Debtor is to make no payments on the

11  monthly fees or expenses starting September 1st and going

12  forward until I get this Order entered approving fees.  Once I

13  get everything from all parties approving the fees, then the

14  Debtor is permitted to start making monthly payments again.

15  But no payments are to be made until I get this Order entered

16  -- none.

17          MR. CARICKHOFF:  With respect to the Omnibus Order,

18  obviously you'll carve out the parties that are subject to a

19  hearing before Your Honor with respect to their responses?

20          THE COURT:  We're doing the hearings now.

21          MR. CARICKHOFF:  Okay.

22          MR. SMITH:  Your Honor, if I could ask a few

23  questions regarding those spreadsheets?

24          THE COURT:  Yes, Sir.

25          MR. SMITH:  One of the problems with the spreadsheet

1    was that there was so many different categories used by so

2    many different parties.  And that really eliminates the

3    possibility of doing one spreadsheet that includes all

4    parties.

5             THE COURT:  No, Mr. Smith.  Contact -- let's see, who

6    from Reed Smith is involved in the case?  Mr. Restivo?

7             MR. CAMERON:  Mr. Cameron here.  Mr. Restivo is

8    involved.

9             THE COURT:  Oh, Mr. Cameron.  Would you kindly have

10   David Ziegler send Mr. Smith a copy of one of the spreadsheets

11   for Pittsburgh Corning or one of the other cases you're

12   involved in?  Pittsburgh Corning would probably be a good one

13   because he can see how it's laid out.

14            MR. CAMERON:  Yes, I will.

15            THE COURT:  All right.  That's the format in which

16   I'd like this done.  If you're not able to do it, Mr. Smith,

17   I'll simply impose that obligation on Debtor's counsel.  But I

18   will get that fee spreadsheet.  I will get one before I

19   approve these fees.

20            MR. SMITH:  I understand, Your Honor.  I'm assuming

21   then in Pittsburgh Corning do all professionals use the same

22   categories?

23            THE COURT:  Yes, sir, they do.

24            MR. SMITH:  That's not been the case so far --

25            THE COURT:  Well --

1          MR. SMITH:  -- in W.R. Grace.

2          THE COURT:  -- that's what I just said.  They're

3  gonna give you the information and the category format you

4  wanted.  And you're gonna certify to me that you're happy with

5  it, because I'm not entering this Order until I get that

6  Certification from you.

7          MR. SMITH:  If I get that information, Your Honor, I

8  can prepare a spreadsheet.

9          THE COURT:  As soon as I get the spreadsheet and an

10 Order that allows fees, I will sign it and life can go on.

11 Until then, all professional life just comes to a halt with

12 respect to payments.  Okay.  Mr. Baena?

13         MR. BAENA:  I think that's an understatement, Judge.

14 Judge, just out of an abundance of candor with the tribunal,

15 somehow or another the Court entered an Order on July 12th

16 which approved our fourth interim quarterly fee application.

17         THE COURT:  Okay.

18         MR. BAENA:  And I suppose we could submit an Order

19 revoking it or vacating it as you wish.

20         THE COURT:  Why don't you just give me one that they

21 think that could be incorporated into the general Order, Mr.

22 Baena, because I really want to get the fees -- the reason I'm

23 doing it is I want to make sure that the spreadsheet continues

24 to go forward on an as allowed fee basis, on a quarterly

25 basis.  And it's much easier to track those numbers if I get

1    the Order and the spreadsheet in one Order.  That's the reason

2    for it.  I think that will assist Mr. Smith or whoever is

3    doing this.  So, yes, if you would kindly submit that to

4    vacate it without prejudice to be addressed in the Order that

5    I'll get from Mr. Smith, I would appreciate that.

6            MR. BAENA:  Very well.  Your Honor, I must say in all

7    candor I wasn't aware at all of a spreadsheet being required,

8    or the fee auditor not being able to prepare one.  I'm unaware

9    of any requests having been made of our firm for additional

10   information.  Of course it would be helpful.  But I just want

11   you to know I suspect that a lot of professionals here were

12   unaware of this.  And I would just say, Judge, you know, we're

13   dealing with a very short period for this fee application.  We

14   have yet -- other quarterly fee applications I haven't even

15   gotten before the Court because of the fits and starts in, you

16   know, the assignment of this case.  So and obviously there are

17   law firms who are working disproportionately more frequently

18   on this case, including the Debtor's counsel, the firms

19   involved in the fraudulent transfer litigation.  And if it's

20   not those firms that are creating the difficulty, it is those

21   firms who are disproportionately going to suffer the economic

22   impact.

23           THE COURT:  I believe significantly it's peer group

24   pressure, Mr. Baena.  And that is my order.

25           MR. BAENA:  I wasn't involved in it, Judge.  I

1   believe in blanket parties too.  But I need to have those

2   people identified before we can serve up that justice to that.

3          THE COURT:  Mr. Smith will identify them.  I have

4   imposed an obligation on him.  If he does not get the

5   information from someone, he will tell me who they are, and

6   they will no longer be counsel or whatever other status they

7   hold in the case.  I will revoke the appointment nunc pro

8   tunc, period, end of story.  I want compliance with this

9   Order.

10          MR. BAENA:  Judge, can we just put like time limits

11  on everybody for this process?  Could we tell the fee examiner

12  he has to report to you by a certain time --

13          THE COURT:  Yes.

14          MR. BAENA:  -- as to who the recalcitrants are?

15          THE COURT:  Yes.  Mr. Smith, how much time is it

16  going to take you to notify the various parties of what

17  information from them you would like, if it's not already

18  obvious in your report?

19          MR. SMITH:  Well, to a certain extent, Your Honor, if

20  I could just circulate the attempt at a spreadsheet that I've

21  given to everyone, it would be obvious.  But I believe, Your

22  Honor, three days should be enough.

23          THE COURT:  All right.

24          MR. SMITH:  Just to make sure that I am able to get a

25  hold of everyone, Your Honor.

1          THE COURT:  All right.  Why don't I say within a week

2   Mr. Smith will notify the various firms of, I'll call them

3   deficiencies -- I'm not really sure that's the best word --

4   but deficiencies in the fee applications, and what's required

5   to correct them.  Okay?  How much time are you going to want

6   to try to get the information back to Mr. Smith?

7          MR. BERNICK:  Fourteen days?

8          THE COURT:  If it involves a recategorization of

9   items, I think that will probably not be too difficult.  If it

10  involves something more than that, and I looked through this

11  report, I don't think it's much more than that.

12         MR. BERNICK:  But that at least will serve to surface

13  that kind of problem if it exists.

14         THE COURT:  Is that sufficient time for everyone?

15         MR. BAENA:  More than adequate.

16         THE COURT:  All right.  I'm sorry?

17         MR. BAENA:  More than adequate.

18         THE COURT:  Responses are due to Mr. Smith -- all

19  right, why don't we use dates?  Mr. Smith's requests are due

20  to you by September 3rd.  Your responses are due to Mr. Smith

21  by September the 18th.  And, Mr. Smith, how much time after

22  that would it take for you to either contact the Debtor and

23  tell them that they've got to do the spreadsheet, or else do

24  it yourself?  When I'm talking about a spreadsheet, I'm

25  literally looking for something in an Excel or some other

1   database spreadsheet format.  That's how I'd like it to get

2   in.  And an Order that will permit the allowance of the fees

3   and expenses.

4          MR. SMITH:  Your Honor, we work in Excel all the

5   time.  That shouldn't be a problem.

6          THE COURT:  Okay.

7          MR. SMITH:  And an Order can be done very quickly as

8   well.  If I get all the responses by September 18th, I should

9   be able to get you a spreadsheet and an Order within a week.

10         THE COURT:  All right.  I'll expect it by September

11  30th then.  Okay.  As to anyone who has not complied, Mr.

12  Smith, by September 30th I want a statement from you as to who

13  is not in compliance with your request.

14         MR. SMITH:  Yes, Your Honor.  Would that be a

15  statement to be filed of record?

16         THE COURT:  Yes.  Yes, because the action it's going

17  to cause me to take is to make that person no longer counsel

18  of record or professional group in this Court.  So --

19         MR. SMITH:  Very good, Your Honor.

20         THE COURT:  All right.  Now, assuming I can get this

21  Order entered promptly after it's submitted to me, then the

22  Debtor automatically may start the 80% payments and 100% of

23  expenses on a monthly basis again going forward, and make the

24  additional payments that would be due under this Order.  Until

25  this Order is entered, no monthlies are to be paid.  Okay.

1  Let's go to the specific objections.  I think #11 is the first
2  one.
3          MR. BERNICK:  Reed Smith.
4          MR. CAMERON:  Yes, Your Honor, this is Doug Cameron
5  on behalf of Reed Smith.  I believe that there were three
6  items that the fee auditor identified for a reduction in fees,
7  two of which we have responded to, the one we have not and
8  would accept.  The first is the question as to why it was
9  necessary to have four lawyers present at a meeting.  We sent
10 explanation to the fee auditor.  And it was inadequate to
11 convince him why those four were necessary.  We've set this
12 forth in our papers.  This was a major litigation strategy
13 meeting attended by lawyers from Reed Smith, lawyers from
14 Kirkland & Ellis, and several briefed in-house counsel, some
15 by phone.  It was held here in Pittsburgh.  And, Your Honor,
16 the way that we at Reed Smith have divided specific
17 responsibility for this case, as we have for the last 12 years
18 that we've been representing Grace, is these four individuals
19 have specific responsibility for various aspects of the case.
20 We thought it was not only necessary that they be present, but
21 that it was probably much more efficient to have all four
22 present to report on their aspects of the case.  We are very
23 aware, and it has been drilled into our head from our
24 bankruptcy people here, Mr. Singer and Mr. Ziegler, to avoid
25 duplication.  And we are cognizant of that.  But this was a,

1  we feel a meeting where all four lawyers, it was necessary for

2  them to be present.

3      Second item, Your Honor, is what is referred to in our

4  time entries as the Grace Defense Project.  This is a rather

5  large project that is an attempt to become familiar and

6  summarize the history of Grace's Vermiculite Attic Insulation

7  product line.  The ZAI has not been previously the subject of

8  the extensive litigation like the bodily injury and asbestos

9  and building litigations, so nothing like this has been

10  developed before in Grace's history.  The project has involved

11  preparation of extensive work product materials that can be

12  used by Reed Smith in the ZAI Science trial, as well as other

13  lawyers representing Grace in other aspects of the bankruptcy

14  where the ZAI issues may need to be addressed.  There have

15  been extensive document review, witness summaries, meetings,

16  and so forth.  And it is an extremely large undertaking in

17  something that hasn't been done in the past.  And for those

18  reasons we would object to the reduction in fees for those two

19  specific items in the fee auditor's report.

20      THE COURT:  All right.  Mr. Smith?

21      MR. SMITH:  Yes, Your Honor, thank you.  Your Honor,

22  I acknowledge that there may be times when four lawyers are

23  necessary to deal with a situation.  But in this case it was

24  unclear to me from the time entries or from the explanation

25  what the division of labor among these four lawyers were.  It

1  was just unclear from the record what we were dealing with,

2  Your Honor.  And in absence of that explanation, Your Honor, I

3  felt a reduction was appropriate.  Regarding the Grace

4  Defense, Your Honor, I can understand the importance of what's

5  being discussed here.  But, Your Honor, if you look at the

6  time entries on Exhibit B to our final report, and you look at

7  the general time entries that are here, it's essentially a

8  draft outline of Grace defense case, a review of materials for

9  Grace story, draft Grace historical case preparation of

10  historical case defense.  They are all very general time

11  entries, and nothing is detailed nor specific as what was just

12  presented to you in oral argument.  It looked like just an

13  analysis of the history of the asbestos litigation.  And we

14  felt that if what was being prepared was a history of this

15  asbestos litigation, then too much time was spent on that

16  project.

17          THE COURT:  Okay.  It seems to me with respect to the

18  Grace Defense Project that the items could stand a little more

19  detail, Mr. Cameron.  I'm going to approve them in this

20  instance because I think that a lot of time has been focused

21  specifically looking at your ZAI issues.  And I think a lot

22  more is going to be spent looking at the ZAI issues too.  But

23  I would like more detail in the application process.

24  Nonetheless, having said that, I will approve it on this

25  instance.  With respect to the four attorneys at one meeting,

1    what is the division of labor that requires four?  That does

2    seem like a lot of people to attend one meeting.

3             MR. CAMERON:  Essentially, Your Honor, we have over

4    the years broken it down into various categories for medical

5    expert witnesses, industrial hygiene expert witnesses,

6    microscopy type witnesses, and Grace history.  I mean there

7    are other subcategories of those, but those are the four

8    principal categories that we have broken it down for division

9    of responsibility in the asbestos and building litigation

10   which we have carried forward into this new ZAI litigation.

11            THE COURT:  All right.  Mr. Smith, does that help?

12            MR. SMITH:  That is helpful, Your Honor.  Are we

13   talking about various lawyers dealing with multiple categories

14   then?

15            THE COURT:  Mr. Cameron?

16            MR. CAMERON:  Yeah.  Well, I mean when you say

17   "categories," maybe not categories vis-a-vis the bankruptcy

18   cost categories that --

19            MR. SMITH:  No, no, I just meant the expertise.  If

20   you're bringing different areas of expertise to the table, I

21   can understand that.  But it's still unclear to me.  I'm

22   sorry.

23            MR. CAMERON:  Yes.  I think that there are different

24   areas of expertise.  Some of those individuals could cross and

25   do more than one area.  But we have focused responsibility for

1   experts and preparation generally along those four areas.

2          MR. SMITH:  I'm sorry, Mr. Cameron, I didn't get the

3   four areas.

4          MR. CAMERON:  Medical, industrial hygiene,

5   microscopy --

6          MR. SMITH:  I'm sorry.  What was that?

7          MR. CAMERON:  Microscopy.

8          MR. SMITH:  Okay.

9          MR. CAMERON:  And Grace history.

10          MR. SMITH:  Okay.

11          MR. CAMERON:  And there are subcategories within

12   those.  But that's a, you know, the broad four categories.

13          MR. SMITH:  Okay.  I now understand that.  Thank you,

14   Your Honor.

15          MR. CAMERON:  And, Your Honor, there will be more

16   detail in the future entries to reflect that.

17          THE COURT:  All right.  I will approve the four

18   attorneys for that meeting, but ask please that you attempt to

19   limit that number, because that is an expensive expense to the

20   Estate.  I appreciate the fact that you need some time for

21   inter-office conferences if you don't have everyone present in

22   the meeting, but that is a lot, to have four.  Nonetheless

23   your explanation is satisfactory and I'll approve it.

24          MR. CAMERON:  Okay.  Thank you, Your Honor.

25          THE COURT:  You can work out the numbers then for the

81

1    agreed upon Order.

2              MR. CAMERON:  Okay.

3              THE COURT:  All right.  Next I think is -- well, it

4    was 16, but I've been told that you resolved that one.  So 19

5    is next.  Good afternoon.

6              MR. BAENA:  May it please the Court, Scott Baena on

7    behalf of Bilzin, Sumberg, Dunn, Price, Baena & Axelrod.  Your

8    Honor, we only had two principal objections lodged by the fee

9    auditor to our fourth interim quarterly fee application.  One

10   was an adjustment for 1,200 and some odd dollars which we

11   didn't dispute regarding I believe it was travel time.  And

12   the second which we did take issue with has to do with time

13   that was incurred in connection with a series of meetings that

14   occurred over a three-day period of time in connection with

15   the fraudulent transfer action.  And again it's not a lot of

16   money, but there's an awful lot of principle at stake.  In

17   this instance the amount in controversy is just a little bit

18   over $8,000.  As I suggested, Your Honor, all the fees relate

19   to the services that we performed in connection with the

20   fraudulent transfer action, which as you well know is pending

21   in front of Judge Roland.  I suppose I could start with some

22   good news.  And that is that this won't be a problem for this

23   Court for very long, because Judge Roland has also withdrawn

24   the reference as to the determination of fees going forward.

25             The fraudulent transfer, as you well know, is a -- has

1  been a matter that is engendered by two lawsuits.  One against

2  a company called C.O. Bayer, another against a company called

3  Frezenious.  The Frezenious case is on hold right now as we

4  proceed with the C.O. Bayer action.  And we're moving towards

5  a trial on September 30th.  And that particular action, Judge,

6  is a four plus billion dollar lawsuit.  And it is clear by

7  anyone's characterization a centerpiece of this bankruptcy.

8  The time that was incurred by our firm that was objected to by

9  the fee examiner actually was the very first working meeting

10  amongst the three law firms that were then expecting to be

11  handling that litigation.  It occurred just about a week or so

12  before the date by which we were required by Judge Roland to

13  file the complaint in that lawsuit.  And it occurred virtually

14  simultaneously with the delivery of some 500,000 pages of

15  documents which this Court at first required the Debtor to

16  produce when it suggested it had gathered up all those

17  materials.

18      The meeting as I suggested was not just our law firm, but

19  Kaplan & Drysdale was there.  They had two partners attending.

20  And then Mr. Lewis Leclare of Leclare, Smith was in

21  attendance.  He thought he was going to be lead counsel in

22  that litigation.  And that subsequently changed.  He had one

23  person there.  Kaplan & Drysdale had two partners there.  We

24  had two partners, and we had two associates.  We had these

25  meetings in South Florida because the production was in South

1    Florida.   And one of the reasons we were looking for lead

2    counsel, Judge, was because we weren't sure that Kaplan &

3    Drysdale and Bilzin had sufficient internal resources to

4    handle all of this.   As a consequence because of our proximity

5    we worked to deploy as many people as we could because it was

6    in our backyard that the production was taking place.   At that

7    meeting there were two principal matters on the agenda without

8    getting at the matter that I shouldn't be discussing publicly

9    particularly in front of Mr. Bernick.   Suffice it to say that

10    the two principal issues were first agreeing on the theories

11    of the case, and how we would articulate that in complaints

12    that had yet to be prepared and needed to be filed.   It sounds

13    like a very simple task, but subsequently we learned from

14    decisions that came along a lot of the things that were

15    discussed at that meeting engendered some very significant

16    decisions, some as recently as a couple of weeks ago

17    concerning things like the standards that would be applied,

18    burdens of proof, and things of that sort.   And the second

19    issue or agenda item was how were we going to actually dig

20    into this half a million pages of paper, what were we going to

21    look for, how were we going to maintain the documents, how

22    were we going to identify the material that was extracted from

23    the documents.   All those large case document retention issues

24    that need to be confronted if you want to be efficient in the

25    future.

1    From Bilzin we had two litigation partners who continue

2  to be the principal litigation attorneys from our firm

3  representing property damage interest in that litigation:  Mr.

4  Widham and Mr. Turpet.  They're not senior partners.  They're

5  mid-level partners.  They've been gainfully involved from that

6  point forward 'til now.  Now virtually on a full-time basis.

7  And we had two associates.  We had Mr. Sakalo, who you know

8  has been involved from the beginning.  He went to that meeting

9  because he had a sense of the continuity from the beginning of

10  this case, and a sense of the issues that might be pertinent

11  regarding property damage asbestos liability.  And we had a

12  very junior associate, a first year associate, Mr. Green, who

13  had the unpleasant task along with a few others of actually

14  physically having to go through the half a million boxes -- or

15  papers that were produced.  We found it entirely appropriate

16  to have four people at all of those meetings.  And, by the

17  way, it is intermittent attendance.  They didn't all attend

18  for the same period of time for every day.  Mr. Green was in

19  and out of those meetings.  Mr. Sakalo and Mr. Widham and Mr.

20  Turpet likewise had different time participating in these

21  meetings.  We thought we did it judiciously.  I did not go to

22  the meeting.  And I easily could have justified being there.

23  We kept it to a minimum.  And we accomplished great things at

24  that meeting.  We made the deadline.  We filed the complaint.

25  We've been ever since totally immersed in this litigation.

1  And everybody but Mr. Green has continued to be very

2  meaningfully involved in this litigation.  Mr. Green isn't,

3  because he's no longer with us.  And that's the only reason

4  he's not involved.

5      The fee auditor's conclusion about our fees, Your Honor,

6  just escapes explanation, in all due respect.  We have the

7  highest respect for Mr. Smith.  Indeed, when nominations for a

8  fee auditor were being asked for, we were the ones that

9  nominated Mr. Smith.  This isn't about his abilities, his

10  credentials, or his good faith approach to all of this.  It's

11  just unfair to say we had too many lawyers at the meeting, it

12  was overstaffed, without any further explanation.  And to then

13  say cut it in half.  And the anomaly I think, and the danger I

14  think of that approach is best evidenced by the fact Kaplan &

15  Drysdale had two partners there for those same meetings.  They

16  billed this Estate $22,000.  Their fee has been approved.

17  That's not to mention the cost of going to Florida and

18  everything else which we didn't have.  And we have no problem

19  with that they were paid.  They earned that fee.  We had four

20  people there who in the aggregate billed this Estate $16,000.

21  And Mr. Smith says we should be paid 8.  That's rough justice

22  by any standard.  It defies explanation.  It defies any

23  quantum of quality or equity in the application of all of

24  this.  And more importantly it's understood that when this

25  function was performed by Mr. Smith, it is merely a matter of

1    determining whether there was more than one lawyer at a

2    particular event, asking for explanation, which we gave him

3    over and over and over again, and for him to determine that it

4    was or was not a good explanation, which resulted in this

5    arbitrary, "Well, I don't accept it, divide it by two," sort

6    of analysis.  We think that that particular aspect of this is

7    what's most offensive about it.

8         I understand there are differences in billable rates

9    amongst law firms, which would explain differences between

10   what was charged by one law firm and another.  But I think you

11   have to take into account the overall good, the overall

12   contribution, the value of the service, the need for the

13   people to be there.  And you have to look at it in the context

14   of a very serious and a very important and a very dramatic

15   event that's taking place within the context of this

16   bankruptcy.  And certainly by any description the fraudulent

17   transfer action fits everyone of those criteria.

18        Your Honor, in all due respect, without attempting to

19   discourage Mr. Smith from doing his job and doing it right, we

20   think he got it wrong this time.  We don't think we should be

21   penalized.

22             THE COURT:  Mr. Smith?

23             MR. SMITH:  Yes, Your Honor.  I disagree that what I

24   did here defies explanation.  And let me now explain it.  Your

25   Honor, basically -- I wanted to point out, Your Honor, that we

1   did not have any objection to the document production that was

2   billed here.  And that was over $33,000.  And I wanted to

3   point out that what we objected to specifically was just this

4   many professionals in this series of meetings.  It was our

5   understanding, Your Honor, that these were essentially high

6   level -- what I would call high level litigation strategy

7   meetings.  And it was perfectly appropriate to have high level

8   litigation strategy meeting as the complaint was being

9   prepared here.  And as such a meeting they had -- these

10  meetings were attended by two litigation strategy lawyers from

11  Kaplan, and two litigation strategy lawyers from Bilzin.  And

12  they were both -- both firms described those lawyers as such,

13  and I accepted them as such.  It did not seem to me that the

14  additional two lawyers from Bilzin really were specialists in

15  litigation strategy.  And that's why I questioned the need for

16  those particular attorneys to be there, Your Honor.

17          THE COURT:  Okay.  What's -- the $8,000 that you're

18  challenging is all as the result of those two associates?

19          MR. BAENA:  No, it doesn't work out that way, Judge.

20  As a matter of math, he just took all of the fees that were

21  charged for that meeting and divided them by two.

22          MR. SMITH:  Yes, Your Honor.  And I would agree that

23  that was an erroneous calculation on my part.

24          MR. BAENA:  And, Judge, I am a little bit concerned

25  about this notion that Mr. Smith makes a distinction amongst

1  lawyers that way.  He's not in a position, in all due respect,

2  to say who should attend the meeting, and to then decide for

3  himself, and observe for the world whether or not somebody by

4  virtue of being an associate versus a partner is a specialist

5  in anything.  And that's why we are annoyed by the result

6  here.

7          THE COURT:  Well, in terms of who has a specialty and

8  how long a person's been with a firm, I think I have to be on

9  Mr. Smith's side on that one to a certain extent.  You know, a

10  first year associate undoubtedly is not a specialist in

11  litigation strategy, or else wouldn't be being brought in as a

12  first year associate.

13          MR. BAENA:  He wasn't brought there for that purpose,

14  Judge.  And that's the associate who was only there

15  intermittently.

16          THE COURT:  Yes, reviewing the documents, yes.  I

17  understand.

18          MR. BAENA:  The other associate is Mr. Sakalo.  And

19  Mr. Sakalo has gained a level of specialty, specialized

20  knowledge in this case.

21          THE COURT:  It seems to me, Mr. Smith, that because

22  of the issues that came up in Court, and the amount of time

23  that was spent on -- time to structure the fraudulent

24  conveyance suit, figuring out where they were going to -- how

25  they were going to proceed, and then the short time frame that

1  was occasioned by Judge Roland's schedule in deciding to hold

2  this trial at the end of September, that quite frankly it

3  probably took the firms a little bit more time and talent than

4  it may otherwise have been required to get up to speed with

5  these issues.  So I think in this instance I'm going to

6  approve the fees.  I don't find them so outrageous that they

7  offend my conscience.  There probably is some room for

8  discretion as to whether four people needed to be involved in

9  all parts of the meetings.  But I don't find it so

10  overwhelmingly abusive that I'm inclined to disallow them

11  completely.  So I think on this page, and for those reasons

12  that it did, I believe, require some additional setup, I'll

13  approve them.

14           MR. BAENA:  Thank you, Judge.

15           MR. SMITH:  Thank you, Your Honor.

16           THE COURT:  All right.  So I want to -- now, Mr.

17  Baena, is that the Order that I already entered that we're

18  going to vacate and that we have to reenter?

19           MR. BAENA:  That Order -- your Order would be wrong

20  anyway, though, because of the $1,200 adjustment.  So we've

21  got to vacate it.  We have to give you a new Order.

22           THE COURT:  All right.  Thank you.

23           MR. BAENA:  Thank you.

24           THE COURT:  So I'm going to get a revised Order that

25  vacates my July whatever Order.

1          MR. BAENA:   July 12th.

2          THE COURT:   Thank you.   That approves the fees at

3    #19.   And Mr. Smith will provide me with the Order that will

4    then reapprove those fees in the correct amount.   Okay.   I

5    think the next is 28.   All right.

6          MS. BAER:   Good morning, Your Honor.   Janet Baer on

7    behalf of Kirkland & Ellis.   Your Honor, again we do not take

8    issue with tremendous dollars here.   We think Mr. Smith did an

9    incredible job with a very, very difficult situation.   There

10   are a couple of categories that we are taking up not for the

11   dollars involved but for the greater principle going forward

12   how do we conduct ourselves, and do we have to reorganize or

13   reassess the way in which we staff certain things.

14   Specifically, Your Honor, Mr. Smith suggested cutting one-

15   third of the fees, and one-half of the fees for attorneys and

16   professionals attending two of the Omnibus hearings.   Those

17   Omnibus hearings were in February and March of this year.

18   Secondly, he recommended cutting one-half of the time for

19   paraprofessionals which were billed during the interim period.

20   The third category was a recommendation of cutting one-fifth

21   of the time for some of the work done by some of the attorneys

22   on the proof of claim process.   And the last category, Your

23   Honor, was a cut of one-third for one of three attorney's time

24   involved in some tax matters.   And if I can address them one

25   at a time.

1    Your Honor, in terms of the two Omnibus hearings, the

2  February hearing and the March hearing, the February hearing

3  we had three attorneys at that hearing:  Mr. Bernick, Mr.

4  Capp, and myself.  This was the first hearing that I attended

5  in the matter.  The reason being that certain matters that I

6  had been working on exclusively had finally come up for

7  hearing before this Court for the first time.  Mr. Bernick and

8  Mr. Capp had consistently been at all of the Omnibus hearings.

9  And Mr. Smith does not recommend cutting of their time in

10  general.  And again although he does not specifically say

11  which lawyer's fees were cut or why, what he indicates on the

12  two hearings, the March and the April -- or the February and

13  March hearings was it may have been convenient to have three

14  lawyers at the hearing, but not necessary.  Your Honor,

15  frankly it is much more than convenience.  We believe it would

16  be a disservice to our client to not have the attorneys at the

17  Omnibus hearing who are actually on a day to day basis working

18  on the issues that come before the Court.

19    At the February hearing two matters came before the Court

20  that were unique and exclusively different than what had come

21  up before, that Mr. Bernick and Mr. Capp had not been dealing

22  with on a daily basis.  That in fact was the first time the

23  Gerard matter came up.  I had written the briefs on the Gerard

24  matter, had looked at the indemnity provisions and insurance

25  contracts and the like.  Being the first time up, it made

1  sense for me to be here.  We weren't quite sure what was

2  coming at that point in time.  Secondly, Your Honor, and much

3  more importantly for that hearing, that was the first time

4  that came before you the whole issue of Grace's multi-million

5  dollar notice program and bar date notice proposals.  That

6  matter I had been working on since last -- the previous June,

7  had retained the experts, had done the discovery, had

8  participated in the discovery of the other side's experts.

9  That was the first time it came before you for review.  For

10 purposes of being the best prepared we could for our client,

11 it made sense to have me there to deal with those issues.  Mr.

12 Capp was there for the reason he is always there.  Mr. Capp,

13 as this case is staffed, is the bankruptcy partner in charge

14 of the case on a day to day basis.  He makes sure that all of

15 those other things that come up -- motions to lift stay,

16 motions for adequate protection and the like are taken care

17 of.  He negotiates them.  He addresses them.  He prepares the

18 Orders and the like.  Mr. Bernick obviously has to be here.

19 He is our quarterback.  He runs this case.

20      Turning to the March hearing, Your Honor, the same thing.

21 There again the three of us were here.  In addition to that,

22 there were two paraprofessionals here.  At the March hearing

23 the justification for the three hearings as well as the

24 paraprofessionals was this was once again more issues related

25 to the bar date and the multi-million dollar bar date notice

1  program.  It also related to the proof of claim process.  Your

2  Honor may recall that was the hearing where we were here and

3  went line by line through the very complicated proof of claim

4  forms that we had put together, detailed proof of claim forms.

5  Your Honor, I had drafted those proof of claim forms along

6  with Andy Runyon of our office who did not come to the

7  hearing.  I had been negotiating with the Committees on the

8  proof of claim forms.  I had gone through numerous, numerous

9  drafts with the Trade Committee on those.  For those reasons,

10  Your Honor, it made sense to have me at that hearing.  Mr.

11  Capp again had the many different other issues that were up.

12  And Mr. Bernick, of course, is the quarterback.  He had to

13  have been here.

14      The two paraprofessionals that were here at that hearing

15  were backup for Mr. Bernick.  Mr. Bernick had prepared charts

16  and graphs and demonstrative exhibits that were being changed

17  and modified as we went along right up until that hearing.

18  Thus Mr. Bernick needed those paraprofessionals to be here to

19  be fully prepared to make a presentation to Your Honor.  So on

20  those two matters, Your Honor, we would ask that all of the

21  fees for the professionals and paraprofessionals at those two

22  hearings be allowed.

23      THE COURT:  Mr. Smith, would you like to address

24  these one at a time?

25      MR. SMITH:  Well, yes, Your Honor.  As far as the two

1    hearings go, with all due respect to Ms. Baer, I think she

2    articulated very good reasons why she would -- it was

3    necessary for her to be at these hearings.  However, just

4    referring to other counsels present as the quarterbacks, Your

5    Honor, or the senior person involved, doesn't necessarily tell

6    us why they necessarily need to be at that hearing.  And

7    again, Your Honor, I think it's somewhat conclusory for them

8    to say -- for Kirkland & Ellis to say that it would be more

9    expensive for Ms. Baer to bring either Mr. Capp or Mr. Bernick

10   up to speed on these issues.  I mean I kind of assume that the

11   quarterback is the person you want to bring up to speed.  And

12   thus, Your Honor, yes, I would say that three professionals at

13   these hearings would not be necessary.

14          THE COURT:  Okay.  Having participated in those

15   hearings, Mr. Smith, I probably have an advantage over you

16   since you were not involved in the case.  And frankly I really

17   did think it was necessary, particularly on the proof of claim

18   issues.  Those were very hard fought with the litigation

19   matters.  And I probably would have been very critical of

20   counsel had they not had somebody here who could address those

21   issues.  And I specifically required at the second hearing, I

22   think it was the March hearing -- I've forgotten the dates now

23   -- someone who could be here to go over those proof of claim

24   forms line by line.  And I remember using those words.  So I

25   think to the extent that there was an undue burden on the fees

1  created to this Estate, I was the cause of it, not counsel for
2  the Debtor.  Unfortunately, the Debtor is going to have to pay
3  for that.  But nonetheless that was my responsibility, I
4  think, not the Debtor's staffing issues.  So for those reasons
5  I'm going to approve the three attorneys at both of those
6  hearings, and the two professionals at the second hearing
7  because I did believe that their attendance was necessary and
8  very helpful not just to the Court but to all parties
9  concerned.

10           MR. SMITH:  Okay.  Thank you, Your Honor.

11           THE COURT:  All right.  Next?

12           MS. BAER:  Thank you, Your Honor.  On the related
13  issue of the proof of claim --

14           THE COURT:  Oh, the proof of claim fees, I have
15  looked at the response.  They're simply approved.  We've gone
16  through these proof of claim forms ad infinitum.  I understand
17  Mr. Smith's point of view why he might think that that is
18  excessive.  But given the bantering back and forth over those
19  issues, and the significant progress that was made as a result
20  of the Committee getting together with the Debtor and its
21  various professionals, I think that has been very helpful to
22  the Estate.  So I'm approving the proof of claim issues.

23           MS. BAER:  Thank you, Your Honor.  Your Honor, the
24  two remaining categories, number one, is Mr. Smith had
25  recommended cutting of one-third of the time for development

1   of the joint stipulation of facts related to a very

2   significant Federal income tax controversy.  Your Honor, as we

3   explained to Mr. Smith, and as we attempted to explain more in

4   this response, this was -- this is the key to getting the IRS

5   to understand our position and address our position.  This is

6   a multi-million dollar matter.  Kirkland & Ellis as it usually

7   does attempts to staff this in a way that is most efficient

8   for the client.  The lead partner on this case put in minimal

9   amounts of time, and only stepped into the matter when it was

10  necessary for him to actually negotiate with the Internal

11  Revenue Service.  The more senior associate effectively

12  quarterbacked that job, put together information, worked with

13  a very young associate who was doing the day to day mundane

14  review of documents, review of case law, putting together the

15  memorandum with the senior associate's supervision.  Your

16  Honor, it was a significant piece of work that was put

17  together that has helped direct where that case is going.  And

18  we believe that in that particular case it was staffed quite

19  efficiently rather than using the time of the more senior

20  people to put in as much of the effort.

21         THE COURT:  Mr. Smith?

22         MR. SMITH:  Yes, Your Honor.  Again it was unclear

23  from the time entries why the involvement of three people were

24  necessary.  "Attend to matters re: joint status report and

25  joint stipulation of facts," was among the time entries, as

1  well as another time entry, Your Honor, "Attend to matters re:

2  same."  I don't know what "Attend to matters re: same" means,

3  Your Honor.  And thus we had suggested a reduction of

4  $2,091.17.

5          THE COURT:  Okay.  Mr. Smith, since this is the first

6  time we've done these fee hearings, to the extent that there

7  is an issue about needing more specificity in the fee

8  applications, I'm making the same ruling with everyone.  I'll

9  approve them this time.  But you're all on fair notice now.

10  So Mr. Smith wants to get more detail so that he doesn't have

11  to make phone calls and address these issues.  And I want that

12  for him.  So put more detail in.  For now I'll approve it.

13  But in the future if I get an issue concerning lack of detail,

14  I'm going to take that very seriously.  I'll approve it for

15  this instance for that reason.

16          MR. SMITH:  Thank you, Your Honor.

17          MS. BAER:  Thank you, Your Honor.  And we will very

18  much direct all of the attorneys in the office to be more

19  attentive to that.

20          THE COURT:  All right.

21          MS. BAER:  The final matter, Your Honor, may also

22  have something to do with descriptions.  And that is our use

23  of paraprofessionals.  Mr. Smith criticized and recommended we

24  be cut by half of the time that we billed for rather senior

25  litigation paraprofessionals.  Your Honor, Mr. Smith's

1  criticism was that much of this work was clerical work that
2  should have been done at a much lower rate.  Again, Mr. Smith
3  isn't here.  He doesn't quite know sometimes what's going on.
4  But this is not a simple case.  This is not a case where when
5  we are looking for documentation and backup to prepare for an
6  Omnibus hearing we can say to our secretaries, "Pull document
7  X."  It involves a much more complicated process sometimes of
8  putting together things that have happened in three or four
9  different hearings, three and four different pleadings and
10 interrelated pleadings where we need somebody who understands
11 the case, is a professional who understands the legal process
12 and especially the litigation process in this kind of a case,
13 who can assist the attorneys in putting together the
14 information they need to be put together in order to prepare
15 briefs, in order to prepare memoranda, and in order to prepare
16 for hearings.

17      Oftentimes, Your Honor, these paraprofessionals are
18 dealing directly with and one-on-one with Mr. Bernick, myself,
19 and others to put together the appropriate back-up
20 documentation, charts, graphs, and the like.  And although
21 there may be entries that sound like they're entries to copy
22 documents, the process by which they got to the document to
23 copy is really what they are being compensated for, and the
24 time that we are asking be compensated.  Under those
25 circumstances, Your Honor, we would ask that the amount of our

1    paraprofessionals be sustained in its full amount.

2        THE COURT:  All right.  Well, maybe this is an issue

3    that's just the choice of words.  I don't know.  But when I

4    took a look at this application on this point I was sort of in

5    Mr. Smith's corner because it seemed that a lot of the entries

6    say -- and I'm not quoting, I don't have the application

7    directly in front of me, but something like, "Docket search,"

8    or "Docket review."  To me what that means is I've had

9    somebody open the docket and take a look at what's been filed,

10   and copied it, and give it to somebody else.  And for that I

11   don't think I need senior litigation counsel rate pay.  Now,

12   if it's something more than that, I think you need a better

13   explanation of what has been done.

14       MS. BAER:  Your Honor, I agree that I believe this is

15   a description issue.  When it comes to just needing something

16   off the docket, that is something we have a file clerk do at a

17   very minimal fee.  And we do draw that distinction.  This is

18   much more complicated.  And I do believe that that is one

19   where we need to have our litigation paralegal describe in

20   much more detail what she's doing.

21       MR. BERNICK:  Just very briefly, Your Honor, part of

22   the problem is that sometimes issues as you know crop up in a

23   variety of different contexts.  And I will be in a sense the

24   culprit.  I'll say, "I know we discussed such and such an

25   issue.  It was either one or two hearings.  Go read the

1 briefs.  Find out if this is the issue that came up.  Or read

2 the transcript."  So it's not just somebody who's going to get

3 a document.  It's somebody using his own judgment about what

4 to search for and what kinds of things are responsive to my

5 question.  Typically in our firm we give that to people who

6 are paralegals.  We do not give that to secretaries, because

7 it requires that they read and understand what it is that

8 they're searching for.

9          MR. SMITH:  Your Honor, there is --

10          THE COURT:  Go ahead, sir.

11          MR. SMITH:  Yeah, there's another aspect to this as

12 well.  And there's so many entries here regarding, "Review

13 correspondence and file same."  And it seems to me that what

14 we have is a fairly senior level paralegal filing

15 correspondence in this case on a regular basis.  And, again,

16 Your Honor, that was a task that I thought was ministerial.  I

17 would like to say that I do appreciate the complexity of this

18 case, in spite of what was said earlier.  And I do know how

19 difficult it is to prepare for these hearings.  But to

20 regularly have an entry regarding reviewing correspondence and

21 filing the same, and sometimes those entries are quite

22 lengthy, Your Honor, I thought those were ministerial tasks.

23          THE COURT:  Well, I had that same reaction.  I'm

24 satisfied with counsel's explanation on the record today.  And

25 I've already directed them in the future additional

1  information to be put in, Mr. Smith, so we have a better clue

2  as to what the task really is.  But I agree.  It appears to be

3  overbilled in this application.  Because this is the first

4  time through, I'll permit it on this occasion.  But in the

5  future I do want some additional explanation as to what's

6  going on.

7      There is one issue -- I do not recall offhand who brought

8  this issue or this request for fees.  We haven't touched it.

9  And I think we've covered the objections, so I want to raise

10 it.  There is one  thing that I am not going to permit as

11 compensable fees or expenses for any professional in this

12 Estate.  And that is attendance at professional seminars of

13 any kind, whether to do with asbestos or not.  So whoever put

14 those requests in, they are disallowed and they are not to be

15 part of this compensation.  Believe me, I very much favor

16 education.  And it's not that.  It's just that that should be

17 part of your firm's overhead.  It should be part of your whole

18 client development.  It should not be charged to a particular

19 client's case, because I don't know you can say that it would

20 relate only to one specific client for whose benefit you were

21 attending the hearing.  So those fees are not permitted

22 whoever had them in.  They are disallowed.  Mr. Smith, if you

23 can't identify them, I'll require the attorneys to do it for

24 you.  But I believe the report picked them out.

25          MR. SMITH:  Yes, Your Honor.  There was one

1   applicant.  In fact, one applicant that we settled with, which

2   had those charges in there.  And, Your Honor, we will go back

3   and make sure that those do not receive compensation.

4            THE COURT:  All right.  Anything else, Ms. Baer?  No.

5            MS. BAER:  No, Your Honor.

6            THE COURT:  Mr. Smith, any -- have I taken care of

7   all the issues that you've raised now?

8            MR. SMITH:  Yes, Your Honor.

9            THE COURT:  Okay.  Mr. Bernick?

10           MR. BERNICK:  I don't have anything else for the

11  Debtor, Your Honor.

12           THE COURT:  Anyone have any additional items?

13           ALL:  (No verbal response).

14           THE COURT:  Okay.  Then I think the only thing that's

15  really -- well, I need several Orders that I'm waiting for.

16  But the most crucial one, I believe, is to get this issue of

17  ZAI litigation done.  So I will attempt to do that as soon as

18  I get the Order from Mr. Baena.  And I'm waiting obviously for

19  your designation of counsel, and for the denial of the relief

20  from stay.  And I think that's about all.  On the ZAI

21  litigation, are there any issues that we should be talking

22  about now?  Any discovery matters?  Anything?

23           ALL:  (No verbal response).

24           THE COURT:  Okay.  We're adjourned.  Thank you.

25       (Court adjourned)

103

1
## CERTIFICATION
I certify that the foregoing is a correct transcript from the
2    electronic sound recording of the proceedings in the above-
entitled matter.

3

4                                                    9-5-02
Signature of Transcriber                            Date

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Writer's Cramp, Inc.

Certified Court Transcribers

732-329-0191