IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline: October 11, 2002 at 4:00 p.m. (EST).**
**Hearing Date: October 28, 2002 at 12:00 p.m. (EST), only if objections received.**

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE AMENDMENT OF THE EMPLOYMENT CONTRACT OF PAUL J. NORRIS AS CHAIRMAN, PRESIDENT AND CHIEF EXECUTIVE OFFICER

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

hereby move (the "Motion") this Court for entry of an order authorizing the amendment of the

employment contract of Paul J. Norris as chairman, president and chief executive officer.  In

support of this Motion, the Debtors respectfully state as follows:

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

## Background

3.      On April 2, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"), which have been consolidated for administrative purposes only.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

4.      On June 22, 2001, the Court entered an order allowing the Debtors to assume the employment contracts of the Debtors' senior executives (the "Employment Contracts Order"). Among the employment contracts assumed pursuant to the Employment Contracts Order was the employment contract of Paul J. Norris ("Mr. Norris") as chairman, president and chief executive officer of the Debtors (the "Norris Contract").  A copy of the Norris Contract is attached hereto as Exhibit A.

5.      In June 2002, Mr. Norris and the compensation committee of the Debtors' board of directors (comprised entirely of independent directors), chaired by John F. Akers, retired chairman and chief executive officer of IBM,[2] negotiated an amendment to the Norris Contract

---

[2]  In addition to Mr. Akers, the Debtors' compensation committee is comprised of five independent, outside directors: H. Furlong Baldwin, Chairman of the Board and former President and chief executive officer of the Mercantile Bankshares Corporation; Ronald C. Cambre, retired Chairman of Newmont Mining Corporation; Marye Anne Fox,

(Continued...)

(the "Norris Amendment"), a copy of which is attached hereto as Exhibit B.  In June 2002, the

Debtors' board of directors approved the terms of the Norris Amendment.

### The Norris Amendment

6.    The Norris Amendment proposes only two substantive changes to the Norris

Contract. These two changes are described as follows:

(a)    Termination Right.    Under the current Norris Contract, Mr. Norris is
required to provide written notice by June 30 of any year of his intent to
resign his employment with the Debtors on December 31 of that year.[3]

The terms of the Norris Amendment allow Mr. Norris to provide notice,
on or after January 1, 2003, of his intent to resign his employment at any
time by providing written notice to the Chairman of the Compensation
Committee of the Debtors' Board of Directors at least 180 days prior to
the date of Mr. Norris's intended resignation.

(b)    Retention Bonus.  Under the Norris Contract, for the years 2001 and 2002,
Mr. Norris received fixed sum retention bonuses in an amount equal to
approximately two-times the maximum percentage of base salary payable
to other key employees under the General Retention Program approved by
the Court on June 22, 2001.  Mr. Norris's 2001 retention bonus was
payable in advance on execution of the Norris Contract and his 2002
retention bonus was payable 50% in advance, on January 1, 2002, and
50% in arrears, on December 31, 2002.  The Norris Contract does not
provide Mr. Norris with a retention bonus for 2003 or thereafter.

The terms of the Norris Amendment provide Mr. Norris with a retention
bonus based on the General Retention Program for other key employees
which was approved by the Court on August 26, 2002.  Under the Norris
Amendment, Mr. Norris's retention bonus will be calculated at two-times
the maximum percentage of base salary (the same as under the current

---

Chancellor of North Carolina State University; John J. Murphy, retired Chairman of the Board of Dresser Industries, Inc.;
and Thomas A. Vanderslice, former Chairman and Chief Executive Officer of M/A-COM.

[3] As outlined above, the Norris Contract can be terminated effective December 31st of any year by Mr. Norris by written
notice provided on or prior to June 30th of such year.  In the event that neither Mr. Norris nor the Debtors exercises their
right to terminate the Norris Contract, it automatically renews for another one year term.  Given this inflexible provision,
on June 30, 2002, out of an abundance of caution, Mr. Norris delivered a conditional notice to the Debtors pursuant to the
terms of the Norris Contract.  Delivery of this notice allows Mr. Norris to terminate his employment with the Debtors on
December 31, 2002, in the event that the Norris Amendment is not approved by the Court.  Approval of the Norris
Amendment will require Mr. Norris to provide a new 180-day advance notice, on or after January 1, 2003, if he wishes to
terminate his employment.

Norris Contract) payable to other key employees under the General Retention Program.[4]

7.    The Norris Amendment also clarifies that (a) Mr. Norris will receive pro-rations of certain benefits and incentive payments if his employment is terminated (i) voluntarily by proper notice and resignation, (ii) on the basis of constructive discharge, (iii) as the result of death or disability or (iv) by the Debtors, other than for cause, and (b) Mr. Norris will not be entitled to pro-ration of those benefits and incentive payments in the event that his employment with the Debtors is terminated for cause or by Mr. Norris without proper prior notice.  To the extent that a pro-ration would be necessary, the Norris Amendment entitles Mr. Norris to receive these pro-rations under the same terms as set forth in the current Norris Contract.  This provision of the Norris Amendment does not change the terms of the Norris Contract in any material way.

## Relief Requested

8.    The Debtors request that the Court authorize and approve the Norris Amendment pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

## Basis For Relief

9.    Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith.  In

---

[4] For 2003 and 2004, the General Retention Program has a maximum payout of 65% of base salary.  Thus, Mr. Norris will be entitled to receive a retention bonus in an amount equal to 130% of his base salary, payable in arrears, on December 31,
(Continued…)

re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

10.    Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71 (2d Cir. 1983). Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

11.    Generally, courts authorize debtors to implement employee retention programs because certain employees are essential to a debtor's continued operations. See Montgomery Ward, 242 B.R. at 155 (approving retention bonuses as within Debtor's sound business judgment); In re America West Airlines, Inc., 171 BR. 674, 678 (Bankr. D. Ariz. 1994) (approving success bonuses to certain officers and employees as within Debtor's sound business judgment); In re Interco Inc., 128 BR. 229, 234 (Bankr. E.D. Mo. 1991) (authorizing the debtor

---

2003 and December 31, 2004. Mr. Norris's retention bonus for 2002 is $1,000,000 and for 2003 would be $1,235,000.

to assume prepetition severance contracts and approving performance based retention program to ensure critical employees remained with the debtor).

12.     The Debtors exercised sound business judgment in determining to implement the Norris Amendment. Indeed, the Norris Amendment was approved by the Debtors' independent Board of Directors. (Akers Aff. at ¶ 2). As described herein, the Norris Amendment benefits the Debtors' estates by: (i) retaining the services of Mr. Norris on terms more consistent with the unique circumstances of these Chapter 11 Cases, (ii) preserving and extending the success the Debtors have achieved under Mr. Norris's leadership and (iii) assuring sufficient advance notice in the event that Mr. Norris decides to voluntarily resign, thereby guaranteeing the Debtors at least a 6-month time period to plan and implement an orderly transition in leadership, under those circumstances.

13.     Without the amendment, the Norris Contract provides Mr. Norris with no retention bonus for 2003 or thereafter. The Norris Amendment provides Mr. Norris with a retention bonus for 2003 and 2004 which retains the proportion of his 2002 retention bonus to the retention bonuses for key employees and is only adjusted to be consistent with the levels provided to key employees under the General Retention Program approved by this Court on August 26, 2002. (Bubnovich Aff. at ¶ 3). Just as with other employees, the increase is needed to compensate Mr. Norris for the uncertainty in the Chapter 11 Cases and the company's increasingly difficult operational environment and reflects Mr. Norris's importance to the successful reorganization of the Debtors. (Akers Aff. at ¶ 5).

14.     The Norris Amendment also changes the timing of his retention bonus. The Norris Contract calls for the 2002 payment to be made 50% at the beginning of the year and 50% at the end. The Norris Amendment will provide for 100% of payouts to be made at the end of

6

the relevant year--after Mr. Norris has performed the year's service to the Debtors.  This change was made to make the payment of Mr. Norris's retention bonus (a) dependant on Mr. Norris's continued employment with the Debtors and (b) consistent with the General Retention Program as approved by this Court on August 26, 2002.  The total payout under the Norris Contract as amended by the Norris Amendment is consistent with programs for companies of comparable size and circumstances.  (Bubnovich Aff. at ¶ 4-9).

15.    The amended termination right provides the Debtors with certainty that they will receive six months notice if Mr. Norris chooses to terminate his employment.  The Debtors' board of directors believes that the Norris Amendment will have the practical effect of increasing the likelihood that Mr. Norris will remain in the Debtors' employ for a longer period of time. (Akers Aff. at ¶ 4).  This is because the Norris Amendment eliminates the pressure on Mr. Norris to tender his resignation by an artificial deadline.  The artificial deadline of June 30 has the effect of potentially requiring Mr. Norris to decide to tender his resignation by June 30 to avoid the prospect of remaining with the Debtors' for eighteen months without an option to terminate his employment and still receive his benefits.  (Akers Aff. at ¶ 4).

16.    The Norris Amendment will accomplish the sound business purpose of aiding the maximization of the value of the Debtors' estates and furthering the Debtors' efforts to successfully reorganize.  Mr. Norris is an experienced and talented executive who is intimately familiar with the Debtors' businesses and could easily obtain employment elsewhere.  (Akers Aff. at ¶ 5).  Mr. Norris has been employed by the Debtors in various positions for a total of nearly fifteen years, including the last four years as chairman, president and chief executive officer.  (Akers Aff. at ¶ 5).  In addition to his service to the Debtors, Mr. Norris has over fifteen years experience at other specialty chemical companies at the executive level with Engelhard

Corporation and Allied Signal (now known as Honeywell International, Inc.). (Akers Aff. at ¶ 5). Furthermore, the Debtors' Board of Directors and outside compensation consultant believe that it would be difficult and expensive to attract and hire a qualified replacement for Mr. Norris. (Akers Aff. at ¶ 8; Bubnovich Aff. at ¶ 10).

17.    Under the leadership of Mr. Norris, the Debtors have achieved substantial success in their business operations. (Akers Aff. at ¶ 6). Throughout Mr. Norris's tenure as chairman, president and chief executive officer, the Debtors have outperformed their industry peers, including being number one in revenue growth and number two in profit growth in 2001 and in the top three year to date for 2002. (Akers Aff. at ¶ 6). Mr. Norris's leadership has been crucial to this success. (Akers Aff. at ¶ 6). He has developed and communicated his vision for the company and the values he has presented are widely accepted by the employee population. (Akers Aff. at ¶ 6). Mr. Norris introduced the highly successful "six-sigma" program which has led to year-on-year productivity improvement and very high levels of employee engagement with the success of the company.    (Akers Aff. at ¶ 6).    Mr. Norris has fostered an open communications environment through frequent contact with the employee population (including quarterly town meetings, "skip-level" meetings with middle management, and personal travel to the Debtors' operating facilities). (Akers Aff. at ¶ 6). Mr. Norris has been the most employee visible chief executive officer in Grace history; this engagement with the Debtors' employees has contributed to significant productivity gains. (Akers Aff. at ¶ 6).

18.    Moreover, losing Mr. Norris likely would adversely affect the Debtors' operations by lowering employee morale because of the appearance of disarray and disruption generated by such a departure. (Akers Aff. at ¶ 7). Employee surveys reveal very high levels of trust and confidence in the Debtors' current leadership. (Akers Aff. at ¶ 7). The results of employee focus

groups reveal that "a potential change in leadership" and "a significant, negatively perceived announcement" would be likely reasons for an employee to leave the company. (Akers Aff. at ¶ 7).

19.     Further, the Debtors would incur substantial monetary and non-monetary costs if Mr. Norris were to be replaced.  If he were to leave, the Debtors would be faced with a potentially lengthy search for an external replacement. (Akers Aff. at ¶ 8).  In addition to the substantial distraction occasioned by such a search, there would be substantial expenses incurred in conjunction with securing a qualified outside executive. (Akers Aff. at ¶ 8).  These expenses would include: (i) recruiting fees and expenses, likely to exceed $500,000; (ii) additional compensation costs for an interim chief executive officer;[5] and (iii) an offer package to a new chief executive officer including a premium related to the uncertainty related to the Chapter 11 Cases.[6]  (Bubnovich Aff. at ¶ 10).

20.     In conclusion, the Norris Amendment will provide a significant benefit to the Debtors' estates by retaining the leadership provided by Mr. Norris.  The Debtors believe that the loss of Mr. Norris would seriously jeopardize their continued operational success and the value of their estates.  Further, the Debtors in their business judgment believe the Norris Amendment is reasonable in light of the circumstances surrounding the Debtors' Chapter 11 Cases including the degree of uncertainty related to the timing of a plan of reorganization.  The Debtors, in their reasonable business judgment, believe that, for all the reasons discussed herein, the Norris Amendment is in the best interests of the Debtors' estates and their creditors and should be approved.

---

[5] An interim chief executive officer would most likely be a member of the Debtors' Board of Directors or a current senior executive.

### Notice

21.          Notice of this Motion has been given to: (i) the United States Trustee, (ii) counsel to the DIP Lender, (iii) counsel to The Chase Manhattan Bank as agent for the Debtors' pre-petition lenders, (iv) counsel to the Committees and (v) all those parties that requested service and notice of papers in accordance with Fed.R.Bankr.P. 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

### No Prior Request

22.     No prior motion for the relief requested herein has been made to this or any other Court.

---

[6] For example, Armstrong World Industries, which has also filed for chapter 11 protection, paid a $5.0 million signing bonus when it hired a new chief executive officer mid-2000.

WHEREFORE, the Debtors request entry of an order substantially in the form attached hereto (a) authorizing the amendment of the employment contract of Paul J. Norris as chairman, president and chief executive officer and (b) granting such other and further relief as is just and proper.

Wilmington, Delaware
Dated: September 23, 2002

Respectfully submitted,
KIRKLAND & ELLIS
David M. Bernick, P.C.
James H.M. Sprayregen, P.C.
James W. Kapp III
Christian J. Lane
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
Christopher J. Lhulier (Bar No. 3850)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession