# EXHIBIT C

## AFFIDAVIT OF NICK BUBNOVICH

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

### AFFIDAVIT OF NICK BUBNOVICH IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE AMENDMENT OF THE EMPLOYMENT CONTRACT OF PAUL J. NORRIS AS CHAIRMAN, PRESIDENT AND CHIEF EXECUTIVE OFFICER

Nick Bubnovich, being duly sworn, deposes and says:

1. I am a partner in Deloitte & Touche's ("Deloitte") Human Capital Advisory Services ("Human Capital") consulting practice. I have worked at Deloitte since May 8, 2002. Prior to my employment with Deloitte, I was a partner in Arthur Andersen's Human Capital consulting practice. I offer this affidavit in support of the Debtors' Motion for an Order Authorizing the Amendment of the Employment Contract of Paul J. Norris as chairman, president and chief executive officer.

2. I have over 20 years of experience in the field of compensation and benefits consulting, but I primarily focus on executive compensation. I have special expertise with compensation programs for companies that have commenced chapter 11 cases or are otherwise financially distressed. My work consists of both designing and evaluating employee retention programs, long-term incentive programs, severance programs, emergence bonus programs, etc.

3. I performed two different analyses to determine if Paul Norris's Total Direct Compensation ("TDC") (i.e., the sum of base salary, annual incentive opportunity, long-term incentive opportunity and retention bonus) under the Norris Contract as it would be amended by

the Norris Amendment (the "Amended Norris Contract") is within the range of competitive practice. The Norris Amendment provides Mr. Norris with a retention bonus for 2003 and 2004 which retains the proportion of his 2002 retention bonus to the retention bonuses for key employees. The adjustment preserves that proportion to the retention bonus levels provided to key employees under the General Retention Program approved by this Court on August 26, 2002.

4. My analysis focused on the total compensation opportunity rather than any specific compensation component for two reasons: (i) the compensation mix varies from company to company and (ii) the other companies used for comparison are not in bankruptcy and therefore do not have retention bonuses. My view, as well as that of most other compensation consultants, is that TDC is the most appropriate measure.

5. The first analysis compared Mr. Norris's TDC to that of CEOs at the Industry Peer Group companies. The Industry Peer Group consists of fourteen specialty chemicals companies that are appropriate for this comparison. A list of the companies in the Industry Peer Group is set forth on Exhibit 1. The Industry Peer Group is appropriate because these companies are in the same industry as Grace and in some cases, direct competitors of Grace. Performance in the specialty chemical industry is sensitive to general economic conditions and, therefore, economic factors which may affect the Industry Peer Group will also affect Grace.

6. Chief executive officer's TDC for the companies in the Industry Peer Group consists of: (i) base salary, (ii) actual annual incentive, (iii) three-year average of the Black-Scholes value of stock options, (iv) the value of any long-term incentive payout, and (v) restricted stock awards valued without regard to any restriction. In this analysis, assuming

the implementation of the Amended Norris Contract, Mr. Norris's TDC is 20% above the median TDC of all chief executive officers in the Industry Peer Group and 29% below the 75th percentile TDC of all chief executive officers in the Industry Peer Group.

7.  The second analysis compared Mr. Norris's TDC to that of CEOs at a broad group of chemical and manufacturing companies, as reported in survey data (the "Survey Group"). The Survey Group consists of chemical and manufacturing companies which participated in executive compensation surveys. The Survey Group was used to validate the Industry Peer Group analysis.

8.  Chief executive officer's TDC for the companies in the Survey Group consists of: (i) base salary, (ii) target annual incentive opportunity and (iii) long-term incentive opportunity. The survey data was adjusted for company revenue and size using a regression analysis, which was used to measure the relationship between compensation and company revenues. In this analysis, assuming implementation of the Amended Norris Contract, Mr. Norris's TDC is 47% above the median TDC of all chief executive officers in the Survey Group and 17% below the 75th percentile of all chief executive officers in the Survey Group.

9.  Based on my experience, as well as that, I believe, of other compensation consultants, most companies target compensation for senior executive positions between the median and 75th percentile. Mr. Norris's TDC, assuming implementation of the Amended Norris Contract, is so targeted. Actual compensation earned, however, is typically dependent upon company financial performance. I note that two elements of Mr. Norris's TDC under the Amended Norris Contract (annual incentive opportunity and long-term incentive opportunity) are contingent upon company performance. Thus, if the Debtors performance is poor and does not

3

trigger the payment of the annual incentive opportunity and the long-term incentive opportunity to Mr. Norris, Mr. Norris's TDC would be below the median of chief executive officer in both the Industry Peer Group and the Survey Group. Accordingly, I conclude that Mr. Norris's TDC under the proposed Amended Norris Contract is within the range of competitive practice.

10. In addition to reviewing the competitiveness of Mr. Norris's TDC, I also note that there would be substantial expenses incurred in conjunction with securing a new qualified outside executive to replace Mr. Norris as chairman, president and chief executive officer. A partial list of these expenses would include: (i) recruiting fees and expenses, likely to exceed $500,000; (ii) additional compensation costs for an interim chief executive officer; and (iii) an offer package to a new chief executive officer including a premium due to the uncertainty related to the Chapter 11 Cases. For example, Armstrong World Industries paid a $5.0 million signing bonus when it hired a new chief executive officer in mid-2000, shortly before it filed for chapter 11 protection.

AFFIANT FURTHER SAYETH NOT

Dated this 23 day of September, 2002.

_____
Nick Bubnovich

SUBSCRIBED AND SWORN TO BEFORE ME

this 23 day of September, 2002.

_____
Notary Public
My Commission Expires: 8/11/05

"OFFICIAL SEAL"
DARLA JEAN YAGER
COMMISSION EXPIRES 08/11/05

4

# EXHIBIT 1

## INDUSTRY PEER GROUP

Albemarle Corporation

Cabot Corporation

Dow Chemical Company

E.I. DuPont De Nemours

Eastman Chemical Company

Ecolab, Inc.

Engelhard Corporation

Great Lakes Chemical

H.B. Fuller Company

Hercules Incorporated

International Flavors & Fragrances

PPG Industries

Rohm & Haas Company

Sigma-Aldrich