FILED

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE    OCT -2 AM 10:54

IN RE:                          )   Case No. 01-1139 (JKF)
                                )   Chapter 11  BANKRUPTCY COURT
W.R. GRACE, et al.,             )               DISTRICT OF DELAWARE
                                )   Bankruptcy Courtroom No. 2
                                )   824 Market Street
              Debtors.          )   Wilmington, Delaware 19801
                                )
                                )
                                )   September 23, 2002
                                )   10:12 A.M.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:            Reed Smith
                        By:  JAMES J. RESTIVO, JR., ESQ.
                             JAMES W. BENTZ, ESQ.
                        435 Sixth Avenue
                        Pittsburgh, Pennsylvania 15219

                        Kirkland & Ellis
                        By:  JANET S. BAER, ESQ.
                        200 East Randolph Drive
                        Chicago, Illinois 60601

                        Pachulski Stang Ziehl Young & Jones
                        By:  SCOTTA McFARLAND, ESQ.
                        919 North Market Street, 16th Floor
                        Post Office Box 8705
                        Wilmington, Delaware 19899-8705

For Asbestos P.I.       Campbell & Levine
Claimants:              By:  MARK HURFORD, ESQ.
                        1201 Market Street, 15th Floor
                        Wilmington, Delaware 19801

Audio Operator:         Sherry Scaruzzi

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**TRANSCRIPTS PLUS**
435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

**215-862-1115   (FAX) 215-862-6639**



Appearances:
(Continued)

| | |
|---|---|
| For the Equity<br>Committee: | Klett Rooney Lieber & Schorling<br>By:  JEFF WAXMAN, ESQ.<br>The Brandywine Building<br>1000 West Street, Suite 1410<br>Wilmington, Delaware 19801 |
| For Asbestos P.D.<br>Claimants: | Ferry Joseph and Pearce, PA<br>By:  THEODORE TACCONELLI, ESQ.<br>824 North Market Street, No. 904<br>Wilmington, Delaware 19899 |
| | Bilzin Sumberg Dunn Baena Price<br>  and Axelrod LLP,<br>By:  SCOTT BAENA, ESQ.<br>     JAY SAKALO, ESQ.<br>First Union Financial Center<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, Florida 33131<br>(via telephone) |
| For Libby Claimants: | Klehr Harrison Harvey Branzburg<br> & Ellers, LLP<br>By:  STEVEN KORTANEK, ESQ.<br>919 Market Street, Suite 1000<br>Wilmington, Delaware 19801 |
| For Maryland Casualty: | Connolly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>1220 Market Street, 10th Floor<br>Post Office Box 2207<br>Wilmington, Delaware 19899 |
| For Z.A.I. claimants: | Elzufon Austin Reardon<br>Tarlov & Mondell<br>By:  WILLIAM SULLIVAN, ESQ.<br>300 Delaware Avenue, Suite 1700<br>P.O. Box 1630<br>Wilmington, Delaware 19899-1630 |
| | Richardson, Patrick, Westbrook<br>    & Brickman, LLC<br>By:  EDWARD WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, South Carolina 29402 |

Appearances:
(continued)

For T. Kane:                    Fox Rothschild O'Brien & Frankel
                                By:  JASON CORNELL, ESQ.
                                Mellon Bank Center,
                                919 North Market Street, Suite 1400
                                14th Floor


                                Conroy, Simberg, Ganon, Krevans
                                      and Abel, P.A.
                                By:  STUART COHEN, ESQ.

For Unsecured                   Stroock and Stroock and Lavan
Creditors' Committee:           By:  ARLENE G. KRIEGER, ESQ.
                                180 Maiden Lane
                                New York, New York 10038-4982

For Ace:                        White and Williams
                                By:  LINDA M. CARMICHAEL, ESQ.
                                824 North Market Street, Suite 902
                                P.O. Box 709
                                Wilmington, Delaware 19899-0709

For CNA:                        Ford Marrin Esposito Whitmyer & Gleser
                                Wall Street Plaza
                                New York, New York 10005-1875

<u>INDEX</u>

| <u>AGENDA ITEMS</u> | <u>Page</u> |
|---|---|
| Items 1 through 45 | 5** |
| Item 46 | 13* |
| Item 47 | 13 |
| Item 48 | 13 |
| Item 49 | 28 |

<u>MISCELLANEOUS ITEMS</u>

| | |
|---|---|
| Z.A.I. scheduling | 79 |
| English and American Insurance Company discovery | 86 |
| Full captions on documents | 89 |
| Business plan discussion | 91 |
| Schedule of dates for 2003 | 94 |

*Continued to October 28, 2002, 10 A.M.
**Continued to November 25, 2002, 10 A.M.

1           THE COURT:    This is the matter of W.R. Grace,
2   Bankruptcy Number 01-1139.    There is an agenda set for this
3   afternoon.    Will anyone who speaks when you speak please enter
4   your appearances. Good morning.

5           MS. BAER:    Good morning, Your Honor.    Janet Baer on
6   behalf of W.R. Grace.

7           Your Honor, I believe the first 45 items on the
8   agenda have to do with fee applications.

9           THE COURT:    Yes.

10          MS. BAER:    I have spoken with Mr. Smith.    He is not
11  on the phone but will be -- is available on the telephone if
12  you'd like to speak with him or have him participate.    He did
13  not feel it was necessary.

14          What he would like to do is have a little time on
15  these first three interim periods.    He is issuing reports now.
16  The reports are being responded to by counsel.    The thought was
17  that a hearing be set for later, perhaps near or if not at the
18  November omnibus hearing.    Your Honor, in that respect,
19  obviously all counsel are concerned they'd like to get the
20  remaining 20 percent of fees not paid by the end of the year.
21  We've been waiting for almost a year and a half for some of the
22  fees.    So, I would say the first opportunity we could get to
23  hear those perhaps in November so that -- the idea being mind
24  that there could be an order entered by the end of year

1 payments paid.

2     THE COURT:  Well, I'm a little confused.  Because I
3 had a hearing on all these fees, I issued orders on all but
4 one.  I asked for some additional information.  I suggested to
5 Mr. Smith, and he had a legitimate concern for some additional
6 information, I told the parties how to get it to them, and
7 that's the last I've heard.  I thought by now, you folks would
8 have been paid what you were due on the fee orders for the last
9 month.  So --

10     MS. BAER:  Your Honor, I apologize then.  I thought
11 Mr. Smith had contacted you and you knew a little more.  Let me
12 back up a moment.  First of all, Your Honor, the hearings that
13 you held and the order that we're going to seek entry on was
14 just on the fourth interim application.

15     THE COURT:  Yes.

16     MS. BAER:  Mr. Smith did not review and issue any
17 reports on the first, second and third interim applications.
18 Those are the applications where his reports are just coming
19 out now, we're just responding now and he has gotten no
20 conclusions on those.  Those are the interim applications we
21 want continued for hearing.

22     On the fourth interim application, you had asked Mr.
23 Smith to put together a spreadsheet.  Mr. Smith immediately
24 worked with the debtor, categories were agreed upon by all
25 parties.  All parties, all counsel that I'm aware of have

 1  submitted information.  And Mr. Smith, on Friday, I believe,

 2  did, in fact, issue the spreadsheet and I was told he was going

 3  to be contacting your chambers and faxing you a copy of the

 4  spreadsheet.  I do have one copy with me.

 5          THE COURT:  Well, I was in the office on Friday and I

 6  didn't get any such copy of a spreadsheet.

 7          MS. BAER:  Your Honor, I can give you the one hard

 8  copy I do have, and I'm happy to do so if that would be helpful

 9  to you right now.

10          THE COURT:  Well, I'm not going to review it now

11  anyway.

12          MS. BAER:  Right.

13          THE COURT:  Is it actually filed?  I can pull it up

14  on the CMECS system?

15          MS. BAER:  Yes.

16          THE COURT:  Okay.

17          MS. BAER:  Yes, Your Honor.

18          THE COURT:  As what?  What's it called or what docket

19  entry --

20          MS. BAER:  Your Honor, we believe it was filed under

21  a certificate of counsel from Mr. Smith.

22          THE COURT:  All right.  It addresses all of the fee

23  apps that I heard?

24          MS. BAER:  It addresses all of the fourth interim

25  period fee applications from every single counsel that was

1 appointed.

2          THE COURT:  All right.

3          MS. BAER:  In addition to that, Your Honor, Mr. Smith
4 circulated on Friday an order awarding the fees pursuant to
5 your previous hearings and the agreements with Mr. Smith.  The
6 parties have until noon today to actually comment on that
7 order.  I have the order with me, but I know Mr. Smith gave
8 them until noon so they could comment on the attachment to make
9 sure the numbers were right.  So, providing noon goes by and
10 whatever adjustments have to be made, by the end of the day Mr.
11 Smith or my office can submit the order for signature, and
12 that's on the fourth application.  That will take care of that
13 one.  And hopefully at that point, Your Honor will be satisfied
14 with the spreadsheet and we could lift the moratorium and keep
15 going.

16          THE COURT:  All right.  So, that's going to be
17 submitted under a certificate of counsel, as well.

18          MS. BAER:  Yes, Your Honor.

19          THE COURT:  And it's an omnibus order so I can --
20 okay.  Is there any way to get people to stop sending me
21 individual orders on these interim fees?  I'm not signing them.
22 I keep getting them.  I get them by fax.  I get them by mail.
23 I get them by e-mail.  I get them from the clerk and I'm not
24 signing any of them.

25          So, if it would make life a lot easier for everybody

1  if we dealt with an omnibus order through Mr. Smith rather than

2  doing these fourth interim -- or whatever the number of interim

3  orders is because I'm not going to enter them that way.  I made

4  that mistake with Mr. Bena (phonetic), he was kind enough to

5  send me an order to correct it, which, by the way, I signed

6  today.  So, that order was vacated, but it hopefully will be

7  reentered either today or tomorrow in the omnibus amount.

8       MS. BAER:  Right.  Your Honor, we can certainly

9  communicate again with all the parties.  Mr. Smith has done a

10 lot of to that in the last month to get the information put

11 into the right format.  We thought it was pretty clear, but we

12 can certainly communicate to everyone again that omnibus orders

13 will be submitted, not individual orders.

14      THE COURT:  Yes, okay.  That would -- that'd be

15 helpful.  Okay.  As soon as I get a chance to look at his

16 spreadsheet and see the certifications of counsel that has the

17 order attached, then I hope to address -- isn't that Items 1

18 through 45 on this agenda?

19      MS. BAER:  No, Your Honor.

20      THE COURT:  Okay.

21      MS. BAER:  Items 1 through 45 on this agenda are the

22 first --

23      THE COURT:  First --

24      MS. BAER:  -- second and third --

25      THE COURT:  Okay.

1        MS. BAER:   -- fee applications, which you have not
2   addressed at all.

3        THE COURT:   All right.

4        MS. BAER:   And on those, the idea would be that we
5   have them set for November.  By that time, Mr. Smith should be
6   done and should have final conclusions.

7        THE COURT:   All right.  Are you just going to put
8   them on your calendar then for that time or do you need some
9   order from me?

10       MS. BAER:   No, Your Honor.  With your permission, I
11  think we can just put them on the calendar for the omnibus in
12  November, which is November 25th.

13       THE COURT:   Okay.  That's fine.  Now, I thought I
14  went over in pretty excruciating detail the types of things
15  that I had problems with in the last one, am I going to have to
16  do it again?

17       MS. BAER:   We certainly hope not, Your Honor.  I
18  believe that from looking at Mr. Smith's report on my own law
19  firm's fees, most of that sort of, okay, we understand that's
20  the case.  There's not a lot of you didn't -- you know, you
21  lumped time and you didn't do this.  It's more into some
22  substantive things.  But we are preparing very long responses
23  again with the hope that we can resolve most everything and you
24  won't have to deal with too much at the hearing.

25       THE COURT:   Okay.  For my -- my preference would be

1 as follows.   To the extent that Mr. Smith has sent a comment,
2 you've worked it out and you've got a revised number, you
3 simply tell me in the agenda somehow that you've worked it out,
4 here's the number that you folks have agreed upon.   If I need
5 to see a revised fee app, then file it.   If I don't, they're
6 already of record.   So, I don't need anything additional.

7       If there's a contest, then list it under the
8 contested matters.   But I would like to get to the point where
9 if you folks don't file some fee objection, I will review the
10 fee applications and I may, on my own determine that
11 something's inappropriate.   But at least for anticipated
12 orders, you could at least get an omnibus order circulated that
13 would have the numbers in it that you folks could agree to.   If
14 I have some challenge with it, I'll let you know.   So, please
15 put them on the agenda.   But I don't need all the details that
16 you're putting here unless that's easier for your staff.   What
17 I really need to know is, you know, Number 44 is contested by
18 so and so, look at this pleading.   You know, and Numbers 1
19 through 43 aren't contested and Number 45 we have agreed on a
20 different number, and here is what it is.   That's the kind of
21 information I need.

22       Now, if in order to do that you have to go through
23 what you're going through now, that's okay.   But if it can
24 eliminate some work for you, then you can do it in a more
25 abbreviated fashion for the fee apps.

1        MS. BAER:   Thank you, Your Honor.   We'll work it out
2   that way.

3        THE COURT:   Okay.   All right.   Yes, 1 through 45 then
4   will be put on the November agenda.

5        MS. BAER:   And, Your Honor, should the debtor assume
6   that the moratorium on paying fees exists until you review the
7   spreadsheet and --

8        THE COURT:   And sign the other order, yes.

9        MS. BAER:   -- sign the other order, yes.   Okay.

10       THE COURT:   I want to make sure that everybody has
11  sent Mr. Smith the information he's looking for.   And your
12  understanding is that everyone has?

13       MS. BAER:   That's my understanding, Your Honor.

14       THE COURT:   Okay.   As soon as I get that order, if
15  it's in today, undoubtedly I'll deal with it either tonight or
16  tomorrow, depending on how soon I get out of court today and
17  when I actually see it.   So, if you get it filed today, you
18  could let me know that it's in, call the visiting judges'
19  chambers, just leave a message for me so I can pull it up, copy
20  it and try to get it dealt with today or, as I said, tomorrow
21  if I don't have time to do it today, but before I leave
22  Delaware tomorrow.

23       MS. BAER:   Thank you, Your Honor.   We'll do that.

24       THE COURT:   All right.   So, these -- 1 through 45 are
25  continued to November the 25th at ten.

13

1      MS. BAER:  Your Honor, that takes us to Item Number
2  46.  On this one, Your Honor, we had hoped to have a
3  stipulation.  We are having trouble getting the other side to
4  agree on what we thought they agreed on.  We will either have a
5  stipulation at the next hearing or we will have filed a motion
6  to dismiss for failure to state a claim.  One way or the other,
7  we will bring it to a head by the next hearing.  So, I would
8  ask that that one be continued to the October omnibus hearing.
9      THE COURT:  Okay.  That's October 28 at ten.  All
10  right.
11      MS. BAER:  Your Honor, that brings us to Item Number
12  47, you've already entered the order on that.
13      THE COURT:  Yes, I did.
14      MS. BAER:  And then the first contested matter, Your
15  Honor, is Item Number 48, which is a motion to lift stay filed
16  by Timothy Kane.
17      THE COURT:  All right.
18      MS. BAER:  Your Honor, it's full briefed and I
19  believe Mr. Kane's counsel is here.
20      THE COURT:  Yes, good morning.
21      MR. COHEN:  Your Honor, with your permission, my name
22  is Stuart Cohen.  I represent the creditor, Timothy Kane, whose
23  motion is before the Court now.  I practice down in South
24  Florida.  Your Honor entered an order admitting me pro hac
25  vice.  I'm here, along with local counsel, Jason Cornell.

1    THE COURT:  Yes, sir.  Good morning.

2    MR. COHEN:  With your permission, Judge, I'd like to

3  address the Court with my argument.

4    THE COURT:  Yes, sir.

5    MR. COHEN:  Has the Court had the opportunity to

6  review the motion?

7    THE COURT:  Yes.

8    MR. COHEN:  And has the Court also had the

9  opportunity to review the --

10    THE COURT:  I've read it all.

11    MR. COHEN:  Okay.  Terrific.  I'll skip most of the

12  preliminaries, Judge, other than to point out to you this is

13  obviously not a toxic tort situation or a toxic tort

14  allegation.  The case does involve allegations of the

15  defectiveness of one of Grace's products that is a roofing

16  underlayment.  And the allegation arise out the slip resistant

17  coating that's on that underlayment.  The allegations are not

18  that it is of a toxic nature, but that it becomes extremely

19  slippery when it's wet.

20    The Court will remember back almost a year ago, you

21  permitted us limited leave to take the depositions of five

22  Grace employees up at Cambridge where their headquarters were

23  located.  We have taken those five depositions and we're back

24  before the Court on a motion to lift stay for Court based on

25  what we learned during those depositions.

1          There are essentially two changes that have happened
2  between the time of that hearing, Judge, and now.  Number one,
3  we were entitled to conduct preliminary discovery before a
4  suggestion of bankruptcy was filed in the local action.  During
5  that discovery, we learned of the existence of a policy of
6  liability insurance providing the debtor with $10 million in
7  liability coverage which would be applicable to Mr. Kane's
8  claim.

9          Now, that $10 million is a per claim limit.  It is
10  actually $15 million in the aggregate.  That means that the $10
11  million would apply only to Mr. Kane's claim.  And much to the
12  dismay of his plaintiff's attorney, I will represent to the
13  Court that although Mr. Kane is a paraplegic as a result of
14  this fall, I would be surprised if a jury hearing the damages
15  in this case would render a verdict that's one-tenth of the
16  amount of liability coverage as opposed to a verdict that might
17  exceed the liability coverage.

18          THE COURT:  Why are you not filing a proof of claim
19  here?

20          MR. COHEN:  We did, Judge.

21          THE COURT:  Okay.  Then why do I have a motion for
22  relief from stay?  If there is a proof of claim, there will be
23  an objection to it, if there is one.  If there isn't, it will
24  be allowed.

25          MR. COHEN:  There hasn't been to date, Judge, number

1  one.

2        THE COURT:  I see.

3        MR. COHEN:  And, number two, we have a current case
4  pending down in Orlando, which is Orange County Circuit Court,
5  with four other defendants.  We want to proceed in that action
6  directly against Grace.

7        Number one, there's no coverage defense that's been
8  alleged here.

9        Number two, there's no self-insured retention or
10 deductible under the policy for Grace.

11       Number three, under the terms of the insurance
12 policy, the defense costs are being borne by the insurance
13 carrier, as opposed to Grace.

14       This bankruptcy proceeding cannot, in any way, be
15 affected by the outcome of the Kane litigation in Florida
16 because, based upon the stipulations that were made in our
17 motion and the existence of this liability insurance coverage,
18 which is not property of the estate based on the authorities we
19 cited to the Court, that case is going to take place and has
20 absolutely no affect on this bankruptcy proceeding.

21       THE COURT:  How many other possible claimants are
22 there who could --

23       MR. COHEN:  Zero.

24       THE COURT:  None.

25       MR. COHEN:  None.  We conducted our preliminary

1  discovery and it was revealed to us by Grace's own discovery
2  responses that ours is the only pending claim alleging these
3  allegations of negligence.   There had been two former claims
4  brought by roofers, they were resolved years ago, and there are
5  no other pending claims arising out of this alleged allegation
6  of defectiveness.

7       I'm sure Your Honor is familiar with the floodgates
8  or the opening of floodgates argument that was made by the
9  debtor in this case.   That is absolutely not the case, it
10 cannot be made here.   If it did, then obviously the debtors'
11 original discovery response telling us we were the only pending
12 claim arguing these allegations of defectiveness would be
13 incorrect.

14      Furthermore, we've got a policy of liability
15 insurance that is a per claim occurrence policy.   That means
16 there's $10 million available to Grace just to satisfy Mr.
17 Kane's claim alone.   Clearly, there's no way we can get to the
18 assets of the debtors' estate.

19      Most importantly to this motion, Judge, is the fact
20 that although the debtors indicate in their motion that they've
21 got a litigation claim that's going to go into effect to deal
22 with the personal injury allegations or defectiveness of
23 product allegations that are made against Grace, obviously the
24 vast majority of which are asbestos claims, based upon their
25 June briefing where they're indicating what the litigation plan

1  is, there's absolutely no procedure in place to deal with a
2  claim of the nature of Timothy Kane's.

3       What we'd have happen here, Judge, if you did not
4  grant the motion to lift the stay, we have to have a regular
5  jury trial, I believe, here in District Court in Delaware to
6  determine whether or not there's a defective product.

7       Mr. Kane's claim cannot possibly fall within the
8  litigation plan that's been laid out by the debtors because
9  this is not an asbestos claim.  There's no claim being made
10 here that he's got mezo epithelioma (phonetic).  There's no
11 claim being made here that he can satisfy any of the
12 allegations that he would have to under the Toxic Tort
13 Litigation Plan.  And because of that, the judicial economies
14 clearly weigh in favor of allowing Mr. Kane to proceed with his
15 State Court action.

16      I can address the factors in terms of substantial
17 prejudice to the parties if the Court would permit me to
18 continue.

19      THE COURT:  You can continue, I mean I'm aware of the
20 factors, but, yes, you can continue if you'd like.

21      MR. COHEN:  I'd rather wait and respond to the
22 defendant's argument, Judge.

23      THE COURT:  All right.

24      MS. BAER:  Your Honor, while Mr. Kane has the only
25 current pending claim for this particular product, Mr. Kane is

1 by no means unique to this case or a unique situation.

2 Your Honor, when Grace filed Chapter 11, there were
3 many, many products liability cases pending.  I can't tell you
4 how many, I know I have a large litigation book of all the
5 other litigation non-asbestos litigation that is stayed because
6 of this bankruptcy case.

7 Your Honor, the matter involving Mr. Kane is covered
8 by insurance.  However, as indicated, this is a $10 million per
9 occurrence policy with a $15 million aggregate.  We anticipate
10 there will be many products liability claims that will be filed
11 that would tap into that insurance, not just Mr. Kane.

12 Your Honor, the litigation plan here is clear.  We
13 have a bar date.  The bar date is March 31st, 2003.  Once we
14 know the total universe of the non-asbestos claims that are to
15 be filed by that bar date, we will be able to put into place a
16 litigation plan for non-asbestos claims.  The June briefing did
17 not address it because the June briefing was before Judge
18 Wolin.  The June briefing only was put together for asbestos
19 personal injury claims.

20 Your Honor, has spent a great deal of time working
21 on, I guess what you'd call, the litigation plan for the rest
22 of the case.  You've put a bar date into place, a notice
23 program has gone out, the bar date is March 31st.  We're
24 working on the Z.A.I. situation and we have a litigation plan
25 for that.

1      We're only at the beginning in terms of the
2 litigation plan for non-asbestos claims, but we have not
3 forgotten them.  They are very significant and there are a lot
4 of them out there.  This situation, Your Honor, is not
5 different from the Smulker (phonetic) situation that you
6 addressed several months ago.  That was a products' liability
7 case in California for Silica Gel.  This is a products
8 liability with related personal injury in Florida having to do
9 with a roofing product.

10      We don't know at this point how many other cases, how
11 many other claims may be filed by the bar date for this
12 product.  For this one case to go forward, Your Honor, would be
13 much like the race to the courthouse that happens and causes
14 bankruptcy cases to be filed each day.

15      Yes, the Grace case was filed because of the asbestos
16 claims.  The overwhelming number.  But, Your Honor, there are
17 many, many non-asbestos claims, non-asbestos lawsuits that are
18 pending that tap into insurance other than insurance that might
19 cover asbestos.

20      THE COURT:  All right.  The per occurrence that we're
21 talking about is not related to the project on which Mr. Kane
22 was working when he fell.  It is product liability coverage for
23 the debtor for all of the debtors' projects on a per occurrence
24 with a 15 million aggregate.

25      MS. BAER:  That's my understanding, Your Honor.

1          THE COURT:    Okay.

2          MS. BAER:    Under these circumstances, Your Honor,

3    while we sympathize with Mr. Kane, he has filed a proof of

4    claim.  We do not, at this point, have objection deadlines.

5    That certainly will be part of the litigation plan going

6    forward after the bar date.

7          Mr. Kane's products' liabilities and personal injury

8    claim, just like many, many others like the Smulkers, like Mrs.

9    Kellogg's claim.  These claims will be dealt with in a non-

10   litigation plan.  For Mr. Kane to go forward would be to give

11   him the preference that bankruptcy stops.  It stops all

12   litigation so the debtor has the opportunity to deal with it

13   all at one time in a mass sense, determine what its assets are

14   and then come up with some plan to equitably try these cases,

15   equitably determine these claims and equitably pay the claims

16   if they're appropriate.  Theirs is no different than many of

17   the others, Your Honor.  The stay needs to remain in place.  We

18   will object to the claim in the appropriate way and will

19   proceed in the appropriate way once the litigation plan is put

20   into place.

21          THE COURT:    Okay.

22          MR. COHEN:    Judge, my understanding as to the nature

23   of that insurance coverage is exactly the opposite as the

24   creditors are indicating here.  I haven't seen the policy of

25   insurance and the policy of insurance has not been provided or

1  filed as an exhibit to the defendants' response or opposition
2  to the creditors motion here.  We don't know what that policy
3  of insurance says.

4         What we do know is there isn't anyone else who's
5  making a plan of the defectiveness of this particular product
6  towards Grace.

7         THE COURT:  Yes, but the fact is this.  You know, the
8  case law as to whether or insurance proceeds are property of
9  the estate is all over the board.  And unfortunately for mass
10 tort cases, most of those decisions are dealt with in cases
11 that are not mass tort cases and look pretty much like two-
12 person plaintiff versus defendant type of lawsuits.  That's not
13 the case in the mass tort context.

14        And where there are multiple products that could be
15 insured by the same product liability policy is also not the
16 case in that context.  I can't see any way that the insurance
17 proceeds are not property of the debtors' estate to be dealt
18 with in a fashion that a plan would permit because all
19 creditors who have claims against those proceeds have the right
20 to tap into them, and that's exactly what the bankruptcy stops,
21 the race to the courthouse.

22        The only way to figure out who, rather than a race to
23 the courthouse, is entitled to those proceeds is to bring them
24 into the estate, have the debtor put forth a plan and pay them
25 out to the people who are entitled to share in those proceeds.

1  I can't see any way in a case such as a mass tort case that
2  proceeds are not property of the estate.

3          And in a product liability case, where the policy
4  insures more than one product and has an aggregate limit as to
5  all claimants who may make claims against those proceeds, I
6  think that theory is the same.  What you need, I guess, is to
7  see the policy.

8          MR. COHEN:   That's correct, Judge.

9          THE COURT:   And I will direct the debtor to show you
10  the policy because to the extent that the policy only covers,
11  which I think unlikely, but to the extent it only covers this
12  particular roofing product, then maybe Mr. Kane has some
13  entitlement to go forward because if there have been no other
14  claims filed, at least not by the claim's bar date in March,
15  then maybe Mr. Kane at that point in time is entitled to go
16  forward.

17          I think it unlikely that this insurance policy covers
18  only one product, but it does.  There are odd things that
19  happen from time-to-time.  I'll direct the debtors to provide
20  you with a copy of the policy.  I will defer ruling on this
21  issue until after the claims bar date on March 31st so I can
22  see at that point whether there are any other claims made that
23  may involve this specific product and whether this policy
24  encompasses only this product.

25          Because if both of those things come to fruition,

1  i.e. there are no other such claims made and the policy covers
2  only this product, you may be entitled to relief from stay.  I
3  think it highly unlikely that both of those things are going to
4  come to pass, but as I said, maybe they will.

5          MR. COHEN:  Judge, would you not also require the
6  debtor to produce a list of those claimants it believes would
7  be takers under that particular policy so we can --

8          THE COURT:  A list of what?

9          MR. COHEN:  A list of those other claimants against
10  those insurance proceeds so we can --

11          THE COURT:  You can check the claims docket, just
12  like the debtors can.

13          MR. COHEN:  But there's no way that we could
14  determine whether or not this particular policy would provide
15  coverage for those particular losses unless we know the actual
16  nature of the dispute being alleged as opposed to simply the
17  creditor's name.

18          THE COURT:  You can check the claims docket, the same
19  way the debtor can.  There will be a claims register, there's a
20  claims agent who's getting copies of the claims.  If you want
21  copies of them, you're entitled to them, ask for them.  I'm not
22  going to make the debtor disclose every claimant filed between
23  now and March 31st on the claim's bar date.  But if you want to
24  see them, you're entitled to them, just contact the claims
25  agent and make arrangements to get them.

1        MR. COHEN:  Lastly, Judge.  In terms of the discovery
2   that's going to take place --

3        THE COURT:  There is no discovery.  There is one
4   thing I'm going to order, a copy of the policy.  The debtor is
5   going to provide this policy that allegedly has a $10 million
6   limit for this occurrence and a $15 aggregate.  I'm not
7   permitting discovery, I've already given you that.

8        MR. COHEN:  And the Kane action is otherwise stayed
9   as to all the parties, as opposed to just simply the debtor?

10        THE COURT:  Oh, no, I -- no, it's stayed as to
11   anybody other than the debtor.

12        MR. COHEN:  The --

13        THE COURT:  I haven't been asked to do that.

14        MR. COHEN:  And I apologize, Judge, I realize that's
15   not framed within the pleadings that I've put before you, but
16   there are four other defendants in the Kane litigation down in
17   Florida and an argument was made based upon your original order
18   that you entered that the stay applicable to the debtor also
19   applied to these other parties.  And when we got before the
20   State Court Judge, he almost made me come back here for
21   clarification before Your Honor, and I didn't want to wait
22   until March 31st to get the clarification.

23        THE COURT:  But what I said, however, is to the
24   extent that the debtors' product is at issue, I am not going to
25   permit any finding by another court to determine that this is a

1 defective product.

2          Now, if the State Court judge refuses to interpret
3 that as saying he can't go forward because the whole issue is
4 bound up and whether the debtor has a defective product, then I
5 would think he's not going to go to trial.  But as to the
6 defendants in the case, it's not stayed.  It is as to the
7 debtors' product.

8          MR. COHEN:  I appreciate that.

9          THE COURT:  Does that help?

10          MR. COHEN:  It does.  I appreciate the clarification,
11 Your Honor.  Thank you.

12          THE COURT:  All right.  Let me give you a date.  The
13 bar date is March 31st.  The debtor is going to need a little
14 time, I'm sure, to go through this with the claims agent to see
15 whether there are other claims with respect to this product.
16 How about if I continue this until my May hearing?  That should
17 be sufficient time for the debtors and your client, as well, if
18 you want to go through that claims register to see if there are
19 any other claims made against these products and also to
20 examine the insurance policy.

21          We haven't picked dates for next year, that's one of
22 the housekeeping things I was going to do later.  I will be
23 here May 19th and May 20th.  Do you know whether you have a
24 Board meeting the 19th?  If not, I would expect to schedule
25 this on the 19th.

1          MS. BAER:  Your Honor, what day of the week?

2          THE COURT:  Monday.

3          MS. BAER:  Monday the 19th will be fine.

4          THE COURT:  All right.  With respect to Agenda Item

5  Number 48, the debtor is to produce to Mr. Kane's counsel a

6  copy of the insurance policy discussed on the record today.

7  How long would that take for you to get the policy to him?

8          MS. BAER:  By the end of the week, Your Honor.

9          THE COURT:  All right.  Within ten days.  The motion

10 for relief from stay is continued to May the 19th.

11         We also haven't discussed the time.  Here we go.  In

12 my wild dreams, we're hoping that we may be able to do the

13 following, so let's discuss this.  What's the possibility that

14 we could start Owens at 8:30 in the morning?  I'm not sure

15 where all of you are coming from, but when we start at ten, are

16 you coming in -- Grace.  I'm sorry.  Oh, no, this is -- I

17 apologize, I'm looking at my wrong list.  I was hoping we could

18 start Grace at noon on Monday, to the extent that you don't

19 have a Board meeting those days.  Would that be a problem?

20         MS. BAER:  I think that's fine, Your Honor.

21         THE COURT:  Noon, all right.  So, this will be May

22 19th at noon.  And the debtor will simply put this back on the

23 agenda at that time and we'll see what happens.

24         MR. COHEN:  I appreciate it.  Thank you, Your Honor.

25         THE COURT:  All right, thank you.  The stay remains

1 in effect until that time as to the debtor and the debtors'
2 product.

3        MS. BAER:  Your Honor, would you like the debtor to
4 prepare a written order to that respect?

5        THE COURT:  I would, please.

6        MS. BAER:  Your Honor, the next item on your agenda
7 is Item Number 49, which is the motion of Carol Gerard.  This
8 is directed toward Maryland Casualty and the request for the
9 posting of the bond.

10        THE COURT:  Good morning.

11        MR. KORTANEK:  Good morning, Your Honor.  Steve
12 Kortanek with Klehr Harrison.  We are one of the law firms
13 representing the Libby Mine claimants who have made this
14 motion, Your Honor.

15        Your Honor, the motion to require Maryland Casualty
16 to post a bond raises some very significant issues.  And --

17        THE COURT:  Why wasn't it raised when the other
18 matters -- I mean Ms. Gerard's here more regularly than the
19 debtor is in this court anymore.  Why hasn't this motion been
20 raised on a timely basis when the initial pleadings were filed?

21        MR. KORTANEK:  Your Honor, frankly, it was something
22 that occurred to us during that process, but we didn't think to
23 pursue it until later.  But we still think that given the
24 amount of time that this injunction will likely be in place,
25 that it's very important for Your Honor to try to at least

1  consider the relief we have requested.

2       THE COURT:  Well, Maryland isn't even a movant, is
3  it?

4       MR. KORTANEK:  Your Honor, we think they're the
5  functional equivalent of a movant.  If you take two
6  hypotheticals, Your Honor, take one where we cited a case
7  called Carabeta (phonetic) and there is both a debtor movant
8  and a non-debtor movant in that case.

9       Say, for example, that the nondebtor movant took
10 little or no meaningful role in the act of persuading the Court
11 to enter that injunction.  Yet Rule 65 or Bankruptcy Rule 7065
12 would automatically allow Your Honor to require a bond from
13 that party.

14      If you take another situation which we think almost
15 happened here where the sole moving party is the debtor and, in
16 reality, Maryland Casualty devoted significant resources --
17 actually wrote more pages and briefs and spent a lot of time
18 arguing before Your Honor trying to protect its own assets,
19 that that's a different situation and one where the permissive
20 nature of Bankruptcy Rule 7065 is very important to consider.
21 It says that Your Honor may enter an injunction without
22 conditioning the injunction on a bond because, of course, the
23 regular Rule 65(c) requirement is absolutely black letter law.
24 The Court has almost no discretion.

25      Obviously it makes sense in the bankruptcy context to

1 excuse the debtor and the estate from the affects of a bond.  A
2 bond is designed fundamentally to give the parties like the
3 Libby claimants some redress if, however, unlikely the Court or
4 the parties consider it, the injunction is later determined to
5 have been improvident.

6        What's crystal clear here is that the primary purpose
7 of Maryland Casualty's efforts in connection with this
8 injunction were to protect its own corporate assets.  And if
9 we're proven right at some point, again, however unlikely, if
10 there is no bond, it's also black letter law, we will have no
11 redress.  We will have the passage of significant amount of
12 time with no remedy.

13        THE COURT:  You've already had passage of time
14 without a remedy because the case wasn't -- the cases basically
15 haven't been pursued until after the debtors filed bankruptcy.
16 So, first of all, their post petition actions -- maybe I'm
17 forgetting one that was pre-petition, but offhand, I can only
18 recall post petition actions having been filed.  It seems to be
19 a theory that's newly created, maybe because the debtor filed
20 bankruptcy.  I've already stated on the record, I can't see
21 much chance that this lawsuit is going to result in a verdict
22 in favor of your client and against Maryland Casualty because
23 at least as to the documents that were submitted, and I will go
24 back and double-check through them.  Again, I thought there
25 were sets here, there are not.  So, I'll have to get them in

1 Pittsburgh, and I apologize for that, it was my
2 misunderstanding.

3          I could find no document that placed an independent
4 duty on Maryland Casualty to do anything.  Maryland Casualty
5 was acting as an insurer.  It was monitoring the debtors'
6 functions, it was making some suggestions about how to control
7 asbestos related issues.  It did nothing on its own, either as
8 an interloper, a contractor person, a donor, nothing that would
9 somehow indicate that there was an independent responsibility
10 on Maryland Casualty to do anything that would impose direct
11 liability.

12          Now, I've already said, maybe I don't have the
13 universe of documents, I'm not making fact findings.  All I'm
14 doing is looking at the question of the likelihood of success
15 on the merits, which is something that I need to do in
16 addressing, A, the concept of the injunction and, B, the
17 necessity for a bond.  On both of those matters, I think that
18 Mrs. Gerard will lose.

19          Now, I don't know how having made those findings I'm
20 now in a position of saying that Maryland Casualty, when I
21 don't think its own assets were implicated to start with,
22 should post a bond to protect Mrs. Gerard against a verdict I
23 don't think she's likely to get.

24          Now, admittedly, I'm not making fact finding.  And at
25 a trial, this could all turn out to be different, that's -- it

1  just could.  And based on the evidence, it may.  I don't have
2  any way of assessing that except to look at the information the
3  parties have submitted so far.  Based on the information the
4  parties have submitted so far, I don't see the likelihood of
5  success on the merits.  And as a result, I don't see how I
6  could exercise my discretion to have Maryland, who isn't a
7  party here, post the bond when I don't think it's likely to
8  lose anyway.
9         Now --
10        MR. KORTANEK:  Well, Your Honor, that's -- that's
11 really the main point.  If you look at Your Honor's threshold
12 decision that -- whether to apply your discretion to impose a
13 bond, what we think is that that then puts you in the realm of
14 Rule 65(c) in the sense that if there's any chance -- unless
15 someone sitting here is 100 percent sure that we'll take
16 nothing as far as Maryland Casualty's direct assets, and we all
17 know there's been no trial, we're estopped from doing anything
18 in the action and we're talking many years in the future before
19 that eventuality can come to pass.
20        Unless someone is 100 percent sure, then the
21 proposition that folds back into what the 3rd Circuit teaches
22 about the purpose of Rule 65(c) and the purpose of a bond is
23 that if somehow it goes to the size of the bond, which, you
24 know, Your Honor then would then be considering, and the
25 purpose is to prevent that manifest injustice of having that

1  determination made, without so much of a likelihood of success
2  judgment today, but the reality of if that situation comes to
3  pass we will have nothing.  This does not have any impact upon
4  the estate because it's requiring Maryland Casualty who, our
5  view is, trying to protect its own assets.  And here, you have
6  to take us at our word, we respectfully submit, because that's
7  our claim.  We're making our claim against their direct assets
8  and we've said in our pleadings, these claims are not claims
9  against any insurance proceeds.  So, that by definition, the
10  injunction is protecting their direct assets.

11      So, we hear Your Honor, we've heard you before.  Your
12  view on our likelihood of success on that claim.  But we're
13  talking about many years, in all likelihood, before we can go
14  forward.  And if that determination is made, we'll have
15  nothing, no protection and they're the free rider here.  And we
16  think that's unjust.

17      THE COURT:  Well, is there some reason to believe at
18  this point in time that Maryland Casualty is either insolvent
19  or approaching insolvency.  Because if there is, there's
20  probably a different issue that I need to be addressing.  And
21  if there isn't, then you should have the likelihood of recovery
22  if your client is successful in obtaining a judgment against
23  Maryland Casualty.

24      MR. KORTANEK:  Oh, yeah, we don't -- we don't contest
25  their solvency, Your Honor.  We're talking about the time value

1  of money primarily, that's the way our papers are flushed out.
2  And there's a significant amount of claims here.  The parties
3  try to downplay them, but reality is certain of these claims in
4  a very analogous sense have gone to trial.  And so there has
5  been jury determinations of the types of harm these people have
6  suffered and --

7           THE COURT:  Against Maryland Casualty?

8           MR. KORTANEK:  No, no, these are claims against Grace
9  that demonstrate once you get passed the liability issue what
10 the damages are.

11          THE COURT:  Oh, heavens, it's not a damage issue as
12 to the -- the reason this case is here is because there's so
13 many damages against Grace.  But that hasn't have anything to
14 do with Maryland Casualty's direct obligation.  As far as I
15 know, there hasn't been a suit tried against Maryland Casualty,
16 has there?

17          MR. KORTANEK:  Well, no.  But, of course --
18          THE COURT:  Okay.  No.
19          MR. KORTANEK:  -- we've just discovered the documents
20 that --

21          THE COURT:  Well, let's stop.  The answer is no.  So,
22 there is no history upon which I can base any evidence of what
23 some likelihood of recovery may be because there has been no
24 past history of recovery.  So, even in that sense, it seems to
25 me that the request for a bond is not appropriately addressed

1  in a positive way by me on this record.

2           MR. KORTANEK:  Well, we think it does show damages

3  that have been established by juries for --

4           THE COURT:  Against Grace, sure.

5           MR. KORTANEK:  Right.

6           THE COURT:  Yes.

7           MR. KORTANEK:  But once --

8           THE COURT:  No doubt about the fact that Grace is

9  significantly -- it has significant liability for matters

10  related to incidents in Libby, Montana.  No doubt about that.

11          MR. KORTANEK:  All right.  So, primarily --

12          THE COURT:  But there's significant doubt about

13  whether Maryland Casualty has an independent obligation.

14          MR. KORTANEK:  That's correct, Your Honor.  And

15  primarily we're talking about the liability issue and we think

16  we have given you some track record as far as the types of

17  damages these people have suffered.  If there's a liability

18  determination, we think that's where it's going to come out.

19          THE COURT:  Well, I don't know because there is a

20  liability determination against the debtor because it's the

21  debtors' mine, the debtors' employee, the debtors' product, the

22  debtors' direction.  I haven't heard anything that says that

23  it's Maryland Casualty.  Nothing.  And I did look at the

24  documents.

25          Mr. Kortanek, I believe that I am going to deny this

1  motion for the reasons that I've expressed on the record.

2      However, since I did think that I would have the
3  chance to review the documents, again, here in Delaware today
4  and they're not here, I have to go back to Pittsburgh and
5  review.  I'm going to go back and take a look because this
6  issue of the direct liability I think is a factor that I want
7  to consider.  So, I'm simply going to ask the debtor to put
8  this back on the November 28th -- I'm sorry, October 28th
9  calendar and I will give you a ruling at that time, if not
10 before, so that I have a chance to go back and take a look at
11 the documents that have been submitted.

12      I simply want to make sure I didn't miss something in
13 taking a look at those documents first.

14      MR. KORTANEK:  Okay.  Thank you, Your Honor.

15      THE COURT:  So, I will continue this.  Does the
16 debtor want to address anything now?

17      MS. BAER:  Your Honor, I only want to remind you that
18 we have to go back and look at why this injunction was put into
19 place.  Even if they did have a potential cause of action
20 against Maryland.  That really is not the issue here.

21      This injunction was entered at the debtors' request.
22 Maryland was not a party.  Counsel for Gerard was notified.
23 They could have participated.  They did not object to the entry
24 of the injunction.  When this matter came back before your
25 Court when counsel for Gerard moved to modify or clarify the

1  injunction, they didn't even notice Maryland.  This was an

2  injunction put into place by the debtor on behalf of the debtor

3  for the debtor to protect its assets and to protect these

4  asbestos claims so they're dealt with in one place.

5          Maryland just happens to be, if you will, a, quote,

6  "beneficiary" to a certain extent of the injunction.  But this

7  is for the debtor, by the debtor, because of the debtor.  And

8  it is a completely inappropriate situation in which to order

9  Maryland to post a bond.

10         THE COURT:  Well, I'm not sure that the discretion

11 function will let me adopt the principle that Maryland is the

12 functional equivalent of a moving party.  They have, of course,

13 filed papers with respect to the bond in this case.  So, I'll

14 consider that aspect of it, as well.

15         But I am, at the moment, more concerned about the

16 fact that I really don't see a likelihood of success on the

17 merits and I want to make sure that I didn't miss something in

18 reviewing the papers that had been submitted on that score.

19 So, I just ask, please, that you put this back on the October

20 28th agenda and if I can do an order in the meantime, I will.

21 If not, I'll announce my findings then and have the debtor

22 submit an order that will memorialize those findings

23 afterwards.

24         MS. BAER:  Thank you, Your Honor.  We'll do so.

25         THE COURT:  All right.

1      MS. BAER:  Your Honor, the next item on your agenda
2  is a new one that was added on an emergency basis.  Late last
3  week, I believe late Wednesday evening, the debtor was served
4  with a motion to expedite hearing, accompanied with a motion
5  and memorandum to compel relative to the Z.A.I. science trial
6  discovery.  A tremendous number of papers were filed with that
7  motion and I think that the movants pretty clearly made their
8  viewpoints known to the Court and educated the Court quite a
9  bit.  In fact, enough apparently to accelerate the hearing to
10 today on the motion to compel.

11     THE COURT:  No, actually I signed the hearing notice
12 that put the hearing on for today before I got any of those
13 papers.  It seems to me that on the expedited time frame that I
14 scheduled that if we're going to do discovery disputes, they
15 should be done on a prompt basis.  That's why it's on for
16 today.

17     MS. BAER:  Thank you, Your Honor.  Your Honor, if I
18 could, Jim Restivo from Reed Smith is here today.  That is
19 special litigation counsel for the debtor in the Z.A.I. science
20 trial.  I believe to put this into context, given you have
21 received a lot now from the movants and very little from the
22 debtor, it would be appropriate to hear Mr. Restivo recite for
23 you the history of where things are at in terms of the Z.A.I.
24 discovery.

25     THE COURT:  All right, that's fine.  Mr. Restivo?

1    MR. RESTIVO:  Good morning, Your Honor.

2    THE COURT:  Good morning.

3    MS. SCARUZZI:  Identify yourself.

4    MR. RESTIVO:  My name is James Restivo, I represent
5 the debtor.

6    Your Honor, the papers filed late last week contain
7 some inferences that suggest that perhaps this is a race to the
8 science trial with respect to discovery and that Grace has been
9 in the race for a while and that plaintiffs are just starting.
10 There's also some inferences that we're involved in some
11 gamesmanship here of hiding the ball.  And so I do think in
12 dealing with the motion to compel, the Court should be made
13 aware of the context.

14    Thirteen years ago today, Your Honor, Mr. Westbrook
15 and I were in a courtroom in the Court of Common Pleas of
16 Allegheny County trying what was known as the Mount Lebanon
17 High School case involving asbestos containing Grace
18 fireproofing.  We tried that case for five weeks.

19    It's true that at that time, I looked a lot younger
20 and Mr. Westbrook looked exactly the same.  But the point is
21 that case was filed in 1983.  It was subject to six years of
22 discovery by Mr. Westbrook's firm, including visits to the
23 Grace repository at Winthrop Square (phonetic).

24    In 1992 and 1993, Your Honor, Reed Smith tried a six-
25 month trial involving all of the State-owned buildings in West

1 Virginia.   That case involved ten years of discovery, including
2 repeated visits to the Grace repository at Winthrop Square.   I
3 mention that because after a jury verdict in favor of Grace, an
4 Appellate decision requiring a new trial, Mr. Westbrook and his
5 firm were called upon to handle the new trial and, therefore,
6 received all of the discovery that took place.

7        And in 1999, Your Honor, Mr. Westbrook and I tried
8 for two months in New York City an asbestos property damage
9 case which had been discovered for ten years, including
10 repeated visits to the Grace repository.

11        With respect to attic fill, Your Honor, in the year
12 prior to the Grace bankruptcy, year, year and a half, a number
13 of putative class actions were filed on behalf of Z.A.I. Attic
14 claimants.   One was Barbanti, which was a putative class
15 action, went for an injunction hearing between Mr. Westbrook's
16 firm and my own.   That was subject to discovery on Z.A.I.
17 documents prior to the hearing.

18        In addition, all of the Federal class actions were
19 placed by the MDL before Judge Patti Saris in Massachusetts.
20 That was subject to discovery on Z.A.I..

21        Mr. Sobol, of the Lieff Cabraser firm, on behalf of
22 the various plaintiffs' firms that you've seen here, Your
23 Honor, sent eight people to the Grace repository.   They tagged
24 and copied 52,000 pages of material allegedly relating to
25 Z.A.I..   When Mr. Westbrook's people showed up two weeks ago,

1  they asked for a recopying of that material and we are doing
2  that for them.

3      And so, independent of the discovery for the science
4  trial, thousands and thousands of documents have already been
5  produced over the last 15 years.  And Mr. Westbrook's firm has
6  been in the repository 14 separate occasions over the last 15
7  years.  And so this is not, and the Court ought to understand
8  this is not a race that's just beginning.

9      With respect to the documents, Your Honor, one, a
10 position might be that nobody needs any historic documents.
11 That the issue is what does science tell us about whether
12 Z.A.I. in an attic is hazardous.  It either is or it isn't.
13 There will be scientific testimony.  The various scientists
14 will testify and so one could make an argument that something
15 that happened 25 years ago, 30 years ago really doesn't answer
16 the scientific question.  It may answer a liability question,
17 possible a damage question.  But it doesn't answer the science
18 question.

19     Nonetheless, the Court ought to understand what we
20 have done and what we are providing.  And if I may give the
21 Court a summary sheet, I think it will put it in context.

22     THE COURT:  Have you seen this, Mr. Westbrook?

23     MR. WESTBROOK:  No, Your Honor.  But I don't mind him
24 handing it up, I'll look at it.

25     THE COURT:  All right.  Thank you.

1          MR. RESTIVO:   May I approach the bench?

2          THE COURT:   Yes.   Thank you.

3          MR. RESTIVO:   Your Honor, the Winthrop Square

4 document repository really grew out of property damage

5 litigation involving fireproofing material, acoustical plaster,

6 Some of which contained asbestos commercially added, some

7 versions of which did not contain asbestos, but still contained

8 vermiculite.

9          That repository has itself organized in terms of

10 copies of original documents in boxes and boxes and boxes.

11 Over the years, a number of plaintiff firms, including Mr.

12 Westbrook's firm, have had some complaints.   They're raised

13 again in these papers, we don't think they're justifiable, that

14 it is difficult to find the relevant needle in a haystack of

15 documents.

16          And so prior to bankruptcy when there was EPA

17 litigation, EPA investigations and the various class actions

18 and approximately, Your Honor, 8,000 boxes of documents that

19 had never been reviewed and never put in a repository because

20 they didn't deal with fireproofing and they didn't deal with

21 acoustical plaster or plastic, those documents needed review.

22          A decision was made, and Reed Smith was part of the

23 decision, to go through the boxes of documents to tag and to

24 burn on disk the relevant documents so that we would not face a

25 criticism that we were producing original documents and someone

1  had to go through 8,000 boxes.  And so another aspect of their

2  motion -- on the one hand they say it's hard to work through

3  the repository because there's boxes and boxes of hard copy

4  documents.  Another part of their motion says with respect to

5  this new group of documents, they want to give us information

6  on a computer disk rather than sending us to the 8,000 boxes of

7  documents.

8          In any event, what we have done, Your Honor, is we

9  have categorized those documents consistent with the subject

10 matter on subject sheet I have provided to Your Honor.  And,

11 again, this was done not only for Z.A.I. civil litigation, but

12 also because the client was obligated to provide documents for

13 administrative EPA investigations.

14          And so if the plaintiffs here want documents dealing

15 with testing of attic insulation, we were going to produce for

16 them documents on a disk which would be number 30 or number 30-

17 02 so they didn't have to look through 8,000 boxes of documents

18 as originally kept.  And so, we believe, with respect to the

19 documents not in the repository, an awful lot of work has been

20 done.  In their papers, they talk about the fees that were

21 charged for doing it.  And it is true the work has been done.

22 The work has been done to counter criticisms about the

23 repository.  And so we think this is easier for everybody and

24 because we elected to do it this way.  We didn't remove the

25 relevant needle in a box of documents from that box.  We didn't

1  segregate it.  We burned it on to a disk so people could have
2  it.

3       And, therefore, to try to go back and now tag it and
4  make sure in that box there are no other documents which would
5  be inappropriate to produce, it is really an effort that
6  shouldn't be done, doesn't need to be done and would slow down
7  this process.  We clearly are in a position to produce to them
8  the relevant documents in a simple way that avoids all the
9  criticisms they've made over the years about the document
10 repository.

11      THE COURT:  Haven't I been asked on several occasions
12 to order the debtor to produce the documents on disk if you had
13 them that way?

14      MR. RESTIVO:  Your Honor, I don't -- I can't answer
15 that because I haven't been here on all of the hearings.  But
16 in any event, the disk approach was decided by us before this
17 bankruptcy.  And so the fact that they are on disk may be
18 consistent with what the Court has said, but it wasn't done
19 because the Court said that we did it pre-bankruptcy.

20      And so, Your Honor, in terms of production and
21 format, we think that their aspects of the motion just simply
22 don't make any sense.  We are giving them the 52,000 pages
23 identified by Mr. Sobol, to the extent they don't have it.
24 They wanted to see 387 boxes of ledgers which we did not burn
25 on the disk, either because of the size that we couldn't or

1 more likely we didn't think there was any relevance. They said
2 they want to see them, we're going to let them go look at the
3 387 boxes of ledgers.

4 So, on format, we think that the approach we've
5 adopted is absolutely correct and in good faith and will move
6 things along.

7 Another issue, Your Honor, is relevance and scope and
8 there is a disagreement among the parties. As they spell out
9 in their papers, vermiculite ore is dug out of the ground in
10 Libby, Montana. It is mined and then it is milled and then it
11 is processed. And then ore concentrate after a lot of
12 procedures is shipped to various expanding plants. It is then
13 further processed and, at some point, it becomes an end
14 product.

15 One of those end products is Z.A.I. attic insulation.
16 If one uses the phraseology vermiculite, and then seeks
17 documents, one is covering everything from the mining of the
18 ore to the finished product. And we have said in our
19 objections to discovery what happened at the mine and the ore
20 and the -- all of that and what happened at the plants and the
21 disposal of waste, none of that relates to the science trial on
22 what does science tell us concerning whether Z.A.I. in an attic
23 is hazardous. And so it is true that we have objected to some
24 of the requests on the grounds of relevance and overbreadth
25 because it hasn't been limited to the finished product.

1          Everyone agrees, Your Honor, at least in the Barbanti
2   preliminary injunction hearing, their experts and our experts,
3   this material, the finished product, contains by weight one
4   one-hundred to one one-thousandth of one percent of asbestos,
5   if it's in there at all.  And so to dig out documents and
6   produce documents relating to what happened when you mine the
7   material clearly is beyond the scope of what this Court is
8   trying to determine what does science tell us about the Z.A.I.
9   in the attic.

10         And, therefore, we have not attempted to give
11  environmental documents, Libby disease documents, mining
12  documents, et cetera.

13         We do agree and have agreed with Mr. Westbrook in his
14  comment at the August 26th hearing, he does need testing
15  related to Z.A.I.  We've agreed to give him testing related to
16  Z.A.I. and there are a lot of documents related to that.  And
17  he's going to get them.

18         They've been in our repository now for two weeks, Mr.
19  Turkewitz plus three individuals, although Mr. Turkewitz left
20  after a couple of days and the individuals are there.  We
21  pointed them to 61 boxes of what traditionally and historically
22  has been called notice documents in the non-Z.A.I. litigation.
23  Obviously a significant issue for liability purposes has been
24  what did the corporation know and when did it know it.  Those
25  documents or anything remotely affecting that issue have been

1 put, years ago, in boxes and have carried the rubric notice
2 documents.

3      Clearly some of the documents in there would have
4 very little relevance, if any.  But in an attempt to, in the
5 prior litigation, segregate out what people may be looking for,
6 that's what was done.  And so it is true when Mr. Turkewitz,
7 for the 15th time in 15 years, visits -- not Mr. Turkewitz, but
8 his firm, visits the repository, he is told in terms of what
9 you may be interested in, the relevant material is probably in
10 these documents.  We're not saying these are all relevant,
11 we're not saying there's anything in there.  But certainly in
12 terms of the prior litigation, as you know, to the extent the
13 plaintiffs wanted to know what did Grace know about asbestos,
14 when did it know it, that's where it is.

15      And so it's true you have to look through material.
16 They weren't -- those documents have never been categorized
17 under our system.  They have been in that repository for years
18 and years, but we're trying to be helpful, rather than have
19 them look through every piece of paper in the repository.

20      Lastly, Your Honor, there is an argument or a
21 suggestion or an inference or a claim, it's not clear to me,
22 that what the plaintiffs would really like to have is to the
23 extent Reed Smith has had attorneys look at documents and make
24 some decisions and conclusions and mental impressions on what
25 the document says, how it can be used, whether it's helpful or

1 non-helpful, yeah, I think it would be very helpful for them to
2 have that Reed Smith work product, okay.  It would be what we
3 think about the documents.   Obviously they're not entitled to
4 that.

5          Under Rule 26(B)(3), even if they could show good
6 cause for other types of work product, the Court clearly has to
7 protect against disclosure of our mental impressions,
8 conclusions and opinions.  And so if we give them the documents
9 that are relevant organized on a disk with a particular subject
10 matter, they can reach their own conclusions.

11          I would note, Your Honor, that many of the documents
12 we have on the disk or have that can be placed on the disk will
13 be of little relevance to them.   The EPA was interested on what
14 went on at expanding plants.  And so for the EPA, if they
15 wanted to know what went on at the Rio Piedras, Puerto Rico
16 Expanding Plant, there was a code entry for that.  If they ask
17 for documents of that type, we would say that's irrelevant
18 unless something in there relates to testing.

19          And so there are a lot of categories on here which
20 they will see eliminates a whole bunch of documents they will
21 never have to look at.

22          And so, Your Honor, with respect to their proposed
23 order, they say any existing computer indices for the Boston
24 repository and for Grace's collection of vermiculite documents.
25 The subjects, and we would organize the documents, we don't

1  have a problem with that.  To the extent that term suggests,

2  Reed Smith's internal listing and work product as to what we

3  think about the documents, some of which is clearly on a

4  computer, that they aren't entitled to.

5          They want you to order us to produce an organized set

6  of what they call vermiculite documents.  And, again, what we

7  can produce that's not in the repository is an organized set of

8  documents.  We object to the term vermiculite if it goes all

9  the way back to the stuff in the ground.  And so we can give

10 them that, but we object to the language in their order because

11 it's too broad.

12         Third, they want originals of all documents

13 requested.  And we think based upon the background we've given

14 to send us back to 8,000 boxes to identify the documents we now

15 have on disk by subject matter so that they can see the hard

16 copy would absolutely be a waste of time and an expense --

17         THE COURT:  Well, have the hard copies been redacted?

18 What's on the disk, are they original documents with no

19 redactions?

20         MR. RESTIVO:  Original documents, no redactions.

21         THE COURT:  And are they all the documents?  You've

22 been talking about relevant documents.

23         MR. RESTIVO:  Relevant documents, Your Honor.  So,

24 for example, I'm told a banker's box will hold about 2,000

25 pieces of paper.  And I'm going to make this up, assume that we

1  have a box from the Rio Piedras, Puerto Rico Expanding Plant.
2  Assume further that one document in that box is someone from
3  the plant took the finished product Z.A.I. if they made it.
4  And they took it and they installed it in an attic, they did
5  some testing on it.  That's in that box along with, I'm making
6  it up, Your Honor, time sheets, reconstruction of a road on the
7  plant.  What we have done is that one document, we have burned
8  that onto a disk, or we have the ability to burn that onto a
9  disk.  It went back in the box.  We did not copy or burn on the
10 disk the other 1,999 pages because they weren't relevant to
11 anything.

12        And so it's true the original one page exists in the
13 box, but we didn't Xerox the whole box.  Didn't copy, burn the
14 whole box because you don't need it.

15        We could go back.  We could send a team of people
16 back on through looking for that one document and we could put
17 a little tab on it or we could take it out of the box so they
18 don't see all the other stuff, but I don't think it's
19 necessary.  Obviously, and Mr. Westbrook knows this, if on the
20 disk there is some particular document that looks funny, okay,
21 looks like maybe it was changed, altered, rewritten, then we'd
22 have to go back and check it and we would do that,
23 notwithstanding this motion.

24        But by and large, you don't need to go back and dig
25 out the originals because a picture of the original is on the

1  disk.

2          THE COURT:  Okay.  Then I guess the question is about
3  the determination of which documents are relevant.  It seems to
4  me that taking a look at the information that's on the disk
5  ought to be a good starting point.  If after that, you think
6  there's something missing, maybe go back to the original
7  documents.  But if there have been no redactions to the
8  documents that were copied, obviously it's somebody's judgment
9  call as to what's relevant at the outset, maybe somebody else
10 would disagree and find something more.  But I'm not sure with
11 all these documents produced whether that will be necessary if
12 this batch of documents is reviewed first.

13          MR. RESTIVO:  We believe, Your Honor, that this batch
14 of documents amounts to 500,000 images, which I understand an
15 image is a page for the non-computer literate.  And so there
16 really is an awful lot of stuff there that can be reviewed and
17 if a review of that material indicates there's some gap
18 somewhere, which I can't believe it will, then we could, you
19 know, revisit the issue.  But that's an awful lot of material.
20 I mean we -- anything that would remotely relate, you know, to
21 attic insulation is in there.  At some point, it won't surprise
22 me if Ed doesn't say to me there's a lot of stuff in there
23 that's just not terribly relevant.  Well, there is, but we were
24 over inclusive, not under inclusive.  And after someone goes
25 through that, plus the 387 ledgers, if they want to look at

1  that, plus the material already reviewed and copied by Lieff

2  Cabraser.  After all that, if it looks like there's some gap

3  somewhere or they need more, then I think that would be fair.

4  But right now, I think there is more than enough to keep all of

5  us busy.

6          THE COURT:  All right.  With respect to the scope,

7  the scope of the discovery at the moment is limited only to

8  what the science trial is going to produce.  It's not for

9  damages, it's not for liability.  I've been trying to make that

10 clear from the outset.

11         So, to the extent that there are documents that shows

12 some medical history of disease in Libby, Montana that's simply

13 a result of the vermiculite mining operation, I don't consider

14 that to be relevant.  I don't see how at this stage of the

15 trial that's going to advance anything.

16         What we need to do is get the information to your

17 expert that they're going to want in order to determine whether

18 Z.A.I. poses some unreasonable risk of harm and that's what I'm

19 trying to get to.

20         So, to the extent that it's a finished product,

21 request the debtors to produce it because to the extent that

22 there is something dealing with Z.A.I., it is to be produced.

23 But until the stuff becomes Z.A.I., it's irrelevant for a

24 science trial, it doesn't matter what it was before.  What

25 matters is what Z.A.I. and what's in the attics and how is it

1 used and what risk of harm does it pose, if any.

2          MR. RESTIVO:  Thank you, Your Honor.

3          THE COURT:  Mr. Westbrook, that's a lot of stuff the
4 debtor wants to give you.

5          MR. WESTBROOK:  That's what I'm worried about, Your
6 Honor, because sometimes the best stuff is not in the first
7 wave, so to speak.

8          Your Honor, let me back-up just a second.  And I know
9 Mr. Restivo knew that we were trying a case 13 years ago before
10 I told him before the hearing started this morning, he
11 remembered that independently.  But anyway, Your Honor -- and I
12 just was handed Mr. Restivo's document entitled W.R. Grace
13 Fall, 2001 document review.  And that indicates, at least as I
14 read it, that in November, 2001, Grace had these documents on
15 disk.  Four days after you appointed me as special counsel, I
16 served a set of document requests and asked for documents.
17 Thirty days later, they responded and they said a lot of
18 objections.

19          A week or two after that, we had a discussion.  They
20 said, well, we have some CDs.  They had said on August 26th,
21 they'll be coming on a rolling basis.  On September 11th, they
22 said, we'll start to get them in three or four weeks.  Well,
23 I'm now 60 days after I served my document request and we're
24 still hearing about the CDs, the CDs which existed in November,
25 2001.  I don't have the first CD.

1          Now, it is true we have been to Winthrop Square on a
2   number of occasions.  And as Mr. Restivo said, the reasons for
3   visiting Winthrop Square on the vast majority of times was to -
4   - were to look for the Monocoat (phonetic) document, the Nelmix
5   (phonetic) documents.

6          The reason you don't find an awful lot of vermiculite
7   documents there is because Grace didn't put the vermiculite
8   documents in Winthrop Square.  They deemed them irrelevant at
9   the time of the Monocoat litigation.  That's the reason that
10  Mr. Restivo and his firm have been out looking at eight-five
11  hundred other boxes, I believe, to pull out the vermiculite
12  documents.

13         So, the argument that we have been to Winthrop Square
14  and are slogging through Winthrop Square is just not an answer
15  as to where the vermiculite documents is.

16         What I want to focus on first, Your Honor, is our
17  request for a computer indices.  At our hearing on July 22nd, I
18  raised the issue that Grace was far ahead and it spent a
19  million dollars or so and perhaps they computerized their
20  documents, and the Court indicated, well, don't worry about
21  that, you don't need more money because you're going to get the
22  benefit of that computer index.  And that was my impression
23  going forward, at least.

24         Our document request, I think, Number 7, I asked for
25  any computer indices.  They refused to produce any saying

1    they're work produce and protected.

2              THE COURT:  Well, they can't have it both ways.  Mr.
3    Restivo, are you going to produce the computer indices or are
4    you going to go back to the original documents?  It's a simple
5    matter.  We're not going to have fights about discovery,
6    gentlemen, we're just not going to do it.  This is the one and
7    only chance, so let's get it resolved right now.

8              MR. RESTIVO:  Your Honor, I think it depends upon
9    what Mr. Westbrook means by computer indices.  The document I
10   provided to Mr. Westbrook just today, and to the Court, is an
11   index of the subject matters and codes by which we have
12   organized the documents.  If that's what he means by a computer
13   indices, yes, he has that.

14             If what he means is my work produce on my computer
15   that tells me what my people thought about a particular
16   document, that, no, we would not produce that.  He can look at
17   the document and draw his own conclusions.  But it is on a
18   computer.  And so our objection --

19             THE COURT:  This is my definition of an index.  It's
20   like a menu, folks.  Whatever it is that the debtor has, not
21   the debtors' attorneys that the debtors' attorneys created for
22   litigation purposes, but if the debtors' attorneys created it
23   for the use of the debtor in organizing documents and it's an
24   index of what's in the box, it's to be produced.

25             If the debtors' attorneys have it on their computers

1  and you're concerned about the fashion in which it's organized,
2  then refashion it to take out your own mental impressions so
3  that it is nothing more than an index.  It goes from A to Z or
4  January 1 or, you know, 1000BC to the present, I don't care
5  what fashion it's organized in.  But whatever index there is of
6  the information that's in these documents, it's to be produced.

7            MR. RESTIVO:  We can do that, Your Honor.

8            THE COURT:  How long from now?

9            MR. RESTIVO:  Twenty-one days, Your Honor.

10           THE COURT:  You'll get your index within 21 days.  If
11 you don't, I'll impose sanctions.  File a motion.

12           MR. WESTBROOK:  Yes, Your Honor.  Your Honor, having
13 heard what I have heard this morning about the original
14 situation, and I talked to Mr. Bentz on Friday afternoon when
15 they filed their opposition, we're willing to defer our request
16 to look at the originals.  It looks like it's an overwhelming
17 task, we just couldn't get to it in the context of what we're
18 trying to do.  So, if we can get a meaningful computer index so
19 we can get into these documents and start to organize them by
20 witnesses and by dates, et cetera, we're going to -- we're
21 certainly going to take a stab at that.

22           THE COURT:  I don't know whether it will be
23 meaningful or not.  Sometimes indexes are meaningful and
24 sometimes they don't do much.  Regardless of that fact, you're
25 going to get an index.

1    With respect to the original documents, before you go
2 through what the debtor has already agreed to produce on the
3 disks and the other documents that you've seen, I really don't
4 see the need to go into those originals.  If you need a
5 particular document that didn't scan properly or something,
6 that's a different issue.  But to go back through all those
7 originals and have the debtor recreate it, I just don't see the
8 need for that right now.

9    So, that request, you can defer it until later, if
10 you'd like, or I'll simply deny it without prejudice.  I think
11 you're going to have enough to go through at the outset.

12    MR. WESTBROOK:  It sounds like once we start to get
13 these, we will have a lot to go through, Your Honor.

14    With respect to the scope, Your Honor, and I want to
15 be clear so we understand what we're all talking about here.
16 If we are going to be permitted at the outset as the first cut
17 to get the expanded vermiculite documents, I think we can get
18 started on those.  But I tried to make the point in our memo to
19 the Court that Z.A.I. is simply a commercial name that Grace
20 gave to expand the vermiculate that it poured into a Zonolite
21 attic insulation bag, the same expanded vermiculite was poured
22 into a masonry fill bag.

23    THE COURT:  Maybe.  But it doesn't -- but the product
24 that we're trying is attic insulation, not masonry products.
25 We're trying Z.A.I. attic insulation, as I understood it.

1       MR. WESTBROOK:  Yes, Your Honor.  But my point is
2  that the same expanded vermiculite, if there were tests done on
3  fiber release during pouring of the expanded vermiculite.  The
4  fact that it was poured into a different bag, it's the same
5  product.

6       We're looking for the expanded vermiculite
7  information.  Some of it may be relevant, some of it may not be
8  relevant.  But we think we need to get that so that we can do
9  our work.  For instance, we provided the Court with a document
10  which shows that the exact same size of vermiculite was used
11  for two or three Grace commercial products.  So, we certainly
12  don't want the cut to be, well, we have a document that shows
13  when you disturb masonry fill insulation, you get this fiber
14  level.  It's the same product that was in an attic insulation
15  bag, but we're not going to produce that because we called that
16  masonry fill.  We think that would be a far too narrow scope of
17  discovery, Your Honor.

18       THE COURT:  We're not trying whether or not masonry
19  fill, when used in a construction product, poses an
20  unreasonable risk of harm.  We're trying whether attic
21  insulation used primarily in homes, although not exclusively,
22  posses an unreasonable risk of harm.  Whether the release
23  content absent that Z.A.I. or the other product is produced and
24  used is the same or not, I don't know, I don't care.  I'm not
25  trying the masonry side, I'm only trying the attic insulation

1  side.  So, to the extent that somebody is going to buy a

2  product that's called masonry something and uses it for attic

3  fill, they have a different problem than one that we can

4  address at the science trial here.

5          MR. WESTBROOK:  Let me go at it this way, Your Honor,

6  perhaps.  Science does not care whether Grace called it Z.A.I.

7  or expanded vermiculate and you get fiber release, and you get

8  fiber levels that have been measured and reported in Grace

9  documents, for instance, we believe that's relevant and may

10 lead to admissible evidence as to the level of fibers you can

11 get when you expand -- when you disturb, for instance, Libby

12 Number 2 expanded vermiculite, which was attic fill.  Simply

13 because you call it a Ford and he calls it a Chevy, if it's the

14 same car, the evidence is relevant, in our view, and we think

15 we're entitled to have the expanded vermiculite information,

16 not going back to Libby now.  I understand what the Court has

17 said about that.  We're talking about when you get through the

18 expansion process and we have the expanded product.  That's

19 what we're seeking.

20         THE COURT:  I don't know how we'd ever identify homes

21 in which some person or any kind of building in which somebody

22 bought something in a bag called masonry fill and used it for

23 attic insulation and expect to have some comparability of

24 evidence.  This is not about trying to notify at some point

25 people who may have used masonry fill of some unreasonable risk

1  of harm.  It's about trying to decide whether there is such a
2  harm in preparation for looking at some notification to these
3  folks that have the insulation that they may have a claim
4  against this estate.  That's what this is preparatory towards.

5          So, I don't see how it's relevant whether stuff in a
6  masonry fill bag has the same asbestos weight or release
7  potential or not.  Because even if it does, it isn't the
8  product that's at issue.

9          MR. WESTBROOK:  And I think, Your Honor, that's where
10 we may have a difference of opinion because the product -- and
11 I'm talking -- for instance, let's say Grace, in its
12 laboratory, tested Libby Number 2 vermiculite by putting it on
13 a surface, disturbing it and getting fiber release.  That, in
14 our view, is attic fill.  That is the product attic fill.
15 Whether Grace calls it Libby Number 2 or product X or whatever
16 they called it, we think we're entitled to that information.

17         THE COURT:  No, wait, Mr. Westbrook, this whole thing
18 started because the Asbestos or Property Damage Committee had
19 pictures that they wanted to go into the notice process of what
20 Zonolite bags looked like.  I wasn't asked to address anything
21 about masonry fill bags or any other attic insulation produced
22 by Grace, only Zonolite, that's it.  And there were pictures of
23 the bags, and there were pictures of the product and there were
24 pictures of what the product would look like if it had been in
25 the attic for a while and covered with dust, that's all I was

1 asked for.

2          Now, how is it that I'm going to now somehow or
3 another open up this whole scope to other products?  This is a
4 very limited and narrow scope trial.  It's to address whether
5 Zonolite, because the class actions that I've been asked to
6 certify relate to Zonolite insulation.  So, what's the
7 relevance to anything else?

8          I mean your experts are going to have Zonolite.
9 They'll test it.  They're decide whether, in their view, it
10 does or doesn't pose some unreasonable risk of harm and they'll
11 tell me about it.

12          MR. WESTBROOK:  I think that's right, Your Honor.  Of
13 course, these other products are Zonolite.  My point is that
14 part --

15          THE COURT:  Well, no, are they Zonolite?

16          MR. WESTBROOK:  Yes, Your Honor.

17          THE COURT:  Well, then why aren't they sold as
18 Zonolite?

19          MR. WESTBROOK:  They were.  Zonolite was the name of
20 the company Grace took over in the early '60's and they put the
21 name Zonolite on all these products.

22          THE COURT:  Okay.  If they're Zonolite products used
23 for attic insulation, then you're entitled to discovery.

24          MR. WESTBROOK:  If they were expanded vermiculite,
25 which is the same product that went into attic insulation,

1  that's what I'm trying to get at.

2          THE COURT:  It's not the product it goes into.  It is
3  the finished product that's in question.  It doesn't matter
4  what that vermiculite -- what danger level the vermiculite has
5  in its nature state or in some work in process state.  It
6  matters about the finish product, doesn't it?  That's what I'm
7  trying.

8          MR. WESTBROOK:  And I'm talking about the finished
9  product as the expanded vermiculite, Your Honor.  And sometimes
10  they took the finished product and they poured it into an attic
11  insulation bag.  They took the same product and they called it
12  something else.  But I'm saying the danger of that product and
13  testing they did back in the laboratory on that same product is
14  information we should have in discovery.  You may not admit it
15  in the trial, but I think we should have it in discovery so we
16  can do our investigation and do the job that you have asked me
17  to do.

18          THE COURT:  Okay.  How is it -- because I'm still
19  missing the link.  If it's calculated to lead to discoverable
20  and admissible -- to admissible evidence, then you're entitled
21  to get it.  But how is it likely to lead to admissible
22  evidence?  Because if the tests were done on something that's
23  put into an attic insulation bag, you're going to get those
24  tests.

25          If the product isn't put into an attic insulation

1 bag, I'm not hearing it.   Because all I'm doing is a trial
2 about attic insulation.

3          MR. WESTBROOK:   I guess what I'm talking about, Your
4 Honor, is testing, say, done in the Grace laboratory.   And
5 let's use Libby Number 2.

6          THE COURT:   Okay.

7          MR. WESTBROOK:   The standard vermiculite because that
8 is -- when into a lot of attic insulation.   If that testing is
9 done by Grace simply to determine can expanded vermiculite
10 Libby 2 release fibers on disturbance, hasn't gotten in any bag
11 yet, they're working on the expanded vermiculite in the lab, we
12 think we're entitled to have that.

13          THE COURT:   That may be relevant to a liability issue
14 as to what the debtor knew and when.   But how is relevant to
15 whether once that product is bagged and purchased by somebody
16 and put into an attic, it constitutes an unreasonable risk of
17 harm?

18          MR. WESTBROOK:   For instance, Your Honor, I would say
19 for instance that if Grace sampled the product, put it on a
20 surface in the lab and disturbed it and they got fiber release,
21 then they take the same product and put it into a bag and then
22 the product is sold, that there is a potential inference that
23 you'll get the same type of fiber release when you disturb the
24 same product that was on the floor here, put into a bag and put
25 on someone else's floor.

1          THE COURT:  Well, let me -- without making a finding,
2  just accept that conclusion for purposes of the next statement.
3  It doesn't matter at that point in time what the level of
4  disturbance was anyway.  What matters, I think, is whether
5  there are claims against this estate now and what happened in
6  the intervening 80 years or 60 years since this stuff has been
7  used in people's home and to date, maybe one person who lives
8  in Libby has recovered a judgment and nobody else has.

9          I mean I'm still having some difficulty seeing how
10 that's going to advance at this trial.  I'll hear from the
11 other side, maybe there is something I'm missing.  I understand
12 the request for similarity and test on similarity of product,
13 it may be relevant, I may let you get it, but I want to hear
14 from the others.

15         MR. WESTBROOK:  Okay, Your Honor.  And I understand
16 the CDs are coming.  Could we have some idea, Your Honor, as to
17 when these documents will come?  I understand the index may
18 take a few weeks to get going, but we had some indefiniteness
19 about when these CDs are going to arrive.  So, we can get
20 geared up and we'll have to --

21         THE COURT:  All right.

22         MR. WESTBROOK:  -- obviously talk to someone on their
23 side about how you access them and what programs they're using,
24 et cetera.

25         THE COURT:  Yeah.

1          MR. WESTBROOK:   I don't know if they're prepared to
2   do that now or whether we'll just have to --

3          THE COURT:   Mr. Restivo, on the CD?   Oh, are you
4   finished?

5          MR. RESTIVO:   Are you finished?

6          MR. WESTBROOK:   No, I have a few --

7          THE COURT:   All right.

8          MR. WESTBROOK:   Related item, Your Honor, is the
9   privileged log.   We've asked for a privileged log, Grace says
10  it has no problem providing that.   We'd like to know when we're
11  going to get that because the Court will not be surprised that
12  sometimes we find some interesting documents on a privilege
13  log.   I think Grace, over the history of the litigation, has
14  had to either, under Court compulsion or after a re-review de-
15  privileged about eight boxes of documents in Winthrop.   So, we
16  think there may be some in there we'd like to look at.

17         THE COURT:   You're entitled to it.

18         MR. WESTBROOK:   So, a privilege log --  Your Honor,
19  we have also asked for Grace to give us information on the
20  personal injury claims relating to expanded vermiculite now,
21  not back at the mind, but expanded vermiculite and the claims
22  that it has resolved.   Grace has refused to produce those.   We
23  think that if we get those -- information on those claims, it
24  may lead us to the plaintiff's attorneys and to the claims and
25  we can find out have these been claims involved in homes, have

1 they been claims of disease, what types of disease.   What
2 product was it.

3        THE COURT:   That's not what we're trying.  We are
4 trying a very simple thing.  At some point in time, if there is
5 a determination that there is an unreasonable risk of harm,
6 they're undoubtedly entitled to that.  But right now, I've made
7 the offer for anybody who wants to join in this trial, either
8 as a member of the Committee portion of the trial or
9 independently who wants to make a claim.  Nobody else has come
10 forward, that's expanding well beyond what you need right now.

11        MR. WESTBROOK:  Your Honor, we had thought that one
12 of the things we would need to at least look into to address
13 the issue of whether there can be a potential hazard from
14 Zonolite is whether it has caused more disease in expanded
15 form.

16        THE COURT:   How are you going to determine that from
17 the claims register that the debtor has that hasn't involved
18 Zonolite?

19        MR. WESTBROOK:  No, we just ask only for expanded
20 vermiculite personal injury claims, Your Honor, not the claims
21 register.  We asked -- and they can separate out that claims
22 have been made against them, I understand, for expanded
23 vermiculite.

24        THE COURT:   All right.

25        MR. WESTBROOK:  Next, Your Honor, we have asked for

1 settle dust testing, re-entrainment testing on asbestos fiber
2 measurements.  Now, maybe this is coming in the new document
3 review, so we may not have a particular problem with those if
4 they show up.

5          THE COURT:  Do you want to defer that one until you
6 see what you get?

7          MR. WESTBROOK:  Your Honor, I think that would
8 probably be best to do that.

9          One other item, Your Honor, we have asked for is the
10 documents produced by Grace.  You've heard about Maryland
11 Casualty in a different context.  Grace and Maryland Casualty
12 had some coverage litigation for property damage and we have
13 asked them for their documents produced to Maryland Casualty,
14 including the pleadings, that relate to Z.A.I., and they've
15 refused to produce that information.

16          THE COURT:  Aren't they on a public record?

17          MR. WESTBROOK:  No, they sealed the record, Your
18 Honor.

19          THE COURT:  Well, then how are we going to get it if
20 the record's sealed?

21          MR. WESTBROOK:  Well, Your Honor, I think -- that
22 Grace can certainly make an application to the Court that
23 sealed the record we're in the Bankruptcy Court here, I think
24 that there can be some process by which those documents are not
25 locked away forever.  They were sealed presumably because Grace

1  didn't want to bring additional litigation or claimants on

2  itself.  It's now in the protection of the Bankruptcy Court, it

3  will take care of everything in this situation.  I don't think

4  there's a compelling reason to continue to seal that.

5         In addition, we'd be willing to take the documents

6  under seal to see what Grace was saying about Z.A.I. to its

7  insurer when it was trying to get coverage for the claims.  We

8  think that could be very relevant.

9         THE COURT:  All right.

10        MR. WESTBROOK:  Your Honor, I believe that covers the

11  issues for right now pending my friend Mr. Restivo --

12        THE COURT:  All right.

13        MR. WESTBROOK:  -- having his comments.

14        MR. RESTIVO:  I will try to take them quickly in

15  order, Your Honor.  With respect to the CDs, what Mr. Bentz

16  told Mr. Westbrook is true.  We will be in a position to

17  provide CDs.  I did not mean to suggest, and I don't think we

18  ever suggested to Mr. Westbrook that in this process, the CDs

19  were actually cut.  If I did suggest that, I didn't mean that.

20  The whole process was designed to be able to do that.  I don't

21  know if we told Mr. Westbrook -- originally, pre-bankruptcy, a

22  company called Lason was the organization that was doing this.

23  Lason's bankruptcy preceded Grace's bankrupt by about two

24  months, three months.  Post bankruptcy, we went to a new

25  service provider.

1          And so in order to get what we looked at back in
2   Lason plus now, yes, they need to be burned onto CDs.  We did
3   not burn a CD as we saw a document.  We're going to do it.  And
4   we told Mr. Westbrook we would be able to begin providing CDs
5   in --

6          MR. BENTZ:  Two weeks.

7          MR. RESTIVO:  -- two weeks.  We don't have -- we
8   don't have -- it's not as if we all have CDs in our office
9   because of Lason's bankruptcy, we didn't have it.  And I
10  thought he understood that.

11         Privilege log, we said we --

12         THE COURT:  You're going to start this rolling
13  process --

14         MR. RESTIVO:  Yes.

15         THE COURT:  -- in two weeks.

16         MR. RESTIVO:  All right.  Privilege log, we said we
17  would provide them.  He is entitled to them.  We will do that.

18         THE COURT:  When?

19         MR. BENTZ:  It could be probably weeks to get that in
20  the position where we have a good sense --

21         MR. RESTIVO:  Again, Your Honor, you need to
22  appreciate that there's two universes of documents.  With
23  respect to anything privileged from the document repository, I
24  suspect he has that.  We can produce that again because that
25  repository and those privilege logs have been produced.

1        The new material we'll take from the 8,000 boxes, we
2   will prepare a privilege log, but we haven't prepared it yet,
3   and that will take a little bit more time.

4        MR. WESTBROOK:  Your Honor, the old privilege log, we
5   do have and don't need that.  I was speaking about the
6   privilege log for the documents they're intending to hold out
7   as vermiculite.

8        THE COURT:  All right.  How long is the roll out on
9   the CDs going to take?  If you start in two weeks, how long is
10  the process going to take?

11       MR. BENTZ:  I would think, Your Honor, that with
12  respect to the -- almost of the Zonolite attic insulation
13  documents, that that could be wrapped up in a few weeks after
14  we start.  There is, I think a minority, maybe 20 percent of
15  the documents that still have to -- may be subject to some
16  further review or may take a little bit longer than that.

17       THE COURT:  So you expect that between two and six
18  weeks from now you will be producing everything, all the
19  documents in the new CD?

20       MR. BENTZ:  I think six weeks is a little bit
21  aggressive, but I think it's a fair estimate.

22       MR. RESTIVO:  They should certainly have 80 percent
23  in six weeks.  We're still looking at some of the 20 percent
24  that we haven't looked at yet.

25       MR. BENTZ:  That's correct.

1          THE COURT:  All right.  Hold on one second then.  So,

2 approximately 80 percent of the documents will be produced

3 between two and six weeks from now.  And the other 20 percent,

4 two weeks after that?

5          MR. RESTIVO:  Yes, Your Honor.  And if we run into a

6 problem with that two weeks, we'll tell Mr. Westbrook and if he

7 has a problem, we'll come to the Court.  But I think two is a

8 fair estimate --

9          THE COURT:  All right.

10          MR. RESTIVO:  -- and we ought to be able to do it.

11          THE COURT:  So, can the privilege logs be produced

12 eight weeks from now when the final installment on the CDs is

13 due?

14          MR. BENTZ:  That would not be a problem.

15          THE COURT:  Mr. Westbrook?

16          MR. WESTBROOK:  Yes, Your Honor.  What I'm hearing is

17 we won't see the last of the documents until Thanksgiving.

18 Then our fact discovery ends 30 days after.

19          THE COURT:  Well, I understand that, and we may end

20 up with this schedule and the debtor can't do any better,

21 having to postpone it a little, I -- I really don't want to

22 drag it on too long, but that may be what we have to do.

23          Why don't we address that issue at the status

24 conference.  Let me give you a date by which all of this

25 production could be done because I want to address it on the

1  November 25th status conference.  So, --

2                     (Pause)

3          THE COURT:  Is it possible to produce the privilege

4  logs on a rolling basis as you're doing the CDs by box?

5          MR. RESTIVO:  Well, I think, Your Honor, we could

6  produce privilege logs on a rolling basis as we prepare them.

7  I don't know they'll be on a box-by-box basis or subject-by-

8  subject basis, but there's no reason we would not be in a

9  position to produce the privilege logs.  We don't have to wait

10 until the end, and we can do that, I would think.

11         MR. BENTZ:  I think that's correct.  If there are

12 technical issues and that's the reason I hesitate, it may be

13 easier or harder, depending upon what the technical people tell

14 me.

15         THE COURT:  All right.  Why don't I expect that the

16 privilege logs will be produced on a rolling basis in that same

17 two- to eight-week process.  But everything, all the documents,

18 the CDs, the privilege log, everything that I'm ordering to be

19 produced has to be produced not later than Monday, November the

20 18th, that's a week before the November status conference.  So,

21 if that's not quite eight weeks from now, bump your schedule

22 back and make it work.  But everything is due not later than

23 Monday, November 18th.

24         MR. RESTIVO:  Next, Your Honor, you keep referring to

25 and, to some extent, I keep referring to Zonolite attic

1  insulation.  Mr. Westbrook carefully keeps referring to
2  expanded vermiculite.  The two things are different.  What
3  we're talking about at the science trial is Zonolite attic
4  insulation.  It's true that in some of the process before it
5  goes into the bag, it gets expanded.  But the use of the term
6  expanded vermiculite is one carefully considered.  What we're
7  talking about is Z.A.I.  The products are not the same, yes,
8  there may be some similarities, but they are different
9  products, they go through different processes.  They are
10 utilized differently.

11        And what the science trial deals with is not whether
12 masonry fill inside a concrete block that may have been
13 expanded at some point in its processing has anything to do
14 with the presence of attic fill in a person's attic.

15        THE COURT:  Well, what he's suggesting, though, is
16 that to the extent that the test -- to the extent that at some
17 point the expanded vermiculite is the same product that then
18 gets shifted two different directions.  That the tests that are
19 done before that shift is made may show some fiber release.
20 And to the extent that that fiber release is then relevant to
21 the end product, it ought to be disclosed.

22        If there are different processes put in place from
23 the point where that expanded product, you know, turns right or
24 tuns left.  At that point, turning left is irrelevant to Z.A.I.
25 if it turns right.  But as to the point at which they are all

1    the same, before that split is made, if there are tests that
2    show a relief, it may have some relevance to the experts who
3    are going to be looking at the end product.  I think that's
4    what Mr. Westbrook suggested.

5              MR. RESTIVO:  And I guess our response to that, Your
6    Honor, and our objection to what he's saying is if there, in
7    fact, was finished product and he is correct that some of it
8    goes into a bag called Z.A.I. and some of the same product goes
9    into a bag called masonry fill, and prior to going into the two
10   separate bags there was a test on that product, yes, we would
11   give him that.  I don't think that's what the import of what
12   he's saying is.  I think he wants to go back in time on other
13   products.

14             But we will commit that if that situation, in fact,
15   existed, which we don't believe existed, yes, we would give him
16   the testing even though half the product went into a bag
17   different than Z.A.I. because it would be the same product.

18             To the extent that happened, I don't believe it did
19   happen, we'll give him testing on that.

20             THE COURT:  All right.  You'll get that test, Mr.
21   Westbrook.  Is that -- so, if it's the same product regardless
22   of how it's bag, you're going to get the test.

23             MR. WESTBROOK:  Thank you.

24             THE COURT:  That's what you're asking for.

25             MR. WESTBROOK:  That's what I was asking for.

1           THE COURT:  All right.

2           MR. RESTIVO:  Lastly, Your Honor, with respect to
3  documentation in Maryland Casualty coverage litigation, again,
4  the issue here is what does science say about Z.A.I.  Any
5  pleadings or other argument there doesn't answer the scientific
6  question.

7           We have said in our answers to interrogatories if
8  some document you have requested also happened to be produced
9  in the Maryland Casualty, we're going to give it to you because
10  you requested it here, not because it was produced in Maryland
11  Casualty.  By the same token, while there may be a protective
12  order in Maryland Casualty, to the extent a Grace corporate
13  document is relevant just because it was protected over there
14  doesn't mean we shouldn't give it to Mr. Westbrook here and
15  we're going to do that.

16           What we do object to is producing the pleadings and
17  whatever else went on in that case that my firm wasn't involved
18  with because it has no relevance to the question of the science
19  phase Z.A.I. in someone's attic is creating a hazard.

20           THE COURT:  Well, I don't know whether it does or
21  not.  Because to the extent that there were tests done on
22  Z.A.I.'s products that were somehow or other disclosed in that
23  case or to the extent that the debtor had witnesses testify or
24  affidavits to explain those products, that may very well lead
25  to admissible evidence in this case.

1          MR. RESTIVO:  Again --

2          THE COURT:  Now, to the extent that there was no such

3 similarity, it won't.

4          MR. RESTIVO:  Well, Your Honor, again to the extent

5 there are documents that exist on Z.A.I. testing, we've already

6 said we're going to produce that to Mr. Westbrook and we

7 wouldn't withhold the production because it was also something

8 produced in Maryland Casualty.  I will ask the debtor or ask

9 the debtor to ask coverage counsel if in that litigation there

10 was testing created for the litigation or testimony or

11 expertise on testing of Z.A.I.  If there were, I'm sure we're

12 producing it otherwise, but we'll be happy to check to make

13 sure.  And if that requires, I can't see how it would, someone

14 to ask the Court to lift the seal, we would take the laboring

15 oar to do that.  But the idea of lifting the seal and then

16 everything that happened in complicated coverage litigation has

17 some relevance to this case, that we object to.

18          THE COURT:  How is coverage litigation over?  Is it

19 over based on attic insulation?  Is it over the mine?  What was

20 it about?

21          MR. RESTIVO:  Your Honor, the most I can tell you,

22 because we weren't involved, certainly back in the days of

23 litigation against asbestos companies such as W.R. Grace, the

24 two Gypsums, a few others, dealing with fireproofing material

25 and dealing with acoustical plaster, I do know that some of

1  those companies, including Grace, had to litigate with their
2  insurance carriers over responsibility for those property
3  damage lawsuits.  I simply don't know, I doubt, but I don't
4  know that attic insulation was a subject matter that I don't
5  believe attic insulation shows up on anyone's radar screen
6  until the Barbanti and similar cases are filed about one year
7  prior to the Grace bankruptcy.  But I will ask and find out.

8           But my sense is if it's like all the other property
9  damage insurance coverage litigation, what it dealt with was
10 fireproofing, maybe pipe insulation.  Grace didn't have that.
11 Or acoustical products.

12          THE COURT:  All right.  If it's in no way involved
13 attic insulation, frankly I don't see how it's relevant.  If it
14 does, however, I think it needs to be produced.

15          MR. RESTIVO:  We will find out and I will send a
16 letter to Mr. Westbrook as to what we found out and then he can
17 take it from there and come back to the Court if he thinks
18 there's some relevance and we disagree with him.

19          THE COURT:  All right, Mr. Westbrook?

20          MR. WESTBROOK:  Yes, Your Honor, that's fine.

21          THE COURT:  All right.

22          MR. RESTIVO:  I think that covered his list of items,
23 I think.

24          MR. WESTBROOK:  I think it did, Your Honor.  I'm
25 waiting the computer index to see what we have.

1          THE COURT:  I want to check one --

2                      (Pause)

3          THE COURT:  Okay.  The computer indices, did I give

4  you a date for --

5          MR. RESTIVO:  Yes, we said that we would -- Reed

6  Smith would produce the non-privileged material indices or

7  index or road map into the categories within three weeks, I

8  thought.

9          THE COURT:  Yes.  Okay.  Will the debtor be producing

10 an order that will memorialize this record?

11         MR. RESTIVO:  Yes, Your Honor.

12         THE COURT:  Is that necessary or you just simply want

13 the record to stand for what the record is?

14         MR. WESTBROOK:  We can go by the transcript, Your

15 Honor.

16         THE COURT:  All right.

17         MR. RESTIVO:  So can we, Your Honor.

18         THE COURT:  All right, that's fine.  And I'll simply

19 state that these are all findings and agreements.  And no

20 written order will follow.

21         Do you need this calendared again of some reason, Mr.

22 Westbrook?  Or if you need something else, will you simply let

23 me know what?  Because I'm concerned that if I just continue

24 this, it's going to be so confusing that you will have gotten

25 stuff in the meantime and it may be better just to do it again.

1          MR. WESTBROOK:  Your Honor, I'm confident we can work

2     with Mr. Restivo, we're going to try our best to work this out

3     and not be here every month with some kind of a dispute.  I

4     hope I don't have to eat my words on that, but I'm hopeful we

5     can try to work these things out.

6          THE COURT:  All right.  So, no further order or

7     hearing is necessary on existing Agenda Item Number 50.  If you

8     need something else, you'll let me know?

9          MR. WESTBROOK:  Yes, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          MR. RESTIVO:  Thank you, Your Honor.

12          MS. BAER:  Your Honor, that concludes what's on the

13     agenda, but there are a few outstanding matters.  The most

14     significant of which is the infamous July 22nd order on Z.A.I.

15     scheduling.

16          THE COURT:  Yes.  And this one is my fault and I

17     apologize for this but I have gotten the transcript, I've

18     looked at all the orders that have been submitted, I've had my

19     law clerk draft our own, and I haven't entered it yet because I

20     haven't had the chance to double-check since she has redrafted

21     this order.

22          Have you come to any conclusion about what this order

23     should say?  We simply could not find what I had signed in

24     court and I'm trying to recreate what I had signed in the court

25     with the addition, of course, of permitting anybody who wants

1 | to raise issue to do so.

2 |     MS. BAER: Your Honor, I thought it was pretty clear

3 | having been here on July 22nd that you had entered the debtors'

4 | version of the order. And it seemed to me there are only two

5 | real issues, one of which didn't come up that day and one which

6 | did, and that is how do you define the science trial.

7 |     And Mr. Westbrook's now given you, I think, three

8 | different ways to define it. The debtors consistent said the

9 | same thing over and over, which is, you know, what does science

10 | demonstrate regarding the health risks of exposure to Z.A.I.

11 |     Mr. Westbrook keeps trying to put property damage in

12 | there and we all understand these are property damage claims,

13 | not personal injury claims. But Z.A.I. doesn't harm property.

14 | The potential exposure of potential dangerous fibers could harm

15 | people and, therefore, cause a property damage, cause a hazard

16 | in their home that has to be dealt with.

17 |     The definitions Mr. Westbrook uses just simply don't

18 | make any sense. We know these are property damage claims. But

19 | the question is does Z.A.I. pose an unreasonable risk of harm

20 | in someone's attic. And I think that's what we've said in our

21 | order.

22 |     The other issue that Mr. Westbrook raised, which he

23 | did not raise in July, was is this confined to the ten

24 | claimants you have before you or is it expanded beyond that.

25 | And, again, I think the order that we submitted was clear. It

1 simply said the claims litigation was defined to the ten
2 claimants.  So, we know who we're deciding for.  It doesn't --

3        THE COURT:  Yes, that one I addressed early because I
4 gave everybody a chance to join.  I don't want people joining
5 at the end of discovery and saying, oh, gee, I haven't had a
6 chance to participate.

7        So, as far as I'm concerned, at this point, we're
8 going forward with the ten named people.  Their discovery is
9 only getting off the ground.  If somebody filed a motion and
10 asked to join it, now I'd probably grant it.  But next month, I
11 won't.

12        So, you know, there's a timing issue here.  And if
13 somebody else wants in, they'd better get in now.  I'm not
14 going to continue the trial based on the fact that somebody
15 decides at the last minute that they want in.  I've given as
16 much notice as I can.  Judge Wolin said I did what was
17 appropriate, he didn't see any need for me to do any more.  So,
18 I think I've covered the basics.

19        MS. BAER:  Your Honor, I think those were the two
20 issues that were raised, and I guess we'll look forward to
21 getting the Court's version of the order then.

22        THE COURT:  Okay.  Mr. Westbrook?

23        MR. WESTBROOK:  Your Honor, my only point is when we
24 went back and look at this -- at the transcript of August 26th
25 at page 62 after we had this colloquy again, the Court said at

1  Line 22, "Well, hopefully I did it myself within the context of
2  the hearing.   If I didn't," talking about the issues, "then
3  I'll take a look at that.   I was trying very hard not to set
4  the parameter for what the issues would be until the discovery
5  is done.   I think the appropriate place to look at that is at
6  the pretrial conference."

7           THE COURT:   Right.   And I still agree with that.

8           MR. WESTBROOK:   Yes, Your Honor.   And so when we
9  submitted our latest proposed order, we tried to be entirely
10 innocuous and neutral and said discovery, which we're talking
11 about now, for the science trial shall be limited to the issues
12 of what science demonstrates regarding Z.A.I. in the property
13 damage context.   That was as neutral and innocuous as I could
14 think to phrase it.

15          MS. BAER:   And, Your Honor, it doesn't make any
16 sense.

17          THE COURT:   Well, you have to have an issue.   I mean
18 you have to have an issue about harm.   It's not what science
19 demonstrates, the question is whether it poses an unreasonable
20 risk of harm because -- I mean science may demonstrate a lot of
21 things about Z.A.I., none of which may lead to claim in this
22 case.   And what I'm trying to get to is what are the claims
23 against this estate and who has them and how do we notify those
24 folks.   That's what I'm attempting to accomplish and that's why
25 we're taking this science trial first so that we can craft an

1   appropriate notice if there is some likelihood that an entity
2   or a person may have a claim against the estate.

3           So, I have to have an area in dispute.  It's not just
4   the demonstration.  And the question is what's the risk of harm
5   that's posed.  And I think the question is whether it's
6   unreasonable because I guess life in general poses its own
7   risks of harm, but that doesn't give you claim.  So, I need to
8   define the claim somehow.

9           MR. WESTBROOK:  And, Your Honor, my concern has been
10  -- and, of course, as Your Honor knows, I got into this a
11  little late after this had been discussed.  But my concern has
12  been, from my experience in this litigation, that when we get
13  down to defining the issues for trial, that I not be foreclosed
14  from presenting to the Court our position on how a property
15  damage claims should be proven up, that's my only concern.

16          THE COURT:  Oh, no.  In fact, that's -- I mean -- in
17  terms of proving up the property damage claim, I don't know
18  that this is the time for proving the claim.  The question is
19  whether or not there is going to be a claim because science
20  would show that, in fact, somebody out there may have a claim.
21  Then how you prove it at a later stage may be a different
22  issue.  But the answer is no, you're not foreclosed from trying
23  to prove your claim however you want to prove your claim.

24          But in terms of defining the issue, I think -- I'd
25  like to try to come to some consensus.  I do need an issue.

1   MR. WESTBROOK:  Your Honor, as neutral as we could
2 probably make it, since we're in the property damage context,
3 we're trying to find out what science will tell us about Z.A.I.
4 in that context.

5   And, again, I come back to the fact that Grace
6 continues to try to push the case to a quasi personal injury
7 claim.  And in our view, most respectfully, Your Honor, that's
8 not what the case is about in the property damage context.
9 I've tried for 20 years property damage cases and the issue is
10 the building, is the building contaminated.  Contaminated, yes,
11 with a hazardous material.  But we don't have to show in our
12 view that there's going to be some percentage of people getting
13 sick from it, that there's some particular emergency hazard to
14 evacuate the building.  That's why I've been somewhat
15 persistent and hopefully not nauseating about this, Your Honor,
16 that we not get foreclosed at the outset from proving and from
17 getting to the pretrial conference to present the issues as we
18 want them presented.

19   THE COURT:  Well, I think you both are probably
20 correct.  Number one,  yes, you're going to have to show me
21 that there is some hazardous contamination.  Now, what makes it
22 hazardous?  The fact is that it's going to either be hazardous
23 to the environment or to the people who live in the home or
24 something.  There has to be a hazard.  If there is no hazard,
25 there is no claim.

1    And as I understood what has taken place, not by way
2 of evidence, just by discussion here, the contention is that
3 attic insulation is hazardous because if it's disturbed, people
4 breathe it, and when they breathe it, there is a likelihood
5 that they could ingest an asbestos fiber which could cause a
6 disease.   Not that it's hazardous just because it's sitting in
7 an attic, but because somebody is going to be eventually
8 injured by virtue of the fact that it's in their home.

9    So, the contamination may have to be remediated
10 somehow in order to eliminate that hazard.   But you have to, I
11 think, show me that there is a way that there is going to be
12 asbestos fibers that are somehow going to pose a hazard to
13 somebody or else it's not going to be hazard.   Right?

14    MR. WESTBROOK:   I hear what you're saying, Your
15 Honor.   I think we will be able to show that asbestos fibers
16 are certainly hazardous.

17    My suggestion, Your Honor, is you say we reach a
18 consensus on this.   We're moving ahead with discovery.   I don't
19 think the debate over the phrasing of this paragraph is holding
20 up the discovery.   So, we have our position reserved, Grace has
21 its position reserved.   The Court's language will be the
22 Court's language.   It won't stop us from moving ahead
23 obviously.

24    MS. BAER:   Your Honor, I agree.   And I think you've
25 heard more than enough on this one and we look forward to

1  receiving your order.

2       THE COURT:  All right.  Okay.  I have -- I'm sorry.
3  Were you finished?

4       MS. BAER:  There was one other housekeeping matter,
5  Your Honor.  On July 22nd, at matter arose related to an action
6  filed by English and American Insurance Company for some
7  discovery.  Your Honor decided that because there was an action
8  going forward in England, you would deny their motion without
9  prejudice and let the English courts do what they can do.

10       We submitted a certification of counsel on August 6th
11  when it was brought to my attention by English and American's
12  lawyers that the order was actually never entered.

13       THE COURT:  I'm not getting your certifications of
14  counsel, that's part of the problem.  And I'm not sure why.
15  Are they being e-mailed to Ms. Bello so that we know to check
16  them?  Because I have not -- I haven't seen that one even today
17  and I thought I was up to speed --

18       MS. BAER:  Your Honor --

19       THE COURT:  -- today with what hasn't been entered.

20       MS. BAER:  I know that it was filed in the e-mail
21  system and it appeared on the Court's docket that way.  That's
22  how we know it's been filed, we get the e-mail notification
23  from the Court.  I don't quite know what happens next.  I mean
24  I do have more copies with me, it's Docket Number 2500 on the
25  docket.

1        THE COURT:  Could I see it, please?

2        MS. BAER:  If I can approach?

3        THE COURT:  Yes.

4        FEMALE SPEAKER:  Judge, may I interrupt?  Once you --
5 though you get e-mail notification once you file a docket, you
6 still have to attach it to a separate e-mail directed to Rachel
7 Bello by name.  The fact that it gets filed does not send it to
8 Rachel.

9        THE COURT:  Some things are getting docketed that
10 we're not finding out about even though we do a docket search.
11 I mean that's what's confusing me.  I'm not sure why we're not
12 finding things on the docket, but I also know that I'm -- the
13 double-check is that if they're e-mailed to Rachel, then she
14 notifies us and we pull it.  So, she's apparently not getting
15 it either and that's why I'm confused about why I'm missing so
16 many orders.

17        FEMALE SPEAKER:  Send an e-mail to Rachel.  Docketing
18 it does not go to Rachel.

19        MS. BAER:  Your Honor, we'll work with Delaware
20 counsel to make sure we can fix this so that it doesn't keep
21 happening.

22        THE COURT:  Okay.  Yes, I have not seen this order so
23 I'm certain I haven't entered it.

24        MS. BAER:  And this is by agreement, Your Honor.
25 EAIC's counsel saw it and we agreed on the language.

1          THE COURT:  All right.  Well, I'm changing the date

2    to be today, September 23rd, and I am signing it now so I'll

3    make a note.

4          Ms. Baer, check the docket in about two days.  If

5    this hasn't been docketed, call my office in Pittsburgh and let

6    me know so that I can double-check.  I really am a little

7    concerned about what happened the last time where an order is

8    missing and I don't want this to get missing.

9          MS. BAER:  Your Honor, I wonder if it would make

10   sense before we leave to get a Xerox copy of your signed one so

11   that --

12         THE COURT:  Sure.  Do you have another one?  I'll

13   sign another.

14         MS. BAER:  I do.  I do.

15         THE COURT:  I'll give you one.

16                         (Pause)

17         THE COURT:  Here you are.

18         MS. BAER:  Thank you.  Your Honor, that concludes all

19   the items on my agenda, plus the few things in addition.

20         THE COURT:  Okay.  I have a couple -- does anybody

21   else, before I start on my list, have any additional

22   housekeeping matters to address.

23                 (No audible response heard)

24         THE COURT:  Okay.  Give me one second.  I have a note

25   to myself about one that I want to cover first.

1                          (Pause)

2          THE COURT:  Oh, yes.  Okay.  First of all, I am still

3    occasionally not getting full captions on documents.  In fact,

4    I have an example of one here that Mr. Tacconelli brought over.

5    This is another order I haven't seen, so I don't -- I have to

6    check back to my July proceeding memo before I know whether

7    this is what I wanted ordered.  But it has no docket number

8    reference, it has no agenda order reference.  It's an order

9    that deals with the motion of the asbestos property damage

10   claimants for a clarification of the counsel of record issue

11   that we talked about in court.

12          Now, I, of course, recall talking about it.  But

13   whether this meets what I said I was going to do by way of an

14   order, I don't know.  And there is absolutely no reference on

15   this proposed order that would clue me in to where I should be

16   searching for this.  There is a caption, it does say order

17   addressing, et cetera, et cetera, but it doesn't have a docket

18   number reference and I've been insistent that I'm not going to

19   deal with these things unless I get all these pieces.  It's

20   simply too complicated to do.

21          MR. TACCONELLI:  Your Honor, Theodore Tacconelli for

22   the Property Damage Committee.

23          Your Honor, I apologize.  We will put a docket

24   reference on that to the motion.  It was filed under a

25   certification of counsel that had it.  It was attached to that,

1  but the order does not have it.

2        THE COURT:  See, now I didn't get that certification

3  either.  So, apparently -- maybe the problem is the

4  certification of counsel.  Because it's happening in one of the

5  other asbestos cases here, too, where I'm missing

6  certifications.  So, maybe that's the problem.  I'll have to

7  double-check and see.  But I haven't seen that either, Mr.

8  Tacconelli.  So, I'll search for it.

9        MR. TACCONELLI:  Your Honor, we will revise that

10 order to reference --

11       THE COURT:  It's fine, I have it, I've got the

12 proceeding memo, I'm going to take care of it as soon as

13 court's done today.  So, I don't need another copy, I don't

14 want to further confuse things.  But in the future, please put

15 a docket number reference.

16       MR. TACCONELLI:  Your Honor, while I'm up here,

17 there's also another order that we've been waiting to have

18 entered, that's the order approving the retention of Hillsoft

19 (phonetic) notifications.

20       THE COURT:  Now, that one I have to go back to, too.

21 Because that hearing was months ago and I thought we had a

22 discussion on the record, but I haven't checked my notes and

23 I'm not sure my memory is that good, but I thought we had a

24 discussion about the fact that I was concerned about

25 duplication of services.  And I thought that I was denying the

1  request.  Your proposed order says that I simply said that I'd
2  make sure that I was going to review the fee for no duplication
3  of services.

4          MR. TACCONELLI:  You may be confusing that with some
5  other processionals employed by our Committee, Your Honor.

6          THE COURT:  Okay.

7          MR. TACCONELLI:  I don't think there ever was a
8  discussion about Hillsoft.

9          THE COURT:  Okay.  Then I'll check back through my
10 notes.  And, again, I didn't get that certification of counsel
11 either, Mr. Tacconelli, but I do have that order and after
12 court I will check the proceeding memo about that one, as well.
13 But, again, please put a docket number reference for me.

14         MR. TACCONELLI:  Very well, Your Honor.

15         THE COURT:  Okay.

16         MS. BAER:  Were there other items, Your Honor?

17         THE COURT:  Oh, yes.  I haven't seen a business plan
18 yet in this case.  And I have extended exclusivity until
19 February, but I'm looking for some sort of a business plan that
20 tells me what the debtor is planning to do, not by way of a
21 reorganization plan.

22         I've approved the compensation for key professionals.
23 I still haven't seen a business plan.  When am I going to get
24 to see a business plan?

25         MS. BAER:  Your Honor, I could certainly talk with my

1  clients about it right -- it isn't something we routinely do
2  for a Bankruptcy Court, so I'm sure it hasn't been teed up as
3  one of those to do things we have to do.

4        In terms of the business plan, Your Honor, a little
5  clarification on exactly what you're looking for.

6        THE COURT:  Well, I thought Ms. Bernick (phonetic)
7  indicated that this debtor is essentially on a rolling basis
8  where it's analyzing its core businesses, looking at its
9  employee compensation and doing the other things that you tend
10 to do when you're running a business.  I'd like to see what the
11 debtors plan is for the next couple of years and how it intends
12 to carry on its core operations or if it's ridding any.  I
13 simply don't know what the debtors' expectation is.  It appears
14 that this case is going to be around for a while until you get
15 through the litigation.  I'd like to see whether there's a
16 chance that it's actually going to have a fundamental business
17 operation to reorganize.

18       And the case is now old enough that by now, I would
19 think the debtor and the various constituents are probably
20 talking about that issue.  So, I'd like to see what the
21 debtors' expectation is.  I don't necessarily expect that it's
22 going to be shared among the Committee.  I certainly don't want
23 it filed on the public record, I'm not trying to cause the
24 debtor anti competitive problems by any means, but I want to
25 know what the debtors' expectation is for its business over the

1  next couple of years.

2        MS. BAER:  Your Honor, I'm sure that the debtor

3  internally prepares those all the time and we'll speak with

4  them about what there is and what is appropriate to submit and

5  how to do so.

6        THE COURT:  Okay.  Can you just put that on the

7  agenda for the next hearing so that as a status conference

8  matter, if you haven't filed something in the meantime.

9        MS. BAER:  And, Your Honor, when you say file

10  something, what you really would propose is to submit something

11  to Your Honor.

12        THE COURT:  Yeah, either in chambers or under seal.

13  I don't -- however you choose to do it.  But I would like to

14  see -- the monthly financial reports, the operating reports in

15  these cases are Greek.  I want to see what the debtor is really

16  doing, and a nice simple profit and loss statement and balance

17  sheet, for example, would go a long way towards helping.  And I

18  know the debtor does them because --

19        MS. BAER:  It has to.

20        THE COURT:  -- you've got all your filings that

21  you've got to --

22        MS. BAER:  Right.

23        THE COURT:  Right.  So, if I could even get something

24  like that with a -- maybe a projection for what the debtor

25  expects the business to do differently in the next year or so,

1 that would be fine.  But I'd like some basic information, not
2 the mountains of documents because I don't have either the time
3 or the inclination to have to search through them regularly.

4            MS. BAER:  We'll do so, Your Honor.

5            THE COURT:  Okay.  The other thing is pick the dates
6 for next year so that you can get the notices out with respect
7 to hearings.  So, if you'll let me catch up my notes one second
8 and then we'll turn to that.

9                         (Pause)

10           THE COURT:  Okay.  Does Grace have any Board meetings
11 on Monday at all next year?

12           MS. BAER:  No.

13           THE COURT:  No.  Okay.  These are the dates that I'm
14 going to be here.  January 27th, February 24th, March 17th,
15 April 28th, May 19th, I'll be here the week of June 16.  My
16 expectation is that that week we will probably do Grace
17 hearings on Tuesday afternoon, June 17th, unless that causes a
18 problem for you.

19           MS. BAER:  Not that we're aware of.

20           THE COURT:  No, all right.  Then let's say that one
21 will be Tuesday the 17th at noon, rather than Monday.

22           July 28th, August 25, September 22, October 22,
23 November 17.

24           Then my Delaware date for December will be December
25 15th, but I believe I'm going to be doing those hearings in

1  Pittsburgh that day.  So, we'll have to discuss whether you

2  want to come there or try to do them by phone or what, but I

3  think I'm going to have a conflict such that I can't come here

4  that day and I may have to do them in Pittsburgh.  So, at the

5  moment, I'm planning to have Grace in Pittsburgh on December

6  15.

7          MS. BAER:  That's fine, Your Honor.

8          THE COURT:  Okay.  Anybody need them repeated?

9          MS. BAER:  No, Your Honor.  And as I understand,

10  those will all be at noon?

11          THE COURT:  That's what I'd like to do.  Now, I'd

12  like to put this issue back on the calendar for next month

13  unless you have to do notices in the meantime.  Because I want

14  to talk to the Kaiser and Owens folks and I just got another

15  asbestos case that's going to take some omnibus dates and I'm

16  trying to sort of put together like a jigsaw puzzle somehow and

17  figure out which cases fit best in what time slots.

18          This has been taking about two hours.  Is that your

19  expectation for how long we're going to continue?  Or will

20  there be periods where it's going to be a lot longer, or do you

21  know?

22          MS. BAER:  Your Honor, I haven't seen anything that

23  would suggest it's going to be any different.  In fact, I know

24  that, for example, this coming October, right now there's not

25  much on the agenda, so that may even be shorter.

1        November sounds like it could be a long one because
2   we have potential -- several fee things, Z.A.I. coming up
3   again.  But there's nothing extraordinary that would suggest it
4   would be any different.

5        THE COURT:  Okay.  If that's the case, I think noon
6   would work pretty well for my schedule, if that doesn't cause a
7   problem for you.  So, let's plan that.

8        How far in advance are you noticing hearing dates?
9        MS. BAER:  Your Honor, we sent out your schedule back
10  -- I think last February for the whole year, which was very
11  helpful because we also keyed into there when people have to
12  file motions and --

13       THE COURT:  Yes.

14       MS. BAER:  -- objections.  So, I would anticipate we
15  could do the same thing here again, send out a whole schedule
16  for the year soon that gives people that planning.

17       THE COURT:  Are any of you going to be here tomorrow
18  for the Owens hearing?  Because I have Kaiser later today and
19  Owens tomorrow, and by the time I get through Kaiser and Owens,
20  I could confirm the time.

21       MS. BAER:  No, Your Honor, we're not going to be
22  here.  But if Ms. Bello would contact our Delaware counsel, we
23  could then adjust and get out a schedule, or we can get out a
24  schedule after the October hearing.

25       THE COURT:  Okay.  I wondered whether that was going

1  to give you sufficient time for people who might have to file
2  motions for January.

3          MS. BAER:  For January, I have -- I think we're still
4  okay, but it's starting to get tight.

5          THE COURT:  Okay.

6          MR. HURFORD:  Your Honor, either myself or someone
7  from my office will be here.

8          MS. SCARUZZI:  Identify yourself.

9          MR. HURFORD:  I'm sorry.  Mark Hurford of Campbell
10 and Levine.  Either myself or someone else from my office will
11 be here tomorrow at Owens Corning.

12         THE COURT:  Oh, okay.  So, then we could, through the
13 Asbestos Committee, get the word out to the debtor about the
14 time at that point, and I can also ask Ms. Bello to confirm it,
15 as well.

16         Okay.  Is there any conflict if this doesn't work?
17 If my grand scheme fails, is there any conflict in terms of
18 starting either earlier or later on the dates that I've just
19 given you?

20         MS. BAER:  Your Honor, I don't think later is too
21 much of a problem.  Earlier may be a problem because I know,
22 for example, that the trade committee people sometimes come up
23 first thing in the morning.  We usually come in the night
24 before, usually there's a lot to do before the hearing.

25         MS. KRIEGER:  Your Honor, if we take the eight

1    o'clock train in, we're here for the ten o'clock hearing.

2    Arlene Krieger from Stroock and Stroock and Lavan.

3                THE COURT:  Okay.  All right.  I'll keep that in mind

4    when I'm doing this.  As I said, at the moment, I'm expecting

5    that noon will work, but I really just don't know until I talk

6    with the other folks and I'd like to try to make it as

7    convenient as possible for everybody who has to get here.

8                MS. BAER:  I think just, Your Honor, at the end of

9    the day, the last flight out may be seven P.M., so that's -- if

10   we don't start until four o'clock, we might have a problem.

11               THE COURT:  Well, I think that the last ones I'm

12   going to try to start will be at three because I have that same

13   problem of getting out, too.  And as a result, I don't like to

14   try to schedule something that's going to last longer.  Most of

15   the time, though, when I start at three, we're done five-ish.

16   Occasionally it runs over, and sometimes it's very late and

17   it's -- I can't really predict that.  I probably have to rely

18   on you to let me know that there is going to be a problem on a

19   given day so that maybe we can let everybody else know either

20   the flights have to be changed or, you know, that something is

21   likely not to go as normal on that day.

22               MS. BAER:  I would say if there was a preference,

23   Your Honor, earlier versus later is probably better for all of

24   us.

25               THE COURT:  All right.

1          MS. BAER:  We do tend to come in the night before
2  anyway.

3          THE COURT:  Okay.  Well, earlier probably will be
4  8:30.  That's probably -- I'll check.

5          MS. BAER:  Okay.  From the debtors' perspective,
6  that's fine.

7          MS. KRIEGER:  Again, I'm going to be spending a lot
8  of time in Delaware.

9          UNIDENTIFIED ATTORNEY:  Your Honor, that six o'clock
10  flight from Pittsburgh is just tremendous.

11                         (Laughter)

12          MR. RESTIVO:  You can't make that six o'clock flight
13  and be here at 8:30, I've tried it.  They cancel it too often,
14  Mr. Restivo.

15          THE COURT:  Yes?

16          MR. WESTBROOK:  Your Honor, I was just going to say
17  those of us from south of the Mason Dixon Line would appreciate
18  that noon hearing, we wouldn't have to spend the night, save us
19  a couple of dollars.

20          THE COURT:  Yeah, see that's -- I think that's going
21  to be the problem with everyone in the cases, that's the issue
22  that I'm facing.  And the ten o'clock hearings have worked
23  pretty well with only three of you.  But now that I've got a
24  fourth case that I'm trying to stick in, I think it's not.  I
25  just have to juggle it a little better and I think I have to --

1  so, somebody's going to suffer, it's early in the day and

2  somebody's going to suffer later in the day, and I was trying

3  to give you the accommodations since you were first in -- so,

4  okay, I'll let you know tomorrow for sure.  But it will

5  probably be noon.

6          Anything else that we need -- anybody needs to

7  address?

8                    (No audible response heard)

9          THE COURT:  Okay.  Thank you, we're adjourned.

10          MULTIPLE SPEAKERS:  Thank you, Your Honor.

11                    (CONCLUSION 12:21 P.M.)

12                    C E R T I F I C A T I O N

13

14          I, Karen Hartmann, certify that the foregoing is a

15  correct transcript to the best of my ability, from the

16  electronic sound recording of the proceedings in the above-

17  entitled matter.

18

19  _____          Date:   September 28, 2002

20  TRANSCRIPTS PLUS

21

22

23

24

25