# EXHIBIT 5

12/17/01  11:16 FAX 312 861 2200       KIRKLAND & ELLIS                          ☒002

UNITED STATES DISTRICT COURT   FILED
DISTRICT OF MASSACHUSETTS CLERK'S OFFICE

APR 2  9 53 AM '01



Newell K. Woodward and
Winifred W. Woodward,

    Plaintiffs

vs.

SEALED AIR CORPORATION (US);
NATIONAL MEDICAL CARE, INC.;
FRESENIUS A.G.; FRESENIUS
MEDICAL CARE, A.G.; FRESENIUS
U.S.A., INC.'s and FRESENIUS
NATIONAL MEDICAL CARE, INC.,
a/k/a FRESENIUS MEDICAL CARE
HOLDINGS, INC.,

    Defendants

NO. 01 10547 PBS

COPY

**CLASS ACTION COMPLAINT FOR
INJUNCTIVE RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and a class of similarly situated people, bring

this action against Sealed Air Corporation (US) National Medical Care, Inc.; Fresenius A.G.;

Fresenius U.S.A., Inc.; Fresenius Medical Care, Inc.; Fresenius National Medical Care, Inc.

Plaintiffs allege the following factual and legal allegations upon information and belief.

Paragraphs pertaining to Plaintiffs' own actions, however, are alleged upon personal knowledge.

## I. INTRODUCTION AND OVERVIEW

1.    This is a national class action asserting claims of fraudulent conveyance in

violation of the Uniform Fraudulent Transfer Act (adopted by M.G.L. c. 109A, §2) and the

common law of fraudulent conveyance; denuding, depletion and dissipation of assets; conspiracy

to denude, deplete and dissipate assets; and common law conspiracy with respect to corporate restructuring transactions involving Defendants and W.R. Grace & Co., Inc. and related entities designed to purposefully and illegally shelter certain assets from asbestos-related liability. This national class action also asserts claims of strict product liability; negligence; and deceit, fraudulent concealment and fraud by nondisclosure with respect to the danger posed by the asbestos contained in Zonolite Attic Insulation products installed in residences of Plaintiffs and other Class members.

2.      W.R. Grace & Co., Inc. and its predecessors and certain subsidiaries ("Grace") mined vermiculite ore and manufactured consumer goods that were sold throughout Massachusetts and the United States, including Zonolite Attic Insulation. Grace did so knowing that this product contained dangerous levels of readily loftable tremolite and other forms of asbestos (hereinafter "asbestos"). Grace concealed the dangerous character of Zonolite Attic Insulation from consumers, public officials, and the general public.

3.      Plaintiffs represent a Class of tens of thousands of people with unsatisfied product liability or property damage claims against Grace and its affiliates based upon exposure to asbestos contained in Zonolite Attic Insulation installed in plaintiffs' homes. As successor corporations to Grace, Defendants are liable for the amount of Plaintiffs' claims.

4.      Many of the proposed plaintiff Class of owners and occupiers of real property throughout the United States remain unaware of substantial dangers to themselves and their properties posed by the presence of Zonolite Attic Insulation in their homes. Others Class members may be newly-aware of the presence of dangerous asbestos contained in Zonolite Attic Insulation, but lack an understanding as to how to properly and safely remediate the problem. As

2

a whole, Class members remain unaware of important safeguards necessary to forestall continued, future exposure to hazardous levels of asbestos contained in Zonolite Attic Insulation. Class members are also unaware that in order to protect themselves from the hazards of Zonolite Attic Insulation, they must restrict their use and enjoyment of their real property, while implementing appropriate operations and maintenance practices to protect the health and safety of themselves and the general public.

   5.  Grace manufactured and sold several brand names of asbestos-containing products, including but not limited to Zonolite Attic Insulation. Those products have been responsible for severe personal injuries and tens of thousands of deaths nationwide. As a result, Grace is now a defendant in over 40,000 lawsuits filed by individuals and survivors of individuals exposed to its asbestos products.

   6.  Facing mounting potential liability related to its manufacture, distribution, and sale of asbestos-containing products such as Zonolite Attic Insulation, Grace entered into a complex series of transactions, in September of 1996 and again in March of 1998, with the intention and effect of insulating valuable assets from potential judgment creditors by fraudulently transferring and conveying such assets to Defendants as herein alleged.

   7.  In September of 1996, Grace Specialty Chemicals, Inc. spun off its packaging and specialty chemicals businesses - - and its asbestos liabilities to the Class - - but first stripped away and segregated out its medical care company. The spun-off company was called W.R. Grace & Co., and the medical care business was merged with and into a German company, Fresenius Medical Care A.G.. The series of transactions rendered Grace insolvent and unable to pay its debts as they matured, and as such, constituted a fraudulent transfer and

3

412 301 2200                                                                                      ☒005

conveyance.

8.       In March of 1998, Grace perpetrated a similarly structured fraudulent transfer and conveyance. This time, Grace spun off its specialty chemicals businesses - - and its asbestos liabilities to the Class - - but first stripped away and segregated its packaging business. This transaction consisted of Grace merging its Cryovac packaging business (with sales of $1.83 billion in 1997) with Sealed Air Corporation in a transaction valued at over $6 billion. This transaction resulted in Grace shareholders owning approximately 63% of Sealed Air Corp. This series of transactions further rendered Grace insolvent and unable to pay its debts as they matured, and as such, constituted a fraudulent transfer and conveyance.

9.       Plaintiffs seek preliminary and final injunctive relief, equitable relief including disgorgement of ill-gotten gains or in the alternative a constructive trust, and a judicial declaration that Defendants to which Grace fraudulently transferred assets are responsible for the asbestos liabilities of Grace. Plaintiffs also seek judgment against all defendants for fraudulently transferring valuable assets of Grace to themselves and to other entities, and for fraudulently manipulating the corporate form in order to deprive Plaintiffs and the Class of their proper remedies. Plaintiffs seek compensatory and punitive damages, in order to advance public health and safety and to compensate property owners for harm suffered.

## II. PARTIES

10.       Plaintiffs, Newell K. Woodward and Winifred W. Woodward, are residents of Hobe Sound, Florida, and are owners of real property in which Zonolite Attic Insulation has been installed located in Florida. Newell K. Woodward and Winifred W. Woodward are prepared to serve as representative of the Class proposed herein.

4

11.    Sealed Air Corporation ("Sealed Air") is a Delaware Corporation that is located at Park 80 East, Saddle Brook, New Jersey. At all times relevant to the facts alleged in this complaint, Sealed Air Corporation, or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) were engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation. Defendant Sealed Air Corporation is a successor corporation that is liable for the actions of predecessor corporations and that was created in an attempt to fraudulently shield the assets of those predecessors corporations.

12.    Defendant National Medical Care, Inc., is a New York corporation with its corporate headquarters located at 1610 Trapelo Road, Waltham, Massachusetts. At all times relevant to the facts alleged in this complaint, National Medical Care, Inc., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) were engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation. Defendant National Medical Care, Inc. is a successor corporation that is liable for the actions of predecessor corporations and that was created in an attempt to fraudulently shield the assets of those predecessors corporations.

13.    Defendant Fresenius A.G. is a foreign corporation with its corporate headquarters located at Bordenberg 14, 61440 Oberursel, Germany. At all times relevant to the facts alleged in this complaint, Fresenius A.G., or its predecessors in interest (including but not

5

limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) were engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation. Defendant Fresenius A.G. is a successor corporation that is liable for the actions of predecessor corporations and that was created in an attempt to fraudulently shield the assets of those predecessors corporations.

14.    Defendant Fresenius U.S.A., Inc. is a Delaware corporation with its corporate headquarters located at 2637 Shadelands Dr., Walnut Creek, California 94598. At all times relevant to the facts alleged in this complaint, Fresenius U.S.A., Inc., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) were engaged in the business of mining vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation. Defendant Fresenius U.S.A., Inc. is a successor corporation that is liable for the actions of predecessor corporations and that was created in an attempt to fraudulently shield the assets of those predecessors corporations.

15.    Defendant Fresenius Medical Care, A.G. is a German Corporation with its principal place of business at Gluckensteinweg 5, 61343 Bad Homburg, Germany. At all times relevant to the facts alleged in this complaint, Fresenius Medical Care, A.G., or its predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation; W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.; Montana Vermiculite Company; and Zonolite Company) were engaged in the business of mining

6

vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation.
Defendant Fresenius Medical Care A.G. is a successor corporation that is liable for the actions of
predecessor corporations and that was created in an attempt to fraudulently shield the assets of
those predecessors corporations.

16.     Defendant Fresenius National Medical Care, Inc. a/k/a Fresenius Medical
Care Holdings, Inc., is the name of the reorganized entity created through the fraudulent
conveyances described herein; a New York Corporation headquarters in Massachusetts.  At all
times relevant to the facts alleged in this complaint, Fresenius National Medical Care, Inc., or its
predecessors in interest (including but not limited to W.R. Grace & Co., a Delaware Corporation;
W.R. Grace & Co.- Conn; W.R. Grace & Co., a New York Corporation; Grace Holding, Inc.;
Montana Vermiculite Company; and Zonolite Company) were engaged in the business of mining
vermiculite ore and manufacturing, marketing, distributing and selling Zonolite Attic Insulation.
Defendant Fresenius National Medical Care, Inc. is a successor corporation that is liable for the
actions of predecessor corporations and that was created in an attempt to fraudulently shield the
assets of those predecessors corporations.

### III.  JURISDICTION AND VENUE

17.     This Court has subject matter Jurisdiction over this civil action pursuant to
28 U.S.C. 1332.  The amount in controversy, that is the amount necessary to effectuate the
claims for injunctive, equitable and monetary relief, exclusive of interest and costs, exceeds
$75,000.

18.     This Court has personal jurisdiction over each of the parties.

19.     Venue in this matter is proper in this Court because a significant part of

7

the conduct at issue occurred in the Commonwealth of Massachusetts. Significantly, Grace's Construction Products Division ("CPD") had overall responsibility for the manufacture and marketing of Zonolite Attic Insulation and was headquartered in Cambridge, Massachusetts. The managers at various Grace vermiculite expanding plants throughout the country reported to personnel in the Cambridge headquarters. Furthermore, the marketing, advertising, and promotional materials for Zonolite Attic Insulation were developed and prepared at the Cambridge headquarters and were distributed to dealers and other members of the distribution network for the product from that location. Finally, CPD personnel in Cambridge were partially or wholly responsible for decisions with respect to whether or not to warn purchasers of Zonolite Attic Insulation or the public about the asbestos content of the product and the attendant health risks; those personnel also were partially or wholly responsible for decisions regarding the labeling of Zonolite Attic Insulation product.

## IV. FACTS

20.     Grace and other predecessor corporations of Defendants named herein were manufacturers, distributors, and sellers of Zonolite Attic Insulation.

21.     Zonolite Attic Insulation is chiefly composed of expanded vermiculite ore.

22.     The predominant source of vermiculite ore used by Grace in the production of Zonolite Attic Insulation was a vermiculite mine owned by Grace and located on Zonolite Mountain near Libby, Montana.

23.     Grace transported vermiculite ore from Zonolite Mountain to expansion plants throughout the United States for purposes of manufacturing the finished insulation product, sold under the product name Zonolite Attic Insulation.

8

KIRKLAND & ELLIS                                    ☑010

24.     Zonolite Attic Insulation manufactured, distributed, and sold by Grace and the aforementioned predecessor corporations was purchased and installed in attics of thousands of homes, businesses, and other properties located throughout the State of Massachusetts and the United States.

25.     Plaintiffs are owners of real property in which Zonolite Attic Insulation manufactured and sold by Grace and the aforementioned predecessor corporations was installed.

26.     Zonolite Attic Insulation manufactured by Grace and the predecessor corporations from Libby vermiculite ore is contaminated with asbestos, including tremolite, a rare and exceedingly deadly form of asbestos.

27.     Zonolite Attic Insulation is a loose-fill type of insulation. Asbestos contained in Zonolite Attic Insulation takes the form of microscopic dust that is readily suspended, resuspended, and lofted into the air upon the slightest disturbance of Zonolite Attic Insulation. Once suspended, asbestos fibers maintain their fog-like airborne status for extended periods of time, are readily transported by natural air currents, and represent a continuing source of exposure danger.

28.     Tremolite asbestos itself consists of sharp, microscopic needle-like fibers that are readily inhaled and easily pierce and lodge in the lining of the lungs. The lungs are unable to remove tremolite asbestos that penetrates lung tissue, and fibers are not washed out of lung tissue by blood. As a result, the assaulted lung areas become inflamed, in time heavily scarred, and ultimately fail to function. For persons inflicted with this slow and lingering disease process, it becomes increasingly difficult to breathe. Ultimately, the person suffocates.

29.     Asbestos is a virtually indestructible substance. Asbestos is a known

9

☑011

human carcinogen. Inhalation of asbestos fibers, either through chronic exposure or one-time heavy exposure, can lead to mesothelioma (diffuse cancer which spreads over the lung lining surface), lung cancer, asbestosis, and other pulmonary diseases that are progressive and often fatal. There is no known safe level of exposure to asbestos.

30.    Disturbance of Zonolite Attic Insulation exposes individuals to heavy doses of airborne asbestos sufficient to cause mesothelioma, lung cancer, asbestosis, and other serious pulmonary diseases.

31.    At all times material to allegations made in this Complaint, Defendants and/or their predecessor corporations had actual knowledge that Zonolite Attic Insulation manufactured from Libby, Montana, vermiculite was dangerously contaminated with tremolite asbestos.

32.    At all times material to allegations made in this Complaint, Defendants and/or their predecessor corporations had actual knowledge that exposure to Zonolite Attic Insulation in the ordinary use of that product exposed users to dangerous levels of asbestos dust.

33.    Zonolite Attic Insulation manufactured by Defendants or their predecessor corporations has caused asbestos contamination to real property in which that product has been installed.

34.    Individuals engaged in ordinary activities commonly associated with property ownership disturb Zonolite Attic Insulation, lofting dangerous levels of asbestos into the air they breathe. Such activities include use of attic spaces for storage of personal belongings, home maintenance activities that involve accessing attic space, home remodeling, installation or replacement of electrical fixtures, upgrading or replacement of attic insulation, and use of attic

spaces by children for play.

35.    Asbestos dust contaminated in Zonolite Attic Insulation can readily migrate from attic spaces into living spaces in homes, constituting a present threat to persons occupying those homes. As such, individuals engaged in the ordinary use and enjoyment of their real property in which Zonolite Attic Insulation is installed are exposed to levels of asbestos threatening to their health and safety.

36.    Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are often unaware that Zonolite Attic Insulation is even present within their home. Further, persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that Zonolite Attic Insulation contains dangerous levels of asbestos and are unaware of the health risks associated with asbestos.

37.    Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that disturbing of Zonolite Attic Insulation exposes individuals to dangerous levels of asbestos. Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that Zonolite Attic Insulation has contaminated their real property. Persons who own and/or reside in homes insulated with Zonolite Attic Insulation are unaware that prudence requires limitation of activities so as to avoid exposure to asbestos dust contained in Zonolite Attic Insulation.

38.    While consumers remain essentially unaware of the substantial dangers posed by Zonolite Attic Insulation, Defendants and/or their predecessor corporations were aware of such dangers and engaged in an intentional pattern and practice of concealing the dangers associated with Zonolite Attic Insulation.

11

39.    From approximately 1930 until 1963, Zonolite Company operated the vermiculite mining and processing plant on Zonolite Mountain. Grace acquired the Libby vermiculite mine from Zonolite Company in 1963. Grace had actual knowledge at the time of its purchase that the vermiculite ore mined from Zonolite Mountain and used to manufacture Zonolite Attic Insulation was heavily contaminated with tremolite asbestos. Grace was aware of reliable estimates that ore originating from Zonolite Mountain regularly contained in excess of 20% asbestos.

40.    At all times material to facts alleged in this Complaint, Defendants and their predecessor corporations had actual knowledge that asbestos was extraordinarily dangerous and that exposure to even minuscule levels of asbestos causes potentially fatal diseases, including asbestosis, lung cancer, and mesothelioma.

41.    Grace was aware of secret medical tests by Zonolite Company that demonstrated that a substantial portion of Zonolite Company's workforce had contracted lung diseases as a result of exposure to the asbestos contained in the vermiculite used to manufacture Zonolite Attic Insulation. These included the July 20, 1959 report to Raymond Bleich, and August 25, 1964 report to Joseph Kelley, a January 29, 1965 report from Dr. Spicer, and a December 23, 1969 in-house study showing lung disease in 92% of long-term workers.

42.    In the 1970's, Grace conducted internal tests confirming high incidents of lung disease among workers exposed to vermiculite used in the manufacture of Zonolite Attic Insulation, including an in-house study reported in a May 24, 1977 memorandum showing these workers' risk of cancer was "five times the national average."

43.    Despite actual knowledge of the health risks associated with Zonolite Attic

12

Insulation, Defendants and/or their predecessor corporations continued to aggressively

manufacture, promote, distribute, and sell Zonolite Attic Insulation, while concealing and/or

failing to disclose the substantial risks of disease associated with asbestos exposure.

      44.     Defendants and/or their predecessor corporations conducted secret animal

tests that demonstrated an association between tremolite asbestos and mesothelioma, including

Dr. W. Smith's biological testing (final report May 25, 1978). Despite those findings confirmed

by its own tests, Grace publicly denied the existence of a relationship between tremolite asbestos

exposure and mesothelioma, including in a letter dated May 8, 1979 to county health officer Dr.

Richard Irons.

      45.     Despite knowledge of the unreasonable risks to human health, Defendants

or their predecessor corporations intentionally chose to not warn the public of health risks

associated with Zonolite Attic Insulation, including the advised decision "not to affix labels" on

attic insulation products (May 24, 1977). This decision to conceal from the public such health

risks was predicated on a calculation of the financial reward to Defendants or their predecessors

corporations should the public be kept uninformed. Written analysis of the financial

consequences include a May 24, 1977 "Zonolite Profitability Impact" projecting a "10-50%

reduction in sales volume that would result from a requirement to label our products as

containing asbestos."

      46.     Until Grace withdrew Zonolite Attic Insulation from the market in 1984,

Defendants and/or their predecessor corporations affirmatively and actively engaged in steps to

conceal the toxicity and dangers of Zonolite Attic Insulation from the public and from

government agencies charged with police powers to protect public health and safety.

47.    In the 1970s, state and federal officials cited various plants belonging to
Grace for excessive asbestos exposures levels, including those summarized in the September 21,
1971 memo to R.M. Coquillette. Defendants and/or their predecessor corporations did not
normally consider controls to abate these levels "until a citation issued" and only then would
each plant be addressed "singly as they are forced to comply."

48.    Defendants and/or their predecessors corporations, falsely and/or
misleadingly represented to government officials that Zonolite Attic Insulation had been treated
with a binder (a substance that would prevent deadly tremolite fibers from being released into the
air) while, in fact, no such binder had been successfully developed or applied to Defendants'
Zonolite Attic Insulation product.

49.    Defendants and/or their predecessor corporations failed to test adequately
or properly the use of a binder in preventing hazardous exposure to asbestos.

50.    Although Defendants and/or their predecessor corporations publicly
represented that Zonolite Attic Insulation posed no health hazard, internal Grace memoranda,
including a May 24, 1977 memo from Wood to Brooks and Graf, demonstrate that Grace knew
that Zonolite Attic Insulation posed an unreasonable risk to human health with exposure
"concentrations upward of 15 f/ml," and that Grace anticipated that Zonolite Attic Insulation
would "eventually be banned" by government agencies.

51.    As early as 1977, Grace drafted a press release, stating that it was
"sufficiently concerned about the entire issue of asbestos and associated health hazards to
discontinue this product (Zonolite Attic Insulation)." Despite actual knowledge by Defendants
and/or their predecessor corporations that Zonolite Attic Insulation posed a substantial hazard to

14

the consuming public, they determined to withhold this important press release, to conceal the health hazards associated with Zonolite Attic Insulation, and to continue to aggressively sell Zonolite Attic Insulation for an additional seven years.

52.    Defendants and/or their predecessor corporations had superior knowledge, as compared with the consuming public and government enforcement agencies, with respect to the health dangers posed by Zonolite Attic Insulation, but concealed their knowledge of the health dangers associated with their product because they believed that asbestos contained in Zonolite Attic Insulation would remain undetected.

53.    As a proximate result of the conduct of the Defendants and/or their predecessor corporations, there is a present, compelling, and immediate need to provide appropriate warnings to the public of the health dangers associated with Zonolite Attic Insulation. Necessary warnings include:

a).    Warning that Zonolite Attic Insulation contains tremolite, an especially dangerous form of asbestos, and that persons should avoid exposure to Zonolite Attic Insulation;

b).    Warning that disturbing Zonolite Attic Insulation exposes individuals to hazardous levels of asbestos;

c).    Warning that persons should not enter or use attic spaces in properties believed to contain Zonolite Attic Insulation, together with advisories on how to identify Zonolite Attic Insulation;

d).    Warning that tests should be conducted on properties where Zonolite Attic Insulation has been disturbed and that disturbance poses a threat that asbestos may

15

12/11/01  11:20 FAX 312 861 2200     KIRKLAND & ELLIS                              ☎017

have been transported to living spaces of the property;

        e).     Warning that property owners and occupants where Zonolite Attic Insulation has been installed should not engage in remodeling or other activities that involve the disturbance of Zonolite Attic Insulation until an asbestos containment plan has been established by qualified asbestos abatement personnel;

        54.     As a direct and proximate result of the conduct of Defendants and their predecessor corporations, real properties of Plaintiffs and Class members have been contaminated with asbestos, requiring the development and implementation of an appropriate operations and maintenance program to limit further exposure to dangerous levels of asbestos.

        55.     As a direct and proximate result of the conduct of Defendants and their predecessor corporations, Plaintiffs and Class members will incur substantial costs of property remediation, restoration, and asbestos abatement.

        56.     As a direct and proximate result of the conduct of Defendants and their predecessor corporations, owners of real property in which Zonolite Attic Insulation has been installed have been interfered with in their use and quiet enjoyment of their real property.

        57.     Plaintiffs and members of the Class possess property interests in claims against various Defendants and/or their predecessor corporations for harms arising out of conduct asserted in the Complaint. Defendants and their predecessor corporations knowingly caused injury to the property interests of Plaintiffs and Class members, including through actions to fraudulently shield assets of one another for purposes of evading asbestos liability.

        58.     Nationwide, experts estimate that at least 21 million American workers have been exposed to "significant" amounts of asbestos at the workplace since 1940. Millions

others have been exposed through environmental contact or contact with relatives who have worked with the products. Because of its injurious propensities, such exposure, in human terms, has meant that literally tens of thousands of people fall ill or die from asbestos-related diseases every year. In legal terms, it has translated into hundreds of thousands of lawsuits centered mainly in industrialized areas along the country's coasts, including Massachusetts.

59.    Asbestos litigation has been ongoing for four decades and as a result of this litigation, numerous corporations have been forced into bankruptcy. Raymark Industries, Forty-Eight Insulations, Unarco, Standard Asbestos, Johns-Manville Corporation, Eagle-Picher Industries, and Celotex Corporation, just to name a few, all have at one point declared bankruptcy due to asbestos liability.

60.    In light of mounting potential asbestos liability, Grace initiated corporate restructuring transactions during the last decade that were specifically designed to shield assets from actual or potential judgements.

61.    On September 30, 1996, Grace and Fresenius A.G. completed a series of transactions that resulted in the creation of two new business entities. First, Grace spun off to its common shareholders a "new" Grace comprised of Grace's packaging and specialty chemicals business. Second, Grace's former health care subsidiary, National Medical Care, Inc. ("NMC") was combined with the worldwide dialysis business of Fresenius A.G. to form a new company name Fresenius Medical Care A.G.

62.    As a result of these transactions, Grace's common shareholders received 100% of a "new" W. R. Grace & Co., focused on its packaging and specialty chemicals businesses. "Old" W. R. Grace & Co. common shareholders also received 44.8% of a newly-

17

created health care company, Fresenius Medical Care A.G., the world's largest fully-integrated renal care company.

63.    On March 31, 1998, the "new" Grace and Sealed Air corporation completed a series of transactions that resulted in the creation of two new companies. First, Grace spun off to its shareholders a second "new" W. R. Grace & Co., comprised of Grace's specialty chemicals businesses. Second, W. R. Grace & Co.'s Cryovac flexible packaging business was combined with Sealed Air, to form the world's leading protective and specialty packaging company.

64.    Valued by the market at more than $6 billion, these 1998 transactions provided substantial value to Grace's shareholders, who received 100% of the second "new" W. R. Grace & Co., a premier global specialty chemicals company, and also received common and preferred stock representing approximately 63% of the "new" Sealed Air, the company combining Grace's former Cryovac business with Sealed Air's protective packaging business.

<u>The 1996 Fraudulent Transfer</u>

65.    On February 4, 1996, Grace and Fresenius A.G. signed an Agreement and Plan of Reorganization and other related agreements. This transaction was designed to strip out and segregate NMC and other good assets from Grace's specialty chemicals business and asbestos exposure, thus leaving Grace without sufficient capital to pay its asbestos victims and creditors.

66.    Briefly stated, the September 28 and 29, 1996 transactions unfolded as follows:

a)    Before the transactions, NMC was a wholly-owned subsidiary of Grace-

18

Conn. (Grace Chemicals), which in turn was a wholly owned subsidiary of the parent company
Grace;

          b)       Grace-Conn. Transferred the stock of NMC to its parent Grace, thus
making Grace-Conn. and NMC equal sibling subsidiaries of Grace;

          c)       Grace then transferred that stock of Grace-Conn. to a newly formed
subsidiary of Grace, Grace Holding Company, Inc.;

          d       Grace then spun off to its shareholders this brand new subsidiary Grace
Holding Company, Inc. as a totally separate company. This left Grace with NMC as its sole
asset;

          e)       Grace (with its sole asset NMC) then merged with Fresenius Medical Care
A.G., a wholly owned subsidiary of Fresenius A.G. This new entity was called Fresenius
National Medical Care ("FNMC"). Grace's shareholders effectively received 44.8% of the stock
of this new entity FNMC , and Grace ceased to exist; and

          f)       Grace Holding Company Inc. was renamed W. R. Grace & Co., a
Delaware corporation.

          67.      The effect of this series of transactions is that Grace-Conn.- the entity with
the asbestos liability and now renamed W. R. Grace & Co. - is totally stripped of, and segregated
from, its profitable former subsidiary NMC. The new W. R. Grace & Co. was left with full
responsibility for satisfying Grace's asbestos liabilities, but was left undercapitalized and did not
receive fair value for its now lost assets.

          67.      In the Form S-4 regarding these 1996 transactions, Grace
expressly recognized that the transactions may constitute a fraudulent transfer. In a section titled

"Fraudulent Transfer and Related Considerations," Grace acknowledged its exposure when it

stated:

> "Under applicable law, the NMC Distribution would constitute a
> 'fraudulent transfer' if (a)New Grace or Grace Chemicals is insolvent, (b)
> the effect of the NMC Distribution would render New Grace or Grace
> Chemicals insolvent, (c) the NMC Distribution would leave New Grace or
> Grace Chemicals unreasonably small capital, or (d) New Grace or Grace
> Chemicals intended to incur, or believed it would incur, debts beyond its
> ability to pay as such debts mature...Grace believes that, based on the
> factors considered in connection with the NMC Distribution, the NMC
> Distribution will not be a fraudulent transfer and will be made out of
> surplus in accordance with applicable law. There is no certainty, however,
> that a court would reach the same conclusion in determining that New
> Grace and Grace Chemicals have satisfied the applicable standards. In this
> regard, it should be noted that Grace Chemicals has had, and is expected to
> continue to have, significant liabilities arising out of asbestos-related
> litigation and claims....If, in a lawsuit filed by an unpaid creditor or a
> representative of unpaid creditors or a trustee in bankruptcy, a court were
> to find that, at the time the NMC Distribution was consummated or after
> giving effect thereto, either New Grace or Grace Chemicals, as the case
> may be, (a) was insolvent, (b) was rendered insolvent by reason of the
> NMC Distribution, (c) was engaged in a business or transaction for which
> its remaining assets constituted unreasonably small capital, or (d) intended
> to incur, or believed it would incur, or believed it would incur, debts
> beyond its ability to pay as such debts matured, then such court might
> require FNMC or NMC to fund certain liabilities of New Grace or Grace
> Chemicals, as the case may be, for the benefit of New Grace's or Grace
> Chemicals' creditors. The same consequences would also apply were a
> court to find that the NMC Distribution was not made out of the surplus of
> Grace Chemicals."

69.    As Grace fully expected, the 1996 "NMC Distribution" rendered

Grace insolvent and with unreasonably small capital reserves. Grace intended and believed that

following, and as a result of, the NMC Distribution transactions, it would have debts beyond its

ability to pay such debts as they matured.

### The 1998 Fraudulent Transfer

20

70.    In August 1997, Grace - - now consisting of the pared down former W. R. Grace-Conn. - - entered into an agreement with Sealed Air to effect another fraudulent conveyance transaction structured almost identically to Grace's 1996 fraudulent conveyance transactions involving Fresenius. This time Grace stripped out and segregated its packaging business from its chemical subsidiary's asbestos liability, thus further leaving Grace without sufficient capital to pay its asbestos victims and creditors.

71.    Briefly stated, the March 1998 transaction unfolded as follows.

a)    Before the transactions, Grace consisted of a specialty chemicals business and a packaging business;

b)    Grace separated its specialty chemicals business and a packaging business into two separate subsidiaries;

c)    Grace then transferred the stock of Grace-Conn. (it specialty chemicals company) to a newly formed subsidiary of Grace, Grace Specialty Chemicals, Inc.;

d)    Grace then spun off to its shareholders this brand new subsidiary, Grace Specialty Chemicals, as a totally separate company. This left Grace with its packaging business as its sole asset;

e)    Grace (with its sole asset the packaging company) then merged with and into Sealed Air Corporation, a company outside the Grace family of companies; and

f)    Grace's shareholders effectively received 63% of the stock of Sealed Air Corporation.

72.    The result of these transactions is that Grace is totally stripped of, and segregated from, its profitable, formerly-affiliated packaging business. The new W. R. Grace &

21

Insulation, Defendants and/or their predecessor corporations continued to aggressively manufacture, promote, distribute, and sell Zonolite Attic Insulation, while concealing and/or failing to disclose the substantial risks of disease associated with asbestos exposure.

44.    Defendants and/or their predecessor corporations conducted secret animal tests that demonstrated an association between tremolite asbestos and mesothelioma, including Dr. W. Smith's biological testing (final report May 25, 1978). Despite those findings confirmed by its own tests, Grace publicly denied the existence of a relationship between tremolite asbestos exposure and mesothelioma, including in a letter dated May 8, 1979 to county health officer Dr. Richard Irons.

45.    Despite knowledge of the unreasonable risks to human health, Defendants or their predecessor corporations intentionally chose to not warn the public of health risks associated with Zonolite Attic Insulation, including the advised decision "not to affix labels" on attic insulation products (May 24, 1977). This decision to conceal from the public such health risks was predicated on a calculation of the financial reward to Defendants or their predecessors corporations should the public be kept uninformed. Written analysis of the financial consequences include a May 24, 1977 "Zonolite Profitability Impact" projecting a "10-50% reduction in sales volume that would result from a requirement to label our products as containing asbestos."

46.    Until Grace withdrew Zonolite Attic Insulation from the market in 1984, Defendants and/or their predecessor corporations affirmatively and actively engaged in steps to conceal the toxicity and dangers of Zonolite Attic Insulation from the public and from government agencies charged with police powers to protect public health and safety.

13

47.    In the 1970s, state and federal officials cited various plants belonging to Grace for excessive asbestos exposures levels, including those summarized in the September 21, 1971 memo to R.M. Coquillette. Defendants and/or their predecessor corporations did not normally consider controls to abate these levels "until a citation issued" and only then would each plant be addressed "singly as they are forced to comply."

48.    Defendants and/or their predecessors corporations, falsely and/or misleadingly represented to government officials that Zonolite Attic Insulation had been treated with a binder (a substance that would prevent deadly tremolite fibers from being released into the air) while, in fact, no such binder had been successfully developed or applied to Defendants' Zonolite Attic Insulation product.

49.    Defendants and/or their predecessor corporations failed to test adequately or properly the use of a binder in preventing hazardous exposure to asbestos.

50.    Although Defendants and/or their predecessor corporations publicly represented that Zonolite Attic Insulation posed no health hazard, internal Grace memoranda, including a May 24, 1977 memo from Wood to Brooks and Graf, demonstrate that Grace knew that Zonolite Attic Insulation posed an unreasonable risk to human health with exposure "concentrations upward of 15 f/ml," and that Grace anticipated that Zonolite Attic Insulation would "eventually be banned" by government agencies.

51.    As early as 1977, Grace drafted a press release, stating that it was "sufficiently concerned about the entire issue of asbestos and associated health hazards to discontinue this product (Zonolite Attic Insulation)." Despite actual knowledge by Defendants and/or their predecessor corporations that Zonolite Attic Insulation posed a substantial hazard to

14

the consuming public, they determined to withhold this important press release, to conceal the health hazards associated with Zonolite Attic Insulation, and to continue to aggressively sell Zonolite Attic Insulation for an additional seven years.

52.    Defendants and/or their predecessor corporations had superior knowledge, as compared with the consuming public and government enforcement agencies, with respect to the health dangers posed by Zonolite Attic Insulation, but concealed their knowledge of the health dangers associated with their product because they believed that asbestos contained in Zonolite Attic Insulation would remain undetected.

53.    As a proximate result of the conduct of the Defendants and/or their predecessor corporations, there is a present, compelling, and immediate need to provide appropriate warnings to the public of the health dangers associated with Zonolite Attic Insulation. Necessary warnings include:

a).    Warning that Zonolite Attic Insulation contains tremolite, an especially dangerous form of asbestos, and that persons should avoid exposure to Zonolite Attic Insulation;

b).    Warning that disturbing Zonolite Attic Insulation exposes individuals to hazardous levels of asbestos;

c).    Warning that persons should not enter or use attic spaces in properties believed to contain Zonolite Attic Insulation, together with advisories on how to identify Zonolite Attic Insulation;

d).    Warning that tests should be conducted on properties where Zonolite Attic Insulation has been disturbed and that disturbance poses a threat that asbestos may

15

have been transported to living spaces of the property;

    e).    Warning that property owners and occupants where Zonolite Attic Insulation has been installed should not engage in remodeling or other activities that involve the disturbance of Zonolite Attic Insulation until an asbestos containment plan has been established by qualified asbestos abatement personnel;

    54.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, real properties of Plaintiffs and Class members have been contaminated with asbestos, requiring the development and implementation of an appropriate operations and maintenance program to limit further exposure to dangerous levels of asbestos.

    55.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, Plaintiffs and Class members will incur substantial costs of property remediation, restoration, and asbestos abatement.

    56.    As a direct and proximate result of the conduct of Defendants and their predecessor corporations, owners of real property in which Zonolite Attic Insulation has been installed have been interfered with in their use and quiet enjoyment of their real property.

    57.    Plaintiffs and members of the Class possess property interests in claims against various Defendants and/or their predecessor corporations for harms arising out of conduct asserted in the Complaint. Defendants and their predecessor corporations knowingly caused injury to the property interests of Plaintiffs and Class members, including through actions to fraudulently shield assets of one another for purposes of evading asbestos liability.

    58.    Nationwide, experts estimate that at least 21 million American workers have been exposed to "significant" amounts of asbestos at the workplace since 1940. Millions

16

others have been exposed through environmental contact or contact with relatives who have worked with the products. Because of its injurious propensities, such exposure, in human terms, has meant that literally tens of thousands of people fall ill or die from asbestos-related diseases every year. In legal terms, it has translated into hundreds of thousands of lawsuits centered mainly in industrialized areas along the country's coasts, including Massachusetts.

59.    Asbestos litigation has been ongoing for four decades and as a result of this litigation, numerous corporations have been forced into bankruptcy. Raymark Industries, Forty-Eight Insulations, Unarco, Standard Asbestos, Johns-Manville Corporation, Eagle-Picher Industries, and Celotex Corporation, just to name a few, all have at one point declared bankruptcy due to asbestos liability.

60.    In light of mounting potential asbestos liability, Grace initiated corporate restructuring transactions during the last decade that were specifically designed to shield assets from actual or potential judgements.

61.    On September 30, 1996, Grace and Fresenius A.G. completed a series of transactions that resulted in the creation of two new business entities. First, Grace spun off to its common shareholders a "new" Grace comprised of Grace's packaging and specialty chemicals business. Second, Grace's former health care subsidiary, National Medical Care, Inc. ("NMC") was combined with the worldwide dialysis business of Fresenius A.G. to form a new company name Fresenius Medical Care A.G.

62.    As a result of these transactions, Grace's common shareholders received 100% of a "new" W. R. Grace & Co., focused on its packaging and specialty chemicals businesses. "Old" W. R. Grace & Co. common shareholders also received 44.8% of a newly-

17

created health care company, Fresenius Medical Care A.G., the world's largest fully-integrated renal care company.

63.      On March 31, 1998, the "new" Grace and Sealed Air corporation completed a series of transactions that resulted in the creation of two new companies. First, Grace spun off to its shareholders a second "new" W. R. Grace & Co., comprised of Grace's specialty chemicals businesses. Second, W. R. Grace & Co.'s Cryovac flexible packaging business was combined with Sealed Air, to form the world's leading protective and specialty packaging company.

64.      Valued by the market at more than $6 billion, these 1998 transactions provided substantial value to Grace's shareholders, who received 100% of the second "new" W. R. Grace & Co., a premier global specialty chemicals company, and also received common and preferred stock representing approximately 63% of the "new" Sealed Air, the company combining Grace's former Cryovac business with Sealed Air's protective packaging business.

### The 1996 Fraudulent Transfer

65.      On February 4, 1996, Grace and Fresenius A.G. signed an Agreement and Plan of Reorganization and other related agreements. This transaction was designed to strip out and segregate NMC and other good assets from Grace's specialty chemicals business and asbestos exposure, thus leaving Grace without sufficient capital to pay its asbestos victims and creditors.

66.      Briefly stated, the September 28 and 29, 1996 transactions unfolded as follows:

a)      Before the transactions, NMC was a wholly-owned subsidiary of Grace-

18

Conn. (Grace Chemicals), which in turn was a wholly owned subsidiary of the parent company Grace;

   b)  Grace-Conn. Transferred the stock of NMC to its parent Grace, thus making Grace-Conn. and NMC equal sibling subsidiaries of Grace;

   c)  Grace then transferred that stock of Grace-Conn. to a newly formed subsidiary of Grace, Grace Holding Company, Inc.;

   d  Grace then spun off to its shareholders this brand new subsidiary Grace Holding Company, Inc. as a totally separate company. This left Grace with NMC as its sole asset;

   e)  Grace (with its sole asset NMC) then merged with Fresenius Medical Care A.G., a wholly owned subsidiary of Fresenius A.G. This new entity was called Fresenius National Medical Care ("FNMC"). Grace's shareholders effectively received 44.8% of the stock of this new entity FNMC , and Grace ceased to exist; and

   f)  Grace Holding Company Inc. was renamed W. R. Grace & Co., a Delaware corporation.

   67.  The effect of this series of transactions is that Grace-Conn.- the entity with the asbestos liability and now renamed W. R. Grace & Co. - is totally stripped of, and segregated from, its profitable former subsidiary NMC. The new W. R. Grace & Co. was left with full responsibility for satisfying Grace's asbestos liabilities, but was left undercapitalized and did not receive fair value for its now lost assets.

   67.  In the Form S-4 regarding these 1996 transactions, Grace expressly recognized that the transactions may constitute a fraudulent transfer. In a section titled

"Fraudulent Transfer and Related Considerations," Grace acknowledged its exposure when it

stated:

> "Under applicable law, the NMC Distribution would constitute a
> 'fraudulent transfer' if (a)New Grace or Grace Chemicals is insolvent, (b)
> the effect of the NMC Distribution would render New Grace or Grace
> Chemicals insolvent, (c) the NMC Distribution would leave New Grace or
> Grace Chemicals unreasonably small capital, or (d) New Grace or Grace
> Chemicals intended to incur, or believed it would incur, debts beyond its
> ability to pay as such debts mature...Grace believes that, based on the
> factors considered in connection with the NMC Distribution, the NMC
> Distribution will not be a fraudulent transfer and will be made out of
> surplus in accordance with applicable law. There is no certainty, however,
> that a court would reach the same conclusion in determining that New
> Grace and Grace Chemicals have satisfied the applicable standards. In this
> regard, it should be noted that Grace Chemicals has had, and is expected to
> continue to have, significant liabilities arising out of asbestos-related
> litigation and claims....If, in a lawsuit filed by an unpaid creditor or a
> representative of unpaid creditors or a trustee in bankruptcy, a court were
> to find that, at the time the NMC Distribution was consummated or after
> giving effect thereto, either New Grace or Grace Chemicals, as the case
> may be, (a) was insolvent, (b) was rendered insolvent by reason of the
> NMC Distribution, (c) was engaged in a business or transaction for which
> its remaining assets constituted unreasonably small capital, or (d) intended
> to incur, or believed it would incur, or believed it would incur, debts
> beyond its ability to pay as such debts matured, then such court might
> require FNMC or NMC to fund certain liabilities of New Grace or Grace
> Chemicals, as the case may be, for the benefit of New Grace's or Grace
> Chemicals' creditors. The same consequences would also apply were a
> court to find that the NMC Distribution was not made out of the surplus of
> Grace Chemicals."

69.    As Grace fully expected, the 1996 "NMC Distribution" rendered

Grace insolvent and with unreasonably small capital reserves. Grace intended and believed that

following, and as a result of, the NMC Distribution transactions, it would have debts beyond its

ability to pay such debts as they matured.

### The 1998 Fraudulent Transfer

20

KIRKLAND & ELLIS

70.   In August 1997, Grace - - now consisting of the pared down former W. R. Grace-Conn. - - entered into an agreement with Sealed Air to effect another fraudulent conveyance transaction structured almost identically to Grace's 1996 fraudulent conveyance transactions involving Fresenius. This time Grace stripped out and segregated its packaging business from its chemical subsidiary's asbestos liability, thus further leaving Grace without sufficient capital to pay its asbestos victims and creditors.

71.   Briefly stated, the March 1998 transaction unfolded as follows.

a)   Before the transactions, Grace consisted of a specialty chemicals business and a packaging business;

b)   Grace separated its specialty chemicals business and a packaging business into two separate subsidiaries;

c)   Grace then transferred the stock of Grace-Conn. (it specialty chemicals company) to a newly formed subsidiary of Grace, Grace Specialty Chemicals, Inc.;

d)   Grace then spun off to its shareholders this brand new subsidiary, Grace Specialty Chemicals, as a totally separate company. This left Grace with its packaging business as its sole asset;

e)   Grace (with its sole asset the packaging company) then merged with and into Sealed Air Corporation, a company outside the Grace family of companies; and

f)   Grace's shareholders effectively received 63% of the stock of Sealed Air Corporation.

72.   The result of these transactions is that Grace is totally stripped of, and segregated from, its profitable, formerly-affiliated packaging business. The new W. R. Grace &

21

Co. is left with full responsibility for satisfying Grace's asbestos liabilities, but was undercapitalized and did not receive fair value for its now lost assets.

73.    In another Form S-4 filing with the SEC, Grace acknowledged - as it had with regard to its September 1996 series of transactions - that its March 1998 series of transactions may constitute a fraudulent transfer:

> "Claimants may also bring suit seeking recovery from New Sealed Air or its subsidiaries by claiming that the transfers of assets and liabilities in connection with the reorganization of Grace, including the separation of Grace's packaging and specialty chemicals businesses and the cash transfer to and spin-off of New Grace, were 'fraudulent transfers.' A transfer would be a fraudulent transfer if the transferor received less than reasonably equivalent value transferor was insolvent at the time of the transfer, was rendered insolvent by the transfer or was left with unreasonably small capital to engage in its business. A transfer may also be a fraudulent transfer if it was made to hinder, delay or defraud creditors. If any transfers in connection with the reorganization of Grace are found to be fraudulent transfers, the recipient (including New Sealed Air and its subsidiaries) might be required to return the property in the transferor.

74.    Grace represented that the newly-formed W. R. Grace & Co. would be adequately capitalized and purported to believe that the transfers effected in the 1998 transactions were not fraudulent. Grace admitted, however, in its SEC filing that "a court applying the relevant legal standards may not reach the same conclusion."

75.    As a result of the 1996 and 1998 fraudulent transfer transactions, the so-called W. R. Grace, & Co. entity left with the asbestos liability is a mere shadow of its former self. Virtually all of its valuable assets have been transferred away from the asbestos liabilities. The asbestos liabilities facing Grace far exceed Grace's fraudulently diminished worth and far

22

exceed Grace's ability to pay its debts as they mature.

76.     As of 1996, Grace was aware that it faced tremendous exposure in the asbestos litigation against it. Its aggregate accrual for asbestos liabilities at December 31, 1996, was reported by the firm to be $994.1 million. This amount includes all pending personal injury and property damage claims as well as personal injury claims expected to be filed through 2001,

77.     This exposure has only increased over time. According to its Form-10K filed with the SEC on March 28, 2000, as of December 31, 1999, W. R. Grace & Company was a defendant in approximately 50,342 asbestos related lawsuits, involving 105,670 claims for personal injury. This number represented an increase over its exposure at the end of 1998, when 45,086 lawsuits involving 97,017 claims for personal injury were pending.

78.     In that same From 10-K, Grace noted that judgements had been entered against it in seven cases for a total of $60.3 million and that it had settled 203 cases for a total of $603.8 million. Grace estimated that its gross aggregate accrual for asbestos liabilities as of December 21, 1999 was $1.084 billion.

79.     At all times mentioned herein, Defendants knew of Grace's massive asbestos liability and the experiences of other asbestos manufacturers mentioned above. With intent to defraud contingent creditors such as Plaintiffs and the class, Defendants intentionally, willfully, maliciously and fraudulently took the actions herein alleged to defraud and oppress Plaintiffs and the Class.

## V.  CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action as a class action for injunctive, equitable, and monetary relief pursuant to Rules 23(b)(1)(A), 23(b)(2) and/or 23(b)(3). F. R. Civ. P. on behalf

23

12/11/01  11:22 FAX 312 861 2200          KIRKLAND & ELLIS                         ☒025

of themselves and a defined class of similarly situated individuals. The Class is defined as: All owners or occupiers of real property located in the United States in which Zonolite Attic Insulation has been installed.

81.    The members of the Class are so numerous that their joinder is impracticable.

82.    There are questions of law and fact common to the Class. Members of the Class share a well-defined community of interest in the questions of law and fact that affect members of the Class, which questions predominate over questions solely affecting individual members. Illustrative common issues of law and fact include, but are not limited to the following:

A.    With respect to the manufacture, distribution and sale of Zonolite Attic Insulation:

i.    Whether Zonolite Attic Insulation designed, manufactured, and sold by said Defendants and/or their predecessor corporations is not reasonably safe in its design and/or manufacture in that it contains dangerous levels of readily-airborne asbestos.

ii.    Whether said Defendants and/or their predecessors failed to provide adequate warnings in connection with Zonolite Attic Insulation.

iii.    Whether asbestos, contained in Zonolite Attic Insulation and installed in homes, constitutes a present threat to public health and safety.

iv.    Whether Zonolite Attic Insulation installed in homes constitutes a present threat to health and safety in that owners and occupants, engaged in their ordinary use and enjoyment of their properties, will be exposed to dangerous levels of asbestos.

24

v.    Whether owners and occupiers of properties in which Zonolite Attic Insulation are installed are unaware of, or unappreciative of, dangers posed by this product, unaware of safeguards that must be taken to avoid harmful exposure to asbestos, unaware of operations and maintenance practices appropriate to properties where Zonolite Attic Insulation is installed, and unaware of the necessity to, and prudent means by which to, engage in such activities as testing, remediation, removal, or abatement.

vi.    Whether said Defendants and/or their predecessor corporations concealed from consumers and government agencies responsible for public health, material information concerning the health hazards associated with Zonolite Attic Insulation.

vii.    Whether said Defendants and/or their predecessor corporatic :s made public announcements, statements, or representations concerning Zonolite Attic Insulation that were untrue, deceptive, or misleading.

viii.    Whether said Defendants and/or their predecessor corporations made public announcements, statements, or representations with respect to Zonolite Attic Insulation that had a capacity to deceive a substantial portion of the consuming public.

ix.    Whether the practices of said Defendants and/or their predecessor corporations representing Zonolite Attic Insulation as asbestos free and safe constitute unfair or deceptive business practices.

x.    Whether preliminary injunctive relief is warranted, including warnings to the public regarding Zonolite Attic Insulation.

xi.    Whether members of the Class have suffered harm to their property interests in that the presence of Zonolite Attic Insulation requires property owners and property

25

occupants to restrict their use and quiet enjoyment of their property.

           xii.     Whether Defendants' conduct with respect to Zonolite Attic

Insulation warrants punitive damages.

        B.     With respect to the corporate restructuring transactions of 1996 and 1998:

           i.     Whether Defendants and/or their predecessor corporations

fraudulently conveyed assets in violation of the Uniform Fraudulent Transfer Act;

           ii.     Whether Defendants and/or their predecessor corporations

fraudulently conveyed assets in violation of the common law of fraudulent conveyance;

           iii.     Whether Defendants and/or their predecessor corporations

conspired to fraudulently transfer assets in violation of Plaintiffs' and the Class members' rights;

           iv.     Whether Defendants and/or their predecessor corporations

denuded, depleted or dissipated Grace's assets;

           v.     Whether Defendants and/or their predecessor corporations

conspired to denude, deplete or dissipate Grace's assets;

           vi.     Whether Grace received a reasonably equivalent value in exchange

for the assets it transferred to Defendants;

           vii.     Whether Grace was engaged or was about to be engaged in

business in which its remaining assets after the transfer were unreasonably small;

           viii.     Whether Grace intended to incur or reasonably believed it would

incur debts beyond its ability to pay as they became due;

           ix.     Whether Defendants and/or their predecessor corporations made

the transfers as herein alleged with actual intent to hinder, delay or defraud the Plaintiffs and the

Class.

83.    The claims of Plaintiffs arise from the same events and course of conduct by Defendants that give rise to the claims of the other Class members. Plaintiffs are members of the Class they seek to represent and possess the same interests and have suffered the same injuries as other Class members, making Plaintiffs' claims typical of the claims of the Class generally.

84.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions and products liability litigation.

85.    Class certification is appropriate pursuant to Rule 23(b)(1)(A) because prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct of Grace.

86.    Class certification is appropriate pursuant to Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Class, in that Defendants and their predecessor corporations have concealed and failed to disclose hazards associated with Zonolite Attic Insulation, rendering millions of homeowners unaware of present dangers in their homes and causing harms and hardship even to those who do learn of this present danger. Furthermore, Defendants and their predecessor corporations have engaged in fraudulent corporate restructuring transactions designed to illegally shield the assets of W.R. Grace & Co., Inc. from individuals, including Plaintiffs and the Class, harmed by tremolite asbestos contained in vermiculite and vermiculite-containing products including Zonolite Attic Insulation. Defendants' common course of conduct makes appropriate preliminary and final injunctive and

27

12·11/01  11:23 FAX 312 861 2200    KIRKLAND & ELLIS    @029

declarative relief.

87.     Class certification is appropriate pursuant to Rule 23(b)(3) because

questions of law and fact common to the Class predominate over any questions affecting only

individual members of the Class and class-wide adjudication of Class members' claims is

superior to other available methods for the fair and efficient adjudication of this controversy.

### CAUSES OF ACTION

88.     Plaintiffs hereby assert each and every cause of action and remedy at law

or in equity supported by facts alleged in this Complaint. The causes of action and remedies at l

law and in equity include, but are not limited to, each of the following:

### COUNT I.

### FRAUDULENT CONVEYANCE IN VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT, ADOPTED BY M.G.L. c. 109A § 2, AND THE COMMON LAW OF FRAUDULENT CONVEYANCE

89.     Plaintiffs refer to and incorporate by reference all preceding paragraphs as

if fully set forth herein.

90.     At all times as herein alleged, Plaintiffs and Class members were creditors

under the Uniform Fraudulent Transfer Act against a debtor, Grace, for their contingent claims

arising from their injuries suffered due to asbestos exposure. In relevant part, the Act provides as

follows. A creditor is any "person who has a claim." A claim under the Act is defined as " a

right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

91.     The distribution of assets from Grace to FNMC and Sealed Air,

respectively, were fraudulent transfers. The transfers were made with the intent to hinder

28

Plaintiffs' and the Class ability to recover. Grace did not receive reasonably equivalent value for the transferred assets. Indeed, Grace's remaining assets after the transfers were unreasonably small. As a result of the transfers, Grace was rendered insolvent and unable to pay its debts as they matured. Grace transferred its assets with the intent and belief that the transactions would deprive the Plaintiffs and Class members of recovery for their asbestos claims.

92.    Defendants acted intentionally, fraudulently, maliciously, and without regard for the legitimate rights of the Plaintiff Class and thus the Class is entitled to exemplary damages.

93.    Knowing of the contingent tort liability faced by Grace resulting from the numerous asbestos-related litigations already pending at the time of the corporate transactions at issue, transferees as herein described did not accept the transfer of assets in good faith.

94.    At the time it made these transfers of assets herein described, Grace and each of the Defendants had actual intent to hinder and defraud Plaintiffs' and the Class' collection of their contingent claims against Grace. Defendants possessed such knowledge by virtue of their long history of dealing with asbestos litigation and knowledge of Grace's massive future asbestos liability.

## COUNT II.

## DENUDING, DEPLETING, AND DISSIPATING THE ASSETS OF GRACE

95.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

96.    This Court should declare that FNMC and Sealed Air are liable for Grace's asbestos liabilities, to the extent of the assets of the former W.R. Grace & Co. that each

29

received as a result of the 1996 and 1998 transactions described above. FNMC and Sealed Air were aware of Plaintiffs' and the Class' claims and potential claims against Grace but still effectively stripped Grace of valuable assets that otherwise would have been available to pay the liabilities of Grace. These transactions were wrongful distributions of assets.

## COUNT III.

## CONSPIRACY TO DENUDE, DEPLETE, DISSIPATE THE ASSETS OF GRACE

97.   Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

98.   Defendants conspired with Grace to denude, deplete and dissipate Grace's assets. They thus are liable for Grace's asbestos liabilities to the extent of the value of the assets of the former W.R. Grace & Co., including subsidiaries, that each received as a result of the 1996 and 1998 transactions, respectively.

## COUNT IV.

## COMMON LAW CONSPIRACY

99.   Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

100.   Grace made the transfer of assets as herein described with the intent to defraud Plaintiffs and the class.

101.   Defendants and each of them knowingly participated in the unlawful plan herein described and agreed to aid Grace to carry out its fraudulent conveyances.

102.   Each of the Defendants had knowledge of the conspiracy and its unlawful

30

purpose.

103.    As alleged herein, Defendants agreed and knowingly and willfully conspired between themselves to defraud Plaintiffs in the collection of their claims against Grace arising from contingent asbestos liability.

104.    Under this conspiracy, Defendants agreed that Grace would fraudulently transfer assets among themselves as more fully detailed above.

105.    Each of the Defendants did the acts and things herein pursuant to, and in furtherance of, the conspiracy and agreement alleged herein.

106.    As a proximate result of the wrongful acts herein alleged, Plaintiffs and the Class have been damaged.

107.    At all times mentioned herein, Defendants knew of Grace's massive asbestos liability and the experiences of other asbestos manufacturers. With intent to defraud contingent creditors such as Plaintiffs and the Class, defendants intentionally, willfully, maliciously and fraudulently did the things herein alleged to defraud and oppress Plaintiffs and the Class. Plaintiffs and the Class are therefore entitled to an award of punitive damages.

## COUNT V.

### STRICT PRODUCT LIABILITY

108.    Plaintiffs refer to and incorporate by reference all preceding paragraphs as if fully set forth herein.

109.    Zonolite Attic Insulation is not reasonably safe in design and not reasonably safe in its manufacture in that it contains readily-loftable asbestos, exposing owners and occupiers of property to unreasonable dangers of injury and damage.

31

110.    Zonolite Attic Insulation manufactured by Defendants or their predecessor corporations is defective in its design and formulation in that it poses dangers beyond that contemplated by an ordinary consumer, which dangers proximately caused harm to Plaintiffs and Class members.

111.    Zonolite Attic Insulation was not accompanied by appropriate or adequate warnings and not accompanied by appropriate or adequate instructions concerning the safe use, handling, or installation of the product, proximately causing harm to Plaintiffs and Class members.

112.    Zonolite Attic Insulation manufactured by Defendants or their predecessor corporations was defective due to inadequate post-marketing warnings and/or instructions in that Defendants or their predecessor corporations acquired actual knowledge of risks to health posed by Zonolite Attic Insulation, but failed to provide adequate warnings to users, consumers, or the public, proximately causing harm to Plaintiffs and Class members.

113.    As a direct, proximate and legal result of the dangerous product injected into the stream of commerce by Defendants or their predecessor corporations as described herein, Plaintiffs and Class members have sustained and will continue to sustain injury to their property and to require the relief prayed for herein, for which Defendants are strictly liable. Injuries suffered include, but are not limited to, contamination of real and personal property, costs of testing, costs of property remediation, costs of asbestos containment, costs of asbestos abatement, and costs of hardship resulting from reasonable effort to avert harm, including interference with Class members' use and enjoyment of real property.

32

## COUNT VI.

### NEGLIGENCE

114.   Plaintiffs hereby reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint.

115.   Defendants and their predecessor corporations had a duty to exercise reasonable care in the manufacture, testing, distribution, and sale of Zonolite Attic Insulation, including a duty to ensure that the product did not pose unreasonable risk of harm to consumers and users as well as a duty to warn consumers and users of the nature, degree, and consequences of exposure to asbestos-laden Zonolite Attic Insulation.

116.   Defendants and their predecessor corporations failed to exercise reasonable care in the manufacture, testing, distribution, warning and sale of Zonolite Attic Insulation.

117.   As a direct, proximate and legal result of the negligence of Defendants and their predecessor corporations, Plaintiffs and members of the Class sustained and continue to sustain injuries including, but not limited to, contamination of real and personal property, costs of testing, costs of property remediation, costs of asbestos containment, costs of asbestos abatement, and costs and hardship resulting from reasonable effort to avert harm, including interference with Class members' use and enjoyment of real property.

### COUNT VII.

### DECEIT. FRAUDULENT CONCEALMENT AND FRAUD BY NONDISCLOSURE

118.   Plaintiffs hereby reallege and incorporate each allegation contained in the

33

KIRKLAND & ELLIS

preceding paragraphs of this complaint.

119.    Defendants and their predecessor corporations knew or reasonably should have known that the properties of Plaintiffs and the Class members were being contaminated with asbestos from Zonolite Attic Insulation.

120.    Defendants and their predecessor corporations deceived, concealed material facts from, and made material misrepresentations to Plaintiffs and the Class, and otherwise knowingly misled Plaintiffs and the Class members so that they were unaware of the presence and/or hazards presented by the asbestos contaminating their homes.

121.    Defendants and their predecessor corporations engaged in a practice of issuing material misrepresentations of fact regarding the safety of Zonolite Attic Insulation and tremolite, including misrepresentations to consumers, governmental officials and the general public.

122.    Defendants and their predecessor corporations knew or reasonably should have known that the representations regarding Zonolite Attic Insulation and tremolite were untrue and/or recklessly or negligently made such representations without regard to their truth or falsity. Standardized misrepresentations include, but are not limited to, the misrepresentations that tremolite is not hazardous, that Zonolite Attic Insulation is safe, that pouring and disturbing the Zonolite Attic Insulation is a "clean" task and presents no need for a protective mask, that Zonolite Attic Insulation "contains no harmful chemicals," and that Zonolite Attic Insulation is a "non-asbestos product."

123.    The misrepresentations, concealment, and suppression of facts by Defendants and their predecessor corporations were done with the intent to induce the plaintiffs

34

and Class members to purchase Zonolite Attic Insulation and/or forbear claims for damages or remediation.

124.    Based on their foregoing misrepresentations, course of conduct and superior knowledge regarding the hazards of Zonolite Attic Insulation, Defendants and their predecessor corporations had an ongoing duty to disclose to Plaintiffs and Class members the fact of asbestos content and/or hazards presented by the asbestos contaminating the Zonolite Attic Insulation in their homes.

125.    Plaintiffs and the Class members were unaware of, and unable to discover, the fact of asbestos content and/or hazards presented by the asbestos contaminating the Zonolite Attic Insulation and their homes.

126.    The foregoing facts, concealed and misrepresented by Defendants and their predecessor corporations, were material, in that a reasonable person would have considered them important; Plaintiffs and the class members justifiably relied upon the non-existence of the concealed facts so as to act and/or refrain from acting and thereby suffered damage.

127.    As a direct, proximate and legal result of the deceit perpetrated by Defendants and their predecessor corporations, the Plaintiffs and Class members have sustained and will continue to sustain injury to their property including, but not limited to, contamination of real and personal property, costs of testing, costs of property remediation, costs of asbestos containment, costs of asbestos abatement, and costs and hardship resulting from reasonable effort to avert harm, including interference with Class members' use and enjoyment of real property.

## COUNT VIII. PUNITIVE DAMAGES

128.    Defendants' conduct as alleged herein was fraudulent and malicious such

☑037

that punitive damages should be assessed against the Defendants in an amount sufficient to punish, deter and make example of the wrongful conduct.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs requests that this Court enter an order, decree and judgement in favor of the Class and against Defendants, and each of them, as follows:

1.    An Order certifying this action as a class action, or appropriate subclasses or issues thereof pursuant to Federal Rule of Civil Procedure 23(c)(4), appointing named Plaintiffs as Class Representatives, and designating undersigned counsel and counsel for the Class.

2.    An Order requiring each Defendant to account for all transfers of the assets of the former W.R. Grace & Co. and any proceeds from the distribution of such assets in connection with the 1996 and 1998 transactions.

3.    A Declaration that the 1996 and 1998 transactions constitute fraudulent transfers and an Order rescinding those transactions.

4.    An Order requiring disgorgement of all ill-gotten gains resulting from said transactions, including all assets transferred and all fees received in connection with those transactions; in the alternative, an Order establishing a constructive trust on all assets transferred in connection with the 1996 and 1998 transactions.

5.    A determination that Defendants are jointly and severally responsible for damages equal to the full fair market value of all assets transferred in connection with the 1996 and 1998 transactions, as well as for exemplary damages.

6.    Interim and final Orders establishing a Defendant-funded Court-supervised

identification program which, through use of Defendants' records, sales records, publications, and other means, will identify homes and buildings containing Zonolite Attic Insulation, together with a testing program to verify the suspected existence of Zonolite Attic Insulation in homes and other buildings.

       7.     Interim and final Orders establishing a Defendant-funded Court-supervised notification program that issues timely and pertinent warnings and information to property owners, public and private health agencies, and members of the building trades, including:

       a.     Warning that Zonolite Attic Insulation contains asbestos and that persons should avoid exposure to Zonolite Attic Insulation.

       b.     Pertinent advisories regarding how to locate and identify Zonolite Attic Insulation.

       c.     Warning that disturbance of Zonolite Attic Insulation exposes individuals to hazardous levels of asbestos.

       d.     Warning that persons should not enter areas containing Zonolite Attic Insulation without taking appropriate safety precautions.

       e.     Warning that tests should be conducted on properties where Zonolite Attic Insulation has been disturbed or where asbestos dust from Zonolite Attic Insulation may have been transported into living spaces.

       f.     Warning that property owners and occupants should not engage in remodeling or other building activities that risk disturbance of Zonolite Attic Insulation, and that such remodeling and building activities should be performed only by qualified personnel and in accordance with an asbestos containment plan.

       8.     A final Order establishing a Defendant-funded, Court-supervised health and safety research and education trust, which conducts pertinent research and disseminates relevant findings to Class members, to public and private health agencies, to professional

37

building trades associations, and to property owners, the missions of the trust to include development of a specialized operations and maintenance program that sets forth safety procedures and remediation techniques appropriate to Zonolite Attic Insulation contamination.

9.    A final Order establishing a Defendant-funded, Court-supervised remediation and containment program and fund, which will provide to Class members:

a.    Information, techniques, procedures, and protocols for safe containment of the asbestos hazards during anticipated activities of repair, remodeling, storage, or other use of attic space, venting ceiling fans, etc.

b.    Training equipment, funding, and other assistance necessary to ensure a safe environment in homes an other buildings during and following repair, maintenance, remodeling, and other activities which disturb Zonolite Attic Insulation.

c.    Training, equipment, funding, and other assistance necessary to contain and control asbestos hazards from undisturbed Zonolite Attic Insulation to as to ensure a safe environment in homes and other buildings during normal anticipated use.

10.    A judgment in favor of the Class and against Defendants, jointly and severally, in an amount to be determined at the time of trial to compensate Class members for damages suffered, including actual and exemplary damages.

11.    A determination that Defendants are liable for pre- and post-judgment interest at the highest legal rate.

12.    An award of punitive damages against Defendants sufficient to punish, deter and make example of the wrongful conduct.

13.    A determination that the Defendants are held liable for costs of Court and reasonable attorneys' fees and an award of such costs and fees as allowed by law.

38

14.    Such other and further relief as the Court may deem necessary and proper.


Dated:  March 30, 2001

Respectfully submitted,

By: _____
Elizabeth J. Cabraser
As Proposed Class Counsel

Elizabeth J. Cabraser
Fabrice N. Vincent
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

and

By: _____
Thomas M. Sobol (BBO No. 471770)
As Proposed Class Counsel

Thomas M. Sobol (BBO No. 471770)
Jan R. Schlichtman
Matthew L. Tuccillo (BBO No. 643336)
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
214 Union Wharf
Boston, MA  02109-1216
Telephone:  (617) 720-5000
Facsimile:  (617) 720-5015

39

By: _____

       John G. Stoia, Jr.,
       As Proposed Class Counsel

John J. Stoia, Jr.
Timothy G. Blood
Jobeth Halper
MILBERG WEISS BERSHAD HYNES &
LERACH LLP
600 West Broadway
1800 One America Plaza
San Diego, CA 92101-5050
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

By: _____

       David Pastor
       As Proposed Class Counsel

David Pastor
Edward L. Manchur
John C. Martland
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

By: _____

       Edward J. Westbrook,
       As Proposed Class Counsel

Edward J. Westbrook
Robert M. Turkewitz
NESS MOTLEY LOADHOLT
RICHARDSON & POOLE
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

40

By: _____
Darrell Scott
As Proposed Class Counsel

Darrell Scott
Michael Black
LUKINS & ANNIS, P.S.
1600 Washington Trust Financial Cntr
717 W Sprague Ave.
Spokane, WA 99201-0466
Telephone: (509) 455-9555
Facsimile: (509) 747-2323

By: _____
Richard Lewis
As Proposed Class Counsel

Richard Lewis
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

and

Steve Toll
Tamara Driscoll
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
999 Third Avenue, Suite 3600
Seattle, WA 98104
Telephone: (206) 521-0080
Facsimile: (206) 521-0166

41