# EXHIBIT 8

1              IN THE UNITED STATES BANKRUPTCY COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4    W.R. GRACE & CO., et al.,        :   CHAPTER 11
                        Debtors       :   Case No. 01-01139 (JJF)
5                                      :   Jointly Administered

6                            - - -

7                                      Wilmington, Delaware
                                       Thursday, May 3, 2001
8                                      8:00 o'clock, a.m.

9                            - - -

10   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

11                           - - -

12   APPEARANCES:

13            PACHULSKI, STANG, ZIEHL, YOUNG & JONES
              BY:  LAURA DAVIS JONES, ESQ.
14
                       -and-
15
              KIRKLAND & ELLIS
16            BY:  JAMES H.M. SPRAYREGEN, ESQ.,
                   DAVID BERNICK, ESQ.
17                 JAMES W. KAPP, III, ESQ.,
                   SAMUEL A. SCHWARTZ, ESQ.
18                 (Chicago, Illinois)

19            Counsel for Debtors

20
              FRANK PERCH, ESQ.
21            OFFICE OF THE UNITED STATES TRUSTEE

22            Counsel for the United States Trustee

23
                                   Valerie J. Gunning
24                                 Official Court Reporter

25

1   APPEARANCES (Continued):

2           ASHBY & GEDDES
            BY:  MATTHEW ZALESKI, ESQ.
3
                -and-
4
            CAPLIN & DRYSDALE
5           BY:  PETER LOCKWOOD, ESQ.
                 (Washington, D.C.)
6
            Counsel for the Official Committee of Asbestos
7           Personal Injury Claimants

8
            MORRIS, NICHOLS, ARSHT & TUNNELL
9           BY:  WILLIAM H. SUDELL, JR., ESQ. and
                 ERIC D. SCHWARTZ, ESQ.
10
                 Counsel for National Medical Care
11

12          ELZUFON, AUSTIN, READO, TARLOV & JMONDELL
            BY:  WILLIAM D. SULLIVAN, ESQ.
13
                -and-
14
            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
15          BY:  THOMAS M. SOBOL, ESQ.

16              -and-

17          SHAW, GUSSIS, DOMANSKIS, FISHMAN & GLANTZ
            BY:  ROBERT M. FISHMAN, ESQ.
18
                 Counsel for Paul Price, et al.
19

20          FERRY & JOSEPH
            BY:  THEODORE TACCONELLI, ESQ.
21
                   -and-
22
            SCOTT L. BAENA, ESQ.
23
                 Counsel for Official Committee of Asbestos
24               Property Damage Claimants

25

```
1  ||  APPEARANCES (Continued):

2  ||            DUANE, MORRIS & HECKSCHER
   ||            BY:  MICHAEL LASTWOSKI, ESQ.
3  ||
   ||                    -and-
4  ||
   ||            STROOCK AND STROOCK AND LAVAN
5  ||            BY:  ROBERT RASKIN, ESQ.

6  ||                Counsel for Committe of Unsecured Creditors

7  ||
   ||            SKADDEN, ARPS, SLATE, MEAGHER & FLOM
8  ||            BY:  MARK CHEHI, ESQ.

9  ||                    -and-

10 ||            SKADDEN, ARPS, SLATE, MEAGHER & FLOM
   ||            BY:  BERT WOLFF, ESQ.
11 ||                 (New York, New York)

12 ||                Counsel for Sealed Air Corporation

13 ||
   ||            PRICKETT, JONES & ELLIOTT
14 ||            BY:  BRUCE JAMESON, ESQ.

15 ||                    -and-

16 ||            McKOOL SMITH
   ||            BY:  LEWIS T. LeCLAIR, ESQ.
17 ||
   ||                Counsel for Abner Asbestos Claimants
18 ||

19 ||            WALSH, MONZACK & MONACO
   ||            BY:  FRANK MONACO, ESQ.
20 ||
   ||                -and-
21 ||
   ||            JEFFREY GLATZER, ESQ.
22 ||
   ||                Counsel for Counsel for Credit Lyonnais
23 ||

24 ||

25 ||
```

1  APPEARANCES (Continued):

2          CONNOLLY, BOVE, LODGE & HUTZ
           BY:   JEFFREY WISLER, ESQ.
3
               Counsel for Maryland Casualty
4
                    - - -
5

6

7

8

9

10

11

12

13          P R O C E E D I N G S

14

15          (Proceedings commenced in the courtroom beginning

16  at 8:00 a.m.)

17

18          THE COURT:  All right.  Be seated, please.

19          Good morning.

20          MR. SPRAYREGEN:  Good morning.  James Sprayregen

21  on behalf of the debtors.  I assume your Honor has received a

22  copy of the agenda.

23          THE COURT:  I have.

24          MR. SPRAYREGEN:  Your Honor, with respect to

25  Items 1 through 5, there were no objections.  We filed a

1   certificate of no objection and we propose to submit orders

2   to the Court.

3               THE COURT:  We'll enter those orders.

4               MR. SPRAYREGEN:  With one exception, your Honor.

5   There was a -- with respect to Item 3, I apologize, there was

6   an agreement with the Creditors Committee to continue that

7   matter for further discussion, so we won't be submitting an

8   order on that one yet.  We may ask for a hearing on that if

9   we can't resolve it, whatever the next omnibus date is, which

10  we don't have yet.

11              THE COURT:  So Item 3 will be continued by

12  agreement.  The others are unobjected to and will be

13  entered.

14              MR. SPRAYREGEN:  Thank you, your Honor.

15              Your Honor, with respect to Items 6 -- excuse

16  me -- with respect to Item 6, that was the ordinary course

17  professional motion.  I understand, although I have not seen

18  it, that the U.S. Trustee, an objection that was filed

19  recently, or I'm not sure if it was a letter objection.  I'm

20  not sure if the U.S. Trustee is here.

21              Ms. Jones is here.

22              (Pause while counsel confer.)

23              MR. SPRAYREGEN:  Apparently, he's stuck in

24  traffic.  Maybe we can pass that.

25              THE COURT:  All right.

1          MR. SPRAYREGEN:  Your Honor, Item 7 is the

2    interim compensation procedures motion.  There were a few

3    comments from the Creditors Committee.  We reached agreement

4    and we propose to submit an order on Item 7.

5          THE COURT:  All right.  We'll execute that.

6          MR. SPRAYREGEN:  Your Honor, with respect to Item

7    8, deeming utilities adequately assured of future performance

8    and establishing procedure for determining adequate

9    assurances, there were a couple of comments we received from

10   the Creditors Committee and a couple of utilities.  We worked

11   out all of those objections.  We intend to propose an order

12   which details the resolution of those.

13          THE COURT:  All right.  We'll enter that order.

14          MR. SPRAYREGEN:  That brings us to Item 9, the

15   preliminary injunction motion.  Mr. Bernick from Kirkland &

16   Ellis will address that.

17          THE COURT:  All right.

18          MR. BERNICK:  Is your Honor's practice to hear

19   the motion first or hear the objection?

20          THE COURT:  Have you been informed as to the

21   allocation of time?

22          MR. BERNICK:  Yes.  We, at the present time, will

23   not use our allocation.  We maybe have 15 minutes at the

24   most.

25          THE COURT:  Typically, in a bankruptcy

1   application, I would hear the objections first, but since

2   this is a motion for a preliminary objection, I'm going to

3   hear the applicant first.

4           MR. BERNICK:   Okay.   I believe, your Honor, that

5   we're down to a small number of issues.   We have the

6   objection as to the -- the Abner plaintiffs.   Excuse me.

7           I'm sorry, your Honor.   The Abner case is

8   the case that's pending in California that involves the

9   fraudulent conveyance claim.   And I think that the only

10  issue there is whether we're going to have collateral

11  litigation in California concerning the fraudulent

12  conveyance claim.

13          The fraudulent conveyance claim is barred, we

14  believe, in California, on four different grounds.

15          First, we have Section 360(a)(1), and 360 (a)(1)

16  concerns -- I'm sorry.   360(a)(1) would protect and stay

17  against claims that involve the -- a claim against the

18  debtor.   Under Colonial Realty, that would be the first

19  ground for staying the California case.   368(3) is

20  alternative grounds for the stay, and 368(3) would also

21  kick in because we're talking about a claim that belongs

22  to the estate, and that would bring in the Mortgage America

23  case.

24          Then we have Section 105, because there are

25  indemnity claims that are implicated here.   And the indemnity

1  claims would indicate the Robinson decision, which has been

2  adopted in the McCarney case.

3          We have Cybergenics.  Under Cybergenics, the

4  Court would look to see if there's the authority that's

5  vested in the -- in the California plaintiffs to pursue the

6  fraudulent conveyance claim.

7          So this is a situation where the claim really has

8  four different -- there are four different problems that are

9  involved, whether you look at the state powers of the Court

10  or the preliminary injunction powers of the Court.

11          The issue today is whether not what actually

12  happens to that claim once it comes to rest.  The issue today

13  is whether there should be the California collateral

14  litigation at all.  And all that's before the Court today is

15  the pendency of the California case.

16          THE COURT:  In that regard, the Abner attorneys

17  tell us in their papers that under bankruptcy law generally

18  and in the Third Circuit, the Court may authorize an

19  individual creditor or an official Committee to pursue a

20  fraudulent transfer claim where the cause of action has merit

21  and the debtors have refused to prosecute the action.  And

22  that's in the context of their opening statement, that

23  although the debtors claim that the fraudulent transfer claim

24  belongs to the debtors, the law in the Third Circuit is clear

25  that a fraudulent transfer claim belongs to the creditors.

1          MR. BERNICK:  Yes.  That's the Cybergenics
2   decision.

3          THE COURT:  Right.

4          MR. BERNICK:  I think that we're going to get to
5   the question ultimately of how that claim should be pursued,
6   if it should be pursued.

7          THE COURT:  How much time are you going to take
8   to get to that, to focus on that and provide some sort of
9   position?

10         MR. BERNICK:  We can do that really -- I think,
11  in fact, the Bodily Injury Committee suggests 30 days.  I
12  don't think we have a problem with that.  It's a fairly
13  straightforward issue about the position that we're going to
14  take with regard to the prosecution of that claim.  And so 30
15  days would be sufficient for us to inform the Court as to
16  what their position would be.

17         But the only matter we're really addressing here
18  today is whether it ought to be done in California, and our
19  position with regard to California is it should not happen in
20  California.  That claim should be addressed, to the extent it
21  is addressed, here.  So 30 days --

22         THE COURT:  And I understand your position from
23  the papers.  And your time frame is you can do that in 30
24  days?

25         MR. BERNICK:  That's correct.

1          THE COURT:   You agree with the Property

2    Committee?

3          MR. BERNICK:   We agree with the Property

4    Committee.   I think it's actually the Bodily Injury Committee

5    that has taken the position it ought to be 30 days, at least

6    with regard to the decision.   I think that the Bodily Injury

7    Committee has a position that pertains to really all aspects

8    of the injunction.   They are saying they want to continue it

9    for 30 days.   We don't agree with that.   But as to what

10   should actually take place in connection with the fraudulent

11   conveyance claim, we believe we'd be prepared to address that

12   in 30 days.

13          THE COURT:   So if you were to prevail and have

14   the injunction entered and it had a time expiration of 30

15   days, you would not be back in asking for any additional time

16   on the issues that pretty much coat the -- the objections or

17   opposition?

18          MR. BERNICK:   We wouldn't need any more time

19   to address the question of what should happen to the claim,

20   that's correct.   But what we're asking for today, and what

21   we would seek not to revisit 30 days from now, is the

22   question of whether the claim should be -- should proceed

23   here or elsewhere.   That is that we believe that it should

24   proceed here.   The question of are we going to pursue the

25   claim and what should be the timing of the pursuit of the

1  claim, those are matters that we would seek to take up 30

2  days from now.

3              But we'd like the Court to enter the stay of the

4  California case as a stay that would be pendent throughout

5  the -- throughout these proceedings.

6              In other words, we would like not to revisit the

7  question of are we going to be traveling out to California to

8  pursue that claim.  If the claim is going to be pursued, it

9  ought to be pursued here.  And then the question is:  Who

10 pursues it here, and on what basis it's pursued, the timing

11 for the pursuit of that claim.

12             Those are the matters that we would be prepared

13 to and would ask to take up 30 days from now.

14             THE COURT:  And in your mind, is there really any

15 question, given what the pleadings were in the California

16 action, that you're going to come to the conclusion not to

17 pursue the claim?

18             MR. BERNICK:  I think that insofar as Grace is

19 concerned, the debtor is concerned, given the positions that

20 we've taken, Grace, through its current counsel, would

21 probably be disabled from pursuing the claim.  However, there

22 may be other ways in which -- we're very concerned that this

23 claim not become something that is a distraction from the

24 mainstream of this case.

25             Our case is -- has a whole lot of other issues to

1   be taking up that are important issues.  And based upon other

2   experience, we're a little bit worried that this kind of

3   claim becomes, in a sense, what everyone starts to focus on

4   in the case as opposed to the matters that we really came

5   here to resolve, which are the liability matters.

6              From that point of view, it may be that,

7   candidly, one of the options is that Grace would retain new

8   counsel, special counsel, a special examiner type of counsel

9   who is independent of Grace and its existing counsel, paid

10  for by the debtor, but independent of the debtor, for

11  purposes of assessing and determining whether to pursue

12  fraudulent conveyance claim.  That might be preferable.

13  There would be greater independence.

14             The claim is really being pursued in a fiduciary

15  capacity that is on behalf of all the creditors.  That might

16  be a better course than to have, for example, one of the

17  creditors be in control of the claim, which is essentially

18  what the California plaintiffs asked for.  They asked to be

19  in control of the claim.

20             There are others who may want to be in control of

21  the claim.  There are a variety of cases that have been

22  brought, all of which make the fraudulent conveyance claim.

23             So rather than confer it upon one creditor or,

24  for that matter, one of the Committees of creditors, maybe it

25  makes more sense to have the claim pursued by somebody who

1   whose sole job it is, accountable to the Court as the

2   fiduciary, to determine whether that claim should be

3   pursued.  That way there's more independence, there's more

4   accountability to the Court.  It does not become a tool or a

5   lever in the hands of one creditor or one Creditors Committee

6   to pursue.  Those are the kinds of things that we want to

7   think about and be able to report to the Court.

8            There are cases that, indeed, talk about the fact

9   that the authority, the Cybergenics analysis as an analysis

10  says that the authority to pursue the claim is an authority,

11  really is conferred on the approval of the Court.  It's an

12  authority that's a fiduciary one that's supposed to benefit

13  everybody who was involved in the case.

14           So there's an element of Court approval and

15  Court, really, supervision, ultimately, of how that claim is

16  pursued.  That's why the leave has to be sought or approval

17  has to be sought by whomever it is that wants to pursue that

18  claim.

19           So we take that seriously.  We say, Well, if

20  there's going to be Court approval and it's really a

21  fiduciary claim that's being brought, why not have it be

22  brought by somebody who's under the direct Court supervision,

23  not accountable to the rest of the Committee or to other

24  creditors, but to the Court directly, and independently of

25  all the parties to the case, to really see if the claim is a

1   worthwhile claim.

2         Obviously, our position has been historically

3   that it's not a meritorious claim, and that's why we

4   recognize that, ultimately, we'll probably be disabled from

5   pursuing it.  At the same time, it does not seem to us to

6   make sense to have the claim then kind of get tossed up and

7   whatever creditor gets it or whatever Committee gets it,

8   that's how it proceeds.

9         So those are the alternatives that we're

10  considering.

11        THE COURT:  All right.

12        MR. BERNICK:  And sorry to be a little bit

13  confused at the outset here.  I misplaced an important part

14  of my notes here.  I apologize, your Honor.

15        I don't know if there are any questions that your

16  Honor has, other questions with regard to the Abner case.

17        THE COURT:  I may have some on Price.

18        MR. BERNICK:  Okay.  Do you want to talk about

19  Price next?

20        THE COURT:  Sure.

21        MR. BERNICK:  Okay.  With regard to Price, there

22  was an emergency motion with respect to Price.  Obviously,

23  it's our position that there really is no emergency here.

24        The Price case is an MDL pending in Boston.

25  Nothing has happened with regard to that case beyond the

1   entry of case management order and the briefs that have been
2   filed in connection with class certification.   There's no
3   class certification ordered.   The CMO calls out a whole
4   series of activities that would take them until July of next
5   year.   And so there's no mature trial imminent case that's
6   out there, which are the classic parameters of when you would
7   lift the stay.

8          More particularly, and there's a suggestion in
9   the papers that there's some other element of emergency, that
10  there's a need for warnings to go out or information to go
11  out or to protect the interests of the people in the Price
12  case.

13         That issue, that is, is there some kind of
14  emergency with respect to notification, already was litigated
15  in connection with the Barbanti class action in Washington
16  State.

17         Your Honor may recall or may not recall, the
18  Barbanti case has been certified as a statewide class in
19  Washington State, and there was a preliminary injunction
20  request, I believe, or request for emergency relief, to
21  notify people of the hazards of Zonolite.   There was a
22  contested here -- evidentiary matters were presented to the
23  Court, and the Court there said that there was no need for
24  any kind of interim or preliminary notification.   So there's
25  no element of emergency whatsoever with respect to Price,

1   none.

2            Price, in addition, presents a very fundamental

3   issue to this case, and, frankly, it's a -- we regard the

4   motion as something of an extreme motion.  The whole purpose

5   of a mass tort bankruptcy in the first instance is to bring

6   all of the claims before one Court, all of the claims before

7   one Court, so they can be consolidated and dealt with on a

8   centralized basis.  That's just basic mass tort bankruptcy.

9   That goes back to the Manville case.

10           That whole issue, that the Court have the power

11  to bring into one location all of the cases for centralized

12  proceedings, was extensively litigated in connection with the

13  Robbins case, because in Robbins, there are cases all over

14  the country.  Judge Merage (phonetic), the trial judge there,

15  had them all transferred to the, I think it's the Eastern

16  District of Virginia.  It was his courtroom in Richmond for a

17  consolidated proceeding.  That went up to the Fourth Circuit

18  and was affirmed.

19           There was extensive discussion I know that

20  your Honor is familiar with about all the different grounds

21  for corralling all the cases in one location.  That's the

22  case, that's the decision that went forward and talked about

23  the stay powers of the Court, the injunction powers of the

24  Court, and the importance of all those different powers to

25  bring to bear in one Court all the cases that were pending

1    elsewhere.

2              Again, centralization was the essence of what the

3    first part of the bankruptcy was all about.

4              And then we litigated the issue again in

5    connection with Dow-Corning.  There was extensive litigation,

6    including involving the very firms that are involved in the

7    Price motion, in the case that's pending in Boston.  And,

8    again, the Court, it went up and down to the Sixth Circuit on

9    two different occasions.

10             The Court was unequivocal in saying

11   centralization is the principal function that we have

12   to be acquitting here.  Centralization is key.  What the

13   Price request is all about is to say that even as to the

14   matters that are central to this Chapter 11, even as to those

15   matters, we're now going to have collateral litigation that's

16   pending in other courts to take up issues or discovery or

17   other matters of that nature.  They're saying, Well, let the

18   Court in Boston consider class certification.

19             THE COURT:  I thought you really thought what it

20   was all about was who was going to be running that litigation

21   for the plaintiff.

22             MR. BERNICK:  That is the more -- we believe

23   that's also true, but I was -- that's kind of a more

24   political analysis.  We think that is also true.

25             THE COURT:  Okay.  You put a line about it in

1   your papers.

2            If that's what it's really all about, what is the

3   harm to the estate to let that all occur up there, let them

4   fight out who's going to lead the case and then bring them

5   down here?  I mean, what interest do you have in who, you

6   know, gets the benefit of a decision about being plaintiffs'

7   lead counsel or co-lead counsel or whatever?

8            MR. BERNICK:  I'm sorry.  If the only question is

9   who gets to represent the different creditors in connection

10  with the litigation that takes place here over what happens

11  to the Zonolite claim, that is a matter in which the debtor

12  does not have a particularly active interest.

13           THE COURT:  May it actually be more efficient

14  to let that all preliminary kind of stuff take place up

15  there?

16           MR. BERNICK:  I think if all that we're going

17  to do is to take that aspect of what's pending in Boston

18  and import it here, I believe it has already been done in the

19  sense that they already have their own Committee.

20           Now, I don't know whether the other folks, for

21  example, the people who have the Barbanti class in

22  Washington, are comfortable with that or whether, for that

23  matter, whether the body injury -- I'm sorry -- Property

24  Damage Committee itself is comfortable with that.

25           But if the only question is who is it that

1   participates in this proceeding --

2              THE COURT:  It's not the only question.  There

3   are some other preliminary questions that they tag on.

4              MR. BERNICK:  They want to take on class

5   certification and discovery, which we feel very, very

6   strongly --

7              THE COURT:  Right.  Put discovery out.  Call

8   that more than preliminary.  The other kinds of things

9   they're talking about, what prejudice would be suffered if

10  the case eventually came here, in a combined form?

11             MR. BERNICK:  No prejudice, except I struggle

12  with what it is that they've asked for that is only that.

13  That is, what they specifically ask for in their papers is

14  class certification and discovery.  And class certification

15  is far more than who it is that represents those people.

16  That is, the whole substantive body of law and procedural

17  body of law that we think is fundamentally not the right way

18  to go and inconsistent with what we're here for.

19             Class certification --

20             THE COURT:  So your answer is it's inconsistent

21  with the purposes of the filing?

22             MR. BERNICK:  Absolutely.  Let me just, again,

23  just put it all on the table.

24             Class certification, A, creates a lot of issues.

25  You know, is it a B(2) class, really, or is it a B(3) class?

1  It creates issues about what's the nature of the relief and

2  how is the case going to be tried.  It's a whole process for

3  actually litigating the merits of the claim.

4          We're here in bankruptcy.  There are separate

5  bankruptcy procedures that are involved in determining

6  whether a claim is going to be allowed or disallowed and

7  there's a process called the bar date process.  The bar date

8  process, a date set, and people have to come in to say I've

9  got a claim that I want to have pursued.  It's a completely

10  different type of procedure.

11          This is not a case, your Honor, in which there

12  are thousands of individual suits that are pending all over

13  the country.  This is a case where there are a small number

14  of suits and they're all class actions.  And essentially what

15  they would do is to create a huge body of claims by virtue of

16  the certification.  The certification would be the creation

17  of the litigation in the first instance.

18          We don't think that there's any reason to do

19  that.  We think, in point of fact, that's exactly what we

20  want to avoid here.  What we want to have take place here,

21  let's find out the people, the individuals, who really want

22  this kind of relief to be begin with and let's do it

23  according to procedures that are used in bankruptcy, which

24  are the bar date procedures.

25          So you set a bar date, people lodge their claims

1   coming before the Court.  At that point in time, if the
2   people who are currently representing the folks in the Boston
3   case are appointed, or, for that matter, we carry it over,
4   and they represent that group of claimants, we would have no
5   quarrel with that at all.
6           Our issue is not -- our issue is not the
7   particular individuals who are involved in the Boston case.
8   Our issue is the procedure that would be applied to
9   addressing the issues that are raised in Addafill (phonetic).
10          One of the principal reasons why we filed this
11  Chapter 11, and we wrote this in our brief to the Court, was
12  to address the Addafill case, and was to do it in ways that
13  were consistent and was done in accordance with the rules of
14  the bankruptcy process.
15          What they want to do essentially is to take what
16  is a mainstream issue in the bankruptcy and say, Well, let's
17  treat it the non-bankruptcy class action way, and then bring
18  it back into the bankruptcy.  And it just does violence to
19  the whole idea of why we're here.
20          Again, we're not concerned about the political
21  situation.  That is, however they resolve who's going to
22  leave is their business.  We don't choose their lawyers.  But
23  we're very concerned about the substance that seems to attach
24  to that.  And that's why, if the Committees agree and those
25  people come in and, you know, they're the representatives,

1   that's fine.  But class action, we would be very, very much

2   against any kind of class action procedure taking place

3   there, in part because Judge Zaras, no matter how good she

4   is, she's not the bankruptcy judge and she's not sitting in

5   bankruptcy and she's going to apply Rule 23 and look at this

6   as basically a piece of civil litigation.  We just can't have

7   that.  That's just something that would be very much

8   inconsistent with why it is that we're here.

9              So we feel very, very strongly about this issue.

10  It's not an emergency matter, but we feel very, very strongly

11  about the substance of this matter.

12             THE COURT:  All right.

13             MR. BERNICK:  Have I been responsive to the

14  Court?

15             THE COURT:  Yes.

16             MR. BERNICK:  Okay.  The only other issues are

17  scope issues.  And the scope issues I think have been

18  addressed in our papers.

19             Let me touch on, I think there are three small

20  issues on the scope.  And if your Honor notes, we have

21  submitted a new proposed order to the Court in light of the

22  scope issues.

23             Number one, the Property Damage Committee.  If

24  your Honor does not have it handy --

25             THE COURT:  No, I do.  I have it to my left

1  here.  Go ahead.

2           MR. BERNICK:  I've actually got a highlighted

3  copy here, your Honor (handing document to the Court).

4           THE COURT:  Oh, if you have a highlighted copy.

5           (Pause.)

6           MR. BERNICK:  If you take a look at the

7  highlighted portions, you'll see that there have been a

8  couple changes.  The order that your Honor entered that

9  basically took us from day -- from the -- from the order that

10  was entered on the first day until this hearing partially

11  granted the relief that we requested on the first day.  And

12  what we've done is to ask for the full relief of what we

13  asked for on the first day in certain areas less -- just

14  changed a little bit.

15           The first change is that if you go down to

16  Paragraph 9, it says, "The actions includes," and it ought to

17  be, "Action include, any case filed or pending."

18           The first day order also would cover cases that

19  haven't yet been filed, future claims.  So that's a change.

20           And that was done really at the suggestion of the

21  Property Damage Committee.  The Property Damage Committee

22  said why do we want to enjoin cases that have not yet been

23  filed, and we acceded to that.  We were very skeptical and

24  remain very skeptical that that is going to be the end of the

25  matter because these cases kind of flow like a stream a

1   little bit, and if you dam it up at one part, they tend to

2   come through on another.

3           We expressed the concern if we don't put in

4   futures, all that will happen, they'll file new cases against

5   new entities or new cases against the same old entities.  And

6   the most prominent example of this is with respect to Sealed

7   Air.

8           Remember, Sealed Air is a company with whom

9   the Grace Companies did a transaction in 1998.  That was a

10  spinoff transaction.  The Sealed Air, that's the 1996 spinoff

11  transaction.  Those two companies are not debtors in this

12  case.  However, there are indemnity claims that they have

13  with respect to any claims that are brought against them and

14  before this bankruptcy was filed, a whole series of claims

15  were brought against Sealed Air.

16          As the order presently stands the way that we've

17  worded it, the only thing that's enjoined are those claims

18  that actually have been filed against Sealed Air, actually

19  filed against Sealed Air.

20          We're concerned that if we don't say future or

21  may be filed, or yet to be commenced, that all of that will

22  mean is that new people will file claims.  And

23  notwithstanding that concern, we've been conservative and

24  said simply filed or pending.  Mayor we're wrong about that.

25  Maybe it ought to be broader so that we don't have to come

1  back here.  Maybe the Sealed Air people will have something

2  to say about it.

3          But our approach here has been very

4  conservative.  We're leery of it, but we don't want to ask

5  the Court for more than what we have to today.  That's why we

6  styled it the way we did.  So that's a change.

7          Number two, if you go down to Sub C under 9,

8  entities alleging fraudulent transfer, fraudulent conveyance

9  claims, those were denied.  That relief was denied the first

10  day.  Judge Newsome said that he was not familiar with the

11  fraudulent conveyance claims, didn't know enough to really

12  deal with them.  I think there was a problem in how the

13  papers were conveyed to the Court.

14          But, clearly, we feel that that is warranted in

15  this case.  We've set it forth in our papers, and the only

16  opposition to that comes from the Abner claimants in

17  California.  But we've added that.

18          And then we've added the insurance carriers,

19  because there are direct actions that have now been brought

20  against two carriers, Maryland Casualty and Continental

21  Casualty down in Louisiana.

22          Louisiana has a direct action statute.  Those

23  insurance companies are insurance companies that have already

24  reached agreements to provide coverage to Grace, and because

25  of that, there are now settlement agreements with them that

1    leave us in the position of indemnifying them.

2            So all that those direct actions do is to go

3    after us, essentially, standing in the shoes of the insurance

4    carrier who's got the indemnity.   There's no more money to be

5    had there.   We've already gotten the money.   All it does is

6    implicate our indemnity obligation.   We want to bring that to

7    a standstill.

8            Finally, if you put your eye up to No. 7, Merrill

9    Lynch, CFSB, Insurance Carriers and Robinson, we've added in

10   Merrill Lynch, CFSB.   Those are two additional defendants in

11   the Abner case that we originally omitted to add.   The

12   insurance carriers that picks up again, that same point that

13   we've made below.   And then Robinson.   Robinson is an

14   installer and licensee of Grace, been sued in Montana, and we

15   have an indemnity that goes to Robinson, so that we've added

16   them back in.

17           So we have narrowed the scope of the request to

18   make it non-future, and we've picked up some other parties,

19   and we've picked up a couple other claims.   And in that

20   respect, we have refined the scope of the injunction.   We're

21   comfortable with that.

22           I have to alert the Court that there may be some

23   cats and dogs out there.   Maybe a couple more cases that are

24   pending.   Probably not even asbestos cases, where Grace has

25   got indemnity obligations.   We would hope we can reach

1  agreement with the other constituencies to include those in

2  at the appropriate point in time.  But we'll let you know

3  if -- let the Court know if there are problems that way.  But

4  those are the refinements that have taken place.

5              THE COURT:  All right.  Thank you.

6              MR. RASKIN:  Your Honor, would you like to hear

7  from other people in support of the --

8              THE COURT:  Yes.  There's about five minutes

9  left, if you want to take that up as opposed to reserve it

10 for rebuttal.  That's fine.

11             MR. RASKIN:  Thank you, your Honor.  I will be

12 brief.

13             Robert Raskin of Stroock & Stroock & Lavan an on

14 behalf of the Official Creditors Committee.

15             I just wanted to rise to question some of the

16 things that were just said by debtors' counsel.  We do

17 support the injunction and we do support the full scope of

18 the injunction that was originally asked for.  We are not

19 trying to bar any claims.  There will be a bar date.  Claims

20 will be brought.

21             It seems to us to be a mistake to leave a hole

22 open for people to flood claims through, although the debtor

23 has already reserved the right to come back.  It seems like

24 if we're going to grant an injunction, it should be one that

25 accomplishes its goals and states the litigation.

1            What we do feel stronger about, your Honor, is

2    the response to the questions regarding fraudulent transfer

3    claims coming back in 30 days and the suggestion how those

4    will be brought and who will bring those.

5            Your Honor, this is a bankruptcy case.  It's a

6    serious bankruptcy case.  It's a complicated bankruptcy

7    case.  There is no bar date as of yet, so we don't know what

8    the claims are likely to be.

9            The case just started.  We don't know what the

10   value of the company is going to be, so we don't know whether

11   it will be necessary to bring fraudulent transfer claims or

12   not.

13           I suggest that, as most things in bankruptcy,

14   things tend to work out, hopefully, in a consensual matter.

15   To come back to this Court in 30 days and say, this

16   Committee, that Committee or this person should bring these

17   fraudulent transfer claims means one and only one thing:

18   That is the fraudulent transfer claims will be brought and

19   there will be litigation now.

20           We think that's a mistake.  The debtor should be

21   given an opportunity along with the Creditors Committee to

22   try to work out the issues in this case, whether the company

23   is solvent, whether it can satisfy all the claims.  And if

24   not, perhaps litigation does have to be brought and the

25   fraudulent transfer claims would be brought.

1         What our Committee does not want to see happen is

2    those fraudulent transfer claims be brought before we know

3    what this case is ultimately going to be about in terms of

4    what can happen in a plan of reorganization.  We would be

5    severely prejudiced if those claims were brought right now

6    and a finding were made that the company were insolvent in

7    1996 -- excuse me -- solvent in 1996 or 1998 and those assets

8    would not be brought back into the estate whereas we find

9    ourselves now in an insolvent position.

10        I don't know whether those are the facts, but I

11   do know it's going to take some time for people to understand

12   these cases and a lot more than 30 days for people to

13   understand these cases, the values that are here, the claims

14   that are around in order to know whether those claims should

15   be brought or whether they can be consensually resolved in a

16   plan of reorganization, where the potential defendants

17   contribute to the assets of the estate, if necessary.

18        Those negotiations should have -- should happen

19   in the context of this bankruptcy and not -- not litigation

20   prematurely brought before we have an opportunity to see if

21   those negotiations can take place.

22        Lastly, your Honor, some mention was made of

23   having a third party coming into these cases as another

24   fiduciary to perhaps bring those claims.

25        At this point, as we said, we don't want the

1    claims brought, but we certainly don't want another fiduciary

2    adding another level of expenses in these cases.  The debtors

3    are a fiduciary.  There are three Official Committees, all of

4    who are fiduciaries, so I suggest to this Court that among

5    us, if the claims have to be brought, and we don't want them

6    brought now, that there are enough parties in interest in

7    this case with enough interests to bring those claims if and

8    when they should be brought.

9            Thank you, your Honor.

10           THE COURT:  Thank you.

11           MR. CHEHI:  Good morning, your Honor.  Mark Chehi

12   of Skadden Arps on behalf of Sealed Air Corporation.  I'd

13   like to move the admission of my partner from New York, Burt

14   Wolff, who would like to address the Court.

15           Sealed Air is a major creditor in the case, your

16   Honor, a major member of the Creditors Committee.

17           THE COURT:  All right.  Thank you.  I will grant

18   the application.  Thank you.

19           MR. WOLFF:  Good morning, your Honor.  Burt

20   Wolff, Skadden Arps, Slate, Meagher & Flom of New York for

21   Sealed Air Corporation.

22           Judge, the preliminary injunction order that is

23   before the Court addresses essentially two classes of cases.

24   The first are the fraudulent transfer matters and the second

25   can generally be swept under the rubric of product liability,

1    personal injury, property damage cases arriving -- arising

2    from alleged exposure to Grace's asbestos-containing

3    products.

4            Your Honor, it is essential that the stay gets

5    extended to future cases.  The TRO that Judge Newsome issued

6    on April 2nd, which was subsequently extended by order of

7    this Court, covered not only pending actions, but also

8    actions that had not yet been filed or were not pending as of

9    the date of the order.

10           Until the submission of Grace's reply papers two

11   days ago, it had consistently been Grace's position that the

12   preliminary injunction should extend to future cases.

13           Since the time Grace filed this matter and the

14   TRO was issued on April 2nd, Sealed Air has been served with

15   20 new asbestos personal injury cases arising out of alleged

16   exposure to Grace's asbestos-containing products.  Those 20

17   new cases are above and beyond the 30 cases that are

18   addressed in the affidavit of Katherine White, and I have a

19   list of those cases for the Court and counsel (handing

20   document to the Court).

21           Based on my conversation with a plaintiff's

22   asbestos lawyer, it is reasonable, and I -- maybe I'm

23   understating this, to expect an avalanche of hundreds,

24   if not thousands, of new cases to be filed if the

25   preliminary injunction does not extend to future cases.

1     Now, one of the key issues that concern all of
2  us is that of judicial economy.  If the preliminary
3  injunction does not extend to future cases, then, given a 20-
4  day period within which to answer or move, it seems likely
5  that at least every two weeks we are going to be back before
6  this Court, asking first for a TRO, and then later for a
7  preliminary injunction with respect to these claims, even
8  though none of the underlying facts or circumstances will
9  have changed.

10     That is an unnecessary waste of judicial
11  resources and cost to the parties insofar as Sealed Air's
12  attorneys' fees are concerned with respect to those matters.

13     We have a claim for indemnity against Grace for
14  our fees.

15     It is in the compelling interest of judicial
16  economy to resolve this matter one time only, and that time
17  is now.  We, therefore, urge the Court to issue the
18  preliminary injunction as it was initially requested to
19  cover future as well as current actions, whether fraudulent
20  transfer, and I understand that those fraudulent transfer
21  claims involve complex and weighty issues as well as for the
22  product liability-type claims.

23     Does the Court have any questions?

24     THE COURT:  No.  Thank you.

25     MR. WOLFF:  Thank you, your Honor.

1          THE COURT:   Thank you.

2          All right.   The proponents have used their time.

3    We'll move to those in opposition.

4          MR. LeCLAIR:   Lew LeClair on behalf of the Abner

5    plaintiffs.

6          Our position is that the motion of the debtor is

7    premature at this point.  We are in agreement with the

8    Committees, at least the two Committees, the Bodily Injury

9    and Property Damage Committee, that there can be a stay for

10   30 days to enable them to determine where, when and how the

11   claim should proceed, the fraudulent transfer claim.  We just

12   want to be sure that we preserve all of the options.

13         I think the debtors' motion seeks to terminate

14   the action in California before the Committees have an

15   opportunity to determine procedurally where and how they want

16   to move forward and to ask the Court for whatever permission

17   they want to ask the Court.  Ultimately, we have not sought

18   leave yet to proceed on behalf of the Abner plaintiffs

19   because we want to cooperate with the Official Committees and

20   determine where they want to go and how they want to go.

21         So our position is ultimately that it's fine to

22   have a 30-day stay and to come back.

23         We will adamantly oppose an attempt by the debtor

24   to appoint some examiner to delay this claim, which we

25   believe is the most important issue.  It's not a side issue;

1    it's the most important issue.   Needs to be brought.   Needs

2    to be brought promptly.

3            So that's going to be our position.

4            But we are perfectly willing -- we're not trying

5    to have a competing race to judgment among creditors.   We

6    believe there ought to be a consolidated action.   Our only

7    goal is to allow the Committee sufficient time over the next

8    30 days to determine exactly how procedurally they want to go

9    forward, because there may be procedural reasons they choose

10   to intervene our action as opposed to filing an independent

11   action.   They may want to be here.   The Court may want to

12   have it here.   All of that is perfectly fine once there's an

13   opportunity to have that determination made.

14           So ultimately I don't think today is the day for

15   the battle about where and how this should go forward.   But

16   we don't think the Court, and we'd implore the Court not to

17   enter an order that prohibits further actions in California

18   should the Committee decide that's ultimately what they want

19   to seek leave from the Court to do.

20           Thank you, your Honor.

21           THE COURT:   All right.   Thank you.

22           MR. SULLIVAN:   Good morning, your Honor.   Bill

23   Sullivan from Elzufon Austin, on behalf of Paul Price and the

24   Zonolite litigation plaintiffs.

25           My office filed motions pro hac vice for Robert

1   Fishman and Robert Sobol Tuesday.  I would request that they

2   be admitted so they can address the Court.

3           THE COURT:  Thank you.  Your application will be

4   granted.  Welcome.

5           MR. SOBOL:  Good morning, your Honor.  Thomas

6   Sobol of Lieff, Cabraser, Hiemann & Bernstein.

7           MR. FISHMAN:  Robert Fishman of Shaw, Gussis,

8   Domanskis, Fishman and Glantz in Chicago.

9           MR. SOBOL:  Your Honor, I believe that Mr.

10  Bernick addressed two issues.  Let me first address the issue

11  with respect to the injunction.  Our opposition was in a

12  limited opposition with respect to the injunction.  The

13  injunction would have enjoined the Price plaintiffs from

14  litigating the MDL case against Sealed Air on the merits in

15  addition to litigating an issue with respect to the

16  fraudulent conveyance.

17          Because we did not want this Court to be issuing

18  an injunction without recognizing that there are additional

19  issues vis-a-vis the MDL and the potential likelihood or

20  possibility of litigating on the merits issues in the MDL, we

21  filed the objection.  The specific request, then, that we

22  would ask be taken care of vis-a-vis the injunction is simply

23  that the injunction only go so far as not to enjoin the

24  parties from litigating cases that have -- that are the

25  subject of any order that this Court may enter with respect

1   to relief from the automatic stay.

2          If this Court were to issue the relief we've

3   requested vis-a-vis the automatic stay, then, by the same

4   token, the injunction, if you will, is lifted as to Sealed

5   Air and the issues that have been within the scope of the

6   automatic stay, those issues that have been lifted vis-a-vis

7   the automatic stay would similarly be listed vis-a-vis Sealed

8   Air.

9          Sealed Air does have the right to defend the

10  Zonolite case in Boston on the merits, if that case is going

11  forward, and we would not want there to be some kind of

12  technical glitch there.   That's the limited nature of our

13  objection vis-a-vis the injunction.

14         Now, Mr. Bernick for Grace has, in essence,

15  argued the merits of the automatic stay.   I guess I ask the

16  Court right now whether you'd like us to address those

17  arguments now or wait until later on in the agenda, where you

18  have Item No. 13, the automatic stay issue.

19         THE COURT:   Why don't you address it now.

20         MR. SOBOL:   Okay.   And I also note there

21  was something about time limitations.   I want to make sure

22  I don't take too much of the Court's time.   I'm not trying

23  to --

24         THE COURT:   Each side was allowed, in addition,

25  to present 30 minutes total, with the understanding that we

1  read the papers that were presented.  It's an opportunity

2  to focus on what you might want to focus on or to respond

3  in some way in greater detail to what the other side said.

4          MR. SOBOL:  Sure.  30 minutes is not going to

5  be necessary, I don't think, unless my brother takes up --

6          THE COURT:  No.  That's the total for everybody.

7          MR. SOBOL:  Right.  I understand that.

8          I think it's important to have a very brief

9  background regarding the facts and the prior proceedings in

10  order to be able to hit the really germane and practical

11  issues, which are, first, whether the class certification

12  issue, Judge Zaras should be permitted to conclude the

13  process that was under way vis-a-vis that.

14          Second, also to address the practical question

15  vis-a-vis the discovery issue that we've raised.

16          And because my points with respect to both of

17  those rely somewhat and my response to Mr. Bernick relies on

18  a couple background facts, I would like to simply outline

19  those.

20          For a couple of decades or more, W.R. Grace,

21  on its own, manufactured and distributed throughout this

22  country Zonolite attic insulation, a loose fill attic

23  insulation, which turns out can, and frequently does, under

24  certain circumstances, release fibers when disturbed that

25  are -- exceed appropriate thresholds.

1          That loose fill attic insulation exists all
2    throughout this country in likely tens of thousands, if not
3    hundreds of thousands, of homes.

4          Attic insulation became the subject of litigation
5    recently, in the past year or a couple of years, has been the
6    subject of extensive proceedings in the State of Washington
7    and a small handful of other class action cases.

8          In the Barbanti case, which is now a statewide
9    Washington case, has been certified by the Washington State
10   Court Judge, and residents in the State of Washington, people
11   who have Zonolite attic insulation in their homes, many be
12   receiving notice crafted by the parties and the Court
13   regarding what Zonolite attic insulation is, what it looks
14   like, the potential hazards that it may or may not have and
15   the existence of the class action case.

16         This kind of litigation is markedly different
17   than the kind of bodily injury or traditional property damage
18   cases that have been litigated throughout this country and
19   have been the subject of cases that have made their way to
20   the Supreme Court, that have had a lot of litigation.
21   Zonolite is markedly different.  It's not only a property
22   damage case, it's a case that's largely equitable in nature.
23   It tries to educate people not merely by notice to proposed
24   class members, but also seeks to afford equitable relief in
25   the form of creating funds by which a fund can further

1   educate people regarding the damage that may or may not be

2   caused by this, to help, and also to create funds that if

3   people do have to disturb or shore up their attics so that

4   this loose attic insulation does not get disturbed, that

5   those funds can be available.

6               This case, the MDL, was the product of the usual

7   judicial panel, and W.R. Grace strenuously made the pitch

8   that the best plays for the rights for this claim to be

9   fashioned, the adversarial process, for us to figure out

10  whether or not this is an important issue for Americans, that

11  W.R. Grace manufactured and distributed to households

12  throughout this country this potentially dangerous product,

13  and how this society, and the responsibilities that W.R.

14  Grace will have with respect to that problem, is an issue

15  that should be adjudicated in a Court.

16              And W.R. Grace and certain parties may be -- took

17  the view that it should be consolidated for efficiency

18  purposes in the District of Massachusetts before an MDL judge

19  there, where that occurred.

20              And for the past several months, we've banged out

21  a CMO in which Judge Zaras plans to try the case, if it needs

22  to be tried, next year, in June, and she set a schedule of

23  events, including a Daubert hearing that she would have and

24  summary judgment issues that she would address toward the end

25  of this year and early next year, that fashioned and deal

1   with this issue.

2           Knowing that Judge Zaras was going to have a

3   hearing about a week ago, and this April W.R. Grace filed

4   this bankruptcy petition in early April.  And they make no

5   bones about what the purpose, from their point of view, that

6   this bankruptcy is.  They don't ever want there to be a class

7   certification process because, from W.R. Grace's point of

8   view, it is litigants and lawyers that create the problems,

9   not W.R. Grace.

10          And Mr. Bernick has made no bones about it:  That

11  if there is ever a class certification process, it would, he

12  says, create litigation.

13          Well, I would suggest that it's not litigants who

14  are creating the litigation and the problems.  It's obviously

15  W.R. Grace and its distribution of the product over the

16  years.  And then the question is:  How is society is going to

17  address it?

18          Very simply, then, there are two practical issues

19  and one nonissue.  I've heard from Mr. Bernick, and

20  apparently there's some suggestion in the papers somewhere

21  which frankly has escaped me.  There may be some feud as to

22  who the lawyers are that are going to litigate this claim and

23  that kind of thing.

24          I will tell you I know of no issues with respect

25  to leadership whatsoever.  There's a leadership structure in

1    place endorsed by Judge Zaras up in Boston.  In this court,

2    there are Creditors Committees in which Barbanti is a

3    Zonolite plaintiff, is a member of the Property Damage

4    Committee, and in Price is a creditor who presumably and

5    realistically is represented through that Committee.  There

6    are no issues regarding leadership, at least that I'm

7    personally aware of.  There are, however, two immediate

8    issues that we do think are appropriate.

9              First, to have class certification heard before

10    Judge Zaras.  It's a discrete issue.  It's an issue that has

11    been briefed.  It's ready to go.  It's where W.R. Grace and

12    the parties thought was the best place to address this

13    issue.  And it is -- you've read the balance of the papers,

14    so I think that it's well within the case law.

15              There's nothing in the case law that says

16    asbestos is an exception and we never grant relief from the

17    automatic stay.  It's an asbestos case, which is essentially

18    W.R. Grace's view.  It's not what the law says.  The law says

19    differently, and we've made -- we've stated to this Court

20    what the law is.

21              I will also say this, your Honor:  As a practical

22    matter, there will be a need to recognize what Grace wants to

23    do here.  What Grace would like to do in this bankruptcy

24    process is curtail the process of realistic education for

25    American citizens regarding the existence of this problem.

1   And it would like to in some way not have class certification
2   go forward somewhere, whether it's in Boston or here,
3   truncate the notice process to the extent that it can, within
4   certain marginal limitations, try to have a discrete number
5   of individuals who may have some particular heightened
6   awareness of Zonolite problems fall through the cracks and in
7   some way address that handful of people.  Terminate the
8   bankruptcy and leave behind for society and for people the
9   problem of Zonolite attic insulation.

10              We don't think that's an appropriate way to go.

11              Finally, as to what has gone on in the MDL, there
12   has been a considerable amount, although, to be sure, it
13   hasn't been pending there for a long period of time.  The
14   Court has heard the parties, does have a schedule of events
15   in terms of how to fashion and address this issue.  There has
16   been an enormous amount of discovery undertaken within a very
17   short period of time, including a dozen or more lawyers who
18   have done discovery.

19              So having said all of that, I just think that we
20   would rest on the brief and what my brother, Mr. Fishman, has
21   to say.

22              THE COURT:  Thank you.

23              MR. FISHMAN:  Your Honor, I have very limited
24   comments.

25              I think it has been interesting for me to listen

1  to the debtor advise the Court about what the playing field

2  is supposed to look like, what order things are supposed to

3  happen in, and who gets to decide the order in which they

4  happen.

5        Your Honor, I'm a very experienced Chapter 11

6  lawyer.  I know that it's always the debtors' job to try to

7  organize the case in a manner that most suits the debtors'

8  goals.  However, that's not the Court's job, and the parties

9  are not bound by the' debtors vision of the case.

10        The most compelling issue before the Court with

11  respect to the Zonolite claimants, your Honor, is not what

12  relief they're going to be entitled to.  It's not how much

13  money they are going to get or when they are going to get it

14  or how they're going to get it.  It's who are they, because

15  these claimants don't know they have claims.

16        And the claims bar date process with a typical

17  mailed notice to known claimants and a published notice in

18  the Wall Street Journal and wherever else the parties might

19  contemplate publishing a notice is not going to reach the

20  claimants.  They're not going to know that they even need to

21  come forward.

22        I consider myself to be a relatively

23  knowledgeable person, aware of what's going on in the world

24  around me, and I don't think I ever even heard of Zonolite

25  until approximately three months -- excuse me -- three weeks

1    ago.   I don't know if I have Zonolite in my attic, and after

2    what I read in these papers, I'm not particularly inclined to

3    go up there and look.

4              One of the big issues that we have here, your

5    Honor, is we have to design a system that is certain that it

6    does not disenfranchise these people from participating in

7    this case.

8              The debtor has suggested that the merits of these

9    claims are not high, and that in the end, they'll prevail,

10   and they won't be required to pay anyone any money.   That may

11   or may not be true.   I really don't know if that's going to

12   be true.

13             But the most important thing that this pro⸳

14   has to ensure is that all of these people become awar⸳  ⸳⸳

15   this potential claim that they have, have a meaningful⸳⸳⸳

16   opportunity to appear before the Court, whether it's this

17   Court or the Court in Boston, or a Court somewhere else,

18   present their claim, and have it adjudicated.

19             And the process that the debtor has outlined and

20   the one that the debtor hopes it can persuade this Court to

21   follow is one which I believe, your Honor, is designed to

22   prevent exactly that from happening.

23             We think that the essential ingredient for making

24   sure that these claimants have a meaningful opportunity to

25   participate in this case is for the class certification to be

1   allowed to go forward so that, hopefully, assuming that, from

2   our standpoint, that a class certification effort is

3   successful, that one person can stand before this Court,

4   speak for these claimants and act for these claimants so that

5   their potential claims are not left behind because they don't

6   even know they have them.

7           We think, your Honor, that's the essence of the

8   cause for lifting the stay, to allow the certification to go

9   forward, and we are not asking today for this Court to let

10  the merits of this claim be decided in Boston.  We may or may

11  not come back in the future and ask for that.  But we're not

12  asking for it today.  We do think that the Court in Boston is

13  poised to act.  We think that it would be a waste of the

14  resources of the parties and the Court to start all over

15  again here.

16          And if your Honor was not inclined to allow class

17  certification to go forward in Boston, we would immediately

18  bring that issue before your Honor and ask your Honor to deal

19  with it.

20          So in our view, someone is going to deal with

21  this issue at some time, and it makes sense for us, for the

22  Court that was in the middle of dealing with it, to continue

23  dealing with it instead of starting all over again here.

24          Your Honor, those are my comments.  Thank you.

25          THE COURT:  All right.  Thank you.

1          Does anyone else want to be heard in opposition?

2          MR. BAENA:  May it please the Court, Scott Baena

3     on behalf of the Official Property Damage Claimants

4     Committee.

5          Good morning, your Honor.  I will try to make it

6     brief and not be repetitious.

7          We, obviously, are opposed to the debtors'

8     motion.  We've objected to it.  We have apparently, however,

9     reached some common ground.  There appears to be no

10     disagreement any longer that this litigation ought to be

11     consolidated.  There appears to be common ground that the

12     litigation against Sealed Air and Fresnias is a claim of this

13     estate.  And despite the presentation of the Official Trade

14     and Bank Committee counsel, this litigation, in fact, will be

15     a centerpiece for some time, I suspect, of this bankruptcy

16     proceeding.

17          So the real question, I think, that emerges, and

18     as I think the Court has already perceived, is where this

19     litigation will be prosecuted and by whom.

20          Let me start with by whom.  The notion of

21     a special prosecutor or an examiner is, we think,

22     respectfully, your Honor, just another device or

23     attempt to disenfranchise the real parties in interest in

24     this litigation.  Indeed, as described by counsel for the

25     debtors just a few moments ago, he has presented a virtually

1    unworkable mechanism for the appointment and for the process

2    of a special prosecutor.

3              It puts the Court in an untenable position of

4    conceivably being the trial court as well as the body that

5    is with authority to supervise the special prosecutor in

6    determining whether or not to bring an action, which we think

7    is irrefutably an action that needs to be brought by this

8    estate.

9              The point is we think irrefutable that the

10   existing litigants and the Committees are not only the

11   appropriate parties, but the parties most capable of

12   prosecuting this action.

13             And if it is appropriate to rule upon that today,

14   we would urge the Court to disenfranchise the debtor, in

15   essence, from making any determinations about how and when

16   this litigation will be brought in the face of its positions,

17   which are wholly inconsistent with the notion of even

18   bringing this litigation, as they have already conceded to

19   their credit.

20             With respect to the argument of Sealed Air, that

21   notwithstanding the debtors' agreement with the Property

22   Damage Committee that future suits ought not be enjoined by

23   this Court at this point in time, Sealed Air, of course, says

24   you ought to do so.

25             The fact that the debtor has agreed with the

48

1  Property Damage Committee that you ought not and cannot at
2  this juncture, preliminarily or otherwise, enjoin future
3  litigation underlines any basis whatsoever for Sealed Air to
4  come in here and argue otherwise, because the only
5  conceivable and legitimate basis for extending, in effect,
6  the automatic stay or other injunctive relief akin to the
7  automatic stay is the effect it would have on the
8  reorganization of this debtor.

9       If the debtor has come to the conclusion that
10  that litigation can be filed and will address it at a later
11  time without affecting its ability to reorganize, it's
12  virtually a legal impossibility for Sealed Air to take a
13  different position.

14       Finally, your Honor, if I may comment on the
15  Price limited objection to the relief sought by the debtor,
16  as I understand it, Price is merely seeking to ensure that
17  it preserves its right at the appropriate time, maybe today,
18  to obtain relief from the automatic stay to do just two
19  things:  The first is to seek class certification and the
20  second is to conduct discovery in connection with that
21  certified class.

22       Your Honor, to provide a different bankruptcy
23  perspective and propriety and the appropriateness of granting
24  Price that limited relief, I think we ought remember that the
25  bankruptcy purpose of class certification is to enable a

1    class claim to be filed in this case.

2              The debtor has made it clear from the outset of

3    this case, through it's informational brief, through its

4    comments to this Court, that it is going to attempt to

5    prevail upon this Court to create a series of bar dates. In

6    the case of Zonolite attic insulation, a separate bar date.

7    They ambiguously refer to whether or not it will be before or

8    after other bar dates, but the point is they're going to seek

9    a special bar date with respect to Zonolite attic

10   insulation.

11             If class certification does not occur, there are

12   tens of thousands, if not hundreds of thousands, of class

13   members, as we have already heard, who will have no

14   opportunity, let alone knowledge of the existence of that bar

15   date and the ability to comply with that bar date.

16             I think that the whole tactical intent of the

17   debtor is to accomplish just that:  To eliminate those

18   hundreds of thousands of claims through a procedural

19   device of shortening in the first instance the bar date

20   and, secondly, prohibiting anybody from certifying the

21   class.

22             We think that that undermines the legitimate

23   claims and interests of persons within the constituency

24   of the Property Damage Committee, and that the Court would

25   not allow that to occur.

1   Thank you, your Honor.

2   THE COURT:  All right.  Thank you.

3   MR. ZALESKI:  Good morning, your Honor.  Matthew

4   Zaleski, Ashby & Geddes, on behalf of the Asbestos Injury

5   Personal Claimants Committee.  I'd like to introduce to the

6   Court and move the admission pro hac vice of Peter Lockwood

7   of the Caplin & Drysdale firm.

8   THE COURT:  Thank you.  Your application is

9   granted.

10   MR. LOCKWOOD:  The Bodily Injury Committee,

11   your Honor, I guess we're winding up.  We've consolidated

12   two agenda items here, if I understand the argument.  One is

13   the injunction and the other is the lift/stay in the Price

14   case.

15   With respect to the injunction, the Bodily Injury

16   Committee's of the matter is that the only appropriate

17   solution at this point that would allow, on one hand,

18   preservation of the status quo and on the other hand, the

19   various parties that you've heard from today, many, if not

20   all of whom, have divergent views about how the fraudulent

21   conveyance action should proceed, a reasonable opportunity to

22   see if there could be some sort of agreement on that subject

23   and, if not, at least an orderly presentation of the

24   different proposed solutions.

25   Certainly, the Bodily Injury Committee disagrees

1    strenuously with the debtor, that the fraudulent conveyance

2    claims are side issues.  We agree with the Property Damage

3    Committee that they are, indeed, central issues.  Even using

4    the debtors' own financial information that's in its

5    information brief and its previously filed SEC documents, the

6    amount of the assets and the value of the assets of the

7    debtor conveyed away in 1996 and 1998 dwarf the value of the

8    assets remaining.

9            The Bodily Injury Committee is confident that the

10   value of the assets remaining are also dwarfed by, at a

11   minimum, the asbestos personal injury claims.

12           Certainly, there are a lot of property damage

13   claims, particularly the Zonolite attic insulation claims,

14   that are going to have to be addressed as well.  Certainly as

15   alleged, they also dwarf it.

16           And we believe that, sooner or later, there is

17   going to have to be a decision to go forward with these

18   fraudulent conveyance claims unless, for some reason

19   presently unknown to us, everybody should decide that they're

20   not worth pursuing.

21           We also agree with the Property Damage Committee

22   and with Mr. LeClair, that the idea of appointing some sort

23   of neutral third party to process these claims is nothing but

24   a desperate effort to try and get somebody in here that the

25   debtor could lobby to attempt to convince that it wasn't in

1  the interests of the estate.

2            The estate has three official representatives:

3  The three Committees.  And that's -- and this proposed

4  representative wouldn't have a client.  I mean, normally,

5  when lawyers make decisions about whether to pursue

6  litigation costs, benefit analysis and the like, they discuss

7  it with a client.

8            Mr. Bernick has conceded that his client, the

9  debtor, is disabled.  He apparently envisages the Committees

10  as inappropriate clients.  So I guess that means he doesn't

11  mind making your Honor the client, because I don't know who

12  else this professional would discuss the merits of the

13  litigation with, and that is wholly inappropriate on its

14  face.

15            The idea of an examiner is the examiner would not

16  solve anything, because the examiner, under the powers of the

17  Bankruptcy Code, does not have the power to institute

18  litigation on behalf of anybody.  And there are plenty of

19  people around that are willing, ready and able to examine the

20  merits of this litigation.

21            So we think that the interested parties should

22  get together and try and see if they can resolve this issue.

23  And we would consent, just by their opposition in principle,

24  to this injunction, to a continuation of the injunction for

25  30 days, to enable them to do that.

1              It is possible, as Mr. Kruger has pointed out,
2    that 30 days might not prove to be enough.  I hope it will.
3    If it isn't, we could certainly come back to your Honor and
4    suggest another extension.  I know that there have been
5    a number of instances, Pittsburgh-Corning, for one, that
6    were involved where consent injunctions have been extended
7    for periods while people have attempted to work matters out,
8    and I don't see any reason why that would be unacceptable in
9    this case.

10             The Price motion, it seems to me there are
11   two aspects of it that I think first require some
12   clarification.

13             As I understand the Price case, it involves
14   both a class action on the merits against the debtor and
15   others for --- with respect to the Zonolite attic insulation
16   product.  It also involves a fraudulent conveyance claim
17   against Sealed Air.

18             With respect to the second aspect of Price, I'm
19   not sure -- I don't think that the lift/stay has requested
20   that the fraudulent conveyance part be permitted to go
21   forward as part of the certification/discovery request.  But
22   if it does, we would oppose that.  We think that the -- that
23   fraudulent conveyance piece of that litigation should be
24   treated just like the Abner case and any of the other cases
25   that might be out there raising that type of claim would be

1    subject to the 30-day stay.

2              With respect to the other part of the lift/stay,

3    the class certification in particular, our view in the

4    matter, frankly, is that although we don't have a position on

5    the merits for certification at this moment, we do have a

6    position about who ought to decide it.  And that is, we think

7    it ought to be decided by your Honor.  And the primary reason

8    for that, frankly, is that, as has been pointed out, there's

9    going to be an interplay here between the proof of claim bar

10   date procedure set up by the bankruptcy rules and the notion

11   of doing anything on a class basis.

12             This case appears, and, again, this has been done

13   on such a rush basis that nobody, I think, other than the

14   authors of the pleadings themselves fully understand all the

15   ramifications.  But this case appears to be seeking a

16   non-opt-out mandatory class certification in which they would

17   seek both notification to warn of the perceived dangers of

18   Zonolite and some form of damages.

19             Respectfully, I think there's a big difference in

20   a bankruptcy context between the possibility of under Rule

21   7023, for example, permitting class certification on a

22   notification program, if the Court determines that such is

23   needed, versus a single class claim in some mega-hundred

24   million, billion dollar amount for some.  As their

25   information brief suggests, a million householdres who want

1  nine to $10,000 apiece to remove the attic insulation from

2  their attic.

3          While it's conceivable that, at the end of the

4  day, that might be the outcome of any class treatment of that

5  litigation, we're not prepared to say that that sort of a

6  decision with respect to the certification issue should be

7  made by a non-bankruptcy judge in Massachusetts, who isn't

8  going to be asked to take into account the limited funds

9  available to pay all creditors in deciding what types of

10  certification will or will not be permitted with respect to

11  the damage elements of that litigation.

12          So we would suggest that the -- that the Price

13  plaintiffs be permitted to, in the ordinary course, present

14  their case here in this Court, move for class certification,

15  everybody participate with respect to the bankruptcy aspects

16  of that, and move forward in that regard.

17          Thank you, your Honor.

18          THE COURT:  Thank you.  All right.  You have

19  about two minutes.

20          MR. BERNICK:  That's all I would like, your

21  Honor.

22          First, to clarify, I made reference to Special

23  Examiner and I'm informed by my learned counsel that we're

24  really -- that has special meaning under the code,

25  potentially.  What I'm really talking about is the debtor

1    retaining special counsel so that the client would be the

2    debtor if the claim is pursued, and this is what we would

3    like a little bit more time to think about.  And we would be

4    talking about a special counsel to the debtor, but it would

5    be counsel that is, in the sense, reportable to the Court,

6    including for the preliminary determination about the merits

7    of the claim itself.  That's what we are looking for, is

8    accountability to the Court, that the claim is worth

9    pursuing, so it does not simply become a tool in the

10   bankruptcy.  There's really a candid, up-front assessment

11   of merits to the claim.

12            Number two, the argument that has taken place

13   about the Price claim in particular demonstrates that the

14   issue in the minds of the people who are pursuing this matter

15   today is not simply who is in control of that litigation.

16   All the points made were substantive points:  Should there be

17   special notice?  Is the bar date adequate?

18            I would agree with Mr. Lockwood:  Those are

19   matters that ought to be decided in this proceeding.  Those

20   are matters that pertain to how the case is actually

21   pursued.  They should not be decided by a judge who's not

22   intimately involved in this case.  This is not simply a

23   question of who represents these people; it's a question of

24   notice and participation.  Those are substantive and

25   procedural matters.  We don't need to start all over, but the

1   matters should be placed before your Honor.

2              Finally, with regard to the futures, I hasten to

3   add it is whether the injunction ought to extend to the

4   claims.  It is not property damage claims.  The concern there

5   is all of these personal injury claims that seem to keep on

6   coming through the process and apparently are still coming

7   through with respect to Sealed Air.  Those are personally

8   claims.  They're not even the constituency that Mr. Baena

9   represents.  That's where the concern lies:  That people will

10  continue to pursue those future claims notwithstanding the

11  order that your Honor has issued.

12             So there is some merit to what Sealed Air has to

13  say on the personal injury claim side.

14             THE COURT:  All right.  Thank you.

15             Okay.  With regard to this application for

16  preliminary injunction, I am going to enter an order.

17  And the order essentially is the order submitted by the

18  debtor.

19             What I am going to order is that the

20  prosecution of all actions are stayed and enjoined

21  pending a final judgment in this adversary proceeding or

22  further order of the Court, and also that the preliminary

23  injunction does not apply to pending motions for transfer and

24  the two cases cited in the proposed order, and that further

25  provide that nothing in the order will prevent anyone from

1   providing notice to insurance carriers or other appropriate

2   persons or entities that would otherwise exercise their

3   rights under the insurance policies provided they don't seek

4   reimbursement or payment under the policies without order of

5   the Court.

6           This order, by implication and expressly,

7   will overrule any objections and deny any competing

8   applications.

9           It is to be understood when the order is

10  entered with the findings that will accompany it that the

11  order in no way addresses any other matter.

12          For instance, it does not address the issue of

13  whether or not class certification will be undertaken or --

14  whether it is undertaken or not, whether it will be done here

15  or in Massachusetts.  It implies nothing about the California

16  litigation.  What it simply does is enjoin, so that the Court

17  and the interested parties can move forward to get the

18  litigation that accompanies this bankruptcy in some sort of

19  order.

20          All right.  I see the Trustee has arrived.

21          MR. CHEHI:  Your Honor, Mark Chehi for Sealed

22  Air.

23          Just one quick question:  Does the scope of

24  the injunction then extend to the future filed or future --

25          THE COURT:  Does not extend to future

1    litigation.  I am going to make a finding in the findings

2    section of the order at this time that it only pertains to

3    filed cases and/or pending cases, but doesn't foreclose the

4    consideration of whether cases that may be filed or

5    contemplated be filed should be enjoined in the future.

6                 MR. CHEHI:  So it's without prejudice to the

7    debtor or --

8                 THE COURT:  Or any other party.

9                 MR. CHEHI:  Thank you, your Honor.

10                 MR. SPRAYREGEN:  Your Honor, the U.S. Trustee has

11    arrived, but we would actually like to come back to that Item

12    6 after we move forward.  Hopefully, we'll try to find a way

13    to resolve that before we get back to it.

14                 THE COURT:  All right.

15                 MR. SPRAYREGEN:  We would then be prepared to

16    move on to Item 10 on the agenda letter, which is the

17    debtors' emergency motion for interim and final orders for

18    DIP financing.

19                 Your Honor, there were, in the course of events

20    of this DIP, we originally had asked at the interim hearing

21    on the first day of the case before Judge Newsome for a

22    hundred million dollar interim DIP.  We thought it would go

23    out about 30 days.  We ended up with $50 million interim for

24    15 days.  We ended up back before your Honor on April 18 and

25    extended that out to today at $100 million, a second interim

1   order.

2          In the interim there was an April 25 new
3   objection deadline established to the final DIP.  There were
4   two objections received, one of which we resolved.  One of
5   the objections was by the Official Committee of Property
6   Damage Claimants, in essence having some concerns about
7   making sure that they receive notice of things and concern
8   about what priorities would be in the event of Chapter 7.
9   We've made some changes to which I understand they've agreed
10  to the proposed final order, and that would resolve their
11  objection.

12         So that would leave the objection of Credit
13  Lyonnais, your Honor, and we have had a number of
14  conversations with them in an attempt to resolve that
15  unsuccessfully.  I'm not sure what's left of their
16  objection.

17             THE COURT:  Let's hear the objection.

18             MR. SPRAYREGEN:  Thank you.

19             THE COURT:  Thank you.

20             MR. MONACO:  Good morning, your Honor.  Frank
21  Monaco for Credit Lyonnais.  I'd like to introduce and move
22  the admission of my co-counsel of Jeffrey Glatzer.  He's
23  admitted in good standing in the Bar of New York and
24  practices in the Southern District of New York in Federal
25  Court.

1      THE COURT:  Thank you.  I will grant the
2  application.  Welcome.
3      MR. GLATZER:  Thank you, your Honor.
4      Your Honor, we represent Credit Lyonnais, which
5  is a prepetition creditor of the debtor under bank
6  facilities, which aggregate at about $500 million.  They were
7  in one of the $250 million facilities, and there were about
8  $10.4 million.
9      When we saw the application for DIP financing,
10  we read it as everybody else did and discovered not in an
11  application, but in the agreement that there was provision
12  for permitted acquisitions.
13      That came on the heels of discussions prepetition
14  that the lenders were having with the debtor with regard to a
15  facility of about $200 million that never got consummated
16  because of the filing of the petitions, during which time the
17  debtors were talking about conducting and taking acquisitions
18  in Europe mostly in the near future, this year and next year,
19  I think, to the tune of two or $300 million.  It was on their
20  radar screen.
21      When we discovered the -- that they were
22  intending or retaining the right to make application to the
23  Court in the future for permitted acquisitions, we wanted to
24  find out what they actually needed of a DIP financing, which
25  would be a superprioroty administrative expense, to, in our

1   view, preserve the estate apart from the acquisitions,

2   because we did not understand how acquisitions fit into a DIP

3   financing, which is ordinarily for the -- to preserve the

4   estate and to run the business, not to engage in

5   acquisitions.

6          We could not discover it from the motion papers

7   and we, through informal discussions and correspondence with

8   the debtors, have gotten some information.  I think the

9   debtors are prepared to show the Court some of that

10  information today.

11         It appears that in their worst-case analysis in

12  the next two years, they might need about $160 million of the

13  DIP financing, and we understand that is for ordinary

14  expenses that a DIP financing would be used for, for

15  preserving the estate, running the business, and that there

16  is, therefore, with the $250 million DIP, approximately $100

17  million or $90 million that we assume are potential --

18  potential for permitted acquisitions.

19         We just don't agree that that is an appropriate

20  use of the DIP and that even allowing for a cushion from the

21  $160 million that they have in their worst-case analysis of

22  use of the DIP in the next year or so, that $200 million

23  would be apparently -- should be adequate.

24         And if they -- and they criticize that or object

25  to our discussion that they were -- that they were sort of

1    preordaining the use of the DIP for these uses despite the

2    fact that they have to come back to the Court.  But, in fact,

3    if they have the financing already pre-approved in the DIP,

4    they are setting up the structure for the use of the DIP for

5    these long-term investments.

6              Coming from New York, you know, years ago New

7    York got into a great deal of financial trouble by using

8    short-term borrowings for long-term investments.  This is the

9    kind of thing that we think is -- has potential here.

10             Furthermore, the money and the acquisitions are

11   going to be -- are going to be of nondebtor entities.  They

12   contemplate buying companies in Europe, and they have

13   informed our client that in the European subsidiaries, which

14   are nondebtors, there are about $100 million cash now and

15   more expected in the future.  None of this will become

16   collateral to the estate directly.  Maybe they would get some

17   stock of some of these companies, but under a variety of

18   rules the most they could get is a percentage of the stock,

19   and the stock gives you a net worth of a value of company,

20   but not the hard assets.

21             So all of this would be layered on the debtor

22   despite the fact that the assets would be outside of the

23   estate.  And there appear to be assets outside of the estate

24   at which they could use for these purposes.

25             So, therefore, we think that either the DIP is

1   too large, $250 million, because it's based upon the

2   permitted -- the contemplation of permitted acquisitions, or

3   they just shouldn't go ahead with the acquisitions.  That's

4   our objection.

5            THE COURT:  All right.  Thank you.

6            MR. SPRAYREGEN:  Your Honor, we did file a

7   response, a written response to the objection, and an

8   affidavit from our Chief Financial Officer, Mr. Robert

9   Torolla.

10           I'm not sure how the Court exactly wants to

11  proceed.  We do have him in court today, ready to testify as

12  to what was in the affidavit and any other matters.  We also

13  have Miss --

14           THE COURT:  You can just argue the affidavit.

15           MR. SPRAYREGEN:  We can do that, your Honor.

16           THE COURT:  And your position.

17           MR. SPRAYREGEN:  Your Honor, in essence, the

18  Credit Lyonnais, which is about two percent of the

19  prepetition unsecured facility, is questioning the business

20  judgment of the debtors in the DIP loan that the debtors

21  obtained.

22           We laid out in very much detail the efforts the

23  debtors went to to obtain the DIP loan prior to the filing of

24  these Chapter 11 cases.  This DIP was actually very heavily

25  shopped among a number of financial institutions and, as a

1   result, priced quite favorably to the debtors.

2           In addition, the DIP has provisions in it

3   that permit these debtors which come into these cases

4   in an unusual position as compared to most debtors that we

5   see in bankruptcy cases.  That is, very strong operating

6   company throwing off large amounts of cash in certain

7   circumstances.

8           And because these are stronger operating

9   companies than we ordinarily would see, we negotiated a

10  different DIP.  That by no measure, though, takes away from

11  the fact that without one acquisition ever being done, and

12  the counsel is correct, we could never do anything like that

13  without coming before the Court, in any event, with all

14  parties here having an opportunity to object and have a

15  position on it.  But without one acquisition being done, we

16  would be asking for the same size DIP.  That is the $250

17  million.

18          The business judgment of the debtors is that even

19  accepting the facts that the objectors lay out, that is that

20  under sort of a reasonable worst case, the DIP within two

21  years would go up to $180 million, to have that amount of

22  room under a DIP we think is entirely reasonable.  And, in

23  fact, it would be irresponsible of the debtors to put this

24  company in a position where we literally have used every

25  available penny of credit, because what happens, and this is

1  laid out in the affidavit in our objection, creditors well

2  understand the debtors' financing situation.

3        And they are not looking at the fact that we --

4  what will happen in two years when they are dealing with us.

5  They're looking at how we are today. And if they are seeing

6  that it is very skinny, that is, we may not have sufficient

7  financing to bring us through these proceedings, it

8  fundamentally alters the way that they do business with us

9  and alters our cost of doing business with them or even doing

10 business with them.

11        So the debtors' very strong business judgment

12 is that this is a reasonable amount of money, the $250

13 million, and that it's necessary to preserve the assets and,

14 hopefully, enhance the assets, ultimately, and that the idea

15 that we should have just barely enough is really not the

16 standard that DIP financing is subject to.

17        Number of practical points also.  This is

18 disclosed in the papers.  This is a DIP that is underwritten

19 by the DIP lender but will be syndicated to a number of

20 parties.  And in the syndication, all of those parties accept

21 whatever the terms of the DIP are.

22        The idea that we should excise certain provisions

23 of the DIP, like the provision permitting acquisitions and

24 then come back some other time to deal with it is

25 fundamentally impractical, because then the debtors would

1  have to be in a position to go out to a DIP that is now

2  syndicated and ask the new Bankruptcy Court, which does not

3  exist at the moment, to approve whatever this amendment will

4  be at that point in time.

5           What that does again, I'm not sure the DIP lender

6  could accomplish that, but it fundamentally again alters the

7  debtors' flexibility in operating its business, and if there

8  are opportunities to enhance the value of the assets, again,

9  subject to coming on a motion before this Court with all

10 parties to be heard on it, the debtors would be in a position

11 with this DIP to act on those opportunities, again, without

12 that flexibility in this current DIP and having to find

13 financing at a later time.  That is a completely different

14 kind of situation in looking at how you are going to operate

15 your business going forward.

16           We also note in the papers that the cost savings

17 suggested by the suggestion that the DIP should be 50 or $100

18 million lower is really throwing the baby out with the bath

19 water.   That is, the cost of this DIP is about, I think it's

20 three-eighths of a percent.

21           I'm looking for the number.  I apologize.  But

22 it's very de minimis, and so we would be talking about saving

23 the estates, if we cut the DIP by $100 million, a few hundred

24 thousand dollars.

25           We would suggest that that would be a very bad

1  business decision for these debtors to save that small amount

2  of money and the consequent negative impacts on its

3  flexibility, not just with respect to potential acquisitions,

4  but with respect to running the business.

5          As we state in the affidavit, the DIP now is

6  already drawn up to about $75 million.  And the debtors

7  have -- do have an extreme need for that to continue and that

8  availability to continue going forward.

9          So with that, your Honor, we would ask that the

10  objection be overruled, and would note, and do think it's

11  quite important, there are obviously a number of Official

12  Committees in this case, and I do think it's important, the

13  lack of objection of those parties and the reasonableness of

14  the amount of the DIP and the, ultimately, the protection of

15  the main thing that seems to be objected to by the objector,

16  this acquisition issue, is really for another day.  That is

17  much speculation about buying something in Europe and whether

18  it would be subject to control over the Court.

19          If we ever bring a motion, those are all issues

20  that can be dealt with at that point in time, and it really

21  is not only inappropriate, but almost impossible to deal with

22  these hypotheticals at this point in time, and in our view

23  don't need to be dealt with right now.  We can deal with that

24  when and if it ever occurs.

25          Thank you.

1          THE COURT:  Thank you.

2          MR. RASKIN:  Your Honor, Robert Raskin for the

3   Official Creditors Committee.

4          We had several concerns with the DIP order that

5   have been addressed by the debtor and the bank, and therefore

6   we did not object to the application.

7          Your Honor, with regard to the permitted

8   acquisition issue, we, of course, would prefer that

9   that was excised from the DIP.  That was not the debtors'

10  business judgment.  That was not the package that was before

11  us.

12         Having said that, your Honor, not objecting to

13  the DIP, with the preservation of all rights in the event the

14  debtors do come back to this Court for authority to use that

15  out in the DIP.  And so we are just reserving all rights with

16  regard to what permitted acquisitions are appropriate in the

17  future.  I don't think the debtor is doing anything here

18  today to prejudice our rights.  The permitted acquisition

19  does say, "Subject to Bankruptcy Court approval."

20         THE COURT:  All right.

21         MR. GLATZER:  May I make one comment?

22         THE COURT:  Sure.

23         MR. GLATZER:  Thank you.

24         Just one response to Mr. Sprayregen.  With regard

25  to vendors' view of the company, based upon the magnitude of

1    the DIP, it seems to us it would be unlikely that the vendors

2    would view the potential use of the DIP for permitted

3    acquisitions and giving them comfort as to whether they're

4    going to be supplying this company or not.  We think a $50

5    million cushion from their worst-case analysis, which would

6    leave a DIP of 200, would -- I understand the business

7    judgment.  I think it's the preservation of the estate under

8    503 of the Bankruptcy Code.

9          Also, on an issue of notice, what happens in

10   these cases, generally, you know, a deal is cut and then, all

11   of a sudden, you get ten days' notice that there's going to

12   be a motion or a hearing to approve something, and getting

13   information, including when the financing concept is

14   preordained, and we think leaves it in a, you know, in an

15   uneven playing field in terms of trying to address the issue

16   at that time.

17          So if the Court is going to permit this, which we

18   object to, we would hope that there would be some imprimatur

19   that they must give 30 days notice of these acquisitions so

20   people can have sufficient opportunity to review them,

21   understand them, and then address them at that time.

22          Thank you.

23          THE COURT:  All right.  Thank you.

24          I'm going to overrule the objection, finding that

25   the grounds of objection do not go to the standard applicable

1   to the granting of such an order in that it does not attack

2   either the principle with regard to business judgment or that

3   the funds are for the preservation and operation of the

4   debtor.

5          What the objection does go to is the acquisition

6   provision, which has not been implemented, and is subject to

7   review by the Court, as the debtor understands.   That

8   provision in and of itself in the context of this bankruptcy

9   I conclude does not meet the standard that would support an

10  objection, and therefore I'm going to overrule it and enter

11  the order as presented.

12          MR. SPRAYREGEN:  Your Honor, we do have

13  a proposed order that do take into account both the

14  Creditor Committees and the Property Damage Committees

15  suggestions.

16          THE COURT:  And you will be mindful of the

17  one point that was made that carries some merit, which

18  is if you're about to engage in a large acquisition, that

19  some sort of adequate notice so we don't have to come in

20  in one day, and that they'd have time to look at the papers,

21  would be appropriate.  I don't know if it's 30 days.  I don't

22  know if it's five days.  But it's some amount of time that

23  permits a fair review of whatever the application is going

24  to be.

25          MR. SPRAYREGEN:  Your Honor, yes, we will

1    be quite mindful of that.  Obviously, even just a short

2    365(d)(5) sale requires notice.  We would do everything we

3    can.

4                    THE COURT:  Thank you.

5                    MR. SPRAYREGEN:  Your Honor, that brings us to

6    Item 11 on the agenda letter, which was the reclamation

7    procedure motion.

8                    Your Honor, there was one objection to that

9    motion.  That actually has been resolved really through

10   informal communications, and there's no proposed change to

11   the order that was attached to the motion, so that objection

12   has been resolved, and we would ask that the order be

13   entered.

14                   THE COURT:  All right.  We'll do that.

15                   MR. SPRAYREGEN:  And I have extra orders here, if

16   I can approach.

17                   THE COURT:  Sure.

18                   (Mr. Sprayregen hands documents to the Court.)

19                   MR. SPRAYREGEN:  Next is Item 12, your Honor,

20   which was the motion for reconsideration of the first-day

21   order concerning the essential trade.

22                   If the Court recalls, Judge Newsome had entered

23   an order actually more expansive than the debtor had

24   requested, authorizing the payment of all of the debtors'

25   prepetition trade in the amount of about $35 million.

1            The debtors have requested essential trade capped
2    at about four and a half million dollars.
3            The movants raise the issue of should that 35
4    million be reduced.  I'm happy to say, your Honor, again,
5    based on a number of informal discussions among the parties,
6    we have resolved that issue, basically a point in between the
7    four and a half million, actually a point far closer to the
8    four and a half million than the 35 million.  And it was
9    basically, as I reported at the last hearing, we were
10   unfortunately no longer able to live at the four million due
11   to the changed circumstances.
12           Through discussion with the Creditors Committee,
13   we did resolve this objection, and we have a proposed
14   stipulation to present.
15           THE COURT:  All right.  Pass it up.  I will
16   approve it.
17           (Mr. Sprayregen hands documents to the Court.)
18           MR. BAENA:  Your Honor, may we be advised of what
19   the new number is?
20           THE COURT:  You didn't get a copy of the proposed
21   order?
22           MR. BAENA:  No, sir.  If I did, I was here,
23   and --
24           THE COURT:  We'll get it to you right now.
25           MR. BAENA:  -- didn't see it.

1        THE COURT:  No problem.

2        MR. RASKIN:  Your Honor, I apologize to Mr.

3   Baena.  We have to work out our communications a little

4   better.  Some of the papers were not served us and we did not

5   include them in these negotiations.  We'll work out those

6   issues outside the province of the Court.

7        The debtors had had previously paid $5.6

8   million.  I will give round numbers.  In addition to that

9   amount, the stipulation called -- allows the debtor to spend

10  an additional $4.9 million plus.  To the extent they get any

11  deposits back from any of their vendors, prepetition deposits

12  back, they can expend those funds.

13       In addition to those amounts, your Honor, the

14  stipulation authorizes the debtor to allow vendors to set off

15  $8 million of prepetition deposits.

16       And that is the general thrust of the

17  stipulation.

18       THE COURT:  All right.  Thank you.

19       MR. SPRAYREGEN:  Your Honor, that gets to Item 13

20  on the agenda, but I believe the Court actually for today, at

21  least, has dealt with that.  That was the automatic stay

22  motion.

23       THE COURT:  Yes.

24       MR. SPRAYREGEN:  So that would leave going

25  back --

1          THE COURT:  Just for the record, that application

2    is denied.

3          MR. SPRAYREGEN:  That would leave Item 3 on the

4    agenda, which was the Ordinary Course Professional Objection

5    of the U.S. Trustee.

6          I would ask Ms. Jones to report on that, because

7    there have been some conversations on that while I was up

8    here.

9          THE COURT:  All right.  Thank you.

10          MS. DAVIS JONES:  Your Honor, if I may, I would

11    back up a little further, and with respect to Matters 1, 2

12    and 4 and 5, your Honor, we do have the orders on that, if

13    that is procedurally easier for the Court than going through

14    the whole --

15          THE COURT:  Sure.

16          MS. DAVIS JONES:  -- certificate of no

17    objection.

18          THE COURT:  You can just pass them up.

19          MS. DAVIS JONES:  Thank you (handing documents to

20    the Court).

21          Your Honor, then as to matter No. 6, with the

22    ordinary course professionals, this had drawn an objection

23    from the U.S. Trustee, and we have spoken with Mr. Perch to

24    try to resolve those, and there are four commitments that we

25    have agreed to make, and I will make them known on the

1   record.

2           First of all, we will be providing additional

3   information to the U.S. Trustee as to what particular

4   professionals will be retained to do particularly what

5   they're doing.  I'm going to provide that by the end of this

6   month.

7           Your Honor, also we've committed that the

8   ordinary course professionals that are on our current list

9   will file an affidavit of disinterestedness within 30 days of

10  that professional's start of providing services

11  post-petition.

12          Also, your Honor, you may recall in the motion

13  there's a provision to allow the debtors to add additional

14  OCP's, as we call them, should that be necessary, as we go

15  down the road.  If we do that, we will also make sure that

16  they file affidavits within 30 days of their start date of

17  providing services post-petition.

18          And, your Honor, lastly, we will -- we do

19  represent that we will not be using essential trade money to

20  pay the OCB's.

21          Your Honor, I think with that, we've resolved the

22  objections.

23          MR. PERCH:  Good morning, your Honor.  Frank

24  Perch for the United States Trustee.

25          I appreciate the Court's indulgence in moving

1   this to the back of the agenda, and Ms. Jones is correct

2   with those modifications and clarifications.  And subject to

3   those provisions being put in the order as necessary, the

4   U.S. Trustee has no objection.

5                    THE COURT:  All right.  Thank you, Mr. Perch.

6                    MR. PERCH:  Thank you, your Honor.

7                    MS. DAVIS JONES:  Your Honor, if I may approach?

8                    THE COURT:  Yes.

9                    MS. DAVIS JONES:  Your Honor, then, with respect

10  to Matters 7 and 8, as the agenda indicates, there were no

11  objections filed to those, but we do have a couple changes

12  that we've made on proposed orders to be submitted to the

13  Court.

14                    Your Honor, with respect to the administrative

15  compensation order, we have just added language to clarify on

16  Page 5, the ordered paragraph that provides, "Ordered that

17  each member of any Committee, when and if appointed, be

18  permitted to submit statements of expenses and supporting

19  vouchers to counsel to any such Committee."

20                    We've added the proviso, "Including individual

21  Committee member counsel expenses but excluding such

22  counsel's fees."

23                    Your Honor is quite aware of that issue from the

24  First Merchants versus Bradford decision.  This is the

25  language that has been agreed to by the Trustee's Office,

1   that goes into all these orders to make clear that there is

2   no surprise, if you will, and that somehow counsel fees are

3   just being accumulated on a monthly basis and being paid at

4   an 80/20 rate, and nobody really focuses on them.

5            This is to specifically provide if there

6   are counsel to particular Committee members who are

7   seeking reimbursement of fees, that they bring that on by

8   particular application that gives the trustee and the

9   debtors and other interested parties the opportunity to

10  respond to that.

11           Your Honor, the utilities motion also had

12  a change in the proposed order that we would give to the

13  Court.  And that is to provide that if a utility company

14  makes a timely additional insurance request that was provided

15  in the motion that the debtor believes is reasonable, the

16  debtor be entitled to reply with the additional insurance

17  request without further order of the Court.

18           What we've added after giving notice to counsel,

19  the Official Committee's intent to comply with additional

20  request and allowing two business days after such notice has

21  been given to permit counsel to the Creditors Committee to

22  object to the debtors' compliance with such additional

23  assurance request.

24           Your Honor, with those changes, both in that

25  order and in the one I just discussed, I'd like to submit

1    them.

2                 THE COURT:  Sure.

3                 (Ms. DAVIS Jones hands documents to the Court.)

4                 MS. DAVIS JONES:  Your Honor, I believe that's

5    all we have on the agenda.

6                 THE COURT:  All right.

7                 MR. SULLIVAN:  Your Honor --

8                 THE COURT:  Yes?

9                 MR. SULLIVAN:  Excuse me, your Honor.  Bill

10   Sullivan on behalf of Paul Price.

11                Your Honor ruleD on the motion for relief from

12   stay and also on the injunction, and I just rise for a point

13   of clarification.

14                In issuing your injunction where you indicated

15   that it did not decide whether you or the Massachusetts

16   Court, whether this Court or the Massachusetts Court would

17   decide the issue of class certification, and therefore can

18   we get a clarification that the denial of the motion for

19   relief from stay, which we felt was appropriate to bring

20   today since we were considering the injunction, is without

21   prejudice so that we can renew that issue and bring it before

22   your Honor at the appropriate time as to where this class

23   issue --

24                THE COURT:  The only thing that happened here

25   today was litigation was enjoined.  Objections were overruled

1    and applications denied that were implicated by the decision

2    to enjoin litigation.

3              Now, whatever that means, it means.

4              Lawyers always ask you, it's not without

5    prejudice.  Then you find out what they really meant when

6    they present the application is something much broader.

7              It's pretty clear.  We enjoined litigation

8    today.  The motion to lift was denied.  And it's without any

9    other decision or issue, a decision being made or issue being

10   addressed.

11             But while we're on this -- so that's my answer to

12   clarify.  I don't do that well, so I stay away from it.

13             If I could, I have a pretrial conference I was

14   going to take during the break.  We're finished on the agenda

15   for what we have today.  And i don't want to hold these folks

16   much longer.  But if you could, since we were going to be

17   here until 12:00 o'clock anyway, if the parties -- if counsel

18   that have an interest and spoke with regard to the motion for

19   preliminary injunction would stay, I'd like to hold -- it

20   will be on the record, a brief conference with you when I'm

21   finished with the pretrial conference, togive you some

22   guidance going forward, that may help you in the 30 days

23   while you're in discussions.  All right?

24             Anything further?

25             MS. JONES:  No, your Honor.

1    THE COURT:  We'll be in recess.

2    (Court recessed at 9:45 a.m.)

3         - - -

4    (Proceedings commenced in the jury room with the

5    Court and counsel present beginning at 10:12 a.m.)

6    THE COURT:  All right.  And this is on the

7    record, if anybody wants a copy of it.

8    You know, now we have an injunction in

9    place about -- for about a month, and the bankruptcy,

10    obviously, focuses on litigation.  You know, judges

11    really aren't suited, believe it or not, to strategize

12    lawyer-managed litigation.  I sit on panels and I know some

13    judges talk about how well they do it, and I don't think we

14    ever do it well.  It's kind of like lawyers managing their

15    office.  You don't really do it well, even though you think

16    you do.  That's why you have office managers now and folks

17    like that.

18    In this case, I'm more than ready to receive

19    papers and make decisions that are required.  But there is a

20    line that crosses over into the idea of managing the case.

21    And we've all been exposed to the orders that go into the

22    multi-district litigation cases.  And there's a book about

23    that that I could go get in my library, and it has the forms,

24    and I just have to fill in your case name and a few other

25    things, and I could look like a judge that knows how to

1   manage a case to the uninitiated.   But to people who really

2   try cases, you would know that I got it from the form book

3   that I got from Washington.

4              What I would really like to see you do, and the

5   purpose of me having you in is, you are probably going to be

6   litigating in Delaware.   And I have not made any decisions,

7   but it's a bankruptcy case, they're interwoven.   Unless

8   there's some persuasive, convincing force or reason to send

9   you around the world, you are probably here.   And what you

10  really ought to focus on is what you want decided and when

11  you want to get to trial.   It will make a lot more sense in

12  the context of not only the litigation that's out there, but

13  of the bankruptcy also.

14             And if you worked at that, I am not going to

15  disagree with anything, if it's an agreement, because I'm

16  going to accept your preference.   And what I am going to do

17  is work to get you timely decisions and have enough lead time

18  to be able to read the papers thoroughly and then get you and

19  ask you questions.

20             That's what I wanted to tell you.   And I think

21  you'll spend your time more productively focused there than

22  anywhere else.

23             Now, if you can't agree, and you think there's

24  some strong force or convincing reason why you shouldn't be

25  working on how you're going to get these cases resolved, you

1   can come tell me that and I have an open mind about it.   But

2   I thought it would be good if you knew what my perspective

3   was, at least to get you started in your discussions.

4            And in the litigation, if it occurs in Delaware

5   or if it goes somewhere else, we're still going to have to

6   move it on a timely basis, and a lot -- and, you know, I

7   don't like the term rocket docket, and we're not that.   But

8   we do try to move fairly expeditiously, so that people get

9   results.

10            Typically in this court, cases of the nature

11   you're talking about would realistically be out of here in 24

12   to 30 months.   In other words, if they just came in, given

13   the idea there would be some extended discovery and some

14   motion practice, and they could be out as early as 16, 18

15   months.   So you ought to focus on that, too, as you plan how

16   you would conduct the cases.

17            MR. BAENA:   Your Honor, is it inappropriate to

18   inquire whether you have a perception you wish to share about

19   the role of the Committees in these cases?

20            THE COURT:   See, that's a substantive issue.

21   That's something I should decide.   I'm only talking about

22   mechanics.

23            MR. BAENA:   Right.

24            THE COURT:   And that's the kind of thing I

25   separate out that ought to be -- because I don't really have

1    a preference.

2              I actually read somewhere where they don't think

3    I'm a plaintiff or defendants' lawyer, but they think my

4    heart is with the plaintiff.  I have no clue.

5              MR. RASKIN:  We're going to stick around and see

6    how you sentence these people.

7              THE COURT:  I was a prosecutor, but I also was

8    Assistant Public Defender for six years.  I had three death

9    penalty cases I tried and then I became a prosecutor and I

10   had to prosecute death penalty.  So I try to keep all of that

11   out of it and just focus on making -- I just said that I'm

12   making informed decisions and get you answers, so, no, I

13   don't have a preference on that.  But that's something you

14   could work out.  But I would be willing to decide it in the

15   short run, so you would get answers to that so you would get

16   on your way.

17             Somebody else said something when you brought

18   that up.  The folks from the Massachusetts case about -- I

19   don't think they -- did they use the word disenfranchise?

20             MR. FISHMAN:  I think I probably used that word,

21   your Honor.

22             THE COURT:  Was it you?

23             MR. FISHMAN:  Yes.

24             THE COURT:  This is Delaware.

25             MR. FISHMAN:  I come from Chicago.

1          THE COURT:  But feel -- you know, I'm wrong as

2  much as I'm right, but everybody will get a shot at, you

3  know, being open.

4          And the other thing I wanted to tell you was,

5  time has become very important in this court, just because of

6  the filings that are coming here.  And when we put time

7  frames on you, it's not really to cut you off, which is a

8  form of disenfranchising litigants.  You have to understand,

9  we've read the papers and it's really a chance for you to

10  enhance or for us to get something straight.  We're not

11  trying just to be arbitrary.

12          But there's really not a lot of time to be set

13  aside, particularly with the trials we have to schedule.

14          So does anybody else have any questions?  I will

15  be happy to --

16          MR. BERNICK:  The purpose of the informational

17  brief was to lay out the elements we think we have to

18  litigate, and we'll be really very diligent in raising issues

19  in a formal way very soon to try to create what I understand

20  your Honor would like, which is a structure of what's going

21  to get litigated, what are the basic tracks of litigation and

22  what is the process going to be for getting that to happen.

23          And we will -- we'll satisfy our burden to

24  initiate those discussions.  We'll do it obviously informally

25  with the Committee in advance.  But we'll put those matters

1   to your Honor very promptly in this case, so at least people

2   will have something to shoot at and we can get the process

3   under way.

4          MR. RASKIN:   Just from a bankruptcy lawyer's

5   perspective once again, that's great in the litigation.  This

6   is a bankruptcy case and I think we ought to spend some time,

7   especially since we're talking about cases that are going to

8   take a couple years to try.   It's worth six months or a year

9   to see what you can resolve consensually or you just have to

10  start teeing up trial and spinning meters, and so that's

11  where we're coming from.

12          THE COURT:   Well, we have two weapons in our

13  arsenal here in Delaware in the District Court.   One is a

14  firm trial date.   Once we set it, it's unusual to go off it,

15  unless there is some real purpose to doing it.

16          And the second is we have a Magistrate Judge that

17  is excellent at mediating, and we have an open mind about

18  bringing in outside mediators as long as the parties, you

19  know, have the will to have a fair discussion toward reaching

20  some sort of a consensual agreement.

21          And I am willing to insert the Magistrate Judge

22  where it appears that parties have that kind of a will and

23  want to talk to someone who's very good at that.   She has a

24  very detailed process she goes through.   She is an

25  experienced litigator.   And she spends a lot of time with the

1  folks going back and forth, first trying to understand the

2  position and then trying to get a recommendation or at least

3  folks moving toward some goal.

4          So if you could do that, that's great, and I will

5  be willing to work with you to get that done.

6          I don't think my job is to push settlement, to

7  advocate settlement.  My job is to make decisions and to get

8  you to trial.  I'm the screening mechanism for the Court of

9  Appeals.  And I'm good at that.

10          The good news is -- off the record.

11          (Discussion held off the record).

12          THE COURT:  But what I'm going to work on is

13  getting you to a trial, if you are going to be here.  But we

14  have resources available.  And actually, we have some folks

15  that are mediating both with Delaware backgrounds and from

16  out of town now in some cases, and they've done an excellent

17  job of parsing out some issues and getting some parts of

18  cases voluntarily resolved.  But you have to want to do it.

19  If you don't, litigation is good.  Bad for the client;

20  right?  Running that clock and all.

21          MR. SPRAYREGEN:  Well, we've resolved a lot of

22  these cases over the years by agreement.  Certainly the

23  majority of the cases that we've had have been resolved by

24  agreement, and we're always interested in doing that, if we

25  can.

1          THE COURT:  Good.

2          MR. LOCKWOOD:  From my Committee's perspective, I

3     think in terms of expedition, the expediting the Zonolite

4     dispute would be a very good thing, because that is really

5     sort of -- it's unaccustomed representing the asbestos

6     personal injury people to be the small monkey in the room and

7     there's another bigger 800-pound gorilla around.

8          But the numbers that are being referred to in the

9     Zonolite stuff make them into the potential at least 800-

10    pound gorilla in this case, and yet the debtor asserts that

11    they're about a two ounce gorilla.

12         MR. BERNICK:  Peter, let me assure you, you're

13    still the gorilla.  Don't worry about it.

14         MR. LOCKWOOD:  Maybe not the biggest gorilla.

15         THE COURT:  At least you're not nasty toward each

16    other.  But, see, that's the kind of thing you might be able

17    to agree in your discussions and come and say, If we can get

18    that case on in X amount of time, we could do all that for

19    you.  Or you could say, We can't agree, but we think that's

20    what should be put before the Judge for a decision, whether

21    you get a 14-month trial date or 30-month trial date.  I will

22    make that decision.  That's the kind of discussion I would

23    hope you would have in the next 30 days.

24         If you can't resolve it, at least if you can join

25    that that is the issue, I can give you an answer.

1          MR. LOCKWOOD:  Mr. Bernick is very good at

2    joining the issue, your Honor.  You'll find he definitely

3    will put it right out there for us all.

4          THE COURT:  Does anybody else have anything?

5          MR. BERNICK:  Thirty days from now, do you want

6    us back to basically report on what we've come up with along

7    those lines?

8          THE COURT:  Somewhere in the range of 30 to 45

9    days I thought you would get back and tell me where you are,

10   because I do want to keep it moving.  It's not on the front

11   burner but it hasn't reached the back burner.  And I don't

12   feel comfortable in cases until there's a course.  And we

13   really don't have a course here.  We kind of have a lot of

14   sentiment, a lot of ideas, a lot of thought, but we don't

15   have a real course.

16         And whether it's part of the case or all of the

17   case, I want to get it on a course, you know, wherever it is

18   or whatever has to be resolved.  That's what we're supposed

19   to do.  That's the job we're supposed to get done, so -- all

20   right.

21         Anybody else?  Thank you very much.  I appreciate

22   it.

23         (Conference concluded at 10:25 a.m.)

24                    - - -

25