# EXHIBIT 17

```
===========================================================================
                UNITED STATES SECURITIES AND EXCHANGE COMMISSION
                         WASHINGTON, D.C. 20549

                      --------------------------------
                                 FORM 10-K
                  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
                      THE SECURITIES AND EXCHANGE ACT OF 1934
```

For the fiscal year ended December 31, 2001      Commission file number 1-13953

                              W. R. GRACE & CO.

Incorporated under the Laws of the        I.R.S. Employer Identification No.
        State of Delaware                          65-0773649

               7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
                              410/531-4000

          SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

                                                 NAME OF EACH EXCHANGE ON
          TITLE OF EACH CLASS                       WHICH REGISTERED
          -------------------                    ----------------

Common Stock, $.01 par value          }          New York Stock Exchange, Inc.
Preferred Stock Purchase Rights       }

            SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

                                   None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes X  No
                    ---    ---

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. X
           ---

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates (consisting of all voting stock other than stock held by directors
and executive officers) was approximately $150,000,000 at March 1, 2002.

At March 1, 2002, 65,478,959 shares of W. R. Grace & Co. Common Stock, $.01 par
value, were outstanding.

                       DOCUMENTS INCORPORATED BY REFERENCE

None.

===========================================================================

TABLE OF CONTENTS

PART 1.................................................................................................................1

      Item 1.     Business..........................................................................................1
                      Chapter 11 Filing................................................................1
                      Business Overview...............................................................2
                      Products and Markets............................................................3
                      Discontinued Operations.........................................................8
                      Research Activities.............................................................8
                      Patents and Other Intellectual Property Matters..................................9
                      Environmental, Health and Safety Matters.........................................9
      Item 2.     Properties.......................................................................................10
      Item 3.     Legal Proceedings...............................................................................10
      Item 4.     Submission of Matters to a Vote of Security Holders.............................................14

PART II...............................................................................................................14

      Item 5.     Market for Registrant's Common Equity and Related Shareholder Matters.....................14
      Item 6.     Selected Financial Data.......................................................................16
      Item 7.     Management's Discussion and Analysis of Results of Operations and Financial Condition.......16
      Item 7A.    Quantitative and Qualitative Disclosures About Market Risk...................................16
      Item 8.     Financial Statements and Supplementary Data...................................................16
      Item 9.     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.......16

PART III..............................................................................................................17

      Item 10.    Directors and Executive Officers of the Registrant...........................................17
      Item 11.    Executive Compensation........................................................................19
      Item 12.    Security Ownership of Certain Beneficial Owners and Management...............................28
      Item 13.    Certain Relationships and Related Transactions...............................................30

PART IV...............................................................................................................30

      Item 14.    Exhibits, Financial Statement Schedules, and Reports on Form 8-K............................30

SIGNATURES............................................................................................................35

FINANCIAL SUPPLEMENT.................................................................................................F-1

PART I

ITEM 1.      BUSINESS

CHAPTER 11 FILING

On April 2, 2001, W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in the United States Bankruptcy Court for the District of Delaware. The cases were consolidated for the purpose of joint administration and were assigned case numbers 01-01139 through 01-01200. Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the filing.

The filing was made in response to a sharply increasing number of asbestos-related bodily injury claims. Under Chapter 11, Grace is operating its businesses as debtor-in-possession under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it.

Prior to 2000, Grace was able to settle asbestos-related claims through direct negotiations. The filing of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in bodily injury claims, which Grace believes was due to a surge in unmeritorious claims. Trends in claims filing and settlement demands showed no signs of returning to historic levels and were exacerbated by the Chapter 11 filings of several co-defendants in asbestos bodily injury litigation. These trends greatly increased the risk that Grace would not be able to resolve its pending and future asbestos claims under the state court system.

Grace concluded that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims settlement process. By filing under Chapter 11, Grace expects to be able both to obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

As a consequence of the filing, pending litigation against Grace is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to order of the Bankruptcy Court. Grace intends to address all of its pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. The formulation and implementation of a plan of reorganization could take a significant period of time. Since the filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court.

Grace's asbestos-related litigation and Chapter 11 filing are further discussed in Item 3 of this Report, and in Notes 1, 2 and 3 to Grace's Consolidated Financial Statements as of December 31, 2001 and December 31, 2000 and for the three years in the period ended December 31, 2001 ("Consolidated Financial Statements") and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

As used in this Report, the term "Grace" or the "Company" refers to W. R. Grace & Co., a Delaware corporation and, in certain cases, one or more of its subsidiaries and/or their respective predecessors.

BUSINESS OVERVIEW

Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace operates in the following two business segments:

o    Davison Chemicals manufactures catalysts and silica-based products. Davison Chemicals' catalysts include (1) fluid cracking catalysts and additives used by petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; (2) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities; and (3) polyolefin catalysts and catalyst supports that are essential components in the manufacture of high density and linear low density polyethylene resins used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison Chemicals' silica gels, colloidal silicas, precipitated silicas, and zeolite adsorbents are used in a wide variety of industrial and consumer applications, such as ink jet paper, separations/chromatography, plastics, toothpastes, paints, precision investment casting, rubber compounds and insulated glass, as well as in the refining of edible oils and for purification in petrochemical processes. Davison Chemicals accounted for approximately 51% of Grace's 2001 sales.

o    Performance Chemicals produces (1) specialty construction chemicals, including performance-enhancing concrete admixtures, cement additives and masonry products; (2) specialty building materials, including fireproofing and waterproofing materials and systems; and (3) sealants and coatings for packaging that protect food and beverages from bacteria and other contaminants, extend shelf life and preserve flavor. Performance Chemicals accounted for approximately 49% of Grace's 2001 sales.

Grace's principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone 410/531-4000. As of year-end 2001, Grace had approximately 6,400 full-time employees worldwide in its continuing operations.

Information concerning the net sales, pretax operating income and total assets of Grace's continuing operations by business segment and information by geographic area for 2001, 2000 and 1999 is contained in Note 20 to the Consolidated Financial Statements in the Financial Supplement to this Report.

Strategic Objectives and Actions. Grace's strategy has been, and will continue to be, to seek to enhance enterprise value by profitably growing its specialty chemicals businesses globally and achieving high levels of financial performance. To achieve these objectives, Grace plans to (i) invest in research and development activities, with the goals of introducing new high-performance products and services and enhancing manufacturing processes; (ii) implement process and productivity improvements and cost-management initiatives (including the use of Six Sigma processes) such as rigorous controls on working capital and capital spending; and (iii) pursue selected acquisitions and alliances. These plans are designed to make Grace a high-performance company focused on the strengths of its global specialty chemicals businesses.

Projections and Other Forward-Looking Information. This Report contains, and other communications by Grace may contain, projections or other "forward-looking" information. Forward-looking information includes all statements regarding Grace's expected financial position, results of operations, cash flows, dividends, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology, plans and objectives of management, and markets for stock. Like any other business, Grace

2

is subject to risks and other uncertainties that could cause its actual results to differ materially from any projections or that could cause other forward-looking information to prove incorrect.

Most significantly, Grace filed for protection under Chapter 11 on April 2, 2001 as a result of a sharply increasing number of asbestos bodily injury claims. See Item 3 of this Report, and Notes 1, 2 and 3 to Grace's Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report, for a more detailed discussion of risks related to Grace's asbestos liabilities.

In addition to general economic, business and market conditions, Grace is also subject to other risks and uncertainties, including the following:

o   developments in and the outcome of the Chapter 11 proceedings, including but not limited to the determination of the allowed number and cost of resolution of pending and future asbestos-related claims and the time required to confirm and implement a plan of reorganization;

o   the loss of flexibility in operating its businesses and the higher costs of doing business under Chapter 11;

o   greater than expected liabilities with respect to environmental remediation;

o   an inability to obtain committed credit facilities or alternative sources of liquidity in amounts sufficient to fund operations, growth initiatives and non-core obligations;

o   a decline in worldwide oil consumption or the development of new methods of oil refining;

o   increases in prices of raw materials and energy costs;

o   the consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

o   an inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements (particularly in the construction industry);

o   changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used, especially petroleum-based products;

o   slower than anticipated economic advances in less developed countries;

o   foreign currency devaluations in developing countries or other adverse changes in currency exchange rates;

o   technological breakthroughs rendering a product, a class of products or a line of business obsolete;

o   an inability to adapt to continuing technological improvements by competitors or customers; and

o   the acquisition (through theft or other means) and use by others of Grace's proprietary formulas and other know-how (particularly in the sealants and coatings business).

See Notes 1, 2, 3, 4, 5, 10, 13 and 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning risks and uncertainties.

PRODUCTS AND MARKETS

Specialty Chemicals Industry Overview. Specialty chemicals, such as those produced by Grace, are high-value-added products used as intermediates, components or additives in a wide variety of products and processes. They are produced in relatively small volumes and must satisfy well-defined performance requirements and specifications. Specialty chemicals are often critical components of the end products and processes in which they are used; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer. Rapid response to changing customer needs and reliability of product and supply are important competitive factors in specialty chemicals businesses.

Grace's management believes that in specialty chemicals businesses technological leadership (resulting from continuous innovation through research and development), combined with product

3

differentiation and superior customer service, lead to high operating margins. Grace believes that these factors reward the research and development and customer service costs associated with its strategy.

Davison Chemicals Business Segment (Catalysts and Silica-Based Products). Davison, founded in 1832, is composed of two primary product groups: (i) catalysts and (ii) silica products and adsorbents. These product groups principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical/nutraceutical companies. Davison believes that its technological expertise provides a competitive edge, allowing it to quickly design products and materials that meet changing customer specifications and to develop new products and materials that expand its existing technology.

Davison produces refinery catalysts, including (i) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into more valuable transportation fuels (such as gasoline and diesel fuels) and other petroleum-based products, and (ii) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison also develops and manufactures FCC additives used for octane enhancement and to reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from the FCC unit. Davison has recently introduced new catalyst/additive technologies for sulfur reduction in gasoline. Oil refining is a highly specialized discipline, demanding that products be tailored to meet local variations in crude oil and the refinery's product mix. Davison works regularly with most of the approximately 360 refineries in the world, helping to find the most appropriate catalyst formulations for refiners' changing needs. To better serve its customers, Davison recently introduced e-Catalysts.com, a user-specific web site.

Davison's catalyst business has benefited from the increased use of FCC units to produce selected petrochemical feedstocks. It has also benefited from the passage of more stringent environmental regulations, which has increased demand for FCC additives that reduce emissions. Davison's business is affected by the capacity utilization of refiners' cracking units - as capacity utilization increases, the refiner uses a disproportionately greater amount of FCCs. Consolidation in the refining industry may affect Davison's sales and margins, as the purchasing power of its customers may increase, and the gain or loss of a customer may have a greater impact on Davison's sales.

Increased demand for hydroprocessing catalysts has recently been driven by the demand for lower sulfur content in transportation fuels. Davison has recently introduced new catalyst technologies for sulfur reduction in gasoline and diesel fuels. Davison also has expanded its hydroprocessing catalyst offerings through two recent transactions. In 2000, Davison acquired the distillate catalyst business of the Crosfield Group. In March 2001, Grace and Chevron U.S.A. Inc. formed Advanced Refining Technologies ("ART") , a joint venture combining Chevron's fixed bed residuum catalyst business with Davison's ebullating bed residuum catalyst and distillate catalyst business.

Davison believes it is one of the world leaders in refinery catalysts and the largest supplier of FCCs in the world. Competition in the refinery catalyst business is based on technology, product performance, customer service and price. Davison's two principal global competitors in FCCs are Engelhard Corporation and Akzo Nobel. Davison has several competitors for FCC additives and hydroprocessing catalysts.

Davison is also a major producer of polyolefin catalysts and catalyst supports, essential components in the manufacture of high density and linear low density polyethylene resins that are in turn used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison catalysts and catalyst supports are used in manufacturing nearly half of all such resins produced worldwide. The polyolefin catalyst business is technology-intensive and focused on providing products formulated to meet customer specifications. There are many manufacturers of polyolefin catalysts, and most compete on a worldwide basis. Competition has recently intensified because of evolving

4

technologies, particularly the use of metallocene catalysts, which allow manufacturers to design polymers with exact performance characteristics. In January 2002, Davison acquired the polyolefin catalyst manufacturing assets of Borealis AB, giving Davison access to polyolefin catalyst and catalyst carrier segments and technologies new to Davison.

Silica products and zeolite adsorbents produced by Davison are used in a wide variety of industrial and consumer applications. Davison manufactures silica gels, colloidal silicas and precipitated silicas. These silicas have different physical properties, such as particle size, surface area, porosity and surface chemistry, which give each type of silica unique features, that make it appropriate for specific applications. Davison has multiple competitors in each silicas/adsorbents segment in which it participates. Competition is based on product performance, customer service and price.

Silica gels are used in coatings as matting agents (i.e., to reduce gloss), in plastics to improve handling, in toothpastes as abrasives and whiteners, in foods to carry flavors and prevent caking, and in the purification of edible oils and beer stabilization. Davison is using its expertise in silica gels technology to develop new products for existing markets, such as coatings. Recently, Davison also has introduced new products for the high-growth ink receptive paper segment, including improved gels for ink absorption on glossy media and new paper coating formulas.

Colloidal silicas are used primarily as binders in precision investment casting and refractory applications. Davison acquired this product line in 2000 from E.I. DuPont de Nemours. Precipitated silicas are used predominantly in the manufacture of tires and other industrial rubber goods such as belts, hoses and footwear. Davison acquired this product line in March 2001 from Akzo-PQ Silicas. Zeolites, while not silica-based products, are based on silica/alumina technology. Zeolites adsorbents are used between the two panes of insulating glass to adsorb moisture and are also used in process applications to adsorb water and separate certain chemical components from mixtures.

In March 2001, Davison acquired The Separations Group, a manufacturer of chromatography columns and separations media. This acquisition is expected to provide Davison with opportunities to use its materials sciences expertise to accelerate growth into biotechnology separations applications.

The silicas and adsorbents business has a large, fragmented customer base, reflecting the diverse markets served by its products. To better serve these customers, Davison has introduced web-based initiatives, starting with online ordering of packaged desiccants and offering process design formulas online to assist customers in quickly and efficiently determining their needs. Approximately half of Davison's silica and adsorbent sales are in Europe.

Davison's net sales were $874 million in 2001, $784 million in 2000 and $751 million in 1999; 42% of Davison's 2001 net sales were generated in North America, 35% in Europe, 17% in Asia Pacific, and 6% in Latin America. Sales of catalysts accounted for 36% of total net sales of Grace in 2001, 35% in 2000, and 34% in 1999. Sales of silica products and zeolite adsorbents accounted for 15% of Grace's total net sales in 2001 and 14% in 2000 and 1999. At year-end 2001, Davison employed approximately 3,100 people worldwide in 15 facilities (10 in the U.S., two in Germany, and one each in Canada, Brazil and Malaysia). Davison's principal U.S. manufacturing facilities are located in Baltimore, Maryland and Lake Charles, Louisiana. Davison has a direct selling force and distributes its products directly to approximately 9,000 customers (500 for catalysts and more than 8,500 for silicas/adsorbents), the largest of which accounted for approximately 2% of Davison's 2001 sales.

Most raw materials used in the manufacture of Davison products are available from multiple sources. In some instances, Davison produces its own raw materials and intermediates. During the second half of 2000 and the first half of 2001, because of worldwide supply/demand imbalances, Davison experienced significantly higher natural gas and petroleum-based raw material price increases, which had a negative impact on its operating margins. Seasonality does not have a significant overall effect on

5

Davison's business. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season. Silica products and polyolefin catalysts are the product lines most sensitive to general downturns in economic activity.

Performance Chemicals Business Segment (Specialty Construction Chemicals, Specialty Building Materials, and Sealants and Coatings). Performance Chemicals was formed in July 1999 by integrating Grace's construction products businesses with its Darex(R) sealants and coatings businesses. Grace integrated these businesses, which share many facilities around the world and are headquartered in the Cambridge, Massachusetts area, in order to realize efficiencies in supply chain management, process improvement, commercialization of new products and marketing.

Performance Chemicals is a leading supplier of specialty construction chemicals and building materials to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction industry. Specialty construction chemicals (principally concrete admixtures, cement additives and masonry products) add strength, control corrosion and enhance the handling and application of cement, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall systems. A number of new construction chemicals products and product enhancements have been introduced in recent years. These include an admixture that reduces concrete shrinkage and helps prevent cracking; a product that enables contractors to obtain acceptable concrete set times in colder temperatures; an admixture that inhibits corrosion and prolongs the life of concrete structures; and an additive that improves cement processing efficiency and product quality. Grace seeks to continuously improve and adapt these products for different applications.

In 1999, Performance Chemicals introduced a new masonry admixture for improving the freeze/thaw durability of segmental retaining wall units and pavers, and new structural fiber reinforcements for concrete that provide a corrosion-free alternative to steel fibers and welded wire mesh. In 2001, new fiber reinforcements and a system for producing self-consolidating concrete (which improves how the concrete conforms to the shape of a structure) were introduced. Also in 2001, Performance Chemicals expanded the geographic scope and product offerings of its specialty construction chemicals business through the acquisition of Pieri S.A., based in France.

Specialty building materials prevent water damage to structures (such as water- and ice-barrier products for residential use and waterproofing systems for commercial structures) and protect structural steel against collapse caused by fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include liquid-applied waterproofing products and new roof underlayments that provide protection from ice and wind-driven rain; enhancements to fireproofing products that improve applicator productivity; and fireproofing products for industrial, petrochemical and acoustical applications. In addition, through the acquisition of International Protective Coatings Corporation in 2000, firestops were added to Performance Chemicals' product offerings. Firestops are caulk and sealant systems that retard the spread of heat, flame and smoke through walls and ceiling joints, as well as openings in buildings for wiring and piping through which heat, flame or smoke can penetrate.

In addition to new product introductions, product enhancements and acquisitions, Performance Chemicals looks for growth opportunities in developing economies, where increases in construction activity and sophistication of construction practices can increase demand for Performance Chemicals' construction chemicals and building materials products.

The construction chemicals and building materials produced by Performance Chemicals are marketed to an extremely broad range of customers, including cement manufacturers, ready-mix and precast concrete producers, local contractors, specialty subcontractors and applicators, masonry block

6

manufacturers, building materials distributors and other industrial manufacturers, as well as construction specifiers, such as architects and structural engineers. For some of these customer groups (such as contractors), cost and ease of application are key factors in making purchasing decisions; for others (such as architects and structural engineers), product performance and design versatility are the critical factors. In view of this diversity, and because the construction chemicals and building materials businesses require intensive sales and customer service efforts, Performance Chemicals maintains a separate sales and technical support team for each of its product groups. These sales and support teams sell products under global contracts, under U.S. or regional contracts and on a job-by-job basis. Consequently, Performance Chemicals competes globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, particularly in markets outside of the U.S. Competition is based largely on technical support and service, product performance, adaptability of the product and price.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal due to weather conditions. Performance Chemicals seeks to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced higher-performance products, expanding geographically, and developing business opportunities in renovation construction markets. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on Performance Chemicals' construction business, the continued success of these strategies cannot be assured, and such cyclicality could adversely affect its business and results of operations in the future.

The raw materials used by the construction chemicals and building materials product lines can be obtained from multiple sources, including commodity chemical producers, petroleum companies and paper manufacturers. In most instances, there are at least two alternative suppliers for each of the principal raw materials used by these businesses.

The Darex(R) sealants and coatings business consists primarily of four product lines: can sealants and closure sealants for rigid containers, coatings for metal packaging, and specialty barrier coatings for flexible packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, to protect the contents against the influences of metal, to ensure proper adhesion of sealing compounds to metal surfaces, and to provide base coats for inks and for decorative purposes. These products are principally sold to companies that manufacture containers. Specialty barrier coatings are used to improve the gas and/or vapor barrier performance of various packaging materials. They are principally sold to manufacturers of oriented polypropylene films for food packaging.

Performance Chemicals is seeking to expand its Darex(R) product offerings and improve sales growth through developing technologies, such as its oxygen-scavenging compounds (which absorb oxygen resulting in extended shelf life) and high barrier materials that limit gas transmission into plastic packaging. Performance Chemicals is also looking to improve sales of sealants and coatings through continued growth in developing regions. However, sales growth has been impacted and will likely be impacted in the future by the trend toward increasing use of plastic packaging. Therefore, Performance Chemicals has also been focusing on improving the profitability and cash flows of this business through productivity initiatives and a worldwide program to rationalize facilities.

Competition is based on providing high-quality customer service at customer sites, as well as on uniform product quality and reliability, the ability to offer environmentally-friendly products and price. In addition, because of the relative concentration of the canning and bottling market, maintaining

relationships with leading container manufacturers, canners and bottlers, and assisting them as they reengineer processes are key elements for success. In 2001, approximately 35% of sealants and coatings sales were derived from its top ten customers.

Although raw materials used in the sealants and coatings business, including resins, rubber and latices, are generally available from multiple sources, certain raw materials are purchased from single source suppliers. Some raw materials are also subject to pricing pressures from time to time, particularly certain specialty resins. Also, currency devaluations in developing countries may adversely affect raw material costs and the prices the business may charge for its products. Performance Chemicals has been successful in establishing a supply chain organization focused on managing raw material costs and flow to alleviate some of these pressures. The impact of seasonality is not significant to the sealants and coatings business.

Performance Chemicals' 2001 net sales totaled $849 million (60% in North America, 20% in Europe, 14% in Asia Pacific, and 6% in Latin America), versus $814 million in 2000 and $800 million in 1999. Sales of specialty construction chemicals accounted for 21% of Grace's total net sales in 2001, 22% in 2000 and 22% in 1999; sales of specialty building materials accounted for 14% of Grace's total net sales in 2001, 2000 and 1999; and sales of Darex products accounted for 14% of Grace's total net sales in 2001, 15% in 2000 and 16% in 1999. At year-end 2001, Performance Chemicals employed approximately 3,000 people at 65 production facilities (25 in North America, 19 in Asia Pacific, 14 in Europe, and 6 in Latin America) and approximately 70 sales offices worldwide. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

DISCONTINUED OPERATIONS

In July 1999, Grace sold substantially all of its interest in Cross Country Staffing, a provider of temporary nurses and other health care related services, to an affiliate of Charterhouse Group International, Inc., a private equity firm, and the management of Cross Country Staffing. The transaction was preceded by Grace's purchase of a minority interest in Cross Country Staffing held by Nestor Healthcare Group plc. Grace received pretax net cash proceeds of approximately $103 million as a result of these two transactions.

RESEARCH ACTIVITIES

Grace's research and development programs are directed toward the development of new products and processes and the improvement of, and development of new uses for, existing products and processes. Research is conducted in all regions, with North America and Europe accounting for the most activity. Grace's research and development strategy is to develop technology platforms on which new products will be based, while focusing development efforts in each business unit on the improvement of existing products and/or the adaptation of existing products to customer needs.

Research and development expenses relating to continuing operations amounted to $50 million in 2001 (including $5.8 million incurred on behalf of the ART joint venture), $46 million in 2000 and $42 million in 1999. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects sponsored by Grace) was not material.

8

PATENTS AND OTHER INTELLECTUAL PROPERTY MATTERS

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications, and include legally protectable know-how and other proprietary information. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance that Grace's patents, patent applications or other intellectual property will provide sufficient proprietary protection. In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

Manufacturers of specialty chemicals products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 2002 and 2003, for (i) the operation and maintenance of environmental facilities and the disposal of wastes with respect to continuing operations; (ii) capital expenditures for environmental control facilities relating to continuing operations; and (iii) site remediation:

|  | (i) Operation of Facilities and Waste Disposal | (ii) Capital Expenditures | (iii) Site Remediation |
|---|---|---|---|
|  |  | (in $ millions) |  |
| 1999 | $31 | $6 | $25 |
| 2000 | 26 | 4 | 47 |
| 2001 | 32 | 4 | 29 |
| 2002 (est.) | 34 | 7 | 27 |
| 2003 (est.) | 36 | 6 | 25 - 40 |

Additional material environmental costs may arise as a result of matters related to Grace's former vermiculite mining activities in the Libby, Montana area. For additional information, see Item 3 of this Report and Note 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

Grace seeks continuously to improve its environmental, health and safety performance. To the extent applicable, Grace extends the basic elements of the American Chemistry Council's Responsible Care(R) program to all Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention.

See Item 3 below for information concerning environmental proceedings to which Grace is a party.

9

ITEM 2.          PROPERTIES

          Grace operates manufacturing and other types of plants and facilities
(including office and other service facilities) throughout the world. Some of
these plants and facilities are shared by more than one Grace business unit, and
since the disposition of its packaging business in 1998, some plants and
facilities are shared with Sealed Air Corporation. Grace considers its major
operating properties to be in good operating condition and suitable for their
current use. Grace believes that, after taking planned expansion into account,
the productive capacity of its plants and other facilities is generally adequate
for current operations and foreseeable growth. See Note 20 to the Consolidated
Financial Statements and "Management's Discussion and Analysis of Results of
Operations and Financial Condition" in the Financial Supplement for information
regarding Grace's capital expenditures.

          Specific information regarding Grace's properties is set forth in Item
1 above.

ITEM 3.          LEGAL PROCEEDINGS

          Asbestos Litigation. Grace is a defendant in property damage and bodily
injury lawsuits relating to previously sold asbestos-containing products. In
most of these lawsuits, Grace is one of many defendants. As a result of the
Chapter 11 filing, all asbestos-related litigation has been stayed and no party
may commence any new proceedings against Grace. However, Grace expects that it
will receive additional asbestos-related claims during the Chapter 11 process.

          Grace was a defendant in 65,656 asbestos-related lawsuits on April 2,
2001, the date of Grace's Chapter 11 filing. Sixteen of such lawsuits involve
claims for property damage, eight relating to Grace's former attic insulation
product (one of which has since been dismissed) and eight relating to a number
of former asbestos-containing products (two of which also involve the attic
insulation product). The remainder of such lawsuits involve 129,191 claims for
bodily injury. At year-end 2000, Grace was a defendant in 61,395 lawsuits, 15
involving claims for property damage, and the remainder involving 124,907 claims
for bodily injury.

          The plaintiffs in property damage lawsuits generally seek to have the
defendants absorb the cost of removing, containing or repairing the
asbestos-containing materials in the affected buildings. Through December 31,
2001, 141 asbestos property damage cases were dismissed without payment of any
damages or settlement amounts; judgments were entered in favor of Grace in nine
cases (excluding cases settled following appeals of judgments in favor of
Grace); judgments were entered in favor of the plaintiffs in seven cases for a
total of $60.3 million (none of which is on appeal); and 207 property damage
cases were settled for a total of $696.8 million.

          In February 2000 a purported class action lawsuit was filed in the U.S.
District Court for the Eastern District of Massachusetts against the Company
(Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing
Zonolite(R) attic insulation, a product previously sold by Grace that may
contain trace amounts of asbestos. The action seeks damages and equitable
relief, including the removal, replacement and/or disposal of all such
insulation. Since Lindholm was filed, nine additional purported class action
lawsuits have been filed against Grace in various state and federal courts
asserting similar claims and seeking damages similar to those in Lindholm. One
of the purported federal class actions has been consolidated with Lindholm. As a
result of the Chapter 11 filing, all of these cases have been transferred to the
U.S. Bankruptcy Court for the District of Delaware. While Grace has not
completed its investigation of the claims described in these lawsuits, Grace
believes that this product was and continues to be safe for its intended purpose
and poses little or no threat to human health. At this time, Grace is not able
to assess the extent of any possible liability related to this matter.

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $996.3 million at December 31, 2001 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all property damage cases for which sufficient information is available to form a reasonable estimate of the cost to resolve. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, Grace's ultimate liability for asbestos-related litigation could differ materially from the recorded liability.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $895.4 million prior to 1999, as well as payments totaling $73.1 million in 1999, $85.6 million in 2000, and $78.8 million in 2001. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded a receivable of $293.4 million to reflect the amounts expected to be recovered in the future, based on projected payments equal to the amount of the recorded asbestos-related liability.

During 2000, the number of bodily injury claims made against Grace increased significantly compared with 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. This trend continued in the first quarter of 2001, when Grace received 16,411 bodily injury claims. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

See Item 1 of this Report and Notes 1, 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

11

Environmental Proceedings.  The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together, in most cases, with many other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 2001, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace does not expect to participate in the joint funding of investigation and remediation, or other settlements, at non-owned sites where it is a PRP, except in a limited number of special cases. Grace's ultimate liability with respect to such sites will be determined as part of its Chapter 11 proceeding.

In November 1999, the EPA began an investigation into alleged excessive levels of asbestos-related disease related to Grace's former vermiculite mining activities in the Libby, Montana area. This investigation led the EPA to undertake additional investigative activity and to carry out remedial actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the United States is also seeking a declaration of Grace's liability that would be binding in future actions to recover further response costs. The EPA has reported that it has spent approximately $25 million in response costs in and around Libby through June 30, 2001. Grace expects that the EPA may incur significant additional response costs, as Libby is expected to be added to the EPA's National Priorities List of Superfund sites, but is unable to estimate the cost at this time. Grace intends to review the EPA's actions and cost claims to determine whether they are justified and reasonable. This case is not subject to the automatic stay provided under Section 362 of the U.S. Bankruptcy Code and is scheduled for trial in January 2003.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of improved, private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. While Grace has not completed its investigation of the claims, and, therefore, is not able to assess the extent of any possible liability related to this lawsuit, Grace has no reason to believe that its former activities caused damage to the environment or property. This case has been stayed as a result of Grace's Chapter 11 filing.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values of residents in the vicinity of a former vermiculite expanding plant in Minneapolis. This case has also been stayed as a result of Grace's Chapter 11 filing. The EPA has remediated industrial property in the area, including the former vermiculite expanding plant. The EPA has also commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of houses near the plant. The EPA has reviewed approximately 800 to 900 properties in the area. In 2001, the EPA took action at 77 properties and intends to take action at an additional 48 properties when weather permits. An

12

additional 68 properties are scheduled for investigation. These activities are not expected to result in material liability to Grace.

The EPA has compiled for investigation a list of 244 facilities that at one time used, stored, or processed concentrate that originated from Grace's former vermiculite mine at Libby, Montana. Included in this list are 50 vermiculite expansion plants currently or formerly operated by Grace. To date, the EPA has listed 15 of these 50 sites as requiring additional action. Corrective actions or investigations have been conducted by Grace at six of these sites. The EPA has investigated another eight of these sites but has neither provided Grace with notice of the investigation results nor advised Grace that further action is necessary. Grace does not have sufficient information at this time to determine the extent of any possible liability related to this investigation.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge or disposition of hazardous wastes and other materials.

Grace is a party to three environmental insurance coverage actions pending in the U.S. District Court for the Southern District of New York. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed in 1988). This litigation, involving Grace's coverage claims against a primary-level carrier for environmental property damage, is currently the subject of an appeal. The second case, entitled Uniguard v. W. R. Grace, was filed in 1997. This declaratory judgment action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. This case has been stayed as a result of Grace's Chapter 11 filing. In June 2000, a separate lawsuit was filed against Grace by one of its former primary insurance carriers seeking coverage determinations regarding 45 claims (Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co.-Conn.). Most of these claims involve alleged environmental property damage at sites once owned and operated by Grace or at waste sites that allegedly received waste materials from plants operated by Grace, including Grace's claims for coverage regarding certain claims involving its former vermiculite mining operation in Libby, Montana. This case has been stayed as a result of Grace's Chapter 11 filing. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. In addition, environmental liabilities related to Libby, Montana could be material, though not currently estimable, if the proceedings described above are adversely determined. Grace does not have sufficient information to determine how the funding of environmental remediation activities will be affected by the Chapter 11 proceedings. For further information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Fraudulent Transfer Litigation. Grace has been named in a purported class action suit filed in September 2000 in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius A.G. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation (the "1996 and 1998 transactions") were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death

13

claims against any of the defendants. The other defendants in the suit have all asserted claims against Grace for indemnification. The amended complaint also names "Does 1-100" as defendants and alleges that those unidentified individuals are responsible "in some manner" for the wrongs alleged. Since Abner, and prior to the Chapter 11 filing, two other similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing. However, fraudulent transfer claims related to the 1996 and 1998 transactions are expected to be heard by the Bankruptcy Court during the fourth quarter of 2002.

Tax Claims. In 1988 and 1990, Grace acquired whole life insurance policies ("COLI") on the lives of certain of its employees as part of a strategy to fund the cost of post-retirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The Internal Revenue Service ("IRS") is challenging the deductions for interest on such loans claimed by Grace and similarly situated companies. In 2000, Grace paid approximately $21.2 million of tax and interest related to COLI deductions taken in 1990 through 1992. Grace is currently under audit for the 1993-96 tax years. During those years Grace deducted approximately $122.1 million in interest attributable to the COLI policies. In 1996, legislation was enacted that phased out the tax benefits for COLI-related interest deductions over a three-year period ending in 1998. During those years, Grace deducted approximately $41.1 million in COLI-related interest. Grace is contesting the IRS's position on the grounds that Grace had and continues to have a valid business purpose for acquiring the COLI policies, that the COLI policies have economic substance and that the interest deductions claimed were in compliance with tax laws in effect at the time.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against CCHP, Inc., a Grace subsidiary that formerly operated a temporary staffing business for nurses and other healthcare personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel that was in effect through 1999. Grace expects that the IRS will make additional assessments for the 1996 through 1999 period. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, for per diem and expense allowance plans. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods as well. The matter is currently pending in the U.S. Court of Claims.

For further information, see Note 15 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations under Financial Condition" in the Financial Supplement to this Report.

ITEM 4.          SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2001.

PART II

ITEM 5.          MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-34); under the heading "Quarterly Summary and Statistical Information -

14

Unaudited" opposite the caption "Market price of common stock" (page F-33); and in Note 16 to the Consolidated Financial Statements (page F-27).

On March 31, 1998, the Company paid a dividend, in respect of each share of the Company's Common Stock, par value $.01 per share ("Common Stock"), of one Preferred Stock Purchase Right ("Right"). The Rights are not and will not become exercisable unless and until certain events occur (as described below). Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights will become exercisable on the earlier to occur of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the then outstanding shares of Common Stock or (b) 10 business days (or such later date as may be fixed by the Company's Board of Directors) after an Acquiring Person commences (or announces the intention to commence) a tender offer or exchange offer that would result in such Acquiring Person becoming the beneficial owner or 20% or more of the then outstanding shares of Common Stock. Holders of Rights, as such, have no rights as shareholders of the Company; consequently, such holders have no rights to vote or receive dividends, among other things.

When the Rights become exercisable, each Right will initially entitle the holder to buy from the Company one hundredth of a share of the Company's Junior Participating Preferred Stock, par value $.01 per share ("Junior Preferred Stock"), for $100, subject to adjustment ("exercise price"). If a person or group becomes an Acquiring Person, each Right will entitle the holder to receive upon exercise, in lieu of shares of Junior Preferred Stock, that number of shares of Common Stock having a market value of two times the exercise price of the Right. If, at any time after a person or group becomes an Acquiring Person, the Company is acquired in a merger or other business combination of 50% or more of the Company's consolidated assets or earning power is sold, each Right not owned by an Acquiring Person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price.

Shares of Junior Preferred Stock that may be purchased upon exercise of the Rights will not be redeemable. Each share of Junior Preferred Stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Common Stock whenever such dividend is declared. In the event of liquidation, holders of Junior Preferred Stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Common Stock. Each share of Junior Preferred Stock will have 100 votes, voting together with the Common Stock. Finally, in the event of any merger, consolidation or other transaction in which the Common Stock is exchanged, each share of Junior Preferred Stock will be entitled to receive an amount equal to 100 times the amount received per share of Common Stock. These rights are protected by customary antidilution provisions.

Because of the nature of the dividend, liquidation and voting rights of the Junior Preferred Stock, the value of the one-hundredth interest in a share of Junior Preferred Stock that may be purchased upon exercise of each Right should approximate the value of one share of Common Stock.

At any time after any person or group becomes and Acquiring Person, and prior to the acquisition by such Acquiring Person of 50% or more of the outstanding shares of Common Stock, the Company's Board of Directors may exchange the Rights (other than Rights owned by such person or group, which will become void after such person becomes an Acquiring Person) for Common Stock or Junior Preferred Stock, in whole or in part, at an exchange ratio of one share of Common Stock, or one hundredth of a share of Junior Preferred Stock (or of a share of another series of the Company's Preferred Stock having equivalent rights, preferences and privileges), per Right (subject to adjustment).

15

At any time prior to the acquisition by a person or group of beneficial ownership of 20% or more of the outstanding shares of Common Stock, the Company's Board of Directors may redeem the Rights in whole, but not in part, at a price of $.01 per Right.

The terms of the Rights may be amended by the Company's Board of Directors without the consent of the holders of the Rights, including an amendment to lower (a) the threshold at which a person becomes an Acquiring Person and (b) the percentage of Common Stock proposed to be acquired in a tender or exchange offer that would cause the Rights to become exercisable, to not less than the greater of (a) the sum of .001% plus the largest percentage of the Company's outstanding Common Stock then known to the Company to be beneficially owned by any person or group and (b) 10%, except that, from and after such time as any person or group becomes an Acquiring Person, no such amendment may adversely affect the interests of the holders of the Rights.

The Rights are currently scheduled to expire on March 31, 2008 (subject to extension or the earlier redemption or exchange of the Rights). As a result of Grace's Chapter 11 filing, the rights could be modified in a plan of reorganization.

The foregoing summary of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as an Exhibit 4.1 to the Company's Form 8-K filed on April 9, 1998.

ITEM 6.            SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-34 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 15 to the Consolidated Financial Statements (pages F-10 through F-18, and F-22 through F-27 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-51) of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 1997-2001.

ITEM 7.            MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS
                   AND FINANCIAL CONDITION

The information called for by this Item appears on pages F-35 to F-49 of the Financial Supplement, which is incorporated herein by reference.

ITEM 7A.           QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The information called for by this Item appears in Notes 12 and 13 to the Consolidated Financial Statements (pages F-23 and F-24 of the Financial Supplement), which is incorporated herein by reference.

ITEM 8.            FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement, which is incorporated herein by reference.

ITEM 9.            CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
                   AND FINANCIAL DISCLOSURE

This Item is inapplicable, as no such changes or disagreements have occurred.

PART III

ITEM 10.        DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The Company's current directors and executive officers are listed below.
The Company's Certificate of Incorporation provides for the division of the
Board of Directors into three classes, each to serve for a three-year term or
until their respective successors are elected. In view of the Chapter 11 filing,
the directors are expected to continue to serve beyond the expiration of their
respective current terms. Executive officers are elected to serve until the
following annual meeting of the Company's Board of Directors or until their
respective successors are elected.

| Name and Age | Office | First Elected |
| --- | --- | --- |
| John F. Akers (67) | Class II Director - term expiring in 2003 | 05/09/97 |
| H. Furlong Baldwin (70) | Class I Director - term expiring at next meeting of shareholders | 01/16/02 |
| Ronald C. Cambre (63) | Class III Director - term expired in 2001 | 09/01/98 |
| Marye Anne Fox (54) | Class I Director - term expiring in 2002 | 05/10/96 |
| John J. Murphy (70) | Class II Director - term expiring in 2003 | 05/09/97 |
| Paul J. Norris (54) | Class III Director (Chairman) - term expired in 2001, President and Chief Executive Officer | 01/01/99 11/01/98 |
| Thomas A. Vanderslice (70) | Class I Director - term expiring in 2002 | 05/10/96 |
| Robert J. Bettacchi (59) | Senior Vice President | 04/01/97 |
| William M. Corcoran (52) | Vice President | 05/11/99 |
| W. Brian McGowan (52) | Senior Vice President | 12/06/90* |
| David B. Siegel (53) | Senior Vice President, General Counsel and Chief Restructuring Officer | 09/01/98* |
| Robert M. Tarola (51) | Senior Vice President and Chief Financial Officer | 05/11/99 |

* Designated an Executive Officer on July 9, 1998

Mr. Akers served as Chairman of the Board and Chief Executive Officer of
International Business Machines Corporation from 1985 until his retirement in
1993. He is a director of Hallmark Cards, Inc., Lehman Brothers Holdings, Inc.,
The New York Times Company, PepsiCo, Inc. and Springs Industries, Inc.

Mr. Baldwin is Chairman of the Board of Mercantile Bankshares Corporation
and has served in such capacity since 1984, and as a director since 1970. From
1977 to 2001 he served as Chief Executive Officer. Mr. Baldwin is also a
director of Constellation Energy Group, Inc., CSX Corp., and The St. Paul
Companies.

17

Mr. Cambre is Chairman of the Board of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and has served as Chairman since 1995. He is also a director of Cleveland-Cliffs Inc. and McDermott International, Inc.

Dr. Fox is Chancellor of North Carolina State University and Professor of Chemistry at that institution. Previously she was Vice President for Research and the Waggoner Regents Chair in Chemistry of the University of Texas, positions she held from 1994 and 1992, respectively, until 1998.

Mr. Murphy served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is a director of CARBO Ceramics, Inc., Kerr-McGee Corporation, PepsiCo, Inc. and Shaw Industries Ltd.

Mr. Norris was Senior Vice President of AlliedSignal Incorporated and President of its specialty chemicals business from January 1997 until joining Grace. He joined AlliedSignal in 1989 as President of its fluorine products/chemicals and catalysts businesses. Mr. Norris is a director of Borden Chemical, Inc. He also performs advisory services for Kolberg, Kravis Roberts & Co. in its capacity as the principal shareholder of Borden.

Mr. Vanderslice served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until his retirement in 1995. He is a director of ChevronTexaco Inc.

Messrs. Bettacchi, McGowan and Siegel have been actively engaged in Grace's business for the past five years.

Mr. Corcoran previously served as Vice President of Business and Regulatory Affairs for AlliedSignal Incorporated's specialty chemicals business from 1997. For nine years prior to that, he served as Vice President of Public Affairs in AlliedSignal's engineered materials sector.

Mr. Tarola joined Grace from MedStar Health, Inc., where he had served as Senior Vice President and Chief Financial Officer from July 1998. He previously served in a similar capacity with Helix Health, Inc. for two years. From 1974 through 1996, Mr. Tarola was an employee and partner of Price Waterhouse LLP.

18

ITEM 11.    ·    EXECUTIVE COMPENSATION

Summary Compensation Table. The following Summary Compensation Table contains information concerning the compensation of (a) Paul J. Norris, Chief Executive Officer; and (b) the other four most highly compensated executive officers of Grace who were serving as such at year-end 2001. Certain information has been omitted from the Summary Compensation Table because it is not applicable or because it is not required under the rules of the Securities and Exchange Commission ("SEC").

| | | Annual Compensation | | | Long-Term Compensation | | | |
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary | Bonus | Other Annual Compensation | Restricted Stock Award(a) | No. of Shares Underlying Options Granted | LTIP Payouts(b) | All Other Compensation(c) |
| P. J. Norris | 2001 | $887,500 | $936,250 | --- | --- | 121,000 | N/A | $1,457,298 |
| Chairman, President and | 2000 | 812,500 | 526,800 | | --- | 315,000 | N/A | 90,766 |
| Chief Executive Officer | 1999 | 737,500 | 942,500 | $272,486(d) | --- | 290,000 | N/A | 33,353 |
| R. J. Bettacchi | 2001 | 345,340 | 275,000 | | --- | 35,000 | N/A | 366,346 |
| Senior Vice President | 2000 | 332,344 | 125,000 | | --- | 85,000 | $102,670 | 42,171 |
| | 1999 | 297,500 | 300,000 | | --- | --- | 45,508 | 41,733 |
| W. M. Corcoran | 2001 | 267,333 | 150,000 | | --- | 12,300 | N/A | 270,928 |
| Vice President (e) | 2000 | 256,667 | 100,000 | | --- | 40,000 | N/A | 7,157 |
| | 1999 | 145,833 | 125,000 | | $178,750 | 32,500 | N/A | 306 |
| D. B. Siegel | 2001 | 370,000 | 240,000 | | --- | 21,800 | N/A | 627,915 |
| Senior Vice President | 2000 | 306,667 | 125,000 | | --- | 60,000 | 75,832 | 22,205 |
| and General Counsel | 1999 | 275,000 | 225,000 | | --- | --- | 35,822 | 16,561 |
| R. M. Tarola | 2001 | 374,500 | 250,000 | | --- | 27,900 | N/A | 374,277 |
| Senior Vice President | 2000 | 359,000 | 155,000 | | --- | 75,000 | N/A | 12,322 |
| and Chief Financial | 1999 | 224,130 | 155,000 | | --- | 100,000 | N/A | 621 |
| Officer (f) | | | | | | | | |

(Footnotes appear on following page)

19

(a)  Represents the dollar value of 10,000 shares of restricted stock issued to Mr. Corcoran on June 1, 1999, the date of issuance of such shares. At December 31, 2001, the dollar value of such shares was $15,500. The restrictions on such shares expire on May 31, 2002.

(b)  The amounts in this column represent payments under the Long-Term Incentive Plan ("LTIP") made in each year, as follows: 2000 - amounts paid for the 1997-1999 Performance Period; and 1999 - amounts paid for the 1996-1998 Performance Period (to the extent not previously paid in 1998). See "LTIP" below for additional information.

(c)  The amounts in this column for 2001 consist of the following:

    (i)  retention payments made as follows: Mr. Norris -- $1,375,000; Mr. Bettacchi -- $336,000; Mr. Corcoran -- $260,000; Mr. Siegel -- $600,000; and Mr. Tarola -- $363,500;

    (ii)  the actuarially determined value of Company-paid premiums on "split-dollar" life insurance, as follows: Mr. Norris -- $19,912; Mr. Bettacchi -- $4,139; and Mr. Siegel -- $4,826;

    (iii)  payments made to persons whose personal and/or Company contributions to Grace's Salaried Employees Savings and Investment Plan ("Savings Plan") would be subject to limitations under federal income tax law, as follows: Mr. Norris -- $50,736; Mr. Bettacchi -- $15,130; and Mr. Siegel -- $12,012;

    (iv)  Company contributions to the Savings Plan, as follows: Mr. Norris -- $10,500; Mr. Bettacchi -- $10,500; Mr. Corcoran -- $10,500; Mr. Siegel -- $10,500; and Mr. Tarola -- $10,200; and

    (v)  the value of Company-provided personal liability insurance, as follows: Mr. Norris -- $1,150; Mr. Bettacchi -- $577; Mr. Corcoran -- $428; Mr. Siegel -- $577; and Mr. Tarola -- $577.

(d)  This amount includes $238,996 of payments made to Mr. Norris under Grace's relocation program.

(e)  Mr. Corcoran was elected Vice President on May 11, 1999.

(f)  Mr. Tarola was elected Senior Vice President and Chief Financial Officer on May 11, 1999.

(Remainder of page intentionally left blank.)

20

Stock Options. The following table contains information concerning stock options granted in 2001, including the potential realizable value of each grant assuming that the market value of the Common Stock were to appreciate from the date of grant to the expiration of the option at annualized rates of (a) 5% and (b) 10%, in each case compounded annually over the term of the option. For example, the options granted to Mr. Norris in 2001 would produce a pretax gain of $461,736 shown in the table if the market price of the Common Stock rises at an annual rate of 10% to $6.216 per share by the time the options are exercised; based on the number and market price of the shares outstanding at year-end 2001, such an increase in the price of the Common Stock would produce a corresponding aggregate pretax gain of approximately $158,578,000 for the Company's shareholders. The assumed rates of appreciation shown in the table have been specified by the SEC for illustrative purposes only and are not intended to predict future stock prices, which will depend upon various factors, including market conditions and future performance and prospects. In view of recent developments, Grace believes it is highly unlikely that its Common Stock will achieve the indicated levels of appreciation in the foreseeable future, if ever (see "Chapter 11 Filing" in Item 1).

Options become exercisable at the time or times determined by the Compensation Committee of the Board of Directors; the options shown below become exercisable in three approximately equal annual installments beginning one year after the date of grant or upon the earlier occurrence of a "change in control" (see "Employment Agreements" and "Severance Agreements"). All of the options shown below have purchase prices equal to the fair market value of the Common Stock at the date of grant.

| NAME | 2001 Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term | |
| --- | --- | --- | --- | --- | --- | --- |
| | No. of Shares Underlying Options Granted | % of Total Options Granted to Employees in 2001 | Purchase Price ($/Share) | Expiration Date | 5% | 10% |
| P. J. Norris. . . . . | 121,000 | 9.03% | $2.40 | 3/7/11 | $182,952 | $461,736 |
| R. J. Bettacchi  . . . | 35,000 | 2.61% | $2.40 | 3/7/11 | 52,920 | 133,560 |
| W. M. Corcoran. . . . | 12,300 | 0.92% | $2.40 | 3/7/11 | 18,598 | 46,937 |
| D. B. Siegel . . . . . | 21,800 | 1.63% | $2.40 | 3/7/11 | 32,962 | 83,189 |
| R. M. Tarola . . . . . | 27,900 | 2.08% | $2.40 | 3/7/11 | 42,185 | 106,466 |
| All Shareholders . . . | - | - | - | - | $62,832,660 | $158,577,666 |
| Named Executive Officers' Percentage of Realizable Value Gained by All Shareholders.  . . . | - | - | - | - | < 1.0% | < 1.0% |

The following table contains information concerning unexercised options held at December 31, 2001. No options were exercised by the named individuals during 2001, and none of the options held by them at year-end 2001 were "in the money" (i.e., the exercise price of all options held by the individuals was above the market value of the Common Stock at year-end 2001).

No. of Shares Underlying Unexercised Options
at 12/31/01 Exercisable/Unexercisable

. Name

P. J. Norris . . . . . . . .          737,359 / 427,667
R. J. Bettacchi . . . . .            656,322 /  91,667
W. M. Corcoran. . . .                 34,999 /  49,801
D. B. Siegel . . . . . . .           318,195 /  61,800
R. M. Tarola . . . . . .              91,666 / 111,234

Long-Term Incentive Program. In connection with the March 31, 1998
transaction with Sealed Air Corporation that separated Grace's chemicals
businesses from its former packaging business (the "Packaging Transaction"), the
Compensation Committee determined to make the following changes in the LTIP: (a)
Performance Units granted for the 1996-1998 and 1997-1999 Performance Periods
vested on a pro rata basis on March 31, 1998, the completion date of the
Packaging Transaction; (b) the amounts earned under those Units were calculated
based on results achieved through March 31, 1998; (c) 75% of the estimated value
of such vested portions was paid in cash prior to completion of the Packaging
Transaction; (d) the balance of such vested portions was paid in cash following
completion of the Packaging Transaction; and (e) the value of the unvested
portions, based on targeted Performance Units and on the final average price of
the Common Stock immediately prior to completion of the Packaging Transaction,
was paid in cash following the end of the respective Performance Periods
(subject to continued service).

     The Board approved a new LTIP for key employees for 2001 ("2001 LTIP").
The 2001 LTIP is generally designed to provide key employees with long-term
incentives having a value at the 60th percentile of long-term incentives offered
by specialty chemical companies of comparable size to Grace. For each key
employee, the targeted value of the 2001 LTIP award has been split so that 50%
of the value of the award was provided in the form of a stock option grant, and
50% was in the form of cash compensation, payable if the Company achieves
certain pretax earnings targets over a three calendar year period. Depending on
the pretax earnings performance of the Company during the applicable three-year
period, the employee may be paid a total amount ranging from zero to two times
the targeted cash compensation applicable to the employee.

     If a key employee becomes entitled to a cash compensation under the
2001 LTIP, then such compensation will generally be paid in two installments;
one in early 2003 (which will be a partial payment based on performance for the
first two years of the applicable three-year period), and the other installment
will be paid to the employee in early 2004 (which will consider performance for
the complete three-year period and will be offset by the amount of the prior
installment). Generally, under the 2001 LTIP, a key employee will forfeit his or
her rights to receive an installment of cash compensation if, prior to the
payment of the installment, the employee either voluntarily resigns from the
Company or is terminated by the Company for cause.

     Pension Arrangements. Salaried employees of designated units  who are
21 or older and who have one or more years of service are eligible to
participate in the Retirement Plan for Salaried Employees. Under this basic
retirement plan, pension benefits are based upon (a) the employee's average
annual compensation for the 60 consecutive months in which his or her
compensation is highest during the last 180 months of continuous participation,
and (b) the number of years of the employee's credited service. For purposes of
this basic retirement plan, compensation generally includes nondeferred base

22

salary and nondeferred annual incentive compensation (bonus) awards; however, for 2001, federal income tax law limited to $170,000 the annual compensation on which benefits under this plan may be based.

Grace also has a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, Grace's deferred compensation plan no longer permits deferrals of base salary or incentive compensation.)

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2001, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans.

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
|---|---|---|---|---|---|---|
| $100,000 | $15,000 | $22,500 | $30,000 | $37,500 | $45,000 | $52,500 |
| 200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |
| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,100,000 | 165,000 | 247,500 | 330,000 | 412,500 | 495,000 | 577,500 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,300,000 | 195,000 | 292,500 | 390,000 | 487,500 | 585,000 | 682,500 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,500,000 | 225,000 | 337,500 | 450,000 | 562,500 | 675,000 | 787,500 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,700,000 | 255,000 | 382,500 | 510,000 | 637,500 | 765,000 | 892,500 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 1,900,000 | 285,000 | 427,500 | 570,000 | 712,500 | 855,000 | 997,500 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,100,000 | 315,000 | 472,500 | 630,000 | 787,500 | 945,000 | 1,102,500 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |

At December 31, 2001, Messrs. Norris, Bettacchi, Corcoran, Siegel and Tarola had 9.83, 30, 2.56, 24.75 and 2.56 years of credited service, respectively, under the basic and supplemental retirement plans. (Mr. Norris' years of credited service include his eligible service with Grace from 1975 to 1981.) For purposes of those plans, the 2001 compensation of such executive officers was as follows: Mr. Norris -- $1,414,300; Mr. Bettacchi -- $470,340; Mr. Corcoran -- $367,333; Mr. Siegel -- $495,000; and Mr.

23

Tarola -- $529,500. Messrs. Norris, Corcoran and Tarola are entitled to additional pension benefits under their employment agreements (see "Employment Agreements").

Employment Agreements. Effective January 1, 2001, Mr. Norris entered into a new employment agreement with Grace, which supercedes the letter agreement between Mr. Norris and Grace dated October 26, 1998. This agreement expires December 31, 2002, subject to automatic one-year renewals unless Mr. Norris or Grace notifies the other that it wishes to terminate the agreement. Under the agreement, Mr. Norris' annual base salary will not be less than $875,000. He will continue to participate in Grace's annual incentive compensation program, under which his targeted award will be at least 75% of his annual base salary.

Under Mr. Norris' prior letter agreement, he received a restricted stock award on November 1, 1998 covering 170,733 shares of Grace Common Stock. The restrictions on the final installment of the award (covering 56,911 shares of Grace Common Stock) lapsed on November 1, 2001. Under his employment agreement, Mr. Norris had the option to receive this installment of the award in the form of unrestricted shares or convert the award to cash in the amount of $10.25 for each share. On November 1, 2001, Mr. Norris elected to receive $583,338 in cash in lieu of unrestricted shares.

Also under the prior agreement, Mr. Norris received upon his commencement of employment on November 1, 1998 a non-statutory stock option grant covering 439,026 shares of Common Stock pursuant to Grace's 1998 Stock Incentive Plan. His employment agreement provides that Grace will make a stock appreciation payment to Mr. Norris, at the time he elects to exercise any vested options under that stock option grant or at the time he elects to cancel such options, provided that the price of a share of Common Stock is above $10.25 at the time. The payment will be equal to the product of the number of shares exercised (or cancelled), multiplied by the difference between (a) the purchase price per share ($16.75), or the price of a share of Common Stock on the date of such exercise, if less than the purchase price per share, and (b) $10.25.

Under his employment agreement, Mr. Norris received an $875,000 retention bonus in January 2001 and a $500,000 retention bonus in December 2001. If he remains employed by Grace (or is terminated without cause or on the basis of constructive discharge, death or disability) through December 2002, he will receive a retention bonus of $500,000.

Under the employment agreement, if Mr. Norris' employment is terminated by Grace without cause or by Mr. Norris on the basis of constructive discharge at any time, then he will be entitled to receive a severance payment equal to two times the dollar amount that equals 175% of his annual base salary at the time of such termination. Such payment will be made in a lump sum immediately after Mr. Norris' date of termination.

Mr. Norris' employment agreement also continues the same retirement benefits provisions as under his prior agreement, which provided that, in determining the benefits payable to Mr. Norris under Grace's basic and supplemental retirement plans, his years of service with Grace and his prior employer will be recognized as if those years were continuous service with Grace, with an offset for any retirement benefits payable from his prior employers' retirement plans. In addition, the "final average compensation" used to determine his retirement benefits payable under Grace's basic and supplemental retirement plans will only consider compensation earned by Mr. Norris from and after the commencement of his current term of employment with Grace on November 1, 1998.

Also, the employment agreement provides that, if Mr. Norris does not receive supplemental retirement benefits under any Grace plan, then such supplemental benefits will become payable to

24

Mr. Norris under his employment agreement. In addition, in the event of Mr. Norris' termination on or after November 1, 2001 (or if he terminates his employment with Grace at any time based on constructive discharge), Grace will immediately pay Mr. Norris a lump sum cash payment equal in value to all supplemental retirement benefits payable to Mr. Norris under his employment agreement or any plan or program of Grace.

The agreement further provides that, upon Mr. Norris' termination of employment, Grace will provide Mr. Norris with relocation assistance to any location within the continental United States selected by Mr. Norris, including certain cash payments and relocation assistance, as well as compensation for any loss incurred on the sale of his Maryland home. The agreement also provides for Mr. Norris' participation in other benefits and compensation programs, including benefits and programs generally available to other senior executives of Grace. The foregoing description of Mr. Norris' employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.20 to Grace's 2000 Annual Report on Form 10-K.

Mr. Corcoran has an employment agreement with Grace that expires on May 31, 2002. Under the agreement, Mr. Corcoran's initial base salary is $250,000, subject to annual review and approval of the Compensation Committee. In addition, Mr. Corcoran is eligible to participate in Grace's annual incentive compensation program, with a target award equal to no less than 37% of his annual base salary (except that his incentive award for 1999 was set at an amount between $92,000 and $182,000). Under the agreement, Mr. Corcoran also received a stock option grant covering 32,500 shares of Common Stock, and a grant of 10,000 shares of restricted Common Stock.

In the event that Mr. Corcoran's employment is terminated by Grace without cause on or before May 31, 2002, he will generally be entitled to a severance payment equal to two times the amount that is 137% of his annual base salary at the time of his termination. If he is terminated by Grace without cause after that date, Mr. Corcoran will generally be entitled to a severance payment equal to one times such amount. (However, along with other executive officers and certain key employees of Grace, Mr. Corcoran has entered into a retention agreement with Grace, described below, under which, in certain circumstances, he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.)

If Mr. Corcoran's employment does not cease prior to May 22, 2002 (or his employment is terminated without cause prior to that date), the benefits payable to Mr. Corcoran under Grace's basic and supplemental retirement plans will be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for an additional one-half year of credited service (up to a maximum of 5 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.24 to Grace's 2000 Annual Report on Form 10-K.

On January 30, 2001, Mr. Siegel entered into a new agreement with Grace that specifies certain terms and conditions of his employment (the "2001 Agreement"). Under the 2001 Agreement, which supercedes his prior agreement, Mr. Siegel received a retention payment and became covered by an enhanced severance arrangement, each of which is described below. In exchange, Mr. Siegel agreed that he would have no right to severance pay under the Grace 1999 Productivity and Effectiveness Program (the "PEP Program") and that he would give Grace at least 90 days' prior notice if he voluntarily resigns or retires on or prior to December 31, 2002.

25

Under the 2001 Agreement, Mr. Siegel received a retention payment in the amount of $600,000. Mr. Siegel is required to repay a pro rata portion of one-half of the retention payment if he voluntarily terminates his employment with Grace (other than as a result of a constructive termination), or his employment is terminated for cause, prior to December 31, 2002. The 2001 Agreement also specifies that Mr. Siegel would be entitled to an enhanced severance payment equal to two times his annual base salary if his employment is involuntarily terminated without cause under circumstances which would qualify him for severance pay under Grace's severance plan that generally covers salaried employees.

The 2001 Agreement also provides that Mr. Siegel will relocate full time to Columbia, Maryland on or before January 1, 2003, unless he gives Grace 90 days' notice of his election to resign prior to September 30, 2002. If Mr. Siegel relocates to Maryland, he will be entitled to the relocation benefits generally available to other Grace employees who relocated to Maryland during 1999 in conjunction with the relocation of Grace's headquarters from Boca Raton, Florida. If Mr. Siegel elects to resign prior to September 30, 2002, then he will be eligible for all separation arrangements under the PEP Program (except severance pay under the PEP Program). The foregoing description of the 2001 Agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.22 to Grace's 2000 Annual Report on Form 10-K.

Mr. Tarola has an employment agreement providing for his service as Senior Vice President and Chief Financial Officer of Grace through November 10, 2002. Under this agreement, Mr. Tarola is entitled to an annual base salary of $350,000, and an annual incentive award (bonus) for each calendar year during his term of employment. That bonus will be targeted to be no less than 45% of his annual base salary (with a maximum bonus equal to double the targeted bonus for any calendar year); except that his incentive award for 1999 was set at an amount no less than $129,000. The agreement also provides that Mr. Tarola's annual base salary and incentive award is generally subject to annual review and approval of the Compensation Committee. Under the agreement, Mr. Tarola received a stock option grant covering 100,000 shares of Common Stock.

In the event that Mr. Tarola's employment is terminated by Grace without cause on or before November 10, 2002, he will generally be entitled to a severance payment equal to two times the amount that is 145% of his annual base salary at the time of termination. If his employment is terminated by Grace without cause after that date, Mr. Tarola will generally be entitled to a severance payment equal to one times such amount. (However, along with other officers and certain key employees of Grace, Mr. Tarola entered into a retention agreement with Grace, described below, under which, in certain circumstances, he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.)

If Mr. Tarola's employment does not cease prior to November 10, 2002 (or if his employment is terminated without cause prior to that date), the benefits payable to Mr. Tarola under Grace's basic and supplemental retirement plans will be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for one additional year of credited service (up to a maximum of 10 additional years of credited service); except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.1 to Grace's Quarterly Report on Form 10-Q for the quarter ended June 30, 1999.

Change-in-Control Severance Agreements. In addition to the severance provisions described under "Retention Agreements" below, Grace has severance agreements with all of its executive officers. These agreements generally provide that in the event of the involuntary termination of the individual's

26

employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control" of Grace, he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to pro rata reduction in the case of an officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means the acquisition of 20% or more of the Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the shareholders of Grace immediately preceding such transaction do not own more than 50% of the combined voting power of the company resulting from such transaction, or the liquidation or dissolution of Grace. This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which was filed as an exhibit to the Registration Statement on Form 10 filed with the SEC by Grace (named Grace Specialty Chemicals, Inc. at the time of filing) on March 13, 1998. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition by a trust of Common Stock, established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization.

Retention Agreements. Effective January 1, 2001, Grace entered into retention agreements with each of the executive officers other than Messrs. Norris and Siegel, whose retention arrangements are covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Common Stock has had and is expected to continue to have on Grace's ability to attract and retain key employees. Under the terms of these agreements, each such executive officer received a payment in January 2001 equal to his annual base salary, subject to remaining employed with Grace for a two-year period. In the event of the voluntary termination of such officer's employment (other than a constructive termination caused by a reduction in salary, a permanent change in job location or a change in job duties inappropriate to such officer's position) or a termination of such officer's employment for cause, then such officer would be required to reimburse Grace for a pro rata portion of such payment based on the number of days remaining in such two-year period. The retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs. In addition to the retention payment, the retention agreements provide that in the event of the involuntary termination of such officer's employment under circumstances that would qualify such officer for severance pay under Grace's severance plan that generally covers salaried employees, then the officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any such officer who has any other agreement with Grace regarding the payment of severance upon termination of employment, if such officer becomes entitled to severance under both the terms of the retention agreement and such other agreement, then the officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the officer would only receive severance pay under such other agreement).

Executive Salary Protection Plan. All executive officers participate in the Executive Salary Protection Plan ("ESPP"), which provides that, in the event of a participant's disability or death prior to age 70, Grace will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the ESPP may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). This description of the ESPP does not purport to be complete and is qualified in its entirety by reference to the text of the ESPP, as amended, which is filed as Exhibit 10.8 to this Annual Report on Form 10-K.

27

Effect of Chapter 11 Filing. The U.S. Bankruptcy Court has approved the employment agreements and the continuation of the executive compensation and benefit agreements and programs described above. The continuation of these agreements and programs, and the establishment of new programs may be affected by the Chapter 11 proceedings.

Directors' Compensation and Consulting Arrangements. Under the compensation program for nonemployee directors in effect for 2001, each nonemployee director received an annual retainer of $50,000, 50% of which was paid in cash and 50% of which was paid in the form of Common Stock. In addition, directors received $4,000 ($5,000 for directors holding a committee chair) in cash for each meeting date in respect of the Board meeting and all committee meetings held on such date. A director may elect to defer all or part of each payment made in Common Stock. The deferred payment will be held in a deferred compensation trust established by Grace. Common Stock held in the trust will be delivered to the director following his or her termination from service (or a subsequent date specified by the director).

Grace reimburses nonemployee directors for expenses they incur in attending Board and committee meetings. Grace also maintains business travel accident insurance coverage for them. In addition, nonemployee directors may occasionally perform additional services at the request of management or the Board for which additional compensation may be paid. No additional compensation was paid to any nonemployee director in 2001.

Compensation Committee Interlocks and Insider Participation. During 2001, the Compensation Committee of the Board was comprised of Messrs. Akers (Chair), Cambre, Murphy and Vanderslice, and Dr. Fox. None of such persons is a current or former officer or employee of Grace or any of its subsidiaries, nor did any of such persons have any reportable transactions with Grace or any of its subsidiaries.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the Common Stock beneficially owned, directly or indirectly, as of January 31, 2002 by (1) each person known to Grace to be the beneficial owner of more than 5% of the outstanding shares of Common Stock, and (2) each current director and nominee, each of the executive officers named in the Summary Compensation Table set forth under "Election of Directors -- Compensation," and such directors and all executive officers as a group.

| Beneficial Owner | Shares of Common Stock Beneficially Owned | Percent |
|---|---|---|
| Peninsula Partners, L.P. (1) ............. <br> 404B East Main Street, 2nd Floor <br> Charlottesville, VA 22902 | 10,765,600 | 16.44% |
| The Baupost Group, L.L.C (2) ............. <br> 10 St. James Avenue, Suite 2000 <br> Boston, MA 02116 | 3,607,600 | 5.51% |
| J. F. Akers ............................... | 17,078 <br> 74,535   (O) <br> 11,287   (T) | * |

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| H. F. Baldwin . . . . . . . . . . . . . . . . . | 0 | | 0 |
| R. J. Bettacchi . . . . . . . . . . . . . | | | * |
| | 656,322 | (O) | |
| | 7,063 | (T) | |
| R. C. Cambre . . . . . . . . . . . . . . | 42,217 | | * |
| W. M. Corcoran. . . . . . . . . . . . . . | 10,000 | | |
| | 52,434 | (O) | |
| | 1,240 | (T) | |
| M. A. Fox . . . . . . . . . . . . . . . | 3,455 | | * |
| | 59,007 | (O) | |
| | 2,834 | (T) | |
| J. J. Murphy . . . . . . . . . . . . . | 17,012 | | * |
| | 15,528 | (O) | |
| | 15,913 | (T) | |
| P. J. Norris . . . . . . . . . . . . . | 138,822 | | 1.99% |
| | 1,216,718 | (O) | |
| | 1,049 | (T) | |
| D. B. Siegel . . . . . . . . . . . . . | 15,100 | | * |
| | 324,922 | (O) | |
| | 20,459 | (T) | |
| R. M. Tarola . . . . . . . . . . . . | 15,000 | | * |
| | 40,967 | (O) | |
| | 49 | (T) | |
| T. A. Vanderslice . . . . . . . . . . . | 17,604 | | * |
| | 69,876 | (O) | |
| | 9,060 | (T) | |
| Directors and executive officers as a group . | 302,161 | | 4.65% |
| | 2,782,949 | (O) | |
| | 90,172 | (T) | |

\*      Indicates less than 1%

(O)   Shares covered by stock options exercisable on or within 60 days after January 31, 2002.

(T)   Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment.

(1)   The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC.

(2)   The ownership information set forth is based in its entirety on material contained in a Schedule 13G dated February 12, 2002 filed with the SEC, which stated that the securities were not acquired for the purpose of changing or influencing the control of Grace.

29

Ownership and Transactions Reports

Under Section 16 of the Securities Exchange Act of 1934, the Company's directors, certain of its officers, and beneficial owners of more than 10% of the outstanding Common Stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Common Stock; such persons are also required to furnish the Company with copies of such reports. Based solely upon the reports and related information furnished to the Company, the Company believes that all such filing requirements were complied with in a timely manner during and with respect to 2001.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Commercial Transactions. During 2001, no director, executive officer (or any member of any of their respective immediate families) or, to the Company's knowledge, any holder of more than 5% of the Common Stock, had a direct or indirect material interest in any transaction (or any proposed transaction) to which the Company was a party.

Legal Proceedings; Indemnification. During 2001 there were no legal proceedings pending in which any current officers or directors of the Company were parties or had a material interest adverse to the Company.

PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

Financial Statements and Schedules. See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement.

Reports on Form 8-K. The Company did not file any Reports on Form 8-K during the fourth quarter of 2001.

Exhibits. The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |

30

| | | |
|---|---|---|
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/9/98) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Filed herewith |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/9/98) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98) |
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10 (filed 3/13/98) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10 (filed 3/13/98) |

| | | |
|---|---|---|
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 for Form 10-Q (filed 8/15/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Annex C to the Information Statement of Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) dated February 13, 1998 including the Form 10 of Grace filed 3/13/98 ("Information Statement")* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Annex D to Information Statement* |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Exhibit 10.4 to Form 10-Q (filed 5/15/98)* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Filed herewith* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Filed herewith* |
| 10.9 | W. R. Grace & Co. 1986 Stock Incentive Plan, as amended | Filed herewith* |
| 10.10 | W. R. Grace & Co. 1989 Stock Incentive Plan, as amended | Filed herewith* |
| 10.11 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Filed herewith* |
| 10.12 | Information concerning W. R. Grace & Co. Incentive Compensation Program, Deferred Compensation Program and Long-Term Incentive Program | Pages 7-12 and 26-36 of Proxy Statement of Old Grace (filed 4/7/97)* |
| 10.13 | Form of Long-Term Incentive Program Award | Exhibit 10.13 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.14 | Forms of Stock Option Agreements | Exhibit 10.15 to Form 10-K (filed 3/29/99)* |

32

| | | |
|---|---|---|
| 10.15 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.16 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98)* |
| 10.17 | Form of Executive Severance Agreement between W. R. Grace & Co. and officers | Exhibit 10.20 to Form 10 of Grace Specialty Chemicals, Inc. (now W. R. Grace & Co.) (filed 3/13/98)* |
| 10.18 | Form of Restricted Share Award Agreements dated April 7, 1998 | Exhibit 10.1 to Form 10-Q (filed 5/15/98)* |
| 10.19 | Employment Agreement, dated January 1, 2001, by and between W. R. Grace & Co. and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.20 | Employment Agreement dated May 11, 1999 between W. R. Grace & Co.-Conn. and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.21 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of W. R. Grace & Co., and David B. Siegel | Exhibit 10.22 to Form 10-K (filed 4/16/01)* |
| 10.22 | Form of Long-Term Incentive Program Award | Exhibit 10.23 to Form 10-K (filed 4/16/01)* |
| 10.23 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of W. R. Grace & Co., and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.24 | Distribution Agreement by and among Grace New York, W. R. Grace & Co.-Conn. and Fresenius AG dated February 4, 1996 | Exhibit 2 to Form 8-K of Grace New York (filed 2/6/96) |
| 10.25 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Directors | Exhibit 10.39 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.26 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Officers and Directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.27 | Form of Retention Agreement | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 12 | Computation of Ratio of Earnings and Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2001 Form 10-K |

33

| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2001 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 99 | Audit Committee Report | Filed herewith |

34

SIGNATURES

      Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

W. R. GRACE & CO.


By:  /s/ Robert M. Tarola
     --------------------
     Robert M. Tarola
     (Senior Vice President and
     Chief Financial Officer)

Dated: March 28, 2002

      Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 28, 2002.

| Signature | Title |
|-----------|-------|
| P. J. Norris* | President and Director (Principal Executive Officer) |
| J. F. Akers*<br>H. F. Baldwin*<br>R. C. Cambre*<br>M. A. Fox*<br>J. J. Murphy*<br>T. A. Vanderslice* | )<br>)<br>)<br>) Directors<br>)<br>) |
| /s/ Robert M. Tarola<br>-------------------------------------<br>(Robert M. Tarola) | Senior Vice President and Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) |

-------------------------------------

*   By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and Exchange Commission.


By:      /s/ Mark A. Shelnitz
         -------------------------
         Mark A. Shelnitz
         (Attorney-in-Fact)

35

FINANCIAL SUPPLEMENT

W. R. GRACE & CO.
ANNUAL REPORT ON FORM 10-K
FOR THE YEAR ENDED DECEMBER 31, 2001

F-1

FINANCIAL SUPPLEMENT

TO

ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2001

W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements
and Financial Statement Schedule and Exhibit

Management's Responsibility for Financial Reporting............................. F-3
Report of Independent Accountants.............................................. F-4
Report of Independent Accountants on Financial Statement Schedule.............. F-5
Consent of Independent Accountants............................................ F-5
Consolidated Statement of Operations for the three years in the
    period ended December 31, 2001............................................ F-6
Consolidated Statement of Cash Flows for the three years in the
    period ended December 31, 2001............................................ F-7
Consolidated Balance Sheet at December 31, 2001 and 2000...................... F-8
Consolidated Statement of Shareholders' Equity (Deficit) for the three
    years in the period ended December 31, 2001.............................. F-9
Consolidated Statement of Comprehensive (Loss) Income for the three
    years in the period ended December 31, 2001.............................. F-9
Notes to Consolidated Financial Statements.................................... F-10 - F-33
Financial Summary............................................................. F-34
Management's Discussion and Analysis of Results of Operations
    and Financial Condition.................................................. F-35 - F-49
Financial Statement Schedule
    Schedule II  -  Valuation and Qualifying Accounts and Reserves.............. F-50
:  Computation of Ratio of Earnings to Fixed Charges and
    Combined Fixed Charges and Preferred Stock Dividends...................... F-51

The financial data listed above appearing in this Financial Supplement are
incorporated by reference herein. The Financial Statement Schedule should be
read in conjunction with the Consolidated Financial Statements and Notes
thereto. Financial statements of less than majority-owned persons and other
persons accounted for by the equity method have been omitted as provided in Rule
3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement
Schedules not included have been omitted because they are not applicable or the
required information is shown in the Consolidated Financial Statements or Notes
thereto.

MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING

Management is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such financial information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

Management maintains internal control systems to assist it in fulfilling its responsibility for financial reporting. These systems include business, accounting and reporting policies and procedures, selection of personnel, segregation of duties and an internal audit function. While no system can ensure elimination of all errors and irregularities, Grace's systems, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed and transactions are properly executed and reported. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial personnel, internal auditors and independent accountants to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal control systems. The Audit Committee reports its findings and recommends the selection of independent accountants to the Board of Directors. Grace's financial management, internal auditors and independent accountants have direct and confidential access to the Audit Committee at all times.

The independent accountants are engaged to conduct the audits of and report on the Consolidated Financial Statements in accordance with auditing standards generally accepted in the United States of America. These standards require an assessment of the systems of internal controls and tests of transactions to the extent considered necessary by the independent accountants for purposes of supporting their opinion as set forth in their report.

| | |
|---|---|
| /s/ Paul J. Norris | /s/ Robert M. Tarola |
| Paul J. Norris | Robert M. Tarola |
| Chairman, President and | Senior Vice President and |
| Chief Executive Officer | Chief Financial Officer |

F-3

REPORT OF INDEPENDENT ACCOUNTANTS

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF
W. R. GRACE & CO.

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of operations, of cash flows, of shareholders' equity (deficit) and of comprehensive (loss) income, present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries at December 31, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.


/s/PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Baltimore, Maryland
January 29, 2002


F-4

REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL STATEMENT SCHEDULE

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF W. R. GRACE & CO.

Our audits of the consolidated financial statements referred to in our report
dated January 29, 2002, which was modified as to a matter raising substantial
doubt about the Company's ability to continue as a going concern, appearing on
page F-4 of this 2001 Annual Report on Form 10-K of W. R. Grace & Co. also
included an audit of the Financial Statement Schedule listed on page F-2 in the
Index to Consolidated Financial Statements and Financial Statement Schedule and
Exhibit of this Form 10-K. In our opinion, this Financial Statement Schedule
presents fairly, in all material respects, the information set forth therein
when read in conjunction with the related consolidated financial statements.


/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Baltimore, Maryland
January 29, 2002

CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in the Registration
Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509,
333-49511, 333-49513, 333-49515, 333-49517, 333-49703, and 333-49705) of W. R.
Grace & Co. of our report dated January 29, 2002 appearing on page F-4 of this
2001 Annual Report on Form 10-K of W. R. Grace & Co. We also consent to the
incorporation by reference of our report dated January 29, 2002 relating to the
Financial Statement Schedule, which appears above in this Form 10-K.


/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Baltimore, Maryland
March 28, 2002

F-5

CONSOLIDATED FINANCIAL STATEMENTS

| W. R. GRACE & CO. AND SUBSIDIARIES CONSOLIDATED STATEMENT OF OPERATIONS | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| Amounts in millions, except per share amounts | 2001 | 2000 | 1999 |
| Net sales | $ 1,723.2 | $ 1,597.4 | $ 1,550.9 |
| Other income | 34.0 | 49.5 | 56.7 |
| | 1,757.2 | 1,646.9 | 1,607.6 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,092.9 | 973.9 | 929.3 |
| Selling, general and administrative expenses | 336.1 | 323.1 | 327.2 |
| Research and development expenses | 44.1 | 45.7 | 42.4 |
| Depreciation and amortization | 89.0 | 87.8 | 89.2 |
| Interest expense and related financing costs | 37.1 | 28.1 | 16.1 |
| Provision for asbestos-related litigation, net of insurance | -- | 208.0 | -- |
| | 1,599.2 | 1,666.6 | 1,404.2 |
| Income (loss) from continuing operations before Chapter 11 reorganization expenses and income taxes | 158.0 | (19.7) | 203.4 |
| Chapter 11 reorganization expenses, net | (15.7) | -- | -- |
| Provision for income taxes | (63.7) | (70.0) | (73.2) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | 78.6 | (89.7) | 130.2 |
| Income from discontinued operations, net of tax | -- | -- | 5.7 |
| NET INCOME (LOSS) | $ 78.6 | $ (89.7) | $ 135.9 |
| BASIC EARNINGS (LOSS) PER SHARE: | | | |
| Continuing operations | $ 1.20 | $ (1.34) | $ 1.84 |
| Net income (loss) | $ 1.20 | $ (1.34) | $ 1.92 |
| Weighted average number of basic shares | 65.3 | 66.8 | 70.7 |
| DILUTED EARNINGS (LOSS) PER SHARE: | | | |
| Continuing operations | $ 1.20 | $ (1.34) | $ 1.75 |
| Net income (loss) | $ 1.20 | $ (1.34) | $ 1.84 |
| Weighted average number of diluted shares | 65.4 | 66.8 | 73.8 |

The Notes to Consolidated Financial Statements are
an integral part of these statements

**W. R. GRACE & CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

| | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| Dollars in millions | 2001 | 2000 | 1999 |

| | 2001 | 2000 | 1999 |
| --- | --- | --- | --- |
| **OPERATING ACTIVITIES** | | | |
| Income before Chapter 11 reorganization expenses and income taxes | $ 158.0 | $ (19.7) | $ 203.4 |
| Reconciliation to cash provided by (used for) operating activities: | | | |
| Depreciation and amortization | 89.0 | 87.8 | 89.2 |
| Interest accrued on pre-petition debt subject to compromise | 23.2 | -- | -- |
| Gain on sales of investments | (7.3) | (19.0) | (9.3) |
| Gain on disposals of assets | (1.8) | (5.5) | (13.6) |
| Provision for environmental remediation | 5.8 | 10.4 | -- |
| Provision for asbestos-related litigation, net of insurance | -- | 208.0 | -- |
| Net income from life insurance policies | (5.4) | (6.4) | (2.1) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | |
| (Increase) decrease in notes and accounts receivable, net | (9.7) | (10.6) | 0.5 |
| Increase in accounts receivable due to termination of securitization program | (98.4) | -- | -- |
| Decrease (increase) in subordinated interest of accounts receivable sold | 33.1 | (4.9) | 37.0 |
| Increase in inventories | (31.2) | (8.0) | (5.7) |
| Increase (decrease) in accounts payable and accrued liabilities | 0.9 | (10.1) | 12.3 |
| Increase in net pension assets | (21.3) | (33.6) | (10.6) |
| Expenditures for asbestos-related litigation | (109.6) | (281.8) | (115.9) |
| Proceeds from asbestos-related insurance | 78.8 | 85.6 | 73.1 |
| Expenditures for environmental remediation | (24.9) | (36.8) | (17.8) |
| Expenditures for postretirement benefits | (22.3) | (23.0) | (19.6) |
| Expenditures for retained obligations of discontinued operations | (13.1) | (34.9) | (42.9) |
| Other | 2.9 | (9.3) | 6.9 |
| NET CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES BEFORE INCOME TAXES AND CHAPTER 11 REORGANIZATION EXPENSES | 46.1 | (111.8) | 184.9 |
| Chapter 11 reorganization expenses paid, net | (11.8) | -- | -- |
| Income taxes paid, net of refunds | (27.9) | (28.3) | (54.4) |
| NET CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES | 6.4 | (140.1) | 130.5 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (62.9) | (64.8) | (82.5) |
| Businesses acquired in purchase transactions, net of cash acquired | (84.4) | (49.0) | (9.4) |
| Investments in unconsolidated affiliates | (1.9) | (3.6) | -- |
| Net proceeds from (investment in) life insurance policies | 0.4 | (11.1) | 0.9 |
| Proceeds from sales of investments | 7.9 | 19.0 | 9.3 |
| Proceeds from disposals of assets | 7.6 | 11.9 | 40.6 |
| Net investing activities of discontinued operations | -- | -- | (54.1) |
| Net proceeds from divestments of businesses | -- | -- | 184.6 |
| NET CASH (USED FOR) PROVIDED BY INVESTING ACTIVITIES | (133.3) | (97.6) | 89.4 |
| **FINANCING ACTIVITIES** | | | |
| Proceeds from loans secured by cash value of life insurance, net of repayments | 33.7 | (5.2) | (3.4) |
| Borrowings under pre-petition credit facilities, net of repayments | 93.6 | 311.3 | 18.7 |
| Borrowings under debtor-in-possession facility, net of fees | 71.5 | -- | -- |
| Repayments of term debt | -- | (24.7) | -- |
| Repayments of borrowings under debtor-in-possession facility | (75.0) | -- | -- |
| Exercise of stock options | -- | 5.8 | 26.6 |
| Purchase of treasury stock | (0.6) | (47.3) | (95.3) |
| Net financing activity of discontinued operations | -- | -- | (27.5) |
| NET CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES | 123.2 | 239.9 | (80.9) |
| Effect of currency exchange rate changes on cash and cash equivalents | (6.9) | (10.1) | (4.5) |
| (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | (10.6) | (7.9) | 134.5 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 191.9 | 199.8 | 65.3 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 181.3 | $ 191.9 | $ 199.8 |

The Notes to Consolidated Financial Statements are
an integral part of these statements.

```
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET                                                  DECEMBER 31,
```

| Amounts in millions, except par value and shares | | 2001 | | 2000 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $ | 181.3 | $ | 191.9 |
| Notes and accounts receivable, net | | 302.1 | | 197.2 |
| Inventories | | 174.0 | | 144.2 |
| Deferred income taxes | | 22.5 | | 98.8 |
| Asbestos-related insurance expected to be realized within one year | | 9.7 | | 83.8 |
| Other current assets | | 57.7 | | 58.0 |
| TOTAL CURRENT ASSETS | | 748.1 | | 773.9 |
| Properties and equipment, net of accumulated depreciation and amortization of $995.3 (2000 - $935.4) | | 589.0 | | 601.7 |
| Goodwill, less accumulated amortization of $7.4 (2000 - $7.2) | | 55.8 | | 34.1 |
| Cash value of life insurance policies, net of policy loans | | 75.6 | | 104.3 |
| Deferred income taxes | | 502.9 | | 388.4 |
| Asbestos-related insurance expected to be realized after one year | | 283.7 | | 288.2 |
| Other assets | | 461.9 | | 394.3 |
| TOTAL ASSETS | $ | 2,717.0 | $ | 2,584.9 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Debt payable within one year | $ | 7.8 | $ | 418.3 |
| Accounts payable | | 99.0 | | 117.5 |
| Income taxes payable | | 14.4 | | 123.1 |
| Asbestos-related liability expected to be satisfied within one year | | -- | | 178.4 |
| Other current liabilities | | 127.9 | | 255.6 |
| TOTAL CURRENT LIABILITIES | | 249.1 | | 1,092.9 |
| Deferred income taxes | | 20.8 | | 20.2 |
| Asbestos-related liability expected to be satisfied after one year | | -- | | 927.5 |
| Other liabilities | | 275.2 | | 615.6 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE | | 545.1 | | 2,656.2 |
| LIABILITIES SUBJECT TO COMPROMISE - NOTE 2 | | 2,313.6 | | -- |
| TOTAL LIABILITIES | | 2,858.7 | | 2,656.2 |
| **COMMITMENTS AND CONTINGENCIES** | | | | |
| **SHAREHOLDERS' EQUITY (DEFICIT)** | | | | |
| Common stock issued, par value $.01; 300,000,000 shares authorized; outstanding: 2001 - 65,399,600 (2000 - 65,438,000) | | 0.8 | | 0.8 |
| Paid-in capital | | 433.0 | | 432.2 |
| Retained earnings (accumulated deficit) | | (137.8) | | (216.4) |
| Treasury stock, at cost: shares: 2001 - 11,500,800, (2000 - 11,443,900) | | (137.0) | | (136.4) |
| Accumulated other comprehensive loss | | (300.7) | | (151.5) |
| TOTAL SHAREHOLDERS' EQUITY (DEFICIT) | | (141.7) | | (71.3) |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | $ | 2,717.0 | $ | 2,584.9 |

The Notes to Consolidated Financial Statements are
an integral part of these statements

F-8

```
==============================================================================================================
W.R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY (DEFICIT)
==============================================================================================================
```

| Dollars in millions | Common Stock and Paid-in Capital | Retained Earnings (Accumulated Deficit) | Deferred Compensation Trust | Treasury Stock | Accumulated Other Comprehensive Loss | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) |
|---|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 1998 | $ 410.0 | $ (203.1) | $ (0.8) | $ (83.1) | $ (80.9) | $ 42.1 |
| Net income | -- | 135.9 | -- | -- | -- | 135.9 |
| Purchase of common stock | -- | -- | -- | (94.4) | -- | (94.4) |
| Shares issued under stock plans. | 42.3 | -- | 0.2 | -- | -- | 42.5 |
| Retirement of treasury stock.... | (28.9) | (59.5) | -- | 88.4 | -- | -- |
| Other comprehensive (loss)...... | -- | -- | -- | -- | (15.0) | (15.0) |
| BALANCE, DECEMBER 31, 1999...... | $ 423.4 | $ (126.7) | $ (0.6) | $ (89.1) | $ (95.9) | $ 111.1 |
| Net (loss) | $ -- | $ (89.7) | $ -- | $ -- | $ -- | $ (89.7) |
| Purchase of common stock........ | -- | -- | -- | (47.3) | -- | (47.3) |
| Shares issued under stock plans. | 9.4 | -- | -- | -- | -- | 9.4 |
| Rabbi trust activity ........... | 0.2 | -- | (0.8) | -- | -- | (0.6) |
| Rabbi trust obligations......... | -- | -- | 1.4 | -- | -- | 1.4 |
| Other comprehensive (loss) ..... | -- | -- | -- | -- | (55.6) | (55.6) |
| BALANCE, DECEMBER 31, 2000...... | $ 433.0 | $ (216.4) | $ -- | $ (136.4) | $ (151.5) | $ (71.3) |
| Net income | $ -- | $ 78.6 | $ -- | $ -- | $ -- | $ 78.6 |
| Purchase of common stock | -- | -- | -- | (0.6) | -- | (0.6) |
| Shares issued under stock plans. | 0.8 | -- | -- | -- | -- | 0.8 |
| Other comprehensive (loss)...... | -- | -- | -- | -- | (149.2) | (149.2) |
| BALANCE, DECEMBER 31, 2001...... | $ 433.8 | $ (137.8) | $ -- | $ (137.0) | $ (300.7) | $ (141.7) |

```
==============================================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF COMPREHENSIVE (LOSS) INCOME                        YEAR ENDED DECEMBER 31,
==============================================================================================================
```

| Dollars in millions | 2001 | 2000 | 1999 |
|---|---|---|---|
| NET INCOME (LOSS)............................................... | $ 78.6 | $ (89.7) | $ 135.9 |
| OTHER COMPREHENSIVE (LOSS) INCOME: | | | |
| Foreign currency translation adjustments........................... | (24.6) | (34.1) | (19.3) |
| Net unrealized (losses) gains on investments, net of income taxes.... | (0.2) | (17.7) | 1.5 |
| Minimum pension liability adjustments, net of income taxes........... | (124.4) | (3.8) | 2.8 |
| Total other comprehensive (loss)................................... | (149.2) | (55.6) | (15.0) |
| COMPREHENSIVE (LOSS) INCOME....................................... | $ (70.6) | $ (145.3) | $ 120.9 |

The Notes to Consolidated Financial Statements are
an integral part of these statements.

F-9

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(Dollars in millions unless otherwise stated)

---

1.  BASIS OF PRESENTATION AND SUMMARY OF
    SIGNIFICANT ACCOUNTING AND FINANCIAL
    REPORTING POLICIES

---

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals
and specialty materials businesses on a worldwide basis. These businesses
consist of catalysts and silica products ("Davison Chemicals") and construction
chemicals, building materials and sealants and coatings ("Performance
Chemicals").

W. R. Grace & Co. conducts substantially all of its business through a direct,
wholly owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn). Grace-Conn.
owns substantially all of the assets, properties and rights of W. R. Grace &
Co., either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term
"Grace" refers to the Company and/or one or more of its subsidiaries and, in
certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING: In response to a sharply increasing number of
asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W.
R. Grace & Co. and 61 of its United States subsidiaries and affiliates,
including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions
for reorganization (the "Filing") under Chapter 11 of the United States
Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States
Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The
cases were consolidated and are being jointly administered under case number
01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of
its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse
developments in its asbestos-related litigation, including: a significant
increase in bodily injury claims, higher than expected costs to resolve bodily
injury and certain property damage claims, and class action lawsuits alleging
damages from a former attic insulation product. (These claims are discussed in
more detail in Note 3 to the Consolidated Financial Statements.) After a
thorough review of these developments, the Board of Directors of Grace concluded
on April 2, 2001 that a federal court-supervised Chapter 11 filing provides the
best forum available to achieve predictability and fairness in the claims
settlement process. By filing under Chapter 11, Grace expects to be able to both
obtain a comprehensive resolution of the claims against it and preserve the
inherent value of its businesses. Under Chapter 11, the Debtors expect to
continue to operate their businesses as debtors-in-possession under court
protection from their creditors and claimants, while using the Chapter 11
process to develop and implement a plan for addressing the asbestos-related
claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation
against the Debtors is generally stayed (subject to certain exceptions in the
case of governmental authorities), and no party may take any action to realize
its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related
claims and all other pre-petition claims in a plan of reorganization. Such plan
of reorganization may include the establishment of a trust through which all
pending and future asbestos-related claims would be channeled for resolution.
However, it is currently impossible to predict with any degree of certainty the
amount that would be required to be contributed to the trust, how the trust
would be funded, how other pre-petition claims would be treated or what impact
any reorganization plan may have on the shares of common stock of Grace. The
interests of Debtors' equity security holders could be substantially diluted or
cancelled under a plan of reorganization. The formulation and implementation of
the plan of reorganization is expected to take a significant period of time.

Since the Filing, all motions necessary to conduct normal business activities
have been approved by the Bankruptcy Court. In addition, the Debtors have
received approval from the Bankruptcy Court to pay or otherwise honor certain of
its pre-petition obligations in the ordinary course of business, including
employee wages and benefits, customer programs, shipping charges and a limited
amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to
propose a plan of reorganization for a 120-day period following the Filing Date.
The Debtors have received an extension of their exclusive period during which to
file a plan of reorganization through August 1, 2002, and an extension of the
Debtors' exclusive rights to solicit acceptances of a

reorganization plan through October 1, 2002. No dates have yet been set for the filing of proofs of claims by claimants.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court, and, together with a legal representative of future asbestos claimants (who Grace expects to be appointed by the Bankruptcy Court in the near future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

All of the Debtor's pre-petition debt is now in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2001 reflects the classification of the Debtors' pre-petition debt within "Liabilities subject to compromise".

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term expiring in April 2003 and bears interest under a formula based on the London Inter-Bank Offered Rate ("LIBOR") rate plus 2.00 to 2.25 percentage points depending on the level of loans outstanding.

In November 2001, the Debtors' Chapter 11 Cases, as well as the Chapter 11 Cases of four unrelated companies with asbestos-related claims, was assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin will preside over the asbestos bodily injury matters affecting all five companies and, at his choosing, certain other asbestos-related lawsuits particular to Grace. Judge Judith Fitzgerald, a U.S. Bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware, will preside over the Debtors' other bankruptcy matters.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7") "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain of Debtors' assets and liquidation of certain of Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2001, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments) as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date adjusted, as warranted, for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the "Liabilities subject to compromise" as of December 31, 2001, and as of the Filing Date.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheet based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

PRINCIPLES OF CONSOLIDATION: The Consolidated Financial Statements include the accounts of the Company and majority-owned companies as to which the Company exercises control over operating and financial policies. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies as to which the Company does not exercise control over operating and financial policies are accounted for under the equity method, unless the Company's ability to influence a company is determined to be temporary, in which case the investment is accounted for under the cost method.

RECLASSIFICATIONS: Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2001 presentation.

EFFECT OF NEW ACCOUNTING STANDARDS: In June 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 supersedes Accounting Principles Board Opinion ("APB") No. 16, "Business Combinations". The provisions of SFAS No. 141: (1) require that the purchase method of accounting be used for all business combinations initiated after June 30, 2001, (2) provide specific criteria for the initial recognition and measurement of intangible assets apart from goodwill, and (3) require that unamortized negative goodwill be written off immediately as an extraordinary gain instead of being deferred and amortized. Grace adopted SFAS No. 141 in July 2001.

SFAS No. 142 supersedes APB 17, "Intangible Assets," and is effective for fiscal years beginning after December 15, 2001. SFAS No. 142 primarily addresses the accounting for goodwill and intangible assets subsequent to their initial recognition. The provisions of SFAS No. 142: (1) prohibit the amortization of goodwill and indefinite-lived intangible assets, (2) require that goodwill and indefinite-lived intangible assets be tested annually for impairment, (3) require that reporting units be identified for the purpose of assessing potential future impairments of goodwill, and (4) remove the 40 year limitation on the amortization period of intangible assets that have finite lives.

Grace will adopt the provisions of SFAS No. 142 in its first quarter ending March 31, 2002. Grace has identified its reporting units as catalyst products, silica products, specialty construction chemicals, specialty building materials and specialty sealants and coatings for purposes of measuring impairment under the provisions of SFAS No. 142. All amounts of goodwill, intangible assets, other assets, and liabilities have been appropriately classified and allocated to these reporting units. Amortization expense on goodwill for the year ended December 31, 2001 was $0.5 million. In connection with the adoption of SFAS No. 142, Grace is in the process of evaluating the useful lives of its existing intangible assets and anticipates that any changes in the useful lives will not have a material impact on the results of its operations.

SFAS No. 142 requires that goodwill and certain intangible assets be tested annually for impairment. An impairment test must be performed at the beginning of the period of adoption. Grace expects that its goodwill and other intangible assets will not be impaired.

In August 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations," and issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" in October 2001. SFAS No. 143 requires the accrual of asset retirement obligations by increasing the initial carrying amount of the related long-lived asset, and systematically expensing such costs over the asset's useful life. The standard is effective for fiscal years beginning after June 15, 2002. SFAS No. 144 supersedes SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets to Be Disposed Of," and expands the scope of discontinued operations. SFAS No. 144 is effective for financial statements issued for fiscal years beginning after December 15, 2001. Grace does not expect SFAS No. 143 or 144 to have a material effect on its financial statements.

Grace adopted Emerging Issues Task Force ("EITF") 00-10, "Accounting for Shipping and Handling Fees and Costs," in the fourth quarter of 2000. The adoption of this standard did not affect pre-tax or net loss; however, freight costs and sales commissions (previously shown as a reduction of net sales) are now included in "Cost of goods sold" and "Selling, general and administrative expenses," respectively, in the Consolidated Statement of Operations.

USE OF ESTIMATES: The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities (including contingent assets and liabilities) reported at the date of the Consolidated Financial Statements and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Grace's accounting measurements that are most affected by management's estimates of future events are:

o  Contingent liabilities such as asbestos-related matters, environmental remediation, tax exposures and retained obligations of divested businesses.

o  Pension and post-retirement liabilities that depend on assumptions regarding discount rates and total returns on invested funds.

o  Depreciation and amortization periods for long-lived assets, including property and equipment, intangibles and goodwill.