o   Realization values of various assets such as receivables, inventories, insurance and tax attributes.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

CASH EQUIVALENTS: Cash equivalents consist of liquid instruments with maturities of three months or less when purchased. The recorded amounts approximate fair value because of the short maturities of these investments.

SALE OF ACCOUNTS RECEIVABLE: Prior to the Filing, Grace entered into a program to sell certain of its trade accounts receivable and retained a subordinated interest and servicing rights. Net losses on the sale of receivables were based on the carrying value of the assets sold, allocated in proportion to their fair value. Retained interests were carried at fair value and were included in "Other current assets" in the Consolidated Balance Sheet. Grace generally estimated fair value based on the present value of expected future cash flows less management's best estimate of uncollectible amounts receivable. Grace maintained an allowance for doubtful accounts receivable based upon the expected collectibility of all trade receivables, including receivables sold. The allowance was reviewed regularly and adjusted for accounts deemed uncollectible by management. Expenses and losses associated with the program were recognized as a component of interest expense and related financing costs. As a result of the Filing, which constituted an event of default under the program, outstanding balances were satisfied through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

INVENTORIES: Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out and, for substantially all U.S. inventories, last-in/first-out. Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value.

PROPERTIES AND EQUIPMENT: Properties and equipment are stated at cost. Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset. Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures. Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or credited to operations. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

GOODWILL: Goodwill arises from certain purchase business combinations and with respect to business combinations completed prior to June 30, 2001 is being amortized using the straight-line method over appropriate periods not exceeding 40 years. Grace reviews its goodwill for impairment whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. The provisions of SFAS No. 141 were applied to goodwill and intangible assets acquired after June 30, 2001.

REVENUE RECOGNITION: Grace recognizes revenue when risk of loss and title to the product transfer to the customer, which usually occurs upon shipment of goods to customers or upon performance of services. In December 1999, the SEC issued Staff Accounting Bulletin ("SAB") No. 101, "Revenue Recognition in Financial Statements," subsequently updated by SAB 101A and SAB 101B (collectively, "SAB 101"). SAB 101 summarizes certain of the SEC's views in applying generally accepted accounting principles to revenue recognition in financial statements. Grace adopted SAB 101 in the fourth quarter of 2000 with no material impact on Grace's results of operations or financial position.

RESEARCH AND DEVELOPMENT COSTS: Research and development costs are charged to expense as incurred.

INCOME TAXES: Grace recognizes deferred tax assets and liabilities with respect to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets.

FOREIGN CURRENCY TRANSLATION: Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while their revenues, costs and expenses are translated at average exchange rates during each reporting period.

F-13

The resulting translation adjustments are included in the "Accumulated other comprehensive loss" section of the Consolidated Balance Sheet. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "Net income (loss)" in the Consolidated Statement of Operations.

FINANCIAL INSTRUMENTS: From time to time Grace enters into interest rate swap agreements and foreign exchange forward and option contracts to manage exposure to fluctuations in interest and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. At December 31, 2001, Grace did not hold and had not issued any derivative financial instruments.

Grace adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (as amended) for 2001. SFAS No. 133 requires, among other things, that all derivative instruments be recognized at fair value as assets or liabilities in the Consolidated Balance Sheet with changes in fair value recognized currently in earnings unless specific hedge accounting criteria are met.

---

## 2.   CHAPTER 11 RELATED FINANCIAL INFORMATION

---

As a result of the Filing, Grace's Consolidated Balance Sheet as of December 31, 2001 separately identifies the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "Liabilities subject to compromise" represent pre-petition liabilities as determined under U.S. generally accepted accounting principles. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the accrual of interest on pre-petition debt at the pre-petition contractual rate; 3) accruals for employee-related programs; and 4) changes in estimates related to pre-petition contingent liabilities and assets.

Components of Liabilities subject to compromise are as follows:

| (Dollars in millions) | DECEMBER 31, 2001 | | Filing Date (Unaudited) | |
|---|---|---|---|---|
| Debt, pre-petition plus | | | | |
| accrued interest | $ | 524.5 | $ | 511.5 |
| Accounts payable | | 31.7 | | 43.0 |
| Income taxes payable | | 216.6 | | 210.1 |
| Asbestos-related liability | | 996.3 | | 1,002.8 |
| Other postretirement benefits | | 169.1 | | 185.4 |
| Environmental | | | | |
| remediation | | 153.1 | | 164.8 |
| Retained obligations of | | | | |
| divested businesses | | 80.5 | | 75.5 |
| Pension related | | 74.6 | | 70.8 |
| Other accrued liabilities | | 67.2 | | 102.1 |
| | | -------- | | -------- |
| | $ | 2,313.6 | $ | 2,366.0 |

Set forth below is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through December 31, 2001.

| (Dollars in millions) (Unaudited) | | Cumulative Since Filing |
|---|---|---|
| Balance, Filing Date | $ | 2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | | |
| Freight and distribution order | | (5.6) |
| Trade accounts payable order | | (8.4) |
| Other court orders including employee wages and benefits, sales and use tax and | | |
| customer programs | | (68.2) |
| Expense/(income) items: | | |
| Interest on pre-petition debt | | 20.9 |
| Current period employment-related | | |
| accruals | | 9.4 |
| Environmental accruals | | 5.8 |
| Interest on income tax contingencies | | 7.7 |
| Balance sheet reclassifications | | (4.9) |
| | | -------- |
| Balance, end of period | $ | 2,322.7 |
| Pre-Filing Date liabilities allowable under | | |
| court orders | $ | 9.1 |
| Pre-Filing Date liabilities subject to | | |
| compromise | $ | 2,313.6 |

Pre-Filing Date obligations allowable under current court orders and expected to be paid prior to an adopted plan of reorganization are classified as "Liabilities not subject to compromise." Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the allowance of contingent or disputed claims.

The Debtors recorded Chapter 11 reorganization expenses for 2001 consisting of:

| (Dollars in millions) | 2001 |
|---|---|
| Legal and financial advisory fees........... | $    16.6 |
| Interest income............................. | (0.9) |
| Chapter 11 reorganization expenses, net..... | $    15.7 |

Pursuant to SOP 90-7, interest income earned on Grace's cash balances must be offset against reorganization expenses. Condensed financial information of the Debtors subsequent to the Filing Date is presented below:

| W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES DEBTOR-IN-POSSESSION STATEMENT OF OPERATIONS (UNAUDITED) DOLLARS IN MILLIONS | APRIL 2, 2001 TO DECEMBER 31, 2001 |
|---|---|
| Net sales, including intercompany........... | $    768.7 |
| Other income................................ | 42.2 |
| | 810.9 |
| Cost of goods, including intercompany, exclusive of depreciation and amortization shown separately below...... | 479.4 |
| Selling, general and administrative expenses | 158.5 |
| Research and development expenses........... | 28.5 |
| Depreciation and amortization .............. | 44.0 |
| Interest expense and related financing costs | 26.9 |
| | 737.3 |
| Income before Chapter 11 reorganization expenses, income taxes, and equity in net income of non-filing entities............ | 73.6 |
| Chapter 11 reorganization expenses, net .... | (12.7) |
| (Provision for) income taxes ............... | (34.3) |
| Equity in net income of non-filing entities | 37.3 |
| NET INCOME ............................. | $     63.9 |

| W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES DEBTOR-IN-POSSESSION CONDENSED STATEMENT OF CASH FLOWS (UNAUDITED) DOLLARS IN MILLIONS | APRIL 2, 2001 TO DECEMBER 31, 2001 |
|---|---|
| OPERATING ACTIVITIES | |
| Net income................................... | $     63.9 |
| Reconciliation to net cash provided by (used for) operating activities: | |
| Non-cash items, net......................... | 67.1 |
| Increase in accounts receivable due to termination of securitization program... | (99.7) |
| Decrease in subordinated interest of accounts receivable sold................ | 34.9 |
| Changes in other assets and liabilities, excluding the effect of businesses acquired/divested...................... | (0.5) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES.. | 65.7 |
| NET CASH USED FOR INVESTING ACTIVITIES..... | (20.0) |
| NET CASH USED FOR FINANCING ACTIVITIES..... | (16.3) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS.. | 29.4 |
| Cash and cash equivalents, Filing Date....... | 8.6 |
| Cash and cash equivalents, end of period..... | $     38.0 |

```
================================================================
```
W. R. GRACE & CO. - CHAPTER 11 FILING
ENTITIES
DEBTOR-IN-POSSESSION BALANCE SHEET                DECEMBER 31,
(UNAUDITED) DOLLARS IN MILLIONS                      2001
```
================================================================
```

ASSETS
CURRENT ASSETS
Cash and cash equivalents ...................  $      38.0
Notes and accounts receivable, net .........         128.2
Receivables from non-filing entities, net ..          33.8
Inventories .................................          89.5
Other current assets.........................          78.6
                                                 ----------------
    TOTAL CURRENT ASSETS ....................         368.1

Properties and equipment, net...............         384.9
Cash value of life insurance policies,
    net of policy loans.....................          75.6
Deferred income taxes ......................         502.6
Asbestos-related insurance expected to be
    realized after one year.................         283.7
Loans receivable from non-filing entities,
    net ....................................         388.0
Investment in non-filing entities ..........         153.5
Other assets ...............................         339.6
                                                 ----------------
    TOTAL ASSETS ...........................  $    2,496.0
```
================================================================
```
LIABILITIES AND SHAREHOLDERS' EQUITY
    (DEFICIT)
LIABILITIES NOT SUBJECT TO COMPROMISE
Current liabilities ........................  $      94.5
Debt payable after one year ................           1.6
Other liabilities ..........................         228.0
                                                 ----------------
    TOTAL LIABILITIES NOT SUBJECT TO
    COMPROMISE...............................         324.1

LIABILITIES SUBJECT TO COMPROMISE ..........       2,313.6
                                                 ----------------
    TOTAL LIABILITIES........................       2,637.7
                                                 ----------------
    SHAREHOLDERS' EQUITY (DEFICIT) ..........        (141.7)
                                                 ----------------
    TOTAL LIABILITIES AND SHAREHOLDERS'
    EQUITY (DEFICIT) .......................  $    2,496.0
```
================================================================
```

In addition to Grace's financial reporting obligations as prescribed by the U.S.
Securities and Exchange Commission ("SEC"), the Debtors are also required, under
the rules and regulations under the Bankruptcy Code, to periodically file
certain statements and schedules and a monthly operating report with the
Bankruptcy Court. This information is available to the public through the
Bankruptcy Court. This information is prepared in a format that may not be
comparable to information in Grace's quarterly and annual financial statements
as filed with the SEC. The monthly operating reports are not audited, do not
purport to represent the financial position or results of operations of Grace on
a consolidated basis and should not be relied on for such purposes.

---
3.  ASBESTOS-RELATED LITIGATION
---

Grace is a defendant in property damage and bodily injury lawsuits relating to
previously sold asbestos-containing products. On April 2, 2001, Grace filed
voluntary petitions for reorganization under Chapter 11 to use the
court-supervised reorganization process to achieve predictability and fairness
in the claims settlement process. See Note 1 for further discussion.

As of the Filing Date, Grace was a defendant in 65,656 asbestos-related
lawsuits, 16 involving claims for property damage (one of which has since been
dismissed), and the remainder involving 129,191 claims for bodily injury. Due to
the Filing, holders of asbestos-related claims are stayed from continuing to
prosecute pending litigation and from commencing new lawsuits against the
Debtors. Additional asbestos-related claims are expected to be filed as part of
the Chapter 11 claims process. Separate creditors' committees representing the
interests of property damage and bodily injury claimants have been appointed in
the Chapter 11 Cases. Grace's obligations with respect to present and future
claims will be determined through proceedings in Delaware bankruptcy court and
negotiations with each of the official committees appointed in the Chapter 11
Cases, which is expected to provide the basis for a plan of reorganization.

PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the defendants
absorb the cost of removing, containing or repairing the asbestos-containing
materials in the affected buildings. Each property damage case is unique in that
the age, type, size and use of the building, and the difficulty of asbestos
abatement, if necessary, vary from structure to structure. Information regarding
product identification, the amount of product in the building, the age, type,
size and use of the building, the jurisdictional history of prior cases and the
court in which the case is pending has provided meaningful guidance as to the
range of potential costs. Grace has recorded an accrual for all outstanding
property damage cases for which sufficient information is available to form a
reasonable estimate of such exposure.

Through December 31, 2001, out of 379 asbestos property damage cases filed, 141
were dismissed without payment of any damages or settlement amounts; judgments
were entered in favor of Grace in nine cases (excluding cases settled following
appeals of judgments in favor of Grace); judgments were entered in favor of the
plaintiffs in seven cases for a total of $60.3 million; 207 property damage
cases were settled for a total of $696.8 million; and 15 cases remain
outstanding. Grace may receive additional asbestos property damage claims as
part of its Chapter 11 proceeding.

Property Damage case activity for 2001 and 2000 was as follows:

| PROPERTY DAMAGE CASE ACTIVITY | 2001 | 2000 |
|---|---|---|
| Cases outstanding, beginning of year | 15 | 11 |
| New cases filed | 1 | 8 |
| Settlements | -- | (4) |
| Dismissals | (1) | -- |
| Judgments | -- | -- |
| Cases outstanding, end of year... | 15 | 15 |

Of the 15 remaining cases, seven relate to a former attic insulation product and
eight relate to a number of former asbestos-containing products (two of which
also involve such attic insulation product). The attic insulation cases were
filed as class action lawsuits in 2000 and 2001 on behalf of owners of homes
containing Zonolite attic insulation. These cases seek damages and equitable
relief, including the removal, replacement and/or disposal of all such
insulation. The plaintiffs assert that this product is in millions of homes
throughout the U.S. and that the cost of removal could be several thousand
dollars per home. These cases are expected to be heard by the Bankruptcy Court
within the next year. While Grace has not completed its investigation of the
claims described in these cases, Grace believes that this product was and
continues to be safe for its intended purpose and poses little or no threat to
human health. At this time, Grace is not able to assess the extent of any
possible liability related to this matter.

BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in
the type of asbestos-related illness allegedly suffered by the plaintiff).
However, Grace's estimated liability for such claims has been influenced by
numerous variables, including the solvency of other former asbestos producers,
cross-claims by co-defendants, the rate at which new claims are filed, the
jurisdiction in which the claims are filed, and the defense and disposition
costs associated with these claims. Grace's bodily injury liability reflects
management's estimate, as of the Filing Date, of the number and ultimate cost of
present and future bodily injury claims expected to be asserted against Grace
given demographic assumptions of possible exposure

to asbestos containing products previously manufactured by Grace.

Through the Filing Date, 16,354 asbestos bodily injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlement and judgments) for a total of $645.6 million.

Bodily injury claim activity for 2001 (through the Filing Date) and 2000 was as follows:

| BODILY INJURY CLAIM ACTIVITY | APRIL 2, 2001 | December 31, 2000 |
|---|---|---|
| Claims outstanding, | | |
| beginning of year .......... | 124,907 | 105,670 |
| New claims ................... | 16,411 | 48,786 |
| Settlements .................. | (11,841) | (26,950) |
| Dismissals ................... | (286) | (2,598) |
| Judgments .................... | - | (1) |
| | | |
| Claims outstanding, end of | | |
| period....................... | 129,191 | 124,907 |

The table above reflects 2001 claims activity through the Filing Date. As a result of the Filing, no additional lawsuits can be filed.

ASBESTOS-RELATED LIABILITY

Since litigation is stayed by the Chapter 11 Cases, ongoing costs are generally limited to claims administration costs and to defense costs incurred in connection with litigation permitted by the Bankruptcy Court. Any other adjustments to the recorded liability will be based on developments in the Chapter 11 Cases. For periods prior to and as of the Filing Date, Grace's estimated property damage and bodily injury liabilities were based on its experience with, and recent trends in, asbestos litigation. Its recorded liabilities covered indemnity and defense costs for pending property damage cases and for pending and projected future bodily injury claims. No change has been made to the pre-filing asbestos-related liability except to record the payment of normal post-filing administrative costs primarily related to claims processing. However, due to the Filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability. The total asbestos-related liability balances as of December 31, 2001 and 2000 were $996.3 million and $1,105.9 million, respectively. As of December 31, 2001, the asbestos-related liability was included in liabilities subject to compromise.

As a result of the developments discussed in Note 1, Grace's evaluation of its recorded liability for asbestos-related litigation as of December 31, 2000 led to a fourth quarter adjustment of $293.6 million to account for an unexpected increase in the number of claims filed, new risk factors and recent cost experience. Grace adjusted its recorded insurance receivable in the fourth quarter of 2000 by $85.6 million to reflect the additional amounts expected to be recovered in respect of the adjusted asbestos-related liability. The net amount of the adjustments recorded during the fourth quarter of 2000 ($208.0 million after insurance recovery) reflects adverse experience in the latter part of 2000 versus certain underlying assumptions used to estimate Grace's liability for asbestos-related litigation. After the 2000 adjustment, Grace's recorded liability for asbestos-related litigation was $1,105.9 million gross and $733.9 million net of insurance recovery.

| ESTIMATED LIABILITY FOR ASBESTOS-RELATED LITIGATION (Dollars in millions) | | 2001 | | 2000 |
|---|---|---|---|---|
| Asbestos-related liability expected to be satisfied | | | | |
| within one year............. | $ | 5.1 | $ | 179.4 |
| Asbestos-related liability expected to be satisfied | | | | |
| after one year.............. | | 991.2 | | 927.5 |
| | | | | |
| Total asbestos-related | | | | |
| liability .................. | $ | 996.3 | $ | 1,105.9 |

The current portion of Grace's asbestos-related liability is based on management's estimate as of the respective balance sheet dates of costs expected to be paid within one year.

ASBESTOS INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

RETAINED OBLIGATIONS

Under certain divestiture agreements, Grace has retained contingent obligations that could develop into situations where accruals for estimated costs of defense or loss would be recorded in a period subsequent to divestiture under U.S. generally accepted accounting principles. Grace assesses its retained risks quarterly and accrues amounts estimated to be payable with respect to these obligations when probable and estimable.

The nature of these obligations includes: (1) future lease payments and other retained contractual commitments; (2) net asset settlements; (3) indemnities and other guarantees; and (4) contingent risks under pending or possible litigation.

During the year ended December 31, 2000, Grace revised its estimate of the outcome of certain retained obligations of discontinued operations based on then current circumstances, and Grace recorded a net charge of $6.2 million ($4.1 million after tax). This charge was fully offset by a foreign pension premium refund and the reduction of previously established accruals for environmental remediation.

| RESULTS OF DISCONTINUED OPERATIONS (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Loss from operations before taxes...................... | $  -- | $  -- | $ (17.7) |
| Income tax provision ........ | -- | -- | 8.0 |
| Loss from discontinued operations.................. | -- | -- | (9.7) |
| Net gain on disposition of business ................. | -- | -- | 76.3 |
| Provision for income taxes on dispositions of businesses. | -- | -- | (44.2) |
| Other charges, net of tax.... | -- | -- | (16.7) |
| TOTAL INCOME FROM DISCONTINUED OPERATIONS.... | $  -- | $  -- | $  5.7 |
| BASIC EARNINGS PER SHARE FROM DISCONTINUED OPERATIONS.... | $  -- | $  -- | $ 0.08 |
| DILUTED EARNINGS PER SHARE FROM DISCONTINUED OPERATIONS | $  -- | $  -- | $ 0.08 |

---

5.   INCOME TAXES

---

The components of income (loss) from continuing operations before income taxes and the related provision for income taxes are as follows:

```
==========================================================
INCOME TAXES - CONTINUING
OPERATIONS
(Dollars in millions)        2001       2000       1999
==========================================================
Income (loss) from
  continuing operations
  before income taxes:
  Domestic..............    $  67.1   $ (94.7)  $  135.9
  Foreign...............       75.2      75.0       67.5
                           ------------------------------
                           $ 142.3   $ (19.7)  $  203.4
                           ==============================

Provision for income taxes:
  Federal - current.....    $  (7.7)  $ (66.2)  $  (21.2)
  Federal - deferred....      (27.5)     39.4     (26.4)
  State and local - current   (3.2)    (20.0)      (3.5)
  Foreign - current.....      (22.2)    (21.8)     (23.1)
  Foreign - deferred....       (3.1)     (1.4)       1.0
                           ------------------------------
                           $ (63.7)  $ (70.0)  $  (73.2)
==========================================================
```

The components of income (loss) from consolidated operations before income taxes
and the related provision for income taxes are as follows:

```
==========================================================
INCOME TAXES -
CONSOLIDATED OPERATIONS
(Dollars in millions)        2001       2000       1999
==========================================================
Income (loss) from
  consolidated operations
  before income taxes:
  Domestic..............    $  67.1   $ (94.7)  $  168.9
  Foreign...............       75.2      75.0       67.5
                           ------------------------------
                           $ 142.3   $ (19.7)  $  236.4
                           ==============================

Provision for income taxes:
  Federal - current.....    $  (7.7)  $ (66.2)  $  (40.7)
  Federal - deferred....      (27.5)     39.4     (29.9)
  State and local - current   (3.2)    (20.0)      (7.8)
  Foreign - current.....      (22.2)    (21.8)     (23.1)
  Foreign - deferred....       (3.1)     (1.4)       1.0
                           ------------------------------
                           $ (63.7)  $ (70.0)  $ (100.5)
==========================================================
```

At December 31, 2001 and 2000, the tax attributes giving rise to deferred tax
assets and liabilities consisted of the following items:

```
==========================================================
DEFERRED TAX ANALYSIS
(Dollars in millions)                    2001       2000
==========================================================
Liability for asbestos-related
  litigation.....................     $  348.7   $  387.1
Net operating loss/tax credit
  carryforwards..................        155.9      178.6
Deferred state taxes.............        105.3       99.7
Liability for environmental
  remediation....................         53.6       61.2
Other post-retirement benefits....        59.2       66.1
Deferred charges.................         50.2       54.4
Reserves and allowances..........         38.2       43.3
Research and development..........        40.0       32.6
Pension liabilities..............         84.8       15.9
Foreign loss/credit carryforwards.        23.3       10.0
Other............................          9.9       13.6
                                      --------------------
Total deferred tax assets........        969.1      962.5
                                      --------------------
Asbestos-related insurance receivable   (106.9)    (123.1)
Pension assets...................        (85.8)     (79.8)
Properties and equipment.........        (56.3)     (52.1)
Other............................        (58.3)     (62.3)
                                      --------------------
Total deferred tax liabilities....      (307.3)    (317.3)
                                      --------------------
Valuation allowance .............       (158.0)    (179.1)
                                      --------------------
Net deferred tax assets...........    $  503.8   $  466.1
==========================================================
```

The valuation allowance shown above arises from uncertainty as to the realization of certain deferred tax assets, primarily foreign tax credit carryforwards and state and local net operating loss carryforwards. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Grace expects to generate U.S. taxable income while in Chapter 11 that will enable it to utilize a portion of its net operating loss carryforwards.

At December 31, 2001, there were $284.8 million of net operating loss carryforwards, representing deferred tax assets of $99.7 million, with expiration dates through 2021; $15.0 million of foreign tax credit carryforwards with expiration dates through 2006; $6.6 million of general business credit carryforwards with expiration dates through 2011; and $34.6 million of alternative minimum tax credit carryforwards. At December 31, 2001, the aggregate tax effect of these net operating losses and credit carryforwards was $155.9 million.

The differences between the benefit (provision) for income taxes at the federal income tax rate of 35% and the Company's overall income tax (provision) benefit for continuing operations are summarized as follows:

| INCOME TAX (PROVISION) BENEFIT ANALYSIS (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Tax (provision) benefit at federal corporate rate......... | $ (49.8) | $ 6.9 | $ (71.2) |
| Change in provision resulting from: ................... | | | |
| Nontaxable income/non-deductible expenses.... | (1.6) | (1.6) | (0.6) |
| State and local income taxes, net of federal income tax benefit................. | (1.7) | (1.8) | (1.9) |
| Federal and foreign taxes on foreign operations............. | 1.3 | 1.5 | 0.5 |
| Chapter 11 reorganization expenses......................... | (5.5) | -- | -- |
| Tax and interest relating to tax deductibility of interest on COLI policy loans (See note 15)............... | (6.4) | (75.0) | -- |
| Income tax provision from continuing operations ........... | $ (63.7) | $ (70.0) | $ (73.2) |

Federal, state, local and foreign taxes have not been provided on approximately $186.7 million of undistributed earnings of certain foreign subsidiaries, as such earnings are expected to be retained indefinitely by such subsidiaries for reinvestment. The distribution of these earnings would result in additional foreign withholding taxes of approximately $14.8 million and additional federal income taxes to the extent they are not offset by foreign tax credits. It is not practicable to estimate the total tax liability that would be incurred upon such a distribution.

---
6.   ACQUISITIONS AND JOINT VENTURES
---

In 2001, Grace acquired three entities for a total cost of $84.4 million, which
was paid in cash, as follows:

o    In March 2001, Grace acquired The Separations Group, a manufacturer of
     chromatography columns and separations media.

o    In March 2001, Grace's German subsidiary acquired the precipitated silicas
     business of Akzo-PQ Silicas.

o    In July 2001, Grace's French subsidiary acquired Pieri S.A., a leading
     supplier of specialty construction chemicals in Europe.

These acquisitions were accounted for under the purchase method of accounting.
Goodwill recognized in those transactions amounted to $23.6 million, which was
assigned to the Davison Chemicals and Performance Chemicals segments in the
amounts of $10.8 million and $12.8 million, respectively.

On March 1, 2001, Grace and Chevron Products Company ("Chevron"- a unit of
ChevronTexaco, Inc.) formed Advanced Refining Technologies LLC ("ART") to
develop and market hydroprocessing catalysts globally. ART conducts business
through two distribution companies and one operating company. Grace has majority
ownership interests in and controls both distribution companies; therefore, for
financial reporting purposes, the assets, liabilities and results of operations
of these entities are included in Grace's Consolidated Financial Statements.
Grace does not exercise governance control over the operating company;
therefore, it accounts for its interest under the equity method. Grace's equity
in the net income or loss of the operating company is reported in "Other income"
in Grace's Consolidated Statement of Operations. As of December 31, 2001, the
accompanying Consolidated Balance Sheet includes a receivable from the operating
company of $25.6 million, included in "Other current assets", and a payable to
the operating company of $4.9 million, included in "Other current liabilities."
As of December 31, 2001, the operating company had no third-party debt, and its
liabilities are all working capital items. Its net assets equaled $6.5 million,
and its cash balance was $10.1 million. ART has agreements with both Grace and
Chevron under which each provides certain administrative and research and
development services to ART. Administrative costs of $1.5 million and research
and development expenses of $5.8 million are reflected in the unconsolidated
financial statements of ART.

During 2000, Grace completed six acquisitions for cash consideration of $49.0
million and an obligation to pay future royalties of $19.6 million. All
acquisitions were accounted for under the purchase method of accounting. The
results of the operations of the acquisitions are included in the Consolidated
Financial Statements from the respective date of acquisition.

In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst
manufacturing assets of Borealis A/S. This acquisition will be accounted for
under the purchase method of accounting.

Pro-forma results of operations have not been presented because the effects of
these acquisitions were not material on either an individual or aggregate basis.

---
7.   OTHER INCOME
---

Components of other income are as follows:

| OTHER INCOME (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Net gain on settlement of notes receivable | $    -- | $    -- | $  18.5 |
| Investment income.... | 5.4 | 6.4 | 2.1 |
| Gain on sale of investments........ | 7.9 | 19.0 | 9.3 |
| Net gain on dispositions of assets | 1.8 | 5.5 | 13.6 |
| Tolling revenue...... | 3.1 | 1.2 | -- |
| Interest income...... | 4.6 | 9.7 | 4.2 |
| Equity in net income of affiliates.......... | 4.0 | 0.6 | -- |
| Other miscellaneous income ............ | 7.2 | 7.1 | 9.0 |
| Total other income... | $  34.0 | $  49.5 | $  56.7 |

---
8.   COMPREHENSIVE (LOSS) INCOME
---

The tables below present the pre-tax, tax and after tax components of Grace's
other comprehensive (loss) income for the years ended December 31, 2001, 2000
and 1999:

| YEAR ENDED DECEMBER 31, 2001 (Dollars in millions) | Pre-tax Amount | Tax Benefit | AFTER TAX AMOUNT |
|---|---|---|---|
| Unrealized (losses) gains on securities: | | | |
| Change in unrealized appreciation during the year................. | $ (0.2) | $ 0.1 | $ (0.1) |
| Reclassification adjustment for gains realized in net income................ | (0.2) | 0.1 | (0.1) |
| Net unrealized (losses) gain | (0.4) | 0.2 | (0.2) |
| Minimum pension liability adjustments............ | (191.4) | 67.0 | (124.4) |
| Foreign currency translation adjustments | (24.6) | -- | (24.6) |
| Other comprehensive (loss) income................ | $ (216.4) | $ 67.2 | $ (149.2) |

| YEAR ENDED DECEMBER 31, 2000 (Dollars in millions) | Pre-tax Amount | Tax (Expense) Benefit | After Tax Amount |
|---|---|---|---|
| Unrealized (losses) gains on securities: | | | |
| Change in unrealized appreciation during the year................. | $ (8.0) | $ 2.7 | $ (5.3) |
| Reclassification adjustment for gains realized in net income................ | (19.0) | 6.6 | (12.4) |
| Net unrealized (losses) gain | (27.0) | 9.3 | (17.7) |
| Minimum pension liability adjustments............ | (2.2) | (1.6) | (3.8) |
| Foreign currency translation adjustments · | (34.1) | -- | (34.1) |
| Other comprehensive (loss) income................ | $ (63.3) | $ 7.7 | $ (55.6) |

| YEAR ENDED DECEMBER 31, 1999 (Dollars in millions) | Pre-tax Amount | Tax (Expense) Benefit | After Tax Amount |
|---|---|---|---|
| Unrealized gains (losses) on securities: | | | |
| Change in unrealized appreciation during the year................. | $ 11.5 | $ (4.0) | $ 7.5 |
| Reclassification adjustment for gains realized in net income................ | (9.3) | 3.3 | (6.0) |
| Net unrealized gains (losses)............... | 2.2 | (0.7) | 1.5 |
| Minimum pension liability adjustments............ | 4.4 | (1.6) | 2.8 |
| Foreign currency translation adjustments | (19.3) | -- | (19.3) |

```
                        ---------------------------------
Other comprehensive loss.   $  (12.7) $   (2.3) $  (15.0)
========================================================
```

The decline in value of the U.S. and global equity markets coupled with a decline in interest rates, primarily in the second half of 2001, created a shortfall between the accounting measurement of Grace's obligations under its qualified pension plan for U.S. salaried employees and the market value of dedicated pension assets. This condition required Grace to record a minimum pension liability for this plan and to offset related deferred costs against shareholders' equity (deficit) at December 31, 2001 (see Note 19.)

COMPOSITION OF ACCUMULATED OTHER
COMPREHENSIVE LOSS

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| Foreign currency translation....... | $ (164.8) | $ (140.2) |
| Minimum pension liability.......... | (136.0) | (11.6) |
| Securities available for sale...... | 0.1 | 0.3 |
| Accumulated other comprehensive loss | $ (300.7) | $ (151.5) |

---

## 9.   OTHER BALANCE SHEET ACCOUNTS

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| **NOTES AND ACCOUNTS RECEIVABLE, NET** | | |
| Trade receivables, less allowance of $5.7 (2000 - $3.9).............. | $ 276.4 | $ 172.2 |
| Other receivables, less allowances of $1.9 (2000 - $0.5).............. | 25.7 | 25.0 |
| | $ 302.1 | $ 197.2 |
| **INVENTORIES (1)** | | |
| Raw materials ................... | $ 39.2 | $ 32.7 |
| In process ...................... | 27.6 | 22.4 |
| Finished products ............... | 108.1 | 96.4 |
| General merchandise ............. | 25.8 | 22.0 |
| Less:  Adjustment of certain inventories to a last-in/first-out (LIFO) basis ................... | (25.9) | (29.3) |
| | $ 174.8 | $ 144.2 |

(1)  Inventories valued at LIFO cost comprised 50.7% of total inventories at December 31, 2001 and 50.1% at December 31, 2000.

| | 2001 | 2000 |
|---|---|---|
| **OTHER ASSETS** | | |
| Deferred pension costs........... | $ 326.1 | $ 304.8 |
| Deferred charges ................ | 44.9 | 44.3 |
| Long-term receivables, less allowances of $0.6 (2000 - $0.8) | 2.8 | 2.4 |
| Investments in unconsolidated affiliates...................... | 3.0 | 3.6 |
| Patents, licenses and other intangible assets, net ......... | 85.1 | 39.2 |
| | $ 461.9 | $ 394.3 |
| **OTHER CURRENT LIABILITIES** | | |
| Retained obligations of divested businesses ................... | $   -- | $ 67.2 |

| | | |
|---|---:|---:|
| Accrued compensation ............. | 39.4 | 32.6 |
| Environmental remediation ........ | -- | 36.2 |
| Deferred compensation ............ | -- | 10.5 |
| Accrued interest ................. | 4.8 | 6.3 |
| Deferred tax liability ........... | 0.8 | 0.9 |
| Customer volume rebates .......... | 19.2 | 17.3 |
| Accrued commissions .............. | 6.1 | 4.3 |
| Accrued reorganization fees ...... | 6.4 | -- |
| Other accrued liabilities ........ | 51.2 | 80.3 |
| | $ 127.9 | $ 255.6 |

OTHER LIABILITIES

| | | |
|---|---:|---:|
| Other postretirement benefits .... | $ -- | $ 189.1 |
| Environmental remediation ........ | -- | 138.7 |
| Pension related .................. | 266.5 | 131.8 |
| Deferred compensation ............ | -- | 9.5 |
| Long-term self insurance reserve . | -- | 5.6 |
| Retained obligations of divested businesses ..................... | -- | 10.9 |
| Taxes payable, including interest | -- | 103.0 |
| Other accrued liabilities ........ | 8.7 | 27.0 |
| | $ 275.2 | $ 615.6 |

F-21

---
10.  PROPERTIES AND EQUIPMENT
---

| PROPERTIES AND EQUIPMENT (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| Land.............................. | $   17.7 | $   16.3 |
| Buildings......................... | 339.7 | 329.6 |
| Information technology and equipment | 104.4 | 67.5 |
| Machinery, equipment and other... | 1,113.5 | 1,076.5 |
| Projects under construction....... | 9.0 | 47.2 |
| Properties and equipment, gross... | 1,584.3 | 1,537.1 |
| Accumulated depreciation and amortization.................... | (995.3) | (935.4) |
| Properties and equipment, net..... | $  589.0 | $  601.7 |

Interest costs are incurred in connection with the financing of certain assets prior to placing them in service. Grace capitalized interest costs for continuing operations of $0.5 million in 2001, $1.0 million in 2000, and $0.8 million in 1999. Depreciation and lease amortization expense relating to properties and equipment amounted to $79.6 in 2001, $84.6 million in 2000 and $86.6 million in 1999. Grace's rental expense for operating leases amounted to $19.8 million in 2001, $18.0 million in 2000 and $15.6 million in 1999. See Note 15 for information regarding contingent rentals.

At December 31, 2001, minimum future payments for operating leases were (dollars in millions):

| MINIMUM FUTURE PAYMENTS UNDER OPERATING LEASES | |
|---|---|
| 2002....................................... | $    7.8 |
| 2003....................................... | 11.6 |
| 2004....................................... | 14.5 |
| 2005....................................... | 13.8 |
| 2006....................................... | 5.0 |
| Thereafter................................. | 9.6 |
| Total minimum lease payments............. | $   62.3 |

The above minimum lease payments are net of anticipated sublease income of $39.5 million in 2002, $25.3 million in 2003, $16.4 million in 2004, $12.0 million in 2005 and $9.5 million in 2006.

---
11.  LIFE INSURANCE
---

Grace is the beneficiary of life insurance policies on certain current and former employees with benefits in force of approximately $2,291.0 million and a net cash surrender value of $75.6 million at December 31, 2001. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years. The following table summarizes activity in these policies for 2001, 2000 and 1999:

| LIFE INSURANCE - ACTIVITY SUMMARY (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Earnings on policy assets | $    40.3 | $    36.8 | $    31.6 |
| Interest on policy loans. | (34.9) | (30.4) | (29.5) |
| Premiums................. | 2.5 | 2.5 | 2.4 |
| Proceeds from policy loans | (48.7) | -- | -- |
| Policy loan repayments... | 15.0 | 5.2 | 3.4 |
| Net investing activity... | (2.9) | 8.6 | (3.3) |
| Change in net cash value. | $   (28.7) | $    22.7 | $     4.6 |
| Gross cash value......... | $  477.5 | $  452.4 | $  432.4 |
| Principal - policy loans. | (377.6) | (325.8) | (331.0) |
| Accrued interest - policy loans ................. | (24.3) | (22.3) | (19.8) |
| Net cash value........... | $   75.6 | $  104.3 | $   81.6 |
| Insurance benefits in force | $ 2,291.0 | $ 2,286.0 | $2,309.0 |
| Tax-free proceeds received | $   18.0 | $   18.7 | $   15.3 |

The Company's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

---
## 12.  DEBT
---

| COMPONENTS OF DEBT (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| **DEBT PAYABLE WITHIN ONE YEAR** | | |
| Bank borrowings (6.9% weighted average interest rate at December 31, 2000) (1)................. | $    -- | $  400.0 |
| 8.0% Notes Due 2004 (2).......... | -- | 5.7 |
| 7.75% Notes Due 2002 (2)......... | -- | 2.0 |
| Other short-term borrowings (3).. | 7.8 | 10.6 |
| | $    7.8 | $  418.3 |
| **DEBT PAYABLE AFTER ONE YEAR** | | |
| DIP facility (4)................. | $    -- | $    -- |
| **DEBT SUBJECT TO COMPROMISE** | | |
| Bank borrowings (1)............. | 500.0 | -- |
| Other borrowings (5)............ | 1.3 | -- |
| Accrued Interest (6)............ | 23.2 | -- |
| | $  524.5 | $    -- |
| Full-year weighed average interest rates on total debt (7)........ | 5.8% | 7.1% |

(1)  Under bank revolving credit agreements in effect at December 31, 2000, Grace could borrow up to $500.0 million at interest rates based upon the prevailing prime, federal funds and/or Eurodollar rates. Of that amount, $250.0 million was available under short-term facilities expiring in May 2001, and $250.0 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance has been reported as short-term debt as of December 31, 2000. The balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(2)  During 1994, Grace sold $300.0 million of 8.0% Notes Due 2004 at an initial public offering price of 99.794% of par, to yield 8.0%; and during 1992, Grace sold at par $150.0 million of 7.75% Notes Due 2002. Interest on these notes was payable semiannually. As a result of the Filing, Grace was in default under the Notes. The 7.75% Notes were repaid on June 11, 2001 and the 8.0% Notes were repaid on August 15, 2001 by the unaffiliated guarantor of the Notes. Grace's liability to reimburse the unaffiliated guarantor with respect to these notes is included in "Liabilities subject to compromise" as of December 31, 2001.

(3)  Represents borrowings under various lines of credit and other miscellaneous borrowings, primarily of non-U.S. subsidiaries. Under a maintenance capital promissory note in effect at December 31, 2001, with ART, an affiliate, Grace could borrow up to $5.0 million ($1.5 million outstanding at December 31, 2001) at interest rates equal to 125 basis points plus LIBOR.

(4)  In 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term of two years, is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. As of December 31, 2001, the Debtors had no outstanding borrowings under the DIP facility. However, $10.7 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2001, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit issued under the DIP facility reduces the borrowing availability by a corresponding amount. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, a combination of cash, cash equivalents and the cash value of life insurance policies.

(5)   Miscellaneous borrowings primarily consisting of U.S. mortgages.

(6)   Grace is continuing to accrue interest expense on its pre-petition debt at the pre-petition contractual rate of LIBOR plus 100 basis points.

(7)   Computation excludes interest expense and financing costs related to the Company's receivables securitization program which was terminated in May 2001.

Interest payments amounted to $9.5 million in 2001, $23.7 million in 2000 and $8.2 million in 1999.

---

13.   FINANCIAL INSTRUMENTS

---

DEBT AND INTEREST RATE SWAP AGREEMENTS

Grace had no outstanding financial derivative instruments at December 31, 2001 and December 31, 2000.

FAIR VALUE OF DEBT AND OTHER FINANCIAL INSTRUMENTS

At December 31, 2001, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $7.8 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2001, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. The fair value of debt subject to compromise is undeterminable due to the Company's bankruptcy filing; the ultimate value of such debt will be determined by the outcome of the Chapter 11 proceedings.

SALE OF ACCOUNTS RECEIVABLE

Prior to the Filing, Grace sold, on an ongoing basis, approximately a $100 million pool of its eligible trade accounts receivable to a multi-seller receivables company (the "conduit") through a wholly owned special purpose subsidiary (the "SPS"). Upon sale of the receivables, the SPS held a subordinated retained interest in the receivables. The estimated fair value of the subordinated interest, excluding allowance for doubtful accounts, was $33.2 million at December 31, 2000 and was included in "Other current assets" in the Consolidated Balance Sheet. Under the terms of the agreement, new receivables were added to the pool as collections reduced previously sold receivables. Grace serviced, administered and collected the receivables on behalf of the SPS and the conduit. The proceeds were used for the reduction of other short-term obligations and are reflected as operating cash flows in the Consolidated Statement of Cash Flows. Grace has recorded net losses of $1.2, $5.0 and $3.9 million in 2001, 2000 and 1999, respectively, from the corresponding sales to the conduit. As a result of the

F-23

Filing, which constituted an event of default under the program, the amount outstanding under the program, approximating $65.3 million, was satisfied through the use of pre-petition trade receivables collected by the SPS during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

CREDIT RISK

Trade receivables potentially subject Grace to credit risk, given concentrations in the petroleum and construction industries. Grace's credit evaluation policies, relatively short collection terms and minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable.

---

14.  RESTRUCTURING COSTS AND ASSET IMPAIRMENTS

---

RESTRUCTURING COSTS

In 2001, the restructuring reserves for employee termination costs were reduced to zero by cash payments of $1.6 million and the reversal of prior period restructuring reserves of $0.8 million. Restructuring reserves for plant/office closures were reduced by cash payments of $0.4 million; the remaining reserve of $0.7 million principally relates to long-term lease obligations in the United Kingdom.

During 2000, Grace recorded a net reduction of $3.9 million in previous restructuring charges to account for new sublease agreements that lowered previously reserved lease termination costs. This amount is reported in "Selling, general and administrative expenses" in the Consolidated Statement of Operations.

During 1999, Grace recorded a net restructuring charge of $2.6 million in continuing operations. In the first quarter of 1999, a restructuring charge of $4.3 million was recorded for additional severance costs directly related to the productivity effectiveness program implemented in the fourth quarter of 1998. The restructuring charge was offset by the reversal of $1.7 million of prior period restructuring charges primarily related to the execution of a sublease agreement which partially offset previously accrued lease termination costs. Such amounts are reported in "Selling, general and administrative expenses" in the Consolidated Statement of Operations.

The components of the restructuring charges recorded in 2001, 2000 and 1999, spending with respect to such charges and other activity during those years, and the remaining reserve balances included in "Other current liabilities" and "Other liabilities" at December 31, 2001 and 2000, were as follows:

| RESTRUCTURING CHARGES (Dollars in millions) | Employee Termination Costs | Plant/ Office Closures | Total |
|---|---|---|---|
| 1999 | | | |
| Restructuring reserve at December 31, 1998.......... | $  23.8 | $   9.5 | $ 33.3 |
| Provisions recorded in continuing operations...... | 4.3 | -- | 4.3 |
| Reversal of prior period restructuring reserves..... | -- | (1.7) | (1.7) |
| Cash payments................ | (19.0) | (2.1) | (21.1) |
| Restructuring reserve at December 31, 1999.......... | $   9.1 | $   5.7 | $ 14.8 |
| 2000 | | | |

```
Reversal of prior period
  restructuring reserves.....   $    (1.1)  $   (2.8)  $ (3.9)
Cash payments................        (5.6)      (1.8)    (7.4)
---------------------------------------------------------------
Restructuring reserve at
  December 31, 2000.........   $     2.4   $    1.1   $  3.5
===============================================================
2001
Reversal of prior period
  restructuring reserves.....   $    (0.8)  $    --   $ (0.8)
Cash payments................        (1.6)      (0.4)    (2.0)
---------------------------------------------------------------
RESTRUCTURING RESERVE AT
  DECEMBER 31, 2001.........    $     --    $    0.7   $  0.7
===============================================================
```

---
## 15.  COMMITMENTS AND CONTINGENT LIABILITIES
---

ASBESTOS-RELATED LITIGATION - SEE NOTE 3

ENVIRONMENTAL REMEDIATION

General Matters and Discussion

Grace is subject to loss contingencies resulting from extensive and evolving
federal, state, local and foreign environmental laws and regulations relating to
the generation, storage, handling, discharge and disposition of hazardous wastes
and other materials. Grace accrues for anticipated costs associated with
investigatory and remediation efforts where an assessment has indicated that a
probable liability has been incurred and the amount of loss can be reasonably
estimated. These accruals do not take into account any discounting for the time
value of money. At December 31, 2001, Grace's liability for environmental
investigatory and remediation costs related to continuing and discontinued
operations totaled $153.1 million, as compared to $174.9 million at December 31,
2000. Grace made cash payments of $28.9 million in 2001, $47.2 million in 2000
and $25.0 million in 1999 to remediate environmentally

impaired sites. These amounts have been charged against previously established reserves.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings, but cannot predict at this time if such proceedings will have a favorable or adverse effect; any such effect could be material. Grace's environmental liabilities are included in "Liabilities subject to compromise" as of December 31, 2001.

Vermiculite Related Matters

In November 1999, the U.S. Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease related to Grace's former vermiculite mining activities in the Libby, Montana area. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the evacuation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the United States is also seeking a declaration of Grace's liability that would be binding in future actions to recover further response costs. The EPA has reported that it has spent approximately $25.4 million in response costs in and around Libby through June 2001. Grace expects that the EPA may incur significant additional response costs, as Libby is expected to be added to EPA's National Priorities List of Superfund sites, but is unable to estimate the amount at this time. Grace intends to review the EPA's actions and cost claims to determine whether they are justified and reasonable. These lawsuits are not subject to the automatic stay provided under the U.S. Bankruptcy Code. However, recovery of any response costs would be subject to the Chapter 11 proceedings.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court in Missoula, Montana against Grace on behalf of all owners of improved, private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. In October 2000, a purported class action lawsuit was filed in the U.S. District Court for Minnesota against Grace on behalf of all owners of real property situated near a former vermiculite processing plant in northeast Minneapolis. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from the former vermiculite processing operations. The complaint seeks remediation, property damages, and punitive damages. Grace has not completed its investigation of these claims, and, therefore, is not able to assess the extent of any possible liability related to these lawsuits. These cases have been stayed as a result of the Filing.

In 2001 and 2000, Grace recorded a pre-tax charge of $5.8 million and $10.4 million, respectively, for clean up costs at previously operating vermiculite mining and processing sites. The environmental risks related to vermiculite could result in material future charges to Grace's earnings, the amounts of which are not currently determinable.

Insurance Matters

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation as well as the amounts of any recoveries that Grace may receive is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

CONTINGENT RENTALS

Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $105.0 million, and are fully offset by

anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that the risk of significant loss from these lease obligations is remote. Grace is also evaluating whether to reject any of these leases as permitted by the Bankruptcy Code.

TAX MATTERS

The Internal Revenue Service ("IRS") is challenging the deductions taken by a number of companies throughout the United States related to interest on policy loans under corporate owned life insurance ("COLI") policies for years prior to January 1, 1999. In 2000 Grace paid $21.2 million of tax and interest related to this issue for tax years 1990-1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Grace filed a claim for refund of the amount paid to date and will contest any future IRS assessments on the grounds that these insurance policies and related loans had, and continue to have, a valid business purpose, that the COLI policies have economic substance and that interest deductions claimed were in compliance with tax laws in effect at the time.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against CCHP, Inc. ("CCHP"), a Grace subsidiary that formerly operated a temporary staffing business for nurses and other healthcare personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel that was in effect through 1999. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its for per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, per diem and expense allowance plans. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods as well. The matter is currently pending in the U.S. Court of Claims.

Grace has received notification from a foreign taxing authority assessing tax deficiencies plus interest relating to the purchase and sale of foreign bonds in 1989 and 1993. This assessment, totaling $10.5 million, is related to the Bekaert Group, which Grace sold in 1991 but as to which Grace retained liability for tax deficiencies attributable to tax periods prior to the sale. The matter is currently before the foreign tax authorities, but no decision has been rendered.

As a result of Grace's Chapter 11 filing, certain tax matters related to open tax years, including COLI interest deductions, could become the direct obligations of predecessor companies that now own Grace's former healthcare and packaging businesses. One or both of these companies could be directly liable to tax authorities for Grace's tax deficiencies. Pursuant to agreements relating to each transaction, Grace may be required to indemnify both parties for taxes relating to periods prior to the closing of such transactions. Any indemnification obligation that arises as a result of these matters would be a pre-petition liability subject to the Chapter 11 proceedings.

FRAUDULENT TRANSFER CASES

The Company and one of its subsidiaries have been named in purported class action suits alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius A.G. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation (the "1996 and 1998 transactions") were fraudulent transfers. The suits are alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. The other defendants in the suits have all asserted claims against Grace for indemnification. Grace believes that the suits are without merit. These lawsuits have been stayed as a result of Grace's Chapter 11 filing. However, fraudulent transfer claims related to the 1996 and 1998 transactions are expected to be heard by the Bankruptcy Court during the fourth quarter of 2002.

PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material

adverse consequences to Grace's operations or financial condition.

FINANCIAL ASSURANCES

At December 31, 2001, Grace had gross financial assurances issued and outstanding of $261.2 million, comprised of $149.2 million of gross surety bonds issued by various insurance companies and $112.0 million of standby letters of credit issued by various banks. Of the standby letters of credit, $29.4 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $231.8 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related financial assurances, approximately $10.1 million were issued by non-Debtor and $221.7 million were issued by the Debtors. Of the amounts issued by the Debtors, approximately $211.0 million were issued before the Filing Date, with the remaining $10.7 million being issued under the DIP facility subsequent to the Filing.

ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "Liabilities subject to compromise" on the accompanying Consolidated Balance Sheet as of December 31, 2001. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2001.

---

16.  SHAREHOLDERS' EQUITY (DEFICIT)

---

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $.01 par value. Of the common stock unissued at December 31, 2001, approximately 12,772,400 shares were reserved for issuance pursuant to stock options and other stock incentives. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $.01 par value, none of which has been issued. 3,000,000 of such shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

The Company's Board of Directors previously approved programs to repurchase outstanding shares of common stock. During the year ended December 31, 2000, the Company acquired 4,815,400 shares of common stock for $47.3 million (at an average price per share of $9.82). During the year ended December 31, 1999, the Company acquired 6,956,200 shares of common stock for $94.4 million (at an average price per share of $13.57). In January 1999, Grace retired 5,476,800 shares of treasury stock with a cost basis of $88.4 million.

In November 2001, 56,911 shares of restricted stock were reclassified as treasury shares to reflect an election made by Paul J. Norris, Grace's Chairman, President and Chief Executive Officer, under a Bankruptcy Court approved employment agreement.

---

17.  EARNINGS (LOSS) PER SHARE

---

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings (loss) per share from continuing operations.

| EARNINGS (LOSS) PER SHARE (Amounts in millions, except per share amounts) | 2001 | 2000 | 1999 |
|---|---|---|---|
| NUMERATORS | | | |
| Income (loss) from continuing operations | $  78.6 | $  (89.7) | $  130.2 |
| DENOMINATORS | | | |
| Weighted average common shares - basic calculation........ | 65.3 | 66.8 | 70.7 |
| Dilutive effect of employee stock options and restricted shares... | 0.1 | -- | 3.1 |
| Weighted average common shares - diluted calculation........ | 65.4 | 66.8 | 73.8 |
| BASIC EARNINGS (LOSS) PER SHARE.............. | $  1.20 | $  (1.34) | $  1.84 |
| DILUTED EARNINGS (LOSS) PER SHARE.......... | $  1.20 | $  (1.34) | $  1.76 |

As a result of the 2000 loss from continuing operations, approximately 800,000 of employee compensation-related shares, primarily issuable under stock options, were excluded from the diluted loss per share calculation in 2000 because their effect would be antidilutive. Additionally, stock options that could potentially dilute basic loss per share in the future (that were excluded from the computation of diluted loss per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 14.2 million in 2001, 9.4 million in 2000 and 3.1 million in 1999.

---

18. STOCK INCENTIVE PLANS

---

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by a committee of the Company's Board of Directors and may have terms of up to ten years and one month. The following table sets forth information relating to such options, as so adjusted, during 2001, 2000 and 1999:

| STOCK OPTION ACTIVITY | 2001 | |
|---|---|---|
| | Number of Shares | Average Exercise Price |
| Balance at beginning of year..... | 14,005,209 | $ 12.70 |
| Options granted.................. | 1,339,846 | 2.53 |
| Options exercised................ | -- | -- |
| Options terminated or cancelled.. | (2,572,624) | 11.46 |
| Balance at end of year........... | 12,772,431 | 11.88 |
| Exercisable at end of year....... | 9,586,993 | $ 12.64 |
| | 2000 | |
| Balance at beginning of year..... | 12,530,287 | $ 12.27 |
| Options granted.................. | 2,555,000 | 13.32 |
| Options exercised................ | (779,863) | 7.52 |
| Options terminated or cancelled.. | (300,215) | 13.62 |
| Balance at end of year........... | 14,005,209 | 12.70 |
| Exercisable at end of year....... | 9,386,539 | $ 11.96 |
| | 1999 | |
| Balance at beginning of year..... | 14,289,870 | $ 10.87 |
| Options granted.................. | 2,332,290 | 13.21 |
| Options exercised................ | (3,811,493) | 7.30 |
| Options terminated or cancelled.. | (280,380) | 16.21 |
| Balance at end of year........... | 12,530,287 | 12.27 |
| Exercisable at end of year....... | 9,212,495 | $ 9.88 |

At December 31, 2001, 4,456,038 shares were available for additional grants. Currently outstanding options expire on various dates through November 2009.

Following is a summary of stock options outstanding at December 31, 2001:

| STOCK OPTIONS OUTSTANDING | | | | | |
|---|---|---|---|---|---|
| EXERCISE PRICE RANGE | Number Outstanding | Weighted-average Remaining Contractual Life | Weighted-average Exercise Price | Number Exercisable | Weighted-average Exercise Price |

| | | | | | |
|---|---|---|---|---|---|
| $2 - $8 | 3,281,071 | 5.88 | $ 4.64 | 2,176,270 | $ 5.76 |
| $8 - $13 | 4,335,469 | 6.30 | 11.82 | 3,800,298 | 11.68 |
| $13 - $18 | 2,841,326 | 8.63 | 14.14 | 1,304,860 | 14.82 |
| $18 - $21 | 2,314,565 | 7.01 | 19.47 | 2,305,565 | 19.47 |
| | 12,772,431 | 6.84 | $11.88 | 9,586,993 | $12.64 |

In 2000 and 1999, the Company granted a total of 25,000 and 45,000 shares, respectively, of the Company's Common Stock to certain executives, subject to various restrictions. No shares were granted in 2001. Such shares are subject to forfeiture if certain employment conditions are not met. For more information, see the Form of Restricted Share Award Agreements filed as an exhibit to the Company's Form 10-Q for the quarter ended March 31, 1998. At December 31, 2001, restrictions on all prior grants of restricted stock, net of forfeitures, totaled 55,000 shares; these restrictions lapse in 2002. The fair value of the restricted shares at the date of grant is amortized to expense ratably over the restriction period.

SFAS No. 123, "Accounting for Stock-Based Compensation," permits the Company to follow the measurement provisions of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the methodology prescribed by SFAS No. 123, the Company's net income (loss) and related earnings (loss) per share for 2001, 2000 and 1999 would have been reduced to the pro forma amounts indicated below:

| PRO FORMA EARNINGS UNDER SFAS NO. 123 (Amounts in millions, except per share amounts) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Net income (loss): | | | |
| As reported.......... | $ 78.6 | $ (89.7) | $ 135.9 |
| Pro forma (1)......... | 71.2 | (98.5) | 128.0 |
| Basic earnings (loss) per share: | | | |
| As reported.......... | $ 1.20 | $ (1.34) | $ 1.92 |
| Pro forma (1)......... | 1.09 | (1.47) | 1.81 |
| Diluted earnings (loss) per share: | | | |
| As reported.......... | $ 1.20 | $ (1.34) | $ 1.84 |
| Pro forma (1)......... | 1.09 | (1.47) | 1.73 |

(1) These pro forma amounts may not be indicative of future income (loss) and earnings (loss) per share.

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model, with the following historical weighted average assumptions applied to grants in 2001, 2000 and 1999:

| OPTION VALUE ASSUMPTIONS | 2001 | 2000 | 1999 |
|---|---|---|---|
| Dividend yield........ | --% | -- % | -- % |
| Expected volatility... | 61% | 59 % | 39 % |
| Risk-free interest rate | 5% | 7 % | 5 % |
| Expected life (in years) | 4 | 4 | 4 |

Based upon the above assumptions, the weighted average fair value of each option granted was $1.28 per share for 2001, $6.86 per share for 2000 and $5.05 per share for 1999.

---

19.  PENSION PLANS AND OTHER POSTRETIREMENT BENEFITS PLANS

---

Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. pension plans in accordance with U.S. federal laws and regulations. Non-U.S. pension plans are funded under a variety of methods, as required under local laws and customs, and therefore cannot be summarized. Grace's accumulated other comprehensive loss, reflected as a reduction of shareholders equity (deficit), included additional minimum pension liabilities as of December 31, 2001 and 2000 of $209.3 million ($136.0 million, net of tax) and $17.9 million ($11.6 million, net of tax), respectively, for plans where the accumulated benefit obligation exceeded the fair market value of assets.

Grace provides certain other postretirement health care and life insurance benefits for retired employees of specified U.S. units. The retiree medical insurance plans provide various levels of benefits to employees (depending on their dates of hire) who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

An amendment to the structure of the retiree-paid premiums for postretirement medical benefits was approved by the Company's Board in November 2001. The amendment became effective January 1, 2002, and requires all retirees and beneficiaries covered by the postretirement medical plan to contribute a minimum of 40% of the calculated premium for that coverage.

The following summarizes the changes in benefit obligation and fair value of plan assets during the period:

| CHANGE IN FINANCIAL STATUS OF RETIREMENT PLANS | PENSION | | | | | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | NON-U.S. | | TOTAL | | | |
| (Dollars in millions) | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 |
| **CHANGE IN BENEFIT OBLIGATION** | | | | | | | | |
| Benefit obligation at beginning of year | $ 741.0 | $ 765.7 | $ 199.2 | $ 196.3 | $ 940.2 | $ 962.6 | $ 176.7 | $ 182.7 |
| Service cost | 7.9 | 6.3 | 3.8 | 3.8 | 11.7 | 10.1 | 0.7 | 0.6 |
| Interest cost | 55.3 | 54.5 | 11.2 | 11.4 | 66.5 | 65.9 | 9.8 | 14.4 |
| Plan participants' contributions | -- | -- | 0.4 | 0.5 | 0.4 | 0.5 | -- | -- |
| Amendments | -- | 2.4 | 1.6 | 0.1 | 1.6 | 2.5 | -- | (20.0) |
| Acquisitions/(divestitures) | -- | 8.3 | -- | -- | -- | 8.3 | -- | -- |
| Acquisitions/settlements recognized gains | -- | -- | -- | -- | -- | -- | -- | -- |
| Actuarial (gain) loss | 42.9 | (17.7) | 0.6 | 13.8 | 43.5 | (3.9) | (28.9) | 22.0 |
| Benefits paid | (70.5) | (78.5) | (11.7) | (12.2) | (82.2) | (90.7) | (22.3) | (23.0) |
| Currency exchange translation adjustments | -- | -- | (9.0) | (15.1) | (9.0) | (15.1) | -- | -- |
| Benefit obligation at end of year | $ 776.6 | $ 741.0 | $ 196.1 | $ 199.2 | $ 972.7 | $ 940.2 | $ 136.0 | $ 176.7 |
| **CHANGE IN PLAN ASSETS** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 800.2 | $ 899.9 | $ 198.3 | $ 224.1 | $ 998.5 | $1,124.0 | $ -- | $ -- |
| Actual return on plan assets | (47.0) | (28.6) | (15.2) | (1.6) | (62.2) | (30.2) | -- | -- |
| Employer contribution | 6.8 | 7.4 | 3.8 | 4.0 | 10.6 | 11.4 | 22.3 | 23.0 |
| Acquisitions/Spinoff | -- | -- | -- | -- | -- | -- | -- | -- |
| Plan participants' contribution | -- | -- | 0.4 | 0.5 | 0.4 | 0.5 | -- | -- |
| Benefits paid | (70.5) | (78.5) | (11.7) | (12.2) | (82.2) | (90.7) | (22.3) | (23.0) |
| Currency exchange translation adjustment | -- | -- | (8.3) | (16.5) | (8.3) | (16.5) | -- | -- |
| Fair value of plan assets at end of year | $ 689.5 | $ 800.2 | $ 167.3 | $ 198.3 | $ 856.8 | $ 998.5 | $ -- | $ -- |
| Funded status | $ (87.1) | $ 59.2 | $ (28.8) | $ (0.9) | $(115.9) | $ 58.3 | $(136.0) | $(176.7) |
| Unrecognized transition (asset)/obligation | 0.7 | (9.3) | 0.8 | 0.9 | 1.5 | (8.4) | -- | -- |
| Unrecognized actuarial loss (gain) | 25.1 | 98.9 | 4.0 | 14.6 | 29.1 | 113.5 | 25.8 | 61.9 |
| Unrecognized prior service cost/(benefit) | 253.7 | 31.0 | 45.6 | 4.6 | 299.3 | 35.6 | (56.9) | (74.3) |
| Net amount recognized | $ 192.4 | $ 179.8 | $ 21.6 | $ 19.2 | $ 214.0 | $ 199.0 | $(169.1) | $(189.1) |
| **AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE SHEET CONSIST OF:** | | | | | | | | |
| Deferred pension costs | $ 241.0 | $ 223.5 | $ 85.1 | $ 81.3 | $ 326.1 | $ 304.8 | $ -- | $ -- |
| Pension related liability | (276.0) | (68.3) | (65.1) | (63.5) | (341.1) | (131.8) | (169.1) | (189.1) |
| Intangible asset | 19.0 | 6.9 | 0.7 | 1.2 | 19.7 | 8.1 | N/A | N/A |
| Accumulated other comprehensive loss | 208.4 | 17.7 | 0.9 | 0.2 | 209.3 | 17.9 | N/A | N/A |
| Net amount recognized | $ 192.4 | $ 179.8 | $ 21.6 | $ 19.2 | $ 214.0 | $ 199.0 | $(169.1) | $ (189.1) |
| **WEIGHTED AVERAGE ASSUMPTIONS AS OF DECEMBER 31** | | | | | | | | |
| Discount rate | 7.25% | 7.50% | 2.3-15.0% | 2.3-15.0% | N/M | N/M | 7.25% | 7.50% |
| Expected return on plan assets | 9.0 | 9.0 | 5.0-15.0 | 5.0-15.0 | N/M | N/M | N/M | N/M |
| Rate of compensation increase | 4.3 | 4.5 | 2.0-14.0 | 2.0-14.0 | N/M | N/M | N/M | N/M |

| COMPONENTS OF NET PERIODIC BENEFIT (INCOME) COST | 2001 | | | 2000 | | | 1999 | | |
|---|---|---|---|---|---|---|---|---|---|
| (Dollars in millions) | U.S. | NON-U.S. | OTHER | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
| Service cost | $ 7.9 | $ 3.8 | $ 0.7 | $ 6.3 | $ 3.8 | $ 0.6 | $ 7.3 | $ 5.2 | $ 0.8 |
| Interest cost | 55.3 | 11.2 | 9.8 | 54.5 | 11.4 | 14.4 | 57.7 | 11.8 | 12.8 |
| Expected return on plan assets | (69.1) | (15.9) | -- | (78.2) | (18.2) | -- | (76.0) | (17.1) | -- |
| Amortization of transition asset | (10.5) | -- | -- | (10.0) | (0.2) | -- | (11.5) | (0.2) | -- |
| Amortization of prior service cost (benefit) | 7.6 | 0.5 | (8.3) | 7.4 | 0.6 | (6.7) | 7.0 | 0.6 | (6.7) |
| Amortization of unrecognized actuarial loss | 2.4 | 0.2 | 0.1 | 0.8 | (0.4) | 2.4 | 3.9 | 0.3 | 2.7 |
| Net curtailment settlement loss | -- | 0.2 | -- | -- | -- | -- | 11.0 | 0.3 | -- |
| Net periodic benefit (income) cost | $ (5.9) | $ -- | $ 2.3 | $(19.2) | $ (3.0) | $ 10.7 | $ (0.6) | $ 0.8 | $ 9.6 |

| PENSION PLANS WHERE ACCUMULATED BENEFIT OBLIGATIONS EXCEED PLAN ASSETS | U.S. | | NON-U.S. | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|
| ASSETS (Dollars in millions) | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 |
| Projected benefit obligation | $ 691.1 | $ 68.7 | $ 74.1 | $ 72.4 | N/A | N/A |
| Accumulated benefit obligation | 676.8 | 68.2 | 63.8 | 62.0 | $ 136.0 | $ 176.7 |
| Fair value of plan assets | 583.7 | -- | 0.9 | 0.6 | -- | -- |

N/M - Not meaningful
N/A - Not applicable

For measurement purposes, rates of increase of 9.0% and 9.5% in the per capita cost of covered retiree health care benefits for pre-age 65 and post-age 65, respectively, were assumed for 2002. The rate is assumed to decrease gradually to 5.3% through 2007 and remain at that level thereafter. Assumed health care cost trend rates have a significant effect on the amounts reported for the postretirement medical plan. A one percentage-point increase (decrease) in assumed health care medical cost trend rates would increase (decrease) total service and interest cost components by $0.1 million and ($0.1) million, respectively, and increase (decrease) postretirement benefit obligations by $1.0 million and ($1.2) million, respectively.

---

20.  BUSINESS SEGMENT INFORMATION

---

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals and Performance Chemicals. Performance Chemicals was formed in 1999 by combining the previously separate business segments of Grace Construction Products and Darex Container Products. These businesses were consolidated under one management team to capitalize on infrastructure synergies from co-location of headquarters and production facilities around the world. Davison Chemicals produces a variety of catalysts and silica products. Performance Chemicals produces specialty construction chemicals, building materials and sealants and coatings. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for 2001, 2000 and 1999, in connection with the adoption of SFAS No. 131, "Disclosure about Segments of an Enterprise and Related Information," only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such. Davison Chemicals pre-tax operating income includes Grace's equity income related to the unconsolidated operating company of ART (see Note 6).

| BUSINESS SEGMENT DATA (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| **NET SALES** | | | |
| Davison Chemicals..... | $   874.1 | $   783.9 | $   751.1 |
| Performance Chemicals. | 849.1 | 813.5 | 799.8 |
| Total................. | $ 1,723.2 | $ 1,597.4 | $1,550.9 |
| **PRE-TAX OPERATING INCOME** | | | |
| Davison Chemicals..... | $   128.7 | $   131.6 | $   124.3 |
| Performance Chemicals. | 101.1 | 95.5 | 105.8 |
| Total................. | $   229.8 | $   227.1 | $   230.1 |
| **DEPRECIATION AND AMORTIZATION** | | | |
| Davison Chemicals..... | $    58.4 | $    57.2 | $    59.2 |
| Performance Chemicals. | 29.5 | 29.3 | 28.8 |
| Total................. | $    87.9 | $    86.5 | $    88.0 |
| **CAPITAL EXPENDITURES** | | | |
| Davison Chemicals..... | $    39.3 | $    33.7 | $    48.0 |
| Performance Chemicals. | 22.8 | 28.3 | 30.7 |
| Total................. | $    62.1 | $    62.0 | $    78.7 |
| **TOTAL ASSETS** | | | |
| Davison Chemicals..... | $   713.0 | $   632.3 | $   590.3 |
| Performance Chemicals. | 497.7 | 479.1 | 478.3 |
| Total................. | $ 1,210.7 | $ 1,111.4 | $1,068.6 |

The table below presents information related to the geographic areas in which Grace operated in 2001, 2000 and 1999.

| GEOGRAPHIC AREA DATA (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| **NET SALES** | | | |
| United States............ | $   835.1 | $   825.6 | $   783.5 |
| Canada and Puerto Rico... | 40.7 | 34.4 | 32.6 |
| Europe................... | 472.9 | 416.8 | 447.3 |
| Asia Pacific............. | 267.5 | 216.8 | 205.7 |
| Latin America............ | 107.0 | 103.8 | 81.8 |
| Total.................... | $ 1,723.2 | $ 1,597.4 | $1,550.9 |
| **PROPERTIES AND EQUIPMENT, NET** | | | |
| United States............ | $   386.7 | $   408.3 | $   399.0 |
| Canada and Puerto Rico... | 20.1 | 19.9 | 20.8 |
| Europe................... | 118.0 | 101.1 | 118.1 |
| Asia Pacific............. | 49.1 | 54.7 | 61.9 |
| Latin America............ | 15.1 | 17.7 | 17.5 |
| Total.................... | $   589.0 | $   601.7 | $   617.3 |

Pre-tax operating income, depreciation and amortization, capital expenditures and total assets for Grace's business segments are reconciled below to amounts presented in the Consolidated Financial Statements.

| RECONCILIATION OF BUSINESS SEGMENT DATA TO FINANCIAL STATEMENTS (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Pre-tax operating income - business segments....... | $ 229.8 | $ 227.1 | $ 230.1 |
| Gain on note receivable... | -- | -- | 18.5 |
| Gain on disposal of assets | 1.8 | 5.5 | 13.6 |
| Gain on sale of investments | 7.9 | 19.0 | 9.3 |
| Provision for environmental remediation............. | (5.8) | (10.4) | -- |
| Provisions for asbestos-related litigation, net of insurance coverage...... | -- | (208.0) | -- |
| Interest expense and related financing costs......... | (37.1) | (28.1) | (16.1) |
| Corporate operating costs. | (42.3) | (40.0) | (52.0) |
| Other, net................ | 3.7 | 15.2 | -- |
| Income (loss) from continuing operations before Chapter 11 reorganization expenses and income taxes....... | $ 158.0 | $ (19.7) | $ 203.4 |
| Depreciation and amortization - business segments................ | $ 87.9 | $ 86.5 | $ 88.0 |
| Depreciation and amortization - corporate | 1.1 | 1.3 | 1.2 |
| Total depreciation and amortization .......... | $ 89.0 | $ 87.8 | $ 89.2 |
| Capital expenditures - business segments....... | $ 62.1 | $ 62.0 | $ 78.7 |
| Capital expenditures - corporate............... | 0.8 | 2.8 | 3.8 |
| Total capital expenditures | $ 62.9 | $ 64.8 | $ 82.5 |
| Total assets - business segments................ | $1,210.7 | $1,111.4 | $ 1,068.6 |
| Total assets - corporate.. | 687.5 | 614.3 | 595.1 |
| Asbestos-related receivables | 293.4 | 372.0 | 371.4 |
| Deferred tax assets....... | 525.4 | 487.2 | 440.0 |
| Total assets............. | $ 2,717.0 | $2,584.9 | $ 2,475.1 |

---

## 21.  QUARTERLY SUMMARY AND STATISTICAL INFORMATION (UNAUDITED)

---

QUARTERLY SUMMARY AND STATISTICAL INFORMATION (Unaudited)
(Dollars in millions, except per share)

| | | March 31 | | June 30 | | September 30 | | December 31 |
|---|---|---|---|---|---|---|---|---|
| **2001** | | | | | | | | |
| Net sales (1) | $ | 395.7 | $ | 450.3 | $ | 448.1 | $ | 429.1 |
| Cost of goods sold (1) | | 252.4 | | 283.3 | | 281.9 | | 275.3 |
| Income from continuing operations (2) | | 14.6 | | 23.0 | | 19.8 | | 21.2 |
| Net income | | 14.6 | | 23.0 | | 19.8 | | 21.2 |
| | | | | | | | | |
| Net income per share: (3) | | | | | | | | |
| Basic earnings per share: | | | | | | | | |
| Continuing operations | $ | 0.22 | $ | 0.35 | $ | 0.30 | $ | 0.32 |
| Net income | | 0.22 | | 0.35 | | 0.30 | | 0.32 |
| Diluted earnings per share: | | | | | | | | |
| Continuing operations | | 0.22 | | 0.35 | | 0.30 | | 0.32 |
| Net income | | 0.22 | | 0.35 | | 0.30 | | 0.32 |
| | | | | | | | | |
| Market price of common stock: (4) | | | | | | | | |
| High | $ | 4.38 | $ | 2.35 | $ | 1.87 | $ | 1.72 |
| Low | | 1.63 | | 1.31 | | 1.46 | | 1.35 |
| Close | | 2.30 | | 1.75 | | 1.55 | | 1.55 |
| **2000** | | | | | | | | |
| Net sales (1) | $ | 384.7 | $ | 405.1 | $ | 415.7 | $ | 391.9 |
| Cost of goods sold (1) | | 231.8 | | 239.8 | | 252.4 | | 249.9 |
| Income (loss) from continuing operations | | 24.2 | | 34.6 | | 34.1 | | (182.6) |
| Net income (loss) | | 24.2 | | 34.6 | | 34.1 | | (182.6) |
| | | | | | | | | |
| Net income per share: (3) | | | | | | | | |
| Basic earnings per share: | | | | | | | | |
| Continuing operations | $ | 0.35 | $ | 0.51 | $ | 0.51 | $ | (2.80) |
| Net income (loss) | | 0.35 | | 0.51 | | 0.51 | | (2.80) |
| Diluted earnings per share: | | | | | | | | |
| Continuing operations | | 0.35 | | 0.50 | | 0.51 | | (2.80) |
| Net income (loss) | | 0.35 | | 0.50 | | 0.51 | | (2.80) |
| | | | | | | | | |
| Market price of common stock: (4) | | | | | | | | |
| High | $ | 14.94 | $ | 14.63 | $ | 12.63 | $ | 7.13 |
| Low | | 9.50 | | 11.38 | | 6.56 | | 1.31 |
| Close | | 12.88 | | 12.13 | | 6.88 | | 3.19 |

(1)  The net sales and cost of goods sold amounts presented above reflect a
     reclassification of freight costs and sales commissions (previously shown
     as a reduction of sales) to cost of sales and selling expenses, in
     accordance with Emerging Issues Task Force Consensus No. 00-10, "Accounting
     for Shipping and Handling Revenues and Costs."
(2)  Fourth quarter results include the effects of changes in estimates related
     to other postretirement plan benefits, which reduced expense by $6.0
     million.
(3)  Per share results for the four quarters may differ from full-year per share
     results, as a separate computation of the weighted average number of shares
     outstanding is made for each quarter presented.
(4)  Principal market: New York Stock Exchange.

F-33

FINANCIAL SUMMARY (1) (Dollars in millions, except per share amounts)

| | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS** | | | | | |
| Net sales | $ 1,723.2 | $ 1,597.4 | $ 1,550.9 | $ 1,546.2 | $ 1,558.9 |
| Cost of goods sold | 1,092.9 | 973.9 | 929.3 | 961.7 | 969.0 |
| Depreciation and amortization | 89.0 | 87.8 | 89.2 | 92.1 | 94.8 |
| Interest expense and related financing costs | 37.1 | 28.1 | 16.1 | 19.8 | 21.2 |
| Research and development expenses | 44.1 | 45.7 | 42.4 | 47.4 | 42.4 |
| Income (loss) from continuing operations before Chapter 11 reorganization expenses and income taxes | 158.0 | (19.7) | 203.4 | (223.2) | 137.4 |
| Income (loss) from continuing operations | 78.6 | (89.7) | 130.2 | (194.7) | 85.9 |
| Income from discontinued operations (2) | -- | -- | 5.7 | 0.9 | 175.1 |
| Net income (loss) | 78.6 | (89.7) | 135.9 | (229.1) | 261.0 |
| **FINANCIAL POSITION** | | | | | |
| Current assets | $ 748.1 | $ 773.9 | $ 779.8 | $ 625.6 | $ 2,175.5 |
| Current liabilities | 249.1 | 1,092.9 | 769.4 | 669.8 | 1,357.7 |
| Properties and equipment, net | 589.0 | 601.7 | 617.3 | 661.4 | 663.3 |
| Total assets | 2,717.0 | 2,584.9 | 2,475.1 | 2,556.3 | 3,769.4 |
| Total debt not subject to compromise | 10.0 | 421.9 | 136.2 | 113.4 | 1,072.3 |
| Liabilities subject to compromise | 2,313.6 | -- | -- | -- | -- |
| Shareholders' equity (deficit) | (141.7) | (71.3) | 111.1 | 42.1 | 467.9 |
| **CASH FLOW** | | | | | |
| Operating activities | $ 6.4 | $ (140.1) | $ 130.5 | $ (66.9) | $ 236.4 |
| Investing activities | (133.3) | (97.6) | 89.4 | (114.0) | 370.1 |
| Financing activities | 123.2 | 239.9 | (80.9) | 196.6 | (621.3) |
| Net cash flow | (10.6) | (7.9) | 134.5 | 17.7 | (20.7) |
| **DATA PER COMMON SHARE (DILUTED)** | | | | | |
| Income (loss) from continuing operations | $ 1.20 | $ (1.34) | $ 1.76 | $ (2.61) | $ 1.13 |
| Net income (loss) | 1.20 | (1.34) | 1.84 | (3.07) | 3.45 |
| Dividends | -- | -- | -- | -- | .56 |
| Average common diluted shares outstanding (thousands) | 65,400 | 66,800 | 73,800 | 74,600 | 75,700 |
| **OTHER STATISTICS** | | | | | |
| Dividends paid on common stock | $ -- | $ -- | $ -- | $ -- | $ 41.2 |
| Capital expenditures | 62.9 | 64.8 | 82.5 | 100.9 | 258.7 |
| Common stock price range (3) | 1.31 - 4.38 | 14 15/16 - 1 5/16 | 21 - 11 13/16 | 21 11/16 - 10 | 18 1/16 - 9 7/8 |
| Common shareholders of record | 11,643 | 12,240 | 13,215 | 14,438 | 15,945 |
| Number of employees - continuing operations | 6,400 | 6,300 | 6,300 | 6,600 | 6,700 |

(1)  Certain prior-year amounts have been reclassified to conform to the 2001 presentation and to reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales) to cost of sales and selling expenses in accordance with Emerging Issues Task Force Consensus No. 00-10, "Accounting for Shipping and Handling Revenues and Costs."

(2)  See Note 4 to the Consolidated Financial Statements for additional information.

(3)  On March 31, 1998, a predecessor of the Company ("Old Grace") completed a transaction in which its flexible packaging business ("Packaging Business") was combined with Sealed Air Corporation ("Sealed Air"). Old Grace effected this transaction by transferring its specialty chemicals businesses along with certain other businesses and assets to the Company (then named Grace Specialty Chemicals, Inc.), distributing the shares of the Company's common stock to Old Grace's shareholders on a one-for-one basis ("Spin-off") and merging a subsidiary of Old Grace with Sealed Air ("Merger"). Immediately following the Spin-off and Merger, the Company changed its name to "W. R. Grace & Co." and Old Grace changed its name to "Sealed Air Corporation" ("New Sealed Air"). As a result of the transaction, the Packaging Business was classified as a discontinued operation as of December 31, 1997. For further information, see Old Grace's Joint Proxy Statement/Prospectus dated February 13, 1998 and the Company's Information Statement dated February 13, 1998. Stock prices in 1997 and 1998 have been adjusted so that they are on a basis comparable to the stock prices following the disposition of the Packaging Business.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL
CONDITION

---

DESCRIPTION OF BUSINESS

---

Grace is engaged in specialty chemicals and specialty materials businesses on a
global basis. Its business segments are Davison Chemicals, which produces
catalysts and silica products, and Performance Chemicals, which produces
construction chemicals, building materials and sealants and coatings.

---

VOLUNTARY BANKRUPTCY FILING

---

In response to a sharply increasing number of asbestos-related bodily injury
claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. ("the Company")
and 61 of its United States subsidiaries and affiliates, including W. R. Grace &
Co.-Conn. (collectively, the "Debtors"), filed voluntary petitions for
reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy
Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy
Court for the District of Delaware (the "Bankruptcy Court"). The cases were
consolidated and are being jointly administered under case number 01-01139 (the
"Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S.
subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse
developments in its asbestos-related litigation, including: a significant
increase in bodily injury claims, higher than expected costs to resolve bodily
injury and certain property damage claims, and class action lawsuits alleging
damages from a former attic insulation product. (These claims are discussed in
more detail in Note 3 to the Consolidated Financial Statements.) After a
thorough review of these developments, the Board of Directors of Grace concluded
on April 2, 2001 that a federal court-supervised Chapter 11 filing provides the
best forum available to achieve predictability and fairness in the claims
settlement process. By filing under Chapter 11, Grace expects to be able to both
obtain a comprehensive resolution of the claims against it and preserve the
inherent value of its businesses. Under Chapter 11, the Debtors expect to
continue to operate their businesses as debtors-in-possession under court
protection from their creditors and claimants, while using the Chapter 11
process to develop and implement a plan for addressing the asbestos-related
claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation
against the Debtors is generally stayed (subject to certain exceptions in the
case of governmental authorities), and no party may take any action to realize
its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related
claims and all other pre-petition claims in a plan of reorganization. Such plan
of reorganization will include the establishment of a trust, through which all
pending and future asbestos-related claims would be channeled for resolution.
However, it is currently impossible to predict with any degree of certainty the
amount that would be required to be contributed to the trust, how the trust
would be funded, how other pre-petition claims would be treated or what impact
any reorganization plan may have on the shares of common stock of Grace. The
interests of Debtors' equity security holders could be substantially diluted or
cancelled under a plan of reorganization. The formulation and implementation of
the plan of reorganization is expected to take a significant period of time.

Since the Filing, all motions necessary to conduct normal business activities
have been approved by the Bankruptcy Court. In addition, the Debtors have
received approval from the Bankruptcy Court to pay or otherwise honor certain of
its pre-petition obligations in the ordinary course of business, including
employee wages and benefits, customer programs, shipping charges and a limited
amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to
propose a plan of reorganization for a 120-day period following the Filing Date.
The Debtors have received an extension of their exclusive period during which to
file a plan of reorganization through August 1, 2002, and an extension of the
Debtors' exclusive rights to solicit acceptances of a reorganization plan
through October 1, 2002. No bar dates have yet been set for the filing of proofs
of claims by claimants.

Three creditors' committees, two representing asbestos claimants and the third
representing other unsecured creditors, and a committee representing
shareholders have been appointed in the Chapter 11 Cases. These committees will
have the right to be heard on all matters that come before the Bankruptcy Court,
and, together with a legal representative of

future asbestos claimants (who Grace expects to be appointed by the Bankruptcy Court in the near future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

All of the Debtor's pre-petition debt is now in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2001 reflects the classification of the Debtors' pre-petition debt within "Liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term expiring in April 2003 and bears interest under a formula based on the London Inter-Bank Offered Rate ("LIBOR") rate plus 2.00 to 2.25 percentage points depending on the level of loans outstanding.

In November 2001, the Debtors' Chapter 11 Cases, as well as the Chapter 11 Cases of four unrelated companies with asbestos-related claims, was assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin will preside over the asbestos bodily injury matters affecting all five companies and, at his choosing, certain other asbestos-related lawsuits particular to Grace. Judge Judith Fitzgerald, a U.S. Bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware, will preside over the Debtors' other bankruptcy matters.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7") "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain of Debtors' assets and liquidation of certain of Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated financial statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2001, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments) as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date adjusted, as warranted, for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the "Liabilities subject to compromise" as of December 31, 2001, and as of the Filing Date.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheet based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items. During 2001, the Debtors recorded Chapter 11 reorganization expenses of $15.7 million. See Note 1 to the consolidated Financial Statements for further information concerning the Chapter 11 filing.

-------------------------------------------------------------------------------
CRITICAL ACCOUNTING ESTIMATES
-------------------------------------------------------------------------------

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities (including contingent assets and liabilities) reported at the date of the Consolidated Financial Statements and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Grace's accounting measurements that are most affected by management's estimates of future events are:

o    Contingent liabilities such as asbestos-related matters, environmental
     remediation, tax exposures and retained obligations of divested businesses.

o    Pension and postretirement liabilities that depend on assumptions regarding discount rates and total returns on invested funds.

o    Depreciation and amortization periods for long-lived assets, including property and equipment, intangibles and goodwill.

o    Realization values of various assets such as receivables, inventories, insurance and tax attributes.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

---

CONTINUING OPERATIONS
---

Set forth below is a chart that lists key operating statistics and percentage changes for the years ended December 31, 2001, 2000 and 1999. Immediately following the chart is an overview of the matters affecting the comparison of 2001 and 2000 as well as the comparison of 2000 and 1999. Each of these items should be referenced when reading management's discussion and analysis of the results of continuing operations. The chart below, as well as the financial information presented throughout this discussion, divides Grace's financial results between "core operations" and "noncore activities." Core operations comprise the financial results of Davison Chemicals, Performance Chemicals and the costs of corporate activities that directly or indirectly support business operations. In contrast, noncore activities comprise all other events and transactions not directly related to the generation of operating revenue or the support of core operations.

| ANALYSIS OF CONTINUING OPERATIONS (Dollars in millions) | 2001 | 2000 (a) | % Change Fav(Unfav) | 1999 (a) | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| NET SALES: | | | | | |
| Davison Chemicals | $ 874.1 | $ 783.9 | 11.5% | $ 751.1 | 4.4% |
| Performance Chemicals | 849.1 | 813.5 | 4.4% | 799.8 | 1.7% |
| TOTAL GRACE SALES - CORE OPERATIONS | $ 1,723.2 | $ 1,597.4 | 7.9% | $ 1,550.9 | 3.0% |
| PRE-TAX OPERATING INCOME: | | | | | |
| Davison Chemicals | $ 128.7 | $ 131.6 | (2.2%) | $ 124.3 | 5.9% |
| Performance Chemicals | 101.1 | 96.5 | 5.9% | 105.8 | (9.7%) |
| Corporate operating costs | (42.3) | (40.0) | (5.8%) | (52.0) | 23.1% |
| PRE-TAX INCOME FROM CORE OPERATIONS | 187.5 | 187.1 | 0.2% | 178.1 | 5.0% |
| PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES | 1.0 | (188.4) | NM | 37.2 | NM |
| Interest expense | (37.1) | (28.1) | (32.0%) | (16.1) | (74.5%) |
| Interest income | 4.6 | 9.7 | (52.6%) | 4.2 | 131.0% |
| INCOME (LOSS) BEFORE CHAPTER 11 REORGANIZATION EXPENSE AND INCOME TAXES | 158.0 | (19.7) | NM | 203.4 | NM |
| Chapter 11 reorganization expenses, net | (15.7) | -- | NM | -- | NM |
| Provision for income taxes | (63.7) | (70.0) | 9.0% | (73.2) | NM |
| INCOME (LOSS) FROM CONTINUING OPERATIONS (b) | $ 78.6 | $ (89.7) | 187.6% | $ 130.2 | NM |
| KEY FINANCIAL MEASURES: | | | | | |
| Pre-tax income from core operations as a percentage of sales | 10.9% | 11.7% | (0.8)pts | 11.5% | 0.2pts |
| Pre-tax income from core operations before depreciation and amortization | $ 276.5 | $ 274.9 | 0.6% | $ 267.3 | 2.8% |
| As a percentage of sales | 16.0% | 17.2% | (1.2)pts | 17.2% | -- |
| NET SALES BY REGION: | | | | | |
| North America | $ 875.6 | $ 860.0 | 1.8% | $ 816.1 | 5.4% |
| Europe | 472.9 | 416.4 | 13.5% | 447.1 | (6.8%) |
| Asia Pacific | 267.5 | 216.8 | 23.4% | 205.7 | 5.4% |
| Latin America | 107.0 | 103.8 | 3.1% | 81.8 | 26.9% |
| TOTAL | $ 1,723.2 | $ 1,597.4 | 7.9% | $ 1,550.9 | 3.0% |

NM = Not meaningful

a = Net sales amounts presented herein reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales)

b = Also net income (loss) for 2001 and 2000.

MATTERS AFFECTING COMPARISON - 2001 VS. 2000

Several major factors affect the comparison of sales and pre-tax earnings from continuing operations between 2001 and 2000. The principal factors affecting core operations are sales and earnings from three acquisitions, the formation of a joint venture, a downturn in world economic activity beginning in late 2000 (exacerbated by the events of September 11, 2001), the continued contributions from Grace's productivity initiatives, the continued strength of the U.S. dollar compared to most foreign currencies, and increased energy costs. (Energy costs were high in the first half of 2001, declining during the second half, but overall were higher year-over-year.) The primary factors affecting pre-tax income from noncore activities were the sale of Grace's remaining interest in Cross Country Staffing, offset by accruals for legal and environmental matters. The effects of each of these factors are quantified throughout management's discussion and analysis.

MATTERS AFFECTING COMPARISON - 2000 VS. 1999

Several major factors affect the comparison of sales and pre-tax earnings from continuing operations between 2000 and 1999. The principal factors affecting core operations are sales and earnings from six acquisitions, contributions from Grace's productivity initiatives, a downturn in the U.S. economy in late 2000, increasing energy prices in the second half of 2000 compared to the first half and to 1999, and a stronger U.S. dollar compared to most foreign currencies. The primary factors affecting pre-tax loss from noncore activities were: 1) the need to increase Grace's estimate of asbestos-related liability to account for adverse developments in claims activity in the latter part of 2000; and 2) new environmental risks related to Grace's former mining operations.

NET SALES

The following table identifies the year-over-year increase or decrease in sales attributable to changes in product volumes, product prices and/or mix, and the impact of foreign currency translation.

| NET SALES VARIANCE ANALYSIS | 2001 AS A PERCENTAGE INCREASE (DECREASE) FROM 2000 | | | |
|---|---|---|---|---|
| | VOLUME | PRICE/MIX | TRANSLATION | TOTAL |
| Davison Chemicals | 9.1% | 4.5% | (2.1%) | 11.5% |
| Performance | | | | |
| Chemicals ...... | 6.6% | 0.5% | (2.7%) | 4.4% |
| Net sales........ | 7.8% | 2.6% | (2.5%) | 7.9% |
| BY REGION: | | | | |
| North America.. | 0.5% | 1.6% | (0.3%) | 1.8% |
| Europe.......... | 14.4% | 2.9% | (3.8%) | 13.5% |
| Latin America.. | (1.3%) | 9.7% | (5.3%) | 3.1% |
| Asia Pacific... | 28.5% | 2.1% | (7.2%) | 23.4% |

| | 2000 AS A PERCENTAGE INCREASE (DECREASE) FROM 1999 | | | |
|---|---|---|---|---|
| Davison Chemicals | 5.2% | 4.4% | (5.2%) | 4.4% |
| Performance | | | | |
| Chemicals...... | 3.8% | 0.4% | (2.5%) | 1.7% |
| Net sales........ | 4.5% | 2.3% | (3.8%) | 3.0% |
| BY REGION: | | | | |
| North America.. | 3.2% | 2.2% | -- | 5.4% |
| Europe.......... | 3.1% | 2.6% | (12.5%) | (6.8%) |
| Latin America.. | 26.8% | 2.9% | (2.8%) | 26.9% |
| Asia Pacific... | 3.6% | 2.3% | (0.5%) | 5.4% |

In 2001 and 2000, volume was the primary factor affecting the change in net sales, most of which is attributable to three acquired businesses in 2001 and six acquired businesses in 1999 and 2000. These acquired businesses added $71.9 million in sales in 2001 (4.5 percentage points of the year-over-year volume increase), and $49.6 million in 2000 (4.0 percentage points of the year-over-year volume increase). Increases in the price/mix profile in both years were offset by the negative impact of foreign currency translation.

In 2001 and 2000, each business segment experienced volume growth. The most significant volume increases in 2001 were experienced in catalyst products and silica products (9.3% and 8.4%, respectively) primarily attributable to new product penetration, acquisitions and the Advanced Refining Technologies ("ART") joint venture. In 2000, the silica products and construction chemicals groups experienced significant volume increases, primarily attributable to acquisitions of 6.3% and 6.2%, respectively.

In 2001, the most significant volume increases were experienced in Asia Pacific and Europe, attributable to acquisitions and the ART joint venture. In 2000, the volume increases were greatest in Latin America, reflecting the acquisition of an admixtures business in Chile in late 1999. Reported net sales for Grace's international operations were negatively impacted from the translation of foreign currencies in relation to the U.S. dollar. Approximately 45% of Grace's reported net sales were generated by its international operations. The 2001 impact related to an approximate 5% devaluation in foreign currency exchange rates.

PRE-TAX INCOME FROM CORE OPERATIONS

Pre-tax income from core operations was $187.5 million for the year ended
December 31, 2001, compared to $187.1 million for the year ended December 31,
2000, an increase of 0.2%. Pre-tax income from core operations in 2000 was $9.0
million or 5.0% higher than 1999.

Operating income of the Davison Chemicals segment for 2001 was $128.7 million,
down 2.2% versus 2000. Davison's operating margin of 14.7% was down 2.1 points
compared to the prior year. Operating income of the Performance Chemicals
segment for 2001 was $101.1 million, up 5.9% from 2000, with an operating margin
of 11.9%, up 0.2 points compared to the prior year. Operating income of the
Davison Chemicals segment for 2000 was $131.6 million, up 5.9% from 1999.
Davison's operating margin was 16.8% compared to 16.5% in 1999. Operating income
of the Performance Chemicals segment for 2000 was $95.5 million, down 9.7% from
1999, with an operating margin of 11.7% in 2000 versus 13.2% in 1999.

Higher energy costs and the negative effects of currency translation served to
dampen the year-over-year performances in both 2001 and 2000. In the first half
of 2001 and the last half of 2000, the rise in natural gas prices (used by
Davison Chemicals as part of its manufacturing process) and transportation fuel
prices (impacting distribution costs for Performance Chemicals) had an adverse
affect on profit margins. These energy sources are also a significant factor in
the cost of many raw materials used by both business segments. Selling price
increases did not keep pace with the rapid rise in these energy related costs.

Corporate operating costs primarily reflect corporate headquarters functions
that support core operations. Corporate operating costs for the year ended
December 31, 2001 totaled $42.3 million, compared to $40.0 million for the prior
period, a 5.8% increase. Corporate operating costs were $52.0 million in 1999.
The improvement in corporate operating costs since 1999 is primarily
attributable to the relocation of Grace's headquarters from Florida to Maryland
in 1999, which reduced occupancy costs and facilitated the consolidation of
corporate support functions.

During 2001 and 2000, Grace continued to focus on productivity improvements. The
results of its productivity initiatives are reflected in: 1) sales - through
added plant capacity by improving production processes; 2) costs through
efficiency gains and purchasing synergies; 3) working capital - by improving
collection process and inventory management; and 4) capital avoidance - by
maximizing asset utilization. Grace's goal is to offset annual base inflationary
increases in personnel, purchased materials and process costs through
productivity improvements. This goal was achieved in both 2001 and 2000.

PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES

The net income from noncore activities totaled $3.0 million for 2001 compared to
a net loss from noncore activities of $188.4 million for 2000. Income from
noncore activities for 2001 includes $7.7 million from the sales of Grace's
remaining cost-based investment in Cross Country Staffing, offset by accruals
for legal and environmental matters primarily related to Grace's former mining
operations. The loss for 2000 included the provision of $208.0 million for
asbestos-related litigation, net of insurance, as well as accruals for legal and
environmental matters related to Grace's former mining operations. These items
were offset by a $19.0 million gain on the sale of marketable securities, and a
$5.5 million gain on the sale of noncore assets.

REORGANIZATION EXPENSES

Net reorganization expenses for the year ended December 31, 2001 of $15.7
million consist primarily of legal and consulting fees incurred by Grace and
three creditors' committees related to the Chapter 11 Filing.

INTEREST AND INCOME TAXES

Net interest expense for 2001 was $32.5 million, an increase of 76.6% from net
interest expense of $18.4 million in 2000. This increase was attributable to the
continued accrual of pre-petition contractual interest on debt subject to
compromise as well as the interest expense on the DIP facility. Net interest
expense increased 54.6% in 2000 over the 1999 amount of $11.9 million. Average
debt levels were $205.0 million higher in 2001 compared to 2000; and $149.5
million higher in 2000 compared to 1999.

The Company's provision for income taxes at the federal corporate rate of 35%
was $49.8 million for the year ended December 31, 2001. The primary difference
between this amount and the overall provision for income taxes of $63.7 million
is attributable to current period interest on tax contingencies and the
non-deductibility of certain Chapter 11 reorganization expenses. In 2000, the
Company's benefit from income taxes at the federal corporate rate was $6.9
million. The primary difference between this amount and the overall

provision for income taxes of $70.0 million is attributable to an accrual for potential additional taxes and interest relating to the tax deductibility of interest on life insurance policy loans. In 1999, the Company's provision for income taxes at the federal corporate rate was $71.2 million. The primary difference between this amount and the provision for income taxes at the effective rate of $73.2 million were state and local income taxes.

DAVISON CHEMICALS

| NET SALES | 2001 | 2000 | % Change Fav(Unfav) |
|---|---|---|---|
| Catalyst products ... | $  624.8 | $  562.7 | 11.0% |
| Silica products...... | 249.3 | 221.2 | 12.7% |
| TOTAL DAVISON CHEMICALS | $  874.1 | $  783.9 | 11.5% |

| | 2000 | 1999 | % Change Fav(Unfav) |
|---|---|---|---|
| Catalyst products ... | $  562.7 | $  538.2 | 4.6% |
| Silica products...... | 221.2 | 212.9 | 3.9% |
| TOTAL DAVISON CHEMICALS | $  783.9 | $  751.1 | 4.4% |

Recent Acquisitions and Joint Ventures

On March 2, 2001, Grace acquired The Separations Group, a manufacturer of chromatography columns and separations media, with sales of approximately $6 million in 2001. On March 28, 2001, a German subsidiary of Grace acquired the precipitated silica business of Akzo-PQ Silicas, with sales of approximately $21 million in 2001.

On March 1, 2001, Grace and Chevron Products Company ("Chevron") formed ART, a joint venture to develop and market hydroprocessing catalysts globally. ART conducts business through two distribution companies and one operating company. Grace has a majority ownership interest in and controls both distribution companies; therefore, for financial reporting purposes the assets, liabilities and results of operations of these entities are included in Grace's Consolidated Financial Statements. Grace does not exercise governance control over the operating company; therefore, the assets, liabilities and results of operations of this company are not consolidated in Grace's financial statements. The equity income or loss related to the operating company is reported in "Other Income" in Grace's Consolidated Statement of Operations. As of December 31, 2001, the operating company had no debt, and its liabilities included only working capital items. ART has agreements with both Grace and Chevron under which each provides certain administrative and research and development services to ART. Administrative costs of $1.5 million and research and development expenses of $5.8 million are reflected in the unconsolidated financial statements of ART.

On January 31, 2000 Grace acquired Crosfield Group's hydroprocessing catalysts business from Imperial Chemical Industries. This business had approximately $14 million of sales in 2000. On June 28, 2000, Grace acquired the Ludox colloidal silica business from the DuPont Company, which had sales of approximately $13 million in 2000.

Sales

The Davison Chemicals segment is a leading global supplier of catalysts and silica products. Catalyst products represented approximately 16%, 35% and 34% of 2001, 2000 and 1999 total Grace sales, respectively. This segment includes fluid cracking catalysts ("FCC") and additives used in petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products, hydroprocessing catalysts which upgrade heavy oils and remove certain impurities, polyolefin catalysts, which are essential components in the manufacture of polyethylene used in products such as high-performance plastic pipe and other plastic parts, and chemical catalysts, which are used in a variety of chemical processes. Silica products, which represented 15% of 2001 total Grace sales (14% in 2000 and 1999), are used in a wide range of biotechnology, industrial and consumer applications such as seperations, coatings, food processing, plastics, adsorbents and personal care products.

Net sales of Davison Chemicals increased by 11.5% in 2001, despite the effect of the currency weakness in Europe, Asia Pacific and Latin America compared with the U.S. dollar, which adversely impacted 2001 sales by $16.6 million. Excluding the impact of currency translation, sales increased by 13.6%.

In 2001, catalyst products sales were $624.8 million, an increase of 11.0% over 2000. Excluding the ART joint venture and hydroprocessing catalysts, which are now part of the joint venture (as discussed above) catalyst products sales for the year 2001 were $531.9 million, or a 12.3% increase over 2000. Excluding ART/hydroprocessing and the negative impact of currency translation, 2001 sales were up 14.1%. This increase mainly reflected sales of new FCC's and additives for value-added refinery applications.

F-40

Silica products sales in 2001 were up 12.7% to $249.3 million compared with 2000. Excluding The Separations Group, Akzo-PQ Silicas and the colloidal silica acquisitions discussed above, silica products sales decreased 5.8% to $208.4 million. Excluding acquisitions and the negative impact of currency translation, 2001 sales decreased 2.5%, mainly reflecting recessionary pressures on end-use segments such as plastics and coatings, which are most affected by the general level of economic activity.

In 2000, catalyst products sales increased 4.6% compared to 1999, which was as a result of volume gains in Latin America, Asia Pacific and Europe partially offset by volume declines in North America. Silica products sales were up 3.9% in 2000 versus 1999, as volume gains in coatings and adsorbents were offset by unfavorable currency translation, mainly for Europe.

Operating Earnings

Pre-tax operating income of $128.7 million reflected a 2.2% decrease compared with 2000. The decrease in operating income was primarily attributable to higher energy and raw material costs, offset by productivity initiatives.

Pre-tax operating income of $131.6 million in 2000 improved by 5.9% over $124.3 million in 1999. The improvement in operating income was primarily attributable to cost savings generated from productivity initiatives, which served to fully offset increased energy costs and the negative impact of foreign currency translation. Operating margins improved 0.3 percentage points to 16.8%.

PERFORMANCE CHEMICALS

| NET SALES | | 2001 | | 2000 | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| Construction chemicals | $ | 365.1 | $ | 348.7 | 4.7% |
| Building materials... | | 239.9 | | 228.0 | 5.2% |
| Sealants and coatings | | 244.1 | | 236.8 | 3.1% |
| TOTAL PERFORMANCE CHEMICALS........... | $ | 849.1 | $ | 813.5 | 4.4% |

| | | 2000 | | 1999 | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| Construction chemicals | $ | 348.7 | $ | 334.3 | 4.3% |
| Building materials... | | 228.0 | | 224.3 | 1.6% |
| Sealants and coatings | | 236.8 | | 241.2 | (1.8%) |
| TOTAL PERFORMANCE CHEMICALS........... | $ | 813.5 | $ | 799.8 | 1.7% |

Recent Acquisitions and Joint Ventures

On July 31, 2001, a French subsidiary of Grace acquired Pieri S.A., a leading supplier of specialty chemicals to the European construction industry. This business had sales of approximately $10 million for 2001.

On December 22, 1999, Grace acquired Sociedad Petreos S.A.'s "Polchem" concrete admixture and construction chemicals business from Cemento Polpaico S.A. Chile, an affiliate of Holderbank of Switzerland. For 2000, this business had sales of approximately $6 million. On March 24, 2000, Grace acquired International Protective Coatings Corp. ("IPC"), which contributed approximately $5 million in sales of fire protection products for the year 2000. On July 20, 2000, Grace acquired the Hampshire Polymers business from the Dow Chemical Company. This business had sales of approximately $12 million for 2000.

Sales

The Performance Chemicals segment was formed in 1999 by combining the previously separate business segments of Grace Construction Products and Darex Container Products. These businesses were consolidated under one management team to capitalize on infrastructure synergies from co-location of headquarters and production facilities around the world. The major product groups of this business segment include specialty construction chemicals and specialty building materials used primarily by the nonresidential construction industry; and container sealants and coatings for food and beverage packaging, and other related products. Construction chemicals, which represented 21% of 2001 total Grace sales (22% in 2000 and 1999) add strength, control corrosion, and enhance the handling and application of concrete, and reduce the manufacturing cost and improve the quality of cement. Building materials, which represented 14% of 2001, 2000 and 1999 total Grace sales, prevent water damage to structures and protect structural steel against collapse due to fire. Sealants and coatings, which represented 14% of 2001 total Grace sales (15% in 2000 and 16% in 1999) seal beverage and food cans, and glass and plastic bottles, and protect metal packaging from corrosion and the contents from the influences of metal.

Net sales of Performance Chemicals products increased 4.4% in 2001 compared with 2000. The effect of currency weakness in Europe, Asia Pacific and Latin America compared with the U.S. dollar

F-41

adversely impacted sales by $20.3 million for 2001. Excluding the impact of currency translation, sales increased 7.0%.

In 2001, sales of construction chemicals were $365.1 million, an increase of 4.7% over 2000. Excluding the Pieri S.A. acquisition discussed above, 2001 sales for construction chemicals were $355.0 million, up 1.8%. Excluding Pieri and unfavorable currency translation, the year-over-year increase was 4.3%. This increase was achieved in all major regions and was driven by penetration of high-performance products for concrete and cement, especially in value added water reducers, grinding aids and quality improvers.

Sales of building materials increased 5.2% to $239.9 million in 2001 compared with 2000. Excluding the impact of the IPC acquisition, discussed above, and unfavorable currency translation, sales were up 5.8%. This growth was attributable to increased sales in North America, primarily roofing underlayments and specialty structural waterproofing.

Sales of sealants and coatings increased 3.1% to $244.1 million in 2001. Excluding the Hampshire Polymers acquisition, discussed above, and unfavorable currency translation, sales were up 0.2%, primarily from volume gains in closure sealants and coatings.

In 2000, Performance Chemicals sales increased 1.7% compared to 1999, as sales increases in construction chemicals and building materials were partially offset by a sales decrease in sealants and coatings. Sales of construction chemicals were up 4.3% in 2000, driven by penetration of high-performance products. Sales of building materials were up 1.6% in 2000, reflecting new product sales in fire protection and volume gains in roofing underlayments. Sealants and coatings sales decreased 1.8% in 2000 versus 1999. Unfavorable foreign exchange more than offset volume gains in can sealants and coatings.

Operating Earnings

Pre-tax operating income increased 5.9% from $95.5 million in 2000 to $101.1 million in 2001. This increase was attributable to higher sales and savings generated from productivity programs, more than offsetting higher energy and raw material costs.

Pre-tax operating income of $95.5 million in 2000 was down 9.7% compared to pre-tax operating income of $105.8 million in 1999. This decrease in pre-tax operating income was caused by increased transportation costs in construction chemicals and higher petroleum-based raw materials costs in both building materials and container products, offset by productivity gains.

---
DISCONTINUED OPERATIONS
---

CROSS COUNTRY STAFFING

In July 1999, Grace completed the sale of substantially all of its interest in Cross Country Staffing ("CCS"), a provider of temporary nursing and other healthcare services, for total cash proceeds of $184.6 million. The Company's investment in CCS had been accounted for under the equity method. The sale resulted in a net pre-tax gain of $76.3 million ($32.1 million after tax), including the cost of the Company's purchase of interests held by third parties in CCS and the amount payable under CCS's phantom equity plan prior to closing under the sale transaction. The gain and operations of CCS prior to the sale are included in "Income from discontinued operations, net of tax" in the Consolidated Statement of Operations. Certain contingent liabilities, primarily related to tax matters of CCS, have been retained by the Company and are included in "Liabilities subject to compromise" in the Consolidated Balance Sheet. In February 2001, Grace sold its remaining interest in CCS, recognizing a $7.7 million gain which is included in "Other income" on the Consolidated Statement of Operations.

RETAINED OBLIGATIONS

Under certain divestiture agreements, Grace has retained contingent obligations that could require Grace in the future to accrue for estimated costs of defense or loss under generally accepted accounting principles.

These obligations primarily consist of: (1) future lease payments and other retained contractual commitments, (2) net asset settlements, (3) indemnities and other guarantees, and (4) contingent risks under pending or possible litigation.

Grace's recorded liability for such matters was $80.5 million at December 31, 2001. Grace's Chapter 11 proceedings could impact the amount and timing of resolution of these retained obligations. Grace is unable to predict whether or to what extent the ultimate resolution of these matters will differ from recorded amounts.

```
---------------------------------------------------------------------------------
FINANCIAL CONDITION
---------------------------------------------------------------------------------
```

The charts below are intended to enhance understanding of Grace's overall
financial position by separately displaying assets, liabilities and cash flows
related to core operations from those related to noncore activities. The
Company's management structure and activities are tailored to the separate
focus and accountability of core operations and noncore activities.

CORE OPERATIONS

The Company had a net asset position supporting its core operations of
$1,299.6 million at December 31, 2001, compared to $1,053.6 million at
December 31, 2000 (including the cumulative translation account reflected in
Shareholders' Equity (Deficit) of $164.8 million for 2001 and $140.2 million
for 2000). After-tax return on capital invested in core operations decreased
by 2.4 percentage points in 2001, due to a combination of higher investment
and only a small improvement in earnings. Net cash flows from core operations
decreased primarily due to investment in new businesses.

| CORE OPERATIONS (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| BOOK VALUE OF INVESTED CAPITAL | | |
| Receivables ..................... | $  296.3 | $  187.4 |
| Inventory ....................... | 174.8 | 144.2 |
| Properties and equipment, net ... | 582.9 | 596.2 |
| Intangible assets and other...... | 616.8 | 455.7 |
| ASSETS SUPPORTING CORE OPERATIONS | 1,670.8 | 1,383.5 |
| Accounts payable and accruals.... | (371.2) | (329.9) |
| CAPITAL INVESTED IN CORE OPERATIONS | $ 1,299.6 | $  1,053.6 |
| After-tax return on average invested capital................. | 9.6% | 12.0% |
| CASH FLOWS: | | |
| Pre-tax operating income ........ | $  187.5 | $  187.1 |
| Depreciation and amortization ... | 89.0 | 87.8 |
| PRE-TAX EARNINGS BEFORE DEPRECIATION AND AMORTIZATION .. | 276.5 | 274.9 |
| Working capital and other changes | (60.3) | (63.0) |
| CASH FLOW BEFORE INVESTING....... | 216.2 | 211.9 |
| Capital expenditures ............ | (62.9) | (64.8) |
| Businesses acquired ............. | (86.3) | (52.6) |
| NET CASH FLOW FROM CORE OPERATIONS | $   67.0 | $   94.5 |

NONCORE ACTIVITIES

The Company has a number of financial exposures originating from past
businesses, products and events. These obligations arose from transactions
and/or business practices that date back to when Grace was a much larger
company, when it produced products or operated businesses that are no longer
part of its revenue base, and when government regulations and scientific
knowledge were much less advanced than today. The table below summarizes the net
noncore liability at December 31, 2001 and 2000 and the net cash flow from
noncore activities for the years then ended:

| NONCORE ACTIVITIES (Dollars in millions) | 2001 | 2000 |
|---|---|---|

```
NONCORE LIABILITIES:
Asbestos-related liabilities..   $    (996.3) $ (1,105.9)
Asbestos-related insurance
  receivable..................        293.4        372.0
                                 ----------------------------
Asbestos-related liability,
  net .....................          (702.9)      (733.9)
Environmental remediation.....       (153.1)      (174.9)
Postretirement benefits.......       (169.1)      (189.1)
Retained obligations and other        (80.6)       (78.1)
                                 ----------------------------
NET NONCORE LIABILITY.........   $ (1,105.7) $ (1,176.0)
=================================================================
CASH FLOWS:
Pre-tax income (loss) from
  noncore activities..........   $      3.0  $   (188.4)
Provision for
  asbestos-related
  litigation, net of
  insurance recovery..........          --        208.0
Other changes.................          0.5       (10.7)
Cash spending for:
  Asbestos-related
  litigation, net of
  insurance recovery.........         (30.8)      (196.2)
  Environmental remediation...        (28.9)       (47.2)
  Postretirement benefits.....        (22.3)       (23.0)
  Retained obligations and
    other.....................         (9.1)       (24.5)
                                 ----------------------------
NET CASH FLOW FROM NONCORE
    ACTIVITIES ...............    $    (87.6) $   (282.0)
=================================================================
```

As described under "Voluntary Bankruptcy Filing," the resolution of most of
these noncore recorded and contingent liabilities will be determined through the
Chapter 11 proceedings. Grace cannot predict with any certainty how, and for
what amounts, any of such estimates will be resolved. The amounts of these
liabilities as ultimately determined through the Chapter 11 proceedings could be
materially different from amounts recorded by Grace at December 31, 2001.

ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold
asbestos-containing products. In 2001, Grace paid $30.8 million for the
defense and disposition of asbestos-related property damage and bodily injury
litigation, net of amounts received under settlements with insurance carriers,
compared to net expenditures in 2000 of $196.2 million. At December 31, 2001,
Grace's balance sheet reflects a gross liability of $996.3 million, ($702.9
million net of insurance). This liability represents management's estimate of
the undiscounted net cash outflows in satisfaction of

Grace's current and expected asbestos-related claims, based on facts and circumstances existing prior to the Filing. Changes to the recorded amount of such liability will be based on Chapter 11 developments and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court.

In the fourth quarter of 2000, Grace recorded a charge of $208.0 million (net of expected insurance recovery) to account for several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims; higher than expected costs to resolve certain property damage and bodily injury claims; and defense costs related to new class-action lawsuits alleging damages from a former attic insulation product not previously subject to property damage litigation. In addition, during 2000, five co-defendant companies in asbestos bodily injury litigation petitioned for bankruptcy court protection. These developments contributed to the risk that Grace would be subject to more claims than previously projected, with higher settlement demands. See Notes 1 and 3 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims.

The Consolidated Balance Sheet at December 31, 2001 includes total amounts due from insurance carriers of $293.4 million pursuant to settlement agreements with insurance carriers. The recovery of amounts due from insurance carriers is dependent upon the timing, character and exposure periods of asbestos-related claims. Grace's Chapter 11 bankruptcy proceedings could also affect recovery timing and amounts.

Grace intends to address all of its pending and future asbestos-related claims as part of a plan of reorganization under Chapter 11. Grace will seek to have the Bankruptcy Court establish a process to assess and appropriately quantify the numerous property damage and bodily injury claims against it. Measurement of Grace's asbestos-related liabilities will be materially affected by Bankruptcy Court rulings, the outcome of litigation and negotiations among interested parties.

ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations. Expenses of continuing operations related to the operation and maintenance of environmental facilities and the disposal of hazardous and nonhazardous wastes totaled $31.7 million in 2001, $26.4 million in 2000 and $31.1 million in 1999. Such costs are estimated to be between $32.0 and $37.0 million in each of 2002 and 2003. In addition, capital expenditures for continuing operations relating to environmental protection totaled $3.8 million in 2001, $4.0 million in 2000 and $5.7 million in 1999. Capital expenditures to comply with environmental initiatives in future years are estimated to be between $5.0 and $7.0 million in each of 2002 and 2003. Grace also has incurred costs to remediate environmentally impaired sites. These costs were $28.9 million in 2001, $47.2 million in 2000 and $25.0 million in 1999. These amounts have been charged against previously established reserves. At December 31, 2001, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $153.1 million, as compared to $174.9 million at December 31, 2000. Future pre-tax cash outlays for remediation costs are expected to average between $25.0 and $40.0 million over the next few years.

In addition, Grace is facing environmental lawsuits related to previously operated vermiculite mining and processing sites that could result in a material future charge to Grace's earnings, the amount of which is not currently determinable. The EPA reported that it had expended approximately $25.4 million in response costs in and around Libby, Montana (the site of a former Grace vermiculite mine) through June 2001. Grace expects that the EPA may incur significant additional response costs, as Libby is expected to be added to the EPA's National Priorities List of Superfund sites. The EPA is also evaluating environmental risks at several vermiculite processing sites throughout the U.S. which processed vermiculite from Libby, Montana, and has made claims against Grace to fund clean-up activities. Grace intends to review the EPA's actions and cost claims to determine whether they are justified and reasonable. These lawsuits are not subject to the automatic stay provided under Section 362 of the U.S. Bankruptcy Code.

PENSION BENEFITS

The decline in value of the U.S. and global equity markets, coupled with a decline in interest rates, primarily in the second half of 2001, created a shortfall between the accounting measurement of Grace's U.S. salaried qualified pension obligations and the market value of dedicated pension assets. This condition required a balance sheet adjustment in shareholders' equity (deficit) at December 31, 2001 of $124.4 million, and will increase Grace's pension

expense by approximately $16 million in 2002. No funding is required in 2002, and no additional pension charge with respect to such obligations was required in 2001.

POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertain to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Effective January 1, 2002, Grace's postretirement medical plan was amended to increase the contribution required to be paid by the retirees to a minimum of 40% of the calculated premium.

RETAINED OBLIGATIONS OF DIVESTED BUSINESSES

The principal retained obligations of divested businesses relate to contractual indemnification and to contingent liabilities not passed on to the new owner. At December 31, 2001, Grace had recorded $80.5 million to satisfy such obligations. Prior to Grace's Chapter 11 filing, $43.5 million of this total was expected to be paid over periods ranging from 2 to 10 years. The remainder represents estimates of probable cost to satisfy specific contingencies that were expected to be resolved over the next few years. However, most of these matters are now subject to the automatic stay of the Bankruptcy Court and will be resolved as part of Grace's Chapter 11 proceedings.

TAX MATTERS

The Internal Revenue Service ("IRS") is challenging the deductions taken by a number of companies throughout the United States related to interest on policy loans under corporate owned life insurance ("COLI") policies for years prior to January 1, 1999. In 2000 Grace paid $21.2 million of tax and interest related to this issue for tax years 1990-1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Grace filed a claim for refund of the amount paid to date and will contest any future IRS assessments on the grounds that these insurance policies and related loans had, and continue to have, a valid business purpose, that the COLI policies have economic substance and that interest deductions claimed were in compliance with tax laws in effect at the time.

During the first quarter of 2001, a U.S. District Court ruling, American Electric Power, Inc. vs. United States, denied interest deductions of a taxpayer in a similar situation. American Electric Power, Inc. is currently appealing this ruling. However, in light of the ruling, Grace recorded an additional accrual in 2000 for tax exposure and related interest, and continues to accrue interest on estimated amounts that may be due. There are two additional COLI cases decided against the taxpayer currently on appeal. The taxpayer in Winn-Dixie Stores, Inc. v. Commissioner of Internal Revenue has petitioned for a rehearing in the United States Court of Appeals and is seeking appeal in the United States Supreme Court. CM Holdings, Inc. v. Internal Revenue Service is currently on appeal to the United States Court of Appeals. Finally, Dow Chemical Company has filed an action to recover income taxes and interest paid in connection with its COLI policies, and that case is currently pending in the United States District Court. Grace is monitoring these cases and will continue to reassess its legal posture as the cases evolve.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against CCHP, Inc. ("CCHP"), a Grace subsidiary that formerly operated a temporary staffing business for nurses and other healthcare personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel that was in effect through 1999. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, per diem and expense allowance plans. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods as well. The matter is currently pending in the U.S. Court of Claims.

Grace has received notification from a foreign taxing authority assessing tax deficiencies plus interest relating to the purchase and sale of foreign bonds in 1989 and 1990. This assessment, totaling $10.5 million, is related to the Bekaert Group, which Grace sold in 1991 but as to which Grace retained liability for tax deficiencies attributable to tax periods prior to the sale. The matter is currently before the foreign tax authorities, but no decision has been rendered.

As a result of Grace's Chapter 11 filing, certain tax matters related to open tax years, including COLI interest deductions, could become the direct obligations of predecessor companies that now own Grace's former healthcare and packaging businesses. One or both of these companies could be directly liable to tax authorities for Grace's tax deficiencies. Pursuant to agreements relating to each transaction, Grace may be required to indemnify both parties for taxes relating to periods prior to the closing of such transactions. Any indemnification obligation that arises as a result of these matters would be a pre-petition liability subject to the Chapter 11 proceedings.

---

## LIQUIDITY AND CAPITAL RESOURCES

---

### CASH FLOW

Grace's net cash flow from core operations before investing was $216.2 million in 2001 compared to $211.9 million in 2000. Acquisition investments aggregated $86.3 million in 2001 compared to $49.0 million in 2000. Total Grace capital expenditures for 2001 and 2000 were $62.9 million and $64.8 million, respectively, substantially all of which was directed toward its business segments and of a routine nature. In 1999, Grace made capital expenditures of $82.5 million. Grace's cash flow from core operations in 2002 is expected to be relatively stable and consistent with recent years. Grace expects to continue to invest excess cash flow and/or other available capital resources in its core business base. These investments are likely to be in the form of added plant capacity, product line extensions and geographic market expansions. Such investments may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review. Grace projects that 2002 will be another challenging year with the first half continuing to be affected by the weak global economy, improving somewhat in the second half. Grace has taken steps to improve productivity and manage costs and, at this time, projects 2002 cash flow from core operations comparable to 2001.

The pre-tax cash outflow of noncore activities was $80.0 million in 2001 compared to an outflow of $270.1 million in 2000. The decreased cash outflow was primarily due to lower asbestos-related payments in 2001 as compared to 2000, resulting from the stay on payments for asbestos-related claims after the Filing Date. Expenditures for environmental remediation were lower in 2001 due partly to Grace's Chapter 11 proceedings and partly to the completion of remediation work on certain sites. Postretirement benefit payments, which are allowed to be paid under Grace's Chapter 11 proceedings, were consistent with the prior year. The payments for retained obligations of divested businesses and other contingencies were lower in 2001 due to the stay of litigation and to the one-time nature of these matters.

Cash flows used for investing activities in 2001 were $133.3 million, compared to cash used of $97.6 million in 2000, and cash provided of $89.4 million in 1999. Net cash outflows in 2001 were primarily impacted by businesses acquired in 2001 of $84.4 million and by capital expenditures as discussed below. Net cash outflows of 2000 consisted of $49.0 million in businesses acquired, capital expenditures and net investment in life insurance policies of $11.1 million. In 1999, the sale of Cross Country Staffing generated net cash of $184.6 million. Proceeds from disposals of assets in 2001 were also lower than 2000, with $7.6 million in 2001, $11.9 million in 2000 and $40.6 million in 1999. Included in the 1999 amount was the sale of the corporate aircraft for $20.4 million and the sale of certain real properties for a total of $17.1 million.

Net cash provided by financing activities in 2001 was $123.2 million as compared to $239.9 million provided in 2000. This principally represents borrowings under credit facilities of $93.6 million, net of repayments, to fund investments in acquired businesses, capital expenditures and noncore obligations. In 2000, $47.3 million used to purchase 4.8 million of the Company's shares as part of share repurchase programs, was partially offset by proceeds from the exercise of stock options of $5.8 million. Net cash used for financing activities of $80.9 million in 1999 primarily related to the purchase of treasury stock ($95.3 million) and the net financing activity of discontinued operations ($27.5 million), offset by borrowings under credit facilities, net of payments and the exercise of stock options, $18.7 and $26.6 million respectively.

### LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with benefits in force of approximately $2,291.0 million and a net cash surrender value of $75.6 million at December 31, 2001. This net cash surrender value is comprised of $477.5 million in policy gross cash value offset by $401.9 million of policy loans. The policies were acquired to fund various employee benefit programs and other

long-term liabilities and are structured to provide cash flows (primarily tax-free) over an extended period. The Company intends to use policy cash flows, which are actuarially projected to range from $15 million to $45 million annually over the policy terms, to fund (partially or fully) noncore liabilities and to earmark gross policy cash value as a source of funding for noncore obligations.

DEBT AND OTHER CONTRACTUAL OBLIGATIONS

Total debt outstanding at December 31, 2001 was $532.3 million. As a result of the Filing, Grace is now in default on $501.3 million of such debt, which has been included in "liabilities subject to compromise" as of December 31, 2001. The automatic stay provided under the Bankruptcy Code prevents the Company's lenders from taking any action to collect the principal amounts as well as related accrued interest. However, Grace will continue to accrue and report interest on such debt during the Chapter 11 proceedings (unless further developments lead management to conclude that it is probable that such interest will be compromised).

In addition, Grace's accounts receivable securitization program was terminated effective May 14, 2001. As a result of the Filing, outstanding balances of approximately $65.3 million were satisfied under the terms of the program through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. During the period from the Filing Date to the termination of the program, Grace compensated for the lack of access to trade receivables collections by borrowing under the DIP facility.

At December 31, 2001, Grace had gross financial assurances outstanding of $261.2 million, comprised of $149.2 million of gross surety bonds issued by various insurance companies and $112.0 million of standby letters of credit issued by various banks. Of the standby letters of credit, $29.4 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $231.8 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. Of the net amount of $231.8 million of financial assurances, approximately $10.1 million were issued by non-Debtor and $221.7 million were issued by the Debtors. Of the amounts issued by the Debtors, approximately $211.0 million were issued before the Filing Date, with the remaining $10.7 million being issued under the DIP facility subsequent to the Filing.

CONTRACTUAL OBLIGATIONS NOT SUBJECT TO COMPROMISE

| | | Payments due by Period | | |
| (Dollars in millions) | Total | Less than 1 Year | 1-3 Years | Thereafter |
| --- | --- | --- | --- | --- |
| Debt............... | $ 7.8 | $ 7.8 | $ -- | $ -- |
| Operating leases.... | 62.3 | 7.8 | 26.1 | 28.4 |
| TOTAL CONTRACTUAL CASH OBLIGATIONS......... | $ 70.1 | $ 15.6 | $ 26.1 | $ 28.4 |

SOURCES OF LIQUIDITY

To meet its liquidity needs in 2002 and 2003, Grace entered into a debtor-in-possession loan facility (see "DIP facility" under Note 12 to Grace's Consolidated Financial Statements) in the aggregate amount of $250 million, under which Grace had no borrowings as of December 31, 2001. In addition, Grace had cash and cash equivalents of $181.3 million and cash value of life insurance (net) of $75.6 million at December 31, 2001. Management believes that Grace's core operating cash flow together with the DIP facility and the existing liquid assets will be sufficient to meet the operating needs of Grace over the next year.

SHARE ACTIVITY

Grace employees currently receive salaries, incentive bonuses, other benefits, and stock options. Each stock option granted under the Company's stock incentive plan has an exercise price equal to the fair market value of the Company's common stock on the date of grant. In 2001, the Company granted a total of 1,339,846 options with an average exercise price of $2.53.

Poor stock price performance in the period leading up to and after the Filing have diminished the value of the option program to current and prospective employees, which caused Grace to change its long-term incentive compensation program into more of a cash-based program. Grace has also sought to address employee retention issues by providing added compensation to certain employees and increasing Grace's contribution to its savings and investment plan. For 2001, Grace's pre-tax income from core operations includes an expense of $10.0 million for the Chapter 11 related compensation charges.

In May 2000, the Company's Board of Directors approved a program to repurchase up to 12,000,000 of the Company's outstanding shares in the open market. Through December 31, 2000, the Company had acquired 1,753,600 shares of common stock for $12.2 million under this program (an average price per share of $6.98).

F-47

---
INFLATION
---

The financial statements are presented on a historical cost basis and do not
fully reflect the impact of prior years' inflation. While the U.S. inflation
rate has been modest for several years, the Company operates in international
economies with both inflation and currency risks. The ability to pass on
inflation costs is an uncertainty due to general economic conditions and
competitive situations. The cost of replacing Grace's property and equipment
today is estimated to be greater than its historical cost. Accordingly,
depreciation expense would be greater if the expense were stated on a current
cost basis.

---
THE EURO
---

As of January 1, 2001 twelve of the fifteen countries of the European Union had
adopted one common currency, known as the Euro. Grace has operations in ten of
the Euro countries and has complied with the legislation applicable to its
introduction. The Euro conversion has not had and is not expected to have a
material adverse impact on Grace's financial condition or results of operations.

---
ACCOUNTING PRONOUNCEMENTS
---

In June 2001, the Financial Accounting Standards Board ("FASB") issued
Statement of Financial Accounting Standards ("SFAS"), No. 141 "Business
Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS
No. 141 supersedes Accounting Principles Board Opinion ("APB") No. 16,
"Business Combinations." The provisions of SFAS No. 141: (1) require that the
purchase method of accounting be used for all business combinations initiated
after June 30, (2) provide specific criteria for the initial recognition
and measurement of intangible assets apart from goodwill, and (3) require that
unamortized negative goodwill be written off immediately as an extraordinary
gain instead of being deferred and amortized. Grace adopted SFAS No. 141 in
July 2001.

SFAS No. 142 supersedes APB No. 17, "Intangible Assets," and is effective for
fiscal years beginning after December 15, 2001. SFAS No. 142 primarily addresses
the accounting for goodwill and intangible assets subsequent to their initial
recognition. The provisions of SFAS No. 142: (1) prohibit the amortization of
goodwill and indefinite-lived intangible assets, (2) require that goodwill and
indefinite-lived intangible assets be tested annually for impairment, (3)
require that reporting units be identified for the purpose of assessing
potential future impairments of goodwill, and (4) remove the 40 year limitation
on the amortization period of intangible assets that have finite lives.

Grace will adopt the provisions of SFAS No. 142 in its first quarter ending
March 31, 2002. Grace has identified its reporting units as catalyst products,
silica products, specialty construction chemicals, specialty building materials
and specialty sealants and coatings for purposes of measuring impairment under
the provisions of SFAS No. 142. All amounts of goodwill, intangible assets,
other assets, and liabilities have been appropriately classified and allocated
to these reporting units. Amortization expense on goodwill for the year ended
December 31, 2001 was $0.5 million. In connection with the adoption of SFAS No.
142, Grace is in the process of evaluating the useful lives of its existing
intangible assets and anticipates that any changes in the useful lives will not
have a material impact on the results of its operations.

SFAS No. 142 requires that goodwill and certain intangible assets be tested
annually for impairment. An impairment test must be performed at the beginning
of the period of adoption. Grace expects that its goodwill and other intangible
assets will not be impaired.

In August 2001, the FASB issued SFAS No. 143, "Accounting for Assets Retirement
Obligations," and SFAS No. 144, "Accounting for the Impairment or Disposal of
Long-Lived Assets." SFAS No. 143 requires the accrual of asset retirement
obligations by increasing the initial carrying amount of the related long-lived
asset, and systematically expensing such costs over the asset's useful life. The
standard is effective for fiscal years beginning after June 15, 2002. SFAS No.
144 supersedes SFAS No. 121, "Accounting for the Impairment of Long-Lived
Assets to Be Disposed Of," and expands the scope of discontinued operations.
SFAS No. 144 is effective for financial statements issued for fiscal years
beginning after December 15, 2001. Grace does not expect SFAS No. 143 or 144 to
have material effect on its financial statements.

Grace adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging
Activities" (as amended) for 2001. SFAS No. 133 requires, among

other things, that all derivative instruments be recognized at fair value as assets or liabilities in the consolidated balance sheet with changes in fair value recognized currently in earnings unless specific hedge accounting criteria are met. At December 31, 2001, the Company did not hold or issue any derivative financial instruments.

FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion and Analysis of Results of Operations and Financial Condition, other uncertainties include the impact of worldwide economic conditions; pricing of both the Company's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; the continued success of Grace's process improvement initiatives; the impact of tax and legislation and other regulations in the jurisdictions in which the Company operates; and development in and the outcome of the Chapter 11 proceedings discussed above. Also, see "Introduction and Overview - Projections and Other Forward-Looking Information" in Item 1 of Grace's current Annual Report on Form 10-K.

F-49

W. R. GRACE & CO. AND SUBSIDIARIES

VALUATION AND QUALIFYING ACCOUNTS AND RESERVES

(Dollars in millions)

FOR THE YEAR 2001

| Description | Balance at beginning of period | Additions/(deductions) | | Balance at end of period |
|---|---|---|---|---|
| | | Charged/ (credited) to costs and expenses | Other net * | |
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable........... | $  4.4 | $  3.2 | $  -- | $  7.6 |
| Allowances for long-term receivables.................. | 0.8 | (0.2) | -- | 0.6 |
| Valuation allowance for deferred tax assets........... | 179.1 | (21.1) | -- | 158.0 |
| RESERVES: | | | | |
| Reserves for divested businesses...................... | $ 78.1 | $  -- | $  2.4 | $ 80.5 |

FOR THE YEAR 2000

| Description | Balance at beginning of period | Additions/(deductions) | | Balance at end of period |
|---|---|---|---|---|
| | | Charged/ (credited) to costs and expenses | Other net * | |
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable........... | $  4.1 | $  0.3 | $  -- | $  4.4 |
| Allowances for long-term receivables.................. | 0.8 | -- | -- | 0.8 |
| Valuation allowance for deferred tax assets........... | 153.2 | 16.4 | 9.5 | 179.1 |
| RESERVES: | | | | |
| Reserves for divested businesses...................... | $ 99.1 | $  6.2 | $ (27.2) | $ 78.1 |

FOR THE YEAR 1999

| Description | Balance at beginning of period | Additions/(deductions) | | Balance at end of period |
|---|---|---|---|---|
| | | Charged/ (credited) to costs and expenses | Other net * | |
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable........... | $  5.5 | $ (1.4) | $  -- | $  4.1 |
| Allowances for long-term receivables.................. | 17.1 | (16.3) | -- | 0.8 |
| Valuation allowance for deferred tax assets........... | 154.7 | (1.5) | -- | 153.2 |
| RESERVES: | | | | |
| Reserves for divested businesses...................... | $ 76.4 | $ 59.8 | $ (37.1) | $ 99.1 |

\*    Consists of additions and deductions applicable to businesses acquired, disposals of businesses, bad debt write-offs, foreign currency translation, reclassifications (including the deconsolidation of amounts relating to discontinued operations), cash payments for previously established reserves for divested businesses and miscellaneous other adjustments.

F-50

EXHIBIT 12

W. R. GRACE & CO. AND SUBSIDIARIES

COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS (a)

(Dollars in millions, except ratios)

(Unaudited)

| | Years Ended December 31, (b) | | | | |
|---|---|---|---|---|---|
| | 2001 | 2000 (c) | 1999 | 1998 (d) | 1997 (e) |
| Net income (loss) from continuing operations......... | $    78.6 | $   (89.7) | $   130.2 | $  (194.7) | $    85.9 |
| Add (deduct): | | | | | |
| Provision for (benefit from) income taxes........... | 63.7 | 70.0 | 73.2 | (28.5) | 51.6 |
| Minority interest in income (loss) of majority owned subsidiaries.................................. | 0.6 | -- | -- | -- | -- |
| Equity in unremitted losses (earnings) of less than 50%-owned companies............................. | (4.0) | (0.5) | (0.2) | (1.2) | (1.0) |
| Interest expense and related financing costs, including amortization of capitalized interest............... | 39.5 | 30.6 | 18.8 | 37.5 | 89.6 |
| Estimated amount of rental expense deemed to represent the interest factor.................................. | 2.9 | 2.9 | 5.2 | 5.2 | 6.9 |
| Income (loss) as adjusted.......................... | $   181.3 | $    13.3 | $   227.2 | $  (181.7) | $   232.9 |
| Combined fixed charges and preferred stock dividends: | | | | | |
| Interest expense and related financing costs, including capitalized interest................................. | $    37.6 | $    29.1 | $    17.0 | $    37.4 | $    94.4 |
| Estimated amount of rental expense deemed to represent the interest factor.................................. | 2.9 | 2.9 | 5.2 | 5.2 | 6.9 |
| Fixed charges..................................... | 40.5 | 32.0 | 22.2 | 42.6 | 101.3 |
| Preferred stock dividend requirements (a)........... | -- | -- | -- | -- | -- |
| Combined fixed charges and preferred stock dividends. | $    40.5 | $    32.0 | $    22.2 | $    42.6 | $   101.3 |
| Ratio of earnings to fixed charges................. | 4.48 | (f) | 10.23 | (f) | 2.30 |
| Ratio of earnings to combined fixed charges and preferred stock dividends......................... | 4.48 | (f) | 10.23 | (f) | 2.30 |

(a)    Grace's preferred stocks were retired in 1996.

(b)    Certain amounts have been restated to conform to the 2001 presentation.

(c)    Includes a pre-tax provision of $208.0 million for asbestos-related liabilities and insurance coverage. The provision for income taxes includes a $75.0 million charge for tax and interest relating to tax deductibility of interest on corporate-owned life insurance policy loans.

(d)    Includes a pre-tax provision of $376.1 for asbestos-related liabilities and insurance coverage; $21.0 relating to restructuring costs and asset impairments, offset by a pre-tax gain of $38.2 for the receipt of insurance proceeds related to environmental matters, partially offset by a charge to reflect a change in the environmental remediation strategy for a particular site.

(e)    Includes a pre-tax gain of $103.1 on sales of businesses, offset by a pre-tax provision of $47.8 for restructuring costs and asset impairments.

(f)    As a result of the losses incurred for the years ended December 31, 2000 and 1998, Grace was unable to fully cover the indicated fixed charges.

F-51

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K          SEC File #: 001-13953
Document Type: EX-3.2
Description: AMENDED AND RESTATED BY-LAWS OF W.R. GRACE & CO.
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC              New York, NY               Chicago, IL
Los Angeles, CA               Miami, FL                 Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 3.2

Adopted on January 16, 2002

AMENDED AND RESTATED
BY-LAWS
OF
W. R. GRACE & CO.

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

ARTICLE I
OFFICES AND RECORDS

Section 1.1. Delaware Office. The principal office of the Corporation in the State of Delaware shall be located in Wilmington, Delaware, and the name and address of its registered agent is The Prentice-Hall Corporation System, Inc., 1013 Centre Road, Wilmington, Delaware.

Section 1.2. Other Offices. The Corporation may have such other offices, either within or without the State of Delaware, as the Board of Directors may designate or as the business of the Corporation may from time to time require.

Section 1.3. Books and Records. The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors.

ARTICLE II
STOCKHOLDERS

Section 2.1. Annual Meeting. The annual meeting of the stockholders of the Corporation shall be held annually (a) on the tenth day of May, or (b) if such day be a Saturday, Sunday or a holiday at the place where the meeting is to be held, on the last business day preceding or on the first business day after such tenth day of May, as may be fixed by the Board of Directors, or (c) on such other date as may be fixed by the Board of Directors.

Section 2.2. Special Meeting. Subject to the rights of the holders of any series of stock having a preference over the Common Stock of the Corporation as to dividends or upon liquidation ("Preferred Stock") with respect to such series of Preferred Stock, special meetings of the stockholders may be called only by the Chairman, by the President or by the Board of Directors pursuant to a resolution adopted by a majority of the total number of directors which the Corporation would have if there were no vacancies (the "Whole Board").

Section 2.3. Place of Meeting. The Chairman, the President or the Board of Directors, as the case may be, may designate the place of meeting for any annual meeting or for any special meeting of the stockholders called by the Chairman, the President or the Board of Directors. If no designation is so made, the place of meeting shall be the principal office of the Corporation.

Section 2.4. Notice of Meeting. Written or printed notice, stating the place, date and time of the meeting and the purpose or purposes for which the meeting is called, shall be delivered by the Corporation not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, to each stockholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the U.S. mail with postage thereon prepaid, addressed to the stockholder at his address as it appears on the stock transfer books of the Corporation. Such further notice shall be given as may be required by law. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Meetings may be held without notice if all stockholders entitled to vote are present, or if notice is waived by those not present in accordance with Section 6.4 of these By-laws. Any previously scheduled meeting of the stockholders may be postponed, and (unless the Certificate of Incorporation otherwise provides) any special meeting of the stockholders may be cancelled, by resolution of the Board of Directors upon public notice given prior to the date previously scheduled for such meeting of stockholders.

Section 2.5. Quorum and Adjournment. Except as otherwise provided by law or by the Certificate of Incorporation, the holders of a majority of the outstanding shares of the Corporation entitled to vote generally in the election of directors (the "Voting Stock"), represented in person or by proxy, shall constitute a quorum at a meeting of stockholders, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of a majority of the voting power of the shares of such class or series shall constitute a quorum of such class or series for the transaction of such business. The chairman of the meeting or a majority of the shares so represented may adjourn the meeting from time to time, whether or not there is a quorum. No notice of the time and place of adjourned meetings need be given except as required by law. The stockholders present at a duly called meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

Section 2.6. Proxies. At all meetings of stockholders, a stockholder may vote by proxy executed in writing (or in any other manner permitted by law) by the stockholder, or by his duly authorized attorney-in-fact.

Section 2.7. Notice of Stockholder Business and Nominations.

-2-

(A) Annual Meetings of Stockholders. (1) Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders (a) pursuant to the Corporation's notice of meeting, (b) by or at the direction of the Board of Directors or (c) by any stockholder of the Corporation who was a stockholder of record at the time of giving of the notice provided for in this Section 2.7, who is entitled to vote at the meeting and who complies with the notice procedures set forth in this Section 2.7.

(2) For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (c) of paragraph (A)(1) of this Section 2.7, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation, and such other business must otherwise be a proper matter for stockholder action. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 60th day nor earlier than the close of business on the 90th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 90th day prior to such annual meeting and not later than the close of business on the later of the 60th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made by the Corporation. In no event shall the public announcement of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. Such stockholder's notice shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re-election as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 14a-11 thereunder (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); (b) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (c) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (i) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner and (ii) the class and number of shares of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner.

(3) Notwithstanding anything in the second sentence of paragraph (A)(2) of this Section 2.7 to the contrary, in the event that the number of directors to be elected to the Board of Directors of the Corporation is increased and there is no public announcement by the Corporation naming all of the nominees for election as director or specifying the size of the increased Board of Directors at least 70 days prior to the first anniversary of the

-3-

preceding year's annual meeting, a stockholder's notice required by this Section 2.7 shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the Corporation.

(B) Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (a) by or at the direction of the Board of Directors or (b) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 2.7, who shall be entitled to vote at the meeting and who complies with the notice procedures set forth in this Section 2.7. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, any such stockholder may nominate a person or persons (as the case may be), for election to such position(s) as specified in the Corporation's notice of meeting, if the stockholder's notice required by paragraph (A)(2) of this Section 2.7 shall be delivered to the Secretary at the principal executive offices of the Corporation not earlier than the close of business on the 90th day prior to such special meeting and not later than the close of business on the later of the 60th day prior to such special meeting or the 10th day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. In no event shall the public announcement of an adjournment of a special meeting commence a new time period for the giving of a stockholder's notice as described above.

(C) General. (1) Only such persons who are nominated in accordance with the procedures set forth in this Section 2.7 shall be eligible to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.7. Except as otherwise provided by law, the Certificate of Incorporation or these By-laws, the chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 2.7 and, if any proposed nomination or business is not in compliance with this Section 2.7, to declare that such defective proposal or nomination shall be disregarded.

(2) For purposes of this Section 2.7, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

-4-

(3) Notwithstanding the foregoing provisions of this Section 2.7, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this by-law. Nothing in this Section 2.7 shall be deemed to affect any rights (i) of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act or (ii) of the holders of any series of Preferred Stock to elect directors under specified circumstances.

Section 2.8. Procedure for Election of Directors; Required Vote. Election of directors at all meetings of the stockholders at which directors are to be elected shall be by ballot, and, subject to the rights of the holders of any series of Preferred Stock to elect directors under specified circumstances, a plurality of the votes cast thereat shall elect directors. Except as otherwise provided by law, the Certificate of Incorporation, or these By-laws, in all matters other than the election of directors, the affirmative vote of a majority of the shares present in person or represented by proxy at the meeting and entitled to vote on the matter shall be the act of the stockholders.

Section 2.9. Inspectors of Elections; Opening and Closing the Polls. The Board of Directors by resolution shall appoint one or more inspectors, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives, to act at meetings of stockholders and make written reports thereof. One or more persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate has been appointed to act or is able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall have the duties prescribed by law.

The chairman of the meeting shall fix and announce at the meeting the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting.

ARTICLE III
BOARD OF DIRECTORS

Section 3.1. General Powers. The business and affairs of the Corporation shall be managed under the direction of the Board of Directors. In addition to the powers and authorities by these By-laws expressly conferred upon them, the Board of Directors may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-laws required to be exercised or done by the stockholders.

-5-

Section 3.2. Number, Tenure and Qualifications. Subject to the rights of the holders of any series of Preferred Stock to elect directors under specified circumstances, the number of directors shall be fixed from time to time exclusively pursuant to a resolution adopted by a majority of the Whole Board. The directors, other than those who may be elected by the holders of any series of Preferred Stock under specified circumstances, shall be divided, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as is reasonably possible, designated Class I, Class II and Class III, with the initial term of office of the Class I directors to expire at the 1999 annual meeting of stockholders, the initial term of office of the Class II directors to expire at the 2000 annual meeting of stockholders and the initial term of office of the Class III directors to expire at the 2001 annual meeting of stockholders, with each director to hold office until his or her successor shall have been duly elected and qualified. At each annual meeting of stockholders, commencing with the 1999 annual meeting, directors elected to succeed those directors whose terms then expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election, with each director to hold office until his or her successor shall have been duly elected and qualified.

Section 3.3. Regular Meetings. A regular meeting of the Board of Directors shall be held without other notice than this Section 3.3 immediately after, and at the same place as, the Annual Meeting of Stockholders. The Board of Directors may fix the time and place for the holding of additional regular meetings without notice.

Section 3.4. Special Meetings. Special meetings of the Board of Directors shall be called at the request of the Chairman, the President or a majority of the directors then in office. The person or persons authorized to call special meetings of the Board of Directors may fix the place and time of such meetings.

Section 3.5. Notice. Notice of any special meeting or notice of a change in the time or place of any regular meeting of the Board of Directors shall be given to each director at his or her business or residence in writing by hand delivery, first-class or overnight mail or courier service, telegram or facsimile transmission, or orally by telephone. If mailed by first-class mail, such notice shall be deemed adequately delivered when deposited in the U.S. mails so addressed, with postage thereon prepaid, at least five (5) days before such meeting. If by telegram, overnight mail or courier service, such notice shall be deemed adequately delivered when the telegram is delivered to the telegraph company or the notice is delivered to the overnight mail or courier service company at least twenty-four (24) hours before such meeting. If by facsimile transmission, such notice shall be deemed adequately delivered when the notice is transmitted at least twelve (12) hours before such meeting. If by telephone, the notice shall be communicated to the director or his or her representative or answering machine. If by telephone or by hand delivery, the notice shall be given at least twenty-four (24) hours prior to the time set for the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these By-laws, as provided under Section 8.1. A meeting may be held at any time

-6-

without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 6.4 of these By-laws.

Section 3.6. Action by Consent of Board of Directors. Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

Section 3.7. Conference Telephone Meetings. Members of the Board of Directors, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.

Section 3.8. Quorum. Subject to Section 3.9, a number of directors equal to at least a majority of the Whole Board shall constitute a quorum for the transaction of business. If at any meeting of the Board of Directors there shall be less than a quorum present, a majority of the directors present may adjourn the meeting from time to time without further notice. The act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. The directors present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough directors to leave less than a quorum.

Section 3.9. Vacancies. Subject to applicable law and the rights of the holders of any series of Preferred Stock with respect to such series of Preferred Stock, and unless the Board of Directors otherwise determines, vacancies resulting from death, resignation, retirement, disqualification, removal from office or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled only by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, and directors so chosen shall hold office for a term expiring at the annual meeting of stockholders at which the term of office of the class to which they have been elected expires and until such director's successor shall have been duly elected and qualified. No decrease in the number of authorized directors constituting the Whole Board shall shorten the term of any incumbent director.

Section 3.10. Committees. The Board of Directors may establish one or more committees. Each Committee shall consist of two or more directors of the Corporation designated by the Board of Directors. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee may to the extent permitted by law exercise such powers and shall have such responsibilities as shall be specified in the designating resolution. In the absence or disqualification of any member of such committee or committees, the member or members thereof present at any meeting and not disqualified from voting, whether or not constituting a quorum, may

-7-

unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Each committee shall keep written minutes of its proceedings and shall report such proceedings to the Board of Directors when requested.

A majority of any committee may determine its action and fix the time and place of its meetings, unless the Board of Directors shall otherwise provide. Notice of such meetings shall be given to each member of the committee in the manner provided for in Section 3.5 of these By-laws. The Board of Directors shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee. Nothing herein shall be deemed to prevent the Board of Directors from appointing one or more committees consisting in whole or in part of persons who are not directors of the Corporation; provided, however, that no such committee shall have or may exercise any authority of the Board of Directors.

The term of office of a committee member shall be as provided in the resolution of the Board designating him or her but shall not exceed his or her term as a director. If prior to the end of his term, a committee member should cease to be a director, he or she shall cease to be a committee member. Any member of a committee may resign at any time by giving written notice to the Board of Directors, the Chairman, the President or the Secretary. Such resignation shall take effect as provided in Section 6.6 of these By-laws in the case of resignations by directors. Any member of a committee may be removed from such committee, either with or without cause, at any time, by resolution adopted by a majority of the whole Board. Any vacancy in a committee shall be filled by the Board of Directors in the manner prescribed by these By-laws for the original designation of the members of such committee.

Section 3.11. Committee on Officers' Compensation. Pursuant to Section 3.10 of these By-laws, the Board of Directors shall designate a committee to evaluate the performance of, and to recommend the appropriate level of compensation for, officers of the Corporation. Such committee shall have access to an advisor not otherwise serving the Corporation. Each member of such committee shall be an "independent director," as that term is defined in the following sentence. For purposes of this Section 3.11, an "independent director" shall mean a person who (a) has not been employed by the Corporation within the past five years; (b) is not, and is not affiliated with, a firm that is an advisor or consultant to the Corporation; (c) is not affiliated with any customer or supplier of the Corporation whose purchases from and/or sales to the Corporation exceed 3% of the sales and revenues of such customer or supplier for its most recently completed fiscal year; (d) has no personal services contract with the Corporation; (e) is not affiliated with a tax-exempt entity, not otherwise affiliated with the Corporation, that receives contributions from the Corporation that exceed 3% of such entity's gross contributions for its most recently completed fiscal year; and (f) is not a member of the "immediate family" (as defined in Item 404(a) of Securities and Exchange Commission Regulation S-K) of any person described in clauses (a) through (e).

Section 3.12. Removal. Subject to the rights of the holders of any series of Preferred Stock with respect to such series of Preferred Stock, any director, or the entire Board of Directors, may be removed from office at any time by the stockholders, but only for cause.

Section 3.13. Records. The Board of Directors shall cause to be kept a record containing the minutes of the proceedings of the meetings of the Board of Directors and of the stockholders, appropriate stock books and registers and such books of records and accounts as may be necessary for the proper conduct of the business of the Corporation.

ARTICLE IV
OFFICERS

Section 4.1. Elected Officers. The elected officers of the Corporation shall be a Chairman, a President, a Secretary, a Treasurer, and such other officers (including, without limitation, a Chief Financial Officer) as the Board of Directors may deem proper from time to time. The Chairman shall be chosen from among the directors. Each officer elected by the Board of Directors shall have such powers and duties as generally pertain to his or her respective office, subject to the specific provisions of this ARTICLE IV. Such officers shall also have such powers and duties as may be conferred from time to time by the Board of Directors. The Board of Directors may from time to time elect, or the Chairman or President may appoint, such assistant officers (including one or more Assistant Vice Presidents, Assistant Secretaries, Assistant Treasurers and Assistant Controllers) as may be necessary or desirable for the conduct of the business of the Corporation. Such assistant officers shall have such duties and shall hold their offices for such terms as shall be provided in these By-laws or as may be prescribed by the Board of Directors or by the Chairman or President, as the case may be.

Section 4.2. Election and Term of Office. The elected officers of the Corporation shall be elected annually by the Board of Directors at the regular meeting of the Board of Directors held after the annual meeting of the stockholders or at any other time as the Board of Directors may deem proper. Each officer shall hold office until his successor shall have been duly elected and shall have qualified or until his death or until he shall resign, but any officer may be removed from office at any time by the affirmative vote of a majority of the Whole Board or, except in the case of an officer elected by the Board of Directors, by the Chairman or President. Such removal shall be without prejudice to the contractual rights, if any, of the person so removed.

Section 4.3. Chairman. The Chairman shall preside at all meetings of the stockholders and of the Board of Directors and shall be the Chief Executive Officer of the Company. The Chairman shall be responsible for the general management of the affairs of the Corporation and shall perform all duties incidental to his office which may be required by law and all such other duties as are properly required of him by the Board of

Directors. He shall make reports to the Board of Directors and the stockholders, and shall see that all orders and resolutions of the Board of Directors and of any committee thereof are carried into effect. The Chairman may also serve as President, if so elected by the Board of Directors.

Section 4.4. President. The President shall act in a general executive capacity and shall assist the Chairman in the administration and operation of the Corporation's business and the general supervision of its policies and affairs. In the absence of or the inability to act of the Chairman, the President shall perform all duties of the Chairman and preside at all meetings of stockholders and of the Board of Directors.

Section 4.5. Vice Presidents. Each Vice President shall have such powers and shall perform such duties as shall be assigned to him by the Board of Directors.

Section 4.6. Chief Financial Officer. The Chief Financial Officer (if any) shall be a Vice President and act in an executive financial capacity. He shall assist the Chairman and the President in the general supervision of the Corporation's financial policies and affairs.

Section 4.7. Treasurer. The Treasurer shall exercise general supervision over the receipt, custody and disbursement of corporate funds. The Treasurer shall cause the funds of the Corporation to be deposited in such banks as may be authorized by the Board of Directors, or in such banks as may be designated as depositaries in the manner provided by resolution of the Board of Directors. He shall have such further powers and duties and shall be subject to such directions as may be granted or imposed upon him from time to time by the Board of Directors, the Chairman or the President.

Section 4.8. Secretary. The Secretary shall keep or cause to be kept in one or more books provided for that purpose, the minutes of all meetings of the Board of Directors, the committees of the Board of Directors and the stockholders; he shall see that all notices are duly given in accordance with the provisions of these By-laws and as required by law; he shall be custodian of the records and the seal of the Corporation and affix and attest the seal to all stock certificates of the Corporation (unless the seal of the Corporation on such certificates shall be a facsimile, as hereinafter provided) and affix and attest the seal to all other documents to be executed on behalf of the Corporation under its seal; and he shall see that the books, reports, statements, certificates and other documents and records required by law to be kept and filed are properly kept and filed; and in general, he shall perform all the duties incident to the office of Secretary and such other duties as from time to time may be assigned to him by the Board of Directors, the Chairman or the President.

Section 4.9. Controller. The Controller shall have general control, charge and supervision of the accounts of the Corporation. He shall see that proper accounts are maintained and that all accounts are properly credited from time to time. He shall prepare or cause to be prepared the financial statements of the Corporation.

-10-

Section 4.10. Removal. Any officer elected by the Board of Directors may be removed by the affirmative vote of a majority of the Whole Board whenever, in their judgment, the best interests of the Corporation would be served thereby. Any assistant officer appointed by the Chairman or the President may be removed by him whenever, in his judgment, the best interests of the Corporation would be served thereby. No elected officer shall have any contractual rights against the Corporation for compensation by virtue of such election beyond the date of the election of his successor, his death, his resignation or his removal, whichever event shall first occur, except as otherwise provided in an employment contract or under an employee deferred compensation plan.

Section 4.11. Vacancies. A newly created elected office and a vacancy in any elected office because of death, resignation, or removal may be filled by the Board of Directors for the unexpired portion of the term at any meeting of the Board of Directors.

ARTICLE V
STOCK CERTIFICATES AND TRANSFERS

Section 5.1. Stock Certificates and Transfers. The interest of each stockholder of the Corporation shall be evidenced by certificates for shares of stock in such form as the appropriate officers of the Corporation may from time to time prescribe. The shares of the stock of the Corporation shall be transferred on the books of the Corporation by the holder thereof in person or by his attorney, upon surrender for cancellation of certificates for at least the same number of shares, with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, with such proof of the authenticity of the signature as the Corporation or its agents may reasonably require.

The certificates of stock shall be signed, countersigned and registered in such manner as the Board of Directors may by resolution prescribe, which resolution may permit all or any of the signatures on such certificates to be in facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

Section 5.2. Lost, Stolen or Destroyed Certificates. No certificate for shares of stock in the Corporation shall be issued in place of any certificate alleged to have been lost, destroyed or stolen, except on production of such evidence of such loss, destruction or theft and on delivery to the Corporation of a bond of indemnity in such amount, upon such terms and secured by such surety, as the Board of Directors or any financial officer may in its or his discretion require.

-11-

ARTICLE VI
MISCELLANEOUS PROVISIONS

Section 6.1. Fiscal Year. The fiscal year of the Corporation shall begin on the first day of January and end on the thirty-first day of December of each year.

Section 6.2. Dividends. The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in the manner and upon the terms and conditions provided by law and the Certificate of Incorporation.

Section 6.3. Seal. The corporate seal shall have enscribed thereon the words "Corporate Seal," the year of incorporation and around the margin thereof the words "W. R. Grace & Co."

Section 6.4. Waiver of Notice. Whenever any notice is required to be given to any stockholder or director of the Corporation under the provisions of the General Corporation Law of the State of Delaware (the "GCL") or these By-laws, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. The attendance of any stockholder at a meeting in person or by proxy, without protesting at the beginning of the meeting the lack of notice of such meeting, shall constitute a waiver of notice of such stockholder. Neither the business to be transacted at, nor the purpose of, any annual or special meeting of the stockholders or the Board of Directors or committee thereof need be specified in any waiver of notice of such meeting.

Section 6.5. Audits. The accounts, books and records of the Corporation shall be audited upon the conclusion of each fiscal year by an independent certified public accountant selected by the Board of Directors, and it shall be the duty of the Board of Directors to cause such audit to be done annually.

Section 6.6. Resignations. Any director or any officer or assistant officer, whether elected or appointed, may resign at any time by giving written notice of such resignation to the Chairman, the President, or the Secretary, and such resignation shall be deemed to be effective as of the close of business on the date said notice is received by the Chairman, the President, or the Secretary, or at such later time as is specified therein. No formal action shall be required of the Board of Directors or the stockholders to make any such resignation effective.

Section 6.7. Indemnification and Insurance.

(A) Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit, or proceeding, whether civil, criminal, administrative or investigative (hereinafter, a "proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative is or was a director or officer of the

-12-

Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans maintained or sponsored by the Corporation, whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the GCL as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith, and such indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that except as provided in paragraph (C) of this Section 6.7, the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors. The right to indemnification conferred in this Section 6.7 shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition, such advances to be paid by the Corporation within 20 days after the receipt by the Corporation of a statement or statements from the claimant requesting such advance or advances from time to time; provided, however, that if the GCL requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such person while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Section 6.7 or otherwise.

(B) To obtain indemnification under this Section 6.7, a claimant shall submit to the Corporation a written request, including therein or therewith such documentation and information as is reasonably available to the claimant and is reasonably necessary to determine whether and to what extent the claimant is entitled to indemnification. Upon written request by a claimant for indemnification pursuant to the first sentence of this paragraph (B), a determination, if required by applicable law, with respect to the claimant's entitlement thereto shall be made as follows: (1) if requested by the claimant, by Independent Counsel (as hereinafter defined), or (2) if no request is made by the claimant for a determination by Independent Counsel, (i) by the Board of Directors by a majority vote of a quorum consisting of Disinterested Directors (as hereinafter defined), or (ii) if a quorum of the Board of Directors consisting of Disinterested Directors is not obtainable or, even if obtainable, such quorum of Disinterested Directors so directs, by Independent Counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the claimant,

-13-

or (iii) if a quorum of Disinterested Directors so directs, by the stockholders of the Corporation. In the event the determination of entitlement to indemnification is to be made by Independent Counsel at the request of the claimant, the Independent Counsel shall be selected by the Board of Directors unless there shall have occurred within two years prior to the date of the commencement of the action, suit or proceeding for which indemnification is claimed a "Change of Control" (as defined below) in which case the Independent Counsel shall be selected by the claimant unless the claimant shall request that such selection be made by the Board of Directors. If it is so determined that the claimant is entitled to indemnification, payment to the claimant shall be made within 10 days after such determination.

(C) If a claim under paragraph (A) of this Section 6.7 is not paid in full by the Corporation within 30 days after a written claim pursuant to paragraph (B) of this Section 6.7 has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been tendered to the Corporation) that the claimant has not met the standard of conduct which makes it permissible under the GCL for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, Independent Counsel or stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the GCL, nor an actual determination by the Corporation (including its Board of Directors, Independent Counsel or stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

(D) If a determination shall have been made pursuant to paragraph (B) of this Section 6.7 that the claimant is entitled to indemnification, the Corporation shall be bound by such determination in any judicial proceeding commenced pursuant to paragraph (C) of this Section 6.7.

(E) The Corporation shall be precluded from asserting in any judicial proceeding commenced pursuant to paragraph (C) of this Section 6.7 that the procedures and presumptions of this Section 6.7 are not valid, binding and enforceable and shall stipulate in such proceeding that the Corporation is bound by all the provisions of this Section 6.7.

(F) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section 6.7 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these By-laws, agreement, vote of

-14-

stockholders or Disinterested Directors or otherwise. No repeal or modification of this Section 6.7 shall in any way diminish or adversely affect the rights of any director, officer, employee or agent of the Corporation hereunder in respect of any occurrence or matter arising prior to any such repeal or modification.

(G) The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the GCL. To the extent that the Corporation maintains any policy or policies providing such insurance, each such director or officer, and each such agent or employee to which rights to indemnification have been granted as provided in paragraph (H) of this Section 6.7, shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage thereunder for any such director, officer, employee or agent.

(H) The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to be paid by the Corporation the expenses incurred in defending any proceeding in advance of its final disposition, to any employee or agent of the Corporation to the fullest extent of the provisions of this Section 6.7 with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

(I) If any provision or provisions of this Section 6.7 shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (1) the validity, legality and enforceability of the remaining provisions of this Section 6.7 (including, without limitation, each portion of any paragraph of this By-law containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (2) to the fullest extent possible, the provisions of this Section 6.7 (including, without limitation, each such portion of any paragraph of this By-law containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

(J) For purposes of this Section 6.7:

(1) "Disinterested Director" means a director of the Corporation who is not and was not a party to the matter in respect of which indemnification is sought by the claimant.

(2) "Independent Counsel" means a law firm, a member of a law firm, or an independent practitioner, that is experienced in matters of corporation law and shall include any person who, under the applicable standards of professional conduct then prevailing, would not have a conflict of interest in representing either the

-15-