Exhibit 17A

Corporation or the claimant in an action to determine the claimant's rights under this Section 6.7.

(3) "Change of Control" has the meaning given such term in the Corporation's 1998 Stock Incentive Plan, as the same may be amended or superseded from time to time.

(K) Any notice, request or other communication required or permitted to be given to the Corporation under this Section 6.7 shall be in writing and either delivered in person or sent by telecopy, telex, telegram, overnight mail or courier service, or certified or registered mail, postage prepaid, return receipt requested, to the Secretary of the Corporation and shall be effective only upon receipt by the Secretary.

## ARTICLE VII
## CONTRACTS, PROXIES, ETC.

Section 7.1. Contracts. Except as otherwise required by law, the Certificate of Incorporation or these By-laws, any contracts or other instruments may be executed and delivered in the name and on the behalf of the Corporation by such officer or officers of the Corporation as the Board of Directors may from time to time direct. Such authority may be general or confined to specific instances as the Board of Directors may determine. The Chairman, the President or any Vice President may execute bonds, contracts, deeds, leases and other instruments to be made or executed for or on behalf of the Corporation. Subject to any restrictions imposed by the Board of Directors or the Chairman, the President or any Vice President of the Corporation may delegate contractual powers to others under his jurisdiction, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 7.2. Proxies. Unless otherwise provided by resolution adopted by the Board of Directors, the Chairman, the President or any Vice President may from time to time appoint an attorney or attorneys or agent or agents of the Corporation, in the name and on behalf of the Corporation, to cast the votes which the Corporation may be entitled to cast as the holder of stock or other securities in any other corporation, any of whose stock or other securities may be held by the Corporation, at meetings of the holders of the stock or other securities of such other corporation, or to consent in writing, in the name of the Corporation as such holder, to any action by such other corporation, and may instruct the person or persons so appointed as to the manner of casting such votes or giving such consent, and may execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal or otherwise, all such written proxies or other instruments as he may deem necessary or proper in the premises.

-16-

ARTICLE VIII
AMENDMENTS

Section 8.1. Amendments. These By-laws may be altered, amended, or repealed at any meeting of the Board of Directors or of the stockholders, provided notice of the proposed change was given in the notice of the meeting and, in the case of a meeting of the Board of Directors, in a notice given not less than two days prior to the meeting; provided, however, that, in the case of amendments by stockholders, notwithstanding any other provisions of these By-laws or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the capital stock of the Corporation required by law, the Certificate of Incorporation or these By-laws, the affirmative vote of the holders of at least 80 percent of the voting power of all the then outstanding shares of the Voting Stock, voting together as a single class, shall be required to alter, amend or repeal any provision of these By-laws.

-17-

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K        SEC File #: 001-13953
Document Type: EX-10.7
Description: SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC                New York, NY                Chicago, IL
Los Angeles, CA                 Miami, FL                  Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 10.7

THE W. R. GRACE & CO.
SUPPLEMENTAL EXECUTIVE
RETIREMENT PLAN

October 1993

CONTENTS

| | |
|---|---|
| 2 | Introduction |
| 2 | Participation |
| 3 | How the Plan Works |
| 3 | Credited Service |
| 3 | Federal Limits on Pension Benefits |
| 4 | Final Average Compensation |
| 4 | Examples of Final Average Compensation |
| 5 | Primary Social Security Benefit |
| 5 | How Benefits Are Calculated |
| 6 | Retirement |
| 6 | Normal Retirement |
| 6 | Early Retirement |
| 6 | How Benefits Are Paid |
| 6 | Normal Method if Single |
| 6 | Normal Method if Married |
| 6 | Other Payment Methods |
| 7 | Pre-Retirement Survivor Coverage |
| 7 | Vesting |
| 7 | Other Information |

5

## INTRODUCTION

This brochure describes certain features of the W. R. Grace & Co. Supplemental Executive Retirement Plan (the supplemental plan) which was adopted by the Grace Board of Directors as of October 4, 1984 for the purposes of:

　　o formalizing the Company's commitment to provide full retirement benefits to eligible executives whose benefits, as calculated under the W. R. Grace & Co. Retirement Plan for Salaried Employees (the salaried plan), exceed the maximum limit payable under federal tax law;

　　o recognizing deferred compensation in benefit calculations;

　　o recognizing as credited service, under certain circumstances, periods of employment with Grace during which executives are or have been ineligible to participate in the salaried plan.

Unlike the salaried plan, the supplemental plan is not a "qualified" plan under federal tax law. All benefits under the supplemental plan are paid by the Company from its general assets. The Board of Directors is responsible for the supplemental plan's maintenance and operation and has appointed the Compensation, Employee Benefits and Stock Incentive Committee to administer the plan. The following pages summarize the main features of the supplemental plan. Because the supplemental plan is tied to the salaried plan, please refer to the summary of the salaried plan for more information on your retirement benefits. Please contact the Human Resources Division at the Boca Raton Headquarters Office if you have any questions or require assistance.

## PARTICIPATION

As an executive of Grace or a company controlled by Grace (an affiliate), you are eligible for the supplemental plan if, on or after October 4, 1984, your annual base salary is at least $75,000 and you are earning credited service under the salaried plan at the same time.

In addition, under certain circumstances, you may be considered eligible for the supplemental plan even if you are not earning credited service under the salaried plan, upon the recommendation of Grace's senior management and the approval of Grace's Board of Directors.

HOW THE PLAN WORKS

The same pension formula is used to calculate benefits under the supplemental and salaried plans. Benefits under either plan will be based on your credited service, final average compensation, and estimated primary social security benefit.

Although the same pension formula is used, calculations under the supplemental plan include deferred compensation and, as credited service, certain periods of employment that may not be included by the salaried plan. Moreover, calculations under the supplemental plan are not subject to federal limits on benefit payments that apply to the salaried plan. Your benefit under the supplemental plan will equal the difference between the total benefit calculated and the benefit actually payable to you under the salaried plan.

CREDITED SERVICE

Subject to the exclusions that follow, credited service under the supplemental plan includes:

    o each month during which you participate in the salaried plan and have at least one hour of service;

    o any period during which you qualify as disabled under the salaried plan;

    o all other employment with a division of Grace or an affiliate that does not participate in the salaried plan.

Credited service, however, will not include any period during which:

    o you were satisfying the salaried plan's participation eligibility requirements (or would have been satisfying these requirement if the Grace company for which you were working had been covered by the salaried plan); o you were eligible to contribute to the salaried plan (or any prior contributory retirement plan) and elected not to do so;

    o you waive participation in the salaried plan;

    o you are away from work on an approved leave of absence for any reason other than disability;

    o you are not an employee of Grace or an affiliate (except for employment before acquisition by Grace which has been approved as credited service under the salaried plan).

If your employment with Grace and all of its affiliates terminates and you are rehired by Grace or an affiliate at a later date, your prior employment may count as credited service under the supplemental plan. Contact the Human Resources Division for details.

FEDERAL LIMITS ON PENSION BENEFITS

Beginning in 1994 the maximum annual compensation used to calculate benefits under qualified benefit plans is $150,000. This limit is subject to change based on a special cost-of-living adjustment formula, but is not likely to be adjusted for inflation until 1996.

In addition, benefit payments under tax qualified pension plans, such as the salaried plan, are subject to a maximum limit under federal tax law. For 1993, benefits payable at the "social security" retirement age (see below) from a qualified pension plan may not exceed $115,641 per year ($9,637 per month); this limit is scheduled to change each year based on a cost-of-living index formula which is different than the special formula used to index the $150,000 noted above. Moreover, this limit is reduced if payments start before social security retirement age. Social security normal retirement age is age 65 for those born

3

before 1938, gradually increasing to 66 for those born between 1938 and 1954, and gradually increasing to 67 for those born after 1954.

FINAL AVERAGE COMPENSATION

Pension benefits under both the salaried and supplemental plans reflect your final average compensation, which is the monthly average of your compensation for the 60-consecutive months (five consecutive years) in which your plan compensation is the greatest during the last 180 moths (15 years) of your continuous employment with Grace or an affiliate.

Under the supplemental plan, your plan compensation includes base salary, commissions and incentive compensation awards (maximum of five) you receive (or are eligible to receive) from Grace or an affiliate, including compensation you elect to defer or have previously elected to defer under the Company's Deferred Compensation Program, before any deductions are made.

As under the salaried plan, the definition of plan compensation under the supplemental plan does not include special pay, income related to stock options or stock awards, long-term incentive awards, or Company contributions made in your behalf to any benefit plan.

If you elect to defer base salary or annual incentive compensation (or both), your final average compensation is determined as if you had received the deferred amount or amounts in the month in which they would have otherwise been paid. That is, if you should elect to defer your 1994 incentive compensation award until after retirement, and you otherwise would have received this award in March 1995, your final average compensation would be determined as if you had received the award in March 1995.

IMPORTANT: If your active employment with Grace and all its affiliates terminates and you are then rehired by Grace or an affiliate, any deferred base salary or annual incentive compensation will count when calculating final average compensation ONLY if credited service for the month in which you would have received that salary or incentive compensation is restored under the supplemental plan.

EXAMPLES OF FINAL AVERAGE COMPENSATION

If an executive retires on January 1, 1996 and the executive's compensation was greatest during the five-year period immediately before retirement, following are two examples of how final average compensation is determined.

|  | Base Salary Paid | Annual Incentive Compensation | | Total Retirement Plan Compensation | |
|--|--|--|--|--|--|
|  |  | Paid | Deferred | Salaried Plan (Limited) | Supplemental Plan (Unlimited) |
| 1991 | $120,000 | $  -0- | $20,000 | $120,000 | $140,000 |
| 1992 | 130,000 | -0- | 20,000 | 130,000 | 150,000 |
| 1993 | 140,000 | 10,000 | 10,000 | 150,000 | 160,000 |
| 1994 | 150,000 | 20,000 | -0- | 150,000(1) | 170,000 |
| 1995 | 160,000 | 20,000 | -0- | 150,000(1) | 180,000 |
| Total | $700,000 | $50,000 | $50,000 | $700,000 | $800,000 |

(1) "Qualified" Plan compensation limited to $150,000 in 1994 and not expected to be indexed for cost of living until 1996.

Under the supplemental plan, the executive's final average annual compensation would equal $160,000 ($800,000 /5). Under the salaried plan, however, the executive's final average annual compensation would equal $140,000 ($700,000 /5), since compensation over $150,000 and the deferred incentive compensation would not be included. Remember, the benefit payable under the supplemental plan would equal the difference between the calculations under the supplemental plan's formula and the salaried plan's formula.

Keep in mind that the incentive compensation in this example represents when awards are paid or would otherwise

4

have been paid if a deferral had not been elected. That is, the total incentive compensation shown for 1993 represents $20,000 awarded in 1993 for 1992 services, for which the executive elected to defer 50 percent in December of 1991.

The calculation works the same if the executive had deferred base salary and not incentive compensation. Again, total compensation, including deferred base salary, would be used to *determine final average compensation* under the supplemental plan as shown in the following example.

|  | Base Salary | | Annual Incentive Compensation | Total Retirement Plan Compensation | |
|  |  |  |  | Salaried Plan | Supplemental Plan |
|  | Paid | Deferred | Paid | (Limited) | (Unlimited) |
| 1991 | $108,000 | $12,000 | $20,000 | $128,000 | $140,000 |
| 1992 | 118,000 | 12,000 | 20,000 | 138,000 | 150,000 |
| 1993 | 128,000 | 12,000 | 20,000 | 148,000 | 160,000 |
| 1994 | 138,000 | 12,000 | 20,000 | 150,000(1) | 170,000 |
| 1995 | 148,000 | 12,000 | 20,000 | 150,000(1) | 180,000 |
| Total | $640,000 | $60,000 | $100,000 | $714,000 | $800,000 |

(1) "Qualified" Plan compensation limited to $150,000 in 1994 and not expected to be indexed for a cost of living until 1996.

Under the supplemental plan, the executive's annual final average compensation would equal $160,000 ($800,000 /5). Under the salaried plan, however, the executive's annual final average compensation would equal $142,800 ($714,000 /5), since the deferred base salary ($60,000 for five years) and the paid compensation in excess of $150,000 in 1994 and 1995 would not be included.

Again, remember that the benefit payable under the supplemental plan would equal the difference between the calculations under the supplemental plan's formula and the salaried plan's formula.

PRIMARY SOCIAL SECURITY BENEFIT

An estimate of your primary social security benefit is used in calculating benefits under both the salaried and supplemental plan. The estimate of the monthly *benefit social* security will pay you at age 65 (or at your current age, if you're over age 65), is based on your career earnings (assuming no additional earnings from the time your employment with Grace terminates) and the terms of the Social Security Act in effect at the time of your employment terminates.

Any social security benefit payable to your spouse or other family member will not be considered in these calculations.

HOW BENEFITS ARE CALCULATED

Your normal annual retirement benefit under the supplemental plan will be calculated as follows:

1.5 percent of your final average compensation times your years of credited service, minus 1.25 percent times your estimated primary social security benefit times your years of credited service,

minus any applicable reductions (i.e., if you start receiving plan payments before age 62; if payments are made under a method other than a life annuity; if you elect a survivor option that results in a pre-retirement revocation penalty; and, if applicable, you elect a transfer or refund of your contributions from the salaried plan),

*minus the actual annual* benefit payable to you under the salaried plan (including any reductions made to reflect the federal maximum annual benefit limit, the exclusion of deferred compensation, or the exclusion of compensation in excess of limits defined by federal tax laws).

If you were employed by Grace or an affiliate when employee contributions were required under the salaried plan and you were ineligible for the salaried plan, the

5

portion of your supplemental plan benefit that is based on credited service for that period will be reduced to 30 percent.

In addition, supplemental plan benefits are reduced by benefits you either received or are eligible to receive from any other pension or profit sharing plan of Grace or an affiliate (excluding the Grace savings and investment plans), including legislated or negotiated plans which Grace or an affiliate has funded. If you are entitled to receive such pension (or profit sharing) benefits, the reduction to your supplemental plan benefit will reflect the credited service (or the years of participation in a profit sharing plan) that counts both under the other pension plan (or profit sharing plan) and the supplemental plan, the payment method that applies, and the date payments start under the supplemental plan.

## RETIREMENT

Your election to retire under the salaried plan automatically applies to the supplemental plan.

### NORMAL RETIREMENT

Generally, normal retirement occurs at the end of the month in which you reach age 65. But if you continue to work past age 65, normal retirement occurs at the end of the month in which your employment terminates.

### EARLY RETIREMENT

If you wish to retire at a younger age, you may do so on the last day of any month on or after your 55th birthday. If you retire early, you may elect to start receiving payments immediately or delay them until a later date. However, if payments start before age 62, your benefit will be reduced to reflect the likelihood that you will receive benefits for a longer period of time. The reduction is based on your age when payments start.

## HOW BENEFITS ARE PAID

The payment method you elect under the salaried plan will automatically apply to the supplemental plan.

### NORMAL METHOD IF SINGLE

Your normal payment method is a LIFE ANNUITY if you're single when payments are scheduled to start. This method provides you with lifetime monthly payments, with no payments continuing to anyone following your death. The dollar amount of this type of payment is greatest because only one lifetime is covered - yours.

### NORMAL METHOD IF MARRIED

If you are married when your payments are scheduled to start, your normal payment method is 50 percent joint and survivor annuity. This method provides you with reduced monthly payments for life. Following your death, your spouse (at the time your benefits commenced), if surviving you, will received one-half of your monthly payment for life. Payments are reduced under this method to cover two lifetimes - yours and your spouse's.

### OTHER PAYMENT METHODS

The plan's other alternate payment methods available to you include:

    o Joint and survivor annuities of 100, 75, or 66-2/3 percent of your monthly payments, as you elect;

    o Life annuity on your life only (which is available as an option to married participants, with spousal consent);

    o Ten-year certain and life annuity (with death benefits, if any, payable to your spouse or designated beneficiary);

6

o Level income benefits.

Certain restrictions apply to the availability of the above options, based on your marital status and time of election, as described in the summary of the salaried plan.

PRE-RETIREMENT SURVIVOR COVERAGE

Under the supplemental plan, pre-retirement survivor coverage for your spouse is the same as the pre-retirement survivor coverage provided under the salaried plan. All elections that apply to pre-retirement survivor coverage under the salaried plan automatically apply to the supplemental plan.

VESTING

Vesting refers to your right to a pension benefit under the supplemental plan. You become vested under the supplemental plan when:

o you reach age 55, if you are an employee of Grace or an affiliate at that time,

o you have at least five years of "vesting service" with Grace or an affiliate, as determined under the salaried plan, or

o you are otherwise vested under the salaried plan.

In the event you terminate employment for any reason other than disability as recognized under the salaried plan, and are not vested, you will not be eligible to receive any pension benefit from the supplemental plan. However, if you are subsequently hired, this benefit may be restored, subject to the break-in-service rules of the supplemental plan.

OTHER INFORMATION

The supplemental plan may be terminated by Grace at any time for any or all employees. Grace may also change any plan feature at any time.

In addition, Grace as administrator of the supplemental plan has the discretionary authority to determine eligibility for plan benefits and to otherwise interpret the terms of the supplemental plan. The decisions of Grace with regard to interpreting the terms of the plan are final.

This brochure describes the main features of the Grace Supplemental Executive Retirement Plan. This brochure is written in everyday terms and avoids technical language wherever possible. This is not an official document. The official plan documents for the Supplemental Executive Retirement Plan adopted by the Grace Board of Directors, not this brochure, will be used to resolve questions about the benefits from the Plan.

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K        SEC File #: 001-13953
Document Type: EX-10.8
Description: W.R. GRACE & CO. EXECUTIVE SALARY PROTECTION PLAN
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC              New York, NY              Chicago, IL
Los Angeles, CA             Miami, FL                 Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 10.8

W. R. GRACE & CO.
EXECUTIVE SALARY PROTECTION PLAN

AS ADOPTED BY
W. R. GRACE & CO.,
A CONNECTICUT CORPORATION,
EFFECTIVE DECEMBER 2, 1976
AND AMENDED
EFFECTIVE MAY 25, 1988

--------------------------------------------------------------------------------

AS ADOPTED AND CONTINUED BY
W. R. GRACE & CO.
A NEW YORK CORPORATION,
EFFECTIVE MAY 25, 1988

W. R. GRACE & CO.
EXECUTIVE SALARY PROTECTION PLAN

INTRODUCTION

Effective December 2, 1976, W. R. Grace & Co., a Connecticut corporation ("Grace Connecticut"), adopted the W. R. Grace & Co. Executive Salary Protection Plan (the "Plan") for the purpose of providing salary continuation benefits in the event of the death or disability of an Eligible Executive (as described in the Plan) of Grace Connecticut or its subsidiaries.

The Plan was last amended effective November 5, 1987, for all Eligible Executives who die or become disabled while employed on or after such date.

As a result of a corporate reorganization whereby Grace Connecticut became a subsidiary of W. R. Grace & Co., a New York corporation ("Grace New York") (and was renamed "W. R. Grace & Co. -- Conn."), Grace Connecticut amended the Plan (as set forth herein), effective May 25, 1988, and Grace New York adopted and assumed the sponsorship of the Plan, as amended, as of such date, for the benefit of all persons who, on the immediately preceding date, were Eligible Executives under the Plan (as maintained by Grace Connecticut) and all other employees of Grace New York or its subsidiaries who on or after May 25, 1988, become Eligible Executives under the terms of the Plan.

-2-

W. R. GRACE & CO.
EXECUTIVE SALARY PROTECTION PLAN

ss.1.     Purpose of the Plan

    To induce the employment or continued employment of Key Employees and to
enable the Company to compete with other corporations offering benefits in
obtaining and retaining the services of competent executives, in order that the
interests of the Company may be advanced.

ss.2.     Definitions

    Unless otherwise required by the context, the following terms when used in
this Plan shall have the meanings set forth in this section.

    (a) "Board of Directors": The Board of Directors of the Company.

    (b) "Committee": The Committee designated to administer the ESP Plan
pursuant to the provision of ss.3.

    (c) "Company": W. R. Grace & Co., a New York corporation. Prior to May 25,
1988, the term "Company" meant W. R. Grace & Co., a Connecticut corporation,
which is referred to herein as "Grace Connecticut".

    (d) "Eligible Executive": A Key Employee under the age of 70 who is
eligible to participate in the ESP Plan in accordance with standards established
by the Committee pursuant toss.4(a).

    (e) "ESP Agreement": An Agreement entered into between the Company and an
Eligible Executive pursuant to the provision of ss.4(b), providing for the
continuance of the Eligible Executive's Recognized Compensation in the event of
death or disability (as determined in accordance with ss.4(b)).

    (f) "ESP Plan" or "Plan": The Executive Salary Protection Plan of the
Company herein set forth as the same may from time to time be amended.

    (g) "Key Employee": An employee of the Company or of a Subsidiary,
including an officer or director who is an employee, who in the opinion of the
Committee can contribute significantly to the growth and successful operations
of the Company or a Subsidiary.

    (h) "Officers": The chairman, vice chairmen, president, secretary,
treasurer and all executive vice presidents, senior vice presidents, and vice
presidents of the Company.

-3-

(i) "Recognized Compensation": The base monthly salary of the Eligible Executive as of the time of death or disability (as determined in accordance with ss.4(b)), or at such other time as shall be specified by the Committee; provided that the Committee may specify a fixed amount which may be higher or lower than the Eligible Executive's base monthly salary, and provided further that Recognized Compensation shall not exceed the highest base salary earned by the Eligible Executive during the five years preceding his death or disability (as determined in accordance with ss.4(b)) in any event.

(j) "Subsidiary": A corporation or other form of business association of which shares (or other ownership interests) having 50% or more of the voting power are owned or controlled, directly or indirectly, by the Company.

ss.3.      Administration

(a) The ESP Plan shall be administered by the Salary, Incentive Compensation and Employee Benefits Committee of the Board of Directors; provided that such Committee shall consist of no less than five (5) directors of the Company, and provided further, that no member of the Committee shall be eligible to participate in the Plan while serving on the Committee.

(b) The Committee may establish such rules and regulations, not inconsistent with the provisions of the ESP Plan, as it deems necessary to determine eligibility to participate in the Plan and for the proper administration of the Plan, and may amend or revoke any rule or regulation so established. The Committee may make such determinations and interpretations under or in connection with the Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations, subject to the provisions of ss.3.1 of the By-Laws of the Company, shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders and all employees, and upon their respective legal representatives, beneficiaries, successors and assigns and upon all other persons claiming under or through any of them.

(c) Any action required or permitted to be taken by the Committee under this Plan may be taken in accordance with Article III of the By-Laws of the Company even though, because of a vacancy or vacancies as a result of resignations or otherwise, the total number of directors who are then members of the Committee shall be less than five.

-4-

(d) Members of the Board of Directors and members of the Committee acting under the ESP Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability except for gross negligence or willful misconduct in the performance of their duties.

ss.4.        Executive Salary Protection Agreements

(a) Officers, and such other Key Employees as the Committee shall from time to time select, shall be eligible to participate in the ESP Plan. The Committee may require participants in the Plan to meet such standards of health as the Committee may from time to time establish, and, for this purpose, the Committee may require the employee to furnish information as to his physical condition and medical history and to submit to one or more physical examinations.

(b) Upon a Key Employee's qualification as an Eligible Executive, the Company may enter into an agreement with such employee providing for the continued payment of his Recognized Compensation in the event he should die or become disabled before reaching age 70 and while an active employee of the Company or a Subsidiary. An Eligible Executive shall be determined to be disabled for purposes of the ESP Plan if and when he is determined to be disabled pursuant to the W. R. Grace & Co. Long Term Disability Income Plan.

(i) The agreement shall provide for the continuation, in the event of such employee's death (except as otherwise provided in subparagraph (iii) of this paragraph (b)), of his Recognized Compensation for such periods as the Committee may determine, provided that the amounts and the periods do not exceed the following:

> (A)  100% of his Recognized Compensation for the first twelve (12) months following death;
>
> (B)  50% of his Recognized Compensation for the next one-hundred-eight (108) months; provided that, in the event the employee dies at age 56 or thereafter, the payments referred to in this clause (B) shall not be continued for more than the following periods:

| Age at Death | Maximum<br>Number of Monthly Payments |
|:---:|:---:|
| 56 | 96 |
| 57 | 84 |
| 58 | 72 |
| 59 | 60 |
| 60 | 54 |
| 61 | 48 |
| 62 | 48 |
| 63 | 48 |
| 64 | 48 |
| 65 | 42 |
| 66 | 36 |
| 67 | 30 |
| 68 | 24 |
| 69 | 18 |

(ii) The agreement shall also provide for the continuation, in the event that an Eligible Executive shall become disabled, of his Recognized Compensation for such periods as the Committee may determine, provided that the amounts and the periods do not exceed the following:

    (A)   100% of his Recognized Compensation for the first twelve (12) months after he has become disabled;

    (B)   60% of his Recognized Compensation until he attains age 65, provided that in the event he becomes disabled at age 60 or thereafter, the payments referred to in this clause (B) shall not be continued for more than the following periods:

-6-

| Age at Date of Disability | Number of Months of Compensation After 12 Months at 100% |
|---|---|
| 60 | 48 |
| 61 | 36 |
| 62 | 30 |
| 63 | 24 |
| 64 | 18 |
| 65 | 12 |
| 66 | 9 |
| 67 | 6 |
| 68 | 3 |
| 69 | 0 |

The agreement shall further provide that no Eligible Executive shall be entitled to any continuation of Recognized Compensation in accordance with this subparagraph (ii) unless he is a participant in the W. R. Grace & Co. Long Term Disability Income Plan, and that any amounts which may be payable to him in accordance with this subparagraph (ii) shall be reduced by (x) the amount of any benefits payable to him under the W. R. Grace & Co. Long Term Disability Income Plan and under any other disability payment arrangement between him and the Company or a Subsidiary, and any social security benefits payable to him, for any reason, or to any members of his family by reason of his disability, and (y) from and after the date he reaches age 62, any retirement benefits to which he may be entitled under any retirement plan of the Company or a Subsidiary.

(iii) The agreement shall also provide for the continuation, in the event of an Eligible Executive's death while he is receiving payments provided for in subparagraph (ii) of this paragraph (b), of his Recognized Compensation for such periods as the Committee may determine, provided that the amounts and the periods do not exceed the amounts and periods specified in clauses (A) and (B) of subparagraph (i) of this paragraph (b).

(c) The payments provided for in an ESP Agreement (other than payments provided for in accordance with subparagraph (ii) of paragraph (b) of this ss.4) shall be made to the beneficiary or beneficiaries (which may include one or more trusts or other entities) of the employee designated by him in

-7-

accordance with the provisions of the ESP Agreement, or, if no such designation was effectively made, such payments shall be made to the employee's estate or other person or persons entitled to receive the same under the laws of testate or intestate succession, as the case may be.

(d) All rights of an employee under an ESP Agreement shall terminate (i) upon his reaching age 70, (ii) thirty (30) days following the date upon which he retires or otherwise (except by reason of death or disability) ceases to be an active employee of the Company or a Subsidiary, or (iii) thirty (30) days following the date upon which written notice is given to him that the Committee has determined that he is no longer a Key Employee, whichever is earlier. A leave of absence, if approved by the Committee, shall not be deemed a cessation of employment or a loss of Key Employee status within the meaning of this paragraph.

(e) Subject to compliance with the provisions of this Plan, each ESP Agreement shall contain such other terms and conditions and shall be in such form as the Committee may determine. Without limiting the foregoing, the ESP Agreement may, if so prescribed by the Committee, include a requirement that the employee contribute towards the cost of the benefits provided thereunder.

ss.5.    Insurance

Upon the determination of the Committee, the Company may procure one or more life insurance policies, including group policies, on the lives of Eligible Executives covered by the ESP Plan or may by other appropriate means provide for the payment of all or part of its obligations under the ESP Plan. All rights and incidents of ownership in any such insurance policies or in any other assets of the Company shall belong to the Company (or, with respect to any such insurance policies procured by Grace Connecticut prior to May 25, 1988, to Grace Connecticut); and no employee (individually or as a member of the group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any such insurance policies or assets.

ss.6.    General Provisions

(a) Nothing in the ESP Plan nor in any ESP Agreement or instrument executed pursuant hereto shall confer upon any employee any right to continue

-8-

in the employ of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the employment of any employee with or without cause.

(b) No ESP Agreement shall become *effective* unless and until all legal requirements applicable thereto have, in the opinion of counsel to the Company, been complied with.

(c) The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding of any taxes which the Company or a Subsidiary determines it is required to withhold in connection with any ESP Agreement, or any contribution or payment thereunder.

(d) Nothing in the ESP Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or fringe benefits to employees generally, or to any class or group of employees, which the Company or any Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any retirement, pension, group insurance, stock purchase, stock bonus or stock option plan.

(e) The ESP Plan may be amended or terminated by the Board of Directors at any time provided, however, that no such amendment or termination shall adversely affect the rights of an employee under an ESP Agreement unless thirty (30) days' prior written notice thereof is given to the employee, and, provided further, that no such amendment or termination shall adversely affect the rights of a deceased employee under an ESP Agreement except as otherwise provided therein.

-9-

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K          SEC File #: 001-13953
Document Type: EX-10.9
Description: W.R. GRACE & CO. 1986 STOCK INCENTIVE PLAN
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC                    New York, NY                  Chicago, IL
Los Angeles, CA                    Miami, FL                     Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 10.9

W. R. GRACE & CO.

1986 STOCK INCENTIVE PLAN
(As amended through March 7, 1996)

W. R. GRACE & CO.

1986 STOCK INCENTIVE PLAN

1. Purposes: The purposes of this Plan are (a) to secure for Key Persons the benefits of incentives attributable to Common Stock, (b) to encourage Key Persons to increase their interest in the future growth and prosperity of the Company and to stimulate and sustain constructive and imaginative thinking by Key Persons, (c) to further the identity of interests of Key Persons with the interests of the Company's shareholders, and (d) to induce the service or continued service of Key Persons and to enable the Company to compete with other organizations offering similar or other incentives in obtaining and retaining the services of competent individuals.

2. Definitions: Unless otherwise required by the context, the following terms when used in this Plan shall have the meanings set forth in this Section 2.

Board of Directors: The Board of Directors of the Company.

cessation of service (or words of similar import): When a person ceases to be, and is no longer, an employee of, or consultant to, the Company or a Subsidiary; provided, however, in the case of an Incentive Stock Option, "cessation of service" (or words of similar import) shall mean when a person ceases to be an employee of the Company or a Subsidiary.

Common Stock: The common stock of the Company, par value $1.00 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 8.

Company: W. R. Grace & Co., a New York corporation.

Fair Market Value: The fair market value of a share of Common Stock determined in accordance with any reasonable method approved by the Incentive Committee. In the absence of any such approved method, Fair Market Value, as applied to any date, shall be the mean between the high and low sales prices of a share of Common Stock as reported on the Consolidated Transactions Tape for securities listed on the New York Stock Exchange for such date or, if no such sales were reported for such date, for the next preceding date for which sales were so reported.

Grace-Connecticut: W. R. Grace &Co.-Conn., a Connecticut corporation which is a subsidiary of the Company and which was formerly known as "W. R. Grace & Co."

Incentive Committee: The committee designated by the Board of Directors to administer stock incentive and stock option plans of the Company and its subsidiaries.

Incentive Compensation: Bonuses, extra and other compensation payable in addition to a salary or other base amount, whether contingent or not, whether discretionary or required to be paid pursuant to a plan, agreement, resolution or arrangement, and whether payable currently or on a deferred basis, in cash, Common Stock or other property, awarded by the Company or a Subsidiary prior or subsequent to the date of the approval and adoption of this Plan.

Incentive Stock Option: An option, including an Option as the context may require, intended to meet the requirements of section 422A of the Internal Revenue Code and the regulations there under applicable to incentive stock options adopted by the Secretary of the Treasury or his delegate, or any provisions that may be adopted to amend or replace such section or regulations or both.

Key Employee: An employee of the Company or a Subsidiary who is a Key Person.

Key Person: An employee of, or a consultant to, the Company or a Subsidiary, including an officer or director who is an employee or consultant, who in the opinion of the Incentive Committee can contribute significantly to the growth and successful operations of the Company or a Subsidiary. The grant of a Stock Incentive to an employee or consultant by the Incentive Committee shall be deemed a determination by the Incentive Committee that such person is a Key Person.

Non-Statutory Stock Option: An option, including an Option as the context may require, which is not an Incentive Stock Option or another form of statutory stock option (within the meanings of sections 422, 423 and 424 of the Internal Revenue Code and the regulations there under as adopted and amended from time to time by the Secretary of the Treasury or his delegate).

Option: An option granted under this Plan to purchase shares of Common Stock.

Plan: The 1986 Stock Incentive Plan of the Company herein set forth as the same may from time to time be amended.

Performance Unit: A unit representing a share of Common Stock subject to a Stock Award, the issuance, transfer or retention of which, in whole or in part, is contingent upon or measured by the attainment of a specified performance objective or objectives, including, without limitation, objectives determined (on a consolidated or unconsolidated basis) by reference to or changes in (a) the Fair Market Value, book value or earnings per share of Common Stock, or (b) the sales and revenues, net income, return on capital employed, asset values or net worth of the Company or one or more of its groups, divisions, Subsidiaries or other units, or (c) a combination of two or more of the foregoing or other factors.

service: Service as an employee of, or a consultant to, the Company or a Subsidiary. "To serve" has a correlative meaning.

Stock Award: An issuance or transfer of shares of Common Stock at the time the Stock Incentive is granted or as soon thereafter as practicable, or an undertaking (other than an Option) to issue or transfer such shares in the future, including, without limitation, such an issuance, transfer or undertaking with respect to Performance Units.

Stock Incentive: A stock incentive granted under this Plan in one of the forms provided for in section 3.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) (a) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) or (b) regularly entitled to receive 50% or more of the dividends (or their equivalents) paid on the common stock (or its equivalent) are owned, directly or indirectly, by the Company; provided, however, that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) which is also a "subsidiary corporation" as defined in section 425(f) of the Internal Revenue Code and the regulations there under adopted by the Secretary of the Treasury or his delegate, or any provisions that may be adopted to amend or replace such section or regulations or both.

3. "Grant" of Stock Incentives:

(a) Subject to the provisions of this Plan, the Incentive Committee may at any time, or from time to time, grant Stock Incentives under this Plan to, and only to, Key Persons; provided, however, that Incentive Stock Options may be granted to, and only to, Key Employees.

(b) Stock Incentives may be granted in the following forms:

            (i) a Stock Award, or
            (ii) an Option, or
            (iii) a combination of a Stock Award and an Option.

4. Stock Subject to this Plan:

(a) Subject to the provisions of paragraph (c) of this section 4 and of section 8, (i) the maximum number of shares of Common Stock which may be issued or transferred pursuant to Stock Incentives granted under this Plan shall not exceed 5,000,000 shares of Common Stock, (ii) the maximum number of shares of Common Stock which may be acquired upon exercise of Options granted at any time or from time to time under this Plan to any one Key Person shall in no event exceed 5% of the maximum number of shares which may be issued or transferred pursuant to Stock Incentives granted under this Plan, and (iii) the maximum number of shares of Common Stock which may be acquired upon exercise of Options granted at any time or from time to time under this

Plan to Key Persons serving as directors of the Company at the time they recommend this Plan for approval and adoption by the shareholders of the Company shall in no event exceed 25% of the maximum number of the shares which may be issued or transferred pursuant to Stock Incentives granted under this Plan.

(b) Authorized but unissued shares of Common Stock and shares of Common Stock held in the treasury, whether acquired by the Company specifically for use under this Plan or otherwise, may be used, as the Incentive Committee may from time to time determine, for purposes of this Plan, provided, however, that any shares acquired or held by the Company for the purposes of this Plan shall, unless and until transferred to a Key Person in accordance with the terms and conditions of a Stock Incentive, be and at all times remain treasury shares of the Company, irrespective of whether such shares are entered in a special account for purposes of this Plan, and shall be available for any corporate purpose.

(c) If any shares of Common Stock subject to a Stock Incentive shall not be issued or transferred and shall cease to be issuable or transferable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance or transfer, be reacquired by the Company or a Subsidiary because of an employee's failure to comply with the terms and conditions of a Stock Incentive, the shares not so issued or transferred, or the shares so reacquired by the Company or a Subsidiary, shall no longer be charged against any of the limitations provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives.

(d) For purpose of this section 4, Common Stock shall include shares of common stock, par value $1.00 per share, of Grace-Connecticut issued or transferred pursuant to Stock Incentives granted by Grace-Connecticut under this Plan as in effect prior to its adoption by the Company, except that in determining, for purposes of this section 4, the number of shares so issued or transferred by Grace-Connecticut prior to the two-for-one split of the common stock of Grace-Connecticut which occurred in December 1987, adjustment shall be made to reflect such stock split.

5.   Stock Awards: Except as otherwise provided in section 12 and in paragraph (f) of section 11, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a) A Stock Award shall be granted only in payment of Incentive Compensation that has been earned or as Incentive Compensation to be earned, including, without limitation, Incentive Compensation awarded concurrently with or prior to the grant of the Stock Award.

(b) For the purposes of this Plan, in determining the value of a Stock Award, all shares of Common Stock subject to such Stock Award shall be valued at not less than 100% of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued or transferred to the Key Person and whether or not such shares are subject to restrictions which affect their value.

(c) Shares of Common Stock subject to a Stock Award may be issued or transferred to the Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time, as the Incentive Committee shall determine. In the event that any such issuance or transfer shall not be made to the Key Person at the time the Stock Award is granted, the Incentive Committee may provide for payment to such Key Person, either in cash or shares of Common Stock, from time to time or at the time or times such shares shall be issued or transferred to such Key Person, of amounts not exceeding the dividends which would have been payable to such Key Person in respect of such shares (as adjusted under section 8) if such shares had been issued or transferred to such Key Person at the time such Stock Award was granted. Any amount payable in shares of Common Stock under the terms of a Stock Award may, at the discretion of the Company, be paid in cash, on each date on which delivery of shares would otherwise have been made, in an amount equal to the Fair Market Value on such date of the shares which would otherwise have been delivered.

(d) A Stock Award shall be subject to such terms and conditions, including, without limitation, restrictions on the sale or other disposition of the Stock Award or of the shares issued or transferred pursuant to such Stock Award, as the Incentive Committee shall determine; provided, however, that upon the issuance or transfer of shares pursuant to a Stock Award, the recipient shall, with respect to such shares, be and become a shareholder of the Company fully entitled to receive dividends, to vote and to exercise all other rights of a shareholder except to the extent otherwise provided in the Stock Award. Each Stock Award shall be evidenced by a written instrument in such form as the Incentive Committee shall determine, provided the Stock Award is consistent with this Plan and incorporates it by reference.

6. Options: Except as otherwise provided in section 12 and in paragraph (f) of section 11, Stock Incentives in the form of Options shall be subject to the following provisions:

(a) Subject to the provisions of section 8, the purchase price per share shall be not less than 100% of the Fair Market Value of a share of Common Stock on the date the Option is granted. The purchase price shall be paid in cash or, if so provided in the Option or authorized by the Incentive Committee (and subject to such terms and conditions as are specified in the Option or by the Incentive Committee), in shares of Common Stock delivered to the Company or in a combination of cash and such shares. Share of Common Stock thus delivered shall be valued at their Fair Market Value on the date of exercise.

(b) Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times, as the Incentive Committee shall determine. Unless otherwise provided in the Option, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of the Option.

(c) Each Option shall be exercisable during the life of the optionee only by him, and after death only by his estate or by a person who acquired the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or canceled, shall terminate as follows after the optionee ceases to serve: (i) if the optionee shall voluntarily resign without the consent of the Incentive Committee or be terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the optionee shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate 15 months after cessation of service if the optionee has served for less than 15 years, the Option shall terminate two years after cessation of service if the optionee has served 15 or more years but less than 25 years, and the Option shall terminate three years after cessation of service if the optionee has served 25 or more years; and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after cessation of service unless the Incentive Committee shall approve a longer period (which approval may be given before or after cessation of service), not to exceed, however, the period which would have been applicable if the optionee had died, become incapacitated or retired under a retirement plan of the Company or a Subsidiary. If the optionee shall die or become incapacitated during the three-month period (or such longer period as the Incentive Committee may approve) referred to in the preceding clause (iii), the Option shall terminate at such time as it would have terminated had the service of the optionee ceased by reason of his death, incapacity or retirement under a retirement plan of the Company or Subsidiary. A leave of absence for military or governmental service or for other purposes shall not, if approved by the Incentive Committee (which approval may be given before or after the leave of absence commences), be deemed a termination of employment within the meaning of this paragraph (c); provided, however, that an Option may not be exercised or canceled during any such leave of absence. Notwithstanding the foregoing provisions of this paragraph (c) or any other provision of this Plan, no Option shall be exercisable after expiration of a period of ten years and one month from the date the Option is granted. Where a Non-Statutory Stock Option is granted for a lease of less than ten years and one month, the Incentive Committee may, at any time prior to the expiration of the Option, extend its term for a period ending not later than ten year and one month from the date the Option was granted. Such an extension shall not be deemed the grant of an Option under this Plan.

(d) Options shall be granted for such lawful consideration as may be provided in the Option or as the Incentive Committee may determine.

(e) No Option nor any right there under may be assigned or transferred except by will or the laws of descent and distribution. If so provided in the Option or if so authorized by the Incentive Committee and subject to such terms and conditions as are specified in the Option or by the Incentive Committee, the Company shall, upon or without the request of the holder of the Option and at any time or from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so canceled over the purchase price of such shares, or (ii) issue or transfer shares of Common Stock

to the holder with a Fair Market Value, at such time or times, equal to such excess.

(f) An Option may, but need not, be an Incentive Stock Option. All shares of Common Stock which may be made subject to Stock Incentives under this Plan may be made subject to Incentive Stock Options; provided that the aggregate Fair Market Value (determined as of the time the option is granted) of the shares subject to each installment becoming exercisable for the first time in any calendar year under Incentive Stock Options granted to any employee on or after January 1, 1987 (under all plans, including this Plan, of his employer corporation and its parent and subsidiary corporations) shall not exceed $100,000.

(g) Each Option shall be evidenced by a written instrument, which shall contain such terms and conditions, and shall be in such form, as the Incentive Committee shall determine, provided the Option is consistent with this Plan and incorporates it by reference. Notwithstanding the preceding sentence, an Option, if so approved by the Incentive Committee, may include restrictions and limitations in addition to those provided for in this Plan.

7. Combinations of Stock Awards and Options: Stock Incentives authorized by paragraph (b) (iii) of section 3 in the form of combinations of Stock Awards and Options shall be subject to the following provisions:

(a) A Stock Incentive may be a combination of any form of Stock Award with any form of Option; provided, however, that the terms and conditions of such Stock Incentive pertaining to a Stock Award are consistent with section 5 and the terms and conditions of such Stock Incentive pertaining to an Option are consistent with section 6.

(b) Such combination Stock Incentive shall be subject to such other terms and conditions as the Incentive Committee may determine, including, without limitation, a provision terminating in whole or in part a portion thereof upon the exercise in whole or in part of another portion thereof. Such combination Stock Incentive shall be evidenced by a written instrument in such form as the Incentive Committee shall determine, provided it is consistent with this Plan and incorporates it by reference.

8. Adjustment Provisions:

(a) In the event that any reclassification, split-up or consolidation of shares of Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, (i) the number and class of shares or other securities or property that may be issued or transferred pursuant to Stock Incentives thereafter granted, (ii) the number and class of shares or other securities or property that have not been issued or transferred under outstanding Stock Incentives, (iii) the purchase price to be paid per

share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued or transferred pursuant to Stock Incentives which are subject to a right of the Company or a Subsidiary to reacquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Incentive Committee.

(b) In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to reacquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Incentive Committee.

9. Term: This Plan was deemed adopted and became effective on the date it was approved and adopted by the shareholders of Grace-Connecticut. This Plan was deemed adopted as to the Company on the date of the adoption and assumption thereof by the Board of Directors with the approval of the shareholders of Grace-Connecticut and became effective as to the Company on the effective date of the merger of Grace Merger Corp., a subsidiary of the Company, with and into Grace-Connecticut. No Stock Incentives shall be granted under this Plan after April 30, 1996.

10. Administration:

(a) This Plan shall be administered by the Incentive Committee. No director shall be designated as or continue to be a member of the Incentive Committee unless he shall at the time of designation and service be a "disinterested person" within the meaning of Rule 16b-3 of the Securities and Exchange Commission (or any successor provision at the time in effect). A member of the Incentive Committee shall not be eligible to be granted a Stock Incentive while serving on the Incentive Committee. Grants of Stock Incentives may be made by the Incentive Committee either in or without consultation with employees, but in either case the Incentive Committee shall have full authority to act in the matter of selection of all Key Persons and in granting Stock Incentives to them.

(b) The Incentive Committee may establish such rules and regulations, not inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to participate in this Plan and for the proper administration of this Plan, and may amend or revoke any rule or regulation so established. The Incentive Committee may make such determinations and interpretations under or in connection with this Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations, subject to the provisions of section 3.1 of the By-laws of the Company, shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders,

and its directors, officers, consultants and employees, and upon their respective legal representatives, beneficiaries, successors and assigns and upon all other persons claiming under or through any of them.

(c) Any action required or permitted to be taken by the Incentive Committee under this Plan may be taken in accordance with Article Ill or the By-laws of the Company even though, because of a vacancy or vacancies as a result of resignations or otherwise, the total number of directors who are then members of the Incentive Committee shall be less than the number initially designated by the Board of Directors.

(d) Members of the Board of Directors and members of the Incentive Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability except for gross negligence or willful misconduct in the performance of their duties.

11. General Provisions:

(a) Nothing in this Plan nor in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b) No shares of Common Stock shall be issued or transferred pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance or transfer of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance or transfer the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive except as to such shares of Common Stock, if any, as shall have been issued or transferred to him.

(d) The Incentive Committee may grant a Stock Incentive to be effective at a specified future date or upon the future happening of a specified event, not more than sixty days from the date on which the Incentive Committee acts. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it is effective. An agreement or other commitment to grant a Stock Incentive in the future to a person who is or will be a Key Person at the time of grant shall not be deemed the grant of a Stock Incentive until the date on which the Incentive Committee takes action to implement such agreement or commitment.

(e) In the case of a grant of a Stock Incentive to a Key Person of a Subsidiary, such grant may, if the Incentive Committee so approves, be implemented by the

Company entering into an agreement with the Subsidiary containing such terms and provisions as the Incentive Committee may authorize, including, without limitation, a provision for the issuance or transfer of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as the Incentive Committee may approve, upon the condition or understanding that the Subsidiary will transfer the shares to the Key Person in accordance with the terms of the Stock Incentive.

(f) In the event the laws of a foreign country, in which the Company or a Subsidiary has employees, prescribes certain requirements for stock incentives to qualify for advantageous tax treatment under the laws of that country (including, without limitation, laws establishing options analogous to Incentive Stock Options), the Board of Directors, upon the recommendation of the Incentive Committee, may restate, in whole or in part, this Plan and may include in such restatement additional provisions for the purpose of qualifying the restated plan and Stock Incentives granted thereunder under such laws of such foreign country; provided, however, that (i) the terms and conditions of a Stock Incentive granted under such restated plan may not be more favorable to the recipient than would be permitted if such Stock Incentive had been granted under this Plan as herein set forth, (ii) all shares allocated to or utilized for the purposes of such restated plan shall be subject to the limitations of section 4, and (iii) the provisions of the restated plan may restrict but may not extend or amplify the provisions of sections 9 and 13.

(g) The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding of any taxes which the Company or a Subsidiary determines it is required to withhold in connection with any Stock Incentive.

(h) Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or fringe benefits to directors, officers, employees or consultants generally, or to any class or group of such persons, which the Company or any Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any incentive compensation, retirement, pension, group insurance, stock purchase, stock bonus or stock option plan.

12. Acquisitions: If the Company or any Subsidiary should merge or consolidate with, or purchase stock or assets or otherwise acquire the whole or part of the business of, another company, the Company in connection therewith, upon the approval of the Incentive Committee, (a) may assume, in whole or in part and with or without modifications or conditions, any stock incentives granted by the acquired company to its directors, officers, employees or consultants in their capacity as such, or (b) may grant new Stock Incentives in substitution therefor. Such assumed or substitute stock incentives may contain terms and conditions inconsistent with the provisions of this Plan, including additional benefits for the recipient; provided that such terms and conditions are permitted under the plan of the other company and such plan was approved by the shareholders of such other company. For the purposes of any applicable plan provision involving time or a date, a substitute stock incentive shall be deemed granted as of the date of grant of the original stock incentive by the other

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K        SEC File #: 001-13953
Document Type: EX-10.10
Description: W.R. GRACE & CO. 1989 STOCK INCENTIVE PLAN
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC                New York, NY                Chicago, IL
Los Angeles, CA               Miami, FL                   Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 10.10

W. R. GRACE & CO.

--------------------

1989 STOCK INCENTIVE PLAN

(As amended through March 7, 1996)

W. R. GRACE &CO.

-------------

1989 STOCK INCENTIVE PLAN

-------------

1. Purposes: The purposes of this Plan are (a) to enable Key Persons to
have incentives related to Common Stock, (b) to encourage Key Persons to
increase their interest in the growth and prosperity of the Company and to
stimulate and sustain constructive and imaginative thinking by Key Persons, (c)
to further the identity of interests of Key Persons with the interests of the
Company's shareholders, and (d) to induce the service or continued service of
Key Persons and to enable the Company to compete with other organizations
offering similar or other incentives in obtaining and retaining the services of
competent individuals.

2. Definitions: Unless otherwise required by the context, the following
terms when used in this Plan shall have the meanings set forth in this section
2.

Board of Directors: The Board of Directors of the Company.

Cessation of service (or words of similar import): When a person ceases to
be an employee of, or consultant to, the Company or a Subsidiary; provided,
however, in the case of an Incentive Stock Option, "cessation of service" (or
words of similar import) shall mean when a person ceases to be an employee of
the Company or a Subsidiary.

Code: The Internal Revenue Code of 1986, as amended.

Common Stock: The common stock of the Company, par value $1.00 per share,
or such other class of shares or other securities or property as may be
applicable pursuant to the provisions of section 8.

Company: W. R. Grace & Co., a New York corporation.

Fair Market Value: (a) The mean between the high and low sales prices of a
share of Common Stock as reported on the Consolidated Transactions Tape for
securities listed on the New York Stock Exchange for the applicable date or, if
no sales of shares of Common Stock were reported for such date, for the next
preceding date for which such sales were so reported, or (b) the fair market
value of a share of Common Stock determined in accordance with any reasonable
method approved by the Incentive Committee.

Incentive Committee: The committee designated by the Board of Directors to
administer stock incentive and stock option plans of the Company and its
subsidiaries generally or this Plan specifically.

Incentive Stock Option: A stock option which states that it is an incentive stock option and which is intended to meet the requirements of Section 422A of the Code and the regulations there under applicable to incentive stock options, as in effect from time to time.

Issuance (or words of similar import): The issuance of authorized but unissued Common Stock or the transfer of issued Common Stock held by the Company or a Subsidiary.

Key Employee: An employee of the Company or a Subsidiary who is a Key Person.

Key Person: An employee of, or consultant to, the Company or a Subsidiary who, in the opinion of the Incentive Committee, has contributed or can contribute significantly to the growth and successful operations of the Company or a Subsidiary. The grant of a Stock Incentive to an employee or consultant shall be deemed a determination by the Incentive Committee that such person is a Key Person.

Non-Statutory Stock Option: An Option, which is not an Incentive Stock Option or another form of statutory stock option (within the meanings of sections 422, 423 and 424 of the Code and the regulations there under, as in effect from time to time).

Option: An option granted under this Plan to purchase shares of Common Stock.

Plan: The 1989 Stock Incentive Plan of the Company herein set forth, as the same may from time to time be amended.

Rule 16b-3: Rule 16b-3 of the Securities and Exchange Commission (or any successor provision in effect at the applicable time).

Service: Service to the Company or a Subsidiary as an employee or consultant. "To serve" has a correlative meaning.

Stock Award: An issuance of shares of Common Stock at the time the Stock incentive is granted or as soon thereafter as practicable, or an undertaking (other than an Option) to issue such shares in the future.

Stock Incentive: A stock incentive granted under this Plan in one of the forms provided for in section 3.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or indirectly, by the Company; provided however, that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) which is also a "subsidiary corporation" as defined in section 425(f) of the Code and the regulations there under, as in effect from time to time.

-2-

3. Grants of Stock Incentives:

(a) Subject to the provisions of this Plan, the Incentive Committee may at any time, and from time to time, grant Stock Incentives under this Plan to, and only to, Key Persons; provided, however, that Incentive Stock Options may be granted to, and only to, Key Employees.

(b) The Incentive Committee may grant a Stock Incentive to be effective at a specified future date or upon the future occurrence of a specified event. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it is effective. An agreement or other commitment to grant a Stock Incentive in the future to a person who is a Key Person or will be a Key Person at the time the grant is intended to become effective shall not be deemed the grant of a Stock Incentive until the date on which the Incentive Committee makes such grant effective.

(c) Stock Incentives may be granted in the following forms:

(i) a Stock Award, or

(ii) an Option, or

(iii) a combination of a Stock Award and an Option.

4. Stock Subject to this Plan:

(a) Subject to the provisions of paragraph (c) of this section 4 and the provisions of section 8, the maximum number of shares of Common Stock which may be issued pursuant to Stock Incentives granted under this Plan shall not exceed 7,500,000 shares of Common Stock.

(b) Authorized but unissued shares of Common Stock and issued shares of. Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan; provided, however, that any shares acquired or held by the Company or a Subsidiary, or otherwise reserved, for the purposes of this Plan shall, unless and until issued to a Key Person in accordance with the terms and conditions of a Stock Incentive, be and at all times remain available for any corporate purpose.

(c) If any shares of Common Stock subject to a Stock Incentive shall not be issued and shall cease to be issuable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance, be reacquired by the Company or a Subsidiary for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives.

-3-

5. Stock Awards: Except as otherwise provided in section 12, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a) For the purposes of this Plan, all shares of Common Stock subject to a Stock Award shall be valued at not less than 100% of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued to the Key Person and whether or not such shares are subject to restrictions which affect their value.

(b) Shares of Common Stock subject to a Stock Award may be issued to the Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time. In the event that any such issuance shall not be made at the time the Stock Award is granted, the Stock Award may provide for payment to such Key Person, either in cash or shares, of Common Stock, of amounts not exceeding the dividends which would have been payable to such Key Person in respect of such shares (as adjusted under section 8) if such shares had been issued to such Key Person at the time such Stock Award was granted. Any Stock Award may provide that the value of any shares of Common Stock to be issued under the terms of such Stock Award may be pail in cash, on each date on which shares would otherwise have been issued, in an amount equal to the Fair Market Value on such date of the shares which would otherwise have been issued.

(c) The material terms of each Stock Award shall be determined by the Incentive Committee. Each Stock Award shall be evidenced by a written instrument consistent with this Plan. A Stock Award (i) may be made contingent upon the attainment of a specified performance objective or objectives, (ii) may be subject to restrictions on the sale or other disposition of the Stock Award or of the shares issued pursuant to such Stock Award, and (iii) may include restrictions and limitations in addition to those provided for in this Plan.

(d) Stock Awards shall be granted for such lawful consideration as may be provided for in the Stock Award.

6. Options: Except as otherwise provided in section 12, Stock Incentive in the form of Options shall be subject to the following provisions:

(a) Subject to the provisions of paragraph (f) of this section 6, the purchase price per share of Common Stock shall be not less than 85% of the Fair Market Value of a share of Common Stock on the date the Option is granted. The Option may provide for the purchase price to be paid (i) in cash, or (ii) in shares of Common Stock (including shares issued pursuant to a Stock Award granted subject to restrictions as provided for in paragraph (c) of section 5) or (iii) in a combination of cash and such shares. Any shares of Common Stock delivered to the Company in payment of the purchase price shall be valued at their Fair Market Value on the date of exercise. No certificate for shares of Common Stock shall be issued upon the exercise of an Option until the purchase price for such shares has been paid in full.

-4-

(b) If so provided in the Option, the Company shall, upon the request of the holder of the Option and at any time and from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so cancelled over the purchase price of such shares, or (ii) issue shares of Common Stock to the holder with a Fair Market Value, at such time or times, equal to such excess, or (iii) pay such excess by a combination of money and shares.

(c) Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times or upon the occurrence of such events, as may be specified in the Option. Unless otherwise provided in the Option, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of the Option.

(d) Each Option shall be exercisable during the life of the optionee only by him and, after his death, only by his estate or by a person who acquired the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or cancelled, shall terminate as follows after the optionee ceases to serve: (i) if the optionee shall voluntarily cease to serve without the consent of the Incentive Committee or shall have his service terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the optionee shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate three years after the date on which he ceased to serve, and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after the date on which the optionee ceased to serve unless the Incentive Committee shall approve a longer period (which approval may be given before or after cessation of service), not to exceed, however, three years. If the optionee shall die or become incapacitated during the three-month period (or such longer period as the Incentive Committee may approve) referred to in the preceding clause (iii), the Option shall terminate three years after the date on which he ceased to serve. A leave of absence for military or governmental service or other purposes shall not, if approved by the Incentive Committee (which approval may be given before or after the leave of absence commences), be deemed a cessation of service within the meaning of this paragraph (d). Notwithstanding the foregoing provisions of this paragraph (d) or any other provision of this Plan, no Option shall be exercisable after expiration of a period of ten years and one month from the date the Option is granted. Where a Non-Statutory Stock Option is granted for a term of less than ten years and one month, the Incentive Committee may, at any time prior to the expiration of the Option, extend its term for a period ending not later than ten years and one month from the date the Option was granted. Such an extension shall not be deemed the grant of an Option under this Plan.

(e) No Option nor any right there under may be assigned or transferred except by will or the laws of descent and distribution.

-5-

(f) An Option may, but need not, be an Incentive Stock Option. All shares of Common Stock which may be made subject to Stock Incentives under this Plan may be made subject to Incentive Stock Options; provided that (i) no Incentive Stock Option may be granted more than ten years after the effective date of this Plan as provided in section 9, (ii) the purchase price per share of Common Stock subject to an Incentive Stock Option shall be not less than 100% of the Fair Market Value of a share of Common Stock on the date such Incentive Stock Option is granted, and (iii) the aggregate Fair Market Value (determined as of the time an Incentive Stock Option is granted)of the shares subject to each installment becoming exercisable for the first time in any calendar year under Incentive Stock Options granted, on or after January 1, 1987 (under all plans, including this Plan, of his employer corporation and its parent and subsidiary corporations), to the Key Employee to whom such Incentive Stock Option is granted, shall not exceed $100,000.

(g) The material terms of each Option shall be determined by the Incentive Committee. Each Option shall be evidenced by a written instrument consistent with this Plan. An Option may include restrictions and limitations in addition to those provided for in this Plan.

(h) Options shall be granted for such lawful consideration as may be provided for in the Option.

7. Combinations of Stock Awards and Options: Stock Incentives authorized by paragraph (b) (iii) of section 3 in the form of combinations of Stock Awards and Options shall be subject to the following provisions:

(a) A Stock Incentive may be a combination of any form of Stock Award with any form of Option, provided, however, that the terms and conditions of such Stock Incentive pertaining to a Stock Award are consistent with section 5 and the terms and conditions of such Stock Incentive pertaining to an Option are consistent with section 6.

(b) Such combination Stock Incentive shall be subject to such other terms and conditions as may be specified therein including, without limitation, a provision terminating in whole or in part a portion thereof upon the exercise in whole or in part of another portion thereof.

(c) The material terms of each combination Stock Incentive shall be determined by the Incentive Committee. Each combination Stock Incentive shall be evidenced by a written instrument consistent with this Plan.

8. Adjustment Provisions:

(a) In the event that any reclassification, split-up or consolidation of shares of Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities

-6-

or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, (i) the number and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number and class of shares or other securities or property which have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives which are subject to a right of the Company or a Subsidiary to reacquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Incentive Committee.

(b) In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number and class of shares or other securities or property which have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives which are subject to a right of the Company or a Subsidiary to reacquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Incentive Committee.

9. Term: This Plan shall be deemed adopted and shall become effective on the date it is approved by the shareholders of the Company. No Stock Incentives shall be granted under this Plan after April 30, 1999.

10. Administration:

(a) This Plan shall be administered by the Incentive Committee. No director shall be designated as or continue to be a member of the incentive Committee unless he shall at the time of designation and at all times during service as a member of the Incentive Committee be a "disinterested person" within the meaning of Rule 16b-3. The Incentive Committee shall have full authority to act in the matter of selection of Key Persons and in granting Stock Incentives to them and such other authority as is granted to the Incentive Committee by this Plan.

(b) The Incentive Committee may establish such rules and regulations, not inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to be granted Stock Incentives under this Plan and for the proper administration of this Plan, and may amend or revoke any rule or regulation so established. The Incentive Committee may make such determinations and interpretations under or in connection with this Plan, as it deems necessary or advisable. All such rules, regulations, determinations and interpretations shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders and its directors, officers, consultants and employees, and upon their respective legal representatives,

-7-

beneficiaries, successors and assigns, and upon all other persons claiming under or through any of them.

(c) Members of the Board of Directors and members of the Incentive Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability in the performance of their duties except as otherwise provided by applicable law.

11. *General Provisions:*

(a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b) No shares of Common Stock shall be issued pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive except as to such shares of Common Stock, if any, as shall have been issued to him.

(d) In the case of a grant of a Stock Incentive to a Key Person of a Subsidiary, such grant may provide for the issuance of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as may be provided, upon the condition or understanding that the Subsidiary will transfer the shares to the Key Person in accordance with the terms of the Stock Incentive.

(e) In the event the laws of a foreign country, in which the Company or a Subsidiary has employees, prescribe certain requirements for stock incentives to qualify for advantageous tax treatment under the laws of that country (including, without limitation, laws establishing options analogous to Incentive Stock Options), the Board of Directors, upon the recommendation of the Incentive Committee, may, for the benefit of such employees, amend, in whole or in part, this Plan and may include in such amendment additional provisions for the purposes of qualifying the amended plan and Stock Incentives granted there under under such laws of such foreign country; provided, however, that (i) the terms and conditions of a Stock Incentive granted under such amended plan may not be more favorable to the recipient than would be permitted if such Stock Incentive had been granted under this Plan as herein set forth, (ii) all shares allocated to or utilized for the purposes of such amended plan shall be subject to the

-8-

limitations of section 4, and (iii) the provisions of the amended plan may restrict but may not extend or amplify the provisions of sections 9 and 13.

(f) The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding of any taxes which the Company or a Subsidiary determines it is required to withhold in connection with any Stock Incentive.

(g) Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or benefits to directors, officers, employees or consultants generally, or to any class or group of such persons, which the Company or any Subsidiary now has or may hereafter put into effect, including, without limitation, any incentive compensation, retirement, pension, group insurance, stock purchase, stock bonus or stock option plan.

12. Acquisitions: If the Company or any Subsidiary should merge or consolidate with, or purchase stock or assets or otherwise acquire the whole or part of the business of, another company, the Company, upon the approval of the Incentive Committee, (a) may assume, in whole or in part and with or without modifications or conditions, any stock incentives granted by the acquired company to its directors, officers, employees or consultants in their capacity as such, or (b) may grant new Stock Incentives in substitution therefor. Such assumed or substitute stock incentives may contain terms and conditions inconsistent with the provisions of this Plan, including additional benefits for the recipient, provided that, if such assumed or substitute stock incentives are Incentive Stock Options, such terms and conditions are permitted under the plan of the other company. For the purposes of any applicable plan provision involving time or a date, a substitute stock incentive shall be deemed granted as of the date of grant of the original stock incentive by the other company.

13. Amendments and Termination:

(a) This Plan may be amended or terminated by the Board of Directors upon the recommendation of the incentive Committee; provided that, without the approval of the shareholders of the Company, no amendment shall be made which (i) causes this Plan to no longer comply with Rule 16b-3 or applicable law, (ii) permits any person who is not a Key Person to be granted a Stock Incentive (except as otherwise provided in section 12), (iii) amends the provisions of paragraph (a) of section 5 or paragraph (a) or paragraph (f) of section 6 to permit shares to be valued at, or to have a purchase price of, respectively, less than the respective percentages of Fair Market Value specified therein, (iv) amends section 9 to extend the date set forth therein, or (v) amends this section 13.

(b) No amendment or termination of this Plan shall adversely affect any Stock Incentive theretofore granted, and no amendment of any Stock Incentive granted pursuant to this Plan shall adversely affect such Stock Incentive, without the consent of the holder thereof.

-9-

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K        SEC File #: 001-13953
Document Type: EX-10.11
Description: W.R. GRACE & CO. 1994 STOCK INCENTIVE PLAN
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC                 New York, NY                Chicago, IL
Los Angeles, CA                  Miami, FL                  Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 10.11

W. R. GRACE & CO.

-----------

1994 STOCK INCENTIVE PLAN

(As Amended through March 7,1996)

This document constitutes part of a
*prospectus covering* securities that
have been registered under the
Securities Act of 1933.

W. R GRACE & CO.

------------

1994 STOCK INCENTIVE PLAN
-------------------------

1. Purposes: The purposes of this Plan are (a) to enable Key Persons to have incentives related to Common Stock, (b) to encourage Key Persons to increase their interest in the growth and prosperity of the Company and to stimulate and sustain constructive and imaginative thinking by Key Persons, (c) to further the identity of interests of Key Persons with the interests of the Company's shareholders, and (d) to induce the service or continued service of Key Persons and to enable the Company to compete with other organizations offering similar or other incentives in obtaining and retaining the services of the most highly qualified individuals.

2. Definitions: When used in this Plan, the following terms shall have the meanings set forth in this section 2.

Board of Directors: The Board of Directors of the Company.

cessation of service (or words of similar import): When a person ceases to be an employee of, or consultant to, the Company or a Subsidiary; provided, however, in the case of an Incentive Stock Option, "cessation of service" (or words of similar import) shall mean when a person ceases to be an employee of the Company or a Subsidiary.

Code: The Internal Revenue Code of 1986, as amended.

Committee: The Compensation, Employee Benefits and Stock Incentive Committee of the Board of Directors of the Company or any other committee designated by such Board of Directors to administer stock incentive and stock option plans of the Company and its subsidiaries generally or this Plan specifically.

Common Stock: The common stock of the Company, par value $1.00 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 8.

Company: W. R. Grace & Co., a New York corporation.

Fair Market Value: (a) The mean between the high and low sales prices of a share of Common Stock in New York Stock Exchange Composite Transactions on the applicable date, as reported in The Wall Street Journal or another newspaper of general circulation, or, if no sales of shares of Common Stock were reported for such date, for the next preceding date for which such sales were so reported, or (b) the fair market value of a share of Common Stock determined in accordance with any other reasonable method approved by the Committee.

Incentive Stock Option: A stock option that states that it is an incentive stock option and that is intended to meet the requirements of Section 422A of the Code and the regulations thereunder applicable to incentive stock options, as in effect from time to time.

issuance (or words of similar import): The issuance of authorized but unissued Common Stock or the transfer of issued Common Stock held by the Company or a Subsidiary.

Key Employee: An employee of the Company or a Subsidiary who is a Key Person.

Key Person: An employee of, or consultant to, the Company or a Subsidiary who, in the opinion of the Committee, has contributed or can contribute significantly to the growth and successful operations of the Company or one or more Subsidiaries. The grant of a Stock Incentive to an employee or consultant shall be deemed a determination by the Committee that such person is a Key Person.

Non-Statutory Stock Option: An Option that is not an Incentive Stock Option or another form of statutory stock option (within the meanings of sections 422, 423 and 424 of the Code and the regulations thereunder, as in effect from time to time).

Option: An option granted under this Plan to purchase shares of Common Stock.

Plan: The 1994 Stock Incentive Plan of the Company herein set forth, as the same may from time to time be amended.

Rule 16b-3: Rule 16b-3 of the Securities and Exchange Commission (or any successor provision in effect at the applicable time).

service: Service to the Company or a Subsidiary as an employee or consultant. "To serve" has a correlative meaning.

Stock Award: An issuance of shares of Common Stock or an undertaking (other than an Option) to issue such shares in the future.

Stock Incentive: A stock incentive granted under this Plan in one of the forms provided for in section 3.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or indirectly, by the Company; provided, however, that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) that is also a "subsidiary corporation" as defined in section 425(f) of the Code and the regulations thereunder, as in effect from time to time.

-2-

3. Grants of Stock Incentives:

(a) Subject to the provisions of this Plan, the Committee may at any time and from time to time grant Stock Incentives under this Plan to, and only to, Key Persons; provided, however, that Incentive Stock Options may be granted to, and only to, Key Employees.

(b) The Committee may grant a Stock Incentive to be effective at a specified future date or upon the future occurrence of a specified event. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it becomes effective. An agreement or other commitment to grant a Stock Incentive that is to be effective in the future shall not be deemed the grant of a Stock Incentive until the date on which such Stock Incentive becomes effective.

(c) Stock Incentives may be granted in the form of:

    (i)    a Stock Award, or

    (ii)    an Option, or

    (iii)    a combination of a Stock Award and an Option.

4. Stock Subject to this Plan:

(a) Subject to the provisions of paragraph (c) of this section 4 and the provisions of section 8, the maximum number of shares of Common Stock that may be issued pursuant to Stock Incentives granted under this Plan shall not exceed 3,000,000 shares of Common Stock.

(b) Authorized but unissued shares of Common Stock and issued shares of Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan.

(c) If any shares of Common Stock subject to a Stock Incentive shall not be issued and shall cease to be issuable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance, be reacquired by the Company or a Subsidiary for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives.

(d) Of the total number of shares specified in paragraph (a) of this section 4 (subject to adjustment as specified therein), during the term of this Plan as defined in section 9, (i) no more than 10% may be subject to Options granted to any one Key Person, (ii) no more than 15% may be subject to Stock Incentives granted to any one Key Person, and (iii) no more than 3% in the aggregate may be subject to Stock Incentives granted to all Key Persons who are consultants to the Company and/or one

-3-

or more Subsidiaries at the date the relevant Stock Incentive is granted.

5. Stock Awards:

Except as otherwise provided in section 12, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a) For purposes of this Plan, all shares of Common Stock subject to a Stock Award shall be valued at not less than 100% of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued pursuant to such Stock Award and whether or not such shares are subject to restrictions affecting their value.

(b) Shares of Common Stock subject to a Stock Award may be issued to a Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time. In the event that any such issuance shall not be made at the time the Stock Award is granted, the Stock Award may provide for the payment to such Key Person, either in cash or shares of Common Stock, of amounts not exceeding the dividends that would have been payable to such Key Person in respect of the number of shares of Common Stock subject to such Stock Award (as adjusted under section 8) if such shares had been issued to such Key Person at the time such Stock Award was granted. Any Stock Award may provide that the value of any shares of Common Stock subject to such Stock Award may be paid in cash, on each date on which shares would otherwise have been issued, in an amount equal to the Fair Market Value on such date of the shares that would otherwise have been issued.

(c) The material terms of each Stock Award shall be determined by the Committee. Each Stock Award may be evidenced by a written instrument consistent with this Plan. It is intended that a Stock Award would be (i) made contingent upon the attainment of one or more specified performance objectives and/or (ii) subject to restrictions on the sale or other disposition for a period of three or more years of the Stock Award or the shares subject thereto; provided that (x) a Stock Award may include restrictions and limitations in addition to those provided for herein and (y) of the total number of shares specified in paragraph (a) of section 4 (subject to adjustment as specified therein), up to 3% may be subject to Stock Awards not subject to clause (i) or clause (ii) of this sentence.

(d) A Stock Award shall be granted for such lawful consideration as may be provided for therein.

6. Options: Except as otherwise provided in section 12, Stock Incentives in the form of Options shall be subject to the following provisions:

(a) Subject to the provisions of paragraph (f) of this section 6, the purchase price per share of Common Stock shall be not less than 100% of the Fair Market Value of a share of Common Stock on the date the Option is granted. The Option may provide for the purchase price to be paid (i) in cash, or (ii) in shares of

-4-

Common Stock (including shares issued pursuant to a Stock Award granted subject to restrictions as provided for in paragraph (c) of section 5), or (iii) in a combination of cash and such shares. Any shares of Common Stock delivered to the Company in payment of the purchase price shall be valued at their Fair Market Value on the date of exercise. No certificate for shares of Common Stock shall be issued upon the exercise of an Option until the purchase price for such shares has been paid in full.

(b) If so provided in the Option, the Company shall, upon the request of the holder of the Option and at any time and from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so canceled over the purchase price for such shares, or (ii) issue shares of Common Stock to the holder with a Fair Market Value, at such time or times, equal to such excess, or (iii) pay such excess by a combination of money and shares.

(c) Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times or upon the occurrence of such events, as may be specified in the Option, as determined by the Committee. Unless otherwise provided in the written instrument provided in paragraph (g) of this section 6, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of such Option.

(d) Each Option shall be exercisable during the life of the holder only by him and, after his death, only by his estate or by a person who acquires the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or canceled, shall terminate as follows after the holder ceases to serve: (i) if the holder shall voluntarily cease to serve without the consent of the Committee or shall have his service terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the holder shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate three years after the date on which he ceased to serve; and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after the date on which the holder ceased to serve unless the Committee shall approve a longer period (which approval may be given before or after cessation of service) not to exceed three years. If the holder shall die or become incapacitated during the three-month period (or such longer period as the Committee may approve) referred to in the preceding clause (iii), the Option shall terminate three years after the date on which he ceased to serve. A leave of absence for military or governmental service or other purposes shall not, if approved by the Committee (which approval may be given before or after the leave of absence commences), be deemed a cessation of service within the meaning of this paragraph (d). Notwithstanding the foregoing provisions of this paragraph (d) or any other provision of this Plan, no Option shall be exercisable after expiration of a period of ten years and one month from the date the Option is granted. Where a Non-Statutory Stock Option is granted for a term of less than ten years and one month, the Committee may, at any

-5-

time prior to the expiration of the Option, extend its term for a
period ending not later than ten years and one month from the date the Option
was granted. Such an extension shall not be deemed the grant of a new Option
under this Plan.

(e) No Option nor any right thereunder may be assigned or transferred
except by will or the laws of descent and distribution, unless otherwise
provided in the Option.

(f) An Option may, but need not, be an Incentive Stock Option. All shares
of Common Stock that may be made subject to Stock Incentives under this Plan may
be made subject to Incentive Stock Options; provided that (i) no Incentive Stock
Option may be granted more than ten years after the effective date of this Plan,
as provided in section 9, (ii) the purchase price per share of Common Stock
subject to an Incentive Stock Option shall be not less than 100% of the Fair
Market Value of a share of Common Stock on the date such Incentive Stock Option
is granted, and (iii) the aggregate Fair Market Value (determined as of the time
an Incentive Stock Option is granted) of the shares subject to each installment
becoming exercisable for the first time in any calendar year under Incentive
Stock Options granted, on or after January 1,1987 (under all plans, including
this Plan, of his employer corporation and its parent and subsidiary
corporations), to the Key Employee to whom such Incentive Stock Option is
granted, shall not exceed $100,000.

(g) The material terms of each Option shall be determined by the Committee.
Each Option shall be evidenced by a written instrument consistent with this
Plan. An Option may include restrictions and limitations in addition to those
provided for in this Plan.

(h) Options shall be granted for such lawful consideration as may be
provided for in the Option.

7. Combination of Stock Awards and Options: Stock Incentives authorized by
paragraph (c)(iii) of section 3 in the form of combinations of Stock Awards and
Options shall be subject to the following provisions:

(a) A Stock Incentive may be a combination of any form of Stock Award and
any form of Option, provided, however, that the terms and conditions of such
Stock Incentive pertaining to a Stock Award are consistent with section 5 and
the terms and conditions of such Stock Incentive pertaining to an Option are
consistent with section 6.

(b) Such combination Stock Incentive shall be subject to such other terms
and conditions as may be specified therein including, without limitation, a
provision terminating in whole or in part a portion thereof upon the exercise in
whole or in part of another portion thereof.

(c) The material terms of each combination Stock Incentive shall be
determined by the Committee. Each combination Stock Incentive shall be evidenced
by a written instrument consistent with this Plan.

-6-

8. Adjustment Provisions:

(a) In the event that any reclassification, split-up or consolidation of the Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, (i) the number and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

(b) In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

(c) In the event of a merger or consolidation of the Company in which the Common Stock is converted into the right to receive a specified amount of cash per share (the "merger price"), then each Option outstanding immediately prior to the effective time of such merger or consolidation (the "effective time") shall be treated as follows: (i) each such Option having a per share purchase price equal to or greater than the merger price shall terminate at the effective time and be of no further force and effect, without the making of any payment to the holder of such Option; and (ii) each such Option having a per share purchase price less than the merger price shall terminate at the effective time and be of no further force and effect, and the holder of such Option shall be paid in cash, as promptly as practicable following the effective time, an amount equal to the product of (A) the excess of the merger price over the per share purchase price of such Option times (B) the number of shares covered by such Option immediately prior to the effective time.

-7-

9. Term:

This Plan shall be deemed adopted and shall become effective on the date it is approved by the shareholders of the Company. No Stock Incentives shall be granted under this Plan after April 30, 2004.

10. Administration:

(a) This Plan shall be administered by the Committee. No director shall be designated as or continue to be a member of the Committee unless he shall at the time of designation and at all times during service as a member of the Committee be a 'disinterested person" within the meaning of Rule 16b-3. The Committee shall have full authority to act in the matter of selection of Key Persons and in granting Stock Incentives to them and such other authority as is granted to the Committee by this Plan.

(b) The Committee may establish such rules and regulations, not inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to be granted Stock Incentives under this Plan and for the proper administration of this Plan, and may amend or revoke any rule or regulation so established. The Committee may make such determinations and interpretations under or in connection with this Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations shall be binding and conclusive upon the Company, the Subsidiaries, its shareholders and its directors, officers, consultants and employees, and upon their respective legal representatives, beneficiaries, successors and assigns, and upon all other persons claiming under or through any of them.

(c) Members of the Board of Directors and members of the Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability in the performance of their duties except as otherwise provided by applicable law.

11. General Provisions:

(a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b) No shares of Common Stock shall be issued pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or

-8-

to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive except as to such shares of Common Stock, if any, as shall have been issued to him.

(d) In the case of a grant of a Stock Incentive to a Key Person of a Subsidiary, such grant may provide for the issuance of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as may be provided, upon the condition or understanding that the Subsidiary will transfer the shares to the Key Person in accordance with the terms of the Stock Incentive.

(e) In the event the laws of a country in which the Company or a Subsidiary has employees prescribe certain requirements for stock incentives to qualify for advantageous tax treatment under the laws of that country (including, without limitation, laws establishing options analogous to Incentive Stock Options), the Committee, may, for the benefit of such employees, amend, in whole or in part, this Plan and may include in such amendment additional provisions for the purposes of qualifying the amended plan and Stock Incentives granted thereunder under such laws; provided, however, that (i) the terms and conditions of a Stock Incentive granted under such amended plan may not be more favorable to the recipient than would be permitted if such Stock Incentive had been granted under this Plan as herein set forth, (ii) all shares allocated to or utilized for the purposes of such amended plan shall be subject to the limitations of section 4, and (iii) the provisions of the amended plan may restrict but may not extend or amplify the provisions of sections 9 and 13.

(f) The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding of any taxes that the Company or a Subsidiary determines it is required to withhold in connection with any Stock Incentive.

(g) Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or benefits to directors, officers, employees or consultants generally, or to any class or group of such persons, that the Company or any Subsidiary now has or may hereafter put into effect, including, without limitation, any incentive compensation, retirement, pension, group insurance, stock purchase, stock bonus or stock option plan.

12. Acquisitions: If the Company or any Subsidiary should merge or consolidate with, or purchase stock or assets or otherwise acquire the whole or part of the business of, another entity, the Company, upon the approval of the Committee, (a) may assume, in whole or in part and with or without modifications or conditions, any stock incentives granted by the acquired entity to its directors, officers, employees or consultants in their capacities as such, or (b) may grant new Stock Incentives in substitution therefor. Such assumed or substitute stock incentives may contain terms and conditions inconsistent with the provisions of this Plan (including the limitations set forth in paragraph (d) of section 4), including additional benefits for the recipient, provided that, if such assumed or substitute stock incentives are Incentive Stock Options, such terms and conditions are permitted under the plan of the acquired entity.

-9-

For the purposes of any applicable plan provision involving time or a date, a substitute stock incentive shall be deemed granted as of the date of grant of the original stock incentive by the acquired entity.

13. Amendments and Termination:

(a) This Plan may be amended or terminated by the Board of Directors upon the recommendation of the Committee; provided that, without the approval of the shareholders of the Company, no amendment shall be made which (i) causes this Plan to cease to comply with Rule 16b-3 or applicable law, (ii) permits any person who is not a Key Person to be granted a Stock Incentive (except as otherwise provided in section 12), (iii) amends the provisions of paragraph (d) of section 4, paragraph (a) of section 5 or paragraph (a) or paragraph (f) of section 6 to permit shares to be valued at, or to have a purchase price of, respectively, less than the percentage of Fair Market Value specified therein, (iv) amends section 9 to extend the date set forth therein, or (v) amends this section 13.

(b) No amendment or termination of this Plan shall adversely affect any Stock Incentive theretofore granted, and no amendment of any Stock Incentive granted pursuant to this Plan shall adversely affect such Stock Incentive, without the consent of the holder thereof.

-10-

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K        SEC File #: 001-13953
Document Type: EX-21
Description: LIST OF SUBSIDIARIES OF W.R. GRACE & CO.
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC              New York, NY              Chicago, IL
Los Angeles, CA              Miami, FL                 Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 21

[X] W. R. GRACE & CO., A DELAWARE CORPORATION
U.S. SUBSIDIARIES

12/31/2001

[X]  Chapter 11 Filing - April 2, 2001

| | SUBSIDIARY NAME | STATE OF INCORPORATION |
|---|---|---|
| [X] | A-1 Bit & Tool Co., Inc. | DE |
| | Advanced Refining Technologiess Management, Inc. | DE |
| | Advanced Refining Technologies LLC | DE |
| [X] | Alewife Boston Ltd. | MA |
| [X] | Alewife Land Corporation | MA |
| [X] | Amicon, Inc. | DE |
| | AP Chem Incorporated | MD |
| [X] | CB Biomedical, Inc. | DE |
| [X] | CCHP, Inc. | DE |
| [X] | Coalgrace, Inc. | DE |
| [X] | Coalgrace II, Inc. | DE |
| | Construction Products Dubai, Inc. | DE |
| [X] | Creative Food 'N Fun Company | DE |
| [X] | Darex Puerto Rico, Inc. | DE |
| [X] | Del Taco Restaurants, Inc. | DE |
| [X] | Dewey and Almy, LLC | DE |
| [X] | Ecarg, Inc. | NJ |
| [X] | Five Alewife Boston Ltd. | MA |
| [X] | G C Limited Partners I, Inc. | DE |
| [X] | G C Management, Inc. | DE |
| [X] | GEC Management Corporation | DE |
| [X] | GN Holdings, Inc. | DE |
| [X] | GPC Thomasville Corp. | DE |
| [X] | Gloucester New Communities Company, Inc. | NJ |
| [X] | Grace A-B Inc. | DE |
| [X] | Grace A-B II Inc. | DE |
| | Grace Asia Pacific, Inc. | DE |
| | Grace Chemicals, Inc. | DE |
| [X] | Grace Chemical Company of Cuba | IL |
| | Grace Collections, Inc. | DE |
| [X] | Grace Culinary Systems, Inc. | MD |
| [X] | Grace Drilling Company | DE |
| [X] | Grace Energy Corporation | DE |
| [X] | Grace Environmental, Inc. | DE |
| [X] | Grace Europe, Inc. | DE |

1

| | SUBSIDIARY NAME | STATE OF INCORPORATION |
|---|---|---|
| | Grace Germany Holdings, Inc. | DE |
| [X] | Grace H-G Inc. | DE |
| [X] | Grace H-G II Inc. | DE |
| [X] | Grace Hotel Services Corporation | DE |
| [X] | Grace International Holdings, Inc. | DE |
| | Grace Management Services, Inc. | DE |
| [X] | Grace Offshore Company | LA |
| [X] | Grace PAR Corporation | DE |
| [X] | Grace Petroleum Libya Incorporated | DE |
| | Grace Receivables Purchasing, Inc. | DE |
| [X] | Grace Tarpon Investors, Inc. | DE |
| [X] | Grace Ventures Corp. | DE |
| [X] | Grace Washington, Inc. | DE |
| [X] | W. R. Grace Capital Corporation | NY |
| [X] | W. R. Grace & Co.-Conn. | CT |
| [X] | W. R. Grace Land Corporation | NY |
| [X] | Gracoal, Inc. | DE |
| [X] | Gracoal II, Inc. | DE |
| [X] | Guanica-Caribe Land Development Corporation | DE |
| [X] | Hanover Square Corporation | DE |
| [X] | Homco International, Inc. | DE |
| | Ichiban Chemical Co., Inc. | DE |
| [X] | Kootenai Development Company | MT |
| [X] | L B Realty, Inc. | DE |
| [X] | Litigation Management, Inc. | DE |
| [X] | Monolith Enterprises, Incorporated | DC |
| [X] | Monroe Street, Inc. | DE |
| [X] | MRA Holdings Corp. | DE |
| [X] | MRA Intermedco, Inc. | DE |
| [X] | MRA Staffing Systems, Inc. | DE |
| [X] | Remedium Group, Inc. | DE |
| | Separations Group, The | CA |
| [X] | Southern Oil, Resin & Fiberglass, Inc. | FL |
| [X] | Water Street Corporation | DE |

2

NON-U.S. SUBSIDIARIES
---------------------

```
-------------------------------------------------------------------
COUNTRY/
Subsidiary Name
-------------------------------------------------------------------
ARGENTINA
-------------------------------------------------------------------
W. R. Grace Argentina S.A.
-------------------------------------------------------------------
WRG Argentina, S.A.
-------------------------------------------------------------------
AUSTRALIA
-------------------------------------------------------------------
Grace Australia Pty. Ltd.
-------------------------------------------------------------------
BELGIUM
-------------------------------------------------------------------
Grace N.V.
-------------------------------------------------------------------
Grace Silica N.V.
-------------------------------------------------------------------
BRAZIL
-------------------------------------------------------------------
Grace Brasil Ltda.
-------------------------------------------------------------------
Grace Davison Ltda.
-------------------------------------------------------------------
PEADCO-Engenharia, Comercio Industria Ltda.
-------------------------------------------------------------------
CANADA
-------------------------------------------------------------------
GEC Divestment Corporation Ltd.
-------------------------------------------------------------------
Grace Canada, Inc.
-------------------------------------------------------------------
W. R. Grace Finance (NRO) Ltd.
-------------------------------------------------------------------
CHILE
-------------------------------------------------------------------
Grace Quimica Compania Limitada
-------------------------------------------------------------------
CHINA - PEOPLE'S REPUBLIC OF
-------------------------------------------------------------------
Grace China Ltd.
-------------------------------------------------------------------
COLOMBIA
-------------------------------------------------------------------
Grace Colombia S.A.
-------------------------------------------------------------------
W. R. G.  Colombia S.A.
-------------------------------------------------------------------
CUBA
-------------------------------------------------------------------
Envases Industriales y Comerciales, S.A.
-------------------------------------------------------------------
Papelera Camagueyana, S.A.
-------------------------------------------------------------------
DENMARK
-------------------------------------------------------------------
Grace A/S
-------------------------------------------------------------------
FRANCE
-------------------------------------------------------------------
Etablissements Pieri S.A.
-------------------------------------------------------------------
Societe Civile Beau-Beton
-------------------------------------------------------------------
W. R. Grace S.A.
-------------------------------------------------------------------
GERMANY
-------------------------------------------------------------------
Advanced Refining Technologies GmbH
-------------------------------------------------------------------
Grace Darex GmbH
-------------------------------------------------------------------
Grace GP G.m.b.H.
-------------------------------------------------------------------
Grace Holding G.m.b.H.
-------------------------------------------------------------------
Grace Management GP G.m.b.H.
-------------------------------------------------------------------
Grace Silica GmbH
-------------------------------------------------------------------
```

3

```
-------------------------------------------------------------------
COUNTRY/
Subsidiary Name
-------------------------------------------------------------------
GREECE
-------------------------------------------------------------------
Grace Hellas E.P.E.
-------------------------------------------------------------------
HONG KONG
-------------------------------------------------------------------
W. R. Grace (Hong Kong) Limited
-------------------------------------------------------------------
W. R. Grace Southeast Asia Holdings Limited
-------------------------------------------------------------------
HUNGARY
-------------------------------------------------------------------
Grace Ertekesito Kft.
-------------------------------------------------------------------
INDIA
-------------------------------------------------------------------
W. R. Grace & Co. (India) Private Limited
-------------------------------------------------------------------
INDONESIA
-------------------------------------------------------------------
PT. Grace Specialty Chemicals Indonesia
-------------------------------------------------------------------
IRELAND
-------------------------------------------------------------------
Amicon Ireland Limited
-------------------------------------------------------------------
Grace Construction Products (Ireland) Limited
-------------------------------------------------------------------
Trans-Meridian Insurance (Dublin) Ltd.
-------------------------------------------------------------------
ITALY
-------------------------------------------------------------------
W. R. Grace Italiana S.p.A.
-------------------------------------------------------------------
JAPAN
-------------------------------------------------------------------
Grace Chemicals K.K.
-------------------------------------------------------------------
Grace Japan Kabushiki Kaisha
-------------------------------------------------------------------
KOREA
-------------------------------------------------------------------
Grace Korea Inc.
-------------------------------------------------------------------
MALAYSIA
-------------------------------------------------------------------
W. R. Grace (Malaysia) Sendiran Berhad
-------------------------------------------------------------------
W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.
-------------------------------------------------------------------
MEXICO
-------------------------------------------------------------------
Grace Container, S. A. de C. V.
-------------------------------------------------------------------
W. R. Grace Holdings, S. A. de C. V.
-------------------------------------------------------------------
NETHERLANDS
-------------------------------------------------------------------
Amicon B.V.
-------------------------------------------------------------------
Denac Nederland B.V.
-------------------------------------------------------------------
Storm van Bentem en Kluyver B.V.
-------------------------------------------------------------------
W. R. Grace B.V.
-------------------------------------------------------------------
NETHERLANDS ANTILLES
-------------------------------------------------------------------
W. R. Grace N.V.
-------------------------------------------------------------------
NEW ZEALAND
-------------------------------------------------------------------
Grace (New Zealand) Limited
-------------------------------------------------------------------
PHILIPPINES
-------------------------------------------------------------------
W. R. Grace (Philippines), Inc.
-------------------------------------------------------------------
POLAND
-------------------------------------------------------------------
Grace Sp. z o.o.
-------------------------------------------------------------------
RUSSIA
-------------------------------------------------------------------
Darex CIS LLC
-------------------------------------------------------------------
SINGAPORE
-------------------------------------------------------------------
W. R. Grace (Singapore) Private Limited
-------------------------------------------------------------------
SOUTH AFRICA
-------------------------------------------------------------------
Grace Davison (Proprietary) Limited
-------------------------------------------------------------------
W. R. Grace Africa (Pty.) Limited
-------------------------------------------------------------------
```

4

```
------------------------------------------------------------------
COUNTRY/
Subsidiary Name
------------------------------------------------------------------
SPAIN
------------------------------------------------------------------
Grace, S.A.
------------------------------------------------------------------
Pieri Especialidades, S.L.
------------------------------------------------------------------
SWEDEN
------------------------------------------------------------------
Grace AB
------------------------------------------------------------------
Grace Catalyst AB
------------------------------------------------------------------
Grace Sweden AB
------------------------------------------------------------------
SWITZERLAND
------------------------------------------------------------------
Pieri S.A.
------------------------------------------------------------------
TAIWAN
------------------------------------------------------------------
W. R. Grace Taiwan, Inc.
------------------------------------------------------------------
THAILAND
------------------------------------------------------------------
W. R. Grace (Thailand) Limited
------------------------------------------------------------------
UNITED KINGDOM
------------------------------------------------------------------
A.A. Consultancy & Cleaning Company Limited
------------------------------------------------------------------
Cormix Limited
------------------------------------------------------------------
Borndear 1 Limited
------------------------------------------------------------------
Borndear 2 Limited
------------------------------------------------------------------
Borndear 3 Limited
------------------------------------------------------------------
Chasmbridge Limited
------------------------------------------------------------------
Darex UK Limited
------------------------------------------------------------------
Emerson & Cuming (Trading) Ltd.
------------------------------------------------------------------
Emerson & Cuming (UK) Ltd.
------------------------------------------------------------------
Grace Construction Products Limited
------------------------------------------------------------------
Pieri U.K. Limited
------------------------------------------------------------------
Servicised Ltd.
------------------------------------------------------------------
W. R. Grace Limited
------------------------------------------------------------------
VENEZUELA
------------------------------------------------------------------
Grace Venezuela, S.A.
------------------------------------------------------------------
Inversiones GSC, S.A.
------------------------------------------------------------------
```

5

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K          SEC File #: 001-13953
Document Type: EX-24
Description: POWERS OF ATTORNEY
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC                 New York, NY               Chicago, IL
Los Angeles, CA                  Miami, FL                 Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and
DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of
signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended
December 31, 2001, and all amendments thereto, to be filed with the Securities
and Exchange Commission. Each of such attorneys-in-fact is appointed with full
power to act without the other.

/s/ John F. Akers
---------------------------------
John F. Akers

Dated:  March 6, 2002

POWER OF ATTORNEY

    The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2001, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ H. Furlong Baldwin
--------------------------------
H. Furlong Baldwin

Dated:  March 6, 2002

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2001, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Ronald C. Cambre
--------------------------------
Ronald C. Cambre

Dated:  March 15, 2002

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2001, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.


                                        /s/ Marye Anne Fox
                                        --------------------------------
                                        Marye Anne Fox

Dated:  March 6, 2002

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2001, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John J. Murphy
--------------------------------
    John J. Murphy

Dated:  March 14, 2002

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2001, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Thomas A. Vanderslice
--------------------------------
Thomas A. Vanderslice

Dated:  March 6, 2002

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2001, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Paul J. Norris
--------------------------------
Paul J. Norris

Dated:  March 6, 2002

Downloaded By: Samira Taylor

Company: W R GRACE & CO
Form Type: 10-K        SEC File #: 001-13953
Document Type: EX-99
Description: AUDIT COMMITTEE REPORT
SEC File Date: 03/28/02

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC              New York, NY              Chicago, IL
Los Angeles, CA              Miami, FL                 Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 99

AUDIT COMMITTEE REPORT

Membership and Role of the Audit Committee

The Audit Committee consists of the following members of the Company's Board of Directors: John J. Murphy (Chair), John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox and Thomas A. Vanderslice. Each of the members of the Audit Committee is "independent," as defined under the New York Stock Exchange's listing standards. The Audit Committee operates under a written charter adopted by the Board of Directors.

The Audit Committee is responsible for reviewing the financial information that the Company provides to stockholders and others, and for overseeing the Company's internal controls and its auditing, accounting and financial reporting processes generally. The Committee's specific responsibilities include (1) recommending to the Board of Directors the selection of independent accountants to audit the annual financial statements of the Company, (2) serving as an independent and objective party to monitor the Company's annual and quarterly financial reporting process and internal control system, (3) reviewing and appraising the audit efforts of the Company's independent accountants and internal auditing department, and (4) providing an open avenue of communication among the independent accountants, the internal auditors, management and the Board of Directors.

Review of the Company's Audited Financial Statements for the Year ended December 31, 2001

The Audit Committee has reviewed and discussed the audited financial statements of the Company for the year ended December 31, 2001 with the Company's management. The Audit Committee has discussed with PricewaterhouseCoopers LLP ("PwC"), the Company's independent accountants, the matters required to be discussed by generally accepted auditing standards.

The Audit Committee has also received the written disclosures and the letter from PwC required by Independence Standards Board Standard No. 1 (Independence Discussion with Audit Committees) and the Audit Committee has considered whether the provision of non-audit services by PwC is compatible with its independence.

Based on the Audit Committee's review and discussions noted above, the Audit Committee recommended to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2001 for filing with the SEC.

AUDIT COMMITTEE

John J. Murphy, Chair
John F. Akers
H. Furlong Baldwin
Ronald C. Cambre
Marye Anne Fox
Thomas A. Vanderslice