# EXHIBIT 29

2002 WL 31102712  
--- F.3d ----  
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 1

**H**

United States Court of Appeals,  
Third Circuit.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CYBERGENICS CORPORATION, on  
Behalf of Cybergenics Corporation, Debtor in Possession, Appellant  
v.  
*Kathleen CHINERY, Executrix of the Estate of Scott Chinery; L & S Research Corporation; Lincolnshire Management, Inc.; Lincolnshire Equity Fund, L.P.  
(* Amended per order dated 11/19/01)  
(Amended per order dated 3/21/02)

No. 01-3805.

Sept. 20, 2002.

Creditors' committee brought strong-arm proceeding to avoid alleged fraudulent transfers, and defendants moved to dismiss on theory that fraudulent transfer claims had been sold to third party as part of court-approved sale of assets of Chapter 11 debtor. The United States District Court for the District of New Jersey, Garrett E. Brown, Jr., J., entered order dismissing complaint, and committee appealed. The Court of Appeals, Rendell, Circuit Judge, 226 F.3d 237, reversed and remanded. On remand, the District Court, Brown, J., again dismissed, and committee again appealed. The Court of Appeals, Fuentes, Circuit Judge, held that only trustee or debtor-in-possession has power to invoke strong-arm provision to avoid fraudulent transfers, and court may not authorize creditor or creditors' committee to bring suit under this provision derivatively.

Affirmed.

West Headnotes

[1] Bankruptcy ⚖3836  
51k3836 Most Cited Cases

Court of Appeals has plenary review over district court's interpretation of the Bankruptcy Code and over its dismissal of complaint as failing to state claim upon which relief can be granted. Bankr.Code, 11 U.S.C.A. § 101 et seq.; Fed. Rules Civ. Proc., Rule 12(b)(6), 28 U.S.C.A.

[2] Bankruptcy ⚖2702.1  
51k2702.1 Most Cited Cases

[2] Bankruptcy ⚖2703  
51k2703 Most Cited Cases

[2] Bankruptcy ⚖2704  
51k2704 Most Cited Cases

Only trustee or debtor-in-possession has power to invoke strong-arm provision to avoid fraudulent transfers, and court may not authorize a creditor or creditors' committee to bring suit under this provision derivatively. Bankr.Code, 11 U.S.C.A. § 544(b).

[3] Statutes ⚖212.7  
361k212.7 Most Cited Cases

When interpreting a statute, court must begin with understanding that Congress says in statute what it means and means in statute what it says.

[4] Statutes ⚖188  
361k188 Most Cited Cases

When statute's language is plain, sole function of courts, at least when disposition required by the text is not absurd, is to enforce statute according to its terms.

[5] Statutes ⚖212.6  
361k212.6 Most Cited Cases

When word or phrase is used in different parts of same statute, it will be presumed to have the same meaning throughout, and this need for uniformity becomes more imperative when same word or term is used in different statutory sections that are similar in purpose and content.

[6] Statutes ⚖212.6  
361k212.6 Most Cited Cases

Presumption that same words will have same meaning when used in different parts of same statute may be overcome whenever there is such variation in connection in which words are used as

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 31102712  
--- F.3d ----  
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 2

reasonably to warrant the conclusion that they were employed in different parts of the statute with different intent.

**[7] Bankruptcy ⇐2154.1**
51k2154.1 Most Cited Cases

**[7] Bankruptcy ⇐2160**
51k2160 Most Cited Cases

**[7] Bankruptcy ⇐2205**
51k2205 Most Cited Cases

Bankruptcy statute authorizing any party in interest, including creditors' committee, to appear and be heard upon any issue in Chapter 11 case grants creditors' committee a broad right to be heard, including an unconditional right to intervene in Chapter 11 adversary proceeding that has been initiated by trustee or another party statutorily authorized to bring it; however, statute is not, in itself, a statutory authorization to bring suit and does not confer on creditors' committee authority to initiate adversary proceeding when trustee or statutorily authorized party has declined to do so. Bankr.Code, 11 U.S.C.A. § 1109(b).

**[8] Bankruptcy ⇐2702.1**
51k2702.1 Most Cited Cases

**[8] Bankruptcy ⇐3024**
51k3024 Most Cited Cases
Meetings.

"Catch-all" provision in bankruptcy statute dealing with powers and duties of creditors' committee in Chapter 11 case had to be interpreted in keeping with limited, discrete rights of participation granted to committee in preceding subsections of same statute and did not, in authorizing committee to perform "other services as are in the interests of those represented," give committee a broad, implied power to initiate strong-arm avoidance or other proceeding. Bankr.Code, 11 U.S.C.A. §§ 544, 1103(c)(5).

**[9] Statutes ⇐174**
361k174 Most Cited Cases

Catch-all provisions are to be read as bringing within a statute categories similar in type to those specifically enumerated.

**[10] Bankruptcy ⇐3790**
51k3790 Most Cited Cases

On determining that creditors' committee was not proper party, after Chapter 11 debtor-in-possession declined to act, to pursue strong-arm avoidance claims upon behalf of estate, Court of Appeals would not remand to give creditors' committee an opportunity to seek appointment of trustee to be substituted as real party in interest, where committee had never before requested appointment of trustee, not even when defendants' motion to dismiss put it on notice that its capacity to commence proceeding was at issue; committee's decision to pursue its claims on its own, rather than seek appointment of trustee at any stage of proceedings, was not "understandable mistake," such as would favor a finding that proper party be substituted. Fed. Rules Civ. Proc., Rule 17(a), 28 U.S.C.A.

**[11] Federal Civil Procedure ⇐131**
170Ak131 Most Cited Cases

Real party in interest rule ensures that, under governing substantive law, the plaintiffs are entitled to enforce the claim at issue. Fed. Rules Civ. Proc., Rule 17(a), 28 U.S.C.A.

Gary D. Sesser [Argued], James Gadsen, Carter, Ledyard & Milburn, New York, NY, for Appellant, Official Committee of Unsecured Creditors of Cybergenics Corporation.

Brian J. Molloy [Argued], Lauren D. Daloisio, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for Appellees, Kathleen Chinery and L & S Research Corporation.

Bruce E. Fader [Argued], Scott A. Eggers, Daniel F. Schiff, James H. Freeman, Proskauer Rose LLP, New York, NY, for Appellees, Lincolnshire Management, Inc., and Lincolnshire Equity Fund, L.P.

Before SCIRICA, ALITO, and FUENTES, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 31102712
--- F.3d ----
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 3

*1 In this appeal, we are asked to determine whether a creditor's committee may assert fraudulent transfer claims under § 544 of the Bankruptcy Code ("Code"), or whether only the trustee or debtor-in-possession may bring such actions. In *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, the Supreme Court considered whether an administrative claimant of a Chapter 7 bankruptcy estate has an independent right to bring suit under 11 U.S.C. § 506(c) to recover payment of its claim. 530 U.S. 1, 3, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Noting that § 506(c) states only that "[t]he trustee may recover ...," the Court in Hartford Underwriters considered "whether it is a proper inference that the trustee is the only party empowered to invoke the provision." 530 U.S. at 6, 120 S.Ct. 1942. The Court had "little difficulty" concluding, in a unanimous opinion, that the phrase "the trustee may" means that *only* the trustee may utilize the recovery power granted in § 506(c). *Id.* [FN1] The Court declined to decide whether its analysis extended to Bankruptcy Code fraudulent transfer provisions which contain the phrase "the trustee may." *Id.* at 13 n. 5, 120 S.Ct. 1942. Specifically, the Court did not address the validity of the practice under which some courts grant "creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so." *Id.*

Appellant in this case, the Official Committee of Unsecured Creditors of Cybergenics Corporation ("Committee"), sued to reverse certain transactions as fraudulent transfers in a Chapter 11 case under 11 U.S.C. § 544(b), a provision of the Bankruptcy Code which includes the identical "[t]he trustee may" phrase as that in § 506(c). The Committee asked Cybergenics Corporation ("Cybergenics"), the debtor-in-possession, to prosecute the fraudulent transfer claims, but Cybergenics refused to do so. The Committee then successfully secured the authorization of the bankruptcy court to bring the claims derivatively, on behalf of the debtor-in-possession. On defendants' motions to dismiss, the District Court held that the Supreme Court's statutory interpretation of § 506(c) in *Hartford Underwriters* applied with equal force to § 544(b) and dictated that *only* a trustee or debtor-in-possession could bring claims under § 544(b). The court dismissed the Committee's complaint without appointing a trustee.

Based on the plain statutory language and the Supreme Court's analysis in *Hartford Underwriters*, we hold that only a trustee or debtor-in-possession has the power to invoke § 544(b) to avoid fraudulent transfers, and that a court may not authorize a creditor or creditors' committee to bring suit under § 544 derivatively. Therefore, we will affirm the judgment of the District Court.

I

Scott Chinery founded L & S Research Corporation ("L & S") in 1985. [FN2] L & S, with Chinery as its sole shareholder, marketed nutritional food supplements under the brand name "Cybergenics" for body-building and weight-loss programs. Lincolnshire Management, Inc. ("Lincolnshire"), initiated negotiations in 1994 to buy L & S. In July 1994, Lincolnshire reached an agreement with L & S and Chinery for the leveraged buyout of L & S. Lincolnshire established Cybergenics Acquisition, Inc., which later became Cybergenics Corporation, to acquire substantially all of L & S's assets. Lincolnshire's equity investment affiliate provided the largest equity investment and was the majority shareholder in Cybergenics. Several banks and other entities ("Lenders") helped finance the asset purchase and agreed to provide working capital for Cybergenics after the acquisition through their equity affiliates. The agreement was memorialized in a writing dated October 13, 1994. [FN3]

*2 Cybergenics's financial outlook soon faltered. Despite increased equity investments by Lincolnshire and the Lenders, in August 1996 Cybergenics filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Cybergenics remained in business as a debtor-in-possession. No bankruptcy trustee was appointed. The United States Trustee appointed the Committee, consisting of representatives of seven of the unsecured creditors.

Rather than reorganize, Cybergenics chose to sell its assets through a court-supervised auction. At the auction, a third party successfully bid $2.65 million for all of Cybergenics's assets, and the bankruptcy court approved the sale in October 1996. Cybergenics moved to dismiss the bankruptcy case in March 1997, but the Committee objected, contending that certain transactions relating to the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 31102712 Page 4
--- F.3d ----
**(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))**

leveraged buyout could give rise to fraudulent transfer actions.

In June 1997, Cybergenics informed the bankruptcy court that it declined to pursue any fraudulent transfer claims. In September 1997, based on its own investigation and on Cybergenics's refusal to pursue the claims, the Committee sought leave from the bankruptcy court to bring a fraudulent transfer action itself on behalf of the debtor-in-possession, under a theory commonly referred to as "derivative standing". After a hearing, the bankruptcy court authorized the Committee to bring the claims.

The Committee filed its complaint in March 1998, seeking to avoid allegedly fraudulent transfers made by and liabilities incurred by Cybergenics in connection with the leveraged buyout and post-buyout transactions and to have the value of the avoided transactions returned to the bankruptcy estate. The three-count complaint includes one count under 11 U.S.C. § 544(b) against each of three groups of defendants: the Lenders; Lincolnshire; and L & S and Chinery. [FN4]

The defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(1). [FN5] Among other things, the defendants contended that the fraudulent transfer claims asserted by the Committee had been sold in the 1996 bankruptcy asset sale. The District Court granted the defendants' motions and dismissed the Committee's complaint for lack of subject matter jurisdiction. The court held that the fraudulent transfer claims were assets of the debtor, and that because the 1996 bankruptcy asset sale sold off all of Cybergenics's assets, the claims were no longer property of the bankruptcy estate and the Committee could not raise them on the estate's behalf.

We reversed, holding that state law provides that fraudulent transfer claims belong to the creditors, and that the claims are not assets of the debtor. *In re Cybergenics Corp.,* 226 F.3d 237, 245 (3d Cir.2000). Therefore, the claims could not have been sold as part of Cybergenics's assets in the 1996 bankruptcy asset sale. *Id.* at 241-46. Although the fraudulent transfer claims "belong" to the creditors, § 544 of the Code expressly authorizes the bankruptcy *trustee* to bring such claims as a representative of the creditors. 11 U.S.C. § 544(b); *Cybergenics,* 226 F.3d at 243-44.

*3 After remand, the defendants again filed motions to dismiss. They raised several grounds for dismissal which they had asserted in their previous motion to dismiss and which this Court declined to reach in *Cybergenics. Cybergenics,* 226 F.3d at 241 n. 5. They also argued, for the first time, that under a plain reading of S 544(b) and the reasoning of *Hartford Underwriters,* the Committee lacked standing to bring the fraudulent transfer action because only a trustee or debtor-in-possession has such standing.

On October 31, 2001, the District Court granted the renewed motions to dismiss, and held that the Committee could not bring suit under § 544. It found that the Code does not authorize a creditors' committee to bring a fraudulent transfer avoidance action derivatively, and that the Supreme Court's interpretation of the "trustee may" phrase in *Hartford Underwriters* applied to the use of the same language in §- 544. The court also provided several alternative grounds for dismissal. The Committee timely appealed. [FN6]

II

[1] This Court has jurisdiction under 28 U.S.C. § 1291 over the District Court's final order granting the defendants' motions to dismiss. We have plenary review over the District Court's interpretation of the Bankruptcy Code and dismissal of the complaint. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 346 (3d Cir.2001); *Anthony v. Interform Corp.,* 96 F.3d 692, 693 (3d Cir.1996).

III

[2] The Committee brings its fraudulent transfer claims under 11 U.S.C. § 544(b), which states:
(b)(1) Except as provided in paragraph (2), *the trustee may* avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
11 U.S.C. § 544(b)(1) (emphasis added). Under 11 U.S.C.§ 1107(a), when no trustee is appointed, a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 31102712
--- F.3d ----
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 5

debtor-in-possession such as Cybergenics here possesses all of the powers and duties of a trustee. [FN7]

In *Hartford Underwriters*, the Supreme Court considered "whether 11 U.S.C. § 506(c) allows an administrative claimant of a bankruptcy estate to seek payment of its claim from property encumbered by a secured creditor's lien." 530 U.S. at 3, 120 S.Ct. 1942. Section 506(c) states:

> *The trustee may* recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c) (emphasis added). In a unanimous opinion authored by Justice Scalia, the Court concluded that by using the phrase "the trustee may," Congress granted the trustee or debtor-in-possession *exclusive* authority to bring an action under the statute. *Hartford Underwriters*, 530 U.S. at 6, 120 S.Ct. 1942.

In an important footnote, the *Hartford Underwriters* Court expressly limited its holding by declining to address "whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c)" or other Code provisions. *Id.* at 13 n. 5, 120 S.Ct. 1942 ("Footnote 5"). The court acknowledged the procedure utilized by the Committee here under which "some courts ... allow[ ] creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions, *see* 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee." *Id.* (citing *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir.1995)). Because the facts of *Hartford Underwriters* did not present the issue, the Court refrained from assessing the legality of the practice:

> *4 Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today. *Cf. In re Xonics Photochemical, Inc.*, 841 F.2d 198, 202-203 (7th Cir.1988) (holding that creditor had no right to bring avoidance action independently, but noting that it might have been able to seek to bring derivative suit).

*Id.* The Committee stresses that, unlike the petitioner in *Hartford Underwriters*, it does not claim a unilateral right to sue under § 544(b), but that it instead followed the derivative suit procedure upon which the Court expressly refused to pass judgment.

Therefore, we must decide in this case whether the plain language of § 544 and the holding of *Hartford Underwriters* invalidates the rather well-established practice of allowing creditors and creditors' committees to bring avoidance actions derivatively. [FN8]

A.

The procedure followed by the Committee here has been adopted in varying forms by several of our sister circuits, and we recognized this practice in our prior *Cybergenics* opinion. *Cybergenics*, 226 F.3d at 240 n. 3 ("[C]ourts have at times authorized individual creditors or creditors' committees to exercise avoidance powers under certain circumstances, particularly when the debtor in possession is unwilling to pursue a colorable claim that would benefit the bankruptcy estate.").

The fraudulent transfer provisions of Chapter 11 of the Bankruptcy Code all utilize the phrase, "the trustee may." 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a). Several courts of appeals and many bankruptcy courts have nonetheless held that creditors or creditors' committees, if they meet certain requirements and with bankruptcy court approval, may bring avoidance actions and other adversary proceedings in Chapter 11 cases under "the trustee may" provisions. *See, e.g., Gibson Group*, 66 F.3d at 1440; *In re Sufolla, Inc.*, 2 F.3d 977, 979 n. 1 (9th Cir.1993); *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1231 (7th Cir.1990); *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir.1988); *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir.1985); *In re Nicolet, Inc.*, 80 B.R. 733, 737-39 (Bankr.E.D.Pa.1987) (collecting cases).

Other courts of appeals have recognized that a derivative suit is at least an option for creditors or creditors' committees wishing to pursue fraudulent transfer claims when the debtor-in-possession refuses to prosecute the claims. *See, e.g., Nebraska State Bank v. Jones*, 846 F.2d 477, 478 (8th

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 31102712
--- F.3d ----
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 6

Cir.1988) (holding that individual creditor lacked standing to bring avoidance action on its own under § 544, but noting that "[w]here no trustee has been appointed and the debtor in possession has not exercised its avoidance powers, a dissatisfied creditor has several options [including] ... gain[ing] court permission to institute the action itself"); *In re Xonics Photochemical Inc.*, 841 F.2d 198, 203 (7th Cir.1988) (holding that individual creditor lacked standing to bring avoidance action but observing that an "alternative route" for the creditor would be "to ask the bankruptcy court to allow it to bring a form of derivative suit in the name of the debtor"). All of these cases were decided *before Hartford Underwriters*, but some courts have reaffirmed the practice post-*Hartford Underwriters* as well. *See, e.g., In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir.2001).

*5 In the instant case, the bankruptcy court drew upon these precedents in requiring the Committee to show that: 1) it presented colorable fraudulent transfer claims; 2) Cybergenics refused to bring the claims; and 3) Cybergenics's refusal was unjustified in relation to its duty as a debtor-in-possession to maximize the value of the bankruptcy estate for the creditors. The court found that the Committee satisfied all these requirements, and granted it authorization to bring suit. [FN9]

B.

[3][4] We must determine whether this practice of allowing creditors and creditors' committees to initiate derivative avoidance actions survives *Hartford Underwriters*. As did the Supreme Court in *Hartford Underwriters*, "we begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters*, 530 U.S. at 6, 120 S.Ct. 1942 (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). The Court further observed that:

> when "the statute's language is plain, 'the sole function of the courts' "--at least where the disposition required by the text is not absurd--" 'is to enforce it according to its terms.' "

*Id.* (quotations omitted).

The Court's reasoning in interpreting the words "the trustee may" in § 506(c) applies with equal force to the identical words used in § 544(b). The Court first recognized the statutory construction maxim that " '[w]here a statute ... names the parties granted [the] right to invoke its provisions, ... such parties only may act,' " and observed that "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Id.* at 6-7, 120 S.Ct. 1942 (quoting Norman J. Singer, *Sutherland on Statutory Construction* § 47.23, at 217 (5th ed.1992)). Like § 506(c), § 544(b) "authorizes specific action"--the avoidance of a transfer--and "designates a particular party [who is] empowered to take it"--the bankruptcy trustee.

The Court then focused on the special role played by the trustee in bankruptcy proceedings. Because "the sole party named--the trustee--has a unique role in bankruptcy proceedings," the Court reasoned that it is "entirely plausible that Congress would provide a power to him and not to others." *Hartford Underwriters*, 530 U.S. at 7, 120 S.Ct. 1942. Furthermore, the Court stated that if no particular party had been specified in § 506(c), "the trustee is the most obvious party who would have been thought empowered to use the provision." *Id.* The trustee fills the same unique role no matter which Code provision is at issue, and that role raises the same presumption that Congress meant to provide the trustee an exclusive right in both statutes.

The Court noted that if Congress intended "the trustee may" to mean "the trustee and other parties in interest may," "it could simply have said so, as it did in describing the parties who could act under other sections of the Code." *Id.* at 7, 120 S.Ct. 1942. [FN10] As the Supreme Court itself noted, all of the avoidance provisions in Chapter 11 utilize the language "the trustee may" and do not refer to other parties. *Id.* at 13 n. 5, 120 S.Ct. 1942. Section 546, which sets forth limitations on the avoidance power, repeatedly refers to "[t]he rights and powers of [a] trustee" under the avoidance provisions. 11 U.S.C. § 546(b)(1), (c), (d), (g). The Court concluded that § 506(c) cannot sensibly be read to extend to all parties in interest, even though it "do[es] not contain an express exclusion." *Id.* at 8, 120 S.Ct. 1942. We similarly cannot read § 544(b) to extend to all parties in interest. [FN11]

*6 [5][6] We agree with the analysis of the District Court in this case that "there is no principled basis

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

under which the Court can apply different meanings to the words 'the trustee may' in separate sections of the Code." App. at 11. "Where a word or phrase is used in different parts of the same statute, it will be presumed to have the same meaning throughout. The need for uniformity becomes more imperative where the same word or term is used in different statutory sections that are similar in purpose and content...." *C.I.R. v. Ridgeway's Estate,* 291 F.2d 257, 259 (3d Cir.1961) (citations omitted); *see also Reich v. Gateway Press, Inc.,* 13 F.3d 685, 700 n. 18 (3d Cir.1994). This presumption may be overcome "whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). However, the words "the trustee may" as used in both § 506(c) and § 554(b) are used for the same purpose and in the same context: they are a description of the powers of the trustee and the avenues for relief available under the Code for the benefit of creditors and the estate.

The Committee conceded at oral argument that no Code provision explicitly authorizes a creditors' committee to prosecute an avoidance action, and even the courts that have allowed derivative fraudulent transfer actions have recognized that "[t]he circumstances in which a creditors' committee may sue on behalf of the trustee or debtor-in-possession are not spelled out in the Bankruptcy Code." *In re Louisiana World Exposition, Inc.,* 832 F.2d 1391, 1397 (5th Cir.1987); *see also STN Enterps.,* 779 F.2d at 904 ("The Bankruptcy Code ... contains no explicit authority for creditors' committees to initiate adversary proceedings."). In light of the Supreme Court's reading of "the trustee may" in § 506(c), and in the absence of clear statutory authority to the contrary, we cannot interpret the same phrase in § 544 any differently.

C.

Rather than engage with the Court's interpretation, the Committee advances several distinctions between *Hartford Underwriters* and the instant case. The Committee emphasizes that *Hartford Underwriters* is a Chapter 7 case, whereas Cybergenics filed under Chapter 11. Chapter 11, which deals with reorganizations, provides creditors' committees with rights unavailable in Chapter 7, which deals with liquidations. *See In re Marin Motor Oil, Inc.,* 689 F.2d 445, 450 (3d Cir.1982) (noting that "Congress intended a creditors' committee to have more extensive rights in a reorganization than in a liquidation"). [FN12]

Some of the courts that allow creditors' committees to bring derivative fraudulent transfer suits in Chapter 11 cases have overcome the absence of explicit statutory authority by relying on 11 U.S.C. § § 1103(c)(5) and 1109(b). *See, e.g., Louisiana World Exposition,* 858 F.2d at 247; *STN Enters.,* 779 F.2d at 904. While both of these provisions are wide-ranging, they do not authorize a creditors' committee to act derivatively to prosecute an avoidance action.

*7 [7] Section 1109(b) states that a "party in interest, including the debtor, the trustee, a *creditors' committee,* an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, *may raise and may appear and be heard on any issue in a case under [Chapter 11].*" (emphasis added). This Court has liberally construed § 1109(b) to grant a creditors' committee a broad right to be heard, including, among other powers, an unconditional right to intervene in a Chapter 11 adversary proceeding that has been initiated by a trustee. *See Marin Motor Oil,* 689 F.2d at 446; *Phar-Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1232 (3d Cir.1994).

However, the Committee conceded at oral argument that this provision does not confer authority upon a creditors' committee to *initiate* an action when the trustee or debtor-in-possession declined to bring suit. Section 1109(b) only establishes a right to be heard by way of *intervention* as a party plaintiff when a proceeding has already been brought by the statutorily-authorized party. Courts that have found authority for creditors to bring avoidance actions under this provision have noted that "a general right to be heard would be an empty grant unless those who had such right were allowed to act when those who should act did not." *Coral Petroleum,Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1363 (5th Cir.1986) (quoting 5 Collier on Bankruptcy ¶ 1109.02(3) (15th ed.1986)). Yet § 544(b), read in light of *Hartford Underwriters,* grants an exclusive right of action to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the trustee, and a broad "right to be heard" provision may not expand the intent evidenced by the plain, specific language used by Congress in § 544(b).

Any doubt on this question is assuaged by the Supreme Court's statement in *Hartford Underwriters*, albeit in dicta, indicating that the Court would not read § 1109(b) to allow a non-trustee to bring suit under a provision stating only that "the trustee may." After acknowledging that § 1109(b) was "by its terms inapplicable" in *Hartford Underwriters* because the case was under Chapter 7 rather than Chapter 11, the Court stated, "[i]n any event, we do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." *Hartford Underwriters*, 530 U.S. at 8, 120 S.Ct. 1942. This is consistent with our prior interpretation of § 1109(b) and it strengthens our view of the statute.

[8] As noted above, some courts have also found support for derivative creditor suits in 11 U.S.C. § 1103(c)(5), a "catch-all" provision which provides that a creditors' committee may "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). The Committee suggests that § 1103(c)(5) demonstrates that the power to initiate a suit under § 544(b) is not inconsistent with the Code's purposes because performing "other services" could include commencing suit. However, if § 1103 is given the extremely broad scope urged by the Committee, this "roving grant of power" (as Lincolnshire terms it) to undertake any action in a committee's interest would swallow all other conflicting Code provisions and any limitations contained in them.

*8 [9] Lincolnshire points us to § 1103(c)(1)-(4), which details rather specific powers granted to the Committee, such as the authority to "consult with the trustee," "investigate ... the debtor," "participate in the formulation of a plan," and "request the appointment of a trustee." 11 U.S.C. § 1103(c)(1)-(4). Furthermore, while 11 U.S.C. § 323(a) declares a trustee to be the "representative of the estate" and § 323(b) grants a trustee the "capacity to sue and be sued," there are no analogous provisions for a creditors' committee, either in § 1103 or elsewhere. Under "a familiar canon of statutory construction," catch-all provisions "are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Federal Maritime Comm'n v. Seatrain Line, Inc.*, 411 U.S. 726, 734, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *see also Norfolk and Western Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.") (citing *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 84-85, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990)). Because Congress expressly authorized only limited, discrete rights of participation for a committee in § 1103(c)(1)-(4), we will not read § 1103(c)(5) to grant a broad, implied power to initiate a suit under general language regarding "other services as are in the interests of those represented."

Neither § 1103(b)(5) nor § 1109(b), taken separately or together, provide sufficient statutory authority for the practice followed by the Committee and approved by the bankruptcy court in this case. Because these Chapter 11 provisions granting significant authority to creditors' committees do not go so far as to allow such committees to initiate avoidance actions, no matter whether the trustee fails to act and/or the committee secures court approval, we cannot distinguish *Hartford Underwriters* on the basis that *Hartford Underwriters* was a Chapter 7 case while here we consider a case under Chapter 11. The Committee urges us to go beyond a "cursory reading" of § 544(b) and examine other provisions of the Code. We have done so, and can find no provision which grants the Committee the authority denied to it in § 544(b).

IV

We are well aware that most courts to consider a creditor or creditors' committee's power to act derivatively under the avoidance provisions in the wake of *Hartford Underwriters* have reaffirmed so-called "derivative standing" and distinguished *Hartford Underwriters* by relying on Footnote 5 of the Court's opinion. After examining these cases and the Supreme Court's unanimous opinion, however, we find that the opinions relying on

Footnote 5 fail to give appropriate weight to the Court's strict interpretation of the Code. In the cases that overlook *Hartford Underwriters*, the issue of whether a derivative creditor suit is valid was not presented to the court. Because that issue is now before us, we must account for the impact of the *Hartford Underwriters* decision now that it has been brought to our attention.

### A.

*9 The courts that have relied on Footnote 5 to allow a creditor or creditor's committee to bring a derivative fraudulent transfer suit under the Code distinguish *Hartford Underwriters* without much analysis of the Court's reasoning in that case. For example, one bankruptcy court, recognizing its authority to allow such a derivative suit, simply stated:

> At footnote 5 of the opinion, the Supreme Court cites both *Xonics* and *The Gibson Group* and expressly declines to decide whether creditors may bring avoidance actions under either Section 547 or 548. As the Supreme Court found that those cases were not analogous, it follows that *Hartford Underwriters Insurance* is not analogous here.

*In re Dur Jac Ltd.*, 254 B.R. 279, 286 n. 7 (Bankr.M.D.Ala.2000) (applying *Gibson Group* to deny derivative authority to an individual creditor).

Another bankruptcy court provided a more extensive analysis of why *Hartford Underwriters* should not bar a creditors' committee from acting derivatively to bring fraudulent transfer claims under §§ 547(b) and 547(d), finding that such actions were authorized by §§ 1103(c)(5) and 1109(b), the same provisions we have rejected as statutory bases for a creditors' derivative suit. *In re Together Development Corp.*, 262 B.R. 586, 589 (Bankr.D.Mass.2001). While we are not bound to follow the decision of a bankruptcy court, we address the *Together* case because the court considered many of the arguments also advanced by the Committee here.

Ultimately, the *Together* court found that "the specter of the [*Hartford Underwriters*] decision as applied to this Adversary Proceeding is no more than a red herring." *Id.* at 591. The court observed that "no provision of the Code ... *prohibits* the Committee's action herein." *Id.* (emphasis in original). We find it more significant, however, that no provision of the Code *allows* a Committee to act derivatively under the avoidance provisions either. *Hartford Underwriters* makes clear that this lack of positive authorization is key. The *Together* court stated that its case was "clearly distinct from [that] in [*Hartford Underwriters*] because the Plaintiff herein is the Debtor seeking recovery for all the creditors of the bankruptcy estate, not a lone creditor seeking recovery for its sole benefit, as was the case in *Hartford Underwriters*." *Id.* at 591. This is indeed true: the Supreme Court concluded that the derivative practice had "no analogous application" in *Hartford Underwriters*, because the claimant in that case "asserted an independent right to use § 506(c)," which the court rejected. *Hartford Underwriters*, 530 U.S. at 13 n. 5, 120 S.Ct. 1942.

The Supreme Court declined to decide the derivative suit practice in Footnote 5 because the facts of *Hartford* Underwriters did not present this issue to the Court. Because "petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead," the derivative suit practice had "no analogous application" to petitioner's case in *Hartford Underwriters. Id.* Although the practice had no application to the facts of that case, it does not necessarily follow that the Court's analysis of the "trustee may" phrase as used in the Code has "no analogous application" to other Code provisions containing that phrase.

*10 In contrast to *Together*, several post-*Hartford Underwriters* opinions have noted that *Hartford Underwriters* casts serious doubt on the validity of creditors' derivative suits. In *In re Blount*, 276 B.R. 753, 761-62 (Bankr.M.D.La.), a bankruptcy court found authority for derivative creditor action in a Chapter 7 case under 11 U.S.C. § 503(b)(3)(B), a provision which notably does *not* contain the key phrase "the trustee may" in establishing a cause of action for recovery of various administrative expenses. In so holding, the court observed that the Supreme Court "at least question[ed] the validity of a judicially created standing doctrine designed to get around the plain language of the Bankruptcy Code." *Id.* at 760. The court commented:

> Although [*Hartford Underwriters*] specifically dealt with only the question of whether a creditor has independent standing to use the collateral

2002 WL 31102712
--- F.3d ----
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 10

surcharge provisions of § 506(c), *the language and rationale of the opinion seemingly have application to all provisions of the Bankruptcy Code wherein the party authorized to seek recovery (to act) is limited to the trustee. Indeed, the [Hartford Underwriters] rationale has been expanded beyond the confines of § 506(c).*
*Id.* (emphasis added). The court noted that "[a]ccepting the [*Hartford Underwriters*] rationale[,] ... standing to recover property transferred or concealed by the debtor, as established by these code provisions, is limited solely to 'the trustee.' " *Id.*

In addition, the Fifth Circuit relied in part on *Hartford Underwriters* in a Chapter 13 bankruptcy case to find that a non-trustee could *not* assert the power to avoid a federal tax lien under 11 U.S.C. § 545(2), which includes the operative phrase "the trustee may." *In re Stangel,* 219 F.3d 498, 501 (5th Cir.2000). The court noted that "[a]lthough § 506(c) is a different provision than the one at issue here, and a Chapter 11 case is different from a Chapter 13 case, the Court's mode of reasoning is fully applicable" because Hartford Underwriters involved a Code provision "that stated that trustees had certain powers" and "rejected interpretations that extended those powers to other parties in interest." *Id.*; *see also In re McLeroy,* 250 B.R. 872, 880-82 (N.D.Tex.2000) (finding in Chapter 7 case that under the avoidance provision of 11 U.S.C.§ 548, the reasoning of *Hartford Underwriters* applies to limit the authority to bring suit to the trustee).

Although the scope of the holding in *Hartford Underwriters* is limited to § 506(c), we must consider the Court's reasoning in interpreting the identical language of § 544(b). The Court's analysis in *Hartford Underwriters* is far from a "red herring." As we have stated:
we should not idly ignore considered statements the Supreme Court makes in dicta. The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket. "Appellate courts that dismiss these expressions [in dicta] and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there."
\*11 *In re McDonald,* 205 F.3d 606, 612-13 (3d Cir.2000) (brackets in original) (quoting *United States v. Bloom,* 149 F.3d 649, 653 (7th Cir.1998)). While no other court of appeals has applied *Hartford Underwriters* to bar a Chapter 11 derivative creditor suit, we conclude that failing to do so would yield "an outcome other than the one the Supreme Court would be likely to reach were the case heard there." As the District Court in this case suggested in a footnote dismissing the relevance of *Dur Jac,* those opinions which distinguish *Hartford Underwriters* by relying on Footnote 5 are "unpersuasive" because they simply "failed to reconcile the divergent interpretations of the phrase 'the trustee may' necessary to reach [their] conclusion[s]." App. at 11. [FN13]

B.

In our previous *Cybergenics* decision, we noted that courts have at times authorized such creditors and creditors' committees' derivative suits, without any reference to *Hartford Underwriters,* or our Court's case law. *Cybergenics,* 226 F.3d at 240 n. 3. In several other opinions issued after *Hartford Underwriters,* this Court and other courts have implicitly approved of the derivative suit practice which we reject today. *See Commodore,* 262 F.3d at 96 (reaffirming and specifying the standards for a creditor or creditor's committee derivative fraudulent transfer suit without citing *Hartford Underwriters*); *Lafferty,* 267 F.3d at 345 (accepting a stipulation approved by the Bankruptcy Court that authorized a creditors' committee to commence and prosecute litigation on behalf of the debtor under 11 U.S.C. § 541 and noting that the committee "effectively acquired all the attributes of a bankruptcy trustee for purposes of this case"); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir.2000) (considering an appeal in fraudulent transfer adverse proceeding initiated by creditors' committee without commenting on committee's capacity to bring the claims). In all of these cases, however, it appears that the validity of creditor derivative suits was not raised to the court by any of the parties. In this *Cybergenics* litigation, Lincolnshire, L & S, and Chinery first raised the *Hartford Underwriters* issue after we remanded the case to the District Court. In the first appeal, none of the parties questioned the capacity of the

2002 WL 31102712
--- F.3d ----
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 11

Committee to bring its claims. [FN14]

In *Lafferty*, the parties stipulated to the authority of the creditors' committee to assert the trustee's claims. In addition, *Hartford Underwriters* was not argued to us in that case. In the Second Circuit's *Commodore* case, the creditors' committee obtained the consent of the parties to bring suit; the defendants apparently conceded that a derivative suit was an available option but contested the standards under which such a suit could be authorized. *Commodore*, 262 F.3d at 98. In none of these cases did the parties appear to contest the underlying validity of a creditor or creditors' committee derivative fraudulent transfer action. Now that we are squarely faced with that question, we reiterate that we cannot ignore the Supreme Court's reasoning. To the extent that we have previously held that creditors may bring derivative suits under the Code's avoidance provisions, those holdings may no longer stand in light of *Hartford Underwriters*. " '[A] panel of this court is bound to follow the holdings of published opinions of prior panels of this court unless overruled by the court en banc or the holding is undermined by a subsequent Supreme Court case.' " *In re Continental Airlines*, 134 F.3d 536, 542 (3d Cir.1998) (quoting *Nationwide Ins. Co. v. Patterson*, 953 F.2d 44, 46 (3d Cir.1991)) (emphasis added).

## V

*12 Finally, the Committee highlights prior practice and policy reasons supporting the validity of creditor and creditors' committee derivative avoidance suits. The Committee makes reference to *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), in which the Supreme Court stated that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id.* at 43, 107 S.Ct. 353 (citations and quotations omitted).

The Court in *Hartford Underwriters* observed that "[b]ecause we believe that by far the most natural reading of § 506(c) is that it extends only to the trustee, petitioner's burden of persuading us that the section must be read to allow its use by other parties is 'exceptionally heavy.' " 530 U.S. at 9, 120 S.Ct. 1942 (quoting *Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992)

(quoting *Union Bank v. Wolas*, 502 U.S. 151, 156, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991))). The Committee faces the same heavy burden here in seeking to overcome the plain language of § 544(b).

The Committee emphasizes that the validity of the creditor derivative suit under the Code's fraudulent transfer provisions was well-established prior to enactment of the Code and continues to be so today. In *Hartford Underwriters*, the Court considered the prior history of a creditor's independent right to sue under § 506(c). 530 U.S. at 9-11, 120 S.Ct. 1942. Although the history of the creditor fraudulent transfer derivative suit is more compelling than that associated with § 506(c), the Court's assessment of the relevance of prior practice still applies here. The Court concluded:

> In any event, while pre-Code practice "informs our understanding of the language of the Code," it cannot overcome that language. It is a tool of construction, not an extratextual supplement. We have applied it to the construction of provisions which were "subject to interpretation," or contained "ambiguity in the text." "[W]here the meaning of the Bankruptcy Code's text is itself clear ... its operation is unimpeded by contrary ... prior practice."

*Id.* at 10, 120 S.Ct. 1942 (citations omitted) (brackets in original). The Court concluded that "we think the language of the Code leaves no room for clarification by pre-Code practice.... Pre-Code practice cannot transform § 506(c)'s reference to 'the trustee' to 'the trustee and other parties in interest.' " *Id.* at 11, 120 S.Ct. 1942. Section § 544(b), using the same operative language as § 506(c), is just as clear and unambiguous, and the provision's meaning may not be altered by prior practice.

Many of the courts that have approved of derivative fraudulent transfer actions have relied upon public policy considerations. For example, the Sixth Circuit in *Gibson Group*, assessing whether a creditor could bring avoidance claims under §§ 547 and 548, dismissed the argument that the Code bars the "judicially created" creditor derivative suit because allowing such actions would "further Congress's intent that a debtor's assets be marshaled and preserved when to do so would further the goal of reorganization." *Gibson Group*, 66 F.3d at 1442. Among other rationales, the Sixth Circuit stressed policy reasons for implying Congressional intent to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

allow creditors to bring derivative avoidance actions under the Code, stating:

*13 A debtor-in-possession often acts under the influence of conflicts of interest and may be tempted to use its discretion under Sections 547 and 548 as a sword to favor certain creditors over others, rather than as a tool to further its reorganization for the benefit of all creditors as Congress intended. Given this reality, we do not believe Congress intended to exclude creditors from seeking to avoid preferential or fraudulent transfers where the debtor-in-possession abuses its discretion.

*Id.* at 1441; *see also Together,* 262 B.R. at 591 (holding that derivative suits are warranted "where debtor's counsel has some reason not to pursue all potential assets of the estate due to a conflict").

We recognize that entrusting the decision to bring avoidance claims to the debtor-in-possession (in the absence of a trustee) creates the potential for a conflict of interest between the debtor and the creditors who stand to benefit from those claims. [FN15] In granting the Committee authority to assert the claims, the bankruptcy court essentially relied on policy considerations. Although the Committee alleges no conflict of interest on the part of Cybergenics, the bankruptcy court found that the avoidance claims were "colorable" and Cybergenics's refusal to assert the claims was "unjustified" because they would benefit the estate. Yet the Supreme Court also weighed policy rationales with regard to its reading of § 506(c). The Court first questioned the petitioner's policy arguments, but then concluded:

In any event, we do not sit to assess the relative merits of different approaches to various bankruptcy problems. It suffices that the natural reading of the text produces the result we announce. Achieving a better policy outcome--if what petitioner urges is that--is a task for Congress, not the courts.

*Hartford Underwriters,* 530 U.S. at 13-14, 120 S.Ct. 1942 (citations omitted). The District Court below echoed this view in commenting that to the extent that allowing the Committee to proceed might be beneficial in this case, "it is a task for Congress, and not the courts, to fashion a new procedure allowing derivative action by a creditor or committee of creditors." App. at 11-12. It might well be sound policy to allow a creditors' committee to bring fraudulent transfer claims with careful court approval if the trustee or debtor-in-possession unjustifiably refuses to assert the claims. Yet this is a policy decision for Congress, not this Court. The "natural reading of the text produces the result we announce." *Hartford Underwriters,* 530 U.S. at 13, 120 S.Ct. 1942.

In light of the plain meaning of § 544(b) and the reasoning of *Hartford Underwriters,* we hold that a creditor or creditors' committee may not initiate a fraudulent transfer action under § 544. Neither may a bankruptcy court authorize such an arrangement. The District Court did not err in holding that the Committee could not prosecute the avoidance claims arising from the leveraged buyout in this case. [FN16]

## VI

*14 Our holding today leaves a creditor or creditors' committee with several options should they desire that fraudulent transfer claims be prosecuted where the debtor-in-possession declines to do so. The District Court dismissed the Committee's complaint outright, but it listed several alternatives provided by the Code to protect creditors' interests when "creditors and the Bankruptcy Court conclude that a debtor in possession is not acting in the best interests of the creditors in declining to prosecute a claim under § 544(b)." App. at 11. Section 1103(c)(4) expressly authorizes a creditors' committee to move for the appointment of a trustee under § 1104. In addition, as "a party in interest," the Committee could have moved to dismiss the bankruptcy petition under § 1112 so that it could pursue its state law avoidance claims in state court. *See, e.g., Nebraska State Bank v. Jones,* 846 F.2d 477, 478 (8th Cir.1988). [FN17]

[10] On appeal, the Committee belatedly attempts to pursue one of these options by urging us (if we reject the validity of its derivative suit) to remand for the appointment of a trustee as a proper party in interest so that the trustee may consider whether to assert the claims. It relies on the final sentence of Federal Rule of Civil Procedure 17(a), which states that "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed" for the substitution of the real party in interest. Fed.R.Civ.P. 17(a). The Advisory Committee's note to Rule 17(a) states that the rule is "intended to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." Fed.R.Civ.P. 17(a) advisory committee's note.

[11] In making its argument under Rule 17(a), the Committee contends that the question in this case is not one of standing in the strictest sense, but rather one regarding the proper party in interest, specifically the proper estate representative to pursue the claims. "The real party in interest rule ensures that under the governing substantive law, the plaintiffs are entitled to enforce the claim at issue." *HB General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1196 (3d Cir.1996). Although most courts have labeled the practice we reject today "derivative *standing*," we agree with the Committee that the issue here is the Committee's *capacity* to sue--whether "the plaintiffs are entitled to enforce the claim at issue"--rather than its standing *per se.*

Notably, the Supreme Court did not frame *Hartford Underwriters* as presenting a question of standing. Indeed, the Court did not even use the word "standing" or cite to precedent regarding the elements of standing. Instead, the Court formulated the question presented by *Hartford Underwriters* as "whether petitioner--an administrative claimant--is a *proper party* to seek recovery under § 506(c)." *Hartford Underwriters,* 530 U.S. at 5-6, 120 S.Ct. 1942 (emphasis added). The decision of the Eighth Circuit which the Court affirmed in *Hartford Underwriters* expressly grounded its analysis in standing and concluded that the non-trustee appellee "lacks *standing* to assert a § 506(c) claim." *In re Hen House Interstate, Inc.,* 177 F.3d 719, 721 (8th Cir.1999) (en banc) (emphasis added). In describing the Eighth Circuit's holding, however, the Court refrained from using the word "standing," instead merely stating that the Eighth Circuit concluded that "§ 506(c) could not be invoked by an administrative claimant." *Hartford Underwriters,* 530 U.S. at 4, 120 S.Ct. 1942.

*15 The Committee satisfies constitutional and prudential requirements for standing in this case. However, it is not the real party in interest because it is not entitled to enforce the avoidance claims under § 544(b). Therefore, we may consider whether remand for substitution of the real party in interest by the appointment of a trustee is appropriate.

Appellees argue that the Committee never asked the court to appoint a trustee--neither in its briefs in response to the second motion to dismiss nor at oral argument on that motion--and therefore we should not entertain this issue on appeal. At oral argument before this Court, counsel for the Committee conceded that it never asked, even in the alternative, for a trustee to be named. The Committee did request twice in its brief in opposition to the second motion to dismiss that it be allowed to replead and correct any deficiencies the court might find in the complaint as an alternative to dismissal.

We conclude that the Committee's decision to pursue its claims on its own, rather than seek appointment of a trustee at any stage of the proceedings, was not an "understandable mistake" which would favor a finding that the proper party be substituted under Rule 17(a). It is indeed understandable that the Committee would initially decline to seek the appointment of a trustee, since before *Hartford Underwriters,* the derivative suit procedure opted for by the Committee was reasonably well-established. However, even if the Committee could not foresee the change in the law wrought by *Hartford Underwriters,* its choice to bring a derivative suit with itself as plaintiff, on behalf of the debtor-in-possession, was not a simple "mistake" in identifying the proper party plaintiff due to the difficulty of such identification. *See Wieburg v. GTE Southwest, Inc.,* 272 F.3d 302, 308 (5th Cir.2001) ("In accordance with the Advisory Committee's note, most courts have interpreted the last sentence of Rule 17(a) as being applicable only when the plaintiff brought the action in her own name as the result of an understandable mistake, because the determination of the correct party to bring the action is difficult."). Instead, it was a litigation choice made based on the prevailing law at the time. After we remanded this case to the District Court in 2000, the defendants filed their second motion to dismiss, in which they argued at length that *Hartford Underwriters* applied to deny the Committee the authority to bring its fraudulent transfer claims. Yet even with this notice that its capacity was an issue, the Committee did not move for the appointment of a trustee, and did not even argue for such an appointment in the alternative.

Because the Committee never argued for the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

appointment of a trustee below, we need not consider that request on appeal. *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 443 (3d Cir.1997).

### VII

We hold that the plain language of § 544 and the holding of *Hartford Underwriters* allow only the trustee or debtor-in-possession to assert fraudulent transfer claims, and a creditor or creditors' committee may not bring such avoidance actions derivatively.

*16 For the foregoing reasons, we AFFIRM the judgment of the District Court.

FN1. Under 11 U.S.C. § 1107(a), a debtor-in-possession has all the rights and powers of a bankruptcy trustee. Where a trustee has not been appointed, the debtor-in-possession assumes the role of a trustee, and therefore a debtor-in-possession may bring suit under § 506(c). *Hartford Underwriters,* 530 U.S. at 6 n. 3, 120 S.Ct. 1942.

FN2. Scott Chinery died on October 24, 2000. Kathleen Chinery, his wife and the executrix of his estate, has been substituted as a defendant in this case.

FN3. The original purchase price was approximately $110.5 million. The transaction made Cybergenics liable for more than $10.1 million in various closing costs and fees. In March 1995, a dispute over the amount of post-closing adjustments to the purchase price led Cybergenics and Lincolnshire to file a lawsuit against L & S, Chinery, and others, alleging fraud, breach of fiduciary duty, and breach of contract. L & S and Chinery filed counterclaims, and the parties quickly settled. Under the settlement, the purchase price for the leveraged buyout was reduced to approximately $60 million.

FN4. In addition, the complaint appears to present a claim of equitable subordination against Chinery and L & S, and a claim for recoupment of professional fees directly from Lincolnshire. Both of these claims depended on the successful avoidance of the allegedly fraudulent transfers under § 544(b).

FN5. In a consent order, the District Court withdrew the reference of this adversary proceeding from the bankruptcy court.

FN6. The Lenders are not participating in this appeal because they have reached a settlement with the Committee. Shortly before we heard oral argument in this case, the Committee reached a settlement with Lincolnshire, but the settlement terms are contingent upon our decision, so Lincolnshire remains a party to this appeal, along with Chinery and L & S.

FN7. In our prior *Cybergenics* opinion, we noted:
The terms "trustee" and "debtor in possession," as used in the Bankruptcy Code, are thus essentially interchangeable. Hence, by virtue of being a debtor in possession, Cybergenics operated not only as a business entity, but essentially as a trustee as well.
*Cybergenics,* 226 F.3d at 243 (3d Cir.2000) (citations omitted).

FN8. In *In re: PWS Holding Corp.,* 303 F.3d 308 (3d Cir.2002), we noted that after *Hartford Underwriters,* "there is some doubt as to whether a creditor can act derivatively in the debtor's stead to invoke § 544(b)." Id. at 315 n. 6. Because the creditor in *PWS* did not seek to invoke § 544(b), we were not faced with this issue in that case.

FN9. The bankruptcy court, consistent with the guidance of several courts of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 31102712
--- F.3d ----
(Cite as: 2002 WL 31102712 (3rd Cir.(N.J.)))

Page 15

appeals, held that "where the debtor-in-possession refuses to assert claims that would maximize the value of the estate, that refusal, without more, is unjustified." App. at 250 (citing *Gibson Group*, 66 F.3d at 1442; *Louisiana World Exposition*, 858 F.2d at 245-46; *STN Enters.*, 779 F.2d at 905-06). The court found that Cybergenics's refusal here was unjustified because the S 554(b) claims would maximize the estate's value. *Id.* at 251. It rejected Cybergenics's litigation costs rationale because the Committee's attorneys were working on a contingency fee basis and would look only to the bankruptcy estate for recovery. *Id.*

FN10. "Section 502(a), for example, provides that a claim is allowed unless 'a party in interest' objects, and § 503(b)(4) allows 'an entity' to file a request for payment of an administrative expense. The broad phrasing of these sections, when contrasted with the use of 'the trustee' in § 506(c), supports the conclusion that entities other than the trustee are not entitled to use § 506(c)." *Hartford Underwriters*, 530 U.S. at 7, 120 S.Ct. 1942 (citing *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)).

FN11. Section 1123(b)(3)(B) authorizes a Chapter 11 bankruptcy plan of reorganization to "provide for ... the retention and enforcement by the debtor, by the trustee, or by a *representative of the estate appointed for such purpose*" of any claim of the debtor or the estate. 11 U.S.C. § 1123(b)(3)(B) (emphasis added). In *Cybergenics*, we recognized that this provision "permits a plan of reorganization to *designate a representative* to enforce certain claims, such as avoidance claims, for the estate's benefit." *Cybergenics*, 226 F.3d at 245 n. 12 (emphasis in original). This provision does not aid the Committee here because no plan of reorganization was ever proposed in this case. Furthermore, § 1123(b)(3)(B) suggests that Congress was aware of the issue of proper estate representation and could have incorporated language allowing a non-trustee estate representative to bring claims under § 544. Congress did not do so, just as it did not allow for the prosecution of a case under § 506(c) by a party that is not a trustee.

FN12. In this case however, even though Cybergenics filed under Chapter 11, it chose to sell its assets in a court-approved auction rather than reorganize.

FN13. We note that some courts have indicated that under Footnote 5, the Supreme Court did not preclude the possibility of a creditor's derivative suit even under § 506(c). *See, e.g., In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir.2001) (implying that a non-trustee could bring suit under § 506(c) if that party "convince[s] the trustee to seek a § 506(c) surcharge or get leave from the Bankruptcy Court to do so") (citing *Hartford Underwriters*, 530 U.S. at 13 n. 5, 120 S.Ct. 1942); *In re Concord Mktg., Inc.*, 268 B.R. 415, 429 (Bankr.D.N.J.2001) (finding that alleged assignment of debtor's rights under § 506(c) to the appellant "does not meet the threshold requirements for derivative standing that the Supreme Court in *Hartford* mandates").
We do not read Footnote 5 to approve derivative creditor suits, either explicitly or implicitly. The Court did not reach the derivative suit issue with regard to § 506(c) or other provisions because it simply was not presented in *Hartford Underwriters*.

FN14. Our holding that a creditor or creditors' committee may not act derivatively to initiate an action under § 544(b) does not depend on or contradict our main holding in *Cybergenics* that fraudulent transfer claims are the property of creditors, not the debtor. We explained that our holding in *Cybergenics* was not altered by the fact that "a debtor in

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

possession is empowered to pursue those fraudulent transfer claims for the benefit of all creditors." *Cybergenics,* 226 F.3d at 245. We explained that the debtor's (and trustee's) power to avoid pre-petition transfers for the benefit of creditors is tantamount to a "legal fiction" which puts the debtor in the "overshoes" of the creditor and allows the debtor to "carry out its trustee-related duties" much like a "public official [who] has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust." *Id.* at 243-44. Therefore, *ownership* of the claims and the *capacity* to bring those claims are two distinct issues, and § 544(b) dictates that only the trustee or debtor-in-possession has this capacity. As we discuss below, the Committee and its creditor members could have exercised several alternative options in pursuing their fraudulent transfer allegations, but they failed to do so.

FN15. "The purpose of chapter 11 reorganization is the salvage and rehabilitation of the financially distressed business. The management may be unwilling to set aside an avoidable transfer with a supplier or lender with whom it intends to do future business after the business is successfully reorganized. Friendships develop in business which may make the debtor in possession hesitant to sue. Therefore, a major problem in chapter 11 cases is assuring that the debtor in possession performs the duties with the same faithful concern for the interests of creditors as would be expected of an independent trustee." '
*In re Sweetwater,* 884 F.2d 1323, 1329 n. 7 (10th Cir.1989) (quoting Richard Aaron, Bankruptcy Law Fundamentals § 10.01).

FN16. Because the Committee's other claims depended on the success of its fraudulent transfer claims, these other claims were also properly dismissed.

FN17. The avoidance power under § 544(b) may be used to avoid transfers that are "voidable under applicable law by a creditor holding an [allowable] unsecured claim," i.e. "if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action." *Cybergenics,* 226 F.3d at 243 (quoting 11 U.S.C. § 544(b)). Here, the "applicable law" is New Jersey's version of the Uniform Fraudulent Transfer Act ("UFTA"), N.J.Stat.Ann. § 25:2-20 *et seq.*

After Cybergenics declined to pursue the avoidance claims, it moved to dismiss the bankruptcy case, which would have allowed the creditors to pursue their New Jersey state law fraudulent transfer remedies in state court. However, the Committee objected to dismissal of the bankruptcy case. We have explained that the federal bankruptcy avoidance action has a significant advantage over avoidance claims brought under state law: "once avoidable pursuant to this [federal] provision, the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim [as under state law]." *Cybergenics,* 226 F.3d at 243. Section 544(b), often referred to as a strong-arm provision, thus allows an entire conveyance to be set aside no matter how small the claim of the "individual creditor actually holding the avoidance claim." *Id.* at 245.

Therefore, it is understandable that the unsecured creditors here preferred to utilize § 544(b)'s strong-arm powers rather than pursue their state claims in state court. Yet the state law route was still an available option for the Committee. *Cf. In re: PWS Holding Corp.,* 303 F.3d 308 (3d Cir.2002) (recognizing that creditor may bring avoidance claims under state law in state court but precluding such action because claims were found to be extinguished).

--- F.3d ----, 2002 WL 31102712 (3rd Cir.(N.J.))

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works