# EXHIBIT 30

1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE:                                      CHAPTER 11
                                            Case Nos. 01-1139 through
W.R. GRACE & CO., et al.,                   01-1200

          Debtors.
------------------------------
OFFICIAL COMMITTEE OF               Adv. No. 02 2210
ASBESTOS PERSONAL INJURY
CLAIMANTS and OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS
OF W.R. GRACE & CO., suing
in behalf of the Chapter 11
Bankruptcy Estate of W.R.
GRACE & CO., et al.,

          Plaintiffs,

vs.

SEALED AIR CORPORATION and
CRYOVAC, INC.,

          Defendants
------------------------------
                              September 24, 2002
                              Newark, New Jersey


B E F O R E:  HONORABLE ALFRED M. WOLIN, USDJ


Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record
as taken stenographically in the above-entitled proceedings.

_____
JACQUELINE KASHMER
Official Court Reporter


                JACQUELINE KASHMER, C.S.R.
                OFFICIAL COURT REPORTER
                     P. O. Box 12
                 Pittstown, NJ 08867
                   (973) 297-4889

OFFICIAL COMMITTEE OF                Adv. No. 02-2211
ASBESTOS PERSONAL INJURY
CLAIMANTS and OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS OF
W.R. GRACE & CO., suing in
behalf of the Chapter 11
Bankruptcy Estate of W.R.
GRACE & CO., et al.,

          Plaintiffs,

vs.

FRESENIUS MEDICAL CARE
HOLDINGS, INC. And
NATIONAL MEDICAL CARE,
INC.,

          Defendants.
----------------------------

A P P E A R A N C E S:


MILBERG, WEISS, BERSHAD, HYNES & LERACH, LLP
One Pennsylvania Plaza
New York, NY 10119-0165
BY:  BRAD N. FRIEDMAN, ESQ.
          And
      RACHEL S. FLEISHMAN, ESQ.,
Attorneys for the Official Committee of Asbestos
Personal Injury Claimants and the Official Committee of
Asbestos Property Damage Claimants


CAPLAN & DRYSDALE
399 Park Avenue
New York, NY 10022-4614
BY:  ELIHU INSELBUCH, ESQ.,
Attorneys for the Asbestos Personal Injury Committee


BILZIN, SUMBERG, DUNN, BAENA, PRICE & AXELROD
First Union Financial Center
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33135
BY:  ROBERT TURKEN, ESQ.,
Attorneys for the Asbestos Property Damage Committee


SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, NY 10036-6522
BY:  HENRY WASSERSTEIN, ESQ.,
          AND
      SHEILA L. BIRNBAUM, ESQ.
For Defendants Sealed Air Corporation and Cryovac, Inc

4

A P P E A R A N C E S, cont'd.:

    KIRKLAND & ELLIS
    200 East Randolph Drive
    Chicago, Illinois 60601
    BY:  DAVID BERNICK, ESQ.
    For the Debtor, W.R. Grace & Co.


    STROOK & STROOK & LAVAN, LLP
    180 Maiden Lane
    New York, NY 10038-4982
    BY:  KEN PASQUALE, ESQ.
    For the Official Creditors Committee


    DUANE, MORRIS & HECKSCHER, LLP
    744 Broad Street
    Newark, NJ 07102
    BY:  WILLIAM KATCHEN, ESQ.,
    For the Creditors Committee

1    THE COURT:  Good morning.  Everyone may be seated.

2  All right.  I think I should take appearances for the

3  record, so, Mr. Friedman, I'll start with you.

4    MR. FRIEDMAN:  Brad Friedman, Milberg, Weiss,

5  Bershad, Hynes & Lerach, special counsel for the Asbestos

6  Committees.  With me here today is Rachel Fleishman, also of

7  our firm.

8    MR. INSELBUCH:  Elihu Inselbuch, Caplan & Drysdale,

9  counsel to the Asbestos Personal Injury Committee.

10    THE COURT:  Okay.

11    MR. TURKEN:  Robert Turken, Bilzin & Sumberg,

12  counsel for the Property Damage Committee, and with me is

13  Mitchell Webb.

14    THE COURT:  Okay.  Thank you, very kindly.

15    MS. WASSERSTEIN:  Henry Wasserstein, Skadden, Arps,

16  Slate, Meagher & Flom, attorneys for Sealed Air and Cryovac.

17  With me is my partner, Sheila Birnbaum.

18    MR. BERNICK:  David Bernick for the debtor.

19    MR. PASQUALE:  Ken Pasquale from Strook & Strook &

20  Lavan, co-counsel for the Official Committee of Unsecured

21  Creditors.

22    MR. KATCHEN:  Good morning, your Honor.  William

23  Katchen, Duane, Morris for the Committee.

24    THE COURT:  For who?

25    MR. KATCHEN:  The Official Committee of Unsecured

1    Creditors.

2              THE COURT:  Okay.

3              MR. KATCHEN:  Thank you.

4              THE COURT:  Well, has everybody had the opportunity

5    to read the Official Committee of Unsecured Creditors' of

6    Cybergenics versus Chinery opinion?  Did everybody have a

7    chance to read it?  Good.  Everybody ready to go the trial

8    on Monday?

9              MR. FRIEDMAN:  Yes, your Honor.

10             THE COURT:  Famous appellate lawyers like Mr.

11   Bernick and Miss Birnbaum, Mr. Wasserstein, they, of course,

12   know that the mandate won't issue for 45 days.  Why

13   shouldn't we go to trial on Monday?  Do you want to answer

14   that?

15             MR. BERNICK:  It may be that we should go to trial

16   on Monday, but I think that in light of the fact that the

17   opinion is issued and it is the articulation of the law, I

18   don't know that we have to wait for a mandate.  The mandate

19   would not be binding on us.

20             THE COURT:  How do you know that there's not going

21   to be an application for reconsideration or request for en

22   banc, maybe a petition for cert to the Supreme Court?

23   Doesn't that happen?  Haven't you ever heard of the Third

24   Circuit being reversed, Mr. Bernick?

25             MR. BERNICK:  It does happen.

1          THE COURT:  Yes.

2          MR. BERNICK:  Sometimes.

3          THE COURT:  I mean, you know how to petition for

4   cert.  Right?  You positioned for cert in the Federal Mogul

5   case.  You know how that works.  It's not a big deal for

6   somebody to run and see a justice down in Washington.  Miss

7   Birnbaum was probably in Washington yesterday.  Right, Miss

8   Birnbaum?

9          MS. BIRNBAUM:  Yes, your Honor, absolutely, and I

10  have a case in the Supreme Court in which they granted cert,

11  but I don't think it's going to happen here.

12         THE COURT:  This Court, first of all, would like to

13  say this morning that I've only one regret and, that is, the

14  schedule that we outlined for the preparation of this case,

15  I would like to compliment every law firm that is connected

16  with the case.  I know that you worked long hours, had many

17  staff assigned to this case, and I'm sure there's been a lot

18  of sacrifice, people with their weekends, their summer

19  vacations, and I would have liked a heads-up on this opinion

20  so that I could have given you a heads-up on this opinion,

21  and we all know by the operating procedures of circuit

22  courts, they must have known about this opinion at least

23  eight days ago, that it was circulated, and I didn't get a

24  heads-up because had I received it, I would have told you

25  about it and we would have then said, okay, what are we

1    going to do about it, as we are here today, what are we
2    going to do about it.

3         So, I regard this opinion as not the final word in
4    this case.  It's a bump in the road.  And we have read the
5    opinion very carefully more than once and there are options
6    for the Court to engage in, but I would like to hear from
7    counsel before I tell you what I think, and maybe, Mr.
8    Bernick, we'll start with you.

9         MR. BERNICK:  Your Honor, I think on the basis of
10   the plain language of the opinion, that clearly at least the
11   posture of this case has to change.  I don't think that
12   there is much room for a different result there.

13        THE COURT:  I think the opinion is clear, you know,
14   committees can't initiate a fraudulent conveyance or an
15   avoidance proceeding.

16        MR. BERNICK:  Right.  In that regard, the debtor is
17   flexible as we don't want to be in a position of impeding
18   the further progress of this case and, therefore, you get to
19   the question of what options might be out there to explore
20   it.

21        We devoted some attention to that as well as has
22   the Court.

23        THE COURT:  Can I infer, I don't want to conclude,
24   can I infer that the debtor-in-possession, one of the two
25   parties that the Court says can bring this action in this

1   particular case, you can't bring this action because the

2   fact that I think you would probably have an intractable

3   conflict of interest?

4        MR. BERNICK:  Well, I think that we can't bring the

5   action itself.  We have -- if it came to actually

6   prosecuting the action itself --

7        THE COURT:  That's what I'm talking about,

8   prosecuting the action.

9        MR. BERNICK:  Prosecuting the action, I don't think

10  that we would prosecute the action ourselves for two

11  reasons.  One is that we are currently a defendant, and the

12  second is that it would have an impact on -- it could have

13  an impact on the Chapter 11 case, that I know that we've

14  been talking about for some time, that may be contrary to

15  the interests of the debtor in the Chapter 11 case.

16       Essentially, we would have to take the position

17  with regard to the tort liabilities that's a different

18  position than we'd take in connection with the Chapter 11

19  case.

20       THE COURT:  I understand that.  But also, you're so

21  privy to the defense strategy of Sealed Air, it would be a

22  conflict of interest for you to prosecute.

23       MR. BERNICK:  For us actually to prosecute the

24  case, that's correct.

25       THE COURT:  I don't think you can prosecute it, so,

1    that leaves me with the potential to appoint a trustee.

2    MR. BERNICK:  Well, that's one possibility.  I

3    think that there are three possibilities altogether.

4    THE COURT:  Okay.

5    MR. BERNICK:  First, let's talk about the trustee.

6    With the trustee, there are obviously different brands and

7    stripes of trustees.  There's a trustee for a limited

8    purpose of prosecuting the claim.  There's a trustee that

9    would have a broader --

10    THE COURT:  Well, we haven't found a case yet, and

11    we haven't done exhaustive research, but I don't know if I

12    can appoint a trustee for the pure purpose of prosecuting a

13    claim.

14    MR. BERNICK:  We've looked at that.  There is

15    actually a fairly significant authority that says --

16    THE COURT:  In the Third Circuit?

17    MR. BERNICK:  -- that you can.  Within the Third

18    Circuit?  I have to go check my memo.  I don't know if they

19    are actually within the Third Circuit itself.

20    THE COURT:  Okay.  Others who have looked at it in

21    the Third Circuit say they haven't found that authority, but

22    we're always willing to listen.

23    MR. BERNICK:  There are ramifications from the

24    appointment of a trustee, even a limited trustee, that are

25    significant here.  Obviously, there would be a significant

1  impact on the Chapter 11 case as a whole if it's not a

2  limited trustee.

3     Even if it were a limited trustee, the appointment

4  of a trustee would effectively work a constructive discharge

5  of most of Grace's top management.  Their employment

6  contracts and arrangements are such that if a trustee is

7  appointed in this case, there's constructive discharge.

8     I know that's true with respect to Mr. Norris.  I

9  also believe it's true with respect to a certain number of

10  other people in Grace's top management.

11     THE COURT:  And potentially could effect debt,

12  also.

13     MR. BERNICK:  That is also correct.

14     THE COURT:  I know that there are a lot of

15  corporations that borrow money and the lending agencies

16  would consider that an act of default.

17     MR. BERNICK:  It is.  We've looked at that as well.

18  It is an act of default in the debtor-in-possession

19  financing.  I won't represent to the Court the debtor-in-

20  possession financing has been substantially tapped.  I don't

21  know.  I haven't looked in detail to see whether the

22  appointment of the trustee for all purposes would also

23  trigger other debt covenant violations with respect to the

24  other debt the company has.

25     Obviously, also the appointment of a trustee would

1   be a significant impact in terms of the administration of

2   the case from a timely point of view.  You have to go find a

3   trustee, appoint a trustee.  They'd have to take charge of

4   the case, etc.

5           THE COURT:  Depending how the matter unfolded, it

6   could be a short term or it could be 50 days.  Okay.

7           MR. BERNICK:  Your Honor is more cognizant of that

8   than I am.  I would have thought it was more significant,

9   particularly given the complexity of this case.

10          THE COURT:  Right.

11          MR. BERNICK:  The second option is an option that

12  we believe is also potentially available, and that's to

13  appoint an examiner.  The appointment of an examiner would

14  be more tailored --

15          THE COURT:  That's a 702 examiner, I take it.

16          MR. BERNICK:  I believe that's correct.  An

17  examiner would be more tailored to the ambit of the issue

18  that has to be addressed.  The authority would be focused on

19  the prosecution of the case and, obviously, that would have

20  a less significant impact on the Chapter 11 case.

21          It would have also less significant impact with

22  respect to the employment contracts.

23          THE COURT:  And by the way, by the way, in the

24  Third Circuit opinion, they only spoke about two options,

25  debtor-in-possession and a trustee.  They did not proffer an

1  examiner and, so, my question to you is in view of the fact

2  that they didn't proffer an examiner as being an acceptable

3  method of initiating a claim, can it be done by consent of

4  the parties?

5       MR. BERNICK:  That, from the debtor's point of

6  view, it could be done by consent to the parties.  I would

7  further say that if you construe the statutes, I forget the

8  section number, escapes me, maybe 1109, the examiner is

9  given the ability, one of the spelled-out duties or

10  activities of the examiner is to prosecute claims with the

11  authority of the trustee; that is, the examiner in a sense

12  has a part of the trustee's power, and the Third Circuit

13  clearly did not entrust the question of whether, given that

14  language, the examiner would also be another avenue, again,

15  particularly if the debtor didn't object to the prosecution

16  of the claim.

17       THE COURT:  What about Sealed Air?  They're a

18  party.  Are you still around?

19       MS. BIRNBAUM:  Still here.

20       MR. BERNICK:  What I'm saying is --

21       THE COURT:  What's the likelihood -- and certainly

22  Mr. Wasserstein and Miss Birnbaum could speak for

23  themselves -- what do you think the possibility is getting

24  consent of Sealed Air to an examiner?

25       MR. BERNICK:  I would be speculating about that,

1   your Honor.  I'm not privy to what they would say about that

2   particular --

3           THE COURT:  You spent enough time over in New York.

4   What do you think?

5           MR. BERNICK:  Well, I would imagine that Sealed Air

6   has got interest in not having this case go forward,

7   significant interest in not having the case go forward.

8           At the same time, I think that there's another

9   dimension to it, which is that Sealed Air continues, I would

10  assume, although I don't know, to need some support in

11  connection with the case, and that may be another element

12  that's part of the calculation about their --

13          THE COURT:  This has really become a very

14  interesting case, hasn't it?

15          MR. BERNICK:  Yes, very interesting case from many

16  different points of view.  Let me say, though, on the

17  examiner issue, I think that an argument could be made, and

18  a good argument could be made, that that option is available

19  in the Cybergenics opinion.

20          In terms of the impact on the company, the

21  appointment of an examiner per se does not trigger a default

22  under the DIP financing.

23          THE COURT:  By the way, whose appointment is that?

24  Is that mine, the U.S. Trustee?

25          MR. BERNICK:  I'm sorry?

1   THE COURT:  Whose appointment is the examiner?  Is

2   that mine?  Is that the U.S. Trustee?  Do I have a veto?

3   MR. BERNICK:  I don't know.  I haven't looked at

4   that.

5   MR. INSELBUCH:  We can tell you.

6   THE COURT:  Okay.  Because I know that if the U.S.

7   Trustee were to appoint a trustee, it has to be confirmed by

8   the Court, so, I kind of have a veto over the trustee in

9   that situation, but I don't know about the examiner.

10   MR. BERNICK:  Okay.  The appointment of an examiner

11   solely for purposes of performing the valuation or issuing a

12   report does not trigger a default under the DIP financing.

13   THE COURT:  For you.

14   MR. BERNICK:  For us.  However, if the examiner

15   does more, then it potentially could trigger a default under

16   the DIP financing.  I'm told, however, that in the case of

17   the appointment of an examiner for purposes of this

18   particular claim, it may not be a very significant default

19   issue to resolve; that is, we probably could work it out.

20   THE COURT:  How would you differentiate, if you

21   can -- this is not a trick question --

22   MR. BERNICK:  Sure.

23   THE COURT:  -- between a limited trustee for the

24   prosecution of this matter and an examiner?

25   MR. BERNICK:  Two ways.  One is that I think that

1    the idea of getting a consent from the banks to the default
2    would be much easier with respect to an examiner.  I think
3    that banks tend to regard trustees, even if they have a
4    limited role, as posing a more substantial threat to the
5    prosecution of the case, a threat of a greater change in the
6    prosecution of the case.

7            And, secondly, again, you have the employment
8    agreements with top management, I believe, would still be
9    triggered by a limited trustee.

10            THE COURT:  Let me ask you one other question,
11   which I think I know the answer to but I'd like to hear it
12   from you.  Could a futures representative be appointed as a
13   trustee?  You know, he represents claimants and he's someone
14   on the creditor's side of the ledger.  Could it be viewed as
15   a trustee because it's in futuro?

16            MR. BERNICK:  Well, if you made I guess kind of mix
17   of the first question, I don't know whether technically
18   under the code there's a provision that says that because
19   the futures representative has this particular interest,
20   that would be a disabling fact for purposes of an
21   appointment.

22            Just in terms of the trustee's obligations, clearly
23   if it were a limited trustee, that is, limited to the
24   prosecution of this claim, it would be hard to argue that
25   there's a conflict of interest between the role that that

1   limited trustee would have on the one hand and the role that

2   the futures representative already has today; that is, that

3   there is a coincident interest.

4        To the extent that the trusteeship, though, is not

5   so limited, then you would have a conflict of interest

6   because the trustee's responsibility for watching over --

7        THE COURT:  I have another question for you as long

8   as we're talking about conflict of interest.  If I were to

9   appoint a trustee for the debtor-in-possession and Milberg,

10  Weiss has been prosecuting this case for the committees, who

11  can no longer prosecute this case, committees initiate it,

12  could Milberg, Weiss represent the trustee who is now the

13  trustee for the debtor-in-possession, or do I have to face a

14  conflict of interest with Milberg, Weiss?

15       MR. BERNICK:  I think you do, and that's something

16  we haven't talked about at all, which is what are the

17  ramifications of all of this with respect to existing

18  counsel, and I have some thoughts about that.

19       THE COURT:  And assuming that you came back to me

20  and said, yes, we think there's a conflict of interest on

21  the part of Milberg, Weiss, is there conflict that's

22  waivable?

23       MR. BERNICK:  Let me address that last point in the

24  context of maybe a third option.

25       THE COURT:  Sure.

1          MR. BERNICK:  Which is that it's not particularly

2   clear.  A fraudulent conveyance claim is a claim that

3   belongs to the estate.  The plaintiff in a sense is really

4   the estate.

5          THE COURT:  The proceeds belong to the estate.

6          MR. BERNICK:  Even the claim.

7          THE COURT:  The right to bring it belongs to the

8   debtor-in-possession.  There's a difference.

9          MR. BERNICK:  The debtor has the authority to bring

10  it.  But what I'm suggesting is that the claim is really

11  brought on behalf of the estate.  The estate is recovering

12  against --

13         THE COURT:  That's correct.

14         MR. BERNICK:  -- a defendant so that all the assets

15  come back into the estate.

16         THE COURT:  Right.

17         MR. BERNICK:  If you follow that through, a third

18  option might be that Grace, that Grace would agree that the

19  claim could be prosecuted by the Milberg firm as counsel to

20  the estate for purposes of prosecuting a claim with the

21  debtor's consent.

22         THE COURT:  You know, when people are doing

23  statutory construction, one cannot help wondering what

24  thought they give to how it plays out in real life.

25         MR. BERNICK:  Right.

1        THE COURT:  Okay.

2        MR. BERNICK:  But that may actually be -- nobody,

3   even if it's a trustee, the problem that you posed, that is,

4   you know, how could Grace actually prosecute the claim, even

5   if the claim is being prosecuted by the trustee, the

6   trustee's got the same problem because the trustee has got

7   Grace at the other end and got the rest of the Chapter 11

8   case to worry about.  That's a different kind of conflict

9   from what usually animates these cases, is that the company

10  doesn't want to go after its own management.

11        That's a profound problem that exists in this case

12  because this happens to be a case where the issue driving

13  the fraudulent conveyance claim is also the issue that's

14  important for other purposes in the Chapter 11 case.

15        Even if there were a trustee, you still have

16  exactly the same kind of problem.  So, what this third

17  option does really is to say, no, Grace is not going to be

18  the plaintiff.  Plaintiff Grace is not going to prosecute

19  the case, but as a party authorized to bring the case, with

20  that power we've agreed that the case can be prosecuted on

21  behalf of the estate under certain circumstances, and we can

22  talk about some of the circumstances, but that would be an

23  important discussion for Grace, about what its role

24  continues to be in the case.

25        THE COURT:  And I take it that if I were to appoint

1  a trustee, that's sayonara to Kirkland & Ellis representing

2  W. R. Grace.

3       MR. BERNICK:  I think if you were to appoint a

4  trustee, it could or could not be.  I don't know.  The

5  thought has not crossed my mind.  God bless, I'm very busy

6  with a lot of matters.  I'm not worried about that.

7       THE COURT:  You could end up in a conflict of

8  interest.

9       MR. BERNICK:  But the trustee, again, would have

10  exactly the same conflict.  The conflict does not emanate

11  from Grace's lack of willingness to have the claim pursued.

12  The conflict emanates from the fact that the fraudulent

13  conveyance case focuses on common facts that are also of

14  importance to the Chapter 11 case.  The trustee has the same

15  obligation.

16       The reason that we were reluctant to and didn't

17  want to bring the claim ourselves is that we were watching

18  over the interest of other constituents of other Chapter 11

19  cases, including equity and the other unsecured creditors.

20       THE COURT:  I guess we've turned the clock back and

21  go back to that conference in the jury room of about six

22  months ago.

23       MR. BERNICK:  Right.

24       THE COURT:  Maybe you'd be prosecuting as the

25  debtor-in-possession.

1    MR. BERNICK:  I don't think so.  I think the

2  analysis hasn't changed.  That's the problem, is that you

3  are faced and a trustee would be faced with exactly the same

4  conundrum, exactly the same conundrum, so the problem

5  doesn't go away.

6    THE COURT:  Go ahead.

7    MR. BERNICK:  The problem doesn't go away, it's

8  endemic, and it's interesting because the Third Circuit, of

9  course, never thought through, because it wasn't before it,

10  the issue of, well, does this really mean that in any case

11  where there's a fraudulent conveyance claim that the debtor

12  doesn't want to bring, that automatically you have a

13  trustee?

14    Well, what if the reason that the debtor doesn't

15  want to bring it is not that it doesn't want to go after its

16  management but it has to do with the merits of the Chapter

17  11 case?  Is the rule that comes out of the Third Circuit a

18  rule that says as long as you maintain you're solvent in

19  Chapter 11 and you've got fraudulent conveyance claims, you

20  must have a trustee?

21    THE COURT:  They never got that far.

22    MR. BERNICK:  Never got that far.

23    THE COURT:  I'm sure.

24    MR. BERNICK:  I'm sure.

25    THE COURT:  They've not got that far, and I'd love

1   to send them this transcript and I probably will.  I

2   probably will.

3          MR. INSELBUCH:  Wait.

4          THE COURT:  You know, would you agree that there

5   cannot be a conflict of such enduring duration that it can't

6   be resolved?  The conflict's got to be resolved somewhere

7   along the line and the case prosecuted.

8          MR. BERNICK:  Yes.  I believe that, A, that is so,

9   and I believe that there are paths to actually do it

10  relatively expeditiously and with little impact on the

11  Chapter 11 case.

12          It's really a question of these options, where do

13  you want to go, where does the Court want to go, and I think

14  an awful lot of it at the end of the day has to be driven by

15  the consent of the parties, and clearly that's the easiest

16  path to get the case tried, and all I'm saying is from the

17  debtor's point of view, there are very, very few limitations

18  that we have on what we're prepared to consent to if we can

19  accomplish both things at once; that is, get this case

20  prosecuted, get it tried and get on with the business of the

21  Chapter 11 case.

22          THE COURT:  I understand.  Let's here from team

23  Sealed Air, whoever is the spokesperson.

24          MS. WASSERSTEIN:  Your Honor, would it make sense

25  to hear first from them, since they seem to have some

1  suggestions with regard to some of the questions?

2         THE COURT:  No.  I want to know what's in your gut,

3  Henry.  That's what I really want to know.

4         MS. WASSERSTEIN:  Okay.

5         THE COURT:  I really want to know whether there's

6  any potential for any type of consent or is this going to be

7  where I think it's a bump in the road, maybe you're going to

8  tell me it's a road block and Sealed Air is going to pursue

9  whatever initiatives that it views best for them but, you

10  know, Wall Street watches us very carefully, Mr.

11  Wasserstein.

12         MS. WASSERSTEIN:  Your Honor, let me say a couple

13  of things.  This is the first time I'm hearing these

14  proposed options, so, it would be very hard to react to

15  them.

16         THE COURT:  Oh, I'm going to give you an

17  opportunity to reply to me at another time in an ex parte

18  letter, probably within three to five days of this little

19  meeting here but --

20         MS. WASSERSTEIN:  Let me --

21         THE COURT:  -- today is sort of stream of

22  consciousness day.  Okay.

23         MS. WASSERSTEIN:  We are concerned about one thing

24  and one thing primarily and, that is, that whatever

25  ultimately occurs is subject to finality.

1          What we are concerned about is that some procedure
2    is created in this situation that someone later on will be
3    able to attack and if we were to win, as we hope we will --
4          THE COURT:  Someone will be unable to attack.
5          MS. WASSERSTEIN:  -- we would like it to be that no
6    one is able to attack whatever is done, and that is to us of
7    the greatest importance.  We are not interested in having
8    this sit around forever.  We would prefer that the issue be
9    resolved sooner rather than later.
10         But bearing in mind that to us the most important
11   thing here is finality and, you know, we are prepared, it
12   seems to me that everybody here is wondering what they're
13   going to be doing with regard to Sealed Air's carcass, and
14   we would like an opportunity to respond to that once we see
15   what finite positions are raised by the other parties, and
16   that is why I asked to be heard last with regard to it.
17         As I said, I don't see how we are in a position to
18   respond to anything today other than to set forth our
19   position that finality is the most important thing to us.
20         THE COURT:  And I take it from your remarks, and I
21   view the statement of finality as being a responsible one,
22   that does not rule out consent.
23         MS. WASSERSTEIN:  It does not rule out consent.
24   That is correct, your Honor.
25         THE COURT:  I just want to know that I have

1   consensual players before me.

2          MS. WASSERSTEIN:  That's correct, your Honor.

3          THE COURT:  Who shall speak for team creditors?

4          MR. INSELBUCH:  I will, your Honor.

5          THE COURT:  Mr. Inselbuch.  You scare me with those

6   books there, Mr. Inselbuch.

7          MR. INSELBUCH:  They scare me, too.

8          THE COURT:  You're not going to cite law to me, are

9   you?

10         MR. INSELBUCH:  I thought I might give you a couple

11  sections of the code and some cases because I think the

12  Court is correct and I think Mr. Bernick is correct that we

13  have a bump in the road.  I believe it is a procedural bump

14  in the road, not a substantive bump in the road.

15         I think every constituency recognizes that the

16  merits of this litigation need to go forward to a

17  conclusion, and everybody has invested, the Court and the

18  parties, as the Court pointed out, have all invested

19  considerable resources in getting to this point, and it

20  would be a shame if we were derailed for any great length of

21  time, and it would be a shame if all of the wheels had to be

22  reinvented, and I think what we should search for is a

23  procedure that will satisfy the Third Circuit's decision and

24  there also would empower the Court to make use of all the

25  work that's gone before and go forward, and I think there is

1  such a procedure.

2       I think Mr. Bernick suggested two possibilities.  I
3  think the possibility that Grace be the nominal plaintiff
4  being represented by the Milberg, Weiss firm is a
5  non-starter.  You can't really have a lawyer without a
6  client.  There has to be a client.  There has to be a party
7  that goes forward.  You can't have a phony party as such,
8  and particularly a party that would prefer the position to
9  be defeated.  I just don't think that makes any sense at
10  all.

11       So, I'd like to talk just briefly about the other
12  two possibilities, the appointment of the trustee and the
13  appointment of an examiner.  As creditors, we are --

14       THE COURT:  When you say a trustee, are we talking
15  about a full-fledged trustee or are we talking about a
16  limited trustee?

17       MR. INSELBUCH:  Any form of trustee.  And also, the
18  possibility of appointing an examiner.  The creditors in
19  this bankruptcy, and in every bankruptcy where I am
20  involved, recognize that really the first imperative is to
21  preserve the value of the debtor's estate because that is
22  going to be ultimately to one degree or another, whether the
23  creditors are commercial creditors, whether the creditors
24  are asbestos creditors, the source from which compensation
25  will be paid, claims will be resolved.  And we are mindful

1  of what will be a substantial disruption in the debtor's

2  affairs if a trustee is appointed, even a limited purpose

3  trustee.

4       We haven't had a chance, either, to look at all of

5  the underlying documents, but we would be very concerned if

6  the effect of the appointment, even of a limited purpose

7  trustee, were to cause substantial unrest in the management,

8  of perhaps management leaving the company or some members of

9  the management leaving the company, substantial difficulties

10 with the DIP financing, with any other financing, or any of

11 the other factors that make the underlying company function.

12      THE COURT:  It's almost a catastrophic result.

13      MR. INSELBUCH:  It could be.  And I would not be

14 happy if we were to recommend to the Court a course that

15 could result in, even if it's not a catastrophic result, a

16 result that is against the interests of all of the creditors

17 of this case.

18      THE COURT:  If you knock out management, you knock

19 out financing, and you neuter the board of directors,

20 there's not much left.

21      MR. INSELBUCH:  That's correct.  If that were the

22 effect, your Honor, we believe that would be a disaster at

23 this stage, because then it might not be worthwhile to

24 bother about the Chapter 11 anymore because you may destroy

25 the company in the process.  And for that reason, we look

1    for another route, and we do believe, as Mr. Bernick

2    suggested, that the route of an examiner is available, and

3    the sections of the code that are relevant are 1106(b) and

4    1104(d), and while there is no mention of the examiner in

5    the Third Circuit's opinion, the Third Circuit's premise in

6    ruling the way it did was you had to look to the plain words

7    of the code to find out who had authority to do what, and

8    you couldn't infer that authority if the code didn't provide

9    for it, and when the code said the trustee may, it didn't

10   say someone else may.

11            THE COURT:  Right.

12            MR. INSELBUCH:  But there are other provisions of

13   the code that naturally weren't before the Third Circuit

14   when they were considering this issue.  And we believe the

15   two sections that I cited to the Court provide exactly the

16   same kind of authority that the Third Circuit found

17   necessary in the Cybergenics case.

18            1106(b), 1106(a) and (b) talk about the duties of a

19   trustee and the duties of an examiner, and 1106(b) says an

20   examiner appointed under Section 1104(d) shall perform the

21   duties specified in paragraphs three and four of the (a)

22   above, which deals with the duties of the trustee, and

23   except to the extent that the Court orders otherwise, any

24   other duties of the trustee that the Court orders the

25   debtor-in-possession not to perform.

1    And here is the situation where it is clear that

2    the debtor-in-possession can't perform these duties.  The

3    debtor-in-possession, in fact, has refused to perform these

4    duties, and I take it that we could easily take Mr.

5    Bernick's suggestion that the debtor be the actual

6    plaintiff's client for purposes of this case be one that the

7    Court could reject and then easily say, then I'm going to

8    order that the examiner take on these duties, these limited

9    duties.

10    THE COURT:  Who appoints the examiner, U.S. Trustee

11    or the Court?

12    MR. INSELBUCH:  If you look at Section 1104(d),

13    your Honor, the appointment of the examiner is the United

14    States, the section reads the United States Trustee, after

15    consultation with parties-in-interest, shall appoint subject

16    to the Court's approval, so, the way that process works,

17    U.S. Trustee in the first instance.  If the Court directs

18    that there be an examiner appointed, the U.S. Trustee would

19    consult, would nominate someone, and if the Court approved,

20    that's how the examiner would come into play.

21    THE COURT:  Well, do we have to go through an

22    election?

23    MR. INSELBUCH:  No, sir.

24    THE COURT:  No election?

25    MR. INSELBUCH:  Not for an examiner.  You need an

1  election for a trustee.  So, as a subsidiary matter, the
2  appointment of an examiner, who would not thus invoke all of
3  these other difficulties that might be invoked at the
4  corporate level by the appointment of a trustee, is also
5  much simpler to do, can be done much faster and doesn't
6  involve a lengthy procedure just to get to the appointment
7  of an examiner.
8          THE COURT:  You said consult with the parties.  I
9  think that was a phrase you used.
10          MR. INSELBUCH:  The statute says consult, after
11  consultation with parties-in-interest, parties-in-interest.
12          THE COURT:  Tell me who they are.
13          MR. INSELBUCH:  Well, I would think --
14          THE COURT:  Is that Sealed Air?
15          MR. INSELBUCH:  I would think so.  And it certainly
16  would include all of the committees in the case, and would
17  certainly include the debtor.
18          THE COURT:  What if, by the way, the U. S. Trustee
19  come up with an examiner and Sealed Air says, no, I don't
20  like that examiner, then what do we do?
21          MR. INSELBUCH:  It's not up to any of the parties-
22  in-interest.  None of the parties in interest have a veto.
23          THE COURT:  They're going to be consulted.
24          MR. INSELBUCH:  They're to be consulted.
25          THE COURT:  So, U.S. Trustee has somebody in mind

1    and says here's who I'm thinking about.  You've got four

2    constituencies to be consulted.  Two say terrific, two say

3    we really don't want that guy, and the U.S. Trustee then

4    goes and does, and the Court approves it, end of case?

5         MR. INSELBUCH:  Yes, sir.  Unless there was some

6    compelling reason, I would think, why the particular

7    candidate should not being approved, and one would think

8    that the Court would listen to the parties-in-interest in

9    considering the approval process, because there are reasons

10   that the Court might care about and there are reasons the

11   Court might not care as much about.

12        THE COURT:  Okay.

13        MR. INSELBUCH:  And I think that that route,

14   1104(d) appointment and 1106(b) are statutory routes under

15   which an examiner could be appointed, and I have four

16   citations of cases where similar appointments have been made

17   of examiners for the purpose of bringing fraudulent

18   conveyance actions, which I can either hand up or read into

19   the record, however --

20        THE COURT:  Why don't you read them into the

21   record.

22        MR. INSELBUCH:  All right.  The first one is

23   Patton's Busy Bee Disposal Service, and it is cited at 182

24   Bankruptcy Reporter, 681, and it's a decision by the

25   Bankruptcy Court in the Western District of New York in May

1  of 1995.

2          The second one is In Re: SRJ Enterprises.  It is

3  found at 151 Bankruptcy Reporter, 189.  It is a decision of

4  the United States Bankruptcy Court for the Northern District

5  of Illinois, dated February 26, 1993.  The third is

6  Williamson against Roppollo, and it is found at 114

7  Bankruptcy Reporter, 127, and it is a decision by the United

8  States District Court for the Western District of Louisiana

9  on May 1st, 1990.

10          THE COURT:  What was the date of the Hartford case?

11          MR. INSELBUCH:  2000.

12          THE COURT:  Hartford case is 2000?

13          MR. INSELBUCH:  I think.

14          THE COURT:  So, all these opinions are before

15  Hartford?

16          MR. INSELBUCH:  Yes, they are, but I think the

17  principles that they adopt and they talk about the

18  appointments of the committees as well.  And the fourth one

19  just for the record, your Honor, is Franklin-Lee Homes, and

20  it is found at 102 Bankruptcy Reporter, 477, and it's a

21  decision of the District Court for the Eastern District of

22  North Carolina in June 1989.

23          I agree that these are old cases but, again, the

24  Supreme Court's decision did not at all talk about this

25  subject --

1          THE COURT:  I understand.

2          MR. INSELBUCH:  -- except in a footnote, which

3     people seem to read differently.

4          THE COURT:  Didn't even talk about this section.

5          MR. INSELBUCH:  That's correct.  But these cases do

6     talk about the powers conveyed by the bankruptcy code that

7     can be given to an examiner by a court, and if I'm correct

8     that the code says that these powers can be given by a court

9     to an examiner, then I'm confident that the Third Circuit

10    would not be upset to say, well, if that's what the code

11    says, that's what the code says.  Because I think in

12    principle, what they were saying in Cybergenics is we have

13    to do what the code says, and we can't look to the

14    ramifications necessarily.

15         As a subsidiary matter, I would like to just

16    briefly say that I think the Court is right, that whether

17    there's a trustee appointed or an examiner appointed, I

18    think it is sayonara to Kirkland & Ellis, because now there

19    will be an entity acting for the estate's interest, and I

20    believe also that that entity will be clothed with all of

21    the rights and duties of the estate, including control of

22    its own attorney-client privilege.

23         THE COURT:  If I were to appoint a trustee, if I

24    declined your examiner proffer, because I'm unsure that it

25    will pass muster later on, is that sayonara to Milberg,

1  Weiss?

2         MR. INSELBUCH:  I don't believe that's necessarily

3  true.  First, I don't see any conflict of interest in

4  Milberg pursuing this litigation.

5         THE COURT:  Why?  A trustee is now appointed for

6  Grace and Milberg, Weiss now represents the trustee who

7  stands in the shoes of Grace.

8         MR. INSELBUCH:  Yes.  But so did the committees in

9  bringing this action in the first place under what the Third

10  Circuit said was a failed procedure.  The whole concept was

11  that because the estate would not pursue the claim, that the

12  committees would stand in the shoes of the estate and pursue

13  the claim.  So, I see no real distinction between the

14  Milberg firm having as the client the two committees who

15  were standing in the shoes of Grace or the trustee or the

16  examiner, for that matter, standing in the shoes of Grace.

17         Now, obviously, one can't speak for the examiner or

18  the trustee.  They would have to make their own decisions

19  about how they would choose to proceed.  But at the same

20  time, I don't see that any of the counsel on the claimants'

21  side would be disqualified for pursuing the same roles, even

22  as the Third Circuit noted, the committees would still have

23  an absolute right to intervene in the proceeding and present

24  whatever evidence they wanted to present.

25         THE COURT:  Certainly have a right to intervene.

1        MR. INSELBUCH:  Yes, sir.

2        THE COURT:  Cybergenics says that, and you can

3    intervene under 1109(b).

4        MR. INSELBUCH:  Yes.

5        THE COURT:  I understand.  Just can't initiate it.

6        MR. INSELBUCH:  So, I don't think there's a

7    conflict problem but it would, of course, be for the trustee

8    if you were to appoint a trustee, or the examiner, to

9    determine what counsel that person would seek to engage and

10   how to proceed.

11       THE COURT:  Okay.

12       MR. INSELBUCH:  Subject, again, to whatever advice

13   might come from the Court.

14       THE COURT:  Today the Court is listening.

15       MR. INSELBUCH:  I think that's the end of my

16   speech, your Honor.  I'll answer any other questions you

17   might have, if I can.

18       THE COURT:  No, I have none at this point.

19       MR. INSELBUCH:  Thank you.

20       THE COURT:  Thank you for your presentation.  Mr.

21   Turken.

22       MR. TURKEN:  Thank you, your Honor.  It's

23   interesting because this is one of those weird situations in

24   this case where we're in agreement on matters with our

25   adversaries.  We are in agreement with Sealed Air.  We want

```
 1   finality.  We're in agreement with the debtor insofar as the
 2   two primary options that it identified.
 3            We don't think this is a situation that allows for
 4   window dressing or form over substance solution that don't
 5   address the main issues that the Third Circuit identified,
 6   which is a capacity to initiate the action or to bring the
 7   action.
 8            I think the Court has ample authority to go either
 9   the trustee route or the examiner route.  I'm not going to
10   suggest to the Court that the authority is uniform, but
11   there's ample authority for both alternatives.
12            THE COURT:  Well, you would concede to me, wouldn't
13   you, that we know how the trustee route would be received
14   upon appellate review.
15            MR. TURKEN:  Yes, your Honor.
16            THE COURT:  We don't know how the examiner route
17   would be received upon appellate review, and I don't even
18   know how it would be received on appellate review even if we
19   had consent of all parties-in-interest to an examiner.  I
20   just don't know.
21            MR. TURKEN:  Well, I think the latter point is a
22   valid one to the extent that if there's not capacity, you
23   can't give capacity by consent.  However, what I was
24   referring to about the trustee was a limited power trustee,
25   and I believe that there is as much uncertainty about a
```

1 | limited power trustee --

2 |        THE COURT:  Have we had a limited power trustee

3 | ever appointed in the Third Circuit given approval --

4 |        MR. TURKEN:  I believe there --

5 |        THE COURT:  -- after Hartford?

6 |        MR. TURKEN:  Not after Hartford, but I believe

7 | there are two Pennsylvania bankruptcy decisions which

8 | recognized the appointment of a limited power trustee, and I

9 | have those citations, if the Court would like them.

10 |        THE COURT:  Sure.

11 |        MR. TURKEN:  Excuse me?

12 |        THE COURT:  Sure.  We want all the help we can get.

13 |        MR. TURKEN:  The case of In Re: North American

14 | Communications, 138 BR, 175, from the United States

15 | Bankruptcy Court for the Western District of Pennsylvania.

16 |        THE COURT:  What's the year?

17 |        MR. TURKEN:  1992.  That's why I said I didn't know

18 | that I had the years.  And In Re: G & G Transport, 1998,

19 | Bankruptcy Lexis, 1634.

20 |        THE COURT:  The year?

21 |        MR. TURKEN:  1998.  We believe, your Honor, that

22 | the authority for the examiner is at least as good and

23 | probably more expansive than the authority for a limited

24 | power trustee.

25 |        We also agree, as Mr. Inselbuch so stated and as

1   Mr. Bernick stated, that the examiner presents the

2   opportunity for less disruption than the appointment of a

3   trustee.

4       There are certain qualifications, however.  If the

5   examiner is going to work, the case law is very clear, that

6   the order of the Court appointing the examiner has to be

7   specific, that the examiner has to have all the powers for

8   purposes of prosecuting the lawsuit that a trustee would

9   have, because an examiner does not have the bankruptcy code

10  authority inherent that a trustee has, and we don't want to

11  have a form over substance situation where the examiner is

12  nominally bringing the case but the debtor is still working

13  behind the scenes to help the defendant.

14      And here's where we get to what we believe is the

15  primary issue here.  Whether the Court goes by the route of

16  an examiner or a limited power trustee, the bankruptcy code

17  and the case law is absolutely clear, the debtor ceases to

18  exist as an independent entity for purposes of the lawsuit.

19  That space is occupied by the trustee.  That space is

20  occupied by the examiner.  There is no existence that the

21  debtor has separate and apart from the examiner or trustee

22  for purposes of bringing the suit.  That's why the case law

23  going from the CFTC decision to the Boileau decision in the

24  Ninth Circuit all recognize the attorney-client privilege as

25  flowing to the examiner or the trustee.

1        So, whatever option is selected by the Court, and

2   we believe those are the only two viable options, we believe

3   the order has to be very clear and tailored to make sure how

4   the circumstances are going to set out.

5        THE COURT:  So, I should let counsel draft it then,

6   so, the Court wouldn't fall into that error.

7        MR. TURKEN:  No.  I think your Honor is going to

8   draft the proper order.  But what we would believe is that

9   regardless of what option, the debtor can no longer exist in

10  this case as a defendant, whether by intervention or

11  otherwise, because the debtor is now going to be the trustee

12  or the debtor is now going to be the examiner.

13        The conflict that Mr. Bernick referred to, the

14  inherent conflict that exists is a false conflict because

15  once the examiner is appointed or the trustee is appointed,

16  even for the limited purposes, in those limited purposes

17  situations, there is only one debtor.  It can't split.  And

18  all of the debtor in every capacity is under the auspices of

19  the examiner, under the auspices of the trustee for purposes

20  of the prosecution of the lawsuit.

21        THE COURT:  Let me ask you this question.  Let's

22  put the examiner aside for a minute and just by putting it

23  aside, you should not conclude that I've rejected the

24  examiner.

25        MR. TURKEN:  Understood.

1          THE COURT:  I want to talk about the trustee.  Why

2     a limited trustee?  Why not a trustee?  I glean from what

3     Mr. Bernick said, unless I'm wrong, that even a limited

4     trustee may create default on debt, may impugn the

5     management agreements, so, why do a limited?  Why not do the

6     whole ball of wax?

7          MR. TURKEN:  Because I would think and I believe,

8     as Mr. Inselbuch said, we're not looking to disable the

9     debtor.  We're not looking to stop the debtor.

10          THE COURT:  Limited trustee disables the debtor.

11          MR. TURKEN:  Not necessarily.  It presents an

12     opportunity.  It may create a default under the DIP

13     financing, it may create a default under certain of the

14     employment agreements, but depending upon how the

15     limitations are instituted, it --

16          THE COURT:  Absolutely, default could be

17     potentially solved by the bank saying, okay, we understand

18     it's a limited purpose trustee and the management contracts

19     that are perhaps abrogated limited --

20          MS. TURKEN:  Exactly.

21          THE COURT:  It's not irrevocable.  I understand.

22          MR. TURKEN:  Interestingly enough, in the cases

23     that I cited to the court, the two Pennsylvania cases,

24     that's exactly what they did.  They appointed the trustee

25     for the purposes of prosecuting certain actions but left

1   management in place for purposes of running the company.

2   But they made it clear in those contexts that for purposes

3   of what the trustee was doing, the company was under the

4   authority of the trustee.

5          THE COURT:  Let me ask you this, switching topics

6   for a moment because I haven't addressed this to anyone.

7   What does this examiner or trustee look like, meaning, is

8   this Paul Volker?  Is it a lawyer?  Is it an investment

9   banker?  What does a trustee, examiner look like?

10         MR. TURKEN:  I think it depends on the powers that

11  your Honor and the trustee give the examiner or the trustee.

12  If you're going to appoint a trustee to run the company,

13  then the qualifications of the trustee are going to be

14  different than if you're going to appoint a trustee or an

15  examiner for the limited purpose of prosecuting the lawsuit.

16         THE COURT:  Well, the trustee isn't really going to

17  run the company.  What the trustee is going to do is, the

18  board is neutered and the trustee is probably going to hire

19  management people to run the company.  That's the reality of

20  it.

21         MR. TURKEN:  That's the reality but, see, in that

22  circumstance, the trustee at least has to have the

23  background, capacity to occupy that role, even though he's

24  going to have management --

25         THE COURT:  Probably good common sense?

1      MR. TURKEN:  Good common sense and some business

2  experience, I would think.  If, by contrast, you're talking

3  about just prosecuting the lawsuit, a lawyer could do it, an

4  ex-judicial officer.

5      THE COURT:  Why would I be looking for a lawyer to

6  prosecute the lawsuit?  If I followed Mr. Inselbuch's

7  argument, I still have Milberg, Weiss to prosecute the

8  lawsuit.

9      MR. TURKEN:  Well, there are many instances where

10  examiners or trustees are appointed not to serve necessarily

11  as active counsel but to have counsel underneath them.

12      THE COURT:  And then that examiner would retain

13  Milberg, Weiss for that purpose?

14      MR. TURKEN:  Presumably.

15      THE COURT:  Still picking Mr. Bernick's pocket.

16      MR. TURKEN:  Hopefully.  We do not believe, your

17  Honor, to echo what Mr. Inselbuch said, that whether your

18  Honor goes the route of the trustee or an examiner, that

19  that necessarily creates a conflict on the plaintiff's side

20  counsel's table.

21      We do think, your Honor, that it most definitely

22  creates a conflict on the defendant's side counsel's table

23  for obvious reasons, and fairness included.  But they're

24  basic realities.

25      THE COURT:  You think we should put this on a bar

1    examination or -- we have some former professors here --

2    maybe this should be a law school final exam in creditors'

3    rights or something like that.

4            MR. TURKEN:  Well, considering the questions that

5    we feel that yesterday as to the Third Circuit's decision,

6    you may be going in that direction in any event.

7            THE COURT:  Okay.  Thank you.  Now, Mr.

8    Wasserstein, you've heard from all these people.  I'll give

9    you another opportunity to be heard.  Okay?

10           MR. PASQUALE:  May I, your Honor?

11           THE COURT:  Absolutely, Mr. Pasquale.  You kind of

12   got me into this several months ago.

13           MR. PASQUALE:  I take no responsibility, your

14   Honor.  Let me just say a couple of things.  Obviously, I

15   thank Mr. Inselbuch for recognizing that the committee I

16   represent is a party-in-interest and certainly has a say in

17   how this proceeds, and we are very concerned and echo the

18   comments that you've heard already that finality is

19   important.

20           THE COURT:  Tell Mr. Kruger that I think that he

21   was probably prescient when he declined the opportunity to

22   prosecute this action on behalf of the unsecured creditors

23   committee.

24           MR. PASQUALE:  I will relay that, your Honor.

25           THE COURT:  Tell him my respect grows everyday.

1          MR. PASQUALE:   Let me just mention a couple of

2     things from my committee's perspective.   First of all, any

3     trustee it seems to me raises problems that could be

4     insurmountable.   Mr. Bernick mentions the business concerns.

5     Mr. Inselbuch correctly mentioned, and I agree with him

6     wholeheartedly that the potential for substantial disruption

7     to the estate is something we need to avoid at all terms.

8          The defaults are significant, sure, there could be

9     negotiations to waive those defaults or negotiate around

10    them, but the concerns are there, and we certainly don't

11    want to see anything happen that disrupts the bankruptcy

12    case as a whole, and I think even a limited trustee, as Mr.

13    Bernick commented, raises that potential.

14          We also have to recognize, and I think it was Mr.

15    Turken who said it, that whether it's a trustee or an

16    examiner, the conflicts with respect to the debtor being a

17    defendant in the case still exist.   It doesn't matter which

18    attorney is there.   The trustee or the examiner stands in

19    the debtor's shoes.   That conflict will still be there.   It

20    doesn't disappear.   I don't know that either of those are

21    solutions.

22          THE COURT:   So, what do we do about it?

23          MR. PASQUALE:   I have a third solution that no one

24    has mentioned.

25          THE COURT:   I've got a fourth, but go ahead.

1          MR. PASQUALE:   Obviously, finality is a concern and
2     expediency we have heard about.
3          THE COURT:   My fourth goes to finality.
4          MR. PASQUALE:   I think finality is served under
5     1123(b).   1123(b), and paraphrasing, the effect through a
6     plaintiff reorganization, the avoidance claims can be
7     assigned to a litigation trust.   When you really boil this
8     right down, there's no reason this has to go ahead today.
9     And if we want finality, that's the way it can be done.   The
10    Cybergenics decision doesn't get in the way.
11         THE COURT:   You can dismiss the bankruptcy and have
12    it go to the state court.
13         MR. PASQUALE:   Then you have creditors racing to
14    the court house to bring the claims.   I'm not sure that
15    makes sense, your Honor.
16         THE COURT:   I'm aware of the fact that in the
17    plaintiff reorganization confirmation, that there can be a
18    representative appointed to prosecute the claim.
19         MR. PASQUALE:   And then you don't have the
20    conflicts.
21         THE COURT:   After the confirmation, I'm aware of
22    that.
23         MR. PASQUALE:   That's what I wanted to raise to
24    your Honor.   It seems to me that that is a course that
25    everyone should be thinking about.

1          THE COURT:  And I will tell people very candidly,

2     if that was the course to be adopted, this Court will remain

3     long enough to try this case, so, you're not getting rid of

4     Wolin by putting it in the plan of confirmation.  Everybody

5     should know that.

6          MR. PASQUALE:  Those were my comments.  Thank you,

7     your Honor.

8          THE COURT:  Thank you, very kindly.

9          All right Mr. Wasserstein I'm looking for

10    enlightenment.

11         MS. WASSERSTEIN:  Don't expect it, Judge.  The one

12    thing I will say is that while you may still have Wolin, to

13    use your words, you may not have Wasserstein by that point,

14    so, I could --

15         THE COURT:  Well, hopefully we'll have Wasserstein

16    and Wolin.  Okay.

17         MS. WASSERSTEIN:  I think that what is very obvious

18    is that these are very complicated issues, as I stated

19    before, and I think that we have heard portions of them some

20    ways and we haven't heard the whole thing spelled out, and I

21    think if somebody is going to, whatever we're going to do,

22    it has to be fully spelled out.

23         I am somewhat troubled with regard to the examiner

24    idea because I think the examiner idea, just looking at the

25    face of the Third Circuit's decision in Cybergenics, might

1   create a problem with regard to finality.

2           You might end up in the Third Circuit saying, you

3   know, if we were to consent to something like that, if that

4   were even possible, it would have to be with a reservation

5   of rights to argue in the Third Circuit in the event that we

6   lost that the examiner was inappropriate under Cybergenics.

7           THE COURT:  You know what's unfair about this whole

8   matter?  I agree with you that we have very, very

9   complicated issues, that if we were writing on a clean slate

10  today, we wouldn't have these complicated issues because we

11  wouldn't have the conflicts.  We would have provided for

12  them and they wouldn't have occurred.

13          Now we're in the middle of this, even past the

14  middle, and then this opinion comes down and now we're in

15  complicated issues, and somebody used the term conundrum and

16  that's probably a very good term -- okay -- which, if we

17  were starting out on a clean slate, we wouldn't be in this

18  position.

19          MS. WASSERSTEIN:  Well, I don't disagree with any

20  of that, your Honor.

21          THE COURT:  But we're there.   But we're there.

22          MS. WASSERSTEIN:  I understand.  And all I'm saying

23  is what I stated before, that we would need an opportunity

24  to examine whatever proposal somebody makes to comment on

25  it, again, looking toward the issue of finality.

1        THE COURT:  Why can't you be an initiator?

2        MS. WASSERSTEIN:  It's possible that we could, but

3   it seems to me that everybody is trying to figure out a way

4   to resolve the issues vis-a-vis Sealed Air and it's harder

5   for us to be the proposer of something rather than somebody

6   else under these circumstances.

7        I think that one of the -- your Honor also must be

8   aware that Sealed Air is a creditor of Grace and, so, we are

9   also concerned about the ramifications of what would occur

10  under the various scenarios such as the appointment of a

11  trustee.

12       THE COURT:  And by the way, if we're going to think

13  outside the box a little, we've got to think about the

14  Fresenius people.

15       MS. WASSERSTEIN:  Understood, understood.  I

16  absolutely agree.  So, I don't have a solution right now,

17  your Honor.  As I said, we are open to anything that would

18  give us finality.  We are certainly willing to think about

19  coming up with our own proposal as a way to solve this.

20       One of the issues, though, that I raise, that I

21  would raise again with regard to the immediacy of resolving

22  the issue and getting on with the trial, if that means the

23  elimination of the debtor as a defendant in this, we're back

24  where we were before concerning the need to get ready with

25  more of a case to try than we thought we were going to be

1    trying, and I just throw that out as an additional

2    complication, although I don't think it should be the

3    controlling one.  It is an additional complication.

4         THE COURT:  See, there's a fifth matter that nobody

5    raised yet; that is, all the parties sitting down and

6    resolving it and getting that finality, but, you see, now I

7    have to raise conflict of interest again.

8         While I think I know how to resolve cases, I have a

9    conflict as the trier of the fact, so, I can't insert myself

10   in that unless there was a waiver.

11        MS. WASSERSTEIN:  Understood.  And I also would

12   understand that, I would think that that is a matter, while

13   it is something that ought to be considered, is something

14   that ought not to be considered in open court.

15        THE COURT:  I understand.  Mr. Bernick.

16        MR. BERNICK:  Your Honor, I just have one further,

17   almost as a question to ask, as a question more than

18   anything else to ask.  There were suggestions made that if

19   the examiner were appointed, they become the debtor for

20   purposes of the case and, obviously, one of the consequences

21   of that, as I understand it, would have to be that we are no

22   longer a defendant in the case because the case is being

23   pursued on behalf of the debtor.

24        That is something that I don't think is

25   problematic, obviously, especially given the motion that we

1   made a little while ago, but I also want to be a little bit

2   careful that to the extent that we're being asked to consent

3   to this, that this is not in a sense the revival of exactly

4   the same concern we had, which is sponsoring the prosecution

5   of a claim that is philosophically different from our

6   position in the main case.

7           THE COURT:  Are you talking about the motion you

8   filed two or three days ago wherein you're concerned about

9   issues of collateral estoppel --

10          MR. BERNICK:  Yes.

11          THE COURT:  -- and res adjudicata?

12          MR. BERNICK:  So, now take us out of the case and

13  say, oh, you're out of the case because the case is now

14  being pursued by the examiner but, by the way, the examiner

15  is now you, so, you are bound by whatever the examiner does

16  and, obviously, that is simply a way not of just solving the

17  problem here but of creating a broader problem which is how

18  does this case fit in with the broader case.

19          All I'm suggesting is we're flexible.  The idea of

20  an examiner sounds like it might be a good idea, but it's a

21  good idea for resolving the problem about how to proceed

22  with this case and it shouldn't be a lever for trying to get

23  things done in the main case.

24          THE COURT:  Anybody else want to be heard?

25          MR. INSELBUCH:  No, your Honor.

1        THE COURT:  Because we're all having so much fun in

2   the pursuit of these intellectual issues of an academic

3   nature, I'm going to ask everybody by next Monday to send to

4   me an ex parte letter, you don't have to share it, it's

5   going to be for my benefit, ex parte letter as to what you

6   think the resolution of these issues are and what the

7   preferred course you want to take on behalf of your

8   respective clients, so, Mr. Wasserstein, you're going to

9   have to commit yourself, and I will then evaluate those and

10  potentially on short notice I will issue some type of Order

11  to Show Cause and we'll have once again maybe a little

12  argument after I am able to assimilate everything and I will

13  be able to tell you somewhat promptly how the Court thinks

14  we should proceed.

15       All right.  I encourage you to stay in contact with

16  Francis McGovern and David Gross to assist this Court in

17  matters that this Court cannot take an active role.  Does

18  anybody have any questions?

19       MR. FRIEDMAN:  Your Honor, I assume you don't want

20  a letter from us, although we'd be happy to submit one.

21       THE COURT:  No.  I want one from each of the

22  committees.  I don't need it from you, Mr. Friedman.  Does

23  anybody have any questions?

24       MR. INSELBUCH:  For the record, is it correct to

25  say that the trial --

1           THE COURT:  Is adjourned.  Do you speak Latin?  You

2    speak Latin?  You went to Princeton.  Right?

3           MR. INSELBUCH:  I didn't learn any Latin in

4    Princeton.

5           THE COURT:  Well, where did you learn it?

6           MR. INSELBUCH:  The only Latin I know is some curse

7    words that I learned from my partner Lockwood.

8           THE COURT:  You know, and I've been suspect of

9    Lockwood for a long time.  Sine die, it will be adjourned

10   sine die.  Thanks for coming.

11           (Whereupon, the proceedings are adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25