IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W.R. GRACE & CO., *et al.*, | ) Case No. 01-1139 (JKF) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Objection Date:  TBD.** |
| | ) **Hearing Date:    TBD.** |

## NOTICE OF FILING OF EXHIBIT [Re: Docket No. 2804]

TO:   All Parties on the Attached 2002 Service List

PLEASE TAKE NOTICE, that on October 11, 2002, the Official Committee of Asbestos Personal Injury Claimants (the "P.I. Committee") filed and served **The Official Committee of Asbestos Personal Injury Claimants' Motion for an Order Appointing A Trustee for W.R. Grace & Co. and Other Debtors Pursuant to 11 U.S.C. Section 1104(a) [Docket No. 2804]** (the "Motion"), with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801.

PLEASE TAKE NOTICE, that on October 17, 2002, the P.I. Committee filed and served **Exhibit 32** to the Motion, with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801.  A true and correct copy **of Exhibit 32** is attached hereto.

CAMPBELL & LEVINE, LLC

Marla Rosoff Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 King Street
Suite 300
Wilmington, DE  19801
(302) 426-1900

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue, 27th Floor
New York, NY  10022-4614
(212) 319-7125

-and-

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Trevor W. Swett
Nathan D. Finch
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

Counsel to the Official Committee of
   Asbestos Personal Injury Claimants

Dated:  October 17, 2002

# EXHIBIT 32

1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE:                                CHAPTER 11
                                      Case Nos. 01-1139 through
W.R. GRACE & CO., et al.,             01-1200

        Debtors.
-----------------------------
OFFICIAL COMMITTEE OF                 Adv. No. 02-2210
ASBESTOS PERSONAL INJURY
CLAIMANTS and OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS
OF W.R. GRACE & CO., suing
in behalf of the Chapter 11
Bankruptcy Estate of W.R.
GRACE & CO., et al.,

        Plaintiffs,

vs.

SEALED AIR CORPORATION and
CRYOVAC, INC.,

        Defendants
-----------------------------
                                October 7, 2002
                                Newark, New Jersey


B E F O R E:  HONORABLE ALFRED M. WOLIN, USDJ


Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record
as taken stenographically in the above-entitled proceedings.


JACQUELINE KASHMER
Official Court Reporter

            JACQUELINE KASHMER, C.S.R.
             OFFICIAL COURT REPORTER
                  P. O. Box 12
               Pittstown, NJ 08867
                 (973) 297-4889

2

OFFICIAL COMMITTEE OF                    Adv. No. 02-2211
ASBESTOS PERSONAL INJURY
CLAIMANTS and OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS OF
W.R. GRACE & CO., suing in
behalf of the Chapter 11
Bankruptcy Estate of W.R.
GRACE & CO., et al.,

       Plaintiffs,

vs.

FRESENIUS MEDICAL CARE
HOLDINGS, INC. And
NATIONAL MEDICAL CARE,
INC.,

       Defendants.
----------------------------

A P P E A R A N C E S:

    MILBERG, WEISS, BERSHAD, HYNES & LERACH, LLP
    One Pennsylvania Plaza
    New York, NY 10119-0165
    BY:  BRAD N. FRIEDMAN, ESQ.
             And
         RACHEL FLEISHMAN, ESQ.,
    Attorneys for the Official Committee of Asbestos
    Personal Injury Claimants and the Official Committee of
    Asbestos Property Damage Claimants


    CAPLAN & DRYSDALE
    399 Park Avenue
    New York, NY 10022-4614
    BY:  ELIHU INSELBUCH, ESQ.,
    Attorneys for the Asbestos Personal Injury Committee


    BILZIN, SUMBERG, DUNN, BAENA, PRICE & AXELROD
    First Union Financial Center
    200 South Biscayne Boulevard
    Suite 2500
    Miami, Florida 33135
    BY:  SCOTT BAENA, ESQ.,
             AND
         ROBERT TURKEN, ESQ.,
    Attorneys for the Asbestos Property Damage Committee


    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    Four Times Square
    New York, NY 10036-6522
    BY:  HENRY WASSERSTEIN, ESQ.,
             And
         BERT WOLFF, ESQ.,
    Attorneys for Defendants Sealed Air Corporation and
    Cryovac, Inc.

4

A P P E A R A N C E S, cont'd.:


GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, NJ 07102
BY:  MICHAEL R. GRIFFINGER, ESQ.,
          AND
MC DERMOTT, WILL & EMERY
222 West Monroe Street
Chicago, IL 60606-5096
BY:  DAVID ROSENBLOOM, ESQ.,
Attorneys for the Defendant Fresenius Medical Care
Holdings, Inc.


KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
BY:  DAVID BERNICK, ESQ.
          And
     MICHELLE BROWDY, ESQ.,
Attorneys for the Debtor, W.R. Grace & Co.


STROOK & STROOK & LAVAN, LLP
180 Maiden Lane
New York, NY 10038-4982
BY:  LEWIS KRUGER, ESQ.
Attorneys for the Official Unsecured Creditors'
Committee


DUANE, MORRIS & HECKSCHER, LLP
744 Broad Street
Newark, NJ 07102
BY:  WILLIAM KATCHEN, ESQ.,
Attorneys for the Official Creditors' Committee

5

A P P E A R A N C E S, cont'd.:


    KRAMER, LEVIN, NAFTALIS & FRANKEL
    919 Third Avenue - 39th Floor
    New York, NY 10022
    BY:  PHILIP BENTLEY, ESQ.,
    Attorneys for the Equity Committee


    UNITED STATES TRUSTEE

    BY:  FRANK PURCH, ESQ.,
            and
        ROBERTA DeANGELIS, ESQ.

6

1          THE COURT:  Welcome to another edition of hard

2     ball.  As Chris Matthews says, that sometime I'm going to

3     tell you what I really think, but not at the beginning.

4          I'd like to thank everybody for being here.  I have

5     your appearances.  You've all had a lot of time to think

6     about the solution to the problem and I want to hear from

7     you today because I really want to make a record.

8          I received all of your thoughtful letters and from

9     those letters there are certain inevitable truths that

10    emerge that -- nobody has to write this down, Mr. Baena,

11    don't write it down, it's not that inevitable or ultimate.

12         There's certain truths that exist that will guide

13    the Court, and the first of those is that whatever we do,

14    people want finality.  There has to be finality.

15         The second is that in zero to six months, when we

16    got this case ready for September 30th, people expended much

17    time, effort, thought, resources, and I believe that it

18    would be wasteful not to pursue this case diligently and

19    promptly.  So, it probably means that for those people who

20    will argue for including this particular action in a plan of

21    confirmation to be litigated by a representative who knows

22    when, I'm not seriously thinking about that, and some of the

23    options that have been presented to the Court are the

24    appointment of a trustee.  Well, that's mainstream.  If you

25    read Cybergenics, you know that's not really rocket science

7

1    because debtor-in-possession or trustee, we all understand

2    what they mean.

3         There's been a proposal for a limited trustee,

4    proposal for an examiner, proposal for a declaratory

5    judgment.  I would like to hear today people argue the issue

6    of waiver on behalf of the debtor-in-possession and Sealed

7    Air, that they waived whatever defense they could have

8    raised as to the capacity to sue by the committees because

9    Cybergenics is an affirmance of a lower court opinion.  It

10   was out there.  It was up in the Circuit once before, so, it

11   shouldn't have been a surprise to everyone, so, there's an

12   issue of waiver.

13        The Court has also given great thought to an

14   expedited appeal that, because of the action taken by all

15   concerned, the trial date of September 30, the opinion

16   coming out on September 20, the projected cost to the

17   estate, and I would imagine that, I haven't seen any figures

18   but I wouldn't be surprised if counsel fees in the last six

19   months for all parties would approximate ten million

20   dollars, and it would be terribly wasteful not to pursue

21   this case promptly, so, there should be an expedited,

22   potentially an expedited appeal to the Third Circuit Court

23   of Appeals as to maybe relief from the stricture of the

24   Cybergenics opinion.

25        I also understand, I haven't had an opportunity to

8

1    read it, but that there's an application en banc in

2    Cybergenics that was recently filed.  Mr. Bernick,

3    obviously, you haven't seen it, either.

4           MR. BERNICK:  I have glimpsed it in hard copy but I

5    have not read it.

6           THE COURT:  Then I misread your body language.  But

7    in any event, if the feelings of the bankruptcy bar could be

8    converted into some type of force, then Cybergenics, from

9    what I've heard, would be blown away into nothingness.

10          I haven't heard one bankruptcy practitioner speak

11   in favor of Cybergenics, and I will not call on any

12   particular bankruptcy practitioner to express his or her

13   opinion.

14          So, we have all these options here today.  I want

15   to tell you one thing that I'm thinking about, and I hope

16   this invites a mandamus or something like that.  I'm going

17   to set a trial date of December 2nd, and unless somebody

18   mandamuses me or whatever, we're going to go ahead on

19   December 2nd.

20          Now, in the order I'd like to hear from people

21   today, I understand there's a representative here from the

22   United States Trustee's Office, whom I do not know.  Is it

23   going to be you, Mr. Purch, or someone else?

24          MR. PURCH:  Yes, your Honor.

25          THE COURT:  I just wasn't sure.  The United States

9

1    Trustee filed a memorandum, and I don't know if anybody had

2    an opportunity to read the memorandum.  Did everybody get

3    the United States Trustee's memorandum?

4             Okay.  Fine.  Then we know what it says.  I thought

5    it was a thoughtful memorandum and it raises many of the

6    questions that the Court had given some thought to in

7    advance of the memorandum, but I won't take credit for them.

8    I'll let the United States Trustee take credit and, so, Mr.

9    Purch, if you want to address the Court, you may.  And what

10   I'm really looking to accomplish today is not just some

11   academic exercise, but I also want to make a real record,

12   because together with what we did on, I guess it was

13   September 24, that transcript, I want this transcript to

14   exist, and I want both transcripts to go up to the Third

15   Circuit Court of Appeals on some expedited basis.

16            Mr. Purch, I'll hear from you, sir.

17            MR. PURCH:  Thank you very much, your Honor.  Good

18   afternoon.  May it please the Court, Frank Purch for the

19   United States Trustee.  With me today is Roberta DeAngelis,

20   the Assistant U.S. Trustee for the District of Delaware, and

21   also Robert Schneider, another trial attorney assigned to

22   the Newark office who has been assisting us on the briefing

23   of these matters.

24            Your Honor, we think, as we expressed in our

25   memorandum, that the first thing that can be done in the

1    posture in which we find ourselves here is take a breath

2    because --

3                THE COURT:  We did that.  Last week we took a

4    breath.

5                MR. PURCH:  We can take another breath, your Honor,

6    because a petition has been filed in the Circuit for

7    rehearing en banc of the Cybergenics case.  I would imagine

8    that we will hear quickly whether or not the Court will

9    entertain the petition for rehearing.

10               If the Court chooses not to entertain the petition

11   for rehearing, then we know what the landscape is.  We know

12   that the decision stands and we can go forward on that

13   basis.  If the Court chooses to entertain the petition for

14   rehearing, presumably at that point also the Court will give

15   some indication of what type of briefing and argument

16   schedule will pertain to the rehearing and, therefore, there

17   might be some context, and I don't want to go too far out on

18   a limb --

19               THE COURT:  What time period do you project that it

20   be; two months, three months?

21               MR. PURCH:  Well, as I said, it's speculative right

22   now.  If the Court grants a rehearing, how much time they'll

23   allow for briefing and argument and how much time might go

24   before an opinion issues --

25               THE COURT:  Let me ask you this question.  If that

1    be the case, mandate hasn't issued, the matter is up on

2    appeal, why can't I try the case?

3            MR. PURCH:  That would be one option.

4            THE COURT:  Because it's not the law in the Third

5    Circuit until the mandate issues.

6            MR. PURCH:  I think that's one option that's

7    available.  What I think would be appropriate is whether --

8    let's first find out whether a rehearing is going to occur.

9    If it's going to be denied, then we know what that means.

10   If it is going to occur, at that point, your Honor, you

11   could decide whether, after inquiry, perhaps more briefing

12   from the parties, whether it would be appropriate to

13   continue the matter further or whether it would be

14   appropriate, your Honor, to proceed with the trial under

15   some proceeding with the existing parties, or whether it

16   would be appropriate for your Honor to make some

17   determination at that point regarding who the proper parties

18   to the trial are.

19           THE COURT:  Well, Mr. Purch, Mr. Wasserstein and I,

20   we're getting older, we're getting on in years, so,

21   therefore, why can't we proceed on a dual track?

22           MR. PURCH:  I think you can, and that was going to

23   be my second point, your Honor.  I think there are issues

24   that can be addressed right away, and I think the first

25   issue that should be addressed, which did not seem to us to

12

1    have been addressed to date by the parties in the

2    submissions and in the argument on September 24, is the

3    question of whether, in fact, the defense of suit not being

4    brought by the real party-in-interest is still available to

5    the defendants or whether it has been waived due to the fact

6    that they did not raise that defense in their answer to the

7    complaint.

8          Their answer to the complaint raised a defense of

9    lack of standing but the Cybergenics decision expressly

10   states it's not a standing decision.

11         I did a little bit of quick research, and these

12   cases are not in the memorandum because I found them this

13   morning.  There are at least two cases that I found just

14   doing some very quick research that indicate that the issue

15   of lack of the real party-in-interest is a waivable defense.

16         One is the Third Circuit decision from 1994 called

17   Allegheny International versus Allegheny Ludlam Steel.  Its

18   cite is 40 F. 3rd, 1416.  There's an Eastern District of

19   Pennsylvania case, it's an old case from 1953 but it still

20   appears to be good law, called McLouth, M-c-L-o-u-t-h,

21   versus Mesta Machine Company and the cite is 116 F. Sup.

22   689, and the reason why I dredge up that somewhat older case

23   is that that is a situation that specifically involved an

24   attempt to raise the defense four days before trial, which

25   is very much the sort of situation --

```
 1          THE COURT:  Nobody follows Fed Sup. cases.  You
 2   know that.  Right?
 3          MR. PURCH:  But the Third Circuit issue from 1994
 4   much more recently is in line with that, and what I suggest,
 5   your Honor, is that what can happen, even while a petition
 6   for rehearing is pending, is that your Honor could direct
 7   the parties to brief the issue of whether the defense has
 8   been waived.  I'm not suggesting your Honor should decide it
 9   today.  I think Sealed Air should have an opportunity to
10   state their opinion on it.  The committee plaintiffs should
11   have an opportunity to state their position.
12          Your Honor, I don't expect Sealed Air to concede to
13   waive a defense.
14          THE COURT:  Anything is possible.
15          MR. PURCH:  But I don't expect them to concede
16   anything.  I think that probably with the possible exception
17   of simply appointing a plenary trustee, which is exactly
18   what Cybergenics says, with the possible exception of that,
19   I would expect Sealed Air's counsel obviously to want to
20   protect their client's interests and, so, we're going to
21   have to proceed under the assumption that Sealed Air is
22   going to at least reserve its rights to challenge whatever
23   other decision might be made.
24          The question, therefore, your Honor, is, as we've
25   suggested in our memorandum, what is it that can be done in
```

14

1    this context if Cybergenics stands.  What can be done in

2    this context that is most consistent with Cybergenics.

3    Since I don't view anything in Cybergenics as intending to

4    change the law on Rule 17(a) and, therefore, intending to

5    change the law that real party-of-interest is a waivable

6    defense, I think that a determination that Sealed Air has

7    waived the defense or determination that it has not waived

8    the defense is a determination that the Court can make

9    that's fully consistent with Cybergenics.

10        In fact, considering the discussion in a somewhat

11   different posture that exists in the Cybergenics opinion of

12   the 17(a) issue presented there, the committee had not moved

13   for a trustee even though they knew that the issue was live

14   and so on.  It's the same sort of argument that exists here.

15        Looking at the other options, your Honor, that have

16   been proposed, we certainly share the Court's concerns about

17   efficiency and finality and, therefore, once again, if

18   Cybergenics stands, we have some serious questions about

19   some of the other options that have been proposed.

20        With respect to the concept of having an examiner

21   being given enough of the trustee powers to pursue these

22   fraudulent conveyance actions, that certainly is facially

23   appealing in the sense that, yes, the bankruptcy code does

24   under Section 1106 create the possibility that an examiner

25   can be assigned certain trustee duties.

```
 1              The difficulty that we have in viewing that and in
 2      getting a comfort level about that is that assuming that you
 3      can delegate these kinds of duties to an examiner, it
 4      doesn't appear to be something that the Third Circuit
 5      contemplated because the Third Circuit spent a lot of time
 6      and a lot of struggle interpreting the phrase "the trustee
 7      may" under Section 544(b), "the trustee may seek to avoid a
 8      transfer", and the Third Circuit says trustee obviously
 9      means the trustee, and the Third Circuit says that under
10      Section 1107, the debtor-in-possession, unless those duties
11      are taken away, has certain duties of a trustee.
12              THE COURT:  Did you ever see the briefs in
13      Cybergenics?  I never saw the briefs.
14              MR. PURCH:  I never saw the briefs, your Honor.
15              THE COURT:  Because perhaps the Court did not opine
16      on an examiner or a limited trustee because it was never
17      before them.
18              MR. PURCH:  That's possible, although the type of
19      statutory analysis reasoning that the Court uses would tend
20      to lead one, in our opinion, to the conclusion that if we
21      say one thing, we don't mean something else that we could
22      have added to that list but we didn't, because that's
23      really, therefore, the Court's way of interpreting the
24      statute.
25              THE COURT:  Well, potentially they read Hartford
```

16

```
 1   with comfort and felt they didn't have to go any further.
 2        MR. PURCH:  But they read Hartford to say trustee
 3   means trustee and debtor-in-possession, not trustee and
 4   debtor-in-possession and examiner given certain trustee
 5   powers under 1106, and given the way that the Circuit seems
 6   then to have spent some time talking about, well, what other
 7   options, and that phraseology is even used in the opinion
 8   somewhere, these are other options that could have been
 9   available to the committee, it would strike me that if
10   someone were going to try and look at what options might be
11   available, that this was one that might have been on their
12   list of options but might not.
13        The point, your Honor, is ultimately that while we
14   can have this discussion about what they might have meant,
15   what we're buying, of course, is a rather involved,
16   potentially involved appellate process of determining on a
17   proceeding brought by Sealed Air to raise the issue whether
18   an examiner is within the scope of what the Cybergenics --
19        THE COURT:  So, the premise of your argument is
20   what you see is what you get.
21        MR. PURCH:  We're all safe if we stay at that
22   point.  My point, your Honor, is that if we want to do
23   something that's safe, as safe as we can possibly make it,
24   as certain as we can possibly make it, we ought to stay
25   within the safe zone, and this is strained beyond the safe
```

17

1    zone.

2           THE COURT:   And you say the same thing about a

3    limited trustee?

4           MR. PURCH:   Your Honor, our argument about a

5    limited purpose trustee is set forth in our papers.   The

6    difficulty that we have with it, notwithstanding the fact

7    that there are a couple of cases which we cited where

8    something like that was ordered, is that it doesn't really

9    seem to be consistent with what the code provides for.

10          It would seem that the code fairly contemplated

11   that when a trustee is appointed, that a trustee takes

12   possession of all the assets of the estate.   The trustee's

13   compensation is, in fact, based upon the presumption that

14   the trustee has control of the assets, and, furthermore, if

15   you take a look at Section 1105, Section 1105, in fact,

16   provides for a mechanism for the trustee, upon request of a

17   party-of-interest, the trustee's appointment to be

18   terminated and the debtor restored to possession.

19   Everything that you read in the code presumes that when a

20   trustee is appointed, the trustee takes possession.

21          What we've stated, your Honor, is that we don't

22   think the reasoning of the cases that purported to create a

23   limited purpose trustee is sound.   In fact, of the three

24   cases involved, only one attempts to come up with any

25   rationale, and that's the Intercat case from Georgia, and

18

1    the Intercat case, in our opinion, really goes at it

2    backwards by using 1107, which defines the duties of

3    debtor-in-possession, to back into what the duties of a

4    trustee might be, and the Intercat court ruled that, well,

5    because under 1107 the Court has the power to take duties

6    away from the debtor-in-possession, they got to go somewhere

7    else, and we'll say they can go to a trustee, but the code

8    in fact says where they go, they go to an examiner, because

9    Section 1106(d) says that the Court may direct the examiner

10    to perform any duties of the trustee which the

11    debtor-in-possession is directed not to perform, which, once

12    again, if the Third Circuit had said an examiner worked,

13    this all would be a lot easier.

14         Your Honor, we then are left with -- one more point

15    about concept of a limited purpose trustee.  I'm sure that

16    you'll hear from the debtor, as the debtor has indicated

17    before, that appointment of the trustee has potential for

18    all sorts of bad things to happen in the case and the

19    trustee really has -- the flip side, as it were, in fact,

20    that the code does not contemplate any limits on the powers

21    of the trustee, any limits on the statutory powers, is that

22    the trustee has a fiduciary duty and discretion in how to

23    exercise his or her powers.

24         The trustee is not required to fire all the

25    employees, is not required to show all the management to the

1   door.  The trustee is not required to totally change the way

2   the business operates.

3        THE COURT:  That's one side of the coin and that's

4   what you argue in your memorandum to the Court, but the

5   other side of the coin may be acts may occur over which the

6   trustee doesn't take any act or control, like maybe

7   management contracts are abrogated and management says, by

8   the way, we're not staying on with the trustee, so, you've

9   got no management, DIP financing may evaporate, because

10   appointing of a trustee may be regarded as an act of

11   default.

12        People who deal with a particular company when

13   confronted with a trustee to operate with no management and

14   DIP financing evaporated may be concerned about the ability

15   of the corporation to meet its commitments in terms of its

16   business.

17        MR. PURCH:  I have a couple of responses to that.

18   One is, of course, that to the extent that these types of

19   doomsday clauses were things that were approved by the

20   bankruptcy court in the course of the bankruptcy process,

21   there certainly, I think, would be the opportunity for the

22   trustee to come to the Court and seek relief or modification

23   from some of the effects of these provisions.

24        Secondly, with respect to the effects of the

25   trustee --

1          THE COURT:  Wait.  Let's take DIP financing.  The

2     trustee can come to me and argue till the trustee is blue in

3     the face and I could be sympathetic, and the hard-nose banks

4     say, ut-uh, we're pulling our financing.

5          MR. PURCH:  The banks may have the negative ability

6     to do that.  We have to decide in this, as in many

7     instances, your Honor, whether we're going to presume that

8     people will act in an economically irrational way or whether

9     they'll act in an economically rational way.  Is it

10    economically rational for the banks to suddenly yank the

11    financing and plunge the debtor into nothingness?  Will the

12    banks ever see their money back?

13         THE COURT:  I don't know.  What will ensue is

14    probably a Chapter 7 dissolution and the banks may or may

15    not get their money.  I don't know.

16         MR. PURCH:  There have been trustees appointed in

17    some many, many large cases and trustees have operated

18    businesses in many large cases.

19         Another point about this, your Honor, is obviously

20    we're having this discussion based on the assumption that we

21    may find that we have to make -- that the Third Circuit's

22    decision is law and we have to deal with it where it is.

23         While I'm not going to try to get inside the head

24    of the panel judges and explain exactly how they came to

25    this rationale, I will say that certainly I think we can

1    presume that the judges were aware that there is an existing

2    legal standard under Section 1104 for appointment of a

3    trustee, and that when the Third Circuit speaks in the

4    Cybergenics case that either a debtor-in-possession or a

5    trustee has to bring an action, that doesn't mean, I don't

6    think, and I don't see anything in the opinion that suggests

7    that if there's a disagreement between the debtor-in-

8    possession and certain creditors about whether an action

9    should be brought, that automatically a trustee should be

10   appointed.  There needs to be cause found.

11          Section 1104 still exists and there's a body of law

12   under Section 1104 that requires a court to make a

13   determination whether there are grounds for appointment of a

14   trustee, either under the first prong, the gross

15   mismanagement, incompetence, dereliction of duty prong, or,

16   alternatively, the best interests of creditors.  So that all

17   of these factors that are discussed about the potential

18   effects of the financing and so on and so forth are all

19   factors that the Court would need to address in determining

20   under Section 1104 whether grounds exist to appoint a

21   trustee.

22          Does that mean if the Court determines that grounds

23   do not exist, that if it would not be in the interest of the

24   creditors to appoint a trustee, does that mean potentially

25   there might not be a plaintiff to bring this suit?  That's

1    one of the factors to be considered.  But ultimately a party

2    would have to file a motion and I guess it would be the

3    current plaintiff committees who would file the motion to

4    appoint a trustee, and they would set forth their arguments

5    as to why a trustee should be appointed, why it would be in

6    the best interests of creditors for a trustee to be

7    appointed so that this action can go forward, and they would

8    argue that there are ways to protect or ameliorate these

9    potential consequences and that the benefits outweigh the

10   risks.

11          That would be what the Court would be asked to

12   consider.  I'm not asking, because I don't think that the

13   Circuit's opinion suggests that appointment of a trustee

14   should be automatic.  I don't think the Circuit even

15   contemplates that if there is a difference of opinion

16   between the debtor-in-possession and creditors about whether

17   to bring a suit, that automatically a trustee should be

18   appointed, automatically the suit should be brought.

19          THE COURT:  Do you think that -- you're experienced

20   in bankruptcy matters.  I'm the new guy on the block.  Was

21   there some overriding concern of the Third Circuit in

22   arriving at the Cybergenics opinion in the manner in which

23   they did?

24          MR. PURCH:  Your Honor, I am very, very reluctant

25   to try and tackle that question because it puts me in the

23

1    situation of trying to do what I said I was reluctant to do,

2    which is to get into the minds of the judges.

3            THE COURT:  Okay.

4            MR. PURCH:  But clearly they felt some concern.

5    Well, they felt some concern about the statute being

6    interpreted in a consistent way and, obviously, they

7    believed that one could correspond the words in 506(a) to

8    the words in 544(b).  That's the decision they made in a

9    certain sense if it --

10           THE COURT:  Was there a potential, the potential

11   concern that perhaps the bringing of fraudulent conveyance

12   actions by committees was abused?

13           MR. PURCH:  Since, once again, I'm not privy to the

14   briefs or the arguments before Cybergenics, I don't want to

15   really speculate as to whether that was one of the arguments

16   raised.  I don't know if that was something that anybody

17   else here is more familiar with.

18           As a matter of fact, my colleague from the New

19   Jersey office might even be able to whisper something in my

20   ear about that, I don't know, but Cybergenics being the case

21   that originated in New Jersey, it's not a case that

22   originated in Wilmington, so, I'm not directly familiar with

23   the proceedings below.

24           THE COURT:  I'm really not talking about

25   Cybergenics in particular.  I'm talking about bankruptcy.

24

1  You've been counsel to the U.S. Trustee for a period of

2  time.

3         MR. PURCH:   Three years.

4         THE COURT:   In your three years you've seen many

5  committee actions brought alleging fraudulent conveyance.

6  True?

7         MR. PURCH:   I've seen them and it's something that

8  generally has been relatively routine.  It is in part a side

9  effect of cases taking a long time to resolve.

10         If you can get plan confirmed before the two years

11  run, you don't have to deal with the issue in this

12  unfortunate context.

13         The much more typical context, your Honor, is the

14  context that Judge Fitzgerald was faced with in

15  Owens-Corning a couple of weeks ago where there were

16  initially, although the ones that were left at the end were

17  not these, but it started out with a dispute over the usual

18  sort of thing where the debtor's reluctant to commence

19  preference actions against parties that it's continuing to

20  do business with, ongoing vendors, for the fear that it will

21  disrupt the business relationship with those vendors, and

22  what you say in Owens-Corning was somewhat of a different

23  ramification of that, where that was one of the group of

24  actions initially when the motions were first filed but then

25  later evolved to actions against certain asbestos plaintiff

25

```
 1    law firms which, of course, are the constituencies with

 2    which the debtor would need to negotiate to formulate a

 3    plan, but it wasn't quite the same type of conflict that

 4    this case creates and it's the unfortunate, unfortunate

 5    situation in this case that it appears very difficult, maybe

 6    impossible, to do what ultimately was the resolution of

 7    Owens-Corning.  The whole bullet was dodged because

 8    ultimately the debtor said they could file the actions.

 9              Here, unfortunately, we have a debtor saying we are

10    simply unwilling to file the action because in order to file

11    the action or take over as plaintiff in the action, we would

12    need to take a position vis-a-vis the estimation of asbestos

13    liability that is diametrically opposite to our entire

14    strategy in the case and, so, unfortunately, I have a

15    concern that as much as I might like to be here, your Honor,

16    and say do the same thing Judge Fitzgerald did in

17    Owens-Corning, direct the debtor to do it, I'm not sure that

18    if you did, they would do it, or if they did, they would do

19    a good job.

20              THE COURT:  They can't do it.

21              MR. PURCH:  I understand the problem.  I understand

22    the problem.

23              THE COURT:  The conflict would be extreme.

24              MR. PURCH:  That's what makes this very unusual.

25    So, when you ask me, your Honor, to somehow take my
```

1    experience and relate it to this case, that's why I have a

2    problem.  That's what makes this case very unusual.

3          There are disagreements in other cases but there

4    are usually ways to resolve the disagreements within the

5    context of the debtor carrying most of the laboring oar.

6          THE COURT:  So, if you think we find a solution to

7    do a good job, that we can make this a semester course at

8    law school like Enron?

9          MR. PURCH:  It probably is already working its way

10   into a number of professors' syllabi, I'm sure.

11         THE COURT:  All right.  I understand your argument.

12         MR. PURCH:  And just one last point, your Honor,

13   with respect to the concept of a declaratory judgment

14   action, is that --

15         THE COURT:  We just put that out.  We wanted a

16   dialogue here today.  Okay.  I have a concern about a case

17   in controversy.  Okay.

18         MR. PURCH:  I'll just stand on my papers as far as

19   the concerns that we have about that action.  Thank you very

20   much, your Honor.

21         THE COURT:  Thank you.  Mr. Friedman, I call on you

22   next, or Mr. Inselbuch.

23         MR. FRIEDMAN:  I'll defer to the committees, I

24   think, to present each of our arguments, if that's all

25   right.

1          THE COURT:  All right.  Mr. Baena.

2          MR. BAENA.  May it please the Court, Scott Baena on

3   behalf of the Asbestos Property Damage Committee.  Your

4   Honor, I'm going first because Mr. Inselbuch is on a diet.

5   He needs to recover a little bit of strength before he gets

6   up here.

7          THE COURT:  I thought maybe you were going before

8   Mr. Inselbuch because you've got an early plane back to Boca

9   Raton.

10         MR. BAENA:  No, sir.  I'm not leaving until he

11  speaks.

12         THE COURT:  I think that's wise.

13         MR. BAENA:  Your Honor, given the choice between

14  receiving the Cybergenics opinion a week before the trial or

15  a week after the trial, as bad as the opinion was, in our

16  opinion, I rather have received it when we did so that we

17  can confront the problem that it does present.

18         I will tell you that having just returned from the

19  national conference of bankruptcy judges, I've yet to hear a

20  bankruptcy judge or practitioner have anything good to say

21  about the opinion and its implications in the practice of

22  bankruptcy law, so, everybody is watching and everybody is

23  very curious about what we're going to do here.

24         I would like to use this time, Judge, to cover two

25  things just a briefly.  First of all, address the proposed

1    case management order short of the declaratory judgment

2    issue that you have already raised and, secondly, offer some

3    other suggestions and observations that the Court might wish

4    to take under consideration.

5         Judge, we ruminated about the Court's proposal long

6    and hard and don't easily come to be critics of anything the

7    Court proposes, but we do think that there are several

8    infirmities with the proposal, not the least of which is

9    that it directly contradicts Cybergenics, and if what we do

10   here is an effort to overcome Cybergenics or live within its

11   strictures, I think the case management proposal, in all due

12   respect, sets us in the wrong direction.

13        The notion that the committees at the outset could

14   be sued is directly inconsistent with the express remarks of

15   the Third Circuit.

16        THE COURT:  Well, they could be sued but their

17   capacity to sue as a counterclaimant and as a third-party

18   plaintiff against Sealed Air is problematic.

19        MR. BAENA:  Is problematic, and even being sued,

20   Judge --

21        THE COURT:  But we got you thinking, didn't we?

22        MR. BAENA:  Yes, very provocative.

23        THE COURT:  I wanted a dialogue to hear.

24        MR. BAENA:  Just to finish that thought, though, the

25   only authority I'm familiar with for committees being sued

1   is when they've breached their fiduciary duty, not in

2   whether to promote some sort of cause of action.

3          THE COURT:  Mr. Bernick would love to sue you.

4          MR. BAENA:  I'm sure he would.  And I think Mr.

5   Purch makes another good point in his response to the effect

6   that the relief that we would be seeking exceeds the kind of

7   relief that could be granted in the construct of the

8   proposed case management order because we want them out

9   of --

10         THE COURT:  Well, there would have to be a second

11  count.

12         MR. BAENA:  There would have to be a second count

13  and then we get into a whole new slippery slope.

14         THE COURT:  If there were a fraudulent conveyance,

15  then you get a limited judgment, I understand.

16         MR. BAENA:  So, we start from that point, your

17  Honor, with some further observations and suggestions.  The

18  points you made at the beginning of this hearing regarding

19  the sense of urgency that we ought to have because of the

20  time and the expense that all have gone to in order to .

21  promote this case and the importance of this case are

22  poignant for a number of reasons but, most importantly,

23  because that is, when synthesized, an expression of this

24  case represents something that needs to be done in the best

25  interests of this estate.

30

1       We are past a point where it's even apparently

2   debated by any side that the prosecution of this case is

3   undoubtedly in the best interests of this estate.

4       Just this week we received a pleading from the

5   Equity Committee which recognizes in its papers that there

6   has already been a determination that this litigation is in

7   the best interests of this estate.  Given that there doesn't

8   appear to be any reasonable disagreement about that fact,

9   it's very easy for us to conclude that this litigation needs

10  to go forward and there are, looking at this through

11  absolute rose-colored glasses, if you will, there are really

12  two ways that we know that we can proceed listening to the

13  Court in Cybergenics.

14      The first is that the debtor brings this cause of

15  action and if the debtor doesn't, the trustee gets

16  appointed.  We know that those are unassailable.

17      THE COURT:  The debtor can't bring it in this case.

18      MR. BAENA:  The debtor can't bring it, but if the

19  debtor doesn't bring it, it only has one other choice and,

20  that is, to not be involved.  Cybergenics isn't all black

21  crepe for us.  There's a positive side to Cybergenics.  It's

22  hard to find, but the positive aspect of Cybergenics is that

23  it promotes the same judicial philosophy as the Supreme

24  Court did in the Weintraub case when it talked about the

25  fiduciary duties of debtor, and when you have already

31

1    concluded, and there doesn't appear to be any reasonable

2    dispute about it, that this litigation is in the best

3    interests of this estate, then it is inescapable to not

4    conclude that the debtor has a fiduciary duty to pursue this

5    litigation.  And if the debtor refuses to do so, Cybergenics

6    tells us there's one path we can take.  We can appoint a

7    trustee.  But implicit in that is the debtor can't be on

8    both sides of this equation.  The debtor has to be out of

9    this litigation.  Kirkland & Ellis cannot be in this

10   litigation.  Those are immutable principles that come out of

11   Weintraub.

12          THE COURT:  What would you say if the debtor-in-

13   possession said, all right, listen, we've read Cybergenics

14   and we understand what the options are.  Judge, if you

15   remember, we made an application to you to vacate our

16   intervention.  Vacate our intervention and we'll now bring

17   the action against Sealed Air, as unappealing as it may be.

18   What if they do that?

19          MR. BAENA:  That's why even the Third Circuit

20   starting with Marin says there's an absolute right of the

21   committees to intervene, to be sure that that --

22          THE COURT:  Fine.

23          MR. BAENA:  -- action is prosecuted appropriately.

24          THE COURT:  We're not talking about your right to

25   intervene.  Your right to intervene is clearly established.

32

1    But it's your capacity to sue and initiate that Cybergenics

2    attacks.

3            Now, Mr. Bernick, on behalf of Grace, says, okay,

4    hey, listen, I read Cybergenics the way you all do and I

5    spoke to my clients and we reconsidered, Judge.  We want you

6    to terminate our intervention and as the debtor-in-

7    possession we are going to bring this action and we know

8    that the committees are going to be here, they're going to

9    intervene and they're going to keep us honest and pursue the

10   case.

11           MR. BAENA:  I could live with that.

12           THE COURT:  You could live with that?

13           MR. BAENA:  But it changes the whole landscape of

14   this case.

15           THE COURT:  Why?

16           MR. BAENA:  It changes the whole landscape of this

17   case because --

18           THE COURT:  Tell me how.

19           MR. BAENA:  -- their witnesses now become the

20   estate's witnesses.

21           THE COURT:  Their witnesses?

22           MR. BAENA:  Yes.  They promoted witnesses to

23   testify in defense of the claims against Sealed Air.

24           THE COURT:  Okay.

25           MR. BAENA:  Those witnesses are now our witnesses.

33

```
 1              THE COURT:  Well, let's assume, you know, I can't
 2    speak for Mr. Bernick, he's his own bright light.  Right,
 3    Mr. Bernick?  He determines that, okay, he's going to bring
 4    it, and then he sits down with you and Mr. Friedman and Mr.
 5    Inselbuch and he says, hey, guys, I brought the action.
 6    Okay.  It says here fraudulent conveyance, whatever, and he
 7    stands up on the day of trial and says, I yield my time to
 8    Mr. Friedman and the committees.  Okay.  I'm not calling any
 9    witnesses.  All right?
10              Of course, we haven't heard from Mr. Wasserstein
11    over there, who's going to say conflict of interest.  We
12    shared our litigation strategy with him.  We relied upon him
13    that he was going to make certain presentations.  Now we
14    need 640 days to work it out.
15              MR. BAENA:  Judge, Mr. Bernick is out of this
16    litigation.  There is no way to hypothesize a scenario where
17    Mr. Bernick and Kirkland & Ellis can be --
18              THE COURT:  You just told me that if I read
19    Cybergenics, I can have the debtor-in-possession bring the
20    action.  He now says I'm going to bring it.
21              MR. BAENA:  I didn't say he could bring the action.
22    The estate can bring this action.
23              THE COURT:  Grace.
24              MR. BAENA:  Grace can bring this action, yes.
25    Cybergenics says they absolutely have the right to bring the
```

1    action.

2            THE COURT:  So, Grace terminates Kirkland & Ellis

3    and in walks ABC, and they bring the action on behalf of

4    Grace -- right -- as debtor-in-possession?

5            MR. BAENA:  You may well have counsel that's able

6    to prosecute this claim already involved in this case.

7            THE COURT:  Well, there is counsel in here who can

8    prosecute the case.  What do you get by knocking Kirkland &

9    Ellis out if they decided that they're going to represent

10   the debtor-in-possession?

11           MR. BAENA:  Judge, you know, I don't know how to

12   quantify what I get out of it.

13           THE COURT:  Don't quantify.  Just articulate it.

14           MR. BAENA:  Your Honor, what I do is disabuse this

15   case of the conflicts that they have created by virtue of

16   their failure to comply with their fiduciary duty in

17   bringing this case in the first place or stepping aside.

18           THE COURT:  What if the -- you know, you discount

19   the fact, you know, I make no findings at this point that

20   they believe they entered into a bona fide transaction for

21   an equivalent value and that they were solvent at the time.

22           Now comes down Cybergenics and they say, hum,

23   notwithstanding what we said, we understand our obligation

24   to the estate so we're going to be Boy Scouts, we're going

25   to bring the action.

1          MR. BAENA:  Judge, the unfortunate part --

2          THE COURT:  What are you going to do?  Now we got

3    Mr. Bernick prosecuting the action, and on the first day of

4    trial I say, Mr. Bernick, you may proceed.  He says, Judge,

5    I yield my time to Mr. Baena.

6          MR. BAENA:  Respectfully, your Honor, the problem

7    is that we got into these ski bindings when we allowed them

8    to intervene in the first place.  That was something that

9    they shouldn't have been allowed to do.

10         THE COURT:  How can I keep them out?  How can I

11   keep them out?  You know, if you remember, I kept them out

12   the first time.

13         MR. BAENA:  They had a fiduciary duty not to come

14   in.  It would be a breach of their fiduciary duty to

15   participate in this litigation by aligning themselves with

16   the transferee.  That's what all the case law tells you,

17   right through Cybergenics.

18             If you determine that this litigation is worth

19   prosecuting and, therefore, in the best interests of the

20   estate, they had no right to be on the other side of this

21   litigation.  That was the problem.

22         THE COURT:  Could we start a suit against Kirkland

23   & Ellis and recover?

24         MR. BAENA:  You know, Judge, I don't take any of

25   this lightly and I don't -- I certainly don't, you know,

36

1    issue veiled threats, but one of the things the Court has to
2    consider --
3            THE COURT:   Should Mr. Bernick be calling his
4    malpractice carrier?
5            MR. BAENA:   Maybe.   I'm not the right one to answer
6    that question, Judge, and maybe you ought to appoint an
7    examiner to determine that, Judge.   That's what examiners
8    do.
9            THE COURT:   That's what we need, another level of
10   bureaucracy in the case.
11           MR. BAENA:   Judge, we're trying to work within the
12   confines of a case that defies common bankruptcy practice.
13   We're also trying to work within the confines of a statute.
14           THE COURT:   We're having this exchange.   If I had
15   the opportunity, if Cybergenics came down last week and we
16   were writing on a clean slate and we hadn't done the last
17   six months of getting the case ready with all the history of
18   this case, it would be a much easier problem to deal with.
19           We're on the eve of trial and out comes Cybergenics
20   and everybody is committed to position.   That's the
21   difficulty about the case, you know, so, you and I can
22   engage in this colloquy and speak academics and what if.
23           MR. BAENA:   And speculate about what the Third
24   Circuit is going to do en banc, and if they don't do
25   anything, what the implications are to us then, and it's

37

1    purely speculation.

2         But we don't have to speculate about the fact that

3    the case law makes it abundantly clear, and we're talking

4    about the United States Supreme Court, not talking about the

5    Third Circuit, that they had a fiduciary duty to pursue this

6    litigation.

7         THE COURT:  All right.  And they're not going to do

8    it.

9         MR. BAENA:  And they're not going to do it.  They

10   can't participate any longer.

11        THE COURT:  And Main Street is the trustee.  Right?

12   Main Street is the trustee.

13        MR. BAENA:  We think, Judge, that the alternatives

14   at this point to get to a trial on December 2 are even more

15   limited than what was suggested in our papers.

16        We either leave everything the way it is, hope for

17   the best in the Third Circuit, or we reconfigure the parties

18   in the case.  We know what kind of reconfiguration has to go

19   on.

20        THE COURT:  There's another solution but nobody

21   ever mentions it.  Right?  Mr. Inselbuch just said the magic

22   word.  Settlement.

23        MR. BAENA:  That would be a wonderful result for

24   everyone, Judge.  As you well know, we've made efforts.   It

25   does seem to me, though, your Honor, that if we proceed with

38

1    the case in the present posture, we decide not to

2    reconfigure the parties, it is a very serious question for

3    the Court even then as to what the role of Kirkland & Ellis

4    will be and we have to focus on that.

5         And secondly, we have to leave ourselves in some

6    position of denial at the end of the day if nothing happens

7    at the Third Circuit --

8         THE COURT:  Let me ask you this.  If there were an

9    appeal of the Third Circuit, an expedited appeal to exclude

10   you from the confines of Cybergenics, and they said, all

11   right, you know, this case was ready, we'll make an

12   exception to this case, we'll make it prospective, however

13   they say it, why do you have to get rid of Kirkland & Ellis

14   at that point?

15        MR. BAENA:  Well, who's appealing and what's on

16   appeal?

17        THE COURT:  You're going to appeal.

18        MR. BAENA:  Judge, I don't think I could ever take

19   an appeal that would put me in the position of having to

20   support Cybergenics.

21        THE COURT:  No.  You're going to take an appeal

22   that says something to the effect, A, the defense waived the

23   defense of lack of capacity to sue.  You'll probably take an

24   appeal saying, you know, with all this time and money spent

25   and effort, Cybergenics should not apply to this case.

39

1    Okay.  Why wouldn't you do that?

2            MR. BAENA:  I'm not sure how we get that.  You

3    enter an order, your Honor, today that says we're going

4    forward?

5            THE COURT:  Oh, yes.  And by the way, I set a trial

6    date and we're going forward.

7            MR. BAENA:  We're going forward on December 2nd?

8            THE COURT:  That's correct.

9            MR. BAENA:  And everything is going to stay the way

10   it is because I perceive that there is some exception that

11   this case may fall into from Cybergenics?

12           THE COURT:  Either waiver, exception, whatever the

13   case may be.  Doesn't that excite your appellate juices?

14           MR. BAENA:  Well, I don't know what I'm appealing.

15   What do I appeal, Judge?  Do I go and say, no, I'm not

16   within an exception to Cybergenics?

17           THE COURT:  You're appealing this trial date of

18   December 2nd, saying I don't want to go to a trial that may

19   cost ten million dollars and potentially minimize the estate

20   by ten million dollars, that may be monies that would accrue

21   to your constituencies.  Maybe it goes to a cross appeal

22   because Mr. Wasserstein is probably going to appeal.

23           MR. BAENA:  I think that that appeal, Judge, would

24   engender the plaintiffs, the present plaintiffs, saying that

25   they subscribe or Cybergenics is applicable.  What you're

40

1    saying is it's not applicable and you're saying we ought to

2    take an appeal because we don't want to be wasteful and we'd

3    have to start that argument, the platform for that argument

4    is that Cybergenics is applicable.  Then you would hear from

5    us to say that Cybergenics was correct.  I can't say that.

6          THE COURT:  Why can't you argue in the alternative?

7    You might not know whether Cybergenics applies to this case,

8    but if it should be construed to be retrospective as opposed

9    to prospective, then we seek that we be excluded from the

10   dictate of this opinion because of what it means to the

11   estate.

12         MR. BAENA:  But you will have ruled that it was

13   excluded from the jaws of Cybergenics.

14         THE COURT:  All I'm doing is establishing a trial

15   date, and I'm inviting you to take an expedited appeal,

16   mandamus me, whatever.  It's not going to stop here or else

17   on December 2nd everybody be ready and we're just going to

18   go forward.

19         Maybe the U.S. Trustee will file something.  I

20   don't know.  I want somebody to file something.

21         MR. BAENA:  I'll defer to Mr. Inselbuch.  I don't

22   perceive the appeal that we could take.

23         THE COURT:  Well, Mr. Inselbuch is going the tell

24   you about it.

25         MR. BAENA:  Thank you.  Judge, if I could just

41

1    remark on the practical implications of appointment of a

2    trustee --

3              THE COURT:   Sure.

4              MR. BAENA:   I'm not even -- first of all, I don't

5    believe that the DIP financing order in this case provided

6    for an automatic event of default.   I think there is still

7    notice and hearing required, which implies some judicial

8    discretion as to whether or not to grant relief to the

9    creditor; and, secondly, I'm not even sure that there's very

10   much money outstanding under the DIP financing in this

11   case --

12             THE COURT:   I don't know.

13             MR. BAENA:   -- if any.   Thank you.

14             THE COURT:   All right.

15             MR. INSELBUCH:   Good afternoon, your Honor.   Elihu

16   Inselbuch for the Personal Injury Committee.   If we take the

17   syllogism that you present, you've ordered the case on for

18   trial and we try the case and it ultimately goes up on

19   appeal, the result of that trial will stand, as we look at

20   the record today, if, one, the Third Circuit were to decide

21   for some reason that Cybergenics was to be viewed

22   prospectively or for some other reason didn't apply to this

23   case, or if the Third Circuit were persuaded that the

24   parties who would be then taking an appeal had waived their

25   rights to that appeal by their conduct up to the time of

42

1    trial.

2            THE COURT:  Or if the Third Circuit en banc vacated

3    Cybergenics.

4            MR. INSELBUCH:  Yes.  If there's a reversal where

5    they changed their mind, but I have to start from the risks

6    that are presented to the committee.  We have to assume the

7    possibility or even the likelihood that the Third Circuit

8    will adhere to its ruling in Cybergenics.  Second, that

9    there's a significant risk that it will decide that since we

10   knew well about it before we started this trial, it applies

11   to this trial; and, third --

12           THE COURT:  Does it apply if the mandate hasn't

13   issued?

14           MR. INSELBUCH:  I think the thinking of the Third

15   Circuit was apparent to us.  I don't know that there's a lot

16   of case law that will tell me whether it applies

17   prospectively or retrospectively and whether or not it turns

18   on whether the mandate is issued.  I don't know the answers

19   to that.

20           I want to address all this from the standpoint of

21   the risks that we perceive from our client's constituency

22   point of view.  I have to accept the risk that I will

23   ultimately be told by the Third Circuit that we flunked

24   Cybergenics and it's a do-over.

25           Third, although I see and I agree with the U.S.

43

1    Trustee that there's a significant argument about waiver, I

2    see also what the Third Circuit said about waiver and it

3    turns full circle on me here, because the Third Circuit said

4    if you were really worried about this, you should have moved

5    for the appointment of a trustee and since you didn't do

6    that, you've waived that fix retroactively after the fact.

7         So, the position that I see the committees in is we

8    have to look down the road to the risk that we would lose

9    this case, we would win the case on the merits but lose the

10   case on appeal for one reason under Cybergenics, and by the

11   time that happens, it would be too late to fix it, so, we

12   need to fix it now.

13        THE COURT:  Too late to fix it?  Why?

14        MR. INSELBUCH:  Because we will have either gone

15   past the point in time where a trustee can be appointed and

16   the two years will have run sometime I believe in April --

17        THE COURT:  You don't think that would be equitably

18   tolled?

19        MR. INSELBUCH:  No, sir.

20        THE COURT:  Why?

21        MR. INSELBUCH:  Because the Third Circuit told

22   us -- I believe what the Third Circuit is warning us in

23   Cybergenics is you know what we had to say.  In fact, they

24   said to the Cybergenics litigants you knew what we said

25   beforehand and you could have fixed it by moving to appoint

44

1   a trustee and you didn't do it.

2        THE COURT:  That's the same argument you're going

3   to make vis-a-vis opposition to Mr. Wasserstein.  You're

4   going to say he waived.

5        MR. INSELBUCH:  Yes, indeed.  I would like to be in

6   a position to make those arguments, but I can't be assured

7   that I will prevail with them in the Third Circuit.  I would

8   like to be in a position to argue why Cybergenics doesn't

9   apply to this case, and I would like to be in a position to

10  argue that Mr. Wasserstein has waived, but I can't assume

11  that I will prevail in those arguments.

12       THE COURT:  Well, I invited you to do that prior to

13  December 2nd.

14       MR. INSELBUCH:  Yes, but the problem with that is

15  that if your Honor rules, if your Honor proceeds on the

16  assumption or not assumption, if your Honor orders that this

17  case goes to trial and, in effect, makes a finding that

18  either Cybergenics doesn't apply or a waiver exists and,

19  thus, this case can proceed to trial in the present posture

20  of the parties, then it is not for me to appeal that.

21       I need to have the alternative route to appeal

22  because I would want to support your Honor's assertion that

23  there has been a waiver or that Cybergenics did not apply,

24  and what I think our position is --

25       THE COURT:  Well, you would probably cross appeal

45

 1   in that circumstance.

 2          MR. INSELBUCH:  But there's no requirement that Mr.

 3   Wasserstein appeal.  Even if your Honor were to certify the

 4   case under 1292(b), there would still be the need for

 5   somebody to take an appeal and Mr. Wasserstein could

 6   determine that it's in the interest of his client not to

 7   pursue the interlocutory appeal but to wait to see how the

 8   trial comes out.  Maybe the statute will run.  Maybe two

 9   years will run.  Maybe something else good will happen, and

10   I assume that he would be well-advised and advise his

11   clients to do that as well.

12          So, the way I see the posture is that if your Honor

13   means it, and I'm all for it that your Honor means it, that

14   we go to trial on December 2nd, although I would ask for

15   maybe another week as a matter of personal problems.

16          THE COURT:  Are you in Russia then?

17          MR. INSELBUCH:  No, I'm not in Russia then but I'm

18   coming back from a prescheduled event with my grandchildren.

19          THE COURT:  You really know how to hurt a judge.

20          MR. INSELBUCH:  But that aside and those procedural

21   issues aside, mechanically aside, we certainly want the case

22   to go forward, but I think the way we would prefer it to go

23   forward if we could have our belts and our suspenders on, is

24   we would like a trustee appointed and the trustee to be the

25   nominal party-in-interest that takes the case forward on

46

1    December the 2nd.

2         THE COURT:  And, therefore, if I were just going

3    one step further in this syllogistic atmosphere, if I were

4    to deny the appointment of a trustee --

5         MR. INSELBUCH:  Then we would have something to

6    appeal.

7         THE COURT:  -- then you would have something to

8    appeal.

9         MR. INSELBUCH:  Yes, your Honor.

10         THE COURT:  Got you.  Do you think I need a round

11   of briefing on reasons why I should appoint a trustee?  Do

12   you think we have enough here today?  Mr. Purch indicated

13   all the fact-finding I'd have to do before I recommended the

14   appointment of a trustee.

15         MR. INSELBUCH:  I don't think it's so much

16   briefing.  Your Honor has already, in effect, I think,

17   reached the conclusion that this case should go forward

18   because even before Cybergenics, your Honor ordered that, in

19   fact, with the debtor not taking the case forward, the

20   committees do that.

21         The case, as your Honor is well aware, is very

22   large.  The stakes involved are almost as large as the

23   debtor's estate to begin with, if not as large or larger

24   than the debtor's estate, and I don't know what other facts

25   your Honor would need to reach a determination under,

1    whether it's 1104, that it's in the interest of creditors

2    and even that the refusal of the debtor to bring the action

3    is improper because of the stakes involved and the

4    reasonableness of bringing the case.  I don't know whether

5    you need a round of briefing on waiver, but it's seems to me

6    this Court is peculiarly knowledgeable, this is not a clean

7    slate.  I would be uninformed by whether Mr. Wasserstein or

8    Mr. Bernick think you need more hearings or more briefings.

9            But what I would suggest I would see as the

10   procedural posture would be your Honor would make a finding

11   that either the case is not controlled by Cybergenics and if

12   it is, that a waiver has been made so that it can go forward

13   for the 2nd, on December 2nd.

14           THE COURT:  What argument would you urge upon the

15   Court that the case is not controlled by Cybergenics?

16           MR. INSELBUCH:  I don't have one, your Honor.

17           THE COURT:  Thank you.

18           MR. INSELBUCH:  But, your Honor, I frankly have no

19   confidence in -- I have to be candid with the Court -- I

20   have no confidence in the argument that because the mandate

21   hasn't come down or because it may yet be en banc and may be

22   another decision, that the Court should not be informed by

23   the opinion of the Third Circuit.  I couldn't look you in

24   the eye and tell you that.  I certainly couldn't look the

25   Third Circuit in the eye and tell them that, so, I don't

48

1   have any confidence in that.

2           The waiver argument I think has substantial merit

3   but, as I said --

4           THE COURT:  Or to ask for relief from Cybergenics.

5           MR. INSELBUCH:  Well, but the Court can't ask for

6   that relief and I don't know how we can get to ask for that

7   without something being on appeal in the Third Circuit, and

8   the way --

9           THE COURT:  No, no.  It's easy.  Deny the trustee

10  and then you get to the Third Circuit.

11          MR. INSELBUCH:  Yes, sir.

12          THE COURT:  And then alternatively, you say, by the

13  way --

14          MR. INSELBUCH:  Yes.  And if your Honor were to

15  order the case to go forward, determining it, at least the

16  reason why the case can go forward in light of Cybergenics

17  is that there has been a waiver by the parties, and perhaps

18  Mr. Wasserstein will appeal that, perhaps he will not.

19          THE COURT:  I would take it that there would be no

20  resistance on the part of certainly the committees in

21  expediting an appeal.

22          MR. INSELBUCH:  Oh, no.  We would much require

23  that.  Otherwise, we would certainly urge that on the Court,

24  because without the ability to resolve this, hopefully even

25  before December 2nd, in the Third Circuit, we would, all of

49

1    us and at the estate's expense be devoting a great deal of

2    energy and effort that might be for naught.

3         THE COURT:  I don't want anybody to leave here

4    thinking that I lack a genuine concern that the Third

5    Circuit should speak as to whatever we decide to do here

6    before December 2nd, rather than, you know --

7         MR. INSELBUCH:  Absolutely.

8         THE COURT:  -- saying mush, full speed ahead and

9    we'll all end up --

10        MR. INSELBUCH:  I understood that.

11        THE COURT:  -- we all end up in Gnome with nothing.

12        MR. INSELBUCH:  So, the posture I see is your Honor

13   order what your Honor orders, certification on under

14   1292(b).  Mr. Wasserstein may or may not appeal.  We would

15   move for the appointment of a trustee.  If your Honor deemed

16   that unnecessary at this time, your Honor would deny that,

17   certify that under 1292(b), and one of the two, if not both

18   of those orders, would be promptly appealed to the Third

19   Circuit.

20        THE COURT:  Okay.  Thank you.  All right.  Mr.

21   Bernick.

22        MR. FRIEDMAN:  May I speak briefly?  I apologize.

23        THE COURT:  Sure.

24        MR. FRIEDMAN:  I realize my side has been heard.

25        THE COURT:  I thought you waived.

50

1              MR. FRIEDMAN:  I deferred.

2              MR. INSELBUCH:  He picks up what we miss.

3              MR. FRIEDMAN:  I deferred.  First, I want to say

4     that I do think that there is a good waiver argument that

5     could be made.  I don't know that I need to articulate all

6     the points here now.  I'm really going to look for the

7     moment at a contrary point, which is this.  I think if we

8     are going to go to the Third Circuit and we are going to

9     argue waiver, and maybe we're going to argue that

10    Cybergenics shouldn't apply because it shouldn't be held

11    retroactive to a case on the eve of trial and, you know,

12    it's funny, if I were representing somebody on death row,

13    that would be a winner.  Guy's ready to go to the electric

14    chair, the new law doesn't apply to him, and I've had that

15    'experience.

16             But putting that aside, when Mr. Bernick moved to

17    intervene in this case, we opposed that and we consistently

18    opposed it and we consistently took the position in opposing

19    it that it would be a breach of fiduciary duty for the

20    debtor to be on the defendant's side of the table, and so,

21    we think we have not waived in argument that even if we go

22    forward on December 2nd, and even if we go forward as this

23    case is essentially alréady structured, we think we are

24    going to be in a better position before the Circuit if the

25    Court's order reflects that the debtor is now going to be

 1   benched on the sidelines.  Assuming that your Honor is not

 2   happy with the debtor on the plaintiff's side of the table,

 3   I don't think even still that the debtor should be

 4   continuing on as defense counsel.

 5          THE COURT:  It is not appropriate.  Defense counsel

 6   for whom?

 7          MR. FRIEDMAN:  On the defendant, for Grace.

 8          THE COURT:  Okay.  Fine.  Knock him out as Grace

 9   counsel.  Why can't Sealed Air hire him as co-counsel?

10          MR. FRIEDMAN:  Because it's a conflict of interest.

11   I mean, Grace, under the Cybergenics opinion, part of the

12   point of it is what we've been saying all along and what

13   I've said many times at this hearing, who benefits

14   economically if we prevail at trial?  Grace.  Grace

15   logically ought to be Sealed Air's adversary.

16          There's no circumstance under which it makes sense

17   for Kirkland & Ellis to be representing the enemy or what

18   should be enemy for purposes of this trial.

19          Now, if your Honor doesn't agree with that, I

20   suppose that is something that your Honor could deny, and it

21   might be something alternative that people could think about

22   to denying a request for a trustee.

23          THE COURT:  Why does it improve your position

24   vis-a-vis the issues that would be before the Third Circuit

25   to disassemble Kirkland & Ellis from this case?

```
1           MR. FRIEDMAN:  Because in the first instance, the
2   Cybergenics opinion teaches us that the debtor-in-possession
3   or a trustee ought to be on the plaintiff's side of the
4   table.  Okay.  We're not doing that.  We're going to go a
5   little bit outside the box and try and argue that we ought
6   to be able to proceed without the debtor at the plaintiff's
7   table.  That's going to be hard enough.  But to try and sell
8   the notion that the debtor ought to be on the defendant's
9   side of the table, I think, is one step beyond what may be
10  palatable, and I think we are -- it's not a perfect
11  solution.  A perfect solution is debtor --
12          THE COURT:  Why can't I -- you know, let's say, you
13  take an expedited appeal and the Circuit indicates that,
14  fine, the case can proceed for whatever reason, and make an
15  application to terminate Kirkland & Ellis?
16          MR. FRIEDMAN:  Where?  In the Third Circuit or
17  before your Honor?
18          THE COURT:  Here, before the Court.
19          MR. FRIEDMAN:  Well, I would think we're certainly
20  making that application now.
21          THE COURT:  Okay.
22          MR. FRIEDMAN:  And if it's denied, I suppose we
23  would have to appeal it.
24          THE COURT:  Okay.  I understand.
25          MR. FRIEDMAN:  Thank you.  By the way, I have a
```

53

1    copy, I can serve it on others but I happen to have an extra

2    copy of the en banc petition.

3         THE COURT:  I have a copy.  Thank you.  Mr.

4    Bernick, you know, you sit there so quietly and everybody

5    wants to beat up on you.

6         MR. BERNICK:  Well, you know, I tell you I'm very

7    accustomed to this, especially down in courtrooms in the

8    southern parts of the United States where there are all

9    kinds of implications of finger pointing, but at one point

10   in time I know I've got to get up and I get my chance, so,

11   I'm a patient guy but I practice --

12        THE COURT:  So, I guess David Bernick, this is your

13   life.

14        MR. BERNICK:  This is not the first time that such

15   marvelous things have been said.  I won't get into it

16   further but I guess in a way it's interesting that there's

17   so much attention being focused on our role.

18        THE COURT:  Isn't it great to cast a long shadow?

19        MR. BERNICK:  Yes.  In my particular case, I've

20   always found that could be rewarding.  Look for your

21   opportunity.

22        THE COURT:  My remark was not lost on you.

23        MR. BERNICK:  I have some what I hope will be

24   productive comments to make and then I'd like to go to the

25   chess exercise that I think that your Honor has initiated

54

1    among counsel in the courtroom about, well, what if we do it

2    this way and what if we do it that way, but I think that

3    there are some concrete things that I'd like to share with

4    the Court, and let me begin with the construct that appears

5    in the proposed case management order.

6           The dec action, I don't know if this is something

7    that your Honor has decided since that time that we're not

8    going to be involved with but I think there are --

9           THE COURT:  I'm concerned whether it works.

10          MR. BERNICK:  I understand that.  And I took it

11   that was one of the reasons why you put it out there for

12   some discussion.  As you know, we did something like that in

13   the Babcock case, and in point of fact, it served a very

14   useful purpose which was that it created -- it told a story

15   to the bankruptcy court about the urgency of the proceeding

16   with that particular litigation, the importance of

17   structuring it so that it focused on the solvency issue and

18   the importance of having it remain in the bankruptcy court

19   and all those objectives were actually successfully

20   achieved.

21          The one problem that Judge Brown had, and Elihu was

22   very proud of pointing out, where he said, look, how can

23   this be merged in the process, Babcock and Wilcox, is the

24   plaintiffs saying there's no cause of action against the

25   other corporate defendants who will madly agree, then of

55

1    course there's no course of action.  Where is the actual

2    diversity of interest?  Where is the actual adversity of a

3    case in controversy?  And that was a fair point.

4         Our anticipation when we filed the suit in that

5    fashion was, in fact, the committees would intervene, we

6    specifically said this, so they'll be able to come in and to

7    pursue the theories that they believe are the best theories

8    to pursue in the case.

9         With the benefit of hindsight, you might think

10   about making some modifications to the process here. First,

11   in this particular case, we do have a defendant that's not

12   part of any Grace entity, so, we could file the dec action

13   against Sealed Air, a real defendant.  If we're wrong in the

14   claims that are being made, the allegations that are making

15   the declaratory judgment action, they would be bound by the

16   absolute or opposite result.

17        THE COURT:  What would you allege against Sealed

18   Air?

19        MR. BERNICK:  I think we would probably, and I

20   think this is something we'll get into, the question that

21   your Honor posed, which is what -- well, what if Grace

22   authorized the prosecution of the case, let me put that off

23   for a moment and assume all we're talking about is the dec

24   action that you described in the CMO.

25        We sued Sealed Air.  They, of course, would madly

56

1   agree with everything that we are saying, but we'd also sue

2   claimants, and this is somewhat similar to what's going on

3   in the ZAI litigation right now.  Remember, that's the

4   litigation that's concerned with whether, is there really a

5   scientific problem with this attic insulation and there, in

6   order that the science issue be precipitated and addressed,

7   the Court has adopted a procedure whereby we brought into

8   the case claimants for purposes of creating an adverse party

9   to then litigate this issue, so, it's Grace versus the

10   claimants on the science, and the costs of representing

11   those claimants are going to be borne by the estate.

12   There's money set aside.

13        What's the concept is you get claimants in there

14   who are actually adverse to the debtor asserting a position

15   and the case gets litigated, so, in this particular case we

16   would make these claims.

17        THE COURT:  How many claimants?  Nominal claimants?

18        MR. BERNICK:  No.  These are actual under 3004,

19   another bankruptcy rule, you can bring in -- the debtor can

20   bring claimants into this case and they are already present

21   in this case.  I believe there are about 10 ZAI claimants

22   who are in the bankruptcy proceeding for that purpose.  We

23   could name them and we could name other claimants John Does,

24   however you want to characterize them.  They also would be

25   adverse parties.

57

 1          At that point the committees could intervene for

 2    purposes of defending against the declaratory judgment

 3    allegations on behalf of those claimants and also on behalf

 4    of all creditors, so, they have a real role to play.  The

 5    committees are not being sued.  They're not initiating suit.

 6    The suit has already been initiated.  All the parties are

 7    there.  There's actual adversity between the parties.

 8    Depending upon how your Honor allocates the burden of proof

 9    and whatever, we can actually go forward and litigate the

10    issue.  How would that stand up?

11          Number one, we, that is, Grace, would be agreeable

12    to the prosecution of that case, with only one proviso.  The

13    lesson of the intervention process is fresh in our minds.

14    We are not interested in pursuing it if the pursuit of that

15    claim, in fact, would be given collateral effect in the

16    Chapter 11 case.

17          We have no problem with its being pursued for

18    purposes of prosecuting the claim against Sealed Air, we

19    will not stand in the way, we'll cooperate in the effort,

20    but it shouldn't be binding.  We should not be bound with

21    respect to the Chapter 11 case for the whole litany of

22    reasons that we've set out in our papers.

23          THE COURT:  Are you only concerned about the

24    Chapter 11 case or are you concerned about other

25    jurisdictions?

58

```
 1            MR. BERNICK:  I'm not sure what other
 2     jurisdictions.  The Missoula, Montana cost recovery case?
 3            THE COURT:  Wherever.
 4            MR. BERNICK:  I'm mostly focused on the Chapter 11
 5     case.  I'd have to think if there's something else, but that
 6     was the dominant concern that we had, that this not be used
 7     to gain an advantage in the Chapter 11 case.  So, Grace
 8     would be agreeable to entry of the CMO along those lines.
 9            Number three --
10            THE COURT:  And by the way, when you say not used
11     in the Chapter 11 case, you mean as a definitive proven
12     fact, not that the Court couldn't consider the same evidence
13     in arriving --
14            MR. BERNICK:  Evidence, whether the evidence comes
15     in or not would be determined with a clean slate on the
16     basis of --
17            THE COURT:  May very well be the same evidence.
18            MR. BERNICK:  A lot of the evidence may well be the
19     same.
20            THE COURT:  Okay.
21            MR. BERNICK:  Also, we wouldn't want to have the
22     argument made that the fact of our making these claims or,
23     for that matter, making statements somehow is a judicial
24     admission; that is, there really is a clean slate in the
25     Chapter 11 case.
```

59

1          Number three, would this solve the Cybergenics
2    problem, and I think it probably would.  In fact, I think I
3    failed to see the problem under Cybergenics for the
4    following reason:
5          It is quite clear under Cybergenics that the debtor
6    has the power to pursue these claims.  Debtor has the
7    authority.  We're exercising the power.  We are initiating
8    the litigation.
9          THE COURT:  How are you going to exercise the
10   power?
11         MR. BERNICK:  By bringing the dec action.
12         THE COURT:  You bring the dec action, you sue
13   Sealed Air, and what does it say vis-a-vis you and Sealed
14   Air?
15         MR. BERNICK:  Under what I'm talking about now,
16   this dec action would be the same dec action set out in the
17   CMO to say this is not a fraudulent conveyance transaction.
18         THE COURT:  And by the way, where do you find that
19   in the bankruptcy code that you can bring --
20         MR. BERNICK:  Well, the bankruptcy code on the
21   adversary side, the adversary side of the bankruptcy code
22   adopts basically --
23         THE COURT:  It says you can bring an action to set
24   aside a fraudulent conveyance.  I didn't find anywhere in
25   the code where it says you can bring an action to say it's

1    not a fraudulent conveyance.

2         MR. BERNICK:  Well, no.  I think if it's an

3    adversary proceeding, what we're really saying is we can

4    initiate the adversary proceeding as a dec action because

5    the dec action rules would be available in the adversary

6    proceeding.  The substantive right to prosecute the claim or

7    power to prosecute the claim --

8         THE COURT:  Where is the case in controversy with

9    Sealed Air?

10         MR. BERNICK:  The case in controversy with Sealed

11    Air is supplied by the presence of those claimants.  They

12    have a real controversy with Sealed Air.

13         THE COURT:  So, you have to bring the claimants in.

14         MR. BERNICK:  They said what I said under this

15    scenario, you bring in both Sealed Air and the claimants.

16         THE COURT:  And I take it the claimants would

17    counterclaim against Sealed Air.

18         MR. BERNICK:  No.  The claimants, the claimants are

19    adverse to Sealed Air.  They are the beneficiaries of the

20    recovery, if there's a recovery.  The claimants are there,

21    they will be there.  They will be represented by the

22    committees who would intervene, and the committees would

23    assert all of the same claims, all of the same claims

24    they're pursuing now by way of the same theories they're

25    pursuing now.

61

1          THE COURT:  What holds Sealed Air in?  You file

2  this action and the following week Mr. Wasserstein, on

3  behalf of Sealed Air, files a motion to dismiss, and nobody

4  said who's going to hold him in --

5          MR. BERNICK:  By that time --

6          THE COURT:  -- unless the claimants file a

7  counterclaim against Sealed Air.

8          MR. BERNICK:  -- the claimants would file their --

9  either could file their own claim or the committee as an

10  intervenor would file a pleading that would make that same

11  claim.

12          THE COURT:  What kind of pleading?

13          MR. BERNICK:  It's the same pleading that we were

14  required to file when we got into the case.

15          THE COURT:  They have no capacity to sue so they

16  can't make a claim over as against Sealed Air.

17          MR. BERNICK:  They are not the ones who are -- they

18  are not exercising their power to initiate the litigation.

19  They're exercising their power which the Cybergenics court

20  recognized to be intervenors and to play a role as

21  completely commensurate with their being intervenors and as

22  intervenors they are required, as your Honor indicated, to

23  align themselves with a side and --

24          THE COURT:  Well, I can align parties but I got

25  nothing to hold Mr. Wasserstein in at that point, and he

62

1    agrees with me.

2         MR. BERNICK:  Well, I'm not sure.  He's held in on

3    our dec action.

4         THE COURT:  He's not held in on your dec action.

5         MR. BERNICK:  Why not?

6         THE COURT:  Because you're in agreement, you're in

7    agreement it was not a fraudulent conveyance and he says

8    goody, goody, it was not a fraudulent conveyance.  Judge,

9    what am I doing here?

10        MR. BERNICK:  But if there's a case in controversy,

11   he's still a party.

12        THE COURT:  Where is the case in controversy?

13        MR. BERNICK:  The case is controversy is actually

14   supplied in a number of different ways.  It's supplied by

15   our reciting, as we did in Babcock, that this is an issue

16   that must be resolved as having an impact on the Chapter 11

17   case.  If you can satisfy a case in controversy without

18   having a traditional plaintiff versus defendant situation,

19   that's what declaratory judgment actions are all about.

20        THE COURT:  Let's say we try this case and it goes

21   up on appeal.  How do you think the Third Circuit would look

22   at this case?  Would they say it's odoriferous?

23        MR. BERNICK:  I think that, in point of fact, the

24   Third Circuit in looking at this would say that this is

25   actually a reasonable way of solving what is a difficult

63

1   problem in our case.  The difficult problem in our case is,
2   I intended to get to this in a little bit but it is
3   appropriate now, your Honor referred to conflict of
4   interest.  They like to talk about conflict of interest.
5   This is not a conflict of interest.  This is not a situation
6   where Grace doesn't want to sue somebody of its own who's on
7   the other side of the "V".
8        The people on the other side of the "V" are Sealed
9   Air.  There's no issue or reluctance to sue Sealed Air
10  because in some fashion we do business with Sealed Air.
11       The reason that there's a conflict is that there's
12  a conflict between competing strategies for how to pursue
13  the Chapter 11 case.  Grace made a judgment.  Grace's
14  judgment as the primary issue in the Chapter 11 case is
15  defining its tort liability.  That's the dog.  That's not
16  the tail.   That's the primary concern in the case.
17       Grace further determined that if this case were
18  initiated, it would not have a lot of merit and it
19  threatened to create an advantage or compromise the process
20  in the Chapter 11 case.  That's why we didn't pursue it.
21       Now, those are both judgments.  They're judgments
22  that recognize what the Grace case is all about, which is
23  defining tort liability.
24       Now, others may make that judgment differently from
25  us, but there's no conflict of interest to making that

64

1    judgment.  It's our assessment that the key issue is the
2    tort liability.  It can only be determined properly in the
3    Chapter 11 case.  The fraudulent conveyance claim threatens
4    to compromise the integrity of that proceeding.  That's how
5    they want to use the fraudulent conveyance litigation.
6    That's what gives rise to the problem, and under those
7    circumstances, this fix, that is, that we initiate a
8    declaratory judgment action so that the issue of was there a
9    fraudulent conveyance does get precipitated with our power
10   and authority, we have the power and authority to do this
11   and we're exercising it is a perfectly reasonable solution.
12        THE COURT:  If there were no Cybergenics, we would
13   not be resorting to consideration of that stratagem.  We
14   would now be in the second week of trial with you aligned
15   with the defendant.
16        MR. BERNICK:  That's correct.  That's correct.
17   This is a way of being able to pursue exactly the same
18   scenario but in compliance with Cybergenics, and what's the
19   key differentiating factor with Cybergenics is the debtor
20   agrees to the prosecution of the litigation.  The debtor
21   agrees we are initiating this process.  That is the big
22   difference with Cybergenics.  And the twist of doing it as a
23   dec action is only there because of the particular nature of
24   our case, whereas this tension between the Chapter 11
25   strategy and what we do in connection with the fraudulent

1   conveyance case, that is the only thing that requires that

2   you have a dec action, and that really highlights a very

3   important feature.

4            THE COURT:  By the way, why do you even have to, in

5   your dec action, sue Sealed Air?  Why don't you just sue the

6   claimants and let the claimants worry about Sealed Air and

7   getting them in?

8            MR. BERNICK:  But that really is the essence of

9   what is going to carry all my remarks here.

10           THE COURT:  Why bother to sue Sealed Air?  Why not

11  sue the claimants?

12           MR. BERNICK:  Because Sealed Air ultimately has got

13  to be bound in the --

14           THE COURT:  Well, the claimants are going to bring

15  Sealed Air in.

16           MR. BERNICK:  Well, I don't know that the claimants

17  themselves can bring Sealed Air in because at that point,

18  how do the claimants get into the case?

19           THE COURT:  You sued them.

20           MR. BERNICK:  We sued the claimants.  They then --

21           THE COURT:  You said to the claimants, by the way,

22  there's an allegation that we engaged in a fraudulent

23  conveyance.  You're the claimants out there.  You're the

24  people that are going to benefit.  You're the people who

25  allege you were deprived of the benefits of what should have

66

1    been the estate as a result of this fraudulent conveyance

2    and, so, therefore, there's a case in controversy between

3    you and the claimants.

4         The claimants say, well, you know, it's not a full

5    test unless we get Sealed Air in there, so, they either

6    bring a third party action and they bring in Sealed Air,

7    claimants become a third party plaintiff.  You know, your

8    suing Sealed Air doesn't do anything.

9         MR. BERNICK:  What it does, your Honor, is that it

10   is the debtor exercising the very power that the

11   Cybergenics -- what the Cybergenics court recognized was

12   critical, which is that we are initiating the litigation,

13   and that carries through all of what we're proposing to the

14   Court today, is that in contrast to the Cybergenics case,

15   the debtor is prepared to have this litigation initiated.

16        Our concern is not with the prosecution of the

17   case.  We're prepared to authorize the prosecution of the

18   case.  We have always been prepared to have this case

19   proceed, and I want to get back to the waiver point towards

20   the end of my remarks.

21        The issue is not whether the case proceeds.  The

22   issue is whether an advantage is gained from it for purposes

23   of a Chapter 11 case, so, whatever power the debtor has here

24   under the code under Cybergenics, we're prepared to see

25   deployed towards the initiation of this litigation, and that

1    brings me to the second and third options here, which are

2    the examiner and the limited trustee.

3         With the examiner, there obviously is clear

4    precedent for appointment of an examiner.  In particular, to

5    deal with this type of claim, PWS Holding case and also Kean

6    case, in both cases the examiner was appointed.  It's

7    consistent with the code, Section 1106(b), that sets out

8    specifically that an examiner can be appointed and can

9    assume other duties of the trustee.

10        Is there a Cybergenics problem if an examiner is

11   appointed for that purpose?  I don't know what it would be.

12   Cybergenics says read the code.  If you comply with the

13   code, you're okay.

14        In this particular case, the code is quite clear,

15   and it's been read in exactly that same fashion.

16        THE COURT:  Cybergenics didn't provide for an

17   examiner or a limited trustee.

18        MR. BERNICK:  It didn't have to.  The matters were

19   not before it, as your Honor pointed out earlier on this

20   afternoon.  All Cybergenics said is read the code.  The

21   power has to be granted.  It has to be granted.  The way it

22   was granted was to a trustee and to the debtor,

23   debtor-in-possession.

24        What's an examiner?  An examiner is given under the

25   code 1106(b) the authority of the trustee or the authority

68

```
1    of the debtor-in-possession.  So, the matter wasn't before
2    the Court in the Third Circuit.  It's totally called for
3    under the code.  There's not a single case that says that
4    you can't do it, and it would be particularly clear that
5    there was compliance with Cybergenics if we were to agree,
6    the debtor were to agree to the appointment of an examiner.
7    And that's my second comment and perhaps contribution.
8            THE COURT:  If an examiner were appointed, would
9    the examiner have to hire counsel?
10           MR. BERNICK:  I don't think that the examiner would
11   have to hire counsel.  I think that the examiner probably
12   could use -- well, what the examiner ought to do is the
13   examiner ought, first of all, to conduct an investigation to
14   see whether the claims --
15           THE COURT:  That's what examiners do.
16           MR. BERNICK:  Right.
17           THE COURT:  How long is that examination going to
18   take?
19           MR. BERNICK:  I wouldn't think that examination
20   would take overly long here.  I mean, let me get to the
21   bottom line.  I believe that if you had an examiner here in
22   a very short period of time --
23           THE COURT:  Quantify short.  I don't understand.
24           MR. BERNICK:  Well, I don't know.  Two weeks.
25           THE COURT:  Two weeks?
```

69

 1          MR. BERNICK:  Sure.  All the information is
 2     available.
 3          THE COURT:  Okay.  And the examiner then says, hum,
 4     I think that this should proceed.  What happens next?
 5          MR. BERNICK:  I know that if the examiner were to
 6     decide the case could proceed, under those circumstances I
 7     don't know why they couldn't use the Milberg firm.
 8          THE COURT:  So, the examiner would then have to
 9     hire the Milberg firm?
10          MR. BERNICK:  Could hire the Milberg firm,
11     presumably would.
12          THE COURT:  Maybe the committees would object to
13     that.
14          MR. BERNICK:  Maybe they would.  I doubt that they
15     would.  I suspect that they would want to intervene in the
16     process as they already have and help out with the
17     prosecution of the claim.  The Milberg firm could not serve
18     as counsel to --
19          THE COURT:  To the committees.
20          MR. BERNICK:  -- as counsel to the examiner if they
21     represent any adverse interest, I think is how the rule
22     reads.
23          THE COURT:  So, what are you suggesting, appoint an
24     examiner as a lawyer who will appear pro se?
25          MR. BERNICK:  Or you appoint a lawyer who's an

1    examiner and probably in the first instance acts to talk

2    with the Milberg firm and find out what facts have been

3    developed.

4         THE COURT:  What if I thought it was better for the

5    case and, by the way, it's not my appointment, it's I

6    believe the U.S. Trustee's appointment, maybe I have a veto,

7    I'm not quite sure, and they decided that some Wall Street

8    person should be the examiner?  As a matter of business, the

9    Wall Street person is then going to have to hire an

10   attorney, who then is going to have to come up to speed.

11   Now we have two more people.

12        MR. BERNICK:  All depends.  I suppose you're

13   correct, there's a way in which you can foresee that the

14   implementation would be cumbersome, would take too much

15   time.  I don't know that that's a given.  I think while all

16   this has to be recommended by the U.S. Trustee's office --

17        THE COURT:  Potentially it could cost the debtor's

18   estate an additional 20 million dollars.

19        MR. BERNICK:  Well, I think that really depends

20   upon how this role is defined.  I think that your Honor has

21   the ability to define exactly what that role is.  It may be

22   that the appointment itself has got to be on recommendation

23   from the U.S. Trustee but defining what the role is is up to

24   the Court.

25        THE COURT:  I understand that, but I don't believe

71

1    I have the appointment.  I say appoint an examiner but they

2    choose the examiner.

3         MR. BERNICK:  I think they make -- Mr. Purch, I'm

4    sure, will correct me if I'm wrong -- I think they make a

5    recommendation with regard to the appointment.

6         THE COURT:  I understand I have a veto.

7         MR. BERNICK:  Yes.  But under this scenario,

8    compliance with Cybergenics would be quite clear,

9    particularly if we were initiating this process.  We're

10   using our power as the debtor-in-possession, which is

11   recognized in the case, we're saying let's have an examiner

12   do it, which we're also entitled to do and the code provides

13   for and the case could go forward.

14        What's more, we are agreeable to this with the one

15   proviso, which is that not have the collateral impact on the

16   Chapter 11 case.  If the case were to proceed on that basis

17   to get to all these claims and issues about the role that

18   our firm would play and the role that Grace would play in

19   the process, I don't know that it's important to have Grace

20   play a part in the process.  I don't know if it's important

21   to have our firm play a part in our process.

22        At that point you've got an examiner.  Time has now

23   passed so presumably the trial can still go forward with

24   Sealed Air.  We're open to other ideas to facilitate it but

25   I don't view it as critical that we participate in the

1    process.

2            Indeed, the whole purpose in the way is to get the

3    examiner to prosecute the claim on behalf of the estate, so,

4    we would agree the examiner prosecute the claim on behalf of

5    the estate.

6            Same kind of remarks with respect to the limited

7    trustee.  The limited trustee, the only thing I heard that

8    I've heard against the idea of a limited trustee is in

9    argument from the U.S. Trustee that says, gee, somehow that

10   role seems to be inconsistent with other provisions in the

11   code.  There's no case that says that and there are a number

12   of cases that do recognize the possibility of having a

13   limited trustee.

14           THE COURT:  Only for purpose of litigation.

15           MR. BERNICK:  Only for purposes of litigating this

16   claim.

17           THE COURT:  This claim.

18           MR. BERNICK:  This claim.

19           THE COURT:  And let's assume management of W. R.

20   Grace is unhappy with the way that the limited trustee is

21   pursuing the claim or taking certain actions, how do I

22   resolve the conflict that may arise between management and

23   the limited trustee?

24           MR. BERNICK:  I think that, again, this all comes

25   down to how that role is defined to begin with, depending

73

1    upon how it's defined.

2            THE COURT:  By the way, do I have to bond that

3    limited trustee?

4            MR. BERNICK:  I don't know the answer to that

5    question but the question that your Honor has raised about

6    the way in which those powers are exercised I think really

7    comes back to a question of how the power is defined to

8    begin with.

9            We are agreeable to the point of a limited trustee,

10   subject to some of the provisos that I talked about.  You

11   have to work out what the scope is, that is, the prosecution

12   of the claims against Sealed Air.  You'd have to work out

13   the impact on the Chapter 11 case, which I think is fairly

14   straightforward.  And you also have to address the question

15   of privileges, which I think largely has already been done

16   by Judge Dreier.

17           Judge Dreier already did some pretty good line

18   drawing on what work product and what attorney-client

19   communications would be within the scope of the fraudulent

20   conveyance action, and I think that that probably has done

21   most of the work or maybe a couple other refinements, but

22   probably has done most of the work.

23           THE COURT:  Well, if you were to withdraw from the

24   case voluntarily, then I take it there are no privilege

25   problems remaining.

1            MR. BERNICK:  No, that's not quite right.  If we

2    were to withdraw from the fraudulent conveyance case, we

3    would want to make sure that the privileges that the client

4    has with respect to matters that pertain to the Chapter 11

5    case are preserved, and that's exactly where Judge Dreier

6    did some line drawing, saying this comes in on fraudulent

7    conveyance, this does not.

8            THE COURT:  By the way, I just raised this now.  I

9    haven't given any thought to it.  Could you withdraw,

10   Kirkland & Ellis withdraw from the fraudulent conveyance

11   case and still remain as Chapter 11 counsel?

12           MR. BERNICK:  I don't see what the impediment would

13   be.

14           THE COURT:  I'm asking.  I don't know the answer.

15           MR. BERNICK:  No.  I mean there are adversary

16   proceedings in which there are limitations on what Chapter

17   11 counsel can do.  We've had them in other cases.  We have

18   this issue in the Babcock case, because there was a

19   potential claim against another client of mine, a tobacco

20   company, and the issue was raised because the estate had a

21   potential claim against a tobacco company, and we defended

22   that tobacco company in another litigation.  Was there a

23   problem, and the way we handled that from the very outset of

24   the case in our application was to carve out that role, that

25   is, the pursuit of that claim, and give it to other counsel

1   while there was a challenge.

2          THE COURT:  If you withdraw from the Chapter 11 and

3   the case proceeded without you and Grace remained passive --

4          MR. BERNICK:  You mean withdraw from the Chapter 11

5   or fraudulent --

6          THE COURT:  From the fraudulent conveyance, and

7   Grace taking a passive position, wouldn't your fears of

8   collateral estoppel or however you want to phrase them in

9   the Chapter 11 case be mitigated, ameliorated, eliminated?

10         MR. BERNICK:  No.  They would potentially be in two

11  ways but subject to two problems.  One is that the argument

12  will be made that it is to their advantage to try to use the

13  fraudulent conveyance case to affect the litigation in

14  Chapter 11, so, what they will say is, well, that's great.

15  Grace has now agreed that there can be another

16  representative, a limited trustee or an examiner.  That

17  other representative now takes on the role of Grace.

18         THE COURT:  No, no.  You're not following me.

19         MR. BERNICK:  I'm sorry.

20         THE COURT:  Forget what they say at this point.  If

21  you were to determine that, you know, maybe it's better that

22  Kirkland & Ellis not bring this action, debtor-in-possession

23  not bring the action, Kirkland & Ellis remove itself from

24  the fraudulent conveyance case.  The case will proceed.

25  Assume that the Circuit finds either a waiver against Mr.

1    Wasserstein, potentially against Grace, the case proceeds,

2    Grace does nothing.  You go back to Chicago.  Mr.

3    Wasserstein carries his own water, what concerns will you

4    then have in the Chapter 11?  You're not here.

5            MR. BERNICK:  I don't think that we would.

6            THE COURT:  Maybe that's a solution.

7            MR. BERNICK:  Maybe that's a solution.  That's, in

8    essence --

9            THE COURT:  I mean, I'm not pushing you out of the

10   case and I'm not telling you how you should comport

11   yourself, but that's a solution.

12           MR. BERNICK:  I only had a couple other remarks,

13   and I know I've been up here for a while, so, I'll sit down

14   very promptly.

15           On a plenary trustee, I don't know that the merits

16   of this idea are really even actually before the Court.

17           THE COURT:  I have concern about it.  I'll just say

18   that.

19           MR. BERNICK:  Okay.  If it is, we are prepared to

20   submit a brief to the Court, and we corresponded with the

21   Court about that last week.  I know some others did make

22   written submissions.  I'm assuming that's just because they

23   went ahead and made them; but if the Court wants to, we

24   would like to have the opportunity to submit a brief to the

25   Court on these matters and are prepared to do so today.

1       THE COURT:  Everything is before the Court.  Every

2   issue is before the Court.  The Court will then distill what

3   it's going to do and if you want to file a brief promptly,

4   go ahead.

5       MR. BERNICK:  Okay.  The last remark that I'll make

6   has to do with this timing, chess game that your Honor has

7   kind of set up a little bit.  As I hear it, I mean, it all

8   sounds very, very complicated, possible permutation and

9   maybe also that there are things I just don't know that your

10  Honor knows about how the Third Circuit will proceed from

11  the timing point of view, but it does seem to me kind of a

12  stretch to operate on the presumption that if an appeal is

13  taken from some order of this Court, that there can be an

14  appeal that is expedited so fast that we really do have some

15  level of certainty by December 2nd.

16      THE COURT:  Why not?  They did the Torricelli

17  matter in two weeks.

18      MR. BERNICK:  I don't know about the Torricelli

19  matter.  That's why maybe the observation, maybe your Honor

20  knows things that I don't.

21      THE COURT:  And potentially that was only a 15

22  million dollar case.

23      MR. BERNICK:  Okay.  There was also a matter of --

24      THE COURT:  And by the way, the Supreme Court

25  denied cert in what, three days?  Okay.

78

1        MR. BERNICK:  As I said, maybe --

2        THE COURT:  Supreme Court of New Jersey acted in a

3   day and a half.

4        MR. BERNICK:  Less surprising to me.

5        THE COURT:  And by the way, if the Third Circuit

6   believes that I set an inopportune trial date, they'll tell

7   me.  They can issue a stay.

8        MR. BERNICK:  What I was going to get to is that

9   whatever goes up to the Third Circuit ought to go up in a

10  meaningful fashion and some of the observations that are

11  made, if all we're doing is to move to appoint a trustee so

12  it can then be denied so we can then take an appeal and that

13  can be up on appeal, it seems to me what I would

14  respectfully submit to the Court is that the Court --

15  there's obviously a waiver argument.  I'm not going to

16  comment on the strengths of that argument unless your Honor

17  wants me to, but apart from the waiver argument, there's a

18  complicated question of how to deal with Cybergenics,

19  assuming that Cybergenics holds that it's there, it's not

20  turned around in a regular en banc, how do you deal with it,

21  and that we ought to craft the best way for this case to

22  deal with Cybergenics.

23       THE COURT:  Could we deal with Cybergenics by

24  consent of all parties saying that for purposes of this

25  case, Cybergenics does not apply?  Everybody consent?

1             MR. BERNICK:  I think if you proceeded by consent,
2     at least language in Cybergenics --
3             THE COURT:  Do I have your consent?
4             MR. BERNICK:  You have my consent on no less than
5     three different possible options.
6             THE COURT:  How about what I just proffered?
7             MR. BERNICK:  Just it has absolutely no effect and
8     we go forward and try the case?
9             THE COURT:  No.  We still give you to December 2nd.
10            MR. BERNICK:  Okay.  Well --
11            THE COURT:  Or the 9th, whatever.
12            MR. BERNICK:  I would also agree to that, but I
13    kind of like the last twist best, which is that on December
14    2nd, you all can go forward and we'll go work on other
15    things.
16            THE COURT:  And let you out.
17            MR. BERNICK:  Just cut us out.
18            THE COURT:  And you're not going to go over to the
19    Sealed Air side?
20            MR. BERNICK:  I wouldn't go over to the Sealed Air
21    side.
22            THE COURT:  Well, they think you're there now.  But
23    we have this famous surgéon out in Los Angeles who can
24    separate you from the hip.  Right?
25            MR. BERNICK:  I'm not sure that the joinder is

80

1   quite that difficult.

2       MR. INSELBUCH:  We consent.

3       THE COURT:  We haven't heard from Mr. Wasserstein

4   yet.  Mr. Wasserstein, always a pleasure. I may not like

5   what you say but I'll defend to the death to permit you to

6   say it.

7       MR. WASSERSTEIN:  Thank you, your Honor.  First,

8   if it please the Court, I'd like to discuss the waiver

9   issue, and we called your Honor and asked about submitting a

10  brief and we were told not to do so and so we didn't.  If

11  your Honor thinks it appropriate, we would like to submit a

12  brief with regard to the waiver issue by the end of the day

13  tomorrow.

14      THE COURT:  Yes.  I do want that, and the reason

15  that I said don't submit something, I really wanted to hold

16  this discussion.  You know, I don't look at this as an

17  argument here today.  We're having a discussion and we're

18  talking about a lot of different permutations to solve a

19  very difficult problem, and if and when this matter goes to

20  the Third Circuit on an expedited basis, I believe it's

21  instructive for them to read a transcript such as this to

22  understand the real-world problems that arise from matters

23  of statutory constructs.

24      MR. WASSERSTEIN:  Understood, your Honor.  With

25  regard to waiver, I will be very brief with regard to it

81

1    right now.

2          THE COURT:  The bankruptcy side of Skadden doesn't

3    talk to the litigation side?

4          MR. WASSERSTEIN:  We talk.  And, in fact, your

5    Honor, the way the issue came up in Cybergenics was not

6    through an argument that there was lack of capacity to sue.

7    The argument came up in Cybergenics as a standing argument.

8          The Court stated at page five of the opinion, and

9    this is after the case had gone back, they also argued for

10   the first time that under a plain reading of Section 544(b),

11   and the reasoning of Hartford Underwriters, the committee

12   lacked standing to bring the fraudulent transfer action

13   because only a trustee or debtor-in-possession has such

14   standing.

15         That is exactly what we did in this case, and we

16   did it in the 12th affirmative defense of our answer.  So,

17   we did exactly what the defendants in Cybergenics did, and

18   the Court went on to say a bunch of things about that issue,

19   such as the Court recognized that many courts had approved

20   of the kind of derivative standing arrangement deployed in

21   this case, Cybergenics and elsewhere, noting, and I'm

22   quoting from page 15 to 16, "We are well aware that most

23   courts to consider a creditor or creditors' committee's

24   power to act derivatively under the avoidance provisions in

25   the wake of Hartford Underwriters have reaffirmed so-called

82

1    'derivative standing' and" --

2        THE COURT:  Are we out of Cybergenics because the

3    committees who have brought this action did not do it

4    derivatively?

5        MR. WASSERSTEIN:  No.  I think they did bring it

6    derivatively in this case as well.  If you read the

7    complaint in this action, it was done derivatively because

8    the first thing I did when I read Cybergenics was to go back

9    and read the complaint in this case as well, so, we are

10   exactly where the Cybergenics defendants were when they were

11   up on appeal to the Third Circuit.  We're at exactly the

12   same position, and the Supreme Court has held in Curtis

13   Publishing against Butts that the mere failure to interpose

14   a defense prior to the announcement of a decision which

15   might support it cannot prevent a litigant from later

16   invoking such a ground, and that's at 388 U.S. at 143.

17       So, I say in the first instance that we did exactly

18   what we were supposed to do, and if your Honor will recall,

19   your Honor requested that no dispositive motions be made in

20   the case management order in this case.  So that we raised

21   it in our answers and we did exactly what the Cybergenics

22   defendants did, and I think that ought to take care of the

23   issue of standing, but we will address it further tomorrow.

24       With regard to Mr. Bernick's -- let me just back up

25   for a second.  I believe you may find this hard to believe

83

1    but I agree with Mr. Baena with regard to his statement that

2    Cybergenics really prevents any consideration of the

3    proposal that your Honor made in the proposed case

4    management order.

5            THE COURT:  The dec action.

6            MR. WASSERSTEIN:  In the dec action.

7            THE COURT:  Because there's no case or controversy.

8            MR. WASSERSTEIN:  That is the reason for it.

9            THE COURT:  And that's why I premised my remarks

10    earlier by saying I wanted a dialogue today.  If I didn't

11    put something out, I don't know what I would have received

12    in return.

13            MR. WASSERSTEIN:  I think it's a problem on two

14    levels but I think that the problem doesn't get cured by Mr.

15    Bernick's proposed solution to it, either.

16            I think it's a problem on the first level of Grace

17    suing the committees.  In the first instance, I would

18    suggest that under Cybergenics, there's an issue as to the

19    committees' right to sue or be sued under Section 1103(c),

20    where the Court specifically states that trustees have the

21    capacity to sue or be sued but there is no corresponding

22    capacity with regard to committees.  So, there's that issue

23    to begin with.

24            But aside from that, Grace does not have an actual

25    controversy with the committees vis-a-vis the fraudulent

84

1   transfer.  If Grace has a controversy at all, it would be

2   with Sealed Air.  Similarly, the committees have no

3   controversy with Sealed Air because Cybergenics says they

4   don't, that they can't bring it, so that there's no

5   controversy at the first level.  There's no controversy at

6   the second level.  Much with Mr. Bernick's proposal, I

7   submit to your Honor that there's still no controversy.

8   Again, there's no controversy between Sealed Air and Grace

9   because they say the same thing.  There's no controversy

10  with individual creditors because an individual creditor

11  can't sue Grace with regard to a fraudulent transfer, nor

12  can Grace sue the individual creditors with regard to the

13  same thing.  And I would point out to your Honor that the

14  Third Circuit has required in declaratory judgment action

15  that there be an actual adversity of interest, actual

16  adversity, and that's Step Saver Data Systems against Wyse

17  Technology, 912 F. 2d 643, and that's a 1990 case in the

18  Third Circuit.

19         So, where I come out at this point, your Honor, is

20  reluctantly I'm about to make a proposal that nobody has

21  made before.

22         THE COURT:  You're going to consent.

23         MR. WASSERSTEIN:  No, sir.  I'm not consenting.

24         THE COURT:  Gee, you know, Mr. Wasserstein, what a

25  surprise.

1           MR. WASSERSTEIN:  What a surprise.  I'm full of

2      surprises.

3           THE COURT:  I'm just overwhelmed as I sit out here.

4           MR. WASSERSTEIN:  Let me suggest a way.  The

5      problem that we have here, your Honor framed the issue right

6      at the beginning, finality at one point, and that is really

7      my chief concern.

8           The other way to go under Cybergenics is the

9      appointment of a trustee, and I think that everybody here, I

10     would have said everybody here based upon the submissions

11     but I'm not so sure that that's the case anymore.  The

12     concern that I have is that finality through use of 1292(b)

13     is not necessarily finality, and the reason for it is that

14     even if your Honor were to certify a question for appeal,

15     the Third Circuit doesn't have to take it.

16          There is only one way in my view to get finality,

17     and let me throw this out as a possible idea.  We move to

18     dismiss on the grounds of Cybergenics.  There are cross

19     motions that are made that Cybergenics should not apply

20     because, fill in the blanks.  There are arguments that could

21     be made that in lieu of dismissal, there ought to be a

22     limited trustee appointed, as Mr. Bernick has argued, or

23     that there ought to be an examiner appointed or that Sealed

24     Air has waived all of these things would come up.  Your

25     Honor reluctantly grants the motion to dismiss.  Poof, we're

86

```
1    in the Third Circuit with regard to all of these issues and
2    anything else that anyone would throw in, and the Third
3    Circuit can do two things.
4          The Third Circuit can affirm, in which case you're
5    back to the problem that you had before trustee versus
6    waiting for reorganization for the possibility of bringing
7    the claim, but if the Third Circuit reverses and says it is
8    appropriate for there to be an examiner or it is
9    appropriate, there is provision or room within Cybergenics
10   for a trustee, a limited trustee, we've solved my problem,
11   and we haven't solved it today but we've solved it a lot
12   sooner than we would to get through a reorganization.
13         THE COURT:  Well, I can get the issue up there
14   without dismissing you.
15         MR. WASSERSTEIN:  Fine.  Your Honor, if we can do
16   that, I'm perfectly happy to do it that way as well.  Again,
17   my sole issue is to finality.  That's all I'm concerned
18   about, and if we can do it quicker, that's good for my
19   client as well.
20         THE COURT:  Let me ask you another question that I
21   haven't asked others, because you'd be a critical player in
22   a court-ordered mediation.  What would your position be on
23   that?
24         MR. WASSERSTEIN:  I rather not discuss it on the
25   record, your Honor, if you don't mind.  I would discuss it
```

1    at side bar.  There are people in this room who are foreign

2    to this and I just don't think it's appropriate to do it

3    that way.

4         THE COURT:  Well, the only reason I bring it up, if

5    you look in B & A today, you'll see under the inherent power

6    of the court, they have a right to order mediation.

7         MR. WASSERSTEIN:  Obviously, if the Court did

8    something within its power, we would consent to it, of

9    course.

10        THE COURT:  Okay.  I understand.   Anybody else

11   want to be heard?  Mr. Kruger, do you want to be heard?  I

12   always find you to be a voice of reason, Mr. Kruger, even

13   though you are aligned with the debtors.

14        MR. KRUGER:  I may be last.  I don't know about

15   voice of reason.  There's no doubt Cybergenics sort of

16   dropped a large bomb into this nice process and I think I

17   agree with Mr. Wasserstein that, obviously, everybody wanted

18   to have finality and at least recognize that if there is to

19   be a trial, that if there is an appeal by the loser, it need

20   not be on the basis of the Cybergenics decision.  And,

21   unfortunately, I begin to like every proposal I hear.  I

22   like the dismissal.  I like Mr. Bernick's proposal of the

23   declaratory judgment.

24        The real problem seems to me is to get something in

25   front of the Third Circuit that may give us some reliable

1   guidance as to what the best way is to go forward, and I can

2   think of the order for an examiner, some will appeal from

3   that decision to the Third Circuit and see if that works for

4   them.

5        We could move to dismiss the Milberg, Weiss firm

6   from this case on the grounds that now Cybergenics has been

7   determined, there's no reason for them to continue to run up

8   fees and do activities on behalf of the plaintiffs because

9   that accomplishes nothing, just as a way of getting the

10  Third Circuit to comment on it.

11       I don't know what the right answer is but I think

12  that the real answer is to try to find some decision that

13  the Court is comfortable making with respect to the various

14  choices that have been presented.

15            THE COURT:  Sooner rather than later.

16            MR. KRUGER:  Sooner rather than later.  I'm not

17  sure that the money that has been spent and the effort to

18  get ready for trial is wasted in a sense because, obviously,

19  there has been discovery.  There have been reports by

20  experts.  Those are not going to go away and those are still

21  all going to be present forever and, obviously, this is an

22  issue that needs to be determined.

23            When we talk about a plenary trustee, there I have

24  some issues because I don't know that's a helpful decision

25  to make because it's sort of like using too big a weapon to

1    try to get to what is only a piece of this puzzle and also

2    not clearly necessary. A trustee standing in the shoes of

3    the debtor may have the same issues that the debtor has with

4    respect to what it does with respect to this prospective

5    litigation, so, it may well be, a better course of conduct

6    may be the examiner with the various parties prepared to

7    submit orders, if you will, or samples of orders to the

8    Court for to you select what the exact role and purpose of

9    the examiner may be, and perhaps using that as a basis to

10   get the Third Circuit to comment on their decision.

11           In the motion that was made for an en banc hearing,

12   the movants point out that there were at least 260 adversary

13   proceedings now pending in the Third Circuit brought by

14   committees. I'm not sure what the Third Circuit meant to do

15   but, obviously, other circuits and other courts all over

16   this country that bankruptcy proceedings have approved the

17   prospect of committees bringing on those kinds of actions.

18   I'm reluctant to see us do something without the Third

19   Circuit's perimeter ultimately because then I think we may

20   in fact spend millions more dollars and end up with the

21   result that is challenged not necessarily on the merits but

22   because of this very narrow reading of the statute.

23           THE COURT: I think that is really where we began,

24   that the Court is reticent to go full speed ahead without

25   some direction, but I can't get any direction unless I get

1   something before them, and one of the ways is to set a trial

2   date.  Another is to maybe grant or deny some of the other

3   relief that people seek, and I'm sure with the strength of

4   the law firms involved in this, an expedited appeal is

5   something that should be able to occur.

6           MR. KRUGER:  We would hope so.  Thank you.

7           THE COURT:  All right.

8           MR. BENTLEY:  Very briefly, your Honor, Philip

9   Bentley for the Equity Committee.  We've heard a lot of

10  proposals today.  Almost all of them have been the subject

11  of vigorous controversy.  Your Honor has heard that the

12  notion of waiver will be vigorously disputed, so will the

13  notion of proceeding with the declaratory judgment action,

14  same with the limited purpose trustee and the plenary

15  trustee also will be vigorously disputed for practical

16  reasons, not the legal reasons.

17          THE COURT:  So you have the answer?

18          MR. BENTLEY:  Well, your Honor, I'm not saying

19  anything that your Honor hasn't heard.  I would just point

20  out that the only proposal that has not been the subject of

21  vigorous dispute here today is the examiner with expanded

22  powers.

23          Obviously, there's not any guarantee as to any

24  proposal, but the only thing negative that has been said

25  about that as a matter of -- as a legal matter that would

1    solve the problem facing the Court, the only negative that

2    has been raised has been the U.S. Trustee Office's comment

3    that the Third Circuit has not specifically addressed it,

4    and I think that the fair characterization is the Circuit

5    has not addressed it one way or the other.

6         THE COURT:  Well, you know, maybe my comments were

7    negative that we've got to pay an examiner, an examiner will

8    cause delay, an examiner may have to retain counsel, you may

9    add ten million dollars to the debtor's estate as a result

10   of the appointment of an examiner.  I don't see that as

11   positive.

12        MR. BENTLEY:  Understood, your Honor, and I would

13   have thought that perhaps Mr. Bernick's response may have

14   somewhat alleviated the Court's concern in that the debtor

15   is amenable to the examiner looking at this quickly when the

16   thing -- this is something the examiner could look at

17   quickly, possibly without hiring his or her own counsel, but

18   even if they did hire their own counsel, it still could be

19   done quickly and the examiner then could retain the Milberg,

20   Weiss firm.  I don't think we've heard anybody disputing

21   that as a possible alternative.

22        THE COURT:  Okay.  I understand.  I noted Fresenius

23   people are here and do they want to be heard?

24        MR. ROSENBLOOM:  Your Honor, briefly.  The hour is

25   late.

1          THE COURT:  No, the hour is not late.  We've got

2     all the time to listen to you.

3          MR. ROSENBLOOM:  David Rosenbloom on behalf of the

4     Fresenius Medical Care Holdings.   We are the case-in-

5     waiting, your Honor, and I understand that there are certain

6     differences between the proceeding against Fresenius and the

7     proceeding against Sealed Air.  Most notably, we are not on

8     the eve of trial and I do not believe there exists as to our

9     case the consensus that Mr. Baena posits regarding the

10     unanimity of it being perceived to be in the estate's

11     interest to go forward as to those claims.

12          Nonetheless, we share concern of everybody here

13     that downtime is the enemy of the plan, of the parties, and

14     impediment to the Court's work and, so, we have a similar

15     interest in getting our case back on track.

16          Mr. Wasserstein addressed to you the concerns about

17     a case or controversy in the context of an action seeking

18     money damages.  I'd like to suggest to the Court that

19     whatever difficulties there are in finding a case in

20     controversy, if it's money damages you're talking about, do

21     not apply to a declaratory judgment action that seeks to

22     declare certain rights, liabilities, interests and property

23     and otherwise.

24          THE COURT:  Fine.  You then make the declaration

25     there was a fraudulent conveyance.  What do you do next?

1           MR. ROSENBLOOM:   Let me step back.  I believe the
2    controversy that most clearly exists and is clearly
3    distinguishable is the controversy between the committees
4    and the members of the committee and the debtor as to the
5    underlying merits of the fraudulent conveyance litigation
6    and the appropriateness of the debtor's conduct so far.
7           We've heard at least twice today, it's been
8    suggested that the debtor has actually breached its
9    fiduciary duties.  Nothing could be more plain to be a
10   controversy with real substantially different interests.
11   The question is, is that controversy susceptible to
12   treatment by a declaratory judgment action or is it
13   susceptible to treatment by this motion that has been
14   suggested, a motion to appoint an examiner.
15          I'll suggest to the Court that whatever the
16   hearing, the hearing Mr. Purch suggested to create a record
17   to justify the appointment of trustee or the hearing that
18   would follow from Mr. Bernick's suggestion of a declaratory
19   judgment action, those are probably going to look like very
20   similar evidentiary hearings.  It's the same question.  So,
21   the issue that comes down to is does the committee or the
22   members of the committee have the capacity to be sued such
23   that Grace can begin its declaratory judgment to bring
24   forward what is clearly a controversy, and I believe nothing
25   in Cybergenics casts down on all of those cases which had

94

1   found and even assumed the ability of committees to

2   litigate.

3        Cybergenics addressed the ability of a committee to

4   initiate an action under a specific statute which limited

5   the entities that could bring an action under that statute,

6   nothing more, nothing less.  The committees are not one of

7   the entities listed in 544.

8        Cybergenics notably preserves a long line of cases

9   which found intervention as a matter of right for

10  committees.  It is hard to understand how a committee to

11  intervene as a party intervention, as party intervention

12  plaintiff or defendant, has a matter of right to be heard.

13  This is part of the committee's right under 1109 to raise

14  issues and be heard on issues if they didn't have the

15  capacity to participate in other adversary proceedings other

16  than the 544 proceeding for money damages that Cybergenics

17  condemns.

18        So, if I understand Mr. Bernick's suggestion, which

19  is a declaratory judgment proceeding, that doesn't

20  necessarily have to contemplate in and of itself the

21  recovery of money but, instead, just the declaration of the

22  rights.

23        The issues raised by both Cybergenics and Mr.

24  Wasserstein should not form impediments to this Court

25  finding justiciable controversy.

1       The other question is how do you get Sealed Air in?

2    Who's got a claim against Sealed Air?  One of the things

3    we've been looking at is Rule 19, clearly a party-in-

4    interest at least as to Fresenius, if that's how the case

5    came to us, we would agree to consent.  We are a proper Rule

6    19 party and whether the debtor brings us in as a party or a

7    committee or a member of the committees or another

8    committee, we think that that much more than the other

9    procedure that is currently before the Court provides us the

10   opportunity to quickly litigate on the merits and obtain, if

11   there's a favorable ruling in our favor, the benefits of

12   that ruling to assert in other actions.

13       That is why we think that if the Court finds that

14   the controversy which is undeniable between the debtors and

15   the committees is, in fact, susceptible to a declaratory

16   judgment action as opposed to just the motion, there will be

17   ways to at least bring us in.  We would not want to sit on

18   the sidelines of that hearing, and I think they could bring

19   in parties like Sealed Air or other transferees.

20       We have left aside today I think wisely the issue

21   of what will we do with Owens-Corning type situations if

22   there is a trustee.  What is the mandate going to be and so

23   forth.  I don't raise those.

24       THE COURT:  Owens-Corning is also operating under

25   timeliness in view of the statute of limitations which runs

96

1   like the first week of October, where that's not the case

2   here.

3         MR. ROSENBLOOM:   I agree, and actually would like

4   to point out we would hopefully and certainly assist the

5   Court in making a sufficient effort to concluding any such

6   declaratory judgment proceedings prior to the April date,

7   which is the Owens-Corning analog, April 2nd, 2003.

8         I would also add that a declaratory judgment is not

9   mutually exclusive with some of the other suggestions.  It's

10   like my grandmother used to say about chicken soup, it

11   couldn't hurt.  All these other things are going on.  You

12   could have a declaratory judgment, hear the evidence about

13   the merits of the underlying actions and it could inform the

14   Court's position on the decision it's going to need to make

15   and the record it's going to need to make on a trustee, and

16   I'm concerned about the record because so much has been said

17   about it's so obvious that these actions are in the interest

18   of the estate.

19         I think Grace's position is, in fact, one that's

20   brought about after reflection in an exercise of what they

21   believe to be the proper exercise of their fiduciary duties

22   and the simple potential of money recovery ought not blind

23   any other reviewing court as to the underlying substance of

24   the Grace position or as to the positions of the other

25   transferees.

97

1          I did promise to be brief, unless the Court had any
2     questions about our position.
3          THE COURT:  No.  Mr. Baena, you want to be heard?
4          MR. BAENA:  Maybe it please the Court, we actually
5     may have accomplished more today, your Honor, than I
6     expected.  I do think that there was some forward-going
7     proposals and discussion by the parties but let me get rid
8     of first those that I don't think were forward.
9          THE COURT:  I've been looking for a fog cutter.
10         MR. BAENA:  Let me cut through the fog that Mr.
11    Bernick left behind in his tall shadow.
12         THE COURT:  See, they're not beating up on you now,
13    big, small or indifferent.  It's atmosphere.
14         MR. BAENA:  As the day goes by and the sun moves,
15    his shadow gets smaller.  Your Honor, what Mr. Bernick
16    describes is not a 544 action at all.  What he describes,
17    and Cybergenics clearly only involves a 544 action, an
18    action to avoid transfers, and what he describes is not a
19    544 action.  It doesn't get us to a monetary judgment.  It
20    begs the issue, and the way he lards it up with these
21    additional accoutrements, like we'll throw in some zonolite
22    claims, well, as Mr. Bernick well knows, we had an issue
23    similar to that in the science trial on the zonolite claims.
24         He filed proofs of claims for those claimants on
25    behalf of the debtor as the Court determined he was allowed

98

1    to, and he used them as the centerpiece of a science trial

2    to debunk the claim that zonolite is harmful, and as part of

3    the process he tried to rule out, he suggested that the

4    committee ought to represent those zonolite claimants that

5    he picked from among the class representatives or punitive

6    class representatives in the course of that litigation, and

7    the committee took the position, Judge Fitzgerald didn't

8    view it differently than the committee articulated the

9    position, that a committee, an official committee, has no

10   statute to represent an individual claimant.  We can't do

11   that.

12          So, as he lards this up with zonolite claimants,

13   he's going to lard this up with zonolite lawyers and this

14   case is going to take on a completely different complexion.

15          Moreover, the relief that would come out of that if

16   somehow he could get us to the right point, the relief that

17   comes out of all of that is squarely within the commentary

18   of the Third Circuit in footnote 17 to the Cybergenics

19   opinion, where the Court describes why you don't -- why

20   committees don't want individuals to be at the epicenter of

21   these kind of claims, because it changes the entire legal

22   landscape.  It changes the amount of damages.  You have to

23   proof up their claims and the amount of damages that they're

24   entitled to in terms of a fraudulent transfer are limited by

25   the amount of each claimant's claim.  It throws into serious

1    question how we apply your standards opinion, and I really

2    think it's a non-starter.

3         The notion of an examiner, as you well know, was

4    one that both personal injury and property damage argued to

5    you at the last time you had a status conference about this

6    whole issue as being a viable alternative, and we argued in

7    our submission to the Court, it was requested by the Court,

8    that there is authority for it but there's a problem with

9    it, too.  And if we're looking for finality, that problem

10   may be enough of a problem not to pursue that alternative

11   and that is, as crazy as it sounds, trustees and debtors-in-

12   possession have a bundle of things given to them under the

13   bankruptcy code which are broadly enumerated as rights,

14   powers and duties and, unfortunately, when you get to the

15   provisions concerning the appointment of an examiner and the

16   expansion of what they can do, it only refers to duties, and

17   there's a serious legal question as to whether the right to

18   bring a lawsuit is a power or a right as opposed to a duty.

19        Some might argue that you can't have a duty without

20   having the power, but we don't want to have that argument.

21   The Court wants to avoid that.

22        Mr. Wasserstein, now I'm going to find myself

23   agreeing with him, making this whole thing rather unusual.

24        THE COURT:  I take it not on the motion to dismiss.

25        MR. BAENA:  Not on the motion to dismiss, but I do

100

1    find it forward going that there is agreement between us

2    that to live within the contours of Cybergenics without

3    appearing to be too cute, and that's what I think we were

4    concerned about when we made our submission to the Court,

5    that whatever we do here, we certainly want to be entirely

6    respectful to the Third Circuit and we certainly don't want

7    to come up with some cute way of thumbing our nose at the

8    opinion that was issued by them in Cybergenics.

9         So, the problem, of course, is the obvious one.  We

10   don't want to have this case dismissed, take that dismissal

11   up on appeal and find out a year and a half from now that

12   whatever we find out, we will find out much too late.  I

13   don't think it engenders a decision promptly.  That reaches

14   the second objective that the Court has, which is not just

15   finality but that we move this along promptly and not waste

16   the resources that have already been expended.

17        If Sealed Air is truly interested in finality, then

18   it could go ahead right now and appeal the Court's order,

19   just as you invited us to do.  It could appeal the Court's

20   order setting this trial.  They have a pedestal for an

21   appeal and they could argue whatever it is they wish to

22   argue, but I suspect they don't want to take that option.

23   They rather hold that one until the end of the case.

24        THE COURT:  They'll consent to anything as long as

25   they can reserve their right.

1          MR. BAENA:  Reserve everything, that's correct.  It

2    seems to me that the real -- oh, and let me deal with Mr.

3    Rosenbloom's comments.  When I was rereading Cybergenics for

4    about the 400th time, I was sort of getting excited like he

5    seems to have  about the fact that the Court kept talking

6    about initiate, initiate, and I was hoping maybe initiate

7    means something else, means like just following the lawsuit

8    and then you can sort of disappear, but it's very clear from

9    the opinion, particularly towards the end of the opinion

10   where the word "initiate" is used interchangeably with the

11   word "prosecute" and other synonyms that indicate that

12   there's a continuing presence, that the Third Circuit didn't

13   anticipate that the debtor would file the suit, just file

14   the suit and go away.

15          THE COURT:  You know, you're experienced in

16   bankruptcy matters.  What's the likelihood of a debtor-in-

17   possession in a fraudulent conveyance action initiating the

18   action?

19          MR. BAENA:  It happens every day, Judge.  It

20   happens.

21          THE COURT:  Debtors-in-possession doing it?

22          MR. BAENA:  It happens, particularly where the

23   debtor has no other exit strategy from bankruptcy and

24   because it doesn't have the resources to reorganize.

25   Debtors do file them.  We file those actions.  I filed them

1    when I was Mr. Kruger's partner.  Our firm filed those kinds

2    of actions.  It happens.

3            Can I generalize from that?  No, I can't, because,

4    obviously, the ugly part is, and it's the ugly part of

5    Cybergenics,  ybergenics even remarks it's kind of ugly to

6    let the architect of a fraudulent transfer also be the

7    gatekeeper for the litigation, but then they say, tough, in

8    practice, unless Cybergenics, and even this circuit I didn't

9    think the answer was tough, and indeed, debtors pursue those

10   actions from time to time.  When they didn't, they were no

11   longer the gatekeeper.  That was the simple evolution of

12   things.

13           Cybergenics creates a problem and we're waiting to

14   find out whether it's a permanent problem.  That's exactly

15   where we are.

16           THE COURT:  Let me ask you this question, and I'm

17   probably going to ask the same question of Mr. Wasserstein

18   as I've been sitting here listening.  Substantively, what's

19   the difference between, other than what Cybergenics says

20   but, substantively, what's the difference between the

21   trustee bringing the action or the committees bringing the

22   action, if any?

23           MR. BAENA:  Without Cybergenics being a factor in

24   my answer?

25           THE COURT:  Yes.

1        MR. BAENA:  Substantively, I don't see a

2  difference.  The undercurrent, I suppose, is the extent of

3  our respective fiduciary duties.

4        THE COURT:  I guess what I'm really asking is what

5  does Mr. Wass.rstein think that he's sacrificing if we were

6  to consent to the committees bringing the action where we

7  are now as opposed to removing Mr. Bernick and company,

8  appointing a trustee to bring the same action?

9        MR. BAENA:  From Sealed Air's perspective, I can't

10  imagine what they think they're giving up.  There may be

11  some really esoteric argument that creditors might have with

12  an estate about vis-a-vis the unsecured creditors versus the

13  asbestos claimants, do we have the same fiduciary duties

14  that a trustee has to their constituents, so, if we make a

15  mistake in this litigation, we're somehow held accountable

16  to their constituency as well.

17        We know a trustee is held accountable to all

18  constituencies, but none of them, in my judgment, impacts

19  Sealed Air.  And I think you've made it abundantly clear and

20  I think we've made it abundantly clear as well, they're

21  getting sued.  There's no doubt about it.  They're going to

22  trial with somebody as a plaintiff.  You know, in some

23  places you want to get that fight on the road and other

24  places you want to take your time.

25        THE COURT:  Are they just being difficult to be

1    difficult because delay potentially works in their favor?

2            MR. BAENA:  Well, I too feel a little bit awkward

3    telling the Court what I think they're doing in a public

4    forum.  I would gladly do so at side bar with them there.  I

5    just don't think the media --

6            THE COURT:  Did you see that last row back there?

7    That was the press.

8            MR. BAENA:  Well, it's worse than that.  We've got

9    traders out there and we view them as the golden goose and

10   we don't want to kill them.

11           THE COURT:  When you say "traders", you mean

12   t-r-a-d-e-r-s.

13           MR. BAENA:  We've got both kinds in the room.  But

14   here's what we see as a very simple formula that emerges

15   from all this conversation.  Mr. Bernick is happy to go.

16   He's had an opportunity to do whatever damage he sought to

17   do.  He's happy to leave.  He's certainly happy not to be in

18   Newark during, if we accommodate Mr. Inselbuch, Christmas.

19           This case ought to proceed as it is with the

20   exception that the debtor is out.  The committees will

21   prosecute this lawsuit just as the committees are

22   prosecuting this lawsuit right now.  The debtor is out.

23   Kirkland & Ellis is out.  We ought to take Mr. Bernick's

24   invitation and RSVP that we accept it.

25           THE COURT:  I don't know if he made that

1    invitation.

2            MR. BAENA:  He's getting pretty close.

3            THE COURT:  I suggest to him a slow boat to China.

4    Are you old enough to remember that?

5            MR. BAENA:  Yes, I am, and I know a variation that

6    I used to sing in the army.

7            THE COURT:  That's all right.

8            MR. BAENA:  The committees, and there's a slight

9    variation on what Mr. Inselbuch suggested, the committees

10   ought to be allowed to file their motion for the appointment

11   of a trustee, but we would ask that you not rule on them.

12   Let's go to trial.  Let's see what happens with Cybergenics.

13   If Cybergenics comes back and says, sorry, the en banc

14   decision is, sorry, got it all wrong, then all we have to do

15   is Rule 17 substitution party.  Even if we completed the

16   trial, we can substitute the trustee in, and 17 is

17   incorporated into the rulings of bankruptcy procedure

18   under --

19           THE COURT:  That's like me holding the trial, then

20   if I think the Third Circuit is going to go the other way, I

21   say, well, I'll vacate my opinion.

22           MR. BAENA:  Maybe.  Again, maybe not everything was

23   bad in Cybergenics.  The Court went out of its way to

24   disabuse even the transferee of the notion that this was a

25   standing --

106

1         THE COURT:  I have to believe that there was a

2    purpose that the Third Circuit held in the manner they did.

3    Okay.

4         MR. BAENA:  I believe that, too.

5         THE COURT:  Whatever the purpose may be, I'm not

6    going to verbalize it, but they had a purpose, just didn't

7    happen itinerant.  Okay.

8         MR. BAENA:  In the same theory, Judge, they made a

9    distinction between standing and real party-in-interest and

10   that's a very material difference under Rule 17, because

11   standing means we could have never brought the suit.  Real

12   party-in-interest means that somebody ought to be

13   substituted in to bring that suit, but we may decide, the

14   Court may decide I'm going forward on this, I'll see what

15   happens en banc, and if it is determined, first of all, the

16   committees are protected from any professional claims that

17   can be asserted against them for not having the motion for

18   appointment of a trustee, and I think we got to be very

19   concerned about that since it doesn't appear that the Third

20   Circuit protects those who practice in this courtroom, so,

21   the committees ought to have that opportunity.

22        The Court can go forward with the trial.  If the

23   Third Circuit en banc says, no, we're not changing our mind,

24   that's exactly what we meant, then the Court, depending, we

25   could even be finished with the trial at that point in time

107

1    and it doesn't affect the judgment that was obtained.  You

2    just substitute the trustee at that point in time for the

3    holders of the judgment.

4           THE COURT:  Maybe the simple answer is we're

5    getting too _omplex.  I set a trial date and everybody

6    mandamus me.  You can't hold that trial, Cybergenics

7    prohibits it.  Maybe that's the answer.

8           MR. BAENA:  I guess I have a question of the Court

9    and, that is, I've been operating since you first said it

10   under the assumption that we don't file any motions here

11   unless you tell us we can.

12          THE COURT:  That's good thinking.

13          MR. BAENA:  And we haven't.  But we want to know if

14   that applies to a motion for the appointment of a trustee.

15          THE COURT:  No.

16          MR. BAENA:  So, we're free to file motion for the

17   appointment of a trustee?

18          THE COURT:  Absolutely, as long as you do it

19   promptly.

20          MR. BAENA:  That would be before Judge Fitzgerald

21   in this case unless the Court withdraws the reference as to

22   that motion if and when it's filed --

23          THE COURT:  We withdraw.

24          MR. BAENA:  -- we have to deal with that.

25          THE COURT:  We withdraw the reference.

1          MR. BAENA: Okay.

2          THE COURT:  You've got two days to file it, like

3    Mr. Wasserstein agreed.

4          MR. BAENA:  Okay.  I think it's become simple,

5    Judge.  Let's go forward.  Let's just go forward on the 2nd.

6    We'll file our motion.  Don't rule on it yet.  Let's see

7    what happens and --

8          MR. INSELBUCH:  Did you say we have two days to

9    file this motion?

10         THE COURT:  Can you?

11         MR. INSELBUCH:  Which two days?

12         THE COURT:  You know, that's like the old Henny

13   Youngman joke, my wife and I go out to dinner twice a week.

14   She goes Tuesdays, I goes Thursdays.

15         MR. INSELBUCH: I just wanted to make sure today

16   wasn't one of the two.

17         THE COURT:  No.  How about by Friday?

18         MR. BAENA:  File it in this court?

19         THE COURT:  Yes.

20         MR. BERNICK:  Then we would have how long to

21   respond?

22         THE COURT:  File simultaneously.  You know what

23   they're going to say.  As a matter of fact, you probably

24   already have it drawn up.

25         MR. BAENA:  The relief being going to seek --

109

1        MR. INSELBUCH:  There is now an order in place that

2  the trial will resume on December 2nd?

3        THE COURT:  Oh, we're going to issue one.

4        MR. INSELBUCH:  So, this motion to appoint a

5  trustee can be made in light of that order?

6        THE COURT:  That's correct.  That's correct.

7  That's the only order that you can really count on is we're

8  going to go forward on December 2nd.  There will probably be

9  more contained in it.

10       MR. BAENA:  It would be the property damage

11  committee's intention, if it didn't have consensus with the

12  personal injury committee, to file a motion also asking the

13  Court not to hear the motion until we determined whether or

14  not it's necessary.

15       THE COURT:  There you and the personal injury

16  claimants may fall out of bed.

17       MR. BAENA:  We haven't so far.  We really behaved

18  ourselves.

19       MR. KRUGER:  Are you talking about a plenary

20  trustee or just limited purpose?

21       MR. BAENA:  We believe there's authority for

22  limited trustee.

23       THE COURT:  I thought you were talking about a

24  plenary trustee.

25       MR. BAENA:  We'll ask both ways alternatively.

1        MR. KRUGER:  Do we have an opportunity to respond

2   after the papers have been filed by both sides?

3        THE COURT:  No.

4        MR. KRUGER:  We have to file by Friday as well?

5        THE COURT:  I want to get on with this process.  I

6   don't want to elongate the process.  I want it to end.

7        MR. KRUGER:  Are we going to presume, your Honor,

8   that this trustee will indeed commence this litigation

·9   rather than having the obligations of a trustee to examine

10   into the facts and all the rest that goes with it?  I mean,

11   I want to understand what it is that I'm supposed to be

12   arguing about.

13        THE COURT:  Talk to Mr. Inselbuch later and he'll

14   tell you what he's going to do.

15        MR. BERNICK:  As I understand, the proposal is to

16   make the motions and have the Court hold the matters in

17   abeyance until some later point in time.

18        THE COURT:  I didn't say that.  That's what Mr.

19   Baena said.

20        MR. BERNICK:  I guess the only thing we can do is

21   let's see what they file.  I can anticipate a lot of what

22   they're going to say but I can't anticipate what they're

23   going to say particularly about when this matter should be

24   taken up, and what we'd like to have is a couple days to at

25   least look at what they have to say and file a response.

1            THE COURT:  Likewise, on your way out, in the

2    hallway talk to Mr. Baena.  He'll lay it out for you.  He'll

3    tell you exactly what he's thinking, just as he said here.

4    You know he's going to make application for a trustee or

5    potentially a limited trustee and the Court should not rule

6    on it until after the hearing.  Okay?  What more do you want

7    to know?

8            MR. BERNICK:  That's fine.  I'll speak with Mr.

9    Inselbuch as well to find out what his --

10           THE COURT:  You have his telephone number.  I know

11   that from prior argument.

12           All right.  Mr. Wasserstein, I posed the question

13   to Mr. Baena.  I want to pose the same question to you.

14   What is the difference between -- you're going to be a

15   defendant regardless.

16           MR. WASSERSTEIN:  Yes, sir.

17           THE COURT:  What's the difference between having

18   the committee bring the action or appointing a trustee to

19   bring the action substantively to you?

20           MR. WASSERSTEIN:  An eight-letter word, finality.

21           THE COURT:  Okay.

22           MR. WASSERSTEIN:  If the committee brings the

23   action and I win, which is the same position I presented to

24   your Honor on September 24th, I have no assurance that that

25   action is going to -- that that result is going to stand up

1     and that it's not going to be attacked collaterally by some
2     other creditor, somebody else, some way, somehow, and that
3     is the concern that I have and that is the difference.
4          THE COURT:  Is there any consent that they could
5     offer to you that would allay that fear?
6          MR. WASSERSTEIN:  Every asbestos person, every
7     asbestos claimant in the world would have to consent to
8     that, Judge, and that I'm not even sure would be enough.
9     The government might have to consent.  I can't begin to tell
10    you.
11         THE COURT:  All right.  I just didn't want to leave
12    here today and the reason I posed the question thinking that
13    your lack of consent was arbitrary to delay the process.
14         MR. WASSERSTEIN:  Oh, no, your Honor, not at all.
15    And that's why I said that if this could be determined some
16    way where the Third Circuit were to say that a limited
17    purpose trustee is okay to bring this case and to confer the
18    jurisdiction, that would protect me.  I don't have a problem
19    with that.
20         THE COURT:  Can I appoint a trustee who would then
21    hire Milberg, Weiss together with the committees to
22    prosecute the action?
23         MR. WASSERSTEIN:  I think I have a problem with it.
24    I'd have to think a little bit more about it.  I do have the
25    concerns that I have had contact with some of the people at

1   Grace, if they are representing Grace, we've had these

2   common interest discussions.

3          THE COURT:  What if I took Mr. Baena's Rule 17 and

4   I substituted a trustee for the committees?

5          MR. WASSERSTEIN:  I don't follow you, your Honor.

6          THE COURT:  What if I appointed a trustee --

7   okay -- and the trustee then took over the prosecution from

8   the committees to have a right to intervene.

9          MR. WASSERSTEIN:  I think I have the same problem

10  as far as counsel is concerned.

11         THE COURT:  So, you still object to Milberg, Weiss

12  proceeding?

13         MR. WASSERSTEIN:  I believe I would, sir.

14         THE COURT:  Because?

15         MR. WASSERSTEIN:  On the same ground they have

16  access now to all of the common interest matters that I have

17  had with Grace principals.

18         THE COURT:  Well, wouldn't the trustee ultimately

19  get exposure to all of those?

20         MR. INSELBUCH:  We should have had that from the

21  beginning.

22         MR. BAENA:  In other words, they did it wrong in

23  the first instance, your Honor, and if Cybergenics is right,

24  we did it wrong in the first instance, if we do it right and

25  he shouldn't be involved and the estate shouldn't have

114

1    aligned itself with Sealed Air, which is clearly the

2    implication of Cybergenics, the committees and the trustee

3    shouldn't benefit from it.   That's ridiculous.   It was their

4    mistake.

5           THE COURT:   One person at a time.

6           MR. BERNICK: Judge Dreier delimited those

7    privileged matters that we had to give up that are germane

8    to the case.   This was litigated specifically and unless he

9    screwed up on that, which I don't think that he did, the

10   parameters of privileged communications and the like that

11   are available to whoever it is that prosecutes this case

12   have already been defined, so, I don't understand Mr.

13   Wasserstein's point, somehow there's privileged

14   communication that somehow would be compromised here.

15          The line has already been drawn and I don't

16   understand Mr. Baena would be somehow hurt in the process

17   because the Milberg firm got whatever Judge Dreier thought

18   was necessary to prosecute the case.

19          THE COURT:   Excuse me.   One moment.   We should

20   permit Mr. Wasserstein to continue.   What is the conflict

21   with the trustee hiring Milberg, Weiss, which would seem to

22   be efficient, would seem to conserve estate assets, rather

23   than having a trustee have to hire new counsel to come up to

24   speed?

25          MR. WASSERSTEIN:   If Mr. Bernick is correct that it

1 would not impact any privileged communications, then I

2 probably don't have a problem with it.

3           THE COURT:  Let me ask you this.  Will you

4 consent -- I know you won't consent to -- would you consent

5 to the appointment of a trustee to retain Milberg, Weiss to

6 prosecute the action?

7           MR. WASSERSTEIN:  With what limitations placed upon

8 information that could go from Grace employees to the

9 trustee to Milberg, Weiss?

10           THE COURT:  Well, how would that differ from what

11 Milberg, Weiss has already ascertained from Grace employees

12 to the discovery?

13           MR. WASSERSTEIN:  To the extent it has obtained

14 information through discovery, I have no problem with that,

15 Judge, none whatsoever.

16           THE COURT:  What if I were to create some type of

17 standstill as to the parties are in today as they would have

18 been on September 30 to prosecute the action?

19           MR. WASSERSTEIN:  It probably would work.

20           MR. FRIEDMAN:  Judge, for what it's worth, I think

21 the issue that Mr. Wasserstein is raising would be the same

22 issue one way or the other, whether it was Milberg, Weiss or

23 any law firm.  A law firm brought in tomorrow brand new, it

24 would be the same issue.

25           THE COURT:  Generic.

```
1            MR. FRIEDMAN:  Generic.  It has nothing to do with
2    Milberg, Weiss.
3            THE COURT:  No.  And I didn't mean Milberg, Weiss.
4            MR. FRIEDMAN:  We don't currently possess any
5    information that would conflict us out.  We don't currently
6    have access to any Sealed Air defense strategies or anything
7    else.
8            THE COURT:  Other than you've gained through
9    discovery.
10            MR. FRIEDMAN:  Public discovery.
11            MR. WASSERSTEIN:  I think what Mr. Friedman is
12   saying is correct.  It's a generic problem as opposed to a
13   Milberg, Weiss problem.
14            THE COURT:  So, is the answer here now that the
15   committees move to appoint a trustee.  I grant the
16   application.  Mr. Bernick is graciously willing to go home
17   and the trustee retains Milberg, Weiss to prosecute the
18   action.  The committees can intervene and represent
19   themselves pro se and the case moves on?
20            MR. KRUGER:  Is this a limited purpose trustee?  Do
21   we get to vote for the trustee?  I think we're going a lot
22   too quickly.
23            THE COURT:  Well, you raise a good question but
24   it's an impediment.  I would think it's a full purpose
25   trustee and I know it's not my appointment.  I would only
```

1    authorize the appointment of trustee and we'd have to get

2    the U.S. Trustee to step in.

3          MR. KRUGER:  This is the decision that would be

4    made on the eve of trial --

5          THE COURT:  On the eve of trial?

6          MR. KRUGER:  -- or is this a decision that's going

7    to be made now?

8          THE COURT:  Well, I'm not making it now but it

9    could be made next week.

10          MR. KRUGER:  Based on a trial with respect to the

11    facts determinative whether or not a trustee should be

12    appointed, because in all due deference, while this is an

13    important issue, it is not to my mind the only issue in this

14    case.  I'm concerned about having a trustee appointed just

15    sort of in this fashion because we want to deal with the

16    Third Circuit issue.  There is the whole business of whether

17    this company will run with a plenary trustee in place.  Will

18    suppliers continue to do business with them.  Will the banks

19    continue to extend credit.  Those are issues that, quite

20    frankly, override the question of whether or not Sealed Air

21    should --

22          THE COURT:  U.S. Trustee wasn't too concerned.

23          MR. KRUGER:  That's nice, because they don't have

24    the interest of trying to protect the creditor interest.

25    They're only interested in protecting their record, so to

118

1   speak.

2        THE COURT:  By the way, don't you have appointment

3   in the trustee, because you're the only one with liquidated

4   claims.  You're the only one that can vote.

5        MR. KRUGER:  I don't know that's true, your Honor,

6   but it does seem to me that the trustee, if we're going to

7   have a plenary trustee, number one, gets to pick their own

8   counsel, not anybody else's selection of counsel.  That's an

9   independent issue for the trustee.  Whether or not the

10  trustee wants to conduct an examination to determine whether

11  or not this is an action worth prosecuting is a separate

12  issue for a trustee.

13        I mean, it just seems to me we're going to talk

14  about a plenary trustee --

15        THE COURT:  Do you really think that a trustee who

16  would be appointed here would walk away from this

17  litigation?

18        MR. KRUGER:  I'm not sure, your Honor, that I want

19  to prejudge it for a trustee because then they've lost

20  whatever independence they're supposed to have and I have no

21  confidence in the result.

22        MR. BERNICK:  If your Honor is seriously saying

23  we're going to entertain a plenary trustee for this case,

24  obviously, Grace is not agreeable to that, and if that is

25  what your Honor seeks to do, then we're going to need

1    some --

2         THE COURT:  You know what my MO is, Mr. Bernick?

3    When you read all those things in those judge books about

4    the American judiciary, you never know what he's thinking

5    and you know what, because I don't know what I'm going to

6    do.

7         MR. BERNICK:  I thought we were going down the path

8    as you discussed it which was that if we had a limited

9    trustee for purposes of prosecuting the claim against Sealed

10   Air, that the privileges as they stood, what privileged

11   information was necessary to prosecute the case per Judge

12   Dreier's order was in place, that, therefore, you had the

13   latitude, the trustee would have the latitude to retain

14   Milberg, Weiss, that Sealed Air could take the position that

15   there had been -- that there was a joint defense,

16   information that was now in the hands of the adverse party,

17   that we're out of the case, therefore, we don't have to

18   worry about collateral estoppel issues, and the only thing I

19   was going to stand up to say is we can't have arguments that

20   what the trustee says are judicially usable in the Chapter

21   11 case, although the evidence can be usable in the Chapter

22   11 case.  I thought we actually sounded pretty close.  But

23   then my colleague over here asked one question too many.

24   Are we saying now this is a plenary trustee and we got going

25   down --

```
 1          MR. WASSERSTEIN:  Your Honor, we would also at that
 2    point wish to move to seek an appeal on your 1292(b).
 3          THE COURT:  Well, I hope somebody does.  I'm trying
 4    to encourage you.
 5          MR. WASSERSTEIN:  I'm not as concerned with regard
 6    to the trial date as I am concerned with the authority of
 7    the Court to granting a special, a limited purpose trustee
 8    under 1292(b).
 9          THE COURT:  I have to tell you, it's not my first
10    choice.  Okay.  And I'm enamored of other things more than
11    that.
12          MR. INSELBUCH:  One small point.  You know, I
13    didn't want to sit here silently why Mr. Bernick keeps
14    saying that if his intervention is removed from this case,
15    that that's the end of the collateral estoppel.
16          We would still urge whatever arguments we might
17    urge at some point about collateral estoppel and, of course,
18    it would be for the Court to decide those issues.
19          THE COURT:  I hope I didn't provide him with any
20    solace from something I may have or may not have said.
21          MR. INSELBUCH:  But I think the bottom line here,
22    everyone expressed their view, we have to tee something up
23    in the Third Circuit.
24          THE COURT:  I think we made a good record today.
25          MR. INSELBUCH:  I think we have displayed for the
```

 1    Third Circuit the conundrums that they've placed on how many
 2    pieces of litigation that are pending in the Third Circuit,
 3    several hundred, but am I still to understand that your
 4    Honor is going to enter an order that the case will go to
 5    trial on December 2nd and that we are under all of the
 6    instructions to file our motion with respect to the
 7    appointment of the trustee by Friday and everyone can
 8    simultaneously respond to that?
 9              THE COURT:  That's correct.
10              MR. INSELBUCH:  I can say for everyone's benefit, I
11    believe, and I'll advise them if we change our mind, that
12    given what the U.S. Trustee has had to say about the lack of
13    authority for something less than a plenary trustee, we
14    would be constrained to ask for a plenary trustee, mindful
15    of the issues that the unsecured creditors' committee
16    raises, simply because we would have to have something in
17    front of the Third Circuit that would fit squarely within
18    the Cybergenics language.
19              THE COURT:  Do you think that when Mr. Kruger
20    months ago declined on behalf of the unsecured creditors to
21    bring this action, he was prescient?
22              MR. INSELBUCH:  No, no, just chicken.
23              MR. BERNICK:  I will say, your Honor, this goes
24    back to one of the first hearings in the case when the issue
25    of this kind of claim came up, and there was somebody who

1    said why don't we have an examiner.

2            THE COURT:  All right.  I've nothing further.  If

3    everybody has had an opportunity to be heard, we will be in

4    recess.

5            (Whereupon, the proceedings are adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25