**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11** |
| W.R. GRACE & CO., et al | § | **Jointly Administered** |
| | § | **Case No. 01-1139 (JJF)** |
| Debtors | § | |

**FEE AUDITOR'S FINAL REPORT REGARDING**
**INTERIM APPLICATION OF LEGAL ANALYSIS SYSTEMS, INC.**
**FOR THE FIRST, SECOND AND THIRD INTERIM PERIODS**

This is the final report of Warren H. Smith & Associates ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Application of Legal Analysis Systems, Inc., for the First, Second and Third Interim Periods (the "Application").

## BACKGROUND

1. Legal Analysis Systems, Inc. ("LAS"), was retained as asbestos-related bodily injury consultant to the official committee of asbestos personal injury claimants. In the Application, LAS seeks approval of fees totaling $56,338.00 and expenses totaling $2,001.38 for its services from April 12, 2001, through January 31, 2001.[1]

2. In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications

---

[1] Although the third interim period as prescribed by the Court ends on December 31, 2001, Legal Analysis has chosen to instead end its interim period on January 31, 2001. The fee detail for January 2002, which should be considered in the fourth interim period, will be considered in this report.

**FEE AUDITOR'S FINAL REPORT** - Page 1
wrg FR re Legal 1-3int 4-12.01.wpd

for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served on LAS an initial report based on our review, and received a response from LAS, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3. In our initial report, we noted a consistent failure by LAS professionals to provide adequate detail in their time entries.  We asked LAS to advise the professionals to provide more information in their time entries in the future.  LAS responded

> We will attempt to provide more thorough detail for time entries.  I note that our services differ from those of law firms or financial analysts, dealing mostly with statistical analyses of claims issues.  While we will attempt to provide more detail, we cannot reveal the nature of some analyses that we are asked to conduct.

At this time, we do not recommend any reduction on the basis of inadequate detail but may recommend such reductions in the future if the level of detail provided does not improve.

4. In our initial report, we noted that all LAS professionals consistently lumped their time entries.  We asked LAS to advise the professionals not to lump their time entries in the future.  LAS responded that

> We will attempt to provide specific times for different services/tasks.  Again, because of the nature of our work some services cannot be easily differentiated, e.g. work in organizing data and in carrying out specific analyses often flow into each other.

We accept this response and recommend no reduction in this regard at this time.

**FEE AUDITOR'S FINAL REPORT** - Page 2
wrg FR re Legal 1-3int 4-12.01.wpd

5.      In our initial report, we noted that although the individual time entries are allocated to categories, the time entries were listed strictly chronologically and not chronologically by category. We asked LAS to segregate the time entries by category in the future. LAS responded, "In our recent submissions we have provided chronological listing of services within categories." This fully addresses our concern.

6.      In our initial report, we noted that beginning with the September 2001 billing period, LAS incorporated a category summary sheet; however, the categories identified in the summary sheet did not match those used in the time entry detail. We asked LAS to coordinate the categories in the future. LAS responded, "Categories in our summary sheets will correspond to billing categories for which detailed listings are provided." This fully addresses our concern.

7.      In our initial report, we noted that effective July 1, 2001, Peterson's billing rate increased from $425 to $500, and Relles's billing rate increased from $290 to $330. We asked LAS to explain these rate increases, as is required under the Guidelines. LAS responded that

> Legal Analysis Systems increased its professional rates on
> July 1, 2001 for several reasons: our rates considerably
> lagged that for other professionals who have less experience
> and are retained to provide similar services. Even after
> our July 1, 2001 increases our rates were less than
> professionals retained to provide similar servics. We have
> gained considerable further experience and more efficient
> procedures in recent years that justify higher rates.
> The demand for our services have increased greatly making
> it appropriate to increase rates.

We note that these increases of 17.6% and 13.8%, respectively, occurred less than three months after LAS was retained in this case (80 days post-petition, to be precise). Moreover, they are not characterized as annual adjustments (or other ordinary-course periodic adjustments) designed to reflect increased overhead costs due to inflation or increased efficiencies due to the professionals' accrual of valuable experience. Instead, they are ad-hoc increases based on a

determination that the agreed-upon rates were too low.  Though we do not know whether the committee's retention of LAS or the Court's approval of that retention was dependent on the rates charged at the time, we recognize that the price of services is generally an important factor in the decision to purchase such services.  The business decision to charge a relatively low rate benefits a service provider by increasing its likelihood of being retained.  In our view, it is not appropriate for LAS to accept this benefit while asking to be relieved of the concomitant cost by raising its rates shortly after being retained.

8. We further note that LAS's response did not indicate a date or dates on which LAS customarily raises its rates on an annual (or other periodic) basis, and we would not have objected if such an increase had occurred in the ordinary course of business shortly after the retention, as long as the imminence of such rate hikes had been disclosed.  In fairness to LAS, we note that as of the end of July 2002 there had been no further increases in the billing rates of Peterson and Relles.

9. We also note that we do not believe it would have been unreasonable for LAS to institute an annual rate increase at the beginning of the new year.  The problem, in our view, is the timing of the rate increase – less than three months after the date of retention, and before LAS had spent significant time on the matter. (From April 12 through June 30, 2001, LAS professionals spent just 12.8 hours on the case; in July 2001 alone, Peterson and Relles spent a total of 65.0 hours on this matter.)  In view of the foregoing, we believe a reasonable recommendation would be to postpone the effective date of the rate increase by six months -- *i.e.*, until January 1, 2002.  Because Peterson and Relles spent, respectively, 84.0 and 2.5 hours on the matter between July 1 and December 31, 2001, we calculate that the fees attributable to the rate increase during that period total $6,400 (84 x $75 = $6,300, plus 2.5 x $40 = $100).

Accordingly, we recommend a reduction of $6,400 in fees.

<u>Specific Time and Expense Entries</u>

10.    In our initial report, we noted that between July 16, 2001, and July 20, 2001, LAS charged $1,974.10 in travel expenses relating to trips to New York by Peterson (July 16-20) and Relles (July 17-20). We also noted that the application states that "all expenses have been pro rated across four bankruptcy proceedings in which LAS has been retained". (The total expended on the trip was $7,896.39.) We asked LAS to provide detailed documentation of these expenses and demonstrate their reasonableness:

| | | |
|---|---|---|
| Airfare | $1,128.75 | (25% of $4,515) |
| Hotel | $537.09 | (25% of $2,148.35) |
| Meals | $150.51 | (25% of $602.04) |
| Taxi Service | $29.50 | (25% of $118.00) |
| Car Service | $110.25 | (25% of $441.00) |
| Parking | $18.00 | (25% of $72.00) |

LAS provided the following response:

> Expenses for Peterson's July 16-20 trip to New York and Relles' July 17-20 trip are documented in the attached receipts. This is a total of nine days travel for two professionals with roundtrip coach fares from Los Angeles to New York. I would respectfully disagree that these expenses "appear to be much higher than necessary". The expenses reflect the actual cost of business travel in 2001. Coach fares were $2,257.00 round trip between Los Angeles and New York, the rate among all major carriers at the time (Peterson's actual fare was higher, including one way at business fare, but reimbursement was requested only for coach fare). The meeting was held at the Waldorf Astoria and the $297 per night hotel rate was a reduced rate negotiated for the meeting. New York taxes add another $38.97 per night, which is of course unavoidable. Peterson seeks reimbursement for $329.22 for his stay at another

> hotel for his first night in New York, which is less than
> the $335.97 negotiated, reduced rate (with taxes) at the
> Waldorf hotel where the meetings were conducted.
>
> Meal expenses consist of one dinner with other professionals
> work on the Grace case paid by Peterson and totaling $322.26
> with tip, a typical charge for a business dinner in New York,
> and $279.78 for the remainder of nine person-days of travel.
> The latter averages $31.09 per day.
>
> Taxi charges represent 3 trips to or from JFK to Midtown
> Manhattan (Peterson's and Relles' separate trips from the
> airport on different days and their joint travel to the
> airport). Actual fares, plus tolls and modest tips total
> about $40.00. Nonstop flights from Los Angeles only go to
> JFK or Newark so these expenses are unavoidable.
>
> The car service charge should only have been requested for
> Peterson, not Relles. The requested reimbursement should
> be reduced by $220.50 for this erroneous entry. I have
> attached receipts for my car service charges totaling
> $220.50 roundtrip from Thousand Oaks to LAX ($96.00 drop off
> at LAX and $124.50 charge to be met at airport and returned
> to Thousand Oaks). This is about a 50 mile distance one way
> taking about an hour (plus an hour for the car to return).
>
> I have tried several car services and these are the lowest
> rates I have found. Taxi fares would be similar. Other
> modes of transportation would take longer and cost the
> estate more in fees (even at a half rate for travel).
>
> Dr. Relles $72.00 charge for LAX parking is for 4 days at
> the airport and is in lieu of (and less than) than charges
> would have been for a roundtrip car service.
>
> To summarize, these charges are reasonable, necessary and
> less than actual expenses. We agree to the reduction of
> $220.50 for one erroneous charge for car service.

In view of LAS's response, we accept that the foregoing travel expenses, with the exception of the one erroneous $220.50 charge acknowledged by LAS, are reasonable. Accordingly, we recommend a reduction of $220.50 in expenses.

    11.    In our initial report, we noted that the applications are silent as to whether travel

time is also pro-rated across the four bankruptcy proceedings in which LAS has been retained, and we further noted that, on its face, the Application appeared to indicate that the time was billed at the full hourly rate, as in this example:

| 07/16/01 | Peterson/Travel | Travel to New York | 1.0 | 500.00 |
|---|---|---|---|---|

We accordingly asked LAS to explain whether it is charging its non-working travel time at an appropriate reduced rate and whether the charges were pro-rated among the four matters. LAS responded, essentially, that the travel time was pro-rated but not billed at a reduced rate:

> The listed travel expense was for Grace's share of nonworking travel time of one hour (out of a total 4 hours charged to all four cases). Note that travel time from Thousand Oaks to a New York destination and the return travel typically is about 9 hours each way. Travel time was billed for only 4 of those 9 hours. This should have been billed at $250.00 rather than $500.00. We agree to a reduction of $250.00

We will assume that this is also the case for the 1.5 hours ($750) billed for Peterson's return trip, indicating a further reduction of $375. Thus, with respect to this trip, we recommend a reduction of $625 in fees.

12. In our initial report, we noted that between January 13, 2002, and January 15, 2002, Peterson traveled to Palm Beach, Florida, to meet with a number of plaintiffs lawyers and that the travel time did not appear to be discounted to the required 50% rate.

| 01/13/02 | Peterson/Travel | Travel to Palm Beach | 1.3 | 650.00 |
|---|---|---|---|---|
| 01/15/02 | Peterson/Travel | Travel to Los Angeles | 1.3 | 650.00 |

LAS responded that

> The travel time of 1.3 hours each day should have been billed at a rate of $250.00. We agree to a reduction of $650.00 in total for the two days to correct this error.

Thus, with respect to this trip, we recommend a reduction of $650 in fees.

## CONCLUSION

13.     Thus, we recommend approval of fees totaling $48,663 ($56,338 minus $7,675) and costs totaling $1,780.88 ($2,001.38 minus $220.50) for LAS's services from April 12, 2001, through January 31, 2002.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES**

By: _____
Warren H. Smith
Texas State Bar No. 18757050
Mark W. Steirer
Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 18th day of October 2002.

_____
Warren H. Smith

# SERVICE LIST

**The Applicant**
Mark A. Peterson
**Legal Analysis Systems, Inc.**
970 Calle Arroyo
Thousand Oaks, CA 91360

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

**FEE AUDITOR'S FINAL REPORT** - Page 9
wrg FR re Legal 1-3int 4-12.01.wpd

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**
Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801