# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Chapter 11** |
| **W.R. GRACE & CO., et al** | § | **Jointly Administered** |
| | § | **Case No. 01-1139 (JJF)** |
| **Debtors** | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## INTERIM APPLICATION OF THE BLACKSTONE GROUP, L.P.,
## FOR THE FIRST, SECOND AND THIRD INTERIM PERIODS

This is the final report of Warren H. Smith & Associates ("Smith"), acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Interim Application of The Blackstone Group, L.P. for the First, Second and Third Interim Periods</u> (the "Application").

## BACKGROUND

1.      The Blackstone Group, L.P. ("Blackstone") was retained as Financial Advisors to the Debtors.  In the Application, Blackstone seeks approval of fees totaling $1,569,166.60[1] and expenses totaling $53,792.82 for its services from April 2, 2001, through December 31, 2001.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time entries included in the exhibits to the Application, for compliance with the Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2001, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States

---

[1]Blackstone is under a $175,000 per month flat-fee agreement with the Debtors; this results in a prorated charge of $519,166.67 for the April 2, 2001, to June 30, 2001, period.

Bankruptcy Court for the District of Delaware, the United States District Court for the District of

Delaware, and the Third Circuit Court of Appeals.  We served on Blackstone an initial report based

on our review and received a response from Blackstone, portions of which are quoted herein.

## DISCUSSION

### General Issues

3.       In our initial report, we noted that Blackstone's retention is based on a flat-fee

arrangement of $175,000 per month.  Noting the number of hours reflected in the Application,

we calculated the following effective hourly billing rates for the indicated periods:

    a.       April 2, 2001, to June 30, 2001:  $495
    b.       July 1, 2001, to July 31, 2001: $494
    c.       August 1, 2001, to August 31, 2001:  $530
    d.       September 1, 2001, to September 30, 2001: $1,254
    e.       October 1, 2001, to October 31, 2001:  $582
    f.       November 1, 2001, to November 30, 2001: $788
    g.       December 1, 2001, to December 31, 2001:  $1,287

4.       In our initial report, we noted that the fee entry detail is reported chronologically

by timekeeper as opposed to chronologically by category.  We asked Blackstone to report time

chronologically by category in the future, and Blackstone replied that it will do so.

5.       In our initial report, we noted that Blackstone professionals Zilly, Shinder, and

Alexander did not consistently provide adequate detail in their time entries.  We asked

Blackstone to advise these professionals to provide adequate detail in each of their time entries in

the future, and Blackstone replied that it will do so.

### Specific Time and Expense Entries

6.       In our initial report, we noted  that between April 2, 2001, and November 30,

2001, Blackstone billed $15,115.34 for word processing.  We noted that this cost may be

characterized as an overhead expense under Paragraph II.E.7 of the Guidelines, and we asked

Blackstone to explain why this constitutes a reimbursable expense.  Blackstone responded:

> The total word processing charges for these three interim periods were $15,115.34. The majority of these charges, $13,906.67, was incurred in the calendar months of June, July, and August (while appearing on the invoices for August, September and October) and relate entirely to the preparation of the Business Plan.  The Business Plan was a 150-page document with color graphs and charts and was prepared for distribution to the Committees' advisors to inform them of the Debtors' businesses and financial projections through 2005.  The document was prepared entirely in house by Blackstone and went through numerous revisions before completion. As Blackstone explained in its response to the Initial Report for the Fourth Interim Period, Blackstone maintains an in-house word processing staff available to prepare exactly this sort of material for its clients.  Blackstone is aware of, and did not contest, the Fee Auditor's determination that the word processing charges submitted by Blackstone for the Fourth Period were deemed overhead and not reimbursable. However, Blackstone respectfully suggests that this is a different, discrete situation and requests that the Fee Auditor, at a minimum, allow these charges.  If Blackstone had known at the time that it would not be reimbursed for these charges, in all likelihood, Blackstone would have outsourced the work although the job, because of the numerous changes and iterations, did not lend itself easily to being performed by outside vendors.  If the job had been outsourced, the charges would most likely have been borne directly by the Debtors and may have exceeded the charges submitted by Blackstone.  Blackstone is prepared to consider the remaining charges non-reimbursable and will not seek reimbursement for any word processing charges in the future.

As Blackstone acknowledges, "Blackstone maintains an in-house word processing staff available to

prepare exactly this sort of material for its clients".  The fact that the 150-page document required

an unusually large expenditure of time is not the same as a claim that $15,115.34 word processing

charge was for overtime services caused by the exigencies of the case.  As for Blackstone's statement

that it would have outsourced the work if it had understood that the word processing charges would

be questioned, it is our opinion that charges for such outsourced work would be similarly

objectionable.  A professional firm should be expected to have the capacity to address its foreseeable

word-processing needs in-house, and Blackstone in fact maintains a word-processing capacity to

handle such matters.   We believe that such basic word-processing capacity qualifies as overhead, and we therefore recommend a reduction in expenses of $15,115.34.

7.    In our initial report, we noted that between April 2, 2001, and December 31, 2001, Blackstone billed $26,928.29 in travel-related expenses for which appropriate detail was not provided and asked for supplementary information regarding these expenses.

| | |
|---|---|
| Other Auto | $3,068.20 |
| Car Services | $5,872.40 |
| Travel - Local | $1,726.94 |
| Travel - Out of Town | $268.73 |
| Meals | $4,939.56 |
| Lodging | $3,577.96 |
| Airfare | $6,199.50 |

Blackstone provided the requested information, which enabled us to attribute travel expenses to particular meetings and hearings, some of which were attended by multiple professionals.

8.    In our initial report, we asked Blackstone to explain why such meetings and hearings required multiple professionals and, thus, why the attendant travel expenses should be considered reasonable.   Exhibit A states the time entries relating to twelve such meetings and hearings. Blackstone provided the following response for each cited instance:

*A-1:*

> This meeting was the first opportunity to meet the managers of the various lines of business, within Davison and Grace Performance Chemicals and to hear presentations of the strategic plans and three-year financial forecasts for each line of business.  All team members with the exception of Mr. Alexander attended in order to better understand the businesses necessary for preparing a business plan and set of financial projections to share with the Committees and serve as the basis for POR discussions (the "Business Plan").

*A-2:*

> The entire Blackstone team attended this meeting primarily because it was one of the early meetings with key members of senior management (CEO, CFO, CRO, internal counsel) to review the strategy of the case, financial objectives, litigation

possibilities, and to outline areas of responsibility in terms of business plan, projections, valuation work, etc.

*A-3:*

Blackstone had been asked by the CEO to make a presentation and attend a two day meeting with Grace's managers regarding aspects of the bankruptcy filing, possible timelines to exiting, business issues of which to be aware and generally to be available to answer questions regarding the filing and ramifications of a chapter 11 proceeding. Given the number of Grace employees attending, Ms. Zilly thought it best to have Mr. Shinder and Mr. Blechman there as well in order to have a visible presence, to meet many of the people with whom Blackstone would be interacting during the bankruptcy and to be available to participate in smaller group meetings of the managers.

*A-4 through A-6:*

These three separate meetings were financial and business briefing sessions with the heads of the business units to review the draft versions of the Business Plan – a 150 page document describing the businesses, strategies and prospects of the lines of business and to review the financial model which incorporated the financial projections. Mr. Shinder, Mr. Blechman, and Mr. Alexander each had separate responsibilities for the drafting and the model such that it was necessary for each to be at the specific meetings identified.

*A-7:*

Zilly and Shinder attended the meeting with the Debtors and P&M. Ms. Zilly would most always be at the first of these meetings as the senior Blackstone representative and to discuss certain of the topics covered in the context of a plan of reorganization. Mr. Shinder attended to offer his understanding of certain of the issues set forth in the presentations and because he and Mr. Blechman would be responsible for the follow-up diligence required by the financial advisor.

*A-8:*

Zilly and Shinder participated in discussions with the Debtors regarding the Equity Committee participation in meetings and information flow. Mr. Shinder was handling the confidentiality agreements with Kirkland and Ellis and issues associated therewith and Ms. Zilly was asked to participate by the client to offer advice on how best to involve the Equity Committee with the other Committees and the ramifications associated therewith.

*A-9:*

Shinder and Blechman attended a due diligence meeting with the Debtors and CDG.

Mr. Shinder attended to offer his understanding of certain of the issues set forth in the presentations and because he and Mr. Blechman would be responsible for the follow-up diligence required by the financial advisor.

*A-10:*

Shinder and Blechman traveled to Wilmington to attend a bankruptcy court hearing where certain issues regarding bar dates, claims resolution procedures were to be discussed.  Both attended to stay informed of the proceedings and rulings; the hearing was unfortunately canceled with no advance notice.

*A-11:*

Zilly and Shinder attended as the two senior respentative of Blackstone in the first meeting with management to discuss case strategies, financial issues and strategic initiatives.

*A-12:*

Zilly/Shinder/Blechman attended a due diligence meeting with financial advisors to the committees.  In addition to Ms. Zilly, Mr. Shinder was available to answer general questions and direct the meeting and Mr. Blechman to handle the numerous follow-up questions from the several representatives of each of the Committees' advisors who always attend for the committees which leads to multiple and overlapping requests which must be responded to.

We accept Blackstone's explanations in each instance and accordingly recommend no reduction in the travel expenses associated with these meetings and hearings.

9.      In addition to addressing (a) our concern that multiple staffing might have resulted in unnecessary travel expenses and (b) our request for an itemization of travel expenses, the supplementary information provided in response to our initial report also included an explanation of the various categories of expenses stated in paragraph 7 above.  Blackstone's further explanation:

Other Auto: $3,068.20
Other Auto Charges are, with the exception of one, Amtrak railroad charges. Please see the attached exhibit for detail.

Car Services: $5,872.40
Car Service charges are for transportation provided by a car service company (e.g.,"Elite" or "Skyline") as opposed to a yellow cab.  These charges include the

expense for transportation to and from an airport, railroad station, place of work to home and exclusively covers charges for transportation in New York. As stated in its fee applications, Blackstone's general policy enables its employees to travel by private car service or taxi to and from meetings while rendering services to a client on a client related matter for which the client is charged. This policy is based on Blackstone's determination that travel by private car service or taxi is the most efficient use of the professional's time. Blackstone employees are not permitted to charge personal commuting expenses to a client unless, for safety reasons, the employee is traveling after 8:00 p.m. and has been required to work late as a result of the time exigencies of that client's matters.

Travel-Local: $1,726.94
Travel- Local charges are primarily for cash out of pocket transportation expenses incurred either in New York or at the site of a meeting. These charges include the following circumstances: travel from the work place to home, travel to and from train station or airport in New York or at the site of a meeting, travel to a meeting in instances when a car service was not used or such as when an employee traveled from the BWI train station to Grace headquarters.

Travel- Out of Town: $268.73
There are three entries are in this category: two entries for Zilly on 10/10/01 which were for cash taxi expenses incurred at the site of a meeting in Columbia and one entry for Shinder on 11/01/01 for $198.73. Expenses are only put in this category if the employee explicitly states that the expenses were incurred out of town, which Zilly did. All other employee expenses of this type would fall under Travel- Local if not identified to the contrary. The Shinder expense was miscategorized- it was a lodging expense. A copy of the invoice is available if necessary.

Meals: $4,939.56
Meal charges include employee meals while traveling on client matters and in accordance with the restrictions set forth below and meals provided during meetings with the Debtors, committees and their advisors. As stated in its fee applications, Blackstone's general policy permits it employees to bill lunch or dinner meals to a client if the employee is required to provide services to the client during such meal time due to extreme time constraints. Blackstone employees are permitted to order meals in the office if the Blackstone employee is required to work on client related matters after 8:00 p.m. Blackstone caps its meal expenses at $20 per meal.

Lodging: $3,577.96
All lodging charges are related to expenses incurred by Blackstone professionals when traveling to Columbia, Maryland for meetings at the Company's headquarters, to Cambridge, Massachusetts to attend business unit review and business plan related meetings, and to Wilmington to attend Court hearings. Please see the attached exhibit for further detail.

Airfare: $6,199.50
All airfare charges are incurred in connection with transportation to the Debtors'
headquarters in Columbia, Maryland or to Boston/Cambridge, Massachusetts where
its GPC business unit is located. Please see the attached schedule for further detail.

We accept these explanations and recommend no reductions with respect to these expense
categories.

## Conclusion

10.    Thus, we recommend approval of fees totaling $1,569,166.60 and expenses totaling

$38,677.48 ($53,792.82 minus $15,115.34) for Blackstone's services from April 2, 2001, through

December 31, 2001.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES**

By:_____
        Warren H. Smith
        Texas State Bar No. 18757050
        Mark W. Steirer
        Texas State Bar No. 19139600

900 Jackson Street
120 Founders Square
Dallas, Texas  75202
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 18th day of October 2002.

_____
Warren H. Smith

## SERVICE LIST

**The Applicant**
Pamela Zilly
The Blackstone Group, L.P.
345 Park Avenue
New York, NY 10154

**The Debtors**

David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**

James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones,
P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**

Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**

Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price &
Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**

Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Matthew G. Zaleski, III, Esq.
Campbell & Levine
Chase Manhattan Centre, 15th Floor
1201 Market Street, Suite 1200
Wilmington, DE 19801

**Official Committee of Equity Holders**

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

**<u>United States Trustee</u>**

Office of the United States Trustee
Frank J. Perch, Esq.
844 King Street, Suite 2311
Wilmington, DE 19801

<u>Exhibit A</u>

<u>A-1:</u>

| | | | |
|---|---|---|---|
| Richard Shinder | 04/23/01 | 2.5 | Transit to Grace meeting - Cambridge, MA |
| Richard Shinder | 04/23/01 | 6.5 | Meeting in Cambridge, MA re: Grace development of business plan & financial forecasts |
| Richard Shinder | 04/23/01 | 2.5 | Transit to NYC from Grace meeting |
| David Blechman | 04/23/01 | 2.5 | Travel to Cambridge |
| David Blechman | 04/23/01 | 5.0 | Attend meeting in Cambridge with S. Farnsworth, M. Brown, D. Dockman, R. Rowan re: business plan |
| David Blechman | 04/23/01 | <u>2.5</u> | Travel to New York |
| | | 21.5 | |

<u>A-2:</u>

| | | | |
|---|---|---|---|
| Pamela Zilly | 05/17/01 | 6.0 | Meetings with Grace management re: case strategy, financial analysis |
| Richard Shinder | 05/17/01 | 5.5 | Meeting with Norris, Siegel, Tarola, Coghlan, Gilbert, Zilly, Blechman and Alexander on various topics |
| David Blechman | 05/17/01 | 5.5 | Attended meeting with mgmt. re: committee meeting, strategy |
| Michael Alexander | 05/17/01 | <u>5.5</u> | Meeting with P. Norris, R. Tarola, K. Coghlan, P. Zilly, R. Shinder, D. Blechman re: committee meeting, strategy |
| | | 22.5 | |

<u>A-3:</u>

| | | | |
|---|---|---|---|
| Pamela Zilly | 06/25/01 | 2.5 | Travel to Columbia |
| Richard Shinder | 06/25/01 | 3.0 | Transit to Columbia, MD/ review of 6/27 presentation |
| David Blechman | 06/25/01 | 2.5 | Travel to Columbia |
| David Blechman | 06/25/01 | 8.0 | Participated in GPC key managers meeting |
| Pamela Zilly | 06/26/01 | 9.0 | Attend Grace management meetings |
| Pamela Zilly | 06/26/01 | 2.0 | Dinner meeting with K. Coghlan, D. Siegel |
| Pamela Zilly | 06/27/01 | 12.0 | Attend Grace management meetings |
| Richard Shinder | 06/26/01 | 9.0 | Participation in Grace Strategic Planning sessions |
| Richard Shinder | 06/26/01 | 2.0 | Dinner meeting with K. Coghlan, D. Siegel |
| Richard Shinder | 06/27/01 | 8.0 | Participation in Grace Key Managers' presentations and workshop |
| Pamela Zilly | 06/27/01 | 2.5 | Travel to New York |
| Richard Shinder | 06/27/01 | 3.0 | Transit to NYC from meeting |
| David Blechman | 06/25/01 | <u>2.5</u> | Travel to New York |
| | | 66 | |

_A-4:_

| | | | |
|---|---|---|---|
| David Blechman | 06/27/01 | 2.5 | Travel to Columbia |
| Michael Alexander | 06/28/01 | 2.5 | Travel to Columbia |
| David Blechman | 06/28/01 | 9.0 | Participated in Davison key managers meeting |
| David Blechman | 06/28/01 | 1.0 | Meeting with M. Brown in Columbia regarding draft financial model |
| Michael Alexander | 06/28/01 | 1.0 | Outline of agenda for meeting regarding financial model |
| Michael Alexander | 06/28/01 | 1.0 | Meeting with M. Brown in Columbia regarding draft financial model |
| Michael Alexander | 06/29/01 | 4.5 | Meeting with C. Haynes in Columbia regarding Catalysts draft of business plan |
| David Blechman | 06/29/01 | 2.5 | Travel to New York |
| Michael Alexander | 06/29/01 | <u>2.5</u> | Travel to New York |
| | | 26.5 | |

_A-5:_

| | | | |
|---|---|---|---|
| Richard Shinder | 07/11/01 | 4.0 | Transit to meeting in Cambridge, MA re: GPC business plan |
| Richard Shinder | 07/11/01 | 5.5 | Meeting with GPC managers re: draft of business plan |
| Richard Shinder | 07/11/01 | 3.0 | Transit from meeting in Cambridge, MA re: GPC business plan |
| David Blechman | 07/11/01 | 4.0 | Transit to Cambridge, MA re: GPC business plan |
| David Blechman | 07/11/01 | <u>5.5</u> | Meeting with R. Rowen, GPC managers re: draft of business plan |
| | | 22 | |

_A-6:_

| | | | |
|---|---|---|---|
| Richard Shinder | 07/13/01 | 3.5 | Transit to meeting in Columbia, MD re: Davison business plan |
| Richard Shinder | 07/13/01 | 5.0 | Meeting with Davison managers re: draft of business plan |
| Richard Shinder | 07/13/01 | 2.5 | Transit from meeting in Columbia, MD re: Davison business plan |
| David Blechman | 07/13/01 | 5.0 | Meeting in Columbia re: business plan |
| Michael Alexander | 07/13/01 | <u>5.0</u> | Meeting in Columbia re: business plan |
| | | 21 | |

_A-7:_

| | | | |
|---|---|---|---|
| Pamela Zilly | 10/10/01 | 3.0 | Travel to Columbia for meeting with Grace management and P&M |
| Pamela Zilly | 10/10/01 | 5.0 | Meeting with Grace management, P&M re: due diligence |
| Pamela Zilly | 10/10/01 | 1.5 | Meeting with D. Siegel re: case status |
| Pamela Zilly | 10/10/01 | 1.0 | Meeting with P. Norris re: case status; 10/4 meeting |

| Pamela Zilly | 10/10/01 | 3.0 | Travel to New York |
| Richard Shinder | 10/10/01 | 3.0 | Transit to meeting with P&M/Grace leadership team - Columbia, MD |
| Richard Shinder | 10/10/01 | 7.0 | Meeting with P&M - due diligence on legacy liabilities w/D. Siegel, R. Tarola, S. Farnsworth, F. Gilbert, M. Brown, P. Zilly |
| Richard Shinder | 10/10/01 | <u>3.0</u> | Transit from meeting with P&M/Grace leadership team - Columbia, MD |
| | | 26.5 | |

*A-8:*

| Pamela Zilly | 10/12/01 | 1.0 | Call with B. Tarola, D. Siegel, K. Coghlan re: Equity Committee participation |
| Richard Shinder | 10/12/01 | <u>1.0</u> | Call on Equity Committee meeting w/D. Siegel, R. Tarola, K. Coghlan, P. Zilly |
| | | 2.0 | |

*A-9:*

| Richard Shinder | 10/22/01 | 3.0 | Transit to meeting with CDG/Grace leadership team - Columbia, MD |
| Richard Shinder | 10/22/01 | 6.0 | Meeting with CDG - due diligence on legacy liabilities w/ D. Siegel, R. Tarola, E. Filon, F. Gilbert, M. Brown, D. Blechman |
| Richard Shinder | 10/22/01 | 3.5 | Transit from meeting CDG/Grace leadership team - Columbia, MD |
| David Blechman | 10/22/01 | 3.0 | Transit to meeting with CDG, company |
| David Blechman | 10/22/01 | 6.0 | Due diligence meeting with CDG, company |
| David Blechman | 10/22/01 | <u>3.5</u> | Transit from meeting with CDG, company |
| | | 25 | |

*A-10:*

| Richard Shinder | 11/21/01 | 5.0 | Trip to Grace hearing in Wilmington, DE. |
| David Blechman | 11/21/01 | 2.5 | Transit to Wilmington DE for hearing. |
| David Blechman | 11/21/01 | 0.5 | Hearing canceled. |
| David Blechman | 11/21/01 | <u>2.5</u> | Transit back to NYC from hearing in Wilmington. |
| | | 10.5 | |

*A-11:*

| Pamela Zilly | 04/16/01 | 2.5 | Travel to Columbia |
| Pamela Zilly | 04/16/01 | 6.5 | Meeting with Grace management re: financial, strategic issues |
| Pamela Zilly | 04/16/01 | 2.5 | Travel to New York |
| Richard Shinder | 04/16/01 | 2.5 | Transit to Grace meeting - Columbia, MD |
| Richard Shinder | 04/16/01 | 6.5 | Meeting at Grace with Coghlan, Norris, Tarola, Siegel |
| Richard Shinder | 04/16/01 | <u>2.5</u> | Transit to NYC from Grace meeting |

23

*A-12:*

| | | | |
|---|---|---|---|
| Pamela Zilly | 06/13/01 | 2.5 | Travel to Columbia |
| Richard Shinder | 06/13/01 | 2.5 | Transit to Columbia, MD/ review of 6/14 presentation |
| David Blechman | 06/13/01 | 2.5 | Travel to Columbia |
| Pamela Zilly | 06/14/01 | 9.0 | Meeting with Management, Committee advisors re: due diligence |
| Pamela Zilly | 06/14/01 | 2.5 | Travel to New York |
| Richard Shinder | 06/14/01 | 9.0 | Grace meeting with financial advisors, Columbia, MD |
| Richard Shinder | 06/14/01 | 2.5 | Transit to NYC from meeting |
| David Blechman | 06/14/01 | 8.0 | Attend due diligence meeting with P&M , CDG in Columbia |
| David Blechman | 06/14/01 | 2.5 | Travel to New York |
| | | 41 | |